UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  TAXOTERE (DOCETAXEL)      *    16-MDL-2740
PRODUCTS LIABILITY LITIGATION     *
                                  *
                                  *    Section N
                                  *
Relates To All Cases              *    March 16, 2017
                                  *

*****************************************************************

REPORTER'S OFFICIAL TRANSCRIPT OF THE

**STATUS CONFERENCE**

BEFORE THE HONORABLE MICHAEL B. NORTH,
UNITED STATES MAGISTRATE JUDGE.

*****************************************************************

**APPEARANCES:**

**For the Plaintiffs:**

Anne Andrews, Esq.                Karen Bart Menzies,Esq.
Dawn Barrios, Esq.                Hunter Shkolnik, Esq.
Larry Centola, Esq.               Zachary Wool, Esq.
Christopher Coffin, Esq.


**For the Defendants:**

Kathleen Kelly, Esq.              Harley Ratliff, Esq.
Andrew Lemmon, Esq.               Deborah Rouen, Esq.
R. Clifton Merrell, Esq.          Jeffrey Schaefer, Esq.
Douglas Moore, Esq.               Michael Suffern, Esq.
Habib Nasrullah, Esq.             Beth Toberman, Esq.
John Olinde, Esq.                 Richard Wolff, Esq.
Patrick Oot, Esq.


**REPORTED BY:**      Mary V. Thompson, RMR, FCRR
                      500 Poydras Street, Room 275
                      New Orleans, Louisiana  70130
                      (504)589-7783

**P R O C E E D I N G S**

3      THE COURT:  Good afternoon.

4      What is the nature of the PowerPoint?

5      MS. MENZIES:  It's just a handful of slides.  It's more

6 guidance than anything.  We have a printed-out version.  It is

7 probably not worth taking more of the Court's time.

8      THE COURT:  Okay.  If you have a version that I can

9 take a look at --

10      MR. OOT:  We agreed to an agenda, and this is a

11 surprise to us.

12      THE COURT:  Let me see whatever it is.  We're not going

13 to start off on that road.  This is a status conference about

14 cooperation, hopefully.

15      Thank you.

16      MS. MENZIES:  You'll see the first two slides are the

17 agenda.

18      THE COURT:  Okay.  All right.

19      So I've read everything that you-all sent me including

20 the agenda.  Specifically what I've got is a draft ESI protocol

21 with some highlighted or shaded area with language that has not

22 been resolved.  I've looked at that.  I've looked at the position

23 papers that I received from both sides.  What I want to do today

24 is to discuss those areas that you-all have not been able to

25 agree on.

01:13:46
01:14:00
01:14:13
01:14:31
01:15:05

1     And as I said, I've looked into that somewhat already,
2 and I'll give y'all an opportunity to speak to it if you want to
3 flesh out those positions.  And I may have some questions for
4 you.

01:15:21
5     What I want to do today is not order anything, not rule
6 on anything, but to give you-all some guidance as to where I
7 think this ought to go, where I think it might go if we have to
8 tee it up in the form of a motion or some sort of contradictory
9 proceeding, and then give you-all some more time to try to come

01:15:40
10 to an agreement on as much of this as you can.

11     What I'm thinking on the front end, before we really
12 get into any of this, is maybe give you-all another 30 days to
13 work towards getting some resolution.  And rather than have
14 everyone come here in 30 days, to maybe have a telephone status

01:16:00
15 conference to let me know where things stand and what it is that
16 still needs to be worked out.

17     And at some point if I or Judge Engelhardt have to get
18 involved to make a call as between two competing issues, we will,
19 but my preference right now would be to talk about what it is

01:16:17
20 that you-all have disagreements about and see if we can come up
21 with some way to resolve those disagreements.

22     I will say that I'm happy to see that you-all have
23 spent a substantial amount of time working together already.  It
24 looks like you've got agreement on a great deal of what's going

01:16:41
25 to go into this order, so I'm happy that you-all have been doing

1   that.  I know I had a phone call with some of you -- was it last
2   week or the week before?  I didn't get a return call so I'm
3   assuming that that worked out pretty well.

4          It looks like you-all are cooperating and have limited
5   the areas in dispute, and I don't see anything as being something
6   that we can't overcome as we kind of talk through the issues.

7          Unfortunately, as I've sort of -- I've got an agenda
8   that sort of lists, generally, the areas where there is not
9   agreement, I've got the document itself that highlights the areas
10  where there is some disagreement, and I've got the two position
11  papers, and they don't all exactly line up in terms of the order
12  of things.

13         So let me ask you how you want to proceed.  How do you
14  think we should proceed?

15         MS. MENZIES:  If we could, Your Honor -- this is Karen
16  Menzies for the plaintiffs, the PSC.

17         First of all, I would maybe suggest a few introductions
18  to -- of our team.

19         This is our ESI consultant, Paul McVoy, from New York.

20         And then this is Zachary Wool.  He is a cochair of our
21  ESI committee.

22         At our last meeting, Genevieve Zimmerman was here.  She
23  is our other co-chair.  Unfortunately for matters related to back
24  home, she's not able to make it and she apologizes to the Court.

25         THE COURT:  Okay.

1        MS. MENZIES:  As we mentioned last time, I'm co-lead

2  counsel for the PSC.

3        And this is co-lead counsel Chris Coffin as well.

4        MR. COFFIN:  Good afternoon, Your Honor.

01:18:21  5        MS. MENZIES:  And these are a lot of our ESI committee

6  members (indicating).

7        THE COURT:  Some of whom I know.

8        MR. MOORE:  Judge, Douglas Moore on behalf of Sanofi.

9  I am defense liaison counsel.

01:18:30  10        I'm joined by my newly minted co-defense liaison

11  counsel, John Olinde from Chaffe McCall.

12        And similarly, by way of introduction, you recall when

13  we were here last time, there were several other defendants who

14  hadn't been served.  Service has now been effected on an entity

01:18:53  15  related to each generic version of Docetaxel that is at issue in

16  the MDL, so that makes basically nine defendants or groups of

17  defendants, if there's a parent company, named.

18        We have lawyers present in the courtroom today on

19  behalf of seven of those nine entities.  They are Sanofi; Sandoz;

01:19:18  20  Hospira and Pfizer, they are together; Actavis; Accord

21  Healthcare, I believe someone was going to be present for them;

22  Northstar; and Sun Pharma.

23        Eagle Pharmaceuticals, who is represented by Kirkland &

24  Ellis in New York, and McKesson Corporation, who is represented

01:19:38  25  by Morrison Foerster in San Francisco -- or San Diego, I should

1    say, had preexisting conflicts for today's conference and were

2    unable to attend.  They had not been served at the time that this

3    conference had been set, and, unfortunately, they were not able

4    to make it, but we have that representation.

01:19:58    5            We've coordinated with as many of the counsel for the

6    defendants that we were able to through this process.  And

7    working forward, we do have some very recent defendants in the

8    case that have not been part of those discussions and have only

9    recently received some of that.

01:20:17   10            I believe Mr. Habib Nasrullah wanted to make a couple

11    of comments, if it was appropriate at this time, about their

12    participation in the case.

13            But that's where things stand on the defense side.

14            MS. MENZIES:  So I would suggest, Your Honor, if we --

01:20:33   15            THE COURT:  I think counsel wanted to --

16            MS. MENZIES:  Oh, I'm sorry.

17            THE COURT:  -- just weigh in before we get started.

18            MS. MENZIES:  Of course.

19            THE COURT:  Come on up.

01:20:42   20            MR. NASRULLAH:  Good afternoon, Your Honor.

21    Habib Nasrullah.  I represent Northstar.

22            We have recently entered this litigation.  We have been

23    served in 14 cases, and defense counsel has worked hard to make

24    sure that I know what's going on with respect to the ESI and I've

01:21:05   25    had a chance to look at those proposals.

1        We have come to this later and we have some concerns.
2   There are some familiar faces here on the plaintiffs' side that I
3   intend to discuss this with, but our situation is that,
4   Your Honor, we are served in 14 cases.  We came to the market in
5   2016.  In none of the 14 cases in which we have been served, were
6   we on the market.  The exposure starts in 2002 and it goes to
7   2014 in those cases, so by definition I cannot be in those cases.
8        So I am concerned about going down this road and
9   starting to negotiate the ESI protocol that would bind my client
10  in light of the fact that so far there's no legitimate showing of
11  product identification.  And I intend to raise that with
12  Ms. Menzies, but that's something I think the Court should know.
13       My biggest concern -- and certainly -- and I think both
14  sides have done a great deal of good work under your tutelage on
15  this, Your Honor, but my biggest concern is this:  I have a
16  client that has some documents in Ireland and so we're dealing
17  with cross-border issues.  I may have to hire an Irish
18  consultant.  I've got to jump through all those hoops to make
19  sure that my client doesn't run afoul of any European
20  regulations.
21       So I think as a threshold matter -- and I understand
22  that there are other defendants in my situation.  Ms. Kelly here
23  represents Sun Pharma, and we've worked on cases together before.
24  They're in the same situation.  They have an Indian client; they
25  have one case.  I'm not sure about the status of product ID.

1          But it almost seems like what we should, perhaps, be

2   thinking about is slowing this down so that we can figure out

3   with the plaintiffs how many cases we're legitimately going to be

4   in.

01:22:57   5          Our market share, I predict, is going to be absolutely

6   miniscule since we came so late.  And I think the burden -- you

7   know, proportionality, rule one, everything we hear in these

8   kinds of cases, is very much a consideration to me and my client.

9          So I'm not looking for an order.  I'm perhaps looking

01:23:14   10   for some guidance or letting you know that this is an issue that

11   is growing in this litigation, and we have some real concerns

12   about the strictures of this protocol in light of our likely

13   very, very little, if any, participation in this litigation.

14          THE COURT:  Why don't you speak to that issue.  You

01:23:31   15   know, I take that currently to really to be an argument about

16   proportionality vis-a-vis certain individual defendants.

17          MS. MENZIES:  Yeah, it's a very important point.  In

18   fact, it's kind of one of the themes that have been throughout

19   this process that we are very well aware of.

01:23:48   20          And just by way of introduction, as you may recall when

21   we first met, we had suggested that we do some in-person meetings

22   while we're waiting for the other defendants to be named and also

23   figuring out what the exposure is for the non-Sanofi defendants;

24   but in this time period, we can be talking with each defendant

01:24:05   25   independently, understanding better what their ESI sources are,

1    what their plans are for methodology, all of that aspect.

2            And so you suggested get this done by a certain date,

3    and we -- from the very beginning, we sent a letter to counsel

4    for Sanofi with a list of information that we were interested in

5    talking about at the meeting.  And we followed your order telling

6    us to talk about sources of information to be searched, search

7    methodologies, time for completion, and things like that.

8            We suggested -- actually, counsel for Sanofi wanted to

9    do the meeting with everybody, all the defendants, and we gave

10   them pushback on that.  And we even said it at the meeting with

11   Your Honor.  We said that doesn't make sense; everybody's

12   exposure is different, everybody's time periods are different.

13   The defendants aren't sitting in a similar position.

14           For example, Sanofi's drug has been on the market for

15   21 years.  The other companies, as Mr. Nasrullah pointed out,

16   less than a couple.  And most of the others that were present at

17   our meeting in Kansas City, four to five years.  So it's a very

18   different analysis.  At the beginning we suggested to do

19   independent meetings so we can address these specifically.

20           Also out of respect for their own proprietary

21   information.  We need to know what their ESI sources are and how

22   they plan to search them and cull that information data.  We need

23   to understand what the structure databases look like.  Many of

24   those are going to be internal databases others don't use.  Out

25   of respect for that, we don't want to have a big group meeting.

01:24:25
01:24:43
01:25:00
01:25:19
01:25:34

1        And also for time's sake.  You know, we were willing to
2    go anywhere in the country to meet with these defense counsel,
3    but counsel for Sanofi insisted that we have all the defendants
4    present.
5        We also requested multiple days.  We mentioned that to
6    you on the call.  They didn't want to do that either.
7        And we spent the better half of our day going through
8    editing of the ESI protocol itself, which is fine.  We did make
9    progress, and I do think that ended up being a useful exercise.
10       The problem we're at goes right back to the beginning
11   of what Mr. Nasrullah was pointing out as well.  When we sat
12   down, the very first thing we said at that Rule 26 conference in
13   Kansas City was, Is there any defendant here that is not going to
14   be making a proportionality argument?
15       And you know how you're on the plane and they make you
16   say verbally, Yes, I can do the exit row?  I did that with each
17   one of them that were present.  And we had counsel for Sandoz,
18   Actavis, and then the same counsel represent Hospira and Pfizer,
19   and Sanofi of course.  Every one of them confirmed verbally that
20   they absolutely intended to.  And understandably.
21            THE COURT:  That doesn't shock me.
22            MS. MENZIES:  Exactly.
23       So we know that this is -- so that's why we have
24   suggested and have wanted to take the approach that the real
25   primary defendant is Sanofi.  We should focus our energies

1  primarily on that right now, and not allow the non-Sanofi

2  defendants that have much fewer claims against them, less

3  exposure, and otherwise, to delay this process.  But because

4  Sanofi has insisted they be in this process the whole time,

01:27:10  5  they've now kind of come to somewhat of a uniform front.

6          For example -- and we'll talk more about this in detail

7  with the protocol.  The biggest problem that we have -- and

8  Your Honor, I'm sure, saw it in our position paper -- is

9  defendants have refused to give us -- are refusing to disclose to

01:27:28  10  us their sources, the way they want to do their search

11  methodology, and they are not willing to disclose any

12  quality-control results of the search methodology that they

13  intend to use.  I mean, to us that's -- and right now every one

14  of the defendants have taken that position.

01:27:45  15          After our meeting they've also now -- and we keep

16  coming back, You need to give us the sources.  I have letters I

17  sent -- a specific letter with my consultant telling me, Okay

18  what more information did we not get from that meeting that we

19  need?

01:28:00  20          And at the meeting -- you know, I spoke with counsel

21  for Sandoz and I said, Listen, I understand you guys probably

22  have very little exposure potentially.  Let's figure this out

23  from day one.  We will do everything we can to figure out product

24  ID if you're willing to disclose your information.  For example:

01:28:17  25  Where does your drug get distributed to and in what regions of

1  the country?  Let's match it up.

2      Judge Engelhardt has ordered that information to be

3  provided to us on a plaintiff-by-plaintiff basis in the DFS.  We

4  said:  Let's not wait for that.  You guys may not need to be

01:28:33   5  spending your energy and time and neither do we want to.  We

6  don't want to waste money on this.

7      At the meeting they seemed open to that.

8      After the meeting I sent an individual letter out to

9  each of them with a list of specific -- you know, to get the

01:28:45  10  conversation started.  You know, tell us this about your -- a lot

11  of technical questions.

12      And I have examples of the letters if you want to see

13  those.

14      And I got no response from most of the defendants.  The

01:28:57  15  only one that did respond was counsel from Sandoz saying --

16  excuse me.

17      First Sanofi came back, and, after our Rule 26 meeting

18  for the first time, said, Well, we can't talk with you anymore

19  about source information until there's a protective order in

01:29:12  20  place, and they put a finger in the penning of the protective

21  order.

22      I had told counsel we were working off of your sample

23  protective order.  And we added a few -- we have a committee that

24  was working on that, and I let counsel know that, and said, We'll

01:29:25  25  exchange that, we'll send you a redline.  And I looked back at

1  what they had been working on and there were a few lines changed,

2  maybe a paragraph added.

3          The one that Sanofi sent to us after our meeting, our

4  Rule 26(f) in-person conference, the best way I can quantify it

01:29:42   5  is yours is 12 pages double-spaced.  The one they sent to us is

6  25 pages single-spaced.  It's basically double what you had and

7  it is a monster.  And I can tell you there's a lot in there that

8  we aren't going to agree with.

9          So the idea that, Well, we can just spend a few days

01:29:58  10  going through the protective order and we'll wait to give you

11  anymore information on ESI sources, to us is yet another way of

12  delaying this process.

13          And then counsel for Sandoz, the only one who actually

14  responded to my individual letter asking for more information on

01:30:11  15  their sources, said, Well, we also don't want to talk anymore

16  until we have a protective order in place.

17          So we have a string of delays.

18          I appreciate Your Honor's intention to give us more

19  time, and I think that if we have guidance from you today that

01:30:26  20  they do, in fact, need to disclose and be cooperative and be

21  transparent in these areas where we're -- I wrote a list down

22  after our meeting of what is the stuff that we absolutely can't

23  agree on.  That's what's in this agenda in the areas of dispute.

24          In other words, there's no point in continuing to talk

01:30:49  25  more about that unless and until we hear some guidance from you.

1        And then at that point if you say, Yes, you guys do
2   need to be more transparent, follow up with our letter, give us
3   answers, let's start the conversation.  Let's do it individually.
4   Let's do it over the next couple of weeks because we can, and we
5   will, make ourselves available.
6        Your next hearing date is April 12th.  If we don't get
7   something done in the next two weeks, I would say by
8   March 31st -- I think we should get papers written to you.  Or
9   maybe we need three weeks.  Whatever it is, however long until
10  you would want to see it.  We know basically what our arguments
11  are.  We do submissions on the same day, we present them to your
12  court, and we appear before you on the 12th and get this decided.
13       This delay has a rippling effect on the entire
14  litigation.  And I know you know, as well as everybody else in
15  this room, that Judge Engelhardt is not going to allow us to
16  wait.
17       And counsel for Sanofi has taken the position, We don't
18  even have a master complaint so we don't know what the
19  allegations are in the complaint.  How can we even do any
20  discovery until we have that?  We are taking the position that
21  we're not even going to have a conversation about the foreign
22  defendant who has been served through the Hague -- which they
23  required us to do, by the way.  We're not even going to have
24  that -- any conversation whether they have relevant information
25  or not.

01:31:06
01:31:21
01:31:35
01:31:49
01:32:02

1          And remember, the French company is the company that

2    patented, filed the NDA, developed this drug, and marketed it

3    over the last 21 years.

4          So our opposition -- if they bring a motion -- and they

5    may or may not, but we expect they will -- to keep out the French

6    entity, and then they're going to take the position, I guess,

7    that we still don't get discovery from that entity, there's

8    relevant information in that French company regardless if they're

9    in the complaint or not.  But if we have to wait, they bring a

10   motion to dismiss on personal jurisdiction, we get discovery on

11   whether that's proper.  And our opposition, per

12   Judge Engelhardt's order, is not due until August.  So we aren't

13   going to do anything until August with Sanofi?

14         So, you know, as I said, we come here today asking for

15   your guidance.  We are willing to continue to work where we can,

16   but we recognize and realize that from their position so far,

17   this case should be treated defendant-by-defendant in terms of

18   ESI discovery.  We are trying to do that.  We need your guidance

19   on how transparent they need to be so that we can move forward.

20   We've agreed to everything else we possibly can at this point,

21   and we would like deadlines so we can keep the process moving.

22         THE COURT:  So based on what I've read coming into

23   today's hearing, and based on what I've heard, just in the short

24   time that we've been here, from multiple lawyers, the need for at

25   least some level of defendant -- individual defendant protocols,

1  discussions, meetings, and exchange of information seems to be

2  pretty apparent.

3       Is there real resistance to that approach on the

4  defense side?

01:34:01

5       MR. OOT:  Your Honor, Patrick Oot for Sanofi.

6       THE COURT:  Because what I've got is a multi-page

7  proposed ESI order that may or may not be untenable as to some of

8  these defendants who -- at least one of which it doesn't sound

9  like has even participated in the process, and the argument that

01:34:22

10  was made early on that this sort of protocol may be overly

11  burdensome and disproportionate to one or more defendants has

12  some traction to me.

13       MR. OOT:  Your Honor, we're operating off of

14  Judge Engelhardt stating that he would like to have everybody

01:34:45

15  governed by the same protocol, but we can't do that if they're

16  not here.

17       So we are moving forward with this ESI protocol to

18  avoid a cacophony of problems going forward.

19       So, sure, sources are going to be different for each

01:35:02

20  individual defendant.  We agree with that.  We agree that there

21  will be these source discussions which we had at the

22  meet-and-confer.

23       So that's driving the point of having a single ESI

24  protocol for everybody.  If there are specific objections for the

01:35:17

25  new defendants, we can address those as we on-board them.

1      I would like to also point out, Your Honor, that --

2      THE COURT:  It seems to me like, to the extent there

3   are provisions in the overall -- let's say an omnibus ESI order,

4   if there are provisions that are -- that the plaintiffs and a

5   particular defendant can agree as to that defendant are overly

6   burdensome or disproportionate to the claims against that

7   defendant, it would appear that the plaintiffs and that defendant

8   could negotiate some amendment or some opt-out of certain

9   provisions if the plaintiffs and that defendant agree, based on

10   the discussions they've had.  I don't know if other defendants

11   would object to that or not.

12      MS. MENZIES:  If I could just interject -- and I don't

13   mean to -- Judge, I'll let you take over.  I just -- we had the

14   same concern -- and I appreciate what counsel wanted to do with

15   this protocol -- and that was can we come to a protocol that

16   could apply to everybody but save the opportunity for it to be

17   adjusted as needed depending on proportionality and otherwise.

18      So in the big yellow sections that you have, that's

19   where you're going to see things like search methodology, for

20   example.  We have a provision if you use TAR, technology-assisted

21   review.  If used, prior to using it the parties will meet and

22   confer.

23      Search validation.  Regardless of the technology or

24   approach used, the parties will meet and confer.

25      So we did try to work with counsel for Sanofi to come

1   up with terms where we have it in here, but it can be adapted to

2   each defendant as needed.

3           THE COURT:  Okay.

4           MR. OOT:  Your Honor, I think it's appropriate to

01:37:02

5   probably follow the agenda and speak to the individual parts of

6   the ESI protocol specifically because each of the defendants has

7   prepared positions in that regard.

8           The other point that Ms. Menzies raised was related to

9   the protective order.  Another point from Judge Engelhardt is

01:37:17

10  that we advise the Court that we would be submitting draft

11  protocols to plaintiffs, which we did, and we did on March 7th.

12  I believe it was referenced in Ms. Barrios' letter to the Court.

13  We haven't received any comments on it.

14          THE COURT:  On what?

01:37:34

15          MR. OOT:  On the modifications to your default

16  protective order, Your Honor.

17          So that is another --

18          THE COURT:  See, it's not going to be enough to get the

19  plaintiffs to agree to your modifications because you've got to

01:37:44

20  get me to agree to them, and that's why I use the model that I

21  use.

22          You-all would not be the first group of litigants who

23  came in with a completely rewritten model protective order that I

24  have sent back to them and said start again.

01:38:03

25          And, you know, I don't know why -- I don't know why

1    this case would -- I mean, this case is different from a

2    garden-variety case for a lot of reasons, but I'm not sure it's

3    different enough to warrant a completely rewritten or different

4    protective order.

01:38:17

5         So here's what I would like for y'all to do on the

6    protective order.  I'm going to give you a deadline by which to

7    hopefully file jointly a proposed protective order.  And if you

8    can't file it jointly, then I'm going to give you a deadline

9    before we leave today to file competing proposed protective

01:38:42
10   orders.  And I'm going to issue one, and it's going to be soon.

11        So I'm probably going to ask you-all to do that in the

12   next -- well, if you sent them 24 pages single-spaced and they

13   haven't responded yet, they still need to respond.

14        I'm going to tell you that I'm not likely to enter a

01:39:03
15   protective order that's four times as long as the one that I

16   usually use, so you can be guided by that.

17        Once we get to the end of this, I'll figure out what

18   the deadline is.  But I'm going to give a hard deadline to file a

19   motion or motions for the entry of a protective order in the

01:39:21
20   case.

21        MR. OOT:  Thank you, Your Honor.

22        And you'll see from our draft, this case is unique in

23   the sense that we're dealing with HIPAA information, FDA

24   redactions, and in federal courts, things that are special that

01:39:33
25   plaintiffs' counsel asked to be removed from what would normally

1    be in the ESI protocol.  So the length of Your Honor's modified

2    protective order is as such because it's specific to this case.

3    But we're happy to meet and confer to discuss those provisions.

4         THE COURT:  Look, I get cases all the time that have

01:39:51   5    special privileges involved, and that's all we're talking about.

6    I mean, HIPAA information is an issue in 50 percent of the cases

7    that I have.  Okay?  That can be dealt with, and it doesn't have

8    to overwhelm the language of the order.  Whether it's FDA,

9    whether it's HIPAA -- I mean, we have special privileges in all

01:40:13   10   kinds of civil litigation that we've got to deal with.

11        So the guidance I'm going to give you on that is that

12   is a good protective order.  It works.  It is the product of a

13   lot of research and study on my part when I got here.  I have not

14   had any problems with it.  I think y'all need to look very

01:40:35   15   critically at the changes that you're proposing to make because I

16   will.

17        MR. OOT:  Yes, sir.

18        THE COURT:  So with that in mind, it may probably be

19   the most efficient use of everyone's time if you-all, before you

01:40:47   20   get a response from the plaintiffs on what you've given them, go

21   back and look at the proposed changes that you've made again,

22   critically, and assess whether you really think they need to be

23   made.  Then maybe submit a revision to the plaintiffs so we can

24   work off of that as opposed to what you've already given them.

01:41:07   25        MR. OOT:  Yes, Your Honor.

1          A final point, Your Honor.  I just would like to point

2     out Ms. Barrios spent two pages talking about our lack of

3     cooperation, and that's just not the case.  As you mentioned

4     earlier, Your Honor, we've seen two meet-and-confers, one a whole

01:41:22    5     day long in Kansas City.  We've spent hundreds of hours amongst

6     the joint defendants preparing for that meet-and-confer and

7     actually at that meet-and-confer.  Each defendant known at the

8     time had an ESI lawyer there plus a merits lawyer there as well.

9          So I'd really like to avoid this sort of future

01:41:39    10    complaint that they're not cooperating, they're not cooperating,

11    when we really are.  Your Honor, I have a very good reputation in

12    this community.  I've been practicing in e-discovery for

13    15 years.  When I get those type of complaints, it really

14    disappoints me because I feel like we've been working really

01:41:53    15    hard.

16          THE COURT:  Well, I take that as just symptomatic of

17    some frustration.  That it's not necessarily a lack of

18    cooperation, it's lack of agreement.

19          MR. OOT:  Exactly.

01:42:06    20          THE COURT:  And I get that.  I mean, there are a lot of

21    moving pieces to getting something like this done, and the

22    lawyers can get frustrated because they don't understand

23    positions that the other lawyers are taking.  I understand that.

24          What I'm seeing is not necessarily the lack of

01:42:20    25    cooperation, it may be some frustration because of inability to

1    get agreement on what one side thinks should be a simple matter,

2    and that's why we're here.  I'm going to try to give you whatever

3    guidance I can so we can get beyond that.

4            You know, we may not solve all of the areas of

5    disagreement today.  We eventually will -- or at least I will or

6    Judge Engelhardt will.  You know, we may have to come up with an

7    approach that is something other than one size fits all.  But

8    let's talk through the issues that have been identified and then

9    we'll circle back around to what we're going to do in the next

10   30 days in terms of addressing the issues with the individual

11   defendants.

12           MR. OOT:  Thank you, Your Honor.

13           THE COURT:  Okay.

14           MR. COFFIN:  Can I just make a comment on the

15   protective order?

16           THE COURT:  Uh-huh.

17           MR. COFFIN:  Chris Coffin on behalf of the plaintiffs.

18           Just so Your Honor understands, we have looked at

19   Your Honor's protective order.  Mr. Centola, who is here, is one

20   of the co-chairs of the committee who deals specifically with

21   protective orders for us.  So we have a version that we can send

22   over, and I suggest we do send over, to the defense, that is not

23   25 pages or near there.  We did make some modifications.

24           So we will send over to the defense our version and

25   perhaps they can start working from that.

 1          THE COURT:  I tell you what, why don't we do that.  But
 2  you've got their really jacked-up version?
 3          MR. COFFIN:  We do.
 4          THE COURT:  Why don't you take a look at it.
01:43:47  5  Incorporate what you think is appropriate to incorporate and then
 6  send them something.  Let's do it that way.
 7          MR. COFFIN:  Fair enough.  Thank you for the direction,
 8  Your Honor.
 9          THE COURT:  All right.
01:44:02  10         Okay.  What do we want to discuss first?
11          MS. MENZIES:  We have the agenda, I think, and our --
12  I'm not sure --
13          THE COURT:  Well, let's talk about the issue with the
14  plaintiffs' discovery first, because unless I missed it, it
01:44:22  15  hasn't really been fleshed out for me what it is that you-all are
16  asking for on the defense side and what the disagreement is.
17          MS. MENZIES:  Yes.  And we're -- our position paper
18  actually follows that, so I think we'll be able to follow the
19  agenda from that.
01:44:35  20         MR. OOT:  And I think it's the first part of our
21  position paper, too, Your Honor.
22          Basically I think the disagreement, Your Honor, is
23  about, on a high level, not the what, which is governed by the
24  PFS, but how, how the PSC is going to collect and preserve ESI
01:45:00  25  from individual plaintiffs.

1          So our concern, based upon experience, is we don't want
2  unsophisticated people collecting ESI from their machines and
3  their g-mail accounts and relying on that for the production of
4  ESI from the plaintiffs.

5          THE COURT:  What information are you expecting them to
6  produce that they need help with?

7          MR. OOT:  Pictures.  E-mail.  Information from chat
8  boards about the product that we found.  There are a variety of
9  different ESI sources, Your Honor, that are very salient to the
10 claims and defenses in this case.

11         So I think Ms. Menzies pointed out that they have an
12 ESI expert, Mr. McVoy, and, you know, he, actually on his
13 website, has guidance about collection and doing it the
14 appropriate way.

15         So it's our position that if we're held to this very
16 high collection standard as companies -- it's very easy for the
17 PSC to collect ESI from individual plaintiffs.

18         So, for example, let me talk about e-mail for a second,
19 Your Honor.  You're familiar with Microsoft Outlook and Microsoft
20 Office tools.  It's five clicks to capture an e-mail account in
21 an Microsoft Outlook profile -- five clicks.

22         We're not asking for full access and we're not asking
23 for log-in information.  We're asking that the capture of the
24 information is done appropriately so that the plaintiffs' counsel
25 can fulfill their 26(g) obligations.  I don't think that's a very

01:45:17
01:45:39
01:45:59
01:46:19
01:46:40

1  large ask.  It's not a heavy burden.  It's using software that's

2  available on pretty much every computer that's working --

3          THE COURT:  Now, who is it that you propose do it?

4          MR. OOT:  We're proposing that it would be with

01:46:57  5  guidance from the PSC's e-discovery people.

6          THE COURT:  Guidance from.  But who's actually doing

7  the collecting?  That's what I'm asking.

8          MR. OOT:  I think that the PSC could develop a protocol

9  for each individual plaintiff and their lawyer on how to collect

01:47:12  10  these ESI sources.

11          So just as we're --

12          THE COURT:  And who is doing that?  That's what I'm

13  asking.  Who do you anticipate doing the collecting?

14          If I'm the plaintiff, am I getting the instructions and

01:47:23  15  guidelines and protocol delivered to me and then I do it myself

16  in my own e-mail account?

17          MR. OOT:  No, Your Honor.  You're represented by, I'm

18  assuming, an outsider, a lawyer, that has to fulfill their 26(g)

19  obligation as well.  So we're proposing that that lawyer that's

01:47:40  20  responsible under 26(g) to conduct that collection to take the

21  responsibility for doing that.

22          Now, whether the person is the PSC's ESI consultant or

23  some litigation support specialist inside that lawyer's firm -- I

24  don't know who that person is.  We're just asking for a

01:47:57  25  methodology to build a process for the evidence handling so we

1  don't find out two years later in a deposition, Oh, yeah, that
2  machine that I had, that PC, that iPhone -- whatever it might
3  be -- I traded that in at Verizon.  Or alternatively, I have a
4  new computer now and that's gone.

01:48:17
5          So we're asking for framework for ESI handling on the
6  other side just as is expected of us, and we don't think that's a
7  large ask.

8          THE COURT:  I don't think that a framework or the
9  process is necessarily burdensome.  What I'm trying to get at is
01:48:34
10  what do you think the framework should be?

11         I don't know that asking every lawyer for every
12  plaintiff to take charge of actually collecting this information
13  for their plaintiff isn't overly burdensome.  That's not what
14  necessarily happens in a regular case.

01:48:55
15         I mean, if this is a single-plaintiff personal injury
16  case, whether it's a products case or -- whatever it is, e-mails,
17  social media, all that has become grist for the mill in any
18  number of regular civil lawsuits.

19         I've never been asked to direct that a lawyer take
01:49:17
20  charge of their client's e-mail accounts and social media
21  accounts and to do that work themselves as opposed to having the
22  client instructed as to how to do it, and then do it; produce the
23  information and verify that they've done everything in this
24  protocol to gather the information.  That's where I'm
01:49:43
25  disconnecting from what you're asking.

1    You're saying, We want a process and framework, and I'm
2  asking, Okay, what does that look like?

3    Because I don't have a problem with telling them, Here
4  is what you need to have your clients do to gather the
01:49:56  5  information and then affirm that they've done it.  But if you
6  want me to take the next step and tell the PSC or its consultant
7  or all of these individual lawyers they have to do this, then I'm
8  not sure that that's appropriate.

9    MR. OOT:  So I think somewhere in-between, Your Honor,
01:50:15  10  would be that we would ask each individual counsel that
11  represents the plaintiff that's responding to these ESI requests,
12  that they certify under 26(g) that they've conducted a reasonable
13  inquiry through their client.

14    So the obligation is --

15    THE COURT:  That's easy.  Right?  I mean, you-all
01:50:33  16  wouldn't have an objection to that?

17    MS. MENZIES:  We are required to by the rules, so...

18    MR. OOT:  And so we would develop this collection
19  protocol, and they would have an understanding that it's not just
01:50:47  20  an "I can do a few keyword search terms," and that it is a
21  substantive collection of their ESI.

22    THE COURT:  So I think it's entirely appropriate for
23  you-all -- they're talking.

24    I think it's entirely appropriate for you-all to sit
01:51:05  25  down with the defendants and see what it is that they want the

1  individual plaintiffs to do; what processes do they think each

2  individual plaintiff should undertake to gather their information

3  that's responsive to be included in the fact sheets.

4       MS. MENZIES:  May we respond?

01:51:25  5       THE COURT:  Yes.

6       MS. MENZIES:  I will bring my consultant up because we

7  did talk about this.

8       And my first point to Your Honor is it is well taken,

9  and we're having a difficulty getting one protocol for seven

01:51:37  10  defendants.  And now we consider having to get a protocol that's

11  going to match thousands of plaintiffs?  I'm worried about that.

12  There's over 800 cases filed.

13       What I can tell Your Honor, and what I told the

14  defendants, is that all plaintiffs' counsel here are well-aware

01:51:51  15  of the preservation requirements and our active involvement in

16  obtaining the information that Judge Engelhardt has already

17  ordered.  He already told us what we have to produce and how we

18  have to produce it.  There are three orders on it now, PTOs 18

19  and 22, and we've got a centrality order, PTO 24.

01:52:10  20       One other point I want to make is that I don't

21  represent -- and none of these individuals, we don't represent --

22  they all have their own counsel.  I can't imagine Mr. Oot telling

23  Mr. Schaefer what his clients should do.  It doesn't work that

24  way.

01:52:23  25       What we can do, and what we are doing, is provide

1  guidance to the plaintiffs' counsel involved in the case through
2  a committee on our PFS, our PSC committee, to make sure that
3  people are honoring their obligations, and if they have any
4  questions or concerns, but of course they represent their own
01:52:39  5  clients.  And we're following up on that process.
6       THE COURT:  What does that guidance look like?  What
7  form does it take?
8       MS. MENZIES:  Well --
9       THE COURT:  The guidance that you're providing to the
01:52:47  10  individual attorneys.
11       MS. MENZIES:  Making sure that they understand.  And we
12  have some suggested preservation information.  And, in fact, I
13  told this to counsel during our meet-and-confer.  Most plaintiff
14  lawyers who have been doing this for a while, and I think all of
01:53:02  15  our PFS members -- when we send out our retainer to a brand-new
16  client, it goes with a preservation letter saying,
17  Unfortunately they're probably going to be asking for this, this,
18  this, and this, and all this stuff through social media and
19  otherwise.  So we do -- we have that already in place.
01:53:16  20       We are also looking at how -- what the judge has
21  ordered in the PFS on what he wants us to collect and provide to
22  the defendants.  We had a big plaintiffs' meeting a couple weeks
23  ago and kind of went through that; discussed what we understand
24  and how it should be done.
01:53:33  25       I've talked to the defendants about pictures, for

1  example.  How are we going to do pictures?  Well, we've told
2  defense counsel that we intend to give a representative sample
3  before the use of Taxotere and after the use of Taxotere.  And a
4  woman when she just wakes up versus a woman when she is kind of
5  trying to make herself look a little prettier.

6          It's difficult.  I'll be straight up with Your Honor.
7  Working with these clients, the last thing they want at this
8  stage of their life is pictures to be taken, especially in the
9  worst scenario.

10         So we are -- it has been, at least in my experience
11 with my clients, necessary to encourage some of our clients to,
12 you know, not do the selfie like this (indicating), that we
13 actually need to get a picture where we can see what they look
14 like.

15         So that kind of active discussion with a large number
16 of people.  And we've been, frankly, setting up meetings with
17 other plaintiffs' counsel.  The PSC committee is designed to do
18 that.

19         I'll let Mr. McVoy talk to you a little bit also about
20 how we talked about addressing the e-mail, for example, and
21 Mr. Oot's comments in his position paper about what he just
22 described to you.

23         MR. MCVOY:  Collection from plaintiffs, individual
24 plaintiffs, is much tricker than working in a corporation.  These
25 people have their entire lives in their e-mail boxes.  They

1    wouldn't agree to turn over all of the information on every item

2    of their life; their kids, wedding plans.  So we have to be very

3    selective and we have to guide them in a way to get their e-mail.

4    We don't feel like it's necessary to do a forensic pull of

01:55:03    5    someone's e-mail if they have one responsive e-mail.

6         You have to remember some of the plaintiffs in this

7    case are older and they don't use e-mail to talk about a lot of

8    things, so our guidance is about what questions to ask.  And when

9    there is information, get it in a reasonable manner.  It follows

01:55:18    10    the federal rules for what they would do for themselves.

11         THE COURT:  So in the spirit of transparency, which is

12    one of the themes of what we're talking about, how much do the

13    defendants know about the guidance that you are giving to these

14    individual plaintiffs and their lawyers?

01:55:39    15         MS. MENZIES:  Everything I've just said.

16         THE COURT:  Is there something in writing?

17         MS. MENZIES:  I cannot tell a lawyer how to collect

18    information from their client.

19         THE COURT:  No.  And I didn't hear that you were doing

01:55:56    20    that.  What I heard was the word "guidance."

21         MS. MENZIES:  Yes.

22         THE COURT:  And I think that it would be appropriate

23    if your response to this particular concern is:  We, as a

24    committee, as lawyers who have experience in these matters, are

01:56:13    25    providing guidance to all of these lawyers as to how to do this.

1        It would only be appropriate, given the common thread
2    that is running through all of these disputes, that the lawyers
3    on the other side know what that guidance is.
4        MS. MENZIES:  I see.  So I think -- I mean, it's
5    probably not unlike what we suggested to the defendants when you
6    start the conversation of how does this stuff exist.  There's a
7    checklist point -- there's even a Sedona paper on it -- on how
8    you begin that conversation with your client.
9        Would it be likely that you have information?  Did you
10   talk about your hair loss in your e-mails?
11       Well, not really other than with my sister.
12       Okay.  Let's look at your e-mails with your sister.
13   Let's go through it.
14       Are we going to -- you know, if she's got 100 e-mails
15   with her sister, we can read every one of them.  If she has
16   2,000, then we may need to search for "hair loss" or "Taxotere"
17   or something like that.
18       So, you know, we can show -- we can give them kind
19   of -- they're going to be very basic-type questions of what we
20   are using with our other plaintiffs' counsel to guide them on how
21   to talk to their clients about this.
22       THE COURT:  The problem we have right now is that the
23   defendants don't know how the individual plaintiffs are looking
24   and searching for the information that we all know is responsive
25   and is going to go along with these fact sheets.  I think it's

1    only appropriate for them to understand what guidance is being

2    given to these folks in terms of how to respond to their

3    discovery obligations.

4         MS. MENZIES:  I think that sounds good.  I think that's

01:57:48

5    fair, and we're happy to be transparent.

6         THE COURT:  The next time y'all are here, we may be

7    arguing about the details of that, but at least for the time

8    being, I think that -- because we're going to talk about the flip

9    side of this in a minute.  But I think that the defendants are

01:58:04

10   entitled to know what direction or what guidance is being given.

11        You may never know what, you know, hundreds or

12   thousands of individuals are doing in their own computers until

13   you ask them in a deposition.  But in a general sense if the

14   committee is advising the individual lawyers as to how to advise

01:58:29

15   their clients to retrieve this, I think they ought to know what

16   that advice looks like and what that guidance looks like.

17        MS. MENZIES:  I appreciate that.  And I think the

18   optimal word is "guidance," recognizing we can't tell them how to

19   do it.

01:58:40

20        We thought it was interesting in Mr. Oot's paper that

21   he cited a case where it says:  Plaintiff's attorney must

22   actively supervise and take responsibility for ensuring that

23   their client conducts a comprehensive and appropriate search for

24   electronic evidence.  That's exactly what we're doing.

01:58:54

25        THE COURT:  Well, the federal rules do apply to this

case even though it's a different case.  I mean, there are
protections in the rules that you-all have in terms of
preservation and diligence and reasonableness and all of those
things.  Just because this is an MDL doesn't mean that you don't
have the benefit of those protections.  And the lawyers on the
other side know what their obligations are -- or at least they
should know what their obligations are in terms of guiding their
clients to gather this material.

Now, just given the way that the litigation is set up
and the fact sheets and what goes into them and the additional
information, I think in this situation it's appropriate for the
defendants to know what guidance is coming from the committee and
flowing downstream so that they can have some level of comfort;
that there's not a step that should be taken that's not being
taken.

They may look at the guidance and say, Well, you should
advise these lawyers that they really ought to also look for this
one thing or this, not to completely rewrite it.  And maybe
that's the argument we'll have next time, but I think they at
least need to know how they're being directed or guided.

MR. OOT:  Thank you, Your Honor.

MS. MENZIES:  Thank you.

MR. OOT:  I think our goal is just to avoid that
spoliation motion two years from now; it's not to create any
extra burdens on the plaintiffs.

1           THE COURT:  Right.

2           All right.  Let's talk about, on the agenda, what is

3     described as "some areas of scope."

4           There are a couple of things I know that you-all have

02:00:41   5     discussed.

6           One is in the very first paragraph in the draft order

7     under "scope of ESI," that last shaded sentence, "Information

8     about products and services that are unrelated to the claims and

9     defenses in this matter is outside the scope of 26(b)(1).

02:01:03   10          So my observation there is that is a statement of fact

11    that is true.  I don't know necessarily that it even needs to be

12    said.

13          I don't really think that language is what the dispute

14    is about.  The dispute is about how do you carve that information

02:01:20   15    out in discovery, I guess, when you're doing your searches, and

16    that information is, you know, populating the database that you

17    are building, right?

18          As I take it, what the defendants want to do is redact

19    that information along with other information that you-all

02:01:48   20    believe is privileged, the FDA information, the HIPAA

21    information, and that sort of thing.  So I think those are two

22    different categories in terms of redactions.

23          And if I'm missing the point, y'all just interrupt me

24    because I don't want to go too far down the road.

02:02:04   25          But I think the first thing we need to discuss is this

1  proposal that the defendants be allowed to redact what they
2  believe is irrelevant information.  I don't know how you do that
3  without providing some notice to the plaintiffs of what it is or
4  why it is that you're redacting the information.  I mean, just in
02:02:27  5  general.
6         And I've just run up against this in a case with
7  another set of unusual privileges.  You don't just redact
8  something and say, Okay, we've redacted everything we need to
9  redact, take it or leave it.  I mean, there's got to be some
02:02:51  10  notification as to why information is being redacted.
11        I don't know that necessarily you would need to log
12  every redaction, but normally if you're redacting something in a
13  garden-variety, single-plaintiff case and you're producing
14  documents with redactions, you're required to explain why you do
02:03:14  15  that in a log.
16        That may be an untenable approach in this case, but
17  I'll let you go ahead and speak to that.
18        MR. MERRELL:  Thank you, Your Honor.  Cliff Merrell on
19  behalf of the Sandoz defendant.
02:03:25  20        You hit the nail on the head.  It is the two issues of
21  redacting irrelevant information, and that typically is a
22  situation where -- the drug at issue here is Taxotere/Docetaxel.
23  All the manufacturers manufacture a lot of different drugs, and
24  so what you'll see is documents, Excel spreadsheets in
02:03:43  25  particular, that will deal not just with Docetaxel/Taxotere, but

1  other drugs.  It's just the information is not relevant to this

2  particular litigation.

3          And we just want to make sure it's spelled out in the

4  ESI protocol that there is that ability to redact information if

02:03:58  5  we decide, based on the review and based on our obligations under

6  the rules, that it's not relevant.  That's something that's been

7  included in some other ESI protocols that we've pointed out in

8  our position paper, including the Takata airbag situation.

9          But I hear what you're saying, there should be some

02:04:14  10  kind of mechanism so the plaintiffs understand the basis for the

11  redaction, and that's fine.  I think that's something that we

12  could negotiate or further discuss with the plaintiffs.  But my

13  concern, based on our discussions previously with the plaintiffs,

14  is that they didn't want there to be any redactions at all.

02:04:30  15          THE COURT:  Well, I think that it would be

16  appropriate -- or I don't think that it would be inappropriate to

17  use that example.  If there is a single document -- if there's a

18  spreadsheet that contains information about other drugs or

19  services, that that information be redacted.  I don't know why

02:04:54  20  that would be inappropriate so long as you're being informed why

21  it's being redacted.

22          MS. MENZIES:  And an idea of what we're not getting.

23          THE COURT:  Yes.

24          MS. MENZIES:  If I may respond?

02:05:08  25          THE COURT:  I can tell you one thing.  Y'all aren't

1  producing redacted documents without explaining why they're

2  redacted.  That's just not going to happen.  It can't happen.

3          And this flows both ways.  There's no way for your

4  opponent to be able to test whether that's an appropriate

02:05:27  5  redaction, or for the Court to do it, without, at a minimum, an

6  explanation for why it was done.  So there has to be a mechanism

7  set forth in this order to identify the reasons or the purpose

8  for a particular redaction.

9          MR. OOT:  We'll agree to that, Your Honor.

02:05:48  10         MS. MENZIES:  As we suggested to the defendants at the

11  meet-and-confer, this is actually -- redactions and how they're

12  managed and handled and documented is probably a better subject

13  matter for the protective order, especially if they want

14  something kept out.  And their normal course of keeping something

02:06:07  15  proprietary otherwise would be to obtain a protective order along

16  those lines.

17          So to have a blanket protocol that goes to all

18  defendants that gives them the right under two places in this

19  protocol, as they have written it, to redact what they're calling

02:06:22  20  "nonresponsive information" or "other product" or this kind of

21  blanket allowance is the language we objected to.

22          It's in the stuff you looked at there, and it's also on

23  Page 16.  And it's Section VIII.

24          THE COURT:  "The producing party may redact

02:06:47  25  nonresponsive portions of an e-mail"?

1          MS. MENZIES:  That's correct.

2          And you see that there.  So we're talking about a

3  couple of things that I want to make sure is clear, Your Honor.

4          Our position is that there will be times that they need

02:06:57  5  to make redactions; we recognize that.  When those are done and

6  whether they're appropriate or not is actually in dispute, and so

7  it is probably something you'll see when we do the protective

8  order presentation.

9          I'll give you an example, unrelated products.

02:07:11  10  Generally unrelated products are really not relevant here.  We

11  may not even want that kind of thing.  But when you start with

12  this -- redactions are being made with -- there are law review

13  articles written on this, Can you redact nonresponsive or

14  irrelevant information out of an otherwise responsive document?

02:07:30  15          So that's what we're talking about.

16          Now, they don't have to give us nonresponsive

17  documents, but a document that's already responsive, can they

18  take stuff out?

19          Normally you would think that's fine, especially with

02:07:40  20  other products; but, frankly, I've had this argument and courts

21  order in the past, if, for example -- and I have no idea -- but

22  say Sanofi is working on another cancer treatment, and this

23  cancer treatment happens to not cause the same side effects that

24  are at issue in this litigation, and, therefore, they're

02:07:57  25  comparing it to the others.  I actually had that happen in a

1  litigation.  So when I saw this, I'm like, wait.  You know, I

2  know it's a rare exception, but we can't do this in a blanket

3  way.

4          And the Takata case that counsel has cited to, it gives

02:08:10  5  specific -- the judge was looking at specific categories of what

6  could be redacted.

7          We don't have any factual information at this time.

8  There may be times where we dispute redactions and times we

9  don't, but to put this language in two places in a general

02:08:27  10  protective order just is too concerning for us, and that's why we

11  couldn't agree with it.

12          THE COURT:  You know, generally irrelevance is not a

13  grounds for redacting information in an otherwise responsive

14  document.  I'm making a general statement.  Privilege is.

02:08:55  15          But, I mean, I don't think I've ever dealt with a

16  situation practicing, or since I've been here, where we're

17  arguing about redacting non-privileged information.

18          And one of the things that strikes me in reading the

19  argument that you-all have made about redacting other products,

02:09:20  20  other services, is there is on page -- well, there are no page

21  numbers.  Hold on.

22          On the second page of your letter, the defendants'

23  letter, where you say, Courts have upheld the rights of parties

24  to redact such information in similar actions, and there's a

02:09:41  25  footnote.

1          MR. OOT:  Your Honor, I actually participated in the

2     Zofran MDL on this very issue before Judge Dein.  So while there

3     might be many law reviews on this subject matter, courts have

4     ordered that it is appropriate to redact other product

02:10:01  5     information.

6          MS. MENZIES:  In the context of the --

7          THE COURT:  Why are we redacting other product

8     information?

9          I mean, so many of the arguments you're making are

02:10:11 10     proportionality arguments, and this certainly isn't one because

11     you're creating even more work for yourselves by going through

12     and redacting what you're claiming is simply irrelevant

13     information.  So it's sort of inconsistent with the rest of your

14     arguments that, you know, they're asking you to do things that

02:10:31 15     are disproportionate.  Well, you're affirmatively going through

16     these documents and having to redact information that's not

17     privileged, it's simply outside the scope of discovery in this

18     case.

19          But I don't understand necessarily what the harm is in

02:10:46 20     having that information produced.  I mean, it happens all the

21     time in everyday litigation.  E-mail strings are produced with

22     one sentence that matters and there are pages of information

23     that's not relevant to a particular case, but it's not -- lawyers

24     aren't going through and redacting that information.  So I'm not

02:11:07 25     exactly sure why it's necessary to redact it in this case.

1       MR. OOT:  I think, Your Honor, the core focus is the

2  scope of 26(b)(1).  That is the reason.  So we're not making a

3  proportionality argument here.  We're talking about what is

4  permissible discovery under 26(b)(1).

5       So, Your Honor, they're not entitled to information

6  about another product and service that's not within the scope of

7  the claims and defenses of the case.  It's pretty clear, at least

8  the arguments that we made before Judge Dein, and we think

9  appropriate here.

10       So we agree, Your Honor, that we will identify the

11  nature of the redactions.  We agree and will defer to that,

12  Your Honor.  But to give wholesale access to every product ever

13  made that just might mention the product in this case, we don't

14  think is appropriate.

15       THE COURT:  Well, my thought is if the information that

16  they're redacting is outside the scope of discovery, I don't know

17  that it's necessarily improper for them to redact it.

18       Like I said, I've not had this issue before.  I've

19  never known of lawyers who wanted to go through and redact things

20  just because they weren't relevant.  I mean, I guess because -- I

21  mean, no one has said anything about proprietary trade secrets --

22  no one has said anything about this information otherwise being

23  sensitive, it's just simply outside the scope of discovery in

24  this case.

25       If the lawyers on the other side want -- the only

concern I have is that things are being redacted that shouldn't

be redacted; and without a log, I don't know how anyone can test

that.  And I can tell you I'm not looking at millions of pages of

redacted documents just to determine whether something is

02:12:57   relevant.  I mean, that's not going to happen.

So my concern is the necessity of redactions in this

case.  If it's not relevant, it's not relevant, which means it's

not going to be used in the litigation; and I don't understand

the harm in producing a document that was otherwise responsive

02:13:17   that may contain some information that's outside the scope of

discovery.  It seems to me to create the potential for more

problems than it solves.

MS. MENZIES:  I think, Your Honor, too, in the backdrop

of a protective order that will be in place in this case, as well

02:13:34   as I mentioned the --

THE COURT REPORTER:  I'm sorry.  I'm having a hard time

hearing you.

MS. MENZIES:  Sorry.

We will have a protective order.  We will not be

02:13:47   sending these documents everywhere.  These are otherwise

responsive documents.  When they start redacting all this stuff

out, it takes away context.  And the cost itself, you know,

they're making the proportionality argument.

What we would suggest to the Court at this stage, and I

02:14:05   think where you may be struggling, is that we can't allow an

open-ended redaction and a blanket right for them in the context
of this ESI protocol that they can just be redacting stuff out.

THE COURT:  No, I agree with that.  The general
language in the protocol I don't think is appropriate.  I think
the better way to handle it is if, in the process of responding
to discovery, you believe there is information that for some
reason should be redacted, that it would need to be addressed in
that context.

And what I'm telling you-all is I'm just not convinced
that the risk of an imprudent redaction is not outweighed by the
need to do it.  I just don't see a need to do that.  And I
haven't heard why it's necessary for you-all to redact that
information other than it's outside the scope of discovery.

But if it's in an otherwise responsive document, I
don't believe there's harm in it being produced.  If it is truly
outside the scope of discovery, it would never be used.  It will
be subject to a protective order and it's not going to be used
because Judge Engelhardt is not going to allow the use of
irrelevant information.

So I'm just concerned about the risks involved with
allowing that sort of practice, particularly in an order that
just allows you-all to do it.  I think the better approach is if
you have specific information that you believe should be redacted
or should otherwise be withheld, that you raise it with regard to
that specific information.

1        And whether it's a contradictory motion or whether it's
2   a negotiation with the plaintiffs at that point, who knows.  But
3   I agree that I don't think that it's appropriate to have this
4   practice as part of the standing ESI order.
5        MR. OOT:  Your Honor, it's an important issue I think
6   to all of our clients so --
7        THE COURT:  Somebody needs to tell me why.  I still
8   haven't heard why.
9        MR. SUFFERN:  Your Honor, may I be heard on that issue?
10       THE COURT:  Yeah.
11       MR. SUFFERN:  Michael Suffern.  I represent Actavis
12  Pharma, Inc.
13       You know, Your Honor, I think the reason, from our
14  client's perspective, is just, you know, fundamental fairness.
15  You know, these are big companies that -- a lot of them that
16  develop and market many, many drugs.  And in the context of the
17  spreadsheet that Mr. Merrell was discussing, for example, you
18  might have a spreadsheet that has, you know, eight or ten data
19  columns that include things like purchase price, start marketing
20  date, end marketing date, that kind of information.
21       You know, it's almost analogous, you know, to the
22  wedding and the birthday photos, Judge.  Just because you're
23  involved in litigation doesn't mean that they have a right to
24  just come in and lift up the hood and look at everything that our
25  clients do.

1    Our clients feel that, you know, on the no-use, no-foul

2  end of it, that's just not the way that they see it.  They see it

3  as this is our data.  These -- we work hard to develop these

4  products, and we have a right to keep our data private from

02:17:27    5  people who, you know, have no use for it in the litigation.

6    The spreadsheets, for example, if you have these eight

7  or ten columns, the column headings remain so the notion of why

8  it's being redacted is self-evident.  It's the product that is

9  irrelevant and so that line gets redacted.

02:17:49    10    And it just comes down to that, for our client, it's

11  that simple.  We just don't want to be able to give them access

12  to data that they're not entitled to because we work hard to

13  create these products and we just don't think they're entitled to

14  it, Your Honor.  It's unfair.

02:18:10    15    MR. RATLIFF:  Your Honor, Harley Ratliff on behalf of

16  Sanofi.

17    I think Mr. Suffern made a good point.  I would like to

18  put a finer point on it, and I think maybe some of the real

19  concern on behalf of our clients, and what we've seen in terms of

02:18:24    20  the other product redaction, which is Mr. Coffin, Ms. Menzies,

21  Mr. Shkolnik, Ms. Barrios, they are excellent attorneys -- they

22  are excellent attorneys.  They have spent their entire careers

23  suing pharmaceutical companies.  They are all very

24  well-experienced lawyers suing pharmaceutical companies.

02:18:42    25    So I think some of our concern -- and you're right, it

1    would be an enormous burden to do these type of redactions, and

2    that's something that we would have to, obviously, discuss with

3    our client, whether we wanted to redact out our products or

4    whether there's a cost concern there.

5    But I think the issue that we see is, yes, let's say

6    there is a chart of adverse event reports and one of them is for

7    Taxotere, and it talks about alopecia.  Of course they're going

8    to get that -- of course they're going to get that.

9    But what if there's a list of other adverse event

10   reports for an unrelated drug outside the scope, and they say,

11   Oh, look, here's Sanofi's drug B -- not a cancer drug; maybe it's

12   an anti-cholesterol drug, maybe it is a diabetes drug -- and they

13   say, Look at all these adverse event reports, they all start to

14   look the same to us.  This is an opportunity for us to come up

15   with another mechanism for filing lawsuits.

16   And we have talked about outside the scope, we've

17   talked about proportionality.  Mr. Suffern made some good points,

18   but I think that's the real point that everyone is sort of

19   beating around the bush.

20   So that's the concern from our client, mostly because

21   we know these fine attorneys so well and we've spent so much time

22   with them.

23   THE COURT:  See, that's the answer I figured I was

24   going to get when I asked the question the first time.

25   MR. RATLIFF:  So I was quite surprised when I was

1   listening to all this.

2           So that's the issue.  And to our client, sometimes

3   that's worth the cost.  And I can tell you, at least on the

4   Sanofi side, this is an issue we've discussed internally.  Not

5   necessarily in this litigation of is this cost really worth it to

6   us, but we would at least like to have that option.  And of

7   course we're going to identify when we redact something as an

8   other product.

9           And I would understand Ms. Menzies' concern about, say,

10  you have an e-mail that has something about Taxotere and alopecia

11  and then we redact everything else after that.  We would be

12  foolish to do that because she will come in here and we will

13  almost certainly lose those arguments, and we're not in the

14  business of losing arguments.

15          THE COURT:  All right.  So that is a legitimate

16  concern.

17          MS. MENZIES:  I'm so busy, Your Honor, with Taxotere, I

18  can't --

19          THE COURT:  I know.  But I bet you there are other

20  lawyers in your office.

21          Listen, that is a legitimate concern.  And what I want

22  to encourage you-all to do is to develop some approach, some

23  protocol, some language to be put into this order that speaks to

24  that concern and that allows that sort of information to be

25  redacted and to have it explained as to why, without this

1    overbroad "We get to redact things that we don't think are
2    responsive."  I think that's just too much.
3            MR. RATLIFF:  I understand, Your Honor.
4            THE COURT:  We've talked about what the issues are.  I
5    do not think it is inappropriate for the defendants to want to
6    address the particular concern that's just been expressed.  And I
7    think that what we're talking about is information that is
8    clearly outside the scope of discovery in this case, and that I
9    wouldn't have a problem with them doing that as long as you-all
10   are given an explanation as to why it's happening.
11           I just want you-all to sit down and figure out if
12   there's a way to describe that prerogative in the order that is
13   narrower than the way it's described now.
14           MR. RATLIFF:  Yes, Your Honor.  We're all paranoid
15   people and so I think we can probably work something out.
16           THE COURT:  Okay.
17           MS. MENZIES:  I was just going to add to that, that in
18   our meet-and-confer Mr. Suffern brought up the spreadsheets.  We
19   suggested, All right, why don't we do a meet-and-confer?  Let's
20   look at the spreadsheets.
21           We don't want -- I can tell you that, you know, we
22   are -- I appreciate his candor.  That's actually the first time
23   I've actually heard it said in open court, that that's --
24           THE COURT:  But you knew that's what they were --
25           MS. MENZIES:  I did.  I did.

1         THE COURT:  -- concerned about.

2         MS. MENZIES:  But as you said, Your Honor, I still

3    continue to emphasize the fact that these are otherwise

4    responsive documents, and that they are the ones who complain

02:22:40   5    about cost and burden and proportionality.

6         So if we can recognize that -- and we have said to

7    them, if there's glaring things that we can cut down on what we

8    have to go through and otherwise, as long as -- you know, when

9    you're searching documents and you have redactions coming in,

02:22:55  10    it's harder to use those tools.  It does increase the cost

11    significantly.  And I've had cases where they'll spend the time

12    to redact one word, because it was the product, in multiple

13    different places.

14         Happy to work with them if we have it in context and

02:23:09  15    know what we're --

16         THE COURT:  And I understand that.  And I think that's

17    what's important.  And, I mean, I don't know that I have to say

18    anything more to give you-all the guidance that you need to try

19    to memorialize that in this order.

02:23:20  20         MR. SCHAEFER:  Good afternoon, Your Honor.  Jeff

21    Schaefer from Ulmer & Berne, Cincinnati, Ohio, for the Actavis

22    defendants.

23         First, to address just briefly the redaction issue and

24    difficulties, I've been doing ESI work in pharmaceutical

02:23:37  25    litigation for some years, and with techniques available now

1   electronically and the review platforms, it's not a big deal when
2   you have an e-mail with 20 spreadsheets attached to put slip
3   sheets in place for all the spreadsheets that don't deal with the
4   product at issue and produce that native Excel.  That's the kind
02:23:56   5   of thing we do all the time.  It's not like when I started
6   practice with a China pencil and a document and you blacken
7   things out.
8          So the process can work, it can work easily, and that's
9   why it's something we do all the time and didn't feel it was that
02:24:13   10   controversial when it was in the protocol.
11          But I'm here to talk about, at this point, the issue of
12   the involvement of the plaintiffs in the actual work of our
13   collection in the discovery process.  They want hit reports, they
14   want statistical data as we conduct the discovery in this case,
02:24:30   15   and right now there's nothing that's been collected.
16          THE COURT:  Y'all are still working on protocol.
17          MR. SCHAEFER:  We're still working on the protocol.
18          But, as I mentioned, I've been involved in
19   pharmaceutical litigation for a long time; I know what kinds of
02:24:42   20   things happen, what kinds of processes are used.  I can't speak
21   for each and every one, I can only speak to my own experience;
22   but I know that the process is difficult, lengthy, and it goes on
23   and iterates.  And it's not a question of, Hey, here's one set of
24   terms, one set of data, here's a hit report, we're all happy;
02:25:00   25   it's the case that you get these kind of statistical outputs as

1    the evidence has moved through many times.

2            Validation, same issue.  Which set are we going to

3    validate?  And why -- to what point do we disclose this by virtue

4    of a protocol at the initiation of litigation where there has

02:25:20    5    been no suggestion that anything is not functioning properly?

6            That's, you know, right -- talking about Sedona

7    Principle 6.  We will use these procedures.  It's not about lack

8    of cooperation, because we cooperate.  We will cooperate if it

9    should be the case that we use e-terms we agree with.

02:25:38    10            They want us to provide the first list, but I have done

11    it the other way in litigation.  We'll get some keywords, we'll

12    work on those.  If there's additional ones that are proposed

13    during the process, we'll work with that as discovery proceeds.

14    It's not a lack of cooperation in that regard.

02:25:51    15            But it's far more than just transparency.  It's

16    actually getting data from us statistically of discovery on

17    discovery, meta discovery some people call it, so that they can

18    monitor the process.

19            Well, why monitor the process unless you intend to

02:26:07    20    become a participant in the process?  And that's going too far

21    from our perspective, particularly in the absence of any

22    demonstration that the work we're conducting has been deficient.

23            THE COURT:  So I think the objective is -- so you just

24    used the words that I was thinking.  What you're suggesting they

02:26:28    25    want to do is going too far?

1          MR. SCHAEFER:  Yes.

2          THE COURT:  So there's a space between going nowhere

3   and going too far, and that's what we're looking for.  I don't

4   know how you describe that level of participation at the outset

02:26:47   5   in an initial ESI order before anything's been done.

6          The plaintiffs in this situation are clearly entitled

7   to some degree of validation and monitoring.  I don't know what

8   you-all can agree is appropriate, but it's got to be somewhere

9   between none and sitting next to your ESI consultants and experts

02:27:13   10  and lawyers, and whoever else is doing this work, and doing it

11  with them.

12         But I think there's -- I mean, you-all have been doing

13  these cases a long time, and there's got to be a level of

14  participation or monitoring or validation throughout the process

02:27:28   15  that is -- that can be acceptable to both sides.

16         MR. OOT:  Your Honor, just briefly.

17         I would like to propose that perhaps this 26(g)

18  certification that we were talking about earlier might be the

19  appropriate opportunity here.

02:27:42   20         The validation is built right into the rules under the

21  26(g) standard that we will conduct a reasonable inquiry.  I have

22  spent my career focusing on that rule, and I've written about it

23  a lot, and I think that that could be our baseline.  Yes, we will

24  have conducted a reasonable search.  Yes, we are following

02:28:02   25  ordinary protocols.

1    Will we exchange keyword search terms?  Will we talk

2    about reports?  Sure.  But on the other side of it, are we going

3    to pick some arbitrary number of validation on the methodology

4    with a certain degree of error rate?  No.  It's not appropriate,

02:28:21    5    because we don't know what the data population is, as we pointed

6    out earlier, until the very end.

7    So I think if they want to rely on 26(g) for a

8    certification for the methodologies and the review, I think that

9    we should be able to as well.

02:28:34    10    THE COURT:  Well, I mean, I get that argument.  We're

11    talking a little bit apples and oranges here in terms of the

12    scope of what's being undertaken when you're talking about

13    individual e-mail accounts versus what you-all are undertaking.

14    Perhaps a better approach -- and you can speak to this.

02:28:57    15    Perhaps a better approach is to build into the order a

16    procedure for you to test what's been done if you have cause to

17    do that.  If during the discovery process you have reason to

18    believe that some monitoring or testing or something is amiss and

19    that you need access to some amount of information to test

02:29:23    20    whether the searches and the discovery is being conducted

21    thoroughly, perhaps the better way to do it is to have the order

22    build in a procedure to address those problems as they arise on

23    the front end.

24    MR. SCHAEFER:  Your Honor, that's what the law

02:29:47    25    provides, and think that's where that bridge should be crossed

1   when there has been such an issue.  Because, otherwise, the

2   effect of what's being requested in the protocol as it's drafted

3   now is, frankly, going to slow the process down.

4           We get a report, we get some kind of data, we have to

02:30:05   5   provide it to the other side.  There has to be potential

6   discussion about it, requests that we change things, things of

7   that sort.  I think the proof is in the pudding, and there will

8   be a process we use.  And we've agreed to cooperate with respect

9   to what those processes are, whether we're using TAR or keywords

02:30:22   10   or both and on what data.  There's some data we don't use

11   anything for.

12           NDA materials, I would expect -- I can't speak for

13   every defendant, but I don't think we need to do any kind of

14   processing on those.  We haven't in the cases that I've been

02:30:32   15   working on to date.

16           But I think that bridge should be crossed when we reach

17   it, and not in the protocol.

18           Thank you, Your Honor.

19           MS. MENZIES:  What defendant is suggesting to you may

02:30:47   20   have been appropriate in 2004.  It's 2017.  The ESI and

21   technology that's available to the parties now is designed and

22   recognized in the federal rules, the Sedona Conference, and your

23   guidelines.  Even Mr. Oot has written on this.  That is, the

24   benefits of having early, informal disclosure and discussions

02:31:11   25   about search methodology, collection, culling, and validation.

1       I would like Your Honor to look specifically at the
2   protocol at Page 6, if you would, under Section V.D.  this is the
3   search methodology section.  It's the start of all the yellow.
4       In the course of our discussions, we had spent a fair
02:31:36
5   amount of time on D where it specifically says:  The parties will
6   discuss and attempt to reach an agreement on search
7   methodologies.
8       We could not agree in that room that -- most of the
9   counsel here, and maybe apparently now all the counsel here, will
02:31:55
10  not agree to attempt to agree with that --
11      THE COURT:  Yes, they will.
12      MS. MENZIES:  -- search protocol.
13      THE COURT:  I predict that they will agree to that.
14      MS. MENZIES:  So this is our problem.  And I've said it
02:32:06
15  to you -- we've said it to you in our position paper.  All of the
16  backdrop and encouragement at early stages -- Rule 26(f).  We
17  cited it in our original letter to the defendants, open
18  cooperation.  This is how we're going to be able to do this in
19  the most efficient and time-expedient way possible.
02:32:25
20      To have to get all the production and us go back and
21  figure out whether or not it was effective, whatever search
22  methodologies they use, with no idea -- with the curtains closed,
23  we have no idea what they're doing.  That's just old fashioned,
24  frankly, Your Honor.
02:32:37
25      The hit reports and the technical stuff aside, I

1   brought my consultant.  He can speak to you more about them.

2            MR. MCVOY:  We can get into the --

3            MR. SCHAEFER:  Your Honor, if I may.  I just -- I'm not

4   sure Mr. McVoy is counsel, an attorney, at all, and --

02:32:54   5            MS. MENZIES:  He's not.

6            MR. SCHAEFER:  -- this is an evidentiary hearing.  I

7   just want to --

8            THE COURT:  I'm going to hear it.

9            MR. SCHAEFER:  Thank you.

02:33:01   10            THE COURT:  Go ahead.

11            MR. MCVOY:  So I approach these matters practically.

12   Right?  I have to get data from Point A to Point B.  The most

13   efficient way to do that is be transparent with the other side.

14            I've done thousands of these agreements, and 99 percent

02:33:12   15   of the time parties get together, they exchange hit reports, they

16   discuss keywords, they boil them down.  It's true, the data

17   moves.  Sometimes I get large swaths of data, sometime I get

18   smaller swaths of data.

19            We talk at the beginning of the case because when

02:33:27   20   you're building a seed set for TAR or you're building a keyword

21   search list, the data is pretty much the same for when they

22   collect the next 12 custodians and the next 12.  It's not a

23   vastly different set of data.

24            So we can come to agreement at the beginning of their

02:33:40   25   process.  If we wait until too late in the process, especially in

the TAR protocols, a bad decision on a document can cause a lot
of issues down the line.  If we can come up with those protocols
and the way they're going to validate them -- what I don't
understand and what was frustrating to me during the discussions
is we have ways out of all of these things.

02:33:55

We set an ideal of 85 percent, right?  So you're going
to make sure you find 85 percent of the responsive documents in
your collection.  That doesn't seem like it's unrealistic.  Maybe
it's a higher number.  But the last part of that is if you cannot
do that, let's meet and confer and talk about why.

02:34:11

Sometimes there's not that many documents in a
collection, it's not rich enough.  And so, yes, we get together,
and they say, We did ten rounds of validation, ways to prove our
way in a TAR case, and we could only get to 60.  Okay, thank you
for trying.  Let's move on.

02:34:27

It's just such a -- it makes no sense to put up this
wall that then we have a lot of arguments sometime down the road.

As for it going faster or slower, it speeds up the
process.  If we can come to an acceptable list of keywords that
they can take their million documents and make it 100,000, or we
fight and fight and fight for four weeks and then we get to a
list of 200,000 documents, it takes longer.  It's -- with TAR,
again, we can spend a lot of time -- two weeks, three weeks --
agreeing on a protocol for TAR that they are going to use

02:34:43

02:35:00

specifically.  That's going to speed up their entire process.

1  It's not a modern-day argument to say this will slow down the

2  process.

3          And we can get into the weeds about the specific things

4  we put in there, if you want to, about --

02:35:12

5          THE COURT:  I don't want to.

6          MR. MCVOY:  Okay.  I didn't think you would.

7          THE COURT:  I'm more focused on the cooperative element

8  of all of this.  If the federal rules aren't enough, if my

9  recently revised ESI guidelines aren't enough -- you can read the

02:35:38

10 paper from the stack of papers that's on the table on the way out

11 of the courtroom.  I have a five- or six-page document that I put

12 together, since I've been here, on civil practice guidelines.

13 And if you read that, you will know that at least this guy is

14 primarily focused on lawyers cooperating where it's appropriate

02:36:00

15 to cooperate.  Because at the end of the day, a failure to

16 cooperate and a failure to sit down and meaningfully confer over

17 things upon which we can agree -- a failure to do that is what

18 causes delay and what causes expense and what causes the Court to

19 have to waste time.

02:36:20

20         And so to the extent that problems like the one we're

21 discussing right now can be solved through early collaboration,

22 I'm always, always, always going to err on the side of forcing

23 you-all to cooperate -- always.

24         There's the language that's been highlighted in this

02:36:48

25 proposed ESI order, and there are suggestions in the plaintiffs'

1  paper that I got that they've even suggested alternatives to the

2  language that's in here; and what Mr. McVoy just said strikes me

3  as being somewhat consistent with a lot of those suggestions,

4  which is we want to participate on the front end so that we

02:37:12  5  understand what it is that you're going to do.  And then when you

6  do it, if it doesn't work, we will sit down and figure out why.

7          That's an entirely reasonable approach to things.

8  Whether it's garden-variety written discovery, whether it's ESI

9  in a smaller case, or whether it's this case, upfront

02:37:36  10  collaboration and cooperation is what is going to get us to the

11  finish line timely and for the least amount of expense and time

12  in court.

13          So that is my overall expectation of how this process

14  needs to work.

02:37:50  15          Within that, if there are specific -- if there are

16  specific issues that you-all don't think the other side should --

17  that it's appropriate for them to sit in a room and collaborate

18  with you on, then talk about them and bring them to my attention.

19          But to suggest that you-all -- and when I say

02:38:19  20  "you-all," I mean defendants -- are going to sort of unilaterally

21  decide how you're going to do this and then do it and produce

22  information to the plaintiffs, and then have them say, Well, we

23  didn't know what you were doing, how did you get there, that's

24  not going to work.

02:38:35  25          It's my expectation, and I'm sure it's

1    Judge Engelhardt's expectation, that this is a collaborative
2    process.  It's an adversarial proceeding.  I get that.  You-all
3    get that.  You-all have your respective client's interest to
4    represent, and I know that you're going to do that.

02:38:53
5            But within the adversarial proceeding there has to
6    be -- particularly at this level with the talent and ability and
7    experience in this room and in this case, you-all have got to be
8    able to sit down on the front end and figure out how to come up
9    with a process, before you start, that everyone understands.

02:39:14
10           Whether you agree with every single element of it is a
11   separate matter, but you ought to at least be able to craft an
12   approach that you-all understand, so that if something doesn't go
13   as planned -- and "planned" being the keyword -- we know what it
14   is that we're trying to address and we hopefully know how to
02:39:36
15   address it.  And you-all can sit down then and try to figure out
16   why something is not working.

17           But this is not going to be done in the blind.  This is
18   not going to be done without everyone understanding what's being
19   done.

02:39:49
20           And if there are proprietary issues, if there are
21   things that either side doesn't feel is appropriate to share with
22   the other side for legitimate reasons in representing your
23   clients, that's fine, we'll talk about them.  But just as an
24   overall matter, it is my expectation -- and we're going to talk
02:40:10
25   about how this is going to look going forward.  It's my

1 expectation that you-all are going to spend an awful lot of time

2 sitting down trying to come to an agreement on how things should

3 be done and an understanding as to how they're going to be done.

4 So collaboration, cooperation, and transparency are all

02:40:27   5 things that I expect to be present in every case, and certainly

6 in this case.  You-all are far too experienced and able for that

7 not to happen.  And that's really part of why we're having these

8 discussions and why I thought you-all were meeting and having

9 discussions initially.

02:40:46  10 So that's my speech, that's the way I see the world,

11 and those are my expectations for how this is going to play out

12 going forward.

13 And if you can't agree, you come back.  But it can't be

14 because you haven't made a meaningful effort to involve each

02:41:05  15 other in how this process is going to work.  Okay?

16 All right.  Hopefully those general comments can give

17 you-all some guidance as to how I expect you-all to handle some

18 of these more specific issues.

19 Okay.  Yes?

02:41:25  20 MR. RATLIFF:  Your Honor, I just want to make one point

21 on that.  It's a good point, and certainly I think your message

22 is very clear, at least on our side.

23 I will not pretend to be someone who is an ESI

24 expert --

02:41:37  25 THE COURT:  Neither am I.  I think I've made that

clear.

MR. RATLIFF:  -- but I do look at things, when I come into these meetings and when we have our meet-and-confers, maybe from a different perspective.

And certainly on the validation point, I think where I came away, and I think certainly where my client came away, was on one side we had parties who are wanting what they saw as full transparency into our process.  But on the other side, I look at it as this should be a two-way street, this should not be a ESI protocol that's used to put their foot on our neck.

So we wanted some transparency into their process and how they are going to collect the records for their individual plaintiffs.  And I realize it's not a total apples-to-apples situation, but many of these plaintiffs all have the same attorney.  Mr. Coffin over here probably has 500 of them himself.

And so that's where -- you know, when they say, Well, we're giving our people guidance and that's all we're going to tell you, and maybe we'll give you a little more, but please give us all your information or hit reports or validation, we just want this to be a two-way exchange of information.

We don't want to walk into depositions and say, Well, what e-mails do you have about Taxotere, and the plaintiff says -- because this happens all the time -- Well, I looked, I didn't really see anything.  I mean, we want to know what the keyword searches are, and help be part of that process in terms

1  of developing the keywords that are going to be used to collect

2  the e-mails, to collect the message boards.

3          And I can tell you, this is a very different group of

4  plaintiffs.  They are highly -- we've done a lot of

5  investigation.  We've done a lot of due diligence.  They are

6  highly active.  They e-mail the FDA.  They e-mail patient

7  advocacy groups.  This goes back to 2007, 2008.  There are

8  private user boards that are related to Taxotere and alopecia.

9          So we understand what Ms. Menzies said, that some of

10  these women are going to be older and maybe they are not going to

11  be using e-mail; but we think, based on our research, this is

12  going to be a much more sophisticated group of plaintiffs.

13          So I guess that's my long way of saying I just want

14  this to be a two-way street.  And we understand your message that

15  we need to work together.

16          THE COURT:  And I agree with that.  It does need to be

17  a two-way street.  And there needs to be transparency as to

18  what's going on, on both sides.

19          I think I used the expression "apples and oranges."

20  It's not exactly apples and oranges, but there are

21  proportionality considerations when you're talking about

22  individual plaintiffs and e-mails versus what you-all are dealing

23  with.  And I don't think it should come as a surprise to anyone

24  that I feel that way.

25          And I think that you-all can be guided by that notion

1    when you're dealing with each other.  But I think, to go back to

2    the issue we started with, which you just raised, if I'm sitting

3    here saying that the plaintiffs' lawyers or the committee needs

4    to have some level of involvement on the front end on how this

02:44:31    5    discovery is going to be conducted of the defendants, the same

6    should be true as to the defendants.

7            Now, what the ultimate product of that is, I don't

8    know.  But there has to be dialogue on both sides going both ways

9    so that everyone is satisfied -- hopefully satisfied -- that it's

02:44:53    10   being done correctly, and that whatever search process that's

11   being undertaken is adequate for the needs of the case.

12           So the idea that you-all should be cooperating and to

13   be as transparent as you can without giving away any secrets or

14   strategies does go both ways.  And, I mean, it's my expectation

02:45:18    15   that you-all will take what I'm saying and put it to use in

16   determining how the plaintiffs are going to respond, as well as

17   how the defendants are going to respond.

18           MR. RATLIFF:  I think Ms. Menzies -- when they were in

19   Kansas City, we had a very lengthy discussion about, for example,

02:45:33    20   what types of photographs we are going to get.  I think we may be

21   at a little bit of difference about how that process works.  She

22   told me what they were kind of doing, and I said, It's not

23   exactly what I would do.  But those are the kinds of discussions

24   I want to keep happening in this case.

02:45:46    25           THE COURT:  I think those are exactly the kind of

1    discussions that ought to happen.

2         And just to jump ahead, those are the kind -- one of
3    the first things we talked about, and we talked about it last
4    time, were some of the plaintiffs' committee meeting with the
5    individual defendants to talk about issues of product ID or
6    proportionality and that sort of thing.  She has convinced me
7    that that's an appropriate thing that should happen sooner rather
8    than later, and that's something I'm going to ask you-all to
9    accomplish sooner rather than later.

10        You've had the one big meeting.  I think now it's time
11   to have the seven or eight or nine smaller meetings, because I
12   think those meetings can only more fully inform the larger issue
13   of crafting this overall order.  It can only help solve some of
14   these problems if every defendant has talked to the plaintiffs'
15   lawyers and expressed what their individual concerns are.

16        I was completely on board with the idea of you-all
17   getting together.  And I'm glad to hear that it may not have been
18   everything to everyone, but that at least you-all do believe that
19   you got some things accomplished.  And I believe that's true, so
20   it wasn't a waste of time.

21        But I do want you-all to go ahead and set up, in the
22   next 30 days or so -- and we'll talk about dates and deadlines
23   when we're done, but I would like for those sessions to take
24   place to the extent they haven't already, and they may have with
25   some of the defendants.

1      MR. RATLIFF:  Your Honor, if I could address that.

2          When we met in Kansas City, Ms. Menzies and Mr. McVoy

3  and Ms. Zimmerman certainly spent some time talking to each one

4  of the defendants, sometimes jointly.  In the case of Sanofi,

02:47:41   5  privately, separately.

6          I think the conversation I had with Ms. Menzies and

7  company probably lasted about an hour and a half.  It was a

8  fairly candid conversation.  I told them the things that I knew

9  off the top of my head and based on my own personal research and

02:47:56  10  knowledge of the case in terms of source data.  There were other

11  things I said I would look into, and I have that list.  And I

12  probably am, admittedly, maybe a little bit delinquent on getting

13  her some of that information.

14          I will say -- and maybe this is where you could help

02:48:10  15  provide a little bit of guidance.  There are certain questions

16  they've asked about that are probably very easy for me to get the

17  answer to, What's the name of your USPB, your pharmacovigilance

18  database, or what type of database is it?

19          There are other questions, though, that I would say,

02:48:28  20  admittedly, without a master complaint, and not knowing what

21  entities will be in this case, and not knowing what claims will

22  exist -- I feel like some of the questions I've received from

23  them I'm answering almost in the abstract.

24          And so our product is very old.  It was developed three

02:48:44  25  or four or five predecessor companies ago.  And I told them -- I

1  said, I think a lot of the documents, at least for Sanofi, are

2  probably going to be paper documents.  And the question I got

3  back was, Well, which ones are going to be the paper documents?

4          I'll be honest.  I don't know exactly how to totally

02:49:01  5  answer that question, because there could be a lot of paper

6  documents and I don't know how to narrow it down.

7          THE COURT:  I wouldn't expect that you-all can answer

8  every question right now, or maybe ever, so it doesn't surprise

9  me that there are things you can't respond to right now.

02:49:16  10          When is the master complaint due to be filed?

11          MR. RATLIFF:  In two weeks.

12          MS. MENZIES:  It's due on March 31st.

13          I'm really glad Mr. Ratliff brought this up, because

14  I --

02:49:24  15          THE COURT:  (Indicating.)

16          MS. MENZIES:  Thank you, Your Honor.

17          I just listened to him --

18          THE COURT:  It doesn't matter one way or the other to

19  me, but next time, if you want to just stay at the table, you can

02:49:34  20  use the microphone at the table.

21          MS. MENZIES:  As long as I don't upset our court

22  reporter, because I know I tend to have a quiet voice.

23          THE COURT:  There is a microphone there.

24          MS. MENZIES:  Yes.  Thank you.

02:49:44  25          I just listened to Mr. Ratliff talk about how

1   encouraged he is about our conversations that we've had, and then

2   he just parlayed into certain areas that I think are glaring,

3   Your Honor, and that is that I have -- we had an exchange of

4   information.  One most glaring to all of us is, as we said

02:50:00   5   before, the primary defendant, who is properly served in this

6   case, is a French entity, and they have discovery back to the

7   late '80s.  There is a U.S. company entirely held by the French

8   company that opened in 2000.

9   But the development of this drug and an enormous amount

02:50:23   10   of information related to this case is involving the French

11   company, and they will not -- and said they will not -- even tell

12   us if there's discoverable information or what type of

13   information is outside the U.S.

14   That is not an exchange of information.  They said that

02:50:39   15   we are going to wait to see whether they are properly in this

16   case, because they're going to -- presumably, I guess, that's our

17   answer.  They are going to move to dismiss the French entities on

18   personal jurisdiction grounds.

19   And as I mentioned to Your Honor, we're going to be

02:50:52   20   doing discovery on that.  And our opposition will then be due at

21   the end of the summer.  And then we will get a reply.  And there

22   will be a hearing set.  And we're not talking about -- I mean,

23   literally I would guess 80 percent of the information may be

24   outside of the U.S., and we aren't even going to get to talk to

02:51:11   25   them about what may be outside of the U.S. until sometime towards

1     the end of the year.

2             Judge Engelhardt is not going to agree to that.  That

3     is unreasonable.  That is not transparent.

4             We're not asking them to produce the stuff right now.

02:51:21
5     This is part of the early process of what is out there, and how

6     do we -- and I asked Mr. Ratliff specifically.  I said, Are you

7     going to -- When you analyze what discovery is relevant for

8     purposes of this litigation, the claims and defenses, are you

9     going to include information located outside of the U.S.?

02:51:39
10            And at the time he said, I don't know, I'll get back to

11    you.  And then later took the position, apparently, of, No, not

12    until we know if we are going to be dismissed on personal

13    jurisdiction.

14            THE COURT:  Let me ask:  Is that, in fact, the position

02:51:50
15    you are taking right now?

16            MR. RATLIFF:  I think, Your Honor, it's a little bit

17    more nuanced than that.

18            The discussion we had, and what I told plaintiffs'

19    liaison counsel, I think, at our last hearing, and what I told

02:52:05
20    Ms. Menzies when we met together, is that my belief, based on the

21    work I have done and the research I have done, is that the

22    documents that are going to be the largest, if not all of the

23    documents that are going to be relevant to the claims and

24    defenses, are going to be held by Sanofi-Aventis U.S., LLC, a

02:52:29
25    company in New Jersey who is the regulatory holder of the new

1    drug application.

2         So let's talk about design documents.  Design documents

3    for Taxotere go back into the late '80s.  Those are going to be

4    held in New Jersey.

02:52:41
5         Regulatory documents and all regulatory filings that

6    relate to the labeling and what was provided to the FDA and what

7    does Sanofi know about alopecia or not know about alopecia, those

8    will be in New Jersey.

9         All labeling decisions, both U.S. -- and I know what

02:52:57
10   they're interested in, global labeling decisions, those will be

11   maintained in the U.S.

12        Adverse event database, that will be in the U.S.

13        Sales data, clinical studies, marketing documents,

14   those will be all in the U.S.

02:53:11
15        So I think the one thing that Ms. Menzies has played

16   sort of loose and fast on is talking about this French entity,

17   Sanofi SA, who they have named --

18        THE COURT:  I'm going to interrupt you because this is

19   how I'm looking at it.

02:53:24
20        What I'm looking at is a statement in the proposed

21   order that says, Data sources do not include ESI outside the

22   custody and/or control of the producing parties or cross-border

23   ESI.

24        Certainly there could be other references to cross-

02:53:50
25   border ESI or discovery outside this country elsewhere in this

1    order, but I'm focused on that.

2              MR. RATLIFF:  Right.

3              THE COURT:  This is my question.

4              MR. RATLIFF:  Okay.

02:54:03
5              THE COURT:  Is there a possibility that there is

6    discoverable information outside the United States?

7              MR. RATLIFF:  (No response.)

8              THE COURT:  Is there a possibility?

9              MR. RATLIFF:  There is a possibility.  I don't think it

02:54:15
10   would be in France, and I don't think it would be held by either

11   of the two French entities.

12             THE COURT:  If there is a possibility, then it's not

13   appropriate to simply carve out cross-border ESI as not being

14   within the scope, because it may be within the scope of

02:54:32
15   discovery.  It may be.  I'm not hearing a reason why it would be

16   appropriate to simply carve it out.

17             On the other hand, merely because it's not even -- I

18   mean, if you take that language out, it's not mentioned in the

19   scope.  If they want to conduct cross-border discovery and you

02:54:56
20   think it's inappropriate, then you come here and you explain why.

21             But to say it is categorically not within the scope of

22   discovery at this stage in the litigation, I don't understand it.

23             MR. OOT:  Your Honor, I can explain a little bit about

24   how that happened, because I was involved in the versioning.

02:55:12
25             We set up the definition of "scope" as "proportional

1    sources."  So the word "proportional" appeared throughout
2    wherever you see "sources" in the ESI protocol.  Plaintiffs asked
3    that we take that out.  We agreed, and that's how we ended up
4    where we are.

02:55:27
5        And the reason that we said that international sources
6    are not within the scope is because 26(b)(1) has two parts,
7    right?  It has the scope related to the claims and defenses of
8    the case, and secondly proportional to the needs of the case as
9    well.

02:55:42
10       So that was our positioning in the ESI protocol and why
11   we included that provision.

12       THE COURT:  Well, what I'm saying is I don't think it's
13   necessary to put that language in the order, because as it
14   develops, cross-border discovery may or may not be proportional,
02:56:04
15   but we don't know that yet.  And what I'm saying is I don't think
16   that it's appropriate to essentially declare that it isn't at
17   this point in the litigation, and so I don't think that's an
18   appropriate approach in this order.

19       Now, that's not to say that you won't convince me or
02:56:25
20   Judge Engelhardt one day that it is disproportional, but I
21   certainly don't think it's appropriate to make that call now.

22       MR. RATLIFF:  Yes.  And, Your Honor, I was mostly -- I
23   appreciate Patrick saying something, because I was mostly trying
24   to address sort of the informal exchange of information that
02:56:41
25   Ms. Menzies had talked about versus the kinds of technical

1  language that ends up in the order.

2        And, you know, we do have a disagreement about whether

3  these two French entities are proper parties.  We have filed a

4  motion to dismiss for lack of personal jurisdiction in several

02:57:00  5  federal courts.  Plaintiffs have never responded.  I presume that

6  issue will be teed up again in the next month.  They may or may

7  not get to do discovery, despite what Ms. Menzies said; and I

8  think it will be ruled on relatively quickly.

9        And so that was my concern when we were having informal

02:57:18  10  discussions about things that I felt like were being done in a

11  more strategic way for other reasons.  And that's why I said I'm

12  going to be a little bit reticent about what we informally

13  discuss here until there is a ruling on whether these are proper

14  parties or not proper parties.  That was really the genesis of

02:57:37  15  the discussion.

16        And, you know, Ms. Menzies has done the same to me.

17  I've asked her for facility information for some of her

18  California plaintiffs, which she omits from the complaints, and

19  she's never given me that.  And I realize it's a tactical reason,

02:57:50  20  and I appreciate that.

21        I think the dialogue was an initial dialogue.  And I

22  feel, despite some frustration, that we're in a surprisingly

23  better place than I anticipated we would be three weeks ago.

24        THE COURT:  And I hope three weeks from now you'll be

02:58:07  25  in an even better place.  That's my hope --

1    MR. RATLIFF:  I will do my best.

2    THE COURT:  That's my hope and expectation.

3    Let me make this comment:  Whether these foreign

4 entities are properly sued or are proper parties in the case is

02:58:24
5 one question.  Whether the plaintiffs get to conduct discovery of

6 those entities is an entirely different question.  And it is not

7 necessarily dependent on whether they are proper parties.

8    MR. RATLIFF:  I agree entirely, Your Honor.

9    THE COURT:  So to resist discovery pending the outcome

02:58:42
10 of the question of whether they're proper parties is not going to

11 work, I'm just telling you.

12    And I don't have a motion in front of me, nor does

13 Judge Engelhardt, and this is not briefed.  I'm just telling you

14 in general, if those related, formerly related -- however they

02:58:59
15 are related, they were sued for a reason.  If those entities,

16 proper parties or not, are in possession of discoverable

17 information, then they're going to be entitled to discover the

18 information.  And that should not await -- I don't think it

19 should await a determination of whether they're proper

02:59:15
20 defendants.

21    MR. RATLIFF:  I guess that's two different questions,

22 though, Your Honor, is whether they can pursue discovery against

23 those entities either through, you know, traditional RFPs or

24 whether they need to go through the Hague Convention and deal

02:59:31
25 with the data privacy laws that they're certainly going to be

confronted with.  I'm not saying they can't try and do that, and
we'll respond accordingly one way or the other after we evaluate.

        None of that is pending.  This was all in the context
of I didn't want this to seem like I had basically said,
Ms. Menzies, I'm never talking to you about this again.

        THE COURT:  I understand that.

        And just looking ahead, whatever hoops the plaintiffs
are made to jump through to obtain information that you-all know
is there and you-all can judge as lawyers is going to be relevant
or discoverable -- whatever hoops they have to jump through, they
will jump through and they'll get to that information.  It's not
in anyone's best interest to make them do that just for form sake
if it can be avoided.

        So that's just a general observation insofar as
responding to discovery requests.

        And I understand -- I'm not saying that if there are
hoops to be jumped through and hurdles to be negotiated -- I'm
not saying it's not your right or it's not appropriate to make
them do that.  I'm just suggesting that everyone consider whether
it's the most efficient and proper use of everyone's time and
money.

        MR. RATLIFF:  I understand, Your Honor.  And I try not
to get too far out into hypotheticals.  I just thought I would --
I felt compelled to respond.

        THE COURT:  And I felt like that was a good time for me

1   to just throw that out there so that if it comes up in the

2   future, you-all at least will have heard that.

3           MR. RATLIFF:  Okay.  Thank you, Your Honor.

4           THE COURT:  What is next?

03:01:10   5           MS. MENZIES:  So just for clarification, the defendants

6   should have discussions with us about possible discovery that may

7   exist outside of the U.S.; is that correct?

8           THE COURT:  Yeah.  I mean, I would encourage you-all to

9   have as open discussions about that subject as you feel that you

03:01:30   10  can.  Okay?

11          And if there's a reason that you feel like there's

12  information that you have that you don't want to share, then I

13  guess you just need to tell -- you need to say that, and you need

14  to explain why.

03:01:45   15          MS. MENZIES:  Our fear, Your Honor, is that -- this is

16  in the backdrop of a motion to dismiss the French defendants on

17  lack of personal jurisdiction, so of course they're not going to

18  want to share information with us if it makes it look like there

19  is more information over in the --

03:02:00   20          THE COURT:  Okay.  So I get that.  And I don't know how

21  to avoid that.  If I'm filing a motion to dismiss for lack of

22  personal jurisdiction, I'm not going to voluntarily disclose to

23  you, necessarily, in an informal conversation, everything you

24  need to know to defeat my motion.

03:02:16   25          If you think you need to do discovery on personal

1  jurisdiction in connection with that motion, then you have to ask

2  Judge Engelhardt or me to conduct it.

3      MS. MENZIES:  Yes.  And that's part of it.  That's

4  already worked into the order on us going that route.

03:02:27

5      I guess what my question is -- and as Mr. Ratliff has

6  pointed out, there are a lot of experienced plaintiff lawyers in

7  this group, and we have sued multi-national companies before and

8  you made a great point.  Whether they're in the case as a named

9  defendant or not, that is a separate question of whether there is

03:02:41

10  information that exists out of the country.  And especially with

11  companies that are outside of the U.S. that market products in

12  this country.  Of course they have global obligations that are

13  particularly relevant in this case about monitoring, safety, and

14  other issues, so obviously we do see this as a big concern.

03:03:08

15      We are supposed to at least have the conversation of

16  what type of information that may be relevant to our interests.

17  If it exists out of the U.S., they should still talk to us about

18  it.

19      THE COURT:  I think they should.

03:03:21

20      MS. MENZIES:  Thank you.

21      The next question is the --

22      MR. MOORE:  If I could jump in, Your Honor.

23      Mr. Olinde has a hard stop.  He's a pinch hitter on the

24  issue of authentication, and we wondered if we could jump to that

03:03:35

25  agenda item.  His father is being honored posthumously in

1   Baton Rouge, and so he needs --

2            THE COURT:  Sure.

3            MR. OLINDE:  Thank you, Your Honor.

4            THE COURT:  So just by way of preview, in the

03:03:51   5   plaintiffs' paper that they gave me, they have suggested, I

6   think, a middle-ground approach to this issue that's not

7   reflected in the highlighted language in the order, which is an

8   agreement that documents created by the producing party are

9   authentic.  My first question is do you-all have a problem with

03:04:18   10   that?

11            MR. OLINDE:  We do.

12            Your Honor, again John Olinde.  I thank you.  My father

13   is getting honored in Baton Rouge, and I have to go for that.

14            THE COURT:  Sure.

03:04:25   15           MR. OLINDE:  Thank you for that.

16            The problem is this:  We ran through this exact same

17   issue in *Xarelto* with Judge Fallon.  And what happened --

18            THE COURT:  I should just ask how he handled it and do

19   whatever he did.

03:04:38   20           MR. OLINDE:  Right.

21            What happened is very simple.  I would say what

22   happened in that particular case is there's an understanding that

23   authentication comes with the trial.  And so what we're talking

24   about is an extra burden on the defendants when they are trying

03:04:51   25   to produce documents.

1      They want to say, Look, if you don't make an objection

2   to authentication, it automatically is authenticated.

3      What that does is a level -- it's a burden on the

4   defendants to have their people go through and determine whether

5   something is authentic.  And a lot of times it depends upon the

6   testimony, perhaps, in the deposition.  You don't know.  It has

7   context.  That's why you wait until trial.

8      So what occurred in the *Xarelto* case, they did have

9   this issue about authentication, but they waited -- we waited

10  until the time of the exhibit list, the time when we're talking

11  about the trial aspect of the case.  Because Your Honor has been

12  through enough trials, and I have too.  I mean, what happens is

13  you look at these documents and you determine whether or not

14  those documents, which are listed for trial, are authentic or not

15  authentic.

16     You know, in most of the cases you say they are

17  authentic.  There may be some that you dispute.  But that comes

18  at the time later on.  It's not a situation where you do it now.

19     Because you could have millions of documents in this

20  case.  Are you going to have people that are going to go through

21  and if they don't say, I object right now, not knowing what the

22  context is, that they somehow waive it?  I mean, that's just not

23  fair.

24     And that was the argument that was made, and that's how

25  it was ultimately resolved is that you have to have a mechanism

03:05:05
03:05:22
03:05:38
03:05:52
03:06:04

1   of a smaller group of documents to make that kind of call.

2   Because it really is a trial call, it's not really a question of

3   discovery.  That's why it's not included in something like this.

4        THE COURT:  So I asked Mr. Olinde the question of what

5   he thought about that suggestion for a reason.  The reason I

6   asked is because I don't think it's appropriate for me to direct

7   you-all to agree to that.

8        Generally I agree with the argument that he's made.  I

9   certainly understand why any lawyer would want every document in

10  discovery to be authenticated on the front end, because it saves

11  a lot of headache and time on the back end.  But I also

12  understand that it's not something that -- I am certainly not

13  going to order anyone to authenticate documents as part of their

14  discovery process.  And if the defendants aren't inclined to

15  agree to do that, I don't think it's appropriate to try to force

16  them to agree to it in the context of this order.

17       It's an evidentiary issue that should be handled with

18  regard to the smaller universe of documents that might be

19  employed at trial.  And it's certainly something that can be

20  handled well enough in advance of trial that it doesn't become an

21  issue.

22       And it would be nice if you-all could get it.  It would

23  be nice if you-all could find a way to do it.  But if you-all

24  object to doing it, you don't think it's appropriate and you

25  articulate why, I tend to agree with that.

1          MR. OLINDE:  Okay.

2          MR. COFFIN:  Your Honor, Chris Coffin on behalf of the

3    plaintiffs.

4          Admittedly I have not dug into this issue as much as I

5    would like to, now having heard what's been presented here.  I

6    wasn't involved in the preparation of this.

7          However, I do know that our law-and-briefing committee

8    has looked at this issue specifically, and I happened to just

9    read a memo the other day where multiple courts in the MDL

10   context -- and outside, I think, outside of the MDL context --

11   have been using this automatic authentication, if you will.

12         That being said, I'm not prepared to cite you case law,

13   but I'd like the opportunity for us to present some of that to

14   the Court before we just throw that issue out the door because of

15   efficiency's sake, quite frankly.

16         From my recollection of reading the memo, as you well

17   know, in this MDL context, we are always looking for efficiency.

18   So if there is a way to preserve the defendants' concerns,

19   preserve their objections somehow, but not have to force us to

20   officially authenticate everything, I'd like to look at that.

21         THE COURT:  Here's how I see that, though.  We're

22   talking about a discovery protocol.  Authentication is not an

23   issue that comes up -- I mean, I know that you-all want it to be

24   part of the discovery protocol, but it's not part of discovery.

25         Every issue you-all have raised today, your rights are

1  reserved to object and argue about them later.  I mean, my

2  purpose here is to try to give you-all guidance so that you can

3  amicably craft an order that everyone can live with, it's not to

4  rule on anything.  And obviously if we were going to continue to

03:09:37  5  argue about this particular issue, I would need to see authority

6  that says it's appropriate for a court to order some

7  authentication protocol or process as part of the discovery

8  process.  I've never heard of that.

9       When I was practicing, I'm sure there were many times I

03:09:56  10  wished it was part of the rules, but I'm just not aware of the

11  authority where either I or Judge Engelhardt would say we are

12  going to make this part of the discovery protocol in the case.

13  Maybe you could convince one of us that it should be.

14       And nothing that I'm giving you today is necessarily

03:10:15  15  foreclosing any of your rights to come back and file a motion on

16  any of these issues if you can't come to an agreement.  What I'm

17  saying right now is this is a negotiation that's taking place

18  between the parties to try to come to an agreement on the order.

19       What I'm trying to say is, if tested, unless there's a

03:10:45  20  case that says otherwise, I would probably say if they don't want

21  to do it, then they don't have to do it, and they shouldn't be

22  forced to do it.

23       If it's not in the ESI protocol, I would certainly

24  encourage, at some point in the litigation, some early effort or

03:11:01  25  process by which to authenticate documents that you know are

1    going to be used at trial.  But, again, you're talking about

2    automatic authentication of potentially millions of documents,

3    and I can envision how that creates an unusual burden on the

4    defendants.

03:11:17    5    MR. COFFIN:  I understand.  And to be clear, I just

6    wanted to ensure that we weren't closing the door on this issue

7    having not fully looked at it on our side.

8    THE COURT:  I don't believe at the end of the day,

9    unless I set some deadlines, that anything is being foreclosed

03:11:30    10    today.  I'm just trying to help y'all in this process.

11    MR. COFFIN:  We appreciate that.

12    MR. OLINDE:  And to be clear, in the *Xarelto* case there

13    was something in the deposition protocol, when you start taking

14    depositions, about authentication, but not in the ESI part of it,

03:11:44    15    just so we understand.

16    THE COURT:  Right.  And I know what you-all are trying

17    to accomplish and what you're trying to avoid, and I think it's

18    certainly reasonable to try to streamline that process.  And I

19    hope that you-all can do it.  It's just that I don't feel that

03:11:58    20    it's necessary for it to be included in this order.

21    MR. OLINDE:  Thank you.

22    MS. MENZIES:  Okay?

23    THE COURT:  Yes.

24    MS. MENZIES:  I think our next issue is on the

03:12:07    25    structured databases.

```
 1              THE COURT:  Mary, are you okay?  Do you need a break?
 2              MS. MENZIES:  Does she need a break?
 3              THE COURT:  Yeah.  Let's take a short break.
 4                              (A recess was taken.)
 5                        AFTER THE RECESS
 6
 7              THE COURT:  Did you solve all the world's problems?
 8              MS. MENZIES:  Almost.
 9              THE COURT:  Good.  I knew that.  We should have taken a
10   break sooner.
11              MR. OOT:  I think we have an agreement to take database
12   and structured ESI off the table because we're going to meet and
13   confer about that one more time.
14              MS. MENZIES:  We're really close on that one.
15              MR. OOT:  So that leaves us discussion on the ephemeral
16   data and the provisions on costs, which I think is
17   noncontroversial because it restates the rule.  It is important
18   to our clients.
19              So those are the two outstanding issues that hopefully
20   we can get done in the next half hour.
21              MS. MENZIES:  And one more also, timing.
22              MR. OOT:  Timing.
23              And with timing, I also think we can probably take that
24   off the table and meet and confer.  The issue there, Your Honor,
25   is how a production schedule will be instituted.  And our issue
```

03:12:13
03:33:06
03:33:15
03:33:29
03:33:42

1   on the front end is we don't even know how we're reviewing the

2   data so it would be kind of premature to say every three weeks

3   we'll give you a production.

4          I understand the plaintiffs' concern, that they don't

03:34:03   5   want us to wait until the day of closing of discovery and give

6   them 3 million documents, and we're aware of that.  We can

7   appreciate that, and we'll agree to some type of production

8   schedule with that.

9          THE COURT:  I think the initial order can simply say

03:34:17   10   that you-all will agree on a schedule, and then you can

11   separately develop a schedule.

12          MS. MENZIES:  This is on Page 4.

13          THE COURT:  Yes.

14          MS. MENZIES:  There's a blank in there for a reason.

03:34:31   15   Here's our concern:  You saw in our position papers that, as

16   counsel said, we're concerned about a giant production

17   back-loaded.

18          What we would suggest -- and we can work with the

19   defendants on this, but given that we are all driven so much by

03:34:44   20   deadlines, we would suggest that we come to maybe every 30 days.

21   This rolling basis -- we can't just live with just a rolling

22   basis, because we've had that in the past and we end up getting

23   them at the end.

24          If they can do a production every 30 days or get with

03:34:59   25   us and tell us a status, We're not going to do this production

1    for these reasons, or whatever, but you'll get it two weeks from

2    now -- at least a meet-and-confer every 30 days so we have -- we

3    work best on deadlines.  And if four months of meet-and-confers

4    go by and we have -- we can say we've talked about it, but we

03:35:17    5    need to come to Your Honor, we still don't have anything.

6         That's all we're suggesting, that it be a little more

7    concrete.

8         MR. OOT:  I think we can agree to have a sort of

9    monthly meet-and-confer on discovery on both sides.

03:35:28    10        THE COURT:  Okay.  I think that's a good idea.

11        MS. MENZIES:  Thank you.

12        THE COURT:  Maybe you can do it without me.

13        MS. MENZIES:  Yes.

14        THE COURT:  Or occasionally with me if necessary,

03:35:38    15    but...

16        MS. MENZIES:  So the next subject is ephemeral data.

17    And I'm going to need Mr. McVoy to come to explain to you what is

18    our general concern.  As you saw from our paper, they would like

19    to -- this is on Page 4 also, c.

03:35:56    20        It talks about they would not have to maintain server,

21    system, or network logs, electronic data temporarily stored by

22    specific equipment or attached devices.

23        When we were at the meet-and-confer, we didn't know

24    what that was.  We didn't know if it was boilerplate language.

03:36:16    25    We were trying to get a little more information on what that was,

1   and we haven't been able to do that.

2           I'll let him explain a little more about that.

3           MR. MCVOY:   I don't know if we need to get into the

4   weeds on this, either.

03:36:24    5           THE COURT:   I've read what everyone has said.

6           MR. MCVOY:   The whole position that we took is we just

7   want to know if there's something specific that they don't want

8   to hold; if they have a certain class of devices that has data

9   that might be relevant to our case that they are going to allow

03:36:38    10  to just disappear.

11          And so we were talking about it before with Patrick --

12  or Mr. Oot, and if there is not a specific set of data that they

13  know about that could be possibly relevant that goes away, we

14  don't have a problem with ephemeral data.

03:36:54    15          MR. OOT:   Thank you, Your Honor.

16          Let me tell you a little story before I turn it over to

17  Mr. Schaefer.   I'm formerly in-house counsel for Verizon, and one

18  of the cases that I worked on was the *Napster* case.   You might

19  remember kids sharing music.   One of the problems that we had was

03:37:11    20  lawyers for the RIAA were asking us to navigate out to network

21  switches, which were in neighborhoods sometimes, and capture

22  information for IP addresses in the individual neighborhoods, in

23  some instances without even filing a John Doe lawsuit.

24          Here we're trying to address the challenge of even

03:37:33    25  identifying what information that we would need to preserve from

1    this stuff.  And it's going to create a challenge for us to have
2    a full understanding of what ephemeral data is out there.
3            What we're seeking is some baseline protection of, you
4    know, when we don't have the knowledge that these systems are
03:37:54  5    kind of operating the way that they do and not storing the
6    information because of very limited RAM cache, that we're not
7    hung up in trouble later on because of the way those devices
8    work.
9            THE COURT:  Yes.
03:38:07 10   MR. OOT:  I'll turn it over to Mr. Schaefer.
11           MR. SCHAEFER:  Thank you, Your Honor.  I'll be very
12   brief.
13           This is really an attempt at transparency.  There are
14   six categories of data here that we just upfront said we really
03:38:18 15   can't control preservation of this.  Five of them aren't in
16   dispute.  This one appears to be.  But there's nothing here that
17   was a setup.  It's just simply these are categories of data that
18   we are telling you upfront we cannot easily get a handle on and
19   preserve.
03:38:32 20           And that's really the issue for us.  It's not various
21   categories of data we've got in some black box we're trying to
22   protect by this.
23           That's all I have to say.
24           THE COURT:  How do we address this problem?
03:38:49 25   MS. MENZIES:  Perhaps there's not a problem.

1        As Mr. McVoy said, our concern is we were thinking is

2   there a scientific machine, system, or a device, attached device.

3   It sounds to us -- we don't know what they're talking about, and

4   it sounds rather specific.

03:39:12

5        If there's nothing specific, it's boilerplate language

6   to catch all, we don't think we really have a problem.  But if

7   there's something they're thinking of that they're saying, Well,

8   we don't have to deal with that, then we need more information of

9   what else --

03:39:21

10       THE COURT:  That's not what I'm hearing it is.

11       MS. MENZIES:  Okay.  So I think we're okay.

12       THE COURT:  Okay.

13       MS. MENZIES:  So I think --

14       THE COURT:  Do I dare say anything else?

03:39:31

15       MS. MENZIES:  Yes.  We're close.

16       THE COURT:  Okay.

17       MS. MENZIES:  Costs.  On the last page -- or almost the

18  last page, on 19, there's a Subsection XII entitled costs.

19       So our position on this is that, similar to what you

03:39:51

20  had mentioned earlier, there is no need to regurgitate the rules

21  in this protocol.  I guess in the nature of the language itself,

22  it fairly summarizes it.

23       Our concern and our experience in the past is by

24  sticking a cost provision in a protocol, it sort of undermines

03:40:10

25  what even the 2015 amendments have talked to, that it really

1  should be the exception to the rule, it's not something that we

2  would necessarily do.  So for us it highlights it unnecessarily,

3  and we aren't comfortable keeping it in.

4          MR. RATLIFF:  Your Honor, as it relates to the cost

03:40:29  5  provision, we're probably just on two sides of the same coin.

6  They see it as sort of being unnecessary and redundant, and we

7  see it as an important belt-and-suspenders provision.

8          I can tell you that I would not have authority from my

9  client to just say, Yeah, I can take that provision out.  It's

03:40:49  10  something that we see as providing clarity for the parties

11  upfront.

12          And so that's what I'm saying, I think we're probably

13  on just two sides of the same coin here.

14          THE COURT:  Obviously it's not necessary.  And if you

03:41:02  15  feel like it has to be addressed, it can be done more generically

16  by reference to the rule as opposed to sort of summarizing the

17  rule.

18          MR. RATLIFF:  I think I hear what you're saying.

19          THE COURT:  Okay.

03:41:17  20          All right.  How much time do we think we need for

21  you-all to accomplish the meetings with the individual

22  defendants?

23          MS. MENZIES:  So having put a lot of thought into it,

24  and the way we started this process today was recognizing that we

03:41:34  25  have a defendant and then a lot of little defendants.  So we

1  obviously would like to put our energy and focus on Sanofi first.
2  We think we should stage this process for other defendants that
3  are either new to the case or have smaller exposure.

4        We maintain our position that we do want to work with
03:41:50
5  each of the defendants in the best way we can, even if working
6  with them means figuring out really what their exposure is on the
7  front end.  So that's what we hope will be part of our
8  conversations in this process as well.

9        So I am mindful of Judge Engelhardt's pushing us
03:42:11
10  forward quickly.  We have a fair amount of discovery now going
11  back and forth of the plaintiff fact sheets now being due.
12  Defense fact sheets are going to be coming due thereafter.  And
13  we still need to get going on general liability; nothing's been
14  served.

03:42:25
15        So we would suggest that in the next two to three weeks
16  we have more meetings with Sanofi.  As I mentioned, we sent a
17  letter to everybody to start this process within two weeks -- a
18  week to two weeks.  If each of them could start to respond to
19  that.  And then as we deal with Sanofi first, then we can stagger
03:42:44
20  the other defendants following that.

21        THE COURT:  Okay.  Somebody wants to weigh in.
22        One of the loose threads.
23        MR. NASRULLAH:  Your Honor, I appreciate that good
24  things happen when we all get together.
03:43:00
25        Mr. Bachus, one of the counsel who also happens to be

1  from Denver, approached me during the break, and we have talked
2  about essentially an exchange of information.  I don't expect
3  them to take me at my word.  We have talked about getting --
4  essentially me providing them with what they need to get us
5  dismissed out of these cases, because we don't think there's any
6  liability.
7          And I suggested to Mr. Bachus, and I think it's
8  probably the right way to go about it for those other defendants
9  who are similarly situated, is let's try and get this done in the
10  next two weeks before they file their master complaint.  They
11  need to know who their real defendants are by that point.
12          So we will endeavor to try and get it done in the next
13  two weeks.  I'll talk to my client.  I'll work with Mr. Bachus.
14  I think that would make sense from our perspective.
15          So the good news, I guess, is I may get out of these
16  cases; and the bad news is I don't get to come to New Orleans
17  again.  But I'm hopeful.
18          So thank you for your time.
19          THE COURT:  Okay.
20          MR. SUFFERN:  Your Honor, may I be heard on that,
21  please?
22          THE COURT:  Yes.
23          MR. SUFFERN:  Michael Suffern for Actavis.
24          I just want to highlight an issue for Your Honor, and
25  maybe I'm just trying to cover my tracks, but, you know, Actavis

1   has been served with two lawsuits in this litigation to date.   On

2   the faces of both complaints, they allege that the last treatment

3   date was before the date our product was marketed.   They actually

4   alleged both the marketing date and the dates of last treatment.

03:44:29

5        I just want to alert Your Honor to the fact that I have

6   difficulties going to my client and saying, you know, A federal

7   magistrate judge just told me that within the next two weeks I

8   have to divulge information about our systems and our databases;

9   and the client's reaction is, Mike, I've been sued in two cases,

03:44:48

10  both of which are baseless on their face.

11       So I'm in a place, Your Honor, that we're going to

12  cooperate to the extent that we can.   And maybe I'm just inviting

13  a bunch of lawsuits, I don't know.   I don't want -- I just want

14  Your Honor to be aware of that fact.   And that we will try in

03:45:03

15  good faith, but understanding that the client's position on it is

16  very different.

17       THE COURT:   Well, one of the reasons that I want these

18  meetings to take place is so that you-all can address these

19  individual concerns, right?

03:45:16

20       So it's not my expectation that in your situation, or

21  in your situation (indicating), where there are a limited number

22  of complaints and there is at least a possibility that, as things

23  stand now, there may not be claims against these defendants --

24  it's not my expectation that that meeting would look the same as

03:45:36

25  the meeting with the larger defendant, and that you're going to

1   be asked to divulge all this information.

2          It's an opportunity for the plaintiffs' side to

3   discover what issues there may be in the case with you so that

4   you-all can jointly determine what type of discovery is

03:45:55   5   appropriate, whether discovery is appropriate at this stage, or

6   how to proceed given the concerns that y'all have stated.

7          I'm not thinking that you-all are going to sit down and

8   necessarily have this meeting in the next two weeks, because it

9   doesn't sound like, as to some of the defendants, it's

03:46:12   10   appropriate.  It may be premature.  What I'm encouraging you-all

11   to do is to get together and talk about the threshold liability

12   issues that you-all have identified; but also, under the

13   circumstances, and assuming that you're still in the case, what

14   level of discovery -- what type of discovery is appropriate as to

03:46:35   15   your clients at this point or at least in the near future.

16          So that's really what I'm expecting those meetings to

17   look like.

18          MR. SUFFERN:  I understand.

19          THE COURT:  What I'm going to do is -- so you-all

03:46:48   20   have -- on the plaintiffs' side, you-all have sent requests for

21   information already?

22          MS. MENZIES:  Yes.  We sent a letter to each.  I can

23   show you if you want to see it to give you an idea.

24          THE COURT:  I would like to get an idea of what it is

03:47:05   25   that you've asked them for.

1      MS. MENZIES:  There is a separate one for each of the
2  defendants.  And you'll see there -- these guys all have it
3  (indicating).
4      It's just to start the discussion about the various
5  different topics.  We took it from the information we did get
6  during the Rule 26(f) conference trying to follow up on
7  information that they didn't have at the time.  We've tried to
8  gear it towards the discussions that we had on that day in
9  Kansas City.
10      We have not had those discussions, obviously, with
11  these other defendants, but this is more technical questions.
12  It's a good place for us for sure to continue on with Sanofi and
13  maybe some of the bigger defendants; but the smaller defendants,
14  we hear loudly and clearly that, you know, it makes perfect sense
15  for us to be talking about exposure.
16      As you know, a lot of the plaintiffs named multiple
17  defendants because they didn't have product ID yet.  So we would
18  love to, by process of elimination, narrow those claims as well.
19      MR. RATLIFF:  Can I?
20      THE COURT:  Yes.
21      MR. RATLIFF:  Your Honor, I get the sense that you're
22  probably going to want us to answer Ms. Menzies' questions that
23  she's put in that letter, and we're certainly looking into it.
24      In terms of timing, as I was sort of thinking about it
25  here -- Ms. Menzies says she's been thinking about it a lot.  I

1 was just thinking about it then.  You had said 30 days to try and

2 get the ESI protocol hammered out as close as we could and come

3 back to you.  You said you were looking at setting a date certain

4 sooner than that for getting back together with the protective

03:48:52  5 order.

6       I guess in terms of getting them information and then

7 setting up a meeting, I would ask on the Sanofi side if we could

8 try and do that within that 30 days only because all of these

9 parts sort of fit together a little bit.  So I don't want to

03:49:06  10 create an artificial setting where Ms. Menzies is saying, Well,

11 we have to meet in two weeks, but then we have to do this in

12 three weeks.  They all go together.  And certainly I would be

13 foolish to come in here having not set up a meeting with her or

14 set up a meeting with her on day 30.

03:49:21  15       So that's the only thing I would say in response to her

16 in terms of timing of meetings and responding.

17       In terms of getting -- I would assume she would want a

18 response before we met.  We would certainly do that, Your Honor.

19       MS. MENZIES:  Let me respond real quick, too, to remind

03:49:38  20 the Court when we originally did this process with Mr. Oot, we

21 had concerns about trying to create this general protocol.  We

22 have now done that.

23       With your guidance today and your suggestions or

24 recommendations that we have more information provided, a little

03:49:54  25 more disclosure and transparency, the yellow portions of this

1   document we might be able to get over because we wrote those with

2   the anticipation that they will apply to the extent necessary for

3   each defendant.

4          Remember I said at the beginning -- where we said

5   "technology-assisted review," it says, "If it's used, we'll meet

6   and confer about it."  If search terms are used, we'll meet and

7   confer about it.

8          So we actually may be able to complete the protocol

9   itself, the language, sooner rather than later.  And then I think

10  our attention more is to the times where we can sit down and meet

11  and have more of an exchange of information.

12          THE COURT:  So what I'm thinking is -- you-all asked

13  for the court reporter, so, you know, to the extent you want to

14  remember exactly what happened in the hearing, I'll expect that

15  you-all will order a transcript of the hearing.  So my minute

16  entry will not be terribly detailed, but you-all will have a

17  transcript that will memorialize sort of everything we've talked

18  about.

19          I guess what I'm inclined to do -- I would like to see

20  Sanofi and the plaintiffs at least meet to resolve the issues

21  we've discussed within the next 30 days, to be able to report to

22  me in 30 days where things stand on the completion of the order,

23  of the ESI; submission of a proposed protective order; and

24  Sanofi's responses to the letter that has been sent.

25          So what I'm going to do is sort of lay out those

03:50:10

03:50:26

03:50:48

03:51:11

03:51:39

1  things.  I'm going to refer generically to the issues that we've

2  discussed and that I think we've resolved or that we've gotten

3  close to resolving during the status conference, and direct that

4  you-all attempt to accomplish those things in the next 30 days.

03:52:04

5       And that counsel for Sanofi and the plaintiffs get in

6  touch with me in that time range, within 30 days, to let me know

7  where things stand.  We can have a telephone call.  And we don't

8  need every lawyer in the room on the phone, because what I want

9  to do is discuss where you-all stand on those bigger-picture

03:52:25

10  issues.

11       MR. OOT:  Your Honor, just one final point.  Our

12  objection to the letter was in good faith.  You know, we are

13  concerned about talking about our sensitive systems and

14  confidential information.  If it's possible, Your Honor, if we

03:52:39

15  could just get a pending order that the conversations that we're

16  having with plaintiffs will be subject to the future-negotiated

17  protective order, that would be great.

18       THE COURT:  That absolutely will be the case.  Any

19  discussions that you-all are having along the lines of the

03:52:54

20  information that has been requested that's been explained to me

21  in these papers, that you-all, on behalf of your clients, are

22  hesitant to discuss in the absence of a protective order -- all

23  of that information in those discussions will be subject to the

24  protective order that's ultimately entered.  And I have no doubt

03:53:11

25  that at the end of the process, you-all will all be satisfied

1  with the level of protection that's afforded to the information.

2          We may argue about crossing Ts and dotting Is, but I

3  think once it shakes out, hopefully you-all can agree on

4  something.  I don't think you-all are going to have any concerns

03:53:30  5  about the protection that's afforded to the information.

6          So the minute entry will reflect that statement.

7          As to the other defendants, I will encourage you-all to

8  meet and discuss these issues as quickly as possible.  But given

9  that I'm sort of cramming a lot of work into the next 30 days, I

03:53:56  10  don't want to -- on the outside I don't want to limit you to

11  30 days, so for now I'll give you 45 days to have those

12  discussions.

13          And just be guided in those discussions by the speech

14  that I made a few minute ago about, you know, what I expect it is

03:54:17  15  that you-all will be talking about, not just ESI.

16          And to the extent you are talking about ESI,

17  proportionality issues, because each one of these defendants may

18  have different issues that I think you-all are sensitive to.

19          So clearly you're entitled to meet sooner than that.  I

03:54:37  20  would encourage you to do that.  If it makes sense to meet with

21  some of the defendants before the master complaint is filed, then

22  please try to do that.  It may save a lot of time and money.

23          So anything else?

24          MR. COFFIN:  Your Honor, just for clarification.

03:54:54  25          When we were talking earlier about the protective

1   order, we indicated that we received their proposal, and that our

2   committee has actually put together our proposal.  You asked us

3   to incorporate what we can accept into our proposal and get it

4   back to them.

5           Can we get a deadline by which, if we don't agree,

6   we'll submit our competing proposals to Your Honor?  Within, you

7   know, 20 or 30 days.

8           THE COURT:  My expectation was the deadline was

9   30 days.  Because one of the things that I want you-all to do

10  within the next 30 days is to come to an agreement or to come to

11  the conclusion that you can't agree on something.  And if you

12  reach that point 10 days from now, then you are free to file

13  whatever it is that you're going to file.  If you're still

14  working through it 30 days from now when I have the phone call

15  with everyone, then that's one of the things we can discuss.

16          But I'm sure I would tell you, if you can't agree, then

17  let me know what it is you disagree about, and I'm going to enter

18  something.

19          So sometime within that 30 days you should reach a

20  point where you either have an agreement or you know that you

21  don't.

22          MR. COFFIN:  Fair enough.

23          THE COURT:  The only deadline I want to set is the

24  30-day deadline right now.  But obviously work -- you know, work

25  as quickly as you can on that; and if it only takes two weeks,

1   then you can file it at that point.

2           MR. COFFIN:  Okay.  Thank you.

3           THE COURT:  Let me ask on the protective order.

4           So the version that your committee drafted was the

03:56:27   5   version that you sent to the defendants?

6           MR. COFFIN:  No.

7           THE COURT:  No?

8           MR. COFFIN:  We took your protective order and we made

9   some modifications to it.

03:56:36   10          THE COURT:  Okay.

11          MR. COFFIN:  We have not sent that to the defense yet.

12          The defense sent us their 25 pager or whatever it is.

13          THE COURT:  Okay.

14          MR. COFFIN:  So what I understood you to say is to work

03:56:50   15  from ours and incorporate what --

16          THE COURT:  I have a better idea.

17          MR. COFFIN:  Sure.

18          THE COURT:  Send to the defendants your version.  Okay?

19          Because I want you-all to start over knowing what you

03:57:04   20  know now about my views on the protective order as opposed to --

21  I think it's going to waste time for you to try to cull what you

22  think is okay from their submission.

23          The plaintiffs are going to send their less-marked-up

24  version of my protective order to the defendants.

03:57:22   25          The defendants will then mark that up and go back and

1    forth.

2            And just understand that I'm not anticipating a

3    25-page, single-spaced protective order.

4            MR. COFFIN:  Probably not a 20-pager either.

03:57:37    5            THE COURT:  Probably not.

6            So I think it would be more expeditious if you-all

7    worked off of the redline that they've already done, and just

8    take into consideration the comments that I've made today and

9    sort of start from there.

03:57:51    10            MR. COFFIN:  Understood.  Thank you, Your Honor.

11            THE COURT:  All right, you-all.  Thank you.

12            I'll get on the phone with you-all in 30 days.

13            I may set a discovery status conference for 60 days

14    from now and reach out to you-all -- maybe not every one of

03:58:19    15    you-all, but reach out to you-all in advance of that, at 45 days

16    or a week before, to see if you-all believe that it's necessary;

17    if there would be enough agenda items that you would need to come

18    here and have a status conference.

19            But I'm going to go ahead, as part of the minute entry,

03:58:40    20    and set another discovery status conference for 60 days from now.

21    If we don't need it, we can take it off the calendar or we can

22    move it forward.  But I would like to have it on the calendar so

23    it's there in case we need the time to try to manage things.

24            MR. COFFIN:  Your Honor, if I could, from the

03:58:55    25    plaintiffs' perspective, we love that idea.  Having been involved

1    in many MDLs, I find that when magistrates are involved in

2    discovery and set a hearing date, whether we do it or not, it

3    encourages us to figure out what the issues are and work through

4    them.  So we're all for that.

03:59:10
5              THE COURT:  That's what we're going to do.

6              And, again, I mean, what I don't want is for lawyers to

7    fly in from all over the place and come here and have a

8    ten-minute status conference because we don't have anything to

9    talk about.  So in advance of any of those sorts of conferences,

03:59:25
10    I would like for you-all to just, as a matter of course, do what

11    you did in this one, which is to come up with an agenda.

12              If it looks like we don't need to have it, then you-all

13    can advise me.  As a result of that process, we can reschedule it

14    or we can bump it or we can have it.

03:59:42
15              MR. COFFIN:  Thank you.

16              THE COURT:  All right.  Thanks, y'all.

17              And if you need a transcript, don't forget to ask for

18    one right away.

19              MS. BARRIOS:  We've already done that.

20                                   (Proceedings adjourned.)

21

22

23                      *  *  *  *

24

25

1

CERTIFICATE

2

3         I hereby certify this 20th day of March, 2017, that the

4   foregoing is, to the best of my ability and understanding, a true

5   and correct transcript of the proceedings in the above-entitled

6   matter.

7

8                                    /s/ Mary V. Thompson

9                                   Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25