**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

In Re: TAXOTERE (DOCETAXEL)                                    MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

                                                               SECTION "N" (5)

THIS DOCUMENT RELATES TO
ALL CASES

**MEMORANDUM IN SUPPORT OF**
**MOTION FOR DISCLOSURE OF**
**NON-PARTY INTERESTED ENTITIES OR PERSONS**

**MAY IT PLEASE THE COURT:**

Defendant, sanofi-aventis U.S. LLC, respectfully requests this Court order disclosure of non-party interested entities or persons in MDL No. 2740.

**INTRODUCTION**

Taxotere® is a chemotherapy agent that FDA approved to treat often fatal cancers, including breast cancer.  Today, Taxotere® continues to save lives as it has for the past 20 years. Alopecia is generally defined as absence of hair from areas of the body where it normally grows, and is known to occur with chemotherapy.  There is no doubt that hair loss of any kind can have a significant impact on a patient's appearance and self-image—nobody suggests otherwise.  But plaintiffs' injury allegations in their respective lawsuit Complaints are vague, shifting, and boilerplate, leading much to be guessed about the nature of the MDL No. 2740 cases individually and as an inventory.  What is clear, however, is that the MDL has attracted the attention of non-lawyers with hopes of financial gain from this dispute.

Identifying non-party interested entities—insurers, lienholders—is commonplace in litigation discovery.  Third-Party Litigation Funding ("TPLF") should be no different.  TPLF is

the advancing of money to advance litigation in exchange for a share in—and sometimes control of—litigation outcomes.[1]  For example, a third party may solicit potential plaintiffs for a fee.  A third party may buy accounts receivable from doctors, in exchange for liens on a plaintiff's lawsuit.  Today, third party funders are "ubiquitous" in "many quarters of the legal market."[2]  Its use by lawyers in the United States has "quadrupled since 2013."[3]  These non-parties routinely sponsor litigation-generating mass tort seminars and plaintiffs' counsel-only social events.[4]

There are parties with large amounts of money at stake in litigation before the Court whose identities are unknown, which may challenge the ability to ensure compliance with local rules and court orders and the ethical guidelines.  Recent lawsuits have lifted this veil.  In *Shenaq v. Akin*, a former officer of a Texas plaintiffs' firm sued the firm over its failure to pay him $4 million for 14,000 pelvic mesh suits he acquired for the firm.[5]  In the suit, the former officer claimed that he helped secure $93 million from a then-leading TPLF participant, Gerchen Keller Capital ("GKC"), to fund the firm's television advertisements and direct purchase of mass-tort suits from other plaintiffs' attorneys.[6]  According to the suit, the former officer's efforts were expected to yield his former employer between $130 to $200 million in fees.[7]  In December 2016, GKC was acquired by another TPLF company, Burford Capital Ltd., for $160 million.[8]  At the time of acquisition, GKC reported roughly $1.3 billion in assets under management and roughly $300 million in new funds being raised.[9]

---

[1] *See* Tripp Haston, *The Missing Key to 3rd-Party Litigation Funding*, LAW 360 (Feb. 7, 2017).
[2] *Id.* (citing Christopher P. Bogart, *The State of The Litigation Finance Industry in 2017*, LAW 360 (Jan. 28, 2017)).
[3] *Id.*
[4] *Id.*
[5] *Id.* (citing *Shenaq v. Akin*, No. 2015-57942 (Dist. Ct. Harris County, Tex., filed Sept. 29, 2015)).
[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *Id.*; *see also* FORBES, *Lawsuit Details How Law Firms Borrow And Pay Millions To Get Mass Tort Cases*, http://www.forbes.com/sites/danielfisher/2015/10/20/lawsuit-details-how-law-firms-borrow-and-pay-millions/#35f7f3bc1bed (last visited Feb. 21, 2017) ("The claims, if true, paint an unflattering portrait of a business

Other interested third parties in the United States civil justice system are routinely disclosed and subject to regulation.[10]   Attorneys, judges, and parties are all subject to ethical and procedural rules.[11]   Defendants disclose the existence of and amount of their insurance, which is considered to be of benefit to the reasonable resolution of the matter.[12]   However, the medical receivables and TPLF industry is almost entirely unregulated and is rarely the subject of disclosure to the Court or other parties.[13]

There is reason for concern about the role of third parties in MDL No. 2740.   On February 7, 2017, Jon Strongman of Shook, Hardy & Bacon L.L.P., counsel for sanofi-aventis U.S. LLC, received an e-mail from Matthew Dean, "Business Development Persist Communications Co-Counsel Liaison for Gacovino Lake & Associate P.C."[14]   Persist Communication's website states that it provides: "[p]owerful and affordable services that help your law firm increase case inventory so you can spend your time with real clients."[15]   On its website, Persist Communications advertises how it *solicits* clients by robot-call, e-mail, and voicemail, raising ethical questions about solicitation, fee-splitting with non-lawyers, and use of personal identifying information and health data.[16]   "In one day, 628 phone calls are made, with 221 voice mails generated automatically, 1717 actual connections with prospective clients, 364 emails sent from our Persist software systems and 386 text messages successfully done." [17]

---

where law firms use television and Internet ads to recruit clients, whom they then trade with other firms in exchange for a piece of the contingency fees that often run to 40%.  This division of labor may make economic sense, but can run afoul of ethics rules that prohibit lawyers from splitting fees unless they perform meaningful legal work for their clients.")

[10] *Id.*
[11] *Id.*
[12] FED. R. CIV. P. 26(a)(1).
[13] *Id.*
[14] *See* February 7, 2017 e-mail attached as **Exhibit A.**
[15] *See* PERSIST COMMUNICATIONS, http://www.forpersist.com (last visited Mar. 15, 2017).
[16] *Id.*
[17] *Id.*

The e-mail from Persist Communications to defense counsel was more concerning and reads:

> Jon,
>
> Hope you're doing well!
>
> Wanted to see if you had a few minutes to discuss a potential co-counsel arrangement in regards to Taxotere.  I'm including our case screening criteria/cost below.  Let me know if you can spare 10 minutes today/this week to discuss further.  We offer guaranteed contracts with your law firm pulling the medical records to proof up.  Will you be in Austin for AAJ?  If so, I'd like to meet with you briefly to discuss further.
>
> **Taxotere:**
> Guaranteed Contract: $1750 – Hair Loss or severe thinning after 6 months of chemo, completed – Via photos
> $3500 – Guaranteed diagnosis (Alopecia) – co-counsel has to get diagnosis.  If negative we will replace
>
> Best regards,
>
> Matt

Terms like "guaranteed," "completed – Via photos," "Guaranteed diagnosis," and "co-counsel has to get diagnosis," *raise questions about the involvement of third parties in the documentation and diagnosis of the injury alleged in this case*.  This inadvertently sent e-mail clearly indicates third party funding—or something else—is occurring in the Taxotere MDL and may require the Court's oversight.  And the only way for the Court to oversee the interested parties before it is to know who they are.

## ARGUMENT

### I.    THE MDL COURT SHOULD REQUIRE PLAINTIFFS TO DISCLOSE TPLF

#### A. Plaintiffs' Counsel in the Taxotere MDL Are Involved With Third Party Funders

The third party involvement in the Taxotere MDL is evidenced not only by the e-mail inadvertently sent to defense counsel, but also by a closer look at the Persist Communications

4

website.  On the homepage, there are testimonials by various plaintiffs' attorneys, including Mike Papantonio, praising the company.  Mr. Papantonio is a senior partner at Levin Papantonio[18] and also co-hosts "Ring of Fire Radio," a nationally syndicated weekly radio program, that promotes various drug and medical device litigations on behalf of his law firm and the plaintiff's bar generally.[19]  On March 8, 2016, an article titled "Taxotere Lawsuit & Medical Issues – Current Facts & Help" was posted on the Ring of Fire website.[20]

On July 10, 2016, Mr. Papantonio also hosted a Ring of Fire episode with Ben Gordon, also of Levin Papantonio,[21] and a member of MDL No. 2740's Plaintiff Steering Committee, titled "Taxotere: A Chemo Drug Bringing More Suffering to Women's Lives."  The dialogue included the following:

> **Papantonio**: Ben, Taxotere, we're hearing a lot about it right now, permanent baldness for thirty to forty year old women that have alternatives when it comes to chemotherapy. It just seems like this company has been pushing their product without warning women that they have an alternative.
>
> **Gordon**: Exactly, it's criminal.
> . . .
> That's right, talk to the scientists, talk to the Oncologists. Ask the Oncologists whether this is a big deal to the women. Ask the oncologist, whether Taxol and Taxotere are the same. What they're going to tell you is, "Taxol is more efficacious is just as powerful, just as good or better in treating the cancer and preventing it from coming back as Taxotere, without the unwanted risk of permanent baldness."
> . . .
> **Papantonio**: Ben you're working with a firm, a superb firm, that has been …
>
> **Gordon**: Bachus and Schanker, great lawyers.
>
> **Papantonio**: Yeah, great lawyers. I know of them and I know their history. What I love about this story is, they've done all of this research and this digging. They've met with thousands of women and they've tried to figure out, does this case matter?

---

[18] *See* LEVIN PAPANTONIO, https://www.levinlaw.com/attorney-profiles/mike-papantonio (last visited Mar. 15, 2017).

[19] *See* THE RING OF FIRE NETWORK, https://trofire.com/host-mike-papantonio/ (last visited Mar. 15, 2017).

[20] *See* TAXOTERE LAWSUIT & MEDICAL ISSUES – CURRENT FACTS & HELP, https://trofire.com/2016/03/08/taxotere-medical-lawsuit-issues-current-facts-assistance/ (last visited Mar. 15, 2017).

[21] *See* LEVIN PAPANTONIO, https://www.levinlaw.com/attorney-profiles/ben-gordon (last visited Mar. 15, 2017).

Everybody without exception, these women they're permanently bald say, "Yeah, this matters. All they had to do was give me a choice. Just give me a choice, let me make the decision . . . [22]

All of these players have cases currently pending before this Court.[23]  Bachus and Schanker has at least 230 Taxotere cases, in addition to J. Kyle Bachus serving on the Plaintiffs' Executive Committee.[24]

Also on the Persist Communications homepage is a testimonial from Mr. Marc Grossman. His firm, Baker Sanders, has at least 14 Taxotere cases pending before this Court.[25]  These lawyers' endorsement of Persist Communications and Persist Communications' solicitation to defense counsel raises alarms about the role of third parties in MDL No. 2740 sufficient to require disclosure.

### B.  Disclosure of Third Party Involvement is Well-Within the Court's Discretion

Requiring disclosure of a litigant's financial relationships is mandated by the Federal Rules of Civil Procedure.  Since 2002, the Rules have required nongovernmental corporate entities to disclose "any parent corporation and any publicly held corporation owning 10% or more of its stock."  FED. R. CIV. P. 7.1.  This disclosure provides judges the information they need to consider

---

[22] *See* TAXOTERE: A CHEMO DRUG BRINGING MORE SUFFERING TO WOMEN'S LIVES,
https://trofire.com/2016/07/10/taxotere-a-chemo-drug-bringing-more-suffering-to-womens-lives-2/ (last visited Mar. 15, 2017).
[23] *See Jones, Angela v. Sanofi SA, et al.*, 2:16-cv-15315 (E.D. La.) (Levin Papantonio).
[24] *In re: Taxotere (Docetaxel) Prod. Liab. Litig.*, MDL No. 2740 (E.D. La. Dec. 28, 2016), ECF No. 154.
[25] *See Kuchtyak, Galemarie v. Sanofi SA, et al.*, 2:16-cv-16235 (E.D. La.); *Dunn, Debra Lynne v. Sanofi SA, et al.*, 2:16-cv-16943 (E.D. La.);  *Mitchell, Lynda v. Sanofi SA, et al.*, 2:16-cv-16948 (E.D. La.);  *Kridner, Miriam v. Sanofi SA, et al.*, 2:16-cv-16945 (E.D. La.); *Mulligan, Brenda v. Sanofi SA, et al.*, 2:16-cv-16949 (E.D. La.); *Luce, Deborah Jean v. Sanofi SA, et al.*, 2:16-cv-16946 (E.D. La.); *Castleberry, Judith Wilma v. Sanofi SA, et al.*, 2:16-cv-16930 (E.D. La.); *Sullivan, Katherine Mary v. Sanofi SA, et al.*, 2:16-cv-16950 (E.D. La.); *Drummond, Kimberly v. Sanofi SA, et al.*, 2:16-cv-16942 (E.D. La.); *Deberry, Karen Annette v. Sanofi SA, et al.*, 2:16-cv-16941 (E.D. La.); *Mansaray-Smith, Baindu v. Sanofi SA, et al.*, 2:16-cv-16947 (E.D. La.); *Hutchens, Laura Louise v. Sanofi SA, et al.*, 2:16-cv-16944 (E.D. La.); *Murray, Linda Yvonne v. Sanofi SA, et al.*, 2:16-cv-17950 (E.D. La.); *Santiago Rivera, Ida Liz v. Sanofi SA, et al.*, 2:16-cv-17952 (E.D. La.).

whether they have a conflict of interest in handling a case.  *See* Advisory Committee Notes to FED.

R. CIV. P. 7.1.  The Committee Notes explain further:

> Rule 7.1 does not prohibit local rules that require disclosures in addition to those required by Rule 7.1.  Developing experience with local disclosure practices and advances in electronic technology may provide a foundation for adopting more detailed disclosure requirements by future amendments of Rule 7.1.

*Id.*  Thus, federal courts may implement broader disclosure requirements.  Numerous state courts

have similar disclosure requirements as well.

> As a growing body of collected authority now recognizes:

> Without disclosure, not only will courts be subject to unknown conflicts of interest, but the courts and all parties will be potentially unaware of the real parties in interest.  Knowing 'who' is really in court with a direct stake in a case's outcome is critical to facilitate control and resolution by the court.  This disclosure rationale is particularly compelling in class action or mass tort cases where TPLF entities may stand to be the largest beneficiary of any recovery and far larger than any individual plaintiff or class member.[26]

> Recently, the Northern District of California in a local rule required disclosure of non-party

interested entities or persons in a broad class of cases.  The standing order states:

> <u>Disclosure of Non-party Interested Entities or Persons</u>: Whether each party has filed the "Certification of Interested Entities or Persons" required by civil Local Rule 3-15.  In addition, each party must restate in the case management statement the contents of its certification by identifying any persons, firms, partnerships, corporations (including parent corporations) or other entities known by the party to have either: (i) a financial interest in the subject matter in controversy or in a party to the proceeding; or (ii) any other kind of interest that could be substantially affected by the outcome of the proceeding.  In any proposed class, collective, or representative action, the required disclosure includes any person or entity that is funding the prosecution of any claim or counterclaim.[27]

---

[26] *See* Tripp Haston, *The Missing Key to 3rd-Party Litigation Funding*, LAW 360 (Feb. 7, 2017).  Indeed, the Florida Court of Appeals has found TPLF entities' interest in, and control over, litigation so relevant that it has characterized them as parties to the lawsuit, even holding them liable for sanctions where appropriate.  *See Abu-Ghazaleh v. Chaul*, 36 So. 3d 691, 694 (Fla. Ct. App. 2009).

[27] *See* Standing Order for All Judges of the Northern District of California, attached as **Exhibit B**.

The California rule followed an August 2016 court-ordered disclosure of third party litigation funder's involvement in a class action against Chevron pending in the Northern District of California.[28]  The disclosure revealed the involvement of a U.K.-based TPLF entity's $1.7 million dollar investment in the class action.[29]

Other jurisdictions abroad where TPLF has been used longer now require disclosure.  In China, the Hong Kong Law Reform Commission recommended both disclosure as well as a "Code of Practice" for such entities.[30]  The Singapore International Arbitration Centre also recently released new investment arbitration rules that allow tribunals to order disclosure of third party entities' identity and arrangements.[31]  Australia requires disclosure of a third party's identity and portions of its agreement in class action cases.[32]  In New Zealand, courts have recently ordered disclosure of third party identities as well as certain aspects of their funding agreements.[33]  Finally, several provinces in Canada routinely require third party arrangements to be disclosed and judicially approved, particularly in class action cases, but in certain non-class cases as well.[34]

---

[28] See Gbarabe v. Chevron Corp., No. 14-CV-00173-SI, 2016 WL 4154849, at *2 (N.D. Cal. Aug. 5, 2016).

[29] See Andrew Stricker, Investors in Chevron Rig Blast Class Action Seek 6X Return, LAW 360 (Sept. 20, 2016).

[30] THE LAW REFORM COMMISSION OF HONG KONG, Third Party Funding for Arbitration, http://www.hkreform.gov.hk/en/publications/rtpf.htm (last visited Feb. 22, 2017).

[31] SINGAPORE INTERNATIONAL ARBITRATION CENTRE, SIAC Announces Official Release of the SIAC Investment Arbitration Rules, http://www.siac.org.sg/images/stories/press_release/SIAC%20Announces%20Official%20Release%20of%20the%2 0SIAC%20Investment%20Arbitration%20Rules.pdf (last visited Feb. 22, 2017).

[32] See FEDERAL COURT OF AUSTRALIA, Practice Note CM 17, http://www.fedcourt.gov.au/law-and-practice/practice-documents/practice-notes/cm17 (last visited Feb. 22, 2017) ("At or prior to the initial case management conference each party will be expected to disclose any agreement by which a litigation funder is to pay or contribute to the costs of the proceeding, any security for costs or any adverse costs order.  Any funding agreement disclosed may be redacted to conceal information which might reasonably be expected to confer a tactical advantage on the other party.").

[33] See LEXOLOGY, Litigation funding in New Zealand, http://www.lexology.com/library/detail.aspx?g=934ec8ba-2b77-42a9-9d39-4d7443bf4ed3 (last visited Feb. 22, 2017).

[34] See Musicians' Pension Fund of Canada (Trustee of) v. Kinross Gold Corp., 2013 ONSC 4974 (CarswellOnt 11197); Stanway v. Wyeth Canada Inc., 2013 BCSC 369 (CarswellBC 563); Schneider v. Royal Crown Gold Reserve Inc., 2012 SKQB 111 (CarswellSask 191).

The MDL Court should require the same third party disclosures here.  The Court would well-exercise its discretion to require third party disclosure given the growing authority for doing so and the specific apprehensions here.[35]

## II.   THE HISTORY OF TPLF, MEDICAL SCREENING, AND LIEN-FACTORING PARASITIC ON WOMEN'S HEALTH LITIGATION ALSO JUSTIFIES THIRD PARTY DISCLOSURE

History need not repeat itself in MDL No. 2740.  Too often, mass tort inventories, women's health litigation, and diagnosis-based case-selection/resolution pools have bred abuse by third-party funders and lien-holders.  In the silicone breast implant litigation, lawyers referred women to doctors under fee arrangements.  Because of these arrangements, if the doctors did not diagnose silicone disease or if the woman did not win her lawsuit, they would have to try to collect their receivables from the woman, not her lawyer.[36]  This created improper incentives to diagnose the "compensable injury" when the disease does not actually exist.  With the Diet Drug litigation, firms set up "echo mills" to diagnose heart valve defects.[37]  Their diagnoses were often mistaken or fraudulent.[38]  This sort of litigation screening is also currently taking place in the pelvic mesh

---

[35] Defendants have submitted proposed Pretrial Order #X, which is modeled on the local rule recently adopted in the Northern District of California, contemporaneously with this Motion.

[36] Gina Kolata & Barry Meier, *Implant Lawsuits Create a Medical Rush to Cash In*, N.Y. TIMES (Sept. 18, 1995).

[37] Anthony dePalma, *9/11 Lawyer Made Name in Lawsuit on Diet Pills*, N.Y. TIMES (Mar. 30, 2008); Lester Brickman, *The Use of Litigation Screenings in Mass Torts: A Formula for Fraud?*, 61 S.M.U. L. REV. 1221 (2008) [hereinafter Brickman, *Fraud*]; Berkeley Rice, *Do these doctors give medicine a black eye?*, 80 MED. ECON. 58 (Dec. 19, 2003); *see also* Robert Lenzner & Michael Maiello, *The $22 Billion Gold Rush*, FORBES (Mar. 24, 2006).

[38] *In re: Diet Drug Litigation,* No. 13379-04, 2005 WL 1253991 (N.J. Super. L.) (May 9, 2005) (Judge Walsh concluded that the echocardiograms of these plaintiffs "have not been performed and/or interpreted in a medically reasonable manner."  In many instances, "the techniques used in performing the schocaridograms fell so far below appropriate practice so as to make the data reported in the echocardiograms virulatlly worthless in either diagnosis or treatment."); *In re Diet Drugs Prod. Liab. Litig.*, 236 F. Supp. 2d 445, 457 (E.D. Pa. 2002); Brickman, *Fraud, supra* note 34 (citing Jimmie E. Gates, *Vicksburg Attorney Indicted in Scam*, CLARION LEDGER (May 27, 2006)); *Barnett v. Wyeth*, 381 F. Supp. 2d 421 (D. Pa. 2005); *Mississippi Attorney Guilty in Scheme to Create Fraudulent Records*, 10 MEALEY'S LIT. REP.: FEN-PHEN/REDUX 6 (April 2007)); Roger Parloff, *Diagnosing for Dollars: A COURT BATTLE OVER SILICOSIS SHINES A HARSH LIGHT ON MASS MEDICAL SCREENERS--THE SAME PEOPLE WHOSE DIAGNOSES HAVE COST ASBESTOS DEFENDANTS BILLIONS*, FORTUNE MAG. (Jun, 13, 2005).

litigation.[39]

Attorneys may also refer women to factoring companies, who, in turn, pay for surgeries or other care, in exchange for a lien on their lawsuits. Lenders have invested as much as $100 million in health care for mass torts plaintiffs.[40] In one typical mesh lawsuit example, a plaintiff was referred by her lawyer to a medical funding group for payment of medical expenses in exchange for a $60,000 lien on her lawsuit.[41] In another mesh litigation example, a doctor saw a woman from out-of-state and scheduled her for her procedure the next day, but the woman's device had already been removed. She was subjected to the invasive surgery anyway. The medical funding company ultimately billed its lien at approximately $63,000.[42] In these circumstances, courts have held that disclosure and discovery of litigation funding is appropriate.[43]

These same issues are implicated here by the language used in Persist Communications' solicitation about "co-counsel. . . get[ting] the diagnosis" and a "guaranteed diagnosis." It may matter in identifying cases whether a plaintiff went to a doctor paid for by lien-factoring or TPLF, or who took out a lien on her lawsuit in exchange for "treatment"—particularly as counsel compare and select cases for discovery and trial. Again, the only way to police these practices is for the Court to know who is practicing them.

## III.   THE AMOUNT OF MONEY AT STAKE MANDATES THIRD PARTY DISCLOSURE

---

[39] *See infra* notes 39-40, 42.

[40] Alison Frankel & Jessica Dye, *The Lien Machine: New breed of investor profits by financing surgeries for desperate women patients*, REUTERS (Aug. 18, 2015).

[41] *Id.*

[42] Boston Scientific Corporation's Motion to Compel, *In re Boston Scientific Pelvic Repair Sys. Prod. Liab. Litig.*, MDL No. 2326, at * 11-12 (S.D.W. Va. Mar. 12, 2014), ECF No. 729.

[43] *In re Boston Sci. Corp. Pelvic Repair Sys. Prod. Liab. Litig.*, MDL No. 2326, 2014 WL 1922755, at *3 (S.D.W. Va. May 14, 2014).

There is a significant amount of money at stake in this litigation.  The more than 850 plaintiffs in the MDL all typically allege they have "suffer[ed] serious and dangerous side effects, severe and personal injuries that are permanent and lasting in nature, and economic and non-economic damages, harms, and losses, including but not limited to: past and future medical expenses; psychological counseling and therapy expenses; past and future loss of earnings; past and future loss and impairment of earning capacity; permanent disfigurement including permanent alopecia; mental anguish; severe and debilitating emotional distress; increased risk of future harm; past, present, and future physical and mental pain, suffering and discomfort; and past, present, and future loss and impairment of the quality and enjoyment of life."[44]

The existence of third-party interests in the financial stakes of this litigation support their disclosure.  In the *In re: Coloplast Corp. Pelvic Support Systems Products Liability Litigation* MDL pending before the Southern District of West Virginia, the court ordered the production of certain document by nonparties, including MedStar Funding.[45]  MedStar Funding, now a part of Key Health, "funds thousands of medical accounts receivable each month from medical providers spanning the U.S.  These providers offer services to injured victims on a lien or letter of protection basis as part of a personal injury claim. . . . Medical providers assign the personal injury accounts receivable to Key Health who then maintains the accounts until case resolution. Key Health communicates with the patient's attorney for payment of the incurred medical charges at settlement."[46]  "These medical liens sometimes spiral to as much as 10 times what private insurers or government programs like Medicaid would pay for the same procedures."  In turn, patients with

---

[44] *See* Second Amended Complaint, *Gahan v. Sanofi S.A., et al.*, 2:16-cv-15283-KDE-MBN, ECF No. 51 (E.D. La. Apr. 13, 2016).
[45] *See* Pretrial Order #47 (Stipulated Protective Order Regarding Nonparty Documents), *In re: Coloplast Corp. Pelvic Support Systems. Prod. Liab. Litig.*, MDL No. 2387 (S.D. W.Va. Jan. 27, 2014).
[46] *See* KEY HEALTH, http://keyhealth.net/Home/AboutUs (last visited Feb. 17, 2017).

increased medical care can generate higher fees for their lawyers, because they typically receive larger settlements than plaintiffs without such care.[47]   Ultimately, the mesh MDL Court ordered discovery of the medical receivables and lien-factoring companies more than once.[48]   Here, the issues with hair loss diagnosis, which requires blood test and biopsy, lends itself to the same potential abuses as highlighted by Persist Communications' email.

Finally, some third party entities are multibillion- and multimillion-dollar publicly traded entities.[49]   Requiring disclosure of their role will allow court personnel and potential jurors to determine whether they have a conflict of interest.   For privately held third party entities, personal relationships could be impacted as well.[50]

## CONCLUSION

Based on the letter received by defense counsel, what is at stake in this litigation, and that third party identification will ensure conflict-disclosure and better facilitate management and resolution of this litigation, sanofi-aventis U.S. LLC respectfully requests that this Court order Disclosure of Non-Party Interested Entities or Persons in MDL No. 2740.

Respectfully Submitted,

/s/ *Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE URQUHART & MOORE LLC**
400 Poydras Street, Suite 2700
New Orleans, LA  70130
Telephone: 504-310-2100
Facsimile:  504-310-2120
dmoore@irwinllc.com

---

[47] Frankel & Dye, *supra* note 37.
[48] *See In re Boston Sci. Corp. Pelvic Repair Sys. Prod. Liab. Litig.*, *supra* note 40; Pretrial Order #47, *supra* note 42.
[49] *See* Tripp Haston, *The Missing Key to 3rd-Party Litigation Funding*, LAW 360 (Feb. 7, 2017).
[50] *Id.*

Harley Ratliff
Adrienne L. Byard
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
Facsimile:  816-421-5547
hratliff@shb.com
abyard@shb.com

*Counsel for sanofi-aventis U.S. LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on April 20, 2017, I electronically filed the foregoing with the Clerk

of the Court using the ECF system which sent notification of such filing to all counsel of record.


/s/ *Douglas J. Moore*

13