UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| | : | |
| IN RE: TAXOTERE (DOCETAXEL) | : | MDL NO. 2740 |
| PRODUCTS LIABILITY LITIGATION | : | |
| | : | SECTION "N" (5) |
| | : | |
| THIS DOCUMENT RELATES TO: | : | HON. KURT D. ENGELHARDT |
| | : | |
| ALL CASES | : | |
| | : | |
| | : | |
| | : | |

**SANOFI AND AVENTIS PHARMA S.A.'S MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR A PROTECTIVE ORDER**

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................ 1

I.      INTRODUCTION ................................................................................................. 2

II.     ARGUMENT ......................................................................................................... 5

        A.      Plaintiffs' Requests Extend Well Beyond the Confines of the Federal Rules ........ 5

        B.      Discovery on Foreign Defendants Triggers Additional Requirements ................. 10

                1.      Even If Plaintiffs Re-crafted Their Requests To Meet The
                        Requirements Of Rule 26, The French Defendants Are Entitled To
                        A Protective Order Compelling Plaintiffs To Pursue Discovery
                        Under The Hague Convention And The Procedures of the FDPA ............ 14

                2.      The Procedures Set Forth In the Hague Convention and FDPA Are
                        Simple and Efficient Means To Produce French-located Documents
                        Without Violating French Law ................................................................. 21

                3.      Plaintiffs Must Share The Expense Of Any Discovery On The
                        French Defendants ................................................................................... 23

III.    CONCLUSION ..................................................................................................... 24

## LIST OF EXHIBITS

**EXHIBIT**

A       Plaintiffs' First Requests for Production to Defendant Aventis Pharma S.A.

B       Plaintiffs' First Requests for Production to Defendant Sanofi S.A.

C       Letter from Harley Ratliff to Matthew Palmer Lambert (June 15, 2017)

D       Declaration of Kami Haeri

E       Declaration of Pierre-Yves Lastic

F       CNIL, *Deliberation No. 2009-474 of 23 July 2009 concerning recommendations
        for the transfer of personal data in the context of American court proceedings
        known as "Discovery"*, available at
        https://www.cnil.fr/sites/default/files/typo/document/D-Discovery_EN.pdf

G       Declaration of Claire Terrazas

I.      **INTRODUCTION**

Plaintiffs, all residents of the United States, have brought claims for alleged injuries experienced in the United States arising from their use of the prescription chemotherapy product Taxotere® (also known as docetaxel) in the United States.  Plaintiffs allege that they suffered permanent hair loss after using Taxotere®, and their claims are all premised on a failure to warn or disclose information to these United States residents about this alleged side effect.

Defendant sanofi-aventis U.S. LLC[1]—the entity that marketed, sold and distributed Taxotere® in the United States as well as the entity that holds the New Drug Application ("NDA") for Taxotere® and is responsible for communicating with FDA regarding the drug's label—has (or has access to) the documents most relevant to this litigation.  Sanofi[2] and Aventis Pharma S.A. (collectively, the "French Defendants"), on the other hand, are foreign corporations without Taxotere®-related contacts in the United States and which do not possess the information necessary to establish Plaintiffs' claims.[3]  Accordingly, the Court does not have personal jurisdiction over the French Defendants, and they should be dismissed from this litigation for the reasons set forth in their pending motion.[4]

---

[1] Plaintiffs have also named Sanofi US Services Inc. as a defendant.  For ease of reference, this Motion refers to sanofi-aventis U.S. LLC and Sanofi US Services Inc. collectively as the "U.S. Defendants."

[2] Plaintiffs incorrectly refer to Sanofi as Sanofi S.A. While Sanofi is organized under French law as a Société Anonyme, the corporate designation is not part of the Company's name.

[3] As set forth in the French Defendants' Motion to Dismiss for Lack of Personal Jurisdiction, the French Defendants are not U.S. companies, do not conduct business in the United States, and have not engaged in the research and development, testing, manufacturing, labeling, advertising, marketing, promoting, selling, or distributing of Taxotere® anywhere in the United States.  *See* Sanofi and Aventis Pharma S.A.'s Memorandum in Support of Their Motion to Dismiss For Lack of Personal Jurisdiction (Dkt. No. 346-1) at 7-9.

[4] *See* Sanofi and Aventis Pharma S.A.'s Memorandum in Support of Their Motion to Dismiss For Lack of Personal Jurisdiction (Dkt. No. 346-1).

Despite the lack of relationship between the French Defendants and the claims in this case, Plaintiffs have served on their counsel a total of 222 document requests (111 requests each).[5] Among other things, Plaintiffs' far-reaching and generalized requests seek such things as "all documents" concerning any government agency's decision to not approve an application to market Taxotere®,[6] "all documents" concerning the French Defendants' e-mail storage and deletion polices,[7] and "all documents" concerning the French Defendants' document retention policies[8]— none of which have any bearing on what was or was not communicated in Taxotere's FDA-approved label to patients in the United States.  Moreover, compliance with these requests, as served, would force the French Defendants to violate French criminal law by producing documents located in France outside the channels authorized by the French government.[9]

In the spirit of cooperation, however, Defendants have met and conferred with counsel from the Plaintiffs' Steering Committee on multiple occasions and appeared before Magistrate Judge North to explain how discovery might reasonably proceed against the U.S. Defendants, which hold (or will be able to access) the potentially relevant documents in this litigation—

---

[5] *See* Plaintiffs' First Requests for Production to Defendant Aventis Pharma S.A. (attached as Ex. A) and Defendant Sanofi S.A. (attached as Ex. B) (collectively "Plaintiffs' Requests").

[6] *See* Request No. 53:  "All DOCUMENTS concerning any governmental agency in any country worldwide that declined to approve an application to market Taxotere® for any indication, including, but not limited to, communication between the sponsor of Taxotere® and the agency, and any English translations that exist in YOUR possession, custody or control."

[7] *See* Request No. 106:  "All DOCUMENTS and or email that reflect the policies and procedures that YOU or any Co-Defendant had and/or have in place for the storage, deletion, and back-up of DOCUMENTS and emails generated by Defendants employees and agents regarding TAXOTERE."

[8] *See* Request No. 103:  "All DOCUMENTS concerning any document retention policy or policies maintained by YOU or any Co-Defendant including, but not limited to, the policies themselves and any communications regarding the policies and/or changes thereto."

[9] In addition, Plaintiffs' Requests were served on counsel, rather than pursuant to the terms of the Hague Convention.  Such service is ineffective, and as a result Defendants' decline to accept service of Plaintiffs' Requests.  *See* Letter from Harley Ratliff to Matthew Palmer Lambert (June 15, 2017) (rejecting service of Plaintiffs' Requests) (attached as Ex. C).

including those reflecting labeling decisions for Taxotere® in the United States, communications and other regulatory filings with FDA, adverse event reports related to permanent hair loss, and clinical studies relating to breast cancer.  Yet Plaintiffs continue on a disproportional path in violation of the Federal Rules of Civil Procedure and French law on nothing more than speculation and guesswork when all indicators point to these less burdensome U.S.-based discovery sources. Speculation alone, however, does not provide a path to foreign discovery—especially when Plaintiffs' foreign discovery requests are, first and foremost, unnecessary.

Rather than force the French Defendants to comply with overly broad and burdensome discovery requests when the documents most relevant to this litigation will be available from the U.S. Defendants—in particular, New Jersey-based sanofi-aventis U.S. LLC—Plaintiffs should first obtain and review the documents that will be produced by those entities, identify if there are items they think are still necessary for their claims that are obtainable only through the French Defendants, and then serve targeted discovery on those entities.  Plaintiffs' proposed duplicative and cumulative discovery will accomplish nothing more than delay the discovery schedule and cause undue burdens and huge administrative overhead—all of which Plaintiffs could avoid by looking no further than New Jersey.

Accordingly, the French Defendants seek a protective order from the Court:

1. Enforcing Rule 26(g)(1)(B) requirements to prevent unreasonable, unduly burdensome, and expensive discovery that needlessly increases the cost of litigation;

2. Finding that Plaintiffs' Requests do not satisfy the relevancy or proportionality requirements of Rule 26(b)(1);

3. Staying discovery against the French Defendants pending discovery against the U.S. Defendants; and

4. To the extent the Court finds discovery against the French Defendants is eventually appropriate, (a) compelling Plaintiffs, in the first instance, to seek targeted discovery from the French Defendants by employing the compulsory

4

procedures of the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, 23 U.S.T. 2555 (the "Hague Convention") and the requirements set forth in French Law No. 78-17 of January 6, 1978, as amended by Law No. 2004-801 of August 6, 2004 (the "French Data Protection Act" or "FDPA"); and (b) ordering Plaintiffs' counsel to bear the financial cost of their international discovery.

II.    **ARGUMENT**

It is well-settled that courts have the power to "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."  Fed. R. Civ. P. 26(c)(1); *Crosswhite v. Lexington Ins. Co.*, 321 F. App'x 365, 368 (5th Cir. 2009) (upholding order protecting files not related to plaintiffs' claims from discovery under Fed. R. Civ. P. 26(c)(1)).  In particular, courts have the power to issue protective orders "forbidding the disclosure or discovery," "specifying terms" for how the discovery be completed, or "prescribing a discovery method other than the one selected by the party seeking discovery."  Fed. R. Civ. P. 26(c)(1)(A).  A protective order is appropriate here because (1) the truly unique information responsive to Plaintiffs' Requests is at best marginally relevant and is not proportional to the needs of the case, especially considering the undue burden of violating French law that Plaintiffs' Requests compel; and (2) the Hague Convention, the French Blocking Statute, and the French Data Protection Act apply and impose additional requirements that are inconsistent with Plaintiffs' Requests.

A.    **Plaintiffs' Requests Extend Well Beyond the Confines of the Federal Rules**

Jurisdictional challenges aside, Plaintiffs' 222 document requests on the French Defendants represent a *prima facie* violation of Rule 26(g)(1)(B), which mandates a proportionality-like standard of care on counsel for *all* parties requesting and producing discovery to certify that all discovery disclosures, requests, responses, and objections do not "needlessly increase the cost of litigation" and that requests are "neither unreasonable nor unduly burdensome

or expensive, considering the needs of the case, prior discovery in the case, the amount in controversy, and the importance of the issues at stake in the action."[10]

The Rules Committee designed Rule 26(g) to curb discovery abuse, excess, and evasion by requiring attorneys to *pause and consider* the legitimacy of all discovery activity, as well as by explicitly authorizing judges to impose appropriate but mandatory sanctions.[11]   Cross-border discovery is the most expensive and time consuming weapon in a requesting party's arsenal—it should be avoided when duplicative sources exist within U.S. borders.  Simply put, U.S.-based sources better meet the Federal Rules of Civil Procedure.

Here, Plaintiffs have rejected this reasonable approach, which seeks the very pause intended by the Rules Committee under Rule 26(g).  Defendants now ask this Court to formalize that approach, ordering the parties to concentrate efforts on U.S. sources, tailoring and phasing Plaintiffs' requests as intended by the Rules.  By analogy, Plaintiffs seek an expensive, global search for the tastiest jambalaya, when common sense dictates that it can easily be found here in New Orleans.  While a massive search might uncover some speculative choices elsewhere, squandering resources to locate those additional options would violate good judgment when quick-access selections exist right down the street.   Indeed, "[t]he standard for evaluating discovery [under Rule 26(g)] is reasonableness, not perfection."[12]

---

[10] Fed. R. Civ P. 26(b)(1) contains similar language in framing "proportionality" but adds an additional factor, "the parties' relative access to information."

[11] Paul W. Grimm, *Are We Insane? The Quest for Proportionality in the Discovery Rules of the Federal Rules of Civil Procedure*, 36 Rev. Lit. 117, 123-4 (2017) (citing Fed. R. Civ. P. 26(g) advisory committee's note to 1983 Amendments, "The Committee introduced the concept of proportionality as a limiting factor on the amount of discovery that parties should seek, or the court should permit, in a civil case.").

[12] *Agerbrink v. Model Serv. LLC*, No. 14 Civ. 7841, 2017 U.S. Dist. LEXIS 33249, at *13 (S.D.N.Y. Mar. 8, 2017) (ruling that a party may limit searches to likely relevant documents instead of searching an entire database even though some responsive documents might be missed ).

Even forgiving certification failures, Plaintiffs' broad and unduly burdensome requests pose additional obstacles. Under Rule 26(b)(1), discovery requests must be both "<u>relevant</u> to any party's claim or defense" and "<u>proportional</u> to the needs of the case." Fed. R. Civ. P. 26(b)(1) (emphasis added). Here, the documents <u>most</u> relevant to this litigation will be available from or accessible to sanofi-aventis U.S. LLC, which is the entity that oversaw the reporting of adverse events to FDA, U.S. labeling decisions, collection and submission of clinical study data to FDA, and dissemination of product materials to Plaintiffs' prescribing oncologists. Further, it was the entity responsible for correspondence with FDA regarding the safety, efficacy, and warnings for the Taxotere® allegedly used by the Plaintiffs in this MDL—the issue at the very heart of this litigation.

In contrast—and as fully set forth in the pending motion to dismiss—the French Defendants did not research, develop, test, manufacture, label, advertise, market, promote, sell, or distribute Taxotere® anywhere in this country. At best, then, the only potential unique and inaccessible information outside of the United States can be defined as e-mail sent to or from an employee of the French Defendants where an employee of sanofi-aventis U.S. LLC was not copied on or forwarded the message. These French-only documents will have little, if any, additional relevance to Plaintiffs' failure-to-warn claims in the United States.

Judge David G. Campbell[13] recently addressed a similar issue in the Bard IVC Filters MDL. *See In re: Bard IVC Filters Prods. Liab. Litig.*, 317 F.R.D. 362 (D. Ariz. 2016). There, Plaintiffs were attempting to obtain discovery from foreign defendants relating to communications with foreign regulators. *Id.* at 365. Judge Campbell concluded that most, but not all, of

---

[13] Judge Campbell chaired the Advisory Committee on the Federal Rules of Civil Procedure in 2014 and 2015 when the Advisory Committee approved important changes to Rule 26.

communications with foreign regulators originate in the United States. *Id.* at 366. There would therefore likely be some communications that would not be captured by searching U.S. sources. *Id.* Plaintiffs argued that the communications between the foreign entities and the foreign regulators were relevant to determine if those communications were inconsistent with communications with American regulators. *Id.* The Court rejected this speculative relevancy argument:

> Courts generally recognize that relevancy for purposes of discovery is broader than relevancy for purposes of trial. Even still, the Court concludes that the discovery sought by Plaintiffs is only marginally relevant. With no foreign-based Plaintiffs, and mere conjecture that communications between foreign entities and foreign regulators might be inconsistent with Defendants' communications with American regulators, the discovery appears to be only potentially relevant—more hope than likelihood.

*Id.* Likewise, the French-only documents at issue here will only be at most "marginally relevant" to the claims of the U.S. Plaintiffs—particularly given the volume of potentially relevant documents that will be available to the U.S. Defendants. The mere possibility or speculation that such documents *could* be relevant is not enough to justify production here. *See Cole's Wexford Hotel, Inc. v. Highmark Inc.*, 209 F. Supp. 3d 810, 822-23 (W.D. Pa. 2016), *recons. sub nom. Cole's Wexford Hotel, Inc. v. UPMC & Highmark Inc.*, No. 10-1609, 2017 WL 432947 (W.D. Pa. Feb. 1, 2017).[14]

Even assuming the French-only documents are marginally relevant, the burden of Plaintiffs' proposed discovery on the French Defendants is not proportional to the needs of this

---

[14] "As set forth in the advisory committee notes to the 2015 amendments to Rule 26(b)(1) and the standing committee's commentary with respect to its proposed 2015 changes to Rule 26(b)(1), the scope of discovery is limited to matter that is relevant to claims or defenses and is proportional to the needs of a case. For the foregoing reasons, the court rejects the amended report and recommendation no. 4 with respect to the special master's statement that '[d]iscovery requests may be deemed relevant if there is any possibility that the information may be relevant to the general subject matter of the action.'"

litigation and should not be permitted.  *See In re: Bard IVC Filters*, 317 F.R.D. at 566; *Elkharwily v. Franciscan Health Sys.*, No. 3:15-CV-00579, 2016 WL 4061575, at *2 (W.D. Wash. July 29, 2016); *Moore v. Lowe's Home Ctrs., LLC*, No. 14-1459, 2016 WL 687111, at *5 (W.D. Wash. Feb. 19, 2016) (ESI regarding individuals not involved in the claims made by the plaintiffs not permitted as not proportional to the case).  The substantial cost of obtaining and processing the required documents would greatly outweigh any marginal benefit arguably associated with such discovery.  Plaintiffs' voluminous document requests would require the French Defendants to produce every piece of paper, e-mail, and electronic document they have relating to Taxotere®, regardless of whether it is tied to Plaintiffs' allegations that they were not adequately informed of the risk of permanent alopecia.[15]

Rather than force the French Defendants to incur the burden and expense of responding to Plaintiffs' Requests, a more solutions-oriented approach would be to have Plaintiffs first obtain and review the documents that will be produced by the U.S. Defendants.  After their review, Plaintiffs can then identify if there are items they think they still need that are located in France (and not otherwise obtainable by the U.S. Defendants) and then serve targeted discovery using the procedures outlined below.  In short, the burden of obtaining and producing Plaintiffs' requested discovery from the French Defendants would far exceed any marginal benefit it could provide this litigation.  Thus, Plaintiffs' requested discovery simply is not proportional to the needs of this wholly domestic, failure-to-warn case, and should not be permitted.

---

[15] Indeed, to comply with these requests, the French Defendants would have to search every possible data source for Taxotere® documents.  This would require the French Defendants to search all centralized document sources for responsive documents.  It would also force the French Defendants to identify all potential custodians, collect ESI from those custodians, and then search and identify all responsive documents from those custodians.  The French Defendants would then have to review the documents identified from centralized sources and custodians for privilege.  Finally, the French Defendants would have to ensure that any production complies with the FDPA (described in Part B below), which would include document redactions, and then produce the redacted documents.

### B.    Discovery on Foreign Defendants Triggers Additional Requirements

Parties and courts must treat discovery on foreign corporations differently.  The United States Supreme Court recognizes that "[w]hen it is necessary to seek evidence abroad . . . the district court must supervise pretrial proceedings particularly closely to prevent discovery abuses." *Société Nationale Industrielle Aérospatiale v. U.S. Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 543 (1987).

To that end, when, as here, a party's obligations under foreign law directly conflict with discovery requests in U.S. litigation, a court must address whether international comity calls for resort to foreign procedures in a particular case.  *Id.* at 544.  In deciding whether to use foreign discovery procedures, district courts must "take care to demonstrate due respect for any special problem confronted by the foreign litigant on account of its nationality or the location of its operations, and for any sovereign interest express by a foreign state."  *Id.* at 546.  In this case, Plaintiffs' Requests trigger application of 1) the Hague Convention; 2) the French Blocking Statute; and 3) the French Data Protection Act.

**The Hague Convention:**  Under French law, the Hague Convention—which has been effective in both the United States and France for more than 40 years—is the <u>exclusive</u> means through which foreign judicial authorities can secure evidence in France.  *See* Decl. of Kami Haeri Ex. D, at ¶¶ 14, 19-23.  Pursuant to the Hague Convention, discovery may be obtained by a party through two primary mechanisms.  The first method is a Letter of Request sent by a court in the requesting state.  23 U.S.T. 2555, Art. 1; *see also* Decl. of Kami Haeri Ex. D, at ¶ 11.  ("[A] judicial authority of a Contracting State, may, in accordance with the provisions of the law of that State, request the competent authority of another Contracting State, by means of a Letter of Request, to obtain evidence, or to perform some other judicial act.").  French law requires French courts to enforce letters of request. *See* Brief of Amicus Curiae the Republic of France at *23, *Société*

10

*Nationale Industrielle Aérospatiale v. U.S. Dist. Court for S. Dist. of Iowa*, 482 U.S. 522 (1987)

(No. 85-1695) (hereinafter "*Aérospatiale Amicus*") (France will execute a letter of request seeking

pre-trial discovery "provided that the documents requested are enumerated in the letter of request

and have a direct and clear nexus with the subject matter of the litigation"); Decl. of Kami Haeri

Ex. D, at ¶¶ 12-13.

The second mechanism authorizes diplomatic officers, consular agents, or appointed

commissioners of the requesting state to collect evidence.  *See* 23 U.S.T. 2555, Arts. 15-16, 23;

Decl. of Kami Haeri Ex. D, at ¶ 11.  While the convention itself does not discuss written discovery

*per se*, it is the long-standing practice in France to handle such requests expeditiously in a manner

similar to that approved for depositions.  *See Aérospatiale Amicus*, 1986 WL 727501, at *26.

**The French Blocking Statute:**  The French Blocking Statute works in tandem with the

Hague Convention, prohibiting the disclosure in foreign judicial proceedings of documents or

information[16] of an economic, commercial, industrial, financial or technical nature except in

accordance with French domestic law or international treaties and agreements.  *See* Law No. 80-

538 of July 16, 1980, Art. 1 *bis*; Decl. of Kami Haeri Ex. D, at ¶¶ 4, 5-10.[17]  Any violation of the

French Blocking Statute is a criminal offense punishable by imprisonment of up to six months and

a substantial monetary fine.  *Id.*; Decl. of Kami Haeri Ex. D, at ¶¶ 6-10, 14.[18]  Specifically, Article

---

[16] The term "information" as used in Article 1 *bis* is broad, and refers to any kind of statement, orally or by other means.  This would include, for example, an oral statement concerning the substance of a discussion or electronic data.

[17] Article 2 requires that persons subject to the French Blocking Statute "promptly inform the competent Minister, upon the receipt of any request concerning such communications."  *Id.*; Decl. of Kami Haeri Ex. D, at ¶ 9.

[18] Violation of this provision is a criminal offense punishable by up to six months imprisonment and a fine of 18,000 euros for an individual *See* Decl. of Kami Haeri Ex. D, at ¶¶ 8, 18.  Legal entities also may be held liable for violating the French Blocking Statute and may be sentenced to up to five times the fine provided for individuals (*i.e.*, 90,000 euros).  *See id.*

1A of the French Blocking Statute, French Penal Code No. 80-538, makes it a <u>crime</u> "for any person to request, seek or disclose, in writing, orally or otherwise, economic, commercial, industrial, financial or technical documents or information leading to the constitution of evidence with a view to foreign judicial or administrative proceedings or in connection therewith." *See Aérospatiale*, 482 U.S. at 526 n.6 (quoting French Blocking Statute); Decl. of Kami Haeri Ex. D, at ¶ 7. Put simply, the French Blocking Statute prohibits the collection and production of materials in France for use outside of France in civil discovery, except in compliance with French law or an international convention such as the Hague Convention. *See* Decl. of Kami Haeri Ex. D, at ¶¶ 4-10, 14.[19]

**The French Data Protection Act:** Finally, while the Hague Convention and the French Blocking Statute touch on the manner in which discovery may be sought from French entities—including the French Defendants in this case—the European Data Protection Directive 95/46/EC (the "European Directive") and the French law n 78-17 of January 6, 1978 (the "French Data Protection Act" or "FDPA") provide rules relating to the type of information that can be lawfully shared. In particular, the FDPA prohibits the disclosure of "personal data," which is defined broadly to include <u>any information</u> that can directly or indirectly identify an individual. *See* Decl. of Pierre-Yves Lastic Ex. E, at ¶ 5; Decl. of Kami Haeri Ex. D, at ¶¶ 24-25. The FDPA requires that certain limiting steps be taken to minimize the gathering and disclosure of personal information. On July 23, 2009, the French data protection authority, Commission Nationale de l'Informatique et des Libertés (the "CNIL"), issued guidance on how the discovery process should be organized in light of French and EU data protection law (the "CNIL Recommendation"). *See*

---

[19] Pursuant to Article 2 of Law No. 69-678 of 26 July 1968 and Article 1 of Decree No. 81-550 of May 12, 1981, the French Foreign Ministry was notified of these requests and further guidance requested. *See* Decl. of Claire Terrazas Ex. G; *see also* Decl. of Kami Haeri Ex. D, at ¶ 9 (setting forth the requirement).

CNIL, Deliberation No. 2009-474 of 23 July 2009, concerning recommendations for the transfer of personal data in the context of American court proceedings known as "Discovery."[20]  The CNIL Recommendation describes the measures that a French company must take when providing documents in the context of U.S. discovery.[21]  The FDPA restricts a French company's ability to collect, process, review, export, and produce business-oriented documents like e-mails, memoranda, and agreements that would inevitably contain personal data, including names, for employees and other individuals.  *See* Decl. of Kami Haeri Ex. D, at ¶¶ 25-2, 28.

Here, Plaintiffs' Requests will require the collection, processing, exporting and production of material that will necessarily involve the disclosure of "personal data," as defined by the FDPA. *See* Decl. of Pierre-Yves Lastic Ex. E, at ¶¶ 2, 6-7.  The fact that the French Defendants are headquartered in France automatically renders their documents, employees, custodians, and lawyers subject to the strictures of the FDPA.  *See* Decl. of Pierre-Yves Lastic Ex. E, at ¶ 3.

---

[20]  An English version of the CNIL Recommendation can be found at https://www.cnil.fr/sites/default/files/typo/document/D-Discovery_EN.pdf.  A courtesy copy is attached as Ex. F.

[21] Those measures include:

- **Data minimization:**  Personal data must be minimized before being transferred outside of France.  Any personal data that is not strictly necessary for the litigation should be redacted or encoded prior to disclosure.

- **Proportionality:**  Where personal data is disclosed in discovery, the amount and kind of personal data produced should be proportionate, i.e. relevant and necessary to the adjudication of the U.S. litigation.

- **Security and confidentiality:** Technical and organization measures should be implemented so that personal data is disclosed only to persons who need to have access to the data for purposes of the U.S. litigation, and those persons are bound by confidentiality obligations.

- **Purpose limitation:**  Personal data disclosed in discovery should be sued only for purposes of the U.S. litigation.

- **Inform data subjects:**  Individuals whose personal data are disclosed in the context of discovery should be informed of the disclosure.

*See id.*; *see also* Decl. of Kami Haeri Ex. D, at ¶¶ 28-29.

13

Further, to the extent Plaintiffs seek clinical trial data stored in France, the FDPA also protects personal data of non-party clinical trial participants involved in these studies. Accordingly, the French Defendants must ensure that any transfer of personal data, including transfers to the United States as part of pretrial discovery proceedings, must take place in accordance with the specific provisions of the FDPA. *See* Decl. of Pierre-Yves Lastic Ex. E, at ¶ 4. Compliance with the FDPA is mandatory even if discovery is conducted through the Hague Convention. *See* Decl. of Kami Haeri Ex. D, at ¶¶ 25-26, 28.

> **1.    Even If Plaintiffs Re-crafted Their Requests To Meet The Requirements Of Rule 26, The French Defendants Are Entitled To A Protective Order Compelling Plaintiffs To Pursue Discovery Under The Hague Convention And The Procedures of the FDPA**

Discovery on foreign entities is not automatic. Just as U.S. courts would object to foreign litigants propounding disclosure laws of a different country within U.S. borders, U.S. courts must honor the sovereignty of the laws of other countries. To determine whether foreign discovery procedures are appropriate, district courts must scrutinize "the particular facts, sovereign interests, and likelihood that resort to these procedures would prove effective." *In re Anschuetz & Co., GmbH*, 838 F.2d 1362, 1364 (5th Cir. 1988). "District courts in the Fifth Circuit have consistently implemented this command by applying the five factors of the Third Restatement." *In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*, MDL No. 2592, 2016 WL 3923873, *14 (E.D. La. July 21, 2016) (collecting cases). Those five factors are:

a.    The importance to the litigation of the documents or other information requested

b.    The degree of specificity of the request;

c.    Whether the requested documents or information originated in the United States.

d.    The availability of other means of securing the information; and

e.   The extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located; and

Restatement (Third) of Foreign Relations Law § 442(1)(c) (1987).[22]

The five comity factors dictate that both (1) the Hague Convention procedures for the service of discovery and (2) the separate FDPA data privacy mandates apply to the discovery sought in this case.

### a.   The most relevant information is available from U.S.-based sources

The first and fourth factors of the post-*Aérospatiale* comity analysis weigh in favor of the French Defendants.  Plaintiffs, all U.S. citizens, contend that they used Taxotere® in the United States and were not adequately informed by the FDA-approved label of its risks, namely "permanent alopecia."  Sanofi-aventis U.S. LLC is the holder of the approved NDA for Taxotere® and corresponds with FDA on labeling issues regarding the same.  Accordingly, the potentially relevant documents in this litigation will be held by (or be accessible to) sanofi-aventis U.S. LLC, including:

- Design documents for Taxotere®;

- Regulatory documents and filings for Taxotere® with FDA, the agency that approves the content of the product's label and safety warnings;

- Communications to FDA regarding permanent hair loss;

- Documents reflecting labeling decisions for Taxotere®, both U.S. and global;

- Adverse event reports related to Taxotere® and permanent hair loss;

- Sales data for Taxotere® in the United States;

---

[22] In addition to these factors, some courts have also considered "the good faith of the party resisting discovery."  *S.E.C. v. Stanford Int'l Bank, LTD*, 776 F. Supp. 2d 323, 330 (N.D. Tex. 2011) (quoting *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 116 F.R.D. 517, 523 (S.D.N.Y. 1987)).  There is no dispute that the French Defendants have acted in good faith here.  From the earliest stages, the French Defendants have informed Plaintiffs that the documents and information most relevant here can be found from sources located in the United States.

- Clinical studies relating to breast cancer; and

- Marketing documents used in the United States.

Where, as here, the most potentially relevant information is likely to be available through or accessible to sources in the United States, courts are hesitant to order discovery that violates foreign law without first requiring the propounding party to attempt to secure the needed information through those American sources. *See, e.g.*, *Moore v. Publicis Groupe & MSL Group*, 287 F.R.D. 182, 186 (S.D.N.Y. 2012) (because defendant's France-based CEO corresponded with U.S. custodians, "and [his] emails stored in France likely would be covered by the French privacy and blocking laws" the CEO should not be a "first-phase custodian"); *In re Vitamins Antitrust Litigation*, 2001 WL 1049433, *10 n.20 (D. D.C. June 20, 2001) ("[G]iven the significant comity concerns of requiring disclosure of information that could conceivable [sic] violate foreign countries' privacy laws, the Court is wary of ordering such discovery until it is clear that the requested discovery is necessary.").

Indeed, the Texas Supreme Court denied a motion to compel production of a foreign corporation's records where (1) the materials sought were covered by a foreign country's data privacy law, (2) the record indicated that it was likely that "alternative methods for obtaining the information exist," and (3) the materials sought were of little importance in the context of the case. *Volkswagen, A.G. v. Valdez*, 909 S.W.2d 900, 903 (Tex. 1995). Because "the information sought can easily be obtained elsewhere, there is little or no reason to require [the French Defendants] to violate foreign law." *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1475 (9th Cir. 1992). The limited categories of noncumulative evidence in France in this case weigh strongly in favor of at least beginning discovery in conformity with the Hague Convention procedures.

### b.      Plaintiffs' requests are broad and lack specificity

"A second consideration in evaluating a discovery request is how burdensome it will be to respond to that request.  Generalized searches for information, the disclosure of which is prohibited under foreign law, are discouraged."  *Richmark*, 959 F.2d at 1475; *see also In re Perrier Bottled Water Litig.*, 138 F.R.D. 348, 355 (D. Conn. 1991) (resorting to Hague Convention procedures where "plaintiffs' discovery requests are not narrowly tailored inquires designed solely to target discreet and material information").  This consideration is particularly germane here and, like the first and fourth factors, weighs in favor of the French Defendants' requested relief.

Rather than serve narrowly-tailored discovery requests, Plaintiffs instead propounded 111 "generalized" Requests for Production on each of the French Defendants.  Plaintiffs made no attempt to narrow such requests to documents or information uniquely relevant to the French Defendants.  Indeed, virtually every one of Plaintiffs' requests seeks "all documents" or "all communications" or "all agreements" or "all studies."  Plaintiffs have seemingly requested every piece of paper, email, and electronic document the French Defendants have relating to Taxotere®, regardless of the actual issues in dispute in this litigation.[23]

Moreover, the broad nature of these requests necessarily contemplates the production of personal information clearly protected by the FDPA.  Without taking the measures required under the FDPA, the requests will violate the FDPA "proportionality" rule, which requires that discovery searches be circumscribed as to ensure that "only the information legally authorized is transmitted

---

[23] Plaintiffs also demand the identities (defined to include personal information such as the person's full name, present or last known address, telephone numbers, email addresses, and last known place of employment (*see* Plaintiffs' First Requests for Production of Documents to Defendant Sanofi S.A., Definition No. 11) of key opinion leaders and other healthcare professionals.  *See* Ex. B, Requests Nos. 94-95.

to the adverse party and to the foreign judge in the framework of the proceeding."  CNIL, Deliberation No. 2009-474 of 23 July 2009.

In this instance, Plaintiffs' discovery requests are the exact type of "unnecessary, or unduly burdensome, discovery" that could place the French Defendants "in a disadvantageous position." *Aérospatiale*, 482 U.S. at 546.  Indeed, the French Blocking Statute was specifically designed to prevent this type of discovery abuse.  *See* CNIL, Deliberation No. 2009-474 of 23 July 2009 ("[The French Blocking Statute] is a 'shielding' law adopted to defend French economic interests and to protect strategic data of companies against abusive actions undertaken by foreign authorities to collect economic information.").  Because Plaintiffs' Requests create the real concern about discovery abuse and the improper use of discovery, this factor counsels in favor of any production being consistent with the procedures set forth in the Hague Convention and the FDPA.

c. **The balance of national interests favors use of the Hague Convention and FDPA procedures**

The respective interests of France and the United States relating to this motion also strongly favor use of Hague Convention and FDPA procedures for the production of documents from the French Defendants.  France has a substantial sovereignty interest in limiting legal actions on French territory to those carried out only in accordance with French law, which would be undermined if this Court were to order production of documents from France outside of the Hague Convention and FDPA procedures.

The Fifth Circuit recognizes that the existence of foreign blocking statutes and data protection laws are important to consider as part of comity analysis.  *See In re Anschuetz & Co., GmbH*, 838 F.2d 1362, 1364 (5th Cir. 1988) ("[W]e emphasize that it is most important that the district court should consider, with due caution, that many foreign countries, particularly civil law countries, do not subscribe to our open-ended views regarding pretrial discovery, and in some

18

cases may even be offended by our pretrial procedures.").  France's adoption of both the FDPA and the Blocking Statute demonstrate its strong interest in protecting the personal information of its citizens as well as protecting its citizens from obtrusive American discovery.  Indeed, "France has been among the most emphatic" of civil law nations who have "expressed their disfavor of private litigants' use of [American] procedures within [their] borders" and without their supervision or consent.  *In re Perrier Bottled Water Litig.*, 138 F.R.D. 348, 355 (D. Conn. 1991).

France's compelling sovereignty interest is also seen in its enforcement of the FDPA and the French Blocking Statute.  For example, France's highest civil court, the *Cour de cassation*, has upheld criminal sanctions for violation of the French Blocking Statute.  In *In re Advocate Christopher X*, Cour de Cassation [Cass. Crim.], Paris, Dec. 12, 2007, Juris-Data No. 2007-83228 (Fr.),[24] a criminal court in Paris found a Paris lawyer guilty of violating the French Blocking Statute and fined him 10,000 euros for circumventing the Hague Convention and soliciting information directly from a former officer of one of the companies involved.

The Paris court determined that the accused French counsel "sought, although he was devoid of any warrant authorized by [the Hague Convention], for information of an economic, commercial or financial nature. . . ." Paris Court of Appeal, 9th Chamber, Section B, Mar. 28, 2007 No. 06/06275.  Finding no error, the *Cour de cassation* affirmed the Paris court's judgment, making clear that the Hague Convention is the exclusive means of securing information in France for use in foreign litigation and that parties caught in France bypassing the Hague Convention may expect to be prosecuted under the French Blocking Statute.  *See also* Decl. of Kami Haeri Ex. D, at ¶ 18.

---

[24] An English translation of the decision is available at 7 Digital Evidence & Elec. Signature L. Rev. 130 (2010), available online at http://sas-space.sas.ac.uk/5427/1/1937-2737-1-SM.pdf.

Likewise, the CNIL, the French body that enforces the FDPA, has issued at least a dozen decisions imposing monetary sanctions.[25]  *See In re Activision Blizzard, Inc.*, 86 A.3d 531, 538 (Del. Ch. 2014).  If, as here, "compliance with a discovery request would subject the party on whom compliance is sought to liability or sanctions, this factor will weigh against compelling disclosure."  *CE Int'l Res. Holdings, LLC v. S.A. Minerals Ltd. P'ship*, No. 12-CV-08087, 2013 WL 2661037, at *15 (S.D.N.Y. Jun. 12, 2013); *see also Société Internationale pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 211 (1958) ("fear of criminal prosecution constitutes a weighty excuse for nonproduction, and this excuse is not weakened because the laws preventing compliance are those of a foreign sovereign").

Finally, while the French Defendants recognize that the United States has an interest in adjudicating the rights of American plaintiffs, that interest is lessened given the ancillary nature of the materials sought from the French Defendants—the vast majority of which have nothing to do with the labeling or regulatory oversight of Taxotere® in the United States.  *See In re Xarelto*, 2016 WL 3923813, at *18 ("Materials that are 'vital to the case-in-chief' produce more substantial national interests than ancillary materials.").

### d.    Whether the information originated in the United States is not a compelling factor here

This factor "directs the court to consider whether the information originated in the United States.  If the information originated in the United States and is simply being stored abroad or was taken there, then the American origins of the information and its prior presence in the United States

---

[25] A first violation of the FDPA is punishable by criminal sanctions of up to 150,000 euros and imprisonment of up to five years, with a subsequent violation punishable by sanctions of up to 300,000 euros.  FDPA, Art. 47; Decl. of Kami Haeri Ex. D, at ¶ 29.  The CNIL has characterized the sanctions for violation of the FDPA as even "more serious than those provided for in the case of a failure to observe the [French] Blocking Statute of 1968."  CNIL, Deliberation No. 2009-474.  The CNIL has enforced violations of the FDPA on numerous occasions with fines as high as 150,000 euros.  *See In re Activision*, 86 A.3d at 538.

counsel in favor of production." *In re Activision*, 86 A.3d at 545.   The rationale behind this factor – and the reason that it typically weighs in favor of production – is because a "company or individual should not be able to evade discovery in American courts by secreting information offshore." *Id.*

Here, however, there is no evidence (or even assertion) that defendant sanofi-aventis U.S. LLC has "secreted information" to France in an attempt evade discovery in American courts.   To the contrary, sanofi-aventis U.S. LLC has (or has access to) the information most relevant to Plaintiffs' claims.   It would make little sense to compel the French Defendants to produce documents that did not originate in France in violation of French law when alternative means for such production are available.

With respect to any French-only documents, those documents were created in the ordinary course of business in a country that grants extensive protection to the personal data of its employees.   This weighs against production.   *See In re Xarelto*, 2016 WL 3923873, at \*16; *see also In re Activision*, 86 A.3d at 546 ("For documents and communications that originated and remained in France, this factor counsels against conducting discovery under this court's rules.").

>    **2.     The Procedures Set Forth In the Hague Convention and FDPA Are Simple and Efficient Means To Produce French-located Documents Without Violating French Law**

Nor will Plaintiffs suffer prejudice through use of the Hague Convention and FDPA procedures.   Counsel for Plaintiffs in this MDL are sophisticated attorneys with experience litigating cases involving national and multinational corporations.   And they are clearly familiar with the procedures set forth in the Hague Convention, having successfully utilized it on at least nine occasions to serve their complaints on the French Defendants.[26]   As a result, they cannot now

---

[26] *See, e.g.*, *Gahan v. Sanofi S.A., et al.*, No. 2:16-cv-15282.

credibly argue that those procedures are either unnecessary or too complex when it comes to the service of discovery.

In any event, the Hague Convention procedures for obtaining evidence abroad are well-established and well-understood. "Letters of request," which are enforceable under French law, are the most common method to obtaining evidence under the Hague Convention. 23 U.S.T. 2555, Arts. 1-14; *see also Aérospatiale Amicus*, 1986 WL 727501, at *23 (France will execute a letter of request seeking pre-trial discovery "provided that the documents requested are enumerated in the letter of request and have a direct and clear nexus with the subject matter of the litigation"). Disclosure of covered documents under the letter of request procedure is likely to occur in a timely manner, permitting Plaintiffs with the opportunity to secure requested information without needlessly delaying discovery in the MDL.[27]

With respect to the FDPA, Plaintiffs and the French Defendants can work together to propose a document production protocol and confidentiality stipulation for implementation of appropriate procedures, including redactions following data processing and collection in conformity with the FDPA's requirements. Plaintiffs and the French Defendants can also collaborate to propose a mechanism to ensure that U.S. recipients of the data respect the security and confidentiality measures imposed by the FDPA. The stipulation or order should, for example, include provisions that data recipients will (1) use the remaining personal data only in the context of this litigation, (2) protect the confidentiality of the personal data through reasonable security measures, and (3) destroy or return the personal data when it is no longer needed for the litigation. *See* Decl. of Kami Haeri Ex. D, at ¶ 28; CNIL, Deliberation No. 2009-474 of 23 July 2009.

---

[27] The second mechanism authorizes diplomatic officers, consular agents, or appointed commissioners of the requesting state to collect evidence. *See* 23 U.S.T. 2555, Arts. 15-17.

Of course, if these procedures prove unworkable, the Court retains the discretion to reconsider the issue.  Indeed, numerous courts have ordered first resort to foreign discovery procedures, while expressly reserving the right to revisit American procedures if foreign procedures prove unduly protracted or burdensome.  *See, e.g.*, *In re Activision*, 86 A.3d at 550-51; *Husa v. Laboratoires Servier SA*, 740 A.2d 1092, 1097 (N.J. Sup. Ct. App. Div. 1999); *Knight v. Ford Motor Co.*, 615 A.2d 297, 302 (N.J. Sup. Ct. Law Div. 1992); *In re Perrier*, 138 F.R.D. at 356; *Hudson v. Hermann Pfauter GmbH & Co.*, 117 F.R.D, 33. 39 (N.D.N.Y. 1987).  At this point, however, it is most appropriate to begin with application of the Hague Convention and the FDPA.  *See In re Perrier*, 138 F.R.D. at 355 ("[T]here is no reason, on the record before the Court, to believe that Convention procedures will be ineffective in producing the discovery to which plaintiffs are entitled.").

**3.    Plaintiffs Must Share The Expense Of Any Discovery On The French Defendants**

Finally, to the extent that the French Defendants must substantively respond at some later time to Plaintiffs' requests, Plaintiffs should share in the resulting expense – including the steps necessary to identify, locate, collect, review, and redact documents.

As one court has recognized, "requesting parties have little incentive not to ask for everything possible" because the producing party typically bears the cost of production.  *Lubber, Inc., v. Optari* LLC, 2012 WL 899631, at *2 (M.D. Tenn. Mar. 15, 2012).  That tendency to seek volumes of irrelevant and overbroad material can be tempered, however, by shifting the allocation of costs to the requesting party:

> It is the Magistrate Judge's experience and the view of a number of economists who have studied this issue that where the requesting party bears a part of the cost of producing what they request, the amount of material requested drops significantly.  When a party has to contemplate whether the last possible bit of information will cost them more than it is worth, they quit asking for items of marginal

> relevance.  As long as requesting the last bit of information costs them nothing they have little, if any, incentive not to request it. Even if they choose never to look at it, they have put the opposing party to the cost of production.

*Id.*

Given the efficacy of the cost-sharing compromise, the *Lubber* court ordered the plaintiffs to post a bond in the amount of the costs to produce the requested documents.  *Lubber*, 2012 WL 899631, at *3-4; *see also Boeynaems v. LA Fitness Int'l, LLC*, 2012 WL 3536306, at *4, *13 (E.D. Pa. Aug. 16, 2012) (ordering plaintiffs' counsel to share in the costs of discovery and reasoning that "[i]f . . . counsel has confidence in the merits of its case, they should not object to making an investment in the cost of securing documents from Defendant and sharing costs with Defendant.").

Here, too, Plaintiffs have sought documents that—at best—are only marginal to their claims and which also unnecessarily implicate foreign discovery procedures.  Moreover, Plaintiffs' counsel is indisputably well-funded and capable of contributing to the costs of discovery.  The French Defendants thus request the Court order Plaintiffs' counsel to bear the financial burden of their global fishing expedition.  *See Lubber*, 2012 WL 899631, at *3-4; *Boeynaems*, 2012 WL 3536306, at *4, *13

## III.   **CONCLUSION**

The French Defendants maintain that they must be dismissed from this litigation for lack of personal jurisdiction.  To the extent that discovery may proceed against them, however, the French Defendants should not be compelled in the first instance to respond to irrelevant and disproportionate discovery that seeks information obtainable through the U.S. Defendants, or to respond in contravention of the Hague Convention and French law.  Accordingly, they respectfully request that the court grant their Motion for a Protective Order, and at a minimum, order Plaintiffs

to narrow their requests to comport with the proportionality and relevance requirements under the Federal Rules of Civil Procedure.

Respectfully Submitted:

/s/ Douglas J. Moore
Douglas J. Moore (Bar No. 27706)
IRWIN FRITCHIE URQUHART & MOORE LLC
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone:  504-310-2100
Facsimile:  504-310-2120
E-Mail:  dmoore@irwinllc.com

Harley V. Ratliff
Adrienne Byard
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, MO 64108-2613
Telephone:  816-474-6550
Facsimile:  816-421-5547
E-Mail:  hratliff@shb.com

Patrick L. Oot
SHOOK, HARDY & BACON L.L.P.
1155 F STREET NW, SUITE 200
Washington, D.C. 20004
Telephone:  202-783-8400
Facsimile:   202-783-4211
E-mail: oot@shb.com

**Counsel for Sanofi and Aventis Pharma S.A.**

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2017, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

/s/ Douglas J. Moore