**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

In Re: TAXOTERE (DOCETAXEL)                           **MDL NO. 2740**
PRODUCTS LIABILITY LITIGATION

                                                      **SECTION "N" (5)**

**THIS DOCUMENT RELATES TO**
**ALL CASES**

<u>**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR DISCLOSURE**</u>
<u>**OF NON-PARTY INTERESTED ENTITIES OR PERSONS**</u>

Defendant sanofi-aventis U.S. LLC ("Defendant") respectfully requests that this Court order disclosure of non-party interested entities or persons in MDL No. 2740.

**INTRODUCTION**

By this Motion, Defendant asks a simple but important question: do non-parties have a financial interest in this MDL?  Under any circumstances, this question would be reasonable, but it is particularly appropriate here. As detailed below, Defendant's counsel was inadvertently sent an email from a lead generator offering to refer cases with a "guaranteed diagnosis" for a fee of $3,500 per case.  Defendant has also learned that approximately 32,000 television advertisements related to Taxotere have been broadcast, at an estimated cost of $9,000,000.  Because mass-tort advertising and lead-generation typically involve third-party funding, Defendant has for months requested that Plaintiffs agree to disclose non-party interested entities or persons.  Plaintiffs have <u>never</u> <u>denied</u> the existence of such entities.  But Plaintiffs refuse to confirm their existence, let alone identify them.  Their silence only further warrants this disclosure.

Financially interested non-parties can substantially influence both the course and the resolution of pending litigation.  Disclosure of non-parties is also essential to determining

1

conflicts of interest—an especially salient consideration in complex litigation involving thousands of parties and dozens of law firms, lawyers, experts, and other legal service providers, as well as judges from transferor jurisdictions across the United States.  In light of these considerations, and even where the need for efficiency and the potential for conflict are less pronounced, disclosure of financially interested non-parties is routinely required in federal litigation. *See, e.g.*, Fed. R. Civ. P. 7.1 (requiring disclosure of corporate parents and owners); Fed. R. Civ. P. 26(a)(1)(A)(iv) (requiring disclosure of insurance agreements).[1]  Consistent with this routine treatment, and in order to facilitate just and efficient proceedings, ensure transparency among the parties, and enable oversight of transactions directly bearing on the merits of the claims before this Court, Defendant requests disclosure.

## ARGUMENT

**I.     Failure to disclose interested non-parties has the potential to prejudice the Court and the parties in this MDL.**

**a.  There is non-party involvement in this MDL.**

Although it is certainly not a prerequisite for disclosure, interested non-parties are participating in MDL No. 2740.  On February 7, 2017, Jon Strongman of Shook, Hardy & Bacon L.L.P., counsel for Defendant, received an e-mail from Matthew Dean, "Business Development Persist Communications Co-Counsel Liaison for Gacovino Lake & Associate P.C."[2]  The e-mail, evidently sent to defense counsel by mistake, raises questions about access to the medical data of

---

[1] As with these other disclosures, disclosure of interested non-parties promotes the "just, speedy, and inexpensive determination" of the underlying actions.   Fed. R. Civ. P. 1.

[2] *See* February 7, 2017 e-mail (attached as **Exhibit A**).

Plaintiffs in these proceedings, as well as potential solicitation and funding or fee-splitting among non-lawyers.[3]  The email states:

> Jon,
>
> Hope you're doing well!
>
> Wanted to see if you had a few minutes to discuss a potential co-counsel arrangement in regards to Taxotere.  I'm including our case screening criteria/cost below.  Let me know if you can spare 10 minutes today/this week to discuss further.  We offer guaranteed contracts with your law firm pulling the medical records to proof up.  Will you be in Austin for AAJ?  If so, I'd like to meet with you briefly to discuss further.
>
> **Taxotere:**
> Guaranteed Contract: $1750 – Hair Loss or severe thinning after 6 months of chemo, completed – Via photos
> $3500 – Guaranteed diagnosis (Alopecia) – co-counsel has to get diagnosis.  If negative we will replace
>
> Best regards,
>
> Matt

Terms like "guaranteed," "completed – Via photos," "Guaranteed diagnosis (Alopecia)," and "co-counsel has to get diagnosis" ***raise serious questions about the involvement of third parties in the solicitation, screening, funding, diagnosis, and documentation of the injuries alleged in this case***.  This inadvertently sent e-mail suggests, at the very least, that there are third parties pursuing financial interests contingent on the diagnosis of the injury alleged in this MDL.  At worst, it suggests that pay-for-diagnosis screening arrangements involving third-party solicitors, funders, medical providers, and/or non-record "co-counsel" may be effecting this litigation.  In either instance, the potential impact on these proceedings is hard to overstate.  The

---

[3] Persist Communication's website states that it provides: "[p]owerful and affordable services that help your law firm increase case inventory so you can spend your time with real clients."  *See* Persist Communications, http://www.forpersist.com (last visited June 12, 2017).  Persist advertises how it solicits this "inventory" by robot-call, e-mail, and voicemail.  *Id.*  "In one day, 628 phone calls are made, with 221 voice mails generated automatically, 171 actual connections with prospective clients, 364 emails sent from our Persist software systems and 386 text messages successfully done."  *Id.*

injuries that Plaintiffs allege in this MDL are clinically defined and diagnosable.[4]  They may be assessed through scalp biopsy, blood tests or hormone tests.[5]  Whether a plaintiff has alopecia and what type—including how it was diagnosed and whether it is related to chemotherapy—are critical, case-altering issues in this litigation.  The fact that such nuanced determinations, which should be made only by a specialist in this field, might be elicited for a fee is relevant to Plaintiffs' claims of injury, causation, *and* damages—and makes disclosure eminently appropriate.

Without disclosure, neither Defendant nor this Court can know the full extent of any participation by financially interested third parties in this litigation—or even who such parties might be.  Persist is not alone in its involvement in this litigation—other entities are  advertising litigation funding for the Taxotere MDL.  For example, litigation financer Law Street Capital specifically advertises Taxotere "[l]awsuit loans for financially-strapped plaintiffs," purportedly to allow plaintiffs to "continue to seek treatment for their condition" while their lawsuit proceeds.[6]  Recent research also reveals that from June 2016 through May 2017, an estimated $9

---

[4] *See, e.g.*, Compl. ¶ 181 (defining "Permanent Chemotherapy-Induced Alopecia" as "an absence of or incomplete hair regrowth six months beyond the completion of chemotherapy.").

[5] *See* "Exhibit A" to Pretrial Order No. 38 (MDL Doc. # 326-1) at 22 (listing scalp biopsy, blood tests, and hormone checks as means of evaluating hair loss).

[6] *See* Whitney Taylor, *Taxotere Hair Loss Plaintiffs Benefit from Lawsuit Funding*, Law Street Capital (Sept. 27, 2016), http://lawstreetcapital.com/2016/09/taxotere-hair-loss-plaintiffs-benefit-lawsuit-funding/.

Another outfit—Record Reform—appears to offer services including "Critical Review of chemotherapy records," and "Oncologists Recommendation" for Taxotere litigation, alongside their general offerings of medical lien purchasing, plaintiff advances and medical care, "Demand Letters by MDs," and "Threshold Evaluations" for mass tort cases.   *See Taxotere – Emerging Litigation*, Record Reform, https://www.medquestltd.com/record-reform/taxotere-emerging-litigation/ (last accessed June 13, 2017); *Pharmaceutical & Mass Tort: Threshold Evaluations – $35 per hr by MDs*, Record Reform, https://www.medquestltd.com/record-reform/pharmaceutical-mass-tort/ (last accessed June 16, 2017).

million was spent on some 32,000 Taxotere® lawsuit advertisements across the United States.[7] As actualized in the number of cases actually filed, this translates to over $7,500.00 in spending for each case that has made it to the courthouse door.  Non-law firm money appears to account for fair percentage of the overall advertisement spending.[8]  Furthermore, despite its relatively small size as a national media market, New Orleans—where the first jury trials in this litigation will likely take place—was the market where the most money was spent on Taxotere® lawsuit advertisements.[9]  More importantly, absent disclosure, neither Defendants nor this Court can ensure that any such participation is lawful, ethical, and conducive to a credible and just adjudication of the claims here presented.[10]  Though Defendant cannot (and need not) say that there has already been foul play in the cases now pending, the consequences of failing to identify and supervise all parties with a financial stake in litigation can be serious.

---

[7] A study of television advertisements across 210 media markets conducted by analytic firm X Ante LLC reveals that from June 2016 through May 2017, an estimated $9 million—some $24,000 per day—was spent on approximately 32,000 advertisements soliciting Taxotere®-related claims across the United States.  *See* Rustin Silverstein, *Data and Analysis of Television Advertisements Related to Taxotere Product Liability Claims, June 2016-May 2017* (June 2017), at 3 (attached as **Exhibit B**).

[8] Some $900,000 of this—nearly ten percent—was spent by a single advertiser, Knightline Legal, which states on its website that it is "not a law firm or referral service and does not provide legal representation to visitors of this site." *See id*. at 7 (citing *Disclaimer*, Knightline Legal, http://www.knightlinelegal.com/disclaimer/ (last accessed June 17, 2017)).  Rather, contacts to Knightline "are forwarded only to law firms which have paid consideration other than costs to be included and receive such information." *See Disclaimer*, *supra*; *see also Taxotere*, Knightline Legal, http://www.knightlinelegal.com/taxotere/.

[9] "New Orleans was the top media market for Taxotere litigation television advertising spending and the market with the third-highest number of ads despite being the fiftieth largest TV media market in the country as measured by Nielsen." *See* Rustin Silverstein, *Data and Analysis of Television Advertisements Related to Taxotere Product Liability Claims, June 2016-May 2017* (June 2017), at 9-10 (attached as **Exhibit B**).

[10] As noted above, at least four entities—Persist, Law Street Capital, Record Reform, and Knightline Legal—have expressed some financial or business interest in the claims or cases in this MDL.  Without a generally applicable, court-ordered disclosure, Defendant has no way of knowing how many more there might be.

**b. Undisclosed interested non-parties can undermine and derail multi-district litigation**

The recent history of mass tort multi-district litigation is littered with examples of undisclosed non-party involvement gone wrong to the detriment of: 1) the integrity of the legal process, 2) the resources available for any meritorious claims, 3) the rights of defendants, and 4) public health.   History also counsels that it is easier to avoid such problems through early disclosure and continued transparency than it is to remedy them through enforcement afterwards.

For example, in silicone breast implant litigation in the 1990s, lawyers referred women to doctors for screening under fee arrangements contingent on the outcome of litigation, creating a potentially "huge conflict of interest."[11]  These arrangements gave doctors "a financial incentive to find illness" and to prescribe expensive, unnecessary, and in some cases permanently harmful tests and treatments in the hopes of recovering these costs upon settlement.[12]  Thus, even this seemingly indirect non-party interest in the litigation created the risk of compromising doctors' medical judgment, subjecting plaintiffs to dangerous treatment (and depriving them of appropriate care), and diverting settlement resources away from meritorious claims—ultimately "overwhelming" an initial settlement agreement and necessitating years of additional litigation.[13]

Similarly, in diet drug litigation in the early 2000s, lawyers set up "echo mills" to screen and diagnose heart valve defects in huge volumes of plaintiffs.[14]  One troubling characteristic of

---

[11] Gina Kolata & Barry Meier, *Implant Lawsuits Create a Medical Rush to Cash In*, N.Y. TIMES (Sept. 18, 1995), http://www.nytimes.com/1995/09/18/us/doctors-lawyers-silicone-special-report-implant-lawsuits-create-medical-rush.html.

[12] *Id.*

[13] *Id.*; *see also* Barry Meier, *A Judge and a Deadline: The Breast Implant Case*, N.Y. TIMES (Sept. 29, 1995), http://www.nytimes.com/1995/09/29/us/a-judge-and-a-deadline-the-breast-implant-case.html; Gina Kolata, *In Implant Case, Science and the Law Have Different Agendas*, N.Y. TIMES (July 11, 1998), http://www.nytimes.com/1998/07/11/us/in-implant-case-science-and-the-law-have-different-agendas.html.

[14] *See* Lester Brickman, *The Use of Litigation Screenings in Mass Torts: A Formula for Fraud?*, 61 SMU L. Rev. 1221, 1258–61 (2008); *see also* Anthony dePalma, *9/11 Lawyer Made Name in Lawsuit on Diet*

such mills was the practice of law firms completing medical histories in diagnostic reports, rather than the Board-Certified diagnosing physician.[15]   Another issue was firms' practice of paying doctors on a contingency basis, providing up to $1,500 of "additional compensation" if a patient's claim was submitted for settlement payment.[16]   This gave the non-party doctors a financial stake in the litigation and "a financial incentive to reach a particular result," resulting in a large number of fraudulent diagnoses that were "beyond the bounds of medical reason".[17]

Such practices are not confined to medical providers themselves, however.   Attorneys may also refer women to non-party lenders or factoring companies who pay for surgeries or other care in exchange for direct liens (with exorbitant interest and return on investment) on the

_Pills_, N.Y. Times (Mar. 30, 2008), http://www.nytimes.com/2008/03/30/nyregion/30lawyers.html; Berkeley Rice, _Do these doctors give medicine a black eye?_, 80 Med. Econ. 58 (Dec. 19, 2003); Robert Lenzner & Michael Maiello, _The $22 Billion Gold Rush_, Forbes (Mar. 24, 2006); _In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prod. Liab. Litig._, 236 F. Supp. 2d 445, 457 (E.D. Pa. 2002) (describing one screeners' practice as "a mass production operation that would have been the envy of Henry Ford.").

[15] _In re Diet Drugs_, 236 F. Supp. 2d at 458-59 (noting with disapproval that "the firm completed the answers with respect to the medical history of the claimant."); _cf. In re Silica Prod. Liab. Litig._, 398 F. Supp. 2d 563, 622-25 (S.D. Tex. 2005) (excluding expert testimony where the plaintiffs' toxic exposure and past medical histories "were virtually always taken by people with no medical training," including lawyers and employees of third-party screening agencies, "who had significant financial incentives to find someone positive for exposure to silica.").

[16] _In re Diet Drugs_, 236 F. Supp. 2d at 459 ("Thus, Dr. Mueller's remuneration depended on how he interpreted the echocardiogram and on what he stated on the form."); _see also United States v. Tai_, 750 F.3d 309, 312 n.6 (3d Cir. 2014) (noting payment of additional $900-$1000 "expert fee" for each diagnosis report approved for benefits).

[17] _In re Diet Drugs_, 236 F. Supp. 2d at 458-59 (lamenting that Settlement Trust's ability to "pay legitimate claims is being undercut by the tender of claims that have no reasonable medical basis."); _see also United States v. Arledge_, 553 F.3d 881, 901 (5th Cir. 2008) (upholding attorney's conviction on seven counts of conspiracy, mail fraud, and wire fraud for working with non-parties to procure and submit fraudulent diet drug claims); _Tai_, 750 F.3d at 312 (upholding doctor's conviction on thirteen counts of mail and wire fraud for producing fraudulent diet drug diagnoses); _In re Diet Drugs (Barnett v. Wyeth)_, 381 F. Supp. 2d 421, 426 (E.D. Pa. 2005) (dismissing case and awarding sanctions where plaintiff and counsel engaged in "abusive litigation practices" that threatened "the public interest in preserving the integrity of this diet drug litigation in particular and the judicial system as a whole.") (internal quote marks and citations omitted); _cf. In re Silica Prod. Liab. Litig._, 398 F. Supp. 2d at 625 (excluding medical expert testimony where "virtually all of the diagnoses fail to satisfy the minimum, medically-acceptable criteria for the diagnosis of silicosis."); Roger Parloff, _Diagnosing for Dollars_, Fortune (Jun. 13, 2005), http://archive.fortune.com/magazines/fortune/fortune_archive/2005/06/13/8262537/index.htm.

women's lawsuits.[18]  It is estimated that lenders have invested as much as $100 million in diagnosis and treatment in mass torts cases.[19]  And with a contingent stake in litigation where recovery is often linked to the severity of treatment, lenders have a financial incentive to encourage compensable diagnoses and expensive treatment options rather than objectively determining and providing the most appropriate care.[20]

In one recent mesh lawsuit example, a plaintiff was referred by her lawyer to a medical funding group to finance a procedure; the plaintiffs' insurer typically paid $6,000 for the procedure.[21]  But under arrangements with the funding group, the doctor was paid $17,000 for the treatment and produced a bill for nearly $37,000 payable to the lender, which ultimately claimed a settlement lien totaling more than $60,000.[22]  Thus, the value of compensable medical expenses was inflated by more than 1,000%, with the additional cost—i.e., profit to the funders—taken from settlement funds, deserving claimants, the defendant, and finally the plaintiff herself.  In another mesh case, a doctor saw a woman from out-of-state and scheduled her for her procedure the next day, but the woman's device had already been removed.  She was

---

[18] *See* Alison Frankel & Jessica Dye, *The Lien Machine: New breed of investor profits by financing surgeries for desperate women patients*, REUTERS (Aug. 18, 2015), http://www.reuters.com/investigates/special-report/usa-litigation-mesh/.  Frankel and Dye report that lenders' lawsuit liens can be 10 times standard costs for treatment and loans may appreciate at compound interest rates of 50 percent a year.  *See id*.  These exceptional returns are corroborated by the financial disclosures of large third-party litigation funders.  For example, industry leader Burford Capital boasted a return on equity of 21.1% for 2016, with $2.3 billion invested or available for legal finance.  *See* Burford Capital, *2016 Annual Report*, http://www.burfordcapital.com/wp-content/uploads/2017/03/BUR-26890-Annual-Report-2016-web.pdf.  88% of new Burford investments in 2016 were portfolio or complex litigation investments.  *See id*.

[19] *See* Frankel & Dye, *supra* n.18.

[20] *Id*. (noting that patients undergo mesh removal surgery in only about 50 percent of the cases, but those cases account for 90 percent of the overall value of the litigation).  In this same vein, Law Street Capital, who offers Taxotere "loans," provides its litigation funding "based on several factors, including severity of injuries, type of litigation, and other factors."  *See* Taylor, *supra* n.6.  "These non-recourse loans are provided against the amount of the jury award or the settlement a plaintiff is expected to receive."  *Id*.

[21] *See* Frankel & Dye, *supra* n.18.

[22] *See id*.

subjected to the invasive surgery anyway.  The medical funding company ultimately billed its lien at approximately $62,000.[23]

### c.  History need not repeat itself in MDL 2740

The same issues presented in these landmark, and some ongoing, MDLs are potentially implicated here by the language used in Persist Communications' solicitation, including references to "case screening," "guaranteed contracts," "completed – Via photos," and "guaranteed diagnosis (Alopecia)."  Though one might (with some effort) *conceive* of innocuous explanations for these offers, a plain reading of the email raises the reasonable inference that the kind of referral-funding agreements, volume screening, and pay-for-diagnosis practices that have sullied past mass tort litigation may also be present here.  Language like "your law firm pulling the medical records to proof up" harkens to practices that drew multiple courts' censure in the diet drug and silica litigation.[24]

But appearances aside, it is precisely the explanation of *any* third-party interests—innocuous or otherwise—that Defendant seeks here.  As in past cases, whether such parties are in play here may affect the integrity of these proceedings, the rights of Defendant, and the just and practicable administration of any potential negotiated resolution.  In addition, at the present stage of this MDL, such information is also important for identifying cases suitable for trial.

---

[23] *See* Boston Scientific Corporation's Motion to Compel, *In re Boston Scientific Pelvic Repair Sys. Prod. Liab. Litig.*, MDL No. 2326, at *11-12 (S.D.W. Va. Mar. 12, 2014), ECF No. 729 (*granted in relevant part by* Pretrial Order #98 (Boston Scientific Corporation's Cross Motion to Compel and For Costs), *In re Boston Sci. Corp. Pelvic Repair Sys. Prod. Liab. Litig*., MDL No. 2326, 2014 WL 1922755, at *1 (S.D.W. Va. May 14, 2014)).  In addition to the obvious danger to specific plaintiffs' health that such practices pose, the American Medical Association has recently adopted a policy resolution stating that the misleading or incomplete information often provided to potential plaintiffs and the public through mass tort solicitation efforts "jeopardize patient care," and has recommended that such solicitations come with a warning.  *See Warnings Urged For Lawyer Ads Targeting Medications*, American Medical Association (June 15, 2016), https://www.ama-assn.org/ama-adopts-new-policies-final-day-annual-meeting; *Attorney ads on drug side-effects*, American Medical Association (June 15, 2016), https://wire.ama-assn.org/ama-news/physicians-take-timely-public-health-issues.

[24] *See In re Diet Drugs*, 236 F. Supp. 2d at 459; *In re Silica Prod. Liab. Litig.*, 398 F. Supp. 2d at 624.

Moreover, Defendant submits that if attorneys with a substantial "inventory" of cases are subject to agreements with non-party solicitors, screeners, funders, or others, that fact is germane to this Court's appointment of leadership positions in this MDL.  And finally, Defendant submits that transparency in this area may foreclose future abuses from happening in the first place.[25]

In a poignant parallel, the revelations of third-party involvement in the mesh cases began with a single solicitation email inadvertently sent to a defendant's expert consultant.[26]  That consultant alerted the defendant, who in turn notified the Court overseeing the mesh MDL.[27] Ultimately, the Court ordered multiple rounds of discovery related to non-party funders and medical providers, "to determine whether these businesses were engaged in a scheme to fraudulently inflate the value of transvaginal mesh cases."[28]  Addressing similarly critical revelations in the silica litigation, Professor Brickman writes:

> Despite the overwhelming nature of the inculpatory evidence [of pay-for-diagnosis] produced in the course of the silica MDL proceeding, it is critically important to note that the only reason this information has ever seen the light of day is that Judge Jack did what no judge had ever previously done with regard to claims generated by mass screenings: she permitted extensive discovery of screening enterprise principals and B-readers.[29]

---

[25]  Defendant notes that although Plaintiffs' applications to or communications with a financier are not privileged, and such documents would be responsive to the PFS, the documents are not likely to be in Plaintiffs' possession.  Therefore, absent a specific order for disclosure, Defendant has no way of knowing which cases, if any, have connections to the third party entities herein identified (Persist Communications, Law Street Capital, Record Reform, Knightline Legal), much less to third party entities it has yet to independently uncover.  Without systematic disclosure, then, Defendant would be left to hunt and peck for discoverable information from third parties, or await further inadvertent revelations—an ineffective and inefficient means of moving this litigation forward.  *Cf.* Fed. R. Civ. P. 1.

[26] *See* Frankel & Dye, *supra* n.18.

[27] *Id*.

[28] Pretrial Order #98, *In re Boston Sci. Corp. Pelvic Repair Sys.*, 2014 WL 1922755, at *1; *see also* Pretrial Order #47 (Stipulated Protective Order Regarding Nonparty Documents), *In re: Coloplast Corp. Pelvic Support Systems. Prod. Liab. Litig.*, MDL No. 2387 (S.D. W.Va. Jan. 27, 2014); Pretrial Order #88 (Motion to Quash and Motion for Protective Order), *In re: American Medical Systems, Inc. Pelvic Repair Systems Product Liability Litigation*, MDL No. 2325 (S.D.W. Va. Oct. 11, 2013).

[29] Lester Brickman, *An Analysis of the Financial Impact of S. 852: The Fairness in Asbestos Injury Resolution Act of 2005*, 27 Cardozo L. Rev. 991, 1027 (2005).

Simply put: in today's mass tort landscape, early, judge-ordered disclosure of financially interested third parties is an indispensable safeguard for the integrity and efficiency of multi-district proceedings and causes no direct prejudice to plaintiffs.

Notwithstanding certain potential similarities to past litigation, Defendant does not now allege widespread wrongdoing or illicit influence on these proceedings by interested non-parties—nor is that the purpose of this Motion. Much less is it Defendant's aim to argue that third party litigation funding—or the existence or involvement of other non-party interested entities or persons—is *inherently* unethical, illegal, or otherwise improper. On the contrary, Defendant's request is premised on the very notion that disclosure, transparency, and even minor oversight regarding interested entities not known before the Court can foreclose injustices before they occur.[30]

That such transparency is possible, beneficial, and minimally burdensome here is demonstrated by the conduct of a Plaintiffs' counsel in this MDL in response to learning of Persist's inadvertent email to the defense. At the time defense counsel disclosed the email, several attorneys with cases pending in this MDL were featured on Persist's website offering what appeared to be video "testimonials" about the company's services.[31] Following Defendant's disclosure of the email to this Court, all such testimonials were quickly removed.[32]

---

[30] On the other hand, such abuses and injustices are extremely difficult to remedy. "Realism dictates that money once paid to improper recipients is unlikely ever to be recouped." *In re Diet Drugs*, 236 F. Supp. 2d at 463.

[31] *See* "Testimonials," Persist Communications, https://web.archive.org/web/20170215220911/http://forpersist.com/ (archived Feb. 15, 2017).

[32] *See* Persist Communications, https://web.archive.org/web/20170612205746/http://forpersist.com/ (archived June, 12, 2017).

Moreover, defense counsel has been contacted on behalf of one Plaintiffs' attorney who confirmed that none of his cases in this MDL are associated with Persist.[33]  He explained that the video testimonial posted by Persist had been produced in April 2012, before Persist Communications even existed, for another entity called Gacovino, Lake, & Associates, P.C.[34] With this additional information, he has requested that Defendant confirm that there is no factual basis to suggest that his cases are associated with Persist Communications, or that his cases should otherwise be cause for alarm about the role of third parties in MDL 2740.  Defendant agrees.  Defendant submits that this type of information sharing is *precisely* what is needed to adequately address questions of third-party interests in this case.  Such disclosures—and the apparent actions of other attorneys to distance themselves from Persist—compliment the relief Defendant seeks in this Motion, and Defendant encourages further similar disclosures.[35] Furthermore, the interaction demonstrates that an order granting Defendant's Motion need not entail a substantial burden to Plaintiffs or needless delay in these proceedings.

On the other hand, not all Plaintiffs have been readily forthcoming.  Indeed, prior to seeking Court intervention, Defendant sought for months to secure agreement to the disclosure it here requests, to no avail.  Defendant provided the proposed disclosure order to the other side weeks before filing any Motion.  Defendant took these actions specifically with the hope of avoiding Court intervention (and without raising the genesis of its concerns), but with the exception noted above, these attempts have been roundly rejected.

Considering the now-public contents of the Persist email—along with the simple efficiency of the disclosures when made—Plaintiffs' counsels' refusal to make straightforward

---

[33] *See* Letter from Mark P. Glago on behalf of Marc Grossman, Baker Sanders (May 26, 2017) (attached as **Exhibit C**).

[34] *Id.*

[35] *See* Letter from Mr. Ratliff (May 31, 2017) (attached as **Exhibit D**).

disclosures, foreclose impropriety, and proceed in this litigation with transparency is curious. Are there indeed non-party entities or persons with financial interests in this MDL?  Are entities such as Persist Communications in fact directly soliciting clients for Plaintiffs' counsel—or providing "guaranteed" alopecia diagnoses for (increased) fees or fee-interests?  Are Plaintiffs being subjected to unfair lending arrangements, inflated diagnoses, or unnecessary or harmful tests and treatments?  Defendant does not purport to know—*that is why it has filed this Motion*. But the other side *does* know, and cannot reasonably object to disclosing any lawful conduct or appropriate relationships with interested non-party entities or persons.

## II.     Disclosure of interested non-party entities is best practice

### a.   Disclosure facilitates resolution and is within the Court's discretion

As noted above, disclosure of financially interested entities is routinely required in litigation, and in some cases mandated by the Federal Rules of Civil Procedure.  Adopted in 2002,[36] Rule 7.1 requires nongovernmental corporate parties to disclose "any parent corporation and any publicly held corporation owning 10% or more of its stock."[37]  This disclosure enables judges to identify any conflicts of interest they might face in overseeing litigation.[38]  The Advisory Committee Notes also explain:

> Rule 7.1 does not prohibit local rules that require disclosures in addition to those required by Rule 7.1.  Developing experience with local disclosure practices and

---

[36] Rule 7.1 was drawn from the nearly identical Rule 26.1 of the Federal Rules of Appellate Procedure, which was added in 1989. *See* FED. R. CIV. P. 7.1 advisory committee's note to 2002 adoption.

[37] *See* Tripp Haston, *The Missing Key to 3rd-Party Litigation Funding*, LAW 360 (Feb. 7, 2017) (quoting FED. R. CIV. P. 7.1).

[38] *See id*. (citing FED. R. CIV. P. 7.1 advisory committee's note to 2002 adoption); *see also Steel Erectors, Inc. v. AIM Steel Int'l, Inc.*, 312 F.R.D. 673, 675 n.3 (S.D. Ga. 2016) (noting the purpose of Rule 7.1 to help judges identify conflicts of interest, which are "matters of utmost public concern.") (internal citation omitted).

advances in electronic technology may provide a foundation for adopting more detailed disclosure requirements by future amendments of Rule 7.1.[39]

Thus, federal courts may require more extensive disclosures to identify conflicts, as may the courts of many states with similar disclosure requirements.[40]

As a growing body of collected authority now recognizes:

Without disclosure, not only will courts be subject to unknown conflicts of interest, but the courts and all parties will be potentially unaware of the real parties in interest.  Knowing 'who' is really in court with a direct stake in a case's outcome is critical to facilitate control and resolution by the court.  This disclosure rationale is particularly compelling in class action or mass tort cases where TPLF entities may stand to be the largest beneficiary of any recovery and far larger than any individual plaintiff or class member.[41]

Accordingly, many Courts have ordered disclosure or discovery regarding interested non-parties.  As discussed above, multiple disclosure orders were issued following the revelation of interested non-party involvement in the mesh cases.[42]  In addition, Judge Susan Illston of the Northern District of California recently ordered the plaintiffs in a class action to disclose a litigation funder's involvement in the case after the defendant moved to compel compliance with Civil Local Rule 3-15.[43]  The disclosure showed that a U.K.-based litigation funding entity had invested $1.7 million dollars in the case, expecting a return on investment of more than 600% if

---

[39] *See* Haston, *supra* n.37 (citing FED. R. CIV. P. 7.1 advisory committee's note to 2002 adoption).

[40] *See id*.

[41] *See id*.  Indeed, the Florida Court of Appeals has found TPLF entities' interest in, and control over, litigation so relevant that it has characterized them as parties to the lawsuit, even holding them liable for sanctions where appropriate.  *See Abu-Ghazaleh v. Chaul*, 36 So. 3d 691, 694 (Fla. Ct. App. 2009).

[42] *See supra* part I.c.

[43] *See* Haston, *supra* n.37 (citing *Gbarabe v. Chevron Corp.*, No. 14-CV-00173-SI, 2016 WL 4154849, at *2 (N.D. Cal. Aug. 5, 2016)).  For more on Northern District of California Local Civil Rule 3-15, *see infra* part II.b.

the action succeeded.[44]  Similarly, but in the context of an individual personal injury case, Judge

Andrea R. Wood recently ordered production of litigation financing documents where they were

relevant to the statute of limitations defense asserted in the defendant's motion to dismiss.[45]  And

in *U.S. v. Homeward Residential, Inc.*, No. 4:12-cv-461, 2016 WL 1031154, at *5 (E.D. Tex.

Mar. 15, 2016), Judge Amos Mazzant ordered disclosure of the names of litigation funders over

the plaintiff's insistence that such information was "not relevant to any claim or defense."  This

growing trend confirms the authority and advisability for the Court to order disclosure of

interested non-parties where it would facilitate smooth and just adjudication.

**b.  Some jurisdictions require disclosure as a matter of course**

At least one court has established a district-wide local rule requiring disclosure of non-

party interested entities or persons in all cases.  Northern District of California Local Rule 3-15,

entitled "Disclosure of Non-party Interested Entities or Persons," provides that all parties are

under a continuing obligation to disclose any entity with either "(i) a financial interest of any

kind in the subject matter in controversy or in a party to the proceeding; or (ii) any other kind of

interest that could be substantially affected by the outcome of the proceeding."[46]  Though not

binding here, this Rule constitutes persuasive authority that early disclosure of interested non-

---

[44] *See id.*, *see also* Andrew Stricker, *Investors in Chevron Rig Blast Class Action Seek 6X Return*, LAW
360 (Sept. 20, 2016), https://www.law360.com/articles/842053/investors-in-chevron-rig-blast-class-
action-seek-6x-return.

[45] *See Doe v. Soc'y of Missionaries of Sacred Heart*, No. 11-cv-02518, 2014 WL 1715376, at *4 (N.D. Ill.
May 1, 2014).  In addition to the other reasons for disclosure stated herein, information regarding
interested non-parties is relevant to the statute of limitations defense that Defendant has raised in this
case.  *Id.*; *see also In re Int'l Oil Trading Co., LLC*, 548 B.R. 825, 839 (Bankr. S.D. Fla. 2016) (ordering
disclosure where the information sought was "central to one theory presented" in the defendant's
dispositive motion).  For example, the apparent injury definition "Hair Loss or severe thinning after 6
months of chemo, completed" stated in the Persist email strongly corroborates Defendants' arguments for
dismissal based on applicable statutes of limitations.  *See* MDL Doc. # 494.

[46] *See* N.D. Cal. Local Civil Rule 3-15 (effective Jan. 17, 2017).

parties facilitates case management and resolution.[47]  Moreover, these policies reflect at least one District's reasoned judgment that such benefits conclusively outweigh any prejudice that a disclosing party might allege.[48]

Disclosure of third party funding is also gaining favor as a default rule nationally.  On March 9 of this year, the U.S. House of Representatives passed the Fairness in Class Action Litigation Act of 2017 (FICALA), H.R. 985, and the bill is now with the Senate.[49]  Among other reforms, the law would require the disclosure of all third-party litigation funders in any federal court class action.[50]  And on June 1, 2017, several organizations joined by the U.S. Chamber Institute for Legal Reform sent a letter to the Committee on Rules of Practice and Procedure of the Administrative Office of the U.S. Courts seeking an amendment to Fed. R. Civ. P. 26(a)(1)(A), which would require disclosure of third party litigation funding by contingency fee lawyers in all cases.[51]  The Committee previously indicated its intent to monitor third-party litigation funding and its use in U.S. federal courts.[52]  The growing call for default disclosure among federal judges, legislators, and industry underscore the propriety of the case-specific order Defendant seeks here.

---

[47] Disclosure of litigation funding is also more widely recommended or required in foreign jurisdictions where such funding has been in use longer, such as Canada, Australia, New Zealand, Hong Kong, and Singapore.  *See* Haston, *supra* n.37.

[48] *Cf. In re Diet Drugs*, 236 F. Supp. 2d at 464 (law firms and doctors who stand to profit from litigation "simply have no interest that is as compelling as the interest of rightful claimants" or the public in the just adjudication of claims).

[49] *See* "Actions Overview: H.R. 985 – 115th Congress (2017-2018)," *H.R.985 - Fairness in Class Action Litigation and Furthering Asbestos Claim Transparency Act of 2017*, https://www.congress.gov/bill/115th-congress/house-bill/985/actions?q=%7B%22search (last accessed June 13, 2017).

[50] *See* "Text: H.R. 985 – 115th Congress (2017-2018)," § 1722, *H.R.985 - Fairness in Class Action Litigation and Furthering Asbestos Claim Transparency Act of 2017*, https://www.congress.gov/bill/115th-congress/house-bill/985/text.

[51] *See* "Renewed Proposal to Amend Fed. R. Civ. P. 26(a)(1)(A)" (June 1, 2017) (attached as **Exhibit E**).

[52] *See id*.

Furthermore, it is worth noting that agreements of champerty and/or maintenance are still illegal in some of the transferor jurisdictions pertinent to this litigation.[53]  Disputes over the terms and enforceability of such arrangements can lead to substantial and distracting ancillary litigation.[54]  Likewise, certain fee-splitting arrangements are prohibited by state ethical rules, and violations could disrupt representation.[55]  Disclosure and oversight of any entities involved in such agreements is thus necessary to ensure smooth case management and lawful further proceedings.

In light of these considerations, the MDL Court would well-exercise its discretion to require simple third-party disclosure in this MDL given the growing authority for doing so and the specific apprehensions here.

Defendant's request is a simple one: the entry of an order requiring Plaintiffs to disclose the existence and identity of each non-party interested entity or person in MDL 2740.[56]  Defendant does not, by this Motion, allege specific wrongdoing on the part of Plaintiffs, their counsel, or any such non-party interested entity.  Defendant does not, by this Motion, seek

---

[53] *See, e.g.*, *Maslowski v. Prospect Funding Partners LLC*, 890 N.W.2d 756, 764 (Minn. Ct. App. 2017) (noting "Minnesota's long-established policy that agreements for champerty are unenforceable"); *WFIC, LLC v. LaBarre*, 148 A.3d 812, 819 (Pa. Super. 2016) (invalidating as champertous direct investment in exchange for litigation proceeds).

[54] *See, e.g.*, *Maslowski*, 890 N.W.2d at 764; *WFIC, LLC*, 148 A.3d at 819.  The dispute-multiplying, judicial resource-sapping potential of third-party involvement gone wrong was likewise on display in a recent Texas state court case stemming from funding/referral arrangements similar to those seemingly proposed by Persist Communications here.  In *Shenaq v. Akin*, a former officer of a Texas plaintiffs' firm sued the firm over its failure to pay him $4 million for 14,000 pelvic mesh suits he acquired for the firm.  *See* Haston, *supra* n.37 (citing *Shenaq v. Akin*, No. 2015-57942 (Dist. Ct. Harris County, Tex., filed Sept. 29, 2015)).  In the suit, the former officer claimed that he helped secure $93 million from a then-leading litigation financer, Gerchen Keller Capital ("GKC"), to fund the firm's television advertisements and direct purchase of mass-tort suits from other plaintiffs' attorneys.  *Id*.  According to the suit, the former officer's efforts were expected to yield his former employer between $130 to $200 million in fees.  *Id*.

[55] *See, e.g.*, *In re Diet Drugs*, 236 F. Supp. 2d at 459 (referring firm's contingent payment of echo-cardiologist to New York Disciplinary Authority for further review).

[56] Defendants submit proposed Pretrial Order #X, which is modeled on Northern District of California Local Civil Rule 3-15, contemporaneously with this Motion.

general capitalization or financial data for the Plaintiffs' firms involved in this MDL. Defendant does not seek a damning admission, but rather that these proceedings be conducted with transparency, so that the worst evils of third-party involvement may be avoided. And although it considers the Northern District of California's Local Rule governing "Disclosure of Non-party Interested Entities or Persons" enlightened and instructive, Defendant does not, by this Motion, seek a District-wide Local Rule regarding disclosure of third-party funding.

## **<u>CONCLUSION</u>**

Based on the letter received by defense counsel, the perils of nondisclosure, and the benefits for determining conflicts of interest and pursuing efficient management and resolution of this litigation, sanofi-aventis U.S. LLC respectfully requests that this Court order Disclosure of Non-party Interested Entities or Persons in MDL No. 2740.

/s/ *Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE URQUHART & MOORE LLC**
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: 504-310-2100
Facsimile: 504-310-2120
dmoore@irwinllc.com

Harley Ratliff
Adrienne L. Byard
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
Facsimile: 816-421-5547
hratliff@shb.com
abyard@shb.com

*Counsel for sanofi-aventis U.S. LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 20, 2017, I electronically filed the foregoing with the Clerk of the

Court using the ECF system which sent notification of such filing to all counsel of record.

<u>/s/ *Douglas J. Moore*</u>