# EXHIBIT E

June 1, 2017


Ms. Rebecca A. Womeldorf
Secretary of the Committee on Rules of Practice and
Procedure of the Administrative Office of the United
States Courts
One Columbus Circle, NE
Washington, D.C. 20544

RE:     Renewed Proposal to Amend Fed. R. Civ. P.
        26(a)(1)(A)

Dear Ms. Womeldorf:

On behalf of the U.S. Chamber Institute for Legal Reform, the Advanced
Medical Technology Association, the American Insurance Association, the
American Tort Reform Association, the Association of Defense Trial Attorneys, DRI
– *The Voice of the Defense Bar*, the Federation of Defense & Corporate Counsel, the
Financial Services Roundtable, the Insurance Information Institute, the International
Association of Defense Counsel, Lawyers for Civil Justice, the National Association
of Mutual Insurance Companies, the National Association of Wholesaler-
Distributors, the National Retail Federation, the Pharmaceutical Research and
Manufacturers of America, the Product Liability Advisory Council, the Property
Casualty Insurers Association of America, the Small Business & Entrepreneurship
Council, the U.S. Chamber of Commerce, the Michigan Chamber of Commerce, the
State Chamber of Oklahoma, the Pennsylvania Chamber of Business and Industry,
the South Carolina Chamber of Commerce, the Virginia Chamber of Commerce,
Wisconsin Manufacturers & Commerce, the Las Vegas Metro Chamber of
Commerce, the Florida Justice Reform Institute, the Louisiana Lawsuit Abuse
Watch, the South Carolina Civil Justice Coalition, and the Texas Civil Justice
League, [1] we are writing to renew the proposal for amending the Federal Rules of
Civil Procedure to require the disclosure of third-party litigation funding ("TPLF")
arrangements in any civil action filed in federal court.

TPLF is the practice of investors buying an interest in the outcome of a
lawsuit, often in part to (a) allow a plaintiff to "cash out" of all or part of its interest
in a claim, (b) allow plaintiffs' counsel to be paid up front for their prosecution of a
claim, or (c) provide a plaintiff with money to litigate its claims.  Absent robust

---

[1]     Descriptions of each of the aforementioned organizations are attached as Appendix A.

Ms. Rebecca A. Womeldorf
June 1, 2017
Page Two

disclosure requirements, TPLF will continue to operate in the shadows, concealing from the court and other parties in each case the identity of what is effectively a real party in interest that may be steering a plaintiff's litigation strategy and settlement decisions. The lack of transparency may also conceal serious conflicts of interest, as TPLF entities may be either publicly traded companies or companies supported by investment funds whose individual stakeholders may include judges, attorneys, or jurors.

To address these concerns, several of the aforementioned organizations submitted a proposal in 2014 that would have added to the list of required "initial disclosures" in the existing provision of Rule 26(a)(1)(A) a requirement that "a party must, without awaiting a discovery request, provide to the other parties . . . for inspection and copying as under Rule 34, any agreement under which any person, other than an attorney permitted to charge a contingent fee representing a party, has a right to receive compensation that is contingent on, and sourced from, any proceeds of the civil action, by settlement, judgment or otherwise."[2]

While the Committee ultimately opted not to proceed with formal consideration of the proposal at that time, it indicated it would continue monitoring TPLF and its usage in the federal courts. Since that time, there have been several relevant noteworthy developments, including new evidence of the rapid expansion of TPLF usage in the United States, the diversification of funding methods in a manner that is likely to fuel further expansion of the practice, and several specific episodes revealing significant problems with TPLF – all of which underscore the need for robust disclosure requirements.

## I.    The Rapid Growth Of TPLF

*Expansion of TPLF in the United States.* A principal reason the Committee cited for not pursuing the TPLF disclosure proposal in 2014 was its belief that there was uncertainty about the frequency with which TPLF was being used in U.S. litigation. In a very real sense, this objection served to underscore the need for greater transparency on this subject because the dearth of meaningful data regarding TPLF usage stems largely from the lack of disclosure. Since there is no standing duty to reveal TPLF arrangements, the presence of litigation funding in a case comes to light only rarely, usually as a result of discovery (in the limited circumstances it has been permitted) or disputes between parties and a funder.

---

[2]    The full text of the proposed amendment is attached as Appendix B.

Ms. Rebecca A. Womeldorf
June 1, 2017
Page Three


The reality is that  since 2014,  TPLF usage has increased substantially.[3]  One
of the largest funders in the United States, Burford Capital Limited ("Burford"),
recently announced record income, profits, cash receipts and new investment
commitments in a March 2017 press release.[4]  Specifically, Burford announced a net
after-tax profit of $115.1 million in 2016, representing a 75% increase from the
profit realized in 2015.[5]  In addition, Burford's income increased by 59% to a record
$163.4 million, which was fueled in large part by a 60% increase in income from
litigation-related investments.[6]  Further, Burford announced robust organic cash
generation facilitated by investment recoveries of $216 million.[7]  And the expansion
of Burford has culminated in record investment commitments of $378 million, which
marks an 83% increase from 2015.[8]  These strong economic figures by Burford were
announced on the heels of its acquisition of Chicago-based Gerchen Keller Capital
LLC, another large U.S. funder.  Burford spent $160 million to buy Gerchen Keller –
its largest rival[9] – which in early 2016 reported more than $1.4 billion in assets.[10]
The combination of the two funders "result[ed] in purchase power of about $2.5
billion or more (with Burford at about $1 billion and Gerchen Keller at about $1.4 or
$1.5 billion)."[11]

---

[3]     Henry Meier, *Litigation Costs Go Third Party*, Los Angeles Business Journal, July 4, 2016
("[TPLF] industry growth has been rapid."); Matthew Fechik & Amy G. Pasacreta, *United States:
Litigation Finance: A Brief History Of A Growing Industry*, Mondaq, Apr. 4, 2016 ("[TPLF] firms
now invest about $1 billion a year, and the industry seems to be growing.").

[4]     *Burford Capital Delivers 75% Growth in Full Year 2016 Profit*, Mar. 14, 2017,
http://www.burfordcapital.com/newsroom/burford-capital-delivers-75-growth-full-year-2016-profit/.

[5]     *Id.*

[6]     *Id.*

[7]     *Id.*

[8]     *Id.*

[9]     Roy Strom, *With Profits Up 75 Percent, Burford's Results Reveal Evolving Litigation
Funding Industry*, Mar. 14, 2017, The American Lawyer,
http://www.americanlawyer.com/id=1202781274593/With-Profits-Up-75-Percent-Burfords-Results-
Reveal-Evolving-Litigation-Funding-Industry.

[10]    Julie Triedman, *Topping $1 Billion Mark, Big Litigation Funder Gets Bigger*, The Am Law
Daily, Jan. 6, 2016, http://www.americanlawyer.com/id=1202746351295/Topping-1-Billion-Mark-
Big-Litigation-Funder-Gets-Bigger?slreturn=20160006110304.

[11]    *Burford Acquires Gerchen Keller: What is Going on?*, Fulbrook Capital Management, LLC,
Dec. 20, 2016, http://www.fulbrookmanagement.com/burford-acquires-gerchen-keller-what-is-going-
on/.

Ms. Rebecca A. Womeldorf
June 1, 2017
Page Four


Burford's strong economic figures are a microcosm of the broader TPLF industry.[12]  Indeed, a number of other major TPLF companies have likewise experienced significant expansion over the past several years.  For example:

- Bentham IMF − the U.S. arm of IMF Bentham Limited, one of the largest litigation funding companies in the world − reported a 109% increase in total income in 2016 and recently announced a new $200 million litigation finance vehicle focused solely on funding U.S. cases and matters.[13]  Bentham also recently announced that it would be opening its fourth office in the United States.[14]

- Therium Group Holdings, another funder, announced in April 2016 that it had secured $300 million to invest in commercial litigation financing ("the largest ever single investment in the litigation funding sector, globally") and that it would be launching operations in the United States in light of increased demand for litigation funding by law firms and businesses.[15]

- Longford Capital Management LP, which was founded in 2014 and invests in contract, antitrust and other claims, raised $56.5 million for its first fund.[16]  The litigation funder experienced significant economic growth in its initial venture, obtaining returns in the "***70-90 percent range***."[17]  Further, the privately held capital fund, now headed by a former Morgan Stanley executive, recently announced

---

[12]     Strom, *supra* note 9.

[13]     IMF Bentham Final Report, June 30, 2016, https://www.imf.com.au/docs/default-source/site-documents/annual-report-30-june-2016; *Commercial Litigation Funder Bentham IMF Expands into Houston, Hiring Top Local Talent*, PR Newswire, Feb. 24, 2017, http://www.prnewswire.com/news-releases/commercial-litigation-funder-bentham-imf-expands-into-houston-hiring-top-local-talent-300413392.html.

[14]     PR Newswire, *supra* note 13.

[15]     *Therium Launches in U.S. to Meet Increasing Industry Demand for Litigation Funding*, Yahoo Finance:  Business Wire, Apr. 19, 2016, http://finance.yahoo.com/news/therium-launches-u-meet-increasing-110300761.html.

[16]     Julie Triedman, *The Big Players in the Litigation Funding Arena*, The American Lawyer, Dec. 30, 2015.

[17]     Lynne Marek, *Chicago Investment Firm Looks To Attract $250 Million for Second Fund*, Crains Chi. Bus., Feb. 27, 2017, http://www.chicagobusiness.com/article/20170227/NEWS01/170229913/chicago-investment-firm-looks-to-attract-250-million-for-second-fund.

Ms. Rebecca A. Womeldorf
June 1, 2017
Page Five

that it has raised more than double that for its sophomore fund − a staggering $118.47 million.[18]

- In 2016, Lake Whillans Litigation Finance LLC expanded by opening an office in Palo Alto to continue its work with Silicon Valley-based companies and corporate counsel.[19]  Established in 2013, the company has already deployed more than $50 million in active capital.[20]

- Harbour Litigation Funding, which operates across the globe, including in the United States, recently announced that it has over £400m of capital commitments.[21]  In 2016, this funder expanded its global team by more than 40%.[22]

- Vannin Capital, another international funder, recently announced the appointment of Jeffery Commission to serve as senior counsel in Washington, D.C.  According to a company press release, "this appointment represents the latest expansion of Vannin's fast-growing business[.]"[23]

Expansion of TPLF in the United States has also been fueled by growing activity in the arena by private hedge funds.[24]  For example, RD Legal Capital, a New Jersey-based hedge fund, invested in a $1.8 billion uncollected judgment against the Iranian central bank, while New York-based Elliott Management Corp. helped fund a lawsuit by Stan Lee Media Inc. against Walt Disney Co. regarding

---

[18]     *Id.*; S.E.C. Form D, Longford Capital Management, Mar. 9, 2017, https://www.sec.gov/Archives/edgar/data/1699903/000169990317000001/xslFormDX01/primary_doc.xml.

[19]     *Litigation Finance Leader Lake Whillans Expands, Opening Palo Alto Office*, PR Newswire, Mar. 3, 2016, http://www.prnewswire.com/news-releases/litigation-finance-leader-lake-whillans-expands-opening-palo-alto-office-300230623.html.

[20]     *Id.*

[21]     Harbour Litigation Funding, https://www.harbourlitigationfunding.com/about-us/our-funds/.

[22]     *Id.*

[23]     *Vannin Capital Expansion Continues*, Jan. 19, 2016, http://vannin.com/press/article/156/2016-01-19/vannin-capital-expansion-continues.

[24]     *See* Thomas Brom, *How Litigation Funding Upsets the Justice Marketplace*, California Lawyer, June 2015.

Ms. Rebecca A. Womeldorf
June 1, 2017
Page Six

popular comic-book characters created by Stan Lee.[25]  And EJF Capital (based in Arlington, Va.) has raised hundreds of millions of dollars to invest in mass tort lawsuits, including transvaginal mesh and Risperdal litigation.[26]  The hedge fund reportedly is targeting "class-action injury lawsuits" at "hefty interest rates," with the loans to be repaid by law firms "as they earn fees from settlements and judgments."[27]

Another driving force behind the TPLF industry's expansion is the increasing use of TPLF by law firms.[28]  According to one partner at a prominent law firm, "[m]y experience with funders is, all I've seen is growth."[29]  Indeed, a recent survey conducted by Burford shows that TPLF is becoming more popular among large law firms in the United States.[30]  The survey found that 28% of private practice lawyers say their firms have used TPLF directly, a four-fold increase since 2013.[31] Consistent with these findings, Burford recently asserted that it "has worked with 75 of the Am Law 100 and last year lent $100 million and $50 million to two global law firms, respectively, to finance their litigation departments."[32]

Another recent survey published by TPLF company Lake Whillans produced similar results.[33]  According to the survey, the strongest motivation for using TPLF was the lack of funds/legal fees and hedging risk of litigation, respectively.[34]

---

[25]     *Id.*

[26]     *See* Rob Copeland, *Hedge-Fund Manager's Next Frontier: Lawsuits*, Wall Street Journal, Mar. 9, 2015, http://www.wsj.com/articles/hedge-fund-managers-next-frontier-lawsuits-1425940706.

[27]     *Id.*

[28]     Julie Triedman, *Arms Race: Law Firms and the Litigation Funding Boom*, The American Lawyer, Dec. 30, 2015, http://www.americanlawyer.com/id=1202745121381/Arms-Race-Law-Firms-and-the-Litigation-Funding-Boom.

[29]     *Id.* (quoting Reed Oslan).

[30]     Julie Triedman, *Big Law Warms Up to Litigation Funding, Burford Survey Finds*, The Am Law Daily, May 3, 2016.

[31]     *Burford's Latest Research Shows Explosive Growth and Ongoing Evolution of Litigation Finance*, Burford Blog, May 3, 2016.

[32]     Strom, *supra* note 9.

[33]     *Litigation Finance, the Litigators Perspective*, http://lakewhillans.com/research/litigation-finance-the-litigators-perspective/.

[34]     *Id.*

Ms. Rebecca A. Womeldorf
June 1, 2017
Page Seven

Notably, in-house counsel were the only category describing TPLF "[a]s a means to fund operating expenses" in significant numbers, at 25%.[35]

In sum, there has been a dramatic expansion of TPLF over the last few years.[36] The scope of TPLF in U.S. civil litigation has reached a point such that the Committee should formally consider our proposal to require the disclosure of TPLF arrangements in all civil actions filed in federal court.

*Changes in Funding Methods/Applications.* TPLF companies are also expanding the ways in which they invest in litigation and the types of litigation they are willing to fund, driving the pervasiveness of TPLF and increasing the likelihood that it will encourage the filing of spurious lawsuits. Traditionally, TPLF firms invested solely in individual cases that went through their own vetting process. But recently, some of these firms have begun investing in portfolios of cases at certain law firms "based on their existing track record" and "the types of cases they handle."[37] In 2015, Bentham invested $30 million into such funding deals with seven different law firms.[38] That investment covered more than 60 cases in intellectual property, insurance coverage, entertainment, health care, contracts and other areas.[39]

Burford has also embraced the portfolio approach to TPLF. In 2015, about 50% of Burford's capital was in case portfolios.[40] Burford continued this trend in 2016, pouring an unprecedented $100 million into a portfolio of cases at one large

---

[35]     *Id.*

[36]     Brom, *supra* note 24 ("By all accounts third-party funding . . .is spreading rapidly.").

[37]     Sara Randazzo, *Litigation Funding Pioneer Hits a Roadblock*, Wall Street Journal, Nov. 23, 2015, http://blogs.wsj.com/law/2015/11/23/litigation-funding-pioneer-hits-a-roadblock/. "Consider Pierce Sergenian, a six-lawyer trial boutique started by" former lawyers from "the litigation powerhouse Quinn Emanuel Urquhart & Sullivan," which "afford[s] to handle the 10 cases it has on board . . . by selling a separate interest in the potential recoveries to a financier[.]" Paul Barrett, *The Business of Litigation Finance Is Booming*, Bloomberg Businessweek, May 30, 2017. "The financing of Pierce Sergenian marks the first time that a law firm and funder have gone public about the existence of such a portfolio-investment arrangement." *Id.*

[38]     *Id.*

[39]     *See* Andrew Strickler, *Litigation Funding Industry Deepening Law Firm Ties*, Law 360, Nov. 16, 2015, http://www.law360.com/articles/727348/litigation-funding-industry-deepening-law-firm-ties.

[40]     Julie Triedman, *Arms Race*, *supra* note 28.

Ms. Rebecca A. Womeldorf
June 1, 2017
Page Eight

global law firm that Burford refuses to name.[41]  One of the most notable findings of
the Burford survey discussed above confirms the growing popularity of portfolio-
based TPLF:  "About as many lawyers said they had experience with portfolio
financing in 2016 (9 percent) as had experience with single case financing, the most
commonly understood form of third-party funding, in 2013 (7 percent)."[42]

Because the portfolio strategy by definition involves funding a larger and
broader array of cases, it can be expected to increase the filing of ill-considered
cases.  Indeed, recent experience in the mass-tort arena revealed that TPLF is being
used in large product liability litigation where lawyers amass as many "faceless
clients as possible" without adequately investigating the merit of the claims.[43]  A
lawsuit brought by a former plaintiffs' law firm employee in connection with the use
of TPLF in litigation involving allegedly defective mesh products summarized the
business model employed by the law firm:

> (i) borrow as much money as possible; (ii) buy as many television
> ads and/or faceless clients as possible; (iii) wait on real lawyers
> somewhere to establish liability against somebody for something;
> (iv) use those faceless clients to borrow even more money or buy
> even more cases; (v) hire attorneys to settle the cases for whatever
> they can get; (vi) take a plump 40% of the settlement from the
> thousands and thousands of people its lawyers never met or had any
> interest in meeting; and (vii) lather, rinse, and repeat.[44]

As one article explained, the TPLF company's "investment in a claims-
bundling firm, known not for trial work but for multimillion-dollar TV blitzes aimed
at potential mass tort claimants, was a far cry from the funder's usual customers:
companies with big business disputes for their Am Law 200 firms."[45]  Indeed, the
use of TPLF to aid personal injury firms in aggregating "faceless" claims contradicts

---

[41]    Julie Triedman, *Burford Boasts Big Year, Invests $100M in Law Firm Portfolio*, The Am
Law Daily, Mar. 23, 2016.

[42]    *Burford's Latest Research Shows Explosive Growth and Ongoing Evolution of Litigation
Finance*, Burford Blog, May 3, 2016.

[43]    David Yates, *"Mass Tort Warehouse" Fires Fund Officer to Avoid Paying Millions for
Acquiring 14,000 Mesh Claims, Suit Alleges*, SE Texas Record, Oct. 10, 2015,
http://setexasrecord.com/stories/510642299-mass-tort-warehouse-fires-fund-officer-to-avoid-paying-
him-millions-for-acquiring-14-000-mesh-claims-suit-alleges.

[44]    Compl. ¶ 76, *Shenaq v. Akin*, No. 2015-57942 (Dist. Ct. Harris County, Tex., filed Sept. 29,
2015).

[45]    Julie Triedman, *Arms Race*, *supra* note 28.

Ms. Rebecca A. Womeldorf
June 1, 2017
Page Nine

the representations of some funders that they rigorously assess each case investment and would never finance frivolous or dubious claims.

TPLF has also taken center stage at a growing number of startup companies that seek to raise funding for lawsuits via online marketplaces.[46]  The usual course has been for TPLF entities to collect money from investors that they would in turn use to buy interests in a collection of cases of the fund's choosing.  LexShares and Trial Funder Inc., however, are attracting investors, commercial plaintiffs, and plaintiffs' firms to their online marketplaces.  Accredited investors are able to shop among individual cases and contribute as little as $2,500 in the hopes of reaping an eventual profit when a matter settles or produces a favorable judgment.  Unlike traditional third-party litigation finance firms, these new startup companies solicit investments using a crowdfunding-like model, which allows ordinary accredited investors to choose among cases vetted by the company.  Thus far, LexShares has raised approximately $5.5 million for 15 cases, including a legal malpractice lawsuit filed by an athletic association, a breach-of-contract lawsuit and a handful of product-liability cases brought against Fortune 500 companies.[47]  Trial Funder's experience has been similar, with it earmarking substantial sums for personal-injury cases.[48]

At bottom, not only has TPLF become a more prominent facet of civil litigation in the United States, but it has also been accompanied by sophisticated changes in funding methods that will likely accelerate its growth.

## II.    The Need For Disclosure Of TPLF

Third-party litigation funding raises a host of legal and ethical issues that provide a compelling need for mandatory disclosure.  The funding agreements may violate state champerty and maintenance laws, as well as ethical canons, and they often distort the traditional adversarial system of civil justice.  Absent a robust disclosure requirement, plaintiffs will continue to utilize TPLF – in some situations, illegally – undetected and unchecked.  Indeed, the rapid growth of TPLF in the United States over the past several years demonstrates that such agreements are used extensively without notice to the court or opposing party.

---

[46]     Sara Randazzo, *Litigation Funding Moves into Mainstream*, Wall Street Journal, Aug. 4, 2016.

[47]     *Id.*

[48]     *Id.*

Ms. Rebecca A. Womeldorf
June 1, 2017
Page Ten

In recognition of this fact, at least one federal district court – the U.S. District Court for the Northern District of California – has adopted its own TPLF disclosure requirement.  Recently, that court added to its "Standing Order For All Judges" a provision requiring that "in any proposed class, collective, or representative action, the required disclosure includes any person or entity that is funding the prosecution of any claim or counterclaim."[49]  That action was taken in the immediate aftermath of a panel discussion at the court's annual judicial conference during which TPLF industry representatives took the position that their investments in class actions and other litigation should not be disclosed.  As one attorney who studies the litigation funding industry explained, the Northern District of California rule is "really a harbinger and a signal that courts . . . need to consider the presence of third-party financiers in a lawsuit and consider their role."[50]  Indeed, published reports indicate that the U.S. District Court for the Eastern District of Texas may also be considering a disclosure rule.[51]

Importantly, a TPLF disclosure requirement would be consistent with federal courts' interest in safeguarding legitimate, ethical civil litigation practices.  Federal courts have long allowed defendants to utilize discovery tools to uncover unethical conduct by plaintiffs that could affect the case at hand.[52]  Indeed, as one court

---

[49]      Standing Order for all Judges of the Northern District of California, Contents of Joint Case Management Statement, § 19 (Jan. 2017).

[50]      Ben Hancock, *New Litigation Funding Rule Seen as "Harbinger" for Shadowy Industry*, The Recorder, Jan. 25, 2017, http://www.legaltechnews.com/id=1202777609784/New-Litigation-Funding-Rule-Seen-as-Harbinger-for-Shadowy-Industry?mcode=1202617583589&curindex=58&slreturn=20170228111023.

[51]      *See* Ben Hancock, *Bentham Hires Yetter Coleman Partner as It Expands to Texas*, Texas Lawyer, Feb. 21, 2017, http://www.texaslawyer.com/id=1202779591965/Bentham-Hires-Yetter-Coleman-Partner-as-It-Expands-to-Texas?slreturn=20170228084913 ("After the [Northern District of California] disclosure rule was announced, Ron Clark, chief judge of the Eastern District of Texas, told Texas Lawyer that jurists in his division may follow the Northern District of California's lead and consider similar measures.").

[52]      *See, e.g.*, *Parrot v. Wilson*, 707 F.2d 1262, 1271, n.20 (11th Cir. 1983) (affirming trial court's order requiring the production of interview tapes that had been secretly recorded by an attorney; "Disclosure is clearly an appropriate remedy when the evidence sought was *generated* directly by the attorney's misconduct."); *Baker v. Masco Builder Cabinet Grp., Inc.*, 2010 U.S. Dist. LEXIS 104018, at *11-12 (D.S.D. Sept. 27, 2010) ("Courts have also allowed defendants to inquire into alleged misconduct of plaintiffs' counsel because such misconduct may result in the denial of class certification."); *Stavrides v. Mellon Nat'l Bank & Tr. Co.*, 60 F.R.D. 634 (W.D. Pa. 1973) (granting defendant's motion to compel answers to deposition questions granted because the possible ethical misconduct on the part of plaintiff's attorneys in a class action could lead to denial of class certification).

Ms. Rebecca A. Womeldorf
June 1, 2017
Page Eleven


explained in requiring the disclosure of consulting agreements securing the
cooperation of a previously hostile witness, courts have an obligation to ensure that
litigants' or their attorneys' "conduct does not *erode the integrity of the adversary
process*."[53]  In that case, the defendants in a complex environmental litigation
entered into various consulting agreements with a former officer of one of the
companies and sought to shield the contracts under the work-product doctrine.
According to the district court, those agreements "were designed to overcome the
hostility between [the former officer] and [one of the defendants] resulting from the
dispute over the circumstances of [the former officer's] departure from [the
company] in 1979[.]"[54]  In addition, the consulting agreements were tantamount to
"purchas[ing] [the former officer's] cooperation in the instant case[.]"[55]  Finding that
"the conduct of [defendants] and their counsel in relation to [the former officer]
ha[d] threatened to undermine the integrity of the adversary process in th[e] case,"
the district court ordered the production of the consulting agreements.[56]

The same logic supports the disclosure of TPLF arrangements at the outset
of civil lawsuits.  As set forth more fully below, a mandatory TPLF disclosure
requirement is critical to the "integrity of the adversary process" because these
arrangements threaten core ethical and legal principles that undergird our civil justice
system.

*TPLF May Violate the Common Law Doctrine of Champerty.*  Champerty
is a centuries-old legal doctrine that prohibits someone from funding litigation in
which he or she is not a party.  It is intended to prevent courts from becoming trading
floors where people buy and sell lawsuits based on their perceived merit.  Although
the TPLF industry has promoted the view that this doctrine has become a "dead
letter,"[57] recent state and federal court decisions have given renewed vitality to
champerty principles, particularly in the TPLF arena.

One recent Pennsylvania appellate decision is illustrative.  In *WFIC, LLC v.
Labarre*,[58] an attorney entered into a contingency-fee agreement with his client under

---

[53]     *New York v. Solvent Chem. Co.*, 166 F.R.D. 284, 289-90 (W.D.N.Y. 1996).

[54]     *Id.* at 289.

[55]     *Id.* at 289-90.

[56]     *Id.* at 289.

[57]     *Litigation Finance Is not Champerty, Maintenance or Barratry*, Burford Capital, July 30,
2013, http://www.burfordcapital.com/blog/litigation-finance-not-champerty-maintenance-barratry/.

[58]     No. 1985 EDA 2015, 2016 WL 4769436, at *5 (Pa. Super. Ct. Sept. 13, 2016).

Ms. Rebecca A. Womeldorf
June 1, 2017
Page Twelve

which a TPLF company that had loaned money to pursue the litigation matter would
be paid out of counsel's expected fees.  In the course of sorting out a dispute among
creditors about which entity should have priority in the distribution of available
assets, the appellate court concluded that counsel's agreement to pay the funder out
of his fees was champertous under Pennsylvania law because the investors were
unrelated parties lacking a legitimate interest in the lawsuit.  The court thus found the
agreement invalid and unenforceable, making clear that "champerty remains a viable
defense in Pennsylvania."[59]

These issues were also at play in *Justinian Capital SPC v. WestLB AG*,[60] a
case decided by New York's highest court.  There, DPAG (a German bank) bought
notes from defendant WestLB that subsequently lost substantial value.  DPAG
wanted to sue West LB for fraud and malfeasance, but feared adverse reactions by
German regulators.  As a result, DPAG agreed to provide the notes to plaintiff
Justinian Capital (a Cayman Islands company) so that it could sue West LB – and it
did so.  However, the defendant argued, and the New York Court of Appeals agreed,
that such an acquisition was champertous.  This was so, the court reasoned, "because
Justinian did not pay the purchase price or have a binding and bona fide obligation to
pay the purchase price of the Notes independent of the successful outcome of the
lawsuit[.]"[61]

And in *Maslowski v. Prospect Funding Partners LLC*, the Minnesota Court
of Appeals refused to enforce a New York forum-selection clause in a funding
agreement on the ground that it was effectuated to evade "Minnesota's local interest
against champerty."[62]  The Minnesota Court of Appeals explained that "in this
particular case, the decision whether the parties' agreement violates Minnesota's
policy against champerty has the potential to expose personal-injury actions in
Minnesota to the negative effects of champerty.  Given that potential, Minnesota has
a strong local interest in applying its prohibition against champerty in this case."[63]

A federal court decision published earlier this year has also made clear that
champerty is not a moribund concept.  In *In re DesignLine Corporation*,[64] a

---

[59]     *Id.*

[60]     65 N.E.3d 1253 (N.Y. 2016).

[61]     *Id.* at 1259.

[62]     2017 Minn. App. LEXIS 26, at *22 (Minn. Ct. App. Feb. 13, 2017).

[63]     *Id.* at *22-23.

[64]     2017 Bankr. LEXIS 182, at *1 (U.S. Bankr. W.D.N.C. Jan. 20, 2017).

Ms. Rebecca A. Womeldorf
June 1, 2017
Page Thirteen

bankruptcy case, the trustee proposed to "sell" several adversarial proceedings to a litigation funder in order to obtain an advance on litigation expenses.  In exchange, the funder would receive a substantial interest in the remaining proceeds of those actions, as well as the right of "input into future decisions" and the "power to cut off funding."[65]  The opponents objected, contending that the agreements contravened North Carolina law because the funding company would exercise significant control over the litigation.  The federal court agreed, placing great emphasis on the funder's "power of the purse" – i.e., the "ultimate power to cut off funding."[66]  In light of this substantial control over the litigation by a party not otherwise interested in the lawsuit, the court found the agreements to be champertous under North Carolina law.

Each of the aforementioned champerty cases arose out of disputes between the funder and a funded party or person involved in the funding arrangement.  But if a party is being sued pursuant to an illegal (champertous) funding arrangement, the defendant has a right to know and presumably would have standing to challenge such an agreement as champertous under the applicable state law.  After all, "[t]he general purpose of the law against champerty and maintenance is to prevent officious intermeddlers from stirring up strife and contention by vexatious or speculative litigation which would disturb the peace of society, lead to corrupt practices, and pervert the remedial process of the law."[67]  Each of these deleterious consequences has the potential to aggrieve a defendant being sued pursuant to a TPLF arrangement, including, for example, by deterring reasonable settlements or needlessly prolonging litigation, as elaborated in greater detail *infra*.  Without a disclosure requirement, plaintiffs will continue to enter into TPLF agreements in the shadows, concealing potential and fundamental violations of state champerty law.

***TPLF May Violate Ethical Rules Prohibiting Sharing Of Attorney Fees With Nonlawyers.***  Another troubling ethical implication of TPLF is the tendency of some lawyers who enter into TPLF arrangements to share their legal fees with the funder.  Model Rule 5.4(a) prohibits an attorney or law firm from sharing legal fees with a nonlawyer except in limited circumstances.[68]  "As stated in the comments to Rule 5.4, this prohibition is intended to 'protect the lawyer's professional independence of judgment.'"[69]  "Fee splitting is [also] viewed as running the risk of

---

[65]      *Id.* at *10.

[66]      *Id.* at *17.

[67]      *Id.* at *11-12 (internal quotation marks and citation omitted).

[68]      Model Rules of Prof'l Conduct, R.5.4(a).

[69]      Maya Steinitz, *Whose Claim Is This Anyway? Third-Party Litigation Funding*, 95 Minn. L. Rev. 1268, 1291-1292 (2011) (quoting Model Rules of Prof'l Conduct R. 5.4 cmt. (2003)).

Ms. Rebecca A. Womeldorf
June 1, 2017
Page Fourteen


granting nonlawyers control over the practice of law or potentially enabling lay persons to practice law without authorization."[70]  While "[f]unders may . . . insist upon contracting directly with the client in order to circumvent the prohibition,"[71] some of them are ignoring this blackletter principle.  This is becoming more apparent in class actions, in which plaintiffs' counsel are securing funding by promising to share their fees (if awarded any) with the funder to pay it back.

For example, in *Gbarabe v. Chevron Corp.*,[72] plaintiffs commenced a putative class action arising out of an explosion on an oil drilling rig off the coast of Nigeria.  Under the agreement entered into by plaintiffs' counsel and the funder, counsel agreed that the funder would be repaid its $1.7 million investment in the case by way of a "success fee" of six times that amount ($10.2 million), to be paid from attorneys' fees – ***plus*** 2% of the total amount recovered by the putative class members.[73]  Thus, apparently without their knowledge or approval, putative class members will have to hand over part of their recovery to the litigation funder.  These sorts of provisions blur the line separating lawyers from nonlawyers and undermine the sacrosanct attorney-client relationship that is at the core of our civil justice system.

***TPLF Creates The Possibility Of Conflicts Of Interest Among The Plaintiff, The Attorney, And The Funder***.  "Loyalty and independent judgment are essential elements in the lawyer's relationship to a client."[74]  Indeed, attorneys owe their clients a fiduciary duty of allegiance – mandated by the rules of ethics – which requires them to put the interests of their client above their own, and to avoid even the appearance of impropriety.[75]  However, an attorney that has contracted directly with a funding company may have contractual duties to it that are separate from – and, perhaps, inconsistent with – the attorney's professional duties to his or her client.[76]  Moreover, because both third-party funders and attorneys are repeat players in the litigation market, it can be expected that relationships among them will

---

[70]     *Id.*

[71]     Jasminka Kalajdzic, Peter Cashman & Alana Longmoore, *supra* note 3.

[72]     *Gbarabe v. Chevron Corp.*, 2016 U.S. Dist. LEXIS 103594, at *6 (N.D. Cal. Aug. 5, 2016).

[73]     Litigation Funding Agreement ("*Gbarabe* Litigation Funding Agreement"), § 1.1, *Gbarabe v. Chevron Corp.*, No. 14-cv-00173-SI, Dkt. No. 1864 (N.D. Cal. filed Sept. 16, 2016).

[74]     Model Rules of Prof'l Conduct, R. 1.7 cmt. [1].

[75]     *Id.*

[76]     *See, e.g.*, *id.*, R. 1.7(a) (providing that a "concurrent conflict of interest exists where" "there is a significant risk that the representation . . . will be materially limited by the lawyer's responsibilities to . . . a third person").

Ms. Rebecca A. Womeldorf
June 1, 2017
Page Fifteen

develop over time.  Attorneys can be expected to "steer" clients to favored financing firms, even if the client's particular circumstances suggest a different firm may be more appropriate, and *vice versa*.

Further, litigation financing arrangements raise confidentiality concerns insofar as they require plaintiffs to disclose privileged information to the financier. In order to evaluate a plaintiff's claim and determine whether and on what terms to finance the case, a litigation financing company generally will ask to evaluate confidential, and possibly privileged, information belonging to the plaintiff.  If the plaintiff elects to provide the information to the financing company, any privilege protecting it likely would be waived.  Attorneys advising a client at the outset of a case may be reluctant to provide the client full and candid advice in writing, knowing that any communications could be viewed by the funder as part of its diligence, and then would be available to the opposing party in discovery.

In short, interjection of a financially interested third party into the adversarial calculus threatens to interfere with fundamental duties owed by the attorney to his or her client.  This unseemly dynamic raises the possibility that the attorney's professional judgment will be guided by the pecuniary interest of the entity bankrolling the litigation rather than the client's own interest.

***TPLF Raises The Possibility Of Judicial Conflicts Of Interest.***  In addition, to threatening the attorney-client relationship, TPLF arrangements also pose a risk of conflicts of interest between the judge and the parties to the litigation.  The Federal Rules of Civil Procedure already require nongovernmental corporate entities to disclose "any parent corporation and any publicly held corporation owning 10 percent or more of its stock."[77]  The purpose of this rule is to provide judges with information necessary to determine whether they have a conflict of interest in adjudicating a case.[78]  "As some TPLF entities are multibillion- and multimillion-dollar publicly traded entities, requiring disclosure of their role will allow judges to determine whether they have a conflict of interest in administering a case.  And for privately held TPLF entities, the web of personal relationships judges have could be impacted as well, leading to unintentional appearances of impropriety."[79]

---

[77]     Fed. R. Civ. P. 7.1(a)(1).

[78]     Fed. R. Civ. P. 7.1 Advisory Comm. Notes, 2002 adoption ("The information required by Rule 7.1(a) reflects the 'financial interest' standard of Canon 3C(1)(c) of the Code of Conduct for United States Judges.").

[79]     Tripp Haston, *The Missing Key to 3rd-Party Litigation Funding*, Law360, Feb. 7, 2017.

Ms. Rebecca A. Womeldorf
June 1, 2017
Page Sixteen

A prime example of this problem arose during a racketeering suit in the United States arising out of misconduct by Steven Donziger, who had helped secure an $18.2 billion judgment against Chevron Corporation on behalf of Ecuadorians allegedly harmed by the company's drilling practices.[80]  During a deposition in that proceeding, Donziger was asked to identify the company that had helped finance the underlying suit against Chevron.[81]  Upon being ordered to answer the question by the special master assigned to the case, Donziger disclosed that the funder was in fact Burford Capital.[82]  The special master then disclosed that he was former co-counsel with the founder of Burford, who at one time sent the special master a brochure about funding one of Burford's cases.[83]  The special master also disclosed that he was friends with Burford's former general counsel.[84]  The special master did not recuse himself from the racketeering litigation, and the parties did not insist that he do so.[85]  Nonetheless, as the special master recognized, the deposition "prove[d] . . . that it is imperative for lawyers to insist that clients disclose who the investors are."[86]

"The Donziger deposition demonstrates how frequently conflicts of interest may arise as a result of third-party funding."[87]  "Without disclosure," courts will "be subject to unknown conflicts of interest,"[88] depriving the parties of their right to a fair and neutral tribunal.  "Requiring routine TPLF disclosure" in all civil cases "will ensure courts are conflict-free"[89] – which is essential to the proper functioning of our civil justice system.

**_Funder Control Over Litigation._**  Another serious issue implicated by TPLF agreements is the threat they pose to the plaintiff's right to control his or her own claim.  TPLF companies frequently dismiss such concerns by baldly asserting that they do **_not_** control litigation strategy.  But Bentham's own 2017 "best practices"

---

[80]     Jennifer A. Trusz, *Full Disclosure? Conflicts of Interest Arising from Third-Party Funding in International Commercial Arbitration*, 101 Geo. L.J. 1649, 1658 (2013).

[81]     *Id.* at 1650.

[82]     *Id.*

[83]     *Id.*

[84]     *Id.*

[85]     *Id.*

[86]     *Id.* (internal quotation marks and citation omitted).

[87]     *Id.*

[88]     Haston, *supra* note 79.

[89]     *Id.*

Ms. Rebecca A. Womeldorf
June 1, 2017
Page Seventeen

guide contemplates robust control by funders.  Specifically, it notes the importance
of setting forth specific terms in litigation funding agreements that address the extent
to which the TPLF entity is permitted to: "[m]anage a litigant's litigation expenses";
"[r]eceive notice of and provide input on any settlement demand and/or offer, and
any response"; and participate in settlement decisions.[90]

A prime example of substantial funder control was the elaborate funding
agreement utilized by Burford in the Chevron litigation discussed above.
Specifically, the funding agreement at issue in that case "provide[d] control to the
Funders" through the "installment of 'Nominated Lawyers'" – lawyers "selected by
the Claimants with the *Funder's approval*."[91]  The law firm of Patton Boggs LLP
had been selected to serve in that capacity, and the execution of engagement
agreements between the claimants and Patton Boggs, "a firm with close ties to the
Funder, [was] a condition precedent to the funding."[92]  "In addition to exerting
control, it [was] clear that the Nominated Lawyers, who among other things
control[led] the purse strings and serve[d] as monitors, supervise[d] the costs and
course of the litigation."[93]

More recent examples show that other TPLF companies are employing
litigation-control tactics similar to those set forth in Bentham's best practices guide.
One illustrative example is *Gbarabe v. Chevron Corp.*, the putative class action
previously discussed.[94]  The funding agreement in *Gbarabe* contains several key
provisions that suggest the funder's desire to influence the course of the litigation.
Specifically, the agreement refers to a "Project Plan" for the litigation developed by
counsel and the funder with restrictions on counsel deviation, particularly with
respect to hiring only identified experts.[95]  The agreement expressly prohibits the
lawyers from engaging any co-counsel or experts "without [the funder's] prior
written consent[.]"[96]  Further, the agreement requires that counsel "give reasonable
notice of and permit [the funder] where reasonably practicable, to attend as an

---

[90]     Bentham IMF, Code of Best Practices (Jan. 2017), https://www.benthamimf.ca/newsroom/
bentham-publications/2017/01/08/bentham-imf-code-of-best-practices-jan-2017.

[91]     Maya Steinitz, *The Litigation Finance Contract*, 54 Wm. & Mary L. Rev. 455, 472 (2012)
(emphasis added).

[92]     *Id.*

[93]     *Id.*

[94]     *Gbarabe*, 2016 U.S. Dist. LEXIS 103594, at *6.

[95]     *Gbarabe* Litigation Funding Agreement, §§ 1.1, 10.1.

[96]     *Id.* § 10.1.

Ms. Rebecca A. Womeldorf
June 1, 2017
Page Eighteen

observer at internal meetings, which include meetings with experts, and send an observer to any mediation or hearing relating to the Claim."[97]

These kinds of provisions vest the funder with substantial control over key litigation decisions.  Realistically, if a plaintiff's lawyer is being paid by the investor, it will be difficult to resist that pressure.  Even when the TPLF provider's efforts to control a plaintiff's case are not overt, the existence of TPLF funding naturally subordinates the plaintiff's own interests in the resolution of the litigation to the interests of the TPLF investor.  Absent concrete disclosure requirements, TPLF will continue to reduce a justice system designed to adjudicate cases on their merits to a litigation system effectively controlled by third parties interested solely in profit.

**Third-Party Funding Undermines Settlement Efforts.**  Another troubling dynamic of TPLF is that it can delay and distort the settlement process.  A party that must pay a TPLF entity a percentage of the proceeds of any recovery may be inclined to reject what might otherwise be a fair settlement offer in the hopes of securing a larger sum of money.  In other words, the party will seek extra money to make up at least some of the amount (likely substantial) that will have to be paid to the TPLF entity.  Further, some TPLF agreements that have become public reveal that TPLF entities often structure their agreements to maximize their take of the first dollars of any recovery, thereby deterring reasonable settlements.  In fact, in the first empirical study of the effects of TPLF, researchers in Australia (where TPLF is also prevalent) found that increased litigation funding was "associated with slower case processing, larger backlogs, and increased spending by the courts."[98]

The most notorious example of this problem was the funding agreement at issue in the Chevron Ecuador litigation discussed above.  The investment agreement included a "waterfall" repayment provision, which provided for a heightened percentage of recovery on the first dollars of any award.[99]  Under the agreement, Burford would receive approximately 5.5% of any award, or about $55 million, on any amount starting at $1 billion.  But, if the plaintiffs settled for less than $1 billion, the investor's percentage would actually go up.

---

[97]     *Id.* § 10.2.4.

[98]     Daniel Chen, *A Market for Justice:  A First Empirical Look at Third Party Litigation Funding* (January 2012), at 27, www.law.upenn.edu/cf/faculty/dabrams/workingpapers/ MarketforJustice.pdf.

[99]     *See* Funding Agreement Between Treca Financial Solutions and Claimants, *Chevron Corp. v. Donziger*, No. 11-cv-0691 (S.D.N.Y.), Docket No. 356, Ex. B

Ms. Rebecca A. Womeldorf
June 1, 2017
Page Nineteen

The disclosure of TPLF agreements will facilitate more accurate and realistic settlement negotiations between the parties.  Further, it will allow courts to structure settlement protocols with greater potential to succeed.  For example, if a litigation funder controls settlement decisions (in whole or in part), the court may wish to require that funder to attend any mediation.  Absent disclosure, the funder's presence as a player in the settlement process likely will remain hidden.

**Proportionality And Cost Shifting.**  Under the Federal Rules of Civil Procedure, federal courts sometimes need to consider the resources of the parties to the litigation.  For example, in every federal case, courts must determine the scope of permissible discovery under Rule 26.  Rule 26(b)(1) states that the scope of discovery shall be "proportional to the needs of the case, considering . . . **the parties' resources** . . . [and] whether the burden or expense of the proposed discovery outweighs its likely benefit."[100]  When a TPLF entity invests money to acquire an outcome-contingent right to proceeds in a case, it for all practical purposes becomes a real party in interest:  the TPLF investor pays to prosecute the case; it presumably is involved in strategic decision-making; it presumably communicates with attorneys; and it often stands to collect a substantial share of any recovery.

Moreover, unlike an average plaintiff, a TPLF entity's business purpose is to raise funds to prosecute and profit from litigation.  Thus, the existence of a TPLF agreement to fund litigation is relevant to the proportionality element of the scope of discovery.  TPLF companies are well-heeled strangers to a case who willingly buy into the litigation hoping to profit from its successful prosecution.  For the purposes of the resources element of the proportionality requirement contained in Rule 26(b)(1), any TPLF company that has bought a stake in a case should be considered as part of the "parties' resources."  It should not be allowed to hide in the shadows behind a relatively impecunious plaintiff.

Similarly, since a funder is effectively a real party in interest, it should bear responsibility (to the same degree as any other party) in the event there is wrongdoing and a corresponding imposition of sanctions or costs.  Rule 11 prohibits the filing of frivolous lawsuits and provides a mechanism for imposing "an appropriate sanction on any attorney, law firm, or party that violate[s] the rule[.]"[101]  Similarly, Rule 37 authorizes the imposition of sanctions on parties and attorneys who engage in misconduct with regard to discovery.[102]  The disclosure of TPLF

---

[100]     Fed. R. Civ. P. 26(b)(1) (emphasis added).

[101]     Fed. R. Civ. P. 11(c)(1).

[102]     Fed. R. Civ. P. 37.

Ms. Rebecca A. Womeldorf
June 1, 2017
Page Twenty

arrangements would be important information to have on the record in the event that a court determines it should impose sanctions or other costs under Rule 11, Rule 37 or any comparable provision.

For example, in *Abu-Ghazaleh v. Chaul*, a Florida state appeals court held that TPLF funders (an individual and company) that controlled the litigation qualified as a party to the lawsuit and therefore became liable for the defendant's attorneys' fees and costs.[103]  The state statute at issue in that case specifically authorized the levy of attorneys' fees on the plaintiff where the claim advanced was "without substantial fact or legal support."[104]  The court found that the plaintiff's claim was bereft of such legal or factual support.  The court then determined that the TPLF providers were liable for the attorneys' fees because they were essentially a "party" to the litigation (and the named plaintiff was financially unable to pay such fees, which is often the case).  The court reached this conclusion by scrutinizing the agreement entered into by the plaintiff and the TPLF providers, which provided that the funders were to receive 18.33% of any award the plaintiffs received and gave them "final say over any settlement agreements proposed to the plaintiffs."[105]  As evidenced by *Abu-Ghazaleh*, if courts are put on notice that a third party is financing the underlying litigation, they will be in a much better position to determine how to impose sanctions or other costs, if such costs are warranted in a given case.

***Third-Party Financing In Class And Mass Actions.***  TPLF has not been limited to individual actions.  Instead, it has expanded into the class and mass action realm.  For example, "class actions make up a significant portion of the cases that [Bay Area-based Law Finance Group] invests in."[106]  "Other firms, like New York-based Counsel Financial, also market themselves as offering various kinds of financing to class-action plaintiffs['] attorneys."[107]  The need for robust TPLF disclosure requirements is most acute in this context because aggregate litigation already involves little, if any, control by the plaintiffs.  In a large consumer class action, the average plaintiff often has only a small amount at stake.  The "representative" plaintiffs in such cases tend to be friends, neighbors or even employees of the attorney bringing the suit.  As a result, the lawyers fully control the

---

[103]    *See Abu-Ghazaleh v. Chaul*, 36 So. 3d 691, 693-94 (Fla. Ct. App. 2009).

[104]    *Id.* at 694.

[105]    *Id.*

[106]    Hancock, *New Litigation Funding Rule Seen as "Harbinger" for Shadowy Industry*, *supra* note 50.

[107]    *Id.*

Ms. Rebecca A. Womeldorf
June 1, 2017
Page Twenty-One

cases instead of the people they supposedly represent.  The concerns raised by such an arrangement are all the more glaring when the person driving the litigation is not even a lawyer with fiduciary obligations to the supposed clients or the court.  After all, an individual can always complain to her lawyer or the court about the conduct of a funding company, but in a class action, there are often no interested plaintiffs. Thus, the funding company can effectively run the litigation with no check on its actions, underscoring the need for disclosure at the outset of a putative class or mass action.

In addition, the contemplated disclosures are relevant to evaluating Fed. R. Civ. P. 23(a)(4)'s adequacy-of-representation prerequisite for class treatment. Indeed, Judge Susan Illston recently recognized that point in *Gbarabe*, granting the defendant's motion to compel the disclosure of the funding agreement in that putative class action.[108]  As the court explained, the "funding agreement is relevant to the adequacy [of representation] determination [required for class certification] and should be produced to [the] defendant."[109]  The court's reasoning proved well-founded.  The funding agreement provided that the lawyers shall endeavor to "recover the ***maximum possible*** Contingency Fee,"[110] a requirement that may conflict with class member interests.  Further, and as previously discussed, the agreement provided for a sharing of fees between plaintiffs' counsel and the funder – unbeknownst to the absent class members.

In sum, adding a funder to the class action fray would further dilute any influence the named plaintiffs have on the prosecution of their lawsuit, undermining their adequacy of representation under Rule 23(a)(4).  As noted above, the Northern District of California recently promulgated a "standing order" requirement that TPLF be disclosed in all class actions and representative cases, providing an important precedent for making the practice more transparent.[111]  And the Fairness in Class Action Litigation Act recently passed by the U.S. House of Representatives contains a similar provision that would apply to all class actions filed in federal courts nationwide.[112]

---

[108]     *Gbarabe*, 2016 U.S. Dist. LEXIS 103594, at *6.

[109]     *Id.*

[110]     *Gbarabe* Litigation Funding Agreement, ¶ 3.1.3 (emphasis added).

[111]     https://www.cand.uscourts.gov/news/210.

[112]     https://www.congress.gov/bill/115th-congress/house-bill/985/actions?q=%7B%22search%22%3A%5B%22fairness+in+class+action+litigation%22%5D%7D.

Ms. Rebecca A. Womeldorf
June 1, 2017
Page Twenty-Two

      ***Disclosure Would Create Parity Of Financial Disclosure.***  One of the most frequently invoked lines of attack against mandatory TPLF disclosure requirements is that they unfairly single out TPLF companies while not requiring defendants to disclose their sources of financing.  This criticism is misdirected because it ignores the unique aspect of TPLF – that a funder voluntarily decides to invest in litigation in the hopes of sharing in any profit.  Our proposed amendment is narrowly targeted at this type of recourse investment – i.e., at those who have "invested" in litigation – in that there is a contingent interest in the outcome of the case.  It is these types of contingent investments that are most likely to give rise to conflicts of interest and disputes over control of key litigation decisions in individual cases, as borne out by recent examples.

      Moreover, requiring TPLF agreements to be disclosed at the outset of litigation would bring plaintiffs' Rule 26 disclosure obligations in line with those of defendants, who are already obligated to disclose information pertaining to their financial wherewithal.  For corporate defendants, securities laws require substantial disclosure about litigation, including the amounts of reserves taken to finance or resolve litigation.  Further, Rule 26 already requires the disclosure of insurance coverage, including insurance that will pay for the defense.[113]  As explained in the Advisory Committee Notes accompanying the insurance provision, "[d]isclosure of insurance coverage . . . enable counsel for both sides to make the same realistic appraisal of the case, so that settlement and litigation strategy are based on knowledge and not speculation."[114]  As previously discussed, this same rationale supports mandatory disclosure of TPLF arrangements, which can inform settlement negotiations.

      As with insurance agreements, TPLF arrangements would be subject to the proviso that the contracts be automatically disclosed "[e]xcept . . . as . . . ordered by the court."[115]  In other words, while the plain language of Rule 26 provides that certain items (like insurance agreements) must be disclosed as a matter course, a court nonetheless has the authority to rule otherwise under the facts of a given case.  Further, Rule 26(c) expressly provides that a "court may, for good cause, issue an order to protect a party or person from . . . oppression or undue burden . . . including

---

[113]     *See* Fed. R. Civ. P. 26(a)(1)(A)(iv).

[114]     Fed. R. Civ. P. 26, Advisory Comm. Notes, 1970 amendment.

[115]     Fed. R. Civ. P. 26(a)(1)(A) ("Except as exempted by Rule 26(a)(1)(B) or as otherwise stipulated or ordered by the court, a party must, without awaiting a discovery request, provide to the other parties . . . .").

Ms. Rebecca A. Womeldorf
June 1, 2017
Page Twenty-Three


. . . forbidding [] disclosure or discovery."[116]  Accordingly, in the event a TPLF
agreement contains confidential information, a plaintiff could move for a protective
order seeking to immunize that information from disclosure.  The court would then
review the agreement *in camera* and determine whether the information is in fact
confidential and whether portions of the agreement should be redacted.

For all of the foregoing reasons, we once again urge the Committee to
consider adoption of the attached proposed amendment to Fed. R. Civ. P.
26(a)(1)(A).  The Advisory Committee's examination of this proposal is greatly
appreciated.


Sincerely,

Lisa A. Rickard
President
U.S. Chamber Institute for Legal Reform


Advanced Medical Technology Association

American Insurance Association

American Tort Reform Association

Association of Defense Trial Attorneys

DRI – *The Voice of the Defense Bar*

Federation of Defense & Corporate Counsel

Financial Services Roundtable

Insurance Information Institute

International Association of Defense Counsel

---

[116]     Fed. R. Civ. P. 26(c)(1)(A).

Ms. Rebecca A. Womeldorf
June 1, 2017
Page Twenty-Four

Lawyers for Civil Justice

National Association of Mutual Insurance
Companies

National Association of Wholesaler-
Distributors

National Retail Federation

Pharmaceutical Research and Manufacturers of
America

Product Liability Advisory Council

Property Casualty Insurers Association of
America

Small Business & Entrepreneurship Council

U.S. Chamber of Commerce

Michigan Chamber of Commerce

Pennsylvania Chamber of Business and
Industry

State Chamber of Oklahoma

South Carolina Chamber of Commerce

Virginia Chamber of Commerce

Wisconsin Manufacturers & Commerce

Las Vegas Metro Chamber of Commerce

Florida Justice Reform Institute

Louisiana Lawsuit Abuse Watch

Ms. Rebecca A. Womeldorf
June 1, 2017
Page Twenty-Five

South Carolina Civil Justice Coalition

Texas Civil Justice League

## <u>APPENDIX A – SUMMARY OF SIGNATORY ORGANIZATIONS</u>

- **U.S. Chamber Institute for Legal Reform.**  The U.S. Chamber Institute for Legal Reform ("ILR") is an affiliate of the U.S. Chamber of Commerce dedicated to making our nation's civil legal system simpler, faster, and fairer for all participants.  The U.S. Chamber of Commerce is the world's largest business federation representing the interests of more than 3 million businesses of all sizes, sectors, and regions, as well as state and local chambers and industry associations.  The Chamber is dedicated to promoting, protecting, and defending America's free enterprise system.

- **Advanced Medical Technology Association.**  The Advanced Medical Technology Association ("AdvaMed") is the world's largest trade association of medical device manufacturers.  AdvaMed advocates on a global basis for the highest ethical standards, timely patient access to safe and effective products, and economic policies that reward value creation.  AdvaMed seeks to advance medical technology to promote healthier lives and healthier economies around the world.  AdvaMed's members range from the largest to smallest medical technology companies doing business in the United States. These companies produce medical devices, diagnostic products and health information systems.

- **American Insurance Association.**  Celebrating its 150th year in 2016, the American Insurance Association ("AIA") is the leading property-casualty insurance trade organization, representing approximately 320 insurers that write more than $125 billion in premiums each year.  AIA member companies offer all types of property - casualty insurance, including personal and commercial auto insurance, commercial property and liability coverage, specialty, workers' compensation, homeowners' insurance, medical malpractice coverage, and product liability insurance.

- **American Tort Reform Association.**  The American Tort Reform Association ("ATRA") is the only national organization exclusively dedicated to reforming the civil justice system.  The organization is a nationwide network of state-based liability reform coalitions backed by 135,000 grassroots supporters.  ATRA's membership is diverse and includes nonprofits, small and large companies, as well as state and national trade, business, and professional associations.

- **Association of Defense Trial Attorneys.**  The Association of Defense Trial Attorneys ("ADTA") is a select group of diverse and experienced civil defense trial attorneys whose mission is to improve their practices through collegial

relationships, educational programs, and business referral opportunities, while maintaining the highest standards of professionalism and ethics.  Membership in the ADTA is exclusive and limited to one "prime" member in any city with population less than one million.

- **DRI – *The Voice of the Defense Bar*.**  DRI is the largest international membership organization of attorneys defending the interests of business and individuals in civil litigation.  DRI provides its members with various educational and other tools that help defense practitioners deliver high-quality, balanced and excellent service to their clients and corporations.  DRI's network consists of over 22,000 defense practitioners and corporate counsel.

- **Federation of Defense & Corporate Counsel.**  The Federation of Defense & Corporate Counsel ("Federation") was founded seventy-five years ago as an international defense organization dedicated to the principles of knowledge, justice, and fellowship.  Members include: (1) practicing lawyers actively engaged in the private practice of law who devote a substantial amount of their professional time to the representation of insurance companies, associations or other corporations, or others, in the defense of civil litigation and have been a member of the bar for at least eight years; or (2) corporate counsel and other executives engaged in the administration or defense of claims or for insurance companies, associations, or corporations who have national, regional or company-wide responsibility for a company of greater than local significance.

- **Financial Services Roundtable.**  Financial Services Roundtable ("FSR") is the leading advocacy organization for America's financial services industry.  With a 100-year tradition of service and accomplishment, FSR is a dynamic, forward-looking association advocating for the top financial services companies, keeping them informed on the vital policy and regulatory matters that impact their business.  FSR members include the leading banking, insurance, asset management, finance and credit card companies in America.  We are financing the American economy — creating jobs, expanding businesses, securing homes, businesses and retirement, insuring growth and building consumer confidence.

- **Insurance Information Institute.**  The Insurance Information Institute ("I.I.I.") seeks to improve public understanding of insurance – i.e., what it does and how it works.  I.I.I. is recognized by the media, governments, regulatory organizations, universities and the public as a primary source of information, analysis and referral concerning insurance.  The organization's members consist of both large

and small insurance companies doing business in the United States, as well as various universities and the Connecticut General Assembly.

- **International Association of Defense Counsel.** Established in 1920, the International Association of Defense Counsel ("IADC") advocates legal reform and professional development. IADC's activities benefit its approximately 2,500 members and their clients, as well as the civil justice system and the legal profession. IADC's membership consists of partners in large and small law firms, senior counsel in corporate law departments, and corporate and insurance executives. Members represent the largest corporations around the world, including the majority of companies listed in the FORTUNE 500.

- **Lawyers for Civil Justice.** Lawyers for Civil Justice ("LCJ") is a national coalition of corporations, law firms and defense trial lawyer organizations that promotes excellence and fairness in the civil justice system to secure the just, speedy and inexpensive determination of civil cases. For over 29 years, LCJ has been closely engaged in reforming federal civil rules in order to: (1) promote balance and fairness in the civil justice system; (2) reduce costs and burdens associated with litigation; and (3) advance predictability and efficiency in litigation.

- **National Association of Mutual Insurance Companies.** The National Association of Mutual Insurance Companies ("NAMIC") is the largest property/casualty insurance trade association with more than 1,400 member companies serving more than 170 million auto, home, and business policyholders. NAMIC promotes public policy solutions that benefit insurance policyholders and the NAMIC member companies that it represents. NAMIC member companies write nearly $230 billion in annual premiums, and have 54 percent of homeowners, 43 percent of automobile, and 32 percent of the business insurance markets. Membership in NAMIC is not restricted to mutual insurance companies and is open to stock insurance companies, reinsurance companies and industry vendor companies.

- **National Association of Wholesaler-Distributors.** The National Association of Wholesaler-Distributors ("NAW") is a federation of wholesale distribution associations. NAW works with academia and the distribution consulting community to advance the state of knowledge in wholesale distribution. It also represents the wholesale distribution industry before Congress, the White House, and the judiciary on issues that affect the industry's various lines of trade. NAW

members represent all lines of trade and include some of the largest wholesaler-distributors in the United States.

- **National Retail Federation.** The National Retail Federation ("NRF") advances the interests of the retail industry through advocacy, communications and education. NRF is the world's largest retail trade association, representing discount and department stores, home goods and specialty stores, Main Street merchants, grocers, wholesalers, chain restaurants and Internet retailers from the United States and more than 45 countries. Retail is the nation's largest private sector employer, supporting one in four U.S. jobs – 42 million working Americans.

- **Pharmaceutical Research and Manufacturers of America.** The Pharmaceutical Research and Manufacturers of America ("PhRMA") represents the country's leading biopharmaceutical research companies. PhRMA's mission is to conduct effective advocacy for public policies that encourage the discovery of important, new medications for patients by biopharmaceutical research companies. PhRMA members, which include some of the largest pharmaceutical companies in the United States, invest billions in the research and development of innovative medicines that enable patients to live longer, healthier and more productive lives.

- **Product Liability Advisory Council.** Formed in 1983, the Product Liability Advisory Council ("PLAC") is a non-profit association that analyzes and shapes the common law of product liability and complex litigation. PLAC's mission is to help members successfully manage every link in the liability chain—from product design to manufacture to distribution through sale to end-users, and on to post-sale responsibilities. PLAC is comprised of more than 100 leading product manufacturers and 350 of the most elite product liability defense attorneys operating in the United States and abroad.

- **Property Casualty Insurers Association of America.** Property Casualty Insurers Association of America ("PCI") is the property casualty industry's most effective and diverse trade association. PCI represents nearly 1,000 member companies in a truly member-driven organization. PCI's purpose is to advocate its members' public policy positions in all 50 states and on Capitol Hill, and to keep its members current on the information that is critical to their businesses. Legislators and regulators depend on PCI as a source of accurate, data-driven information. Not spin. Not one-sided messages. Just solid insight about how

proposed legislation or regulation will affect our industry and the business community.

- **Small Business & Entrepreneurship Council.** The Small Business and Entrepreneurship Council ("SBE Council") is a 501c(4) advocacy, research and education organization dedicated to protecting small business and promoting entrepreneurship. SBE Council educates elected officials, policymakers, business leaders and the public about key policies that enable business start-up and growth. SBE Council's members include entrepreneurs and small business owners.

- **U.S. Chamber of Commerce.** The U.S. Chamber of Commerce ("Chamber") is the world's largest business federation representing the interests of more than 3 million businesses of all sizes, sectors, and regions, as well as state and local chambers and industry associations. The Chamber is dedicated to promoting, protecting, and defending America's free enterprise system.

- **Michigan Chamber of Commerce.** The Michigan Chamber of Commerce ("Michigan Chamber") encompasses approximately 6,600 member employers, trade associations and local chambers of commerce of every size and type in all 83 counties of the state. The Michigan Chamber's mission is to promote conditions favorable to job creation and business success in Michigan. Michigan Chamber member businesses provide jobs to 1.5 million residents. One of every 2.6 employees in Michigan works for a Chamber member firm.

- **State Chamber of Oklahoma.** Representing more than 1,500 Oklahoma businesses and 350,000 employees, the State Chamber of Oklahoma has been the state's leading advocate for business since 1926. The organization's mission is to advance public policies that promote Oklahoma businesses and employees.

- **Pennsylvania Chamber of Business and Industry.** Founded in 1916, the Pennsylvania Chamber of Business and Industry ("Pennsylvania Chamber") has served as "The Statewide Voice of Business™" by advocating public policies that expand private sector job creation and lead to a more prosperous Pennsylvania for all its citizens. The Pennsylvania Chamber is the largest business association in Pennsylvania, which consists of more than 9,400 member businesses of all sizes and industry sectors throughout the state—from sole proprietors to Fortune 100 companies—representing nearly 50 percent of the private workforce in the Commonwealth.

- **South Carolina Chamber of Commerce.**  The South Carolina Chamber of Commerce ("South Carolina Chamber") is the leading statewide organization championing a favorable business climate for South Carolina companies and employees.  Its mission is to strategically create and advance a thriving, free-market environment where South Carolina businesses can prosper.  The South Carolina Chamber represents its members, which include both small and large companies, by assisting them with legislative advocacy and tracking, marketing, connecting and expanding their bottom line.

- **Virginia Chamber of Commerce.**  The Virginia Chamber of Commerce ("Virginia Chamber") is the leading non-partisan business advocacy organization in the Commonwealth.  Working in the legislative, regulatory, civic and judicial arenas at the state and federal level, the Virginia Chamber seeks to promote long-term economic growth in the Commonwealth.  The Virginia Chamber's members include 25,000 Virginia companies, ranging from small businesses to Fortune 500 companies.

- **Wisconsin Manufacturers and Commerce.**  Wisconsin Manufacturers and Commerce ("WMC") is the state chamber of commerce, the state manufacturers' association and the state safety council.  Founded in 1911, WMC is Wisconsin's leading business association dedicated to making Wisconsin the most competitive state in the nation.  The association has nearly 3,800 members that include both large and small manufacturers, service companies, local chambers of commerce and specialized trade associations.

- **Las Vegas Metro Chamber of Commerce.**  The Las Vegas Metro Chamber of Commerce ("Las Vegas Chamber") is the largest business organization in Nevada.  Founded in the early days of Las Vegas, the Las Vegas Chamber has effectively protected and strengthened the Southern Nevada business community, helping its member businesses grow and thrive and providing a voice for those businesses in local, state and federal government.  The Las Vegas Chamber has thousands of member businesses from nearly every industry, representing more than 200,000 people.

- **Florida Justice Reform Institute.**  The Florida Justice Reform Institute ("FJRI") is Florida's leading organization of concerned citizens, business owners, business leaders, doctors, and lawyers who are working towards the common goal of promoting predictability and personal responsibility in Florida's civil justice system.  FJRI's mission is to fight wasteful civil litigation through

legislation, promote fair and equitable legal practices, and provide information about the state of civil justice in Florida.  To facilitate these goals, FJRI employs research and advocacy in support of meaningful tort reform legislation.

- **Louisiana Lawsuit Abuse Watch.**  The Louisiana Lawsuit Abuse Watch ("LLAW") is a local non-partisan, nonprofit, citizen watchdog group dedicated to stopping lawsuit abuse that hurts Louisiana's families and threatens local businesses and jobs.  Using community outreach, public education and grassroots advocacy, LLAW raises awareness about the costs and consequences of lawsuit abuse and urges elected officials to advance more balance, fairness and common sense to Louisiana's civil justice system.  Since it was formed in 2007, LLAW has grown to nearly 6,000 supporters across the state, representing small business owners, health care providers, taxpayers, workers and their families.

- **South Carolina Civil Justice Coalition.**  The South Carolina Civil Justice Coalition ("SCCJC") serves as the united voice for the business community on tort and workers' compensation issues; coordinating lobbying, legal, grassroots and public relations activities.  Since 2003, SCCJC has been working to improve the legal climate in South Carolina and reduce the number and types of frivolous lawsuits brought against small, medium and large businesses who provide jobs and the many goods and services for South Carolina's citizens.

- **Texas Civil Justice League.**  Founded in 1986, the Texas Civil Justice League ("TCJL") advocates for a fair and balanced judicial system in Texas.  The Austin-based group is the oldest and largest state legal reform organization in the nation, with membership comprised of corporate businesses, law firms, professional and trade associations, health care providers and individual citizens.

## APPENDIX B – PROPOSED AMENDED RULE

The amended Fed. R. Civ. P. 26(a)(1)(A) would read as follows, with the new proposed language in underscore and deletions in ~~strikethrough~~:

(A) In General.  Except as exempted by Rule 26(a)(1)(B) or as otherwise stipulated or ordered by the court, a party must, without awaiting a discovery request, provide to the other parties:

(i) the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment;

(ii) a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment;

(iii) a computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered; ~~and~~

(iv) for inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment~~.~~; and

(v) for inspection and copying as under Rule 34, any agreement under which any person, other than an attorney permitted to charge a contingent fee representing a party, has a right to receive compensation that is contingent on, and sourced from, any proceeds of the civil action, by settlement, judgment or otherwise.