UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  TAXOTERE (DOCETAXEL)   *       16-MD-2740
PRODUCTS LIABILITY LITIGATION  *
                               *       Section N
                               *
Relates to:  All Cases         *       August 7, 2017
* * * * * * * * * * * * * * *  *


ORAL ARGUMENT BEFORE
THE HONORABLE MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE


<u>Appearances</u>:


For the Plaintiffs:            Barrios Kingsdorf & Casteix, LLP
                               BY:  DAWN M. BARRIOS, ESQ.
                                 ZACHARY L. WOOL, ESQ.
                               701 Poydras Street, Suite 3650
                               New Orleans, Louisiana 70139


For the Plaintiffs:            Gainsburgh Benjamin David Meunier
                                 & Warshauer, LLC
                               BY:  M. PALMER LAMBERT, ESQ.
                               1100 Poydras Street, Suite 2800
                               New Orleans, Louisiana 70163


For the Plaintiffs:            Gibbs Law Group, LLP
                               BY:  KAREN BARTH MENZIES, ESQ.
                               400 Continental Blvd., 6th Floor
                               El Sugundo, California 90245


For the Plaintiffs:            Lemmon Law Firm, LLC
                               BY:  ANDREW A. LEMMON, ESQ.
                               650 Poydras Street, Suite 2335
                               New Orleans, Louisiana 70130

<u>Appearances</u>:

For the Plaintiffs:           Simmons Hanly Conroy, LLC
                              BY:  DAVID F. MICELI, ESQ.
                              One Court Street
                              Alton, Illinois 62002


For the Sanofi Defendants:    Shook Hardy & Bacon, LLP
                              BY:  HARLEY V. RATLIFF, ESQ.
                              2555 Grand Boulevard
                              Kansas City, Missouri 64108


For the Sanofi Defendants:    Irwin Fritchie Urquhart
                                & Moore, LLC
                              BY:  KELLY E. BRILLEAUX, ESQ.
                              400 Poydras Street, Suite 2700
                              New Orleans, Louisiana 70130


Official Court Reporter:      Toni Doyle Tusa, CCR, FCRR
                              500 Poydras Street, Room B-275
                              New Orleans, Louisiana 70130
                              (504) 589-7778


Proceedings recorded by mechanical stenography using
computer-aided transcription software.

**<u>PROCEEDINGS</u>**

**(August 7, 2017)**

1
2
3              **THE COURT:**  Good afternoon, everyone.  You can take a
4    seat.
5              **THE CLERK:**  This is 16-MD-2740, *In Re:  Taxotere*
6    *Products Liability Litigation.*
7                     Counsel, could you please make appearances for
8    the record.
9              **MS. MENZIES:**  Good afternoon, Your Honor.  Karen
10   Menzies on behalf of plaintiffs.
11             **MR. MICELI:**  David Miceli on behalf of the
12   plaintiffs.
13             **MR. LEMMON:**  Andrew Lemmon on behalf of the
14   plaintiffs.
15             **MS. BARRIOS:**  Dawn Barrios on behalf of plaintiffs.
16             **MR. LAMBERT:**  Palmer Lambert also on behalf of
17   plaintiffs.
18             **MR. WOOL:**  Zachary Wool on behalf of plaintiffs.
19             **MR. RATLIFF:**  Harley Ratliff on behalf of the Sanofi
20   defendants.
21             **MS. BRILLEAUX:**  Hi, Your Honor.  Kelly Brilleaux,
22   liaison counsel for Sanofi defendants.
23             **THE COURT:**  We have a number of counsel on the phone.
24   Do y'all hear me?
25                     What I'm going to do -- because I had Blanca

03:42

1  take roll call of the folks on the phone -- so we don't spend

2  20 minutes with everyone talking all over each other, I'm going

3  to list everyone that we have on the phone.  If I miss you,

4  just speak up.

5              I have Chris Coffin.

6         **MR. COFFIN:**  Yes, Your Honor.

7         **THE COURT:**  Kathleen Kelly.

8         **MS. KELLY:**  Yes.

9         **THE COURT:**  Mara Gonzalez.

10        **MS. GONZALEZ:**  Present.

11        **THE COURT:**  Peter Rotolo.

12        **MR. ROTOLO:**  Present.

13        **THE COURT:**  Michael Suffern.

14        **MR. SUFFERN:**  Present, Your Honor.

15        **THE COURT:**  Brandon Cox.

16        **MR. COX:**  Present.

17        **THE COURT:**  Beth Toberman.

18        **MS. TOBERMAN:**  Present.

19        **THE COURT:**  Kyle Bachus.

20        **MR. BACHUS:**  Present.

21        **THE COURT:**  André Mora.

22        **MR. MORA:**  Present.

23        **THE COURT:**  Did I miss anyone?

24        **MR. MOORE:**  Douglas Moore, Your Honor.

25        **THE COURT:**  Okay.  Douglas Moore.  Gotcha.

03:43

1           We are here on plaintiffs' motion to compel
2      responses to requests for production, at least part of it.
3      This matter has to some extent been bifurcated or trifurcated
4      by Judge Engelhardt in terms of what's before me and what's
5      before him.  You all are well aware of other issues on French
6      law and the Hague Convention and the service issues that
7      Judge Engelhardt is presiding over.  I'm presiding over
8      essentially the scope of the discovery requests that have been
9      propounded.
10          I don't think that we have had an actual motion
11     hearing yet in this case in my court.  So just by way of
12     background, when I have these discovery hearings, having
13     reviewed everything that's been presented by way of the
14     pleadings and any other part of the record that I think is
15     appropriate, I usually come in with some sense of what I want
16     to do in the case and what I think the right result is.
17     Oftentimes I have questions for counsel, to either or both
18     sides.  What I will usually do is rather than have an oral
19     argument in the traditional sense, I usually have questions.
20          In this case what I'm going to do is ask the
21     defendants if they have anything they want to add to the
22     arguments they have made that aren't in the pleadings because
23     the plaintiffs did file a reply memo.  Then I'm going to tell
24     you all what I think about the motion and what I'm inclined to
25     do.  Then I will give you all the opportunity to address those

1  comments once I'm finished with that.

2         Mr. Ratliff, the first thing I want to ask is:

3  Do you have anything to add to the submissions?  As I said, I

4  know the plaintiffs filed a reply memo.  This is sort of an

5  opportunity for you to have the last word, so to speak.

6         **MR. RATLIFF:**  Thank you, Your Honor.  I will try to

7  keep it brief, at least as it relates to some of the issues

8  that they have raised in their reply memo.

9         One of the things that you will see throughout

10  their reply memo is the, I guess, complaint that the two French

11  defendants -- Sanofi S.A., the holding company, Aventis

12  Pharma S.A., another French company -- and the two U.S.

13  defendants have not responded to the request for production

14  where they mentioned the interrogatories on behalf of what they

15  called the predecessor entities.

16         Now, the predecessor entities, as defined in

17  their discovery, is essentially all 350 of the subsidiaries in

18  the Sanofi group of companies -- the parent companies, the

19  affiliate companies, the sister companies, former companies,

20  lawyers, officers, directors -- a fairly broad scope.  In

21  support of that they say, well, any time a successor company is

22  the, quote, mere continuation of a predecessor company, their

23  liabilities and acts are relevant and can be imputed.

24         The one part that I feel like that Your Honor

25  needs to understand is there is a clear, logical misstep on

03:46

1    their part which is, one, there is nothing in their complaint

2    that alleges that any of these successor companies are the mere

3    continuation of these undefined predecessor companies.  So it's

4    not part of any of the allegations in the complaint.

5              The other part of this, Your Honor, is that

6    whether a successor company is a, quote, mere continuation of a

7    predecessor company -- same company, new path -- is a legal

8    determination that has to be made by the Court.  That's exactly

9    what the case that they cited to -- I think it's the *Patin*

10   case -- says.

11             So it's not just an assumption.  It's not just a

12   given that predecessor entities automatically -- their contacts

13   or their liabilities pass on to the successor entities.  That's

14   a separate legal determination, a separate evidentiary legal

15   determination that has to be made.  That part of it, I think,

16   is what takes us so far afield from really the issue at hand,

17   which is:  Is Sanofi S.A., the global parent corporation in

18   France, the alter ego of these two U.S. defendants?

19             That is the allegations that are in their

20   complaint, paragraphs, I believe, 17 and 18.  They don't allege

21   that the French entities sell or market in the U.S.  They

22   allege that they are the alter egos of these two U.S.

23   defendants.

24             So that is one of my concerns, as I read through

25   the reply brief, that it seems to take what we think is already

03:48

1  expansive discovery and expands it even further out beyond what

2  is sort of the narrow issue at hand.

3              Your Honor, one of the things that you said to

4  me at the last hearing that kind of stuck with me is you said,

5  "Mr. Ratliff" -- and I'm paraphrasing, Your Honor.  You said,

6  "There may be things you don't think they are entitled to, but

7  there's probably some wiggle room."  I think that goes both

8  ways, Your Honor.

9              There may be things they think are interesting,

10 things that in an ideal world they would like to have, but what

11 it really is is:  What are the facts that are necessary?

12 That's the term the Fifth Circuit uses.  That's the term the

13 Eastern District of Louisiana uses.  What are the facts that

14 are necessary to rule upon the limited issue or the discrete

15 issue of personal jurisdiction as put forth by the plaintiffs?

16 So in that case it is are these entities -- Sanofi up here, the

17 foreign company, their two indirect U.S. subsidiaries -- are

18 they one and the same?  So that is where I think the crux of

19 this dispute lies.

20             **THE COURT:**  So the issue you are raising is an issue

21 that I did want to talk to you all about.  That's the ultimate

22 question.  To answer that question, certain facts are required,

23 the development of certain facts are required, and the

24 plaintiffs are entitled to develop some of those facts.  So

25 what I'm wondering is the issue you have raised with the

03:49

1   predecessor companies -- so whether a successor company is a

2   mere continuation is a legal determination, but it has to be

3   made on facts.

4             **MR. RATLIFF:**  Correct.

5             **THE COURT:**  And whether the successor corporation is

6   the mere continuation of a predecessor may be relevant in this

7   case if the answer to that question is "yes" and the

8   predecessor company had sufficient relationships here.  Then

9   that's relevant to the ultimate determination of whether

10   there's personal jurisdiction over the French defendants in

11   this case.

12             How is the legal question of whether the

13   successor is the mere continuation of the predecessor answered

14   without any information from the or a predecessor company?

15   That's Part 1 of the question.  Part 2 is I think the answer is

16   they are entitled to some information, but how do we reasonably

17   limit the scope of that request?

18             **MR. RATLIFF:**  I think how you limit the scope of that

19   request -- well, let me step back a little bit.  I think to

20   make that determination, the mere continuation determination as

21   I'm going to call it, would literally require the review of

22   every sort of -- how one particular company was acquired, what

23   were the terms and agreements of the merger, did one company

24   take on the liabilities or contacts of another company.

25             **THE COURT:**  Did they ask for that information?

03:51

1    **MR. RATLIFF:**  Of course not, Your Honor.

2    **THE COURT:**  I didn't think so.

3    **MR. RATLIFF:**  Of course not.  It's also not part of

4    their allegations.  There is nothing in their master complaint,

5    which Judge Engelhardt gave them three months to put together,

6    that says these predecessor companies had some sort of

7    jurisdictional contacts that would give rise to specific

8    jurisdiction.  There is nothing in their master complaint that

9    says these predecessor companies are, guess what, also the

10    alter ego of these two U.S. defendants.

11            They are bound by the allegations that they put

12    in.  Those are the allegations they chose to make.  The

13    allegations they made were Sanofi S.A. is the alter ego of

14    these two U.S. defendants.  In responding to discovery, I think

15    that's what we were guided by.

16    **THE COURT:**  There are ways to prove that that go

17    beyond -- I don't know that they are required to allege those

18    specific facts in a complaint.  If they are alleging that the

19    Court has personal jurisdiction over the French defendants and

20    they are alleging that the French defendants are the alter ego

21    of the U.S. defendants, they are making those allegations.  The

22    specific factual elements to get from Point A to Point B, I

23    don't think they are required to allege every single

24    possibility.

25    **MR. RATLIFF:**  Maybe not, Your Honor, but I think

1  there has to be something in the master complaint that speaks
2  to that.  So this morning, when I was reviewing the master
3  complaint, the things I looked for were:  Is the term *mere*
4  *continuation* used anywhere in the master complaint?  It's not.
5  Is *successor in interest* or that these were all one and the
6  same mentioned in the master complaint?  No.  Is there any
7  allegation that these predecessor entities were also the alter
8  ego of the U.S. defendants?  That's nowhere in the complaint.
9  So most of their reply focuses on the successor predecessor
10  entity.

11         Then I went back and I looked at how they
12  defined that in their discovery, and it literally talks about
13  everybody, all subsidiaries.  So I don't even know -- and this
14  is a conversation I had with Mr. Lemmon, who I have had very
15  good discussions -- we have talked a lot about this.  I said,
16  "I know you probably don't believe me.  I want to help you find
17  what you want, but I can't just go back to my client and say,
18  'Give me all communications for all of your companies for the
19  last 20 years.'"

20         **THE COURT:**  Based on the definition in the discovery
21  request.

22         **MR. RATLIFF:**  Yeah, for the last 20 years.  "Give me
23  an idea of what are you looking for and that will help me" --
24  it's like "Tell us everything about how you allocate profits
25  and losses."  I wouldn't even know where to start in talking to

03:53

1   my client about where you go down that road.  So I said, "Tell

2   me what are the things that you want to know."

3        I know one of the complaints is that they are

4   not happy with what they think are generalized interrogatory

5   responses.  The discussion I had with Mr. Lemmon after those

6   were served is, I said, "Look them over.  This is the best we

7   could do based on how this interrogatory was phrased."  He said

8   just describe this process, so we described it in general

9   terms.  "If there's additional information that you want to

10  know, tell me what that additional information is so I have

11  something actionable that I can go back to my client and find

12  out how I go about getting it."

13        To me, it's a practical standpoint on my side,

14  which is I need to be able to send something to my client

15  besides "Give me all your intercompany loans that you have ever

16  made for the last 20 years."  They wouldn't even know where to

17  start with that.  So that is, I think, sort of the crux of the

18  problem as we talk about how we get to, I guess, a solution to

19  this.

20        I think the other part is you have to look at

21  what are the factors for making an alter ego determination.

22  Some of those factors are stock -- they are the *Hargrave*

23  factors.

24        **THE COURT:**  I'm going to interrupt you because part

25  of the issue that I have with where we are in the briefing is

03:54

1    that you all spent a lot of time in your opposition memorandum

2    trying to relitigate their entitlement to personal jurisdiction

3    discovery in the first instance.  That's the impression I got

4    when I read it, and it's clearly the impression that the

5    plaintiffs' lawyers got when they read it because they came

6    right out of the gate in the reply memo.  I took it the same

7    way.

8            In large part we can discuss how to further

9    limit some of the requests and to, I guess, narrow the scope,

10   but I believe, based on what I've been reading, that the

11   plaintiffs' counsel has made a good-faith effort to narrow and

12   tailor their requests to establish what they needed to

13   establish to prove personal jurisdiction under the

14   circumstances in this case.  I don't think -- and I'm

15   generalizing.  I don't think, generally, that you have provided

16   what I think are responsive responses.

17           Now, what you are telling me now is that you're

18   having difficulty -- and you have tried to negotiate, I guess,

19   some narrowing with plaintiffs' counsel.  You are having

20   difficulty responding fully to some of these requests because

21   you think they are too broad.  For instance, a request for

22   production asks for all documents about --

23           MR. RATLIFF:  Your Honor, I will give you an example.

24   One of them is we submitted a sworn declaration that said these

25   two French entities have never sold or marketed this product in

03:56

1    the United States.  They don't allege otherwise.  One of their

2    requests for production is all communications from 1997 to 2011

3    about marketing and Taxotere with the French defendants.  What

4    that would require me to do --

5              THE COURT:  I don't want us to be here all night.

6    Your response to that request was to refer to the affidavit or

7    the declaration.

8              MR. RATLIFF:  Correct, Your Honor.

9              THE COURT:  This may be overly technical, but that's

10   not an appropriate response.  The response is to affirmatively

11   state in an objection or a response that is directed in direct

12   response to that request, whatever the response is, not to

13   direct their attention to another document that is executed

14   broadly to cover many other topics and issues and say your

15   answer to this specific request is covered by this general

16   statement, whether it's under oath or not.

17              That's not going to work, and it's not going to

18   work for a lot of reasons, one of which the plaintiffs pointed

19   out in their original motion and reply.  It's not responsive to

20   the specific request.  You have to read between the lines on

21   that declaration to get to the answer that they are looking

22   for.  Whether it's an interrogatory response or a response to a

23   request for production, they are entitled to responsive

24   information in the pleading that is directed at that specific

25   request or interrogatory.

03:58

1    **MR. RATLIFF:**  I understand that, Your Honor.  I

2    think, again, a little bit of the difficulty that we have had

3    is when I have met and conferred with plaintiffs' counsel and I

4    said, "I need you to narrow this request," and the general

5    answer is -- I would respectfully disagree about who has been

6    doing most of the giving on this.  The general request I have

7    had is "Okay.  No, we are not going to do that.  We are not

8    going to narrow these."

9        **THE COURT:**  I'm not taking a position on who has been

10   doing most of the giving or any giving.  All I have ever said

11   was it's my impression that you all have a productive

12   adversarial relationship and that you have made a lot of

13   progress without Court intervention.  I'm not judging whether

14   they have not given, whether you have not given, because I

15   don't know.  I'm not in those meet-and-confers.  I have had

16   cases in the past where I have ordered the parties to hire a

17   court reporter at every meet-and-confer they have because they

18   always disagree about what happens.  I'm not going to do that

19   here --

20       **MR. RATLIFF:**  I don't think we want to do that.

21       **THE COURT:**  -- because that's not what's going on.

22   All I can glean is what I can glean from the pleadings.  I

23   don't know what you all talk about in the meet-and-confer.  I

24   do know that there was an indication in your opposition

25   memorandum that you were going to meet further and you were

03:59

1   going to try to resolve what you could.  I heard nothing beyond

2   that from either side, whether all of these things are still in

3   dispute; and, if so, why haven't we been able to make any

4   progress.  I don't know what happens in those meetings.

5           **MR. RATLIFF:**  Understood, Your Honor.  So we did meet

6   and confer for probably an hour and a half the Friday before

7   last -- me, Mr. Lemmon, and two of his colleagues -- on all of

8   these.  We made it through, I think, two or two and a half of

9   the requests for production before we essentially ran out of

10  time.  Ultimately it was decided that they would just file

11  their reply.  We would get a chance to look at it.

12          We have not had time to have a substantive

13  meet-and-confer about the individual requests for production,

14  their responses that they have outlined in their reply.  That

15  just hasn't happened, and some of it is a by-product of time,

16  Your Honor.  They're traveling, I'm traveling, and now it's

17  Monday and we had to be back here before Your Honor on that.

18          So one of the things I was going to tell them

19  and I will say now is there are a number of these requests for

20  production, now that I have seen their replies, where I think

21  they could be answered in a more fulfilling way by giving them

22  a detailed interrogatory response, now that I know what they

23  are looking for, that explains the foreign exchange risk

24  management system -- how it's used, how often it's used, when

25  it's used, why it's used -- versus just telling them what it

04:01   1   is, as opposed to me having to go through 20 years worth of

2   documents that maybe -- transactions that literally happen

3   every single day for 20 years.

4            So there's the burden part and the sort of just

5   practical standpoint of what I can give them versus what would

6   be almost impossible to give them.

7        **THE COURT:**  Why doesn't somebody from the plaintiffs'

8   side kind of advise me where things are.

9            Here's my concern.  I could order the defendants

10  to do all kinds of things and respond without objection.  You

11  all have two issues:  (1) Time; and (2) You want to get to the

12  bottom of whatever it is that you want to get to the bottom of,

13  and you want responses and information that make sense and that

14  are not thousands or tens of thousands of pages of documents

15  that counsel has been able to go, with a targeted request, to

16  go obtain what it is that you need.

17           I can say, "Give them everything they ask for,"

18  and it sounds to me like you're not going to like what you get.

19  I can understand if that's the result because either you or

20  they are going to be casting too broad a net.  And that's not

21  going to address the first problem, which is time.

22       **MR. LEMMON:**  Right.

23       **THE COURT:**  It's going to take more time, perhaps, to

24  do it that way than less.

25       **MR. LEMMON:**  That may well be right.  I would like to

04:02

1   start kind of where Mr. Ratliff left off, which is an offer to

2   prepare a fulsome interrogatory response to address the

3   questions that we ask.  That will not satisfy us.

4           We would like to see -- we need to see the

5   documents to be able to traverse whatever it is that they say.

6   What we have seen so far, which they have represented as being

7   fulsome responses, is very general, as you identified in your

8   preliminary remarks.

9   **THE COURT:**  I will tell you all again I think they

10  are general responses.  I really am not saying this to be

11  critical.  I think that they are dancing on the head of a pin,

12  and in some cases they are answering questions that weren't

13  asked.  I'm hoping that we can get beyond that because, as I

14  have already stated, I think that, with some exceptions, the

15  interrogatories and requests for production are narrowly

16  tailored enough.

17          I have already stated I have some issues with

18  all documents related to -- we may have some other issues in

19  terms of the breadth of the request that I will speak to.

20  Generally speaking, I think that the information that the

21  plaintiffs are seeking, that is apparent to me in these

22  discovery requests, is information they are entitled to.

23          I am only interested in ensuring that counsel

24  for the defendants understands exactly what it is that you all

25  are looking for and can get it.  So I'm agreeing with you that

04:04

1   these are not full responses.  I do not believe that they are

2   full and complete responses.  In some cases I think they are

3   too general, and in some cases I think that they are rewriting

4   your request.  I'm going to tell y'all that up front.  I agree

5   with that proposition.

6           What I'm trying to figure out is -- I mean,

7   obviously you all are trying to resolve these issues.  There's

8   only so much time I can give you all to do that among

9   yourselves.  I'm just concerned that dropping an order that

10  they respond fully and without objection to all of these

11  requests is going to turn into a larger problem than we even

12  have now.

13          **MR. LEMMON:**  Your Honor, that was fair enough.

14  That's the reason why in the reply we attached the Exhibit A,

15  which gave sort of our suggestion as to the ways that we could

16  agree to narrow stuff.  When we had the meet-and-confers, from

17  the very beginning the issue that you raised, I think, is fair,

18  and Mr. Ratliff raised the same issue.  He said, "How can I

19  produce all documents that have to deal with this?"  We

20  understand that so from the very beginning acknowledged that

21  and gave suggestions as to how some of it could be narrowed.

22          It can't be narrowed by just giving us a general

23  description of what it is and not producing documents that show

24  the scope of whatever it is.  The cash pooling agreement is the

25  first time that it comes up in Request for Production No. 2.

04:06

1    They give a very general description of what that cash pooling

2    agreement is, but in order to prove what we need to prove --

3          THE COURT:  I don't even know that that was a general

4    description.  In some cases it's practically a restatement of

5    what was in the disclosures.

6          MR. LEMMON:  Right.

7          THE COURT:  It's like saying, "Describe the cash

8    pooling system or arrangements," and the response was, "We have

9    one."  There's hardly any detail associated with the response,

10   so that's one of the issues that I have with the responses.  We

11   know there is one because the defendants disclosed it to any

12   number of governmental entities.  It's obvious they are looking

13   for more information.

14         MR. LEMMON:  It's not just the information that we

15   are looking for because, you know, we asked that question in

16   both interrogatories and in the requests for production.  We

17   need to see documents that actually show what -- not their

18   description of what this particular agreement is, but documents

19   that we can dig into and make our own determinations of whether

20   or not it's important to prove in the jurisdiction of the

21   Court, and then to be able to know the scope of that, to be

22   able to know who is in control of the cash pooling agreement.

23              Can Sanofi, the French entity, tell the U.S.

24   entity to put the money up?  I don't know the answer to that.

25   I would like to see all of the instances when it has come up.

04:07

1    I would like to see the correspondence back and forth

2    instructing them how it goes.

3              So we tried.  Maybe we could do better or maybe,

4    you know, we could talk about it further, but we tried to put

5    all of that into the Exhibit A.  That was after meeting and

6    conferring, after having their side to the story of why they

7    were objecting to it, after going through the case law to

8    figure out exactly what we needed out of the requests.  Then we

9    tried to put that in sort of at least categorically so that

10   they can go back to their client and say, "This is what we

11   need," or they can do a search using search terms or however

12   they go and pull the documents.

13             We started with only 15 requests for production.

14   A lot of them deal with specific issues from their specific

15   filings, and we targeted them from the beginning.  We spent a

16   lot of time on the front end drafting the discovery requests in

17   a way that it would be narrow and that it would be meaningful.

18             **THE COURT:**  I agree with that.  I agree with almost

19   everything you have said.  I am saying that for everyone's

20   benefit, that I agree with almost everything that's been said.

21             The boilerplate-type objections that I saw in

22   both the interrogatories and requests for production are just

23   not sufficient.  They are not sufficient in any case, and they

24   are certainly not going to be sufficient here.

25             I understand that you all are fighting a battle

04:09

1   over limited discovery because it only goes to jurisdiction.

2   Frankly, I don't see -- or at least it's not striking me in any

3   obvious way that there's a lot of overlap between what might be

4   merits discovery in this case and what is being propounded

5   right now as jurisdictional discovery.  Of course, there's

6   always the potential for some overlap.

7                I can't imagine what motivation plaintiffs'

8   counsel in this case would have for intentionally conducting

9   discovery outside the scope of what they think they need to

10  prove their case on the jurisdictional side.  I don't see any

11  of that reflected in their requests.  I think that what they

12  have asked for is reasonable, and I think they are entitled to

13  it.

14               The thing that concerns me is something like

15  what Mr. Ratliff mentioned right out of the bat, which is --

16  and it may be an example or it may be the only major issue, and

17  it's an issue that I was going to talk to you about anyway --

18  an overly broad definition of *predecessor*.  That is a real,

19  actual, legitimate objection.  It may not have been stated

20  particularly well or in detail in the responses, but it's a

21  problem.

22               You all are entitled to learn whether, I guess,

23  relevant predecessor companies, the successors of which might

24  be mere continuations, had or have the sort of interactions or

25  relationship with the forum that would support your claim that

04:11
1    you have jurisdiction over the French defendant.  But to throw
2    out the typical definition of all successors, agents, lawyers,
3    whatever, just isn't going to get you to the finish line.
4    That's not a controllable sort of request.  There has to be
5    some sort of limitation on the information that you are looking
6    for.
7              **MR. LEMMON:**  Right.  We do understand that.  I think
8    it's a lot of who the predecessors were, who the active
9    participants were, were presented during the Science Day or
10   whatever you will, Economics Day, whatever it was called, with
11   Judge Engelhardt.
12             **THE COURT:**  Science Day, is that what it was?
13             **MR. LEMMON:**  Information Day.
14             **MS. MENZIES:**  I don't mean to interrupt, Mr. Lemmon.
15             My only point -- and I apologize.  We had talked
16   about this earlier.  One of the concerns we have, we appreciate
17   350 -- many, many entities concerned.  In our very first
18   interrogatory on this issue, we asked for better understanding
19   of what are the predecessor entities -- we are also trying to
20   nail it down -- and the responses we got were very vague.  If
21   we get more meaningful responses, perhaps we can do that.
22             **THE COURT:**  Have you had an opportunity to look at
23   the exhibit to the reply memo that Mr. Lemmon is talking about?
24             I guess which is sort of your proposal as to how
25   to limit your own discovery.

04:12

1           **MR. LEMMON:**  So it's really in two places that we are

2     willing to limit it pretty much across the board.  There are a

3     couple places where it doesn't make logical sense, and you will

4     come across that.  I think it will be obvious.  We are willing

5     to limit it to a certain time period in 1997 to 2011.  That

6     particular time period is the time when there would have been

7     things going on with the predecessor entities, and much less

8     went on later on.

9                 Now, you will see what I'm talking about with

10    one of the last questions.  It's a statement that happened in

11    2015 regarding the HR system.  That's something, obviously,

12    that wouldn't be restricted to 1997 and 2011.  Other than that,

13    we are generally willing to restrict it to those time periods.

14                The other restriction that we suggested is

15    appropriate is the predecessor entities.  So it is something

16    that we don't disagree with what you are saying.  We understand

17    that we are not looking for a thousand different entities and

18    every lawyer who was ever involved and all that kind of stuff,

19    but there is significant activity that took place by specific

20    French entities:  Rhone-Poulenc, for example, Rhone-Poulenc

21    Rorer S.A.  There's specific activities that took place that

22    involved specific U.S. predecessors to the entities who were

23    the defendants to this litigation now.

24                So I think we all know what we are looking for.

25    The discussion hasn't been had between us to specifically

04:14

1    identify exactly which entities it applies to.  Frankly, we may

2    not know all of those entities.  So that's part of the reason

3    why the interrogatories request for identification of those

4    entities.

5              Mr. Miceli had something he wanted to add.

6              **THE COURT:**  Hold on.  Mr. Ratliff wants to say

7    something.

8              **MR. RATLIFF:**  Before I have to respond to three

9    attorneys, I would just like to address a couple of points.

10             **THE COURT:**  Right.

11             **MR. RATLIFF:**  The first point, which is when you were

12   talking about the cash pooling and we gave what you said was

13   maybe too general of a description of how that cash pooling

14   worked --

15             **THE COURT:**  That was one of the responses.  There's

16   another one.  Is there a risk management question?

17             **MR. RATLIFF:**  A foreign exchange risk management

18   system.

19             **THE COURT:**  Right.

20             **MR. RATLIFF:**  When we start talking about the timing

21   issue, that's my concern, Your Honor.  When I went back to them

22   a month ago and said, "Tell me what you want more," I heard

23   nothing back from them until I got their reply and the

24   Exhibit A to it.

25             Let me give you an example on the cash pooling.

04:15

1  I went back to my client and said, "Here is the information

2  they want to know.  Can I give them a more detailed

3  interrogatory?  What could we conceivably be able to produce to

4  them that would illuminate that this is a pretty basic

5  process?"

6  Every single day the U.S. subsidiaries, if they

7  have a cash surplus, pool those together, send them to another

8  U.S. subsidiary, and then put them in a bank account.  Every

9  single day.  If one of those U.S. subsidiaries is at a loss,

10  then they get a loan at an interest rate.  That happens

11  literally every single day, so you are talking about thousands

12  and thousands and thousands of transactions that go on every

13  single day for what they are saying is for 15 and 20 years.

14  **THE COURT:**  I don't think that's what they are

15  looking for.

16  **MR. RATLIFF:**  But that's what I don't know,

17  Your Honor.  I can give them a more fulsome description.  It is

18  what it is.  We are fine with it.  It's the document part of

19  it.

20  **THE COURT:**  Here's how we got here, because you

21  didn't give them much of anything.  I'm hearing what you just

22  told me for the first time.  I don't know if these guys over

23  here are or not.  I don't know if you have had that

24  conversation as part of your meet-and-confer.  I don't know,

25  but I certainly haven't heard it.

04:16

1          **MR. RATLIFF:**  Right.

2          **THE COURT:**  I'm going to go out on a limb and say

3    this, based on what you just told me for the first time, so I'm

4    making this up as I go along.  I would think that they would

5    like to have as detailed an explanation of that system as you

6    can give them, which would be more detailed than what you just

7    gave me, and what you just gave me is way more detailed than

8    what you gave them the first time.

9               So, as a starting point, I would think that they

10   are entitled to however that system works.  I don't think that

11   they wanted daily transaction documents going back 20 years.

12   On the other hand, all of these entities are operating the way

13   they are operating on the basis of some set of rules, some

14   direction, some policy, some something.  They are entitled to

15   that information.

16         **MR. RATLIFF:**  Right.

17         **THE COURT:**  That's the information that you should be

18   marshaling and giving to them --

19         **MR. RATLIFF:**  Absolutely.

20         **THE COURT:**  -- to explain systematically how and why

21   those things happen.

22         **MR. RATLIFF:**  Absolutely, Your Honor.  In our

23   opposition we had our own Exhibit A and we said, "These are the

24   things that we could produce to you that we think would be

25   helpful.  We will produce documents that are illustrative, that

04:18

1    explain what this process is," without having to get into the

2    nuts and bolts of "Here is a million pages of transactions that

3    happened over the course of 20 years" and "Here is every single

4    communication where somebody is sending an email to the bank."

5    That part of it I'll tell you right now -- and you may order me

6    to do it.

7            THE COURT:  I'm not going to order you to do it.

8            MR. RATLIFF:  It's going to be difficult to comply

9    with it.

10           THE COURT:  No, I think I just made it clear.  Not

11   only am I not going to order you to do it, I think that they

12   would not be happy if I ordered you to do that because I don't

13   think they want that.

14           MR. RATLIFF:  It would be the same for the foreign

15   exchange risk management system.  I will give them a far more

16   detailed response now that I have seen what they are really

17   looking for, what they are interested in, how it's used, how

18   often it's used.  I'm happy to do that with something that's

19   sort of -- if there's a standard operating procedure or a

20   policy that said this is how this process works.  The process

21   is what it is.  My concern is more of a burden of what all do I

22   have to try to find and hunt down in a relatively short amount

23   of time.

24           THE COURT:  Let me go back to the beginning because I

25   think where this is headed is -- I'm going to do what we have

04:19

1  been doing in the past.  I'm going to tell you what I think

2  needs to happen.  I'm going to give you all a brief opportunity

3  to work through making it happen or agreeing on what that's

4  going to look like, and it's not going to be long.  If we have

5  to do this again by phone or in person, then we will.  Okay.

6         Let me go back to the beginning so everyone

7  understands how I am viewing this overall.  I said what I said

8  at the beginning of the hearing for a reason.  We are not going

9  to relitigate the plaintiffs' entitlement to jurisdictional

10  discovery.  I feel it's important to say that because the

11  defendants' opposition memoranda went down that road.

12         There are even arguments as to scope in which

13  you all rely on cases that concern themselves -- the decisions

14  themselves were the ultimate decisions on whether the court had

15  jurisdiction over a particular party, and there were statements

16  in those cases such as a close relationship or intertwined

17  relationship standing alone is not enough.  There are

18  statements in those cases as to what is sufficient and what

19  isn't sufficient, but that's not what I'm concerned with.

20         **MR. RATLIFF:**  Understood, Your Honor.

21         **THE COURT:**  No one can prove their position in this

22  case, irregardless of who has the burden of proof, without the

23  facts that they need.

24         The defendants and the plaintiffs in those

25  cases -- you cited many of them; the *Jackson* case in the

04:20

1    Fifth Circuit, for instance.  The Court can't get to the

2    ultimate question unless the necessary facts are presented to

3    the Court to be able to make the case-by-case determination

4    that has to be made.  So what I'm concerned with is the

5    plaintiffs' opportunity, ability, and right to obtain the

6    information they need to make their case.

7           **MR. RATLIFF:**  Understood.  Your Honor, one of the

8    things I had suggested in one of our meet-and-confers -- and

9    it's still an open offer to the plaintiffs -- is there are

10    certain things on here that we will streamline for them by just

11    stipulating that they are true or not true.

12           So one of their questions asked about

13    operational policies.  They want operational policies for

14    labeling or operational policies for marketing, etc., etc.  If

15    what they are looking for -- and this is what I would be

16    looking for -- is are there operational policies that are

17    corporationwide, do they cut across all subsidiaries, we will

18    stipulate that, yes, there certainly are operational policies

19    that cut across all of the various subsidiaries and there are

20    some that do not.  That seems to be a way to try to cut through

21    some of this and particularly given the timing mechanism.

22           **THE COURT:**  Maybe that is a way.  I'm seeing

23    legitimate requests in terms of subject matter.  I understand

24    the issue when we talk about predecessor companies and we talk

25    about the pooling arrangement and the daily transactions.

04:22

1         Again, I understand the objection and the
2    concern, even though it wasn't stated particularly clearly in
3    the responses.  If this was a garden-variety two-party case, we
4    might be talking about waiver of objections and all of that,
5    but it's not.  I'm not going down that road because it's only
6    going to make matters worse, frankly, which is why I'm saying
7    I'm not ordering you to produce a bunch of stuff that nobody
8    wants or needs or is going to help anyone, including the Court.
9         What I do want is for you all to sit down one
10   more time and go through these requests with an eye toward
11   plaintiffs' counsel actually informing defense counsel exactly
12   what it is you need.  It may be broader than you think they are
13   entitled to, but I doubt it, because I'm telling you --
14        Well, I don't think they are entitled to
15   20 years of daily transactions on something that happens on a
16   daily basis.  I think that the information that they have asked
17   for generally, in their discovery requests, they are entitled
18   to.  I'm only concerned with how you are going to marshal the
19   information that they need.  That's the conversation I want you
20   all to have.
21        So I'm already telling you you owe them a bunch
22   of information, and I want you all to take one more stab at
23   figuring out how you are going to give it to them and what it
24   is that you are going to give them.
25        **MR. RATLIFF:**  I understand, Your Honor.  My concern

04:24

1    is marshaling that information too.  So I guess the only

2    request I have -- and certainly from the plaintiffs' side -- is

3    that we not go back to a meet-and-confer and then they just dig

4    in their heels and say, "Look, you lost that hearing.  We are

5    going to get everything we want.  Produce all of it," and then

6    I'm back in front of you.  That's my concern.  I think that's

7    probably what will happen.

8              I want to make sure that when we do meet

9    again -- and I can meet on Wednesday.  I get back late tonight.

10   I need to talk to my client tomorrow -- that there is at least

11   some understanding of "Give me what you really need or what you

12   really want."

13             **THE COURT:**  Does somebody want to respond to that?

14             **MR. MICELI:**  Let me take a couple of stabs at it

15   first.  Your Honor, David Miceli.  I'm a member of the PEC.  I

16   want to talk about a couple of issues that have been raised

17   during the discussions with you today.

18             I think one way that we can identify who we are

19   looking for documents from and who might be relevant is how the

20   defendants hold themselves out to the public in the history,

21   including the argument today from Mr. Ratliff about what might

22   be relevant.  I'm going to take some of this in reverse order.

23             Mr. Ratliff said, "In order for us to respond on

24   these predecessor companies, we would have to go back

25   20 years."  Well, clearly Sanofi has not been the registered

04:25

1   market holder of this drug for 20 years.  There's been a

2   predecessor company, Rhone-Poulenc Rorer.  There are public

3   documents that demonstrate that Rhone-Poulenc Rorer S.A. had a

4   U.S. representative, not a company.  There was a U.S.

5   representative, Rhone-Poulenc Pharmaceuticals U.S.  That's the

6   way it was held out to the FDA.  Who is the patent holder?

7   This French company.  Who submitted the NDA?  The NDA was

8   submitted through their U.S. representative.

9           So that predecessor interest -- I think

10  Your Honor might have alluded to it earlier.  There may be

11  companies that are predecessor companies that held themselves

12  out differently than Sanofi holds themselves out today, and I

13  think that might be just one case.

14      THE COURT:  If we just started with predecessor

15  companies and got rid of all of the other folderol in the

16  definition of *predecessor* that brings in a world of other

17  people and entities, that would be a good place to start.

18      MR. MICELI:  I would agree with Your Honor, but the

19  web that is created is not created by the plaintiffs' counsel.

20  The web that is created is by the French entity and the various

21  entities they maintain here in the U.S.

22          We have to have the opportunity, I think, to

23  have a fair and thorough sifting through that information and

24  the facts, as Your Honor has pointed out, of how that works.  I

25  think that's what we are really asking for.

04:26

1          Secondly, how does Sanofi hold itself out today,
2     something as simple as going to their website and seeing where
3     they take credit for all of the innovations of this worldwide,
4     global medical scientific company, and it starts out, at least
5     in 1996, with inventing Taxotere.  That's not Sanofi's
6     invention.  That's their predecessor's invention, Rhone-Poulenc
7     Rorer.
8          So there are items of fact that we have looked
9     at to try to come up with our requests that take us back
10    farther than 1996, that take us back to the innovators of the
11    product here in the U.S. and in France.  So there are facts and
12    there are pieces of evidence that are out there that are
13    required that came to the U.S. in order to get this product on
14    the market here.  We have included all that in our submissions.
15         Those are two of the things, how they hold
16    themselves out, how they have held themselves out, what they
17    take credit for --
18         **THE COURT:**  It shouldn't be difficult to identify
19    those entities.
20         **MR. MICELI:**  It shouldn't.
21         **THE COURT:**  So now that you have them identified, now
22    what happens?
23         **MR. MICELI:**  Well, we have to find out what their
24    involvement was.  Some may fall by the wayside, but certainly
25    there are those that will remain.  And we know that because

04:28

1    those are the people that dealt with the Food and Drug

2    Administration here in the U.S., the French individuals that

3    are from those companies, both Sanofi and from Rhone-Poulenc

4    Rorer, its predecessor, where they interacted on this product

5    with the FDA.  That's why we have that out there.

6         THE COURT:  Mr. Ratliff, I'll say like I did with

7    Mr. Lemmon when he was arguing.  I agree with everything he

8    just said in terms of what they are entitled to learn.  I agree

9    with that.  Now, the only question I'm having is:  How do we

10   gather that information, and how do we make sure that the net

11   is wide enough, but not too wide, to capture what it is that

12   I'm saying they are entitled to?

13        MR. RATLIFF:  Sure, Your Honor.  I assume that

14   whatever website Mr. Miceli has gone to will be one of the

15   exhibits in the opposition and it will be all in there.

16        THE COURT:  But that's not evidence.

17        MR. RATLIFF:  Right.

18        THE COURT:  They can't traverse a website.  They are

19   entitled to gather the information that they have identified

20   that's out there.  What I'm trying to do is say:  You all are

21   all smart.  You know this business better than I do.  I am

22   telling you what I think they are entitled to, and I am trying

23   to reasonably limit it so that they don't gather too much, they

24   get what they need, and we do it without an excess of waste of

25   time.  I'm talking about the next step in the process.

1    **MR. RATLIFF:**  Right.

2    **THE COURT:**  That's the kind of information that I'm

3    saying to everyone they are entitled to.

4    **MR. RATLIFF:**  I guess my concern, Your Honor, is what

5    does any of what Mr. Miceli just said -- which is not set forth

6    in any of their requests for production in the way Mr. Miceli

7    said.  What does any of that have to do with whether one

8    entity, Sanofi S.A., is the alter ego of these two U.S.

9    entities?

10           So I agree they are probably going to be

11   entitled to that in terms of merits discovery -- who these

12   people are, what they do, who invented the product -- but we

13   are talking about a more narrow issue of --

14   **THE COURT:**  So when does evidence as to alter ego

15   stop?  How far back can you go?  You can only go back to when

16   your client's company came into existence?

17   **MR. RATLIFF:**  I would need to go back farther, but I

18   wasn't looking at that because that's not what these requests

19   were asking for.  Again, from my perspective, Your Honor, it

20   becomes the same issue we have talked about, which is the

21   practical --

22   **THE COURT:**  It's not just about requests for

23   production.  It's about interrogatory responses.

24   **MR. RATLIFF:**  Right.

25   **THE COURT:**  The information that I think I was just

04:30

1    provided by Mr. Miceli did not come from you.  It didn't come

2    in an interrogatory response.  That's part of the problem.  We

3    are not just here on requests for production.  We are here on

4    interrogatory responses that are insufficient.

5              They don't even have a starting point of actual

6    real information that was provided in discovery, in a response,

7    to be able to refine their document requests.  That's the way I

8    see it.

9         MR. RATLIFF:  Okay.

10        THE COURT:  Everything I'm hearing right now I'm

11   hearing for the first time.  I ought to be able to read it in

12   an interrogatory response somewhere.

13        MR. RATLIFF:  I guess, Your Honor, I'm also hearing

14   it for the first time from them in terms of what they want

15   because that's not what their interrogatories or requests for

16   production are asking.  That's what I've been guided by, and

17   that's what I've been guided by in my discussions with

18   Mr. Lemmon.  So I feel a little bit from -- what Mr. Miceli

19   said is what I'm hearing for the first time.

20        THE COURT:  All right.  Well, let me say two things.

21   First of all, are you saying that they have never asked for

22   that sort of predecessor company information in discovery?

23   They have not asked for that information in some form or

24   fashion in discovery?

25        MR. RATLIFF:  In their merits discovery, in the

merits discovery that they just served.  In terms of their actual interrogatories, I believe it's:  Who are your subsidiaries in the U.S.?  Where are they located?  How were they formed?  That's the information they have asked in terms of the corporate structure.  We actually give them a very detailed response about that.  We say for the U.S. defendants -- I mean, what does it matter what all the other subsidiaries -- where they are formed, what they do?

THE COURT:  Well, predecessor companies of either the U.S. defendants or the French defendants could be relevant to the alter ego theory.  There are certainly conceivable arguments to be made there.

I haven't memorized all of these interrogatories and requests for production, so I don't know if that information was specifically requested or if it was assumed in a request or a request for production.  I don't know the answer to that.

I'm trying to make it as clear as I possibly can what I think they are entitled to.  I'm trying to set you all on a very short path to have that open communication, with the benefit of what I'm saying today, to get responses that are meaningful.  That's what I want you all to do.

MR. RATLIFF:  Understood, Your Honor.

THE COURT:  Mr. Miceli.

MR. MICELI:  If I can just add a few things.  From

04:33

1    the beginning of this case -- Mr. Bachus, who is on the
2    telephone, filed the first case back towards the end of 2015,
3    and he alleged allegations against Sanofi and its predecessor,
4    Rhone-Poulenc Rorer.  That has been a continuous issue on
5    identifying who the defendants are.
6            We know that Sanofi wasn't around in '96 when
7    this was submitted on an NDA or it was approved on an NDA.  We
8    know there were a series of companies.  That's why we have
9    these documents.  We used the documents that were in our
10   possession to fashion the requests that we did.  We didn't
11   spell out for Mr. Ratliff what our theory of recovery is in a
12   memo that says, "Please, this is why we are asking."
13           **THE COURT:**  Okay.  I have already heard Mr. Lemmon
14   say --
15           **MR. MICELI:**  Right.
16           **THE COURT:**  -- he has already offered to limit the
17   scope going back temporally to 1997.
18           **MR. LEMMON:**  Yes, sir.
19           **THE COURT:**  Mission accomplished.
20           **MR. MICELI:**  Okay.
21           **THE COURT:**  Notwithstanding the one issue that you
22   have raised, the 2015 -- I usually have a pretty good memory,
23   but I can't remember what the specific issue is.
24   Notwithstanding that, that's already on the table.
25           **MR. MICELI:**  Understood.  With regard to going

04:34

 1    forward, we have been involved in this MDL since October of

 2    last year, and we have had many, many discussions with the

 3    defendants.  We want to move forward with discovery as quickly

 4    as possible, on all meaningful discovery -- on the

 5    jurisdictional discovery, on the merits discovery that does not

 6    involve right now the French, until that issue is resolved --

 7    but there are many fronts we are moving forward on and desire

 8    to move forward on.  In the responses that were offered by the

 9    defendants, it says there's some things they will do, but

10    there's no time limit for when they are going to start

11    producing things.  That's an issue for us.

12              **THE COURT:**  That's going to be soon.

13              **MR. MICELI:**  Okay.  There's an issue of the Court

14    wants us to have a meet-and-confer so that we can come and

15    bring these things to a head.  We are going to be back before

16    Your Honor next Friday.  We would like a deadline that we can

17    inform Your Honor -- before we leave the courtroom today, we

18    can talk and set deadlines to have that, because we want to

19    have hard deadlines so we can ultimately have a hard deadline

20    for our documents.

21              **THE COURT:**  I'm going to give it to y'all right now.

22    This is how I want to proceed.  You all are going to be back

23    here on August 18.

24              **MR. MICELI:**  Yes, Your Honor.

25              **THE COURT:**  I gave this some thought before we

04:35

1    started, and I wasn't sure if I wanted to go this route.  Once

2    y'all started talking, I immediately decided this was the most

3    prudent thing to do.

4              Y'all are going to be here on August 18.  We are

5    going to resolve this finally by that day.  The reason that I

6    think that it's acceptable to put off the final resolution

7    until August 18 is because at this point, regardless what I

8    order, nothing is actually going to happen until

9    Judge Engelhardt decides whether there's this entirely

10   different obstacle to conducting this discovery.

11             So anything I was going to do today was going to

12   be subject to how he rules on the other issues.  He hasn't done

13   that.  I suspect that he will do that or at least he will have

14   some sort of telephonic hearing or something with you all

15   before the 18th.  But because it hasn't happened yet, I don't

16   think that it causes a problem timewise for me to have you all

17   try to at least limit what's left in this dispute.  So that's

18   how I want to handle it.

19             I want you all to take what I have said and sit

20   down and try to resolve as much of this as you can.  The

21   interrogatory responses need to be more robust and detailed.  I

22   don't want references in any of the responses "See the response

23   to Interrogatory No. 1" or so-and-so's declaration.  This is a

24   big enough case -- it involves enough parties and enough

25   lawyers and two judges -- everyone needs to take the time to do

04:37

1    everything technically correct and match responses to the
2    specific requests that are requesting that information so that
3    no one has to read between the lines.
4              If information is being withheld on the basis of
5    an objection, that needs to be stated.  That wasn't clear to me
6    in the responses.  That's clearly the rule now under Rule 34.
7    It's less clear whether you have to do that with regard to
8    interrogatories, but I expect you all to do that on both sides.
9    If you are objecting and then responding to an interrogatory,
10   you need to make an indication that you are withholding
11   information, if indeed you are, subject to that objection.
12             As I said, I think that the information that the
13   plaintiffs are looking for is grist for the mill.  I think they
14   are entitled to it.  There are some scope issues in terms of
15   overbreadth that we have already discussed that I want you all
16   to try to address between yourselves.
17             For the most part, I think the plaintiffs are
18   entitled to conduct the discovery that they are attempting to
19   conduct.  I have no qualms currently that this is merits-based
20   discovery.  None.  My only concern is potential overbreadth,
21   and that's what I want you all to talk about.
22             When I say "potential overbreadth," I mean
23   things like going back 50 years.  I mean things like
24   definitions of terms that are overbroad.  I mean things that
25   are going to make it overly burdensome for the defendants to

04:39

1    try to marshal a response.  That's what I mean by overbreadth.

2                    Hopefully you all can come back on the 18th --

3    I'm not Pollyanna.  I'm not going to necessarily predict we

4    won't have any issues left, but I'm hopeful that you all can

5    take this conversation and make good use of it and come to some

6    agreements and accommodations as to what's going to be produced

7    by way of information and documents.

8                    If not, we will hash it out some more and I will

9    issue an order.  Timewise, I'm going to give you all a short

10   leash.  For the record, I'm referring to the defendants.  I'm

11   going to give you all a short leash to respond, but the clock

12   won't start ticking until and unless Judge Engelhardt says you

13   have to respond, because there is the potential that he is

14   going to say you don't get to conduct any discovery at all and

15   we are talking about the scope of discovery that won't be

16   conducted.

17                   In any event, if he does rule that it's going to

18   go forward, then whatever time period I give the defendants to

19   respond is going to go from then, but it's going to be short,

20   because I've not been given any indication or any permission or

21   anything else to suggest to anyone that any of these deadlines

22   are going to move.  We are a little bit more than a month away

23   from the deadline.

24                   I want you all to try to get this solved.  If

25   you can't, you can't.  That's fine.  You're making a record.

04:41   1   You have already made a record.  We will make whatever
2   additional record is necessary on the 18th.  If you all want to
3   give me an update by way of letter -- joint letter, separate
4   letters -- to let me know before we get to the 18th what's left
5   to be decided, I would appreciate it, and we can have a more, I
6   guess, enlightened discussion if I know where things stand.
7           I've lost my train of thought.  There was one
8   other thing I was going to say.
9           Go ahead, Mr. Ratliff.  Everybody wants to say
10   something.
11       MR. MICELI:  I wasn't concluded myself yet, and I
12   think there are some things I may want to say that Mr. Ratliff
13   is going to want to respond to.
14       THE COURT:  Okay.  What's left?
15       MR. MICELI:  Well, you made the statement that
16   everything that you can do for us is going to be put on hold
17   until Judge Engelhardt rules on the jurisdictional rights of
18   the parties.
19       THE COURT:  Right.
20       MR. MICELI:  There are some things, however, that we
21   see that we wanted to address to the Court and perhaps just
22   give you a preview for what we would like to discuss with you
23   again on the 18th.
24       THE COURT:  Okay.
25       MR. MICELI:  One thing that was brought up in some

04:42

1   letters -- and you probably understand we talk and we
2   correspond regularly -- is the discovery plan.  You will recall
3   when we were here 10 days ago, I believe Mr. Oot said that some
4   of their deadlines are triggered by the entry of a discovery
5   plan.  We have provided them with our draft.  We are waiting
6   for their redlines, and then we want to have a meet-and-confer.
7   We need to get that entered because --

8           THE COURT:  That's what we are talking about on the
9   18th.

10          MR. MICELI:  That's what we are talking about on the
11  18th.  We want to make sure that that is what we are talking
12  about on the 18th.

13          THE COURT:  Just to be clear, when I'm talking about
14  ruling subject to Judge Engelhardt's order, I'm talking about
15  jurisdictional discovery on the French defendants --

16          MR. MICELI:  Right.

17          THE COURT:  -- that the French defendants have said
18  they are not subject to for reasons that have nothing to do
19  with the Federal Rules of Civil Procedure.

20          MR. MICELI:  I understand.  We understand that, I
21  should say, but we want to make sure we are before Your Honor
22  on the 18th with a clear understanding that we will be ready to
23  address the entry of a discovery plan on or shortly after that
24  date that will begin triggering the timeline.

25          THE COURT:  That's my expectation.

1   **MR. MICELI:**  Okay.

2   **THE COURT:**  That's the discussion we had the last

3   time you all were here.

4   **MR. MICELI:**  That's Issue No. 1.  Issue No. 2 -- and

5   it's my final issue, so I will sit down in a moment.

6   **THE COURT:**  It usually works the other way.  There's

7   usually 15 lawyers on the defense team and two lawyers on the

8   plaintiffs' team.

9   **MR. MICELI:**  I understand, Your Honor.  The other

10  thing is we were here last 10 days ago, I believe, and we

11  talked about this informal discovery.  In the meantime, we have

12  sent a letter to defendants.  They have responded to us

13  concerning 26(a) issues.  That's an issue that I came prepared

14  to talk with you today, but it doesn't sound like the Court

15  is -- that may be something the Court wants to discuss on the

16  18th.

17  **THE COURT:**  Well, I'm not prepared to discuss it

18  today.

19  **MR. MICELI:**  Exactly.  Okay.  There are obligations

20  that go beyond a discovery plan, and Rule 26(a) disclosures are

21  just such a thing.  The rule clearly says --

22  **THE COURT:**  We are going to talk about that on the

23  18th.

24  **MR. MICELI:**  We'll talk about that on the 18th.

25  Thank you, Your Honor.

04:44

1        **THE COURT:**  Let Mr. Ratliff say something.

2        **MR. MICELI:**  Thank you, Your Honor.

3        **MR. LEMMON:**  I'm sorry.  I didn't hear you.

4        **MR. RATLIFF:**  Your Honor, I am not going to try and

5   belabor this anymore because it's getting late, and I feel like

6   you have made it abundantly clear what your position is.  The

7   one sort of practical standpoint that I wanted you to think of

8   is you said, "I don't care whether their jurisdictional

9   discovery is merits discovery or jurisdictional discovery."  I

10  guess the one part from just a --

11       **THE COURT:**  Wait.  Are you saying you don't care or

12  you think I said I don't care?

13       (Phone rings.)

14       **THE COURT:**  Boy, don't let that happen in

15  Judge Engelhardt's courtroom.

16       **MR. RATLIFF:**  I understand your position.  You

17  said --

18       **THE COURT:**  I don't think that this is mixed.  If

19  there is some overlap, it's not hitting me in the face.

20       **MR. RATLIFF:**  Okay.  The one issue I see is on some

21  of these, these documents are going to be rolled out in merits

22  discovery, but they are going to be voluminous documents that

23  don't really have a bearing on jurisdiction.

24            So, for example, one of them is "Produce all

25  your communications with a regulatory agency in the

04:46

1   United States regarding Taxatere."  They are certainly going to

2   get that from the U.S. defendants.  We are working on that now.

3   In fact, I would like to get those out sooner rather than later

4   so they don't come back here every time and complain about it.

5   I don't want to be in that position.

6          THE COURT:  Okay.

7          MR. RATLIFF:  That really has no bearing on

8   jurisdictional discovery and so there's my concern.  If I can

9   get some of that out, I will, but when there's that overlap --

10  I mention it only because the timeline for jurisdictional

11  discovery is this (indicating).  The timeline for the merits

12  discovery is going to be a little bit broader.  So I guess

13  that's where I would ask ultimately you and at least the

14  plaintiffs, when I talk to them, for a little bit of leeway

15  when they think about what do they really need for the

16  jurisdictional discovery.

17         THE COURT:  What was the specific request you just

18  used in the example?

19         MR. RATLIFF:  "Produce all your communications with a

20  regulatory agency in the United States regarding Taxotere."

21         THE COURT:  Let me just say that to say that that

22  request can't seek information that's germane to the

23  jurisdictional argument from the French defendants, I do not

24  agree with that.

25         MR. RATLIFF:  That I understand Your Honor, but as it

04:47

1  relates to all the communications the U.S. defendant had with

2  that regulatory agency --

3       THE COURT:  We are talking about the requests that

4  are directed to the French defendants.

5       MR. RATLIFF:  There lies the rub.  They have sent

6  this discovery to all four of the defendants, so now I have to

7  figure out who I respond and who they are asking the documents

8  from.

9       THE COURT:  Hold on.  This motion to compel is a

10 motion to compel responses from the French defendants.  That's

11 the issue in front of the Court today.  They have not moved to

12 compel responses from the U.S. defendants.  That's not an issue

13 I'm concerned with.  That's not to say they can't conduct

14 jurisdictional discovery against the U.S. defendants to try to

15 close the loop --

16      MR. RATLIFF:  I understand, yes.

17      THE COURT:  -- but that's not been briefed.  Nobody

18 has complained about it.  There was a statement that the U.S.

19 defendants haven't responded as they agreed to do in a status

20 conference with Judge Engelhardt, but that's the limit of what

21 I have seen in terms of a complaint about the U.S. defendants'

22 responses.

23      MR. RATLIFF:  So, for example, on the regulatory

24 communications from the French defendants, there are going to

25 be no documents, and I will tell them there are no documents.

04:48

1   But as it relates to the U.S. defendants, that's probably going

2   to be 2 million pages of documents.

3        THE COURT:  Well, that's a legitimate concern, but

4   then again I'm asking you all to talk about the responses of

5   the French defendants to this discovery.  That's what we are

6   talking about.

7        MR. LEMMON:  Your Honor, there is -- well, it's

8   complete overlap because it's the same questions asked to all

9   four entities.

10        THE COURT:  Right.  It's identical.

11        MR. LEMMON:  Judge Engelhardt made clear in the

12   July 12, or whatever it was, call that they were required to

13   answer those requests on behalf of all of the entities,

14   including the U.S. entities.  The only reason why it's not

15   before you on a specific motion to compel is that we didn't get

16   those answers until last week.  Now, we have gotten those

17   answers now.  They are basically identical to the answers we

18   got from the French entities.  So I think it is fair that it

19   would be included across the board.

20        THE COURT:  The discussion I want you all to have

21   should include that topic.

22        Now, having said that, Mr. Ratliff raises a

23   perfectly legitimate concern.

24        MR. LEMMON:  No doubt.  I understand that.  That

25   certainly will be part of the conversation.  To the extent that

04:49

1  I think you have identified, Your Honor, specific things that

2  might be pertinent to jurisdictional discovery, we can limit it

3  to that for present purposes, although we still want those

4  documents at some point.  We can work together on that --

5       THE COURT:  What we are working toward is a

6  production and a set of responses that allow the plaintiffs to

7  support -- I know you don't want them to, but this is

8  discovery -- to support their motion by September 18, which

9  means we can't fool around with a bunch of stuff that's merits

10  discovery.  You shouldn't have an interest in that right now

11  anyway.  Because if Judge Engelhardt says September 18 is the

12  deadline and the deadline is September 18 and y'all are fooling

13  around with merits discovery, you are the ones who are going to

14  pay the price ultimately.

15       MR. LEMMON:  We understand that.  I wanted also to

16  bring up sort of another issue because now we are here on

17  interrogatories and requests for production.  That's what we

18  are talking about.  The requests for production were pretty

19  fully briefed.  The interrogatories, we really didn't, and I

20  think from the plaintiffs' side sort of expected that more to

21  be covered on the 18th.

22            So what I would suggest and ask is that the

23  interrogatories -- not just the 22, or whatever number it was,

24  that they answered, but all of the interrogatories be part of

25  the discussion that we have between now and the 18th.  And to

04:51

1   whatever extent we are unable to come to a resolution on it, we

2   would bring it before the Court at that time.

3          **THE COURT:**  For me to resolve it on the 18th, I need

4   to know what the specific concerns with every interrogatory

5   are.  I certainly read the first 22.  In fact, I read them all.

6   What I want you all focused on is what you need by way of

7   jurisdictional discovery.

8          **MR. LEMMON:**  Yes.  We understand that.

9          **THE COURT:**  I'm just trying to get you all to the

10  finish line on September 18 so that the schedule is not upset.

11  If we can't get there, we can't get there.  I just don't want

12  to be here every week arguing about what you all have produced.

13  I think, after sitting here now for an hour or so, you all have

14  a pretty good idea.  The defendants may think I'm allowing the

15  plaintiffs to cast too wide a net, and I don't think that I am.

16          I think, as I said, generally speaking, the

17  information they are requesting is potentially relevant to or

18  germane to the arguments they are making.  Regardless of

19  whether they pleaded every single element of fact that they

20  needed to to get to the finish line, I think they are

21  positioned to ask those questions and to get those answers, and

22  Judge Engelhardt has said they can do it.  The Fifth Circuit,

23  in the *Jackson* case that you cited to me, it's implicit in the

24  result of that case that this is the kind of information that

25  is grist for the mill in jurisdictional discovery.

04:53

1      **MR. RATLIFF:**  Your Honor, I think one thing that

2  would be helpful -- and certainly we will talk about this, and

3  I have asked the plaintiffs this before -- is as we go through

4  the interrogatories or we go through the requests for

5  production, if they could let me know who they are directing

6  that request for production to.  Like I said, they identified

7  all four of the defendants, but in my mind some of them seem

8  clearly targeted to one defendant --

9      **THE COURT:**  That's quite possible.  If that's the

10  case, that's part of what you all should be talking about.

11      **MR. RATLIFF:**  That would be helpful.

12          The response I have received is "Well, how do we

13  know?"

14          I said, "Well, just give me your proof."

15          *Help me help you* is sort of the mantra I'm

16  trying to get to because I don't want to be back here arguing

17  these.  My client certainly wants to get this resolved, the

18  jurisdictional issue resolved.

19      **THE COURT:**  The message I'm trying to send is the

20  jurisdictional issue is going to get resolved.  It's going to

21  get resolved according to the law, and it's going to get

22  resolved with Judge Engelhardt having every single relevant

23  fact that either party can put before him to make the

24  determination he needs to make in this case on these

25  defendants.  That's going to happen.  I want everyone to

04:54   1   understand that.

2           MR. MICELI:  We understand that, Your Honor.  I think
3   that part of what Mr. Ratliff just raised is -- I don't want to
4   say a hollow argument, but much of this is going to be
5   determined by a simple timeline.  Sanofi didn't exist as the
6   market holder for the -- for the registered market holder, so
7   that's not an issue.  Who answers the question is going to be a
8   calendar-driven item.

9           THE COURT:  You guys keep arguing about a
10   meet-and-confer that you haven't had yet.

11           MR. MICELI:  Right.

12           THE COURT:  You get to come back here on August 18,
13   hopefully, and tell me that you've got it resolved, which won't
14   happen.  I have given everybody their marching orders.  We
15   don't need to keep beating it to death.

16           MR. MICELI:  I understand, Your Honor.  Just so we
17   are clear, we want the Court to know when we come, we are going
18   to sit down in good faith and go through these topics with
19   them.  We don't have the crystal ball that tells us what the
20   documents are.  So when we say to Mr. Ratliff we don't know
21   because we haven't seen, what we are not asking for is
22   Mr. Ratliff's considered and researched summary of what Sanofi
23   and Rhone-Poulenc Rorer did.

24           We want to judge what the documents tell us and
25   what the documents that were filed here in the U.S. -- and

04:55

1    perhaps there's some in France that tell us about what these

2    companies did.  Because I can assure you I have never stood up

3    in front of a jury and said, "The defendants have explained

4    this to me.  This is what they say, and this is why you should

5    find for our clients."  It is the documents that will tell the

6    story in this case, it's the documents that will prove their

7    liability, and it's the documents that we want to see.

8         THE COURT:  We are not talking about proving

9    liability.  We are talking about jurisdiction.

10        MR. MICELI:  Correct.

11        THE COURT:  We are also talking about a situation

12   where no documents have been produced yet and we have a

13   September 18 deadline.

14        MR. MICELI:  No documents have been produced by any

15   defendant in this case other than some labels.  Lots of

16   documents have been produced and obtained so far from the

17   plaintiffs.

18        THE COURT:  I'm just telling y'all when we get here

19   on August 18 and I start ordering things to be produced or

20   responded to, it's not going to be 30 days.  It's going to be

21   on a much shorter timeline.  It has to be.

22        MR. MICELI:  Thank you, Your Honor.

23        MS. MENZIES:  Thank you, Your Honor.  Just a couple

24   maybe somewhat housekeeping items.

25             So it sounds like just foreshadowing for the

04:56

1    18th -- and if you recall, we are a little bit concerned about

2    the amount of things that will be covered that day.  I just

3    want to make sure we get our submissions to you in time for you

4    reviewing all of it.

5                    We had talked before about the general discovery

6    plan.  We would submit, to the extent we can't agree, we will

7    make our submissions three days before, which would be the

8    15th.  If we have issues on this front -- so what we may be

9    faced with in court are, I guess, both the jurisdictional

10   interrogatories and the requests for production -- should we

11   make submissions to you on that same day?  Do you want those

12   sooner?

13              **THE COURT:**  I don't need them sooner than that.

14              **MS. MENZIES:**  Okay.  So we will have that one also on

15   the 15th.

16              **THE COURT:**  What I don't want -- and I'm not picking

17   on anybody.  I don't want:  "We have to give the judge a

18   submission by this date, so we are going to stop talking

19   because we have to give him something three days before."  If

20   it takes another day, take another day.

21              **MS. MENZIES:**  I appreciate that.

22              **THE COURT:**  I want y'all to work as close to the

23   hearing as you can.  I am familiar with this part of the

24   dispute, so I just need to know what's left.  If it's

25   everything, it's everything, and we will deal with it, but I

04:57   1   need to know what's left.  As to what's left, I would like to
        2   know what you have talked about and why you can't resolve it
        3   and what the sticking point is so that we can be focused when
        4   we get together on the 18th.
        5           MS. MENZIES:  Okay.  One issue, since we are still
        6   focused on the timeframe of the jurisdictional discovery -- and
        7   we appreciate that.  We served last week, I guess a week ago
        8   from today, the 30(b)(6) notice related to the jurisdictional
        9   issue.  We have not received a response on that.
       10           I raise it only because I'm concerned that
       11   before they have told us they would not be producing anybody.
       12   So I don't know if we need to have an accelerated time to sort
       13   that out.  We noticed it for August 22.  I'm not sure what
       14   their position will be.
       15           THE COURT:  I doubt that the defendants' position is
       16   that they are not going to produce a 30(b)(6) witness.
       17           MR. RATLIFF:  Your Honor, no.  We received their
       18   30(b)(6).  I looked at all of the topics.  I was waiting,
       19   frankly, to have this hearing before I fired off some sort of
       20   missive to the other side about what I would or would not do.
       21           The other part, on sort of my standpoint, is
       22   finding the witness or multiple witnesses, which I'm trying to
       23   avoid because, as phrased, I may have to find five, six, seven
       24   witnesses to address these.  I'm hoping that's not the case.  I
       25   would like that to be part of our meet-and-confer, in terms of

04:59

1   how do we narrow some of those, so that I can get one witness

2   or two witnesses on this 30(b)(6) and then give them dates.

3                I can tell you August 22, Karen, is not going to

4   work, but I assume given --

5                **MR. MICELI:**  We are good the 23rd.

6                **MS. BARRIOS:**  Or the 21st.

7                **THE COURT:**  I'm going to encourage you all to discuss

8   as much of this as you can.  We don't need formal motions to

9   resolve everything, as you all know.  When y'all come on the

10  18th, we can talk about all these things.  We can talk about

11  what issues y'all are having in terms of the areas of

12  examination of the 30(b)(6).  We can do that on the 18th as

13  well.  If you all have those conversations before then, all the

14  better.

15               **MR. RATLIFF:**  Okay.

16               **THE COURT:**  I know that the 18th is, in large part,

17  about the discovery plan, but I want the time that you all

18  spend on discovery between now and then to be primarily aimed

19  at trying to solve the jurisdictional discovery problems.  It's

20  easy for me to come in here and say to the defendants you're

21  going to do this, this, and that.  I'm trying to avoid creating

22  more problems by doing that than would be created if we talk

23  about what the real problems are and try to solve them that

24  way.

25               We are going to get to a point where I'm just

05:00

1   going to have to order you all to produce things and respond to

2   interrogatories.  That's what I'm going to have to do because

3   I'm as beholding to the schedule as you all are.

4        MR. RATLIFF:  We will do everything to avoid that

5   happening.

6        THE COURT:  See you all next week.  Thanks.

7        (Proceedings adjourned.)

8                              * * *

9                          <u>CERTIFICATE</u>

10       I, Toni Doyle Tusa, CCR, FCRR, Official Court

11  Reporter for the United States District Court, Eastern District

12  of Louisiana, certify that the foregoing is a true and correct

13  transcript, to the best of my ability and understanding, from

14  the record of proceedings in the above-entitled matter.

15

16

17                       *s/ Toni Doyle Tusa*
                         Toni Doyle Tusa, CCR, FCRR
18                       Official Court Reporter

19

20

21

22

23

24

25