UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  TAXOTERE (DOCETAXEL)      *    16-MDL-2740
PRODUCTS LIABILITY LITIGATION     *
                                  *
                                  *    Section N
                                  *
Relates To All Cases              *    August 18, 2017
                                  *
*******************************************************************

REPORTER'S OFFICIAL TRANSCRIPT OF THE

**STATUS CONFERENCE**

BEFORE THE HONORABLE MICHAEL C. NORTH,
UNITED STATES MAGISTRATE JUDGE.

*******************************************************************


**APPEARANCES:**

**For the Plaintiffs:**

Kyle Bachus, Esq.                    Karen Barth Menzies,Esq.
Dawn Barrios, Esq.                   David Miceli, Esq.
Christopher Coffin, Esq.             Jessica Reynolds, Esq.
M. Palmer Lambert, Esq.             Darin Schanker, Esq.
Daniel Markoff, Esq.

**For the Defendants:**

Kelly Brier, Esq.                    John Olinde, Esq.
Kelly Brilleaux, Esq.                Patrick Oot, Esq.
Brandon Cox, Esq.                    Julie Parks, Esq.
Mara Cusker Gonzalez, Esq.           Harley Ratliff, Esq.
Kathleen Kelly, Esq.                 Michael J. Suffern, Esq.
R. Clifton Merrell, Esq.
Douglas Moore, Esq.



**REPORTED BY:**      Mary V. Thompson, RMR, FCRR
                      500 Poydras Street, Room B-275
                      New Orleans, Louisiana  70130
                      (504)589-7783

**OFFICIAL TRANSCRIPT**

**P R O C E E D I N G S**

(Call to order of the court.)

THE COURT:  Y'all can have a seat.

All right.  We have some folks on the phone.

MR. OLINDE:  Yes, Your Honor.  John Olinde representing -- as liaison counsel for the 505(b)(2) defendants.

MS. PARKS:  And Julie Parks.

THE COURT:  All right.  I got an agenda yesterday which was -- it's not the only thing I got yesterday, but it was the shortest document that I received yesterday.  We're going to go according to that.

The first issue we're going to discuss is the issue of whether we're going to have one or more general discovery protocols.

The first thing I want to mention to everyone is I talked to Judge Engelhardt yesterday after the conference you-all had with him, and I know that he stressed to everyone again that in this sort of litigation, and particularly in this case with the sort of compressed or ambitious deadlines that have been set, how important it is for counsel for the parties to work cooperatively and try to get this -- to advance the litigation in a reasonable way that gets everything done within the deadlines that the district judge has set.

I've told you-all on multiple occasions that I was pleased with the level of cooperation and how you-all have, I

**OFFICIAL TRANSCRIPT**

1  think, worked from the beginning of the case to get things done.

2  And for some reason now that does not seem to be the case and we

3  seem to be stuck in the mud on some issues, not all of which I

4  think are particularly complicated.

*10:07:58*

5         So what I'm going to do today -- y'all will probably

6  listen more than talk.  I'm going to try to get us unstuck.

7         And I have looked at all of the issues that are on this

8  agenda and the things that we talked about the last couple of

9  times we were together, and I'm prepared to make decisions about

*10:08:15*

10  all of them and give you-all some clear direction as to how

11  things are going to proceed.

12         I do have some questions about the status of some of

13  the discovery because I know that some information has been

14  exchanged, you know, in the last couple of days.  I need to know

*10:08:31*

15  where things stand there, but otherwise I'm going to be prepared

16  to deal with each request for production -- not so much

17  necessarily each interrogatory, because the interrogatories and

18  the quality of those responses weren't necessarily teed up in the

19  briefing, but I'm going to try to weave all of that together,

*10:08:54*

20  including the 30(b)(6) responses, which I only received yesterday

21  at about 2:45 in the afternoon along with 150 pages of other

22  discovery responses, so my ability to meaningfully review some of

23  that has been limited.

24         But for the most part, in terms of the jurisdictional

*10:09:14*

25  discovery, you-all ought to have sufficient direction from me, in

**OFFICIAL TRANSCRIPT**

1  light of what I'm going to direct, in terms of responses to the
2  requests for production, that we ought to be able to resolve also
3  any issues with the interrogatories and the 30(b)(6) responses.
4        I understand from talking to Judge Engelhardt that he
5  warned -- perhaps he would have you-all conducting
6  meet-and-confers in his conference room in the future, which I
7  know you-all want to avoid.  I'm pretty sure he wants to avoid
8  that as well.
9        And independent of that, it had occurred to me,
10 although I'm not prepared to do it -- I've done it before in
11 other cases.  It occurred to me that I was going to tell you-all
12 that I wanted you-all to have a court reporter at your
13 meet-and-confers so there wouldn't be any debate or disagreement
14 over what occurred.  I've decided that we're not there yet.
15       So I don't want to -- I don't want to unduly complicate
16 you-all's ability to continue to meet-and-confer meaningfully to
17 try to resolve these issues, but I also don't want to be
18 presented with dueling versions of what happened in a meeting
19 between you-all.  And if that happens again, I will do what I've
20 done in other cases and just order y'all to have a court reporter
21 at all of them and split the cost, and I'll be able to see for
22 myself what happened.
23       But I trust that, once we get through this process,
24 that's not going to become -- that's not going to be an issue
25 anymore.

10:09:35
10:09:51
10:10:10
10:10:35
10:10:49

**OFFICIAL TRANSCRIPT**

1       All right.  The first issue on the agenda that I want
2  to discuss --
3       MR. MOORE:  Your Honor, before we get to the agenda,
4  there's a housekeeping issue --
5       Again, Douglas Moore on behalf of sanofi and the
6  defense liaison counsel.
7       -- that we wanted to address, something that was
8  brought to my attention yesterday.  It's in keeping with
9  Judge Engelhardt's remarks to us yesterday about, on both sides,
10  having lawyers that are solutions-oriented for problems.
11       In the submission that sanofi made to Your Honor, we
12  included an e-mail from Andrew Lemmon that -- we didn't include
13  it because we were trying to invoke Your Honor's governance of a
14  lawyer's civility or professionalism in the court, or to
15  embarrass him.  It was to demonstrate to the Court what we're
16  facing in terms of our negotiations with them.  We do have
17  concerns about illegitimate controversies arising for the purpose
18  of atmospherics, and that was the point of attaching that.
19       The reason I bring it up now is that Ms. Barrios
20  mentioned to me yesterday morning, and apparently Mr. Coffin sent
21  an e-mail to Mr. Ratliff who authored the letter that was
22  submitted yesterday, that we were possibly under a responsibility
23  to destroy that communication when we received it.
24       And we looked at the rules, and in keeping with
25  Judge Engelhardt's admonition -- and rather than coming in here

**OFFICIAL TRANSCRIPT**

1    and debating whether this was an inadvertent communication,

2    something that was meant to be said behind our backs, or whether

3    it's something that contains privileged information that would be

4    subject to some clawback or destruction responsibilities, we

5    decided to come in here today, withdraw Exhibit B, and strike

6    Footnote 2 from our submission to the Court.

7             THE COURT:  Well, I'm glad you brought that up.  That's

8    the appropriate approach.  I wasn't happy to see that e-mail, not

9    because of what was in it but I don't think that it belonged in

10   the record.  And I think that it should have been clear to

11   anybody who received it that it was not intended to be sent to

12   you-all.

13            So I'm glad that -- I'm glad you stood up to address it

14   before I addressed it because I was going to address it before

15   the end of the conference.

16            Okay.  So that --

17            MR. COFFIN:  Your Honor, could I just make a comment,

18   please?

19            THE COURT:  Yes.

20            MR. COFFIN:  Christopher Coffin on behalf of the

21   plaintiffs.

22            We, too, appreciate that Mr. Moore stepped up and

23   withdrew that exhibit.  Obviously we felt it was inappropriate as

24   well.

25            But I want to assure the Court that we are not in any

10:12:33
10:12:49
10:13:03
10:13:11
10:13:19

**OFFICIAL TRANSCRIPT**

1  way acting in bad faith when we enter into these negotiations and

2  discussions.

3       THE COURT:  Let me stop you because I don't want this

4  to get -- I don't want us to get into a debate about what

*10:13:33*

5  Mr. Lemmon said in that e-mail.  I'm not interested in it.  I

6  shouldn't have seen it, but I did, and all I will say is -- I

7  mean, I practiced law for a long time, and lawyers are entitled

8  to communicate with each other any number of things when they --

9  because they're entitled to believe that those communications are

*10:13:56*

10  cloaked in privilege.

11       Lawyers say things about other lawyers, litigants, and

12  judges to each other all the time.  E-mail has made that a much

13  more perilous undertaking, but I understand it.  It does not have

14  to be defended.

*10:14:12*

15       I understand why -- Mr. Moore, why you-all thought it

16  was meaningful and wanted me to see it, but at the end of the

17  day, I saw it, I know what's in it, and I choose to ignore it

18  because I shouldn't have seen it.

19       So we need not discuss it anymore because it's going to

*10:14:31*

20  be stricken from the record.

21       MR. COFFIN:  Understood.  Thank you, Judge.

22       THE COURT:  All right.

23       All right.  I first want to discuss the issue of

24  whether there will be one general discovery protocol or two.

*10:14:43*

25       The dispute, as I understand it -- and believe me when

**OFFICIAL TRANSCRIPT**

1    I tell you-all I have read everything you've sent to me.  I have

2    read some things more closely than others, including what was, I

3    think, a 13-page letter that I received from one of you-all.  I'm

4    not sure which one.  But I understand the competing positions.

5    I'll also say that I discussed the issue with

6    Judge Engelhardt yesterday after you-all met with him.

7    I'm convinced that the appropriate approach in this

8    case is to have a general discovery protocol for the sanofi

9    defendants and a different general discovery protocol for the

10   505(b)(2) defendants.  There are sufficient differences between

11   those defendant groups to justify separate protocols, including

12   the number of cases that are pending against each one; what

13   appears to be, at least in the communications I've received, a

14   lag in product identification as to some of those -- that second

15   group of defendants; the fact that no cases concerning those

16   defendants are currently scheduled for trial; and there are

17   issues of scope and proportionality that we have discussed in

18   prior conferences that I believe merit a different approach.

19   I'm not suggesting a wholly different approach, but

20   particularly as it concerns issues of proportionality, I think

21   that it will be a more efficient and a cleaner way to approach

22   things as between the plaintiffs and these two groups of

23   defendants for there to be separate protocols.

24   I understand from Mr. Olinde's letter to the Court that

25   they continue to await a specific proposal from the plaintiffs in

**OFFICIAL TRANSCRIPT**

1   that regard, and I'll -- I don't know, do you-all have a timeline

2   for when you might be able to submit that?

3           MR. MICELI:  Once we finalize -- David Miceli,

4   Your Honor.

5           Once we finalize one for the sanofi defendants, we have

6   informed Mr. Olinde that what we will submit to him will be

7   substantially similar.  A number of the 505(b)(2) defendants have

8   been on the telephone meet-and-confers that we've had with

9   sanofi, and they've received copies of that within a day or so of

10  when we finalized one with sanofi -- sanofi and Aventis Pharm,

11  excuse me.  There's more than one U.S./French --

12          THE COURT:  Right.

13          MR. MICELI:  But we'll be able to do it within a matter

14  of 24 hours, get them a copy or get them a draft.

15          MR. OLINDE:  Your Honor, this is John Olinde.  One of

16  the --

17          THE COURT:  Hold on.  Stop.  The court reporter is

18  having a hard time hearing you.  She needs to make an adjustment.

19                          (A pause in the proceedings.)

20          THE COURT:  Okay.  Go ahead.

21          MR. OLINDE:  I'm sorry.  I wanted to say -- you read my

22  letter so I don't need to go through the letter.  One of the

23  things that concerns us, obviously, is that -- given the fact

24  that we haven't had a meet-and-confer concerning the 505(b)(2)

25  defendants with the plaintiffs, what we were concerned about is

*10:16:46*  *10:17:05*  *10:17:22*  *10:17:37*  *10:17:56*

**OFFICIAL TRANSCRIPT**

1  we did not want to have a situation where there was going to be a
2  discovery plan which was to be entered into with sanofi alone and
3  there would be some indication that it was going to be the same
4  as with respect to the 505(b)(2)s.  Because as the Court already
5  said, there are going to be some differences.
6          THE COURT:  No, you-all are going to have the
7  opportunity and the obligation to meet-and-confer before anything
8  is entered by the Court.  So if you haven't had that yet, you
9  will.  But that's not going to happen until the plaintiffs give
10 you a draft proposal.
11          And so my expectation is, once we get the general plan
12 as to sanofi, you will shortly thereafter see a proposal from the
13 plaintiffs and you-all can thereafter meet-and-confer and
14 hopefully agree amongst yourselves on a plan.
15          That's my intention.  Nothing is going to be entered
16 without your input.
17          MR. OLINDE:  I appreciate it.  Thank you, Your Honor.
18          MR. MICELI:  Thank you, Your Honor.
19          THE COURT:  Okay.  All right.  I want to move to the
20 issue of jurisdictional discovery.  And I'm going to circle back
21 to the general discovery plan because I know Mr. Olinde had asked
22 specifically that we talk about one or two -- one versus two
23 plans because he's on the phone and may have to get off the
24 phone.  So I'm going to move to general discovery -- I mean to
25 jurisdictional discovery and then we'll circle back to the actual

10:18:16
10:18:34
10:18:55
10:19:09
10:19:29

**OFFICIAL TRANSCRIPT**

1    disputes that you-all have outlined for me in the red lines as

2    far as the terms of the general discovery plan that's going to

3    apply to the sanofi defendants.

4         All right.  So I'm not saying this to be critical --

*10:19:50*

5    I'm really not -- but I've been working all week to try to work

6    through what I think is the appropriate scope for jurisdictional

7    discovery, and this is one of the issues that is inherent in me

8    encouraging y'all to continue to work together and you-all doing

9    that.

*10:20:05*

10        And what's happened is I've got an idea as to what I

11   think should happen with this jurisdictional discovery, and I'm

12   ready to go through every one of these requests for production

13   and say, to the extent it hasn't already been done, this is what

14   I think needs to happen.

*10:20:22*

15        Because, frankly, I don't know to what extent you-all

16   still have disputes, because you've been provided with a bunch of

17   additional discovery responses.  And I don't want to get into the

18   weeds as to what is in them because I've already got a -- I've

19   already made a decision as to what the scope of that discovery

*10:20:43*

20   ought to be and I want to explain it to you-all.  And you-all can

21   determine to what extent those requests have been properly

22   responded to and to what extent any additional information needs

23   to be provided.

24        As I said, I've gone through all these -- we've had

*10:21:03*

25   arguments in two different sessions about a lot of these issues,

**OFFICIAL TRANSCRIPT**

1    but particularly a lot of argument about the reach of

2    jurisdictional discovery last week.  And I've taken all of

3    that -- I've taken all of that into consideration in going

4    through the requests for production in particular to determine

5    whether they are appropriate as written, whether they should be

6    modified, and whether they are, in at least one case, seeking

7    relevant information at all.

8            Now, on this agenda it has interrogatories, requests

9    for production, and then Rule 30(b)(6).  As I have mentioned,

10   beyond the discussion we had at the last status conference, I

11   have not delved into comparing the responses to the

12   interrogatories themselves.

13           I don't really have any meaningful briefing on that,

14   but I think that you-all will -- I think that you-all -- I went

15   through them in detail before our last session, and I think I

16   gave you some direction as to what I thought was appropriate.

17           I also think that you'll be able to take what I've

18   given you-all as far as requests for production and use that

19   guidance or that order to inform how you respond to the

20   interrogatories if you haven't already done so.

21           MR. RATLIFF:  Your Honor, may I address the

22   interrogatories briefly?

23           THE COURT:  Yes.

24           MR. RATLIFF:  So after our last hearing, I returned to

25   Kansas City.  I flew out the next morning to visit with my client

10:21:25
10:21:47
10:22:07
10:22:24
10:22:34

**OFFICIAL TRANSCRIPT**

1   and to make it very clear to them what your expectations were.

2   I was there all of last week working to get the

3   documents out the door; the tax returns, which are at Mr. Moore's

4   office, and about 800 pages of additional documents.  And it

5   sounds like you don't want me to go through what those individual

6   documents are so I'm not going to do that.  That was produced to

7   them yesterday.

8   We are in the process of supplementing our

9   interrogatories.  My understanding is -- I can only do so much.

10  And the documents, from my discussions with them, and from

11  hearing from them in court, was that was what was most important

12  to them in the short term.  So in terms of a bandwidth issue, I

13  put most of my energy into that.

14  As it relates to the interrogatories, one of the things

15  that we discussed at the last hearing was that the

16  Interrogatories 1 through 4 -- the whole discussion about

17  predecessor entities and whether it's 350 subsidiaries,

18  et cetera, et cetera.  So yesterday -- and this is one thing you

19  did not get.  I'll be happy to provide you a copy of it.

20  We went ahead and supplemented Interrogatories 1

21  through 4.  I outlined the corporate structure, and, even though

22  they didn't ask for who the predecessor companies are, who the

23  predecessor companies are for these individual entities.  And

24  then we're in the process of updating and supplementing the other

25  interrogatories that are in there.

**OFFICIAL TRANSCRIPT**

1      One of the things we did from a -- in terms of

2   understanding the time component and your interest in us being

3   more forthright on this, is in our RFP responses we didn't just

4   say, We're producing these documents.  We tried to build

5   essentially what were almost interrogatory-like responses in

6   there to go into detail about the things like the cash pooling or

7   the intercompany financing or the foreign exchange risk

8   management.

9      So a lot of what we anticipate will be in some of those

10   interrogatories will be -- has already been provided in the form

11   of a request for production.

12      As to the remaining interrogatories, I think we

13   originally responded to 22 of the 45.  I think they withdrew one

14   or two.  We are working to supplement a large number of those.

15      I know you have not been briefed on this, and so I

16   don't know how much you want to get into the granularity of

17   individual interrogatories, but there are --

18      THE COURT:  I don't.

19      MR. RATLIFF:  I assumed not.

20      There remain some that I have substantive objections as

21   to the scope of what they are.  Things like life insurance

22   policies or vacation policies or whether an employee has ever

23   traveled from France to the United States time immemorial.

24      Those are things that I don't think fall into the facts

25   that are necessary, but we are doing everything we can to

**OFFICIAL TRANSCRIPT**

1   supplement as many of these as possible and hopefully to get them

2   to plaintiffs' counsel by Monday or Tuesday of next week.

3            Some of this -- and this is what I've told counsel --

4   is if there is any delay since we met last Monday, it is because

5   I also don't want to provide them information in a hurry for it

6   to be wrong information.  I want them to have the right

7   information and the correct information.  And some of the

8   questions that they are asking about are -- involve very

9   complicated processes with very complicated financial processes.

10            And so that's the status of where things land on the

11   interrogatories.

12            The requests for production, like I said, we produced

13   about 15,000 pages of tax returns for as many years as we could

14   locate.  We produced another thousand pages of what I would call

15   standard operating procedures, contracts, guidance documents,

16   policies, et cetera, et cetera.

17            I will be returning back to my client's office on

18   Sunday to see what else I can locate that goes even further back

19   in time.  Some of that is -- I'm handcuffed, because as we go

20   further back in time, the less likely I'm going to be able to

21   locate something.

22            But that's the current status as it relates to your

23   admonitions to me, what you expected of me, and what I could get

24   to them in terms of the facts necessary -- the documents

25   necessary to help them hopefully not prove up, you know, their

**OFFICIAL TRANSCRIPT**

1    opposition.

2        And then also on the 30(b)(6), I provided them with

3    responses to those Wednesday, I believe.  There are a few in

4    there -- I think we've said we will produce witnesses on most of

10:26:38
5    those.

6        There is a little bit of, I would say, maybe not a

7    total meeting of the minds in terms of the specificity of what

8    they are asking and the reciprocal obligations of them asking for

9    something in detail so I can adequately prepare two, three --

10:26:55
10    maybe four witnesses to address these topics.

11        I'm also in the process of trying to identify who those

12    actual deponents will be and to get them produced in relatively

13    short order, but some of it deals with the scope of those

14    particular requests.

10:27:08
15        THE COURT:  All right.  I'm going to jump ahead.

16        As to the 30(b)(6) issues, as I started to go

17    through -- and I haven't even gone through all of their

18    responses, but it looked like to me, at least initially, that the

19    defendants were essentially agreeing -- I don't know, as I got

10:27:27
20    maybe halfway through the topics, that they were essentially

21    agreeing to produce a witness to testify to those topics.

22        What I want you-all to do is you-all -- Ms. Menzies

23    just got those responses in the last couple of days.

24        MR. RATLIFF:  Yes.

10:27:44
25        THE COURT:  Obviously you need to try to work through

**OFFICIAL TRANSCRIPT**

1  whether there is an issue.  And if there is one, I'm going to ask

2  you-all -- and we'll talk about dates when we are done.  I'm

3  going to ask you-all for -- and no more than five pages this

4  time -- letters outlining your positions.  And I'll either make a

10:28:04   5  decision or I'll get you on the phone and work through it.

6        But we're going to try to get it done -- it will be

7  next week.  We're going to get those issues resolved next week if

8  you-all can't resolve them amongst yourselves.

9        MR. RATLIFF:  And we certainly are strongly in favor of

10:28:16   10  that because I have the burden of --

11        THE COURT:  I know you have to find them.

12        MR. RATLIFF:  -- getting these witnesses ready and what

13  they need to do to get themselves prepared.  Because there's not

14  going to be, unfortunately, one witness who can address all 17

10:28:25   15  topics.  And I'm certain my client, and I'm certain maybe

16  Ms. Menzies, doesn't want me to produce 17 different deponents

17  for those particular depositions.

18        THE COURT:  Right.

19        Okay.  As to the interrogatories, we're dealing -- we

10:28:44   20  have a deadline that the plaintiffs have to respond on -- you

21  know, in the pleadings on your jurisdictional motion to dismiss.

22        MR. RATLIFF:  Right.

23        THE COURT:  I understand that you -- you know, you need

24  time to respond, but we're running out of time.  So it has to be

10:29:02   25  done and we've got to be able to assess the adequacy of those

**OFFICIAL TRANSCRIPT**

1   responses immediately.

2        I've got to be -- to the extent that you-all can't

3   agree, I've got to be able to determine whether you need to

4   provide more information.

10:29:16

5        Now, I am hopeful that even if you think you're

6   entitled to some more, what you're going to get is plenty and it

7   will get you, hopefully, a long way down the road to what you

8   need.

9        And if there's additional information that you think is

10:29:32

10  out there that you don't have that you are entitled to, that's

11  what we should be talking about.  And we'll do that -- again,

12  we'll do that next week once you get the information.

13       But it has to be produced yesterday.

14       MR. RATLIFF:  Understood, Your Honor.  And that's why I

10:29:45

15  didn't wait -- one of the things we had talked about, me,

16  Mr. Lemmon, and Ms. Menzies, was not waiting to supplement all of

17  the interrogatories when I got all of them done, but if I have

18  some of them done, get them out the door; which is why I said

19  let's just go ahead and serve our supplemental responses to 1

10:30:02

20  through 4, so you can see the predecessors and the corporate

21  structure, and get those out the door to them yesterday so they

22  can see that it's a far more limited group of predecessor

23  companies.

24       Because it gets back into that issue of who -- in a

10:30:14

25  family of corporations that has 350 subsidiaries, how do I

**OFFICIAL TRANSCRIPT**

1 navigate that to get the information that they want?

2 One thing, Your Honor, I don't know if it will be

3 helpful for you, I would be happy to circulate our -- when we

4 serve our responses to them, or supplemental responses to the

10:30:29  5 interrogatories -- there's probably just a handful of them that I

6 think we still have legitimate objections to -- I'm happy to

7 serve them concurrently to your chambers as well.

8 THE COURT:  Yeah, send them to my e-file.

9 MR. RATLIFF:  We can move this process along.

10:30:40  10 Because I can assure you we want to get through this

11 process as quickly as they do because to me this is -- I don't

12 want this to become an unnecessary distraction on a legal issue,

13 both for our own efforts on the merits of discovery, for them --

14 and I know why they want it -- and, honestly, because you've made

10:30:59  15 it very clear what your position is.

16 THE COURT:  All right.  Yes?

17 MS. MENZIES:  If I can respond on a couple matters

18 generally to what Mr. Ratliff has brought up.

19 The first is the interrogatories.  There must have been

10:31:14  20 a miscommunication on when we would need those.  Our

21 understanding was today was the hearing for all of this.  It is

22 very problematic to us that we haven't received these yet.

23 When we spoke a week ago last Friday, Mr. Ratliff

24 described what he was going to produce by way of supplemental

10:31:30  25 interrogatories and it sounded like it would be informative and

**OFFICIAL TRANSCRIPT**

1    helpful.  We still don't have those.

2            THE COURT:  You've got some of them.

3            MS. MENZIES:  We have the four, that's correct, which I

4    got last night -- which is why I have my computer up here.

*10:31:42*   5            And which is -- you know, I appreciate that the Court

6    recognized -- and I heard you say we're going to figure this out

7    even by next week, and that's what we came here to ask, because

8    there is some stuff that we can't address with you today, but

9    there are some things that I think we can address today if we get

*10:31:58*  10    guidance and orders from you that we don't have to wait until

11   next week.

12           For example, in the requests for production, which

13   we're going to talk about in a minute, there are three of them,

14   one of which includes communications between the foreign

*10:32:12*  15   defendants and FDA and the U.S. defendants and FDA.  They've told

16   us you'll get those -- that's being produced as part of the

17   general discovery.

18           The relationships between the foreign defendants and

19   marketing Taxotere in the United States, they said we'll get that

*10:32:29*  20   as part of general discovery sometime in the future.

21           THE COURT:  All right.  I'm going to interrupt you

22   because I'm going to tell everyone what's going to happen with

23   the requests for production.  That's what is next.

24           MS. MENZIES:  Great.  And if we can get that done

*10:32:41*  25   today, then we can look closer -- we did get some documents last

**OFFICIAL TRANSCRIPT**

1    night.  We tried to look at them.  That's the second concern I

2    wanted to raise to the Court is as they're producing things to

3    us, it's sort of a mix of stuff.  We just are getting -- we have

4    to get passwords.  And we're trying to look at it as fast as we

10:32:56  5    can, but we don't know if it's responsive to the jurisdictional

6    requests or if it's part of the general discovery or both, and so

7    we need to be able to prioritize --

8            THE COURT:  I'm pretty sure that, based on what I've

9    heard, you're not getting any responses that are general in

10:33:11  10   nature.  I've heard, We're not giving you any of that until we

11   have a plan in place.

12           MS. MENZIES:  We got some organizational charts last

13   night in a -- I've had our counsel looking closer at it.  People

14   were looking at it through the evening and the night last night

10:33:25  15   to try to just figure out, Well, what did they actually give us?

16           There are some studies that are related to hair loss

17   that appear to be internal documents.  There is a smattering of

18   things, but the way it's being produced, we have no way to tell,

19   Okay, here's your jurisdictional stuff; focus on this so we can

10:33:43  20   get this stuff to you in time for the depo.

21           THE COURT:  That seems simple enough to address going

22   forward.

23           MR. RATLIFF:  Your Honor, may I address that?

24           And it should have gone out like this.  All of the

10:33:52  25   jurisdictional discovery was given a different Bates prefix that

**OFFICIAL TRANSCRIPT**

1  says sanofi, underscore, PJ.

2          MR. MICELI:  I think we're waiting on the password on

3  that.

4          MR. RATLIFF:  Because when I talked to our vendor, I

10:34:04   5  said, I don't want this -- what Ms. Menzies is raising, I didn't

6  want that to be an issue, so I said, Let's take one extra day and

7  let's make sure everything is Bates labeled with a clear --

8          THE COURT:  All right.  That's something you-all can

9  work out amongst yourselves.

10:34:16   10          MS. MENZIES:  Then the second issue on the tax returns

11  that Mr. Ratliff said they produced, they have produced them for

12  inspection at Mr. Moore's office.  That does not comply with the

13  ESI protocol.  And those of us who are going to be looking at it,

14  to come and fly to New Orleans to be able to look at those -- we

10:34:32   15  think those need to be produced.

16          THE COURT:  Why can't those be produced?  We have a

17  robust protective order in this case.

18          MR. RATLIFF:  Right.

19          Your Honor, there are 15,000 pages in 10 years of tax

10:34:45   20  returns that my client considers highly sensitive.  And, yes,

21  there is a robust protective order in this case, but my client's

22  concern is allowing what they consider to be some of their most

23  sensitive financial data being turned over to a group of

24  attorneys who -- I don't know how many hands are going to touch

10:35:02   25  it and --

**OFFICIAL TRANSCRIPT**

1       THE COURT:  If it's available for inspection, it is,

2 under the rules, going to be available for production once they

3 figure out what they need.  It's going to be produced.

4       MR. RATLIFF:  Understood, Your Honor.  And the offer --

*10:35:16* 5 just to be clear, the offer I had suggested to them was there are

6 15,000 pages.  I assume they're not going to need all of these.

7 If they review them and tell me the ones that they need, then

8 we'll make Bates-stamped copies of them.

9       Because right now they're not even Bates stamped

*10:35:28* 10 because I wanted to get them out the door as quickly as possible.

11       THE COURT:  Well, they're not out the door, they are in

12 Mr. Moore's office.  That's an issue given the press of time.

13       MR. RATLIFF:  Okay.  Well, then, if I'm hearing,

14 Your Honor, you want that disk produced to them.

*10:35:41* 15       THE COURT:  Yes, sir.

16       MR. RATLIFF:  I would like the opportunity to -- we'll

17 send that over this afternoon if we can.  Although I would like

18 the opportunity, since they're not Bates stamped, to do a Bates-

19 stamped production and re-send it to them.

*10:35:56* 20       THE COURT:  Absolutely.

21       MR. MICELI:  And, Your Honor, because Mr. Ratliff had

22 represent that these go back 10 years, and 10 years -- we don't

23 know necessarily which companies we're talking about here, but if

24 our clients are making a lost-wages claim, with their PFS we have

*10:36:10* 25 to provide an authorization to collect those tax records

**OFFICIAL TRANSCRIPT**

1   independently.  They get to order them and we don't even get to

2   see them until --

3          THE COURT:  I just ordered them to produce them to you.

4          MR. MICELI:  But ten years back.  If we want to go back

10:36:22   5   further, will -- because he's having a difficult time finding

6   them, if we can lessen his burden by just simply getting an

7   authorization where we can get them ourselves from the IRS.

8   We're doing it for our clients, can they do it for theirs?

9          THE COURT:  I don't know.  You haven't asked him that

10:36:36  10   question.  And that's not why we're here.

11          MR. MICELI:  Okay.

12          MS. MENZIES:  So the only last point I wanted to make

13   was the -- we just learned last night, in response to the

14   supplemental 1 through 4, that the -- Taxotere was sold and

10:36:54  15   marketed in the United States by Aventis Pharmaceuticals and

16   Rhone, which are the predecessor companies to Aventis Pharma.

17          What the defendants are producing or agreeing to

18   produce and provide is largely information related to -- that

19   still excluded the predecessors.  So as we walk through these

10:37:17  20   RFPs, if we can keep that in mind.  If Your Honor is inclined to

21   order them to produce information from predecessors, that would

22   be helpful for us to know so that we can make sure that what we

23   get is enough.  And if we don't, we can come back to Your Honor.

24          THE COURT:  Yes?

10:37:33  25          MR. RATLIFF:  May I hand you a copy of the 1 through 4?

**OFFICIAL TRANSCRIPT**

1       THE COURT:  Yes.

2       MR. RATLIFF:  Thank you, Your Honor.

3       I understand you --

4       THE COURT:  Just give me a second.

10:38:08    5                               (A pause in the proceedings.)

6       THE COURT:  Okay.

7       MR. RATLIFF:  One thing that needs to be made clear is

8   sometimes we -- some of the corporate names get used very loosely

9   in this courtroom, and so when we say that Aventis Pharmaceutical

10:38:21   10   Products, Inc., a U.S. company, and Rhone-Poulenc

11   Pharmaceuticals, Inc., a U.S. company, those are the predecessors

12   of the U.S. defendants and then you lay out who are the

13   predecessors of the foreign defendants, and so it's not as

14   Ms. Menzies said, that they are all just one in the same.

10:38:35   15       I'll say this:  When we are looking for documents,

16   we're not cutting some bright-line and saying, Well, it's just

17   this entity or it's just that predecessor.  We're looking for the

18   entities that we've described here.  That is what we are looking

19   for and where those records are at.

10:38:51   20       So I'm not taking some sort of arbitrary bright-line of

21   "we're only doing this."

22       THE COURT:  Well, where -- depending on the request for

23   production, and where appropriate, the information in response to

24   the requests for production should be coming from those entities

10:39:08   25   that you have now identified as predecessors.

**OFFICIAL TRANSCRIPT**

1        MR. RATLIFF:  That's what we're doing, Your Honor.

2        THE COURT:  Okay.  There's no lack of clarity on that?

3        MR. RATLIFF:  Understood, yes.

4        THE COURT:  All right.

*10:39:22*  5        So I'm going to go through these requests for

6   production and tell you how I expect them to be responded to, to

7   end a sentence in a preposition.

8        And the minute entry -- or order memorializing this

9   will be -- and to be clear, will reflect what I said earlier.

*10:39:49*  10        To the extent that this information has not already

11   been provided, and to the extent that the parties have not, in

12   the interim, agreed on a different scope of production, the

13   responses will be made to the requests for production as follows:

14        We've already discussed No. 1.  No. 1 is going to be

*10:40:18*  15   responded to as written.

16        Request For Production No. 2.  The defendants will

17   respond to Request For Production No. 2 as limited by the

18   language set forth in Record Document 706-1 at Pages 4 and 5,

19   which is the further narrowing of the requests that plaintiffs

*10:40:56*  20   have suggested they would be willing to do to more specifically

21   denominate the specific information that they are asking for in

22   Request For Production No. 2.

23        I think that the manner in which they have narrowed

24   what it is that they are looking for is appropriate.

*10:41:15*  25        MR. MICELI:  For the record, Your Honor, is that

**OFFICIAL TRANSCRIPT**

1  Exhibit A to our reply?

2         THE COURT:  Yes.  It's Record Document 706-1.

3         And I am referring to their Exhibit A because there are

4  limitations on the requests that the plaintiffs have suggested in

5  Exhibit A, and those limitations are what I'm going to -- in

6  large part are what I'm going to impose as we go through these.

7         So the defendants will respond to Request For

8  Production No. 2 as limited by the plaintiffs on Page 5 of

9  Exhibit A to the reply memo.

10         The defendants will respond to Request For Production

11  No. 3 as written.

12         They'll respond to Request For Production No. 4 as

13  written.  And specifically the information that's produced should

14  be information that describes the details of any intercompany

15  financing and/or capital fund flow activities, how and by whom

16  those were accomplished.

17         Request For Production No. 5, that request seeks

18  production of all documents regarding the financing and cash

19  surplus management provided by sanofi to any of its U.S.

20  subsidiaries.  I'm going to alter the scope of that to "all

21  documents describing the subject matter of the request."

22         We discussed this at the last hearing.  The way that

23  some of these are drafted would encompass an entire universe of

24  documents that are not going to be helpful to anyone in the case

25  and would overwhelm -- probably overwhelm the defendants, the

**OFFICIAL TRANSCRIPT**

1  plaintiffs, and the Court.

2       I think what the plaintiffs need, and are entitled to,

3  are documents that describe these processes so that you can

4  understand the details of them without getting detailed

10:43:55  5  transactional information that I don't think is going to be -- is

6  proportional to what it is that you-all need to prove.

7       So otherwise as written, the scope of that request is

8  fine, but the documents that are going to be produced are

9  documents that describe those activities as opposed to all

10:44:13  10  documents regarding or pertaining to.

11       MS. MENZIES:  Just for clarification on the record, we

12  had agreed to limit a time frame of '97 to 2000 --

13       THE COURT:  Yes.  I missed that one.

14       As to that one -- I know there were a number of them.

10:44:25  15       The response is also limited to the time frame of 1997

16  to 2011.

17       MR. RATLIFF:  May I address that?

18       THE COURT:  Yes.

19       MR. RATLIFF:  In terms of the limitation of '97 to

10:44:36  20  2011, there may be a lot of the documents that we have

21  produced -- although not a lot, but a number of the documents

22  that we have produced that are available that describe these

23  processes that are going to be after 2011, and those are going to

24  be the ones that are most available.

10:44:51  25       I will -- and we have looked and we are looking for

**OFFICIAL TRANSCRIPT**

1   ones beyond that, but in terms of this cut-off, I plan to still

2   produce documents, if I find ones, that are after that because

3   those may be the ones that are available and salient that

4   describe how these processes work.

5               THE COURT:  I think that's appropriate.  I'm not sure

6   why, as to all of these requests, the limitation -- the request

7   stops in 2011, especially under jurisdictional matters.

8               MR. RATLIFF:  I'm unsure also, Your Honor.

9               MS. MENZIES:  Well, I think part of the concern -- and

10  we appreciate the later stuff to a degree.  The problem is that

11  what we're getting in response is everything from later, nothing

12  from earlier, and then we get a response saying, you know, that's

13  not helpful that you limit it to, you know, '97 to 2011 because

14  it just makes it much harder to find it.

15              THE COURT:  I think the real concern is how far you're

16  going backwards.  So unless -- maybe when we get into general

17  discovery, or discovery that's related to particular plaintiffs,

18  a cut-off -- the more recent cut-off might make sense.  You know,

19  '97 to 2011.  But in terms of jurisdictional discovery, it

20  doesn't make a lot of sense to me that we would cut it off in

21  2011.

22              MS. MENZIES:  Yeah.  And we appreciate that.  Our

23  concern, again, is trying to capture the stuff from the

24  predecessor entities.

25              THE COURT:  Right.

**OFFICIAL TRANSCRIPT**

10:45:08

10:45:21

10:45:36

10:46:01

10:46:12

1          And I think that going back to 1997 appropriately

2    limits the information that you're going to have to look for from

3    the predecessor entities.

4          MR. RATLIFF:  It sort of is encapsulated in the request

5    for the tax returns.  Finding the tax returns for these

6    companies -- or the U.S. subsidiaries for 2015 back to 2006, we

7    can do.  The rest of them, if they exist at all, are offsite and

8    maybe not even kept at all.  And so that is the sort of practical

9    struggle in us trying to navigate this.

10          THE COURT:  Well, to the extent that happens, obviously

11   you need to explain to plaintiffs' counsel that that is the wall

12   you've run into.

13          MR. RATLIFF:  And that's what we put in our objection.

14   In each one of the objections we put in there, we tried to detail

15   what the sort of burden or difficulty is in terms of obtaining

16   some of the information that they are looking for, including the

17   tax returns.

18          We said, Past 2006 it becomes a much more muddled

19   picture.  They're all offsite.  We would have to -- if they exist

20   at all, they're not going to be kept in their entirety so they

21   would have to be, then, reassembled, so let's start with what we

22   can give you, which is 11 years, approximately, of tax returns.

23          THE COURT:  All right.  So as to that request, in terms

24   of a time frame, it's going to -- it will be limited -- it will

25   go back to 1997 to the present.

**OFFICIAL TRANSCRIPT**

 1          Plaintiffs' Request No. 6 similarly will -- the

 2     defendants will produce all documents describing the activities

 3     or issues set forth as opposed to "regarding."

 4          Request For Production No. 7, the defendants will

 5     respond to that request as limited by the plaintiffs in

 6     Exhibit A, which will be directed to the French defendants, the

 7     U.S. defendants, and their predecessor entities from 1997 to the

 8     present.

 9          Request For Production No. 8 is one that you-all have

10     had some negotiation over, and there's a paragraph in the

11     plaintiffs' reply -- or in this Exhibit A that says:  The

12     plaintiffs are willing to adopt the French defendants' proposed

13     rephrasing of "produce documents sufficient to describe the

14     ownership or licensing of intellectual property rights, patents,

15     or trademarks related to Taxotere in the United States.

16          The French defendants had proposed that those documents

17     be limited to documents pertaining to the U.S. defendants, and

18     the plaintiffs have suggested the U.S. defendants be stricken and

19     the request also include "and communication by the French

20     defendants or their predecessors regarding same."

21          I don't understand -- I don't understand how those two

22     things are similar.  I'm not sure what that means.

23          MR. RATLIFF:  And, Your Honor, the communications part

24     seems not to be so much a limitation but an expansion of the

25     original request.

10:48:02
10:48:28
10:48:49
10:49:16
10:49:33

**OFFICIAL TRANSCRIPT**

1      THE COURT:  That's what I think.  And I don't know

2  who -- communications with whom?

3      I think that the proper way to limit this request is

4  the way in which the French defendants suggested it be limited.

5      MR. RATLIFF:  Thank you, Your Honor.

6      And as we put in our RFP responses, we have located no

7  agreements between the French defendants and the U.S. defendants

8  to license these trademarks or patents for use in the

9  United States.

10      What we have located for them, and tried to put in

11  detail, is where -- the documents that are publicly available

12  would be the same ones available to us that describe the

13  ownership of these patents and trademarks and how they have

14  changed over time.

15      THE COURT:  Well, that request is going to be responded

16  to as suggested by the French defendant.  "Produce documents

17  sufficient to describe the ownership or licensing of intellectual

18  property rights, patents, and trademarks related to Taxotere in

19  the United States by the U.S. defendants.

20      Request For Production No. 9, the defendants will

21  respond to that as limited.  The response will come from the

22  French defendants, the U.S. defendants, and their predecessor

23  entities.  And the time frame will be 1997 to the present.

24      As to Request For Production No. 10, the defendants are

25  going to respond to that request for production going only as far

10:49:47
10:49:58
10:50:13
10:50:30
10:50:58

**OFFICIAL TRANSCRIPT**

1    back as 1997.

2           Request For Production No. 11, the defendants will

3    respond to that request with the limitation that it is directed

4    to the French defendants, the U.S. defendants, and their

5    predecessor entities going back only to 1997.

6           The same will be the case as to Request For

7    Production No. 12.

8           MR. RATLIFF:  Your Honor, may I just have a

9    clarification on No. 12?

10          When it says -- and this is sort of the struggle in

11   trying to sort of parse these out.  It says:  Produce your

12   communications regarding the marketing of Taxotere in the

13   United States.

14          And this is the issue that Ms. Menzies raised, but I

15   don't think was totally clear, which is if this is asking for

16   communications between the French defendants and the U.S.

17   defendants on marketing, that's one thing.  And that's what we

18   have looked for and have not located so far.

19          THE COURT:  That's how I interpret it.

20          MR. RATLIFF:  That's how I read it as well.

21          If we're talking about just any communications by the

22   U.S. defendants about marketing of Taxotere, that's what we said

23   doesn't go to jurisdictional discovery and that will be produced

24   as part of merits discovery.  Those are two separate concepts.

25          THE COURT:  Well, I interpret this, and am directing

10:51:22
10:51:40
10:51:53
10:52:05
10:52:17

**OFFICIAL TRANSCRIPT**

1  the defendants to produce, as communications between and among

2  themselves.

3         MR. RATLIFF:  Thank you, Your Honor.

4         THE COURT:  All right.  As to Request For

5  Production No. 13, I'm going to direct that the defendants

6  respond to that request for production.  And the documents that I

7  believe should be produced are the documents that are related to

8  the activities that were described in their response -- in

9  Interrogatory Response No. 20, that sanofi observed research and

10 developing activities, workflow, strategic priorities, and

11 industrial property rights with respect to subsidiaries, and they

12 helped defined general business strategies related to Taxotere.

13        Any documents that are related to those activities are

14 what I think the defendants need to produce in response to that

15 request.

16        Request For Production No. 14, the defendants will

17 produce information that describes the sanofi -- the HR policies

18 as they relate to the U.S. and French defendants.

19        And Request For Production No. 15, I don't believe that

20 the information that is sought in that request is relevant to the

21 jurisdictional issues and the defendants can rest on their

22 responses on the request for production.

23        All right.  Let's talk about the general discovery

24 protocol.

25        MR. COFFIN:  Your Honor, before we move on can I ask

**OFFICIAL TRANSCRIPT**

1   one question?

2           THE COURT:  Yes.

3           MR. COFFIN:  We appreciate what you've ordered.  Do you

4   have a date -- or will you put a date in the entry by which these

5   documents shall be produced?

6           THE COURT:  Yes.

7           MR. COFFIN:  Thank you.

8           THE COURT:  To the extent that the material has not

9   been produced, I'm going to require it to be produced no later

10  than close of business Friday, August 25, 2017.

11          To the extent that there are any issues that remain

12  that you-all can identify over the weekend of August 26th and

13  27th, I'll need to be -- you'll need to alert me to those as

14  quickly as possible.  And we'll probably have to -- to the extent

15  that we need to, we'll probably have to talk over the phone to

16  try to get some resolution.

17          We're going to have to do that in all likelihood.  I

18  really don't -- I think your time is used more prudently and

19  effectively in working and not flying back and forth to

20  New Orleans, so I really -- on this jurisdictional information,

21  because of the deadline that we're facing, if we're going to have

22  any more disputes or issues that I need to get involved with, I'm

23  going to default to doing it over the phone once you-all have

24  alerted me to what they are.

25          MR. COFFIN:  Agreed.  And if we could put a time on the

**OFFICIAL TRANSCRIPT**

1  calendar, maybe at the end, to when we just set that call.  And

2  if we don't need it, it won't happen.

3          THE COURT:  We will.  Just remind me.

4          MR. MICELI:  Your Honor, how do you want to proceed on

10:56:05
5  the general discovery protocol?

6          THE COURT:  I'm going to tell you what it's going to

7  be.

8          MR. MICELI:  All right.  I wondered because we both

9  stood up to address it, Your Honor.  Do you just want us to sit

10:56:12
10 down and wait for your questions?

11         THE COURT:  I don't know if Mr. Oot was going to

12 address it.  I was hoping he was just going to stand up there and

13 listen to what I was going to say.

14         MR. MICELI:  Well, if he's going to have to take

10:56:21
15 punches, I'll sit down, Your Honor.

16         THE COURT:  Okay.  Hold on.

17         MS. MENZIES:  I'm sorry.  Because we haven't received

18 the interrogatory supplemental responses yet, if there's a

19 concern about those, once we get them -- I'm hoping we get them

10:56:33
20 today or Monday -- we may need to request some time with you next

21 week by phone.

22         THE COURT:  That's fine.  And the way to do that is for

23 one person from each side to get on the phone with Blanca and she

24 will make it appear on my calendar.  That's the way to handle

10:56:48
25 that.

**OFFICIAL TRANSCRIPT**

1      MS. MENZIES:  Perfect.  Thank you.

2      THE COURT:  That's the way to handle that.  And then

3  you-all can, once you get a date and a time, circulate it amongst

4  yourselves.

5      MS. MENZIES:  Thank you, Your Honor.

6      MR. OOT:  Thank you, Your Honor.  Patrick Oot for the

7  sanofi defendants.

8      Hopefully I will make you happy today to report that we

9  are sending 165,000 pages today of the IND over to the PSC as I

10  promised when we were here last time.

11      I thought it might be helpful to have a real pragmatic

12  conversation about how discovery works at sanofi.  I don't want

13  to waive privilege of the discovery processes of sanofi and I

14  want to preserve that, and I certainly don't want to invite

15  discovery on discovery, but I thought it might be helpful to kind

16  of walk you through this process.

17      I explained this on our meet-and-confers and I've

18  developed a flowchart -- and I can pass that up --

19      MR. MICELI:  Your Honor, I haven't seen the flowchart.

20      Did you bring a copy for me as well?  Do you have an

21  extra copy of that?

22      MR. OOT:  Yes.

23      MR. MICELI:  Just for purposes of understanding,

24  Your Honor, that has not been produced to us before and I haven't

25  had any opportunity to try to make sense of it.

**OFFICIAL TRANSCRIPT**

1          THE COURT:  Mr. Oot's trying to educate me.  And when
2     this hearing is over, in all likelihood I'm going to require that
3     these documents be handed back to Mr. Oot.
4          MR. OOT:  Thank you, Your Honor.
5          This is the process that I was explaining to the
6     representatives of the PSC on our last meet-and-confer and was
7     going to continue the conversation but for missing the two
8     subsequent meet-and-confers.
9          But the real thrust of this is I thought it would be
10    helpful to have a full understanding on the floor of what the
11    PFS/DFS process is and what's the discovery that's generated from
12    that process.
13         So when we were here last time, I think there was a
14    perception that the sanofi defendants aren't doing anything, and
15    that's just not the case.
16         So as you kind of walk down the briar patch of the
17    flowchart, you see the PFS process.  The PFS get the plaintiffs
18    into the case.  And then all of a sudden, once those are
19    substantially complete, it kicks off this routine -- or this
20    discovery routine with sanofi.
21         So the real primer of this -- and that's why I put the
22    key there.  The healthcare provider is the primer that allows us
23    to sort of rush forward into Sanofi's systems to identify some of
24    the relevant information.
25         So first off, once we have that information, we go to

10:58:18
10:58:33
10:58:50
10:59:06
10:59:24

**OFFICIAL TRANSCRIPT**

1  the accounting system and we see that there are currently 911

2  healthcare providers that are in play under the existing fact

3  sheets.

4           Then we also produce those adverse event reports that

10:59:40  5  come out of pharmacovigilance that relate to that particular

6  healthcare provider.

7           We also then turn to Call Notes, because also during

8  that process of accounting we identify the sales reps that are

9  associated with that particular healthcare provider.  So those

10:59:58  10  Call Notes again get produced under this DFS process.

11           Then we move on to PeopleSoft, which is Sanofi's HR

12  system, and we produce HR data around those very same sales

13  representatives that existed at the company at the time.

14           We also produce, under this process -- and this is

11:00:19  15  where I think that I would like to spend a little bit of time --

16  sales rep e-mail.

17           So once a sales rep comes into play under the DFS

18  process, sales rep e-mail is produced that touches on a certain

19  set of keyword search materials that are in the DFS.

11:00:37  20           So I'm kind of acting as a carrier right now, Your

21  Honor, and just warning the Court that this is a pretty big

22  burden.

23           So as of right now -- and this was a couple days ago --

24  we had 348 sales reps that we have e-mail in play of which there

11:00:57  25  are 15 currently in play from the existing bellwether DFSs, if

**OFFICIAL TRANSCRIPT**

1  that makes sense.

2        So why we're really focusing on this proportionality

3  discussion is that we want the Court to appreciate all the

4  information that the plaintiffs get under the DFS process.  So

5  when we're asking the Court, under this process that we're in

6  right now, for a 26(b)(1) and 26(g) proportionate discovery plan,

7  we really want the Court to appreciate this process here.

8        So what we've done right now, on the 8th I sent to

9  Mr. Wool the keyword search terms that the Court asked us to do

10  the last time we were here.

11        I have not heard a counter proposal on those yet so

12  we're still waiting.

13        We've also sent over the org charts that Ms. Menzies

14  referenced yesterday as part of the discovery.

15        And then on Pages 2 and 3 of Mr. Ratliff's letter we

16  provided a schedule of what we're producing very soon.

17        And I would like to kind of point out -- we've been

18  talking about the NDA for a long time.  The NDA is no easy

19  process.  Under FDA regs, we were required by law to redact

20  patient information -- patient-identifying information that a

21  court order cannot obviate.  So that's what's taking so long.

22        Even so, we have agreed to produce that, a million

23  pages, within the next almost 30 days.  We're anticipating that

24  we'll be able to produce that on September 15th.

25        So we're giving it all she's got and we want the Court

**OFFICIAL TRANSCRIPT**

1    to understand that.  And that's why, when we pivot to the general

2    discovery protocol, we have to have some scope around it.

3            So back in May of 2010, Judge Koeltl organized a group

4    of practitioners and about 200 of us went to Duke Law School and

11:02:46    5    we sat down to talk about the very problem that we're dealing

6    with here, 26(b)(1), and came up with this plan that's

7    proportional to the case and also relevant to the claims and

8    defenses.  So we have this kind of two-way approach that we've

9    got to attack this problem.

11:03:00    10            And why I'm putting the warning out there now, the more

11    we dump onto these systems, they're not going to be able to

12    perform.  So there are system limitations on what we can export

13    out of e-mail systems.  As I told Ms. Menzies and Mr. Wool back

14    in May, we have limitations on what we can export out of e-mail

11:03:18    15    archives and we've reached capacity.

16            So that's why it's so important for us to say, Hey,

17    let's focus on the most important discovery first and scope this

18    properly.

19            So that's really why we're asking for proper scope and

11:03:32    20    limitations and phasing in the discovery plan.  It's not just

21    because we don't want to produce information.

22            THE COURT:  The problem is we've got -- this is a

23    general discovery protocol.  And in Judge Engelhardt's trial

24    scheduling order from July 21st, which is Record Document 669, on

11:04:00    25    the first page he refers to phased discovery; but he says:  The

**OFFICIAL TRANSCRIPT**

1  above cases, which are the particular plaintiffs who are set for

2  trial, will be subject to phase discovery as set forth in a

3  protocol established by the parties and submitted to the Court.

4  All cases herein will be subject to the first phase of discovery

5  which will conclude on February 6, 2018.

6          So as to -- there are certain issues, certain discovery

7  issues, that are linked to these plaintiffs.  And I suspect that

8  issues like Call Notes and -- that you-all can identify which of

9  the -- I mean, you told me how many you had linked to the

10  plaintiffs who are scheduled for trial.  That sort of information

11  I understand is subject to Judge Engelhardt's view of discovery

12  in terms of phasing.

13          But in terms of general discovery and the way that

14  you-all have suggested it be phased and the subject manner areas

15  or topics, it does not work under Judge Engelhardt's schedule.

16          You've got the third phase of discovery, which is

17  marketing, starting 120 days after -- starting, beginning --

18  120 days after this plan is entered, which is after the discovery

19  deadline that he set in this order.

20          MR. OOT:  Well, Your Honor, the reason I gave you that

21  chart, so you understand, is that we're covering sales and

22  marketing from the PFS/DFS process.  So that process of

23  leave-behinds and marketing materials for these plaintiffs are

24  covered by this process so that's why it's at the tail-end of the

25  case.

11:04:21
11:04:43
11:05:03
11:05:27
11:05:44

**OFFICIAL TRANSCRIPT**

1    And you have to remember this is a labeling case.  This

2 is a failure --

3    THE COURT:  It's not on the tail-end of the case.  It's

4 commencing after the deadline that the district judge has set for

5 discovery.  Those two things are incompatible.

6    MR. OOT:  But what I'm saying, Your Honor, is that

7 they're getting this material.  And maybe it's an argument over

8 deadlines.  Maybe its an argument of what we focus on first.

9    But what we're saying is right now it's important for

10 us to focus on custodians that relate to regulatory issues; that

11 relate to, perhaps, science issues.  And the sales and marketing

12 material, they're getting a flow of this material as it exists

13 right now, and that's why we should focus on it later.

14    So for us to go forward with language of no limitation

15 and a shotgun approach, I'm going to tell you this is going to go

16 off the rails.  So we need to think about how we can export this

17 information out of these systems appropriately and phase it so we

18 can answer this problem.

19    Because adding more servers is not going to help.

20 Adding more attorneys to look at the information is not going to

21 help.  So we have to be measured and proportional to how we are

22 looking for this information.

23    THE COURT:  The way that we're going to approach this

24 is there is an order in this case already that talks about phased

25 discovery that is connected to the plaintiffs who are set for

11:05:53

11:06:13

11:06:29

11:06:46

11:07:06



1   trial, and what I've got so far is not a discovery plan that's

2   consistent with that language.

3        What you-all have given me is a general discovery

4   protocol that speaks to everything, and what I'm saying is I

5   don't -- whatever you-all talked about at Duke, I'm sure you came

6   up with the best-of-the-best ideas, but plugging them into a

7   schedule where you have got a trial in a year may not work.

8        I doubt that you-all assumed, when you were having that

9   discussion, that this is the situation you would be trying to

10  exercise those ideas within.

11       You-all need to make one more pass at figuring out how

12  to address the actual practical problems that you have just

13  identified.  I am not insensitive or deaf to the problems that

14  you've identified.  They are real.  There is a lot of information

15  that you're looking for.  It is probably a monumental task and it

16  has to be managed.  And the plaintiffs have to recognize that and

17  have to sit down and come up with a plan that addresses those

18  problems.

19       That plan is not going to be 60 days, 60 days, 60 days.

20  It's not going to be "general discovery does not reopen once it's

21  closed on a certain topic."  That's not going to work.

22       We've got two different tracks that we're on.  We're on

23  one track where these identified plaintiffs have to have cases --

24  and the defendants as well -- have to have cases that are fully

25  discovered and ready to try in a year.

**OFFICIAL TRANSCRIPT**

1       That puts a lot of pressure on your client, and I

2  understand that, but that's the situation that we're in.

3       There's a separate track where the plaintiffs in

4  particular -- counsel has to be prepared to hand off fully

11:09:09
5  discovered cases when the time comes.  And those two things can

6  happen in a parallel way, but the lawyers who understand and

7  practice in this area every day need to sit down and work through

8  how that looks.

9       I recognize that the problems that you've identified,

11:09:31
10 and as illustrated in the slide that you gave me, are real

11 problems.  And I'm concerned that if I were just to say, We're

12 going to adopt the plaintiffs' version of the general discovery

13 plan and apply it across the board, that we would potentially

14 have a case going off the rails because of the burden of

11:09:51
15 producing just generally, as you said, in a shotgun way would

16 overwhelm the systems and that it would become a serious problem.

17 I'm concerned about that.

18       So I need you-all to take all of these issues into

19 consideration and very quickly sit down and come up with a

11:10:14
20 discovery plan that addresses them.

21       These cases that are set for trial in a year have to be

22 completely and fully discovered, which means all subject matters

23 have to be part of the equation.  How you get that information --

24 how you request that information and how you respond to it is

11:10:32
25 what you-all need to talk about.  But waiting 120 days to start

**OFFICIAL TRANSCRIPT**

1 producing marketing materials is not going to work because you --

2 it's after the discovery deadline that the Judge set.

3 MR. OOT: So, Your Honor -- and that's just the point,

4 that we're not waiting.

11:10:46 5 So, you know, what we're asking the Court to do is kind

6 of consider these processes. And so, for example, we're talking

7 about these bellwether cases. So if we're talking about sales

8 and marketing material for these bellwether cases, it makes sense

9 for us to focus on the marketing materials for these bellwether

11:11:04 10 cases first.

11 So if we go forward with a shotgun approach and say,

12 Let's get all of the marketing materials, and not phase this

13 properly and not seek the information that is most relevant to

14 these cases first, we're going to have some trouble.

11:11:16 15 So that's all I'm saying early on right now.

16 THE COURT: So what you're telling me is it's not only

17 possible, but you believe it is prudent, as to all of these

18 subject matters, to produce information within those topics that

19 are germane only to these bellwether plaintiffs?

11:11:39 20 MR. OOT: Correct, Your Honor.

21 THE COURT: Do you-all dispute that?

22 MR. COFFIN: Yes, Your Honor.

23 MR. MICELI: Yes, Your Honor.

24 THE COURT: Why?

11:11:45 25 MR. MICELI: Can I take the podium?

**OFFICIAL TRANSCRIPT**

1          THE COURT:  Yes.

2          MR. MICELI:  I've been sitting down.

3          THE COURT:  Well, that's where -- you have to sit while

4   he's at the podium.

11:11:52   5          MR. MICELI:  I understand.  I understand.  I've been

6   itching to get up.

7          There are a couple of things, Your Honor.  First of

8   all, I want to address the last item first.

9          Knowledge builds for this company from the very start

11:12:02  10   of when they market this drug.  Now, they can say there were

11   predecessor companies and entities, but the knowledge builds over

12   time.

13          Artificially limiting a date we can go back to by the

14   usage dates does not encompass the full knowledge scope of the

11:12:19  15   company; when they started investigating it, when their duty

16   arose to investigate it.  That's number one.

17          The other things are portions of discovery that can be

18   immediately produced because they don't involve the need for

19   review.

11:12:37  20          Also there's litigation that has been going on for

21   years in the Eastern District of Pennsylvania on the marketing of

22   Taxotere in a *qui tam* action where there has been substantial

23   production of materials -- and I'm certain subject to a

24   protective order because those attorneys can't talk to us -- that

11:12:56  25   could be immediately produced here.

**OFFICIAL TRANSCRIPT**

1          If those include marketing plans -- maybe an index for

2     you to review *in camera* would be helpful to see what has been

3     produced in that litigation and make a determination if it can be

4     immediately produced here.

11:13:10

5          One of the other items that Mr. Oot addressed was the

6     NDA, the New Drug Application, the most fundamental piece of

7     discovery in any pharmaceutical case.

8          When I read their letter, I went back and I reviewed

9     the FDA's guidance for industry and I tried to find certain

11:13:28 10  aspects of that, that I know from my experience in this

11     litigation -- in -- not in this litigation but in this field of

12     litigation.  Defendants -- or sanofi and Aventis defendants

13     provided to you with their letter a number of orders from other

14     courts.  None of them are discovery protocol, but a number of

11:13:47 15  them.

16          I have the benefit of having been involved in that

17     litigation heading up the expert discovery for the

18     Bextra/Celebrex litigation; heading up a discovery team for the

19     PPA MDL.  I know what's there.  And I know what happened with the

11:13:59 20  NDAs.

21          NDAs -- you're going to look at an NDA and it's going

22     to have Section 1.1.1 through 8. whatever.  We could identify for

23     Your Honor a sampling of three, four, five or six sections of an

24     NDA and ask the defendants to submit it for an *in camera* review.

11:14:20 25  And I would submit that if Your Honor can find any patient-

**OFFICIAL TRANSCRIPT**

1   identifiable information on aspects of the NDA that are central

2   to this case, I would agree with Mr. Oot, they have to look at it

3   and redact; but there are portions of the NDA, the marketing

4   portions -- everything that sanofi and their predecessors ever

11:14:39   5   submitted to the FDA is in the NDA -- that has nothing about

6   patients in it.  That can be produced and should have been

7   produced months ago.

8              THE COURT:  What was just produced?

9              MR. MICELI:  I can't tell you, Your Honor, because some

11:14:53   10   of the jurisdictional discovery is protected by a password that

11   we have not received yet.

12              And I can't tell you what was produced at 4:30 because

13   I was busy preparing for today.

14              THE COURT:  So you're arguing about information being

11:15:07   15   redacted but you haven't seen the documents?

16              MR. MICELI:  They have not produced the NDA.  I do know

17   that, Your Honor.

18              THE COURT:  What did Mr. Oot just tell me?  Is it about

19   to be produced?

11:15:16   20              MR. OOT:  Your Honor --

21              MR. MICELI:  No, they --

22              THE COURT:  One at a time.

23              MR. MICELI:  I'm sorry.

24              THE COURT:  I'm asking Mr. Oot to explain it.

11:15:21   25              MR. OOT:  We are producing the IND later today,

**OFFICIAL TRANSCRIPT**

1  Your Honor.  The NDA is a much -- it's a different document, and

2  it's a document that's mostly in paper form.  So it's not like we

3  can kind of hunt and peck out sections, especially being as old

4  as it is.  It is what it is.

5  So it's not like we can hunt and peck out those

6  sections pretty easily and turn it over to them.  We can try to

7  accelerate this and --

8  THE COURT:  Why hasn't it been produced?

9  MR. OOT:  Because under the current schedule we weren't

10  even supposed to produce it until after the entry of this order.

11  So after -- remember, we were here last time talking

12  about this NDA, and you said, Well, don't create any artificial

13  deadlines.  So we first -- again, while --

14  THE COURT:  I also strongly encouraged you-all to

15  produce that which you know you are going to have to produce

16  without waiting for a deadline.

17  MR. OOT:  And that's why you have the schedule before

18  you, Your Honor.  That's why we had to reprocess a million pages.

19  Because we went to one of those legacy cases, the patent case

20  that I think that Ms. Menzies referenced last time, and we saw

21  that it wasn't the full NDA.  There were pieces of the

22  information that weren't relevant to this case.  There were

23  patents in there.  If I turned over what is essentially a mess to

24  them, we would be here complaining about that later on.

25  THE COURT:  All right.  Here is what we are going to

**OFFICIAL TRANSCRIPT**

11:15:39
11:15:52
11:16:07
11:16:20
11:16:38

1   do.

2          MR. OOT:  What we have given you is a schedule,

3   Your Honor, to produce within 30 days a million pages, which is a

4   lot of effort.  And it's a lot of attorneys looking at documents

5   right now that have to redact information pursuant to FDA reg --

6   it's 21 CFR 20.63(f).  I'm happy to send that to them, too.

7          But those redactions are required.  And 30 days is

8   30 days.  We gave them that schedule and they are complaining

9   about it.  I think it's a moot conversation that we're having

10  right now, whether or not we're producing something that's coming

11  to them in 30 days.

12         MR. MICELI:  Your Honor, if I can just address part of

13  it.  I'm jumping ahead on the agenda.

14         The Rule 26(a) information -- which we disagree with

15  the defendants that they don't have a duty to produce --

16         THE COURT:  There's a statement in the same order that

17  I'm reading from that says the parties stipulated that you're not

18  subject to those disclosures.  How is that not the end of the

19  conversation?

20         MR. MICELI:  That is in CMO-3 which is the trial

21  scheduling order.  And by the time we're getting ready to

22  identify cases for trial, all of plaintiffs' 26(a)(1) information

23  would be included.  And much more is included in the plaintiffs'

24  fact sheets.

25         THE COURT:  I think you're wrong.

11:16:47

11:17:08

11:17:24

11:17:37

11:17:51

**OFFICIAL TRANSCRIPT**

1        MR. MICELI:  Okay.

2        THE COURT:  This order says:  This document relates to

3   all actions.

4        In the caption it says:  All parties have stipulated

11:18:03    5   that initial disclosures pursuant to Federal Rule of Civil

6   Procedure 26(a)(1) will not be conducted in this case.  There's

7   one case number on this documentation and it says it applies to

8   all cases.

9        It's a non-issue.

11:18:16   10        MR. MICELI:  Well --

11        THE COURT:  According to the district judge, the

12   parties have stipulated that those disclosures will not be made

13   in this case.

14        MR. MICELI:  Okay.  The way we read that document,

11:18:24   15   Your Honor, just so we're clear, is that if you read Paragraphs 8

16   through 11 where it talks about expert disclosures, they relate

17   only to those trial cases.

18        When you look at -- let me pull my document.

19        Your Honor, if you look at the other paragraphs in

11:18:44   20   here --

21        THE COURT:  I tell you what.  Y'all are going to have

22   to raise that with Judge Engelhardt, because this is his order,

23   and I'm reading it to mean what I just said.

24        MR. MICELI:  Moving beyond that -- we'll address that

11:18:56   25   with Judge Engelhardt, Your Honor.

**OFFICIAL TRANSCRIPT**

1          With regard to the NDA, beginning in 2001, all

2     submissions to the FDA had to be under what's called a CTD, a

3     Common Technical Document, and that's not in any of the orders.

4     This is in the guidance for industry, Your Honor.

5          THE COURT:  I know.

6          MR. MICELI:  So to the extent that there are sNDAs,

7     marketing, or other materials that would be included in the NDA,

8     they would be electronically available to us and should be easily

9     produceable.

10          There is -- and, again, we could provide to Your Honor

11     a few -- whatever Your Honor would like, three, four, five, or

12     six sections of the NDA to have --

13          THE COURT:  This is what's going to happen.  Someone

14     needs to send me, if I don't have it already -- and I don't think

15     that I do.  I'm going to ask Ms. Barrios, who's been e-mailing me

16     with the agendas, to e-mail me the red-lined version, that I

17     received in pdf, in Word.

18          MR. MICELI:  Of the protocol?

19          THE COURT:  Of the competing versions of the general

20     discovery protocol.  I am imminently going to go through and

21     create a general discovery protocol that I approve and I'm going

22     to send it to you.

23          When you receive the NDA, if you believe there is --

24     there are redactions that are inappropriate based on your

25     experience, then you will alert me, and you alert Mr. Oot, that

**OFFICIAL TRANSCRIPT**

1  you want me to look at the unredacted NDA *in camera*.  I will

2  allow Mr. Oot to submit the unredacted version to me *in camera*

3  along with an explanation for me only as to why the information

4  is redacted.  I will make a determination as to whether any of

5  those redactions should be removed.

6          That's how it's going to work.

7          MR. MICELI:  Thank you, Your Honor.  Will we be setting

8  a deadline today for when that should be produced to you?

9          THE COURT:  No.

10         MR. OOT:  There's a schedule that includes the NDA that

11 we provided to them in a letter.  And we discussed it.

12         THE COURT:  That's what I was just looking for.  Is it

13 in --

14         MR. MOORE:  It's on Page 2 of Mr. Ratliff's submission,

15 Your Honor, August 16th.  We begin rolling out of NDA, the

16 one-million page document, next Friday.

17         THE COURT:  Are you giving me a million pages of

18 redactions?

19         MR. MOORE:  We're not going to give you a million pages

20 of redactions.

21         THE COURT:  Good.

22         MR. MOORE:  Parts of it are in electronic form, but we

23 have an ESI protocol and a vendor that it has to go to, and we

24 have to produce it in a format that -- it's not like we can just

25 take an electronic file and e-mail it to them.  We have to go

**OFFICIAL TRANSCRIPT**

1  through the vendor and --

2          THE COURT:  I am a hundred percent with you on that.

3  It doesn't do just to say they can send me a pdf.

4          MR. MICELI:  No, Your Honor.  But what we can say,

11:21:46   5  though, is this MDL was created last October and the NDA is not a

6  surprise to anybody in the room, and this could have been

7  provided long ago.

8          THE COURT:  Well, it wasn't so we're going to speak to

9  it.

11:21:58   10          MR. MICELI:  Understood.

11          THE COURT:  I can't turn back the clock.

12          MR. MICELI:  Understood.

13          For clarity sake, the example that Mr. Oot gave

14  concerning the sales documents that are ferreted out through an

11:22:10   15  examination of the plaintiffs' fact sheets and defendants' fact

16  sheets, while the Court is fashioning a discovery protocol, we

17  would encourage the Court to draw a distinction between sales and

18  marketing.  Because there are marketing documents which are from

19  a marketing department and then there are sales reps who go out

11:22:30   20  and visit doctors.  They are very different documents, marketing

21  plans, and one is part of the NDA and one is partially part of

22  the NDA.

23          So we want to make sure that we're -- the discovery

24  protocol, as it relates to marketing, is not simply limited to

11:22:45   25  sales representative information, because that would be --

**OFFICIAL TRANSCRIPT**

1   wouldn't even be the tip of the iceberg, it would be the vapor

2   above it.

3           MR. OOT:  Your Honor, yesterday I sent Mr. Wool a list

4   of custodians that -- a preliminary list of custodians that we

5   would agree to search, and there isn't that sort of limitation

6   that the PSC is talking about here.

7           So what we're saying is we're not limiting any other

8   sort of area of sanofi based upon the PFS/CFS right now.  We sent

9   these custodians over and are waiting for a meet-and-confer with

10  the PSC.  And I think that will at least address the marketing

11  information.

12          THE COURT:  Okay.

13          MR. MICELI:  Your Honor, just so you're aware, because

14  of this discussion of phasing of 60-day windows to do things --

15  because I think you pointed out, if we were to adopt that,

16  September 6th is the date we would have to begin our first 60-day

17  window based on the deadline you had mentioned earlier.

18          So we wanted to just encourage the broadest possible

19  way of conducting discovery.  We have discovery teams on the

20  topical areas that the defendants suggest.  And because of the

21  time crunch we are going to be under, I think it's inescapable to

22  conclude that we're going to have to multi-track these topics.

23  And we have persons that are ready to lead those teams to begin

24  that discovery so we can meet our trial and discovery deadlines.

25          Thank you.

**OFFICIAL TRANSCRIPT**

1          THE COURT:  Okay.  Mr. Moore.

2          MR. MOORE:  Your Honor, if I could make a quick

3    comment.

4          I think that we've been focusing a little bit on

5    discovery disputes that aren't really ripe yet, but I want to go

6    back to the point that you were making, and it's one that we

7    discussed with Judge Engelhardt yesterday in the liaison counsel

8    meeting, and that is this concept of doing -- the way the Judge

9    described it yesterday was walking and chewing gum at the same

10   time.  That we have MDL discovery that's going to happen, because

11   this is an MDL, but we can do that while we're getting individual

12   cases ready.

13         And one of the things that Ms. Barrios said, and I

14   agreed with, is when he raised that issue, she kind of pointed

15   out, Well, Judge, we need to be able to prove liability.  And one

16   of the things we talked about yesterday is that if one Taxotere

17   case was filed in the Eastern District of Louisiana today, it

18   would probably be set for trial next September.  And that single

19   case would involve document productions from the defendants that

20   would be proportionate to the needs of that single case, and we

21   would never be doing the expensive and burdensome productions

22   that we're doing in an MDL.  What makes the productions so vast

23   in an MDL is the proportionality of 1400 or 1500 plaintiffs.

24         And so it's clear to us from the meeting yesterday --

25   we know what the Judge wants us to do.  We know what his

**OFFICIAL TRANSCRIPT**

1   expectations are as to walk and chew gum at the same time.  I've

2   just never -- I'm not sure how we're going to do it.  It's going

3   to take a lot of work by the lawyers -- all the lawyers in this

4   room --

11:25:55   5        THE COURT:  I don't dispute that.

6        MR. MOORE:  -- to do that.

7        THE COURT:  And I'm glad I'm on this side and y'all are

8   on that side.

9        MR. MOORE:  Right.  Because, to be frank -- I mean, we

11:26:03   10   can all list -- I was in PPA and I was in Celebrex and Bextra,

11   too.  The NDA in Celebrex and Bextra was 190,000 banker boxes --

12   literally in banker boxes.

13        We can all list all the MDLs we've been involved in.  I

14   can't think of one where we've done it this way where we're

11:26:23   15   separate-tracking a single case and then having MDL discovery as

16   a separate thing.  It's never been -- usually you do one thing

17   and then you try the cases once all of the discovery -- maybe not

18   all the discovery but --

19        THE COURT:  When you say MDL discovery --

11:26:38   20        MR. MOORE:  Well, that's the Judge's -- yeah.

21        THE COURT:  -- I mean, how is that different than what

22   is needed to try the first set of cases?

23        MR. MOORE:  Yeah.  I don't know, Your Honor, that there

24   is a single request that we would be responding to in the context

11:26:57   25   of an MDL that is not relevant to a claim or defense of anybody's

**OFFICIAL TRANSCRIPT**

1 case.  There may be time frames where something came out after or

2 something came before.  I don't think it's different.  But what's

3 different is the scope of it.  And how long and how much effort

4 it takes to do it.

5 So I'm not asking -- I just want the Court to

6 understand, and everyone here to understand, how much work this

7 is going to take to do what the Court expects us to do.  It's

8 going to require compromise and reasonableness on both sides to

9 get this done on the schedule.

10 THE COURT:  I agree with you a hundred percent, and

11 that's what I'm trying to say.  What Judge Engelhardt said to

12 you-all, he said to me.  And your general discovery protocol is

13 going to reflect that.

14 Having said that, and looking at the plaintiff counsel

15 table, you-all have to work with the defendants within that plan

16 to address the burden that this discovery plan and this schedule

17 is going to place on them.  It's going to have to -- it has to

18 happen that way.  You-all are going to have to work together to

19 make this discovery plan work.

20 And this is the case that we're in.  Okay?  All of us.

21 You have a trial in a year -- or a set of trials in a year.  They

22 have to be fully discovered.  They have to be -- everyone has to

23 know everything there is to know to try those cases.  And it's a

24 short time frame, I understand that, but this has to happen.  And

25 this is the schedule that we're working under and everyone has

**OFFICIAL TRANSCRIPT**

1  got to work together to make it work.

2          MS. MENZIES:  We appreciate that, Your Honor.

3          I had sent a letter on Wednesday that we've showed you,

4  of the 164, and 59 of which are what we think are specifically

5  identified documents that wouldn't meet the application of search

6  terms.  At least portions of the request would call for those

7  types of responsive documents.  Start those in a rolling process

8  and getting them.

9          We're trying to do what we can to work with, you know,

10  the most logical approach in this rolling of production so that

11  we can -- it's not just everything all at once or end-loaded or

12  whatever.

13          THE COURT:  Well, I don't think that's going to happen.

14  I think what's more likely to happen is everything is going to

15  come to a screeching halt or there won't be any sort of rhyme or

16  reason to the production that's being made on a rolling basis,

17  and that's what you-all need to try to avoid.

18          Focus on what you need for next September.  And that's

19  really the -- I mean, I know you need a lot -- you think you need

20  a lot.  And it's going to require a lot of work by the defendants

21  because that is, quote, unquote, MDL discovery -- at least some

22  of it is.  They have got to be able to prove liability, but you

23  have to prove liability as to those plaintiffs.

24          So to the extent that you-all are -- that the

25  defendants are coming back to you and saying, Do you really need

**OFFICIAL TRANSCRIPT**

1  this information now, then you need to look at that critically

2  and make that decision.  And be able to explain to me, if need

3  be, why you need that information now.

4          And, I mean, within the discovery plan that I'm going

5  to send to you-all -- and not for a formal objection.  I'm not

6  just going to issue it in the record, I'm going to send it to you

7  first and give you some short period of time, not to relitigate

8  what we've already talked about, but to point out any issues

9  that -- serious issues that you-all have that we can address.

10  And we'll probably do that by phone.

11          MR. MOORE:  I think we are the master and keeper of the

12  Word version of what you received by pdf so we'll get that to

13  you.

14          THE COURT:  Okay.  Mr. Moore can send it to me, that's

15  fine.

16          MS. MENZIES:  Thank you, Your Honor.

17          MR. COFFIN:  Your Honor, when we sit down and we talk

18  about what you have just explained to us we need to undertake,

19  and the burden, the issue that I see as potential -- and we need

20  to talk to them about this to be fair, but what I heard Mr. Moore

21  saying, is his interpretation of what Judge Engelhardt was

22  indicating we need to be considering, is some type of separate

23  track of these trial plaintiffs versus what we're going to do in

24  MDL discovery.  And there is such a -- they're so intertwined,

25  it's very difficult --

**OFFICIAL TRANSCRIPT**

1    THE COURT:  I think what Mr. Moore said was what
2  Judge Engelhardt said, and it's up to the rest of us to interpret
3  that.

4    MR. COFFIN:  Right.

11:31:34  5    THE COURT:  And right after Mr. Moore said what he
6  said, he then said, But I agree with what Ms. Barrios said, that
7  they have to be able to prove liability.  That means it's really
8  not two tracks, because what -- because the information on the
9  second track is necessary to try the cases on the first track.

11:31:55  10    MR. COFFIN:  Correct.

11    THE COURT:  There's a reference in the CMO to phased
12  discovery.  I interpret that to mean phased as to the individuals
13  who have been identified for trial.

14    That does not mean that we phase everything else more
11:32:14  15  generally that is, nonetheless, required to be presented at those
16  trials.  I mean, that cannot be the case.

17    So Mr. Moore I think was identifying a challenge that
18  everyone in the case faces.  It is the defendant's particular
19  challenge in this situation to be able to marshal information --
11:32:36  20  a lot of information in a short period of time in a meaningful
21  way that satisfies more importantly the Court -- satisfies the
22  plaintiffs, but ultimately satisfies the Court.

23    And I understand that it's a challenge, and we'll
24  continue to visit on a regular basis to monitor where things
11:32:56  25  stand and what issues are arising and just how big a challenge it

**OFFICIAL TRANSCRIPT**

1   is.  And we're not going to wait for something to go off the

2   rails because we're going to be meeting regularly.  I'm going to

3   be talking to y'all now between those meetings to address any

4   issues that are coming up and hopefully take steps to avoid any

5   real problems.

11:33:17

6           MR. COFFIN:  I think that would be extremely effective.

7   We thank you for that.

8           MR. MICELI:  One last item, the 30(b)(6) deposition,

9   we've been offered September 7th and 8th and we're going to move

10  forward on that date, but we do need records.  And that's just

11:33:28

11  the week after next.  So if we could ask Your Honor to direct

12  whether those productions --

13          THE COURT:  I just ordered them to produce them by

14  close of business next Friday.

15          MR. MICELI:  Thank you, Your Honor.

11:33:45

16          THE COURT:  Did I miss something?

17          MR. RATLIFF:  I didn't miss it, Your Honor.

18          MR. MICELI:  I hadn't heard it, but that gives us three

19  days before the deposition.

20          THE COURT:  Well, that's when they're going to be

11:33:53

21  produced.  I'm giving them seven days to produce the documents.

22          You probably have -- you've made one document

23  production?

24          MR. RATLIFF:  We've made two.

25          THE COURT:  Two.  You've got some documents.  And I'll

11:34:03

**OFFICIAL TRANSCRIPT**

1  say for the third or fourth time, my order is, to the extent that
2  they haven't already been produced, these additional records are
3  to be produced.

4        So you've got some documents.  You've got interrogatory
5  responses.  You've got enough to start working with.

6        MR. RATLIFF:  And, Your Honor, I'll work with counsel
7  on the date.  I offered September 7th and 8th --

8        THE COURT:  There was another set of dates that you
9  offered as well.

10        MR. MICELI:  They were a little too close to our
11  briefing deadline, Your Honor.

12        MR. RATLIFF:  And I understand that.  And those
13  actually aren't good days for me either.  If I can accelerate one
14  of those witnesses before that, that's what I'm trying to do.

15        THE COURT:  You-all work on that.

16        MR. RATLIFF:  Okay.

17        THE COURT:  I think that's enough for one day.  I'm
18  going to get you -- I will have -- I will have a version of this
19  general discovery plan to you-all by Monday.

20        MR. COFFIN:  Could we put a date on the calendar, Your
21  Honor, for the telephone conference subsequent to the production
22  date that you said?

23        THE COURT:  Yeah.  This is to discuss the August 25th
24  production?

25        MR. COFFIN:  And the full answers to interrogatory

**OFFICIAL TRANSCRIPT**

11:34:20
11:34:32
11:34:43
11:34:58
11:35:31

1    responses.

2              THE COURT:  So it is going to be -- hold on.

3                        (A pause in the proceedings.)

4              THE COURT:  Yes, it will be Wednesday, the 30th.  Let

5    me see if I can do it sooner.

6                        (A pause in the proceedings.)

7              THE COURT:  I don't think I can -- I think

8    that's Wednesday, the 30th.

9              MR. RATLIFF:  Is there a time, Your Honor?

10             THE COURT:  Afternoon.  Why don't y'all work that out

11   with Blanca, but my whole afternoon is free.

12             MR. RATLIFF:  Thank you, Your Honor.

13             MR. COFFIN:  With regard to your order on the

14   interrogatories, I don't think we talked about a day by which

15   those will be completed.

16             THE COURT:  I thought that they --

17             MR. RATLIFF:  I will have them to them by Tuesday.

18             THE COURT:  By Tuesday.  Next Tuesday.

19             MR. RATLIFF:  If I can get them before or I can roll

20   out pieces of them, I will do that.

21             MR. COFFIN:  Next Tuesday, the 22nd of August?

22             MR. RATLIFF:  That's the only next Tuesday I know.

23             THE COURT:  Yes.

24             MR. COFFIN:  Just making sure we're on the same page,

25   because, believe it or not, we aren't always on the same page.

**OFFICIAL TRANSCRIPT**

1      THE COURT:  Are you confident in that date?

2      MR. RATLIFF:  Not particularly, Your Honor, but I'm

3  going to go with it.

4      THE COURT:  Wednesday.

5      MR. RATLIFF:  Okay.

6      MS. MENZIES:  Sooner if you can.  We were hoping to get

7  them before this hearing.

8      THE COURT:  I get it.

9      Look, this is what we've been talking about.  This is a

10  challenging process, and I credit everything that Mr. Ratliff

11  said to me about his travels and trying to marshal documents and

12  draft interrogatory responses at the same time.  You know, we're

13  under the gun.

14      The plaintiffs are under the gun on their response to

15  this motion, and not a lot got done in the last few weeks but --

16  so a lot has to get done in the next few weeks, and that's the

17  way it's just going to have to work.

18      You-all -- so we're going to be on the phone on the --

19  what did I say, the 30th?  I would really, really like not to

20  have 25 people on the phone.  If you-all can figure out how to

21  streamline who actually needs to be on the phone, because having

22  three people on the phone is often a nightmare enough because

23  it -- people can't help talking over each other because we're not

24  in the same room.

25      So to the extent we can limit the number of people on

11:36:51
11:37:02
11:37:20
11:37:44
11:38:01

**OFFICIAL TRANSCRIPT**

1   the phone for those sessions, I would like to do that.  I'll

2   leave that up to you.

3         Why don't we say 2:00 on August 30th so everybody has a

4   time and a date now.

*11:38:17*
5         MR. COFFIN:  Should we set a court report -- we would

6   like a court reporter to be on the phone.

7         THE COURT:  We'll have a court reporter.

8         MR. COFFIN:  Thank you.

9         THE COURT:  The court reporter will be in my office.

*11:38:27*
10         And, you know, the New Orleans folks can come to my

11   office, too.  If you want to participate, I would encourage you

12   to come sit in the room with me so that we have that fewer number

13   of voices on the phone.

14         Okay.  I'll get you-all something on the discovery plan

*11:38:46*
15   Monday.

16         MR. COFFIN:  Thank you.

17         THE COURT:  Thank you-all.

18                    (Proceedings adjourned.)

19                  * * * *

20               **CERTIFICATE**

21     **I hereby certify this 21st day of August, 2017, that the**

**foregoing is, to the best of my ability and understanding, a true**

22   **and correct transcript of the proceedings in the above-entitled**

23   **matter.**

24                  */s/ Mary V. Thompson*

                   _____

25                   **Official Court Reporter**

**OFFICIAL TRANSCRIPT**