UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)            MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

SECTION "N" (5)

THIS DOCUMENT RELATES TO
ALL CASES

### PLAINTIFFS' OPPOSITION TO SANOFI DEFENDANTS' MOTION FOR ENTRY OF A PROTOCOL REGARDING EX PARTE CONTACT WITH PHYSICIANS

#### INTRODUCTION

Defendants propose to take with one hand—and then to take more with the other. At the same time that Defendants seek to impose unworkable restrictions on Plaintiffs' ability to communicate with prescribing and treating physicians, they also seek permission to retain as experts a large number of Plaintiffs' prescribing and treating physician. Defs' Mem. in Supp. of Mot. for Entry of Protocol Regarding *Ex Parte* Contact with Physicians, Rec. No. 917-1. The request to take away Plaintiffs' ability to communicate freely with prescribing and treating physicians is based on unsubstantiated concerns. And the request to take on as experts a large number of Plaintiffs' prescribing and treating physician may cause Plaintiffs irreparable harm and in any event is completely unwarranted given the numerous other physicians available to Defendants.

There is nothing evenhanded about Defendants' proposal to regulate both Plaintiffs' and Defendants' *ex parte* communications with treating and prescribing physicians. Contrary to Defendants' submission, the law does not require, or otherwise call for, restrictions on Plaintiffs' *ex parte* communications with their *own* treating and prescribing physicians. Nor does it allow

1

Defendants to retain a large number of plaintiffs' treating physicians as testifying and consulting experts, when, as here, there is a strong likelihood that physician-patient privileges may be implicated; there is a complete lack of oversight to police such communications; and plaintiffs whose cases are remanded for trial would be prejudice by such *ex parte* contacts.

## ARGUMENT

**I.     There Is No Legal Basis or Reason for Restricting Plaintiffs' Communications with Their Own Treating Physicians.**

Defendants have proposed that several limitations be placed on Plaintiffs' ability to communicate freely with their own treating and prescribing physicians:

> Plaintiff's counsel may engage in *ex parte* communications with any MDL Plaintiff's prescribing or treating physician <u>limited to discussions of the facts of treatment that the physician provided</u> as well as <u>diagnosis, prognosis, and causation related to the particular patient/plaintiff</u>. Plaintiffs are <u>prohibited from providing or discussing documents produced by the Defendants in this litigation to Plaintiffs' prescribing or treating physicians</u>. Plaintiffs are also <u>prohibited from providing or discussing medical literature with Plaintiffs' prescribing or treating physicians that the physician has not previously seen or reviewed</u>.

Defs' Mem., Ex. A at 2, Doc. No. 917-2, Oct. 10, 2017 (emphasis added). MDL courts regularly reject defendants' attempts to impose such limitations, because there is no basis in law or policy for doing so. *See, e.g.*, *In re Testosterone Replacement Therapy Prod. Liab. Litig.*, 167 F. Supp. 3d 936, 937–38 (N.D.Ill. 2016) ("[E]ven though some states restrict defense-to-physician communications, the Court is unaware of, and [defendant] has not identified, any such state that takes the step advocated [. . .] here: imposition of a parallel prohibition (or some other form of restriction) on the plaintiff's attorney."). Indeed, "no statute or established rule requires or even counsels in favor of these sorts of restrictions." *Id.* at 938; *see also In re Yasmin & Yaz (Drospirenone) Prod. Liab. Litig.*, No. 3:09-md-02100, 2011 WL 9996459, at *1 (S.D. Ill. Mar. 4, 2011) ("[T]he Court is not aware of and the Defendants have not cited, any rule or controlling

authority that prohibits an attorney from providing a witness with documents when engaged in permissible ex parte communications."). Instead, overwhelming policy considerations—especially in the presence of the disclosure obligations fairly proposed by Defendants—warrant the Court's rejection of any such limitations.

Defendants frame these limitations as necessary to prevent "Plaintiffs or counsel [from . . .] attempting to influence physicians' medical opinions with materials produced or uncovered in the course of this litigation"—a practice commonly called "woodshedding." *See In re: Benicar (Olmesartan) Prod. Liab. Litig.*, 2016 WL 1370998, at *1 n. 2 (D.N.J. Apr. 6, 2016) (describing "woodshedding" as "an alleged attempt by plaintiffs' attorneys to taint and influence the testimony of plaintiffs' physicians," "manipulating the physician's recollection of events and tainting their eventual deposition testimony," or "impermissibly coaching a witness or unfairly prejudicing a witness during *ex parte* communications"). The Court in *Benicar* rejected this line of argument, finding "there is no credible evidence to support it." *Id*. at *3 ("No contention has been made that plaintiffs' counsel engaged in any type of improper communication."). Where there is no evidence of "woodshedding"—and here there is none—or where "defendants can only cite to … one isolated instance even though tens and probably hundreds of thousands of MDL and mass tort cases have been filed," then "defendants are proposing a solution to a problem that does not exist" and "simply have not shown good cause to grant the … relief they request." *Id*.; *see also In re Xarelto Prod. Liab. Litig.*, 2016 WL 915288, at *3 (E.D. La. Mar. 9, 2016) (where defendants "only cite[] one *bona fide* example of woodshedding" in an unrelated medical devices litigation, they have shown but "the mere potential for abuse"); *In re: Zoloft Prod. Liab. Litg.*, No. 12-MDL-2342, 2013 LEXIS 190081, at *12-13 (E.D. Penn. June 13, 2013) (refusing to adopt Pfizer's proposed restrictions on plaintiffs' ex parte communications with treating physicians where there is no

evidence of abusive contacts).

Further, physicians are fully capable of comporting themselves professionally and ethically, and free from untoward influence in these types of situations. *See id*. at *5 ("[These] learned professionals who have devoted themselves to the sciences … cannot be analogized to the cowed, reprimanded children referenced in the 'woodshed' idiom."). On this point, the *Xarelto* opinion, quoted approvingly by the court in *Benicar*, sharply observed: "The Court cannot conclude based on Defendants' sparse anecdotal evidence that physicians are a vulnerable or dishonest population. Assuming otherwise would disservice the medical profession." *Id*. (also noting "the healthy skepticism which exists between" physicians and attorneys); *In re Benicar*, 2016 WL 1370998, at *3-4. The *Benicar* court further rejected another rather tenuous argument that Defendants make here: that Plaintiffs' counsel's *ex parte* communications with their treaters could negatively impact the doctors' future treatment and prescription decisions to the detriment of future patients. *Id*. ("The Court has more confidence in the medical profession and its professionals than defendants express. The Court is doubtful that plaintiffs' physicians can and will be duped, and that they will defer to plaintiffs' lawyers about what drugs to prescribe.")

These proposed restrictions on Plaintiffs' counsel's communications with their physicians are not only unnecessary but also wholly unworkable. Numerous MDL courts have roundly dismissed the prospect of "imposing restrictions on the substantive content of *ex parte* contacts between Plaintiffs' counsel and prescribing or treating physicians" as "both unenforceable and unreasonable." *In re Xarelto*, 2016 WL 915288, at *4. As the *Benicar* court observed, "it will be almost impossible and certainly problematic to police the communications between plaintiffs' counsel and physicians." *In re Benicar*, 2016 WL 1370998, at *5. This is in part because "[w]hat may seem innocuous to plaintiffs may appear to be coaching to defendants." *Id*. The task of

"sanitizing" these *ex parte* discussions "from all advocacy concerning liability" is "easier said than done" because "advocacy is in the eye of the beholder." *In re Xarelto*, 2016 WL 915288, at *5 ("The ability to subtly persuade is a core characteristic of the effective advocate.") Because advocacy "may not be easily detectible" and because, even where it may be, courts "lack[] the ability to surgically remove delicate insinuations from the individual sentences of Plaintiffs' counsel," any protocol forbidding physician communications on issues like general causation or liability "is not enforceable," will be "impossible to police," and accordingly will not be issued by a court. *Id*. (citations omitted). Further, the approach advanced by Defendants would waste the Court's resources and is contrary to the efficiency aims of MDLs generally. *See Benicar*, 2016 WL 1370998, at *5 ("Given the myriad of substantive and procedural issues the Court has to address in this MDL, there is no need to referee the side litigation likely to occur if defendants' restrictions are imposed.").

Rather than policing these communications between plaintiffs' counsel and physicians prospectively, MDL courts have instead put faith in defendants' ability to question physicians at deposition and cross-examine them at trial as sufficient to remedy any perceived improprieties. *See, e.g.*, *id*. at *4 ("If this occurs, the expert runs the risk of getting obliterated on cross-examination as occurred at the *DePuy* trial. Defendants are also protected because they are free to question plaintiffs' physicians at their depositions and at trial regarding their contacts with plaintiffs' counsel."); *In re: Zoloft*, 2013 LEXIS 190081, at *14 ("[Depositions] will also allow the defendant to explore whether the physician's testimony is the product of what it calls 'woodshedding' of the physician.") As reasoned by the court in *In re Testosterone Replacement*:

> [T]he fact that abuses are possible is not grounds to prohibit otherwise appropriate witness preparation. Rather, the law deals with such abuses in other ways: the opposing party may question the witness about his contacts with the other side to shed light on improper attempts to influence or mislead; may, with some

5

>limitations, obtain discovery regarding those contacts; and may, if the circumstances warrant, seek sanctions.

*In Testosterone Replacement*, 2016 WL 929343, at *1. For this reason, the *Xarelto* Court, following the lead of the court in the *Kugel Mesh* MDL, required plaintiffs to make certain disclosures to defendants regarding their *ex parte* communications with physicians:

>However, because the Court prescribes a strong dose of cross-examination as the cure for Defendants' perceived ills, the Court finds it appropriate to facilitate the discovery of the character of Plaintiffs' *ex parte* contacts with treating physicians. The Court … orders that Plaintiffs' counsel shall document the following regarding *ex parte* meetings with treating physicians: the date(s); the approximate duration; the location; the participants; and the identity of the documents, photographs, or other materials that were shown or provided to the treating physician by Plaintiffs' counsel in connection with the meeting. Plaintiffs' counsel shall provide such information to Defendants at least forty-eight hours prior to the treating physician's deposition.

*In re Xarelto*, 2016 WL 915288, at *6; *see also In re Testosterone Replacement*, 167 F. Supp. 3d at 939-40; *In re Bard IVC Filters Prod. Liab. Litig.*, 15-md-02641, ECF Doc. No. 4865 (D. Ariz. Feb. 6, 2017)) (establishing disclosure requirements for documents shown to deponent physicians); *In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 16-md-02734 (ECF No. 235 (N.D. Fla. Mar. 9, 2017) (same). These disclosure requirements are identical to those proposed by Defendants here, which Plaintiffs agree are fair and reasonable. However, Defendants ignore the fact that the *Xarelto* Court—along with the others cited immediately *supra*—provided for these disclosures *in lieu of* prospectively limiting Plaintiffs' permissible contacts with their treating physicians, and not *in addition to* such restrictions, as Defendants propose.[1]

---

[1] On this point, Defendants have fully conceded the merits of Plaintiffs' policy arguments *supra*—specifically that disclosure obligations and the opportunities to question physicians at deposition and at trial obviate the need for completely impracticable restrictions on these communications. (*See* Defs' Br. at 5-6 ("Judge Fallon held that an attempt to completely prohibit or prevent counsel from "woodshedding" physicians through *ex parte* contact 'would be both unenforceable and unreasonable. … The Proposed Order would allow the parties to self-police and explore potential bias through deposition and cross examination.").

6

Finally, Defendants' reliance on *Patton v. Novartis Consumer Health, Inc*., No. 4:02-CV-0047, 2005 WL 1799509 (S.D. Ind. July 25, 2005) is misplaced. There is simply no requirement or reason to require "equal footing," "parallel restrictions," or "symmetry." Where MDL defendants have made similar arguments "that it is fair and appropriate to impose parallel restrictions on plaintiffs' counsel in return for defendants' agreement to limit their communications with plaintiffs' physicians," this argument has been rejected. *In re Testosterone Replacement Therapy*, 167 F. Supp. 3d at 938-39. This is because the restrictions placed on defendants' communications often amount to simple compliance with laws that apply asymmetrically to defendants. Where plaintiffs have not requested the court impose restrictions on defendants' *ex parte* communications beyond what the law and equities require, defendants cannot leverage agreement to these restrictions "into an imposed restriction on otherwise permissible actions by plaintiffs' counsel." *Id*. "There is nothing un-evenhanded about this approach," which "rely[ies] on the restrictions, or absence thereof, imposed by state laws and precedents that are aimed at protecting the physician-patient relationship."

For these reasons, the Court should not impose prospective restrictions on the substance of Plaintiffs' communications between Plaintiffs' counsel and physicians, or on the type, category, or amount of documents shown to those physicians. *See, e.g.*, *In re Benicar*, 2016 WL 1370998, at *8 ("Defendants' request that plaintiffs' counsel's communications with plaintiffs' treating and prescribing physicians be limited to just diagnosis, treatment, and medical condition issues is DENIED[.]")[2]

---

[2] In addition to the *Xarelto*, *Benicar*, *Testosterone Replacement*, and *Kugel Mesh* MDL courts cited *supra*, the courts in the *Obtape Transobturator Sling*, *Vioxx*, and *Yasmin* MDLs have issued substantially similar rulings. *See In re Mentor Corp. Obtape Transobturator Sling Prod. Liab. Litig.*, 2015 WL 12990485, at *1 (M.D.Ga. May 28, 2015); *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prod. Liab. Litig.*, 2011 WL 9996459, at *1-2 (S.D.Ill. Mar. 4, 2011) (explicitly approving the showing to physicians of "research documents, scientific studies, and related materials; internal Defendant documents; documents identified as confidential …; and product warnings or labels");

7

**II.     Defendants' Proposed Use of Plaintiffs' Physicians as Experts Will Likely Violate Physician-Patient Privilege and Duties of Loyalty and Thus Should Be Prohibited.**

Defendants ask the Court to approve their contact with and retention of a large number of Plaintiffs' treating and prescribing physicians, both as testifying and consulting experts. Defendants, however, fail to justify their need to access the small pool of plaintiffs' prescribers and treater given the abundance of other physicians available to them. Moreover, while purporting to strike a balance between competing interests, Defendants' proposal is in fact problematic and deceptively open-ended, with the potential for abuse and with no means for oversight or audit by patients, Plaintiffs' counsel, or the Court. Accordingly, Plaintiffs strongly oppose any use by Defendants of their prescribing and treating physicians as experts and request that the Court reject any such arrangement.

   A.     *Defendants Lack a Sufficient Justification to Warrant Ex Parte Access to Plaintiffs' Prescribing and Treating Physicians*.

On multiple occasions courts in this District have recognized "the responsibility of an MDL court to be sensitive to the physician/patient relationship when considering a request for *ex parte* physician contact." *In re Xarelto*, 2016 WL 915288, at *8 (citing *In re Vioxx*, 230 F.R.D. at 475, 477). Exploring the millennia-old roots of this modern relationship, *Vioxx* court observed one of the essential pledges contained in the classical version of the Hippocratic Oath:

> What I may see or hear in the course of the treatment or even outside of the treatment in regard to the life of men, which on no account must spread abroad, I will keep to myself, holding such things shameful to be spoken about.

*In re Vioxx*, 230 F.R.D. at 476. In evaluating the permissibility of *ex parte* contact with physicians by defendants, courts balance "a patient's right to safeguard both private medical information and the trusting character of the physician/patient relationship" with "the due process concerns raised

---

*In re Vioxx Prod. Liab. Litig.*, 230 F.R.D. 473, 477 (E.D.La. July 22, 2005) (allowing *ex parte* interviews only "with those doctors who have not been named as defendants").

8

by the inability to present effective expert testimony." *In re Xarelto*, 2016 WL 915288, at *7. Courts have permitted defendants to access and retain plaintiffs' physicians where defendants otherwise would have been precluded from a "fair opportunity to present" [a] defense." *See, e.g.*, *Seroquel*, 2008 WL 821889, at *4 (noting that "[m]ore than 3,100 physicians have already been identified as treating physicians for Plaintiffs, which limits the local pool of physicians available to serve as experts significantly"). But when defendants have shown no proof that their only available experts "likely treated one or more Plaintiffs," they have been prohibited from engaging in *ex parte* communication with plaintiffs' prescribing and treating physicians. *In re Kugel Mesh*, 2008 WL 4372809, at *2 ("Defendants do not, however, identify the size of this "small group" [of potential experts] or present any other evidence to support that they will be significantly prejudiced in retaining experts.").

Defendants point to *Xarelto*, which permitted defendants to engage in these expert arrangements, in arguing that the ability to retain Plaintiffs' treaters as defense experts is necessary "[t]o assure equitable and appropriate access to potential expert witnesses." The *Xarelto* litigation is easily distinguishable. Unlike this matter, the *Xarelto* litigation involves approximately 15,000 cases in the federal MDL and over a thousand cases in state litigations. The *Xarelto* court focused on the difficulty Defendants would face in locating qualified experts absent access to plaintiffs' prescribing and treating physicians:

> The Court recognizes the dangers of inappropriate *ex parte* contacts, but also recognizes the significance of the at-issue due process interests in accessibility and fairness. Several thousand Xarelto Plaintiffs are currently in the present litigation, and several hundred more submit Plaintiff Fact Sheets each month for review by the Defendants. Disallowing testimony from the many competent, articulate physicians who have prescribed Xarelto would impose a significant burden on the Defendants.

9

*In re Xarelto*, 2016 WL 915288, at *8; *In re Seroquel Prods. Liab. Litig.*, 2008 WL 821889, at *4 (acknowledging "the potential for misuse of [*ex parte* physician contact], [as well as] the danger of inappropriate communications and the possibility of conflicts and complexities as the cases develop and the varying roles of physicians intertwine."). In addition, and unlike this case, all trial plaintiffs had been selected before the *Xarelto* court allowed defendants to engage in *ex parte* communications. Here, given that trial plaintiffs for future MDL trials may not be selected for months to come, Defendants' proposal jeopardizes the ability of the parties and the Court to select trial plaintiffs that have not been tainted by Defendants' *ex parte* communications.

Further, none of the countervailing concerns identified in *Xarelto* are present here. Since September 2017, less than 1700 cases have been filed in the Taxotere MDL, and among the Plaintiff Fact Sheets ("PFS") of Louisiana Plaintiffs, only unique 58 prescribers have been identified—far less than half of the 127 oncologists listed on the website of the Louisiana State Medical Board in addition to those listed. Keeping these 58 treaters off-limits will not "limit[] the local pool of physicians available to serve as experts significantly." *In re Seroquel*, 2008 WL 821889, at *4. Indeed, with over half of Louisiana's licensed oncologists still left to choose from, Defendants will hardly lack a "fair opportunity to present [a] defense," *id.* at *7, or "access to qualified physician experts," *In re Xarelto*, 2016 WL 915288, at *7. Likewise, this is not a situation where any significant number of additional cases are likely to be filed that would further restrict this pool—certainly not enough to warrant Defendants' proposal, which seeks to contact and retain as experts twice as many plaintiffs' prescribing and treating physicians as compared to the *Xarelto* litigation.

As such, there are simply no "due process concerns raised by the inability to present effective expert testimony" that would justify any impingement on "a patient's right to safeguard

both private medical information and the trusting character of the physician/patient relationship." *Id*. at *7. Accordingly, Defendants should not be permitted to retain any of plaintiffs' treating or prescribing physicians as experts—either testifying or consulting—until such time that those Plaintiffs' claims have been resolved.

    B.  *Defendants' Proposed Restrictions Are Also Deficient*.

  In ruling on the propriety of allowing plaintiffs' treaters as defense experts, "accessibility and fairness must be balanced against the potential for misuse and manipulation." *In re Xarelto*, 2016 WL 915288, at *7. The *Xarelto* court took seriously the concern that "service as a physician-expert, even in cases unrelated to the physician's patients, may complicate the relationship between the physician-expert and his or her patients." *In re Xarelto*, 2016 WL 915288, at *8. ("A patient may feel betrayed, or at the very least uncomfortable, if his or her physician represents a company that the patient is suing in a products liability action. Courts must be sensitive when considering *ex parte* contacts that may jeopardize the physician-patient relationship."). In ruling to prohibit treaters' retention as defense experts, the *Kugel Mesh* Court rested its ruling not only on the confidentiality, but also "the trust … embodied in the physician-patient relationship." *In re Kugel Mesh*, 2008 WL 4372809, at *1.

  In this Taxotere litigation, these treating physicians' usefulness to Defendants is obvious: Defendants will want to discuss the physicians' experiences treating their patients with docetaxel. Where Defendants frame their proposed use of these experts as limited to their "general clinical experiences with docetaxel," it must be underscored that those "experiences with docetaxel" only occur *vis a vis* the treatment of individual patients. Indeed, Defendants do not seek to discuss docetaxel in terms of its pharmacology or the general causation of the injuries alleged—there are numerous scientists at their disposal for that purpose—but rather what these treaters have learned,

11

and what Defendants may learn from them, in the context of their patients' medical treatment. How these individual clinical experiences translate to "general" ones that Defendants propose be allowed in their defense is unclear. However, even where it is only treating experts' general prescribing habits or categorical practices that might be discussed, these topics nonetheless clearly involve or betray information about individual patients' treatment.

But more importantly, Defendants' proposed protocol does not necessarily limit these expert-treaters' consulting work only to discussions of the facts of the trial pool plaintiffs' cases. Even though the proposal prohibits Defendants from using an expert in a case where his or her patient is a plaintiff, these experts—particularly these poorly-defined "consulting" experts—will likely assist in developing defense strategy across all MDL cases—or for subsets of cases. Whether for the benefit of Defendants in an individual Trial Pool case or across the entire MDL, the expert work envisioned in Defendants' proposal would not foreclose Defendants' ability to glean or elicit information about their expert's current or former patients in order to advance Defendants' interests.

It is true that Plaintiffs have no reason to doubt the integrity of the physicians that Defendants seek to employ. However, there is nothing stopping Defendants from posing treatment "hypotheticals" that intentionally mirror the facts at issue in the experts' patients' lawsuits in order to gain an advantage in those cases. Experts who fail to recognize this tactic may unwittingly betray their patients' confidences. Further, consulting experts may otherwise be encouraged to discuss details of their treatment of patients without naming them; yet Defendants, who will at all times have the benefit of Plaintiffs' relevant medical records, might nonetheless be able to identify these nameless patients by their treatment details. Therefore, even where Defendants pledge that these experts' uses are limited to the work-up of the Trial Pool Plaintiffs' cases, the discussions

that this work-up will invite and entail will undoubtedly extend beyond the treatment of the individual Trial Pool Plaintiffs.

This is especially problematic where, as Defendants have proposed, there will be no mechanisms in place to monitor or enforce any limitations or restrictions on consulting experts. To be sure, Defendants' proposal does not require that these experts be disclosed until they are designated as trial witnesses. Accordingly, Plaintiffs and the Court will not know who these consulting witnesses are, whom they have treated, what they are in fact working on, or what they have been asked to discuss. Defendants' own proposed limitations on the numbers of physicians that they may contact and retain would be similarly meaningless where Plaintiffs and the Court have no way of tracking them. This stands in stark imbalance to the disclosures Defendants seek from Plaintiffs and the availability of depositions and cross-examinations that Defendants propose to uncover any of *Plaintiffs*' potential improper conduct with own physicians. (*See* Defs' Br. 5-6.) As the state *Kugel Mesh* Court observed, Defendants are asking both the Plaintiffs and the Court to accept a "Scout's Honor" promise here, one that is potentially disingenuous, and certainly unfair. *In re Kugel Mesh*, 2008 WL 4372809.

Further, because such expert engagement would very likely implicate the treatment history of the expert's patients as described *supra*, this Court is required to give effect to Louisiana's health care provider-patient privilege, which would bar Defendants' proposed retention of those experts. *See* Fed. R. Evid. 501 ("[I]n a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision."). Louisiana's privilege rule is found in Louisiana Code of Evidence article 510:

> In a non-criminal proceeding, a patient has a privilege to … prevent another person from disclosing a confidential communication made for the purpose of advice, diagnosis or treatment of his health condition between or among himself or his representative, his health care provider, or their representatives.

13

La. Code of Evid. art. 510(B)(1). Under this article, Louisiana Plaintiffs in this MDL have an exercisable privilege over all confidential communications, broadly defined in the Code as "any information, substance, or tangible object, obtained incidental to the communication process and any opinion formed as a result of the consultation, examination, or interview …." La. Code of Evid. art. 510(A)(1)(b).

Even where a patient may be said to have waived this privilege by putting his or her medical treatment at issue in a lawsuit, such waiver is only made as to trial testimony and the formal discovery sanctioned in Louisiana's Code of Civil Procedure or other limited statutory provisions. La. Code of Evid. art. 510(E) ("The exceptions to the privilege set forth in Paragraph B(2) shall constitute a waiver of the privilege only as to testimony at trial or to discovery of the privileged communication by one of the discovery methods authorized by Code of Civil Procedure Article 1421 et seq., or pursuant to R.S. 40:1165.1 or R.S. 13:3715.1."). These methods[3] are limited to:

> depositions upon oral examination or written questions; written interrogatories; production of documents or things or permission to enter upon land or other property, for inspection and other purposes; physical and mental examinations; request for release of medical records; and requests for admission.

La. C.C.P. art. 1421. Because *ex parte* communications with a treating physician are not a formal discovery method referenced in the Code, a patient does not waive privilege as to them. *See Johns v. United States*, 1997 WL 695608, at *5 (E.D. La. Nov. 6, 1997) ("The discovery limitations incorporated into the statutory waiver of a plaintiff's provider/patient privilege act a substantive part of the state's privilege law …. [T]hey define the scope of the waiver and are therefore part in [sic] parcel of Louisiana privilege law.") Even where the particular facts of a case "invite the use of informal discovery methods, this Court is bound by Federal Rule of Evidence 501's

---

[3] The statutory provisions referenced in art. 510(E) relate only to medical records.

incorporation of Louisiana privilege law." *Id*. at *6. This approach is required to the same extent in MDLs under these circumstances. *See, e.g.*, *In re Aredia & Zometa Prod. Liab. Litig.*, 2008 WL 8576167, at *1 (M.D. Tenn. Jan. 17, 2008) (allowing defendants' *ex parte* contacts with physicians only as to "Plaintiffs' physicians … located in states where physician-patient privilege does not exist … and/or where state law has not expressly prohibited ex parte communications between defense counsel and plaintiffs' treating physicians even after waiver of privilege."); *accord*. *In re Baycol Prod. Litig.*, 219 F.R.D. 468, 474 (D. Minn. 2003).

Accordingly, all Louisiana Plaintiffs' treatment histories are protected from *ex parte* discovery by Louisiana's healthcare provider-patient privilege, which must be given force by the Court pursuant to Federal Rule of Evidence 501. For this reason, Defendants cannot be allowed to retain these Louisiana Plaintiffs' physicians during the MDL proceedings until such time that their claims are no longer pending.

## CONCLUSION

For the foregoing reasons, the Court should not impose any prospective restrictions on the substance of Plaintiffs' and their counsel's communications with their treating or prescribing physicians, and Defendants should not be permitted to have *ex parte* communications with these physicians or to retain them as experts while any of their patients' claims against Defendants are pending.

Dated: October 17, 2017               Respectfully submitted,

/s/ *Christopher L. Coffin*                              /s/ *Karen B. Menzies*
Christopher L. Coffin (#27902)           Karen Barth Menzies (CA Bar #180234)
PENDLEY, BAUDIN & COFFIN, L.L.P.   Andre Mura (on the brief)
1515 Poydras Street, Suite 1400          GIBBS LAW GROUP LLP
New Orleans, LA 70112                       400 Continental Boulevard, 6th Floor
Phone: 504-355-0086                           El Segundo, CA 90245
Fax: 504-523-0699                                Telephone: 510-350-9700

15

ccoffin@pbclawfirm.com

*Plaintiffs' Co-Lead Counsel*

Facsimile: 510-350-9701
kbm@classlawgroup.com

*Plaintiffs' Co-Lead Counsel*

/s/*M. Palmer Lambert*
M. Palmer Lambert (#33228)
GAINSBURGH BENJAMIN DAVID
MEUNIER & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: 504-522-2304
Fax: 504-528-9973
plambert@gainsben.com

*Plaintiffs' Co-Liaison Counsel*

/s/*Dawn M. Barrios*
Dawn M. Barrios (#2821)
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: 504-524-3300
Fax: 504-524-3313
barrios@bkc-law.com

*Plaintiffs' Co-Liaison Counsel*

## PLAINTIFFS' STEERING COMMITTEE

Anne Andrews
Andrews Thornton Higgins Razmara, LLP
2 Corporate Park, Suite 110
Irvine, CA 92606
Phone: (800) 664-1734
aa@andrewsthornton.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@atkinsandmarkoff.com

J. Kyle Bachus
Bachus & Schanker, LLC
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Phone: (303) 893-9800
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635

Karen Barth Menzies
Gibbs Law Group LLP
400 Continental Boulevard, 6th Floor
El Segundo, CA 90245
Phone: 510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

lcentola@mbfirm.com

| | |
|---|---|
| Christopher L. Coffin<br>Pendley, Baudin & Coffin, L.L.P.<br>1515 Poydras Street, Suite 1400<br>New Orleans, LA 70112<br>Phone: (504) 355-0086<br>Fax: (504) 523-0699<br>ccoffin@pbclawfirm.com | David F. Miceli<br>Simmons Hanly Conroy<br>One Court Street<br>Alton, IL 62002<br>Phone: (618) 259-2222<br>Fax: (618) 259-2251<br>dmiceli@simmonsfirm.com |
| Alexander G. Dwyer<br>Kirkendall Dwyer LLP<br>440 Louisiana, Suite 1901<br>Houston, TX 77002<br>Phone: (713) 522-3529<br>Fax: (713) 495-2331<br>adwyer@kirkendalldwyer.com | Rand P. Nolen<br>Fleming, Nolen & Jez, L.L.P.<br>2800 Post Oak Blvd., Suite 4000<br>Houston, TX 77056<br>Phone: (713) 621-7944<br>Fax: (713) 621-9638<br>rand_nolen@fleming-law.com |
| Emily C. Jeffcott<br>The Lambert Firm, PLC<br>701 Magazine Street<br>New Orleans, LA 70130<br>Phone: (504) 581-1750<br>Fax: (504) 529-2931<br>ejeffcott@thelambertfirm.com | Hunter J. Shkolnik<br>Napoli Shkolnik PLLC<br>360 Lexington Avenue, 11th Floor<br>New York, NY 10017<br>Phone: (212) 397-1000<br>hunter@napolilaw.com |
| Andrew Lemmon<br>Lemmon Law Firm, LLC<br>P.O. Box 904<br>15058 River Road<br>Hahnville, LA 70057<br>Phone: (985) 783-6789<br>Fax: (985) 783-1333<br>andrew@lemmonlawfirm.com | Genevieve Zimmerman<br>Meshbesher & Spence Ltd.<br>1616 Park Avenue South<br>Minneapolis, MN 55404<br>Phone: (612) 339-9121<br>Fax: (612) 339-9188<br>gzimmerman@meshbesher.com |

**CERTIFICATE OF SERVICE**

I hereby certify that on October 17, 2017, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

*/s/ Dawn M. Barrios*
Dawn M. Barrios
