UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: TAXOTERE (DOCETAXEL)     )   MDL No. 2740
PRODUCTS LIABILITY LITIGATION   )
                                )   SECTION: "N" (5)
                                )
THIS DOCUMENT RELATES TO:       )
ALL ACTIONS                     )

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR ENTRY OF A PROTOCOL REGARDING *EX PARTE* CONTACT WITH PHYSICIANS**

**INTRODUCTION**

Plaintiffs' Opposition selectively cobbles together case law to advocate for a wholly one-sided approach to *ex parte* communications with treating physicians in MDL 2740. This approach would function to strip Defendants of their ability to retain local medical experts, while giving Plaintiffs unfettered access to these physicians and silent permission to use litigation-based documents unrelated to their care and treatment of Plaintiffs to influence testimony.

First, Plaintiffs seek to prevent Defendants from contacting physicians for the legitimate purpose of retaining experts. Plaintiffs contend that there are ample oncologists outside of their treating physicians whom Defendants may retain in connection with this litigation. Plaintiffs state that 127 oncologists are registered with the Louisiana state board of medical examiners—but this figure includes all oncologists regardless of whether they treat breast cancer or are familiar with Taxotere.[1] Of these 127 oncologists, Plaintiffs identify almost half as treaters in the litigation, leaving less than 70 oncologists (regardless of specialty) in the state. Notably, however, there are more than 1,000 cases in the MDL for which prescribing doctor information

---

[1] In their Opposition, Plaintiffs state many statistics without full citation or substantiation. Defendants do not concede these statistics as accurate, but discuss them herein as if accurate for the sake of argument because the scarcity of qualified experts—and Defendants' need to retain some treaters as experts—is apparent regardless.

1

has not been provided—meaning that the number of prescribing oncologists will only grow. The limited pool of relevant Louisiana oncologists pointed out by Plaintiffs demonstrates exactly why Defendants seek the instant Order. And, even absent a similar showing of need, numerous MDL Courts have authorized defendants to contact plaintiffs' treating physicians for the purpose of finding and retaining experts. Indeed, Defendants' request for such contacts is made with nearly identical terms as those agreed to by the parties and approved by Judge Fallon in the *Xarelto* case, under effectively identical circumstances. *See* Memo at 6 n.3; Memo Ex. A, D (Rec. Docs. 917-2, 917-5).

Plaintiffs also advocate for unfettered access by Plaintiffs' counsel to these same physicians, including the ability to provide treaters with litigation documents untied to their care and treatment of Plaintiffs. Plaintiffs' position, however, extends far beyond the scope of the protected physician-patient relationship and is not supported by any legitimate policy or purpose.

To ensure that all contact with such physicians adequately protects the parties' interests and the integrity of the treating physician as a fact witness in each case, the Court should reject Plaintiffs' uncompromising stance and enter Defendants' Proposed Order governing both parties' ex parte contact with Plaintiffs' treating physicians.

## ARGUMENT

**I. There is a Legal and Reasonable Basis for Placing Certain Limitations on Plaintiffs'** ***Ex Parte*** **Communications with Treating Physicians.**

In their Opposition, Plaintiffs' argue that "no legal basis or reason" exists for restricting Plaintiffs' communications with their own treating physicians. *See* Opp. at 2-7. Plaintiffs overstate their position and misrepresent the landscape of legal authority on this issue. As noted in Defendants' Memorandum in Support—and ignored in Plaintiffs' Opposition—other MDL courts have imposed similar limitations to those proposed by Defendants here. *See, e.g., In re*

2

*Chantix (Varenicline) Prod. Liab. Litig.*, No. 2:09-CV-2039, 2011 WL 9995561, at *4 (N.D. Ala. June 30, 2011) (limiting Plaintiffs' *ex parte* communications to "the individual **care** of the individual plaintiffs, such as the plaintiffs' **treatment, medical records** and **conversations with their health care providers**," and prohibiting discussion of "defendant's internal documents with plaintiffs' health care providers outside of a deposition or other on the record setting") (emphasis in original); *In re Ortho Evra Prod. Liab. Litig.*, No. 1:06-40000, 2010 WL 320064, at *2 (N.D. Ohio Jan. 20, 2010) (limiting Plaintiffs' *ex parte* contacts to discussion of "physicians' records, course of treatment and related matters," and prohibiting discussion of "Defendant research documents or related materials" during *ex parte* contact); *see also In re Nuvaring Prod. Liab. Litig.*, No. 4:08MD1964, 2009 WL 775442, at *2 (E.D. Mo. Mar. 20, 2009) (limiting Plaintiff *ex parte* physician interviews "to the particular plaintiff's medical condition at issue in the current litigation.").[2]

As noted in the Zometa/Aredia litigation, such restrictions help eliminate "the potential for either counsel to influence Plaintiffs' treating physicians." *Gaus*, 2009 N.J. Super. Unpub. LEXIS 3282, *40. Likewise, restricting Plaintiffs from disclosing discovery documents and novel medical literature to treating physicians prior to deposition prevents those physicians from being used as "undesignated experts," who present opinions formed in the course of litigation under the guise of fact testimony or without meeting designated expert requirements. *See Actos*

---

[2] State courts facing the same issue in the mass tort context have likewise approved such restrictions. *See, e.g.*, *Actos Prod. Liab. Cases*, No. BC411687, 2015 WL 1387938, at *8 (Cal. Super. Ct. Mar. 20, 2015) (limiting Plaintiffs' *ex parte* contacts "to a discussion of the physicians' records, course of treatment and related issues such as diagnosis and prognosis" and prohibiting discussion or disclosure of "liability issues or theories, product warnings, Defendants' research documents, medical literature, or related materials"); *Gaus v. Novartis Pharms. Corp.*, 2009 N.J. Super. Unpub. LEXIS 3282, *40 ("To ensure that all parties have the same right of access to all non-party fact witnesses, this court shall prohibit the parties from engaging in *ex parte* contacts with Plaintiffs' treating physicians."); *see also* Memo at 3-4 and Exhibit B (additional authority).

3

*Product Liability Cases*, 2015 WL 1387938 (Cal.Super.), at *6; Fed. R. Civ. P. 26(a)(2). For these same reasons, this Court should adopt Defendants' proposed restrictions.

Defendants' proposal seeks entry of an enforceable protocol to govern the scope and type of materials that can fairly be shown to treating physicians in an *ex parte* setting. Under this protocol, Plaintiffs and their attorneys would still be permitted to discuss all subjects central to the physician-patient relationship, including treatment and causation. *See* Memo at 2; Exhibit A at ¶ 1. However, Defendants' proposal restricts the use of discovery documents with treating physicians on an *ex parte* basis that such physicians do not rely on in providing care and treatment to their patients, and indeed have never even seen before.[3] Defendants' proposed restrictions pertain to an easily identifiable, tangible, and objective set of materials, which do not require subjective interpretation or inquiry.

This approach also resolves concerns cited by Plaintiffs and raised in the *Xarelto* MDL regarding the administration and enforcement of such a protocol. *See* Opp. at 4-5 (citing *In re Xarelto Prod. Liab. Litig.*, 2016 WL 915288, at *4 (E.D. La. Mar. 9, 2016) and *In re: Benicar (Olmesartan) Prod. Liab. Litig.*, 2016 WL 1370998, at *5 (D.N.J. Apr. 6, 2016) for the proposition that substantive restrictions on parties' contacts with treating physicians are "wholly unworkable"). The bright-line ban on disclosing certain specific documents or literature proposed by Defendants would not require parsing communication from "coaching" or eliminating "delicate insinuations" from counsels' statements. *Cf.* Opp. at 4-5. The proposed restriction is binary and objective: either such materials were disclosed to the treaters, or they were not. The rule would not give rise to interpretive posturing.

---

[3] Of course, nothing about Defendants' proposal limits Plaintiffs' use of such materials during a physician deposition or other setting where defense counsel is present. *See* Memo, Exhibit A ¶ 1.

Notably, Plaintiffs' Opposition provides no legitimate reason as to why the disclosure of discovery materials to treating physicians should be permitted, particularly in circumstances where the physician does not rely on such information in providing care and treatment to patients and/or has never seen the material before. *See generally* Opp. In this context, the use of such materials with treating physicians logically serves to influence the physician's testimony and/or their views on future use of the medication with other patients in need of life-saving treatment. Both purposes seek to inject unnecessary, unfair, and unbalanced bias against Defendants and neither warrants this Court's protection. Defendants' proposal seeks to preserve the integrity of the treating physician's knowledge as a fact witness in the case. Given that no legitimate reason exists to permit such *ex parte* disclosures, this Court should enter an order prohibiting the use of such materials for strategic litigation purposes. An order from this Court establishing the bounds of appropriate disclosures will (1) help curtail any abuses before they occur, and (2) set a standard by which enforcement through cross examination can be measured.

The importance of judicial guidance in this area was highlighted in *Gadolinium* litigation in the Northern District of Ohio. Considering the issue, Judge Polster remarked:

> I'm not prepared to enter an order without extensive briefing and considering what to do, but that being said, I don't think it's appropriate for any counsel, either the plaintiffs' side or the defense side, to attempt to influence or shade any doctor's deposition testimony.
>
> Anyone can talk to a treating doctor. That doctor is a fact witness. But it's not appropriate to try and suggest to a doctor what his or her testimony should be about the issues in this case, whether it's diagnosis, treatment, what the doctor would have done had there been a different warning, things like that. That's up to the doctor to give that testimony.
>
> Further, should things like this occur and it be disclosed to the jury, because, of course, either counsel can discover any communications written or oral made by any other counsel to a fact witness, that would erode the credibility of the doctor.

5

> So I think all counsel know what their responsibilities are and what is appropriate and inappropriate communication with witnesses. But if the problem persists, I guess I will have to rule in a formal way.

*See In Re: Gadolinium-Based Contrast Agents Products Liability Litigation*, Case No. 1:08-Gd-50000), Transcript of Pretrial Proceedings at 8:17—9:11 (N.D. Oh. March 18, 2010). The same rationale applies here.

Disclosure and cross-examination *alone* are not sufficient to prevent unfair and improper influences stemming from *ex parte* communications. While ascertaining that a treating physician has been improperly influenced or biased can occur through deposition, it is unlikely to fully restore the witnesses' knowledge and/or state of mind before such influence was introduced, thereby eliminating "pristine" evidence from the case. Treating physicians play a unique role in these types of cases, which makes their testimony exceptionally valuable to the parties and the jury. Any conduct that threatens the credibility of that testimony harms the parties and the judicial process itself. As such, simply discrediting a witness through cross examination does not provide an adequate remedy when the witnesses' "pristine" testimony is otherwise lost.

## II. Defendants Have A Legitimate and Substantial Need To Contact Treating Physicians to Serve as Medical Expert Witnesses.

Plaintiffs contend that Defendants "fail to justify their need to access the small pool of plaintiffs' prescribers and treater[s] given the abundance of other physicians available to them." Opp. at 8. In doing so, they state that 127 oncologists are listed on the website for the Louisiana State Medical Board and that 58 of those are "off-limits" to Defendants for purposes of retaining expert witnesses in this litigation.[4] *Id.* at 10. According to Plaintiffs, there are 69 remaining

---

[4] Plaintiffs provide no proof that their identification of a "unique 58 prescribers" of MDL 2740 Plaintiffs is accurate. First, it is unclear whether this number includes surgical, radiological and other treating oncologists, or just prescribers. But even if the figure is correct, which Defendants do not concede, the fact that some 350 Louisiana Plaintiffs were treated by only

6

oncologists eligible for consideration—plenty to obviate any need for Defendants to seek Plaintiffs' treating physicians as experts. *Id.* Plaintiffs' math is misleading and misunderstands important parameters around which the pool of true potential experts exists. Plaintiffs offer no information about how many of these remaining 69 oncologists in Louisiana treat breast cancer and which of those use Defendants' products. *See generally* Opp. Moreover, Plaintiffs disregard the fact that multiple defendants are involved in the litigation, all of whom must retain qualified medical experts who use their products, further cutting down the pool of potential candidates. When a proper analysis of the factors involved in identifying and retaining qualified medical experts is considered, Defendants' real concerns respecting "equitable and appropriate access to potential expert witnesses" become apparent. *See* Opp. at 8-9; Memo at 6; *Xarelto*, 2016 WL 915288, at *9.

Two additional factors serve to limit the pool of potential experts for Defendants. First, Plaintiffs' contention that only 58 treating physicians are "off limits" is based only on Plaintiff Fact Sheets ("PFS") that have been submitted as of a particular date. It does not account for the more than 1,000 other PFSs in this MDL that have yet to come due or be submitted. Second, as the Court is aware, new case filings continue to increase. Over the past three months, more than 1,500 new case filings were made in MDL 2740. Both of these factors function only to further limit the pool of viable expert witness candidates for Defendants.

As Plaintiffs admit, numerous MDL courts have recently authorized Defendants to contact Plaintiffs' treating physicians for the limited purpose of finding and retaining experts. *See, e.g.*, *Benicar*, 2016 WL 1370998, at *6 ("In the most recent MDL cases discussing this issue, there is a consensus permitting [*ex parte* contacts by defendants for purposes of expert

---

58 physicians would suggest that the pool of properly qualified, practicing local breast cancer oncologists is extremely limited.

7

retention]."); *Xarelto*, 2016 WL 915288, at *8; *In re Testosterone Replacement Therapy Prod. Liab. Litig.*, 167 F. Supp. 3d 936, 940 (N.D. Ill. 2016); *In re Zimmer NexGen Knee Implant Prod. Liab. Litig.*, 890 F. Supp. 2d 896, 906 (N.D. Ill. 2012); *In re Seroquel Prod. Liab. Litig.*, No. 606MD-1769-ORL-22DAB, 2008 WL 821889, at *4 (M.D. Fla. Mar. 21, 2008).

Plaintiffs do not and cannot dispute that Defendants' proposal regarding *ex parte* contact by Defendants with treating physicians falls in line with (and in some cases, is more stringent than) the protocols adopted by other MDL Courts for the same purposes. *See* Memo at 4, 6 n.3 (collecting cases); *see also Testosterone*, 167 F. Supp. 3d at 940 (approving contact for expert retention "provided that defendants do not discuss with the physician any matters related to any [individual] plaintiff," and that "[d]efendants will not use a treating physician as a consulting or testifying expert in a particular case in which a current or former patient of the physician is a plaintiff.").[5]

Instead, Plaintiffs attempt to distinguish such cases by arguing that other MDLs have been larger or at a more advanced stage when such contact was approved. *See* Opp. at 9. Such efforts are unavailing. With more than 2,500 pending cases in MDL 2740, this litigation is presently more than twice the size of the *Benicar* litigation at the time such contact was approved. *Benicar*, 2016 WL 1370998, at *1 ("This is a 1200 plus case Multidistrict Litigation"). Other recent cases approving *ex parte* contacts in this context have done so without specific reference to the size of the MDL, the number of physicians involved, or the overall pool

---

[5] In this regard, Plaintiffs' arguments that Defendants' proposed limitations on communications for expert purposes is particularly misplaced. Not only is Defendants' Proposed Order squarely in line with precedent, but Plaintiffs' policy arguments are oddly duplicitous. For example, Plaintiffs argue that proposed limitations on Defendants' *ex parte* contacts cannot be enforced, and are therefore insufficient. *See* Opp. 13. At the same time, Plaintiffs argue that proposed limitations on their own contacts with physicians are unenforceable, and therefore no such restrictions should be imposed. *See* Opp. 4-6.

8

of potential experts. *See, e.g.*, *Testosterone*, 167 F. Supp. 3d at 940 (noting that "nothing in this order precludes defendants from retaining as an expert a physician who may have treated a plaintiff who has filed a lawsuit against any of the defendants" without requiring any showing of need). Plaintiffs' arguments are unavailing and do not address the circumstances and realities at play in MDL 2740.

## CONCLUSION

For the foregoing reasons, and those presented in Defendants' original motion and memorandum (Rec. Doc. 917), Defendants respectfully request this Court to grant their motion and enter Defendants' Proposed Pretrial Order to govern interactions with MDL Plaintiff's prescribing or treating physician(s).

Respectfully submitted,

/s/ *Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE URQUHART & MOORE LLC**
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: 504-310-2100
Facsimile: 504-310-2120
dmoore@irwinllc.com

Harley V. Ratliff
Adrienne L. Byard
**SHOOK, HARDY& BACON L.L.P.**
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
Facsimile: 816-421-5547
hratliff@shb.com
abyard@shb.com

*Counsel for sanofi-aventis U.S. LLC and Sanofi U.S. Services Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 20, 2017, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ *Douglas J. Moore*