1               UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF LOUISIANA
2
    *****************************************************
3   IN RE:  TAXOTERE (DOCETAXEL)
    PRODUCTS LIABILITY LITIGATION
4                                    MDL No. 16-2740
    VS.                              Section "N"
5                                    New Orleans, Louisiana
                                     February 22, 2018
6   THIS DOCUMENT RELATES TO
    ALL CASES
7
    *****************************************************
8
                TRANSCRIPT OF STATUS CONFERENCE
9     HEARD BEFORE THE HONORABLE JUDGE MICHAEL B. NORTH
                 UNITED STATES MAGISTRATE JUDGE
10

11  FOR THE PLAINTIFFS:          MS. DAWN M. BARRIOS
                                 MR. ZACHARY WOOL
12                               Barrios Kingsdorf & Casteix
                                 701 Poydras Street
13                               Suite 3650
                                 New Orleans, Louisiana  70139
14
                                 MR. M. PALMER LAMBERT
15                               Gainsburgh Benjamin David
                                   Meunier & Warshauer
16                               1100 Poydras Street
                                 Suite 2800
17                               New Orleans, Louisiana  70163

18                               MR. CHRISTOPHER L. COFFIN
                                 Pendley, Baudin & Coffin
19                               1515 Poydras Street
                                 Suite 1400
20                               New Orleans, Louisiana  70112

21                               MS. KAREN B. MENZIES
                                 Gibbs Law Group
22                               400 Continental Boulevard
                                 6th Floor
23                               El Segundo, California  90245

24

25

```
 1                              MS. EMILY JEFFCOTT
                               Lambert Firm
 2                             701 Magazine Street
                               New Orleans, LA  70130
 3
                               MR. J. KYLE BACHUS
 4                             MR. DARIN SCHANKER
                               Bachus & Schanker
 5                             1899 Wynkoop Street
                               Suite 700
 6                             Denver, Colorado  80202

 7                             MR. DANIEL P. MARKOFF
                               Atkins & Markoff Law Firm
 8                             9211 Lake Hefner Parkway
                               Suite 104
 9                             Oklahoma City, Oklahoma  73120

10                             MR. DAVID F. MICELI
                               Simmons Hanly Conroy
11                             One Court Street
                               Alton, Illinois  62002
12
                               MR. ANDREW LEMMON
13                             Lemmon Law Firm
                               650 Poydras Street
14                             Suite 2335
                               New Orleans, LA 70130
15
                               MR. ALEXANDER G. DWYER
16                             (Via telephone)
                               Kirkendall Dwyer
17                             440 Louisiana
                               Suite 1901
18                             Houston, Texas 77002

19
     FOR SANOFI S.A.:          MR. DOUGLAS J. MOORE
20                             Irwin, Fritchie,
                                  Urquhart & Moore
21                             400 Poydras Street
                               Suite 2700
22                             New Orleans, LA  70130

23                             MR. HARLEY V. RATLIFF
                               (Via telephone)
24                             Shook, Hardy & Bacon
                               2555 Grand Boulevard
25                             Kansas City, Missouri  64108
```

```
 1                              MR. PATRICK OOT
                                Shook, Hardy & Bacon
 2                              1155 F Street NW
                                Suite 200
 3                              Washington, DC 20004

 4
      FOR PFIZER, INC., AND     MS. MARA CUSKER GONZALEZ
 5    HOSPIRA WORLDWIDE, LLC:    Quinn Emanuel Urquhart &
                                    Sullivan
 6                              51 Madison Avenue.
                                22nd Floor
 7                              New York, New York 10010

 8
      FOR HOSPIRA                MR. JOHN F. OLINDE
 9    WORLDWIDE, LLC:            Chaffe McCall
                                2300 Energy Centre
10                              1100 Poydras Street
                                New Orleans, LA  70163
11

12    FOR SANDOZ, A NOVARTIS     MS. BETH TOBERMAN
      DIVISION:                 MR. EVAN C. HOLDEN
13                              Greenburg Traurig
                                Terminus 200
14                              3333 Piedmont Road, NE
                                Atlanta, GA  30305
15
      FOR ACTAVIS PHARMA, INC.:  MR. MICHAEL J. SUFFERN
16                              (Via Telephone)
                                Ulmer & Berne, LLP
17                              600 Vine Street
                                Suite 2800
18                              Cincinnati, OH 45202

19    FOR McKESSON CORPORATION:  MR. SAMUEL CORTINA
                                (Via telephone)
20                              Morrison Foerster
                                12531 High Bluff Drive
21                              Suite 100
                                San Diego, CA 92130-2040
22
      FOR ACCORD HEALTHCARE,     MR. BRANDON COX
23    INC.:                     (Via telephone)
                                Tucker Ellis
24                              950 Main Avenue
                                Suite 1100
25                              Cleveland, OH 44113
```

```
1   FOR SUN PHARMACEUTICAL          MS. KATHLEEN KELLY
    INDUSTRIES, INC.:               (Via telephone)
2                                   Hinshaw & Culbertson
                                    28 State Street
3                                   24th Floor
                                    Boston, Massachusetts  02109
4

5   Official Court Reporter:        Lanie M. Smith, RPR, CRR
                                    500 Poydras Street, B-275
6                                   New Orleans, Louisiana 70130
                                    (504) 589-7782
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
            Proceedings recorded by mechanical stenography,
25   transcript produced via computer.
```

1            **P R O C E E D I N G S**

2                (Call to order of the court.)

3        THE COURT:  I know we've got some folks on the phone.

4    You-all can have a seat.

5            All right, you-all.  I have reviewed pretty

6    closely the letters that you-all submitted to me along with the

7    hundreds of pages of exhibits that came along with those

8    letters.  I actually did look at everything.

9            I've got another matter in about 45 minutes, so I

10   need to kind of expedite this conference; and I'm going to tell

11   you-all where I come down on these various issues.

12           As to the request for extra deposition time for

13   Dr. Hangai -- I imagine that's how it's pronounced -- I don't

14   believe at this point that good cause has been demonstrated to

15   extend that deposition.  It appears to me that the issue is not

16   one of language or a language barrier.  But more of the

17   deponent's accent.

18           There are obviously a number of passages where

19   words are, perhaps phrases, were unintelligible to the court

20   reporter and I understand that.  I don't think that that's a

21   reason to extend the deposition, much less by five hours.

22   There are highlighted passages where there are words that are

23   unintelligible.  I think that the plaintiffs are entitled to

24   know what it is that the deponent intended to say in those

25   passages.  And I think the best way to get that information in

1   the instances where the plaintiffs feel like they need to know

2   that information because not every -- I don't know that every

3   one of those passages was relevant to what you were looking

4   for; but where you need that information, I'm going to allow

5   the plaintiffs to propound through Sanofi's counsel to the

6   doctor a deposition upon written questions that is specifically

7   targeted to have the deponent fill in the blanks where the

8   court reporter cannot understand the word or words that were

9   spoken.  I think that's the most efficient way to handle that

10  issue.

11          And, again, I'm not sure that you-all are going

12  to feel the need to do that with every one of those instances;

13  but you will be entitled to do that, okay?  I don't want to

14  have a situation where we've got a deposition and we're going

15  to trial and we've got passages that are unintelligible.  So

16  I'm going to let the plaintiffs correct that problem through

17  written questions.  All right.

18          MR. COFFIN:  Your Honor, can we be heard on the issue?

19          THE COURT:  Yes, quickly.  As I said, I spent a lot of

20  time going through a lot of pages.  The idea is to streamline

21  this and it's great when I get a five-page letter; but then

22  I've got a thousand pages of exhibits that I've got to go

23  through with two five-page letters.  So it's a little bit

24  counterproductive.

25          MR. COFFIN:  Understood.  And so you know, Your Honor,

1    that's one of the last things that we want to bring up is the

2    housekeeping of how we submit things to you because we realize

3    that it's getting a little out of hand; so I'll save that for

4    later.

5              On this issue, just so the Court understands, it

6    wasn't just the difficulty in understanding the witness,

7    although that's major and we're happy to show you the video if

8    it comes to that at some point.  It's also the fact that we

9    continue to get late productions, and we're starting to become

10   very skeptical about the defense's good faith in producing as

11   many documents as they can prior to the deposition.  And I

12   don't say that easily because I understand it's a huge burden,

13   but there were 69 documents -- we didn't tell you about this in

14   writing because we decided we didn't want to be providing you

15   with more written stuff -- but 69 documents removed from their

16   privilege log specifically related to Dr. Hangai two weeks

17   after --

18        THE COURT:  As part of the established process for

19   de-designation of previously designated privileged documents.

20        MR. COFFIN:  The problem we have is that this

21   deposition was scheduled for a month, two months and there

22   wasn't any prioritization to ensure that those documents were

23   looked at before the deposition, so we didn't get --

24        THE COURT:  Well, that's your argument.  I understand

25   that that's your position and that's your argument, but I get a

1   completely different version of the facts from the defendant on

2   that issue.

3        MR. COFFIN:  I don't doubt that at all; but what are we

4   to do when we receive documents two weeks after -- 69 is one

5   thing, but those are de-designated from the privilege log --

6   thousand of others with her name on it.  There's a technical

7   argument that the defense is technically right -- "Well, we

8   produced what we were supposed to in the custodial file."

9             But that prejudices us, Your Honor, when they

10  say, "Well" --

11       THE COURT:  If you can point to a specific shortcoming

12  in the document production where you have been specifically

13  prejudiced and you bring it to my attention, then we'll have

14  that discussion.

15       MR. COFFIN:  Fair enough.  We did not do that.

16       THE COURT:  General reference to late document

17  productions that are -- I don't know.  They may be technically

18  late with regard to the deadline that was originally set that

19  we've discussed back and forth, but they were produced before

20  the deposition -- references to general issues like that are

21  not going to cause me to upset all of the parameters that are

22  in the CMO at this point.  If you've got a specific situation

23  where you can point to prejudice or potential prejudice, then

24  bring it to my attention and we'll talk specifics.

25       MR. COFFIN:  That makes good sense.  Thank you,

1    Your Honor.

2          THE COURT:  All right.  The second issue on the agenda

3    is the PSC's Requests for Production Nos. 7 and 8, 64 and 74

4    and 75.  I don't think -- I just got this this morning.  I

5    don't think that is a proper agenda item for today.  Both sides

6    told me in their letters that this was either a nonissue for

7    today, or the plaintiffs told me it was not currently in need

8    of Court intervention.

9          So given the amount of time I spent going through

10   everything else that is in need of Court intervention, I'm not

11   really prepared to discuss those matters right now.

12         MR. COFFIN:  Your Honor, Chris Coffin again on behalf

13   of plaintiffs.  This one is relatively easy.

14         Our point in putting it in the agenda, quite

15   frankly, was just to have Your Honor know about the issue

16   because we met and conferred back in September.

17         And so that you know the background of it, TAX316

18   and TAX301 are the only two studies in which the follow-up data

19   looked at permanent alopecia.  Pivotal -- pivotal studies in

20   the defendants' word.  Those are two of 28 studies that we

21   haven't received any data on until last night.

22         The reason we wanted to bring this up is because

23   we are going to look at it and we're going to have our experts

24   look at it carefully to see if we've got a complete production.

25   But at this point, knowing that they agreed to produce it back

1    in September -- they produced every other study except the two

2    pivotal studies -- we want to make sure we've got everything as

3    soon as possible, so we might be back in front of you --

4              THE COURT:  You're going to be back in front of me for

5    a lot of things.

6              MR. COFFIN:  Well, we will.

7              THE COURT:  I have every expectation of that.

8              MR. COFFIN:  Okay.

9              THE COURT:  All right.

10             MR. COFFIN:  I just wanted you to be aware, but that

11   was a quick one.

12             MR. OOT:  Judge, if it's all right, Patrick Oot for

13   Sanofi.  Just to clarify that issue, in October, Mr. Miceli

14   asked us for XGT files.  We have a CMO that deals with files

15   that are processed differently in the litigation support

16   technologies.  In other words, we went back and we produced

17   those.

18             These SAS files are statistical files.  They

19   don't open with ordinary applications.  So we went back after

20   Mr. Miceli's January 31st letter and went back to the original

21   production, reprocessed the data and produced them to them

22   yesterday.

23             Now, what's important to reference, in their own

24   letter they stated that we've already given them the study.

25   This is the statistical data for the experts.  So they haven't

1    been prejudiced up until now.  So they have the data.  If they

2    want more data, they can come back and say that these files are

3    missing or these file formats are missing.  I've been willing

4    to and even in Exhibit D, I said to them, we're happy to meet

5    and confer.  This process isn't working.  Sometimes difficult

6    files come up.

7        THE COURT:  All right.  Y'all have both been heard on

8    this nonissue.  So if it comes up, I get what the issue is.

9    You included it, for whatever reason, in your letters as a

10   nonissue.  But you've at least brought it to my attention.  I

11   appreciate that, but we're going to move on.

12       All right.  The designation of sales managers in

13   the Defendant Fact Sheets.  I find myself in agreement with

14   Mr. Oot that Sanofi is adhering to the requirements in the

15   Defendant Fact Sheets as they're currently comprised.  I think

16   that to the extent that the plaintiffs or PSC somehow wish to

17   amend that document or the format or what is being provided or

18   how it's being provided, I think that's a matter that you need

19   to raise with the district judge because, frankly, I didn't

20   have anything to do with the negotiation or the convection of

21   those fact sheets.  I guess I'll say if you strongly believe

22   that that's something that needs to be addressed, then I think

23   you need to raise that with the district judge.

24       As for the concerns that the PSC stated with the

25   Zimmerman and Steuart depositions, I think the manner in which

1    that issue was handled, at least as it's been described to me

2    by Sanofi's counsel, after the Zimmerman deposition and with

3    regard to the Steuart deposition, where, as I understand it,

4    the plaintiffs were given the opportunity to informally

5    interview the upcoming deponent to determine whether that

6    person had enough relevant information to justify their

7    deposition, I think that was a reasonable approach, at least as

8    to those depositions.  And I would expect and encourage that

9    you-all would continue to employ that approach if you have any

10   additional concerns about these sales managers.

11            I don't have the Zimmerman deposition.  I don't

12   know what, if anything, you got from it.  You know, this isn't

13   the first federal case where you've deposed somebody and you've

14   gotten less information from that deponent than you expected.

15   This is also not the only federal case that's got deposition

16   limits.  So y'all are dealing with all those things in this

17   case, but it doesn't surprise me that occasionally you're going

18   to depose someone who has less than the information than you

19   thought they would.

20            The issue is going forward, how do you prevent

21   that?  And I think that the manner in which y'all addressed the

22   upcoming Steuart deposition was the appropriate way to handle

23   that.

24            MR. LEMMON:  Your Honor, Andrew Lemmon on behalf of the

25   PSC.  It is an ongoing problem and it is a problem that we are

1    concerned about for all of future depositions.  After

2    Mr. Steuart's deposition, which was last Friday, that we

3    canceled after we had already traveled -- somebody had already

4    traveled there for the deposition, you know, we did cancel it

5    before it went forward.

6              Yesterday there was another deposition of another

7    person who had very little to do with -- from my

8    understanding -- I was not at that deposition -- but one of the

9    witnesses, I think it was Ms. Knight, was identified in the DFS

10   as a supervisor and had very, very little knowledge of

11   Taxotere.  The problem that we have is that we're not able to

12   interview all of these people in advance of the deposition.

13        THE COURT:  Well, if you feel like there's a precedent

14   being established, then you need to talk to Mr. Oot and

15   Mr. Ratliff, anyone else, and establish that protocol so that

16   you aren't wasting time.

17        MR. LEMMON:  Well, we did, Your Honor; and they said,

18   "You know what?  We complied with the DFS.  If you don't like

19   it, you go talk to the Judge."

20        THE COURT:  All right.  Now you're talking to me and I

21   just said that I think that the manner in which the Steuart

22   deposition was handled is appropriate.  And to the extent that

23   you-all, plaintiffs, have a concern about a particular deponent

24   and not wanting to, quote/unquote, waste your time with that

25   deponent, you need to raise it with defense counsel and defense

1    counsel needs -- I think you should take the same steps that

2    you took with Steuart and give the plaintiffs -- some of the

3    plaintiffs' counsel an opportunity to interview that person

4    informally to decide whether they want to take the deposition.

5    Your concern should be that you're missing someone who has got

6    relevant information.

7              MR. LEMMON:  It is.  It's exactly that.  We're trying

8    to identify --

9              THE COURT:  You're not there that.  You're not to a

10   point where you can tell me, "They're designating shu-shu

11   witnesses and somebody important is back here and I'm going to

12   miss out on them because I'm going to hit my deposition limit."

13             MR. LEMMON:  I think we are at that point.

14             THE COURT:  Well, you've got to explain to me in detail

15   why that is.  I am not going to let that happen.

16             MR. LEMMON:  I'll be happy to -- You know, I can give

17   you great detail about it.  I know that these conferences are

18   generally more abbreviated than that, but I will file -- before

19   the next hearing, I will definitely file something that

20   explains exactly what happened.

21             THE COURT:  Here's my view of this.

22             MR. LEMMON:  If they're willing -- I don't mean to

23   interrupt.  If they're willing to talk to us in advance of all

24   these depositions -- and there's really not that many -- and if

25   they're willing to talk to us like they did with Mr. Steuart

1    and we take the ones we take need to take and we don't take the

2    ones we don't need to take, that solves the problem.

3         THE COURT:  I'm going to direct you-all to employ that

4    process, but I'm also going to caution you that it doesn't

5    necessarily have to apply to every witness.  You-all ought to

6    be able to tell based on the fact sheets when you've got a live

7    witness.  If you've got a question about a handful of them,

8    then talk to defense counsel.

9         MR. LEMMON:  We know it for the sales reps because the

10   DFS is precise on the sales reps.  It's the managers and the

11   district managers that we just don't have any idea because

12   sometimes they identify the current manager, sometimes they

13   identify somebody else.  And there's no way to tell from that

14   whether they have anything to do with Taxotere from our

15   standpoint.

16        THE COURT:  Both sides now know what the issue is.

17        MR. LEMMON:  Yes, Your Honor.

18        THE COURT:  Okay.  And I think that I've given you the

19   guidance that you need to handle it.  I'm not going to let you

20   miss out on an important witness because you've reached the

21   deposition limit.  That's not going to happen.

22        MR. LEMMON:  Thank you.

23        THE COURT:  But as I said, sometimes some witnesses

24   know more than others.  Just because you get seven hours on the

25   record doesn't mean you need to use it.  For some reason, one

1    of the depositions you told me was a waste of time is a

2    500-page deposition transcript.  I don't know how that

3    happened, but it was provided to me.  It was quoted in a letter

4    as support on another issue, so obviously you-all have

5    different opinions as to what constitutes a waste of time.

6         MR. LEMMON:  Just to be fair, that was not one of the

7    ones that we were specifically complaining about and that guy

8    had to do with some other things.

9         THE COURT:  I'm going to move on to the next point.

10        MR. LEMMON:  I get your point, and we appreciate it.

11        THE COURT:  There was a specific complaint about that

12   deposition in a footnote in a letter that was provided to me,

13   and it specifically said that that deposition was a waste of

14   time.  And if it continued, then the PSC was going to ask me to

15   replace those deponents or to grant new depositions.  That's

16   what I read, and I read the deposition excerpts that were

17   provided to me.

18        MR. LEMMON:  I understand.

19        THE COURT:  And I saw that the last page that I saw was

20   Page 496.  All right.

21             All right.  The foreign witness depositions.  I

22   don't think that it's appropriate for me to order these

23   deponents to be available for two days.  I think that it may be

24   prudent for you-all to make those arrangements.  And while I

25   don't believe that the language barrier or the issues in the

1    first doctor's deposition, Hangai --

2            MR. COFFIN:  Hangai.

3            THE COURT:  -- rise to the level that would lead me to

4    give you-all more time with that witness, I can envision that

5    some of these foreign witnesses, there could be a problem.  I

6    don't know what their command of the English language is.  They

7    are entitled and Sanofi is entitled to have them testify in

8    English under the CMO, but if I find after the deposition that

9    a language barrier caused a delay or that more time is

10   appropriate, then there's going to be a cost associated with

11   having to re-depose that person and in all likelihood, that

12   cost is going to fall to Sanofi because you're the ones -- your

13   witness is the one making the choice as to what language they

14   want to be deposed in.

15            I'm only saying that because I think it would be

16   prudent for both sides to prepare themselves for that

17   possibility and at least have the witness available.  I'm not

18   going to order it, but I think it makes sense to have the

19   witness available for additional time if you-all can agree on

20   it or if you can find me while you're in Europe and get me to

21   order it.

22            I also would urge you-all to exercise some

23   flexibility.  If you get to a point and you've got a witness

24   whose second language or first language is not English -- and

25   there have been some issues -- I think that good lawyers --

 1   good and professional lawyers can exercise some flexibility so

 2   that this doesn't become an issue.  If the deposition needs to

 3   go on another 45 minutes or an hour, whatever it may be.  While

 4   you are all there together in another country, it would behoove

 5   everyone to make that happen.

 6              All right.  So as to the foreign witnesses,

 7   that's the guidance I'll give you-all.  I'm not going to order

 8   them to be available for more than one day, but I think that I

 9   made clear what my thoughts on that issue are.

10        MR. RATLIFF:  Your Honor, this is a Harley Ratliff.

11   May I address the Court?

12        THE COURT:  Yes.

13        MR. RATLIFF:  Thank you, Your Honor.

14              With respect to the two foreign witnesses,

15   Vanina Groult and Pierre Mancini, I have presented -- I have

16   asked them point-blank whether they would prefer to be deposed

17   in English or if they would prefer to have an interpreter.  I

18   have left that entirely at the witnesses' discretion.

19              Both of them have told me that they conduct

20   business in English, they write in English, they speak fluently

21   in English and that would be their preference.  I spoke with

22   Vanina Groult as recently as this morning with respect to

23   Mr. Coffin's concern about the language barrier; and I can

24   assure the Court and Mr. Coffin and I can speak with the PSC

25   offline about this in terms of the scheduling that you had

1    discussed; but to me this witness speaks fluent English.  She

2    has a French accent, but she is easy to understand.  I don't

3    really envision this being a problem with either Ms. Groult or

4    Mr. Mancini; but certainly we understand your admonition that

5    the scheduling -- it is a bit more difficult just from a purely

6    logistical perspective of doing these depositions abroad and

7    the travel that's entailed and having to get these witnesses

8    out of France and to another country, where depositions are not

9    allowed in France.  So we appreciate your guidance on that and

10   I will follow up with Mr. Coffin and Ms. Menzies accordingly

11   after this conference.

12        THE COURT:  All right.  I appreciate that.  I can

13   imagine -- I'm only speaking to the potential of a language

14   problem.  I mean, we deal with people with accents all the time

15   who may be difficult for some of us to understand when they're

16   giving depositions.  Just you-all work together and just keep

17   in mind the costs associated and the time associated with

18   taking these depositions.

19        MR. RATLIFF:  We understand, Your Honor, because it's

20   an enormous cost for us as well, not just the plaintiffs.

21        THE COURT:  All right.  Discovery on discovery.  We've

22   discussed this to some extent before.  I'm just going to say

23   this:  I know you-all are still in the process of conferring as

24   to what that might look like and it's not really teed up today.

25   I think that it would likely be more appropriate to attempt

1  some written discovery before we jump into a 30(b)(6), but I'm

2  not coming down solidly on that because I haven't seen a notice

3  and I haven't seen any written discovery.  I want to give

4  you-all an opportunity to try to work through that.

5          I agree that it's generally inappropriate; but as

6  I said when we talked about this the first time, there

7  certainly may be issues here that plaintiffs are concerned

8  about and rise to the level that some limited discovery on

9  retention issues and those sorts of issues might be

10  appropriate.

11          I said that to you-all when we talked about this

12  the first time.  I continue to believe that.  I think that the

13  requests need to be narrowly tailored and I think that written

14  discovery is probably the best -- the most appropriate

15  procedural vehicle to use under the circumstances.  But I will

16  leave that to you-all to try to discuss and negotiate and agree

17  to.  If you can't, then we'll talk about that the next time

18  we're together.

19          All right.  The last issue I have is, I guess,

20  general conduct in depositions.  The first thing I will say is

21  the last time we talked on the phone, we addressed speaking

22  objections and such; and from what I've seen, you-all have

23  followed that guidance which was already in the CMO, but I

24  don't think that that's a problem anymore.

25          There were some specific comments in Sanofi's

1   letter -- excuse me -- addressed to some comments that

2   Mr. Miceli made in one of the depositions and while my

3   conscience is not shocked by those comments or colloquy, I'm

4   going to do like Barney Fife used to do and nip it in the bud.

5           I don't want any of this -- I don't want this

6   starting to roll downhill and gaining steam.  It may not be

7   entertaining, it may be boring; but I want y'all to stick to

8   the book when you're taking these depositions, all right?  It's

9   discovery and it's discovery on an accelerated pace and it

10  creates pressure for all the lawyers and I get that, but it is

11  discovery.  It's not sound-bite time.  It's time to get answers

12  to questions so you-all can come in here and tell me if you

13  need more depositions, if you've got the right deponents or

14  what have you.

15          So I understand the pressures that are on the

16  lawyers.  I can -- at some times it's almost palpable when I'm

17  reading the deposition transcripts and some of the colloquy,

18  and I get it.  But, you know, the CMO, I think, unnecessarily

19  provides for a level of professionalism and dare I say

20  collegiality in the conduct of this litigation and in

21  depositions.

22          And I'll just use this opportunity to remind

23  everybody to try to keep those things in the forefront of your

24  thinking even when things get stressful and difficult in the

25  depositions, okay?  Those are my expectations.  I think those

1   are the expectations of anyone.

2        MS. MENZIES:  May I address this briefly?

3        THE COURT:  Yes.

4        MS. MENZIES:  Karen Menzies for the plaintiffs.

5             With all due respect, Your Honor, Mr. Oot has

6   characterized on a written transcript what occurred at the

7   deposition.  He has not been at any depositions.  I was there

8   with Mr. Miceli and some of the comments that were made were in

9   jest and smiled at by the witness and by defense counsel.

10  Defense counsel didn't raise it.

11            So I just -- I guess this underlines my other

12  concern and that is that we received a seven-page letter from

13  Mr. Oot yesterday.  Our position papers are supposed to be put

14  in together and then if we need to respond, then we can

15  respond.  We can't respond to what Mr. Oot has put into his

16  letter and, frankly, there's a lot of mischaracterizations in

17  there that we don't agree with, as you might not be surprised

18  to hear.

19       THE COURT:  That doesn't surprise me.  I wouldn't

20  expect you to.  And I've got excerpts of excerpts and I think I

21  made it clear.  I don't think that I saw Mr. Miceli say or do

22  anything inappropriate.  I imagine that at least some of it was

23  said in jest.  If it were otherwise, I would expect someone to

24  pick up a phone and call me.

25       MS. MENZIES:  Exactly.

1    THE COURT:  I'm just saying this is as good a time as

2  any for me to remind you-all that I think all of us are aware

3  of -- particularly these last couple of months, that they have

4  been difficult for both sides -- for the lawyers on both sides.

5  There's a lot of work being done, sometimes at the same time by

6  various lawyers.  There's a lot of traveling.  You-all

7  obviously are not in agreement on many things, and I get all

8  that.  So I just want to remind you-all in case we start to

9  lose the plot a little bit, to keep things on an even keel.

10    MS. MENZIES:  I appreciate that.  Just so the Court

11  knows, so maybe we can end on a more positive note, we do

12  have -- everybody is working very hard, not just with Sanofi,

13  but counsel for the PSC is working with the defendants on the

14  505(b)(2) to move those forward as well.  We have multiple

15  deposition teams out still doing doctor depos in the trial pick

16  cases.  The second round of those is coming up.  We are doing

17  also corporate witnesses and sales reps.  So there is a lot of

18  work going on and we are trying to move it forward as quickly

19  as we can and we appreciate --

20    THE COURT:  I appreciate all of that and understand it

21  all.

22    MS. MENZIES:  Thank you.

23    THE COURT:  Anything else?

24    MR. COFFIN:  Your Honor, just one kind of housekeeping

25  kind of issue that my colleague, Ms. Menzies, touched on and

1   that is that with regard to our submissions, I think we have a

2   little bit of a disconnect as to what Your Honor intended in

3   Case Management Order No. 5.

4           Our understanding is that we're supposed to make

5   submissions on those issues that are up for discussion before

6   Your Honor; we're supposed to do that approximately three

7   business days before; and then if it's necessary, we're

8   entitled to a response.

9           As Ms. Menzies pointed out, it's very difficult

10  for us when we receive what is supposed to be an initial

11  submission from the defense and it's seven pages long with

12  30-some footnotes the day before we're coming in here.  And

13  then we come in here and Your Honor has read all that and

14  you've spent a lot of time and you have your mind basically

15  made up on some of these things that we have decided not to

16  respond to because it's the day before.  We don't want to

17  provide you with more --

18          THE COURT:  I get it.  I get it.

19          MR. COFFIN:  We just need some guidance.

20          MR. OOT:  CMO 5 states they submit their position paper

21  three days beforehand --

22          THE COURT:  I can't hear you.

23          MR. OOT:  Excuse me, Your Honor.

24          CMO 5 states they submit their position paper

25  three days beforehand, which they didn't this time, and our

1    response is due noon the day before.  That's the process that

2    we've been following.  So if we need to change that, we can

3    have a discussion about that; but we've been following Case

4    Management Order 5.

5         MR. COFFIN:  That's what I'm saying.  There's a

6    disconnect.  Because our understanding is -- it is Case

7    Management Order No. 5, and I have it here -- time is limited.

8    But perhaps we can meet and confer and not involve Your Honor

9    on this.  We'll try that.

10        THE COURT:  Look, somebody is going to have the last

11   word in writing.  It's the nature of the beast.  I would

12   encourage y'all to have that discussion.  The other thing that

13   I think would be helpful is if we can get the agenda for the

14   meeting before the letters.

15             I think that you-all ought to agree on the issues

16   that you should be addressing in the letters and not have the

17   agenda come after the letters.  So why don't we at least agree

18   that you-all discuss what issues are going to be raised at the

19   status conference in an agenda, agree on the agenda as you have

20   done in the past, get that first and then you-all can talk

21   about the timing.

22             We're in a little bit different situation today

23   because both Judge Milazzo and I have to be somewhere else, and

24   we can't avoid it, in a little while.  So I did have to kind of

25   rifle through these issues and tell you what I thought from the

1    beginning, but as you -- in the normal situation, I'll give you

2    every opportunity to address what Sanofi has said to me and to

3    you-all in those letters or whoever sends me the last

4    submissions.  I don't want to shut y'all down; but, again, I

5    had an awful lot to read in this situation.  Y'all gave me a

6    lot to work with.

7         MR. COFFIN:  Right.  That caused us to literally have a

8    debate of something we had ready to submit to you as to whether

9    or not we really should burden Your Honor with additional

10   argument.  And we decided, no, let's not do that.  Let's just

11   discuss it with him.  And this Dr. Hangai issue was a big

12   issue.  We brought the video because we felt pretty strongly

13   about it.

14         But that being said, I like your suggestion of

15   going back and meeting and conferring about the timing of the

16   agenda.  You're correct.  That is kind of the starting point.

17   If we can establish that, we will work with Mr. Oot and

18   Mr. Ratliff on that.  If we establish that, then the rest of

19   it, I think will fall in based on the orders.

20         THE COURT:  Maybe one way to do that is to come up with

21   an agenda, have you-all submit your letter four days instead of

22   three days in advance, have you-all submit your letter two days

23   in advance and give you-all an opportunity to address whatever.

24   Work something out.  Just work something out.

25         MS. MENZIES:  I apologize for interjecting.  We aren't

1    always the ones with the issues.

2         THE COURT:  Right.

3         MS. MENZIES:  So it's turning into an opposition and a

4    reply.  Our understanding of the CMO originally was we submit

5    position papers.  It's an issue that's in dispute and so each

6    side has a position.

7              And then if that position at each side -- because

8    this is part of our meet and confer.  We're doing our monthly

9    meet and confers.  We do an agenda for that meet and confer.

10   You know what, these are in dispute.  Let's put these in that

11   section, submit the paper.

12        THE COURT:  If we put the horse before the cart and the

13   agenda before the letters, I think that that makes sense.

14        MS. MENZIES:  I think that that will help and then I think

15   we need to abide by CMO 5 and each submit our position on the

16   disputed issues and then if there's a response that's necessary

17   to that position --

18        THE COURT:  I don't mind having the extra paper.  I

19   think that that approach makes sense.  If there's an agreed to

20   set of issues, give me a simultaneous submission on those

21   issues and then you can respond respectfully to the positions

22   and I'll have four letters instead of two or four letters of

23   instead of three.

24        MS. MENZIES:  We were expecting to get a submission

25   paper by the defendants on Tuesday as well and then if there

1    needed to be a response --

2        THE COURT:  Well, it's been a while since I read

3    CMO No. 5; so I don't want to engage in that debate.  I'm just

4    giving you-all some direction.  I think that would make sense.

5        MS. MENZIES:  That's helpful.

6        THE COURT:  So we can use the time that we have in the

7    courtroom or on the telephone appropriately.

8        MS. MENZIES:  Thank you.

9        MR. COFFIN:  One last quick thing.

10       THE COURT:  Yes.

11       MR. COFFIN:  Your Honor recognized Judge Milazzo in the

12   courtroom.  I haven't personally welcomed her, not quite yet,

13   to the litigation and I don't believe the other members of the

14   PSC have, but we're appreciative of your willingness to be

15   involved in this litigation and look forward to working with

16   you.

17       THE COURT:  What's two weeks from today?  Who has got a

18   calendar?  I didn't bring mine.

19       MR. OOT:  8th of March.

20       MR. LAMBERT:  Your Honor, Palmer Lambert.  We have a

21   general status conference with Judge Engelhardt and

22   Judge Milazzo on the 7th in the morning.

23       THE COURT:  Okay.  What time?

24       MR. LAMBERT:  I believe it's 10:00.

25       MR. MOORE:  That's when we have the series of meetings,

1    liaison counsel, steering --

2         THE COURT:  Do you want to do it that day?  Do you want

3    to do it the day before, do you want to do it that day or do

4    you want to do it the day after?

5         MR. COFFIN:  Our preference would be to do it in the

6    afternoon on the 6th.  There's a reason for that that

7    Mr. Ratliff and Mr. Oot and I discussed during those meet and

8    confers.

9         THE COURT:  Okay.

10        MR. COFFIN:  We have this 30(b)(6) issue standing out

11    there.  We would like to be able to -- we have to meet and

12    confer on that by the 6th.  I think we are going to agree on

13    the morning of the 6th to meet and confer.  We would like to

14    have the afternoon, if it's available, to bring that issue up.

15        THE COURT:  I think I may be out of town.

16          Blanca, if can you hear me, would you see if I'm

17    available on March 6th?  I think I'm out of town that day.  We

18    could do it by telephone.

19        MR. COFFIN:  If that's okay with Your Honor.

20        THE COURT:  Y'all are going to be here already.

21        MR. OOT:  Your Honor, if we can't resolve the 30(b)(6)

22    issue with written discovery, I think it's more appropriate to

23    be in person.  There will be some materials that we're going to

24    submit *in camera* that we think will help resolve the issue.

25        THE COURT:  I'm out of town Monday, Tuesday and

1    Wednesday.

2         MR. COFFIN:  It's okay.  Unfortunately it sounds like

3    we may be heading towards briefing on that 30(b)(6) issue

4    anyway, so I don't think that we should worry about the timing

5    of our meet and confer.

6         THE COURT:  What I'm going to do is I'm going to set

7    the next status conference for the week after that.  So...

8         MR. MOORE:  The week after the 8th?

9         THE COURT:  The week after the 8th.  Let's do the 14th.

10   Let's do Wednesday at 1:00.

11        MR. COFFIN:  I'm sorry.

12        THE COURT:  What's the Wednesday?  Wednesday,

13   March 14th, here at 1:00.

14        MR. COFFIN:  On the 30(b)(6) issue, I heard what you

15   said about your guidance on written discovery.  I want

16   Your Honor to know upfront we feel really strongly about the

17   need for a 30(b)(6).  We are going to go through the process

18   and meet and confer in good faith, and we have already talked

19   about the idea of written discovery.  We have met and conferred

20   on that.  We'll do it again.  But I don't want the Court's

21   comments to be construed by the defense that we, in fact, have

22   to go forward with written discovery.

23        THE COURT:  I think I made that clear.

24        MR. COFFIN:  I think you did too, but I just wanted to

25   be sure.  Thank you.

1    THE COURT:  I want you-all to continue discussions.  I

2    can be convinced that a deposition is superior to the written

3    discovery.  I just don't have any of it in front of me yet.

4    MR. COFFIN:  Understood.

5    MR. OOT:  Just for clarification, Your Honor, they are

6    not submitting proposed written discovery to us?  That's what I

7    kind of took away.

8    THE COURT:  Well, I think -- I mean, I don't want to

9    get in the middle of your negotiation; but if you're going to

10   talk about potential written discovery, you need to talk about

11   what it would look like.

12   MR. COFFIN:  I think we can meet and confer, and I

13   think we have an obligation to meet and confer about that in

14   light of the 30(b)(6) notice.  I just wanted Your Honor to know

15   that we've looked at this pretty carefully and we feel pretty

16   strongly about the 30(b)(6).

17   THE COURT:  I haven't seen it.

18   MR. COFFIN:  That being said, we haven't even seen

19   their objections yet is the reality.  They just told us they're

20   going to object to everything.  So why don't we wait and see

21   what their objections are, we'll meet and confer, and we'll try

22   to work it out.

23   MR. OOT:  This is the most expensive deposition they're

24   going to have, Your Honor.  Just preview, we have to bring in

25   somebody from the outside.  There isn't one person who knows

1   all of these systems.  Usually these experts are $900 an hour,

2   the prep time alone takes weeks and weeks on end, they have to

3   analyze all of these different systems, they have to review all

4   of these documents.  Just the cost of it alone and the

5   preparation time, it's our position that it's just untenable

6   given the schedule.

7        THE COURT:  All right.  You-all see what you can do and

8   if you can't come to an agreement, then we'll talk about it the

9   next time you are here.

10       MR. COFFIN:  Will do.

11       THE COURT:  Thanks.

12           (WHEREUPON, the proceedings were adjourned.)

13                        *  *  *  *

14

15           (WHEREUPON, the proceedings were adjourned.)

16                        *  *  *  *

17               REPORTER'S CERTIFICATE

18           I, Lanie M. Smith, CRR, RPR, Official Court
    Reporter, United States District Court, Eastern District of
19  Louisiana, do hereby certify that the foregoing is a true and
    correct transcript, to the best of my ability and
20  understanding, from the record of the proceedings in the
    above-entitled and numbered matter.

21

22                        ___/s/ Lanie M. Smith_____
                          Official Court Reporter
23

24

25