UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

*********************************************************************

IN RE:  TAXOTERE (DOCETAXEL)
PRODUCTS LIABILITY LITIGATION

                                    MDL No. 16-2740
VS.                                 Section "N"
                                    New Orleans, Louisiana

THIS DOCUMENT RELATES TO           March 7, 2017
ALL CASES

*********************************************************************

**TRANSCRIPT OF THE STATUS CONFERENCE WITH THE STEERING COMMITTEES
HEARD BEFORE THE HONORABLE KURT D. ENGELHARDT,
UNITED STATES DISTRICT JUDGE.**


**APPEARANCES:**

FOR THE PLAINTIFFS:                 MS. DAWN M. BARRIOS
                                    Barrios Kingsdorf & Casteix
                                    701 Poydras Street
                                    Suite 3650
                                    New Orleans, Louisiana  70139

                                    MR. M. PALMER LAMBERT
                                    Gainsburgh Benjamin David
                                       Meunier & Warshauer
                                    1100 Poydras Street
                                    Suite 2800
                                    New Orleans, Louisiana  70163

                                    MR. CHRISTOPHER L. COFFIN
                                    Pendley, Baudin & Coffin
                                    1515 Poydras Street
                                    Suite 1400
                                    New Orleans, Louisiana  70112

                                    MS. KAREN B. MENZIES
                                    Gibbs Law Group
                                    400 Continental Boulevard
                                    6th Floor
                                    El Segundo, California  90245

**OFFICIAL TRANSCRIPT**

MS. ANNE ANDREWS
Andrews Thornton Higgins
      Razmara
2 Corporate Park
Suite 110
Irvine, California 92606

MR. J. KYLE BACHUS
Bachus & Schanker
1899 Wynkoop Street
Suite 700
Denver, Colorado  80202

MR. LAWRENCE J. CENTOLA
Martzell Bickford & Centola
338 Lafayette Street
New Orleans, Louisiana  70130

MS. EMILY JEFFCOTT
The Lambert Firm
701 Magazine Street
New Orleans, LA  70130

MR. DANIEL P. MARKOFF
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway
Suite 104
Oklahoma City, Oklahoma  73120

MR. DAVID F. MICELI
Simmons Hanly Conroy
One Court Street
Alton, Illinois  62002

MR. RAND P. NOLEN
Fleming, Nolen & Jez
2800 Post Oak Boulevard
Suite 4000
Houston, Texas  77056

MR. ANDREW LEMMON
Lemmon Law Firm
650 Poydras Street
Suite 2335
New Orleans, LA 70130

```
                                    MR. ALEXANDER G. DWYER
                                    Kirkendall Dwyer
                                    440 Louisiana
                                    Suite 1901
                                    Houston, Texas 77002

                                    MS. GENEVIEVE ZIMMERMAN.
                                    Meshbesher & Spence
                                    1616 Park Avenue South
                                    Minneapolis, MN  55404


FOR SANOFI S.A.:                    MR. DOUGLAS J. MOORE
                                    Irwin, Fritchie,
                                       Urquhart & Moore
                                    400 Poydras Street
                                    Suite 2700
                                    New Orleans, LA  70130

                                    MR. HARLEY V. RATLIFF
                                    Shook, Hardy & Bacon
                                    2555 Grand Boulevard
                                    Kansas City, Missouri  64108

FOR ACTAVIS PHARMA, INC.:           MR. MICHAEL J. SUFFERN
                                    Ulmer & Berne, LLP
                                    600 Vine Street
                                    Suite 2800
                                    Cincinnati, OH 45202

FOR HOSPIRA                         MR. JOHN F. OLINDE
WORLDWIDE, LLC:                     Chaffe McCall
                                    2300 Energy Centre
                                    1100 Poydras Street
                                    New Orleans, LA  70163

FOR SANDOZ, A NOVARTIS              MR. R. CLIFTON MERRILL
DIVISION:                           Greenberg Traurig
                                    Terminus 200
                                    3333 Piedmont Road, NE
                                    Atlanta, GA  30305

FOR ACCORD HEALTHCARE,              MS. JULIE A. CALLSEN
INC.:                               Tucker Ellis
                                    950 Main Avenue
                                    Suite 1100
                                    Cleveland, OH 44113
```

**OFFICIAL TRANSCRIPT**

FOR SUN PHARMA GLOBAL,              MR. GEOFFREY COAN
INC.:                              Hinshaw & Culbertson
                                   28 State Street
                                   24th Floor
                                   Boston, Massachusetts   02109


**Official Court Reporter:**       Mary V. Thompson, RPR, FCRR
                                   500 Poydras Street, B-275
                                   New Orleans, Louisiana 70130
                                   (504) 589-7782


        Proceedings recorded by mechanical stenography;
        transcript produced via computer.

**OFFICIAL TRANSCRIPT**

```
 1                    P R O C E E D I N G S

 2

 3          THE COURT:  Sorry about the delay.  We're a little

 4   behind schedule, but we'll see if we can make up some time here.

 5          First of all, has anybody here not signed in yet on

 6   this sheet?

 7          (Indicating.)

 8          THE COURT:  Okay.  Let's get that signed.

 9          Is there anybody here whose name is not on this sheet?

10          (No response.)

11          THE COURT:  If your name is not on the sheet and you

12   don't have a place to sign in, then this is probably not the

13   meeting for you, and I would ask you to step outside until we get

14   to the 10:00 meeting.

15          If you're on the sheet, though, you need to have signed

16   in, in order for us to begin.

17          I just met with the liaison counsel and we covered a

18   number of things.  I looked at the draft Joint Report No. 8, and

19   I didn't really have any questions on it.

20          We did talk about a few other issues.  I'll go ahead

21   and open the floor -- well, before I do that, I do have the

22   nominations on the cases that -- for the first bellwether.  We

23   received those earlier this week, and we will advise you by the

24   end of the week which cases will be selected.

25          In making that decision, I will -- I have already
```

09:17:14
09:17:27
09:17:39
09:17:57
09:18:19

**OFFICIAL TRANSCRIPT**

1    provided to Judge Milazzo, who is here today -- if you have not

2    met Judge Milazzo -- and unofficially, but with great expectation

3    that she will be my successor presiding over this case.  I don't

4    know when that will happen because I don't know when anything

09:18:43    5    else is going to happen, but Judge Milazzo will be assigned the

6    case I'm told from good sources, including the chief of the JPML

7    who happens to be in the building.

8            So I know you-all will look forward to working with

9    her.  And I'll preside over the case until the day that I go

09:19:05   10    across the way, but I don't know when that's going to be, so, in

11    the meantime, she and I are going to work together.  Our

12    calendars will be coordinated.

13            She has already invested a great deal of time climbing

14    the learning curve on this case, and we appreciate all your

09:19:19   15    efforts to try to make things clear so that she and I can both

16    understand it and impart to her what she needs to know to proceed

17    from that day forward.

18            I also will say here -- and I'll say in the big

19    conference -- that she will do as good a job as I could possibly

09:19:39   20    do.  And my expectation, knowing her work ethic and having been

21    around her the last several years here on the bench, I expect

22    that she'll probably do a better job than I could ever hope to do

23    on the case.

24            Let's go ahead and open the floor for discussion.

09:19:54   25            Anybody have anything about the report itself, Joint

**OFFICIAL TRANSCRIPT**

1    Report No. 8 itself?

2              MR. COFFIN:  (Indicating.)

3              THE COURT:  Chris.

4              MR. COFFIN:  Chris Coffin, Your Honor, on behalf of the

*09:20:07*    5    plaintiff steering committee.

6              And welcome Judge Milazzo.

7              I'm not sure if this falls in line with the report

8    itself, but the *Lexecon* issue.  I think we need to have a little

9    bit of discussion.  Would Your Honor like to do that now?

*09:20:20*   10              THE COURT:  Sure.

11              MR. COFFIN:  The issue is that after we made our

12    selections for the second bellwether trial, we learned that the

13    defense is going to take the position that the cases that are

14    outside of the Eastern District of Louisiana cannot be tried by

*09:20:38*   15    Your Honor or Judge Milazzo.

16              We now find ourselves in a difficult predicament

17    because, understandably, defense counsel would like to start

18    deposing the plaintiffs, including those that fall outside of the

19    Eastern District of Louisiana.  They want to depose their

*09:20:55*   20    doctors.  We are very concerned about the resources that we'll be

21    expending to defend those depositions and to take our own

22    depositions related to those cases, if, in fact, the Court is

23    going to rule that none of those can be tried because they're not

24    here.

*09:21:13*   25              At the same time --

**OFFICIAL TRANSCRIPT**

1          THE COURT:  Let me interrupt you there.

2          I'm not going to rule that.  I think it was understood

3 from way back that we would certainly follow the *Lexecon* holding

4 and that there would be cases that would not be Eastern District

5 cases.

6          That's my thought off the top of my head for what you

7 just said, but go ahead.  I didn't mean to interrupt you.  I just

8 thought I would cut to the chase.

9          MR. COFFIN:  Maybe that resolves it.  I hear you saying

10 that you expect that you or Judge Milazzo would try those cases

11 somehow, whether you travel, whether --

12          THE COURT:  Or a state court judge.

13          MR. COFFIN:  Or a state court judge.  Okay.

14          And so that -- I think that resolves the issue.

15          THE COURT:  Yeah.

16          MR. COFFIN:  We just wanted some comfort that we're not

17 going out there and expending our resources only to come down to

18 the defense saying, Sorry, you can't try this case.

19          THE COURT:  No.  I don't think -- and, Harley, I'll let

20 you respond if you wish -- but at this point in the case my

21 expectation is that that would not be waived unless things

22 change.

23          I mean, obviously, you mentioned resources, the

24 consumption of resources.  That's going to be a concern on both

25 sides, I would think.

09:21:32
09:21:42
09:21:56
09:22:07
09:22:21

**OFFICIAL TRANSCRIPT**

1     But if there is a case that should be tried that would

2 benefit the MDL, then I don't see any reason why we should not

3 try a case in another jurisdiction with either Judge Milazzo or

4 me, if I'm presiding over the case, going elsewhere to try a case

*09:22:40*  5 with a different jury pool, or, as I just mentioned, a state

6 court case.  That has happened with some frequency in the other

7 MDLs.

8     I know Judge Fallon just tried a case a few months ago

9 in Jackson in Xarelto.  And I know in the -- one of his prior

*09:22:56*  10 MDLs, I believe he had a trial in Delaware or New Jersey or

11 somewhere, a state court trial.

12     We don't have to do that, but it would make sense for

13 the attorneys in the case, and for the parties, if they sought a

14 broader result from a bellwether.  I mean, at some point I would

*09:23:14*  15 have to agree that constantly getting Eastern District of

16 Louisiana jury verdicts might be counterproductive in that there

17 may be a need to expose the right case to a jury elsewhere.

18     MR. COFFIN:  And that's what our understanding was as

19 to the reason why Your Honor wanted us to reach wider, and then

*09:23:32*  20 we come into this potential conflict.

21     THE COURT:  Sure.

22     MR. COFFIN:  I appreciate your clarification.  I think

23 that --

24     THE COURT:  It's obviously easier to try them here, but

*09:23:41*  25 I recognize that -- and I'm sure Judge Milazzo does, too -- that

**OFFICIAL TRANSCRIPT**

1    there may be some benefit in testing these cases against a

2    different jury pool.

3         MR. COFFIN:  Thank you, Your Honor.  I don't know if

4    Mr. Ratliff has a comment.

09:23:54
5         THE COURT:  Sure.

6         MR. RATLIFF:  Your Honor.  And good morning,

7    Judge Milazzo.

8         I would like to address what Chris said, which is as it

9    relates to *Lexecon*, there's a number of reasons that a defendant,

09:24:04
10   including my client, may not waive the *Lexecon*.

11        I think in this situation where we have the three

12   Sanofi cases that they picked that are from Missouri, Colorado,

13   and Georgia, there is a more sort of acute reason why we're not

14   going to waive it.  It's because these, to us, are three of the

09:24:22
15   plaintiffs' cherry-picked best cases that they think are the best

16   cases that they would like to proceed forward with.  And so

17   that's one reason we're not going to waive *Lexecon*.

18        And so the only other options are you seeking a

19   temporary assignment in another district, which sometimes is

09:24:38
20   possible, sometimes is not, or that those cases get sent back to

21   the federal courts from which they came.

22        THE COURT:  Right.

23        MR. RATLIFF:  In that instance I don't think that's a

24   just sort of outcome for our client, because we'll now have three

09:24:51
25   cases that get worked up that are their first selected best cases

**OFFICIAL TRANSCRIPT**

1    that are not representative of the pool total to be sent back

2    down to the federal courts in the districts of Colorado and the

3    Northern District of Georgia.

4            I could foresee a situation down the road, where -- if

09:25:07  5    we were talking about trial three or trial four, where maybe we'd

6    say, Look, we'll meet with them and we'll waive *Lexecon* for these

7    10 cases or these 15 cases, so we're all operating under the same

8    playing field and we're all picking national cases.

9            But for these cases, I think there would be a lot of

09:25:23  10    prejudice to our client to have them sent back with their's being

11    the cases that they selected that they think are their best when

12    we picked cases that had original jurisdiction with you.

13            As it relates to the use of resources, we've only asked

14    for the depositions of the Sanofi plaintiffs that we picked that

09:25:41  15    are in the Eastern District of Louisiana, and the deposition

16    dates for the doctors of those particular plaintiffs, mindful of

17    the very fact that Mr. Coffin raised, that we didn't want to go

18    down the road of expending resources on cases that we didn't know

19    where they were going.

09:25:56  20            So I don't really see this issue as being resolved as

21    it relates to the three cases Kelly Gahan, Barbara Addelson, and

22    Jacqueline Mills as we move forward.

23            I know at one point Chris and I had talked about them

24    suggesting, Well, can we substitute out, for trial two, Louisiana

09:26:13  25    plaintiffs so we know that they can be tried here?  We would be

**OFFICIAL TRANSCRIPT**

1    amenable to that, although it would put a tight squeeze on

2    Phase 1 discovery for trial two, which I believe concludes in

3    maybe July or mid-June.

4              So I think that's where we fall out on this issue.  We

09:26:30  5    are not going to waive *Lexecon* for these three cases for the

6    reasons I articulated, and we don't really feel like they're

7    appropriate to go forward in any form or fashion in this MDL.

8              And if we're in the process of working up cases to send

9    them back to the transferee courts, then we should be working up

09:26:46  10   a lot more cases if that's the end goal, to get these cases all

11   worked up to go back to their federal courts.

12             THE COURT:  Like I said, my expectation is that you

13   would not waive.  That's always subject to change on your part.

14             As far as counsel are concerned, I purposefully, on the

09:27:03  15   plaintiffs' side, in -- one of the criteria I used in appointing

16   committee members was to have some geographic diversity,

17   obviously, based on the experience and all the other variety of

18   factors.  One of the factors was to have some geographic

19   diversity because we do have cases from coast to coast in this

09:27:23  20   case.  It's a very, very widespread collection of cases.

21             And so in terms of -- I think I'm actually responding

22   to what Chris said earlier.  You know, in terms of traveling and

23   going out of state to do discovery, we should have lawyers

24   present who can do the necessary discovery even if it's not an

09:27:45  25   Eastern District case.

**OFFICIAL TRANSCRIPT**

1        MR. RATLIFF:  Right.

2        THE COURT:  So is there something more that I can say?

3        It's the defendants' -- I mean, I read *Lexecon* pretty

4    clearly and it sounds like you-all do, too.

09:27:56    5        MR. RATLIFF:  Correct, Your Honor.  I'm left uncertain

6    as to whether we are to be now working up these three cases that

7    they selected that they think are their best cases that are

8    outside of the Eastern District for trial two or do we push those

9    to a different trial date?

09:28:09   10        THE COURT:  I think you work up all of them until we

11    decide which ones to go forward in greater detail on.

12        I mean, if they've been nominated -- it sounds like --

13    Chris is clarifying that you can still choose cases out of state

14    under *Lexecon,* which was his concern, and your concern is whether

09:28:27   15    or not we can still work up cases that the plaintiffs have

16    designated that are Eastern District cases.  I don't think any of

17    them are precluded at this point.

18        MR. RATLIFF:  Thank you, Your Honor.

19        THE COURT:  John.

09:28:39   20        MR. OLINDE:  Just very briefly, one of the cases

21    involves Accord, and their counsel is here, Julie Callsen.  I

22    don't know whether she wanted to say something about that.

23        MS. CALLSEN:  Yes.  I was just going to say it's not

24    just Sanofi.  I have a plaintiff in that trial pick four from

09:28:55   25    defendants -- again, Julie Callsen is my name on behalf of

**OFFICIAL TRANSCRIPT**

1  Accord.

2           And we also -- it's from Ohio, and we're not waiving

3  *Lexecon.*  But that, to me, was contemplated by CMO 8 when it was

4  first drafted, as you pointed out, Your Honor.  So I'm in

*09:29:09*  5  agreement with Harley.

6           MR. OLINDE:  The point, Your Honor, is just simply that

7  there has to be -- the discussion has to include Accord as well.

8           THE COURT:  Right.  Sure.  Okay.

9           MR. COFFIN:  I think at the risk of repeating this, I

*09:29:24*  10  want to be clear that Your Honor believes that the whole purpose

11  of choosing cases outside of the Eastern District is because of

12  the diversity it brings, and because those cases also represent

13  the population in this entire MDL, which obviously is not just

14  here in the Eastern District, so we are to move forward on the

*09:29:45*  15  discovery on those cases.

16           THE COURT:  Well, don't attribute a belief system to

17  me, please.

18           MR. COFFIN:  Oh, I didn't intend to.

19           THE COURT:  I have stated what the procedure is going

*09:29:54*  20  to be.  Let me put it as succinctly as possible.

21           Nominee cases don't have to be Eastern District of

22  Louisiana cases for a lot of reasons -- for a lot of reasons --

23  including *Lexecon,* which we will follow.  Unless waived by those

24  who enjoy the benefit of it, we will follow *Lexecon.*

*09:30:15*  25           MR. COFFIN:  Understood.  Thank you very much.  We

**OFFICIAL TRANSCRIPT**

1    appreciate that clarification.

2         THE COURT:  Okay.  Next on our list of things to cover.

3    Anybody?

4         MR. COFFIN:  If you don't mind, Your Honor, I'll just

*09:30:25*  5    go through a couple of highlighted things that I had.

6         THE COURT:  Sure.

7         MR. COFFIN:  I think really the next thing -- and it

8    deals really mostly with the settlement committee, and I'll just

9    cut to the chase.

*09:30:35*  10        It's very clear to us from the plaintiffs' side that

11   you wanted distinct separation from the activities of the

12   settlement committee and the activities of the litigation side.

13   We've totally abided by that, although, to be honest with you,

14   there are very, very fine litigators that you have appointed in

*09:30:53*  15   the settlement committee we would like to be able to use.

16        Mr. Strongman, who, as you know, is the chair of

17   Sanofi's settlement committee, has been deeply involved.  He has

18   now argued a motion to dismiss on their behalf.  He has defended

19   a deposition recently and did the direct examination of Sanofi's

*09:31:10*  20   witness.

21        We just want to be able to use our people.  We're all

22   strapped for resources, as Your Honor knows.  And people like

23   Ben Gordon and Dennis Reich and Mark Neimeyer and Irving

24   Warshauer, Your Honor, who have this kind of experience, we would

*09:31:26*  25   like to use them, too, but we understood Your Honor to say, no,

**OFFICIAL TRANSCRIPT**

1  that's not what the Court wants.

2      So we're a bit perplexed by Mr. Strongman's

3  involvement, and we just want to be able to do the same thing if

4  Your Honor is okay with that.  If you're not, I think everybody

09:31:41  5  needs to know that.

6      THE COURT:  Well, Jon is not here to respond to it, but

7  it did come up this morning.  The settlement committees were

8  designed -- and I've said this orally several times, both in this

9  meeting and in the big meeting, and I think I said it in writing

09:31:58  10  in the appointment papers, which I want to say is PTO No. 6 --

11  that I wanted the settlement committee members to not be involved

12  in the trench warfare, which is the word I used, for better or

13  worse.  To not be involved in the actual litigation of discovery

14  and trying cases and whatnot.

09:32:17  15      So that's the way I envisioned it.  That's the way I

16  designed it.

17      To be fair to Jon, again who is not here to respond

18  personally, there are fewer lawyers on the defendants' side than

19  the multitude of nominations -- or I should say applications I

09:32:34  20  got for a variety of posts on the plaintiffs' side.  There are

21  fewer lawyers and fewer defendants.  I put Jon on that committee

22  because I felt like he was a pivotal person for the committee.

23      Now, having said that, yes, I would prefer that the

24  settlement committee members concentrate on communicating with

09:32:54  25  the counterparts without getting involved in taking depositions

**OFFICIAL TRANSCRIPT**

1  and trying cases and doing the actual roll-up-your-sleeves brass

2  knuckle litigation work that's going to be done on these cases.

3        If there is a need for someone to have a dual role, if

4  there is a drain on resources and you would like to get a

5  Dennis Reich or somebody to go to a deposition out of necessity,

6  or to save costs, you know, that would be something different.

7        I don't know the circumstances of Jon participating.

8  My understanding was that the settlement committee members would

9  not be participating -- I said "my understanding."  My

10  instruction was that they not be participating in that.  If there

11  is a change where that is necessary, I would like to be apprised

12  of it beforehand such that I can approve it or at least know that

13  it's going on.

14        Jon's status as counsel is obviously one that's pivotal

15  on the defendants' side, but I would like to have known that he

16  was going to wade into the litigation waters at that level prior

17  to him doing it.

18        If someone wants to litigate and not be on the

19  settlement committee, whether it's Jon or Dennis or whoever, you

20  know, you just let me know and you won't be on the settlement

21  committee, you'll be taking depositions.

22        MR. COFFIN:  Understood.  Some of them are a bit

23  conflicted because they're chomping at the bit because this is

24  what they do.

25        THE COURT:  That's right.

**OFFICIAL TRANSCRIPT**

1          MR. COFFIN:  Look, I just wanted to get your

2    clarification.  I thought it was pretty clear.  Thank you,

3    Your Honor.

4          MR. RATLIFF:  Your Honor, may I address this?

09:34:36    5          THE COURT:  Go ahead.

6          MR. RATLIFF:  Your Honor, as it relates to

7    Jon Strongman, he was intimately involved in this case before the

8    MDL, and he didn't seek appointment on the settlement committee.

9    We understood why you put him on there.

09:34:47   10          THE COURT:  I asked him to serve, that's correct.  I

11   asked him to serve because I thought it would facilitate the

12   settlement committee discussions.

13          MR. RATLIFF:  And I think it has.  He is sort of really

14   the figurehead.  There are four other attorneys on our settlement

09:34:58   15   committee who are not involved in the litigation at all.

16          I mean, with Jon's role, he's in somewhat of a unique

17   position because our client -- my client expects him to be

18   involved to some degree in the nuts and bolts of the litigation.

19   By and large, he has stayed out of that to focus on the

09:35:15   20   settlement committee work.  His role is a little bit -- there's

21   more duality there than when, I think, you just appoint somebody

22   else who's maybe sort of an outsider to the litigation.

23          So we certainly did not intend to violate any of your

24   instructions.  We were under the working assumption that you

09:35:33   25   understood that Jon sort of had a dual role, as I think Doug may

**OFFICIAL TRANSCRIPT**

1    have mentioned in the liaison counsel meeting.

2            And I appreciate what Chris is saying about people

3    being stretched with resources.  I think we've taken 45

4    depositions in the last two-and-a-half months and we're all

09:35:49  5    trying to march forward, and so sometimes it's just a matter of

6    who is somebody with knowledge of the litigation who can cover

7    these issues and do so in a way that our client expects.

8            Jon, like myself, has a longstanding relationship with

9    Sanofi so they have certain expectations of him.

09:36:05  10           I have no objection to what Chris is proposing.  If

11   someone like Mark Neimeyer wants to get involved, that is of no

12   concern for us.  I understand why you separated it, and I think

13   that logically it makes a lot of sense to keep sort of the houses

14   separate, but to the extent they need somebody, we obviously have

09:36:20  15   no objection to that.

16           THE COURT:  Well, I really don't want to -- I think --

17   why have a settlement committee if we're just going to declare

18   open season and everybody can do anything they want?

19           I think it kind of defeats the purpose of those who

09:36:35  20   concentrate conceptually on if the case can be resolved and what

21   the parameters of that is going to be.

22           And I think they've made some progress.  They have a

23   long way to go.  I don't think they are close.  I wouldn't

24   announce to anybody that it's imminent because it's not.  There

09:36:53  25   is going to be a lot of litigation in this thing before we ever

**OFFICIAL TRANSCRIPT**

1   get to the point where we're close to that serious discussion.

2          But we have made a lot of progress on the parameters of

3   how the case might be resolved and what is needed in order to

4   have that conversation so I don't want to just release everybody

09:37:12   5   from their obligations as settlement committee members.  I

6   think -- I see benefit so far.  I have not done it in my two

7   prior MDLs, but I see benefit already from having it that way.

8          As far as Jon is concerned, you're right, it was my

9   idea to put Jon in that capacity and I did understand from the

09:37:29   10   get-go that he was going to have a dual capacity.  It would be

11   almost as if I had personally selected Chris to be on the

12   settlement committee, and then say, Well now you can't do the

13   litigation work.  I understood Chris to be someone who was

14   involved already, at the outset of the MDL, doing litigation

09:37:46   15   work.  So --

16          MR. RATLIFF:  Chris, do you want to get on the

17   settlement committee?

18          MR. COFFIN:  No, thank you.

19          THE COURT:  If I were to have unilaterally designated

09:37:57   20   him as being on the settlement committee, he might have come back

21   to me and said, I don't want to be on the settlement committee, I

22   want to litigate.

23          My appreciation -- without confirming it, shame on

24   me -- was that you and the other folks were doing the litigation

09:38:09   25   side of the work and Jon was sort of overseeing everything

**OFFICIAL TRANSCRIPT**

1   because of the client relationship.  If it's better for Jon not

2   to be in the capacity of actually being on the settlement

3   committee, but nonetheless have input all around, then maybe we

4   should designate someone else from his firm, or however y'all

09:38:29   5   want to do it, such that Jon can go in and take depositions

6   free -- he can take every one of them if he wants, as far as I'm

7   concerned, but I don't want to have him compromised as a

8   settlement committee person because he's concentrating on taking

9   depositions and arguing motions.

09:38:43   10            MR. RATLIFF:  Your Honor, I'll certainly raise that

11   with Jon.  I don't foresee that being an issue.

12            I can tell you personally that he has devoted most of

13   his time to the settlement committee stuff.  I have very little

14   discussion with him on that on a day-to-day basis; when people

09:38:56   15   are meeting, what the discussions are about.

16            In terms of overseeing the litigation, for better or

17   for worse that falls on my shoulders.  And so Jon has some input,

18   but the overall management is mine.

19            And so all I would say is that there may be some times

09:39:12   20   where we're stacking up witnesses that we may need Jon to handle.

21            THE COURT:  That's fine.

22            And the same thing goes for plaintiffs.  If you call --

23   if you e-mail or call and say, We have to depose doctor so-and-so

24   in Houston, Texas, on such and such a date and Dennis is there

09:39:27   25   and Dennis is available, and we have people deposing other people

**OFFICIAL TRANSCRIPT**

1    elsewhere, is it okay if Dennis takes it or attends a

2    deposition -- defends a deposition or takes a deposition, that's

3    probably not going to be a problem.  You know, we can work that

4    out.

09:39:41    5           I just don't want to have a free-flow of people that

6    are supposed to be thinking about how to resolve the case wasting

7    their mental resources on trying to get around evidentiary issues

8    at trial or what to cover in a deposition.

9           MR. RATLIFF:  I think Jon would like to cover as few

09:39:59   10    depositions as possible, Your Honor.

11          THE COURT:  Okay.  Let me know.  If it's a continuing

12    problem, bring it to my attention and we'll have to address it.

13          But I really feel like the idea of the settlement

14    committee is one that I think we need to -- is promising, and I

09:40:13   15    think we need to give it a chance without starting to filter

16    these people back into the litigation mode.

17          MR. COFFIN:  Yeah, we feel the same way, and that's

18    exactly why we haven't just started having Dennis and Ben get

19    involved.  My concern is how that will affect their ability to

09:40:28   20    actually focus on resolution without their brain thinking about

21    what happened in those liability depositions.

22          So thank you, Your Honor.  We understand.

23          MR. OLINDE:  Just really quickly, Your Honor.

24          I understand the marching orders going forward, and

09:40:41   25    from the 505(b)(2) defendants, they haven't been involved with

**OFFICIAL TRANSCRIPT**

1  litigation yet.  But if indeed they would have resource issues,
2  one or more of the 505(b)(2)s will bring it to the Court's
3  attention.  And maybe there has to be a substitute of someone on
4  the settlement committee again because of resource issues, but
09:40:58  5  we'll let you know.
6       THE COURT:  Okay.  We have enough really outstanding
7  lawyers in this case that we shouldn't have problems finding
8  people to serve in these capacities.
9       So go ahead.
09:41:08  10      MR. COFFIN:  That's it for that issue, Your Honor.
11      THE COURT:  Okay.
12      MR. COFFIN:  I wasn't clear.  My understanding is you
13  have our submissions on bellwether selections.  If you want more
14  information, you'll ask us --
09:41:20  15      THE COURT:  We will.
16      MR. COFFIN:  -- for whatever you need?
17      THE COURT:  We will.
18      MR. COFFIN:  Thank you.
19      MR. MOORE:  Your Honor, there was an issue that we
09:41:26  20  discussed in -- Douglas Moore on behalf of Sanofi.
21       -- an issue we discussed in the liaison counsel meeting
22  that Dawn brought up that I was not able to answer, and that was
23  the statistics, the denominators being different when we
24  determined percentages for certain characteristics that we
09:41:44  25  flagged as being relevant for Your Honor's consideration of the

**OFFICIAL TRANSCRIPT**

1   selection of bellwether picks.

2        I asked Mr. Ratliff why that was the case, and the

3   reason the case numbers were different is that when we calculated

4   percentages of how many people had this type of tumor, we

09:42:02    5   excluded from the denominator plaintiffs who left that blank in

6   their PFS.  So our statistics were based on the people who

7   answered those questions in their PFS and told us what tumor type

8   they had.  That's the percentage that we used.  That was the

9   reason for the difference in the statistics.

09:42:23   10        And to get to a point that I think was mentioned during

11  the MDL, both sides have relied on this data to make arguments.

12        To us, I think the two things that are most strikingly

13  different about the submissions really are the representativeness

14  of the injury -- we think that's a paramount consideration -- and

09:42:46   15  also a representative treatment regimen.  Someone who received a

16  high dose who has an injury that's inconsistent with the pool we

17  think would be a poor bellwether selection.

18        THE COURT:  Well, I agree with that.

19        I guess -- you know what they say about statistics.

09:43:03   20        The purpose of MDL centrality was that we could all

21  draw upon the same information.  But now if we're going to

22  distinguish between fields that have been filled out versus those

23  that haven't been filled out when we choose our percentages --

24  because I read the submissions, and I know Judge Milazzo has as

09:43:24   25  well, and you-all talk about there are so many percentage of

**OFFICIAL TRANSCRIPT**

1   plaintiffs that fall within this age group or this protocol or
2   what have you.  If we're talking about two different sets of data
3   all rooted in MDL centrality -- in other words, you're
4   manipulating the data to exclude fields that aren't filled in --
09:43:44   5   then it kind of defeats the purpose of centrality.
6          I mean, the name is "centrality" because it has --
7   everything we all are going to use is going to be there, except
8   for what we don't, except for when it's not, which means we're
9   basically back to where we were before we got Jake involved.
09:44:01   10         So we're going to have to figure out a way, when we
11   talk about these nominees cases, where we're talking about apples
12   and apples and not apples and oranges.
13         It's fine.  We'll choose from the ones we have.  And,
14   as Chris said, if we need more information, we'll ask.  I think
09:44:14   15   we have enough information to choose based on the criteria that
16   you-all have submitted.
17         But I think henceforth, if we're going to be citing to
18   statistics rooted in the MDL centrality bank of information,
19   let's compare notes before we start quoting percentages and
09:44:31   20   whatnot.
21         MR. COFFIN:  I would suggest, respectfully, Your Honor,
22   that if there is a question, to just contact Jake.
23         I can tell you that we went directly to him and said,
24   Hey, we need this data, because Your Honor had suggested that we
09:44:44   25   needed to look at what's in the MDL.  So why there's a

**OFFICIAL TRANSCRIPT**

1   distinction, I have no idea, but I bet Jake could probably tell

2   you.

3       THE COURT:  I think Doug just mentioned they discounted

4   some of the numbers because some certain fields weren't filled

09:44:57   5   in.  And without getting into the weeds on this thing, and

6   without deciding who's right or wrong, I think we at least need

7   to be talking the same language in terms of data, how the data is

8   going to be used.

9       If you-all want to let Jake be the one to provide the

09:45:12   10   percentages and agree to be bound by his manipulation of the data

11   based on a single question that you both submit to him.  In other

12   words, what's the median between age or what have you.  Agree on

13   the questions you want to submit to him, get him to provide you

14   the data; and then if you want to question him about it, that's

09:45:34   15   fine.

16       What we can't have is one person manipulating the data

17   and excluding certain things, whether for good reason or not, and

18   another person manipulating the data and coming up with

19   percentages that are different.

09:45:47   20       MR. COFFIN:  Agreed.  And the reason I even brought it

21   up is because Ms. Barrios said to me, I think Jake did the same

22   exclusions.  So I don't know what Jake did.  We just asked him to

23   give us the numbers.

24       THE COURT:  We'll just get on the same page.  The next

09:45:57   25   go-around, let's make sure we're on the same page.

**OFFICIAL TRANSCRIPT**

1           Again, it's not fatal to what we have.  I think we're

2   fine with it.  But next time maybe we can compare notes before we

3   start quoting criteria from the data.

4           MR. COFFIN:  Understood.

09:46:12
5           MR. RATLIFF:  Your Honor, just to address that point,

6   as it related to the exclusion of information that wasn't filled

7   out, I think we actually put a footnote in our submission saying

8   for the ones we didn't have information, we took that out.

9           We actually had -- maybe we should have reached out to

09:46:28
10  plaintiffs' counsel or Your Honor of how to address that, but we

11  had an internal discussion of how do you address data that's not

12  there.  So we thought let's just go with the people that actually

13  responded to those questions.

14          THE COURT:  That's right.  And I don't think it's fair

09:46:40
15  to imply an assumption based on a blank field of information, you

16  know, on the one hand.

17          On the other hand, we should have had that information

18  supplied from the plaintiffs' side.

19          MR. RATLIFF:  That's a different question.

09:46:52
20          THE COURT:  That's a whole other issue.

21          But, again, it's not critical to making the selection

22  this go-around.  We just now know it's something we need to

23  address when we start quoting averages, things that -- types of

24  information that we have in these submissions, because it's not

09:47:08
25  helpful if y'all are singing from different songbooks.

**OFFICIAL TRANSCRIPT**

1      MR. RATLIFF:  I agree wholeheartedly, because I was

2  getting e-mails from my team back in Kansas City saying things

3  like plaintiffs' counsel was saying, none of the data makes any

4  sense to us, what numbers are they pulling from?

*09:47:23*  5      So I think that's probably the answer.  To be candid, I

6  wasn't the one pulling every single set of data on that, but I

7  think that's probably --

8      THE COURT:  Well, I noticed the discrepancy.  The first

9  time I read it, I noticed the discrepancy.  I thought there was a

*09:47:38*  10  good explanation for it, and this is it, but it's just not as

11  helpful because we're talking about two different things.  So

12  next time.

13      MR. RATLIFF:  This is our first time through this

14  process so we'll make sure that it's consistent going forward.

*09:47:50*  15      THE COURT:  Right.  Okay.

16      MR. RATLIFF:  Thank you, Your Honor.

17      THE COURT:  Are there other items before we adjourn for

18  the big room?

19      MR. COFFIN:  Nothing else from the plaintiffs' side,

*09:47:59*  20  Your Honor.

21      THE COURT:  Okay.  Karen?

22      MS. MENZIES:  Nothing.  Thank you, Your Honor.

23      THE COURT:  Harley?  Doug?

24      MR. RATLIFF:  Nothing, Your Honor.

*09:48:04*  25      THE COURT:  John?

**OFFICIAL TRANSCRIPT**

1        MR. OLINDE:  There was going to be a discussion about

2   the date for the next conference.  I don't know whether you want

3   to do that in the next room or this room.

4        THE COURT:  Yes.  Well, I think the thing to do is to

09:48:12   5   make certain that -- we're going to give you a couple dates that

6   are good on both my calendar and Judge Milazzo's calendar.  And

7   regardless of which one of us is presiding, those two dates will

8   be available.  And then maybe you-all can talk and get back with

9   us later today or by Monday and make the final decision on what

09:48:31   10   works best for you.

11        I told Judge Milazzo in the liaison committee meeting,

12   we typically have been having these meetings on Fridays,

13   notwithstanding today's is on Wednesday, we typically have been

14   having them on Fridays.  But whatever works best for you-all and

09:48:46   15   for her henceforth based on her docket demands, that's what we'll

16   do.

17        JUDGE MILAZZO:  I'm available April 26th and 27th and

18   May 3rd or May 4th.

19        The week before, the 19th, I think, Judge Engelhardt,

09:49:03   20   you had mentioned it earlier.  That's the week of the New Orleans

21   Bar Association conference and I'm committed to that.

22        THE COURT:  Okay.  Based on those dates, I'm available

23   on the 26th but not the 27th.

24        And what were the other ones, the 3rd and 4th?

09:49:22   25        JUDGE MILAZZO:  The 3rd and 4th.

**OFFICIAL TRANSCRIPT**

1          THE COURT:  I can probably do either one of those, the

2    3rd or 4th, May 3rd or 4th.

3          So if you-all want to focus on those and let us know

4    out of those three dates.  That's two Thursdays and a Friday.

09:49:33   5          MR. OLINDE:  I'm not available on the 3rd and 4th, I

6    know that.

7          JUDGE MILAZZO:  All right.  Well, how about April 26th?

8          THE COURT:  How does April 26th sound?

9          MR. OLINDE:  Unfortunately I'm getting to the age where

09:49:43  10   I'm having 40th reunions so I just wanted to bring that to

11   Your Honor's attention.

12         THE COURT:  Let's focus on the Thursday, April 26th.

13   Let's focus on that one.  If that one works for everybody or

14   enough people, that's fine.

09:50:00  15         JUDGE MILAZZO:  I can do the 10th and 11th as well.

16         MR. OLINDE:  Of May?

17         JUDGE MILAZZO:  I just would have to move these things.

18         THE COURT:  Those are, likewise, available for me,

19   May 10th or 11th.

09:50:10  20         MR. RATLIFF:  Those are the dates I mentioned all the

21   defense lawyers are in New York.

22         THE COURT:  Okay.  If we need more dates, we can confer

23   and give you more dates.

24         Let's now focus on the 26th, and you-all let us know if

09:50:20  25   we need to -- in fact, if we want to make it earlier, then

**OFFICIAL TRANSCRIPT**

1  Judge Milazzo and I will look at some earlier dates, the 19th or

2  20th, and go from there.  But let's focus on the 26th on the

3  assumption that that will be the day that most people can make

4  it.

5          All right.  Okay.  If there's nothing else, we'll see

6  you-all at 10:00 in the courtroom.

7                                  (Proceedings adjourned.)

8

9                      *  *  *  *

10                     CERTIFICATE

11

12      **I hereby certify this 9th day of March, 2018, that the**

13  **foregoing is, to the best of my ability and understanding, a true**

14  **and correct transcript of the proceedings in the above-entitled**

15  **matter.**

16

17                              */s/ Mary V. Thompson*

18                              **Official Court Reporter**

19

20

21

22

23

24

25

**OFFICIAL TRANSCRIPT**