UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  TAXOTERE (DOCETAXEL)   *        16-MD-2740
PRODUCTS LIABILITY LITIGATION  *
                               *        Section N
                               *
Relates to:  All Cases         *        April 25, 2018
* * * * * * * * * * * * * * *   *


STATUS CONFERENCE BEFORE
THE HONORABLE MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE


<u>Appearances</u>:


For the Plaintiffs:          Barrios Kingsdorf & Casteix, LLP
                             BY:  DAWN M. BARRIOS, ESQ.
                             701 Poydras Street, Suite 3650
                             New Orleans, Louisiana 70139


For the Plaintiffs:          Gainsburgh Benjamin David Meunier
                               & Warshauer, LLC
                             BY:  M. PALMER LAMBERT, ESQ.
                             1100 Poydras Street, Suite 2800
                             New Orleans, Louisiana 70163


For the Plaintiffs:          Pendley Baudin & Coffin, LLP
                             BY:  CHRISTOPHER L. COFFIN, ESQ.
                                  JESSICA A. PEREZ, ESQ.
                             1515 Poydras Street, Suite 1400
                             New Orleans, Louisiana 70112


For the Plaintiffs:          Gibbs Law Group, LLP
                             BY:  KAREN BARTH MENZIES, ESQ.
                             400 Continental Boulevard
                             El Sugundo, California 90245

Appearances:

For the Plaintiffs:                 Simmons Hanly Conroy, LLC
                                    BY:  DAVID F. MICELI, ESQ.
                                    One Court Street
                                    Alton, Illinois 62002


For the Plaintiffs:                 Martzell Bickford & Centola
                                    BY:  LAWRENCE J. CENTOLA, ESQ.
                                    338 Lafayette Street
                                    New Orleans, Louisiana 70130


For the Plaintiffs:                 Atkins & Markoff
                                    BY:  DANIEL MARKOFF, ESQ.
                                    9211 Lake Hefner Parkway
                                    Suite 104
                                    Oklahoma City, Oklahoma 73120


For the Plaintiffs:                 Kirkendall Dwyer, LLP
                                    BY:  ALEXANDER DWYER, ESQ.
                                    440 Louisiana, Suite 1901
                                    Houston, Texas 77002


For the Sanofi Defendants:          Irwin Fritchie Urquhart
                                       & Moore, LLC
                                    BY:  DOUGLAS J. MOORE, ESQ.
                                    400 Poydras Street, Suite 2700
                                    New Orleans, Louisiana 70130


For the Sanofi Defendants:          Shook Hardy & Bacon, LLP
                                    BY:  HARLEY V. RATLIFF, ESQ.
                                         KELLY GARRITY BIERI, ESQ.
                                    2555 Grand Boulevard
                                    Kansas City, Missouri 64108


For the Sanofi Defendants:          Shook Hardy & Bacon, LLP
                                    BY:  PATRICK OOT, ESQ.
                                    1155 F Street NW, Suite 200
                                    Washington, DC 20004

Appearances:

| | |
|---|---|
| For Hospira Worldwide, LLC: | Chaffe McCall, LLP<br>BY:  JOHN F. OLINDE, ESQ.<br>1100 Poydras Street, Suite 2300<br>New Orleans, Louisiana 70163 |
| For Actavis, LLC: | Ulmer & Berne, LLP<br>BY:  MICHAEL J. SUFFERN, ESQ.<br>600 Vine Street, Suite 2800<br>Cincinnati, Ohio 45202 |
| For Sandoz, Inc.: | Greenberg Traurig, LLP<br>BY:  CLIFF MERRELL, ESQ.<br>3333 Piedmont Road NE, Suite 2500<br>Atlanta, Georgia 30305 |
| Participating By Phone: | Brandon Cox, Esq.<br>Kathleen Kelly, Esq.<br>Andrew Lemmon, Esq.<br>Andre Mura, Esq.<br>Sara Roitman, Esq.<br>Darin Schanker, Esq.<br>Beth Toberman, Esq.<br>Zachary Wool, Esq. |
| Special Master: | Kenneth W. DeJean, Esq. |
| Official Court Reporter: | Toni Doyle Tusa, CCR, FCRR<br>500 Poydras Street, Room B-275<br>New Orleans, Louisiana 70130<br>(504) 589-7778 |

Proceedings recorded by mechanical stenography using
computer-aided transcription software.

**PROCEEDINGS**

**(April 25, 2018)**

1
2
3        **THE COURT:**  Hello everybody.  You can have a seat.

4           Out of order a little bit, one of the issues on

5   the agenda was the challenge to the clawback and privilege

6   documents.  I think Mr. Coffin indicated in his letter that you

7   all were working on that.

8        **MR. MICELI:**  We are still communicating with Mr. Oot

9   on that.

10          Is that correct?

11       **THE COURT:**  Well, that's not an issue for today

12  because I don't have any background.

13       **MR. OOT:**  We agreed that we were going to provide

14  them to you in court, Your Honor.

15       **THE COURT:**  Okay.

16       **MR. CENTOLA:**  Larry Centola on behalf of the PSC.

17          There are three documents that are currently at

18  issue.  I believe Sanofi has agreed to provide them unredacted

19  to Your Honor by Friday.  We are hoping to use them in the

20  depositions next week in London.  That's why these are

21  fast-tracked.  We were wondering if Your Honor wanted to have a

22  hearing on Monday or Tuesday or give us a ruling by Tuesday.

23       **THE COURT:**  If you can give me a letter explaining

24  what your respective positions are and I get it the same time

25  as the documents, I will make a ruling.

04:19

1    **MR. CENTOLA:**  Thank you, Your Honor.

2    **THE COURT:**  I forgot something.  Give me a second.

3    Let's talk about Ms. Earnest's journal.  Let me

4    ask this question because it's not entirely clear.  What was

5    clawed back, the entire second journal or the two entries that

6    were discussed in your letter?

7    **MR. COFFIN:**  Your Honor, Mr. Darin Schanker --

8    **MR. SCHANKER:**  Your Honor, this is -- go ahead.  Go

9    ahead.  I'm sorry.

10   **MR. COFFIN:**  There he is.

11   I was going to introduce you, Darin.  I wanted

12   to make sure you were on the phone.

13   Your Honor, Darin Schanker is going to handle

14   this for us.

15   **MR. SCHANKER:**  Your Honor, this is Darin Schanker,

16   and thank you for letting me appear via phone.

17   Specifically, what was clawed back were just the

18   two entries that were inadvertently disclosed.  You should have

19   a copy of the unredacted version of that so that you can see

20   what exactly was clawed back.

21   **MR. COFFIN:**  May I approach, Your Honor?

22   **THE COURT:**  Yes.

23   **MR. SCHANKER:**  You called it a journal.  It's really

24   an appointment list.  The remainder of that has been disclosed.

25   **THE COURT:**  I have three pages.  There's two pages

04:21

1    that I have been handed from this journal.  You all have clawed

2    back the entirety of both pages?

3              MR. SCHANKER:  That is not correct, Your Honor.  If

4    you have what I have, there should be a color photograph.

5              THE COURT:  Yes.

6              MR. SCHANKER:  There is a highlighted yellow box with

7    two entries dated 3/26 and 3/28.

8              THE COURT:  Yes.

9              MR. SCHANKER:  The yellow box is what has been -- the

10   entire document was clawed back.  Then it has been redisclosed,

11   along with a privilege log, absent what you have in the yellow

12   box.

13             THE COURT:  Okay.  I understand.

14                  Well, here's the thing.  As I understand it, the

15   argument is that to the extent that Ms. Earnest was sent to

16   medical appointments with providers that were arranged by her

17   attorneys, her notes as to those appointments and the identity

18   of those doctors is privileged.  Is that the idea?

19             MR. SCHANKER:  Correct.  Correct, Your Honor.

20             THE COURT:  I'm not ready to make a call on that

21   because that's a new one on me.  As you know, most of the time

22   when injured plaintiffs go to see doctors, the defendants are

23   entitled to all of their medical records, whether a particular

24   doctor is going to be called to testify or whether even the

25   treatment is related to the injury or the condition that's the

04:23

1   subject of the litigation.  So you all are going to have to
2   flesh that out for me.
3          What I would like to do is, by May 2, I would
4   like to have each side give me no more than five pages on that
5   issue, whether an injured plaintiffs' notes about doctor visits
6   that she has made that have been arranged by the plaintiffs'
7   counsel can be shielded from discovery on the basis that that
8   doctor or those doctors are consulting experts under Rule 26.
9          **MS. BIERI:**  Do you want to hear anything further
10  today?
11         **THE COURT:**  Sure, sure.
12         **MS. BIERI:**  Kelly Bieri on behalf of Sanofi.
13         Your Honor, we have looked at this law and we --
14         **THE COURT:**  You need to speak up.
15         **MS. BIERI:**  Your Honor, we have looked at the law on
16  this issue, and we understand that certain things related to
17  consulting experts are privileged under 26(b)(4)(B), but the
18  rule itself, 26(b)(4)(B), and case law in Louisiana suggests
19  other facts -- such as the identity, type of appointment and
20  doctor -- are not.  We will put that in our briefing to you.
21         **THE COURT:**  I want you all not just to shoot out a
22  brief, but to look at what the law is, particularly on the
23  plaintiffs' side, and considering the information that you all
24  are seeking to withhold, which is essentially the identity of
25  this physician or physicians.

04:25

1      There's not a whole lot there, so give some

2  thought to whether in this case it's really conceivably subject

3  to some sort of privilege, because I'm skeptical.  I don't want

4  to make that call now because I haven't had time to do the

5  independent research on my own.

6           **MS. BIERI:**  We will provide that to you.

7           **THE COURT:**  So let's handle it that way.

8           **MR. SCHANKER:**  Okay.

9           **THE COURT:**  I'm going to hold onto these documents.

10          **MR. SCHANKER:**  Okay.

11          **MS. BIERI:**  Your Honor, may I ask one quick question?

12  You want separate submissions by each side?

13          **THE COURT:**  Yes.

14          **MS. BIERI:**  Thank you.

15          **MR. SCHANKER:**  Thank you, Your Honor.

16          **THE COURT:**  Let me skip to the Wise database.  I've

17  already made the decision and stated on the record last time

18  that I didn't find that the late identification of the Wise

19  database was due to any misconduct by Sanofi, whether it was

20  oversight or intentional.  On the other hand, it's my

21  understanding that whether it was identified shortly before

22  Mr. Mancini's deposition, at Mr. Mancini's deposition, it was

23  identified very late in the game vis-à-vis his deposition.

24          Under the circumstances -- and obviously,

25  Mr. Oot, I have read your position -- I think it's appropriate

04:26

1   to give some additional time to the PSC to ask Mr. Mancini

2   questions surrounding that database, what came out of it, to

3   what extent it is similar/identical to other documents that you

4   already received.  I guess you all either reserved an hour or

5   didn't use an hour.

6          Mr. Oot has argued at least that the format of

7   some of this information makes it, in his view, impossible or

8   very difficult to use to interrogate a witness.  I don't know

9   that that's the case.  There may be more than just the

10   documents themselves.  There may be conclusions or questions

11   about the documents that you all want to ask Mr. Mancini given

12   his role in all this.

13          The fact that the database was identified

14   somewhat late in the game, I think it's appropriate and will

15   let you all ask him another two hours of questions.  Those two

16   hours of questions should be limited in scope to issues, I will

17   say, surrounding the database.

18          I would admonish you all not to spend much or

19   any of that time pounding the table and demanding why those

20   documents weren't already produced because we have been through

21   that.  This should be substantive inquiry into what information

22   was there and the substance of whatever was ultimately produced

23   from that database.

24          Mr. Oot, just to address all of the arguments,

25   as to the fact that they could have canceled the deposition

04:28

1   because they knew that this was important information and they

2   didn't have it, I'm not going to, I guess, penalize them for

3   not doing that given that everybody in the case has been under

4   the pressure of looming deadlines, and they didn't know when

5   they were going to get what they thought they needed.  Under

6   the circumstances, I think it's appropriate.

7                Obviously, that deposition ought to take place,

8   I guess, in London around the time that you all have already

9   got other depositions set --

10       **MR. RATLIFF:**  May I address that, Your Honor?

11       **THE COURT:**  -- hopefully, subject to the witness'

12   availability.  We don't need lawyers flying overseas for a

13   two-hour deposition.

14       **MR. RATLIFF:**  Certainly, Your Honor.  There are a

15   couple of things I wanted to address with respect to the

16   additional time for Mr. Mancini.

17                As it relates to next week in London, we have

18   all-day depositions May 3 and May 4.  I don't want to belabor

19   the point, but getting these witnesses in France scheduled to

20   London is a Herculean scheduling and logistics task,

21   particularly for next week.  There is a major French holiday,

22   which the employees at Sanofi in France get off several days,

23   and so the employees that we are bringing over have forgone

24   that.

25                I don't think I can make Mr. Mancini available

04:29   1   on such short notice for essentially maybe an hour,

2   hour-and-a-half deposition.  I will certainly reach out to him

3   and see if that is a possibility.  I think, the other thing,

4   given the limited scope of this deposition and the fact that it

5   may only be an hour or so merits the thought of trying to do

6   this via videoconference.

7       THE COURT:  I'm going to let you all work that out.

8   What I said was the deposition ought to take place next week,

9   not that it shall take place.

10       MR. RATLIFF:  Understood, Your Honor.

11       THE COURT:  I will let you all work through those

12   logistical issues.  I would agree with you, as a general

13   proposition, that a deposition by video under these

14   circumstances would normally be appropriate.  There are

15   documents involved.  There's going to need to be someone there

16   with the witness.  I don't know if you all have handled that

17   already in this litigation, but I'm going to leave that to you

18   all to work out among yourselves.  I'm sure you can do that.

19       MR. RATLIFF:  Understood, Your Honor.  The second

20   question I wanted to raise about this is sort of the scope of

21   what you are envisioning as the limitation.  My concern, when

22   Mr. Miceli raised this to me, was whether this was an

23   opportunity to go back and clean up questions or re-cover

24   issues that have already been covered extensively as part of a

25   six, six-and-a-half-hour deposition.

04:31

1        I think Mr. Miceli used 40-plus documents.  So

2  if the scope is going to be limited to the Wise database and

3  what's in there, we understand that.  My concern is that

4  Mr. Miceli will try to go beyond that to revisit issues.

5        **THE COURT:**  If there are a handful of things that he

6  wants to revisit, that's fine.  He has an hour left on the

7  record, as I understand it, notwithstanding this other issue.

8        There's a lot of time and expense and effort

9  associated with even putting together another two-hour

10  deposition.  I take him at his word that he wants to question

11  this witness on the information that he didn't have.  If there

12  are some questions or some time in those two hours that he does

13  want to clean things up, I'm going to let him do that because

14  he has an hour left on the record to do that.

15        **MR. RATLIFF:**  Okay.  Understood, Your Honor.  Thank

16  you.

17        **THE COURT:**  Okay.  The Google group, the emails, let

18  me ask this question first, Mr. Oot.  I guess the opening

19  premise of your argument was that you all recently received

20  these documents from the PSC, from Ms. Menzies.  She received

21  them from this Ms. Kirby, I guess, or from some nonparty to the

22  litigation.  I know that we have a whole other issue that you

23  raised, which is:  What else is out there and why don't we have

24  it?

25        Ms. Menzies did raise an issue in her letter

04:32

1   that I want to ask you first, which is you should have had

2   these two documents because they were sent to multiple

3   recipients at Sanofi.  So the fact that you didn't have them or

4   didn't know you have them, I guess, is an issue with regards to

5   how you all are getting documents from your clients.

6   Ms. Menzies raised the argument or the issue that you all

7   should have produced those documents to them in the course of

8   your producing ESI.  What's the status there?

9          MR. OOT:  If there was a legal hold trigger at the

10  time -- I mean, there are a lot of different factors that could

11  go into whether or not those documents would exist at Sanofi or

12  not.  Just as we were arguing on the call about the redactions

13  on the document that relate to this email, it's not 100 percent

14  that there was a legal hold obligation -- there was no legal

15  hold obligation in this case related to that communication.

16          So if we pivot to the whole legal hold issue

17  generally, does a call from a customer service center or an

18  email into a customer complaint center count as something for a

19  legal hold trigger?  I think the case law is in our favor there

20  that it doesn't.

21          I dealt with this issue a lot when I was at

22  Verizon.  We had a lot of people calling and saying, "I'm going

23  to get my lawyer.  I'm going to sue you."  If we issued a

24  litigation hold every time we did that, we wouldn't have --

25          THE COURT:  I don't want to get down into that

04:34

1  particular tar pit right now, but I thought it was a legitimate

2  question.  If that's the answer, then that's the answer.  If

3  that's an argument for another day, that's fine.

4        The larger question is what to do about what may

5  still exist out there.  Now, I have read what both of y'all

6  gave me.  I have done some research on my own.  My

7  understanding of the way this works is that these are simply

8  people that are in a group marshaled, I guess, by Google or

9  some function that Google provides to communicate with each

10  other by email, and so the resulting information and documents

11  are emails.  That's all I have seen.

12        **MR. OOT:**  May I approach, Your Honor?

13        **THE COURT:**  Yes.

14        **MR. OOT:**  This might be helpful.  These are

15  screenshots of Google groups.

16        So when you go to the Taxotears Google group

17  site, there is an administrative password and log-in in order

18  to get there.  Obviously we can't see this information, but as

19  we put in our papers, in footnote 9 in particular, there are

20  plaintiffs in this case that have said that they are members.

21  So what I thought to do is go to my Google groups and show you

22  how Google Groups works from this perspective.

23        The first page you log in, you see your groups

24  that you are members of.  Mine are Drug and Device Law, Sedona

25  Conference, Brainstorming Group on Cloud Computing.  You click

04:36

1    through.  The next one just shows what one of those posts looks

2    like.  The following page after that is the archive of messages

3    inside the Google group that is retained.

4              You will see that I didn't write any of those

5    messages.  Those are messages from other people that are

6    retained inside the archive of Google Groups, so it's akin

7    to -- I don't know if, Your Honor, you remember the old Usenet

8    or bulletin board system.  That's really what Google Groups is.

9              So in addition to the actual content of these

10   messages, the final page is a list of noncontent information

11   that lists what's the group name, what's the description of the

12   group, what's the group email.  You can see that you can get

13   this information out via RSS feed, or real simple syndication,

14   or alternatively Atom is another real simple syndication tool.

15   You will see the number of members in this noncontent

16   information, and you can see who can access it.  This group is

17   from 2009, so it was sometime ago that I joined the Sedona

18   Conference group.  You will see that there's a lot of

19   noncontent information there.

20             So what we are asking, Your Honor, is that -- we

21   have seen a pattern here.  There is a pattern that we are not

22   getting this highly relevant information, and it's something

23   that I believe that the PSC has access to.  We know that the

24   PSC has access to at least two of the messages, as we found out

25   on the call with you last week, Your Honor, but we would like

04:37   1   access to it or we would like it produced to us.

2               So what we are proposing is kind of threefold.

3   First, we are asking that the Court issue an order for

4   preservation to Google.

5           **THE COURT:**  I'm not doing that.

6           **MR. OOT:**  Okay.

7           **THE COURT:**  The provision you cited to me is part of

8   the code of criminal procedure.  I'm not doing that.

9           **MR. OOT:**  I cited to you the Stored Communications

10  Act.

11          **THE COURT:**  18 U.S.C. § 2703 --

12          **MR. OOT:**  § 2703(f).

13          **THE COURT:**  -- is found in the crimes section of the

14  criminal code.

15          **MR. OOT:**  It's the Stored Communications Act,

16  Your Honor, and the other communications privacy --

17          **THE COURT:**  As far as I know, you are not an attorney

18  for the government.  You are not in a position to ask me to

19  issue that order.

20          **MR. OOT:**  That is --

21          **THE COURT:**  I'm not going to do it on my own.

22          **MR. OOT:**  I'm not asking for a § 2703(f) letter,

23  Your Honor.  What I am asking for is a preservation order.  So

24  what that statute does say is a government agency can issue

25  that § 2703(f) letter without a court order until a court can

04:38

1  issue the order for that production.  So the reason that I put

2  that in there is to -- I tell the Court that we are not a

3  government agency, and § 2703 also states that a Rule 45

4  subpoena to Google is not good enough.  So the *FTC* case, the

5  *Netscape* case, those are all cases that state that if we run to

6  Google and issue just a plain old-fashioned Rule 45 subpoena,

7  they would tell us to go pound salt.

8           So we have a serious concern about the

9  preservation of this material.  Ms. Menzies has already said to

10  the Court that this doesn't exist and it only exists in email.

11  Well, that's one place that it can exist.  So we have a concern

12  that if the archive is not there, where is it?

13           So the next point of that would be we would like

14  the access to the noncontent information.  We would like to

15  know who are the members of this group.  So if we had access to

16  the members of the group and that archive is not there, as

17  Ms. Menzies has already said, we could go and issue third-party

18  subpoenas again to all of the members of the group.  So what

19  our real concern is is that --

20           **THE COURT:**  Why are you interested in issuing

21  subpoenas to the nonparty members?

22           **MR. OOT:**  Because this content, Your Honor -- and

23  what we put in our papers too -- is that it's highly relevant.

24           **THE COURT:**  I'm focused on why aren't we talking

25  about parties.  How many plaintiffs are there in this case?

04:39    1          **MR. RATLIFF:**  Your Honor, I can address it.  How many

2   plaintiffs are in this case or as part of this Google group?

3          **THE COURT:**  Altogether.  Well, you don't know the

4   answer to the second one.

5          **MR. RATLIFF:**  Well, we know that there are at least,

6   I think, 30 to 35 plaintiffs who have disclosed that they are a

7   member of this Google group.  I think we need to step back and

8   look at this in a little more simple fashion.

9                This is a Google group that was set up directly

10   related to women who believed that Taxotere had caused their

11   permanent hair loss.

12          **THE COURT:**  I know that.

13          **MR. RATLIFF:**  There have been productions to us,

14   snapshot productions from some plaintiffs.  What we have seen

15   from those snapshots is highly relevant, highly probative

16   information:  people talking about the alternative causes to

17   their hair loss; people talking about their diagnosis for their

18   hair loss; people talking about when they knew -- when they

19   knew -- that their hair loss had started and when they believed

20   it to be permanent.  What we are seeing is just a snapshot of

21   that.

22                So as part of this group, what we are getting is

23   the emails that this group distributes out to the members.  But

24   what exists and what we don't have visibility into are all of

25   the posts -- the message board, if you will -- of everything

04:40

1   that is in this group that people have been talking about, what

2   they say about these issues, what our plaintiffs may have been

3   reviewing or at least could have reviewed, which would go to

4   summary judgment motions, which would go to depositions.

5           The part that strikes me as the fundamental

6   imbalance is that a plaintiff, a client of some of the

7   attorneys in this room, could go access this group, look

8   through it, provide to their attorneys what they find

9   interesting that their attorneys may want to use, and because

10  it is a private group we have zero visibility in there.

11          So the plaintiffs and the PSC can access this

12  information at will.  We have no ability to access this

13  information at all.  All it would take is for one plaintiff to

14  go in, access it, download what exists in terms of the

15  historical posts about Taxotere, about permanent hair loss,

16  about potential alternative causes, what is being investigated.

17          We think there is a reason that the plaintiffs

18  do not want this information disclosed; because based on the

19  little bit of ESI that's been produced to us so far from this,

20  it is game-changing.  It's the kind of information that will

21  totally shift the scales of this particular litigation.

22          **THE COURT:**  Particularly with the plaintiff, why

23  isn't the approach to determine every plaintiff in this

24  litigation that's a member of this group and request them to

25  download that information that pertains to them?

04:42

1        **MR. RATLIFF:**  I think there's kind of two parts to
2   that, Your Honor, which is they should be doing that anyway.
3        **THE COURT:**  They should.
4        **MR. RATLIFF:**  We will make that request again, that
5   we don't want just when they get an email in their Gmail; we
6   want them to go into the actual portal and pull this
7   information.  If they are only getting what pertains to them,
8   what we are not getting is everything that these people could
9   review that maybe were posted by other individuals.  We would
10  be happy to have this submitted, have it produced in full to
11  us, or to the Court, or to a third party to review to see if
12  this is information that should be turned over to us.
13            My concern is, for example, Ms. Menzies said,
14  "Well, we got this information from a woman named Shirley
15  Ledlie, who lives in France."  That was the nonparty.  From
16  what we have seen, Shirley Ledlie is a prodigious poster on
17  this Taxotears user group.  In fact, upon information and
18  belief, I believe she is the one who started this user group
19  and is the owner of this user group.
20            So if Ms. Ledlie, who lives in France, who we
21  have no access to, we can't issue the normal type of
22  third-party discovery to to obtain this -- if she can funnel
23  information to the PSC that they find beneficial to their
24  particular legal issues, the litigation hold and the sort of
25  ongoing drumbeat on spoliation, but we don't have access to the

04:43

1   99 percent of other information that is damaging to their case,

2   there is a fundamental imbalance.  It would be an easy, easy

3   solution for them to do, but there's a reason they don't want

4   this information disclosed.

5                So, yes, there may be 30 plaintiffs.  Those are

6   the ones who have disclosed.  We have had plaintiffs who in

7   their 71A disclosure said, "I went and I looked and I searched

8   these posts."  So while Ms. Menzies says it's impossible, this

9   doesn't exist, clearly the plaintiffs in this litigation are

10  going to this user group and looking through the posts.  So we

11  are at a point now where I think we deserve and are entitled to

12  the corpus of information that exists inside this user group.

13               I think the point Mr. Oot was making about a

14  preservation order is this.  If there's no decision made

15  today -- and you may not.  You may deny it.  I understand that.

16  These nonparties then can go back in there.  Ms. Ledlie can go

17  back in there, if she is the owner of this group, and start

18  deleting things, and we have zero recourse.

19               Maybe we get a ruling from you today, maybe we

20  get a ruling from Judge Engelhardt in two months, and we find

21  out that information from a nonparty or a nonparty had gone

22  through and cleaned up what they know now is damaging, damaging

23  information about the nature of their claims --

24               **THE COURT:**  Let me here from Ms. Menzies.

25               **MR. OOT:**  Your Honor, just very quickly, Judge Roby

04:45  1    has ruled on this very issue.

2              THE COURT:  Look, in the future, if you all want to

3    hand me things, hand them to me by email two days before the

4    hearing.

5              MR. OOT:  The reason I'm giving it to you now,

6    Your Honor, is Ms. Menzies said that this information doesn't

7    exist.  That struck me to actually research the information

8    that I did just last night to find out how Google Groups works

9    to see if that information is there.

10                  To answer your earlier question, Your Honor, why

11   we would seek access to all of the members of this group and

12   potentially third parties is to remediate that.  So if

13   Ms. Menzies is right and this archive is not there, the only

14   place that we are going to be able to remediate this from are

15   the emails that exist in the individual accounts from both

16   plaintiffs and potentially third parties.  So we want access to

17   the archive.  If the archive is not there, the next step would

18   be to find out where we can find the other information.

19             MS. MENZIES:  Karen Menzies for the plaintiffs.

20                  I think, Your Honor, the entire premise of this

21   argument is based on inaccurate accusations of what we have or

22   have access to.

23             THE COURT:  I know what you all have.  I know what

24   you all have given them.  I'm really fed up with the personal

25   *ad hominem* attacks that are going on in this case between

04:46   1   lawyers and it's going to stop.  I'm not going to speak to it

2   beyond to tell you all that it's going to stop.  If the lawyers

3   in this case can't figure out a way to litigate it

4   professionally, we will find other lawyers who can.

5           I don't want to read any more personal attacks

6   among the lawyers in this case.  You are going to keep that to

7   yourselves.  What I'm interested in is access to this

8   information.  That's what I'm interested in.

9           MS. MENZIES:  Thank you, Your Honor, and I appreciate

10   what you just said.

11           THE COURT:  Well, it's gone both ways.  I'm not

12   speaking just to one side right now.  This is a two-way street,

13   and it has been for a long time.  I'm talking to everybody in

14   the case.  It needs to stop.

15           Go ahead.

16           MS. MENZIES:  So the fundamental misunderstanding is

17   that this is postings or some way that we can go to a database

18   and obtain all this and figure out who was all in it.

19           There is an avenue for counsel to obtain

20   discovery from Ms. Ledlie.  Even though she is a third party,

21   we named her as a witness, as we told you in our paper.  They

22   can notice her deposition, and they can request everything she

23   has.  I have talked to her about that.  We understand that.

24           What we can't do and what she can't do -- and I

25   have verified -- is go to some Google account and look at all

04:47

1    the -- they are not done like posting.  As I explained in our

2    paper, they get a notice that somebody sent an email through

3    Taxotears in their personal email.  That's it.  I have asked

4    very thoroughly --

5                    **THE COURT:**  They can go read that post?

6                    **MS. MENZIES:**  Yes.  And the ones in the past -- so

7    they read it as they go.  Then ones from the past, if they kept

8    their email address, they may be able to find it.  Ms. Ledlie

9    has an old Hotmail account.

10                   **THE COURT:**  I'm looking at what Mr. Oot just showed

11   me he pulled up on his own group.  There's a list of historical

12   email exchanges that don't include him.  He has printed one out

13   and that's what I'm looking at.

14                   **MS. MENZIES:**  This is the first time I have seen

15   this.  I have no idea.  I have gone to Ms. Ledlie and we have

16   gone to our plaintiffs to ask them if they can access this

17   stuff and how it's set up.

18                        Now, I can explain to the Court that it is not

19   Ms. Ledlie or Ms. Kirby who set up the Google group.  It's

20   another third party from another country.  I have never been in

21   touch with that person, but that's my understanding.  I have no

22   idea if she is able to do it, but I can tell you my

23   understanding from Ms. Ledlie is that she is off of the

24   Taxotears and, in fact, the other woman is as well.  So if that

25   woman could do it, because she was the one vetting the women

04:49

1    into the group, that's a whole other issue.  I don't even know

2    where this woman is, but -- or you go to Google.

3                   Let me go back to the proper avenue of what we

4    said.  As far as what our plaintiffs have done -- I have looked

5    at all the ones -- at the plaintiffs in the footnotes in

6    defendants' submission.  There's 13 of them that they list.

7    Only two of them even were diagnosed with breast cancer and

8    took Taxotere in a timeframe where they would have access to

9    those 2010 emails.

10                  I don't know when they joined the Taxotears

11   group, but this is all in the PFS.  I got it from the PFS.

12   Most of these women that they are talking about, they say when

13   they joined the group.  Some of them, even though they were

14   diagnosed back in 2007, they joined the Taxotears group in

15   2016.  That point is that --

16        THE COURT:  The PFS requires every plaintiff to

17   disclose whether they are a member of a group like this.

18        MS. MENZIES:  Correct.  They are answering those

19   questions, and that's where I got this information.  I don't

20   represent any of these women, so I went to Centrality and

21   looked at their PFS to see if they are responding now.

22                  If counsel has concerns -- now, remember, they

23   are required to do, under PTO 71, a review of their ESI, a

24   reasonable inquiry on what they can find and get and produce.

25   That's what they have been doing.  If the defendants have

04:50

1   concerns about deficiencies about what they have produced,

2   there's procedures for them to do that, but I don't have access

3   to all that stuff.

4           Mr. Oot says in his footnote 11, "We are not

5   asking the PSC to provide documents they have obtained through

6   their investigation."  Yes, he is.  This is information --

7           THE COURT:  He is asking for an entirely different

8   investigation is what he is asking for.

9           MS. MENZIES:  It's not even within our technical

10  capabilities.  Maybe he could go to Google and get it.

11          THE COURT:  You probably can't answer this question,

12  but maybe you can.  Can you tell me if there's one lawyer for

13  one plaintiff in this case that's got access to this group?  Is

14  there a lawyer involved in this litigation that is representing

15  any plaintiff anywhere in this case that has access to this

16  group as a member?

17          MS. MENZIES:  As a current member --

18          THE COURT:  Someone who can go right in, like Mr. Oot

19  went into his group, and access all this information.

20          MS. MENZIES:  That's two different questions.  Are

21  there members who are plaintiffs and they are currently members

22  of Taxotears?  Yes.

23          THE COURT:  No.  I'm asking about lawyers, their

24  lawyers.

25          MS. MENZIES:  My understanding from the plaintiffs

04:51   1   and Ms. Ledlie -- when I was trying to address whether we could
        2   even do this, my understanding is there is no place to go find
        3   posts or past emails unless you happen to have them in your
        4   email already, which is being collected through PTO 71.
        5            **THE COURT:**  You are not answering my question.
        6            **MS. MENZIES:**  Okay.
        7            **THE COURT:**  There are how many members that you all
        8   are aware of --
        9            **MS. MENZIES:**  I have no idea.
       10            **THE COURT:**  -- from the PFS that are plaintiffs?
       11            **MS. MENZIES:**  I would have to look at 8,000 claims.
       12   I have no idea.
       13            **THE COURT:**  No, the ones you just said are in the
       14   footnote, 13.
       15            **MS. MENZIES:**  So of this group --
       16            **THE COURT:**  They have access to this group.  They are
       17   members of the group.
       18            **MS. MENZIES:**  Apparently they added these in because
       19   they understand from their PFS that they said they were members
       20   of the group.
       21            **THE COURT:**  What I want to find out is if there are
       22   any lawyers on the plaintiffs' side of this case who have
       23   access to this group in the same fashion that any of these
       24   ladies have access to this group, who have inserted themselves
       25   into this group.  That's what I want to know.

04:52

1              **MS. MENZIES:**  If I understand what you are asking,

2   access, going to their plaintiffs and getting their old emails,

3   yes.

4              **THE COURT:**  No, no.

5              **MS. MENZIES:**  Going to a Google group --

6              **THE COURT:**  Yes.

7              **MS. MENZIES:**  -- and a database and posting, no.  As

8   far as we understand from all of our research, they --

9              **THE COURT:**  I don't know that -- can you possibly

10  know that?

11             **MS. MENZIES:**  Okay.

12             **MR. COFFIN:**  I think what you are asking, Your Honor,

13  is do we know if any lawyers who are in this litigation --

14             **THE COURT:**  Yes.

15             **MR. COFFIN:**  -- representing plaintiffs, if the

16  lawyers themselves have become members of the Taxotears group.

17             **THE COURT:**  Yes.

18             **MS. MENZIES:**  Oh.

19             **MR. COFFIN:**  I have no clue.  I can tell you this.

20             **THE COURT:**  I want to know.  I want to find out.

21             **MR. COFFIN:**  Well, Your Honor, there are -- I don't

22  know -- 100 different firms or 150.

23             **THE COURT:**  How do you communicate with those people?

24             **MR. COFFIN:**  Through liaison counsel.  We send

25  messages out to them.

04:53

1          THE COURT:  Well, that's a message that's going to

2    get sent.

3          MR. COFFIN:  Okay.

4          THE COURT:  If that's the case, I think it changes

5    how I approach this.

6          MR. COFFIN:  Well, okay.  I'm not sure where you are

7    going there, but we do have --

8          THE COURT:  Because I keep hearing about everything

9    that can't be done by the lawyers:  we can't go back; we can't

10   look for this; we can't collect this; we can't do this.  I

11   don't know if it's because you all aren't members or because

12   you rely -- I don't know.  I'm trying to find out what -- when

13   I say "you," I mean as attorneys who are not members of this

14   group, what your relative access to the information that can be

15   obtained by members of the group is.

16         MS. MENZIES:  I can't speak for 150 lawyers and if

17   anybody joined the group, but what I can tell you is Shirley

18   Ledlie and Pam Kirby set up the support group that eventually

19   became the Google group.  A third party set it up as a Google

20   group, and my understanding is she was the one who would vet

21   the women who came in.

22              I grilled Ms. Ledlie to find out, for

23   preparation of today, "Can you go back on any website, any

24   database, anything, as a member of this Taxotears group, and

25   find previous posts?"

04:54

1          She said, "I have no idea how I would do that."

2          THE COURT:  Mr. Oot knows how to do it, apparently,

3    by what he showed me just now.

4          MS. MENZIES:  How do we even know if that's the same

5    type of Google group?

6          THE COURT:  I don't.  I'm trying to figure it out.

7          MR. COFFIN:  Your Honor, can I address one thing

8    here?

9          THE COURT:  Yes.

10          MR. COFFIN:  There is a mechanism for plaintiffs to

11    answer discovery in this case.  It's called the Plaintiff Fact

12    Sheet.  It's incredibly detailed.  On the tail of that is

13    PTO 71A, an ESI order that is incredibly detailed.  There is a

14    certification that Judge Engelhardt has required.  These people

15    are looking through their ESI like I have never seen required

16    in a case.

17          I think the process is in place to make sure

18    that the discovery that they are seeking is coming out, either

19    through the PFS or through the ESI order.  With respect, I

20    can't imagine another layer of discovery on the plaintiffs when

21    those two documents or certifications are in place.  They

22    should be going to each individual plaintiff.

23          MR. RATLIFF:  Your Honor, on behalf of Sanofi, we

24    don't know -- I think one of the very first pages that Mr. Oot

25    gave you is the link that goes into that Google group.  We

don't have access to it, so we have no ability to test the
validity of Ms. Menzies' claims or Ms. Ledlie's claims, what's
in there, what posts exist, what can be searched, what cannot
be searched.

What I do know, from looking at what Google
represents, is that it's a way to organize your favorites and
folders and posts.  We have one plaintiff who said, "I went to
Taxotears and I searched the online posts."  There is a simple
solution.  Let's just test the veracity and find out what
exists inside of this Google group.  Maybe I'm wrong.  Maybe
there's 15 posts and that's it, and we have an answer to our
question.

**THE COURT:**  How do you propose to test the veracity
of what we are being told?

**MR. RATLIFF:**  Why don't we have one of the
plaintiffs -- I don't know if any plaintiffs' counsel have
access to it.  Their clients certainly have access to it.  They
certainly instructed their clients -- or I would hope they have
instructed their clients -- to go to this user group and find
out what's in there so we are not talking about this in the
dark.

I think the issue, as it relates to what
Mr. Coffin raised, it's not so much about what an individual
plaintiff posted; it's what is in the corpus of information
that they would have reviewed.

04:57

1    **THE COURT:**  I think that's a bridge too far.  You are
2    talking about what could be stream of consciousness blog posts
3    or thoughts from some person that nobody has ever met before
4    and has never seen.  That's too much.

5            You have nonparties that are either blogging or
6    sending emails.  God knows what's in them.  To search for that
7    kind of information that's probably not relevant -- and if it
8    is, it's in all likelihood disproportionate to the needs of
9    this case -- I'm just not going there.  To start subpoenaing
10   third parties?

11   **MR. RATLIFF:**  Well, see, I would like to avoid the
12   subpoena of third parties if we can to see what is in this type
13   of information, because it gets back to sort of the issue or
14   point I was talking about.  If Ms. Ledlie has access to this
15   and she can provide plaintiffs' counsel information she thinks
16   is helpful to their litigation but not all the other
17   information that's in there, it puts us at a strategic
18   disadvantage.

19           So I think the solution that Your Honor
20   suggested is at least a first step to this issue because this
21   is potentially a massive amount of information that is
22   directly -- not tangentially.  It's not a breast cancer
23   survivors network.  This is a group that is dedicated to people
24   who believe Taxotere caused them to have permanent hair loss.
25   That is, I think, what you suggested --

04:58

1        **THE COURT:**  I'm not sure that I agree with that.  You

2  don't know what every one of these people were thinking when

3  they joined this group.

4        **MR. RATLIFF:**  You're right.  I'm just going on what

5  the title is and what the organization represents that they

6  stand for.

7        **MR. OOT:**  Your Honor, may I propose a technical

8  solution?

9        **THE COURT:**  Uh-huh.

10       **MR. OOT:**  So, as you know, I used to be at the

11  Securities and Exchange Commission.  We dealt with this type of

12  issue all the time, specifically in front of Judge Oetken,

13  where he ordered our adversaries in the case to consent to the

14  disclosure of that material to a taint team.  We could do a

15  very similar type of thing in this case because we know that

16  there are plaintiffs in this case that have access to the full

17  archive; not just their posts, but the full archive.

18            So if we are concerned about nonresponsiveness

19  or privacy or things that are not relevant to this case, the

20  Court could order those plaintiffs that are participating in

21  this case to consent to that disclosure from Google to some

22  third party, some taint team.  That could be an approach to

23  accomplish the goals that I think Your Honor is thinking about,

24  avoiding the production of irrelevant or nonresponsive

25  information, and then also provides us with the ability to find

05:00

1    out what information is there.

2                    And then secondly, the noncontact information,

3    Your Honor, I don't think that there's anything that could be

4    irrelevant or nonresponsive or secret about the noncontact

5    information.  It's very basic.  It's numbers, subscribers.

6    It's the users in the group.  It's the title of the group.

7    It's really, really baseline things, including the account

8    holder information.  Under the Electronic Communications

9    Privacy Act, it's something that we would be entitled to if we

10   were a federal regulator, but it's something that you can order

11   as noncontent information and Google could provide to us.

12        **MS. MENZIES:**  So they want us to do their third-party

13   investigation for them.  Your Honor, they have --

14        **THE COURT:**  Hold on a second.

15        **MS. MENZIES:**  Your Honor, they have Shirley Ledlie.

16        **THE COURT:**  They want to conduct an investigation

17   that they can't conduct without a procedure similar to the one

18   that Mr. Oot just suggested.  They know that there's

19   information out there because there are individual plaintiffs

20   who have testified that they are members of the group and have

21   access to certain types of information that they are looking

22   for.  They can't get it.  You all are putting up a fight.

23   That's what this is about.

24        **MS. MENZIES:**  We are not putting up a fight,

25   Your Honor.

05:01

1       THE COURT:  Well, sure you are.

2       MS. MENZIES:  We are responding to the discovery on

3   every one of these women.  They are admitting that they are

4   members of the Taxotears group.  They are producing the emails

5   that they have, that they are able to produce through the very

6   onerous PTO 71 for every one of these women.

7       THE COURT:  Look, I'm a humble magistrate judge.  I

8   am not an expert in these matters.  I have one set of lawyers

9   telling me this information is accessible to any member of the

10   group.  I have another set of lawyers telling me no, it's not.

11       MS. MENZIES:  And I'm talking to the members.

12       THE COURT:  How do I answer that?  How do I get to

13   the bottom of what the truth is?

14       MS. MENZIES:  What I would suggest, Your Honor, is

15   that they are trying to avoid discovery against the originator

16   of the support group, Shirley Ledlie.  We have her on our

17   witness list.  We will produce her even though she is in

18   France.  We will produce the documents.  They can request

19   everything she has about the Taxotears group.  I can tell you

20   if anybody has a large number of emails left over that started

21   back in 2008, 2009, it's going to be her.  They have a right to

22   do discovery against her because we have disclosed her as a

23   witness.

24       Now, for them to say to me, "Well, we don't want

25   to depose her.  We want to steer clear of that" --

05:02

1      **THE COURT:**  I haven't heard that.

2      **MS. MENZIES:**  Mr. Ratliff just said that.

3      **THE COURT:**  No, I didn't hear that.

4           Maybe you did.

5      **MR. RATLIFF:**  I have never had this offer made to me

6  until today.

7      **MS. MENZIES:**  She is on the witness list since

8  March 16.

9      **THE COURT:**  Before I start ordering special masters

10  or whatever it is that I would order, it would certainly be

11  appropriate for you all to depose this person.

12      **MR. OOT:**  If we can have a consent form for access to

13  the Google group too, that would help us get --

14      **MS. MENZIES:**  We need to brief that issue,

15  Your Honor.

16      **THE COURT:**  Yes, I think you do.

17           Here is what we are going to do.  You already

18  owe me something in a week.  So on the same deadline, on

19  May 2 -- and I guess I have to put a time, too, so that we are

20  not jockeying to see who files first and who can wait.  Let's

21  say by 5:00, and you all can send me emails 30 seconds apart.

22  I want to know -- actually, let's do this.

23           By this Friday, Mr. Oot is going to communicate

24  with Ms. Menzies as to what it is specifically that you are

25  proposing.  Then I will give you all until next Friday to brief

05:03

1    it.  I don't want you briefing in the dark.  I want to know

2    exactly what the specific proposal is, and then I will give

3    everybody a week to support it or oppose it, as the case may

4    be.

5             MR. RATLIFF:  We can do that, Your Honor.

6             THE COURT:  I will consider some arrangement using

7    some neutral third party, but I'm not convinced that I'm going

8    to do it.  I'm not convinced, if I do do it, that I'm going to

9    do it before we have the benefit of the testimony of the woman

10   who apparently started this whole thing.  It's somebody who is

11   clearly going to be in a position to answer a number of

12   questions that you all are going to have and that I will have.

13            In all likelihood, that's going to be step

14   number one, because I don't know if this is a mountain or a

15   molehill.  I don't want to go too far down the road arguing

16   about something that's ultimately not that big of a deal.  You

17   may be able to get access to what you need by talking to

18   Ms. Ledlie.

19            MS. MENZIES:  Yes, Your Honor.

20            MR. RATLIFF:  Thank you, Your Honor.

21            MS. MENZIES:  I would like to make a statement for

22   the record if I could, please.  Even after you just admonished

23   us not to do personal attacks, counsel for Sanofi said that he

24   doesn't have any way to test my veracity, and I also have a --

25            THE COURT:  That's not a personal attack.

05:05

1          **MS. MENZIES:**  Your Honor, if I may just make a

2    statement for the record because counsel has inserted

3    allegations of unethical behavior by me against the rules of

4    professional conduct in their submission yesterday.  They have

5    put that to a federal court.  I take that very seriously.

6          **THE COURT:**  So do I.

7          **MS. MENZIES:**  I have been doing this for 20 years and

8    never been accused of that in the past.  If Mr. Oot has a

9    reason to contest my ethical behavior, he should take a

10   complaint to the bar so I have an appropriate forum to respond

11   to it.  I will leave it at that.

12         **THE COURT:**  Well, let me say this.  I don't have any

13   concerns about the ethics of any of the lawyers in this case.

14   I am beginning to have concerns about the professionalism of

15   some of the lawyers in this case.  I'm not going to continue to

16   endure some of what has been going on.  I just got finished

17   telling you that.  This is the last time that I'm going to fire

18   a shot across anybody's bow.  The next time there will be

19   consequences.  You all should be much better than this.

20              I understand how you took that comment.  I did

21   not take it that way.  The way I took it is that the

22   information you are being provided, as to how to deal with this

23   particular platform, is coming from other people.  You don't

24   hold yourself out to be an expert in Google Groups.  I think

25   that what they are concerned about is -- I think they have a

05:06

1  different experience.  It's not, I don't think, in this

2  situation about whether the lawyers are trying to hide

3  something.  It's what does the technology allow.  That's what

4  I'm interested in getting to the bottom of.

5          **MR. OOT:**  Your Honor, I will apologize for my comment

6  to Ms. Menzies, but it had nothing to do with the Google group.

7  It had to do with a submission to Your Honor that we didn't

8  have the opportunity to respond to.

9          I apologize to Ms. Menzies for referencing the

10 Northern District of California rules, but it really took us

11 aside where we didn't have an opportunity to file a very

12 similar document.  We weren't copied on the message right after

13 I got off the phone with her.  We were --

14         **THE COURT:**  I'm going to say this for the last time.

15 Emails that are late, those are my problems.  If I have a

16 problem with that, you all will know it.  I don't need to just

17 keep being re-fed everything that I'm trying to talk to y'all

18 about.  I know what the rules are.  I know what the parameters

19 are of how we are running these conferences.

20         I don't think I've been shy about telling you

21 all if I have a problem, so I don't need to be reminded.

22 Let's, as they say, keep it in between the lines.  All right?

23 I don't want to have to go down this road anymore.  Enough is

24 enough.

25         **MR. COFFIN:**  Your Honor, on the briefs you just

05:08   1   mentioned, five pages each side?

2           THE COURT:  Yes, let's limit it to five pages.  On

3   the Earnest brief, we are going to push that deadline to Friday

4   at 5:00 as well so I'm getting everything at once.

5           MR. COFFIN:  Okay.

6           THE COURT:  The next conference is May 10 at 10:00

7   a.m.

8           MR. COFFIN:  Is that up for discussion?  I think I'm

9   fine with it.

10          THE COURT:  I'm inclined to say no because once I

11  open it for discussion, then we are never going to get -- this

12  happened last time.

13          MR. COFFIN:  It's just a long pause.  I just wanted

14  to make sure.

15          MR. MOORE:  DRI's drug and medical device conference

16  is that day in New York.  A lot of us are already committed to

17  the meeting in New York that day.

18          THE COURT:  Okay.  That's a fair point.  I want to do

19  it that week.  How about 4:00 on the 8th?

20          MR. MICELI:  Is that Monday?

21          THE COURT:  It's Tuesday.

22          MR. RATLIFF:  Your Honor, I will be here available

23  for Sanofi.

24          THE COURT:  Let's do 4:00 on the 8th.

25          MR. COFFIN:  We will have somebody here.

05:09

1    THE COURT:  I want some of y'all to be here because
2    we are going to be addressing the issues that y'all are
3    briefing.
4         MR. COFFIN:  Absolutely, Your Honor.
5         THE COURT:  I really don't want to do that over the
6    phone.
7         MR. RATLIFF:  Could I respectfully make one
8    scheduling suggestion?
9         THE COURT:  Uh-huh.
10        MR. RATLIFF:  One of the things -- I may be speaking
11   somewhat on behalf of the plaintiffs too, but something that I
12   have seen that has occurred is -- I understand the Court's
13   interest in having these conferences every two weeks to move
14   the ball along, but I think one of the things that I have
15   noticed that is happening that I think may be frustrating the
16   Court is we leave these conferences essentially on a Wednesday
17   or a Thursday, and our submission for the next conference is
18   due by that next Friday, which means that the parties -- I
19   would assume plaintiffs likewise -- are already starting to
20   work on their next submissions essentially two or three days
21   later.  I sometimes don't know if it allows for breathing room
22   to maybe actually have meaningful meet-and-confers to take some
23   of these issues off your plate.  That's a practical --
24        THE COURT:  What I would suggest is that we go back
25   to the way that we started.  I haven't found a period of time

05:11

recently where I thought it was okay not to have one of these
hearings because of how they are going.  So what I would
suggest is that you all seriously discuss whether we need to
have a hearing on that day, a week later, two weeks later, but
that's up to you all.

**MR. RATLIFF:**  Understood, Your Honor.

**THE COURT:**  Because every two weeks I'm getting
submissions.  People are coming in here and arguing about
things, so I assume that means they are important.  Certainly
when the schedule was what it was -- I don't know that it's
been changed yet, but it's going to be changed -- I think that
was more of a problem.  If breathing room is what you think you
all need to try to work some of these things out, I think maybe
that you have some of that now, and you all can let me know.

We are going to schedule it for that day.  I
don't need to have you all here to make decisions, necessarily,
on those issues; but if we are going to meet anyway, we are
going to talk about those issues since you all are here.

**MR. RATLIFF:**  Absolutely, Your Honor.  I didn't
necessarily mean for the May 8 date.  I just meant going
forward.  I'm not trying to interfere with how the Court wants
to run the courtroom.  It was just something that I have
noticed and I think our team has noticed over the past couple
of weeks is that there's sort of a knee-jerk reaction, "Well,
we have to get started on the next ones."

05:12

1       **THE COURT:**  I said we don't have to have these

2   conferences just because they are on the calendar.  I have had

3   a lot of lawyers stand up and say, "This is urgent.  We need an

4   answer yesterday.  This is the most important evidence in the

5   case."  There's a lot of that going on.  As long as that's the

6   way that these issues are presented to me rhetorically, I'm

7   going to assume that they need to be addressed every two weeks.

8       **MR. RATLIFF:**  Understood, Your Honor.

9       **THE COURT:**  I'm happy to lengthen the time between

10   our meetings.

11       **MR. RATLIFF:**  I'm sure you are.  I've got it.  Thank

12   you, Your Honor.

13       **THE COURT:**  Thank you all.

14       (Proceedings adjourned.)

15                            *  *  *

16

17

18

19

20

21

22

23

24

25

1          **<u>CERTIFICATE</u>**

2          I, Toni Doyle Tusa, CCR, FCRR, Official Court

3   Reporter for the United States District Court, Eastern District

4   of Louisiana, certify that the foregoing is a true and correct

5   transcript, to the best of my ability and understanding, from

6   the record of proceedings in the above-entitled matter.

7

8

9                              */s/ Toni Doyle Tusa*
                               Toni Doyle Tusa, CCR, FCRR
10                             Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25