**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

In Re: TAXOTERE (DOCETAXEL)                         MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

                                                   SECTION "H"

THIS DOCUMENT RELATES TO
ALL CASES

---

**MEMORANDUM IN SUPPORT OF SANOFI DEFENDANTS' MOTION FOR
PROTECTIVE ORDER**

---

Plaintiffs served Sanofi with the first of what they claim will be a series of deposition notices pursuant to Rule 30(b)(6). Under Federal Rule of Civil Procedure 30(b)(6), a party may depose a corporation about matters described with reasonable particularity on the information known or reasonably available to the organization. But Plaintiffs have unfairly and unreasonably noticed a Sanofi corporate representative deposition for the time period from 1992 to 2004—thus dating back as long as 26 years ago and for a period in time spanning over twelve years—on adverse event reports about "persistent alopecia" with Taxotere. *See* Plaintiffs' Notice of Deposition Pursuant to Fed. R. Civ. P. 30(b)(6) (May 30, 2018), attached as **Exhibit A**.

Plaintiffs, however, do not define persisting alopecia with any nexus to chemotherapy treatment, so the notice as fairly read includes women who lose their hair during treatment as expected, who fail to regrow hair immediately after treatment, who never overcome active cancer such that their hair never regrows, and women whose hair later does regrow. Given that alopecia is a well-known and common side effect of Taxotere, Plaintiffs' failure to define "persistent alopecia" in terms of a date certain, temporal relationship to treatment renders the entire notice deficient. Additionally, for each adverse event report, Plaintiffs ask the witness to be prepared to

answer questions about dates, recipients, sources, standard operating procedures, categorization, databases, follow up, other actions, regulatory reporting, and whether the report amounted to a safety signal – all for events that occurred two decades ago.  In addition, Plaintiffs have included four other topics ranging from "strawman" study plans that Plaintiffs know do not exist to findings of studies set forth plainly in documents.

Since receipt of Plaintiffs' notice, Sanofi[1] has worked diligently to identify answers to the topics posed.  This effort has made a handful of related issues with the notice abundantly clear:

- First, <u>some of this information is impossible to locate because it is so granular and so old</u>.

- Second, <u>no witness could ever be realistically prepared to answer questions about a twelve-year period dating back as far as 26 years-ago</u>. To do so would be costly and difficult before ultimately proving hopeless.

- Third, what information <u>is ascertainable</u> is readily offerable <u>in writing</u> or appears on the face of the documents themselves.

In sum, there is nothing fair or reasonable to be gained from a deposition going forward on this notice or the numerous notices that are to follow.  Going forward with such depositions would be extremely burdensome to Sanofi. Nevertheless, Sanofi has agreed to provide the information in the most efficient way: through written discovery.  *See, e.g.*, *Smithkline Beecham Corp. v. Apotex Corp.*, No. 98-cv-3952, 2000 WL 116082, at *10 (N.D. Ill. Jan. 24, 2000) (refusing to allow a 30(b)(6) deposition because "standard interrogatories would be a better method of discovering the particulars of [the] investigation because [the responding party] could synthesize the information from all the necessary sources, which would then be presented to [the requesting party] in a comprehensible manner."). "Where responsive information can be provided more accurately and

---

[1] The party-defendants did not even exist in their present corporate form during the time period covered by the notice. Defendants denominate themselves as "Sanofi" herein for ease of reference.

with less burden through one method of discovery, that method should be used." *See HSBC Bank USA, N.A. v. Green Valley Pecos Homeowners Ass'n, Inc.*, No. 2:16-cv-00242, 2016 WL 6915301, at *6 (D. Nev. Nov. 21, 2016).

Thus, the Court should grant Sanofi's Motion for Protective Order and (1) order that Plaintiffs' amend their definition of "persistent alopecia" to include some timing to treatment or resolution, and (2) limit the information sought through Plaintiffs' 30(b)(6) notice to written discovery, foreclosing a deposition. *See* Fed. R. Civ. P. 26(b)(1); Fed. R. Civ. P. 26(c)(1)(C). *See also* Status Conf. Tr., at 19:25-20:1 (Feb. 22, 2018) ("I think that it would likely be more appropriate to attempt some written discovery before we jump into a 30(b)(6)").

## LAW AND ARGUMENT

Three central flaws in Plaintiffs' notice warrant quashing this deposition:

As set forth in Section I, Plaintiffs refuse to say what "persistent" means in the most critical term in the notice—"persistent alopecia." The entire 30(b)(6) notice is about reports of patients with alopecia. But alopecia with chemotherapy is both common and expected.  Without knowing which reports of alopecia Sanofi is meant to cover, it cannot prepare a witness for this deposition.

As set forth in Section II, the notice is too burdensome, particularly in light of Plaintiffs' plan to serve multiple similar notices, because it covers such a vast period in time so long ago. With the difficulty of tracking down such information, the noticed topics either lend themselves to writing because the documents speak for themselves or are far too extensive for any witness to cover except at a level of detail reducible to writing.  There is nothing for a witness to elaborate on.

As set forth in Section III, adverse event reports – which are the entire basis of Plaintiffs' notice – are doubtful and unreliable evidence, both scientifically and legally, tipping the scale even more sharply against a deposition.

Finally, in Section IV, Sanofi illustrates how the three central flaws impact each Topic.

## I.        Plaintiffs Fail to Describe "Persisting Alopecia" with Reasonable Particularity

A party noticing a deposition pursuant to Rule 30(b)(6) must describe the matters for examination with "reasonable particularity," so that the noticed organization can designate and prepare a witness to testify on its behalf.  Fed. R. Civ. P. 30(b)(6).  "The effectiveness of the Rule bears heavily upon the parties' reciprocal obligations."  *Lipari v. U.S. Bancorp, N.A.*, No. 07-cv-2146, 2008 WL 4642618, at *5 (D. Kan. Oct. 16, 2008).

Only when the requesting party has specifically described the topics on which it is requesting examination can the responding party produce a witness who has been prepared to give answers on the organization's behalf.  *Id.*  A vague or ill-defined notice puts the noticed party to "an impossible task": it cannot prepare a witness to give answers when the examination topics are unclear or all encompassing.  *See e.g.*, *Reed v. Bennet*, 193 F.R.D. 689, 692 (D. Kan. 2000).

Plaintiffs' definition of "persisting alopecia" is both.

Plaintiffs define "persisting alopecia" as "hair loss to any part of the body which is persistent, or persisting, or permanent, or ongoing, or nonreversible, or irreversible, or continuing, or prolonged, or delayed hair regrowth, or not growing, or baldness, or thinning, or thinned hair."  *See* **Ex. A**, at 2.  The most obvious problem with Plaintiffs' definition is that it is circular – it defines <u>persistent</u> alopecia as "hair loss…which is <u>persistent</u>...."  That definition provides Sanofi with no guidance on what types of hair loss Plaintiffs expect a 30(b)(6) witness to be prepared to testify.  Are Plaintiffs seeking information about people with hair loss during chemotherapy?

4

People with hair loss 3 months, 6 months, 1 year, or several years after chemotherapy? Should Sanofi's witness be prepared to talk about hair that grew back years or months after chemotherapy? Plaintiffs' definition leaves all of these question unanswered.

Plaintiffs' definition is also vague and all-encompassing.   Plaintiffs define persistent alopecia as:

- ▪ "hair loss to any part of the body which is…not growing"

- ▪ "hair loss to any part of the body which is…baldness"

- ▪ "hair loss to any part of the body which is…thinning"

- ▪ "hair loss to any part of the body which is…thinned hair"

These definitions do not—on their face—make sense. It is unclear how hair loss can "not grow" or be "bald" or "thin."  But even if Sanofi were to read these definitions to mean that persistent hair loss means hair that does "not grow" or is "thin" or a part of the body is "bald," that definition would not fairly narrow the types of reports of alopecia about which Sanofi's witness would need to testify.   Alopecia is one of the most common and expected side effects of Taxotere®—a drug which has been on the market for over two decades.  Because alopecia is such a common side effect, it would be impossible for a witness to testify about *every* report of alopecia with Taxotere® patients.  As drafted, however, that is exactly what Plaintiffs require.

In their Master Complaint, Plaintiffs defined "permanent chemotherapy-induced alopecia" as "an absence of or incomplete hair regrowth six months beyond the completion of chemotherapy." *See* Am. Mast. Comp. ¶ 180.  For reasons not clear to Sanofi, Plaintiffs use a different term here ("permanent chemotherapy-induced alopecia" vs. "persistent alopecia") and a different definition here, with no reference to *when* hair had not grown back *in relation to treatment*.  And they have refused to amend their notice to reflect what "persistent alopecia"

5

means.  Sanofi cannot be left to guess.

A quick review of the 70-plus reports listed in Plaintiffs' notice illustrates the issue concretely.  Based on criteria Plaintiffs described orally,[2] but will not commit to writing in their notice, Sanofi asked Plaintiffs to remove 45 reports.[3]

Plaintiffs removed some, but not others:

| Plaintiffs Removed | Plaintiff Did Not Remove |
|---|---|
| #21 – 3 months of unresolved alopecia | #2 – Alopecia resolution 4 months after last treatment |
| #22 – No alopecia information provided between last dose of Taxotere and date of death (6 months after last dose) | #9 – 4 months of unresolved alopecia |
| | #11 – 5 months of unresolved alopecia |
| #23 – Alopecia resolution noted at the first follow-up visit | #15 – 1 month of unresolved alopecia |
| #27 – 1 month of unresolved alopecia | #16 – No information provided between last dose of Taxotere and date of death (8 months after last dose) |
| #31 – 5 months of unresolved alopecia | #18 – 4 months of unresolved alopecia |
| #44 – Patient withdrew from study after developing alopecia during treatment.  No follow-up information | #19 – 2 months of unresolved alopecia |
| | #20 – No treatment dates – alopecia duration impossible to determine |
| | #26 – 1 month of unresolved alopecia |
| | #29 – Resolution of alopecia after 5 months |
| | #30 – 1-2 months of unresolved alopecia |
| | #32 – Treatment ongoing at time of report (less than 6 months) |
| | #33 – Less than 1 month of unresolved alopecia |
| | #35 – Less than 1 month of unresolved alopecia |
| | #36 – Still being treated with Taxotere at time of report |
| | #37 – Less than 1 month of unresolved alopecia |
| | #38 – No information on treatment dates or duration.  Only notes alopecia during treatment. |
| | #40 – Only notes alopecia after treatment.  Cannot determine duration |
| | #41 – No information beyond last treatment.  Cannot determine duration |

---

[2] Plaintiffs suggested during meet and confers that they only considered alopecia persisting if there was "affirmative" evidence that hair loss continued after six months.
[3] Sanofi asked Plaintiffs to remove four other reports as duplicates; Plaintiffs removed only two.

| | |
|---|---|
| | #42 – Alopecia after treatment with Taxotere.  Outcome not reported |
| | #43 – Alopecia after treatment with Taxotere.  Outcome not reported |
| | #46 – No treatment dates.  Impossible to determine duration |
| | #50 – Resolution after 10 months |
| | #53 – Redevelopment of alopecia after resolution of chemotherapy-related alopecia." |
| | #57 – Still receiving treatment at time of report |
| | #58 – Resolution after 7 years |
| | #59 – Only notes alopecia during treatment |
| | #60 – Less than 6 months of unresolved alopecia |
| | #64 – Treatment dates and duration of alopecia not provided |
| | #65 – Treatment dates and duration of alopecia not provided |
| | #66 – Treatment dates and duration of alopecia not provided |
| | #67 – Treatment dates and duration of alopecia not provided |
| | #68 – Treatment dates and duration of alopecia not provided |
| | #70 – Duration of alopecia and dates of treatment not provided |
| | #72 – Resolution after 17 months |
| | #73 – Resolution of alopecia; alopecia may have re-developed |
| | #74 – Alopecia resolved after 12 months |
| | #76 – Resolution after 10 years |
| | #78 – Resolution after 6 years |

With such an indecipherable approach to the reports listed in the notice, Sanofi is left to suppose what other reports it should be identifying and about which the witness should be prepared to testify.  As such, Plaintiffs have failed to define "persisting alopecia" with reasonable particularity, and they have put Sanofi to an impossible task of guessing what it means.  Thus, the Court should

grant Sanofi's Motion as no witness could be prepared to discuss decades-old unspecified reports.

II.     **Plaintiffs' Insistence on a 30(b)(6) Witness is Disproportionate to Their Actual Need and Unduly Burdensome and Expensive**

Serious constraints face an entity asked to produce a witness under Rule 30(b)(6) on vast periods of time, and particularly, remote periods in time. *See, e.g.*, *Sahu v. Union Carbide Corp.*, 528 Fed. Appx. 96, 103–04 (2d Cir. 2013) (unduly burdensome to require defendants to prepare witnesses to respond to questions regarding events that took place between[15 and 35 years ago); *Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC*, No. 09–cv–0916, 2011 WL 3880787, at *2 (E.D. Wis. Sept. 1, 2011) (information dating back approximately 20 years was no longer reasonably available to 30(b)(6) witness); *In re JDS Uniphase Corp. Secs. Litig.*, No. 02-cv-12486, 2007 WL 219857, at *2 (N.D. Cal. Jan. 29, 2007) (no employee could testify as a 30(b)(6) witness to events that occurred over seven years earlier); *Barron v. Caterpillar, Inc.*, 168 F.R.D. 175, 177 (E.D. Pa. 1996) (information regarding a product designed and manufactured roughly 25 years ago was unavailable for purposes of a 30(b)(6) deposition).

Further, the recently-revised Federal Rules of Civil Procedure mandate that ***all*** discovery be proportionate to the needs of the case.  Fed. R. Civ. P. 26(b)(1).  This proportionality requirement was added to the rules to "eliminate unnecessary or wasteful" discovery expenses and requires the parties and the court to make a "careful and realistic assessment of ***actual need***."  *See* Chief Justice John Roberts, *2015 Year-End Report on the Federal Judiciary*, at 7 (Dec. 31, 2015) (emphasis added), available at https://www.supremecourt.gov/publicinfo/year-end/2015year-endreport.pdf.

To eliminate wasteful discovery expenses, courts have broad authority to control the method of discovery.  Fed. R. Civ. P. 26(c)(1)(C) (a court may "perscrib[e] a discovery method other than the one selected by the party seeking discovery").  Plaintiffs here seek a deposition of

Sanofi pursuant to Rule 30(b)(6). Rule 30(b)(6) allows a party to notice the deposition of an entity by describing with reasonable particularity the matters on which examination is requested. Fed. R. Civ. P. 30(b)(6). The entity must then designate and prepare witnesses to testify on the specific matters to the extent that information is known or reasonably available. Fed. R. Civ. P. 30(b)(6).

Given the burden and difficulty of preparing a witness to provide answers on the organization's behalf on complex or old issues, courts have recognized that the information sought in a 30(b)(6) notice should be provided through interrogatory responses if it can be provided more accurately and with less burden. *Smithkline*, 2000 WL 116082, at \*10; *In re Enron Creditors' Recovery*, No. 01-16034, 2007 WL 2680427, at \*3 (Bankr. S.D.N.Y. Sept. 6, 2007); *Wyatt v. ADT Sec. Servs., Inc.*, No. 10-cv-383, 2011 WL 1990473, at \*1 (N.D. Okla. May 23, 2011); *McCormick-Morgan, Inc. v. Teledyne Indus., Inc.*, 134 F.R.D. 275, 285–86 (N.D. Cal.) *overruled on other grounds by*, 765 F. Supp. 611 (N.D. Cal. 1991); *U.S. v. Taylor*, 166 F.R.D. 356, 363 n.7 (M.D.N.C. 1996); *Eng'g Co. v. U.S.*, 44 Fed. Ct. 597, 601 (Fed. Ct. 1999).

Courts have found this reasoning even more persuasive following the amendment to Rule 26, which added the proportionality requirement. *See, e.g. HSBC Bank*, 2016 WL 6915301, at \*6 ("a party's right to pursue less efficient or duplicative discovery avenues can no longer be justified under amended Rule 26(b) given its greater emphasis on the need for proportionality in discovery."). Here, the information sought in Plaintiffs' 30(b)(6) notice can be provided more accurately and with less burden through interrogatory responses.

Review of deposition **Topics 1 and 2** confirms these flaws:

---

**30(b)(6) Deposition Topic No. 1: Reports of any kind between 01/01/1992 and 12/31/2004 regarding PERSISTING ALOPECIA being associated and/or related in any way with the use of TAXOTERE (alone or in combination) regardless of the source of such report(s) and including but not limited to the following potential sources:**

**a. Solicited reports; b. Unsolicited reports; c. Global pharmacovigilance database; d.**

---

ICSRs; e. Scientific Literature; f. Product Complaints Database; g. Company Sponsored Websites; h. Clinical Trials and Other Studies in Humans; i. Non-Clinical Safety Information; j. Pharmacoepidemiology Studies; k. Media; l. Competitive Intelligence; m. Queries/Requests from Regulatory Authorities; n. Safety Information Tracking Systems; o. Adverse Events reported; and p. Other means.

The deponent shall have knowledge of all such reports, including, but not limited to the reports existing in the following Reference Numbered/Bates Numbered documents:

**TABLE 1:**

|     | Bates Beg Number | Estimated Date of Report | Reference No. |
|-----|------------------|--------------------------|---------------|
| 1.  | SANOFI_00695624  | Fri 08/07/1992           | Patient 252   |
| 2.  | SANOFI_00630235  | Wed 08/07/1996           | Patient 05183 |
| 3.  | SANOFI_02705693  | Tue 02/09/1999           | US90-05265    |
| 4.  | SANOFI_02705693  | Tue 02/09/1999           | US90-05266    |
| 5.  | SANOFI_02705693  | Tue 02/09/1999           | US90-05267    |
| 6.  | SANOFI_02705693  | Tue 02/09/1999           | US90-05268    |
| 7.  | SANOFI_02705693  | Fri 02/19/1999           | US90-05288    |
| 8.  | SANOFI_02705693  | Tue 05/18/1999           | US01-21837    |
| 9.  | SANOFI_02705693  | Tue 07/20/1999           | US01-22336    |
| 10. | SANOFI_00364461  | Tue 10/05/1999           | Patient 26809 |
| 11. | SANOFI_02705693  | Tue 11/30/1999           | US01-23390    |
| 12. | SANOFI_02705693  | Mon 12/06/1999           | US01-23443    |
| 13. | SANOFI_02705693  | Mon 01/31/2000           | US01-23861    |
| 14. | SANOFI_02680953  | Tue 02/01/2000           | US01-23859    |
| 15. | SANOFI_02596207  | Fri 07/28/2000           | 200020089JP   |
| 16. | SANOFI_02705693  | Mon 09/18/2000           | 200020456JP   |
| 17. | SANOFI_02705693  | Mon 12/04/2000           | 200020984JP   |
| 18. | SANOFI_02705693  | Wed 12/06/2000           | 200020984JP   |
| 19. | SANOFI_02705693  | Tue 12/26/2000           | 200110104JP   |
| 20. | SANOFI_02705693  | Tue 02/27/2001           | 200111952US   |
| 21. | REMOVED          |                          |               |
| 22. | REMOVED          |                          |               |
| 23. | REMOVED          |                          |               |
| 24. | REMOVED          |                          |               |
| 25. | SANOFI_02705693  | Thu 04/26/2001           | 20013638US    |
| 26. | SANOFI_02705693  | Wed 06/27/2001           | 200112281JP   |
| 27. | REMOVED          |                          |               |
| 28. | SANOFI_02705871  | Fri 09/07/2001           | 200120360EU   |
| 29. | SANOFI_00612509  | Sun 09/30/2001           | Patient 30304 |
| 30. | SANOFI_02705693  | Mon 10/15/2001           | 200120325JP   |
| 31. | REMOVED          |                          |               |
| 32. | SANOFI_02705693  | Thu 11/15/2001           | 20012166DE    |
| 33. | SANOFI_02705693  | Wed 11/21/2001           | 200120600JP   |
| 34. | SANOFI_02705871  | Mon 11/26/2001           | 200121748FR   |
| 35. | SANOFI_02705693  | Mon 12/17/2001           | 200121748FR   |
| 36. | SANOFI_02705693  | Tue 12/25/2001           | 200120915JP   |
| 37. | SANOFI_02705693  | Tue 02/05/2002           | 200210242JP   |

| | Bates Beg Number | Estimated Date of Report | Reference No. |
|---|---|---|---|
| 38. | SANOFI_02705693 | Fri 03/01/2002 | 200212410DE |
| 39. | SANOFI_02705871 | Wed 07/31/2002 | 200217798US |
| 40. | SANOFI_02705693 | Fri 09/27/2002 | 200215813DE |
| 41. | SANOFI_02705693 | Tue 10/15/2002 | 200215940DE |
| 42. | SANOFI_02705693 | Tue 10/15/2002 | 200215942DE |
| 43. | SANOFI_02705693 | Fri 10/18/2002 | 200215976DE |
| 44. | REMOVED | | |
| 45. | SANOFI_02705693 | Mon 11/18/2002 | 200214577FR |
| 46. | SANOFI_02705693 | Thu 03/13/2003 | 200312417US |
| 47. | SANOFI_02705871 | Sat 05/31/2003 | 200315104US |
| 48. | SANOFI_02647849 | Wed 08/13/2003 | 200317903GDDC |
| 49. | SANOFI_02647849 | Thu 08/14/2003 | 200317924GDDC |
| 50. | SANOFI_02705871 | Mon 08/18/2003 | 200318032GDDC |
| 51. | SANOFI_02705871 | Fri 09/05/2003 | 200318617GDDC |
| 52. | SANOFI_02705871 | Fri 09/05/2003 | 200318637GDDC |
| 53. | SANOFI_02647849 | Mon 10/13/2003 | 200319936GDDC |
| 54. | SANOFI_02705871 | Fri 10/24/2003 | 200320929GDDC |
| 55. | SANOFI_02705693 | Mon 10/27/2003 | 200319314US |
| 56. | SANOFI_02705693 | Tue 11/12/2003 | 200314232FR |
| 57. | SANOFI_02343937 | Thu 12/04/2003 | 200317927US |
| 58. | SANOFI_02343937 | Thu 12/04/2003 | 200318614GDDC |
| 59. | SANOFI_02343937 | Thu 12/04/2003 | 200319153US |
| 60. | SANOFI_02705693 | Tue 12/09/2003 | 200313681EU |
| 61. | SANOFI_02705693 | Wed 12/10/2003 | 200313710EU |
| 62. | SANOFI_02705871 | Mon 12/15/2003 | 200322626GDDC |
| 63. | SANOFI_02705871 | Mon 12/15/2003 | 200322629GDDC |
| 64. | SANOFI_02670563 | Wed 01/21/2004 | 200410497US |
| 65. | SANOFI_02705963 | Wed 01/21/2004 | 200410498US |
| 66. | SANOFI_02705963 | Wed 01/21/2004 | 200410499US |
| 67. | SANOFI_02705963 | Wed 01/21/2004 | 200410500US |
| 68. | SANOFI_02705963 | Wed 01/21/2004 | 200410501US |
| 69. | SANOFI_02705871 | Mon 01/26/2004 | 200410633US |
| 70. | SANOFI_02705693 | Tue 01/27/2004 | 200410408FR |
| 71. | SANOFI_02705909 | Mon 02/16/2004 | 200411167US |
| 72. | SANOFI_02705871 | Mon 03/01/2004 | 200412698GDDC |
| 73. | SANOFI_02705693 | Fri 03/12/2004 | 200412005US |
| 74. | SANOFI_02705693 | Tue 03/16/2004 | 200413195GDDC |
| 75. | SANOFI_02705693 | Wed 03/24/2004 | 200413453GDDC |
| 76. | SANOFI_02705693 | Wed 04/07/2004 | 200413926GDDC |
| 77. | SANOFI_02705693 | Wed 05/12/2004 | 200413785US |
| 78. | SANOFI_02705693 | Fri 06/18/2004 | 200416170GDDC |
| 79. | SANOFI_02705693 | Wed 07/07/2004 | 200416744GDDC |
| 80. | SANOFI_02705693 | Mon 08/02/2004 | 200417622GDDC |

A witness cannot possibly be prepared to discuss, in the abstract, reports of "any kind" about alopecia from 1992 to 2004 because there are no particulars about what the witness is expected to

know, the reports are aged, and it is not clear which reports of alopecia—namely temporally in relation to chemotherapy treatment—are in play.

**Topic 2** suffers the same flaws, illustrating why the deposition is best-suited to writing:

> **30(b)(6) Deposition Topic No. 2:**  For each report (as described in Number 1 above) between 01/01/1992 and 12/31/2004 regarding PERSISTING ALOPECIA:
>
> **a.** The first date on which YOU received or became aware of the information or the report; **b.** To whom was the report sent; **c.** Who received the report; **d.** When the report was received; **e.** The source of the report; **f.** Whether there were Standard Operating Procedures ("SOP"s) in place regarding YOUR receipt and handling of the report; **g.** The Standard Operating Procedures ("SOP"s) regarding receipt of such reports; **h.** Whether YOU followed Standard Operating Procedures ("SOP"s) regarding the report; **i.** How YOU categorized and recorded the report; **j.** Every database in which the report was recorded; **k.** Actions taken by anyone associated with YOU regarding the report; **l.** All follow-up efforts by YOU regarding the report, both internally and externally; **m.** Whether and how the report was handled in the regular course and scope of YOUR business; **n.** Was the report submitted by YOU to any regulatory authority and if so for each by whom, to whom, when and in what manner and/or form (i.e., did you full provide the full case report, did you provide the CIOMS report, did you simply report it as a numerical incidence of alopecia, etc.); and **o.** Whether the report alone or in combination with other report(s) constitutes a safety signal and why.

No single person at Sanofi could know the information Plaintiffs seek in Topics 1 and 2 of Plaintiffs' notice because it involves over 70 reports that occurred two decades ago over the course of 12 years.   That means that to provide the information Plaintiffs seek, Sanofi first has to potentially review thousands of documents from numerous sources and identify the answers to Plaintiffs' detailed questions.  *See* **Ex. A**, Topic 1 (listing 17 sources Plaintiffs expect Sanofi to review).  That task is, on its own, burdensome and expensive.  To date, Sanofi, through counsel, has already spent over 500 hours at a cost of tens of thousands of dollars scouring decades-old documents in response to Plaintiffs' notice—and the task is not done.  Nevertheless, in good faith effort to cooperate in discovery, Sanofi agreed to search for the minutia that Plaintiffs demand and provide it in writing.  *See* Sanofi's Responses and Objections to Plaintiffs' 30(b)(6) Notice, attached as **Exhibit B** (subject to objections, responding to all but subtopics (f – h).

But Plaintiffs demand that Sanofi take on the ***additional*** burden of preparing a witness to testify about all of that information.  To do that, the designated witness—or, more likely, witnesses—would have to set aside multiple weeks from work to prepare and sit for the deposition. Sanofi's attorneys would have to spend those days preparing the witness(es) by going through each of the decades-old reports, databases, operating procedures, and studies.  This is in addition to the costs associated with the logistics of preparing and producing a witness for deposition, including travel and shipping costs.  All of this will only be compounded as Plaintiffs have stated that this notice is just the first of <u>many identical notices that will cover at least three or four different time periods</u>. *See* PSC's Letter to Magistrate Judge Michale B. North (June 8, 2018), attached as **Exhibit C**. Sanofi would do all of that work just to provide Plaintiffs the information in a less-accurate form as "no witness can be expected to provide accurate and detailed accounts of events so far in the past." *Janki Bai Sahu*, 528 Fed.Appx. at 103.  Such an approach makes little sense.

### III.   Adverse Event Reports Are Inherently Unreliable, Inadmissible, and Lack Scientific and Evidentiary Value

Discussing more what these "reports" entail demonstrates the flaws in Plaintiffs' notice. Manufacturers of pharmaceutical drugs receive reports of unwanted experiences in patients who took their medicines.  Someone who took aspirin may be injured in a car accident.  Depending on what gets relayed and to whom—regardless of any relationship between the medicine and the harm—such confluences of events may constitute a "report" of an adverse event.  Various regulations here and abroad define such reports and what is done with them.

**Topic 1** describes adverse event reports as meaning that persistent alopecia was "associated and/or related in any way with the use of TAXOTERE." *See* **Ex. A.**  Definition No. 4 in the notice is a six line-long gestalt of anything and everything "related" might mean. *Id.*  But adverse event reports are in fact defined as "[a]ny adverse event associated with the use of a drug in humans,

13

*whether or not considered drug related.*"  21 C.F.R. § 314.80(a) (emphasis added).  Federal regulation thus recognizes that adverse event reports do not establish any causal relationship between the drug and the event. 21 C.F.R. § 314.80(k).  FDA provides various "caveats" about the proper use of AERs including that "the information contained in the reports *has not been scientifically or otherwise verified*" and that "For any given report, *there is no certainty that the suspected drug caused the reaction*."  FDA, AER System, Office of Pharmacoepidemiology and Statistical Science, *Brief Description with Caveats of System* at 4 (July 18, 2005).

For these reasons, adverse event reports are not scientifically reliable, meaning courts reject such evidence.  *See, e.g., Rhodes v. Bayer Healthcare Pharm., Inc.*, No. 10-1695, 2013 WL 1289050, at *5 (W.D. La. Mar. 26, 2013) (excluding expert opinion based on AERs because "uncontrolled anecdotal information offers one of the least reliable sources to justify opinions about both general and individual causation"); *In re Denture Cream Prods. Liab. Litig.*, 2015 WL 392021, at *32 (S.D. Fla. Jan. 28, 2015) (case reports and adverse event reports are both "insufficient to show general causation."); *In re Accutane Prods. Liab.*, 511 F.Supp.2d 1288, 1298 (M.D. Fla. 2007) (excluding expert opinion because AERs "are unreliable as proof of causation because, in general, the events were not observed in such a way as to rule out coincidence or other potential causes.").[4] Plaintiffs have not made any proffer of relevance for their notice, but, presumably, they believe that the reports "constitute a safety signal." *See* **Ex. A** (Topic 2, subtopic (o)).  They do not.

Alternately—seemingly knowing that adverse event reports do not establish causation— Plaintiffs suggest that these reports constitute "notice" of a safety issue that ought to have been

---

[4] *Sprague v. Upjohn Co.*, No. 91-cv-40035 (D. Mass. May 13, 1994) (Halcion); *Lopez v. Wyeth-Ayerst Laboratories*, Inc., 1998 WL 81296 (9th Cir. 1998); *Hollander v. Sandoz Pharmaceuticals Corp.*, 289 F.3d 1193 (10th Cir. 2002) (Parlodel); *In re Meridia Products Liability Litigation*, 328 F. Supp.2d 791 (N.D. Ohio 2004) (Meridia); *Smith v. Pfizer Inc.*, 2010 WL 1754443 (M.D. Tenn. Apr. 30, 2010) (Neurontin).

acted on differently or sooner.  Not so.  Where Plaintiffs intend to use these out of court statements to prove the truth of the matter asserted—that Taxotere caused the reported hair loss—they are classic hearsay. *See Klein v. TAP Pharm. Products, Inc.*, 518 F. App'x 583, 584 (9th Cir. 2013) *cert. denied*, 134 S. Ct. 800, 187 L. Ed. 2d 612 (U.S. 2013) *reh'g denied*, 134 S. Ct. 1055 (2014) (excluding adverse event reports as hearsay of "uncertain reliability, lacking information relevant to causation."). *See also Goldstein v. Centocor*, 05-cv-21515, 2007 WL 7428597 (S.D. Fla. May 14, 2007) (adverse event reports are inadmissible hearsay); *Appleby v. Glaxo Wellcome, Inc.*, 04-cv-0062, 2005 WL 3440440 (D.N.J. Dec. 13, 2005) ("compilations of information or recommendations submitted by outsiders to the FDA, including adverse event reports" are inadmissible hearsay).[5]

Adverse event reports also are not admissible to prove "notice" because they intrinsically pose a rhetorical question: notice of what? *Goldstein,* 2007 WL 7428597, *2-3 ("Defendants cannot be considered to have manifested an adoption or belief in the truth of the reports to the extent that it may have forwarded them to FDA under a legal duty to do so.").  *See also See Stupak v. Hoffman-La Roche, Inc.*, 326 Fed. Appx. 553, 560 (11th Cir. 2009) (holding that case reports were insufficient to establish notice of causation); *Moon v. Advanced Med. Optics, Inc.*, No. 4:08-cv-0021, 2010 WL 11500832, at *8, n.3 (N.D. Ga. Dec. 29, 2010) ("Plaintiffs might not be able to use the case reports to prove notice."); *Soldo v. Sandoz Pharmaceuticals Corp.*, 244 F. Supp. 2d 434, 550−551 (W.D. Pa. 2003); *Wolf v. Proctor & Gamble Co.*, 555 F. Supp. 613, 622 (D.N.J.

---

[5] Where adverse event reports are made by healthcare providers under 21 U.S.C. § 360i(b), federal law prohibits the use of such reports in any civil action: "[N]o report made under [section 360i(b)(1)] by (A) a device user facility, (B) an individual who is employed by or otherwise formally affiliated with such a facility, or (C) a physician who is not required to make such a report, shall be admissible into evidence or otherwise used in any civil action involving private parties unless the facility, individual, or physician who made the report had knowledge of the falsity of the information contained in the report." Courts have held that this language renders such reports inadmissible. *See In re Medtronic, Inc.*, 184 F.3d 807, 811-12 (8th Cir. 1999) (information "contained in or gleaned from" reports not discoverable by mandate of federal law); *Adcox v. Medtronic, Inc.*, 131 F. Supp. 2d 1070, 1072, 1075-76 (E.D. Ark. 1999) (reports and information contained therein not discoverable under federal statute).

1982).   Furthermore, a prerequisite for reports to constitute legal "notice" is substantial similarity—these reports are not substantially similar with the patient's distinct medical histories, regimens, cancer diagnoses, and differences in hair loss.  *See Rutledge v. Napco, Inc.*, 992 F.2d 1217 (6th Cir. 1993) (excluding other accidents involving the defendant's electroplating machines based on a lack of substantial similarity); *Pierson v. Ford Motor Co.*, 06-cv-6503, 2008 WL 7084522 (N.D. Cal. Aug. 1, 2008) (exclude evidence of other accidents that are not substantially similar to the subject crash); *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1248 (10th Cir. 2000) (excluding evidence of subsequent incidents to show notice of a defect).  If these reports are not sufficiently reliable to show a causal link, the reports are similarly not sufficiently reliable to serve as notice.

In the end, courts thus routinely exclude adverse event reports given that the probative value attributable to them is outstripped by the danger of prejudice they pose.  *In re Accutane Prods. Liab.*, No. 8:04-md-2523, 2007 WL 1288354, at *6 (M.D. Fla. May 2, 2007) (excluding evidence of adverse events as more prejudicial than probative because "simply because a person takes drugs and then suffers an injury does not show causation.  Drawing such a conclusion from temporal relationships leads to the blunder of *post hoc ergo propter hoc* fallacy."); *Renfro Hosiery Mills Co. v. Nat'l Cash Register Co.,* 552 F. 2d 1061, 1068-69 (4th Cir. 1977) (excluding data and reports, because the evidence was "voluminous and complex" with "little if any probative value but rather considerable potential for prolongation of the trial and possible confusion of the issues"); *In re Norplant Contraceptive Products Liab. Litig.*, MDL 1038, 1997 WL 80527 (E.D. Tex. Feb. 19, 1997) (excluding adverse event reports because of the risk of confusion and time required for Defendants to present evidence to rebut their significance).

Because Plaintiffs' entire notice asks a witness to trot through over a decade of unreliable adverse event reports, especially when there is little likelihood the reports would be admitted into evidence, the Court should limit Sanofi's obligations to respond to writing.

### IV.   Each of Plaintiffs' Noticed Topics Fall to the Flaws of their Ill-Defined Focus, Over-reaching Timeframe, and Susceptibility to Written Response

It is within this context that Plaintiffs' notice—asking a witness to mine all conceivable details on more than 70 reports and to identify any other reports of any kind from 1992 to 2004— is so unfair and unreasonable.  In addition to the problems identified above with Topics 1 and 2, the remainder of the notice suffers the same fatal flaws.  On Topics 3–6, it is not efficient or necessary to prepare a witness to read out loud the identities of patients by reference numbers in studies (Topics 3), findings of old studies (Topic 6) or what is plainly stated in old documents (Topic 5).  *Wyatt*, 2011 WL 1990476, at *1 ("A number of the topics…are essentially a substitute for written discovery.  Deposition on those topics would require that a corporate representative essentially read the information sought into a deposition transcript.  Defendant will not be required to prepare a corporate representative to read reports into the record.").  Further, Sanofi already provided Plaintiffs with the majority of the information Plaintiffs seek.  *See* **Ex. B**; *see also* June 8, 2018 Ltr. from Harley V. Ratliff & Adrienne Byard to Kyle Bachus, attached as **Exhibit D**.

> **30(b)(6) Deposition Topic No. 3** **The identity of each patient, by reference number, who reportedly experienced PERSISTING ALOPECIA while enrolled as a participant in the TAX316 and /or TAX301/GEICAM and/or NABHOLTZ Phase II Study of Docetaxel, Doxorubicin, and Cyclorubicin as First-Line Chemotherapy for Metastatic Breast Cancer studies, so that it can be determined whether each such patient is included in Table 1.**

Topic 3 requests the identities of certain patients.  Sanofi provided this information for one of the studies identified by Plaintiffs.  For the two other studies, it is not clear whether Plaintiffs want patient information for reports from 1992 – 2004, or at the conclusion of the studies.  *See* **Ex. B**.  With this clarification, if the information is available, Sanofi can provide it in writing as it has

previously done.  If it is not, Sanofi can say so in writing.  Either way, it makes no sense to have a witness read Sanofi's response into the record at such great expense.

> **30(b)(6) Deposition Topic No. 4:   The full plan to study and/or analyze the "Reversibility" of Alopecia (referenced in the Statistical Analysis Plan for the TAX316 study Bates No. SANOFI_01234420) including but not limited to the execution, methodology, all follow up actions, the recording of results and reporting of results related in any way to the plan, study, and/or analysis related to the Reversibility of Alopecia.**

Topic 4 asks about a quote from a Sanofi document on the pretense of this quote being the tip of some great iceberg.  It is not.  As Plaintiffs already know—because Sanofi told them in writing—there was no "plan" to study the reversibility of alopecia.  *See* **Ex. B**.  The TAX316 study protocol and amendments, which documented alopecia as part of the study, *are* the full "plan." And Plaintiffs have those documents.  There is no separate protocol, plan, or study; no study-within-the-study.  Plaintiffs know this.  They seek a witness to testify about a plan they know does not exist, so they can get out-of-context answer to a "gotcha" question on the record.

> **30(b)(6) Deposition Topic No. 5:   The reversibility of alopecia as observed and documented in PSUR 4 dated September 30, 1997.**

For Topic 5, the reversibility of alopecia observed in Periodic Safety Update Report No. 4, from September 30, 1997, is contained in the cited document itself, which Sanofi already told Plaintiffs.  *See* **Ex. B**.  Namely, "Alopecia was observed in a total of 79% of patients but was considered severe in about 67% of the patients.  Alopecia was reversible in 13% of the patients for whom data is available; the median recovery time was 22 weeks following the initial hair loss." As drafted, it unclear what, if anything else, Plaintiffs want a witness to know because they do not describe any additional matter for examination.  Because the data is so old, Plaintiffs are in the same position as Sanofi—both parties can read it.  A 30(b)(6) witness would provide no additional benefit to discovery but the cost would be enormous and disproportionate.

> **30(b)(6) Deposition Topic No. 6:**  The findings regarding alopecia as a TEAE persisting into the follow-up period in TAX316 at the median follow-up of 55 months.

Sanofi told Plaintiffs that the cited findings in Topic 6 are contained in the January 21, 2004, TAX316 study report and even directed Plaintiffs to the specific parts of the report where the information can be located.  *See* **Ex. B**.  The findings are that alopecia was reported as on-going in 3.2% on TAC subjects and 1.4% on FAC; that 97.8% of the 744 subjects in the TAC cohort experienced alopecia during treatment; and 97.1% of the 736 subjects in the FAC cohort experienced alopecia during treatment.  Additionally, Appendix IV.A, Table L14 contains a listing of adverse-event data for each patient at each cycle and follow-up, including when each adverse event resolved.  Plaintiffs do not describe any additional matter for examination.  A witness on this topic is, therefore, unnecessary.

 All told, standard interrogatories would be a better method of discovering the particulars of these reports, identities, and findings because Sanofi has or is in the process of synthesizing the information from all the necessary sources, for presentation to Plaintiffs in a comprehensible manner. *Smithkline*, 2000 WL 116082, at *10 ("standard interrogatories would be a better method of discovering the particulars of [the] investigation because [the responding party] could synthesize the information from all the necessary sources, which would then be presented to [the requesting party] in a comprehensible manner.").  Because preparing a witness to give testify on these topics would be incredibly inefficient, disproportionate to Plaintiffs' actual need, and unduly burdensome and expensive, the Court should grant Sanofi's Motion.

## CONCLUSION

Preparing and producing a witness to testify on the topics in Plaintiffs' 30(b)(6) notice would be disproportionate to the needs of the case and unduly burdensome and expensive – particularly because the information can be provided through written discovery.  *See* Fed. R. Civ.

P. 26(b)(1); Fed. R. Civ. P. 26(c)(1)(C). *SmithKline*, 2004 WL 739959, at *3 ("In [determining whether interrogatories are more appropriate than a 30(b)(6) deposition] we will be guided by which device would yield most reliably and in the most cost-effective, least burdensome manner information that is sufficiently complete to meet the needs of the parties…"). Further, Plaintiffs' vague and all-encompassing definition of persistent alopecia makes it impossible for Sanofi to respond. Therefore, the Court should grant Sanofi's Motion and order (1) Plaintiffs to amend their definition of "persistent alopecia" to include a temporal element and (2) that the information sought in the 30(b)(6) notice be discovered only through written discovery.

Respectfully submitted,

/s/ *Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE URQUHART & MOORE LLC**
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: 504-310-2100
Facsimile: 504-310-2120
dmoore@irwinllc.com

Harley V. Ratliff
Adrienne L. Byard
Kelly Bieri
**SHOOK, HARDY& BACON L.L.P.**
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
Facsimile: 816-421-5547
hratliff@shb.com
abyard@shb.com
kbieri@shb.com

***Counsel for sanofi-aventis U.S. LLC and Sanofi US Services Inc.***

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 11, 2018, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.


/s/ *Douglas J. Moore*
Douglas J. Moore

## **<u>RULE 37 CERTIFICATION</u>**

I hereby certify that on various occasions including April 24, April 26, May 1, May 6, May 8, and June 8, I and/or another of my defense counsel colleagues have conferred with Plaintiffs' counsel about the subject of this motion.

*/s/ Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
IRWIN FRITCHIE URQUHART & MOORE LLC
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone:  504-310-2100
Facsimile:  504-310-2120
E-Mail:  dmoore@irwinllc.com