# Exhibit 3

```
                                                                    1
 1  UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF LOUISIANA
 2
    CASE NO. 2:16-cv-15283
 3  _____

 4  VIDEO DEPOSITION OF KELLY GAHAN
                                         May 16, 2018
 5  _____

 6  KELLY GAHAN,

 7  Plaintiff,

 8  vs.

 9  SANOFI, S.A., SANOFI-AVENTIS U.S. L.L.C., SANOFI US
    SERVICES INC. f/l/a SANOFI-AVENTIS U.S. INC. and
10  AVENTIS-PHARMA S.A.,

11  Defendants.
    _____
12
    APPEARANCES:
13
         BACHUS & SCHANKER, LLC
14              By Darin Schanker, Esq.
                1899 Wynkoop Street
15              Suite 700
                Denver, Colorado  80202
16              Appearing on behalf of Plaintiff.

17       SHOOK, HARDY & BACON LLP
                By Connor Sears, Esq.
18              By Hillary Nicholas, Esq.
                2555 Grand Boulevard
19              Kansas City, Missouri  64108
                Appearing on behalf of Defendants.
20

21       Also present:  Jay R. Wren, videographer

22

23

24

25  Job No. NJ2904009
```

Page 2

```
 1       Pursuant to Notice and the Federal Rules of
 2   Civil Procedure, the video deposition of KELLY GAHAN,
 3   called by Defendants, was taken on Wednesday, May 16,
 4   2018, commencing at 9:19 a.m., at 1899 Wynkoop
 5   Street, Suite 700, Denver, Colorado, before Dianna L.
 6   Buckstein, Registered Professional Reporter and
 7   Notary Public within and for the State of Colorado.
 8
 9                    I N D E X
10
11   VIDEO DEPOSITION OF KELLY GAHAN
12   EXAMINATION BY:                    PAGE
13     Mr. Sears                          5
14     Ms. Nicholas                      --
15     Mr. Schanker                     346
16
17   EXHIBITS                    INITIAL REFERENCE
18   Exhibit 1  E-mail chain, Subject:
               Taxotears conference call
19
     Exhibit 2  Document entitled:        37
20             Gahan, Kelly - Documents
               Reviewed for deposition
21
     Exhibit 3  Second Amended Notice of  39
22             Videotaped Deposition of
               Plaintiff Kelly Gahan
23
     Exhibit 4  E-mail chain, Subject:    40
24             SMS with Eric Morrison
25   Exhibit 5  Color photographs         45
```

Page 3

```
 1   Exhibit 6   1/15/13 Nursing Note       89
 2   Exhibit 7   E-mail chain,             101
                 Subject:  Hi
 3
     Exhibit 8   Spreadsheet               125
 4
     Exhibit 9   2/4/13 Progress Note      139
 5
     Exhibit 10  Appendix B, Understanding 159
 6               Chemotherapy Drugs
 7   Exhibit 11  Document entitled         163
                 Doxorubicin Hydrochloride
 8               for Injection, JSP
 9   Exhibit 13  1/24/13 letter to Denise  189
                 Norton from Sarah Conlon
10
     Exhibit 14  E-mail chain, Subject:    193
11               Taxotears Blood pressure
                 medications
12
     Exhibit 15  Document entitled:        202
13               Chemotherapy-induced
                 alopecia
14
     Exhibit 16  E-mail chain, Subject:    206
15               Article
16   Exhibit 17  E-mail chain, Subject:    220
                 Taxotears Introducing
17               Ann from the U.K.
18   Exhibit 18  E-mail chain, Subject:    224
                 Taxotere posts
19
     Exhibit 19  Journal of Clinical       233
20               Oncology article
21   Exhibit 20  E-mail chain, Subject:    241
                 Taxotears Potential
22               new members
23   Exhibit 21  3/28/13 uchealth medical  250
                 record
24
     Exhibit 22  4/18/13 uchealth medical  256
25               record
```

Page 4

```
 1   Exhibit 23  9/24/13 uchealth medical  257
                 record
 2
     Exhibit 24  10/10/13 uchealth medical 262
 3               record
 4   Exhibit 25  1/2/14 uchealth medical   269
                 record
 5
     Exhibit 28  2/6/14 uchealth medical   273
 6               record
 7   Exhibit 29  2/24/14 uchealth medical  275
                 record
 8
     Exhibit 30  4/24/14 uchealth medical  279
 9               record
10   Exhibit 31  Document entitled         310
                 RiverTown Therapeutics
11
     Exhibit 32  E-mail chain, Subject:    313
12               Hi
13   Exhibit 33  E-mail chain, Subject:    321
                 Pictures
14
     Exhibit 34  E-mail chain, Subject:    323
15               Checking in
16   Exhibit 35  Document entitled:        326
                 RiverTown Therapeutics
17               Inc. Results:  Exclusive
18   Exhibit 36  5/3/18 e-mail to David    331
                 Weinstein with attachment
19
20   INFORMATION REQUESTED TO BE SUPPLIED  PAGE
21   Every photo from deponent's
     computer/phone for prior 10 years      42
22
     Dates previously-provided videos       54
23   were filmed
24   Photographs of deponent               273
25
```

Page 5

```
 1                P R O C E E D I N G S
 2         (Ms. Nicholas is not present at the
 3   commencement of the deposition.)
 4         THE VIDEOGRAPHER:  My name is Jay R. Wren
 5   of Veritext.  The date today is May 16, 2018, and the
 6   time is approximately 9:19 a.m.  This deposition is
 7   being held in the offices of Bachus & Schanker, LLC,
 8   located at 1899 Wynkoop Street, Suite 700 in Denver,
 9   Colorado.
10         The caption of this case is Kelly Gahan
11   versus Sanofi S.A, et al., in the U.S. District
12   Court, Eastern District of Louisiana.  Case No.
13   2:16-CV-15283.  The name of the witness is Kelly
14   Gahan.
15         At this time the attorneys will identify
16   themselves and who they represent, and after which
17   our court reporter, Dianna Buckstein of Veritext,
18   will swear in the witness and we can proceed.
19         MR. SCHANKER:  You know what?  I'm actually
20   going to ask that we go off the record for just one
21   sec.  I forgot something.  I apologize.
22         THE VIDEOGRAPHER:  The time is 9:20.  We
23   are going off the record.
24         (Recess from 9:20 a.m. to 9:22 a.m.)
25         THE VIDEOGRAPHER:  The time is 9:22.  We're
```

**Page 38**

```
 1   list of documents that Ms. -- or Dr. Gahan reviewed
 2   before deposition.
 3        MR. SCHANKER:  And it's Dr. Gahan
 4   (pronouncing), actually.
 5        MR. SEARS:  Gahan?
 6        MR. SCHANKER:  Yes.
 7        MR. SEARS:  I'm just butchering everyone's
 8   name today, aren't I?
 9   Q   (By Mr. Sears) Gahan (pronouncing)?
10   A   Uh-huh.
11        (Mr. Sears is reviewing the document.)
12   Q   (By Mr. Sears) Did you have a chance to
13   review Exhibit 2 before your deposition?
14   A   I have not read through it.  I knew it
15   existed.
16        MR. SCHANKER:  If you're ask -- if -- you
17   can ask her questions about it if she just has time
18   to review it.
19   Q   (By Mr. Sears) My only question is:  Is
20   there anything that you reviewed in preparation for
21   your deposition that is not on that list?
22   A   I do not believe so.  Can I go back and
23   clarify something --
24   Q   Sure.
25   A   -- for the record?
```

**Page 39**

```
 1        So I was rereading this while you were
 2   looking at this (indicating), and I think part of
 3   what she is referring to about so much research here
 4   is that I actually figured out who the head of FDA
 5   hematology oncology was and wrote to him.  And I also
 6   did further research on what's required for reporting
 7   for FDA.
 8        So I think some of what she's referring to
 9   in the context of the FDA meeting is just finding out
10   who at the FDA we needed to talk to.
11   Q   Who is the person that is the head of the
12   hematology oncology at FDA?
13   A   It was --
14        MR. SCHANKER:  Objection, form.
15   A   -- Richard Pazdur.  I don't know if he
16   still is.
17   Q   (By Mr. Sears) Do you keep a journal?
18   A   No.
19   Q   Do you keep a calendar that you write
20   appointments on or anything like that?
21   A   I usually write my work schedule.
22   Sometimes I put doctors' appointments on there.
23   Q   Do you keep a file at home about either the
24   lawsuit or Taxotere?
25   A   No.
```

**Page 40**

```
 1   Q   I'm marking as Exhibit 3 the second amended
 2   notice of the deposition.
 3        (Exhibit 3 was marked.)
 4   Q   (By Mr. Sears) Did you have a chance to
 5   review this before your deposition?
 6   A   I did.
 7   Q   There's an Exhibit A in the notice.  It's a
 8   bunch of items that we requested you to produce.
 9   A   Uh-huh.
10   Q   Is there anything that we requested on here
11   that you have not already produced?
12   A   Not to the best of my knowledge.  I do keep
13   a calendar on my phone for work things, but it would
14   just be for this year, and I have no idea how I would
15   get you that.  So, you know, occasionally if I put a
16   time for a doctor's appointment, that might be on
17   there, but it's mostly for work.
18   Q   Do you have any additional photos that you
19   haven't produced?
20   A   I have a lot of photos.  I have given you
21   guys what the Court required.
22        (Exhibit 4 was marked.)
23   Q   (By Mr. Sears) I'm handing you Exhibit 4,
24   and it's text correspondence it appears you had with
25   Eric Morrison.
```

**Page 41**

```
 1   A   Okay.
 2        MR. SCHANKER:  4?
 3        MR. SEARS:  4.  Yes, sir.
 4   Q   (By Mr. Sears) For now what I want to
 5   focus on is the page that I'm handing to you.
 6   A   Okay.
 7   Q   And it notes:  It is pretty hard to look
 8   through pics on the phone, have 800 pictures, and
 9   going through the ones before January makes me sad.
10   A   Yes.
11   Q   Do you have pictures on your phone of your
12   hair before chemotherapy?
13        MR. SCHANKER:  I would ask you to go ahead
14   and review, and you can see it's multi-page, but --
15        THE DEPONENT:  Okay.
16        MR. SCHANKER:  -- the entirety of what has
17   been marked as Exhibit 4.
18   Q   (By Mr. Sears) Just to let you know, we
19   will talk about some of that later on.
20   A   So that would have been my old phone, and
21   Eric was asking me for pictures of a hike we went on,
22   and that was me telling him that I had too many
23   pictures to go back and find his pictures from the
24   hike.  So, yeah, on my old phone I had a lot of
25   pictures.  It might have also been referring to my
```

11 (Pages 38 to 41)

42

1  old camera. I don't know.
2  Q  I believe this was an Apple phone?
3  A  I don't think so. I think that might have
4  been a T-Mobile phone.
5  Q  Do you back up your photos from your phone
6  in any capacity?
7  A  So the phone doesn't back up well. Well,
8  my iPhone does now. What I used to do with the
9  T-Mobile phone -- because the data comes across weird
10 when you load it onto a Mac -- was most of the photos
11 I took on my phone were kind of insignificant. If I
12 was going to go on vacation, something like that, I
13 would bring my actual camera and then load those onto
14 my computer.
15 Q  Do you still have those photographs that
16 were referenced?
17 A  You know, I don't know if I have those
18 specific photographs because some of them might have
19 been what I consider insignificant and would have
20 been lost with that phone. But I would say of the
21 800 I'm referencing here, I'm sure a large number of
22 them were on my computer, and I do have those.
23 Q  Just for the record, we would request those
24 photos.
25 A  Okay. So can I ask you a clarifying

43

1  question? So you're basically asking for every photo
2  I've ever taken in the last like 10 years?
3  Q  Yes.
4  A  Okay. It's going to be a lot of photos.
5  Q  We recently received a link from your law
6  firm that has some new materials that were produced.
7  A  Uh-huh.
8  Q  There's some photographs --
9  A  Uh-huh.
10 Q  -- some videos. There's a study from
11 Dr. Kluger. I think he's a dermatologist.
12 A  Is that the -- hum. I don't -- I'd have to
13 see it.
14 Q  And there's also just a single page, and it
15 was from Dr. Bourgeois. It was a 2009 presentation
16 that he made in San Antonio.
17 A  Uh-huh.
18 Q  How did you get the 2009 Dr. Bourgeois San
19 Antonio sheet?
20    MR. SCHANKER: Objection, form.
21 A  I cannot say 100 percent, but I believe it
22 was from one of the Taxoteres after I joined the
23 Taxotere group. It was not something I had ever seen
24 beforehand.
25 Q  (By Mr. Sears) And I believe you joined

44

1  the Taxoteres -- was it February 14, 2014?
2  A  Yes.
3  Q  Just to make sure I understand, the 2009
4  Dr. Bourgeois page that you produced was something
5  that you got after joining --
6  A  Uh-huh.
7  Q  -- Taxoteres?
8  A  Uh-huh.
9  Q  Yes?
10 A  Yes.
11 Q  And I'm sorry, I really don't mean to be --
12 A  Just keep doing it.
13 Q  Okay. And it will really help her if you
14 just give a beat in between --
15 A  Okay.
16 Q  -- my question and your answer. I
17 appreciate it.
18 A  You can kick me under the table.
19 Q  (By Mr. Sears) For some of the photographs
20 that you recently produced, some were photographs of
21 bruising?
22 A  Yes.
23 Q  Why did you produce those ones?
24 A  Because of what the subpoena for the
25 deposition said. And it said to produce any pictures

45

1  of, I believe, the effect that this has had on you.
2  I don't remember the exact words.
3  Q  How does the bruising relate to that?
4  A  So after it became apparent that I was
5  going to have permanent alopecia, I suffered extreme
6  emotional distress for quite a long time and I would
7  get really upset and I'd get worked up in fits and I
8  couldn't stop crying and screaming. And I would hit
9  myself or otherwise try to hurt myself. And those --
10 those photos are of me doing that.
11    MR. SEARS: I'm going to mark a group of
12 photographs that were produced as Exhibit 5.
13    (Exhibit 5 was marked.)
14 Q  (By Mr. Sears) The only question I have
15 about these is I would like you to identify the
16 people in the photographs.
17 A  Okay. So this is me and my friend Kathy
18 Wares.
19 Q  Kathy?
20 A  Wares, W-a-r-e-s.
21 Q  Who is Kathy Wares?
22 A  Kathy Wares is one of my very good friends
23 from Charlotte, North Carolina, from when I was doing
24 my residency.
25 Q  Is she also a medical doctor?

12 (Pages 42 to 45)

46

1  A  Yes.
2  Q  Does she still live in Charlotte?
3  A  Yes.
4  Q  Do you keep in contact with her?
5  A  Yes.
6  Q  How long have you been friends with
7  Mrs. Wares?
8  A  Since we started internship, probably 2007.
9  Q  Have you either gone back to Charlotte or
10 has Mrs. Wares come here to visit you since you moved
11 to Denver?
12 A  Yes.
13 Q  Okay.
14 A  This picture is a picture of one of my very
15 best friends' weddings.  The bride is Melissa
16 Dasgupta Smith.  I am next to her, and the other girl
17 that's next to her, I guess on the left there, is
18 Beryl Jo -- I'm trying to think of her -- she just
19 got married.  Her last name, Dueitt, Beryl Jo Dueitt,
20 who was one -- Missy and Beryl and I were roommates
21 in college.  And then standing on the other side of
22 me is Melissa Stockwell, who was also one of our
23 roommates in college.
24 Q  Do you stay in contact with all three of
25 them?

47

1  A  I do.  Melissa, unfortunately, lost her leg
2  in Iraq, and she's become a big triathlon, and she is
3  often very busy with that.  So I don't talk with her
4  as often.  And then Beryl I don't talk to super
5  often, but I have stayed in touch.  And then Missy I
6  still talk to frequently.
7  Q  Where do they all live currently?
8  A  Beryl lives in New Orleans.  Missy is in
9  the military, so it's complicated; but I'm going to
10 go with North Carolina, although she's currently
11 staying in Virginia.  And Melissa Stockwell is in
12 Chicago.
13 Q  About when was this photograph taken?
14 A  I put the dates on everything that I gave
15 you guys.  It was July 4th.  I don't remember what
16 year.  Maybe 2008, 2009, somewhere in there.
17 Q  I should have asked you the same question
18 about that first photograph, too.
19 A  Uh-huh.  That first photograph -- I also
20 put the date on that.  In looking at the plaque it
21 says May 2009.
22 Q  It looks like there's five people in the
23 next photograph --
24 A  Uh-huh.
25 Q  -- who I believe you're the one in the

48

1  middle?
2  A  Yes.
3  Q  And who are the other four people?
4  A  So from left to right is Maria Glenn.
5  She's one of my friends from Charlotte.  She's also a
6  medical doctor.  It's Kathy Wares again.  Myself,
7  Beth -- whose name, I'm blanking on her last name.
8  And Mandy, who I'm also blanking on her last name.
9  Beth and Mandy did residency with us.
10 Q  Do you stay in contact with any of them?
11 A  With Maria and Kathy, yes.  With Beth and
12 Mandy, no.
13 Q  Where does Maria live?
14 A  In Charlotte.
15 Q  About when was this photograph taken?
16 A  This was for my 30th birthday.  So it would
17 have been about October 12, whatever year that was.
18 I put it on the dates again.  It would have been
19 about -- oh, I can never remember how the date works.
20 Somewhere in there.
21 Q  It looks like in the next photograph
22 there's four people?
23 A  Yes.  From left to right, again, it's Maria
24 Glenn, Kathy Wares, myself, and Ian Cole, who also
25 did residency with us.

49

1  Q  Do you stay in contact with Mr. Cole?
2  A  No.
3  Q  About when was this photograph taken?
4  A  That was our graduation I believe from
5  residency.  So it would have been 2009.
6  Q  The last photograph looks like there's two
7  people.
8  A  Yeah.  Myself and my mom.
9  Q  It looks like you're up in the mountains.
10 Was this taken here in Colorado?
11 A  It was.
12 Q  About when was that photograph taken?
13 A  I do not remember on that one; but I did
14 put the date on the file that I turned over to you
15 guys, which is a date stamp from my computer, so I
16 believe it would be accurate.
17 Q  Also, in the new materials that you
18 produced, there's some articles about tamoxifen.
19 A  Uh-huh.
20 Q  Did you read those articles?
21 A  I did read those articles.
22 Q  When did you read those articles?
23 A  I would have read them after my hair didn't
24 grow back when I was trying to figure out why my hair
25 wasn't growing back.

13 (Pages 46 to 49)

306

1  article they talked about two cases of persistent
2  alopecia, and one of the patients took Taxol and the
3  other one took Taxotere?
4      MR. SCHANKER: Objection, form.
5   A  I don't know that I read that article or if
6  we just talked about that article. I would have to
7  go back and reread the whole article.
8   Q  (By Mr. Sears) You also saw a Dr. Norris.
9   A  Correct.
10  Q  And is that the one that Dr. Borges
11 suggested you see?
12  A  Yes.
13  Q  Did you only see Dr. Norris once?
14  A  Yes.
15  Q  Why didn't you go back and see Dr. Norris
16 again?
17  A  Because he felt there was nothing that
18 could be done. He told me that they could do a scalp
19 biopsy if I wanted to, but it would be for academic
20 interest to see if I had any stem cells left on my
21 scalp. And I felt like at that time I was kind of
22 holding on by a thread, and that finding out that I
23 didn't have any stem cells would be crushing for me.
24 And since he said it wouldn't change anything, I
25 decided not to do that.

307

1   Q  Have you ever had a punch biopsy taken?
2   A  No.
3   Q  Why not?
4   A  You know, I think at the time I couldn't
5  handle it. I could probably handle it now, but since
6  they said there's nothing to be done about it, I
7  haven't -- it hasn't been on my list of things to do.
8  It's terribly embarrassing to have to show your head
9  to people, and so it's just not been anything that
10 I've done so far.
11  Q  Have you reviewed any of the medical
12 literature about reports of chemotherapy-induced
13 alopecia and whether the hair follicle is preserved?
14     MR. SCHANKER: Objection, form.
15  A  I think there was that one initial article,
16 The 10 Cases of Alopecia. That was one of the ones I
17 read before chemotherapy. And I think that the hair
18 follicles were preserved. It was nonscarring, and
19 they didn't know what was causing it. I think in the
20 article they speculated maybe the bulge cells or
21 something had gotten destroyed.
22  Q  (By Mr. Sears) Off the top of your head,
23 can you think of any other treatments you've used for
24 hair loss?
25  A  Off the top of my head. Oh, I did laser.

308

1  I tried low-level laser. I did one of those laser
2  combs that they're always advertising on TV. I tried
3  a hair roller. I tried horsetail supplements. I
4  tried the biotin.
5      As you can tell, I've tried a lot of
6  things, and there's probably other things that I've
7  tried, but I can't remember them off the top of my
8  head.
9   Q  So let's talk about Dr. Weinstein.
10  A  Dr. Weinstein. Oh, before you move on. I
11 did remember one other thing that I tried. The
12 Monistat for yeast infections, there's data that that
13 would grow on your head. So I ordered Monistat from
14 Amazon and put it all over my head. It doesn't do
15 anything.
16     Okay. Dr. Weinstein. Oh, Dr. Weinstein.
17 Yes. He sent me some stuff in the mail that I've
18 been -- I had been trying.
19  Q  Do you no longer use it?
20  A  What was that?
21  Q  Do you no longer use --
22  A  I don't. I gave it about a year, and
23 probably about April of this year I stopped using it
24 because I wasn't -- it helped a little, but it wasn't
25 hugely significant.

309

1   Q  Have you had any other treatment for your
2  hair that caused the extent of hair regrowth that you
3  saw with Dr. Weinstein's treatment?
4   A  I would say the oral minoxidil was better
5  than Dr. Weinstein's treatment. The oral minoxidil
6  was probably the best, but it still wasn't enough to
7  go without a wig.
8   Q  So how did you find Dr. Weinstein?
9   A  I do a lot of research on hair growth and
10 follow a lot of the hair growth things. I am very
11 frequently sending e-mails to various researchers who
12 have promising research. And he was one of those
13 people that I came across, and I e-mailed him. And
14 unlike most of the researchers who I never hear
15 anything back, he responded and was very interested
16 in what had happened.
17  Q  Is Dr. Weinstein's treatment approved by
18 the FDA?
19  A  No. We had actually spoken with the FDA
20 about getting compassionate use for it.
21  Q  Is that something that you had to work out
22 with the FDA before he sent you the samples?
23  A  I believe so.
24  Q  Did you sign a consent form for taking
25 Dr. Weinstein's treatment?

78 (Pages 306 to 309)

310

1  A  No.
2  Q  Did you have any idea what sort of side
3  effects might occur from Dr. Weinstein's treatment?
4  A  I thought that they would probably be
5  pretty limited because I had already tried both the
6  topical cyclosporine and minoxidil. And it was just
7  his one new compound. And he had told me that not
8  much of that gets absorbed through the skin. So I
9  didn't really think there would be any side effects
10 and he didn't know of any.
11 Q  Have you reviewed the Follicle Thought
12 Blog?
13    MR. SCHANKER: Objection, form.
14 A  I -- I believe so. I follow -- I get
15 e-mails from them.
16    (Exhibit 31 was marked.)
17 Q  (By Mr. Sears) I hand you what's been
18 marked as Exhibit 31, and it's a portion of the
19 Follicle Thought Blog.
20 A  Okay.
21    MR. SCHANKER: 31.
22    MR. SEARS: Yes, sir.
23 A  So this is from March 9th, 2018?
24    (The deponent is reviewing the document.)
25 A  Okay.

311

1  Q  (By Mr. Sears) So, essentially, what this
2  is is a question/answer session with Dr. Weinstein,
3  right?
4  A  It looks like it.
5  Q  And one of the things that Dr. Weinstein
6  says is: We have some preliminary evidence that RT
7  1640 treatment does restore hair growth in the
8  setting of taxane-induced permanent alopecia. These
9  are people that have been treated with taxane drug to
10 treat cancers, usually breast cancers, and have
11 suffered what has been thought to be an irreversible
12 alopecia.
13 A  That's what it says.
14 Q  Is RT 1640 the compound that you took as
15 well?
16 A  Yes.
17 Q  And there's two types of taxanes, aren't
18 there? There's Taxol and there's Taxotere.
19    MR. SCHANKER: Objection, form.
20 A  At least.
21 Q  (By Mr. Sears) So he notes that RT 1640 is
22 used for treating taxane-induced alopecia, right?
23 A  Yes.
24    MR. SCHANKER: Objection, form.
25 Q  (By Mr. Sears) So wouldn't that cause you

312

1  to think that Taxol or other taxanes can also cause
2  irreversible alopecia?
3  A  I would think he is using the word
4  "taxanes" in general. I don't think he specifically
5  knows of cases of Taxol-induced, but you'd have to
6  ask him.
7  Q  So you started using Dr. Weinstein's
8  treatment on April 5th, 2017, right?
9  A  Somewhere in there. I would have to look
10 back at our e-mail strings.
11 Q  And over the course of your treatment, you
12 sent Dr. Weinstein photos about your hair growth.
13 A  Yes.
14 Q  In some of those e-mails he notes that he's
15 delighted at how your hair looks.
16    (Reporter requested clarification.)
17 Q  (By Mr. Sears) In some of those e-mails,
18 Dr. Weinstein notes that he is delighted at your hair
19 regrowth.
20 A  He notes that, yes.
21 Q  Were you delighted with your hair regrowth?
22 A  Not really. I thought maybe it was getting
23 a little bit better. I think one of the things that
24 had concerned me was that I found him on Facebook and
25 he is a pretty dang bald man himself. And I was

313

1  like, "If this drug is working so great, why are you
2  still so bald?" And I certainly wanted him to keep
3  sending it to me because he said sometimes it takes
4  up to a year to work. And so I would try to see if I
5  could send a good picture. And he said that he was
6  delighted with it. I thought maybe it was helping a
7  little bit. I didn't ever feel like it was doing a
8  ton. And, in fact, I still have three unused
9  bottles.
10    (Exhibit 32 was marked.)
11 Q  (By Mr. Sears) So I'm handing you what's
12 been marked as Exhibit 32, and it's an e-mail
13 exchange between you and Dr. Weinstein.
14    (The deponent is reviewing the document.)
15 A  Okay.
16 Q  (By Mr. Sears) So the last page there are
17 photographs, and there's baseline 8 weeks and 12
18 weeks.
19 A  Uh-huh.
20 Q  Yes?
21 A  Correct.
22 Q  These are pictures of you, aren't they?
23 A  They are.
24 Q  And so it shows two vantage points of your
25 hair regrowth, and it starts before you had

79 (Pages 310 to 313)

314

1  treatment, right?
2  A  Correct.
3  Q  Then it shows your hair growth at eight
4  weeks, right?
5  A  Correct.
6  Q  And then it shows it at 12 weeks?
7  A  Correct.
8  Q  Do you agree that you had hair regrowth
9  between when you started the treatment and by 12
10 weeks?
11 A  I don't know.  I would say maybe it was a
12 little bit better.  Dr. Weinstein would take all the
13 photos I would send him and he would selectively
14 choose the best-looking one to compare.  I think the
15 light matters a lot here.  This one looks a little
16 bit fuzzy, and it was probably right after I took a
17 shower and it was a little damp in the room.  I mean,
18 maybe they look a little better, but the eight-week
19 one looks worse than the baseline to me.
20    So, yeah, I thought they helped a little
21 bit, but I also kind of felt like maybe Dr. Weinstein
22 was selectively choosing the pictures that looked the
23 best because they are trying to get funding.
24 Q  So Dr. Weinstein sends you the photographs
25 and he asks you if he can use those as part of

315

1  fund-raising efforts, right?
2  A  Yes.
3  Q  And you respond by asking him how widely
4  the photographs will be distributed, right?
5  A  I do.
6  Q  And then you write, quote, you would rather
7  not have the lawyers for the other side put 2 and 2
8  together just yet.
9  A  Correct.
10 Q  What did you mean by that?
11 A  You know, I don't remember.  I don't know
12 if I was talking about you guys or if I was talking
13 about the FDA because we had talked about doing a
14 compassionate use trial with the FDA.
15 Q  Did you have any thought that if the
16 lawyers for the other side, the lawyers who represent
17 Sanofi, saw hair regrowth, that it might be
18 problematic for your lawsuit?
19    MR. SCHANKER:  Objection, form.
20 A  I don't think I did because of several
21 things.  First is that I had talked to my lawyers
22 about all the things I was doing.  And I specifically
23 said, "You know, I'm eternally optimistic."  And I
24 said, "What if all my hair grows back."  And they
25 said, "Well, you still suffered very significant

316

1  harm."
2     And the other thing is that there is no way
3  that I would assume that I'm going to get through all
4  of this without you guys taking a punch biopsy,
5  without you guys wanting to see your own expert.
6     I think I was just trying to give him a
7  reason not to share my photos widely because I was
8  afraid of seeing my head on every commercial.
9  Q  (By Mr. Sears)  So did you have concerns
10 with the lawyers from Sanofi seeing these photographs
11 of you?
12    MR. SCHANKER:  Objection, form.
13 A  I don't know.  I mean, I don't remember
14 this specific e-mail, and it could have been the
15 lawyers at the FDA because you're not supposed to be
16 using drugs off-label.  So I'm not sure which party I
17 was referring to.
18 Q  (By Mr. Sears)  Well, I think we already
19 talked about how you and Dr. Weinstein got approval
20 from the FDA for you to use the treatment, right?
21    MR. SCHANKER:  Objection, form.
22 A  To the best of my knowledge, we did not get
23 actual approval.  We started the process for
24 compassionate use, and I think it is still in
25 progress, but I don't know that we ever got official

317

1  permission from them.  I would have to check with
2  him.
3  Q  (By Mr. Sears)  Could Dr. Weinstein lose
4  his medical license for sending you a drug that has
5  not been approved by the FDA?
6     MR. SCHANKER:  Objection, form.
7  A  I don't know.
8  Q  (By Mr. Sears)  Okay.  So as we sit here
9  today, you can't tell us whether you were writing
10 about the lawyers for the FDA or the lawyers for
11 Sanofi?
12 A  No.
13 Q  So as part of this litigation you filled
14 out what are called fact sheets, right?
15 A  Yes.
16 Q  And one of the questions in those fact
17 sheets is to ask you who your treaters are, right?
18 A  Yes.
19 Q  Do you agree that you did not disclose
20 Dr. Weinstein in any of the four versions of your
21 fact sheets?
22 A  I would have to look at them, but I never
23 considered him my physician.  He was just sending me
24 this stuff, and I was using it, and maybe that wasn't
25 a correct idea, but I didn't ever feel like, you

80 (Pages 314 to 317)

318

1  know, I didn't -- I didn't have a relationship with
2  him, like I never went and saw him in person or
3  anything like that. And I -- so I don't think I
4  ever -- I didn't ever really think he was my doctor
5  per se.
6      Q   We're going to look at a few more
7  photographs of your hair regrowth from the treatment
8  that Dr. Weinstein was sending you, but was it, I
9  guess, a big deal for you to have that extensive of
10 hair regrowth?
11         MR. SCHANKER: Objection, form.
12     A   Not really. I thought it got a little bit
13 better, and I thought one of the interesting things
14 with this is that topical minoxidil and topical
15 cyclosporine had never done anything. And when you
16 added this other compound in, I did feel like it was
17 a little bit better. I think for me being like
18 pretty dang bald versus slightly less bald, did I
19 feel a little bit more comfortable in my own home?
20 Yes. But it wasn't clinically -- I guess
21 "clinically" is not the right word here. It wasn't
22 significant to me in terms of my quality of life
23 because it wasn't something I could go out of the
24 house with. It's still not something you could do
25 extensions with or that you could hide a weave in.

319

1      Like is it a little better? Sure. I gave
2  it the full year he said that it requires to get
3  better, but at the end of that year, it wasn't worth
4  it to me to keep doing it twice a day. I felt like
5  it helped a little, especially in the beginning, but
6  it wasn't doing a whole lot.
7      Q   (By Mr. Sears) The fact sheets that you
8  filled out were actually during the time that you
9  were using Dr. Weinstein's treatment?
10     A   Okay.
11     Q   Is there any reason you wouldn't have
12 included him in the fact sheets?
13     A   I might have just forgotten. He -- like I
14 said, I didn't think he was my doctor per se. He was
15 just in my mind a researcher that I was talking to.
16     Q   Did you not want the defendants to find out
17 about Dr. Weinstein?
18         MR. SCHANKER: Objection, form.
19     A   I wouldn't say that I didn't want them to
20 find out. I knew all my e-mails were being turned
21 over and there was a court order to not destroy
22 anything related to the hair terms. I assumed that
23 you guys would see that stuff.
24     Q   (By Mr. Sears) Are there other researchers
25 that you're talking to about hair growth that are not

320

1  in your fact sheets?
2      A   I've sent a couple e-mails back and forth
3  with a gentleman named Bill Lowry at UCLA, but it
4  hasn't gone anywhere. He asked me to send him some
5  scout biopsies from some of the other women, and he
6  said that they were looking into maybe trying to get
7  funding. And that was seven or eight months ago.
8      Q   And Dr. Lowry hasn't sent you any
9  treatments to use, has he?
10     A   No. And just to clarify the record, I
11 probably reached out to at least 20 different
12 scientists, and I don't remember all of them.
13     Q   You disclosed all the dermatologists that
14 you have gone to in your fact sheet though, right?
15     A   I thought so, although I saw yesterday when
16 I was looking through all of the stuff on the MDL
17 that both sides had that there was an Advanced
18 Dermatology appointment in November of 2013 which I
19 had just completely forgotten about.
20     Q   That was with Dr. Alonso?
21     A   Yes.
22     Q   So had you seen any other dermatologists or
23 received any other treatments for your hair from a
24 medical doctor that you did not include in your fact
25 sheet?

321

1      A   I do not believe so.
2      Q   Okay. So the only physician that sent you
3  hair treatment that was not included in your fact
4  sheet is Dr. Weinstein.
5      A   Yeah. I think he's the only one that sent
6  me anything.
7      Q   All right. I'm going to hand you
8  Exhibit 33, and it's additional e-mail correspondence
9  between you and Dr. Weinstein.
10        (Exhibit 33 was marked.)
11     A   Okay.
12     Q   (By Mr. Sears) You know, actually, I'm
13 sorry, one more thing about that last exhibit that we
14 were looking at.
15     A   Okay.
16     Q   You write in your e-mail to Dr. Weinstein
17 that if the Taxotere girls get wind of it, they will
18 hunt you down to the end of the earth begging for
19 help.
20     A   Yes.
21     Q   Is that because you felt as though you were
22 getting a response from his treatment?
23     A   I think it was that I had seen something
24 that he put out there, and it might have been -- I
25 don't know what it was, but there was something

**322**

1  somewhere where he said on some public Web site thing
2  that there's some suggestion it was helping with
3  Taxotere-induced hair loss.  And I was basically
4  trying to be like, be careful, like we don't know
5  yet, you're going to get a lot of phone calls.
6     Q   Did you ever tell any of the women in the
7  Taxotere community about the response that you're
8  having to the treatment that Dr. Weinstein provided?
9     A   I did not.
10    Q   All right.  So let's go to the next
11 exhibit --
12    A   Uh-huh.
13    Q   -- which was Exhibit 33.  And Dr. Weinstein
14 notes that your hair looks great.
15    A   Uh-huh.
16    Q   Right.
17    A   Yes.
18    Q   And you note that you blow-dried your hair
19 but still pretty incredible, right?
20    A   Correct.
21    Q   So at this time, August 1st, 2017, when you
22 had been using the treatment for about four months --
23    A   Correct.
24    Q   -- did you feel as though your hair
25 regrowth was pretty incredible?

**323**

1     A   I felt like the progress that I had seen
2  was pretty incredible.  I don't think I'd say my hair
3  regrowth was incredible because as you can tell from
4  these pictures, I still have very large bald spots.
5  I thought that my -- what improvement I had was
6  pretty hopeful at this point.
7         And, again, I'm just trying in my e-mails
8  in part to get him to send me more.  I say to him, "I
9  hate to ask again, but I will be out in two weeks."
10 And I was very much afraid that he would stop sending
11 it to me before the one-year mark.
12    Q   You wanted to keep on using what he was
13 sending you because you felt like were responding to
14 it, right?
15    A   And he showed me pictures of people who'd
16 had good hair regrowth with androgenic alopecia, and
17 when we talked about it, it made sense to me that
18 maybe this would really help me.
19    Q   And one of the reasons why you wanted him
20 to continue sending you the treatment was because you
21 felt like you were having a response to it, right?
22    A   I felt like I had a little bit of a
23 response, but it was more of I was hoping if I
24 reached the year mark, I would have like my hair
25 back.

**324**

1         (Exhibit 34 was marked.)
2     Q   (By Mr. Sears)  Let's look at another
3  e-mail exchange between you and Dr. Weinstein, and
4  this is Exhibit 34.
5     A   Okay.
6         (The deponent is reviewing the document.)
7     A   Okay.
8     Q   (By Mr. Sears)  So the date of this e-mail
9  is October 5th, 2017, right?
10    A   Correct.
11    Q   That's about six months after you started
12 the treatment?
13    A   Correct.
14    Q   There's a couple photographs of your hair?
15    A   Uh-huh.  Correct.
16    Q   Dr. Weinstein notes that the goods news is
17 your hair looks great.  I couldn't be happier with
18 your progress.  Right?
19    A   That's what he said.  And then I said in
20 response, "I feel like I plateaued."
21    Q   So you disagree that your hair looks great
22 in these photographs?
23    A   I would categorically disagree.  I think my
24 hair looks horrible.  I think it looked better than
25 it did a few months prior.  I wouldn't say "great"

**325**

1  though.  And I think this is the point where I
2  started to lose faith that it was going to do much.
3  It did seem to help a little bit in the beginning,
4  but this is kind of the point where I was like, "I
5  don't know that this is doing a lot."
6         And, again, these are those bathroom
7  pictures that are all misty and hard to see.
8     Q   So around this time period you actually
9  bought hair straightener from Amazon, didn't you?
10    A   I did for my new wig.
11    Q   It wasn't for your hair?
12    A   No.
13    Q   Did you have an old hair straightener that
14 broke?
15    A   No.
16    Q   So you just didn't have a hair straightener
17 before that?
18    A   No.  I didn't have a hair straightener.
19 I'd always for the most part curl my hair.  And then
20 I went to this lady -- I think this is around the
21 time -- it must be around the time that I tried doing
22 a weave again.  And I, of course, didn't like that.
23 And she got me a super cheap wig that to this day is
24 one of my favorite wigs.  It was a very inexpensive
25 wig.  And then she styled it and did these beautiful

82 (Pages 322 to 325)

326

1  curls with her hair straightener, and she taught me
2  how to do that. And that's what made me want to get
3  a hair straightener.
4     Q   So we talked about the Follicle Thought
5  Blog earlier.
6     A   Okay.
7     Q   I'm going to hand you another excerpt from
8  that, and it's marked as Exhibit 35.
9        (Exhibit 35 was marked.)
10    A   Okay.
11       (The deponent is reviewing the document.)
12    A   Okay.
13    Q   (By Mr. Sears) So, again, this is another
14 question-and-answer session with Dr. Weinstein,
15 right?
16    A   Yes.
17    Q   And Dr. Weinstein notes that 100 percent of
18 the people that have used his treatment have had
19 satisfactory growth, and a significant percentage
20 have had complete hair regeneration, right?
21    A   That's what he says.
22    Q   Do you disagree with that?
23    A   I don't --
24       MR. SCHANKER: Objection, form.
25    A   I don't know if I'm included with that.

327

1  Would I say that I personally have had satisfactory
2  hair regrowth? No. Do I think I've even had much?
3  No, not really. And when I stopped taking it,
4  whatever little benefit I saw, I didn't see any
5  longer.
6     Q   (By Mr. Sears) Did you exchange e-mails
7  with Dr. Weinstein where you talked about how you
8  were having a dream that you could go out without a
9  wig?
10    A   Yes.
11    Q   And did you refer to your hair as looking
12 great in that e-mail exchange?
13       MR. SCHANKER: Objection, form.
14    A   I think I did, but I didn't -- I meant
15 great for using a drug. Not great, like my hair
16 looks like it did before I had chemo great. But it
17 was the first hope that I'd had that maybe we'd found
18 something that would make a difference.
19       I would like to point out that you can see
20 a picture of Dr. Weinstein on here, and he is
21 noticeably bald. And so I've always dealt with this
22 drug with a little bit of skepticism, and I think
23 my -- I've never been totally convinced it would
24 work. In the very beginning when I seemed to be
25 getting a little bit of progress, I was very excited

328

1  and very hopeful, and I really believed in his drug;
2  but as time wore on, I just started to question
3  whether it was anything at all. And, you know,
4  certainly maybe a topical combination of cyclosporin
5  and minoxidil could help a little bit, and maybe this
6  third drug is no use at all. We don't know. That
7  was -- you'd need to run a randomized, control trial
8  to look at that.
9     Q   (By Mr. Sears) So you e-mailed him on
10 April 2nd, 2018?
11    A   Okay.
12    Q   And you told him, "Just wanted to let you
13 know" that you stopped using the medication, right?
14    A   That sound about right. I had probably
15 actually stopped using it just -- I had gotten lazy
16 about it the last month before I e-mailed him. I was
17 probably only using it once a day because I didn't
18 really think it was working.
19    Q   Did you know that the defendant had sent
20 Dr. Weinstein an authorization requesting records of
21 his treatment of you?
22    A   Yes, I did.
23    Q   How did you find out about that?
24    A   He sent me an e-mail and asked me to call
25 him, and I did.

329

1     Q   What did you two talk about?
2     A   He just said, "I don't have any medical
3  records." And I was like, "Well" -- and he was
4  like -- and I was like, "Well, you weren't really my
5  doctor." I was like, "Just tell them that you
6  weren't really my doctor because you don't have any
7  records, you never saw me."
8        I guess I never considered us to have a
9  physician/patient relationship. I considered us to
10 have more of a physician/physician relationship. And
11 he was sending me this as a colleague, not as a
12 treating patient.
13    Q   So did he tell you that initially when he
14 was contacted about records he said that he did have
15 records?
16    A   That he did have records?
17       MR. SCHANKER: Objection, form.
18    A   I know nothing about whether he had records
19 or not. The only records that I would know for sure
20 that he had would be our e-mails.
21    Q   (By Mr. Sears) Did you know that he was
22 sent what's called a no-record certification?
23    A   I did not.
24    Q   And essentially all that is is getting him
25 to swear that he doesn't have anything involving you

83 (Pages 326 to 329)

330

1  or your treatment or your hair loss.
2  A  Okay.
3  Q  Did you know he was sent something like
4  that?
5  A  No. I would like to say also that I have
6  gotten a bunch of calls from a bunch of people about
7  these Veritext requests for records. They have sent
8  them to a bunch of places that I've worked. They
9  have sent them kind of all over the place. So this
10 is not the only call that I got about it.
11     They sent them to one of my old bosses, and
12 he was like, "What do I do with this?" And I was
13 like, "Just tell them you don't have records. You
14 were my boss, but HR has the records."
15     The same thing with another one of the ER
16 sites. They were like, "They're asking for your
17 medical records." I was like, "Write them back and
18 tell them you don't have medical records, that I
19 worked there."
20     So to me, this call from him was not
21 anything out of the ordinary from what I was getting
22 from other people at the time.
23 Q  So did you know that Dr. Weinstein received
24 a subpoena for his records?
25 A  I did.

331

1  Q  How did you learn about that?
2  A  I was notified about it by e-mail.
3  Q  By whom?
4  A  My lawyers, but this might be a violation
5  of attorney-client privilege.
6  Q  Did you decide to reach out to
7  Dr. Weinstein after you found out that the defendants
8  were going to subpoena his records?
9  A  Yes. I sent him a message and said, "Just
10 so you know, you're going to get served with a
11 subpoena." And I don't remember his exact response,
12 but he was like, "Okay." And I apologized to him,
13 and I said, "I'm sorry. I think because this is a
14 big case they're just looking under every rock."
15     (Exhibit 36 was marked.)
16 Q  (By Mr. Sears) All right. I'm going the
17 hand you what's marked as Exhibit 36 and it's a
18 combination of an e-mail from you to Dr. Weinstein
19 and also a series of texts.
20 A  Okay.
21     (The deponent is reviewing the document.)
22 A  Okay.
23 Q  (By Mr. Sears) So your e-mail is dated May
24 3rd, 2018, right?
25 A  Yes.

332

1  Q  And it's from you to Dr. Weinstein.
2  A  Yes.
3  Q  And here's what it says: Just FYI,
4  opposing counsel is going to serve a subpoena
5  tomorrow. They gleaned your info from my e-mails.
6  Sorry. It looks like a tear face and an angry face.
7  A  Yes.
8  Q  Why did you send him a tear face?
9  A  I don't know. I felt bad that he was
10 getting dragged into all of this. I know that he
11 should not have been sending me that -- the compound
12 that he was sending me, and he was doing that for me
13 as a professional courtesy, as a colleague to
14 colleague, and he had already called me about this.
15     And I felt bad that he was going to get a
16 subpoena; and he's a medical doctor, and I was afraid
17 that they would show up and like arrest him at his
18 house or something. And I just wanted him to be
19 aware that he should be expecting a subpoena.
20 Q  You also put an angry face on there. Why
21 did you include an angry face?
22 A  I felt frustrated. They have sent these
23 things to everybody. I, myself, keep getting them;
24 and I keep writing them back and telling them they
25 have to contact HR, they can't keep sending these to

333

1  me.
2      And I feel like Dr. Weinstein did a really
3  good thing for me, and I feel really bad that he's
4  now getting dragged into this whole mess.
5  Q  Do you feel as though defendants don't have
6  a right to gain access to your records?
7      MR. SCHANKER: Objection, form.
8  A  To the best of my knowledge he had no
9  records. I knew that there were e-mails between us.
10 I -- again, I've never seen him personally. I -- to
11 the best of my knowledge, he told me when he called
12 me and asked me what he should do about it; that he
13 had no records.
14 Q  (By Mr. Sears) So did you feel as though
15 even though Dr. Weinstein was sending you treatment
16 for alopecia, he wasn't actually treating you?
17     MR. SCHANKER: Objection, form.
18 A  I felt like he was giving me that solution
19 as a colleague. I didn't feel like he was actually
20 treating me. And I would also like to state for the
21 record that part of the reason I sent him the text
22 and the e-mail rather than picked up on the phone and
23 called him was because I knew there was a subpoena
24 out there, and I wanted to leave a paper trail of
25 what I said to him because I didn't want there to be

84 (Pages 330 to 333)

334

1  the appearance of anything improper.  But I did want
2  him to know so that the police didn't show up at his
3  place of work or something and he didn't know.
4       And the other thing about this is when I
5  got this e-mail, I wasn't sure he may have already
6  been subpoenaed.  They said either that day or the
7  next day.  But I felt like having dragged him into
8  this whole mess, that I should give him a heads-up.
9  And, again, I did not call him, and I specifically
10 put this out there because I wanted to make sure that
11 there was nothing, you know, untoward going on.
12    Q   (By Mr. Sears)  So is your testimony as you
13 sit here today that you do not know if Dr. Weinstein
14 got FDA approval to send you his treatment?
15    A   I -- I don't know.  I don't believe he did.
16 I know we talked to the FDA about it, and it was
17 going to be a complicated process.  And I think he
18 said, "You're a colleague of mine.  I'm just going to
19 send you this."  And I was very desperate, and I was
20 happy to take it.
21    Q   So you don't recall being cc'd on any
22 e-mails between the FDA and Dr. Weinstein about how
23 it's great news that you can use his treatment?
24       MR. SCHANKER:  Objection, form.
25    A   I don't recall.

335

1       MR. SEARS:  Can we go off the record,
2  please.
3       THE VIDEOGRAPHER:  The time is 6:09.  We're
4  going off the record.
5       (Recess from 6:09 p.m. to 6:20 p.m.)
6       THE VIDEOGRAPHER:  The time is 6:20.  We're
7  back on the record.
8    Q   (By Mr. Sears)  So we're back from break.
9       Do you feel okay to keep on going?
10   A   I do.
11      MR. SEARS:  And it sounds like we have 12
12 minutes left until we have seven hours.  So I know we
13 talked about this earlier, but it's our position we
14 get another deposition for the Taxotere
15 communications.  I understand your position, so I'm
16 going to continue on for the last 12 minutes, and
17 then you can either agree to another depo or I guess
18 we'll have to take it up with the judge.
19      MR. SCHANKER:  Correct.  And it's our
20 position that this is your chance to take the
21 deposition.  Dr. Gahan has made herself available
22 here today.  You've had the opportunity to fully
23 prepare for this, and Dr. Gahan's prepared to go on
24 and give you time to question her about this here
25 tonight, and that it sounds like you are refusing to

336

1  utilize that time.
2       MR. SEARS:  My impression is I have 12
3  minutes of time left, and I suspect I have four to
4  five hours of questions about the Taxoteres.
5       And the other problem is I believe we are
6  still getting ESI from the group, and I don't think
7  we have all that yet.  So I don't want to take the
8  opportunity to ask her about that with all of that
9  information.
10      MR. SCHANKER:  Right.  And it's our
11 position that you asked her from her perspective and
12 that that was turned over to you on I believe it's
13 March 5th, which has given you over two months with
14 the ESI information.  And she's had plenty of time to
15 prepare for it, she's made herself available today,
16 and you have the opportunity here today.  And that
17 nothing in any order that we've seen or that you can
18 show me say that you get a second deposition of
19 Dr. Gahan.
20      MR. SEARS:  And, again, I would cite the
21 language in the order that says that the deposition
22 of Dr. Gahan with respect to the Taxoteres does not
23 count against our limits for depositions.
24   Q   (By Mr. Sears)  So I have a couple more
25 questions about the dermatology visits.

337

1       So the dermatologists told you that you
2  have a nonscarring form of alopecia, right?
3    A   I don't know that they could say that
4  without doing a biopsy.  They may have put that in
5  their note, but nobody knows until you do a biopsy.
6    Q   So as you sit here today, you don't know if
7  you have scarring or nonscarring alopecia?
8       MR. SCHANKER:  Objection, form.
9    A   No.
10   Q   (By Mr. Sears)  Have any of the
11 dermatologists taken blood tests?
12   A   I had those done through my primary care
13 doctors -- or my oncologist, I should say.
14   Q   Did they test for things like
15 hyperthyroidism?
16   A   Yes.
17   Q   Do you have hypothyroidism?
18   A   No.
19   Q   Have you also had your blood tested for
20 nutritional deficiencies?
21      MR. SCHANKER:  Object to form.
22   A   Which specific nutritional deficiency?
23   Q   (By Mr. Sears)  Any.
24      MR. SCHANKER:  Same objection.
25   A   I don't know what deficiencies you would

85 (Pages 334 to 337)

338

1  describe as nutritional deficiencies. When I think
2  about this in medicine, I think people who are
3  nutritionally deficient have low albumin levels; and
4  that has been tested for in my routine labs.
5     Q  (By Mr. Sears) Have you gone through
6  menopause?
7     A  No.
8     Q  Are you regularly having your period?
9     A  Yes.
10    Q  Have you been in any romantic relationships
11 since you had breast cancer?
12       MR. SCHANKER: Objection, form.
13    A  Yes.
14    Q  (By Mr. Sears) With whom?
15    A  Dan Lann. Charly Schollart. Dusty
16 Spangler. I think I've gone on dates with other
17 people, but those are people that I would consider
18 having had relationships with.
19    Q  Are you currently in a romantic
20 relationship?
21    A  No.
22    Q  Do the three that you mentioned, do they
23 all live in the Denver area?
24    A  Dusty is an airline pilot, and I do not --
25 I think he still lives in Denver, but he was talking

339

1  about moving to Atlanta. So I think so, but I don't
2  know for certain.
3     Q  How long did you date Dan Lann?
4     A  Hum. Maybe six or seven months.
5     Q  How long did you date Charly?
6     A  Probably six months.
7     Q  How long did you date Dusty?
8     A  Maybe six months. Somewhere -- these are
9  rough estimates. These are all a couple of years
10 ago.
11    Q  Are you currently seeing any sort of mental
12 health counselor?
13    A  Yes.
14    Q  Who do you see?
15    A  Kim Sherman.
16    Q  How frequently do you see Kim Sherman?
17    A  Every couple of months.
18    Q  What kind of -- is she a psychologist,
19 psychiatrist, therapist?
20    A  Psychiatrist.
21    Q  And is that who you go for your medication?
22    A  Citalopram. Yes.
23    Q  Have you taken any other medications
24 relating to any mental health concerns?
25    A  After all this happened and even before it

340

1  I had trouble sleeping, and they would give me Ativan
2  and Ambien to help sleep. I don't know that that was
3  specific to mental health condition. Because of the
4  tamoxifen I can't have a lot of the mental health
5  drugs, and so we've just done the citalopram.
6     Q  Do you have anxiety?
7     A  I don't think so.
8     Q  Did you ever seek treatment for PTSD?
9     A  I mean, I sought treatment for the distress
10 I was going through after my hair loss. I'm sure
11 some people would characterize that as PTSD and other
12 people wouldn't. I think I sought more just for
13 distress. I don't know that I'm qualified to
14 diagnose myself in terms of an actual mental health
15 diagnosis.
16    Q  Before you were diagnosed with breast
17 cancer, did you -- sorry. Let me start that over
18 again.
19        Before you were diagnosed with breast
20 cancer, had you ever seen a therapist or psychiatrist
21 or psychologist?
22    A  Not that I recall. When I was a little
23 kid, like four or five, my mom took me to a play
24 psychologist when they got divorced. But I don't
25 believe I've seen anyone besides that person when I

341

1  was a little kid.
2        Oh, there is one other person. There's --
3  there's a lady named Amy Gorsline who I saw a couple
4  of times when I was going through treatment, like at
5  the university. But we ended up discovering she
6  wasn't covered by my insurance. She helped me deal
7  with some of my anxiety about going back to the
8  operating room for my reconstruction.
9     Q  Who's -- is there someone called David
10 Lann?
11    A  Dan Lann.
12    Q  Dan Lann. Is he a medical doctor?
13    A  He is.
14    Q  Has he ever prescribed you any medication?
15    A  Probably. So Dan Lann is one of the people
16 that I dated, and we also worked together. We dated
17 before we worked together. But, you know, if I had a
18 little cold or something, we would be changing off at
19 shift change and I'd say, "I'm fighting this allergy"
20 or "I'm fighting this cold. Can you give me a
21 Z-Pak." And he'd ask me a couple questions, and he'd
22 say, "Yeah, sure, no problem. I'll give you a
23 Z-Pak."
24        Again, this is getting into that really
25 gray area. This was more of a colleague-to-colleague

86 (Pages 338 to 341)

342

1  kind of a thing.  This is not the kind of thing that
2  he would have been like, "Oh, I'm going to write a
3  medical chart about you."
4      The medical board would prefer that you do
5  that, but it's not something we commonly do.
6    Q  Have you dated someone named John since
7  you've been diagnosed with breast cancer?
8    A  Can you give me a last name?  I have a very
9  good friend named John who's a pilot, who I've known
10 since I was probably 15 or 16.  I don't recall off
11 the top of my head dating someone named John.  It's
12 within the realm of possibilities.
13   Q  Are you claiming lost wages in your
14 lawsuit?
15   A  Yes.
16   Q  Can you tell me how you believe that hair
17 loss caused you to lose wages?
18   A  I was so incredibly distressed that I could
19 barely function, much less go to work.  I knew to
20 keep my health insurance and to keep my house I had
21 to go to work, but I made it all the way through
22 cancer and the mastectomy and the chemotherapy
23 without any problems at work.  And after this
24 happened, I would just break down and start sobbing
25 at work.  I would be sobbing when I got to work.  I

343

1  had a really hard time pulling it together enough to
2  go to work.
3    Q  How long did you not go to work?
4    A  I don't remember the exact dates, but I
5  would say during all the cancer stuff I've never
6  completely stopped working; but in January is when I
7  found out that Dr. Borges said my hair wasn't normal.
8  And in October of that year I started working
9  part-time for UC Health -- or back then it was First
10 Choice Emergency Room, and that job was very, very
11 chill.  We would see oftentimes only two people in 24
12 hours.  And so that job kind of allowed me to go back
13 to work, and I would shut the door sometimes and just
14 cry in my office.  I would go in the sleep room and
15 cry.  I think if it hadn't been for that job, I don't
16 know that even today I'd be working full-time.
17   Q  Was there ever a time that you actually
18 stopped working?
19   A  I don't believe so.  Dr. Borges asked me to
20 take those six weeks off, and I did.  I didn't work a
21 lot during chemotherapy.  I would go in for four
22 hours here, four hours there.  But I felt like I
23 didn't want to lose my skills as a physician.  And,
24 honestly, I think sometimes when you're going through
25 something really bad, it's helpful to be in the ER

344

1  because you really can't focus on anything else; you
2  have to pay attention to what's ahead of you.  And so
3  sometimes when I was going through the cancer stuff,
4  it was nice to not be the patient, to be the doctor
5  again.
6    Q  How much do you claim that you lost in lost
7  wages?
8    A  I don't know.  We would need to get an
9  expert or to look through all of that.  I don't
10 remember.
11   Q  How are you doing financially today?
12   A  Good.
13      MR. SCHANKER:  Objection, form.
14   Q  (By Mr. Sears)  Do you have a house?
15   A  I do.
16   Q  Do you have a car?
17   A  I do.
18   Q  How much money are you making every year
19 right now?
20   A  I mean, you guys have all my tax returns,
21 but I think last year I probably made close to
22 400,000.
23   Q  What kind of car do you have?
24   A  I have two.  I have my Mustang that I've
25 had since I was 20.  It's a 2000 Mustang.  And I have

345

1  a BMW that is a convertible that I initially promised
2  myself I would buy for myself when I made it through
3  chemo.
4      MR. SCHANKER:  Can I have that seven hours?
5      MR. SEARS:  So are you shutting the depo
6  down?
7      MR. SCHANKER:  No.  I have some questions.
8  But that's your seven hours.  Again, I will again
9  give you the opportunity if you would like to use
10 this chance that Dr. Gahan made herself available to
11 ask the questions concerning the Taxoteres.  But
12 other than that, you've utilized the seven hours.
13     MR. SEARS:  Well, again, it's our position
14 that we get a separate depo to talk about the
15 Taxoteres and the communication.  And like I said, I
16 referenced the order of the court and I referenced
17 the fact that we're still getting ESI information
18 from the Taxotere community, and I feel like we'd be
19 prejudiced to take a deposition without access to all
20 the information.
21     MR. SCHANKER:  Sure.  And obviously in this
22 case as we understand, there's an abundance of
23 depositions that are going on with discovery still
24 coming in.  But at some point, you know, in
25 deposition, a deponent is made available as Dr. Gahan

87 (Pages 342 to 345)

350

1    MR. SEARS: Object to the form.
2    A    I think for me, getting back to my life
3 after chemotherapy was just as important as surviving
4 chemotherapy or surviving cancer. And for me as a
5 young, single woman who works in a field that is
6 often a situation where you need to be able to put
7 your hair back, you need to be able to be sterile,
8 you need to be comfortable when you're sitting and
9 talking to your patients and not wondering if they
10 think that you have cancer.
11    For me, I think permanent disfigurement is
12 almost more scary than really anything else because
13 we are inherently social creatures and your ability
14 to fit in with other people and to be a normal human
15 being is so important.
16    I always think of -- it was after, I think,
17 the Civil War, and rather than kill traitors, they
18 would brand them on their faces with a sign that let
19 everyone know that they were traitor so that they
20 wouldn't be welcome in either the North or the South.
21 And that was considered a greater punishment than
22 death.
23    And I don't know how else to say that, but
24 it's a very hard thing to go through life feeling
25 like you're not human, that you're not like all the

351

1 other girls, that you're weird, that you're a freak,
2 that you're always in danger of being exposed, that
3 you can't even open your front door without someone
4 seeing you, that you don't feel safe in your own
5 home, that you don't feel safe when you're going
6 through airport security, that you don't feel safe
7 going on dates.
8    I mean, the list goes on and on. But I
9 would say for me persistent shame, humiliation, and
10 embarrassment, I don't know, I think that's one of
11 the worst things you can do to a human being.
12    MR. SCHANKER: All right. Thank you.
13    THE VIDEOGRAPHER: Okay. The time is 6:40.
14 This is the conclusion of the deposition for today.
15    (The deposition adjourned at 6:40 p.m.,
16    May 16, 2018.)

352

1    I, KELLY GAHAN, do hereby certify that I
2 have read the foregoing transcript and that the same
3 and accompanying amendment sheets, if any, constitute
4 a true and complete record of my testimony.

            _____
8              Signature of Deponent
9              ( ) No amendments
               ( ) Amendments attached

12    Acknowledged before me this _____ day of
   _____, 20____.

14    Notary public:_____
15    My commission expires:_____
16    Seal:

DLB

353

STATE OF COLORADO)
              ) ss.  REPORTER'S CERTIFICATE
COUNTY OF DENVER )
    I, Dianna L. Buckstein, do hereby certify
that I am a Registered Professional Reporter and
Notary Public within the State of Colorado; that
previous to the commencement of the examination, the
deponent was duly sworn to testify to the truth.
    I further certify that this deposition was
taken in shorthand by me at the time and place herein
set forth, that it was thereafter reduced to
typewritten form, and that the foregoing constitutes
a true and correct transcript.
    I further certify that I am not related to,
employed by, nor of counsel for any of the parties or
attorneys herein, nor otherwise interested in the
result of the within action.
    In witness whereof, I have affixed my
signature this 30th day of May, 2018.

    My commission expires November 25, 2021.

            _____
            Dianna L. Buckstein, RPR
            216 - 16th Street, Suite 600
            Denver, Colorado  80202