UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)             MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

SECTION "H" (5)

THIS DOCUMENT RELATES TO:
ALL CASES

**PLAINTIFFS' OPPOSITION TO SANOFI'S
MOTION FOR PROTECTIVE ORDER**

**RESPONSE TO CERTIFICATE OF CONFERRAL**

Sanofi's Motion for Protective Order (Rec. 2850) does not inform the Court of months of negotiations that resulted in a Rule 30(b)(6) deposition notice the Plaintiffs were led to believe Sanofi agreed to. Plaintiffs provided Sanofi with a first draft of a notice on April 3, 2018. Thereafter, ten iterations of the notice resulted from multiple conferrals. The notice Sanofi objects to is version 11, and it represents a notice that Sanofi's counsel had a hand in crafting. To avoid any semblance of surprise, Plaintiffs provided a comprehensive list of the documents they intended to discuss at the deposition during the conferral process. Over the course of negotiations, Plaintiffs repeatedly modified, at Sanofi's request, the list of documents and language describing certain topics. In particular, Plaintiffs negotiated with Sanofi's counsel concerning the adverse event documents within the scope of its deposition notice, and Sanofi even added two additional documents in its possession that it considered responsive to the definition of "persistent alopecia" outlined by the Plaintiffs in the draft notice.

After these discussions, and after Plaintiffs incorporated the requests of Sanofi, Sanofi's counsel requested a final draft of the notice. Then, Sanofi filed the present motion for protective order. Sanofi offered no explanation for why further discussions would be unavailing, and why

1

such a motion was filed after it had successfully negotiated limitations. After this Court ordered the parties to obtain dates for this deposition during the status conference on June 13, 2018, the parties secured mutually available dates on August 21-22. Sanofi's discontinuation of negotiations and present motion is now jeopardizing those dates.

After Sanofi filed its motion, however, the parties conferred again and have now reached a working agreement for purposes of this 30(b)(6) Notice regarding the issue of the definition of "Persisting Alopecia." For the purposes of this 30(b)(6) Notice only, the parties agree as follows:

- Plaintiffs acknowledge that Sanofi has discharged its 30(b)(6) obligation as to Topic 1 by looking for affirmative reports of alopecia six months after chemotherapy ended and without subsequent resolution.

- For the purposes of Topic 1, Plaintiffs also agree that any 30(b)(6) witness will only be prepared to discuss the reports in Tables 1 and 2, and any reports identified by Sanofi or by Plaintiffs in advance of the deposition.

Sanofi's other objections to Plaintiffs' 30(b)(6) notice remain outstanding.

## INTRODUCTION

This MDL includes over 8,600 cases. The women seeking recovery for their permanent disfigurement took Taxotere at different times. The PSC is responsible for conducting corporate discovery for all of these cases – whether the patient was administered Taxotere in 2006 or 2016. One of the core factual inquiries in this MDL is ascertaining when Sanofi should have been on notice that permanent hair loss – or persisting alopecia – was a common side effect of taking Taxotere, such that Sanofi was under an obligation to further investigate and warn patients of its existence. That core factual inquiry may have a different impact on women who, for example, were administered Taxotere in 2006 as opposed to those administered the drug in 2016.

2

After the FDA provisionally approved Taxotere in 2004, Sanofi was required to submit Periodic Safety Update Reports ("PSUR") to the FDA, documenting Sanofi's post-marketing obligations to monitor Taxotere to ensure both that it was reasonably safe for its labeled use and that all common side effects were included on the label. As part of its PSUR submissions, Sanofi made representations to the FDA that it was monitoring data from individual studies or individual reports of side effects, expected or unexpected – to ensure its label adequately described Taxotere's risks. In its PSUR submissions to the FDA, Sanofi represented that its post-marketing monitoring included obtaining, evaluating, and following up on Adverse Event Reports ("AERs") related to the use of Taxotere. Regardless of whether these AERs are ultimately admissible at trial to prove causation or other matters, there can be no reasonable dispute that the AERs are relevant evidence with respect to Sanofi's notice that Taxotere usage was associated with unusual reports of persisting alopecia.

In light of the parties' working resolution requiring the specific identification of adverse events prior to the deposition, Sanofi's rationale for desiring to pursue this discovery through written interrogatories rather than oral deposition largely disappears. Sanofi can reasonably prepare a witness to testify to the limited and specific set of documents identified by the Plaintiffs. While Sanofi might prefer to answer such questions in writing, with assistance from its attorneys, topics identified by Plaintiffs are just that – topics. Plaintiffs are entitled to ask questions reasonably related to those topics and to obtain answers unfiltered by Sanofi's attorneys.

With respect to topics 3-6 in Plaintiffs' notice – Sanofi attempts to eliminate these topics by narrowly construing them as calling for nothing more than reading already disclosed data into the record. Even if this were accurate, which it is not, Plaintiffs are authorized under the Federal Rules of Civil Procedure to use a 30(b)(6) deposition to obtain formal corporate testimony with

respect to its adoption or belief in data or statements made in corporate documents. Furthermore, these topics fall within the larger context of Plaintiffs' inquiries, as the previously disclosed documents present factual issues related to Sanofi's knowledge of safety signals that did or should have caused it to further investigate whether persistent alopecia is a common side effect of Taxotere.

## ARGUMENT

Under Federal Rule of Civil Procedure 26(b)(1) parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim.[1] The court must also consider whether the burden of expense of the proposed discovery outweighs its benefit.[2] "The discovery rules are accorded a broad and liberal treatment to achieve their purpose of adequately informing litigants in civil trials."[3] However, discovery does have "ultimate and necessary boundaries."[4]

Rule 26(b)(2) allows the court to limit discovery if: (1) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from another, more convenient, less burdensome, or less expensive source; (2) the party seeking discovery has had ample opportunity to obtain the information; or (3) the proposed discovery is outside the scope permitted by Rule 26(b)(1).[5] In assessing whether the burden of discovery outweighs the benefit, a court must consider: (1) the needs of the case; (2) the amount in controversy; (3) the parties' resources; (4)

---

[1] Fed. R. Civ. P. 26(b)(1)
[2] *Id.*
[3] *Herbert v. Lando*, 441 U.S. 153, 176 (1979).
[4] *Oppenheimer Fund Inc. v. Sanders*, 437 U.S. 340, 351 (1978).
[5] Fed. R. Civ. P. 26(b)(2).

the importance of the issues at stake in the litigation; and (5) the importance of the proposed discovery in resolving the issues.[6]

Federal Rule of Procedure 26(c) governs the issuance of protective orders. Under this rule the court may issue a protective order to "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."[7] Rule 26 contains the requirement that good cause be shown and the "burden is upon the movant to show the necessity of its issuance, which contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements."[8]

Sanofi claims that a protective order is necessary because Plaintiffs' notice for this 30(b)(6) deposition and the issuance of a protective order for three reasons: (1) failure to describe "persisting alopecia" with reasonable particularity[9]; (2) the need for the deposition is unduly burdensome and expensive; and (3) adverse event report are inherently unreliable, inadmissible, and lack scientific and evidentiary value. For the reasons that follow, none of Sanofi's claims merit their requested relief.

**I.    A Definition of "Persistent Alopecia" is Not Needed for the Deposition, But Regardless, Sanofi Cannot be Confused by the Phrase "Persistent Alopecia"—Sanofi Regularly Uses the Phrase in and Outside the Context of Litigation.**

Sanofi focuses much of its Motion arguing that Plaintiffs have failed to describe "persisting alopecia" with reasonable particularity. Under Rule 30(b)(6), the party seeking the deposition must "describe with reasonable particularity the matters for examination."[10] Sanofi claims that

---

[6] Fed. R. Civ. P. 26(b)(1); *see also Scioneaux v. Elevating Boats, LLC*, 2010 WL 4366417, at *2 (E.D. La. Oct. 20, 2010).
[7] Fed. R. Civ. P. 26(c)
[8] *In re Terra Int'l, Inc.*, 134 F.3d 302, 306 (5th Cir. 1998).
[9] The parties' recent agreement addressed earlier herein renders this first item a non-issue.
[10] Fed. R. Civ. P. 30(b)(6)

5

Plaintiffs' definition of "persisting alopecia" is unclear and confusing and has put "Sanofi to an impossible task of guessing what it means."[11] Not so. Plaintiffs have agreed to limit Topics 1 and 2 of the deposition to the 80 specific AERs where the patient, medical provider, or study physician generated and submitted a report identifying some species of on-going alopecia after the patient completed or terminated her treatment with Taxotere. With respect to these AERs, Plaintiff has asked Sanofi to prepare a witness to testify with respect to what was done with the AERs, how they were handled, whether Sanofi complied with their internal protocols in handling the reports, etc. Under these circumstances, the definition of persisting alopecia is irrelevant.

Regardless, Sanofi knows what "persistent alopecia" means. Sanofi has internally used the phrase "persistent alopecia" or "persistent hair loss" for over a decade. Sanofi has used the phrase in sales training materials and internal emails.[12] Notably, Sanofi itself has defined "persistent alopecia" in different ways. In the 2011 Clinical Overview drafted by Emanuel Palatinsky, Global Safety Officer for Taxotere, persistent alopecia was defined "persistent alopecia" as lasting a year or more.[13] Later in the 2015 Clinical Overview drafted by Nanae Hangai, Global Safety Office for Taxotere, the term permanent alopecia replaced persistent and was defined as lasting more than two years.[14] Sanofi should not now be able to request that Plaintiffs define specific timing in relation to the hair loss, especially when they do not even have a consistent definition of persisting in their own clinical studies.

In addition, Sanofi has repeatedly used the phrase "persistent alopecia" in this litigation in hearings before the Court. Likewise, in discovery previously propounded on Sanofi, Sanofi did

---

[11] Defs. Br. at 7.

[12] Exhibit A, Sanofi Memorandum re Planning for possible questions about persistent alopecia (March 23, 2010); Exhibit B, Palatinsky Email re Persistent Alopecia.

[13] Exhibit C, Clinical Overview – Persistent Alopecia, 01/18/011, Sanofi_02994797.

[14] Exhibit D, Clinical Overview: Docetaxel and Permanent Alopecia, 11/11/2015, Sanofi_01268765.

not object to Plaintiff's use of "persistent alopecia" nor did the phrase preclude them from responding to the discovery.[15] In fact, Sanofi used the phrase "persistent hair loss" throughout their responses to Plaintiffs' Requests for Production. For example, in Request No. 51, Plaintiffs asked Sanofi for documents relating to actual or potential signals between Taxotere and hair loss.[16] In response, Sanofi used the term "persistent hair loss" and directed Plaintiffs to the Original NDA for Taxotere as well as adverse event reports on hair loss in patients taking Taxotere.[17] Likewise, Sanofi did not object to the term "persistent alopecia" in their recent March 21, 2018 responses to interrogatories.[18]

As such, Sanofi cannot reasonably claim that it does not understand the meaning of "persistent alopecia" nor should Plaintiffs be forced to redefine it for Sanofi. While some of the adverse event reports specifically identified in the 30(b)(6) notice identify alopecia for short durations (i.e. 1 month, 3 months, etc.), these reports are nonetheless relevant for purposes of discerning the steps taken by Sanofi to follow and determine the extent and nature of the hair loss.

## II.     A Deposition is the Proper Vehicle to Obtain the Information Sought by Plaintiffs.

"The duty to present and prepare a Rule 30(b)(6) designee goes beyond matters personally known to that designee or to matters in which that designee was personally involved. The party must prepare the designee to the extent matters are reasonably available, whether from documents, past employees, or other sources."[19] Sanofi must make a conscientious effort to designate the

---

[15] *See* Exhibit E, Defs. Resp. First Req. for Prod. (August 10, 2017).
[16] *Id*. at 35.
[17] *Id.* at 36.
[18] *See* Exhibit F, Defs. Resp. First Req. for Interrog. (March 21, 2018) at 13.
[19] *Brazos*, 469 F.3d at 433.

7

persons having knowledge of the matters sought and *prepare* those persons "in order that they can fully, completely, and un-evasively" answer the questions posed.[20]

The Federal Rules of Civil Procedure do not permit a party served with a Rule 30(b)(6) deposition notice or subpoena request "to elect to supply the answers in a written response to an interrogatory" in response to a Rule 30(b)(6) deposition notice or subpoena request.[21] Rule 30(b)(6) contains no requirement that a party first seek by other means of discovery the facts underlying the claim against him.[22] "It is very unusual for a court to prohibit the taking of a deposition altogether and absent extraordinary circumstances, such an order would likely be in error."[23]

Here, without any specific, objective evidence, Sanofi claims that the cost of preparing a witness for a deposition on the 30(b)(6) topics notice will impose a significant time and financial burden, and written interrogatories are an equal, if not better, substitute for obtaining the information.[24] Plaintiffs disagree. First, Sanofi's claim of unusual expense or undue burden arose largely from its concern that Plaintiffs were not adequately defining the potential set of reports on which the witness would need to be educated. This concern has now been eliminated. Secondly, Sanofi fails to explain why the costs or burden of preparing a witness to answer what are essentially "open book" questions concerning a defined set of reports at deposition would necessarily exceed the cost and burdens associated with having the same witness answer sworn interrogatories.

Sanofi's objections to preparing a witness expose a fundamental inconsistency in its logic. First it claims that no one knows this information because it is so old. Then it claims the costs of

---

[20] *Id.*
[21] *Great Am. Ins. Co. of New York v. Vegas Const. Co.*, 251 F.R.D. 534, 539 (D. Nev. 2008)
[22] *S.E.C. v. Kramer*, 778 F. Supp. 2d 1320, 1328 (M.D. Fla. 2011).
[23] *Id.* (citing *Salter v. Upjohn Co.*, 593 F.2d 649, 651 (5th Cir. 1979)).
[24] Defs. Br. at 13.

preparing a witness to testify on these topics would be prohibitive. Respectfully, Sanofi either has the information or it does not. For 10 years Sanofi told the FDA through its PSUR's that it was collecting, reporting, and analyzing the *very same data* that Plaintiffs are now asking Sanofi's witness(es) to testify about in a deposition. As such, Sanofi has a duty to know its product, and a regulatory duty to document that its knowledge of its product. Sanofi seems to suggest that no one knows what Sanofi or its predecessors knew in 1996. Plaintiffs are legally entitled to examine a live witness or witnesses with respect to whether Sanofi did the work and lost it, or never did the work, and Plaintiffs deserve answers directly from Sanofi witnesses and not simply responses drafted by Sanofi's attorneys.

A deposition will allow Plaintiffs to question a witness on various aspects of Sanofi's adverse event reporting system related to persistent alopecia, and that witness' responses will be binding upon the company. It is not possible for Plaintiffs to issue written interrogatories regarding the areas that Plaintiffs intend cover in the deposition because Plaintiffs are entitled to ask follow-up questions that often depend on the witnesses' answer to the prior question. As relevant here, Plaintiffs are entitled to ask a live witness questions with respect to how each of these Adverse Event Reports were obtained and analyzed under Sanofi's pharmacovigilance protocols for determining safety signals. Using interrogatories to obtain this information would result in multiple rounds of written discovery.

Finally, and importantly, "it has long been recognized that there are far greater advantages in obtaining the facts and circumstances involved in a confronting examination than in a written one."[25] Even if, as Sanofi claims, some of the topics or documents designated by Plaintiffs are so "old or granular" as to preclude it from obtaining a witness to testify, the failure of Sanofi to

---

[25] *Goldberg v. Raleigh Mfrs.*, 28 F. Supp. 975, 976 (D. Mass. 1939).

9

maintain records concerning its pharmacovigilance protocols and safety signal analytics is, in and of itself, a relevant fact. If Sanofi's corporate representatives' answer with respect to what Sanofi did with a particular Adverse Event Report is "Sanofi does not know," Plaintiffs are entitled to that answer.

### III.    Adverse Event Reports are Relevant to this Litigation.

Sanofi claims that adverse event reports are unreliable, inadmissible, and lack scientific and evidentiary value. This is incorrect and directly contradicts the Reference Manual on Scientific Evidence. Specifically, the Manual states:

> With the explosion of available medical evidence, increased emphasis has been placed on assembling, evaluating, and interpreting medical research evidence. A fundamental principle of evidence-based medicine (see also Section IV.C.5, infra) is that the strength of medical evidence supporting a therapy or strategy is hierarchical. When ordered from strongest to weakest, systematic review of randomized trials (meta-analysis) is at the top, followed by single randomized trials, systematic reviews of observational studies, single observational studies, physiological studies, and unsystematic clinical observations. An analysis of the frequency with which various study designs are cited by others provides empirical evidence supporting the influence of meta-analysis followed by randomized controlled trials in the medical evidence hierarchy. Although they are at the bottom of the evidence hierarchy, *unsystematic clinical observations or case reports may be the first signals of adverse events or associations that are later confirmed with larger or controlled epidemiological studies (e.g., aplastic anemia caused by chloramphenicol, or lung cancer caused by asbestos).*

Reference Manual of Scientific Evidence, at 724-25 (footnotes omitted).

Additionally, Sanofi ignores Rule 26(b), which provides that "[i]nformation within this scope of discovery need not be admissible in evidence to be discoverable."[26] But more importantly, Sanofi is wrong in asserting that adverse event reports are not relevant. Plaintiffs explained the relevance of the 30(b)(6) depositions of adverse events in their letter to Judge North

---

[26] Fed. R. Civ. P. 26(b)

on June 8, 2018,[27] noting that "it is important to establish what Sanofi knew about Taxotere causing persisting hair loss, and when Sanofi came to know it," i.e. to establish that Sanofi was on "notice" of persistent alopecia.[28]

When used to establish that the FDA or the company was on notice of safety risks, or that the company should have been on notice of such risks, adverse event reports do not constitute hearsay.[29] The court was faced with a similar issue in the *Vioxx* litigation wherein Merck filed a Motion *in Limine* to exclude all evidence of and reference to adverse event reports and case reports because the evidence was irrelevant, overly prejudicial, and hearsay. [30] Judge Fallon denied the motion as too broad and vague.[31]

Indeed, multiple courts throughout the country have allowed plaintiffs to offer adverse events as proof of defendant's notice.[32] "A[dverse Drug Experience (ADE)] reports are proper to prove 'causation in correlation' when appearing alongside other evidence."[33] Therefore, ADE

---

[27] *See* Exhibit G, Letter to Judge North dated June 8, 2018.

[28] *Id*. at pg. 4.

[29] *Barlett*, 2010 WL 3092649 at *1. *See also Golod v. Hoffman La Roche*, 964 F. Supp. 841, 855 (S.D.N.Y. 1997) (adverse event "reports are not hearsay, because they are offered as proof of the fact that [the drug] caused the reported blindness, but as evidence that [the defendant] was on notice of potentially serious optical side effects").

[30] *In re Vioxx*, Order on Motion in Limine, ECF No.1563.

[31] *Id.*

[32] *See Brown v. Novartis Pharm. Corp.*, No. 7:08-CV-130-FL, 2012 WL 3066588, *9 (E.D.N.C. July 27, 2012) (specific adverse drug experience reports admissible to show notice on defendant, rather than for the truth of the matter asserted); *Bartlett v. Mutual Pharm. Co.*, No.08-CV-358, 2010 WL 3092649, *1 (D.N.H. Aug. 2, 2010) (permitting plaintiff's experts to rely on ADE reports to the extent they were "reasonably relied upon by experts in the particular field"); *In re Fosamax Prod. Liab. Litig.*, No. 06 MD 1789 JFK, 2013 WL 174416, *4 (S.D.N.Y. Jan. 15, 2013) ("Adverse event reports received by Merck until the time of Plaintiff's injury are admissible if used as evidence that Merck was on notice of potentially serious jaw injuries").

[33] *Mahaney ex rel. estate of Kyle v. Novartis Pharm. Corp.*, 825 F. Supp.2d 299, 312 (W.D. KY. 2011), *order vacated in part on reconsideration sub nom. Mahaney on behalf of estate of Kyle v. Novartis Pharm. Corp.*, No. 1:06-CV-00035-R, 2012 WL 12996015 (W.D. Ky. Jan. 4, 2012) *quoting In re Levaquin*

reports may show notice on pharmaceutical manufacturers of the drug's side effects.[34] Courts have also allowed experts to rely on aggregate adverse event reports to prove medical causation.[35]

Nonetheless, Sanofi argues that the AERs in question are not substantially similar due to the plaintiffs' distinct medical histories, regimens, diagnoses, and differences in hair loss.[36] Sanofi, however, too narrowly defines what qualifies as "substantially similar." In *Mahaney ex rel. estate of Kyle v. Novartis Pharm. Corp*, the court found that it was enough that the ADE reports concern a patient suffering medical complications analogous to ONJ after taking Zometa.[37] Taking it even further, the court in *Hogan v. Novartis Pharm. Corp* held that "[i]ndividual reports and the total number of ONJ reports before June, 2005 can establish notice regardless of whether Hogan's jaw condition was not similar to any of the patients described in the report."[38]

Adverse events are relevant to this litigation and, therefore, are properly the subject of the instant 30(b)(6) deposition of Sanofi. This is especially true since Sanofi itself relied on these Adverse Event Reports as a source of safety signals, and its knowledge of "safety signals" is relevant to Sanofi's ongoing, post-approval obligation to update the label so that patients could make an informed choice as to whether accept the risk of permanent side effects when choosing a chemotherapy regimen. Absolute causation is not the standard applicable to a drug company's

---

*Products Liab. Litig.*, No. 08-MDL-1943, No 08-CV-5743, 2010 WL 4676973, at *4 (D.Minn. Nov. 9, 2010).

[34] *Id*. *See also Hogan v. Novartis Pharm. Corp.*, No. 06 Civ. 0260(BMC)(RER), 2011 WL 1533467, *13 (E.D.N.Y. Apr. 24, 2011), and *Bartlett v. Mutual Pharm. Co., Inc.*, Civil No. 08-cv-358-JL, 2010 WL 3092649, *1 (D.N.H. Aug. 2, 2010).

[35] *Id.* ("Plaintiff's experts may reference the aggregate number of Zometa-and Aredia related ADE reports to prove medical causation, insofar as they relied on it to form their opinions"). *Brown*, 2012 WL 3066588 at *9, (plaintiff's expert on general causation could reference ADE reports and defendants may address on cross-examination dissimilarities between plaintiff's medical conditions and experiences and those referenced in the ADE reports).

[36] Defs. Br. at 16.

[37] *Mahaney,* 825 F. Supp.2d at 313.

[38] *Hogan,* 2011 WL 1533467 at *13.

12

labeling obligations. Correlation is sufficient if the correlation is statistically significant – as demonstrated by Sanofi's ultimate decision to update its label for Taxotere after it went off-patent and its profitability diminished. In light of the strong possibility Sanofi's purported use of AERs to find (or ignore) potential safety signals will be admissible at trial, it would be error to prevent Plaintiffs from obtaining discovery in this area.

### IV. Sanofi Offers No Legitimate Basis to Limit Plaintiffs' Other 30(b)(6) Topics.

Sanofi argues that the remaining topics in the deposition notice are unfair, unreasonable, and unnecessary because they have already provided Plaintiffs with this information and that the corporate witness would simply be reading the information sought into a deposition transcript.[39] Sanofi is mistaken.

On Topic 3, Plaintiffs have no objection to Sanofi's proposal to provide a written list of the identity of each patient in the three studies who experienced persisting alopecia in the follow-up period, so that the list can be correlated to the 80 AERs identified in Plaintiffs' deposition notice. For purposes of clarification, Sanofi can provide Plaintiffs with a complete list of any study participants who were observed to be experiencing persistent alopecia after their Taxotere therapy concluded, whether identified in follow-up or at the conclusion of the study. Plaintiffs request that Sanofi provide this list no later than 7 days prior to the 30(b)(6) deposition so that Plaintiffs can analyze and incorporate the information in its deposition preparation.

On Topic 4, Sanofi seeks to preclude Plaintiffs from questioning its witness concerning a "plan" to study the reversibility of alopecia referenced in its own Statistical Analysis Plan for its TAX 316 study. Sanofi's attorney tells Plaintiffs no such "plan" exists, but no one from Sanofi has so testified.[40] Regardless of whether a separate "plan" or "study" was ever completed,

---

[39] Defs. Br. at 17.
[40] *Id.* at 18.

13

Plaintiffs are entitled to question a Sanofi witness about the reference in its Statistical Analysis Plan – which clearly reflects that someone at Sanofi was thinking about the reversibility of alopecia as early as 2003. If the facts developed in discovery do not ultimately support the proposition that Sanofi was concerned about Taxotere causing irreversible alopecia when it was formulating the TAX 316 study, any potentially excludable testimony may be addressed through a pre-trial motion. Plaintiffs are unaware of any Rule 26 ground for granting a protective order merely because the opposing party's attorney has provided assurances that the topic is a dead end.

As to Topic 5, Sanofi claims that all the requested information is provided in the PSUR. The PSUR states that "alopecia was reversible in 13% of the patients for whom data is available," presumably meaning Sanofi had data that alopecia was irreversible in 87% of the patients. Plaintiffs quite naturally would like to ask a corporate witness whether this finding was accurate, and what, if anything, Sanofi did in light of what would appear to be a significant safety signal. While this PSUR finding is a "topic," Plaintiffs also intend to depose the corporate witness to obtain information about Sanofi's reaction to this finding.

Finally as to Topic 6, Sanofi again argues that all of the TAX 316 findings have been provided in the study report. Plaintiffs are authorized under the Federal Rules to ask a witness about the impact of those findings, how they defined persisting, how that definition was arrived at, what follow-up did they do, etc.

For the same reasons articulated hereinabove, disallowing these topics from being addressed a corporate deposition would likely result in serial written interrogatories and objections that Your Honor would be asked to referee. Sanofi's suggestion not only is inefficient, but it also attempts to thwart the ordinary course of entity discovery through the 30(b)(6) process.

## CONCLUSION

For the foregoing reasons, Sanofi's Motion for a Protective Order should be denied.

Dated: July 12, 2018                                     Respectfully submitted,

*/s/ Christopher L. Coffin*                              */s/ Karen B. Menzies*
Christopher L. Coffin (#27902)                           Karen Barth Menzies (CA Bar #180234)
PENDLEY, BAUDIN & COFFIN, L.L.P.                         Andre Mura (on the brief)
1515 Poydras Street, Suite 1400                          GIBBS LAW GROUP LLP
New Orleans, LA 70112                                    400 Continental Boulevard, 6th Floor
Phone: 504-355-0086                                      El Segundo, CA 90245
Fax: 504-523-0699                                        Telephone: 510-350-9700
ccoffin@pbclawfirm.com                                   Facsimile: 510-350-9701
*Plaintiffs' Co-Lead Counsel*                            kbm@classlawgroup.com
                                                         *Plaintiffs' Co-Lead Counsel*


*/s/M. Palmer Lambert*                                   */s/Dawn M. Barrios*
M. Palmer Lambert (#33228)                               Dawn M. Barrios (#2821)
GAINSBURGH BENJAMIN DAVID                                BARRIOS, KINGSDORF & CASTEIX, LLP
MEUNIER & WARSHAUER, LLC                                 701 Poydras Street, Suite 3650
2800 Energy Centre, 1100 Poydras Street                  New Orleans, LA 70139
New Orleans, LA 70163-2800                               Phone: 504-524-3300
Phone: 504-522-2304                                      Fax: 504-524-3313
Fax: 504-528-9973                                        barrios@bkc-law.com
plambert@gainsben.com                                    *Plaintiffs' Co-Liaison Counsel*
*Plaintiffs' Co-Liaison Counsel*


## PLAINTIFFS' STEERING COMMITTEE

Anne Andrews                                             Daniel P. Markoff
Andrews Thornton Higgins Razmara, LLP                    Atkins & Markoff Law Firm
2 Corporate Park, Suite 110                              9211 Lake Hefner Parkway, Suite 104
Irvine, CA 92606                                         Oklahoma City, OK 73120
Phone: (800) 664-1734                                    Phone: (405) 607-8757
aa@andrewsthornton.com                                   Fax: (405) 607-8749
                                                         dmarkoff@atkinsandmarkoff.com

J. Kyle Bachus
Bachus & Schanker, LLC
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Phone: (303) 893-9800
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1515 Poydras Street, Suite 1400
New Orleans, LA 70112
Phone: (504) 355-0086
Fax: (504) 523-0699
ccoffin@pbclawfirm.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

Emily C. Jeffcott
The Lambert Firm, PLC
701 Magazine Street
New Orleans, LA 70130
Phone: (504) 581-1750
Fax: (504) 529-2931
ejeffcott@thelambertfirm.com

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

Karen Barth Menzies
Gibbs Law Group LLP
400 Continental Boulevard, 6th Floor
El Segundo, CA 90245
Phone: 510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

| | |
|---|---|
| Andrew Lemmon<br>Lemmon Law Firm, LLC<br>P.O. Box 904<br>15058 River Road<br>Hahnville, LA 70057<br>Phone: (985) 783-6789<br>Fax: (985) 783-1333<br>andrew@lemmonlawfirm.com | Genevieve Zimmerman<br>Meshbesher & Spence Ltd.<br>1616 Park Avenue South<br>Minneapolis, MN 55404<br>Phone: (612) 339-9121<br>Fax: (612) 339-9188<br>gzimmerman@meshbesher.com |

## CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2017, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

                                                */s/ Dawn M. Barrios*
                                                Dawn M. Barrios