**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**In Re: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION**

**MDL NO. 2740**

**SECTION "H" (5)**

**THIS DOCUMENT RELATES TO ALL CASES**

---

**REPLY IN SUPPORT OF SANOFI DEFENDANTS' MOTION FOR PROTECTIVE ORDER**

---

The Court should quash Plaintiffs' 30(b)(6) notice because it seeks to reach back decades and impose notice on Sanofi of something that Plaintiffs cannot even define today. Closely examining the Adverse Event Reports (AERs), which Plaintiffs wish to use to establish Sanofi's "notice," demonstrates just how useless a 30(b)(6) deposition would be. Nevertheless, Sanofi has spent hundreds of attorney hours attempting to provide Plaintiffs with all of the information that they want about these AERs and other company documents. In light of all the time and money already spent, the minimal utility of the AERs, and the difficulty of preparing a witness; the additional expense and time of a 30(b)(6) deposition is not justified. As such, proportionality favors discovery on the matters for examination through written responses. The Court should grant Sanofi's Motion.

## I. Plaintiffs' Notice Requires Sanofi to Take a Corporate Position on an Injury that Plaintiffs Refuse to Define

Plaintiffs admit that the purpose of their 30(b)(6) notice is to establish the earliest date when Sanofi was on notice of "persisting alopecia." *See* Pls.' Br. at 2. At the same time, Plaintiffs refuse to tell Sanofi how they define "persisting alopecia." It is unreasonable to expect Sanofi to

take a corporate position on an injury that Plaintiffs refuse to define. The parties cannot say whether there was notice of a potential injury; nor can they date such notice if they do not know what the injury is that is the object of those questions. This is true even if Plaintiffs limit their questioning to a certain list of AERs.

Plaintiffs' refusal to define persistent alopecia highlights not only a fundamental challenge to the resolution of this litigation, but also specifically the unfairness of this 30(b)(6) deposition. Plaintiffs make serious allegations that Sanofi "hid this devastating side effect" from patients for profit. *See* Master Complaint, at ¶ 4; Pls.' Br. at 13. Plaintiffs' purpose with the 30(b)(6) notice is to suggest to a jury that Sanofi "knew" something about "persisting alopecia" that it did not tell doctors. In their effort to do so, however, they confront the reasonableness of Sanofi's defense and the weighty burden of their case: "persisting alopecia" is not easily defined nor are its causes easily determined. This is a reality ignored by Plaintiffs' provocative allegations.

The 30(b)(6) deposition is a microcosm of this litigation-wide challenge. With their 30(b)(6) deposition, Plaintiffs would use reports of "alopecia" more generally to ascribe notice to Sanofi of "persisting alopecia."[1] But the injury complained of in the litigation is unique in that alopecia—or hair loss—is a common and expected side effect of Taxotere and most other chemotherapy treatments. The broad medical term "alopecia" just means "hair loss" and is used to describe many types of conditions that vary in degree, location, and duration. Sanofi has always warned of alopecia. Thus, it is no surprise that alopecia was reported in patients taking

[1] This is not the first time, nor is it likely to be the last, that Plaintiffs have used this tactic. At the deposition of Nanae Hangai, for example, Plaintiffs' counsel repeatedly inserted the words "permanent" and "persistent" when asking about documents that just referred to "alopecia." *See* Nanae Hangai Tr., at 321:13–21. Plaintiffs use a similar strategy in their Opposition when they consistently imply the "persisting alopecia" is a "common" side effect of Taxotere. *See* Pls.' Br., at 2–4. Alopecia is certainly a common side effect of Taxotere—long-lasting or permanent alopecia is not. It is no mistake that Plaintiffs ignore the difference.

Taxotere. Plaintiffs' 30(b)(6) notice, however, takes many of these common, expected reports of alopecia and includes them as reports of "persisting alopecia." They are not. *See, e.g.*, Report No. 2 (alopecia resolved 4 months after last treatment); Report No. 9 (reported alopecia 4 months after treatment); Report No. 11 (reported alopecia 5 months after treatment); Report No. 15 (reported alopecia 1 month after treatment); Report No. 18 (reported alopecia 4 months after treatment); Report No. 19 (reported alopecia 2 months after treatment); Report No. 26 (reported alopecia 1 month after treatment); Report No. 29 (alopecia resolved 5 months after last treatment); Report No. 30 (reported alopecia 1–2 months after treatment); Report No. 33 (reported alopecia less than 1 month after treatment); Report No. 35 (reported alopecia less than 1 month after treatment); Report No. 37 (reported alopecia less than 1 month after treatment); Report No. 60 (reported alopecia less than 6 months after treatment).

For example, Plaintiffs include in their 30(b)(6) notice a breast cancer patient who last received Taxotere on June 19, 1996. *See* Report No. 2 (Sanofi_00630096–00630542). On August 7, 1996, the ***first time*** that the patient went back to see her doctor after finishing chemotherapy, alopecia was recorded as ongoing. *See* Sanofi_00630235, Sanofi_00630205. That is not surprising given that hair must *grow*. The ***second time*** that she went to see her doctor, on October 16, 1996, alopecia was recorded as "ceased." *See* Sanofi_00630246, Sanofi_00630209. In other words, her alopecia resolved within ***four months*** after chemotherapy treatment—the same as tens of thousands of women who have successfully survived cancer with Taxotere over the past two

decades.[2] Plaintiffs include ten reports of alopecia that eventually resolved. *See* Report No. 2; Report No. 29; Report No. 50; Report No. 53; Report No. 58; Report No. 72; Report No. 73; Report No. 74; Report No. 76; Report No. 78. They also include eight reports of alopecia that do not document when the patient took Taxotere, making it impossible to know whether alopecia was "persistent." *See* Report No. 20; Report No. 46; Report No. 64; Report No. 65; Report No. 66; Report No. 67; Report No. 68. Still, in an effort to tell a story of deception and greed, Plaintiffs characterize these reports as examples of "persisting alopecia" that should have put Sanofi on notice. *See* Plaintiffs' Notice of 30(b)(6) deposition, attached as **Ex. A** to Sanofi's Motion for Protective Order, at Topic 1 (defining the reports in Table 1 as reports of "persisting alopecia").

By defining all of the AERs in the notice as reports of "persisting alopecia," Plaintiffs effectively ask Sanofi to concede—and the Court to endorse—that "persisting alopecia" means alopecia that:

(1) **occurs during treatment** (Report Nos. 16, 32, 36, 38, 40, 41, 42, 43, 57, 59);

(2) **continues less than six months after the last infusion** (Report Nos. 9, 11, 15, 18, 19, 26, 30, 33, 35, 37, 60);

(3) **eventually resolves** (Report Nos. 2, 29, 50 ,53, 58, 72, 73, 74, 76, 78); and/or

(4) **occurs at a time unknown relative to the treatment** (Report Nos. 20, 46, 64, 65, 66, 67, 68).

Plaintiffs ignore these issues and simply argue that because the term has been used in this

---

[2] Report No. 29 provides another example of how Plaintiffs use reports of "alopecia" more generally to attribute notice to Sanofi of "persistent" alopecia. *See* Report No. 29 (Sanofi_00612519–00612761). This breast cancer patient received her last dose of chemotherapy on July 7, 1999. *See* Sanofi_00612587. At her first follow up visit with her doctor on September 13, 1999, alopecia was recorded. *See* Sanofi_00612608. At her second follow up visit on December 20, 1999, alopecia was recorded as "ceased," meaning her alopecia resolved within five months of her last chemotherapy infusion. *See* Sanofi_00612614. There are numerous more examples of common reports of alopecia on Plaintiffs list. *See* Sanofi's Memorandum in Support of Motion for Protective Order, at 6–7.

litigation, everyone must know what it means. Attempting to make that point, they demonstrate that multiple definitions have been used by multiple sources over time. This only shows that the term can be interpreted a variety of ways and that there is no universally-accepted definition. For the purposes of a 30(b)(6) deposition, ***Plaintiffs*** have the obligation of describing with "reasonable particularity the matters for examination." Fed. R. Civ. P. 30(b)(6). The issue matters so much more than that, though, since it is not just any-old matter for examination. Instead, the matter for examination is the ***precise*** injury alleged in the lawsuits and on which plaintiffs have asked Sanofi for its corporate position.

But Plaintiffs now claim that the definition of "persisting alopecia" is "irrelevant" because they have agreed that Sanofi's witness will only be prepared to discuss the specific AERs in the 30(b)(6) notice. If the definition were truly irrelevant, though, then there is nothing stopping Plaintiffs from amending their notice to provide one—or from not using the term at all. They refuse. The reason why Plaintiffs refuse is the same reason why the deposition is unfair without a definition: Plaintiffs would rather say that what persisting alopecia means "depends." To Plaintiffs, it must "depend," because there are plaintiffs without appreciable hair loss, plaintiffs whose hair regrew, and plaintiffs whose hair regrew only to later fade with age, the use of other medications, and with other medical conditions. The definition of the injury alleged by Plaintiffs could not be more relevant—it is at the heart of the dispute about what Sanofi knew and allegedly should have done. Plaintiffs must, therefore, define it precisely. *See, e.g., Lipari v. U.S. Bancorp, N.A.*, 2008 WL 4642618, at *5 (D. Kan. Oct. 16, 2008) ("the requesting party must take care to designate, with ***painstaking specificity***, the particular subject areas that are intended to be questioned, and that are ***relevant to the issues in dispute***.") (emphasis added).

## II. Adverse Event Reports Are Of Little Utility

Plaintiffs acknowledge that AERs are "at the bottom of the evidence hierarchy." *See* Pls.' Br. at 10. This is true in ***any*** case because of what AERs are: "[a]ny adverse event associated with the use of a drug in humans, ***whether or not considered drug related***." 21 C.F.R. § 314.80(a) (emphasis added). But it is particularly true in this case where there is no universal definition of "persistent" or "permanent" and where alopecia is associated with so many cancer-treatment drugs that are given successively and in combination. Indeed, it is not uncommon for a cancer patient to take four or five drugs (or undergo radiation) that cause hair loss over the course of their treatment and for that treatment to last up to a decade (including hormone therapy).

Report No. 3 shows just how difficult it is to attribute ongoing alopecia to any particular cause. This patient's breast cancer was initially treated with Adriamycin, Cyclophosphamide, and Taxotere in 1997. After her chemotherapy, her cancer relapsed and she began hormone therapy with Arimidex. *See* Sanofi_020705693, at pg. 5159; *see also* Sanofi_05527492–05529840, at Sanofi_05527603. After further progression of her cancer in late 1998, the patient was placed on Capecitabine, another chemotherapy agent. *Id.* All of these drugs have been reported with hair loss. Even though this patient had taken four cancer-treatment medications with reports of alopecia and was actively on chemotherapy at the time of the report, Plaintiffs would still use it to tell a jury that Sanofi knew Taxotere could cause long-lasting alopecia. Report No. 3 in no anomaly in Plaintiffs list.[3]

And this is to say nothing of the other causes of alopecia including age, genetics, and other

[3] *See, e.g.* Report No. 4 (patient treated with Arimidex and had relapse of cancer); Report No. 5 (patient treated with Adriamycin and Cyclophosphamide); Report No. 6 (same); Report No. 7 (patient treated with Adriamycin, Cyclophosphamide, and Tamoxifen); Report No. 8 (patient treated with Adriamycin and Cyclophosphamide); Report No. 9 (patient treated with Adriamycin); Report No. 10 (patient treated with Adriamycin and Cyclophosphamide). For the sake of space, not all reports are included here, but in almost all AERs the patient was treated with numerous drugs reported with alopecia.

medical conditions that could also be the cause of the alopecia reported in these AERs. With this background, it is easy to see why hours of deposition testimony[4] pouring over the details of decades-old reports of alopecia—where the cause can in no way be attributed to Taxotere—would be of little use to the issues in this litigation. *See* Fed. R. Civ. P. 26(b)(1) (courts must consider the whether the burden outweighs the likely benefit).

Plaintiffs misconstrue Sanofi's argument here when they overemphasize the inadmissibility of AERs and point out that inadmissible evidence may still be discoverable. Sanofi has not objected to the discovery of AERs—Plaintiffs created their list from documents Sanofi produced. Sanofi has not even objected to most of the additional, detailed, and burdensome discovery on those AERs that Plaintiffs requested in their notice. Sanofi's attorneys spent hundreds of hours scouring documents for the detailed information requested and provided it to Plaintiffs. *See* **Ex. B** to Sanofi's Motion for Protective Order. Sanofi's point in demonstrating the general inadmissibility, marginal relevance, and minimal utility of AERs was not to prohibit all discovery on them—it was to demonstrate the disproportionality of Plaintiffs' demand for a 30(b)(6) deposition. With so much time and money already spent, Rule 26 advises that the additional, unnecessary, and less-accurate discovery method of a 30(b)(6) deposition be avoided. Fed. R. Civ. P. 26(b)(1) (discovery must be proportional to the needs of the case).

### III. Proportionality Favors Discovery on Matters for Examination Through Written Reponses

Plaintiffs leave one vital component out of their 30(b)(6) analysis: proportionality. Instead,

---

[4] Even one 30(b)(6) deposition would be disproportionate. But Plaintiffs have made clear that this notice is just the first in a series of similar notices they intend to serve.

they cite pre-amendment[5] case law as far back as 1939 and argue for a deposition—as opposed to written discovery—regardless of the burden, expense, or comprehensiveness of doing so. Their position ignores the "common-sense concept of proportionality," which requires a "careful and realistic assessment of actual need." *See* Chief Justice John Roberts, *2015 Year-End Report on the Federal Judiciary* (Dec. 31, 2015) https://www.supremecourt.gov/publicinfo/year-end/2015year-endreport.pdf. The Advisory Committee specifically added this requirement to address explosive costs of civil discovery and "encourage judges to be more aggressive in identifying and discouraging discovery overuse." *See* Rule 26(b)(1) Advisory Committee Notes, 2015 Amendment. Indeed, proportionality is the reason that post-amendment courts quash 30(b)(6) depositions in favor of written discovery when "a party's right to pursue less efficient or duplicative discovery avenues can no longer be justified under amended Rule 26(b) given its greater emphasis on the need for proportionality in discovery." *See, e.g. HSBC Bank USA, N.A. v. Green Valley Pecos Homeowners Ass'n, Inc.*, No. 2:16-cv-00242, 2016 WL 6915301, at *6 (D. Nev. Nov. 21, 2016).

Proportionality here favors discovery on the matters for examination through written responses. As indicated, the time, burden, and expense of preparing a 30(b)(6) witness is not justified because the information can be provided more accurately and with less burden in writing.

**Topic 1**

| **<u>30(b)(6) Deposition Topic No. 1:</u>** Reports of any kind between 01/01/1992 and 12/31/2004 regarding PERSISTING ALOPECIA being associated and/or related in any way with the use |
|---|

[5] Rule 26(b)(1), which defines the scope of discovery, was amended in 2015. Plaintiffs do not cite a single post-amendment case; nor do they mention the word proportionality. Courts have chastised parties for ignoring the proportionality requirement and citing old case law in discovery disputes. *See, e.g.*, *Fulton v. Livingston Finan., LLC*, No. C15-0574JLR, 2016 WL 3976558, at *7 (W.D. Wash. July 25, 2016) ("Defendants cited caselaw that analyzed the version of Federal Rule of Civil Procedure 26(b)(1) that existed before the highly publicized amendments took effect on December 1, 2015…[the 2015 amendments to Rule 26(b)(1)] ***dramatically changed*** what information is discoverable.") (emphasis added); *see also In re Bard IVC Filters Prods. Liab. Litig.*, 317 F.R.D. 562, 566 (D. Ariz. 2016) ("Old habits die hard").

of TAXOTERE (alone or in combination) regardless of the source of such report(s) and including but not limited to the following potential sources:

**a.** Solicited reports; **b.** Unsolicited reports; **c.** Global pharmacovigilance database; **d.** ICSRs; **e.** Scientific Literature; **f.** Product Complaints Database; **g.** Company Sponsored Websites; **h.** Clinical Trials and Other Studies in Humans; **i.** Non-Clinical Safety Information; **j.** Pharmacoepidemiology Studies; **k.** Media; **l.** Competitive Intelligence; **m.** Queries/Requests from Regulatory Authorities; **n.** Safety Information Tracking Systems; **o.** Adverse Events reported; and **p**. Other means.

The deponent shall have knowledge of all such reports, including, but not limited to the reports existing in the following Reference Numbered/Bates Numbered documents:

With Plaintiffs' agreement that Sanofi has discharged its 30(b)(6) obligation by looking for affirmative reports of alopecia six months after chemotherapy ended and without subsequent resolution, there is nothing for a witness to discuss on Topic 1. And because Topic 1 purports to require a corporate position on reports of "persisting alopecia"—which, as described above, is not reasonably defined—Topic 1 should be quashed.

**Topic 2**

**30(b)(6) Deposition Topic No. 2:** For each report (as described in Number 1 above) between 01/01/1992 and 12/31/2004 regarding PERSISTING ALOPECIA:
**a.** The first date on which YOU received or became aware of the information or the report; **b.** To whom was the report sent; **c.** Who received the report; **d.** When the report was received; **e.** The source of the report; **f.** Whether there were Standard Operating Procedures ("SOP"s) in place regarding YOUR receipt and handling of the report; **g.** The Standard Operating Procedures ("SOP"s) regarding receipt of such reports; **h.** Whether YOU followed Standard Operating Procedures ("SOP"s) regarding the report; **i.** How YOU categorized and recorded the report; **j.** Every database in which the report was recorded; **k.** Actions taken by anyone associated with YOU regarding the report; **l.** All follow-up efforts by YOU regarding the report, both internally and externally; **m.** Whether and how the report was handled in the regular course and scope of YOUR business; **n.** Was the report submitted by YOU to any regulatory authority and if so for each by whom, to whom, when and in what manner and/or form (i.e., did you full provide the full case report, did you provide the CIOMS report, did you simply report it as a numerical incidence of alopecia, etc.); and **o.** Whether the report alone or in combination with other report(s) constitutes a safety signal and why.

Topic 2 seeks a list of specific answers about the AERs identified in the notice (Table 1). The parties have agreed that the notice is limited to those AERs. This means that, with the exception of a few subparts, Sanofi can provide the specific, accurate answers in writing.

Plaintiffs' demand for a witness is precisely the type of discovery overuse intended to be curtailed by the proportionality requirement. *See*, *e.g. HSBC*, 2016 WL 6915301, at *6. The parties need not incur the time and expense of a "live witness."[6] *See* Pls.' Br. at 9.

As to subparts (f), (g), and (h), such discovery is disproportionate and unduly burdensome and expensive regardless of the discovery method. These subparts ask Sanofi about the specific Standard Operating Procedure or "SOP" that was in place at the time of each adverse event report and analysis of whether that SOP was followed. To provide that information, Sanofi would first have to identify each internal SOP, which often change, for each report from 1996 to 2004.[7] That is a monstrous task given that some of the AERs are more than a quarter century old and they span more than a decade. But Plaintiffs' notice would also require an analysis of whether the SOP was followed. That requires detailed knowledge of every old SOP ***and*** each AER. Such a burdensome discovery exercise is not justified. This is particularly true because, as shown above, the AERs have minimal utility in this litigation. *See* Fed. R. Civ. P. 26(b)(1) (directing courts to consider the "importance of the of the discovery in resolving the issues, and whether the burden or expense of discovery is outweighed by its likely benefit.").

**Topics 3–6**

| **30(b)(6) Deposition Topic No. 3:** The identity of each patient, by reference number, who reportedly experienced PERSISTING ALOPECIA while enrolled as a participant in the TAX316 and /or TAX301/GEICAM and/or NABHOLTZ Phase II Study of Docetaxel, |
|---|

[6] *See also Wyatt v. ADT Sec. Servs., Inc.*, No. 10-cv-383, 2011 WL 1990473, at *1 (N.D. Okla. May 23, 2011) ("A number of the topics…are essentially a substitute for written discovery. Deposition on those topics would require that a corporate representative essentially read the information sought into a deposition transcript. Defendant will not be required to prepare a corporate representative to read reports into the record.").

[7] Plaintiffs' justification for needing such burdensome discovery is that there are "over 8,600" women in this MDL, some of which took Taxotere more than a decade ago. That fact just highlights the need for a ruling on statute of limitations—most of these cases have long been barred. The problem here, as is all too common in MDLs, is that Plaintiffs file thousands of cases in hopes of avoiding close scrutiny and getting a settlement. *See In re Mentor Corp. Obtape Transobturator Sling Prods. Liab. Litig.*, 4:08-MD-2004 (CDL), 2016 WL 4705827, at *1 (M.D. Ga. Sept. 7, 2016) (MDLs "produce incentives for the filing of cases that otherwise would not be filed if they had to stand on their own merit as a stand-alone action."). In the meantime, they use the sheer number of cases as a weapon for unduly burdensome discovery on the company.

Doxorubicin, and Cyclorubicin as First-Line Chemotherapy for Metastatic Breast Cancer studies, so that it can be determined whether each such patient is included in Table 1.

**<u>30(b)(6) Deposition Topic No. 4</u>:** The full plan to study and/or analyze the "Reversibility" of Alopecia (referenced in the Statistical Analysis Plan for the TAX316 study Bates No. SANOFI_01234420) including but not limited to the execution, methodology, all follow up actions, the recording of results and reporting of results related in any way to the plan, study, and/or analysis related to the Reversibility of Alopecia.

**<u>30(b)(6) Deposition Topic No. 5:</u>** The reversibility of alopecia as observed and documented in PSUR 4 dated September 30, 1997.

**<u>30(b)(6) Deposition Topic No. 6:</u>** The findings regarding alopecia as a TEAE persisting into the follow-up period in TAX316 at the median follow-up of 55 months.

As Sanofi demonstrated in its motion, it is not efficient or necessary to prepare a witness to read out loud the identities of patients by reference numbers in studies (Topic 3), state that a plan does not exist (Topic 4), read findings of old studies (Topic 6) or state what is plainly stated in old documents (Topic 5). *See* Sanofi's Memorandum in Support of Motion for Protective Order, at 17–19. *See Wyatt*, 2011 WL 1990476, at *1 ("A number of the topics…are essentially a substitute for written discovery."). Because preparing a witness to give testify on these topics would be incredibly inefficient, disproportionate to Plaintiffs' actual need, and unduly burdensome and expensive, the Court should grant Sanofi's Motion.

## <u>CONCLUSION</u>

The Court should quash Plaintiffs' 30(b)(6) notice because it is unreasonable to expect Sanofi to take a corporate position on an injury that Plaintiffs will not define with reasonable particularity as required by Rule 30(b)(6). Further, given the minimal utility of adverse event reports in this litigation, the further expense and burden of preparing a 30(b)(6) witness is not warranted. Finally, proportionality favors discovery on the matters for examination through written responses. As such, the Court should grant Sanofi's Motion.

Respectfully Submitted:

/s/ *Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
IRWIN FRITCHIE URQUHART & MOORE LLC
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: 504-310-2100
Facsimile: 504-310-2120
E-Mail: dmoore@irwinllc.com

Harley V. Ratliff
Adrienne Byard
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, MO 64108-2613
Telephone: 816-474-6550
Facsimile: 816-421-5547
E-Mail: hratliff@shb.com

***Counsel for Sanofi and Aventis Pharma S.A.***

**CERTIFICATE OF SERVICE**

I hereby certify that on **July 16, 2018**, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

/s/ *Douglas J. Moore*
Douglas J. Moore