# EXHIBIT B

Page 1

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3                        *   *   *

4    CHRISTINE KINDERDINE AND

5    JIM KINDERDINE,

6          Plaintiffs,

7          vs.              CASE NO. 2:17-CV-00348-KDE-MBN

8    ACCORD HEALTHCARE, INC.,

9          Defendant.

10                       *   *   *

11          Deposition of CHRISTINE KINDERDINE,

12   Plaintiff herein, called by the Defendant for

13   cross-examination pursuant to the Rules of Civil

14   Procedure, taken before me, Stacey L. Kimmel, a

15   Notary Public in and for the State of Ohio, at the

16   offices of Mike Mobley Reporting, 334 South Main

17   Street, Dayton, Ohio, on Thursday, April 19, 2018,

18   at 8:58 o'clock a.m.

19                       *   *   *

20

21

22

23

24

25      Job No. NJ2862592

```
 1    APPEARANCES:
 2       On behalf of the Plaintiffs:
 3            Fleming, Nolen, Jez, LLP
 4       By:  Rand P. Nolen
              Attorney at Law
 5            2800 Post Oak Boulevard
              Suite 4000
 6            Houston, TX  77056
 7            and
 8            The Lawrence Firm, PSC
 9       By:  Anne L. Gilday
              Attorney at Law
10            606 Philadelphia Street
              Covington, KY  41011
11
         On behalf of the Defendant:
12
              Tucker, Ellis, LLP
13
         By:  Brenda A. Sweet
14            Attorney at Law
              950 Main Avenue
15            Suite 1100
              Cleveland, OH  44113
16
                         *   *   *
17
18
19
20
21
22
23
24
25
```

Page 11

```
 1    last week.  I'm sorry.
 2           Q.    Last week?
 3           A.    Yes.
 4           Q.    How long did you meet with your
 5    attorneys yesterday?
 6           A.    An hour and a half.
 7           Q.    And I believe right before we came
 8    in someone indicated that you had met here at
 9    the court reporter's office?
10           A.    Yes.
11           Q.    Do you know someone at the court
12    reporter's office here?
13           A.    Not this one.
14           Q.    Okay.  You know anyone with Mike
15    Mobley Court Reporting?
16           A.    Not that I'm aware of anymore.  I
17    used to work for attorneys, so I don't know
18    who's working here anymore.
19           Q.    What attorneys did you used to
20    work for?
21           A.    I've worked for patent attorneys
22    here downtown, Killworth, Gottman, Hagan and
23    Schaeff, and then I worked for John Ruffolo up
24    in Centerville.
25           Q.    And when did you work with
```

1   Killworth -- I don't recall the rest of the

2   name of the firm.  What was it?

3          A.    Killworth, Gottman, Hagan and

4   Schaeff, and they merged with another firm and

5   I don't know the name of it now, and I worked

6   there 199 -- I worked until my first son was

7   born.  He was born in '95.  So I worked there

8   from maybe '92 to '95.  Prior to that I worked

9   for my father's firm, which was downtown

10  Dayton, and that was Jenks, Surdyk & Cowdrey.

11         Q.    Is your father an attorney?

12         A.    He is.

13         Q.    What kind of law does he practice?

14         A.    Medical malpractice.

15         Q.    Does he do -- does he represent

16  plaintiffs or does he represent doctors,

17  hospitals?

18         A.    He represents -- represented

19  doctors, hospitals.  He's retired now.  And I

20  worked for John Ruffolo from 2009 to 2012.

21         Q.    To go back to the -- we'll come

22  back to that.  At the -- at Killworth, what was

23  your position there?

24         A.    Administrative.

25         Q.    Were you involved -- were you a

Page 13

```
 1    secretary or a paralegal or clerk?
 2            A.    Secretary.
 3            Q.    What sorts of things did you do as
 4    a secretary?
 5            A.    Prepare documents, just typical
 6    secretarial duties.  I don't really remember at
 7    that firm what I did.
 8            Q.    Your father, did he ever tell you
 9    about his job?
10            A.    Sure.
11            Q.    What did he tell you?
12            A.    Talked about -- I really don't
13    remember specifically.  I mean, I'm sure he
14    talked about it all the time, going to trial,
15    preparing for depositions, preparing for trial.
16            Q.    Did you ever have discussions
17    about his feelings about doctors and hospitals
18    being sued by plaintiffs?
19            A.    No.
20            Q.    Anything specific?
21            A.    No, not specific.  I don't
22    remember.
23            Q.    Okay.  So then in 2009 to 2012 you
24    worked with John Ruffolo?
25            A.    Yes.
```

1          Q.    And what did you do for

2    Mr. Ruffolo?

3          A.    I was his office manager and

4    administrative assistant.

5          Q.    What kind of law did he practice?

6          A.    He does a lot of real estate and

7    estate law, a little bit of personal injury, a

8    little bit of everything except criminal, a

9    little DR work.

10         Q.    Did you have any bankruptcy

11   experience while you were working there?

12         A.    Oh, yes, a little bankruptcy too.

13         Q.    I know you ultimately went to work

14   at PNC in bankruptcy; right?

15         A.    Yes.

16         Q.    When you were working for any of

17   these attorneys and any other attorneys that

18   you worked for, did you have any exposure to

19   products liability?

20         A.    Not that I'm aware of.

21         Q.    Okay.  Circling back.  We were

22   originally talking about discussions that --

23   discussions you had with your attorneys

24   preparing for this deposition.  Have you told

25   anyone else about your meetings with your

```
 1   attorneys?
 2           A.    My husband.
 3           Q.    And how long did you speak to your
 4   husband about it?
 5           A.    Maybe ten minutes after our
 6   discussion and just let him know what we talked
 7   about.
 8           Q.    Did you -- you live close by so
 9   you didn't stay in this area overnight?  You
10   went back home; correct?
11           A.    Correct.
12           Q.    Did you review any documents with
13   your attorney in preparation for this
14   deposition?
15           A.    A few, yes.
16           Q.    What were they?
17           A.    The exhibits list and the fact
18   sheet that I filled out.
19           Q.    In terms of the exhibit list,
20   did -- I'm trying to get to exactly what that
21   is?
22               MR. NOLEN:  Request for documents.
23   It was attached to your notice.
24               MS. SWEET:  Thank you.
25           Q.    We'll go over that in a minute
```

1   too.

2              (Thereupon, Defendant's Exhibit

3   Letter A, a copy of a notice of deposition, was

4   marked for purposes of identification.)

5          Q.   Marked as Exhibit A, the notice of

6   deposition.  So your testimony is that you have

7   seen this document before --

8          A.   Yes.

9          Q.   -- gone over it?  Would you flip

10  to page -- well, I guess it's not numbered, but

11  Exhibit A, items to be produced.  Was there

12  anything that was requested on Exhibit A that

13  you have in your possession but have not

14  previously produced?

15         A.   No.

16         Q.   To confirm, you don't keep any

17  journals or diaries or any calendars related to

18  your use of docetaxel or your hair loss?

19         A.   I have written on a calendar my

20  appointments but I don't -- I didn't keep those

21  calendars.  You know, it was just a calendar

22  that was hung up at my desk.

23         Q.   So you didn't -- like, after a

24  visit, did you have any notes left over from

25  any of your doctors' visits?

1           A.    No, I didn't write anything down.

2           Q.    Do you keep any personal diaries?

3           A.    Never.

4           Q.    Understood.  Now, one of the

5    requests was for a photograph that is

6    representative of your hair composition in the

7    present day.  Do you have any photographs that

8    would reflect that?

9           A.    Yes.

10                MR. NOLEN:  They would be in that

11   binder.

12                MS. SWEET:  I think the most recent

13   one in the binder is from May of 2017.

14                MR. NOLEN:  Yes, that's what she

15   looks like now.

16          Q.    Okay.  So that has not -- to be

17   clear, we can go over this a little bit later,

18   it has not changed since May of 2017; correct?

19          A.    It has not.

20          Q.    Okay.  I'm going to mark another

21   exhibit.  This is the original complaint that

22   was filed on your behalf in this suit.  I will

23   mark this as Exhibit B.

24                (Thereupon, Defendant's Exhibit

25   Letter B, a copy of a complaint, was marked for

1          A.   No, I didn't write anything down.

2          Q.   Do you keep any personal diaries?

3          A.   Never.

4          Q.   Understood.  Now, one of the

5     requests was for a photograph that is

6     representative of your hair composition in the

7     present day.  Do you have any photographs that

8     would reflect that?

9          A.   Yes.

10              MR. NOLEN:  They would be in that

11    binder.

12              MS. SWEET:  I think the most recent

13    one in the binder is from May of 2017.

14              MR. NOLEN:  Yes, that's what she

15    looks like now.

16         Q.   Okay.  So that has not -- to be

17    clear, we can go over this a little bit later,

18    it has not changed since May of 2017; correct?

19         A.   It has not.

20         Q.   Okay.  I'm going to mark another

21    exhibit.  This is the original complaint that

22    was filed on your behalf in this suit.  I will

23    mark this as Exhibit B.

24              (Thereupon, Defendant's Exhibit

25    Letter B, a copy of a complaint, was marked for

Page 18

```
 1    purposes of identification.)
 2          Q.   To be clear, this is a long form
 3    complaint.  Had you seen this document before?
 4          A.   I have a copy of this, yes.
 5          Q.   Did you have an opportunity to
 6    review this before it was filed?
 7          A.   I believe I did.
 8          Q.   Were you -- can you confirm that
 9    this complaint was filed on January 13th of
10    2017?
11          A.   Yes.
12          Q.   Were you aware of the plan date
13    for filing the complaint?
14          A.   I was.
15          Q.   Can you think of any documents
16    that you have in your possession relating to
17    docetaxel or Taxotere or medical care you've
18    received or injuries you've sustained that are
19    in your possession?
20          A.   I don't have any.
21          Q.   I saw in the record that you were
22    given at various times cancer and chemotherapy
23    handouts.  Do you have any of those?
24          A.   None.
25          Q.   Do you recall receiving those?
```

```
 1            A.    Yes.
 2            Q.    Okay.  Have you done any Internet
 3   searches at any time regarding chemotherapy,
 4   docetaxel or Taxotere?
 5            A.    I have done research regarding
 6   chemotherapy prior to -- I'm sorry -- prior to
 7   my treatments.
 8            Q.    What did you look up?
 9            A.    Side effects, what to expect, and
10   I did very little research because I had been
11   told by my oncologist and another friend who
12   had gone through chemotherapy not to do too
13   much Internet research.
14            Q.    What reason did they give you to
15   not do Internet research?
16            A.    Not all the sites are credible.
17   So my oncologist's office had given me written
18   paperwork on it, that he recommended I read
19   that instead.
20            Q.    And that oncologist was Dr. Romer;
21   correct?
22            A.    Correct.
23            Q.    Okay.  What websites did you go to
24   to look up side effects?
25            A.    I just Googled it, and I couldn't
```

1    tell you what the websites were.

2           Q.    Do you remember anything that you

3    read while you were doing that research?

4           A.    Nothing in particular other than

5    the typical side effects that most people have

6    heard of.

7           Q.    And what were those?

8           A.    Fatigue, nausea, I think those

9    were the basic ones.

10          Q.    And so this was in the somewhat

11   short time period between your diagnosis and

12   when you started chemotherapy; correct?

13          A.    Correct.

14          Q.    Have you done any Internet

15   research on those issues, on chemotherapy,

16   docetaxel, Taxotere, hair loss, since that

17   initial search before you started chemotherapy?

18          A.    I did not look up anything else

19   regarding the chemotherapy but I did look up a

20   little bit about hair loss when my hair wasn't

21   coming back just to see if that was normal or

22   not.

23          Q.    When did you do that research?

24          A.    I would guess a couple of months

25   after I finished the treatments.

Page 21

1      Q.   And what did Google or whatever
2  search results you saw, what did it say?
3      A.   That you should expect your hair
4  to return after treatment's finished, but I
5  don't remember if it gave a time frame.
6      Q.   And can you put a -- you said this
7  was a few months after you completed
8  chemotherapy; correct?
9      A.   Yes.
10     Q.   Was it then the -- can't remember
11  when I finished -- you finished in April of
12  20 --
13     A.   '15.
14     Q.   -- 15.  When would you say that
15  you did this research?
16     A.   June, July.
17     Q.   So what was your thought when you
18  saw, well, my hair should be coming back?
19     A.   Initially thought mine was just
20  taking a little longer.
21     Q.   Had you found any information
22  online about lawsuits against manufacturers of
23  Taxotere at that point?
24     A.   I did not.
25     Q.   Had you ever found information

```
 1    like that while doing Internet research?
 2          A.   I did not.
 3          Q.   Did you print any of the materials
 4    that you had researched or had found through
 5    your research online?
 6          A.   I did not.
 7          Q.   When was the last time you did a
 8    search on those issues, specifically,
 9    chemotherapy, Taxotere, docetaxel or hair loss?
10          A.   I have not looked up anything
11    regarding chemotherapy that I remember since my
12    treatments.
13          Q.   And how about hair loss?
14          A.   I think I looked -- well, I know I
15    looked that up a couple of months after my
16    treatments had finished and then I had looked
17    up alternatives to promoting hair growth and I
18    may have looked up Taxotere once.  I didn't do
19    much research on that.
20          Q.   What prompted you to search for
21    Taxotere?
22          A.   After I was aware of the lawsuit,
23    I looked it up.
24          Q.   How did you become aware of a
25    lawsuit?
```

1          A.    My father.

2          Q.    What did he tell you?

3          A.    He asked me if I had seen the

4    commercial for it and I had told him no and I

5    wasn't even sure if I had taken Taxotere.  I

6    didn't remember the names of the specific chemo

7    drugs that I took.  So I reached out to my

8    oncologist's office and they confirmed that

9    that was one of the chemo drugs I was

10   prescribed and I let my dad know that that was,

11   indeed, one that I had taken.

12         Q.    Okay.  When did your father ask if

13   you had seen a commercial?

14         A.    That would have been the fall --

15   late fall, maybe early winter of 2016.

16         Q.    And then you called -- is this

17   Dr. Romer's office that you called?

18         A.    Yes.

19         Q.    And was that -- how long did you

20   wait between the time your father had asked you

21   about if you had seen the commercial and when

22   you had called your oncologist's office?

23         A.    Probably within a couple of days I

24   called.

25         Q.    At what point did you consult with

Page 24

```
 1   an attorney other than your father about this
 2   case?
 3           A.   Not until we decided to utilize
 4   the services of Anne's firm.
 5           Q.   And who is we?
 6           A.   My father and I.
 7           Q.   And when was that?
 8           A.   That would have been in late fall,
 9   early winter of 2016.
10           Q.   So Anne's office came recommended
11   from your father?
12           A.   Yes, he did all the research.
13           Q.   And in terms of research, can you
14   define the scope of the research that he did on
15   your behalf?
16           A.   What I am aware of is that he
17   contacted a couple of firms that specialized in
18   class action lawsuits and we met with two
19   different firms, Anne's firm and another firm,
20   which I don't remember the name, and we liked
21   Anne's firm so we picked that firm.
22           Q.   Did your father share any research
23   that he had done about the merits of the
24   lawsuit, anything with respect to docetaxel or
25   Taxotere?
```

1          A.    No.
2          Q.    Are you aware of whether he did
3    any of that research?
4          A.    I'm not aware.
5          Q.    Have you ever been to any websites
6    specific to women who have hair loss?
7          A.    Yes.
8          Q.    Which ones?
9          A.    I have no idea.  I just would
10   Google and -- when my hair wasn't coming back,
11   I just Googled to see if there were other
12   people out there that had the same issues or if
13   I was -- this was before I heard of the
14   lawsuit, so I thought maybe mine's taking a
15   little bit longer.  I wanted to see if there
16   were other people that had the same issues, and
17   I don't remember if I found any that did or
18   not.
19         Q.    So the websites, generically, that
20   you went to, they were geared towards women who
21   had gone through chemotherapy; is that correct?
22         A.    Yes.
23         Q.    And were there other women who had
24   experienced the same thing?
25         A.    I really don't remember.  I didn't