UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  TAXOTERE (DOCETAXEL)        *        16-MD-2740
PRODUCTS LIABILITY LITIGATION       *
                                    *        Section H
                                    *
Relates to:                         *        July 18, 2018
                                    *
*Gahan v. Sanofi, et al.*           *        11:30 a.m.
16-CV-15283                         *
                                    *
* * * * * * * * * * * * * * * * *


TRANSCRIPT OF MOTION HEARING BEFORE
THE HONORABLE JANE TRICHE MILAZZO
UNITED STATES DISTRICT JUDGE


<u>Appearances</u>:


For Kelly Gahan:              Bachus & Schanker, LLC
                             BY:  DARIN L. SCHANKER, ESQ.
                             1899 Wynkoop Street, Suite 700
                             Denver, Colorado 80202


For the Sanofi               Shook Hardy & Bacon, LLP
Defendants:                  BY:  HARLEY V. RATLIFF, ESQ.
                             2555 Grand Boulevard
                             Kansas City, Missouri 64108


Official Court Reporter:     Toni Doyle Tusa, CCR, FCRR
                             500 Poydras Street, Room B-275
                             New Orleans, Louisiana 70130
                             (504) 589-7778


Proceedings recorded by mechanical stenography using
computer-aided transcription software.

## INDEX

                                                          Page

Oral Argument

    Harley V. Ratliff, Esq.                          3

    Darin L. Schanker, Esq.                        13

    Harley V. Ratliff, Esq.                        25

<u>**PROCEEDINGS**</u>

**(July 18, 2018)**

     **THE DEPUTY CLERK:**  Court is back in session.  This is 16-MDL-2740, *In Re: Taxotere (Docetaxel) Products Liability Litigation*.  Counsel arguing, if you would make your appearance.

     **MR. SCHANKER:**  Still good morning, I guess, Your Honor.  My name is Darin Schanker.  I'm appearing on behalf of the plaintiff, Dr. Kelly Gahan.

     **THE COURT:**  Thank you.

     **MR. RATLIFF:**  Harley Ratliff on behalf of the Sanofi defendants.

     **THE COURT:**  Mr. Ratliff, are you ready to proceed?

     **MR. RATLIFF:**  Good morning, Your Honor.  Before you is a Rule 37 motion that we filed as it relates to bellwether plaintiff Kelly Gahan.  That motion that was filed is not before you lightly.  We filed that motion, Your Honor, after it became clear to us after a lot of investigation, a lot of discovery, that Dr. Gahan had intentionally and repeatedly concealed relevant evidence from Sanofi:  evidence of her hair regrowth treatment; evidence of her particular treaters who were treating the very injury in this case; and evidence that she knew would be damaging to her case, financially damaging to her case.

     We are also here because it was not just

11:28

1   Dr. Gahan's own efforts to repeatedly and intentionally try to

2   conceal this information from Sanofi, but it was also her

3   intentional and repeated efforts to instruct others; to

4   instruct others to conceal this evidence and to instruct others

5   to tell Sanofi that they did not have records related to her

6   care and treatment and, in particular, to the care and

7   treatment of the very injury involved in this case.  We are

8   also here because to this day Dr. Gahan still will not disclose

9   this information and will not produce this information to

10   Sanofi.

11           I think it's important, Your Honor, to

12   understand who this particular plaintiff is.  Dr. Gahan is not

13   an unsophisticated plaintiff.

14         **THE COURT:**  I understand.  She is a physician.

15         **MR. RATLIFF:**  She is not an uneducated plaintiff.

16   This is not some random one-off plaintiff in Wyoming who

17   happens to be one of the 9,000 in this MDL.  Dr. Gahan is not

18   only a medical doctor, she is the plaintiff who filed the very

19   first Taxotere lawsuit.  Before that she had spent months and

20   months communicating with the FDA and other individuals who

21   have now signed up to be plaintiffs in this litigation.

22           So Dr. Gahan is what she is.  She is a champion

23   of this litigation.  She is well-connected with other

24   plaintiffs in this litigation.  She certainly knows her

25   obligations under the various discovery orders.

11:29

1      **THE COURT:**  Mr. Ratliff, what information do you not
2   have now?  You indicated she is still not forthcoming.
3      **MR. RATLIFF:**  Right.  So, Your Honor, that's a good
4   question because I think --
5      **THE COURT:**  Thank you.
6      **MR. RATLIFF:**  -- it raises the question of prejudice.
7      One, there's certainly the retrospective
8   prejudice of all of the work and time and hours spent trying to
9   uncover what has been done and what has not been done, but I
10   think the real question becomes:  What do we not know going
11   forward?
12      We only know the information that we have now
13   because we had to, over the objection of plaintiffs, get
14   PTO 71A, so then we got all of her emails.  So if we had just
15   taken her word for it that she had none of these documents --
16      **THE COURT:**  I understand that, but you're not
17   answering my question, which is:  What information do you not
18   have now?
19      **MR. RATLIFF:**  The reality is, Your Honor, we do not
20   know what we don't know.  We don't know what we don't have.
21   Dr. Gahan -- I was surprised in her motion -- was unapologetic;
22   unapologetic about what she had done and the steps that she had
23   taken to conceal this information from Sanofi.  So as I sit
24   here today, unless we stumble on something again, we won't know
25   what she has got.  We don't know if this is the tip of the

11:30   1   iceberg or if this is the whole thing.

2              I think the other important component of this,

3   Your Honor, is not only we don't know what we don't know -- we

4   know that she admits to what she has done and she has no

5   apologies, there's no "get it" factor that she has done

6   something that is incorrect -- but there's also the real

7   deterrent effect.  She is well-connected with numerous,

8   numerous plaintiffs both via email, via text --

9              **THE COURT:**  Is that the reason for this Court to

10   sanction one plaintiff, so that we send a message to the

11   others?  Have you filed a motion to compel against Dr. Gahan?

12              **MR. RATLIFF:**  Well, there's not really a motion to

13   compel process.  There's a fact sheet process.  When we filed a

14   motion to compel once before, we were told to go back through

15   the fact sheet process.  There's not really a compel process.

16              Basically what happened is Dr. Gahan had never

17   produced any of her emails, any of her correspondence until we

18   got PTO 71A.  So if we had taken her word on it, we would never

19   have received those.  Dr. Weinstein, the doctor who treated her

20   hair, if we had taken his word that he didn't have records,

21   which is what she had instructed him to do, we would have never

22   known more about his treatment.

23              So instead of being able to litigate the merits

24   of this case, Your Honor, we have spent most of our time having

25   to police what she has done or what she has not done and what

11:32

1   we do not know yet.  That is why we brought this motion.

2                    Again, she is not unsophisticated.  These are

3   not accidents.  These are intentional and repeated actions that

4   without some sort of sanction or some sort of punishment we

5   don't know if it will continue.

6           **THE COURT:**  Is there a less severe sanction that

7   would be available to the Court?  This seems pretty drastic.

8   It is drastic.  It's not pretty.

9           **MR. RATLIFF:**  I agree, Your Honor.  We laid out a

10  number of different alternatives absent a dismissal.  She is a

11  bellwether plaintiff.

12          **THE COURT:**  Right.

13          **MR. RATLIFF:**  She was selected by the plaintiffs as

14  representative.

15          **THE COURT:**  Right.

16          **MR. RATLIFF:**  I think there are other actions.  You

17  said, well, what do we know that we don't know.  Well, one of

18  the things we asked for is what were all of her communications

19  with her counsel.  We are not asking for us to look at them.

20  We are asking for them to be produced to you for in camera

21  review to see is there other misconduct that has been done.  We

22  have asked for monetary --

23          **THE COURT:**  Are you inferring --

24          **MR. RATLIFF:**  I'm not inferring --

25          **THE COURT:**  -- that she and her counsel have engaged

11:33

1    in anything in violation of the rules?

2         **MR. RATLIFF:**  We are not inferring nor are we

3    alleging that her counsel has done anything wrong.

4         **THE COURT:**  Okay.

5         **MR. RATLIFF:**  How are we to know what else is out

6    there?  How are we to know what she is doing?  Who is she

7    calling?  Who is she talking to?  Who else is she telling,

8    "Don't give them records"?

9              So this is someone who, if she continues to be

10   in this bellwether and she is not punished in some way, if

11   there's not a deterrent effect, if all she gets is just sort of

12   a "Well, please don't do this in the future," then there's

13   going to be no deterrent for her to continue to do this," and

14   we will only find out what she has not done if we stumble upon

15   it or if we are lucky to find it out.

16             It's clear from her pleading she has no

17   apologies about it.  In fact, that's the words she uses in her

18   pleading, "I have no apologies to Sanofi."  There is no falling

19   on the sword and saying, "I probably shouldn't have done that.

20   I should not have told Dr. Weinstein to lie to Sanofi.  I

21   should not tell other medical providers to lie to Sanofi and

22   say you do not have records."

23             One of the things, Your Honor, that strikes me

24   about the issue of the photographs -- which we still do not

25   have all of her photographs.

11:34

1     **THE COURT:**  Maybe you need to explain that to me
2  because, as I appreciate it, she has produced about 80
3  photographs.

4     **MR. RATLIFF:**  She has produced about 80 photographs,
5  Your Honor, but those were the self-selected photographs.  She
6  testified she has many, many more, including biweekly photos;
7  biweekly photos that she was taking for Dr. Weinstein to
8  demonstrate her hair regrowth.

9          I think this is a salient point, Your Honor,
10  which is in the fall of last year -- the self-selected photos
11  that Dr. Gahan produced to us, the ones that she said, "These
12  are representative samples.  These are representative of my
13  hair loss," she is totally bald.  At the exact same time, she
14  is sending pictures to Dr. Weinstein related to her treatment
15  where all of her hair has grown back.

16          So, to me, allowing her to just self-select what
17  she thinks are the relevant photos or what are the
18  representative photos doesn't cure the issue.  If she is taking
19  photos that show the regrowth of her hair and she is doing it
20  on a biweekly scheduled basis at the request of this doctor,
21  those are the photographs that we are entitled to.

22          I know the position of the plaintiffs, of her
23  counsel, is, well, they don't have to produce all of the
24  photographs.  Well, this is a bellwether plaintiff, Your Honor.
25  This is a bellwether plaintiff that shows a demonstrated track

11:35

1    record of trying to conceal evidence.

2             I think we are certainly entitled to all of

3    those photographs and whatever other information that she might

4    have so we can go back and take her deposition again with the

5    full corpus of information that should have been provided to us

6    as part of the fact sheet process, not a year and a half later.

7             So that to me is the prejudice, but I also think

8    that Rule 37 sanctions, they are used to serve as a deterrent

9    to a big litigation.  So, again, would we be asking for this

10   type of relief if this was just a single one-off case that we

11   were before you on?  Maybe not.  But this is one with 9,000

12   plaintiffs who are actively following this particular issue.

13            My opinion is if they think that this activity

14   is condoned or can be got away with or that they can shut down

15   their Facebook or they can shut down their blogs or they can

16   delete their emails and there will be no recourse, then we have

17   a much, much bigger issue.  But if they think that the lead

18   plaintiff in this entire litigation, the one who has championed

19   this litigation and the one who has connected all of these

20   plaintiffs to their attorneys, if they know that she can't get

21   away with it, then I think it's far less likely that we are

22   going to see these exact same issues manifest themselves with

23   other plaintiffs.

24            **THE COURT:**  Let me ask you, Mr. Ratliff, because I

25   wasn't quite certain.  Did you have a meet-and-confer with

11:37

1    plaintiffs' counsel and review all of those complaints?

2            **MR. RATLIFF:**  Well, there's two parts to that.  Yes,

3    we have had multiple meet-and-confers, but we sent them a

4    letter on maybe May 22.  That letter, Your Honor, was

5    essentially verbatim of what our motion was going to be.  We

6    said, "Here are the various types of relief that we are going

7    to be seeking," so not just a dismissal, but the kind of

8    laundry list of other potential lesser sanctions:  Can we have

9    access to her computer?  Can we get another deposition?  Will

10   you agree to pay for costs?

11            The only thing I got back from the other side

12   was "We are not going to respond to your accusations of

13   malfeasance."  That's it.  "We have your requests, Sanofi.  We

14   have your demands, Sanofi."

15            "Here's what we want," and the only response I

16   got back from plaintiffs' counsel is "I'm not going to respond

17   to your actions of malfeasance."  At that point, Your Honor,

18   I'm not sure what a meet-and-confer is going to do.

19            I think the other part, Your Honor, is --

20            **THE COURT:**  I understand, as I appreciate it, the

21   letter contained a list of demands, but I'm curious if there

22   was ever a conversation where you indicated, "I need to see

23   these photographs"?

24            **MR. RATLIFF:**  Absolutely.

25            **THE COURT:**  "The two-week photographs from

11:38

1   Dr. Weinstein, I need those produced within the next two

2   weeks," has that conversation taken place?

3            **MR. RATLIFF:**  Absolutely, absolutely.

4            **THE COURT:**  And they have refused to turn those

5   photographs over?

6            **MR. RATLIFF:**  Correct and still have not done so

7   today, and we have asked for additional deposition time.  They

8   have refused that.  We would like some of our costs spent on

9   having to go back and forth with Dr. Weinstein to serve

10  subpoenas, to follow up with him, to pay for our vendor to

11  follow up with him because he said, "I don't have records.  I

12  don't have records because Dr. Gahan told me to tell them I

13  don't have records."

14           So I think the other part, Your Honor, about a

15  meet-and-confer is I'm not entirely sure how to meet and confer

16  to say, "Well, tell your client to stop committing discovery

17  fraud, to stop concealing evidence, to stop signing authorized

18  or verified fact sheets that she knows are incorrect, to stop

19  telling your client to tell other treaters to lie to Sanofi."

20  I'm not sure what type of meet-and-confer that is.

21           **THE COURT:**  Well, I was thinking in terms of

22  photographs, information from Dr. Weinstein, and that sort of

23  thing.

24           **MR. RATLIFF:**  Your Honor, I think that's

25  information -- I guess what's frustrating to us, Your Honor, is

11:39

1   that's information that we were entitled to without a

2   meet-and-confer.  That was information that we were entitled to

3   through the fact sheet process.  That is information we were

4   entitled to through PTO 71A.

5         So I think what we are asking for is not just

6   simply the production of photographs and other documents that

7   we should have been given long ago subject to multiple orders,

8   certainly should have been given to us once it was disclosed at

9   her deposition, but I'm looking for something that sanctions

10   the activity of Dr. Gahan and her willingness to do it

11   repeatedly and her willingness to do it intentionally and her

12   willingness to do it unapologetically.

13         **THE COURT:**  Thank you.

14         Mr. Schanker.

15       **MR. SCHANKER:**  Still good morning, Your Honor.

16       **THE COURT:**  Good morning.

17       **MR. SCHANKER:**  It's an honor to appear before you

18   here today to discuss a case that I've dedicated a significant

19   part of my life to over the last three years.  As has been made

20   clear in these motions, Dr. Gahan was the first plaintiff in

21   this case.  I think you understand that.  Quite frankly,

22   without Dr. Gahan, I think most here would agree that this case

23   wouldn't even exist.  Because of that, 9,000 women have the

24   opportunity for redress.

25         What I have to say -- I've never really been in

11:41

1   this situation before, with the false allegations just

2   constructed out of whole cloth, and I'm disgusted by it.

3         THE COURT:  Okay.  We are going to bring down the

4   vitriol.

5         MR. SCHANKER:  Yes, I will.  Yes.

6         THE COURT:  I read the texts to Dr. Weinstein -- and

7   it's troubling -- that Dr. Gahan forwarded to him basically

8   saying, "I think you can tell them we are just colleagues and

9   I'm not your patient," and the subpoena is coming.

10         MR. SCHANKER:  May I address that?

11         THE COURT:  Well, I think you need to.  Those things

12   are troubling.

13         MR. SCHANKER:  Specifically, I will talk about the

14   Dr. Weinstein relationship.  So understanding the context of

15   how Dr. Gahan came into contact with Dr. Weinstein, she had

16   lost her hair --

17         THE COURT:  Right.

18         MR. SCHANKER:  -- and she was devastated.  She

19   reached out to Dr. Weinstein not for treatment.  As you see

20   from the response, she reached out to Dr. Weinstein to see if

21   she could organize a clinical trial.

22         THE COURT:  Right.

23         MR. SCHANKER:  Not for treatment at all.  As a matter

24   of fact, a clinical trial through the FDA.

25               That was the communication for several months.

11:42

1   Then Dr. Weinstein reaches back to her after this had gone on

2   and says, "You know, I have, obviously, this product.  Are you

3   interested in using it?"

4                So, first of all, kind of this idea of a

5   doctor-patient relationship existing and then getting on to the

6   facts that you referenced is it's Dr. Gahan's professional

7   opinion and personal opinion there was no doctor-patient

8   relationship.  Specifically, Dr. Weinstein doesn't even

9   practice.  He is not a medical practitioner.  He is a

10  biopharmaceutical engineer.

11               He didn't ever examine or meet Dr. Gahan

12  specifically.  There was no testing.  He gave her no prognosis,

13  no diagnosis.  He didn't get paid by her.  She never

14  compensated him.  He had no medical records.  All there were

15  were the email communications that, by the way, were not

16  hidden.  They were provided in the ESI discovery.

17               There's nothing else that exists.  There's no

18  medical records in the classic context, no evaluation, no SOAP

19  notes, nothing like that, literally the email correspondence

20  that you saw back and forth.

21               Another clarification, nobody reached out to

22  warn our office or Dr. Gahan that a medical records request was

23  going to be coming.  So what happens is Dr. Weinstein gets this

24  request and says, "I don't know what to do with it.  I don't

25  have any medical records."  He reaches out to Dr. Gahan.

11:44   1   That's the truth of what happened.

2                    So Dr. Gahan and he have a communication.  By

3   the way, she testified to this under oath, and it's

4   uncontroverted and also supported in the affidavit that

5   Dr. Weinstein provided.

6                    Dr. Gahan has a communication with Dr. Weinstein

7   in which Dr. Weinstein says, "I don't have any records.  You

8   know, all I have are these email correspondence."

9                    She says, "Then tell them the truth, that you

10   don't have any medical records."

11                    She is not counseling him to hide records.

12   That's made up out of whole cloth.  What I described to you is

13   the accuracy of the communication and how it occurred.  There's

14   nothing nefarious going on there.  All she said is "Tell them

15   the truth, that you don't have any medical records," and that's

16   what he did, plain and simple.

17            **THE COURT:**  Was there ever a request for the

18   photographs?

19            **MR. SCHANKER:**  Request from the --

20            **THE COURT:**  Because I did see -- I don't know which

21   exhibit it was -- that Dr. Gahan was taking photographs every

22   two weeks and forwarding those to Dr. Weinstein.

23            **MR. SCHANKER:**  Yes.  And all of those, to clarify --

24            **THE COURT:**  Have those been produced?

25            **MR. SCHANKER:**  Yes, they have been produced.  That

11:45

1    was a misrepresentation that you heard.  They have been

2    produced.  Everything that Dr. Weinstein has, all the

3    photographs that he possesses, have been produced per

4    Dr. Weinstein and per Dr. Gahan.

5              Your Honor, the misrepresentations go on with

6    regard to this whole concept of Dr. Gahan.  I want to clarify

7    this.  There is no action by her, which basically would be

8    criminal in nature, to attempt to have medical providers not

9    send records.

10             There's another reference to a Dr. Lann, you may

11   recall, in the motion and response.  The context for that one,

12   so Dr. Lann is a colleague of Dr. Gahan and, as a matter of

13   fact, is a former boyfriend.  They had a romantic relationship.

14   They are colleagues at this point in time.

15             What happened is that Dr. Gahan was interested

16   in some acne medication and she asked Dr. Lann to call in the

17   prescription.  There's probably no one in this room that hasn't

18   had a friend or colleague, when they need a Z-Pak or something

19   like that, call in a prescription.  That's all that it was.

20             So defendants, when they received the pharmacy

21   records, saw this particular prescription on there and sent a

22   medical records request to Dr. Lann.  So what does Dr. Lann do?

23   He says, "I don't have any medical records."  He contacts

24   Dr. Gahan.

25             What does Dr. Gahan tell him?  "Tell the truth,

11:46

1    that you don't have any medical records," and so that's what he

2    does.

3            From that, defense is trying basically to shred

4    Dr. Gahan's reputation that she's involved in some effort to

5    subvert the medical records.  It's completely untrue.

6        **THE COURT:**  Well, there are a couple of things that I

7    found troubling, and maybe you can give me some context.  What

8    do we do with the communication to Dr. Weinstein where she

9    says, "I really am going to stop this because I don't want the

10   defendants to put two and two together"?

11       **MR. SCHANKER:**  Right.  The context with regard to

12   that, put "two and two together just yet" is what she says, so

13   how does that even fit under -- as we talked about, Dr. Gahan

14   is entitled to have bad thoughts.  She is entitled to be upset

15   with Sanofi.  She is upset with Sanofi.

16       **THE COURT:**  Absolutely.  She is not entitled to

17   advise other potential witnesses to be less than forthcoming.

18   She is entitled to not like Sanofi at all.

19       **MR. SCHANKER:**  Right.  She in no way advised

20   Dr. Weinstein not to be forthright.  Dr. Weinstein was and said

21   that he had medical records.

22           You hit the nail on the head when you asked the

23   question:  What else do you want?  There is nothing else there.

24   There is no other communication between Dr. Weinstein.  All the

25   photographs have been received and provided.  There is no other

11:48

1  ESI that we have been able to find.  As you are aware, we

2  turned over 18,000 pages.  That was nine banker boxes.

3          **THE COURT:**  All right.  Well, now my question is:

4  Was that information turned over subsequent to her deposition?

5          **MR. SCHANKER:**  No, it was turned over months before

6  her deposition.

7          **THE COURT:**  The photographs from Dr. Weinstein --

8          **MR. SCHANKER:**  Yes.

9          **THE COURT:**  -- were turned over before, all of the

10  ESI?

11          **MR. SCHANKER:**  Yes.  They had all of it.  All of it

12  was turned over at the -- I believe by April 15, a month before

13  the deposition -- by the way, it took us months to go through.

14  You can imagine going through 18,000 pages looking for

15  privileged information pursuant to the ESI order, but we went

16  over and above and turned all of that over.

17             You are hitting on the issue of prejudice,

18  Your Honor.  First of all, there's no bad conduct by Dr. Gahan.

19  Certainly she should be allowed to be upset with Sanofi but

20  certainly not withhold information, and she didn't.  They have

21  everything.  There is nothing else there.  Everything was

22  provided months before the deposition so that they could

23  adequately prepare.

24          **THE COURT:**  When was Dr. Gahan's deposition taken?

25          **MR. SCHANKER:**  My birthday, May 16.  That's why I

11:49

1    remember.

2         **THE COURT:**  Happy Birthday.  That's my brother's

3    birthday, so I will remember it too.

4         **MR. SCHANKER:**  I think it's important to understand

5    what she has done to comply.  She has filled out the PFS and

6    amended it multiple times.  She sat for the 7-hour deposition.

7    Well before the deposition all of the information, to the best

8    of her knowledge, was provided.

9              The allegations by the defense that I think need

10   to be addressed and some of them were referenced here as well,

11   this concept that Dr. Gahan -- and this is just like fluff on

12   the sides that has no support, and when you dive into it you

13   see that it's not true.

14              There's an allegation that Dr. Gahan, without

15   consent of other women, provided their biopsies to

16   Dr. Weinstein.  That's flat-out false.  If the 18,000 pages

17   were actually digested, you would see Dr. Gahan seeking

18   permission and receiving it.  That's just a flat-out untruth

19   that's being asserted.

20              Another concept we heard, that Dr. Gahan

21   encourages other plaintiffs -- encourages other plaintiffs --

22   to withhold information, there's no basis for that whatsoever.

23   As a matter of fact, as we deconstructed in our response, the

24   defense bases that on emails that aren't even involving

25   Dr. Gahan that occur before the MDL was even created, back in

11:51

1    April of 2016, six months before the MDL existed.  That's their

2    support, their only support for this false allegation -- false

3    allegation -- that Dr. Gahan is encouraging others.

4                    Then we saw this concept of concealment, whether

5    it be Dr. Gahan or our law firm, advising plaintiffs to conceal

6    information.  Well, first of all, understand that the email

7    that they cite with regard to that isn't even from or to

8    Dr. Gahan.

9                    Secondly -- and this was in the reply and so we

10   didn't have a chance -- I have the actual letter here that I

11   can make available to the Court or summarize for the Court

12   under seal.  We can figure out a context, but I can, as an

13   officer of the court, let you know what this particular letter

14   says.

15                   What it is -- and you may remember the context

16   where an email from an individual that becomes a plaintiff in

17   the case talks about making her Facebook page private.

18            **THE COURT:**  Right.

19            **MR. SCHANKER:**  Well, that comes from a letter from

20   our law firm that in the "Re:" line is entitled "Litigation

21   Hold Preservation of Relevant Information, Paper Documents, and

22   Electronically Stored Information."  It's an advisory to

23   clients to save everything because they are going to be

24   potentially required to turn it over.

25                   Now, as part of that, as is a practice of

11:52

1    probably any plaintiffs' lawyer worth his or her salt, is to

2    tell your client "Don't be stupid.  Don't be putting stuff on

3    social media right now.  Let's try to control the environment,"

4    and that's what it does.  It says, you know, "We advise why

5    don't you make your Facebook private."

6              There's nothing nefarious about that.  That's

7    called good lawyering.  There's nothing unethical about that.

8    So again this is just another example of the defense using some

9    shred to try to create some idea that there's concealment going

10   on when it's the exact opposite.  It's save your information

11   because you may be required to turn it over.

12             **MR. RATLIFF:**  Your Honor --

13             **THE COURT:**  Okay.  As soon as he finishes, you will

14   have an opportunity to respond.

15             **MR. SCHANKER:**  You asked the key question, which I

16   didn't hear an answer to, and that was the question of what

17   else is there.  There's nothing else.

18             We have the issue of the photographs.  If you

19   want to blame that on us, that's my fault because I'm following

20   PTO 68, which says send representative photographs.  We have

21   sent representative photographs.

22             **THE COURT:**  I just want to make sure I understand.

23   You did send the photographs taken every two weeks when she was

24   working with Dr. Weinstein?

25             **MR. SCHANKER:**  I don't know exactly when those photos

11:54

1    were taken.  We provided every photograph that she represented

2    that she had given to Dr. Weinstein.

3            THE COURT:  So the photographs that she has told you

4    were the ones that were forwarded to Dr. Weinstein have been

5    provided to you and those have been provided to defense

6    counsel?

7            MR. SCHANKER:  Yes.

8            THE COURT:  That was done before the deposition?

9            MR. SCHANKER:  Yes, that was done before the

10   deposition.  In the ESI production, those were there.  They

11   were not selected out.

12           THE COURT:  Okay.

13           MR. SCHANKER:  I think what's important with regard

14   to that, too, is there was no -- you asked a question about

15   conferral on this.  On May 24 we received an ultimatum letter

16   with demands and "Oh, by the way, we are going to seek to

17   dismiss this case."  There was no conferral about the

18   photographs, "Boy, maybe you should be giving us more.  Maybe

19   these aren't representative," or we could actually have an

20   adult conversation and try to work it out.

21               There was no conferral about this what's now

22   been misrepresented, on the obtaining of medical records.

23   There's no any kind of real effort to communicate with regard

24   to that.  A simple explanation could have been had.

25               This concept of conferral, I think, is

11:55

1    epitomized in our request to defense -- and it's attached as

2    Exhibit 2 to you -- the ESI issue in which we reached back out

3    and said, "What is there that you think you don't have because

4    we don't see what you don't have?"

5               The response back was that "We think that

6    Dr. Gahan is a perjurer, so it's a waste of time.  We can't

7    trust her."

8               That's conferral.  That's all we got.

9          **THE COURT:**  Okay.

10         **MR. SCHANKER:**  Your Honor, in this case I see

11   absolutely no reason for any kind of sanctions against

12   Dr. Gahan because she has gone above and beyond to comply.  She

13   has turned over everything.  There is no evidence that there is

14   anything else.

15              They don't need another deposition of her to

16   talk about the photographs.  They spent five minutes in the

17   deposition on the photographs, and they didn't ask anything

18   about her current hair condition with regard to photos.  All

19   they asked about were who the friends were in the prior

20   photographs.  Now we have a demand that they want every

21   photograph for basically what amounts to the last 11 years.

22   That's not what PTO 68 contemplates, at least our

23   interpretation of it.

24              So I see no reason for any kind of sanctions at

25   all against Dr. Gahan.  Quite frankly, this entire motion is

11:56

1  frivolous.  It's groundless.  It's baseless.  I don't even see

2  what the purpose of it was other than to harass Dr. Gahan

3  because she is the first plaintiff that brought a case.

4          So we would encourage, Your Honor, in opposite

5  to that, that you would consider sanctions against the defense.

6  What I see is a broader issue of this was not discovery for

7  discovery sake, to learn and educate.  What I see is going on

8  here -- and I'm afraid it's going to be epitomized as we go

9  down the road -- is discovery to dismiss.  That's what this is

10  about, and that's not what the purpose of this is.

11          We would also, as we said, Your Honor, seek our

12  attorneys' fees for the extensive time we had to spend to

13  respond to this frivolous motion.

14          **THE COURT:**  Thank you.

15          Mr. Ratliff.

16          **MR. RATLIFF:**  Thank you, Your Honor.  I would just

17  like to address a few quick points.

18          The evidence is uncontroverted that over the

19  course of 2017 and into early 2018, Dr. Gahan was being treated

20  and was taking a medication for the very injury that she

21  alleges in this case.  She can say it's not a physician, she

22  can say, "I don't consider him a physician," but the fact is

23  this was a doctor who was giving her a medication to treat the

24  very injury in this case, the very injury that she is seeking

25  compensation from Sanofi for.

11:57

1          After that treatment she executed four fact

2     sheets that require her to disclose information about where she

3     has received hair treatment.  One fact sheet doesn't disclose

4     it.  Two fact sheets doesn't disclose it.  Three facts doesn't

5     disclose it.  At no point does she disclose to us that she had

6     been treated by this particular doctor until we uncover it.

7          The idea that he is not a physician is belied by

8     his own statements that we cited in here which he said, talking

9     about her hair recovery -- which we didn't know about -- "Your

10    hair looks great.  This is one of the instances when being a

11    physician is really rewarding.  Thanks for the privilege and

12    the trust."  Your Honor, that sounds like a doctor-patient

13    relationship to me.

14         When he gets our subpoena, she said, "Just tell

15    them you weren't really my doctor, you don't have any records,

16    you never saw me."  She also in her email says, "I don't want

17    the other side to put two and two together."

18         Your Honor, these are not the communications of

19    somebody who is making sort of accidental representations.

20    These are the type of communications by somebody who is trying

21    to conceal a particular piece of information.

22         As it relates to the photographs, she testified

23    at her deposition -- I know Mr. Schanker said, "Well, we

24    produced all the photographs before her deposition."  She

25    testified at her deposition that she had hundreds of more

11:59

1   photographs that she had not produced for us.  So this idea
2   that she has produced to us --
3         **THE COURT:**  I'm curious about the photographs that
4   were taken during the time that she was using Dr. Weinstein's
5   product.  Were those photographs produced to you?  If I gave
6   you representative photographs but I have thousands at my
7   house --
8         **MR. RATLIFF:**  Here is the reality, Your Honor.  We
9   have some photographs from her.  But if she says, "Well, I have
10  800 photographs and here's 50 of them," I don't know which
11  one --
12        **THE COURT:**  800 photographs of her hair?
13        **MR. RATLIFF:**  Correct.  I don't know what has been
14  produced or what has not been produced.  That is the position
15  that we have been put in, is we don't know what we don't know.
16  So if she says on one hand, "Well, I have 800 photographs," and
17  they say, "Well we have produced these," well, I don't know
18  what else is out there unless they produce those to us so we
19  can verify what their representations are.
20              This is a plaintiff who knows what she is doing.
21  She is a sophisticated plaintiff.  She is a representative
22  plaintiff.
23        **THE COURT:**  Oh, I understand.  I understand.  I have
24  read all of that.  I know she is a physician.  I know she is in
25  her 30s.  I know all of those things about her.

12:00

1           There is something about Dr. Weinstein that I'm

2   curious about.  As I appreciate it, they don't live in the same

3   community.

4           **MR. RATLIFF:**  They do not.

5           **THE COURT:**  They live in separate states.

6           **MR. RATLIFF:**  She lives in Denver, Colorado, and he

7   lives in Connecticut.

8           **THE COURT:**  I just want to make sure I'm

9   understanding the factual background correctly.  She read an

10  article of his and then contacted him --

11          **MR. RATLIFF:**  Correct.

12          **THE COURT:**  -- about being a potential member of a

13  test.

14          **MR. RATLIFF:**  Correct.

15          **THE COURT:**  Then he sent her some product over the

16  mail, and then she was sending photographs by mail while she

17  was using the product.

18          **MR. RATLIFF:**  And she was taking blood level tests to

19  send what her levels were back to him so he could see where

20  they were at.  He would send her more medication, check in on

21  what was the progress.  "How is it coming?"  "Your hair looks

22  great."

23          **THE COURT:**  Right, right.  Did he ever physically see

24  her?

25          **MR. RATLIFF:**  My understanding is no.  He tried to

12:01    1    see her.  Based on the communications that we have received, he

2    tried to arrange meetings to see her, but no.

3        **THE COURT:**  That never occurred.

4        **MR. RATLIFF:**  That never occurred.  What has happened

5    is he treated her for her hair loss.

6        **THE COURT:**  No, I understand.  I understand.  The

7    other thing that I didn't quite understand -- and pardon me if

8    I have gotten this confused -- was there ever the trial?  As I

9    appreciate it, there was this trial of this drug he was

10    speaking of, but then he sent her something else that he had

11    used?

12        **MR. RATLIFF:**  Well, my understanding, Your Honor --

13    and we will be taking Dr. Weinstein's deposition should this

14    case continue, and we may be back here before you once we hear

15    his particular testimony --

16        **THE COURT:**  Okay.

17        **MR. RATLIFF:**  -- is that she worked with him through

18    her contacts at FDA -- and this is in some of the exhibits --

19        **THE COURT:**  Right, right, right.

20        **MR. RATLIFF:**  -- to try to get an accelerated

21    approval process for this particular product.  So again this is

22    somebody who not only was taking his product, not only

23    regrowing her hair, but also working with this particular

24    physician to get FDA approval for this treatment, and yet this

25    is somebody that she never disclosed to Sanofi.

12:02

 1          **THE COURT:**  No, I understand.  I understand that.  I
 2    want to make sure that I understand what the factual
 3    underpinnings are.  The product that she used was not the
 4    product that was being tested for FDA purposes, right?
 5          **MR. RATLIFF:**  No, I believe it's the same product.
 6          **THE COURT:**  I thought initially he said, "Well, I
 7    have something else."
 8          **MR. RATLIFF:**  The reason he can't write her a
 9    prescription for that particular product is because it's an
10    experimental product that hasn't been approved by FDA.
11          **THE COURT:**  Right, right.  Okay.  Anything further?
12          **MR. RATLIFF:**  That would be it.  Thank you,
13    Your Honor.
14          **THE COURT:**  Thank you.  You will be hearing from me
15    shortly.  Court is adjourned.
16          **THE DEPUTY CLERK:**  All rise.
17          (Proceedings adjourned.)
18                          * * *
19
20
21
22
23
24
25

1                     **CERTIFICATE**

2        I, Toni Doyle Tusa, CCR, FCRR, Official Court

3 Reporter for the United States District Court, Eastern District

4 of Louisiana, certify that the foregoing is a true and correct

5 transcript, to the best of my ability and understanding, from

6 the record of proceedings in the above-entitled matter.

7

8

9                         */s/ Toni Doyle Tusa*

                             Toni Doyle Tusa, CCR, FCRR

10                           Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25