13:06:29

1      UNITED STATES DISTRICT COURT
       EASTERN DISTRICT OF LOUISIANA

2 ****************************************************************

3 IN RE:  TAXOTERE (DOCETAXEL)
  PRODUCTS LIABILITY LITIGATION

4          Docket No. 16-MD-2740
          Section "N"

5          New Orleans, Louisiana
          Tuesday, August 7, 2018

6

  [THIS DOCUMENT RELATES TO:

7 ALL CASES]

  ****************************************************************

8

       TRANSCRIPT OF STATUS CONFERENCE

9   HEARD BEFORE THE HONORABLE MICHAEL B. NORTH
      UNITED STATES MAGISTRATE JUDGE

10

11 APPEARANCES:

12

  FOR THE PLAINTIFFS:   GIBBS LAW GROUP

13         BY:  KAREN B. MENZIES, ESQ.
         400 Continental Blvd., 6th Floor

14        El Segundo, CA 90245

15        PENDLEY BAUDIN & COFFIN
         BY:  CHRISTOPHER L. COFFIN, ESQ.

16        1515 Poydras St., Suite 1400
         New Orleans, LA 70112

17

         BACHUS & SCHANKER

18        BY:  DARIN SCHANKER, ESQ.
         1899 Wynkoop St., Suite 700

19        Denver, CO 80202

20        SIMMONS HANLY CONROY
         BY:  DAVID F. MICELI, ESQ.

21        One Court St.
         Alton, IL 62002

22

         GAINSBURG BENJAMIN DAVID

23        MEUNIER & WARSHAUER
         BY:  M. PALMER LAMBERT, ESQ.

24        1100 Poydras St., Suite 2800
         New Orleans, LA 70163

25

```
1                                  LEMMON LAW FIRM
                                   BY:  ANDREW A. LEMMON, ESQ.
2                                  15058 River Road
                                   Hahnville, LA 70057
3

4

5    FOR SANOFI S.A.:              SHOOK, HARDY & BACON
                                   BY:  KELLY G. BIERI, ESQ.
6                                  2555 Grand Blvd.
                                   Kansas, City MO 64108
7
                                   SHOOK, HARDY & BACON
8                                  BY:  PATRICK OOT, ESQ.
                                   1155 F St. NW, Suite 200
9                                  Washington, D.C. 20004

10                                 IRWIN FRITCHIE URQUHART & MOORE
                                   BY:  KELLY E. BRILLEAUX, ESQ.
11                                 400 Poydras St., Suite 2700
                                   New Orleans, LA 70130
12

13
     FOR HOSPIRA WORLDWIDE, LLC    CHAFFE McCALL
14   and 505(b)(2) LIAISON:        BY:  JOHN F. OLINDE, ESQ.
                                   2300 Energy Centre
15                                 1100 Poydras Street
                                   New Orleans, LA 70163-2300
16

17

18

19   Official Court Reporter:     Karen A. Ibos, CCR, RPR, CRR, RMR
                                   500 Poydras Street, B-275
20                                 New Orleans, Louisiana 70130
                                   (504) 589-7776
21

22

23      Proceedings recorded by mechanical stenography, transcript
     produced by computer.
24

25
```

<u>P R O C E E D I N G S</u>

(TUESDAY, AUGUST 7, 2018)

(STATUS CONFERENCE)

(OPEN COURT.)

THE COURT:  Before I get to the agenda, I wanted to address a couple of general items.

The PSC raised this issue in its response to sanofi's submission, and it had already -- it was already on my radar before the PSC raised it.

Why am I getting ten page, single spaced submissions from sanofi?  I am not supposed to get -- if the font was the right size and it was double spaced, it would be longer than the 25-page limit on a memorandum in support of a motion.  We've got limitations in the CMO on what these submissions are supposed to look like.  And if you think you need more space, there's a procedure for you to ask for it.  But I keep getting three days before a hearing these massive letters.

MR. OOT:  I apologize, your Honor.

THE COURT:  What's going on?

MR. OOT:  So, a couple of things.  One, obviously we apologize and we will follow the procedure going forward.  We did include some screenshots in the actual flow of the text, the margins on the letters are a little smaller than they are on an ordinary filing.

13:08:00  1        But regardless of all of that, we kind of went back after

13:08:03  2   we read plaintiffs' point, and we did see that both sides have a

13:08:10  3   history of this problem.

13:08:13  4        So going forward, your Honor, we will seek for permission

13:08:16  5   to file additional pages, but we thought it was important to imbed

13:08:26  6   the screenshots in this particular filing as opposed to --

13:08:26  7        THE COURT:  Just let me know that it's coming.  I mean,

13:08:27  8   all of the footnotes, ten pages, single spaced, exhibits.  And I am

13:08:32  9   having to look at it, you all are having to look at each other's

13:08:37 10   submissions on an accelerated time line.  The idea is not just to

13:08:41 11   accelerate the time line and have to read the same amount of

13:09:19 12   material.  If you have five issues and you can't do it in the

13:09:19 13   amount of pages that have been agreed to and memorialized in the

13:09:19 14   CMO, then ask me for more and explain why and we'll do it like

13:09:19 15   that.

13:09:19 16        MR. OOT:  Understood, your Honor.

13:09:19 17        THE COURT:  It's just kind of spiralling out of control.

13:09:19 18        MR. OOT:  One final point.  We did take all of our issues

13:09:19 19   off of the last case management conference after our meet and

13:09:19 20   confer and slated them for this case management conference, so

13:09:19 21   that's another reason that you're seeing kind of double pages

13:09:19 22   that's --

13:09:19 23        THE COURT:  And if it's five or six issues, it is what it

13:09:19 24   is.  And I am going to give you the opportunity to address them

13:09:19 25   all, but let's just try to streamline everything.

13:09:23  1          MR. OOT:  Thank you, your Honor.

13:09:24  2          THE COURT:  The only other thing I'll mention is, because

13:09:26  3   I think I've addressed this in this case once before, my guidelines

13:09:31  4   that are sitting in the back of the courtroom, y'all don't need to

13:09:35  5   tell me what's in them because I wrote them.  So let's stop citing

13:09:41  6   my guidelines in letters that you write to me.  So hopefully I

13:09:45  7   won't have to deal with that again.

13:09:47  8          I am going to start with the PSC's issues on sanofi's

13:09:52  9   retention policies.  Obviously this is, you know, the umpteenth

13:09:57 10   time we're talking about this issue.  So I've gone back through

13:10:01 11   what we've done in the past, I've gone back through the discussions

13:10:05 12   we had last time and the submissions of both parties coming out of

13:10:11 13   our last status conference and leading up to this one, and I am

13:10:16 14   going to direct sanofi to do a few things.  I want y'all to listen.

13:10:23 15   This is all going to be in a minute entry obviously.

13:10:28 16          We had another breakdown, somehow or another another

13:10:31 17   breakdown of communication because I think Ms. Menzies sent y'all a

13:10:35 18   letter raising all of the problems that they have in the summaries

13:10:39 19   but not specifically listing out in bullet points or numbers

13:10:42 20   exactly what they wanted, and then sanofi's response was, "You

13:10:46 21   didn't tell us what you wanted.  All you wanted are the policies."

13:10:50 22          So I have read all of the lines and in-between the lines,

13:10:54 23   and there's obviously not much space in-between the lines, but I

13:10:59 24   have read everything that y'all gave me, and this is what I am

13:11:01 25   going to order take place.

13:11:02  1          I want sanofi to provide a supplemental and amended

13:11:11  2    summary of its retention policies, not the policies of the

13:11:17  3    schedules themselves.  What I want the amended supplemental summary

13:11:23  4    to include is the following information:  The categories of records

13:11:29  5    that each custodian would have had; how long each type of record

13:11:36  6    was to be retained by each custodian; whether any custodian was

13:11:45  7    subject to a litigation hold; and if so, what was the case, when

13:11:51  8    was the hold triggered, and when did it end, if it did end.

13:11:59  9          As to records of custodians who left the company.  And

13:12:03 10    this is based on my -- this is based on my review of Mr. Oot's

13:12:08 11    explanation of what happens to those records.  I want the

13:12:12 12    supplemental summary to include the identity of that custodian's

13:12:16 13    manager who would have reviewed and reassigned or destroyed those

13:12:21 14    records, where or with whom any reassigned records were located,

13:12:30 15    and whether reassigned records still exist in the possession of

13:12:34 16    some other custodian.

13:12:39 17          And what I would like you to do, Mr. Oot, is take the

13:12:43 18    substance of your July 18th letter that you wrote in response to

13:12:49 19    Ms. Menzies and incorporate that information into the summary so

13:12:53 20    that it all resides in one place.  And that place is not letters

13:13:00 21    from lawyers back and forth, okay.

13:13:02 22          So you provided detailed explanations for what happens to

13:13:09 23    these documents and why some of these -- responding to the

13:13:14 24    plaintiffs' concerns about gaps in the production and such.  I

13:13:16 25    think that information needs to be included in the summary.  And I

13:13:21  1   think based on reading the plaintiffs' submission, if the

13:13:27  2   information that I've just described is included in the summaries

13:13:29  3   and I think that they have what they need to traverse whatever

13:13:34  4   productions have been made that they think may be inadequate.

13:13:39  5          So that's how we're going do it.  Instead of them telling

13:13:42  6   you what they want in a summary, I am going to tell you what I want

13:13:45  7   in a summary and we'll do it like that.

13:13:47  8          All right.

13:13:49  9          MR. OOT:  Your Honor, point of clarification on that?

13:13:52 10          THE COURT:  Sure.

13:13:53 11          MR. OOT:  So what we have said both in our filing to your

13:13:56 12   Honor and our filing to the plaintiffs is that what we'll call

13:13:59 13   custodial files, the e-mail of a user, a user's hard drive, those

13:14:04 14   are considered transitory records under the sanofi policy.  So the

13:14:08 15   true record keeping location of all of these are the centralized

13:14:11 16   sources that we disclosed to plaintiffs back in October of last

13:14:14 17   year.

13:14:14 18          THE COURT:  Right.

13:14:15 19          MR. OOT:  So just like the federal government, there are

13:14:17 20   default locations where even the U.S. courts have their places

13:14:21 21   where they have to go and storage locations --

13:14:23 22          THE COURT:  You would think that that's true.  Not

13:14:26 23   always.

13:14:27 24          MR. OOT:  Well, at least that's how it worked at the SEC.

13:14:30 25   So there are default record keeping locations and then there are

13:14:31 1   the transitory locations, which would be the user's custodial file.

13:14:34 2   And that's what we put in our response to the plaintiffs and that's

13:14:36 3   what we'll put into the centralized schedule as well.

13:14:39 4        THE COURT:  Some of what I am ordering you all to include

13:14:42 5   in the summary you've already explained or whether it's responding

13:14:47 6   to a letter, because I know you said both in your submission to me

13:14:53 7   and also in your letter to Ms. Menzies on July 18th you've taken a

13:14:58 8   position that we've already given you this information.  What I

13:15:01 9   am -- what I want is that you provide the information that I just

13:15:05 10  listed that will be in the minute entry in a form that matches up

13:15:09 11  with each of these custodians.

13:15:11 12       You all both have given me different types of charts, so

13:15:15 13  the information that I am saying needs to be in these summaries can

13:15:20 14  easily be plugged into the same sort of matrix so that it's easily

13:15:24 15  digestible by the PSC.

13:15:29 16       Once we get through that, if there are additional issues,

13:15:31 17  we will address them as they arise.  Okay?

13:15:34 18       MR. OOT:  Okay.

13:15:35 19       THE COURT:  But I understand your explanation, I just

13:15:39 20  wanted it to be incorporated into the summary so that we can put

13:15:42 21  all of that information in the hands of the PSC and move forward.

13:15:46 22       MR. OOT:  Thank you, your Honor.

13:15:48 23       THE COURT:  Now to sanofi's issues.  Again, this is one

13:15:56 24  of the issues that just keeps coming up.  In terms of the, I guess,

13:16:00 25  the accessibility or the usability of the plaintiffs' ESI

13:16:05  1    productions.  We have a Pretrial Order 71A that addresses all of

13:16:16  2    this, or is supposed to address it all.  And there's a process in

13:16:21  3    place for dealing with -- in the individual cases where you all see

13:16:25  4    that you have a problem.  And obviously you're locating those

13:16:28  5    because you're putting samples into your submission.

13:16:35  6          I think the proposed Case Management Order that sanofi

13:16:41  7    attached to its submission I view as taking another bite at the

13:16:48  8    apple, going back and sort of rewriting in part what 71A says.  And

13:16:53  9    I am not going to do that right now because 71A was negotiated and

13:16:58  10   approved by the Court, and it's been in place for quite awhile and

13:17:03  11   there are lawyers all over the country who are supposed to have

13:17:07  12   their clients complying with it.

13:17:12  13         That is an issue that I am going to discuss in some more

13:17:16  14   detail with Judge Milazzo, but I have not had a chance to do that.

13:17:21  15   I want to talk to her about whether the deficiency process that

13:17:24  16   she's outlined is compatible with these problems.  And if not, then

13:17:32  17   either she or I will raise it with the parties to figure out how to

13:17:35  18   address it.

13:17:38  19         You know, it's obvious to me that you all are getting

13:17:41  20   some ESI from some plaintiffs in the country, presumably

13:17:46  21   represented by lawyers who are not routinely in the courtroom,

13:17:49  22   screenshots and that, some of the things that you included in your

13:17:52  23   submission, which are not okay, they're not compatible or

13:17:56  24   acceptable under CMO-71A, and we have to figure out a way to

13:18:01  25   address it.

13:18:03  1          There is an order in this case that says that plaintiffs'

13:18:06  2  ESI's has to be produced so that the metadata is accessible; and if

13:18:12  3  that's not happening, we're going to have to figure out how to

13:18:15  4  address it.

13:18:16  5          I think -- I might get to this later.  I know that the

13:18:27  6  PSC has sent out reminders and e-mails in the original guidance.

13:18:33  7  What I am going to do first to address this is I am going to

13:18:37  8  discuss it with Judge Milazzo and I am going to determine or we're

13:18:41  9  going to determine whether the deficiency process that you all have

13:18:47 10  discussed with her with regard to the plaintiff fact sheets is

13:18:49 11  adequate to address the problems that I think are present with some

13:18:54 12  of the plaintiffs' productions with regard to metadata in

13:18:59 13  particular.  Because it's clear that -- it's clear that some of the

13:19:03 14  plaintiffs are not producing the documents or the ESI in the form

13:19:06 15  they're supposed to, so we're going to have to figure out how to

13:19:11 16  remedy that.

13:19:11 17          And I am not going jump right into this proposed new CMO.

13:19:16 18  I am going to talk to Judge Milazzo about it.  So the next time we

13:19:20 19  get together, make sure that this issue is on the agenda, and I

13:19:24 20  will have some more insight into how I think I want to address it.

13:19:28 21          MR. OOT:  Thank you, your Honor.  And a final point there

13:19:30 22  is -- and we're going to talk to Judge Milazzo about some of the

13:19:34 23  problems that we're having.  We think that we provided a simple,

13:19:37 24  pragmatic solution to deal with the problems rather than the very

13:19:41 25  expensive deficiency process that is expensive, I think, on both

13:19:45  1    sides.  If it means that we have to launch deficiencies based upon

13:19:48  2    the failure to follow 71A or even Federal Rules, then that's the

13:19:52  3    process we have to follow.  But we think there's a middle ground

13:19:55  4    approach of how to best manage this that's less expensive and more

13:19:59  5    efficient.

13:20:00  6            THE COURT:  I agree that that would be ideal.  The

13:20:02  7    problem -- this is what I perceive the problem is from the PSC

13:20:06  8    standpoint is they're not controlling or in contact with the

13:20:11  9    individual plaintiffs who are producing inadequate ESI, right, the

13:20:18 10    PSC isn't.  There is another lawyer in-between the PSC and these

13:20:23 11    individuals, presumably.  And there's a limit to what the PSC, the

13:20:30 12    lawyers on the committee can do to address individual shortcomings

13:20:35 13    with plaintiffs they don't represent.  So it may be that when this

13:20:39 14    is all said and done that what we're left with is the deficiency

13:20:43 15    process.  I just don't know how far I can push the lawyers on the

13:20:47 16    PSC to make things happen with people that they don't represent.

13:20:52 17            MR. OOT:  To that, your Honor, again, we're just looking

13:20:57 18    for pragmatic solutions and an idea of how we can get the

13:21:01 19    information.

13:21:01 20            We don't see this as an individual problem, we see this

13:21:05 21    as a general problem.  It's something that's pervasive, it's

13:21:07 22    inventory wide.  We see that there is collaboration between each of

13:21:12 23    the plaintiffs.  We've seen ESI related to that from social media

13:21:16 24    groups.  So, from our perspective, we just want to be able to

13:21:20 25    search it.  We want to be able to see where those connections exist

13:21:23 1  amongst the plaintiffs, and we think we're entitled to that.

13:21:25 2          THE COURT:  Well, I think in cases that are much smaller

13:21:27 3  than this one the defendants ought to be -- they ought to be able

13:21:33 4  to expect a searchable format when plaintiffs produce ESI.

13:21:39 5          MS. MENZIES:  We have a searchable format in Centrality.

13:21:42 6  What I guess we still haven't gotten an answer to is -- these are

13:21:46 7  all individual cases.  None of them have been coordinated and

13:21:51 8  presented as trial picks for a grouped plaintiff trial.  And so

13:21:52 9  what the purposes of searching across plaintiffs and associating

13:21:56 10 them with each other, we still haven't gotten an answer to that.

13:21:59 11         THE COURT:  Well, it sounds to me like that they've got

13:22:01 12 some strategic purpose behind that to, you know, to prove some sort

13:22:06 13 of collaboration, whatever.  Whatever value the defendants may

13:22:11 14 derive from that approach.  The order requires their ESI to be

13:22:17 15 produced with metadata and searchable.

13:22:20 16         MS. MENZIES:  I understand that, your Honor.

13:22:21 17         THE COURT:  And if it's not being produced that way,

13:22:23 18 we've got a problem, and we have to figure out the best way to

13:22:26 19 address it.

13:22:27 20         MS. MENZIES:  And that I understand.  And the concern I

13:22:30 21 had and the reason I raised that is because -- and we said this in

13:22:34 22 our paper -- that, as it may not surprise you, we don't agree with

13:22:37 23 this characterization that this is a no cost, pragmatic solution.

13:22:41 24 I've talked on our ESI consultant on that.  So at the time we do

13:22:45 25 address that, we will appreciate the opportunity for full briefing.

13:22:48    1          THE COURT:  I don't know that it's low cost or pragmatic

13:22:51    2    either, because in reading the order, the proposed order, it seems

13:22:58    3    to place a lot more sort of detailed requirements on the plaintiffs

13:23:02    4    in terms of searching their ESI and gathering it and what to

13:23:07    5    produce.  And if I can't get them to produce something other than a

13:23:11    6    screenshot when they've specifically been told that that's not

13:23:14    7    acceptable, I am scared to death of what happens if I send them a

13:23:18    8    five-page protocol for what they're supposed to do.  Very few of

13:23:22    9    them are going to be able to comply with it or will comply with it

13:23:26   10    whether they're able to or not.

13:23:27   11          So, again, I am going to discuss it and raise it with

13:23:31   12    Judge Milazzo.  I couldn't do it this week and I only got -- the

13:23:35   13    issue was really only raised Friday, so she is not in town right

13:23:40   14    now.  So between now and the next session that we have, like I

13:23:43   15    said, I will have a little bit more insight into how we can address

13:23:46   16    it.

13:23:47   17          MR. OOT:  Thank you, your Honor.

13:23:48   18          MR. COFFIN:  Your Honor, just to kind of reiterate what

13:23:51   19    Ms. Menzies said.  I understand you're going to talk to Judge

13:23:54   20    Milazzo about this.  This is a huge issue for the PSC and for the

13:23:57   21    thousands of cases, so we really want to be heard on this.  I don't

13:24:00   22    know whether you're the appropriate audience or she is, I know

13:24:03   23    you're going to talk to her about that, but at some point we either

13:24:06   24    need to have briefing or at least be able to discuss this issue.

13:24:09   25    Because 71A of itself is a major issue for all of these cases and

13:24:13  1   now they're trying to go a level deeper.

13:24:16  2          THE COURT:  Well, 71A is what it is and it was negotiated

13:24:19  3   and agreed to and submitted and it's been approved by the Court.

13:24:24  4          MR. COFFIN:  I understand.  I am not re-urging that.

13:24:26  5          THE COURT:  And I just said we are not going to re-invent

13:24:29  6   the wheel.  The last time we were here we talked about it and I

13:24:32  7   know y'all have talked about it with Judge Milazzo.  We haven't

13:24:36  8   decided to what extent 71A is going to be included in the

13:24:40  9   deficiency process that you all have been talking about for the

13:24:45 10   plaintiff fact sheets.  I've got to have that conversation with

13:24:47 11   her.

13:24:47 12          The last time we talked we didn't -- we had not come to a

13:24:51 13   conclusion as to whether all of those issues should come to me

13:24:56 14   first, like the discovery issues normally do, before they go to

13:25:01 15   her; these are things we have to talk about.

13:25:03 16          MR. COFFIN:  Understood, I get it.

13:25:05 17          THE COURT:  Nothing is going to be foisted upon either

13:25:07 18   one of y'all.  I am going to talk to the district judge, we're

13:25:10 19   going to come up with a concept, and then we're going to talk about

13:25:13 20   it.  And if either one of y'all don't like it, you will have the

13:25:17 21   opportunity to brief it.

13:25:18 22          MR. COFFIN:  Understood.  Thank you.

13:25:20 23          THE COURT:  All right.

13:25:21 24          MR. LAMBERT:  Judge, I am sorry to stay on this topic

13:25:25 25   just for a minute.  Palmer Lambert on behalf of the plaintiffs.

13:25:29  1        Pretrial Order 71 before 71A was entered actually was

13:25:33  2   entered over the plaintiffs' objection because of a perceived

13:25:38  3   problem with photograph productions and other electronic type

13:25:43  4   information that was related to the fact sheet obligations.  Judge

13:25:49  5   Engelhardt originally ordered that we send some guidance around,

13:25:55  6   and apparently Judge Engelhardt felt that wasn't enough; and so

13:25:59  7   sanofi submitted a proposed pretrial order on plaintiff ESI, we

13:26:04  8   submitted a proposal based on sort of a beefed up guidelines that

13:26:10  9   we would send around to all plaintiffs, and Judge Engelhardt's

13:26:14 10   Order 71 was more like what the defendants had requested than what

13:26:20 11   we had proposed.

13:26:22 12        But as Ms. Menzies and Mr. Coffin said, we believe that

13:26:27 13   there is a big distinction between the trial plaintiff discovery

13:26:35 14   and the discovery in individual cases, which at some point if

13:26:40 15   they're not resolved in the MDL will get remanded and fully worked

13:26:46 16   up for trial.  And at that point, certainly the defendants will

13:26:49 17   have an opportunity to test the sufficiency of the documents and

13:26:52 18   the evidence in those cases when they each individually get set for

13:26:58 19   trial.

13:26:58 20        And so the concern is that, you know, they're using these

13:27:04 21   types of additional requirements on top of the fact sheet as sort

13:27:09 22   of target practice for individual cases, when if there wasn't this

13:27:14 23   MDL device, they would have to do that in each and every single

13:27:19 24   case.  And so we're very sensitive to that and the obligations on

13:27:24 25   those individual lawyers around the country, like you said, are

13:27:28 1  already hard enough to follow.

13:27:30 2        THE COURT:  All right.  Well, I mean, that's one of the

13:27:32 3  issues that I am going to discuss with Judge Milazzo, whether we're

13:27:39 4  going to treat trial plaintiff discovery different than the other

13:27:42 5  plaintiffs.  You all have made it clear that that's an issue for

13:27:45 6  you all in your submission.  I've got a list of things to talk to

13:27:49 7  the district judge about and that's one of them.

13:27:52 8        MR. LAMBERT:  Thank you, your Honor.

13:27:53 9        THE COURT:  And whatever we come back with, everybody is

13:27:56 10 going to have issues with some or all of it.  And if we need

13:27:59 11 briefing on it, then that's what we'll do.

13:28:02 12       MR. COFFIN:  Thank you.

13:28:18 13       THE COURT:  The issue of the letter from, I guess,

13:28:24 14 Mr. Bachus' firm to Ms. Free.  Is it from his firm?

13:28:28 15       MS. MENZIES:  Yes, your Honor.  Darin Schanker is on the

13:28:31 16 phone to respond to that.

13:28:31 17       MR. SCHANKER:  Hello, your Honor, this is Darin Schanker.

13:28:34 18 Thanks for letting me appear via phone, your Honor.

13:28:37 19       THE COURT:  All right.  I wasn't at the conference with

13:28:39 20 you all and Judge Milazzo or at the hearing, so I don't know what

13:28:43 21 was said.  And if there's a transcript, I haven't read it.

13:28:49 22       So, Mr. Schanker, is this a letter that went out -- is it

13:28:52 23 a form letter that went out to all of your clients?

13:28:57 24       MR. SCHANKER:  Your Honor, I know that a similar letter

13:29:01 25 went to many clients.  I don't want to misstate, but it was a

13:29:05  1    letter that went -- the one in particular is a letter that went to

13:29:09  2    Ms. Free specifically, or generally speaking, talking about

13:29:13  3    requirements and obligations for, you know, kind of the issues that

13:29:17  4    you're talking about, saving any social media, any computers,

13:29:21  5    anything like that, make sure you preserve all of that.  That's

13:29:24  6    what the purpose of the letter was to the client.

13:29:25  7         THE COURT:  How did it come up in context -- how did it

13:29:29  8    come up with Judge Milazzo?

13:29:31  9         MR. SCHANKER:  So it was utilized by defense counsel in

13:29:34  10   the Rule 37 motion against -- involving Dr. Gahan, plaintiff Gahan,

13:29:44  11   really we feel improperly used.  They attempted to say that our

13:29:47  12   firm was involved in some kind of subterfuge, basically advising

13:29:52  13   clients to destroy, you know, documentation, information, computer

13:29:58  14   e-mails, et cetera, et cetera, based on a statement, an e-mail that

13:30:04  15   Ms. Free had sent to someone else in which she referenced that

13:30:12  16   particular obligation and documentation, and, you know, not making

13:30:17  17   things public.

13:30:18  18        So basically what we did, your Honor, is explain the true

13:30:21  19   context of what that was without disclosing the intimate details

13:30:26  20   but to give Judge Milazzo a perspective since, quite frankly, it

13:30:31  21   had been misrepresented in defendant's motion.  Just to explain,

13:30:35  22   that's not what this was, it wasn't our firm involved in any

13:30:39  23   subterfuge.  As a matter fact, it was, in fact, opposite, which is

13:30:42  24   "hold on to your stuff."  And, Judge, you can make your social

13:30:48  25   media pages private if you wish, et cetera, et cetera.

13:30:51  1        THE COURT:  Right.  I mean, I read the e-mail, I just

13:30:53  2   didn't know if there was anything beyond that, beyond what was in

13:30:57  3   the submissions that was discussed.

13:30:58  4        All right.  Obviously in the first instance, a letter

13:31:05  5   such as that would be privileged.  I know that sanofi has made any

13:31:11  6   number of waiver arguments.  But before I even go down that road, I

13:31:20  7   have not decided whether I think that it's relevant to any claim or

13:31:24  8   defense or issue in the case.

13:31:27  9        So I am just going to tell -- I am just going to say this

13:31:31 10   to you all.  If I decide that something in that letter or something

13:31:36 11   that was represented about what was in that letter is potentially

13:31:40 12   relevant, at most I will order it to be produced to me for in

13:31:45 13   camera review.  At most.

13:31:49 14        If I do that and if I perceive any issues that could

13:31:55 15   potentially lead me to order it to be produced, before I did that I

13:32:02 16   would issue a Rule to Show Cause on exactly what the issues were

13:32:06 17   that I perceived and I would have formal briefing on it.  But I am

13:32:11 18   not yet convinced that it's relevant to even have me go down that

13:32:17 19   road.  I need to go back and look at what you all went through with

13:32:21 20   Judge Milazzo.  But it's not going to take me very long, I am just

13:32:26 21   not going to pull the trigger on that one way or another yet.

13:32:29 22        All I am saying is the most that I would do would be to

13:32:32 23   order it for in camera review, and then obviously I would give you

13:32:37 24   all the opportunity for formal briefing if I thought what I read,

13:32:40 25   you know, caused me to believe it should be produced for any

13:32:43  1    reason.  So we're going to handle it that way.

13:32:46  2            MR. SCHANKER:  Thank you.

13:32:47  3            MR. OOT:  Final point on that, your Honor.  Just it does

13:32:52  4    fold in to the whole 71A discussion you're going to have with Judge

13:32:56  5    Milazzo, too.  So we're not making any accusations, we just want

13:33:00  6    the information, we want the ESI produced to us, and we're seeing

13:33:04  7    themes of people misunderstanding perhaps the directions and not

13:33:07  8    following them.

13:33:08  9            THE COURT:  Well, look, I understand how you all as

13:33:12  10   lawyers could read Ms. Free's e-mail and let's say be concerned

13:33:18  11   about what it says.  I understand that.  I am just not prepared

13:33:23  12   right now one way or another to say -- before I start looking at

13:33:27  13   something, I've got to decide that it's relevant to a claim or

13:33:32  14   defense or some issue like the ones that you all were having with

13:33:38  15   the EIS, and I haven't made that decision.  And all I am saying is

13:33:40  16   if I do make that decision, what steps, what the incremental steps

13:33:45  17   will be going forward.

13:33:46  18           MR. OOT:  Thank you, your Honor.

13:33:47  19           THE COURT:  I don't know what I am going to do, but I

13:33:49  20   want the PSC and Mr. Schanker to understand that I am not just

13:33:55  21   going to launch into "produce the document."  We're going to take

13:33:58  22   it step by step.

13:34:00  23           All right.

13:34:02  24           MR. SCHANKER:  Thank you, your Honor.

13:34:03  25           THE COURT:  As to this issue with the Taxotears group

13:34:07  1  membership, this is what I want to do.  I would like for the PSC to

13:34:15  2  produce to me basically the correspondences that you all listed in

13:34:23  3  your submission - the e-mail of May 18th, 2018, the March 29th and

13:34:31  4  April 18th, 2018, and September 27th, 2017, reminders to plaintiffs

13:34:37  5  counsel, and the July 14, 2017, correspondence sending the guidance

13:34:42  6  originally.  What I want to do is I want to see the correspondence

13:34:45  7  and the reminders and the e-mails and such that you all sent to the

13:34:51  8  plaintiff lawyers around the country.

13:34:53  9      And if I am satisfied that the PSC has done what I

13:35:01 10  ordered them to do in informing plaintiffs' counsel around the

13:35:04 11  country with regard to this issue, then I am probably going to have

13:35:08 12  to direct you all -- then the issue is going to be subsumed into

13:35:11 13  the first ESI conversation we had and I am going to have to decide

13:35:17 14  with Judge Milazzo how to handle that in the deficiency process.

13:35:23 15      I am concerned at this level that the PSC has done what I

13:35:28 16  ordered them to do, which is to inform all of these lawyers that

13:35:31 17  they need to inquire of their clients whether they were or are

13:35:37 18  members of the Taxotears group.  And if I am satisfied that they've

13:35:41 19  done that, then we will go to the next step.  All right.

13:35:46 20      MS. MENZIES:  Just a point of clarification, too.  As I

13:35:48 21  mentioned, there were 84 members on that list, we were able to

13:35:51 22  figure out 82 of them.  And so I was able to go through all 82 of

13:35:55 23  them and search Centrality for their names and that's how we got to

13:35:59 24  that 37.  So the non-parties that I was calling absent, the two I

13:36:04 25  couldn't figure out who they were because the handles were hard to

13:36:07  1   understand, were not in Centrality.  And there were no PFS's for

13:36:13  2   them or not.

13:36:15  3         So whether there's been a plaintiff that's filed a case

13:36:19  4   since and had a PFS due, the vast majority of the PFS's have been

13:36:26  5   due already and have been served and so I have at least their

13:36:28  6   names, and then I was able to cross-check those questions 18

13:36:32  7   through 20 and what did they respond to those questions.  So I feel

13:36:35  8   like we've got the bulk of them, unless there were some that came

13:36:38  9   up, a member that happened to join or file a lawsuit and they

13:36:41 10   haven't filed a PFS yet.

13:36:44 11         THE COURT:  Did you all inform counsel around the country

13:36:47 12   who represent the 9,000 individuals that they needed to identify

13:36:54 13   their clients who were or who are members of that group?

13:36:57 14         MS. MENZIES:  Yes.

13:36:58 15         THE COURT:  Okay.

13:36:58 16         MS. MENZIES:  And we sent our order with that

13:37:01 17   communication to everybody and emphasized, you know, this is very

13:37:05 18   important, not just answer 18 through 20.  Because 20 says -- PFS

13:37:10 19   question No. 20 says:  Were you ever -- "Are you now or were you

13:37:15 20   ever a member of an alopecia support group?"  So it doesn't say

13:37:19 21   Taxotere so we highlighted that and said, for example, Taxotears or

13:37:23 22   any other kind of things.  So we tried to ferret that out a little

13:37:28 23   bit or highlight it.

13:37:28 24         THE COURT:  That's why I just wanted to have you all

13:37:31 25   provide me with those communications so I can confirm all of that.

13:37:33  1    And then like I said, then we will go from there.

13:37:36  2         MR. OOT:  Your Honor, just to preview something for your

13:37:38  3    conversation with Judge Milazzo.  What we're seeing is that 80 some

13:37:41  4    odd that Ms. Menzies mentioned is a snapshot in time long after the

13:37:45  5    original order.  So what we're seeing is new other Taxotears

13:37:50  6    members that aren't on that list, so people that may have

13:37:53  7    unsubscribed, who knows when, right, so either from the time that

13:37:59  8    they were e-mailing each other or posting up until the time that

13:38:04  9    they took the snapshot.  So that's kind of what we're getting at,

13:38:08  10   what we're seeking is we're seeking for those members that are not

13:38:12  11   on that list of 80 some odd plaintiffs just to make sure that we're

13:38:16  12   capturing that.

13:38:17  13        MS. MENZIES:  Which is why we --

13:38:21  14        THE COURT:  You mean of the 8,900 remaining plaintiffs?

13:38:27  15        MR. OOT:  No, no, no.  So, your Honor, the list that

13:38:31  16   Ms. Menzies provided is a screen capture of the "about page" that

13:38:35  17   was taken long after --

13:38:36  18        THE COURT:  When it was taken.

13:38:38  19        MR. OOT:  Yes.  So the issue that we're seeing is there

13:38:42  20   are other members or plaintiffs that also have ESI that relates to

13:38:48  21   Taxotears that are not on that list.

13:38:50  22        THE COURT:  Right, they're not on the list.

13:38:53  23        MR. OOT:  So they unsubscribed at some time.  And our

13:38:55  24   issue is that they perhaps unsubscribed during the time period when

13:38:59  25   they were ordered to stay on it and the time that we got the

13:39:04 1    screenshot.

13:39:05 2         THE COURT:  Well, look.  There's only so much I can do

13:39:10 3    and there's only so much that these lawyers here can do to inform

13:39:15 4    those individual plaintiffs of what their obligations are.  What I

13:39:20 5    am hearing is that they sent the individual plaintiffs' counsel a

13:39:25 6    copy of my order.  The order says exactly what they need to do.

13:39:30 7         Now, if you turn up evidence that there are individuals

13:39:33 8    who are plaintiffs in the case who should have received that order

13:39:39 9    or did receive that order and you're not getting the information

13:39:42 10   from them, then we have to address that as they come up.

13:39:48 11        MS. MENZIES:  And that's the first I've heard of that.

13:39:51 12   So if counsel has additional plaintiffs that appear to be Taxotears

13:39:56 13   members of that support group that we haven't identified that

13:40:01 14   they've now learned of, I think you just said that you have that,

13:40:03 15   please tell us who those plaintiffs are, we will talk to those

13:40:06 16   lawyers, I mean --

13:40:08 17        THE COURT:  This is -- we've got to be able to cooperate

13:40:10 18   in these matters to get to the bottom of things.  So if you all are

13:40:14 19   uncovering people through their other ESI indicates that they

13:40:19 20   either were or recently subscribed to the group, you need to talk

13:40:26 21   to plaintiffs' counsel to figure out why they weren't on the list.

13:40:30 22   There's no reason to hold that information back.  The objective is

13:40:33 23   to identify everybody who was or is a member of that group.  And if

13:40:38 24   you all are finding people that aren't on the list that you got

13:40:40 25   from the PSC, you need to talk about it.

13:40:43  1          MR. OOT:  Okay.  Thank you, your Honor.

13:40:44  2          THE COURT:  Nothing that I said or suggested or ruled

13:40:57  3  requires the PSC to issue any affidavits about their communications

13:41:01  4  with Ms. Ledlie, so I am not going to order them -- I am not going

13:41:07  5  to order them to create or sign an affidavit concerning those

13:41:10  6  communications.  One of these days y'all are going to get to depose

13:41:13  7  that lady, presumably, and you can ask her all of the questions

13:41:19  8  that you want about that.

13:41:19  9          Let me ask about Dr. Thompson.  Has Dr. Thompson met with

13:41:25 10  or treated any of the trial plaintiffs?

13:41:28 11          MS. MENZIES:  David Miceli is on the phone and will

13:41:33 12  respond to that for your Honor.

13:41:34 13          THE COURT:  David.

13:41:35 14          MR. MICELI:  Yes, your Honor.  Thank you for letting me

13:41:38 15  appear, and the answer is, yes, he has.  Not all bellwethers but

13:41:45 16  some bellwethers.

13:41:47 17          THE COURT:  All right.  Obviously my initial order was

13:41:49 18  focused on Dr. Claiborne, but there is no reason in my mind -- and

13:41:58 19  I have thought about it from multiple angles -- there's no reason

13:42:03 20  in my mind that I should treat Dr. Thompson any differently than

13:42:07 21  Dr. Claiborne.  To the extent that Dr. Thompson has met with or

13:42:12 22  treated any of the trial plaintiffs, those records are

13:42:15 23  discoverable.

13:42:16 24          MR. COFFIN:  Your Honor, can I just make something clear?

13:42:18 25  I'm sorry, I know Mr. Miceli is handling this, but I want to be

13:42:22   1   very clear here.

13:42:22   2           Dr. Thompson saw this plaintiff as a consulting expert.

13:42:28   3   This is not treatment outside of this litigation.  So I just want

13:42:36   4   to be clear on that, because it seems --

13:42:37   5           THE COURT:  That's not what I just heard.  I asked the

13:42:39   6   question --

13:42:40   7           MR. COFFIN:  I think he was misunderstanding.

13:42:42   8           THE COURT:  -- did he meet with or treat any plaintiff.

13:42:44   9           MR. COFFIN:  I think that was a misunderstanding.

13:42:46  10   Mr. Miceli, can you just clear that up?

13:42:49  11           MR. MICELI:  Sure.  If I can.  Your Honor, I thought --

13:42:54  12   what I heard was did they meet.  The answer is they met.

13:42:58  13           When we first talked about Dr. Claiborne, when you asked

13:43:03  14   is he going to be an expert, is this going to be somebody -- it's

13:43:07  15   not about if, it's about when you disclose this.  I made the

13:43:12  16   statement then, I am looking at page 33 of that hearing's

13:43:15  17   transcript, I said, "they," meaning sanofi, "will receive all of

13:43:19  18   the records that our experts rely upon."  I can't tell the Court as

13:43:24  19   we're having this hearing today that Dr. Thompson is or is not

13:43:28  20   going to be a testifying expert.  He saw some plaintiffs as a

13:43:35  21   consulting expert, not to offer treatment but to consult for the

13:43:42  22   benefit of the attorneys.

13:43:45  23           MR. COFFIN:  That's correct, your Honor.  And I'm sorry

13:43:47  24   about that but I thought there was a misunderstanding.

13:43:49  25           THE COURT:  I am having a hard time envisioning how that

13:43:53  1    works.

13:43:53  2              MR. COFFIN:  Well, it's like -- I am just going to be

13:43:55  3    clear with your Honor.  When we think we need a plaintiff -- let's

13:44:00  4    take a theory case.  In theory, when I am prosecuting a case on

13:44:05  5    behalf of a plaintiff and I think that that plaintiff may have some

13:44:10  6    mental or physical issue that I need to send to a consulting expert

13:44:14  7    to evaluate, I retain that expert, send it -- send the plaintiff to

13:44:19  8    that expert as a consultant to get an opinion, to get some advice,

13:44:24  9    to get some guidance as a consulting expert purely for litigation.

13:44:29  10   And then I make a determination as to is this somebody who is going

13:44:33  11   to actually be someone who provides opinions in this case.  That's

13:44:37  12   what we're talking about.

13:44:39  13             THE COURT:  Doctors don't work that way.

13:44:42  14             MR. COFFIN:  When you retain them as experts --

13:44:44  15             THE COURT:  Well, you know, I don't know what

13:44:45  16   Dr. Thompson's records of his meetings with these people say.

13:44:49  17             MR. COFFIN:  It's only for litigation, Judge.  This is

13:44:50  18   only for litigation.  This is nothing to do with anything outside

13:44:52  19   of the litigation.  This is like any expert.

13:44:55  20             THE COURT:  It's not like any expert.

13:44:58  21             MR. COFFIN:  I am very confused because this is very

13:45:02  22   foreign to me, quite frankly.  Like, I send my plaintiff to an

13:45:05  23   expert to consult with about a particular condition and I have to

13:45:10  24   disclose that before the expert deadlines?  Why do we have expert

13:45:14  25   deadlines?  That's what I am confused about, and I am wondering --

13:45:17  1          THE COURT:  Your position is you're never going to have

13:45:19  2     to disclose it because he's a consulting expert.  And I don't know

13:45:23  3     what happened when these individuals met with Dr. Thompson, but if

13:45:27  4     it can be considered treatment in any form or fashion, they're

13:45:31  5     entitled to it and they don't have to wait until an expert

13:45:34  6     deadline.

13:45:34  7          MR. COFFIN:  Well, if he is an expert in this case and I

13:45:38  8     send my plaintiff and I know that he may be an expert, then I would

13:45:44  9     be giving all of my expert materials to the defendants before the

13:45:47 10     expert disclosure deadline.

13:45:49 11          THE COURT:  I don't know -- listen again to what I am

13:45:52 12     saying.  Dr. Thompson is a doctor, he is a medical doctor.  And I

13:45:58 13     don't know whether what -- his interaction with these plaintiffs, I

13:46:02 14     don't know whether they can be considered treatment or not.

13:46:04 15          The last time you made this argument, right, I asked the

13:46:09 16     same question:  Did Dr. Claiborne take biopsies?  What did he do?

13:46:15 17     Did he do testing?  That's all in the nature of treatment.  It's

13:46:19 18     all in the nature of treatment, and I got to the bottom of it by

13:46:22 19     asking you what did he do.  And I asked those questions and when

13:46:27 20     you told me this is what he did, I said that's treatment, they're

13:46:30 21     entitled to it.

13:46:32 22          MR. COFFIN:  Let me clear this up.  Dr. Thompson provided

13:46:34 23     no treatment.

13:46:37 24          THE COURT:  All right.  Let me hear from sanofi.

13:46:41 25          MS. DIERI:  Your Honor, regarding Mr. Thompson.  It's my

13:46:44  1  understanding that plaintiffs, at least some of the bellwether

13:46:47  2  plaintiffs, including Ms. Ernest, went to Dr. Thompson, presumably

13:46:51  3  talked about their mental or emotional state, he interacted with

13:46:55  4  them.  He heard them, he may have formed opinions that they're

13:46:59  5  calling consulting.  But there is factual information in the course

13:47:04  6  of being heard by this doctor and in the course of being

13:47:08  7  evaluated -- and I think there may be a disagreement about what

13:47:11  8  treatment is between sanofi and the plaintiffs -- but it's our

13:47:15  9  position that the factual information about what these bellwether

13:47:20 10  plaintiffs are communicating to and what Dr. Thompson is hearing

13:47:23 11  and interacting with and treating these plaintiffs is discoverable,

13:47:26 12  and I think that's consistent with how your Honor ruled regarding

13:47:30 13  Dr. Claiborne.

13:47:31 14          And, for example, in the context of Dr. Thompson, it's

13:47:34 15  important because, for example, Ms. Ernest said she never talked to

13:47:39 16  anyone about her claimed mental damages or her emotional condition.

13:47:45 17  It's the only evidence of her -- factual evidence of her talking to

13:47:51 18  a medical provider, to a doctor, to a physician about the mental

13:47:55 19  damages I presume she'll be claiming in this case, and potential

13:47:59 20  other things that could affect her mental state.

13:48:03 21          MR. COFFIN:  I just don't know why expert disclosures and

13:48:09 22  experts in cases and the district court judge set a deadline.  This

13:48:13 23  is --

13:48:13 24          THE COURT:  This isn't a metallurgist, this isn't a

13:48:17 25  molecular scientist.  This is a doctor who is individually meeting

13:48:21  1   with trial plaintiffs.

13:48:22  2           MR. COFFIN:  Because we retained the person as an expert,

13:48:25  3   Judge.  It's not treatment in terms of the way -- this is an

13:48:29  4   evaluation.

13:48:31  5           MR. SCHANKER:  Your Honor, if I may, this is Darin

13:48:35  6   Schanker for the plaintiffs and I represent plaintiff Ernest as

13:48:38  7   well.

13:48:38  8           With regard to Thompson, Dr. Thompson, there is no

13:48:45  9   physician-patient privilege which is existing, no doctor-patient

13:48:48 10   relationship, at least that's what Dr. Thompson's opinion is, has

13:48:52 11   been established, that he is at this point purely a consulting

13:48:56 12   witness who may or may not offer opinions in the case.  He is not

13:48:59 13   providing any kind of -- he is not -- in his mind he is not

13:49:03 14   treating them.

13:49:07 15           THE COURT:  Well, how am I to know what's in

13:49:10 16   Dr. Thompson's mind?

13:49:16 17           MR. MICELI:  Your Honor, and I hate to play tag team with

13:49:20 18   my team members that are in the courtroom, but this is the reason

13:49:22 19   why we have 26(b), you shouldn't have to wrestle with this as to

13:49:27 20   what's in his records.  When we shared on November 7th the agreed

13:49:31 21   upon date that we submitted to Judge Milazzo and she signed off on,

13:49:38 22   we're going to have to put the factual basis for every single

13:49:43 23   expert's opinions and the assumptions that they've made.

13:49:46 24           Now, we've talked about Dr. Claiborne as a consulting

13:49:49 25   expert, we've talked about Dr. Thompson and wrestling with the

13:49:53   1   issue with the Court about whether they're consulting or treating

13:49:56   2   physicians.  However, if it's not absolutely necessary that either

13:50:01   3   or both of those experts testify, that if their findings, their

13:50:07   4   factual findings are part of what is relied upon by another expert,

13:50:12   5   we have to disclose that in our mandatory disclosures for our

13:50:19   6   testifying experts.  And when that occurs the defendants will have

13:50:22   7   all of it.

13:50:24   8         The fact that they evaluated our patients or our

13:50:29   9   plaintiffs is not what should control this, the character and

13:50:34   10  nature of the relationship between the plaintiff and the expert

13:50:37   11  that they're visiting.  They do not --

13:50:40   12        A psychiatrist like Dr. Thompson is a secondary or even a

13:50:44   13  tertiary provider.  No primary treating physician of either

13:50:49   14  plaintiff or any of the plaintiffs was referred to Dr. Thompson for

13:50:54   15  care.  They were referred by a lawyer for an evaluation.  So the

13:50:59   16  character and nature of the relationship and the visit that was --

13:51:02   17  that took place, the one visit, there's not follow-up treatment,

13:51:05   18  there's not follow-up care the way you would see with a referral

13:51:09   19  from one doctor to another, this is simply evaluations for discrete

13:51:16   20  information and for discrete purpose for communication with the

13:51:21   21  attorneys.  It's very different than treating -- a doctor-patient

13:51:26   22  treatment relationship that you normally see, and we're not going

13:51:29   23  and sending our clients to --

13:51:32   24        If there were a case where there was an orthopedic

13:51:35   25  injury, we're not sending our clients to another orthopedic to

13:51:38  1   change the diagnosis that the contemporaneous treating doctor had

13:51:44  2   made.  We're simply sending them, for the purposes of

13:51:49  3   Dr. Claiborne, which we've already discussed, for one particular

13:51:52  4   purpose to get a biopsy; and for Thompson, to get an evaluation as

13:51:56  5   a consulting expert.

13:51:58  6        And Mr. Coffin's absolutely right.  What we're seeing

13:52:02  7   here is just sanofi taking the opportunity to try to whittle away

13:52:06  8   when we have to make expert disclosures, and there's a reason for

13:52:10  9   26, Rule 26(b) and that is so that we can workup our cases without

13:52:17 10   interference from the defendants and without the fear of having to

13:52:22 11   disclose consulting experts.  And it's not a fear that we're afraid

13:52:28 12   of what our consulting experts tell us, it's just a fear that we

13:52:31 13   have to be able to work up our case to be able to work it up.  And

13:52:35 14   if they're going to be in our back pocket every time we walk in to

13:52:40 15   talk to a consultant, what's the reason for 26(b)?

13:52:44 16        THE COURT:  Well, you made the same argument as to

13:52:46 17   Dr. Claiborne but Dr. Claiborne treated these individuals.  You

13:52:50 18   don't do what Dr. Claiborne --

13:52:50 19        MR. MICELI:  He took a biopsy.

13:52:52 20        THE COURT:  That's right.  Well, you can't do that, I

13:52:53 21   can't do that.  That's treatment.

13:52:57 22        So you made the same argument as to him about premature

13:53:03 23   expert disclosures and reports, but those individuals were treated

13:53:08 24   by that doctor.  Now, it might have been limited and it might have

13:53:12 25   been for a limited purpose, but you're not going to convince me

13:53:18  1    that in that case that wasn't treatment.  And that's why I ordered

13:53:25  2    that information to be shared.  This isn't a run of the mill

13:53:31  3    consulting expert.  It just isn't.  There are differences.

13:53:36  4            Is there a separate deadline in this case for the

13:53:39  5    disclosure of records from treating physicians?  Is there a

13:53:45  6    separate stand-alone deadline for that information?

13:53:49  7            MR. COFFIN:  No, but this isn't a treating --

13:53:51  8            MR. MICELI:  Actually I --

13:53:52  9            THE COURT:  Hold on.

13:53:53 10            MR. MICELI:  The discovery deadline, your Honor, is

13:53:57 11    beyond the expert disclosures.  We're not saying wait until

13:54:01 12    December 15th.  We're saying let's do it on November 7th.

13:54:04 13            THE COURT:  Is there a deadline in this case for the

13:54:08 14    trial plaintiffs' medical records from their treating physicians to

13:54:11 15    have been produced or made available?

13:54:16 16            MS. MENZIES:  Well, yes, and that's passed, that's the

13:54:20 17    fact discovery.

13:54:21 18            THE COURT:  Right.

13:54:21 19            MS. MENZIES:  And then as -- if a patient, say a patient

13:54:23 20    is still injured and they're continuing to get treatment when their

13:54:26 21    trial date comes up, you have to supplement with treating

13:54:28 22    physicians, yep.

13:54:29 23            THE COURT:  Right.  This is -- we're not just having a

13:54:33 24    discussion about the difference between a testifying expert and a

13:54:37 25    consulting expert.  We're having a discussion about whether these

13:54:40 1   individuals can be or should be considered treating physicians.

13:54:46 2   That's what I am concerned about.

13:54:48 3            MR. COFFIN:  They are not providing treatment.

13:54:50 4            THE COURT:  Well, the first one did.

13:54:52 5            MR. COFFIN:  Well, you ruled that the first one did.  But

13:54:55 6   a psychiatrist who is being retained specifically for litigation as

13:54:58 7   an expert by the plaintiffs' counsel is not providing treatment.  I

13:55:04 8   am sorry, your Honor, I just respectfully, if that's where you're

13:55:07 9   going, I respectfully --

13:55:08 10           THE COURT:  I don't know what he did.

13:55:09 11           MR. COFFIN:  -- I vehemently disagree.

13:55:12 12           THE COURT:  So I'm stuck with -- I hear what you're

13:55:13 13  saying.  What's in his mind and what he did and whether he

13:55:17 14  considers himself to have a doctor-patient relationship, I don't

13:55:20 15  know any of those things.  Those are lawyers telling me what he

13:55:24 16  thinks about the relationship he has with these individuals.  And I

13:55:26 17  am supposed to make a decision on that basis?

13:55:30 18           MR. COFFIN:  I think you make the decision based on

13:55:33 19  whether or not we've represented to the Court that this was for

13:55:35 20  purposes of litigation and that we retained this expert for

13:55:39 21  purposes of litigation.  That's -- there is no rule that says we

13:55:44 22  have to disclose that.  In fact, there's a rule to the contrary

13:55:47 23  that says we don't have to disclose who that person even is

13:55:51 24  until --

13:55:52 25           THE COURT:  If the Court is satisfied that you are

13:55:53  1   categorizing that person correctly.

13:55:57  2          MR. COFFIN:  I understand.

13:55:58  3          MS. BIERI:  The situation, your Honor, is that this is

13:56:01  4   not a consulting expert in the traditional sense where you send

13:56:05  5   some medical records and they look at them and they provide their

13:56:08  6   opinion to the lawyers for litigation strategy.  These are doctors

13:56:12  7   of medicine who have seen, talked to, heard from --

13:56:17  8          THE COURT:  I know all of that, that's why we're having

13:56:19  9   this discussion.

13:56:21 10          MR. COFFIN:  I just -- I don't know how to explain it any

13:56:25 11   other way.  You asked if they're receiving treatment, at least with

13:56:29 12   Dr. Thompson, no, that's who we're talking about right now.  No,

13:56:32 13   it's not treatment.  This is purely for purposes of litigation.

13:56:35 14   These women didn't even know who Dr. Thompson was until --

13:56:39 15          THE COURT:  Well, you know what, the guy that fell down

13:56:42 16   the stairs on the crew boat didn't know who Dr. Joe Blow was until

13:56:47 17   his lawyer sent him there.  That doesn't mean anything that they

13:56:50 18   didn't know who he was.  Lawyers send --

13:56:50 19          MR. COFFIN:  They sent him for treatment.

13:56:52 20          THE COURT:  Hold on.  This is what we're going to do.  I

13:56:55 21   am going to look -- I am going to look at Dr. Thompson 's records

13:56:59 22   on these however many plaintiffs.  I am going to look at -- that's

13:57:03 23   the only way I feel comfortable that I am going to make the right

13:57:07 24   decision is to know what happened, and the only way for me to know

13:57:09 25   what happened is to look at the records.

13:57:11  1         So I am going to review Dr. Thompson's records on the

13:57:16  2  however many of the trial plaintiffs he met with, and I am not

13:57:21  3  going to order -- again, I am not ordering that kind of stuff to be

13:57:25  4  produced without giving y'all an opportunity to fight me over it.

13:57:29  5  Okay.  But if it is as you say it is, it may well be that it's all

13:57:36  6  -- that it's all protectable up to a certain point in time.

13:57:41  7         MR. COFFIN:  Subject to the deadline, yes.

13:57:43  8         THE COURT:  And I know the argument is that there are

13:57:45  9  facts and statements and such that are underlying information that

13:57:49 10  was provided by these ladies to the consulting expert.  But if

13:57:52 11  that's all there is, I am not convinced that y'all are entitled to

13:57:55 12  it at this point.  The only thing that makes you all potentially

13:57:59 13  entitled, and I say you all I mean sanofi, potentially entitled to

13:58:02 14  any of this information is the possibility that it is records of

13:58:08 15  treatment, which the deadline for which has already passed.  That's

13:58:12 16  it.  If there's underlying factual information and I am not

13:58:17 17  convinced that there is anything that qualifies as treatment by a

13:58:21 18  physician, then sanofi's going to have to wait to get the records.

13:58:26 19         I made my opinion clear on Dr. Claiborne.  I think when

13:58:31 20  you start, you know, taking pieces of people and sending them off

13:58:35 21  to a lab, I think that you've crossed the line between consulting

13:58:38 22  and treating.  But that ship has sailed.  This is a different kind

13:58:43 23  of doctor but it's still an issue.  And so the way that I am going

13:58:48 24  to solve it is to look at the records.

13:58:53 25         So do I need -- I would like to get this done as quickly

13:58:58  1   as I can.  Can you all obtain those records if I order you obtain

13:59:02  2   them, Chris?

13:59:03  3             MR. COFFIN:  Yes.  He's our consulting retained expert,

13:59:08  4   your Honor, so he'll provide them to us.

13:59:10  5             THE COURT:  All right.  That's what I'll do, I'll have

13:59:12  6   you all provide them to me within 14-days and then we'll go from

13:59:16  7   there.  Okay?

13:59:17  8             MR. COFFIN:  Yes, sir.

13:59:17  9             THE COURT:  If you need more time, I am familiar with

13:59:21 10   Dr. Thompson and I am familiar with the fact that he has been out

13:59:24 11   of the country for some period of time and I don't know if he's

13:59:27 12   back.  So if you need more time, let me know.

13:59:29 13             MR. COFFIN:  Okay.  Thank you, your Honor.

13:59:31 14             THE COURT:  Dr. Claiborne.  Sanofi suggests in its

13:59:38 15   submission that at a minimum they strongly believe that punch

13:59:44 16   biopsy reports were not produced, they exist but were not produced.

13:59:50 17   Mr. Miceli, is that right?

13:59:52 18             MR. MICELI:  That is correct and I can address that.

13:59:56 19   There were punch biopsies taken, as you know we retained

14:00:00 20   Dr. Claiborne to do that.  We had asked for the accommodation back

14:00:05 21   in June that we would provide his records unredacted, which we

14:00:10 22   have, that lists all of the objective evidence, four of the five

14:00:16 23   pieces of objective evidence that you ordered be disclose:  When,

14:00:20 24   where, observations, whether samples were taken and from where.

14:00:23 25             The question now becomes what we've done with those

samples. We had the biopsies sent to a separate consulting expert who made slides and those slides were offered, the copies of those slides -- because it's human tissue, you can't reproduce it with a -- even with a 3D copier. So we offered to take photographs, professional photographs that would be sent to -- copies of the slides and provide them to sanofi. And when we had the biopsies taken, we asked both Dr. Claiborne and our other consulting expert whether they could make sure that we have enough tissue, that we do not use more than half of it so that we could have enough that sanofi could do the same thing that we were doing and that is make slides.

So in the hearing that we had on this back on June 13th, your Honor drew the comparison to an MRI. If we sent somebody for an MRI, there would be a film and we would produce the film. And in this particular case, the equivalent to the MRI film is the slide; and we have offered to provide the slides and the tissue, the remaining tissue to sanofi so that they can make their own slides on the condition that we provide our copies to them, they provide their copies to us. So we have complied with every aspect of your prior order.

THE COURT: Are you telling me that your position is that punch biopsy reports are not objective results of tests?

MR. MICELI: Well, I am not saying that they don't include objective results, your Honor. I am saying that "the" objective results of a biopsy is the slide and that the retained

14:02:16  1    expert who made those cuts produced the report to us of his

14:02:20  2    findings.  And his findings and conclusions are his opinions and

14:02:25  3    your prior order specifically states that they don't get opinions.

14:02:29  4    All there is is that he received tissue and then he gives the

14:02:32  5    opinion of what the tissue samples of the slides demonstrate.  And

14:02:37  6    so we've offered the slides.

14:02:39  7         THE COURT:  Your position is that the punch biopsy

14:02:42  8    reports are in their entirety expert opinion work product?

14:02:48  9         MR. MICELI:  Well, it's not just expert opinion work

14:02:51 10    product because there's a difference between consulting and

14:02:54 11    testifying expert.  However, what they're going to get if I produce

14:02:58 12    that to them, again for the third time now, the name of my expert,

14:03:03 13    where he is located, and they start their workup on expert

14:03:08 14    discovery three months early, your Honor.

14:03:11 15         THE COURT:  Look, we've already been down this road.  I

14:03:14 16    ordered objective test results to be produced.  In my view biopsy

14:03:22 17    reports are objective test results.  And I have yet to be -- nobody

14:03:28 18    has told me why I am wrong.

14:03:34 19         MR. MICELI:  Well, concerning a report, a report is

14:03:39 20    important.  I am not going to disagree with you on that, your

14:03:41 21    Honor.  Whether or not they get our consulting expert's identity

14:03:47 22    and their findings, I disagree with the Court.

14:03:50 23         THE COURT:  Wait, what identity?  You mean there's

14:03:52 24    another expert whose referenced?

14:03:55 25         MR. COFFIN:  This is what you're missing, yes.

14:03:58 1      MR. MICELI:  Your Honor, Dr. Claiborne did not make these

14:04:02 2  slides.  Dr. Claiborne sent those slides to a pathologist and the

14:04:07 3  pathologist sliced the tissue and put it on a slide and looked at

14:04:15 4  it with a microscope.  There is a separate retained consulting

14:04:19 5  expert who received the tissue and made the slides.  And what we're

14:04:26 6  getting to now is our third expert that sanofi is wanting to do

14:04:32 7  discovery on at this point.

14:04:34 8      THE COURT:  You know --

14:04:36 9      MR. MICELI:  And --

14:04:39 10      THE COURT:  Hold on.  What sanofi wants is for you all to

14:04:44 11  comply with the order that I issued and that's what I want, too.

14:04:47 12  And I issued an order that ordered you all to produce the objective

14:04:51 13  results of any tests.

14:04:54 14      MR. MICELI:  Your Honor --

14:04:57 15      THE COURT:  And now I am hearing for the first time --

14:04:57 16      MR. MICELI:  Yes, you --

14:04:59 17      THE COURT:  Hold on.  Now I am hearing for the first time

14:05:03 18  you don't want to produce them because they identify another person

14:05:06 19  as a consulting expert.  I am hearing that for the first time

14:05:10 20  sitting up here today.

14:05:11 21      MR. MICELI:  Your Honor, I pointed that out simply

14:05:13 22  because this is the third time, this is the third expert that

14:05:16 23  you're ordering the identity of to be produced.

14:05:19 24      Getting to the objective findings.  When a pathologist

14:05:24 25  looks at a slide and gives his findings, those are not objective

14:05:29  1   findings.  That's not taking blood out of somebody's arm, putting

14:05:34  2   it in the centrifuge, and telling you how much cholesterol is in

14:05:40  3   it.  That is the opinion of that pathologist.  Those are his

14:05:42  4   observations and opinions of that person.  That is not -- it's not

14:05:44  5   an objective test to put it into a machine and it produces a result

14:05:50  6   to you.

14:05:51  7              THE COURT:  I don't know that I agree with that.

14:05:53  8              MR. MICELI:  So that's why we --

14:05:54  9              MR. COFFIN:  There's going to be a difference of

14:05:56 10   opinions -- I promise that they will bring different opinions from

14:05:59 11   their pathologist about what is really showing in the slides,

14:06:03 12   that's why we have competing experts, which is why this is such a

14:06:06 13   big issue.  It's not Dr. Claiborne who took the biopsy out, it's

14:06:10 14   the guy who is actually, or girl, who is actually reading it.

14:06:13 15              THE COURT:  Why wasn't this raised when I said out loud,

14:06:18 16   I said it out loud, that the objective results of those biopsies

14:06:22 17   would be subject to production, then I put it in an order, and now

14:06:26 18   I am hearing the reason you're resisting is because they were

14:06:29 19   objective results that were obtained by a third person that nobody

14:06:32 20   knows the identity of except you all?

14:06:35 21              MR. COFFIN:  I think Mr. Miceli said that, because the

14:06:38 22   objective -- I'm sorry, Dave, go ahead.

14:06:40 23              MR. MICELI:  The objective result of the biopsy is the

14:06:47 24   slide.  That is what resulted, the tissue was taken out and the

14:06:50 25   tissue was put on a slide.  We are happy to produce that slide and

14:06:54 1   have them -- we first spoke about this with your Honor that we are

14:07:00 2   happy to make copies of these slides and produce the tissues so

14:07:04 3   that they can make their own and get their own consulting expert's

14:07:08 4   opinion.

14:07:08 5        MR. COFFIN:  This isn't new by the way, your Honor.  This

14:07:11 6   is what happens very often with tissue samples, that's why we had

14:07:15 7   the biopsy be large enough so that we could share with the defense;

14:07:19 8   because what the defense would have said if we didn't do that is,

14:07:22 9   oh, my goodness --

14:07:24 10       THE COURT:  I am not concerned about that part.  I am

14:07:27 11  concerned about this report.

14:07:28 12       MR. COFFIN:  What report?

14:07:29 13       THE COURT:  This all goes back, this all goes back to

14:07:32 14  what I talked about earlier and that we talked about last time.

14:07:35 15  The idea that these individuals are not being -- this is not

14:07:40 16  treatment, I disagree with.

14:07:44 17       MR. COFFIN:  How can we have a pathologist who is a

14:07:46 18  consulting expert, your Honor, that's not supposed to be disclosed

14:07:51 19  until the expert deadline and have to disclose his opinions about

14:07:54 20  what the pathology shows?  I don't understand that.  I disagree

14:07:59 21  with your Honor, it's not treatment.

14:08:01 22       THE COURT:  What authority do you have that you can

14:08:03 23  protect that information when you're talking about a medical

14:08:06 24  procedure?  Because that's what this is.  This is a medical

14:08:10 25  procedure and the results of a medical procedure.

14:08:13  1        MR. COFFIN:  But it's medical procedures for the purposes

14:08:15  2   of litigation, retaining an expert for the purposes of litigation.

14:08:19  3   It's different, your Honor.  It's different because otherwise we

14:08:22  4   wouldn't have an expert discovery deadline, we might as well just

14:08:26  5   send them every individual who we've sent tissue to or a plaintiff

14:08:30  6   to, we send them all of that information now.  That's why we have

14:08:34  7   an expert discovery cutoff or deadline for disclosure.

14:08:37  8        THE COURT:  Oh, no, that's not the only reason.

14:08:38  9        MR. COFFIN:  Well, that's one.

14:08:39 10        THE COURT:  We are talking about an unusual and specific

14:08:43 11   sort of expert who has done medical procedures on these women.

14:08:47 12   You're going to tell me that a biopsy is not a medical procedure?

14:08:50 13        MR. COFFIN:  So it's like in a hip implant case.  If we

14:08:54 14   send an individual, we send the materials from the hip implant to

14:08:59 15   an expert and we want the expert to evaluate what they -- that's an

14:09:04 16   expert.

14:09:05 17        THE COURT:  Where did the materials come from?

14:09:07 18        MR. COFFIN:  The plaintiff.  The plaintiff.  It was taken

14:09:09 19   out of the plaintiff and it goes to our expert.  And then they say,

14:09:12 20   "Well, who is your expert?  Well, we'll tell you who your expert

14:09:16 21   is, Defendants, when we get to the expert discovery deadline."  And

14:09:18 22   they say, "Well, we want to evaluate the X plant, the hip implant

14:09:21 23   that came out of the plaintiff."  We say, "Oh, yeah, you can do

14:09:23 24   that."  Just like we're offering here.  But you can't get the

14:09:26 25   opinions of our, you know, orthopedic surgeon or metallurgist who

14:09:29 1   is evaluating the metal hip implant until we have to disclose that

14:09:34 2   under the expert deadlines.

14:09:35 3        So it's not that much different than other pharmaceutical

14:09:39 4   or medical device cases where we have pathologists or orthopedics.

14:09:43 5   They're not treating, they're providing opinions, that's the

14:09:46 6   distinction, that's why we're having such a hard time with what

14:09:51 7   your Honor seems to be saying because it is different, it's not

14:09:54 8   treatment, it's evaluation for purposes of litigation.

14:09:58 9        MS. BIERI:  Your Honor, these medical records of

14:10:01 10  pathology, a dermal pathology report will have things such as the

14:10:04 11  follicle counts, what the follicle looks like.  What I suggest --

14:10:08 12       THE COURT:  There are going to be objective findings in a

14:10:10 13  pathology report.  They're going to be there.

14:10:14 14       MS. BIERI:  I suggest your Honor review them in camera

14:10:17 15  and you can determine if you think that they're factual

14:10:20 16  information.

14:10:21 17       THE COURT:  Well, that's what I was leaning toward doing

14:10:24 18  anyway because y'all know how much I love to review things in

14:10:27 19  camera.

14:10:28 20       MR. COFFIN:  Your Honor, obviously --

14:10:30 21       THE COURT:  But I am going to do more than that.

14:10:48 22       MR. COFFIN:  I think, if I may interrupt your thought for

14:10:50 23  a second, your Honor.

14:10:52 24       THE COURT:  Yep.

14:10:53 25       MR. COFFIN:  This is hitting me personally so, I don't

14:10:57  1   know, so blindly that I would really like us to be able to provide

14:11:02  2   case law and brief this.

14:11:03  3          THE COURT:  All I am thinking of right now --

14:11:07  4          MR. COFFIN:  This is a major issue.

14:11:08  5          THE COURT:  All I am thinking about right now is a time

14:11:11  6   line for you all to do that.

14:11:13  7          MR. COFFIN:  I understand.  Okay.

14:11:15  8          THE COURT:  All right.  I want you all to -- so I want

14:11:17  9   the PSC to produce the reports to me in camera, and I want --

14:11:29 10   let's see.  What's today?

14:11:29 11          MR. COFFIN:  To be clear, I don't know this, Mr. Miceli

14:11:33 12   might know this, I don't know that we actually have reports.  I

14:11:36 13   don't know that.

14:11:37 14          MS. BIERI:  I thought Mr. Miceli said the reports --

14:11:40 15          THE COURT:  I asked him if punch biopsy reports have been

14:11:44 16   withheld and he said yes.

14:11:46 17          MR. COFFIN:  Maybe I don't know that.

14:11:46 18          THE COURT:  I'm assuming that that meant yes.

14:11:46 19          MR. COFFIN:  Dave, can you clear that up?  Do we have

14:11:48 20   reports from a pathologist I think is what Magistrate Judge North

14:11:51 21   is asking.

14:11:54 22          MR. MICELI:  I was on mute, your Honor.  I am sitting

14:11:57 23   here talking to myself.  Let me confirm whether we have written

14:12:02 24   reports or whether we received oral reports from our pathologist,

14:12:07 25   because right now I simply can't tell you.  And I am not in front

14:12:11  1   of my computer, so I can let you know by the end of the day whether

14:12:17  2   we have written reports.

14:12:18  3            THE COURT:  Well, you know, why wasn't that the answer

14:12:21  4   when I asked you that question in the beginning of this argument?

14:12:26  5   I specifically asked you had punch biopsy reports been withheld and

14:12:31  6   you said yes.  That's why we've been talking about it for the last

14:12:34  7   20 minutes.

14:12:35  8            MR. COFFIN:  I think the difference is -- I don't know.

14:12:37  9   Let me not speculate for Dave.

14:12:39  10            THE COURT:  I don't either.  I mean, let's not start to

14:12:42  11   predict --

14:12:42  12            MS. BIERI:  And I guess we're confused because I thought

14:12:44  13   the representation was if we give this report, it's going to

14:12:47  14   identify the author's name.

14:12:48  15            THE COURT:  Yeah.  I mean, how are y'all telling me

14:12:50  16   what's in reports if they don't exist?  I mean, come on.

14:12:52  17            MR. COFFIN:  I honestly don't know the answer to that,

14:12:55  18   Judge.  I don't know.  I know we have -- go ahead, Dave.

14:12:58  19            MR. MICELI:  I know what a lab report is going to look

14:13:05  20   like, your Honor.  I think we all know a lab report is if we've

14:13:07  21   ever had our blood taken and received that report from our doctors.

14:13:09  22   It's going to have the patient's name on it, it's going to have the

14:13:13  23   facility's name on it, it's going to have the doctor's name on it,

14:13:15  24   the date the specimen was received, the date the specimen was

14:13:18  25   tested, and then it will have the findings.

14:13:21  1          THE COURT:  Well, it's going to have the findings --

14:13:22  2          MR. MICELI:  And I apologize --

14:13:23  3          THE COURT:  And as you said earlier, a blood report is

14:13:26  4   going to have all kinds of objective information in it, not like a

14:13:29  5   biopsy report.  No, they're definitely two different things is what

14:13:33  6   you told me a little while ago.  So we're going --  I'm --

14:13:35  7          MR. MICELI:  They are because --

14:13:36  8          THE COURT:  I am going to look at them and I am going to

14:13:39  9   give y'all an opportunity to explain to me why, based on my

14:13:44 10   original order, they should not be produced.  And I'll give you all

14:13:51 11   until whatever a week from Friday is.

14:13:55 12          MR. LEMMON:  The 17th.

14:13:57 13          THE COURT:  The 17th.  And give me something that's less

14:14:01 14   than ten pages.  Both sides.  The arguments have been made.  We're

14:14:05 15   not going to go back and forth.  I am going to have briefing on the

14:14:10 16   discoverability of these reports by next Friday, less than ten

14:14:17 17   pages, double spaced, and you all give me the documents along with

14:14:24 18   it.  And, again, I am not going to pull the trigger on anything

14:14:30 19   until we talk about it at the next status conference.  Okay?

14:14:33 20          MR. COFFIN:  Okay.

14:14:38 21          THE COURT:  All right.  That's all I've got.  So I wanted

14:14:47 22   to have our next conference on August 28th at either 10 o'clock or

14:15:00 23   3 o'clock.  And I offer those two times because oftentimes y'all

14:15:06 24   tell me that you're either getting in town, you have something else

14:15:10 25   with Judge Milazzo or --

14:15:14   1        MR. OOT:  Ten o'clock would probably be preferable.

14:15:18   2        THE COURT:  Ten o'clock.  Let's do ten o'clock.  We will

14:15:20   3   do ten o'clock on August 28th for our next status conference.

14:15:23   4        MR. COFFIN:  Thank you, your Honor.

14:15:24   5        THE COURT:  Thank you all.

14:15:25   6        MS. MENZIES:  Thank you, your Honor.

14:15:26   7        MS. BIERI:  Thank you, your Honor.

14:15:27   8        (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

9

10                           *  *  *  *  *  *

11

12                      REPORTER'S CERTIFICATE

13

14        I, Karen A. Ibos, CCR, Official Court Reporter, United

15   States District Court, Eastern District of Louisiana, do hereby

16   certify that the foregoing is a true and correct transcript, to the

17   best of my ability and understanding, from the record of the

18   proceedings in the above-entitled and numbered matter.

19

20

21            /s/ Karen A. Ibos

22            Karen A. Ibos, CCR, RPR, CRR, RMR

23            Official Court Reporter

24

25