UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re:  TAXOTERE (DOCETAXEL)　　　　　　　　MDL NUMBER: 2740
　　　　PRODUCTS LIABILITY
　　　　LITIGATION

　　　　　　　　　　　　　　　　　　　　　　　　SECTION: "H"(5)

　　　　　　　　　　　　　　　　　　　　　　　　THIS DOCUMENT RELATES TO
　　　　　　　　　　　　　　　　　　　　　　　　ALL CASES

## ORDER AND REASONS

In advance of the Court's regularly scheduled discovery status conference on June 13, 2018, Sanofi informed the Court by letter brief that it had learned that certain bellwether Plaintiffs had seen a Dr. Martin Claiborne for the purpose of that doctor performing a procedure known as a "punch biopsy" of the plaintiffs' scalps. (Rec. doc. 3915-1). Sanofi also stated that it had learned that at least one Plaintiff had been seen by Dr. John Thompson, a psychiatrist at Tulane University. (*Id.*). Sanofi claimed that the PSC had failed to disclose the identity of either doctor or the fact that any plaintiff had been "treated" by them.

The PSC responded in a letter brief, arguing that Sanofi's requested discovery on the work of either Dr. Claiborne or Dr. Thompson was "impermissible" because they had both been deemed "consulting experts" by the PSC, retained solely for the purpose of litigation. (*Id.* at pp. 14-15). The PSC also explained how Sanofi "discovered" the work of Dr. Claiborne:

> Sanofi's request for discovery on Dr. Claiborne is the fortuitous result of Dr. Claiborne joining a practice where a different dermatologist (now retired) treated Plaintiff Lisa Tuyes. Specifically, this retired dermatologist, Dr. Koretsky, appeared in a medical record received by Sanofi in the course of Sanofi's collection of medical records for Ms. Tuyes. Because Dr. Koretsky's name did not appear in Ms. Tuyes' PFS, Sanofi requested records from Dr. Koretsky at his last known New Orleans address. As luck would have it, the PSC's consulting

>expert, Dr. Claiborne, practices in the same group where Dr. Koretsky used to practice. In response to an initial request for records, Dr. Claiborne's staff forwarded records from all physicians that have seen Ms. Tuyes, regardless of [the] reason for the visit and including records related to Dr. Claiborne's punch biopsy of Ms. Tuyes. Sanofi now seeks additional discovery from Dr. Claiborne regarding his analysis and conclusions related to the punch biopsy.
>
>(*Id.*).

The Court entertained argument on the matter at the June 13, 2018 status conference, (Transcript, rec. doc. 3482) and issued the following order:

>Discovery Related to Work Done by Dr. Claiborne: Sanofi is entitled to documents related to the facts of Dr. Claiborne's examination of any Plaintiff, including when and where such examination occurred, Dr. Claiborne's observations of Plaintiffs, what samples or tissues were taken and from where, what was done with those samples and the objective results of any testing of those samples. Sanofi is not yet entitled to information pertaining to any opinions that Dr. Claiborne may have concerning testing of any samples taken by him and must await the period for expert discovery to conduct such discovery.
>
>(Rec. doc. 3074 at p. 2).

Notably, this order was not appealed.

Following the issuance of the June 13, 2018 order and in advance of a discovery status conference set for August 7, 2018, Sanofi advised the Court that the PSC had failed to produce the punch biopsy pathology reports, *i.e.*, "objective results of any testing of" the tissue samples taken by Dr. Claiborne. The PSC responded in its letter brief, explaining that it had made slides of the tissue taken from Plaintiffs' scalps and offering to provide photographs of those slides to Sanofi. The PSC argued that the tissue slides, not the pathology reports, were the only "objective results" of testing. The PSC also offered to provide Sanofi with actual tissue so that its expert(s) could conduct tests.

2

The Court once again discussed the issue with counsel for the parties at its August 7, 2018 status conference.  The Court began the discussion with a straightforward question:

> THE COURT:  Sanofi suggests in its submission that at a minimum they strongly believe that punch biopsy reports were not produced, <u>they exist but were not produced.  Mr. Miceli, is that right?</u>
>
> MR. MICELI:  <u>That is correct</u> and I can address that.
>
> (Rec. doc. 3861 at p. 36)(emphasis added).

The Court inquired further concerning the content and nature of these punch biopsy reports:

> THE COURT:  Are you telling me that your position is that punch biopsy reports are not objective results of tests?
>
> MR. MICELI:  Well, I am not saying that they don't include objective results, your Honor.  I am saying that "the" objective results of a biopsy is the slide and that <u>the retained expert who made those cuts produced the report to us of his findings.</u>  And his findings and conclusions are his opinions and your prior order specifically states that they don't get opinions.
>
> . . . .
>
> THE COURT:  Look, we've already been down this road.  I ordered objective test results to be produced.  <u>In my view biopsy reports are objective test results.</u>  And I have yet to be – nobody has told me why I am wrong.
>
> MR. MICELI:  Well, <u>concerning a report, a report is important</u>.  I am not going to disagree with you on that, your Honor.
>
> (*Id.* at pp. 37-38)(emphasis added).

This conversation concerning the "reports" and their contents went on for a number of minutes, involving three separate attorneys for the PSC.  Then, on the matter of these "reports," the conversation took an unexpected turn:

3

THE COURT:  All right. I want you all to -- so I want the PSC to produce the reports to me in camera, and I want -- let's see. What's today?

MR. COFFIN:  To be clear, I don't know this, Mr. Miceli might know this, I don't know that we actually have reports.  I don't know that.

MS. BIERI:  I thought Mr. Miceli said the reports –

THE COURT:  I asked him if punch biopsy reports have been withheld and he said yes.

MR. COFFIN:  Maybe I don't know that.

THE COURT:  I'm assuming that that meant yes.

MR. COFFIN:  Dave, can you clear that up?  Do we have reports from a pathologist I think is what Magistrate Judge North is asking.

MR. MICELI:  I was on mute, your Honor.  I am sitting here talking to myself.  Let me confirm whether we have written reports or whether we received oral reports from our pathologist, because right now I simply can't tell you.  And I am not in front of my computer, so I can let you know by the end of the day whether we have written reports.

THE COURT: Well, you know, why wasn't that the answer when I asked you that question in the beginning of this argument?  I specifically asked you had punch biopsy reports been withheld and you said yes.  That's why we've been talking about it for the last 20 minutes.

MR. COFFIN:  I think the difference is -- I don't know.  Let me not speculate for Dave.

THE COURT:  I don't either.  I mean, let's not start to predict –

MS. BIERI:  And I guess we're confused because I thought the representation was if we give this report, it's going to identify the author's name.

THE COURT:  Yeah. I mean, how are y'all telling me what's in reports if they don't exist?  I mean, come on.

4

>	MR. COFFIN: I honestly don't know the answer to that, Judge. I don't know.

(*Id.* at pp. 44-45).

The Court is troubled by what can fairly be described as a shell game regarding the very existence of pathology reports. After lengthy discussion of the <u>content</u> of the reports and why they were privileged <u>because</u> of that content, the moment the Court stated that it wanted them produced for *in camera* review, counsel – for the first time – suggested they may not actually exist at all. It is difficult to reconcile these competing narratives – how can counsel with the PSC make representations to the Court about what's in a report and in the next breath claim not to remember if they ever even saw the report or if it even exists?

In any event, coming out of the status conference, the Court issued a Minute Entry, which included the following two orders:

>	The PSC is to provide to the Court for *in camera* review the records of Dr. Thompson's meeting with any trial Plaintiff with whom he met.
>	. . . .
>	No later than Friday, August 18, 2018, the parties are to submit briefs on the issue whether the withheld punch biopsy reports resulting from Dr. Claiborne's scalp biopsies of certain Plaintiffs should be produced as "objective results of any testing" of samples taken by Dr. Claiborne.

(Rec. doc. 3709 at pp. 2-3).

The briefs were timely filed by the PSC and Sanofi but no documents have yet been produced for *in camera* review.

The question whether pathology reports existed at all was ultimately answered in the affirmative by the PSC in its brief. (Rec. doc. 3926-1 at p. 3). In that brief, the PSC states that "[t]he Court's attempt to separate 'opinions' from 'facts' – and its Order protecting opinions but not facts – misapprehends" Rule 26 of the Federal Rule of Civil Procedure. (*Id.* at p. 1).

5

In fact, it is the PSC that misapprehends that rule and the cases construing it on questions concerning the status of physicians as "experts."

Throughout its brief and the two status conferences that preceded it, counsel with the PSC insisted that these physicians – Dr. Claiborne, Dr. Thompson and the as-yet-unnamed pathologist who tested the Plaintiffs' tissue – could be lumped together and treated like any other "consulting expert" whose work product is <u>generally</u> not discoverable under Rule 26. The PSC's position ignores ample authority that stands for the now well-accepted notion that "it is possible for a witness to wear both two hats:  one as a specially employed expert in anticipation of litigation and one as an ordinary witness."  *Jones. v. Celebration Cruise Operator, Inc.*, No. 11-CV-61308, 2012 WL 1029469 at *3 (S.D. Fla. Mar. 26, 2012); *Caribbean I Owners' Ass'n, Inc. v. Great American Insurance Co. of New York*, No. 07-CV-0829, 2009 WL 499500 * 1-2 (S.D. Ala. Feb. 20, 2009)(quoting *Essex Builders Grp., Inc. v. Amerisure Ins.*, 235 F.R.D. 703 (M.D. Fla. 2006) and citing In re *Shell Oil Refinery*, 134 F.R.D. 148, 150 (E.D. La. 1990)).  "When that happens, some of the information that the expert holds may be protected, while other such information may be subject to disclosure."  *Id.*

This is <u>exactly</u> what the Court ordered in its June 13, 2018 Minute Entry.  The PSC is incorrect in its position that such a bifurcated treatment of witnesses is prohibited by Rule 26.

The PSC's second argument, advanced at the hearings but not in its recent filing, is that the subject pathology reports are not "objective results" or facts subject to the Court's June 13, 2018 order.  To the extent the PSC still advances this position, it is fatally undermined by the PSC's own memorandum.

6

Throughout its memorandum addressing whether the pathology reports should be produced as "objective results" of Dr. Claiborne's punch biopsies, the PSC concedes that those reports contain both facts and opinion, to wit:

- "Sanofi now seeks additional 'facts' – pathologist reports resulting from punch biopsies obtained by Dr. Claiborne, and psychological reports/ opinions prepared by another non-testifying expert, Dr. Thompson."
- "Upon reconsideration, the Court should protect from disclosure both *facts and opinions. . . .*"
- "Dr. Claiborne's biopsies and opinions are not medical treatment, but rather the gathering of facts and the formation of opinions in preparation for trial by a person not expected to be called as a witness. The same is true of Dr. Thompson: he was hired by counsel to prepare for trial; he does not treat Plaintiffs."

(*Id.* at pp. 2, 4).

The PSC's argument now is not that the pathology reports do not contains facts, *i.e.*, "objective results of testing," but that even those facts should be shielded from discovery. The Court has already determined, however, that facts gathered as a result of Dr. Claiborne's biopsies are discoverable. That determination was memorialized in the Court's June 13, 2018 Minute Entry, in which the PSC was ordered to produce the objective results of Dr. Claiborne's biopsies.

As noted above, this order was not objected to or appealed to the District Judge, yet the PSC is now, three months later, asking the Court to wholly reconsider and vacate its order calling for production of the pathology reports. The Court declines the invitation.

To suggest that the punch biopsies are not a form of medical treatment ignores reality and common sense. The medical records[1] of each Plaintiff who saw Dr. Claiborne demonstrate that they each provided medical histories prior to the procedure. Each signed a "Pathology Agreement Form" in which each agreed that she understood "that it is at the recommendation of my physician that I have the above stated lesions removed and sent to an outside lab for pathology testing" and that each had "been given the opportunity to either accept or deny this treatment." Each were given "Post Operative Instructions." Each required sutures and a follow-up visit to have those sutures removed.

It is simply not credible to suggest this was not a form of medical treatment.

The question, raised by the PSC, is whether such treatment should be protected from disclosure in all circumstances simply <u>because</u> it was provided for litigation purposes. The PSC adamantly argues this question should be answered in the affirmative. The Court believes that the law is not so inflexible in circumstances such as these. These circumstances include, for instance, allegations by just one of the Plaintiffs who saw Dr. Claiborne, Lisa Tuyes, that she has suffered "[p]ermanent, irreversible and disfiguring alopecia beginning after treatment with Taxotere (docetaxel) and continuing to present." (Rec. doc. 8 in case no. 16-15473). In the face of allegations of "permanent, irreversible" damage "continuing to the present," the data attached to scalp biopsies taken in the present are clearly discoverable in this Court's view.

---

[1] One cannot seriously debate whether the records of these Plaintiffs' visits to Dr. Claiborne that detail where and when the biopsies were taken should be considered "medical records." Indeed, as explained by the PSC in its June 12, 2018 letter to the Court, they were produced as the medical records of another provider in Dr. Claiborne's office. (Rec. doc. 3915-1 at p. 14).

The law and the facts compel a finding here that, based upon the totality of the circumstances presented, the objective or factual information derived from the Plaintiffs' punch biopsies is discoverable.

The Court has not yet seen the pathology reports (indeed, their very existence was only just confirmed by the PSC), so it does not know, for instance, whether they are addressed solely to counsel or whether they contain any recommendations for further treatment or new diagnoses, all of which could implicate Federal Rule of Civil Procedure 26(b)(4)(D)(ii)'s "exceptional circumstances" exception, which Sanofi argues should apply here. In an abundance of caution, because the Court has yet to see the reports, the Court will order their production for *in camera* review, to determine what, if anything, should be redacted. That production shall be made no later than September 5, 2018.

In addition, the Court reiterates here its order of August 7, 2018 in which it directed the PSC "to provide to the Court for *in camera* review the records of Dr. Thompson's meeting with any trial Plaintiff with whom he met." Those records have not yet been produced and they shall be produced no later than September 5, 2018.

New Orleans, Louisiana, this 28th day of August, 2018.

_____
MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE

9