1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3

4
   IN RE:  TAXOTERE (DOCETAXEL)      *
5          PRODUCTS LIABILITY        *   Docket No.: 16-MD-2740
           LITIGATION                *   Section "H(5)"
6                                    *   August 28, 2018
   *This Document Relates To All Cases* *  New Orleans, Louisiana
7   * * * * * * * * * * * * * * * * * *

8              TRANSCRIPT OF STATUS CONFERENCE
9      HEARD BEFORE THE HONORABLE MICHAEL B. NORTH
            UNITED STATES MAGISTRATE JUDGE
10

11
   APPEARANCES:
12
   For the Plaintiffs:          Barrios, Kingsdorf & Casteix, LLP
13                               BY:  DAWN BARRIOS, ESQ.
                                 BY:  ZACHARY WOOL, ESQ.
14                               701 Poydras Street
                                 Suite 3650
15                               New Orleans, Louisiana 70139

16

17                               Pendley, Baudin & Coffin, LLP
                                 BY:  CHRISTOPHER COFFIN, ESQ.
18                               1515 Poydras Street
                                 Suite 1400
19                               New Orleans, Louisiana 70112

20

21                               Gainsburgh, Benjamin, David,
                                   Meunier & Warshauer, LLC
22                               BY:  PALMER LAMBERT, ESQ.
                                 2800 Energy Centre
23                               1100 Poydras Street
                                 New Orleans, Louisiana 70163-2800
24

25

                      OFFICIAL TRANSCRIPT

1    APPEARANCES:

2    For Plaintiffs:              Bachus & Schanker, LLC
                                  BY:  DARIN SCHANKER, ESQ.
3                                 BY:  J. KYLE BACHUS, ESQ.
                                  1800 Wynkoop Street
4                                 Suite 700
                                  Denver, Colorado 80202
5

6
                                  Nicios & Nungesser
7                                 BY:  VAL P.EXNICIOS, ESQ.
                                  1515 Poydras Street
8                                 Suite 1400
                                  New Orleans, Louisiana 70112
9

10
                                  Gibbs Law Group, LLP
11                                BY:  KAREN BARTH MENZIES, ESQ.
                                  BY:  ANDRE MURA, ESQ.
12                                400 Continental Boulevard
                                  6th Floor
13                                El Segundo, California 90245

14

15                                Simmons Hanly Conroy
                                  BY: DAVID F. MICELI, ESQ.
16                                One Court Street
                                  Alton, Illinois 62002
17

18
                                  Martzell Bickford & Centola
19                                BY: LAWRENCE J. CENTOLA, ESQ.
                                  338 Lafayette Street
20                                New Orleans, Louisiana 70130

21

22                                Atkins & Markoff Law Firm
                                  BY: MR. DANIEL P. MARKOFF, ESQ.
23                                9211 Lake Hefner Parkway
                                  Suite 104
24                                Oklahoma City, Oklahoma 73120

25

OFFICIAL TRANSCRIPT

```
1    APPEARANCES:

2    For Plaintiffs:              Dall Dwyer
                                  BY:  ALEXANDER G. DWYER, ESQ.
3                                 440 Louisiana
                                  Suite 1901
4                                 Houston, Texas 77002

5

6    For sanofi S.A.:             Irwin Fritchie Urquhart
                                    & Moore, LLC
7                                 BY:  DOUGLAS J. MOORE, ESQ.
                                  BY:  KELLY BRILLEAUX, ESQ.
8                                 400 Poydras Street, Suite 2700
                                  New Orleans, Louisiana 70130
9

10                                Shook Hardy & Bacon
11                                BY:  HARLEY RATLIFF, ESQ.
                                  BY:  KELLY BIERI, ESQ.
12                                BY:  ADRIENNE BYARD, ESQ.
                                  2555 Grand Boulevard
13                                Kansas City, Missouri 64108

14

15                                Shook, Hardy & Bacon
                                  BY:  PATRICK OOT, ESQ.
16                                1155 F Street NW
                                  Suite 200
17                                Washington, DC 20004

18

19   For Hospira
     Worldwide, LLC:              Chaffe McCall
20                                BY:  JOHN F. OLINDE, ESQ.
                                  BY:  PETER J. ROTOLO, ESQ.
21                                2300 Energy Centre
                                  1100 Poydras Street
22                                New Orleans, Louisiana 70163

23

24

25
```

OFFICIAL TRANSCRIPT

```
 1   APPEARANCES:

 2   For Hospira
     Worldwide, LLC:
 3                              Dechert, LLP
                               BY:   SARA B. ROITMAN, ESQ.
 4                              35 West Wacker Drive
                               Suite 3400
 5                              Chicago, Illinois 60601

 6

 7   For Sandoz, A Novartis
     Division:
 8                              Greenburg Traurig
                               BY:   R. CLIFTON MERRELL, ESQ.
                               BY:   BETH TOBERMAN, ESQ.
 9                              Terminus 200
                               3333 Piedmont Road, NE
10                              Atlanta, Georgia 30305

11

12   For Actavis Pharma, Inc:   Ulmer & Berne, LLP
                               BY:   MICHAEL J. SUFFERN, ESQ.
13                              600 Vine Street
                               Suite 2800
14                              Cincinnati, Ohio 45202

15

16   For Accord Healthcare,
     Inc.:
17                              Tucker Ellis
                               BY:   JULIE A. CALLSEN, ESQ.
                               950 Main Avenue
18                              Suite 1100
                               Cleveland, Ohio 44113
19

20   For Sun Pharma Global,
21   Inc.:
                               Hinshaw & Culbertson
                               BY:   KATHLEEN E. KELLY, ESQ.
22                              28 State Street
                               24th Floor
23                              Boston, Massachusetts 02109

24

25
```

OFFICIAL TRANSCRIPT

1    APPEARANCES:

2    McKesson Corporation:          Morrison Foerster
                                    BY:   SUZY MARINKOVICH, ESQ.
3                                   12531 High Bluff Drive
                                    Suite 100
4                                   San Diego, California   92130-2040

5

6
     Official Court Reporter:       Jodi Simcox, RMR, FCRR
7                                   500 Poydras Street
                                    Room B-406
8                                   New Orleans, Louisiana 70130
                                    (504) 589-7780
9

10

11   Proceedings recorded by mechanical stenography, transcript

12   produced by computer.

13

14

15

16

17

18

19

20

21

22

23

24

25

OFFICIAL TRANSCRIPT

<u>**PROCEEDINGS**</u>

**(August 28, 2018)**

**\*\*\*\*\*\***

(COURT CALLED TO ORDER)

**THE COURT:**  All right.  Let's start with the PSC agenda items.  The first is this issue with the use of cameras in the depositions.  I don't know who thought it was a good idea to put another camera in the room.

**MR. RATLIFF:**  Your Honor, may I?

**THE COURT:**  Go ahead, Mr. Ratliff.  You want to say something?

**MR. RATLIFF:**  The mistake of asking for the second camera is 100 percent my fault, nobody else at my firm's fault on that issue.  That was something that my client had inquired about after the most recent deposition.  I instructed my paralegal to contact Golkow.  They offered it as a service.  I was familiar with the case law.  I did a review of CMO 9, probably too quick of a review of CMO 9, thought it to be a non-issue.

In retrospect, clearly, I should have notified the PSC in advance to the extent that they did have an objection so you, Your Honor, were not bothered in the course of a deposition with a dispute that need not have arisen.

**THE COURT:**  It didn't bother me that much.

OFFICIAL TRANSCRIPT

1     **MR. RATLIFF:**  Okay.  That said, we do think it's an

2     important issue.  We're not sure what the PSC's objection is,

3     or if they still object to that.

4           In terms of going forward, depositions, in part

5     because a lot of the witnesses that have been deposed and who

6     have been requested are former employees.  Their likelihood

7     that they will appear at trial I think is probably minimal.  So

8     having a second examiner provides a more realtime experience

9     for the jurors.

10          I think the other component of it is, and I'm

11    not saying we would do this for every deposition, but I do

12    think that having a camera on the examiner might curtail what I

13    see as conduct that has been detrimental to the examinations:

14    The eye rolling, the guffawing, the pointing, the theatrical

15    demonstrations.  Obviously, that should be covered under CMO 9

16    and the professional obligations that are set forth in CMO 9.

17    But as was done in the *Xarelto* order by Judge Fallon, we think

18    that's something that we should be entitled to do.  It's

19    certainly not prohibited by the Federal Rules of Civil

20    Procedure.

21          We have a deposition coming up on

22    September 26th of a corporate representative with counsel who

23    was at previous depositions.  So to the extent the PSC still

24    objects to this or has a problem with it -- we're not sure why

25    they would since the camera would be on the examiner of the

OFFICIAL TRANSCRIPT

1　defense attorney as well when they do their direct

2　examination -- we would like the opportunity to submit to you a

3　short letter brief on the issue this week.

4　　　　　　**THE COURT:**  What's the PSC's position on it?  I'm

5　only interested in this:  We've already got rules in place.

6　Okay?  Those rules were negotiated between the parties, and

7　they've been in place throughout the litigation.  So every

8　deposition that's been taken thus far has been taken with one

9　camera in the room on the witness or the exhibit that's used in

10　the deposition.

11　　　　　　This case is no different than any other case as

12　far as I'm concerned in terms of, you know, lawyers' body

13　language or what you've described as eye rolling and that.

14　I've never had two cameras in a deposition in my life.

15　Nobody's ever even raised it.  And the depositions that I've

16　sat through, that kind of thing happens.  I don't know why in

17　this case we need to start putting cameras on lawyers, unless

18　there is -- unless there is a legitimate reason to do it.

19　　　　　　And I know that Judge Fallon in other cases and

20　judges in other cases have done it where the parties know that

21　a particular witness is not going to be available for trial.  I

22　think in those circumstances, that's something that the PSC and

23　sanofi could talk about and discuss and, you know, make an

24　exception to the status quo in those sorts of cases.

25　　　　　　I don't know that the PSC necessarily would

1    disagree with that if you all are trying to put together a

2    better presentation for a jury for a witness that you know is

3    not going to testify live.  I think that makes sense.  I don't

4    see any cause to upset the protocol that we've been using

5    throughout the litigation at this point, though.

6                 I'm curious, Mr. Coffin, do you all have a

7    problem with talking about, perhaps, using that approach for

8    witnesses going forward that you know are not going to be here?

9         MR. COFFIN:  Well, Your Honor -- Chris Coffin on

10   behalf of the plaintiffs -- we certainly can talk about it.  We

11   do have an objection to it.  The concern is then we would like

12   to have an additional camera because of the issues that we

13   see -- probably won't surprise you -- as inappropriate on the

14   defense counsel's side who are defending the depositions.

15                It's really -- I think that's going to bog us

16   down.

17        THE COURT:  Oh, it's not going to bog us down because

18   it's not going to happen.

19        MR. COFFIN:  Well, I'm with you on that, which is why

20   we object to it.  So I don't think we should go down that road.

21   However, to answer your question, sure, we're willing to talk

22   about it.  I just don't think it's productive, Your Honor.

23        THE COURT:  I think there's value -- I think there's

24   potential value in it in terms of presentation to the jury, and

25   I think that that's something that's worth talking about for

1    you all.  I mean, because it -- I mean, it might cut both ways.
2    I mean, you may have witnesses -- both of you all could have
3    witnesses who are unavailable for trial.
4              So all I'm going to do at this point, I'm not
5    going to entertain additional briefing on the matter because I
6    think it's settled in terms of the protocol that you all, as I
7    said, negotiated and that the Court signed already.  And I
8    don't need a camera to police the conduct of lawyers in
9    depositions.
10             **MR. RATLIFF:**  Understood.
11             **THE COURT:**  Okay.
12             **MR. RATLIFF:**  Thank you.
13             **THE COURT:**  I'll encourage you all to discuss it,
14   though, if you've got legitimate concerns about the quality of
15   the presentation of the testimony at trial.  Okay?
16             All right.  The issue with the TAX311
17   information.  It sounds like some of that's been produced since
18   I got the letter.
19             **MR. MICELI:**  Some of it's produced, and produced
20   without objection, Your Honor.  David Miceli for the PSC.  Our
21   only concern is, you know, we put two lines in a letter and we
22   got a page of objections about science day.  There wasn't any
23   objection to producing it.  The fact that evidence was
24   mentioned at science day doesn't shield it from discovery.
25   This is the TAX311 data.

1        **THE COURT:**  All right.  Well, let me just stop you.

2        **MR. MICELI:**  Sure.

3        **THE COURT:**  I'm not really interested in the science

4    day part because that's not my order and it's not my protocol.

5    And what you just said is true.

6              On the other hand, you all have produced the

7    information.  Sanofi's produced the information.  You all have

8    received it.  I assume you have not had an opportunity to fully

9    digest it.  I mean, I don't know that there's anything for us

10   to discuss on the matter today.

11       **MR. MICELI:**  I think you're right, Your Honor.  I

12   don't think any of us forget the pains we went through on the

13   clinical trial data previously.  We haven't been able to fully

14   digest it; but what we have done, it appears that it's not in

15   the same format as what we previously received ultimately.  So

16   we'll probably be addressing it at a later hearing.  But I

17   don't think that because it's been produced and produced

18   without objection --

19       **THE COURT:**  Well, address it with them first --

20       **MR. MICELI:**  We will.

21       **THE COURT:**  -- before we address it in a hearing.  I

22   mean, if you're talking about format, that's something that you

23   all ought to be able to talk about.

24       **MR. MICELI:**  I mean, it's content, not format.  But

25   we'll discuss it with them, Your Honor.

1          Thank you.

2              THE COURT:  All right.

3              MR. RATLIFF:  Your Honor, may I address that just

4     briefly?

5              THE COURT:  Sure.

6              MR. RATLIFF:  We have produced over 200,000 pages of

7     TAX311 data.  It has been used scantly in depositions, if at

8     all.  So I guess our concern is, one of the reasons we had

9     science day was to give Judge Milazzo sort of an open,

10    freewheeling, without prejudice presentation of the various

11    issues, knowing that they wouldn't be used against us later.

12             Our expert at that science day probably talked

13    about TAX311 for about two or three minutes on efficacy.  It's

14    a study about the efficacy of the drug, which is certainly not

15    being challenged in this particular litigation.  So our concern

16    was when the basis for requesting yet more TAX311 data was on

17    science day, when the data we've given to them before has not

18    really been used in depositions, we don't want to go down

19    another rabbit hole where this becomes a dispute for the sake

20    of having a dispute.

21             And, obviously, if they review and they think

22    they need more, we're happy to address it.  But at a certain

23    point --

24             THE COURT:  Well, if you think that it should come to

25    an end, then I'll have to address it at that point.

1       **MR. RATLIFF:**  Thank you, Your Honor.

2       **THE COURT:**  Let them -- let them, you know, look at

3   what you've given them.  And then you all are going to discuss

4   what it is, whether there's more, whether there should be more.

5   You made arguments about relevance in your letter brief, which

6   is fine.  I'm not afraid to address those issues when it's

7   ripe, but I don't think that -- I don't think that the issue is

8   ripe.

9       **MR. MICELI:**  Okay.

10      **MR. RATLIFF:**  I understand, Your Honor.  Thank you.

11      **THE COURT:**  All right.  Moving on to the sanofi

12  agenda items.  Let me first address, the PSC raised in its

13  letter that at the meet and confer session that is mandated in

14  advance of these status conferences, the PSC advises me that

15  none of the issues that were raised in sanofi's letter or in

16  the agenda today were discussed at the most recent meeting.

17      **MR. RATLIFF:**  May I address that, Your Honor?

18      **THE COURT:**  Yes.

19      **MR. RATLIFF:**  Your Honor, every month we have a

20  court-ordered meet and confer that we do, I think, pursuant to

21  maybe CMO No. 5.  That happens like clockwork.  The reality,

22  though, is that is not the only meet and confer that we have

23  with the PSC or individual trial counsel.  That goes on almost

24  on a weekly basis or a biweekly basis.

25      **THE COURT:**  Right.

1    **MR. RATLIFF:**  So for the two issues that we raised,

2    one, the authorization to receive Dr. Gahan's psych records.

3    We had sent a communication to Mr. Schanker on August 17th

4    saying, "We need more than this.  We need an updated

5    authorization because the one that we have is outdated, and we

6    think the law you're citing is incorrect."  We got no response.

7            On August 21st, we sent him another e-mail

8    saying, "We still have not received an authorization.  If we

9    don't hear from you, we will need to raise this with the

10   Court."  We received no response.

11           So we address it in, what, two or three

12   paragraphs, and then we get a response finally back from them

13   saying, "Here is this whole series of events that occurred, and

14   here's what's going on, and this is not an issue.  And you'll

15   get the records, and the authorizations you have are fine."

16   Even though they are invalid authorizations at this point.

17           And so all that would have taken was for

18   Dr. Gahan's counsel to call us or respond to us and say, "We're

19   looking into it.  We get what you're saying about the Colorado

20   law.  We'll provide you a new authorization."

21           **THE COURT:**  And I get that.  But what I'm being told

22   by Dr. Gahan's counsel is that they sent -- whatever records

23   they received, the records were sent in early August, and they

24   didn't get a response from you all until ten days later.

25           **MR. RATLIFF:**  Well, we got a letter on August 6th,

OFFICIAL TRANSCRIPT

1  and then we responded on August 17th --

2           THE COURT:  On the 17th.

3           MR. RATLIFF:  -- and, again, on August 21st.  And,

4  Your Honor --

5           THE COURT:  It looked like it was a pretty convoluted

6  path that they had to travel to figure out why the production

7  looked like it did.

8           MR. RATLIFF:  And that was the first we had ever

9  heard of it was in -- was in their letter brief as opposed to

10  one of their counsel -- Dr. Gahan's counsel contacting us or

11  responding to -- I mean, it was a very basic e-mail that we

12  sent them just saying, "Can you send us an authorization?"  And

13  the reality is, is Dr. Gahan is in Phase I, Trial 2 discovery.

14          THE COURT:  Well, and there was a problem in Colorado

15  with her treating physician's view of what was discoverable or

16  what was proper under the law.  Has it been resolved?

17          MR. RATLIFF:  We would like to get an updated

18  authorization.

19          THE COURT:  Let me hear from her counsel.  Because, I

20  mean, I read your letter to say -- or the excerpt -- your

21  excerpt that went into the PSC's letter to basically say this

22  is all going to be sorted out and they're going to get the

23  report that they want.

24          MR. SCHANKER:  Yes, Your Honor.  Darin Schanker on

25  behalf of Dr. Gahan.  Good morning.  And, yes, you read that

1  correctly.

2              As it's been represented to us, once -- and

3  you're right, it was convoluted.  There was confusion about,

4  wait a second, the psychologist thought that the release wasn't

5  proper to allow this, and then was using doctor privilege that

6  she was asserting and gave us a summary.  We provided that.

7              Defense counsel then indicated -- and I think

8  that's correct -- on the 17th that that was not sufficient and

9  that they had a different interpretation of Colorado law.  We

10  began trying to get the doctor to give us the records.  She

11  said she didn't have a proper release to do that.  And then we

12  found out there were two releases, blah, blah.  I won't go into

13  any more detail.

14              But the bottom line to answer your question is,

15  I believe it's been resolved.  Either they have the records or

16  Veritext, which is the company, the middle man, has the

17  records.  The doctor assured us that she would be providing

18  them last Friday as we attempted to educate her on what we

19  believe was, you know, the exceptions required under Colorado

20  law, et cetera.

21              So the bottom line is, it should be resolved.

22  The records have already been received or should be on their

23  way and be received shortly.

24          **THE COURT:**  All right.  If it turns out to be a

25  problem, just let me know, but it sounds like it's no longer an

OFFICIAL TRANSCRIPT

1  issue.

2         **MR. RATLIFF:**  Yeah.  And, Your Honor, all we really

3  wanted was a valid authorization since the one we had had

4  expired so we can assure that the records we get, we don't get

5  later an objection saying, "Well, we didn't give you all the

6  records because you didn't have a valid authorization."  We're

7  just trying to do our -- button everything up.

8         **THE COURT:**  If you don't get all the records, let me

9  know.  It doesn't sound like we need another authorization.

10         **MR. SCHANKER:**  Let us know if you don't get all the

11  records or you don't think you have them all.

12         **MR. RATLIFF:**  So but on the issue of meeting and

13  conferring, we can only meet and confer when people respond to

14  us.

15         **THE COURT:**  I'm just going to say this because

16  there's a lot of that in the papers for this conference, that

17  some of these issues, the format of the privilege log, that

18  we'll get to that, that a lot of these issues haven't, I guess,

19  been the subject of a meet and confer on that -- of that

20  particular issue with the -- between the PSC and counsel for

21  sanofi.

22         I'm just going to say one more time that you all

23  should not be bringing issues to me or to Judge Milazzo or to

24  any of us unless you have exhausted all reasonable possibility

25  of resolving them in a meaningful conference.  Okay?  I'm just

1   going to remind you all of that.

2                   Yes?

3                   **MS. MENZIES:**  Thank you, Your Honor.  Karen Menzies

4   on behalf of the plaintiffs.

5                   And to respond to the more global issue that the

6   PSC was raising as a concern on that front, to remind the Court

7   that the CMO that you entered on our behalf, which was

8   negotiated.  Then, you remember, we couldn't come to an

9   agreement, and you entered CMO 5.  It was the general --

10  general discovery order for the sanofi defendants.

11                  The applicability of that order goes to -- in

12  paragraph one, it explains, the following procedures and

13  schedules will govern general discovery against sanofi, and it

14  names all the entities.  And then we go through the

15  conferences, as you've said.

16                  And every month we have submitted to them by

17  noon the day before our conference or before our list of

18  topics.  I got a list of topics from defendants one time on a

19  Sunday night before the conference.  I haven't ever gotten the

20  others.

21                  But our larger concern on this, Your Honor, is

22  that, and I don't have to remind you about this either, but as

23  of April 2018, when we first started seeing the Taxotears issue

24  and the Google group, 37 plaintiffs -- it involved 37 specific

25  plaintiffs, only one of whom was a potential bellwether trial

1  plaintiff, and we have spent the last six out of seven hearings

2  arguing about those.  The amount of briefing you've had to deal

3  with that --

4       THE COURT:  I'm going to address that issue

5  separately at the end of our status conference.

6       MS. MENZIES:  And that's one of the reasons we

7  brought it up.  We were trying to follow the conferences and

8  the briefing issues, but, inevitably, we'll end up with a fire

9  drill over a weekend trying to address issues that relate to

10  case specific non-bellwether plaintiffs, trying to contact

11  their personal counsel to see if they can handle stuff.  It's

12  really been difficult for us, and we felt we really had to

13  raise that to your attention.

14       THE COURT:  Well, I'm going to address that before we

15  finish.

16       MS. MENZIES:  Thank you, Your Honor.

17       MR. RATLIFF:  Your Honor, may I address that briefly?

18       THE COURT:  Yes.

19       MR. RATLIFF:  We do have meet and confers with the

20  PSC on PSC issues, but we still have to be able to have meet

21  and confers with individual counsel, like Dr. Gahan's counsel.

22       THE COURT:  I understand that.

23       MR. RATLIFF:  So just because we do not submit those

24  issues to Ms. Menzies for the one meet and confer that's

25  ordered as opposed to all the other meet and confers, I don't

OFFICIAL TRANSCRIPT

1    think that makes these issues not ripe.  I mean, we try to meet

2    and confer with the individual counsel.  And in Dr. Gahan's

3    case, that's a bellwether case, and so --

4            THE COURT:  Well, you need to keep them in the loop

5    as to what's going on and what you intend to raise at these

6    status conferences because those lawyers that you're talking to

7    in Colorado and California aren't here, and the lawyers, the

8    PSC, who are here are the ones who are charged with having to

9    respond to those issues here in New Orleans in this courtroom.

10   So they need to be apprised of whatever it is that you're

11   working on that you're going to raise with me.  They need to be

12   in the loop.

13           MR. RATLIFF:  And on that exact issue, Dr. Gahan's

14   counsel is a member of the PSC.

15           THE COURT:  I get that, but that's one issue.  That's

16   one plaintiff.  There is -- there is an ongoing, I guess,

17   complaint from the PSC that they are hearing things for the

18   first time in the submissions that show up before these status

19   conferences.

20                And I perceive that part of the problem is just

21   what Ms. Menzies said, that there are, as Mr. Oot often says,

22   inventory-wide issues, and issues with plaintiffs who are not

23   trial plaintiffs that you all may be trying to resolve with

24   their lawyers, but the PSC isn't looped in on them.  But

25   they've got to come in here and address those issues in a

1  status conference, and you haven't talked about it with them.

2  That needs to happen.

3         **MR. RATLIFF:**  We will make sure that happens.  I

4  think the one frustration that we've had, starting back when we

5  were originally trying to schedule bellwether depositions, is

6  we send communications, we send communications, we make phone

7  calls, we never hear back from anyone.  And so -- and then when

8  we do raise the issue, we get the complaint, "Well, you didn't

9  meet and confer on it."  Well, we can't meet and confer with

10  people who will not meet and confer with us.

11         **THE COURT:**  I agree with you.

12         **MR. RATLIFF:**  It takes two to tango on this.

13         **THE COURT:**  I don't know that I've really seen that

14  issue before.  If you can't get somebody to respond to you,

15  then you can let me know.

16         **MR. RATLIFF:**  Would you rather us do that by a phone

17  call or would you rather us raise it on these --

18         **THE COURT:**  I want you to raise it with the PSC.

19         **MR. RATLIFF:**  All right.

20         **THE COURT:**  Maybe they will help you.  They should if

21  they can.  And then maybe it doesn't become an issue that we

22  have to talk about here.

23         **MR. RATLIFF:**  Understood, Your Honor.  Thank you.

24         **THE COURT:**  That's what I'm saying.  If you're having

25  that problem, then it's a problem.  If you're going to bring it

1   to me in a status conference, you need to bring it to the

2   committee first so that you all can try to work together to

3   solve it before it comes here.  All right.

4           **MR. RATLIFF:**  Understood, Your Honor.

5           **THE COURT:**  Even if it's as simple as, "This lawyer

6   wouldn't respond to my phone calls and e-mails."

7           **MR. RATLIFF:**  Well, and I think on the point that you

8   just referenced, I don't want to jump ahead, but on the issue

9   of privilege logs from plaintiffs' counsel, that was one of the

10  issues that we raised.

11          In July of this year-- was it in July or was it

12  June?  It was in July -- we sent a letter to Ms. Barrios, the

13  PSC, saying, "Here are the issues we're having not getting

14  Rule 26 privilege logs from plaintiffs' counsel globally.  But

15  also the ones that we have received, we're not getting

16  responses from them."  We also sent responses to the individual

17  counsel.  We received no response from Ms. Barrios as we tried

18  to get her assistance to resolve this particular issue.

19          So we kind of get to a point, Your Honor, where

20  we feel like -- that there is an unnecessary delay built into

21  this process by not responding to our requests.  So --

22          **THE COURT:**  Well, not responding to correspondence is

23  a problem.  Okay?  And I don't know why it happens, and I'm

24  sure it happens in both directions.  But that's -- again,

25  that's why you all have a requirement to have simultaneous

1   communication in your meet and confer, so that you can actually
2   speak to each other.

3                Because there's nowhere to run and hide when
4   you're actually together or on the phone as to why someone
5   hasn't responded to an e-mail, and that's why you're required
6   to communicate that way, to cut through those problems.  I
7   mean, maybe you've been having those problems, but that's how
8   you address them and get to the bottom of why, "Why isn't this
9   other lawyer responding to the three letters I sent and the
10  phone messages that go unanswered?"

11           **MR. RATLIFF:**  Understood, Your Honor.  We'll make
12  sure that that is corrected going forward in additional -- the
13  court-ordered meet and confers, and, obviously, all of the
14  other meet and confers that we have along the process.

15           **THE COURT:**  I just don't want, unless there is some
16  exceptional situation as I think was probably the case with
17  this camera issue in the deposition that happened after you all
18  had your meeting, absent something like that, no one should be
19  surprised when they get each other's submission letter, the
20  letters that you all are submitting to me.

21           **MR. RATLIFF:**  And I guess, Your Honor, on our behalf,
22  we didn't think any of the issues that we were raising would
23  come as any sort of surprise given the volume of communications
24  that we've had with the PSC, the PLC, and individual bellwether
25  plaintiffs' counsel of which are attached to most of our

1  exhibits.

2          THE COURT:  I know that you've corresponded with

3  individual counsel, and I know that you've corresponded with

4  Ms. Barrios because I read the letter.  And it wasn't an

5  attachment; it was part of the letter with the examples on it

6  and the issues with the privilege log, but you all haven't

7  talked about any of that.  That's what I'm talking about.

8          MR. RATLIFF:  Okay.  Well, we will be sure that they

9  contact us so we can have individual meet and confers.

10          THE COURT:  I'm guessing that Ms. Barrios is having a

11  hard time getting answers to some of those questions from the

12  same lawyers that you've had a hard time getting answers from.

13  And until you all sit down and discuss the matter, you're not

14  going to know that.  You're going to fire off a letter to me

15  that complains that nobody's doing what they're supposed to,

16  and you haven't talked about it yet.  That's what I'm --

17          MR. RATLIFF:  Okay.  We just want to make sure that

18  the obligations go both ways in terms of if we raise an issue,

19  someone actually gets back to us.

20          THE COURT:  I expect -- the obligation is on

21  everyone.

22          MR. RATLIFF:  Okay.  Thank you.

23          THE COURT:  My expectations are that I don't care

24  who's raising an issue, you all will have spoken about it

25  before it comes here.  All right.

1          **MR. RATLIFF:**  Understood, Your Honor.

2          **THE COURT:**  I don't think I can be any clearer than

3     that.

4          **MR. RATLIFF:**  Crystal.

5          **THE COURT:**  Okay.  And I'm going to talk about the

6     privilege log and some of the other issues that Ms. Menzies

7     raised in a minute.  But, first, the last issue before that are

8     this -- the issue of these client intake questionnaires.  Now,

9     I have a hard time envisioning how something called a "client

10    intake questionnaire" is not privileged under the law of

11    whatever state you happen to be in where it's executed.

12         **MR. RATLIFF:**  So, Your Honor, what we have -- we have

13    read their position paper on that, or their reply.  All we have

14    to go on is what we've seen in the communications, which is

15    intake questionnaires that disclaim that there's an

16    attorney/client relationship.

17              And so what we have been asking them, starting

18    back, I believe, in May and over the series of multiple

19    correspondence, which were attached as exhibits, is if you're

20    going to make a claim that those are privileged -- and we think

21    the case law is in favor of us.  They've obviously cited case

22    law they think is in favor of them -- then at least give us the

23    foundational elements for your privilege claim, whether it be,

24    here are the clients who signed these, here's when they signed

25    them, here's when they became clients, or give us a privilege

 1  log so we can test the veracity of the their privilege claim,

 2  particularly as they say, well, it applies to all different

 3  types of state law.

 4              So on one hand, they're saying, well, these are

 5  all privileged, we don't have to give them to you kind of

 6  because we say so, ipse dixit.  All we're saying is give us

 7  something.  If you're not going to give us the forms, if that's

 8  your assertion --

 9          **THE COURT:**  You're talking about plaintiffs in the --

10  you're talking about litigants in the case that are

11  represented, and you're asking for communications with the

12  lawyers who represent them about their case before they --

13  before they filed suit.

14          **MR. RATLIFF:**  Before they were engaged as a client.

15  This was a vetting form.

16          **THE COURT:**  I don't guess too many of you all --

17  maybe you all weren't plaintiffs lawyers, and you've never had

18  that sort of interaction with a potential client before, but

19  the disclaimer is not at all uncommon when you're in that

20  stage, and I don't -- I mean, I think you all quoted that.  I

21  don't know that I got a copy of the Weinberger document.

22          **MR. RATLIFF:**  It was one of our -- yeah.  It was one

23  of our exhibits, Your Honor.

24          **THE COURT:**  It was?

25          **MR. RATLIFF:**  Yeah.

1       **THE COURT:**  Okay.  Because I saw the Bachus &

2  Schanker one which has completely different language.  And I

3  know that Weinberger was a lawyer and he wound up working at

4  Bachus & Schanker, and now he's retired.  I just -- I cannot

5  envision that those are not privileged communications.  That is

6  information shared with a lawyer for the purpose of procuring

7  representation.  And I don't know what -- I don't know the

8  attorney/client privilege law of every state in the country,

9  but I'm going to have to if we're going to go down this path.

10      **MR. RATLIFF:**  Well, and I think, Your Honor, if we

11  were able to get a privilege log of these types of

12  communications that are made prior to representation that are

13  part of a vetting process, which case law has said those are

14  not privileged communications, if we were able to get a

15  privilege log, that would not be Your Honor having to vet the

16  privilege analysis.  That would be up to the defendants to sort

17  through that and determine whether there was a privilege -- a

18  valid privilege claim or there was not a valid privilege claim.

19  That's all we're asking for.

20      **THE COURT:**  Where have you all -- under what request

21  or requirement, whether it's in the plaintiffs' fact sheets or

22  somewhere else, where is the production of that information

23  triggered?  What request have you sent?  What requirement is

24  there in any of the orders in this case that that information

25  is discoverable?

OFFICIAL TRANSCRIPT

1       **MR. RATLIFF:**  We think the factual information that's

2   set forth in there is certainly discoverable as part of the

3   plaintiff fact sheet.  So maybe it's not the form itself, but

4   it's the information, the factual information --

5           **THE COURT:**  But you all are asking for the form.  You

6   all asked -- this is a document request because you want it

7   listed on a privilege log.  It's not facts known to these

8   people.  You want documents.  Where is the requirement or the

9   request that they be produced?

10          **MR. RATLIFF:**  I think it's responsive to the

11  plaintiff fact sheet, Your Honor.

12          **THE COURT:**  Client intake questionnaires?  I read

13  through the plaintiffs' fact sheet.  I didn't see anywhere

14  where that information is, as a document, to be produced.  I

15  went through every document and requirement and it's not in

16  there.  Nothing even approximating that is called for in the

17  plaintiff fact sheet in my view.

18          **MR. RATLIFF:**  Understood, Your Honor.

19          **THE COURT:**  All right.  I think it's privileged

20  information to begin with.  I can't find where it's required to

21  be produced, so I'm not going to make them list that -- list

22  all of the information in a privilege log.

23          **MR. RATLIFF:**  Okay.  Thank you, Your Honor.

24          **THE COURT:**  All right.  Okay.  The more general issue

25  of the privilege logs that we touched upon earlier I think is

1   part and parcel of a larger problem that also includes these --
2   the perceived deficiencies in ESI productions of the nine trial
3   plaintiffs, and we've been talking about these issues now for a
4   number of conferences.
5            It has been a concern of mine as to how we
6   handle those deficiencies.  And I think that the PSC in its
7   letter, and what Ms. Menzies just said at the podium, I agree
8   with, that we have begun to spend what I think is a
9   disproportionate amount of time trying to address deficiencies
10  in non-trial plaintiffs' ESI primarily.
11           And so -- and what we don't have, in my view, is
12  a suitable approach -- or suitable protocol for dealing with
13  those problems, and I'm only talking about non-trial plaintiffs
14  right now, which are most of the people in the MDL.
15           I want you all -- I want you all to discuss a
16  solution to this problem before I just sit down perhaps with
17  Judge Milazzo and come up with something.  I want the PSC and
18  sanofi and perhaps the other defendants who are going to be
19  involved who maybe have the same issues, I want you all to talk
20  about a deficiency process for non-trial plaintiffs.
21           That's going to take in privilege log, that's
22  going to take in shortcomings in ESI, non-production of ESI.
23  You've got people that have said they don't have any, and you
24  know that they do because you've seen it in another plaintiff's
25  production.  I know that there are issues there.

1            And I guess from a technical standpoint, at some

2   point sanofi and the other defendants are entitled to traverse

3   those productions and to ensure that they've got the

4   information that they're entitled to according to the various

5   orders that have been issued in the case.  What I don't want is

6   for the parties' preparation for these bellwether trials, for

7   the Court's preparation for these bellwether trials, to be

8   overwhelmed by non-trial plaintiff discovery issues.

9            So I'm going to direct you all to discuss, I'll

10  call it, a protocol for handling these non-trial plaintiff

11  discovery issues that don't include us talking about them every

12  two weeks when we should be talking about and working toward

13  the bellwether trials that are scheduled.

14       **MR. RATLIFF:**  Your Honor, we are happy to do that.

15  We would like to have some sort of process in place that is --

16  that streamlines the deficiency process.  And I think our

17  concern has always been there are some things that are just not

18  clear-cut deficiencies that maybe are more nuanced.

19            Take, for example, the issue of Taxotears,

20  that's not something that seems readily available to be put on

21  a particular list.  And so we just never -- we don't want to

22  foreclose the idea that there may be certain issues that are

23  nuanced or holistic in nature that we would still have the

24  opportunity to come to you as opposed to it just being put on a

25  form because our interest is not necessarily putting

1  deficiencies on a list.  Our interest -- I mean, sure that may

2  be helpful to us down the road in terms of getting dismissals.

3         Our interest is more in getting the production

4  of these documents so we can vet these claims and we can vet

5  this inventory and we can understand what it is.  Because at

6  some point I assume the plaintiffs will be wanting a pot of

7  money from sanofi.  And there is not going to be a pot of money

8  where we don't have information on the ten thousand plaintiffs

9  that are coming to us.

10         So we would love to work on a process of dealing

11  with these issues because we don't necessarily want to be

12  briefing them every two weeks either.

13         **THE COURT:**  No.  And it's got to be a process that

14  recognizes that it is a lower priority than many of the other

15  tasks that have to be completed.  It's not to say that it is a

16  nonpriority, but it has -- it's got to find its place in the

17  continuum where it belongs, not at the top of the list where

18  it's been for the last two or three months every time we come

19  and talk about discovery issues.

20         **MR. RATLIFF:**  Well, and prior to today, and prior to

21  I think maybe our last meeting with Judge Milazzo is --

22  certainly for the fact sheets there was a process in place.

23  Judge Milazzo saw some issues that she wanted to have that

24  streamlined.  With PTO 71A, when it was entered by Judge

25  Engelhardt, there was no -- there were no deficiency processes

1   set up in place.

2           **THE COURT:**  Well, that's what we're talking about

3   now.  So we're going to have to -- we're going to treat trial

4   plaintiffs and non-trial plaintiffs differently.  So -- and

5   right now I'm talking about non-trial plaintiffs, the vast

6   majority of the people.

7               And, again, all I'm doing is I'm giving you all

8   the guidance when you sit down and try to come up with a

9   process to keep in mind that I can't let it overwhelm all the

10  other work that needs to be done primarily by the lawyers in

11  the case.

12          **MR. RATLIFF:**  Right, and we understand that, Your

13  Honor.  I think where we have some concern in this process is

14  that the PSC is conducting core discovery against sanofi on

15  behalf of not one or two plaintiffs, but on behalf of the

16  entirety of the ten thousand plaintiffs.  So we don't want to

17  be stuck in a situation where our corresponding discovery is

18  simply limited to a small, small sliver of the bellwether

19  plaintiffs when we need to also be learning about what is the

20  nature of the claims of the other 9,000.

21          **THE COURT:**  I'm not saying you're not entitled to all

22  of that.  It's how do you identify deficiencies and how do we

23  address them.  That's the task that I'm going to give you all.

24          **MR. RATLIFF:**  We will add that to agenda one for the

25  next meet and confer with the PSC.

1      **THE COURT:**  And the next time we meet -- the next

2  time we meet, I don't expect the finished product, but we will

3  talk about where things stand and whether you all have been

4  able to -- whether you think you'll be able to come to any

5  agreement, and we'll go from there.  Okay?

6      **MR. RATLIFF:**  Well, and I do think -- it may not be

7  by the next time we meet, but it is important to sanofi, and I

8  assume the 505 defendants, that it's an issue that doesn't

9  linger on too long so we can get this process started.  Because

10  until there are deadlines -- everyone in this courtroom has

11  said deadlines make action.

12      **THE COURT:**  But I want it to be meaningful.

13      **MR. RATLIFF:**  We agree.  We agree.

14      **THE COURT:**  So I'm not going to jam a deadline down

15  your throats because I am just putting this on everybody's

16  plate for the first time.

17      **MR. RATLIFF:**  Yes.

18      **THE COURT:**  Now, as to the trial plaintiffs, I think

19  that -- and let me say this, let me go back and say this about

20  the non-trial plaintiffs.  In terms of comparing the 71A

21  deficiencies to what Judge Milazzo does with the plaintiff fact

22  sheet deficiencies and putting them on a list to show cause,

23  it's going to take more than a deficiency in an ESI production

24  to put somebody on a list to have their case dismissed, and

25  that you all need to be mindful of as well.

1    ESI is a part of -- it's essentially a part of

2  what is required by the plaintiffs that is best represented in

3  whole by the plaintiff fact sheets.  So I don't -- I don't

4  consider the two to be the same.  So the mere fact that you

5  think somebody didn't produce all their e-mails is not going to

6  put them necessarily on a show cause list to have their case

7  dismissed.

8    We've got to figure out, like we would in any

9  other case, we're not getting Rule 37 motions to dismiss a

10  personal injury plaintiff's case because they didn't produce

11  some documents in discovery.  So just keep that in mind.

12    **MR. RATLIFF:**  We understand, Your Honor.  And we

13  agree.  We do see 71A as complementary --

14    **THE COURT:**  It is complementary.

15    **MR. RATLIFF:**  -- of the fact sheet and was entered

16  because of deficiencies with the fact sheets.

17    **THE COURT:**  Right.

18    **MR. RATLIFF:**  So we will certainly work with the PSC

19  to come up with a procedure that -- like I said, our interest

20  is getting the information more than putting people on a list.

21    **THE COURT:**  And because it's complementary, I guess

22  that's why it didn't have its own deficiency process, but I

23  think it's clear that we need one.

24    **MR. RATLIFF:**  Agreed.

25    **THE COURT:**  And we need to go through that before we

1  start considering moving somebody onto a show cause list

2  because of -- now, if somebody just is refusing to participate

3  in discovery, then that's a different issue.  So just keep

4  those ideas in mind when you all are meeting.

5         As to the -- I didn't think what I just said was

6  that controversially.

7         MR. OLINDE:  There was a lot of assumptions and

8  guesses, but from a standpoint of the 505(b)(2) defendants, we

9  do want to be part of that discussion.

10         THE COURT:  Yeah.  I expect you all to be part of it.

11         MR. OLINDE:  I just wanted to make sure that was

12  clear.  Thank you.

13         MR. COFFIN:  Your Honor, on the difference between

14  the trial plaintiffs and the non-trial plaintiffs, I think a

15  lot of what you said is how we feel on the PSC side, but there

16  is a fundamental difference, I believe, in how the -- we

17  believe in how the defendants view the discovery on the

18  individual plaintiffs and how we do in an MDL.

19         And we have already set a meeting because in our

20  negotiations on the trial -- the renewed trial schedule, we

21  have agreed to sit down and narrow -- or discuss, I should say

22  discuss, I'm sorry, discuss narrowing what's required by the

23  plaintiffs.  Because, quite frankly, I like to be very

24  transparent, it is the most extensive PFS and ESI protocol for

25  the individual non-trial plaintiffs that I've ever seen in an

1  MDL, and I've been in a lot.  So we've agreed to sit down and

2  trim that down.

3          But I do think it's really important to look at

4  the fundamental difference.  Because I'm afraid we may be back

5  in front of you or in front of Judge Milazzo discussing this

6  again, and that is, the MDL's purpose is general discovery,

7  yes, against sanofi and the 505(b)(2)s because that's the way

8  the Manual for Complex Litigation and the JPML sets it up.

9          That does not mean, and we are not saying, that

10  they aren't entitled to some discovery on these non-trial

11  plaintiffs; they are.  And the purpose of that is to get those

12  cases at least somewhat worked up so that they can be remanded

13  when the trial package is put together on that common discovery

14  against the defendants, remanded for full discovery, which is

15  why both Judge Engelhardt and Judge Milazzo indicated that

16  there is limited discovery.

17          THE COURT:  Well, I'm glad to hear that you all are

18  planning to have that meeting because I think it makes sense to

19  do that.

20          MR. COFFIN:  And we do too.  But we're at a point in

21  this MDL where -- you've hit it on the head -- we have to focus

22  on these trial plaintiffs.  And if we can't resolve it after a

23  bellwether or two, then they'll be remanded, and the defendants

24  will have their day to do discovery as deep as they want.

25          THE COURT:  Well, have that meeting.  Have that

OFFICIAL TRANSCRIPT

1   meeting.  I think that it is -- I think it's a very good idea

2   for you all to address that.  I mean, I don't disagree that the

3   plaintiff fact sheets and the ESI protocol are robust.  And to

4   the extent that you all can talk about that to make things

5   easier to handle for the non-trial plaintiffs, it makes sense.

6   So, I mean, all I'm saying is make the deficiency process a

7   part of that discussion.

8         **MR. COFFIN:**  We'll do that.  The meeting is already

9   set up.  I believe it's September 26th.

10         **THE COURT:**  Okay.

11         **MR. MOORE:**  Your Honor, I'd like to be heard on that

12   point.  I wanted to address two things.  First, at the last

13   status conference, we all were in agreement that individuals

14   who simply ignored PTO 71A and CMO 12 could go through the

15   existing deficiency process.  And we're happy to have a

16   discussion with them about a way to address substantive

17   deficiencies with PTO 71A.

18         But I wanted to make a comment if I could about

19   this concept that, you know, we have been hearing in this MDL

20   from the very first meetings with Judge Engelhardt on the

21   plaintiff fact sheet and that is that the purpose of an MDL is

22   simply to conduct common issues, evidence and common issues

23   discovery.  And what that translates to is minimal evidence

24   taken from these thousands of plaintiffs and mountains of

25   evidence taken from the defendants.

1      **THE COURT:**  No, I understand that you don't agree

2   with that.  And I don't agree with it 100 percent either.  You

3   have to have some discovery from the non-trial universe of

4   plaintiffs to be able to make this work.  I get that.  No one's

5   saying that you're not entitled to it.  I'm just trying to

6   manage how it's conducted.

7      **MR. MOORE:**  Yeah.  I think the point that when we had

8   these discussions with Judge Engelhardt, you know, they asked

9   for a six-page fact sheet.  That was their side's position.

10   Our position was that it was -- this is our opportunity for

11   written discovery.  That's made clear in the Manual for Complex

12   Litigation, a form set of written discovery to all of the

13   plaintiffs.

14         And the information that we gathered through the

15   fact sheet, even if we're limited to common issues because 1407

16   creates an MDL when there are common issues, but it doesn't

17   litigate pretrial proceedings only to common issues.  This

18   is -- we're supposed to be getting these cases ready -- trial

19   ready, and not just 12 of them or 30 of them, but all of them.

20         And so I hear your comments that we need to

21   focus on the bellwethers and, you know, lower the importance of

22   discovery as to these plaintiffs, but, you know, this is

23   evidence we think is relevant to their claim in these cases.

24   We think that the obligation to produce evidence in support of

25   their claims in response to our only opportunity to do written

```
 1   discovery in this MDL against these non-trial plaintiffs is a
 2   common responsibility to all of them.
 3                So we'll have these discussions with them, Your
 4   Honor, but I just wanted to make sure our position was clear,
 5   that we don't think that discovery from the fact sheet is
 6   something that's less important than having a bellwether in the
 7   MDL.  We think it's equally important both for the
 8   administration for potential resolution and for our
 9   responsibilities under 1407.
10        THE COURT:  I've said what I've said, and I think you
11   all know what I expect in terms of the subject matter of the
12   discussions that you all need to have.  All right.  We'll see
13   where that gets us.
14        MR. MOORE:  Thank you, Judge.
15        THE COURT:  All right.  As to the trial plaintiffs, I
16   think that there are few enough of them that I'm comfortable
17   essentially handling them as I would any other case as far as
18   discovery problems.  That doesn't mean, you know, three motions
19   to compel or for protective orders per plaintiff.
20                What that means is when -- if sanofi gets to a
21   point where they have identified deficiencies in the discovery
22   responses of a particular trial plaintiff, and you all have
23   discussed those deficiencies or perceived deficiencies, and you
24   all have reached a point where you can't resolve them all, you
25   know what they are, then I will have a motion to compel --
```

OFFICIAL TRANSCRIPT

1  presumably a motion to compel or a motion for protective order
2  per plaintiff and keep it short.  Okay?  I don't need 25 pages.
3  I'm not going to -- I thought about putting a page limit on it,
4  but I won't, but just try to keep it short.

5           I will address each one of those plaintiffs as
6  they come.  Try to get to a point where you know everything
7  that you think you need that you don't have so we can do it in
8  a single motion, file the motion, set it for submission at the
9  appropriate status conference so that we don't have a
10  separate -- we don't need to have a separate hearing.  We can
11  do it at one of these.

12           The briefing schedule will be the same as it
13  always is.  And if you want an accelerated schedule, you can
14  ask me for it, to fit it in, and as long as the PSC doesn't
15  have a problem with that, we can do it that way.

16           But I intended to handle discovery issues for
17  trial plaintiffs as though they were not MDL trial plaintiffs.
18  But, again, don't file a motion a week.  Once you know what --
19  once you know what you don't have or what you think you don't
20  have, have your conference with PSC, with the lawyer who's
21  representing that trial plaintiff if it's not someone with the
22  PSC, and I'll handle it through a regular -- through regular
23  motion practice.

24           All right.  Any questions about that?  Good.
25           **MR. COFFIN:**  You didn't let us think long enough,

OFFICIAL TRANSCRIPT

1  Your Honor.

2          **THE COURT:**  I did that on purpose.  And I'm not going

3  to say anything else because then everybody's going to jump up.

4          That's all I have.  Is there something that I'm

5  missing?

6          **MR. LAMBERT:**  Just the next conference, Your Honor.

7          **MR. RATLIFF:**  May I, Your Honor?

8                          **(OFF THE RECORD)**

9          **THE COURT:**  I'm going to do that in a minute.

10          **MR. BACHUS:**  Your Honor, this is Kyle Bachus.  I

11  don't know if you can hear me.

12          **THE COURT:**  Yes, I can.

13          **MR. BACHUS:**  There is one issue that has been brought

14  up by the defense regarding the deposition scheduled for next

15  week in terms of the location of that deposition that if you

16  have a moment now might be a good time.  If you want to do it

17  separately, that's okay too.

18          **MR. RATLIFF:**  That was the other issue I was talking

19  to Mr. Coffin about, whether we need to raise it now or if it

20  had been resolved because I was unsure.

21          **THE COURT:**  Do we need all these people to be here to

22  listen to this?

23          **MR. BACHUS:**  Absolutely not.

24          **THE COURT:**  Kyle, do you need to be in on that

25  conversation or can I have that conversation with the lawyers

1  who are here?  Do you need to be --

2          **MR. BACHUS:**  Yes, sir, I probably -- I probably

3  should be the person.

4          **THE COURT:**  All right.  Look, when we wrap up, I'll

5  give you a call.  I'll get on the phone, one of the sanofi

6  folks will get on the phone with me, and we'll handle it that

7  way.

8          **MR. BACHUS:**  Okay.  Thank you, Your Honor.

9          **THE COURT:**  Just stand by for a few minutes.

10          **MR. BACHUS:**  Will do.

11          **THE COURT:**  Okay.  As usual, I forgot my calendar so

12  I got to go back and get it.  I think Judge Milazzo in the

13  meantime wanted to talk to liaison for a minute.  So if you

14  all...

15                     **(OFF THE RECORD)**

16          **THE COURT:**  All right.  The minute entry is going to

17  reflect that we're going to have our next conference on the

18  18th, September 18th at 11:00.

19          **MR. COFFIN:**  Thank you, Your Honor.

20          **THE COURT:**  Okay.

21          (WHEREUPON, the proceedings were concluded.)

22

23

24

25

OFFICIAL TRANSCRIPT

1                          *****

2                       __CERTIFICATE__

3          I, Jodi Simcox, RMR, FCRR, Official Court Reporter

4    for the United States District Court, Eastern District of

5    Louisiana, do hereby certify that the foregoing is a true and

6    correct transcript, to the best of my ability and

7    understanding, from the record of the proceedings in the

8    above-entitled and numbered matter.

9

10

11                          _s/Jodi Simcox, RMR, FCRR_
                            Jodi Simcox, RMR, FCRR
12                          Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

                       OFFICIAL TRANSCRIPT