10:17:21

1                       UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA

2   *******************************************************************

3   IN RE:  TAXOTERE (DOCETAXEL)
      PRODUCTS LIABILITY LITIGATION

4                               Docket No. 16-MD-2740
                               Section "N"

5                               New Orleans, Louisiana
                               Wednesday, June 13, 2018

6

7   [THIS DOCUMENT RELATES TO:
      ALL CASES]
   *******************************************************************

8

9                    TRANSCRIPT OF STATUS CONFERENCE
         HEARD BEFORE THE HONORABLE MICHAEL B. NORTH
             UNITED STATES MAGISTRATE JUDGE

10

11  APPEARANCES:

12

13  FOR THE PLAINTIFFS:        GIBBS LAW GROUP
                       BY:  KAREN B. MENZIES, ESQ.
                       400 Continental Blvd., 6th Floor

14                   El Segundo, CA 90245

15                   PENDLEY BAUDIN & COFFIN
                       BY:  CHRISTOPHER L. COFFIN, ESQ.

16                   1515 Poydras St., Suite 1400
                   New Orleans, LA 70112

17

18                   BACHUS & SCHANKER
                       BY:  J. KYLE BACHUS, ESQ.
                          DARIN SCHANKER, ESQ.

19                   1899 Wynkoop St., Suite 700
                   Denver, CO 80202

20

21                   SIMMONS HANLY CONROY
                       BY:  DAVID F. MICELI, ESQ.
                     One Court St.

22                   Alton, IL 62002

23                   MARTZELL, BICKFORD & CENTOLA
                     BY:  LAWRENCE J. CENTOLA, III, ESQ.

24                   338 Lafayette St.
                   New Orleans, LA 70130

25

```
 1                                    GAINSBURG BENJAMIN DAVID
                                      MEUNIER & WARSHAUER
 2                                    BY:  M. PALMER LAMBERT, ESQ.
                                      1100 Poydras St., Suite 2800
 3                                    New Orleans, LA 70163

 4                                    BARRIOS KINGSDORF & CASTEIX
                                      BY:  DAWN M. BARRIOS, ESQ.
 5                                           ZACHARY L. WOOL, ESQ.
                                      701 Poydras St., Suite 3650
 6                                    New Orleans, LA 70139

 7                                    LEMMON LAW FIRM
                                      BY:  ANDREW A. LEMMON, ESQ.
 8                                    15058 River Road
                                      Hahnville, LA 70057
 9
                                      ATKINS & MARKOFF
10                                    BY:  DANIEL P. MARKOFF, ESQ.
                                      9211 Lake Hefner Pkwy., Suite 104
11                                    Oklahoma City, OK 73120

12
     FOR SANOFI S.A.:                 SHOOK, HARDY & BACON
13                                    BY:  HARLEY V. RATLIFF, ESQ.
                                      2555 Grand Blvd.
14                                    Kansas, City MO 64108

15                                    SHOOK, HARDY & BACON
                                      BY:  PATRICK OOT, ESQ.
16                                    1155 F St. NW, Suite 200
                                      Washington, D.C. 20004
17
                                      IRWIN FRITCHIE URQUHART & MOORE
18                                    BY:  DOUGLAS J. MOORE, ESQ.
                                      400 Poydras St., Suite 2700
19                                    New Orleans, LA 70130

20

21   FOR HOSPIRA WORLDWIDE, LLC       CHAFFE McCALL
     and 505(b)(2) LIAISON:           BY:  JOHN F. OLINDE, ESQ.
22                                    2300 Energy Centre
                                      1100 Poydras Street
23                                    New Orleans, LA 70163-2300

24

25
```

1

Official Court Reporter:          Karen A. Ibos, CCR, RPR, CRR, RMR
2                                 500 Poydras Street, B-275
                                  New Orleans, Louisiana 70130
3                                 (504) 589-7776

4

5
   Proceedings recorded by mechanical stenography, transcript
6 produced by computer.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

(WEDNESDAY, JUNE 13, 2018)

(STATUS CONFERENCE)

    (OPEN COURT.)

        THE COURT:  Y'all have a seat.  Good to see you all again.

        All right.  We have a number of issues to discuss and I have a two o'clock settlement conference, so we're going to move through these.  We're going to start at the top of the agenda that was sent to me, with the PSC's agenda items first.

        The duration of the Emmanuel Palatinsky deposition.  What I am going to do as to this deposition is this:  I am going to strongly suggest that you all set aside additional time, but I am not going to order it; because technically, nobody's made a case specifically as to why this deposition will take more than seven hours on the record.  I can easily see that it might, it appears to me that this is a witness who will have a number of things to testify about, and I will simply suggest that I will be disappointed if this matter comes back to me because this guy has got to be deposed for a second day and you all didn't arrange for that to happen.  But I am not going to order it to happen.  I think you all know where I am going to come down on it if the issue comes up again.

        The 30(b)(6) deposition notice is on the agenda, but

13:12:21  1    there is a motion pending for protective order on that issue and

13:12:25  2    the plaintiffs haven't had an opportunity to respond; or if they

13:12:28  3    have, I haven't seen it.  So I don't think it's appropriate for us

13:12:31  4    to discuss those matters because plaintiffs haven't been heard yet

13:12:34  5    on the record and they will.

13:12:36  6         So I believe we may have set that for hearing already.

13:12:41  7         MR. RATLIFF:  Your Honor, yes, I believe we set it

13:12:44  8    for submission.

13:12:45  9         THE COURT:  We have a couple of matters that are set for

13:12:46 10    hearing coming up, I think maybe in July.

13:12:49 11         MR. RATLIFF:  I think it was set for maybe July 11th, but

13:12:52 12    don't hold me to that.  It was set for one of the mid July dates.

13:12:56 13         THE COURT:  Okay.  I think, again I am not sure, we were

13:12:58 14    looking at some of those this morning, I think there was something

13:13:02 15    else that was filed that was set for the next week.  So if that's

13:13:05 16    the case, everything is going to be set for that second week.  If

13:13:09 17    we have things set for the 11th and the 18th, I am going to do

13:13:13 18    everything on the 18th.  And that may not have been done in the

13:13:16 19    record yet, but that's how we're going to do it.

13:13:19 20         MR. RATLIFF:  Understood, your Honor.  I actually think

13:13:20 21    maybe it was set for the 18th because that corresponds with also

13:13:22 22    our next general status conference with Judge Milazzo.

13:13:26 23         THE COURT:  But the recent motions are all going to be

13:13:29 24    set on the same day.

13:13:30 25         MR. RATLIFF:  Understood.  Thank you, your Honor.

13:13:30  1          MR. BACHUS:  Your Honor, Kyle Bachus on behalf of the

13:13:32  2   Plaintiff Executive Committee.  First of all, I understand that on

13:13:35  3   the date of the 18th at 11:00 A.M. from the liaison counsel meeting

13:13:42  4   with Judge Milazzo this morning, the timing of that hearing is

13:13:44  5   currently set at 11 might conflict with proceedings, and so I don't

13:13:48  6   know whether there's an opportunity to maybe move it to one

13:13:52  7   o'clock.

13:13:52  8          THE COURT:  Proceedings that you all have scheduled

13:13:54  9   already?

13:13:55 10          MR. BACHUS:  It's my understanding from Ms. Barrios that

13:13:57 11   there was a meeting, that the timing of the PSC judicial conference

13:14:03 12   is going to conflict with the time that you have set.

13:14:07 13          THE COURT:  If you all want to bump it back a couple of

13:14:10 14   hours, if someone will just call Blanca, she'll do that, we'll bump

13:14:15 15   it to one o'clock.

13:14:16 16          MR. BACHUS:  The other thing I just wanted to bring to

13:14:19 17   the Court's attention.  It was a little disheartening to get a

13:14:23 18   motion for protective order after the date that we were subject to

13:14:26 19   submissions today having spent seven weeks negotiating the terms of

13:14:32 20   that 30(b)(6).

13:14:34 21          THE COURT:  I don't know why that happened.

13:14:36 22          MR. BACHUS:  And not once was I told that there was an

13:14:38 23   intention to do a protective order and to have it maybe,

13:14:43 24   coincidentally occur the day after these submissions that then push

13:14:48 25   it off further with a trial scheduled.  And this is a series -- so

13:14:53  1  I just wondered, is there a way that we could agree to a date to

13:14:57  2  set this deposition in the event that it goes forward so we're not

13:15:00  3  starting that process on the 18th, presume that you hear on the

13:15:03  4  18th --

13:15:04  5       THE COURT:  I think that you all ought to be scheduling

13:15:07  6  these depositions, they're going to take place.  Some deposition is

13:15:10  7  going to take place.  It doesn't make any sense to wait for me to

13:15:13  8  rule on the scope of a notice to start trying to schedule.  I mean,

13:15:16  9  I know you have to find witnesses, but I'm sure you have witnesses

13:15:19 10  that you know that are going to be subject to a 30(b)(6)

13:15:23 11  deposition.  So I think you all can start talking about dates.

13:15:26 12       MR. BACHUS:  Yeah, I think that would be -- if we could

13:15:27 13  do that, I feel much better about having to resolve it on the 18th.

13:15:30 14  I just started looking at time frame that has just been put into a

13:15:34 15  trial schedule based upon when we think things are going to occur

13:15:37 16  and now, at the first instance, we are already facing --

13:15:40 17       THE COURT:  Well, look.  You all have been talking about

13:15:42 18  these matters for weeks.  Now there is a motion for protective

13:15:45 19  order.  I am not reading anybody's mind, I don't know why it was

13:15:48 20  filed when it was, but you know what's in it.  So while you do have

13:15:54 21  to respond to it, there's nothing stopping you all from continuing

13:15:54 22  to try to resolve the issues that are raised in the motion.  I

13:15:59 23  would love to hear that it's moot.

13:16:01 24       MR. BACHUS:  And go ahead and set the deposition dates?

13:16:04 25       THE COURT:  Yes.

13:16:05    1            MR. BACHUS:  Thank you.

13:16:05    2            All right.  Supplemental discovery responses related to

13:16:09    3    the label change.  Obviously sanofi acknowledges that it has a duty

13:16:14    4    to supplement its responses on this subject matter from

13:16:18    5    non-custodial sources, that's what I've picked up from the papers.

13:16:25    6    Are y'all taking the position that you don't have a similar duty to

13:16:28    7    produce -- to supplement discovery from custodial sources?

13:16:31    8            MR. RATLIFF:  No, your Honor.

13:16:32    9            THE COURT:  What's the issue?

13:16:33   10            MR. RATLIFF:  The issue is this is that this is a label

13:16:37   11    change that just recently was proposed to FDA.  FDA has responded

13:16:41   12    and said we'll get back to you in the next six months, so we are

13:16:45   13    dealing with a little bit of a moving target.

13:16:47   14            There is only a small number of employees who actually

13:16:50   15    have worked on this label change, and so what we wanted to propose

13:16:54   16    to the PSC was, yes, we would do a non-custodial refresh of what

13:16:59   17    was submitted to the FDA, what would go into the new drug

13:17:02   18    application.  But we would like to work on some sort of targeted

13:17:05   19    way to collect these documents from the relevant custodians, so

13:17:09   20    instead of taking a clever and doing for every single custodian,

13:17:14   21    let's figure out the way to find the right documents that they are

13:17:16   22    looking for.  We have no objection that they're entitled to them.

13:17:18   23            THE COURT:  So, here is my view on your duty to

13:17:20   24    supplement your previous discovery responses.  You know, in a

13:17:27   25    regular case that duty exists as to all litigants, at all times,

13:17:31 1    and it's not triggered by a new round of requests.

13:17:36 2         MR. RATLIFF:  Right.

13:17:36 3         THE COURT:  Or necessarily a letter or a request that you

13:17:40 4    supplement specific responses from specific sources.  I think that

13:17:47 5    the obligation to determine where relevant, new material that is

13:17:53 6    subject to your duty to supplement resides -- I think that's your

13:17:57 7    obligation.  I don't think this is a matter of you going back to

13:18:03 8    however many custodians there are previously in the case and doing

13:18:07 9    some sort of search that's going to be fruitless.  That's not the

13:18:11 10   objective.  You know what it is that they're looking for, you know

13:18:15 11   what you have to produce.  Presumably you or somebody at sanofi

13:18:20 12   knows who has that information.  That's what they're entitled to.

13:18:23 13        I don't care if it comes from a custodian, non-custodial

13:18:27 14   source, a new custodian that wasn't -- and I want to be clear about

13:18:30 15   that.  If there is a new custodian that wasn't initially identified

13:18:34 16   or from whom you haven't conducted discovery but has this

13:18:39 17   information, it needs to be provided.  Right?

13:18:41 18        MR. RATLIFF:  And we will obtain that, your Honor.

13:18:44 19        THE COURT:  I think that solves the problem.

13:18:48 20        MR. RATLIFF:  My concern in my conversations with

13:18:51 21   Ms. Menzies was they were looking for a much broader sweep when we

13:18:56 22   know that this can be done through the custodians we know who are

13:18:59 23   involved in it and to be able to go through and collect and produce

13:19:02 24   that information to them.

13:19:03 25        THE COURT:  I think the nature of the rule is that it is

13:19:09  1    up to the producing party to determine essentially when and from

13:19:14  2    what sources and what should be produced in keeping with its

13:19:19  3    obligation to supplement its discovery responses.

13:19:22  4            MR. RATLIFF:  Right.

13:19:23  5            THE COURT:  I don't think that -- if what I am hearing is

13:19:26  6    that the PSC wanted you to go back and re-search a number of

13:19:30  7    custodians that you're saying aren't going to have information and

13:19:33  8    then that would be a waste of time, I agree with you.  I think

13:19:37  9    sanofi knows where this information is and they ought to be able to

13:19:40 10    go get it.  The idea that broad discovery, the way it was described

13:19:47 11    by Mr. Oot in his letter, is going to slow down discovery, the

13:19:51 12    reality is I don't care because you have a duty to do it.

13:19:55 13            So what I don't want to do is unnecessary work searching

13:19:59 14    for material from previously identified custodians who aren't going

13:20:04 15    to have it.  So I am simply going to order them -- I'll order

13:20:07 16    sanofi to supplement its discovery responses with, particularly on

13:20:14 17    this label change issue, from whatever source it has information

13:20:19 18    that should be produced, that is relevant to the claims or defenses

13:20:24 19    in the case.

13:20:24 20            MR. RATLIFF:  Understood, your Honor.

13:20:25 21            THE COURT:  How long is it going to take you to do that?

13:20:28 22            MR. RATLIFF:  Your Honor, could we get maybe 21 days?

13:20:31 23    And the reason I ask is we are dealing with people being gone for

13:20:36 24    summer holidays, and I do know some --

13:20:37 25            THE COURT:  I think 21 days is reasonable, but I am going

13:20:39  1    to direct you to begin production as soon as possible and do it on

13:20:44  2    a rolling basis.

13:20:45  3            MR. RATLIFF:  Understood, your Honor.

13:20:46  4            THE COURT:  We don't need them waiting 21 days to get a

13:20:49  5    load of documents.

13:20:50  6            MR. RATLIFF:  Understood.

13:20:51  7            THE COURT:  There's going to be some things you can

13:20:53  8    access now, and if people are on a holiday wherever they're on

13:20:58  9    holiday and get the rest of it in 21 days.

13:21:01  10           MR. RATLIFF:  And we already have our attorneys at Shook

13:21:04  11   working on this.

13:21:05  12           MS. MENZIES:  Thank you, your Honor.  Karen Menzies for

13:21:08  13   the plaintiffs.

13:21:09  14           The only other thing as, Mr. Ratliff has noted, is that

13:21:13  15   it's a moving target, things are going to continue.  So

13:21:16  16   supplementing -- we don't want it to delay the depositions, and we

13:21:18  17   recognize we can't stop taking the depositions until this is all

13:21:21  18   finished.  So if we can have continued supplements, you know, is

13:21:26  19   there anything else, seven days before we do a relevant depo,

13:21:29  20   that's one of the things that we ask for, too, just so we know

13:21:33  21   we're continuing to get --

13:21:36  22           THE COURT:  I think that you all ought to be able to

13:21:38  23   arrange for seasonable updates as you move forward knowing --

13:21:45  24   clearly the obligation exists to update that information.  Sanofi

13:21:50  25   is going to know better than me, for sure, and maybe better than

13:21:54  1    you all when events are taking place with regard to the label

13:22:00  2    change, you know, maybe on an irregular schedule when another

13:22:04  3    supplementation should take place.

13:22:06  4           MS. MENZIES:  Thank you.

13:22:07  5           MR. RATLIFF:  And on Ms. Menzies' point, we will

13:22:11  6    certainly be notified if there's additional correspondence from

13:22:14  7    FDA.

13:22:14  8           Just for your Honor's background, sometimes what happens

13:22:17  9    is these labels get submitted, FDA responds and says we got it, and

13:22:20 10    then it goes quiet for the time FDA has to respond.  So if we get

13:22:25 11    something back from FDA before that time, we will certainly be

13:22:28 12    alerted and make a supplemental production to the PSC.  It may well

13:22:33 13    be we don't hear anything back from FDA for six months.

13:22:36 14           THE COURT:  Right.  I mean, there's no point in sitting

13:22:38 15    on that information, because when you eventually produce it, it's

13:22:42 16    going to be evident when it was created and received and everything

13:22:44 17    else.  So there is no point in delaying, right?

13:22:46 18           MR. RATLIFF:  Yep.  Understood, your Honor.

13:22:50 19           THE COURT:  All right.  Moving to the defendant's agenda

13:22:53 20    items.  Compliance with the Taxotears Discovery Order.  Let me ask

13:22:58 21    this question first.  The first issue that jumps out at me is that

13:23:07 22    the order that I issued called for identification of current MDL

13:23:16 23    plaintiffs who were or are members of the Taxotears group, and it

13:23:20 24    looks like what I got is current plaintiffs who are members of the

13:23:25 25    Taxotere group.  But I am not entirely clear if that's true, if

13:23:30  1   that's --

13:23:30  2              MR. OOT:  That's correct, your Honor.

13:23:33  3              MS. MENZIES:  Well, actually I know what we did.

13:23:34  4              THE COURT:  Let me find out what they did first.

13:23:38  5              MR. OOT:  Okay.

13:23:38  6              MS. MENZIES:  Thank you.

13:23:39  7              THE COURT:  Let me --

13:23:41  8              MS. MENZIES:  Yes.  Karen Menzies again for the

13:23:45  9   plaintiffs.

13:23:45 10              What we did is looked for -- to identify any plaintiff

13:23:50 11   who ever was a member of the Taxotears group, and we've

13:23:55 12   supplemented that with the Facebook and found no new plaintiffs.

13:23:59 13   So what we looked at was the unredacted version of the About Group,

13:24:03 14   you remember that, and found what we think, you know, 82 of the 84.

13:24:09 15   To our knowledge, that's anybody who has ever been a member.

13:24:12 16   Because there's women who joined -- we have the date that women

13:24:16 17   joined like in 2010, nine, whatever it is.

13:24:20 18              And I don't know if -- I think the difference -- there's

13:24:22 19   not a way to unjoin.  I think when we said that some women have

13:24:26 20   stopped being involved in Taxotears, I think it's just they stopped

13:24:29 21   looking at the e-mails or they stopped getting it or whatever they

13:24:31 22   did, but the membership group, as we understand it, that doesn't

13:24:36 23   change.

13:24:36 24              THE COURT:  So the list that you looked at from the About

13:24:40 25   page, you believe is everyone who has ever been a member of that

13:24:44  1    group?

13:24:44  2              MS. MENZIES:  That's our understanding, yes.

13:24:50  3              THE COURT:  Are you going to tell me that's not true or

13:24:53  4    you don't know if it's true?

13:24:54  5              MR. OOT:  Surprisingly, your Honor, I would disagree with

13:24:56  6    that.  The 80 some odd members of the group was a snapshot at a

13:25:02  7    certain point in time, and perhaps many weeks after we first

13:25:05  8    brought this issue up with the Court.  So we interpreted your

13:25:08  9    order, your Honor, that the plaintiffs were required to go back to

13:25:11 10    the individual plaintiffs' lawyers to determine the accuracy of the

13:25:16 11    statements in the PFC and the 71A disclosures.  So that, I don't

13:25:22 12    think that that identification process has been completed, because

13:25:24 13    if they're just going back to a document that exists at a time

13:25:29 14    after the order was entered, we don't know what the look back

13:25:33 15    period is.  So --

13:25:34 16              THE COURT:  We don't know that it hasn't accomplished.

13:25:37 17              MR. OOT:  So if you're reliant upon a document that's

13:25:43 18    later on where people had the opportunity to just unsubscribe, I

13:25:48 19    would disagree with Ms. Menzies that anyone can unsubscribe from a

13:25:54 20    group and potentially after the Court has focused on this issue.

13:25:57 21    So that is -- it was our understanding from your order, your Honor,

13:26:00 22    that you ordered the plaintiffs to go back and --

13:26:03 23              THE COURT:  And ask 8,500 people if they were members of

13:26:07 24    this one particular group?

13:26:08 25              MS. MENZIES:  Well, in a sense, your Honor, we have.  We

13:26:11  1   did send out e-mail communication through our liaisons to every

13:26:15  2   single lawyer and sent your discovery order to advise -- and

13:26:19  3   received some responses of people, oh, I might have a plaintiff as

13:26:22  4   we described in our papers.  We worked to figure out did they just

13:26:26  5   visit that website or did they actually become a member.  So we

13:26:29  6   spent a lot of time trying to really ferret that out.  So we

13:26:34  7   have -- we feel like we have communicated to all plaintiffs'

13:26:36  8   counsel about this obligation.

13:26:38  9            MR. OOT:  So let's run through the numbers, your Honor.

13:26:40  10  So, of the 37 they've identified, 26 have produced zero pages.

13:26:47  11  And --

13:26:47  12            THE COURT:  When was their obligation to produce ESI --

13:26:53  13  are all of those folks people whose deadline to produce ESI has

13:26:59  14  already run?

13:27:00  15            MR. OOT:  I believe so, your Honor.  I believe it was --

13:27:03  16            THE COURT:  Because I've been given a different deadline

13:27:05  17  in Ms. Menzies' paper.

13:27:09  18            MR. OOT:  -- I believe it was June 4th.

13:27:10  19            MS. MENZIES:  I think that's a matter in dispute that we

13:27:13  20  may need to take up with the Court.  We understand our obligations

13:27:16  21  were to identify the women and then the PFS process for purposes of

13:27:21  22  complying with PFS obligations as well as PTO 71A obligations, that

13:27:27  23  they're all required to do that within the time they're required to

13:27:30  24  do it.  We went back to look to see to the extent that ones had

13:27:33  25  already been served may inaccurately reflect that they were

13:27:36  1  members.

13:27:36  2          THE COURT:  That's what I intended to take place.

13:27:38  3          MS. MENZIES:  And that's what we checked for.  But there

13:27:39  4  are a number, including some on their list, where the ESI for

13:27:45  5  PTO 71A isn't due until the end of this month.  I spoke to one

13:27:49  6  individual with the firm Morgan and Morgan, theirs is due on the

13:27:53  7  21st, so we've been trying to track down those dates.  So most of

13:27:57  8  them have been either served, and if they haven't been -- there are

13:28:00  9  three that are deficient, and we let the Court know about that.

13:28:04 10          MR. OOT:  So sanofi will agree that if they're going to

13:28:07 11  produce documents on June 26th, we'll agree to that.  But the

13:28:10 12  current numbers are not indicating that.  Of the 11 plaintiffs that

13:28:13 13  did produce information, ten of them produced less than 50 pages or

13:28:18 14  one page, four pages, seven pages, eight pages.

13:28:21 15          THE COURT:  I don't know what that means.  I mean, these

13:28:23 16  are individuals and we're talking about e-mails, mostly.  Right,

13:28:28 17  it's an e-mail group?  So what does it mean that somebody produced

13:28:32 18  less than 50 pages?

13:28:34 19          MR. OOT:  We would say that it's a deficiency, your

13:28:36 20  Honor.

13:28:37 21          THE COURT:  How do you know?

13:28:39 22          MR. OOT:  Saying that they received -- that they've been

13:28:40 23  a member of Taxotears -- again, another part of the deficiencies of

13:28:44 24  the PFS, we're missing dates of membership.  So it's just not

13:28:49 25  credible to say that I have one e-mail from Taxotears and I've been

13:28:54 1    a member for a certain period of time.

13:28:56 2          THE COURT:  I don't know if it's credible or not.  That's

13:28:59 3    not a fact.  You're wanting me to infer a whole lot of information

13:29:05 4    from the volume of documents that an individual plaintiff produced

13:29:09 5    in ESI, and I am just not prepared to do that.

13:29:13 6          MR. OOT:  Well, let's pivot to the 71A disclosures then,

13:29:13 7    your Honor.

13:29:13 8          THE COURT:  Okay.

13:29:16 9          MR. OOT:  So let's talk about some of those, because of

13:29:18 10   those plaintiffs that have made 71A disclosures, they haven't

13:29:22 11   produced any documents or a statement why they haven't produced any

13:29:25 12   documents.  So again, if we want to focus to the end of June where

13:29:29 13   we anticipate that this whole process will be done, we'll agree to

13:29:34 14   that.

13:29:34 15         THE COURT:  You see, I tried -- I tend to anticipate that

13:29:38 16   everything that is supposed to be done will be done, but then y'all

13:29:42 17   show up and tell me that nothing's being done.  So I don't have any

13:29:47 18   reason to believe that for people whose deadline hasn't arrived yet

13:29:54 19   that they're not going to comply with their obligation.  Now, maybe

13:29:57 20   when the deadline comes we'll be back here talking about deficient

13:30:01 21   productions.  I am more interested in talking about what we do

13:30:06 22   about productions that we know are already deficient.

13:30:11 23         MR. RATLIFF:  Your Honor, may I address this point right

13:30:13 24   here?

13:30:14 25         THE COURT:  Yes.

13:30:14  1          MR. RATLIFF:  I think what we have is a little bit of a

13:30:16  2  moving target.  So when Ms. Menzies talks about a firm who has a

13:30:20  3  deadline on this particular date, I don't know if that's because of

13:30:23  4  the staggering provisions that are built-in here.  So we don't ever

13:30:26  5  really know because they get to pick how they stagger when a

13:30:30  6  production is going to be made or not going to be made or when

13:30:32  7  there is going to be a cutoff period.  And so the PFS has been in

13:30:37  8  place for a long time, PTO 71A has been in place for a long time.

13:30:43  9  I would say that for all of these plaintiffs the deadline has come

13:30:45  10 and gone.

13:30:46  11         Now, what would be helpful is if we had a date certain

13:30:48  12 for these 37 plaintiffs to make these productions because then we

13:30:52  13 would be able to look at kind of the corpus of productions and

13:30:55  14 compare them against each other.  And I think what Mr. Oot said, we

13:31:00  15 have certain plaintiffs who have produced five pages, but yet we

13:31:04  16 see their names on e-mails from other plaintiffs but they're not in

13:31:09  17 their productions.  So that becomes -- you know, we have one

13:31:12  18 plaintiff who produced several thousands of e-mails.

13:31:15  19         THE COURT:  Let's talk about that.  We have a couple of

13:31:17  20 things.  When you say you want a date certain for the remainder of

13:31:21  21 the 37 to produce their ESI from this group?

13:31:26  22         MR. RATLIFF:  Correct.  Or supplement.

13:31:28  23         THE COURT:  Are those the ones that you're telling me,

13:31:29  24 Ms. Menzies, have different staggered deadlines?  Some of those 37

13:31:36  25 haven't reached the deadline yet?

13:31:37  1          MS. MENZIES:  That's correct.  But most of them actually

13:31:39  2   have.  There's a handful from Mr. Bachus's office that don't have

13:31:44  3   the deadline until the end of the month, but they've already been

13:31:46  4   supplementing it ahead of time.  And then there's one I know of

13:31:49  5   one-off plaintiff counsel that has one due on the 21st.

13:31:52  6          But I think what the problem is is that the plaintiffs --

13:31:57  7   two things really.  The plaintiffs responding to PTO 71 and

13:32:02  8   complying doesn't necessarily mean that they have those e-mails.

13:32:05  9   So as long as they comply with getting them, because one plaintiff

13:32:09 10   happened to save an old e-mail account and another one didn't.  And

13:32:13 11   again, none of these are trial plaintiffs.  And so as we said in

13:32:17 12   our papers, their deadlines come due.  There may be plaintiffs that

13:32:21 13   join the case that happen to be Taxotears sometime in the future,

13:32:24 14   and in those instances we will need to supplement.  But I think

13:32:28 15   procedures are in place that are getting to the information.

13:32:31 16          MR. BACHUS:  Your Honor, I think I can help with this

13:32:33 17   because most of them are my firm's clients.

13:32:37 18          We have a staggered deadline that is June the 28th, that

13:32:40 19   is the deadline for, I believe, the remainder of those women who

13:32:46 20   are with our firm, anyway, that have PFS due dates and PTO 71 due

13:32:54 21   dates.  So while that has been the deadline, we have also tried to

13:33:01 22   produce what we have as it comes in and then work with the clients

13:33:05 23   to make sure that they're satisfying the obligation.  So there may

13:33:09 24   be some partial productions that have occurred, not because they're

13:33:12 25   late but trying to help out before the date that they're actually

13:33:17  1   due.  When they're due, we intend to comply.

13:33:19  2           Now, we're the lawyers, we're not the clients, and to the

13:33:23  3   extent there are two people, I believe, whose deadline has come and

13:33:27  4   gone who I will assure you without violating any attorney-client

13:33:31  5   relationship that it's not for lack of effort and we will see, and

13:33:35  6   there is a process in place that the Court has cited to for

13:33:38  7   deficiencies.  We are hopeful that those people will act and will

13:33:43  8   supply.  But that's not for any of the derogatory reasons that have

13:33:48  9   been -- we've been accused of.  We're doing everything we can, I

13:33:52  10  assure the Court.  That's the date, the 28th.

13:33:55  11          MR. OOT:  Your Honor, can I make a proposal?  So if

13:33:56  12  June 28th is the date, so we're entitled to a couple of things.

13:33:58  13  We're entitled to a 71A disclosure of whether or not they lost or

13:34:04  14  destroyed the information.  So for those people that aren't

13:34:06  15  producing any information from Taxotears, we should have that.

13:34:08  16          THE COURT:  And let me stop you there because I think

13:34:14  17  you're entitled -- and that could take a number of forms.  You're

13:34:18  18  entitled to a statement that they've lost it, destroyed ESI that

13:34:22  19  they once had that would have been appropriate.  If that's the

13:34:28  20  case.  If there is a production, you're also entitled to a

13:34:32  21  statement that that is everything that they have to produce.

13:34:35  22          MR. OOT:  Correct.

13:34:37  23          THE COURT:  Okay.  That should come with whatever is

13:34:40  24  produced on the 28th.

13:34:41  25          Now, looking beyond that.  You all have the ability to do

13:34:50   1    this because you've done it in some cases, you have identified

13:34:53   2    individual plaintiffs where you think their production is

13:34:56   3    deficient, correct?

13:34:58   4              MR. OOT:  Correct, your Honor.

13:34:59   5              THE COURT:  The first thing that needs to happen is you

13:35:02   6    need to raise that issue either with the PSC or with their lawyer.

13:35:08   7    If you have identified a specific plaintiff and you know they have

13:35:11   8    a deficient response, you need to have a conference, you need to

13:35:15   9    have a talk with the lawyer who is representing that person to

13:35:18  10    resolve it.  And if you can't, there is a procedure in place to

13:35:23  11    deal with that.

13:35:26  12              But I am convinced that while there are a lot of

13:35:30  13    plaintiffs in this MDL, sanofi's ability to identify individual

13:35:37  14    plaintiffs and specify where their responses are deficient means

13:35:43  15    it's possible to have conversations with their lawyers about those,

13:35:46  16    because it's going to be quicker to have a conversation with that

13:35:49  17    lawyer than it took you to figure out that their responses were

13:35:52  18    deficient.

13:35:54  19              MR. RATLIFF:  Your Honor, we're happy to do that.  But it

13:35:57  20    does get back to the issue of knowing that we have everything that

13:36:00  21    they say is going to be produced and knowing that they are not

13:36:05  22    going to be staggering later down the road --

13:36:07  23              THE COURT:  I am not hearing anything about anything

13:36:10  24    going beyond June 28th.

13:36:12  25              MR. RATLIFF:  And once we get those productions --

| | |
|---|---|
| 13:36:15 | 1 |
| 13:36:17 | 2 |
| 13:36:18 | 3 |
| 13:36:21 | 4 |
| 13:36:27 | 5 |
| 13:36:30 | 6 |
| 13:36:32 | 7 |
| 13:36:37 | 8 |
| 13:36:37 | 9 |
| 13:36:40 | 10 |

THE COURT:  Wait.  Hold on.  As to your clients that you
just identified.

MR. BACHUS:  So let's say that a client that has filed a
lawsuit today, they get their PFS and the questions 18 through 20
they answer, yep, I was a member and it was missed all the way
around, but, yep, they're a member.  Then obviously that's not
going to happen by the 28th, that'll happen when their deadline for
them --

THE COURT:  I am not going to accelerate other deadlines,
just so that we're clear.

MR. RATLIFF:  Your Honor, and I am talking about the 37
that they've identified.  That's I think a good starting point of
the universe so we can look down and say, okay.  Ms. Dodson,
Ms. Amy Dodson who last filled out her fact sheet on October 2017,
she's produced nothing from the Google group, she's not done
PTO 71A.  We have seen her names on numerous other e-mails from
other productions, so presumably she has those e-mails, and we
would like to be able to see those so we can determine where the
deficiency exists.

THE COURT:  I understand that, right.  So let's see what
happens on June 28th.

MR. OOT:  So, your Honor, one more point.  You know,
through our research we're learning that it's not just the Google
Taxotears group where we're seeing information and we're not
getting that information as part of the process.  We're hoping that

13:37:24  1    the Court would extend the May 9th order to all social media,

13:37:30  2    again, that's also in the PFS and it's in 71A disclosures, and not

13:37:35  3    just the Google group that we're talking about.  We think that

13:37:37  4    there are Facebook groups out there.  We've listed several of the

13:37:39  5    groups that we found in our research.

13:37:41  6              THE COURT:  That's required in the PFS.

13:37:44  7              MR. OOT:  We agree, your Honor.  We agree.

13:37:46  8              THE COURT:  So you want me to issue an order that

13:37:49  9    everybody's got to affirm that their PFS is complete and that they

13:37:52 10    produced everything they have?

13:37:53 11              MR. OOT:  Your Honor, what we are saying is that we would

13:37:56 12    like to expand the scope of not just Google group.  So if they're

13:38:00 13    not meeting their production requirements under the schedule of the

13:38:03 14    order, then we can also follow the 71A --

13:38:07 15              THE COURT:  I am not inclined to do that right now.  This

13:38:10 16    is the issue you raised with me a few weeks ago, this is the issue

13:38:13 17    that we've been talking about and discussing.  This is what we're

13:38:16 18    trying to solve right now.  I don't see that we have a problem

13:38:19 19    anywhere else.

13:38:20 20              MR. OOT:  Okay.  So for our next status conference we'll

13:38:23 21    work on it.

13:38:24 22              THE COURT:  To make that order subject to or applicable

13:38:29 23    to all social media across all platforms is re-inventing the wheel,

13:38:34 24    and I am not prepared to do that.

13:38:36 25              MR. OOT:  Okay.  Thank you, your Honor.

13:38:38 1          THE COURT:  All right.

13:38:38 2          MS. MENZIES:  And just so the record is clear, I kind of

13:38:40 3  mentioned it earlier.  We did learn from their submission that

13:38:44 4  there is a Taxotears Facebook page that's private.  So we had one

13:38:48 5  of the clients give us that membership list, we were able to do

13:38:51 6  that in the last two days, last 48 hours, and I have been able to

13:38:56 7  personally confirm comparing the two on the work we had done

13:38:58 8  before, as I mentioned, we didn't find any -- it was basically the

13:39:01 9  same people.  And any of the new people's names that I was able to

13:39:05 10 identify, none of them are plaintiffs.  At least they're not in

13:39:09 11 Centrality.

13:39:12 12          THE COURT:  Okay.

13:39:12 13         MR. OOT:  Your Honor, they should be fulfilling these

13:39:14 14 obligations as part of the overall process, we shouldn't have to

13:39:18 15 identify it through these submissions to you.  Maybe there's a --

13:39:19 16         THE COURT:  How is the PSC supposed to know that a

13:39:23 17 private Facebook page exists if nobody's told them?  It's a private

13:39:27 18 Facebook page.

13:39:27 19         MR. RATLIFF:  Because there are members of the PSC whose

13:39:31 20 clients are part of those groups.

13:39:33 21         THE COURT:  And so it should be disclosed in the PFS?

13:39:37 22         MR. RATLIFF:  It should.

13:39:38 23         THE COURT:  Y'all are telling me that nobody has ever

13:39:40 24 disclosed the existence of a private Facebook page in any of the

13:39:43 25 PFS's that y'all have?

13:39:43  1          MR. RATLIFF:  No, not that we have seen, no.

13:39:45  2          THE COURT:  Well, then you've got a bunch of

13:39:46  3     deficiencies.

13:39:48  4          MR. BACHUS:  And that's inaccurate.  I mean, that's just

13:39:48  5     inaccurate.  There are plenty of people who have said Facebook.

13:39:52  6     They might not have said Facebook forum because they don't

13:39:54  7     recognize the difference between that when they're answering.

13:39:57  8          THE COURT:  That's enough on that issue.  Again, I am

13:40:01  9     going to say for the umpteenth time.  There is a process in place

13:40:06 10     for traversing the adequacy of these fact sheets, and that's going

13:40:10 11     to be -- that's always going to be my default position.  It hasn't

13:40:15 12     been, right, with Taxotears Google group, went off on an entirely

13:40:21 13     different tangent, but I am not going to do that with every social

13:40:25 14     media platform that y'all throw up in front of me.

13:40:28 15          Cancellation of depositions.  Is the issue as to the

13:40:38 16     Sposaro deposition moot as has been suggested?  Where does that

13:40:42 17     stand?

13:40:44 18          MR. RATLIFF:  No, your Honor.  We had submitted to the

13:40:46 19     PSC on April 23rd, 2018, an e-mail asking for $2,258.10, which

13:40:53 20     included four hours of attorney time to travel, not the prep time,

13:40:55 21     not the time getting ready for the deposition, purely the travel

13:40:58 22     time, as well as the hotel bill.  The PSC said they would not pay

13:41:03 23     for that.  And we think at this point in the game that, look,

13:41:06 24     things happen, depositions get canceled, depositions get

13:41:09 25     rescheduled --

13:41:10 1      THE COURT:  I don't think I heard why that deposition got

13:41:13 2  canceled.

13:41:13 3      MR. RATLIFF:  All I know is we had four depositions set,

13:41:17 4  they cancelled -- we had five depositions set, they canceled four

13:41:19 5  of them, one within seven days, one within six days, we are not

13:41:25 6  going to fuss about that, your Honor.  But when we already had

13:41:28 7  people travel and then we get the deposition canceled 36 hours in

13:41:31 8  advance.  Well, that's not only the time spent by my client in

13:41:35 9  terms of attorneys, but that's also arranging witness schedules,

13:41:39 10  having people off for work.  And so, look --

13:41:41 11      THE COURT:  I want to know why the deposition was

13:41:43 12  canceled.

13:41:44 13      MR. COFFIN:  Your Honor, Chris Coffin on behalf of the

13:41:47 14  plaintiffs.  The deposition was canceled because that was at a time

13:41:49 15  when we needed relief from the schedule.  We were cramming all of

13:41:52 16  those depositions in, and I believe it was your Honor said this

13:41:56 17  schedule is going to get moved out.  And we said, well, wait a

13:42:01 18  second.  Why would we be cramming ourselves with multiple

13:42:03 19  depositions -- I think there were about four of them within two

13:42:05 20  days.

13:42:06 21      MS. MENZIES:  Five within two days, three different

13:42:09 22  states.

13:42:09 23      MR. COFFIN:  Five within two days in multiple states.

13:42:13 24  And we said, wait.  We don't need to kill ourselves anymore.  We

13:42:16 25  need some relief here because we had a lot to review in a very

13:42:19 1   short period of time.

13:42:20 2        THE COURT:  Well, you agreed to pay their costs for a

13:42:23 3   reason.

13:42:23 4        MR. COFFIN:  We did.  However, what the rule is in the

13:42:24 5   Eastern District and the Fifth Circuit is they have to explain why,

13:42:29 6   in an affidavit, attorney time should be reimbursed, and they have

13:42:33 7   not met that burden.

13:42:34 8        THE COURT:  Do you want me to make them do that?  I mean,

13:42:37 9   do we have to go through that?  Obviously you've acknowledge that

13:42:40 10  you shouldn't have canceled the deposition by agreeing to pay their

13:42:43 11  costs.  What am I missing?  Because I wouldn't agree to pay

13:42:49 12  somebody's costs if I didn't think I did anything to merit that.

13:42:52 13       MS. MENZIES:  There were three depos or four depos that

13:42:55 14  we cancelled.  We only agreed to pay costs on Ms. Sposaro

13:42:59 15  deposition, not the others.  But because it was -- the others we

13:43:02 16  canceled within a week, which is CMO 9.  Sposaro was about two or

13:43:09 17  three days before, so we recognized that they probably had already

13:43:11 18  flown so we would cover their costs on that.  That was why Sposaro

13:43:15 19  was treated differently.

13:43:16 20       THE COURT:  I get that.  But that's why we're talking

13:43:18 21  about that one deposition.

13:43:22 22       MR. COFFIN:  Yeah, I mean, we were in a time crunch, your

13:43:24 23  Honor.  I don't know what else to say.  And you gave us relief, and

13:43:27 24  we just -- we didn't think it was necessary for us to have to push

13:43:31 25  ourselves more than we were already being pushed with the

13:43:34 1    incredible amount of documents we had to review.

13:43:37 2              THE COURT:  I want to talk about the other deposition.

13:43:45 3    Is that Phillips?

13:43:45 4              MR. RATLIFF:  June Phillips who is one of the second

13:43:49 5    bellwether plaintiffs.

13:43:50 6              THE COURT:  Is her lawyer here somewhere?  No.

13:43:56 7              MR. COFFIN:  No, your Honor.

13:43:57 8              THE COURT:  I got a letter.

13:43:58 9              MR. COFFIN:  Right.  We asked him to submit a letter only

13:44:00 10   because we don't specifically represent that plaintiff.  But I

13:44:04 11   think his position is laid out in the letter.

13:44:07 12             I am happy to speak on his behalf if you have some

13:44:09 13   questions.

13:44:10 14             THE COURT:  You all canceled the deposition?

13:44:14 15             MR. RATLIFF:  It was canceled jointly, yes.  The day of

13:44:18 16   the deposition there was one -- the production of all of these new

13:44:22 17   documents, cancer treatment documents.  And I spoke with Ms. Bieri,

13:44:25 18   my partner.  I think what turned on why the deposition was canceled

13:44:29 19   was not just the volume of new, clearly relevant documents for his

13:44:33 20   deposition, but the fact that Mr. -- her counsel indicated that he

13:44:37 21   had not checked her e-mails, even though they had submitted a

13:44:41 22   PTO 71A disclosure, that there would be more of those coming.

13:44:44 23             And so at that point rather than try and revisit another

13:44:49 24   deposition, Ms. Bieri and Mr. Root agreed that they would cancel

13:44:53 25   the deposition and reschedule it.

13:44:56  1          And this is, your Honor, this is the 10th of 11

13:45:00  2    bellwether depositions where documents have been produced either at

13:45:02  3    the deposition, documents that are clearly called for in the fact

13:45:06  4    sheets or the PTO 71A disclosures that show up the day of or

13:45:10  5    promise to appear after the deposition.  Again, if this was a

13:45:15  6    one-off situation, we would say let bygones be bygones.  It's

13:45:20  7    frustrating.  We come down to New Orleans all the time.  But when

13:45:23  8    we encounter this over and over again, we said, no, we think we're

13:45:28  9    entitled to the time spent -- and we did bring two attorneys, but

13:45:31 10    the costs we submitted to Mr. Root was for just one attorney and it

13:45:33 11    was just for travel time.  It was not any -- I've got what we

13:45:36 12    submitted to him, less than $5,000, and we think we're entitled to

13:45:41 13    those types of costs.

13:45:43 14          Frankly, the more concerning part is not just the costs

13:45:47 15    that we feel we're entitled to, but the continued problems of

13:45:50 16    plaintiffs showing up with these documents, or in this instance

13:45:54 17    submitting a PTO 71A disclosure that is verified by the client only

13:46:00 18    to find out from the attorney that day that they haven't looked for

13:46:04 19    additional e-mails.

13:46:05 20          THE COURT:  All right.  Well, that's a different problem.

13:46:07 21          MR. RATLIFF:  It is a different problem.

13:46:10 22          THE COURT:  Look.  The other issue I am having is I am

13:46:14 23    not hearing about any of these things happening until weeks later

13:46:18 24    when I get a letter asking me for costs and fees, and I think I am

13:46:22 25    supposed to hear about these things while they're happening.

13:46:26 1   Right?  I mean, CMO No. 9 has two different provisions in it where

13:46:32 2   if you've got an issue with the scheduling of a deposition or a

13:46:35 3   dispute during a deposition, and I consider this to be such a

13:46:39 4   dispute, that y'all are supposed to call me and so we can have this

13:46:43 5   conversation and determine whether there is a different path than

13:46:49 6   cancelling the whole deposition.  But that's not happening.

13:46:52 7          Now, I don't want 1,000 phone calls -- and I'll make that

13:46:56 8   pretty clear when they start -- but that's --- I'm really hesitant

13:47:03 9   to start assessing costs and fees against lawyers when I am not

13:47:07 10  involved in any part of the process while it's happening, and

13:47:11 11  that's what everybody's bargained for and got in this Case

13:47:17 12  Management Order.

13:47:17 13         So I am simply going to say this about the two

13:47:20 14  depositions that we're here for.  The PSC is going to pay the costs

13:47:26 15  that you all submitted.  I am not going to assess attorney's fees,

13:47:31 16  sanctions against these folks for those two depositions right now,

13:47:35 17  okay.  Now, that is not to say that that's going to be the result

13:47:38 18  if this keeps happening.

13:47:40 19         MR. RATLIFF:  And we weren't asking for sanctions --

13:47:44 20         THE COURT:  I get it.  I used the word sanctions, but I

13:47:47 21  am not going to start down that road because I don't think we need

13:47:50 22  to do that yet.

13:47:52 23         Now, right after I have said that there's a process in

13:48:01 24  place, or I've said for the tenth time that there's a process in

13:48:05 25  place to deal with certain deficiencies, particularly in the

13:48:08  1  plaintiffs' fact sheets, I am going to say that to the extent that

13:48:16  2  there is a problem that is repeating itself with these bellwether

13:48:20  3  plaintiffs where documents are being produced at or shortly before

13:48:24  4  the deposition, that even arguably should have been produced

13:48:28  5  earlier, that is a serious concern for me.  If it happens once it's

13:48:33  6  a problem, if it's happening more than once, it becomes a serious

13:48:39  7  concern.

13:48:42  8        I think this is an issue that goes beyond some of the

13:48:47  9  issues we've been talking about just in what's been disclosed in

13:48:53 10  the PFS.  That can't happen.  And if it does happen, if it does

13:49:00 11  happen I expect you all to bring that to my attention as it's

13:49:02 12  happening.

13:49:03 13        MR. RATLIFF:  Understood, your Honor.

13:49:04 14        THE COURT:  I am going to include language in the minute

13:49:09 15  entry from this conference that makes it clear that, again, I want

13:49:13 16  the PFS to share that language with every lawyer in this case.  I

13:49:21 17  know that at least some of what Mr. Ratliff has described is

13:49:27 18  happening has been happening because I am told about at numerous

13:49:30 19  discovery status conferences.  And we've discussed it, I've

13:49:34 20  discussed it with some of the lawyers on the PSC.

13:49:39 21        The lawyers representing these bellwether plaintiffs, any

13:49:43 22  plaintiff that's being deposed has got to understand that showing

13:49:47 23  up the day before the deposition with a bunch of documents that

13:49:50 24  should have been produced a year earlier is unacceptable.  And I

13:49:55 25  will entertain, I'm sure Judge Milazzo will entertain individual

13:50:00  1   motions if that occurs that go beyond the deficiency process for

13:50:09  2   the PSF.  Because obviously it's untenable to have that continue to

13:50:14  3   happen when you've got bellwether plaintiffs selected and you're

13:50:16  4   finding out at the last minute that they haven't produced documents

13:50:20  5   that should have been produced.  That just cannot happen, and I

13:50:23  6   don't think there's anybody here that disagrees with me.

13:50:25  7        So I am going to make that clear in the minute entry that

13:50:31  8   the issue has been raised.  I am not interested right now in

13:50:34  9   traversing whether it's nine out of ten or eight out of ten or five

13:50:39 10   out of ten, but it's an issue that's been raised again.  I perceive

13:50:43 11   that it is a problem and has been a problem, and going forward I am

13:50:48 12   going to direct you all on the PSC to share with all of the lawyers

13:50:51 13   in the case that it's not going to be tolerated.

13:50:56 14        And I will expect -- and obviously, discovery is a

13:51:00 15   two-way street, but right now we are talking about individual

13:51:03 16   plaintiffs.  I will expect sanofi, or other defendants if it

13:51:09 17   occurs, to bring those matters to the attention of the Court in a

13:51:13 18   motion if it occurs again.  And obviously it's a problem that can't

13:51:18 19   continue.

13:51:18 20        MR. RATLIFF:  Thank you, your Honor.

13:51:19 21        THE COURT:  Okay.  This Dr. Claiborne.  So I want to make

13:51:28 22   sure I understand the issue.  Dr. Claiborne is someone retained by

13:51:34 23   the plaintiffs to do biopsies on a number of individual plaintiffs,

13:51:42 24   and because of the moving of offices and such, some records of that

13:51:47 25   doctor were sent to sanofi, I guess by mistake, by that office's

13:51:53 1    administrator, and so it's come to sanofi's attention that this

13:51:57 2    work has been done.  I think sanofi takes the position that this

13:52:00 3    doctor should be considered to be a treating physician.

13:52:06 4         I think the issue is that you all consider this doctor to

13:52:11 5    be an expert.  The word consulting has been used, but then in

13:52:15 6    reading the letter, I got the impression that the real issue is not

13:52:22 7    whether this information is discoverable at all, but when it's

13:52:26 8    discoverable.

13:52:28 9         MR. MICELI:  Yes, your Honor.

13:52:29 10        THE COURT:  You all are not taking the position,

13:52:33 11   Mr. Miceli, that sanofi is not entitled to this information ever?

13:52:40 12        MR. MICELI:  No, we're not.  They will receive all of the

13:52:44 13   records that our experts rely upon, and I expect reasonably that

13:52:51 14   Dr. Claiborne's biopsies will be part of that package.

13:52:57 15        THE COURT:  Well, I think -- this is an interesting

13:52:59 16   situation.  I don't know that I've ever had this specific sort of

13:53:06 17   hybrid situation.  It does not appear from what I've seen -- it

13:53:18 18   doesn't appear from what I've seen that Dr. Claiborne fits the

13:53:22 19   definition that we normally think of when we think of a treating

13:53:26 20   physician.  On the other hand, he has interacted with these

13:53:32 21   plaintiffs in a way that no other expert can.  I mean, you couldn't

13:53:36 22   do what he did, right?

13:53:38 23        MR. MICELI:  No, your Honor.  But that's also why we made

13:53:40 24   our accommodation.  We told -- we asked when that tissue was taken

13:53:45 25   that enough would be taken to share with the defendants.  And we

13:53:50  1  have offered to do that and making reasonable accommodations for

13:53:54  2  the transfer of that tissue.  Normally from our perspective, when

13:53:58  3  we made our expert disclosures and they learned of it, we would

13:54:01  4  then make that and they would have 30 days because there there's

13:54:05  5  about 30 days between expert disclosures.  Knowing that that's a

13:54:08  6  tight window and we said because they can't unsee what they have

13:54:12  7  seen, we will make that accommodation now as to that tissue to give

13:54:15  8  them the opportunity to do what they want to with it.

13:54:17  9       THE COURT:  I think they're entitled to something more

13:54:20 10  than that.  Because of the nature of this expert and because of the

13:54:24 11  nature, as I said, of the work that he's done and the interaction

13:54:28 12  that he's had with the plaintiffs, it is -- it's in the nature of

13:54:35 13  medical care.  I'll accept for now that this individual is not a

13:54:42 14  treating physician in the traditional sense, but because of what

13:54:49 15  he's done in the case, because he's interacted as he has with the

13:54:55 16  plaintiffs, because he's done testing, because he may have spoken

13:54:58 17  to these plaintiffs and made observations and asked questions

13:55:03 18  germane to the testing he was doing, I think that sanofi's entitled

13:55:07 19  to that information, those facts.  If they're going to be able to

13:55:14 20  do anything with that tissue, I think there's background

13:55:18 21  information that they're entitled to know.

13:55:19 22       And I think they essentially laid that out in the letters

13:55:24 23  as to what they want and what they need, and it's, you know -- even

13:55:31 24  treating physicians can testify about what they know, the facts and

13:55:37 25  their observations.  And I think in that regard, discovery of that

13:55:41  1    information now is appropriate because I do think they're entitled

13:55:48  2    to use the tissue that you preserved for that reason, but I don't

13:55:54  3    think that they should be put in a position of having to decide

13:56:02  4    what to do with that.  They shouldn't have to wait to know what

13:56:06  5    your guy did with it before they decide what to do with it.

13:56:10  6         Now, they must wait on his opinions.  But I don't think

13:56:17  7    the facts that he has gathered in terms of what he did, what he

13:56:23  8    observed, what tests he did, and the objective results of those

13:56:27  9    tests I think they're entitled to now.  The objective results,

13:56:32 10    whether they're -- which I assume would be found in documents

13:56:36 11    somewhere.  I mean, these are -- if he was doing an MRI instead of

13:56:41 12    a biopsy, you would have films of the MRI.  I think that they're

13:56:48 13    entitled -- they're entitled to it eventually and I think under the

13:56:51 14    circumstances they're entitled to it now.

13:56:53 15         MR. MICELI:  They have the records on Ms. Tuyes.

13:56:56 16         THE COURT:  Okay.

13:56:56 17         MR. MICELI:  There were three others, we would be happy

13:56:58 18    to coordinate with them to have those three other biopsy records

13:57:03 19    produced to them.

13:57:04 20         THE COURT:  All right.  I think the records, you know, as

13:57:07 21    I said, the records of what happened I think are going to be

13:57:12 22    sufficient for you all to proceed.  And obviously at some point

13:57:16 23    you'll have an opportunity to depose the doctor on everything else,

13:57:20 24    why he did what he did, what he learned, what his opinions are and

13:57:24 25    that.

13:57:24  1          MR. RATLIFF:  And thank you, your Honor.  That's all we

13:57:27  2     were looking for is not just the biopsy itself but the medical

13:57:31  3     records that demonstrate the facts and observations, because the

13:57:34  4     reality is that we may get to November, or whenever the deadline is

13:57:38  5     for expert disclosures, and they may choose not to disclose

13:57:42  6     Dr. Claiborne and then we've been kept away from that information.

13:57:44  7     So that's all we were looking for.

13:57:46  8          THE COURT:  I think I'm on solid ground letting you all

13:57:49  9     do that discovery as to that information.  So the minute entry will

13:57:53 10     reflect that.

13:58:01 11          Have I reached the end?

13:58:04 12          MR. COFFIN:  We've got about four minutes, your Honor.

13:58:07 13          THE COURT:  Pretty good.  Am I missing something?

13:58:10 14          MR. BACHUS:  There is just one issue on timing.  Harley

13:58:12 15     and I spoke about it just before the hearing with respect to the

13:58:16 16     response to the Gahan --

13:58:17 17          MR. RATLIFF:  It's not before him, it's before Milazzo.

13:58:22 18          MR. BACHUS:  Just trying to --

13:58:24 19          THE COURT:  One of those motions?

13:58:25 20          MR. BACHUS:  Yes.

13:58:25 21          THE COURT:  I think that may get referred to me.

13:58:28 22          MR. COFFIN:  No.

13:58:31 23          THE COURT:  No?

13:58:32 24          MR. COFFIN:  Judge Milazzo said that she is going to

13:58:34 25     handle that.

13:58:34 1          THE COURT:  Okay.  Great.  I'm okay with that.

13:58:39 2          All right.  Anything else?  How soon do we need to do

13:58:43 3  this again?

13:58:44 4          MR. COFFIN:  Two.

13:58:46 5          THE COURT:  Two weeks?

13:58:47 6          MS. MENZIES:  Yes.

13:58:47 7          MR. COFFIN:  Our suggestion is every two weeks like we've

13:58:51 8  done been doing; and if we don't need it, we'll take it off.

13:58:54 9          THE COURT:  Okay.

13:58:54 10         MS. MENZIES:  Yeah.  And realistically, you know, we've

13:58:56 11  raised some concerns about getting responses and otherwise, and

13:58:59 12  your conferences cause results.

13:59:01 13         THE COURT:  I don't mind.

13:59:02 14         MS. MENZIES:  And we appreciate it.

13:59:04 15         THE COURT:  I don't have my calendar, as usual.  Harley,

13:59:07 16  can you and Chris maybe talk to Blanca and get a time in two weeks

13:59:10 17  and get it on the calendar?

13:59:11 18         MR. RATLIFF:  Yeah, absolutely, your Honor.  Would it be

13:59:13 19  possible to have it be -- the next one be a telephonic conference,

13:59:17 20  is that possible?

13:59:18 21         THE COURT:  I'm fine with that.  I'm simply going to say

13:59:22 22  this.  We got a lot of people on the phone right now.  I'm okay if

13:59:27 23  somebody needs to be on the phone being on the phone.  I do like

13:59:31 24  having you all all in the same room, you know, around once a month,

13:59:35 25  every other conference.  So doing it that way is fine.

13:59:38  1          MR. RATLIFF:  And, your Honor, I agree.  I find the
13:59:41  2  in-person is good.  We just all have -- not all of us live in New
13:59:44  3  Orleans and we are on the road a lot.
13:59:46  4          THE COURT:  Right.  And I am sensitive to that.
13:59:47  5          MR. COFFIN:  It just so happens that Mr. Ratliff and his
13:59:51  6  crew will be in New Orleans on the 27th.
13:59:58  7          THE COURT:  The 28th is better.  I'm out of town on the
14:00:01  8  27th.
14:00:02  9          MR. COFFIN:  28th is fine for us, either way whether it's
14:00:05 10  telephonically or not.  But we have a --
14:00:08 11          MR. RATLIFF:  Do you mind if I check my calendar?
14:00:11 12          THE COURT:  We can do it in the morning.  If y'all are
14:00:13 13  going to be here, if you were planning to leave on the 28th, we can
14:00:16 14  do it in the morning.
14:00:16 15          MR. RATLIFF:  We were probably planing to leave on the
14:00:18 16  27th.  If the Court would --
14:00:21 17          THE COURT:  I can do it by phone though, that's fine.
14:00:23 18          MR. RATLIFF:  Okay.  Thank you, your Honor.
14:00:24 19          THE COURT:  So we'll schedule it for one on the 28th, one
14:00:27 20  o'clock on the 28th.
14:00:31 21          MR. COFFIN:  Okay.  That's fine.
14:00:34 22          THE COURT:  All right.  Now I get to go write the minute
14:00:37 23  entry.
14:00:59 24      (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)
         25

```
 1                        * * * * * *

 2

 3

 4                    REPORTER'S CERTIFICATE

 5

 6        I, Karen A. Ibos, CCR, Official Court Reporter, United

 7   States District Court, Eastern District of Louisiana, do hereby

 8   certify that the foregoing is a true and correct transcript, to the

 9   best of my ability and understanding, from the record of the

10   proceedings in the above-entitled and numbered matter.

11

12

13                        /s/ Karen A. Ibos

14                   Karen A. Ibos, CCR, RPR, CRR, RMR

15                   Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```