UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)            MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

           SECTION "H" (5)

THIS DOCUMENT RELATES TO
*Suzanne Mink v. Sanofi U.S. Services Inc., et al.*, No. 17-02931

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON STATUTE OF LIMITATIONS GROUNDS AGAINST PLAINTIFF SUZANNE MINK

The Court should grant Defendants' Motion for Summary Judgment because Plaintiff Suzanne Mink's claims are barred by California's two-year statute of limitations. *See* Cal. Civ. Proc. Code § 335.1. The pleadings and undisputed evidence establish that Ms. Mink alleges to have suffered an open and obvious injury—which she always associated with chemotherapy—more than six years before she filed suit. In those six years, Ms. Mink joined a group of women that allege that Taxotere® injured them and that accuse Sanofi of wrongdoing, and she joined an effort to lobby FDA to change the medicine's label. All the while, she was reluctant to file suit, discussed the likelihood that the statute of limitations had expired on her case, and became part of a litigation strategy by Plaintiffs and their counsel to delay filing until amassing enough lawsuits to avoid individual discovery.

**Pleadings**: Plaintiff alleges that she finished chemotherapy with Taxotere® in September 2010 and that she was injured "six months after completion of chemotherapy" when her hair did

1

not grow back as she expected.[1] She does not allege that she was unable to discover her injury or its potential cause despite exercising reasonable diligence, making her suit barred on its face. Under California law, "a plaintiff whose complaint shows on its face that [her] claim would be barred without the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery *and* (2) the inability to have made earlier discovery despite reasonable diligence." *Fox v. Ethicon Endo-Surgery, Inc.*, 110 P.3d 914, 920–21 (Cal. 2005).

**Evidence**: The undisputed evidence confirms what is already obvious from the pleadings: Plaintiff's cause of action accrued on the date she was injured. Ms. Mink states in her verified Plaintiff Fact Sheet ("PFS") that she had "visible bald spots on [her] head no matter how [she] styled [her] hair" in March 2011. *See* PFS, § VI.5.[2] The facts make clear that, by March 2011, she had reason to suspect this alleged injury was "wrongfully caused." She said as much on social media to other women.[3] By then, she had also joined groups that claim Taxotere® causes permanent hair loss. *See* PFS, § II.20.

During the two year period in which she could have filed suit, Ms. Mink was reluctant to do so.[4] She decided to wait to join the mass filing by the Plaintiff law firm Bachus & Shanker LLC, on the belief that careful, case-specific discovery would never occur in an MDL because of the number of lawsuits.[5] Deciding not to file a lawsuit for strategic purposes, however, does not

---

[1] *See* Second Amended Master Long Form Complaint (Rec. Doc. 4407) ("AMC") at ¶ 181. Where Master and Short Form Complaints are used in an MDL like this one, the documents together comprise a Plaintiff's complaint. *See In re Zofran (Ondansetron) Prods. Liab. Litig.*, No. 1:15-MD-2657, 2017 WL 1458193, at *5 (D. Mass. Apr. 24, 2017). Plaintiffs' Master and Ms. Mink's Short Form Complaints are attached as **Exhibits A and B**, respectively.

[2] PFS references are to Suzanne Mink's Third Amended Plaintiff Fact Sheet, attached as **Exhibit C**.

[3] *See* **Exhibit D**, Post to BreastCancer.org (May 3, 2016) ("I think if you are going to have permanent baldness from Taxotere, you know pretty early on that things just aren't right. *I think I knew at about 4 months*…").

[4] *See* **Exhibit E**, Email from Suzanne Mink to Taxotears Group (Dec. 20, 2015) ("I would never have sought a lawyer. I don't know why. Just could not see me doing that. Maybe I don't want someone to tell me to go away and just be happy to be alive.").

[5] *See* **Exhibit F**, Email from S. Makshanoff to Taxotears Group (Nov. 30, 2016) ("***The more women that sue, the more leverage*** and stronger the lawsuit against the fourth largest company in world [*sic*].") (emphasis added); *see*

toll the statute of limitations.

The evidence confirms: (1) that Plaintiff was injured, at the latest, six months after chemotherapy as alleged in her Complaint, and (2) that her cause of action accrued on the date that she was injured because she both knew of her alleged injury and suspected a wrongful cause. Thus, there is no triable issue of fact regarding the untimeliness of Plaintiff's claims and Defendants are entitled to summary judgment.

## BACKGROUND

Ms. Mink is one of several thousand Plaintiffs in MDL No. 2740 who alleges that she took Taxotere® at some point in its 22-year history and has been injured ever since. Taxotere® was first approved by the Federal Food & Drug Administration in 1996, and Plaintiffs in this MDL completed treatment as far back as 1998. As with all Plaintiffs in this MDL, Ms. Mink alleges that she has suffered permanent or persistent hair loss caused by Taxotere®.

Unlike cases where an injury is latent, the injury alleged in this MDL—hair loss caused by chemotherapy—is such that lawsuits like Ms. Mink's are either timely or untimely on their face. The alleged injury is open and obvious and its potential link to chemotherapy is evident. Still, the majority of Plaintiffs in this MDL filed cases far outside the applicable statute of limitations—and only after the creation of this MDL. *See In re Mentor Corp. Obtape Transobturator Sling Prod. Liab. Litig.*, No. 4:08-md-2004, 2016 WL 4705827, at *2 (M.D. Ga. Sept. 7, 2016) ("[T]he evolution of the MDL process…has produced incentives for the filing of cases that otherwise would not be filed if they had to stand on their own merit as a stand-alone action.").

Sanofi first raised the MDL-wide statute of limitations issue in an omnibus motion to

---

*also* **Exhibit G**, Email from K. Free to Taxotears Group (Oct. 24, 2016) ("Also the more they could file, the more chances of getting a 'redistricting.' [Bachus & Schanker LLC] ***told me their goal was to redistrict and then settle out of court. They said they never had an intent to actually go to court***.").

3

dismiss on May 26, 2017, noting that at that time, some 850 of approximately 1,100 then-pending cases were facially untimely. *See* Motion to Dismiss Claims Barred by the Applicable Statutes of Limitations (May 26, 2017) (Rec. Doc. 494). In deferring a decision on the merits of the motion, the Court concluded that it would be appropriate to take it up at a later date with the benefit of further discovery before considering an MDL-wide approach. *See* Hr'g Tr. 25:8–18 (Oct. 27, 2017). Discovery continued through the PFS process, including production of electronically stored information, as well as phased discovery. This discovery squarely confirmed the *prima facie* untimeliness of Plaintiff's claims. Summary judgment is therefore appropriate.

## STANDARD

Summary judgment is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The party seeking summary judgment initially bears the responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323–24 (1986). The moving party can meet this burden by pointing out that the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof. *Id.* at 322–23.

Once the moving party has met its burden, the nonmoving party bears the burden of coming forward with evidence of each essential element of its claim, such that a reasonable jury could find in its favor. *Id.* The existence of a mere scintilla of evidence to support the nonmoving party's position, however, will not defeat summary judgment; there must be sufficient evidence on which the jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). "The failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial and requires the court to grant the motion for

summary judgment." *In re Trasylol Prods. Liab. Litig.*, No. 08-md-01928, 2010 WL 6098571, at *4 (S.D. Fla. Mar. 16, 2010).

**ARGUMENT**

Summary judgment should be granted here for three reasons:

1. First, the untimeliness of this case, like so many cases in this MDL, is apparent from the pleadings.

2. Second, the discovery rule is inapplicable to Ms. Mink's case and does not toll the statute of limitations.

3. Third, the undisputed facts establish that Ms. Mink not only suspected—but knew—of the basis for her claims years ago. Yet, she did not file a lawsuit until many years after the statute of limitations had expired.

Because there is no genuine issue of material fact as to the untimeliness of Plaintiff's lawsuit, the Court should grant summary judgment.

### I. Plaintiff's Case is, on its Face, Barred by the Statute of Limitations

A plaintiff alleging personal injury from a product in California must bring her action within two years after the cause of action accrues. Cal. Civ. Proc. Code § 335.1; *Norgart v. Upjohn Co.*, 981 P.2d 79, 88 (Cal. 1999). This statute bars untimely personal injury claims based on allegedly defective products "regardless of the specific cause of action asserted." *Soliman v. Phillip Morris Inc.*, 311 F.3d 966, 971 (9th Cir. 2002); *see also Rivas v. Safety-Kleen Corp.*, 119 Cal. Rptr. 2d 503, 512–13 (Cal. Ct. App. 2002) (applying California's statute of limitations to claims for negligence, strict liability (including design defect, manufacturing defect, and failure to warn), breach of warranty, loss of consortium, and fraudulent concealment). In a lawsuit alleging personal injury, the date the cause of action accrues is generally the date of injury. *See, e.g.*, *Jolly v. Eli Lilly Co.*, 751 P.2d 923, 926 (Cal. 1988) (en banc). On the date of injury both the alleged cause and harm have occurred. *See Fox*, 110 P.3d at 921.

Here, Ms. Mink's case is untimely because her alleged injury occurred when her hair did not grow back in March 2011. The MDL Master Complaint, which Ms. Mink adopted through her Short Form Complaint, alleges that Ms. Mink developed permanent alopecia which is "an absence of or incomplete hair regrowth *six months beyond the completion of chemotherapy*." AMC at ¶ 181 (emphasis added). Her Short Form Complaint states that she was last treated with Taxotere® in September 2010. *See* Short Form Complaint ("SFC") at ¶ 10 (No. 2:17-cv-02931, Rec. Doc. 5). Thus, taken together, Ms. Mink alleges that she was injured in March 2011. Under California's statute of limitations, Ms. Mink's cause of action accrued in March 2011 and she had until March 2013 to file her lawsuit. *See, e.g.*, *Norgart*, 981 P.2d at 93. But Ms. Mink did not file until April 6, 2017—more than four years too late. As such, Ms. Mink's case is barred by the statute of limitations.

## II. The Discovery Rule is Inherently Inapplicable to Ms. Mink's Case

The so-called "discovery rule" addresses the unique circumstance in which a plaintiff is "blamelessly ignorant" of her cause of action even after the date of injury. *Norgart*, 981 P.2d at 88. Under the exception, a cause of action does not accrue until the plaintiff has reason to suspect the factual basis for the elements of her cause of action. *Id.* "Elements" in this context is not a legal term of art, but merely "generic" indicia of wrongdoing: the action that causes the harm and the harm itself. *Fox*, 110 P.3d at 920 ("In so using the term 'elements' we do not take a hypertechnical approach to the application of the discovery rule. Rather than examining whether the plaintiffs suspect facts supporting each specific legal element of a particular cause of action, we look to *whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them*.") (emphasis added). Absent evidence that a plaintiff was *unable* to discover her cause of action despite reasonable diligence, the discovery rule cannot be invoked. *See Fox*, 110

7

P.3d at 920–21 (to invoke the discovery rule, a plaintiff must plead and prove facts that show "(1) the time and manner of discovery *and* (2) the ***inability*** to have made earlier discovery despite reasonable diligence.") (second emphasis added).

Here, Plaintiff knew of her alleged injury and had reason to suspect a wrongful cause in March 2011. First, she claims her injury is obvious. So obvious, in fact, that she seeks recovery for the negative effects of alopecia on her body image and identity, which she claims hinder her relationships and have harmed others' perceptions of her. AMC at ¶¶ 6, 215–216. Such damages are possible only to the extent Plaintiff's injuries are evident.

Second, Plaintiff claims that her injury reminds her of its potential cause: chemotherapy. She acknowledges that hair loss or "alopecia" (a term that includes all types and durations of hair loss) is a well-known side effect of chemotherapy and has always been in Taxotere®'s FDA-approved label. *See, e.g.*, *id.* at ¶¶ 129; 135; 174. She even acknowledges that she expected to develop alopecia during chemotherapy treatment. *Id.* at ¶ 135. But she claims that Taxotere® caused the hair loss to be permanent when it did not grow back as she expected "six months beyond the completion of chemotherapy." *See id.* at ¶ 181. She inextricably links the hair loss and chemotherapy, noting that chemotherapy causes hair loss and "[a]lopecia symbolizes cancer identity and treatment." *Id*. at ¶¶ 174, 216. She further alleges that after completing chemotherapy, she "struggled to return to normalcy […] because an integral element of [her] identit[y], [her] hair, never returned," and that this "acts as a permanent reminder" of her cancer. *Id.* at ¶ 6. And she emphasizes her continual awareness of both her alleged hair loss and its cause as chemotherapy: "women who suffer from alopecia have a heightened awareness of their appearance"; alopecia can "heighten an individual's everyday awareness that she has or had cancer"; and she remains "stigmatized with the universal cancer signifier—baldness—long after [she] underwent cancer

treatment." *Id*. at ¶¶ 216–17, 6.

Thus, "[t]here was simply no mystery regarding the possible connection" between Plaintiff's injuries and Taxotere®. *See In re Mirena IUD Prods. Liab. Litig.*, No. 13-cv-3383, 2015 WL 144214, at *11 (S.D.N.Y. Jan. 9, 2015) (applying California law). "[T]he connection was sufficiently obvious that a diligent individual in Plaintiff's position would have inquired into whether she had a claim…." *Id.*; *see also Jolly*, 751 P.2d at 927 ("the limitations period begins once the plaintiff has notice or information of circumstances to put a reasonable person *on inquiry*….").

This is especially true when there has been, according to Plaintiffs, more than a decade of public discussion about this very injury.[6] Plaintiff broadly claims that there was popular publicity and medical discourse that Sanofi ignored. She at the same time buries those allegations when it would be to her benefit. But Plaintiff cannot have it both ways. Based on her own allegations, Plaintiff had "notice or information of circumstances to put [her] *on inquiry*" and she had "*the*

---

[6] *See* AMC ¶¶ 149–162; 180–187 (referencing Chan, S., et al., "Prospective randomized trial of docetaxel versus doxorubicin in patients with metastatic breast cancer," J. Clin. Onc. 17.8: 2341-2354 (1999); Martin, M., et al., "Adjuvant docetaxel for node-positive breast cancer." New Eng. J. Med. 352.22: 2302-2313 (2005); Sedlacek, S.M., "Persistent significant alopecia (PSA) from adjuvant docetaxel after doxorubicin/cyclophosphamide (AC) chemotherapy in women with breast cancer," Breast Cancer Res. Treat. 100 (Supp. 1), No. 2105 (2006); Prevezas, C., "Irreversible and severe alopecia following docetaxel or paclitaxel cytotoxic therapy for breast cancer," 160 Brit. J. Derm. 881-898 (2009); Trueb, R.M., "Chemotherapy-Induced Alopecia," 28 Seminars in Cutaneous Medicine and Surgery 11-14 (2009); Bourgeois, H., et al., "Long Term Persistent Alopecia and Suboptimal Hair Regrowth after Adjuvant Chemotherapy for Breast Cancer: Alert for an Emerging Side Effect: ALOPERS Observatory," Cancer Res. 69 (Supp. 24), No. 3174 (2009); The Globe and Mail, *Women who took chemo drug say they weren't warned of permanent hair loss*, http://www.theglobeandmail.com/life/health-and-fitness/women-who-took-chemo-drug-say-they-werent-warned-of-permanent-hair-loss/article572591/ (published Mar. 4, 2010); CBS News, *Sanofi's Latest Challenge: Women Who Say Its Chemotherapy Left Them Permanently Bald*, http://www.cbsnews.com/news/sanofis-latest-challenge-women-who-say-its-chemotherapy-left-them-permanently-bald/ (last updated Mar. 6, 2010); Tallon, B., et al., "Permanent chemotherapy-induced alopecia: Case report and review of the literature," J. Am. Acad. Dermatol. 63:333-6 (2010); Miteva, M. et al., "Permanent alopecia after systemic chemotherapy: a clinicopathological study of 10 cases," Am. J. Dermatopathol. 33:345-50 (2011); Kluger, N., et al., "Permanent scalp alopecia related to breast cancer chemotherapy by sequential fluorouracil/epirubicin/cyclophosphamide (FEC) and docetaxel: a prospective study of 20 patients," Annals of Oncology 10.1093 (2012); Thorp, N., et al., "Long Term Hair Loss in Patients with Early Breast Cancer receiving Docetaxel Chemotherapy," NCRI Cancer Conference abstract A218 (2014)).

*opportunity to obtain knowledge* from sources to open [her] investigation." *See, e.g.*, *Gutierrez v. Mofid*, 705 P.2d 886, 896–97 (Cal. 1985) (en banc) (emphasis in original).[7]

The discovery rule is inapplicable to Ms. Mink's case. Because her cause of action accrued over six years before she filed, her lawsuit is barred by the statute of limitations.

### III. The Evidence Confirms that Plaintiff's Case is Barred by the Statue of Limitations

Discovery in Ms. Mink's case corroborates what is evident from the pleadings: Ms. Mink's cause of action accrued in March 2011 when she allegedly suffered an injury that she suspected was wrongfully caused by Taxotere®.

#### a. Ms. Mink claims in her PFS that she suffered an open and obvious injury in March 2011

Section VI ("Claim Information"), question 5 of the PFS asks Ms. Mink to describe her alleged injury and the date on which it began. Ms. Mink alleged several types of hair loss, including "***visible bald spots on your head no matter how you style your hair***." *See* PFS, § VI.5. She alleges that this inconcealable injury occurred in March 2011. *Id.*[8] Her other PFS responses likewise demonstrate that her injury occurred in March 2011:

> 23. As of the date you verify your PFS, how long have you had alopecia or incomplete hair re-growth?  Approximately seven (7) years

*See* PFS, § VII.23. Thus, there is no genuine issue of material fact that Ms. Mink allegedly suffered

---

[7] *See also e.g., Plumlee v. Pfizer, Inc.*, 664 F. App'x 651, 653 (9th Cir. 2016) (affirming dismissal where "the district court took judicial notice of an extensive record of documents—all publicly available during the relevant limitations periods—which discussed Pfizer's unpublished clinical trials and the allegation that Zoloft was no more effective than a placebo."); *Carey v. Kerr-McGee Chem. Corp.*, 999 F. Supp. 1109, 1117 (N.D. Ill. 1998) (disposing of claims where "the pervasive media coverage and publicity surrounding the issue…leads the court to the inescapable conclusion that a reasonable person in [plaintiffs'] situation should have known of their claim.").

[8] Plaintiff claims to have suffered other open and obvious injuries in March 2011: (a) permanent/persistent hair loss on scalp; (b) diffuse thinning of hair on total scalp; (c) significant thinning of hair – visible bald spots no matter how styled; (d) permanent/persistent loss of eyebrows; (e) permanent/persistent loss of eyelashes; (f) permanent/persistent loss of body hair; (g) permanent/persistent loss of genital hair; and (h) permanent/persistent loss of arm and leg hair. *See* PFS, § VI.5.

an open and obvious injury in March 2011.

### b. Ms. Mink's PFS, emails, and social media posts make clear that the discovery rule does not delay accrual of her cause of action

"California law recognizes a general, rebuttable presumption, that plaintiffs have 'knowledge of the wrongful cause of an injury.'" *Shamsnia v. Anaco*, No. 2:14-cv-01431, 2015 WL 12672091, at *2 (C.D. Cal. Mar. 30, 2015) (quoting *Grisham v. Phillip Morris U.S.A., Inc.*, 151 P.3d 1151, 1159 (Cal. 2007)). To overcome that presumption, a plaintiff has the burden of proving that delayed discovery of her cause of action was justified. *See In re Trasylol Prods. Liab. Litig.*, 2010 WL 6098571, at *4. The statute of limitations begins running "when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her." *Jolly*, 751 P.2d at 927. A plaintiff need not be aware of who the wrongful actor is or what the actor did because "that is a process contemplated by pretrial discovery." *Id.* Instead, she need only have reason to "suspect" that her injury was wrongfully caused by something. *See id.*; *see also Norgart*, 981 P.2d at 88 ("'wrong' being used, not in any technical sense, but rather in accordance with its 'lay understanding.'").

Here, in March 2011 Ms. Mink not only suspected that her injury had been wrongfully caused by something—she *specifically* suspected that it had been wrongfully caused by Taxotere®. By January 2011, four months after her last Taxotere® treatment, she had such suspicions. That month, she claims that she joined "Taxotears" and "Ahead of Our Time," both of which are groups of women claiming that Taxotere® causes permanent hair loss. *See* PFS, § II.20. Posting as "DoubleWhammy," *see* PFS § II.19, she later described her early suspicions: "I think if you are going to have permanent baldness from Taxotere, you know pretty early on that things just aren't right. ***I think I knew at about 4 months***…." *See* **Exhibit D**, Post to BreastCancer.org (May 3, 2016):

11

> May 3, 2016 10:58AM DoubleWhammy wrote:
>
> You ladies who have posted photos are doing great. Your stubble looks like it's going to fill in fine. 5+ years later and I still don't have that much hair. I think if you are going to have permanent baldness from Taxotere, you know pretty early on that things just aren't right. I think I knew at about 4 months, but kept being told to be patient, maybe I was a slow responder, etc., but I knew in my gut. You ladies look just fine!

Ms. Mink plainly had a ***reason to suspect*** a potential link between Taxotere® and her alleged injury on the date that she was injured—six months after chemotherapy. *See Jolly*, 751 P.2d at 927–28 (holding that the statute is triggered when the plaintiff should have "a suspicion of wrongdoing" because, at that point, she has an "incentive to sue"). And, in Ms. Mink's case, she did *in fact* suspect that Taxotere® caused her injury in January 2011.

Ms. Mink was so convinced that her injury had been wrongfully caused that she, and other Taxotears group members, actively discussed it on social media for years and asked FDA to open an "investigation into the permanent side effect to Taxotere that many of us have experienced that of permanent hair loss." *See* **Exhibit H**, Email from Suzanne Mink to FDA (Sept. 8, 2015) (discussing a conference call with FDA in April 2015). Ms. Mink demonstrates that the statute of limitations cannot have been tolled until a December 2015 revision to the Taxotere® label to state that "[c]ases of permanent alopecia have been reported" as part of the medicine's post-marketing adverse reaction information. She was not ignorant of her cause of action until the label change because she was part of the group that advocated for that label change. In reality, Ms. Mink—and all Plaintiffs—had reason to suspect her cause of action as soon as she believed she was injured. The subsequent update in Taxotere®'s label does not change that.[9]

---

[9] *See In re Xarelto Prods. Liab. Litig*, MDL No. 2592, 2017 WL 4517287, at *3 (E.D. La. Oct. 10, 2017) (labeling change irrelevant to the question of when the statute began to run on the plaintiff's claim); *Yurcic v. Purdue Pharma, L.P.*, 343 F. Supp. 2d 386, 392-93 (M.D. Pa. 2004) ("Plaintiffs' argument that they only became aware of their claim against the pharmaceutical companies when the label change occurred must fail. The accrual of Plaintiffs' cause of action is not dependent on this label change […] Plaintiff might have ascertained that the original label was inadequate on the basis of his injuries, if indeed the label has anything to do with his negligence and fraud claims."); *N. Tr. Co. v. Upjohn Co.*, 572 N.E.2d 1030, 1038 (Ill. App. 1991) (finding post-treatment warnings irrelevant in failure to warn product liability cases involving prescription drugs).

Other discovery likewise demonstrates that Ms. Mink had reason to—and did—suspect that Taxotere® caused her alleged injuries in 2011. Plaintiff first discussed her hair loss, generally, with a healthcare provider in March 2011. *See* PFS, § VII.5. Then, in that same year, Plaintiff specifically discussed whether Taxotere® caused or contributed to her alleged injury with two different physicians. *See* PFS, § VI.8. With one such physician, Dr. Knowpfler, Ms. Mink also had her hormones checked to evaluate her hair loss problem. *See* PFS, § VI.6. Then, in May 2012, Plaintiff visited Dr. Anabella Pascucci for a consultation and scalp biopsy to diagnose and treat her hair loss. *See* PFS, §§ VI.6, VI.7. They too specifically discussed whether Taxotere® caused or contributed to Ms. Mink's hair loss. *See* PFS, § VI.8. Ms. Mink states that Dr. Pascucci diagnosed her with the injury she is alleging in this lawsuit. *See* PFS, § VI.7.

Thus, by May 2012, Ms. Mink had (1) allegedly suffered an open and obvious injury, (2) suspected that Taxotere® caused it, (3) discussed whether Taxotere® caused it with three different physicians, (4) joined social media groups for the purpose of discussing permanent alopecia after Taxotere®, and (5) been treated for and diagnosed with hair loss by a physician and discussed whether Taxotere® caused it. All of that was done within the two years given by California's statute of limitations and shows that Ms. Mink was capable of bringing a timely lawsuit.

Going further, in April 2013 (four years before she filed her lawsuit), she posted on social media that she believed her hair loss was due to Taxotere®. *See* **Exhibit I**, Post to BreastCancer.org (Apr. 2, 2013) ("I believe mine is permanent hair loss from Taxotere®."). In 2014 (three years before she filed her lawsuit), she filed a MedWatch report with FDA. *See* **Exhibit J**, Email to Taxotears Google Group (June 1, 2014); *see also* **Exhibit K**, MedWatch Report dated 05/31/2014. In her MedWatch report, Ms. Mink reported to the FDA that the only possible cause of her hair loss was Taxotere®:

13

| 3. Date of Event (mm/dd/yyyy) | 4. Date of this Report (mm/dd/yyyy) |
|---|---|
|  | 05/31/2014 |
| 5. Describe Event, Problem or Product Use Error | |
| I had 4 cycles of Taxotere and Cytoxin for breast cancer 3.5 years ago. Only about 25% of my hair returned. Tests and biopsies ruled out any other cause leading to the conclusion that I have permanent hair loss from Taxotere. | |

By 2015, Ms. Mink believed that the statute of limitations had likely expired on her claims—and on those of many of the Taxotears group members—because the women were aware of their injury and its potential cause many years ago. *See* **Exhibit E**, Email from Suzanne Mink to Taxotears Group (Dec. 20, 2015) ("Whether some of us have surpassed the statute of limitations and whether that will apply is also sort of unimportant to me.").

Their correspondence, however, demonstrates why so many facially-untimely cases have been filed in this MDL anyway. The Taxotears group members encouraged each other to file lawsuits on the belief that it would force resolution. *See* **Exhibit L**, Email from Debbie Cantwell to Taxotears Group (Dec. 9, 2015) ("It has to be high enough to hurt!"); *see also* **Exhibit F**, Email from S. Makshanoff to Taxotears Group (Nov. 30, 2016) ("***The more women that sue, the more leverage*** and stronger the lawsuit against the fourth largest company in world [*sic*].") (emphasis added). They also hoped that such a strategy would lead to the creation of an MDL where their cases could avoid close scrutiny:

> The more [lawsuits Bachus & Schanker LLC] can file, and fastly, the more other law firms will pick up on it and start their advertising. Also the more they could file, the more chances of getting a 'redistricting.' [Bachus & Schanker LLC] told me their goal was to redistrict and then settle out of court. They said they never had an intent to actually go to court.

*See* **Exhibit G**, Email from K. Free to Taxotears Group (Oct. 24, 2016).

Ms. Mink did not delay filing her lawsuit because she was "blamelessly ignorant" of her cause of action—she delayed filing her lawsuit because she was not inclined to contact a lawyer

14

and pursue a legal claim.  *See* **Exhibit E**, Email from Suzanne Mink to Taxotears Group (Dec. 20, 2015) ("I would never have sought a lawyer.  I don't know why.  Just could not see me doing that.  Maybe I don't want someone to tell me to go away and just be happy to be alive.").

And she knew that even if her oncologist had given her a more detailed warning about alopecia, she still would have taken Taxotere® to treat her life-threatening cancer.  *See* **Exhibit M**, Post to BreastCancer.org (May 6, 2013) ("I know if I'd been warned about this potential side effect that I would still have had Taxotere®."); *see also* **Exhibit N**, Post to BreastCancer.org (May 24, 2018) ("Had I been warned I probably would have done it anyway.").  This point is confirmed by the fact that she read about the possibility of permanent alopecia before having chemotherapy and opted for the treatment anyway because "I didn't believe it would happen to me."  *See* **Exhibit O**, Email from Suzanne Mink to Taxotears Group (April 15, 2015) (describing social media posts she read about permanent alopecia "prior to my having chemo").

Mass-litigation strategy, however, does not toll the statute of limitations.  Other MDL courts have cautioned that transferee judges should be aware of this strategy by plaintiffs to avoid the statute of limitations:

> Some lawyers seem to think that their case will be swept into the MDL where global settlement will be reached, allowing them to obtain recovery without the individual merit of their case being scrutinized as closely as it would be if it proceeded as a separate, individual action. This attitude explains why so many cases are filed without regard for the statute of limitations and with so little pre-filing preparation.

*In re Mentor Corp. Obtape Transobturator Sling Prod. Liab. Litig.*, No. 4:08-md-2004, 2016 WL 4705827, at *2 (M.D. Ga. Sept. 7, 2016).  Transferee courts should, therefore, "consider approaches that weed out non-meritorious cases early, efficiently, and justly."  *Id.*

Like so many Plaintiffs in this MDL, Ms. Mink failed to timely file suit even though she

had reason to suspect the factual basis for her cause of action. Nothing further is required under California law for her claim to accrue. *Jolly*, 751 P.2d at 927 (holding that the plaintiff need only have reason to suspect some kind of wrongdoing and rejecting a rule that would toll the statute of limitations until the plaintiff is aware of the "facts constituting wrongful conduct."); *see also In re Mirena IUD Prods. Liab. Litig.*, 2015 WL 144214, at *7 (holding that California plaintiffs only needed to suspect a connection between the device and the injury to trigger the statute). Not only *could* Plaintiff discover the factual basis for her cause of action in March 2011—she *did*. Summary judgment is therefore warranted. *Shamsnia*, 2015 WL 1272091, at *3 (to overcome summary judgment a plaintiff must produce facts that prove she "*could not* have reasonably discovered facts supporting [her] product liability claim before the statute of limitations expired.").

## CONCLUSION

Plaintiff's pleadings make clear that she both knew of her open and obvious alleged injury and had reason to suspect its cause when it happened. The limited discovery in Ms. Mink's case confirms this. In such circumstances, the cause of action accrues on the date of injury, which, here, is March 2011. Because Plaintiff failed to file her lawsuit within the two years allowed by California's statute of limitations, her claim is barred. For the foregoing reasons, the Court should hold that Ms. Mink's claims are barred by Cal. Civ. Proc. Code § 335.1, and GRANT Defendant Sanofi's Motion for Summary Judgment.

Respectfully submitted,


/s/ *Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE URQUHART & MOORE LLC**
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: 504-310-2100
Facsimile: 504-310-2120
dmoore@irwinllc.com

Harley V. Ratliff
Adrienne L. Byard
Kelly Bieri
**SHOOK, HARDY& BACON L.L.P.**
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
Facsimile: 816-421-5547
hratliff@shb.com
abyard@shb.com
kbieri@shb.com


*Counsel for sanofi-aventis U.S. LLC and Sanofi US Services Inc.*


**CERTIFICATE OF SERVICE**

I hereby certify that on October 24, 2018, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ *Douglas J. Moore*