UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  TAXOTERE (DOCETAXEL)        *       16-MDL-2740
PRODUCTS LIABILITY LITIGATION       *
                                    *
                                    *       Section N
                                    *
Relates To All Cases                *       November 8, 2018
                                    *

*********************************************************************

REPORTER'S OFFICIAL TRANSCRIPT OF THE
**DISCOVERY CONFERENCE**
BEFORE THE HONORABLE MICHAEL B. NORTH,
UNITED STATES MAGISTRATE JUDGE.

*********************************************************************

**REPORTED BY:**

Mary V. Thompson, RMR, FCRR
500 Poydras Street, Room B-275
New Orleans, Louisiana  70130
(504)589-7783

**OFFICIAL TRANSCRIPT**

**APPEARANCES:**

**For the Plaintiffs:**

**In person:**

Kyle Bachus, Esq.                    Lawrence Centola, Esq.
David Miceli, Esq.                   Palmer Lambert, Esq.
Karen Barth Menzies, Esq.            Christopher Coffin, Esq.
Dawn Barrios, Esq.

**By phone:**

Andre Mura, Esq.                     Zachary Wool,Esq.
Daniel Markoff, Esq.                 Abby McClellan, Esq.
Darin Schanker, Esq.                 Anne Andrews, Esq.
Andrew Lemmon, Esq.                  John Thornton, Esq.
Andrew Dwyer, Esq.


**For the Defendants:**

**In person:**

Douglas Moore, Esq.                  Patrick Oot, Esq.
Harley Ratliff, Esq.                 Kelly Brilleaux, Esq.
Peter Rotolo, Esq.                   John Olinde, Esq.
Jon Strongman, Esq.

**By phone:**

Julie Callsen, Esq.                  Cliff Merrell, Esq.
Kathleen Kelly, Esq.                 Suzy Marinkovich, Esq.
Mike Suffern, Esq.                   Adrienne Byard, Esq.
Mara Cusker Gonzalez, Esq.

**OFFICIAL TRANSCRIPT**

## P R O C E E D I N G S

THE COURT:  Morning everybody.  Y'all can have a seat.

All right.  The first issue on the agenda is the plaintiff's request to quash the subpoena duces tecum to Dr. Tosti.

Mr. Ratliff tells me in his submission that I -- the parties did not meet and confer on this particular issue.

Mr. Miceli, is that the case?  What's going on here?

MR. MICELI:  Your Honor, we did send an e-mail to defense counsel and requested a meet-and-confer.  Ms. Adrienne Byard responded to me, said she would cancel the deposition that they had noticed, but they would not pull it down.  And we did not discuss further.

I have had multiple other meet-and-confers over the course of the last week -- have requested no less than five meet-and-coffers on various topics, and this didn't come up.

THE COURT:  It needs to come up if y'all are going to bring it to my attention.

MR. MICELI:  Well, we did bring it up.  We asked for a meet-and-confer, and they told us that they would not, and that was it.

THE COURT:  All right.  Look, if this keeps happening, I'm going to start sanctioning lawyers for bringing -- for bringing issues in detail to my attention for resolution when

**OFFICIAL TRANSCRIPT**

1   you-all haven't talked about it.  I've been -- I've been pounding

2   the table on this for months.  It's got to stop.

3         MR. MICELI:  Your Honor, I hear you.  And I understand

4   fully.  But when we request meet-and-confers and we're not given

*11:08:23*   5   the opportunity to talk --

6         THE COURT:  Then the issue should have been that you

7   requested a meet-and-confer and they are ignoring you.

8         MR. MICELI:  Thank you, Your Honor.

9         THE COURT:  All right.

*11:08:32*   10         So I had stated earlier, back I believe in August, that

11   as to the bellwether plaintiffs, issues such as this -- discovery

12   issues such as this one, we were going to handle through regular

13   practice pursuant to the federal rules.

14         So we don't have a motion to quash.  And so I've

*11:08:52*   15   construed this objection, I guess, as a written objection under

16   Rule 45(d)(2)(B).  And that rule requires that the objection has

17   to be made before the earlier of the time specified for

18   compliance or 14 days after the subpoena is served.

19         So obviously, under that rule, without my finding some

*11:09:17*   20   exception, the request is untimely.  I'm not sure what exception

21   or why I should consider it to be a timely request.

22         MR. MICELI:  Well, Your Honor, we received notice that

23   a subpoena would be served.  We were never put on notice formally

24   when a subpoena was served.  The first I spoke to the University

*11:09:38*   25   of Miami's lawyer is when Dr. Tosti contacted me -- it was either

**OFFICIAL TRANSCRIPT**

1   last week or the Friday before last -- and I learned that a

2   subpoena had, in fact, been served on the University of Miami.

3        It is my understanding from those discussions that the

4   time for compliance has been continued at least until

*11:09:55*   5   November 9th, so a motion would not need to be filed until that

6   date.

7        And that's where we stand right now.  That's why we

8   brought it to you, because of the case we cited that, in the

9   context of an MDL, it's appropriate for the MDL court, without

*11:10:09*   10  the motion to quash or -- or just to handle such an issue.

11       THE COURT:  Well, there are other issues that I'm

12  concerned with, one of which is I'm not inclined to quash

13  anything on the basis that somebody might be a testifying

14  witness.

*11:10:24*   15       MR. MICELI:  They are a testifying witness, Your Honor.

16       THE COURT:  I know that you-all cited a case, but it's

17  not from this circuit, that a -- or maybe you did cite a case

18  from Texas -- that a subpoena *duces tecum* is not an acceptable

19  means to obtain information from such a witness; but there is

*11:10:46*   20  competing authority in the Fifth Circuit that a subpoena *duces*

21  *tecum* sent to a testifying expert witness, particularly for the

22  kind of information that's being sought in this subpoena, is an

23  appropriate vehicle.

24       MR. MICELI:  There is competing authority.  I can't

*11:11:01*   25  dispute that, Your Honor.  We filed this because we think

**OFFICIAL TRANSCRIPT**

1  Rule 26 -- there's conflict between Rule 26 disclosure of expert

2  witnesses and Rule 45.

3        We think that this is going to open up a circus of

4  requests.  We know from information of -- or suspect very

11:11:17  5  strongly of who some of their experts are.  When they disclose

6  their experts, we will be firing off the same types of subpoenas.

7  And it's going to just open up, as I said, a circus of discovery

8  that's a sideshow to what we're here to do, and that's disclose

9  experts, depose them, and move forward.

11:11:35  10        THE COURT:  I'm going to allow this discovery to go

11  forward as to this witness.  I'm not encouraging, nor am I

12  suggesting, that this ruling is going to apply across the board

13  to discovery of all properly designated testifying experts.

14        This discovery was propounded before this individual

11:11:55  15  was ever identified as a testifying witness.  Obviously I've

16  looked at the material that's been requested.  I think that it's

17  fair game.  So as to this particular subpoena *duces tecum* and

18  subpoena, I'm going to allow it to go forward.  I'm going to deny

19  the request to quash it.

11:12:14  20        MR. MICELI:  All right.

21        THE COURT:  Mr. Miceli, I don't know if this next issue

22  is yours as well on the anonymized --

23        MR. MICELI:  It is.  If I may, I'm going to grab my pad

24  because there may be a couple of items that I need to cite to you

11:12:29  25  specifically.

**OFFICIAL TRANSCRIPT**

1          THE COURT:  Sure.

2          All right.  The thing that's troubling me here is

3     you-all have had this information for quite a while.

4          MR. MICELI:  When you say "quite a while," you're

*11:12:43*   5     referring to August?

6          THE COURT:  Yes.

7          MR. MICELI:  It was produced after, by our count, at

8     least nine witnesses were deposed without the type of

9     investigation that has been allowed since we learned of this

*11:12:54*  10     identifying number, this anonymous number that was anonymized and

11     then deanonymized.  So we have been able to conduct

12     investigations within the last week that are critical, that would

13     have impacted how we deposed and conducted discovery against at

14     least nine witnesses.

*11:13:12*  15          And we have not yet received an explanation that is

16     reasonable and believable as to why anonymous information was

17     changed before its production.  By its very definition, the

18     uniform subject ID number in Sanofi's documents is recognized as

19     an anonymous number.

*11:13:38*  20          THE COURT:  That's not what I'm being told in their

21     paper.

22          MR. MICELI:  I understand.  They're claiming that they

23     anonymized it for personal identification information.

24          21 CFR 20.63(c) defines personal identification

*11:13:52*  25     information for study subject as names and any information that

**OFFICIAL TRANSCRIPT**

1    would identify the patient.

2            There is nothing about the uniform identification

3    number that was produced in August that will identify the

4    patient.  The very fact that it's used to identify a patient in a

5    clinical study, although anonymous in that nature, does not make

6    it personal identification information, which is what their

7    explanation means.

8            THE COURT:  What was your expectation back in April

9    when you knew you were going to receive anonymized data?

10            MR. MICELI:  Well, Your Honor, we expected, with Sanofi

11    fulfilling its duties and obligations under rules of Federal

12    Civil Procedure for discovery disclosures, that they would

13    anonymize personal identification information.  Information that

14    would identify Mary Smith, John Q. Public, David Miceli,

15    Chris Coffin.

16            THE COURT:  But what you got were just numbers?

17            MR. MICELI:  We got numbers.  We got numbers that were

18    changed from TAX 316 or TAX 301, dash, a series of four, dash, a

19    series of three.

20            THE COURT:  What I'm getting at is why didn't you

21    object in April?

22            MR. MICELI:  To borrow a phrase from our opponents, we

23    don't know what we don't know, Your Honor.

24            THE COURT:  Okay.

25            MR. MICELI:  When they give us a number that is nine,

11:14:11

11:14:26

11:14:49

11:15:01

11:15:11

**OFFICIAL TRANSCRIPT**

1    nine, nine, zero, zero, zero, and then a couple of numbers, or

2    one through seven hundred and forty-four, perhaps, we don't know

3    that that is not the appropriate number.  It wasn't designated --

4    the discussion about anonymizing PII was had in the abstract, not

11:15:30    5    as to the specific disclosure.

6            So when we received that, we looked at that number and

7    we moved forward with our discovery with the use of that number.

8            When we learned of it, and we learned of what those

9    other numbers within the uniform subject identifier mean, we were

11:15:48    10    able to conduct multiple investigations, only one of which we

11    referenced in our letter, that would have allowed us to depose

12    anybody who reviewed clinical trial data and clinical trial data

13    sets with the information we have.

14            For instance, that the only adverse events that were

11:16:08    15    reported in TAX 301 were reported in less than 22 percent of the

16    study centers.

17            THE COURT:  So what Sanofi is telling me in their

18    letter is that the -- at least the way I interpreted it was that

19    with the unique identifier numbers that you received in August,

11:16:32    20    that patient identities can be discerned somehow.

21            MR. MICELI:  I would like to sit down and listen to

22    them explain that to Your Honor.

23            THE COURT:  Let me hear them.

24            MR. MICELI:  I would suggest, if that is the case, we

11:16:45    25    look at their protocols for their clinical studies, because the

**OFFICIAL TRANSCRIPT**

1 protocols in the assignment of a unique -- the word "unique"

2 should give us a little indication.  Unique subject identifier is

3 itself an anonymous number.  If they can look at the numbers and

4 tell us the people's names, I would like to know.

*11:17:02*   5       THE COURT:  Let me hear whether that's the case.

6       MR. RATLIFF:  Thank you, Your Honor.

7       In April, earlier this year, we told them we would be

8 anonymizing this data.

9       THE COURT:  By the way, this is Harley Ratliff for

*11:17:13*  10 Sanofi.

11       MR. RATLIFF:  Harley Ratliff on behalf of Sanofi.

12       In early April of this year, we told them we would be

13 anonymizing the data.  They said that was fine.  We received no

14 response back from them.  We produced it anonymized.

*11:17:27*  15       THE COURT:  So far what they have told me is of

16 interest because they don't know how you originally anonymized

17 it, and so they -- I accept what Mr. Miceli is telling me, that

18 he doesn't know what he's looking at when you give it to him.

19 And there is an argument to be made that it was already

*11:17:45*  20 anonymized through the use of these unique IDs.

21       MR. RATLIFF:  Yes.  And so on the issue of personal

22 identifying information, and the standards for that, the FDA --

23 we'll be happy to brief this additionally, but the FDA has

24 specific guidance on that.  They say there is a broad definition

*11:18:01*  25 of what constitutes PII.  So it's not just a particular piece of

**OFFICIAL TRANSCRIPT**

1   information on its own is going to be PII, it may not, but once

2   it can be linked up with additional information in the same data

3   set, it then becomes PII.  And the guidance from the FDA is it

4   takes a broad look at that.

*11:18:18*

5          So if you take the numbers which Mr. Miceli is talking

6   about which he says are purely anonymous numbers -- if you take

7   those numbers and link them up with the rest of the data in the

8   clinical trial set, you become -- you can start sorting out

9   initials, locations, birth dates, names.  And so those two things

*11:18:34*   10   worked hand-in-hand.

11          And so just because one number may appear anonymous to

12   Mr. Miceli, when you look at the totality of the evidence that's

13   presented in that clinical data set, it squarely fits the

14   definition of personal identifying information as set forth by

*11:18:49*   15   the FDA guidance, which we are obligated to comply with as being

16   part of the heavily --

17          THE COURT:  Why are you using that to anonymize the

18   data to begin with?

19          MR. RATLIFF:  I apologize, Your Honor.  I don't --

*11:19:01*   20          THE COURT:  Why are you using the unique identifier,

21   that system -- why are you using that to anonymize that

22   information in the first instance without reference to the

23   litigation?

24          MR. RATLIFF:  Are you talking about the "U" numbers?

*11:19:15*   25          THE COURT:  Yes.

**OFFICIAL TRANSCRIPT**

1           MR. RATLIFF:  Why were we anonymizing it?

2           THE COURT:  Yes.

3           MR. RATLIFF:  We were anonymizing it because when you

4    see the full set of numbers, which we produced to them in August

5    in advance of the 30(b)(6) deposition on this topic, we see those

6    unique sets of numbers, and they match up with patient initials,

7    patient birth dates, and patient names that can be linked

8    together.  So to us that creates PII.  And so having to take a

9    broad look at what we are obligated to anonymize, that's how it

10   was produced.

11          THE COURT:  Why did you produce it?

12          MR. RATLIFF:  Why did we produce it later?

13          THE COURT:  Uh-huh.

14          MR. RATLIFF:  Your Honor, I think from just a purely

15   practical standpoint, which is we received a 30(b)(6) notice on

16   wanting to know the exact identities of the patients who had

17   reported persistent alopecia as part of that study for this

18   30(b)(6).  There was no way for us to be able to do that, to

19   comply with the 30(b)(6), without deanonymizing it.  That was not

20   a choice we wanted to make.

21          So instead of coming back to Your Honor and

22   relitigating a 30(b)(6) notice, which we had already litigated

23   extensively before Your Honor, we made the decision we will

24   deanonymize it so these names can be linked up so Mr. Bachus and

25   the PSC can take this deposition.

**OFFICIAL TRANSCRIPT**

1   And they had that data.  We produced that data.  We

2   identified it in our production logs.  And then we identified

3   that data again in our discovery responses and in the materials

4   reviewed that were submitted to the PSC in advance of a corporate

*11:20:47*   5   deposition on this very subject.

6   THE COURT:  Well, we're not talking about the corporate

7   deposition now.

8   MR. RATLIFF:  Right.

9   THE COURT:  I mean, I assume -- because we haven't even

*11:20:55*   10   had this discussion yet, I assume Mr. Miceli is talking about

11   other witnesses who were deposed before the 30(b)(6).

12   MR. RATLIFF:  Right.  So in their letter they say, Well

13   we need six additional depositions from these particular

14   departments.

*11:21:09*   15   Since we've produced the non-anonymized data -- so they

16   have the anonymized and they have the non-anonymized data -- they

17   took a corporate deposition that we referenced on the very topic

18   of the identities of these patients.  On September 21st they took

19   a pharmacovigilance deposition.  On October 11th, in London, they

*11:21:27*   20   took the TAX 316 clinical trial coordinator deposition.  On

21   October 12th they took the biostat deposition of Pierre Mancini.

22   On October 26th they took the deposition of the chief oncologist

23   in Sanofi's medical affairs and regulatory department.  Also on

24   October 26th they took the deposition of Sanofi's global safety

*11:21:47*   25   officer during the large time period of the issues in dispute.

**OFFICIAL TRANSCRIPT**

1  And on November 5th they took the deposition of a marketing

2  person.  That's all after having all of this data, and they did

3  not ask a single question about the anonymized or non-anonymized

4  in any one of those particular depositions.

5  11:22:08        So the idea that they need to go back on this one issue

6  of anonymized/non-anonymized to retread nine additional

7  depositions over the course of 21 days just does not strike me as

8  something that is reasonable.

9        THE COURT:  Let me hear from Mr. Miceli on that point.

10  11:22:24        MR. OOT:  May I just add one point?

11        And in my e-mail I met and conferred multiple times

12  with Mr. Wool and Mr. Miceli on this issue.  This data is coming

13  out of France.  We've been talking about the FDA regulation for a

14  while, but data coming out of France is subject to GDPR and also

15  11:22:40  the data protection standards of France.  So we have to take that

16  into account when you piece this information together with other

17  information to link up.

18        THE COURT:  That's all -- I mean, I get that.  And I

19  appreciate you filling in that gap.  But the fact of the matter

20  11:22:55  is, it's all been produced.  It's in the hands of the PSC at this

21  point.

22        MR. MICELI:  Right.

23        THE COURT:  So that doesn't concern me as much.

24        MR. MICELI:  Your Honor --

25  11:23:06        THE COURT:  I still don't know whose depositions you

**OFFICIAL TRANSCRIPT**

1  want to take.

2       MR. MICELI:  It depends how many we get, Your Honor,

3  because we have a priority setting in our minds but -- if we have

4  two, we get two.  If we get three, we get three.

11:23:19

5       THE COURT:  Why didn't this subject come up in all the

6  depositions that were taken subsequent to the production of this

7  information in August?

8       MR. MICELI:  Your Honor, there are two points I would

9  like to make there.

11:23:28

10       One, with regard to the depositions that have been

11  taken since a reasonable time after receiving this information --

12  that came in with a larger production of other clinical trial

13  data, but it came in with it so we have to accept that.  A

14  reasonable time after that, to digest the information, puts it at

11:23:47

15  the first week in September.  For the depositions that came after

16  the first week of September, shame on us.  Don't give us those

17  people again.  But for all the people that came before

18  October 24th that they could have been used on, that is fair

19  game.

11:24:02

20       And to address the personal identification information,

21  Mr. Ratliff continues to refer to anonymized versus

22  non-anonymized.  We're talking about two sets of anonymous data.

23  The definition for what "anonymous data" --

24       THE COURT:  I agree with you.

11:24:19

25       MR. MICELI:  Thank you.

**OFFICIAL TRANSCRIPT**

1    The 22 patients that were the subject of a 30(b)(6)

2  deposition is when we learned of the actual production of this.

3  And the production of this information came days before the

4  deposition -- the second 30(b)(6) deposition.  We don't think

5  that should be lost on the Court.

6    They produced to us information that hampered our

7  ability to investigate, and now we come in and we have a

8  deposition that they want to walk a man through some information

9  on these numbers and they provide a production to us that will

10  say "they had this information."

11    However, we have an expert -- they are going to learn

12  his name tomorrow so I'll say it now -- David Madigan.  He is the

13  head of statistics for Columbia University, and he scoured this

14  clinical trial data and could not find personal identification

15  information.  He is a world-renowned and recognized biostatician

16  that they will get the opportunity to depose.  That gentleman

17  could not investigate through the clinical trial data sets,

18  linking up, as Mr. Ratliff has explained, these numbers with

19  individuals.

20    And, in fact, we're going to be back in this town next

21  week for a hearing with Judge Milazzo, and I would suggest that

22  perhaps we have a hearing again just on this issue on if they can

23  demonstrate, with what has been produced to us, personal

24  identification, the names of individuals, with the data sets

25  alone.  Not the data sets and searching obituaries or the data

**OFFICIAL TRANSCRIPT**

1  sets and searching medical records that are in their possession

2  but not ours.  When they produce clinical trial reports to us,

3  they blackout even the numbers so we don't even know who they are

4  talking about in the clinical trial reports.  I don't know what

*11:26:03*  5  linking up Mr. Ratliff is referring to.

6        THE COURT:  I don't know why I'm concerned about that

7  anymore because it's been produced.

8        MR. BACHUS:  Your Honor, could I just weigh in on the

9  30(b)(6)?

*11:26:11*  10        THE COURT:  You need to identify yourself.

11        MR. BACHUS:  Just briefly.  Kyle Bachus.

12        So that you have context, when we appeared for the

13  30(b)(6) deposition, you know they have to give us a list of the

14  documents that they reviewed.  These documents -- this is how we

*11:26:28*  15  located this.  These documents on a list, one document number was

16  a native file of 47,000 pages that we see for the first time when

17  we walk in to the 30(b)(6).

18        We looked for the data.  We can't put it together.  We

19  can't figure it out.  It's one of the reasons it was a topic.

*11:26:47*  20  But they were completely prepared in that deposition -- they'd

21  clearly spent substantial time with their witness -- to go

22  through some of that 47,000 pages that they have all the dots

23  connected, and I have no ability to respond to what they're doing

24  because we had no way of knowing.  They had changed the data.

*11:27:04*  25  Somebody changed the data so it couldn't be matched up.

**OFFICIAL TRANSCRIPT**

1       So we were -- I was literally learning about this
2  during the course of the depo.  I'm calling Miceli and he's
3  calling our expert and we are searching and we can't figure it
4  out.
5       THE COURT:  Mr. Ratliff, how were they to match the
6  second production to the first one?
7       MR. RATLIFF:  How were they supposed to match --
8       THE COURT:  The second production to the first.  It's
9  the same information, they are just designated differently.  How
10  were they to match that up?
11       MR. RATLIFF:  It's the exact same information, it's
12  just one has the anonymized name and the other one has the
13  specific number.
14       THE COURT:  Was it produced in a way to make that
15  readily --
16       MR. RATLIFF:  Yes.  Absolutely.
17       THE COURT:  -- obvious?
18       MR. RATLIFF:  Absolutely.  It was produced to them on
19  August 24th, two weeks in advance of that deposition, which was
20  the first time that our witness would have looked at it as well.
21       So that's what I'm saying, why are we talking about
22  this now, on October 25th, when it was produced on August 24th in
23  advance of all of these depositions?
24       And then we get a note from Mr. Miceli on October 26th
25  saying, You never produced this to us.  And we have to go back

11:27:17
11:27:30
11:27:38
11:27:45
11:28:01

**OFFICIAL TRANSCRIPT**

1   and say, No, actually, we did produce that to you.  And he said,

2   Well, no, you buried it in your logs.  But we made it abundantly

3   clear that it was in the logs, and then we provided all of that

4   in our discovery responses in advance of the 30(b)(6).

11:28:18   5        And then all of this time goes by.  All of these

6   depositions take place.  Their experts had it for two months.

7   And then here on the very close of discovery, it suddenly becomes

8   this is an issue we haven't been able to do a proper

9   investigation on.

11:28:31   10        THE COURT:  Let me ask, Mr. Miceli, who determined, on

11   behalf of the PSC, what the significance of the unique

12   identifiers was?

13        MR. MICELI:  I don't know that we can say it was one

14   person.  But I can tell you the minute that I learned about this,

11:28:53   15   I contacted --

16        THE COURT:  How did you learn about it?

17        MR. MICELI:  I learned about it because Mr. Bachus told

18   me.

19        THE COURT:  I'm trying to figure out how -- when

11:28:59   20   you-all learned that there was some significance to the numbers

21   and the pattern of numbers in the unique identifiers.

22        MR. MICELI:  It would have been -- I sent the e-mail to

23   Mr. Ratliff on a Friday at about 4:00.

24        MR. RATLIFF:  October 26th.

11:29:13   25        MR. MICELI:  Which I believe is a Friday.

**OFFICIAL TRANSCRIPT**

1    I would have learned about it that day, Your Honor.
2    That's when I would have.

3    And I'll -- again, falling on the sword about the
4    production in August, and not recognizing it, when we received
5    that production, we checked the number of patients, we checked
6    the number of incidents, the number of reports.  It appears to be
7    an exact replica of what was produced to us in April except for
8    the different anonymous numbers.

9    And we keep talking different semantics -- I say
10   "anonymous" and he says "anonymized" -- but the change of the
11   numbers.

12   When we realized that -- when we realized that there
13   was -- the country code and the center code are the two parts
14   that are in that number, we began some serious investigations.
15   And, again, one of the examples is in there.  That was all over
16   the course of the last week.  Two days over the last week --

17   THE COURT:  What I'm asking is when and how did you-all
18   realize the significance of those codes?

19   MR. MICELI:  With the use of an expert witness helping
20   us.

21   THE COURT:  When did that happen?

22   MR. MICELI:  Last week.

23   THE COURT:  All right.  Here's what I want you-all to
24   do.  I'm no longer particularly concerned about whether those
25   identifiers are truly anonymous or whether they are PII because

**OFFICIAL TRANSCRIPT**

1  they've been produced already.  I'm not going to make a decision

2  at all until I know exactly what you're asking for because you

3  haven't told me.

4          MR. MICELI:  Okay.

5          THE COURT:  So you need to tell me.  You need to submit

6  to me exactly what you're asking for.  And I'm going to give

7  Sanofi an opportunity to respond, and then I'll make a decision.

8          MR. MICELI:  Okay.

9          THE COURT:  So give me something in the next couple of

10  days -- by the end of the week, and then I'll give Sanofi -- hold

11  on a second.

12                          (A pause in the proceedings.)

13          THE COURT:  So by close of business Friday, can you

14  give me exactly what depositions, how long, who they are, and why

15  you ought to be entitled to redepose those individuals?

16          MR. MICELI:  Yes.

17          THE COURT:  By close of business Friday.

18          And Mr. Ratliff, you-all give me something by close of

19  business Wednesday of next week.

20          And then I'll make a decision.

21          MR. MICELI:  I believe, Your Honor, one of the other

22  things we asked for that has nothing to do with taking another

23  deposition, when we realized this last week and we saw the code

24  numbers for the country and center codes, we looked in all of the

25  documents -- we did electronic searches within the documents that

**OFFICIAL TRANSCRIPT**

1   have been produced for a list of the country codes and a list of

2   the center codes, because we can say Center No. 22 is where 26 of

3   the 49 individuals were documented as having this adverse event,

4   but we don't know what Center 22 is.

5           That's a separate ask.  Can we have a deadline for

6   Sanofi to provide to us a list of the country codes and the

7   center codes for TAX 316 and TAX 301?

8           MR. RATLIFF:  May I address that?

9           THE COURT:  Yes.

10           MR. RATLIFF:  There are no deadlines needed because

11   those documents have been produced.

12           THE COURT:  Well, y'all talk about it.  Get them that

13   information.  If they already have it, tell them --

14           MR. RATLIFF:  We'll look and identify that it has been

15   produced to them a long time ago in advance of all these

16   depositions.

17           MR. MICELI:  Thank you.

18           THE COURT:  Why don't you-all talk about that.  That's

19   how some of these problems get resolved, by you-all talking about

20   it like you are supposed to.

21           On the two proposed protocols, I've gone through them

22   and made a decision as to what they ought to look like.  I'm not

23   going to go through them in detail with y'all right now.  Nobody

24   is going to be heartbroken and nobody is going to be elated.

25   I've borrowed from both sides in terms of what's going to go in

**OFFICIAL TRANSCRIPT**

1    here, and I'm going to finalize them and just issue them rather

2    than go through all of the various details sitting in here.  So

3    y'all will get something in the record on that shortly.

4             MR. RATLIFF:  Your Honor, may I address one additional

5    item?

6             THE COURT:  Maybe.

7             MR. RATLIFF:  I want to give you an update on the ^

8    Debra Cantwell subpoena.  Their counsel filed a motion to quash

9    that subpoena.  I guess they complied in part and filed a pretty

10   extensive motion to quash I guess in the last day or so in the

11   Western District of Washington.

12            Given the significant overlap in the issues we have

13   been before Your Honor here on and your knowledge of the issues,

14   we would like to try and move to have that transferred -- that

15   issue transferred before you so you can rule on it as opposed to

16   a judge in the Western District of Washington who has no

17   background into these issues.

18            THE COURT:  I think it's within that judge's discretion

19   to transfer it over here.  Honestly, I'm not real familiar with

20   what the usual mechanism is to make that happen, other than if

21   you-all want to file something in that miscellaneous action in

22   the Western District of Washington and request that it be sent

23   here.  You can represent to that Court that I'm perfectly willing

24   to adjudicate the issue.

25            MR. RATLIFF:  And that's all I was asking for.  We're

**OFFICIAL TRANSCRIPT**

11:33:31

11:33:41

11:34:01

11:34:16

11:34:33

1   not the most familiar with the process either, but we would like

2   to say Judge North in the Eastern District of Louisiana is

3   willing to take on this particular issue.

4            THE COURT:  You can represent that.

5            MR. RATLIFF:  Thank you, Your Honor.

6            MR. OOT:  It's noticed on November 23rd, Your Honor, so

7   we'll need a little bit of acceleration.

8            THE COURT:  Sure.

9            MR. LAMBERT:  Palmer Lambert for the plaintiffs.

10           On the 71A deficiency protocol, there was one issue

11   that I'm not sure was very clear in the two sides' pleadings, and

12   I just want to make that note.

13           These are fairly individual-specific issues, and when

14   there comes to be a hearing for those plaintiffs to be able to

15   respond to the allegations, it would be nice if those individual

16   counsel for --

17           THE COURT:  They will be.

18           MR. LAMBERT:  Thank you, Your Honor.

19           THE COURT:  We're going to be dealing with the lawyers

20   who represent the individual plaintiffs.

21           MR. LAMBERT:  Thank you, Your Honor.

22           THE COURT:  All right.  For our next status conference,

23   how is December 6th at 2:00 p.m. or December 12th at

24   10:00 a.m. -- I mean December 11th at 10:00 a.m.?

25           MR. RATLIFF:  May I address that?

*11:34:44*
*11:34:53*
*11:35:13*
*11:35:23*
*11:35:40*

**OFFICIAL TRANSCRIPT**

|    |    |
|----|----|
|    | 1  |
|    | 2  |
|    | 3  |
|    | 4  |
| 11:35:57 | 5 |
|    | 6  |

1    We will obviously make either of those dates work if

2 that's what you want to do.  I will say that over the next month,

3 two months, three months, we're going to be heavily in expert

4 discovery and the run-up to the bellwether trials.  And these

5 conferences, I know they have a lot of value.  We see the value

6 in them, but they do create an enormous resource --

7         THE COURT:  Are you suggesting I not set one?

8         MR. RATLIFF:  I would suggest that if there are

9 discrete issues that the parties can't resolve, that they bring

10 them to you *ad hoc* as opposed to setting a formal schedule

11 where -- the attorneys in here will be taking depositions,

12 defending depositions, going through reports.  I mean, I guess

13 the practical reality is, Your Honor, when we have these hearings

14 we do --  you're aware, but we have the submissions, we have the

15 replies that are usually extensive, they are detailed, and then

16 at least for the non-Louisiana attorneys, it's a two-day

17 commitment.

18         THE COURT:  Let me hear from Mr. Coffin.

19         MR. COFFIN:  Chris Coffin on behalf of the plaintiffs.

20 Good morning, Your Honor.

21         Our position is, as it has been all throughout this

22 MDL, that these conferences make both parties address the issues

23 and get them resolved.  And the problem that occurs -- and I've

24 seen it firsthand -- is when we take these off, then all of a

25 sudden things go --

11:36:11  10
11:36:29  15
11:36:41  20
11:36:57  25

**OFFICIAL TRANSCRIPT**

11:37:12
11:37:22
11:37:37
11:37:54
11:38:09

1       THE COURT:  Well, the problem that I just saw is that
2  we had an issue brought to my attention because we had a hearing
3  scheduled, and you-all did not make an attempt to resolve it.  So
4  that's the flip side of your observation.
5       MR. COFFIN:  I understand.
6       THE COURT:  Things are being brought to my attention at
7  these scheduled hearings without the appropriate effort to
8  amicably resolve them.
9       MR. COFFIN:  That's going to stop.
10       THE COURT:  Yes, it is going to stop.
11       I want to set something in the middle of December.
12  It's a month from now.  That gives you-all some --
13       MR. RATLIFF:  Just from a practical scheduling
14  standpoint, we're down here this week and then we come right back
15  next week to be in front of Judge Milazzo.  There's another two
16  days.  I believe the next hearing before Milazzo is on the 19th.
17  So if we could at least sandwich it with that, that would help.
18       MR. COFFIN:  Let me make a suggestion.  Why don't we
19  set something by phone in the interim?  If we don't --
20       THE COURT:  The 19th is soon enough for me.
21       MR. COFFIN:  If the 19th is soon enough, that's soon
22  enough for us.
23       THE COURT:  Here is what I would like you-all to do
24  because I didn't go that far out in the dates that I picked --
25  well, let me go get my calendar to make it easy.

**OFFICIAL TRANSCRIPT**

```
 1                        (A pause in the proceedings.)

 2            THE COURT:  Y'all are in to see Judge Milazzo on the

 3   19th?

 4            MR. RATLIFF:  We are.

 5            THE COURT:  What time?

 6            MR. RATLIFF:  9:00 a.m.  And it's just a liaison lead

 7   counsel meeting which usually runs about an hour and a half, and

 8   there is not a general status conference directly afterwards.  So

 9   we will probably be out of there by 10:30 or 11:00.

10            THE COURT:  I have my regular motion docket at 11:00,

11   so you-all just plan to come over here at 11:30.  And we may

12   still be rolling on the motions, but we'll go right into that.

13            So 12-19 at 11:30.

14            All right.  I'll see you-all then.

15            MR. BACHUS:  Your Honor, Kyle Bachus.  May I approach?

16            THE COURT:  (Nods head.)

17            MR. BACHUS:  Maybe I shouldn't remind you, but you

18   did -- at the conclusion of the order on the 30(b)(6)

19   continuation, you had asked that myself and Mr. Ratliff appear in

20   person at this hearing and I'm here.

21            THE COURT:  Good.  Why don't you-all come back and

22   visit with me for a minute.

23                        (Proceedings adjourned.)

24

25                        *  *  *  *
```

11:38:39
11:38:55
11:39:16
11:39:31

**OFFICIAL TRANSCRIPT**

CERTIFICATE


     I hereby certify this 13th day of November, 2018, that the foregoing is, to the best of my ability and understanding, a true and correct transcript of the proceedings in the above-entitled matter.


                                        /s/ Mary V. Thompson
                                   _____
                                        Official Court Reporter

**OFFICIAL TRANSCRIPT**