UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)           MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

                                                                          SECTION "H" (5)

**THIS DOCUMENT RELATES TO:**                    JUDGE MILAZZO
*Durden v. Sanofi, S.A., et al.*

Civil Action No. 2:16-cv-16635

## OPPOSITION TO PLAINTIFF ANTOINETTE DURDEN'S MOTION TO ENFORCE CMO 12A

       Seventeen months of discovery in *Durden* has produced irreconcilable evidence as to product identification, creating a genuine dispute of material fact that cannot be resolved prior to trial. Plaintiff's arguments concerning product identification have changed like the seasons, and neither reliable nor uncontroverted product identification evidence has been submitted at any phase of discovery in this case.

       To the contrary, there is substantial and compelling "contrary evidence" creating a dispute of material fact regarding product identification. This disputed material fact has not been resolved despite extensive discovery, is not resolved by Plaintiff's recent submissions, and cannot be resolved except by a finder of fact at trial. As Ochsner, the facility where Ms. Durden received chemotherapy, recently confirmed: (1) Plaintiff could have been administered docetaxel made by *four* different manufacturers; (2) the NDC codes relied upon by Plaintiff pertain to medicines that *could not possibly have been administered to Antoinette Durden;* and (3) Ochsner is unable to produce *any* witness who can identify or certify the manufacturer of the docetaxel administered to Plaintiff. Sanofi has a right to present this evidence to a jury, who will decide whether Plaintiff

1

has carried her burden of proving that all and each of her six different chemotherapy infusions in 2011 and 2012 involved products manufactured by Sanofi.

Recognizing that the evidence in this case is disputed and that summary judgment could never be granted in Plaintiff's favor on the issue of product identification, Plaintiff has filed a Motion that is not authorized under CMO 12A or the Federal Rules of Civil Procedure.

CMO 12A does not reduce Plaintiff's burden of proof to establish product identification as an essential element of her claim. Instead, CMO 12A was submitted as an agreed-upon order by the parties for the purpose of addressing lack of product identification in thousands of cases filed in this MDL against multiple manufacturers. The purpose of the Order is to secure dismissals of improperly-named defendants when certain evidence of product identification is submitted. CMO 12A, however, specifically authorizes a defendant to dispute product identification when countervailing evidence exists. The Defendant simply needs to identify the contrary evidence by the close of Phase II discovery, which Sanofi did here.[1] Once countervailing evidence is submitted under CMO 12A, the only way remove a disputed issue from the jury is to prevail on a properly filed Summary Judgment Motion under FRCP 56.

Plaintiff, however, knows that she could never prevail under Rule 56 and so she seeks to have this Court adjudicate the issue under CMO 12A. Nothing, however, in CMO 12A authorizes the Court to adjudicate the sufficiency of evidence regarding product identification as a <u>matter of law</u> – let alone sit as fact-finder for an essential element of Plaintiff's claim – where a dispute of material fact exists based on substantial conflicting evidence. Tellingly, Plaintiff cites no provision

---

[1] *See* **Ex. 15**

in CMO 12A that would permit the Court to do so.  Indeed, Sanofi would never have agreed to the submission of a product identification CMO that alters the Federal Rules of Civil Procedure and allows it to be cast in judgment in cases where its product may not have been used.  Rather, where, as here, product identification cannot be adduced after exhaustive discovery, the sole mechanism for resolving this issue outside of a trial is through Rule 56, a standard not met by Plaintiff's present Motion and one that cannot be met based on the record evidence.  No additional discovery will eliminate the dispute that exists on this record in Plaintiff's favor.

Sanofi has a right to present this contrary evidence to a jury, and cannot be precluded from presenting product identification among its defenses.  But because an outcome that turns on idiosyncratic product identification evidence would not helpfully instruct litigation across the inventory, this case is inappropriate to be tried as a bellwether.

As such, Plaintiff's motion should be denied.

**RELEVANT BACKGROUND**

*Durden* is unlike the thousands of cases that have uploaded valid evidence of product identification under CMO 12.  Plaintiffs selected Ms. Durden's case for bellwether discovery in June 2017 and, at the time, represented to the Court that all cases selected by the Plaintiffs had confirmed product identification by NDC code.

As it related to Ms. Durden, though, it is difficult to understand how Plaintiff's counsel could have believed that statement to be true given that Plaintiff's counsel did not possess NDC codes for Ms. Durden at that time.  Instead, in May 2017, Plaintiff's counsel uploaded to MDL Centrality a printout of a Taxotere carton from the website "DailyMed" as "proof of use."  *See* Doc. ID 3289.  This printout was faxed to Plaintiff's counsel from Ashley Canty, an employee in

3

the "Revenue Cycle Billing Department" at Ochsner, and was printed from the internet on May 11, 2017. Handwritten on this document was NDC 00075-8003-01. Ms. Canty, however, testified that this document was given to her by someone whose identity she cannot recall.[2] Further, she does not know who wrote this code on the document.[3] Nonetheless, Plaintiff's counsel uploaded it to MDL Centrality and represented to this Court that Plaintiff had confirmed product identification by NDC code.

Perhaps fearing that this document would not withstand closer scrutiny, Plaintiff's counsel continued to contact Ms. Canty in July and August of 2017, and requested that she execute a "Statement Regarding Chemotherapy Drug Administered," similar to that appended to CMO 12A. After more than a half-dozen phone calls, five emails, two facsimiles, and four separate requests for billing records, Ms. Canty eventually signed the statement as requested by Plaintiff's counsel.[4] As Ms. Canty would later testify, however, that she had no information concerning the medicines actually administered to Plaintiff and simply signed the document because she was requested to do so.[5] Nevertheless, **this was Plaintiff's counsel's first argument for product identification in the *Durden* case: the Canty certification established that Plaintiff was administered NDC 0075-8003-01 during each of her six chemotherapy administrations in 2011 and 2012**.

Plaintiff's argument based on the Canty certification unraveled. In March of 2018, Ochsner issued a separate statement confirming that due to the dates of service, NDC code information for Plaintiff could not be provided.[6] A month later, in April of 2018, Ms. Canty rescinded her prior

---

[2] *See* **Ex. 14**.
[3] *Id.*
[4] Rec. Doc. No. 5518-6
[5] *Id.*
[6] *See* **Ex. 3**.

certification and confirmed that she signed it without authorization and had no information concerning the medicines administered to Ms. Durden.[7]

In the following months, NDC codes or other reliable evidence of product identification were never produced. Therefore, in September 2018, Sanofi requested that the *Durden* case be removed from the bellwether pool.

This request was made because <u>the parties agreed in writing</u>, and the Court confirmed in CMO 14, that cases without confirmed product identification would not be part of the bellwether process. **At this point, Plaintiff's counsel advanced a new argument: Ms. Durden was administered 20mg of docetaxel and Sanofi was the only manufacturer with a 20mg product on the market at the time.** *See* Plaintiff's September 18, 2018 Letter Submission. This argument was also based on information printed off from the internet. Specifically, Plaintiff offered an excel spreadsheet allegedly obtained from FDA's website, which she claimed demonstrated that the only "20mg products" on the market at the time bore NDC codes: 0955-1020-01 and 00075-8003-01, and both were manufactured by Sanofi. And because Plaintiff's billing records state "Taxotere 20mg," it must have been a Sanofi manufactured product. This argument failed as well.

Multiple other manufactures were, in fact, selling 20mg docetaxel at the time.[8] Plaintiff's suggestion that only Sanofi manufactured 20mg products at the time requires that the products be standardized based on concentration per milliliter. No such algebraic calculation, however, is contained in the Plaintiff's medical records. In fact, Hospira and Sandoz were selling 20mg vials of docetaxel at the time, which could just have easily been administered to Ms. Durden in 2011

---

[7] *See* **Exs. 12 and 14**
[8] *See* **Exs. 6 thru 9**

5

and 2012. There is no medical or billing record in this case to support the argument that Plaintiff received 20mg per milliliter and not 20mg per vial.

Appearing before Your Honor in Chambers on September 20, 2018, in response to Sanofi's request that *Durden* be removed from the trial pool, this Court permitted the Plaintiff to continue discovery on the issue but confirmed that <u>cases involving disputed product identification would not be part of the bellwether process</u>. After issuing subpoenas to Ochsner and Molina, the fiscal intermediary to Louisiana Medicaid program, **Plaintiff's counsel settled on his third and final argument for product identification: Ms. Durden was administered medicines bearing NDCs 0075-8001-80 and 75-8001-20, manufactured by Sanofi**.

Plaintiff abandoned her claim that she received docetaxel identified by NDC 00075-8003-01, as originally argued based on the false Canty certification. Nor was she claiming that she received 20mg per milliliter based on the FDA spreadsheet, since NDCs 0075-8001-80 and 75-8001-20 are 40mg concentrations. Rather, Plaintiff's final argument is premised on Medicaid billing information obtained from Molina and Ochsner. *See* Plaintiff's Nov. 13, 2018 Letter Submission, Rec. Doc. NO. 5518-7. However, Plaintiff's argument ignores countervailing evidence produced by Ochsner in response to her subpoenas. Namely, that according to the affidavit of Neil Hunter, Ochsner's pharmacy manager, NDCs 0075-8001-80 and 75-8001-20 had not been purchased at the time and could not possibly have been administered to Ms. Durden.[9]

Ochsner offered three witnesses to Plaintiff in response to her subpoenas, but confirmed that it does not have a witness who can explain the discrepancy.[10] Plaintiff chose not to proceed

---

[9] *See* **Ex. 2**
[10] *See* **Ex. 4**.

6

with any of these depositions and, instead, filed the instant motion seeking to have the Court adjudicate product identification under CMO 12A, in the face of countervailing evidence. Rec. Doc. 5518. For the arguments set for the below, the Court should deny Plaintiff's Motion.

**ARGUMENT**

**I.    Summary Judgment Is the Appropriate Procedural Vehicle Where Product ID Is Disputed, Not CMO 12A.[11]**

Plaintiff's motion attempts to circumvent Rule 56's heightened summary judgment standard in seeking a final adjudication of an essential element of her case.

Summary judgment is "an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (emphasis added). Rule 56 prescribes specific procedures to be followed in submitting evidence for or against a summary judgment motion. These procedures help assure the fair and prompt disposition of cases. They also allow the court to determine – through criteria designed to ensure reliability and veracity – that a party has *actual* proof of a claim before proceeding to trial. The Rule 56 requirements are logically sound given the need to safeguard a party's fundamental right to present contrary evidence and assert available defenses. Plaintiff's motion, however, if ruled on by this Court, would necessitate a final adjudication of an essential element of her case under no cognizable standard and without procedural safeguards.

In addition, CMO 12A does not authorize the Court to grant the relief Plaintiff seeks. Paragraph 6 of CMO 12A first lays out three types of evidence a plaintiff can obtain. *See* CMO 12A, at ¶ 6. Each of these is "presumed sufficient evidence to establish the identity of the

---

[11] Sanofi's position here is consistent with its position in *Earnest* (Rec. Doc. 5364): CMO 12A (and not Rule 56) is the appropriate mechanism for product identification where it is not in dispute and there is not contrary evidence.

7

manufacturer(s) or labeler of docetaxel" <u>unless</u>, under paragraph 8, the manufacturer offers "testimonial or documentary evidence to rebut the presumption." *Id.*, at ¶¶ 6, 8.  CMO 12A thus affords Defendants an opportunity to present contrary evidence and assumes that genuine disputes of material fact, such as here, will be resolved by the trier of fact and under the Rules.  Indeed, nothing in CMO 12A substitutes the Court for the fact-finder as to an essential element of Plaintiff's claim where a dispute of material fact based on substantial conflicting evidence exists.  Plaintiff's request is not only unfounded, it is inconsistent with this Court's Order and the Rules, and therefore should be denied.

## II. Substantial Conflicting Evidence of Product ID Exists, Creating A Dispute of Material Fact.

After seventeen months of discovery – including a half-dozen subpoenas, multiple affidavits and deposition testimony, six separate purported product identification submissions and/or rescissions, and at least three audiences before this Court – no one knows which manufacturer made the docetaxel administered to Plaintiff.  Stated differently, clear and reliable evidence of product identification for Plaintiff's treatment does not exist.  Instead, there is irreconcilable evidence, all of which would need to be presented to the fact finder.

### A. Certification and Affidavit of Neil Hunter, Inpatient Pharmacy Manager at Ochsner Medical Center

Neil Hunter is the manager of the Inpatient Pharmacy at Ochsner Medical Center.  He is the only person with personal knowledge of the possible products that Plaintiff might have been administered.  Here, Plaintiff received chemotherapy from October 2011 to February 2012.  Mr. Hunter signed a "Certification" of Ochsner's docetaxel purchase history for March 2011 to February 2012. *See* attached **Exhibit 1**.  Mr. Hunter also provided an affidavit, the source data

used in creating the Certification ("Spreadsheet"), and a Statement Regarding Chemotherapy Drug Administered ("Statement").  *See* attached **Exhibit 2** and exhibits appended thereto.

Mr. Hunter's Certification identifies the docetaxel products purchased by Ochsner for more than seven months prior to, and throughout the period of Plaintiff's treatment.  The source data lists the docetaxel products purchased by Ochsner for an even longer period of time, from December 2000 through April 2018, which shows the following:

a. Ochsner purchased docetaxel products from Hospira,[12] Sandoz,[13] Sanofi, and Winthrop, for more than seven months prior to Plaintiff's treatment. *See* **Ex. 1**, **Ex. 2**, at ¶¶ 9-14.

b. Ochsner did *not* buy Sanofi docetaxel products with NDCs 75800180 and 75800120 – the products Plaintiff claims she received – for more than eight months before Plaintiff's first treatment.[14]  *See* **Ex. 2**, at ¶¶ 4-5, 12, and referenced Spreadsheet.

c. Sanofi docetaxel products with NDCs 75800180 and 75800120 were not possibly administered to Plaintiff. *See* **Ex. 2**, at ¶ 15 and Statement (Ex. C to the affidavit, included in **Ex. 2**).

d. Among the Hospira, Sandoz, Sanofi, and Winthrop products *possibly* administered to Plaintiff, there is no way to know which product actually was administered to Plaintiff. *See* **Ex. 2**, ¶ 14; **Exhibit 3** (March 5, 2018 Ochsner Response to NDC Record Request).

Accordingly, Mr. Hunter provided a Statement Regarding Chemotherapy Drug Administered identifying the possible docetaxel products given to Plaintiff.  *See* **Ex. 2**, at ¶ 15 and

---

[12] As early as March 2011 – seven months prior to Plaintiff's first chemotherapy treatment – Ochsner began purchasing Hospira docetaxel, including National Drug Codes ("NDCs") 409020102, 409020110, and 409020120.  These purchases continued past the end of Plaintiff's treatment in February 2012.  **Ex. 2**, at ¶ 10.

[13] As early as August 2011 – two months prior to Plaintiff's treatment – Ochsner began purchasing Sandoz docetaxel, including NDCs 66758005001, 66758005002, and 66758005003.  These purchases continued past the end of Plaintiff's treatment in February 2012.  **Ex. 2**, at ¶ 11.

[14] In fact, except for a single unit purchased in February 2011, Ochsner had not purchased the Sanofi products Plaintiff claims she received for more than a year before her first treatment.  *See* **Ex. 2**, at Spreadsheet.

Statement. The Statement identifies ten products made by four different manufacturers. None of the products listed include Sanofi NDCs 75800180 and 75800120. Responding to Plaintiff's most recent 30(b)(6) deposition notice, Ochsner confirmed "there are four (4) possible manufacturers of the docetaxel products administered to Ms. Durden in 2011 and 2012." *See* Ochsner's Objections and Comments regarding Plaintiff's Revised 30(b)(6) Notice and subpoena *duces tecum*, attached **Exhibit 4** at p. 3, ¶ 2.

As Ochsner's Infusion Pharmacy Manager, Mr. Hunter is the only person claiming any basis for knowing the *possible* docetaxel products administered to Plaintiff to provide evidence of product ID in this case.[15] Further, Ochsner more recently attested:

> Ochsner is unable to identify a person able to identify or certify the manufacturer(s) of the docetaxel product(s) administered to Ms. Antoinette Durden at Ochsner between October, 2011 and February, 2012.

*See* **Ex. 4** at p. 2, ¶ (c). Thus, while Mr. Hunter's affidavit and Certification, as well as Ochsner's response to Plaintiff's revised 30(b)(6) notice, can *rule out* certain products that Plaintiff might have received, they cannot, importantly, establish which product she *did* receive. No one knows why Ochsner identified records with NDC codes for medicines that it was not purchasing at the time and that could not have been administered to Ms. Durden.

That fact, however, is not relevant. What is relevant is that the existing record cannot resolve the factual dispute as to product identification in the Plaintiff's favor. Sanofi has a product identification defense that it would be entitled to present on its own summary judgment motion or

---

[15] On October 23, 2018, Sanofi issued its own notice and subpoena to depose Ochsner on November 7, 2018 concerning, *inter alia*, NDC documentation for drug infusions between October 2011 and February 2012. In response to the subpoena, Ochsner's counsel stated that despite diligent efforts, no witness able to testify to the matters identified could be identified or produced within the timeframe provided. *See* Transcript of *process verbal* (Nov. 7, 2018), attached as **Exhibit 5**.

10

to the fact finder at trial.

**B. Ochsner Attests that "DUE TO THE AGE" of the Treatment Dates, Product ID Is Not Ascertainable**

Mr. Hunter's affidavit and Certification confirm the statement issued by Ochsner in March 2018 that "DUE TO THE AGE OF [PLAINTIFF'S] DATES OF SERVICE, THE NDC CODE INFORMATION IS UNAVAILABLE."[16] Put otherwise, Ochsner does not have records of Plaintiff's treatment that identify the specific docetaxel product she received by NDC. This is consistent with Ochsner's inability to produce a corporate representative in response to Sanofi's 30(b)(6) notice. This is further consistent with Ochsner's inability to produce *any* witness able to identify or certify the specific manufacturer of the docetaxel actually administered to Plaintiff in response to Plaintiff's revised (30)(b)(6) notice. Ochsner is thus already "on record" that it is unable to provide the information requested, which no amount of additional discovery will change.

**C. Plaintiff's Chemotherapy Infusion Records**

The Hunter affidavit and Ochsner's March 2018 statement are also consistent with the specific infusion records of Plaintiff's chemotherapy treatment. These records contain no reference to NDC numbers, but do note docetaxel dosages on the following infusion dates:

- 122mg on 10/18/2011
- 119mg on 11/09/2011
- 119mg on 11/30/2011
- 122mg on 12/21/2011
- 122mg on 1/11/2012
- 122mg on 2/1/2012

---

[16] *See* **Ex. 3**.

11

Contrary to Plaintiff's representations, she did not receive 20mg or 80mg doses of Taxotere.[17] Rather, Plaintiff received doses between 119 and 122mg.

Billed for 6 to 7 units of docetaxel per chemotherapy cycle, it is plausible that Plaintiff was administered docetaxel from 20mg vials. Defendants Hospira and Sandoz both sold docetaxel in 20mg vials before and during Ms. Durden's treatment, which Ochsner purchased at the time. *See* **Exhibits 6-9**. What is not plausible, or even possible, is that Plaintiff received 6 or 7 units of the 80mg docetaxel product NDC 75800180 – as theorized by Plaintiff's counsel. At this size, the resulting cumulative dose of 480-560mg of docetaxel per administration is not only inconsistent with Plaintiff's infusion records, but would have been deleterious to her.

### III. Plaintiff's Product Identification "Evidence" Is Not Reliable.

Ignoring the contrary evidence provided by Ochsner, Plaintiff relies exclusively on three records as "evidence" of product identification:

a. "Patient Specific Billing Records for Antoinette Durden Produced by Ochsner" (Ex. A to Plaintiff's Mem. in Supp., Rec. Doc. 5518-2);

b. a certification and table provided by Molina Health Solutions, Inc. ("Molina") (Ex. B to Plaintiff's Mem. in Supp., Rec. Doc. 5518-3); and

c. Ochsner's responses to Plaintiff's revised 30(b)(6) notice and subpoena *duces tecum* (Ex. C1-C2 to Plaintiff's Mem. in Supp., Rec. Doc. 5518-4, 5518-5).

*See* Mem. in Supp., at 2 (Rec. Doc. 5518-1). None of these records, however, create a presumption of product identification under CMO 12A. Much less could they resolve the genuine dispute of material fact regarding on this essential element of Plaintiff's case.

---

[17] Plaintiff's responses to Sanofi's Second Set of Requests for Admission stated that "Plaintiff received a 20mg dose of Taxotere" and repeatedly asserted that "20mg" in patient billing records "refers to the dose of the drug."

12

**Ochsner's responses to Plaintiff's revised 30(b)(6) notice:** Plaintiff suggests Plaintiff's "UB-04 Claim Forms," ("Claim Forms") which Ochsner produced in response to the 30(b)(6) notice (Rec. Doc. 5518-5) were "made close in time or contemporaneously with Plaintiff's chemotherapy treatments" and "identify Sanofi products by NDCs as having been administered to [Plaintiff]." *See* Mem. in Supp., at 5-6. A review of the evidence, however, directly refutes Plaintiff's claims. The "Creation Date" in each of the "Claim Forms" states "December 6, 2018" – a mere seven days before Plaintiff filed her motion – a far cry from being "close in time or contemporaneously with" Plaintiff's treatment seven years ago. There is no support that these records were made "contemporaneously" with Plaintiff's treatment. Nor is there any showing the records were prepared by a person with knowledge of the treatment administered to Plaintiff.

Plaintiff's argument that these records identify Sanofi by NDC as the manufacturer of the docetaxel administered to Plaintiff also fails. The Claim Forms were provided as an attachment to Ochsner's objections and comments to Plaintiff's revised 30(b)(6) notice – which Plaintiff, for good reason, does not address in her brief. In its objections and comments, Ochsner confirmed: (1) there are *four* possible manufacturers of the docetaxel administered to Ms. Durden (*see* **Ex. 4** at p. 3, ¶ 2); and (2) it is unable to produce *any* witness able to identify or certify the manufacturer(s) of the docetaxel product(s) administered to Plaintiff (**Ex. 4** at p. 2, ¶ (c)). Thus, Ochsner had these records and did not believe that they resolved the question of fact regarding product identification. Plaintiff – apparently undeterred by the lack of clear evidence – ignores Ochsner's response, and instead claims these records prove something completely different than what Ochsner says.

13

**Molina's certification and table*:*** The NDC codes that Plaintiff relies on for product identification were retrieved from a database maintained by Molina, the fiscal intermediary for Louisiana's Medicaid program. The documentation, however, does not provide product identification:

a. The documentation does not purport to evidence the drug actually administered to Plaintiff. As the custodian himself states, he "does not and cannot certify the integrity or currency of the data submitted to the fiscal intermediary by the managed care organization." *See* **Exhibit 10**, at ¶ 9. In other words, Molina is not in a position to know what product was administered to Plaintiff, and cannot certify any information submitted by Ochsner.

b. Molina affirmatively disclaims any "direct knowledge of the medicines actually administered to any given patient," so it doubly cannot know what Ochsner does not know. *See* **Exhibit 11**, at ¶7.

c. Molina does not participate in patient care and is not present when medical service is provided; it does not participate in the administration of pharmaceutical drugs to patients; and it is not present to witness the actual medication given to any patient at any given time. *See* **Ex. 11**, at ¶¶ 4-6.

d. Neither Molina nor Ochsner has produced, or claims to possess, any record of what was submitted by Ochsner to Molina. Thus, there is no evidence of when or how the information in the Molina documents came to be there—nor whether it was entered or populated by Ochsner, Molina, the fiscal intermediary, or some other source.

e. Ochsner has already said that it does not have NDC information for Plaintiff's treatment. *See* **Ex. 2**; **Ex. 3; Ex. 4**.

f. Ochsner's certified docetaxel purchase history affirmatively establishes that it did not purchase, and could not possibly have administered, Sanofi NDCs 75800180 and 75800120 at the time of Plaintiff's treatment. *See* **Ex. 1**; **Ex. 2** ¶¶ 4-5, 14-15, and Statement.

g. As Plaintiff's counsel has been directly informed by Ochsner, Ochsner regularly used "default" product codes in non-treatment records such as billing records prior to (and for some time after) its transition to electronic record-keeping starting in 2012.

Simply put, the Molina document is not – and does not purport to be – evidence of the specific docetaxel product actually administered to Plaintiff. *See* **Ex. 2; Ex. 11**.

14

Lacking evidence related to her actual case, Plaintiff invokes the Deficit Reduction Act of 2005 (DRA), a federal budget measure, to suggest the Molina documents identify Sanofi by NDC as the manufacturer of the docetaxel administered to Plaintiff. *See* Mem. in Supp. at 6-8. Putting aside the question of whether this particular measure would have applied to Ochsner's administration of docetaxel to Plaintiff in 2011 and 2012, evidence of a legal requirement is not evidence of an actor's conduct. If that were true, there would be no litigation, as compliance with all legal requirements would be conclusively presumed. Moreover, Plaintiff cannot rely on federal and state regulations as a substitute for actual evidence. Such regulations are not one of the three types of evidence set forth in paragraph 6 of CMO 12A – much less evidence sufficient to remove any question of fact regarding product identification.

**"Patient Specific Billing Records for Antoinette Durden Produced by Ochsner:"** As further "evidence," Plaintiff submits a spreadsheet purporting to show billings records related to Plaintiff's treatment from Ochsner. The spreadsheet is not certified or authenticated. The author, source, and creation date are not known. In addition, the 18 items billed in the spreadsheet do not correspond to the actual number of chemotherapy treatments Plaintiff received (6 treatments total). As is the case with all of Plaintiff's submissions, this document does not demonstrate product identification.

**Plaintiff's Counsel's Conduct in Attempting to Obtain Product ID Evidence Questions the Integrity of the Discovery Process:** In an attempt to establish product identification, Plaintiff's counsel initially contacted an employee of Ochsner with no knowledge of Plaintiff's treatment to obtain a "Statement Regarding Chemotherapy Drug Administered" identifying Sanofi Taxotere. After more than a half-dozen phone calls, five emails, two facsimiles

and four separate requests for billing records, the employee eventually signed the statement as instructed by Plaintiff's counsel, but rescinded it when subject to further discovery because she "did not have personal knowledge of the NDC Codes of the docetaxel that was in fact administered to Antoinette Durden" and had not been authorized to complete the statement.[18] In one of several exchanges between Plaintiff's counsel's staff and the employee, Ms. Canty had been instructed to transfer handwritten NDC numbers from an unknown source onto the Certification.[19] This series of persistent interactions is an unfortunate part of the genuine question of product identification in the *Durden* case, which the trier of fact ought to be made aware of through trial as circumstantial evidence in deciding the issue of product identification against Plaintiff.

Subsequently, Sanofi noticed the deposition for an Ochsner 30(b)(6) corporate representative on November 7, 2018, at which point all parties were informed that Ochsner did not have a witness to produce to testify regarding product identification in Plaintiff's case. Plaintiff's counsel at the time, nonetheless, insisted that a deposition of Ochsner must proceed, and later issued a revised 30(b)(6) notice on November 20, 2018.

---

[18] *See* Ochsner Health System, Rescission of Certification of Statement Regarding Chemotherapy Drug Administered (Apr. 17, 2018) (attached as **Exhibit 12**) ("I completed this Statement without the approval of the Ochsner Health System Legal Affairs Department or Release of Information department. Further, I did not have personal knowledge of the NDC Codes of the docetaxel that was in fact administered to Antoinette Durden by Ochsner Health System when I completed the Statement.").

[19] *See* Canty Dep., Ex. 8 (Email from Plaintiffs' Counsel to Ashley Canty requesting her to transfer handwritten NDC Code to certification form) (attached as **Exhibit 13**); Canty Dep. 28:8-11 (disclaiming personal knowledge of Durden NDC Codes), 29:17-31:10 (recounting transfer of handwritten NDC Code to statement), 32:10-16 (affirming Rescission); 42:11-14 (disclaiming review of records to determine docetaxel manufacturer); 46:18-49:13 (explaining that she transferred code handwritten by unknown person to statement at direction of Plaintiff's counsel's staff); 74:15-25 (stating she did not know anything about the NDC Code but was "just trying to help"); 96:7-99:15 (explaining that only basis for product use statement was NDC Code handwritten by someone unknown to her) (Jun. 29, 2018) (attached as **Exhibit 14**).

Responding to that notice, Ochsner (again) informed Plaintiff's counsel that it could not produce *any* witness able to identify or certify the manufacturer of the docetaxel actually administered to Plaintiff. *See* **Ex. 4** at p. 2, ¶ (c). Ochsner did offer to produce several witnesses in response to Plaintiff's revised 30(b)(6) notice, including Neil Hunter. *See* **Ex. 4**. Despite the Court's earlier approval for the depositions to proceed, Plaintiff's counsel – for reasons unknown – declined to conduct these depositions. Whether these depositions were taken or not (Plaintiff has since abandoned them), the record of disputed evidence does and will always remain in the *Durden* case as factors rendering it impossible to resolve product identification against Sanofi on this Motion, and on any summary judgment motion by Plaintiff.

## IV. CMO 12A Does Not Abrogate Plaintiff's Burden to Prove the Essential Element of Product ID.

CMO 12A does not reduce Plaintiff's burden of both proof to establish product identification as an essential element of her claim. In any lawsuit, each plaintiff is obligated to determine whether a factual basis exists to sue a particular defendant prior to filing suit.[20] In a product liability action, a plaintiff must present facts showing that each defendant named manufactured a product that caused her harm.[21] No product identification evidence exists to support this essential element of Plaintiff's claim.

---

[20] *See, e.g., Herbert v. Miles Pharmaceuticals*, No. 92-cv-4290, 1994 WL 10184, at *3 (E.D. La. 1994) (affirming summary judgment in favor of defendant manufacturer of a prescription drug, stating "the defendant manufacturer has carried its burden in pointing out that the record contains insufficient proof concerning an essential element of the plaintiff's claim upon which she bears the burden of proof (i.e., that any [defendant's] product proximately caused her damages."); *see also Avandia Mktg., Sales Pract. And Prods. Liab. Litig.*, No. 2007-md-1871, 2010 WL4720335, at *1 (E.D. Pa. Nov. 15, 2015) (requiring plaintiffs to produce evidence that they used the drug because "plaintiffs and their counsel should have possessed [such evidence] before filing their claims.").

[21] *See, e.g., Burns v. Univ. Corp. Prot. Alliance*, No. 4:07-cv-00535, 2007 WL 2811533, at *2 (E.D. Ark. Sept. 25, 2007) (requiring evidence in a consolidated multi-plaintiff, multi-defendant case that "a specific product manufactured by a specific defendant caused injury to a particular plaintiff [….]"); *Lee v. Baxter Healthcare Corp.*, 721 F. Supp. 89, 92 (D. Md. 1989) ("Under traditional products liability law, the plaintiff must prove that the defendant

17

Equally important, Sanofi has a right to present this contrary evidence to a jury, and cannot be precluded from presenting it among its defenses. To be sure, "[d]ue process requires that there be an opportunity to present *every available defense.*" *Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1303 (2010) (citing *Lindsey v. Normet*, 405 U.S. 56, 66 (1972)) (emphasis added). This constitutionally mandated opportunity to be heard "must be granted at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965); *see also Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). Further, the right to due process "encompasses the individual's right to be aware of and refute the evidence against the merits of his case." *Application of Eisenberg*, 654 F.2d 1107, 1112 (5th Cir. 1981). If Plaintiff's motion were granted, Sanofi's rights to due process would be violated in that it would be deprived the opportunity to assert viable defenses and present contrary evidence on product identification.

Besides, there is ***no*** reliable product identification evidence that has been submitted and it is clear that this issue cannot be resolved except by a fact finder at trial. The purpose of bellwether trials is to produce "representative verdicts and settlements" that inform the parties' and court's assessment and valuation of other pending claims. *See* Test Cases, Manual Complex Lit. § 22.315 (4th ed.). The PSC and Sanofi agreed that the bellwether process in this MDL should not include disputed product identification. Trying Plaintiff's case in which the threshold issue is whether Plaintiff actually took defendants' product is not only counterproductive, but it risks an outcome that would provide no insight on the ultimate questions of liability, causation and damages. Stated differently, weeks of testimony, evidence and presentation would be meaningless if the jury simply

---

manufacturer made the product that caused plaintiff's injury.") (citing, *inter alia*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 319 (1986)).

18

decides there was not a sufficient demonstration of product identification. Even if this Court is inclined to let Plaintiff's case to proceed to trial, it must permit Sanofi to present contrary evidence to a jury and product identification among its available defenses.

## CONCLUSION

For the foregoing reasons, Sanofi requests that the Court deny Plaintiff's Motion to Enforce CMO 12A, remove Plaintiff's case from the trial pool in MDL 2740 pursuant to CMO Nos. 12 and 14, and grant any other relief it deems appropriate.

Respectfully submitted,

/s/ *Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE URQUHART & MOORE LLC**
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: 504-310-2100
Facsimile: 504-310-2120
dmoore@irwinllc.com

Harley V. Ratliff
Adrienne L. Byard
**SHOOK, HARDY& BACON L.L.P.**
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
Facsimile: 816-421-5547
hratliff@shb.com
abyard@shb.com
***Counsel for sanofi-aventis U.S. LLC and Sanofi US Services, Inc.***

**CERTIFICATE OF SERVICE**

I hereby certify that on January 7, 2018, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ *Douglas J. Moore*

9090185 v1