January 7, 2019
Opposition To Plaintiff Antoinette Durden's Motion To Enforce CMO 12a

# EXHIBIT 14

1   A.   Correct.

2   Q.   You say further: "I did not have
3   personal knowledge of the NDC codes of the Docetaxel
4   that was, in fact, administered to Antoinette Durden
5   by Oschner Health Systems when I completed the
6   statement."

7   A.   Correct.

8   Q.   Have you ever at any time had any
9   personal knowledge of the NDC codes of the Docetaxel
10  that was administered to Antoinette Durden?

11  A.   No.

12  Q.   You state further: "I have no personal
13  knowledge of the origin of Page Nos. 4 and 5 of
14  Exhibit No. 1, which appears to be a printout from
15  the Internet that was given to me by another
16  employee whose identity I cannot recall."

17       When you refer to Page Nos. 4 and 5,
18  you're referring to the first page is a photocopy of
19  a display panel; is that correct?

20  A.   Correct.

21  Q.   And at the bottom of that page there is
22  a website, https://dailymed.nlm.nih.gov?

23  A.   Correct.

24  Q.   And the website date is 5/11/2017?

25  A.   Correct.

```
 1        Q.    The other page, Page No. 5, is also an
 2    internet printout with the same site,
 3    https://dailymed.nlm.nih.gov?
 4        A.    Correct.
 5        Q.    You say that you have no personal
 6    knowledge of the origin of those pages, right?
 7        A.    Correct.
 8        Q.    And you say:  "Which appears to be a
 9    printout from the Internet that was given to me by
10    another employee whose identity I cannot recall."
11              Correct?
12        A.    Correct.
13        Q.    Do you remember being given pages 4 and
14    5 by somebody?
15        A.    No.  I do not remember where it came
16    from, how I found it.  No idea.
17        Q.    There's handwriting in the upper
18    left-hand corner of Page No. 4?
19        A.    Yes.
20        Q.    Do you know whose handwriting that is?
21        A.    No.  From what I know, it came from the
22    -- when it came back from the attorney.  This all
23    came back together.
24        Q.    And the handwriting I'm referring to on
25    Page No. 4 says "Taxotere 1MG".  Then below that
```

1    it's written "0075-88003-01"?
2         A.    Yes.
3         Q.    And so that is not your handwriting,
4    correct?
5         A.    No, correct.
6         Q.    And do you know whose handwriting it is?
7         A.    No, I do not.
8         Q.    But you said that you think that was
9    written on there when it was sent to you from the
10   law firm?
11        A.    Correct.  Because it was sent to place
12   on here.  This was sent to me to check off on this
13   form, the Page No. 6.
14        Q.    You're saying Page No. 4 that was an
15   Internet printout with the handwriting and number
16   was sent to you in order for you to place that
17   number on the statement regarding chemotherapy drug
18   administered?
19             MR. COFFIN:  Object to the form.
20        A.    Correct.
21        Q.    When you received Page No. 4, was it
22   your understanding that you were supposed to take
23   the handwritten number on that page and put it on
24   the statement regarding chemotherapy drug
25   administered?

```
 1        A.    Correct.
 2        Q.    And why did you have that understanding?
 3              (Witness indicating.)
 4        A.    That number was on this.  It was
 5   somewhere else on here as well.
 6        Q.    You're saying the number that is
 7   handwritten on Page No. 4 is also on Page No. 5?
 8        A.    Yes.
 9        Q.    The other Internet printout?
10        A.    Yes.
11        Q.    Okay.
12              And then you state:  "As such, I rescind
13   my signature/certification of the statement, and
14   defer to the release of information department's
15   production of March 5, 2018 as to the NDC code
16   information as to patient Antoinette Durden."
17              Is that correct?
18        A.    Yes, correct.
19        Q.    And you say that production is attached
20   as Exhibit 2; is that correct?
21        A.    Correct.
22        Q.    You know, when I've been referring to
23   the last page of Exhibit 2, the statement regarding
24   chemotherapy drug administered, that is actually the
25   next to the last page of our Exhibit 2.  The last
```

```
 1      page of our Exhibit 2 is the March 5, 2018 document,
 2      correct?
 3          A.    Correct.
 4          Q.    And the release of information
 5      department's production of March 5, 2018, which is
 6      the last page of Exhibit 2, states that due to the
 7      age of the dates of service, the NDC code
 8      information is unavailable; is that right?
 9          A.    Correct.
10          Q.    All of the statements that you made in
11      your Rescission Of Certification Of Statement
12      Regarding Chemotherapy Drug Administered is true and
13      correct to the best of your knowledge?
14                (Witness indicating.)
15          A.    Correct.  I have not ever seen this
16      before.
17          Q.    You're referring to the last page of
18      Exhibit 2?
19          A.    Uh-huh.  I've never seen that.
20          Q.    Well, in the front page of your
21      rescission it says that you defer to the release of
22      information department's production of March 5,
23      2018.
24          A.    Uh-huh.
25          Q.    And is that last page that you were just
```

```
 1    patient records", and then it goes on to say that:
 2    "We are asking you to review whatever records may
 3    provide the information of the manufacturer for the
 4    Taxotere Docetaxel administered."
 5        A.   Uh-huh.
 6        Q.   And it gives examples of types of
 7    documents.
 8             Do you see that?
 9        A.   Yes.
10        Q.   Okay.
11             Did you review any records to try to
12    determine the identity of the manufacturer of the
13    Docetaxel administered to Ms. Durden?
14        A.   No.
15        Q.   When you received this letter, did you
16    go talk to anyone in your department?
17             (Witness indicating.)
18        A.   Well, this is -- this is after.  Well,
19    she had sent it again after I had already sent this.
20    This is when I reached out to find this.
21             MR. COFFIN:  I'm sorry, we all need to
22             be clear what you mean by "this".
23             THE WITNESS:  The box of the medicine
24             or whatever.
25    BY MS. SCHULTZ:
```

```
1        A.    No.
2        Q.    I'm going to hand you deposition Exhibit
3   No. 6.
4              (Whereupon Exhibit No. 6 was marked
5               for Identification.)
6   BY MS. SCHULTZ:
7        Q.    This is an E-mail string.  At the very
8   top of Exhibit No. 6, the E-mail string starts with
9   an E-mail from Jessica Perez dated March 15th, 2018,
10  and it's to A. Canty at Ochsner?
11       A.    Yes.
12       Q.    Is that your E-mail address?
13       A.    Yes.
14       Q.    Let's start on Page No. 2 of Exhibit
15  No. 6.  This is an E-mail from Lauren Waldrep to you
16  dated Thursday, June 29th, 2017, correct?
17       A.    Yes.
18       Q.    It says:  "Good afternoon, Ashley, can
19  you please give me a call in regards to Ms. Durden.
20  I wanted to see if you can check on the NDC on our
21  checklist and sign the bottom as well.  I know a
22  while back you gave us the NDC on the fax cover
23  page, but my attorney would like it put on the
24  actual checklist.  So, basically, I just need you to
25  transfer it over to the other page attached.  If you
```

```
 1   have any questions, please feel free to contact me
 2   at any time.  If I'm not available you can ask for
 3   Shelly."
 4        A.    Yes.
 5        Q.    Do you recall receiving that E-mail?
 6        A.    Yes.
 7        Q.    And did you understand what you were
 8   being asked to do in this E-mail?
 9        A.    Uhmm, no.  I was not at first, no.
10        Q.    Did you call Ms. Waldrep about it?
11        A.    Yes.  And that's when she advised that I
12   had to just pretty much just check off which is on
13   the -- let me find it.
14              (Witness peruses document.)
15   BY MS. SCHULTZ:
16        Q.    You're looking now at Exhibit 2?
17              (Witness indicating.)
18        A.    It's the same page as this.  So
19   Exhibit 5 or 6 that I just transferred it just to
20   this form.  To this statement.
21        Q.    So you transferred what was --
22        A.    I didn't transfer.  I just checked the
23   box off and then signed it.
24        Q.    And this is the statement regarding
25   chemotherapy drug administered that you signed on
```

1    March 20th, 2018?
2        A.   Yes.
3        Q.   And when you say that you checked the
4    box off, you checked a box under Sanofi-Aventis that
5    has the number 00758003-01, correct?
6        A.   Correct.
7        Q.   And why did you check that box?
8             (Witness indicating.)
9        A.   Because that's the same number as the
10   Taxotere.
11       Q.   And you're pointing to the number that's
12   written on the printout that's handwritten on there?
13       A.   Yes.
14       Q.   That's also handwritten on the letter --
15       A.   Yes.
16       Q.   -- dated April 19th?
17            (Witness indicating.)
18       A.   Yes.  It's also -- the page is not in
19   this one, but it's also on here. Exhibit 4.
20       Q.   You're referring to the other printout
21   that is also May 11th, 2017?
22       A.   Yes, not written, but typed.
23       Q.   Under the product information heading?
24       A.   Item code.
25       Q.   So if I'm clear, the reason that you

```
 1      checked the box under Sanofi-Aventis was because
 2      that number was handwritten on the April 19, 2017
 3      letter?
 4           A.   Yes.
 5           Q.   And on the principal display panel
 6      printout?
 7           A.   Yes.
 8           Q.   Handwritten by someone you don't know,
 9      correct?
10           A.   Correct.
11           Q.   And is there any other reason that you
12      checked that box?
13           A.   No.
14           Q.   I can't remember if I asked you this
15      already, but the Thursday June 29th, 2017 E-mail
16      that says, "can you please give me a call in regards
17      to Ms. Durden" --
18           A.   Uh-huh.
19           Q.   -- it's what I just read that, that says
20      "I just need you to transfer it over to the other
21      page".
22                Do you see that?
23           A.   Yes.
24           Q.   Did you have a telephone conversation
25      with Ms. Waldrep?
```

```
 1      Q.    You're referring to the printout that
 2   you testified that you believe came from the coding
 3   department, right?
 4      A.    Correct.
 5      Q.    Did you personally type the statements
 6   titled "Rescission of Certification of Statement
 7   Regarding Chemotherapy Drug Administration"?
 8      A.    No.
 9      Q.    Do you know who did?
10      A.    Yes.
11      Q.    Who?
12      A.    Her.
13      Q.    Your counsel?
14      A.    Yes, my counsel.
15      Q.    Why did you rescind the certification of
16   statement regarding chemotherapy drug administered?
17      A.    Why did I rescind?
18      Q.    Right.
19      A.    Because I don't know anything about it.
20   I was just trying to help, you know, the attorney.
21   Like I don't know no personal information about the
22   code.  I don't know if it's the correct code.  I
23   don't know.  I just try not to be involved in
24   something I don't really know a lot of information
25   about.
```

```
1    on March 20th, 2018?
2              MR. COFFIN:  Object to form.
3        A.    No, I do not.
4        Q.    You don't agree with that?
5        A.    Say it again.
6        Q.    Let me ask it without a negative.
7              Did you have any actual knowledge of the
8    manufacturer of the drug administered to Ms. Durden
9    when you signed that certification on March 20th,
10   2018?
11       A.    The manufacturer?  No, I do not.  I did
12   not know who that came from.
13       Q.    Did you have any knowledge of any drug
14   administered to Ms. Durden when you signed that
15   certification?
16       A.    No, just off of what they were looking
17   for.
18       Q.    When you say "just off of what they were
19   looking for", was the only information that you
20   relied on was to check the box and sign the
21   statement and the handwritten number on Page No. 4
22   of Exhibit 4?
23       A.    Yes.
24       Q.    And that's a number written by someone
25   that is unknown to you, correct?
```

1    A.    Correct, yes.
2    Q.    The only information that you had when
3  you signed the statement on March 20th, 2018 was a
4  website printout that some unknown person had
5  provided to you that included handwritten numbers
6  written by an unknown person, correct?
7              MR. COFFIN:  Object to the form.
8    A.    Correct.
9    Q.    You were asked some questions about
10  having educated yourself on the product codes
11  provided to Ms. Durden.
12              Do you recall that?
13    A.    Education?  Say it again.
14    Q.    You were asked to agree that you had
15  educated yourself on products that were administered
16  to Ms. Durden, do you remember that?
17              MR. COFFIN:  Object to the form.
18    A.    Yes.
19    Q.    Did you ever actually educate yourself
20  on what products were administered to Ms. Durden?
21              MR. COFFIN:  Object to the form.
22    A.    No, I didn't not educate myself, but I
23  just went based off -- I didn't go look to see, no.
24    Q.    Is the only thing that you did was to
25  take this handwritten number that's on this website

```
 1   printout --
 2        A.   Yeah.
 3        Q.   -- and match it up with the number on
 4   the certification form?
 5             MR. COFFIN:  Objection to the form.
 6        A.   I was looking for the NDC for that
 7   specific Taxotere, that was it.
 8        Q.   When you say "that specific Taxotere",
 9   what do you mean?
10        A.   The medicine called Taxotere.
11        Q.   And it was your understanding from this
12   website and the handwritten number that that number
13   that's handwritten applies to Taxotere?
14        A.   Correct.
15        Q.   So you were just trying to find out what
16   Taxotere's code was, correct?
17        A.   NDC code, yes.
18        Q.   And so you then saw that handwritten
19   number and that's why you checked the box on the
20   statement?
21             MR. COFFIN:  Object to the form.
22             (Witness indicating.)
23        A.   Correct.  It's also here too.  It's not
24   just handwritten.
25        Q.   It's also on the next to the last page
```

```
 1     of Exhibit 4, which is also a website printout,
 2     correct?
 3         A.    Yes.  That was with it, yeah.  Yes.
 4         Q.    Okay.
 5               So it's your understanding based on this
 6     page that is second from the back and that
 7     handwritten number, that Taxotere's code is
 8     758003-01, correct?
 9         A.    Correct.
10         Q.    But you have no personal knowledge as to
11     whether Ms. Durden when she was in treatment
12     actually received Taxotere or any one of these other
13     manufacturers' drugs, correct?
14         A.    I do not know.  No.  Personally, no, I
15     do not.
16         Q.    Okay.
17               And if you'll look with me at Exhibit
18     No. 8.  On the last page of Exhibit No. 8, the
19     E-mail from -- the June 29th, 2017, E-mail?
20         A.    Yes.
21         Q.    This was to you from the Pendley firm,
22     correct?
23         A.    Yes.
24         Q.    And in it it says:  "I wanted to see if
25     you can check on the NDC on our checklist and sign
```