UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)          MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

SECTION "H" (5)

**THIS DOCUMENTS RELATES TO**
*Kelly Gahan*
Case No. 2:16-cv-15283

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

The Court should grant Defendants Sanofi-aventis U.S. LLC and Sanofi US Services Inc.'s ("Defendants") motion for summary judgment because Plaintiff cannot establish the essential element of causation.

This is a warnings case; Plaintiff alleges Defendants failed to provide adequate warnings to her and her prescribing physicians regarding an alleged risk of permanent alopecia associated with Taxotere. But Plaintiff has no evidence that an additional or different warning would have changed her physician's decision to prescribe Taxotere. Plaintiff's oncologist, Dr. Virginia Borges, unequivocally testified that a different warning would not have altered her decision to prescribe Taxotere.

Without evidence that a <u>different</u> warning would have resulted in a different prescribing decision, Plaintiff cannot carry her burden to prove that the alleged failure to warn caused her alleged permanent alopecia—i.e., Plaintiff cannot establish the essential elements of causation. And where, as here, there is no genuine factual dispute concerning this break in the chain of causation, Defendants are entitled to summary judgment on all of Plaintiff's claims.

**BACKGROUND**

A. **Introduction**

Taxotere is a chemotherapy prescribed to treat various forms of cancer, including breast cancer. *See, e.g.,* Second Am. Master Compl. ¶ 4. Taxotere was first approved for use in the United States in 1996 and its FDA-approved label has always warned that hair loss is one of the drug's most common side effects. Ex. A, 1996 Label; Ex. B, March 2013 Label. In December 2015, Sanofi, following discussions with FDA, made a modest change to the label's post-marketing section to reflect that "cases of permanent alopecia have been reported." Ex. C, 2015 Label. Taxotere has never been removed from the market and oncologists continue to prescribe Taxotere to treat potentially life-threatening forms of breast cancer. *See, e.g.*, Ex. D, Dr. Virginia Borges ("Borges Dep.") 140:3-18; *see also id*. 33:1-6.

B. **Plaintiff's Decision to Undergo Chemotherapy**

Plaintiff is a 37-year-old emergency room physician in Aurora, Colorado. Ex. E, Deposition of Kelly Gahan ("Gahan Dep.") at 62:12-63:12. She graduated from the University of Colorado Medical School in 2007. *Id.* 59: 8-17. She has no expertise in oncology. *Id.* 64:3-4. On January 14, 2013, Plaintiff was diagnosed with breast cancer, type PR-positive, ER-positive, and HER2 positive. Ex. E, Gahan Dep. 50:20-24; Ex. F, PFS at p. 11.

Following her diagnosis, Plaintiff's perspective was that she should "get a second opinion, I'm going to look at the literature, I'm going to try to see what the best course of action here would be." Ex. E, Gahan Dep. 99:1-15. She began seeking treatment options in January 2013. Ex. F, PFS at 12; Ex. E, Gahan Dep. 72: 18-20. On January 22, 2013, Plaintiff saw Dr. Borges and discussed options for treating her breast cancer. (Ex. G, Dr. Borges' record 1/22/13). Plaintiff and Dr. Borges discussed chemotherapy options and Dr. Borges recommended a chemotherapy regimen called

TCH, which included docetaxel (T),[1] carboplatin (C), and Herceptin (H). *Id*. The second opinion Plaintiff obtained also suggested the Taxotere regimen. (Ex. H, Conlon MD note 1/24/13). Plaintiff began the Taxotere chemotherapy regimen on March 28, 2013. Ex. E, Gahan Dep. 254:13-16; *see also* Ex. I, SFC at ¶ 9. Plaintiff's last dose of chemotherapy was administered on July 11, 2013. Ex. E, Gahan Dep. 254:19-21. Plaintiff is currently cancer-free. Ex. F, PFS at 16.

Prior to beginning chemotherapy treatment in March 2013, Plaintiff performed additional medical research about taking Taxotere because she read posts on the "Taxotears" Group's website and was concerned that Taxotere could result in permanent hair loss. Ex. E, Gahan Dep. 23:2-14. Plaintiff also reviewed medical literature, case studies, and articles about persistent or permanent hair loss from chemotherapy regimens, including Taxotere. *E.g.*, *id.* 23:24-31:25. Plaintiff also reviewed the Taxotere label because "she was specifically worried about the risk of permanent alopecia." *Id*. 53:2-12.

Dr. Borges informed Plaintiff that she had consulted or treated hundreds of women a year that used Taxotere for breast cancer treatment. Ex. D, Borges Dep. 74:4-14. Prior to chemotherapy, Plaintiff asked Dr. Borges if there was a risk of permanent alopecia from Taxotere. Ex. E, Gahan Dep. 217:16-20. Plaintiff believes Dr. Borges informed her that the risk of permanent or persistent alopecia with Taxotere was very small. *Id.* 217:16-218:5; *see also id.* 226:7-16.

Dr. Borges presented Plaintiff with two chemotherapy regimens: TCH and ACTH. The second regimen did not contain Taxotere. Dr. Borges was in favor of the TCH regimen over ACTH. Ex. E, Gahan Dep. 281:2-25. Plaintiff does not blame Dr. Borges "at all" for her persistent or permanent alopecia. *Id*. 221: 12-20. Nor does Plaintiff believe that Taxotere should be pulled from the market because it is an effective chemotherapy drug. *Id*. 224:24-226:1.

---

[1] Docetaxel is the generic version of Taxotere. For ease of reference, Defendants use Taxotere interchangeably.

### C. Dr. Borges' Treatment of Plaintiff

Dr. Borges' first patient that developed persistent alopecia after taking Taxotere occurred in 2011. Ex. D, Borges Dep. 26:1-27:5. This patient was treated for HER2-postive breast cancer with the same TCH regimen. *Id*. 27:2-13. Since 2011, Dr. Borges has had seven patients that exhibited persistent or permanent alopecia due to chemotherapy. *Id*. 27:14-28:6. Dr. Borges has treated hundreds of patients in the adjuvant breast cancer setting and she routinely uses TCH (and now TCHP) because of the safety profile. *Id*. 30:15-31:10. TCH is Dr. Borges' preferred chemotherapy regimen in the adjuvant breast cancer setting, and that is what she was recommending to patients when Plaintiff received her chemotherapy treatment in 2013. *Id*. 33: 10-23.

Plaintiff alleges in her Complaint that she was not warned of the potential side effect of persistent or permanent alopecia from the TCH regimen. Plaintiff, however, has once again failed to be forthright with the Court. *See, e.g.*, Order and Reasons (Doc. # 5618) (Dec. 20, 2018); Order and Reasons (Doc. # 3917) (Aug. 22, 2018). Contrary to Plaintiff's allegations, Dr. Borges began warning her patients in 2013 (before seeing Plaintiff) that there was a risk of persistent chemotherapy-induced alopecia from the TCH regimen. Ex. D, Borges Dep. 50:15-51:12. Dr. Borges testified that she specifically warned Plaintiff that she had seen persistent or permanent chemotherapy-induced alopecia from taxanes in three patients prior to Plaintiff's TCH treatment. *Id.* 51:13-25. She also provided Plaintiff with Dr. Scot Sedlacek's article regarding the risk of persistent or permanent alopecia from such treatment. *Id.* Dr. Borges and Plaintiff discussed many times the pros and cons of ACTH versus TCH, weighing Plaintiff's concerns about permanent hair loss against the other concerning side effects of ACTH (including cardiomyopathy and the secondary leukemia). *Id.* 78:20-79:21. Dr. Borges advised Plaintiff that, if it were her, she would

take the TCH regimen and use cold caps. *Id*. 77:22-78:4. Ultimately, Plaintiff decided the process of hair preservation was not worth the risk of leaving circulating tumor cells in her body. Ex. E, Gahan Dep. 250:13-251:6.

At her deposition, Dr. Borges testified that she believes the TCH regimen is not only effective but is, in fact, a "lifesaving" and "one of the best things we've ever done in breast cancer."[2] *Id*. 140:3-18; *see also id*. 33:1-6 (Q. You agree that docetaxel's an outstanding drug? A. Yes, for breast cancer. Q. Do you believe that it's helped save lots of women lives? A. Yes."). Dr. Borges testified that Plaintiff weighed the risk profiles of the two chemotherapy regimens (TCH and ACTH), and decided to take TCH. *Id.* 77:9:15.

Dr. Borges' further testified that TCH is a superior regimen to ACTH regimen. *Id.* 34:15-21. Dr. Borges discussed "extensively" with Plaintiff her options of ACTH versus TCH prior to her chemotherapy. *Id*. 74:8-75:17. Dr. Borges discussed with Plaintiff her experiences with TCH, including information about three patients that developed permanent chemotherapy-induced alopecia. Dr. Borges testified that each agreed on TCH and that Dr. Borges implemented the TCH regimen they agreed on. *Id*. 76:6-12; *see also* Ex. E, Gahan Dep. 75:2-13.

Dr. Borges' recommendation that Plaintiff take the TCH regimen and use cold caps remains true today. *Id.* 107:5-13. No label change to Taxotere would have changed Dr. Borges' recommendation. *Id.* 107:14-22. Dr. Borges would not have stopped using Taxotere as part of her treatment with Plaintiff even if there had been a label change that indicated permanent hair loss, because she would "not forego life-saving chemotherapy for any risk." *Id*. 48:23-49:14.

---

[2] In addition to hair loss, Dr. Borges discussed with Plaintiff the risk of bone marrow suppression, life-threating infection, death, temporary or permanent menopause and infertility, neuropathy, heart damage, and secondary leukemia.

5

## STANDARD

Summary judgment is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The party seeking summary judgment initially bears the responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323–24 (1986). The moving party can meet this burden by pointing out that the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof. *Id.* at 322–23.

Once the moving party has met its burden, the nonmoving party bears the burden of coming forward with evidence of each essential element of its claim, such that a reasonable jury could find in its favor. *Id.* The existence of a mere scintilla of evidence to the support the nonmoving party's position, however, will not defeat summary judgment; there must be sufficient evidence on which the jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). "The failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial and requires the court to grant the motion for summary judgment." *In re Trasylol Prods. Liab. Litig.*, No. 08-md-01928, 2010 WL 6098571, at *4 (S.D. Fla. Mar. 16, 2010).

## ARGUMENT

Plaintiff asserts the following claims: Count I-strict products liability-failure to warn; Count II-strict products liability for misrepresentation; Count III-negligence; Count IV-negligent misrepresentation; Count V-fraudulent misrepresentation; Count VI-fraudulent concealment; Count VII-fraud and deceit; Count VII-breach of express warranty (Sanofi Defendants only). *See* SFC, Doc. # 82 ¶ 13. The Court should grant summary judgment to Defendants on each of these claims.

6

## I. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S FAILURE TO WARN CLAIMS

### A. Colorado Law Governing Negligence and Strict Liability Failure to Warn Claims

A plaintiff bringing a negligent failure-to-warn claim "is required to prove that a manufacturer's failure to warn of a risk fell below an acceptable standard of care." *Fibreboard Corp. v. Fenton*, 845 P.2d 1168, 1174 (Colo. 1993). "[A]s with all tort claims, the plaintiff must prove the elements of causation and damages" to show negligent failure to warn. *Oja v. Howmedica, Inc.*, 111 F.3d 782, 791 (10th Cir. 1997) (interpreting Colorado law); *Hackett v. Breg, Inc.*, No. 10-CV-1437, 2011 WL 4550186, at *2 (D. Colo. Oct. 3, 2011).

To establish a strict products liability claim under Colorado law, a plaintiff must prove:

> (i) the product has a defective condition rendering it unreasonably dangerous to the consumer; (ii) the product was expected to and did reach the consumer without substantial change in that condition; (iii) the defect caused the plaintiff's injury; (iv) the defendant sold the product and is in the business of doing so; and (v) the plaintiff sustained damages.

*Xtreme Coil Drilling Corp. v. Encana Oil & Gas (USA), Inc.*, No. 08-CV-02750, 2010 WL 3777303, at *4 (D. Colo. Sept. 19, 2010) (citing *Barton v. Adams Rental, Inc.*, 938 P.2d 532, 536-37 (Colo. 1997)). The causation standard is the same for both negligence and strict products liability claims. *Id*. It is the plaintiff's burden to prove "that the manufacturer gave an inadequate warning of the danger that caused the injury." *O'Connell v. Biomet, Inc.*, 250 P.3d 1278, 1281 (Colo. Ct. App. 2010).

### B. The Court Should Grant Defendants Summary Judgment on Plaintiff's Failure to Warn Claims

Plaintiff's failure to warn claims under strict products liability and negligence are based on Defendants' alleged failure to adequately warn of an alleged risk of permanent alopecia with Taxotere use. *See generally* First Master Complaint ¶¶ 220-230; 239-246. To prevail on any of her

7

claims under Colorado law, she must show that Defendants' "failure to warn was a proximate cause of her injury." *Peterson v. Parke Davis & Co.*, 705 P.2d 1001, 1004 (Colo. App. 1985); *O'Connell v. Biomet, Inc.*, 250 P.3d 1278, 1281 (Colo. Ct. App. 2010).

Colorado courts have recognized and applied the learned intermediary doctrine to cases involving prescription medications and medical devices. *E.g., O'Connell*, 250 P.3d at 1281. Under Colorado law, a drug manufacturer's duty to warn runs to the prescribing physician, not to the patient or to the general public. *See Caveny v. Ciba-Geigy Corp.*, 818 F. Supp. 1404, 1406 (D. Colo. 1992) ("A warning is adequate when it explains to the physician the risk which the plaintiff is asserting to be associated with the drug and which caused the death."); *O'Connell v. Biomet, Inc.*, 250 P.3d 1278, 1281 (Colo. App. 2010) ("[W]here prescription drugs are concerned, the manufacturer's duty to warn has been limited to an obligation to advise the prescribing physician of any potential dangers that may result from the drug's use."); *see also Haffner v. Stryker Corp.*, 2014 WL 4821107, at *4 (D. Colo. Sept. 29, 2014).

"It is the responsibility of the physician as a learned intermediary to assess the risks and benefits of a particular course of treatment." *Caveny v. CIBA-GEIGY Corp.*, 818 F. Supp. 1404, 1406 (D. Colo. 1992). Accordingly, the proximate cause analysis focuses on the actions of the prescribing physician and whether the alleged failure to warn affected her prescribing decision. Where the evidence shows that an additional or different warning would not have changed the prescribing decision, summary judgment is warranted. *See, e.g., In re Nuvaring Litig.*, 2013 WL 1874321, *26 (N.J. Super. L. Div. Apr. 18, 2013) (applying Colorado law); *In re Trasylol Prods. Liab. Litig.*-MDL-1928, 2013 WL 1192300, at *14 (S.D. Fla. Mar. 22, 2013) (applying Colorado law); *Wollam v. Wright Med. Grp., Inc.*, 2012 WL 4510695, at *6 (D. Colo. Sept. 30, 2012).[3]

---

[3] It is legally insignificant that Plaintiff is a medical doctor, as there are only two recognized exceptions to learned intermediary doctrine and neither apply here.

8

In *Nuvaring*, for example, a New Jersey court applying Colorado law in a case involving a prescription birth control product granted summary judgment based on a lack of evidence of proximate cause where plaintiff failed to establish an issue of fact as to whether her doctor would have changed his decision to prescribe the product if defendant had provided additional or stronger warnings about the alleged risk. *In re Nuvaring Litig.*, 2013 WL 1874321, at *26. The court observed that plaintiff's prescriber testified that he "continues to prescribe NuvaRing, and would not have (or at the very least, 'did not know' whether he would have) changed his decision to prescribe based on Plaintiffs['] questions at the deposition." *Id*. (citations omitted). The court found: "This evidence does not sufficiently raise any issues of fact as to whether the physician would have changed his decision to prescribe NuvaRing, therefore Plaintiff has not established issues of material fact." *Id.*; *see also Trasylol Prods Liab. Litig.*, 2013 WL 1192300, at *15 n.27 (noting that "the Plaintiffs present no evidence whatsoever that the doctor who made the decision to use Trasylol … would not have made the decision to use Trasylol with a different warning.").

Summary judgment is warranted under Colorado law in a prescription medication failure-to-warn case where, as here, a plaintiff fails to introduce evidence that a different warning would have caused her treating physician to change her decision to prescribe the medication at issue. Courts around the country routinely grant summary judgment in prescription pharmaceutical and device cases where there is no evidence that a different warning would have changed the physician's prescribing decision. *See*, *e.g.*, *Ackermann v. Wyeth Pharmaceuticals*, 526 F.3d 203, 2014 (5th Cir. 2008) (Texas law); *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1024 (10th Cir. 2001) (Oklahoma law); *Odom v. G.D. Searle & Co*., 979 F.2d 1001, 1004 (4th Cir. 1992) (South Carolina law); *Garrison v. Novartis Pharm. Corp.*, 30 F. Supp. 3d 1325, 1335 (M.D. Ala. 2014) (Alabama law); *D'Agnese v. Novartis Pharm. Corp.*, 952 F. Supp. 2d 880, 891 (D. Ariz. 2013) (Arizona law);

*In re Diet Drugs Prods. Liab. Litig.*, MDL No. 1203, 2009 WL 902351, at *2 (E.D. Pa. Apr. 2, 2009) ("even assuming the warnings are inadequate, plaintiffs must show that a proper warning would have changed the decision of the treating physician, i.e. that but for the inadequate warning, the treating physician would not have used or prescribed the product."); *Woulfe v. Eli Lilly & Co.*, 965 F. Supp. 1478, 1486 (E.D. Okla. 1997) (Oklahoma law). The prescribing physician's decision in such cases "breaks the causal chain as to the allegedly inadequate warnings." *Miller v. Pfizer Inc.*, 196 F. Supp. 2d 1095, 1130 (D. Kan. 2002) (Kansas law).

Defendants are entitled to summary judgment because no evidence exists to establish a causal connection between the purported inadequacies with Taxotere's warnings and Plaintiff's alleged injuries. Plaintiff's oncologist, Dr. Borges, testified that a label change would not have affected her decision to prescribe the life-saving TCH chemotherapy regimen to Plaintiff and that she discussed with Plaintiff the risk of permanent alopecia. Indeed, when confronted with medical literature provided by Plaintiff's counsel regarding the risk of permanent alopecia and Taxotere, Dr. Borges testified that she would not have changed her opinion to provide Plaintiff Taxotere.

> Q. If you had access to all those materials back in 2013 when making a recommendation for Dr. Gahan, would you have still recommended she take TCH?
> A. What I recommended to her then and what I would recommend to her now is that she takes TCH and uses the cold caps. **Q. *And no matter what label change that might have happened for the Taxotere label would not have changed your recommendation? A. Not for the use of that chemotherapy regimen.***

Ex. D, Borges Dep. 107:5-22 (emphasis added).

Without testimony from Dr. Borges that a different warning might have made a difference to her in deciding whether to prescribe Taxtotere to Plaintiff, Plaintiff cannot establish as a matter of law that any allegedly deficient warnings proximately caused her injuries. *See Peterson v. Parke Davis & Co.*, 705 P.2d 1001, 1003 (Colo. App. 1985); *see also Miller*, 196 F.Supp.2d at 1130 (prescribing physician's decision "breaks the causal chain as to the allegedly inadequate

10

warnings."). Nor is it sufficient that Dr. Borges may have changed her treatment in other ways—such as enforcing the need for Plaintiff to utilize a cold cap. *See* Ex. D, Borges Dep. 107:18-22. Proximate cause requires proof that the learned intermediary—Dr. Borges—would have made a *different prescribing decision*, which Plaintiff lacks. *See* Ex. D, Borges Dep. 107:5-22. Accordingly, the Court should grant Defendants summary judgment on Plaintiff's claims for failure to warn under strict product liability and negligence.

## II.   SUMMARY JUDGMENT IS APPROPRIATE ON PLAINTIFF'S ADDITIONAL CLAIMS

Plaintiff's Fourth, Fifth, Sixth, Seventh, and Eighth causes of action assert claims for negligent misrepresentation, fraudulent misrepresentation, fraudulent concealment, fraud and deceit, and breach of express warranty (Ex. I, SFC ¶ 13) that should be dismissed for the further reason that Plaintiff cannot meet her burden of establishing required elements of these causes of action.

### A.   Colorado Does Not Recognize Negligent Misrepresentation in the Personal Injury Context

Colorado does not recognize the claim of negligent misrepresentation outside the context of business transactions, such as in the personal injury context. *See Denver Health & Hosp. Auth. v. Beverage Distributors Co.*, LLC, 843 F. Supp. 2d 1171, 1178 (D. Colo. 2012); *Allen v. Steele*, 252 P.3d 476, 483 (Colo. 2011) ("[T]o state a claim of negligent misrepresentation, the misrepresentation *must be given for the plaintiff's business or commercial purposes*."). Plaintiff's action alleges personal injury based on her treatment of cancer with Taxotere and does not involve alleged negligent misrepresentation in a business transaction. The Court should grant Defendants summary judgment on Plaintiff's negligent misrepresentation claim.

### B.   Plaintiff's Fraud-Based Claims Should Also Be Dismissed Because There Is No Evidence Plaintiff Relied on Any Representations by Defendants

11

Plaintiff asserts causes of action for fraudulent misrepresentation, fraudulent concealment, and fraud and deceit. Each of these causes of action requires the plaintiff to prove, among other elements, that Defendants made a misrepresentation to Plaintiff and Plaintiff relied on that representation. For example, "[t]o establish a prima facie case of fraud," under Colorado law, "a plaintiff must present evidence that the defendant made a false representation of a material fact; that the party making the representation knew it was false; that the party to whom the representation was made did not know of the falsity; that the representation was made with the intent that it be acted upon; and that the representation resulted in damages." *Brody v. Bock*, 897 P.2d 769, 775–76 (Colo. 1995); *see also Shaw v. 17 West Mill St., LLC*, 307 P.3d 1046, 1050 n. 5 (Colo. 2013). Similarly, to establish a claim for strict product liability involving a misrepresentation about a product, the plaintiff must prove: (1) the defendant made a misrepresentation of a material fact concerning the character or quality of a product; (2) the misrepresentation was made to the public; and (3) physical harm resulted to plaintiff from justifiable reliance upon the misrepresentation. *Am. Safety Equip. Corp. v. Winkler*, 640 P.2d 216, 222 (Colo. 1982); Restatement (Second) of Torts § 402B (1965); C.R.S. § 13-21-401(3) (definition of seller).

Plaintiff cannot satisfy the representation or reliance elements of these causes of action. There is no evidence that Defendants made any express statement or representation directly to Plaintiff, nor that Plaintiff relied upon any such alleged statement. To the extent Plaintiff's fraud-based claims are based on an alleged non-disclosure, *i.e.*, fraudulent concealment, these claims fail because Defendants had no "duty to speak" directly to Plaintiff. "To succeed on a claim for fraudulent concealment or non-disclosure," the Colorado Supreme Court has held that, "a plaintiff must show that the defendant had a duty to disclose material information." *Mallon Oil Co. v.*

*Bowen/Edwards Associates, Inc.*, 965 P.2d 105, 111 (Colo. 1998). Under the learned intermediary doctrine, Defendants had no duty to warn Plaintiff directly. *See, e.g., Caveny*, 818 F. Supp. at 1406. Defendants are entitled to summary judgment on Plaintiff's fraudulent misrepresentation, fraudulent concealment, and fraud and deceit claims.

### C. Plaintiff Has Not Established the Elements of Her Express Warranty Claim

To maintain a claim for breach of express warranty, Plaintiff must prove (1) the existence of a warranty, (2) breach of the warranty, (3) the breach proximately caused the losses claimed as damages, and (4) defendant received timely notice of the breach. *Scott v. Honeywell Int'l Inc.*, 2015 WL 1517527, at *3 (D. Colo. Mar. 30, 2015). An express warranty is an "affirmation of fact or promise" relating to the goods that became "part of the basis of the bargain." C.R.S. § 4-2-313(1)(a). Plaintiff's breach of express warranty claim fails because, as discussed above, Plaintiff cannot satisfy the causation requirement. Nor is there any evidence that Defendants made any express statement directly to the Plaintiff that could have become "part of the basis of the bargain." Plaintiff's breach of warranty claim also fails because Plaintiff has not provided timely notice of the purported breach to Defendants. Colorado law requires that a buyer asserting an express warranty claim provide timely notice of the breach to the seller. C.R.S. § 4-2-607. Plaintiff has not offered any evidence that she provided notice prior to filing this suit, and her express warranty claim fails for this reason as well.

### CONCLUSION

For these reasons, the Court should grant Defendants' motion for summary judgment on Plaintiff's claims.

Date: January 7, 2019

Respectfully submitted,

| | |
|---|---|
| /s/ *Douglas J. Moore* | |
| Douglas J. Moore (Bar No. 27706) | Harley Ratliff |
| **IRWIN FRITCHIE URQUHART & MOORE LLC** | Adrienne L. Byard |
| 400 Poydras Street, Suite 2700 | **SHOOK, HARDY & BACON L.L.P.** |
| New Orleans, LA 70130 | 2555 Grand Boulevard |
| Telephone: 504-310-2100 | Kansas City, Missouri 64108 |
| Facsimile: 504-310-2120 | Telephone: 816-474-6550 |
| dmoore@irwinllc.com | Facsimile: 816-421-5547 |
| | hratliff@shb.com |
| | abyard@shb.com |

*Counsel for sanofi-aventis U.S. LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on January 7, 2019, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ *Douglas J. Moore*