# EXHIBIT D

Page 1

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
2
3        JACQUELINE MILLS,
4                 Plaintiff,
                                          CIVIL ACTION FILE
5             vs.
                                          NO. 2:17-cv-02689
6
         SANOFI S.A., SANOFI-AVENTIS
7        U.S. L.L.C., and
         AVENTIS-PHARMA S.A.,
8
                  Defendants.
9
10
11                    VIDEO DEPOSITION OF
12                    SHEFALI SHAH, MD
13                    July 26, 2018
14                     10:04 a.m.
15                   Kaiser Permanente
16                 20 Glenlake Parkway NE
17                 Sandy Springs, Georgia
18           Robyn Bosworth, RPR, CRR, CCR-B-2138
19
20
21
22
23
24
25       Job No. NJ2969335

18

```
 1      A     That's how it works.
 2      Q     Very good.  And in 2014 and 2015 the
 3 standard regimen that was prescribed in the NCCN
 4 guidelines was what you employed here, which was TCH
 5 with Arimidex; is that right?
 6           MR. GOMEZ:  Objection, form.
 7           THE WITNESS:  Say that again?
 8 BY MR. KEENAN:
 9      Q     He's just objecting.
10           MR. GOMEZ:  I said objection, form.
11 BY MR. KEENAN:
12      Q     He's allowed to.
13           MR. GOMEZ:  Yeah, you don't have to worry
14 about that.
15           THE WITNESS:  I don't have to?  Okay.
16      A     Well, for HER2 positive in what we call
17 the adjuvant -- adjuvant means after surgery --
18 BY MR. KEENAN:
19      Q     Right.
20      A     -- yes, TCH is standard of care.  We don't
21 add in -- so Arimidex is an estrogen receptor
22 blocker.
23      Q     Right.  Right.  We'll talk about -- you
24 add -- they take Arimidex after they've had these
25 other therapies?
```

1        A     After the Taxotere part.

2        Q     Okay.

3        A     The TC part.

4        Q     Okay.

5        A     But they can take the Arimidex during the

6    Herceptin part.

7        Q     Okay.  There's no doubt in your mind that

8    when you saw her and you saw her diagnosis the TCH

9    was the go-to regimen for her cancer.

10             MR. GOMEZ:  Objection to form.

11   BY MR. KEENAN:

12       Q     True?

13       A     That is true.

14       Q     And your number one goal was what when she

15   came to your office, was to achieve your desire of

16   living longer, living better?

17       A     Highest chance for curative intent.  It's

18   what we call curative intent.  In cancer in general

19   it's either curative intent, meaning we're trying to

20   cure you from the cancer, or it's palliative intent,

21   meaning you will probably -- we're never going to

22   cure you from it, but we're going to try to control

23   it as long as we can.

24       Q     She was of the first category?

25       A     Curative intent.

Page 43

1   BY MR. KEENAN:

2        Q    Okay, Doctor.  You ready to resume?

3        A    Yes.

4        Q    Okay.  I'm going to move here pretty

5   quickly.  Let me start with this, today if Ms. Mills

6   came in to you as a patient, would you -- would your

7   preference be the same regimen you employed before?

8        A    Yes.

9        Q    And the -- and why is that?

10       A    What do you mean why is that?

11       Q    Why is the TCH your go-to?

12       A    Because it's standard of care in this

13  setting.

14       Q    Okay.  All right.  Let's talk about her

15  medical records, and what I'd like to do, Doctor, is

16  direct your attention to the first record which is

17  an informed consent that I have here as December

18  9th, 2014.  Can you pull that up?

19       A    Yes.

20       Q    Okay.  I'm going to mark this as Exhibit

21  Number 5.

22            (Exhibit Number 5 was marked for

23  identification.)

24  BY MR. KEENAN:

25       Q    And walk me through -- walk me through

102

1      Q      I'll hand you -- going to show you what's

2 been marked as Exhibit 19.

3            MR. GOMEZ:  Here you go.

4 BY MR. GOMEZ:

5      Q      Have you -- do you recognize Exhibit 19?

6      A      Is this the weekly paclitaxel article?

7      Q      Who's the author is what you're asking?

8      A      No.

9            Yes, I do.  This is the New England

10 Journal article.  Yes, I've read it.

11     Q      All right.  And you recognize the New

12 England Journal of Medicine as a reliable and

13 authoritative source?

14     A      Yes.

15     Q      And you have read this article?

16     A      I have.

17     Q      And what is this article about, and what

18 are its conclusions?

19     A      I mentioned this earlier, but in small HER

20 positive tumors you can use weekly paclitaxel with

21 the trastuzumab as opposed to the TC part of the

22 other regimen.

23     Q      And would this treatment have been

24 appropriate for Ms. Mills at the time?

25     A      Yeah, this would have been a legitimate

1    option.

2         Q    And was it an option that you were aware

3    of back at the beginning of 2015?

4         A    I don't remember.  I mean, it was a big

5    deal when the article came out, but I believe she

6    had already been treated, right?  No, I already --

7    it came out right when I started her treatment.

8              MR. KEENAN:  January 2015.

9              THE WITNESS:  Yeah, that's what it looks

10   like.

11   BY MR. GOMEZ:

12        Q    Had you -- before its formal publication

13   and release, had you heard about this treatment?

14        A    Before the formal publication?  I don't --

15   I don't remember.

16        Q    Through abstracts and --

17        A    I don't remember --

18        Q    Okay.

19        A    -- at that time.

20        Q    But just to be clear, this would have been

21   an acceptable treatment for Ms. Mills; that is, the

22   treatment outlined in Exhibit 19?

23        A    Yes.  Where did that --

24        Q    And so let me take you back to your

25   treatment of Ms. Mills.  Okay?

1      A     Okay.

2      Q     And assume that at that time you knew, as

3  you do now, that Taxotere carried with it the risk

4  of permanent and total hair loss.

5            MR. KEENAN:  Object to form.

6      A     Okay.

7  BY MR. GOMEZ:

8      Q     And you told her that like you said you

9  would if you knew that, right?

10     A     Yes.

11     Q     And she said, you know, that's a big deal

12  to me, are there other forms of care that I can

13  pursue.

14     A     I would offer this regimen anyway today.

15     Q     The one that I just --

16     A     This.

17     Q     -- put in front of you?

18     A     Yes.

19     Q     What about back at the time of her care?

20     A     I don't remember.

21            I will say generally when something like

22  this comes out initially we wait for the experts to

23  weigh in on if it's an alternative -- if it's an

24  acceptable alternative.

25     Q     So pursuant to your practice of respecting

1    a patient's right to choose back then she says,

2    look, you know, I don't want to have my hair look

3    like an old man, you know, I'd like to try something

4    else, would you have come up with something else or

5    tried your best?

6         A    I mean, just out of best practices I'm

7    going to stick with what the experts recommend.

8              I will say, for example, recently an

9    article came out that said six months of Herceptin

10   is just as good as 12.  Just because that -- and

11   that was a big deal at our recent ASCO conference in

12   first week of June.  Still today most oncologists

13   are going to do 12 months until it's truly vetted

14   and you get the big experts to say, yes, this is

15   acceptable.  Because, again, when you're treating

16   for curative intent and I give a 42-year-old six

17   months of Herceptin and she comes back with

18   recurrent disease and now her life expectancy is

19   three to five years, that's a big deal.

20             And so today, yes, I would offer this, but

21   the day an article comes out it's a big deal, but

22   it's not practice-changing that day typically.

23             So today you're right, yes, I have a --

24   I'm thinking of a specific patient, a 42-year-old,

25   and I talked to her about the six months versus 12,

1   and I would honor her wishes if she wants to stop at

2   six, but my recommendation would be until Ruth

3   O'Regan tells me otherwise, 12.  Does that make

4   sense?

5            MR. KEENAN:  Yeah.

6   BY MR. GOMEZ:

7        Q    So just to be clear, I just want to

8   clearly ask, my question is you share with her your

9   knowledge now that Taxotere can cause permanent

10  total baldness and she says, Doctor, that's not

11  something that I want, can we -- can you at least

12  advise me of other treatments, would you at least

13  advise her and allow her to make the choice?

14       A    Yes.  I would give her both options today,

15  and I think this is actually an acceptable regimen

16  in early stage.

17       Q    And when you say acceptable, you're

18  pointing to Exhibit 19?

19       A    Yes.

20       Q    And I know that you don't choose any of

21  the alternative regimens that are included under the

22  NCCN guidelines as what you would recommend as a

23  first level of treatment, but if --

24       A    Correct.

25       Q    -- Ms. Mills said, look, I want to try one

1    of these, you would respect her wishes?

2              MR. KEENAN:  Talking about Exhibit 15?

3              MR. GOMEZ:  Correct.

4              MR. KEENAN:  Objection, asked and answered

5    repeatedly.

6         A    Yes, but, again, I would counsel on the

7    risks of pertuzumab with trastuzumab for a year in

8    the adjuvant setting for heart failure for a stage 1

9    patient.  Even now the recommendations for adding

10   pertuzumab in the adjuvant setting are controversial

11   and typically only done in multiple node positive

12   disease.

13   BY MR. GOMEZ:

14        Q    But the answer is yes, it's a choice you'd

15   allow her to make, an informed choice?

16        A    An informed choice.

17        Q    And/or if she said, look, Doctor, I'd like

18   to go get a second opinion, you'd allow her to do

19   that too?

20        A    I'd allow all my patients to get a second

21   opinion.  I always tell them, it doesn't hurt my

22   feelings.  This is your life, your body.  For all

23   you know I could be a quack.  Please do so.  Most --

24   I'm serious, I actually say that.  And it's true

25   because this is a foreign language to most people.

Page 108

1     Q    And remind me when was the first

2  administration of chemotherapy for Ms. Mills?  Do

3  you have that available?

4     A    Yes, January 6, 2015.

5     Q    So assuming this paper that you say is an

6  acceptable regimen that we talked about in Exhibit

7  19 --

8     A    Yes.

9     Q    -- comes out before her chemotherapy

10  starts, she's expressed grave reservations about

11  being bald forever, would you have gone back and

12  talked to her about this new --

13     A    Yes.

14     Q    -- treatment --

15     A    Yes.

16     Q    -- and allowed her to choose that?

17     A    Yes.

18     Q    That makes probably more sense to you than

19  the other regimens under NCCN?

20     A    I would have allowed her to choose it,

21  yes.

22     Q    Okay, thanks.

23         MR. GOMEZ:  Then that's all I have.

24              FURTHER EXAMINATION

25  BY MR. KEENAN:

1      Q    Well, let's see.  January 6 of 2015 is

2   when the chemotherapy started; is that right?

3      A    Yes.

4      Q    What's the date this published, January

5   8th?

6      A    Yes.

7      Q    In December of 2014, when you were

8   formulating the plan, Exhibit 15, the NCCN

9   guidelines, this is your Bible, right?

10      A    Something like that.

11      Q    Okay.

12      A    I rely heavily on it.

13      Q    Okay.  This paper was a long way from

14   finding its way to the NCCN?

15      A    Correct.

16      Q    And is the standard of care here to adopt

17   a therapy within two days of it being published in

18   the -- even a journal as the New England Journal of

19   Medicine?

20      A    No.  For example, the Herceptin example I

21   gave you.

22      Q    Thank you.

23          MR. GOMEZ:  You done?  I'm just going to

24   do one quick little thing.

25                  FURTHER EXAMINATION

1  BY MR. GOMEZ:

2      Q    So assume you have a conversation with

3  Ms. Mills and you're saying, look, the treatment

4  that I recommend has a risk of causing you to be

5  permanently bald, and she said, look, you know, I

6  want to think about it some, and in the meanwhile

7  this treatment came out that's set forth in Exhibit

8  19, that's something you would have allowed her to

9  choose?

10     A    Probably.

11     Q    And even though it's a new sort of

12  treatment, not yet made its way into the NCCN, it's

13  in the New England Journal of Medicine, which is a

14  pretty highly respected publication, right?

15     A    Yes.

16     Q    And certainly using that treatment at the

17  time with Ms. Mills would not be below the medical

18  standard of care, correct?

19     A    It's not the highest guidelines.  The

20  other thing about this study was it was an

21  uncontrolled single group, so it wasn't a phase III

22  that took TCH versus paclitaxel weekly and put them

23  head-to-head, so it's not the highest level of

24  evidence.  But, again, today, yes, I would offer.

25     Q    Let me just clean up because I need a --

Page 111

1    it would not have been beneath the medical standard

2    of care for you to have prescribed the treatment

3    described in Exhibit 19 to Ms. Mills at the time of

4    her treatment, correct?

5         A    Maybe not at the time of my treatment

6    recommendations, and then she had already started

7    treatment.  Right?  I saw her in December, and that

8    wasn't even out yet, right?

9              MR. KEENAN:  Right, wasn't.

10   BY MR. GOMEZ:

11        Q    My question simply is the use of the

12   regimen described in Exhibit 19 would have been

13   medically acceptable at the time, correct?

14             MR. KEENAN:  Object to the form.

15        A    Not at the time of my recommendations.

16   And once she had already started treatment I

17   wouldn't go back, say this uncontrolled single-phase

18   study came out because even at that month it still

19   wouldn't have been standard of care.

20   BY MR. GOMEZ:

21        Q    You would have allowed her to make the

22   choice?  If she chose to follow that treatment, you

23   would have allowed her to do it?

24        A    If this came out before initially, yeah,

25   probably.  I can't speak to what I would have done

Page 112

1   then, honestly.  But the timing -- she had already

2   started treatment.  We already had the plan.  Again,

3   the paper you -- you really need it vetted before

4   you start changing recommendations.

5              MR. KEENAN:  I think we've -- I think

6   we're done, yeah.

7              THE VIDEOGRAPHER:  One moment.  The time

8   is approximately 12:49 p.m.  This concludes today's

9   videotaped deposition for Dr. Shefali Shah.  We are

10  off video record.

11             (Off video.)

12             MR. KEENAN:  We've added her notations as

13  Exhibit Number 20.

14             (Exhibit Number 20 was marked for

15  identification.)

16             (Deposition concluded at 12:49 p.m.)

17             (Signature waived.)

18

19

20

21

22

23

24

25