# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)                             MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

                                                        SECTION "H" (5)

THIS DOCUMENT RELATES TO
*Deborah Johnson*
Case No. 16-15607

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT BASED ON THE STATUTE OF LIMITATIONS

Deborah Johnson's claims are barred by Louisiana's one-year statute of limitations, which begins "to run from the day injury or damage is sustained," *Asbestos v. Bordelon, Inc.*, 726 So. 2d 926, 974 (La. App. 4 Cir. 1998) (citing La. Civ. Code Ann. art. 3492), and is tolled only "in cases where a plaintiff's ignorance [of her injury] is not negligent or unreasonable." *Id.* Here, the pleadings and undisputed evidence establish that Ms. Johnson was aware of her alleged injury in 2010 or, at the latest, June 2011, more than five years before she filed suit in October 2016:

▪  In her **Complaint**, Ms. Johnson alleges that she finished chemotherapy with Taxotere in December 2010 and then suffered "disfiguring permanent alopecia" ever since, and that this became an injury when her hair did not regrow "six months beyond completion of chemotherapy" (*i.e.*, in June 2011).[1] She alleges that she has been permanently reminded of her treatment and has struggled to return to normalcy since that time.[2] Her allegations make clear not only that she *associated* hair loss with chemotherapy, but that hair loss *symbolized* cancer treatment for her over the last six years.

   ▪  In her verified **Plaintiff Fact Sheet**, Ms. Johnson indicated that she lost her hair after

---

[1] *See* Second Amended Master Long Form Complaint ("AMC") (Rec. Doc. 4407) at ¶ 181; *see also* Amended Short Form Complaint ("SFC") at ¶ 12, 10 (No. 2:16-cv-15607, Rec. Doc. 8). Where Master and Short Form Complaints are used in an MDL like this one, the documents together comprise a Plaintiff's complaint. *See In re Zofran (Ondansetron) Prods. Liab. Litig.*, No. 1:15-MD-2657, 2017 WL 1458193, at *5 (D. Mass. Apr. 24, 2017). Plaintiffs' Master and Ms. Johnson's Short Form Complaints are attached as Exhibits A and B, respectively.

[2] In various places and pleadings, Ms. Johnson has alleged that the injury she is suing for began during, after, or six months after her treatment with Taxotere. Importantly, she has never alleged or reported a date *later* than six months after completion of treatment—June 2011—as the date of her injury. Thus, even if measured from the latest date of injury that Ms. Johnson offers, her claims are still untimely by many years.

beginning treatment with Taxotere and "experienced" several injuries, including "Permanent/Persistent Hair Loss on Scalp," "[d]iffuse thinning of hair: total scalp (on the top, back, sides, and temples)," and a "[l]arge bald area in the hair on [her] head." She indicated that "after six (6) months of discontinuing Taxotere . . . [t]here are visible bald spots on [her] head no matter how [she] style[s] [her] hair." She stated that each of these injuries first began in August 2010. At the same time, Ms. Johnson's PFS shows she was not reasonably diligent and made no investigation whatsoever into her injury or its cause in the six years between 2010 and 2016. In particular, she sought no diagnosis or treatment for hair loss.

- In her **medical records** Ms. Johnson was warned of hair loss and understood hair loss to be a risk of treatment with chemotherapy.

- In her **deposition**, Ms. Johnson testified that after her last chemotherapy treatment in December 2010, her hair had still not grown back. She knew of her injury and its cause, becoming "very" concerned that her hair might not grow back and agreeing that she did not think that anything other than chemotherapy had caused it: ". . . **at one -- some point in time, I just figured I was just the unlucky one, that it wasn't going to come back.**" Deposition of Deborah Johnson at 307:13−309:11 (emphasis added).[3] She confirmed she *first* held that belief when her radiation treatment ended in 2010. *Id.*

Charged with this information, Ms. Johnson would have had to file her lawsuit in 2011 to be timely—and she admits she knows no more about the details of her claim now than she did then that would justify the five-year delay in filing suit. *See id.* at 313:22−314:15. It is unreasonable for a plaintiff "to think that [s]he can sit on [her] rights indefinitely until an attorney tells [her s]he is actually entitled to benefits." *Causby v. Perque Floor Covering*, 707 So. 2d 23, 27 (La. 1998). On these facts, no tolling exception applies; Ms. Johnson's claims are time-barred and therefore Defendants are entitled to summary judgment.

## PROCEDURAL BACKGROUND

Ms. Johnson is one of several thousand Plaintiffs in MDL No. 2740 who alleges that she took Taxotere at some point in its 22-year history and has been injured. Taxotere was first approved by the Federal Food & Drug Administration in 1996, and Plaintiffs in this MDL

---

[3] Ms. Johnson's deposition is attached as Exhibit C.

completed treatment as far back as 1998.[4]  As all other Plaintiffs in this MDL, Ms. Johnson alleges

that she has suffered severe and disfiguring injuries since her treatment with Taxotere.

Unlike cases where an injury is latent, the injury alleged here makes lawsuits like Ms.

Johnson's facially timely or untimely.  Plaintiffs' alleged permanent hair loss from Taxotere is so

obvious, they claim, that it stigmatizes Plaintiffs, their body image and social relationships.  *See*

AMC ¶¶ 214–20.  Plaintiffs do not dispute that <u>any reasonable plaintiff knew she had lost her hair</u>

<u>when it happened</u>.  *See* AMC at ¶ 174 (hair loss well-known side effect of chemotherapy), 129

(hair loss, or "alopecia," has always been in Taxotere's FDA-approved label), 135 (same).

Plaintiffs do not claim hair loss during chemotherapy as an injury, but rather, claim that hair loss

became an injury when their hair failed to grow back <u>six months after completing treatment</u>.  *See*

*id.* at ¶ 181 (plaintiffs defining "permanent" alopecia as "absence of or incomplete hair regrowth

six months beyond the completion of chemotherapy.").  They also do not dispute that Plaintiffs

had <u>notice</u> that the issue <u>may have been caused by chemotherapy treatment</u>.  Indeed, Plaintiffs cite

more than a decade of public discussion about the very injury that they allege. *See* AMC ¶¶ 149–

162.[5]

Sanofi first raised the statute-of-limitations issue in this MDL in an omnibus motion to

dismiss on May 26, 2017, noting that at that time some 850 of approximately 1,100 then-pending

cases were facially untimely, including Ms. Johnson's.  *See* Motion to Dismiss Claims Barred by

the Applicable Statutes of Limitations (May 26, 2017) ("Omnibus Motion") (Rec. Doc. 494).  In

---

[4] *See, e.g.*, Patricia Hollis Complaint ¶ 305 (treatment September 1998); Carol Ford Complaint ¶ 95 (same); Carolyn Purdue Complaint ¶ 55 (1999); Annie Marbury Complaint ¶ 95 (same).

[5] *See* AMC ¶ 155 (referencing Jim Edwards, *Sanofi's Latest Challenge: Women Who Say Its Chemotherapy Left Them Permanently Bald*, CBS News (March 6, 2010), http://www.cbsnews.com/news/sanofis-latest-challenge-women-who-say-its-chemotherapy-left-them-permanently-bald/); *see also* Taxotears Turns Ten, aheadofourtime.org (April 4, 2016), http://aheadofourtime.org/taxotears-turns-ten/. Many Plaintiffs even explicitly discussed their claims with lawyers and each other for years. (Rec. Doc. 4687) (E.D. La. Oct. 24, 2018) (Sanofi's memorandum in support of summary judgment on statute of limitations grounds against plaintiff Suzanne Mink).

deferring a decision on the merits of that motion, the Court recognized that it would be appropriate to revisit at a later date with the benefit of further discovery in the initial bellwethers before considering an MDL-wide approach.  *See* Hr'g Tr. 25:8–18 (Oct. 27, 2017).  The parties proceeded with further discovery—both through the Plaintiff Fact Sheet (PFS) process and phased discovery, including in Ms. Johnson's case.

## LEGAL STANDARD

Summary judgment is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  A genuine dispute of fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id.* at 249–50 (internal citations omitted).

## ARGUMENT

Summary judgment should be granted here for three reasons:

1. First, the untimeliness of Ms. Johnson's case, like so many cases in this MDL, is apparent from the pleadings.

2. Second, discovery from Ms. Johnson's PFS and deposition testimony confirms the untimeliness of her case.

3. Third, no exception applies to toll the statute of limitations and save Ms. Johnson's case.

Because there is no genuine issue of material fact as to the untimeliness of Ms. Johnson's lawsuit, the Court should grant summary judgment.

1050012 v7

I.      **According to her Complaint, the prescriptive period for Ms. Johnson's claims began in June 2011**

In Louisiana, the statute of limitations for product-liability claims is one year, which begins "to run from the day injury or damage is sustained."  La. Civ. Code Ann. art. 3492; *see also Carter v. Matrixx Initiatives, Inc.*, 391 F. App'x 343, 344–45 (5th Cir. 2010) (noting that "[article] 3492 establishes a one-year prescriptive period for products liability claims").

Ms. Johnson's Complaint establishes that the one-year prescription period commenced no later than June 2011 (six months after the end of her chemotherapy treatment) because, according to her own allegations, that is when she sustained her injury.  Ms. Johnson alleges she was treated with Taxotere from August 2010 through December 2010, and that she has suffered "[p]ermanent, irreversible, and disfiguring Alopecia" ever since.  *See* Short Form Complaint (SFC) at ¶¶ 10, 12. The MDL Master Complaint, which Ms. Johnson incorporates by reference in her SFC, defines her injury as "Permanent Chemotherapy Induced Alopecia" or "an absence of or incomplete hair regrowth *six months beyond the completion of chemotherapy*."  AMC at ¶ 181 (emphasis added).

The Master Complaint stresses plaintiff's notice of her injury and its potential cause (and therefore possible legal claims) as soon as her hair did not regrow after ending chemotherapy.  Ms. Johnson alleges that after completing chemotherapy, she "struggled to return to normalcy […] because an integral element of [her] identit[y], [her] hair, never returned," and that this "acts as a permanent reminder" of her cancer.  AMC at ¶ 6.  She inextricably links this injury to her chemotherapy: "[a]lopecia symbolizes cancer identity and treatment."  *Id.* at ¶¶ 173, 216.  She emphasizes the continual awareness of both her alleged hair loss and its cause as chemotherapy: "women who suffer from alopecia have a heightened awareness of their appearance;" alopecia can "heighten an individual's everyday awareness that she has or had cancer;" and she remains "stigmatized with the universal cancer signifier—baldness—long after [she] underwent cancer

treatment." *Id*. at ¶¶ 215–17, 6.

Similarly, the damages Ms. Johnson seeks turn on her hair loss's obviousness and its purported universal association with chemotherapy. Ms. Johnson seeks recovery for negative body image and identity, which she claims hinder relationships and shape others' perceptions of her. *Id*. at ¶¶ 6, 214–215. Such damages are possible only to the extent Ms. Johnson was aware of the injury that she claims here. *See* SFC at ¶ 12 (describing injury as "[p]ermanent, irreversible and disfiguring alopecia beginning after treatment with Taxotere (docetaxel) and continuing to present."). Thus, by her own allegations, Ms. Johnson sustained her injury no later than June 2011, and the statute of limitations began to run at that time.

## II. Ms. Johnson's Plaintiff Fact Sheet, medical records, and deposition testimony confirm that her claims are prescribed

Written discovery, medical records, and deposition testimony confirm that Ms. Johnson's claims are prescribed. In her PFS, Ms. Johnson alleges that the following injuries first manifested in *August 2010*:

- Permanent/persistent hair loss on scalp
- Diffuse thinning of hair: total scalp (Top, Back, Sides, and Temples)
- Significant thinning of the hair on her head after six (6) months of discontinuing Taxotere or Docetaxel treatment, with visible bald spots on her head no matter how she styles her hair
- Large bald area in the hair on her head
- Multiple bald spots in the hair on her head
- Permanent/Persistent Loss of Eyelashes/Genital Hair
- Change in the texture, thickness, or color of her hair after being treated with Taxotere or Docetaxel.

PFS § VI.5.[6] She reports all injuries *from August 2010 to present*. Elsewhere in her PFS, which she filed in December 2018, Ms. Johnson reports that she has had alopecia from August 2010 to

---

[6] PFS references are to Deborah Johnson's Fifth Amended Plaintiff Fact Sheet, attached as Exhibit D.

1050012 v7

present.  PFS § VII.23.  Ms. Johnson also reports that she was injured at age 53, which was her age in 2010, according to her birthdate.  *See* PFS § I.15; ¶ IV.2.  The PFS includes itemized out-of-pocket expenses for wigs purchased from August 2010 to the present.  *See* PFS §§ VI.25; VII.26.  In sum, Ms. Johnson's PFS places her injury as early as August 2010 and confirms that her prescriptive period began to run in 2010—many years (and certainly more than one year) before she filed her lawsuit in October 2016.

Ms. Johnson's medical records also reflect that Ms. Johnson was warned of hair loss and understood the risk of hair loss with chemotherapy.  For example, her prescribing oncologist, Dr. Brian Lewis, warned her of the risk of hair loss on August 9, 2010, before Ms. Johnson started chemotherapy.  *See* INFUSION PHARMACY University Medical Center New Orleans ("UMCNO") 00071−72.[7]  Dr. Lewis "discussed with Ms. Johnson the risks and the benefits of chemotherapeutic intervention," including "nausea, vomiting, diarrhea, hair loss, fatigue, malaise changes in her nails, 1.7% risk of heart failure, a risk of acute myelogenous leukemia, infection, fever, bleeding, need for transfusion, peripheral neuropathy."  *Id.*  Ms. Johnson understood these risks "and signed a consent to that effect."  *Id.* at 00071. Ms. Johnson testified to discussing with Dr. Lewis and accepting the risk of hair loss before treatment, alongside other potentially long-term side effects, and knowing that chemotherapy risked all forms of body hair loss.  Dep. Tr. at 257:2−258:3; 266:5−268:13.

Ms. Johnson further described her belief in chemotherapy's role in her hair loss as coming from observing her own family members undergoing treatment in the past.  *See* Dep. Tr. 258:4−259:3.  She was aware of the risk of hair loss at the time she started treatment.  *See id.* at 255:25−256:20.  She acknowledged receiving printed "Micromedex" handouts warning of the risk.

---

[7] Ms. Johnson's medical records referenced herein are attached as Exhibit E.

*See id*. at 254:2–255:2.[8]  She knew that chemotherapy caused her hair loss when Nurse Debbie

Jarrett noted her "chronic hair loss secondary to chemo" on November 4, 2010.  *See* UMCNO

00113–14; Dep. Tr. at 298:2–298:21.  On November 30, 2010, at her final infusion, Ms. Johnson

signed a final consent form that prominently warned of the risk of hair loss and other risks to bodily

organs and functions.  *See* Dep. Tr. at 305:13–305:21; UMCNO 00503–05 (noting the potential

for damage to, *inter alia*, "bone marrow" and the "brain, heart, kidneys, liver, lungs, nervous

system, and skin").  The express warnings[9] demonstrate that the one-year prescriptive period had

begun when Ms. Johnson's hair did not regrow completely after her chemotherapy ended.

Ms. Johnson's deposition testimony also confirms that her claims are time-barred.  Ms.

Johnson testified that she was bald after the completion of her chemotherapy in 2010 and that she

stayed bald even after it was over.  *See* Dep. Tr. at 307:13–309:11.  While Sanofi disputes legal

and medical causation, for purposes of this motion, what matters is that Ms. Johnson testified that

she "knew" her chemotherapy, which included Taxotere, caused her hair loss.  She initially thought

that her hair loss would be temporary—not because of anything on Sanofi's part—but from seeing

her sister and other women at her chemotherapy clinic regrow their hair.  *See id*. at 273:19–274:5.

As a result, she initially expected her own hair would regrow like it was before.  *See id*. at

279:5–279:13.

But for Ms. Johnson something was different, and she knew it.  All of her hair fell out on

the night of her first infusion.  *See id*. at 292:15–292:18.  She knew that it fell out due to

chemotherapy.  *See id*. at 298:18–98:24.  She knew there was an injury and of its cause when her

---

[8] Ms. Johnson did not produce these handouts during discovery.  She does not allege that they were from Sanofi.

[9] The inclusion of hair loss, with no suggestion of expected duration, alongside other obviously long-term side effects such as heart failure, leukemia, and organ damage undermines Ms. Johnson's claim of inadequate warning due to the alleged long-term nature of her hair loss.

hair did not return after chemotherapy stopped:

> Q. When your hair wasn't growing back, and you knew that your sister's hair had grown back, you saw the person in radiation whose hair had come back, **did you become concerned that yours might not grow back?**
>
> A. **Very.**
>
> Q. Okay. **Did you think anything other than the chemotherapy had caused it?**
>
> A. **No.**
>
> Q. How long did you think it would take before it would begin to grow back?
>
> A. I was uncertain at that point. After taking -- still taking treatments. After I had my chemo, I was still under treatment and medication. And I just thought, at some point, I would regain it, since it was temporarily, but I just, **at one -- some point in time, I just figured I was just the unlucky one, that it wasn't going to come back.**
>
> Q. **When do you think that point happened, that you thought it wasn't going to come back?**
>
> A. After --
>
> Q. **Was it six months after?**
>
> A. **After I finished my radiation. [....]**
>
> Q. **Okay. At that point, you thought, my hair's not going to grow back.**
>
> A. **Right. [....]**
>
> Q. And your radiation, was that in 2011?
>
> A. No. All that should have been, in what, 2010. Everything went straight back-to-back.
>
> Q. **So that was in 2010. And at the time of your last radiation in 2010, at that point, you said to yourself, my hair is not going to grow back anymore?**
>
> A. **Right.**

*See id*. at 307:13−309:11 (emphasis added).

Ms. Johnson testified that when her hair did not grow back as she expected, she was very concerned, and then "devastated and depressed." *See id*. at 309:12−309:14. Despite this, Ms. Johnson did not discuss this alleged injury with her health care providers or otherwise seek treatment for it in the six years before filing her lawsuit. *See id*. at 309:12−309:14; 313:1−313:21 ("Q. [....] In all the years that have passed, why have you not gone to see someone about your hair loss? A. I just fingered [*sic*] it wasn't coming back."). Indeed, Ms. Johnson made no attempt to

9

further investigate the cause of her hair loss—*including after filing the present lawsuit*:

> Q.  Did you ever try and figure out which of the three chemotherapeutic agents were -- whether all of them or what -- which one exactly had caused your hair loss?
>
> A.  No.
>
> Q.  Has any doctor ever told you that your hair loss was caused by Taxotere?
>
> A.  No.
>
> Q.  Have you ever thought that your hair loss was caused by something other than any of the chemotherapeutic agents?
>
> A.  No.
>
> Q.  As you sit here today, do you know which of the chemotherapeutic agents you believe caused your hair loss?
>
> A.  No.
>
> Q.  So you think it could have been one, two, or all three of them.
>
> A.  Right.

*See id*. at 313:22–314:15.

Ms. Johnson's deposition testimony confirms that she was aware of her injury in 2010 and of its potential connection to Taxotere in 2010.  Consequently, the one-year prescriptive period began and expired long before October 2016, when Ms. Johnson filed this lawsuit.

### III.    No exception applies to save Ms. Johnson's case

"Ordinarily, the party pleading prescription bears the burden of proving that the plaintiff's claims have prescribed."  *Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002).  However, where, as here, a plaintiff's claims are prescribed on their face, the plaintiff bears the burden of proving an exception.  *See Marin v. Exxon Mobil Corp.*, 48 So. 3d 234, 256 (La. 2010); *see also Campo v. Correa*, 828 So. 2d 502, 508 (La. 2002).

"[A] Plaintiff has three theories on which [s]he may rely to establish prescription has not run: suspension, interruption and renunciation."  *Hanover Ins. Co. v. Plaquemines*, No. 12-1680, 2015 WL 4197579, at *2 (E.D. La. July 10, 2015).  The latter two theories do not apply (and there is no claim that they apply).  *See* La. Civ. Code Ann. art. 3450, 3462, 3464.  The remaining

theory—suspension on the theory of *contra non valentem*—does not save Ms. Johnson's claims.

### a. The principle of *contra non valentem* does not apply to Plaintiff's claims

As this Court has explained, "Generally, the prescriptive period for a tort claim begins to run from the time the plaintiff is injured." *In re: Xarelto (Rivaroxaban) Prods. Liab. Litig.*, MDL No. 2592, No. 15-4790, 2017 WL 4517287, at *2 (E.D. La. Oct. 10, 2017). However, in Louisiana, the doctrine of *contra non valentum* "provides some grace for those plaintiffs who are unaware that their injury was caused by a tort." *Id.* Importantly, "this grace period does not extend until the plaintiff has gathered all of the facts necessary to successfully pursue her claim," nor does it "extend until the plaintiff has determine[d] the legal theory upon which his lawsuit will be based." *Id.* Instead, the doctrine acts to suspend prescription until the plaintiff has "actual or constructive knowledge of a causal relationship between the object or product and the injury." *Id.* For purposes of the doctrine, "[c]onstructive knowledge is whatever notice is enough to excite attention and put the injured party on guard and call for an inquiry." *Campo*, 828 So. 2d at 510–11.

Establishing both subjective ignorance and objective unknowability requires meeting standards that are "exceedingly stringent," *Eastin v. Entergy Corp.*, 865 So. 2d 49, 55 (La. 2004), and as long as claimed damages are "appreciable" and "not merely speculative," prescription will not suspend. *Harvey v. Dixie Graphics, Inc.*, 593 So. 2d 351, 354 (La. 1992). Thus, "prescription runs from the date on which [a plaintiff] first suffered actual and appreciable damage, ... even though he may thereafter come to a more precise realization of the damages he has already incurred or incur further damage as a result of the completed tortious act." *Marin*, 48 So. 3d at 246 (quoting *Harvey*, 593 So. 2d at 354) (alterations in original). As the Louisiana Supreme Court has emphasized:

> The doctrine of *contra non valentem* provides that prescription does not run against one who is ignorant of the *facts* upon which their cause of action is based and

applies an exception to the statutory prescriptive period where *in fact and for good cause* a plaintiff is *unable* to exercise his cause of action when it accrues.

*Eastin*, 865 So. 2d at 55 (emphasis in original). *Contra non valentem* should only be applied in "extreme circumstances," *Marin*, 48 So. 3d at 245, and "[a]s a judicial exception to the statutory rule of prescription, Louisiana courts strictly construe this doctrine and only extend its benefits up to the time that the plaintiff has actual or constructive knowledge of the tortious act." *Eldredge v. Martin Marietta Corp.*, 207 F.3d 737, 743 (5th Cir. 2000) (internal quotes omitted).

"[A] plaintiff will be deemed to know what he could by <u>reasonable diligence</u> have learned." *Renfroe v. State ex rel. Dep't of Transp. & Dev.*, 809 So. 2d 947, 953 (La. 2002) (internal quotation omitted) (emphasis added). Courts will not reward plaintiffs for failing to diligently investigate their alleged injuries. Stated differently, "[p]laintiffs may not simply sit on their hands and do nothing to investigate their [injury] and expect their actions to be deemed reasonable." *Eastin*, 865 So. 2d at 56. Rather, they must allege "facts which show that their delay in joining the suit is reasonable." *Id.* And it is unreasonable for a plaintiff "to think that [s]he can sit on h[er] rights indefinitely until an attorney tells h[er s]he is actually entitled to benefits." *Causby, supra*, 707 So. 2d at 27; *see also Xarelto*, 2017 WL 4517287, at *2-3 (a plaintiff need not "be informed by an attorney or physician of a possible claim before prescription begins to run.").

### i.   Plaintiff was not diligent in investigating her alleged injury

Where, as here, the complaint is facially untimely and the Plaintiff bears the burden of establishing suspension of prescription, she must put forth objective, substantially probative evidence that her cause of action was undiscoverable despite diligent efforts on her part to discover it. Ms. Johnson cannot do so.

Having been warned of hair loss with Taxotere prior to undergoing treatment, *see* AMC ¶ 135, and—according to her complaint—having sustained "[p]ermanent, irreversible and

disfiguring alopecia beginning after treatment with Taxotere (docetaxel) and continuing to present," SFC ¶ 12, any reasonable person in Ms. Johnson's shoes would at the very least have investigated the nature and cause of her alleged injury.  This is all the more true where the alleged injury was so apparent that it altered the person's identity, harmed her self-image, disrupted her relationships, and caused mental and physical suffering.  *See* AMC ¶ 6 (describing baldness as "the universal cancer signifier" and how she "ha[s] struggled to return to normalcy, even after surviving cancer because an integral element of [her] identity, [her] hair, never returned."); *see also* AMC ¶ 173 (acknowledging that chemotherapy is known to cause hair loss); ¶ 178 ("hair loss usually begins one to three weeks after the initiation of chemotherapy").

Ms. Johnson's prescriptive period began in December 2010 because she had enough notice to excite her attention to call for an inquiry at that time.  Ms. Johnson alleged that as of June 2011, she was experiencing what she defines as permanent alopecia that she associated with her chemotherapy treatment.  *See* Dep. Tr. at 308:8–18, 313:22–314:15.  By her own testimony, Ms. Johnson was aware of her permanent alopecia and of its connection to chemotherapy drugs in December 2010.  She was aware that her hair had fallen out due to chemotherapy, and it had not regrown as expected.  *See id*. at 314:5–314:8.

### ii. Plaintiff's claimed uncertainty as to which of her chemotherapy drugs caused her alleged injury does not toll the statute of limitations.

Further, it is irrelevant that during discovery Plaintiff expressed uncertainty as to which of her chemotherapy drugs caused her alleged injury. *See id.* at 313:22–314:15. "[T]he prescriptive period commences when there is enough notice to call for an inquiry about a claim, not when an inquiry reveals the facts or evidence that specifically outline the claim." *Luckett v. Delta Airlines, Inc.*, 171 F.3d 295, 300 (5th Cir. 1999) (citing *Terrel v. Perkins*, 704 So. 2d 35, 39 (La. App. 1st

Cir. 1997)).

First, Ms. Johnson still does not know which chemotherapy drug caused her injury—yet that obviously has not rendered her unable to file suit. *Cf. Terrebonne Parish School Bd.*, 310 F.3d at 884 n.36. Second, "a plaintiff will be responsible to seek out those whom [she] believes may be responsible for a specific injury." *Carter*, 391 F. App'x at 345. Ms. Johnson's admitted awareness of Taxotere as a *possible* cause of her injury was sufficient to commence limitations in 2011. *See Mason v. Danek Med., Inc.*, No. 95-cv-3481, 1998 WL 774176, at *1 (E.D. La. Oct. 30, 1998) (finding claims prescribed where "plaintiff's symptoms which are the basis for this suit manifested themselves to such a degree after his [treatment] that he should have known by exercising reasonable diligence that there was a reasonable possibility that his problem was caused by" one of several medical products involved in treatment); *Bultman v. Danek Med., Inc.*, No. 96-cv-3447, 1999 WL 33537321, at *3 (E.D. La. Dec. 17, 1999) (same); *see also Oil Ins. Ltd. v. Dow Chem. Co.*, 977 So. 2d 18, 21, 23–24 (La. App. 2007), *writ denied*, 976 So. 2d 1284 (La. 2008) (finding limitations triggered where plaintiff had suspected that defendant's conduct "may have been" a "possible" or "potential" cause of injury, over objection that the "true cause" was not "confirmed," noting that *contra non valentem* "does not allow the plaintiff to wait until the cause of the damage is certified or confirmed," and that "certitude is not a prerequisite to the commencement of prescription.").

Therefore, the prescriptive period for Ms. Johnson began in December 2010 (or no later than June 2011) when she had enough information to inquire about a claim, or when she had constructive knowledge of the relationship between her chemotherapy treatment and her permanent alopecia. *See Luckett,* 171 F.3d at 299–300 (citing *Terrel*, 704 So. 2d at 39).

Similarly, that no doctor ever told Ms. Johnson that Taxotere caused her alleged injury is

irrelevant to whether her claims have prescribed. It does not matter what Ms. Johnson was told because "[t]he commencement of prescription does not necessarily wait for the pronouncement of a victim's physician or of an expert." *Luckett*, 171 F.3d at 300 (citing *Hunter v. Sisters of Charity of the Incarnate Word*, 236 So. 2d 565, 568 (La. App. 1st Cir. 1970) (holding that prescription commenced on plaintiff's medical malpractice claim when she was improperly lifted into a hospital bed, not when a chiropractor told her that the improper handling caused her pain)). By June 2011, Ms. Johnson knew that she had been treated with Taxotere during her chemotherapy, that chemotherapy caused her hair to fall out, and that her hair was not growing back. Ms. Johnson had sufficient notice to excite her attention and call for an inquiry about a claim at that time. *See Campo*, 828 So. 2d at 510–11; *see also Carter*, 391 F. App'x at 346 (finding the plaintiff's claims prescribed where she immediately associated her injury with medication but did not file suit until one year and five days later); *Luckett*, 171 F.3d at 300 (finding prescription where plaintiff was generally aware of the medical cause of her injury but did not serve defendant until one year and one day later).

Once aware of her injury and of Taxotere as a possible cause, Ms. Johnson was duty-bound to further investigate. *See Bartucci v. Jackson*, 246 F. App'x 254, 258 (5th Cir. 2007) (finding prescription commenced and inquiry prompted where plaintiff claimed visible, persistent injuries, despite alleged lack of suspicion or evidence of any cause); *see also Nungesser v. New York Life Ins. & Annuity Corp.*, No. 08-cv-3964, 2009 WL 2707441, at *3 (E.D. La. Aug. 25, 2009) (collecting cases finding constructive notice sufficient to prompt inquiry and commence prescription despite ignorance of specific cause). But Ms. Johnson demonstrated "absolutely no active role in determining if [her injuries] were for unlawful reasons and made no inquiry into the reasons for [her injuries]," meaning "the plaintiff's delay in filing suit was not reasonable and does

1050012 v7

not merit the application of the doctrine of *contra non valentem*." *Eastin*, 865 So. 2d at 56. Ms. Johnson was able to investigate her suit and file it within the prescriptive period, having not done so, her lawsuit is untimely by six years.[10]

Judge Fallon recently granted summary judgment on the basis of prescription over an assertion of *contra non valentem* under substantially similar circumstances. *See Xarelto*, 2017 WL 4517287, at *3. Ruling on a motion in *Louiviere v. Janssen*, Judge Fallon found that the plaintiff was on "inquiry notice" of his potential claims for internal bleeding more than two years before filing suit—specifically, once his doctors discontinued his Xarelto treatment. *Id.* Because the Xarelto label warned of "bleeding" generally, and the plaintiff's treatment history suggested a causal link (plaintiff was hospitalized for internal bleeding not long after being prescribed Xarelto), Judge Fallon concluded that the plaintiff had "sufficient actual or constructive knowledge to alert a reasonable person that there was a relationship between Xarelto and his bleed and that he could be the victim of a tort" when his doctors told him to stop taking Xarelto. *Id.* This was true even though the plaintiff "may not have known how or why" the bleeding was associated with his treatment or "all the details pertaining to prosecuting his lawsuit and how the Defendant committed its alleged tortious actions." *Id.*

        **iii.**    **Because the facts clearly demonstrate that Plaintiff was on inquiry notice by June 2011, Plaintiff's October 2016 filing of suit was untimely**

---

[10] The policies underlying prescription also weigh in favor of summary judgment. *See Albertson v. T.J. Stevenson & Co., Inc.*, 749 F.2d 223, 232 (5th Cir. 1984) (purpose of statutes of limitation is "to ensure that the defendant is not prejudiced as a result of lost evidence, fading memories, and disappearing witnesses"). For example, Ms. Johnson testified throughout her deposition that she could not remember critical facts, including the name of a social worker from whom she sought medical records in 2010 after experiencing negative side effects of cancer treatment, and names of treating doctors. *See* Depo Tr. at 46:8−47:4; 168:22−169:8. Similarly, her oncologist Dr. Lewis testified that he had no independent recollection of Ms. Johnson, and could not recall such essential information as whether he had verbally warned her of the possibility of permanent hair loss. *See* Lewis Depo Tr. at 7:12−14; 82:24−84:6 (attached as Exhibit F). Likewise, certain key documents including the Micromedex handouts Ms. Johnson allegedly received and the initial chemotherapy consent forms she signed have evidently been lost to time, and at least five of Ms. Johnson's medical providers from 2009 on have stated they have no record of treating her, with one indicating any such records were destroyed.

As in the *Louiviere* case, the basic facts on which Ms. Johnson bases her claims reveal that she was on inquiry notice well over one year before filing suit.  The timeline regarding Ms. Johnson's injury and knowledge is as follows:

- August 2010—Ms. Johnson begins treatment with Taxotere as part of her chemotherapy regimen.  *See* SFC ¶ 10.  Ms. Johnson is aware that chemotherapy can cause hair loss, *see* Dep. Tr. 266:21–267:11, 305:13–17; and following her first chemotherapy treatment— Ms. Johnson loses her hair, *see id.* at 282: 19–283:9; 284:13–16.

- December 2010—Ms. Johnson ceases chemotherapy treatment including treatment with Taxotere.  *See* SFC ¶ 10.

- August 2010—Per Ms. Johnson's PFS, her injures, including permanent/persistent hair loss on scalp, diffuse thinning of hair, and large bald areas on head, begin.  *See* PFS §VI.5.

- June 2011—Per the definition of her injury in her Complaint, latest date on which Ms. Johnson begins suffering from the injury which forms the basis of her lawsuit— "Disfiguring permanent alopecia."  *See* SFC ¶ 12; AMC ¶ 181.

- October 2016—Ms. Johnson files this lawsuit.

These facts are not alterable, nor are Plaintiff's claims tolled, by any event occurring *after* her limitations period had begun.  Limitations cannot be "re-triggered."  Thus, Taxotere's *subsequent* label is irrelevant to her claims having prescribed four years beforehand.  In December 2015, Sanofi added to the "Post-Marketing Experiences" section of the product label a sentence stating that "[c]ases of permanent alopecia have been reported." *See* AMC ¶ 138.  It is undisputed that the Taxotere label has always prominently warned of hair loss (*see, e.g.*, AMC ¶¶ 129; 135).  The 2015 label change did not announce any new or unexpected adverse event with the drug, or identify any previously unknown cause of hair loss.  Where injury and potential causation are known, it is well-established that the possible extent or duration of an injury does not bear on prescription.

For example, in *Fontenot v. ABC Ins. Co.*, 674 So. 2d 960 (La. 1996), the Louisiana

17

Supreme Court declined to apply *contra non valentem* where plaintiff had notice of injury and potential cause—even where the defendant assured plaintiff that her condition was "temporary and would resolve over time." *Fontenot*, 674 So. 2d at 964.  As the Court explained, "Plaintiffs' contention that [defendant]'s failure to inform them that [plaintiff]'s condition was permanent versus temporary is of no consequence," since prescription is not delayed by "[i]gnorance or misunderstanding of the probable extent or duration of injuries." *Id.*

The court in *Xarelto* also recently concluded that a label change was irrelevant to the question of when the statute began to run on the plaintiff's claim. *See Xarelto*, 2017 WL 4517287, at *3; *see also Yurcic v. Purdue Pharma, L.P.*, 343 F. Supp. 2d 386, 392–93 (M.D. Pa. 2004) ("Plaintiffs' argument that they only became aware of their claim against the pharmaceutical companies when the label change occurred must fail. The accrual of Plaintiffs' cause of action is not dependent on this label change […] Plaintiff might have ascertained that the original label was inadequate on the basis of his injuries, if indeed the label has anything to do with his negligence and fraud claims."); *N. Tr. Co. v. Upjohn Co.*, 572 N.E.2d 1030, 1038 (Ill. App. 1991) (finding post-treatment warnings irrelevant in failure to warn product liability cases involving prescription drugs).  Indeed, in ruling that the *Louiviere* claim accrued in March 2013, Judge Fallon wholly ignored subsequent "major changes" to the Xarelto label's "Risk of Bleeding" section made in January 2014 and May 2016.  *See Xarelto*, 2017 WL 4517287, at *3. Here, Ms. Johnson never read or discussed any subsequent label with healthcare providers. [11]

Such reasoning is especially applicable where, according to Plaintiffs, there has been more

---

[11] There is no evidence that Ms. Johnson ever actually read or knew the content of any hair loss warning in any Taxotere label, much less the December 2015 label.  Ms. Johnson testified that she did not read the labels of any of the chemotherapy drugs she received.  *See* Dep. Tr. 279:17–280:3.  This includes the label for Adriamycin (doxorubicin), which since 2011 has included in its "common side effect" warnings: "hair loss (alopecia). Your hair *may* re-grow after your treatment." (emphasis added).

than a decade of public discussion about this very injury.  *See supra* at 5 n.4 and AMC ¶¶ 149–162; 180–187 (collecting sources). *See e.g., Plumlee v. Pfizer, Inc.*, 664 F. App'x 651, 653 (9th Cir. 2016) (affirming dismissal where "the district court took judicial notice of an extensive record of documents—all publicly available during the relevant limitations periods—which discussed Pfizer's unpublished clinical trials and the allegation that Zoloft was no more effective than a placebo."); *Carey v. Kerr-McGee Chem. Corp.*, 999 F. Supp. 1109, 1117 (N.D. Ill. 1998) (disposing of claims where "the pervasive media coverage and publicity surrounding the issue…leads the court to the inescapable conclusion that a reasonable person in [plaintiffs'] situation should have known of their claim."); *In re Avandia Mktg., Sales Practices And Prod. Liab. Litig.*, No. 07-md-1871, 2014 WL 2011239, at *1 (E.D. Pa. May 16, 2014) (publicly available information put any reasonable plaintiff suffering the injury alleged on notice of potential causes).  Based on their own allegations, had Plaintiff made basic inquiries into permanent hair loss and Taxotere, she would have readily identified such information.

Ms. Johnson's PFS shows no investigation into her injury (or any potential cause) in the six years before filing suit.  She had no discussions with any healthcare provider about her hair loss.  *See* PFS § VII.5.  She has never been diagnosed with, or treated for, her alleged injury.  *See* PFS § VI.6–7.  She has never undergone a biopsy, blood test, or hormone testing to evaluate her hair loss problem.  *See* PFS § VII.6, "Hair Loss History."  She has never tried over-the-counter-medications, supplements, or cosmetic aides for her hair loss.  *See* PFS § VII.19.  And she claims no specific expenses for medical or psychiatric treatment over this time.  *See* PFS § VI.19–21. Ms. Johnson was "in no way prohibited from filing suit or investigating the circumstances of [her injury] to determine if [she] had a cause of action, yet failed to do so." *Eastin*, 865 So. 2d at 57 (rejecting plaintiff's claim that *contra non valentem* applied to bar prescription). Because Ms.

Johnson sustained her injuries more than one year before filing suit, Ms. Johnson's claims are time-barred.

Like the *Louiviere* plaintiff, it does not matter that Ms. Johnson did not know "how or why" Taxotere was causing her permanent alopecia, or "all the details pertaining to prosecuting [her] lawsuit and how the Defendant committed its alleged tortious actions."  *See Xarelto*, 2017 WL 4517287, at \*3.  Because Ms. Johnson knew that her chemotherapy treatment had caused her hair loss, Dep. Tr. 307:19–21, that Taxotere was part of her chemotherapy treatment, and that her treatment had ended but her hair was not growing back, Ms. Johnson had "sufficient actual or constructive knowledge to alert a reasonable person that there was a relationship between" her chemotherapy treatment and her injury.  *See Xarelto*, 2017 WL 4517287, at \*3*; see also Kling Realty Co. v. Chevron USA, Inc.*, 575 F.3d 510, 518 (5th Cir. 2009) (holding *contra non valentem* inapplicable, and claims prescribed, where plaintiff knew of toxic chemical release and that crops were not growing).  In sum, Ms. Johnson's claims are untimely on their face, and no exception applies to save her case.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' Motion for Summary Judgment.

1050012 v7

Respectfully submitted,

/s/ *Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE URQUHART &
MOORE LLC**
400 Poydras Street, Suite 2700
New Orleans, LA  70130
Telephone: 504-310-2100
Facsimile:  504-310-2120
dmoore@irwinllc.com

Harley Ratliff
Adrienne L. Byard
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
Facsimile:  816-421-5547
hratliff@shb.com
abyard@shb.com

*Counsel for sanofi-aventis U.S. LLC*

1050012 v7

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 7, 2019, I electronically filed the foregoing with the Clerk

of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ *Douglas J. Moore*