# EXHIBIT F

1

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3  * * * * * * * * * * * * * * * * * * * * * * *

4 DEBORAH JOHNSON,                    CASE NO.
          Plaintiff.               2:16-cv-15607
5 v.
  SANOFI S.A.,
6 SANOFI-AVENTIS U.S.,
  L.L.C., SANOFI US
7 SERVICE, INC., and
  AVENTIS-PHARMA, S.A.,
8         Defendants.

9

10  * * * * * * * * * * * * * * * * * * * * * * *

11

12                    DEPOSITION
                         OF
13              DR. BRIAN E. LEWIS

14        Taken on Monday, December 11, 2017

15             Commencing at 1:07 p.m.

16                     at the
                     offices of

17

18          TULANE UNIVERSITY
          HEALTH SCIENCES CENTER
          Tidewater Building
19          1440 Canal Street
          New Orleans, Louisiana

20

21

22

23

24

25   Job No. NJ2769449

**2**

1  APPEARANCES:
2  ATTORNEYS FOR PLAINTIFFS
   MORRIS BART, LLC
3  601 Poydras Street
   24th Floor
4  New Orleans, Louisiana 70130
   504.599.8000
5  rroot@morrisbart.com
   BY: RICHARD L. ROOT, ESQ.
6
7  ATTORNEYS FOR PLAINTIFF STEERING COMMITTEE:
   ANDREWS THORNTON HIGGINS RAZMARA
8  2 Corporate Park
   Suite 110
9  Irvine, California 92606
   949.748.1000
10 jct@andrewsthornton.com
   BY: JOHN C. THORNTON, ESQ.
11
   and
12
   BACHUS & SCHANKER, LLC
13 1899 Wynkoop Street
   Suite 700
14 Denver, Colorado 80202
   303.893.9800
15 dschanker@coloradolaw.net
16
   ATTORNEYS FOR DEFENDANTS
17 SHOOK, HARDY & BACON, L.L.P.
   1155 F Street, NW
18 Suite 200
   Washington, D.C. 20004-1305
19 202.639.5609
   bmims@shb.com
20 BY: BUFFY J. MIMS, ESQ.
21
22 Reported by:  Marybeth E. Muir, CCR, RPR
               Certified Court Reporter
23             In and for the State of
               Louisiana and Registered
24             Professional Reporter
25

**3**

1  * * * * * * * * * * * * * * * * * * * * * * * * *
2
               I N D E X
3                              Page
   Caption                      1
4
   Appearances                  2
5
   Stipulation                  4
6
   Examination
7    Ms. Mims                   5
8
   Reporter's Certificate       145
9
10
               EXHIBITS
11
   Exhibit A  Amended Notice of Deposition Of
12            Brian Lewis, M.D.        7
13
   Exhibit B  Curriculum Vitae, Brian E. Lewis,
14            MD, MPH, FACP            9
15 Exhibit C  University Medical Center Medical
             Records of Deborah Johnson    41
16
   Exhibit D  NCCN Guidelines, Version 2.2011
17            Invasive Breast Cancer   65
18
   Exhibit E  Taxotere label information    84
19
   Exhibit F  Physicians Desk Reference, 2001
20            Edition                  92
21 Exhibit G  Doxoruvicin Hydrochloride for
             Injection USP information    94
22
   Exhibit H  LSU Hospitals Patient Consent
23            to Medical Treatment, Deborah
             Johnson                  117
24
   Exhibit I  Arimidex label information    128
25

**4**

1            S T I P U L A T I O N
2        It is stipulated and agreed by and between
3  Counsel that the testimony of the witness, BRIAN E.
4  LEWIS, is hereby being taken pursuant to Notice
5  under the Federal Rules of Civil Procedure for all
6  purposes permitted under law.
7        The witness reserves the right to read and
8  sign the deposition.  The original is to be
9  delivered to and retained by BUFFY J. MIMS for
10 proper filing with the Clerk of Court.
11       All objections, except those as to the form
12 of the questions and/or responsiveness of the
13 answers, are reserved until the time of the trial of
14 this cause.
15
16
17
18
19
20
21
22
23
24
25

**5**

1        DR. BRIAN E. LEWIS,
2        Tulane University Health Sciences
3        Center, Tidewater Building, 1440
4        Canal Street, New Orleans, Louisiana
5        70122, having been first duly sworn,
6        testified as follows:
7  EXAMINATION
8  BY MS. MIMS:
9     Q.  Good afternoon, Dr. Lewis.
10    A.  Good afternoon.
11    Q.  My name is Buffy Mims, and I'm here
12 representing Sanofi-Aventis today.  And there are a
13 number of other attorneys around the table, and I am
14 going to let them all introduce themselves.
15    A.  Yes, ma'am.
16        MR. BAEHR:  I'm Jordan Baehr, also
17 representing Sanofi-Aventis.
18        MR. THORNTON:  My name is John Thornton, and
19 I'm here for Deborah Johnson.
20        MR. SCHANKER:  Darin Schanker, for Deborah
21 Johnson.  Good afternoon, Doctor.
22        THE WITNESS:  Good afternoon.
23        MR. ROOT:  And Richard Root, for Deborah
24 Johnson.
25        THE WITNESS:  Good afternoon.

2 (Pages 2 to 5)

6

1      MS. BETHANCOURT:  And I'm Patricia
2   Bethancourt.  I'm associate general counsel
3   for Tulane School of Medicine and
4   representing Dr. Lewis.
5   BY MS. MIMS:
6      Q.  Dr. Lewis, we just met a few minutes ago,
7   right?
8      A.  Yes, ma'am.
9      Q.  And we have never met prior to today, have
10  we?
11     A.  No, ma'am.
12     Q.  We've never communicated in any fashion,
13  never spoken on the phone?
14     A.  Outside of the subpoena, but yes -- no, you
15  have not contacted me.
16     Q.  Do you understand that we are here today
17  because of a lawsuit that Ms. Johnson, a former
18  patient of yours, has filed against my client,
19  Sanofi-Aventis?
20     A.  Yes.
21     Q.  Do you also understand that there are no
22  claims against you in that lawsuit; that the lawsuit
23  does not allege that you did anything wrong?
24     A.  Yes, ma'am, that is my understanding.
25     Q.  Do you understand that you are here today to

7

1   testify about your treatment of Ms. Johnson?
2      A.  Yes, ma'am.
3      Q.  Have you ever had a deposition taken before?
4      A.  No, ma'am.
5      Q.  Is there any reason that you're unable to
6   give accurate, complete, truthful testimony here
7   today?
8      A.  No, ma'am.
9      Q.  Have you ever served as an expert witness
10  before?
11     A.  I have not.
12     Q.  Do you have any independent memory of the
13  plaintiff, Ms. Deborah Johnson?
14     A.  I don't, actually.  I don't.
15     Q.  So will your testimony here today be based
16  solely upon your review of the medical records in
17  this case?
18     A.  I would say essentially solely, yes.  I
19  mean, not -- I would not be able to -- I mean, I
20  don't have any recollection of specific dates that I
21  saw her in clinic or that sort of thing.
22     Q.  You requested a copy of the medical records
23  in advance of this deposition, right?
24     A.  Yes, ma'am.
25     Q.  Did you review those records?

8

1      A.  I became familiar with those records, yes,
2   ma'am.
3      Q.  You received a Notice of Deposition in this
4   case, correct?
5      A.  I did.
6      Q.  And when you saw Ms. Johnson's name on that
7   deposition, Deborah Johnson, did you have an
8   independent recollection of who she was?
9      A.  Uhmm, that -- my initial -- I mean, not a
10  specific recollection; no, ma'am.
11     Q.  After your review of the medical records and
12  becoming familiar with the records again, did that
13  refresh your memory as to who Ms. Johnson was?
14     A.  Uhmm, not in any sort of specific way.  I
15  mean, like, more as a -- I don't want to say a vague
16  memory, but just that -- I mean, nothing in
17  particular.  I'm not trying to be difficult.  I
18  just --
19     Q.  That's fine.  We only need what you
20  remember.
21        I'm going to hand you what I am marking as
22  Deposition Exhibit A in this case.
23        (Whereupon Exhibit A was marked for
24        identification.)
25     A.  This is?

9

1      Q.  Do you recognize the document that I just
2   handed you?
3      A.  Is this what you e-mailed me earlier?
4      Q.  Well, if you look at the title of the
5   document, it says "Amended Notice of Deposition of
6   Brian Lewis"; do you see that?
7      A.  Yes, ma'am.
8      Q.  Okay.
9        And do you recall receiving a notice of
10  deposition for this case, instructing you about a
11  time and a location and the name of the case?
12     A.  Yes, ma'am.
13     Q.  Okay.
14        If you could turn to Page 5, did you review
15  Exhibit A of this notice?
16     A.  I did not.
17     Q.  We'll review it now, and I'm going to go
18  through it with you.
19     A.  Sure.
20     Q.  Exhibit A is a list of items that we asked
21  that you look for, and if you had them, to bring
22  them to the deposition.
23     A.  Sure.
24        MS. BETHANCOURT:  Can I make one comment for
25        the record?  If the list applies to medical

3 (Pages 6 to 9)

10

1  records, the physicians are generally not
2  the custodian of records, and that would
3  require the records to come directly from
4  the hospital or facility where they treat
5  the patients. And therefore, this is not in
6  his custody.
7      MS. MIMS: That's fine. And we'll go
8  through and we'll establish what is and is
9  not in his custody. So that's understood.
10 BY MS. MIMS:
11     Q. The most recent -- No. 1 on the list of
12 items to be produced, your most recent curriculum
13 vitae and/or resume, did you bring a copy of that?
14     A. I did.
15     THE WITNESS: Would you like it?
16     MS. MIMS: Yes, that would be great.
17     And we're going to go ahead and mark
18     that as Exhibit B.
19     (Whereupon Exhibit B was marked for
20     identification.)
21 BY MS. MIMS:
22     Q. Now I understand that your lawyer made a
23 comment about medical records, but I am still going
24 to walk through the list and see what you may or may
25 not have.

11

1      A. Sure.
2      Q. No. 2 asks for a complete set of medical
3  records relating to the medical care and treatment
4  of the plaintiff -- and in this case that would be
5  Deborah Johnson -- that are in your care, custody,
6  possession or control.
7      Do you have or maintain any records
8  whatsoever related to Deborah Johnson?
9      A. I do not.
10     Q. No. 3 asks for a file in connection with Ms.
11 Johnson. Again, do you have --
12     A. I have no files.
13     Q. You have no files related to Ms. Johnson.
14     No. 5 lists any and all research,
15 educational materials, counseling materials,
16 handouts, in your possession regarding chemotherapy,
17 including but not limited to Taxotere and/or
18 Docetaxel. Do you maintain anything like that in
19 your records here?
20     MS. BETHANCOURT: To the extent that they
21     would be clinic materials, they're not his.
22     A. Yeah. I mean, I don't have anything. I
23 guess I don't understand. Is this something that I
24 would give to the patient?
25     Q. Yes.

12

1      Q. Do you have educational materials,
2  pamphlets?
3      A. Not in my possession, no. If that were to be
4  used it would be in the clinic or something like
5  that. I mean, I don't keep those things.
6      Q. And for what you would have been using in
7  2010 --
8      A. Sure.
9      Q. -- is it fair to say that you don't have
10 any of those materials here?
11     A. Yes.
12     Q. Okay.
13     In terms of -- well, we'll come back to
14 that.
15     Do you maintain any consent forms regarding
16 chemotherapy?
17     A. Those are also in the clinic.
18     Q. When you say "the clinic", what are you
19 referring to?
20     A. The clinical area that I see patients in.
21     Q. Where is that?
22     A. Currently, it's both the VA hospital, the
23 Southeast Louisiana Veterans Association, and the
24 Tulane University Cancer Center. This patient was
25 seen over at the University Hospital, the Charity

13

1  Hospital, the -- I'm not sure what it's called
2  now -- the UMC hospital.
3      Q. At the time that you were treating
4  Ms. Johnson, where would those records have been
5  maintained? Consent forms, would they have been a
6  part of her file?
7      A. I --
8      Q. If you know.
9      A. I mean, I imagine so.
10     Q. Do you have any correspondence between you
11 and the Food and Drug Administration or any other
12 federal, state or local agency regarding Taxotere or
13 Docetaxel, or hair loss as a side effect of cancer
14 treatment?
15     A. I do not have any direct communication
16 withthe FDA regarding any of those things; no,
17 ma'am.
18     Q. Do you have indirect communication regarding
19 those things?
20     A. Uhmm, I guess I do not know. I don't think
21 so; no, ma'am.
22     Q. Have you been provided any materials in
23 advance of this deposition here today, aside from
24 the medical records that we sent you, by any other
25 counsel in this case?

4 (Pages 10 to 13)

14

1    A. No, ma'am.
2    Q. Have you communicated in any way with
3  attorneys representing the plaintiffs in this case?
4    A. No, ma'am.
5    Q. Prior to coming here for the deposition
6  today, tell me what you did, if anything, to prepare
7  for the deposition.
8    A. I reviewed the medical record that was sent
9  to me, and I sort of reviewed the -- it was largely
10  review the medical record that you sent me.  And
11  then I looked -- I looked to just to -- at the
12  chemotherapy regimen that was used.  I reviewed -- I
13  briefly reviewed the guidelines regarding the
14  management of breast cancer.
15    Q. What guidelines?  Let me back up.  How much
16  time did you spend reviewing the medical records?
17    A. I don't know.  Thirty minutes, maybe, 30,
18  60 minutes, right around in there.  Maybe a half
19  hour, I would say.
20    Q. In your review of those records, were there
21  any particular pages that you focused on, or did you
22  review the whole stack in that time?
23    A. I focused mostly on the clinic progress
24  notes that were dictated by myself.  I reviewed --
25  let's see.  Maybe, like, the operative report.  Some

15

1  of the radiology stuff.  But I mostly focused on the
2  clinic records that I had, that involved myself.
3    Q. You mentioned some guidelines that you
4  reviewed?
5    A. Yes, ma'am.
6    Q. Who publishes the guidelines?
7    A. They are a set of guidelines put out by the
8  national -- the NCCN; the National Comprehensive
9  Cancer Network.
10    Q. And they were guidelines that discussed
11  what, specifically?
12    A. The staging and the treatment of cancer.  In
13  particular, breast cancer is the set of guidelines
14  that I reviewed.
15    Q. How long did you spend reviewing those
16  guidelines?
17    A. Uhmm, five or 10 minutes only.
18    Q. Do you know what year those guidelines were
19  from?
20    A. Yes.  They are current.  So not from 2010;
21  no, ma'am.
22    Q. Now, I know that you have handed us your CV,
23  and we marked that as Exhibit B here.  Some of the
24  questions that I'm going to ask you right now I'm
25  sure are probably on the CV --

16

1    A. Okay.
2    Q. -- but I have not had time to review it.  So
3  I'll ask you a couple of questions about your
4  background.  What is your area of medical specialty
5  today?
6    A. I'm a medical oncologist.
7    Q. Can you define that any more; do you have a
8  subspecialty within medical oncology?
9    A. Uhmm, sure.  So I have two appointments.
10  One appointment is at the Tulane University School
11  of Medicine, and in that position I focus work on
12  genitourinary malignancy -- so prostrate cancer,
13  testicle cancer, bladder cancer, kidney cancer.  I
14  have a dual appointment at Southeast Louisiana
15  Veterans Association, where I do mostly general
16  medical oncology and hematology, and I try to see
17  most of the GU patients there as well.  My focus, I
18  consider myself to be, like, a GU oncologist.
19    Q. Has that focus changed over time?
20    A. No, ma'am -- I mean, since I took the job at
21  Tulane in 2011, that was my position.
22    Q. So the focus that you just described with
23  genital urinary oncology and then the general
24  oncology, that has been your focus from 2011
25  forward?

17

1    A. Yes, ma'am.
2    Q. Correct.
3      What was your focus prior to 2011?
4    A. I was in fellowship.  So it was a training
5  program for medical oncology and hematology, between
6  2008 and 2011.
7    Q. In that fellowship, what were your areas of
8  focus?  Was it general?
9    A. It was general medical oncology and
10  hematology, yes, ma'am.
11    Q. When did you graduate from medical school?
12    A. 2005.
13    Q. From what medical school?
14    A. Tulane University.
15    Q. And you did a residency?
16    A. Yes, ma'am.
17    Q. In what field?
18    A. Internal medicine.
19    Q. When was that?
20    A. That was 2005 until 2008, also at Tulane.
21    Q. And you discussed your fellowship.  What
22  were the years of your fellowship?
23    A. 2008 to 2011.
24    Q. And that was in what field, again?
25    A. Medical oncology and hematology.

5 (Pages 14 to 17)

18

1    Q. Are you board certified?
2    A. Yes, ma'am.
3    Q. In what field?
4    A. In internal medicine, medical oncology, and
5  hematology.
6    Q. Do any of those that you just named require
7  a recertification process?
8    A. Yes, ma'am.
9    Q. How often?
10    A. Every ten years.
11    Q. And how long have you been certified in
12  those?
13    A. Nine-and-a-half years.
14    Q. So your recertification is coming up?
15    A. Yes, ma'am -- in internal medicine. The
16  other two I have three more years.
17    Q. Let me back up a little bit, because I know
18  that you said you've never been deposed before. And
19  in a deposition, if you could wait until I get the
20  full question out before you answer it --
21    A. Yes, ma'am.
22    Q. -- or the court reporter won't be able to
23  take down what we're saying.
24    A. Well she says she's my friend, so I'll try
25  to be her friend too.

19

1    Q. And if at any time you need a break, just
2  let me know.
3    A. Yes, ma'am.
4    Q. What states are you licensed to practice
5  medicine?
6    A. Louisiana.
7    Q. Have you ever been licensed in any other
8  states?
9    A. No, ma'am.
10    Q. Now, are you required to take any continuing
11  medical education courses?
12    A. Yes, ma'am.
13    Q. And tell me about what those requirements
14  are.
15    A. It's 20 hours of continuing medical
16  education a year. That's to maintain the licensure
17  in Louisiana. They can be done through a variety of
18  ways. I typically get my continuing medical
19  education credit through the attendance of
20  conferences.
21    Q. Can you tell me a little bit about the types
22  of conferences that you attend?
23    A. Yes, ma'am. Typically I attend the national
24  meeting of the American Society of Clinical
25  Oncology.

20

1    Q. Any others?
2    A. No, that's pretty much it.
3    Q. Do you attend any conferences or seminars
4  regarding the care and treatment of breast cancer,
5    A. Not specifically the treatment of breast,
6  cancer; no, ma'am.
7    Q. Do you attend any seminars, conferences,
8  regarding the development and implementation of
9  chemotherapy regimens?
10    A. Not specifically in the development of
11  chemotherapy regimens; no, ma'am.
12    Q. Have you ever attended seminars like that?
13    A. So at the American Society of Clinical
14  Oncology meeting, if there was a lecture that I was
15  particularly interested in regarding breast cancer
16  or regarding a chemotherapy, then I may attend a
17  lecture.
18    Q. What areas might you be more interested in?
19  Can you give us some examples of some regarding
20  breast cancer or chemotherapy that you've attended.
21    A. Yes, ma'am. The last breast-cancer related
22  lecture I attended regarded the duration of hormonal
23  therapy in the adjuvant setting.
24    Q. When was that?
25    A. Maybe two years ago.

21

1    Q. Why was it that the duration of hormonal
2  therapy in the adjuvant setting was something that
3  interested you?
4    A. It was part of the plenary session, and I
5  went to all the plenary sessions.
6    Q. Okay.
7       Do you have privileges at any local
8  hospitals?
9    A. I can see patients at Tulane, at the VA and
10  at UMC.
11    Q. And have you ever served as an instructor at
12  any medical schools?
13    A. With the specific title of "instructor", no
14  ma'am.
15    Q. Have you taught any courses at medical
16  schools?
17    A. Like lecturing-type things? No, ma'am. I
18  give lectures to the fellows at their Friday
19  conferences.
20    Q. And when you say you give lectures to the
21  fellows at Friday conferences, are you referring to
22  that's something that you currently do?
23    A. Yes, ma'am.
24    Q. And that's at Tulane?
25    A. Yes, ma'am.

6 (Pages 18 to 21)

22

1    Q.  What types of topics do you lecture to the
2  fellows on?
3    A.  Typically either bladder cancer or testicle
4  cancer or kidney cancer.
5    Q.  Do you ever lecture on chemotherapy
6  regimens?
7    A.  Uhmm, not a specific lecture on
8  chemotherapy, no.
9    Q.  Do you belong to any medical organizations?
10    A.  Yes, ma'am.
11    Q.  And can you tell me which ones?
12    A.  The American Society of Clinical Oncology,
13  the American College of Physicians, and the American
14  Society of Hematology.
15    Q.  I see from your CV that you have a number of
16  publications here.  Do any of these publications
17  relate to breast cancer?
18    A.  No, ma'am, I don't think so.
19    Q.  Do any of the publications relate to
20  chemotherapy treatment?
21      MS. BETHANCOURT:  You can look.
22      THE WITNESS:  Oh.  Let's see.
23      (Witness peruses document.)
24    A.  No, ma'am, nothing in particular.
25    Q.  You also have listed on your CV a number of

23

1  poster presentations?
2    A.  Yes, ma'am.
3    Q.  Could you tell me what that is?
4    A.  It's a -- how do I describe?
5    Q.  Is that something that happens at a medical
6  conference?
7    A.  Yes, ma'am.  It's a non-peer -- I assume
8  it's a non-peer reviewed sort of publication of
9  preliminary data that you -- that you have -- which
10  has not been formally published in the medical
11  literature.
12    Q.  Are these poster presentations based off of
13  research that you performed?
14    A.  That I am a part of.
15    Q.  That you're a part of, okay.
16      Do any of these poster presentations relate
17  to breast cancer?
18    A.  No, ma'am.
19    Q.  Do any relate to chemotherapy treatment or
20  chemotherapy regimens?
21    A.  No, I don't see any.  I mean -- no, ma'am.
22  Like, not cytotoxic chemotherapy, no ma'am.
23    Q.  Do you regularly subscribe to or use any
24  medical journals?
25    A.  Yes, ma'am.

24

1    Q.  Which ones?
2    A.  The New England Journal of Medicine and the
3  Journal of Clinical Oncology.
4    Q.  Do you use or subscribe to any internet
5  services for research or for current information?
6    A.  I have access to an internet service through
7  Tulane.
8    Q.  What internet service is that?
9    A.  It's uptodate.com.
10    Q.  What kinds of things do you use uptodate.com
11  for?
12    A.  Uhmm, any question that I have regarding the
13  management of patients.  So -- okay.
14      So sometimes if I'm in clinic with a
15  patient, I'll go through the -- like up-to-date
16  risks and benefits to the patients that are in the
17  UpToDate.  If I want to -- how do I say it?  Like,
18  learn about something that's a little current with
19  regard to treatment, then I'll, you know, review
20  these things.
21    Q.  Is uptodate.com -- it sounds like that's
22  your go-to, your first line of research if you have
23  particular questions or issues that you want to look
24  up; that is where you go first is UpToDate?
25    A.  I think that's fair.  Or it would be either

25

1  UpToDate or pubmed.com.
2    Q.  And pubmed.com is a database containing
3  literature that you can look up; is that correct,
4  medical literature?
5    A.  Yes, ma'am.
6    Q.  How long have you been using uptodate.com?
7    A.  Oh, I don't know.
8    Q.  Is that something that you would have been
9  using in 2010?
10    A.  Yeah.  I'm trying to remember if we had it.
11  I don't think I used it during my residency, but
12  maybe during the fellowship.
13    Q.  Do you remember whether the university had a
14  subscription to UpToDate?
15    A.  If they had it, then I probably would have
16  used it.  I think those two are together.
17    Q.  Okay.
18      So you don't have an independent
19  recollection --
20    A.  Of when?  No.  Like the -- like, the sky
21  opened up and uptodate.com came to Tulane.  No, I
22  have nothing like that.
23    Q.  So is uptodate.com something that you might
24  have used during your treatment of Ms. Johnson?
25    A.  I might have; yes, ma'am.

26

1    Q.  What about pubmed.com?
2    A.  Yes, pubmed.com has been around a long time,
3  so that is something that I might have used during
4  that time frame.
5    Q.  Do you keep any medical textbooks or
6  reference books in your office?
7    A.  Uhmm; yes, ma'am.
8    Q.  Which ones?
9    A.  Uhmm, so I -- the American -- the American
10 Society of Clinical Oncology sends a medical book
11 every year, and so I keep that in my office.  And I
12 have a copy of an oncology textbook.
13   Q.  The reference books sent by the American
14 Society of Clinical Oncology, what kind of topics
15 does that cover?
16   A.  Oh, it's varied.  I mean, it's on cancer.
17   Q.  Would it also cover specifically breast
18 cancer?
19   A.  Uhmm, I mean maybe not specifically, but
20 there might be something regarding breast cancer in
21 there; yes, ma'am.
22   Q.  Is there anything that you rely on
23 specifically to determine a treatment regimen for
24 breast cancer?
25   A.  Probably the NCCN, the National

27

1  Comprehensive Cancer Network.
2    Q.  Is that what you would have relied on in the
3  2010-2011 time period?
4    A.  I might have.
5    Q.  You say you might have.  Do you have an
6  independent recollection of using that?
7    A.  No, I -- I had used it, yes, during my
8  fellowship; yes, ma'am.
9    Q.  Is there anything else that you would use to
10 determine a treatment regimen?
11   A.  I don't think so.  I think between NCCN and
12 UpToDate, that's probably what I would use.
13   Q.  Have you ever acted as a consultant for any
14 pharmaceutical company?
15   A.  I have not, no ma'am.
16   Q.  Have you ever participated in a speakers
17 bureau, advisory committee, anything like that?
18   A.  No, ma'am.
19   Q.  Have you ever been a clinical investigator?
20   A.  Yes, ma'am.
21   Q.  For what?  Tell me about that.
22   A.  Oh, sure.  So I am -- I have it on my thing.
23 So I'm a principal investigator for -- these are
24 largely prostrate cancer therapies.
25   Q.  What page of your CV?

28

1    A.  On Page 5, ma'am.
2    Q.  Okay.
3    A.  So I have, "I am currently the principal
4  investigator in six studies."  Three of them appear
5  to be closed.
6    Q.  Do any of these studies relate to breast
7  cancer?
8    A.  No, ma'am.
9    Q.  Are they all related to prostate cancer?
10   A.  No, ma'am.  I have one -- I have one RTOG
11 trial that is looking at pancreas cancer.
12   Q.  And all the rest are related to prostrate
13 cancer?
14   A.  I believe so; yes, ma'am.
15   Q.  Tell me what it means to be a principal
16 investigator.
17   A.  It means that I generally -- that I
18 initiated the effort to get the clinical trial open
19 at our institution, and that I'm responsible for the
20 running of the trial.
21   Q.  How is it that a patient comes to be in a
22 clinical trial?
23   A.  If we have a clinical trial that -- if we
24 see a patient in clinic and we happen to have a
25 clinical trial that the patient would be eligible

29

1  for, we discuss the clinical trial with the patient.
2  And if they're interested in pursuing it, then we
3  discuss enrollment.  And if they're not, then we
4  don't.
5    Q.  What percentage of your time is currently
6  spent doing research?
7    A.  Uhmm, I don't -- I guess a couple of hours a
8  week, I'd say.
9    Q.  What percentage of your time is spent in the
10 clinical setting?
11   A.  I have three full days of clinic a week.
12   Q.  Okay.
13     Is there anything else that you do besides
14 the clinical and the research?
15   A.  Uhmm, yes, ma'am.  So there's -- how do I
16 say?  I guess my non-clinical -- the days that I
17 don't have clinic are still engaged in patient care
18 with regard to reviewing results and contacting
19 patients and doing these sorts of things.
20   Q.  And then you have your Friday -- I'm sorry,
21 I don't remember what you called it?
22   A.  Friday conference.
23   Q.  Your Friday conference?
24   A.  Yes, ma'am.
25   Q.  About how many patients do you see a week?

8 (Pages 26 to 29)

30

1  A. Uhmm, let's see. I'd have to count. I see
2  probably on my own, maybe 30 patients a week. And
3  then I also oversee two fellows clinics where I'm
4  the faculty, and probably there I see maybe, I don't
5  know, 15 to 20 patients, plus or minus.
6  Q. Let's go back to the 2010-2011 period,
7  before you came to Tulane in 2011.
8  A. Yes, ma'am.
9  Q. And you were a fellow then, right?
10  A. Yes, ma'am.
11  Q. Tell me what the responsibility of a fellow
12  is.
13  A. The responsibility of the fellow is mostly
14  inpatient consult work. So if there's a patient in
15  the hospital that has a hem/onc, that the medicine
16  service or the admitting provider has a hematologic
17  or oncologic question, they would consult us. I
18  believe I had two half-day clinics a week that I had
19  a few patients as an outpatient. And that's
20  basically the role of the fellow, inpatient consult,
21  inpatient service, and then outpatient service.
22  Q. If you had two half-days per week during
23  that 2010-2011 time period where you were seeing
24  patients in the clinical setting, what was the
25  remainder of your time spent doing?

31

1  A. Largely consultative work. I need to see
2  patients in the hospital. I would see patients in
3  the hospital, and then you'd round with your
4  attending.
5  Q. As a fellow, were all of your duties in the
6  clinical setting or were you also doing research at
7  that time?
8  A. It was majority clinical setting.
9  Q. As a fellow during the time period of 2010
10  to about March of 2011, do you have a sense of how
11  many patients you would see per week during that
12  time period?
13  A. I don't. I mean, I don't remember. You
14  know, in the -- no, I don't remember.
15  Q. Is it fair to say that you have not been
16  involved with the manufacture, testing or marketing
17  of pharmaceutical products?
18  A. Uhmm, that's -- that is fair.
19  Q. Do you agree that you're not an expert on
20  any of those subjects?
21  A. I am not an expert on chemotherapies, no
22  ma'am, or pharmaceuticals.
23  Q. Do you agree that you're not an expert in
24  the labeling of prescription drugs?
25  A. Yes, ma'am.

32

1  Q. Do you agree that you're not an expert in
2  the regulatory process as it pertains to
3  prescription drugs?
4  A. Yes, ma'am. I have no experience in the
5  regulatory process.
6  Q. And based on your background and what we've
7  discussed, is it also fair to say that you're not a
8  dermatologist and you don't have any expertise in
9  dermatology?
10  A. Yes, ma'am.
11  Q. Okay.
12  Do you also agree that you're not an expert
13  in alopecia or hair loss generally?
14  A. Yes, ma'am.
15  Q. Do you agree that you're not an expert in
16  the causes of alopecia?
17  A. Uhmm, no, I'm not an expert in that, no.
18  Q. Do you agree that you are not an expert in
19  pharmacology?
20  A. Yes, ma'am.
21  Q. Do you agree that you are not an expert in
22  epidemiology?
23  A. I am -- I would not consider myself to be an
24  expert in epidemiology, but I do have a master's
25  degree in epidemiology.

33

1  Q. You're currently employed by Tulane Cancer
2  Center, correct?
3  A. Yes, ma'am.
4  MS. BETHANCOURT: No.
5  THE WITNESS: Oh, no?
6  MS. BETHANCOURT: You're employed by Tulane
7  University in the medical group.
8  THE WITNESS: Yes, ma'am.
9  MS. BETHANCOURT: Which is separate. They
10  are separate.
11  THE WITNESS: No, you're right. I guess I
12  don't even know who I work for.
13  MS. BETHANCOURT: It's confusing.
14  BY MS. MIMS:
15  Q. So I'm sorry, you're employed by the Tulane
16  Medical Group, is that what your attorney said?
17  MS. BETHANCOURT: Yes. Tulane University
18  Medical Group, which is under Tulane
19  University. The clinic is under the
20  hospital, which is known as Tulane Medical
21  Center.
22  MS. MIMS: Okay.
23  BY MS. MIMS:
24  Q. Are there any particular areas of cancer
25  that the Tulane Cancer Care Center specializes in?

9 (Pages 30 to 33)

34

1   A. Uhmm, I'm not -- I'm not sure.
2   Q. Let me ask you this --
3   A. How you mean?
4   Q. Do you treat or currently treat breast
5   cancer patients?
6   A. I treat maybe -- none at Tulane; no, ma'am.
7   I have treated a few patients with breast cancer at
8   the VA over the course of the past six years or so.
9   Q. Okay.
10      How is it that a breast cancer patient would
11  come to be your patient?
12  A. Oh. If -- if they were in my clinic at the
13  VA. The VA has a centralized scheduling process --
14  you know, mechanism. So a patient would be
15  scheduled into my clinic and I would see them.
16  Q. I think you said that you've had a few
17  breast cancer patients. About how many breast
18  cancer patients might you have in a given year?
19  A. In a given year?
20  Q. Well, let's start with this. How many
21  breast cancer patients are you currently treating?
22  A. Uhmm, female breast cancer patients; maybe
23  one or two.
24  Q. Are you treating any male patients with
25  breast cancer?

35

1   A. Yes, ma'am. I have one.
2   Q. Okay.
3   A. I have two.
4   Q. So you're treating four total breast cancer
5   patients, two female, two male, approximately?
6   A. Approximately; yes, ma'am.
7   Q. Has that number changed at all since 2011,
8   since you started with Tulane?
9   A. That might be an increase.
10  Q. Okay.
11      Tell me about the other types of cancer
12  patients that you see.
13  A. It's -- so the majority is prostrate cancer,
14  testicle cancer, bladder cancer, kidney cancer. And
15  those are the vast majority of the patients that I
16  see. At the VA hospital it's typically lung cancer,
17  colon cancer, and then hematologic issues, anemia,
18  low blood counts, stuff like that. Multiple
19  myeloma.
20  Q. Breast cancer is not a subspecialty of
21  yours; is that accurate?
22  A. That's accurate; yes, ma'am.
23  Q. At the time that you were treating
24  Ms. Johnson, from August 2010 to April 2011, what
25  percentage of your patients during that period were

36

1   breast cancer patients?
2   A. Oh, I don't -- I don't know what percentage.
3   I'm not sure. I mean, it wasn't very many then
4   either.
5   Q. Was it about the same as now?
6   A. No, I think I saw a little bit more then,
7   but not much.
8   Q. Are there any types or stages of breast
9   cancer that you do not treat?
10  A. Uhmm, I don't think so.
11  Q. Are there any categories of patients that
12  you don't treat, such as pediatric patients --
13  A. Yes, ma'am. I don't treat -- I didn't let
14  you finish, I apologize.
15  Q. I'll just restate the question.
16      Are there any categories of patients that
17  you don't treat?
18  A. No, you're right. I don't treat pediatric
19  patients. I also do not typically treat acute
20  leukemia.
21  Q. Do you keep yourself current on medical
22  issues surrounding breast cancer?
23  A. I do not make that my focus; no, ma'am.
24  Q. And it's fair to say that over the past
25  seven-and-a-half years, most of your clinical

37

1   experience has not been in the area of breast
2   cancer; is that right?
3   A. I think that is fair.
4   Q. I want to talk a little bit about how you go
5   about identifying a treatment regimen for a breast
6   cancer patient that you're treating. Let's start
7   with the patients that you said that you have now.
8   For those patients, do you come up with a treatment
9   regimen for them?
10  A. Uhmm, yes, if they need treatment, then I
11  would be the one to come up with a treatment
12  regimen; yes, ma'am.
13  Q. And has that been the same since you started
14  here at Tulane from 2011? You would come up with
15  the treatment regimen for your patients with breast
16  cancer?
17  A. Yes, ma'am. Or sometimes I would discuss it
18  with a fellow, you know, we would have a
19  conversation about it. But yes.
20  Q. How about from August 2009 to March 2011,
21  the breast cancer patients that you were treating at
22  that time, would you come up with the treatment
23  regimen?
24  A. That would be -- I possibly would have, or
25  the attending who was overseeing the clinic, you

38

1  know, might also as well.  We'd discuss various
2  regimen or regimens.
3      Q.  Sorry, go ahead.
4      A.  Or regimens.
5      Q.  What kind of factors do you consider in
6  order to identify an appropriate treatment regimen
7  for a breast cancer patient?
8      A.  Uhmm, I guess the factors that would come
9  into play would include the efficacy, the various
10  patient characteristics.  Uhmm, the patient's
11  personal feelings about a regimen.  Uhmm, and then,
12  you know, then you'd factor in tolerability.  So I
13  guess those are the big things that you think about.
14      Q.  So those are the things that you would have
15  thought about for your treatment of Ms. Johnson?
16      A.  More than likely; yes, ma'am.
17      Q.  And one of the things -- I think you
18  described it as tolerability?
19      A.  Uh-huh.
20      Q.  By that -- is another way to say that
21  toxicity?
22      A.  Toxicity; yes, ma'am.
23      Q.  Are there chemotherapy drugs that are more
24  toxic than others?
25      A.  Yes, ma'am.

39

1      Q.  I assume that affects your recommended
2  treatment regimen for a particular patient?
3      A.  It can; yes, ma'am.
4      Q.  Do you consider preexisting conditions or
5  risk factors specific to a patient before developing
6  a treatment regimen for them?
7      A.  I think that would be typical, to take the
8  patient's health into account.
9      Q.  Do you have a preferred regimen for the
10  treatment of breast cancer patients?
11      A.  I don't.
12      Q.  Now, I know that we discussed -- and you'd
13  have to remind of the acronym you used again --
14      A.  The NCCN.
15      Q.  The NCCN?
16      A.  Yes, ma'am.
17      Q.  -- as a resource that you might use for
18  breast cancer patients; is that right?
19      A.  Yes, ma'am.
20      Q.  Is that something that you would use to
21  determine a treatment regimen for breast cancer
22  patients?
23      A.  Sure.
24      Q.  Is there anything else that you can think of
25  that you would use as a resource to determine a

40

1  treatment regimen for breast cancer patients?
2      A.  I guess the only other thing I would think
3  about would be to consult a friend -- phone a
4  friend, you know.
5      Q.  Do you base your regimen at all on peer
6  review studies that have been published, which might
7  show disease-free survival or overall survival
8  rates?
9      A.  I think that would be typical, to consider
10  the published literature; yes, ma'am.
11      Q.  Has your treatment regimen for breast cancer
12  patients changed at all over time, since the time
13  that you were treating Ms. Johnson in 2010?
14      A.  I don't -- I don't know.  I mean, maybe.  I
15  don't know.  Because I see so few, so it's hard to
16  know -- it's hard to say that I've really changed.
17      Q.  Have you ever changed the treatment regimen
18  of a patient during treatment, due to an adverse
19  event related to the chemotherapeutic agent?
20      A.  Have I ever?
21      Q.  Yes.
22      A.  Yes, ma'am.
23      Q.  Could you give me an example of that?
24      A.  Uhmm, sure.  So the patient doesn't tolerate
25  the current regimen, and I would adjust the dose.  I

41

1  would hold it or even discontinue it.  In the case
2  of -- like if somebody had a particularly -- like
3  hospitalization as a result of -- that I attributed
4  to their regimen, then I might do something
5  different the next time.
6      Q.  Can you think of any chemotherapeutic drugs
7  in particular that caused an adverse reaction which
8  required you to change a patient's chemotherapy
9  regimen?
10      A.  Can I think of any in particular?  So yes,
11  in the middle of the treatment course -- I guess it
12  depends on when we're treating the patient.  Uhmm,
13  if you have a set number of cycles to give, then I
14  typically just try to push on.  And if it is a
15  continuous thing that goes on without a set number
16  of cycles, then I might switch.  Or if a patient did
17  not tolerate one regimen and then we're starting him
18  back on, I might do something different.
19      Q.  So how is it that you would learn a patient
20  is experiencing an adverse event during your
21  treatment of them?
22      A.  They would usually tell me or tell the
23  nurse.
24      Q.  Do you see patients while they are
25  undergoing their chemotherapy treatments?

11 (Pages 38 to 41)

42

1    A. Yes, ma'am. That's -- yes, ma'am.
2    Q. And was that your practice in the 2010-2011
3  time period as well?
4    A. Yeah, my typical practice is to see patients
5  before each cycle of chemotherapy, to ensure they're
6  tolerating it.
7    Q. Has that practice changed at all over the
8  years?
9    A. Not very much; no, ma'am.
10    MS. MIMS: I'm going to mark Exhibit C.
11    (Whereupon Exhibit C was marked for
12    identification.)
13  BY MS. MIMS:
14    Q. I'm handing you --
15    A. Sure.
16    Q. -- a stack of papers.
17    A. Yes, ma'am.
18    Q. If you look at that stack, we had discussed
19  earlier that you had requested a set of medical
20  records related to Ms. Johnson in this case, so that
21  you could review them prior to the deposition. Does
22  that generally look like the stack that you
23  reviewed?
24    (Witness peruses document.)
25    A. This looks like the file that I was sent;

43

1  yes, ma'am.
2    Q. Okay.
3    As we go through these records, if you look
4  in the bottom right-hand corner, you're going to see
5  numbers, which I'm going to call Bates numbers.
6    A. Yes, ma'am.
7    A. It says University Medical Center New
8  Orleans, and it starts with 00001. Do you see that?
9    A. I do.
10    Q. And so as I reference pages that I want to
11  direct you to, I'm going to use that number. And
12  the stack that I handed you, just for your
13  information, is printed on both the front and the
14  back.
15    A. Got it.
16    Q. So that the stack could be half as small.
17    A. Okay. Save the trees.
18    Q. When you reviewed these medical records --
19    A. Yes, ma'am.
20    Q. -- you said that you took about a half an
21  hour to review them prior to the deposition. Did
22  that help refresh your recollection of your
23  treatment of Ms. Johnson?
24    A. Uhmm, I mean, not in a large way; no, ma'am.
25  I mean, I didn't review the records and go, Oh, I

44

1  know exactly who this is, no, ma'am.
2    Q. As you sit here today, can you remember what
3  Ms. Johnson looked like?
4    A. I cannot.
5    Q. The records that you reviewed -- and you
6  said that you looked at largely records that had
7  your name on it?
8    A. Yes, ma'am.
9    Q. We'll look at some of those, but when you
10  reviewed those, were they records that you prepared
11  in the course of your treatment of Ms. Johnson?
12    A. Uhmm, yeah. That would -- they were the
13  clinic notes from the visits.
14    Q. Okay.
15    And it's your regular course of practice to
16  prepare and keep those types of records; is that
17  right?
18    A. I mean, I dictate them into the medical
19  record, and they are kept by the hospital. And I
20  don't dictate them and take them home.
21    Q. Okay, understood.
22    But the records are prepared by you or
23  someone with knowledge of Ms. Johnson's treatment
24  and what's going on at the time, and are generally
25  taken at the time of treatment; is that right?

45

1    A. Generally; yes, ma'am.
2    Q. Is there anything that you came across in
3  your review of the records that you thought that you
4  didn't expect to see as a part of her file?
5    A. Uhmm, that I didn't expect to see?
6    Q. Yes.
7    A. I guess the -- you know, I was expecting to
8  see another consent form, I think, in the medical
9  records.
10    Q. Okay.
11    What consent form? Did you specifically
12  look for consent forms?
13    A. Well, I saw my -- one of my notes had
14  detailed that we signed a consent in clinic. But
15  that consent I did not see, in this stack.
16    Q. Okay, we'll get to that note.
17    A consent form that would have been signed
18  in clinic, is that something that as far as you know
19  should have been a part of the file?
20    A. It's typically -- my expectation is that it
21  would be in the medical record; yes, ma'am.
22    Q. And the consent form that you're referring
23  to, was it something that Ms. Johnson would have
24  signed prior to starting her chemotherapy treatment
25  regimen?

12 (Pages 42 to 45)

46

1    A. Yes.
2    Q. Okay.
3        Was there anything else that you expected to
4    see that you didn't see, other than this consent
5    form?
6    A. I'm not -- nothing jumps out to me; no,
7    ma'am.
8    Q. Is there any other place or any place that
9    we could look for the consent form that you believe
10   might be missing from this stack of medical records?
11   A. I believe it should be with the medical
12   records department at UMC, at the hospital.
13   Q. When is the last time that you spoke with
14   Ms. Johnson?
15   A. It was probably in the last clinic visit.
16   Q. Okay.
17       Did you ever speak with Ms. Johnson about
18   any claims against Sanofi?
19   A. No, ma'am.
20   Q. Has Ms. Johnson ever complained in any way
21   about her treatment by you?
22   A. Not to me, ma'am, no. Not that I recall.
23   Q. Let's look at the records now, and I'm going
24   to ask you to turn to -- in the lower-right-hand
25   corner of the page, No. 00046.

47

1    A. Give me one minute. Got it.
2    Q. All right.
3        Now first, I want to look at the upper
4    left-hand corner of Bates No. 00046. In the upper
5    left-hand corner, you see Ms. Johnson's name?
6    A. I do.
7    Q. And for date of visit it says 7/19/2010; do
8    you see that?
9    A. I do.
10   Q. Then if you flip forward to Page 00049, can
11   you tell me if for this record, is it correct to say
12   that it begins on Page 46 and ends on Page 49; is
13   that the whole document? You can take a minute to
14   look at it.
15       (Witness peruses document.)
16   A. On 00045 it says Page 1 of 5, so I don't
17   know if that's included.
18   Q. So it looks like 00045 might be the start of
19   this document?
20   A. And I think I mean that this looks like this
21   would be the whole -- the whole thing.
22   Q. Ending on 000049?
23   A. Sure.
24   Q. Now, looking at 00045, it says, on the first
25   page, "dictating physician"?

48

1    A. Yes, ma'am.
2    Q. And then that's you listed there, right?
3    A. Yes, ma'am.
4    Q. And then if you look on the last page,
5    there's also the name -- and that is Page 49 --
6    named Mary Anne Barnhill, Dr. Barnhill; do you see
7    that?
8    A. Yes, ma'am.
9    Q. Who is Dr. Barnhill?
10   A. She was the attending physician in clinic
11   that I discussed Ms. Johnson with.
12   Q. So Dr. Barnhill was the attending and you
13   were a fellow at that time?
14   A. Yes, ma'am.
15   Q. Tell me what that means in terms of your
16   role in the treatment of Ms. Johnson. What is the
17   role of the attending physician and what was your
18   role as the fellow?
19   A. Uhmm, sure. So I would see the patient,
20   discuss the treatment, how things are going, review
21   whatever information with her, kind of see how she's
22   tolerating the therapy. And then I would go and
23   discuss the case with the attending. I mean in this
24   case Dr. Barnhill. And then she would provide
25   guidance with regard to continuing therapy,

49

1    dose-reducing therapy, make sure we check this, you
2    know, this sort of thing. And then I would write
3    the note.
4    Q. Would Dr. Barnhill be present on each of the
5    occasions when you would see the patient?
6    A. Uhmm, she would be in the clinic. Typically
7    the clinic interaction was -- would be me and the
8    patient. A lot of times -- I don't know what
9    percent of times -- the attending physician would go
10   in to the room after me and then the three of us
11   would discuss things.
12   Q. And can you tell from looking at this
13   medical record whether Dr. Barnhill was actually in
14   the room with you and Ms. Johnson, whether she saw
15   Ms. Johnson on this visit?
16   A. Uhmm, you can't -- it doesn't look like from
17   this document that you can determine that.
18   Q. If you look at the document, could you tell
19   from reviewing this record whether this would have
20   been your first visit with Ms. Johnson?
21   A. It looks like it would be the initial visit,
22   and this is -- the 7/19 date I believe is the first
23   visit in the records that I sent. So I believe this
24   is consistent with the initial visit.
25   Q. Could you tell or do you know how it was

13 (Pages 46 to 49)

50

1  that Deborah Johnson came to be your patient on that
2  day?
3     A. She was assigned to me.
4     Q. What was the process by which patients were
5  assigned to a particular physician?
6     A. Oh, I don't know.
7     Q. And on that first visit, it's fair to say
8  that you were treating Ms. Johnson for breast
9  cancer, right?
10    A. I think that's fair, that's why she saw me;
11 yes, ma'am.
12    Q. For an initial consult with a breast cancer
13 patient, as Ms. Johnson was on this visit on
14 July 19, 2010, did you have a practice that you
15 would follow for an initial consult with patients?
16 Would you take a history and then have a discussion
17 about the cancer? Tell me a little bit about the
18 first meeting that you have with a breast cancer
19 patient.
20    A. No, I think that is fairly accurate. I
21 mean, you would -- I would typically talk to them
22 about how this particular -- in the case of her
23 breast cancer, came to be, you know, and make sure
24 they had an accurate understanding of what was going
25 on. And if we needed to proceed with other

51

1  therapies, then I would likely discuss that with her
2  or the patient. I would -- yeah, that's the typical
3  first visit.
4     Q. Prior to your initial consult with her on
5  this day, would you have reviewed other records,
6  would you have reviewed the pathology reports?
7     A. Uhmm, some -- sometimes. Typically I did
8  not know who was going to be in my clinic until the
9  day of clinic. Sometimes if a patient didn't show
10 up for the clinic visit, I would have reviewed their
11 records prior to me actually seeing them. I don't
12 know if that happened with her or not.
13    Q. When you have this initial consult, does the
14 patient come to you already knowing that they have
15 breast cancer?
16    A. Uhmm, sometimes.
17    Q. Could you tell from this record whether
18 Ms. Johnson knew that she had breast cancer already,
19 or whether you were the one who told her that?
20    A. Uhmm, I -- it looks like she had already
21 known that she had breast cancer, because she
22 underwent a surgical intervention on the cancer.
23 She already started the therapy for the cancer.
24    Q. So tell me what would have been your
25 practice, to tell Ms. Johnson about how the breast

52

1  cancer came to be?
2     A. About how she got it?
3     Q. I thought you said one of the things you
4  would initially say in an initial consult is how the
5  breast cancer came to be?
6     A. Forgive me. How did it present or how did
7  it come to light in her case.
8     Q. Okay.
9        And so --
10    A. Not like what was the -- Why did I get
11 cancer? Not that.
12    Q. Not what was the cause or anything like
13 that?
14    A. Right.
15    Q. And looking at the medical record, can you
16 tell me what it would have been your practice to
17 tell Ms. Johnson about her breast cancer?
18    A. Uhmm, I probably would have discussed
19 whether or not additional therapy would be needed,
20 be it radiation therapy or chemotherapy or other
21 therapy. That would not be unusual on an initial
22 visit.
23    Q. Would you have talked about the staging of
24 her cancer?
25    A. We might have; yes, ma'am.

53

1     Q. And what was the staging of Ms. Johnson's
2  cancer at that time?
3     A. She had a Stage IIB breast cancer.
4     Q. So what would you have told Ms. Johnson
5  about what that means; what is a Stage IIB breast
6  cancer patient?
7     A. I would have probably told her the size of
8  the tumor and that there is a lymph node involved,
9  and that typically this is treated with additional
10 chemotherapy. And that might have been a
11 conversation that I had.
12    Q. Would you have told her whether her cancer
13 was highly invasive; would you have given her any
14 more direction if she said is this a fast growing
15 cancer or, you know, if she had asked, what does
16 that mean, what would you tell her?
17    A. I guess I would go patient by patient. You
18 know, it's difficult for me to know what exactly I
19 would have told her then. I mean, I don't know.
20    Q. Okay.
21       The size of the mass in her breast -- you're
22 looking at the record, right?
23    A. Yes, ma'am.
24    Q. Would you have told her anything related to
25 the size of the mass; whether that was a small mass

14 (Pages 50 to 53)

54

1  or a large mass?
2     A. Uhmm, I might have. I don't know. Maybe.
3  I guess it would depend on how -- I guess some of
4  those questions would depend on how much information
5  the patient wanted.
6     Q. If Ms. Johnson had asked you any questions
7  about her cancer and her diagnosis, would you have
8  put that in your records, in your notes? Would that
9  appear here?
10    A. Maybe or maybe not. I don't know. I mean,
11 we could well have talked about it and I just didn't
12 document it.
13    Q. Was it your practice to tell a breast cancer
14 patient what it means to have cancer that has gone
15 to the lymph nodes?
16    A. We might have talked about that.
17    Q. But you don't know, as you sit here today,
18 whether you discussed that with Ms. Johnson?
19    A. No, ma'am.
20    Q. At the time when you had this initial
21 consult with Ms. Johnson in July of 2010, had you
22 come up with a treatment plan for her yet?
23    A. I don't know. I might have.
24    Q. If you had come up with a treatment plan for
25 her, would it be noted in your records at this

55

1  point?
2     A. It might have. If I had a specific plan
3  that I had in mind, then I might have documented it.
4  If we had an initial visit and I was going to bring
5  her back to further discuss treatment, I might not.
6     Q. Now, Ms. Johnson was ER-positive; is that
7  right?
8     A. Yes, ma'am.
9     Q. And she was HER2-negative?
10    A. Yes, ma'am.
11    Q. Would you have told Ms. Johnson what that
12 means, to be ER-positive, HER2-negative?
13    A. I might have.
14    Q. What would you have said to a patient; what
15 does that mean?
16    A. I would have told her that there is a
17 particular component of her cancer that is
18 responsive to another therapy. And that we would
19 use that therapy if it were positive.
20    Q. Would you tell her what the goals of the
21 therapy were?
22    A. More than likely.
23    Q. And what do you tell a patient the goal of
24 therapy is?
25    A. If the goal is to prevent the cancer from

56

1  recurring and to improve her survival, I would say
2  that. If the goal is palliation and relief of
3  cancer-associated symptoms, then I would say that.
4     Q. And what was the goal for Ms. Johnson?
5     A. To extend her survival.
6     Q. In reviewing the notes of the first meeting
7  that you had with Ms. Johnson, there is no notation
8  of you recommending a treatment regimen at that
9  point; is that right?
10    A. No, ma'am. I only said we'll proceed with
11 chemotherapy, but a particular regimen has not --
12 was not detailed.
13    Q. Would it have been part of your practice at
14 this first initial consult with Ms. Johnson to
15 discuss risks and benefits of particular treatments?
16    A. Maybe in a general form. You know, if she
17 -- maybe in a general form, but not specifically. I
18 might typically -- and that would be more when you
19 needed a consent for chemotherapy. Here I might
20 just have said she'll get chemotherapy.
21    Q. If you had provided a risk/benefit calculus,
22 would you have noted that in your record?
23    A. I believe I did; yes, ma'am.
24    Q. You believe you did on this first visit?
25    A. No, ma'am. I believe it was in the

57

1  August 9th visit.
2     Q. Okay. And we'll get to that.
3        Is it your practice -- or was it your
4  practice at that time to discuss your referral rates
5  with patients?
6     A. Uhmm, I don't know if I would have done that
7  or not. I mean, maybe.
8     Q. You can't tell from looking at this record
9  whether you did with Ms. Johnson or not?
10    A. No, ma'am.
11    Q. When treating patients -- and let's just go
12 with your breast cancer patients -- is it fair to
13 say that most of your patients are concerned with
14 survival rates?
15    A. That's probably fair to say; yes, ma'am.
16    Q. Do most of them ask you about survival
17 rates?
18    A. Not specifically, I wouldn't say most; no,
19 ma'am.
20    Q. If a patient presented to you as Ms. Johnson
21 did, what would you tell her about her survival
22 rate?
23    A. Honestly I would have to look it up. I
24 mean, I don't know -- I don't know the specifics
25 about the survival rate of Stage IIB breast cancer

15 (Pages 54 to 57)

58

1  off the top of my head right now.
2    Q.  When coming up with a treatment plan for
3  patient such as Ms. Johnson, a Stage IIB
4  HER-negative ER-positive, do you suggest or do you
5  try and come up with a treatment plan with the
6  highest likelihood of long-term survival; is that a
7  fair statement?
8    A.  Yes, ma'am.
9    Q.  If Ms. Johnson had any immediate concerns
10  about breast cancer or had asked you specific
11  questions, would you have noted that = in the
12  record?
13    A.  Maybe so, but maybe not.
14    Q.  Okay.
15    If we could turn to -- before we move from
16  this page, if you could look at 00048 and at the
17  bottom you see it says Brian Lewis, Dr. Brian Lewis,
18  and it says 1/8/2011?
19    A.  Yes, ma'am.
20    Q.  What does that mean?
21    A.  That's when I signed the note.
22    Q.  Dr. Lewis, before we move on to the next
23  record, I want to ask you about your process or how
24  it is that the notes end up in this medical record?
25  Because I see there is a dictation date --

59

1    A.  Uh-huh.
2    Q.  -- or note on there?
3    A.  (Witness indicating.)
4    Q.  Tell me, when a patient comes in, a patient
5  like Ms. Johnson, in July of 2010 and that time
6  period, how do the notes make to it this record?
7  When she comes in, are you taking handwritten notes?
8    A.  Uhmm, I believe so.  Because the medical
9  records system has changed, but I believe thst there
10  would be a piece of paper that I would write
11  handwritten notes on, and then from that I would do
12  the dictation.
13    Q.  So the handwritten notes that you were
14  taking during your patient visits with Ms. Johnson
15  would be taken contemporaneously with your visit
16  with her?
17    A.  You mean at the same time?
18    Q.  Yes.
19    A.  Yes, ma'am.
20    Q.  And then at some point later you would then
21  dictate them into a recorder?
22    A.  Into a phone.
23    Q.  Into a phone.  And then someone else
24  transcribes them?
25    A.  It goes into the ether.

60

1    Q.  Okay.
2    And was that your practice throughout your
3  treatment of Ms. Johnson?
4    A.  That was the way clinic was set up for the
5  majority of -- I daresay all of my fellowship is
6  that there would be a thing that you could take
7  notes on, like a blank piece of paper, and then you
8  would dictate at the end of the visit.
9    Q.  You would look at the blank piece of paper
10  and just read your notes into the dictaphone or the
11  recording device?
12    A.  Yes, ma'am.  And if I had a memory of the
13  visit that was not in the thing, I may or may not
14  mention that as well.
15    Q.  What was the time period from when you were
16  meeting with a patient like Ms. Johnson and taking
17  the notes, to actually putting it down into the
18  recording device?
19    A.  It would vary.  I would try to do it the
20  same day.  If it couldn't be done the same day, then
21  the next day or the day after.  I would try not to
22  wait too long.
23    Q.  Thank you.
24    If we can go back to the records, and if you
25  can turn to the page that says 00035.

61

1    A.  35.  Yes, ma'am.
2    Q.  This is a visit that you had with
3  Ms. Johnson that was dated August 2, 2010; is that
4  correct?
5    A.  Yes, ma'am.
6    Q.  And I'm looking at the last paragraph on
7  00035, and I'm looking at sentence that starts "We
8  will likely".  It is the last three words on the
9  page.
10    A.  We will likely, okay.
11    Q.  And I'm going to read that sentence to you
12  which starts 00035 and goes on to Page 36:  "We will
13  likely use the TAC regimen for adjuvant
14  chemotherapy."  Did I read that correctly?
15    A.  Yes, ma'am.
16    Q.  And TAC, that stands for Taxotere,
17  Adriamycin, Cytoxan?
18    A.  Cyclophosphamide; yes, ma'am.
19    Q.  Cyclophosphamide is another name for
20  Cytoxan, right?
21    A.  Yes, ma'am.
22    Q.  So at this point, on August 2nd, you had
23  come up with a regimen for Ms. Johnson, right?
24    A.  Yes, ma'am.
25    Q.  Before we get into the regimen, tell me what

16 (Pages 58 to 61)

62

1  you know about Taxotere?
2      A.  What do I know about it?
3      Q.  Uh-huh.
4      A.  It's a chemotherapeutic IV, a
5  chemotherapeutic agent, used for the treatment of a
6  variety of cancer histologies.  It's a microtubule
7  stabilizing agent.  And that's -- I mean, as far
8  Taxotere, that is all I know.
9      Q.  When did you first learn about Taxotere?
10     A.  Probably during the fellowship.
11     Q.  Do you recall when your first use of
12  Taxotere would have been with a patient, when you
13  first prescribed it?
14     A.  I don't know.  That I wouldn't be able to
15  tell you.
16     Q.  About how many times have you prescribed
17  Taxotere, if you know?
18     A.  In my life?
19     Q.  Uh-huh.
20     A.  Oh, I have no idea.
21     Q.  Do you still prescribe Taxotere today?
22     A.  Yes, ma'am.
23     Q.  To treat what types of cancers; when do you
24  prescribe Taxotere?
25     A.  For the most part it would be prostate

63

1  cancer.
2      Q.  And approximately how many patients per year
3  do you prescribe Taxotere for?
4      A.  I don't know.
5      Q.  If it's easier to say per month?
6      A.  I usually have a few patients a week on
7  Taxotere.  It would not be unusual to see three or
8  four people in a clinic, during that week.
9      Q.  Okay.
10         And you said that you prescribe it -- or
11  maybe you didn't -- you prescribe it for prostate
12  cancer?
13     A.  For the most part, yes, ma'am.
14     Q.  Any other types of cancer?
15     A.  Yes, ma'am I've prescribed it for head and
16  neck cancer, I've prescribed it for lung cancer,
17  I've prescribed it for esophageal cancer, and for
18  breast cancer.
19     Q.  Is there a certain patient population that
20  you feel is the right candidate for Taxotere?
21     A.  Uhmm.
22     Q.  Well, let me ask it this way.  Some patients
23  will come to you, whether it's prostrate, lung
24  cancer, esophageal cancer, breast cancer, there is a
25  reason you are prescribing Taxotere to that

64

1  particular patient, right?
2      A.  Yes, ma'am.
3      Q.  You don't prescribe to it every cancer
4  patient?
5      A.  No, ma'am.
6      Q.  So how do you make the decision to prescribe
7  Taxotere to any particular patient?
8      A.  All right.  In the case of prostate cancer,
9  it's an FDA-approved agent for first line
10  chemotherapy, so I would use it.  If the patient was
11  progressing and needed chemotherapy, I would often
12  prescribe it for that patient.  For the other
13  malignancies, I mean, it's typically given in -- the
14  majority of my experience would be in patients who
15  have failed first or second line therapy, and it's
16  used as either a second or third line treatment.
17     Q.  How about in breast cancer patients.  What
18  type of breast cancer patients do you prescribe
19  Taxotere for?
20     A.  Uhmm, well, I prescribed it for Ms. Johnson
21  in the adjuvant setting.  I would have to look and
22  see how effective it is in the second or third line
23  setting.  And I haven't treated enough breast cancer
24  really to have a practice.
25     Q.  Is there a reason that you would have chosen

65

1  Taxotere over other therapeutic agents?
2      A.  Not that I can recall at this time.  I mean
3  why that particular regimen was picked for this
4  particular patient, I mean, I just can't recall.
5      Q.  What alternative chemotherapeutic agents
6  would you have considered at the time?
7      A.  I mean, there's a regimen that uses
8  paclitaxel instead of Docetaxel.  And it's the same
9  other drugs, cyclophosphamide and Adriamycin, but
10  it's paclitaxel instead of Docetaxel.
11     Q.  And in what circumstances do you choose
12  Taxotere?
13     A.  Oh, I guess I don't know.  I mean, I'd have
14  to -- I don't know what the situation was then.  I
15  mean, I think now I would either have a discussion
16  with the patient or I would see what the NCCN
17  suggested.  If there's multiple regimens sometimes
18  the NCCN would have a preferred regimen, and if
19  that's the case, I would use that one.
20     Q.  And so, as you it here today, would it have
21  been -- can you say that it would have been your
22  practice to look at the NCCN in order to determine
23  what treatment, chemotherapeutic treatment regimen
24  you were going to choose for Ms. Johnson?
25     A.  I mean, it could have been.  My -- it's hard

17 (Pages 62 to 65)

66

1 for me to know what I would have done then.  But I
2 did use the NCCN if they had a particular preference
3 for a regimen, then I might have used it; yes,
4 ma'am.
5     MS. MIMS:  I'm going to mark as Exhibit D --
6     (Whereupon Exhibit D was marked for
7     identification.)
8 BY MS. MIMS:
9     Q.  -- I'm going to hand you what I've marked as
10 Exhibit D, and you see at the top it says NCCN
11 Guidelines?
12     A.  Yes, ma'am.
13     Q.  Version 2.2011?
14     A.  Yes, ma'am.
15     Q.  Putting aside the version, NCCN Guidelines,
16 is this generally the document that you've been
17 referring to?
18     A.  Yes, ma'am.
19     Q.  And --
20     MR. THORNTON:  Let me just object to this.
21     It's incomplete, I think.  At least, Page 1
22     of 5.
23     MS. MIMS:  I have the remaining pages,
24     although they are --
25     MR. THORNTON:  Just a second.  This is an

67

1     after in time version to when it would have
2     been in effect.  It seems to be a 2011
3     version.
4 BY MS. MIMS:
5     Q.  I'm going to add to Exhibit D.  As counsel
6 has pointed out, I have only had 1 in the record, so
7 I'll put 2 through 5 in.  So Exhibit D is going to
8 be NCCN Guidelines, Version 2.2011, and it's pages 1
9 through 5.  We don't have full copies so if there's
10 a copier we can take a break and make a copy, or you
11 can take a look at it on the break?
12     MR. THORNTON:  Let's see if we can get into
13     some stuff.  I don't want to stop it either.
14     MS. MIMS:  We're not going to get into
15     detail about the remaining pages.
16 BY MS. MIMS:
17     Q.  Okay.
18     So Dr. Lewis, do you generally recognize
19 that type of document as something that you would
20 have used to assist you in determining a
21 chemotherapeutic treatment regimen for patients in
22 2010 and 2011?
23     A.  Sure.  This is the NCCN guidelines --
24 guidance.
25     Q.  And if you could look at the guidelines

68

1 there, do those guidelines indicate a preferred
2 treatment regimen for a patient who presents as
3 Ms. Johnson did?
4     A.  Yes, ma'am.
5     Q.  What treatment regimen is that?
6     A.  There are five preferred adjuvant regimens.
7 One is TAC.  One is dose-dense AC followed by
8 paclitaxel every two weeks.  And one is AC
9 followed by weekly paclitaxel.  One is TC.  And one
10 is an AC.
11     Q.  So a patient who presents as Ms. Johnson
12 did, how is it that you determined which
13 chemotherapeutic regimen you're going to prescribe
14 for her?
15     A.  Uhmm.
16     Q.  And I'll just -- given the guidelines, give
17 you a number of different options.
18     A.  Sure.  So some would be a little bit -- I
19 guess I don't -- it's hard for me to re -- I can't
20 remember back then why we picked a particular
21 regimen.  Typically now, I would use a regimen
22 thinking about maybe the patient characteristics.
23 Like as an example, the Docetaxel and the
24 cyclophosphamide regimen, it might be someone having
25 cardiac trouble, so you'd avoid the anthracycline.

69

1     As far as the other regimens, I can't think
2 of one reason why I would use one over another off
3 the top of my head.  Or why I picked one for her,
4 off the top of my head.
5     Q.  As you it here today, you don't know why you
6 chose the TAC regimen for Ms. Johnson; is that
7 right?
8     A.  I don't have any direct recollection of why
9 I chose that particular regimen; no, ma'am.
10     Q.  Are you aware generally of the history of
11 the development of taxanes to treat cancer?
12     A.  Uhmm, I think that paclitaxel may have been
13 developed from the yew tree.  Docetaxel might also
14 be a plant-derived chemotherapy.  That's about all I
15 know.
16     Q.  Are you aware that Taxotere is one of the
17 most effective third generation chemotherapy
18 treatments for node-negative breast cancer?
19     MR. THORNTON:  Objection.  Leading.
20     A.  No, ma'am.
21     Q.  You can still answer.
22     MS. MIMS:  I should have told you earlier,
23     there may be an objection by counsel.  And
24     I'm assuming now that it's going to be you.
25     MR. THORNTON:  I've tried to keep it down,

18 (Pages 66 to 69)

70

1    because we're doing fine.
2        I can't instruct you not to answer.  We
3    have no privilege we share.  I can't direct
4    you not to answer.  I'm just making an
5    objection for the record.  I'm sorry if it's
6    distracting.
7    THE WITNESS:  Not at all.
8    MS. MIMS:  The objections are being made for
9    the record.  I know you have not been in a
10   deposition before, but they're for the
11   record, later.
12   THE WITNESS:  Sure.
13   MS. MIMS:  If your attorney doesn't want you
14   to answer a question I'm sure she'll say so.
15   THE WITNESS:  She'll tell me.
16   BY MS. MIMS:
17       Q.  What are the benefits of Taxotere?
18       A.  Uhmm, in general?  In general, ma'am?
19       Q.  Yes.  If you're telling a patient about
20   Taxotere and the benefits of your prescribing
21   Taxotere to them, what do you tell them?
22       A.  Well, my -- again, the majority of my
23   experience is in prostrate cancer.  And it's been
24   shown to increase overall survival in men with
25   metastatic cancer, resistant prostrate cancer, and

71

1    in men with metastatic hormone sensitive prostate
2    cancer.  And so in those situations I would tell
3    them this is a chemotherapy that can prolong your
4    overall survival with regard to this cancer.
5        Q.  What would you tell a woman who had breast
6    cancer for whom you were prescribing Taxotere, the
7    benefit was?
8        A.  Uhmm, so I mean -- I mean, I don't know,
9    because it's chemotherapy regimen, so not a single
10   agent Docetaxel and I would probably tell her this
11   regimen is geared to prolong is survival.
12       Q.  So when you tell a patient -- and let's go
13   back to during the time period that you were
14   treating Ms. Johnson -- about the chemotherapeutic
15   regimen that you're prescribing them, would you
16   discuss it as a regimen in terms of generally all
17   three drugs, or would you break it down and tell a
18   patient about Taxotere, Adriamycin and Cytoxan
19   separately?
20       A.  A little bit of both, ma'am.  So I think for
21   benefit I would often discuss the chemotherapy
22   regimen like it's this combination of treatments.
23   With regard to side effects, I mean a lot of times I
24   would list the individual drugs and the side effects
25   that they entail.  That is my practice now in the

72

1    treatment of patients with combination chemotherapy.
2        Q.  So your practice has stayed the same with
3    respect to telling a person about the risks and
4    benefits of the chemotherapeutic regimen?
5        A.  I would assume so, ma'am.
6        Q.  Tell me what you have told Ms. Johnson with
7    respect to the benefits of her chemotherapeutic
8    regimen, TAC?
9        A.  I probably would have told her there is an
10   improved chance of keeping the cancer from
11   returning -- versus not using chemotherapy.
12       Q.  Anything else?
13       A.  I can't -- it would probably be more related
14   to ridding her of the cancer.  Yes, ma'am, as far as
15   an anticipated benefit.
16       Q.  Meaning what?  You said it would be more in
17   terms of ridding her of the cancer?
18       A.  Meaning have the cancer not return.  Yes,
19   ma'am.
20       Q.  Okay.
21           Looking back at 00035 --
22       A.  Yes, ma'am.
23       Q.  -- we're still at the last paragraph.
24       A.  Okay.
25       Q.  So I'm going to read the first sentence of

73

1    that:  "Today we discussed the risks and benefits of
2    chemotherapy using the Adjuvant! Online tool has
3    demonstrated a 25 percent increase in ten-year
4    survival with the use of hormonal plus chemotherapy
5    intervention."
6        A.  Yes, ma'am.
7        Q.  What -- I'm assuming that you wouldn't have
8    told Ms. Johnson this in exactly that manner.  So
9    what would you have told her with respect to what it
10   means, that the chemotherapy has demonstrated a
11   25 percent increase in ten-year survival?  What does
12   that mean?
13       A.  I don't know.  I might have -- uhmm, I --
14   gosh.  I don't know.  That when -- I guess I don't
15   know how I would have told her specifically.  The
16   Adjuvant! Online tool has a little patient handout
17   which sort of spells things out.  Like a little bar
18   graph; like percent alive at ten years with no
19   chemotherapy and percent alive at ten years with
20   chemotherapy, so you can see the difference.  And
21   that difference is 25 percent.  So I mean, I might
22   have gone over that with her in clinic.
23       Q.  And what is the Adjuvant! Online tool that
24   you were using?
25       A.  It's a tool to discuss adjuvant chemotherapy

19 (Pages 70 to 73)

74

1  with patients and what the benefit of the
2  chemotherapy could be for her.
3      Q.  What specifically -- is this a website that
4  you went to with her?
5      A.  Yes.  So this is a website that you log
6  into.  There's things that you detail -- the age of
7  the patient, the type of cancer, the hormone status,
8  the nodes status; all those types of things.  I have
9  not used in it a while, but they detail some of the
10  types of chemotherapy, and you plug all this in and
11  it generates like a benefit page, just to see how
12  patients do.
13      Q.  Was it your practice to use this online
14  tool?
15      A.  Uhmm, yeah, I used it a few times.  Then it
16  was just for breast cancer.  And so if I had a
17  breast cancer patient that I would give adjuvant
18  chemotherapy to, I would probably use it; yes,
19  ma'am.
20      Q.  If you had a breast cancer patient and you
21  were explaining the risks and benefits, it was your
22  practice to use this online tool?
23      A.  It would not be out of the realm of
24  unreasonable for me to do that; yes, ma'am.
25      Q.  And when the note says here, using the

75

1  online tool, does that mean that you were sitting
2  with Ms. Johnson in front of the computer screen and
3  you pulled it up?
4      A.  I did either did that or I pulled it up in
5  another room and printed the form and brought it to
6  her.  I may have looked it up myself and discussed
7  it with her.  It's hard to know exactly, because I
8  didn't say that I handed her any adjuvant form.
9      Q.  Is the Adjuvant! Online form that you're
10  discussing here different than the Micro Medic
11  patient information that is discussed in the next
12  sentence?
13      A.  Yes, ma'am.
14      Q.  We're going to come to that.  I want to put
15  that off for now.  The Adjuvant! Online tool, what
16  was the website for it?
17      A.  Adjuvant! Online.
18      Q.  Do you still use that today?
19      A.  It doesn't work.  It's being updated
20  currently.  Last I checked it's been updated for
21  over a year.
22      Q.  So you haven't used it in over a year?
23      A.  Yes.  I mean it's been a long time.
24      MR. THORNTON:  Still not?
25      THE WITNESS:  Still not out.  Maybe 2018.

76

1  BY MS. MIMS:
2      Q.  Do you know who is it that maintains that
3  website, adjuvantonline.com?
4      A.  Not personally; no ma'am.
5      Q.  Now that you don't have the Adjuvant! Online
6  tool, is there something that you use in its place?
7      A.  No, ma'am.  Not that I can think of off the
8  top of my head.
9      Q.  Nothing that had the same type of use, where
10  you plugged in the patient information and then it
11  shows you the survival rate?
12      A.  Nothing like that.
13      Q.  The Adjuvant! Online tool you discussed, you
14  know, that you can show the patient how they have
15  this 25 percent increased chance, and so that's a
16  benefit, was the Adjuvant! Online tool -- did you
17  only use that to discuss benefits, or did it also
18  have risks on it as well?
19      A.  I do not think that Adjuvant! Online details
20  the particular risks.  I don't think so.  I have not
21  used it in so long, so I can't remember specifically
22  if it just -- I don't know.  I don't think so,
23  though.
24      Q.  Now you've told us about your discussion
25  generally with the chemotherapy regimen, but you

77

1  also said some of the drugs you might discuss
2  specific risks associated with that drug, right?
3      A.  Yes, ma'am.
4      Q.  What risks would you discuss as it relates
5  to Taxotere?
6      A.  So typically I would discuss peripheral
7  neuropathy, fingernail changes, the need for
8  pre-medication, allergic reaction.  Uhmm, would I
9  mention in this particular case, hair loss?  I don't
10  know as its specific to Taxotere.  I'm not sure.
11      Q.  You don't know whether you would have
12  specifically mentioned hair loss as it relates
13  specifically to Taxotere; is that what you're
14  saying?
15      A.  Right.
16      Q.  Would you have mentioned hair loss as it
17  relates to chemotherapy generally?
18      A.  Yes, ma'am.
19      Q.  I want to come back to that.  What would you
20  have told Ms. Johnson of the specific risks or side
21  effects as it relates to Adriamycin?
22      A.  I have -- hold on a second.  For Adriamycin
23  I probably would have related the risk of leukemia
24  and heart failure, myelosuppression.  I may have
25  mentioned that with Taxotere too, myelosuppression.

20 (Pages 74 to 77)

78

1     Q.  Anything else that you can think of?
2     A.  Off the top of my head, no.  I mean I have --
3  I detailed a little paragraph in one of these notes
4  where I discussed the risks and benefits, or the
5  ones that I told her about, but I can't find it
6  here.
7     Q.  You don't see it on the date of August 2,
8  2010, right, that note?
9        (Witness peruses document.)
10    A.  I do not; no, ma'am.
11    Q.  What about with respect to cyclophosphamide
12  or Cytoxan?  What are the risks that you would have
13  informed Ms. Johnson of, specific to that
14  chemotherapeutic drug?
15    A.  Probably more marrow suppression.
16    Q.  Anything else?
17    A.  Uhmm, I mean, I don't know.  I don't know
18  what I would have told her.
19    Q.  Have you ever prescribed Taxol instead of
20  Taxotere?
21    A.  Uhmm paclitaxel.  Yes, ma'am, I've
22  prescribed paclitaxel.
23    Q.  Would you agree, even though they are
24  structurally similar drugs, that they carry
25  different risks and benefits?

79

1     A.  Uhmm, it's probably accurate.  I guess I
2  don't thnk of -- I probably -- I mean, I don't know.
3  And they are different drugs.
4     Q.  They are different drugs.  Has one been
5  associated with cardiotoxicity more than the other?
6     A.  Oh.  I don't know.  I have a vague
7  recollection, but I don't know specifically.
8     Q.  Has one been associated with peripheral
9  neuropathy more than the other?
10    A.  Uhmm, I don't know if one is more than the
11  other.  I usually think of them both as causing
12  peripheral neuropathy.
13    Q.  In a patient with HER2-positive breast
14  cancer, with a history of cardiac problems, would
15  you consider paclitaxel or Docetaxel as a better
16  option?
17       MR. THORNTON:  Objection.  Incomplete
18       hypothetical.
19    A.  Honestly, I don't know.  If I had a patient
20  that was HER2-positive, I would have to look and
21  see.
22    Q.  When discussing the risks of chemotherapy,
23  are there risks that you don't discuss with
24  patients?
25    A.  Uhmm, I try to think of the pertinent risks

80

1  or the big risks.  A lot of times -- or what I'll do
2  now is I'll look at the UpToDate monograph on the
3  drug and go through the risks of the drugs that way,
4  so I don't forget anything.
5     Q.  Is it fair to say that you don't tell a
6  patient every single risk associated with the drug?
7     A.  Yeah, that would be very difficult to do, in
8  practice.
9     Q.  Going back to the Adjuvant! Online tool that
10  you used, was that a subscription program?
11    A.  You need to be a member, I believe.  There
12  is a login and password, but I don't think you have
13  to pay for it.  I think it is a free service.
14    Q.  Let's look at the sentence on the top of
15  Page 00036?
16    A.  Yes, ma'am.
17    Q.  The one that's the first complete sentence.
18  "Ms. Johnson was given a Micro Medic patient
19  information handout on these three medications, with
20  the expectation we will start chemotherapy next week
21  after her port is placed."  Do you see that?
22    A.  Yes, ma'am.
23    Q.  Tell me what the Micro Medic patient
24  information handouts are?
25    A.  Yeah, it's just that.  I actually don't know

81

1  what-all is included.  And I can't remember what-all
2  is included in the patient information handout.  But
3  it was something that was available at University
4  Medical Center.  You could put the drug name in and
5  it would give, like, a patient information page.
6     Q.  What do you mean, she could put the drug
7  name in?
8     A.  I mean, I would or the nurse would.  You
9  know, sometimes we introduce them to this, though I
10  don't think that is how it happened then.  But you
11  could pull up, like, a patient information and it
12  would have how it is given, you know, things you
13  could call your doctor about, you know, side effects
14  and stuff like that.
15    Q.  Micro Medic, that's an online tool?
16    A.  I think so; yes, ma'am.  Yeah, you type it
17  in.
18    Q.  Yes.  And when you're saying you type it in,
19  you're saying you would type in each specific
20  chemotherapeutic drug that you were prescribing,
21  right?
22    A.  Right.
23    Q.  And then it would give you a handout
24  specific to that particular chemotherapeutic drug?
25    A.  Right.

21 (Pages 78 to 81)

82

1     Q. Okay.
2     So it says here "on these three
3 medications." Does that mean that you gave her
4 three handouts; one for each of the chemotherapeutic
5 drugs that were being prescribed?
6     A. That's what I would assume from that
7 sentence, but I mean, I don't remember that.
8     Q. What types of information was included in
9 the Micro Medic's handout?
10     A. I mean I don't recall. I haven't used Micro
11 Medic in a long time, probably since my fellowship.
12 But I think it is a lot of sort of generic
13 information about the chemotherapy; about how it's
14 given, about possible side effects that you might
15 have.
16     Q. Do you remember anything in particular that
17 it discussed with respect to Taxotere?
18     A. No, ma'am.
19     Q. How about with respect to Adriamycin?
20     A. No, ma'am.
21     Q. How about with respect to the
22 cyclophosphamide?
23     A. No, ma'am.
24     Q. Tell me what you would have told Ms. Johnson
25 as it relates to hair loss and chemotherapy? What

83

1 was it your practice to tell breast cancer patients
2 at that time?
3     A. I probably would have told her that she'd
4 lose her hair as a result of the chemotherapy.
5     Q. What else would you have told her; anything
6 else?
7     A. Maybe not. I don't know. Probably that it
8 would happen all at once. I think that's sort of
9 typical for that regimen, if I remember. I remember
10 my attending telling me that.
11     Q. Would you have told her when she would lose
12 her hair?
13     A. Probably not.
14     Q. Would you have provided her any handouts
15 specifically related to hair loss?
16     A. Specifically related to hair loss? Probably
17 not, ma'am.
18     Q. Do you know if you had handouts related to
19 hair loss at the clinic in the waiting room, or
20 anywhere else that she might have --
21     A. Not that I am aware of.
22     Q. Would you have told her anything about how
23 long the hair loss would last?
24     A. Probably not. I mean, I don't know. Maybe
25 not.

84

1     Q. Was it your practice to tell someone that
2 there hair loss would be temporary?
3     A. Uhmm, I don't know. I mean -- I don't know.
4 I don't know if I had told her that it would grow
5 back or that there was a chance it wouldn't. I
6 mean, I'm not sure; I can't remember. I don't know.
7     Q. What is your practice today? What do you
8 tell breast cancer patients about hair loss and
9 chemotherapy?
10     A. Uhmm, I guess I don't -- I mean I haven't --
11 let me see. I mean, probably that they would have
12 -- that their hair would fall out; I mean that is
13 for sure. And whether or not it would be permanent
14 or that it would grow back, and I don't know what I
15 would say regarding that. I see -- maybe I would it
16 could be permanent. I see the commercials for this
17 on TV.
18     Q. Maybe you would say it could be permanent
19 today?
20     A. Right. As a result of the exposure of this.
21     Q. Do you know whether you would have said that
22 in 2010?
23     A. I don't know.
24     Q. Is it your practice to look at labels of any
25 of the drugs that you're prescribing?

85

1     A. Like the FDA label?
2     Q. Yes.
3     A. Not specifically. If I have a specific
4 question, then I might go to the FDA label and
5 review it.
6     MS. MIMS: I'm going to mark as Exhibit E.
7     (Whereupon Exhibit E was marked for
8     identification.)
9 BY MS. MIMS:
10     Q. I'm handing you Deposition Exhibit E. Have
11 you seen that document before?
12     A. Yes. This FDA package insert for Docetaxel.
13     Q. At the top left-hand corner it has
14 highlights for prescribing information, and then it
15 also says Taxotere (Docetaxel); do you see that?
16     A. Yes.
17     Q. So this is the label for Taxotere?
18     A. Yes, ma'am.
19     Q. If you look on the right-hand column at the
20 end of that paragraph, you will see a date on that
21 says "revised 05/2010"; do you see that?
22     A. Yes, ma'am.
23     Q. I'd like you first to take a look underneath
24 the word Taxotere, and you'll see a black box. Do
25 you see that?

22 (Pages 82 to 85)

86

1  A. I do.
2  Q. What does that mean, when there is a black
3  box on a label?
4  A. Uhmm, I mean, that these are important
5  risks.
6  Q. Okay.
7  So a black box signifies that Look at these
8  risks; these are important ones?
9  A. Sure.
10  Q. And if you look under there it says,
11  "Warning: Toxic deaths, hepatoxicity, neutropenia,
12  hypersensitivity reactions and fluid retention."
13  Right?
14  A. Right.
15  Q. And are those risks that you would have
16  warned Ms. Johnson about?
17  A. I mean, I'm aware of the fluid retention and
18  hypersensitivity. I probably would have told her we
19  would have to premedicate her to prevent that. I
20  may have told her we'll have to watch and monitor
21  her liver and stuff like that. And that's typically
22  what I do now. I may not tell the patient, but that
23  is what I do, right.
24  Q. Do you tell the patient there is a risk of
25  death from chemotherapy?

87

1  A. Uhmm. I tell them if they have a fever they
2  should seek care, because it's possible to have --
3  to die; yes, ma'am.
4  Q. At the time in 2010 when you prescribed
5  Ms. Johnson's chemotherapeutic regimen, would you
6  have told them about the risk of death as it relates
7  to the treatment regimen in general, or would you
8  have related it to specific drugs?
9  A. Probably more the treatment regimen in
10  general.
11  Q. Okay.
12  I'd like you to also look back at the label
13  on the right-hand side. You see where it says,
14  "adverse reactions"?
15  A. Yes, ma'am.
16  Q. I'd like you to take a look at that list, if
17  you could, for a minute.
18  A. Okay.
19  Q. Could you tell me, under that list of
20  adverse reactions, whether there are any specific to
21  Taxotere that you would have informed Ms. Johnson
22  of. And I know that you've told me a few of them,
23  but I want to know if this refreshes your
24  recollection as to any additional risks you might
25  have informed her of, specific to Taxotere?

88

1  A. I mean, I probably would have told her that
2  all of them can suppress the counts, right, as far
3  as this can suppress your blood counts and cause
4  fevers that can further additionally suppress your
5  counts. I always tell people about nausea and
6  vomiting.
7  The neuropathy and nail disorders, I mean
8  typically, issues with the nails, I would have
9  mentioned that. I mean that's what I mention to
10  people now. I do mention dysesthesia with regard to
11  the Docetaxel now. I don't know if that's something
12  that I would mentioned then.
13  Q. Everything that you just mentioned, with the
14  exception of dysesthesia, now you mention that as it
15  relates specifically to Docetaxel, right?
16  A. I might have.
17  Q. But all the other ones that you described,
18  do you mention those as risks as it relates to the
19  chemotherapeutic regimen?
20  A. Yeah, that might have been more a
21  conversation with regard to chemotherapy as a whole.
22  Q. Okay.
23  I'd like you to turn to Page 15 of the
24  label. I'm looking at section 6.1, clinical trial
25  experience. Do you see that?

89

1  A. Yes, ma'am.
2  Q. And then if you turn to page -- let's start
3  there. On Page 5, under clinical trial experience,
4  you'll see 16 to 17 there is a list of adverse
5  reactions. Do you see those?
6  A. Yes, ma'am.
7  Q. And one of those adverse reactions on Page
8  17 is alopecia. Do you see that?
9  A. Yes, ma'am.
10  Q. And do you see that there is under the first
11  column, which is all tumor types, normal LFTs -- is
12  the LFT a liver function test?
13  A. Yes, ma'am.
14  Q. And under that, for alopecia, it says 76.
15  Do you see that?
16  A. I do.
17  Q. Is that 76 percent?
18  A. It looks like it; yes, ma'am.
19  Q. Looking back at the beginning on 15, that
20  first chart is for monotherapy with Taxotere, right?
21  A. Yes, ma'am.
22  Q. So the label says there is a 76 percent
23  chance of alopecia, which is hair loss, for
24  monotherapy; is that right?
25  A. Yes, ma'am.

23 (Pages 86 to 89)

90

1    Q.  And Ms. Johnson did not have monotherapy,
2  right?
3    A.  She did not.
4    Q.  So if you could turn to Page 22.  And you'll
5  see in the middle of the page it says "Combination
6  therapy with Taxotere in the adjuvant treatment of
7  breast cancer"?
8    A.  Uhmm, combination therapy, yes, ma'am.
9    Q.  That's what Ms. Johnson had, right,
10  combination therapy?
11    A.  She did.
12    Q.  If you look on the chart on the next page,
13  what does it say the risk of alopecia is in a
14  patient with combination therapy with Taxotere, in
15  the adjuvant treatment of breast cancer?
16    A.  98 percent.
17    Q.  Do you know if you would have reviewed this
18  label in the time period that you were treating
19  Ms. Johnson?
20    A.  I suspect I did not review this specific
21  labeling with the patient, no.
22    Q.  I'm not asking if you reviewed it with
23  Ms. Johnson.  I'm asking you if you would have
24  reviewed the label yourself, as the treating
25  physician?

92

1  I assume that it's probably a similar document.
2  They probably get it from the FDA label.
3    Q.  If you can look at Page 61 -- and actually
4  let's start on the bottom of 60.  It says, "What are
5  the possible side effects of Taxotere?"  Do you see
6  that?
7    A.  Yes, ma'am.
8    Q.  And then on Page 61, continuing, it says,
9  "The most common side effects of Taxotere
10  include" -- do you see that list?
11    A.  I do.
12    Q.  And in that list, about three-quarters of
13  the way down, it says "hair loss."  Do you see that?
14    A.  I do.
15    Q.  Does it say anything about the hair loss
16  being temporary in nature?
17    A.  It does not.
18    Q.  Do you have any criticisms of the
19  Taxotere -- in May 2010, the Taxotere label that I
20  just showed you?
21    A.  None come to mind immediately, ma'am.
22    Q.  All right.
23      Is it your opinion or do you think anything
24  in that label that we reviewed is false and
25  misleading?

91

1    A.  Probably -- probably not.  I mean, at the
2  time it's hard for me to know whether I would have
3  looked at this or not.
4    Q.  At the time it wasn't your habit to review
5  labels unless you had a specific issue; is that
6  right?
7    A.  Yes.
8    Q.  If you can now turn to Page 58.  In the
9  middle of Page 58 you see it says, "patient
10  information"?
11    A.  Yes, ma'am.
12    Q.  Starting on Page 58 and going through to the
13  end of the document, is it your understanding that
14  information at the end of the label is something
15  that could be given to a patient?
16    A.  Yes, ma'am.
17    Q.  Have you ever given that information to a
18  patient?
19    A.  No, I have not printed out the label and
20  then supplied this to a patient.
21    Q.  But do you provide the patient with
22  information which is contained within this document
23  under patient information?
24    A.  Uhmm, I don't -- I can't recall if the Micro
25  Medic's patient information handout has this in it.

93

1    A.  No, ma'am, I have no reason to believe that.
2    Q.  Do you think anything in the Taxotere May
3  2000 label is incomplete?
4      MR. THORNTON:  Objection.  No expertise.  It
5      calls for speculation.
6    A.  I mean, I don't know.  I would have to -- I
7  have no reason to think that it's not complete.  And
8  if it's put out by the FDA...
9      MS. MIMS:  I'm going to mark Exhibit F.
10      (Whereupon Exhibit F was marked for
11      identification.)
12  BY MS. MIMS:
13    Q.  I'm handing you a document that says
14  Physicians' Desk Reference on it?
15    A.  Yes, ma'am.
16    Q.  Are you familiar with the Physicians'
17  Reference?
18    A.  Yes, ma'am.
19    Q.  And that's also referred to as the PDR,
20  right?
21    A.  It is.
22    Q.  Do you ever use the PDR?
23    A.  No, ma'am.
24    Q.  Have you ever used a PDR to look up a
25  specific drug?

24 (Pages 90 to 93)

94

1      A. I can't think of a specific time. I owned a
2   PDR for a while, but then . . .
3      Q. It's more of an online -- information that
4   you would get online now, is that it?
5      A. Yes, ma'am.
6      Q. This is the PDR for cyclophosphamide, or
7   Cytoxan?
8      A. I see that in the -- yes, in the middle of
9   the second page.
10      Q. Yes.
11         And if you look at the third page, which at
12   the top says "Cytoxan continued"?
13      A. Yes, ma'am.
14      Q. If you go all the way down to the last,
15   bolded paragraph, that says "skin and structure"; do
16   you see that?
17      A. Yes, ma'am.
18      Q. And for Cytoxan it says, "Alopecia occurs
19   commonly in patients treated with cyclophosphamide";
20   do you see that?
21      A. I do.
22      Q. "The hair can be expected to grow back after
23   treatment with the drug or even during continued
24   treatment, though it may be different in texture or
25   color"; do you see that?

95

1      A. I do.
2      Q. Would you tell anything to your patients
3   about when their hair came back that it could be
4   different in color or texture? Let me strike that
5   and start again.
6         Would you ever tell your patients that if
7   their hair grew back it could be different in
8   texture or color?
9      A. I do that now; yes, ma'am.
10      Q. Do you know whether you would have done that
11   back in 2010?
12      A. I don't know.
13      Q. I am going to mark as Deposition Exhibit
14   G --
15         (Whereupon Exhibit G was marked for
16         identification.)
17      Q. -- which I will hand you, and that is the
18   label for doxorubicin hydrochloride.
19         Do you see that?
20      A. I do.
21      Q. Have you seen this label before?
22      A. This looks different than the previous one.
23   I'm used to seeing an FDA label that looks like the
24   Docetaxel one that you gave me. I'm not aware of --
25   I don't know if I've looked at the FDA label product

96

1   information before in the past or not.
2      Q. And doxorubicin is Adriamycin, right?
3      A. Yes, ma'am.
4      Q. Like the label for Taxotere, this also has a
5   black box on the front, right?
6      A. Yes, ma'am.
7      Q. And we've established that that black box is
8   to alert the doctor to the most serious adverse
9   events or side effects of the drug, right?
10      A. Right.
11      Q. And also, like Taxotere, does Adriamycin
12   come with the risk of death?
13      A. Uhmm, I don't see that in the black box
14   warning. I would have to read it more carefully, I
15   guess.
16      Q. Let's look at No. 2. It says "Myocardial
17   toxicity manifested in its most severe form by
18   potentially fatal congestive heart failure, and may
19   occur either during therapy or months to years after
20   the termination of therapy." Do you see that?
21      A. Yes.
22      Q. So Adriamycin, like Taxotere, comes with the
23   risk of death?
24      A. Yes, ma'am.
25      Q. If you could turn to Page 12 -- and I'm

97

1   looking at the section that says "precautions."
2      A. Yes, ma'am.
3      Q. And then in the middle of the page there is,
4   in bolded, "information for patient"; do you see
5   that?
6      A. I do.
7      Q. I am about midway down, five sentences down,
8   to be precise --
9      A. Yes.
10      Q. -- in the middle of that paragraph. I'm
11   reading the sentence that starts with the word
12   "patients"; do you see that?
13      A. Yes.
14      Q. "Patients should be informed that they will
15   almost certainly develop alopecia."
16         Did I read that correctly?
17      A. Yes, ma'am.
18      Q. Was it your understanding in 2010, when you
19   prescribed Ms. Johnson's chemotherapeutic regimen,
20   that she would almost certainly develop alopecia?
21      A. Yes, ma'am.
22      Q. And that means that she would almost
23   certainly lose her hair, right?
24      A. Yes, ma'am.
25      Q. And is that something that it would have

25 (Pages 94 to 97)

98

1 been your practice to tell her as a patient of
2 yours?
3     A. That she'd lose her hair?
4     Q. Yes.
5     A. Yes, ma'am.
6     Q. Would it have been your practice to tell her
7 that that hair loss would have been temporary?
8     A. I don't know if that would have been my
9 practice or not. I don't know if I would have
10 specifically said it would grow back or it won't.
11     Q. Is that your practice now?
12     A. No. Sometimes I now I tell people that -- I
13 don't know -- it's hard to say what I do every time.
14 But yeah, I mean, in the recent past I've told
15 people that it may not grow back -- with regard to
16 chemotherapy in general.
17     Q. In coming up with Ms. Johnson's treatment
18 regimen, did you consider her prior medical history?
19     A. I'm sure I did.
20     Q. Okay.
21        Would something like an extensive family
22 history of cancer have played into any of your
23 decisions about which chemotherapeutic regimen to
24 choose?
25     A. I am not sure if it would.

99

1     Q. How about poorly controlled hypertension;
2 would you have considered that?
3     A. Maybe or maybe not. I mean, I don't know.
4     Q. What kind of impact would that have on a
5 chemotherapeutic regimen?
6     A. Probably -- I don't know; probably very
7 little.
8     Q. What about high blood pressure? Would that
9 impact your decision as it related to
10 chemotherapeutic regimen?
11        MR. THORNTON: Didn't you just ask
12        hypertension?
13 BY MS. MIMS:
14     Q. Oh, I did. I'm sorry. Heart disease.
15        I asked about poorly controlled hypertension
16 before, and so now I'm asking about hypertension in
17 general, not poorly controlled.
18     A. Probably not.
19     Q. What about heart disease? Would that impact
20 your decision about a treatment regimen?
21     A. I think it would -- yeah, it might; yes,
22 ma'am.
23     Q. How so?
24     A. If a patient has a history of heart failure,
25 then would I probably not give Adriamycin due to the

100

1 risk of cardiomyopathy.
2     Q. What about if the patient had had a prior
3 left modified radical mastectomy?
4     A. Uhmm, I don't -- I mean no, I don't know
5 that that would impact my treatment decision of
6 which regimen.
7     Q. A prior history of cancer and then a
8 mastectomy would not affect your treatment regimen
9 choice?
10     A. I mean yeah, in the adjuvant, no, I don't
11 think that particular surgery. I'm not -- I don't
12 think so.
13     Q. What about axial lymph node dissection?
14     A. Uhmm, probably not very much.
15     Q. Did Dr. Barnhill work with you to come up
16 with the regimen for Ms. Johnson?
17     A. I can't remember.
18     Q. I think you said this before, but at that
19 time Dr. Barnhill was the attending, right?
20     A. Yes, ma'am.
21     Q. So would it have been your practice to come
22 up with a treatment regimen first, and then you may
23 or may not consult with her; is that ow it works?
24     A. No. She has to agree on the treatment
25 regimen, because she is the -- I mean, she is the

101

1 attending physician. Whether or not I came up with
2 the regimen or she said, we should use this regimen,
3 that I can't remember.
4     Q. Did you consider potential hair loss when
5 developing the treatment plan for Ms. Johnson?
6     A. Uhmm, no, ma'am.
7     Q. Is that because you're trying to come up
8 with a chemotherapeutic regimen that gives her the
9 greatest chance of long-term survival?
10     A. I mean, I was trying to think of a good
11 regimen to give her; yes, ma'am.
12     Q. To give her the greatest chance of long-term
13 survival, right?
14     A. Yes, ma'am.
15     Q. And in addition to Taxotere, Adriamycin and
16 Cytoxan, you also recommended radiation and hormonal
17 therapy, right?
18     A. Yes, ma'am.
19     Q. Why is that?
20     A. I can't remember specifically why I
21 recommended radiation therapy, maybe because of the
22 size of the lymph node. And then the hormonal
23 therapy because she was hormone receptor positive.
24     Q. Would it have been your practice to discuss
25 the risks and benefits of hormonal therapy with

26 (Pages 98 to 101)

102

1  Ms. Johnson?
2     A. Yes, ma'am.
3     Q. Tell me what you would have told her about
4  the benefits of hormonal therapy?
5     A. Uhmm, probably, you know, largely, you know,
6  hot flashes, bone mineral loss, some arthralgia, and
7  that might have been the things we would have
8  discussed.
9     Q. What are the risks that you would have told
10 her about as it relates to hormone therapy?
11    A. Uhmm, I thought that is what I just
12 answered, no?
13    Q. I thought you were saying benefits.
14    A. So the benefits of hormone therapy?
15    Q. Yes, let's go with benefits.
16    A. The benefits would have been, you know,
17 improved chance of the cancer not coming back. It
18 improves survival.
19    Q. Would it have been your practice to suggest
20 an alternative treatment for her?
21    A. Uhmm.
22    Q. Like alternate treatment options?
23    A. Yeah, we may have talked about that, I don't
24 know. I mean if there are two equivalent regimens,
25 sometimes I'll talk about both of them with the

103

1  patient. I can't recall if I did that with her or
2  not.
3     Q. If you had discussed two different treatment
4  regimens with her, would you have noted that? Would
5  it have been your practice to note that in the
6  record?
7     A. Uhmm, maybe or maybe not. I mean I might
8  have just documented the one that we were going to
9  use.
10    Q. Let's go back to the medical records and
11 look at 00036 again. And so at the bottom of that
12 page it says, "This case was discussed with
13 Dr. Barnhill and she is in agreement"; do you see
14 that?
15    A. Yes.
16    Q. Okay.
17       And so at some point your attending,
18 Dr. Barnhill, approved or agreed with the treatment
19 regimen that you had come up with for her, right --
20 for Ms. Johnson?
21    A. That was come up with, yes.
22    Q. Let's go to Page 00071. This is a visit
23 with Ms. Johnson on August 9, 2010, right?
24    A. August 9, 2010, right.
25    Q. I'm looking again at the first page, 00071,

104

1  the last paragraph on that?
2     A. Yes, ma'am.
3     Q. The first sentence reads: "We again
4  discussed with Ms. Johnson the risks and benefits of
5  chemotherapeutic intervention."
6       Do you see that?
7     A. Yes.
8     Q. The risks being nausea, vomiting, diarrhea,
9  hair loss, fatigue, malaise, changes in her nails,
10 1.7 percent risk of heart failure, a risk of acute
11 myelogenous leukemia, infection, fever, bleeding,
12 need for transfusion, peripheral neuropathy." Did I
13 read that correctly?
14    A. Yes, ma'am.
15    Q. Are those risks -- those are risks, many of
16 which we've already discussed, that it was your
17 practice to discuss with your patients, right?
18    A. Yes, ma'am.
19    Q. And so here you specifically discuss hair
20 loss, right?
21    A. Yes, ma'am.
22    Q. And you've already discussed that with
23 Ms. Johnson at this point, right?
24    A. I may have. I said "we again discussed." I
25 don't know which risks we'd discussed, because I

105

1  didn't detail it in the other note.
2     Q. Well tell me about your practice at that
3  time, in discussing the risks of the drugs. Because
4  this says "again." Was it your practice to discuss
5  the risks of the chemotherapeutic regimen at your
6  initial meeting and then again before chemotherapy?
7     A. Yeah. I mean, I may have discussed in broad
8  terms, you know, the risk of chemotherapy and the
9  benefit of chemotherapy, at the previous meeting.
10 And then a little bit more detailed when we were
11 actually discussing the chemotherapy. And I think
12 I'd given her the Micro Medic sheet at the previous
13 visit, if I'm not mistaken. And so then, you know,
14 it was just more of a discussion about it.
15       MS. BETHANCOURT: Off the record.
16       (Brief recess taken.)
17    MS. MIMS: On the record.
18    BY MS. MIMS:
19    Q. Dr. Lewis, before the break we were looking
20 at the August 9, 2010 medical record.
21    A. Yes, ma'am.
22    Q. Okay.
23       And we were looking at the paragraph, "We
24 again discussed the risks with Ms. Johnson" -- are
25 you there?

27 (Pages 102 to 105)

106

1    A. Yes, ma'am.
2    Q. And starting on the bottom of 71 and then
3  continuing to Page 72, I'm going to read that
4  sentence. "Ms. Johnson expressed understanding of
5  the risks associated with chemotherapy and signed a
6  consent to that effect." Do you see that?
7    A. Yes, ma'am.
8    Q. Earlier, when we were talking about the
9  records, you indicated that there was a consent that
10  you were surprised that you couldn't find. A
11  consent form. Do you remember that?
12    A. Yes, ma'am.
13    Q. Is this the consent form that you were
14  referring to?
15    A. Yes.
16    Q. The August 9, 2010 form, was that a consent
17  form that was standard practice for you to get a
18  chemotherapy patient, a breast cancer patient who
19  had been prescribed a chemotherapy regimen -- was it
20  standard practice for them to sign a consent format
21  that time?
22    A. Yes, ma'am.
23    Q. And this was prior to her first cycle of
24  chemotherapy, right?
25    A. Yes, ma'am.

107

1    Q. Tell me what you remember about that consent
2  form?
3    A. Uhmm. I mean that particular form -- I mean
4  I don't really have -- I haven't worked there for
5  seven years. So I mean, I don't really remember
6  that form specifically, except that there's a
7  section -- and a section where you can write in
8  risks and benefits. There's a section where you can
9  write in, like, benefits, risks; there's a section
10  that maybe has a list of risks preprinted. And then
11  there is, like, a signed area. And it's a basic
12  form, you know.
13    Q. Is it a fair assumption that the risks
14  listed in your medical record here, that are
15  specifically noted, would have been listed on that
16  consent form?
17    A. More than likely.
18    Q. So you would expect that because nausea,
19  vomiting and diarrhea are specifically laid out and
20  listed here, that they would have been on that
21  August 9, 2010 consent form?
22    A. Uhmm, yeah. I mean, I probably would have
23  written them on the form.
24    Q. Okay.
25      You would also expect that hair loss would

108

1  be on that August 9, 2010 consent form, right?
2    A. It might have been.
3    Q. And here it does not say anything about hair
4  loss being temporary or that it would regrow back;
5  it just says hair loss, right?
6    A. Yes, ma'am.
7    Q. And you would also expect that this risk of
8  heart failure, the risk of leukemia, they also would
9  have been listed on that consent form, right?
10    A. Probably, yes.
11    Q. And there would have been very serious
12  risks, such as the risk of death, listed on there,
13  right?
14    A. I don't know if I would have written death
15  on it.
16    Q. Okay.
17      But in writing, 1.7 percent risk of heart
18  failure?
19    A. I may have written heart failure; yes,
20  ma'am. I can't remember specifically what I put on
21  that form. But if I had mentioned it in the note I
22  may have put it on the consent form as well.
23    Q. Okay.
24      Now some of these risks are long-term risks,
25  right?

109

1    A. Uhmm, yes, ma'am.
2    Q. And you don't note in here when these risks
3  may happen?
4    A. I do not.
5    Q. And that probably wouldn't have been noted
6  on the consent form; is that fair to say?
7    A. Probably -- probably not.
8    Q. And is it fair to say that when describing
9  hair loss you wouldn't have put on the consent form,
10  This may or may not happen; the hair might grow
11  back?
12    A. Uhmm, I suspect -- I don't know. I don't
13  know what I would have specifically put on the
14  consent form. I mean, on the chart here, I just put
15  hair loss, not whether or not it would grow back or
16  whether or not it would be permanent or when it
17  would happen.
18    Q. Okay.
19      When you say that Ms. Johnson expressed
20  understanding of the risks associated with
21  chemotherapy, what do you mean by that?
22    A. Uhmm, I mean -- so usually what I would do
23  is I would discuss the risks and benefits of
24  treatment, and I would ask them if they understand
25  or have any questions. And they would say they

28 (Pages 106 to 109)

110

1  understand and ask questions if they had any, and
2  then sign the form.
3      Q. And if Ms. Johnson had refused to sign the
4  form, would you have proceeded with the
5  chemotherapy?
6      A. No, ma'am.
7      Q. So this note and the fact that she had went
8  on to get chemotherapy, leads to you believe that
9  she signed this form, consenting?
10     A. Yes, ma'am.
11     Q. If you go back, again on page 00071, under
12  History of Present Illness?
13     A. Yes.
14     Q. You'll see that it says "Ms. Johnson's case
15  was slightly complicated by a Port-A-Cath associated
16  thrombosis?
17     A. Yes, ma'am.
18     Q. Could you tell me what that means?
19     A. A blood clot where the Port-A-Cath was.
20     Q. And Ms. Johnson had to have her Port-A-Cath
21  replaced because of a blood clot, right?
22     A. Right.
23     Q. At the time that you were treating
24  Ms. Johnson, would it have been your practice to
25  e-mail any of your patients any information about

111

1  their treatment?
2      A. Uhmm, I mean, I don't remember doing that.
3      Q. At that time, would you suggest any programs
4  or support groups for breast cancer patients or
5  patients who are about to undergo chemotherapy?
6      A. Uhmm, I don't recall specifically doing
7  that.
8      Q. Do you discuss -- or would it have been your
9  practice to discuss with a breast cancer patient,
10  menopause in patients who are undergoing
11  chemotherapy treatment?
12     A. Uhmm, I don't know.
13     Q. Would you have warned patients?  Would it
14  have been your practice to warn patients about side
15  effects or adverse events related to menopause?
16     A. Uhmm, I mean, I can't remember if I did that
17  with Ms. Johnson or not.
18     Q. Let's move to Page 00099, please.
19     A. 91?
20     Q. 99.
21     A. Oh, 99.  Okay.
22     Q. Now this is a follow-up visit of yours with
23  Ms. Johnson on August 30, 2010; is that right?
24     A. Yes.
25     Q. And at that point she has had one cycle of

112

1  chemotherapy, right?
2      A. Uhmm, yes.
3      Q. At this time on August 30, 2010, after one
4  cycle of chemotherapy, Ms. Johnson had reported
5  having nausea and vomiting; is that correct?
6      A. Right.
7      Q. But she reports that she's feeling overall
8  well; is that also correct?
9      A. Yes.
10     Q. If Ms. Johnson had lost hair at this point
11  during her chemotherapeutic regimen after her first
12  cycle, would you have noted it in the record?
13     A. Uhmm, possibly not.
14     Q. You weren't in the practice to note in the
15  record if a patient lost hair during chemotherapy?
16     A. Uhmm, not as a routine practice.
17     Q. Why not?
18     A. Uhmm.  I don't know why not.
19     Q. Is it because most of your patients lost
20  their hair?
21     A. Uhmm, I mean, that could be.
22     Q. If Ms. Johnson has testified in this case
23  that she lost all of her hair after the first cycle
24  of chemotherapy, do you have any reason to
25  disbelieve that?

113

1      A. Uhmm, no, not sitting here right now.
2      Q. Did you have other patients who would lose
3  all thereof hair after the first cycle of
4  chemotherapy?
5      A. Uhmm, I mean, I can't remember specific
6  patients losing their hair after the first cycle.
7      Q. As you sit here, you can't remember a single
8  patient losing their --
9      A. No.
10     Q. Losing their hair after the first cycle of
11  chemotherapy?
12     A. No.  Like, specifically remembering one
13  cycle down and all the hair is gone.  I mean, it
14  seems fast.
15     Q. Would it surprise you if a patient lost all
16  of their hair after only one cycle of chemotherapy?
17     A. Uhmm, yeah, maybe a little bit.
18     Q. Let's go to Page 00081, and this is an
19  October 11, 2010, visit that you had with
20  Ms. Johnson; is that correct?
21     A. October 11, 2010, yes.
22     Q. Is Ms. Johnson still having side effects
23  from the chemotherapy?
24     A. She is.
25     Q. What side effects are those?

29 (Pages 110 to 113)

114

1    A.  She reports that she had some nausea and
2  vomiting a couple of weeks ago, but had stopped
3  taking her -- I'm just reading from the note here --
4  stop taking her antiemetics upon reading discussion
5  of her antiemetic therapy.  I'm not sure about that.
6  But nausea had resolved.  So it sounds like she had
7  some nausea which has resolved.  She's eating but
8  losing weight.
9    Q.  If you turn to Page 00082, and I'm reading
10  from the top.  After Ramen noodles, the first full
11  sentence.  "She is interested in continuing her
12  chemotherapy."
13      Do you see that sentence?
14    A.  Yes, ma'am.
15    Q.  Would it have been your practice, as a
16  person is going through there chemotherapy
17  treatment, to discuss with them as they begin to
18  have side effects from the chemotherapy, to ask
19  them, Do you still want to continue?
20    A.  That is my current practice.  That's what I
21  do.
22    Q.  Why do you do that?
23    A.  Uhmm, just to see -- get an idea of where
24  the patient is with regard to how they're doing,
25  right?  If a patient says I'm not interested in

115

1  doing this anymore, then we stop treatment.
2    Q.  Do you have any reason to believe that your
3  practice would have been any different with
4  Ms. Johnson?
5    A.  Uhmm, no, I have no reason to believe that,
6  no.
7    Q.  It appears from your note that Ms. Johnson
8  indicated that despite the side effect, she wanted
9  to go ahead and continue with her chemotherapy,
10  right?
11    A.  Yes, ma'am.
12    Q.  Let's go to Page 00109.  This is a November
13  1, 2010 follow-up that you had with Ms. Johnson,
14  right?
15    A.  November 1, 2010; yes, ma'am.
16    Q.  Now, on November 1, 2010, at this point she
17  has had four cycles of chemotherapy; is that right?
18    A.  It looks like it, yes, ma'am.
19    Q.  And you've prescribed six, right?
20    A.  Yes, ma'am.
21    Q.  In each of the records that we've looked at
22  so far, there is no mention of hair loss; is that
23  right?
24    A.  Yes, ma'am.
25    Q.  And when I say no mention of hair loss, I

116

1  don't mean discussing the risk of hair loss.  There
2  is no mention of Ms. Johnson complaining of or
3  having hair loss at this point, just to clarify; is
4  that accurate?
5    A.  Yes, ma'am.
6    Q.  If you look at 00110, under Number 7, under
7  Assessment and Plan?
8    A.  Yes.
9    Q.  The last sentence reads, "I am hesitant to
10  do this as she is tolerating the chemotherapy well."
11      What did you mean by that?
12    A.  Uhmm, probably that overall, I mean, she's
13  tolerating things without too much difficulty.  I
14  mean, despite having some weight loss.
15    Q.  And despite the side effects that are
16  mentioned in the notes, right?
17    A.  Yes, ma'am.
18    Q.  Let's turn to 00122, please.  This is a
19  November 22, 2010 follow-up that you had with
20  Ms. Johnson, correct?
21    A.  November 22, 2010; yes, ma'am.
22    Q.  And if you go and look at 00123, under
23  History of Present Illness?
24    A.  Yes, ma'am.
25    Q.  I'm reading, starting with the third

117

1  sentence:  "She does report that she had some
2  diarrhea Thursday through Sunday, resolved on its
3  own."  That is November 18, 2010 through
4  November 21, 2010.
5      "She does report that when her diarrhea
6  started she had some blood on her tissue with
7  wiping.  However, that also resolved.  She is
8  interested in continuing chemotherapy for her sixth
9  and final cycle."
10      Did I read that correctly?
11    A.  Yes.
12    Q.  So is this note, again, relating to your
13  practice of discussing with your patient that given
14  the side effects of the chemotherapy treatment that
15  you've prescribed, do they still want to go on; is
16  that fair?
17    A.  Yes, ma'am.
18    Q.  And Ms. Johnson indicated that despite the
19  side effects she was having, she wanted to continue
20  with her chemotherapy treatment, right?
21    A.  Yes, ma'am.
22    Q.  Let's go to 00053.  At the top of this
23  document it says, "Patient consent to medical
24  treatment or surgical procedure and acknowledgment
25  of receipt of medical information."

30 (Pages 114 to 117)

118

```
1        Do you see that?
2     A. Yes.
3     Q. And is this a chemotherapy consent form?
4     A. Yes.
5     Q. Okay.
6        This is a consent to some risks of
7  chemotherapy; is that right?
8     A. Yes.
9        MS. MIMS:  I am actually at this point going
10       to introduce this as an exhibit separate
11       from the larger stack.  So I'm going to mark
12       as Exhibit H -- and it's 00503 through
13       00505.  And I'll give you this copy.
14          You have it in your stack.  Do you want
15       an additional copy?
16       MR. SCHANKER:  Sure.
17       (Whereupon Exhibit H was marked for
18       identification.)
19  BY MS. MIMS:
20    Q. All right.
21       We're looking at what's been marked as
22  Exhibit H.  And I believe you said that you
23  recognize this document, right?
24    A. Yes, ma'am.
25    Q. Tell me what it is.
```

119

```
1     A. A consent for chemotherapy.
2     Q. And this is on LSU hospital letterhead,
3  right?
4     A. Yes, ma'am.
5     Q. Was it standard practice at LSU to do a
6  consent form for chemotherapy at that time?
7     A. Yes, ma'am.
8     Q. Why would it have been the practice to get a
9  consent for chemotherapy treatment at the end of her
10 chemotherapy regimen?
11    A. That I don't know.  Now this was -- I would
12 have to go back and look at the date.
13    Q. Well, let's do that.  Let's turn to 00505.
14 And do you see that there is a patient signature
15 line, right?
16    A. Yes.
17    Q. And next to that is a date that says
18 11/30/10; do you see that?
19    A. Yes.
20    Q. And there's also a line at very bottom of
21 that for a physician certification?
22    A. Yes.
23    Q. And that's your name, right?
24    A. Yes, ma'am.
25    Q. And is that your signature?
```

120

```
1     A. Yes, ma'am.
2     Q. And the date and time that's on there for
3  your signature is 11/15/2010, right?
4     A. Right.
5     Q. How would it be that the dates are
6  difference?  Well, actually if you look at it
7  closely -- if you look at the date, under patient
8  signature, does it appear that that date, there's
9  something written over in that date?  Could you tell
10 me what that date actually is?
11    A. It's hard to.  It's hard to -- it looks like
12 11/36/2010?
13    Q. Well, we know there is no 11/36/2010 right?
14    A. Yes, ma'am.
15       MS. BETHANCOURT:  Can we take a poll?  I
16       will tell you what I think it looks like.
17  BY MS. MIMS:
18    Q. Ms. Johnson at this point had already signed
19 a consent form on August 9, 2010, right?
20    A. Right.
21    Q. And you had discussed the risks with her a
22 number of times at your visits --
23    A. Right.
24    Q. -- in talking about her chemotherapeutic
25 regimen, right?
```

121

```
1     A. Yes.
2     Q. So why would it be that she was signing
3  another consent form?
4     A. I don't know.  It says here that the consent
5  expired, and they wanted another one on file.  And
6  I'm not sure.
7     Q. And do you remember a practice associated
8  with that, where you would get more than one consent
9  form?
10    A. Uhmm, if -- so there's some times if people
11 were getting treatment that was ongoing, then they'd
12 be re-consented.  Yeah.
13    Q. And by treatment that is ongoing, that could
14 be something like chemotherapeutic regimens, cycles
15 that was receiving?
16    A. Right.
17    Q. If you look at the top of Page 00504, and it
18 says, Risks Identified By the Louisiana Medical
19 Disclosure Panel; do you see that?
20    A. Yes, ma'am.
21    Q. What is the Louisiana Medical Disclosure
22 Panel?
23    A. I guess -- honestly, I don't know.
24    Q. Do you have an understanding as to whether
25 this consent form was required by the Louisiana
```

31 (Pages 118 to 121)

122

1   Medical Disclosure Panel?
2       A.  I suspect that the consent form was required
3   by the LSU hospital.
4       Q.  One of the things listed as a risk
5   identified by the Louisiana Medical Disclosure Panel
6   is hair loss; do you see that?
7       A.  Yes, ma'am.
8       Q.  It's the first risk, correct?
9       A.  Yes.
10      Q.  Would it have been your practice to discuss
11  the risks that are listed here on this consent form
12  with Ms. Johnson before she signed it?
13      A.  Uhmm, I mean typically I'd go through the
14  form with the patient.
15      Q.  And with respect to hair loss, it doesn't
16  say anything with respect to whether the hair loss
17  will be temporary or permanent, does it?
18      A.  No, ma'am.
19      Q.  It just lists hair loss, right?
20      A.  Right.
21      Q.  In addition to hair loss, it would have been
22  your practice to go through other risks that are
23  identified here by the Louisiana Medical Disclosure
24  Panel?
25      A.  I know often what I do if I am going through

123

1   a form, I go over the whole thing with the patient.
2   It's not unusual for me.
3       Q.  So it would not have been unusual for you to
4   review, in addition to the hair loss, to let
5   Ms. Johnson know that a risk of chemotherapy was
6   damage to blood forming organs, which is may result
7   in bleeding, infections, anemia, and possible need
8   for transfusion, right?
9       A.  Right.
10      Q.  And it would not have been unusual for you
11  to discuss the damage to brain, heart, kidneys,
12  liver, lungs, nervous system and skin, right?
13      A.  Right.  Or if sometimes if I think those
14  aren't big risks, I would tell them that this might
15  not be such a big deal.  Whether or not I did that
16  then, I don't know.  I often would go through the
17  consent form; yes, ma'am.
18      Q.  When you say that you might tell them that
19  you don't think it's a big risk, you mean the
20  percentage chance that that risk would happen to
21  them?
22      A.  Right.
23      Q.  That's not something that you would have
24  said with respect to hair loss and chemotherapy,
25  right?

124

1       A.  I mean I can't -- I can't remember
2   specifically.  But for this regimen, I probably
3   would not have said that it was a minor risk,
4   meaning that it was likely to happen.
5       Q.  How long would you have spent going through
6   a consent form like this with a patient?
7       A.  I have no way of knowing.
8       Q.  If you look at page 00505?
9       A.  Yes, ma'am.
10      Q.  And there is a witness signature line.  Do
11  you have any idea who that is?
12      A.  I don't.
13      Q.  On the first page, where it's the
14  description of treatment, and it says chemotherapy?
15      A.  Yes, ma'am.
16      Q.  Is that your handwriting?
17      A.  It is not.
18      Q.  So on the first pages, any of that your
19  handwriting?
20      A.  It is not.
21      Q.  Do you recognize the handwriting?
22      A.  I do not.
23      Q.  But that's your signature on Page 00505,
24  right?
25      A.  It is.

125

1       Q.  Let's turn to Page 00126.  Are you on 126?
2       A.  Yes, ma'am.
3       Q.  This is a December 6, 2010 visit with
4   Ms. Johnson, correct?
5       A.  Yes, ma'am.
6       Q.  And at this time is Ms. Johnson still having
7   side effects of chemotherapy?
8       A.  So I have written on 000127 under History of
9   Present Illness, "She reports some mild peripheral
10  neuropathy in her fingers and toes.  Denies nausea,
11  vomiting or diarrhea.  Denies chest pain and
12  shortness of breath."
13      Q.  Are those side effects that you just read
14  into the record, side effects that you would expect
15  were the result of her chemotherapy treatment?
16      A.  Uhmm, I mean -- I mean in general; yes,
17  ma'am.
18      Q.  Looking at that record from December 6,
19  2010, there is also no mention of hair loss in
20  there, is there?
21      A.  No, ma'am.
22      Q.  If you could turn to 00175, please.  This
23  Page 00175 represents a follow-up on February 28,
24  2011; is that right?
25      A.  Yes, ma'am.

32 (Pages 122 to 125)

126

1    Q.  And if you could look at 00176, in the
2  middle of the page, "I discussed with Ms. Johnson."
3  Do you see that paragraph?
4    A.  I do.
5    Q.  It says, "I discussed with Ms. Johnson the
6  next phase of her breast cancer management, which is
7  hormonal therapy, since her breast cancer is
8  ER-positive."  Do you see that?
9    A.  Yes.
10    Q.  In addition to the chemotherapy you had also
11  prescribed hormonal therapy?
12    A.  Yes, ma'am.
13    Q.  And why is that?
14    A.  I noted an inpatient with hormone receptor
15  positive breast cancer there's a benefit to adjuvant
16  hormonal therapy.
17    Q.  The ER-positive, how does that impact
18  hormonal therapy?
19    A.  Oh, that's the marker of hormone receptor
20  positivity.  I mean, if you're negative then you
21  don't give hormonal therapy afterwards.
22    Q.  So ER-positive means that the patient may be
23  receptive to hormonal therapy, right?
24    A.  Yes, ma'am.
25    Q.  And those are the cases in which you'll

127

1  prescribe hormonal therapy, right?
2    A.  Yes, ma'am.
3    Q.  And you prescribed Arimidex for Ms. Johnson?
4    A.  Yes.
5    Q.  If you look later on in that same paragraph,
6  it reads, "The risks and benefits of Arimidex were
7  discussed with the patient, namely bone loss and the
8  risk of fracture of myologias -- did you pronounce
9  that right?
10    A.  It's probably risk of fracture or of
11  myalgia.
12    Q.  Or of myalgia.  Okay.
13       And it goes on to talk about the risk of
14  some discomfort consisting of nausea, vomiting and
15  diarrhea; is that correct?
16    A.  Yes, ma'am.
17    Q.  Now in the next sentence it also indicates
18  that Ms. Johnson signed a consent regarding
19  treatment with Arimidex, right?
20    A.  Yes, ma'am.
21    Q.  Would it -- do you -- strike that.
22       The consent for hormonal therapy with
23  Arimidex, is that something that you're surprised
24  not to find in the record as well?
25    A.  Uhmm, oh, I guess yes and no.  Because I

128

1  mean, I specifically said that it was signed, but it
2  did not strike me when I was going through the
3  chart.
4    Q.  Okay.
5       You would expect, though, a consent form for
6  hormonal therapy to be included in the record, given
7  this note?
8    A.  Yes.  I mean, if I had said that, a consent
9  was signed.
10    Q.  Tell me how you would have described the
11  risks to Ms. Johnson of hormonal therapy?
12    A.  I mean probably similar to what's in the
13  thing here.  Fractures, myalgia -- I mean, nausea.
14  These are probably what I would have mentioned to
15  her.
16    Q.  Would you have discussed the risk of going
17  through menopause while on hormonal therapy?
18    A.  Probably not.  Because -- I mean, it looks
19  like she hadn't had a period in over a year, so she
20  might already have been menopausal.
21    Q.  Why did you choose Arimidex for Ms. Johnson?
22    A.  I can't recall a specific reason why I chose
23  that medicine.
24    Q.  Arimidex is an aromatase inhibitor; is that
25  right?

129

1    A.  Yes, ma'am.
2    Q.  How do aromatase inhibitors work, if you
3  know?
4    A.  Uhmm, they inhibit the enzyme aromatase.
5    Q.  How long do you generally prescribe them
6  for?
7    A.  Several years.  Five years, I believe.  And
8  I think there is a recent -- there might be a recent
9  literature that ten years might be better, but I'm
10  not 100 percent sure.
11    Q.  Is one of the reasons that you prescribed it
12  because it reduces the risk of recurrence of cancer?
13    A.  Yes, ma'am.
14    Q.  How long did you prescribe Arimidex for, for
15  Ms. Johnson?
16    A.  Uhmm, I suspect my intention would be to do
17  it for five years.
18       MS. MIMS:  I will mark Deposition Exhibit I,
19  and I will hand you that.
20       (Whereupon Exhibit I was marked for
21       identification.)
22  BY MS. MIMS:
23    Q.  What I've marked as deposition Exhibit I,
24  that's a copy of the Arimidex label; is that
25  accurate?

33 (Pages 126 to 129)

130

1    A. Yes, ma'am. It looks like the Arimidex
2  package insert from the FDA.
3    Q. Have you ever looked at the Arimidex label
4  before?
5    A. I can't recall doing so; no, ma'am.
6    Q. On the first page there is a list in the
7  right-hand column of adverse reactions; do you see
8  that?
9    A. Uhmm. Yes, ma'am.
10    Q. Looking at that list of adverse reactions,
11  would you have warned Mrs. Johnson, told her about
12  any of the risks that are listed there?
13    A. Uhmm, I mean, I did discuss with her the
14  nausea, the vomiting, fractures, uhmm, nephralgia.
15    Q. Could you turn to Page 12, please?
16    A. Yes, ma'am.
17    Q. Just to give some context, on Page 11, a
18  list is started that discusses adverse reactions; do
19  you see that?
20    A. On Page 11?
21    Q. Yes. And it continues on to Page 12.
22    A. Yes.
23    Q. One of the things listed on Page 12 is hair
24  thinning, and then in parentheses it says alopecia;
25  do you see that?

131

1    A. Uhmm.
2    Q. Next to skin and appendages. Sorry, I
3  should have pointed that out.
4    A. Yes.
5    Q. So hair thinning and alopecia were a risk of
6  Arimidex; is that fair to say, given this label?
7    A. Yes.
8    Q. Would you have discussed the risk of
9  alopecia with Ms. Johnson regarding her hormonal
10  therapy?
11    A. I do not remember if I did or not. I don't
12  know.
13    Q. If you could turn to Page 34. On Page 34
14  there is a list continued from Page 33. Turn back
15  to 33. It says, "Common side effects in women
16  taking Arimidex include" -- and then it last a list
17  of side effects; do you see that?
18    A. I do.
19    Q. One of those side effects listed as a common
20  side effect is thinning of hair, and then in
21  parentheses it says "hair loss"; do you see that?
22    A. Yes.
23    Q. Was it your understanding, in the time
24  period that you were treating Ms. Johnson, that hair
25  loss and hair thinning was a common side effect of

132

1  the hormonal therapy Arimidex?
2    A. I can't remember.
3    Q. You can put that aside now. Thank you.
4      Let's turn to 00165, if you would, please,
5  Dr. Lewis.
6    A. Okay.
7    Q. And this is a visit dated April 11, 2011; do
8  you see that?
9    A. Yes.
10    Q. Were you able to tell from the records
11  whether this was your last visit with Ms. Johnson?
12    A. I think this was.
13    Q. Do you know or do you remember why it was
14  that you stopped seeing Ms. Johnson as a patient?
15    A. I graduated from fellowship.
16    Q. All right.
17      Let's look at 00165. And at this point
18  Ms. Johnson is complaining about numbness in her
19  hands; do you see that?
20    A. Yes.
21    Q. Is that a side effect that you would expect
22  to see from chemotherapy?
23    A. Yes, ma'am. Numbness and tingling occurs
24  with chemotherapy -- can occur.
25    Q. If you turn to Page 00167, and I'm looking

133

1  at paragraph with the number 3?
2    A. Yes, ma'am.
3    Q. Starting with the third sentence, "She
4  inquired about receiving disability secondary to her
5  neuropathy. I told her that if this is persistent
6  then we will assist her with that in whatever of way
7  we can, although I am hesitant to do so now as she
8  still seems to be able to maintain her activities of
9  daily living."
10    A. Yes.
11    Q. What did you mean by that?
12    A. Uhmm, I was just wondering if she was -- I
13  mean, it says here she inquired about receiving
14  disability secondary to the neuropathy, and I told
15  her that we would assist her in whatever way she
16  can, but she was still able to function, so maybe
17  give it a little bit of time.
18    Q. Do you know whether Ms. Johnson ever went on
19  disability?
20    A. I do not know, ma'am.
21    Q. Did you ever tell Ms. Johnson, during the
22  course of your treatment with her, that her hair
23  would absolutely regrow and that it was temporary?
24      MR. THORNTON: Objection. Asked and
25      answered.

34 (Pages 130 to 133)

134

1    A. I don't remember specifically saying that;
2 no, ma'am.
3    Q. Do you ever counsel or warn patients about
4 hair loss related to other medications or other
5 treatments that they might not be undergoing, other
6 than chemotherapy?
7    A. Uhmm, such as? I mean, if I think hair loss
8 is a particular risk, then I might mention it. But
9 I don't -- I'm trying to think. I mean, I don't
10 know.
11    Q. So as you sit here, can you think of any
12 other prescription drug that you might give to
13 someone in which you list hair loss as a risk?
14    A. Not off the top of my head; no, ma'am.
15    Q. How often do your patients with breast
16 cancer experience alopecia during chemotherapy?
17    A. Uhmm, I mean I guess I don't know an exact
18 number. So that would be hard for me to tell what
19 percentage of patients undergo hair loss with
20 chemotherapy.
21    Q. Would you say it's most of your patients who
22 undergo chemotherapy have hair loss?
23    A. I think that's fair.
24    Q. How many months after treatment with
25 chemotherapy would you expect a patient's hair to

135

1 regrow?
2    A. I don't know. I mean I don't -- I don't --
3 I don't know.
4    Q. Have you ever had a patient whose hair has
5 not regrown, who comes to you and says, My hair
6 hasn't regrown; when can I expect it to regrow?
7    A. I can't recall a specific incident like
8 that; no, ma'am.
9    Q. If a patient's hair had not grown back six
10 months after they were done and completed with their
11 chemotherapy regimen, would you expect it to still
12 regrow?
13    A. Oh, I mean, I don't know. If they're all
14 done with the chemotherapy? I mean I'd have to look
15 and see when the average time for regrowth is. I
16 don't know that off the top of my head.
17    Q. If a patient's hair hasn't regrown after a
18 year of completing chemotherapy treatment, would you
19 expect that it might at some point regrow?
20    A. I mean a year is a fairly long time. I mean
21 just like I said before, I'm not sure. But after
22 a year I might suppose that it doesn't -- it won't
23 grow back.
24    Q. So if a patient came to you after a year and
25 their hair had not regrown back and they said to

136

1 you --
2    A. When will it happen?
3    Q. -- when is this going to happen; is it now
4 permanent, what would you your answer be?
5    A. I might say that it might very well be.
6    Q. The same question after two years. If a
7 patient's hair hasn't grown back, would you consider
8 at that point that it's probably not going to grow
9 back?
10    A. I mean, like I said before, without --
11 without -- I don't know what the average is, but two
12 years seems like a long time, just sitting here.
13    Q. And how about three years. Does that seem
14 like a very long time to go without their hair
15 having regrown back in after chemotherapy treatment
16 had concluded?
17    A. It seems like you could expect it to grow
18 back after three years, but . . .
19    Q. Have you ever observed a patient's hair who
20 hair regrew, but it grew back with a different
21 texture?
22    A. Yes, ma'am.
23    Q. How often have you observed that?
24    A. I don't know a specific number of times. I
25 can just think of a specific example or two -- two

137

1 specific examples.
2    Q. Two specific examples. How about a patient
3 for whom -- a breast cancer patient for whom her
4 hair grew back but it was thinner; have you had that
5 experience with patients?
6    A. I cannot remember a specific patient in that
7 regard.
8    Q. I know that you said that you don't treat a
9 lot of breast cancer patients.
10    A. I don't.
11    Q. That being said, do you have a particular
12 way that you manage the expectations of your
13 patients when they ask you about hair loss and
14 chemotherapy?
15    A. Not a specific way; no, ma'am.
16    Q. When you explain hair loss to a patient,
17 what do you tell them?
18    A. Uhmm, I guess it depends. A lot of times I
19 just tell them that your hair will fall out. The
20 majority of the time -- I mean typically, I tell
21 them that their hair will fall out if I believe that
22 it will.
23    Q. Has your practice with respect to counseling
24 women with breast cancer about hair loss -- you said
25 that it changed; at some point you started saying,

138

1  Well, it might be permanent, right?
2      A. Yes, ma'am.
3      Q. That change that occurred, was that specific
4  to any particular chemotherapeutic drug or did that
5  change occur, in saying that it might be permanent,
6  do you now say that in terms of all chemotherapeutic
7  drugs?
8      A. Yeah, just in general.
9      Q. Has a patient ever suggested to you that
10 they want to stop their treatment with chemotherapy
11 because of hair loss -- a breast cancer patient?
12     A. Uhmm, I've not had a patient stop therapy as
13 a result of hair loss, that I can recall.
14     Q. Have you ever reviewed any updates to the
15 Taxotere label between 2010 and today?
16     A. I've looked at Taxotere label between 2010
17 and today.
18     Q. What reason was it that you were looking at
19 the label for?
20     A. I -- I mean, I can't recall a specific
21 reason.  Just review, I think.
22     Q. You testified earlier that you do prescribe
23 Taxotere currently for patients, right?
24     A. Yes, ma'am.
25     Q. And you mentioned prostate cancer patients.

139

1  Do you still prescribe Taxotere for your breast
2  cancer patients?
3      A. Uhmm, I'm not sure what chemotherapy.  I
4  can't remember which chemotherapy.  I don't know.  I
5  mean, I have to say I don't know.  I mean I think
6  the one patient that we have is on the ACT regimen,
7  instead of TAC regimen.
8      Q. Do you know whether you have any patients
9  who you've prescribed -- breast cancer patients who
10 you've prescribed the TAC regimen to?
11     A. Not recently; no, ma'am.
12     Q. After having reviewed Ms. Johnson's medical
13 records in preparation for this deposition and in
14 our discussions here today, do you have any reason
15 to believe that back in 2010, when you prescribed
16 the TAC regimen for Ms. Johnson, that you would do
17 that any differently today?
18     A. Uhmm, I -- I mean I -- I guess I would
19 probably -- yeah.  I think it would be unreasonable
20 for me to treat her in a similar manner.  If -- now
21 if she does have permanent alopecia, and I took that
22 knowledge back with me to 2010, then maybe we would
23 have -- I mean, I don't know, you know?  But I don't
24 see any reason to do anything different now.
25     Q. Well, let's explore that.  If she has

140

1  permanent alopecia and you are saying you took that
2  back to 2010, what does that mean; does that mean
3  you would prescribe a different chemotherapy
4  regimen?
5      A. Uhmm, I guess I don't know.  I was maybe
6  speaking without thinking.  I don't know.  I don't
7  know if I would have done anything different.  My
8  suspicion is that I would have done things in a
9  similar way; yes, ma'am.
10     Q. Do you consider the risk of permanent
11 alopecia outweighed by the benefits of prescribing a
12 regimen such as the TAC regimen that you prescribed
13 for Ms. Johnson?
14     A. Me, personally?  Uhmm, I mean, I don't.  I
15 mean I don't think that that risk outweighs the
16 benefits, personally.
17     Q. And if you were counseling a patient who was
18 considering the risks of permanent alopecia in
19 trying to balance that with the benefits, what would
20 you tell them?  Would you tell them about the
21 increased long-term survival if getting
22 chemotherapy?
23         MR. THORNTON: Objection.  Incomplete
24         hypothetical.
25     A. Yeah, I guess it would be hard for me to

141

1  know what I would -- I guess I don't know.
2      Q. As you sit here today?
3      A. Yes, ma'am.
4      Q. We've established that you don't have an
5  independent recollection of Ms. Johnson, right?
6      A. Yes, ma'am.
7      Q. Assuming that Ms. Johnson did have hair loss
8  back in 2009, could you say with any degree of
9  medical certainty as to what caused that hair loss?
10         MR. THORNTON: Objection.  Lacks foundation.
11     A. Uhmm, I mean, I guess I don't know.
12     Q. Do you allow -- or back in 2010 and '11, the
13 time frame when were you treating Ms. Johnson, did
14 you ever talk to sales representatives from
15 pharmaceutical companies?
16     A. Uhmm, I can't remember specifically.  I
17 can't remember a specific pharmaceutical company,
18 but we would have -- I mean, I've had conversations
19 with drug representatives; yes, ma'am.
20     Q. Is that something that you would also do as
21 a fellow during that period of time -- you would
22 talk to pharmaceutical sales reps?
23     A. When I was a fellow, yes.
24     Q. Regardless of whether you can remember any
25 specific sales rep.

36 (Pages 138 to 141)

| | 142 |
|---|---|

1    A. Sure.
2    Q. What types of information would you get from
3 a pharmaceutical sales rep, just generally?
4    A. Generally, it's a discussion of the FDA
5 approval or a recent study.
6    Q. Do you remember -- go ahead.
7    A. No, never mind.
8    Q. Do you remember any specific discussions
9 with sales reps regarding chemotherapeutic drugs at
10 that time?
11    A. Nothing specific.
12    Q. Did a sale rep ever contact you about
13 Taxotere, that you can recall?
14    A. Uhmm, I don't remember that.
15    Q. Do you recall the names of any sales reps
16 who you would have spoken to in 2010 and '11?
17    A. No, ma'am.
18    Q. Do you recall ever being shown any materials
19 about Taxotere?
20    A. In 2010?
21    Q. In 2010 and '11.
22    A. No, ma'am.
23    Q. When you have discussions with sales reps,
24 generally how long are your conversation was them?
25    A. A few minutes.

| | 143 |
|---|---|

1    Q. And do you rely on sales representatives as
2 the only source of information about the medications
3 you prescribe?
4    A. No, ma'am.
5    Q. Have you ever attended any Sanofi-Aventis
6 events related to Taxotere?
7    A. No, I don't recall doing that; no, ma'am.
8    Q. Have you ever had any contact with
9 Sanofi-Aventis regarding Taxotere?
10    A. In what way? I mean I don't think so.
11    Q. Have you ever reported an adverse event to
12 Sanofi?
13    A. I don't think so; no, ma'am.
14    Q. Do you know, as you sit here today, in 2010,
15 when Ms. Johnson was prescribed her chemotherapeutic
16 regimen, whether Ms. Johnson would have received a
17 generic version of Taxotere or the brand name?
18    A. I have no way of knowing that.
19    Q. Do you know what the hospital's policy was
20 in terms of if you prescribed the TAC regimen,
21 whether they would use the brand name if it was
22 available or use the generic if it was available?
23    A. I mean, I don't know.
24    MS. MIMS: Off the record.
25    (A discussion was held off the record.)

| | 144 |
|---|---|

1    MS. MIMS: We're back on the record. I have
2 no further questions for the witness. And
3 we apparently are going to end the
4 deposition prior to completion, because
5 Dr. Lewis's counsel has a conflict, and she
6 can explain that.
7    MS. BETHANCOURT: Yes, I have a conflict
8 with another meeting, and it is not probable
9 that this can be concluded over the time
10 that I would be able to allow for set-up of
11 any other alternative arrangement. So I'm
12 asking that we conclude at another time,
13 especially based on the fact that we were
14 told four hours and that was what was
15 allotted.
16    MR. THORNTON: All right, very well. Are we
17 going to transcribe this record?
18    MS. MIMS: I would object to transcribing
19 this record, because if we're going to
20 continue the deposition, it should be
21 continued as if we were still sitting here
22 going through it. I'm going to object to
23 having a draft given to the plaintiffs to
24 have additional time to prepare for the
25 continuation of the deposition.

| | 145 |
|---|---|

1    MR. THORNTON: It happens in continued
2 depositions.
3    MS. MIMS: It does. I can also object.
4    MR. THORNTON: I want the record
5 transcribed. I don't think it's necessary
6 -- I mean if for some reason something
7 terrible were to happen to the doctor, I
8 suppose we could argue about whether we have
9 a record or not. But in any event, we'll
10 try -- when is the likely date for
11 reschedule?
12    MS. BETHANCOURT: Neither of us have looked
13 at our calendars.
14    MR. THORNTON: I understand.
15    MS. MIMS: And in terms of a draft of the
16 transcript, we're going to have to get back
17 to you on that, because I think that's
18 something that we may want to bring up in
19 terms of either party getting a draft
20 transcript prior to the completion of the
21 deposition.
22    THE REPORTER: Off the record.
23
24    (Deposition adjourned at 4:59 p.m.)
25

37 (Pages 142 to 145)

146

```
 1          C E R T I F I C A T E
 2
 3       Certification is valid only for a transcript
 4   accompanied by my original signature and
 5   Original required seal on this page.
 6
 7       I, Marybeth E. Muir, Certified Court
 8   Reporter in and for the State of Louisiana, and
 9   Registered Professional Reporter, as the officer
10   before whom this testimony was taken, do hereby
11   certify that BRIAN E. LEWIS, after having been duly
12   sworn by me upon authority of R.S. 37:2554, did
13   testify as hereinbefore set forth in the foregoing
14   145 pages; that this testimony was reported by me in
15   the stenotype reporting method, was prepared and
16   transcribed by me or under my personal direction and
17   supervision, and is a true and correct transcript to
18   the best of my ability and understanding; that the
19   transcript has been prepared in compliance with
20   transcript format guidelines required by statute or
21   by rules of the board, and that I am informed about
22   the complete arrangement, financial or otherwise,
23   with the person or entity making arrangements for
24   deposition services; that I have acted in compliance
25   with the prohibition on contractual relationships,
```

147

```
 1   as defined by Louisiana Code of Civil Procedure
 2   Article 1434 and in rules and advisory opinions of
 3   the board; that I have no actual knowledge of any
 4   prohibited employment or contractual relationship,
 5   direct or indirect, between a court reporting firm
 6   and any party litigant in this matter nor is there
 7   any such relationship between myself and a party
 8   litigant in this matter.  I am not related to
 9   counsel or to the parties herein, nor am I otherwise
10   interested in the outcome of this matter.
11
12
         This 13th day of December, 2017.
13
14
15
16
17
         _____
         MARYBETH E. MUIR, CCR, RPR
18
19
20
21
22
23
24
25
```

148

```
 1          C E R T I F I C A T E
 2
 3       I, BRIAN E. LEWIS, do hereby certify that I have
 4   read or have had read to me the foregoing transcript
 5   of my testimony given on December 11, 2017, and find
 6   same to be true and correct to the best of my
 7   ability and understanding with the exceptions noted
 8   on the amendment sheet;
 9
10   CHECK ONE BOX BELOW:
11   ( ) Without Correction.
12   ( ) With corrections, deletions, and/or
13       additions as reflected on the errata
14       sheet attached hereto.
15
16       Dated this ____ day of _____, 2017.
17
18
         _____
19       BRIAN E. LEWIS
20
21
22
23
24   Reported by:  Marybeth E. Muir, CCR, RPR
25
```

149

```
 1        DEPOSITION ERRATA SHEET
 2   Page No._____ Line No._____ Change to:_____
 3   Reason for change:_____
 4   Page No._____ Line No._____ Change to:_____
 5   Reason for change:_____
 6   Page No._____ Line No._____ Change to:_____
 7
 8   Reason for change:_____
 9   Page No._____ Line No._____ Change to:_____
10
11   Reason for change:_____
12   Page No._____ Line No._____ Change to:_____
13   Reason for change:_____
14   Page No._____ Line No._____ Change to:_____
15   Reason for change:_____
16
17   Page No._____ Line No._____ Change to:_____
18   Reason for change:_____
19
20
21   SIGNATURE:_____DATE:_____
         BRIAN E. LEWIS
22
23
24
25
```

38 (Pages 146 to 149)

150

```
1              DEPOSITION ERRATA SHEET
2    Page No._____Line No._____Change to:_____
                  _____
3    Reason for change:_____
4
5    Page No._____Line No._____Change to:_____
                  _____
6    Reason for change:_____
7
8    Page No._____Line No._____Change to:_____
                  _____
9    Reason for change:_____
10
11   Page No._____Line No._____Change to:_____
                  _____
12   Reason for change:_____
13
14   Page No._____Line No._____Change to:_____
                  _____
15   Reason for change:_____
16
17   Page No._____Line No._____Change to:_____
                  _____
18   Reason for change:_____
19
20   Page No._____Line No._____Change to:_____
                  _____
21   Reason for change:_____
22
23
     SIGNATURE:_____DATE:_____
24        BRIAN E. LEWIS
25
```

Veritext Legal Solutions
290 W. Mt. Pleasant Ave. - Suite 3200
Livingston, New Jersey 07039
Toll Free: 800-227-8440  Fax: 973-629-1287

December 15, 2017

To: Patricia Bethancourt, Esq.

Case Name: Johnson, Deborah v. Sanofi S.A., Et Als
Veritext Reference Number: 2769449
Witness:  Brian Lewis Deposition Date: 12/11/2017

Dear Sir/Madam:
The deposition transcript taken in the above-referenced matter, with the reading and signing having not been expressly waived, has been completed and is available for review and signature.  Please call our office to make arrangements for a convenient location to accomplish this or if you prefer a certified transcript can be purchased, which can be sent to you or the deponent directly.

If the jurat is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

Cc: Buffy J. Mims, Esq.
    Richard L. Root, Esq.