UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION | MDL NO. 2740 |
| | SECTION "H" (5) |

**THIS DOCUMENT RELATES TO:**

**Antoinette Durden, Case No. 2:16-cv-16635**

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT BASED ON THE STATUTE OF LIMITATIONS

Antoinette Durden's claims are barred by Louisiana's one-year statute of limitations, which begins "to run from the day injury or damage is sustained," *Asbestos v. Bordelon, Inc.*, 726 So. 2d 926, 974 (La. App. 4 Cir. 1998) (citing La. Civ. Code Ann. art. 3492), and is tolled only "in cases where a plaintiff's ignorance [of her injury] is not negligent or unreasonable," *id.* at 976. Here, the pleadings and undisputed evidence establish that Ms. Durden was aware of her alleged injury and its potential relationship to her Taxotere chemotherapy regimen in 2012, more than four years before she filed suit in November 2016:

- In her **Complaint**, Ms. Durden alleges she finished chemotherapy with Taxotere® in February 2012 and then suffered "[p]ermanent, irreversible and disfiguring alopecia beginning after treatment with Taxotere (docetaxel) and continuing to present." (*i.e.*: in September 2012).[1]

- In her verified **Plaintiff Fact Sheet**, Ms. Durden indicated she "experienced" several injuries, including "Persistent total alopecia," "Permanent/Persistent Hair Loss on Scalp," and a "[l]arge bald area in the hair on [her] head." She indicated that "after six (6) months of discontinuing Taxotere® . . . [t]here are visible bald

---

[1] *See* Second Amended Master Long Form Complaint ("AMC") (Rec. Doc. 4407) at ¶ 181; *see also* Amended Short Form Complaint ("SFC") at ¶ 12, 10 (No. 2:16-cv-16635, Rec. Doc. 7). Where Master and Short Form Complaints are used in an MDL like this one, the documents together comprise a plaintiff's complaint. *See In re Zofran (Ondansetron) Prods. Liab. Litig.*, No. 1:15-MD-2657, 2017 WL 1458193, at *5 (D. Mass. Apr. 24, 2017). Ms. Durden's Short Form Complaint is attached as **Exhibit A.**

- spots on [her] head no matter how [she] style[s] [her] hair." She stated each of these injuries first began in March 2012.[2]

- In her **deposition**, she testified that one year after she completed chemotherapy in 2012, she believed that Taxotere® had caused her permanent hair loss.[3]

- Ms. Durden's **medical records** reveal she was warned about hair loss associated with chemotherapy and understood that hair loss was a risk of treatment, putting her on notice of the association between chemotherapy and her hair loss since before beginning treatment in October 2011.[4]

Charged with this information, Ms. Durden would have had to file her lawsuit in 2013 to be timely—and there is nothing in the record that would justify her three-year delay in filing suit. It is unreasonable for a plaintiff "to think that [s]he can sit on [her] rights indefinitely until an attorney tells [her s]he is actually entitled to benefits." *Causby v. Perque Floor Covering*, 707 So. 2d 23, 27 (La. 1998). In other words, the objectively reasonable plaintiff in these circumstances—on knowing that she had lost her hair, on knowing why she had lost her hair, and on knowing that her hair had not grown back as expected because of and after chemotherapy—would have been excited to do something to inquire about a claim. Ms. Durden instead did nothing for six years. On these facts, no tolling exception applies; Ms. Durden's claims are time-barred and Defendants are entitled to summary judgment.

## PROCEDURAL BACKGROUND

Ms. Durden is one of several thousand plaintiffs in MDL No. 2740 who alleges that she took Taxotere® at some point in its 22-year history and has been injured. Taxotere® was first approved by the Federal Food & Drug Administration in 1996, and plaintiffs in this MDL completed treatment as far back as 1997.[5] Like all other plaintiffs in this MDL, Ms. Durden alleges

---

[2] PFS references are to Ms. Durden's Fourth Amended Plaintiff Fact Sheet, attached as **Exhibit B.**
[3] Ms. Durden's deposition is attached as **Exhibit C**.
[4] Ms. Durden's relevant medical records are attached as **Exhibit D.**
[5] *See, e.g.*, Deleese Blackmon SFC ¶ 10; Angela Foster SFC ¶ 10; Dorothy Mims SFC ¶ 10.

2

that she has suffered severe and disfiguring injuries because of her treatment with Taxotere®.

Unlike cases where an injury is latent, the injury alleged here makes the lawsuit either timely or untimely on its face. Plaintiffs' alleged permanent hair loss from Taxotere® is so obvious, they claim, that it stigmatizes plaintiffs, their body image, and their social relationships. *See* AMC ¶¶ 214–20. Plaintiffs cannot dispute that every reasonable plaintiff knew she had lost her hair when it happened. *See* AMC at ¶ 174 (hair loss well-known side effect of chemotherapy), 129 (hair loss, or "alopecia," has always been in Taxotere's FDA-approved labeling), 135 (same). And, plaintiffs do not claim hair loss during chemotherapy as an injury, but rather, claim that hair loss became an injury when their hair failed to fully grow back six months after completing treatment. *See id.* at ¶ 181 (plaintiffs defining "permanent" alopecia as "absence of or incomplete hair regrowth six months beyond the completion of chemotherapy."). They also cannot dispute that plaintiffs had notice that their alleged injury may have been caused by chemotherapy treatment because plaintiffs cite more than a decade of public discussion about permanent hair loss and its alleged association with Taxotere® in their master complaint. *See* AMC ¶¶ 149–162.[6]

Sanofi first raised statute-of-limitations in this MDL in an omnibus motion to dismiss on May 26, 2017, noting that, at that time, some 850 of approximately 1,100 then-pending cases were facially untimely, including Ms. Durden's. *See* Motion to Dismiss Claims Barred by the Applicable Statutes of Limitations (May 26, 2017) ("Omnibus Motion") (Rec. Doc. 494). In deferring a decision on the merits of that motion, the Court recognized that it would be appropriate

---

[6] *See* AMC ¶ 155 (referencing Jim Edwards, *Sanofi's Latest Challenge: Women Who Say Its Chemotherapy Left Them Permanently Bald*, CBS News (March 6, 2010), http://www.cbsnews.com/news/sanofis-latest-challenge-women-who-say-its-chemotherapy-left-them-permanently-bald/); *see also* Taxotears Turns Ten, aheadofourtime.org (April 4, 2016), http://aheadofourtime.org/taxotears-turns-ten/. Many plaintiffs even explicitly discussed their claims with lawyers and each other for years. (Rec. Doc. 4687) (E.D. La. Oct. 24, 2018) (Sanofi's memorandum in support of summary judgment on statute of limitations grounds against plaintiff Suzanne Mink).

3

to revisit the issue at a later date with the benefit of further discovery in the initial bellwethers before considering an MDL-wide approach. *See* Hr'g Tr. 25:8–18 (Oct. 27, 2017). The parties proceeded with further discovery—both through the Plaintiff Fact Sheet process and phased discovery, including in Ms. Durden's case. This discovery confirms the untimeliness of Ms. Durden's claims, and why the Court should now grant Defendants' motion for summary judgment.

## LEGAL STANDARD

Summary judgment is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A genuine dispute of fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. at 249–50 (internal citations omitted).

## ARGUMENT

Summary judgment should be granted here for three reasons:

1. First, the untimeliness of Ms. Durden's case, is apparent from the pleadings.

2. Second, discovery from Ms. Durden's PFS, deposition testimony, and medical records confirm the untimeliness of her case.

3. Third, no exception applies to toll the statute of limitations.

Because there is no genuine issue of material fact as to the untimeliness of Ms. Durden's lawsuit, the Court should grant summary judgment.

### I. According to her Complaint, the prescriptive period for Ms. Durden's claims began in September 2012

In Louisiana, the statute of limitations for product-liability claims is one year, which begins "to run from the day injury or damage is sustained." La. Civ. Code Ann. art. 3492; *see* also *Carter*

4

*v. Matrixx Initiatives, Inc.*, 391 F. App'x 343, 344–45 (5th Cir. 2010) (noting that "[article] 3492 establishes a one-year prescriptive period for products liability claims").

Ms. Durden's Complaint establishes that the one-year prescription period commenced in September 2012 (six months after the end of her chemotherapy treatment) because, according to her own allegations, that is when she allegedly sustained her injury. Ms. Durden alleges she was treated with Taxotere® from October 2011 through February 2012, and that she has suffered "[p]ermanent, irreversible and disfiguring alopecia" ever since. *See* Ms. Durden's Amended Short Form Complaint (SFC) at ¶¶ 10, 12. The MDL Master Complaint, which Ms. Durden incorporates by reference in her SFC, defines her injury as "Permanent Chemotherapy Induced Alopecia" or "an absence of or incomplete hair regrowth *six months beyond the completion of chemotherapy.*" AMC at ¶ 181 (emphasis added).

The Master Complaint stresses Ms. Durden's notice of her injury and its potential cause (and therefore possible legal claims) as soon as her hair did not regrow after ending chemotherapy. Ms. Durden alleges that after completing chemotherapy, she "struggled to return to normalcy […] because an integral element of [her] identit[y], [her] hair, never returned," and that this "acts as a permanent reminder" of her cancer. AMC at ¶ 6. She inextricably links this injury to her chemotherapy: "[a]lopecia symbolizes cancer identity and treatment." *Id*. at ¶¶ 173, 216. She emphasizes the continual awareness of both her alleged hair loss and its cause as chemotherapy: "women who suffer from alopecia have a heightened awareness of their appearance;" alopecia can "heighten an individual's everyday awareness that she has or had cancer;" and she remains "stigmatized with the universal cancer signifier—baldness—long after [she] underwent cancer treatment." *Id*. at ¶¶ 215−17, 6.

Similarly, the damages Ms. Durden seeks turn on her hair loss's obviousness and its

5

purported universal association with chemotherapy. Ms. Durden seeks recovery for negative body image and identity, which she claims hinder relationships and shape others' perceptions of her. *Id*. at ¶¶ 6, 214–215. Such damages are possible only to the extent Ms. Durden was aware of the injury that she claims. *See* SFC at ¶ 12 (describing injury as "[p]ermanent, irreversible and disfiguring alopecia beginning after treatment with Taxotere (docetaxel) and continuing to present."). Thus, by her own allegations, Ms. Durden sustained her injury no later than September 2012, and the statute of limitations began to run at that time.

## II. Ms. Durden's Plaintiff Fact Sheet, deposition testimony, and medical records all confirm that her claims are prescribed

Written discovery, deposition testimony, and medical records confirm that Ms. Durden's claims are prescribed. In her PFS, Ms. Durden alleges the following injuries first manifested in March 2012:

- Persistent total alopecia—No hair growth on [her] head or body after six (6) months of discontinuing Taxotere® or Docetaxel treatment

- Permanent/Persistent Hair Loss on scalp

- Diffuse thinning of hair: total scalp (Top, Sides, Temples)

- Significant thinning of the hair on [her] head after six (6) months of discontinuing Taxotere® or Docetaxel treatment

- Large bald area in the hair on [her] head

- Permanent/Persistent Loss of Eyebrows/Eyelashes/Body Hair/Genital Hair/Nasal Hair/Ear Hair

PFS § VI.5. She reports all injuries *from March 2012 to present*. Elsewhere in her PFS, which she filed in October 2017, Ms. Durden reports that she has had "alopecia or incomplete hair re-growth" for "5 years"—in other words, since 2012. PFS § VII.23. Ms. Durden also reports that she was injured at age 61, which was her age in March 2012, according to her birthdate. *See* PFS § I.15; ¶ IV.2. In sum, Ms. Durden's PFS places her injury as early as March 2012 (even earlier

6

than Ms. Durden's Complaint) and confirms that her prescriptive period began to run in 2012—many years (and certainly more than one year) before she filed her lawsuit in November 2016.

Ms. Durden's deposition testimony also confirms her claims are time-barred because she was aware of her injury in 2012. Ms. Durden testified that she was "bald after chemo" in 2012, and she stayed bald even after it was over. *See* Durden Dep. Tr. 44:11–22; 45: 17–22.[7] Furthermore, Ms. Durden explained that she went to see her dermatologist in 2013 because her hair had not grown back. *See* Durden Dep. Tr. 50:13–15; *see also* Bianchini Dep. Tr. at 217: 7–23, attached as **Exhibit F** (Plaintiffs' psychology expert who evaluated Ms. Durden testifying that Ms. Durden realized her hair loss was permanent when she was being treated for hair loss). And, according to Ms. Durden, the dermatologist told her one month later that her hair loss was probably permanent. *See* Durden Dep. Tr. 66:14–67:10. Ultimately, Ms. Durden testified in no uncertain terms that one year after she completed chemotherapy in 2012, she believed that Taxotere® had caused her permanent hair loss.

> Q: Well, when your hair hadn't grown back a year after chemotherapy, did you think it might be because of the other drug you took?
>
> A: No.
>
> Q: Did you think it was because of the Taxotere?
>
> A: Yes.

Durden Dep. Tr. 32: 6–13. Ms. Durden's deposition testimony confirms that Ms. Durden was aware of her injury in 2012 and of its potential connection to Taxotere® no later than "a year after

---

[7] Ms. Durden testified initially in her deposition that she noticed "somewhere around 2014" that her hair was not coming back in. *See* Durden Dep. Tr. 21:1–9. Later, Ms. Durden clarified that her hair had not grown back within one year after completing chemotherapy, which she completed in 2012. *Id*. at 26:7–10. While 2014 is a later date than Ms. Durden provided in her Complaint and PFS, if her prescription period began running in 2014, Ms. Durden's claims are still untimely.

7

chemotherapy" (*i.e.*, 2013). Consequently, the one-year prescriptive period began and expired long before November 29, 2016, the date upon which Ms. Durden filed her lawsuit.[8]

Ms. Durden's medical records also confirm that she was aware of her hair loss and associated it with her chemotherapy more than one year before filing her claim. In August 2011, prior to beginning chemotherapy, Ms. Durden's physician reviewed chemotherapy's side effects, including hair loss. Ochsner Health System 2590–93. Then, in October 2011, Ms. Durden signed a chemotherapy consent form which identified hair loss as a risk. Ochsner Health System 2673–74. Ms. Durden was on notice her hair was not growing back at least by 2013 when in March she called her physician and asked what vitamins she should take for hair growth, and in May when she requested something to treat her hair loss. Ochsner Health System 287, 355–65.

In sum, the discovery in Ms. Durden's case confirms what was clear from the face of her pleadings. Ms. Durden's claims prescribed more than one year before November 2016.

### III.   No exception applies to save Ms. Durden's case

"Ordinarily, the party pleading prescription bears the burden of proving that the plaintiff's claims have prescribed." *Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002). However, where, as here, a plaintiff's claims are prescribed on their face, the plaintiff bears the burden of proving an exception. *See Marin v. Exxon Mobil Corp.*, 48 So. 3d 234, 256 (La. 2010); *see also Campo v. Correa*, 828 So. 2d 502, 508 (La. 2002).

"[A] plaintiff has three theories on which [s]he may rely to establish prescription has not run: suspension, interruption and renunciation." *Hanover Ins. Co. v. Plaquemines*, No. 12-1680, 2015 WL 4197579, at *2 (July 10, 2015). The latter two theories do not apply (and there is no

---

[8] Sanofi disputes Ms. Durden's assertions that her injuries, if any, were caused by Taxotere®. Nothing in this Memorandum should be perceived as an admission by Sanofi to the contrary. However, for the purposes of this Motion for Summary Judgment, even if Taxotere® caused Ms. Durden's injury, her claims are barred by La. Civ. Code Ann. art. 3492.

8

claim they apply). *See* La. Civ. Code Ann. art. 3450, 3462, 3464. The remaining theory—suspension on the theory of *contra non valentem*—does not save her claims.

As this Court has explained, "[g]enerally, the prescriptive period for a tort claim begins to run from the time the plaintiff is injured." *In re: Xarelto (Rivaroxaban) Prods. Liab. Litig.*, MDL No. 2592, No. 15-4790, 2017 WL 4517287, at *2 (E.D. La. Oct. 10, 2017). In Louisiana, however, the doctrine of *contra non valentum* "provides some grace for those plaintiffs who are unaware that their injury was caused by a tort." *Id.* Importantly, "this grace period does not extend until the plaintiff has gathered all of the facts necessary to successfully pursue her claim," nor does it "extend until the plaintiff has determine[d] the legal theory upon which his lawsuit will be based." *Id.* Instead, the doctrine acts to suspend prescription until the plaintiff has "actual or constructive knowledge of a causal relationship between the object or product and the injury." *Id.* For purposes of the doctrine, "[c]onstructive knowledge is whatever notice is enough to excite attention and put the injured party on guard and call for an inquiry." *Campo*, 828 So. 2d at 510–11.

Establishing both subjective ignorance and objective unknowability requires meeting standards that are "exceedingly stringent," *Eastin v. Entergy Corp.*, 865 So. 2d 49, 55 (La. 2004), and as long as claimed damages are "appreciable" and "not merely speculative," prescription will not suspend, *Harvey v. Dixie Graphics, Inc.*, 593 So. 2d 351, 354 (La. 1992). Thus, "prescription runs from the date on which [a plaintiff] first suffered actual and appreciable damage, ... even though he may thereafter come to a more precise realization of the damages he has already incurred or incur further damage as a result of the completed tortious act." *Marin*, 48 So. 3d at 246 (quoting *Harvey*, 593 So. 2d at 354) (alterations in original). As the Louisiana Supreme Court has emphasized:

> The doctrine of *contra non valentem* provides that prescription does not run against one who is ignorant of the *facts* upon which their cause of action is based and

> applies an exception to the statutory prescriptive period where *in fact and for good cause* a plaintiff is *unable* to exercise his cause of action when it accrues.

*Eastin*, 865 So. 2d at 55 (emphasis in original). *Contra non valentem* should only be applied in "extreme circumstances," *Marin*, 48 So. 3d at 245, and "[a]s a judicial exception to the statutory rule of prescription, Louisiana courts strictly construe this doctrine and only extend its benefits up to the time that the plaintiff has actual or constructive knowledge of the tortious act." *Eldredge v. Martin Marietta Corp.*, 207 F.3d 737, 743 (5th Cir. 2000) (internal quotes omitted).

"[A] plaintiff will be deemed to know what [s]he could by <u>reasonable diligence</u> have learned." *Renfroe v. State ex rel. Dep't of Transp. & Dev.*, 809 So. 2d 947, 953 (La. 2002) (internal quotation omitted) (emphasis added). Courts will not reward plaintiffs for failing to diligently investigate their alleged injuries. Stated differently, "[p]laintiffs may not simply sit on their hands and do nothing to investigate their [injury] and expect their actions to be deemed reasonable." *Eastin*, 865 So. 2d at 56. Rather, they must allege "facts which show that their delay in joining the suit is reasonable." *Id.* It is unreasonable for a plaintiff "to think that [s]he can sit on h[er] rights indefinitely until an attorney tells h[er] s]he is actually entitled to benefits." *Causby*, 707 So. 2d at 27; *see also Xarelto*, 2017 WL 4517287, at *2–3 (a plaintiff need not "be informed by an attorney or physician of a possible claim before prescription begins to run.").

### A. Ms. Durden had sufficient notice of her alleged injury in September 2012

Where, as here, the complaint is facially untimely and the plaintiff bears the burden of establishing suspension of prescription, she must put forth objective, substantially probative evidence that her cause of action was undiscoverable despite diligent efforts on her part to discover it. Ms. Durden cannot do so.

Having been warned of hair loss with Taxotere® prior to undergoing treatment, *see* AMC ¶ 135, and—according to her complaint—having sustained "[p]ermanent, irreversible and

10

disfiguring alopecia beginning after treatment with Taxotere (docetaxel) and continuing to present," SFC ¶ 12, any reasonable person in Ms. Durden's shoes would at the very least have investigated the nature and cause of her alleged injury. This is all the more true where the alleged injury was so apparent that it altered the person's identity, harmed her self-image, disrupted her relationships, and caused mental and physical suffering. *See* AMC ¶ 6 (describing baldness as "the universal cancer signifier" and how she "ha[s] struggled to return to normalcy, even after surviving cancer because an integral element of [her] identity, [her] hair, never returned."); *see also* AMC ¶ 173 (acknowledging that chemotherapy is known to cause hair loss); ¶ 178 ("hair loss usually begins one to three weeks after the initiation of chemotherapy").

Ms. Durden's prescriptive period began in September 2012 because a reasonable person would have had enough notice to "excite" her attention to call for an inquiry at that time. In September 2012, six months after completing chemotherapy, Ms. Durden alleged she was experiencing what she defines as permanent alopecia—and from September 2012, she associated this alopecia with her chemotherapy treatment. *See* AMC ¶ 173 (acknowledging that chemotherapy is known to cause hair loss); ¶ 178 ("hair loss usually begins one to three weeks after the initiation of chemotherapy"); ¶ 6 (describing baldness as "the universal cancer signifier" and how she "ha[s] struggled to return to normalcy, even after surviving cancer because an integral element of [her] identify, [her] hair, never returned.").

By her own testimony, Ms. Durden was aware of her permanent alopecia in 2012 and of its potential connection to Taxotere® no later than "a year after chemotherapy" (*i.e.*, 2013):

> Q: Well, when your hair hadn't grown back a year after chemotherapy, did you think it might be because of the other drug you took?
>
> A: No.

11

> Q: Did you think it was because of the Taxotere?
>
> A: Yes.

Durden Dep. Tr. 32: 6–13.

### B. Ms. Durden's failure to diligently investigate her injury does not toll her prescription period

The fact that Ms. Durden asserts that she "didn't know [her hair loss] was going to be permanent until [she] saw the ad on the TV about Taxotere," *see* Durden Dep. Tr. 54:9–11, does not toll the statute of limitations and is irrelevant to whether her claim has prescribed.

Where, as here, the complaint is facially untimely and the plaintiff bears the burden of establishing suspension of prescription, she must put forth objective, substantially probative evidence that her cause of action was undiscoverable despite diligent efforts on her part to discover it. *See Eastin*, 865 So. 2d at 56. This is because "the prescriptive period commences when there is enough notice to call for an inquiry about a claim, not when an inquiry reveals the facts or evidence that specifically outline the claim." *Luckett v. Delta Airlines, Inc.*, 171 F.3d 295, 300 (5th Cir. 1999) (citing *Terrel v. Perkins*, 704 So. 2d 35, 39 (La. App. 1st Cir. 1997)). In other words, the prescriptive period for Ms. Durden began in September 2012 when she had enough information to inquire about her claim, or when she had constructive knowledge of the relationship between her chemotherapy treatment and her permanent alopecia—not when she saw an attorney's advertisement on television outlining a claim for her. *See Luckett*, 171 F.3d at 299–300 (5th Cir. 1999) (citing *Terrel*, 704 So. 2d at 39).

Such reasoning is especially applicable where, as detailed in the AMC, there has been more than a decade of public discussion about permanent hair loss and Taxotere®. *See supra* at 3 n.6 and AMC ¶¶ 149– 162; 180–187 (collecting sources). *See e.g., Plumlee v. Pfizer, Inc.*, 664 F. App'x 651, 653 (9th Cir. 2016) (affirming dismissal where "the district court took judicial notice

12

of an extensive record of documents—all publicly available during the relevant limitations periods—which discussed Pfizer's unpublished clinical trials and the allegation that Zoloft was no more effective than a placebo."); *Carey v. Kerr-McGee Chem. Corp.*, 999 F. Supp. 1109, 1117 (N.D. Ill. 1998) (disposing of claims where "the pervasive media coverage and publicity surrounding the issue…leads the court to the inescapable conclusion that a reasonable person in [plaintiffs'] situation should have known of their claim."); *In re Avandia Mktg., Sales Practices And Prod. Liab. Litig.*, No. 07-md-1871, 2014 WL 2011239, at *1 (E.D. Pa. May 16, 2014) (publicly available information put any reasonable plaintiff suffering the injury alleged on notice of potential causes). With all of this information publically available, Ms. Durden could have readily learned about alleged associations between Taxotere® and permanent hair loss many years before she saw an advertisement on television. A plaintiff with even constructive knowledge is "tantamount to knowledge or notice of everything to which a reasonable inquiry may lead." *Campo*, 828 So. 2d at 511.

### C. Labeling changes are irrelevant to the statute of limitations

Nor can Ms. Durden argue that Taxotere's 2015 labeling change was the start of her prescription period, as labeling changes are wholly irrelevant to statute of limitations.[9] Indeed, in ruling that a plaintiff's claim accrued in March 2013, Judge Fallon ignored subsequent major changes to the Xarelto label's "Risk of Bleeding" section made in January 2014 and May 2016. *See Xarelto*, 2017 WL 4517287, at *3; *see also Yurcic v. Purdue Pharma, L.P.*, 343 F. Supp. 2d 386, 392–93 (M.D. Pa. 2004) ("Plaintiffs' argument that they only became aware of their claim against the pharmaceutical companies when the label change occurred must fail. The accrual of

---

[9] In 2015, the Taxotere® labeling was updated to include the following language: "cases of permanent hair loss have been reported." AMC at ¶ 171.

13

Plaintiffs' cause of action is not dependent on this label change […] Plaintiff might have ascertained that the original label was inadequate on the basis of his injuries, if indeed the label has anything to do with his negligence and fraud claims."); *N. Tr. Co. v. Upjohn Co.*, 572 N.E.2d 1030, 1038 (Ill. App. 1991) (finding post-treatment warnings irrelevant in failure to warn product liability cases involving prescription drugs). Regardless, there is no evidence Ms. Durden read or discussed any Taxotere® labeling with healthcare providers.

### D. The clock on Ms. Durden's prescription period does not wait for a physician's diagnosis.

Similarly, Ms. Durden's deposition testimony that "no one ever told [her] that [her hair loss] was going to be permanent[]," is irrelevant to whether her claims have prescribed. *See* Durden Dep. Tr. 21:16–21; 51:18–21; 52: 16–19. It does not matter what Ms. Durden's doctors did or did not tell her because "[t]he commencement of prescription does not necessarily wait for the pronouncement of a victim's physician or of an expert." *Luckett*, 171 F.3d at 300 (citing *Hunter v. Sisters of Charity of the Incarnate Word*, 236 So. 2d 565, 568 (La. App. 1st Cir. 1970) (holding that prescription commenced on plaintiff's medical malpractice claim when she was improperly lifted into a hospital bed, not when a chiropractor told her that the improper handling caused her pain)).[10] By September 2012, (or at the very latest, early 2013 pursuant to Ms. Durden's deposition testimony cited above), Ms. Durden knew that she had been treated with Taxotere® during her chemotherapy, that chemotherapy caused her hair to fall out, and that her hair was not growing back—which she believed was directly caused by Taxotere®. Based on this, Ms. Durden had

---

[10] Here, Ms. Durden's physician actually told her that "the reason both for her hair loss during chemotherapy and the reason it wasn't coming back was because of chemotherapy"; this conversation took place no later than October 2015 (and perhaps years earlier), and, in event, over a year before she filed this lawsuit. *See* Jancich Dep. at 93:13–95:5 (Jan. 12, 2018), 147:10–18 (Feb. 2, 2018), attached as **Exhibit E**.

14

sufficient notice to excite her attention and call for an inquiry about a claim at that time. *See Campo*, 828 So. 2d at 510–11; *see also Carter*, 391 F. App'x at 346 (finding the plaintiff's claims prescribed where she immediately associated her injury with medication but did not file suit until one year and five days later); *Luckett*, 171 F.3d at 300 (finding prescription where plaintiff was generally aware of the medical cause of her injury but did not serve defendant until one year and one day later).

The timeline regarding Ms. Durden's injury and knowledge is as follows:

- 2006—The online blog and support group "Taxotears" is formed, consisting of women who claim they experienced permanent hair loss caused by Taxotere®. Posts to the blog, which are publicly available, directly and consistently argue that Taxotere® causes permanent and persistent hair loss in breast cancer patients. *See* AMC ¶ 155; *see also supra* at 3 n.6.

- December 2006—Dr. Scot Sedlacek publishes research reporting persistent significant alopecia in breast cancer patients treated with docetaxel. *See* AMC ¶ 150.

- April 2009—British Journal of Dermatology publishes an article reporting irreversible and severe alopecia in breast cancer patients treated with docetaxel and paclitaxel. *See* AMC ¶ 152.

- December 2009—Dr. Hugues Bourgeois publishes research reporting long term persistent alopecia and suboptimal hair regrowth in breast cancer patients treated with docetaxel, among other drugs. *See* AMC ¶ 154.

- March 4, 2010—The Globe and Mail publishes an article reporting permanent hair loss as a "lasting side effect of the chemotherapy drug Taxotere," that affects 3–6% of women treated with Taxotere® in combination with other drugs. *See* AMC ¶ 153.

- March 6, 2010—CBS News publishes article citing reports of permanent baldness in up to 6.3% of breast cancer patients treated with Taxotere®, including members of the "Taxotears" group. *See* AMC ¶ 155.

- May 10, 2010—Dr. Ben Tallon publishes an article reporting permanent hair loss in breast cancer patients treated with docetaxel. *See* AMC ¶ 157.

- June 2011—Dr. Mariya Miteva publishes an article in the American Journal of Dermopathology reporting permanent alopecia and hair thinning in breast cancer patients treated with docetaxel. *See* AMC ¶ 158.

- October 18, 2011—Ms. Durden begins treatment with Taxotere® as part of her chemotherapy regimen. *See* SFC ¶ 10. Ms. Durden is aware that chemotherapy causes hair loss. *See* Durden Dep. Tr. 212: 5–13; 275:1–11; 276: 7–12; *see also* Ochsner Health System 2590–93, 2673–74. Sometime during or closely after chemotherapy treatment, Ms. Durden loses her hair. *See* Durden Dep. Tr. 282: 19–283:9; 284:13–16.

- February 1, 2012—Ms. Durden ceases chemotherapy treatment including treatment with Taxotere®. *See* SFC ¶ 10.

- March 2012—Per Ms. Durden's PFS, her injures, including persistent total alopecia, diffuse thinning of hair, and large bald areas on head, begin. *See* PFS §VI.5.

- April or May 2012—Ms. Durden tells her oncologist, Dr. Sophy Jancich, that "her hair wasn't coming back," and the two "discussed that if it's not coming back, it's likely not going to come back." *See* Jancich Dep. at 93:13–93:21. Dr. Jancich told Ms. Durden that chemotherapy was both the reason she had lost her hair, and the reason it was not coming back. *See* Jancich Dep. at 93:13–95:5.

- May 9, 2012— Dr. Nicholas Kluger publishes an article in the Annals of Oncology reporting permanent scalp alopecia in breast cancer patients treated with docetaxel. *See* AMC ¶ 159.

- September 2012—Per the definition of her injury in her Complaint, Ms. Durden begins suffering from the injury which forms the basis of her lawsuit—"[p]ermanent, irreversible and disfiguring alopecia." *See* SFC ¶ 12; AMC ¶ 181.

- February 2013—Per Ms. Durden's deposition testimony, one year after chemotherapy, her hair has not grown back and Ms. Durden believes Taxotere® is the cause. Durden Dep. Tr. 32: 6–13.

- March–May 2013—Ms. Durden calls her physician to ask what vitamins she should take for hair growth and requests something to treat her hair loss. Ochsner Health System 287, 355–65.

- November 2014— Dr. Nicola Thorp publishes research reporting long term hair loss in breast cancer patients treated with docetaxel. *See* AMC ¶ 161.

- October 22, 2015—Ms. Durden sees Dr. Jancich for the last time. All discussions between the two regarding chemotherapy and hair loss took place prior to this date. *See* Jancich Dep. at 147:10–23.

- November 29, 2016—Ms. Durden files this lawsuit.

Indeed, Judge Fallon recently granted summary judgment on the basis of prescription over an assertion of *contra non valentem* under substantially similar circumstances. *See In re Xarelto*, 2017 WL 4517287, at *3. Ruling on a motion in *Louiviere v. Janssen*, Judge Fallon found that the plaintiff was on "inquiry notice" of his potential claims for internal bleeding more than two years before filing suit—specifically, once his doctors discontinued his Xarelto treatment. *Id*. Because the Xarelto labeling warned of "bleeding" generally, and the plaintiff's treatment history suggested a causal link (plaintiff was hospitalized for internal bleeding not long after being prescribed Xarelto), Judge Fallon concluded that the plaintiff had "sufficient actual or constructive knowledge to alert a reasonable person that there was a relationship between Xarelto and his bleed and that he could be the victim of a tort" when his doctors told him to stop taking Xarelto. *Id*. This was true even though the plaintiff "may not have known how or why" the bleeding was associated or "all the details pertaining to prosecuting his lawsuit and how the Defendant committed its alleged tortious actions." *Id.*

As in the *Louiviere* case, the basic facts on which Ms. Durden bases her claims reveal that she was on inquiry notice well over one year before filing suit. Like the *Louiviere* plaintiff, it does not matter that Ms. Durden did not know "how or why" Taxotere® was causing her permanent alopecia, or "all the details pertaining to prosecuting [her] lawsuit and how the Defendant committed its alleged tortious actions." *See In re Xarelto*, 2017 WL 4517287, at *3.

As another example, in *Fontenot v. ABC Ins. Co.*, 674 So. 2d 960 (La. 1996), the Louisiana Supreme Court declined to apply *contra non valentem* where plaintiff had notice of injury and potential cause—even where the physician assured plaintiff that her condition was "temporary and would resolve over time." *Fontenot*, 674 So. 2d at 964. As the Court explained, "Plaintiffs'

17

contention that [defendant]'s failure to inform them that [plaintiff]'s condition was permanent versus temporary is of no consequence," since prescription is not delayed by "[i]gnorance or misunderstanding of the probable extent or duration of injuries." *Id.*

Because Ms. Durden knew that her chemotherapy treatment had caused her hair loss, that Taxotere® was part of her chemotherapy treatment, and that her treatment had ended but her hair was not growing back, Ms. Durden had "sufficient actual or constructive knowledge to alert a reasonable person that there was a relationship between" her chemotherapy treatment and her injury. *See id.* It does not matter what anyone—physician or otherwise—told her. In sum, Ms. Durden's claims are untimely on their face, and no exception applies to save her case.

## CONCLUSION

Statute of limitations analysis here is not a shifting, impossible feat. Statutes of limitations run from a trigger date, which is the date of injury and a concrete, recognizable moment. Ms. Durden unequivocally alleges that she was injured based on the dates of her treatment and a period of persisting hair loss afterwards. The Plaintiffs cannot dispute that 6 months after completing treatment, any reasonable one amongst them would have known of her hair loss, known that it was persisting, and had notice that such persistence may have been caused by chemotherapy treatment. Ms. Durden does not claim that she thought something other than chemotherapy caused her hair loss, or that she was not warned hair loss might happen. She does not claim that she believed something else was causing her hair loss as, according to her, it persisted over the years after finishing chemotherapy. There is not an ever-sliding scale where at some moment that failure to regrow hair transformed into a "permanent" injury, thereby triggering the statute or, else, there still would not be standing to sue even up until this day. This analysis easily bars untimely cases like Ms. Durden's. Even if a woman questioned whether her hair might eventually regrow, or

18

questioned whether something else might contribute to her hair not regrowing, that woman was on inquiry notice. An injury cannot, on one hand, be so obvious that it interferes with a Plaintiff's identity, self-image, and social relationships, and, at the same time, be undiscoverable to her. This is especially true where Ms. Durden's pleadings establish an ascertainable trigger date for her claims, whether one looks to reasonable individual notice, or broader public dialogue. Thus, this Court's analysis is simple. Ms. Durden's claim accrued long ago. For the foregoing reasons, the Court should grant Defendants' Motion for Summary Judgment.

Date: February 5, 2019

Respectfully submitted,

*/s/ Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE URQUHART & MOORE LLC**
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: 504-310-2100
Facsimile: 504-310-2120
dmoore@irwinllc.com

Harley Ratliff
Adrienne L. Byard
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
Facsimile: 816-421-5547
hratliff@shb.com
abyard@shb.com

***Counsel for Sanofi-Aventis U.S. LLC***

## CERTIFICATE OF SERVICE

I hereby certify that on February 5, 2019, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ *Douglas J. Moore*