UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION | MDL NO. 2740 |
| | SECTION "H" (5) |

THIS DOCUMENT RELATES TO:

Tanya Francis, Case No. 2:16-cv-17410

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT BASED ON THE STATUTE OF LIMITATIONS**

Tanya Francis's claims are barred by Louisiana's one-year statute of limitations, which begins "to run from the day injury or damage is sustained," *Asbestos v. Bordelon, Inc.*, 726 So. 2d 926, 974 (La. App. 4 Cir. 1998) (citing La. Civ. Code Ann. art. 3492), and is tolled only "in cases where a plaintiff's ignorance [of her injury] is not negligent or unreasonable," *id*. Here, the pleadings and undisputed evidence establish that Ms. Francis was aware of her alleged injury and its potential relationship to her Taxotere chemotherapy regimen in 2010, more than six years before she filed suit in December 2016:

- In her **Complaint**, Ms. Francis alleges she finished chemotherapy with Taxotere in approximately October 2009 and then suffered "permanent, irreversible and disfiguring alopecia beginning after treatment with Taxotere (docetaxel) and continuing to present," and "[p]ermanent/persistent hair loss and diffuse thinning of hair."[1]

- In her verified **Plaintiff Fact Sheet**, Ms. Francis indicated she lost her hair after beginning treatment with Taxotere and "experienced" several injuries, including "Permanent/Persistent Hair Loss on Scalp," "[d]iffuse thinning of hair: total scalp,"

---

[1] *See* Second Amended Master Long Form Complaint ("AMC") (Rec. Doc. 4407) at ¶ 181; *see also* Amended Short Form Complaint ("SFC") at ¶ 12 (2:16-cv-17410, Rec. Doc. 5). Where Master and Short Form Complaints are used in an MDL like this one, the documents together comprise a Plaintiff's complaint. *See In re Zofran (Ondansetron) Prods. Liab. Litig.*, No. 1:15-MD-2657, 2017 WL 1458193, at *5 (D. Mass. Apr. 24, 2017). Ms. Francis's Short Form Complaint is attached as **Exhibit A**.

> - "[m]oderate thinning of the hair" on her head, a "[c]hange in the texture, thickness or color" of her hair, and "Permanent/Persistent Loss" of eyebrows and eyelashes. She indicated that "after six (6) months of discontinuing Taxotere® . . . [t]here is noticeable hair loss. . . ." She stated each of these injuries first began in May 2010.[2]
>
> - In her **deposition**, Ms. Francis testified that in "April or May" 2010, approximately six months after her last chemotherapy treatment, her hair began to regrow, but it was "thin" and "curly."[3] Ms. Francis testified that her hair "grew and grew," but that since 2012 there were "spots" on the sides, middle, and top of her scalp that remained thinner than before chemotherapy.[4] Ms. Francis believed her alleged incomplete hair growth was a result of the three chemotherapy drugs she received "put together," which included Taxotere.[5]
>
> - Ms. Francis's **medical records** reveal she was warned about hair loss associated with chemotherapy and understood that hair loss was a risk of treatment, putting her on notice of the association between chemotherapy and her hair loss since before beginning treatment in July 2009.[6]

Charged with this information, Ms. Francis would have had to file her lawsuit in 2011 to be timely, and it is unreasonable for Ms. Francis "to think that [s]he can sit on [her] rights indefinitely until an attorney tells [her s]he is actually entitled to benefits." *Causby v. Pergue Floor* Covering, 707 So. 2d 23, 27 (La. 1998). In other words, the objectively reasonable plaintiff in these circumstances—on knowing that she had lost her hair, on knowing why she had lost her hair, and on knowing that her hair had not grown back as expected because of and after chemotherapy—would have been excited to do something to inquire about a claim. Ms. Francis instead did nothing for six years. On these facts, no tolling exception applies; Ms. Francis's claims are time-barred, and therefore Defendants are entitled to summary judgment.

## PROCEDURAL BACKGROUND

---

[2] PFS references are to Ms. Francis's Eighth Amended Plaintiff Fact Sheet, attached as **Exhibit B.**

[3] Ms. Francis's deposition is attached as **Exhibit C**. Francis Dep. at 221:14-21

[4] Francis Dep. at 221:14-21; 232: 1-14

[5] Francis Dep. at 236:20-238:2.

[6] Ms. Francis's relevant medical records are attached as **Exhibit D**. Ms. Francis's treating oncologist, Dr. Cherian Verghese's, deposition is attached as **Exhibit E**.

Ms. Francis is one of several thousand plaintiffs in MDL No. 2740 who alleges that she took Taxotere to treat her breast cancer. Taxotere was first approved by the Food & Drug Administration in 1996, and plaintiffs in this MDL completed treatment as far back as 1997.[7] Like all other plaintiffs in this MDL, Ms. Francis alleges that she has suffered severe and disfiguring injuries because of her treatment with Taxotere.

Unlike cases where an injury is latent, the injury alleged here makes the lawsuit either timely or untimely on its face. Plaintiffs allege permanent hair loss from Taxotere is so obvious, they claim, that it stigmatizes plaintiffs, their body image, and their social relationships. *See* AMC ¶¶ 214–20. Plaintiffs do not dispute that any reasonable plaintiff knew she had lost her hair when it happened. *See* AMC at ¶ 174 (hair loss well-known side effect of chemotherapy), 129 (hair loss, or "alopecia," has always been in Taxotere's FDA-approved labeling), 135 (same). And plaintiffs do not claim hair loss ***during*** chemotherapy as an injury, but rather, claim that hair loss became an injury when their hair failed to grow back six months after completing treatment. *See id.* at ¶ 181 (plaintiffs defining "permanent" alopecia as "absence of or incomplete hair regrowth six months beyond the completion of chemotherapy."). They also do not dispute that plaintiffs had notice that the issue may have been caused by chemotherapy treatment, because plaintiffs cite more than a decade of public discussion about permanent hair loss and its alleged association with Taxotere in their master complaint. *See* AMC ¶¶ 149–162.[8]

---

[7] *See, e.g.*, Deleese Blackmon SFC ¶ 10; Angela Foster SFC ¶ 10; Dorothy Mims SFC ¶ 10.

[8] *See* AMC ¶ 155 (referencing Jim Edwards, *Sanofi's Latest Challenge: Women Who Say Its Chemotherapy Left Them Permanently Bald*, CBS News (March 6, 2010), http://www.cbsnews.com/news/sanofis-latest-challenge-women-who-say-its-chemotherapy-left-them-permanently-bald/); *see also* Taxotears Turns Ten, aheadofourtime.org (April 4, 2016), http://aheadofourtime.org/taxotears-turns-ten/. Many plaintiffs even explicitly discussed their claims with lawyers and each other for years. (Rec. Doc. 4687) (E.D. La. Oct. 24, 2018) (Sanofi's memorandum in support of summary judgment on statute of limitations grounds against plaintiff Suzanne Mink).

3

Sanofi first raised statute-of-limitations in this MDL in an omnibus motion to dismiss on May 26, 2017, noting that, at that time, some 850 of approximately 1,100 then-pending cases were facially untimely, including Ms. Francis's.  *See* Motion to Dismiss Claims Barred by the Applicable Statutes of Limitations (May 26, 2017) ("Omnibus Motion") (Rec. Doc. 494).  In deferring a decision on the merits of that motion, the Court recognized that it would be appropriate to revisit the issue at a later date with the benefit of further discovery in the initial bellwethers before considering an MDL-wide approach.  *See* Hr'g Tr. 25:8–18 (Oct. 27, 2017).  The parties proceeded with further discovery—both through the Plaintiff Fact Sheet (PFS) process and phased discovery, including in Ms. Francis's case.  This discovery confirms the untimeliness of Ms. Francis's claims, and why the Court should now grant Defendants' motion for summary judgment.

## LEGAL STANDARD

Summary judgment is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  A genuine dispute of fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id*. at 249–50 (internal citations omitted).

## ARGUMENT

Summary judgment should be granted here for three reasons: First, the untimeliness of Ms. Francis's case is apparent from the pleadings. Second, discovery from Ms. Francis's PFS, deposition testimony, and other evidence demonstrates she was allegedly injured long ago. Third, deposition testimony and other evidence revealed through discovery confirm that no exception applies to toll the statute of limitations.  Because there is no genuine issue of material fact as to the

untimeliness of Ms. Francis's lawsuit, the Court should grant summary judgment.

### I. According to her Complaint, the prescriptive period for Ms. Francis's claims began in May 2010.

In Louisiana, the statute of limitations for product-liability claims is one year, which begins "to run from the day injury or damage is sustained." La. Civ. Code Ann. art. 3492; *see also Carter v. Matrixx Initiatives, Inc.*, 391 F. App'x 343, 344–45 (5th Cir. 2010) (noting that "[article] 3492 establishes a one-year prescriptive period for products liability claims").

Ms. Francis's Complaint establishes that the one-year prescription period commenced in May 2010 (six months after the end of her chemotherapy treatment) because, according to her own allegations, that is when she sustained her alleged injury. Ms. Francis alleges she was treated with Taxotere from July 2009 through October 2009, and that she has suffered "[p]ermanent/persistent hair loss and diffuse thinning of hair" ever since. *See* SFC at ¶¶ 10, 12. The MDL Master Complaint, which Ms. Francis incorporates by reference in her SFC, defines her injury as "Permanent Chemotherapy Induced Alopecia" or "an absence of or incomplete hair regrowth *six months beyond the completion of chemotherapy.*" AMC at ¶ 181 (emphasis added).

The Master Complaint stresses Ms. Francis's notice of her injury and its potential cause (and therefore possible legal claims) as soon as her hair did not regrow after ending chemotherapy. Ms. Francis alleges that after completing chemotherapy, she "struggled to return to normalcy [...] because an integral element of [her] identify, [her] hair, never returned," and that this "acts as a permanent reminder" of her cancer. AMC at ¶ 6. She inextricably links this injury to her chemotherapy: "[a]lopecia symbolizes cancer identity and treatment." *Id*. at ¶¶ 173, 216. She emphasizes the continual awareness of both her alleged hair loss and its cause as chemotherapy: "women who suffer from alopecia have a heightened awareness of their appearance;" alopecia can "heighten an individual's everyday awareness that she has or had cancer;" and she remains

5

"stigmatized with the universal cancer signifier—baldness—long after [she] underwent cancer treatment." *Id.* at ¶¶ 215–17, 6.

Similarly, the damages Ms. Francis seeks turn on her hair loss's obviousness and its purported universal association with chemotherapy. Ms. Francis seeks recovery for negative body image and identity, which she claims hinder relationships and shape others' perceptions of her. *Id.* at ¶¶ 6, 214–215. Such damages are possible only to the extent Ms. Francis was aware of the injury that she claims here. *See* SFC at ¶ 12 (describing injury as "permanent/persistent hair loss and diffuse thinning of hair").

Thus, by her own allegations, Ms. Francis sustained her injury in May 2010, and the statute of limitations began to run at that time. Her claim is therefore barred on its face because she filed her lawsuit more than six years after her alleged injury.

**II.     Ms. Francis's Plaintiff Fact Sheet, medical records, and deposition testimony confirm that her claims are prescribed.**

In her PFS, Ms. Francis alleges the following injuries first manifested in ***May 2010***, all of which are open and obvious:

- Permanent/Persistent Hair Loss on Scalp;
- Diffuse thinning of hair: total scalp (top, sides, temples);
- Moderate thinning of the hair on [her] head after six (6) months of discontinuing Taxotere or Docetaxel treatment;
- Permanent/Persistent Loss of Eyebrows; and
- Permanent/Persistent Loss of Eyelashes

PFS § VI.5. Elsewhere in her PFS, which she filed in May 2017, Ms. Francis reports that she has had "alopecia or incomplete hair re-growth" "[s]ince [c]hemotherapy with Taxotere"—in other words, since 2009. PFS § VII.23. Ms. Francis also reports that she was injured at age 38, which was her age during treatment in 2009, according to her birthdate. *See* PFS § I.15; ¶ IV.2. The PFS

6

includes itemized out-of-pocket expenses for wigs purchased from 2009 to present. *See* PFS § VII. 26. Consequently, the one-year prescriptive period began and expired long before December 14, 2016, when Ms. Francis filed her lawsuit.[9]

In sum, Ms. Francis's PFS places her injury as early as 2009, and confirms that her prescriptive period began to run in 2010 – many years (and certainly more than one year) before she filed her lawsuit in December 2016.

Ms. Francis's medical records and her prescribing oncologist's testimony also reflect that Ms. Francis was warned of and understood the risk of hair loss with chemotherapy. For example, Dr. Verghese testified that at the time he prescribed Taxotere for Ms. Francis, it was his general understanding that alopecia was a common side effect – but he would "never tell people that it's temporary." *See* Verghese Dep. 102:17–103:18. Dr. Verghese testified that he warned his patients:

> I tell them that expecting not to lose hair, expecting the hair to look the same, these are all unreal expectations. We have to treat this, and you will have hair-related problems. If they tell me - - if they ask me whether their hair loss is going to be permanent, then I tell them, even though there aren't - - I'm not going to take a chance on that, and that's where the wig comes in.
>
> So the discussion is a little different from saying it may be permanent or never permanent. I tell them it's better to take a different approach to some of these side effects.

*See* Verghese Dep. 104:23 – 105:16.

Following this conversation with Dr. Verghese, Ms. Francis again reviewed the side effects of chemotherapy with Nurse Celeste Keller. *See* University Medical Center New Orleans 518. Ms. Keller advised Ms. Francis that "total hair loss" would occur in 2-3 weeks, and suggested she

---

[9] Sanofi disputes Ms. Francis's assertions that her injuries, if any, were caused by Taxotere. Nothing in this Memorandum should be perceived as an admission by Sanofi to the contrary. However, for the purposes of this Motion for Summary Judgment, even if Taxotere caused Ms. Francis's injury, her claims are barred by La. Civ. Code Ann. art. 3492.

7

purchase wigs and scarfs or hats. *See* University Medical Center New Orleans 518. Ms. Francis then certified that she had attended the hospital's "Look Good Feel Better program," discussing, among other topics, hair loss related to chemotherapy. *See* University Medical Center New Orleans 518.

Ms. Francis's deposition testimony also confirms that her claims are time-barred. Ms. Francis testified that six months following her chemotherapy treatment, in May 2010, her hair was "short and thin." *See* Francis Dep. 222:8-14. While her hair "grew and grew," certain areas on the sides, middle, and top of her head were thinner than before chemotherapy treatment. *See* Francis Dep. 223:3-10. Ms. Francis further testified that the incomplete hair growth on the side, top, and middle of her head have remained the same since at least 2012. *See* Francis Dep. 230:23-232:14. Similarly, Ms. Francis testified that her allegedly thin or missing eyebrows and eyelashes have looked the same for more than three years. *See* Francis Dep. 233:11-234:14.

Ms. Francis attributed her incomplete hair growth to "all the chemo drugs put together," and, as early as 2012, raised her concerns with her oncologist's nurse practitioner, as well as her primary care physician. *See* Francis Dep. 236:20-238:2. Ms. Francis's deposition testimony confirms that she was aware of her injury in May 2010, and of its potential connection to Taxotere in 2011. Consequently, the one-year prescriptive period began and long expired before December 2016, when Ms. Francis filed this lawsuit.

### III. No exception applies to save Ms. Francis's case

"Ordinarily, the party pleading prescription bears the burden of proving that the plaintiff's claims have prescribed." *Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002). However, where, as here, a plaintiff's claims are prescribed on their face, the plaintiff bears the burden of proving an exception. *See Marin v. Exxon Mobil Corp.*, 48 So. 3d 234, 256

8

(La. 2010); *see also Campo v. Correa*, 828 So. 2d 502, 508 (La. 2002).

"Generally, the prescriptive period for a tort claim begins to run from the time the plaintiff is injured." *In re: Xarelto (Rivaroxaban) Prods. Liab. Litig.*, MDL No. 2592, No. 15-4790, 2017 WL 4517287, at *2 (E.D. La. Oct. 10, 2017). However, in Louisiana, the doctrine of *contra non valentum* "provides some grace for those plaintiffs who are unaware that their injury was caused by a tort." *Id.* But the doctrine "only suspends the running of prescription during the period of time when the action was not reasonably knowable to the plaintiff." *Id.* For an action to be "reasonably knowable" to a plaintiff, she need not gather all of the facts to support her claim nor determine the legal theory upon which her lawsuit is based. *Id.* Instead, she need only have "actual or constructive knowledge" of facts indicating to a reasonable person that she may have a cause of action. *Id.* In a product liability case, "constructive knowledge" of the cause of action is whatever notice would be necessary to excite the attention of a reasonable person and call for inquiry into whether the product could have caused the injury. *Campo*, 828 So. 2d at 510–11; *In re: Xarelto (Rivaroxaban) Prods. Liab. Litig.*, 2017 WL 4517287, at *2.

Here, Ms. Francis's prescriptive period began in May 2010, because, at the time, she had more than enough notice to "excite" her attention to call for an inquiry. Ms. Francis alleges in her pleadings that in May 2010, she experienced permanent alopecia, which she associated with her chemotherapy treatment. *See* AMC ¶ 173 (acknowledging that chemotherapy is known to cause hair loss); ¶ 178 ("hair loss usually begins one to three weeks after the initiation of chemotherapy"); ¶ 6 (describing baldness as "the universal cancer signifier" and how she "ha[s] struggled to return to normalcy, even after surviving cancer because an integral element of [her] identify, [her] hair, never returned.").

Further, Ms. Francis's claimed uncertainty as to which of her chemotherapy drugs caused

9

her alleged injury does not toll the statute of limitations. Ms. Francis's claim that she did not know which chemotherapy drug caused her injury until she, "read [] [Facebook] posts about Taxotere, and [] read the comments that other women were saying," *see* Dep. Tr. 237:13-238:4, is irrelevant because "the prescriptive period commences when there is enough notice to call for an inquiry about a claim, not when an inquiry reveals the facts or evidence that specifically outline the claim." *Luckett v. Delta Airlines, Inc.*, 171 F.3d 295, 300 (5th Cir. 1999) (citing *Terrel v. Perkins*, 704 So. 2d 35, 39 (La. App. 1st Cir. 1997)).

First, Ms. Francis still does not know which chemotherapy drug caused her alleged injury – yet that obviously has not rendered her unable to file suit. *Cf. Terrebonne Parish School Bd.*, 310 F.3d at 884 n.36. Second, "a plaintiff will be responsible to seek out those whom [she] believes may be responsible for a specific injury." *Carter*, 391 F. App'x at 345. Ms. Francis's admitted awareness of Taxotere as a *possible* cause of her injury was sufficient to commence limitations in 2010. *See Mason v. Danek Med., Inc.*, No. 95-cv-3481, 1998 WL 774176, at *1 (E.D. La. Oct. 30, 1998) (finding claims prescribed where "plaintiff's symptoms which are the basis for this suit manifested themselves to such a degree after his [treatment] that he should have known by exercising reasonable diligence that there was a reasonable possibility that his problem was caused by" one of several medical products involved in treatment); *Bultman v. Danek Med. Inc.*, No. 96-cv-3447, 1999 WL 33537321, at *3 (E.D. La. Dec. 17, 1999) (same); *see also Oil Ins. Ltd. v. Dow Chem. Co.*, 977 So. 2d 18, 21, 23-24 (La. App. 2007), *writ denied*, 976 So. 2d 1284 (La. 2008) (finding limitations triggered where plaintiff had suspected that defendant's conduct "may have been" a "possible" or "potential" cause of injury, over objection that the "true cause" was not "confirmed," noting that *contra non valentem* "does not allow the plaintiff to wait until the cause of the damage is certified or confirmed," and that "certitude is not a prerequisite to the

10

commencement of prescription.").

Therefore, the prescriptive period for Ms. Francis began in May 2010 (or no later than December 2011) when she had enough information to inquire about a claim, or when she had constructive knowledge of the relationship between her chemotherapy treatment and her permanent alopecia. *See Luckett*, 171 F.3d at 299-300 (citing *Terrell*, 704 So. 2d at 39).

Similarly, that no doctor ever told Ms. Francis that Taxotere caused her alleged injury is irrelevant to whether her claims have prescribed, because the triggering of the prescription period does not depend on the "pronouncement of a . . . physician or of an expert." *Luckett*, 171 F.3d at 300 (citing *Hunter v. Sisters of Charity of the Incarnate Word*, 236 So. 2d 565, 568 (La. App. 1st Cir. 1970) (holding that prescription commenced on plaintiff's medical malpractice claim when she was improperly lifted into a hospital bed, not when a chiropractor told her that the improper handling caused her pain)).

By May 2010, Ms. Francis knew that she had been treated with Taxotere during her chemotherapy, that chemotherapy caused her hair to fall out, and that her hair was not growing back as it was before her treatment. Ms. Francis had sufficient notice to excite her attention and call for an inquiry about a claim at that time. *See Campo*, 828 So. 2d at 510-11; *see also Carter*, 391 F. App'x at 346 (finding the plaintiff's claims prescribed where she immediately associated her injury with medication but did not file suit until one year and five days later); *Luckett*, 171 F.3d at 300 (finding prescription where plaintiff was generally aware of the medical cause of her injury but did not serve defendant until one year and one day later).

The timeline regarding Ms. Francis's injury and knowledge is as follows:
- 2006—The online blog and support group "Taxotears" is formed, consisting of women who claim they experienced permanent hair loss caused by Taxotere. Posts to the blog, which are publicly available, directly and consistently argue that

11

Taxotere causes permanent and persistent hair loss in breast cancer patients. *See* AMC ¶ 155.

- July 2009 – Ms. Francis begins treatment with Taxotere as part of her chemotherapy regimen. *See* SFC ¶ 10. Ms. Francis is aware that chemotherapy can cause hair loss. *See* Francis Depo. 178:4-10.

- October 2009 – Ms. Francis ceases chemotherapy treatment including treatment with Taxotere. *See* SFC ¶ 10.

- March 4, 2010—The Globe and Mail publishes an article reporting permanent hair loss as a "lasting side effect of the chemotherapy drug Taxotere," that affects 3-6% of women treated with Taxotere in combination with other drugs. *See* AMC ¶ 153.

- March 6, 2010—CBS News publishes article citing reports of permanent baldness in up to 6.3% of breast cancer patients treated with Taxotere, including members of the "Taxotears" group. *See* AMC ¶ 155.

- May 2010 – Per Ms. Francis's PFS, her injuries, including permanent/persistent hair loss on scalp, diffuse thinning of hair, and changes in the texture and thickness of her hair, begin. *See* PFS § VI.5.

- December 2011 – Per the definition of her injury in her Complaint, latest date on which Ms. Francis begins suffering from the injury that forms the basis of her lawsuit – "Permanent/persistent hair loss and diffuse thinning of hair." *See* SFC ¶ 12.

- December 2016 – Ms. Francis files this lawsuit.

Judge Fallon recently granted summary judgment on the basis of prescription over an assertion of *contra non valentem* under substantially similar circumstances. *See In re Xarelto*, 2017 WL 4517287, at *3. Ruling on a motion in *Louiviere v. Janssen*, Judge Fallon found that the plaintiff was on "inquiry notice" of his potential claims for internal bleeding more than two years before filing suit—specifically, once his doctors discontinued his Xarelto treatment. *Id*. Because the Xarelto label warned of "bleeding" generally, and the plaintiff's treatment history suggested a causal link (plaintiff was hospitalized for internal bleeding not long after being prescribed Xarelto), Judge Fallon concluded that the plaintiff had "sufficient actual or constructive knowledge to alert a reasonable person that there was a relationship between Xarelto and his bleed and that he could

12

be the victim of a tort" when his doctors told him to stop taking Xarelto. *Id.* This was true even though the plaintiff "may not have known how or why" the bleeding was associated or "all the details pertaining to prosecuting his lawsuit and how the Defendant committed its alleged tortious actions." *Id.*

### IV. Because the facts clearly demonstrate that Ms. Francis was on inquiry notice by May 2010, Ms. Francis's December 2016 filing of suit was untimely.

As in the *Louiviere* case, the basic facts on which Ms. Francis bases her claims reveal that she was on inquiry notice well over one year before filing suit. These facts are not alterable, nor are Plaintiff's claims tolled, by any event occurring *after* her limitations period had begun. Limitations cannot be "re-triggered." Thus, Taxotere's *subsequent* labeling is irrelevant to her claims having prescribed six years beforehand. In December 2015, Sanofi added to the "Post-Marketing Experiences" section of the product labeling a sentence stating that "[c]ases of permanent alopecia have been reported." *See* AMC ¶ 138. It is undisputed that Taxotere labeling has always prominently warned of hair loss (*see, e.g.*, AMC ¶¶ 129; 135). The 2015 labeling change did not announce any new or unexpected adverse event with the drug, or identify any previously unknown cause of hair loss. Where injury and potential causation are known, it is well-established that the possible extent or duration of an injury does not bear on prescription.

For example, in *Fontenot v. ABC Ins. Co.*, 674 So. 2d 960 (La. 1996), the Louisiana Supreme Court declined to apply *contra non valentem* where plaintiff had notice of injury and potential cause—even where the defendant assured plaintiff that her condition was "temporary and would resolve over time." *Fontenot*, 674 So. 2d at 964. As the Court explained, "Plaintiffs' contention that [defendant]'s failure to inform them that [plaintiff]'s condition was permanent versus temporary is of no consequence," since prescription is not delayed by "[i]gnorance or misunderstanding of the probable extent or duration of injuries." *Id.*

13

The court in *Xarelto* also recently concluded that a labeling change was irrelevant to the question of when the statute began to run on the plaintiff's claim. *See Xarelto*, 2017 WL 4517287, at *3; *see also Yurcic v. Purdue Pharma, L.P.*, 343 F. Supp. 2d 386, 392–93 (M.D. Pa. 2004) ("Plaintiffs' argument that they only became aware of their claim against the pharmaceutical companies when the label change occurred must fail. The accrual of Plaintiffs' cause of action is not dependent on this label change […] Plaintiff might have ascertained that the original label was inadequate on the basis of his injuries, if indeed the label has anything to do with his negligence and fraud claims."); *N. Tr. Co. v. Upjohn Co.*, 572 N.E.2d 1030, 1038 (Ill. App. 1991) (finding post-treatment warnings irrelevant in failure to warn product liability cases involving prescription drugs). Indeed, in ruling that the *Louiviere* claim accrued in March 2013, Judge Fallon wholly ignored subsequent "major changes" to the Xarelto labeling's "Risk of Bleeding" section made in January 2014 and May 2016. *See Xarelto*, 2017 WL 4517287, at *3. Here, Ms. Francis never read or discussed any subsequent labeling with healthcare providers.[10]

Such reasoning is especially applicable where, according to Plaintiffs, there has been more than a decade of public discussion about this very injury. *See supra* at 5 n.4 and AMC ¶¶ 149–162; 180–187 (collecting sources). *See e.g., Plumlee v. Pfizer, Inc.*, 664 F. App'x 651, 653 (9th Cir. 2016) (affirming dismissal where "the district court took judicial notice of an extensive record of documents—all publicly available during the relevant limitations periods—which discussed Pfizer's unpublished clinical trials and the allegation that Zoloft was no more effective than a placebo."); *Carey v. Kerr-McGee Chem. Corp.*, 999 F. Supp. 1109, 1117 (N.D. Ill. 1998)

---

[10] There is no evidence that Ms. Francis ever actually read or knew the content of any hair loss warning in any Taxotere label, much less the December 2015 label. Ms. Francis testified that she did not read the Taxotere label. *See* Francis Dep. 198:11-13. Ms. Francis further testified Dr. Verghese did not show her the labels for any of the chemotherapy drugs she was prescribed. *See* Francis Dep. 192:4-7.

14

(disposing of claims where "the pervasive media coverage and publicity surrounding the issue…leads the court to the inescapable conclusion that a reasonable person in [plaintiffs'] situation should have known of their claim."); *In re Avandia Mktg., Sales Practices And Prod. Liab. Litig.*, No. 07-md-1871, 2014 WL 2011239, at *1 (E.D. Pa. May 16, 2014) (publicly available information put any reasonable plaintiff suffering the injury alleged on notice of potential causes). Based on their own allegations, had Ms. Francis made basic inquiries into permanent hair loss and Taxotere, she would have readily identified such information.

Like the *Louiviere* plaintiff, it does not matter that Ms. Francis did not know "how or why" Taxotere was causing her permanent alopecia, or "all the details pertaining to prosecuting [her] lawsuit and how the Defendant committed its alleged tortious actions." *See In re Xarelto*, 2017 WL 4517287, at *3. Because Ms. Francis knew that her chemotherapy treatment had caused her hair loss, that Taxotere was part of her chemotherapy treatment, and that her treatment had ended but her hair was not growing back, Ms. Francis had "sufficient actual or constructive knowledge to alert a reasonable person that there was a relationship between" her chemotherapy treatment and her injury. *See id.* In sum, Ms. Francis's claims are untimely on their face, and no exception applies to save her case.

## CONCLUSION

Statute of limitations analysis here is not a shifting, impossible feat. Statutes of limitations run from a trigger date, which is the date of injury and a concrete, recognizable moment. Ms. Francis unequivocally alleges that she was injured based on the dates of her treatment and a period of persisting hair loss afterwards. The Plaintiffs cannot dispute that 6 months after completing treatment, any reasonable one amongst them would have known of her hair loss, known that it was persisting, and had notice that such persistence may have been caused by chemotherapy treatment.

Ms. Francis does not claim that she thought something other than chemotherapy caused her hair loss, or that she was not warned hair loss might happen. She does not claim that she believed something else was causing her hair loss as, according to her, it persisted over the years after finishing chemotherapy. There is not an ever-sliding scale where at some moment that failure to regrow hair transformed into a "permanent" injury, thereby triggering the statute or, else, there still would not be standing to sue even up until this day. This analysis easily bars untimely cases like Ms. Francis's. Even if a woman questioned whether her hair might eventually regrow, or questioned whether something else might contribute to her hair not regrowing, that woman was on inquiry notice. An injury cannot, on one hand, be so obvious that it interferes with a Plaintiff's identity, self-image, and social relationships, and, at the same time, be undiscoverable to her. This is especially true where Ms. Francis's pleadings establish an ascertainable trigger date for her claims, whether one looks to reasonable individual notice, or broader public dialogue. Thus, this Court's analysis is simple. Ms. Francis's claim accrued long ago. For the foregoing reasons, the Court should grant Defendants' Motion for Summary Judgment.

Date: February 5, 2019

        Respectfully submitted,

        /s/ *Douglas J. Moore*
        Douglas J. Moore (Bar No. 27706)
        **IRWIN FRITCHIE URQUHART & MOORE LLC**
        400 Poydras Street, Suite 2700
        New Orleans, LA 70130
        Telephone: 504-310-2100
        Facsimile: 504-310-2120
        dmoore@irwinllc.com

        Harley Ratliff
        Adrienne L. Byard
        **SHOOK, HARDY & BACON L.L.P.**
        2555 Grand Boulevard
        Kansas City, Missouri 64108
        Telephone: 816-474-6550
        Facsimile: 816-421-5547
        hratliff@shb.com
        abyard@shb.com

        *Counsel for Sanofi-Aventis U.S. LLC*

## CERTIFICATE OF SERVICE

    I hereby certify that on February 5, 2019, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

                              /s/ *Douglas J. Moore*