UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  TAXOTERE (DOCETAXEL)      *      16-MDL-2740
PRODUCTS LIABILITY LITIGATION     *
                                  *
                                  *      Section H
                                  *
Relates To All Cases              *      February 6, 2019
                                  *

*******************************************************************

REPORTER'S OFFICIAL TRANSCRIPT OF THE

**HEARING**

BEFORE THE HONORABLE MICHAEL C. NORTH,
UNITED STATES MAGISTRATE JUDGE.


*******************************************************************


**APPEARANCES**:

**For the Plaintiffs**:

Emily Jeffcott, Esq.              Karen Menzies,Esq.
Palmer Lambert, Esq.             Zachary Wool, Esq.
Dawn Barrios, Esq.               David Miceli, Esq.
Kyle Bachus, Esq.                Andre Mura, Esq.


**For the Defendants**:

Douglas Moore, Esq.              Beth Toberman, Esq.
Jeremiah Wikler, Esq.            Kelly Brilleaux, Esq.
Patrick Oot, Esq.                John Olinde, Esq.




**REPORTED BY**:        Mary V. Thompson, RMR, FCRR
                        500 Poydras Street, Room B-275
                        New Orleans, Louisiana  70130
                        (504)589-7783


**OFFICIAL TRANSCRIPT**

**P R O C E E D I N G S**

(Call to order of the court.)

THE COURT:  All right.  Have we got our participants on the phone?

UNIDENTIFIED SPEAKER:  Yes, Your Honor.

THE COURT:  All right.

THE LAW CLERK:  This is Multidistrict Litigation 2740, *In Re: Taxotere.*

Counsel, could you please make appearances for the record.

MR. OOT:  Patrick Oot for Sanofi.

MR. MOORE:  Douglas Moore for Sanofi.

MS. BRILLEAUX:  I'm kelly Brilleaux for Sanofi.

MR. WIKLER:  Jeremiah Wikler for Sanofi.

MR. LAMBERT:  Palmer Lambert, co-liaison counsel for plaintiffs.

MR. BACHUS:  Kyle Bachus for the PSC.

MS. MENZIES:  Karen Menzies for the PSC.

MR. OLINDE:  And John Olinde as liaison for the 505(b)(2) defendant.

THE COURT:  On the sidelines as usual.

MR. OLINDE:  Yes.  I've been here for a while.

THE COURT:  All right.  As you-all might expect, I have reviewed the submissions of both sides and I have gone through and reviewed all the attachments as well.  I think I know what I

**OFFICIAL TRANSCRIPT**

1  want to do.

2           What I don't want to do is debate with you-all the

3  timeliness of the PSC's deposition request.  I don't want to have

4  a conversation about why they didn't ask some individual witness

11:21:01    5  a handful of questions a couple years ago, or that they should be

6  precluded from doing discovery now that I think would be

7  appropriate in scope, because they are conducting it at the end

8  of the discovery period rather than the beginning.

9           I think this litigation is unwieldy enough without me

11:21:19   10  imposing overly strict interpretations about how these parties

11  should or could have conducted discovery at the beginning versus

12  where we are now.

13           How many cases are in this MDL now?

14           MS. MENZIES:  Over 12,000, Your Honor.

11:21:32   15           THE COURT:  12,000.  Okay.  I thought it was 10,000.

16           So there are 12,000 individual cases in the MDL, and

17  each of those cases depend in part on proper and complete

18  discovery of the information by all the parties.  I intend to

19  continue to try to see to it that proportional discovery

11:21:52   20  appropriate in scope is completed in full.

21           So as to the issues that you-all have raised and that

22  are before the Court today, let me say generally that I continue

23  to believe that discovery on retention policies has not been

24  triggered.  I understand the PSC's argument that they believe

11:22:12   25  that some information or documents are missing or otherwise

**OFFICIAL TRANSCRIPT**

1    elusive, but what I've been given thus far does not sufficiently

2    demonstrate with particularity what documents no longer exist

3    that may have existed and should still exist.

4    Now, that said, and turning to the specifics of the

5    request on the topics for a 30(b)(6) deposition that the PSC is

6    requesting, I do believe it's appropriate to allow the PSC to

7    further question a knowledgeable designee under Rule 30(b)(6) on

8    the substance of Sanofi's follow-ups to the ICSRs.

9    The PSC, in its brief, suggests that -- and I quote --

10   this is a legitimate line of inquiry, and if Sanofi can prepare a

11   witness to testify about this follow-up by documentary evidence

12   rather than conjecture, then plaintiffs need not inquire about

13   retention.

14   Now, I agree with that in part.  If a witness can

15   knowledgeably testify without a document, it does not necessarily

16   mean it's by conjecture.  I don't know what that testimony would

17   look like, but I don't think that those two things are -- I don't

18   think that it's a binary proposition.

19   I do think, though, given the requirements of PTO 49,

20   which requires the PSC to specifically identify what they think

21   is missing, that a 30(b)(6) deposition on the nature of the

22   follow-ups and whether they would or should have been documented

23   is the only way that the PSC can determine if something that

24   should exist no longer exists.

25   So to be clear, I will allow that deposition to go

11:22:33
11:23:00
11:23:16
11:23:39
11:23:55

**OFFICIAL TRANSCRIPT**

1  forward on the nature of the follow-ups that Sanofi has already

2  testified would have occurred.

3       That deposition may include questions concerning how

4  far such follow-ups would have or should have been documented.

5       It will not concern the retention policy for those

6  documents.

7       And as I ordered at the last status conference, to the

8  extent that the PSC plans to question a witness about particular

9  ICSRs, they must identify them in advance so the witness can be

10 properly prepared to testify about the follow-ups on those

11 documents.

12      I think the communications between Sanofi and patients

13 is also an appropriate subject matter for 30(b)(6) testimony

14 including whether and how they were documented.  But, again,

15 questions about the retention policies of such documents are not

16 appropriately within the scope of that deposition.

17      Sanofi's concern seems to be that that topic, while it

18 does not specifically address retention policies, is included in

19 a deposition notice that overall and generally refers itself to

20 retention policies.

21      So to be clear, I think that it is appropriate to ask a

22 30(b)(6) designee about those communications and how they were

23 handled, but not about retention policies of any documents,

24 forms, or other sorts of documentation that would have been

25 created as a result of those communications.

11:24:12
11:24:31
11:24:50
11:25:15
11:25:33

**OFFICIAL TRANSCRIPT**

1          Finally, I think that questions regarding the substance

2     of the ten identified legacy files is also appropriate.  But,

3     again, questions regarding the retention policies of those

4     documents are not.

5          Now, it may be that after asking these witnesses

6     questions about any of these topics, the PSC may actually

7     identify documents they think should exist and no longer exist or

8     haven't been produced, in which case the procedures of PTO 49

9     would be triggered.

10         The issue there is Sanofi continues to complain that

11    the PSC has not identified particular documents they think are

12    missing or have been destroyed when they shouldn't have been or

13    been destroyed when they should have been but still weren't

14    around.  This is the only way -- or at least the most appropriate

15    way that I can think of -- to allow Sanofi to conduct discovery

16    on the substance of these matters to determine how they would

17    have been documented and whether those documents should still

18    exist.

19         I think without that context and without the ability to

20    ask about how these matters were handled, it's not possible for a

21    lawyer to know what they are missing.  If they don't know what

22    should have existed in the first place, they can't come to you

23    and tell you it's missing, which is why you keep having these

24    conversations amongst the lawyers that we think we don't have

25    everything, and Sanofi's response is, Well, you have to tell us

**OFFICIAL TRANSCRIPT**

1  exactly what you don't have.  They don't know what they don't

2  have.  And I don't know where this process goes from here, but I

3  think these are subject matters that they are entitled to ask

4  prepared corporate designees about.

5       So that's how I intend to handle the request.

6       MR. MOORE:  Your Honor, just a couple of points of

7  clarification.

8       I understand that you don't want to hear from us that

9  the discovery that they are seeking now is something that should

10  have been done earlier, and I'm not going to do that.  But I will

11  ask Your Honor for a couple of clarifications, because the

12  arguments that were advanced in their papers didn't really line

13  up with the deposition notices that we were here on.

14       THE COURT:  I don't disagree with that entirely --

15       MR. MOORE:  Okay.

16       THE COURT:  -- but I am looking at the arguments that

17  are being advanced in the papers.

18       MR. MOORE:  Okay.  And so --

19       THE COURT:  I have looked at the deposition notices,

20  and what I'm trying to do is cut through the minutiae of the

21  notices and tell you-all generally what I think they are entitled

22  to ask your witness about.

23       MR. MOORE:  Okay.  And that was sort of my question.

24       As it relates to Topic No. 5, when Your Honor made your

25  statements on the record, you referred to "communications with

**OFFICIAL TRANSCRIPT**

1  patients."

2          THE COURT:  That may by the wrong terminology.  It

3  was --

4          MR. MOORE:  Well, no, that's what it says.

11:28:55
5          THE COURT:  -- patients -- there is a -- I guess there

6  is a -- some testimony that's developed and documents that have

7  been produced that indicate that --

8          MR. MOORE:  There was an e-mail, yeah.

9          THE COURT:  There was one e-mail.  I don't know if

11:29:08
10  there's more than one e-mail.  I seem to recall that there have

11  been multiple communications between individuals and the company

12  over time.

13          MR. MOORE:  Right.  And so -- but Topic No. 5 was

14  "communications between you and Taxotere patients relating to the

11:29:25
15  possibility of legal action," and so "communications with

16  Taxotere patients" is a much broader subject than "communications

17  with Taxotere patients regarding legal action."

18          THE COURT:  I intend to limit it to as it is drafted in

19  the notice.

11:29:39
20          MR. MOORE:  Okay.  Right.  Understood.

21          THE COURT:  My point being -- and, of course, as I do

22  in all these situations, it's going to be reduced to writing.

23  All of this is going to be in a minute entry.

24          My intention is to make clear that I think the subject

11:29:57
25  matter is appropriate, but I still do not believe that a

**OFFICIAL TRANSCRIPT**

1 deposition on retention policies has been triggered.

2          MR. MOORE:  All right.  Okay, Your Honor.

3          And then as it relates to Topic No. 2, is this a

4 30(b)(6) deposition that is in addition to the continuation --

11:30:21  5 the 11 hours they still have left with Kopreski?  Because I think

6 there's some overlap between the --

7          THE COURT:  I don't know the answer to that.  I don't

8 know the answer to that.  You-all are in a better position.

9          The problem I have with Kopreski is he is the one -- at

11:30:36  10 least from what's been provided to me, he is a person who has

11 already testified to some extent that he does not know the answer

12 to some of these questions, so I don't know if there is somebody

13 else who does.

14          But some of the testimony that was presented to me in

11:30:53  15 support of the plaintiffs' position is that it was he who

16 testified there should have been follow-up and the fact that

17 there is not a document here at this deposition does not mean

18 there wasn't.

19          MR. MOORE:  Right.

11:31:05  20          THE COURT:  I mean, I think that that is -- I think

21 that the plaintiffs are entitled to ask questions and to drill

22 down and to figure out what happened.

23          MR. MOORE:  Okay.  We'll look -- I think what we ought

24 to do is perhaps look at your minute entry on that subject

11:31:19  25 matter, and then figure out who is the best person at the company

**OFFICIAL TRANSCRIPT**

1   to research that issue and respond to it, whether it's Kopreski

2   or someone else.

3           THE COURT:  Yes.

4           MR. OOT:  So a preview issue on that, Your Honor, is we

5   are currently negotiating with the plaintiffs on the time to get

6   those follow-ups.  In your last order, Your Honor gave us seven

7   days upon identification of the follow-ups.  I think we went from

8   500 to 400, and to both track down and prepare a witness on 400

9   follow-ups is going to be difficult.

10          THE COURT:  Okay.

11          MR. OOT:  So a preview for a topic that may be a topic

12  for the 20th is that we're going to ask for more time.

13          THE COURT:  I don't have a problem with that.  You

14  know, we have gone back and forth in this litigation with time

15  being a major problem to not being a major problem to maybe it

16  becomes a major problem again.

17          But what I don't want to have is another round of

18  argument about what information the PSC could not get from a

19  30(b)(6) witness because they weren't prepared to answer specific

20  questions.  They've got to be -- they've got to have time to

21  prepare the witness to be able to answer the questions that

22  you-all have.  And if they need more time to do that, I'm going

23  to give it to them because I don't want to have to keep going

24  through this.

25          MR. OOT:  Your Honor, finally on Topic No. 5 related to

**OFFICIAL TRANSCRIPT**

1   the possibility of legal action, we addressed this.  They were
2   supposed to brief a trigger issue back in March which they never
3   did.

4       So now we've put up a witness that actually is speaking
5   about the document that said a possibility of legal action, or
6   whatever it said, and we're kind of at a loss that they didn't
7   sort of follow Your Honor's procedure to go file their motion on
8   the trigger issue so we would have a consistent idea of what that
9   trigger date is.

10      So I think that it's plaintiffs' position that there
11  was this early trigger date based upon a call into a call center
12  and maybe an unrelated French administrative proceeding.  I don't
13  think that that opens the door to discovery on discovery related
14  to litigation hold triggers.  And I think that that's a problem
15  to put up another witness that wouldn't be associated with
16  this --

17          THE COURT:  I don't know -- I don't know the extent to
18  which there is any information available on that topic beyond
19  that which has already been testified about.  I don't know.  I'm
20  looking at a topic, and I'm telling you that that subject matter
21  is appropriate for discovery.

22          You're telling me there's been some discovery already.
23  I don't recall what was supposed to happen in March.  You'll have
24  to forgive me.  It's almost March of 2019 now.  I do not have a
25  memory of what should have happened in the past.  I don't know

**OFFICIAL TRANSCRIPT**

1  if -- I don't know if there are additional communications beyond
2  that which has already been identified.

3      All I'm saying is if there is, it's an appropriate
4  topic for discovery.

11:34:24  5      MR. OOT:  So our point is that at the point that it
6  moves into a decision of the legal department of when they are
7  issuing a legal hold or, you know, when we're sending out a
8  litigation hold, we've already gone through that, Your Honor.  We
9  have already tread that ground, and we are going to object to the
11:34:39  10  sort of discovery related to the conduct of the legal department
11  in this case.

12      THE COURT:  Well, what's left to ask about?

13      MS. MENZIES:  You said it precisely -- and I know he
14  wants to keep going back to this argument of whether there's
11:34:51  15  trigger or not and then we are trying to establish the
16  spoliation, but we are not.  We actually are trying to get it --
17  and you said it exactly right, that we don't know what's missing
18  or whether anything is missing until we have an opportunity to
19  talk to these people about that.

11:35:03  20      We tried to do that with two of the witnesses.  There
21  are -- I think there are around 14 or 15 people on this one
22  e-mail, two of whom I asked about this, and they don't remember.

23      So now we're at a point where again, as Your Honor
24  pointed out, this is within our limits of discovery of depos.
11:35:19  25  You set a time limit.  We need follow-up discovery on that.

**OFFICIAL TRANSCRIPT**

1        Whether we ever get into spoliation stuff or whatever,

2   I think is well down the path.  I mean, as you just said, we

3   don't even know what we're missing.  So whether we're missing

4   anything or not -- you know, if it looks like we are and it was

5   inappropriate, then maybe we'll go down that path.

6        THE COURT:  I think that they're entitled to -- they're

7   entitled to conduct that basic discovery.  We're not -- if they

8   want to argue about trigger dates and legal holds and the

9   decision of the legal department, that's going to come down the

10  road and we're not there yet.  I hope that I made that clear.

11       MR. OOT:  Okay.  So just for clarity, Your Honor, the

12  fact issues around the e-mails associated with the possibility of

13  litigation --

14       THE COURT:  Who saw them, what do you remember about

15  them, what did you do in response, who did you talk to -- all of

16  those things.  I mean, that is basic discovery that I think they

17  are entitled to obtain.

18       MR. OOT:  And we're going to cut off at the sort of

19  privileged communications?

20       THE COURT:  Well, yeah.  I mean, when you start asking

21  about talking to lawyers, yeah.

22       MR. OOT:  Thank you, Your Honor.

23       MR. MOORE:  And then one more observation, Judge.

24       That there are 12,000 plaintiffs in this case, and at

25  the end of last year we had a big run-up of filings because of

**OFFICIAL TRANSCRIPT**

1    the three-year statute of limitations.  But we are where we sort

2    of are in this case, and one of the things that we addressed with

3    Your Honor's help, when Judge Milazzo was assigned the

4    litigation, was to set up a case management system where we're

5    not doing fact discovery out beyond the trials.

6         And where we are today is both sides have submitted

7    their expert reports.  We're basically done with expert

8    discovery.  We've submitted our witness lists.  We started filing

9    our motions for summary judgments yesterday.  And we feel like --

10   and we haven't fought them on having to do things beyond the

11   discovery cut-off in this case which was six weeks ago.

12        And I'm not saying that that's a reason not to do this,

13   but we feel like we are approaching the point at which it's

14   Mr. Olinde's turn to sit at this table and our turn to sit over

15   there and for discovery against Sanofi in MDL 2740 --

16        THE COURT:  I don't disagree with you.  This is limited

17   discovery.  This is not earth shattering.  This is not going to

18   change the case.  But it's -- and they didn't just pop out of the

19   hole yesterday and say, We want to ask these people questions.  I

20   mean, it's been going on for some time.

21        I mean, look, y'all sat and listened to me tell --

22   light up these other lawyers because they waited until the end of

23   discovery.

24        They are two different cases.  And, I mean, y'all know

25   that.

**OFFICIAL TRANSCRIPT**

| | |
|---|---|
| 1 | MR. MOORE:  Okay. |
| 2 | THE COURT:  We are very close to being to that point in |
| 3 | this case with regard to Sanofi and the first trial.  We're just |
| 4 | not quite there yet.  I don't have a problem allowing this |
| 5 | limited discovery to go forward. |
| 6 | MR. MOORE:  Thank you, Judge. |
| 7 | MR. OOT:  Your Honor, a final point.  Can we have an |
| 8 | order that really clarifies the scope of discovery, that |
| 9 | clarifies that -- |
| 10 | THE COURT:  I'm going to be as -- I'm going to be as |
| 11 | detailed as I can be. |
| 12 | MR. OOT:  Thank you, Your Honor. |
| 13 | THE COURT:  All right. |
| 14 | MR. BACHUS:  Your Honor, Kyle Bachus for the PSC. |
| 15 | Just to touch on the topic that Mr. Moore raised in |
| 16 | terms of the 30(b)(6) wrapping into the current Kopreski -- the |
| 17 | final Kopreski piece, I would just remind the Court that the |
| 18 | Court segmented by years the topics that could be covered during |
| 19 | each setting. |
| 20 | THE COURT:  You're telling me you need all 11 hours to |
| 21 | do what you need to do that we've already said you can do? |
| 22 | MR. BACHUS:  That's not exactly what I'm saying. |
| 23 | What I am saying is that just understand that time was |
| 24 | consumed in Table 1 deposition and Table 2 deposition to make the |
| 25 | inquiries to -- that led to the responses by Kopreski saying, I |

11:38:15
11:38:24
11:38:33
11:38:57
11:39:15

**OFFICIAL TRANSCRIPT**

1  don't have the information and the ability to answer the

2  question, but that time was still consumed.

3         I just -- I'm not saying that I need the full time for

4  him that's been given by the Court, but I just want to remind the

5  Court that we need to -- we will go back -- I will go back to

6  Table 1 and Table 2, and I'll be able to identify where we see

7  that there should be communications.  And I'll be able to

8  identify those for a witness who it doesn't sound like will be

9  Dr. Kopreski, and I will ask those follow-up questions as the

10  Court --

11         THE COURT:  I think that's the most productive way to

12  do it, is for you to identify for their benefit which one of

13  those documents you want to ask questions on follow-up so that

14  they can figure out who is the right person to ask and you-all

15  aren't wasting time in the deposition.

16         MR. BACHUS:  So some of those reports we've --

17  two-thirds of them we've already asked questions about.

18         THE COURT:  Right.

19         MR. BACHUS:  One-third are a fresh set that we're

20  identifying.

21         Also, per the Court's order, there was that -- I intend

22  to make a deep dive into them -- I think is the language that was

23  utilized.  But I just don't want us to be left with the

24  impression that causes us to come back to the Court on, Oh, we're

25  going to have to cover -- we're going to have -- not only are we

**OFFICIAL TRANSCRIPT**

1   going to have to cover one of the most intensive periods of time

2   of adverse event reporting, which is 2012 to the present in your

3   setting, plus we're going to have to cover all of this --

4   potentially another witness --

11:40:45   5   THE COURT:  That's not my intention.

6   MR. BACHUS:  Okay.  That's all I was trying to clarify.

7   And then the only other thing is I presume -- just

8   because there's been some question about scope -- that it is

9   permissible to ask in the 30(b)(6) topics that have just been

11:41:01   10   discussed, Have you been able to find the documents and have they

11   been produced in litigation?

12   THE COURT:  There's nothing wrong with that question.

13   MR. BACHUS:  I don't think so either.  I just want to

14   make sure.

11:41:11   15   THE COURT:  Look -- I mean, this is not rocket science.

16   Okay?  I mean, that's not discovery -- Would a document have been

17   created?  Yes or no.

18   If it was created:  Has it been produced?  Yes or no.

19   If it hasn't been produced:  Did you look for it?

11:41:27   20   I mean, those are questions that are asked in every

21   case.  There's nothing, you know -- nobody should be allergic to

22   that sort of --

23   MR. OOT:  We're in agreement, Your Honor.

24   THE COURT:  Good.

11:41:37   25   MR. BACHUS:  Thank you, Your Honor.  So I don't want to

**OFFICIAL TRANSCRIPT**

1   waste time --

2           THE COURT:  No, no.

3           MR. OOT:  The issue, as we referred to last week --

4   remember that we produced the -- what is essentially a report out

11:41:46   5   of this database, and the follow-up could be in offsite storage.

6   It could be in other locations.  It was their obligation under

7   PTO 49 to get back to us and say, Hey, we want follow-up on these

8   specific items.

9           Again, we have to run down and go back to whether it's

11:42:02   10   at Iron Mountain or offsite storage or -- you know, it could be

11   onsite in a document database.  It could be a variety of

12   different places.

13           But we're going to get to a point that there's a burden

14   associated with that and there's a time associated with that.  So

11:42:17   15   there really has to be known value of is what's in the database

16   enough or do you really need the document that went out or do we

17   need to remanufacture the document that was a mail merge out of a

18   database?  So those questions are going to come up.

19           Bottom line, I think we still haven't received from the

11:42:41   20   PSC the sort of scope of what the follow-up is as required under

21   PTO 49, and that's something they should be required to be

22   prepared before --

23           THE COURT:  I assume -- look, you-all want whatever

24   document there is that follows up on these particular adverse

11:42:58   25   event reports.

**OFFICIAL TRANSCRIPT**

1      MR. BACHUS:  Yes, sir.  And we requested them in our
2  original request for production of documents, and when they
3  didn't -- and when we got to the deposition --
4      THE COURT:  All right.  Well, here we are today.
11:43:07    5      MR. BACHUS:  I presume that the answer was they don't
6  exist.
7      THE COURT:  Okay.  Well, you have a limited number of
8  AERs --
9      MR. BACHUS:  Yes, sir.
11:43:17   10      THE COURT:  -- that you are interested in.  Have you
11  given that list to Mr. Oot and said, Where is the follow-up
12  documentation on these?
13      MR. BACHUS:  The answer is yes.  They have them in the
14  tables.  Okay?  There's -- I went to great lengths, as the Court
11:43:32   15  knows, to identify each and every document in the table.
16      There's Tables 1 and 2 and now there's Table 3.  Those
17  are the documents that we would like to have the follow-up
18  communication, if any, from the company regarding those sets of
19  documents.
11:43:44   20      THE COURT:  Okay.
21      MR. BACHUS:  I've said that -- honestly, Your Honor, I
22  don't know -- Mr. Oot, in fairness, isn't a part of those
23  conversations.  I'm talking to Harley, I'm talking to Adrienne,
24  I'm talking to Matt Keenan.  They may not be sharing.
11:43:54   25      I can't say it more or more clearly than I just said --

**OFFICIAL TRANSCRIPT**

1    THE COURT:  Isn't that sufficient to trigger you-all to

2  go look for these documents?

3    MR. OOT:  Not -- well, so I'm unaware of the follow-up.

4  I know that there was some follow-up that was done prior to the

5  last deposition.

6    But the -- I mean, the bottom line, we need a report so

7  we can actually assess -- also assess the burden of it because we

8  might be back --

9    THE COURT:  Well, Kyle says he gave it to you.

10    MR. BACHUS:  Your Honor, in the first --

11    THE COURT:  He wants the follow-up documentation on the

12  reports that are listed in his three tables.

13    MR. OOT:  I will take that -- if he's provided it to

14  Adrienne and Harley, that's fine.  I will take that on his word.

15    The issue, Your Honor, is once we assess the scope of

16  that, there may be a burden argument associated with that.  We

17  might be back here saying that -- you know, if it's thousands of

18  AERs, you know, we'd like --

19    THE COURT:  Well, I don't know if it's -- I mean, we

20  should know what the number is.  They are already in a table

21  somewhere.

22    What's the number?  How many are we talking about?

23    MR. OOT:  So I will get that information from Mr. --

24    MR. BACHUS:  It's probably close to 500 in total, some

25  of which, when they look through it, there's going to be no

**OFFICIAL TRANSCRIPT**

1    follow-up communication.

2           I just don't know -- other than asking for it in an RFP

3    and asking about it in a deposition and telling Mr. Keenan during

4    the course of the first deposition when it first came up, I need

5    somebody who can answer that question --

6           THE COURT:  I think that putting them -- listing them

7    in the table is sufficient to put you-all on notice of what it is

8    they're looking for.  So look for them.

9           MR. OOT:  Okay.

10          THE COURT:  If there's a burden -- if you think there's

11   a burden problem, you can raise it with me, but, I mean, this is

12   an important issue.

13          MR. OOT:  And that's --

14          THE COURT:  I mean, I would think that if the documents

15   exist, Sanofi would want the plaintiffs to have them as opposed

16   to arming them with the argument that there was no follow-up,

17   which they can make when there is no documentation of it.

18          MR. OOT:  I agree, Your Honor.  But the reason we had

19   PTO 49 was for the reason of burden that's associated with

20   getting that follow-up and doing customer --

21          THE COURT:  Well, you now know -- talk to Harley.  Talk

22   to someone who's got -- I mean, I think you-all have access to

23   the tables that Kyle is talking about.  Get the documents.

24          MR. OOT:  We'll assess that.

25          THE COURT:  Okay.

**OFFICIAL TRANSCRIPT**

1          MR. OOT:  Thank you, Your Honor.

2          THE COURT:  All right.  I think that's it.

3          I got an e-mail this morning about adding -- from Kelly

4     about adding the deficiency issue to the end of the next status

5     conference.  How long is that going to take?

6          MS. BRILLEAUX:  I think there are a total of between 35

7     and 40 cases right now so it depends on how many are cured

8     between now and then and what the issues are.  I would say an

9     hour or less.

10         THE COURT:  Okay.  Because I haven't been through this

11    process yet.

12         MS. BRILLEAUX:  Right.  It will be an adventure.

13         MR. MOORE:  Yeah.  And we haven't done it in the

14    context of the way this particular PTO is set up versus what we

15    would do for PTOs 22 and 22-A where the consequence was dismissal

16    of the case.  Here it's something else.

17         THE COURT:  Right.

18         MR. MOORE:  And we've made improvements in the process

19    in front of Judge Milazzo by being able to group cases, and, you

20    know, proposing consent resolutions as to certain things.  And

21    we'll certainly endeavor to do that to shorten the --

22         THE COURT:  Look, I don't have anything set that

23    afternoon after our conference, so time-wise it's a good time to

24    do it as long as you-all can get together and figure out -- come

25    up with a plan for how we're going to accomplish it.  And then

**OFFICIAL TRANSCRIPT**

1    let me know what the plan is before we start the conference.

2             MR. LAMBERT:  Judge, Parker Lambert.

3             We'll talk with them about that.  We've worked on

4    trying to group issues before Judge Milazzo with fact sheets so

*11:47:36*    5    we'll try to make it as palatable and efficient as possible.

6             THE COURT:  Very good.  I'll see y'all then.

7             Let me go start working on my minute entry.

8                                  (Proceedings adjourned.)

9

10                          *  *  *  *

11                          CERTIFICATE

12

13        **I hereby certify this 7th day of February, 2019, that the**

14    **foregoing is, to the best of my ability and understanding, a true**

15    **and correct transcript of the proceedings in the above-entitled**

16    **matter.**

17

18                          */s/ Mary V. Thompson*

19                          _____
                              **Official Court Reporter**

20

21

22

23

24

25

**OFFICIAL TRANSCRIPT**