UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION | MDL NO. 2740 |
| | SECTION "H" (5) |

THIS DOCUMENT RELATES TO:

Antoinette Durden, Case No. 2:16-cv-16635;
Tanya Francis, Case No. 2:16-cv-17410;
Barbara Earnest, Case No. 2:16-cv-17144

---

**MEMORANDUM IN SUPPORT OF SANOFI DEFENDANTS'
MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. LINDA BOSSERMAN**

---

Dr. Linda Bosserman was trained as a medical oncologist.[1] Her work now focuses on "value-based care" business practices.[2] She no longer sees patients.[3] Dr. Bosserman is not offering any opinions on general causation,[4] specific causation,[5] the Plaintiffs' hair loss,[6] or the adequacy of Sanofi's FDA-approved labeling.[7] Instead, outside of high-level background opinions on breast cancer, Dr. Bosserman's role is to offer "informed consent" opinions.[8] These "informed consent" opinions amount to nothing more than: (1) reading the depositions of Plaintiffs and their treating physicians; (2) cherry-picking testimony to fit a preconceived, speculative narrative (*i.e.*, that

---

[1]   Bosserman Dep. 96:3-5 (Ex. A).
[2]   *Id.* 36:14-17; Bosserman CV (describing current position at City of Hope Medical Foundation) (Ex. B).
[3]   Bosserman Dep. 190:18-191:1.
[4]   *Id.* 155:9-12.
[5]   *Id.* 83:1-10.
[6]   *Id.* 83:1-10, 87:6-7.
[7]   *Id.* 63:4-11, 92:14-16, 311:6-11, 550:4-22.
[8]   *Id.* 86:20-87:1, 152:9-14, 155:7, 169:7-10.

Plaintiff would have been offered and chosen a non-Taxotere chemotherapy regimen if she had been told about a risk of permanent alopecia); and (3) presenting that narrative as expert opinion. These litigation-driven[9] opinions are inadmissible under Rule 702 because:

1. Merely repeating and summarizing the depositions of the Plaintiffs and their prescribing physicians is not expert testimony and is not helpful to the jury;

2. There is no duty to warn the Plaintiffs (only their treaters); thus any opinion concerning chemotherapy regimens these Plaintiffs might have chosen had they been warned of a risk of permanent alopecia is irrelevant;

3. Opinions based on 20/20 hindsight about what chemotherapy these Plaintiffs might have chosen or been offered in retrospect is inherently speculative—as Dr. Bosserman acknowledges;

4. Dr. Bosserman's methodology is unreliable as she cherry-picked testimony while ignoring contrary deposition testimony and facts that did not support her opinion; and

5. Dr. Bosserman's reliance on "on-line" predictive tools and cooling-cap prevention do not fit the facts of these cases.

The Court should grant Sanofi's motion and exclude Dr. Bosserman's irrelevant and speculative opinions.

## **LEGAL STANDARD**

Under Rule 702, the Court's gatekeeping function concerning expert evidence involves a two-part inquiry into reliability and relevance:

> First, the Court must determine whether the proffered expert testimony is reliable. The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence. The reliability inquiry requires the Court to assess whether the reasoning or methodology underlying the expert's testimony is valid. The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation.
>
> Second, the Court must determine whether the expert's reasoning or methodology is relevant. The question here is whether the reasoning

---

[9] *Id.* 288:16-24 (admitting that her opinions came about as a result of litigation and did not grow out of research she was doing before being contacted for this litigation).

2

>  or methodology "fits" the facts of the case and will thereby assist
>  the trier of fact to understand the evidence.

*Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 550 (E.D. La. 2015) (citations omitted).

## ARGUMENT

### I. EXPERT TESTIMONY THAT MERELY REPEATS FACT TESTIMONY IS INADMISSIBLE UNDER RULES 702 AND 703.

In her report, Dr. Bosserman devotes 21 pages to selectively summarizing the deposition testimony of Plaintiffs and their prescribing physicians on the treatment choices they might have made had Plaintiff theoretically been told about permanent alopecia.[10] Dr. Bosserman acknowledged that her methodology in forming her case-specific opinions consisted of reading the depositions of the Plaintiffs and prescribing doctors and summarizing what she believed were the key points regarding the "informed consent discussion" in her report.[11] Dr. Bosserman confirmed that her informed consent opinions "are based on, essentially, just summarizing what [she] read in the depositions."[12] Those opinions are inadmissible.

First, summarizing fact-witness testimony under the guise of "expert opinion" is not helpful to the trier of fact. Dr. Bosserman admitted that her summaries of the Plaintiffs' and their treaters' depositions are not necessary to understand the actual testimony of those witnesses.[13] The jury is perfectly capable of listening to and understanding this fact-witness testimony without Dr. Bosserman's help. *See Peters v. Five Star Marine Serv.*, 898 F.2d 448, 449–50 (5th Cir. 1990) (upholding trial court's exclusion of expert opinions because "the trial judge correctly decided that the jury could adeptly assess this situation using only their common experience and knowledge."); *Jarrow v. Cupit*, 2000 WL 1537989, at *2 (E.D. La. Oct. 17, 2000) ("[E]xpert testimony on matters

---

[10] Bosserman Report, at 29-50 (Ex. C).
[11] Bosserman Dep. 403:21-405:25, 450:15-20.
[12] *Id.* 538:10-15.
[13] *See, e.g.*, *id.* 544:2-545:1.

3

which a jury is capable of understanding and deciding without an expert's help should be excluded.").

Second, an expert merely "repeating hearsay evidence without applying any expertise whatsoever" is not giving an expert opinion. *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) ("When an expert is no longer applying his extensive experience and a reliable methodology, *Daubert* teaches that the testimony should be excluded."). That testimony violates Rule 703, which "was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion." *Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 524 (5th Cir. 2013) (citations omitted); *id*. ("Courts must serve a gate-keeping function with respect to Rule 703 opinions to ensure 'the expert isn't being used as a vehicle for circumventing the rules of evidence.'").[14] Dr. Bosserman's attempts to summarize fact-witness testimony under the guise of "expert opinion" is precisely the type of non-expert hearsay that is inadmissible under Rules 702 and 703.

## II.  DR. BOSSERMAN'S "INFORMED CONSENT" OPINIONS ARE LEGALLY IRRELEVANT UNDER THE LEARNED-INTERMEDIARY DOCTRINE.

Under Rule 702, an expert's opinions must be relevant. *Burst*, 120 F. Supp. 3d at 550. Dr. Bosserman's "informed consent" opinions are not relevant in light of the learned-intermediary doctrine, which applies to all of Plaintiffs' claims. *See, e.g., Grenier v. Med. Eng'g Corp.*, 99 F. Supp. 2d 759, 766 (W.D. La. 2000); *see* Memorandum In Support of Defendant's Motion for

---

[14] Under Rule 703, experts can testify to opinions based on inadmissible evidence, including hearsay, if experts in the field reasonably rely on such evidence in forming their opinions. But no expert may simply transmit that hearsay to the jury. Otherwise, the expert is simply repeating hearsay evidence without applying any expertise whatsoever, a practice that allows the expert to circumvent the rules prohibiting hearsay. *See United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008).

4

Summary Judgment on Causation Based on the Learned Intermediary Doctrine (Rec. Doc. 6076, 6078, 6080).  Under that doctrine, the duty to warn runs only to the prescribing physician (the "learned intermediary"), not the patient.  At trial, the jury will *not* be asked to decide what actions *Plaintiff* would have taken had she been adequately warned.

Dr. Bosserman's opinion concerning what actions *Plaintiff* would have taken had she been adequately warned is necessarily irrelevant.  *See Tutwiler v. Sandoz, Inc.*, No. 17-13985, 2018 WL 1719024, at *3 (11th Cir. Apr. 9, 2018) ("Regardless of what Ms. Tutwiler would or would not have done with the information, Alabama law requires a showing of what Dr. Plumb would have done with it.").[15]  Louisiana law is the same on this point.  *See*, *e.g.*, *Willett v. Baxter Int'l, Inc.*, 929 F.2d 1094, 1098 (5th Cir. 1991) ("[a prescription drug] manufacturer has no duty to warn the patient, but need only warn the patient's physician"); *Grenier*, 99 F. Supp. 2d at 766 ("Defendants' duty runs only to the implanting physician as learned intermediary").

Second, even if it were relevant (it is not), Dr. Bosserman lacks any foundation to testify about the risks that Plaintiffs Durden, Earnest, and Francis hypothetically would have accepted.  Dr. Bosserman concedes (as she must) that she does not know what risks Plaintiffs Durden, Earnest, and Francis would have accepted at the time their physicians recommended a Taxotere-based chemotherapy regimen: "I don't know what they would have decided."[16]

---

[15] In *Tutwiler*, the plaintiff argued that the learned-intermediary doctrine did not apply because the plaintiff's treating physician was inadequately warned of the risks of amiodarone. The court rejected the plaintiff's claim because she failed to plead that if her physician had been aware of the risks of amiodarone, he would not have prescribed it for her. *Id*. at *3. Rather, the plaintiff alleged only what the plaintiff would have done if plaintiff had been aware of the risks of amiodarone. *Id.* The Court correctly found that allegation was irrelevant because a manufacturer's duty to warn under Alabama law (like Louisiana law) runs only to the prescribing physician. *Id*. Because the plaintiff failed to carry her burden to plead proximate cause, the learned-intermediary doctrine barred her claim. *Id*. The same result is warranted here.

[16] Bosserman Dep. 136:8-15.

Finally, to the extent Dr. Bosserman opines regarding what a Plaintiff's prescribing physician would have recommended had the Plaintiff refused to take a Taxotere regimen, this opinion is likewise irrelevant. The learned-intermediary doctrine turns on the testimony of the Plaintiff's prescribing physician, not the testimony of a retained expert speculating about what might have happened if the Plaintiff refused her physician's recommendation.[17] To do so would involve pure speculation about: (1) what the prescribing physician would have said regarding Taxotere and hair loss; (2) what the prescribing physician would have said regarding the risks and benefits of an alternative non-Taxotere chemotherapy regimen (including the permanent hair loss risk, cardiac risk, neuropathy risk, leukemia risk, and greater chance of death); and (3) what the Plaintiff would have then decided with all that information. Dr. Bosserman's "opinion" on these issues is legally irrelevant and unreliable speculation.

### III. DR. BOSSERMAN'S OPINIONS BASED ON HINDSIGHT ABOUT WHAT CHEMOTHERAPY A PLAINTIFF WOULD HAVE CHOSEN OR BEEN OFFERED IN RETROSPECT IS INHERENTLY SPECULATIVE AND INADMISSIBLE.

Opinions based on unsupported speculation must be excluded. *Burst*, 120 F. Supp. 3d at 550. Dr. Bosserman's informed consent opinions epitomize speculation. Dr. Bosserman opines that, based on her selective summary of deposition testimony, Ms. Durden would have chosen the CMF[18] chemotherapy regimen and Ms. Francis and Ms. Earnest would have chosen the AC-Taxol

---

[17] *See Grenier*, 99 F. Supp. 2d at 766 ("The affidavit of Dr. Louie Worthing submitted by Plaintiffs is the exact information needed to carry their burden through the gauntlet of the learned intermediary doctrine—if only the information had come from Dr. Ramey [plaintiff's treater], the person who the inquiry must revolve around. Coming from Dr. Worthing, it is irrelevant to the learned intermediary analysis.").

[18] Bosserman Dep. 124:14-125:6; Bosserman Report at 35. The "CMF" regimen consists of cyclophosphamide, methotrexate, and fluorouracil.

6

regimen had they known the risk of permanent alopecia with Taxotere.[19]  Plaintiffs' treating doctors never actually offered these alternative regimens to the Plaintiffs.  Dr. Bosserman admits that each chemotherapy regimen carries its own set of risks.[20]  Non-Taxotere regimens have unique risks of leukemia, neuropathy, and cardio-toxicity, to name a few.[21]  Dr. Bosserman also admits there are reported cases of permanent alopecia with *every one* of these alternative non-Taxotere chemotherapy regimens.[22]  For example, Dr. Bosserman admits that, based on the reports of permanent alopecia with Taxol regimens, it would be reasonable for a physician to warn a patient about a risk of permanent alopecia when prescribing Taxol.[23]  Sitting here today, there is no possible way to know what any of these Plaintiffs would have done if offered Taxol instead of Taxotere but warned of some risk of permanent hair loss with both.[24]  Moreover, the CMF regimen that Dr. Bosserman has contrived for Ms. Durden is an old, first-generation treatment with a lower overall survival rate.[25]  It simply does not work as well as Taxotere in fighting breast cancer.  Ms. Durden never indicated that she would have wanted a less effective cancer treatment and higher chance of death.   Additionally, there is no way to know what Ms. Durden would have done if offered CMF but also told of the reports of permanent hair loss that exist with CMF.[26]  Treatment

---

[19] Bosserman Dep. 134:22-25, 464:9-13, 474:16-19; Bosserman Report at 44, 47. The "AC-Taxol" regimen consists of Adriamycin (doxorubicin), cyclophosphamide, and Taxol (paclitaxel).
[20] Bosserman Dep. 122:11-15.
[21] *See, e.g.*, *id.* 284:4-12, 299:8-15, 140:8-23.
[22] *Id.* 142:19-143:18.
[23] *Id.* 524:3-14.
[24] *See, e.g.*, *id.* 525:3-4. ("We did not know what anyone would have done, except be accurately informed.")
[25] *Id.* 412:24-413:7.
[26] *Id.* 448:14-19.

decisions are not made with the benefit of 20/20 hindsight.[27] Medicine does not work that way and neither can Dr. Bosserman's opinions.

> As Dr. Bosserman testified on multiple occasions:
>
> > Q.  It's speculative to know what risks Ms. Earnest or Mrs. Durden or Mrs. Francis really would have accepted back in 2009 and 2011, correct?
> >
> > MR. THORNTON:  Objection.
> >
> > THE WITNESS:  *I don't know what they would have decided*, but they clearly were willing to weigh information provided in making their final decision with their oncologist.[28]
> >
> > …
> >
> > A.  *We did not know what anyone would have done*, except be accurately informed.[29]

Moreover, Dr. Bosserman's opinion hinges entirely on the notion that the prescribing physician would have relayed a known risk of permanent hair loss with Taxotere to the plaintiff. For a risk to be conveyed to a patient, as Dr. Bosserman acknowledges, that risk must be known or knowable.[30] However, Dr. Bosserman admits that she is offering no opinion on when any alleged risk of permanent hair loss with Taxotere was known or knowable.[31] Dr. Bosserman is creating hypotheticals that cannot be tested: if a risk truly exists, if that risk were then known, if the doctor then had relayed it, if the patient then rejected the treatment recommendation, if the patient had then been offered something else, what would the patient then do. And even assuming that each of those premises existed, Dr. Bosserman cannot (and should not) come to the ultimate

---

[27]  *Id.* 120:12-15.
[28]  *Id.* 136:8-15 (emphasis added).
[29]  *Id.* 525:3-4 (emphasis added).
[30]  *Id.* 172:16-18.
[31]  *Id.* 172:19-22.

conclusion (that the patient would not have chosen Taxotere in the face of the risk of hair loss, different, sometimes more serious safety risks with the alternatives, and lower chances of survival).

Finally, Dr. Bosserman had to admit that had Ms. Durden, Ms. Francis, or Ms. Earnest been prescribed a non-Taxotere regimen, there was no certainty that the Plaintiffs would be cancer free today[32] or that they wouldn't have permanent/persistent hair loss today had they survived.[33] In Dr. Bosserman's own words: ***"All of it is speculative."***[34]  Such speculation is inadmissible and must be excluded.

### IV. DR. BOSSERMAN'S METHODOLOGY IS UNRELIABLE AS SHE SELECTIVELY IGNORED CONTRARY TESTIMONY AND FACTS THAT DID NOT FIT HER PRECONCEIVED NARRATIVE.

An expert cannot cherry pick the facts that theoretically support her opinion while ignoring those that do not. *Konrick v. Exxon Mobil Corp.*, 2016 WL 439361, at *13 (E.D. La. Feb. 4, 2016), aff'd, 670 F. App'x 222 (5th Cir. 2016) (excluding expert's general-causation opinions, in part, because she "cherry-picks data and fails to explain results that contradict her conclusion"; noting such failure "casts doubt on the reliability of her methodology") *Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001) ("Because in formulating his opinion Dr. Hynes cherry-picked the facts he considered to render an expert opinion, the district court correctly barred his testimony because such a selective use of facts fails to satisfy the scientific method and Daubert, and it thus fails to 'assist the trier of fact.'").  An expert must consider contrary data and testimony when preparing her opinion; failure to do so renders an expert opinion unreliable. *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.* (No. II), 341 F. Supp. 3d 213, 296 (S.D.N.Y. 2018)

---

[32]  *Id.* 121:12-122:7.
[33]  *Id.* 130:2-5, 134:14-20, 135:1-5.
[34]  *Id.* 129:13 (emphasis added).

(excluding causation opinion because the expert's "cherry-picking approach is at odds with principles of sound science"). But this is exactly what Dr. Bosserman did.

### A. Dr. Bosserman Ignores Reports of Permanent Alopecia with Non-Taxotere Regimens.

Dr. Bosserman's report focused only on the "informed consent" involving a purported risk of permanent alopecia with Taxotere while ignoring the accompanying risks (including a permanent-alopecia risk) with the alternative, non-Taxotere treatments she proposes for each Plaintiff. As discussed above, Dr. Bosserman admits there are reports of permanent hair loss with Taxol, Adriamycin, Cyclophosphamide, and CMF.[35] Yet, Dr. Bosserman did not do any independent research to identify the nature of such reports or the risk involved. She simply did not look into it.[36] Dr. Bosserman's methodology is flawed. It is unreliable to opine that an alternative treatment is more appropriate than Taxotere while failing to do the research needed to account for the risks of the alternative.

### B. Dr. Bosserman Ignores Contrary Deposition Testimony of Dr. Verghese in the Francis Case.

Dr. Bosserman's report states that Dr. Verghese told Ms. Francis that her hair loss would be temporary.[37] She also states in her report that Dr. Verghese later learned of an association between Taxotere and permanent hair loss and now uniquely warns Taxotere patients of such a risk.[38] Neither of these statements are consistent with Dr. Verghese's actual testimony. Dr. Bosserman reluctantly admitted that Dr. Verghese actually testified: "I never tell people that it's temporary."[39] Dr. Bosserman likewise had to admit that Dr. Verghese actually testified that he

---

[35] *Id.* 142:19-143:18.
[36] *Id.* 348:11-349:7.
[37] Bosserman Report at 39.
[38] *Id.* at 43.
[39] Bosserman Dep. 458:1-5; Verghese Dep.102:22-103:5 (Ex. D).

10

connected any risk of permanent hair loss that may exist to *both* Taxol and Taxotere.[40] Accordingly, if Dr. Verghese hypothetically prescribed Taxol (Dr. Bosserman's alternative) he would likewise have informed a patient of a risk regarding permanent hair loss.[41] In other words, the counseling on the subject (hair loss) that Dr. Bosserman feels ought to have made a difference in the "informed consent" would actually have been the same for both Taxotere and Taxol. By ignoring testimony that did not fit her preconceived narrative, Dr. Bosserman misrepresented Dr. Verghese's true testimony, leading to an unreliable methodology and opinion.

> C. **Dr. Bosserman Ignores Contrary Deposition Testimony of Ralph Earnest and Written Materials Given to Ms. Earnest Prior to Chemotherapy.**

Ralph Earnest, the husband of plaintiff Barbara Earnest, was present during the risk/benefit conversation with the prescribing physician, Dr. Carinder. Mr. Earnest testified that, regarding hair loss, "He [Dr. Carinder] said it was possible it would never grow back."[42] Similarly, Ms. Earnest received a breast cancer educational booklet prior to chemotherapy that specifically included a statement that there were "rare reports of permanent hair loss" with Taxotere.[43] Dr. Bosserman never cited either key piece of evidence in her report, and these items are not on Dr. Bosserman's reliance list.[44] Once again, Dr. Bosserman selectively chose only the data that fit her narrative and ignored the data that contradicted it. That was improper and resulted in an unreliable opinion.

---

[40] Bosserman Dep. 467:20-25, 470:20-471:12.
[41] *Id.* 471:13-472:8.
[42] Ralph Earnest Dep. 147:24-148:2 (Ex. E).
[43] Bosserman Dep. 511:25-512:20.
[44] *Id.* 356:8-20; 511:25-512:20.

11

**D.     Dr. Bosserman Ignores Contrary Deposition Testimony in the Durden Case.**

Ms. Durden "adamantly" rejected any chemotherapy regimen that included Adriamycin, known as the "red devil."[45] But the <u>only</u> NCCN Guideline preferred regimen that did not include Adriamycin was a Taxotere containing regimen (Taxotere and Cyclophosphamide – "TC").[46] Ms. Durden's prescriber, Dr. Jancich, testified that if Ms. Durden came in today and did not want Adriamycin, the Taxotere "TC" regimen would still be one of her recommendations.[47] Dr. Bosserman ignores this fact. Instead, she states that Ms. Durden could have received CMF—an old, rarely used first-generation chemotherapy regimen that has less efficacy than the Taxotere regimen. Dr. Jancich never actually offered CMF to Ms. Durden.[48] The *only* options that Dr. Jancich considered at the time of treatment were the AC-Taxol regimen containing Adriamycin (that Ms. Durden adamantly rejected) and the "TC" Taxotere regimen—and Dr. Jancich still would have offered the "TC" Taxotere regimen today. Dr. Bosserman failed to address these realities in her opinion.

**E.     Dr. Bosserman Ignores the Clinical Experience of the Prescribing Physicians.**

Each of the prescribing physicians in these three cases had positive clinical experience with Taxotere. Dr. Bosserman ignores that testimony in her report.[49] This cherry-picking approach is not reflective of a reliable methodology. *See Konrick*, 2016 WL 439361, at *13.

---

[45]  *Id.* 398:6-17.
[46]  *Id.* 400:3-7.
[47]  Jancich Dep. 240:4-10 (Ex. F).
[48]  Bosserman Dep. 413:14-20.
[49]  *See, e.g.*, *id*. 409:5-8, 472:9-12, 473:24-474:2, 513:5-8.

12

## V. DR. BOSSERMAN'S RELIANCE ON CERTAIN "ON-LINE" TOOLS AND OPINIONS ON COOLING-CAP PREVENTION ARE IRRELEVANT.

Dr. Bosserman also offers opinions regarding certain on-line predictive tools and opinions on the ability of Plaintiffs to use cooling caps to prevent alopecia. Neither of these opinions "fit" the facts of these cases and should be limited accordingly.

In forming her expert opinions, Dr. Bosserman ran reports through the on-line tools "ONCO assist" and "PredictUK 2.0" to "estimate prognostic benefits of adjuvant chemotherapy for breast cancer patients."[50] These tools intend to provide some estimate of the benefit gained by adding treatment. Dr. Bosserman attempted to use these on-line tools to disparage the benefit chemotherapy offered each of these women. However, these tools are irrelevant as neither ONCOassist nor PredictUK 2.0 were available at the time the Plaintiffs underwent chemotherapy with Taxotere.[51] These tools could not possibly have played a role in the "informed consent" decisions for any of these three Plaintiffs. Moreover, for Ms. Durden, Dr. Bosserman points to CMF as the alternative regimen she could have received. CMF is so old and rarely used that the current on-line tools will not even allow the physician to input CMF as an option, and therefore, will not generate a report relevant to CMF treatment.[52]

With regard to cold caps, Dr. Bosserman opined that the Plaintiffs could have used cold caps to prevent hair loss in the first place with Taxotere.[53] The study that Dr. Bosserman relied on came out in 2018. A 2018 study could not have played a role in the "informed consent" that took

---

[50] Bosserman Report at 16-17, Exs. E-H.
[51] Bosserman Dep. 291:14-17, 292:3-6. ONCOassist was not developed until 2012 and PredictUK 2.0 was not published until 2017. The plaintiffs received Taxotere in 2009 and 2011. The only on-line tool that was available, Adjuvant Online, is no longer available.
[52] *Id.* 176:7-177:12.
[53] Bosserman Report at 26-29, 53.

13

place in 2009 and 2011.[54]   Moreover, the FDA did not clear a cold cap for use until 2015—years after the prescription decisions made here.[55]   Finally, even if some versions of a non-FDA authorized cold cap were available back in 2009 or 2011, there is no evidence that any of the prescribing physicians in these cases offered the use of a cold cap to these Plaintiffs or that a cold cap was an option for any of them.[56]   As a result, Dr. Bosserman's cold-cap opinions do not fit the facts of the cases and are irrelevant.

## CONCLUSION

Dr. Bosserman's "informed consent" opinions are nothing more than a cherry-picked selection of summarized deposition testimony with an added layer of unsupported speculation that is not legally relevant to the case.  For these reasons, the Court should grant Defendants' motion.

---

[54]   Bosserman Report at 29.
[55]   *Id.* at 27.
[56]   Bosserman Dep. 547:11-548:14.

Date:  February 8, 2019

Respectfully submitted,

 /s/ *Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE URQUHART & MOORE LLC**
400 Poydras Street, Suite 2700
New Orleans, LA  70130
Telephone: 504-310-2100
Facsimile:  504-310-2120
dmoore@irwinllc.com


Harley Ratliff
Adrienne L. Byard
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
Facsimile:  816-421-5547
hratliff@shb.com
abyard@shb.com

**Counsel for sanofi-aventis U.S. LLC and Sanofi U.S. Services Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2019, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ *Douglas J. Moore*