# EXHIBIT A

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          FOR THE EASTERN DISTRICT OF LOUISIANA
 3    _____
                                      )
 4    IN RE:  TAXOTERE (DOCETAXEL )MDL No. 2740
      PRODUCTS LIABILITY LITIGATION)
 5                                   )Section:  H
      This Document Relates to:     )
 6                                   )
      Antoinette Durden,             )
 7    Case No. 2:16-cv-16635;        )
      Tanya Francis,                 )
 8    Case No. 2:16-cv-17410;        )
      Barbara Earnest,               )
 9    Case No. 2:16-cv-17144         )
      _____)
10
11
12
13
14      VIDEOTAPED DEPOSITION OF LINDA D. BOSSERMAN, M.D.
15                 Costa Mesa, California
16                Monday, December 3, 2018
17                     Volume I
18
19
20
21    Reported by:
      DENISE BARDSLEY
22    CSR No. 11241
23    Job No. 3134931
24
25    PAGES 1 - 314
```

Page 62

1   Q  Is that correct?
2   A  Yes, the 15.
3   Q  And the comments that you just made
4 regarding the Taxotere product information and the
5 supplement approval in 2007 was from the year 2015,
6 correct?
7   A  Yes, the supplemental approval, yes.
8   Q  Now, you had made some comments about 2003.
9     Do you remember that?
10   A  Yeah, I know there was a supplemental
11 application. I don't know if I have a copy of that.
12 That was from Dr. Feigal's report.
13     I thought I was reading it in here -- I
14 can't find the reference offhand here. I thought it
15 was from Dr. Feigal's report.
16     And maybe from a conversation with her on
17 her report, because she mentions the post-marketing
18 and the -- she mentioned on her page 34 that
19 multiple abstracts and publications after the FDA
20 approval had noted it. I don't have it with me.
21   Q  So sitting --
22     MR. THORNTON: I can represent this witness
23 is not a regulatory expert.
24     THE WITNESS: Yes.
25     MR. THORNTON: As you know, there are

Page 63

1 regulatory experts in the case, and so that
2 regulatory issue is not going to be an issue --
3 BY MR. STRONGMAN:
4   Q  Dr. Bosserman, do you agree that you're not
5 going to offer any opinions about regulatory matters
6 in this case?
7   A  Yes. That's not my scope.
8   Q  And would you agree that you're not going
9 to offer any opinions about whether Sanofi's
10 labeling satisfied FDA requirements?
11   A  That's not my area of expertise.
12   Q  And, similarly, you're not going to offer
13 any opinions in this case regarding whether or not
14 Sanofi complied with the FDA's post-market
15 surveillance requirements?
16   A  Correct. I'll talk about the moral issues.
17   Q  You were referring to something in front of
18 you when you said 2003. What were you looking at?
19   A  I meant 2015. Sorry.
20   Q  Just so the record is clear, a little bit
21 ago you talked about a supplemental application.
22 And what you were really referring to is what we've
23 now marked as Deposition Exhibit Number 5,
24 correct --
25   A  Correct.

Page 64

1   Q  -- or, pardon me, that's not it --
2   A  5 -- oh.
3   Q  Yes.
4     What we've marked as Deposition Exhibit
5 Number 7; is that correct?
6   A  Number 7, yes.
7   Q  And the date on that is 2015, correct?
8   A  Correct.
9     (Deposition Exhibit 8 was marked for
10     identification by the court reporter
11     and is attached hereto.)
12 BY MR. STRONGMAN:
13   Q  I'm also going to hand you what was given
14 to me this morning by counsel as Exhibit Number 8.
15 Can you tell me what Exhibit Number 8 is?
16   A  This is a summary of the label review
17 regarding alopecia over time for docetaxel.
18   Q  Okay. And did you prepare Deposition
19 Exhibit Number 8?
20     MR. THORNTON: Objection.
21 BY MR. STRONGMAN:
22   Q  You may answer.
23   A  No.
24   Q  Do you know who did?
25   A  I don't.

Page 65

1   Q  And so what purpose did Deposition Exhibit
2 Number 8 serve?
3   A  So as I tried to search all of this and
4 develop it myself, I believe -- I assume Dr. Feigal
5 did this, but this helped me summarize the main time
6 points of when things were on the label and when
7 they were changed --
8   Q  And with regard to --
9   A  -- how it was described.
10   Q  Sorry.
11     With regard to Deposition Exhibit Number 8,
12 when did you first receive that document?
13   A  I believe yesterday.
14   Q  So when you prepared your expert report in
15 this case, you did not have Exhibit Number 8,
16 correct?
17   A  Correct.
18   Q  And when you prepared your expert report in
19 this case --
20   A  This isn't my scope. The label is not my
21 scope of work.
22   Q  Fair enough.
23     Counsel, do you have a copy of -- of her
24 report? I can give you one if you need one.
25     MR. THORNTON: I could use one. I don't

17 (Pages 62 - 65)

Page 82

1 and after photograph of each of the three
2 plaintiffs; is that correct?
3     A   Yes.
4     Q   And did you review any photographs for any
5 of the plaintiffs other than the photographs that
6 are contained in Deposition Exhibit Number 10?
7     A   I didn't for my report.  I believe I've
8 seen other photographs in the past.
9     Q   Sitting here today, do you have any
10 specific recollection of seeing photographs of the
11 plaintiffs, other than what is identified in Exhibit
12 Number 10?
13     A   No.
14     Q   And so were you trusting counsel to provide
15 the most accurate and fair pictures for you to look
16 at in Deposition Exhibit Number 10?
17     A   Yes.
18     Q   And you also relied on counsel to provide
19 accurate information in the chart that goes along
20 with the pictures as well; is that correct?
21     A   Yes, although I independently reviewed all
22 of the treatments and the doctors and all the
23 staging information and all the breast cancer
24 information from the actual medical records.
25     Q   Very good.

Page 83

1         MR. THORNTON:  And just so we're clear,
2 this physician isn't giving specific testimony on
3 hair loss.  That would be another expert, who is
4 going to be deposed tomorrow.
5 BY MR. STRONGMAN:
6     Q   And, Doctor, just so the record is clear,
7 do you agree you're offering no testimony about the
8 hair loss that any of these three plaintiffs may or
9 may not have experienced?
10     A   Correct.
11     Q   And we were talking about Exhibit B to your
12 report, which is the materials consulted, correct?
13 Do you remember that?
14     A   Yes.
15     Q   And there are depositions listed, and we
16 talked about that, correct?
17     A   Correct.
18     Q   Do you know if there are other depositions
19 that were taken in these three cases that you did
20 not review?
21     A   I don't know.
22     Q   So do you know whether or not other
23 treating doctors were deposed in any of the three
24 cases, other than the ones listed in Exhibit B to
25 your expert report?

Page 84

1     A   I don't know.
2     Q   Did you ever ask counsel whether or not
3 there were any other depositions of treating doctors
4 in any of the three cases that you reviewed?
5     A   I believe that I had all the relevant
6 treating doctors' depositions I needed.
7     Q   Would you consider an oncologist a relevant
8 treating doctor?
9     A   If they treated the patient, yes.
10     Q   Would you consider a dermatologist a
11 relevant treating doctor?
12     A   Not in the scope of what I was doing.
13     Q   Did you believe that you had reviewed all
14 the treating doctor testimony in each of these three
15 cases?
16     A   Let me look at the list.  I don't know if I
17 had all the dermatology --
18     Q   Exhibit B to your expert report there.
19     A   Let's see.  Let me look at my copy.  You
20 took back the one that has all the exhibits on it.
21     Q   There you go.
22     A   Yes, so I had one of the dermatologists
23 that I reviewed.  I can't remember who was whom, who
24 I have his chart.  I have Birkhoff and Prier, which
25 is a family member.  These are the ones I reviewed,

Page 85

1 so one of the dermatologists.
2     Q   And --
3         MR. THORNTON:  Wait.  Before there is
4 another question, I'm going to adjourn for just a
5 moment with the witness./STOPBG strong before you --
6 I'm not following.
7         MR. THORNTON:  I'm just going to walk out
8 and speak with the witness for a moment.
9         MR. STRONGMAN:  And it's my position that
10 what you talk about is subject to my questioning
11 when she comes back in.
12         MR. THORNTON:  That's fine.
13         MR. STRONGMAN:  Okay.
14         (Interruption in the proceedings.)
15         THE WITNESS:  Okay.
16 BY MR. STRONGMAN:
17     Q   And, Doctor, Counsel just stopped the
18 deposition for a moment and went out in the hall and
19 talked with you; is that correct?
20     A   Correct.
21     Q   And what did you discuss?
22     A   The depositions that I have and that I
23 reviewed that I've stated that I reviewed in my
24 expert report and what I relied on for that report.
25     Q   Elaborate.  What do you mean?  Why did you

22 (Pages 82 - 85)

Page 86

1 need to take a break to discuss that?
2    A   Because you asked if I had -- if it was
3 important to review all oncologists.  And, as you
4 know from this, there is a patient that has a
5 subsequent oncologist that wasn't the treating
6 oncologist.  So I don't have that deposition and I
7 haven't reviewed it.
8    Q   Okay.
9    A   And --
10    Q   Is it your testimony that that subsequent
11 oncologist is irrelevant in this case?
12    A   Yes.
13    Q   But you don't even know what that
14 oncologist said, correct?
15    A   So my issues that I'm expert about are the
16 treatment, the treatment decisions, the informed
17 consent process.  That's my expertise.  He wasn't
18 part -- he or she wasn't part of that informed
19 consent process.
20    Q   Hypothetically, say that there were
21 conversations about hair loss with that oncologist,
22 that's not relevant to your opinion in this case?
23    A   My opinion is about the decision, the
24 informed consent process that led to the treatment
25 decision that the patient received.  That's my area

Page 87

1 of expertise.
2    Q   So you said you reviewed one dermatologist?
3    A   It was given to me, so I looked at it, but
4 my --
5    Q   It's irrelevant to your --
6    A   Right.  I'm not talking on the hair loss
7 part.  That's not my area of expertise.
8    Q   So the deposition of Dr. Martin, the
9 dermatologist, correct?
10    A   Correct.
11    Q   And your testimony here today is that the
12 deposition of Dr. Martin is irrelevant to your
13 opinions today, correct?
14    A   I did not rely on that to -- I reviewed it.
15 I did not rely on it or quote her, I remember, in my
16 report.
17    Q   And your testimony is the depositions of
18 any subsequent oncologist that may have treated any
19 one of these women is not relevant to your opinion
20 today?
21    A   Correct.
22    Q   And, similarly, any other dermatologist
23 that any of these plaintiffs may have seen and the
24 depositions which you did not review, those
25 depositions would likewise be irrelevant to your

Page 88

1 opinions today?
2    A   Correct.
3    Q   So we talked about the fact that your rate
4 is $650 an hour, at least that's the rate that goes
5 from NDA Partners to the plaintiffs' lawyers, right?
6    A   Right.
7    Q   Is that the same rate for your review of
8 the materials as it is for your testimony?
9    A   Yes.
10    Q   And so, obviously, when you reviewed the
11 materials that are identified in Exhibit B, you
12 would keep track of your time, correct?
13    A   Correct.
14    Q   And how did you keep track of your time?
15    A   I noted it in my Outlook calendar.
16    Q   In which way?  How did you note it?
17    A   I put a start and stop time and I put a
18 total time on the top.
19    Q   And that, ultimately, is used to generate
20 an invoice; is that correct?
21    A   Correct.
22    Q   And does anybody help you generate that
23 invoice or do you do it yourself?
24    A   Sadly, I do it myself.
25    Q   And then that invoice goes to NDA Partners;

Page 89

1 is that correct?
2    A   Correct.
3    Q   And so the time that you've tracked and
4 submitted for your review of the materials included
5 in Exhibit B is captured in the invoices that we
6 marked earlier as Exhibit 6, correct?
7    A   Correct, except for November.  I haven't
8 submitted that.
9    Q   Okay.  Do you know how much time you spent
10 in November that you plan to invoice for?
11    A   Many hours.  I don't have a total.
12    Q   Do you have an approximation?
13    A   I prepped 12 hours yesterday to review
14 things for today.  My report took many hours.
15    Q   So you say you -- sorry.
16    A   It will be a lot.  20 hours, it was 12
17 yesterday.  It was a lot.
18    Q   You say you spent 12 hours yesterday?
19    A   Yes.
20    Q   And what did you do during that 12 hours?
21    A   I reviewed all of these documents, I read
22 all of Dr. Feigal's report.  I reviewed all of my
23 report again.  I looked at this.  I reviewed the
24 2015, just for my own interest.  I looked at these
25 labels of interest, just tried to memorize as much

23 (Pages 86 - 89)

1 as I could. And there is so much information. I
2 don't have a photographic memory, so --
3    Q   During that 12 hours did you spend any time
4 with counsel?
5    A   I did.
6    Q   How much time?
7    A   I believe 6 hours.
8    Q   And who was present?
9    A   John and Trevor.
10    Q   Anybody else?
11    A   Karen was on the phone.
12    Q   Anybody else?
13    A   No.
14    Q   Was Dr. Feigal a participant in those --
15    A   No.
16    Q   Other than the 12 hours you spent
17 yesterday, did you do anything else to prepare for
18 your deposition today?
19    A   I wrote the report, all that work.
20    Q   When did you write your report?
21    A   I finished it on the 9th. I worked on it
22 for weeks in between.
23    Q   Okay. So any time you spent in October on
24 your report is reflected in Exhibit 6, correct?
25    A   I'm not sure because I think -- let me look

1 it up.
2        This October 4th is for September. You
3 don't have the October bill. It says it is dated
4 October, but I don't believe it is the October bill.
5 I may have failed to submit it.
6    Q   And do you have accessible to you your --
7 the amount of time that you've spent in October and
8 November on this case?
9    A   I don't know --
10    Q   And you don't have to do it this second --
11    A   I don't know if my phone fully connects to
12 my Outlook calendar on my desktop. It is glitchy.
13    Q   And you understand that we're going to be
14 back together next Monday?
15    A   Yes, and I do, and I will have that
16 information for you of October and November.
17    Q   Very good. Thank you.
18        MR. THORNTON: I appreciate the rational
19 problem solving.
20 BY MR. STRONGMAN:
21    Q   And, Doctor, you mentioned that you
22 reviewed the 2015 supplemental approval and then
23 also the summary of the Taxotere labeling
24 information for interest?
25    A   Yes.

1    Q   And by that you're saying that those are
2 not documents that you're actually offering opinions
3 about in this case, correct?
4    A   Correct.
5    Q   And you're not relying on those documents
6 as support for your opinions as you set them out in
7 Exhibit Number 9, correct?
8    A   That's kind of a broad question because
9 from those documents, the educational materials get
10 made. And that's what went to patients and doctors
11 about their understanding. So tangentially, but I
12 am not here to comment on the regulatory accuracy.
13 That's not my area of focus.
14    Q   You would agree you're not an expert in
15 prescription drug labeling, correct?
16    A   For this event, that's correct.
17    Q   And you mentioned -- did you say
18 "educational materials"? Is that the word you just
19 used?
20    A   Yes.
21    Q   You don't cite any specific educational
22 materials in your expert report; is that correct?
23    A   Yes. Because in the -- the patients
24 themselves, when you review them, so the nurses that
25 they gave a handout, they didn't remember where it

1 came from or which one they actually gave --
2    Q   So my question was --
3    A   -- so I didn't cite any.
4    Q   -- in your expert report, you don't
5 actually cite or identify any particular educational
6 material, correct?
7    A   Correct.
8    Q   Have you ever spoken with Ms. Durden?
9    A   I have not.
10    Q   Have you spoken with Ms. Francis?
11    A   I have not.
12    Q   Have you spoken with Ms. Earnest?
13    A   I have not.
14    Q   And have you spoken to any of Ms. Durden's
15 treating physicians?
16    A   I have not.
17    Q   Have you spoken to any of Ms. Francis'
18 treating physicians?
19    A   No.
20    Q   And, similarly, have you spoken to any of
21 Ms. Earnest's treating physicians?
22    A   No.
23    Q   Did you request any documents from
24 plaintiffs' counsel that you did not receive?
25    A   Not that I recall.

24 (Pages 90 - 93)

1   Q   Is there anything specific that you can
2 remember requesting to review?
3   A   Getting the copies of the NCCN 2009, '10
4 and '11, Dr. Feigal pulled those, and I have -- I
5 tend to keep them copied on my computer, but I
6 didn't have all of them.
7   Q   And so you -- did you receive those from
8 counsel or from Dr. Feigal?
9   A   From counsel.
10   Q   All right.
11       And you mentioned that you had communicated
12 with Dr. Feigal about this case over time; is that
13 correct?
14   A   Correct.
15   Q   And that would have been starting somewhere
16 in late 2017, correct?
17   A   Correct.
18   Q   And have you ever e-mailed with Dr. Feigal?
19   A   Yes.
20   Q   And have you e-mailed with Dr. Feigal about
21 this case?
22   A   Yes.
23       MR. THORNTON:  Let me interpose an
24 objection, because what I believe, at least from my
25 review, is that the e-mailing was during work on the

1 science day presentation, which I understand from
2 the court is not subject to -- that that was an
3 off-the-record, kind of like an arbitration,
4 privilege, and so that's our position.
5 BY MR. STRONGMAN:
6   Q   And, Doctor, did you e-mail with Dr. Feigal
7 about Taxotere in e-mails that did not include
8 plaintiffs' lawyers?
9   A   I believe I may have.  And it was usually
10 when we were going to have a call or what day worked
11 to have a discussion or to get together.  It wasn't
12 about the case at all.
13   Q   And do you have access to your e-mails with
14 Dr. Feigal?
15   A   Yes.
16   Q   And I think we touched on this, you've had
17 no direct communication with any other expert in
18 this case, correct?
19   A   Correct, as I recall.
20   Q   Have you had any conference calls where
21 experts, other than yourself and Dr. Feigal,
22 participated?
23   A   Not that I recall.
24   Q   I want to shift gears for a second and talk
25 a little bit about what you've done in your career.

1 Okay?
2   A   Sure.
3   Q   So you are a medical oncologist; is that
4 correct?
5   A   Correct.
6   Q   And can you explain what a medical
7 oncologist does?
8   A   So to become a medical oncologist, you have
9 to go to four years of medical school and have an
10 M.D. degree, you have to be board certified or board
11 eligible -- I am board certified identified in
12 internal medicine, a three-year residency, which I
13 did a lot of oncologist at the time.
14       And then you do a two- to three- or
15 four-year fellowship -- I did a three-year
16 fellowship at Harvard -- where you spend all your
17 time learning about cancer, the treatment of cancer.
18       But the medical oncologist focuses on the
19 medical health of the patient and, generally, the
20 systemic therapy, therapy for the whole body, but
21 also is often the primary person in private practice
22 developing the treatment plans.  So you have to know
23 about the radiation oncology, the surgery,
24 rehabilitation, psychosocial support, palliative
25 care, hospice and the treatment for the cancer

1 itself.
2       And then you oversee the treatment,
3 ordering the changing support of them and are,
4 really, the leader of the care team.
5   Q   And when did you first start treating of
6 patients for breast cancer?  Would that have been in
7 your fellowship?
8   A   Back in medical school.  So I was very
9 interested in -- Stanford had a really remarkable
10 oncology program, with the team there, and so I
11 started focusing early on in medical school by the
12 third year in oncology.  I really decided that's
13 what I was going to do.  I originally thought about
14 neurology.
15       So I went to Saturday tumor rounds starting
16 back in 1981 -- so starting in 1979 I was going to
17 tumor rounds and Saturday rounds and the tumor
18 boards I could attend in medical rotations.
19       And then as an internal medicine intern and
20 resident at Stanford, I did a lot of oncology.  I
21 was interested in what they were doing in research,
22 all the work they were doing.  Primarily it was at
23 that time in Hodgkin's and lymphomas.  Breast
24 cancer, there wasn't that much going on at the time.
25 But I did a lot of oncology work, oncology patient

1 surgery, there are risks.
2    Q   Having a mastectomy has risks, correct?
3    A   Yes.
4    Q   Having a double mastectomy has risks,
5 correct?
6    A   Yes.
7    Q   And, obviously, having a surgical procedure
8 like a mastectomy or a double mastectomy has a lot
9 of emotional components to it as well?
10   A   Yes.
11   Q   And these are things that are discussed
12 with patients that have breast cancer, correct?
13   A   Yes.
14   Q   And there are certainly patients that are
15 willing to undergo that surgery to have a mastectomy
16 or a double mastectomy in order to fight their
17 cancer, correct?
18   A   Yes.
19   Q   And here we know that two of the patients
20 had either a mastectomy or a double mastectomy,
21 correct?
22   A   Uh-huh.
23   Q   Is that correct?
24   A   I didn't make notes on what surgery they
25 had to review today, so I would have to look at the

1 exact record.  I can't comment on it.  I don't have
2 any independent recollection of that.
3    Q   And then if you have a lumpectomy, you
4 would often recommend radiation, correct?
5    A   Correct.
6    Q   And do you know whether any of these three
7 patients had radiation?
8    A   I don't -- I didn't make a note here.  I
9 could look at the record and tell you, but I don't
10 independently remember who had which procedure.
11   Q   And there are risks with radiation,
12 correct?
13   A   Correct.
14   Q   And, certainly in your experience, there
15 are patients willing to accept those risks, correct?
16   A   Yes.
17   Q   And some of those risks with radiation can
18 be significant, correct?
19   A   Yes.
20   Q   And with regard to chemotherapy, certainly
21 the systemic chemotherapies that are used to treat
22 breast cancer like the cancers that these three
23 women had carry potentially life-threatening risks,
24 correct?
25   A   Yes.

1    Q   Including the risk of death, correct?
2    A   Yes.
3    Q   And in your experience, there are a number
4 of patients who are willing to accept those
5 significant and life-altering risks to treat their
6 cancer, correct?
7    A   Yes, and I told them about them up front.
8    Q   And certainly, having reviewed the
9 depositions here, you understand that all three of
10 these plaintiffs were told about hair loss, correct?
11   A   Yes.
12   Q   And, as we said earlier, unfortunately you
13 just don't have the ability to practice medicine
14 with 20/20 hindsight, correct?
15   A   True.
16   Q   All right.  With the specific patient, you
17 make the best recommendation you can, not knowing
18 for a hundred percent what's going to happen,
19 correct?
20   A   Make it with the information you have.
21   Q   And in this case, one thing we know for
22 100 percent certainty is that Ms. Earnest is alive
23 today, correct?
24   A   Yes, as far as I know.
25   Q   And we know with 100 percent certainty that

1 Ms. Durden is alive today, correct?
2    A   Since I haven't talked to them, I assume
3 so.  I think it is a reasonable assumption.
4    Q   And we know with a hundred percent
5 certainty that Ms. Francis is alive today?
6    A   A reasonable assumption.
7    Q   Okay.  And one of the things that you do in
8 your report is you talk about other alternatives
9 that could have been available to them back when
10 their treatment decisions were made, correct?
11   A   That were available, yes.
12   Q   But you would certainly agree, sitting here
13 today, that you would never be able to tell
14 Ms. Earnest that if she had a different chemotherapy
15 regimen, she 100 percent would survive, correct?
16       MR. THORNTON:  Objection.
17       THE WITNESS:  There is no 100 percent of
18 anything in medicine, as we agree.
19 BY MR. STRONGMAN:
20   Q   And with regard to Ms. Francis, you cannot
21 tell her if she had a different chemotherapy
22 regimen, she would 100 percent have survived to
23 today, correct?
24       MR. THORNTON:  Objection.
25       THE WITNESS:  Correct.

31 (Pages 118 - 121)

1 BY MR. STRONGMAN:
2    Q  With regard to Ms. Durden, if she had taken
3 a different chemotherapy regimen, you cannot say
4 with a hundred percent certainty that she would have
5 survived today, correct?
6        MR. THORNTON:  Objection.
7        THE WITNESS:  Correct.
8 BY MR. STRONGMAN:
9    Q  And, similarly, the other chemotherapy
10 regimens that you recommend -- strike that.
11       The other chemotherapy regimens that you
12 mentioned as alternatives that were available for
13 each of these three women, they obviously have
14 significant risks too, correct?
15   A  Yes.
16   Q  And you cannot say with 100 percent
17 certainty that if -- let's take Ms. Durden, for
18 example, okay?  Are you with me?  Can you find her
19 spot there on your chart?
20   A  Yes.
21   Q  So Ms. Durden had which regimen?
22   A  We called it TC, Taxotere Cytoxan.
23   Q  And Ms. Durden took TC because she made an
24 informed decision to not have Adriamycin?
25   A  She made an informed decision that the

1 risks disclosed to her for TC were more acceptable
2 than the risks disclosed to her about AC-T.
3    Q  Let me be specific.
4        Ms. Durden said she would not take
5 Adriamycin, correct?
6    A  She said she didn't want the red devil,
7 which is what they refer to Adriamycin as, but she
8 was willing to consider it in a clinical trial,
9 which she took home and read more about.  And then
10 with the TC side effects disclosed to her, that was
11 her preference.
12       So I don't have the sense, reviewing her
13 records and having talked to patients for years who
14 sometimes say I won't do something, when there is
15 extensive discussion, education, many patients will
16 change.
17   Q  But you've read both Ms. Durden's
18 depositions?
19   A  Yes.
20   Q  And the deposition of her --
21   A  A Daughter, yes.
22   Q  As well as the deposition of her
23 prescribing oncologist, correct?
24   A  Yes.
25   Q  And it was clear that Ms. Durden ultimately

1 decided that she wanted a regimen that did not
2 include Adriamycin, correct?
3    A  Yes.
4    Q  And at the time --
5    A  Based on what she was told were the side
6 effects of the other regimen.
7    Q  And based on the guidelines at the time,
8 the only preferred regimen in the NCCN Guidelines
9 that did not include Adriamycin was the TC regimen,
10 correct?
11   A  On the preferred list, but many patients
12 who didn't want that side effect or didn't want a
13 taxane and couldn't afford it did CMF still.
14   Q  Dr. Bosserman, if you could focus on my
15 question, the only regimen on the preferred list in
16 the NCCN Guidelines at the time Ms. Durden was
17 prescribed her chemotherapy, the only option on the
18 preferred list that did not include Adriamycin was
19 TC, correct?
20   A  True.
21       MR. THORNTON:  Objection.
22 BY MR. STRONGMAN:
23   Q  That was a Taxotere-containing regimen,
24 correct?
25   A  Yes.

1    Q  And in your report you ultimately say that
2 CMF could have been an option for her, correct?
3    A  Yes.
4    Q  CMF is a first-generation chemotherapy,
5 correct?
6    A  Yes.
7    Q  It is not a preferred chemotherapy regimen
8 for people presenting with the same factors that
9 Ms. Durden presented with, correct?
10       MR. THORNTON:  Objection.
11       THE WITNESS:  As you mentioned, its first
12 generation is an acceptable alternative, but it is
13 not on the preferred list.
14 BY MR. STRONGMAN:
15   Q  And you mentioned -- is it cheaper?
16   A  Yes, hugely cheaper.  And it has less hair
17 loss associated with it.  Only about 70 percent of
18 the patients will lose their hair with CMF.
19   Q  In the NCCN Guidelines there are oftentimes
20 three categories, I think you mentioned in your
21 report.  There is a preferred, there is other
22 recommended and then there's certain circumstances?
23   A  For other treatments, yes.
24   Q  Okay.  And --
25   A  Where are you referring?

32 (Pages 122 - 125)

Page 126

1    Q   If you go to page 21 of your report.  Are
2  you with me?
3    A   Yes.
4    Q   Okay.  And this is Exhibit 9, which is your
5  expert report in this case.  And on page 21 you talk
6  about different NCCN Guidelines and the categories,
7  correct?
8    A   Yes.
9    Q   And you actually cite something off of the
10 NCCN website, correct?
11   A   Correct.
12   Q   And based on what you write in your report,
13 there are three categories of preference, correct?
14   A   Yes.
15   Q   And the first one is preferred
16 intervention, correct?
17   A   Yes.
18   Q   And preferred intervention is defined as:
19       "Interventions that are based on
20       superior efficacy, safety and evidence
21       and, when appropriate, affordability."
22       Did I read that correctly?
23   A   Correct.
24   Q   And so in the NCCN Guidelines, that's what
25 we've been referring to here in this conversation,

Page 127

1  the preferred regimens, correct?
2    A   Yes.
3    Q   The second category you list here is called
4  other recommended intervention; is that correct?
5    A   Yes.
6    Q   And that's defined as:
7        "Other interventions that may be
8        somewhat less efficacious, more toxic
9        or based on less mature data or
10       significantly less affordable for
11       similar outcomes."
12       Did I read that correctly?
13   A   Yes, uh-huh.
14   Q   And then the third category is useful in
15 certain circumstances, which is defined as:
16       "Other interventions that may be
17       used for selected patient populations
18       defined with recommendation."
19       Did I read that correctly?
20   A   Yes.
21   Q   And so in the NCCN Guidelines, this is sort
22 of the hierarchy of the recommendation, correct?  It
23 moves from preferred to other recommended to useful
24 in certain circumstances, correct?
25   A   Yes.

Page 128

1    Q   And, certainly, you're familiar with the
2  current NCCN Guidelines, correct?
3    A   Yes.
4    Q   And you know that under the current NCCN
5  Guidelines CMF is not a preferred intervention for
6  the treatment of breast cancer, correct?
7    A   Correct.
8    Q   You also know that -- strike that.
9        You also know that CMF is not an other
10 recommended intervention for the treatment of breast
11 cancer, correct?
12   A   Not that I recall.
13   Q   And you know that, at most, today CMF falls
14 under the useful and certain circumstances category,
15 correct?
16   A   Yes.
17   Q   And certainly --
18   A   I also know it is highly ineffective.  I
19 know the data for CMF, having given it for years.
20   Q   And we know that a lot of prescribing
21 doctors don't use CMF because of its toxicity,
22 correct?
23   A   Don't use it?
24   Q   Correct.
25   A   No.  The toxicity of CMF is so much less

Page 129

1  than most other chemotherapies.
2    Q   Well, certainly doctors exist that don't
3  use CMF because it is less effective, correct?
4    A   That might be a choice.
5    Q   And what we know, sitting here today, is
6  that if Ms. Durden had been prescribed CMF, we don't
7  know that she would be cancer free today, correct?
8    A   We don't know if she is cancer free today
9  because the chemotherapy she got.  It may have done
10 nothing for her.  So you can't make that parallel
11 either.
12   Q   That's speculative, correct?
13   A   All of it is speculative.  She may be alive
14 without any chemo at all given her subtype, all
15 three of these women.
16   Q   But you can't say with 100 percent
17 certainty --
18   A   I'm not going to say --
19       MR. THORNTON:  Objection.
20       THE WITNESS:  -- anything with a hundred
21 percent certainty that you ask me today, because
22 that's absurd.
23 BY MR. STRONGMAN:
24   Q   I'm just asking you to answer my questions.
25 Okay?

33 (Pages 126 - 129)

Page 130

1    A   Okay.
2    Q   You can't say with 100 percent certainty
3  that had Ms. Durden been given CMF in 2011 that she
4  wouldn't have persistent hair loss today, correct?
5    A   Correct.
6       MR. THORNTON:  Objection.
7  BY MR. STRONGMAN:
8    Q   And we also know that if you were to go
9  back in time -- which we cannot do, correct?
10   A   Not that I know of.
11   Q   But we know if we went back in time and
12 used a different chemotherapy with any of these
13 three patients, they may have had a side effect that
14 they are not experiencing today, correct?
15      MR. THORNTON:  Objection.
16      THE WITNESS:  That's possible.
17 BY MR. STRONGMAN:
18   Q   That's certainly something that we just
19 can't know, correct?
20   A   Correct.
21   Q   And would you agree with me that you
22 talked -- strike that.
23      We were talking about the NCCN Guidelines,
24 correct?
25   A   Okay.

Page 131

1    Q   And was the regimen prescribed to
2  Ms. Durden in the preferred recommendation in the
3  NCCN Guidelines at the time of their prescription?
4    A   TC was on the preferred list, yes.
5    Q   And TC remains on the preferred list today,
6  correct?
7    A   It does.
8    Q   Taxotere was within the standard of care
9  when Ms. Durden received her chemotherapy, correct?
10   A   Yes.
11   Q   And Taxotere is within the standard of care
12 today, correct?
13   A   Yes.
14   Q   And what regimen did Ms. Francis receive?
15   A   Mrs. Francis got the TAC regimen --
16   Q   And at the time --
17   A   -- which is where you give all three
18 together.
19      Sorry.
20   Q   And at the time of Ms. Francis'
21 prescription was TAC within the preferred
22 recommendations?
23   A   Yes.
24   Q   And that would be the NCCN preferred
25 recommendations, just for clarity, correct?

Page 132

1    A   As I recall.  I believe I put those in --
2    Q   You did.  They are on page 18 and 19.
3    A   Here?
4    Q   In your report.
5    A   Okay.  I worked to get that to fit.
6       So you were asking about Mrs. Francis --
7    Q   Right.
8    A   -- in 2009.  Yes, TAC was on the preferred
9  list then.
10   Q   And then prescribing TAC would still be
11 within the standard of care, correct?
12   A   Yes.
13   Q   And what regimen did Ms. Earnest get?
14   A   Ms. Earnest got the AC-Taxotere regimen.
15   Q   And can you just describe for me how that
16 regimen would be administered?
17   A   Generally, it's given as the Adriamycin and
18 Cytoxan IV every three weeks, or every two weeks
19 dose dense with a growth factor, for four treatments
20 followed by docetaxel every three weeks or every two
21 weeks with the growth factor.
22   Q   And Ms. Earnest, when she was prescribed
23 the AC followed by T, that was within the standard
24 of care in 2011, correct?
25   A   So the AC-docetaxel was on the other list.

Page 133

1  It wasn't on the preferred list.  It was within the
2  standard of care, as you mentioned, but it was not
3  on your preferred list.
4    Q   Very good.
5       Do you know whether or not Ms. Durden lost
6  all her hair before she was ever administered
7  Taxotere?
8    A   I would have to go back and look.  I know
9  one of the patients had had some hair problems
10 before.  I don't remember which one.  I don't recall
11 her previous history right now.
12   Q   So sitting here right now --
13   A   I'd have to check it.
14   Q   Sitting here right now, do you know whether
15 or not Ms. Earnest lost all of her hair before she
16 was ever administered Taxotere?
17   A   I would have expected her to because AC
18 will usually -- by week 3 you are usually a hundred
19 percent, certainly by week 5 or 6 you've usually
20 lost a hundred percent of your hair, meaning you
21 could have some scragglers.
22   Q   And I think, looking at your report with
23 regard to Ms. Francis, you mentioned that
24 Ms. Francis could have received the AC-Taxol
25 regimen.

34 (Pages 130 - 133)

Page 134

1      Do you remember that?
2   A   What page are we referring to?
3   Q   45.
4   A   I agree with the statement.  I just wanted
5   to see what you were referring to.
6   Q   Top of page 45.
7      Do you see that?
8   A   Yes.
9   Q   So Mrs. Francis, it's your opinion, based
10  on what you've expressed in your expert report, that
11  AC-Taxol would have been an appropriate alternative
12  regimen, correct?
13  A   For Mrs. Francis, yes.
14  Q   And certainly as we've discussed, you
15  cannot say with certainty, sitting here today, that
16  had Ms. Francis received AC-Taxol that she wouldn't
17  have permanent hair loss today, correct?
18      MR. THORNTON:  Objection, vague as to what
19  you're asking.
20      THE WITNESS:  Correct.
21  BY MR. STRONGMAN:
22  Q   And with regard to Ms. Earnest, I
23  believe -- did you also state that the AC-Taxol
24  regimen would have been appropriate for Ms. Earnest?
25  A   If I didn't state it, I still agree to it.

Page 135

1   Q   And as we've just discussed, you can't say
2   with certainty that had Ms. Earnest been prescribed
3   AC-Taxol that she wouldn't have permanent hair loss
4   today, correct?
5   A   Correct.
6   Q   And wouldn't you agree with me that there
7   is a difference between a patient thinking about and
8   considering risks that they are willing to take
9   moving forward and patients looking at their
10  circumstances today in retrospect; those are two
11  different mental exercises, would you agree?
12  A   They are different exercises.
13  Q   So, for example, when you offered your
14  opinions in this case, you essentially assume that
15  everything will be exactly the same, except for what
16  you believe to be the complaints of hair loss that
17  each of these plaintiffs are expressing, correct?
18  A   I believe they would have considered that
19  and their alternatives, and they may have chosen an
20  alternative.
21      If they didn't choose an alternative, they
22  would have done it knowingly that there was that
23  risk, which is their right, and they also had the
24  option of using the cold caps, which were so
25  expensive at the time, that without thinking it was

Page 136

1   going to be permanent, a lot of patients forewent it
2   because of the cost.
3   Q   But you would certainly agree it is
4   speculative to know what really would have happened,
5   correct?
6      MR. THORNTON:  Objection.
7   BY MR. STRONGMAN:
8   Q   It's speculative to know what risks
9   Ms. Earnest or Mrs. Durden or Mrs. Francis really
10  would have accepted back in 2009 and 2011, correct?
11      MR. THORNTON:  Objection.
12      THE WITNESS:  I don't know what they would
13  have decided, but they clearly were willing to weigh
14  information provided in making their final decision
15  with their oncologist.
16  BY MR. STRONGMAN:
17  Q   But that's simply an exercise we can't do
18  in retrospect, correct?
19      MR. THORNTON:  Objection.
20      THE WITNESS:  I don't think you're correct,
21  because if you look at the information they were
22  provided, they thought about it significantly.
23      And when they were advised, as Ms. Durden,
24  that there was a risk of cardiac problems,
25  particularly with Adriamycin, and didn't have

Page 137

1   anything permanent that she was concerned about with
2   TC, many people would choose TC and did choose TC.
3      But I think if she would have been informed
4   of potential permanent hair loss, she may or may not
5   have made that decision, but it would have been her
6   decision.
7   BY MR. STRONGMAN:
8   Q   But we just simply can't know, correct?
9      MR. THORNTON:  Objection.
10      THE WITNESS:  We don't know what her
11  decision would have been.
12  BY MR. STRONGMAN:
13  Q   Correct.
14  A   We know she would have been informed, as
15  they informed her of everything else they knew about
16  at the time.
17  Q   And that's the same for all three of these
18  women, correct?
19  A   Yes.
20  Q   And don't you agree with me that if,
21  hypothetically, your patient who is sitting here
22  today believing that you had a side effect from a
23  medication, you view that whole conversation
24  differently because you believe you had a side
25  effect, correct?

35 (Pages 134 - 137)

1  A  I don't agree with you.
2  Q  You don't?
3  A  Absolutely not. From my experience, when I
4  have told people about potential experience (sic)
5  and they have it, they will remember that discussion
6  or they'll look at the notes or the handouts, and
7  then they don't feel betrayed.
8      Our job in that relationship when the
9  patient is so vulnerable and does not have the years
10 of experience or knowledge is to try to share all
11 the relevant things with them to help them make the
12 right decision.
13     And if you don't have trust with your
14 patient, that's devastating to their health and
15 their compliance with medication, their engagement
16 and their outcome. It is a sacrosanct trust to
17 disclose information to patients in oncology.
18 Q  And just so I've got it right too, you've
19 actually been named in lawsuits because of things
20 that people have said they believed happened because
21 of your care and treatment, correct?
22 A  Sure.
23 Q  And you said you went back and you had
24 documented everything appropriately, and so there
25 was no fault on your part, correct?

1  A  Right.
2      I mean, that case I told you was the sister
3  who was upset. The patient had no issue, but she
4  died and her sister brought suit. They reviewed it
5  with her, and there was no lack of disclosure.
6  Again, it was the disclosure that made all the
7  difference.
8  Q  Would you agree with me that not every
9  patient is a candidate for Taxol?
10 A  Yes.
11 Q  And would you agree with me that there are
12 some patients that are candidates for Taxotere that
13 are not candidates for Taxol?
14 A  That I have hard -- trouble figuring out.
15 The reason is we think about avoiding the taxanes,
16 we usually think of the neurotoxicity. A piano
17 player or a violin player, you're not going to give
18 either of them taxane because both can have
19 significant neurotoxicity, so --
20 Q  Are there any -- let me back up. Strike
21 that.
22     Are there any NCCN-recommended regimens
23 that involve Taxol but not Adriamycin?
24 A  In adjuvant breast cancer?
25 Q  Correct.

1  A  No.
2  Q  And the same question, are there
3  recommended regimens for adjuvant treatment of
4  breast cancer that involve Taxotere that do not
5  involve Adriamycin?
6  A  Yes. That's the TC regimen we talked
7  about.
8  Q  And you would agree with me that there are
9  some patients for which Adriamycin is not a viable
10 option?
11 A  It wouldn't be a recommended option in
12 adjuvant when you are -- if they had significant
13 congestive heart failure or a poor ejection
14 fraction, yes.
15 Q  For example, if there is an increased risk
16 of cardiotoxicity?
17 A  Yes.
18 Q  And that's with Adriamycin, correct?
19 A  Yes.
20 Q  And, in fact, there's a synergistic effect
21 with Adriamycin and paclitaxel with regard to
22 cardiotoxicity, correct?
23 A  There can be.
24 Q  And, as a result of that, there are no
25 preferred chemotherapy regimens in the NCCN

1  Guidelines that involve the concurrent
2  administration of Adriamycin and Taxol, correct?
3  A  No. You're saying because of the combined
4  toxicity, that that combined regimen wasn't tested
5  and existed, that's incorrect. The reason NCCN
6  stepped against each other is people thought the
7  Taxotere at that time, based on claims that related
8  to bumps, was a better drug for breast cancer. And
9  so the cost of doing those trials -- Steve Jones led
10 the TC/AC trial US Oncology network, who I know
11 well, and showed that the TC was better than AC.
12 Nobody was going to do the cost of doing Taxol/
13 Cytoxan. Everybody wants to know the result of that
14 study, and there are people that do substitute Taxol
15 with Cytoxan, because it would be very doable. It
16 was never tested in a formal clinical trial to reach
17 the evidence it would take to be on the NCCN
18 Guidelines. It is not because of toxicity you
19 mentioned, it has to do with trial development and
20 cost and that there were generic drugs and no one is
21 going to fund that study.
22 Q  Let me --
23 A  It may be equal.
24 Q  Let me just ask the question this way.
25     In the NCCN Guidelines for the adjuvant

36 (Pages 138 - 141)

Page 142

1 treatment of breast cancer, there are no regimens,
2 preferred or recommended, that involve the
3 concurrent administration of Adriamycin and
4 paclitaxel, correct?
5       MR. THORNTON:  Objection.
6       THE WITNESS:  In adjuvant therapy, correct.
7 BY MR. STRONGMAN:
8    Q   And, similarly, there's no preferred or
9 recommended regimen in the adjuvant treatment of
10 breast cancer that involve Adriamycin,
11 cyclophosphamide and paclitaxel administered at the
12 same time, correct?
13    A   Not in adjuvant.  There's sequential.
14    Q   And by "sequential," it means the Taxol
15 portion is administered later?
16    A   Separately, because it is remarkably less
17 toxic and the most effective regimen published to
18 date in adjuvant breast cancer.
19    Q   And you would certainly agree with me that
20 there have been cases of permanent hair loss
21 reported with Taxol, correct?
22    A   I believe so, yes.
23    Q   And you would agree with me that there are
24 cases of permanent hair loss reported with
25 cyclophosphamide, correct?

Page 143

1    A   Yes, especially in the transplant site.
2    Q   And you would agree with me that there were
3 cases of permanent hair loss reported with
4 Adriamycin, correct?
5    A   In regimens, yes.
6    Q   In fact, you know that there have been
7 cases of permanent hair loss with the AC regimen,
8 correct?
9    A   Rarely, yes.
10    Q   And you actually know that there have been
11 cases of permanent hair loss with the AC-Taxol
12 regimen?
13    A   I believe so.
14    Q   And you know that there have been cases of
15 permanent hair loss reported with CMF, correct?
16    A   There are cases in almost everything.
17    Q   So yes?
18    A   Yes.
19    Q   And in oncology, of all specialties, there
20 is attention paid to levels of evidence, correct?
21 Do you understand what I mean by that?
22    A   No.  Because it depends who is defining
23 that.  So what do you mean -- what are you referring
24 to?
25    Q   Fair enough.

Page 144

1       But when you look at published clinical
2 trials, for example, some of them are denominated
3 level 1 evidence.
4       Do you understand that?
5    A   Yes.
6    Q   And what does that mean?
7    A   The randomized, placebo-controlled
8 double-blind trials is considered the gold standard
9 that will come into question when data comes to
10 light, but that is the current gold standard for
11 level 1 evidence.
12    Q   And there is kind of a pyramid of evidence
13 that cascades down from that, correct?
14    A   Yes.
15    Q   What would be the next level down, level 2
16 evidence?
17    A   A trial that didn't have the same power of
18 a randomized phase 3, it may not have been powered
19 enough for all the outcomes, it might be a
20 high-level phase 2 all the way down to expert
21 opinion when there just aren't clinical trials.
22    Q   Okay.  And you're saying all the way down
23 to just an opinion of a medical professional or a
24 scientist that's expressed --
25    A   Generally key opinion leaders are

Page 145

1 considered the expert opinion.  They have enough
2 experience in something maybe rare, maybe there is a
3 big published trial, or a trial at all, what do you
4 think your best option is.
5    Q   And would you agree with me that case
6 reports are very low in the pyramid of scientific
7 and medical evidence?
8    A   Yes, they are the indicators that usually
9 lead to further investigation if it is significant
10 enough.
11    Q   Are you familiar in your training and
12 experience what the difference between association
13 and causation is?
14    A   Yes.
15    Q   And would you agree with me that case
16 reports alone are not sufficient to draw a
17 scientifically reliable conclusion about causation?
18       MR. THORNTON:  Objection; form.
19       THE WITNESS:  Individual case reports, as I
20 said, could be an indicator.  They do not prove
21 causation.
22 BY MR. STRONGMAN:
23    Q   And we've also been talking a little bit
24 about endocrine therapy as well, correct?
25    A   Yes.

37 (Pages 142 - 145)

1 and your review of the medical literature that there
2 are case reports of permanent hair loss with the
3 aromatase inhibitors?
4     A   Very rarely, yes.
5     Q   But there are cases reporting, correct?
6     A   I would imagine.  I don't know that I've
7 looked at them, but I imagine they exist.  I don't
8 know of any specific ones.
9     Q   When you prepared your expert report, did
10 you do any specific searches of the medical
11 literature?
12     A   For this report?
13     Q   Correct.
14     A   Over the last year, I definitely pulled and
15 looked at articles that are here that are mentioned
16 here.  I didn't go searching for aromatase inhibitor
17 reports.
18     Q   Did you go searching for case reports with
19 cyclophosphamide?
20     A   No, because I'm well aware of the data.  I
21 did a lot of bone marrow transplant work when I was
22 at Harvard.
23     Q   And so you are also aware, though, that
24 there's reports of hair loss with cyclophosphamide,
25 not just in that bone marrow setting, but also in

1 the breast cancer setting?
2     A   I would imagine they exist, but in my years
3 of experience, it wasn't an issue, so I'm saying
4 there is a perspective there.
5     Q   And I think you indicated in your years of
6 experience --
7     A   And a couple with Taxotere.
8     Q   -- and two with Taxotere, correct?
9     A   In retrospect, yes.
10     Q   But you certainly have -- as a medical
11 doctor, you have access to the medical literature,
12 correct?
13     A   Yes.
14     Q   And do you have avenues by which you can
15 electronically search the medical literature?
16     A   I do.
17     Q   And when you were forming your expert
18 report in this case, did you go to those databases
19 of medical literature and perform any searches?
20     A   I did not.
21     Q   You referenced Dr. Feigal's report earlier;
22 is that correct?
23     A   Yes.
24     Q   And you said that you have reviewed
25 Dr. Feigal's report?

1     A   Yes.
2     Q   Did you review her report before you
3 drafted yours?
4     A   I believe so.  I had a draft of it, an
5 early draft, as I recall.
6     Q   And you are talking about --
7     A   I think they were both due on the 9th,
8 somewhere around there.
9     Q   And so you believe you saw some version of
10 Dr. Feigal's report while you were working on your
11 report?
12     A   I might have.  But, again, she was dealing
13 with different issues, so I really focused on the
14 treatment and the informed consent.
15     Q   And I think in your expert report there is
16 a sentence or two toward the end where you reference
17 Dr. Feigal's --
18     A   Report.
19     Q   -- report?
20     A   Yes.
21     Q   And specifically you talk about --
22     A   What page?
23     Q   51.
24         Are you with me?
25     A   Yes.

1     Q   And so on page 51 of your expert report you
2 mentioned that you had reviewed Dr. Feigal's Rule 26
3 report, correct?
4     A   Yes.
5     Q   Do you know what Rule 26 is, by the way?
6     A   It is the rule that the experts work under
7 to develop the report on our expert opinion.
8     Q   Have you ever read Rule 26?
9     A   I have not.
10     Q   I don't know why you would.
11     A   Thank you.
12     Q   I'm just curious why you use that term,
13 specifically?
14     A   What term?
15     Q   Rule 26.  It is a legal term.
16     A   Because that's what my report's called.
17     Q   Very good.
18         Okay.  So in your report on page 51 you
19 specifically reference a section of Dr. Feigal's
20 report, correct?
21     A   Yes.
22     Q   And that's section 8, correct?
23     A   Subsection (b) and (c), including Table 2,
24 section 8, yes.
25     Q   In Table 2 of Dr. Feigal's report she

39 (Pages 150 - 153)

Page 154

1 has --
2    A  Let me pull that up because I don't
3 memorize it.  Do you know what page that's on?
4    Q  It's toward the end.
5    A  So it is pages -- on page 35, 36 and 37,
6 yes.
7    Q  All right.
8       And so in Table 2 of Dr. Feigal's report,
9 there is sort of a listing of various, I guess you
10 call them, publications; is that correct?
11   A  Yes.
12   Q  Did you go review each and every one of
13 those publications independently?
14   A  I've read Nabholtz's paper.  I've read
15 Sedlacek's paper.  I didn't read the other ones.  I
16 haven't read the other ones.  I've not read them
17 directly, no.
18   Q  So of the publications listed in Table 2 of
19 Dr. Feigal's report, you believe you've read the
20 Nabholtz's paper, correct?
21   A  Correct.
22   Q  And you've read the Sedlacek's paper,
23 correct?
24   A  Yes.
25   Q  But you didn't independently go and pull up

Page 155

1 the remaining publications that she cites in
2 Table 2, correct?
3    A  I don't remember reading dermatology.  I
4 don't remember the JCO.  I don't remember looking at
5 these other alopecia ones, no.
6    Q  And to be fair, you took her --
7    A  I'm on informed consent.
8    Q  Okay.  Very good.
9       And so you're not offering any opinions
10 about whether or not Taxotere, in fact, causes
11 permanent hair loss, correct?
12   A  Not my area of expertise to comment on.
13      (Deposition Exhibit 11 was marked for
14      identification by the court reporter
15      and is attached hereto.)
16 BY MR. STRONGMAN:
17   Q  And I'm going to hand you what I marked as
18 Exhibit 11, which is just a copy of Dr. Feigal's
19 expert report, correct?
20   A  Yes.
21   Q  And you were just looking at it, and I want
22 to make sure, just for the record, it is the same
23 thing we were looking at, correct, Exhibit 11?
24   A  Yes.
25   Q  Okay.  And, Doctor, we've touched on this a

Page 156

1 little bit earlier, but you, obviously, can't review
2 everything in the world to prepare your expert
3 report, correct?
4    A  Correct.
5    Q  That's not possible and that's not a fair
6 expectation, I understand that.  Right?
7    A  Yes.
8    Q  For you to review every piece of literature
9 in the entire world, that's too much, correct?
10   A  Yes.
11   Q  But you would also agree that
12 cherry-picking certain literature to look at and
13 ignoring other literature would also not be a --
14   A  Because you haven't reviewed it in detail
15 doesn't mean you're ignoring it.  I mean, there is a
16 weight of evidence here.  And there's years of
17 experience of reading journals and articles on this
18 and treating patients, so you're not ignoring that.
19   Q  Doctor, would you at least just agree with
20 me that, as a scientific principle, you can't
21 cherry-pick data?
22   A  That's an interesting statement.  You say
23 you don't weigh one publication more than another
24 based on what it is talking about?  I mean, what
25 does cherry-picking mean to you?

Page 157

1    Q  You can't pick some things to put forward
2 and not put forward other things that are contrary,
3 correct?
4    A  Depends if you think they are credible or
5 not.
6    Q  Let me just put it this way.  Let's say you
7 were doing a clinical trial -- are you with me so
8 far?
9    A  Yes.
10   Q  So you've treated 10 patients with a
11 certain therapy.  Okay?  Are you with me?
12   A  Yes.
13   Q  And it worked for eight and it didn't work
14 for two.
15      Are you with me so far?
16   A  Yes.
17   Q  You have to report the two that it didn't
18 work along with the eight where it did, correct?
19   A  That's the rules of the trial, yes.
20   Q  You can't cherry-pick the eight and say,
21 uh-huh, it worked, and ignore the two where it
22 didn't, correct?
23   A  When you do a report, you report on your
24 findings.
25   Q  Correct.  Good, bad or indifferent,

40 (Pages 154 - 157)

Page 166

1 permanent hair loss, correct?
2    A  Yes, in a nonofficial study.  I didn't do a
3 poll, I didn't do anything scientific.
4    Q  And based on what you know, that is under
5 1 percent, correct?
6    A  In my experience, in my recollection and
7 non-study, which is pretty irrelevant.
8    Q  You believe your experience is irrelevant?
9    A  I believe my data on the number of
10 permanent hair loss I may have seen is not a
11 relevant number to informed consent.
12    Q  Do you believe that the experience that
13 each individual prescribing doctor in these three
14 cases had with Taxotere is an irrelevant
15 consideration?
16    A  For permanent hair loss, yes.
17    Q  So you --
18    A  That's why we need studies, why we count on
19 studies to carefully follow adverse events to their
20 conclusion and report in a validated, statistical
21 manner to us.
22       Our own experience over and over has been
23 shown indicative of something, but it is not
24 scientific in any way.
25    Q  I'm trying to understand if you have a

Page 167

1 prescribing doctor who has used Taxotere for
2 15 years -- okay?  Are you with me so far?
3    A  Taxotere came on the market, what, in --
4    Q  Let me put it this way.
5    A  Okay.
6    Q  Do you know what year that Taxotere
7 received an adjuvant indication?
8    A  I do.  '04.
9    Q  Okay.  So if you have a doctor who has been
10 using Taxotere to treat adjuvant cancer from 2004 to
11 today -- okay?  Are you with me so far?
12    A  How about 2009, five years or seven years?
13    Q  All right.  Fair enough.
14       But is it your testimony that if a doctor
15 has been using Taxotere for years and years and they
16 have not seen one single patient that has had
17 permanent hair loss from Taxotere, that that is an
18 irrelevant consideration?
19    A  Scientifically as far as informed consent,
20 yes.  They may not have seen any liver function
21 abnormalities, they may not have seen a lot of
22 things that are important to disclose to a patient
23 in informed consent.
24    Q  But certainly doesn't one's own clinical
25 experience reflect on that doctor's perception of

Page 168

1 what the risks and the benefits of a particular
2 medication are?
3    A  That's a different question.  It can
4 certainly influence their perception, but the rules
5 established by ASCO and NCCN and informed consent
6 are that we disclose what the scientifically
7 validated and -- you know, it could be emerging
8 concerns.
9       For instance, people thought Taxotere was
10 better for a while, and that was often shared with
11 patients, but it turned out not to be valid.
12    Q  So do you believe informed consent should
13 be based on scientifically reliable data?
14    A  I think that's what should be at a minimum
15 disclosed.
16    Q  And so mere case reports we've already
17 discussed are not scientifically reliable data,
18 right, correct?
19    A  Right.
20    Q  So giving informed consent based solely on
21 some case reports wouldn't be adequate, correct?
22    A  Wouldn't be adequate, no.
23    Q  Wouldn't be appropriate --
24    A  I mean, if you were concerned there were 50
25 case reports on something before it was fully

Page 169

1 studied and validated, you know, if you are aware of
2 that, you usually share that with the patient; look,
3 something is emerging, we don't know yet the
4 importance.
5       People try to share what's relevant to
6 patients if there is emerging data.
7    Q  In your expert report, do you cite any
8 level 1 evidence involving Taxotere and hair loss?
9    A  That's not what I addressed in my report.
10       So I address the issue of informed consent.
11    Q  I understand.  But if informed consent must
12 be based on scientifically valid data --
13    A  Uh-huh.
14    Q  -- there's not to be a nexus of the two,
15 right?
16    A  Right.  I mean, so when you look at
17 Dr. Feigal's report, she looked at evidence from the
18 clinical trials, so you look at the TAC FAC study or
19 you look at the 316 study.  Those were validated
20 clinical trials.
21    Q  And you would certainly agree that in those
22 studies there was no statistically significant
23 increased risk of persistent hair loss with
24 Taxotere, correct?
25    A  No, I don't agree with that.

43 (Pages 166 - 169)

Page 170

1    Q   Have you reviewed TAX 316?
2    A   No.  I'm just saying there was -- so that's
3  where you get to a 3.9 versus a 2.2.  Those are
4  relevant numbers to patients as a concern --
5    Q   Well --
6    A   -- even if they are not statistically
7  different.
8    Q   You can't have it both ways, though, right,
9  Doctor?  You can't require scientific validity on
10  one side and ignore statistical significance on
11  another?
12    A   You're mixing up two concepts.  You are
13  mixing up the idea of a scientific validated
14  difference with a reported side effect difference
15  that needs to be explained to the patient.  You're
16  mixing apples and oranges.
17    Q   Well, so based on TAX 316, if a patient
18  received the FAC arm, they should be warned about
19  permanent hair loss too?
20    A   Except there, there is so much more FAC
21  data in the literature to look at, but I think they
22  should be.
23    Q   And what is the statistical significance?
24    A   That all depends.  I'm not a statistician.
25  I'm not a biostatistician, so I --

Page 171

1    Q   You would certainly agree with me that if
2  you had a study that is looking at two things and
3  they are comparing them -- correct?  Are you with me
4  so far?
5    A   Yes.
6    Q   If you are comparing one treatment to
7  another, you're trying to see if there is a
8  difference between the two, correct?
9    A   Yes.
10    Q   And when you develop a study, you set out
11  parameters at the beginning about what must be found
12  in order to establish that difference on a
13  scientifically and statistically significant level,
14  correct?
15    A   Right.  But you -- the study parameters are
16  about survival or disease survival.  They didn't
17  power the study to look at statistical differences
18  for hair loss.  That would be a different powered
19  study of an event.
20        The way the studies are reported is you
21  have your primary outcomes, your secondary outcome
22  to the trial.  Those have to meet statistical
23  significance to report the trial.  And you report
24  all the AEs and the SAEs that you experienced, but
25  those are not usually represented in statistically

Page 172

1  significant unless they happen to have enough
2  events.  But the trials aren't powered for that.
3    Q   Let me ask just the question this way.
4  You're certainly not here testifying that there was
5  a statistically significant difference in persistent
6  hair loss between the TAC arm and the FAC arm in TAX
7  316, correct?
8    A   Correct.
9        MR. THORNTON:  And just to reiterate, there
10  are -- there is a biostatistician on the case.
11        THE WITNESS:  I agree.  I'm not a
12  biostatistician.
13        MR. THORNTON:  It is not the area of this
14  witness's analysis.
15  BY MR. STRONGMAN:
16    Q   In order to inform a patient of a risk,
17  that risk has to be known or knowable; is that fair?
18    A   Yes.
19    Q   And in your expert report, you don't offer
20  any opinion as to when a risk with Taxotere and
21  permanent hair loss was known or knowable, correct?
22    A   Correct.
23    Q   You also mentioned the Adjuvant Online and
24  other related tools; is that right?
25    A   Yes.

Page 173

1    Q   And I think you said Adjuvant Online, if
2  I'm not mistaken, was no longer available in 2014;
3  is that correct?
4    A   Correct.
5    Q   Why?
6    A   I don't know why.
7    Q   How were those prediction tools developed?
8    A   So I put in the article specifically about
9  PredictUK, and Adjuvant Online has all their
10  validating data.  They generally went to trials and
11  they looked at developing risk models and testing
12  against populations.  And I put the detailed article
13  on the PredictUK that I ran with the updated
14  validation, all the models and statistical
15  information in here.
16    Q   All right.
17        So just as an example, if you look at
18  Exhibit I to your report --
19    A   Exhibit I.  Yes, that's the Predict model,
20  yes.
21    Q   Is Exhibit I -- this is what's entitled:
22        "An updated Predict breast cancer
23        prognostication and treatment benefit
24        prediction model with independent
25        validation."

44 (Pages 170 - 173)

Page 174

1    Is that correct?
2    A   Yes.
3    Q   And when I look at this, there is a section
4 called methods and patient data.
5        Do you see that?
6    A   Yes.
7    Q   And so am I correct that what this article
8 is reporting on is the data that was analyzed to
9 ultimately come up with the tool to make a
10 prognostication?
11   A   Right.
12   Q   And if you look at this article, it
13 indicates that the primary analysis was done on
14 patients with invasive breast cancer diagnosed in
15 East Anglia U.K. between 1999 and 2003 identified by
16 ECRIC.
17       Did I get that right?
18   A   Yes.
19   Q   Do you know when the use of Taxotere was
20 approved for adjuvant treatment in Europe or the
21 U.K.?
22   A   I do not know.
23   Q   So do you know whether or not any of the
24 patients looked at in this paper between 1999 and
25 2003 actually received Taxotere?

Page 175

1    A   I do not.
2    Q   And so do you know, sitting here today,
3 whether the Predict prognostication tool actually
4 includes data on anybody that received docetaxel for
5 their treatment of breast cancer?
6    A   I don't know that as we sit here today, but
7 they referred to third-generation regimens, which
8 all have taxanes in them, so I assume they do.
9    Q   But based on the paper you are talking
10 about, patients that received treatment between 1999
11 and 2003, correct?
12   A   That's how the model was developed, and
13 then they validate it on other groups.  And that was
14 diagnosed in 1990 to 2000.  So I expect taxanes to
15 be available, because they were able to validate
16 third-generation regimens.  I was looking.  And
17 Herceptin, which really got approved in 2006.
18       And you look at the -- they validate on the
19 POSH study, which is 2000 and 2008, so the model
20 they developed, they then looked at in populations
21 that would have had taxanes.
22   Q   And, I guess, can you point me to anything
23 in the article that is Exhibit I to your expert
24 report that indicates that there is actually
25 patients who received Taxotere who are part of the

Page 176

1 data set used to build the prognostications tool?
2    A   I'd have to look into the reference 12 on
3 the POSH trial and -- let's see what the reference
4 is for the other trial periods that they validated
5 on.
6        I have to look at those references.
7    Q   And I think when I looked at the reports
8 that you developed for each of the three plaintiffs
9 we are here talking about, you have a section where
10 you plug in first generation, second generation or
11 third generation, correct?
12   A   Second and third only.  Adjuvant Online
13 used to have first.  Neither of these do have first.
14   Q   So you can't even plug in CMF?
15   A   You cannot on either of those.  You could
16 on Adjuvant Online, which was available at the time,
17 as I recall.
18   Q   But just so I'm clear, the prognostication
19 tools available to oncologists today don't allow you
20 to plug CMF in as an option?
21   A   Today they don't tell you the difference.
22 You know it is 1 in a hundred.  You look at how
23 little benefit there is, and it might be slightly
24 less than that.
25   Q   But my question was simple.  It's that the

Page 177

1 prognostication tools that are available today don't
2 even allow you to input first generation --
3    A   In 2000- --
4    Q   Can you let me finish my question?
5    A   I thought you finished.
6    Q   Yes.
7        So the prognostication tools that are
8 available to oncologists today do not even allow you
9 to input first-generation chemotherapy treatments
10 like CMF, correct?
11   A   In 2018 the two available that I know of do
12 not.
13       MR. STRONGMAN:  Okay.  And I think we're
14 running out of time here, so we'll take a break.  It
15 is exactly 12:00, and I think there's some food out
16 there too.
17       We can do that easily and move on.
18       MR. THORNTON:  That makes sense to me,
19 especially you guys on East Coast time.
20       MR. STRONGMAN:  We can go off the record.
21       THE VIDEOGRAPHER:  We are off the record.
22 The time is 11:59 a.m.
23       (Recess.)
24       THE VIDEOGRAPHER:  We are back on the
25 record.  The time is 1:01 p.m.

45 (Pages 174 - 177)

Page 190

1  faculty gives their opinions and then follows up
2  with the physicians to make sure, especially in rare
3  things, that we are helping people.
4      A lot of times they get treatment --
5  somebody who is in the Mid West with a really rare
6  sarcoma, they are perfectly capable of giving the
7  chemotherapy, but it wasn't the standard that was
8  needed, and we've set the references and reviews,
9  and I oversee and edit those and work on all the --
10  work with the team on business strategy for that.
11      Q   Okay.
12      A   So those are my four jobs:  I work on EPIC,
13  I work on international medicine, I work on employer
14  strategy and I'm very much part of the breast team.
15  And breast care is my expertise, so now I do it as
16  second opinions and review of records.
17      Q   Okay.
18      A   But I don't directly see patients right
19  now.  I do a lot of intake.
20      Q   When did that change?  Was that when you
21  made the move in January 2017?
22      A   January of 2017.
23      Q   Okay.  So your direct patient care, patient
24  interaction changed when you made that shift in
25  January of 2017?

Page 191

1      A   Yes.
2      Q   And when you go back to, say, that 2014
3  time frame --
4      A   Uh-huh.
5      Q   -- before you made the move to the City of
6  Hope, what percentage of your time was with patient
7  care in that role?
8      A   So I saw patients Tuesdays, Wednesdays,
9  Thursdays.  I see new patients on a Monday or
10  Friday, if somebody needed something.  We try to see
11  people within one to two days.  So -- but I would
12  tend to work really long days Tuesday, Wednesday,
13  Thursday and do more administrative work Monday and
14  Friday, unless they needed me.  I oversaw my nurse
15  practitioner calling, you know, e-mails, all of that
16  type of thing, calling patients back, so, you know,
17  I know what was happening with my patients and
18  oversaw all their treatment and directions, but I
19  started to cut down the breast cancer load.
20      Q   Okay.  And when did that cut-down start?
21      A   About 2000 -- sometime in 2014, '15.
22      Q   Okay.  And so was your -- as you would call
23  it, your breast cancer load, your patient load, I
24  assume, is that what you mean by that?
25      A   Yes.

Page 192

1      Q   How did it change between 1990 and 2014?
2      A   It just got bigger and bigger and bigger.
3          So as I took on more administrative
4  responsibility.  I was really one of the few people
5  in private practice.  Most people in private
6  practice see every tumor type.  And I did, because I
7  had patients long term.  I mean, I had number 9 on
8  the CAR T cell presentation at ASCO, that was my
9  patient, because it was a long-term patient of mine
10  that I sent out for CAR T cell, so I would have
11  others, but really 90, 95 percent of my work was
12  breast cancer and I would see between three and six
13  new consults a week.
14          And that was really my reputation in the
15  community, I loved taking care of patients.  I like
16  talking to them and educating them.  I think that's
17  the difference.  I would send -- my chart would be
18  completely prepped, they would fill out all their
19  information ahead of time.  I would have all their
20  records, my nurse practitioner would have
21  synthesized it all, would have seen the patient,
22  understood all their issues and concerns.  And when
23  I went in, I could do all the highlights and spend
24  one hour, which I'm known to spend one hour minimum
25  on a new patient, really making sure they are

Page 193

1  educated.  Because people -- as you said, they come
2  in emotional.  It may be difficult, but, to me, as I
3  tell them:
4          "You can know as much as I know,
5      you can't know it in one day but I can
6      help you understand the foundation how
7      you make decisions and how to think
8      about risk and benefit and take that
9      deep breath from your fear and really
10      be able to think about what's right
11      for you, because there are so many
12      true choices."
13          There isn't just a path or a prescription
14  for a patient.
15      Q   And what percentage of your oncology
16  practice over time -- I think you started to get
17  into this, I just want to make sure I understand
18  it -- what percentage of your practice has been
19  breast cancer versus other types of cancer?
20      A   Since -- well, 2010 for sure, but it really
21  started even before that becoming, you know, breast
22  cancer.
23          Again, I was the -- I was the principal
24  investigator for our group and there was a
25  sub-investigator for almost every breast cancer

49 (Pages 190 - 193)

Page 282

1 there's certainly a benefit to some patients not
2 having to go through chemotherapy every single week,
3 correct?
4    A   There can be, yes.  And both Taxotere and
5 Taxol can be given every three weeks and they can be
6 given every two weeks.
7    Q   And in the studies that you cite actually
8 don't show the same efficacy of Taxol every three
9 weeks and Taxotere every three weeks, does it?
10    A   Right.  It is every two weeks.  Generally
11 dose dense is given AC and then T every two weeks,
12 so you're done in 16 weeks.
13    Q   And when you take the Taxol regimens where
14 you have to have Adriamycin included -- are you with
15 me on that?
16    A   You mean TAC?  Like all together or
17 sequential?
18    Q   Well, we talked about in the preferred
19 regimen there is no Taxol option when they are all
20 together, correct?
21    A   Okay.
22    Q   So you get AC to start, if you are having a
23 Taxol-based regimen, correct?
24    A   Right.  Or you can actually start the Taxol
25 first.  There's papers showing that that may be

Page 283

1 easier on patients.
2    Q   But that's not the ]typical decision or
3 preferred regimen, right?
4    A   Typically it is AC first, yes.
5    Q   And you would agree with me that there is a
6 certain percentage of patients that, after receiving
7 the AC combination, have side effects, right?
8    A   Can you repeat that?
9    Q   Of course.
10       You would agree with me that there is a
11 certain percentage of patients that, after receiving
12 the AC section of the treatment, have significant
13 side effects?
14    A   Yes.
15    Q   You would also agree with me there is a
16 percentage of those patients that never make it to
17 the Taxol portion of that treatment, correct?
18    A   Likely.  Maybe some.  I don't remember.
19    Q   Have you done any research on the
20 percentage of patients that don't actually receive
21 the taxane component of that regimen due to side
22 effects from the AC component?
23    A   I have not done research on that.
24    Q   And you would certainly agree with me that
25 in the research and the clinical trials that have

Page 284

1 been done, receiving the taxane is of a benefit to
2 the patient in terms of overall survival, correct?
3    A   In addition to the AC, yes.
4    Q   You mentioned leukemia earlier.
5       Do you remember that?
6    A   Yes.
7    Q   And that is a risk of what, exactly?
8    A   Actually, it can be seen in any number of
9 chemotherapies as a rare effect, but with the
10 dose-dense regimen and the AC regimens, we know that
11 that could be -- we will disclose that as a
12 potential risk because it is so serious.
13    Q   And I think you've indicated that you've
14 actually seen that manifest itself in your patient
15 population?
16    A   I have not seen leukemia in my breast
17 cancer patients.  I've been incredibly lucky.  It
18 was the Hodgkin's patient I referred to.
19    Q   But you would agree with me also that the
20 potential for leukemia with Adriamycin is a
21 significant concern?
22    A   Yes.
23    Q   And something that needs to be discussed
24 with patients?
25    A   Yes.

Page 285

1    Q   And you think -- strike that.
2       Would you agree that it's a good thing that
3 there's options for patients that involve a taxane
4 but no Adriamycin?
5    A   I think it's important to have options,
6 yes.
7    Q   And you would agree with me that options
8 are good for patients and for oncologists in making
9 decisions, correct?
10    A   I think options are helpful so patients can
11 weigh the risks and benefits and have input in
12 what's important to them.
13       I also know that early breast cancer
14 trialists are about to publish a big meta-analysis
15 showing the best outcome with AC-Taxol in
16 all-comers, and we have people that don't think TC
17 should be used at all, so there is always evolution
18 of that.
19       MR. STRONGMAN:  Doctor, I'm going to move
20 to strike that as nonresponsive to a question.
21    Q   Doctor, you would agree with me that in the
22 medical community there is always disagreements
23 among doctors, correct, different people view
24 things --
25    A   They can view it differently, yes.

72 (Pages 282 - 285)

1   Q   And some disagreement and dialogue is a
2 healthy thing?
3   A   Yes.
4   Q   And you would certainly welcome kind of
5 that exchange of ideas among doctors, correct?
6   A   Yes.
7   Q   And certainly you would agree that there
8 are doctors out there that have the same level of
9 qualification, experience, training, et cetera, as
10 you that prefer Taxotere?
11   A   I don't think anybody has the same training
12 I have, to be honest, because of my experience
13 through the medical group, but I think there are
14 doctors that prefer Taxotere, yes.
15   Q   And you're certainly not saying that you're
16 more qualified than they are, correct?
17   A   Correct.  In the hypothetical I don't know
18 who you are talking about.
19   Q   Sure.  But there are reasonable doctors
20 that believe Taxotere is the best option for many of
21 their patients?
22   A   There are reasonable doctors that give TC
23 as adjuvant therapy.
24   Q   In fact, there's probably reasonable
25 doctors that give other regimens involving Taxotere

1 also, correct?
2   A   I think that's really gone out of favor to
3 be really honest, other than in the TCH regimen or
4 the TCHP in the HER2-positive, I think that's a very
5 popular West Coast regimen still, compared to AC,
6 the or THP, yes.
7   Q   Not to go back to it again, but there are
8 regimens in the NCCN Guidelines under the other
9 options that involve TAC, correct, still to this
10 day?
11   A   TAC is now other.  It's not considered a
12 preferred regimen currently.
13   Q   But it is still within the standard of care
14 based on the NCCN Guidelines, that's my point?
15   A   Yes, just like CMF.
16   Q   Yes.
17      And I think you mentioned the City of Hope
18 is a comprehensive cancer institute?
19   A   Yes, NCI designated.
20   Q   And how many of those are there in the
21 country?
22   A   There are 11 standalones.  And I believe
23 there are 19 NCCN organizations, as well.
24   Q   And you would certainly agree with me that
25 there is not one single comprehensive cancer

1 institute that doesn't have Taxotere as an option
2 for some of its patients who are fighting cancer?
3   A   I have no knowledge of that.  I can't
4 believe they wouldn't, but I have no knowledge of
5 every cancer center what's on their formulary.
6   Q   But you know what's in the guidelines,
7 correct?
8   A   Yes.
9   Q   And Taxotere is in the guidelines?
10   A   Yes.
11   Q   When you were contacted by Dr. Feigal
12 sometime in the last quarter or so of 2017, you were
13 not studying permanent alopecia and taxanes,
14 correct?
15   A   Correct.
16   Q   And so the work that you did in generating
17 your report came about as a result of this
18 litigation, correct?
19   A   Yes.
20   Q   It didn't actually grow out of some
21 research that you were already conducting before
22 Dr. Feigal contacted you, correct?
23   A   Right.  I'm not doing individual research
24 right now.
25   Q   And so the answer is, the work that you did

1 in your expert report, which is Exhibit 9, did not
2 grow out of any specific research that you were
3 doing or involved in before Dr. Feigal contacted
4 you?
5   A   Yes.
6   Q   And have you ever communicated any concerns
7 to the FDA about Taxotere and hair loss?
8   A   No.  The current forms are so onerous that
9 it is hours of uncompensated work to fill out their
10 forms currently, and I have not sent it in.
11   Q   So two questions.
12      You have not communicated any concerns to
13 the FDA about Taxotere and permanent hair loss,
14 correct?
15   A   Correct.
16   Q   And you have not submitted any MedWatch
17 forms on behalf of any patients regarding permanent
18 hair loss and Taxotere, correct?
19   A   Correct.
20   Q   Were regard to the reports that you ran on
21 the prognostication software, you attached those
22 reports to your expert report as exhibits; is that
23 correct?
24   A   Yes.
25   Q   And I notice that you ran two reports for

73 (Pages 286 - 289)

Page 290

1  Ms. Durden, but one for the other two?
2     A   Yes.
3     Q   Why?
4     A   Because they were very similar.  ONCOassist
5  has just become more widely -- it's been available,
6  but it really wasn't well known.  I was asked to
7  review it for ASCO a number of months ago, and it
8  was so well done and validated, and the printouts
9  are excellent for patients compared to the printouts
10  for the Predict UK, which I've used a lot in my
11  practice.  But it was the closest to the Adjuvant
12  Online printouts, which we actually did use all the
13  time until it became unavailable.  So to me it was
14  the closest to Adjuvant Online, which would have
15  been available during the 2009 to 2011 period, but I
16  could run the rest of the Predict UK for the other
17  two if you would like to see it.
18     Q   Was the Predict UK 2.0 available in 2016?
19     A   I cannot remember the exact date that
20  became available.
21         Did you look?
22     Q   If you look at your report, and this is
23  what I was asking for a little bit of clarification
24  on -- if you look at page 16 and 17 of your report,
25  you have some language about an updated Predict

Page 291

1  breast cancer prognostications model version 2.0
2  that was published in Peer Review -- in the Peer
3  Review Breast Cancer Research Journal in May of
4  2017.
5         Do you see that?
6     A   Yes.
7     Q   Would that have been when that model became
8  validated for use?
9     A   That's the article on validation.  I don't
10  remember when they flipped the switch so when you go
11  to the website you only get Predict UK 2.0.  I don't
12  know if you could still get 1.  I don't know the
13  answer to that.
14     Q   But at least based on the data you have in
15  your report, there is nothing that indicates Predict
16  UK 2.0 was available in 2011, correct?
17     A   Right.
18     Q   And then with regard to ONCOassist, I think
19  you indicate that was developed in 2012 and received
20  CE certification in 2013; is that correct?
21     A   Yes.
22     Q   So the ONCOassist tool was not available at
23  the times when either of the three patients here
24  were prescribed Taxotere, correct?
25     A   As I stated, Adjuvant Online was, and this

Page 292

1  is the closest to that.  It has very similar numbers
2  in reporting.
3     Q   But the simple thing is that exact model,
4  ONCOassist, wasn't available at the time the
5  prescriptions for Taxotere were made in this case?
6     A   Correct, Adjuvant Online was available.
7     Q   And Adjuvant Online is no longer available,
8  correct?
9     A   Correct.
10     Q   And you said that that ceased in around
11  2014; is that right?
12     A   Yes.
13     Q   And you don't know why?
14     A   I do not.
15     Q   And when you say it's unavailable,
16  literally, you can't go find it or use it or create
17  a report from it at all, correct?
18     A   Correct.
19     Q   Were there concerns about its reliability?
20  And this would be the Adjuvant Online.
21     A   I don't believe so.
22         For the longest time the website said an
23  update is coming.  I thought it was going to do a
24  lot more with subtyping and it stopped, and I don't
25  know why -- why it is not available, what it was.

Page 293

1     Q   Do you have your report in front of you?
2     A   Which one?
3     Q   It is Exhibit 9.
4     A   Yes.
5     Q   Okay.  I'm just going to walk through and I
6  had a few questions and things I wanted to ask you
7  about as I went through it.
8         I think we established you were the
9  clinical research trial lead for your group at the
10  Wilshire Oncology Medical Group; is that right?
11     A   Yes.
12     Q   And that means that you were the one in
13  charge of and responsible for the clinical trials
14  going on in the Wilshire Oncology Medical Group?
15     A   I oversaw them.  I was the managing
16  partner, but we had sub-leads that were interested
17  in different cancers that would review, actually,
18  those protocols, and those seven investigators would
19  review colon, breast.  I focused on breast cancer
20  and I was responsible for the overall operations of
21  the practice.
22     Q   Okay.  And on page 8 you were talking about
23  kind of the development of systemic therapy over
24  time with chemotherapy?
25     A   Yes.

74 (Pages 290 - 293)

Page 298

1 personal preferences.
2    Q   And when you look at page 20, you state:
3        "Generally, the regimens with
4        Taxotere/docetaxel or Taxol/paclitaxel
5        and anthracyclines are considered the
6        most effective for adjuvant treatment
7        of early breast cancer."
8        Did I read that correctly?
9    A   Yes.
10    Q   And then it goes on to talk about the fact
11 that anthracyclines have greater cardiac toxicity
12 risks than other chemotherapy drugs; is that
13 correct?
14    A   Yes.
15    Q   And that's still true today, correct?
16    A   Yes.
17    Q   And that was true back in 2009 and 2011 as
18 well?
19    A   Yes.
20    Q   And so if you have a patient that presents
21 with a significant cardiac history, that's something
22 you have to take into account when you deal with
23 putting together a chemotherapy regimen, correct?
24    A   Yes.  But when you look at -- when you say
25 "cardiac history," it's a muscle effect.  It's not

Page 299

1 an effect on the arteries, which people think about
2 atherosclerotic disease.  It is not that effect, it
3 is the effect of the muscle weakness and the risk of
4 congestive heart failure from the weak muscle.
5    Q   But, again, you have to take into account
6 that patients' cardiac history one way or the other?
7    A   Yes.
8    Q   You also mention in here when you are
9 discussing the risks of chemotherapy the risk of
10 neuropathy; is that correct?
11    A   Yes.
12    Q   And what is neuropathy?
13    A   It can be anything from tingling and
14 numbness, typically in the toes and fingers, it can
15 go up the hands, arms, to weakness or paralysis.
16    Q   And neuropathy can be a particularly
17 frustrating side effect for some patients, correct?
18    A   I wouldn't use the word "frustrating."  I
19 would say painful, annoying and irritating.
20    Q   So worse than frustrating?
21    A   Yes.
22    Q   And would you agree that there's some data
23 that suggested that Taxol has a higher risk of
24 neuropathy than Taxotere?
25    A   Overall, I believe they are equal.  In

Page 300

1 several studies, there are definitive studies.
2 There may have been early studies that suggested
3 that, but I do not agree with that statement.
4    Q   Do you know whether or not the
5 consideration of neuropathy came into the informed
6 consent process for any of the three patients at
7 issue in your work?
8    A   Well, we saw this one where it talked about
9 the quadriplegia, paraplegia.  Those are all
10 neuropathies.  They didn't specifically talk about
11 the most common ones, which is really just numbness
12 and tingling, which will generally get better over a
13 number of months or years.  They list the most
14 serious on this consent form.
15    Q   But do you have any specific memory about a
16 very detailed discussion in deposition about
17 neuropathy for any of these three patients --
18    A   No memory of that.  I'm happy to review the
19 consent forms and discussions.
20    Q   And would you agree with me that when you
21 conduct a consent process with a patient that's your
22 patient, you would never use the word "temporary" as
23 it relates to a side effect?
24    A   I absolutely would.
25    Q   Would you use the word "temporary" as it

Page 301

1 relates to hair loss?
2    A   That's my most common explanation.  That's
3 our most common experience.  And my general spiel
4 is:
5        "It comes out a hundred percent,
6        you can expect that" -- it doesn't
7        always, but you tell them to expect
8        it -- "between usually three weeks,
9        four, sometimes five.  And when you
10        finish, it starts to grow back
11        generally a half an inch a month,
12        starting six to eight weeks after the
13        last treatment.  And, in general,
14        depending on how long your hair is, it
15        will be back without needing a wig
16        within" --
17        Usually it is more like 8 to 12 months,
18 depending on how sensitive they are.  A lot of my
19 patients wear spiked hair in California, go with
20 short hair.
21        But that my general -- in general, it is
22 temporary and it is the expectation.  And then we
23 give the caveat anything really unusual could happen
24 to other patients.  But just like we'll tell people
25 we know with anthracycline there could be a

76 (Pages 298 - 301)

Page 310

1    beyond 24 months and possibly
2    irreversibly."
3    And they give three references.
4    It also says:
5       "Hair should grow back," but
6    "cases of poor hair re-growth or
7    persistent hair loss have been
8    reported."
9    And I believe this was in this FDA label.
10   Q  So I guess my question is:  You've looked
11   at product labels before, I assume?
12   A  Yes.
13   Q  Have you looked at United States
14   FDA-approved product labels before?
15   A  Yes.
16   Q  And what you decided to attach to the
17   letter that's Exhibit Number 7, that is not a
18   package insert for Taxotere in the United States,
19   correct?
20   A  Right.  It is the supplemental discussion
21   with the FDA on it, so --
22   Q  So my question is:  Did you actually read
23   the FDA-approved package insert for Taxotere from
24   2015?
25   A  I believe I did.

Page 311

1    Q  Do you know specifically what the
2    FDA-approved package insert for Taxotere from 2015
3    says?
4    A  I don't know offhand.  I can pull it up and
5    look at it.
6    Q  And you did not cite in your report the
7    specific language contained in the 2015 updated
8    FDA-approved Taxotere package insert, correct?
9    A  That's not the scope of my report.  I did
10   not say that, but I did cite Dr. Feigal, who will
11   talk about that.
12   Q  And you'll leave Dr. Feigal's opinions for
13   her?
14   A  To Dr. Feigal.
15   Q  Fair?
16   A  Yes.
17   MR. THORNTON:  May I ask, are you taking
18   Dr. Feigal's deposition?
19   MR. STRONGMAN:  I don't know if I can tell
20   you.
21   MR. THORNTON:  Oh, okay.
22   MR. STRONGMAN:  Let me just look at my
23   notes and see if I have anything else today, and let
24   me just make sure.
25   THE VIDEOGRAPHER:  Off the record.

Page 312

1    We are off the record.  The time is
2    3:50 p.m.
3    (Recess.)
4    THE VIDEOGRAPHER:  We are back on the
5    record.  The time is 4:00 p.m.
6    MR. STRONGMAN:  Dr. Bosserman, thank you
7    for your time today.  We will rejoin next Monday and
8    continue this, but I appreciate your patience today.
9    Thank you, and we'll see you back next week.
10   MR. THORNTON:  Pleasure, Counsel.  See you
11   next week.
12   THE VIDEOGRAPHER:  We are off the record.
13   The time is 4:00 p.m.
14   This concludes today's testimony given by
15   Dr. Linda Bosserman.  The total number of media
16   units was 5 and will be retained by Veritext Legal
17   Solutions.
18   (TIME NOTED:  4:00 p.m.)
19
20
21
22
23
24
25

Page 313

1    I, LINDA D. BOSSERMAN, M.D., do hereby
2    declare under penalty of perjury that I have read
3    the foregoing transcript; that I have made any
4    corrections as appear noted, in ink, initialed by
5    me, or attached hereto; that my testimony as
6    contained herein, as corrected, is true and correct.
7
8
9    EXECUTED this _____day of _____,
10
11   2018, at _____,_____.
         (City)           (State)
12
13
14   _____
15   LINDA D. BOSSERMAN, M.D.
     Volume I
16
17
18
19
20
21
22
23
24
25

79 (Pages 310 - 313)

Page 315

1         IN THE UNITED STATES DISTRICT COURT
2          FOR THE EASTERN DISTRICT OF LOUISIANA
3    _____
                                    )
4    IN RE:  TAXOTERE (DOCETAXEL )MDL No. 2740
     PRODUCTS LIABILITY LITIGATION)
5                                  )Section:  H
     This Document Relates to:     )
6                                  )
     Antoinette Durden,            )
7    Case No. 2:16-cv-16635;       )
     Tanya Francis,                )
8    Case No. 2:16-cv-17410;       )
     Barbara Earnest,              )
9    Case No. 2:16-cv-17144        )
     _____)
10
11
12
13
14    VIDEOTAPED DEPOSITION OF LINDA D. BOSSERMAN, M.D.
15              Costa Mesa, California
16            Monday, December 10, 2018
17                   Volume II
18
19
20
21   Reported by:
     DENISE BARDSLEY
22   CSR No. 11241
23   Job No. 3154285
24
25   PAGES 315 - 557

Page 348

1    A  I say on behalf of patients, so that's
2  pretty clear.
3    Q  Now, in the conversations that you had with
4  the three medical oncologists at this Puma meeting,
5  did you acknowledge to them that you had not gone
6  and researched what the risk may or may not be for
7  hair loss with other chemotherapy drugs that are not
8  Taxotere?
9    A  That is in some of the papers, so I've said
10  I've looked at what the literature is looking at.
11    Q  But to be fair, Doctor, you haven't gone to
12  see what the literature says about drugs outside of
13  Taxotere, unless it happened to be mentioned in an
14  article that also discussed Taxotere, correct?
15    MR. THORNTON:  Objection; form.
16    THE WITNESS:  That's a good -- I mean, I've
17  done a lot of literature searching, but I'm most
18  familiar with the articles that are head to head.  I
19  look at the head-to-head trials and see what that is
20  and the multiple case reports.
21  BY MR. STRONGMAN:
22    Q  Doctor, in the entirety of your expert
23  report and your materials reviewed, do you cite any
24  paper that discusses the risk of chemotherapy-
25  induced permanent alopecia with a chemotherapy drug

Page 349

1  that is not Taxotere in an article that wasn't
2  otherwise discussing Taxotere?
3    A  That wasn't the focus of my report.  So I
4  don't recall, no.  That wasn't my focus.  There are
5  other experts that are addressing that.
6    Q  But that wasn't your focus, correct?
7    A  Correct.
8    Q  You also indicated that you had a
9  conversation with an individual or individuals at
10  the City of Hope; is that correct?
11    A  Yes.
12    Q  Who did you talk to?
13    A  My department chairman.
14    Q  Anyone else?
15    A  The breast cancer team.  We meet weekly.
16    Q  Anybody else?
17    A  I bring it up most times I'm in a group of
18  physicians, to be really honest, a group of
19  oncologists, so there are probably a lot of others.
20  We've had symposia, we have meetings all the time.
21    Q  Well, Doctor --
22    A  It is at the top of my mind to try to make
23  sure doctors are educated and can go look more for
24  themselves if they want.
25    Q  Doctor, let's be more particular about it.

Page 350

1  I'm just asking you about conversations you had in
2  the last week.
3    A  Oh, in the last week?
4    Q  Do you remember that?  Are you with me?
5    A  Thank you for clarifying.
6    Q  Sure.  No, I understand.
7      So you indicated that in the last week you
8  had your presentation to the Puma group, correct?
9    A  Yes.
10    Q  You also indicated that you had a
11  conversation with somebody at City of Hope?
12    A  My department chair.
13    Q  And your department chair, what is his or
14  her name?
15    A  Dr. Salgia, S-a-l-g-i-a.
16    Q  And then outside of the department chair at
17  City of Hope and the group at Puma, have you had any
18  conversations about Taxotere and hair loss with
19  anybody else in the last week?
20    A  Most oncologists I talk to, I'm sure I
21  brought it up several other times over the week.
22    Q  In what setting?
23    A  Generally, if we are talking about what was
24  happening in life, interests, science, medicine,
25  patients.

Page 351

1    Q  Do you have any specific names?
2    A  I don't.
3    Q  And, Doctor, I assume that in none of the
4  conversations that you've had with any of these
5  oncologists have you ever told them to stop using
6  Taxotere, correct?
7    A  Correct.
8    Q  Because that would be a disservice to
9  patients, correct?
10    A  It is their job to discuss what the right
11  treatment would be, but they need all the right
12  information to be able to do the right informed
13  consent.  That's my concern, informed consent.
14    Q  But having Taxotere as an option in the
15  treatment against cancer, that's a good thing,
16  correct?
17    A  Absolutely.
18    Q  You also mentioned that in the conversation
19  with the department head at the City of Hope that
20  there was some conversation about the lung cancer
21  informed consent?
22    A  Yes.
23    Q  Okay.  And did you have a conversation with
24  that individual about the breast cancer informed
25  consent?

10 (Pages 348 - 351)

Page 356

1    A   Correct.
2    Q   And, certainly, you haven't come today with
3 any amended report, correct?
4    A   Correct.
5    Q   You also reviewed the deposition of
6 Ralph Earnest; is that correct?
7    A   I did.
8    Q   And, obviously, Mr. Earnest's deposition
9 was available at the time you drafted your report,
10 correct?
11   A   Yes.
12   Q   And you did not review it prior to drafting
13 your report in this case, correct?
14   A   Correct.
15   Q   Plaintiffs' lawyers hadn't given it to you,
16 correct?
17   A   That, I don't remember.
18   Q   But it wasn't listed on your materials
19 reviewed, correct?
20   A   Correct.
21   Q   Outside of reviewing the depositions and
22 looking at some of the materials we discussed last
23 week, did you do anything else to prepare for today?
24   A   I read some of the papers that were in the
25 binder that we talked about, and that's all.

Page 357

1    Q   And "in the binder," you are talking about
2 the binders of documents we marked as exhibits in
3 the last deposition, correct?
4    A   Correct.
5    Q   Anything else that you did to prepare?
6    A   I did talk to the legal team, as well,
7 about depositions and my report.
8    Q   And when did those conversations take
9 place?
10   A   I talked some, I believe, on Saturday and
11 then yesterday.
12   Q   And how much time on Saturday?
13   A   I don't think more than 15 minutes, that I
14 remember.
15   Q   And how much time yesterday?
16   A   Six hours.
17   Q   Was that a call or an in-person meeting?
18   A   In person.
19   Q   And who was present?
20   A   John Thornton and Lauren Davis and
21 Trevor White.
22   Q   And that meeting lasted approximately six
23 hours?
24   A   Yes.
25       MR. THORNTON:  Counsel, I'm aware of one

Page 358

1 other thing that she's forgotten.  Do you want me to
2 volunteer that?
3       MR. STRONGMAN:  No.
4       MR. THORNTON:  Okay.
5 BY MR. STRONGMAN:
6    Q   We're going to talk through, as you know,
7 in a little more detail the specifics of the three
8 cases that you've offered opinions on today.  Okay?
9    A   Okay.
10   Q   And as we get into that, I have a few
11 questions that I want to make sure we have some
12 commonalty on in terms of terminology.  Okay?
13   A   Yes.
14   Q   Does that make sense?
15   A   I'm thinking about what I forgot, so I'm
16 trying --
17   Q   How do you define "alopecia"?
18   A   So I don't define it.  It's -- there are
19 different ways of looking at it.
20       So the Common Toxicity Criteria has a way
21 of defining it, and then there are generally grade 1
22 and 2.  So that would be a standardized definition
23 we could look up and print.
24   Q   And "alopecia" is a medical term, fair
25 enough?

Page 359

1    A   Yes.
2    Q   And I could go to a common medical
3 dictionary and find a definition of "alopecia,"
4 correct?
5    A   Probably.
6    Q   And you would certainly understand the
7 definition of "alopecia" to mean hair loss, correct?
8    A   It's not a term we actually use with
9 patients.  So that's why -- there is kind of the
10 technical alopecia and then what people think about
11 it.
12   Q   Okay.  And what I want to talk about is
13 what a specific medical term means to the doctor,
14 okay?  Does that make sense?
15   A   Okay.
16   Q   So in the medical profession, the word
17 "alopecia" means hair loss, correct?
18   A   Yes.
19   Q   And inherent -- strike that.
20       Have you ever gone to a medical dictionary
21 and looked up "alopecia" to see how it was defined?
22   A   Not that I recall.
23   Q   But you would certainly agree that there's
24 nothing in the definition of "alopecia" that implies
25 that it means temporary hair loss, correct?

12 (Pages 356 - 359)

1   Q  My question is:  Do you have any memory of
2  whether the record says that or not?
3   A  I reviewed all the records.  My take is
4  that patient absolutely would not have had
5  Adriamycin unless she thought there was enough
6  benefit to take it.  To me it wasn't an absolute no.
7  It was that if -- her preference, given risk and
8  benefit analysis was to avoid it, as is most
9  patients.
10      But that doesn't mean I will never take it.
11  And people absolutely come into your clinic saying I
12  don't want this drug, just like this, and then you
13  have a discussion, and people may or may not change
14  their mind.
15      So if you're saying they absolutely
16  preferred not to, if they didn't need it, that would
17  be my interpretation too.
18   Q  Okay.  I understand.
19      And my question is just based on your
20  review of the medical records and the deposition
21  testimony, it indicates that Ms. Durden and her
22  daughter were adamant that they did not want to
23  receive an Adriamycin-containing regimen, correct?
24   A  In this statement, I will agree with you.
25  But this is out of context, in my opinion, because

1  the patient not only reviewed the clinical trial
2  with Adriamycin, went to a meeting on it, and was
3  open to understanding the risk and benefit and
4  potential.  So that tells me she wasn't, like, I
5  don't care what you tell me, no matter what you say,
6  I will never have this drug.
7      People come in saying I prefer not to.
8  Almost everybody prefers not to have any
9  chemotherapy until we tell them risk and benefits.
10   Q  So, Doctor, it's okay to just acknowledge
11  that the record says they were adamant they did not
12  want to receive an Adriamycin-containing regimen?
13   A  This deposition question uses the word
14  adamant, you're correct.
15   Q  In the medical --
16      MR. THORNTON:  I'm trying to make sure,
17  it's a little tricky, objection form on the last
18  question.
19  BY MR. STRONGMAN:
20   Q  And you understand that the medical record
21  says "adamant" as well?
22   A  That's why I ask -- I would feel more
23  comfortable looking at the actual record that she
24  documented in her discussion.
25   Q  Do you have any reason to dispute that the

1  medical record that they are talking about in
2  deposition uses the word "adamant"?
3   A  Are you saying they actually looked at the
4  record and found the word in those words?  I can
5  believe that.
6   Q  And then the next question and the next
7  answer in the deposition:
8      "And because they were adamant
9      about not wanting to receive an
10      Adriamycin-containing regimen, you
11      write:  Therefore, will receive TC
12      (Docetaxel, 75 milligrams/m2; and
13      Cytoxan, 600 milligrams/m2) every 21
14      days, times six cycles, correct?
15      "ANSWER:  Yes, yes."
16      Did I read that correctly?
17   A  You did.
18   Q  Okay.  So you talked about the fact that
19  when Ms. Durden presented to Dr. Jancich, there were
20  really two alternatives that were presented to
21  Ms. Durden by the doctor; is that correct?
22   A  Yes.
23   Q  One of them involved AC followed by Taxol,
24  correct?
25   A  Yes.

1   Q  And that was, I think you referred to, as a
2  clinical trial that was going on that she could
3  participate in; is that correct?
4   A  Yes.  I haven't reviewed that actual trial.
5  I assume she would have offered it to her off trial
6  too, but she mentioned she could get it as part of
7  the trial.
8   Q  The bottom line, there was one regimen that
9  was AC-Taxol, correct?
10   A  Yes.
11   Q  And then the other option that Ms. Durden
12  was given was the TC regimen, correct?
13   A  Correct.
14   Q  And that's docetaxel and cyclophosphamide,
15  correct?
16   A  Correct.
17   Q  And you understand that Ms. Durden was
18  given information about the clinical trial and she
19  took it home and she considered it; is that correct?
20   A  Yes.
21   Q  Along with her daughter, correct?
22   A  Yes.
23   Q  And they came back and they decided they
24  did not want to have an Adriamycin-containing
25  regimen, correct?

22 (Pages 396 - 399)

Page 400

1    A   Correct, based on what they knew of the
2  risk and benefits of the treatments offered.
3    Q   And so you also understand that, looking at
4  the NCCN Guidelines in place at the time in 2011,
5  that the only preferred regimen that did not include
6  Adriamycin was the TC regimen, correct?
7    A   Correct.
8    Q   And that's what Dr. Jancich prescribed,
9  correct?
10   A   Right.
11   Q   And when you went through and created your
12 report, you have a section about each of the three
13 plaintiffs; is that correct?
14   A   Correct.
15   Q   And you have a section about Ms. Durden in
16 your report, and it starts on page 29; is that
17 correct?
18   A   Correct.
19   Q   And it's 25 paragraphs long; is that
20 correct?
21   A   I haven't counted them.  It is 25 points,
22 yes.
23   Q   And as you went through, you summarized
24 your thoughts on Ms. Durden and you cited to various
25 deposition testimony; is that correct?

Page 401

1    A   Correct.
2    Q   And in your footnotes on the section on
3  Ms. Durden, you cite to the deposition of
4  Dr. Jancich and you cite to Ms. Durden's deposition,
5  correct?
6    A   Correct.  I did read all of those.
7    Q   You don't specifically cite to Ms. Prier's
8  deposition; is that correct?
9    A   I did not, that's correct.
10   Q   Were the depositions that you were provided
11 to look at highlighted in any fashion?
12      MR. THORNTON:  Objection to form, but even
13 beyond that, this all has to do with drafting the
14 Rule 26 report.  And there is a federal rule that
15 prohibits discussions of drafting of Rule 26
16 reports, and I instruct the witness not to answer.
17      (Instruction not to answer.)
18      MR. STRONGMAN:  So, Counsel, just so I
19 understand it, your objection is the state of the
20 materials in which she received them is privileged?
21      MR. THORNTON:  No.  There's a -- the
22 amendment to Rule 26 provides that the process of
23 drafting the report and the interaction between
24 counsel and the witness in drafting of the report is
25 not discoverable.

Page 402

1    So I don't think that's a privilege,
2  technically, I think it is a federal rule barring
3  disclosure.
4       MR. STRONGMAN:  So your take is that if the
5  witness were provided depositions with certain
6  segments already highlighted, whether or not that
7  happened, that's not a discover fact under Rule 26?
8       MR. THORNTON:  Correct, because it clearly
9  goes to the drafting of her report and the content
10 of a Rule 26 report.
11      MR. STRONGMAN:  And you would instruct your
12 witness not to answer any questions to that effect,
13 correct?
14      MR. THORNTON:  Yes.
15 BY MR. STRONGMAN:
16   Q   Doctor, how did you determine which
17 portions of the depositions to put a footnote and
18 citation to in the report?
19      MR. THORNTON:  Same objection; same
20 instruction.
21      (Instruction not to answer.)
22      MR. THORNTON:  This is all having to do
23 with the drafting of the Rule 26 report.  And I
24 appreciate your related question, but it goes to the
25 same content.  The writing of the Rule 26 report,

Page 403

1  that gamesmanship has been barred by the Rule 26.
2  We aren't going to ask your witnesses and you don't
3  get to ask ours.
4       MR. STRONGMAN:  Counsel, I want to know
5  about your methodology, and that I'm allowed to ask
6  about.  Okay?
7    Q   Okay.  I want to talk about your
8  methodology and how you formed your opinions.  Okay?
9    A   I read all the depositions.  I was writing
10 my report about informed consent, so then I went and
11 pulled out key areas I thought were relevant to the
12 discussion of informed consent and the patient's
13 decision and the doctor's decision.
14      I went to the medical records.  I actually
15 read every path report and surgical notes and
16 summary of what their case was.  And I drafted an
17 outline and just started working through it and
18 putting in the points I thought were relevant to the
19 informed consent discussion.  That's where I
20 focused.  That was my responsibility.
21   Q   So in terms of your methodology in forming
22 your case-specific opinions in the case that we're
23 here to talk about today, what you did was you read
24 the depositions of the plaintiffs and the relevant
25 prescribing doctors; is that correct?

23 (Pages 400 - 403)

Page 404

1   A  Yes.
2      Q  And you identified or summarized the key
3   points that you identified in those depositions,
4   correct?
5      A  Uh-huh.
6      Q  Is that yes?
7      A  Yes.
8      Q  And you summarized those in the paragraphs
9   in your report under each plaintiff's name; is that
10  correct?
11     A  Yes.
12     Q  And then you ultimately offered an opinion
13  about whether or not there was some other
14  chemotherapy regimen that would have been
15  appropriate for each patient; is that correct?
16     A  I independently took that information and
17  entered it in Predict UK and ONCOassist, which turns
18  out ONCOassist is just a website that uses Predict
19  UK, which is a European-wide tool to help doctors
20  and patients and share decision-making, understand
21  the impacted choices on their ultimate disease-free
22  or overall survival.
23         That reminds me, you asked me earlier what
24  else.
25         I did do a lot of research on that this

Page 405

1   last week, because you had asked me about the
2   validation set.  So I have -- I did a lot of reading
3   about that and actually contacted the company.
4      Q  Back to my question --
5      A  Yes.
6      Q  -- what you did was you read the
7   depositions and you summarized what you thought were
8   the key points --
9      A  Yes.
10     Q  -- in your paragraph under each plaintiff's
11  name; is that correct?
12     A  Yes, and I focused on the informed consent
13  discussion between the doctor and the patient.
14         So I did note her daughter's participation,
15  but --
16     Q  And certainly there are portions of each
17  prescribing doctor's deposition that you cite to and
18  there's portions of each prescribing deposition that
19  you -- that you don't?
20     A  Yes.
21     Q  And what you cite to are the portions that
22  you found pertinent to the opinions that you were
23  offering; is that right?
24     A  Yes, but I tried not to be exhaustive and
25  repetitive.

Page 406

1      Q  Understood.
2         But did you find anything in any of the
3   depositions that you reviewed that was contrary to
4   the opinions that you're offering?
5      A  No.
6      Q  And if there had been testimony from one of
7   the prescribing doctors in one of these three cases
8   that was contrary to the narrative you're telling me
9   in your report, you certainly would have cited that
10  testimony, correct?
11     A  I might have or might not have.  I tried to
12  look at the context of the discussion.  You know,
13  informed consent is not a signature, it is a
14  process.  It is a bunch of steps in that process
15  that lead to an eventual decision.
16         So I really focused on the discussion of
17  permanent hair loss, hair loss in the informed
18  consent, so I didn't address every other issue.
19         I read all of it and I tried to pull
20  relevant things for my report.  I'm sure there's
21  more I could have added.
22     Q  In walking through your report on
23  Ms. Durden, you indicate -- in paragraph 9 you have
24  some commentary about Ms. Durden's hair
25  specifically.

Page 407

1         Do you see that?
2      A  Yes.
3      Q  And you would agree, as we discussed last
4   time, it is not your role to offer opinions about
5   Ms. Durden's hair loss that she may or may not have
6   had, correct?
7      A  Correct.
8      Q  You're leaving that to other experts,
9   correct?
10     A  Correct.
11     Q  I noticed that when you went through your
12  25 different paragraphs on Ms. Durden's case, you
13  didn't discuss Dr. Jancich's clinical experience
14  with Taxotere, correct?
15     A  Not that I recall.
16     Q  What was Dr. Jancich's clinical experience
17  with Taxotere?
18     A  I don't have -- I don't have an independent
19  recollection right now.  I would have to go read all
20  of her thoughts on that.
21     Q  Do you know when Dr. Jancich first started
22  prescribing Taxotere?
23     A  I don't recall independently, no.
24     Q  Do you know how many years she had
25  prescribed Taxotere to her patients?

24 (Pages 404 - 407)

Page 408

1    A  I don't recall offhand.
2    Q  And you know that Dr. Jancich still uses
3  Taxotere with patients today, correct?
4    A  Yes -- I assume so.  I don't -- I know
5  she's changed her education methods and I know she's
6  changed her preference, but I don't remember -- I
7  just don't remember her statements at the moment.
8    Q  And, basically -- strike that.
9         Certainly based on your review of
10  Dr. Jancich's deposition, you understand that she
11  still prescribes Taxotere today, correct?
12       MR. THORNTON:  Objection to form.
13       THE WITNESS:  I would not be surprised for
14  that.  I don't remember a specific line in the
15  deposition, but I don't know any oncologist who
16  doesn't use Taxotere.
17  BY MR. STRONGMAN:
18    Q  And the fact that Dr. Jancich still uses
19  Taxotere today is not something you included in your
20  report, correct?
21    A  It's not relevant to the informed consent
22  what she does today.
23    Q  And, Doctor, my question was just:  The
24  fact that Dr. Jancich still uses Taxotere is not
25  something you included in your report, correct?

Page 409

1       MR. THORNTON:  Objection to form.
2       THE WITNESS:  If you're not seeing it, I
3  must not have addressed it, yes.
4  BY MR. STRONGMAN:
5    Q  Certainly Dr. Jancich's clinical experience
6  with Taxotere is not something you addressed in your
7  report, correct?
8    A  I don't recall that, yes.
9    Q  Do you know whether or not Dr. Jancich
10  testified about having a patient who may have taken
11  Taxol who had long-term hair loss?
12       MR. THORNTON:  Objection; form.
13       THE WITNESS:  I recall one of the doctors
14  had said that.  I don't remember which one.
15  BY MR. STRONGMAN:
16    Q  Assuming that Dr. Jancich testified along
17  those lines, that is not something you included in
18  your report?
19       MR. THORNTON:  Objection to form.
20       THE WITNESS:  It is irrelevant.
21  BY MR. STRONGMAN:
22    Q  And you believe Dr. Jancich's clinical
23  experience across the board is irrelevant to your
24  opinion?
25       MR. THORNTON:  Objection to form.

Page 410

1       THE WITNESS:  I believe anecdotal
2  experiences by doctors is not what we give informed
3  consent with.
4  BY MR. STRONGMAN:
5    Q  So my question is:  As it relates to the
6  opinions you're offering in this case, you believe
7  Dr. Jancich's clinical experience is irrelevant?
8    A  No, I don't think --
9       MR. THORNTON:  Objection to form.
10       THE WITNESS:  -- all her clinical
11  experience is irrelevant.  But whether she had a
12  patient with hair loss and something or another has
13  nothing to do with the informed consent for this
14  patient and the regimen that she got.
15  BY MR. STRONGMAN:
16    Q  And the fact of the matter is, that's just
17  not a fact, whether or not Dr. Jancich had a patient
18  with long-term hair loss and Taxol that you cited in
19  your report?
20    A  I didn't see --
21       MR. THORNTON:  Objection to form.
22       Let me get my objections in, please.
23       THE WITNESS:  I didn't see it in her
24  discussion with the patient, that's what I focus on.
25  Her informed discussion with the patient, that's

Page 411

1  what I'm focusing on.
2  BY MR. STRONGMAN:
3    Q  And I'm not trying to be difficult, either,
4  Doctor, but in terms of the question I specifically
5  asked, I want you to focus on my question.  Okay?
6    A  Okay.
7    Q  Assuming in Dr. Jancich's deposition she
8  testified about a patient who may have taken Taxol
9  and had long-term hair loss, that's not something
10  you cited to or addressed in your report, correct?
11       MR. THORNTON:  Objection to form.
12       THE WITNESS:  I think that's correct.
13  BY MR. STRONGMAN:
14    Q  Now, you know that Dr. Jancich did warn
15  Ms. Durden about hair loss, correct?
16    A  Correct.
17    Q  And you would also agree that Dr. Jancich
18  provided Ms. Durden no guarantees about her hair,
19  correct?
20    A  Correct.
21    Q  And no medical oncologist would provide any
22  guarantees to any patient about their hair, correct?
23    A  About anything.
24    Q  Correct?
25    A  Correct.

25 (Pages 408 - 411)

Page 412

1    Q   And so you certainly know that Dr. Jancich
2  never told Ms. Durden that her hair will certainly
3  come back, correct?
4        MR. THORNTON:  Objection to form.
5        THE WITNESS:  Correct.
6  BY MR. STRONGMAN:
7    Q   If you look at paragraph 10 of your
8  report -- do you have that before you, Exhibit 9?
9    A   I do.
10   Q   You understand Dr. Jancich relies on the
11 NCCN Guidelines; is that right?
12   A   That's what she said, yes.
13   Q   And you say there were 13 different
14 regimens in the 2011 NCCN Guidelines, correct?
15   A   Correct.
16   Q   And that there were two that did not
17 include anthracyclines, according to your paragraph
18 10 in the NCCN-recommended regimens.
19       Do you see that?
20   A   Correct.
21   Q   And you listed the TC regimen and the CMF
22 regimen; is that correct?
23   A   Correct.
24   Q   And we know that based on the 2011 NCCN
25 Guidelines that the CMF regimen was not a preferred

Page 413

1  regimen, correct?
2    A   Correct.
3    Q   And we know that CMF is less effective,
4  correct?
5    A   Slightly.
6    Q   So yes?
7    A   Slightly less effective, yes.
8    Q   And we know that CMF would provide
9  Ms. Durden with a lower chance at survival based on
10 the data, correct?
11       MR. THORNTON:  Objection to form.
12       THE WITNESS:  Slightly lower, yes.
13 BY MR. STRONGMAN:
14   Q   And you know that CMF was not actually an
15 option that Dr. Jancich considered when she was
16 treating Ms. Durden in 2011, correct?
17   A   Correct --
18       MR. THORNTON:  Objection to form.
19       THE WITNESS:  -- I didn't see any
20 discussion of that in the notes.
21 BY MR. STRONGMAN:
22   Q   And, in fact, Dr. Jancich testified that
23 the only two options that were on the table for
24 Ms. Durden were the AC-Taxol regimen and the TC
25 regimen, correct?

Page 414

1    A   That's what she testified, yes.
2    Q   And you mentioned that you did the
3  prognostications analyses for each of these
4  patients, correct?
5    A   Correct.
6    Q   And you attached those as exhibits to your
7  report; is that correct?
8    A   Correct.
9    Q   And you did two of them for Ms. Durden; is
10 that right?
11   A   Yes.
12   Q   And the first one is Exhibit E; is that
13 correct?
14   A   I don't remember the exact exhibit number.
15 Hold on one second.
16       Yes.
17   Q   And --
18   A   One second.  Is it E or is it -- is it H?
19 I forget the exact number.  Yes.  I did, on her, E
20 and H.
21   Q   Very good.  So let's start with Exhibit E
22 to your report.  Okay?
23   A   Okay.
24   Q   And Exhibit E to your report is an
25 ONCOassist report that you had generated based on

Page 415

1  certain factors that were consistent with
2  Ms. Durden's case; is that correct?
3    A   Yes.
4    Q   And the ONCOassist report in Exhibit E was
5  not run for the CMF treatment, correct?
6    A   Correct.
7    Q   And, in fact, if you look at the
8  chemotherapy regimen in your Exhibit E, it says
9  second, correct?
10   A   Yes.
11   Q   And that means second generation?
12   A   Yes.
13   Q   And CMF is a first-generation chemotherapy,
14 correct?
15   A   Correct.
16   Q   As we discussed last time, ONCOassist won't
17 let you put in first-generation chemotherapy,
18 correct?
19   A   It doesn't, correct.
20   Q   With regard to Exhibit H, which was a
21 separate report that you had run on Ms. Durden on
22 the Predict tool --
23   A   Yes.
24   Q   -- is that correct?
25   A   I think it would be referred to as the

26 (Pages 412 - 415)

1 know, the record of the discussion she and
2 Dr. Jancich talked about.
3    Q   And based on Ms. Durden's signature, she
4 was willing to accept those risks identified in
5 Exhibit 18 in order to receive chemotherapy,
6 correct?
7    A   Correct.
8    Q   Doctor, we've already discussed you can't,
9 unfortunately, practice medicine with 20/20
10 hindsight?
11       MR. THORNTON:  Objection to form.
12       THE WITNESS:  Not that I know of.
13 BY MR. STRONGMAN:
14    Q   And assuming that Ms. Durden had been
15 offered the option of CMF, but was told that there
16 was some risk of permanent hair loss, we don't know
17 what she would have done in that situation either,
18 correct?
19    A   Right.
20       MR. THORNTON:  Objection; form.
21 BY MR. STRONGMAN:
22    Q   Okay.  Let's talk about Ms. Francis.  Okay?
23    A   Okay.
24    Q   What was Ms. Francis' presentation?
25       Are you okay?

1    A   I have a neuropathy.  If I twist my neck, I
2 will cough.  I'm not sick.
3       Let's see, I don't have -- I have to go
4 back to my notes.
5       What I know is that she had -- her breast
6 cancer diagnosed, the left simple mastectomy on
7 4/9/09.  And then met with Dr. Verghese and had a
8 discussion and was given TAC times six cycles.
9       And then she went on to have Tamoxifen and
10 an aromatase inhibitor.  Those are my notes and the
11 information about her type of cancer.
12    Q   So Ms. Francis also had invasive breast
13 cancer; is that correct?
14    A   Infiltrated ductal breast cancer, yes.
15    Q   And she also had cancer show up in a lymph
16 node, correct?
17    A   Right.
18    Q   And Ms. Francis was also ER and PR
19 positive; is that correct?
20    A   Yes.  Let me go to my particle report.
21       She had 1 of 21 lymph nodes positive, a
22 3-centimeter tumor estrogen positive, progesterone
23 positive and HER2-negative and a low Ki67.
24    Q   Tell me what Ki67 is.
25    A   It's a measure of the cell turnover rate,

1 the aggressiveness of the cell turnover rate.  It is
2 extremely low.
3    Q   What type of surgery did Ms. Francis have?
4    A   My notes say she had a mastectomy on the
5 left side, 4/9/09.
6    Q   And in your report, just like we talked
7 about before, you have a section on Ms. Francis; is
8 that correct?
9    A   Yes.
10    Q   And in that section, I think in this one
11 you have 15 separate -- 16, pardon me, separate
12 numbered paragraphs for her as well; is that
13 correct?
14    A   Yes.
15    Q   And what you did with Ms. Francis, like we
16 talked about with Ms. Durden, was you read the
17 depositions and summarized the key parts as it
18 related to your opinion and reported them here in
19 your report; is that correct?
20    A   Yes.  And I did an ONCOassist analysis of
21 the potential risks and benefit of any chemo- --
22 wait -- 2 and 3 you could run in that particular
23 tool.
24    Q   And did you read all of Dr. Verghese's
25 deposition?

1    A   I read through it all, yes.
2    Q   Did you read through the entire deposition
3 at the time that you wrote your report?
4    A   Before I read it -- before I wrote it.  I
5 read them all, made some notes about it and then
6 started writing and pulling things.
7    Q   In paragraph 2 in your report under your
8 section on Ms. Francis, you reference a Ms. Celeste.
9       Do you see that?
10    A   Yes.
11    Q   Do you know who that is?
12    A   I believe it was the oncologist nurse.
13    Q   Do you know her full name is
14 Celeste Keller?
15       Do you know that?
16    A   I don't happen to remember that, no.
17    Q   Do you know whether or not she was deposed?
18    A   I've not seen a deposition, if she was,
19 that I remember.
20       Was it on the list of things I reviewed?
21    Q   It was not.
22    A   I don't remember it, looking at it, yeah.
23    Q   So as long as it wasn't on the list, you
24 were not provided Ms. Keller's deposition, correct?
25    A   Not that I recall.

35 (Pages 448 - 451)

Page 456

1 of 103.
2    Q   So there is a start of a question on
3 page 102 at line 17.  It says:
4         "What it reads what is alopecia?
5         "Alopecia is another word for hair
6    loss or thinning of hair.  It is a
7    common, yet temporary, side effect for
8    some cancer medicines."
9    A   I read all that, yes.
10   Q   So Dr. Verghese is being asked a question
11 about some document, correct?  They are quoting out
12 of a document, right?
13   A   Yes.
14   Q   And the questioner turns and says:
15        "Doctor, at the time you described
16    Taxotere for Ms. Francis, was it your
17    general understanding that alopecia,
18    as it related to chemotherapy, was a
19    common, yet temporary, side effect?"
20    Did I read that correctly?
21   A   Yes.
22   Q   And Dr. Verghese's answer was:
23        "It is common, but I would not
24    call it temporary.  I would never tell
25    people that it's temporary."

Page 457

1         Correct?
2    A   Uh-huh, I read that, yes.
3    Q   And you didn't cite that in your report?
4    A   He didn't because he goes on to clarify
5 that's not what he says.
6    Q   He goes on to say:
7         "Well, what do you tell them?"
8         That's the next question, correct?
9    A   Yes.
10   Q   And Dr. Verghese goes on to set out that
11 there is multiple factors involved with hair loss,
12 correct?
13   A   Yes.
14   Q   And he even says:
15        "Even though all these people say
16    it's temporary, and all that, there
17    are multiple factors involved so I
18    don't use the word 'temporary.'"
19        Correct?
20   A   But then look at what he actually does tell
21 them.
22   Q   "I even tell them, you know, your
23    hair may come back and it may look
24    totally different."
25   A   That's what he tells them.

Page 458

1    Q   But the point is, Dr. Verghese
2 unequivocally testified that he would never use the
3 word temporary, correct?
4    A   He said that he did not use the word
5 temporary, yes.
6    Q   And Ms. Francis testified that she
7 explicitly remembered being told it would be
8 temporary, correct?
9    A   But told temporary and using the word
10 temporary, I think, we are slicing apples and
11 oranges here.
12        If you look back here, he tells you, you
13 know, they expect it to come back.  He expects it to
14 be different, it may be totally different, it may
15 feel totally different, and don't expect normal hair
16 growth back after multi agents.  That's what I sort
17 of tell them.
18        So when you put that in context, I can
19 understand the patient saying, it's temporary, it
20 may come back differently.  Because he didn't say, I
21 don't expect your hair to never come back at a
22 significant rate.  That's what he didn't say and
23 that's what she didn't hear.
24   Q   And I'm interested in the details, Doctor.
25   A   Me too.

Page 459

1    Q   In your expert report --
2    A   Yes.
3    Q   -- you don't just say that Ms. Francis
4 remembers in general thinking it was going to
5 temporary, correct --
6        MR. THORNTON:  Objection to form.
7 BY MR. STRONGMAN:
8    Q   -- that's not what you say, correct?
9        MR. THORNTON:  Objection to form.
10       THE WITNESS:  Let's go back to it.
11 BY MR. STRONGMAN:
12   Q   If you go to paragraph 3 --
13   A   Uh-huh.
14   Q   -- you state:
15        "Ms. Francis specifically
16    remembers Dr. Verghese using the
17    word," quote "temporary," unquote,
18    "when describing hair loss."
19        Correct?
20   A   Yes, that's what she remembers.
21   Q   And my point is just that there is a
22 contradiction when you read Dr. Verghese's
23 deposition, correct?
24   A   On the word use, there is a contradiction.
25 I don't think there is any contradiction in the

37 (Pages 456 - 459)

Page 464

1      THE WITNESS:  I do not believe I quoted
2 that.
3 BY MR. STRONGMAN:
4      Q   And when you look through your report, when
5 you go down to the next one, you ultimately can
6 state the fact that Ms. Francis received six cycles
7 of TAC chemotherapy; is that correct?
8      A   Correct.
9      Q   And in your conversation, in your expert
10 opinion, the alternative regimen that you've put
11 forward for Ms. Francis is the AC-Taxol regimen; is
12 that correct?
13     A   Yes, that is now the current standard.
14     Q   And we can agree that you're not offering
15 any opinions about Ms. Francis' hair and any hair
16 loss she may or may not have had -- strike that.
17         You're not offering any opinions about
18 Ms. Francis' hair loss, correct?
19     A   Yes.
20     Q   That is correct?
21     A   Correct.
22     Q   And in your expert report we discussed last
23 time a little bit, you talked about sales reps,
24 right?
25     A   I believe so.

Page 465

1      Q   What did Dr. Verghese say about sales reps?
2      A   Did I quote that, what you're referring to?
3      Q   Do you recall anything that Dr. Verghese
4 did or didn't say about sales reps?
5      A   Not specifically.  I would have to go look
6 at it.
7      Q   Do you know that Dr. Verghese testified
8 that he does not rely on sales reps?
9      A   He may well have.  I don't recall it
10 specifically.
11     Q   So do you have any memory about what
12 Dr. Verghese said in terms of whether he relies on
13 sales reps regarding labeling information?
14     A   I don't have any specific recollection.  We
15 have to look back at the record.
16     Q   And you certainly did cite Dr. Verghese's
17 testimony that he doesn't depend on the sales reps
18 as a source of information at any time?  You didn't
19 cite that?
20     A   Not that I recall, no.  I didn't cite that.
21     Q   Dr. Verghese testified about knowledge
22 regarding permanent hair loss and taxanes, correct?
23 Do you remember that?
24     A   I read all these, you know, a long time ago
25 and I looked through them.  So any specific

Page 466

1 references, let's look at his deposition and we'll
2 discuss it.
3         In 14, I discuss that in my report.  If
4 that's what you're referring to, I put those
5 references in.
6      Q   Right.  And you state:
7          "In approximately 2014
8       Dr. Verghese first learned of the
9       association between Taxotere,
10      docetaxel and permanent hair loss
11      through medical literature and case
12      reports."
13      That's what you state, correct?
14     A   That's what he said in his deposition.
15     Q   And you cite what page for that?
16     A   106 to 107.
17     Q   Right.  And if you would look to page 107
18 of Dr. Verghese's deposition with me.
19     A   Did I quote the wrong page?  I might have.
20     Q   Look at line 18.
21      Are you there?
22     A   Let's see, "2009" -- "first become aware,"
23 "probably about four years back" -- okay.
24     Q   So --
25     A   Yes.  Okay.  Now, line what?

Page 467

1      Q   Page 107, line 18.
2      A   18.
3      Q   Do you see that?
4      A   Uh-huh.
5      Q   Dr. Verghese was specifically asked:
6          "And do you remember if those
7       articles were specific to Taxotere?
8          "ANSWER:  No, I don't think I
9       recall that.  Taxanes, yes.  I don't
10      recall whether it is docetaxel or
11      paclitaxel."
12      Did I read that correctly?
13     A   You did read that, uh-huh.
14     Q   And anywhere in your report did you cite
15 the fact that Dr. Verghese, in fact, attributed the
16 risk to the taxane class, generally?
17     A   No.
18         MR. THORNTON:  Objection; form.
19 BY MR. STRONGMAN:
20     Q   And what we know is when you read
21 Dr. Verghese's deposition, in fact, he does
22 attribute a risk to both Taxotere and Taxol,
23 correct?
24         MR. THORNTON:  Object to form.
25         THE WITNESS:  He notes he's seen that, yes.

Page 468

1 BY MR. STRONGMAN:
2    Q   And, in fact, if he were to prescribe Taxol
3 to a patient, he would also advise that patient of
4 the risk of permanent hair loss, correct?
5       MR. THORNTON: Objection to form.
6       THE WITNESS: What line are you looking at
7 for that one?
8 BY MR. STRONGMAN:
9    Q   Well, do you remember what his testimony
10 is?
11    A   I don't remember the testimony,
12 specifically, along those lines, no.
13    Q   So if you look at page 108 --
14    A   108, okay. All righty.
15    Q   In looking at your report, you don't cite
16 page 108, by the way, correct?
17    A   Not that I recall, no.
18    Q   You don't cite page 109 either, do you?
19    A   Not that I see, no.
20    Q   You don't cite page 110, do you?
21    A   Let me take a look.
22       Not that I see.
23    Q   At least as it relates to your citations,
24 you skipped 108, 109 and 110, correct?
25    A   Looks like it, yes.

Page 469

1    Q   And Dr. Verghese was specifically asked
2 about the risk of permanent alopecia and his
3 prescribing habits; is that correct?
4    A   Which -- where are you referring to?
5    Q   Page 108.
6    A   108. Okay. I'll take a look.
7    Q   The question:
8       "Fair enough. After you viewed
9    this general article, did that risk of
10    permanent alopecia factor in, at all,
11    to your prescribing habits?"
12    Do you see that?
13    A   Yes.
14    Q   And we know that the journal article,
15 Dr. Verghese doesn't recall whether it was docetaxel
16 or paclitaxel, correct?
17    A   Yes.
18    Q   And then his answer is:
19       "Well, my approach to alopecia has
20    always been make a wig, because that
21    way you can treat. And if it takes
22    longer to come back, you still have
23    your wig. Your option is between
24    either of those taxanes. Both of them
25    cause hair loss. Even though one may

Page 470

1 be more than the other, both cause
2 hair loss. So if I were to see hair
3 loss in one, I would predict hair loss
4 in the other one too. So what my
5 recommendation is just to make a wig
6 all the time."
7    Did I read that correctly?
8    A   Yes.
9    Q   Next question:
10       "And when you say they both cause
11    hair loss, are you referring to
12    temporary anticipated hair loss or
13    permanent hair loss?
14       "ANSWER: Both are known to cause
15    temporary hair loss. If there is a
16    report on one being permanent, I would
17    apply it to the other one too."
18    Did I read that correct?
19    A   You did.
20    Q   And so, obviously, what Dr. Verghese is
21 talking about is applying reports on hair loss from
22 the taxane docetaxel to the taxane paclitaxel and
23 vice versa, correct?
24    A   Yes.
25    Q   Okay. And so it's clear that if there is a

Page 471

1 risk of permanent hair loss, Dr. Verghese is
2 attributing it to both taxanes, correct?
3       MR. THORNTON: Objection; form.
4       THE WITNESS: That's what he's implying,
5 yes.
6 BY MR. STRONGMAN:
7    Q   And you did not cite that in your expert
8 report, correct?
9    A   I did not.
10    Q   You didn't discuss that at all in your
11 expert report?
12    A   I did not.
13    Q   On page 110, Dr. Verghese is asked, on line
14 13:
15       "After learning about this
16    potential risk of permanent hair loss,
17    have you begun to counsel or educate
18    your patients about this risk when you
19    reviewed side effects of chemotherapy
20    with them?
21       "ANSWER: Yes."
22    Did I read that correctly?
23    A   Yes.
24    Q   What we know, based on the context of
25 Dr. Verghese's deposition testimony, is that

40 (Pages 468 - 471)

Page 472

1  Dr. Verghese educates his patients about the risk of
2  permanent hair loss when he's using a taxane,
3  correct?
4      A  That's what this implies, yes.
5      Q  And, again, that's not something that you
6  included in your summary in your expert report,
7  correct?
8      A  Correct.
9      Q  With regard to Dr. Verghese's clinical
10  experience, you, likewise, didn't summarize that in
11  your expert report, correct?
12      A  Correct.
13      Q  That's for the same reasons we've discussed
14  with regard to Dr. Jancich, right?
15      MR. THORNTON:  Objection; form.
16      THE WITNESS:  I don't know why I didn't put
17  it in.  I put in the things that they discussed, the
18  issues of informed consent discussion.
19  BY MR. STRONGMAN:
20      Q  Do you believe Dr. Verghese's clinical
21  experience is relevant to the informed consent
22  discussion?
23      MR. THORNTON:  Objection; form.
24      THE WITNESS:  That's a really broad
25  question.  Clearly, your clinical experience comes

Page 473

1  into the process.  Whether you're asking whether an
2  individual doctor's experience with particular side
3  effects means they shouldn't discuss it, I don't
4  agree.
5      So, I mean, yes, your experience at how you
6  talk to people, how you understand people, all that
7  comes to play in the process.  But the actual
8  information is based on evidence.
9  BY MR. STRONGMAN:
10      Q  And so you believe that if a doctor has had
11  a very favorable clinical experience with Taxotere,
12  that that's not something that should be part of the
13  informed consent discussion?
14      A  Well, I think you definitely give your
15  patient a flavor for what you expect in your years
16  of practice.  But also, if I've never seen a case of
17  leukemia, it doesn't mean I don't tell people it is
18  a 1 percent risk and it is deadly.
19      So there is a balance in the sense of what
20  you expect, what it is going to be like in general
21  for the majority of patients.  There are still these
22  rare effects, whether or not you've ever seen them,
23  so there's two different parts to that question.
24      Q  Okay.  On a basic level, you didn't lay out
25  in your report what Dr. Verghese's clinical

Page 474

1  experience with Taxotere has been, correct?
2      A  I did not.
3      Q  Similarly, with regard to Ms. Keller, the
4  nurse, as you did not review her deposition, you
5  could not have set forward what her clinical
6  experience has been, correct?
7      A  Correct.
8      Q  And I think we established that you did not
9  review the subsequent oncologist's deposition for
10  Ms. Francis, correct?
11      A  Correct.  That was after the treatment.
12      Q  And, similarly, the dermatology depositions
13  are not relevant to your opinions in this case,
14  correct?
15      A  Correct.
16      Q  And we know that the regimen that you
17  mention in your report for Ms. Francis is the
18  AC-Taxol regimen; is that correct?
19      A  Yes.
20      Q  And would you recommend the AC weekly Taxol
21  regimen?
22      A  Yes.
23      Q  And would you agree with me if Ms. Francis
24  got the AC weekly Taxol regimen, that she would have
25  more treatment with steroids than she did with the

Page 475

1  regimen she actually received back in 2009?
2      A  Well, I would have to calculate that
3  because the Taxotere high dose you have to give big
4  time day before, day of, day after, big time
5  Decadron doses.  The Taxol weekly often needs a lot
6  less, depending on how people tolerate it.  So no, I
7  don't agree they get more steroids.
8      Q  You don't know one way or another for sure?
9      A  I'd have to sit and write it down.  I
10  actually know all the regimens.  I would have to sit
11  and calculate.  But I'm not sure at all that it's
12  more steroids.
13      Q  And remind me, if you were having the Taxol
14  regimen following the AC, walk me through how that
15  would work day by day?
16      A  Okay.  The AC finishes.  And either two or
17  three days later you start the weekly Taxol.  You
18  generally -- most patients we can give them a dose
19  of steroid the night before, the morning of.  They
20  may or may not need it that night.  They don't need
21  it, they come in that week, it is about an hour
22  infusion, the next week, the next week for 12 weeks
23  in a row.
24      You have to see the doctor every two to
25  four weeks like you would if you were getting it

41 (Pages 472 - 475)

Page 508

1    A   Yes.
2    Q   And we also know that Ms. Earnest was
3 actually provided a book that had information in it
4 about permanent hair loss and Taxotere, correct?
5    A   You don't know if she provided it or picked
6 it up.  It is very unclear where the book came from,
7 where she got it, what office she got it or who she
8 got it from.
9    Q   Well, you haven't read all the depositions
10 in Mrs. Earnest's case, I assume, correct?
11       MR. THORNTON:  Objection; form.
12       THE WITNESS:  Probably not.
13 BY MR. STRONGMAN:
14    Q   Have you read a deposition of Dr. Le Garde?
15    A   If it is not on my list, then no, I have
16 not.
17    Q   So if -- strike that.
18       You don't know what Dr. Le Garde had to say
19 about where that book came from, correct?
20    A   I do not.  I do not have the list, nor do I
21 know who Dr. Le Garde is.
22    Q   And what we know is that nowhere in your
23 expert report do you cite the fact that Ms. Earnest
24 had a book that had information about permanent hair
25 loss and Taxotere in it, correct?

Page 509

1    A   Correct.
2    Q   And, in fact, when you and I had the
3 occasion to talk last week, you didn't even remember
4 that information, correct?
5    A   I didn't remember it, right.
6    Q   And what we know is Ms. Earnest actually
7 received a book of information before she started
8 chemotherapy that actually had information about
9 Taxotere and reports of permanent hair loss,
10 correct?
11    A   From reading her depo, she picked it up or
12 got it.  She wasn't sure who or when and she wasn't
13 sure she read it after she started treatment and it
14 wasn't part of her informed consent.
15    Q   Again, if you read the deposition of
16 Dr. Le Garde, you would know when she got it; fair
17 enough?
18       MR. THORNTON:  Objection; form.
19       THE WITNESS:  If you say.  I don't have a
20 reason to question that.  I haven't read the
21 deposition, so --
22 BY MR. STRONGMAN:
23    Q   Correct.  And I'm not trying to be
24 difficult on you, but you just simply can't know if
25 you --

Page 510

1    A   Right, I can't know, correct.
2    Q   But the actual fact that Ms. Earnest
3 received information about Taxotere and permanent
4 hair loss, you had in your possession when you wrote
5 your expert report, correct?
6       MR. THORNTON:  Objection; form.
7       THE WITNESS:  It has nothing to do with the
8 informed consent process between her and her doctor
9 discussing it.  From what I read from her, she's not
10 sure whether she got it afterwards, but she didn't
11 use it in making any of her decisions or discussion
12 with her doctor.  So that's the process that I'm
13 talking about that led to the orders in her starting
14 treatment.
15 BY MR. STRONGMAN:
16    Q   So is it your testimony that any
17 information that Ms. Earnest had and considered but
18 was outside of the dialogue with a doctor is not
19 relevant?
20       MR. THORNTON:  Objection; form.
21       THE WITNESS:  That's not what I'm saying.
22 If she didn't give it or use it or read it or ask
23 questions of it before she started her treatment,
24 then it is not really relevant in the treatment
25 decision.

Page 511

1 BY MR. STRONGMAN:
2    Q   But it is certainly relevant that
3 Ms. Earnest had, in her possession, information
4 about Taxotere and reports of permanent hair loss,
5 correct?
6    A   No.
7       MR. THORNTON:  Objection to form.
8       THE WITNESS:  Our offices are full of books
9 that people drop off; drug reps, patients bring
10 books.  People can pick these up anywhere.  Support
11 groups, and that doesn't mean they read them or use
12 them.  So I can't tell if it is relevant from her --
13 from reading her deposition, it had nothing to do
14 with her process of informed consent.  And when she
15 did read it, she doesn't remember what part she read
16 about it, so I can't say that that's relevant.
17 BY MR. STRONGMAN:
18    Q   And certainly we can appreciate that it's
19 fair that Ms. Earnest, seven years later, wouldn't
20 remember exactly what she read, correct?
21    A   Possibly.
22    Q   Or when exactly she read it.  Sometimes we
23 forget those things, correct?
24    A   It's possible, yes.
25    Q   But you agree with me that Ms. Earnest had

50 (Pages 508 - 511)

Page 512

1 in her possession information that reported a risk
2 of rare reports of permanent hair loss with
3 Taxotere, correct?
4      MR. THORNTON:  Objection.
5      THE WITNESS:  She had a massive book in
6 which there was a line.  I don't consider that
7 information.  She had a book that had a lot of
8 things in it.  It only becomes information if you
9 can actually use it and read it and discuss it.
10      So I'm hesitant to say she had information.
11 She had a book that had a lot of information in it,
12 but I don't know if that was informative to her at
13 all, and it certainly wasn't ever documented in part
14 of her discussions or informed consent process with
15 her oncologist, who she made the decision with.
16 BY MR. STRONGMAN:
17    Q   But, again, either way, it is not something
18 you found relevant to include in your expert report,
19 correct?
20    A   Correct.
21    Q   Did you include anything in your expert
22 report about Dr. Carinder's clinical experience with
23 Taxotere?
24    A   I'd have to go look through it.  I believe
25 I addressed what he would do now.  I don't remember

Page 513

1 I discussed his past.  I have to read through it.
2 Is there an area that you're referring to?
3    Q   I'm just asking whether it is something you
4 documented -- strike that.
5      I'm just asking whether Dr. Carinder's
6 clinical experience with Taxotere is something you
7 documented in your expert report.
8    A   Not that I recall.
9    Q   And we know that Dr. Carinder still uses
10 Taxotere today, correct?
11    A   I assume so.
12    Q   And we know that Dr. Carinder testified
13 that Taxotere is a good drug, correct?
14    A   Yes.
15    Q   And you would agree with that?
16    A   Yes.
17    Q   And we know that Dr. Carinder actually
18 talked about another patient he had.
19      Do you remember that testimony?
20    A   I don't remember that.
21    Q   Okay.  Do you remember any -- any testimony
22 from Dr. Carinder about a patient that he had going
23 back to 2005 that he treated with AC-Taxotere?
24    A   I do not remember.
25    Q   And do you know whether or not Dr. Carinder

Page 514

1 was asked questions about what he would say to
2 patients who asked about permanent hair loss?
3    A   I don't remember what he would say, no,
4 except I know what he said he would say now, and I
5 quoted that from his deposition.
6    Q   Do you remember Dr. Carinder testifying
7 that if a patient asked about permanent hair loss,
8 he would actually tell them he had a patient who
9 received AC-Taxotere back in 2005 that didn't grow
10 her hair back?
11    A   I don't remember that specifically.
12    Q   And you didn't cite that in your expert
13 report, correct?
14    A   No.  Because I didn't see that he discussed
15 that with Ms. Earnest.
16    Q   But you don't know either way?
17    A   Well, I know what she says and what she
18 says he said and they seem to say the same thing, so
19 I --
20    Q   Well, we know, as you said, sometimes
21 patients hear some things differently than the
22 doctors recall them, correct?
23    A   Correct.
24    Q   You know from reading Ms. Earnest's
25 deposition that what she wanted was her best chance

Page 515

1 at survival, correct?
2    A   Correct.
3    Q   And she never asked her doctors about a
4 percentage likelihood of any particular risk,
5 correct?
6    A   I didn't see that documented.
7    Q   Do you recall whether she was asked about
8 that in her supplemental deposition?
9    A   I don't recall that, no.
10    Q   And you would certainly just leave her
11 testimony to that to speak for itself, whatever it
12 was she did or didn't raise with her doctors?
13    A   It really depends on the context.  I can't
14 really answer that.
15    Q   Well, one of the things that we talked
16 about last time with regard to Ms. Earnest's consent
17 form --
18    A   Yes.
19    Q   -- was the fact that some of the things
20 listed on the consent form are very serious,
21 correct?
22    A   Yes.
23    Q   And I know that at times you indicated
24 that, well, some of those may be very rare, correct?
25    A   Yes.

51 (Pages 512 - 515)

Page 524

1        MR. THORNTON:  Objection; form.
2 BY MR. STRONGMAN:
3    Q  And, certainly, you would agree that it
4 would be reasonable for a doctor to discuss that
5 risk with AC-Taxol and permanent hair loss with a
6 patient, correct?
7        MR. THORNTON:  Objection; form.
8        THE WITNESS:  I would say it wouldn't be
9 unreasonable, I think we're weighing, giving a
10 bucket list of a book saying I told you from
11 actually communicating effective information.  So if
12 you really thought it was, you know, a significant
13 risk and patients are clearly concerned about it,
14 then I think it is reasonable to talk about it.
15 BY MR. STRONGMAN:
16    Q  And sitting here today, we can't say what
17 Ms. Earnest would have or wouldn't have done if
18 Dr. Carinder recommended AC-Taxol but provided her
19 some warning about a risk of permanent hair loss,
20 correct?
21        MR. THORNTON:  Objection; form.
22        You're asking the witness to -- it sounds
23 like a speaking objection, and I guess maybe it is,
24 but isn't this an ultimate issue that is not an
25 expert issue at all?

Page 525

1 BY MR. STRONGMAN:
2    Q  You can answer.
3    A  We did not know what anyone would have
4 done, except be accurately informed.
5    Q  And do you know that, based on your review
6 of Dr. Carinder's deposition, that he will -- strike
7 it.
8        You know, based on your review of
9 Dr. Carinder's deposition, that he would not tell
10 patients that their hair absolutely will regrow,
11 correct?
12        MR. THORNTON:  Objection; form.
13        THE WITNESS:  I expect -- I don't think
14 there's any doctor that guarantees any patient a
15 specific outcome.
16 BY MR. STRONGMAN:
17    Q  And that certainly goes with survival too?
18    A  Yes.
19    Q  You certainly would never guarantee
20 survival for a patient that you are treating,
21 correct?
22    A  In my dreams.  No, we do not do it in
23 reality.
24    Q  If you could look at Dr. Carinder's
25 deposition with me, page 128.

Page 526

1    A  What exhibit was that?  21?  Yes.  Sorry.
2 I put it in the pile.
3        I'm sorry.  What page?
4    Q  128.
5    A  Okay.
6    Q  And Dr. Carinder is being asked about his
7 prescribing habits, and one of the things that he
8 says is that he still uses docetaxel.  And he's
9 asked:
10        "How much a month do I prescribe
11        docetaxel?"
12        Do you see that at the end of 128?
13    A  128.  Yes.
14    Q  Okay.  And so he is specifically asked how
15 many patients a month he prescribed docetaxel to.
16        And he says "A lot."
17        Do you see that?
18    A  Yes.
19    Q  And then he goes on to have a conversation
20 about his various thought processes as it relates to
21 different types of cancer.
22        Do you see that?
23    A  Yes.
24    Q  Okay.  And I know in your report you cited
25 to the fact that he uses AC followed by weekly

Page 527

1 paclitaxel, correct?
2    A  Yes.  That's what he says he uses now, yes.
3    Q  Yes.  And that's something that you've
4 cited in your report, correct?
5    A  Yes.
6    Q  And then at the bottom of 129 he says "At
7 the time."
8        Do you see where that starts?
9    A  Yes.
10    Q  He says:
11        "At the time Ms. Earnest was being
12        treated, paclitaxel was given on an
13        every two week schedule at a high dose
14        and the neuropathy was -- was daunting
15        in a lot of those patients, and plus
16        the infusion reactions, as because it
17        was a pretty sizable dose of the
18        drug."
19        Did I read that correctly?
20    A  You did.
21    Q  And did you cite that testimony in your
22 expert report?
23    A  I did not.  Because, as we know, an NCCN,
24 which he also relied on, lists AC-Taxol as well
25 within those papers published in 2008 or 2009, so --

54 (Pages 524 - 527)

Page 536

1    Q   You certainly would agree that it's
2 possible that these three women are here and alive
3 today because they received systemic treatment for
4 their cancer that included Taxotere?
5        MR. THORNTON: Objection to form.
6        THE WITNESS: Yes, I would agree to that
7 statement.
8 BY MR. STRONGMAN:
9    Q   And, Doctor, you know what speculation is,
10 correct?
11   A   Yes.
12   Q   Okay.  And we've talked about, looking
13 backwards, what we know and don't know.  We've had
14 this conversation a couple of times.
15       Do you know what I'm talking about?
16       MR. THORNTON: Objection; form.
17       THE WITNESS: I don't really know
18 specifically what you are talking about.  We've had
19 a lot of conversations.  So which -- how can I help?
20 BY MR. STRONGMAN:
21   Q   In your report you specifically offer
22 opinions about offering these patients other
23 alternatives back in the time frames when they were
24 prescribed their chemotherapy treatment, correct?
25   A   Yes.

Page 537

1    Q   And you offer opinions about what may or
2 may not have been important to them at the time to
3 consider, correct?
4    A   I believe I stated that it was important
5 that they would have considered that and may or may
6 not have made the same choice.  If they made the
7 same choice, they may not have used a cold cap.  I
8 think those are my three summary statements.
9    Q   And the fact of the matter is, it is
10 speculative to know anything about what would or
11 would not have happened back in 2009 or 2011,
12 correct?
13       MR. THORNTON: Objection; form.
14       THE WITNESS: Well, the doctors and the
15 patients have stated that information would have
16 been important to them, so I didn't just make it up.
17 BY MR. STRONGMAN:
18   Q   My question is: It's speculative to know
19 what decisions would have been made back in 2009 for
20 Ms. Francis and 2011 for Ms. Durden and Ms. Earnest,
21 correct?
22       MR. THORNTON: Objection to form.
23       THE WITNESS: Based on what their doctors
24 have said.  If their doctors knew -- they've
25 testified in different amounts, if they would have

Page 538

1 used a different regimen, would have made that
2 knowledge available to the patient, because they all
3 participated in pretty detailed informed consent, as
4 they thought it was important at the time, that the
5 patients would have listened to that and they may or
6 may not have made a different decision.  I think
7 that's a very reasonable statement based on all the
8 depositions and their testimony.
9 BY MR. STRONGMAN:
10   Q   And so your opinions on that fact are based
11 on, essentially, just summarizing what you've read
12 in the depositions, correct?
13       MR. THORNTON: Objection.
14       THE WITNESS: Right.  I've not talked to
15 them directly.
16 BY MR. STRONGMAN:
17   Q   Did you read the questions that were asked
18 of the doctors carefully?
19       MR. THORNTON: Objection; form.
20       THE WITNESS: It depends what you mean by
21 "carefully."  I read through a lot of depositions --
22 I read through all of them, actually.
23 BY MR. STRONGMAN:
24   Q   Do you agree that all of these doctors were
25 actually asked whether or not they would recommend

Page 539

1 anything else?
2        MR. THORNTON: Objection; form.
3        THE WITNESS: I would have to go through
4 every line to actually answer that.  I know
5 specifically Carinder said, had he known, he would
6 have prescribed something differently.  I believe
7 the others said something to that same effect over
8 time.
9 BY MR. STRONGMAN:
10   Q   Do you agree it's a different question when
11 you're asked if plaintiff patient refused to take
12 docetaxel, would you have given her another option?
13 Do you agree that's a different question?
14       MR. THORNTON: Objection to form.
15       THE WITNESS: In what respect?  Yes, there
16 is question A and question B.  What does that mean?
17 The words were different.
18 BY MR. STRONGMAN:
19   Q   And the concept is different too, correct?
20   A   I don't believe the concept.  The concept
21 is, if you weigh risks and benefits and you present
22 patients the different options with different risks
23 and benefits known, that's your job.
24       If the risks aren't known, then you can't
25 present them.

57 (Pages 536 - 539)

1   Q   So you've cited nothing in your report,
2 specifically, that indicates whether the treating
3 doctors in these three cases actually entertained
4 cold cap use as an option back in 2009 or 2011,
5 correct?
6   A   I believe that's correct.
7   Q   And what we know is that there were no
8 FDA-approved cold caps back in 2009, correct?
9   A   True.
10   Q   And there were no FDA-approved cold caps in
11 2011, correct?
12   A   True, but there were cold caps available.
13   Q   But not FDA approved, correct?
14   A   Correct.
15   Q   The report that we marked as Exhibit
16 Number 9, you have not submitted that to a peer
17 review process, correct?
18   A   But, as you know, I am the expert
19 witness in this, so I do have a lot of experience.
20 So while you may not consider my opinion relevant, I
21 think it is.
22   Q   I understand.  And my question was just the
23 opinions as you've drafted them in your expert
24 report have not been submitted through a peer review
25 process, correct?

1   A   This report is free for the court, yes.  It
2 has not been submitted for publication or review.
3   Q   And as we've discussed, you've not
4 published or submitted anything else for review on
5 the topic of Taxotere and hair loss, correct?
6   A   Correct.
7   Q   And you understand in scientific studies
8 there is sometimes something called the rate of
9 error, correct?
10   A   Yes.
11   Q   And, certainly, there is no way to
12 calculate any kind of rate of error on the opinions
13 you've offered here, correct?
14   A   I am not a biostatistician, so I can't
15 answer that question.
16   Q   Could you even imagine how you could come
17 up with some sort of rate of error for the opinions
18 you've offered here?
19       MR. THORNTON:  Objection; form.
20       THE WITNESS:  That's so outside of my area
21 of expertise.
22 BY MR. STRONGMAN:
23   Q   And when we talked last week about your
24 general opinions, we talked some about the types of
25 opinions that you're not offering in the case,

1 correct?  Do you remember some of those
2 conversations?
3   A   Yes.
4   Q   And I believe in a general sense you
5 testified that you weren't offering any general
6 opinions about the adequacy of the Taxotere
7 labeling, correct?
8   A   Correct.
9   Q   And when I use the word "labeling," you
10 understand that means the FDA-approved prescribing
11 information for the drug, correct?
12   A   Correct.
13   Q   So as it relates to these three patients
14 specifically, you're not offering any opinion about
15 the adequacy of the FDA-approved labeling in any of
16 their individual cases, either, correct?
17   A   That's not the area that I am testifying.
18 There are other experts who will testify on that
19 area.
20   Q   And you're leaving that area to those
21 experts, correct?
22   A   Yes.
23   Q   Okay.  And that's the same as -- strike
24 that.
25       The same goes for any kind of dermatology

1 issues, correct?
2   A   Correct.
3   Q   And, Doctor, you would agree that, sitting
4 here today, you can't say what decision Ms. Earnest
5 would have made back in 2011 --
6       MR. THORNTON:  Objection; form.
7       MR. STRONGMAN:  Can I finish my question,
8 Counsel?
9       MR. THORNTON:  Yes, certainly.
10 BY MR. STRONGMAN:
11   Q   Doctor, you understand, sitting here today,
12 you can't say what decision Ms. Earnest would have
13 made back in 2011 if Dr. Carinder had offered
14 AC-Taxol, but had told her there was some risk of
15 permanent hair loss, correct?
16   A   I cannot say.
17       MR. STRONGMAN:  I think that's all the
18 questions I have right now.
19       Counsel?
20       MR. THORNTON:  I'm not going to do any
21 redirect.
22       MR. STRONGMAN:  All right.  So that's easy.
23       MR. THORNTON:  You're going to catch your
24 flight, I'm going to catch my flight.
25       Off the record.

Page 544

1 BY MR. STRONGMAN:
2    Q   If I wanted to understand what Ms. Earnest
3 would or wouldn't have done, the best place to go is
4 to Ms. Earnest, correct?
5    A   Yes.
6    Q   And if I want to understand what
7 Dr. Carinder would or wouldn't have done, the best
8 place to go is to Dr. Carinder, correct?
9    A   Yes.
10   Q   I don't need Dr. Bosserman to offer an
11 opinion about what they would or wouldn't have done?
12       MR. THORNTON:  Objection to form.
13       THE WITNESS:  If you don't need that,
14 that's fine.
15 BY MR. STRONGMAN:
16   Q   And that's the same for Ms. Francis' case
17 and Ms. Durden's case, correct?
18       MR. THORNTON:  Objection to form.
19       THE WITNESS:  That you don't need my
20 opinion?  That's up to you.
21 BY MR. STRONGMAN:
22   Q   That I don't need your opinion to summarize
23 what the witnesses in the case said?
24       MR. THORNTON:  Objection to form.
25       THE WITNESS:  Okay.  I accept you don't

Page 545

1 need that.
2       MR. STRONGMAN:  Let me take a few minutes
3 to go through my notes and see what I've got, but
4 we're almost done.
5       THE VIDEOGRAPHER:  We are off the record.
6 The time is 2:08 p.m.
7       (Recess.)
8       THE VIDEOGRAPHER:  We are back on the
9 record.  The time is 2:25 p.m.
10 BY MR. STRONGMAN:
11   Q   All right.  Dr. Bosserman, we're in the
12 home stretch.  Okay?
13   A   If you say so.
14   Q   In your report, if you have it in front of
15 you, Exhibit Number 9, you offered a summary of your
16 opinions on the last two pages.
17   A   Exhibit Number 9?
18   Q   Your report is Exhibit Number 9.
19   A   Okay.  I'm sorry.  I'm sorry.
20       Yes, my opinions.  Yes, my summary
21 opinions, yes.
22   Q   Okay.  So in your expert report we marked
23 as Exhibit 9, you include your summary opinions on
24 page 52 and 53 of your report, correct?
25   A   Correct.

Page 546

1    Q   And you have three numbered paragraphs
2 there, correct?
3    A   Yes.
4    Q   And in your first numbered paragraph
5 regarding your summary opinions, you discuss your
6 opinions about the communication of information
7 concerning the risk of PCIA to the various treating
8 physicians; is that correct?
9    A   Yes.
10   Q   Okay.  And we have covered the opinions
11 that you have as it relates to that summary
12 paragraph number 1 for Ms. Francis, Ms. Durden and
13 Mrs. Earnest's case, correct?
14   A   I believe I've answered all your questions.
15   Q   Say that again.
16   A   I believe I've answered all your questions
17 on it.
18   Q   And have we covered the opinions that you
19 hold on those three cases as it relates to your
20 summary number 1?
21   A   I believe so.
22   Q   And then for paragraph number 2 you
23 mentioned there were several alternative choices for
24 adjuvant care for these three patients that, in your
25 opinion, didn't present the same PCIA risk as

Page 547

1 Taxotere; is that correct?
2    A   Yes.
3    Q   And have we discussed all of the opinions
4 that you have in that regard with respect to
5 Ms. Durden, Ms. Francis and Ms. Earnest's case?
6    A   I believe I answered all the questions you
7 asked me about it.
8    Q   And then in your last paragraph you talk
9 about cold cap use, correct?
10   A   Yes.
11   Q   And we've talked about cold caps some
12 throughout these two days, correct?
13   A   We've touched on the topic, yes.
14   Q   Yes.
15       Did you cite anything in Dr. Jancich's
16 deposition regarding the potential of cold cap use?
17   A   I don't remember that.
18   Q   Do you remember citing anything in
19 Dr. Verghese's deposition regarding the
20 possibilities of cold cap use?
21   A   I don't remember that.
22   Q   And did you cite anything in Dr. Carinder's
23 deposition regarding the possibility of cold cap
24 use?
25   A   I don't remember that.

59 (Pages 544 - 547)