## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)                 **MDL NO. 2740**
PRODUCTS LIABILITY LITIGATION

                                          **SECTION "N" (5)**

**THIS DOCUMENT RELATES TO:**

**Antoinette Durden, Case No. 2:16-cv-16635;**
**Tanya Francis, Case No. 2:16-cv-17410;**
**Barbara Earnest, Case No. 2:16-cv-17144**

---

### MEMORANDUM IN SUPPORT OF SANOFI DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF JAVID MOSLEHI M.D.

---

Defendants move to exclude Plaintiffs' expert Dr. Javid Moslehi from testifying: (1) that a patient's cardiovascular health does not impact an oncologist's decision to prescribe a specific taxane;[1] and (2) whether Ms. Durden, Ms. Francis, and Ms. Earnest's cardiac risk factors impacted their treating oncologists' selection of chemotherapy regimen.[2] Based on Dr. Moslehi's report and deposition, these opinions are inadmissible:

First, Dr. Moslehi is not qualified to testify about an oncologist's decision-making process in developing a chemotherapy regimen.[3] By his own admission, Dr. Moslehi is not an oncologist. He would defer to an oncologist to discuss the factors that an oncologist considers before including

---

[1] Moslehi Dep. 156:16-157:12 (Ex. A); Moslehi Report at 6 (Ex. B).

[2] Moslehi Dep. 217:6-11 ("I am saying that cardiac risk factors or cardiac disease would not play a role in selecting her cancer therapy").

[3] *Id.* 68:9-14 ("I am not an oncologist, you're correct"); *id.* 85:11-21; *id.* 95:3-6 ("That's not my expertise"); *id.* 140:11-22 ("I don't make those recommendations"); *id.* 152:7-18 ("I can't comment on that because I'm not an oncologist"); *id.* 154:2-19 ("I don't know anything about the cancer treatment and how you give the treatments because I don't prescribe the drugs.").

specific drugs in a chemotherapy regimen for a breast cancer patient.[4]  Dr. Moslehi does not know the specific risk profiles of the taxane options.[5] He does not know that an oncologist cannot use Taxol and Taxotere interchangeably.[6]  He does not know whether the decision to prescribe one taxane over another then dictates which other chemotherapy medicines can or cannot be administered.[7] To wit, Dr. Moslehi "can't comment"[8]  on whether using one taxane instead of another then impacts the ability to administer an anthracycline.  This is remarkable because doing so increases the risk of short and long-term cardiac toxicity – and necessarily requires an oncologist to consider the cardiovascular health of a patient.[9]  Thus, by his own testimony, Dr. Moslehi has conceded that he is not qualified to offer an opinion in his report (i.e. whether a patient's cardiovascular risks impact an oncologist's selection of taxanes).

        <u>Second</u>, his opinions are irrelevant and unreliable.  Dr. Moslehi's opinion that each plaintiff's cardiac risk-factors played no role in her oncologist's decision to prescribe a chemotherapy regimen was incredulously rendered *without reviewing Plaintiffs' oncologists' depositions.*[10] It is also not rendered on complete review of the medical records.[11]  It is not based on the Plaintiffs' deposition testimony.[12]  It is instead based on the briefest review of an attorney-

---

[4]  *Id.* 156:21-160:11; *see also id.* 85:11-21; *id.* 91:21-92:5; *id.* 94:20-95:6; *id.* 131:25-132:10.

[5]  *Id.* 154:15-19 ("I don't know anything about the cancer treatment and how you give the treatments because I don't prescribe the drugs.");

[6] *Id.* 152:7-152:14; *id.* 153:25-154:19.

[7]  *Id.* 154:15-19 ("I don't know anything about the cancer treatment and how you give the treatments because I don't prescribe the drugs.")

[8] *Id.* 156:16-158:20.

[9] *Id.*

[10] *Id.* 52:21-53:1 ("I did write my report without having reviewed their deposition"); *id.* 54:16-23 ("I think they would be relevant. I didn't know they existed."); *id.* 57:21-58:19.

[11] *See, e.g.*, *id.* 210:1-211:3.

[12] *Id.* 47:23-48:7; *see also id.* 191:11-19.

selected subset of medical records. While offering the jury *his* opinion about what each oncologist was thinking at the time that they prescribed chemotherapy, Dr. Moslehi has ignored the fact that each oncologist has already testified about the factors that *they actually* considered.  Finally, even if Dr. Moslehi had reviewed the relevant testimony before preparing his report, his opinion about what each oncologist was thinking over eight years ago when prescribing chemotherapy is inherently speculative, irrelevant, and unhelpful to the trier of fact.

The Court should grant Defendants' motion and exclude these inadmissible opinions.

## LEGAL STANDARD

Federal Rule of Evidence 702 controls the admission of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

In other words, under Rule 702, the Court's gatekeeping function first involves determining whether the expert is *qualified*; then it "involves a two-part inquiry into *reliability* and *relevance*":

> First, the Court must determine whether the proffered expert testimony is reliable. The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence. The reliability inquiry requires the Court to assess whether the reasoning or methodology underlying the expert's testimony is valid. The aim is to exclude expert testimony based merely on

> subjective belief or unsupported speculation.
>
> Second, the Court must determine whether the expert's reasoning or methodology is relevant. The question here is whether the reasoning or methodology "fits" the facts of the case and will thereby assist the trier of fact to understand the evidence.

*Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 550 (E.D. La. 2015) (citations omitted) (emphases added).

The "reliability analysis applies to *all aspects* of an expert's testimony," including "the methodology, the *facts underlying the expert's opinion*, [and] the link between the facts and the conclusion." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (emphasis added). Importantly, "the expert's testimony must be reliable at each and every step or else it is inadmissible." *Id.* These "exacting standards of reliability," *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000), provide that "conjecture, hypothesis, subjective belief, or unsupported speculation are impermissible grounds on which to base an expert opinion." *Wehling v. Sandoz Pharm. Corp.*, 162 F.3d 1158, 1998 WL 546097, at *5 (4th Cir. 1998) (per curiam). Courts also consider whether the expert's findings are litigation-driven or results-driven. *See Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (*Daubert II*). In making this assessment, courts have considered "whether experts are 'proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.'" *Burst*, 120 F. Supp. 3d at 551 (quoting *Daubert II*, 43 F.3d at 1317)). Defendants do not bear the burden of demonstrating its inadmissibility. *See Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 534 (W.D. Pa. 2003).

Even if qualified as an expert, the testimony must also be relevant to the issues in the case, and the Court must determine whether the proffered expert testimony is sufficiently tied to the

4

facts in issue that it will aid the jury. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993) (stating that the district court's "gatekeeping role" requires ensuring that the expert testimony "is relevant to the task at hand"). "The question here is whether the reasoning or methodology 'fits' the *facts of the case* and will thereby assist the trier of fact to understand the evidence." *Burst v. Shell Oil Co.*, 120 F. Supp. 3d at 551.

## ARGUMENT

### I.    Dr. Moslehi Lacks the Qualifications to Testify Regarding the Selection of a Taxane in a Chemotherapy Regimen.

Dr. Moslehi lacks the qualifications to testify that "cardiovascular complications . . . do not play a big role [in an oncologist's decision to select] a specific taxane."[13]   When an expert lacks "specialized understanding of the subject involved in the dispute" his testimony is unhelpful and should be excluded. *See* Fed. R. Evid. 702, advisory committee's notes; *Matthiews v. Crosby Tugs, LLC*, No. 15-cv-5985, 2016 WL 6821956, at *6 (E.D. La. Nov. 18, 2016).

First, Dr. Moslehi is not an oncologist – he is a cardiologist.[14]  Dr. Moslehi does not develop treatment regimens for cancer patients,[15] prescribe chemotherapy,[16] or administer chemotherapy drugs.[17] He does not know the efficacy of one chemotherapy regimen over another,[18] or the reason one regimen may contain certain drugs (including specific taxanes) that another regimen omits.[19] To simplify this concept, consider that some drugs cannot be administered together due to side

---

[13] Moslehi Report at 6 (Ex. B).

[14] Moslehi Dep. 68:9-14.

[15] *Id.* 94:20-95:6; *id.* 88:18-21.

[16] *Id.* 85:16-21.

[17] *Id.* 153:24-154:19.

[18] *Id.* 95:3-6; *id.* 140:11-22.

[19] *Id.* 152:7-152:14; *id.* 153:25-154:19.

effects or potential lethality (at the extreme of this continuum are drugs that are "contraindicated"). In foil, some drugs being administered together enhances their beneficial effects (the term here is "synergy" or "synergistic effect"). Without grasping what the co-administrations or synergies are amongst taxanes with other chemotherapies, instead, the majority of Dr. Moslehi's work is in researching the cardiovascular effects of "anthracyclines and nonanthracycline" chemotherapy drugs on cancer patients who have *already been prescribed* the medication by an oncologist.[20] Only 1% of Dr. Moslehi's practice consists of consulting with oncologists who have concerns about a breast cancer patients' cardiovascular health *before* prescribing an anthracycline – and, even then, he is consulting on the management of cardiac risk factors related to an anthracycline, not those factors for other chemotherapy drugs prescribed with the anthracycline in the regimen prescribed by the oncologist for the patient.[21]

Second, Dr. Moslehi concedes that he is relying on general conversations with oncologists as support for his opinion, rather than his own expertise, because he has no specialized knowledge regarding the decision to prescribe one specific taxane versus another to a patient. Dr. Moslehi admits that he cannot discuss the distinguishing features of one taxane over another,[22] the role a taxane plays in a patient's chemotherapy regimen,[23] or how the inclusion of a taxane may impact an oncologist's ability to prescribe an anthracycline – which is an inquiry that is directly relevant to the patient's cardiovascular health before, during, and following treatment.[24]

---

[20] *Id.* 307:6-308:7.

[21] *Id.* 115:17-116:6. The remainder of Dr. Moslehi's clinical practice, which still only constitutes 30% of his time, is spent consulting with oncologists who are treating cancer patients that are either already undergoing or have completed cancer treatment, and have active cardiac disease that requires management. *See id.* 87:6-16.

[22] *Id.* 151:25-152:14.

[23] *Id.* 153:24-154:19.

[24] *Id.*

As Dr. Moslehi testified:

> Q. Do you know whether or not Taxotere can be administered concurrently with Adriamycin?
>
> A. ***I don't know anything about the cancer treatment and how you give the treatments because I don't prescribe the drug***.[25]
>
> . . . .
>
> Q. But do you understand that if you chose paclitaxel [Taxol] as the taxane - - let's look at [the 2011 NCCN Guidelines] - - that the chemotherapy regimen, if you are going to use paclitaxel, must include Adriamycin?
>
> A. ***I'm not an oncologist so I can't comment on that***. . . .[26]

Third, contrary to Dr. Moslehi's unsubstantiated opinion, a patient's cardiovascular health may, in fact, impact the specific taxane that an oncologist prescribes. In particular, the label for Adriamycin includes **a black box warning** specifically cautioning oncologists that "myocardial damage can occur with doxorubicin HCI with incidences from 1 to 20 percent for cumulative doses from 300 milligrams to 500 milligrams (M squared) when doxorubicin HCI is administered every three weeks," and then goes on to warn that "**Paclitaxel, when given prior to doxorubicin HCI, increases the plasma concentrations of doxorubicin and its metabolites.**"[27] Should an oncologist decide to prescribe Taxol and Adriamycin, the order of administration must be considered. The same is true for the attendant risks and benefits of deciding whether to prescribe them together (in combination) or sequentially. Should an oncologist decide *not to* include Adriamycin due to cardiovascular concern, there is only one taxane-containing preferred regimen that was available to oncologists treating HER2 negative breast cancer in 2009 and 2011 –

---

[25] *Id.* 154:15-19 (emphasis added); *id.* 156:3-157:4 (emphasis added).

[26] *Id.* 157:13-19.

[27] *Id.* Ex. 7 ("Prescribing Information for Doxorubicin) (emphasis added) (Ex. C).

Taxotere administered in conjunction with cyclophosphamide.[28] Thus, a patient's cardiovascular health may play a role in an oncologist's decision to prescribe a taxane.

When confronted with the fact that a patient's cardiovascular health may, in fact, impact an oncologist's decision to prescribe one taxane over another, Dr. Moslehi again deferred to an oncologist to provide an answer:

> Q. And then you go on to say that 'cardiovascular complications, however, do not play a big role selecting a specific taxane' . . . But do you agree that the selection of a taxane for use in a regimen determines whether or not an anthracycline must be part of that regimen?
>
> A. That's an oncology question. Again, I can't - - **oncologists tell me these are what I'm considering, so I can't comment on that**. I don't know whether that dictates whether you give anthracyclines or not.[29]
>
> . . . .
>
> Q. Okay. But do you understand that the choice of taxane dictates what other cancer therapies are that can be used in connection with that taxane?
>
> A. I actually don't - - I don't know the answer to that. **I don't know whether the choice of taxane completely rules out using anthracyclines or not. I'm unaware of it**. Again, I'm not an oncologist.[30]

Thus, by Dr. Moslehi's own admission, he does not actually know – and is therefore not qualified to offer an opinion – on whether cardiovascular complications play a role in an oncologist's decision to prescribe a taxane to a HER2 negative breast cancer patient. The Court should exclude his testimony.

---

[28] NCCN Clinical Practice Guidelines in Oncology, Breast Cancer at BINV-J (2009); NCCN Clinical Practice Guidelines in Oncology, Breast Cancer at BINV-K (2011) (Ex. D).

[29] Moslehi Dep. 156:17-157:4 (emphasis added).

[30] *Id.* 158:5-21 (emphasis added).

II.     **Dr. Moslehi's Opinions Regarding Plaintiffs' Oncologists' Prescribing Decisions Are Unreliable and Irrelevant.**

Dr. Moslehi devotes only three short paragraphs of his report to reach the broad conclusion that "cardiac issues . . . did not play a role whatsoever in the decision" of each Plaintiff's prescribing oncologist.[31]  Dr. Moslehi's case-specific opinions in this case should be excluded, because: (1) Dr. Moslehi ignored contrary facts and testimony; and (2) Dr. Moslehi's opinion about the state of mind of Plaintiffs' oncologists is speculative and legally irrelevant.

A.     **Dr. Moslehi Did Not Consider Available Relevant Evidence.**

Dr. Moslehi acknowledged that his methodology in forming his case-specific opinions consisted of a two hour review of an attorney-selected set of each plaintiff's medical records – generally spanning six months before and after chemotherapy treatment.  In preparing his report, Dr. Moslehi did not review the large majority of relevant evidence available to him, including Ms. Francis's deposition, Ms. Earnest's deposition, Ms. Durden's deposition, Dr. Cherian Verghese's deposition, Dr. Sophy Jancich's deposition, or Dr. James Carinder's deposition.[32]  He did not review plaintiffs' primary care physician's depositions or specifically focus on their medical records.[33]  Ultimately, by his own admission, Dr. Moslehi did not review the actual testimony of the Plaintiffs (which is rich with cardiovascular risk factor information) or of their oncologists to determine if cardiac risk factors, or cardiovascular health, *did actually play a role* in the decision to prescribe a specific chemotherapy regimen.

At most, Dr. Moslehi reviewed a fraction of the information available, and from that *interpreted* the state of mind of each prescribing oncologist. What did the oncologists themselves

---

[31] *Id.* 49:10-14.

[32] *Id.* 48:12-19.

[33] *Id.* 48:12-19; *see e.g.*, *id.* 233:10-21 ("First of all, I didn't know - - this is the first time I realized it existed."); *see also id.* 288:5-17.

say on these matters, though?  Dr. Moslehi does not know. Of course, the best place to go to understand what a plaintiff or a treating doctor was thinking is the witnesses themselves.[34] As Dr. Moslehi acknowledged:

> Q. And it is correct that, in your opinion, the deposition testimony of the plaintiffs' treating oncologists was into relevant to you forming your opinions and issuing your report? Is that correct?
>
> A. I think they would be relevant. ***I didn't know they existed***.
>
> . . . .
>
> Q. So you acknowledge that the deposition testimony of the treating oncologists is relevant to your opinions in this case, correct?
>
> A. ***It may be relevant***.
>
> . . . .
>
> Q. And if depositions of the treating oncologists had been taken in these cases, that would be something you would have wanted to see and review prior to forming your opinions and issuing your report in this case, correct?
>
> A. I - - ***the more material you review is always better***.[35]

The singular question thus becomes what limited value, if any, a doctor who does not prescribe chemotherapy offers to the jury on the issue of what risks were of concern to the oncologist when he did not read the oncologist's testimony.  Dr. Moslehi is left only to parrot the small excerpt of medical records made available to him by Plaintiffs' counsel.  But an expert merely "repeating hearsay evidence without applying any expertise whatsoever" is not giving an expert opinion.  *U.S. v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) ("When an expert is no longer applying his extensive experience and a reliable methodology, *Daubert* teaches that the testimony

---

[34] *See, e.g.*, Bosserman Dep. 544:2-545:1 (Ex. E).

[35] Moslehi Dep. 54:16-55:16 (emphasis added).

should be excluded.").  Also, such testimony violates Rule 703, which "was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion." *Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 524 (5th Cir. 2013) (citations omitted); *id.* ("Courts must serve a gate-keeping function with respect to Rule 703 opinions to ensure 'the expert isn't being used as a vehicle for circumventing the rules of evidence.'").[36] The bar on adorned hearsay alone is sufficient reason to exclude Dr. Moslehi's case-specific opinions.

### B.    Dr. Moslehi Ignored Contrary Testimony and Facts.

An expert cannot simply cherry pick the facts that theoretically support their opinion while ignoring those that do not. *Burst v. Shell Oil Co.*, No. 14-109, 2015 WL 3755953, at *13 (E.D. La. June 16, 2015), *aff'd*, 650 F. App'x 170 (5th Cir. 2016) (excluding expert's opinion because, *inter alia*, he "cherry-picks data from studies in several significant instances and fails to explain contrary results in a manner that belies the reliability of his methodology");[37] *Konrick v. Exxon Mobil Corp.*, No. 14-524, 2016 WL 439361, at *13 (E.D. La. Feb. 4, 2016), aff'd, 670 F. App'x 222 (5th Cir. 2016) (excluding expert's general-causation opinions, because, *inter alia*, she "cherry-picks data and fails to explain results that contradict her conclusion"; noting such failure "casts doubt on the reliability of her methodology"); *Konrick v. Exxon Mobil Corp.*, No. 14-524, 2016 WL 439361, at

---

[36] Under Rule 703, experts can testify to opinions based on inadmissible evidence, including hearsay, if experts in the field reasonably rely on such evidence in forming their opinions.  But no expert may simply transmit that hearsay to the jury. Otherwise, the expert is simply repeating hearsay evidence without applying any expertise whatsoever, a practice that allows the expert to circumvent the rules prohibiting hearsay.  *See U.S. v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008).

[37] This decision, *Burst v. Shell Oil Co.*, No. 14-cv-109, 2015 WL 3755953, at *5 (E.D. La. June 16, 2015), and *Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 550 (E.D. La. 2015), are two distinct orders on different *Daubert* motions in the same case.  Both orders were reviewed and affirmed by the Fifth Circuit.  *Burst v. Shell Oil Co.*, 650 F. App'x 170 (5th Cir. 2016).

*13 (E.D. La. Feb. 4, 2016), aff'd, 670 F. App'x 222 (5th Cir. 2016) (excluding expert's general-causation opinions, because, *inter alia*, she "cherry-picks data and fails to explain results that contradict her conclusion"; noting such failure "casts doubt on the reliability of her methodology").[38] An expert must consider contrary data and testimony when preparing their opinion. *Id.* Failure to do so renders an expert opinion unreliable, *id.*, as it does with Dr. Moslehi here.

Namely, the oncologists' testimony directly contradicts Dr. Moslehi's opinion that they did not consider the cardiac risk factors of each plaintiff before making a prescribing decision:

- Ms. Francis suffered a deep vein thrombosis of the internal jugular vein directly before Dr. Verghese prescribed her treatment regimen, and as a result, he brought her case to the hospital's Tumor Board – to discuss the appropriate chemotherapy regimen given this cardiovascular event.[39]

- For Ms. Earnest, Dr. Carinder testified that one of the personal risk factors that he considers when determining the specific chemotherapy drugs to prescribe a patient includes, "if they have a bad heart," because you would be putting the patient "at big risk" if you prescribed them doxorubicin.[40] Before prescribing Ms. Earnest a specific chemotherapy regimen, Dr. Carinder ordered "a MUGA scan to assess [Ms. Earnest's] left ventricular ejection fraction in anticipation of anthracycline based chemotherapy."[41]

- Dr. Jancich heavily considered Ms. Durden's cardiac risk factors before prescribing a chemotherapy regimen – ultimately prescribing a non-anthracycline containing regimen because of Ms. Durden's *own* insistence that she would not

---

[38] *See also EEOC v. Freeman*, 778 F.3d 463, 469-70 (4th Cir. 2015) ("[C]ourts have consistently excluded expert testimony that 'cherry-picks' relevant data. 'Cherry-picking' data is essentially the converse of omitting it: just as omitting data might distort the result by overlooking unfavorable data, cherry-picking data produces a misleadingly favorable result by looking only to 'good' outcomes.") (collecting cases); *Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 889 (E.D. Wis. 2010) ("[I]t is readily apparent that Dr. Keegan all but 'cherry picked' the data he wanted to use, providing the court with another strong reason to conclude that the witness utilized an unreliable methodology.").

[39] Verghese Dep. 65:19-66:17 (Ex. F); *cf.* Moslehi Dep. 291:15-18 ("Q: And are you aware of any impact that the DVT had on Ms. Francis's cancer treatment? A: I'm unaware of it.").

[40] Carinder Dep. 76:1 (Ex. G).

[41] Northshore Oncology Associates 233, 222-224 (Ex. H).

assume the cardiotoxicity risks associated with Adriamycin.[42]

In addition, Dr. Moslehi's opinion in the courtroom contradicts *his own* practice in the clinic, including the method that he uses when assessing his patients' cardiac risk factors. Dr. Moslehi testified that when a patient comes in that "clearly has cardiac disease," and her oncologist is concerned about her health pre-treatment, Dr. Moslehi:

- Reviews the entirety of the patient's previous medical records;

- Orders specific tests, if necessary, including an EKG or echocardiogram, stress test, or any number of additional tests "if they are relevant;"

- Has a conversation with the patient about "their level of activity and what symptoms they have depending on when they do [that] activity;" and

- Has a conversation with the oncologist about the patient's risk factors and treatment plan – including the possibility of an anthracycline-containing chemotherapy regimen, radiation, and surgery[43]

In particular, Dr. Moslehi considers his personal interactions with the patient – and his ability to use these conversations to determine cardiovascular risks *outside those present in her medical records* – to be the "art [he] puts into it when [he] sees the patients."[44] However, in his review of each plaintiff's case, Dr. Moslehi disregarded plaintiffs' depositions – the closest analogy to a patient conversation that was available to him.

Dr. Moslehi also testified that in his clinical practice he considers "other cardiac risk factors," including: the age and sex of the patient, whether she is post-menopausal, her history of smoking, diabetes, obesity, hyperlipidemia, her family history of heart disease, and any pre-existing artherosclerosis – including blockages in the arties and general heart dysfunction. In the court of law, though, Dr. Moslehi's opinions overlooks these factors:

---

[42] Jancich Dep. 162:1-21 (Ex. I).

[43] Moslehi Dep. 127:4-129:9.

[44] *Id.* 129:8-9.

- Ms. Durden is a 68-year-old, post-menopausal African American female with a history of obesity, poorly controlled high blood pressure, and heart murmur, among other issues.[45]

- Ms. Francis is a 46 year-old, post-menopausal African American female with a history of smoking, obesity, high blood pressure, high cholesterol, and pre-diabetes, among other issues.[46]

- Ms. Earnest is a 68-year-old, post-menopausal Caucasian female with a history of morbid obesity (BMI: 42), and a strong family history of diabetes and coronary artery disease, among other issues.[47]

Each of the Plaintiffs has cardiac risk factors that each woman's oncologist considered, none of which was afforded any weight in Dr. Moslehi's opinion.

## C.    Dr. Moslehi's Opinions are Speculative and Unhelpful to the Trier of Fact.

Setting aside whether he followed a reliable method, the ultimate conclusion reached by Dr. Moslehi is also inadmissible. Dr. Moslehi's opinion regarding the state of mind of plaintiffs' oncologists is inherently speculative, and unhelpful to the trier of fact.  "Speculation and conjecture built upon speculation and conjecture is neither helpful nor reliable under Rule 702."  *Graves ex rel. W.A.G. v. Toyota Motor Corp.*, No. 2:09-cv-169, 2011 WL 4590768, at *6 (S.D. Miss. Sept. 30, 2011) (citing *Goebel v. Denver & Rio Grande W. R.R. Co.,* 215 F.3d 1083, 1088 (10th Cir. 2000)). Indeed, "the courtroom is not the place of scientific guesswork, even of the inspired sort." *Id.* (citing *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996)). Thus, opinions based on unsupported speculation must be excluded.  *Burst*, 120 F. Supp. 3d at 550.

Dr. Moslehi opines that, based upon his review of a limited set of medical records in 2018, plaintiffs had no cardiac risk factors that *he would consider* to impact their oncologists' decisions to prescribe one chemotherapy regimen over another in 2009 or 2011. This epitomizes conjecture.

---

[45] *Id.* 241:8-24; *id.* 242:2-16; *id.* 243:8-14; *id.* 250:23-259:18; *id.* 265:6-267:18.
[46] *Id.* 300:25-304:20.
[47] *Id.* 191:1-20; *id.* 194:7-198:20; *id.* 214:24-217:4.

Furthermore, Dr. Moslehi admits that he does not know why the oncologist in each case chose the specific regimen he or she chose for each plaintiff.

> Q. Well, based on your review of the medical records, do you have any information as to why that regimen was chosen?
>
> A. Again – I'm not an oncologist. ***I don't know what - - what therapies they used. That's not my expertise here***.[48]

Dr. Moslehi cannot offer his opinion that each Plaintiff's cardiac risk factors did not impact their chemotherapy regimen treatment options, and in the same breath admit that he does not actually know what information each oncologist considered when making their decision. Should there be a question about the factors each oncologist considered when prescribing chemotherapy, the jury may reference that oncologist's deposition testimony and medical records. Dr. Moslehi's speculative testimony is not required.

**D.     Dr. Moslehi's Opinions are Irrelevant.**

Finally, in outlining his case-specific opinions, Dr. Moslehi provides a single, conclusory paragraph for each plaintiff – offering no explanation or analysis of plaintiff-specific facts for his ultimate opinion in each case. "It is not sufficient simply to list the resources [an expert] utilized, and then state an ultimate opinion without some discussion of their thought process." *Elder v. Tanner*, 205 F.R.D. 190 (E.D. Tex. 2001).  Dr. Moslehi should not be allowed to testify regarding his case-specific opinions, because they are nothing more than conclusory statements unsupported by (and directly contradictory to) the facts. As a result, his case-specific opinions should be excluded.

---

[48] *Id.* 200:5-13 (emphasis added).

## CONCLUSION

Sanofi-Aventis U.S. LLC and Sanofi U.S. Services Inc. respectfully request that the

Court exclude the opinions and testimony of Dr. Javid Moslehi in their entirety.

Date:  February 8, 2019

                                                                          Respectfully submitted,

                                                                          /s/ *Douglas J. Moore*
                                                                          Douglas J. Moore (Bar No. 27706)
                                                                          **IRWIN FRITCHIE  URQUHART & MOORE LLC**
                                                                          400 Poydras Street, Suite 2700
                                                                          New Orleans, LA  70130
                                                                          Telephone: 504-310-2100
                                                                          Facsimile:  504-310-2120
                                                                          dmoore@irwinllc.com

                                                                          Harley Ratliff
                                                                          Adrienne L. Byard
                                                                          **SHOOK, HARDY & BACON L.L.P.**
                                                                          2555 Grand Boulevard
                                                                          Kansas City, Missouri 64108
                                                                          Telephone: 816-474-6550
                                                                          Facsimile:  816-421-5547
                                                                          hratliff@shb.com
                                                                          abyard@shb.com

                                                                          **Counsel for Sanofi-Aventis U.S. LLC**

## CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2019, I electronically filed the foregoing with the Clerk

of the Court using the ECF system which sent notification of such filing to all counsel of record.

                                                                          /s/ *Douglas J. Moore*