# EXHIBIT F

```
                                                              1
 1            UNITED STATES DISTRICT COURT

 2            EASTERN DISTRICT OF LOUISIANA

 3            ~~~~~~~~~~~~~~~~~~~~

 4

 5  TANYA FRANCIS,

 6

 7              Plaintiff,

 8

 9       vs.           Case No. 2:16-cv-17410

10

11  SANOFI S.A., SANOFI-AVENTIS U.S.
    L.L.C., SANOFI US SERVICE, INC., and
12  AVENTIS-PHARMA S.A.,

13              Defendants.

14

15            ~~~~~~~~~~~~~~~~~~~~

16               Deposition of

17            CHERIAN VERGHESE, M.D.

18

                  January 10, 2018
19                   11:25 a.m.

20

                    Taken at:
21
        University of Toledo Medical Center
22            3000 Arlington Avenue
                  Toledo, Ohio
23

24  Job No. NJ2775665

25            Stephen J. DeBacco, RPR
```

## Page 2

```
 1  APPEARANCES:
 2
 3      On behalf of the Plaintiff:
 4          Pendley, Baudin & Coffin, by
            JESSICA PEREZ REYNOLDS, ESQ.
 5          24110 Eden Street
            PO Drawer 71
 6          Plaquemine, Louisiana 70765
            (888) 725-2477
 7          jperez@pbclawfirm.com
 8
            Lowe Law Group, by
 9          MARK D. HESIAK, ESQ.
            6028 South Ridgeline Drive
10          Suite 200
            Ogden, Utah 84405
11          (801) 900-4681
            mark@lowewalgroup.com
12
13      On behalf of the Defendants:
14
            Shook, Hardy & Bacon, L.L.P., by
15          CONNOR J. SEARS, ESQ.
            HILLARY NICHOLAS, ESQ.
16          2555 Grand Boulevard
            Kansas City, Missouri 64108
17          (816) 474-6550
            csears@shb.com
18          hnicholas@shb.com
19               ~ ~ ~ ~ ~
20
21
22
23
24
25
```

## Page 4

```
 1              INDEX OF EXHIBITS
 2  NUMBER        DESCRIPTION        MARKED
 3  Exhibit 1  Notice of Deposition of ...... 11
               Cherian Verghese, M.D.
 4
    Exhibit 2  Cross-Notice of Deposition ... 11
 5             of Cherian Verghese, M.D.,
               was marked for purposes of
 6             identification.)
 7  Exhibit 3  06/08/2009 Dr. Verghese ...... 58
               Dictation Re: Tanya Francis,
 8             00476 to 00479
 9  Exhibit 4  06/16/2009 Dr. Verghese ...... 68
               Dictation Re: Tanya Francis
10
    Exhibit 5  07/09/2009 Dr. Verghese ...... 76
11             Dictation Re: Tanya Francis,
               TXT - 3050 to 3052
12
    Exhibit 6  NCCN Clinical Practice ....... 81
13             Guidelines in Oncology:
               Breast Cancer, V.I.2009
14
    Exhibit 7  Partnering with your ......... 100
15             Patients Along Their
               Journey, Sanofi_01038470 to
16             01038537
17  Exhibit 8  Annex I:  Summary of Product . 111
               Characteristics
18
    Exhibit 9  11/16/2011 History and ....... 149
19             Physical, 00473 to 00475
20
21
22
23
24
25
```

## Page 3

```
 1             TRANSCRIPT INDEX
 2
 3  APPEARANCES...............................   2
 4
 5  INDEX OF EXHIBITS ........................   4
 6
 7  EXAMINATION OF CHERIAN VERGHESE, M.D.
 8  By Ms. Perez Reynolds.....................   5
 9  By Mr. Sears.............................. 124
10
11  REPORTER'S CERTIFICATE.................... 182
12
13  EXHIBIT CUSTODY
14  EXHIBITS RETAINED BY THE COURT REPORTER
15
```

## Page 5

```
 1         CHERIAN VERGHESE, M.D., of lawful age,
 2  called for examination as provided by the
 3  Federal Rules of Civil Procedure, being by me
 4  first duly sworn, as hereinafter certified,
 5  deposed and said as follows:
 6         EXAMINATION OF CHERIAN VERGHESE, M.D.
 7  BY MS. PEREZ REYNOLDS:
 8     Q.   Good morning, Doctor.  Can you
 9  state your name for the record, please?
10     A.   Cherian Verghese.
11     Q.   And, Dr. Verghese, my name is
12  Jessica Perez Reynolds, and I'm here today on
13  behalf of the Plaintiff in this case, Ms. Tanya
14  Francis.  Do you know who Tanya Francis is?
15     A.   I remember her -- well, not
16  completely, but from what I was doing, my
17  training in the South, I remember her, yes.
18     Q.   So as we sit here, do you have an
19  independent recollection of who Ms. Francis is?
20     A.   Yes, I do.
21     Q.   And when you came into the room,
22  you introduced yourself to the other attorneys
23  that are here today as well.  Now, you and I
24  have met before, correct?
25     A.   Right.
```

Page 62

1  Did you perform any of those
2  surgeries that are referenced in that
3  paragraph?
4      A.   No.
5      Q.   It goes on to state that, "The
6  initial mastectomy seems to have been done on
7  April 9, 2009, and she was diagnosed at that
8  time with T2, N1 MX/Stage II CA breast cancer."
9           Because I am not a medical doctor
10 and I certainly do not profess to be, could you
11 explain to me what that diagnosis means of the
12 T2, N1 MX Stage II?
13     A.   T2, it looks at the size of the
14 tumor.  It goes from T1, T2, T3, and T4.  And N
15 is -- refers to the nodes in axilla.  That's
16 where the breast cancer spreads to.  And so
17 there was one node, which was positive in the
18 initial screening biopsy.  And MX means that we
19 don't have any information to say, test-wise,
20 whether it has spread beyond the lymph nodes.
21 So we use the T2 and N1 to call it a Stage II
22 cancer.
23     Q.   And then, if we look at the very
24 next sentence, it says, "This consult has been
25 called for advice regarding any adjuvant

Page 63

1  treatment that remains."
2      A.   She had a node that was positive
3  with cancer, so she did what's called an
4  extended lymph node removal.  So we need to
5  look at those nodes too, and if those nodes are
6  positive or how many nodes are positive, she
7  may need extra treatment beyond surgery.  So
8  that's what the consult is called for.
9      Q.   So the consult in this context for
10 Ms. Francis was to determine if she needed
11 treatment in addition to the surgery she had
12 already had?
13     A.   Yes.
14     Q.   And do you have any recollection of
15 this initial meeting between you and
16 Ms. Francis?
17     A.   I remember Ms. Francis very well,
18 but I will not be able to recollect exactly the
19 conversation, simply because of so many
20 patients we see.
21     Q.   And that's fine.  I was just
22 wondering if you remembered anything
23 specifically about the first time you had met
24 her.
25     A.   No, I don't remember anything that

Page 64

1  was out of the way.  It was a pretty routine
2  consult, in terms of extra treatment that is
3  needed.
4      Q.   If you'll turn with me now to the
5  next page, Bates 478, and if you look all the
6  way to the bottom where it says "assessment,"
7  was this what you were referencing earlier when
8  you said that Dr. Leissinger would have
9  reviewed your assessment?
10     A.   Right.
11     Q.   And is what's written in the
12 assessment, to the best of your knowledge and
13 recollection, recommendations that you yourself
14 had made --
15     A.   Yes.
16     Q.   -- at this time?
17     A.   Uh-huh, yes.
18     Q.   And if we just look at the
19 assessment very quickly, it says that, "The
20 patient is a 38-year-old-female with
21 infiltrating ductal carcinoma, which appears to
22 be either T1 or T2, N1 and M" -- I'm not sure
23 if that's a zero or an O.
24     A.   That's a zero.
25     Q.   "Likely at Stage II.  ER positive,

Page 65

1  and ECOG status 0."
2           Now, earlier you explained to me
3  what the T1, T2, N1 and MO or M0 stand for.
4  What does it mean when it says that the patient
5  is ER/PR positive?
6      A.   That means the tumor has estrogen
7  receptors and progesterone receptors on the
8  cancer cells.
9      Q.   Is this information that's
10 essential in order for you to be able to a
11 determine chemotherapy regimen for treatment?
12     A.   Yes.
13     Q.   Is the same true for the T1 -- or
14 the T2, N1, and M0 diagnosis?
15     A.   Yes.
16     Q.   Would those be two of the factors
17 that you would take into consideration?
18     A.   Yes.
19     Q.   And then, if we continue, it says,
20 "The issue with her seems to be the recent DVT,
21 which will make it difficult to get tamoxifen."
22          What are you referring to when you
23 say DVT here?
24     A.   She has a clot in her arm, and
25 tamoxifen is a medicine which will increase

```
                                          66                                              68
 1  your risk for clotting. So if you have a clot    1  recommendation?
 2  already there, you're limited in being able to   2      A.  Yes.
 3  use tamoxifen.                                   3      Q.  And then you also see the last
 4      Q.  And then it says, "Considering           4  thing here on the last page of this document.
 5  this, the possibility of chemotherapy is there.  5  It says "signed by." And is that your name
 6  We will discuss with the -- or will discuss      6  there with the date?
 7  with the oncology team whether which to give     7      A.  Yes.
 8  her adjuvant chemotherapy or just hormone        8      Q.  Does that indicate to you that you
 9  therapy. If needed, would also get a radiation   9  are the person that wrote this record and then
10  oncology consult."                              10  electronically signed it?
11          What did you mean when you said,        11      A.  Yes.
12  "Will discuss with the oncology team"?          12          - - - - -
13      A.  Well, I'm -- I'm doing a                13      (Thereupon, Deposition Exhibit 4,
14  fellowship, so we had Dr. Leissinger. We had    14      06/16/2009 Dr. Verghese Dictation
15  also tumor boards, where we discuss patients    15      Re: Tanya Francis, was marked for
16  with problems like this, to get a consensus on  16      purposes of identification.)
17  what is an appropriate treatment.               17          - - - - -
18      Q.  Would this discussion with              18      Q.  I'm going to show you now what I've
19  Dr. Leissinger -- or did you say there were two 19  marked for identification purposes as
20  boards that you consulted with?                 20  Exhibit 4. You'll notice that this is a
21      A.  Tumor boards.                           21  medical record, much like the other record.
22      Q.  And who makes up a tumor board?         22  Would you like a moment to look over it before
23      A.  Tumor board has all the oncologists     23  we discuss it?
24  in the hospital come together and discuss       24      A.  Please.
25  cases. Regardless of whether they're            25      Q.  Okay.

                                          67                                              69
 1  complicated or not, we discuss the cases.        1      A.  Okay.
 2      Q.  Were you required to seek out            2      Q.  Have you had a chance to
 3  Dr. Leissinger and those tumor boards' opinions  3  familiarize yourself with this document?
 4  prior to making a final recommendation?          4      A.  Yes.
 5      A.  We do discuss cases, but it's not        5      Q.  What is this document?
 6  mandatory.                                       6      A.  This is a follow-up document. It's
 7      Q.  Okay. So you had the ability, as a       7  the subsequent visit a week after the initial
 8  fellow, to make a decision about a chemotherapy  8  consult.
 9  regime without necessarily having to have prior  9      Q.  And the initial consult was the one
10  approval by Dr. Leissinger; is that correct?    10  that we just went through on 6/8 of '09; is
11      A.  No. Dr. Leissinger is the one who      11  that correct?
12  makes the final decision, not me.               12      A.  Yes.
13      Q.  Okay. So I want to make sure I          13      Q.  And if we're looking at the first
14  understand. As the fellow, would you be the    14  page of this document, again, does it show that
15  person charged with going through the protocol 15  you are the dictating physician?
16  and making the initial recommendation?          16      A.  Yes.
17      A.  Yes, but Dr. Leissinger is the one     17      Q.  And the date of this visit -- well,
18  who will sign off on whatever is said or        18  actually, let's look at the second page. I
19  whatever is decided.                            19  apologize. Again, at the top, does this appear
20      Q.  So she would look at your               20  to be a document related to the treatment of a
21  recommendation, Dr. Leissinger, and then, as we 21  patient by the name of Tanya Francis?
22  said earlier, check your homework --            22      A.  Yes.
23      A.  Right.                                  23      Q.  And the date of service, does that
24      Q.  -- and if there were no issues,         24  appear to be June 16, 2009?
25  assuming, she would then sign off on that       25      A.  Yes.
```