UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION | MDL NO. 2740 |
| | SECTION "H" (5) |
| THIS DOCUMENT RELATES TO: *Durden v. Sanofi S.A., et al.*, 16-16635 *Earnest v. Sanofi S.A., et al.*, 16-17144 *Francis v. Sanofi S.A., et al.*, 16-17410 | JUDGE MILAZZO MAG. JUDGE NORTH |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE DEFENDANT'S EXPERT DAVID SPIEGEL, M.D.

It should go without saying that it is not possible to render psychological opinions without a personal evaluation. Yet it must be said here because Sanofi has hired an expert, Dr. David Spiegel, who opines on Plaintiff Durden's and Earnest's psychological status and whether they are malingerers *without ever* meeting or speaking with these women. Dr. Spiegel comfortably concludes that these women are likely lying about their pain based solely on a paper record Sanofi has assembled and paid him to read.

Longstanding rules within the psychiatric community outright forbid psychiatrists or psychologists from offering a professional opinion on someone they haven't evaluated in person. That has not slowed Dr. Spiegel—until now. This motion seeks to exclude Dr. Spiegel's far-reaching medical opinions on Durden and Earnest because he lacks any reliable basis to conclude that persons he has never evaluated are malingerers or psychologically unharmed.

### FACTUAL BACKGROUND

Plaintiffs Antoinette Durden and Barbara Earnest were prescribed Taxotere (docetaxel) as part of their treatment for breast cancer. Each suffered permanent hair loss, as well as other physical and psychological damages.

1

### Antoinette Durden

Plaintiff Antoinette Durden ("Ms. Durden") was diagnosed with breast cancer in 2011. On July 20, 2011, Ms. Durden underwent a prophylactic right mastectomy in addition to a left simple mastectomy. After the surgeries, lymph node pathologies showed that Ms. Durden had adenocarcinoma of the left breast. Thereafter, Ms. Durden received an additional surgery and was recommended to receive chemotherapy.

Ms. Durden was administered Taxotere as part of her chemotherapy treatment. Ms. Durden was not informed that she may suffer permanent hair loss as a result of treatment with Taxotere. Following chemotherapy treatment Ms. Durden was forced to file a claim for social security disability due to her physical disability from her cancer diagnosis and treatment

In the summer of 2012, Ms. Durden underwent bilateral breast reconstruction surgery. Ms. Durden continued to suffer from permanent hair loss. She sought treatment from a dermatologist concerning her hair loss, but was ultimately unable to recover from her alopecia.

Ms. Durden has been evaluated by psychiatrist Dr. John W. Thompson, Jr. and psychologist Dr. Kevin Bianchini. Both Bianchini and Thompson have concluded that Ms. Durden suffered from an adjustment disorder with mixed anxiety and depressed mood as a result of her permanent hair loss.

### Barbara Earnest

Plaintiff Barbara Earnest was diagnosed with breast cancer in 2011. On March 10, 2011, Mrs. Earnest underwent a lumpectomy. Thereafter, Mrs. Earnest was to begin a chemotherapy regimen consisting of doxorubicin and cyclophosphamide, but after the first four doses she began to receive Taxotere.

As a result of her chemotherapy treatments, Mrs. Earnest lost her hair entirely. Mrs. Earnest was not informed that she may suffer permanent hair loss as a result of treatment with Taxotere. Rather, the Taxotere warning indicated that if she suffered hair loss, it would grow back.

Mrs. Earnest has also been evaluated by Thompson and Bianchini. They both concluded that Mrs. Earnest suffered from an adjustment disorder with mixed anxiety and depressed mood as a result of her permanent hair loss.

## **David Spiegel, M.D.**

David Spiegel, M.D., a psychiatrist, was retained by Sanofi to render psychological opinions concerning the above Plaintiffs. He authored three reports in which he renders opinions. The first is a general report totaling approximately seven pages. *See* Expert Report of David Spiegel, M.D., December 10, 2018 (hereinafter "Ex. J, Spiegel General Report"). The second two are case specific reports for Ms. Durden and Mrs. Earnest. *See* David Spiegel, M.D. Report of Antoinette Durden, January 21, 2019 (hereinafter "Ex. D, Spiegel Durden Report"); David Spiegel, M.D. Report of Barbara Earnest, January 21, 2019 (hereinafter "Ex. E, Spiegel Earnest Report").

Dr. Spiegel has never performed any psychological or medical testing on Ms. Durden or Mrs. Earnest. He has never requested to meet with or speak with them. His psychological analysis of their diagnoses and symptoms is entirely dependent on documents Sanofi spoon-fed him. Although Dr. Spiegel gives a historical social psychological narrative of Ms. Durden and Mrs. Earnest, he has no personal knowledge on which to base his opinion.

## **LEGAL STANDARD**

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590-93 (1993), the Supreme Court instructed courts to function as gatekeepers and determine whether expert testimony should be presented to the jury. Courts act as gatekeepers of expert testimony "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). The burden is on the party offering the expert testimony to establish by a preponderance of the evidence that it is admissible. *See Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *see also Daubert*, 509 U.S. at 590-91.

Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702; *and see Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167 (1999) ); *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 113 S. Ct. 2786 (1993).

A proffered expert witness is qualified to testify by virtue of his or her "knowledge, skill, experience, training, or education." FED. R. EVID. 702. Moreover, in order to be admissible, expert testimony must be "not only relevant, but reliable." *Daubert*, 509 U.S. at 589. "This gate-keeping obligation applies to all types of expert testimony, not just scientific testimony." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) (citing *Kumho*, 526 U.S. at 147).

In deciding whether to admit or exclude expert testimony, the Court should consider numerous factors. *Daubert*, 509 U.S. at 594. In *Daubert*, the Supreme Court offered the following, non-exhaustive list of factors that courts may use in evaluating the reliability of expert testimony: (1) whether the expert's theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the challenged method; and (4) whether the theory or technique is generally accepted in the relevant scientific community. *Id.* at 593-94; *Pipitone*, 288 F.3d at 244. When evaluating *Daubert* challenges, courts focus "on [the experts'] principles and methodology, not on the conclusions that [the experts] generate." *Daubert*, 509 U.S. at 594.

The *Daubert* factors are not "a definitive checklist or test." *Daubert*, 509 U.S. at 593. As the Supreme Court emphasized, the *Daubert* framework is "a flexible one." *Id.* at 594. Accordingly, the decision to allow or exclude experts from testifying under *Daubert* is committed to the sound discretion of the district court. *See St. Martin v. Mobil Exploration & Producing U.S., Inc*., 224 F.3d 402, 405 (5th Cir. 2000).

The proposed testimony and expert report of Sanofi's expert, Dr. Spiegel, do not meet the standards for admissibility under Rule 702 or *Daubert.* Plaintiffs, therefore, request that the Court strike his expert reports and exclude his proposed expert testimony.

## **ARGUMENT**

In evaluating whether an expert's methodology conforms to generally accepted standards of medical practice, courts often looks to the guidelines and rules promulgated by leading medical organizations. *See, e.g.*, *United States v. Fishman*, 743 F. Supp. 713, 717 (N.D. Cal. 1990) ("A more significant barometer of prevailing views within the scientific community is provided by professional organizations such as the American Psychological Association..."). Relevant here, the

American Psychological Association publishes *Ethical Principles of Psychologists and Code of Conduct*, which contains ten ethical standards that create "enforceable rules for conduct as psychologists." (*See* Ex. A, at 2.) These rules apply not only to a clinical setting, but also to forensic analysis such as that performed by an expert witness. (*Id.* at 2-3.) As noted in the preamble to these standards, "[Psychologists] perform many roles, such as researcher, educator, diagnostician, therapist, supervisor, consultant, administrator, social interventionist, and expert witness. This Ethics Code provides a common set of principles and standards upon which psychologists build their professional and scientific work." (*Id.* at 3.) The American Psychiatric Association likewise publishes *The Principles of Medical Ethics With Annotations Especially Applicable to Psychiatry*, which are "standards of conduct which define the essentials of honorable behavior for the physician." (Ex. B, at 2.)

Psychologists and psychiatrists are obligated to comply with these standard and rules, and as such, they reflect not only what is generally accepted but what is ethically required in the field of psychology and psychiatry. In diagnosing Ms. Durden and Mrs. Earnest as malingerers and disputing the diagnoses rendered by Plaintiffs' experts, Dr. Spiegel failed to conform to these generally accepted standards as required under *Daubert*.

### A. Dr. Spiegel's Case Specific Reports[1] Should be Excluded as His Opinions Do Not Conform to the Generally Accepted and Required Practices Among Psychologists

One of the core ethical standards mandated by the American Psychological Association pertains to the psychological "assessment" of individuals and includes the following rule: "[P]sychologists provide opinions of the psychological characteristics of individuals *only after they have conducted an examination of the individuals adequate to support their statements or*

---

[1] Spiegel authored case specific reports for only Ms. Durden and Mrs. Earnest. He has not submitted a case specific report for Ms. Francis.

6

*conclusions."* (Ex. A at § 9.01b (emphasis added).) The American Psychiatric Association has adopted a similar position, stating in a March 15, 2017 ethics opinion that "*[i]t is a departure from the methods of the profession to render an opinion without an examination* and without conducting an evaluation in accordance with the standards of psychiatric practice. Such behavior compromises both the integrity of the psychiatrist and of the profession itself." (Ex. C at 1 (emphasis added).)

"When, despite reasonable efforts, such an examination is not practical," the American Psychological Association requires that "psychologists document the efforts they made and the result of those efforts, clarify the probable impact of their limited information on the reliability and validity of their opinions, and appropriately limit the nature and extent of their conclusions or recommendations." (Ex. A at § 9.01b.) Despite this, it is routine for defense experts in the context of litigation—particularly those who seek to offer a diagnosis as to a plaintiff's psychological condition—to request and obtain an examination of the plaintiff. The American Psychiatric Association recognizes this, noting that in the forensic setting, offering opinions is permissible because "there is court authorization for the examination (or an opinion without examination)." (Ex. C at 2).

### 1. Dr. Spiegel's Opinions Lack Reliability Because Dr. Spiegel Failed to Conduct In-Person Examinations of Ms. Durden and Mrs. Earnest.

As a lifetime fellow of the American Psychiatric Association and a participant in subcommittees to the American Psychological Association, Dr. Spiegel is presumably aware of the generally accepted standards in his field, including the requirement to conduct an in-person examination prior to rendering opinions regarding an individual's psychological condition. Despite this—and unlike Plaintiffs' experts, Drs. Thomas and Bianchini—Dr. Spiegel elected not to examine Ms. Durden or Mrs. Earnest nor did Dr. Spiegel explain in his reports why he felt it impractical to examine these women. (Ex. D, Spiegel Durden Report at 1; Ex. E, Spiegel Earnest

7

Report at 1.) Indeed, defense counsel never requested an opportunity for Spiegel to examine Ms. Durden or Mrs. Earnest.

In addition, Dr. Spiegel's reports fail to address the impact of his failure to examine these women has on his opinions—this is an absolute requirement in the forensic setting as "any evaluation conducted or opinion rendered based on methodology that departs from the established practice of an in-person evaluation must clearly identify the methods used and the limitations of those methods." (Ex. A at 2; Ex. C at 2.) Moreover, rather than limit the nature and extent of his conclusions as required by both the American Psychological Association and the American Psychiatric Association (*id.*), Dr. Spiegel disputes the diagnoses of Plaintiffs' experts and offers his own diagnoses of Ms. Durden and Mrs. Earnest, including that they should be strongly suspected of malingering under DSM-V criteria. (Ex. D at 13-18; Ex. E at 8-13.) This contravenes the standard put forth by the American Psychiatric Association, which states "[p]sychiatric diagnosis occurs in the context of an evaluation, based on thorough history taking, examination, and where applicable, collateral information." (Ex. C at 1.)

"When psychiatrists offer medical opinions about an individual they have never examined, this behavior has the potential to stigmatize those with mental illness." (*Id.*) Here, Dr. Spiegel rejects Ms. Durden's assertion that here hair loss made her feel sexually inadequate, stating that "Ms. Durden's hair was not a serious concern in relation to her sexuality." Dr. Spiegel bases this opinion off his inability to find statements in the record to the contrary. (Ex. D at 12.) To imply such from an absence of evidence is, as noted above, not a generally accepted approach by which psychologists and psychiatrists make determinations about individuals. Similarly, Dr. Spiegel assesses Ms. Durden and Mrs. Earnest as a malingerers, stating that there is "evidence that Ms. Durden may have been inclined to respond in such a way that her symptoms seem worse than they

8

are," (Ex. D at 17) and claiming that both women meet the conditions for DSM-V diagnosis of "malingering should be strongly suspected." (Ex. D at 17-18; Ex. E at 12-13.)  Dr. Spiegel also disagrees with Plaintiff's experts—doctors who actually examined Ms. Durden and Mrs. Earnest—regarding their diagnosis of Ms. Durden and Mrs. Earnest as having adjustment disorder with depressed mood and anxious features. (Ex. D at 13-17; Ex. E 8-12.) For Dr. Spiegel to offer such opinions without conducting an in-person examination of Ms. Durden and Mrs. Earnest violates the methodology recognized, accepted, and applied throughout the field of psychology and psychiatry and promulgated in standards published by the American Psychological Association and the American Psychiatric Association and has the potential to inflict additional emotional injury on Plaintiffs.

> 2. *Dr. Spiegel's Opinions Do Not Fit Within the Exception to the In-Person Examination Requirement.*

The American Psychological Association provides that "[w]hen psychologists conduct a record review or provide consultation or supervision and an individual examination is not warranted or necessary for the opinion, psychologists explain this and the sources of information on which they based their conclusions and recommendations." (Ex. A at § 9.01c.)  Similarly, the American Psychiatric Association permits psychological profiling, which occurs when an "… authorized party engages a mental health professional to provide information about the characteristics of an individual who might have perpetrated a crime; the behavior of a suspect or other figure; other characteristics of an individual; or a prediction of future risk." (Ex. C at 3.) However, because psychological profiling "often lacks examination of the individual and relevant data from appropriate collaterals, the psychiatrist must explicitly address the limitations of the methods used in rendering a profile, should not opine about a diagnoses, should not include a

9

diagnostic opinion, and must clearly state the inherent limitations in making predictions about future behavior." (*Id.*)

Dr. Spiegel does not meet any of the above exceptions that would allow him to render his opinions without first conducting an in-person examination. First, Dr. Spiegel is not a consulting expert in this matter—Sanofi has designated him as a testifying expert. Moreover, Dr. Spiegel's report is not limited to a record review, and his report likewise goes far beyond that permitted for psychological profiling. For example, in the report for Mrs. Earnest, which totals thirteen (13) pages and is similar in format to the report issued for Ms. Durden, Dr. Spiegel spends the first seven (7) pages summarizing her records. (Ex. E.) The last final five (5) pages are dedicated to assessing Mrs. Earnest's psychological condition, rebutting the diagnosis of Plaintiffs' experts and offering his own diagnosis of Mrs. Earnest, all which require an in-person examination in order to comply with the generally accepted standards describe above.

**B. In Addition to Failing Conduct an In-Person Examination, Dr. Spiegel's Rebuttal Opinions Should Also be Stricken as Speculative and Factually Inaccurate.**

A trial court may properly exclude expert testimony "which was not based upon the facts in the record but on altered facts and speculation." *Gillory v. Domtar Indus. Inc.,* 95 F.3d 1320, 1331-1332 (5th Cir. 1996) (general principles of relevance require exclusion of expert opinion based on facts that are indisputably wrong; expert testimony properly excluded). Under this standard, a separate basis exists to exclude Dr. Spiegel's rebuttal opinions in addition to his failure to conduct an in-person examination of Ms. Durden and Mrs. Earnest. Here, Dr. Spiegel mischaracterizes or ignores the facts gathered by Plaintiffs' experts, Drs. Thomas and Bianchini, during their in-person examinations of Ms. Durden and Mrs. Earnest in order to rebut their

diagnoses that Ms. Durden and Mrs. Earnest suffer from adjustment disorder with mixed anxiety and depressed mood.

Specifically, Dr. Spiegel misleadingly claims that the assessments of Ms. Durden and Mrs. Earnest performed by Plaintiffs' experts do not support the following bolded DSM-V diagnostic criteria for adjustment disorder:

(A) **The development of emotional or behavioral symptoms in response to an identifiable stressor(s) occurring within 3 months of the onset of the stressor(s);**

(B) **the symptoms or behaviors are clinically significant, as evidenced by one or both of the following:**

　　1. **Marked distress that is out of proportion to the severity or intensity of the stressor…**

　　2. **Significant impairment in social, occupational, or other important areas of functioning.**

(C) **The stress-related disturbance does not meet the criteria for another disorder and is not merely an exacerbation of a preexisting mental disorder.**

(D) The symptoms do not represent normal bereavement.

(E) **Once the stressor or its consequences have terminate, the symptoms do not persist for more than an additional six months.**

Regarding the first criteria, Dr. Spiegel claims that because Plaintiffs' experts have not identified an exact date in which the stressor occurred, it is impossible to determine that Ms. Durden and Mrs. Earnest's emotional symptoms occurred within three (3) months. (Ex. D at 14-15; Ex. E at 9-10.) To the contrary, it is not necessary to identify precisely when the stressor—i.e., permanent hair loss—occurred. Rather, the examination of both Ms. Durden and Mrs. Earnest revealed that they felt emotional symptoms after realizing the permanency of their hair loss. (Ex. F, Bianchini Rep. of Durden at 3; Ex. G, Bianchini Rep. of Earnest at 3; Ex. H, Thomas Rep. of Durden at 3-4; Ex. I, Thomas Rep. of Earnest at 4-5.)

11

Dr. Spiegel likewise contests the evaluation by Plaintiffs' experts of the second criteria, asserting that Ms. Durden and Mrs. Earnest's response to their permanent hair loss is not out of proportion to expected reactions because neither has sought counseling nor do they intend to seek counseling. (Ex. D at 15; Ex. E at 10-11.) This is speculative at best. There are many reasons for not seeking counseling – none of which Dr. Spiegel explored because he elected not to conduct an in-person examination of Ms. Durden and Mrs. Earnest. Further, Plaintiffs' experts learned from their examinations that both women have been socially impacted by their hair loss – both women reported that they engage in social activities less often because of their permanent hair loss. (Ex. F at 2-4; Ex. G at 3; Ex. H at 4-5; Ex. I at 5.) Dr. Spiegel discounts this, stating that because Ms. Durden and Mrs. Earnest participate in some social activities, they have not been significantly impaired. (Ex. D at 15-16; Ex. E at 10-11.)

Next, Dr. Spiegel claims that the third diagnostic criteria has not been met because Plaintiffs' experts did not analyze whether there were other life stressors affecting Ms. Durden or Mrs. Earnest. (Ex. D at 16; Ex. E at 11.) To the contrary, Plaintiffs' experts evaluated other possible sources, performing a thorough review of Ms. Durden and Mrs. Earnest's pre- and post-treatment medical history. (Ex. F at 3-4; Ex. G at 3-4; Ex. H at 3-6; Ex. I at 3-8.)

Finally, Dr. Spiegel states that the last criteria cannot be met because no information has been provided by when Ms. Durden and Mrs. Earnest began to adjust and cope. (Ex. D at 16-17; Ex. E at 11-12.) Dr. Spiegel ignores the statements made by Ms. Durden and Mrs. Earnest in the examinations conducted by Plaintiffs' experts in which they state they continue to experience emotional symptoms related to their permanent hair loss. (Ex. F at 2-4; Ex. G at 2-3; Ex. H at 3-4; Ex. I at 4-5.)

Because Dr. Spiegel has ignored obvious facts from the examinations of Ms. Durden and Mrs. Earnest and drawn speculative conclusions on areas that he could have explored had he examined these women, Dr. Spiegel's rebuttal opinions are rendered unreliable. This alone provides an independent basis to exclude his rebuttal opinions.

**C. Dr. Spiegel's General Report Does Not Assist the Trier of Fact with Respect to the Psychological Characteristics of the Plaintiffs.**

The Federal Rules of Evidence permit an expert witness with "scientific, technical or other specialized knowledge" to testify if such testimony "will help the trier of fact to understand the evidence or to determine a fact in issue," so long as "the testimony is based upon sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case." FED. R. EVID. 702.

Dr. Spiegel's general report contains statements which, even if true, have no scientifically established connection to Ms. Durden and Mrs. Earnest[2] as well as and particularly to Ms. Francis, who is not addressed in any of Dr. Spiegel's reports. For example, in Dr. Spiegel's general report, he opines that women with breast cancer diagnoses are unable to make an accurate risk-benefit analysis because of the PTSD associated with the diagnoses. (*See* Ex. J, Spiegel General Report, at 3.) Breast cancer patients have the highest overall prevalence of mental disorders (41.6%) among all cancer patients. (*See id.*) Emotions driven by fear (PTSD, anxiety and depression) make the careful assessment of risks and benefits difficult. (*See id.*) "In addition, women with a family history of cancer are understandably more fearful of cancer and choose more aggressive treatments." (*See id.* at 5.) Whether these generalizations are true or not, Dr. Spiegel should not be

---

[2] Spiegel intends to make conclusory statements about the Plaintiffs based off of statistical data in his general report. He writes in both case specific reports "I incorporate by reference my opinions outlined in my general expert report, served on December 10, 2018. That report is attached as Exhibit A." *See* Ex. E, Spiegel Earnest Report, at 1; Ex. D, Spiegel Durden Report, at 1.

13

permitted to testify at trial that these particular Plaintiffs assessed their risks based on emotions or out of concern for their families. He simply has not employed any scientific methodology to determine whether that is the case for Ms. Durden, Mrs. Earnest, or Ms. Francis.

Later in his report Dr. Spiegel also notes, "[r]isks are difficult to assess, and the ability to assess them changes over time." (Ex. J at 5.) Yet again, this testimony suggests that Plaintiffs' ability to access the risk of a particular treatment plan has changed over time, but Dr. Spiegel offers no reason to believe that Ms. Durden, Mrs. Earnest, or Ms. Francis's ability to assess risk has changed over time.

Referring generally to a cancer patient's decision to pursue aggressive treatment, Dr. Spiegel notes, "[r]egret is not uncommon among women treated for breast cancer." (Ex. J at 6.) However, neither case specific report is able to articulate whether Ms. Durden o Mrs. Earnest actually felt regret. (*See generally* Ex. D; Ex. E.) Moreover, this logically fails to assist the trier of fact with interpreting scientific evidence because a cancer patient cannot make an informed decision regarding a side effect she was not informed of.

Dr. Spiegel also claims "Assigning responsibility for a decision, either directed toward oneself (guilt) or towards a treating physician (blame) can have the effect of reducing helplessness because someone can be held responsible and the decision might have been different, even a decision that represented a rational assessment of risks vs. benefits." (Ex. J at 5.) Here, Dr. Spiegel appears to be implying women who filed a lawsuit about the drug company's failure to warn them of permanent hair loss did so because of regret for their own actions. *See id.* Again, Dr. Spiegel has not employed a method to determine whether this is true of Ms. Durden, Mrs. Earnest, or Ms. Francis. (*See generally* Ex. D; Ex. E.)

Likewise, Dr. Spiegel claims cancer scares many patients out of proportion to the actual risk, meaning many women seek aggressive treatment that may be unnecessary and does not necessarily improve their chances of survival. (*See* Ex. J at 3.) Again, there is no reason to believe Ms. Durden or Mrs. Earnest experienced fear that would drive them to seek more "aggressive" cancer treatments. Dr. Spiegel's additional claim that even if the Plaintiffs knew about the risk of permanent hair loss, they would have taken Taxotere anyway,[3] is likewise unsubstantiated with regard to the Plaintiffs.

In another example, Dr. Spiegel writes the following:

> Patient participation in choosing which chemotherapy regimen to take is generally low, and is affected by the patient's state of mind at time of diagnosis, their level of anxiety about a bad survival outcome, their reliance on their oncologist, and the complicated nature of chemotherapy regimens and risk/benefit trade-offs. In addition, cancer patients often feel that they need to make decisions rapidly to quickly remove the cancer from their bodies.

(Ex. J at 4.) Again, Dr. Spiegel did not evaluate the Plaintiffs in terms of their participation levels in choosing a treatment option. Notwithstanding that the above quote is not properly referenced to an authority, Dr. Spiegel again appears to contradict himself, claiming simultaneously that the patient has not participated in the selection and risk assessment of chemotherapy drugs, while also claiming that in Plaintiffs' evaluation of different treatment plans, their choices are affected by their states of mind.

Accordingly, Dr. Spiegel's general report should be excluded because he fails to connect the opinions in his general report to Ms. Durden, Mrs. Earnest, or Ms. Francis.

---

[3] "[M]ost women are willing to pay any price necessary to give themselves the best chance of surviving breast cancer and avoiding recurrence" (Ex. J, Spiegel General Report, at 3.)

15

## **CONCLUSION**

Sanofi cannot satisfy its burden to prove Dr. Spiegel's opinions are admissible under Federal Rule of Evidence 702. Plaintiffs, therefore, request the Court grant their motion to exclude, and strike Defendants' designated expert, Dr. Spiegel, and his opinions from this case.

Dated: February 8, 2019                                     Respectfully submitted,

*/s/ Christopher L. Coffin*                                 */s/ Karen B. Menzies*
Christopher L. Coffin (#27902)                              Karen Barth Menzies (CA Bar #180234)
PENDLEY, BAUDIN & COFFIN, L.L.P.                            Andre Mura (CA Bar # 298541) (on the brief)
1100 Poydras Street, Suite 2505                             GIBBS LAW GROUP LLP
New Orleans, Louisiana 70163                                6701 Center Drive West, Suite 1400
Phone: (504) 355-0086                                       Los Angeles, California 90045
Fax: (504) 355-0089                                         Telephone: 510-350-9700
ccoffin@pbclawfirm.com                                      Facsimile: 510-350-9701
                                                            kbm@classlawgroup.com
*Plaintiffs' Co-Lead Counsel*
                                                            *Plaintiffs' Co-Lead Counsel*


*/s/M. Palmer Lambert*                                      */s/Dawn M. Barrios*
M. Palmer Lambert (#33228)                                  Dawn M. Barrios (#2821)
GAINSBURGH BENJAMIN DAVID                                   BARRIOS, KINGSDORF & CASTEIX, LLP
MEUNIER & WARSHAUER, LLC                                    701 Poydras Street, Suite 3650
2800 Energy Centre, 1100 Poydras Street                     New Orleans, LA 70139
New Orleans, LA 70163-2800                                  Phone: 504-524-3300
Phone: 504-522-2304                                         Fax: 504-524-3313
Fax: 504-528-9973                                           barrios@bkc-law.com
plambert@gainsben.com
                                                            *Plaintiffs' Co-Liaison Counsel*
*Plaintiffs' Co-Liaison Counsel*

16

**PLAINTIFFS' STEERING COMMITTEE**

Anne Andrews
Andrews Thornton Higgins Razmara, LLP
2 Corporate Park, Suite 110
Irvine, CA 92606
Phone: (800) 664-1734
aa@andrewsthornton.com

J. Kyle Bachus
Bachus & Schanker, LLC
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Phone: (303) 893-9800
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@atkinsandmarkoff.com

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Phone: 510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

| | |
|---|---|
| Emily C. Jeffcott<br>Morgan & Morgan<br>700 S. Palafox Street, Suite 95<br>Pensacola, Florida 32505<br>Phone: (850) 316-9074<br>Fax: (850) 316-9079<br>ejeffcott@forthepeople.com | Hunter J. Shkolnik<br>Napoli Shkolnik PLLC<br>360 Lexington Avenue, 11th Floor<br>New York, NY 10017<br>Phone: (212) 397-1000<br>hunter@napolilaw.com |
| Andrew Lemmon<br>Lemmon Law Firm, LLC<br>P.O. Box 904<br>15058 River Road<br>Hahnville, LA 70057<br>Phone: (985) 783-6789<br>Fax: (985) 783-1333<br>andrew@lemmonlawfirm.com | Genevieve Zimmerman<br>Meshbesher & Spence Ltd.<br>1616 Park Avenue South<br>Minneapolis, MN 55404<br>Phone: (612) 339-9121<br>Fax: (612) 339-9188<br>gzimmerman@meshbesher.com |

## CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2019, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

*/s/ Dawn M. Barrios*
DAWN M. BARRIOS