UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)　　　　　　　　　　MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

　　　　　　　　　　　　　　　　　　　　　　　　　SECTION "H" (5)

THIS DOCUMENT RELATES TO:

Antoinette Durden, Case No. 2:16-cv-16635;
Barbara Earnest, Case No. 2:16-cv-17144

---

**MEMORANDUM IN SUPPORT OF SANOFI DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. JOHN W. THOMPSON, JR.**

---

　　　　In two cases, *Durden* and *Earnest,* Plaintiffs disclosed Dr. John W. Thompson, Jr., a psychiatrist, to testify that Antoinette Durden and Barbara Earnest have "Adjustment Disorder[s] with depressed mood and anxious feature[s]." Thompson *Durden* Rpt. at 7 (Ex. A); Thompson *Earnest* Rpt. at 9 (Ex. B). Dr. Thompson's opinions are outside of his expertise and are neither reliable nor relevant. Dr. Thompson's opinions should be excluded.

　　　　First, Dr. Thompson is unqualified to render these opinions. Plaintiffs are the only two patients Dr. Thompson has ever evaluated with alleged emotional distress from hair loss. *See* Thompson Dep. 69:13-18 (Ex. C). Dr. Thompson also does not consider himself a specialist in treating cancer patients. *Id.* at 69:4-12 (Ex. C).

　　　　Second, Dr. Thompson's opinions are unreliable. Before reaching his opinions, Dr. Thompson requested all medical records and all depositions in both cases from Plaintiffs' counsel. *Id.* at 21:8-15; 43:16-20 (Ex. C). However, despite the fact that the vast majority of medical records and all depositions in both cases were produced/completed in advance of November 9, 2018—when Dr. Thompson was disclosed as an expert and his reports were served—Dr.

Thompson was only provided a small set of medical records and only six depositions total for both cases. *See* Thompson *Durden* Rpt. at 2-3 (Ex. A); Thompson *Earnest* Rpt. at 2-3 (Ex. B). Dr. Thompson's opinions are unreliable because he did not review or consider relevant information before rendering his opinions. Further, Dr. Thompson's opinions are unreliable because he did not apply the Diagnostic and Statistical Manual of Mental Disorders criteria for an Adjustment Disorder to either Plaintiff and failed to rule out alternative causes for Plaintiffs' alleged emotional distress.

Under Rule 702, all of Dr. Thompson's opinions are inadmissible.

## **LEGAL STANDARD**

Federal Rule of Evidence 702 controls the admission of expert testimony. In other words, under Rule 702, the Court's gatekeeping function first involves determining whether the expert is *qualified*; then it "involves a two-part inquiry into *reliability* and *relevance*":

> First, the Court must determine whether the proffered expert testimony is reliable. The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence. The reliability inquiry requires the Court to assess whether the reasoning or methodology underlying the expert's testimony is valid. The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation.
>
> Second, the Court must determine whether the expert's reasoning or methodology is relevant. The question here is whether the reasoning or methodology "fits" the facts of the case and will thereby assist the trier of fact to understand the evidence.

*Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 550 (E.D. La. 2015) (citations omitted) (emphases added).

The "reliability analysis applies to *all aspects* of an expert's testimony," including "the methodology, the *facts underlying the expert's opinion*, [and] the link between the facts and the conclusion." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (emphasis

2

added). Importantly, "the expert's testimony must be reliable at each and every step or else it is inadmissible." *Id*. These "exacting standards of reliability," *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000), provide that "conjecture, hypothesis, subjective belief, or unsupported speculation are impermissible grounds on which to base an expert opinion." *Wehling v. Sandoz Pharm. Corp.*, No. 97-2212, 162 F.3d 1158, 1998 WL 546097, at *5 (4th Cir. Aug. 20, 1998) (Table Decision). Courts also consider whether the expert's findings are litigation-driven or results-driven. *See Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (*Daubert II*). In making this assessment, courts have considered "whether experts are 'proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.'" *Burst*, 120 F. Supp. 3d at 551 (quoting *Daubert II*, 43 F.3d at 1317)). Defendants do not bear the burden of demonstrating its inadmissibility. *See Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 534 (W.D. Pa. 2003).

On the relevance factor, the Court must determine whether the proffered expert testimony is sufficiently tied to the facts in issue that it will aid the jury. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993) (stating that the district court's "gatekeeping role" requires ensuring that the expert testimony "is relevant to the task at hand"). "The question here is whether the reasoning or methodology 'fits' the *facts of the case* and will thereby assist the trier of fact to understand the evidence." *Burst*, 120 F. Supp. 3d at 551 (emphasis added).

## ARGUMENT

**I.   DR. THOMPSON'S OPINIONS ARE INADMISSIBLE BECAUSE THEY ARE OUTSIDE OF HIS EXPERTISE.**

Dr. Thompson is a psychiatrist. But that designation does not qualify him to offer any and all psychiatric opinions. Rather, Dr. Thompson may only testify within the "reasonable confines"

3

of his practice area. *Thompson v. U.S.*, No. 4:17-cv-63, 2019 WL 149553, at *4 (S.D. Ga. Jan. 9, 2019) ("A medical degree, however, does not qualify a physician to testify concerning any medical issue; a physician's expert testimony must stay within the 'reasonable confines' of his or her practice area.") (citing *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001)); *see also Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1112-13 (5th Cir. 1991) (concluding that an "M.D. degree . . . alone is not enough to qualify [an expert] to give an opinion on every conceivable medical question").

Plaintiffs allege emotional damages resulting from hair loss. But Dr. Thompson has no experience evaluating cancer patients or any other patients claiming emotional distress from hair loss and he has never researched or published in this area:

- He has never performed research on the psychological impact of breast cancer or cancer. Thompson Dep. 67:17-23 (Ex. C).

- He has never written any articles on the psychological impact of breast cancer or cancer. *Id.* at 67:21-68:2 (Ex. C).

- He has never performed any research on the psychological impact of hair loss. *Id.* at 68:3-6 (Ex. C).

- He has never written any articles on the psychological impact of hair loss. *Id.* at 68:3-6 (Ex. C).

- He has never written any articles on the psychosocial aspects of cancer treatment. *Id.* at 68:7-10 (Ex. C).

- He has never written any articles on emotional distress resulting from cancer treatment. *Id.* at 68:11-14 (Ex. C).

- He has never written any articles on mental disorders from cancer diagnosis and treatment. *Id.* at 68:15-18 (Ex. C).

- He has never written any articles on adjustment disorders in cancer patients or generally. *Id.* at 68:19-25 (Ex. C).

- He has never been published in any cancer or oncology related journals. *Id.* at 69:1-3 (Ex. C).

4

Moreover, Dr. Thompson admitted that he would not consider himself a specialist in treating cancer patients and that Plaintiffs are the only two patients he has ever evaluated with alleged emotional distress from hair loss. *Id.* at 69:4-18 (Ex. C). Dr. Thompson's proffered testimony thus fails the requirements of Rule 702 because he is not "qualified as an expert by knowledge, skill, experience, training, or education" to opine on psychological symptoms allegedly related to hair loss, cancer, or hair loss due to cancer. *See* FED. R. EVID. 702. Dr. Thompson's testimony regarding the emotional impact of hair loss should be excluded.

## II. DR. THOMPSON'S OPINIONS ARE INADMISSIBLE BECAUSE THEY ARE UNRELIABLE.

### A. Dr. Thompson failed to consider relevant evidence.

When evaluating claimed psychological effects of an incident, an evaluator—like Dr. Thompson—should carefully review available, relevant information to assess specific symptoms, their severity, and their time course. Thompson Dep. 126:2-14 (Ex. C). Family members, friends and other individuals involved in a patient's support network can be important sources of information about the reason for the evaluation, the patient's current symptoms and behavior, and past history. *Id.* at 124:8-15 (Ex. C).

In cases like this, when a plaintiff is claiming impaired social functioning, it is important for the evaluator to consider personal relationships, daily activities, participation in hobbies, attendance at religious institutions, and recent or planned vacations. *Id.* at 126:20-25; 127:4-8; 127:11-14 (Ex. C). The evaluator should compare the individual's current level of social functioning to the level before the alleged incident. *Id.* at 127:15-23 (Ex. C). Here, prior to forming his opinions and issuing his expert reports in these cases, Dr. Thompson did not review sufficient facts or data to reliably support his opinions and satisfy Rule 702. *See* FED. R. EVID. 702. This not only failed to satisfy Rule 702, it failed to satisfy Dr. Thompson's own standards.

5

Dr. Thompson requested all medical records for both Plaintiffs. *Id.* at 21:8-15 (Ex. C). He relied on Plaintiffs' counsel to provide him with all of Plaintiffs' medical records. *Id.* at 22:6-8 (Ex. C). Dr. Thompson testified that he made this request "so that I can do a thorough evaluation of the records and take all of the psychiatric information into consideration." *Id.* at 21:16-22 (Ex. C). However, Dr. Thompson admittedly was not provided with all of the Plaintiffs' medical records prior to reaching his opinions and issuing his reports in these cases. *Id.* at 21:23-22:5 (Ex. C); *see* Thompson Durden Rpt. at 2-3 (Ex. A); Thompson Earnest Rpt. at 2-3 (Ex. B).

Dr. Thompson also requested all depositions in both cases. Thompson Dep. 43:16-20 (Ex. C). Again, he relied on Plaintiffs' counsel to provide him with those transcripts. *Id.* at 185:1-7 (Ex. C). Notwithstanding the fact that all depositions in both cases were taken in advance of Dr. Thompson being designated as an expert and serving his expert reports on November 9, 2018, Dr. Thompson admittedly was not provided with copies of the transcripts. *See* Thompson Durden Rpt. at 2-3 (Ex. A); Thompson Earnest Rpt. at 2-3 (Ex. B).

Dr. Thompson did not know that he was not provided with all of the information he requested from Plaintiffs' counsel until Dr. Bianchini (another Plaintiffs expert) was deposed. Dr. Bianchini learned at his deposition that he also did not have a complete set of medical records and depositions for both cases. Thompson Dep. 22:9-22 (Ex. C).[1] After Dr. Bianchini's discovery, and four days before Dr. Thompson's deposition, Plaintiffs' counsel sent Dr. Thompson additional information. *See id.* at 27:3-20 (Ex. C). Dr. Thompson spent more time reviewing medical records

---

[1] On February 7, 2019, Plaintiffs served purportedly updated "reliance lists," reflecting materials that were not reviewed in formulation of Plaintiffs' experts' opinions and that Sanofi has not yet had an opportunity to review as of the date of this filing. As indicated by the Court, this subjects both Drs. Thompson and Bianchini to redeposition. But it does not fix the flaws in these experts' methods. Their opinions should just be excluded.

and depositions in those four days than he did before reaching his opinions and issuing his reports. *Id.* at 60:3-61:12 (Ex. C).

*Ms. Durden*. In the *Durden* case, prior to reaching his opinions and issuing his report, Dr. Thompson was only provided and only reviewed a small subset of Ms. Durden's medical records. *See* Thompson Durden Rpt. at 2-3 (Ex. A). He failed to review and consider thousands of pages of relevant medical records obtained by Plaintiff in connection with this litigation prior to submitting his report on November 9, 2018. Dr. Thompson was also only provided and only reviewed four deposition transcripts before submitting his report. *Id.* In developing his opinions, Dr. Thompson failed to review and consider the following depositions—nearly all of which were taken four to seven months before he submitted his expert report on November 9, 2018:

- 4/3/18 Priya Velu – Primary Care Provider
- 4/4/18 Julie Mermilliod – Dermatologist
- 4/17/18 Trenell Brown –Niece
- 4/20/18 John Cole – Oncologist
- 5/18/18 Dorothy Durden – Sister-in-Law
- 5/18/18 Paulette Derkins – Cousin and close friend
- 5/19/18 Mary Mitchell – Friend
- 5/19/19 Tonya Durden – Niece
- 6/28/18 David Delio – Friend
- 6/29/18 Darryl Durden – Brother
- 11/6/18 Antoinette Durden (second deposition) – Plaintiff

Dr. Thompson opines that Ms. Durden's social functioning has been affected by her hair loss, yet he did not review any deposition transcript of the individuals with whom Ms. Durden socializes besides her daughter. Thompson Dep. 187:20-188:4 (Ex. C). Dr. Thompson conceded that in order to form an opinion about Ms. Durden's social functioning, he would want to review what her friends and family members had to say about the issue. *Id.* at 190:11-22 (Ex. C).

Dr. Thompson agreed that it would be important to his diagnosis whether Ms. Durden was accurately reporting examples of her social functioning. *Id.* at 218:18-22 (Ex. C). Dr. Thompson

7

did not know whether any of the medical records indicated Ms. Durden's desire to resume sexual intercourse after her cancer diagnosis. *Id.* at 246:11-20 (Ex. C). He agreed that if Ms. Durden had a desire to resume sexual intercourse with her partner since having lost her hair, that would be important in assessing her social functioning. *Id.* at 246:25-247:6 (Ex. C). Dr. Thompson's report states that Ms. Durden claimed that she fights through depressed moods on a regular basis. Thompson Durden Rpt. at 4 (Ex. A); Thompson Dep. 213:14-18 (Ex. C). Yet, he admitted that this was not mentioned or confirmed in the medical records or depositions that he reviewed in her case. *Id.* at 213:21-214:13; 214:21-215:2 (Ex. C). Dr. Thompson's report also states that Ms. Durden claims that she worries on a daily basis about her hair and whether her hair will grow back. Thompson Durden Rpt. at 7 (Ex. A); Thompson Dep. 215:3-7 (Ex. C). Yet, he admitted that this was not mentioned or confirmed in the medical records that he reviewed in her case. Thompson Dep. 215:8-13 (Ex. C). Finally, Dr. Thompson's report states that Ms. Durden claims distressing recollections and intense distress and psychological reactivity when exposed to situations that remind her of her hair loss. Thompson Durden Rpt. at 4 (Ex. A); Thompson Dep. 219:22-220:3 (Ex. C). Yet, Dr. Thompson conceded that this was not mentioned or confirmed in the medical records that he reviewed in her case. Thompson Dep. 220:21-25 (Ex. C).

Importantly, prior to forming his opinions and issuing his report, Dr. Thompson was not even aware that Ms. Durden had been diagnosed with anxiety and depression. *Id.* at 37:4-13; 38:5-11 (Ex. C). It is clear that Dr. Thompson did not base his opinions on sufficient facts or data in the Durden case.

***Ms. Earnest***. In the *Earnest* case, prior to reaching his opinions and issuing his report, Dr. Thompson was only provided and only reviewed a small subset of Ms. Earnest's medical records. *See* Thompson Earnest Rpt. at 2-3 (Ex. B). Again, he failed to review and consider thousands of

8

pages of relevant medical records obtained by Plaintiff in connection with this litigation prior to submitting his report on November 9, 2018.  Dr. Thompson was also only provided and only reviewed Ms. Earnest's 2017 deposition. *Id.*  In developing his opinions, he failed to review and consider the following depositions—nearly all of which were taken more than six months before he submitted his expert report on November 9, 2018:

- 1/11/18 James Carinder – Oncologist
- 4/4/18 Raymond Baez – Primary Care Provider
- 4/9/18 Edward Mannina – Radiologist
- 4/11/18 Bridgette Collins-Burow – Oncologist
- 4/13/18 Lisa Reso – Oncology Nurse
- 4/16/18 Ralph Earnest – Husband
- 4/17/18 Michael Earnest – Son
- 4/18/18 Glenn Hedgpeth – Gastroenterologist
- 5/3/18 Jules LeBlanc – Brother
- 5/3/18 Ronald LeBlanc – Brother
- 11/1/18 Marie Celest Lagarde – Breast Surgeon
- 11/5/18 Barbara Earnest (second deposition) – Plaintiff

While Dr. Thompson did interview Mr. Earnest for approximately thirty minutes before issuing his report, he did not review Mr. Earnest's sworn testimony or the testimony of any other fact witnesses who provided information as to Ms. Earnest's social functioning.  He also had no information as to Ms. Earnest's social functioning prior to her cancer diagnosis.  With his limited review of medical records and no review of treating physician or fact-witness testimony, Dr. Thompson certainly could not corroborate any emotional symptoms that Ms. Earnest relayed to him.  In fact, Dr. Thompson did not see that Ms. Earnest reported any of her purported symptoms in any medical records.  Thompson Dep. 330:4-14 (Ex. C).  Of the medical records that he reviewed prior to forming his opinions and issuing his report in this case, Dr. Thompson did not see any mention of Ms. Earnest reporting that she was upset about her hair. *Id.* at 292:10-293:7 (Ex. C).  Dr. Thompson agreed that, according to her medical records, Ms. Earnest never sought treatment for her hair loss or asked for a referral to a dermatologist for treatment of her hair loss.

*Id.* at 293:13-17; 293:9-12 (Ex. C).

Based on Dr. Thompson's limited review of materials in Ms. Earnest's case, his opinions regarding Ms. Earnest were not based on sufficient facts are data, are unreliable, and should be excluded.

**B.     Dr. Thompson failed to follow the DSM-5 Adjustment Disorder criteria.**

Dr. Thompson diagnosed both Plaintiffs with "Adjustment Disorder[s] with depressed mood and anxious feature[s]." Thompson Durden Rpt. at 7 (Ex. A); Thompson Earnest Rpt. at 9 (Ex. B). He testified that an adjustment order is "on the lower end of what we would call impairing psychiatric disorders." Thompson Dep. 96:5-8 (Ex. C). Dr. Thompson then testified that Ms. Durden is "[o]n the lower end" of the adjustment disorder "range." *Id.* at 110:7-15 (Ex. C). He also testified that Ms. Earnest was on "the lower end" of an adjustment disorder in terms of severity of social impairment. *Id.* at 110:16-111:1 (Ex. C).

The Diagnostic and Statistical Manual of Mental Disorders (DSM-5) is a book that "defines and classifies mental disorders in order to improve diagnoses, treatment, and research." *Diagnostic and Statistical Manual of Mental Disorders* (*DSM–5*), AMERICAN PSYCHIATRIC ASSOCIATION, https://www.psychiatry.org/psychiatrists/practice/dsm. The DSM-5 "is the product of more than 10 years of efforts by hundreds of international experts in all aspects of mental health." *Id.* The DMS-5 sets forth the criteria for an adjustment disorder as follows:

A.     The development of emotional or behavioral symptoms in response to an identifiable stressor(s) occurring within 3 months of the onset of the stressor(s).

B.     These symptoms or behaviors are clinically significant, as evidenced by one or both of the following:

   1.     Marked distress that is out of proportion to the severity or intensity of the stressor, taking into account the external context and the cultural factors that might influence symptom severity and presentation.

        2.        Significant impairment in social, occupational, or other important areas of functioning.

    C.        The stress-related disturbance does not meet the criteria for another mental disorder and is not merely an exacerbation of a preexisting mental disorder.

    D.        The symptoms do not represent normal bereavement.

    E.        Once the stressor or its consequences have terminated, the symptoms do not persist for more than an additional 6 months.

American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-5") at 286-87 (5th ed. 2013). Dr. Thompson testified that the DSM-5 acts as a "guideline even though they say criteria." Thompson Dep. 134:12-23 (Ex. C). He testified "we use it as a guideline and we attempt to fit everybody in the criteria, but they don't always fit neatly in the criteria." *Id.* Here, however, it does not appear that Dr. Thompson even considered the criteria when diagnosing Plaintiffs with adjustment disorders.

*Ms. Durden*. Dr. Thompson agreed that when evaluating a patient's symptoms for purposes of a mental disorder diagnosis, it is important to know the timeframe of the symptoms and whether the symptoms have gotten worse or better over time. *Id.* at 168:7-17 (Ex. C). Criterion A for an adjustment disorder states that the "emotional or behavioral symptoms" in response to the stressor occur within three months of the onset of the stressor. *See* DSM-5 at 286. Yet, Dr. Thompson did not know when Ms. Durden realized that her hair was not going to grow back and could not recall even asking Ms. Durden when she reached the conclusion that her hair was not going to grow back. Thompson Dep. 157:8-22 (Ex. C). He also did not know whether Ms. Durden's purported emotional symptoms worsened when she realized her hair was not growing back—whenever that may have been. *Id.* at 161:14-24 (Ex. C). Moreover, Dr. Thompson did not review any of Ms. Durden's medical records *prior* to her cancer diagnosis. *Id.* at 181:12-17 (Ex. C). He did not know what Ms. Durden's hair looked like prior to her cancer diagnosis or

11

at any point from 2011 until the date that he interviewed her in March 2018. *Id.* at 182:15-24 (Ex. C). Instead, Dr. Thompson relied on Ms. Durden's statements regarding her hair and how much it meant to her. *Id.* at 182:25-183:3 (Ex. C). Without knowing when Ms. Durden's "emotional or behavioral symptoms" occurred, Dr. Thompson cannot opine that any emotional or behavioral symptoms were caused by Ms. Durden's hair loss. He provides no temporal connection between the two. *See* DSM-5 at 286.

As to criterion B, Dr. Thompson did not see that Ms. Durden "had marked distress out of proportion to the severity of the stressor." Thompson Dep. 231:22-5 (Ex. C). He also did not determine whether Ms. Durden suffered from any occupational impairment. *Id.* at 279:21-25 (Ex. C).

For criterion C, Dr. Thompson admitted that he did not know, prior to serving his expert report in this case, that Ms. Durden had been diagnosed with anxiety and depression. *Id.* at 37:4-13; 38:5-11 (Ex. C). He could not have considered whether any alleged symptoms by Ms. Durden were "merely an exacerbation" of her preexisting mental disorder. While Dr. Thompson's testimony is that the DSM-5 criteria are merely guidelines, he appears to have ignored them entirely in making his diagnosis of Ms. Durden. Dr. Thompson's opinion that Ms. Durden has an adjustment disorder from hair loss is not the product of reliable principles and methods. *See* FED. R. EVID. 702(c)-(d).

*Ms. Earnest*. Like Ms. Durden, Dr. Thompson could not say when Ms. Earnest's alleged adjustment disorder began. He did not know when Ms. Earnest determined that her hair was not going to grow back and does not recall ever asking Ms. Earnest when she determined that her hair was not going to grow back. Thompson Dep. 287:4-14; 287:16-20 (Ex. C). He also did not recall asking Ms. Earnest if there was any change in her symptoms when she decided that her hair was

not going to grow back—whenever that may have been. *Id.* at 290:6-11 (Ex. C). Dr. Thompson did not know of any changes in Ms. Earnest's reported symptoms from the time she lost her hair until the present date. *Id.* at 290:12-19 (Ex. C). He did not even know whether Ms. Earnest experienced hair loss prior to her cancer treatment. *See id.* at 120:18-121:4 (Ex. C). Without any temporal connection between Ms. Earnest's alleged emotional symptoms and her supposed realization that her hair loss was permanent, there can be no causal association between the two. For this reason, Dr. Thompson's opinion that Ms. Earnest has an adjustment disorder from hair loss is unreliable and should be excluded.

        **C.    Dr. Thompson failed to rule out alternative causes for his diagnoses.**

In determining what caused Plaintiffs' respective emotional symptoms, Dr. Thompson only considered one cause—hair loss. Dr. Thompson failed to consider and rule out any other possible causes for Plaintiffs' claimed emotional distress. Dr. Thompson's opinions should be excluded because of his failure to perform a differential diagnosis.

"Differential diagnosis is a process of elimination by which medical practitioners determine the most likely cause of a set of signs or symptoms from a set of possible causes." *Pick v. American Medical Systems, Inc.*, No. 97-cv-30858, 1999 WL 824505, at *2 (5th Cir. 1999). "A reliable differential diagnosis must rule in the suspected cause of an injury and rule out other causes or determine which of the remaining explanations is most likely the cause." *Hooks v. Nationwide Housing Systems, LLC*, No. 15-cv-729, 2016 WL 3667134, at *15 (E.D. La. 2016). "[T]he presence of a known risk factor," let alone a contested risk factor, "is not a sufficient basis for ruling out" alternative causes, including idiopathic causes, of a disease. *Perry v. Novartis Pharm. Corp.,* 564 F. Supp. 2d 452, 470 (E.D. Pa. 2008); *accord Henricksen v. ConocoPhillips Co.,* 605 F. Supp. 2d 1142, 1162 (E.D. Wash. 2009).

13

*Ms. Durden*. Ms. Durden reported to Dr. Thompson that she avoided activities, places, and people because of her hair loss. Thompson Durden Rpt. at 4 (Ex. A); Thompson Dep. 221:4-6 (Ex. C). The only examples that Dr. Thompson included in his report were (1) her grandchildren calling her "Bozo," and (2) her refusing to go on a family cruise. Thompson Durden Rpt. at 3, 4 (Ex. A); Thompson Dep. 221:14-222:1 (Ex. C). Dr. Thompson had no other examples at the time he formed his opinions. Thompson Dep. 222:15-19 (Ex. C). However, Ms. Durden's own testimony reveals that both of these examples are not accurate. Durden Supp. Dep. 166:25-167:11 (Ex. D). ("Q. So you told Dr. Thompson that they refer to you as Bozo? A. Yes. Q. That's what they call you? A. They don't call me that. They don't call me that, no. Q. Okay. Well, did you tell Dr. Thompson that your grandchildren refer to you as Bozo? A. They called -- they called me that that particular day, yes. Q. Oh, on one day they did? A. Yes. They don't call me that now, no."); *id.* at 169:4-170:15 (Ex. D) ("Q. There's a reference on the next page. It's saying that you reported that you have refused to participate in activities, such as going on a family cruise. Did you tell that to Dr. Thompson? A. Yes. Q. And did you refuse to go on a family cruise? A. Yes. Q. Which family -- when was that? A. Last year. Q. In 2017? A. Yes. Q. And when in 2017? A. November. Q. November? Okay. And the reason I'm asking you about that is there are medical records where you report that you are going on the cruise November 25 to 30, and then when you get back, you reported that you went on the cruise. A. Yes, because I changed my mind, so I did. Q. So you are saying you did go -- A. Yes. Q. -- on the family cruise? A. Yes. Q. But you told Dr. Thompson that you had refused to go on the cruise? A. Yes. Previously, I had refused to go, yes. Q. And just so I'm clear, but what you are saying to me is that you actually did go on the family cruise in November, correct? A. Yes."). Dr. Thompson did not review this

14

testimony before forming his opinions in this case or before issuing his report. Thompson Durden Rpt. at 2-3 (Ex. A).

Dr. Thompson also confirmed that his report does not address any other stressors of Ms. Durden, even though they could also impact her social functioning. Thompson Dep. 226:6-23 (Ex. C). Dr. Thompson did not recall ever asking Ms. Durden whether her lymphedema syndrome or hyperpigmentation impacts her social functioning. *Id.* at 274:15-19; 274:20-275:11 (Ex. C). Dr. Thompson did not rule out Ms. Durden's spondylosis, degenerative disc disease, neuritis, and acute back pain with sciatica as other stressors and conceded that these could all be things that cause her emotional distress. *Id.* at 276:13-277:11; 277:3-11 (Ex. C). He did agree that Ms. Durden's age plays a role in her social functioning and that her sciatica and back pain could also play a role in her social functioning, yet he did not discuss any of these alternative causes in his expert report. *Id.* at 275:12-23; 275:25-276:8 (Ex. C); *see generally* Thompson Durden Rpt. (Ex. A).

***Ms. Earnest***. Likewise, Dr. Thompson could not rule out Ms. Earnest's age, neuropathy, or initial cancer diagnosis and fear of cancer returning as factors that impact Ms. Earnest's social functioning. Thompson Dep. 358:4-10; 358:24-359:7; 360:22-361:7 (Ex. C). Yet he did not address these issues in forming his opinions. Because Dr. Thompson did not rule out other causes of Ms. Earnest's alleged emotional distress, his opinions are unreliable and should be excluded. *See Hooks v. Nationwide Housing Systems, LLC*, No. 15-cv-729, 2016 WL 3667134, at *15 (E.D. La. 2016) ("A reliable differential diagnosis must rule in the suspected cause of an injury and rule out other causes or determine which of the remaining explanations is most likely the cause.").

## CONCLUSION

For the foregoing reasons, the Sanofi Defendants respectfully request that the Court exclude the opinions and testimony of Dr. John W. Thompson, Jr., in their entirety from the above-

15

captioned cases.

Date: February 8, 2019

>Respectfully submitted,
>
>*/s/ Douglas J. Moore*
>Douglas J. Moore (Bar No. 27706)
>**IRWIN FRITCHIE URQUHART & MOORE LLC**
>400 Poydras Street, Suite 2700
>New Orleans, LA  70130
>Telephone: 504-310-2100
>Facsimile:  504-310-2120
>dmoore@irwinllc.com
>
>Harley Ratliff
>Adrienne L. Byard
>**SHOOK, HARDY & BACON L.L.P.**
>2555 Grand Boulevard
>Kansas City, Missouri 64108
>Telephone: 816-474-6550
>Facsimile:  816-421-5547
>hratliff@shb.com
>abyard@shb.com
>
>***Counsel for Sanofi-Aventis U.S. LLC***

## CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2019, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

>/s/ Douglas J. Moore