# EXHIBIT C

Page 1

```
 1           UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF LOUISIANA
 2
 3      IN RE:  TAXOTERE (DOCETAXEL)
        PRODUCTS LIABILITY LITIGATION
 4
        This Document Relates To:
 5
        Antoinette Durden, Case No. 2:16-cv-16635;
 6      Tanya Francis, Case No. 2:16-cv-17410;
        Barbara Earnest, Case No. 2:16-cv-17144
 7
        MDL No. 2740
 8      Section: H
 9
            VIDEOTAPED DEPOSITION OF DR. JOHN W.
10      THOMPSON, JR., 1440 CANAL STREET, SUITE
        1000, NEW ORLEANS, LOUISIANA, 70112, TAKEN
11      AT TULANE UNIVERSITY SCHOOL OF MEDICINE,
        DEPARTMENT OF PSYCHIATRY, 1440 CANAL
12      STREET, SUITE 1000, NEW ORLEANS,
        LOUISIANA, 70112, ON WEDNESDAY, THE 16TH
13      DAY OF JANUARY, 2019.
14      APPEARANCES:
15        LISKA, EXNICIOS & NUNGESSER
          ATTORNEYS AT LAW
16        BY:  VAL PATRICK EXNICIOS, ESQUIRE
          BY:  LACY RADCLIFF, ESQUIRE
17        1515 POYDRAS STREET, SUITE 1400
          NEW ORLEANS, LOUISIANA  70112
18
             ATTORNEYS FOR PLAINTIFF
19
          PENDLEY BAUDIN & COFFIN
20        ATTORNEYS AT LAW
          BY:  CHRISTOPHER L. COFFIN, ESQUIRE
21        1100 POYDRAS STREET, SUITE 2505
          NEW ORLEANS, LOUISIANA  70163
22
             ATTORNEYS FOR PLAINTIFF
23
24
25        Job No. NJ3193587
```

Page 18

1  what you are referring to as your
2  literature index?
3      A.  Yes.  Yeah.  I think you have
4  a couple of copies of it there.  So why
5  don't you keep that one.
6      Q.  Thank you.
7      A.  All right.
8      Q.  We were also provided with two
9  fee schedule contracts.  And I'm going to
10  hand you Deposition Exhibits 10 and 11.
11  And are these the fee schedule contracts
12  for plaintiff Antoinette Durden and
13  plaintiff Barbara Earnest?
14      A.  Yes.
15      Q.  Now, I've also been provided
16  with copies of Civil Forensic Evaluation
17  forms.
18      A.  Yes.  That's basically the
19  template that I use when I interview
20  people in any kind of litigation case, a
21  civil litigation case.
22          So those forms are notes that
23  I filled out while I was evaluating Ms.
24  Earnest and Ms. Durden.
25      Q.  I'm trying -- I have four

Page 19

1  piles here.  I'm trying to see where I've
2  been -- I'm going to hand you what has
3  been marked Deposition Exhibit 12, and is
4  that the Civil Forensic Evaluation form
5  for Antoinette Durden?
6      A.  Yes, it is.  It also contains
7  a photograph of her and then also contains
8  the list of files of the documents that I
9  reviewed as far as medical records.  And
10  the depositions are also listed on those
11  files so that would be a list of
12  everything.
13      Q.  Now, I have not received
14  Exhibit 12 until just this morning.  Is
15  this something that you had provided to
16  plaintiffs' counsel previously?
17      A.  Yes.  Plaintiff -- well,
18  plaintiffs' counsel was provided the
19  Forensic Civil Evaluation form and the
20  photograph of Ms. Durden.
21  I think this form went first.
22  I didn't realize that we hadn't sent the
23  photograph that I took, so that was sent
24  recently.
25          And then these are printouts

Page 20

1  of the medical records that were sent to
2  me last Friday and the entire file of
3  medical records that were sent last
4  Friday.
5      Q.  And when you say these
6  printouts, are you referring to the last
7  eight pages of Exhibit 12?
8      A.  Yes, ma'am.
9      Q.  And were all of the items on
10  the last eight pages of Exhibit 12
11  provided to you on Friday, just this past
12  Friday?
13      A.  Yes.  Some of those were ones
14  that I had reviewed before.  So if you
15  look at my final report, I will list the
16  sources of information on page 2 and page
17  3, and that would be everything I reviewed
18  prior to giving my report.
19          And then some of those are
20  duplicates, but some are also additional
21  information.  So the second depositions of
22  each of the plaintiffs were in there.
23  Depositions of their family members were
24  also in those records.
25          And then there was lots of

Page 21

1  duplicates of medical records in those,
2  but I requested absolutely all of the
3  medical records so I could go through and
4  make sure there wasn't any additional
5  psychiatric history in the records.  So
6  some of them are duplicates of what was
7  previously provided.
8      Q.  When did you request
9  absolutely all medical records?
10      A.  I request that from the
11  beginning in every single case.  So my --
12  Paula, my assistant, is aware of that.  We
13  request whenever new information comes
14  that we get new information and we request
15  that on a regular basis.
16      Q.  And why do you as a general
17  rule request all of a plaintiff's medical
18  records in every case?
19      A.  So that I can do a thorough
20  evaluation of the records and take all of
21  the psychiatric information into
22  consideration.
23      Q.  So based on what you've
24  provided me, it's my understanding that
25  you were not provided with all of the

6 (Pages 18 - 21)

Page 22

1  plaintiff's medical records prior to
2  reaching your opinions and issuing your
3  report in the Durden case; is that
4  correct?
5      A.  Yes.  That would be correct.
6      Q.  Had you relied on plaintiffs'
7  counsel to provide you with those records?
8      A.  Yes.
9      Q.  And how was it that you became
10  apprised that you had actually not
11  received all of the records?
12      A.  After Dr. Bianchini's
13  deposition he called me and said, "I don't
14  think that we have all the medical
15  records.  I've requested all the medical
16  records, and I just want you to be aware
17  of that so you can make sure and request
18  those as well."
19      I think it was already in the
20  process of getting me additional
21  information that was being provided to Dr.
22  Bianchini.
23      Q.  So you said after Dr.
24  Bianchini's deposition he called you?
25      A.  Yes.

Page 23

1      Q.  And that was last week?
2      A.  Yes.
3      Q.  And after he called you, did
4  you call plaintiffs' counsel and have a
5  discussion with plaintiffs' counsel about
6  wanting the additional records?
7      A.  Yes.
8      Q.  Okay.  Tell me about your
9  conversation with Dr. Bianchini last week
10  after Dr. Bianchini's deposition.
11      A.  He said that he had -- there
12  were -- obviously during his deposition
13  there were documents that he had not
14  reviewed, or depositions that he had not
15  reviewed that he would have liked to have
16  reviewed.
17      And so he requested again to
18  get all the records, and that he had
19  called Mr. Exnicios to let him know that
20  we needed everything.  So I did the same
21  just to ensure that we would get all of
22  the medical records.
23      Q.  What else did he tell you in
24  that conversation?
25      A.  That was it, that he -- that

Page 24

1  there was stuff that he didn't have that
2  he needed to review and he wasn't really
3  sure how much it was.  But he requested
4  everything and that was pretty much the
5  extent of the conversation.
6      Q.  Did he tell you that because
7  he hadn't been able to review all of the
8  records and depositions, that upon being
9  able to do so it might change his opinions
10  in this case?
11      A.  I don't think he -- no, he
12  just said he wanted to be able to look at
13  the information.  So I don't think he said
14  upon looking at it he would change his
15  opinions.
16      Q.  During that conversation, did
17  you talk with Dr. Bianchini about the
18  substance of either of the cases, Mr.
19  Durden or Ms. Earnest?
20      A.  Just that we -- you know, that
21  I thought it was important that we did
22  have other depositions that they were
23  taken of family members and such so we
24  could have collateral information from
25  them.

Page 25

1      And then I thought it was
2  important that we would have all the
3  medical records so that we could look and
4  see if there were any other references to
5  other psychiatric issues or to hair loss,
6  those kinds of things.
7      Q.  And do you agree that it's
8  important that you have all of the
9  depositions, including depositions of
10  family members, before you form your
11  opinions in a case?
12      MR. EXNICIOS:
13      Objection to the form.
14      THE WITNESS:
15      Well, it would depend.  Some of
16  those are evolving, so it depends on when
17  the report came out and when the
18  depositions were done.  So we would have
19  to look at the exact dates of each
20  deposition.
21      But I always like to review all
22  the information even as it's evolving so
23  that in this case I have to address new
24  information, I can address it or make an
25  addendum to my report.

7 (Pages 22 - 25)

1 EXAMINATION BY MS. SCHULTZ:
2    Q.   Are you aware that you weren't
3 identified as an expert in this case until
4 November 7 of 2018?
5    A.   I'm not aware of when I was
6 actually designated as an expert.
7    MR. EXNICIOS:
8       Objection to the form.
9 EXAMINATION BY MS. SCHULTZ:
10    Q.   And I need to correct that.  I
11 need to correct that.  You were not
12 designated as an expert in the Durden and
13 Earnest cases until November 9, 2018.
14    MR. EXNICIOS:
15       Just an objection to the form.
16    THE WITNESS:
17       I wasn't aware of that.
18 EXAMINATION BY MS. SCHULTZ:
19    Q.   And are you aware that Sanofi
20 was not provided with an expert report for
21 Ms. Earnest or Ms. Durden until November
22 9, 2018?
23    MR. EXNICIOS:
24       Objection to form.
25    THE WITNESS:

1       No.
2 EXAMINATION BY MS. SCHULTZ:
3    Q.   Can you walk through me for
4 with respect to the Durden case Exhibit
5 12, and identify which records and
6 depositions were not provided to you until
7 last Friday?  And for the record, last
8 Friday was January 11, 2019.
9    A.   It's a date I will not forget.
10 Okay.  So let's see, do you want me to
11 start with the ones I got prior to my
12 report, or do you want me to subtract them
13 out?
14       I haven't really gone through
15 and subtracted them all out.  So I got
16 Ochsner Health System records prior, but
17 there were additional records that came.
18 I don't know the specific additional
19 records.  I didn't go through them in that
20 detail.
21    Q.   Well, hold on just a minute.
22    A.   Okay.  Okay.
23    Q.   It's my understanding that the
24 last eight pages of Exhibit 12 reflect the
25 records that you have, the complete set of

1 records that you have now been provided in
2 this case?
3    A.   Yes.
4    Q.   Is that correct?
5    A.   Yes, but I won't be able to
6 subtract out.  You know, as we sit here
7 today, it would be difficult for me to
8 subtract out the ones that were sent
9 before and which ones are additional.  I
10 can go over additional depositions if
11 that's what you're asking for.
12    Q.   So are you telling me that you
13 can't tell me which medical records you
14 had reviewed prior to forming your
15 opinions in this case and preparing your
16 expert report?
17    MR. EXNICIOS:
18       Objection to the form of the
19 question.
20    THE WITNESS:
21       No.  That's what I was trying to
22 do in the first place.  But you were
23 asking for all of the new information, and
24 I haven't gone through the new information
25 and subtracted out the old information to

1 decide which was new.
2       The new information included the
3 old information.  Does that make sense?
4 So it was a larger batch of medical
5 records than I had previously reviewed.
6 But as I went through the medical records,
7 there might be a page here or a page there
8 that could be duplicates.  So I would have
9 to go back and research that to find out
10 exactly what was provided in addition to
11 what I had before.
12 EXAMINATION BY MS. SCHULTZ:
13    Q.   Well, did you review new
14 medical records on Friday of Antoinette
15 Durden?
16    A.   Yes.  There were additional
17 medical records from the ones I had
18 received before.
19    Q.   And did you receive new
20 medical records of Barbara Earnest on
21 Friday?
22    A.   There were additional medical
23 records from what I had received before.
24    Q.   And when you say from what you
25 had received before, you're saying from

Page 30

1  the records you had received prior to
2  forming your opinions and preparing your
3  expert report?
4      A.  Yes, ma'am.
5      Q.  Okay.  What additional medical
6  records did you receive on Friday?
7      MR. EXNICIOS:
8          Objection to the form.
9      THE WITNESS:
10         I'll try and explain this as
11  simply as possible.  I haven't made it
12  through all of those medical records to
13  date.  And I am in the process of trying
14  to determine which ones are new and which
15  ones are duplicates.
16         So I'm in the process of going
17  through that.  I was able to look through
18  the depositions, so that I got some
19  additional depositions of family members
20  for Ms. Durden and her second deposition
21  which I reviewed.
22         And then with reference to Ms.
23  Earnest, I was able to get additional
24  depositions of her family members, which I
25  hadn't yet reviewed, and her second

Page 31

1  deposition.
2          So I've made it through those and
3  I'm working my way through the medical
4  records.
5  EXAMINATION BY MS. SCHULTZ:
6      Q.  All right.  So let's go back
7  to the medical records.  The additional
8  medical records you received for Ms.
9  Durden, you have not yet had an
10  opportunity to review those; correct?
11     A.  I've reviewed some of them,
12  but I haven't had an idea to abstract out
13  the old ones from the new ones so I could
14  tell you, you know, page 5 is a new record
15  or page 6 is not.  I'm going through them
16  right now to try and do that.
17     Q.  So you're going through the
18  entire group of medical records, some of
19  which you've already reviewed?
20     A.  Yes.
21     Q.  And some of which you have not
22  reviewed?
23     A.  Right.  The ones that I have
24  reviewed are summarized in my report, so
25  it's easy to find the ones I have reviewed

Page 32

1  before.  And then I'm sure there are going
2  to be additional ones that are going to
3  come up because this appears to be an
4  expanded version of the medical records.
5      Q.  And when do you plan to review
6  those additional records in the -- for the
7  Durden case?
8      A.  I am, you know, going as fast
9  as I can right now.  It's a lot of
10  information.  So I'm just going through it
11  as fast as I can.
12     Q.  And --
13     A.  I assume by the end of, you
14  know, probably by within a week I'll be
15  able to have an expanded summary of the
16  medical records so we'll know what was in
17  it before and what was in it now.
18     Q.  And with Ms. Earnest, are you
19  in the same situation that as you sit here
20  today you can't tell me what additional
21  medical records were provided to you that
22  you had not previously received?
23     A.  That's correct.  I haven't
24  been -- I haven't gotten to the point
25  where I've had those all subtracted out

Page 33

1  yet.  Or added in would be a better term
2  because there's some additional medical
3  records that I needed to add it.
4      Q.  Do you have any idea how many
5  additional medical records you received
6  for Ms. Durden that you had not had
7  previously?
8      A.  I mean, I know there's a lot
9  of medical records than what I received on
10  Friday and because when I looked at the
11  files there were, you know, thousands of
12  pages.
13         So it was a lot of medical
14  records.  I don't know exactly, I don't
15  recall specifically how many pages I had
16  the first time around.  So I have to go
17  back through and sort that out.
18         But I did -- I was able to
19  look for substantive issues with reference
20  to mental health symptoms.  And I believe
21  that I'm aware of most of the mental
22  health symptoms.  Some of those were
23  already present in the medical records and
24  there was a record or two that we reviewed
25  that had some mental health issues in it

9 (Pages 30 - 33)

Page 34

1  as well.
2      Q.   And for Ms. Earnest, do you
3  have any idea as to the number of medical
4  records, the additional medical records
5  that you were provided on Friday that you
6  had not previously received?
7      A.   No.  It's a larger amount and
8  substantial amount of records.
9      Q.   You just said that you were
10 able to look through the records for
11 substantive issues for mental health
12 issues.  What did you mean by that?
13     A.   Well, there was some
14 references in the Ochsner medical records
15 with reference to Ms. Durden I believe
16 that had to -- that had to do with a
17 mental health diagnosis that she was given
18 that had anxiety and depression in it, and
19 that was by one of her treating doctors.
20        So I was able to look at that.
21 And then I also read the treating doctor's
22 deposition to get an idea if there was any
23 expanded information with reference to her
24 mental health symptoms when that was
25 documented in the record.

Page 35

1      Q.   Okay.  So the statement you
2  made that you were able to look for
3  substantive issues for mental health
4  issues, that related to Ms. Durden only?
5      A.   Primarily.  We went through
6  the records, or I went through the records
7  with reference to the other plaintiff as
8  well, but I didn't see any substantive
9  issues with reference to mental health
10 that, you know, jumped off the page.  I
11 would have to go through it in more detail
12 to make sure.
13     Q.   Well, you haven't even
14 reviewed all of the additional records
15 that you received for Ms. Earnest;
16 correct?
17     A.   That's correct.
18     Q.   And you haven't reviewed all
19 of the additional medical records that you
20 received for Ms. Durden; correct?
21     A.   No.  I just went through them
22 screening to look for depression and
23 anxiety symptoms because I wanted to make
24 sure that I had covered that before I came
25 today.

Page 36

1      Q.   And when you say a screening,
2  did you do a word search?
3      A.   No.  Just flipping through as
4  quick as I can flip through, but not
5  really reading every line.
6      Q.   Well, were you told that Ms.
7  Durden had a diagnosis of anxiety and
8  depression when you were provided the
9  additional medical records?
10     MR. EXNICIOS:
11        Objection to the form of the
12 question.
13     THE WITNESS:
14        No.  I don't think that was
15 addressed.  But when I was provided the
16 additional medical records, I just said we
17 need the additional medical records.
18 EXAMINATION BY MS. SCHULTZ:
19     Q.   Well, did Dr. Bianchini tell
20 you that he was not aware until the day of
21 his deposition that Ms. Durden had been
22 diagnosed with anxiety and depression?
23     A.   I think that's he mentioned
24 that and that's probably what I was
25 looking for.

Page 37

1      Q.   He told you that in his
2  telephone call after the deposition?
3      A.   Yes.
4      Q.   And you weren't aware that Ms.
5  Durden had been diagnosed with anxiety and
6  depression; correct?
7      A.   No, I was not.  She told me
8  that she had never had a psychiatric
9  diagnosis prior to that time.  And I
10 didn't see anything in the medical records
11 that I reviewed, even though I reviewed
12 medical records that were around that
13 time.
14        But she did have a diagnosis
15 of I think it was anxiety associated with
16 depression was how it was documented if I
17 recall correctly.
18        But the deposition of the
19 physician who had evaluated her then, the
20 physician could not independently recall
21 what exactly they were talking about or
22 whatever other than that she may have had
23 some concerns about her cancer diagnosis
24 or her chemotherapy, all along those
25 lines.

10 (Pages 34 - 37)

1     But she didn't refer her to a
2  psychiatrist or get any additional
3  treatment.  So that's what I was able to
4  glean from the new records.
5     Q.   So the -- at the time you
6  formed your opinions and issued your
7  report for Ms. Durden, you were not aware
8  that she had a previous diagnosis of
9  anxiety associated with depression; is
10  that right?
11     A.   That's correct.  I did not see
12  that in the medical records I initially
13  reviewed.  When we went back, when I went
14  back to look at them, part of it is the
15  Epic Ochsner medical record and the way
16  it's documented.
17     It's very difficult to go
18  through and get all the diagnoses because
19  there are so many added in and so many
20  removed.
21     I did find that diagnosis in
22  the initial set that I had, but it was
23  only on a problem list.  So it wasn't
24  really, you know, easy to find.
25     So I had to -- when I went

1  back and found it, even though I had
2  additional medical records to elaborate
3  more on it, the diagnosis really wasn't
4  that elaborative.  It just said, you know,
5  anxiety associated with depression or
6  depression associated with anxiety.
7     And that's not really a
8  typical psychiatric diagnosis that we
9  would give.  I believe it came from one of
10  her primary care providers.
11     And the deposition of the
12  primary care provider that I read didn't
13  elaborate a whole lot on those symptoms.
14  So that's all I know about that.
15     Q.   So the diagnosis of anxiety
16  associated with depression was in medical
17  records you had received prior to forming
18  your opinions and issuing your report, but
19  you had missed it; is that correct?
20     A.   Yeah.  I missed it when I did
21  my report.  And then there were some more
22  notes surrounding it where we could kind
23  of look before and after to see whether or
24  not there was an elaboration on what the
25  diagnosis was, and I didn't see a lot of

1  elaboration.
2     Q.   And during what timeframe was
3  Ms. Durden diagnosed with anxiety
4  associated with depression; do you know?
5     A.   I can't recall the specific
6  date.
7     Q.   Do you recall the timeframe?
8     A.   I've looked at so many
9  documents in the last few days.  I was
10  thinking it was 2012 that I recall and --
11     Q.   Do you know how long she had
12  that diagnosis?
13     A.   Well, it's hard to tell.
14  She -- in the Ochsner records you can put
15  it into the -- you can put it in the
16  treatment plan and then you can later say
17  it's resolved.
18     But there's no elaboration on
19  it as to what kind of treatment she
20  received or she didn't receive.  She said
21  she didn't receive any treatment.  And I
22  believe the doctor as well, when I read
23  the doctor's deposition, said that she had
24  not received specific treatment for that.
25     Q.   Well, was the diagnosis

1  identified as having been resolved in her
2  medical records?
3     A.   I can't specifically recall
4  that right now.  That's part of what I
5  want to go back and elaborate on or review
6  more, but --
7     Q.   Would you agree that if Ms.
8  Durden had been diagnosed with anxiety and
9  depression previously, that's something
10  that would have been important to you in
11  forming your opinions regarding Ms.
12  Durden; correct?
13     A.   It may --
14  MR. EXNICIOS:
15     Object as to the form of the
16  question.
17  THE WITNESS:
18     It may or may not have.  It would
19  just depend on -- it would be something
20  that I could ask her questions about or
21  elaborate more with questions for her.
22     So I might be able to get more
23  information about that.  She may have said
24  I'm not familiar with that or I don't know
25  what that's about or she could have

11 (Pages 38 - 41)

Page 42

1  elaborated more on it.
2      So it would have been something I
3  could have asked her questions about in my
4  evaluation.
5  EXAMINATION BY MS. SCHULTZ:
6      Q.  And are you planning to
7  perform another evaluation of Ms.
8  Earnest -- of Ms. Durden?
9      A.  I'm contemplating that right
10  now given the additional information.
11      Q.  Because as you said, if she
12  had a diagnosis of anxiety associated with
13  depression, that would be something that
14  you would want to ask her about in an
15  interview to find out the details;
16  correct?
17      MR. EXNICIOS:
18          Objection to form.
19      THE WITNESS:
20          Yes.  It would be something that
21  I would want to ask her about or elaborate
22  more about.  I believe she was asked about
23  it in her subsequent deposition, but I'd
24  have to go back and look through the whole
25  deposition.  If I recall she was asked

Page 43

1  about it, but certainly it would be
2  helpful if I asked her about it.
3  EXAMINATION BY MS. SCHULTZ:
4      Q.  And you said that you've also
5  read the treating doctor's deposition.
6  That's Dr. -- what doctor is that?
7      A.  She has an odd name, but let
8  me see.
9      Q.  Is it Dr. Velu?
10      A.  Dr. Velu.  Velu, that's it.
11  Dr. Velu.
12      Q.  And you had not reviewed Dr.
13  Velu's deposition prior to forming your
14  opinions in preparing your report?
15      A.  I didn't have it.
16      Q.  And had you asked plaintiffs'
17  counsel for all of the depositions in this
18  case?
19      A.  Again, I asked for all the
20  information as I said before.
21      Q.  Did you expect to receive all
22  of the depositions that had been taken in
23  this case?
24      A.  I did.
25      Q.  And so you can't tell me what

Page 44

1  additional medical records you've received
2  for either Ms. Earnest or Ms. Durden, but
3  you can tell me what additional
4  depositions you received for each; is that
5  correct?
6      A.  I believe I can.
7      MR. EXNICIOS:
8          Objection to the form.
9  EXAMINATION BY MS. SCHULTZ:
10      Q.  And what additional
11  depositions did you receive on Friday in
12  the Durden case?
13      A.  Earnest is a little easier.
14  Do you mind if we go with that one first?
15      Q.  That's fine.  What additional
16  depositions did you receive in the Earnest
17  case?
18      A.  The Barbara Earnest second
19  deposition performed at 11/5/18 is one
20  that I received and I thought was new and
21  reviewed.  Michael Earnest's deposition
22  from 4/17/18 is a new deposition I
23  reviewed.  Ralph Earnest's deposition
24  taken on 4/16/18.  Jules LeBlanc, Ronald
25  -- taken on 5/3/18.  Ronald LeBlanc taken

Page 45

1  on 5/3/18.  And I believe Lisa Reso as
2  well.  That was 4/13/18.
3      So those are the ones that I
4  got that were new that I reviewed.  I also
5  received Dr. Baez's deposition from 4/4
6  2018, Dr. Carinder's deposition from 1/11
7  2018.  I already had Ms. Earnest's
8  deposition from 12/12 2017 and had
9  reviewed it.
10      I also received Hedgpeth,
11  M.D.'s deposition.  I have not gone
12  through that yet.  And Mannina taken on
13  4/19/18, I have not gone through that yet.
14      Q.  And for Ms. Durden, what
15  additional depositions did you receive on
16  Friday?
17      A.  That would be a little bit
18  more difficult just because the file is
19  not exploded in a way that you can tell.
20      Q.  Well, I tell you what, I'll
21  ask you those questions as we run through
22  your sources of information if that's
23  easier for you.
24      A.  Okay.
25      Q.  Have you reviewed any

12 (Pages 42 - 45)

Page 58

1     A.   Not particularly.  Well, they
2   may have sent me, but I may have given the
3   copies back.  I don't know where I put
4   them, but I'm happy to look at it.
5     Q.   When you record
6   review/summary, what does that mean?
7     A.   As I'm doing the record
8   reviews and doing summaries for the
9   medical records, if you refer to any of
10  the reports there's a summary of the
11  medical records in an appendix.
12        So I try to summarize the
13  medical records in an appendix so that I
14  can refer to that and not have to try and
15  go through every medical record at the
16  time of a deposition or at the time I'm
17  testifying at trial.
18     Q.   So the record review/summary
19  refers to both medical records and
20  depositions?
21     A.   Yes.  Either one.
22     Q.   So it looks like in the
23  Earnest case you had spent about 15 hours
24  reviewing medical records and depositions
25  prior to receiving the additional

Page 59

1   information on Friday; is that correct?
2     A.   Yes.
3     Q.   And that medical record review
4   and summary, was that all time that you
5   put in prior to issuing your report for
6   Ms. Earnest?
7     A.   Yes, because the report
8   writing would have been on 5/22, 5/23 and
9   those -- the record review was prior to --
10  oh, you mean prior to me seeing her?  I'd
11  have to look.
12     Q.   No.  Prior to you issuing your
13  report.
14     A.   Yeah.  It was prior to me
15  issuing my report.  But some of it
16  sometimes I get them before I see the
17  person and sometimes I get them after.  So
18  I could have been -- I could have seen her
19  and then did record review afterwards.
20     Q.   And for Ms. Durden it looks
21  like you spent about 19 hours reviewing
22  medical records and depositions prior to
23  issuing your report; is that correct?
24     A.   Yes.  And also just reviewing
25  Dr. Bianchini's report with reference to

Page 60

1   the testing.  So there was some time with
2   that as well.
3     Q.   And so since receiving the
4   additional information from plaintiffs'
5   counsel on Friday, you've spent more time
6   reviewing medical records and depositions
7   in the Earnest case than you did prior to
8   issuing your report; correct?
9     A.   Oh, definitely.  Yes.  I spent
10  primarily reading depositions of what we
11  would refer to as the collateral sources
12  or the collateral family members or
13  friends.
14     Q.   And you still have additional
15  review of medical records and depositions
16  that you plan to do; correct?
17     A.   Yes.
18     MR. EXNICIOS:
19        Objection to form.
20  EXAMINATION BY MS. SCHULTZ:
21     Q.   And with respect to Ms.
22  Durden, you've spent more time reviewing
23  medical records and depositions since you
24  received the additional information on
25  Friday than you had spent prior to issuing

Page 61

1   your Durden report; correct?
2     A.   Yes.  It was quite a lot of
3   depositions, so there was a fair amount to
4   review.  Yes.
5     Q.   And you still plan to spend
6   more time reviewing medical records and
7   depositions for Ms. Durden; correct?
8     MR. EXNICIOS:
9        Objection to form.
10  THE WITNESS:
11        Yes.  Do you want those in the
12  pile?
13     MS. SCHULTZ:
14        Yes.  Those can go in the pile.
15  EXAMINATION BY MS. SCHULTZ:
16     Q.   Is the majority of your work,
17  Doctor, forensic in nature serving as an
18  expert witness?
19     A.   No.  I usually reserve
20  Wednesdays to do independent medical
21  evaluations or evaluations for attorneys,
22  or either plaintiff attorneys or defense
23  attorneys.
24        And I spend usually early
25  mornings reviewing medical records.  The

16 (Pages 58 - 61)

1     Q.   But what was missing from that
2  is any percentage of time that you're
3  actually seeing patients for evaluation
4  and treatment.
5     A.   Yeah.  That's in the third
6  that I would say is the forensic piece, I
7  also see patients for evaluation and
8  treatment during that time.  So if I have
9  slow weeks, if I don't have -- if I don't
10 have an IME scheduled, then I'll see
11 patients for evaluation and treatment.
12         Primarily now because I'm the
13 chair, I mostly do evaluations and then
14 refer individuals out for treatment.  So I
15 might get emergency, I get, you know,
16 emergency requests all the time, can we
17 see somebody.
18         I can't see a psychiatrist for
19 three months and then I'll have the
20 patient come over, see me.  I'll do the
21 evaluation and then I'll find them
22 follow-up care or follow-up treatment.
23     Q.   But so you at times see
24 patients for evaluation that are not being
25 seen as part of a lawsuit or some type of

1  claim?
2     A.   Oh, yes.  Sure, sure.  I mean,
3  I saw one emergently last Friday even with
4  all this stuff going on so it just
5  depends.
6     Q.   But that isn't a large
7  percentage of what you do day-do-day?
8     MR. EXNICIOS:
9         Objection to form.
10    THE WITNESS:
11        No.  I would not be in a clinic
12 everyday just seeing one patient after the
13 other.  I've done that over the years and,
14 but I still see patients and teach and
15 evaluate them as needed.
16 EXAMINATION BY MS. SCHULTZ:
17    Q.   Have you performed any
18 research on the psychological impact of
19 breast cancer?
20    A.   No.
21    Q.   What about on the
22 psychological impact of cancer?
23    A.   No.
24    Q.   Have you written any articles
25 on the psychological impact of breast

1  cancer or cancer?
2     A.   No.
3     Q.   Have you performed any
4  research or written any articles on the
5  psychological impact of hair loss?
6     A.   No.
7     Q.   Do you have any publications
8  in the areas of psychosocial aspects of
9  cancer treatment?
10    A.   No.
11    Q.   Any publications in the area
12 of emotional distress resulting from
13 cancer treatment?
14    A.   No.
15    Q.   Any publications with any
16 mental disorders from cancer diagnosis and
17 treatment?
18    A.   No.
19    Q.   Any publications regarding
20 adjustment disorders in cancer patients?
21    A.   No.
22    Q.   Any papers on adjustment
23 disorders in general?
24    A.   No.  I've not written a paper
25 on adjustment disorder.

1     Q.   Any publications in any cancer
2  or oncology related journals?
3     A.   No.
4     Q.   You agree that you're not a
5  specialist in treating cancer patients?
6     MR. EXNICIOS:
7         Objection to the form.
8  EXAMINATION BY MS. SCHULTZ:
9     Q.   Is that right?
10    A.   No.  I wouldn't consider
11 myself a specialist in treating cancer
12 patients.
13    Q.   Are Ms. Durden and Ms. Earnest
14 the only two patients you've ever
15 evaluated with alleged emotional distress
16 from hair loss?
17    A.   I believe those are the first
18 two that I've evaluated, yes.
19    Q.   The Notice of Deposition that
20 was served on you includes the case of
21 Tanya Francis in the title.  Did you ever
22 evaluate Tanya Francis?
23    A.   Not -- not to my knowledge.  I
24 mean, I would have to go back and look,
25 but I don't think so.

Page 94

1  to make sure that we covered, you know,
2  validity measures and those kind of things
3  and he felt, you know, comfortable with
4  the battery that he put together that
5  would do that.
6          When he -- when the testing
7  was complete he looked at it and, you
8  know, gave me a preliminary that he didn't
9  see major psychiatric disorders, like
10 major depression or posttraumatic stress
11 disorder which have also been reported in
12 the literature in individuals, in cancer
13 patients that lose their hair and they're
14 involved in treatment.
15         So I was aware that those
16 things were present shortly after I think
17 he did the testing.  And then I was able
18 to look at his reports right before I
19 completed mine.
20     Q.  And so the testing Dr.
21 Bianchini did was after you had met with
22 and evaluated the plaintiffs; correct?
23     A.  It was scheduled -- I have no
24 idea.  It could have been after, but it
25 was scheduled around the same time.

Page 95

1     Q.  Well, you didn't talk to Dr.
2  Bianchini about the testing he performed
3  until after you had already interviewed
4  the plaintiffs; correct?
5  MR. EXNICIOS:
6          Objection to the form.
7  THE WITNESS:
8          Well, I can look at the dates.
9  So --
10 EXAMINATION BY MS. SCHULTZ:
11     Q.  It looks like your evaluations
12 were March 29 and 30, and his testing was
13 on April 18 and April 23.
14     A.  So it was after then.
15     Q.  So after you evaluated the
16 plaintiffs and before you formed your
17 opinions and issued your report you talked
18 with Dr. Bianchini about the testing that
19 he had performed; correct?
20     A.  Yes.
21     Q.  Okay.  And did you also talk
22 with him about the diagnoses that he made
23 for each of the plaintiffs?
24     A.  I don't know that I recall
25 speaking specifically about the diagnoses

Page 96

1  other than he didn't see evidence in the
2  data for major depression, for
3  post-traumatic stress disorder and for
4  other major psychiatric disorders.
5          So adjustment disorder, if you
6  look at a spectrum is sort of on the lower
7  end of what we would call impairing
8  psychiatric disorders.
9          And so I don't know if I
10 talked to him specifically about that
11 diagnosis, but that was the diagnosis I
12 was entertaining would be most likely
13 after I evaluated them, and his testing
14 didn't reveal that it was anything more
15 severe than that.
16     Q.  So you don't recall talking to
17 Dr. Bianchini about whether either of the
18 plaintiffs met the criteria for an
19 adjustment disorder?
20     A.  I'm sure we may have had a
21 conversation along those lines.
22     Q.  And prior to you issuing your
23 report in this case, you had received Dr.
24 Bianchini's report in which he diagnosed
25 Ms. Earnest and Ms. Durden with adjustment

Page 97

1  disorder with mixed anxiety and
2  depression?
3     A.  Yes.  Which meant that they
4  had some depressive symptoms or some
5  anxiety symptoms, but would not meet
6  criteria for another major psychiatric
7  disorder.
8     Q.  And you diagnosed Ms. Earnest
9  and Ms. Durden with those very same
10 disorders; correct?
11     A.  Yes.  That would be a pretty
12 common diagnoses.  And I don't typically
13 -- I'm -- Dr. Bianchini and my diagnosis
14 in general are fairly close, and I find
15 that in most of these cases the diagnoses
16 are fairly close.
17     Q.  In most of the cases in which
18 you and Dr. Bianchini have been named as
19 experts?
20     A.  No.  Even in forensic cases.
21 You know, the vast majority of time it's
22 not an issue over whether the person has a
23 diagnosis or not.  It's usually an issue
24 over whether the person is -- how impaired
25 they are or what their length of treatment

25 (Pages 94 - 97)

1    So she's been to church
2  functions regularly and she's done some
3  other things.  So I wouldn't say she's
4  close to major depression.  I would say
5  it's more on the milder side of an
6  adjustment disorder.
7    Q.  Well, when you made your
8  diagnosis of Ms. Durden and issued your
9  report in this case, where did you think
10  Ms. Durden was in terms of the range of
11  individuals with an adjustment disorder?
12    A.  On the lower end of that
13  range.  So we have upper end would be more
14  severe.  Lower end would be lower, so I
15  thought she was on the lower end.
16    Q.  What about Ms. Earnest, where
17  did you determine Ms. Earnest fell in the
18  range of individuals with an adjustment
19  disorder at the time you issued your
20  report?
21    A.  I thought she was in a similar
22  area.
23    Q.  On the lower end in terms of
24  severity of symptoms?
25    A.  So probably I would say

1  severity of social impairment.  She -- you
2  know, she does -- she does seem to be
3  super fearful of people seeing her other
4  than her family without her turban on.
5    She's not as fond of wigs.  I
6  don't think either one of them are really
7  fond of wigs, but she's very careful about
8  who she allows to see her.
9    And so she does and to me
10  adjusts her social interactions with
11  people, but she still gets out and goes
12  and does thing.  So she's not in the house
13  and not going out specifically because of
14  her hair, but she worries when she goes
15  out.
16    They both worry when they go
17  out in public that they have to have their
18  head covered or in a certain way in order
19  to be in public and feel comfortable.
20    Q.  What would e the symptoms be
21  of an individual who was at the high range
22  of an adjustment disorder?
23    A.  It would be someone that you
24  would -- either they have fear of going to
25  work.  They call in frequently and don't

1  go to work because of the fear of
2  encountering the stressor at work or
3  encountering other people who might see
4  them in public.
5    Or they might do the same
6  thing from in the social context.  So you
7  would have, you know, numerous examples of
8  that happening.
9    They were able to give me some
10  examples of that happening, but it didn't
11  appear that they were doing that every
12  single day of their, you know, of their
13  week.  Or they could see say that, you
14  know, I'm just not going out at all
15  because of this.
16    Overtime they've sort of
17  adjusted their social schedule.  I think
18  both of them have adjusted their social
19  schedule.  Probably Ms. Earnest more than
20  Ms. Durden from what I could tell in the
21  records and in the depositions.
22    And so there will be times
23  when her husband wants her to go out to
24  the tomato festival or to do something and
25  she's, you know, not really up for it or

1  doesn't want to go out.
2    So but if that happens
3  periodically or rarely, I think that would
4  be on the lower end.  If it happens
5  everyday or every week, then it would
6  probably be what I would consider on the
7  upper end of adjustment disorder.
8    Q.  And with Ms. Earnest it was
9  periodically or rarely?
10    A.  Well, you see, you do see in
11  her second deposition the one I reviewed,
12  you do see her being social a fair amount
13  and some of the folks saying she does go
14  to church every weekend, which is she's a
15  very religious person so I understand
16  that's a high priority for her.
17    But you also see in the
18  depositions that she will not go out of
19  the house without a hat on.  And so she
20  has, you know, more of a male pattern
21  baldness that I can see.  I'm not an
22  expert in that, but --
23    Q.  Let me stop you there a
24  minute.  I was asking you about Ms.
25  Earnest.

29 (Pages 110 - 113)

1         Oh, was I given any in the
2 totality of information that I reviewed?
3 EXAMINATION BY MS. SCHULTZ:
4         Q.   When -- with respect to your
5 retention and your communications with
6 plaintiffs' counsel.
7         MR. EXNICIOS:
8         Same objection.
9         THE WITNESS:
10         I'm not -- can you repeat that
11 again?  I'm just a little confused as to
12 what you were asking.
13 EXAMINATION BY MS. SCHULTZ:
14         Q.   Well, you said that you were
15 asked to evaluate the plaintiffs and
16 whether or not they had a psychiatric
17 diagnosis, what their prognosis was;
18 correct?
19         A.   Yes.
20         Q.   Were you given information
21 when you were retained concerning the
22 nature of the plaintiffs' claims in the
23 case?
24         A.   Oh, the -- I don't know if I
25 was given it immediately.  In the records

1 I received I did get a portion of what I
2 reviewed was their petition for damages,
3 which said something to the affect that
4 they had experienced long-term hair loss
5 secondary to taking a particular
6 chemotherapy medication.
7         But my job really wasn't to
8 determine whether there was a cause and
9 effect relationship between those two.  It
10 was to determine whether or not they had
11 psychiatric symptoms as a result of
12 long-term hair loss and whether or not
13 they needed some treatment for that.  That
14 was my understanding.
15         Q.   And when you say your job was
16 not to determine if there was a cause and
17 effect relationship between those two,
18 what two things are you referring to?
19         A.   Between the medication
20 Taxotere and their hair loss.  I was
21 really -- I was -- my understanding was I
22 was to determine whether or not their hair
23 loss and the long-term hair loss, their
24 hair not returning, resulted in
25 psychiatric symptoms that they might need

1 treatment for.
2         Q.   And so you're not providing
3 any opinion in this case as to the cause
4 of either plaintiffs' hair loss; correct?
5         A.   No, ma'am.
6         Q.   And you're not providing any
7 opinion as to whether either plaintiffs'
8 hair loss is temporary or permanent;
9 correct?
10         A.   That would not be an area of
11 my expertise.  I would say that they have
12 experienced hair loss for a long period of
13 time based upon the information I've seen
14 so far.  But I'm not opining about which
15 medication may have caused that or not
16 caused it and what other conditions may
17 have contributed to it.
18         Q.   Do you know if either of the
19 plaintiffs experienced hair loss prior to
20 their cancer treatment?
21         A.   I would have to go look back
22 in the record at that.  I don't -- I
23 didn't see any significant reports of that
24 prior to their cancer treatment, but I
25 would have to go look for that specific

1 issue in the records.
2         Q.   So as you sit here, you don't
3 know one way or the other?
4         A.   No.  I've seen photographs and
5 pictures and before of their treatment and
6 after, and their hair seems substantially
7 different to me.  But again, that would be
8 something I think for another expert to
9 provide information about.
10         Q.   And the photographs that
11 you've seen that you just referenced.
12         A.   Uh-huh (affirmative response).
13         Q.   You were provided with a
14 number of photographs of Ms. Earnest by
15 plaintiffs' counsel?
16         A.   Well, they came either that or
17 attached to depositions or, you know, it
18 could be multiple different ways.
19         Q.   Do you know if the photographs
20 you received of Ms. Earnest are all of the
21 photographs that have been produced in the
22 case?
23         A.   I don't -- I don't have any
24 idea.  I just, you know, have seen some
25 photographs with her with hair and seen --

31 (Pages 118 - 121)

1 and I've seen a picture of her with not a
2 whole lot in my office.
3      Q.   And is it correct that you did
4 not receive any photographs of Ms. Durden?
5      A.   I thought there was some
6 photographs in the most recent deposition,
7 but I don't know if those were -- I can't
8 recall if those were before or after.
9          I know in one of the more
10 recent depositions or second deposition
11 there were photographs, or in one of the
12 depositions I just reviewed, there were
13 photographs of her engaging in social
14 activities.
15      Q.   Now, is it correct that you
16 reviewed no photographs of Ms. Durden
17 prior to forming your opinions and issuing
18 your report?
19      A.   I don't know about that.  Let
20 me see.  Oh, here we go.  I'm sorry.
21      Q.   You don't list any
22 photographs --
23      MR. EXNICIOS:
24          Objection to form.  Now, let him
25 look.  He wants to answer your question.

1      THE WITNESS:
2          Unless they were attached to her
3 initial first deposition, and I don't
4 recall if they were or not.
5 EXAMINATION BY MS. SCHULTZ:
6      Q.   Are you familiar with the
7 American Psychiatric Association Practice
8 Guidelines for the Psychiatric Evaluation
9 of Adults?
10      A.   Yes.
11      Q.   I want to ask you if you agree
12 with some of these statements.  Okay?
13      A.   Sure.  Can I have a copy of
14 that?
15      Q.   Well, and I'm not going to
16 take the time to find each section in
17 here.
18      MR. EXNICIOS:
19          These are yours so I will pull it
20 from here.
21      MS. SCHULTZ:
22          That's all right.
23      THE WITNESS:
24          Well, if I could just take a look
25 at what you're --

1 EXAMINATION BY MS. SCHULTZ:
2      Q.   You know what, I'm just going
3 to ask you if you agree with these
4 statements without reference to whether or
5 not they're guidelines of any particular
6 entity.  Okay?
7      A.   Okay.
8      Q.   All right.  Do you agree that
9 family members, friends and other
10 individuals involved in the patient's
11 support network can be important sources
12 of collateral information about the reason
13 for evaluation, the patient's current
14 symptoms and behavior and past history?
15      A.   Yes.
16      MR. EXNICIOS:
17          Objection to form.
18 EXAMINATION BY MS. SCHULTZ:
19      Q.   Do you agree that it's
20 important to know over what period of
21 times symptoms reported by an individual
22 have developed or fluctuated?
23      A.   That depends.
24      Q.   Depends on what?
25      A.   It depends on the information

1 you can gain.  If the person can't
2 remember the period of time and when the
3 symptoms arose or didn't arise, then you
4 can't really gain that information.
5          It's always good to get a, to
6 try and get a chronological history or a
7 history that gives you some kind of
8 longitudinal course so that you have an
9 idea of when the symptoms arose and when
10 they didn't, but it's just not always
11 possible.
12      Q.   And if the individual can't
13 remember that information, you can look
14 for that information in collateral
15 sources; correct?
16      A.   Yes.  Either through -- in
17 these cases it would be either through
18 interviewing someone or reviewing
19 depositions of people that are -- other
20 people that have been deposed that are
21 family members.
22      Q.   And those other individuals
23 would include friends, spouse?
24      A.   Yes.
25      Q.   Significant other?

32 (Pages 122 - 125)

1     A.  Yes.
2     Q.  Do you agree that when you're
3  evaluating claimed psychological effects
4  of an incident, the evaluator should
5  carefully review collateral records to
6  assess specific symptoms, their severity
7  and their time course?
8     MR. EXNICIOS:
9        Objection as to form.
10    THE WITNESS:
11       Yes.  You should review
12  collateral records to attempt to do that.
13  You can't always do it, but it's helpful
14  to review collateral records.
15  EXAMINATION BY MS. SCHULTZ:
16    Q.  Do you agree that the
17  evaluee's social functioning is important
18  when evaluating claimed emotional damages?
19    A.  Yes.
20    Q.  And in order to determine
21  social functioning, do you agree that
22  areas to explore include personal
23  relationships?
24    A.  Yeah.  To a certain extent,
25  yes.

1     Q.  Participation in exercises or
2  hobbies?
3     A.  Sure.
4     Q.  Daily activities during the
5  week?
6     A.  Yes.
7     Q.  Recent or planned vacations?
8     A.  Yes.
9     Q.  Scheduled activities?
10    A.  Sometimes, yes.
11    Q.  Attendance at religious
12  institutions?
13    A.  Yes.  If you have that
14  information.
15    Q.  And do you agree that it's
16  important for you to compare the
17  individual's current level of social
18  functioning to the level before the
19  alleged incident?
20    MR. EXNICIOS:
21       Objection to form.
22    THE WITNESS:
23       Yes.
24  EXAMINATION BY MS. SCHULTZ:
25    Q.  Do you agree that collateral

1  information may add to or compliment the
2  evaluee's account, and may be compared to
3  the evaluee's account to help detect
4  malingering and assess reliability?
5     MR. EXNICIOS:
6        Objection to form.
7     THE WITNESS:
8        It can be and it also can confuse
9  it.  But sometimes it makes it less clear
10  when you look at more information, but
11  typically more is better.
12  EXAMINATION BY MS. SCHULTZ:
13    Q.  But it's your job to look at
14  all of that information and draw your
15  opinion based on all of that information
16  correct?
17    MR. EXNICIOS:
18       Objection to form.
19    THE WITNESS:
20       Yes.  Typically that's what you
21  would do.
22  EXAMINATION BY MS. SCHULTZ:
23    Q.  Do you agree that experts
24  should endeavor to obtain all necessary
25  and relevant information as early in the

1  process as possible as subsequent
2  revelations of contradictory or
3  inconsistent data may change the expert's
4  opinion?
5     MR. EXNICIOS:
6        Objection as to form.
7     THE WITNESS:
8        I believe that you should request
9  all the information if you're performing
10  an evaluation, which I do.  And that, but
11  there will be times when information comes
12  up overtime and you may have to alter your
13  opinions.  That's -- I don't think that's,
14  if you're an honest expert, that's, you
15  know, what you would do.
16  EXAMINATION BY MS. SCHULTZ:
17    Q.  Do you agree that
18  psychiatrists practicing in a forensic
19  role enhance the honesty and objectivity
20  of their work by basing their forensic
21  opinions, forensic reports and forensic
22  testimony on all available data?
23    A.  Yes.  If you have it available
24  to you, yes.
25    Q.  I'm handing you what is marked

33 (Pages 126 - 129)

Page 134

1    MR. EXNICIOS:
2       Objection to the form of the
3  question.
4  EXAMINATION BY MS. SCHULTZ:
5    Q.   And the individual must meet
6  each of these diagnostic criteria;
7  correct?
8    A.   It says by one or both of the
9  following in B.
10   Q.   And I'm not to B yet.
11   A.   Right.
12   Q.   Correct.  The individual must
13  meet the criteria of A, B, C, D and E;
14  correct?
15   MR. EXNICIOS:
16      Object to the form.
17   THE WITNESS:
18      No.  I would not say that they
19  must meet the criteria.  And that's
20  probably -- that's probably a good time to
21  talk about that and I will elaborate.
22      The DSM-5 has a cautionary
23  statement in the beginning of the DSM-5
24  that says, you know, you can use it in
25  medical, legal or courtroom context, but

Page 135

1  it doesn't necessarily always fit into the
2  kinds of questions that are asked about in
3  court.
4      And there is some variability
5  with the criteria.  The criteria are there
6  to guide clinicians in making their
7  diagnosis, but the clinician's clinical
8  judgment always trumps DSM-5.
9      So you use it as a guideline even
10  though they say criteria, just like you
11  would use clinical practice guidelines,
12  the one you went before, but it doesn't
13  mean that you have to check box the
14  criteria.
15      It's there's many articles
16  written on why you should not use the DSM
17  as a check box or criteria A, B and C has
18  to be met or you can't give the person
19  that particular diagnosis.
20      So we use it as a guideline and
21  we attempt to fit everybody in the
22  criteria, but they don't always fit neatly
23  in the criteria.
24  EXAMINATION BY MS. SCHULTZ:
25   Q.   But if you're evaluating a

Page 136

1  patient and making a determination as to
2  whether or not that patient has an
3  adjustment disorder, you analyze each of
4  the diagnostic criteria in the DSM which
5  are A, B, C, D and E; correct?
6    MR. EXNICIOS:
7       Objection to the form.
8    THE WITNESS:
9       No.  I don't analyze each of the
10  criteria.  When I see patients and
11  diagnosis them on a regular basis, I have,
12  you know, been doing psychiatry for 35
13  years, so I have those criteria in my head
14  as guidelines, but it doesn't necessarily
15  mean that I would analyze the criteria
16  every time I would diagnose someone.  What
17  you would do is use the criteria as a
18  guideline.
19  EXAMINATION BY MS. SCHULTZ:
20   Q.   And you use the criterias set
21  forth under diagnostic criteria for
22  adjustment disorder as your guideline when
23  you're making a diagnosis of an adjustment
24  disorder; correct?
25   MR. EXNICIOS:

Page 137

1       Objection to the form.
2    THE WITNESS:
3       I know you asked it and I
4  answered it.  You would have the
5  guidelines in your mind as what you wanted
6  to use -- that you would use it and you
7  would look at the criteria to see if the
8  person met neatly into that category, but
9  they might not meet neatly into the
10  category.
11      So I think this is an area that
12  I'm being a little persnickety about
13  because it's important.  We talked before
14  about that a person with an adjustment
15  disorder can have a wide variety of
16  presentation than someone who Might be
17  minimally compromised in their social and
18  occupational function as to someone who
19  would be significantly impacted in their
20  social and occupational function.
21      And in my training and
22  experience, I've seen people diagnosed
23  with adjustment disorders that have both,
24  minimal symptoms and have significant
25  symptoms.

35 (Pages 134 - 137)

Page 154

```
1        I understand.
2     MS. SCHULTZ:
3        Okay.  And so for the record,
4  it's clearly complicated by the fact that
5  you say you have now reviewed additional
6  materials that you didn't have when you
7  issued your report.  I'm going to focus on
8  the materials that you had when you issued
9  your report.
10    THE WITNESS:
11       Okay.
12    MS. SCHULTZ:
13       And the findings in your report,
14  and we'll get through that and we can get
15  that done in that time period.
16    THE WITNESS:
17       Okay.  That's the plan and we can
18  go for lunch.
19    MR. EXNICIOS:
20       Just note my objection to
21  counsel's colloquy.
22    VIDEOGRAPHER:
23       This is the end of media number
24  2.  We are now off the record at 1:10.
25    (Whereupon a lunch recess was taken)
```

Page 155

```
1     VIDEOGRAPHER:
2        This is the beginning of media
3  number 3.  We are back on the record at
4  2:02.
5  EXAMINATION BY MS. SCHULTZ:
6     Q.  If you can take a look at
7  Deposition Exhibit 12.
8     A.  Okay.
9     Q.  This is the Civil Forensic
10  Evaluation form for Ms. Durden that you
11  brought to your deposition today.
12    A.  Okay.
13    Q.  I reviewed it over the lunch
14  hour and I have just a couple questions
15  about your handwriting.
16       On the third page at the top
17  of the page, the third line down it says
18  six years, no hair?
19    A.  Hair back.
20    Q.  Back?
21    A.  Yeah.
22    Q.  And what does that refer to?
23    A.  That refers to Ms. Durden
24  saying that her hair hasn't grown back in
25  the six years since her treatment.
```

Page 156

```
1     Q.  All right.
2     A.  So she's tried some local
3  remedies like tea tree oil and her hair
4  hasn't grown back.  And I believe she
5  actually went through some treatment with
6  a dermatologist and it hasn't grown back.
7        So I think what she was
8  expressing there, what I was trying to
9  shorthand is that it hasn't come back in a
10  while and she's not really expecting it to
11  come back.
12    Q.  When did she have the
13  expectation that it was not coming back?
14    A.  By the time I saw her she
15  definitely had the expectation.  I don't
16  know particularly when she had the
17  expectation that it might not come back.
18       I didn't really see a clear
19  description in the medical records of when
20  she thought it was not going to come back.
21  So I don't know that specific date.
22    Q.  Well, do you know the general
23  date?
24    A.  I don't know the general date
25  when she stated that she didn't think it
```

Page 157

```
1  was going to come back.  I would imagine,
2  you know, after it hadn't come back for a
3  year or two she would expect that there
4  was concerns about that.  But I didn't
5  talk to her about the specific date when
6  she felt it wasn't going to come back.
7     Q.  Well, you keep using the word
8  "specific date".  I'm asking you generally
9  what year was it, or couple of years, when
10  she reached the realization that her hair
11  was not going to grow back.
12    MR. EXNICIOS:
13       Objection to the form of the
14  question.
15    THE WITNESS:
16       I don't know the answer to that
17  question.
18  EXAMINATION BY MS. SCHULTZ:
19    Q.  Well, did you not ask Ms.
20  Durden when it was that she decided that
21  her hair was not going to come back?
22    A.  I don't recall.
23    MR. EXNICIOS:
24       Objection to the form of the
25  question.
```

40 (Pages 154 - 157)

Page 158

1    THE WITNESS:
2        I don't recall asking her that
3    specific question.  And I may have and
4    that could have been her response, it
5    hasn't come back in six years so it's not,
6    but I don't recall asking her that
7    specific question.
8    EXAMINATION BY MS. SCHULTZ:
9        Q.   Well, is that not important to
10   your evaluation of Ms. Durden and her
11   symptoms?
12       MR. EXNICIOS:
13           Objection to the form of the
14   question.
15       THE WITNESS:
16           On the date I evaluated her, I
17   wouldn't think that would be important.  I
18   would think it would be important to know
19   that she is not expecting it to come back
20   on that day, and she's made a decision
21   that it's not coming back.  At least she
22   believes it's not coming back at that
23   point in time.  So that's the point in
24   time that I'm evaluating her.
25       Q.   Well, wouldn't you want to

Page 159

1    take a look at whether her symptoms had
2    been better or worse prior to or after
3    that point when she realized that her hair
4    was not going to come back?
5        MR. EXNICIOS:
6            Objection to the form of the
7    question.
8        THE WITNESS:
9            You know, in speaking with Ms.
10   Durden and also in reviewing her
11   deposition, it appears that she really
12   doesn't recall those specific dates.
13           And I, you know, folks have tried
14   to ask her specific questions and she
15   replied that she didn't recall, and I
16   don't recall her giving me a specific
17   date.
18           All I know is she doesn't think
19   her hair is going to come back in any
20   substantial way by the time I evaluated
21   her.
22   EXAMINATION BY MS. SCHULTZ:
23       Q.   And I'm not asking you for
24   specific dates.  You understand that?
25       A.   I am and I understand.

Page 160

1        Q.   What I'm asking you is for
2    what period of time has Ms. Durden been
3    distressed, distressed over the fact that
4    her hair loss is permanent and not going
5    to come back?
6        MR. EXNICIOS:
7            Objection to the form of the
8    question.
9        THE WITNESS:
10           I would imagine it's been for a
11   period of time, but I couldn't give you an
12   exact date.  I would imagine she was
13   concerned about it when it didn't come
14   back when all the other folks that are
15   getting treatments hair normally comes
16   back.
17           But I don't think she could tell
18   me the exact date when she felt it was or
19   even approximately date that I recall.
20   EXAMINATION BY MS. SCHULTZ:
21       Q.   Well, did you even ask her
22   when she reached the realization that her
23   hair was not going to grow back?
24       MR. EXNICIOS:
25           Objection to the form of the

Page 161

1    question.
2        THE WITNESS:
3            I think you asked that and I
4    answered that as many times as I can.  I
5    may have asked her that question.  I don't
6    write down every question that I ask a
7    patient.
8            When she says six years, it's
9    been six years and it hasn't come back,
10   that could have been in response to that
11   direct question, but I didn't record my
12   questions.
13   EXAMINATION BY MS. SCHULTZ:
14       Q.   Well, when she reached that
15   realization that her hair was not growing
16   back, whatever date that was, okay, did
17   her emotional symptoms get worse?
18       MR. EXNICIOS:
19           Objection to the form of the
20   question.
21       THE WITNESS:
22           Yeah.  I don't know that I would
23   know the answer to that particular
24   question either.  I mean, I think that she
25   is reporting that each day that her hair

41 (Pages 158 - 161)

Page 166

1  to grow back?
2      A.   The way she described it is
3  she said everyday I woke up and I looked
4  in the mirror and hoping it was going to
5  grow back and it hasn't yet.  So it hasn't
6  done that in six years.  That was my
7  recollection of her response.
8      Q.   Do you recall any statements
9  made to you by Ms. Durden that are not
10  reflected in your handwritten notes in
11  this Civil Forensic Evaluation form or in
12  your report?
13      A.   Yeah.  I mean, I recall the
14  gist of the conversation.  I wouldn't be
15  able to say it word-for-word, but I think
16  I recall and have an independent
17  recollection of my evaluation of her.
18      Q.   Well, when you are evaluating
19  her and taking your notes, you're writing
20  down the relevant information that Ms.
21  Durden is providing to you; correct?
22      A.   I'm usually trying to keep up
23  with the person, but I don't write -- I
24  don't do shorthand and so I may write a
25  note and they may talk for a little while

Page 167

1  and then I write another note.
2          And so I'm not writing every
3  single word they write down, but I'm
4  trying to get the gist of what they're
5  saying.
6      Q.   And when you prepared your
7  report on Ms. Durden in this case, you
8  included in that report all of the
9  relevant information that Ms. Durden
10  provided to you; correct?
11      MR. EXNICIOS:
12          Objection to the form of the
13  question.
14      THE WITNESS:
15          Yes.  I followed my outline and
16  tried to include all of that.  I don't
17  think I included every single word that
18  she said.
19  EXAMINATION BY MS. SCHULTZ:
20      Q.   But you included all relevant
21  information that Ms. Durden had provided
22  to you that you used in forming your
23  opinions and issuing your report; correct?
24      MR. EXNICIOS:
25          Objection.

Page 168

1      THE WITNESS:
2          For the most part that's true.
3      MR. EXNICIOS:
4          Objection to the form of the
5  question.
6  EXAMINATION BY MS. SCHULTZ:
7      Q.   When you're evaluating an
8  individual's symptoms for purposes of a
9  diagnosis, isn't it important to know the
10  timeframe of those symptoms and whether or
11  not they've gotten worse or gotten better
12  overtime?
13      MR. EXNICIOS:
14          Objection to form.
15      THE WITNESS:
16          Yeah.  I mean, that theoretically
17  that's true that it's better.  But if it's
18  a long timeframe, then it's pretty
19  difficult to know the constellation of
20  symptoms for someone with -- that's had a
21  stressor that's been going on for that
22  long.
23          And I think it would be hard for
24  her to recollect, you know, all those
25  symptoms on any particular day.  So I

Page 169

1  would suspect that the symptoms that she
2  reports, since she's not over-reporting
3  symptoms, the ones she's reporting to me
4  are the ones that she remembers.  And but
5  I don't know that she's going to remember
6  the exact timeframe.
7  EXAMINATION BY MS. SCHULTZ:
8      Q.   And you keep using the words
9  "exact timeframe" and "specific
10  timeframe".  My question was when you're
11  trying to evaluate Ms. Durden, wasn't it
12  important for you to determine whether her
13  symptoms had gotten worse or gotten better
14  overtime, and for how long she had had
15  those symptoms?
16      MR. EXNICIOS:
17          Objection to the form.
18      THE WITNESS:
19          Well, I think you're asking a
20  very specific question, so I'm trying to
21  give you an answer that I can't give you
22  the specifics that you want or that you're
23  asking about.
24  EXAMINATION BY MS. SCHULTZ:
25      Q.   Okay.  So let's turn --

43 (Pages 166 - 169)

1      Q.  It includes a heading on the
2  Statement of Non-Confidentiality and then
3  the qualifications of the examiner;
4  correct?
5      A.  Yes, yes.
6      Q.  And there's a line written
7  through addiction psychiatry and it's
8  handwritten in neurology.
9      MR. EXNICIOS:
10        I'm sorry, counsel.  What page?
11  EXAMINATION BY MS. SCHULTZ:
12      Q.  Not on your copy I take it?
13      A.  No.  That's our copy.
14      Q.  Well, here.
15      MR. EXNICIOS:
16        What page, Doctor?
17  EXAMINATION BY MS. SCHULTZ:
18      Q.  If you will look with me at
19  the document that we've marked Deposition
20  Exhibit 3.
21      A.  Yes.
22      Q.  Your expert report and you see
23  under qualifications of examiner?
24      A.  Uh-huh (affirmative response).
25      Q.  Where it says that I am board

1  certified in adult psychiatry with added
2  qualifications in forensic psychiatry and
3  addiction psychiatry.
4        There's a line drawn through
5  it as to addiction psychiatry and the word
6  neurology is written in.  Do you see that?
7      A.  Yeah.  That should say I'm
8  board certified in psychiatry with added
9  qualifications in forensic psychiatry and
10  addiction psychiatry by the American Board
11  of Psychiatry and Neurology is how that is
12  supposed to be in there.  I don't know why
13  you have a copy with neurology on there.
14      Q.  Well, is that not a change
15  that you made?
16      A.  No.
17      Q.  Do you know who drew through
18  the words addiction psychiatry and wrote
19  in the word neurology?
20      A.  No.
21      Q.  All right.  Now, the next
22  section is entitled Sources of
23  Information.
24      A.  Do you want this back?
25      Q.  Correct?

1      A.  Yes.
2      Q.  And it says sources of
3  information and then open parentheses
4  Appendix 1 for the summaries of the
5  sources.
6      A.  Right.
7      Q.  Correct?
8      A.  Yeah.
9      Q.  And so you have a listing of
10  your sources of information and then
11  you've summarized those sources in this
12  report; correct?
13      A.  Yes.  That's correct.
14      Q.  And under in that list of your
15  sources of information you listed all of
16  the records that you reviewed and relied
17  on in forming your opinions in this
18  report; correct?
19      A.  Yes.
20      Q.  And at the time you formed
21  your opinions and wrote this report, did
22  you believe that you had all of the
23  medical records of Ms. Durden?
24      A.  Yes.  I had requested all of
25  the medical records of Ms. Durden, and I

1  thought that I had the medical records and
2  the depositions that were available at
3  that time.
4      Q.  The -- your summary of the
5  medical records provides timeframes for
6  the records you reviewed; correct?
7      A.  Yes.
8      Q.  For example, the first one
9  Ochsner Health Systems it says 5/18/11 to
10  8/1/17; correct?
11      A.  Yes.
12      Q.  Is it correct that you
13  reviewed no medical records of Ms. Durden
14  from a time period prior to her cancer
15  diagnosis?
16      A.  That may be true as of the
17  time I did the evaluation.  So it looks
18  like most of the records are subsequent to
19  her cancer diagnosis.
20      Q.  And so the timeframes included
21  in the summary of records would also show
22  the most recent records that you reviewed
23  of Ms. Durden when you formed your
24  opinions and issued this report; correct?
25      A.  Can you repeat that?

46 (Pages 178 - 181)

Page 182

1    MR. EXNICIOS:
2        Objection to form.
3    EXAMINATION BY MS. SCHULTZ:
4        Q.   The timeframes noted in your
5    summary of the records would also show
6    what the most recent records were that you
7    reviewed; correct?
8        A.   Yes, ma'am.
9        Q.   And you don't list any
10   photographs for Ms. Durden; correct?
11       A.   I do not list photographs. I
12   am not -- I can't recall if they were
13   attached to her deposition or not, but I
14   do not list photographs.
15       Q.   And you don't know what Ms.
16   Durden's hair looked like before her
17   cancer diagnosis; correct?
18       A.   As of the time I wrote this
19   report, probably not.
20       Q.   And you didn't know what her
21   hair looked like at any point from 2011
22   until the date you interviewed her in
23   March of 2018; correct?
24       A.   On that date, that's correct.
25       Q.   And you relied on Ms. Durden's

Page 183

1    statements regarding her hair and how much
2    it meant to her; correct?
3        A.   Yes.
4        Q.   And you relied on Ms. Durden's
5    statement that she has to wear a baseball
6    cap whenever she goes out; correct?
7        A.   Yes.  I don't think she has
8    to, but she chooses to.
9        Q.   The sources of information
10   that you relied on also include
11   depositions; correct?
12       A.   Yes.
13       Q.   And they're numbered, there is
14   three, four, five, six and seven in your
15   report?
16       A.   Yes.
17       Q.   The first was the deposition
18   of Anesha Prier.  Who is that?  Is Ms.
19   Prier Ms. Durden's daughter?
20       A.   Yes.  She's a patient
21   navigator, but she's also her daughter.
22   And I think she attended some of the
23   initial informed consent meetings or
24   meetings that's talking about what kinds
25   of treatments might occur with Ms. Durden.

Page 184

1        Q.   So for the depositions you
2    have listed under your sources of
3    information, you have the deposition of
4    Anesha Prier, the deposition of Antoinette
5    Durden?
6        A.   Uh-huh (affirmative response).
7        Q.   Correct?
8        A.   Uh-huh (affirmative response).
9        Q.   And that was the original
10   deposition she gave in the case; correct?
11       A.   Yes.  That was the 2017
12   deposition.
13       Q.   Yes.  And the deposition of
14   Julie Martin; correct?
15       A.   Yes.
16       Q.   And the deposition number one
17   and two of Sophy Jancich; correct?
18       A.   Yes.
19       Q.   And those are the only
20   depositions that you had reviewed when you
21   formed your opinions and issued this
22   report; correct?
23       A.   Yes.  One, two, three, four,
24   those are the five depositions that I
25   reviewed.

Page 185

1        Q.   And you had asked Ms. Durden's
2    counsel for all depositions of -- in the
3    Durden case; correct?
4    MR. EXNICIOS:
5        objection.  Form.
6    THE WITNESS:
7        Yes.
8    EXAMINATION BY MS. SCHULTZ:
9        Q.   Is it correct that when you
10   issued your report, you had not reviewed
11   the deposition of Ms. Durden's treating
12   oncologist, Dr. John Cole?
13       A.   Yes.
14   MR. EXNICIOS:
15       Objection.  Form.
16   EXAMINATION BY MS. SCHULTZ:
17       Q.   And you still haven't reviewed
18   it; correct?
19       A.   No.  I may have perused it,
20   but I don't recall reviewing it.  I
21   reviewed the collateral sources before I
22   reviewed that.  So I'll be reviewing that
23   soon.
24       Q.   When you formed your opinions
25   set forth in this report, you had not

47 (Pages 182 - 185)

1  reviewed the deposition of Dr. Priya Velu;
2  correct?
3      MR. EXNICIOS:
4        Objection. Form.
5      THE WITNESS:
6        That's correct. I reviewed that
7  this weekend.
8  EXAMINATION BY MS. SCHULTZ:
9      Q.   When you formed your opinions
10  set forth in this report, you had not
11  reviewed the deposition of Dr. July
12  Mermilliod; correct?
13      MR. EXNICIOS:
14        Objection. Form.
15      THE WITNESS:
16        Correct.
17  EXAMINATION BY MS. SCHULTZ:
18      Q.   And are you aware that she's a
19  dermatologist that treated Ms. Durden in
20  late 2016?
21      A.   Yes. As I believe I have
22  reviewed her records.
23      Q.   Do you know as you sit here
24  today if you reviewed the records of Mrs.
25  -- of Dr. Mermilliod?

1      A.   Let me just take a look at
2  that and see. I know I reviewed some
3  dermatologic records on her. Yes. So on
4  page 14 is a paragraph 1, 2 -- under D.
5      Q.   I see the paragraph.
6      A.   You see her name?
7      Q.   Yes. And appointment on
8  November 21, 2016; correct?
9      A.   Yes, yes.
10      Q.   Correct?
11      A.   Yeah.
12      Q.   All right. When you formed
13  your opinions in your report, is it
14  correct that you had not reviewed any
15  friends and family depositions other than
16  the deposition of Ms. Durden's daughter?
17      A.   That's correct. That I
18  haven't seen other depositions besides
19  that one.
20      Q.   And your report and your
21  diagnosis states that Ms. Darden's social
22  functioning has been affected; correct?
23      A.   Yes, yes.
24      Q.   And at the time you made that
25  statement you had not reviewed any

1  depositions of the individuals with whom
2  she socializes other than her daughter;
3  correct?
4      A.   That's correct.
5      MR. EXNICIOS:
6        Objection to the form.
7  EXAMINATION BY MS. SCHULTZ:
8      Q.   You had not reviewed the
9  deposition of Ms. Durden's niece, Trenell
10  Brown; correct?
11      MR. EXNICIOS:
12        Objection to form.
13      THE WITNESS:
14        Correct.
15  EXAMINATION BY MS. SCHULTZ:
16      Q.   You had not reviewed the
17  deposition of Ms. Durden's sister-in-law,
18  Dorothy Durden; correct?
19      A.   Correct.
20      MR. EXNICIOS:
21        Objection to form.
22  EXAMINATION BY MS. SCHULTZ:
23      Q.   Or the deposition of Ms.
24  Durden's cousin and one of her closest
25  friends, Paulette Derkins; correct?

1      MR. EXNICIOS:
2        Objection to form.
3      THE WITNESS:
4        Correct.
5  EXAMINATION BY MS. SCHULTZ:
6      Q.   You had not reviewed the
7  deposition of Ms. Durden's friend Mary
8  Mitchell; correct?
9      MR. EXNICIOS:
10        Objection to form.
11      THE WITNESS:
12        Correct.
13  EXAMINATION BY MS. SCHULTZ:
14      Q.   And you had not reviewed the
15  deposition of Ms. Durden's niece, Tanya
16  Durden; correct?
17      MR. EXNICIOS:
18        Objection to form.
19      THE WITNESS:
20        Correct.
21  EXAMINATION BY MS. SCHULTZ:
22      Q.   And you have not reviewed the
23  deposition of David Dileo; correct?
24      A.   Correct.
25      MR. EXNICIOS:

48 (Pages 186 - 189)

Page 190

1     Objection to form.
2  EXAMINATION BY MS. SCHULTZ:
3     Q.   And you had not reviewed the
4  deposition of Daryl Durden, Ms. Durden's
5  brother; correct?
6     MR. EXNICIOS:
7        Objection to form.
8     THE WITNESS:
9        Correct.
10 EXAMINATION BY MS. SCHULTZ:
11    Q.   Do you agree that in order to
12 form an opinion about Ms. Durden's social
13 functioning, you would want to review what
14 her friends and family members had to say
15 about her social functioning?
16    MR. EXNICIOS:
17       Objection to form.
18    THE WITNESS:
19       Yes.  I would have liked to
20 review those prior to rendering a report.
21 And I reviewed the one that was available
22 that was her daughter's deposition.
23 EXAMINATION BY MS. SCHULTZ:
24    Q.   Did you ask to interview any
25 of Ms. Durden's friends and family?

Page 191

1     A.   I did not.  My assumption is
2  that those people would be deposed and I
3  would get that information overtime.  And
4  I already had the deposition of her
5  daughter.
6        I interviewed the husband of
7  Ms. Earnest, and then her daughter was the
8  one that took her to appointments and was
9  very familiar with her.  So I used the
10 daughter as a collateral source of
11 information.
12    Q.   Well, when you say it was your
13 assumption that you would get those
14 depositions overtime, what do you mean?
15    A.   I mean, as the depositions are
16 being taken, I was assuming that I would
17 get them or that I would be able to look
18 at them and amend the report.
19    Q.   And that didn't occur;
20 correct?
21    A.   Yes.
22    MR. EXNICIOS:
23       Objection to form.
24    THE WITNESS:
25       The 10th or 15th time now, that

Page 192

1  did not occur.
2  EXAMINATION BY MS. SCHULTZ:
3     Q.   And do you know when those
4  depositions I just recited of the friends
5  and family members were taken?
6     A.   They were taken over a
7  timeframe of I believe from May -- I would
8  be guessing.  I mean, there's dates on
9  every one of them.  I mean, some of them
10 were taken towards the middle and end of
11 last year.  So I could have received them.
12    Q.   You're saying some of the
13 depositions --
14    A.   Let me give you the exact
15 dates of the depositions of Ms. Durden so
16 I can give you the -- and I will see if
17 the exact dates are in the documents that
18 I have.
19    Q.   It's all right.  If you have
20 to look at the list, that's fine.
21    A.   No.  That's what I'm going to
22 have to do.  I'm going to have to look at
23 the list.  So it looks like those
24 depositions were taken in April was --
25 some of them were taken in April and some

Page 193

1  of them were taken in May, if those are
2  the dates that are correct of these of
3  when they were taken.
4     Q.   Okay.
5     A.   Of 2018.
6     Q.   Under your sources of
7  information you include what is listed as
8  NDC-Taxotere label as number 8?
9     A.   I think that was in the
10 documents that were sent so I just put it
11 in there.
12    Q.   So that was something that was
13 sent to you by plaintiffs' counsel, not
14 something you requested to see; is that
15 right?
16    A.   Correct.
17    Q.   Your list for Ms. Durden's
18 report goes through, under the sources of
19 information goes through number 16.
20    A.   Okay.
21    Q.   And I note that you don't
22 include Dr. Bianchini's report in your
23 sources of information, but there's a
24 summary of his report in your report that
25 is numbered number 17.

49 (Pages 190 - 193)

1  not Ms. Durden stopped seeing Dr. Martin
2  for the injection treatments?
3       MR. EXNICIOS:
4          Objection to form.
5       THE WITNESS:
6          I don't think she's continuing to
7  see him, but I don't -- I don't recall
8  whether she stopped seeing him or not.  I
9  would have to look in the record.
10  EXAMINATION BY MS. SCHULTZ:
11      Q.  And it's a her.
12      A.  Oh, I'm story.
13      Q.  Dr. Martin just so we're
14  clear.
15      A.  Oh, sure.
16      Q.  Did you ask Ms. Durden whether
17  or not she planned to stop seeing Dr.
18  Martin?
19      A.  No, I didn't.
20      MR. EXNICIOS:
21          Objection to form.
22  EXAMINATION BY MS. SCHULTZ:
23      Q.  Did you ask Ms. Durden why she
24  did not use Rogaine?
25      MR. EXNICIOS:

1          Objection to the form.
2       THE WITNESS:
3          No.  I didn't ask her whether she
4  used Rogaine or not or why she didn't use
5  Rogaine.
6  EXAMINATION BY MS. SCHULTZ:
7      Q.  And at the bottom of that
8  section you state, "Ms. Durden reported
9  that she has not gone to see a mental
10  health professional to discuss her
11  situation."  Correct?
12      A.  Yes.
13      Q.  And has not started taking any
14  antidepressant medication; correct?
15      A.  Correct.
16      Q.  And we talked earlier today
17  about the fact that Ms. Durden had been
18  diagnosed with anxiety with depression;
19  correct?
20      A.  Yes.  It was in the problem
21  list in her Ochsner records at some point.
22      Q.  And that fact you agree is not
23  noted anywhere in your report or in the
24  records you summarized; right?
25      A.  That's correct.

1       MR. EXNICIOS:
2          Objection to form.
3       THE WITNESS:
4          I didn't find it in the records
5  until later.
6  EXAMINATION BY MS. SCHULTZ:
7      Q.  And when you found it in the
8  records later, do you recall reading that
9  Ms. Durden was suffering from anxiety
10  because she had had three deaths in the
11  family in one month, and was very worried
12  that something else may be wrong with her
13  and that she is next?
14      A.  Yes.  The doctor said that she
15  did have concerns about whether or not she
16  might pass away.  So certainly that was
17  important.
18      Q.  And that was in 2014; correct?
19      A.  20 -- yes.
20      Q.  As you sit here today, do you
21  know whether or not Ms. Durden continues
22  to have that anxiety over whether or not
23  she may be next and that she may pass
24  away?
25      A.  She didn't report that to me.

1  I asked her about what the kinds of
2  symptoms she had and the reasons that she
3  was having them, and she did not report
4  that to me.
5      Q.  And you didn't ask Ms. Durden
6  any questions about what she reported to
7  Dr. Velu when he diagnosed her with
8  anxiety associated with depression;
9  correct?
10      A.  No.  I just saw the expanded
11  version of Dr. Velu's deposition.  Not the
12  expanded version, but Dr. Velu's
13  deposition where that was mentioned.
14      Q.  Under psychiatric review of
15  symptoms you state that Mrs. Durden
16  reports that she fights through depressed
17  moods on a regular basis.
18      A.  Right.
19      Q.  Correct?
20      A.  Yes.
21      Q.  Was that corroborated in any
22  of the medical records you reviewed in
23  preparing this report?
24      A.  She did not report to the
25  doctors regularly that she was fighting

1  through depressed moods.
2      Q.  Well --
3      MR. EXNICIOS:
4          Objection to the form.
5  EXAMINATION BY MS. SCHULTZ:
6      Q.  Did she report to her doctors
7  that she was fighting through depressed
8  moods?
9      MR. EXNICIOS:
10         Objection to the form.
11     THE WITNESS:
12         I said she did not.  That's what
13 I just said.  She did not report that.
14 EXAMINATION BY MS. SCHULTZ:
15     Q.  You said she did not report
16 regularly that she was fighting through
17 depressed moods?
18     A.  The only documentation that I
19 saw was the documentation that you just
20 mentioned.
21     Q.  And none of the depositions
22 that you read in preparing your report
23 reflected that Ms. Durden fights through
24 depressed moods on a regular basis; is
25 that correct?

1      A.  I did not see that recorded in
2  those depositions.
3      Q.  It also says that she worries
4  on a daily basis about her hair and
5  whether her hair will grow back.
6      A.  Yes.  She did report that to
7  me.
8      Q.  Did you see that in any of Ms.
9  Durden's medical records that she worries
10 on a daily basis about whether her hair
11 will grow back?
12     A.  I did not see that in the
13 medical records.  I did see that she had
14 sought dermatologic treatment in order to
15 try and improve her hair.  So she was
16 seeking out care.
17     Q.  It then says that she has
18 refused to participate in activities such
19 as going on a family cruise secondary to
20 fear someone would see her hair.
21     A.  Yes.
22     Q.  Do you see that?
23     A.  Yes.
24     Q.  And that's what she told you;
25 correct?

1      A.  Yes.
2      Q.  Did she give you any other
3  examples of activities that she has
4  refused to participate in?
5      A.  I think that was the main one
6  that she described to me, that she had
7  refused to participate in, going on the
8  cruise.
9          Or that it looks like from
10 what I read this weekend that she
11 postponed going to the cruise for a little
12 bit, but that she actually did go on a
13 cruise.
14     Q.  Well, and you cite that as
15 your only example in her diagnoses;
16 correct?
17     MR. EXNICIOS:
18         Objection to the form.
19 EXAMINATION BY MS. SCHULTZ;
20     Q.  You say she appears to be
21 distressed about this on a daily basis,
22 particularly when she sees herself in the
23 mirror or when she contemplates going out
24 in the public functions such as going on a
25 cruise ship.

1      A.  Or doing things where it would
2  be hard for her to wear a cap that she
3  wears whenever she leaves the house.  So
4  she did talk about not wanting to go
5  swimming because she was concerned that
6  her hair would get wet and it would look
7  bad -- or that she didn't want to go
8  places that were outdoors where she would
9  be swimming and people could see her.
10     Q.  And you assumed that that
11 statement she made to you was true, that
12 she had refused to go on a family cruise
13 when she told you; correct?
14     A.  Yes.
15     Q.  And you have now reviewed her
16 supplemental deposition and have realized
17 that that was not, in fact, a true
18 statement; correct?
19     A.  Well, she did go on the
20 cruise, but I think she postpone the one.
21 So technically she went on a cruise.  She
22 did end up going on the cruise, but she
23 may have pushed it from --
24     Q.  Where did you find any
25 evidence in the depositions or the records

1  that she may have postponed a cruise?
2      A.  I thought that was in her
3  second deposition, but I could be
4  mistaken.
5      Q.  Have you reviewed the medical
6  records in which Ms. Durden reports to her
7  physicians that she is going on a cruise
8  and then reports to them when she gets
9  back that she's come back from the family
10  cruise?
11      A.  I don't recall that.
12      MR. EXNICIOS:
13          Objection to form.
14      THE WITNESS:
15          I haven't read that in the
16  medical record yet.
17  EXAMINATION BY MS. SCHULTZ:
18      Q.  Well, is it important to your
19  diagnosis whether or not Ms. Durden was
20  accurately reporting examples of her
21  social functioning?
22      A.  Yes.
23      Q.  And as you sit here today you
24  haven't -- you don't recall or you may not
25  have yet reviewed any record that in which

1  she's reporting that she's going on the
2  family cruise and then reports that she's
3  come back from the family cruise; correct?
4      A.  Not yet, but if you report
5  that it's in there, it may well be in
6  there.
7      Q.  And it may simply be a record
8  that you haven't reviewed yet?
9      A.  Yes.
10      Q.  Okay.  Below that you say with
11  reference to alopecia she's reported the
12  distressing recollections and intense
13  distress and psychological reactivity when
14  exposed to situations that remind her of
15  her hair loss.
16          What situations remind her of
17  her hair loss?
18      A.  I'm sorry.  Where are you?
19      Q.  I am still under the same
20  page, page 4.
21      A.  Okay.
22      Q.  At the bottom of that page you
23  state that she reported distressing
24  recollections and intense distress and
25  psychological reactivity when exposed to

1  situations that remind her of her hair
2  loss.
3      A.  Right.  So she has these kinds
4  of -- she reported that she has these
5  kinds of symptoms when she looks in the
6  mirror in the morning, but they did not
7  rise to the level of what I would consider
8  posttraumatic stress type anxiety or
9  related symptoms.
10          So part of that is I'm going
11  through a review of symptoms of different
12  psychiatric symptoms, and she's reporting
13  that she's had some distress when she
14  looks into the mirror and when she has to
15  see herself without her hair.
16          And she reported those as
17  being significant symptoms, but they
18  didn't really add up to the symptoms of
19  posttraumatic stress.  So I was going
20  through that criteria.
21      Q.  And to your knowledge, she had
22  never reported those symptoms to any of
23  her treating physicians; correct?
24      A.  I didn't see those
25  specifically reported, no.

1      MR. EXNICIOS:
2          Object to the form.
3  EXAMINATION BY MS. SCHULTZ:
4      Q.  And then you did state she
5  does avoid activities, places and people.
6      A.  Yes.
7      Q.  Do you see that?
8      A.  That's what she reported, that
9  at times she avoids activities.  At times
10  she avoids going places and does not
11  necessarily want to be around people if
12  she has to -- if she has concerns about
13  them seeing her hair.
14      Q.  And the only example you've
15  given in your report is the family cruise;
16  correct?
17      MR. EXNICIOS:
18          Objection to form.
19      THE WITNESS:
20          Yeah.  That's the only one that
21  I've given about her not going places.
22  Yes.  She did mention the other one, which
23  the other one that I remember she
24  mentioned that was upsetting to her is
25  that one of the, one of her children

56 (Pages 218 - 221)

1  referred to her as Bozo and that was very
2  upsetting to her.  So those are the two
3  that I specifically remember.
4  EXAMINATION BY MS. SCHULTZ:
5      Q.  You're referring to a
6  grandchild?
7      A.  Yes.
8      Q.  And those are the only
9  examples you've included in your report;
10  correct?
11      A.  Yes.
12      Q.  So --
13      A.  I think those are the ones
14  that she mentioned.
15      Q.  You have no other information
16  as to what activities, places or people
17  that she avoids; correct?
18      A.  At the time of this report,
19  no.  I've reviewed some other stuff where
20  she has gone to a lot of social functions,
21  but they reported that she does not seem
22  to be the life of the party like she was
23  before.
24          But it would be minimal as far
25  as reports of actual instances of her

1  avoiding places and things because of her
2  hair.  Usually she -- it seems to me like
3  goes to great lengths to disguise her hair
4  or to wear baseball caps or wear other
5  caps that are more fashionable.  But I
6  didn't see a lot of reports in those
7  depositions that she was avoiding places.
8      Q.  And when you concluded that
9  her social functioning had been affected
10  in your report.
11      A.  Yes.
12      Q.  You weren't aware that Ms.
13  Durden's cousin, Paulette Durden,
14  testified that she didn't think Ms.
15  Durden's cancer diagnosis or treatment has
16  affected Durden's social life?
17      A.  No.  I'm aware of that now.
18      Q.  And you weren't aware that her
19  good friend, Ms. Mitchell, testified that
20  the only reason they don't go out as much
21  as they used to is because Ms. Mitchell no
22  longer has a car.
23          Ms. Durden does not drive and
24  she used to live down the street from Ms.
25  Durden, but now lives far away and they

1  are both older and occupied.
2          You weren't aware of that
3  testimony; correct?
4      MR. EXNICIOS:
5          Objection to the form.
6      THE WITNESS:
7          Well, I don't think that was, you
8  know, that she was testifying that was the
9  only reason.  I think the questions had to
10  do with what is the reason that you don't
11  see her as much.
12          And she said it's because they're
13  separated by distance.  So she didn't
14  identify a specific reason related to Ms.
15  Durden's hair, but she identified other
16  reasons why they don't see each other.
17  EXAMINATION BY MS. SCHULTZ:
18      Q.  But you had no information
19  about her testimony when you formed your
20  opinions because you hadn't read it;
21  correct?
22      MR. EXNICIOS:
23          Objection.  Form.
24      THE WITNESS:
25          I hadn't read it until this

1  weekend then I did, yes.
2  EXAMINATION BY MS. SCHULTZ:
3      Q.  Did -- when you prepared your
4  report and stating that she does avoid
5  activities, places and people, we've
6  talked about activities and what
7  information that you had.
8      A.  Uh-huh (affirmative response).
9      Q.  What about places, did you
10  have any information about what places she
11  claims to avoid?
12      A.  No.  Other than she's -- she
13  gave me the impression that she didn't go
14  out as much or didn't go out on activities
15  as much as she had done in the past.
16          But she did say that she still
17  went to church and that she participated
18  in some activities, but not as many as she
19  did before.
20      Q.  And did you ask her what
21  people she avoids?
22      A.  No.  My assumption was that
23  the people, anybody that can see her
24  without a covering on her head is what she
25  avoids.  She really wants to make sure

57 (Pages 222 - 225)

Page 226

1  that they have a covering on her head.
2        And I believe her brother's
3  deposition verified that, that she won't
4  go out of the house without a covering on
5  her head.
6      Q.  I don't see in your report
7  that you cite to any other stressors of
8  Ms. Durden.
9    MR. EXNICIOS:
10       Objection to form.
11   THE WITNESS:
12       Any other stressors?
13 EXAMINATION BY MS. SCHULTZ:
14     Q.  Yes.
15     A.  Oh, you mean competing
16 stressors?
17     Q.  Other things that cause her
18 stress.
19     A.  Oh, I see, yes.  I didn't
20 particularly list those.  She didn't
21 describe that she was particularly
22 stressed about anything other than this
23 issue.
24       I would assume that she has
25 some stress with related to cancer

Page 227

1  diagnosis and cancer returning because of
2  what I saw in the medical records.
3        And would -- and because Dr.
4  Velu said that that was something that
5  worried her from time to time, so I would
6  assume that that would be a competing
7  stressor for her.
8      Q.  Well, if you didn't ask her
9  about continuing distress from her concern
10 that cancer may return.
11     A.  Uh-huh (affirmative response).
12     Q.  How did you rule that out as a
13 cause of her adjustment disorder?
14     A.  Well, it's primarily from, you
15 know, her description of the things that
16 are bothering her, stressing her at the
17 time.
18       So, you know, psychiatric
19 evaluations, you do take what the person
20 says, but you also have to look to see
21 whether there's other information.
22       So she describes that as her
23 primary stressor, not that she didn't have
24 other stressors, but that was the one that
25 was worrying her primarily.

Page 228

1      Q.  So you relied on the
2  statements that Ms. Durden made to you?
3      A.  As with any patient that I
4  would see.
5      Q.  Well, when you're evaluating a
6  patient in a forensic setting, you not
7  only listen to what the individual says to
8  you, but you also have the responsibility
9  to go review all available information and
10 see if that information is corroborated or
11 contradicted; correct?
12   MR. EXNICIOS:
13       Objection to form.
14   THE WITNESS:
15       And when the information came to
16 me, when I received the information I
17 reviewed it as I've explained several
18 times and I was able to review that
19 documentation so.
20 EXAMINATION BY MS. SCHULTZ:
21     Q.  And --
22     A.  As well as the other
23 depositions.
24     Q.  Well, you didn't review the
25 information you received on Friday prior

Page 229

1  to forming your opinions that you set
2  forth in this report; correct?
3    MR. EXNICIOS:
4       Objection.  Form.
5    THE WITNESS:
6       That's correct.  But I have
7  reviewed them now.  So one question you go
8  to where we are now, then you go back to
9  where we were then.
10       So are we going to talk about all
11 the information I reviewed and where we
12 are now, or are we going to keep going
13 back and forth and saying we don't have
14 it, we have it, we don't have it, we have
15 it?
16 EXAMINATION BY MS. SCHULTZ:
17     Q.  And so we're clear, as you sit
18 here today, you still have not reviewed
19 all of Ms. Durden's medical records;
20 correct?
21   MR. EXNICIOS:
22       Objection.  Form.
23   THE WITNESS:
24       And I'm in the process of doing
25 that.

58 (Pages 226 - 229)

Page 230

1 EXAMINATION BY MS. SCHULTZ:
2     Q.   And you still have not
3 reviewed all of the depositions; correct?
4     MR. EXNICIOS:
5        Objection.  Form.
6     THE WITNESS:
7     Correct.  There is doctor
8 depositions that I haven't gotten through
9 yet.
10 EXAMINATION BY MS. SCHULTZ:
11     Q.   And you're still planning to
12 do that?
13     A.   Yes.
14     MR. EXNICIOS:
15        Objection.  Form.
16 EXAMINATION BY MS. SCHULTZ:
17     Q.   Now, your diagnosis of Ms.
18 Durden is entitled adjustment disorder
19 with depressed mood and anxious features?
20     A.   Yes.
21     Q.   Correct?
22     A.   Yes.
23     Q.   And you made that diagnosis
24 based on looking at what you called
25 guidelines?

Page 231

1     A.   Yes.
2     Q.   Set forth in the DSM; correct?
3     A.   Correct.
4     MR. EXNICIOS:
5        Objection.  Form.
6 EXAMINATION BY MS. SCHULTZ:
7     Q.   Can you walk me through how
8 you came to that diagnosis in conjunction
9 with reviewing the guidelines of the DSM-5
10 for adjustment disorder?
11     A.   Sure.  Oh, there is -- okay.
12 So the development of emotional or
13 behavior symptoms in response to an
14 identifiable stressor occurring within
15 three months of the onset of the stressor.
16        So this is an ongoing
17 stressor.  I wouldn't think that the three
18 months would necessarily apply.  But as
19 her -- the stressor of her hair not coming
20 back as she's expecting it to come back
21 creates some emotional symptoms in her.
22        And those symptoms are
23 evidenced by, I didn't see she had marked
24 distress that was out of proportion to
25 severity of the stressor because I think

Page 232

1 she probably has distress that's
2 consistent with the severity of the
3 stressor.  Meaning, her hair not coming
4 back would be a stressor and would be
5 significant.
6        And then significant and
7 apparent and social occupation are other
8 areas of functioning.  So I thought that
9 based on what I saw when I evaluated her,
10 that she had some social impairments and
11 in other areas of function she was
12 altering her behavior, such as not going
13 out without covering her head or wearing
14 her wig or those kinds of things.
15        It didn't meet criteria for
16 any other mental disorder that I could
17 find.  And I searched for that in the
18 medical records other than what we talked
19 about the anxiety associated with
20 depression diagnosis at some point in
21 time.
22        But I wouldn't give her a
23 diagnosis of major depression at this
24 point.  I didn't think that the symptoms
25 represented normal bereavement and E

Page 233

1 really didn't apply.
2        She reported both depressive
3 symptoms as well as anxiety symptoms.  So
4 on the DSM-5 it would be referred to as
5 mixed anxiety with depressed mood.
6        In the previous versions of
7 the DSM it would be depressed mood with
8 anxious features or similar kinds of
9 things.  But it's a mixture of some
10 anxiety symptoms and some depressive
11 symptoms.
12        She also reported some
13 posttraumatic stress symptoms which we
14 went over before.  And so with that in
15 mind, I felt that adjustment disorder with
16 depressed mood with anxious features was
17 reasonable.
18        As I stated earlier given the
19 information that I have now, I wouldn't
20 think that she would have the most severe
21 form of that.  I would think that she
22 would probably have a mild form of it.
23        And thus, I made
24 recommendations for her to have some
25 cognitive therapy regarding that

Page 246

1     Q.  Do you know if the statement
2  she made to Dr. Bianchini was correct when
3  she told him she had avoided dating since
4  she had had her treatment?
5     MR. EXNICIOS:
6        Objection to the form of the
7  question.
8     THE WITNESS:
9        No, I don't.
10  EXAMINATION BY MS. SCHULTZ:
11     Q.  Have you seen in any of Ms.
12  Durden's medical records references to her
13  wanting to resume sexual intercourse with
14  her partner?
15     A.  I didn't see anything --
16     MR. EXNICIOS:
17        Objection to form.
18  EXAMINATION BY MS. SCHULTZ:
19     Q.  Pardon me?
20     A.  I didn't see that.
21     Q.  You haven't reviewed any
22  medical record that includes that
23  information?
24     A.  Not that I recall yet.
25     Q.  If Ms. Durden had a desire to

Page 247

1  resume sexual intercourse with her partner
2  since having lost her hair, is that
3  something that would be an important
4  consideration to you in terms of assessing
5  her social functioning?
6     A.  Yes.
7     MR. EXNICIOS:
8        Objection to the form.
9        Lori, just timing wise, remember
10  I have to take a break in like five
11  minutes.  I've got to get on the
12  teleconference for four, just to give you
13  a heads up.
14     MS. SCHULTZ:
15        Okay.  Well, we should -- let's
16  go ahead and keep going while we can.
17     MR. EXNICIOS:
18        Yeah.  That's fine.  I was just
19  putting a five-minute warning.
20     MS. SCHULTZ:
21        That's the alarm.
22  EXAMINATION BY MS. SCHULTZ:
23     Q.  All right.  Let's keep walking
24  or wading through your report.  Under your
25  diagnoses there's a heading that says

Page 248

1  presence or lack of malingering.
2     A.  Correct.
3     Q.  Correct?
4     A.  Yes.
5     Q.  And you refer to the DSM-5;
6  correct?
7     A.  Yes.  That's correct.
8     Q.  And you state malingering
9  should be strongly suspected if any
10  combination of the following is noted?
11     A.  That's correct.
12     Q.  Correct?  And those are set
13  forth in the DSM-5; correct?
14     A.  Yes.
15     Q.  Now, I take it since your
16  report says malingering should be strongly
17  suspected if any combination of the
18  following is noted, you don't look at
19  these factors 1 through 4 as just
20  guidelines that you may or may not rely
21  on?
22     A.  Sure.  They are all
23  guidelines.  I mean, malingering is a
24  guideline.  So you have to take into
25  consideration -- I mean, you could go

Page 249

1  through any forensic report and find that
2  a person's claimed distress or disability
3  might not be exactly how someone else
4  reports their claim distress or
5  disability.
6        So you wouldn't automatically
7  assume they're malingering.  You would
8  take this into consideration and also take
9  into consideration psychological testing,
10  if you had that done, to see if the person
11  is trying to exaggerate symptoms.
12        And so I take all of that into
13  consideration.  People who present in the
14  medical/legal context have a higher rate
15  of malingering and so we take that into
16  consideration under number 1.
17     Q.  And before you get through the
18  rest of them.
19     A.  Uh-huh (affirmative response).
20     Q.  Your first statement,
21  malingering should be strongly suspected
22  if any combination of the following is
23  noted.
24     A.  Right.
25     Q.  That means if more than one of

63 (Pages 246 - 249)

Page 274

1 functioning?
2    A.  Specifically I don't know that
3 it plays a major role.
4    Q.  Did you ask her about her
5 lymphedema?
6    A.  I know that she had that as a
7 symptom, but I don't know -- I don't
8 recall specifically that being addressed
9 in the depositions about how it limited
10 her.
11    Q.  And I'm asking about your
12 interview with Ms. Durden.
13    A.  I didn't spend a lot of time
14 on her lymphedema symptoms.
15    Q.  Well, did you ask her whether
16 or not her lymphedema syndrome impacts her
17 social functioning?
18    A.  I don't recall specifically
19 asking that.
20    Q.  Did you ask her how her
21 hyperpigmentation impacts her social
22 functioning?
23    A.  I know that she doesn't like
24 the hyperpigmentation so that would
25 probably be something that would play a

Page 275

1 role in her body image and perception of
2 herself.
3    Q.  But that's not something that
4 you talked with Ms. Durden about during
5 her evaluation; correct?
6    A.  I didn't talk to her
7 extensively about that, no.
8    Q.  Well, did you talk to her at
9 all about hyperpigmentation and any impact
10 it has on her social functioning?
11    A.  Not that I recall.
12    Q.  What role does Ms. Durden's
13 age play in any differences between her
14 social functioning now and her social
15 functioning prior to her cancer diagnosis?
16    A.  I think --
17    MR. EXNICIOS:
18       Objection to the form.
19    THE WITNESS:
20       I think that as people age, they
21 probably do less socially or engage in
22 less social activities.  So that would
23 play some role.
24 EXAMINATION BY MS. SCHULTZ:
25    Q.  Did -- well, what role does

Page 276

1 the sciatica and back pain that Ms. Durden
2 suffers from play in impacting her social
3 functioning?
4    A.  I think that could play a role
5 as well if she was in pain from a
6 particular situation.  I believe that was
7 mentioned in the most recent deposition
8 that I reviewed.
9    Q.  Well, did you ask her about
10 the impact of those diagnoses on her
11 social functioning?
12    A.  I did not focus on that, no.
13    Q.  She's been diagnosed with
14 spondylosis; correct?
15    A.  Yes.
16    Q.  And degenerative disk disease?
17    A.  Yes.
18    Q.  And neuritis?
19    A.  Yes.
20    Q.  And acute back pain with
21 sciatica?
22    A.  Yes.
23    Q.  And she -- do you know if
24 she's still suffering from sciatica to
25 this day?

Page 277

1    A.  I think she is from what I
2 recall.
3    Q.  And so what did you do to rule
4 out those diagnoses in terms of her social
5 functioning?
6    MR. EXNICIOS:
7       Objection to the form.
8    THE WITNESS:
9       I don't think I ruled those out.
10 I think there are things that could play a
11 role in her stress as well.
12 EXAMINATION BY MS. SCHULTZ:
13    Q.  What about the stress she's
14 under from running her daycare center and
15 the amount of time that takes, how has
16 that impacted her social functioning?
17    A.  She's -- I think she sees that
18 as something that's positive and that she
19 enjoys doing.  And so I would see that
20 more as a positive as far as her social
21 functioning, in the fact that she's still
22 participating in it.  And she gets I think
23 emotional benefit from that, so I wouldn't
24 see that necessarily as being a negative.
25    Q.  Do you know, is she still

70 (Pages 274 - 277)

Page 278

1  receiving social security disability?
2      MR. EXNICIOS:
3          Objection to the form of the
4  question.
5      THE WITNESS:
6          There was some mention of that in
7  one of the depositions.
8  EXAMINATION BY MS. SCHULTZ:
9      Q.   Why was she receiving social
10  security disability?
11      MR. EXNICIOS:
12          Objection to the form.
13      THE WITNESS:
14          I thought she was receiving that
15  for physical symptoms.
16  EXAMINATION BY MS. SCHULTZ:
17      Q.   Well, did you consider whether
18  or not the reasons for her receiving
19  social security  disability played a role
20  in her social functioning?
21      MR. EXNICIOS:
22          Objection to the form.
23      THE WITNESS:
24          I think the actual medical
25  conditions would play the role, not her

Page 279

1  social security disability.  I think the
2  medical conditions would play a role would
3  be more direct.  Those would be
4  contributing factors to her emotional
5  symptoms.
6  EXAMINATION BY MS. SCHULTZ:
7      Q.   And you don't know what those
8  emotional -- what those medical conditions
9  are?
10      MR. EXNICIOS:
11          Objection to the form.
12  EXAMINATION BY MS. SCHULTZ:
13      Q.   Correct?
14      A.   Well, you just mentioned
15  several medical conditions, and there's --
16  and I'll look at the additional medical
17  records and see if those are present.  But
18  certainly if medical conditions are
19  associated with pain, they can impact upon
20  psychological functioning.
21      Q.   Did you make any determination
22  as to whether Ms. Durden is suffering from
23  any occupational impairment?
24      A.   No.  I did not do an
25  occupational evaluation on her.

Page 280

1      Q.   Did you consider the testing
2  that Dr. Bianchini performed with respect
3  to her cognitive abilities?
4      A.   Yes.  And that, those
5  cognitive tests allow you to do more of
6  what we call the symptom validity
7  measures.  So I think those are -- they
8  added to some of the data that he
9  collected.
10      Q.   Well, did you reach any
11  conclusion as to what Ms. Durden's ability
12  would have been to comprehend information
13  that she's being given about particular
14  drugs and side effects?
15      A.   Oh, I don't think I made a
16  determination about that, nor was asked
17  to.
18      Q.   Let's move, if you can take a
19  look with me at Deposition Exhibit 13
20  which is, it's the Civil Forensic
21  Evaluation form of Ms. Earnest.
22      A.   And do you want to replace
23  that one with this one?  Paula assures me
24  that is the copy.
25      MR. EXNICIOS:

Page 281

1          Thanks.
2  EXAMINATION BY MS. SCHULTZ:
3      Q.   And this is a copy of your
4  report on Barbara Earnest dated May 23,
5  2018?
6      A.   Yes.
7      Q.   And this is a copy of what was
8  made from the report that you have in your
9  file; correct?
10      A.   Yes.
11      Q.   So let's go ahead and mark
12  this as Deposition Exhibit 18.
13      MS. HATTEN:
14          Nineteen.
15  EXAMINATION BY MS. SCHULTZ:
16      Q.   Oh, 19.  And Exhibit 13
17  includes handwritten notes that you took
18  during your interview of Ms. Earnest;
19  correct?
20      A.   Yes.
21      Q.   Under purpose of the
22  evaluation you have written a line through
23  accident which occurred on?
24      A.   Yeah.
25      Q.   And you wrote in side effect

71 (Pages 278 - 281)

Page 286

1  that.
2      I asked her can you clarify
3  what that means.  And she said, well, it
4  grew back, but it grew back kind of very
5  sparsely and, you know, towards the back
6  and then along the sides which appear to
7  be similar to what she looked like when
8  she took her turban off that she had on
9  that day.
10     Q.  And how long did it take for
11 her hair to grow back to the point that it
12 is today?
13     A.  I don't recall the specific
14 timeframe for that.
15     Q.  Well, do you recall a general
16 timeframe?
17     A.  No.  Not -- if you have a
18 reference, I'm happy to look at it.
19     Q.  When did Ms. Earnest determine
20 that her hair was not going to come back?
21     A.  I don't recall that specific
22 date either when she determined that it
23 would not come back.  I think by the time
24 I saw her, she had little hope that it
25 would come back.  But what specific date

Page 287

1  she made that determination, I don't
2  recall.
3      Q.  And I'm not asking you for a
4  specific date.  I'm just asking you
5  generally when did Ms. Earnest determine
6  that her hair was not going to grow back?
7      MR. EXNICIOS:
8          Objection to the form.
9      THE WITNESS:
10         I think this is a similar answer
11 I have with the prior individual that I
12 evaluated.  So I don't know exactly when
13 she said her hair -- she knew that her
14 hair was not going to grow back.
15 EXAMINATION BY MS. SCHULTZ:
16     Q.  Well, did you ask Ms. Earnest
17 when she decided that her hair was not
18 going to grow back?
19     A.  I don't recall asking that
20 specific question.
21     Q.  Did you ask her anything
22 generally about when she decided her hair
23 wasn't going to grow back?
24     A.  She reported that I kept
25 waiting for my hair to come back and it

Page 288

1  never came back like it did before and she
2  began to cry.  It does affect me.
3      I feel like wearing this when
4  she pointed to her turban, my headdress.
5  So I didn't get a specific date from her
6  as to when she felt her hair was never
7  going to grow back.
8      Sometime prior to my
9  evaluation and after her treatment.  And I
10 do recall in one of her depositions that
11 she mentioned a timeframe.  I think it was
12 2016 that she got information or her
13 brother saw a commercial about permanent
14 hair loss.
15     So she must have thought it
16 was permanent at that point in time, but I
17 didn't specifically question her about
18 that.
19     Q.  Well, was she more upset once
20 she learned that her hair was not going to
21 grow back?
22     A.  I think she was upset from the
23 time she lost her hair and that she
24 continued to be upset when her hair was
25 not growing back as rapidly as she

Page 289

1  expected because other people that she
2  knew or saw hair was growing back after
3  chemotherapy and hers was not.
4      Q.  Were there any changes in Ms.
5  Earnest's symptoms from the time she lost
6  her hair up until the time you interviewed
7  her?
8      A.  I think she's maintained that
9  it's been distressing to her and that it's
10 distressing to her when she particularly
11 goes shopping and as in Wal-Mart or a
12 store and a person asks her if she's in
13 cancer treatment.
14     And she says no, I'm not in
15 cancer treatment anymore.  I'm in
16 remission.  And that individual reveals to
17 her that they were in cancer treatment and
18 their hair grew back.
19     So she mentioned those
20 symptoms.  She mentioned having when she
21 looks in the mirror everyday, that's a
22 reminder that it's, you know, not going to
23 come back or that it's going to remain
24 sparse like it is.
25     So those are the continuing

73 (Pages 286 - 289)

1  symptoms that she's had.  Whether they
2  changed on the day she decided my hair is
3  never going to grow back or not, I don't
4  know that and I don't know that I have
5  that information.
6      Q.  Well, did you ask her if there
7  was any change in her symptoms when she
8  decided that her hair was not going to
9  grow back?
10     A.  I do not recall asking that
11  question.
12     Q.  Are you aware of any changes
13  in her reported symptoms from the time she
14  lost her hair up until the present date?
15     MR. EXNICIOS:
16         Objection to the form of the
17  question.
18     THE WITNESS:
19         No.  I think she's -- from what I
20  can tell, she's been pretty consistent
21  with the feelings that she has about no --
22  the way she looks now, that she doesn't
23  feel attractive or that she has -- she's
24  less attractive than she used to be prior.
25         But she's pretty -- I think she's

1  pretty tough about her symptoms.  She
2  doesn't really reveal a lot to her family
3  it seems like in the depositions that I
4  have reviewed, and she doesn't really --
5  she tries to protect them from what she's
6  experiencing.
7         So I think there is a lot of, on
8  her part anyway, kind of suffering in
9  silence.  And that's -- and it only comes
10  out when she has to talk about losing her
11  hair for the first time and also that her
12  hair has not come back.  At least that's
13  what I saw in my evaluation.
14  EXAMINATION BY MS. SCHULTZ:
15     Q.  And it's been over seven years
16  since she had her chemotherapy treatment
17  and lost her hair; correct?
18     A.  Yes.
19     Q.  And during that seven-year
20  period based on the medical records you've
21  reviewed so far, is there any statement in
22  any medical record regarding her being
23  distraught about her hair?
24     A.  I didn't see anything that
25  related to a psychiatric diagnosis like

1  anxiety or depression.  And, you know,
2  I've yet to review some of the medical
3  records.
4         But unlike Ms. Durden, I
5  didn't see any psychiatric diagnosis or
6  recommendation that she have a specific
7  type of therapy for that.
8      Q.  And I'm not referring to a
9  psychiatric diagnosis.  My question is:
10  In the medical records that you've
11  reviewed, have you seen any indication
12  that Ms. Earnest reported that she was
13  upset about her hair?
14     MR. EXNICIOS:
15         Objection to the form of the
16  question.
17     THE WITNESS:
18         Yeah.  I didn't see specific
19  references to see her being upset about
20  her hair, and I didn't see any referrals
21  to a dermatologist or somebody to address
22  the issues of her hair loss.
23  EXAMINATION BY MS. SCHULTZ:
24     Q.  Well, did you see any general
25  references to Ms. Earnest being upset

1  about her hair?
2      MR. EXNICIOS:
3         Objection to the form.
4      THE WITNESS:
5         No.  If I didn't see specific
6  ones, I don't think I saw general ones
7  either.
8  EXAMINATION BY MS. SCHULTZ:
9      Q.  And Ms. Earnest never sought
10  treatment for her hair loss; correct?
11     A.  She did not in the records
12  that I saw.
13     Q.  And to your knowledge, she
14  never asked for a referral to a
15  dermatologist for treatment of her hair
16  loss; correct?
17     A.  That's correct.
18     Q.  Now, you said a few minutes
19  ago that based on your review of
20  depositions she does not reveal a lot to
21  her family.  But as of the time you formed
22  your opinions and issued your report, you
23  had read no depositions of any family
24  members or friends of Ms. Earnest;
25  correct?

1  about not having hair, but it's more about
2  her peripheral neuropathy.  So she was
3  addressing that symptom.
4      Q.  So taking the sleep problems
5  and neuropathy out, the list of symptoms
6  you just stated, did you see those
7  reported by her to any of her physicians
8  in any of her medical records?
9      A.  I think you asked me that
10 question before --
11     MR. EXNICIOS:
12        Objection.
13     THE WITNESS:
14        And I said I did not.
15     MR. EXNICIOS:
16        Objection to form.
17 EXAMINATION BY MS. SCHULTZ:
18     Q.  Is the first time that Ms.
19 Earnest brought up her hair to a physician
20 after the time she filed her lawsuit in
21 this case?
22     A.  It may well be.  I don't
23 recall that specifically in the medical
24 record.
25     Q.  Did you talk with Ms. Earnest

1  about the activities she does participate
2  in, what types of things she does do
3  socially?
4      A.  Yeah.  She does -- I think she
5  does do social activities, and it sounds
6  like she primarily enjoys spending time
7  with her grand kids.
8          So her social activities in
9  that would have involved around helping to
10 take care of I believe Michael's son who
11 works offshore.
12         So she participates in those
13 activities and activities related to I'm
14 sure the child's school and such.  I don't
15 recall, you know, every specific instance
16 of activities.
17     Q.  Do you have any information as
18 to how her activities are different now
19 than they were prior to her cancer
20 diagnosis?
21     A.  I don't think that necessarily
22 the activities are different.  I think
23 what's again is that she's fighting
24 anxiety and depressive symptoms when she
25 gets reminders about her hair loss.  Those

1  are the symptoms that she reports
2  primarily to me or she did report.
3      Q.  Well, are the social things
4  that she does now any different than they
5  were before her cancer diagnosis; do you
6  know?
7      MR. EXNICIOS:
8         Objection to the form.
9      THE WITNESS:
10        Yeah.  No.  I didn't have her
11 actual social calendar before and after to
12 compare it, but it sounded to me like she
13 from what I read most recently in the
14 depositions that she does get out and do
15 things.
16        Her husband reported that as I
17 said before, that there have been times
18 where he asked her to go out to festivals
19 or whatever and she says I just don't want
20 to do it because I don't want to be out in
21 public.
22        So he reported some of that in
23 his deposition.  And there's some things I
24 think that she doesn't go to, but I don't
25 see it as a consistent pattern of she's

1  not going to all social activities because
2  of the symptoms.
3  EXAMINATION BY MS. SCHULTZ:
4      Q.  Well, are there any social
5  activities that she's not going to because
6  of her symptoms?
7      A.  I thought she mentioned to me
8  that if she had -- if there was a wedding
9  that was not a close friend, that she
10 might not go to the wedding or might not
11 go to the function because she either
12 didn't feel like she wanted to dress up
13 and wear the wig or she doesn't want
14 people to see her in the turban.
15     Q.  Can you think of any other
16 examples?
17     A.  I'll let you know if it pops
18 into my head.  It's a long day.  It's been
19 a long day.
20     Q.  It has been and so I apologize
21 if I've asked you this.  But is it correct
22 that she has not received any type of
23 counseling or treatment for her symptoms?
24     A.  No, she has not.  And I think
25 in her most recent deposition, she said

84 (Pages 330 - 333)

Page 358

1  from not getting enough sleep, you know,
2  she might not be as social. So that would
3  be one way it could contribute.
4      Q.  So is it correct that you
5  cannot rule out neuropathy as a factor in
6  her symptoms with respect to her social
7  functioning?
8      A.  No. I wouldn't rule it out.
9  I would say it probably contributes, but I
10  don't think it contributes as much.
11     Q.  What about the losses in her
12  life of her sister?
13     A.  I think the loss of her sister
14  was very important to her. Obviously she
15  had a time of bereavement when her sister
16  passed. And I mean, I recall she became
17  emotional when she talked about that as
18  well.
19         But I think there's enough
20  time that's passed to where she's gone
21  through the normal bereavement process and
22  she's processed that to the extent she
23  can.
24     Q.  To what extent has her age
25  impacted her social functioning?

Page 359

1      A.  I would say --
2      Q.  Do you know?
3      A.  -- the same answer as I had
4  before. As we age it gets more difficult
5  for us to do things. But I want you to
6  know that I'm 62 and I've been here for
7  like a long time so.
8      Q.  Did you talk with her about
9  whether or not her weight impacted her
10  social functioning?
11     A.  Yeah. That's improving though
12  overtime. So I think she's getting -- she
13  said that from one of the recent
14  depositions I read when her husband has
15  gastric bypass surgery she got on the same
16  diet he did.
17         And she got rid of rice and
18  breads and stuff like that and she's lost
19  45 pounds. So that's more of -- I think
20  that would be more of an improvement in
21  her mental health symptoms overtime.
22     Q.  That wasn't the case at the
23  time you interviewed Ms. Earnest; correct?
24     A.  I think she had --
25     Q.  Is that what she told you

Page 360

1  during her interview?
2      A.  No. I read that in her
3  deposition recently. I didn't put the
4  timeline to that, though. I would have to
5  look at the timeline to it.
6         But if her weight is improving
7  and she's getting healthier weight wise,
8  than that should be a positive for her.
9      Q.  But that's not something that
10  you asked her about; correct?
11     A.  No. I just saw that in the
12  deposition. I didn't realize that she had
13  lost 45 pounds. I think her husband told
14  me he had had a bypass.
15         I didn't write notes about it,
16  but I do recall him saying that he had it
17  done and that he was doing a lot better.
18  And that he talked to me about his diet
19  and that he had quit stuff and she was
20  dieting with him. But I don't know if she
21  had lost that much by then.
22     Q.  And what did you do to rule
23  out the fact that she has been diagnosed
24  with cancer and has a fear of cancer
25  returning --

Page 361

1      A.  I think that those --
2      Q.  -- in terms of its impact of
3  her social functioning?
4      A.  I think those -- I think
5  that's a contributing factor to emotional
6  symptoms and it has to be taken into
7  consideration. And but if you think
8  about, you know, that in relation to her
9  diagnosis, I mean, you know, seeing your
10  hair loss reminds you that you have
11  cancer.
12         When you don't -- when you
13  have a full head of hair, you can sort of
14  tuck that baby in the back burner and have
15  less fear. If everyday you wake up and
16  you see I look like a cancer patient, it
17  seems to me that contributes to that fear,
18  the concern about whether or not you're
19  going to get it again just because it
20  reminds you of what you were like when you
21  were in the throws of the treatment.
22     Q.  So it's your opinion that for
23  those individuals who have been through
24  chemotherapy and have had their grow back,
25  they can tuck cancer on the back burner?

91 (Pages 358 - 361)