# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)     **MDL NO. 2740**
PRODUCTS LIABILITY LITIGATION

               **SECTION "H" (5)**

THIS DOCUMENT RELATES TO:

Antoinette Durden, Case No. 2:16-cv-16635;
Tanya Francis, Case No. 2:16-cv-17410;
Barbara Earnest, Case No. 2:16-cv-17144

---

## MEMORANDUM IN SUPPORT OF SANOFI DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF DAVID MADIGAN, PhD

---

Plaintiffs loosely allege that the labeling for Taxotere was inadequate, suggesting that a labeling change both different and earlier than the 2015, FDA-approved change should have been made.  In an attempt to prove when Defendants should have provided a warning, Plaintiffs have disclosed a biostatistician, Dr. David Madigan, to offer the opinion that a "safety signal" existed for Taxotere and permanent alopecia "several years earlier" than 2015.[1]  As the basis for his opinion, Dr. Madigan conducted three separate analyses—none of which was conducted in a reliable manner, rendering his opinion inadmissible.

First, Dr. Madigan's FAERS analysis was unreliable.  Dr. Madigan merely identified the number of case reports in the FDA Adverse Event Reporting System (FAERS) with an "Outcome" of "disability or permanent damage" and that included the terms "alopecia" and "Taxotere" or

---

[1] This motion addresses Dr. Madigan's methodology and non-general causation opinions. Sanofi also seeks to preclude Dr. Madigan's testimony for the reasons identified in Defendants' Motion to Exclude General Causation Expert Opinions.

"docetaxel." Madigan Report at 11-12 ¶ 35 (Ex. A); Madigan Dep. 34:5–10 (Ex. B).  But Dr. Madigan's FAERS analysis is flawed, because the search criteria he used was overbroad; it failed to isolate the only injury relevant in this litigation—permanent, non-scarring alopecia following chemotherapy—and counted a number of plainly irrelevant cases.

Second, Dr. Madigan's keyword search across Sanofi's internal pharmacovigilance database has similar flaws.  His methodology consisted of identifying any case report that included an adverse event of "alopecia," and a term such as "permanent,"  "persistent," or "chronic." Madigan Report at 16–17 ¶ 42.  Dr. Madigan admitted his methodology used an overbroad search criteria that could include potential false hits, and Dr. Madigan admitted he did not review the underlying case reports to confirm their accuracy and rule out false hits.

Third, Dr. Madigan conducted a statistical analysis on the TAX316 and GEICAM9805/TAX301 clinical trials separately and combined them to do a "meta-analysis."  But Dr. Madigan based his analysis on unproven assumptions, rendering his methodology unreliable. Even without those assumptions, Dr. Madigan did not find statistical significance for either of the clinical trials independently, making this analysis unhelpful to the trier of fact.

Finally, besides being based on unreliable methodology, Dr. Madigan's overall opinion is unhelpful to the trier of fact because he is unable to pinpoint a date, or even a time period, that corresponds with his opinion that a safety signal emerged "several years earlier" than 2015. Madigan Report at 20 ¶ 54; Madigan Dep. 284:18–285:25.  See Fed. R. Evid. 401 and 702.  That matters here because the three Plaintiffs received Taxotere in 2009 and 2011. Dr. Madigan's testimony will leave the jury guessing whether "several years earlier" means 2010 or 2008, for example, or some other time.  Such vague testimony is not helpful to the trier of fact.

Dr. Madigan's testimony is inadmissible under Rule 702.

## FACTUAL BACKGROUND

David Madigan is a biostatistician.  He is not a medical doctor, an epidemiologist, or a dermatologist.  Madigan Dep. 53:14–20 (Ex. B); Madigan Report, Curriculum Vitae (Ex. A).  Dr. Madigan admitted he does not know:

- If there is a medical standard for diagnosing a patient with alopecia;

- The different types of alopecia; or

- The various causes of alopecia.

Madigan Dep. 53:21–55:2.  Dr. Madigan is not qualified to diagnose a patient with permanent alopecia or breast cancer.  *Id.* at 53:17–20.  As a result, in conducting all three of his analyses, Dr. Madigan did not, and could not, evaluate any of the underlying data (the case reports) to determine if each was a valid, medically accurate report of a patient who had permanent alopecia associated with chemotherapy.  *See id.* at 118:12–13 ("Why would I? I'm doing a statistical analysis here.").

Likewise, Dr. Madigan did not consult any of Plaintiffs' other expert witnesses or a medical doctor to make such an assessment.  Madigan Dep. 228:2–9.  Dr. Madigan, in fact, did not pull the underlying case reports that resulted from his key word searches, though he had the ability to do so and other experts in this litigation asked to see them.  *Id.* at 117:18–118:13 ("Q. Is your customized software capable of identifying manufacturer control numbers within reports in the FAERS system?  A. Capable of -- sure.").  *See also*, Kessler Dep. 159:18–20 (Ex. C) ("But I, specifically, asked for the underlying case reports in the FAERS database, and I didn't get them.").  Instead, Dr. Madigan chose to assume that all case reports resulting from his key word searches were actually tied to patients with permanent alopecia associated with chemotherapy.

Case reports and spontaneous adverse event reports are located at the bottom of the scientific hierarchy.  A case report describes an individual incident or episode, usually keyed to a

specific user.  *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.* (No. II), 341 F. Supp. 3d 213, 228 (S.D.N.Y. 2018).  Case reports from healthcare professionals and consumers are voluntary.  *Id.*  This kind of evidence is generally considered "hypothesis generating" and cannot provide a scientifically reliable basis on which to form a causation opinion.  *See* Pharmacoepidemiology 21-25 & Table 2.4 (Brian L. Strom ed., 4th ed. 2005) (noting that case reports and case series cannot be used for hypothesis testing).  Case reports are often confounded (*i.e.*, the case involves an adverse event that has possible etiologies other than the product of concern), are often missing information, may be subject to reporting or attribution bias, and lack any comparison group.  That is why FDA has concluded that "[f]or any individual case report, it is rarely possible to know with a high level of certainty whether the event was caused by the product."  FDA, Guidance for Industry: Good Pharmacovigilance Practices and Pharmacoepidemiology Assessment, at 7 (Mar. 2005).  Thus, it was improper for Dr. Madigan to leap from the statistical fact of case reports, which he did not then individually review, to the existence of a "safety signal."

Without confirming that any case report was valid or relevant, Dr. Madigan still purported to opine that a safety signal existed between Taxotere and permanent alopecia "several years earlier" than 2015.  Madigan Report at 20 ¶ 54.  A "safety signal" is "a concern about an excess of adverse events compared to what would be expected to be associated with a product's use."  FDA, Guidance for Industry: Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment, at 4 (2005) ("FDA Guidance").  The existence of a "safety signal" does not establish causation, nor does it establish that additional warnings were necessary.  *Terry v. McNeil-PPC, Inc.,* (*In re Tylenol (Acetaminophen) Mktg., Sales Practices, & Prods. Liab. Litig.*), No. 2:12-cv-07263, 2016 U.S. Dist. LEXIS 99177, at *9-10 (E.D. Pa. July 28, 2016).  Rather a "safety signal"

4

only indicates "the need for further investigation . . . to determine whether it represents a potential

safety risk and whether other action should be taken."  FDA Guidance at 4.  Other Plaintiffs'

experts, though, took Dr. Madigan's "say so" at face value and conducted no such investigation,

causality assessment, or analysis of whether additional warnings were necessary.  Making it worse,

Dr. Madigan is unable to specify when the safety signal allegedly emerged and when further

investigation was allegedly required.

## LEGAL STANDARD

Federal Rule of Evidence 702 controls the admission of expert testimony.  Under Rule 702,

the Court's gatekeeping function first involves determining whether the expert is *qualified*; then

it "involves a two-part inquiry into *reliability* and *relevance*":

> First, the Court must determine whether the proffered expert
> testimony is reliable. The party offering the testimony bears the
> burden of establishing its reliability by a preponderance of the
> evidence. The reliability inquiry requires the Court to assess whether
> the reasoning or methodology underlying the expert's testimony is
> valid. The aim is to exclude expert testimony based merely on
> subjective belief or unsupported speculation.
>
> Second, the Court must determine whether the expert's reasoning or
> methodology is relevant. The question here is whether the reasoning
> or methodology "fits" the facts of the case and will thereby assist
> the trier of fact to understand the evidence.

*Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 550 (E.D. La. 2015) (citations omitted) (emphases

added).

The "reliability analysis applies to *all aspects* of an expert's testimony," including "the

methodology, the *facts underlying the expert's opinion*, [and] the link between the facts and the

conclusion." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (emphasis

added).  Importantly, "the expert's testimony must be reliable at each and every step or else it is

inadmissible." *Id.*  These "exacting standards of reliability," *Weisgram v. Marley Co.*, 528 U.S.

440, 455 (2000), provide that "conjecture, hypothesis, subjective belief, or unsupported speculation are impermissible grounds on which to base an expert opinion." *Wehling v. Sandoz Pharm. Corp.*, No. 97-2212, 162 F.3d 1158, 1998 WL 546097, at \*5 (4th Cir. Aug. 20, 1998) (Table Decision).  Courts also consider whether the expert's findings are litigation-driven or results-driven.  *See Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (*Daubert II*).  In making this assessment, courts have considered "whether experts are 'proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.'" *Burst*, 120 F. Supp. 3d at 551 (quoting *Daubert II*, 43 F.3d at 1317)).  Defendants do not bear the burden of demonstrating its inadmissibility.  *See Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 534 (W.D. Pa. 2003).

On the relevance factor, the Court must determine whether the proffered expert testimony is sufficiently tied to the facts in issue that it will aid the jury.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993) (stating that the district court's "gatekeeping role" requires ensuring that the expert testimony "is relevant to the task at hand").  "The question here is whether the reasoning or methodology 'fits' the *facts of the case* and will thereby assist the trier of fact to understand the evidence." *Burst v. Shell Oil Co.*, 120 F. Supp. 3d at 551 (emphasis added).

## ARGUMENT

## I.    DR. MADIGAN'S STATISTICAL ANALYSIS OF THE FAERS AND SANOFI'S INTERNAL DATABASES IS IRRELEVANT AND UNRELIABLE.

Dr. Madigan's "analysis" on the FAERS and Sanofi's internal pharmacovigilance databases was based on a collection of case reports.  Aside from the known unreliability of case reports, here, Dr. Madigan had to create a process to gather the case reports he used for his

"analysis."  Dr. Madigan's case report selection process for both of these databases have *serious* methodology issues.

But courts regularly reject expert opinions based upon case reports.  *See Rhodes v. Bayer Healthcare Pharma., Inc.*, No. 10-cv-1695, 2013 WL 1289050, at *5 (W.D. La. Mar. 26, 2103) (the court excluded an expert's opinion based in part on case reports because they "do not demonstrate the requisite degree of reliability demanded by *Daubert*"); *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1250 (11th Cir. 2005) (finding case reports "reflect complaints called in by product consumers without any medical controls or scientific assessment" and such anecdotal information "lacks the indicia of scientific reliability"); *DeLuca v. Merrell Dow Pharms., Inc.*, 791 F. Supp. 1042, 1051 (D.N.J. 1992), *aff'd*, 6 F.3d 778 (3d Cir. 1993) (case reports "are not of a type of data that are reasonably relied upon by experts in the fields of epidemiology and public health to make a determination of the causal relationship"); *Wade-Greaux v. Whitehall Labs., Inc.*, 874 F. Supp. 1441, 1481 (D.V.I. 1994), *aff'd*, 46 F.3d 1120 (3d Cir. 1994), *for text, see* No. 94-7199, 1994 WL 16973481 (3d Cir. Dec. 15, 1994) (case reports "represent anecdotal information of chance associations, do not purport to assess cause and effect[,] have no epidemiological significance ... [,] have inherent biases as they are second or third hand reports, are affected by medical or mass media attention, and are subject to other distortions").  Because Dr. Madigan's opinions are based entirely on case reports, which are necessarily unreliable, his opinions do not satisfy the requirements of Rule 702 and should be excluded.  Dr. Madigan's opinions must also be excluded because his methodology was inherently unreliable.

### A.    Dr. Madigan's FAERS database examination was unreliable.

Dr. Madigan conducted an analysis of case reports in the FDA Adverse Event Reporting System ("FAERS") database collected from searches that he constructed with Plaintiffs' regulatory

expert, Dr. Kessler.  Madigan Report at 11 ¶ 34 (Ex. A); Madigan Dep. 33:13-34:25 (Ex. B).  The FAERS database is a spontaneous reporting system that consists of individual case reports from manufacturers, healthcare professionals, and consumers.  Madigan Report at 3 ¶ 10.  Dr. Madigan's assessment of the FAERS database is (1) based on case reports that he admits are not "terribly useful," and (2) riddled with methodological issues that require its exclusion.

The Fifth Circuit has made clear that a "trial court's inquiry into whether [Rule 703's] standard is satisfied … should focus on the reliability of the opinion *and its foundation*[.]"  *Soden v. Freightliner Corp.*, 714 F.2d 498, 502–03 (5th Cir. 1983) (citing *Bauman v. Centex Corp.*, 611 F.2d 1115, 1120 (5th Cir. 1980)) (emphasis added).  If an expert's underlying data is "not shown to be of a type reasonably relied upon by experts in his field," the court may exclude any opinion dependent on that data.  *Id.* at 503.  Even when reliably analyzed, spontaneous case reporting has known limitations.  Case reports often lack complete information and follow-up data, and there are risks that adverse events will be both under and over reported.  *See Rhodes,* 2013 WL 1289050 at *5; *McClain.*, 401 F.3d at 1250; *DeLuca.*, 791 F. Supp. at 1051; *Wade-Greaux*, 874 F. Supp. at 1481; *see also* Madigan Dep. 80:11–81:4.  Dr. Madigan, in fact, admitted that "individual case reports are not that terribly useful."  Madigan Dep. 273:6–7.

Despite these limitations, Dr. Madigan still rested his opinions on case reports located in the FAERS database.  More specifically, Dr. Madigan's methodology consisted of searching the FAERS database for case reports that included all three of the following: (1) "alopecia" as a listed adverse event; (2) "Taxotere" or "docetaxel" as one of the listed drugs; and (3) "disability or permanent damage" listed as an "Outcome."[2]  Madigan Dep. 34:5–10; 94:15–95:5; Madigan

---

[2]   The "Outcome" is a section of the form that tracks death, hospitalization, life-threatening, disability or permanent damage, congenital anomaly, and/or other serious outcome.  A case form does not require an outcome and "documenting one or more of these outcomes in a report

Report at 11-12 ¶ 35.  Dr. Madigan's search identified 31 case reports.  Madigan Report at App. 4.

While Dr. Madigan believes that his methodology "precisely" captured case reports of permanent alopecia associated with chemotherapy, he could not identify any literature or peer-reviewed publications confirming his methodology was reliable.  Madigan Dep. 36:18–37:5; 97:10–18; *see Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 379 (5th Cir. 2010) (factors the court should consider in assessing the reliability of the exponent's testimony include whether the expert's methodology is "generally accepted" in the scientific community and/or has been subjected to "peer review and publication"); *see also Burst v. Shell Oil Co*., 104 F. Supp. 3d 773, 777 (E.D. La. 2015).  When pressed on <u>why</u> he chose this particular methodology, Dr. Madigan responded that he and Dr. Kessler "didn't come up with a better one."  Madigan Dep. 159:3–9.  That is insufficient under Rule 702.

Indeed, it is clear that Dr. Madigan's methodology was not reliable, because it could not (and did not) exclude irrelevant data.  Dr. Madigan readily admits that an adverse event listed as "alopecia" does not distinguish between the multiple types of alopecia (*i.e.*, genetic or drug-induced hair loss, scarring versus non-scarring alopecia); the severity of alopecia (*i.e.*, 2% or 90% loss of hair); or the duration of alopecia (*i.e.*, hair loss that remained after six months versus hair that regrew).  Madigan Dep. 69:22–72:6; 38:6–10.  In other words, Dr. Madigan's chosen methodology could return case reports of scarring alopecia or alopecia that resolved.  But there is only one injury relevant in this litigation—permanent, non-scarring alopecia following

---

does not necessarily mean that the suspect product(s) named in the report was the cause of the outcomes."
https://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Surveillance/AdverseDrugEffects/default.htm (citing to Madigan Rpt., p. 3 fn.1).

chemotherapy—and Dr. Madigan's analysis failed to isolate it.  An analysis that "lumps" together all forms of a disease is "not generally accepted by the scientific community" as a means of assessing the relationship between a drug and the specific problem at issue in the lawsuit.  *Frischhertz v. SmithKline Beecham* Corp, No. 10-cv-2125, 2012 WL 6697124, at *5 (E.D. La. Dec. 21, 2012) (holding that the general causation expert's opinion was unreliable because she "lump[ed]" together all congenital malformations when only limb or heart defects were at issue); *In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 950, 964 (D. Minn. 2009) (excluding pharmacovigilance expert testimony on safety signals that was based on "adverse event reports for [the drug] for eye conditions other than [the one at issue in the litigation].").

Limitations with the database itself further compound these problems.  First, the "Outcome" field does not distinguish between "disability" and "permanent damage." Madigan Dep. 99:18–24.  Likewise, the case reports do not link the "Outcome" to any specific adverse event, and do not link either the "Outcome" or the adverse event to any specific drug.  Madigan Dep. 106:6–109:3.  While all three search criteria may have been present in an individual case report, because the search criteria are not linked *to each other* in any manner, the case report could have nothing to do with permanent alopecia following chemotherapy.  In other words, just because a case report listed "Taxotere" as a medication taken, listed "alopecia" as an adverse event, and had an "Outcome" of "disability or permanent damage" does not mean that the alopecia *was* the patient's disability or permanent damage or that the disability or damage was *linked* to Taxotere. Madigan Dep. 156:19–157:10.  For example, Dr. Madigan's methodology could include:

- A female patient who took Taxotere, has genetic alopecia, and has a learning disability would have hit on Dr. Madigan's search terms;

- A female patient who took Taxotere, has scarring alopecia, and who is disabled due to a genetic issue would hit on Dr. Madigan's search terms; and

> ▪ A male patient who took Taxotere, has male-pattern balding, and who suffered permanent damage in a house fire would have hit on Dr. Madigan's search terms.

Madigan Dep. at 112:16–113:7, 114:11–14, 159:15–160:17.

Perhaps Dr. Madigan could have minimized these methodological problems and database limitations had he taken the time to examine the underlying case reports that hit on his search terms. He did not. This choice was selective. Madigan Dep. 117:17–118:25; 131:5–7. While Dr. Madigan was capable of identifying FAERS case ID numbers and reviewing the underlying case reports, he chose not to do so. Madigan Dep. 117:18–118:13; 119:11–120:4. Dr. Madigan instead stated that Dr. Kessler could attest that the methodology used by Dr. Madigan was reliable. However, Dr. Kessler testified that the only way to ensure reliability was to analyze the underlying case reports, which Dr. Kessler also did not do. Kessler Dep. 159:18–20 (Ex. C) ("But I, specifically, asked for the underlying case reports in the FAERS database, and I didn't get them."); 157:18–19 ("We would have to look at those -- that -- those data tapes"). In other words, each expert left it to the other to do an individual case report review. The gravity of the present exercise commands more than a game of hide-the-ball, though.

Had Dr. Madigan examined the underlying case reports, he would have found multiple reports that hit on his search terms but that were not relevant to his analysis. Three examples, from *his* own search, shown to Dr. Madigan at his deposition, included:

> (1) a patient who took Taxotere for lung cancer treatment, developed alopecia *during* treatment, and died within three weeks after her last dose of chemotherapy;

> (2) a patient who *had* alopecia but was reporting that she "still suffered from disturbance of short term memory, dizziness, peripheral motor disturbance and feeling of numbness of hands and feet"; and

> (3) a patient who reported alopecia *during* treatment, and was now reporting other persisting events (including yellow fur on her tongue), however, alopecia was not reported as one of the persisting adverse events.

11

Madigan Dep. Ex. 16–18 (Ex. D).  When asked if he could justify his methodology in the face of these irrelevant case reports, Dr. Madigan stated, "[i]t doesn't support my way of determining. My way of determining is my way of determining.  And then these are the reports that – given the assumptions, it identifies [irrelevant] reports like this one."  Madigan Dep. 167:20–25.

Rule 702 does not permit a methodology that yields irrelevant and inconsistent results.  *See Burst v. Shell Oil Co.*, No. 14-cv-109, 2015 WL 3755953, at *13 (E.D. La. June 16, 2015), *aff'd,* 650 F. App'x 170 (5th Cir. 2016) (excluding expert's opinion because, inter alia, he "cherry-picks data from studies in several significant instances and fails to explain contrary results in a manner that belies the reliability of his methodology").  Dr. Madigan's analysis of the FAERS database must be excluded.  The case reports themselves are admittedly unreliable, and Dr. Madigan's methodology to locate them was unreliable in multiple respects.

**B.    Madigan's key word search across Sanofi's internal pharmacovigilance database was unreliable.**

Dr. Madigan's second analysis was of Sanofi's internal pharmacovigilance safety database.  This database is housed within Sanofi and is used to collect case reports of adverse events that the Company receives.  For this analysis, Dr. Madigan used a "PERL code," which is simply a key word search.  Madigan Report at 16–17 ¶ 42; App. 5.  To create the PERL code, Dr. Madigan relied upon Dr. Tosti, one of Plaintiffs' other experts, a dermatologist, to come up with search terms.  Madigan Report at 16–17 ¶ 42; Madigan Dep. 223:17-224:17.  Dr. Tosti, however, is not an expert in signal detection or statistical analyses.  *See* Tosti Dep. 491:15–24 (Ex. E) ("A. No, I'm not a statistician. I have no knowledge on that field.  Q. All right. And you haven't run any statistical analysis to consider whether the rate of persistent chemotherapy-induced alopecia is higher is an anthracycline and cyclophosphamide regimen versus a taxane-containing regimen, right?…A. This is not my expertise.").  In addition, Dr. Madigan has "no opinion" about whether

the search terms that he used are synonymous with permanent alopecia, or whether they were appropriate.  Madigan Dep. 224:10–17; 234:19–24.

Dr. Madigan's methodology consisted of identifying any case report that included an adverse event of "alopecia," and a term such as "permanent,"  "persistent," or "chronic."  Madigan Report at 16–17 ¶ 42.  Dr. Madigan acknowledged that the adverse event of "alopecia" would not distinguish between the different types, severity, or duration of alopecia.  Madigan Dep. 69:22–72:6.   Nor would the case reports evaluate when the alopecia existed in relation to the chemotherapy treatment.  *See e.g.*, Madigan Dep. 233:13–18 ("Q. If there is a report that says "still has no hair," that it was three weeks after chemo ended, would that be important to know?  A. I don't know.").

Further, if a report included an adverse event of "alopecia" and contained even *one* of the search terms—even if the search term was not related to the alopecia—Dr. Madigan would have counted the report in his Cumulative Report Table.  Madigan Report at 17 ¶ 43, Table 4.  This approach was over inclusive and yielded irrelevant results.  As Dr. Madigan testified:

> Q. So if there's a report with a higher-level term of alopecia and in the narrative, there's a comment that this individual's **headache is permanent**, that report would be counted as one of your 291 in Table 4?
>
> A. I suppose <u>that could happen</u>. I don't know.
>
> Q. If the report has a higher-level term of alopecia and the narrative describes the individual having **chronic back pain**, that report would be counted and included in your Table 4? …
>
> A. You know, I don't know if that ever happened.  <u>That could happen</u>.
>
> Q. The methodology you used to search wouldn't prevent that from happening?
>
> A. <u>That's true</u>.

Madigan Dep. 228:10–229:5 (emphasis added).   And while a false hit "could happen," Dr. Madigan, again, did not examine the underlying case reports to determine if the hit was accurate.

Madigan Dep. 228:2–9 ("Q. Did you or anyone look at any of the individual narratives to determine whether the search term actually described the alopecia?  A. I didn't. I just ran the analysis with - - you know, with these terms.").

If the foundational data underlying scientific opinion testimony is unreliable, the expert will not be permitted to base opinions on that data, because any opinion drawn from that data is likewise unreliable.  Fed. R. Evid. 702; *Soden*, 714 F.2d at 502–03; *Slaughter v. S. Talc Co.*, 919 F.2d 304, 307 (5th Cir. 1990) (holding that "bare conclusions derived from erroneous data" are inadmissible).  Dr. Madigan's analysis of Sanofi's internal safety database was inherently flawed and cannot support his "safety signal" opinion.

## II.   DR. MADIGAN'S ANALYSIS OF SANOFI'S CLINICAL TRIALS USED UNRELIABLE METHODOLOGY AND WILL NOT BE HELPFUL TO THE JURY.

Dr. Madigan's third analysis involved evaluating the TAX316 clinical trial and the GEICAM9805/TAX301 clinical trial ("TAX clinical trials").  Madigan Report at 2 ¶ 8 (Ex. A). But Dr. Madigan based his analysis on unproven assumptions, rendering his methodology unreliable.  Further, even without these assumptions, Dr. Madigan could **not** find statistical significance for either of the clinical trials independently—making this analysis unhelpful to the trier of fact.

### A.   Dr. Madigan's analysis of Sanofi's clinical trials is irrelevant.

Dr. Madigan's assessment of the TAX clinical trials to identify a "safety signal" is irrelevant to the question here because it is based on over-inclusive data.  Both TAX clinical trials examined two different treatment *regimens*, TAC (docetaxel in combination with doxorubicin and cyclophosphamide) versus FAC (5-fluorouracil in combination with doxorubicin and cyclophosphamide).  Madigan Report at 18–19 ¶¶ 47–48.  Dr. Madigan admitted that TAC is not

Taxotere alone, Madigan Dep. 305:21–23 (Ex. B); however, he did not rule out doxorubicin or cyclophosphamide in his analysis.   Madigan Dep. 284:4–12 ("Q. You can't rule out other chemotherapies as causes of irreversible alopecia? … A. I can't rule out -- I do not know, one way or another, whether other chemotherapy agents cause irreversible alopecia."). *See Burst*, 2015 WL 3755953, at *7 (quoting *LeBlanc v. Chevron USA, Inc.*, 396 F. App'x 94, 99 (5th Cir. 2010)) ("[A] study that notes 'that the subjects were exposed to a range of substances and then nonspecifically note[s] increases in disease incidence' can be disregarded.").

Further, the TAX clinical trials looked only at "ongoing" (not permanent) alopecia, as Dr. Madigan admitted.  Madigan Dep. 247:20–24.  Although there is no medically-accepted definition of permanent alopecia (*see* MedDRA Dictionary (the term "irreversible alopecia" does not exist)), if hair regrows, alopecia necessarily is not permanent.  Madigan Dep. 38:11–20.  The TAX clinical trial participants have not been seen for follow-up since January 2010, and it is unknown whether any have experienced hair regrowth since the study ended.  Madigan Report at 18 ¶ 47.  Evidence that a participant had ongoing alopecia at a specific point in time, without further follow-up or when hair regrew by the time of further follow-up, is not evidence of permanence.

In analyzing the clinical trial data, Dr. Madigan did not look at any of the individual records from the clinical trials.  Madigan Dep. 249:5–15.  Rather, he relied on the internal coding of "on-going alopecia" and equated it to permanent alopecia.  Because there was no specific diagnosis for "permanent/irreversible alopecia" in the clinical trials, however, Dr. Madigan counted all cases where "alopecia started on treatment, continued into follow-up, and, for the last occurrence in follow-up, had neither an end date nor was marked 'ceased.'"   Madigan Report at 11 ¶ 33.

Therefore, his analysis included patients who dropped out of the clinical trial, were lost to follow-up, or died.[3]  *See* Victoria Report at 49–50 (Ex. F).

Dr. Madigan acknowledges that he was not actually looking for a diagnosis of permanent alopecia but was solely looking at whether alopecia in general was reported at different points in time.  Madigan Dep. 247:15–248:25.  Dr. Madigan's analysis is irrelevant to permanence.  *See* Wei Report at 23 ¶ 54 (Ex. G) (Dr. Madigan's analysis is not relevant to permanence).

Dr. Madigan's analysis of the TAX clinical trials is irrelevant to the question he asked – when did a safety signal regarding permanent alopecia and Taxotere emerge?  His analysis was over-inclusive, did not isolate Taxotere, did not assess permanence, and should be excluded.

**B.**      **Dr. Madigan's analysis of the individual clinical trials did not result in statistical significance, thus is unhelpful to the jury and will unfairly prejudice Sanofi.**

Dr. Madigan "perform[ed] a statistical analysis comparing the adverse event rate for irreversible alopecia in the TAC versus FAC arms from the TAX 316 and [GEICAM9805/]TAX301 clinical trials as well as meta-analysis combining the studies."  Madigan Report at 2 ¶ 8.  This analysis **did not result in a statistically significant difference** between the two regimen arms for *either* of the TAX clinical trials.  Madigan Report at 19–20, Table 5.  This is insufficient.

Statistical significance is only satisfied if the results of a study are expressed with a 95% confidence interval when using a p-value of 0.05.  *Burst*, 2015 WL 3755953, at *6.  The Fifth

---

[3]    This concern is amplified, here, where Sanofi conservatively counted all cases of unresolved alopecia, even counting patients with unresolved alopecia who died, were lost to follow up, or began other chemotherapy treatment within 6 months after completing study chemotherapy treatment.   Counting the number of cases of "permanent" alopecia from the TAX316 "ongoing" data is not so simple as looking to whether there was an end date or "ceased" marked, because "ongoing" does not necessarily mean "persistent" or "permanent" at 10 years. Dr. Madigan did not do this due diligence.

Circuit has cautioned District Courts to be "vigilant in scrutinizing the ... statistical significance of studies." *Brock v. Merrell Dow Pharmaceuticals, Inc.*, 874 F.2d 307 (5th Cir.), *modified on reh'g*, 884 F.2d 166, 167 (5th Cir. 1989), cert. denied, 494 U.S. 1046 (1990) (the Fifth Circuit reversed a jury verdict for plaintiff's due to their "failure to present statistically significant epidemiological proof."). *See also, Allen v. Pennsylvania Engineering Corp.*, 102 F.3d 194, 195 (5th Cir. 1996) (Fifth Circuit affirmed summary judgment when "no epidemiological study ha[d] found a statistically significant link" between an exposure and the plaintiff's condition."); *In re Norplant Contraceptive Prod. Liab. Litig.*, 215 F. Supp. 2d 795, 831 (E.D. Tex. 2002) (citation omitted) ("epidemiological data that is not "statistically significant" cannot provide a scientific basis for an opinion on causation."); *Soldo,* 244 F. Supp. 2d at 455 ("study ... results [we]re not statistically significant and may not be used in a scientifically valid manner to support an expert's opinion."). Dr. Madigan's opinions do not meet this standard.

Dr. Madigan's analysis did not result in a statistically significant difference between the two regimen arms for *either* of the TAX clinical trials when using a p-value of 0.05. Madigan Report at 19–20, Table 5. Dr. Madigan admitted that the results were "***not statistically very impressive.***" Madigan Dep. 256:14–15 (emphasis added). While Dr. Madigan stated several times that a p-value of 0.05 is arbitrary, he also testified "the standard conventional thing is .05." Madigan Dep. 266:18–19. *See* Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 357–58 (3d ed. 2011) ("The most common significance level, or alpha, used in science is .05. A .05 value means that the probability is 5% of observing an association at least as large as that found in the study when in truth there is no association.").

Dr. Madigan's statistically insignificant findings will confuse and mislead the jury and must be excluded. Similar opinions by Dr. Madigan have been excluded in other litigations for

the same reason. *See In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 299 F. Supp. 3d 1291, 1367 (N.D. Fla. 2018) (excluding Dr. Madigan's "statistically insignificant findings from the clinical trials, and also his characterization of those findings as a trend" because "the statistically insignificant data undoubtedly will tend to confuse the issues and mislead the jury"); *see also Soldo,* 244 F. Supp. 2d at 455 ("In addition, such evidence would undoubtedly tend to confuse the issues and mislead the jury, and NPC would be unfairly prejudiced. Therefore, even if relevant, the evidence of non-statistically-significant epidemiologic studies must be excluded."). Dr. Madigan tried to avoid that result here by conducting a "meta-analysis"—a greywashed term meaning that he combined two statistically ***insignificant*** results to try to achieve statistical significance. Madigan Report at 20 ¶ 53. Courts have held that meta-analyses are admissible, but only when used to reduce the numerical instability on existing *statistically significant* differences, not as a means to achieve statistical significance where it does not exist. RMSE at 361–362, fn76.

Further, to conduct this "meta-analysis," Dr. Madigan used the GEICAM9805/TAX301 data. However, he also testified that GEICAM9805/TAX301 "failed to explicitly capture either the continuation of alopecia into the follow-up phase or alopecia resolution for the majority of patients." Madigan Report at 19 ¶ 50; Madigan Dep. 254:23–255:11. *See also*, Plunkett Dep. 278:7-13 (Ex. H) ("But certainly I -- I don't believe that you would use the number from GEICAM, with such a significant problem with reporting or -- or -- or lack of reporting at the ten-year follow-up, to indicate that that number you have is a true reflection of the percentage of permanent alopecia."). Thus, Dr. Madigan is relying on the same data that he, and other Plaintiffs' experts, criticize. Where an expert "violates his own standard of proper methodology," it suggests that the expert "does not apply the same rigor in the courtroom that he would apply to his [scientific] endeavors." *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 563 (S.D.N.Y. 2004); s*ee also*

*E.R. Squibb & Sons, Inc. v. Stuart Pharms.*, No. 90-cv-1178, 1990 WL 159909, at *15 (D.N.J. Oct. 16, 1990) (acknowledging the utility of meta-analysis but rejecting its use in that case because one of the two studies included was poorly performed).  If Dr. Madigan does not believe this is reliable data, how can he present this to a jury?

Dr. Madigan certainly cannot pool what he deems to be unreliable data to achieve the outcome-determinative conclusion that the TAX316 data alone could not justify, which is a separate basis for exclusion.  *Burst*, 120 F. Supp. 3d at  551 (assessing whether a method is reliable or impermissibly litigation-driven, the court looked at "whether the expert 'is being as careful as he would be in his regular professional work outside his paid litigation consulting'").  Dr. Madigan's meta-analysis must be excluded because he is "an expert on a mission" and his "opinions aren't 'methodology based,' but rather conclusion driven."  *In re Accutane Litig.*, 2015 WL 753674, at *19 (N.J. Super. L. Feb. 20, 2015), *aff'd*, 234 N.J. 340, 191 A.3d 560 (N.J., Aug. 1, 2018).  Dr. Madigan's opinions on the clinical trial results must be excluded.

## III.   DR. MADIGAN'S OPINION THAT A SAFETY SIGNAL EXISTED "SEVERAL YEARS EARLIER" IS VAGUE AND UNHELPFUL TO THE TRIER OF FACT.

Dr. Madigan's opinion that a safety signal between Taxotere and permanent alopecia was available to Sanofi "several years earlier" is vague and leaves the jury to stand in the expert's shoes.  Madigan Report at 20 ¶ 54 (Ex. A).  *See U.S. v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004) (citing *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985)) ("Because of the powerful and potentially misleading effect of expert evidence …expert opinions…may still be excluded…if the probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury, or if the expert testimony is cumulative or needlessly time consuming."); *Twin Cities Bakery Workers Health & Welfare Fund v. Biovail Corp.*, No. 01-2197, 2005 U.S. Dist. LEXIS 5570, at *11–12 (D. D.C. Mar. 31, 2005) (citing Fed. R. Evid. 702,

703) ("The court found that the expert testimony was not "sufficiently reliable to 'assist the trier of fact to understand the evidence or to determine a fact in issue,' and that in any event their value is substantially outweighed by the danger of unfair prejudice or misleading the jury."); *Daubert*, 509 U.S. at 595 ("Rule 403 permits the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury"" because "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it") (internal citations omitted).

Dr. Madigan was unable to pinpoint a date, or even identify a time period, when the alleged "safety signal" emerged.  Dr. Madigan could not clarify this at his deposition:  "Q. What does several mean?  A. Sometime in the 2000s, you know, potentially early 2000s."  Madigan Dep. 285:1–3 (Ex. B). *See also* Madigan Report at 20 ¶ 54 ("…was available to Sanofi **several years earlier**.") (emphasis added).  Dr. Madigan cannot specifically or reliably tell the jury the most essential detail of his opinion.  If it were true that a safety signal for permanent alopecia with Taxotere had emerged, Dr. Madigan would be able to say when.  The fact that he cannot, or will not, undermines the notion that a safety signal ever existed.  Transparently too, this failing underscores the litigation-driven nature of his opinion, namely, that Dr. Madigan cannot and will not point to a moment in time lest it eliminate liability in the many cases across the MDL with much earlier treatment periods than the three presented here.  Dr. Madigan's vague opinion should be excluded as it will only confuse the jury.

## CONCLUSION

For the foregoing reasons, Sanofi respectfully requests the Court grant this Motion and exclude Dr. Madigan's testimony that a "safety signal" between Taxotere and permanent/irreversible alopecia emerged "several years earlier" than 2015, as well as any

testimony concerning the bases for that opinion, namely Dr. Madigan's three unreliable analyses of the FAERS database, Sanofi's internal pharmacovigilance database, and Sanofi's clinical trials.

 Date:  February 8, 2019

                                        Respectfully submitted,

                                         /s/ Douglas J. Moore
                                        Douglas J. Moore (Bar No. 27706)
                                        **IRWIN FRITCHIE  URQUHART & MOORE LLC**
                                        400 Poydras Street, Suite 2700
                                        New Orleans, LA  70130
                                        Telephone: 504-310-2100
                                        Facsimile:  504-310-2120
                                        dmoore@irwinllc.com

                                        Harley Ratliff
                                        Adrienne L. Byard
                                        **SHOOK, HARDY& BACON L.L.P.**
                                        2555 Grand Boulevard
                                        Kansas City, Missouri 64108
                                        Telephone: 816-474-6550
                                        Facsimile:  816-421-5547
                                        hratliff@shb.com
                                         abyard@shb.com

                                        *Counsel for Sanofi-Aventis U.S. LLC and Sanofi*
                                        *U.S. Services Inc.*

## CERTIFICATE OF SERVICE

        I hereby certify that on February 8, 2019, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

                                        /s/ Douglas J. Moore

21