# EXHIBIT B

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4                         MDL NO.: 2740

                         SECTION: H

5

6      IN RE: TAXOTERE (DOCETAXEL)

       PRODUCTS LIABILITY LITIGATION

7

8      This Document Relates To:

       Antoinette Durden, Case No. 2:16-cv-16635;

9      Tanya Francis, Case No. 2:16-cv-17410;

       Barbara Earnest, Case No. 2:16-cv-17144.

10     _____/

11

12                    December 7, 2018

                      8:13 a.m.

13

14

15          VIDEOTAPED DEPOSITION of DAVID MADIGAN, PHD,

16     held at the offices of Napoli Shkolnik PLLC, located

17     at 360 Lexington Avenue, New York, New York 10017,

18     before Anthony Giarro, a Registered Professional

19     Reporter, a Certified Realtime Reporter and a Notary

20     Public of the State of New York.

21

22

23

24

25     Job No. NJ3151484

1     A     I believe I have.  And
2  they're the programs that I've provided.
3     Q     The programs, which search
4  the databases, but in terms of any
5  images, printouts, documents where we can
6  look at the results of the searches, you
7  have none of that information; correct?
8     A     I mean -- so in terms of
9  FAERS, Appendix 4 is that output.  In
10  terms of -- in terms of Table 5, I
11  believe it is -- in terms of Table 4, I
12  beg your pardon, this is what the program
13  produces, these counts.  So I just took
14  the counts and put them into this
15  document.
16     Q     Table 4 is from your PERL
17  analysis?
18     A     That's right, yeah.  So
19  there are no documents.  Everything that
20  exists that is responsive to this
21  request, I believe I have provided.
22     Q     Exhibit 2 is the report for
23  the plaintiffs you created in this
24  litigation; correct?
25     A     Correct.

1     Q     Exhibit 2 contains all the
2  opinions you plan to offer in this case;
3  true?
4     A     Yes, unless I'm asked to,
5  you know, address further questions.
6     Q     Your report, Exhibit 2, also
7  contains all the bases for each opinion
8  you plan to offer in this case; correct?
9        MR. MICELI:  Object to the
10     form.
11     A     Yeah.  In addition, the
12  programs, I suppose, provides some of the
13  bases.
14     Q     So if we combine the text of
15  Exhibit 2 and the programs that you've
16  provided, that is the entirety of all the
17  bases for your opinions you plan to offer
18  in this case?
19        MR. MICELI:  I'm going to
20     object to the form only because you
21     have a very thick CV in front of you
22     as well.
23     A     The papers I cite, published
24  literature is part of the basis as well.
25  I'm not trying to be picky with you.

1     Q     No.  I understand.
2     A     The document you have in
3  front of you, Exhibit 2, it's the
4  programs that I prepared to perform the
5  analysis.  And it's the various documents
6  that I cite to that I rely on.
7     Q     Setting aside the
8  plaintiffs' counsel, did anybody assist
9  you in any way in creating your report?
10     A     No.
11     Q     Setting aside plaintiffs'
12  counsel, did anybody assist you in any
13  way in performing any of the work that
14  led to your opinions in this case?
15     A     No.  Other than there are
16  other experts involved with the case that
17  I'm relying on to some extent, I
18  presumably talk about that.  They didn't
19  assist me.  Is that how you phrased the
20  question?
21     Q     Yes.
22        What other experts in this
23  case are you relying on?
24     A     So Drs. Feigal --
25     Q     Sorry.  Let me just

1  interrupt you.
2        You specifically referenced
3  some other experts in your report?
4     A     That's right.
5     Q     Dr. Feigal, Dr. Tosti.  Are
6  those the two?
7     A     Dr. Feigal, Dr. Plunkett,
8  Dr. Tosti and Dr. Kessler.
9     Q     For what do you rely on
10  Dr. Kessler's opinions?
11     A     So in my analysis of the
12  FAERS database --
13     Q     And do you reference
14  Dr. Kessler in your report?
15     A     No.  I noticed this
16  yesterday.  His name is not in here.  It
17  ought to be.  So I, through counsel,
18  asked Dr. Kessler if it was appropriate
19  to use --
20     Q     What page are you on?
21     A     Sorry.  I beg your pardon.
22  Page 11, paragraph 35.  Let me back up.
23  So in my FAERS analysis, I used an
24  endpoint which is -- it's the MedDRA
25  higher-level term alopecias.  So I did

9 (Pages 30 - 33)

1  ask, said through counsel to Dr. Kessler
2  if he thinks this is the right endpoint,
3  an appropriate endpoint.  And he said it
4  was.
5          And then I further focus on
6  alopecias with an outcome of, quote,
7  disability or permanent damage.  I'm
8  still in paragraph 35.  And I also asked
9  if he -- in his opinion, this was the
10  correct thing to do.  And he said it was.
11      Q     Did you come up with those
12  approaches by yourself and then run them
13  by Dr. Kessler or did you ask Dr. Kessler
14  what approach to take?
15      A     So in terms of using the
16  higher-level term, that's what Sanofi
17  used in their internal report.  So that's
18  why I used it.  But I just sort of
19  doublechecked with Dr. Kessler.
20          On the restriction -- the
21  focus on the outcome of disability or
22  permanent damage, I'm very familiar with
23  FAERS.  That seemed exactly the right
24  thing to do.  But I just doublechecked
25  with Dr. Kessler.

1      Q     So in your opinion, you
2  thought the right search to do was to
3  combine a higher-level term of alopecias,
4  plus the outcome of disability or
5  permanent damage?
6      A     Yup.
7      Q     And then after you came up
8  with that approach, you asked Dr. Kessler
9  if he thought it was appropriate?
10      A     Yup.  That's fair enough,
11  yes.
12      Q     And he agreed?
13      A     Yes.
14      Q     How many conversations did
15  you have with Dr. Kessler?
16      A     None.
17      Q     Was all the information you
18  just described from Dr. Kessler obtained
19  through plaintiffs' counsel?
20      A     Yeah.  Please ask
21  Dr. Kessler the following question.  And
22  then a response goes back.
23      Q     Do you know Dr. Kessler?
24      A     I've never actually met him.
25  I've spoken to him on the phone, not in

1  this case.  But in the years gone by,
2  I've spoken to him.
3      Q     How did you know he was
4  involved in this case?
5      A     I presume counsel told me.
6      Q     You said you asked
7  Dr. Kessler whether he thinks this is an
8  appropriate endpoint; right?
9      A     Yes.
10      Q     Appropriate endpoint for
11  what?
12      A     For my analysis in this
13  case?  I'm not sure --
14      Q     Well, you said that you
15  had --
16      A     Actually, let me --
17      Q     Please.
18      A     My report is about docetaxel
19  and taxotere and irreversible alopecia.
20  So if I'm going to study that and do
21  analysis in whatever it is, FAERS in this
22  case, you know, I need to use an
23  endpoint.  The company had used
24  alopecias.
25          So on the face of it, seems

1  like a very reasonable thing to do.  But,
2  of course, in this case, I wanted to
3  focus on irreversible alopecia so there
4  is an outcome, you know, on the MedWatch
5  form which is precisely that.
6      Q     There's no outcome on the
7  MedWatch that is, quote, slightly
8  irreversible alopecia, unquote?
9      A     No.  But it indicates
10  permanency.
11      Q     Disability or permanency;
12  correct?
13      A     Yes.
14      Q     You've just raised the issue
15  of irreversible alopecia.  Obviously,
16  it's in the title of your report.
17          What is irreversible
18  alopecia?
19          MR. MICELI:  Object to the
20      form.
21      A     So it's alopecia, which is
22  hair loss --
23      Q     Let me rephrase the
24  question.
25          For purposes of your

Page 38

1  analysis, what is irreversible alopecia?
2     A     It's alopecia that has not
3  resolved.
4     Q     Is that it?
5     A     Yeah.
6     Q     Is there any durational
7  component to that?
8     A     Not necessarily.  I mean
9  it's -- it's permanent alopecia.  It's
10  alopecia that's not going away.
11     Q     If a patient has alopecia
12  that does go away, then by definition, it
13  is not irreversible; correct?
14          MR. MICELI:  Object to the
15      form.
16     A     I mean if it's later -- I'm
17  not going to disagree with you.  But if
18  it's later reversed, then evidently, it
19  was not irreversible.  Is that what you
20  literally mean?
21     Q     Yes.  Fairly obvious.
22          If the patient experienced
23  alopecia and at some point, whenever that
24  point is, regrows hair, the alopecia was
25  neither irreversible, nor permanent;

Page 39

1  true?
2          MR. MICELI:  Object to the
3      form.
4     A     I'm aware that in some
5  contexts, people do put a time frame on
6  it, you know; and it's, for example, 12
7  months or 24 months, you know, since the
8  hair was lost, people consider that
9  permanent.  I don't have an opinion on
10  this.  Dr. Tosti will certainly be the
11  right person to ask.
12     Q     But for purposes of your
13  analysis, if someone had alopecia and the
14  alopecia lasted 12 months or 24 months
15  and then at 36 months the person regrew a
16  full head of hair and in hindsight, you'd
17  agree that was not irreversible alopecia;
18  correct?
19     A     At that later time point, if
20  the person has hair on their head, on
21  their body, I presume not; for example,
22  in the context of FAERS, you know, it is
23  reported as -- you know, what I'm focused
24  on is adverse events of alopecia where it
25  is tagged as, you know, disability or

Page 40

1  permanent damage.  So if you will, it's
2  self-reported or a physician reported as
3  permanent.
4     Q     We'll come back and talk in
5  more detail about that in a little bit.
6  But I do appreciate the clarification.
7          You gave us a Reliance list
8  as part of your report.  You may have
9  gave us an updated one, I think.  It has
10  not changed?
11     A     No, it has not changed.
12     Q     I just want to make sure.
13          You have not relied on any
14  materials for your work in this case that
15  are not included on that list?
16     A     I have not.
17     Q     As part of your work in the
18  case --
19     A     Actually, that was too
20  quick.  I suppose other than my
21  background knowledge and things I've
22  learned over the years.
23     Q     Statistics 101, you would
24  not have on your Reliance list?
25     A     Correct.

Page 41

1     Q     Do you even teach that
2  anymore?
3     A     I do sometimes, yeah.
4     Q     As part of your work on this
5  case, did you review any materials that
6  are not on the list?
7     A     As part of my work in this
8  case, no, I don't believe so.
9     Q     Do you understand the
10  distinction I'm drawing?
11     A     Yes.
12     Q     You reviewed but did not
13  rely on them?
14     A     Yes.
15     Q     And there were no such
16  materials?
17     A     That's correct.
18     Q     Your first time entry on the
19  case is January 6th, 2018?
20     A     Yup.
21     Q     Do you know when you were
22  first contacted about this case?
23     A     Not exactly.  But a week or
24  two before that.
25     Q     Other than things you

11 (Pages 38 - 41)

Page 50

1  seeing anything.
2      Q      Correct me if I'm wrong, I
3  assume you're not offering any opinions
4  that are specific to the plaintiffs in
5  these cases, are you?
6      A      I am not.
7      Q      You provided us with a prior
8  testimony list, and you have updated it
9  today.
10         All the cases on that list,
11  you also reference a number of them in
12  your CV where you served as a consultant
13  in litigation; correct?
14      A      Yes.  I hope the list in the
15  CV is complete.
16      Q      If it's not, Exhibit 4 is
17  your most current list?
18      A      That's right.
19      Q      Are all of those cases ones
20  where you were hired by plaintiffs'
21  counsel?
22      A      Most of them.  There's one
23  case which I could identify.
24      Q      Sure.
25      A      So there's one case, it's

Page 51

1  the Gilenya patent litigation, where I
2  was hired by the defense.
3      Q      That was in 2016?
4      A      Okay, yup.
5      Q      Is that case still ongoing?
6      A      No.  I don't believe so.  I
7  think it settled or it's over.
8      Q      Your work is done?
9      A      I believe so, yes.
10      Q      How much money have you been
11  paid in total for your work as an expert
12  in litigation?
13      A      I have no idea.
14      Q      Do you have a guesstimate?
15         MR. MICELI:  Object to the
16  form.
17      A      No.  It's not something I
18  ever thought about.
19      Q      More than a million dollars?
20      A      It's 12 or 13 years or
21  something like that.  I'd say roundabout,
22  a million would be a reasonable ballpark
23  estimate.
24      Q      Are you currently doing any
25  work with or for FDA?

Page 52

1      A      So I'm involved with -- back
2  up a little bit.  So my major research
3  focus for the last couple of years is
4  called OHDSI.  And in that context,
5  there's a lot of FDA involvement.  And in
6  particular, OHDSI has a contract with the
7  FDA to do certain work.  I'm not -- I'm
8  not very involved with that.  But I'm
9  peripherally involved with it.
10      Q      Does that have anything to
11  do with alopecia or chemotherapy?
12      A      No.
13      Q      Have you ever done any work
14  with or for -- you've never worked for
15  the FDA -- correct? -- as an employee?
16      A      In any kind of common sense
17  way, no.  But for a period of time, I was
18  what's called a special government
19  employee.  So when you serve on -- as a
20  consultant or on advisory committees to
21  the FDA, which I have done over the
22  years, they appoint you as a special
23  government employee.  So in some
24  technical sense, the answer is, yes, I
25  was an employee but not really.

Page 53

1      Q      You're not currently an
2  advisor on anything related to the FDA;
3  correct?
4      A      Other than this work on the
5  BEST contract.
6      Q      An acronym also related to
7  the OHDSI?
8      A      Yeah.
9      Q      A few more background
10  questions.  Then we'll get to what I
11  think you really want to talk about
12  today.
13      A      Okay.
14      Q      Dr. Madigan, obviously,
15  you're a Ph.D.?
16      A      Correct.
17      Q      You're not qualified to
18  medically diagnose a patient with
19  alopecia; correct?
20      A      I am not.
21      Q      Do you know if there's a
22  medical standard for diagnosing a patient
23  with alopecia?
24      A      No.
25      Q      Do you consider yourself an

14 (Pages 50 - 53)

1   expert on the different kinds of
2   alopecia?
3       A       No.
4       Q       Do you know if there are
5   different kinds of alopecia?
6       A       No, I don't.
7       Q       Do you know if there are
8   different grades or severities of
9   alopecia?
10      A       That, I had seen reference
11  to. I'm not an expert in this.
12      Q       Do you know what the grades
13  are?
14      A       Actually, some of the things
15  I saw were kind of confusing to me. I
16  had understood it was Grades 1, 2, 3 and
17  4. But I did see a document that says
18  it's only Grades 1 and 2 for alopecia.
19  So I'm actually a little confused on that
20  point.
21      Q       Not something you consider
22  within your area of expertise?
23      A       That's correct.
24      Q       You don't hold yourself out
25  as an expert in the various possible

1   causes of alopecia; correct?
2       A       I do not.
3       Q       Or any kind of hair loss for
4   that matter?
5       A       Correct. Correct, I do not,
6   yes.
7       Q       Have you ever designed or
8   been involved in a clinical study where
9   the endpoint was alopecia?
10      A       No.
11      Q       Have you ever designed a
12  clinical study at all?
13      A       Yes.
14      Q       How many times?
15      A       Depends on how you define
16  clinical study. So I've been involved in
17  the design -- if you want to restrict it
18  to randomized control trials, three or
19  four over the years. How did you say? A
20  clinical study was the term you used?
21      Q       Yes.
22      A       If you cast the net more
23  broadly, it's dozens.
24      Q       What would that include?
25  Just give me an example.

1       A       Observational studies.
2       Q       Had you ever advised the
3   pharmacovigilance department of any
4   company on any issues related to
5   alopecia?
6       A       Alopecia specifically, no.
7       Q       Have you ever been hired to
8   do any kind of work for Sanofi?
9       A       Yes.
10      Q       What context?
11      A       I'll give you my best
12  recollection. I can't swear this is what
13  it is. I think I did a short course at
14  Sanofi about ten years ago.
15      Q       What do you mean a short
16  course?
17      A       I taught a course on
18  pharmacovigilance.
19      Q       About ten years ago, so
20  approximately 2008? You want your CV?
21      A       Yes, please. You know what,
22  this list, it's not here on my CV because
23  at some point, I -- this list became
24  very, very long.
25      Q       You're on page 30 of

1   Exhibit 3?
2       A       Correct. So I just -- I
3   only list the ones like in the last seven
4   or eight years. So therefore, I can't
5   pinpoint the date. But, yeah, 2008 or
6   something like that is about right.
7       Q       Where did you teach -- where
8   do you think you taught that short
9   course?
10      A       Bridgewater.
11      Q       Who is your contact person
12  at Sanofi?
13      A       You know what, I can get it
14  for you at a break. I can't remember off
15  the top of my head. Hui-Kuan.
16      Q       And you said it was a short
17  course in pharmacovigilance?
18      A       That's my memory.
19      Q       What is a short course?
20      A       Like a half-day course to
21  their pharmacovigilance folks or a day.
22  I don't remember exactly. But something
23  like that, not a month or something; just
24  a brief.
25      Q       Did you get paid for this?

Page 66

1   A    Yes, as far as I looked at
2 other strands of evidence that have a
3 bearing on this safety question.
4   Q    Which other strands of
5 evidence would you say fit into that
6 second category of signal evaluation?
7   A    They all do. I mean, you
8 know, my entire analysis is evaluating a
9 signal.
10   Q    There's a difference,
11 though, between identifying that a signal
12 exists -- correct? -- and then looking at
13 whether the signal is a positive signal;
14 true?
15   A    So what you're describing is
16 reasonable in a pharmacovigilance context
17 where you're looking very broadly,
18 typically, at many drugs and many
19 outcomes. So if a signal pops up, you
20 know, out of the blue, you certainly want
21 to go ahead and do an evaluation of that
22 signal.
23        Here, this has a slightly
24 different flavor, as does most of the
25 work that the FDA does in this context,

Page 67

1 which is -- the context here is a
2 specific safety issue. So you look at
3 the available strands of evidence that
4 have a bearing that are relevant to that
5 safety question.
6        So the FAERS analysis is one
7 leg of that, looking at the internal
8 database is another leg of it, looking at
9 the randomized trials is another leg,
10 part of that -- dimension to that
11 analysis.
12   Q    Is it fair to say you've
13 combined the signal detection and signal
14 evaluation into one step in this case?
15        MR. MICELI: Object to the
16   form.
17   A    No. Maybe yes. I mean --
18 it's not so much that I combined it into
19 one step as I have looked at three -- in
20 particular in this case, three strands of
21 evidence that have a bearing on this
22 safety question. One of those is
23 disproportionality analysis and logistic
24 regression which is really not
25 disproportionality.

Page 68

1   Q    We're going to talk about
2 logistic regression. I can't wait. It's
3 going to be a little later.
4        The signal you were looking
5 for in this case relates to docetaxel and
6 irreversible alopecia; right?
7   A    That's correct.
8   Q    We talked a little bit about
9 alopecia a few minutes ago. Let me ask
10 you a couple of more questions, just to
11 make sure I know where you stand on
12 things.
13        Do you know what
14 androgenetic alopecia is?
15   A    No. I don't believe I do.
16   Q    Do you know what scarring
17 alopecia is?
18   A    Same answer. And I could
19 hazard a guess based on those words in
20 each case. But I don't have any
21 expertise in the ins and outs of
22 different kinds of alopecia.
23   Q    Same answer for traction
24 alopecia?
25   A    Yes.

Page 69

1   Q    Alopecia areata?
2   A    Yes.
3   Q    I have to read them because
4 they're in my outline.
5        Telogen effluvium?
6   A    I can't give you a
7 definition of that term.
8   Q    Or even broadly what it
9 means?
10   A    Correct.
11   Q    Anagen effluvium?
12   A    Same answer.
13   Q    Centrifugal cicatrical
14 alopecia?
15   A    Same answer.
16   Q    Lichen planopilaris, same
17 answer?
18   A    Same answer.
19   Q    Frontal fribrosing alopecia,
20 same answer?
21   A    Same answer.
22   Q    Fair to say that in your
23 work in this case, none of your
24 methodologies distinguish between those
25 different kinds of alopecia?

18 (Pages 66 - 69)

1    A    That's fair enough, insofar
2   as they are different kinds of alopecia,
3   actually, I should add.
4    Q    Fair enough.
5        The methodology you've
6   employed in this case assumes that all
7   different types of alopecia are grouped
8   together as one disease; true?
9        MR. MICELI:  Object to the
10   form.
11    A    So I look at -- I look at an
12   endpoint which is, you know, in the case
13   of the FAERS analysis, it's the MedDRA
14   higher-term alopecias.  That's what I
15   looked at.  That's what the company used
16   internally.  And I checked with
17   Dr. Kessler that that was a reasonable
18   endpoint to use in that context.  So
19   that's what I looked at.
20    Q    But to the extent there are
21   different kinds of alopecia out there,
22   the methodology you have applied in this
23   case doesn't take that into account;
24   correct?
25    A    Fair enough, insofar as

1   there are different kinds of alopecia.
2   I'm not slicing and dicing it by those
3   types.  I'm doing an analysis of
4   particular endpoints as specified in my
5   report.
6    Q    By the same token, whether
7   an individual patient has 1 percent hair
8   loss or 100 percent hair loss, does your
9   methodology in this case distinguish
10   between those individuals in any way?
11        MR. MICELI:  Object to the
12   form.
13    A    Same answer.  You know, I'm
14   studying specific endpoints in each of
15   the three analysis I do.  It is what it
16   is.
17    Q    So the answer would be no,
18   the methodology does not account for any
19   differences between 1 percent hair loss
20   and 100 percent hair loss?
21        MR. MICELI:  Object to the
22   form.
23    A    I don't distinguish
24   different types of alopecia.  It's
25   crystal clear what I did.

1    Q    Or different severities of
2   alopecia?
3        MR. MICELI:  Objection.
4    A    Yeah, that's correct.  My
5   analysis does not separate out or get
6   into different degrees of severity.
7    Q    The methodology you've
8   applied in this case also doesn't
9   distinguish between patients who were
10   given a medical diagnosis of alopecia and
11   those who are self-diagnosed; correct?
12        MR. MICELI:  You're talking
13   about just the disproportionality
14   analysis?
15        MR. MICHELMAN:  Any
16   analysis.
17        MR. MICELI:  Then object to
18   the form.
19    A    I'm not sure what you mean
20   by medical diagnosis.  You mean a
21   diagnosis by a medical professional?
22    Q    Yes.  Thank you.  Let's make
23   sure that's clear.
24        We're talking in this case
25   about spontaneous reporting systems;

1   right?
2        MR. MICELI:  Object to the
3   form.
4        MR. MICHELMAN:  Thank you.
5    Q    Let me make sure I'm clear
6   about one thing, Doctor.  I never intend
7   to cut you off.  And I realized I did
8   just put up my hand and stopped you from
9   talking.  I never intend to prevent you
10   from finishing an answer.  I was just
11   going to clarify what I meant.
12        So if you feel that you do
13   need to continue answering, please don't
14   ever feel like you can't just tell me.
15   And I apologize if I seemed rude in doing
16   that.
17    A    No.  That's fine.
18    Q    Let's focus right now on
19   FAERS analysis.
20    A    Okay.
21    Q    In the FAERS analysis, your
22   work -- your methodology is based on data
23   that comes from the spontaneous reporting
24   system?
25    A    Correct.

19 (Pages 70 - 73)

1 concerns.  But I realize that many in the
2 scientific community do.  So, you know,
3 by just omitting them, if there are
4 any -- I don't even know if there are any
5 in this case -- it takes the issue off
6 the table.
7     Q     We talked a little bit
8 earlier about what irreversible alopecia
9 is.  And I want to ask you a couple of
10 follow-up questions on that.
11        If a patient initially loses
12 all of her hair but then regrows
13 98 percent of that, your approach in this
14 case is that irreversible alopecia?
15        MR. MICELI:  Object to the
16 form.
17     A     I don't have an opinion
18 about that.
19     Q     Not something you've thought
20 about?
21        MR. MICELI:  Object to the
22 form.
23     A     No.  In each of the three
24 analysis, there's an endpoint.  It is
25 what it is.

1     Q     We've talked about the
2 spontaneous reporting systems a little
3 bit.  Let me just go through a couple of
4 quick questions to make sure we're on the
5 same page.
6        You did research on the
7 FAERS database; right?
8     A     Yes.
9     Q     There are other spontaneous
10 reporting databases; right?
11     A     Yes.
12     Q     Did you only analyze FAERS?
13     A     Yes.
14     Q     Why?
15     A     It's the only one I have
16 access to.  And I probably should add,
17 you know, it is large, it is widely-used
18 in the scientific literature and so on.
19 It's not like that I feel that I missed
20 out here somehow.
21     Q     Two other well-known ones
22 are the yellow card scheme of the MHRA;
23 right?
24     A     Yes.
25     Q     And the international

1 pharmacovigilance program of the WHO;
2 correct?
3     A     Yes.
4     Q     Just so we're clear, you
5 didn't run your FAERS analysis -- you
6 didn't run -- you did not conduct your
7 analysis in this case on either of those
8 other database?
9     A     I did not, nor do I have any
10 ability to.
11     Q     Actually, you specifically
12 referenced in your report that this type
13 of reporting to these database has
14 inherent well-documented limitation;
15 right?
16     A     Sure.
17     Q     They can have incomplete
18 information; right?
19     A     Sure.
20     Q     They can have limited
21 temporal information; right?
22     A     Sure.
23     Q     There can be lack of
24 follow-up information?
25     A     I suppose so, yeah.

1     Q     There can be underreporting?
2     A     Sure.
3     Q     There can be overreporting?
4     A     Sure.
5     Q     There can be stimulated or
6 publicity-triggered reporting?
7        MR. MICELI:  Object to the
8 form.
9     A     I discuss that in the
10 report.  People talk about that.  I'm not
11 sure it really happens.
12     Q     Well, you reference a recent
13 review of FDA safety alerts; right?
14     A     Two of them, I think, yeah.
15     Q     Would you say it suggests
16 only modest evidence for significant
17 reporting changes?
18     A     Sorry.  Where are you?
19     Q     On your report,
20 paragraph 30.
21     A     Yup.  Sorry.  What was the
22 question?  Sorry.
23     Q     Sure.
24        What you mention in your
25 report is limited to a review specific to

21 (Pages 78 - 81)

Page 94

1  category?
2     A     I could have.  But I
3  wouldn't.
4     Q     And you didn't?
5     A     And I didn't.
6     Q     And you didn't because?
7     A     Because I'm using an
8  endpoint, which is the higher-level term
9  alopecias, which is what Sanofi used.
10  And it's what Dr. Kessler said was the
11  appropriate endpoint.
12     Q     To perform your search or
13  analysis, better term?
14     A     Sure.
15     Q     Of the FAERS database?
16     A     Yeah.
17     Q     You search for a
18  higher-level term of alopecias; so far?
19     A     Okay, yeah.
20     Q     Analyzed?
21     A     Yup.
22     Q     For a higher-level term of
23  alopecias?
24     A     That's the endpoint.
25     Q     Combined with an outcome of

Page 95

1  disability or permanent damage?
2     A     That's right.
3     Q     The outcome of disability or
4  permanent damage, where do you get that
5  language?
6     A     From the MedWatch form.
7     Q     Do all of the forms that
8  feed into FAERS database use that same
9  term?
10        MR. MICELI:  Object to the
11     form.
12     Q     Let me ask it a different
13  way.
14        You're saying there's a
15  MedWatch form, and on the MedWatch form,
16  there's a box you can check for
17  disability or permanent damage; right?
18     A     Yes.
19     Q     Are there other forms that
20  can be submitted to the FAERS database
21  other than a MedWatch form?
22        MR. MICELI:  Object to the
23     form.
24     A     Pretty sure it's on the
25  CIOMS form and on the MedWatch form.

Page 96

1     Q     Is it the same language on
2  the CIOMS form?
3     A     I believe so, yes.  It's
4  certainly the language that's used in the
5  standardized version of the data from
6  DrugLogic that I'm using.
7        MR. MICHELMAN:  Let's go off
8     the record for a second.
9        THE VIDEOGRAPHER:  The time
10     now is approximately 10:18.  We're
11     going off the record.
12        (A short recess was taken.)
13        THE VIDEOGRAPHER:  The time
14     now is 10:21 a.m.  We're back on the
15     record.
16     Q     Doctor, we talked about the
17  two aspects of your FAERS analysis:  The
18  higher-level alopecias and the endpoint
19  of disability or permanent damage; fair?
20     A     Okay.
21     Q     You've already described
22  your conversation with Dr. Kessler when
23  you came up with that approach.
24        MR. MICELI:  Object to the
25     form.

Page 97

1     A     Not a conversation, a
2  communication.
3        MR. MICHELMAN:  Was that
4     your objection?
5        MR. MICELI:  Yes.
6     Q     You've already described the
7  extent to which Dr. Kessler was involved
8  in that process?
9     A     I believe I have, yes.
10     Q     Can you point me to any
11  literature, scientific or otherwise, that
12  says the way to analyze FAERS for
13  irreversible alopecia is to combine
14  higher-level term of alopecias plus an
15  outcome of disability or permanent
16  damage?
17     A     Not sitting here, I can't.
18  But maybe it exists.  I don't know.
19     Q     Other than your work in this
20  case, are you aware of anybody anywhere
21  who has determined that the appropriate
22  way to analyze the FAERS database for
23  irreversible alopecia is to combine the
24  higher-level term of alopecias, plus an
25  outcome of disability or permanent

25 (Pages 94 - 97)

Page 98

1  damage?
2      A     I'm not.  But it's not
3  something I've looked for.  Good question
4  for Dr. Kessler.
5      Q     In your methodology in this
6  case, do you make any assumptions about
7  how people filling out the adverse event
8  reports interpret the term disability or
9  permanent damage?
10     A     Do I make any assumptions
11 about that?
12     Q     Do you assume for your
13 opinions in this case that everyone who
14 checks the box for disability or
15 permanent damage means the same thing by
16 checking that box?
17         MR. MICELI:  Object to the
18     form.
19     A     In my analysis, you know,
20 the endpoint is irreversible alopecia.
21 And how I identify that mechanically is
22 higher-level term alopecias in the MedDRA
23 codes on the form and that the box is
24 checked.  That's what my analysis looks
25 like precisely.

Page 99

1      Q     Your analysis doesn't
2  consider, one way or the other, what the
3  reporter meant when he or she checked the
4  box disability or permanent damage?
5          MR. MICELI:  Object to the
6      form.
7      A     What the reporter meant, I
8  mean -- you know, it is the definition of
9  my endpoint.  So I don't -- I'm not going
10 deeper than that.  I have no ability to
11 go deeper than that in terms of -- let me
12 just leave it at that.  I analyze it as
13 is.
14     Q     In the endpoint of
15 disability or permanent damage, there's
16 an or in there; correct?
17     A     Correct.
18     Q     Are you focused on the
19 disability part of it or the permanent
20 damage part of it?
21     A     I don't distinguish between
22 those.  My endpoint is higher-level term
23 alopecias, plus that box is checked.
24 That's the endpoint.
25     Q     The box said disability or

Page 100

1  permanent damage.
2          Why do you believe that's an
3  appropriate way to reach your endpoint?
4      A     In terms of what's on that
5  form, that is the box.  That is the term
6  that's used.  This is one of the reasons
7  I consulted with Dr. Kessler, is this a
8  reasonable way to capture the concept of
9  irreversible alopecia.  And he said it
10 was.
11     Q     Is that because the outcome
12 includes the word permanent?
13         MR. MICELI:  Object to the
14     form.
15     A     That's certainly part of it.
16 This is -- this is really -- you should
17 ask Dr. Kessler.
18     Q     Okay.
19         If the outcome -- if the
20 option -- the box you're going to check
21 for outcome only said disability, it did
22 not have -- or permanent damage, would
23 you still believe that was the
24 appropriate way to search for your
25 endpoint?

Page 101

1          MR. MICELI:  Object to the
2      form.
3      A     I'd ask Dr. Kessler.
4      Q     So if there's an adverse
5  event report that only had higher-level
6  terms of alopecia, plus a box checked for
7  disability, you don't know whether that
8  would still be an appropriate way to
9  analyze the FAERS database?
10         MR. MICELI:  Object to the
11     form.
12     A     As I said, I'd consult
13 Dr. Kessler in deciding how to formulate
14 my endpoint.
15     Q     Well, without consulting
16 Dr. Kessler, I only have you here today.
17         You told me that you came up
18 with the outcome initially, and by that,
19 I mean the outcome you included with the
20 higher-level terms, and then you ran it
21 by Dr. Kessler; right?
22     A     That's right.
23     Q     Through counsel?
24         MR. MICELI:  Right.
25         MR. MICHELMAN:  I don't mean

26 (Pages 98 - 101)

Page 102

1    to misstate that.
2       Q      When you looked at the issue
3    initially, you decided disability or
4    permanent damage is the correct outcome
5    to use; right?
6       A      Seemed appropriate to me.
7       Q      If it didn't say disability
8    or permanent damage but it only said
9    disability, would you have still thought
10   that seemed like an appropriate outcome
11   to use?
12          MR. MICELI:  Object to the
13       form.
14       A      I don't know.
15       Q      Not something you've
16   considered?
17       A      No.  It's not something I've
18   considered.  I've certainly consulted
19   Dr. Kessler.
20       Q      If someone filled out an
21   adverse event report -- let me rephrase
22   that.
23          In your report, you
24   reference using -- you say you used
25   higher-level term of alopecias tagged, is

Page 103

1    your word, quote on quote, with
2    disability or permanent damage.  What
3    does tagged mean?
4       A      It just means that in that
5    entry in FAERS, there is a preferred term
6    that belongs within the higher-level
7    term.  And the box for permanent and
8    disabled -- exact wording -- that box is
9    checked permanent or disabled.
10      Q      You say there's a preferred
11   term that appears within the higher-level
12   term.  What do you mean by that?
13      A      We're talking about two
14   different things.  So there's the
15   higher-level term.  And then there's,
16   let's call it, tagging.  So the
17   higher-level term alopecias, that
18   higher-level term is defined as a set of
19   preferred terms.  The encoding in the
20   database is actually at the level of
21   preferred term.  So my program simply
22   reads in the metadictionary, reads in the
23   preferred terms underneath that
24   higher-level term alopecias and then
25   performs the analysis of the FAERS

Page 104

1    database.
2          Separately, there is an
3    entry in the FAERS database which is that
4    box for permanent and -- disabled or
5    permanent and so that box -- you know,
6    it's either a 1 or a 0.  So what I'm
7    looking for -- what my analysis -- to
8    determine whether a patient has
9    experienced the endpoint, you know, FAERS
10   report, I simply look for one of the
11   preferred terms in the higher-level term.
12   And the box that we talked about contains
13   a 1.  Is this what you want me to --
14   where you want me to go?
15      Q      Yes.
16          Tagged is not a term of art?
17      A      Absolutely not.
18      Q      It's your way of expressing
19   an individual report in the database
20   contains two things that are important to
21   you.  The first is the higher-level term
22   of alopecias, the second is the boxes
23   checked for disability or permanent
24   damage; correct?
25      A      I agree with you with regard

Page 105

1    to the endpoint.  That's what's
2    important.  You said -- you know, when
3    I'm looking at a FAERS report, what's
4    important to me is just those two things.
5    That's not the case.
6       Q      For your disproportionality
7    analysis, is it something more than those
8    two things?
9       A      Sure.
10      Q      You also can look at things
11   like the date of the report?
12      A      Yeah, for example, yeah, and
13   the drugs that are listed.
14      Q      We'll definitely get to that
15   in just a minute.
16          I'll ask you a few more
17   questions to make sure we're talking
18   about the same thing as it relates to the
19   forms.
20          You said MedWatch and CIOMS?
21      A      Yes.
22      Q      Are those the two most
23   common forms that appear in the FAERS
24   database?
25      A      Yeah.

27 (Pages 102 - 105)

1    Q    Can there be others?
2    A    I'm not sure. I think maybe
3 years and years ago, I think -- you know,
4 certainly the last decade, I believe
5 they're the only two forms in use.
6    Q    When somebody fills out an
7 adverse event report, they can include
8 multiple adverse events on the same form;
9 right?
10    A    The actual form, the raw
11 form has a narrative.
12    Q    And the narrative can
13 include multiple adverse events?
14    A    Sure. I mean the coder can
15 attach multiple preferred terms to
16 that -- to a given narrative.
17    Q    To make it more simple, if
18 I've taken a drug and I experienced loss
19 of consciousness and --
20    A    Fever.
21    Q    Fever, sure, thank you.
22         -- I can submit an adverse
23 event report, identifying the drug I took
24 and saying after taking the drug, I
25 experienced loss of consciousness and

1 fever?
2    A    Sure.
3    Q    There's no requirement when
4 someone fills out a form that they
5 indicate an outcome at all, is there?
6         MR. MICELI: Object to the
7    form.
8    A    I mean there's no
9 requirement -- requirements, period. It
10 is a form. People fill it out as they
11 see fit.
12    Q    A reporter can submit an
13 adverse event report and not check any of
14 the outcome boxes; right?
15    A    Yes.
16    Q    Including the disability or
17 permanent damage box?
18    A    That's right.
19    Q    There isn't -- if we're
20 talking about disability or permanent
21 damage, there isn't -- when the reporter
22 submits the report, they don't identify
23 the outcome to specific adverse events;
24 right?
25         MR. MICELI: Object to the

1    form.
2    A    That's right. It's one --
3 the outcome is a box on the form, one
4 box.
5    Q    It's one box for the entire
6 form?
7         MR. MICELI: Object to the
8    form.
9    A    That's right.
10    Q    Does the methodology you've
11 used for your FAERS analysis in this case
12 assume that for every report that
13 contains a higher-level term of alopecias
14 and the checked box of disability and
15 permanent damage that the checked box
16 refers to the alopecias?
17         MR. MICELI: Object to the
18    form.
19    A    No. It doesn't assume that.
20 The definition of the endpoint in my
21 analysis is higher-level term of
22 alopecias, and that box is checked we've
23 been talking about. It is what it is.
24    Q    We got your higher-level
25 term alopecias, plus the box of

1 disability and permanent damage so far;
2 right?
3    A    Okay.
4    Q    Did you include a date on
5 your restriction analysis?
6    A    No.
7    Q    How far back does it go?
8    A    It actually goes back to the
9 beginning of the database which is -- I
10 think it might start in 1990, actually.
11 It goes back further than that. But the
12 results I provide, the raw results in
13 Appendix 4 begin with the first quarter
14 of 2000.
15    Q    We're going to come back to
16 that. Let's mark it now since we're
17 talking about it.
18         (The above-referred-to
19    document was marked as Exhibit 14 for
20    identification, as of this date.)
21    Q    This is Appendix 4 from your
22 report?
23    A    Yes.
24    Q    And as you said, your first
25 page of Appendix 4 begins in the year

28 (Pages 106 - 109)

1  2000; right?
2      A      Yes.
3      Q      And first quarter 2000, and
4  you identify events, and there are three
5  here.  You didn't limit the dates that
6  you searched; right?  You searched all
7  the way back?  You analyzed -- I'm sorry
8  -- the FAERS database without date
9  restriction?
10     A      That's right.
11     Q      Your Appendix 4 has three
12  cases in the first quarter of 2000?
13     A      Through the first quarter of
14  2000.
15     Q      When did those three cases
16  occur?  Were they in the first quarter of
17  2000?
18     A      I think so.  But I can't
19  swear to that.  I'd have to doublecheck.
20     Q      How would you check?
21     A      I'd look -- run my program.
22  I believe that's why I didn't print --
23  you know, I didn't include in the
24  spreadsheet anything before that time.  I
25  believe that's the case.  I'm not

1  100 percent sure.
2      Q      You mentioned a couple of
3  times the program you ran of this
4  analysis.  What program is that?
5      A      CHIPT5F.PL.
6      Q      Is that referenced in your
7  report?
8      A      You have it.  I don't think
9  I referenced programs in my report.
10     Q      Is that a standard -- is
11  that a commercially available program or
12  is that a customized one?
13     A      It's customized.  I wrote
14  it.
15     Q      Can an adverse event report
16  contain multiple higher-level terms?
17     A      Sure.
18     Q      Did you specify whether --
19  say for the taxotere analysis, did you
20  specify whether docetaxel or taxotere is
21  the primary suspect or appeared anywhere?
22           MR. MICELI:  Object to the
23     form.
24     A      I did not do that.  It
25  appears anywhere in the list of drugs.

1      Q      Is that the proper
2  terminology, the primary suspect or
3  concomitant; am I using that correctly?
4      A      Yes.
5      Q      Yes.  As long as docetaxel
6  or taxotere was listed for the taxotere
7  analysis, your search would find that?
8      A      That's right.
9      Q      And include it in your
10  results, if you had the criteria?
11     A      Sure.
12     Q      That wasn't a great
13  question.
14     A      Okay.  I don't think I
15  disagree.
16     Q      Did you limit your search to
17  instances of alopecia in women?
18     A      No.
19     Q      Why not?
20     A      I understand men can have
21  breast cancer.  I don't know.  I wasn't
22  asked to do that.  I didn't -- I didn't
23  do that.
24     Q      Did you limit your search to
25  breast cancer?

1      A      No.
2      Q      And by that, breast cancer
3  patients or breast cancer chemotherapy
4  treatments.  Did you limit it either way?
5      A      I didn't limit it.  It's
6  taxotere and the endpoint we talked
7  about.
8      Q      Do you know if your
9  results -- let's start using numbers.
10          You came up with 31 reports
11  for taxotere; correct?
12     A      My analysis finds 31
13  reports, yeah, on taxotere meeting the
14  requirements of the criteria of the
15  endpoint.
16     Q      Are all of the 31 cases that
17  you identified women?
18     A      I don't know.
19     Q      Are all the 31 cases
20  involving breast cancer?
21     A      I don't know.
22     Q      Is that something you could
23  have looked at but decided not to?
24     A      It's not something I
25  considered.  Sex is recorded.  As a

29 (Pages 110 - 113)

1  matter of fact, my analysis is stratified
2  by age, sex and year of report.  So that,
3  I could have done.  But it's not
4  something I said, you know, should I do
5  that.  No, I won't do it.  I never
6  considered doing that.  The breast
7  cancer, maybe, maybe not.  So there's an
8  indication field in the MedWatch form.
9  But it's quite incomplete.  So it's
10  tricky.
11      Q      Do the 31 reports include
12  patients outside the U.S.?
13      A      Could do.  I don't know.
14  They can do.
15      Q      You mentioned the program,
16  this customized program that you wrote:
17  CHIPT5F.PL?
18      A      PL.
19      Q      You couldn't have picked a
20  better, easier --
21      A      No.  It's beautiful.
22      Q      Does it stand for something?
23      A      No.
24      Q      That's a program that you
25  wrote that reaches out and analyzes data

1  from FAERS?
2      A      That's correct.
3      Q      How do you access the FAERS
4  data?
5      A      So I have extracted the
6  FAERS data out of the DrugLogic QSCAN
7  system.  And that's proprietary to
8  DrugLogic, yeah.  Let me just leave it at
9  that.  That's the data I analyzed.
10      Q      Was that data as of a
11  particular date?
12      A      End of 2017.
13      Q      From inception through end
14  of 2017?
15      A      That's right.  I think it's
16  1969, if my memory serves me right.
17      Q      Which certainly predates
18  taxotere?
19      A      Indeed.
20      Q      You said you never
21  considered limiting your analysis to
22  women; right?
23      A      That's right.
24      Q      You agree in a case like
25  this, that would be something that would

1  be important to know --
2          MR. MICELI:  Object to the
3  form.
4      Q      -- whether the effect was
5  the same on women versus men?
6      A      I really have no opinion.  I
7  was asked to address certain questions.
8  I addressed it.  This is the only
9  analysis I did.
10      Q      Nobody helped you perform
11  the actual analysis; right?
12      A      Correct, no.  I did it
13  myself.
14          MR. MICHELMAN:  We took a
15  couple of short breaks earlier for
16  the technical issues.  Do you want to
17  keep going?
18          MR. MICELI:  I was going to
19  suggest in about five minutes, we
20  take a break only because we ordered
21  lunch for you.  And I think it's
22  going to be here around noon.  So I
23  wanted to set it up to where we're
24  finishing the next session around
25  noon.  So if you want to go five more

1  minutes or so and take a ten-minute
2  break and come back.
3          MR. MICHELMAN:  Is that okay
4  with you, Doctor?
5          THE WITNESS:  I'm good.
6      Q      You ran your analysis using
7  your customized program?
8      A      Right.
9      Q      And it generated results;
10  right?
11      A      It did.
12      Q      How did you see those
13  results?  What did they look like?
14      A      They looked like exactly
15  what you're looking at.
16      Q      Exhibit 14?
17      A      Exhibit 14.
18      Q      Is your customized software
19  capable of identifying manufacturer
20  control numbers within reports in the
21  FAERS system?
22      A      Capable of -- sure.
23      Q      Is your customized software
24  capable of identifying FAERS case ID
25  numbers in the database?

30 (Pages 114 - 117)

Page 118

1    A     Yes.  Maybe I should
2   clarify.  So the version of the FAERS
3   database that I have extracted from
4   DrugLogic, there's a roll for every
5   report in the FAERS database, six million
6   or whatever the number is.  And there's a
7   bunch of columns in each one of those.
8   One of those is the manufacturer control
9   numbers, if it's there.  And the other is
10  the case ID.  But I don't look at them.
11   Q     Why not?
12   A     Why would I?  I'm doing a
13  statistical analysis here.
14   Q     Your analysis tells you
15  there are 31 reports set out as you had
16  them in Exhibit 14; right?
17   A     Yes.
18   Q     For taxotere?
19   A     Right.
20   Q     What's contained in any
21  individual one of those reports other
22  than your required criteria, you have no
23  idea?
24   A     Sitting here this minute, I
25  have no idea.  I can find out.

Page 119

1    Q     How would you find out?
2    A     I'd go back and change my
3   program and let it print out.  If you
4   want manufacturer's control number, the
5   other fields, it's there.  I can get it.
6   I don't have it.  And I didn't generate
7   it.
8    Q     You could get the line item
9   reports?
10   A     I could, absolutely.
11   Q     And you said you could get
12  the manufacturer control numbers and the
13  FAERS IDs?
14   A     I can.
15   Q     And that would allow you to
16  look at the substance of the underlying
17  reports; right?
18   A     How so?  I don't understand.
19  I'm not supposed to ask questions.  I
20  don't understand.
21   Q     That's all right.
22         Do you know any way using a
23  manufacturer ID number you could obtain
24  the actual adverse event report for that
25  number?

Page 120

1    A     Sure.  You could do a FOIA
2   request and get the report.  I'm a
3   statistician.  This is way outside my
4   bailiwick.
5    Q     If you had wanted to see
6   what was in these 31 reports, you know
7   how you could have done that; right?
8    A     Careful here.  I mean I have
9   the information I need to do my analysis.
10  I have many, many fields from FAERS -- in
11  the FAERS database that I have.  I use a
12  subset of those fields to do my analysis.
13  They are completely adequate for what I
14  am doing in this context.
15         If I wanted to access the
16  narrative, which I don't, particularly, I
17  would have to issue a FOIA request to get
18  those.  It's the antitheses of what I'm
19  doing because here, this is a
20  disproportionality analysis.  If I was to
21  do something with narratives, I'd have to
22  get the narratives for all the reports,
23  not on taxotere, and all the reports that
24  don't hit on my endpoint.
25         So I need every -- if I was

Page 121

1   to do something with narratives, which is
2   not what I'm doing here, I need -- I
3   wouldn't just need the 31.  I can't do
4   anything with the 31.  I'd need the whole
5   six million.  And even then, I don't
6   exactly know what I'd do other than what
7   I'm doing here, Appendix 4.
8    Q     Thank you for that.
9    A     Okay.
10         MR. MICHELMAN:  Could you
11  read back the question?
12         (The requested portion was
13  read back by the court reporter.)
14   A     Yeah.  And I suppose --
15         MR. MICELI:  Do you want him
16  to answer it again?  He clicked back
17  through a number of pages.
18         MR. MICHELMAN:  Actually, I
19  do want him to answer that question.
20         MR. MICELI:  Then I'll
21  object because I think he did answer
22  it.
23   A     So I believe I have just
24  about -- what I'm stumbling over is just
25  the way you kind of phrased the question.

31 (Pages 118 - 121)

1  anyway, she received therapy on the 7th
2  of October.  Is that the first time?  I
3  don't know.  There's no implication here
4  that it's the first time.
5      Q      She was still receiving
6  docetaxel on December 14th; right?
7          MR. MICELI:  Object to the
8      form.
9      Q      I'm sorry.  December 11th.
10     A      Can you point me to that?
11     Q      Yes.  On the fourth page 4.
12     A      I see, yes.  That appears to
13  be the case.
14     Q      And according to this
15  report, she had died by the end of
16  December?
17     A      That may be the case.
18     Q      From your perspective, that
19  report is consistent with your
20  understanding of what irreversible
21  alopecia is?
22          MR. MICELI:  Object to the
23      form.
24     A      I don't have an opinion on
25  that.

1      Q      On what?
2      A      On that question.  You asked
3  me, is this consistent with my analysis
4  or something like that with my definition
5  of irreversible alopecia, I don't have an
6  opinion.  My definition is what it is.
7  It's black-and-white.  Higher-level term
8  of alopecia, alopecias, plus this box,
9  the outcome box that we discussed
10  checked, that's my outcome.  And my
11  analysis then flows from that definition.
12  This kind of analysis is completely
13  different.
14          And as I said before, if
15  you're going to go in and start reviewing
16  narratives, you have to do it for every
17  report in the database.  If you want to
18  do a disproportionality analysis, that
19  can be done.  I suppose.  It's way beyond
20  my -- I don't have expertise to -- to do
21  such an analysis.  And it's highly
22  impractical obviously, too.
23     Q      I'm more focused on the
24  question of whether your conclusion that
25  this is the appropriate way to analyze

1  the database.  I understand if we take
2  your definition, as you've called it,
3  alopecias, plus the outcome, you'd want
4  to search everything to know the answer.
5          But this all started with
6  your conclusion that irreversible
7  alopecia can be found by looking for
8  higher-level term of alopecia, plus the
9  outcome of disability, plus permanent
10  damage; right?
11          MR. MICELI:  Object to the
12      form.
13     A      I encode the concept of
14  irreversible alopecia in that way and
15  then did my analysis of FAERS
16  accordingly.  My report goes on at length
17  about the limitations of these kinds of
18  analysis.  It is what it is.
19     Q      When you say "it is what it
20  is," you mean that your analysis could
21  very well include cases where the
22  alopecia was not irreversible in reality;
23  right?
24          MR. MICELI:  Object to the
25      form.

1      A      Of course, there's this
2  chronic problem of underreporting.  I
3  have no doubt there are many cases of
4  irreversible alopecia on taxotere that
5  were never reported to FAERS.  It cuts
6  every which way.  So there are
7  limitations to these kinds of analysis
8  that I describe at great length in my
9  report.  And you're kind of drilling down
10  on limitation.
11     Q      If you wanted to know
12  whether there were reports of
13  irreversible alopecia, why not just
14  search the higher level term of alopecias
15  and then look at the reports?
16     A      Because you'd have to look
17  at every report in the database to do
18  that.  And I'm not -- let me just leave
19  it at that.
20     Q      You agree, though, looking
21  at the reports would be a helpful way to
22  determine whether your definition was
23  finding what you were looking for?
24          MR. MICELI:  Object to the
25      form.

Page 158

1    A    Maybe for Dr. Kessler,
2  Dr. Tosti. In my case, I consulted with
3  Dr. Kessler as to the reasonableness of
4  this endpoint. I mean the kind of
5  analysis that I'm doing here, this
6  quantitative analysis is completely
7  standard. These are done routinely by
8  all the pharma companies, by the FDA, by
9  regulators around the world. They have
10  their limitations. But people find them
11  useful.
12    Q    The disproportionality
13  analysis is what you're talking about?
14    A    Yes.
15    Q    But the analysis starts with
16  how am I going to reach out in the
17  database and gather my information;
18  right?
19         MR. MICELI: Object to the
20    form.
21    A    So it begins with defining
22  an exposure and an outcome. And then to
23  actually do the analysis, you need to be
24  precise about both of those things. And
25  that's what I did. And, you know, the

Page 159

1  particular endpoint I used seemed
2  reasonable to me.
3         But I ran it by Dr. Kessler,
4  who is focused on irreversible alopecia.
5  And I'm relying on him to say that is a
6  reasonable analysis to do in this
7  context. And he didn't come up with a
8  better one; a better endpoint, I should
9  say.
10    Q    You agree, Doctor, that the
11  definition that you have used and the way
12  you've used it, to analyze the FAERS
13  database will likely include reports --
14  let me rephrase that.
15         You agree that the
16  definition you've used, the way you've
17  analyzed the FAERS database may include
18  reports of individuals whose alopecia
19  resolved?
20         MR. MICELI: Object to the
21    form.
22    A    You asked, is it likely. I
23  wouldn't absolutely not go so far. Could
24  that happen? Sure, that could happen.
25  And it could happen that there are lots

Page 160

1  of people who had irreversible alopecia
2  on taxotere whose report never made it
3  into FAERS. It cuts both ways.
4    Q    Why do you say it can't
5  happen, but it's not likely that there
6  would be a report where the individual
7  alopecia actually resolved?
8    A    I have no basis for that. I
9  don't know whether it's likely or not. I
10  wouldn't know.
11    Q    You said it's not likely.
12    A    No. Sorry. I apologize if
13  I said that. You said do I agree with
14  the position if it's likely that. And I
15  don't agree with that position. I don't
16  have an opinion. Could it happen? Yes,
17  it could happen.
18    Q    Is that because there is an
19  imperfect fit between the way you have
20  decided to analyze the database and what
21  irreversible alopecia means to an
22  individual patient?
23         MR. MICELI: Object to the
24    form.
25    A    I wouldn't go so far to say

Page 161

1  it's an imperfect fit; you know, we have
2  a primary -- we're looking at a primary
3  data source for drug safety here that's
4  used, you know, hundreds, thousands of
5  times a year by regulators and by pharma
6  companies and so on.
7         This is -- I'm conducting a
8  quantitative analysis that is also done
9  routinely over and over and over again.
10  You choose -- you define the exposure,
11  you define the outcome. And the rest of
12  it is math, so to speak, or statistics;
13  you know, the practice I followed here is
14  the same practice I follow over and over
15  in other contexts, which is I consulted,
16  you know, Dr. Kessler about the nature of
17  the endpoint.
18    Q    If you had defined a
19  different exposure, you would likely get
20  different results; right?
21    A    Different exposure, meaning
22  a different drug?
23    Q    Well, you said you defined
24  an exposure and you defined an outcome?
25    A    Yeah. The exposure's

41 (Pages 158 - 161)

Page 166

1  sit here today, that this report,
2  Exhibit 17, was, in fact, one of the 31
3  that your analysis identified; right?
4      A     Right.  I can't be certain
5  that it was sent to the FDA.  I can't be
6  certain that it's in the FAERS database.
7  And I can't be certain that it was coded
8  to a MedDRA term in the HLT.  Probably
9  was but can't be certain.
10     Q     Anything about this form
11 that suggests to you it would not have
12 been in the FAERS database?
13         MR. MICELI:  Object to the
14     form.
15     A     There wouldn't be anything.
16     Q     Assume this report is one of
17 the 31 your analysis identified --
18     A     Okay.
19     Q     -- how does this report
20 support your methodology for identifying
21 cases of irreversible alopecia?
22         MR. MICELI:  Object to the
23     form.
24     A     How does it support my
25 methodology?  If your assumptions are

Page 167

1  correct and this report is, indeed, in
2  FAERS and if it is coded to alopecia, the
3  MedDRA term, then I would have -- because
4  it has an outcome -- because it is
5  alopecia and because it has the
6  appropriate outcome box checked, I would
7  include this in my analysis.
8      Q     Let me ask that question a
9  little differently.
10         Assuming this is one of your
11 31, granting Mr. Miceli the same
12 objection, how does a report like this
13 support your determination that the way
14 to find instances of irreversible
15 alopecia in FAERS is by looking for
16 alopecia, plus disability or permanent
17 damage?
18         MR. MICELI:  Object to the
19     form.
20     A     It doesn't support my way of
21 determining.  My way of determining is my
22 way of determining.  And then these are
23 the reports that -- given the
24 assumptions, it identifies reports like
25 this one.  That's -- so it doesn't

Page 168

1  support the choice of the endpoint in the
2  first place.
3      Q     Looking at a report like
4  this or even the one we just saw, does it
5  cause you to question at all whether you
6  did the right FAERS analysis?
7          MR. MICELI:  Object to the
8      form.
9      Q     And by that, I mean
10 identifying irreversible alopecia as
11 higher-level term of alopecia, plus
12 outcome of disability or permanent
13 damage.
14     A     No, not one bit.
15     Q     We talked about this on the
16 last one.  Let me ask a couple of quick
17 questions.
18         We have a single outcome,
19 multiple adverse events; right?
20     A     Sorry.  We're still on 17?
21     Q     Yes.
22     A     A single outcome box is
23 checked.  And, yes, there appear to be
24 several adverse events, yes.
25     Q     Your methodology in this

Page 169

1  case assumes that the reporter intended
2  the checked box, persistence of
3  disability or incapacity, to relate to
4  alopecia?
5          MR. MICELI:  Object to the
6      form of the question.
7      A     I'm not assuming that this
8  outcome box pertains to a particular
9  reaction.  It pertains to the report in
10 general.
11     Q     If the reporter intended
12 that checked box to apply very
13 specifically to something other than
14 alopecia, this report would still be
15 included in your results?
16         MR. MICELI:  Same objection.
17     A     Well, I think you're asking
18 me to speculate about the mind of the
19 reporter.
20     Q     No.  I'm asking you to
21 assume --
22         MR. MICELI:  Let's not talk
23     over each other.
24     A     I think I'm going to repeat
25 myself, though.

43 (Pages 166 - 169)

1  looking at Sanofi's internal safety
2  database.
3      A      Okay.
4      Q      Here, you're still trying to
5  identify all reports of irreversible
6  alopecia and docetaxel users; right?
7      A      Yes.  I got a little
8  distracted there.  You asked me this
9  morning if I heard of Dr. Hangai.  I
10 forgot.  I have seen a report offered by
11 Dr. Hangai.  It's referenced in
12 paragraph 45.
13     Q      The 2015 clinical overview?
14     A      Yes.
15     Q      But you have not reviewed
16 her deposition?
17     A      Oh.  Maybe that's what you
18 asked me this morning.  No.  I have not
19 reviewed her deposition.
20     Q      You've identified the search
21 terms that you used to search Sanofi's
22 internal database; right?
23     A      I have, yes.
24     Q      You've listed them on pages
25 16 and 17 of your report?

1      A      Well and Appendix 5, yes.
2      Q      Well, isn't Appendix 5 just
3  the program that incorporates the search
4  terms from pages 16 and 17?
5      A      More or less, it includes --
6  what's in the appendix includes I think
7  what I call linguistic variants on these
8  terms.
9      Q      Do you know Dr. Tosti?
10     A      No.
11     Q      Had you met her or spoken
12 with her before this case?
13     A      No.
14     Q      And you didn't speak
15 directly with her; correct?
16     A      Correct.
17     Q      Did you make a request of
18 Dr. Tosti?
19     A      Yes.
20     Q      What was that request?
21     A      So I was asked to review
22 Sanofi's internal global
23 pharmacovigilance database in relation to
24 this question.  So if I am to do such an
25 analysis, I need a list of terms to

1  search for.
2          And so I said to counsel,
3  whomever the appropriate expert is in
4  this case, can you have them provide me
5  at least a list of terms to search for
6  that capture irreversible alopecia in
7  narratives.  By contrast with my FAERS
8  analysis, we're looking at codes.  Here,
9  I'm looking at narratives.
10     Q      Do you consider all the
11 terms, the search terms to be synonymous
12 with irreversible alopecia?
13     A      I don't have an opinion
14 about this.  These are the terms that
15 were provided by Dr. Tosti and the
16 analysis is the -- the results that you
17 get if you use those search terms.
18     Q      Do you have any reason to
19 believe that Dr. Tosti considered all
20 those terms to be synonyms for
21 irreversible alopecia?
22     A      You'd have to ask Dr. Tosti
23 or Dr. Fiegal or Dr. Plunkett who
24 reviewed these also.
25     Q      Why didn't you search

1  Sanofi's internal database using the same
2  definition of irreversible alopecia used
3  for the FAERS database?
4      A      So there isn't an equivalent
5  outcome according to that database, yeah.
6  That's it, actually.
7      Q      So you had to come up with a
8  different way to search for the same
9  disease endpoint?
10     A      Fair enough, yes.
11     Q      And the way you came up with
12 the search is by using the terms
13 Dr. Tosti provided?
14     A      Yes.
15     Q      Was there any time
16 limitation to the search?
17     A      No.
18     Q      The search you performed,
19 did your search look for these terms,
20 plus linguistic variations anywhere in
21 the narrative of the database?
22     A      Yeah.  Report by report,
23 yes.
24     Q      If a report contained two of
25 the search terms, did that record get

57 (Pages 222 - 225)

Page 226

1  counted twice in your Table 4?
2     A     No.
3     Q     How did you exclude it from
4  being counted twice?
5     A     There's an ID associated
6  with each report.  I'm counting IDs here.
7  Each one only gets counted once, at most
8  once.
9     Q     You have an ID for each of
10  the 291 reports you identified in
11  Table 4?
12          MR. MICELI:  Object to the
13     form.
14     A     I don't.  But my program
15  doesn't spit it out.  But it could.
16     Q     But you looked at the IDs?
17     A     No, never.  My program looks
18  at them.
19     Q     And this is a program you've
20  provided us?
21     A     Yes.  That's the program:
22  Tosti F.PL.
23     Q     How did your program
24  determine that these terms were being
25  used in connection with alopecia?

Page 227

1     A     So the -- it's restricted to
2  reports of alopecia.  So I'm looking
3  in -- in the SITS database.  So the SITS
4  database contains 2,000 plus reports that
5  the company identified as cases of
6  alopecia, using the higher-level term,
7  the MedDRA term that I used for my FAERS
8  analysis.
9          So they identified -- is the
10  number here?  No.  We could -- if we
11  looked at the file, we could figure it
12  out very quickly.  But it's 2,000 plus
13  reports of alopecia in their internal
14  database that were extracted from their
15  central pharmacovigilance database and
16  put in this SITS database.  2,179,
17  actually, I think is the number.  That
18  was my starting point.  And then these --
19  these searches are intended to try and
20  zero in on the irreversible ones.
21     Q     If a record -- if a report
22  mentions alopecia as a higher-level term
23  and anywhere in the report one of these
24  search terms occurs, that report gets
25  counted in your Table 4?

Page 228

1     A     That's right.
2     Q     Did you or anyone look at
3  any of the individual narratives to
4  determine whether the search term
5  actually described the alopecia?
6     A     I didn't.  I just ran the
7  analysis with -- you know, with these
8  terms.  And the code is in the appendix.
9  You can see exactly what I did.
10     Q     So if there's a report with
11  a higher-level term of alopecia and in
12  the narrative, there's a comment that
13  this individual's headache is permanent,
14  that report would be counted as one of
15  your 291 in Table 4?
16     A     I suppose that could happen.
17  I don't know.
18     Q     If the report has a
19  higher-level term of alopecia and the
20  narrative describes the individual having
21  chronic back pain, that report would be
22  counted and included in your Table 4?
23          MR. MICELI:  Object to the
24     form.
25     A     You know, I don't know if

Page 229

1  that ever happened.  That could happen.
2     Q     The methodology you used to
3  search wouldn't prevent that from
4  happening?
5     A     That's true.
6     Q     I want to understand
7  something about how you did this
8  searching.
9          And I understand that you
10  through counsel have provided us several
11  different databases.  And there was some
12  back-and-forth on that.
13     A     On the stick -- the data
14  files that were used for this analysis
15  are on the thumb drive.
16     Q     You performed this search on
17  Sanofi's database using the PERL script
18  that you wrote?
19     A     Right.
20     Q     There was a master data file
21  that had all events, 38,000-some-odd
22  records.
23     A     If you say so.  Okay.
24     Q     And your report ultimately
25  discusses 291 or includes 291 of them?

58 (Pages 226 - 229)

Page 230

1     A      Well, I'm not aware -- I
2  don't know if I was ever provided with
3  the global database.  What I was provided
4  with -- maybe I was.  But what I looked
5  at was the SITS extraction for alopecia,
6  which is 279 or 2,179, something like
7  that, reports.
8     Q      I think maybe 2,174.
9     A      Okay.
10    Q      So you started with a
11 database that had already been tolled
12 down to include reports with a higher
13 level term of alopecia?
14    A      Which is exactly what they
15 did.  So I'm mimicking their methodology,
16 they Sanofi.
17    Q      And you wrote the PERL
18 program to search that group of 2,174
19 records in a manner you've described?
20    A      That's correct.
21    Q      The 291 reports, you have
22 determined are all irreversible alopecia;
23 right?
24    A      I think it's implicit here
25 as defined above.

Page 231

1     Q      Subject to the limitation of
2  that search that we've already talked
3  about?
4     A      Subject to the limitations
5  of the search, it's -- it's
6  deterministic.  Here's the definition.
7  If this is your definition as provided by
8  Dr. Tosti, if this is your definition,
9  you will find 291 reports.
10    Q      You have not looked at any
11 of the actual narratives for the 291
12 reports?
13    A      I wouldn't go so far as to
14 say I've never looked at any of them
15 because in particular, these linguistic
16 variance -- so I looked through
17 narratives to see, gee -- you know, we
18 can look at some of them, but, you know,
19 Dr. Tosti provided, for example, hair
20 never grew back.
21          So if I saw hair never grown
22 back, I believe that it's the intent of
23 Dr. Tosti's definition to include that.
24 So I came up with these variants, sent
25 them to Dr. Tosti via counsel and said,

Page 232

1  is this what you mean, you know, do these
2  capture your intent.  And the answer was
3  yes.  I don't think she modified any of
4  them.
5     Q      And if the report said hair
6  never grew back until chemotherapy ended,
7  you would still include that in your 291?
8          MR. MICELI:  Object to the
9     form.
10    A      I'd have to look at the
11 linguistic variations.  Probably.  I
12 didn't see that when I reviewed them.
13    Q      How many narratives did you
14 review?
15    A      I reviewed them all.
16    Q      All 291?
17    A      No.  All 2,000 --
18    Q      174.
19    A      Okay.
20    Q      You reviewed narratives for
21 all of those?
22    A      I did.  Not from a -- I'm
23 not trying to decide who has irreversible
24 alopecia and who does not.  That's not my
25 area of expertise.

Page 233

1          What I was -- what I was
2  reviewing them for was do they convey in
3  the English sense the sense that I
4  believe and Dr. Tosti confirmed was
5  intended in her definition.
6     Q      When you say you reviewed
7  the 2,174, did you review the entirety of
8  the narrative for each one?
9     A      Yes.
10    Q      One of the terms is still
11 have no hair; right?
12    A      I see that.
13    Q      If there is a report that
14 says "still has no hair," that it was
15 three weeks after chemo ended, would that
16 be important to know?
17    A      I don't know.  That's a good
18 question to Dr. Tosti.
19    Q      You said you looked at the
20 2,174.
21          After you identified the 291
22 in Table 4, did you look at those
23 specifically again, the 291?
24    A      No.  What I was doing was
25 taking her definition and expanding it to

59 (Pages 230 - 233)

1  include phrases that, to me, seemed
2  logically equivalent to what she was
3  doing.  That's all I did.  And then I ran
4  my program.
5      Q      When you looked at the
6  narratives, you saw a report where the
7  individual alopecia completely resolved,
8  did you do anything to exclude that from
9  your search?
10     A      That wasn't my purpose.  I
11  don't have the expertise to classify
12  these documents -- these reports as
13  irreversible alopecia or not irreversible
14  alopecia.  I was simply trying to
15  implement her definition.
16     Q      So Table 4, all this is a
17  count based on Dr. Tosti's search terms?
18     A      That's absolutely correct.
19     Q      Whether those are the
20  appropriate search terms for truly
21  irreversible alopecia, you have no
22  opinion about?
23     A      No.  You need to ask
24  Dr. Tosti or Plunkett or Fiegal.
25     Q      Can you tell us how many

1  reports are returned for each of the
2  search terms?
3      A      No.  I didn't keep track of
4  that.
5      Q      Do you know how many reports
6  were returned if you only searched using
7  permanent or irreversible?
8      A      No.
9      Q      Can you tell us which search
10 terms appeared in reports for which
11 years?
12     A      No.  I'm saying no to all
13 these questions.  I can do this.  It can
14 be done.  But I didn't do it.
15     Q      The script you wrote was
16 designed not to save or retain the
17 underlying narratives for the 291
18 reports; right?
19     A      No.  I mean it can do.  I
20 have no opposition to that.  But that's
21 not the nature of what I was doing.
22     Q      You knew that after you ran
23 the search, you would actually have no
24 ability to go back and look at the 291
25 individual narratives?

1      A      Sure I can.  It would take
2  me ten seconds to modify the program if I
3  wanted to.
4      Q      But you did not do that?
5      A      No.  It's not part of my
6  analysis.
7      Q      You say you went through and
8  removed instances where the alopecia
9  recovered?
10     A      I did two separate analyses,
11 yeah.
12     Q      How did you do that?
13     A      So there's a field in the
14 SITS database which is -- I don't
15 remember what it's called -- outcome,
16 maybe, with -- one of the possible
17 entries in that column is recovered.
18     Q      If that column was checked
19 off, is that recovered, you subtracted
20 it?
21     A      Yeah.  In essence -- and
22 actually, just to clarify, recovered or
23 had an end date.  So there's a field in
24 the SITS database for the -- which
25 records the end date of the adverse event

1  of the alopecia.
2          So if there was an end date
3  present or if it was labeled as
4  recovered, it is excluded in the counts
5  on the right-hand side, on the rightmost
6  column.
7      Q      How do you know the end date
8  was referring to the alopecia?
9      A      These are alopecia reports.
10     Q      They don't contain any
11 information other than related to
12 alopecia?
13     A      Good question.  Not sure.
14     Q      Not something you've looked
15 at?
16     A      Yeah, it is.  But I just
17 don't remember.  It's very -- it's
18 somewhat academic.  There are very few as
19 you can see.  There aren't that many
20 dates with an end date.  But it's a good
21 question.  And I don't have an answer for
22 you.
23     Q      The script you provided does
24 not identify how you calculated the
25 reports that were recovered or had end

60 (Pages 234 - 237)

1  definition.  I agree with you.  You
2  actually get out to 117 five years
3  earlier.
4      Q      Was Sanofi's conclusion in
5  2015 based solely on the number of
6  reports?
7      A      I believe it was based on
8  the number of reports and the clinical
9  trials.  But the clinical trials, the
10  relevant clinical trials had concluded
11  many years earlier.
12      Q      Did the 2015 clinical
13  overview address any medical literature
14  between 2011 and 2015?
15      A      Some case reports, maybe.
16  That's about it.
17      Q      You're not suggesting that
18  the first 117 cases that you have in
19  Table 4 are the same as the 117 cases
20  that Dr. Hangai referenced, are you?
21      A      I don't know.
22      Q      That's not something you've
23  looked at?
24      A      No.
25      Q      Did you do the same kind of

1  database search for any other
2  chemotherapy drugs?
3      A      I only have this database
4  for this one drug.
5      Q      Let's talk about your third
6  research question, analyzing the adverse
7  event rates in the -- call them TAC and
8  FAC arms of the clinical trials.  I guess
9  to be more specific, you title it
10  Irreversible Alopecia in the TACs 301 and
11  the TACs 316 studies.  In paragraph 49,
12  you note that -- let's talk about TAC 316
13  first.
14      A      Okay.
15      Q      You note that a study
16  completion, 29 of the TAC patients had
17  ongoing alopecia compared with 16 of the
18  FAC patients; right?
19      A      Yes.
20      Q      Ongoing alopecia is, in
21  fact, the term that was used in the
22  study; right?
23      A      I think that's right, yeah,
24  in the clinical study report.
25      Q      When a clinical study is

1  going on, investigators could only
2  document what they see with a given
3  adverse event on a given day?  They can't
4  project what's going to happen with an
5  event in the future?
6      A      Generally not.
7      Q      The patient comes in, the
8  investigator can note for alopecia, does
9  patient still have it today or not?
10      A      Fair enough.
11      Q      No idea what's going to
12  happen tomorrow or next week or a year
13  from now?
14      A      That might or might not be
15  true.  If you had your leg amputated
16  today, you ain't coming back tomorrow.
17      Q      Fair enough.
18          But your hair might?
19      A      Maybe.  I don't know if that
20  could be ruled out or not.  I don't know.
21      Q      Whether a particular adverse
22  event like alopecia is measured again
23  depends on whether there's further
24  follow-up with the patient?
25      A      That's fair enough.

1      Q      And did you review the
2  underlying clinical trial data for TAC
3  316?
4      A      Sure.
5      Q      Did you review the case
6  report forms for any of the 29 patients
7  that had -- that determined to be ongoing
8  alopecia?
9      A      No.  I looked at the
10  quantitative data in the SAS data files.
11      Q      Did you review any of the
12  patient narratives for any of the 29
13  patients?
14      A      I didn't.  I wouldn't.  I
15  don't have them.
16      Q      But you agree at a meeting
17  follow-up of ten years, there is not a
18  statistically significant difference
19  between the two arms of TAC 316 as it
20  relates to ongoing alopecia?
21      A      The P value is .053 or
22  something like that.  It is what it is.
23  If you use .05 as a threshold to apply
24  that sort of tag, then it's not
25  statistically significant.  To me, that's

1  alopecia?
2    A    I don't know either.  We can
3  call it Fred or Mary.  But the program
4  that I'm referencing here is utterly
5  black-and-white.  That's what I did.
6    Q    You agree that the TAC 316
7  did not look at irreversible alopecia?
8        MR. MICELI:  Object to the
9    form.
10   A    I don't know.  Does that
11  word appear anywhere in those clinical
12  study reports?  I don't know.
13   Q    Let's talk about TAC 301.
14   A    Okay.
15   Q    I believe this is also known
16  as GECAM.
17       MR. MICELI:  It's actually
18    GECAM 9805.  But for the purposes of
19    the deposition, let's say GECAM.
20       MR. MICHELMAN:  In light of
21    that clarification, which I
22    appreciate, let's stick with TAC 301.
23   Q    You say in paragraph 50,
24  "Unfortunately, the trial data failed to
25  explicitly capture either the

1  continuation of alopecia into the
2  follow-up phase or alopecia resolution
3  for the majority of patients"; right?
4    A    Yes.
5    Q    Do you view that as a flaw
6  in the study?
7    A    It's more inexplicable to
8  me, you know, why one study, you know,
9  316, you know, records it for many, many
10  patients and follow-up.  And the other
11  one doesn't.  I just don't understand it.
12   Q    You say, "Given that the
13  patients enrolled in TAC 316 and 301 were
14  very similar, I know of no reason for
15  this striking asymmetry between the two
16  studies." Same concept?
17   A    Yup.
18   Q    Is that a flaw or a problem
19  in the study?
20   A    I'm not going to go there.
21  I just -- it's inexplicable to me.
22   Q    Table 5, I believe you told
23  us is program-generated?
24   A    That's correct.
25   Q    TAC 301, there are three

1  patients in the TAC arm and one patient
2  in the FAC arm identified as having
3  ongoing alopecia?
4    A    Using Sanofi's definition,
5  yes.
6    Q    No statistically significant
7  difference between the TAC and FAC arms
8  of TAC 301 as it relates to ongoing
9  alopecia?
10   A    Looking at 301 alone, not at
11  that moment in time, the P value of 0.3,
12  yeah, there's limited.  And the evidence
13  is pointing towards an increased risk.
14  But it's not statistically very
15  impressive.
16   Q    Same question for TAC 301.
17       How did you determine the
18  number of TAC 301 patients that have
19  irreversible alopecia?
20   A    Are you asking something new
21  there or do you want me to repeat what I
22  said before?
23   Q    I think we talked about TAC
24  316.
25       This is specific to TAC 301?

1        MR. MICELI:  Why don't we
2    start with a new question.
3    A    I thought TAC 316 was in
4  your preamble there.  I'm confused.
5    Q    I may have misspoke.
6        How did you determine the
7  number of TAC 301 patients that have
8  irreversible alopecia?
9    A    Same answer.  I used the
10  definition that is baked into the logic
11  in that SAS program.
12   Q    Is your conclusion that in
13  TAC 301, three patients in the TAC arm
14  and one arm in the FAC arm had
15  irreversible alopecia?
16   A    So that's what the data
17  show.  But there's an issue there which
18  is I just don't really know what the
19  follow-up -- the alopecia state is -- for
20  the patients in 43 of the 55 study sites,
21  there's nothing there.  So we don't know.
22   Q    Let's go back and ask the
23  same question for TAC 316 then.
24       Is it your conclusion or
25  your assumption that 29 patients in the

Page 266

1  It's binary.
2      Q      It is or isn't statistically
3  significant?
4      A      Using .05, it's not right or
5  wrong.  The definition of the English
6  phrase, statistical significance, is P
7  value bigger than 0.05 or a P value of
8  less than 0.05.  So it is statistically
9  significant.
10     Q      So P value greater than .05,
11 not statistically significant; P value
12 less than .05, statistically significant?
13     A      Right.  I just want to keep
14 reiterating, it's a bit of a so what; you
15 know, above .05, it's fuzzy.  And below
16 .05, it's not or it's read above .05 or
17 not.  It doesn't make any sense.
18         Be that as it may, the
19 conventional thing is .05.  And by the
20 standard convention, this is a
21 statistically significant difference.
22     Q      Assume that in TAC 316, the
23 patients with ongoing alopecia at ten
24 years weren't 29 and 16.
25     A      Okay.

Page 267

1      Q      Assume it was 18 and 12.
2      A      Okay.
3      Q      The TAC 301 data stays the
4  same.
5      A      Okay.
6      Q      If you did a meta-analysis
7  with those changes, there would no longer
8  be a statistically significant difference
9  between the TAC and FAC arms as it
10 relates to alopecia; correct?
11         MR. MICELI:  Object to the
12 form.
13     A      I don't know.
14     Q      Let me give you a different
15 hypothetical.
16         Instead of TAC 316 being
17 2916 and we're talking about ongoing
18 alopecia at the median ten-year
19 follow-up -- there are six patients in
20 TAC and three patients in FAC arm, TAC
21 301 stays the same?
22         MR. MICELI:  Is that a
23 question or you're getting ready to
24 hit the question?
25         MR. MICHELMAN:  I'm getting

Page 268

1  ready to ask the question.
2         MR. MICELI:  I'll have to
3  get ready to make my objection.
4         MR. MICHELMAN:  You can make
5  it now.
6         MR. MICELI:  No.  That's
7  okay.  Go ahead.
8      Q      When you do the
9  meta-analysis combining TAC 301 and TAC
10 316 with that change, there would not be
11 a statistically significant difference
12 between the TAC and FAC arms as it
13 relates to irreversible alopecia;
14 correct?
15         MR. MICELI:  Object to the
16 format.
17     A      Probably not.  You're asking
18 me to do meta-analysis in my head.  I'm
19 not that smart but probably not.
20     Q      Let's move to your fourth
21 research question which was the analysis
22 of time to resolution for alopecia.
23         Why did you do a
24 time-to-resolution analysis?
25     A      Because I was asked.

Page 269

1      Q      Do you know what it was
2  going to be used for?
3      A      No.  It is what it is.  If
4  you define, for example, irreversible
5  alopecia as not resolved within 24 months
6  after treatment, then this analysis shows
7  what the comparator effect of TAC versus
8  FAC is.
9      Q      If we're looking at
10 permanent or irreversible alopecia,
11 what's the relevance of time to
12 resolution?
13     A      Well, the company used 12
14 months in one analysis, two years in
15 another analysis.  It's my understanding
16 that people have their different
17 definitions of permanent that involve
18 time periods of that order.  That's about
19 it.  I just looked at these time points.
20     Q      Within your
21 time-to-resolution analysis, are there
22 results that you consider statistically
23 significant?
24     A      Sure.  If you look at
25 individual time points --

68 (Pages 266 - 269)

Page 270

1    Q      Yes.
2    A      -- 22 months, 6 months --
3  I'm looking at 316 -- 22 weeks, 6 months,
4  12 months, 24 months, 60 months, the P
5  value is below .05 in every one of those
6  cases.  So individually, they are
7  statistically significant.
8    Q      But not of 120 months?
9    A      It's above .05.  So by this
10 conventional definition, it's not
11 statistically significant.
12   Q      And in TAC 301, there's no
13 statistical significance after six
14 months; right?
15   A      That's right.  It's
16 statistically significant at 22 weeks and
17 at 6 months.  And thereafter, the P value
18 is bigger than .05.
19   Q      Why did you decide to use
20 these different time intervals?
21   A      I can't remember.  I think
22 they were given to me.  I think I was
23 asked by counsel.  I'm not certain of
24 that.  The 12 and the 24 are the -- you
25 know, are in those -- the Sanofi reports.

Page 271

1  I'm not entirely sure whether these were
2  given to me.  It seemed like a reasonable
3  spread of time points to me.  They're the
4  only ones I looked at.  I can tell you
5  that.
6    Q      Let's talk about your
7  summary on page 20.
8          We talked earlier about the
9  quote you include here from Dr. Hangai's
10 2015 clinical overview; right?
11   A      Yes.
12   Q      And we established that you
13 have no information about how Dr. Hangai
14 explains that quote; right?
15   A      That is black-and-white.
16 She said it's sufficient to support a
17 causal association.  I can't imagine how
18 you can interpret -- how you can
19 interpret that any other way than she
20 thinks there's a causal effect.
21   Q      You told us earlier that you
22 agree with that conclusion?
23   A      Yeah.  It's in my report.
24   Q      Fair enough.  You told us
25 earlier, and it's in your report, that

Page 272

1  you agree with the conclusion.  I'm not
2  asking if you agree with somebody else's
3  conclusion on the issue.
4          What I want to know is, have
5  you independently done the work necessary
6  to form an independent opinion that
7  taxotere causes irreversible alopecia?
8          MR. MICELI:  Object to the
9    form.
10   A      Sure.  I believe it does.  I
11 believe there is a causal effect
12 established here.
13   Q      And the work that you did to
14 establish that taxotere causes
15 irreversible alopecia includes what
16 elements?
17   A      So the analysis from the
18 randomized trials.  So the meta-analysis
19 of the randomized trials and the analysis
20 of the individual trials, the analysis of
21 the FAERS database and my analysis of the
22 internal database.
23   Q      You've done no review of the
24 published medical literature on this
25 issue; right?

Page 273

1    A      It's my understanding there
2  are only case reports in the literature.
3    Q      Have you reviewed any of
4  those?
5    A      I may have seen them.
6  Individual case reports are not that
7  terribly useful.  When you have
8  randomized clinical trials, case reports
9  are sort of distant, you know, whatever,
10 contributor to any causal assessment.
11   Q      Did you conduct any analysis
12 using the Bradford Hill criteria?
13   A      No.
14   Q      Why not?
15   A      I've never been terribly
16 persuaded by it.  It's not wrong, it's
17 not right.  It's just some set of
18 criteria.  Here, I looked at the
19 available quantitative strands of
20 evidence that I had at my disposal and
21 analyzed all of those that I had in my
22 disposal.
23   Q      Other than telling us you've
24 looked at the FAERS data and whatever
25 else you listed a moment ago, can you

69 (Pages 270 - 273)

Page 282

```
 1    form.
 2    A    I don't have an opinion on
 3  this matter.
 4    Q    As long as the individual's
 5  alopecia is permanently irreversible, is
 6  it then your opinion that taxotere can
 7  cause it?
 8         MR. MICELI:  Object to the
 9    form.
10    A    Yes.
11    Q    But you've done nothing in
12  your analysis to break down the
13  individual types of alopecia to know if
14  that's correct?
15         MR. MICELI:  Same objection.
16    A    I have not.  That last
17  clause, to know if that's correct, I
18  don't want to imply that that is
19  necessary in order for me to arrive at my
20  conclusion.  I don't believe it is.
21    Q    Let me ask you this.
22    Androgenic alopecia, I want
23  you to assume that is a type of alopecia;
24  okay?
25    A    Okay.
```

Page 283

```
 1    Q    Assume someone has
 2  androgenic alopecia and it's permanent or
 3  irreversible, your opinion is that
 4  docetaxel can cause permanent or
 5  irreversible androgenic alopecia?
 6         MR. MICELI:  Object to the
 7    form.
 8    A    No.  I don't know.  It
 9  causes alopecia.  Which type of alopecia
10  it causes, I have not examined whether
11  it's all types, some types.  I don't
12  know.
13    Q    Wouldn't that be important
14  to know?
15         MR. MICELI:  Object to the
16    form.
17    A    It's interesting.  But it's
18  not what I was asked to look at.  I was
19  not asked to differentiate different
20  types of alopecia.
21    Q    I believe I asked this
22  earlier.  I apologize.
23    Do you have an opinion on
24  whether any other chemotherapies do or
25  don't cause irreversible alopecia?
```

Page 284

```
 1         MR. MICELI:  Object to the
 2    form.
 3    A    I do not.
 4    Q    You can't rule out other
 5  chemotherapies as causes of irreversible
 6  alopecia?
 7         MR. MICELI:  Object to the
 8    form.
 9    A    I can't rule out -- I do not
10  know, one way or another, whether other
11  chemotherapy agents cause irreversible
12  alopecia.
13    Q    We talked about the entirety
14  of your opinions as they relate to
15  docetaxel, causing irreversible alopecia.
16  Have we?
17    A    Yes.  I believe we have.
18    Q    You say in your summary that
19  adequate statistical evidence supporting
20  a causal association was available to
21  Sanofi several years earlier; right?
22    A    I say that, yes.
23    Q    And you're saying several
24  years earlier than 2015?
25    A    That's right.
```

Page 285

```
 1    Q    What does several mean?
 2    A    Sometime in the 2000s, you
 3  know, potentially early 2000s.  So I'm
 4  primarily focused on the clinical trials.
 5    So based on -- I believe the
 6  last patient finished treatment in Study
 7  316 in 2000 sometime.  So, you know,
 8  looking at my analysis in Table 5, you
 9  know, there were certainly evidence --
10  you know, if you looked at various points
11  in time, two years, five years after that
12  time, you're going to see an actual
13  effect, a statistically significant
14  effect.
15    But more important to me,
16  you would see a rate ratio around 2,
17  close to 2.  So that plus -- in the FAERS
18  analysis, depending on which metric you
19  used, there are signals emerging back in
20  the early 2000s.  So I'm not -- I'm
21  not -- I did not attempt to pin this down
22  to, you know, 17th of March on such and
23  such a year.  But it's clear there was --
24  there's evidence of a causal effect
25  dating back many, many years.
```

72 (Pages 282 - 285)

1  Adriamycin plus something, it would have
2  excluded it?
3          MR. MICELI:  Object to the
4  form.
5      A    I just don't know sitting
6  here this minute.  We could look at the
7  program.  And we'd know.
8      Q    Oh.  The electronic version?
9      A    Right.  It's possible this
10 is a duplicate report.  It's possible --
11 there are other reasons why it might or
12 might not be in the version that I have.
13 I don't know.
14     Q    Duplicate to what?  Is it
15 possible it might be a duplicate?
16     A    Fair enough.  You're right.
17 That doesn't make sense.  I exclude
18 duplicates.  You're right.  But if there
19 was a duplicate, the duplicate would be
20 in there.  So fair enough.
21     Q    Assuming Exhibit 21 or the
22 report that is represented by Exhibit 21
23 was in the FAERS database, it should have
24 been identified by your analysis; yes?
25         MR. MICELI:  Object to the

1  form.
2      A    It's not even should.  It
3  would.  If you look at the code, it's
4  just completely deterministic what I
5  retrieved from the FAERS database.  So
6  either it's not in there, that's one
7  possibility, I can check, or I'm only
8  picking up Adriamycin -- a drug named
9  Adriamycin, not Adriamycin, space, PFS.
10 I'm not sure.
11     Q    Because you say if it were
12 in there, it would pick it up?
13     A    The programs, they're not
14 moody.  It's just completely
15 deterministic what the program does.  And
16 you have the program.
17     Q    All these questions are
18 going to limit my ability to go back to
19 the LASO analysis.
20     A    Okay.
21     Q    Dr. Madigan, you didn't --
22 as part of your work on this case, you
23 didn't look at any other adverse
24 reactions for docetaxel other than
25 alopecia; correct?

1      A    That's right.
2      Q    You didn't assess the
3  efficacy of docetaxel; correct?
4      A    I did not.
5      Q    You didn't assess the safety
6  of docetaxel; correct?
7          MR. MICELI:  Object to the
8  form.
9      A    This is a safety issue.  I
10 looked at one safety issue.
11     Q    A safety signal?
12     A    I looked at a safety issue.
13 I conducted an analysis and focused on a
14 particular safety concern, a safety
15 issue.  I didn't know there was going to
16 be a signal or not until I did the
17 analysis.
18     Q    You did nothing to evaluate
19 the overall risk-benefit profile of
20 docetaxel?
21         MR. MICELI:  Object to the
22 form.
23     A    No.
24     Q    I want to talk about the
25 clinical trials again.

1          Based on the clinical trial
2  data, is it your opinion that FAC causes
3  irreversible alopecia?
4      A    Nope.
5      Q    Why not?
6      A    So what the clinical trial
7  enables us to see or to infer is that
8  TAC, it's a comparative trial.  It
9  compares TAC with FAC.  So it enables us
10 to conclude that TAC causes irreversible
11 alopecia as defined, as we talked about,
12 you know, at a higher rate than FAC.
13         So counterfactually, had you
14 had TAC rather than FAC, you are at
15 higher risk -- for a patient who had FAC
16 had they had TAC, they would have had a
17 higher risk of irreversible alopecia.
18     Q    You say TAC causes
19 irreversible alopecia; correct?
20     A    Yes.
21     Q    TAC is not docetaxel alone;
22 right?
23     A    That's right.
24     Q    If FAC doesn't cause
25 irreversible alopecia, what's your