UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)                    MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

SECTION "H" (5)

**THIS DOCUMENT RELATES TO:**

Antoinette Durden, Case No. 2:16-cv-16635;
Tanya Francis, Case No. 2:16-cv-17410;
Barbara Earnest, Case No. 2:16-cv-17144

---

**MEMORANDUM IN SUPPORT OF SANOFI DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF DAVID A. KESSLER, M.D., J.D.**

---

Dr. David A. Kessler offers the opinion that the Taxotere label should have said something (he does not specify what) about "irreversible alopecia" as early as 2009. While Dr. Kessler has specialized knowledge concerning the regulations of the Food and Drug Administration (FDA), he lacks the expertise of a dermatologist, oncologist, or other medical specialist, and admitted that he will not opine on medical causation. That matters here because the opinion that Taxotere's label should have included "irreversible alopecia" requires specialized medical expertise that Dr. Kessler lacks. Dr. Kessler's opinion also risks misleading the jury because it conflates "causal association"—a regulatory term he admits does not mean causation—with medical *causation* or legal, proximate *causation*, which is an essential element of Plaintiffs' claims. For these very reasons, regulatory experts like Dr. Kessler have been excluded from using such language and offering the ultimate opinion on when any alleged "reasonable evidence of causal association" was established, thereby prompting a labeling change. A regulatory expert still could (as Sanofi's regulatory experts have) offer an opinion about the adequacy of a medicine's label if his analysis

were based on a reliable review of reliable evidence using a reliable methodology. But Dr. Kessler did not do that work here. His opinions should be excluded for several reasons:

<u>First</u>, his standard-less methodology is no methodology at all. He failed to define what constitutes a case of "irreversible alopecia." Without a clear definition, Dr. Kessler's methodology cannot reliably identify cases that involve (a) "irreversible alopecia" (versus alopecia generally) or (b) alopecia *from chemotherapy* (versus myriad potential alternative causes).

<u>Second</u>, Dr. Kessler's regulatory opinions are unreliable because Dr. Kessler applies regulatory-labeling standards in a manner different than the FDA and others outside the courtroom. The question presented is whether, under FDA regulations, a labeling change was warranted at some discrete point in the past based on information then available. In answering that question, though, Dr. Kessler seeks to place the need for an updated Taxotere label as far back in time as he can. With the benefit of hindsight, he relies on evidence post-dating the time period when he claims the label should have been updated. He relies on evidence that would not have been considered by the FDA. In the real world, the FDA and the manufacturer evaluate the emerging evidence as it becomes available (not years later, in the context of litigation) to consider whether a labeling change is warranted.

Third, Dr. Kessler's opinion that "irreversible alopecia" should have been labeled in the Warning and Precaution Section in 2009 is unreliable. Kessler Report at 22–23, ¶¶ 89–92 (Ex. A). The FDA Guidance upon which he relies actually comes to the opposite conclusion; it uses alopecia as an example of a non-serious and non-clinically significant adverse event in the context of cancer treatment to illustrate types of events not requiring a Warning and Precaution. FDA Guidance for Industry—Warnings and Precautions, Contraindications, and Boxed Warning

2

Sections of Labeling for Human Prescription Drug and Biological Products — Content and Format at 4 (Oct. 2011) (hereinafter "FDA Guidance") (Ex. B).

Finally, Dr. Kessler is not permitted to offer legal conclusions, regurgitate the contents of company documents, or testify about manufacturer intent.

## FACTUAL BACKGROUND

Dr. Kessler offers reports and opinions on labeling in vast numbers of mass tort, pharmaceutical litigations. *See In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*, MDL No. 2592, 2017 WL 1352860, at *2 (E.D. La. Apr. 13, 2017) (opining on conduct of pharmaceutical company); *see also J.C. by and through Michelle C. v. Pfizer, Inc.*, 240 W.Va. 571, 576 (2018) ("Dr. Kessler has been designated to testify regarding . . . the adequacy of [Pfizer's] Zoloft labeling"); *In re Zoloft (Sertralinehydrochloride) Prods. Liab. Litig.*, 176 F. Supp. 3d 483, 496 (E.D. Pa. 2016) (opining on adequacy of Zoloft label); *In re C.R. Bard*, 948 S. Supp.2d 589, 627–28, 629 (S.D. W.Va. 2013) (opining that Bard failed to warn with its surgical mesh label label); *In re Actos (Pioglitazone) Prods. Liab. Litig.*, No. 12-cv-00064, 2014 WL 120973, at *1 (W.D. La. Jan. 10, 2014) (opining that Actos' label was inadequate for omitting data purportedly showing increased risk of bladder cancer); *In re Yasmin and YAZ (Dropirenone) Mktg., Sales Practices and Prods. Liab. Litig.*, MDL No. 2100, 2011 WL 6302287, at *10 (S.D. Ill. Dec. 16, 2011) (opining that Bayer's label should have included different information about thromboembolic events).

Dr. Kessler is a professional witness. Plaintiffs disclosed Dr. David A. Kessler on November 9, 2018. Although he holds himself out as a regulatory expert, Dr. Kessler is more aptly described as a professional litigation consultant. Kessler Report at 1–2, ¶ 1–11. In the last seven years alone, Dr. Kessler has provided opinions and testimony approximately 40 times,

charging $1,000 per hour. Kessler Report at App'x B (Ex. C). Dr. Kessler admits that he has made multiple millions of dollars testifying on behalf of plaintiffs in pharmaceutical product liability litigation. Kessler Test., *Russell v. Janssen Pharm., Inc.*, at 140 (Ex. D).

Courts routinely restrict Dr. Kessler's role in testifying because of various concerns that he might offer improper opinions. *In re C.R. Bard*, 948 F. Supp. 2d at 627, 629 (Dr. Kessler precluded from giving opinions on Bard's intent or motives, from offering impermissible legal conclusions— "[t]he questions of whether Bard's Avaulta products were not reasonably safe, for example, or whether Bard failed to warn, are questions for the jury, not for Dr. Kessler"—stating legal standards, or offering opinions relating to testing and labeling, Bard's promotion of its product, and post-marketing activities ); *In re Bard IVC Filters Prods. Liab. Litig.*, No. 15-cv-02641, 2017 WL 6523833, at *7, *9 (D. Ariz. Dec. 21, 2017) ("Dr. Kessler will not be permitted to provide ultimate legal conclusions concerning Plaintiffs' state law tort claims," or about "Bard's intent or ethics."); *Wells v. Allergan, Inc.*, No. 12-cv-973, 2013 WL 7208221, at *2 (W.D. Okla. Feb. 4, 2013) (Dr. Kessler precluded from testifying about the knowledge, motivations, intent, state of mind, and purposes of Allergan or the FDA). Those concerns are amplified here, meriting Dr. Kessler's exclusion across the board.

Dr. Kessler is not an expert on alopecia. Dr. Kessler has never published on the topic of alopecia or given presentations on the topic of alopecia. Kessler Dep. 227:8–13 (Ex. E). The same is true for breast cancer, the disease state targeted by Sanofi's life-saving chemotherapy medicine. *Id*. 225:1–6, 31:22–32:4. Here, Dr. Kessler merely applied factors from FDA Labeling Guidance to assess whether there is reasonable evidence of a casual association between Taxotere and irreversible alopecia. Kessler Report at 39–54, ¶¶ 110–163 (citing FDA Guidance). Dr. Kessler came to the same opinion that he always does in this context, testifying for plaintiffs, which is that

the Taxotere label should have been updated sooner to include "irreversible alopecia," by as early as 2009. Kessler Report at 54, ¶ 165. This is a labeling opinion, not a medical causation opinion or a legal, proximate causation opinion.

Methodologically, Dr. Kessler must begin by defining the alleged harm before examining the evidence on whether the label should have been changed. For "irreversible alopecia," there is no consensus on its definition in the medical community. Kessler Dep. 135:21–136:10. Though Dr. Kessler confessed at his deposition that he cannot give a clinical definition for "irreversible alopecia," his report adopts a definition purportedly from the medical literature. *Id.* 137:9–138:5; Kessler Report at 20, ¶ 81 ("With respect to irreversible alopecia, the medical literature has generally defined this condition at the 'complete loss of growth or partial regrowth at least 6 months after chemotherapy.'").

What a date-based definition of irreversible alopecia does not do, however, is account for hair that regrows more than six months after chemotherapy or account for failure to regrow hair without it being attributable to chemotherapy. Dr. Kessler abrogated any responsibility for dealing with either one of these components of a principled evaluation of the Taxotere evidence. He clarified that he could not identify when "alopecia" becomes "irreversible" as that determination is outside his area of expertise and better suited for other experts. Kessler Dep. 137:8–138:5. Dr. Kessler also concedes that there is necessarily a diagnostic component of whether any individual case of hair loss is actually "irreversible alopecia" *from chemotherapy*. *Id.* 140:16–142:13 (Deferring to a dermatologist for the diagnostic criteria for all types of alopecia). But Dr. Kessler did not use such criteria to evaluate identified cases of "irreversible alopecia." *Id.* 138:11–139:18.

Assuming cases of interest have been reliably captured, the next step methodologically is to examine any evidence against the factors in the FDA Guidance. For most of these factors, Dr.

5

Kessler relies on data points that did not exist in 2009 (when Sanofi allegedly should have had reasonable evidence of a causal association). *See*, *e.g.*, Kessler Report at 41–44, ¶¶ 120–22, 124–25.

Finally, Dr. Kessler uses the FDA Guidance to offer an opinion on the labeling section in which "irreversible alopecia" should have appeared. Dr. Kessler ultimately opines that Sanofi should have warned of the irreversibility of alopecia in the Warnings and Precautions section of Taxotere's label because this adverse reaction is "serious" and "clinically significant"—threshold requirements for inclusion of adverse reactions in this section of the product labeling. Kessler Report at 22–23, ¶ 89–92. But the FDA Guidance that Dr. Kessler relies on expressly rejects his conclusion that alopecia is a serious and clinically significant event in the context of breast cancer treatment. FDA Guidance at 4.

Dr. Kessler never offers an opinion on what the label language should have been, rendering his opinions unhelpful to the jury. *See generally* Kessler Report.

## LEGAL STANDARD

Under Rule 702, the Court's gatekeeping function first involves determining whether the expert is *qualified*; then it "involves a two-part inquiry into *reliability* and *relevance*":

> First, the Court must determine whether the proffered expert testimony is reliable. The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence. The reliability inquiry requires the Court to assess whether the reasoning or methodology underlying the expert's testimony is valid. The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation.
>
> Second, the Court must determine whether the expert's reasoning or methodology is relevant. The question here is whether the reasoning or methodology "fits" the facts of the case and will thereby assist the trier of fact to understand the evidence.

*Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 550 (E.D. La. 2015) (citations omitted).

The "reliability analysis applies to *all aspects* of an expert's testimony," including "the methodology, the *facts underlying the expert's opinion*, [and] the link between the facts and the conclusion." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (emphasis added). Importantly, "the expert's testimony must be reliable at each and every step or else it is inadmissible." *Id*. These "exacting standards of reliability," *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000), provide that "conjecture, hypothesis, subjective belief, or unsupported speculation are impermissible grounds on which to base an expert opinion." *Wehling v. Sandoz Pharm. Corp.*, No. 97-2212, 162 F.3d 1158, 1998 WL 546097, at *5 (4th Cir. Aug. 20, 1998) (Table Decision). Courts also consider whether the expert's findings are litigation-driven or results-driven. *See Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (*Daubert II*). In making this assessment, courts have considered "whether experts are 'proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.'" *Burst*, 120 F. Supp. 3d at 551 (quoting *Daubert II*, 43 F.3d at 1317)).

On the relevance factor, the Court must determine whether the proffered expert testimony is sufficiently tied to the facts in issue that it will aid the jury. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993) (stating that the district court's "gatekeeping role" requires ensuring that the expert testimony "is relevant to the task at hand"). "The question here is whether the reasoning or methodology 'fits' the *facts of the case* and will thereby assist the trier of fact to understand the evidence." *Burst*, 120 F. Supp. 3d at 551 (emphasis added).

## ARGUMENT

### I. DR. KESSLER'S OPINIONS ON "REASONABLE EVIDENCE OF CAUSAL ASSOCIATION" SHOULD BE EXCLUDED.

Dr. Kessler's regulatory opinion about the labeling content will confuse and mislead the

7

jury.  The issue is simple.  The labeling standards that Dr. Kessler relies upon use some of the same language that is used for general/medical causation and proximate legal causation.  However, it is well-established that the labeling standard does not reach the level of proof needed for the general/medical or proximate legal causation determinations.  Therefore, Dr. Kessler should be precluded from using this language to confuse the jury.

Dr. Kessler reached an opinion that there was "reasonable evidence of a causal association" for Taxotere and irreversible alopecia by applying factors ***from FDA Labeling Guidance***.  Dr. Kessler admits that these regulatory guidelines only probe whether there is "reasonable evidence of a causal association"—a regulatory definition for determining whether adverse reactions are appropriate for inclusion in the Warning section of product labeling—*but do not require that a definitive causal association be established*.  FDA Guidance at 3; *see also* Kessler Dep. 121:25–123:18.

Accordingly, this FDA Guidance does not provide a reliable basis for establishing medical causation.  In Louisiana, plaintiffs bear the burden of proving causation to a reasonable degree of medical probability.  *Lasha v. Olin Corp.*, 625 So. 2d 1002, 1005 (La. 1993); *Cormier v. CITGO Petroleum Corp*., 228 So. 3d 770, 773 (La. App. 3 Cir. 2017).  Dr. Kessler does not hold himself out to be a medical causation expert in this case.  Kessler Dep. 268:19–22 ("Q. Okay. Okay. Your focus, and it's not identified in your report, is not one of a general medical causation expert.  A. Exactly, sir.").  But in his report, Dr. Kessler opines that there was "reasonable evidence of a causal association" between Taxotere and irreversible alopecia "as early as 2009."  Kessler Report at 54, ¶ 165.  As Dr. Kessler admits, it is easy to confuse "reasonable evidence of a causal association" with medical causation.  Kessler Dep. 42:12–18.  To avoid such confusion, the Court should preclude Dr. Kessler from offering any medical causation testimony.

Any testimony as to medical causation from Dr. Kessler would also be inappropriate because Dr. Kessler failed to apply an accepted and reliable methodology to offer such opinions. Dr. Kessler did not analyze epidemiological studies through the two-step process of identifying "statistically significant associations between medication exposure and [the injury]," *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 26 F. Supp. 3d 449, 455 (E.D. Pa. 2014); Federal Judicial Center, *Reference Manual on Scientific Evidence* (RMSE) at 552 (3d ed. 2011), and following the Bradford Hill criteria to assess "whether a causal relationship underlies a statistically significant association between an agent and a disease," *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 803 (E.D. La. 2011); *see also Burst v. Shell Oil Co.*, No. 14-cv-109, 2015 WL 3755953, at *5 (E.D. La. June 16, 2015)[1]; *Frischhertz v. SmithKline Beecham Corp.*, No. 10-cv-2125, 2012 WL 6697124, at *3 (E.D. La. Dec. 21, 2012).

In addition, this FDA Guidance does not provide a reliable basis for establishing *legal causation* because "reasonable evidence of a causal association" is a lower threshold of proof than that which is required by state tort law. *See Burst*, 2015 WL 3755953, at *8 (citing *Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 198 (5th Cir. 1996)). Courts have routinely held that regulatory determinations are not probative on the issue of general causation. *See id.*; *see also In re Garlock Sealing Techs., LLC*, 504 B.R. 71, 81–82 (Bankr. W.D.N.C. 2014) (holding that "agency statements, policies and regulations—and company warnings required by them"—"cannot be probative on the issue of causation.").

Courts have excluded other regulatory expert labeling opinions couched in "causal

---

[1] This decision, *Burst v. Shell Oil Co.*, No. 14-cv-109, 2015 WL 3755953, at *5 (E.D. La. June 16, 2015), and *Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 550 (E.D. La. 2015), are two distinct orders on different *Daubert* motions in the same case. Both orders were reviewed and affirmed by the Fifth Circuit. *Burst v. Shell Oil Co.*, 650 F. App'x 170 (5th Cir. 2016).

association" terms based on these same concerns. *See e.g.*, *Jones v. Novartis Pharma. Corp.*, 235 F. Supp. 3d 1244, 1259 (N.D. Ala. 2017); *Stanley v. Novartis Pharm. Corp.*, No. 11-03191, 2014 WL 12573393, at *4 (C.D. Cal. May 6, 2014); *Dopson-Troutt v. Novartis Pharm. Corp.*, No. 8:06-cv-1708, 2013 WL 1344755, at *2–4 (M.D. Fla. Apr. 2, 2013); *Georges v. Novartis Pharm. Corp.*, No. 06-5207, 2012 WL 9064768, at *9–11 (C.D. Cal. Nov. 2, 2012). In *Jones*, another frequent regulatory expert used by plaintiffs, Dr. Suzanne Parisian, sought to testify that "in order to make a label change pursuant to FDA regulations, you must have 'reasonable evidence of a causal association.'" *Id.* at 1258. However, recognizing that there was no way for Dr. Parisian to meaningfully distinguish "causal association" from "medical causation," the *Jones* court prohibited Dr. Parisian from testifying about whether the defendant ever "had reasonable evidence" or "should have changed its label." *Jones*, 235 F. Supp. 3d at 1257–58. The Court further recognized that Dr. Parisian did not specialize in a practice relevant to the injury or otherwise have specific expertise to opine as to the injury in the case. *See Jones*, 235 F. Supp. 3d at 1257. While Dr. Parisian was permitted to tell the jury "what action is required if a drug manufacturer has 'reasonable evidence' of a causal association between a drug and an injury," *she was not permitted to testify that defendant had reasonable evidence of a causal association between a drug and an injury*. *Jones*, 235 F. Supp. 3d at 1258. Similarly, Dr. Kessler should not be permitted to testify about whether reasonable evidence of a causal association existed, particularly, that there was reasonable evidence of a causal association between Taxotere and irreversible alopecia as early as 2009. *See Jones*, 235 F. Supp. 3d at 1259.

**II.  DR. KESSLER FAILS TO DEFINE "IRREVERSIBLE ALOPECIA" IN A RELIABLE MANNER SUFFICIENT TO SUPPORT HIS OPINIONS.**

As indicated above, Dr. Kessler's Report adopts a case definition for irreversible alopecia tied to time-since chemotherapy: "complete loss of growth or partial regrowth at least 6 months

after chemotherapy." Kessler Report at 20, ¶ 81. But Dr. Kessler confessed at his deposition that he cannot give a clinical definition for "irreversible alopecia" and yielded the answer to other experts. Kessler Dep. 137:9–138:5. Dr. Kessler was admittedly unaware of any consensus on the definition of "irreversible alopecia" in the medical community. *Id.* 135:21–136:10.

Dr. Kessler ultimately conceded that a six-month cutoff may not accurately capture cases of truly "irreversible" alopecia because hair can begin to regrow more than six months after chemotherapy. *Id.* 216:9–19. It may be over a year after chemotherapy where the alopecia begins to be considered irreversible, but it may be a matter of years. *Id.* at 135:9–136:6; *see also id.* at 118:10–24 (agreeing with a publication that states it often takes about 6 to 12 months for hair to regrow completely), 115:18–116:24 (agreeing that there's variability with hair regrowth). Dr. Kessler clarified that he could not provide a cutoff for when "alopecia" becomes "irreversible" because it is outside his expertise. *Id.* at 137:9–138:5. Secondarily, there may be patients who have had chemotherapy and experience hair loss, and even patients whose hair does not regrow after chemotherapy, all having nothing to do with chemotherapy being the cause.

Dr. Kessler concedes that there is necessarily a diagnostic component of whether any individual case of hair loss is actually "irreversible alopecia" *from chemotherapy*. *Id.* 140:16–142:13 (Deferring to a dermatologist for the diagnostic criteria for all types of alopecia). But Dr. Kessler made no effort to account for that diagnostic component. *Id.* 138:11–139:18. He applied his date cutoff and ended the analysis. If someone had alopecia 6 months after chemotherapy, that person had "irreversible alopecia" caused by chemotherapy for purposes of Dr. Kessler's analysis. *Id.* The problem, though, is that Dr. Kessler's definition may capture cases of *reversible* alopecia—a fact he admitted. *Id.* at 216:9–19, 135:9–136:10, 118:10–24, 115:18–116:24. This type of "analytical gap between the data and the opinion proffered" is precisely the type of

11

"unsupported speculation" that the Court aims to exclude. *See Burst*, 120 F. Supp. 3d at 550–51; *see also Moore v. Int'l Pain, L.L.C.*, 547 F. App'x 513, 515 (5th Cir. 2013) ("When an expert's testimony is not based upon the facts in the record but on altered facts and speculation designed to bolster [a party's] position, the trial court should exclude it.") (internal quotation marks and citations omitted). Dr. Kessler should not be permitted to opine that there was reasonable evidence to warn of a risk of "irreversible alopecia" in 2009 when (1) he cannot define that risk today, and (2) when the evidence did not reliably meet an acceptable definition of that risk. *See Burst*, 120 F. Supp. 3d at 550–51.

### III. DR. KESSLER'S OPINION ON WHEN THE TAXTOERE LABEL SHOULD HAVE BEEN UPDATED SHOULD BE EXCLUDED DUE TO HIS RELIANCE ON UNAVAILABLE AND UNRELIABLE DATA.

The Court should exclude Dr. Kessler's ultimate opinion that "reasonable evidence of a causal association" existed between Taxotere and irreversible alopecia by as early as 2009 because it relies on data that did not exist in 2009 or is otherwise unreliable.[2] "A court may rightfully exclude expert testimony where a court finds that an expert has extrapolated data, and there is 'too great an analytical gap between the data and the opinion proffered.'" *Burleson v. Texas Dep't of Criminal Justice*, 393 F.3d 577, 587 (5th Cir. 2004) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). The Fifth Circuit has made clear that a "trial court's inquiry into whether [Rule 703's] standard is satisfied … should focus on the reliability of the opinion *and its foundation*[.]" *Soden v. Freightliner Corp.*, 714 F.2d 498, 502–03 (5th Cir. 1983). If an expert's underlying data is "not shown to be of a type reasonably relied upon by experts in his field," the court may exclude

---

[2] Underscoring the unreliability of Dr. Kessler's opinion and method, at his deposition Dr. Kessler often vacillated about when the evidence became enough to change the label. *See* Kessler Dep. 100:21–101:18 (stating that there was a safety signal as early as 2004), 250:17–252:1 (stating that there was sufficient evidence in 2006); *see also* Kessler Report at 41, ¶ 118 (stating that Dr. Madigan found a safety signal in the First Quarter of 2000).

any opinion dependent on that data. *Id.* at 503; *Slaughter v. S. Talc Co.*, 919 F.2d 304, 307 (5th Cir. 1990) (holding that "bare conclusions derived from erroneous data" are inadmissible).

Dr. Kessler applies seven factors outlined in the FDA's Guidance to assess reasonable evidence of a casual association. Kessler Report at 39–54, ¶¶ 110–163. At the outset, it is not established that FDA's Guidance is meant to be used retroactively to pin the need for a labeling change to some exact earlier moment in time. *See* FDA Guidance at 2 ("This guidance is intended to assist applicants and reviewers in <u>drafting</u> . . . sections of labeling.") (emphasis added). Dr. Kessler does that only for litigation. Then, for most of these factors, Dr. Kessler primarily relies on multiple data points that did not exist in 2009 when Sanofi (according to Dr. Kessler) allegedly should have had reasonable evidence of a causal association. *See* Kessler Report at 41–44, ¶¶ 120–22, 124–25 (first factor: Dr. Madigan's analysis of reports in Sanofi's internal global pharmacovigilance database through 2015, Sanofi's Causation Analysis from 2015; inquiries related to reports of irreversible alopecia from 2010–11), 46, ¶ 132 (second factor: Sanofi's Causation Analysis from 2015), 47–48, ¶¶ 135–38 (third factor: *Martin* article from 2018; *Crown* abstract from 2017; *Bourgeois* presentation from 2014), 49–50, ¶¶ 143–48 (fourth factor: Sanofi's Causation Analysis and other company documents from 2015; medical literature from 2011, 2013, and 2017), 50–51, ¶¶ 150–53 (fifth factor: Dr. Madigan's search for reports in Sanofi's internal global pharmacovigilance database through 2015, Sanofi's Causation Analysis from 2015), 51–52, ¶¶ 155–56 (sixth factor: no evidence offered in support of this factor), 53, ¶ 161 (seventh factor: Sanofi's Causation Analysis from 2015; EMA Variation Assessment Report from 2016; company documents from 2015).

But Dr. Kessler cannot use data that did not exist until <u>after</u> 2009 to opine that Sanofi had "reasonable evidence of a causal association" between Taxotere and irreversible alopecia in 2009.

13

*See Rodriguez v. Stryker Corp.*, No. 2:08-cv-0124, 2011 WL 31462, at *7–8 (M.D. Tn. Jan. 5, 2011) (granting summary judgment to defendants because articles published after the plaintiff's surgery did not create a genuine issue of material fact about whether defendant was on notice of a risk of injury stemming from its use of a medical device at the time of plaintiff's surgery), *aff'd* 680 F.3d 568 (6th Cir. 2012). In particular, most of the "evidence" aggregated here comes from the time period when Sanofi actually implemented a labeling change with FDA in 2015, and after this litigation began. Dr. Kessler trying to use that anachronistic data underscores the litigation-driven nature of his opinions. Dr. Kessler has not identified standalone evidence from the time period when he says that a warning should have been given—an "analytical gap" rendering his opinion unreliable and subject to exclusion under Rule 702. *See Burleson*, 393 F.3d at 587 (quoting *Joiner*, 522 U.S. at 146).

The bulk of Dr. Kessler's remaining "evidence" was lifted from Dr. David Madigan, Plaintiffs' expert biostatistician. For the reasons set forth more fully in the Memorandum in Support of Sanofi Defendants' Motion to Exclude the Expert Opinions of Dr. David A. Madigan, Dr. Madigan's opinions are inadmissible. Even if not independently excluded, though, Dr. Kessler is not permitted to parrot Dr. Madigan's opinions to buoy his otherwise unreliable analysis. Courts have repeatedly rejected expert opinions as unreliable and inadmissible under *Daubert* when an expert adopts "wholesale" another's opinion with no independent analysis. *See Burst*, 2015 WL 3620111, at *5 ("[T]o the extent Dr. Harrison relies on Dr. Infante's report and the studies cited therein, his opinion is inadmissible because it reflects no original analysis or any evaluation of Dr. Infante's methodology or the studies upon which he relies."); *see also In re TMI Litigation*, 193 F.3d 613, 715–16 (3d Cir. 1999) (excluding expert's opinion because "unblinking reliance" on another's opinion demonstrates that the expert's opinion was flawed under *Daubert*); *Mooring v.*

14

*Capital Fund, LLC v. Phoenix Cent., Inc.*, No. 06-cv-0006, 2009 WL 4263359, at *5 (W.D. Okla. Feb. 12, 2009) (experts may rely "on the opinions of other experts so long as it does not involve the wholesale adoption of another expert's opinions without attempting to assess the validity of the opinions relied on."); *St. Paul Fire and Marine Ins. Co. v. Nolen Grp., Inc.*, Nos. 02-8601, 03-3192, 03-3651, 2005 WL 1168380, at *9 (E.D. Penn. May 13, 2005) (an expert may not rely on the work of another without being able to also testify about the veracity of that work).

IV. **DR. KESSLER'S OPINION THAT IRREVERSIBLE ALOPECIA IS A SERIOUS OR OTHERWISE CLINICALLY SIGNIFICANT ADVERSE EVENT DIRECTLY CONTRADICTS THE FDA GUIDANCE ON WHICH HE BASES HIS OPINION.**

Dr. Kessler opines that Sanofi should have warned of the irreversibility of alopecia in the Warnings and Precautions section of Taxotere's label because this adverse reaction is "serious" and "clinically significant." Kessler Report at 22–23, ¶¶ 89–92. Dr. Kessler rests this opinion on FDA's "Guidance for Industry on Warnings and Precautions, Contraindications, and Boxed Warnings Sections of Labeling for Human Prescription Drug and Biological Products—Content and Format". Yet, under the express terms of this FDA Guidance, alopecia should *not* be included in the "Warning and Precautions" section of the product label for cancer medications. The FDA Guidance specifically states that alopecia is neither a serious nor clinically significant adverse reaction in the context of cancer treatment.

> For example, ***non-serious adverse reactions (e.g., nausea, pruritus, alopecia)*** caused by drugs intended to treat minor, self-limiting conditions (e.g., allergic rhinitis, cosmetic conditions, transient insomnia) may be considered clinically significant. ***However, those same adverse reactions caused by drugs intended to treat serious or life-threatening conditions (e.g., cancer) may be considered much less clinically significant and not appropriate for inclusion in this section.***

FDA Guidance at 4. Taxotere is a chemotherapy product approved by FDA to treat a variety of life-threating cancers. *See* Kessler Report at 6–8, ¶¶ 21–29. This context is important. First,

15

FDA's Guidance lists alopecia as an example of a non-serious adverse reaction when discussing "clinically significant" adverse reactions. Alopecia in the context of cancer treatment is, by definition, not clinically significant[3] according to FDA Guidance. FDA Guidance at 4. Dr. Kessler confirmed that he agreed with this Guidance sentence at his deposition. Kessler Dep. 183:5–17. Second, FDA's Guidance explicitly states that non-serious adverse reactions (like alopecia) are not appropriate for inclusion in the Warning and Precautions section of the label for medications treating life-threatening conditions such as cancer. FDA Guidance at 4. Accordingly, no expert reliably applying FDA Guidance could determine that Sanofi should have warned of the irreversibility of alopecia in the "Warning and Precautions" section of the Taxotere label.[4]

Rule 702 requires more. It requires that an expert's proposed testimony "must be supported by appropriate validation—*i.e.,* 'good grounds' based on what is known." *Daubert*, 509 U.S. at 590. As part of its gatekeeping function, the court must do more than "glance at the expert's credentials," the court must also "ensure that the expert has reliably applied the methods in

---

[3] In his report, Dr. Kessler makes no distinction between the clinical significance of "irreversible alopecia" and "alopecia." Instead, Dr. Kessler considers the significance the same. In fact, the majority of the medical literature Dr. Kessler cites describing clinical significance focuses on "alopecia" and "hair loss," generally. *See, e.g.*, Kessler Report at 23, ¶ 93 n.92 (citing articles discussing "quality of life studies in women with alopecia," and how "[a]lopecia has been shown in multiple studies to have a psychosocial impact in both men and women . . .," "Both scarring and nonscarring forms of alopecia have been shown to have a negative impact on [quality of life]," "Chemotherapy-induced alopecia is very common . . . ," "Chemotherapy-induced alopecia is probably one of the most shocking aspects for oncological patients . . . ," "Hair loss in women is associated with . . . ," "Hair loss is also a traumatic experience . . . ," "women with breast cancer often consider scalp hair loss as the most distressing appearance altering side effect of chemotherapy . . . ," "[t]he loss of hair is often experienced more negatively . . . ," "[h]air loss has been rated . . . ," "[a]mong side effects, alopecia is considered . . . .").

[4] In 2015, Sanofi added the statement of "cases of permanent alopecia have been reported" to the product labeling. FDA reviewed its labeling submission and concluded that the adverse reaction was appropriately labeled in the Adverse Reaction, and not Warning and Precautions, section of the labeling. FDA Regulatory Project Manager Labeling Review (Dec. 11, 2015) at 76, *available at*, https://www.accessdata.fda.gov/drugsatfda_docs/nda/2015/020449Orig1s075.pdf. (Ex. F).

question." *U.S. v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010). Because Dr. Kessler came to a conclusion based on FDA Guidance when the FDA Guidance itself comes to the opposite conclusion, his opinion is not reliable. Dr. Kessler cannot ignore the Guidance upon which he relies. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146.

## V. THE COURT SHOULD EXCLUDE DR. KESSLER'S TESTIMONY RELATED TO SANOFI'S INTENT, LEGAL CONCLUSIONS, AND ON COMPANY DOCUMENTS.

As set forth in the Memorandum in Support of Sanofi Defendants' Omnibus Motion to Preclude Improper Expert Testimony (filed concurrently herewith and incorporated herein by reference), the Court should also exclude Dr. Kessler from testifying about: (1) the intent, motive, or state of mind, or knowledge of Defendants or other entities, including "interpretation" of documents authored by Defendants or other entities as a basis for such testimony; (2) testimony that merely repeats fact-witness testimony or other written evidence; and (3) testimony containing legal conclusions.

## CONCLUSION

As in the *Jones* decision, it is impermissible for an expert like Dr. Kessler to tell the jury that the defendant *had* reasonable evidence of a causal association between a drug and an injury or that there was reasonable evidence of a causal association between Taxotere and irreversible alopecia as early as 2009. *Jones*, 235 F. Supp. 3d at 1258–59. In some circumstances, that might salvage a regulatory expert's testimony for a narrow opinion on "what action is required if a drug manufacturer has 'reasonable evidence' of a causal association between a drug and an injury." *Id.* However, in this litigation, professional witness Dr. David Kessler was unable—as an initial

17

matter—to define the alleged harm as is needed to then conduct a reliable analysis of the "evidence" against the FDA labeling requirements. Without a definition of the alleged harm, it was impossible to reliably evaluate whether that evidence was or was not justification for a labeling change on that harm. Going further, he reached a conclusion about where and how alopecia should have been labeled that is directly at odds with the FDA Guidance on which his method relies. While Dr. Kessler may in some contexts reliably apply his chosen methodology to a record of evidence such that narrower opinions from him are permitted in part, he was unable to do so here because he deflected the scope of the alleged harm and analysis of whether the evidence that he identified actually represented that harm from a diagnostic perspective, such that he must be excluded entirely. For all the reasons stated above, the Court should exclude the cited expert opinions of Dr. Kessler under Federal Rule of Evidence 702.

Date:  February 8, 2019

        Respectfully submitted,

        */s/ Douglas J. Moore*
        Douglas J. Moore (Bar No. 27706)
        **IRWIN FRITCHIE URQUHART & MOORE LLC**
        400 Poydras Street, Suite 2700
        New Orleans, LA  70130
        Telephone: 504-310-2100
        Facsimile:  504-310-2120
        dmoore@irwinllc.com

        Harley Ratliff
        Adrienne L. Byard
        **SHOOK, HARDY & BACON L.L.P.**
        2555 Grand Boulevard
        Kansas City, Missouri 64108
        Telephone: 816-474-6550
        Facsimile:  816-421-5547
        hratliff@shb.com
        abyard@shb.com

        **Counsel for Sanofi-Aventis U.S. LLC and Sanofi U.S. Services Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2019, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

        /s/ *Douglas J. Moore*