UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)                          MDL NO. 2740
      PRODUCTS LIABILITY
      LITIGATION
                                              SECTION "H" (5)

THIS DOCUMENT RELATES TO:
*Durden v. Sanofi S.A., et al.*, 16-16635
*Francis v. Sanofi S.A., et al.*, 16-17410
*Earnest v. Sanofi S.A., et al.*, 16-17144

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE DEFENDANT'S EXPERT VIVIAN FONSECA, M.D.

MAY IT PLEASE THE COURT:

To a hammer, everything looks like a nail. And to Dr. Vivian Fonseca—an endocrinologist hired by the Sanofi Defendants to diagnose the cause of permanent hair loss for Plaintiffs Durden, Francis, and Earnest—everything looks hormone-related. To put it as bluntly as Dr. Fonseca does, these three Plaintiffs lost their hair because they are menopausal and overweight. Dr. Fonseca thus blames these women's hormones—but not Taxotere.

The Court should exclude Dr. Fonseca's testimony in its entirety. Dr. Fonseca cannot speak to general or specific causation because he lacks the scientific knowledge, training, and experience to opine on hair loss and its causes. By his own admission, Dr. Fonseca is *not* a hair expert and he lacks expertise about hair loss outside of the endocrine context. Plaintiffs wholeheartedly agree: Dr. Fonseca's training in endocrinology does not provide him the breadth of knowledge necessary to identify the underlying cause of Plaintiffs' permanent hair loss.

As you might expect from someone who is not an expert in hair loss but knows only about hormone-related diseases (if that), Dr. Fonseca considered *no* causes of hair loss other than *endocrine*-related causes. Dr. Fonseca is thus unable to provide *any* determination as to the

underlying cause of Plaintiffs' hair loss because he knows nothing of, and thus is unable to differentiate between, various forms and presentations of hair loss.

All told, Dr. Fonseca lacks the knowledge required to reliably apply methodologies, principles, and testing criteria necessary to render a sound scientific opinion on causation. His opinions should be struck in their entirety.

## STANDARD

A qualified expert's testimony is only admissible if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The party offering the expert testimony bears the burden of establishing each of these elements by a preponderance of the evidence. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 275-76 (5th Cir. 1998). And the trial judge is obligated to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).

Expert testimony is inadmissible when "the witness is not qualified to testify in a particular field or on a given subject." *Wilson v. Woods*, 136 F.3d 935, 937 (5th Cir. 1999). Similarly, an expert's testimony should be excluded where it "go[es] beyond the scope of his expertise in giving his opinions." *Goodman v. Harris Cty.*, 571 F.3d 388, 399 (5th Cir. 2009) (citing *First United Fin. Corp. v. U.S. Fid. & Guar. Co.*, 96 F.3d 135, 136 (5th Cir. 1996)).

Additionally, testimony is not admissible unless "the expert's reasoning or methodology can be properly applied to the facts in issue, meaning that there is an appropriate fit between the scientific testimony and the specific facts of the case." *Tripkovich v. Ramirez*, No. 13-6389, 2015 WL 3849392, at * (E.D. La. June 22, 2015) (citing *Daubert*, 509 U.S. at 593). Likewise, testimony

should be stricken as irrelevant when there is "too great an analytical gap" between the data or facts considered and the opinion proffered. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Thus, opinion evidence is inadmissible if it is only tethered to existing facts through the *ipse dixit* of the expert. *Id.*

## **ARGUMENT**

While Dr. Fonseca purports to offer a relevant and reliable opinion regarding the potential causes of Plaintiffs' hair loss, he wholly lacks the tools and expertise to do so. The distillate of Dr. Fonseca's medical opinion is that endocrine conditions cannot be "ruled out" as the alternative cause of each Plaintiff's hair loss. Put simply, Dr. Fonseca's contribution is: Anything is possible.

Federal evidentiary standards are not so lax. Dr. Fonseca does not conduct a differential diagnosis—he does not rule in the suspected cause of an injury nor rule out other causes or explain which is the most likely cause. This is because he is ignorant of numerous types of hair loss, the mechanisms underlying them, and the specific symptoms associated with each type. On these matters, Dr. Fonseca all but confesses ignorance when he testifies that he is "not a hair expert." Ex. A, Dep. Tr. of Fonseca ("Tr.") at 128:18-21.

Dr. Fonseca's opinions may be faulted at every turn. *First*, Dr. Fonseca has no qualifications or specialized knowledge to opine competently on hair loss generally. Further, he lacks the expertise to reliably diagnose the cause of Plaintiffs' hair loss. In his rush to diagnose an endocrine-related issue, Dr. Fonseca cannot even be bothered to follow the diagnostic steps used by actual hair loss experts—though it is obvious he wouldn't know how, since he is "not a hair expert" himself.

*Second*, his opinions regarding alternative causes are irrelevant because he lacks the expertise to provide a link between those causes and the specific type of hair loss experienced by Plaintiffs. Even assuming for argument's sake that an association between his imagined alternative

causes and Plaintiffs' actual symptoms could be established, Dr. Fonseca's opinions would not be admissible because he fails to provide any quantification or qualification that would help a layperson determine the relative likelihood that a potential cause is the actual cause.

*Finally*, his opinions suggesting a causal connection between hormones and Plaintiffs' hair loss are not even justified by the literature upon which he purportedly relies.

## I.   DR. FONSECA IS NOT QUALIFIED TO RELIABLY DIAGNOSE ANY CAUSE OF HAIR LOSS.

Dr. Fonseca has never once diagnosed, treated, studied, or written about hair loss—until Sanofi paid him to opine on Plaintiffs' hair loss in this case. This stunning lack of experience gives the game away: Dr. Fonseca knows zilch about the tools and considerations used by the medical community to diagnose causes of hair loss and is merely a hired gun. His lack of expertise and methodological guesswork renders him wholly unhelpful to determining causation.

Dr. Fonseca's approach is unrecognizable by Fifth Circuit standards. The Fifth Circuit has approved the use of a differential diagnosis to establish specific causation.  *See, e.g.*, *Johnson v. Arkema, Inc.*, 685 F.3d 452, 467-68 (5th Cir. 2012).  "Differential diagnosis is 'a process of elimination by which medical practitioners determine the most likely cause of a set of signs or symptoms from a set of possible causes.'" *Hooks v. Nationwide Housing Sys. LLC*, No. 15-729, 2016 WL 3667134, at *15 (E.D. La. July 11, 2016) (quoting *Pick v. Am. Med. Sys., Inc.*, 198 F.3d 241 (5th Cir. 1999)). "A reliable differential diagnosis must rule in the suspected cause of an injury and rule out other causes or determine which of the remaining explanation is most likely the cause." *Hooks,* 2016 WL 3667134, at *15.

Dr. Fonseca, however, has not performed any differential diagnosis—in fact, he does not consider *any* cause that is *not* endocrine-related. To the extent Dr. Fonseca attempts to claim that he has definitively determined that any one of his proposed alternative causes is actually the cause

of any Plaintiff's hair loss, such an opinion is entirely unfounded and thus easily excludable as unreliable.

In any event, at his deposition, Dr. Fonseca conceded that he believes Plaintiff Antoinette Durden "suffers from permanent chemotherapy-induced alopecia." Ex. A, Tr. at 255:22-256:5. There is simply no good basis to allow Dr. Fonseca to pollute the jury's minds with speculative testimony about unsubstantiated endocrine-related causes of hair loss.

A.      **Experts are routinely struck when they lack the expertise to testify as to specific causation in a specialized field.**

Under Fifth Circuit precedent, to reliably opine on the cause of a particular condition, a medical expert must have a specialized expertise relating to the causation of that condition. For example, in *Tanner v. Westbrook*, the Fifth Circuit reversed the district court's admission of Dr. Nestrud's opinion as to the cause of a child's cerebral palsy. 174 F.3d 542 (5th Cir. 1999), *superseded in part by rule on other grounds*, Fed. R. Evid. 103(a) (2000). While the Court found Nestrud well-qualified to testify regarding the standard of care to be given to a baby suffering from asphyxia, it nonetheless determined that his opinions regarding causation were unreliable because he "did not have the kind of specialized knowledge required to testify regarding causation, nor did he rely upon medical literature directly addressing the causation issue in this case." *Id.* at 548.

*Verzwyvelt v. St. Paul Fire & Marine Ins. Co.*, is also instructive. 175 F. Supp. 2d 881 (W.D. La. 2001). There, the district court determined that Dr. McCormick's opinion that listeriosis caused plaintiff's death was inadmissible under Rule 702 and *Daubert*, because he had never "(1) investigated a case involving listeriosis; (2) never testified in a listeriosis case; (3) never performed any studies or received any grants to study Listeria; or (4) never written any research papers relating to the Listeria bacteria or its [e]ffect on the body." *Id.* at 884. The court further considered Dr. McCormick's lack of "scientific knowledge concerning listeria, listeria infections, or the

subfield of hematopathology" and his inability to identify the presence of listeria in the decedent. *Id.* at 886. Thus, the Court determined his testimony "attempts to bridge too great of an analytical gap between the data and the proposed opinions." *Id.* at 887-88.

Dr. Fonseca is similarly unqualified to address the particular causation issues herein: whether Taxotere (docetaxel) may cause permanent hair loss, and whether it did in fact cause Plaintiffs' hair loss. Since this is the relevant dispute, and because Dr. Fonseca lacks specialized knowledge to help answer these questions, he is unqualified to reliably testify in this case.

**B.     Dr. Fonseca demonstrates a remarkable lack of knowledge related to hair loss and hair growth.**

Dr. Fonseca has exhibited demonstrable ignorance regarding the causes and classifications of hair loss. He even admits that he does not have the expertise to talk about hair loss issues seen outside of the endocrine context. Ex. A, Tr. at 297:3-14. Dr. Fonseca's niche expertise is a perfect example of Maslow's hammer:  If all he knows is endocrinology, then all symptoms will be viewed as endocrine-related.

*1.   No relevant clinical or research experience.*

Dr. Fonseca has no clinical or research experience relating to hair or hair loss. Dr. Fonseca spends only about 50% of his time in clinical practice, which focuses exclusively on treatment of patients with endocrine disorders, such as diabetes. Ex. B, Fonseca Rpt. at 1; Ex. A, Tr. at 85:10-25. In his own words: "I'm not a hair expert." *Id.* at 128:18-21. And he *disclaims* expertise in "endocrine alopecia." *Id.* at 128:14-16. He readily admits that he does not "treat changes in scalp hair as the primary problem," but rather treats only endocrine issues. Ex. B, Fonseca Rpt. at 4. In fact, Dr. Fonseca's sole focus is on hormonal issues—"not the dermatological or psychological aspects" of those conditions. Ex. A, Tr. at 39:9-11. Indeed, as an endocrinologist, Dr. Fonseca's sole clinical exposure to hair loss issues is in the narrow subset of patients he sees with "androgenic

hormonal imbalances." *Id.* at 76:14-77:7. He only sees patients when they are referred to him for a serious endocrine abnormality, *id.* at 132:2-7—which suggests that the early diagnosis of endocrine abnormality is done by the referring physician, not him. In sum, Dr. Fonseca has no exposure or expertise whatsoever relating to patients whose hair loss is *not* endocrine-related. *Id.* at 79:21-80:6.

Dr. Fonseca has never researched or written about hair loss issues. Dr. Fonseca has authored "over 400 papers" relating to endocrinology. Ex. B, Fonseca Rpt. at 2. But in those 400 papers, he has never once written about hair loss and the term "hair loss" never even appears. Ex. A, Tr. at 82:22-83:12. The only time in his professional life that he has ever written about hair loss is after Sanofi paid him to write an "Expert Report" in this matter. *Id.* at 83:14-84:15. Additionally, Dr. Fonseca has never specifically researched hair loss. *Id.* at 86:15-87:18. And none of his academic duties relate to the study of hair loss. *Id.* at 87:19-88:6.

What's more, Dr. Fonseca has never offered an opinion regarding the cause of alopecia. *Id.* at 113:15-20. He has never diagnosed or offered expert opinion relating to chemotherapy-induced alopecia. *Id.* at 112:14-113:13. And he has never made a diagnosis of permanent versus temporary alopecia. *Id.* at 272:3-6.

### 2. No experience in or knowledge of the science of hair.

Similarly, Dr. Fonseca lacks any knowledge, much less expertise, regarding the basic anatomy and life cycle of hairs. He admits he has no knowledge of the quantity of hairs typically found on woman's scalp based on her age, race, and hair color. *Id.* at 119:3-122:13. He cannot identify any distinction between the two main types of hair on the human body (vellus and terminal); he does not know whether those hairs can transform into the other; and he does not know what conditions may cause such a transformation. *Id.* at 122:15-123:25, 148:18-22. In fact, he does

not draw a distinction between, on the one hand, growth of vellus (tiny, non-pigmented hairs present everywhere except, for example, the palms, lips, and navel); and on the other hand, terminal hairs (larger, pigmented hairs that would commonly come to mind as hair) in patients with hirsutism. *Id.* at 147:24-148:3.

More specifically, Dr. Fonseca does not know how androgens impact the transition from vellus to terminal hairs and vice versa. *Id.* at 124:6-18. In fact, he admits that he is not an expert "on what happens in the actual hair follicle." *Id.* at 124:20-23. He does not know the normal ratio of terminal to vellus hairs on a female scalp. *Id.* at 124:25-125:3. Dr. Fonseca does not understand the hair follicle growth cycle and readily admits that he cannot explain "anything about the hair follicle cycle." *Id.* at 125:5-12. For instance, he is ignorant of the anagen (growth), catagen (regressing), telogen (resting), and exogen (shedding) stages or how long those stages last on the scalp. *Id.* at 125:14-127:5, 127:16-128:2. Dr. Fonseca cannot explain "anything" about how aging impacts the anagen stage for scalp follicles. *Id.* at 127:7-14. He fails to understand whether eyebrows and eyelashes are androgen-dependent, yet was willing to opine that they "may be" based on his anecdotal experience with "a few patients" with hair loss in their eyebrows and eyelashes despite having done no research on the issue. *Id.* at 138:11-140:22. It should come as no surprise, then, that  he would defer to a qualified dermatologist to explain whether eyebrows and eyelashes are androgen-dependent. *Id.* at 140:19-141:2. After all, it would be pointless for him to defer to his own opinions, which he is unqualified to give.

Dr. Fonseca does not even appear to understand what a hair follicle is—specifically, that the follicle refers to the small hair generating organ in the skin, rather than the hair or hair shaft itself, as he has opined that all permanent hair loss stems from a lack of follicles. *Id.* at 171:4-17 ("If you have permanent loss of hair, you don't have hair follicles."). Alternatively, he incorrectly

believes that all permanent hair loss is caused by the loss of hair follicles, indicating that he is unaware of other permanent hair conditions like follicle miniaturization. Regardless, he could not provide any source for his opinion. *Id.* at 171:19-21. His rush to opine without any reliable source underscores the real risk that Dr. Fonseca would offer the jury junk science.

>    3.    *No experience in or knowledge of the science of hair loss.*

Dr. Fonseca also has no knowledge of the basic types of hair loss. For instance, he cannot define, explain, or diagnose telogen effluvium (stress-induced hair loss) or its causes. *Id.* at 128:4-12, 129:13-130:17, 138:6-9. And he does not know the difference between telogen effluvium and androgenetic alopecia. *Id.* at 178:15-24. He is not familiar with lichen planopilaris (psoriasis-like rashes causing scarring alopecia). *Id.* at 134:23-136:1. He is not familiar with CCCA or cicatricial alopecia (idiopathic scarring alopecia). *Id.* at 136:3-138:4. Additionally, he has no ability to distinguish permanent from temporary hair loss. *Id.* at 190:15-23. Surprisingly given his endocrinology background, he cannot even identify the type of hair loss that will respond to treatment of underlying endocrine disorders, nor the mechanism by which hair loss will improve. *Id.* at 132:12-133:15. Likewise, he has no expertise relating to hair loss caused by the miniaturization of the follicles (which is typically related to dihydrotestosterone exposure). *Id.* at 153:17-25. And he is unaware of whether there is a loss of hair follicles in patients with female pattern hair loss. *Id.* at 154:22-155:8, 245:1-7.

Most critically, Dr. Fonseca does not have any knowledge regarding the differences in presentation between endocrine-induced alopecia and chemotherapy-induced alopecia. *Id.* at 141:4-144:21, 214:16-215:1. Instead, he admits that he has no knowledge "of follicular things and chemotherapy." *Id.* at 142:13-21. In fact, the only method he could articulate in differentiating between the two was by looking to see whether the patient had recently undergone chemotherapy.

*Id.* at 143:15-144:9. Obviously, this method is unhelpful in this case where all Plaintiffs have undergone Taxotere therapy. Ultimately, he admits that he is unqualified to offer his key opinion in this case: whether chemotherapy or hormones caused a patient's hair loss. *Id.* at 145:9-17 ("Q. Is it fair to say that if an individual presented to you who had undergone chemotherapy that you very well may not be able to distinguish between and diagnose between androgenetic alopecia and chemotherapy-induced alopecia because of the limitation in your expertise on a follicular level? Correct? A. Yes." (objection omitted)). And he admits that he would have to defer to someone with expertise in hair loss to determine the cause of the hair loss. *Id.* at 145:19-22. Likewise, he admits his lack of follicle expertise renders him unable to differentiate between menopause-induced and chemotherapy-induced hair loss, between endocrine-therapy induced and chemotherapy-induced hair loss, between androgenetic alopecia and chemotherapy-induced hair loss, or between telogen effluvium and chemotherapy-induced hair loss. *Id.* at 241:25-244:4. Similarly, he admits that he lacks the expertise to rule in or rule out permanent chemotherapy-induced alopecia in patients that have undergone chemotherapy. *Id.* at 181:11-22. In short, he cannot help rule in or rule out any cause for Plaintiffs' hair loss.

### C.   Dr. Fonseca did not perform the medically-accepted tests and examinations necessary to determine the cause of hair loss.

Sanofi has produced expert reports from two dermatologists, Dr. Love and Dr. Shapiro, who opine on the causation of Plaintiffs' injuries. Putting aside for argument's sake Plaintiffs' disagreement with these experts and their conclusions, and also Plaintiffs' disagreement that scalp biopsies or other diagnostic tools are required, it is worth nothing that Sanofi's other experts take the position that certain diagnostic tests and examinations are in fact needed in order to diagnosis the type of hair loss and then determine its cause.  *See* Ex. C, Expert Rpt. of Dr. Porcia Bradford

Love ("Love Gen. Rpt.") at 9-10; Ex. D, Expert Rpt.: Alopecia in Women, Jerry Shapiro, M.D. ("Shapiro Gen. Rpt.") at 14-16.

According to Love and Shapiro, in order to diagnose the cause of hair loss, it is necessary to consider the patient's full and accurate clinical history, dermoscopy or trichoscopy, scalp biopsies, and pathology. In Dr. Shapiro's words, "[d]ifferential diagnoses, scalp biopsies, and pathology are critical to the accurate diagnosis and treatment of hair loss." See Ex. E, Shapiro Earnest-Specific Report at 4-6. Such tools are necessary, Dr. Love says, because "[d]iagnosing the type and cause of alopecia can be very difficult." Ex. C, Love Gen. Rpt. at 10.

These diagnostic approaches clash with Dr. Fonseca's. Sanofi's position before the jury cannot be that these tests are *required*—only to proffer expert testimony from Dr. Fonseca, who performs none of these tests and concedes he is unaware of what methods can be used to determine the cause of alopecia. *See* Ex. A, Tr. at 270:1-270:23; *see also id*. at 37:8-12, 118:14-25 (Dr. Fonseca acknowledging he never performed a scalp biopsy, never ordered a hair follicle scalp biopsy, never interpreted a hair follicle scalp biopsy, and never even read a hair follicle scalp biopsy); *Id.* at 37:22-38:9, 228:10-21 (Fonseca acknowledging he does not even know what dermoscopy or trichoscopy is (it's an examination of the skin or scalp under magnification).

Critically, Dr. Fonseca does not rely on any other expert to assist him in reaching his conclusions. *Id.* at 145:19-22.  In fact, Dr. Fonseca testified that he has *not* read Love's and Shapiro's expert reports. *Id.* at 34:17-22. As such, Dr. Fonseca's free-floating approach to causation is unmoored from *any* diagnostic tool.

To be sure, the Court need not (and should not) decide in the context of this motion which diagnostic tool is needed. It may simply recognize that Sanofi's experts believe that *some*

diagnostic tool is needed to identify the type of hair loss and determine its cause—and that Dr. Fonseca relies on none.

## II.   DR. FONSECA'S OPINIONS REGARDING CONDITIONS POTENTIALLY CAUSING HAIR LOSS ARE IRRELEVANT AND UNSUPPORTED.

To bolster his obvious lack of expertise regarding hair loss, Dr. Fonseca relies on medical literature purportedly relating to certain endocrine conditions' association with hair loss.  But Dr. Fonseca's opinions regarding these alternative conditions lack relevance because he cannot establish: (1) that the conditions cause symptoms consistent with Plaintiffs' hair loss; or (2) the relative likelihood that the condition can cause hair loss generally; or (3) that any Plaintiff even has the condition.  Additionally, Dr. Fonseca's literature review is unreliable, as he draws conclusions that go far beyond what is supported.

### A.   Dr. Fonseca has failed to establish foundational relevance of his purported alternative causes.

Dr. Fonseca's opinions regarding alternative causes are irrelevant because he cannot establish a foundational nexus between the proposed condition and Plaintiff's actual symptoms. For each purported alternative cause, Dr. Fonseca cannot identify whether the proposed cause is consistent with the specific hair loss symptoms experienced by each Plaintiff. *See* § I.B., *supra*.

Rather than provide his own conclusive differential diagnosis, Dr. Fonseca attempts to undercut Plaintiffs' experts' differential diagnoses by proposing alternative causes.  In order to assist laypersons with causation, however, Dr. Fonseca must be able to rule out potential causes or provide some evidence regarding the relative likelihood that his proposed alternative causes specifically caused each Plaintiff's hair loss.  Dr. Fonseca can do neither.

*Pipitone v. Biomatrix, Inc.*, compels Dr. Fonseca's exclusion. 288 F.3d 239 (5th Cir. 2002). There, the proffered expert testimony of Dr. Millett was excluded because it was not helpful to the fact-finder due to his inability to conclude it is was more likely than not that the injection caused

the claimed injury. *Id*. at 245. The Fifth Circuit found that Dr. Millet's "perfectly equivocal opinion does not make any fact more or less probably and is irrelevant under the Federal Rules of Evidence." *Id.* Here, Dr. Fonseca concedes that he cannot rule out any cause and cannot identify whether any one cause is more likely than another. Ex. A, Tr. at 200:22-201:22. Because he suggests alternative causes without providing the fact-finder any ability to weigh their relative likelihood, Dr. Fonseca's causation opinions are irrelevant.

Additionally, Dr. Fonseca should not be allowed to opine or suggest that any Plaintiff may suffer from conditions for which they have not been diagnosed. He has never examined these Plaintiffs nor even reviewed their entire medical files, particularly "the dermatological aspects." *Id.* at 31:17-32:13, 273:12-24. As such, he cannot provide, and has not attempted to provide, a definitive diagnosis of endocrine disorders for any Plaintiff. What's more, none of these three Plaintiffs has been diagnosed with polycystic ovary syndrome, thyroid conditions, or diabetes. Thus, Dr. Fonseca's opinions regarding these conditions are wholly irrelevant.

**B.    Dr. Fonseca's opinions are unsupported by the literature he cites.**

Dr. Fonseca tries to make up for his inexperience with medical literature. But his opinions are not supported by the literature he cites, and his conclusions go far beyond what the literature could plausibly support. What's more, Dr. Fonseca is not equipped to help laypersons understand these medical studies, because he lacks the experience to critically analyze and contextualize this literature, and is completely unfamiliar with basic vocabulary in the articles (like telogen effluvium).

*1.   Menopause*

Dr. Fonseca makes broad, unsupported conclusions that menopause causes hair loss. For example, Dr. Fonseca opines that "almost all postmenopausal women" become "very deficient" in estrogen, which "often leads to a most severe hair loss on the scalp, which is in many ways similar

to male pattern baldness that is often seen in men." Ex. B, Fonseca Rpt. at 4. Similarly, he opines that "significant changes in scalp, facial and body hair occur after the menopause." *Id.* at 5. Further, he opines that menopause cannot be "ruled out" as a cause for each of the three Plaintiff's hair loss. *Id.* at 8, 9, 10. Each of these opinions should be struck.[1]

Dr. Fonseca's broad conclusions establishing a causal link between menopause and hair loss are based on just one subjective survey study and two literature reviews. *See id.* at 11, fn. 12-14. Notably, *none* of these studies supports the contention that menopause *causes* hair loss.

The two literature reviews Dr. Fonseca relies on for his menopause claims are the "Hormonal changes in menopause: do they contribute to a 'midlife hair crisis' in women?' by Dr. Mirmirani ("Mirmirani Article") and "Androgens and menopause" by Dr. Shulman ("Shulman Article"). *See id.* at 11 nn. 13-14. The Mirmirani article actually contradicts Dr. Fonseca's opinion that there is a causal connection between menopause and hair loss, as it concludes that "there is currently inadequate information to attribute specific hair changes to hormonal alterations seen in menopause. Despite the prevalence of [female pattern hair loss] there are still many shortcomings in our pathogenetic understanding of hair loss in women." Ex. F, Mirmirani Article at 9. The Shulman article makes only two passing mentions of a general association between menopause and estrogen reduction or "changes in hair growth," but notably, it does not provide any reference or study supporting the findings. *See* Ex. G, Shulman Article at 491, 493. Regardless, neither of these articles support Dr. Fonseca's conclusion that menopause *causes* hair loss.

The only study Dr. Fonseca relies on to support his conclusion that menopause causes hair loss is "Physiological changes in scalp, facial and body hair after the menopause: a cross-sectional population-based study of subjective changes" by Drs. Ali and Wojnarowska ("Ali Study"). Ex.

---

[1] The following portions of Fonseca's Expert Report should be struck: Section II.b.; Section III.a.; Sections IV. a. and b. related to menopause; Section V. a. and b. related to menopause; Section VI a. and b. related to menopause.

B, Fonseca Rpt. at 11 n. 12. As implied by the study's title, this was not a prospective, controlled study, but rather a subjective questionnaire with a response rate of only 41%. Ex. H, Ali Study at 509. Notably, the study excluded women who had an existing hair disease, *id.*, which means that individuals like Plaintiffs with severe alopecia would have been excluded. Also, whereas Plaintiffs Francis and Durden are African-American, the Ali study included only northern European women and "exclude[d] ethnic variation in hair distribution," *id.*—further undercutting the study's relevance.

Additionally, 42% of respondents were either on or had been on hormone replacement therapy (HRT). *Id.* Accordingly, nearly half of the study participants would not have had the estrogen deficiency that Dr. Fonseca attempts to link to hair loss. The Ali study wholly undermines Dr. Fonseca's opinion that hormone changes are the cause of menopausal hair loss, as it found no difference in scalp hair change between women taking HRT and those not taking HRT. *Id.* Similarly, the Ali study finds no support that generalized hair loss is caused by falling estrogen levels. *Id.* at 511. And the study notes that changes in hair density occur "independent of the endocrine changes relating to the menopause." *Id.* at 512. Ultimately, the Ali Study concludes that only for certain patterned hair loss ("frontal loss and temporal recession") does the evidence suggest that androgens may play a role. *Id.* at 512-13. But Dr. Fonseca lacks the expertise to determine and thus has not opined that any plaintiff has this type of patterned hair loss. *See* §§ I.B.-I.C., *supra*. Regardless, because the Ali Study is a survey rather than a prospective, placebo-controlled trial, it can provide no support for a causal connection between menopause and hair loss, but rather lists a mere *association* from the surveys. Ex. H, Ali Study. In short, Dr. Fonseca lacks the evidentiary basis to testify that menopause is the cause of hair loss for any patient, let alone the Plaintiffs.

Even if the literature cited by Dr. Fonseca were to establish a clear association between menopause and hair loss—which it does not—that association is unhelpful and unreliable for the jury in the absence of some *quantification* of the strength of that association. On this score, Dr. Fonseca can say nothing to aid the jury. In fact, he admits that he is unable to provide any statistics regarding the frequency with which postmenopausal women suffer from severe hair loss. Ex. A, Tr. at 182:21-183:16, 199:21-200:1. As such, Dr. Fonseca is unable to provide any reliable quantification of whether, say, 99%, 50%, or 0.001% of postmenopausal women suffer from severe hair loss. Without that context, an undefined association between menopause and hair loss is simply not relevant to causation. Indeed, Dr. Fonseca cannot even articulate a plausible underlying endocrine and follicular mechanism that could theoretically cause permanent hair loss in postmenopausal women. *Id.* at 191:7-25, 198:11-15.

Dr. Fonseca does not offer an opinion that any plaintiff suffers from menopause-induced hair loss. *Id.* at 195:13-25, 196:2-197:3. Additionally, Dr. Fonseca does not offer an opinion regarding when, if ever, hair loss allegedly caused by menopause began occurring for Plaintiffs. *See, e.g.*, *Id.* at 192:11-15. In fact, he is unaware of any technique that could be used to identify whether hair loss is related to menopause by examining the follicles. *Id.* at 198:11-199:5. Nor does he know whether only certain types of hair loss, like scalp density, is influenced by menopausal status. *Id.* at 192:2-5. Because Dr. Fonseca does not have these tools, he incorrectly opines that menopause can never be ruled out as a cause of hair loss for any post-menopausal patient under any circumstances. *Id.* at 203:8-25. Indeed, the entire basis for Dr. Fonseca's opinions on menopause causing Plaintiffs' hair loss is: (1) two journal articles, (2) one survey study, and (3) that each plaintiff is both postmenopausal and suffering from permanent hair loss. *Id.* at 258:9-259:6, 263:25-264:6, 267:8-16.

2. *Endocrine Therapy*

Dr. Fonseca makes unsupported assertions identifying endocrine therapy as a cause of each Plaintiff's hair loss. Despite acknowledging that no causal connection has been established between endocrine therapy and hair loss, he nonetheless opines that he "cannot rule out" long-term endocrine therapy as the cause of hair loss for each Plaintiff. Ex. B, Fonseca Rpt. at 8-10. But Dr. Fonseca does not have the requisite knowledge to connect endocrine therapy to the specific hair loss symptoms afflicting Plaintiffs. For example, he does not know what hormone-therapy-induced hair loss does to the hair follicle, *i.e.*, whether it drives the follicle to a resting state or whether it kills the hair follicle. Ex. A, Tr. at 225:14-226:8. Similarly, in his report he draws a connection between endocrine therapy and "monk pattern" hair loss, "frontal pattern" hair loss, and "crown" hair loss. Ex. B, Fonseca Rpt. at 7. But Dr. Fonseca fails to identify whether Plaintiffs have these types of hair loss, undoubtedly because he is unqualified to do so. Rather, the entirety of the evidence from which Dr. Fonseca concludes that endocrine therapy may be the cause of each Plaintiff's hair loss is: she took endocrine therapy, and she developed hair loss. Ex. A, Tr. at 260:3-8, 266:18-22, 269:19-25.

Critically, Dr. Fonseca expressly disclaims that he is offering a general causation opinion that endocrine therapy causes permanent hair loss. *Id.* at 221:6-10. Rather, in his report he states vaguely that "[a]lopecia can occur with endocrine therapy," a statement he bases on just four references. Ex. B, Fonseca Rpt. at 7. None of his cited references, however, identifies a causal connection between endocrine therapy and hair loss; at best, several identify a mere association. To the extent Dr. Fonseca intends to opine that a causal connection is established by the medical literature he cites, his opinion on that matter must be stricken.

The five references Dr. Fonseca cites (four in his report and one at his deposition) do not bolster his knowledge. None conclude there is any causal connection between endocrine therapy and hair loss. At most, they recognize a potential association and a need for further study.[2]

For example, Dr. Fonseca opines that the literature indicates that only about 22% of women on hormone therapy report hair loss. Ex. A, Tr. at 213:13-214:4. This is presumably based on a single survey he hyperlinks in his report which actually states there has been "no controlled studies" on the incidence of endocrine therapy-induced alopecia and was a mere survey to ask women about hair loss they experienced. *See* Ex. I, Goodman Survey. This survey did not account for women that had been treated with chemotherapy before endocrine treatment and did not provide a definition of "hair," "hair loss," or "hair thinning". None of the other references he cites provide percentages of women who experience hair loss with endocrine therapy, and none states there is a connection between hair loss and endocrine therapy.

### 3. Obesity & Insulin Resistance

For Ms. Durden, the entirety of the evidence that Dr. Fonseca offers to support his conclusion that obesity may be a cause of her hair loss is: Durden is obese and she has hair loss. Ex. A, Tr. at 259:8-260:1. For Ms. Earnest, Dr. Fonseca similarly states: "She has quite severe obesity, and she has hair loss." *Id.* at 264:7-11. And for Ms. Francis, Dr. Fonseca claims she is obese based on her body-mass index, and her hair loss is caused by obesity. *Id.* at 267:18-25.

There is no support for these claims. Dr. Fonseca is unable to offer any data or evidence indicating the frequency or percentage of patients for which obesity causes *permanent* hair loss.

---

[2] Fonseca cites a bizarre collection of references: one study involving mice - not women (Skarra); two letters to the editor about very small populations of women (one and fifteen, respectively) who had hair loss after chemotherapy and while taking endocrine therapy (Rossi and Puglisi); one meta-analysis which concedes the issue has not been systematically investigated (Saggar); and one article about "anecdotally reported but not systematically described" alopecia (Freites-Martinez). *See* Ex. B, Fonseca Rpt. at 7.

*Id.* at 262:13-23, 265:2-5.[3] And Dr. Fonseca does not offer any opinion that obesity contributes to or accelerates permanent *chemotherapy-induced* alopecia. *Id.* at 271:16-20.

Similarly, Dr. Fonseca does not offer an opinion that insulin resistance accelerates or exacerbates permanent chemotherapy-induced alopecia. *Id.* at 271:22-272:1. Dr. Fonseca does not explicitly offer an opinion in his report that Plaintiffs Durden, Francis, or Earnest suffer from insulin resistance. Ex. B, Fonseca Rpt. at 8-10; Ex. A, Tr. at 165:24-166:16, 166:22-169:2. Instead, Dr. Fonseca simply assumes that "all obese people . . . will have insulin resistance," yet he acknowledges that measuring insulin resistance "is quite challenging" and has "not been actually quantified" for these Plaintiffs. *Id.* at 301:8-16.

Dr. Fonseca says he has only seen an association between insulin resistance and alopecia in regard to patients with polycystic ovary syndrome. But Dr. Fonseca cannot support this claim, and in fact no literature he cites establishes any link between insulin resistance and hair loss for patients without polycystic ovary syndrome. See Ex. B, Fonseca Rpt. at 3. In any event, none of the Plaintiffs have polycystic ovary syndrome, Ex. A, Tr. at 286:6-20, which means this entire line of testimony is irrelevant.

In all, Dr. Fonseca's unsupported claim that obesity cannot be ruled out as "the cause" of each plaintiff's hair loss is exactly the sort of unreliable, junk-science that *Daubert* forbids.

### 4. *Metabolic Syndrome*

Dr. Fonseca's report offers overbroad and unfounded conclusions that metabolic syndrome "is associated with" hair loss in women, that "more severe hair loss [is seen] in postmenopausal

---

[3] The Tarkun study involved 31 "young women" all of whom were non-obese and had PCOS. Ex. J, Tarkun Study at 115. However, this study did not look at hair loss, and the word hair does not even appear in the text of the study. *Id.* This study provides no support that obesity is associated with hair loss. The Ehrmann study involved 13 obese women with "PCOS and impaired glucose tolerance." Ex. K, Ehrmann Study at 2108. However, this study did not look at hair loss, and the word hair does not ever appear. *Id.*

women with metabolic syndrome," and that metabolic syndrome may be the cause of the hair loss seen with Plaintiffs Francis and Earnest. *See* Ex. B, Fonseca Rpt.at 6, 9, 10. But Dr. Fonseca relies on just two studies and one literature review "concerning the relationship between alopecia and [metabolic syndrome (MetS)]" to support these opinions: (1) "Androgens and menopause" by Dr. Shulman ("Shulman Article"); (2) "Androgenetic alopecia as an indicator of metabolic syndrome and cardiovascular risk" by Dr. Ertas, et al. ("Ertas Study"); and (3) "Alopecia and the metabolic syndrome" by Dr. Lie et al. ("Lie Study"). *Id.* at 6, 11 nn. 14-15, 12 n. 19. These references, however, do not support a causal connection between metabolic syndrome and hair loss.

While the Shulman Article links metabolic syndrome to falling estrogen levels, the study does not provide any link whatsoever—causal or mere correlation—between metabolic syndrome and hair loss. Ex. G, Shulman Article at 493. Worse yet, the Ertas Study involved a population of 68 males—and zero females. Ex. L, Ertas Study at 1. A study on male hair loss simply has no relevance to female hair loss.

The Lie Study is a meta-analysis that relates primarily to males and Asians—demographics that do not include Plaintiffs. The Lie Study notes that support for an association between androgenetic alopecia and metabolic syndrome is found "particularly in men," Ex. M, Lie Study at 54, a conclusion that Dr. Fonseca parrots in his report, Ex. B, Fonseca Rpt. at 6. The Lie Study notes "most of the studies have been conducted in male-only populations rather than in populations consisting of both genders. The number of studies on female-only populations is even smaller." Ex. M, Lie Study at 56. In fact, the only study that Dr. Lie describes as finding a significant association between metabolic syndrome and androgenetic alopecia in women is a study of a "middle-aged Korean population." *Id.*; *see also* Ex. N, S.M. Yi et al., *Gender-specific association of androgenetic alopecia with metabolic syndrome in a middle-aged Korean population*, Br. J.

20

Dermatology, Aug. 2012, at 306-13. Because hair follicles in East Asian populations are markedly different than those in African-American or Caucasian populations, a significant analytical leap is necessary to conclude that this association exists among other races. Thus, Dr. Fonseca provides no reliable support for an association between metabolic syndrome and androgenetic alopecia for female plaintiffs that are of non-Asian descent.

Even assuming such an association, Dr. Fonseca has not provided any quantification that would allow a jury to weigh the strength of this association. *See* Ex. B, Fonseca Rpt. Nor could Dr. Fonseca do so. Dr. Lie explains that androgenetic alopecia is characterized by two symptoms: (1) miniaturization of hair follicles and (2) an increase in the number of empty hair follicles. Ex. M, Lie Study at 54-55. Dr. Fonseca, however, admits that he has not looked at any follicle biopsy or dermoscopy that would support the presence of these symptoms in the bellwether plaintiffs, nor would he have the expertise to do so. Ex. A, Tr. at 35:17-39:11. Because Dr. Fonseca cannot determine whether any bellwether plaintiff specifically has androgenetic alopecia, he cannot establish any relevance of this association as it relates to each Plaintiff's specific type of hair loss.

Further, Dr. Fonseca clarified at his deposition that he does not in fact provide an opinion that metabolic syndrome causes androgenetic hair loss, and he refused to answer whether a causal relationship exists. *Id.* at 157:15-162:20. Absent a causal relationship, Dr. Fonseca has no reliable evidence upon which to conclude that metabolic syndrome is a cause of Plaintiffs' hair loss. Similarly, Dr. Fonseca does not offer any opinion that metabolic syndrome accelerates or exacerbates permanent chemotherapy-induced alopecia. *Id.* at 271:9-14.

On these issues, Dr. Fonseca is out of his depth. He admits that his expertise regarding the alleged association between metabolic syndrome and alopecia relates exclusively to his studies on

women with polycystic ovary syndrome. *Id.* at 287:9-18. Again, none of the Plaintiffs suffer from this syndrome.

Lastly, Dr. Fonseca's opinions relating to metabolic syndrome, the opinions contained in Report section III.c. titled "Consequences of the Metabolic Syndrome: Risk of Serious Medical Problems," Ex. B, Fonseca Rpt. at 6-7, have no relevance to hair loss. They relate only the association of metabolic syndrome with other adverse health consequences, like diabetes, cancer, and cardiovascular issues. *Id.* These opinions simply have no conceivable relevance to any issues in this case.

### 5. *Polycystic Ovary Syndrome and Hirsutism*

Dr. Fonseca sprinkles "polycystic ovary syndrome" on many of the other conditions he says can be related to hair loss. But that cannot counteract the bitter truth that Dr. Fonseca's testimony is unreliable. Whatever Dr. Fonseca may think about hair loss and polycystic ovary syndrome,[4] *none* of the Plaintiffs have this condition and Dr. Fonseca does not offer any opinion that they are so afflicted. Ex. A, Tr. at 146:12-23.

Hirsutism is another condition Dr. Fonseca discusses in conjunction with polycystic ovary syndrome. Hirsutism's hallmark is unwanted facial hair, and it may develop in women with polycystic ovary syndrome. Dr. Fonseca's mention of hirsutism is also irrelevant because he offers no opinion regarding whether Durden, Francis, and Earnest have hirsutism. *Id.* at 148:25-149:23. They do not, and in fact complain of a lack of facial hair. Any reference to these syndromes is irrelevant.

---

[4] In his Report in the section titled "Obesity and Insulin Resistance," Fonseca makes the opinion that "loss of scalp hair are common features of the syndrome." Ex. B, Fonseca Rpt. at 3. He has clarified that opinion as referring specifically to polycystic ovary syndrome. Ex. A, Tr. at 150:10-25. According to Fonseca, polycystic ovary syndrome primarily impacts young, premenopausal women, particularly women in their 20s. *Id.* at 149:12-150:2. Fonseca does not know the proportion of women with polycystic ovary syndrome who have hair loss. *Id.* at 151:25-153:3.

6. *Thyroid Disease*

Dr. Fonseca states that having a hormonal imbalance such as thyroid disease is related to hair loss. Ex. B, Fonseca Rpt. at 4. But he does not explain the mechanism for this assertion or provide any statistics. In addition, he does not offer an opinion that Plaintiffs Durden, Francis, or Earnest suffers from any thyroid condition that would contribute to their hair loss. Ex. A, Tr. at 154:2-15. This entire line of testimony should be stricken.

7. *Diabetes*

Dr. Fonseca does not detail any connection between diabetes and hair loss and only briefly discusses diabetes in his report.[5] Ex. B, Fonseca Rpt. at 3-4. While Dr. Fonseca's report could be read to suggest that he thinks Plaintiff Earnest has diabetes, Dr. Fonseca corrected the record at his deposition, when he stated that he is not offering any such opinion. Ex. A, Tr. at 241:16-24. Dr. Fonseca also does not offer an opinion that Plaintiffs Durden or Francis suffer from diabetes. Ex. B, Fonseca Rpt. at 7-9; Ex. A, Tr. at 240:16-241:11.[6] Because no Plaintiff has diabetes and the relation diabetes to hair loss is not otherwise discussed, Dr. Fonseca's musings on diabetes and hair loss should be discarded.

**III.   THE COURT SHOULD STRIKE TWO OTHER UNSUPPORTED STATEMENTS PROVIDED BY DR. FONSECA.**

Dr. Fonseca provides no support for his belief that patients "may experience more than one type of alopecia," that "the causes of many types of alopecia are not well-understood," or that "many conditions, including alopecia, are multifactorial in nature." Ex. B, Fonseca Rpt. at 7.

---

[5] Diabetes is only discussed in the relation to obesity, insulin resistance, and hypertension. *See generally* Ex. B, Fonseca Rpt.
[6] Sanofi has seized on a single entry in Francis's medical records that references diabetes, but Francis's doctor testified under oath that this was incorrectly recorded and that Francis is not a diabetic. Ex. O, Dep. Tr. of Dr. Tillery at 42:7-44:1.

Because Dr. Fonseca is not a hair-loss expert and provides no literature support for these statements, his opinions regarding the "multi-factorial nature of alopecia" should be stricken.

In his report, Dr. Fonseca opines: "Even modest changes in testosterone levels in *women* lead to marked changes in hair growth, particularly hirsutism and loss of hair in the scalp." *Id.* at 4 (emphasis added). He bases this opinion on a single citation to a study by Ragip Ertas, et al. Ex. A, Tr. at 170:12-15; Ex. B, Fonseca Rpt. at 11 n. 15. This study is inapposite. It involved 60 male patients and no women. *See* Ex. L, Ertas Study at 2. If anything, the study directly contradicts Dr. Fonseca's opinion, when it says: "[T]here is no relation between the severity of alopecia and serum androgen concentrations. In support of these findings, hair loss, which is generally encountered in both males and females, is considered to result from the abnormal sensitivity of hair follicles to the circulating androgens in genetically susceptible individuals." *Id.* at 4.

As such, Dr. Fonseca has no scientific support for either of these opinions and they should be stricken.

## CONCLUSION

For the foregoing reasons, Sanofi's expert Dr. Vivian Fonseca should be excluded from opining in this case and his expert report should be stricken in its entirety.

Dated: February 8, 2019                     Respectfully submitted,


*/s/ Christopher L. Coffin*                  */s/ Karen B. Menzies*
Christopher L. Coffin (#27902)               Karen Barth Menzies (CA Bar #180234)
PENDLEY, BAUDIN & COFFIN, L.L.P.             Andre Mura (CA Bar # 298541) (on the brief)
1100 Poydras Street, Suite 2505             GIBBS LAW GROUP LLP
New Orleans, Louisiana 70163                6701 Center Drive West, Suite 1400
Phone: (504) 355-0086                       Los Angeles, California 90045
Fax: (504) 355-0089                         Telephone: 510-350-9700
ccoffin@pbclawfirm.com                      Facsimile: 510-350-9701
                                            kbm@classlawgroup.com
*Plaintiffs' Co-Lead Counsel*
                                            *Plaintiffs' Co-Lead Counsel*

_/s/M. Palmer Lambert_
M. Palmer Lambert (#33228)
GAINSBURGH BENJAMIN DAVID
MEUNIER & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: 504-522-2304
Fax: 504-528-9973
plambert@gainsben.com

_Plaintiffs' Co-Liaison Counsel_

_/s/Dawn M. Barrios_
Dawn M. Barrios (#2821)
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: 504-524-3300
Fax: 504-524-3313
barrios@bkc-law.com

_Plaintiffs' Co-Liaison Counsel_

## PLAINTIFFS' STEERING COMMITTEE

Anne Andrews
Andrews Thornton Higgins Razmara, LLP
2 Corporate Park, Suite 110
Irvine, CA 92606
Phone: (800) 664-1734
aa@andrewsthornton.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@atkinsandmarkoff.com

J. Kyle Bachus
Bachus & Schanker, LLC
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Phone: (303) 893-9800
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Phone: 510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, Florida 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

Andrew Lemmon
Lemmon Law Firm, LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Genevieve Zimmerman
Meshbesher & Spence Ltd.
1616 Park Avenue South
Minneapolis, MN 55404
Phone: (612) 339-9121
Fax: (612) 339-9188
gzimmerman@meshbesher.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2019, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

/s/ M. Palmer Lambert
M. PALMER LAMBERT