UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)     MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

SECTION "H" (5)

THIS DOCUMENT RELATES TO:

Antoinette Durden, Case No. 2:16-cv-16635;
Tanya Francis, Case No. 2:16-cv-17410;
Barbara Earnest, Case No. 2:16-cv-17144

---

## MEMORANDUM IN SUPPORT OF SANOFI DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF ELLEN FEIGAL, M.D.

---

Dr. Ellen Feigal became a certified oncologist 30 years ago, but she has not treated a single breast cancer patient in 28 years.[1] She has never prescribed Taxotere, and she has never counseled a breast cancer patient on the risks and benefits of Taxotere.[2] Despite her lack of experience with the drug, Plaintiffs offer Dr. Feigal (an industry consultant) to opine generally as to the adequacy of risk/benefit discussions ("informed consent") between practicing oncologists and their breast cancer patients about the use of Taxotere, particularly with respect to the risk of hair loss.[3]

Dr. Feigal is not offering any case-specific opinions about the three bellwether Plaintiffs, their prescribing oncologists, the risk/benefit discussions that took place in these cases, Plaintiffs' hair loss, or specific causation.[4] Dr. Feigal also is not opining as to the adequacy of Defendants'

---

[1]   *See* Feigal Curriculum Vitae at 1-2 (Ex. A); Feigal Dep. Vol. I 76:23-77:1 (Ex. B).

[2]   *See* Feigal Dep. Vol. I 81:6-11 (Ex. B).

[3]   Dr. Feigal also attempts to opine on general causation—opinions that should be precluded for the reasons set forth in Sanofi Defendants' Motion to Exclude Testimony on General Causation, which is being filed concurrently herewith, and is incorporated herein by reference.

[4]   *See* Feigal Dep. Vol. I 122:14-123:3 (Ex. B); Vol. III 591:23-592:13 (Ex. C).

FDA-approved labeling for Taxotere.[5]  Viewed in this context, Dr. Feigal's litigation-driven "informed consent" opinions should be precluded under Rule 702 for the following reasons:

1. Dr. Feigal lacks the qualifications to opine on the adequacy of risk/benefit discussions between practicing oncologists and breast cancer patients regarding the use of Taxotere;

2. Opinions on what an "objective" physician would have discussed with a patient are legally irrelevant under the learned-intermediary doctrine and are unhelpful to the jury because they lack any nexus to these three cases;

3. Dr. Feigal's opinion that Defendants did not adequately communicate risk information to physicians lacks a reliable foundation and methodology;

4. Opinions based on 20/20 hindsight about what chemotherapy options might have been available and selected are inherently speculative; and

5. Dr. Feigal's methodology is unreliable because she selectively ignored contrary evidence that did not support her opinion.

The Court should grant Defendants' motion and exclude Dr. Feigal's irrelevant, unhelpful, and speculative opinions.

## LEGAL STANDARD

Federal Rule of Evidence 702 controls the admission of expert testimony.  Under Rule 702, the Court's gatekeeping function first involves determining whether the expert is *qualified*; then it "involves a two-part inquiry into *reliability* and *relevance*":

> First, the Court must determine whether the proffered expert testimony is reliable. The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence. The reliability inquiry requires the Court to assess whether the reasoning or methodology underlying the expert's testimony is valid. The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation.
>
> Second, the Court must determine whether the expert's reasoning or methodology is relevant. The question here is whether the reasoning

---

[5] *See* Feigal Dep. Vol. I 97:10-16, 100:23-101:2, 102:13-16, 116:8-11 (Ex. B).

> or methodology "fits" the facts of the case and will thereby assist the trier of fact to understand the evidence.

*Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 550 (E.D. La. 2015) (citations omitted) (emphasis added).

The "reliability analysis applies to *all aspects* of an expert's testimony," including "the methodology, the *facts underlying the expert's opinion*, [and] the link between the facts and the conclusion." *See Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (emphasis added). Importantly, "the expert's testimony must be reliable at each and every step or else it is inadmissible." *Id*. These "exacting standards of reliability," *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000), provide that "conjecture, hypothesis, subjective belief, or unsupported speculation are impermissible grounds on which to base an expert opinion," *Wehling v. Sandoz Pharm. Corp.*, No. 97-2212, 162 F.3d 1158, 1998 WL 546097, at *5 (4th Cir. Aug. 20, 1998) (Table Decision). Courts also consider "whether experts are 'proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.'" *Burst*, 120 F. Supp. 3d at 551 (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (*Daubert II*)). Defendants do not bear the burden of demonstrating inadmissibility. *See Soldo v. Sandoz Pharm. Corp.*, 244 F. Supp. 2d 434, 534 (W.D. Pa. 2003).

As to relevance, the Court must determine, as part of its gatekeeping role, whether the proffered expert testimony is sufficiently tied to the facts in issue that it will aid the jury. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993) (stating that the district court's "gatekeeping role" requires ensuring that the expert testimony "is relevant to the task at hand"). "The question here is whether the reasoning or methodology 'fits' the *facts of the case* and will

thereby assist the trier of fact to understand the evidence." *Burst*, 120 F. Supp. 3d at 551 (emphasis added).

## ARGUMENT

I. **DR. FEIGAL IS NOT QUALIFIED TO OPINE AS TO THE ADEQUACY OF RISK/BENEFIT DISCUSSIONS BETWEEN ONCOLOGISTS AND BREAST CANCER PATIENTS REGARDING THE USE OF TAXOTERE.**

Dr. Feigal's opinions regarding the adequacy of risk/benefit discussions between practicing oncologists and their breast cancer patients about Taxotere exceed the scope of her "knowledge, skill, experience, training, or education." *See* Fed. R. Civ. Evid. 702. Although she was certified as an oncologist 30 years ago, Dr. Feigal is actually an industry consultant who has not treated a single breast cancer patient for 28 years. *See* Feigal CV at 1-2, 21 (Ex. A); Feigal Dep. Vol. I 76:23-77:1 (Ex. B). Dr. Feigal has never prescribed Taxotere or Taxol to a breast cancer patient. *See* Feigal Dep. Vol. I 81:6-15 (Ex. B). In fact, she stopped treating breast cancer patients two years before *any* taxane chemotherapy was approved to treat *any* cancer.[6] *See* Feigal Dep. Vol. I 77:24-78:22, 81:6-15, 82:1-7 (Ex. B).

Dr. Feigal has never counseled a breast cancer patient on the risks and benefits of Taxotere. *See* Feigal Dep. Vol. I 82:8-11, 82:21-83:1 (Ex. B). Moreover, she has never: (1) published any papers or presented on Taxotere to treat early stage breast cancer; (2) "done any presentations, slides, handouts, or posters regarding [Taxotere] and alopecia;" (3) been involved in a clinical study involving Taxotere to treat early stage breast cancer; (4) treated a breast cancer patient who complained of permanent alopecia; (5) formally diagnosed a breast cancer patient with permanent alopecia; or (6) performed a differential diagnosis to determine the cause of permanent alopecia in

---

[6] FDA first approved Paclitaxel (Taxol) for use in the treatment of metastatic ovarian cancer on December 29, 1992. *See* Kessler Report at ¶ 16 (Ex. D). FDA first approved docetaxel (Taxotere) for use in the treatment of advanced metastatic breast cancer on May 14, 1996. *See* Arrowsmith Report at ¶ 62 (Ex. E); *see also* 21 U.S.C. § 355(d).

4

a breast cancer patient.  *See* Feigal Dep. Vol. I 36:3-9, 83:2-84:5, 92:8-16, 93:3-6 (Ex. B).  Dr. Feigal has no clinical experience with either the product at issue or the alleged injury in this litigation.

Despite her lack of qualifications, Plaintiffs nonetheless offer Dr. Feigal to testify as to the adequacy of risk/benefit discussions between practicing oncologists and their breast cancer patients about Taxotere.  *See* Feigal Report at 7, 43 (Ex. F).  But Dr. Feigal has no experience with such discussions and, therefore, should be precluded from opining (1) as to their adequacy, or (2) as to what a reasonable or objective prescribing physician would have done if provided different information about Taxotere.  *See, e.g.*, *In re Bard IVC Filters Prods. Liab. Litig.*, MDL No. 15-2641, 2018 WL 495187, at *4 (D. Ariz. Jan. 22, 2018) (finding plaintiffs' expert unqualified to opine as to how other physicians would react to different information about the device at issue where the expert never used the device and never researched it prior to litigation.); *Nelson v. Biogen Idec, Inc.*, No. 12-cv-7317, 2018 WL 1960441, at *12-13 (D.N.J. Apr. 26, 2018) (finding plaintiffs' expert unqualified to opine as to the adequacy of a prescription drug warning where he never prescribed the drug to a patient, never counseled patients on the risks and benefits of the drug, and "declared that he was 'not going to comment on the labeling'" of the drug).[7]  Because Dr. Feigal lacks the requisite "knowledge, skill, experience, training, or education" to offer opinions on these issues, her opinions should be excluded.  *See* Fed. R. Evid. 702.

---

[7]  As in *Nelson*, Dr. Feigal never prescribed Taxotere, never counseled a patient on the risks and benefits of Taxotere, and declared at deposition that she "will not opine on the adequacy of the Taxotere label" or other FDA requirements.  Feigal Dep. Vol. I 81:6-15, 82:8-11, 82:21-83:1, 107:23-108:11, 116:8-11 (Ex. B).

## II. DR. FEIGAL'S GENERAL "INFORMED CONSENT" OPINIONS SHOULD BE EXCLUDED AS IRRELEVANT AND UNHELPFUL TO THE JURY.

Even if Dr. Feigal were qualified to opine as to the adequacy of risk/benefit discussions on Taxotere (she is not), her "informed consent" opinions should still be excluded as irrelevant and unhelpful to the extent Dr. Feigal seeks to opine as to what a "reasonable" physician would have done if provided different information regarding the risk of alopecia with Taxotere. *See* Feigal Report at 43 (Ex. F); Feigal Dep. Vol. III 592:18-593:10 (Ex. C).

First, Dr. Feigal's opinion is irrelevant. In a pharmaceutical warnings case, what a theoretical "reasonable prescriber" might have done (if provided an allegedly adequate warning) is entirely irrelevant because causation turns on the actions of plaintiff's treater.[8] *See, e.g., Stafford v. Wyeth*, 411 F. Supp. 2d 1318, 1322 (W.D. Okla. 2006) ("Likewise irrelevant is plaintiff's argument regarding what a reasonable physician would do. The question in the learned intermediary context is not what an objective physician would decide, but rather what plaintiff's doctor would determine based on his knowledge of the drug in question and the plaintiff's risk factors."); *Fraley v. Am. Cyanamid Co.*, 589 F. Supp. 826, 828 (D. Colo. 1984) ("The acts of the treating physician, not the average or 'reasonable' physician, are the acts relevant to proximate

---

[8] To prove but-for causation in a pharmaceutical warnings case, it is well-established that each plaintiff must prove causation with evidence specific to her treating physician: "the plaintiff must show that a proper warning would have changed the decision of ***the treating physician***, *i.e.* that but for the inadequate warning, the treating physician would not have used or prescribed the product." *See Willett v. Baxter Int'l, Inc.*, 929 F.2d 1094, 1099 (5th Cir. 1991) (emphases added); *Pellegrin v. C.R. Bard*, No. 17-cv-12473, 2018 WL 3046570, at *4 (E.D. La. June 20, 2018) ("This causation requirement means that the plaintiff must show that 'a proper warning would have changed the decision of ***the treating physician***, i.e., that but for the inadequate warning, the treating physician would not have used or prescribed the product.'" (quoting *Willett*, 929 F.2d at 1099); *Huffman v. Squibb*, No. 16-cv-3714, 2016 WL 6024532, at *2 (E.D. La. Oct. 14, 2016) ("To demonstrate causation under Louisiana law, the plaintiff must ultimately show that ***the doctor*** would not have prescribed [the drug] had the doctor received a proper warning."); *Rhodes v. Bayer Healthcare Pharm. Inc.*, No. 10-cv-1695, 2013 WL 1282450, at *4 (W.D. La. Mar. 28, 2013) ("Plaintiffs bear the burden to show that a proper warning would have changed the decision of ***Dr. Chandler***, i.e., that but for the inadequate warning, he would not have used or prescribed Avelox.") (emphases added).

6

cause. One must prove what that particular physician would have done in that particular circumstance."); *Gronniger v. Am. Home Prod. Corp.*, No. 03-cv-3584, 2005 WL 3766685, at *5 (Pa. Com. Pl. Oct. 21, 2005) ("[T]he affidavit of Dr. Busch, attesting to what a 'reasonable doctor' would have done had a different warning been supplied is insufficient evidence to create a material issue of fact and satisfy her burden on proximate causation. . . . [A]n affidavit or testimony of Dr. Busch as to what a 'reasonable doctor' would have done with appropriate knowledge is not admissible, is irrelevant and is contrary to the legal standard long established under Pennsylvania law.").

Second, Dr. Feigal's opinion is unhelpful. Because causation turns on the testimony of the Plaintiff's prescribing physician (rather than testimony of a retained expert speculating about what a "reasonable" physician might have done with different risk information),[9] Plaintiffs can only meet their burden on this point with testimony from each Plaintiff's prescribing physician. And, as Dr. Feigal admits, each of the three Plaintiff's prescribing physicians can speak for themselves as to what they would have done if provided different risk information. *See* Feigal Dep. Vol. II 28:8-11 (Ex. G).

Further, Dr. Feigal's opinions amount to pure speculation regarding: (1) what the "reasonable" physician would have said regarding Taxotere and hair loss; (2) what the "reasonable" physician would have said regarding the risks and benefits of an alternative non-Taxotere chemotherapy regimen (including the permanent hair loss risk, cardiac risk, neuropathy risk, leukemia risk, and greater chance of death); and (3) what the patient would have decided after

---

[9] *See Grenier v. Med. Eng'g Corp.*, 99 F. Supp. 2d 759, 766 (W.D. La. 2000), *aff'd*, 243 F.3d 200 (5th Cir. 2001) ("The affidavit of Dr. Louie Worthing submitted by Plaintiffs is the exact information needed to carry their burden through the gauntlet of the learned intermediary doctrine—if only the information had come from Dr. Ramey [plaintiff's treater], the person who the inquiry must revolve around. Coming from Dr. Worthing, it is irrelevant to the learned intermediary analysis.").

7

considering such information. Dr. Feigal's opinion has no bearing on what the *Plaintiffs'* prescribing physicians may have done with different risk information. Her opinions constitute unreliable and inadmissible speculation.

Finally, to the extent Plaintiffs suggest Dr. Feigal's opinion is somehow relevant to whether Plaintiffs (rather than their physicians) were adequately warned, they are incorrect. *See* Memorandum In Support of Defendants' Motions for Summary Judgment on Causation Based on the Learned Intermediary Doctrine (Doc. # 6076, 6078, 6080). Under the learned intermediary doctrine, a drug manufacturer's duty to warn runs only to the prescribing physician (as the "learned intermediary"), not to the patient. *See, e.g.*, *Willett*, 929 F.2d at 1098 ("[a prescription drug] manufacturer has no duty to warn the patient, but need only warn the patient's physician"); *Grenier*, 99 F. Supp. 2d at 766 ("Defendants' duty runs only to the implanting physician as learned intermediary"). Other courts have excluded expert testimony regarding the importance of patients receiving information on prescription drugs because "this testimony runs contrary to controlling law as reflected in [FDA] regulations and the learned intermediary doctrine, which mandate that accurate warnings be directed to the physician rather than to the patient." *In re Diet Drugs Prods. Liab. Litig.*, No. MDL 1203, 2001 WL 454586, at *18 (E.D. Pa. Feb. 1, 2001). Dr. Feigal's opinion is inadmissible as it is just "a personal opinion about what standards [Dr. Feigal] believes should apply to pharmaceutical company conduct." *Id.*

### III. DR. FEIGAL'S OPINION THAT DEFENDANTS DID NOT ADEQUATELY COMMUNICATE RISK INFORMATION TO PHYSICIANS SHOULD BE EXCLUDED BECAUSE IT LACKS A RELIABLE METHODOLOGY.

Dr. Feigal's claim that Defendants did not communicate "relevant risk information to physicians" should be excluded because it is not based on any reliable methodology. *See* Feigal Dep. Vol. I 116:12-117:9 (Ex. B); *Burst*, 120 F. Supp. 3d at 550 ("The reliability inquiry requires

8

the Court to assess whether the reasoning or methodology underlying the expert's testimony is valid. The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation.").

Dr. Feigal did not review any version of the Taxotere prescribing information in forming her opinions—and she expressly disclaimed any opinion that the Taxotere prescribing information was inadequate. *See generally* Feigal Reliance List (not including a citation or reference to any version of the Taxotere prescribing information) (Ex. H); Feigal Report (same) (Ex. F); Feigal Dep. Vol. I 97:10-16 ("I am not offering opinions on what should be in their label") (Ex. B); *id.* 100:23-101:2, 102:13-16, 116:8-11 ("I will not opine on the adequacy of the Taxotere label"). Having not reviewed the prescribing information and having disclaimed any opinion with respect to the adequacy of its content, there is no reliable basis for Dr. Feigal to opine that Defendants did not communicate "relevant risk information to physicians" regarding the use of Taxotere.

Moreover, Dr. Feigal's opinion is not premised on any reliable standard. She conceded at deposition that it is not based on any FDA regulatory requirements or any of Defendants' internal standards and procedures. *See* Feigal Dep. Vol. I 102:13-16, 108:8-11, 119:2-19 (Ex. B). She also admitted that she cannot point to a single authority, principle, or standard obligating manufacturers to communicate risk information to physicians. *See id.* 108:24-109:5 ("Oh, I can't comment on other standards or principles, but I can certainly say I offer no opinions about whether they did or did not meet FDA requirements, which is consistent with what I have in my report."), 112:3-21 ("So I can't point you to a single regulation. I can't point you to a single reference. I can see if I can find something, but it's definitely an expectation that companies should share – it's their responsibility to share information about risk to physicians. That's very expected by physicians and patients."), 120:2-122:9 (". . . I mean, having worked on product development as a physician,

I certainly expect companies to share relevant information. Do I go to a page in a book to find it? No. I just expect it."). Dr. Feigal's opinions are based on nothing more than her personal belief and, therefore, lack a reliable, scientific methodology. *See In re Diet Drugs*, 2001 WL 454586, at *18 ("[T]estimony of an expert that constitutes mere personal belief as to the weight of the evidence invades the province of the jury."); *In re Bard IVC Filters*, 2018 WL 495187, at *3 ("Personal views on proper corporate behavior are not appropriate expert opinions."). Dr. Feigal's opinions should be excluded pursuant to Rule 702.

### IV. OPINIONS BASED ON HINDSIGHT ABOUT WHAT CHEMOTHERAPY A PATIENT WOULD HAVE CHOSEN OR BEEN OFFERED IN RETROSPECT IS INHERENTLY SPECUALTIVE AND INADMISSIBLE.

Opinions based on unsupported speculation must be excluded. *Burst*, 120 F. Supp. 3d at 550. Dr. Feigal's "informed consent" opinions epitomize speculation. Dr. Feigal opines:

> Physicians would have included, had they known, of the risk of permanent chemotherapy-induced alopecia in their benefit-risk discussion of treatment options with their patients with early stage breast cancer, to allow for more informed discussions. This information may have changed the treatment options discussed, and the patient's choice.

Feigal Report at 43 (Ex. F). But Dr. Feigal conceded at her deposition that she "can't speak for all physicians. No one can." Feigal Dep. Vol. II 27:3-6 (Ex. G). Dr. Feigal testified that she cannot guarantee whether (1) every oncologist reviews every drug label or label change, or (2) whether every physician would have included this risk in their benefit-risk discussion with patients. *See id.* 15:18-20, 24:14-24 ("I don't use 100 percent certainty; I don't use the word 'guarantee'"). She has not surveyed every oncologist in the U.S. on the issue, but she "actually know[s] just from looking at blogs and things like that that physicians are completely unaware of permanent alopecia with this regimen."); 25:5-16, 25:22-26:21. Dr. Feigal testified that she does not know if any physician in the U.S. is *currently* warning of the risk of permanent hair loss

10

associated with Taxotere—despite a label change in 2015 advising physicians that "cases of permanent hair loss have been reported."[10] *See id.* 25:22-27:21 ("I do not know that. You could ask another expert about that who's actively talking with her colleagues and finding out what they're doing. I imagine some of them may be doing that."). Dr. Feigal's opinions have no reliable basis and amount to pure speculation.

Dr. Feigal admits that each chemotherapy drug carries its own set of risks, including life-threatening and potentially permanent risks, but her report does not discuss the side-effect profile associated with other drugs and regimens. *See* Feigal Dep. Vol. II 9:12-21, 10:7-11:7, 22:13-23 (Ex. G). Dr. Feigal also admits that there are reports of permanent alopecia with other chemotherapy drugs and regimens used to treat breast cancer, including Taxol, Adriamycin, Cyclophosphamide, AC, and AC-Taxol. *See* Feigal Dep. Vol. III 596:2-597:11 (Ex. C). There is no way to know today what decision any patient would have made if offered a different treatment option in the past—a reality Dr. Feigal acknowledged at her deposition: ". . . it's possible that she could still choose a Taxotere-containing regimen. I'm not precluding that." Feigal Dep. Vol. II 29:12-31:4 ("Once they discuss it in a shared decision-making mode, the patient certainty could elect – at the end of the day, a woman wants to take that potential risk, that is her decision.") (Ex. G). Treatment decisions are not made with the benefit of 20/20 hindsight. Medicine does not work that way, and neither can Dr. Feigal's opinions

Dr. Feigal's opinion hinges entirely on the notion that the "reasonable" prescribing physician would have relayed a "known risk" of permanent hair loss with Taxotere to patients. For a risk to be conveyed to a patient, as Dr. Feigal acknowledges, that risk must be known or knowable. *See* Feigal Dep. Vol. II 20:22-22:9 ("If the manufacturer isn't aware of a risk, then, no,

---

[10] *See* Arrowsmith Report at ¶ 77-80 (Ex. E).

11

they can't communicate the risk.") (Ex. G). However, Dr. Feigal admits that she is not offering an opinion on when any alleged risk of permanent hair loss with Taxotere was known or knowable. *See* Feigal Dep. Vol. I 97:10-16, 159:13-17 (Ex. B). Dr. Feigal is creating hypotheticals that cannot be tested: if a risk exists, if that risk were known, if the doctor relayed it, if the patient rejected the treatment recommendation, if the patient had been offered something else, what would the patient then do? Even assuming each of those premises existed, Dr. Feigal does not and cannot come to the ultimate conclusion—that any one of the bellwether Plaintiffs would not have used Taxotere in the face of (i) the risk of hair loss, (ii) different, sometimes more serious safety risks with alternative regimens, and (iii) lower chances of survival. Such speculation is inadmissible, irrelevant, and unhelpful to the jury. *See In re Diet Drugs*, 2001 WL 454586, at *18 (excluding expert opinion on "whether or not physicians would have prescribed or patients would have taken [the prescription drugs at issue] had certain adverse event information been discussed in the drugs' labeling" because these opinions were "purely speculative and not based on scientific knowledge").

## V. DR. FEIGAL'S METHODOLOGY IS UNRELIABLE BECAUSE SHE SELECTIVELY IGNORED CONTRARY EVIDENCE THAT DID NOT FIT HER PRECONCEIVED NARRATIVE.

An expert cannot simply cherry pick facts that theoretically support her opinion while ignoring those that do not. *Konrick v. Exxon Mobil Corp.*, No. 14-cv-524, 2016 WL 439361, at *13 (E.D. La. Feb. 4, 2016), *aff'd*, 670 F. App'x 222 (5th Cir. 2016) (excluding expert's general-causation opinions, because, *inter alia*, she "cherry-picks data and fails to explain results that contradict her conclusion"; noting such failure "casts doubt on the reliability of her methodology"); *Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001) ("Because in formulating his opinion Dr. Hynes cherry-picked the facts he considered to render an expert opinion, the district

12

court correctly barred his testimony because such a selective use of facts fails to satisfy the scientific method and Daubert, and it thus fails to 'assist the trier of fact.'"). An expert must consider contrary data and testimony when preparing an opinion; failure to do so renders an expert opinion unreliable. *In re Mirena IUS Levonorgestrel-Related Prod. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 296 (S.D.N.Y. 2018) (excluding causation opinion because the expert's "cherry-picking approach is at odds with principles of sound science"). Yet, that is exactly what Dr. Feigal did here.

Dr. Feigal's report focused only on the "informed consent" regarding a purported risk of permanent alopecia with "Taxotere-containing regimens," while ignoring the accompanying risks (including a permanent-alopecia risk) with alternative, non-Taxotere-containing regimens. *See* Feigal Report at 42 (Ex. D); Feigal Dep. Vol. II 22:13-23 (Ex. G). As stated above, Dr. Feigal admits there are reports of permanent hair loss with Taxol, Adriamycin, Cyclophosphamide, AC, and AC-Taxol. *See* Feigal Dep. Vol. III 596:2-597:11 (Ex. C). Yet, Dr. Feigal did not consider the side effect profiles associated with other chemotherapy drugs and regimens when forming her opinions. *See* Feigal Dep. Vol. II 22:13-23 (Ex. G). She simply did not look into it, which is insufficient. It is unreliable to opine that an alternative treatment might be more appropriate than Taxotere while failing to do the research needed to account for the all of the risks of the alternative. Dr. Feigal's opinions based on this flawed methodology must be excluded.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion and exclude Dr. Feigal's opinions and testimony.

Date: February 8, 2019

Respectfully submitted,

*/s/ Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE URQUHART & MOORE LLC**
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: 504-310-2100
Facsimile: 504-310-2120
dmoore@irwinllc.com

Harley Ratliff
Adrienne L. Byard
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
Facsimile: 816-421-5547
hratliff@shb.com
abyard@shb.com

**Counsel for Sanofi-Aventis U.S. LLC and Sanofi U.S. Services Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2019, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ *Douglas J. Moore*