# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE TAXOTERE (DOCETAXEL) )
PRODUCTS LIABILITY LITIGATION ) MDL NO. 2740
)
THIS DOCUMENT RELATES TO: ) SECTION: H
)
ANTOINETTE DURDEN, )
CASE NO. 2:16-cv-16635 )
TANYA FRANCIS, )
CASE NO. 2:16-cv-17410; )
BARBARA EARNEST, )
CASE NO. 2:16-cv-17144 )
)
______________________________)

VIDEOTAPED DEPOSITION OF ELLEN FEIGEL, M.D.
FRIDAY, DECEMBER 7, 2018

JOB NO. 3151489

REPORTED BY STEPHANIE J. COHEN,
CSR NO. 7920

Job No. NJ3151489

Page 34

of your search terms or methodology used in compiling the literature that is maintained in Table 2?

A No.

Q Why not?

A Because I basically -- there are a lot of different searches that are done using different words. So what I did was I look at the references and I was able to see whether or not by looking at that whether or not it was relevant for the case.

I'm sure -- I know oftentimes with searches there is all kinds of extraneous things that are completely irrelevant, so I used my judgment. I use searches all the time as part of my work. I have been doing that for 30 years, so I think I know how to use good judgment to pick things that are relevant.

Q So you did not keep a written record of the search terms that you used; is that correct?

A Correct.

Q No. 8, "Documents and printouts of the searches and results that you used to create Table 2."

A I provided the documents I actually reviewed and used.

Page 35

Q When you say documents, you are talking about literature or the studies?

A The literature and the studies.

Q Did you have any printouts of any of searches themselves?

A No.

Q Drafts -- No. 9, "Drafts, notes or previous versions of your records regarding plaintiffs in this litigation." Noting plaintiffs' objection --

MR. THORNTON: Right.

THE WITNESS: So, no, I did not provide any drafts.

BY MR. KAUFMAN:

Q "Any and all templates or forms that you created or were provided that you reviewed or considered in preparing your report."

A I was not provided any templates and I did not use any templates.

Q Number 11, "Any and all research, education materials, counseling materials or handouts that are in your possession regarding cancer treatment and hair loss including, but not limited to, hair loss as a side effect of cancer treatment, cancer treatment and hair loss prevention, managing hair loss following treatment for cancer and caring for

Page 36

hair regrowth following treatment of cancer."

A I provided you everything I reviewed.

Q Number 12, "All documents, including presentations, speeches, slides, notes, handouts or posters regarding any presentation or speech by you concerning Docetaxel and alopecia."

A I have not done any presentations, speeches, slides, notes, handouts or posters regarding Docetaxel and alopecia.

Q Number 13, "Any and all correspondence or communications by and between you and the FDA or any other state, federal or local agency relating to Taxotere and/or Docetaxel and/or hair loss as a side effect of cancer treatment."

A I have no communication between myself and the FDA regarding Docetaxel and hair loss.

Q Number 14, "A list of all articles, publications, abstracts, reports and studies authored or co-authored by you."

A I provided that in my curriculum vitae.

Q Number 15, "Any and all research, education materials, counseling materials or handouts in your possession regarding chemotherapy, including but not limited to, Taxotere and/or Docetaxel."

A That's a pretty broad question. I'm an

Page 37

oncologist for 30 years. I don't think that's possible to answer that question in a tangible way. It's a very broad question.

Q Are there materials that are responsive to this that come to mind that you did not produce to counsel?

A No, not related to this. This question No. 15 was much broader.

Q And I am asking if there is anything in your possession that falls within the scope of --

A No. Sorry.

Q That comes to mind that you have that you have not given to Mr. Thornton?

A No.

Q Number 16, "Any and all research, education materials, counseling materials or handouts in your possession regarding alopecia."

A I provided everything I have in my possession.

Q Number 17, "A list of all expert reports and depositions reviewed by you in connection with your report."

Are those contained within the list of materials that you considered?

A I believe it's in the Appendix B, if I

Page 74

working with the FDA on a variety of initiatives that were involved in how to mark expeditiously and smartly design clinical trials.

Q Let's back up. From the time you completed your medical degree until you joined the National Cancer Institute in 1992, describe your clinical practice.

What types of patients were you treating?

A Well, I'm a hematologist oncologist, so I was seeing patients with malignant cancers, both solid tumors as well as acute and chronic leukemias. I was in the clinic. I was on the wards.

I also spent time -- because it was during the AIDS epidemic, I was also managing patients with HIV, for example, and their cancers. I would say my breast cancer patients were probably about 10 or 15 percent of the patients that I took care of.

In addition to that -- well, maybe I'll leave it there. If it's just about patients, I also, obviously, was training younger physicians, providing education, doing research.

Q I am only interested in the treatment of patients.

A Yes.

Q From about 1988 to 1991, 1992, when you

Page 75

joined the NCI, 10 to 15 percent of your clinical practice as a treating physician related to treating patients with breast cancer?

A That's correct.

Q From 1992, when you were at the National Cancer Institute until 2004, can you describe your practice as a treating physician during that time?

A My practice as a treating physician was attending clinic in immunology and AIDS clinic at the National Cancer Institute.

Q What types of patients were you seeing?

A Primarily those were patients with immunodeficiencies. I also worked with one of the investigators there on lymphoma trials, so other types of cancers.

I would say there was minimal exposure to breast -- treatment of breast cancer patients in my clinic.

Q Did you treat any breast cancer patients from 1992 to 2004 --

A Did I treat them? No.

Q Let me finish the question. Did you treat any breast cancer patients during your time while you were at the National Cancer Institute from 1992 to 2004?

Page 76

A No.

Q Then from 2004 to you said 2007, 2008, describe your clinical practice as a treating physician during that period of time.

A So that was primarily I was at the Genomics Research Institute. There I was primarily involved in some of the diagnostic work to use patient specimens to help figure out the signatures of their tumors. So most of that was mainly involved in clinical research.

Q Were you a treating physician from 2004 to 2007?

A I was not the treating physician. I was doing clinical research.

Q From 2004 to 2007, did you treat any breast cancer patients?

A I did not treat any breast cancer patients myself.

Q Since 2000 -- strike that.

From 2007 to present day, have you treated any breast cancer patients?

A No.

Q The last time you treated a breast cancer patient would have been as recently as 1991.

Fair?

Page 77

A Correct.

MR. THORNTON: We have been going an hour, a little more than that.

MR. KAUFMAN: We can take a break now.

MR. THORNTON: A break might not be a bad idea.

THE VIDEOGRAPHER: We are off the record. The time is 11:22 a.m.

(Break taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 11:41 a.m. Please continue.

BY MR. KAUFMAN:

Q Dr. Feigel, are you ready to continue?

A Yes.

Q We were talking over each other a little bit in the last segment. So if you could just try to wait until I finish my question, it will make things go a little bit more smoothly.

MR. THORNTON: Keep in mind the court reporter has to take it down and sometimes she will even chop up a question and an answer, and everybody hates that.

BY MR. KAUFMAN:

Q I am interested in your experience treating breast cancer patients from approximately 1981 to

Page 78

1991. You characterize that as 10 to 15 percent of your practice during that time.
Is that an accurate reflection?
A I'm sorry. Say the dates again.
Q Approximately 1981 to 1991.
A Correct.
Q During that ten-year period of time, 10 to 15 percent of your clinical practice as a treating physician involved treating breast cancer patients?
A Correct.
Q Did that involve the treatment of early stage breast cancer patients?
A Yes.
Q Metastatic breast cancer patients?
A Yes.
Q What types of treatments were you providing to breast cancer patients during this period of time?
A Those would primarily have been Anthracycline, Cyclophosphamide based treatments because this was before taxons were actually available.
Q You were prescribing chemotherapy to breast cancer patients during this period of time?
A Oh, yes, and endocrine therapy as well.

Page 79

Q Radiation?
A I mean, this is -- breast cancer, particularly early stage, is multi-modality treatment, so it's surgery. It's radiation therapy, and where indicated, chemotherapy and endocrine therapy.
We often had tumor boards, you know, also to make informed decisions about treatment options for patients. So anyway, my practice was very active with people who came to the university, but also people who came as referrals to the university.
Q Have you ever consulted NCCN guidelines to identify treatment regimens for breast cancer patients that were under your care?
A Yes.
Q And that was during that period of time from 1981 to 1991?
A Yes.
Q You in your report referenced ASCO Guidelines. What guidelines were you referring to for --
A I'm sorry. I'm talking over you. Finish your sentence.
Q No. Please. What guidelines were you referring to?

Page 80

A American Society of Clinical Oncology and they are a major professional organization, probably somewhere between 45,000 to 50,000 people belong to the organization, so it is one of the major professional organizations that I belong to.
Anyway, they publish guidelines as well in terms of specific topics regarding treatment including that of breast cancer. There's papers. There's publications.
Q Would you agree with me that you've never prescribed a Taxane chemotherapy to a patient?
A No.
Q You would not agree with me?
A No. I would not agree with you. I have -- I do have, you know, clinics in which the Taxanes were appropriate. And at the National Cancer Institute I was involved with investigational treatments as well as treatments that were commercially available and I did give Taxanes to cancer patients, but they weren't breast cancer patients.
Q Let me clarify my question.
A Okay.
Q Is it fair to say you have never prescribed a Taxane chemotherapy to a breast cancer?

Page 81

A I don't recall even investigational treatment during that time for breast cancer patients using Taxane, so the best of my recall, I don't think I have for a breast cancer patient, but I am familiar with it for other types of cancer.
Q Is it fair to say you have never prescribed a Taxotere to a breast cancer patient?
A Yes.
Q Is it fair to say that you've never prescribed any Docetaxel to a breast cancer patient?
A Correct.
Q Is it fair you have never prescribed Taxol or Paclitaxel to a breast cancer patient?
A Not that I recall. If I did, it would have been in the context of an investigational study.
Q You have never prescribed Taxol or Paclitaxel to a breast cancer patient as a treating physician?
A As I said, I don't know whether or not I might have participated in an investigational study where, of course, I would be the treating physician for that patient on the investigational study.
When you are an investigator on the study, you do take care of the treatment and management of the patient.

Page 82

Q I believe you indicated earlier that you stopped treating breast cancer patients before either Paclitaxel or Docetaxel or were on the market; is that right?
A That's correct. That's why I qualified it with it would be in the context of an investigational study if I was using that product.
Q Have you ever counseled a breast cancer patient on the risks and benefit of Taxotere?
A Only if it would have been done in the context of clinical trial, but not that I recall.
Q Have you ever counseled a breast cancer patient on the risks and benefits of any Docetaxel product?
A Docetaxel, not that I recall. I, obviously, counseled patients on a wide variety of chemotherapy agents.
Q This is going to be a long day. I have got a lot of questions for you. If you just answer the question that I'm asking, I would appreciate it.
Have you ever counseled a breast cancer patient on the risks and benefits of any Taxane chemotherapy?
A Breast cancer patient, not that I recall. If I did, as I said, it would have been in the

Page 83

context of an investigational study at that time.
Q Have you ever treated a breast cancer patient who complained of permanent alopecia?
A Never.
Q Have you ever formally diagnosed a breast cancer patient with permanent alopecia?
A No.
Q Have you ever -- strike that.
Have you ever conducted a differential diagnosis to determine the cause of permanent alopecia in a breast cancer patient?
A Well, if I never saw it.
MR. THORNTON: Objection; form.
THE WITNESS: I guess the answer is it's a funny question.
BY MR. KAUFMAN:
Q So the question is "no"?
A The answer is I haven't needed to do so because I never had a patient with permanent alopecia so I did not have to determine a differential diagnosis.
Q So you have never conducted a differential diagnosis to determine the cause of permanent alopecia in a breast cancer patient?
MR. THORNTON: Objection; form.

Page 84

THE WITNESS: I will restate my response. I never had the need to do a differential diagnosis on permanent alopecia because that event never occurred. I do differential diagnoses on issues that are before me.
BY MR. KAUFMAN:
Q Understood. You have never done that, correct?
A Because I've never had a patient with permanent alopecia. That's my response.
Q You've never done that because you have never had a patient with permanent alopecia, correct?
MR. THORNTON: Objection; form.
THE WITNESS: I have not had a patient with permanent alopecia so, no, I haven't needed to do a differential diagnosis for it.
BY MR. KAUFMAN:
Q Would you agree that you are not an expert or a specialist in dermatology?
A I agree.
Q Would you agree that you are not an expert or specialist in pathology?
A Well, not in terms of the legal terms, but I certainly have a tremendous amount of experience

Page 85

from working in oncology and looking under the microscope, examining issues with the pathologist and I have a great deal of knowledge, but no, I am not a pathologist.
Q You are not a pathologist. You don't hold yourself out as a pathologist?
A No.
Q You agree that you are not an expert or specialist in dermatopathology?
A I have certainly gained a lot of knowledge because a lot of our cancers are on the skin, such as melanoma, so I have certainly examined pathologies with a pathologist. But as I said before, I am not a pathologist nor am I dermatopathology.
Q You are not an expert or specialist in cardiology?
A I am not an expert in cardiology, but I certainly am very familiar with the issues of cardiac toxicity and other issues because a lot of these issues occur in oncology patients, so I'm certainly familiar with the context of cancer patients, but no, you wouldn't come to me to get a coronary artery bypass.
Q You are not a cardiologist?

Page 90

A No.
Q You have never examined a biopsy of any plaintiffs' hair tissue specimen?
A Within the -- of these plaintiffs, no.
Q You have never --
A Let me rephrase that. I have seen photos, but I'm not the responsible person interpreting that.
Q You have reviewed photos of plaintiffs' hair tissue specimens as part of this litigation?
A I have viewed them.
Q You are not offering opinions with respect to those, are you?
A No.
Q Have you diagnosed any of the plaintiffs in this litigation with hair loss?
A I have not even seen these patients, so no, I haven't been involved in their diagnosis.
Q And that would include a diagnosis with respect to any psychological, mental or emotional disorder?
A You are talking specifically to the plaintiffs?
Q Yes.
A Have I interviewed them for that, no, I

Page 91

have not for psychological impact. I have seen their depositions which describe psychological impact.
Q Prior to being retained as an expert by the plaintiffs in this litigation, have you ever researched, published or presented on the use of Taxotere or Docetaxel to treat early stage breast cancer?
A I have written a chapter in a textbook on the pre-clinical -- actually, I brought the textbook. I wrote Chapter 1 in a textbook, but it was published in I think 1998, and at any rate it included -- my chapter was more on the pre-clinical aspect of it and I have written papers on Paclitaxel but not on Docetaxel.
Q That was not my question.
A I have not written any papers on Docetaxel.
Q Just so it is clean, you have not written, researched, published or presented on Taxotere or Docetaxel to treat early stage breast cancer?
A Rephrase your question again.
Q Can you read it back.
THE REPORTER: "Just so it is clean, you have not written, researched, published or presented on Taxotere or Docetaxel to treat early stage breast

Page 92

cancer?"
THE WITNESS: No. I have obviously read articles on Taxotere and Docetaxel in breast cancer.
MR. KAUFMAN: I strike as nonresponsive.
THE WITNESS: Well, then maybe I didn't understand your question.
MR. KAUFMAN: Can you read it back again.
THE REPORTER: "Just so it is clean, you have not written, researched, published or presented on Taxotere or Docetaxel to treat early stage breast cancer?"
THE WITNESS: I have researched by reading the literature, so your question was a little confusing as phrased. I have not published and I have not presented, but I certainly have reviewed and I consider that part of research.
BY MR. KAUFMAN:
Q And that review was before or after you became retained as an expert for the plaintiffs?
A Oh, my. I mean, I have 30 years' experience in oncology, so somewhere over the context I have certainly reviewed papers and literature on Docetaxel and Taxotere in breast cancer.
I have a pretty long history, so I can't

Page 93

say my life was devoid of research and education before the deposition.
Q Were you involved in a clinical study involving Taxotere or Docetaxel to treat early stage breast cancer?
A I was not.
Q Have you ever been?
A I have not been involved in a clinical trial of Taxotere or Docetaxel in treating patients with breast cancer, but I very well would have been involved at the National Cancer Institute in reviewing clinical trial designs and end points and data on those issues because both those drugs, as you know, were developed during the time period I was at the National Cancer Institute.
Q Move to strike.
Have you ever published or presented on the use of any Taxane chemotherapy to treat early stage breast cancer?
MR. THORNTON: Objection; form.
THE WITNESS: I have published on Taxanes which could have been -- in material that could be relevant across cancers including breast cancer.
BY MR. KAUFMAN:
Q Which material is that?

Page 94

A Oh, over the years. I'll have to look at -- I can look at my CV. I do have a chapter. It's part of a larger book on Taxanes that's not anatomic specific.

Q Have you ever published or presented -- strike that.

Prior to being retained as an expert by plaintiffs in this litigation, have you ever published or presented on the informed consent process involving chemotherapy for early stage breast cancer?

A I have certainly been involved in multiple presentations that include informed consent, and part of that could certainly include breast cancer. I also, as I think you know from my CV, teach at the Sandra Day O'Connor College of Law on human subject research and the ethics, and a good part of that is teaching about informed consent and the principles behind that.

And I'm trying to think if some of the examples included breast cancer, but I just want to explain the principles behind informed consent is not uniquely different in breast cancer patients than it is in many other aspects of oncology.

Q Have you ever published -- strike that.

Page 95

Prior to being retained as an expert by plaintiffs in this litigation, have you ever published or presented on permanent or persistent alopecia?

A Not that I recall.

Q Prior to being retained by plaintiffs in this litigation, have you ever published or presented on -- strike that.

Prior to being retained as an expert by plaintiffs in this litigation, have you ever published or presented on any of the types or forms of alopecia in women?

A I have not published a paper on alopecia in women, although as I mentioned early in cancer, reversible alopecia is something you see commonly. I did not publish on that topic.

Q I move to strike the nonresponsive portion of the answer.

In looking at your report, which has been marked as Exhibit No. 3, I noted in a prior version -- and I guess it's the same here. If you could turn to Page 1.

A Page 1?

Q Yes, of Exhibit No. 3. You state in the last paragraph right above the qualifications

Page 96

section, "I am not offering regulatory opinions about FDA requirements."

Do you see that?

A Correct.

Q You agree with that statement?

A I agree that I am not offering as an expert FDA opinions, but I am offering opinions as somebody who is very knowledgeable about product development, about FDA issues as they pertain to some of those issues.

Q I don't understand what that means. If you are not offering regulatory opinions about FDA requirements, how are you offering regulatory --

A As part of my report, you can see I talk about the responsibility of companies to identify, investigate and communicate adverse events. You don't have to be an FDA regulatory expert to know what the responsibilities are.

From having been an investigator, having been somebody who is very experienced in product development, I know what the responsibilities are, but no, I am not offering as a former FDA expert opinion on that.

Q Looking at the conclusions set forth at the end of your report, Numbers 1 through 6 --

Page 97

A Yes.

Q You would agree with me none of those conclusions pertain to opinions with respect to compliance with FDA regulatory requirements?

A What I'm saying, I think some of the opinions or conclusions, as they're called, are relevant to the responsibilities of companies. If you want to -- call it what you will. I'm just saying I have experience in product development.

Q What does it mean to say that you are not offering regulatory opinions about FDA requirements? What does that mean?

A I'm not offering formal -- what that means is I'm not going to offer opinions about what the company knew and when they knew it and I am not offering opinions on what should be in their label.

Q Okay. You are not offering an opinion with respect to adequacy of the Taxotere label. Is that true?

A I would -- may I rephrase your question so I can answer it.

Q You can answer it "yes" or "no."

A Well, I can't really.

Can I tell you what I'm thinking?

Q Sure.

A Then you can decide whether or not it's responsive. The issue I'm having is a lot of this is about communication to physicians and patients about risk, and so I can't completely divorce responsibilities of the company to communicate risk.

I am not offering though what and when they knew it and when, you know, the specifics about it, but I am offering opinion about communication of risk that is important to physicians in their conversations with patients. So I don't have an -- I know you want it to be very well segregated, but it's hard for me to answer the question.

Part of my opinion is based on it is very important and vitally important to communicate risk and the way companies do that often is through prescribing information. So that's why I'm having a hard time answering your question.

Q The way companies communicate risk, benefit information is through the prescriptive information, correct?

A The prescription, yes.

Q And --

A Information.

Q The prescriptive --

A It's called prescribing information.

Q The prescribing information for a drug like Taxotere, the scope and content of that information is governed by FDA regulations, correct?

A The company has the primary responsibility for what's on their label.

Q And the scope and content of that label is governed by FDA regulations, correct?

MR. THORNTON: Objection; form.

THE WITNESS: I think -- yes, there are FDA regulations, but the company has the final responsibility for what goes on their label.

BY MR. KAUFMAN:

Q So are you opining -- do you intend to offer the opinion in this case that the Taxotere prescriptive information was inadequate?

A As you can see in my report -- let me talk and then you can decide if it's responsive. I do talk about in my report that physicians use prescribing information to learn about the potential benefits and risk of a drug. So that's one of the pieces of information that they look at to learn.

Once again, I can't divorce myself from the fact that they have to look at prescribing information in addition to other types of information.

Q I understand that piece of it and I have read your report.

A Okay.

Q I am not suggesting that you are not allowed to use the word prescribing information. That term appears in your report. Okay.

Are you offering an opinion in this litigation that the Taxotere prescribing information, the label, is inadequate?

MR. THORNTON: Objection; form.

THE WITNESS: I am stating that physicians didn't know about the risk of permanent chemotherapy induced alopecia from Taxotere and would be happy to provide my opinion that one of the key pieces of information they look at is the prescribing information, and if it's not there, then, yes, I might conclude it's inadequate.

BY MR. KAUFMAN:

Q I am interested in the opinions that you are offering within the scope of your report that you provided.

A I understand that.

Q Where in your report -- can you point me to it? Do you say that the Taxotere prescribing information is inadequate?

A That exact sentence, I don't have that exact sentence.

Q That opinion does not exist in your report, correct?

A What I was agreeing to is that exact sentence doesn't exist in my report.

Q Would you agree with me that the content of -- strike that.

Would you agree with me that your report does not contain any discussion about the content of any Taxotere prescribing information label?

MR. THORNTON: Objection; form.

THE WITNESS: I'm just trying to tell you that I feel that I should be able to comment that since physicians get information from prescribing information, if the prescribing information does not have that type of safety information, then they can't have an informed discussion with their patient.

So take it as I said it. I don't know how else to respond.

BY MR. KAUFMAN:

Q Are you offering an opinion that Sanofi did not comply with FDA requirements governing prescribing information?

MR. THORNTON: Objection; form.

THE WITNESS: Let me approach it a different way rather than regulatory.

I think there's an ethical responsibility. If you -- if the company is aware of side effects to communicate that so each -- regardless of regulatory issues, there's ethical responsibilities to do that because part of having an informed discussion between physicians and patients is to have the full balanced information about benefits and potential risk.

BY MR. KAUFMAN:

Q Are you offering an opinion that Sanofi violated federal regulations with respect to the Taxotere prescribing information?

A Oh, I am not offering that opinion, no.

Q Are you offering -- strike that.

You are not offering opinion regarding Sanofi's compliance with FDA regulations or requirements with respect to Taxotere.

Fair?

MR. THORNTON: Objection; form.

Could you please reread the question. We are getting technical here.

MR. KAUFMAN: I don't think it's that hard.

She says right in her report that she is not offering regulatory opinions.

MR. THORNTON: I understand. I didn't think it was hard either, but you have asked several questions about it so you seem to have --

THE WITNESS: Did you want her to reread it?

THE REPORTER: "You are not offering opinion regarding Sanofi's compliance with FDA regulations or requirements with respect to Taxotere. Fair?"

THE WITNESS: I would be willing to offer opinions on the responsibility of the company to communicate risk to the FDA, but in terms of violating regulatory requirement, no. I'm not offering any regulatory opinions on that.

BY MR. KAUFMAN:

Q I understand you might have opinions that go beyond the scope of the report. Lots of people in this room probably have opinions on a lot of different topics.

I am interested in the opinions that you intend to offer the jury at trial in this case. Okay?

MR. THORNTON: Objection; form.

THE WITNESS: I understand your question. I actually don't think what I am saying is outside the scope of my report.

BY MR. KAUFMAN:

Q You are commenting on ethical requirement. Putting aside FDA requirement, correct, if that's what you were just discussing?

MR. THORNTON: Objection --

THE WITNESS: Let me -- I'm just trying to understand because I obviously have opinions about communicating risk and the communication of risk does go through the FDA, so physicians have to get that information somehow.

So I am offering from the context of communications of risk need to be -- need to be conducted. I'm not going to comment on violation of regulatory law, no, or regulations.

I hope that answers your question.

BY MR. KAUFMAN:

Q Your report says you are not offering regulatory opinion about FDA requirements, correct?

A Yes, that's correct, about FDA requirements.

Q So you are not offering any opinions about any requirements that were in place with respect to

Sanofi or Taxotere, correct?

MR. THORNTON: Objection; form.

THE WITNESS: What I am trying to get at -- sorry to go back and forth so much, but maybe we're from two different cultures, legal and medicine.

But what I am trying to get across is communication is a responsibility of the company about risk. There is no other way. The company is the best entity to know everything about their product.

BY MR. KAUFMAN:

Q Who establishes the responsibility of the company?

MR. THORNTON: Objection; form.

THE WITNESS: The company has inherent principles about how they decide to communicate information and the FDA does have regulatory requirements.

BY MR. KAUFMAN:

Q So the company's inherent principles and then the FDA requirements. That's who governs company conduct in this regard?

MR. THORNTON: Objection; form.

THE WITNESS: If you're saying is that all-encompassing, I can't answer that question. I

Page 106

do know, obviously, there's FDA requirements for how any investigator and companies have to follow regulations and there's a variety of different compliance issues.

There's also a variety in different departments. There's the office of human research protections. There's a whole variety of regulations that companies conducting studies have to do. It's not -- it's not just simply one agency.

BY MR. KAUFMAN:

Q Let me go to another subject.

A Sure.

Q You are not offering opinions regarding the adequacy of Sanofi's submissions and communications with FDA regarding Taxotere?

A That's correct.

Q You are not offering opinions regarding the adequacy of Sanofi's promotional claims regarding Taxotere?

A I would not be offering opinions on that.

Q You are not offering opinions about the adequacy of Sanofi's post market surveillance programs, practices and/or actions regarding Taxotere?

MR. THORNTON: Objection; form.

Page 107

THE WITNESS: I'm not sure that's just a regulatory question. Post marketing surveillance is part of the responsibility of the company. I'm not going to offer opinions about what they knew and when they knew it.

BY MR. KAUFMAN:

Q You are not offering opinions regarding whether the FDA should have approved Taxotere for the treatment of breast cancer?

A No, I'm not. No.

Q You are not offering opinions regarding FDA's determination of the safety and effectiveness of Taxotere?

A No.

THE REPORTER: Can we take a break?

MR. KAUFMAN: Sure.

THE VIDEOGRAPHER: We are off the record. The time is 12:17 p.m.

(Break taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 12:30 p.m. Please continue.

BY MR. KAUFMAN:

Q Dr. Feigel, turn to Page 1 of your report, Exhibit No. 3.

A Sure.

Page 108

Q The language we were just looking at, "I am not offering regulatory opinions about FDA requirements."

Do you see that?

A Yes.

Q Did you write that sentence?

A Yes.

Q Would you agree that to the extent any of your opinions touch on an FDA requirement, you have conceded those opinions in this report?

A I agree.

Q To the extent that your opinions pertain to the communication between Sanofi and doctors and patients, what standards -- strike that.

To the extent that your opinions bear on communications between Sanofi and doctors and patients, do you believe Sanofi violated some rule, standard or principle?

A I have no opinion --

MR. THORNTON: Objection; form. I'm sorry.

THE WITNESS: I have no opinion on whether they violated any FDA regulation or law.

BY MR. KAUFMAN:

Q Do you have an opinion as to whether they violated any other standard or principles?

Page 109

A Oh, I can't comment on other standards or principles, but I can certainly say I offer no opinions about whether they did or did not meet FDA requirements, which is consistent with what I did have in my report.

Q And when you say you can't talk on other standards or principles, that means that you don't have any opinions as to whether Sanofi complied with those standards or principles?

A That is not what I said.

What I said is I couldn't agree not to have an opinion. What I'm saying is -- I guess we'll go back. We can agree that, as stated in my report, that I do not have an opinion on the interactions between Sanofi and the FDA. I didn't review that.

I have no reason to have an opinion there and I will not comment on anything regarding their FDA requirements.

Q Okay.

A Is that -- I think --

Q I think we just made some progress.

A Okay.

Q Good. I have a different question.

A Okay.

Q As it pertains to Sanofi's communications

Page 110

to doctors, is it your opinion that Sanofi failed some obligation, principle or standard in communicating to physicians about Taxotere?

A I think there was definitely no information about permanent alopecia communicated by the company in any way whether it was to the FDA or directly to doctors or patients.

Q Where is that opinion set forth in your report?

A I set forth that physicians were not aware of any of this, even though there were randomized clinical trials showing those adverse events, even though there were case studies coming in since 2001, even though there were over 2,100 cases of permanent or irreversible alopecia that the company was looking at.

So I am basing my opinion on the fact that there was information that wasn't communicated. I'm not going to opine on what FDA law they did or did not follow.

Q Is there a single standard you can point me to or principle that Sanofi did not meet, satisfy or comply with?

A I think there's certainly precedent that there's expectation that the company, when they

Page 111

identify adverse events, it is their responsibility to investigate it and to communicate that.

Q What is the basis of that responsibility? Where is that set forth? What governs that?

A Well, I think there's precedence in other -- first of all, as you know, I'm not a lawyer, but there is precedent for companies being responsible for the communication of adverse events to patients, and that is charily a principle that is entirely expected from physicians and patients because there is no way a single treating physician could ever know the world's literature on that particular product. It has to come from somewhere.

Q Where is that precedent or that standard or that requirement written or set forth?

A You mean outside -- well, I mean, I think that's the standard expectation. Is it written in law? It's certainly a principle and it's certainly a standard that's expected, is that companies will provide information about risk to physicians.

Q If I'm a company and I want to find out more about that standard, where do I go to find it?

A I think there's a long history of companies being expected to follow that and I think there's a lot of examples where companies didn't follow that

Page 112

that are very public in terms of it's not a good practice not to communicate adverse events.

Q I am not looking for examples. I want to know what the source is so that if I'm a company and I want to comply with this standard, I want to know what the standard says.

Where can I go to find the standard?

A I think --

MR. THORNTON: Objection; form. I'm sorry.

THE WITNESS: I think there's certainly case precedent for that, but as I said, there's obviously language about companies, the timing of what the expectations are for that and physicians and patients are aware of that expectation.

So I can't point you to a single regulation. I can't point you to a single reference. I can see if I can find something, but it's definitely an expectation that companies should share -- it's their responsibility to share information about risk to physicians. That's very expected by physicians and patients.

BY MR. KAUFMAN:

Q Would you -- strike that.

Would you agree that the precedents that you are referring to are all based on FDA

Page 113

enforcement?

MR. THORNTON: Objection; form.

THE WITNESS: I'm not a lawyer so I can't -- I honestly can't answer that question for you.

BY MR. KAUFMAN:

Q You have testified extensively about your career?

A Yes.

Q And your experience?

A Yes.

Q And you are referring to precedent and you are referring to examples. Is that set by FDA requirements?

MR. THORNTON: Objection; form.

THE WITNESS: Yeah, I really can't -- as I said, I know many things, but lawyer is not one of them so I really can't knowledgeably answer that question.

BY MR. KAUFMAN:

Q You can't point me to a single standard or principle or objective measure by which a company can go to or consult to figure out its obligations to communicate to physicians? You can't point me to that?

MR. THORNTON: Objection; form.
THE WITNESS: I certainly think -- if I can, I would like to get back to you, but I think there are ways in which the expectations from physicians or patients are -- I mean, are you telling me that companies don't think it's their responsibility to share adverse event information?
BY MR. KAUFMAN:
Q I appreciate that you are asking me questions during the deposition.
A And I shouldn't do that. Sorry.
Q I am trying to understand the scope of your opinions and the basis of your opinions. We made progress on the FDA piece just a second ago.
A Yes.
Q We are past that now. Now I want to know what the objective measure is outside of FDA requirements that govern what a company should or should not communicate to a doctor.
MR. THORNTON: Objection; form.
BY MR. KAUFMAN:
Q What is the basis of your opinion?
A I think there are human subjects, rules and regulations that aren't part of the FDA and certain expectations about informed consent and the informed

consent process.
I think there's elements of making sure the patient is updated on relevant information for them, so I think there are expectations. I would have to -- and I also think it's so engrained in the expectations from physicians and patients that companies will provide relevant information on the safety and risk of their product.
And I don't have a better way to communicate that to you right this instant, but it's certainly a longstanding expectation that companies will communicate safety and adverse event information so that physicians can avail themselves of information, because there is no other way for them to get it.
Q And that is all governed by FDA requirements, correct?
MR. THORNTON: Objection; form.
THE WITNESS: Let me see if I can help you with this. I didn't mean to come across that way, but what I was going to say was if you want me to answer a question, am I going to opine on the of adequacy a specific label, I can tell you I will not.
Does that help?

BY MR. KAUFMAN:
Q That answers a prior question.
A Well, good.
Q So we are making more progress.
A Good.
Q So the record is clean, you are not opining -- strike that.
You do not intend to opine as to adequacy of any Taxotere label; is that correct?
A I will not opine on adequacy of the Taxotere label.
Q In terms of Sanofi's obligations to communicate to doctors, where can Sanofi go to identify those obligations to make sure it complies? What's the source?
MR. THORNTON: Objection; form.
THE WITNESS: The problem -- I am going to get back to the problem. My issue is communication of risk is something -- is a responsibility of the company.
Are you saying because it's all -- it's only an FDA requirement and there are no other expectations outside the FDA? I mean, that's what I'm having difficulty saying.
A company has their own ethical principles

that don't necessarily -- there are legal requirements, but then there are ethics and principles that companies have about sharing information with physicians and with patients.
So I'm not here -- as I said, I will not opine on the specifics of inadequacy of a label, but I do have an opinion about whether or not communication of relevant information to physicians was done.
BY MR. KAUFMAN:
Q And as long as you don't consider that a regulatory opinion, I think we can be in agreement.
Would you agree that's your personal opinion?
MR. THORNTON: Objection; form.
THE WITNESS: That is my opinion based on my years of experience in clinical medicine and oncology and in product development and having worked inside companies.
So I have worked with them so I know what these issues are, but so it's based on -- yes, my personal universe of experiences have helped inform my opinion on that.
BY MR. KAUFMAN:
Q When you are in that role based on that

Page 118

experience, what governs the company's conduct?
A Well, the company has their own -- they have regulatory requirements that they follow, but they also have their operational principles. They have core data sheets that they put together that say, "Okay. I'm doing global development. I'm going to have this type of adverse event uniformly communicated across the world with my product."
So they do establish those types of issues in terms of how they are going to communicate important information. I think that's the best I can do right now.
Q Okay. Have you reviewed those internal standards as they pertain to Sanofi?
A I have reviewed -- well, you know what I've reviewed in terms of the clinical documents. So I mean, I can talk about that without -- I can talk about it in the general sense in terms of what the expectations are that companies follow with their own rules without having to know exactly what Sanofi's rules were.
So I can't opine on whether they did or did not follow their own rules, but I can certainly say the company should have their own internal operating principles by which they operate and that doesn't

Page 119

require me to read confidential documents.
Q You are not opining that Sanofi deviated or did not comply with its own internal standards, correct?
MR. THORNTON: Objection; form.
THE WITNESS: You're correct. I can't comment because I haven't read their internal documents. What I -- I basically said what I would be able to say is what the expectations are.
BY MR. KAUFMAN:
Q So if there are --
A That wouldn't -- I'm sorry.
MR. THORNTON: Go ahead. Complete your answer.
THE WITNESS: What I was going to say was I would not be the expert to opine on what Sanofi said they were going to do and what they did or did not do. That would be another expert in this case opining on that.
BY MR. KAUFMAN:
Q That's not your purview?
A Correct.
Q We're making more progress.
A Oh, good.
Q Slowly, but surely.

Page 120

A Good.
Q If we have carved out FDA requirements and we have carved out Sanofi's internal procedures, rules and requirements that they might follow, what standard are you using to opine that Sanofi did not communicate effectively or properly risks associated with Taxotere to doctors?
MR. THORNTON: Objection; form.
THE WITNESS: I am opining on the fact of years -- is it written down somewhere? No. I'm opining on the expectation that physicians have in terms of where they get their information from. And if they aren't told the information, then, you know, they don't have it and they can't communicate it with their patients. That's a problem.
And I think the expectation is physicians expect important and relevant information to be communicated with them so they can take the best care of their patients.
That's part of the -- if you want to go back to my experience in terms of teaching about informed consent and the process, it's not just about signing a document.
It's actually a process of being informed. So within that context, I could, you know,

Page 121

communicate that. Whether you agree with that I guess is another issue, but that's how I feel -- how I think this issue could be presented.
BY MR. KAUFMAN:
Q I appreciate that. What I'm trying to get at is the baseline, the threshold. How does a company like Sanofi know that it has met a physician's expectation?
MR. THORNTON: Objection; form. Go ahead.
THE WITNESS: They're a very experienced company. Maybe if this was a startup company that had no experience with product development, maybe that might be an issue, but this is a very experienced company.
They know what the expectations are. They do presumably have their own internal operating principles. They have worked on developing many products. This is something that a company should know.
BY MR. KAUFMAN:
Q Based on FDA requirement and their own internal procedures, correct?
A And their own experiences with how products are developed. I mean, having worked on product development as a physician, I certainly expect

Page 122

companies to share relevant information.
Do I go to a page in a book to find it?
No. I just expect it.
Q And so you cannot point me to that page in the book because it doesn't exist, correct?
MR. THORNTON: Objection; form.
THE WITNESS: At this point in time, no, I can't point you to a page in a book, but I think we've agreed on a lot of other things.
BY MR. KAUFMAN:
Q I think we've made some progress. We worked it out. Thank you.
A Okay.
Q Can we agree that you are not offering any case specific opinions?
A Yes. Well, case specific as regards the plaintiffs. Obviously, some of the publications deal with case studies.
Q You are not offering any opinions regarding Ms. Durden, Ms. Francis or Ms. Earnest?
A Correct.
Q You are not offering any opinions regarding whether they suffered permanent alopecia?
A No.
Q Or whether Taxotere caused them to

Page 123

experience permanent alopecia?
A I am not offering any specific plaintiff case opinions at all.
Q Can we agree that you are not offering any opinions regarding the development of Taxotere?
MR. THORNTON: Objection; form.
THE WITNESS: Could you be more specific? It's just such a broad question.
BY MR. KAUFMAN:
Q You have already told me that you are not offering opinions as to adequacy of the label, correct?
A Correct.
Q Are you offering any opinions as to adequacy of the development of Taxotere?
MR. THORNTON: Objection; form.
THE WITNESS: No.
BY MR. KAUFMAN:
Q Are you offering any opinions -- strike that.
You are not offering any opinions as to the methods used by Sanofi to detect the safety and effectiveness of Taxotere?
A I'm not sure I'm aware of the methods they used other than, you know, what I have access to, so

Page 124

I don't know if I can answer that question.
Q You're not opining as to the adequacy of the methods that Sanofi used or -- to detect the safety and effectiveness of Taxotere, and if you don't know the methods, you probably would not be opining as to that, correct?
A All I can say is I have no reason to opine one way or another on the development of Taxotere as regards its safety and effectiveness.
Q That opinion is not in your report, correct?
A Correct.
Q You are not opining as to the adequacy of any Sanofi sponsored clinical trials on Taxotere, correct?
A Just repeat the question.
THE REPORTER: "You are not opining as to the adequacy of any Sanofi sponsored clinical trials on Taxotere, correct?"
THE WITNESS: By "adequacy," do you mean the conduct?
BY MR. KAUFMAN:
Q Do you intend to offer opinions that are critical of the Sanofi sponsored clinical trials conducted on Taxotere?

Page 125

A I do have an opinion in my report that addresses that, so that is in my report now.
Q Where is that in your report?
A That's talking about the inadequacy of follow-up of alopecia on the Geicam 9805 trial.
Q Outside of that, do you have any opinions on adequacy of any Sanofi sponsored clinical trials on Taxotere?
A On the conduct of the trial, other than that, no.
Q You are not offering any opinions as to Sanofi's promotion of Taxotere and adequacy of its -- strike that.
You have no opinions as to Sanofi's promotion of Taxotere including its promotional materials?
A I have no opinion on their promotional materials on Taxotere.
Q Do you want to take a lunch break?
A Sure.
THE VIDEOGRAPHER: We are off the record. The time is 12:52 p.m.
(Lunch recess to 1:41 p.m.)
/ / /
/ / /

Page 158

Q That is what I want to know. It says post marketing surveillance. What is that based on?
A That is by the company and the fact that they, you know, in their clinical summary refer to over 2,100 cases.
Q So when you refer to post marketing surveillance, you are referring to information contained within the 2015 clinical overview that you reviewed in forming your opinions?
A Yes, I believe so.
Q And the last item that you reference here, multiple case studies from 2001 to the present?
A Correct.
Q Are you referring to the literature that you summarize and include in Table 2 of your report?
A Correct.
Q Anything else?
A No.
The only caveat I want to note because I don't know how -- I know you read what I stated, but it should be known to the company because, obviously, they're the only ones who know the results of the permanent alopecia from the randomized clinical trials because it is never published, so there is no way for anybody else to

Page 159

know. Their post marketing surveillance is known to the company not to anybody else.
Q I move to strike --
A So it should have been known to the company.
Q I move to strike.
Looking at the very beginning of Conclusion No. 3 you state, "That permanent alopecia is a known adverse event of Taxotere containing regimens in the adjutant treatment of early stage breast cancer." I am going to stop right there.
A Well, you didn't read the whole sentence.
Q I know. I want to focus on just that piece. Are you opining as to when permanent alopecia became a known adverse event?
A As I told you earlier, I'm not going to opine on when the company knew or did not know.
Q And I appreciate that. That wasn't my question.
Are you opining as to when permanent alopecia became known as an adverse event because you note here in Conclusion No. 3 that permanent chemotherapy induced alopecia is a known adverse event of Taxotere containing regimens.
A Right. What I was trying to make clear to

Page 160

you is make known to the company.
Q That's what that means?
A Yes, because nobody else knew the results of the unpublished follow-up of Geicam 9805 or Tax 316 except the company and no one else except the company would know their own pharmacological data.
Q That opinion as referenced in Conclusion No. 3 also refers to multiple case studies from 2001 to the present?
A It does. Those would be found if somebody did a vigorous search for then.
Q The authors of those studies would have known that information, right?
A They know from their own individual site in their institution. They don't know what the company knows. It's a -- as you can imagine, the company has resources to do a worldwide search on what's going on.
An individual physician at an institution would know what's in their own universe.
Q Move to strike as nonresponsive.
Some of these case studies that you refer to from 2001 to the present were presented at symposiums or congresses; is that right?
A Right.

Page 161

You ever been to an oncology conference?
Q I am not here to answer your questions.
A The reason I prefaced it is yes, but these are multi-thousands, you know -- I am just going to share a story. I just got back from the hemotology conference. 28,000 people concurrent sessions, poster session, abstracts, posters.
There's no way -- yes, it was presented at a conference but only a certain percentage of people who go to that session would hear it.
Q Doctors who did go to that session did hear it and would have been exposed to the information, correct?
A To that individual institution's experience, not to the randomized clinical trials, not to data from the surveillance. They would hear from that individual -- just that individual's reports.
Q So going back to my prior question, which I'm not sure we actually fully addressed, you state that permanent chemotherapy induced alopecia is a known adverse event.
When did it become known?
MR. THORNTON: Objection; form.
THE WITNESS: Actually, as I told you, to