# EXHIBIT G

Page 1

1            UNITED STATES DISTRICT COURT
2            EASTERN DISTRICT OF LOUISIANA
3
4   IN RE TAXOTERE (DOCETAXEL)        )
5   PRODUCTS LIABILILTY LITIGATION    ) MDL NO. 2740
6                                     )
7   THIS DOCUMENT RELATES TO:         ) SECTION:   H
8                                     )
9   ANTOINETTE DURDEN,                )
10  CASE NO. 2:16-cv-16635            )
11  TANYA FRANCIS,                    )
12  CASE NO. 2:16-cv-17410;           )
13  BARBARA EARNEST,                  )
14  CASE NO. 2:16-cv-17144            )
15                                    )
16  _____    )
17
18     VIDEOTAPED DEPOSITION OF ELLEN FEIGEL, M.D., VOL. 2
19                FRIDAY, DECEMBER 7, 2018
20
21  JOB NO. 3151489
22
23  REPORTED BY ISRAEL REYES
24
25  Job No. NJ3151489

Page 6

1  APPEARANCES OF COUNSEL: (CONTINUED)
2
3  FOR DEFENDANT SUNDAY PHARMACEUTICAL: (VIA PHONE)
4     HINSHAW & CULBERTSON, LLP
5     BY: GEOFFREY M. COAN, ESQ.
6     ATTORNEY AT LAW
7     53 STATE STREET
8     27TH FLOOR
9     BOSTON, MASSACHUSETTS 02109
10    (617) 213-7045
11    GCOAN@HINSAHWLAW.COM
12
13 VIDEOGRAPHER: GRANT CIHLAR

Page 7

1                I N D E X
2
3  WITNESS:        EXAMINATION         PAGE
4  ELLEN FEIGEL, M.D.
5          BY MR. KAUFMAN          8
6
7              E X H I B I T S
8  No.    PAGE    DESCRIPTION
9  EX 11   84    CLINICAL STUDY OF
10               CHEMOTHERAPY-INDUCED
11               PERMANENT ALOPECIA
12 EX 12   91    LATE EFFECTS OF ADJUVANT
13               CHEMOTHERAPY AND POSTOPERATIVE
14               RADIOTHERAPY ON QUALITY OF LIFE
15               AMONG BREAST CANCER PATIENTS
16 EX 15   66    OBJECTIONS AND RESPONSES

Page 8

1  WESTLAKE VILLAGE, CALIFORNIA; FRIDAY, DECEMBER 7,
2      2018; 6:10 P.M.
3
4         ELLEN FEIGEL, M.D.,
5  having been first duly sworn by the reporter, was
6       examined and testified as follows:
7
8      THE VIDEOGRAPHER: We're back on the record.
9  The time is 6:10 p.m. Please continue.
10
11         EXAMINATION (CONTINUED)
12 BY MR. KAUFMAN:
13    Q  Dr. Feigel, are you ready to continue?
14    A  Yes.
15    Q  When was the last time you consented a
16 patient?
17    A  For a clinical trial, it probably would have
18 been back -- probably about 10 or 11 years ago
19 directly. As you know, informed consent is something
20 that I design and do all the time for the clinical
21 trials. So although I'm not directly in the room with
22 the patient, I actually design informed consent forms
23 for patients.
24    Q  So in your role in the clinical trials, you
25 design the forms and what the forms say. And then

Page 9

1  someone else actually does the consenting of the
2  patient.
3     A  That's correct.
4     Q  Okay. Outside of the scope of a clinical
5  trial, when was the last time that you consented a
6  patient?
7     A  In the clinic? Probably back at the NIH days
8  -- 2004.
9     Q  And when was the last time you consented the
10 patient on the risks of chemotherapy?
11    A  It would have been 2004.
12    Q  Do you agree that all chemotherapy drugs are
13 associated with side effects?
14    A  Yes, in general.
15    Q  Do you agree that there are no risk-free
16 chemotherapy options?
17    A  I agree that there are risks with every
18 chemotherapy.
19    Q  And stated in the reverse, there's no risk-
20 free chemotherapy options.
21    A  Right.
22    Q  Would you agree that chemotherapy drugs are
23 used despite their risks because the benefits of using
24 such drugs outweigh the benefits --
25    A  I agree --

Page 10

1  Q  -- side effects?
2  A  If I could just -- I know where you're going
3  in terms of the sentence.  And yes, it's the benefits
4  outweigh the risks, and it's certainly reasonable to
5  use chemotherapy regimens in a discussion with a
6  patient.
7  Q  Do you agree that chemotherapy drugs carry
8  serious life-threatening and potentially permanent
9  risks?
10  A  I agree that some chemotherapy agents can
11  certainly lead to that kind of adverse event.
12  Q  And some of these risks would include death?
13  A  Do -- we're just talking about theoretical
14  chemotherapy agents in general?
15  Q  Just in general.
16  A  Yes, certain kinds may lead to death.
17  Q  Heart damage?
18  A  Certain kinds may lead to heart damage.
19  Q  Nerve damage?
20  A  Certain kinds can cause nerve damage.
21  Q  Leukemia?
22  A  Certain drugs can cause secondary leukemias.
23  Q  Neutropenia?
24  A  Many drugs can cause neutropenia.
25  Q  Including chemotherapy drugs?

Page 11

1  A  Including chemotherapy drugs.
2  Q  And neuropathy.
3  A  I think you just asked that, but I can re-
4  answer.  Neuropathy is certainly a side effect of --
5  Q  Yeah.
6  A  -- can be a side effect of chemotherapy
7  drugs.
8  Q  Information about the side effect profile of
9  a drug or -- strike that.
10     Information about the side effect profile of
11  a drug is not limited solely to the prescribing
12  information; would you agree?
13  A  I would say the vast majority of what you
14  know about a drug safety is in prescribing
15  information.
16  Q  Would you agree that physicians learn from
17  many sources of information about the treatment
18  options?
19  A  If you're going beyond safety, sure, there's
20  other sources of information.  But the prescribing
21  information should contain all relevant information
22  about adverse events.
23  Q  Would you agree that these many sources of
24  information enable an informed discussion with the
25  patient about treatment options?

Page 12

1  A  I would say that communication on benefits
2  and adverse events obtained from prescribing
3  information and other information a physician may have
4  can inform a discussion with a patient.
5  Q  These sources include the prescribing
6  information, correct?
7  A  Prescribing information is a key source of
8  information for risk and safety issues.
9  Q  Scientific and medical publications would be
10  a source for information on safety, correct?
11  A  It could be supplemental to knowing what's in
12  the prescribing information.
13  Q  Presentations and publications of clinical
14  trials?
15  A  Supplementary.
16  Q  Professional meetings?
17  A  Supplementary.  It depends on the
18  presentation.  I mean, there's only -- it -- the full
19  sum -- the -- not full sum -- the full information on
20  safety and adverse events should be in the prescribing
21  information.
22  Q  A personal clinical experience would inform a
23  physician's --
24  A  Absolutely.
25  Q  -- knowledge.

Page 13

1  A  Experience should also help guide that.
2  Q  Should a doctor who has had a patient develop
3  permanent or persistent alopecia with hair loss in his
4  or her personal clinical practice warn all subsequent
5  patients of the risk of permanent alopecia.
6     MR. THORNTON:  Objection; form.
7  BY MR. KAUFMAN:
8  A  It's very hypothetical.  Is this just in
9  their practice on a clinical trial?  They should
10  report it if it's an unusual event, whether it's
11  occurring in their practice or in a clinical trial.
12  Q  Okay.  So the reporting portion of it, if a
13  physician in a clinic treats a patient with, let's
14  say, Taxotere, and that patient develops permanent
15  alopecia, should that treating oncologist for the next
16  patient that comes in, warn the next patient of the
17  risk of permanent alopecia?
18     MR. THORNTON:  Objection; form.
19  BY MR. KAUFMAN:
20  A  I think they should share what their
21  experience is when they're talking to the next
22  patient, so whatever's relevant -- whatever that
23  physician thinks is relevant.  But obviously, they'd
24  want to know it from prescribing information about
25  adverse events.

Page 14

1  Q  So the prescribing oncologist can make a
2  judgment call as to which risks he or she believes are
3  relevant in terms of which ones he or she chooses to
4  share with the patient.
5      MR. THORNTON:  Objection; form.
6  BY MR. KAUFMAN:
7  A  I think experience is something that they can
8  choose to utilize in their conversation with the
9  patient.  But usually, they really heavily rely on
10 safety information and prescribing information because
11 that's the most comprehensive summary.
12 Q  Is it your testimony that every oncologist
13 reviews the prescribing information for the
14 chemotherapy drugs that they use?
15 A  I hope --
16     MR. THORNTON:  Objection; form.
17 BY MR. KAUFMAN:
18 A  -- they read it.
19 Q  Do you know that?
20     MR. THORNTON:  Objection; form.
21 BY MR. KAUFMAN:
22 A  At some point in time, I'm sure they have
23 read it.
24 Q  Are you speculating as to whether they have
25 read it?

Page 15

1  A  I --
2     MR. THORNTON:  Objection; form.
3  BY MR. KAUFMAN:
4  A  I think it's pretty standard that they read
5  prescribing information.  Do they need to read it for
6  every patient?  Probably not.  But they certainly are
7  very knowledgeable about prescribing information.
8  Q  Well, prescribing information can change over
9  time, correct?
10 A  Correct.
11 Q  And are you testifying that every doctor
12 reviews every label update for every chemotherapy drug
13 that they prescribe?
14     MR. THORNTON:  Objection; form.
15 BY MR. KAUFMAN:
16 A  I think if they're informed that there's an
17 important label change, then they would read it.
18 Q  But you can't guarantee that every oncologist
19 reviews every label or every label change.
20 A  No, I can't.  I just --
21     MR. THORNTON:  Wait.  Let me get my objection
22 out there.  When you speak over his -- answer over his
23 -- yeah, there's no room for me.
24     Objection; form.
25 BY MR. KAUFMAN:

Page 16

1  Q  Should a treating oncologist warn of every
2  risk that's contained in the prescribing information?
3      MR. THORNTON:  Objection; form.
4  BY MR. KAUFMAN:
5  A  I think the physician should be knowledgeable
6  about the adverse events for a regimen and be able to
7  comprehensively discuss it with a patient and try to
8  tailor the discussion according to the patient that
9  they know and be able to answer questions if the
10 patient should have additional questions.
11 Q  So if a drug label, for example, has a list
12 of 10 risks associated with it, do you believe that
13 the doctor should warn the patient of all 10 risks?
14     MR. THORNTON:  Objection; form.
15 BY MR. KAUFMAN:
16 A  Sometimes the risks are overlapping.  So I
17 can't answer in a theoretical whether or not every
18 single one should be mentioned, but they should
19 somehow convey the spectrum of risks and the magnitude
20 of the risk and the frequency of the risk.
21 Q  Can a doctor exercise his or her medical
22 judgment in determining whether or not to warn a
23 patient of the risk of permanent alopecia?
24     MR. THORNTON:  Objection; form.
25 BY MR. KAUFMAN:

Page 17

1  A  No.  I mean, permanent alopecia in a woman
2  who has decades of life ahead of her would be a very
3  important adverse event to communicate.  So I can't
4  imagine they would elect not to share that
5  information.
6  Q  So if a physician knew the risk of permanent
7  alopecia but exercised the -- their own medical
8  judgment to not to warn the patient of the risk of
9  permanent alopecia, would that be a deviation from the
10 standard of care?
11     MR. THORNTON:  Objection; form.
12 BY MR. KAUFMAN:
13 A  I'm having a hard time envisioning why they
14 would elect not to share that information with a woman
15 patient.
16 Q  Do you -- are you saying it's not -- that
17 scenario that I've just set forth is not possible?
18     MR. THORNTON:  Objection; form.
19 BY MR. KAUFMAN:
20 A  Well, I suppose it's possible.  I'm just
21 saying that the standard would be to share important
22 risk of that with the patient.
23 Q  What if a doctor testified that they warn
24 their patients of one of the most common adverse
25 events that they see in their practice?

Page 18

1  MR. THORNTON: Objection; form.
2  BY MR. KAUFMAN:
3    Q  If permanent alopecia was not one of the most
4  common, do you think that doctor should still warn the
5  patient of the risk of permanent alopecia?
6     MR. THORNTON: Objection; form.
7     THE WITNESS: You done? Okay.
8  BY MR. KAUFMAN:
9    A  So permanent alopecia, whether it's 1
10 percent, 5 percent, 15 percent, is a very important
11 adverse event that a woman would want to know about.
12 So it's not whether it's common or whether it's rare.
13 If it's something that's really a key issue that women
14 who are undergoing chemotherapy are concerned about,
15 it should be something that is shared.
16    Uncommon side effects and rare side effects,
17 if they have major impact, should certainly be shared,
18 not just common ones.
19    Q  And if a doctor is aware of the risk of
20 permanent alopecia, regardless of its frequency in
21 that physician's practice, you believe that physician
22 should always warn of the risk of permanent alopecia.
23     MR. THORNTON: Objection; form.
24 BY MR. KAUFMAN:
25    A  I think it's an important discussion because

Page 19

1  it has -- we know that even temporary, reversible
2  alopecia has major psychological impact on women
3  undergoing chemotherapy. So one could envision that
4  permanent chemotherapy-induced alopecia would have
5  even more importance. It has implications, not just
6  for the regimen, but whether they want to offer them
7  some ways to mitigate the hair loss from occurring.
8    Q  If a physician knows of the risk of permanent
9  alopecia associated with Taxotere and chooses not to
10 warn the patient of the risk of permanent alopecia
11 associated with Taxotere, has that physician deviated
12 from the standard of care?
13     MR. THORNTON: Objection; form.
14 BY MR. KAUFMAN:
15    A  I think if the physician knows of the risk of
16 permanent alopecia and selectively decides not to
17 share it with a woman patient undergoing breast cancer
18 therapy, I don't think that's within the standard of
19 care.
20    Q  You mentioned a few minutes ago that the
21 physician can make a determination regarding which --
22 of risks shared to the -- with the patient based on
23 whether or not it's relevant. Do you remember saying
24 that?
25    A  I actually don't remember saying that exactly

Page 20

1  as you're saying that.
2    Q  Do you remember using the word "relevant"?
3     MR. THORNTON: Objection; form.
4  BY MR. KAUFMAN:
5    A  I think what I said is trying to convey the
6  risk and the relative magnitude and the frequency of
7  them, whether it's common or it's rare, and then being
8  able to hear back from the patient. Some of these
9  risks may be a particular impact to the patient; some
10 may not. So I think it's not a cookbook. It's -- and
11 it's not just -- and you actually haven't satisfied
12 your responsibilities just by reading them a laundry
13 list. It's really having a discussion with a patient
14 about the potential harms in addition to the potential
15 benefits and having a discussion with a patient.
16    Q  Do you agree that physicians and
17 manufacturers can only warn of information that is
18 known or knowable at the time of treatment?
19     MR. THORNTON: Objection; form.
20 BY MR. KAUFMAN:
21    A  Repeat your question.
22    Q  Do you agree that physicians and
23 manufacturers can only warn of information that is
24 known or knowable at the time of the treatment?
25     MR. THORNTON: Objection; form.

Page 21

1  BY MR. KAUFMAN:
2    A  Well, you're equating physicians and
3  manufacturers in the same sentence. Manufacturers
4  have an enormous amount of data about their own
5  product and the safety and efficacy, and they have a
6  certain responsibility to communicate that
7  information.
8     Physicians who are only privy to what's in
9  the public domain or from their own experience, yes,
10 they cannot communicate risks they don't know about.
11 I agree with that.
12    Q  If a new risk comes out in a clinical study,
13 let's say, in 2018, would you agree that that new risk
14 was not known or knowable in 2009?
15     MR. THORNTON: Objection; form.
16 BY MR. KAUFMAN:
17    A  If that risk was not -- let me separate --
18 I'm going to segregate it a little bit. Not known to
19 whom?
20     So if there was a risk that was only knowable
21 publicly in 2018 and not in 2009, yes, I agree the
22 physician would have no way to warn about that risk.
23    Q  Does that analysis change if it's in the
24 perspective of a manufacturer?
25    A  Well, the --

Page 22

1    MR. THORNTON: Objection; form.
2 BY MR. KAUFMAN:
3    A   So are you saying the manufacturer is not
4 aware of a risk and, therefore, they can't communicate
5 the risk? Is that your question to me?
6    Q   Sure. Yeah.
7    A   If the manufacturer isn't aware of a risk,
8 then, no, they can't communicate the risk. But you do
9 have to look for it.
10   Q   We spoke earlier about the regimens that were
11 set forth in your report --
12   A   Yeah.
13   Q   -- the NCCN regimens. Do you agree that your
14 report does not contain a discussion of the side
15 effect profile associated with each of those regimens?
16   A   I didn't consider that to be required in this
17 kind of report because we're mainly focusing on
18 permanent alopecia from Taxotere, not every other
19 single type of side effect that can occur.
20   Q   Okay.
21   A   Those are normal conversations that a
22 physician would have with every patient. I didn't
23 feel I had to go through that in this report.
24   Q   You did not conduct an analysis of the side
25 effect profile of each of the proposed drugs and/or

Page 23

1 regimens that are set forth in your report.
2    A   I am --
3       MR. THORNTON: Objection; form.
4 BY MR. KAUFMAN:
5    A   Through 30 years' experience, I know the risk
6 and issues with those different chemotherapy regimens.
7 I didn't think it was relevant to include in this
8 report that's focused on permanent alopecia from
9 Taxotere.
10   Q   In Opinion number 6 in your report, you state
11 that, "Physicians would have included, had they known
12 of the risk of permanent and chemotherapy-induced
13 alopecia, in their benefit-risk discussion of
14 treatment options with their patients with early-stage
15 breast cancer to allow for more informed decisions.
16 This information may have changed the treatment
17 options discussed and the patient's choice." Did I
18 read that correctly?
19   A   That is correct.
20   Q   Are you purporting to testify as to what
21 every oncologist in the United States would do if they
22 knew about a certain risk?
23      MR. THORNTON: Objection; form.
24 BY MR. KAUFMAN:
25   A   I'm giving you my opinion. This is my --

Page 24

1 this whole report is my opinion. I'm not speaking for
2 anybody except me. This is my opinion based on what I
3 know about physician practices and what I know about
4 physician-patient discussions that important side
5 effect that would have such impact on women that
6 physicians would have wanted to have known about this.
7    Q   That's your personal opinion.
8    A   Well, it's a professional opinion. I have 30
9 years in the field. I have a lot of knowledge about
10 what physicians do, and I've worked -- my whole career
11 is involved with clinical research, clinical trials,
12 the practice of oncology. So I do have a lot of
13 knowledge in this area.
14   Q   Can you guarantee that physicians would have
15 included the risk of permanent chemotherapy-induced
16 alopecia in their risk-benefit discussions --
17      MR. THORNTON: Objection; form.
18 BY MR. KAUFMAN:
19   A   As I said earlier, I don't use 100 percent
20 certainty; I don't use the word "guarantee." But I
21 would think that it would be -- I think it would be
22 highly unusual if physicians did not share that kind
23 of significant adverse event information with their
24 patients if they had known about it.
25   Q   You would hope that they'd warn.

Page 25

1    A   My opinion is I think it would be highly
2 unusual if they did not share that information with a
3 patient because it's known to be a very important
4 issue to women.
5    Q   Have you surveyed every oncologist in the
6 United States on this issue?
7       MR. THORNTON: Objection; form.
8 BY MR. KAUFMAN:
9    A   This is based on my knowledge of oncology. I
10 don't think I ever even had the opportunity for
11 anything to survey every physician in the United
12 States. That's sort of an unreasonable question.
13   Q   Okay. I'm just asking if you've done that,
14 and the answer would be no.
15   A   Every physician, no, not for anything. I
16 don't know anybody that is able to do that.
17   Q   You said earlier that -- I think you
18 testified earlier that physicians do not know of the
19 risk of permanent alopecia?
20   A   They certainly are not aware of unpublished
21 information.
22   Q   Do you know whether any physician in the U.S.
23 is currently warning patients of the risk of permanent
24 hair loss associated with Taxotere or Docetaxel?
25   A   I would --

Page 26

1      MR. THORNTON:  Objection; form.
2  BY MR. KAUFMAN:
3      A   I do not know that.  You could ask another
4  expert about that who's actively talking with her
5  colleagues and finding out what they're doing.  I
6  imagine some of them may be doing that.
7      Q   So you can testify as to what every physician
8  would do, had they known of the risk, but you can't
9  testify as to whether every physician is currently
10 warning of that risk?
11     MR. THORNTON:  Objection; form.
12 BY MR. KAUFMAN:
13     A   I suspect a relatively few number may, if
14 they are aware of the information, are warning about
15 it.
16     Q   And what is that based on?
17     A   Well, that's why I said, at this point in
18 time, I don't know the answer to that question.  I
19 don't think anybody can survey every physician in the
20 United States.  So if that's your question, I don't
21 think anybody can do that.
22     Q   Did you survey any oncologist, not every
23 oncologist, but any oncologist on this issue?
24     A   I actually know just from looking at issues
25 that come in to blogs and things like that that

Page 27

1  physicians are completely unaware of permanent
2  alopecia with this regimen.
3      Q   It's your testimony that all physicians are
4  unaware of the risk of permanent alopecia?
5      A   I can't speak for all physicians.  No one
6  can.  That's not an answerable question.
7      Q   How many physicians can you speak for?
8      A   I can speak from my --
9          MR. THORNTON:  Objection; form.
10 BY MR. KAUFMAN:
11     A   -- opinion and my knowledge in the field and
12 my colleagues.  And I go to theses conferences.  This
13 is not an issue that's discussed.  I go to the patient
14 survivor meetings.  I work with patient advocacy
15 groups.  I've worked with breast cancer patient
16 advocacy groups.  This is not an issue that they're
17 aware of.
18     Q   Do you agree that any opinion as to what
19 physicians would or would not have done would be
20 speculative?
21         MR. THORNTON:  Objection; form.
22 BY MR. KAUFMAN:
23     A   It's based on my professional knowledge and
24 my knowledge of what physicians do with an informed
25 consent with their patient and my knowledge that

Page 28

1  physicians would know that permanent alopecia would be
2  a very important event to a woman undergoing therapy.
3  So that's based on my professional knowledge.
4      Q   Can we agree that each physician can speak
5  for him or herself as to what he or she would or would
6  not do when provided with certain information?
7      A   Please repeat that question.
8      Q   Can we agree that each physician can speak
9  for him or herself as to what he or she would do or
10 would not do when provided certain risk information?
11     A   Certainly.
12     Q   And you're not here to question or second-
13 guess that.
14         MR. THORNTON:  Objection; form.
15 BY MR. KAUFMAN:
16     A   I am not second-guessing what an individual
17 physician may choose to do.  I am just using my
18 professional knowledge and 30 years of experience in
19 oncology and attending a variety of conferences and
20 workshops and actually being actively involved in
21 informed consents for clinical studies of the types of
22 information that would be included in an informed
23 consent and expect it to be communicated with
24 patients.
25     Q   You also state in your report that this

Page 29

1  information may have changed the treatment options
2  discussed in the patient's choice, correct?
3      A   I -- yes.  That's based on my professional
4  knowledge.
5      Q   You can't guarantee that a different
6  treatment choice would have been made, right?
7          MR. THORNTON:  Objection; form.
8  BY MR. KAUFMAN:
9      A   As I said, I don't ever use the word
10 "guarantee" when I'm talking about medicine.  So it's
11 not a term I ever use.
12     Q   So it's possible that the patient -- even if
13 the doctor and the patient knew of the risk of
14 permanent alopecia associated with Taxotere, it's
15 possible that the patient would have been presented
16 with the same treatment options?
17         MR. THORNTON:  Objection; form.
18 BY MR. KAUFMAN:
19     A   If a physician knew about the risk of
20 permanent alopecia with a Taxotere-containing regimen
21 and -- I don't know what -- you know, they probably
22 would have non-Taxotere-containing regimens listed
23 among their options.
24     Q   But there could also be Taxotere-containing.
25     A   Oh, yes, yes.  I'm not pre-concluding what

8 (Pages 26 - 29)

```
                                                    Page 30
 1  the decision will be.  I'm only focused on
 2  communicating it so that there's transparency and
 3  they're aware of it so that they can have an informed
 4  discussion.  If they don't know the risk exists, then
 5  they really aren't having an informed consent -- they
 6  aren't having an informed discussion and decision if
 7  there is adverse event information that they're not
 8  aware of.
 9      Q   Why --
10      A   But it could be possible.  Once they discuss
11  it in a shared decision-making mode, the patient
12  certainly could elect -- at the end of the day, a
13  woman wants to take that potential risk, that is her
14  decision.
15      Q   So it's possible that a patient would still
16  have chosen Taxotere treatment.
17          MR. THORNTON:  Objection; form.
18  BY MR. KAUFMAN:
19      A   Yeah, if she had an informed discussion she -
20  - and knows of the risk.  Perhaps she would choose
21  that; perhaps she would choose to try and mitigate the
22  risk with a cooling cap, you know.  Those are all
23  things that -- so her treatment -- she may still
24  choose the regimen, but perhaps she chooses a way to
25  mitigate the risk with a cooling cap.
```

```
                                                    Page 31
 1      So in that context, her treatment approach is
 2  different.  But it's possible that she could still
 3  choose a Taxotere-containing regimen.  I'm not
 4  precluding that.
 5      Q   And it's possible she might choose a
 6  Taxotere-containing regimen without a cold cap.
 7          MR. THORNTON:  Objection; form.
 8  BY MR. KAUFMAN:
 9      A   It's -- yes, that is possible.
10      Q   All of the options are still on the table,
11  correct?
12      A   Yes.  I think --
13          MR. THORNTON:  Objection; form.
14  BY MR. KAUFMAN:
15      A   -- the main issue is communication and
16  transparency so that the patient and the physician are
17  having an informed discussion.  I'm not precluding
18  that the decision may or may not be different.  I'm
19  just saying the first point is to have that
20  transparency in communication of risk and benefits.
21      I'm also, as you know, not specifically
22  talking about these plaintiffs.  I can't -- you know,
23  that's a discussion you'll be having with different
24  experts.
25      Q   Do you agree that Taxotere is a life-saving
```

```
                                                    Page 32
 1  treatment for early-stage breast cancer?
 2      A   I agree that Taxotere is a very reasonable
 3  regimen, among many, for treatment of patients with
 4  early-stage breast cancer.  There are -- Taxotere
 5  regimens have safety and efficacies, as do a menu of
 6  other options that are reasonable for a patient and
 7  their physician to talk about.
 8      Q   Do you believe that Taxotere is still within
 9  the standard of care for treating early-stage breast
10  cancer?
11      A   I believe that Taxotere-containing regimens
12  are a reasonable option, among many, for patients with
13  early-stage breast cancer.
14      Q   And that is despite the potential risk of
15  permanent alopecia.
16      A   I think, with transparency of discussion and
17  risk and benefits, it certainly still could be a
18  reasonable approach.  It just depends on the patient
19  and that discussion with her physician.
20      Q   You're not critical of any prescribing
21  oncologist's decision to use Taxotere.
22      A   As long -- oh.
23          MR. THORNTON:  Objection; form.
24  BY MR. KAUFMAN:
25      A   As long as it is done with full disclosure of
```

```
                                                    Page 33
 1  the risk as well as the benefits, then if there's a
 2  shared decision and the decision is to use it, yes,
 3  that's fine.
 4      Q   And if a physician knows of the risk but
 5  chooses not to warn the patient, are you critical of
 6  the physician in that case?
 7          MR. THORNTON:  Objection; form.
 8  BY MR. KAUFMAN:
 9      A   Highly critical.
10      Q   Do you agree that Taxotere and Taxol are
11  different chemotherapy drugs?
12      A   Yes.
13      Q   Do you agree they're not identical?
14      A   Yes.
15      Q   Do you agree they are not interchangeable?
16      A   Yes.
17      Q   You cannot simply swap out Taxol and put in
18  Taxotere in the same regimen, right?
19          MR. THORNTON:  Objection; form.
20  BY MR. KAUFMAN:
21      A   Let me be clear about the use of the term
22  "interchangeable."  That's a term I generally use for
23  generics, not for regimens with similar efficacy and
24  safety.  Taxol and Taxotere regimens have similar
25  efficacy but do have different safety profiles.  You'd
```

Veritext Legal Solutions
800-227-8440                                         973-410-4040