**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

In Re: TAXOTERE (DOCETAXEL)                                         **MDL NO. 2740**
PRODUCTS LIABILITY LITIGATION

                                                                                              **SECTION "H" (5)**

THIS DOCUMENT RELATES TO:

Antoinette Durden, Case No. 2:16-cv-16635;
Barbara Earnest, Case No. 2:16-cv-17144

---

**MEMORANDUM IN SUPPORT OF SANOFI DEFENDANTS' MOTION**
**TO EXCLUDE EXPERT TESTIMONY OF DR. KEVIN BIANCHINI**

---

In two cases, *Durden* and *Earnest,* Plaintiffs disclosed Dr. Kevin Bianchini, a neuropsychologist, to testify that both Antoinette Durden and Barbara Earnest have "Adjustment Disorder[s] with Mixed Anxiety and Depressed Mood." *See* Bianchini *Durden* Report at 12 (Ex. A); Bianchini *Earnest* Report at 9 (Ex. B). Based on Dr. Bianchini's reports and deposition, however, Dr. Bianchini's opinions are outside of his expertise and are neither reliable nor relevant. Dr. Bianchini's opinions should be excluded.

    First, Dr. Bianchini is not qualified. Dr. Bianchini has never treated a patient with psychological symptoms resulting from hair loss due to cancer treatment. Bianchini Dep. at 48:5-7 (Ex. C). Within "a month or two" of evaluating Plaintiffs, he researched literature and studies regarding psychological symptoms and alopecia and learned "[t]hat women with hair loss commonly report emotional psychological symptoms." *Id.* at 38:8-12. This was not literature that he "had reviewed in any detail in the past." *Id.* at 41:5-14. He was "not sure" if he had ever reviewed any literature or studies regarding psychological symptoms associated with hair loss in women before that time. Dr. Bianchini does not specialize in the treatment of cancer patients and

has "probably" treated "less than 20" cancer patients in his career.  *Id.* at 48:22-49:7.  Any opinions Dr. Bianchini offers regarding alleged psychological injuries of Ms. Durden and Ms. Earnest are beyond his area of expertise and should be excluded.

Second, Dr. Bianchini's opinions are unreliable.  Dr. Bianchini was identified as an expert on November 9, 2018.  His deposition took place on January 8, 2019, and January 9, 2019.  After the first deposition day, Dr. Bianchini learned that, despite his request for all information related to both Plaintiffs, he did not receive that information.  The vast majority of medical records and all of the depositions in both cases were complete in advance of November 9, 2018.  Despite this, Dr. Bianchini was provided and reviewed only a small fraction of these materials.  Before the start of deposition day two, Dr. Bianchini testified:

> So I should also say that I have discovered now that despite requesting all of the information, I was not provided with all the information.  So, you know, my opinions are now subject to some change once I review additional information, and so my answers are going to have to be couched based on current information and subject to change based on review of additional information.

Bianchini Dep. at 167:4-167:11 (Ex. C).  He further testified that his opinions "would be rendered conditionally based on the possibility of change from looking at additional materials."  *Id.* at 169:12-15.  Dr. Bianchini essentially admitted that the opinions stated in his expert report are unreliable and based on insufficient facts and data.  Dr. Bianchini's opinions are further unreliable because (1) he did not apply the Diagnostic and Statistical Manual of Mental Disorders criteria for an Adjustment Disorder to either Plaintiff, and (2) he failed to rule out alternative causes for Plaintiffs' alleged emotional distress.

Under Rule 702, all of Dr. Bianchini's opinions are inadmissible.

## LEGAL STANDARD

Federal Rule of Evidence 702 controls the admission of expert testimony.  Under Rule 702,

the Court's gatekeeping function first involves determining whether the expert is *qualified*; then

it "involves a two-part inquiry into *reliability* and *relevance*":

> First, the Court must determine whether the proffered expert
> testimony is reliable. The party offering the testimony bears the
> burden of establishing its reliability by a preponderance of the
> evidence. The reliability inquiry requires the Court to assess whether
> the reasoning or methodology underlying the expert's testimony is
> valid. The aim is to exclude expert testimony based merely on
> subjective belief or unsupported speculation.
>
> Second, the Court must determine whether the expert's reasoning or
> methodology is relevant. The question here is whether the reasoning
> or methodology "fits" the facts of the case and will thereby assist
> the trier of fact to understand the evidence.

*Burst v. Shell Oil Co*., 120 F. Supp. 3d 547, 550 (E.D. La. 2015) (citations omitted).

The "reliability analysis applies to *all aspects* of an expert's testimony," including "the

methodology, the *facts underlying the expert's opinion*, [and] the link between the facts and the

conclusion." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (emphasis

added).  Importantly, "the expert's testimony must be reliable at each and every step or else it is

inadmissible." *Id*.  These "exacting standards of reliability," *Weisgram v. Marley Co.*, 528 U.S.

440, 455 (2000), provide that "conjecture, hypothesis, subjective belief, or unsupported

speculation are impermissible grounds on which to base an expert opinion." *Wehling v. Sandoz

Pharm. Corp.*, No. 97-2212, 162 F.3d 1158, 1998 WL 546097, at *5 (4th Cir. Aug. 20, 1998)

(Table Decision).  Courts also consider whether the expert's findings are litigation-driven or

results-driven.  *See Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995)

(*Daubert II*).  In making this assessment, courts have considered "whether experts are 'proposing

to testify about matters growing naturally and directly out of research they have conducted

independent of the litigation, or whether they have developed their opinions expressly for purposes

of testifying.'" *Burst*, 120 F. Supp. 3d at 551 (quoting *Daubert II*, 43 F.3d at 1317)).  Defendants

do not bear the burden of demonstrating its inadmissibility.  *See Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 534 (W.D. Pa. 2003).

On the relevance factor, the Court must determine whether the proffered expert testimony is sufficiently tied to the facts in issue that it will aid the jury.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993) (stating that the district court's "gatekeeping role" requires ensuring that the expert testimony "is relevant to the task at hand").  "The question here is whether the reasoning or methodology 'fits' the *facts of the case* and will thereby assist the trier of fact to understand the evidence."  *Burst*, 120 F. Supp. 3d at 551 (emphasis added).

## **ARGUMENT**

## I.   **DR. BIANCHINI'S OPINIONS ARE INADMISSIBLE BECAUSE THEY ARE OUTSIDE OF HIS EXPERTISE.**

Dr. Bianchini is not qualified to opine on the psychic or emotional impact of hair loss on cancer patients.  A physician may only testify within the "reasonable confines" of his practice area. *Thompson v. U.S.*, No. 4:17-cv-63, 2019 WL 149553, at *4 (S.D. Ga. Jan. 9, 2019) ("A medical degree, however, does not qualify a physician to testify concerning any medical issue; a physician's expert testimony must stay within the 'reasonable confines' of his or her practice area.") (citing *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001)); *see also Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1112-13 (5th Cir. 1991) (concluding that an "M.D. degree . . . alone is not enough to qualify [an expert] to give an opinion on every conceivable medical question").

Dr. Bianchini is a neuropsychologist whose practice focuses on patients with traumatic brain injury and chronic pain.  *See* Bianchini Dep. at 78:16-79:2 (Ex. C); *see also* Bianchini *curriculum vitae* (Ex. D).  Plaintiffs do not allege a neuropsychological injury in connection with this litigation, nor do they allege a traumatic brain injury or chronic pain.  Rather, both Plaintiffs

allege emotional damages resulting from hair loss allegedly due to their chemotherapy treatment as cancer patients.  On these issues, Dr. Bianchini lacks knowledge, skill, experience, training, or education that would qualify him to offer an opinion.  *See* FED. R. EVID. 702.

Dr. Bianchini does not specialize in the treatment of cancer patients, *see* Bianchini Dep. at 49:5-7 (Ex. C), and has treated "probably" less than twenty patients with emotional problems related to a cancer diagnosis in his entire career.  *See id.* at 48:22-49:4.  He has not performed any research on the psychological impact of breast cancer or any cancer.  *See id.* at 75:5-10.  Dr. Bianchini has not published on the psychosocial aspects of cancer treatment.  *See id.* at 75:11-13. He has not published on emotional distress from cancer treatment or diagnosis, *see id.* at 75:14-16, or mental disorders from cancer treatment or diagnosis, *see id.* at 75:17-19, including the adjustment disorders on which he seeks to opine in these cases.  *See id.* at 75:20-22.  Dr. Bianchini has never published in any cancer or oncology-related journals.  *See id.* at 76:25-77:2.

Likewise, Dr. Bianchini admitted that he does not have "targeted expertise" or a "publication track record" with respect to psychological symptoms associated with hair loss in women.  *See id.* at 42:15-43:1.  Outside of this litigation, Dr. Bianchini cannot point to a single experience evaluating someone with alleged emotional distress from hair loss.  *See id.* at 79:7-18. Nor, of course, can he recall treating anyone—other than Plaintiffs—where psychological symptoms resulting from hair loss due to cancer treatment was "a major presenting symptom" or "the primary presenting symptom."  *See id.* at 48:5-17.

Dr. Bianchini's proffered testimony thus fails the requirements set forth in FRE 702.  Dr. Bianchini is not "qualified as an expert by knowledge, skill, experience, training, or education" to opine on psychological symptoms allegedly related to hair loss, cancer, or hair loss due to cancer.

*See* FED. R. EVID. 702.  Dr. Bianchini's testimony with respect to the emotional impact of alleged hair loss due to chemotherapy should be excluded.

## II.     DR. BIANCHINI'S OPINIONS ARE INADMISSIBLE BECAUSE THEY ARE UNRELIABLE.

Dr. Bianchini's proffered testimony is also unhelpful to a fact finder because it is unreliable.  By his own account, Dr. Bianchini's opinions are grossly under-informed and based on unreliable and idiosyncratic methodology.

### A.     Dr. Bianchini failed to consider relevant evidence.

Dr. Bianchini's proffered testimony is not based on sufficient facts or data.  *See* FED. R. EVID. 702.  Dr. Bianchini did not review significant relevant medical records and depositions before reaching his conclusions, drafting his report, or offering his testimony in Plaintiffs' cases. *See* Bianchini Dep. at 167:2-20; 170:16-21; 172:19-173:6 (Ex. C).  Dr. Bianchini also did not conduct any interviews with persons close to Plaintiffs, and cannot offer an explanation why.  *See id.* at 130:25-131:23.  These failures are inconsistent with accepted methodology for psychological assessment and render Dr. Bianchini's opinions unreliable and inadmissible.

Dr. Bianchini agrees with the following professional and ethical standards for conducting neuropsychological evaluations (*see id.* at 84:20-24):

- When conducting a comprehensive evaluation, the neuropsychologist attempts to obtain relevant background information from written records whenever possible. *See id.* at 85:7-12.

- By gathering historical information, the neuropsychologist may improve diagnostic predictive accuracy, better describe cognitive and behavioral functioning, and assist treatment planning.  *See id.* at 85:13-23.

- When interviewing a patient, the neuropsychologist typically considers the events that led to the referral for an evaluation.  *See id.* at 86:13-17.

- The neuropsychologist typically considers the duration of the presenting problems or condition.  *See id.* at 86:18-21.

- [T]he neuropsychologist typically considers the primary symptoms and change in symptom presentation over time.  *See id.* at 86:22-87:1.

- [I]nterviewing a family or friend of the patient . . . may yield useful information not otherwise available.  *See id.* at 87:2-6.

- Because of problems with motivation, memory, language, reduced awareness of their illness or other neurobehavioral symptoms, patients may not always be reliable informants for past or current events.  *See id.* at 87:7-12.

- Information from a person who knows the patient and can talk about the patient's premorbid history and the effects that the illness/injury has had on the patient and family can be critical in understanding the functional consequences of the illness/injury.  *See id.* at 87:13-88:3.

- [W]hether used in evaluating the patient or to obtain information from other informants, a structured interview can help to reduce bias and ensure thoroughness and consistency of cross examinations.  *See id.* at 88:4-9.

Dr. Bianchini further testified that when patients—like Plaintiffs—are seen in connection with a lawsuit, "they have the capacity to gain from being symptomatic or impaired," and that "there's a higher incidence of -- of exaggeration in the forensic context."  *See id.* at 89:3-17.  To help determine if a person involved in litigation is exaggerating symptoms, an assessing physician can look at medical records to see if those symptoms are reported and discussed consistently prior to litigation.  *See id.* at 91:19-92:12.

***Ms. Durden***.  For Ms. Durden, Dr. Bianchini asked Plaintiffs' counsel for "all of the patient's medical records" and "all depositions and all statements taken of collaterals and/or eye witnesses" so that he could review them.[1]  Bianchini Durden File at 6 (Ex. E); *see also* Bianchini Dep. at 131:24-132:21 (Ex. C). This is Dr. Bianchini's standard practice and is consistent with

---

[1]   Dr. Bianchini explained that collateral sources would include any "spouse or significant other, someone who knows [the Plaintiff,] someone who spends time with them."  *See* Bianchini Dep. at 93:9 to 93:11 (Ex. C).

professional and ethical standards for neuropsychology evaluations.  *See* Bianchini Dep. at 85:7-12; 131:24-132:21 (Ex. C).   He also requested "to conduct a collateral interview with the significant other."  Bianchini Durden File at 6 (Ex. E); *see also* Bianchini Dep. at. 130:25-131:10 (Ex. C).

But Plaintiffs' counsel did not provide Dr. Bianchini with all of Ms. Durden's medical records, or all depositions of collaterals or witnesses, and he was not permitted to interview such witnesses either.  In fact, Dr. Bianchini was provided and reviewed only medical records from two sources: "Medical Center of Louisiana – New Orleans" and "Ochsner Medical Foundation."  *See* Bianchini Durden Rpt. at 5 (Ex. A).[2]  Those records were a very small subset of the total records collected in Ms. Durden's case.  In forming his opinions and submitting his report on November 9, 2018, Dr. Bianchini failed to review and consider thousands of pages of available, relevant medical records obtained by Plaintiff in connection with this litigation.  Dr. Bianchini did not review or consider all available records from the following sources:

- Ochsner Health System[3]
- Ochsner Medical Center
- Ochsner Baptist Health System
- Ochsner Baptist Medical Center
- Ochsner Health Center - Baptist McFarland Medical Plaza
- Ochsner Clinic Dermatology
- LSU Healthcare Network

---

[2]   On February 7, 2019, Plaintiffs served purportedly updated "reliance lists," reflecting materials that were not reviewed in formulation of Plaintiffs' experts' opinions and that Sanofi has not yet had an opportunity to review as of the date of this filing.  As indicated by the Court, this subjects Dr. Bianchini (as well as Dr. John Thompson, who also had not reviewed such materials when drafting his report) to redeposition.  But it does not fix the flaws in these experts' methods.  Their opinions should just be excluded.

[3]   "Medical Center of Louisiana – New Orleans" and "Ochnser Medical Foundation" do not correspond to source entities or bates labels for any records obtained in Ms. Durden's case. Despite repeated requests, Plaintiff's counsel has failed to provide defendant copies of the records Dr. Bianchini actually reviewed.  The brief inspection of Dr. Bianchini's case file permitted at his deposition showed that it could not have included the thousands of pages of records received for Ms. Durden from the six Ochsner entities and multiple medical centers which participated in her care.

- University Medical Center New Orleans
- Julie Martin – Dermatologist
- Julie Mermilliod – Dermatologist
- Richard Sherman – Dermatologist
- Rebekah Lemann – Gastroenterologist
- Centers for Medicare & Medicaid Services
- Social Security Administration
- Humana, Inc.
- Humana Pharmacy
- Rite Aid Pharmacy
- CVS Pharmacy
- Walgreens Pharmacy
- Therapy & Wellness-Elmwood
- Touro Infirmary Hospital
- St. Charles Vision

Moreover, in forming his opinions, Dr. Bianchini did not sufficiently review or consider even those records that were in his possession.  In particular, Dr. Bianchini admitted that he "missed" a notation in Ms. Durden's medical records that she suffered from anxiety associated with depression dating from November 27, 2012.  *See* Bianchini Dep. at 177:24-179:7 (Ex. C). Dr. Bianchini was not aware of this notation until Plaintiff's attorney mentioned it to him after the first day of his deposition.  *See id.* at 180:15-181:19.  Dr. Bianchini admitted that this was a potentially important fact for his opinion regarding Ms. Durden.  *See id.* at 181:20-181:25.  At the time of his deposition, however, Dr. Bianchini remained unaware of what physician had identified anxiety associated with depression in Ms. Durden, or the reasons it was identified.  *See id.* at 178:23-179:12.  Without having considered such critical facts—and indeed, without having reviewed the majority of Ms. Durden's medical records—Dr. Bianchini's opinions were not based on sufficient facts or data, and his methodology was unreliable.  *See* FED. R. EVID. 702(b).

Similarly, Dr. Bianchini reviewed only two depositions in Ms. Durden's case and part of a third, failing to consider more than a dozen transcripts with testimony of key witnesses.  Dr. Bianchini was provided and reviewed only Ms. Durden's 2017 deposition, Ms. Anesha Prier's

deposition, and volume II of Dr. Sophy Jancich's deposition.  Bianchini Durden Rpt. at 5 (Ex. A).
In developing his opinions, Dr. Bianchini failed to consider the following depositions, nearly all
of which were taken at least five months before he submitted his expert report on November 9,
2018:

- 1/12/18 Sophy Jancich (vol. I) – Oncologist
- 1/23/18 Julie Martin – Dermatologist
- 4/3/18 Priya Velu – Primary Care Provider
- 4/4/18 Julie Mermilliod – Dermatologist
- 4/17/18 Trenell Brown –Niece
- 4/20/18 John Cole – Oncologist
- 5/18/18 Dorothy Durden – Sister-in-Law
- 5/18/18 Paulette Derkins – Cousin and close friend
- 5/19/18 Mary Mitchell – Friend
- 5/19/19 Tonya Durden – Niece
- 6/28/18 David Delio – Friend
- 6/29/18 Darryl Durden – Brother
- 11/6/18 Antoinette Durden – Plaintiff

Thus, contrary to accepted methodology and his own standard practice, *see, e.g.*, Bianchini Dep.
at 45:13-23; 87:13-88:3; 131:24-132:21 (Ex. C), Dr. Bianchini failed to consider important
testimony from medical providers and friends and family close to Ms. Durden, including highly
relevant background and historical data and information on her "premorbid history and the effects
that the illness/injury has had on the patient and family."  *See id.* at 87:13-88:3.  Dr. Bianchini
admitted that such depositions would be relevant to assessing Ms. Durden's reported symptoms.
*See id.* at 255:21-256:10.  Dr. Bianchini could not recall whether the depositions that he did review
corroborated his diagnosis.  *See id.* at 254:21-254:25.

Dr. Bianchini also failed to conduct any collateral interview in Ms. Durden's case,
including any of the above named persons who know and spend time with Ms. Durden.  Dr.
Bianchini testified that other than Ms. Prier's deposition—the specific content of which he could
not remember—the only way to corroborate Ms. Durden's reported symptoms "would be to talk

to a collateral, which I plan on doing, but I don't have -- I haven't done that as of yet." *Id.* at 254:3-254:5.   Dr. Bianchini made this statement despite that fact that in April 2018 Plaintiff identified family members Paulette Derkins, Darryl Durden, Trenell Brown, and Anesha Prier and friend Mary Mitchell as witnesses she reasonably expects to call at trial to testify about "how her hair loss has impacted her life."   *See* Supplemental Witness List of Case Specific Witnesses for Antoinette Durden (Ex. F).   All of these witnesses were deposed months before Dr. Bianchini rendered his opinions.   When questioned at his deposition, Dr. Bianchini gave the following explanation:

> Q.   And you said you would have no other way of corroborating the symptoms other than to talk to a collateral.  What did you mean by that?
>
> A.   So she's not dating, but she's still friends with her daughter's father, so that would be one person.  I could speak with the daughter also.  I could speak to anyone who would potentially have social contact with her and would be -- would have been part of her social life to examine whether or not there's been a change.
>
> Q.   And -- but you didn't do that in reaching your opinions; correct?
>
> A.   Correct.
>
> Q.   You could also read depositions of her friends and family members; correct?
>
> A.   Do such things exist?
>
> Q.   Yes.  They exist.
>
> A.   They do?
>
> Q.   Yes.
>
> A.   Then I could, yes.

Bianchini Dep. at 255:1-20 (Ex. C).  Without interviewing any of these individuals, or considering each of their testimonies, Dr. Bianchini's opinions were not based on sufficient facts and data and

failed to follow a reliable methodology or Dr. Bianchini's standard practices. *See* FED. R. EVID. 702(b)-(d). His opinions in Ms. Durden's case should be excluded.

**Ms. Earnest.** For the *Earnest* case, Dr. Bianchini also asked for "all of the patient's medical records" and "all depositions and all statements taken of collaterals and/or eyewitnesses." Bianchini Earnest File at 10 (Ex. G); *see also* Bianchini Dep. at 150:1-20 (Ex. C). He also requested "to conduct a collateral interview with the significant other." *See* Bianchini Dep. at 148:1-4 (Ex. C).

But again, Dr. Bianchini was not provided all of Ms. Earnest's medical records, or all depositions of collaterals or witnesses, and was not permitted to interview any collateral source. Dr. Bianchini was only provided and only reviewed medical records from "Lakeview RMC's Women's Center," "St. Tammany Parish Hospital," "CancerCare of Louisiana/Northshore Oncology Associates, LLC," "A.W. Dermatopathology Service," "Slidell Memorial Hospital," "Tulane Medical Center," "Our Lady of the Angels Hospital," "Walgreens," and "Peoples Health." Bianchini Earnest Rpt. at 5 (Ex. B). These records are a very small subset of the total records collected in Ms. Earnest's case. In forming his opinions and submitting his report on November 9, 2018, Dr. Bianchini failed to review and consider thousands of pages of available, relevant medical records obtained by Plaintiff in connection with this litigation. Dr. Bianchini did not review or consider all available records from the following sources:

- Ochsner Health Center
- Ochsner Health Center NorthShore
- Ochsner Medical Center Northshore
- Tulane Cancer Center
- Tulane GI and Surgery Clinic
- Slidell Radiation Center
- Slidell Memorial Hospital Imaging Center
- LSU Bogalusa Medical Center
- Doctors Urgent Care
- Medicaid LA

- Pan American Life Insurance Group
- CVS Caremark/Pharmacy
- Walmart Stores, Inc.
- Marie Celeste Lagarde – Oncologist
- Nicole Dufrechou – Dermatologist
- Robert Shafor – Surgeon
- Adela Marie Narcisse – Ob/Gyn
- Glenn Hedgpeth – Internal Medicine
- Michael Feldman - Orthopedist
- Andrew Fuller – Emergency Medicine

Even among those of Ms. Earnest's records Dr. Bianchini did review, Dr. Bianchini admitted that he did not find corroboration for his diagnosis. *See* Bianchini Dep. at 257:7-258:4 (Ex. C).

As in Ms. Durden's case, Dr. Bianchini was provided and reviewed only two depositions: Ms. Earnest's 2017 deposition, and Dr. James Carinder's deposition. Bianchini Earnest Rpt. at 5 (Ex. B). In developing his opinions, Dr. Bianchini failed to consider the following depositions—nearly all of which were taken at least six months before he submitted his expert report on November 9, 2018:

- 4/4/18 Raymond Baez – Primary Care Provider
- 4/9/18 Edward Mannina – Radiologist
- 4/11/18 Bridgette Collins-Burow – Oncologist
- 4/13/18 Lisa Reso – Oncology Nurse
- 4/16/18 Ralph Earnest – Husband
- 4/17/18 Michael Earnest – Son
- 4/18/18 Glenn Hedgpeth – Gastroenterologist
- 5/3/18 Jules LeBlanc – Brother
- 5/3/18 Ronald LeBlanc – Brother
- 11/1/18 Marie Celest Lagarde – Breast Surgeon
- 11/5/18 Barbara Earnest – Plaintiff[4]

---

[4] At Dr. Bianchini's deposition, Plaintiffs' counsel claimed that there was "information gleaned through discovery that was not provided to Dr. Bianchini at the time of his evaluation either because it had not yet been received by counsel or the depositions had not yet been taken or whatever the circumstances may have been." *See* Bianchini Dep. at 163:10-22 (Ex. C). Any deposition transcripts or other information obtained in the *Durden* and *Earnest* cases could have been provided to Dr. Bianchini, and informed his opinions, up until the date Dr. Bianchini was disclosed as an expert and his reports were served – November 9, 2018. As noted, the vast majority of medical records were produced in advance of November 9, 2018, and all of the

Again, contrary to accepted methodology and his own standard practice, *see* Bianchini Dep. at 45:13-23; 87:13-88:3; 148:1-12 (Ex. C), Dr. Bianchini failed to consider important testimony from medical providers and friends and family close to Ms. Earnest, including highly relevant background and historical data and information on her "premorbid history and the effects that the illness/injury has had on the patient and family." *See id.* at 87:13-88:3.  Dr. Bianchini testified that he would have liked to review such depositions, as they could have been helpful in informing his opinions in Ms. Earnest's case.  *See id.* at 258:24-260:3.

Dr. Bianchini also failed to conduct any collateral interview in Ms. Earnest's case, including of Ms. Earnest's husband of forty-plus years, Ralph Earnest.  After realizing during his deposition that Ms. Earnest was married, Dr. Bianchini testified that he would have liked to interview Mr. Earnest, but that he did not.  *See id.* at 148:1-149:3 *see also id.* at 258:18-259:11. Dr. Bianchini could not give any explanation for this failure.  *See id.* at 149:4-149:18.  Indeed, Plaintiff identified the family listed above as fact witnesses having knowledge of her alleged injuries, harms, and losses in April 2018, and each was deposed many months before Dr. Bianchini rendered his opinions.  *See* Supplemental Witness List of Case Specific Witnesses for Barbara Earnest (Ex. H).  Without interviewing any of these individuals, or considering each of their testimonies, Dr. Bianchini's opinions are not based on sufficient facts and failed to follow a reliable methodology or his standard procedures.  *See* FED. R. EVID. 702(b)-(d).  His opinions in Ms. Earnest's case should be excluded.

### B.    Dr. Bianchini failed to follow DSM-5 Adjustment Disorder criteria.

Dr. Bianchini diagnosed both Ms. Durden and Ms. Earnest with "Adjustment Disorder[s] with Mixed Anxiety and Depressed Mood."  *See* Bianchini Durden Rpt. at 12 (Ex. A); Bianchini

---

depositions—in both cases—were taken before that date.

Earnest Rpt. at 9 (Ex. B).   At his deposition, Dr. Bianchini testified that this diagnosis was "probably misstated for Ms. Earnest," and that her diagnosis "should be just with anxiety" and not depressed mood.  *See* Bianchini Dep. at 244:9-245:2 (Ex. C).  He noted that an adjustment disorder is "not a major depressive disorder" nor a "major mental condition[]."  *Id.* at 238:1-2.

The Diagnostic and Statistical Manual of Mental Disorders (DSM-5) is a book that "defines and classifies mental disorders in order to improve diagnoses, treatment, and research." *Diagnostic and Statistical Manual of Mental Disorders* (*DSM–5*), AMERICAN PSYCHIATRIC ASSOCIATION, https://www.psychiatry.org/psychiatrists/practice/dsm.  The DSM-5 "is the product of more than 10 years of efforts by hundreds of international experts in all aspects of mental health." *Id.*  Dr. Bianchini described DSM-5 diagnostic criteria as the "list of symptoms or aspects of the symptoms that are important for making a diagnosis." *Id.* at 292:4-6.  The DMS-5 sets forth the criteria for an adjustment disorder as follows:

A.   The development of emotional or behavioral symptoms in response to an identifiable stressor(s) occurring within 3 months of the onset of the stressor(s).

B.   These symptoms or behaviors are clinically significant, as evidenced by one or both of the following:

1.   Marked distress that is out of proportion to the severity or intensity of the stressor, taking into account the external context and the cultural factors that might influence symptom severity and presentation.

2.   Significant impairment in social, occupational, or other important areas of functioning.

C.   The stress-related disturbance does not meet the criteria for another mental disorder and is not merely an exacerbation of a preexisting mental disorder.

D.   The symptoms do not represent normal bereavement.

E.   Once the stressor or its consequences have terminated, the symptoms do not persist for more than an additional 6 months.

American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 286-87 (5th ed. 2013).  Dr. Bianchini agreed that the DSM-5 criteria are necessary for making a

diagnosis. *See* Bianchini Dep. at 292:7-9 (Ex. C). However, he did not reference the DSM-5 or include the listed criteria in his reports. *See id.* at 242:14-20.

**Ms. Durden**. Dr. Bianchini claims that Ms. Durden began "experiencing her current anxiety" when "she realized that the hair loss was going to be permanent." *See id.* at 200:16-22. Notwithstanding that the DSM-5 criteria states that the "development of emotional or behavioral symptoms" must occur "within 3 months of the onset of the stressor," Dr. Bianchini did not know when Ms. Durden realized that her hair loss was permanent and admitted that he did not ask her because "it didn't seem important." *See id.* at 200:24-5. He could not say "the exact amount of time" that Ms. Durden has had an adjustment disorder, but testified it was "sometime" from 2011 until the date of his evaluation of Ms. Durden in 2018. *See id.* at 206:10-207:3. Dr. Bianchini also did not know if Ms. Durden had similar symptoms prior to realizing her hair loss was permanent— whenever that may have been. *See id.* at 214:18-20.

Dr. Bianchini testified that Ms. Durden's symptoms are not out of proportion to the severity or intensity of the stressor. *See id.* at 297:20-24. He also testified that he was not able to check or corroborate Ms. Durden's account of her own symptoms and their impact on her functioning with any external evidence, including Ms. Durden's medical records. *See id.* at 253:12-256:20. All Dr. Bianchini was able to confirm by reviewing the medical records provided by her counsel was that she had been diagnosed with breast cancer and treated with chemotherapy. *See id.* at 240:11-241:7.

Ultimately, it is unclear whether Dr. Bianchini followed the DSM-5 at all in his diagnosing Ms. Durden:

> Q.   For Ms. Durden, can you walk me through how you came to a diagnosis of adjustment disorder with mixed anxiety and depressed mood under the DSM criteria?

A.     It's just simply the -- an adjustment disorder is an onset of emotional symptoms, and – and that can include depression symptoms, anxiety symptoms, and other symptoms, like anger symptoms, you know, with some temporal link to the stressor.  And, you know, it's not a major depressive disorder.  It's not something -- it's not other major mental conditions.

So, you know, she had -- she had those symptoms, and there was a temporal link described in her history, and that's how I came to the diagnosis.
. . .

Q.    Is it correct that you also don't provide an analysis of how Ms. Durden meets the criteria in your report?

A.    That's true.

*See id.* at 237:17-238:5; 242:21-24.

Without following—and seemingly without attempting to follow—the criteria set forth in the DSM-5 for adjustment disorders, Dr. Bianchini's opinions are not the product of reliable principles and methods, and do not reliably apply such methods to the facts of Ms. Durden's case. *See* FED. R. EVID. 702(c)-(d).  Dr. Bianchini's diagnosis of Ms. Durden fails under two separate prongs of Rule 702 and should be excluded.

**Ms. Earnest**.  Similar to Ms. Durden, Dr. Bianchini could not say when Ms. Earnest's alleged adjustment disorder began:

[M]y understanding is that she -- so she was not -- her hair was not coming back.  She was bothered by that.  That's when she would have started to have adjustment -- that's when she started to have some adjustment symptoms, but then she -- after being bothered by that, then she was informed that that was likely permanent once she -- I -- I guess became aware of this litigation and spoke to an attorney.

Q.    And -- and you say that she was bothered that her hair wasn't coming back, and you said that's when she started to have some of the symptoms; right?

17

> A.    Well, "bothered" is -- right "bothered" is a reflection of emotional symptoms.
>
> Q.    And when was that that she became bothered that her hair wasn't coming back?
>
> A.   Sometime after the chemotherapy and radiation treatment were finished.
>
> Q.   What -- how long?  A period of six months?  A year?
>
> A.   I'm not sure.
>
> Q.   Do -- do you have any idea?
>
> A.   I -- I don't -- I mean, obviously, it's limited by how much time that is, but I don't know how much times that is.

See Bianchini Dep. at 224:11-225:10 (Ex. C).  He was "not sure exactly of the time of onset" of

Ms. Earnest's adjustment disorder.  *See id.* at 232:25-233:13.

Dr. Bianchini also testified that Ms. Earnest's symptoms are not out of proportion to the

severity or intensity of the stressor.  *See id.* at 297:25-298:3.  But again, Dr. Bianchini could point

to no external evidence of social or functional impairment outside of the Plaintiff's own account:

> Q.    With respect to Ms. Earnest, in reaching your diagnosis, did you make any effort to determine whether or not the symptoms she reported to you were corroborated by any other evidence?
>
> A.    I mean, I looked in her medical records.  I looked at her deposition.  I looked at the deposition of her physician.  Those are all places where you would look for corroboration.  I don't recall right now whether or not that corresponded, but the -- the – and that's kind of what I did.
>
> Q.    Well, you said you looked in her medical records.  Was there any corroborating evidence in her medical records?
>
> A.   There was no -- I don't -- I don't recall there being any mention of psychological symptoms from Ms. Earnest in the medical records.
>
> Q.    In your review of the medical records, did you see anywhere

18

where Ms. Earnest talked to any of her treating physicians about her
hair loss?

A.    I -- I don't recall that.

*See id.* at 257:7-258:17; *see also id.* at 272:10-15.

Likewise, it is unclear whether Dr. Bianchini followed the DSM-5 in coming to his

diagnosis for Ms. Earnest:

Q.    Now, can you walk me through how you applied the DSM
adjustment disorder criteria to Ms. Earnest?

A.    You know, there's not -- I mean, adjustment disorder criteria
are not elaborate.  I mean, it's basically, you know, emotional
symptoms, a temporal link to the -- a temporal link to the stressor
and, you know, in the forensic context, an absence of malingering,
and that it had some impact on her social functioning for her.  So
those are the ways that I came to that conclusion with Ms. -- with
Ms. Earnest.

*See id.* at 249:4-249:13. Without following the criteria set forth in the DSM-5 for adjustment

disorders—which he acknowledges are necessary for making a diagnosis, *see id.* at 292:7-9—Dr.

Bianchini's opinions are not the product of reliable principles and methods, and do not reliably

apply such methods to the facts of Ms. Earnest's case.  *See* FED. R. EVID. 702(c)-(d).  As with Ms.

Durden, Dr. Bianchini's diagnosis of Ms. Earnest fails under two separate prongs of Rule 702 and

should be excluded.

**C.    Dr. Bianchini failed to rule out alternative causes for his diagnoses.**

The methods by which Dr. Bianchini formed his opinions are additionally unreliable—and

his testimony additionally inadmissible—because he failed to consider and rule out causes other

than those alleged by Plaintiffs.  *See Jenkins v. Slidella L.L.C.*, No. 05-cv-370, 2008 WL 2649510,

at *7 (E.D. La. 2008) (excluding experts who, among other things "did not rule out other possible

causes").

"Differential diagnosis is a process of elimination by which medical practitioners determine the most likely cause of a set of signs or symptoms from a set of possible causes." *Pick v. American Medical Systems, Inc.*, No. 97-cv-30858, 1999 WL 824505, at *2 (5th Cir. 1999). "A reliable differential diagnosis must rule in the suspected cause of an injury and rule out other causes or determine which of the remaining explanations is most likely the cause." *Hooks v. Nationwide Housing Systems, LLC*, No. 15-cv-729, 2016 WL 3667134, at *15 (E.D. La. 2016). "[T]he presence of a known risk factor," let alone a contested risk factor, "is not a sufficient basis for ruling out" alternative causes, including idiopathic causes, of a disease. *Perry v. Novartis Pharm. Corp.,* 564 F. Supp. 2d 452, 470 (E.D. Pa. 2008); *accord Henricksen v. ConocoPhillips Co.,* 605 F. Supp. 2d 1142, 1162 (E.D. Wash. 2009).

Though acknowledging that differential diagnosis is necessary for reliable conclusions, Dr. Bianchini did not present a differential diagnosis or related analysis either in his report or in deposition testimony. Dr. Bianchini testified he generally "look[s] at alternate explanations for symptoms" to "rule out important alternate causes" for psychological conditions. *See* Bianchini Dep. at 105:5-15 (Ex. C). He testified that for both Plaintiffs, he considered the following "alternate explanations": malingering, "just having a cancer diagnosis," "[o]ther emotional issues," "[p]rior psychiatric history," and "other psychosocial factors." *See id.* at 105:21-106:25. But based on his incomplete review of the medical records and sworn testimony in both cases, there is no evidence that Dr. Bianchini actually ruled out any alternative causes for Ms. Durden or Ms. Earnest.

Notably, Dr. Bianchini did not know prior to issuing his report that Ms. Durden had previously been diagnosed with anxiety associated with depression. *See id.* at 177:24-178:8; 181:2-6 ("Q: Why -- why did you last night go look at the dermatology records of Ms. Durden?

20

A: One of the attorneys mentioned that there was a mention of depression in the record, and it wasn't in my report."). He does not know what kind of anxiety Ms. Durden was having in 2012 when this first appeared in her medical records, and did not ask her about this diagnosis during his interview with her. *See id.* at 200:1-9. He does not know what physician first concluded that she was experiencing depression, or the reasons for that conclusion. *See id.* at 178:23-179:12. And he could not have considered psychosocial factors "like relationship problems," when he did not review any fact witness depositions in either case (except Anesha Prier's for Ms. Durden, which he did not cite in his report and could not remember well).

Dr. Bianchini admitted that during his deposition, he

> discovered [] that despite requesting all of the information, I was not provided with all the information. So, you know, my opinions are now subject to some change once I review additional information, and so my answers are going to have to be couched based on current information and subject to change based on review of additional information.

*See id.* at 167:2-20. He testified "I'm going to want to look at the other materials." *Id.* Dr. Bianchini claimed his opinions were "rendered conditionally based on the possibility of change from looking at additional materials." *See id.* at 169:13-15. He could not say "whether or not review of [the additional] materials will lead to any substantive change in [his] opinion without reviewing the materials." *See id.* at 170:16-21. He does not know if, after reviewing the additional information, he would reach the same opinions or same diagnosis for Ms. Durden or Ms. Earnest. *See id.* at 172:19-173:6. In other words, Dr. Bianchini is not truly able to attempt a differential diagnosis, as he has not reviewed the weight of the medical evidence describing the possible alternate causes in either case.

In the end, Dr. Bianchini's opinion that Ms. Durden's emotional symptoms are "linked to the hair loss" is based solely on Ms. Durden telling him that her emotional symptoms are linked

to her hair loss. *See id.* at 285:6-21. Dr. Bianchini did not know whether there was information in the medical records or depositions that he had not reviewed that could be important to a differential diagnosis for Ms. Durden's alleged symptoms. *See id.* at 289:10-18. The same is true for Ms. Earnest. *See id.* at 291:1-19.

Dr. Bianchini failed to perform differential diagnoses for either Ms. Durden or Ms. Earnest, and he was not able to corroborate Plaintiffs' own accounts of their symptoms—meaning that he could not reliably rule *in* hair loss resulting from chemotherapy as a cause for his diagnoses and he did not rule *out* other causes. *See id.* at 253:12-256:20; 257:7-258:17; *see also Hooks*, 2016 WL 3667134, at *15. These deficiencies render his testimony unreliable and unhelpful.

## <u>CONCLUSION</u>

For the foregoing reasons, the Sanofi Defendants respectfully request that the Court exclude the opinions and testimony of Dr. Kevin Bianchini in their entirety from the above-captioned cases.

Date:  February 8, 2019

Respectfully submitted,

*/s/ Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE  URQUHART & MOORE LLC**
400 Poydras Street, Suite 2700
New Orleans, LA  70130
Telephone: 504-310-2100
Facsimile:  504-310-2120
dmoore@irwinllc.com

Harley Ratliff
Adrienne L. Byard
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
Facsimile:  816-421-5547
hratliff@shb.com
abyard@shb.com

*Counsel for Sanofi-Aventis U.S. LLC*
*and Sanofi U.S. Services Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2019, I electronically filed the foregoing with the Clerk

of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ *Douglas J. Moore*