# EXHIBIT C

Page 1

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4   * * * * * * * * * * * * * * * * * * * * * * * * *

5   IN RE:  TAXOTERE (DOCETAXEL)          MDL No. 2740

    PRODUCTS LIABILITY LITIGATION

6                                         SECTION: H

7   This Document Relates To:

8   Antoinette Durden, Case No. 2:16-cv-16635;

    Tanya Francis, Case No. 2:16-cv-17410;

9   Barbara Earnest, Case No. 2:16-cv-17144

10  * * * * * * * * * * * * * * * * * * * * * * * * *

11

12                    VOLUME I

13

14

15        Videotaped Deposition of KEVIN J. BIANCHINI,

16  PhD, ABPN, taken at Jefferson Neurobehavioral Group,

17  2901 N. I-10 Service Road E., Suite 300, Metairie,

18  Louisiana 70002, on Tuesday, January 8th, 2019, at 1:08

19  p.m.

20

21

22

23

24  By:  Ashlee B. Ancalade

    Registered Professional Reporter

25  Job No. NJ3184787

1        In other words, for example, if they -- if
2  the trier of fact decides that the -- they agree
3  that -- that -- that Taxotere causes hair loss, and if
4  I've rendered the opinion that the hair loss was caused
5  by -- I mean, that the hair loss caused some emotional
6  symptoms, which I have concluded, then the -- you know,
7  then the trier of fact may wish to conclude that
8  there's a connection between the Taxotere and the
9  psychological symptoms.
10     Q   Well, have you rendered any opinions in
11 either the Durden case or the Earnest case as to
12 whether or not either plaintiffs' emotional problems
13 are caused by having taken Taxotere?
14     A   No, not really.  I -- I mean, again, that's a
15 kind of complicated causal relationship.  If the trier
16 of fact concludes based on -- you know, the trier of
17 fact is going to get evidence, right, from different
18 experts that have to deal -- do with causality of --
19 you know, for example, of hair loss, and -- and so --
20 so contingent on their decision about that, that could
21 impact their decision about the emotional or
22 psychological symptoms.
23        But I'm not going to be rendering an opinion
24 that Taxotere itself causes emotional symptoms.  My --
25 my opinion is going to -- is -- pertains to hair loss

1  and emotional symptoms.
2      Q   So --
3      A   I guess you could --
4      Q   -- you have -- you have not rendered any
5  opinion as to whether or not Taxotere caused hair loss
6  in either of these plaintiffs; correct?
7      A   Right.  My expertise does not cover hair
8  loss, cause --
9      Q   And --
10     A   -- causes of hair loss.
11     Q   And you don't intend to render any opinion at
12 any time in the future as to whether or not Taxotere
13 caused hair loss for either Ms. Durenst or Ms. --
14 Durden or Ms. Earnest; is that correct?
15     A   I don't believe I'll be rendering any
16 opinion, now or in the future, as to causes of hair
17 loss.
18     Q   Did you review all of the expert reports
19 listed in Exhibit 13?
20     A   I -- I looked through them.  I -- I -- I
21 didn't have time to look- -- read them in great detail,
22 but I -- I looked through them.  I -- I -- if you
23 decided to quiz me on them, I'd have to refer to them.
24     Q   Well, are there any reports that you read in
25 more detail than any other report?

1      A   No.
2      Q   Did you ask plaintiff's counsel for all of
3  the expert reports in the cases?
4      A   Yes.
5      Q   Regardless of the nature of the expert;
6  correct?
7      A   Yes.  I believe so.
8      Q   In reviewing the expert reports, did you read
9  anything that caused you to change in any way the
10 opinions you've set forth in your expert reports for
11 Ms. Earnest or Ms. Durden?
12     A   No.
13     Q   In reviewing these expert reports, did you
14 come across anything that made you think you needed to
15 do some additional investigation or follow-up with
16 respect to your opinions regarding Ms. Earnest and
17 Ms. Durden?
18     A   No.
19     Q   I'm going to go ahead and set aside
20 Exhibit 13, but we may come back to that in a little
21 bit.
22     A   Sure.
23     Q   And did you also bring another folder or two
24 to the deposition today?
25     A   Yes.

1      Q   And what are those?
2      A   Those are the files of -- of my evaluation of
3  these two ladies.
4      Q   I'm going to hand you what I've marked as
5  Deposition Exhibit 6.
6          (Exhibit 6 is marked.)
7      A   (Views document.)
8  BY MS. SCHULTZ:
9      Q   Is that the file for Ms. Durden?
10     A   It is with the exception of the test
11 materials.  The test materials refers to anything that
12 has test questions.
13        And as we discussed prior to the start of the
14 deposition, we psychologists have an ethical obligation
15 to prevent proliferation of test materials because it
16 could -- it could degrade the value of the test for --
17 for a number of reasons, but it could degrade the
18 usefulness of the test both for courts and for clinical
19 use; and so we try to -- because most psychological
20 tests rely on the -- the idea that the person who's
21 taking the test is naive to the test stimuli, so we --
22 because of that, we try not to release test materials
23 into the public record.  However, if you wish to name a
24 psychologist that -- I could release all of that
25 information to the psychologist.

8 (Pages 26 - 29)

Page 38

1    Q   Well, how did you go about finding the
2  literature and studies you reviewed regarding
3  psychological symptoms and alopecia?
4    A   For searches, I usually use the site PubMed
5  and -- which is, I think, the National Library of
6  Congress' medical search site.  And -- and then I just
7  entered various search terms.
8    Q   And what did you learn about psychological
9  symptoms and hair loss from your research and
10 literature review?
11   A   That women with hair loss commonly report
12 emotional psychological symptoms.
13   Q   Did you learn anything else based on your
14 review of the literature regarding psychological
15 symptoms and hair loss?
16   A   That's the main thing, I think.  I don't
17 think there was any -- much beyond that.
18   Q   When you say "women with hair loss commonly
19 report emotional and psychological symptoms," what do
20 you mean?
21   A   What?  I'm sorry.  What -- what about -- what
22 do you mean?  It's going to sound funny:  What do you
23 mean, what do I mean?
24   Q   Let -- let's start with the first part of
25 that.

Page 39

1    A   Okay.
2    Q   Women with hair loss.
3    A   Okay.  Right.
4    Q   What -- what kind of studies and research was
5  this pertaining to women with hair loss?
6    A   So it would -- most of the ones that I --
7  that I read were -- were clinical studies, meaning that
8  these were women with hair loss as a result of some
9  medical treatment, chemotherapy being one of them.
10       And -- and so there were clinical studies
11 obviously, you can't create an experimental condition
12 where you produce baldness, so there were clinical
13 studies, meaning people that had -- had, you know, hair
14 loss for some reason.  And then there -- in the sort of
15 typical study, there was an examination of those
16 individuals versus some comparable base -- some
17 comparable comparison group and looked at, you know,
18 responses to either -- either endorsement of symptoms
19 or responses to questionnaires.  And then quality of
20 life is something else that -- that was looked at.
21   Q   And -- and the results of the research and
22 studies you looked at were what?
23   A   Just generally that women with hair loss
24 have -- have some increased psychological symptoms, and
25 I think in some -- in some studies, some reduced

Page 40

1  quality of life.
2    Q   And when you say "women with hair loss," hair
3  loss caused by anything?
4    A   I think in the -- the research that I looked
5  at was different causes.
6    Q   Did it include hair loss caused by aging?
7    A   I -- I think there were some with -- that
8  were nonchemotherapy-related.  In other words, people
9  had other conditions or reasons why they had hair loss.
10   Q   And those individuals --
11   A   And -- and just -- just to -- I'm doing this
12 from memory, so I'm not absolutely sure that that is
13 the case, but I -- that's my recollection.
14   Q   And how was hair loss defined in those
15 studies?
16   A   I don't recall.
17   Q   For what duration was the hair loss in those
18 studies?
19   A   Yeah.  I don't -- I don't remember that
20 detail.
21   Q   And explain to me, then, how did you use the
22 information from the studies you reviewed in forming
23 your opinions in this case?
24   A   I just wanted to understand generally whether
25 there was a -- a literature basis for understanding

Page 41

1  whether or not there was psychological symptoms
2  associated with hair loss in women, and -- and that
3  was -- that was my intention.  And it seemed that there
4  was some.
5    Q   So you were trying to find out if there was a
6  literature basis for psychological symptoms associated
7  with hair loss?
8    A   In women, yes.
9    Q   And that was something that you didn't know
10 prior to performing the research?
11   A   Well, I wouldn't say that.  I would say, you
12 know, I -- I -- I thought that there very well might
13 be, but I wasn't -- it was not a literature I had
14 reviewed in any detail in the past.
15   Q   And did you review this literature within,
16 say, a month or two of evaluating Ms. Durden and
17 Ms. Earnest?
18   A   I think so, yes.
19   Q   Prior to reviewing that -- the literature
20 within that month or two, had you ever reviewed any
21 literature or studies regarding psychological symptoms
22 associated with hair loss in women?
23   A   You know, I'm not sure.
24       I studied health psychology in graduate
25 school, meaning I studied specifically physical

1 symptoms and illness and -- and psychological responses
2 and psychological factors in -- involved in -- in those
3 things, so I've -- so I've, you know, studied and
4 been -- and involved in my whole career in kind of
5 physical problems and symptoms and emotional reactions.
6       I don't -- I don't -- I don't remember for
7 sure if I looked at hair loss before.  I have looked
8 at -- I have looked -- I have looked at research on
9 kind of psychological response to cancer, and I'm
10 not -- I wouldn't be surprised if, contained within
11 that, there was some research on some patients that
12 were undergoing chemotherapy and had some physical
13 changes in their appearance and the emotional
14 consequences of that.
15    Q   So you agree that you're not an expert with
16 respect to psychological symptoms associated with hair
17 loss in women; correct?
18       MR. EXNICIOS:
19            Objection to the form of the question.
20    A   No.  I think my -- I mean, I think my hair --
21 my expertise includes psychological responses to things
22 like hair loss.  I have never published anything on
23 hair loss, so if what you mean by an "expert" -- I
24 mean, I think my expertise covers this -- this area.  I
25 don't have specific, you know, targeted expertise and

1 don't have any publication track record in this.
2 BY MS. SCHULTZ:
3    Q   Well, but prior to interviewing the
4 plaintiffs, you just stated that you reviewed the
5 literature because you wanted to understand generally
6 whether there was a literature basis for psychological
7 symptoms associated with hair loss in women; correct?
8       MR. EXNICIOS:
9            Objection to the form of the question.
10    A   All right.  So let me --
11       THE WITNESS:
12            Can you read that last question back for
13       me?
14       THE REPORTER:
15            I don't have my glasses, but I'll do my
16       best.
17    A   All right.  So you want -- you want to repeat
18 it or --
19       THE REPORTER:
20            "But prior to interviewing the
21       plaintiffs" --
22    A   You want to repeat it or --
23 BY MS. SCHULTZ:
24    Q   I can restate the question, if that helps.
25    A   Oh, that's fine, yeah.

1    Q   All right.  Prior to interviewing Ms. Durden
2 and Ms. Earnest, you said that you conducted this
3 research and reviewed lit- -- the literature to
4 understand generally whether there was a literature
5 basis for psychological symptoms associated in hair --
6 hair loss in women?
7    A   Right.
8    Q   That's a correct statement?
9    A   That I -- specifically for that purpose, yes.
10    Q   And that you learned from that literature and
11 the studies you reviewed -- strike that.
12       You learned from the studies and literature
13 you reviewed that women with hair loss have some
14 increased psychological symptoms and some reduced
15 quality of life.  That's what you said; right?
16       MR. EXNICIOS:
17            Objection to the form of the question.
18    A   Okay.  So I -- I -- so I did that to -- to
19 kind of understand and refresh, you know, my reading in
20 this area.  I haven't -- you know, so I haven't -- if
21 I've looked at literature relevant to that, like I said
22 in my recent response to a question, it was in the
23 context of emotional responses to cancer, and it would
24 have been part of that.
25       So it's not that I never had, you know, kind

1 of contact with this -- this kind of thing in the past;
2 but, yes, I wanted to kind of -- you know, I wanted to
3 kind of understand current updated literature and what
4 the status of the current updated literature was on
5 that; and -- and I believe my previous answer was
6 that -- that, yes, there was psychological symptoms in
7 women with -- with hair loss, and I thought that -- I
8 think, at least in some studies, there was an impact on
9 quality of life, but I'm not sure if that was the case
10 in all of the studies.
11 BY MS. SCHULTZ:
12    Q   And those studies that you've relied on in
13 forming your opinions in this case are studies that you
14 can't identify as you sit here today; correct?
15    A   That is correct.
16    Q   You said that you looked at literature
17 pertaining to a psychological response to cancer?
18    A   Yes.
19    Q   Is that literature you looked at in
20 connection with forming your opinions in these cases?
21    A   No.  That -- that was -- that was in my
22 training and -- and in general reading over the years.
23       I mean, like I -- as I mentioned, I -- I --
24 my -- my PhD is in clinical psychology with a focus on
25 health psychology, meaning clinical psychology as it

12 (Pages 42 - 45)

1 pertains to medical problems and symptoms.

2　　And so I had courses involving emotional
3 responses to treatment, and I -- I feel confident that
4 cancer was covered in -- in the -- in all that
5 coursework and some of my studies back then.

6　Q　And you're referring to coursework when you
7 were receiving your education back in the 1980s?

8　A　Yes.

9　　I thought your -- I thought your question was
10 about, like, did I -- I thought your question was about
11 the timing of that, like, did I do that, like -- like
12 as if that was new, recent to this case, and it isn't.

13　　So, in other words, over the years, I mean,
14 yes, it was in my training, and then there -- there's
15 a -- there were -- for a number of years, I used to get
16 a journal on health psychology, and I used to read that
17 one, and, you know, that -- that had articles on cancer
18 and emotional responses, and cancer and psychological
19 factors.

20　　And so, you know, over the years, I've read
21 stuff relevant to cancer and treatment of cancer and
22 psychological issues and factors.

23　Q　What is your professional experience in
24 treating individuals diagnosed with cancer?

25　A　So I worked in -- I worked in hospitals for a

1 long time and -- and treated some patients there that
2 had -- that had cancer.  Typically, that was in the
3 context of -- of -- of rehabilitation because most of
4 my -- much of my career was involved in rehabilitation
5 activities, you know, inpatient rehabilitation and
6 outpatient rehabilitation programs.  So some of those
7 patients had cancer.

8　　I also, because I'm a neuropsychologist, have
9 over the years been asked to evaluate and/or treat
10 patients that have brain cancers.

11　　And, you know, that's -- that's the main
12 thing.  I never worked on a dedicated cancer unit,
13 but -- but -- but I've worked in -- in medical settings
14 and -- and in collaboration with -- with medical
15 doctors.

16　　We -- we do -- we've collaborated over the
17 years with -- with some oncology groups, mostly --
18 mostly on the issue of kind of brain problems and
19 either -- either brain problems in cancer itself or
20 brain problems and brain changes related to rad- --
21 radiation treatment.

22　　I have seen some patients with
23 chemotherapy-related cognitive issues.  There's a new
24 term people have talked about, like "chemo brain" or
25 "chemo fog" or whatever.

1　　And then we have done a little bit -- "we"
2 including me -- have done a little bit having to do
3 with kind of adjustment to illness and that with cancer
4 patients.

5　Q　Have you ever treated a patient who was
6 complaining about psychological symptoms resulting from
7 hair loss due to cancer treatment?

8　　MR. EXNICIOS:

9　　　Objection to the form of the question.

10　A　As a clinical patient, have I treated someone
11 with that?  I don't recall -- I don't recall treating
12 that as -- as a major presenting symptom.

13　　And I may have treated patients that were
14 just having difficulty adjusting to cancer, and that
15 was part of their struggle; but I don't remember
16 treating anybody where that was the primary presenting
17 symptom.

18 BY MS. SCHULTZ:

19　Q　There are many psychological symptoms that
20 come with just a cancer diagnosis; you agree?

21　A　Yes.

22　Q　Have you ever -- I believe you said you may
23 have treated patients that were having problems dealing
24 with a cancer diagnosis?

25　A　Yes.

1　Q　Approximately how many patients have you
2 treated?

3　A　I'm not sure.  Probably less than -- less
4 than 20.

5　Q　Now, you don't specialize in the treatment of
6 cancer patients; correct?

7　A　Correct.

8　Q　So with respect to the research and studies
9 that you reviewed regarding a basis for psychological
10 symptoms associated with hair loss in women that we've
11 talked about --

12　A　Yes.

13　Q　-- you said that you didn't keep any notes
14 with respect to what you reviewed; correct?

15　A　Yes.

16　Q　And you haven't identified any of that
17 literature in your report; correct?

18　A　Yes.

19　Q　And do you intend to try to find and identify
20 that literature that you relied on with respect to your
21 opinions in this case?

22　A　I certainly can do that if that's something
23 that -- that -- that you -- you-all desire.

24　Q　How would you go about doing that?

25　A　I would repeat my searches, look at the

Page 74

1  chapter on -- on -- on malingering and PTSD, I think.
2     Q    When did you publish that chapter?
3     A    It's a couple years ago.
4     Q    Other than publishing a chapter on
5  malingering and PTSD, have you done any work with
6  respect to malingering of emotional symptoms?
7     A    Most -- let me think.  I don't -- I don't
8  think so.
9     Q    The -- and the -- the physical symptoms with
10 respect to your publications, it looks like those are
11 pretty well limited to traumatic brain injury, chronic
12 pain, and environmental toxins and cognitive
13 functioning; would you agree?
14    A    That -- you said that those are the -- those
15 are the main areas of -- that are covered in my -- in
16 my publication track record; is that what you mean?
17    Q    Yes.
18    A    So, yeah, I think -- so we've -- yes, I think
19 we've looked at malingering of cognitive impairment
20 from TBI, malingering of cognitive impairment from
21 toxicity, and we've looked at malingering of pain
22 symptoms.  Now, that's included -- within the pain
23 stuff, there's some examination of exaggeration of
24 emotional complaints, including malingering of
25 emotional complaints, included in the pain research.

Page 75

1        So I think that that's -- we -- we published
2  a few other things, but that's been the main -- the
3  main areas that we -- that we -- we have focused on in
4  our research group.
5     Q    Is it correct that you haven't performed any
6  research on the psychological impact of breast cancer?
7     A    Yes.
8     Q    And no research on the psychological impact
9  of cancer?
10    A    Yes.
11    Q    And no publications in the area of the
12 psychosocial aspects of cancer treatment?
13    A    I haven't published in that.
14    Q    And no publications pertaining to emotional
15 distress from cancer treatment or diagnosis?
16    A    Correct.
17    Q    No publications regarding mental disorders
18 from cancer diagnosis or treatment?
19    A    That's true.
20    Q    No publications regarding adjustment
21 disorders in cancer patients?
22    A    True.
23    Q    Any publications pertaining to adjustment
24 disorders generally?
25    A    It may have been included in our pain

Page 76

1  research, but no -- no papers on that as the primary
2  subject.
3     Q    Can you think of any papers where adjustment
4  disorders was part of your research?
5     A    Again, I think emotional symptoms was looked
6  at in some of our -- our pain research.  Like, we -- we
7  published two papers on the use of the MMPI -- first
8  the MMPI II and then later the MMPI RF.  We looked
9  at -- at those measures in pain patients.
10       But pain patients often present with both
11 physical symptoms and emotional symptoms, and in -- in
12 our use of the MMPI, we look not just at physical
13 symptom indicators but also at psychological symptom
14 indicators as measures of -- of malingering and
15 their -- specifically their classification accuracy for
16 detecting malingering.
17       So if -- I think if you look at the two
18 papers, the -- the 2006 or 2008 paper on the MMPI II
19 and then the more recent paper, which I think was 2016
20 or 2017, on the RF.
21    Q    Okay.  But the patients being studied in
22 those cases were chronic-pain patients; correct?
23    A    Their primary -- their primary presentation
24 was pain, yes.
25    Q    Have you ever published in any cancer- or

Page 77

1  oncology-related journals?
2     A    No.
3     Q    Your CV states that you're board-certified by
4  the American Board of Professional Neuropsychology?
5     A    Yes.
6     Q    Do you have any other board certifications?
7     A    No.
8     Q    Okay.  Under "Licenses" it states that you
9  have a specialty designation in neuropsychology?
10    A    In Louisiana.
11    Q    And that's a specialty license?
12    A    Yeah.  In Louisiana you can get a specialty
13 designation added onto your license, and -- and I have
14 that.
15    Q    Your other areas that you talked about,
16 psychological factors and medical problems, you're not
17 board-certified in those areas; correct?
18    A    Right, I'm not.
19    Q    And you're not licensed in those areas;
20 correct?
21    A    Well, no.  My license covers those areas.
22    Q    Your --
23    A    Clinical psychology license covers those
24 areas.
25    Q    Is there any such thing as a specialty

20 (Pages 74 - 77)

Page 78

1 designation in psychological factors or medical
2 problems?
3     A   I'm not aware of any.
4         There might be a board certification in
5 health psychology, but I'm -- but I'm not absolutely
6 sure.
7     Q   Are you board-certified in health psychology?
8     A   I'm not.
9     Q   Would it be fair to say that most frequently
10 in your practice you focus on chronic pain or brain
11 injuries?
12        MR. EXNICIOS:
13            Objection to the form of the question.
14     A   So could you ask that again?  I'm sorry.
15 BY MS. SCHULTZ:
16     Q   Well, most frequently in your practice, do
17 you focus on the injuries of chronic pain and head
18 injuries?
19        MR. EXNICIOS:
20            Objection to the form.
21     A   So those are -- those are two of the most
22 common patients that I see, patients with pain from
23 different kind of physical injuries, back injuries,
24 neck injuries.  And then I also see patients that have,
25 you know, for evaluation or -- or even treatment that

Page 79

1 have -- that have questions about brain problems.
2 Those are the most common, yes.
3 BY MS. SCHULTZ:
4     Q   What percentage of the individuals that you
5 evaluate have been diagnosed with cancer?  Do you know?
6     A   I don't know.
7     Q   Are Ms. Durden and Ms. Earnest the only two
8 individuals you've ever evaluated with alleged
9 emotional distress from hair loss?
10     A   There may have been others in my hospital
11 work and -- and earlier in my career when I was seeing
12 patients for oncologists.  I can't recall any recently,
13 but I may have evaluated some earlier in my career.
14     Q   Well, you may have evaluated some individuals
15 for emotional distress from hair loss earlier?
16     A   Yes.
17     Q   You just don't know one way or the other?
18     A   I can't remember.
19     Q   Your description of Jefferson Neurobehavioral
20 Group in your CV, that -- that's the group owned by
21 you; correct?
22     A   Yes.
23     Q   And why is it called "Jefferson
24 Neurobehavioral Group"?
25     A   Because we're in Jefferson Parish and some of

Page 80

1 the patients that we see have neuro -- neuro -- you
2 know, neuro-related problems.
3     Q   Well, what percentage of the patients seen by
4 your group have neurobehavioral problems?
5     A   I don't know.  I mean, it's, you know, a
6 fair -- it's pretty -- the whole question and answer
7 that we had about my practice where we talked about
8 neuropsych evaluations versus clinical, that whole
9 breakdown, it's pretty similar to others in the group.
10 So maybe -- maybe they see a little more nonforensic
11 cases, some -- some of the others, but -- so that's
12 pretty -- that -- that -- the -- my answers to those
13 questions about me are -- are close to what the group
14 does.
15     Q   And the Jefferson behavioral group, do you
16 have 20 -- approximately 20 psychologists?
17        MR. EXNICIOS:
18            Objection to the form of the question.
19     A   It's -- it's a little lower now.  I think
20 it's probably 17, something like that.
21 BY MS. SCHULTZ:
22     Q   And you also have what you call "technicians"
23 that work within the group?
24     A   Yes.
25     Q   It says that the group provides

Page 81

1 neuropsychology services to numerous area hospitals,
2 rehabilitation programs, as well as forensic clinical
3 neuropsychology setting and clinical psychology services in an
4 outpatient setting; correct?
5     A   Yes.
6     Q   What is forensic clinical neuropsychology?
7     A   Forensic neuropsychology.
8     Q   So there's no difference between forensic
9 neuropsychology and forensic clinical neuropsychology;
10 is that right?
11     A   It -- it might -- it might be that there
12 should have been a -- should have been a comma in
13 there, that it was forensic and clinical
14 neuropsychology and clinical psychology services.  That
15 may have been a typo.
16     Q   How would you define "forensic
17 neuropsychology"?
18     A   Anything where the evaluation takes place in
19 the context of litigation.  Of any kind.
20     Q   Well, do you consider an individual having
21 filed a workers' compensation claim litigation?
22     A   No.  Unless there is litigation.
23     Q   So when you refer to forensic neuropsycho --
24 psychology, under your definition that only refers to
25 situations where an actual lawsuit has been filed by

21 (Pages 78 - 81)

1 the individual?

2　A　I mean, yes. Although, it also would
3 include, you know, criminal matters too. So there's
4 not a lawsuit. They're being -- they're being accused
5 of something. And I've done work for the federal
6 prosecutors and for lawyers defending criminal cases.

7　Q　Are there certain guidelines or standards
8 that you follow as a neuropsychologist?

9　A　I mean, there are some ethical principles.

10　Q　And when you say "there are some ethical
11 principles," from what entity identifies what those
12 ethical principles are?

13　A　American Psychological Association. And
14 then, typically, those are adopted by the state
15 psychological association, at least in some form.

16　Q　Let's see. Does your CV include the -- ah,
17 here's your professional affiliations. Last page.

18　　　You're a member of the American Psychological
19 Association?

20　A　Yes.

21　Q　And the Louisiana Psychological Association?

22　A　Yes.

23　Q　The National Academy of Neuropsychology?

24　A　Yes.

25　Q　And the International Neuropsychology

1 Society?

2　A　I think I'm -- I think I still am of that;
3 although, I think my -- my membership may have lapsed
4 on that one, on the last one.

5　Q　Well, so does the American Psychological
6 Association have any guidelines or standards other than
7 the ethical principles for neuropsychologists?

8　A　I don't know about specifically
9 neuropsychologists, but they have them for
10 psychologists. And I think -- I think there are
11 forensic guidelines within there too.

12　Q　Are you familiar with the American Academy of
13 Clinical Neuropsychology?

14　A　Yes.

15　Q　And how are you familiar with that academy?

16　A　I've given lectures at their national meeting
17 a number of times. I -- I -- Dr. Greve is
18 board-certified under that group, and I am a -- I'm
19 a -- I'm on the editorial board of their journal,
20 the -- the clinical neuropsychologists.

21　Q　So the American Academy of Clinical
22 Neuropsychology provides board certifications?

23　A　The American Academy . . . Say it again.

24　Q　The American Academy of Clinical
25 Neuropsychology provides board certificates?

1　A　Yes.

2　Q　And that's done by the American Board of
3 Clinical Neuropsychology?

4　A　Yes.

5　Q　Or the ABCN?

6　A　Correct.

7　Q　Are you aware that there are guidelines for
8 neuropsychological assessments that are published by
9 the ABCN?

10　A　Yeah. Yes, I think so.

11　Q　Do you know what they are?

12　A　I don't. I mean, sitting here right now, I
13 couldn't -- I couldn't -- I couldn't recant -- you
14 know, recount them to you. I'm familiar with the --
15 with the document.

16　Q　When you say you're familiar with the
17 document, what do you mean?

18　A　That they -- that they have -- they have
19 published some guidelines.

20　Q　And what -- what do the guidelines pertain
21 to?

22　A　It pertains to kind of professional and
23 ethical standards for conducting neuropsychological
24 evaluations.

25　Q　And do you know what those professional

1 ethical standards are?

2　A　I mean, sitting here right now, I can't -- I
3 couldn't -- couldn't list them all out for you.

4　Q　Let me ask you if you agree with some of
5 these statements. Okay?

6　A　Okay.

7　Q　"When conducting a comprehensive evaluation,
8 the neuropsychologist attempts to obtain relevant
9 background information from written records whenever
10 possible."

11　　　Do you agree with that?

12　A　Yes.

13　Q　"By gathering historical information, the
14 neuropsychologist may improve diagnostic predictive
15 accuracy, better describe cognitive and behavioral
16 functioning, and assist treatment planning."

17　　　Do you agree with that statement?

18　A　Say that one again.

19　Q　"By gathering historical information, the
20 neuropsychologist may improve diagnostic predictive
21 accuracy, better describe cognitive and behavioral
22 functioning, and assist treatment planning."

23　A　Yes.

24　Q　"Historical information is relevant in
25 assessing patients with histories of psychological --

22 (Pages 82 - 85)

Page 86

1 psychiatric illnesses, developmental disabilities, or
2 learning or attention disorders and for whom the time
3 sequence of the problems and interventions used to
4 manage these problems may be important in clinical
5 decision making."
6   A   I'm sorry.  You have to do that one again.
7 That was a long -- that was a long one.
8   Q   That was a long one.  I'm going to skip --
9   A   I lost --
10   Q   -- that one because I don't want to read it
11 again.
12   A   Oh, thank you.
13   Q   "When interviewing a patient, the
14 neuropsychologist typically considers the events that
15 led to the referral for an evaluation."
16       Do you agree with that statement?
17   A   Sure.
18   Q   The neuropsychologist typically considers
19 the duration of the presenting problems or condition."
20       Do you agree with that?
21   A   Yes.
22   Q   "And the neuropsychologist typically
23 considers the primary symptoms and change in symptom
24 presentation over time."
25   A   Yes.  I mean, that's a -- that's a good thing

Page 87

1 to do.
2   Q   "Although interviewing a family member or
3 friend of the patient is not always possible, doing so
4 may yield useful information not otherwise available."
5       Do you agree with that?
6   A   Yes.
7   Q   Because of problems with motivation, memory,
8 language, reduced awareness of their illness or other
9 neurobehavioral symptoms, patients may not always be
10 reliable informants for past or current events."
11       Do you agree with that?
12   A   It can happen.
13   Q   "Information from a person who knows the
14 patient and can talk about the patient's premorbid
15 history and the effects that the illness/injury has had
16 on the patient and family can be critical in
17 understanding the functional consequences of the
18 illness/injury."
19       Do you agree with that?
20   A   Could you read that one again?
21   Q   Sure.
22       "Information from a person who knows the
23 patient and who can talk about the patient's premorbid
24 history and the effects that the illness/injury has had
25 on the patient and family can be critical in

Page 88

1 understanding the functional consequences of the
2 illness/injury."
3   A   It could certainly be important.
4   Q   "And whether used in evaluating the patient
5 or to obtain information from other informants, a
6 structured interview can help to reduce bias and ensure
7 thoroughness and consistency of cross examinations."
8       Do you agree with that?
9   A   It says "can."  I think it can.
10   Q   All right.  And the evaluations that you
11 performed of Ms. Durden and Ms. Earnest, were those
12 considered forensic evaluations?
13   A   Yes.
14   Q   And that's because they were done in a legal
15 context?
16   A   Yes.
17   Q   When you're conducting a forensic evaluation
18 of an individual, do you adhere to any different
19 standards or methodologies?
20   A   No, not necessarily.  I mean, there are some
21 deviations, I guess, but I think symptom and
22 performance validity become more critical in a forensic
23 context.
24   Q   And when you refer to symptom and performance
25 validity, you're referring to the testing?

Page 89

1   A   I'm talking about evaluation of the . . .
2 Well -- well, let me start over.
3       So when patients are seen in a forensic
4 context, different than a normal clinical context, they
5 have the capacity to gain from being symptomatic or
6 impaired.  Because they have the capacity to gain from
7 being symptomatic or impaired, it's important that you
8 examine the -- whether or not symptoms are exaggerated
9 and whether or not performances are valid.  And that --
10 so that's symptom validity and performance validity.
11       So those -- those things are more
12 important -- they're somewhat important in clinical
13 evaluations, but they're more important in forensic
14 mostly -- in forensic evaluations mostly because
15 there's a higher incidence of -- of exaggeration in the
16 forensic context, and -- I guess that's -- that's the
17 main reason.
18   Q   And when you say in a forensic contest [sic],
19 the individuals have the -- have capacity to gain from
20 being symptomatical?
21   A   Symptomatic or impaired.
22   Q   And, for instance, in a lawsuit, an
23 individual has the capacity to gain financially from
24 the lawsuit if they are -- have symptoms or are
25 impaired; correct?

23 (Pages 86 - 89)

Page 90

1    A    Yes.
2    Q    And you said that you look to see if symptoms
3 are exaggerated; correct?
4    A    Yes.
5    Q    And also performance validity?
6    A    Yes.
7    Q    And what do you do to try to determine if
8 symptoms have been exaggerated by an individual?  And
9 let's talk specifically about emotional symptoms.
10    A    Okay.  So you -- you know, you include
11 measures that have symptom validity indices or measures
12 as part of the measure, and so -- you want me to talk
13 about how --
14    Q    Well --
15    A    -- how that works?
16    Q    -- is that -- that's through testing.
17    A    Yes.
18    Q    Correct?
19    A    Yes.
20        There are -- you know, there are other
21 informal ways of looking at that that are not nearly as
22 effective as the testing is.  Testing has -- has known
23 classification accuracy for detecting malingering and
24 things like that.
25    Q    What are the informal ways?

Page 91

1    A    You know, it's observing the person as
2 they're in the interview, asking questions, looking at
3 consistency of responses.  Those are less effective
4 than the testing.
5    Q    When you say asking questions and looking at
6 consistency of responses, you're referring to
7 consistency of responses to the questions you ask;
8 correct?
9    A    Yeah.  I mean, consistency in terms of, you
10 know, what would be expected given the nature of the
11 problem itself.  You know, consistency of the -- you
12 know, of their presentation and that kind of thing.
13    Q    Are there any other -- well, when you refer
14 to informal ways, you're referring to every --
15 everything other than testing.
16    A    Yes.
17    Q    Correct?
18    A    Yes.
19    Q    Are there other informal ways of determining
20 if symptoms have been exaggerated?
21    A    Well, you could look at the records and look
22 at consistency of symptoms across records -- I mean, in
23 the records, if those symptoms are discussed in the
24 records.
25    Q    So if an individual is complaining to you

Page 92

1 about emotional symptoms, whether or not that
2 individual has been complaining about those symptoms in
3 the medical records?
4    A    That and -- and for example --
5    MR. EXNICIOS:
6        Objection to the form of the question.
7    A    That and you can also look at -- you can use
8 the records to look at their, you know, consistency of
9 symptom reports.  You can look at -- you can look at
10 consistency of history, for example, is another -- is
11 another thing.  So those are some of the things that
12 you can use the records for.
13 BY MS. SCHULTZ:
14    Q    Have -- have you -- are you familiar with the
15 American Academy of Psychiatry and the Law?
16    A    I mean, yes, roughly.
17    Q    When you say "roughly," what do you mean?
18    A    I mean -- yeah, I guess that was -- that
19 probably wasn't the right adverb, I guess.
20        I -- I'm -- I am familiar with it, yes.  I'm
21 not -- I don't -- I'm not a member.  I'm not intimately
22 familiar with the workings of it or anything like that.
23 I think I went to one of their conferences once.
24    Q    Are you aware that the AAPL has created
25 guidelines for forensic assessments?

Page 93

1    A    I don't know those.
2    Q    Let me ask you if you agree with these
3 statements.
4        First, "Collateral sources of information
5 when available are usually an important element of the
6 forensic assessment."
7    A    I'm -- I'm aware of that idea.
8    Q    And what do you consider a collateral source?
9    A    Speaking to a spouse or significant other,
10 someone who knows them, someone who spends time with
11 them.
12    Q    Any other things that you consider to be
13 collateral sources?
14    A    Sure.  Boss, supervisor.
15    Q    Anything else?
16    A    No.  Those are the main ones.
17    Q    With -- "With the consideration of multiple
18 data sources, varying points of view may have to be
19 reconciled.  Memory deficits, effects of treatment and
20 malingering may affect the evaluee's statements.
21        "Collateral information may add to or
22 complement the evaluee's account and may be compared
23 with the evaluee's account to help detect malingering
24 and assess reliability."
25        Do you agree with that?

24 (Pages 90 - 93)

1 about your -- the fee schedule of $178 an hour and $257
2 for nonforensic work, you -- and you referred to a
3 Workers' Comp fee schedule.
4       Do you recall that?
5   A   I'm sorry.
6   Q   Let -- let me re- --
7       MR. EXNICIOS:
8           Objection to the form of the question.
9 BY MS. SCHULTZ:
10  Q   Let me rephrase the -- let me rephrase the
11 question.
12      You -- you do -- for forensic work, you
13 consider that work where an actual lawsuit has been
14 filed; correct?
15  A   Yes.
16  Q   Then you also do evaluations where there's
17 been a Workers' Compensation claim made but no lawsuit
18 has been filed?
19  A   Correct.
20  Q   In those situations, what is your hourly
21 rate?
22  A   We went over that already.
23  Q   That's what you were talking about with the
24 Workers' Comp fee schedule?
25  A   Correct.

1   Q   All right.  Now, what about when a patient --
2 when an individual is seen and evaluated who does not
3 have a lawsuit pending or a Workers' Compensation claim
4 pending, what is the hourly rate?
5   A   We charge the same as what we charge for
6 Workers' Comp cases, but we don't always get paid that.
7       So, in other words, that's the charge that's
8 submitted, but the insurance companies make their own
9 determinations about what's acceptable charges.
10  Q   So you -- you may get paid less than what you
11 recited for the Workers' Comp fee schedule?
12  A   That's correct.
13  Q   Who first contacted you in regard to these
14 cases?
15  A   Mr. Exnicios.
16  Q   And how long ago was that?
17  A   I don't remember.
18  Q   Was it within the past year?  More than a
19 year?
20  A   It would have been some -- maybe within two
21 or three months before I saw all the individuals.
22  Q   And who are all of the individuals you saw?
23  A   Just Ms. Earnest and Ms. Durden.
24  Q   And with respect to Ms. Earnest and
25 Ms. Durden, what were you asked to do?

1   A   Perform psychological evaluations.
2   Q   For what purpose?
3   A   The litigation.
4   Q   But perform psychological evaluations to
5 determine what?
6   A   Well, to look at psychological problems and
7 examine the causality of those problems.
8   Q   And when you say "examine the causality of
9 those problems," what do you mean?
10  A   Well, psychological problems can be caused by
11 many things.  So, you know, to look at whether or not
12 these individuals had emotional problems and what they
13 were caused by.
14  Q   And how did you go about determining the
15 cause of any psychological problems of Ms. Durden or
16 Ms. Earnest?
17  A   Well, see, that comes from their history.
18  Q   And what do you mean when you say it mostly
19 comes from their history?
20  A   Okay.  So let me take a minute.  That's a
21 pretty complicated question.
22      Your question pertains to the general issue
23 of causality of psychological symptoms.  That's your
24 question; right?
25  Q   Well, you said psychological problems can be

1 caused by many things, and I am wanting to know, well,
2 so what do you do, what type of methods do you employ,
3 to determine what is causing a psychological problem.
4   A   Right.  And -- and --
5   Q   Just in general terms, not specifically
6 related to Ms. Durden or Ms. Earnest.
7   A   So you ask about the symptoms, you -- you ask
8 about the history of the symptoms, you ask the patient
9 about their attribution of causes, and you examine
10 their symptoms with testing.
11      And then we also look at alternate
12 explanations for symptoms, including in the forensic
13 context, we look at, you know, malingering or
14 intentional exaggeration of symptoms and -- and look --
15 look -- you know, rule out important alternate causes.
16  Q   With respect to Ms. Durden, did you look at
17 alternate explanations for her symptoms?
18  A   Sure.
19  Q   What --
20  A   For both of them.
21  Q   What alternate explanations did you look at?
22  A   Malingering for both of -- you want to do one
23 at a time?  I'm sorry.
24  Q   Let's do Durden first.
25  A   Okay.  Malingering.  Just -- just having a

Page 106

1 cancer diagnosis. Other emotional issues. Prior
2 psychiatric history. Those are the main ones.
3    Q    And for Ms. Earnest, did you look at
4 alternate explanations for her symptoms?
5    A    Yes.
6    Q    And what did you look at?
7    A    Malingering or -- or exaggeration,
8 intentional exaggeration. I looked at just having a
9 cancer diagnosis, just having breast cancer. This
10 applies really to both -- both of them. Having breast
11 cancer. Prior psychiatric history. You know, other
12 psychosocial factors, like relationship problems,
13 things like that.
14    Q    Did you look at other psychosocial factors
15 for Ms. Durden as well?
16    A    We already covered Ms. Durden; right?
17    Q    Right. And you didn't state other
18 psychosocial factors.
19    A    What do you mean?
20        Oh -- oh, I see.
21    Q    Well, maybe you just stated it differently.
22    A    Okay. So I guess probably the best way to
23 say this is that that list I gave for both of them
24 individually, if you add up everything, it applies to
25 both.

Page 107

1    Q    All right.
2    A    So, in other words, if I left something off
3 of one of them, it would be added to the other.
4    Q    Okay. Thank you.
5    A    Sure.
6    Q    Who retained you as an expert in these cases?
7    A    The Taxotere Plaintiff Steering Committee is
8 my understanding.
9    Q    What is the Taxotere Plaintiff Steering
10 Committee?
11    A    That is a question that's beyond my
12 expertise.
13    Q    Do you have any understanding as to the role
14 of the steering committee?
15    A    Not much. I know it's -- there's a group of
16 lawyers, and their -- they have some claims of people
17 that have hair loss from Taxotere. That's about --
18 that's pretty -- about the extent of my knowledge.
19    Q    Do you understand that plaintiffs expect to
20 call you to testify at trial?
21    A    Yes.
22    Q    And do you expect to testify at trial?
23    A    I don't know, you know.
24    Q    Have you ever been retained by the
25 individuals that retained you on the Plaintiffs

Page 108

1 Steering Committee?
2    A    Yes.
3        You mean in previous cases?
4    Q    Yes.
5    A    Yes.
6    Q    And which -- which individuals are we talking
7 about?
8    A    Mr. -- Mr. Exnicios.
9    Q    How many previous cases?
10    A    Less than ten in the last ten years.
11    Q    And when I refer to cases --
12    A    Well --
13    Q    -- and you would say ten, is that --
14    A    -- let me --
15    Q    -- ten individuals?
16    A    That's right. Sorry. I was thinking about
17 another case where there was a whole bunch of people
18 where we were -- okay. And Mr. Exnicios wasn't
19 involved in that one.
20        So, I'm sorry, say that again.
21    Q    When you say -- when I asked you the number
22 of previous cases and you said less than ten --
23    A    In ten years.
24    Q    -- in ten years, and did each of those cases
25 just involve one plaintiff?

Page 109

1    A    I think so.
2    Q    Do you recall one way or the other?
3    A    I'm pretty sure they did. I believe that
4 we -- that I had a conversation with Mr. Exnicios many
5 years ago about another case that may have involved
6 multiple plaintiffs, but I don't think we actually did
7 work on that case.
8    Q    What was the nature of the cases that you
9 were retained on?
10    A    I -- I think -- I think that the cases that
11 Mr. Exnicios sent, the individual cases, were brain
12 injury cases.
13    Q    All of those cases were brain injury cases?
14    A    I think so.
15    Q    And what was the claimed cause of the brain
16 injury?
17    A    Some accident.
18    Q    Different types of accidents?
19    A    Sure.
20    Q    Any other types of cases?
21    A    And -- and when you say "with," you mean
22 retained by -- you're not asking about cases where I've
23 been on the other side of lawyers in the Taxotere
24 Plaintiff Steering Committee?
25    Q    No. I am just asking about the cases in

28 (Pages 106 - 109)

Page 130

1    I apologize, Counsel.  I was distracted
2    for a second.  Would you mind telling --
3    telling me where we are?
4    MS. SCHULTZ:
5        Oh.  On Exhibit 6.
6    MR. EXNICIOS:
7        Six?
8    THE WITNESS:
9        Page 6.
10   BY MS. SCHULTZ:
11   Q    Page 6.  And Exhibit 6, again, is the Durden
12   file; correct?
13   A    Yes.
14   Q    This is dated April 3, 2018?
15   A    Yes.
16   Q    It's a memo to Val Exnicios; correct?
17   A    Yes.
18   Q    And it's from Yvonne Krumins/Dr. Kevin
19   Bianchini's office; correct?
20   A    Yes.
21   Q    All right.  And it's stating that it's
22   confirming the appointment of Ms. Durden with you for a
23   psychological evaluation on April 19, 2018; correct?
24   A    Yes.
25   Q    And then it states:  "Additionally,

Page 131

1    Dr. Bianchini is requesting to conduct a collateral
2    interview with the significant other."
3    A    Right.
4    Q    "This interview may be conducted in person or
5    preferably over the phone.  Please request permission
6    from opposing counsel to conduct this interview.
7    Please follow up with our office to set up this
8    interview."
9        Do you see that?
10   A    Yes.
11   Q    Did you ever conduct a collateral
12   interview --
13   A    No.
14   Q    -- with Ms. -- and why didn't you conduct any
15   collateral interviews?
16   A    I'm not sure.  Sometimes it's because
17   someone's not available.  And also, sometimes if
18   there's deposition testimony that suffices, then I
19   don't need to conduct a collateral interview.
20   Q    But you don't know one way or the other why
21   you did not conduct a collateral interview with respect
22   to Ms. Durden?
23   A    Correct.
24   Q    It also states further down the page:
25   "Please forward one-sided paper copies and a CD of all

Page 132

1    of the patient's medical records prior to the
2    evaluation date."
3        Do you see that?
4    A    Yes.
5    Q    And so you requested to be able to review all
6    of Ms. Durden's medical records for purposes of your
7    opinion in this case; correct?
8    A    We do that standardly, yes.
9    Q    And you do it standard because you want to
10   review all of the medical records and not have the
11   attorney representing the individual pick and choose
12   what medical records to give you; correct?
13   A    Yes.
14   MR. EXNICIOS:
15       Objection to the form of the question.
16   A    Yes.  Or -- or -- or either -- I mean, either
17   way, it -- sometimes it's not the attorney representing
18   the person.  Sometimes it's the attorney representing
19   the insurance company or whatever.  Whoever has
20   retained me, I don't want them sorting through and
21   giving me selective records.  I want to see everything.
22   BY MS. SCHULTZ:
23   Q    And do you know if you received all of the
24   patient's medical records?
25   A    I don't.

Page 133

1    Q    And when I refer to the patient -- let me ask
2    it this way:  Do you know if you've received all of
3    Ms. Durden's medical records?
4    A    Pretty much, that's not knowable for me
5    because unless someone else, you know, provides me with
6    additional information that I didn't have.  So when
7    we -- when we request that, then we -- you know, we
8    assume that we're getting all the records, and I don't
9    have any -- I don't -- I don't engage in any effort to
10   double-check whether people have sent me everything or
11   not.  I don't know exactly how I would do that anyway,
12   but that's -- so I don't -- I don't usually have no way
13   of knowing whether they do that or not until sometime
14   later.
15   Q    And so because you had requested all of
16   Ms. Durden's medical records, you assumed that her
17   counsel had provided you with all of her medical
18   records; correct?
19   A    Well, I don't know.  I mean, basically what I
20   do there is -- I don't know if I assume that.  I mean,
21   I -- those are the records that I received, and that's
22   what I go -- you know, go with based on the
23   conversation.  That doesn't mean that there was not --
24   that I assume that there's no other records ever in
25   existence.  All I can do is ask for all the records and

34 (Pages 130 - 133)

Page 134

1 then kind of take it from there.
2    Q    But for purposes of rendering an opinion with
3 respect to Ms. Durden, you asked for all of her medical
4 records; correct?
5    A    I did.
6    Q    And you wanted to receive all of her medical
7 records; correct?
8    A    Yes, I did.
9    Q    And you relied on plaintiff's counsel to
10 provide you with those records; correct?
11    A    Yes.
12    Q    And then the next sentence says:  "Also,
13 please send all depositions and statements taken of
14 collaterals and/or eyewitnesses."
15        Do you see that?
16    A    Yes.
17    Q    And you do that because you want to be able
18 to review all of the depositions and statements of
19 collaterals or eyewitnesses, not only those chosen by
20 Ms. Durden's counsel for you to review; correct?
21        MR. EXNICIOS:
22           Objection to the form of the question.
23    A    Well, I -- I -- I say that in general because
24 I -- I want -- I'm requesting all of the available
25 information regarding collateral statements or

Page 135

1 eyewitness statements.
2        Now, that -- eyewitness statements obviously
3 refers more to accidents, but, but, right.  In other words,
4 we request -- we send -- we send a request that is
5 broad trying to get all available information.
6 BY MS. SCHULTZ:
7    Q    And do you agree that experts should endeavor
8 to obtain all necessary and relevant information as
9 early in the process as possible as subsequent
10 revelations or contrary or inconsistent data may change
11 the expert's opinion?
12    A    So I -- so I guess the answer to that is no
13 because, I mean, we -- we -- we do try to request the
14 information early, but if something -- if I'm provided
15 with something then -- that leads to a change in my
16 opinion, then I'll change my opinion.
17        So if I'm provided with additional records --
18 and I think I even say that somewhere in my reports,
19 that, you know, I may have to change my opinion if I'm
20 provided with something that leads to a change.
21    Q    But before you reach an opinion, you ask --
22 you asked Ms. Durden's counsel to provide you with all
23 of her medical records and all depositions; correct?
24        MR. EXNICIOS:
25           Objection to the form of the question.

Page 136

1    A    All dep- -- yes.
2 BY MS. SCHULTZ:
3    Q    Do you know whether or not you received all
4 of the depositions in the case?
5    A    I -- I -- I suspect I didn't, but I'm not
6 sure.
7    Q    Why do you say you suspect you didn't?
8    A    Because they're experts and expert reports.
9 Usually, if they're experts and expert reports, they
10 are often depositions of said experts.
11    Q    Well, what about fact witnesses?  Did you
12 receive all of the fact witness depositions taken in
13 Ms. Durden's case?
14    A    I don't believe I've seen fact witness
15 depositions.  So if there are fact witness depositions,
16 I may not have seen those.
17    Q    Well, if there were depositions taken of
18 close friends and family members of Ms. Durden, that
19 would definitely be something you would have wanted to
20 see in reaching your opinions in this case; correct?
21    A    Yes.
22    Q    And do you know if those depositions exist?
23    A    I don't.
24    Q    For the record, you have never been provided
25 with any of those depositions; correct?

Page 137

1        MR. EXNICIOS:
2           Objection to the form of the question.
3    A    Yes.
4 BY MS. SCHULTZ:
5    Q    And you relied on Ms. Durden's counsel to
6 provide you with all of the depositions; correct?
7        MR. EXNICIOS:
8           Objection to the form of the question.
9    A    Well, I requested them.
10 BY MS. SCHULTZ:
11    Q    But you relied on Ms. Durden's counsel to be
12 the people that gave you those depositions; correct?
13        MR. EXNICIOS:
14           Objection to the form of the question.
15    A    Well, I guess that's true.  In other words,
16 I -- I request it from whoever sends the person to us,
17 and then, you know, we -- we do depend on them to send
18 us the stuff, that's correct.
19 BY MS. SCHULTZ:
20    Q    And the people that sent Ms. Durden to you
21 were Ms. Durden's counsel; correct?
22    A    Yes.
23    Q    Did you review the medical records of
24 Ms. Durden's primary-care physician, Dr. Velu?
25    A    I -- if it's not listed in my report, I

35 (Pages 134 - 137)

Page 138

1  didn't -- I didn't review it.
2     Q   And what's difficult is that your report only
3  lists two categories of records -- two categories of
4  records, that being the Ochsner -- Medical Center of
5  Louisiana, New Orleans at Ochsner Medical Foundation;
6  correct?
7        MR. EXNICIOS:
8           Objection to the form of the question.
9     A   Yes.
10 BY MS. SCHULTZ:
11    Q   All right.  And then below that section on
12 "Review of Medical Records" in your report, there are
13 some paragraphs that appear to be summarizing some of
14 the records?
15    A   Yes.
16    Q   Is that right?
17    A   Yes.
18    Q   There is one record from Medical Center of
19 Louisiana that is summarized; correct?
20    A   Okay.  So this is the Durden --
21    Q   This is --
22    A   So and -- and then --
23    Q   Exhibit 8.
24    A   Okay.  And which page?
25    Q   And we're on page 5.

Page 139

1     A   Okay.
2        Okay.  Go ahead.  I'm sorry.
3     Q   There's one record of Medical Center of
4  Louisiana that's been summarized; correct?
5     A   Yes.
6     Q   Is that the only record that you deemed
7  relevant with respect to the records reviewed from
8  Medical Center of Louisiana?
9        MR. EXNICIOS:
10          Objection to the form of the question.
11    A   It was -- it was a record that I felt needed
12 to be in the report.  I'm not sure that it wasn't
13 relevant -- I mean, that others weren't relevant, but
14 that was probably the -- a representative record that I
15 thought was relevant.  I'm not saying that anything
16 else I reviewed there wasn't relevant.
17 BY MS. SCHULTZ:
18    Q   And did you personally review all of the
19 medical records you were provided?
20    A   Yes.
21    Q   And who prepared these -- this summary of
22 some of the records that is on pages 5 through 9 -- no,
23 5 through 10 of the report?
24    A   I did that.
25    Q   Okay.  And then the other heading is "Ochsner

Page 140

1  Medical Foundation," and it looks like you summarized
2  about 20 or so records, approximately.
3     A   Yes.
4     Q   And why did you choose those 20 or so records
5  to summarize?
6     A   I -- I just look at the -- the record as it
7  evolves and try to find the important -- what seems to
8  me to be important pieces of information.
9        Now, I'm not an oncologist, so I don't always
10 know what is important from an oncology standpoint, but
11 I try to look at those -- like, for example, if there's
12 an evaluation, and then there's a determination of a
13 specific diagnosis, and there's maybe four visits in
14 between the -- the evaluation and the diagnosis, I may
15 jump to the diagnosis.
16       But I'm trying to basically tell the story of
17 what's in those medical records through selective, you
18 know, narration of the records.
19    Q   And so are the records that you summarized in
20 your report the records that you determined to be the
21 most relevant to your opinions in the case?
22    A   Yeah.  No, it's not -- it really isn't like
23 that.  Again, it's basically representative records
24 that -- that kind of tell the story of what goes on in
25 the records as I understand them, and so there may be

Page 141

1  other things that are very relevant, but there -- there
2  might be like -- you know, those records may be
3  repeated.
4        Like sometimes in psychological therapy
5  records, there will be the same issue over and over
6  again, and -- and so I may not, you know, list all ten
7  of those that have the same exact information.
8        So it -- I -- it's -- it does not mean that
9  they're most relevant; it just means that I was trying
10 to kind of tell the story of what I understood was in
11 the records through narration of what was in the
12 records, so . . .
13    Q   And this is the only place in your report
14 that I see any reference to any specific medical
15 records.
16       Do you agree?
17    A   Yes.  This is where that happens.
18    Q   And the story that you are telling with this
19 summary is the -- the -- the story, though, that
20 pertains to the opinion you're giving in the case;
21 correct?
22    A   I don't understand that question.
23    Q   Well, did -- let me ask it this way.
24    A   Okay.
25    Q   Did you take notes regarding any of the

36 (Pages 138 - 141)

1    A   I'm sorry.  One more time.
2  BY MS. SCHULTZ:
3    Q   Other than your basic training and
4  background, did you rely on anything other than the
5  procedures administered set forth on page 1 and the
6  medical records set forth on page 5 in reaching your
7  opinions regarding Ms. Earnest?
8        MR. EXNICIOS:
9            Same objection.
10   A   Right.  Other than -- yeah, you know, just
11  not my training and background, but the information
12  that I reviewed over the years on these conditions.
13       And I suppose we should mention that, you
14  know, the -- the DSM is part of that, the current
15  version.
16       So other than that, no.
17  BY MS. SCHULTZ:
18   Q   When you say "the information reviewed over
19  the years on these conditions," what do you mean?
20   A   I should just say "adjustment disorder."
21   Q   Adjustment disorder in general?
22   A   Okay.  Well, let me -- so . . .
23   Q   Let -- I think I can rephrase the question.
24       Have you reviewed information over the years
25  that pertain to adjustment disorder caused by hair

1  loss?
2    A   So I haven't reviewed information over many
3  years, but, I mean, I've reviewed -- again, I've looked
4  at information on emotional and psychological responses
5  to cancer, and that usually involves, you know, some
6  information about people's responses to treatment,
7  including chemotherapy and including hair loss.
8        And -- and then more recently I looked
9  specifically at some literature on hair loss in women
10  and emotional consequences or emotional comorbidities,
11  you know, for that.
12   Q   And that's what we talked about earlier in
13  the deposition?
14   A   Yes.
15   Q   All right.  I'm going to hand you what has
16  been marked as Deposition Exhibit 7, and this is the
17  Earnest file.
18   A   Okay.
19   Q   And if you can turn with me to page 10 of
20  that file.
21   A   Okay.
22   Q   And this is a memo from your group to
23  Ms. Durden's counsel, and it is, again, here -- let me
24  strike that.  I'm starting over.
25   A   Oh, that's all right.

1    Q   In this memo, you ask to conduct a collateral
2  interview with Ms. Earnest's significant other;
3  correct?
4    A   Yes.
5    Q   And why did you want to conduct a collateral
6  interview with Ms. Earnest's significant other?
7    A   You know, for reasons that we spoke about
8  earlier.  Just -- just for completeness and -- and --
9  and, you know, I want to request information having
10  to -- you know, I want to ask people their perspective
11  on -- on symptoms or -- or get information from people
12  about the things that I'm observing and evaluating.
13   Q   And who is Ms. Earnest's significant other?
14   A   I'm not sure.  Let's see.
15   Q   Do you know if she's married?
16   A   Let me see -- yeah, it should be in here.
17       She is married, yes.
18   Q   And she's been married for a long time, huh?
19   A   Long time, yes.
20   Q   Same husband; correct?
21   A   Yes.
22   Q   And that would be at least one of the people
23  you would --
24   A   Yes.
25   Q   -- have liked to have interviewed; correct?

1    A   Yes.
2    Q   Were -- did you interview Mr. Earnest?
3    A   No.
4    Q   And why not?
5    A   I'm not sure.
6    Q   What do you mean when you say you're not
7  sure?
8    A   I'm -- I don't know the reason why the
9  interview did not take place.
10   Q   Well, did you do any follow-up to -- to say,
11  "Look, I really want to interview her significant
12  other"?
13   A   (Shakes head.)
14   Q   You just --
15   A   No.  I mean, my -- that -- that is set up
16  typically by my assistants working with the attorneys,
17  and I didn't follow up when it -- when it didn't
18  happen.
19   Q   Did you review Mr. Earnest's deposition?
20   A   If it's not listed there, I probably didn't
21  have it.
22       Wait.  No, I didn't have it.
23   Q   And so you weren't provided with his
24  deposition; correct?
25   A   Looks like I wasn't, yes.

38 (Pages 146 - 149)

1    Q    And on this same page, you also asked that --
2 for a copy of all of Ms. Earnest's medical records.
3    A    Uh-huh.
4    Q    Correct?
5    A    Yes.
6    Q    And you want those medical records prior to
7 the evaluation date; correct?
8    A    Yes.
9    Q    And do you know if you were provided with all
10 of Ms. Earnest's medical records?
11    A    Again, you know, I -- I requested them.  I
12 don't know because I can't know about something that I
13 don't have in my possession, so I don't know.
14    Q    You relied on Ms. Earnest's counsel to
15 provide you with all of her medical records; correct?
16    A    Yes.
17    Q    And you also request that you be sent all
18 depositions and statements taken of collaterals and/or
19 eyewitnesses; correct?
20    A    Yes.
21    Q    And you relied on Ms. Earnest's counsel to
22 provide you with all of the depositions; correct?
23    A    Yes.
24    Q    And the only depositions that you received
25 were the deposition of the plaintiff herself,

1 Ms. Earnest, and her oncologist; correct?
2    A    Yes.
3    Q    And the reason that --
4    A    Looks like we have about 15 minutes, it looks
5 like, left.
6    Q    Okay.  And the reason that you ask for all of
7 Ms. Earnest's medical records and all of the
8 depositions is because you want to be the one to make
9 the choice as to what is relevant and what is not
10 relevant to your opinions; correct?
11    A    That's true.
12        MR. EXNICIOS:
13          Objection to the form of the question.
14 BY MS. SCHULTZ:
15    Q    It's -- it's correct that you do not want
16 Ms. Earnest's counsel deciding which records for you to
17 see and which records you won't see; correct?
18        MR. EXNICIOS:
19          Objection to the form of the question.
20    A    That's generally true, yes.
21 BY MS. SCHULTZ:
22    Q    And it's --
23    A    I -- I want to, you know, read as much of the
24 records as possible.
25    Q    And it's correct that you do not want

1 Ms. Earnest's counsel deciding which depositions to
2 provide you and which depositions won't be provided to
3 you; correct?
4    A    Correct.
5        MR. EXNICIOS:
6          Objection to the form of the question.
7        MS. SCHULTZ:
8          You know what, I'm at a breaking point,
9 so --
10        THE WITNESS:
11          Sure.
12        MS. SCHULTZ:
13          -- why don't we just --
14        THE WITNESS:
15          Stop for now?
16        MS. SCHULTZ:
17          -- go ahead and stop.
18          Where -- where are we . . .  Let's --
19 okay.
20        MR. EXNICIOS:
21          Off the record.
22        THE VIDEOGRAPHER:
23          This concludes today's deposition.  It's
24 4:46.
25        (The deposition concluded at 4:46 p.m.)

1        WITNESS CERTIFICATE
2
3 * * * * * * * * * * * * * * * * * * * * * * * * * *
4 IN RE:  TAXOTERE (DOCETAXEL)        MDL No. 2740
   PRODUCTS LIABILITY LITIGATION
5            SECTION: H
6 This Document Relates To:
7 Antoinette Durden, Case No. 2:16-cv-16635;
   Tanya Francis, Case No. 2:16-cv-17410;
8 Barbara Earnest, Case No. 2:16-cv-17144
9 * * * * * * * * * * * * * * * * * * * * * * * * * *
10
11
12        DECLARATION UNDER PENALTY OF PERJURY
13      I declare under penalty of perjury that I
14 have read the entire transcript of my Deposition taken
15 in the captioned matter or the same has been read to
16 me, and the same is true and accurate, save and except
17 for changes and/or corrections, if any, as indicated by
18 me on the DEPOSITION ERRATA SHEET hereof, with the
19 understanding that I offer these changes as if still
20 under oath.
21    Signed on the _____ day of _____,
22 20___.
23        _____
24        KEVIN J. BIANCHINI, PhD, ABPN
25

Page 163

1     My understanding is that you have
2 elected to proceed at this time and visit, or
3 whatever, the issue of the additional
4 information at a later date.
5 MS. SCHULTZ:
6     And, for the record, what are the
7 multiple productions that you're referring
8 to?
9 MR. EXNICIOS:
10     Multiple productions that have been
11 uploaded by either defense counsel and/or
12 various and sundry -- that we've received and
13 subsequently uploaded, whether they're
14 medical records or depositions, that may have
15 been taken after Dr. Bianchini's evaluation
16 of the plaintiffs.  Basically, information
17 gleaned through discovery that was not
18 provided to Dr. Bianchini at the time of his
19 evaluation either because it had not yet been
20 received by counsel or the depositions had
21 not yet been taken or whatever the
22 circumstances may have been.
23 MS. SCHULTZ:
24     Well, for the record, to my knowledge,
25 there has been no additional information or

Page 164

1 disclosures or productions of information
2 since you designated Dr. Bianchini as an
3 expert in this case.
4     When he conducted his evaluation, it
5 has -- is of -- of no -- no meaning under the
6 circumstances where you've designated him as
7 an expert and we're to take his deposition.
8     In fact, he was -- he was designated as
9 an expert on November 9, 2019.  Were here
10 today on January 8?  Is it January 8 --
11 THE WITNESS:
12     The 9th.
13 MS. SCHULTZ:
14     -- January 9, 2019, two months later.
15 All of the depositions in the Durden case had
16 occurred prior to plaintiffs designating
17 Dr. Bianchini as an expert.  All were
18 available to him prior to that designation
19 and prior to you providing his report to
20 Sanofi.
21     In the Earnest case, all of the
22 depositions had been taken in that case and
23 all were available for you to provide to
24 Dr. Bianchini prior to you designating him as
25 an expert and prior to you providing his

Page 165

1 expert report to Sanofi on November 9.
2     Same with all of the medical records.
3 All of the medical records and exhibits, all
4 were available, had been produced.  Most of
5 them, years ago, and they were all available
6 for you to provide to Dr. Bianchini prior to
7 designating him as an expert and prior to him
8 issuing his report in this case.
9     Instead, you went ahead and issued his
10 report as an expert on November 9.  On
11 December 10, Sanofi's psychologist,
12 Dr. Spiegel, was designated as an expert in
13 response to Dr. Bianchini's report, and we're
14 now here for his deposition.
15     And, as you know, we've got a deadline
16 for case-specific reports of Dr. Spiegel, we
17 also have his deposition set, and we've got
18 dispositive Daubert motions due on
19 February 8, 2019.
20     So when you say you offered a choice of
21 going ahead and -- and proceeding with the
22 rest of this deposition, there is no choice
23 here.  Our only choice here is to continue
24 with the deposition as noticed, and that's
25 what we're going to do today.

Page 166

1 MR. EXNICIOS:
2     Counsel, I understand your argument.
3 Obviously, there's no judge here to rule on
4 it.  That's fine.  You put on the record
5 whatever you wanted to put on the record.
6 The offer, nonetheless, remains to either
7 proceed or postpone the rest of
8 Dr. Bianchini's deposition.
9 MS. SCHULTZ:
10     Well, and as I said, that's not an
11 offer, and you know I'd be -- if it was, I'd
12 be crazy to accept that under these
13 circumstances, so . . .
14 MR. EXNICIOS:
15     Ma'am, I'm not going to comment on
16 your -- your mental state one way or
17 another --
18 MS. SCHULTZ:
19     Well --
20 MR. EXNICIOS:
21     -- either on the record or otherwise,
22 so --
23 MS. SCHULTZ:
24     Perhaps Dr. Bianchini can.
25         EXAMINATION

3 (Pages 163 - 166)

1 BY MS. SCHULTZ:
2     Q   All right.  Let's -- let's get started.
3         Did you review any --
4     A   So I should also say that I have discovered
5 now that despite requesting all of the information, I
6 was not provided with all the information.  So, you
7 know, my opinions are now subject to some change once I
8 review additional information, and so my answers are
9 going to have to be couched based on current
10 information and subject to change based on review of
11 additional information.
12        And I'm just letting you know that for the
13 rest of the deposition, that's -- that's going to be --
14 you know, I found out during the deposition yesterday
15 that there was a fair number of materials that I had
16 not received.
17        So, you know, I -- I did my report based on
18 my getting all of the materials, and I didn't receive
19 all the materials.  So I'm going to want -- you know,
20 I'm going to want to look at the other materials.
21     Q   And you relied on counsel for plaintiff to
22 provide those other materials to you; correct?
23     A   Sure.
24     Q   And it's your testimony today that you need
25 to be able to review those other materials in order to

1 render your opinions in the case of both Ms. Durden and
2 Ms. Earnest?
3     A   My -- my --
4         MR. EXNICIOS:
5             Objection to the form of the question.
6     A   My -- my testimony today is that I -- I've
7 rendered my opinion based on the materials that I have
8 available to me, which were, I now understand, not
9 complete.
10        So my testimony is that I need to review the
11 additional materials, and there is some possibility
12 that my -- my opinion may change based on review of
13 additional materials.  I will only know that after
14 reviewing those materials.
15        So, therefore, I mean, I understand you
16 have -- you guys have deadlines and so on, but -- but
17 we're going forward with the deposition with the
18 understanding that I'm going to get additional
19 information and then may wish to, you know, make a
20 change or not depending on that additional information.
21 BY MS. SCHULTZ:
22     Q   Well, do you need to review those additional
23 materials in order to be able to give an opinion
24 regarding Ms. Durden to a reasonable degree of medical
25 certainty?

1         MR. EXNICIOS:
2             Objection to the form of the question.
3     A   I -- I think, again, I -- I already did that
4 based on materials that were available to me.  I was
5 unaware that there was so much additional material that
6 was unavailable.  I wasn't aware of that when I
7 rendered my opinion.  Now I am aware of that.
8         And, you know, when you -- you read -- we
9 read into the record yesterday our document requesting
10 all materials, and -- and we -- I didn't get all the
11 materials.
12        So, yes, I think that makes it harder to --
13 my opinion would be rendered conditionally based on the
14 possibility of change from looking at additional
15 materials, which I -- I think is going to make this
16 deposition today difficult, and -- and I -- I'm -- if
17 you wish to go forward, that -- that's fine with me.  I
18 understand you guys have deadlines, but I just have to
19 be -- you know, my position with the Court as someone
20 who is asked to render testimony about causality and so
21 on, I -- I would like to review those materials now
22 that I understand that that -- that I wasn't provided
23 with everything.
24     Q   Well --
25     A   My preference would be that we suspend the

1 deposition.  I mean, I don't get a vote.  That's
2 determined by the lawyers.  But that would be my
3 preference.
4     Q   Well, knowing -- first of all, with respect
5 to the Durden case, knowing what you know now about the
6 additional materials that you asked for but were not
7 provided to you, can you provide a diagnosis of
8 Ms. Durden to a reasonable degree of medical
9 probability without having reviewed those records?
10        MR. EXNICIOS:
11            Objection to the form of the question.
12     A   See, that's the question you asked me the
13 last time, and my answer's going to be the same.  So
14 I'm going to give you the same answer as I gave to the
15 last one for -- for both.
16        You know, I -- I -- you're always rendering
17 an opinion to a degree of psychological or medical
18 probability based on materials that you're provided,
19 and that's what I did.  Now I'm finding out that there
20 was a whole bunch of materials or fair number of
21 materials that I wasn't provided.
22        So I -- I just can't tell you whether or not
23 review of those materials will lead to any substantive
24 change in my opinion without reviewing the materials.
25        So, you know, my opinion currently is based

4 (Pages 167 - 170)

1  on the material -- is to a degree of medical
2  probability based on the degree of -- I mean, based on
3  the materials that I received, but now there's going to
4  be much more material that I received or a fair amount
5  of more material that I receive, and, you know, I -- I
6  want to review that, as I did from the beginning.
7  And -- and if I do that, it will be -- there's a chance
8  it will change my opinion.
9  BY MS. SCHULTZ:
10  Q   Well, as a psychologist, before you render
11  a -- an opinion, you want to make sure that opinion is
12  based on all of the information that is available to
13  you; correct?
14  A   Yes.
15  Q   Okay.  So as a psychologist, if I told you
16  that there were ten medical records to you -- available
17  for you, but I'm only going to give you one of those
18  medical records, could you render a diagnosis of a
19  patient to a reasonable degree of medical probability?
20  MR. EXNICIOS:
21  Object to the form of the question.
22  A   I -- I don't know.  It depends on what's in
23  that one record and what's in the nine that I'm not
24  getting.  So -- so it depends.  And the only way to
25  know that is to look at them.

1  In other words, if you get a record that
2  contains the bulk of the information that is important
3  for understanding the issues at hand, then you may be
4  able to render an opinion, but the only way to know
5  that is to look at them.
6  BY MS. SCHULTZ:
7  Q   So would --
8  A   So -- and so, in other words, I don't know if
9  I -- it would depend on what's in the ten and what's in
10  the one that you give and what's in the other nine.
11  And -- and, you know, like, if -- for example, there
12  might be something in those nine records that
13  contradict what's in the first record, or the nine
14  records may completely confirm or enhance even the --
15  the -- the view that's expressed in the first record.
16  So that -- all of that is going to determine
17  whether or not it would impact your ability to render
18  an opinion.
19  Q   So as you sit here today, you don't know once
20  you've reviewed -- reviewed that additional information
21  whether you will reach the same opinions for Ms. Durden
22  and Ms. Earnest; is that correct?
23  A   I do not know that, right.
24  MR. EXNICIOS:
25  Objection to the form of the question.

1  BY MS. SCHULTZ:
2  Q   And you don't know whether or not you will
3  reach the same diagnosis for Ms. Durden and Ms. Earnest
4  once you've reviewed the additional information; is
5  that correct?
6  A   That's correct.
7  MR. EXNICIOS:
8  Same objection.
9  MS. SCHULTZ:
10  Let's go off the record just for a
11  minute.  Okay?
12  THE WITNESS:
13  Okay.  Okay.
14  THE VIDEOGRAPHER:
15  We're off the record.  It's 8:47.
16  (A short break is taken.)
17  THE VIDEOGRAPHER:
18  Back on record.  It's 8:55.
19  MS. SCHULTZ:
20  The -- the information that you've --
21  you've just testified to will likely impact
22  the nature of the questioning today, but
23  given the deadlines set by the Court and the
24  deadline for plaintiffs to identify you as an
25  expert and provide us with your report and

1  all of -- of the other deadlines and things
2  that have already transpired, I have no
3  choice but to -- to go ahead and -- and
4  proceed with the -- the rest of my time
5  today, albeit the nature of my questions may
6  be different.
7  THE WITNESS:
8  Thank you.  Okay.
9  BY MS. SCHULTZ:
10  Q   Did you review any additional documents or
11  materials between the time we finished yesterday and
12  this morning?
13  A   I went back over some of the ones that I
14  reviewed before, particularly Ochsner records.
15  Q   So you went back over the Ochsner records for
16  which plaintiff?
17  A   Ms. Durden, I think.
18  Q   And that is in Deposition Exhibit 10?
19  A   Let me double-check.
20  Yes.
21  Q   Were there particular records of Ms. Durden
22  that you reviewed yesterday evening?
23  A   Yes.  The dermatology records.
24  Q   The dermatology records of which
25  dermatologist?

5 (Pages 171 - 174)

1    A   It's the NOMC dermatology, Ochsner Southshore
2  Region.  Looks like there are a couple of -- couple of
3  doctors involved.
4    Q   Well, which was Ms. Durden's treating
5  dermatologist?
6    A   Just for the record, this is an electronic
7  medical record, which --
8      THE REPORTER:
9        "Is" or "isn't"?
10     THE WITNESS:
11       It is an electronic medical record.
12    A   -- which presents challenges for any
13  review -- any reviewer.
14      I believe the doctor is Mermilliod, but I'm
15  not absolutely sure because sometimes there are
16  multiple -- in -- in an Ochsner record, sometimes
17  multiple providers are . . .
18  BY MS. SCHULTZ:
19    Q   Do you know the name of Ms. Durden's treating
20  dermatologist?
21    A   Again --
22      MR. EXNICIOS:
23        Objection to the form of the question.
24    A   I'm look -- I know she was treated for --
25  treated at Ochsner dermatology.  Let me see if I can

1  find this.
2  BY MS. SCHULTZ:
3    Q   Are you aware that she was treated by at
4  least four different dermatologists during the time
5  period from 2013 to present?
6      MR. EXNICIOS:
7        Objection to the form of the question.
8    A   Yeah.  I don't have the record memorized like
9  that, so I don't know how many dermatologists that she
10  was treated.  I was aware that she was treated through
11  Ochsner dermatology, so it wouldn't surprise me that
12  there were multiple dermatologists involved.
13  BY MS. SCHULTZ:
14    Q   What -- tell me what treatment you were aware
15  of.
16      MR. EXNICIOS:
17        Objection to the form of the question.
18    A   She was treated for hyperpigmentation and
19  hair loss.
20  BY MS. SCHULTZ:
21    Q   And when was she first treated for
22  hyperpigmentation and hair loss?
23    A   That is not something that I would have
24  committed to memory, but I'm looking at the records now
25  and it looks like it was -- it looks like it might have

1  been in December of 2013.
2    Q   And did she continue to be treated for
3  hyperpigmentation and hair loss from December 2013
4  until the present?
5    A   I don't know.  It looks like the last -- the
6  last records that I appear to have seem to be in 2017.
7  So I don't know if she was treated beyond that time.
8    Q   Do you know if Ms. Durden stopped receiving
9  treatment from a dermatologist?
10    A   I don't.
11    Q   Do you know if --
12    A   From -- from the records, you know, from her
13  history, I don't -- I don't know if she was treated
14  beyond that time or not.
15    Q   Do you know any reason why Ms. Durden would
16  stop treatment by a dermatologist?
17    A   I don't.
18      MR. EXNICIOS:
19        Objection to the form of the question.
20  BY MS. SCHULTZ:
21    Q   So last night you reviewed some dermatology
22  records; correct?
23    A   Yes.  Uh-huh.
24    Q   And what did you learn from those dermatology
25  records other than what you've already stated, that she

1  was treated for hyperpigmentation and hair loss?
2    A   Just that -- that in the dermatology records
3  where she's treated for those things, there's a mention
4  in the dermatology records of a problem of anxiety
5  associated with depression that they list as being from
6  November 27, 2012, to the present time, and -- and
7  that -- I didn't have that in my report.  That's
8  actually in a list of problems.
9      When I looked at the records, I was looking
10  at the -- trying to find the clinical notes, and I -- I
11  missed that in those -- in the problem list.
12    Q   So you missed the fact that Ms. Durden had
13  anxiety and associated depression starting in 2012?
14    A   Well, what I missed was that somebody in the
15  dermatology department wrote that.  I -- I don't see
16  any clinical activity where that was investigated or
17  examined.  I don't see a consult with a psychiatrist or
18  psychologist or -- it's just listed as a problem in --
19  in some derma- -- in the dermatology records.
20    Q   And is it your belief that that problem was
21  determined by a dermatologist?
22    A   I can't tell from this.
23    Q   Do you know whether or not that problem of
24  anxiety associated with depression was identified by a
25  different physician of Ms. Durden?

6 (Pages 175 - 178)

Page 179

1    MR. EXNICIOS:
2        Objection to the form of the question.
3    A   In what I -- in what I have -- so the answer
4  to your question is:  I don't know.  And the answer in
5  what I have are these -- just it's one problem in a
6  list of many problems, and so I'm not exactly sure
7  where it comes from.
8  BY MS. SCHULTZ:
9    Q   Do you know the reasons for the listing of
10  the problem of anxiety associated with depression
11  starting in 2012?
12    A   I don't.  Well, I -- I mean, it is -- it
13  is -- there -- there are some clinical notes where the
14  patient is expressing some distress, I think, about
15  hair loss, and there's mention of reassurance,
16  reassuring the patient.  That -- that may be -- now,
17  they do say through -- many times in that -- in this
18  same record she has normal mood and affect, but they
19  also mention -- I -- I recall that she maybe was
20  displeased or upset or worried or something like that
21  in those records, and they -- they talk about
22  reassurance in -- in some places.
23        So it seems as though it may be connected to
24  hair loss, but I'm not sure.
25    Q   And you think that in the dermatology notes

Page 180

1  it talks about Ms. Durden's distress and that she was
2  upset or worried?
3    MR. EXNICIOS:
4        Just objection to the form of the
5        question.
6    A   So to answer that question, I'm going to need
7  to look at this, if you can bear with me.
8  BY MS. SCHULTZ:
9    Q   That --
10    A   Unless you want to move on to a different
11  question.
12    Q   That's fine.
13        Let's move on.
14    A   Okay.
15    Q   Let me ask you:  The records you're looking
16  through right now trying to find an answer to that
17  question --
18    A   Uh-huh.
19    Q   -- those are records that you had in your
20  possession prior to the start of this deposition;
21  correct?
22    A   Yes.  So we're going to move on to a --
23    Q   Why -- why --
24    A   -- different question --
25    Q   Yeah.

Page 181

1    A   -- and I should stop looking?  Okay.
2    Q   Why -- why did you last night go look at the
3  dermatology records of Ms. Durden?
4    A   One of the attorneys mentioned that there was
5  a mention of depression in the record, and it wasn't in
6  my report.
7    Q   So after we stopped the deposition yesterday
8  to be continued this morning, you said one of the
9  attorneys told you that there's a mention of depression
10  in the dermatology records?
11    A   No.  In the Ochsner record.
12    Q   Just in an Ochsner record?
13    A   Yes.
14    Q   And told you that you had not put that in
15  your report?
16    A   No.  He just told me that there was a mention
17  of that.  I knew I hadn't put it in my report, and so I
18  went and checked the Ochsner record and found that in
19  the dermatology record.
20    Q   And if Ms. Durden had suffered from anxiety
21  associated with depression starting in 2012, that would
22  be an important fact for your opinion regarding
23  Ms. Durden.
24        Do you agree?
25    A   Potentially, yes.

Page 182

1    Q   Did -- did you review any other records after
2  we concluded yesterday afternoon and prior to starting
3  this morning?
4    A   No.
5    Q   Were you told that you had forgotten to
6  include other matters in your report?
7    MR. EXNICIOS:
8        Objection to the form of the question.
9    A   Yeah, I -- I -- I don't think that I was told
10  that I forgot to include that.  I was just told that it
11  was in there.
12  BY MS. SCHULTZ:
13    Q   Okay.  Were you told that there were other
14  facts in the records that were not included in your
15  report?
16    A   No.
17    Q   Other than going back to look at the Ochsner
18  records, did you do anything else to prepare for a --
19  continuing your deposition this morning?
20    A   No, I did not.
21    Q   You provided us with a list of your expert
22  trial and deposition testimony that we've marked as
23  Exhibit 3, and I'm not going to go through that in any
24  detail.
25        Just one question.  You said that you believe

7 (Pages 179 - 182)

Page 199

1    Q    So you're saying that because the anxiety
2  associated with depression was first listed in a
3  problem list in 2012, that means there's a temporal
4  association with her hair loss?
5        MR. EXNICIOS:
6            Objection to the form of the question.
7    A    No.  What I mean is, because it's first
8  listed in the -- in some records, in the Ochsner
9  records, where she's seeing dermatology and being
10 treated for hair loss, that that's where the temporal
11 connection comes; that that's the first place I saw it
12 mentioned in the Ochsner records because they mentioned
13 in the dermatology records treatment for hair loss.
14 BY MS. SCHULTZ:
15   Q    And you don't know if there's any more
16 information about the problem of anxiety associated
17 with depression in the records you have not yet seen;
18 agreed?
19       MR. EXNICIOS:
20           Objection -- objection to the form.
21   A    So I don't know what it says, obviously, in
22 the records that I haven't seen.  So whether or not
23 depression is mentioned there, of course, sitting here
24 right now, I couldn't tell you.
25 BY MS. SCHULTZ:

Page 200

1    Q    Do you know what kind of anxiety Ms. Durden
2  was having in 2012?
3    A    No.
4        MR. EXNICIOS:
5            Objection to the form.
6  BY MS. SCHULTZ:
7    Q    Did you in your interview ask Ms. Durden
8  about any anxiety or depression she was having in 2012?
9    A    I didn't.
10   Q    Did you ask her about any anxiety or
11 depression that she was having in 2013?
12   A    Yeah.  I didn't ask her anything about a
13 specific time frame, other than that -- that it was
14 associated with her realization that the hair loss was
15 going to be permanent.
16   Q    Well, did you ask her how long she had been
17 experiencing her current anxiety?
18       MR. EXNICIOS:
19           Objection to the form.
20   A    Only that -- no, and I didn't ask for the
21 duration of time just that its onset was once she
22 realized that the hair loss was going to be permanent.
23 BY MS. SCHULTZ:
24   Q    When did she realize that the hair loss was
25 going to be permanent?

Page 201

1    A    I don't know that.
2    Q    Did you ask her when that was?
3    A    No.
4    Q    Why not?
5    A    It didn't -- it didn't seem important.
6    Q    Well, isn't it important to your diagnosis as
7  to when any adjustment disorder began?
8        MR. EXNICIOS:
9            Objection to the form.
10   A    I mean, it can be.  If -- well, it can be
11 because adjustment disorders have a typical time period
12 when there's a kind of isolated stressor.  However,
13 when there's an ongoing stressor, you can have the
14 problem as long as you have the stressor.  So it
15 becomes less important when she had a problem that was
16 going to be ongoing.
17 BY MS. SCHULTZ:
18   Q    Well, and -- and in this case, her stressor
19 was when she realized the hair loss was going to be --
20 what word did you use, "permanent"?
21   A    "Permanent."
22   Q    "Permanent."
23       So in this case, the stressor was when she
24 realized her hair loss was going to be permanent;
25 correct?

Page 202

1    A    Well, I think it was hair loss and then when
2  she realized it was going to be permanent, like, both
3  of those things.
4    Q    So she had two stressors?
5    A    Well, it's not really two.  It -- they're --
6  they're connected.  It's hair loss and -- and the
7  realization that that hair loss is not going to be
8  reversed.
9    Q    And when did she suffer her hair loss?
10   A    I'm not sure.  I would assume that that was
11 shortly after the chemotherapy treatment.
12   Q    And -- and -- and you have no idea as to when
13 she realized that her hair loss was going to be
14 permanent; is that correct?
15   A    I don't know --
16       MR. EXNICIOS:
17           Objection to the form.
18   A    Yeah, I don't know that.
19 BY MS. SCHULTZ:
20   Q    And explain to me why you didn't ask her
21 that.
22   A    I -- asked and --
23       MR. EXNICIOS:
24           Objection to form.
25   A    As you lawyers say, "asked and answered."  I

12 (Pages 199 - 202)

Page 203

1 think I already answered that question.  You asked it a
2 little bit ago.
3 BY MS. SCHULTZ:
4   Q   Well, I -- I don't -- I don't believe I got
5 an answer as to why you would not want to know when she
6 came to the realization that her hair loss was going to
7 be permanent.
8       MR. EXNICIOS:
9         Objection to the form.
10   A   I think I did -- I think I did give you an
11 answer.  I'm not trying to not give you --
12 BY MS. SCHULTZ:
13   Q   Well, that's fine.  I'm going to ask --
14   A   All right.
15   Q   I'm just -- my question is:  Why didn't you
16 ask her --
17   A   Can --
18   Q   -- when she realized her hair loss was going
19 to be permanent?
20   A   I think -- I think I --
21       MR. EXNICIOS:
22         Objection to the form.
23   A   I think I did answer that.  Can we check --
24 check the -- my previous answer?  Is it all right?
25 BY MS. SCHULTZ:

Page 204

1   Q   No.  It -- I'm going to go -- I'm asking you
2 the question.  Whether or not you think you've already
3 answered it, I'd like an answer.
4       Why didn't you ask her when she realized that
5 her hair loss was going to be permanent?
6       MR. EXNICIOS:
7         Objection to the form.
8   A   I mean, it just didn't seem important to ask
9 when.  Again, there's a relatively -- my understanding
10 is that the time frame of the -- of hair loss is
11 associated with chemotherapy -- I'm very familiar with
12 that -- and that somewhere in there, she realized it
13 was -- that it was going to be permanent, but that
14 specific time frame wasn't important for me to evaluate
15 the condition she had now nor the causality of the
16 condition, I don't believe.
17 BY MS. SCHULTZ:
18   Q   So the timing of when she realized her hair
19 loss was permanent is not important to your opinion on
20 causality of her symptoms?
21       MR. EXNICIOS:
22         Objection to the form of the question.
23   A   The specific time of when she realized that
24 is not -- is not particularly important.
25 BY MS. SCHULTZ:

Page 205

1   Q   Well, what about the general time of when she
2 realized that?
3       MR. EXNICIOS:
4         Objection to the form.
5   A   I mean, it's important that -- well, I mean
6 my -- okay.  So -- I'm sorry.  Ask that question again.
7 Let me see if I can get -- get you a better answer.
8 BY MS. SCHULTZ:
9   Q   Well, you said you didn't think the specific
10 time --
11   A   Right.
12   Q   -- of when she realized it was permanent was
13 important, and my question was:  Well, wasn't the
14 general time of when she made that realization
15 important in your opinion?
16       MR. EXNICIOS:
17         Objection to the form.
18   A   So -- so my -- my opinion is that she has
19 problems associated with hair loss.  That's -- that's
20 her problem.  The realization of the permanence of it
21 is secondary to the fact that it's permanent, so -- so
22 that means that what's important is that she has had
23 hair loss and continues to have hair loss.  The -- the
24 time of when she realized it was permanent is not
25 particularly important.  What's more important is that

Page 206

1 she has had it, and that she continues to have hair
2 loss.
3 BY MS. SCHULTZ:
4   Q   Well, your opinion is that she has a mental
5 disorder; correct?
6   A   Emotional disorder.  Psychological disorder.
7   Q   And -- and your opinion is that she has an
8 adjustment disorder; correct?
9   A   Correct.
10   Q   And how long has she had an adjustment
11 disorder?
12       MR. EXNICIOS:
13         Objection to the form.
14   A   Yeah, I'm not sure of the exact amount of
15 time --
16 BY MS. SCHULTZ:
17   Q   Okay.  Well --
18   A   -- that she's had that.
19   Q   -- generally, how long has she had an
20 adjustment disorder?
21   A   Since sometime after she experienced the hair
22 loss and sometime after she realized it was going to be
23 permanent.
24   Q   So sometime from 2011 until the date of your
25 interview in 2018?

13 (Pages 203 - 206)

Page 207

1       MR. EXNICIOS:
2           Objection to the form.
3   A   Yes, sometime in there.
4   BY MS. SCHULTZ:
5   Q   Okay.  And so for your opinion, it doesn't
6   matter when that occurred during that seven-year time
7   period?
8       MR. EXNICIOS:
9           Objection to the form.
10  A   Well, it -- it doesn't matter that -- no, the
11  specific time frame doesn't matter.  What matters is
12  that it was linked with -- it was linked with hair loss
13  and it linked with her realization that the hair loss
14  was not going to be reversed.
15  BY MS. SCHULTZ:
16  Q   Well, how do you know it's linked with a
17  realization that the hair loss is not going to be
18  reversed if you don't know when she came to that
19  realization that the hair loss was not going to be
20  reversed?
21  A   Because the --
22      MR. EXNICIOS:
23          Objection to the form.
24  A   Because the history that she provided to me
25  was that it -- the two were linked in time.

Page 208

1   BY MS. SCHULTZ:
2   Q   And so you relied on the testimony provided
3   by Ms. Durden for your diagnosis?
4   A   Of course.
5       MR. EXNICIOS:
6           Objection to the form.
7   A   I -- I relied on her history that there was a
8   connection.
9   BY MS. SCHULTZ:
10  Q   And when you say "her history," you're
11  talking about the -- what she told you?
12  A   Correct.
13  Q   So you've said that there's a stressor of the
14  hair loss and you don't know when that occurred, and
15  then there's a stressor of her realization that her
16  hair loss is permanent and you don't know when that
17  occurred; correct?
18      MR. EXNICIOS:
19          Objection to the form.
20  A   No, not exactly.
21  BY MS. SCHULTZ:
22  Q   Not even generally; correct?
23  A   No.
24      MR. EXNICIOS:
25          Objection as to form.

Page 209

1   A   No.  What -- what I said was -- my testimony
2   was that there was a link between the chemotherapy,
3   that the hair loss was -- I didn't -- I don't know
4   exactly when, and I don't know exactly what year, but
5   there was a link between her hair loss and the
6   chemotherapy, and then sometime down the road from
7   there, a time that I don't -- I don't know exactly
8   when, she had the realization that the hair loss was
9   permanent.
10  BY MS. SCHULTZ:
11  Q   So tell me about the symptoms she had when --
12  between the time she had the hair loss from the
13  chemotherapy and up until the time she had the
14  realization that her hair loss was permanent.
15  A   I don't know those -- wait.
16  Q   Okay.  So --
17  A   Let me see.  Hang on.
18  Q   -- are the symptoms that --
19      MR. EXNICIOS:
20          Whoa, he said hang on.
21      MS. SCHULTZ:
22          Okay.
23  A   Yes.  I -- I don't know what symptoms she had
24  prior to realizing it was permanent.
25  BY MS. SCHULTZ:

Page 210

1   Q   So the symptoms that you list on page 3 of
2   your report are symptoms that began once she realized
3   her hair loss was permanent?
4   A   I'm -- I'm not sure about that.  She may have
5   had some of the symptoms prior to this.
6       Those are the symptoms that she has now.  I
7   don't know exactly when they began, but I -- I know
8   that they're linked with hair loss.  And my
9   understanding from her history is that -- again, that
10  there are basically two pieces of it:  One is hair
11  loss, and one is her realization that the hair loss was
12  permanent.
13  Q   Now, the -- when you say you know that her
14  symptoms are linked to hair loss, that's based solely
15  on what Ms. Durden told you; correct?
16  A   Sure.  It's based --
17      MR. EXNICIOS:
18          Objection to the form of the question.
19  A   It's based on her history, right, that she
20  provided to me.
21  BY MS. SCHULTZ:
22  Q   And when you say her history provided to you,
23  what she tells you about her history?
24  A   In -- right.  In the interview where I ask
25  questions and she answers them, that's where that comes

14 (Pages 207 - 210)

Page 211

1  from.
2     Q   Well, isn't it important to know whether her
3  symptoms have gotten better or worse over time in
4  making your analysis of Ms. Durden?
5     A   I mean, it can be.  What's most important is
6  to understand how she presents at the time that I'm
7  seeing her, which is what I -- which is what I got.
8     Q   Well, in order to diagnose Ms. Durden with an
9  adjustment order [sic] under the DSM, as a -- don't you
10  first have to determine that the onset of her symptoms
11  occurred within three months of the time of the
12  stressor?
13     A   There has to be a connection with -- a
14  temporal connection with the stressor, that's true.  My
15  understanding from what she told me was that that
16  occurred.  That once -- she said that -- she said, once
17  she realized it was permanent, she felt really hurt.
18  And -- and that was my understanding of -- of her
19  ailment, of her history, that indicated that when she
20  had the -- that realization that, you know, she had --
21  she had emotional symptoms.
22     Q   So you did not ask her when she realized that
23  her hair loss was permanent; correct?
24        MR. EXNICIOS:
25           Objection to form.

Page 212

1     A   I didn't -- I didn't ask her when she
2  realized it was permanent, that's correct.
3  BY MS. SCHULTZ:
4     Q   And you didn't make any effort to find out
5  whether her symptoms began within three months of
6  whatever date that was when she realized her hair loss
7  was permanent; correct?
8        MR. EXNICIOS:
9           Objection to form.
10     A   The history that she provided to me -- so,
11  no.  I think the history that she provided to me made
12  me believe that it was within three months because she
13  said that she had emotional symptoms, she felt really
14  hurt once she realized that it was permanent.
15  BY MS. SCHULTZ:
16     Q   But you agree that if she had those symptoms
17  prior to realizing that her hair loss was permanent,
18  that those symptoms wouldn't begin three months after
19  she realized her hair loss was permanent?
20        MR. EXNICIOS:
21           Objection to the form.
22     A   Yeah.  And it's okay.  I'm just trying to
23  understand.  Are you asking -- are you asking about
24  after she had hair loss or -- or are you asking -- I
25  mean, I understand you're trying to --

Page 213

1  BY MS. SCHULTZ:
2     Q   Well, let -- let me -- let me rephrase my
3  question.
4        You can't tell me whether or not Ms. Durden
5  reported these same symptoms after she had hair loss
6  from chemotherapy and prior to the time she realized it
7  was permanent; correct?
8     A   She --
9        MR. EXNICIOS:
10           Objection to form.
11     A   I'm sorry.  One more time.  What's the
12  question again?
13        (Ms. Schultz views the reporter's
14        computer screen.)
15  BY MS. SCHULTZ:
16     Q   You can't tell me whether or not Ms. Durden
17  reported these same symptoms after she had hair loss
18  from chemotherapy and prior to the time she realized it
19  was permanent?
20     A   Yeah.  I --
21        MR. EXNICIOS:
22           Objection to form.
23     A   I don't know whether she had it immediately
24  with the onset of hair loss.  I'm not sure about that.
25  BY MS. SCHULTZ:

Page 214

1     Q   So she may have had these symptoms you list
2  on page 3 when she first had her hair loss from
3  chemotherapy all the way up until the present, or they
4  may have just begun once she realized they were
5  permanent?
6     A   Its my understand- --
7        MR. EXNICIOS:
8           Objection to form.
9     A   It's my understanding, again, from her
10  comment about the permanence that, you know, the
11  emotional symptoms became a focus after she realized it
12  was permanent.  I can't say for sure that she
13  doesn't -- didn't have any of these symptoms prior to
14  that.
15        MR. EXNICIOS:
16           Let me --
17  BY MS. SCHULTZ:
18     Q   Well, do you know if she had any of these
19  symptoms prior to that?
20     A   I'm not sure.
21        MR. EXNICIOS:
22           Objection to form.
23  BY MS. SCHULTZ:
24     Q   When did Ms. Earnest's adjustment disorder
25  begin?

15 (Pages 211 - 214)

Page 223

1 different than any other chemotherapy agent, and,
2 therefore, the expectation was that her hair loss would
3 be reversible. That's my understanding.
4 BY MS. SCHULTZ:
5    Q   So when did Ms. Earnest's adjustment disorder
6 begin?
7    A   When her -- when she started to realize that
8 her hair was not coming back. She was bothered that it
9 was not coming back. She thought that it would. And
10 then so sometime in that time frame prior to speaking
11 to the lawyer about -- after seeing an ad for this
12 litigation.
13    Q   Okay. So she realized it was -- her hair
14 loss was permanent sometime between the time she was
15 worried that it wasn't coming back and the time she
16 spoke to a lawyer in either 2015 or 2016?
17    A   Correct.
18    Q   And what was it about speaking with a lawyer
19 that made her realize her hair loss was permanent?
20    A   It's my understanding that she was
21 informed -- because of the nature of the litigation,
22 she was informed that that was an effect of Taxotere
23 that she wasn't informed about prior to that time.
24 That's my understanding.
25    Q   She was informed by her lawyers that . . .

Page 224

1    A   No. I -- I mean, my understanding is that
2 part of the nature of this litigation is about -- that
3 an effect of this particular agent, Taxotere, is that
4 it produces permanent hair loss in some people and --
5 and thus, if she saw an ad for that, that would have --
6 that would have informed her that she received the
7 agent that in some patients produces permanent hair
8 loss.
9    Q   So what informed her was the advertisement
10 she saw, not a discussion with a lawyer?
11    A   I don't know that for sure, but my -- my
12 understanding is that she -- so she was not -- her hair
13 was not coming back. She was bothered by that. That's
14 when she would have started to have adjustment --
15 that's when she started to have some adjustment
16 symptoms, but then she -- after being bothered by that,
17 then she was informed that that was likely permanent
18 once she -- I -- I guess became aware of this
19 litigation and spoke to an attorney.
20    Q   And -- and you say that she was bothered that
21 her hair wasn't coming back, and you said that's when
22 she started to have some of the symptoms; right?
23    A   Well, "bothered" is -- right "bothered" is a
24 reflection of emotional symptoms.
25    Q   And when was that that she became bothered

Page 225

1 that her hair wasn't coming back?
2    A   Sometime after the chemotherapy and radiation
3 treatment were finished.
4    Q   What -- how long? A period of six months? A
5 year?
6    A   I'm not sure.
7    Q   Do -- do you have any idea?
8    A   I -- I don't -- I mean, obviously, it's
9 limited by how much time that is, but I don't know how
10 much times that is.
11    Q   Well, when did she lose her hair?
12    A   Sometime after she started the chemotherapy
13 and radiation treatment. I -- I don't know exactly
14 when.
15    Q   And what -- what year did she start the
16 chemo? Do you remember?
17    A   I don't remember, but I can look it up.
18    Q   It's -- well --
19    A   Do you want me not to look it up?
20    Q   I think it's in your report that she had her
21 chemo in 2011?
22    A   Okay. Yeah. I can --
23    Q   Do you agree with that?
24    A   Let's -- let's let -- my -- if this is a
25 memory test, I will probably fail, so I don't want to

Page 226

1 leave it --
2    Q   I think it's right --
3    A   -- leave it to memory.
4    Q   -- in the beginning of your report.
5    A   Right. So it looks like the chemotherapy
6 started in March of 2011.
7    Q   Okay. So sometime after March 2011 and prior
8 to or -- or -- strike that. I'm going to start that
9 over.
10       Sometime after 2011, Ms. Earnest began to be
11 bothered that she -- that her hair was not growing
12 back?
13    A   Yes.
14    Q   And --
15    A   Sometime after discontinue- -- after
16 discontinuation of that treatment.
17    Q   Discontinuation of the chemotherapy?
18    A   Correct.
19    Q   And what kind of symptoms was she having at
20 that time?
21    A   I'm not sure other than she was, you know,
22 bothered, upset.
23    Q   Did she have an adjustment order?
24    A   I don't know. She may have.
25       Let's see. She had -- she had -- I think she

18 (Pages 223 - 226)

Page 231

1 BY MS. SCHULTZ:
2    Q    And in Ms. Durden's case, her realization
3 came from seeing the attorney advertisements on
4 television about the Taxotere litigation?
5        MR. EXNICIOS:
6            Objection to the form of the question.
7    A    So --
8        MS. HATTEN:
9            Durden.
10 BY MS. SCHULTZ:
11    Q    Okay.  I used the word "Durden."
12    A    You did?  Okay.  All right.
13        THE WITNESS:
14            Thank you for that.
15        MS. SCHULTZ:
16            Thank you.
17 BY MS. SCHULTZ:
18    Q    So -- so Ms. Earnest's realization that her
19 hair loss was going to be permanent came from seeing
20 the advertisements on televising about this litigation;
21 correct?
22        MR. EXNICIOS:
23            Objection to the form of the question.
24    A    So what -- what she -- now, what she told me
25 was that that's when she realized that it wasn't coming

Page 232

1 back.  But I believe that, you know, she had had hair
2 loss for a while and it wasn't coming back.  So I don't
3 think she fully understood that it was never going to
4 come back --
5 BY MS. SCHULTZ:
6    Q    Okay.
7    A    -- but it wasn't progressing well, wasn't
8 returning, so she may have had some concerns about the
9 fact that it wasn't coming back, and I think she did
10 have those, but I think the full realization that it
11 was not going to be reversible happened when she saw an
12 ad for this litigation.
13    Q    And after she saw an ad for the litigation
14 and talked with her lawyers, she then began
15 experiencing the additional feelings you described of
16 hopelessness and anger at the pharmaceutical companies;
17 correct?
18    A    I think so.
19    Q    What was so -- what was the identifiable
20 stressor for Ms. Earnest for purposes of an adjustment
21 disorder diagnosis?
22    A    Hair loss.
23    Q    Hair loss at the time of her chemotherapy?
24    A    Yes.
25    Q    And so is it your opinion that Ms. --

Page 233

1 Ms. Earnest has had an adjustment order since the time
2 she lost her hair during chemotherapy?
3        MR. EXNICIOS:
4            Objection to the form of the question.
5    A    I'm -- I'm not sure exactly of the time of
6 onset, like whether there was a period where she may
7 not have had adjustment disorder when she thought her
8 hair would promptly return.
9            She indicated to me that she was -- during
10 the acute treatment period, she felt more sick than,
11 you know, upset and denied emotional problems to me
12 during the time of the treatment period.  But sometime
13 after that.
14 BY MS. SCHULTZ:
15    Q    Well, how can you make an adjustment disorder
16 diagnosis for Ms. Earnest if you don't know whether or
17 not her symptoms began within three months of the
18 identifiable stressor?
19        MR. EXNICIOS:
20            Objection to the form of the question.
21    A    Because the stressor is ongoing, and -- and
22 so -- so, in other words, she has hair loss that's
23 persistent.
24            So, you know, it's possible that she could
25 develop an adjustment disorder in response to that

Page 234

1 anywhere along the way.  It wouldn't have to co- --
2 coincide -- to be an adjustment disorder -- for an
3 adjustment disorder to be linked to hair loss, it would
4 just be -- have to link in time with hair loss.  It
5 wouldn't necessarily have to be linked in time with the
6 immediate onset of the hair loss.
7            And so I don't know -- you know, like, the
8 question you're asking is -- to differentiate, I think,
9 the time whether she had adjustment symptoms
10 immediately upon hair loss or sometime after that,
11 prior to being informed about the -- the litigation.
12 And I don't know the precise time there, but it still
13 is temporally linked to hair loss.
14 BY MS. SCHULTZ:
15    Q    And that's all that matters for an adjustment
16 disorder is if there's some sort of temporal linkage to
17 the stressor?
18    A    There's temporal linkage to the stressor,
19 yes.
20    Q    All right.
21    A    Can I --
22    Q    One more question.
23        MR. EXNICIOS:
24            Let's take a break.
25        THE WITNESS:

20 (Pages 231 - 234)

Page 235

1      Sure.
2      MS. SCHULTZ:
3      Okay.  That's fine.
4      THE WITNESS:
5      You want to -- you want to ask one more
6   before and then take a break?
7      MS. SCHULTZ:
8      Well, I just have -- you know what, let
9   me ask this one last question, and then I can
10   move to a different area.
11   BY MS. SCHULTZ:
12   Q    You made a statement during this discussion
13   that part of the nature of litigation is -- part of the
14   nature of this litigation is that Taxotere produces
15   hair loss in some people.
16   A    No.  I -- I don't think I said that.
17   Q    Well, let me --
18   A    Go ahead.
19   Q    Let me -- my question is:  Are you giving any
20   opinion in the case of either Ms. Earnest or Ms. Durden
21   as to whether or not Taxotere can cause hair loss in
22   some people?
23   A    No.
24      MR. EXNICIOS:
25      Objection to the form of the question.

Page 236

1      MS. SCHULTZ:
2      All right.  Let's take a break.
3      THE VIDEOGRAPHER:
4      Were off the record at 10:12.
5      (A short break is taken.)
6      THE VIDEOGRAPHER:
7      Back on the record at 10:24.
8   BY MS. SCHULTZ:
9   Q    Now, you diagnosed Ms. Durden with?
10   A    You're doing Durden now --
11   Q    Durden.
12   A    -- not Earnest?
13   Q    Durden.
14   A    Okay.
15   Q    You diagnosed Ms. Durden with an adjustment
16   disorder with mixed anxiety and depressed mood.
17   A    Right.
18   Q    Correct?
19   A    Yes.
20   Q    And in your report it says "Diagnosis
21   F43.23."  What is the F43.23?
22   A    That's a -- I think it says the ICD code, I
23   think.  Or it could be the DSM code.  I'm not sure.
24   Q    And the criteria for an adjustment disorder
25   is set forth in the DSM; correct?

Page 237

1   A    Yes.
2   Q    And what is the DSM?
3   A    Diagnostic and Statistical Manual of -- it's
4   the -- basically just the list of conditions and
5   disorders and -- and their -- some diagnostic criteria
6   for them.
7   Q    So the DSM is the Diagnostic and Statistical
8   Manual of Mental Disorders?
9   A    Yes.
10   Q    And is it now the DSM-5?
11   A    I think so, yes, uh-huh.
12   Q    Do you know whether it's in the fifth edition
13   or not yet?
14   A    No.  I think it is -- I think the one we're
15   using now is the fifth.  There's probably a revision in
16   progress.
17   Q    For Ms. Durden, can you walk me through how
18   you came to a diagnosis of adjustment disorder with
19   mixed anxiety and depressed mood under the DSM
20   criteria?
21   A    It's just simply the -- an adjustment
22   disorder is an onset of emotional symptoms, and -- and
23   that can include depression symptoms, anxiety symptoms,
24   and other symptoms, like anger symptoms, you know, with
25   some temporal link to the stressor.  And, you know,

Page 238

1   it's not a major depressive disorder.  It's not
2   something -- it's not other major mental conditions.
3      So, you know, she had -- she had those
4   symptoms, and there was a temporal link described in
5   her history, and that's how I came to the diagnosis.
6      And -- and -- and then, also, when we did --
7   we did testing, she didn't have severe emotional
8   symptoms on her testing.  She didn't -- she, in fact,
9   didn't have clinical elevations on her MMPI.  She
10   didn't show any indication of exaggeration.
11      So, to the degree possible, we ruled out, you
12   know, malingering or exaggeration for purposes of the
13   litigation.  Of course, that's never possible to do
14   perfectly, but we -- we would -- you know, we looked at
15   it pretty rigorously and didn't find any -- you know,
16   didn't find -- didn't find evidence of that, evidence
17   that would lead to a diagnosis of it.
18      And so the -- that combination of the -- the
19   symptoms temporally linked to the stressor with the
20   forensic context and absence of findings -- absence of
21   a conclusion of malingering based on an examination of
22   that supported a diagnosis of adjustment disorder.
23   Q    Did you take any other steps in reaching your
24   opinion that Ms. Durden had an adjustment disorder?
25   A    Yes.  I -- I looked at the records.  I -- I

21 (Pages 235 - 238)

Page 239

1 asked her questions about prior psychiatric history.
2 She denied prior psychiatric history.
3     So those are some of the -- some other steps.
4     Q   What information from the records did you use
5 in reaching your adjustment disorder diagnosis?
6     A   Well, I mean, her history -- her history was
7 as relayed to me, which is that she had the diagnosis
8 of breast cancer and that she was treated with
9 chemotherapy. We confirmed that -- I think that she
10 had chemotherapy.
11     And so, basically, her history as she related
12 to me was consistent with what was described in the
13 records. That's -- that's the main way.
14     Q   And when you say "consistent with what was
15 described in the records," you're referring to the
16 records that you reviewed?
17     A   Sure.
18     Q   Well, was there --
19     A   Well, the -- your question there -- you --
20 you're asking -- that question is about records I
21 didn't review? Is that what you mean?
22     Q   No. You said basically her history was
23 consistent with what was described in the records, and
24 you're referring to the records in Exhibit 10?
25     A   Yeah. I'm -- I'm referring to the only

Page 240

1 medical records that I had, which -- which I now have
2 found out is not all of the records.
3     Q   And those are all in Exhibit 10?
4     A   I believe they are, yes. This -- this is --
5 it looks like -- we're talking about Durden?
6     Q   Yes.
7     A   Those are all in Exhibit 10.
8     Q   And Exhibit 11 does not contain any medical
9 records; correct?
10     A   No. It's depositions.
11     Q   All right. Now, with respect to your
12 statement that the history that she gave to you was
13 consistent with what was described in the medical
14 records, what facts did she give to you that you
15 determined were consistent with what was described in
16 the medical records?
17     A   That she was diagnosed with breast cancer and
18 that she was treated with -- at least in part, with
19 chemotherapy.
20     Q   Any other information that you determined was
21 described in the medical records?
22     MR. EXNICIOS:
23         Objection to the form of the question.
24     A   Those are the main ones.
25     This is Durden now we're talking about;

Page 241

1 right?
2 BY MS. SCHULTZ:
3     Q   Yes.
4     A   Yes. Those are the main things.
5     Q   Anything else that you can -- that you can
6 think of as --
7     A   No. Not right now.
8     Q   So what are the criteria for diagnosing an
9 adjustment disorder under the DSM?
10     MR. EXNICIOS:
11         Objection. Form.
12     A   Yeah. I mean, again, well, I did -- I did
13 answer that, I think, already, but just the onset of
14 emotional symptoms linked to the stressor -- temporally
15 linked to the stressor, not -- not -- you know, not
16 another condition like major depression. In other
17 words, the symptoms are not explained by another, you
18 know, medical condition.
19     It doesn't say this in the DSM, but in the
20 forensic context of evaluating somebody, you would want
21 to rule out malingering also.
22 BY MS. SCHULTZ:
23     Q   Are there any other criteria in the DSM for
24 diagnosing an adjustment disorder?
25     A   I mean, there may be other specific criteria,

Page 242

1 but I think that captures the spirit of the -- I mean,
2 I can -- do you want me to get the book? Are you --
3 you're quizzing my -- my -- my memory for the -- I
4 mean, can -- I can go get the book if you'd like.
5     Q   Let me -- let me ask it this way.
6     A   Okay.
7     Q   Did you use any additional DSM criteria for
8 an adjustment disorder in making your diagnosis of an
9 adjustment disorder for Ms. Durden?
10     A   I mean, at the time, I looked at the book
11 like I always do. My memory for these things is not
12 awesome, but, you know, I -- I felt it was consistent
13 with the description in the DSM.
14     Q   Well, your report doesn't include the DSM
15 criteria; correct?
16     A   Well, my -- you mean, I don't -- I don't
17 write out the DSM criteria in my report? Is that your
18 question?
19     Q   Yes.
20     A   I do not write out the criteria in my report.
21     Q   Is it correct that you also don't provide an
22 analysis of how Ms. Durden meets the criteria in your
23 report?
24     A   That's true.
25     MR. EXNICIOS:

22 (Pages 239 - 242)

1        Objection to the form of the question.
2 BY MS. SCHULTZ:
3    Q   All right.  Now, for Ms. Earnest.
4    A   Okay.  The same -- similar questions, I would
5 guess, yes.
6    Q   Could you walk us through the process you
7 used to come to -- well, strike that.  I'm going to
8 start that whole question over.
9        For Ms. Earnest, you also diagnosed her with
10 an adjustment disorder with mixed anxiety and depressed
11 mood; correct?
12    A   Yes.  Although -- let me see.  And that --
13 that's probably misstated for Ms. Earnest.  That one
14 probably should be just with anxiety, not with -- not
15 with mixed anxiety and depressed mood.  It should be
16 just -- just for the anxiety.
17        She denies depression and she doesn't have --
18 I think her problem -- her predominant symptom for
19 Ms. Earnest is anxiety.
20    Q   Okay.  So on -- on page 9 of --
21    A   Right.
22    Q   -- your Earnest report, which is -- and your
23 Earnest report is Exhibit 9?
24    A   Right.
25    Q   On page 9 under the heading "Summary and

1 Recommendations" --
2    A   Right.
3    Q   -- in all caps it says "Diagnosis F43.23."
4    A   Right.
5    Q   "Adjustment Disorder with Mixed Anxiety and
6 Depressed Mood."
7    A   Right.
8    Q   Correct?
9    A   Right.
10    Q   And you're now saying that diagnosis is not
11 correct?
12    A   It should probably be -- well, it's -- it is
13 still an adjustment disorder, so in that sense it's
14 correct, but it should probably be an adjustment
15 disorder with anxiety as opposed to with mixed -- with
16 adjust- -- with depression and anxiety.
17    Q   When did you decide that your diagnosis
18 should be an adjustment disorder with mixed anxiety as
19 opposed to an adjustment disorder with mixed anxiety
20 and depressed mood?
21    A   Well, I -- I probably put the wrong
22 specific one down is all.  And -- and, again, they're
23 close.  They're both adjustment disorders.  I just --
24 I -- I use that one more frequently, and -- and it may
25 have been just a typographical error.  But I didn't --

1 you know, I -- I thought that all along that her -- her
2 main problem was anxiety.
3    Q   Now, when you diagnose an adjustment disorder
4 under the DSM, you're required to designate the type of
5 adjustment disorder; correct?
6    A   Well, I think there's one that's not
7 designated, and there's like a nonspecific one, I
8 think, but -- but usually there's some modifier that
9 designates that.
10    Q   And there are different letters and numbers
11 for each subtype; correct?
12    A   I think there's a different number.
13    Q   Okay.  In other words, F43.23 is adjustment
14 disorder with mixed anxiety and depressed mood;
15 correct?
16    A   Yes.
17    Q   Is there any information you reviewed between
18 the time you wrote your report and today that causes
19 you to now decide that her diagnosis should be
20 adjustment disorder with mixed anxiety?
21    A   Yeah.  And, look, I understand you're not
22 trying to -- you know, you're just asking a question,
23 but I think I already said I think that was my
24 impression all along.  I may have just put the wrong
25 one down.  You just said caused me to change my

1 opinion, which I don't -- I don't think I did.  I just
2 probably put down the wrong one.
3        If you look in my report, it says -- when --
4 when I talk about -- if you look -- on page 10, it says
5 "She has emotional symptoms that include anxiety and
6 avoidance and most -- most significantly impact her
7 social functioning."
8        And I should add -- I should add that the
9 other criteria for adjustment disorder, which I
10 probably failed to mention before for -- in your
11 questioning about Ms. Durden, the other criteria is
12 that it has an impact on social, occupational, and some
13 other areas of functioning.  And that's another kind of
14 element to the adjustment disorder diagnosis.
15        And so, you know, I felt all along that with
16 Ms. Earnest, the problem was more anxiety than
17 depression.
18    Q   And so you just said for a DSM diagnosis, you
19 have to determine that the symptoms are having some
20 sort of an impact on social, occupational, or other
21 functioning?
22    A   Yes.
23        MR. EXNICIOS:
24            Object to the form.
25    A   Social, occupational, and there's another --

23 (Pages 243 - 246)

Page 247

1 there's another one.  I can't remember the other
2 category.
3 BY MS. SCHULTZ:
4     Q    So can you walk us through what you did to
5 come to a diagnosis of an adjustment disorder for
6 Ms. Earnest?
7     A    Okay.  So --
8        MR. EXNICIOS:
9           Objection to the form.
10    A    -- I conducted a history.  I reviewed
11 records.  I administered testing.  The testing included
12 an examination of performance and symptom validity,
13 looking to see if there was exaggerated symptoms or
14 even -- even diagnosable malingering.  And then, you
15 know, looked at the records and -- and some other
16 things.  I guess -- I guess records and -- you know, as
17 listed in my report, and -- and then, you know, put
18 that -- all that information together, and that's how I
19 came to the diagnosis.
20 BY MS. SCHULTZ:
21    Q    And --
22    A    That may not be an answer to your question,
23 though.
24    Q    Well, all of the information that forms the
25 basis of your diagnosis, you've set forth in your

Page 248

1 report for Ms. Earnest?
2        MR. EXNICIOS:
3           Objection to the form.
4     A    Yes.  Although, again, I have recently found
5 out that there was materials that I didn't receive, and
6 so now I -- I'm going to -- I'm going to want to go
7 back and look at those materials.
8 BY MS. SCHULTZ:
9     Q    And those materials obviously played no role
10 in your diagnosis and the conclusions set forth in your
11 report; correct?
12    A    Correct.
13    Q    And same with Ms. Durden:  All of the
14 information that you relied upon for your diagnosis of
15 an adjustment disorder for Ms. Durden, is that
16 contained in your report for Ms. Durden?
17    A    Say that again?
18    Q    Is --
19    A    All the information?
20    Q    -- the information you relied upon in
21 reaching your conclusion that Ms. Durden has a
22 diagnosis of adjustment disorder, is that all set forth
23 in your report for Ms. Durden?
24    A    Yes.  I mean --
25    Q    Now --

Page 249

1     A    -- the information that I have relied upon us
2 until this time, right?  Which I think is what you're
3 asking about.
4     Q    Now, can you walk me through how you applied
5 the DSM adjustment disorder criteria to Ms. Earnest?
6     A    You know, there's not -- I mean, adjustment
7 disorder criteria are not elaborate.  I mean, it's
8 basically, you know, emotional symptoms, a temporal
9 link to the -- a temporal link to the stressor and, you
10 know, in the forensic context, an absence of
11 malingering, and that it had some impact on her social
12 functioning for her.  So those are the ways that I came
13 to that conclusion with Ms. -- with Ms. Earnest.
14    Q    And I'm sorry.  You said it had a what social
15 impact?
16    A    It had an impact on her social functioning.
17    Q    And can you summarize for me how you
18 determined that her emotional symptoms had a temporal
19 link to the stressor?
20        MR. EXNICIOS:
21           Objection to the form.
22    A    That was in her history.
23 BY MS. SCHULTZ:
24    Q    And what was that?
25    A    We -- we talked about that.  So that -- so,

Page 250

1 in other words, the answer to that question is by
2 history, by her history.
3     Q    And by what she reported to you?
4     A    Yes.
5     Q    Okay.  And what did she report to you that
6 caused you to determine that her symptoms had a
7 temporal link to the stressor?
8     A    So her description about -- about her
9 emotional response to hair loss in general, which has
10 to do with, you know, her discomfort with wearing the
11 wig or a turban.  And her -- her description of that is
12 all of page 3.  And then -- and then her description
13 about kind of later realizing that it was not going to
14 come back.
15        So that -- all of that is laid out in -- on
16 page 2 and 3 in my report.
17    Q    And you said that it had an impact on her
18 social functioning?
19    A    Yes.
20    Q    And -- and how did it have an impact on her
21 social functioning?
22    A    On page 3 of my report, it says "She feeling"
23 -- "she reports feeling uncomfortable and upset when
24 she's in public wearing her turban because she gets
25 looks and questions from strangers.  Therefore, she

24 (Pages 247 - 250)

Page 251

1 avoids social situations and these feelings by not
2 going to social events."
3     She reports feeling anxious about being in
4 public even when she is wearing a wig or turban.  When
5 she wears a wig, she worries it's not on correctly.  I
6 already -- the -- "She avoids going out in public."
7 I'm now up above that.  "She avoids going out in public
8 because she does not want to deal with being seen in
9 public with a head scarf.  She avoids social
10 circumstances."
11     So what it's caused with her is some social
12 anxiety and social avoidance having to do with the
13 accommodations to the hair loss which are either for
14 her a head scarf or turban or -- or a wig.
15   Q   And now I'm switching back to your diagnosis
16 of Ms. Durden of adjustment disorder.  All right?
17   A   Okay.
18   Q   And you said you -- you referred to her
19 emotional symptoms that you relied on in making your
20 diagnosis.
21   A   Uh-huh, yes.
22   Q   And what were those emotional symptoms?
23   A   Those are listed on page 3 of my report.
24     "Hurt feelings.  Cried a lot about not being
25 able to look like herself.  Identity issues.  Feeling

Page 252

1 unattractive.  And some rumination about having --
2 thinking about it a lot, thinking about not having
3 hair.
4   Q   And then when we were talking about
5 Ms. Earnest, you added an -- the element that the
6 symptoms must have an impact on social, occupational,
7 or other functioning --
8   A   Uh-huh.  Yes.
9   Q   -- for a diagnosis; correct?
10   A   Yes.
11     MR. EXNICIOS:
12       Objection to the form.
13 BY MS. SCHULTZ:
14   Q   And did you determine that Ms. Durden's
15 symptoms had an impact on her social functioning?
16   A   Yes.
17   Q   Did you determine that her symptoms had an
18 impact on her occupational functioning?
19   A   No.
20   Q   Did you determine that her symptoms had an
21 impact on any other type of functioning?
22   A   No.
23   Q   And --
24   A   It's social.
25   Q   And how did her symptoms have an impact on

Page 253

1 her social functioning?
2     MR. EXNICIOS:
3       Objection to the form.
4   A   She feels self-conscious about either the wig
5 or the baseball cap, feels embarrassed, and so she
6 avoids -- avoids social situations.  She reports to me
7 that she used to socialize two to three times per week
8 and now it's more likely two to three times per month.
9 So she's had a reduction in her social life, and that's
10 the -- that's the impact on her social functioning.
11 BY MS. SCHULTZ:
12   Q   Did you do anything to determine whether the
13 symptoms reported to you by Ms. Earnest could be
14 corroborated with any other evidence?
15     MR. EXNICIOS:
16       Objection to the form of the question.
17   A   In -- in the deposition of her daughter, I
18 think there is some description of that.  Although, I
19 have to look at it.  I can't remember right now.  That
20 would -- so the question of whether or not the symptoms
21 and the social functioning is -- could be discussed and
22 corroborated in there, and I don't -- I don't --
23 sitting here right now, I'd have to check it to
24 remember if it is or not.
25     But other than that -- other than the

Page 254

1 daughter's deposition, I would have no other way of
2 checking that.  And I mean -- I mean, I would have
3 another way, which would be to talk to a collateral,
4 which I plan on doing, but I don't have -- I haven't
5 done that as of yet.
6 BY MS. SCHULTZ:
7   Q   Now, the deposition of your -- the daughter,
8 you don't refer to any of her deposition testimony in
9 your report; correct?
10   A   I -- I mentioned that I had it and reviewed
11 it, but I didn't summarize it.
12   Q   Okay.  But you don't mention in your report
13 that the dep-- -- any deposition testimony of the
14 daughter speaks to any of Ms. Durden's symptoms;
15 correct?
16   A   Yeah.  I don't -- I don't mention that --
17     MR. EXNICIOS:
18       Objection to the form of question.
19   A   I don't mention that in the report, right.
20 BY MS. SCHULTZ:
21   Q   And you think that her -- the deposition of
22 Ms. Durden's daughter may have information about
23 Ms. Durden's symptoms, but you're not sure one way or
24 the other?
25   A   I can't remember right now.

25 (Pages 251 - 254)

Page 255

1   Q   And you said you would have no other way of
2   corroborating the symptoms other than to talk to a
3   collateral.  What did you mean by that?
4      A   So she's not dating, but she's still friends
5   with her daughter's father, so that would be one
6   person.  I could speak with the daughter also.  I could
7   speak to anyone who would potentially have social
8   contact with her and would be -- would have been part
9   of her social life to examine whether or not there's
10  been a change.
11     Q   And -- but you didn't do that in reaching
12  your opinions; correct?
13     A   Correct.
14     Q   You could also read depositions of her
15  friends and family members; correct?
16     A   Do such things exist?
17     Q   Yes.  They exist.
18     A   They do?
19     Q   Yes.
20     A   Then I could, yes.
21     Q   But you have not read -- other than the
22  deposition of Ms. Durden's daughter, you have not read
23  any depositions of Ms. Durden's friends and family;
24  correct?
25     A   I have not.

Page 256

1   Q   But you do agree that reading those
2   depositions would be helpful to determine if there is
3   collateral -- through those collateral sources to
4   determine whether or not there is corroborating
5   evidence of the symptoms that Ms. Durden reported;
6   correct?
7      A   It could be --
8      MR. EXNICIOS:
9         Objection to the form.
10     A   It could be useful for that.
11  BY MS. SCHULTZ:
12     Q   And you could also look for corroborating
13  evidence of the symptoms Ms. Durden reported in her
14  medical records; correct?
15     A   Well, it would -- that would depend on -- I
16  mean, you can look for it.  It doesn't mean it would be
17  there necessarily.  It would depend on what kind of
18  treatment she got and whether or not people were even
19  paying attention to those kind of things.  Many times,
20  they don't.
21     MS. SCHULTZ:
22        We're out of tape, so we need to stop
23     for a moment.
24     THE VIDEOGRAPHER:
25        We're off the record.  It's the end of

Page 257

1   Tape 2 [sic] at 10:53.
2         (A short break is taken.)
3   THE VIDEOGRAPHER:
4         Back on the record at 10:57.  Beginning
5      of Tape 4.
6   BY MS. SCHULTZ:
7      Q   With respect to Ms. Earnest, in reaching your
8   diagnosis, did you make any effort to determine whether
9   or not the symptoms she reported to you were
10  corroborated by any other evidence?
11     MR. EXNICIOS:
12        Objection to the form.
13     A   I mean, I looked in her medical records.  I
14  looked at her deposition.  I looked at the deposition
15  of her physician.  Those are all places where you would
16  look for corroboration.  I don't recall right now
17  whether or not that corresponded, but the -- the -- and
18  that's kind of what I did.
19  BY MS. SCHULTZ:
20     Q   Well, you said you looked in her medical
21  records.  Was there any corroborating evidence in her
22  medical records?
23     A   There was no -- I don't -- I don't recall
24  there being any mention of psychological symptoms from
25  Ms. Earnest in the medical records.

Page 258

1   Q   In your review of the medical records, did
2   you see anywhere where Ms. Earnest talked to any of her
3   treating physicians about her hair loss?
4      A   I -- I don't recall that.
5      Q   And you said you looked in her deposition,
6   and that would be Ms. Earnest's own sworn testimony;
7   correct?
8      A   Yes.
9      Q   Okay.  And then you said -- did you say you
10  looked at the deposition of her physician?
11     A   James Carinder.
12     Q   And what kind of physician is Dr. Carinder?
13     A   I'm not sure.
14     Q   Was there any corroborating evidence of the
15  symptoms Ms. Durden reported to you in the deposition
16  of Dr. Carinder?
17     A   I -- I don't recall right now.
18     Q   And you had asked for an interview of a
19  significant other of Ms. Earnest; correct?
20     A   Yes.
21     Q   And you did not conduct such an interview;
22  correct?
23     A   Yes.
24     Q   And you have not read the deposition of her
25  husband; correct?

26 (Pages 255 - 258)

1    A    I have not read the deposition.  I -- I -- is
2  there a -- well, she's not married, though.  Is that
3  her --
4    A    Mrs. Earnest is married.
5    A    I'm sorry.  I'm mixing up Durden and Earnest.
6  So, right, Ms. Earnest is married.
7        And there's a deposition of her husband?
8    Q    Yes.  There is a deposition of her husband.
9    A    Okay.  I didn't read that, no.
10   Q    And --
11   A    It wasn't provided to me.
12   Q    -- it would be very helpful to your review
13  and reaching opinions regarding Ms. Earnest to read the
14  deposition of a husband of 40 years.  Do you agree?
15       MR. EXNICIOS:
16           Objection to the form.
17   A    I -- I mean, it can be -- it certainly can be
18  helpful.  It may or may not depending on what is
19  contained therein, but it's -- it's -- it would be -- I
20  would like to do it.  I'd like to review it.
21  BY MS. SCHULTZ:
22   Q    And that's what you asked for at the outset;
23  correct?
24   A    Yes.
25   Q    The opportunity to review all of the

1  depositions in both the cases of Ms. Earnest and
2  Ms. Durden; correct?
3    A    Yes.
4    Q    Along with all of the medical records?
5    A    Yes.
6    Q    And along with the opportunity to conduct a
7  collateral interview of a significant other of both
8  Ms. Earnest and Ms. Durden; correct?
9    A    Yes.
10       MR. EXNICIOS:
11           Objection to the form.
12  BY MS. SCHULTZ:
13   Q    What type of symptoms would you expect to see
14  in an individual who has permanent hair loss?
15       MR. EXNICIOS:
16           Objection to the form.
17   A    There's -- you said "permanent hair loss."
18  I'm not sure that there's been much studied about --
19  well, permanent hair loss, there have been studies of
20  folks with -- let me think.  There probably has been
21  some studies of people with permanent -- of women with
22  permanent hair loss, but there's reports of just
23  increased emotional symptoms, like anxiety and
24  depression, in -- in folks with hair loss and permanent
25  hair loss, I believe.

1  BY MS. SCHULTZ:
2    Q    Reports of increased emotional symptoms with
3  people that have hair loss and permanent hair loss?
4    A    Yes, I think so.
5    Q    And what is the basis of that statement?
6    A    Just clinical studies of emotional symptoms
7  in those patients.
8    Q    And do you know what those clinical studies
9  are that you're referring to?
10   A    And this is the thing that we talked about
11  earlier that I didn't prepare the whole -- the list of
12  research or, you know, bring the research with me.  I
13  don't have that committed to memory.
14   Q    And when you -- when -- so are you saying you
15  would expect to see increased emotional symptoms from
16  individuals who have had hair loss and permanent hair
17  loss?
18       MR. EXNICIOS:
19           Objection to the form.
20   A    Yes.
21  BY MS. SCHULTZ:
22   Q    And what kind of emotional symptoms would you
23  expect to see?
24   A    Yeah.  We -- I -- I said anxiety and
25  depression symptoms.

1    Q    And anxiety and depression symptoms of any
2  certain type?
3    A    No.
4    Q    Would you expect to see an impact on the
5  individual's social functioning?
6    A    Yes.
7    Q    In what ways?
8    A    Embarrassment, avoidance.
9        And I'm -- so you're asking me in -- in
10  general -- you're asking me in general terms, not about
11  these two ladies?
12   Q    Correct.
13   A    All right.  And so I'm -- I'm aware that
14  there is studies on emotional symptoms.  As I'm sitting
15  here right now, I cannot recall if there are any
16  symptoms specifically on -- you -- you asked me if --
17  would I expect that, and -- and so now I'm coming back
18  to the recognition that that question is about the
19  literature, and I'm not sure as I sit here right now
20  if -- if there was any article specifically on
21  occupational -- I mean, on social functioning.  I'm not
22  sure if it was.  I know that there was some articles
23  that included the concept of quality of life, and I
24  believe that the social function may be an element of
25  that concept.

27 (Pages 259 - 262)

Page 271

1          Objection to the form of the question.
2 BY MS. SCHULTZ:
3     Q    -- statement you made.
4     A    What's the question?
5     Q    Do you recall testifying that Ms. Earnest
6 reported that she wasn't given information that
7 Taxotere was different than other drugs in terms of
8 hair loss?
9     A    Yeah.  I think what I -- what I said was
10 she -- she has a statement that she told me that she
11 found out that it was not going to -- that her hair was
12 not coming back when she saw an ad for the litigation
13 in either 2015 or 2016.
14          So, from that statement, it was my belief
15 that she -- despite the fact that she had a, you know,
16 significant time with -- I mean a -- you know, a fair
17 amount of time with hair loss, that -- that she thought
18 it still might come back.  So that -- that's my
19 understanding.
20     Q    Well, and my -- my question was more along
21 the lines of what Ms. Durden was or was not warned
22 about in respect to the drug Taxotere.
23     A    Okay.
24     Q    So let me -- let me ask a better question.
25     A    Okay.

Page 272

1     Q    Did Ms. -- well, let's stick with Ms. Earnest
2 for now.  Did Ms. Earnest make any statements to you
3 about what risks and side effects she was warned of
4 with taking the drug Taxotere?
5     A    She didn't -- she didn't -- other than --
6 this -- Ms. Earnest now saying that she wasn't informed
7 that she would be permanent -- she would have permanent
8 hair loss, that's the only thing that she explained to
9 me.
10     Q    Do you know whether or not Ms. Earnest was
11 informed about the potential of her hair not regrowing?
12     A    No.
13     Q    And have you done anything to try to
14 corroborate the statement to you made by Ms. Earnest?
15     A    No.
16     Q    Do you know if there were other individuals
17 present at Ms. Earnest's appointments with her
18 oncologist where those risks and side effects were
19 discussed?
20     A    I don't know that.
21     Q    Is that information that you would want to
22 find out in terms of diagnosing Ms. Earnest?
23     A    Well, I -- I suppose it may be, you know,
24 important in a small way, but it's not -- it wouldn't
25 change the fact that she has permanent hair loss.  So,

Page 273

1 fundamentally, we're dealing with folks with permanent
2 hair loss.
3          Now, this -- this element of not being
4 informed plays some minor role, but -- plays some role,
5 but it -- it's not -- it's not the only basis for
6 diagnosing her with adjustment disorder.  The
7 adjustment disorder diagnosed is fundamentally based on
8 the fact that she has persistent hair loss.
9     Q    Well, is there a difference between
10 persistent and permanent hair loss?
11     A    I guess "permanent" means you know that it
12 will never return.  "Persistent" means it's still going
13 on up until the current time.
14          So, I mean, I don't know if somebody's going
15 to come -- discover some miracle cure a couple of years
16 from now for this, but persist- -- that's why I used
17 the word "persistent."  "Persistent" is a little less
18 definite, I guess, as far as the future than the word
19 "permanent."
20     Q    And were those just definitions that you made
21 up?
22     A    I think -- I think that I try to use the --
23 the English language.  I -- I -- I was just explaining
24 my use of those because I thought that's what your
25 question was about.

Page 274

1     Q    Do you know if there is a definition of
2 "permanent hair loss" that is used in dermatology?
3     A    Yeah.  That would be outside my expertise.
4     Q    And the same --
5     A    Or, you know, I'm not an expert on permanent
6 hair loss.
7     Q    And do you know if there is a definition of
8 "persistent hair loss" that would be used by
9 dermatologists?
10     A    I don't know that.
11     Q    Now, the -- the symptoms, though, that you
12 said Ms. Earnest had after the time when she was
13 informed that her hair loss was permanent were things
14 like anger towards the pharmaceutical company, anger --
15 I think you reported -- you said the words about not
16 having a choice, that kind of thing.
17          MR. EXNICIOS:
18          Objection to the form.
19 BY MS. SCHULTZ:
20     Q    Correct?
21     A    Yeah.  I'm sorry.  That -- that question
22 folded over on itself a little bit, so let me -- would
23 you mind asking it again so I can understand?  I
24 can't -- I don't -- I don't -- I can't tell if you
25 asked me -- were you asking me what she told me?

30 (Pages 271 - 274)

Page 283

1 BY MS. SCHULTZ:
2    Q   And is this the diagnostic criteria for
3 adjustment disorders in the DSM-5?
4    A   Yes.
5    Q   I just want to ask you some questions --
6    A   Sure.
7    Q   -- about the criteria.
8        Under the heading "Adjustment Disorders,"
9 there is a heading of "Diagnostic Criteria"; correct?
10   A   Yes.
11   Q   And then if you look on the next page,
12 there's a heading of "Diagnostic Features" and there's
13 also a heading of "Prevalence."
14       Do you see that?
15   A   Yes.
16   Q   And it says that, "Adjustment disorders are
17 common; although, prevalence may vary widely as a
18 function of the population study and the assessment
19 methods used."
20       Do you agree with that?
21   A   It says that.
22   Q   Okay.  What different kind of assessment
23 methods are there for determining if someone has an
24 adjustment disorder.
25       Do you know?

Page 284

1    A   The -- I mean, that -- that's referring to
2 the method used in the -- in the studies.  So
3 they're -- what they're saying there is that the
4 prevalence varies depending on which method that you
5 use and that -- that would include interviews,
6 structured interviews, symptom surveys, questionnaires,
7 some combination.
8        So, in other words, the method -- the method
9 could vary in terms of how the symptoms were assessed.
10   Q   Do you have -- personally have any knowledge
11 as to the -- an estimate of the percentage of people in
12 an outpatient population that have been diagnosed with
13 an adjustment disorder?
14   A   I mean, the outpatient pop- -- they have it
15 here.  They talk about it 5 to 20 percent.
16   Q   You're reading from the DSM right now?
17   A   Sure.
18   Q   Yes.  Right?
19   A   You asked about outpatient population; right?
20   Q   Correct.
21       And do you agree with that, that it could be
22 anywhere from 5 to 20 percent?
23   A   I mean, agree with it.  I'm assuming there
24 that they are taking that from research that they
25 reviewed.  That's what this document -- the -- the book

Page 285

1 itself is based on.
2        So, you know, I -- I think that what that
3 just means is that different studies have shown a
4 different prevalence depending on how they look at it
5 from 5 to 20 percent.  So, yeah, I think that's right.
6    Q   Do you agree that an adjustment disorder can
7 be a common response to someone being diagnosed with a
8 medical illness?
9    A   Yes.
10   Q   An adjustment disorder can be a common
11 response for someone diagnosed with breast cancer?  Do
12 you agree?
13   A   Some people -- yes, some patients with breast
14 cancer have adjustment disorders.
15   Q   Well, does Ms. Durden have an adjustment
16 disorder as a result of her diagnosis with breast
17 cancer?
18   A   I don't think now she does.
19   Q   And what do you base that statement on?
20   A   Her history.
21   Q   And what do you mean when you say, "Her
22 history"?
23   A   She -- she -- the way she described the
24 history was the -- that the emotional symptoms are
25 temporally linked to the hair loss.

Page 286

1    Q   Well, aren't the emotional symptoms
2 temporally related to her breast cancer diagnosis?
3    A   They're -- well, let's see.
4        Talking about Ms. Durden now; right?
5    Q   Yes.
6    A   Yeah, I don't think it was linked to -- to
7 the breast cancer diagnosis because she reports that it
8 was linked to the hair loss.
9    Q   So you're basing that opinion on Ms. Durden
10 telling you that her symptoms are linked to her hair
11 loss?
12   A   Yes.
13   Q   Anything else you're basing that -- your
14 opinion on?
15   A   No.  It's based on --
16       MR. EXNICIOS:
17           Objection to the form of the question.
18   A   -- based on her history.
19 BY MS. SCHULTZ:
20   Q   The history she reported to you?
21   A   Correct.
22   Q   Okay.  Do you know what type of symptoms
23 Ms. Durden experienced -- emotional symptoms that
24 Ms. Durden experienced as a result of her breast cancer
25 diagnosis, and whether or not those symptoms continued

33 (Pages 283 - 286)

Page 287

1 after her treatment was over?
2    A   It's my understanding that she didn't have
3 emotional symptoms during the -- during the breast
4 cancer diagnosis, at least, that's my understanding.
5 She didn't give a history of that, and I didn't see
6 that in her records, that her emotional symptoms begin
7 with the hair loss.
8    Q   What did you not see in the records?
9    A   That any -- any description of emotional
10 symptoms during the time she was getting treated for --
11 for -- for breast cancer.
12    Q   Well, didn't her hair loss occur during the
13 time she was being treated for breast cancer?
14    A   Yes.
15    Q   What kind of emotional symptoms did
16 Ms. Durden have pertaining to her breast cancer
17 diagnosis after her treatment ended?
18    A   (Views document.)
19    Q   I didn't see any mention in your report.
20    A   Yeah.  I'm -- I'm just checking.  I'm not
21 aware of any.  I'm not aware of any emotional symptoms.
22    Q   So you're not aware that she continued to
23 have a fear of dying for many years after her breast
24 cancer diagnosis?
25    A   That may have been in her deposition.  I

Page 288

1 don't recall right now, though.
2    Q   Do you know whether or not she had --
3 whether, after she lost several family members, she
4 reported to her physician that she was afraid she would
5 be next and have -- was having anxiety over that?
6    A   That may be in her deposition.
7    Q   You don't know one way or the other?
8    A   I just don't recall sitting here right now.
9    Q   And you don't recall reading that in any
10 medical record; correct?
11    A   I don't.
12    Q   What did you do to rule out any other causes
13 for Ms. Durden's adjustment disorder with mixed
14 depression and anxiety?
15    A   I looked at her prior -- I asked her about
16 prior psychiatric history, and I asked her about, you
17 know, prior emotional symptoms as -- in asking about
18 prior psychiatric history.
19         I looked at, again, malingering as a possible
20 or alternate cause and -- and employed a methodology to
21 rule that out or -- or in.  Looked at the medical
22 records in terms of her -- you know, how -- whether --
23 whether it corresponded to her history and what
24 happened to her medically.  And -- and those are the
25 main things I did.

Page 289

1         But you don't know if there is other
2 information in the medical records and depositions you
3 haven't received that would be important to a
4 differential diagnosis of Ms. Durden's symptoms;
5 correct?
6         MR. EXNICIOS:
7            Objection as to form.
8    A   Could you say that one again?
9 BY MS. SCHULTZ:
10    Q   You don't know whether or not there is
11 information in the medical records you have not yet
12 reviewed, and depositions, that could be important to a
13 differential diagnosis for Ms. Durden's symptoms;
14 correct?
15    A   Yes.
16         MR. EXNICIOS:
17            Same objection.
18    A   That -- that's correct.
19 BY MS. SCHULTZ:
20    Q   And what did you do to rule out other
21 possible causes of Ms. Durden's -- Ms. -- strike that.
22         What did you do to rule out other possible
23 causes of Ms. Earnest's symptoms and diagnosis?
24    A   So it's the same answer -- so you -- we're --
25 we're switching now from Ms. Durden to Ms. Earnest;

Page 290

1 correct?
2    Q   Yes.
3    A   So it's the same answer, which is I
4 interviewed her, asked her about these symptoms.  I,
5 you know, took a history of the symptoms.  I asked her
6 about -- I mean, I looked at the medical records to
7 examine -- you know, just in part to see if the -- the
8 medical treatment was as she described.  I employed a
9 method of looking at exaggeration of symptoms and --
10 and looking specifically at the question of
11 malingering, and looked at records, and that's
12 basically the methodology that I used.
13    Q   Well, how did you determine that
14 Ms. Earnest's symptoms were not due in whole or in part
15 due to her cancer diagnosis?
16    A   Because that's -- by her history.  Her
17 history is that -- that her symptoms were, you know,
18 related to -- the -- the specific symptoms that I
19 describe in there were related to hair loss.
20         Now, it doesn't mean that she doesn't have
21 any symptoms related to her breast cancer diagnosis.
22 She certainly may have some symptoms related to her
23 breast cancer diagnosis.  She didn't give me a history
24 of that, but she linked her symptoms in her history to
25 hair loss.

34 (Pages 287 - 290)

Page 291

1   Q   And you don't know whether or not there may
2 be information in the medical records and other
3 documents and depositions that you have not yet
4 reviewed that would be important for making a
5 differential diagnosis with respect to Ms. Durden; is
6 that correct?
7       MR. EXNICIOS:
8           Objection to the form.
9   A   So your -- just -- the question -- the
10 question there is:  I don't know what's in the records
11 that I did not review.
12 BY MS. SCHULTZ:
13   Q   Correct.
14   A   If there's anything that would impact a
15 differential diagnosis specifically of adjustment
16 disorder.
17       That's the question?
18   Q   Correct.
19   A   Yes.  I don't know.
20   Q   All right.  And looking back at Exhibit 14,
21 if you can turn to the first page, this is the DSM
22 criteria for adjustment disorders.
23   A   Uh-huh.
24   Q   And you see where it says "Diagnostic
25 Criteria" on the first page?

Page 292

1   A   Yes.
2   Q   And "Diagnostic Criteria," that phrase means
3 what?
4   A   Just -- it just means list of symptoms or
5 aspects of the symptoms that are important for making a
6 diagnosis.
7   Q   And are these DSM criteria necessary for
8 making a diagnosis?
9   A   Yes.  They're -- they're -- yes.
10   Q   Well, let's look at the first one, capital
11 "A."  "The development of emotional or behavioral
12 symptoms in response to an identifiable stressor
13 occurring within three months of the onset of the
14 stressor"; is that correct?
15   A   Yes.
16   Q   So you must first determine -- you must first
17 identify the stressor?
18   A   Yes.
19   Q   Determine what the identifiable stressor, is
20 and then determine that the onset of the emotional or
21 behavioral symptoms occurred within three months of the
22 onset of that stressor; correct?
23   A   Yes.  Except, in this situation, we have a
24 stressor that's continuous, which is different.
25   Q   Well, are -- are you saying that if you have

Page 293

1 a continuous stressor, it doesn't matter when the
2 symptoms began with respect to that stressor?
3   A   I'm saying that that -- that the adjustment
4 disorder can begin in relation to the stressor -- to
5 the stressor.  It doesn't have -- it doesn't have to
6 begin -- in other words, let's say the -- the hair loss
7 began on February 1st.  The stressor doesn't have to
8 begin three months -- it doesn't have to begin within
9 three months of February 1st to be an adjustment
10 disorder.
11       In other words, if the -- if the -- if the
12 hair loss is continuous, then it can begin sometime
13 within three months of hair loss because it's
14 continuous.
15   Q   So in that case, would you even have an
16 identifiable stressor?
17   A   Sure.  You would.
18   Q   Hair loss at some point in time?
19   A   You have -- hair loss would be the
20 identifiable stressor, right.  And it would -- and it's
21 a continual stressor.
22   Q   And "Diagnostic Criteria, B," says, "These
23 symptoms or behaviors are clinically significant."
24       What does "clinically significant" mean?
25   A   Meaning the -- well, it says there "As

Page 294

1 evidenced by the" -- "the following."  So they define
2 what they mean by "clinically significant."
3       In this particular case --
4   Q   Well, do -- but do you have --
5       MR. EXNICIOS:
6           Whoa, let him finish, please.
7 BY MS. SCHULTZ:
8   Q   My -- but --
9       MR. EXNICIOS:
10           Go ahead, Doctor.
11 BY MS. SCHULTZ:
12   Q   I wasn't asking you what the DSM says.  I
13 think you're misinterpreting my question.
14   A   Okay.
15   Q   My question for you is:  To you, what does
16 the phrase "clinically significant" mean?
17   A   It means important enough to warrant clinical
18 designation or attention.
19   Q   When you say "clinical designation" --
20   A   Right.
21   Q   -- what does that mean?
22   A   Like a -- a diagnosable condition.
23   Q   And is it significant enough to need
24 treatment?
25   A   I -- I don't think that is always what

35 (Pages 291 - 294)

Page 295

1 "clinically significant" means.
2   Q   Okay.  So under the second criteria, "B," it
3 states:  "These symptoms or behaviors are clinically
4 significant as evidenced by one or both of the
5 following."  And then it has two specific subcriteria;
6 correct?
7   A   Yes.
8   Q   Okay.  The first one is, "Marked distress
9 that is out of proportion to the severity or intensity
10 of the stressor, taking into account the external
11 context and the cultural factors that might influence
12 the symptom severity and presentation"; is that
13 correct?
14   A   That's what it says.
15   Q   And the second is, "Significant impairment in
16 social, occupational, or other important areas of
17 functioning"; correct?
18   A   Yes.
19   Q   And then the third criteria, "C," says, "The
20 stress-related disturbance does not meet the criteria
21 for another mental disorder and is not merely an
22 exacerbation of a pre-existing mental disorder";
23 correct?
24   A   That's what it says.
25   Q   And that's -- do you agree that's the third

Page 296

1 criteria?
2   A   I do.
3   Q   And the fourth criteria is capital "D."  "The
4 symptoms do not represent normal bereavement"; is that
5 correct?
6   A   Yes.
7   Q   What does that mean," The symptoms do not
8 represent normal bereavement"?
9   A   "Bereavement" means grief.  Like -- like if
10 you had a loss and you have grief about the loss.
11   Q   So the symptoms don't represent how someone
12 would normally be bereaved in that type of situation?
13     MR. EXNICIOS:
14       Objection to the form.
15   A   I -- I don't know.  I mean, it basically
16 refers to normal grieving.  So, in other words, if --
17 if a woman loses her husband and has a period of time
18 where she's sad about the loss of her husband, that's
19 not an adjustment disorder.  That's -- that's normal
20 bereavement.
21 BY MS. SCHULTZ:
22   Q   Because that would be a normal reaction to
23 the loss of a husband?
24   A   Yes.
25   Q   And then the last criteria:  "Once the

Page 297

1 stressor or its consequences have terminated, the
2 symptoms do not persist for more than an additional six
3 months"; correct?
4   A   Yes.  It says that.
5   Q   And that's the . . .
6   A   It's "E."
7   Q   "E."
8       That's the fifth criteria; correct?
9   A   That's what it says there, yes.
10   Q   And then it indicates that you're supposed to
11 specify whether the adjustment disorder is -- and then
12 it gives subcategories.
13   A   Yes.
14   Q   Such as depressed mood.
15   A   Right.
16   Q   Anxiety.
17       And each of those have a separate diagnostic
18 number; correct?
19   A   Yes.
20   Q   All right.  Now, you agree that the symptoms
21 reported by Ms. Durden are not out of proportion to the
22 severity or intensity of the stressor that she has;
23 correct?
24   A   Yes.
25   Q   And you agree that the symptoms reported by

Page 298

1 Ms. Earnest are not out of proportion to the severity
2 or intensity of the stressor that she has; correct?
3   A   Yes.
4   Q   And you agree that the symptoms Ms. Durden
5 has represent normal bereavement for the type of
6 stressor she has.
7       Do you agree?
8   A   No.
9     MR. EXNICIOS:
10       Objection to the form of the question.
11   A   I'm sorry.
12 BY MS. SCHULTZ:
13   Q   Why don't you agree with that?
14   A   Well, you skipped over one that you --
15 "Significant impairment and social occupational or
16 other important areas of functioning."
17       So it's my understanding from the history
18 that -- that they both actually -- maybe we shouldn't
19 talk about both, but they both have impacts on their
20 social functioning.
21   Q   And that -- the requirement is that it be a
22 significant impairment --
23   A   Right.
24   Q   -- in their social functioning; correct?
25   A   Yes.

36 (Pages 295 - 298)