UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION | MDL NO. 2740 |
| | SECTION "N" (5) |

THIS DOCUMENT RELATES TO:

Antoinette Durden, Case No. 2:16-cv-16635;
Tanya Francis, Case No. 2:16-cv-17410;
Barbara Earnest, Case No. 2:16-cv-17144

---

**MEMORANDUM IN SUPPORT OF SANOFI DEFENDANTS'
MOTION TO EXCLUDE EXPERT TESTIMONY OF ALAN BAUMAN, M.D.**

---

Dr. Bauman is a hair-restoration physician who readily admits he has no opinions concerning the three bellwether Plaintiffs (in fact, he does not even know who they are). Instead, he seeks to offer sweeping and generalized opinions on societal views of beauty and hair loss, the "potential" psychological impact of hair loss on women, and the "healing" that might be achieved by purchasing one of the most expensive hair-restoration treatments offered by his facility in Boca Raton, Florida: a semi-permanent hair replacement system called the CNC Scalp and Cranial Prosthesis. As his report and deposition testimony confirm, the Court should preclude Dr. Bauman's testimony in its entirety under Rule 702:

First, his opinions regarding societal norms concerning women, beauty, and hair are within the common understanding of the jury. To the extent that this topic is an appropriate subject of expert testimony, Dr. Bauman is not qualified to provide it, and his subjective opinions are neither relevant nor reliable.

Second, his opinions concerning the "potential" psychological impact of hair loss on

women is outside his expertise as a hair-restoration physician and is wholly unsupported by any methodology for evaluating emotional distress. Further, he knows nothing about the three bellwether Plaintiffs' claimed hair loss or their psychological condition. His generalized opinions are irrelevant and unhelpful to the trier of fact, particularly where the actual Plaintiffs can offer testimony about their specific claimed damages.

Third, Dr. Bauman's testimony concerning potential hair-restoration treatments that may (or may not be) appropriate is irrelevant and unreliable, as he knows nothing about the level of Plaintiffs' alleged hair loss, their daily activities, or their actual preferences for hair restoration, assuming such "restoration" is even applicable to or desired by them. Without such information, he cannot reliably opine which treatments are or are not appropriate for these Plaintiffs.

Finally, Dr. Bauman's testimony concerning the cost of a CNC prosthesis is irrelevant (because, again, there is no basis to opine such treatment would be appropriate for the three Plaintiffs) and unreliable because he has no knowledge of how the cost estimates in his report were derived.

As such, the Court should grant Sanofi's motion and exclude all of Dr. Bauman's opinions.

## LEGAL STANDARD

Federal Rule of Evidence 702 controls the admission of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

>(d) the expert has reliably applied the principles and methods to the facts of the case.

In other words, under Rule 702, the Court's gatekeeping function first involves determining whether the expert is *qualified*; then it "involves a two-part inquiry into *reliability* and *relevance*":

>First, the Court must determine whether the proffered expert testimony is reliable. The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence. The reliability inquiry requires the Court to assess whether the reasoning or methodology underlying the expert's testimony is valid. The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation.
>
>Second, the Court must determine whether the expert's reasoning or methodology is relevant. The question here is whether the reasoning or methodology "fits" the facts of the case and will thereby assist the trier of fact to understand the evidence.

*Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 550 (E.D. La. 2015) (citations omitted) (emphases added).

The "reliability analysis applies to *all aspects* of an expert's testimony," including "the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (emphasis added). Indeed, "the expert's testimony must be reliable at each and every step or else it is inadmissible." *Id*. These "exacting standards of reliability," *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000), provide that "conjecture, hypothesis, subjective belief, or unsupported speculation are impermissible grounds on which to base an expert opinion." *Wehling v. Sandoz Pharm. Corp.*, No. 97-2212, 162 F.3d 1158, 1998 WL 546097, at *5 (4th Cir. Aug. 20, 1998) (Table Decision).

Even if qualified as an expert, the Court must determine whether the proffered expert testimony is sufficiently tied to the facts at issue and whether the testimony will aid the jury in understanding the evidence. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591

3

(1993) (stating that the district court's "gatekeeping role" requires ensuring that the expert testimony "is relevant to the task at hand").

## ARGUMENT

### I. Dr. Bauman's Opinions On How Society Views Women and Their Hair Are Inadmissible.

Dr. Bauman is a physician who performs hair transplants and offers hair restoration products and treatments to his clients. He concedes he has no expertise in sociology, psychology, psychiatry or anthropology. Bauman Dep. 69:25–70:8 (Ex. A). Nonetheless, Dr. Bauman seeks to offer expert testimony at trial about how society views women and their hair, including that:

- Hair is "directly linked to the identity of the woman;"

- Hair is linked to a woman's "femininity, sexuality, attractiveness, and personality;"

- Society teaches women that hair is "a precious item;"

- Hair is identified in the media as a "woman's crowning glory" and often "defines" her beauty;

- A bald woman is not socially acceptable; and

- There is no socially acceptable option for a woman with extensive hair loss.

Bauman Rpt. at 2 (Ex. B).

Dr. Bauman's opinions must be excluded because his views on how the media portrays—and how people supposedly perceive women and their hair—are within the common understanding and experience of a lay juror. Even if relevant and the proper subject of expert testimony, Dr. Bauman is not qualified to offer such opinions and his subjective beliefs are not the product of any methodology—let alone a reliable one.

4

### a. Dr. Bauman's Beliefs about the Media and Society's Views of Women and their Hair is Unhelpful to the Trier of Fact.

Expert testimony is inadmissible as unhelpful to the trier of fact when the proffered opinions are within the common knowledge or experience of the average juror. *See, e.g.*, *Peters v. Five Star Marine*, 898 F.2d 448, 449–50 (5th Cir. 1990) (upholding trial court's exclusion of expert opinions because "the trial judge correctly decided that the jury could adeptly assess this situation using only their common experience and knowledge."); *Henry v. O'Charley's Inc.*, No. 2:11-1330, 2013 WL 837178, at *1 (W.D. La. Mar. 6, 2013) (excluding expert testimony that tile is slippery making it easier to fall because that is within the common experience and knowledge of jurors); *Lee v. Offshore Logistical & Transport, LLC*, No. 15-2528, 2017 WL 6501151, at *4 (E.D. La. Dec. 19, 2017) (excluding expert testimony and collecting Fifth Circuit cases).

Here, Dr. Bauman's opinions regarding how people in society view women and their hair, even if relevant, is within the knowledge and experience of the average layperson and reaches conclusions well-within the jury's competence. Dr. Bauman acknowledged as much during deposition while attempting to deflect from his failure to employ a scientific methodology in forming his opinions:

> **Q**: What research have you done to determine what is socially acceptable and what is not socially acceptable?
>
> **A**: ***I've lived 48-and-a-half years, and observed the world.***

Bauman Dep. 170:2–6 (emphasis added).[1]

---

[1] When describing the basis for his opinion that hair defines beauty in society, Dr. Bauman again made clear that he formed his opinions the way any juror would, through popular media (Bauman Dep.158:23–159:9):

> **Q**: On what do you base your opinion that hair often defines beauty?
>
> **A**: Well, when we look at – in the media, when we look in, whether it be television or magazines, or entertainment, very often we see fashion described in and shown, you know, in terms of hairstyle, cuts, colors. And very much engrained within fashion and beauty is cuts, colors and curls and so forth. Trends.

5

Dr. Bauman's opinions are unhelpful because—like him—jurors have "obser[ved] the world" and do not need expert testimony to evaluate how society views women and hair. They are "capable of understanding and deciding" themselves. *Jarrow v. Cupit*, No. Civ. A. 99–3539, 2000 WL 1537989, at *2 (E.D. La. Oct. 17, 2000); *see also E.E.O.C. v. Bloomberg, L.P.*, No. 07-cv-8383, 2010 WL 3466370, at *17 (S.D.N.Y. Aug 31, 2010) (excluding opinions of social psychologist as irrelevant because "[i]t is unarguable that virtually all adults in our society know about gender stereotypes.").

### b. Dr. Bauman's Subjective Opinions Are Not Supported by Sufficient Qualifications or a Reliable Methodology.

Further, Dr. Bauman's generalized proclamations about the media and society's views are neither grounded in any specialized knowledge, skill, experience, training, or education in the relevant disciplines nor underpinned by a reliable methodology.

Dr. Bauman readily concedes that he has no expertise in sociology, psychology, or anthropology. Bauman Dep. 69:25–70:8. Nor has he conducted any studies on the social acceptability of hair loss or the portrayal of hair or beauty in the media, and he has not published a single peer-reviewed article on such subjects. *Id.* 159:16–19, 166:7–17, 174:24–175:5. *See Hufnagel v. McGraw-Hill Co., Inc.*, No. 2:12-cv-0579-sab, 2014 WL 12527209, at *4 (E.D. Wash. July 24, 2014) (excluding expert testimony regarding gender "tokenism" in the workplace because the plaintiff "offered no evidence indicating that [the expert] has studied, taught, conducted research, or written about 'tokenism.'"). Dr. Bauman also admits that he did not rely on any documents or materials in forming his opinions. *Id.* 93:23–94:1 ("Q: What materials did you

---

**Q**: And is that what supports your opinion that hair often defines beauty?
**A**: Yes.

6

consider in the formation of your opinions?...A: No materials. No materials."), 92:1–15 (only relying on clinical experience—nothing else). Indeed, Dr. Bauman freely acknowledges that his opinions are not based on any scientific method or analysis of data but on his observations as a 48-year-old man and what the select group of women he treats tell him. *See, e.g. id.* 159:12–15 ("just relying on what my patients tell me."); *see also* 91:7–18, 170:2–6, 175:24–176:20. *Contra Wehling*, 1998 WL 546097, at *5 ("subjective belief, or unsupported speculation are impermissible grounds on which to base an expert opinion."). Dr. Bauman's anecdotal experience talking to the select subset of women that seek treatment for hair loss from him in Boca Raton, Florida, however, does not qualify him to project his beliefs onto all of society.

And Dr. Bauman admits that the only data that he relied on to form his opinions about what society collectively thinks are "in [his] brain" and cannot be tested:

> **Q**: Okay. And do you record in those medical records things that support your opinions in this litigation or is it something that's in your brain?
>
> **A**: It's in my brain.
>
> **Q**: Not reduced to paper?
>
> **A**: No, there's no --- there's no report that's going to be provided that's the sum total. This [his report] is what I've written.
>
> **Q**: I understand that's what you've written. I'm trying to understand—
>
> **A**: Where it comes from?
>
> **Q**: Yeah.
>
> **A**: Yeah, my brain.
>
> **Q**: Okay. So then how do we test that opinion?
>
> **A**: I don't know.

7

Bauman Dep. 121:22–122:12.  However, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.'"  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 155 (1999) (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)); *see also Hathaway v. Bazanay*, 507 F.3d 312, 318 (5th Cir. 2007) ("Without more than credentials and a subjective opinion, ***an expert's testimony that 'it is so' is not admissible***.") (emphasis added).  Dr. Bauman—who applied no identified or testable methodology in forming his opinion—is no more qualified than any juror to opine about how society views the attractiveness of women and their hair.  His opinions on societal norms concerning women, beauty, and hair are thus inadmissible.

## II. Dr. Bauman's Opinion Concerning the Potential Psychological Impact of Alopecia on Women is Inadmissible.

Dr. Bauman readily admits that he has no knowledge of or opinion on the three bellwether Plaintiffs or the impact of hair loss on them, but instead seeks to opine—in a completely generalized fashion—about the "potential" physiological impact of hair loss on women, including that:

- It is common that even small degrees of hair loss and hair thinning, e.g. loss of volume, widening part lines, loss of coverage and receding hairlines have significant psychological impact;
- For those with more extensive hair loss, the psychological trauma can run deep and is long lasting;
- When hair loss triggers a feeling of bad hair it is commonly accompanied by reduced self-esteem, increased social insecurity and diminished sense of being a worthwhile person;
- Women with hair loss feel disgraced, embarrassed, ashamed and highly self-conscious and tend to search for and dwell on their own personal character flaws that go well beyond their appearance;
- The constant fear of having to explain the condition and-or its causes to younger family members, relatives, coworkers, friends or acquaintances weighs heavily and becomes top of mind;

8

- The effects of the stress and psychological trauma of alopecia patients can be seen in their personal and professional lives, limiting or ending interpersonal relationships as well as triggering the avoidance of social activities; and

- A "bad hair day" can turn into a "bad hair life."

Bauman Rpt. at p. 2. Dr. Bauman's sweeping opinions must be excluded. First, Dr. Bauman is unqualified to opine about the psychological impact of hair loss as he is not a psychologist or psychiatrist, nor does he diagnose or treat any psychological conditions. Second, Dr. Bauman employed no reliable scientific methodology to form his opinions. Finally, his generalized opinion about the potential psychological impacts of hair loss on women—wholly divorced from the actual Plaintiffs at issue who can testify regarding these matters—will not assist the trier of fact in understanding the evidence or determining the facts at issue.

### a. Dr. Bauman is not qualified to offer opinions on psychology.

Dr. Bauman is a self-described "hair-restoration physician." Bauman Dep. 6:20–22. He is not a psychologist or psychiatrist, and he does he treat or diagnose psychological conditions. *Id.* 69:25–70:3. Nonetheless, he seeks to offer expert testimony at trial that hair loss can lead to depression, anxiety, reduced self-esteem, increased social insecurity, and diminished sense of "being a worthwhile person," all of which can affect women's personal and professional lives. *See* Bauman Rpt. at 2–3. These opinions are based solely on the anecdotal reporting of patients who specifically seek out his hair restoration services. *See id.* 91:10–92:15, 175:6–176:21 ("Q: And are ***basing that on comments*** that patients that you have who have actively sought out hair loss treatment have made to you in the course of treatment? A: Yes.") (emphasis added).

But Dr. Bauman also admits the obvious—that numerous things in a person's life unrelated to hair loss can negatively affect their psychological state. *Id.* 132:6–18; 137:19–138:4. While Dr. Bauman carefully attempts to carve out expertise in addressing the psychological impact of hair loss in isolation, he categorically denies the expertise to opine about other factors that can

9

cause a negative psychological impact on women:

> **Q**:…do you that a cancer diagnosis could possibly cause high levels of depression or anxiety?
>
> **A**: *I'm not an expert to say*.
>
> **Q**:…do you think a cancer diagnosis could affect a person's self or self-identity?
>
> **A**: *I'm not qualified to say*.

*Id.* 137:9–18 (emphasis added).

Dr. Bauman's frank admission that he "is not an expert" and "is not qualified to say" what things in a person's life beyond hair loss cause or contribute to psychological disorders only demonstrates that he is not qualified to offer expert opinions on mental health and psychological conditions generally. Dr. Bauman's opinions that hair loss could affect someone psychologically are not based on any specialized knowledge; in fact, he admits his opinions in this regard are based on common knowledge. *Id.* 241:23–242:1 ("Q: And do you agree that or would you say that it's pretty ***common knowledge*** that hair loss could affect someone psychologically? A: ***Yes***.") (emphasis added). Dr. Bauman's anecdotal clinical experience talking to women with hair loss does not transform him into a mental health professional qualified to offer expert opinions about mental or emotional issues or the potential impact hair loss may have on women in general.

### b. Dr. Bauman's opinions regarding the psychological impact of hair loss are unreliable.

Even if he possessed the qualifications to offer such testimony, Dr. Bauman's psychological opinions are not the product of a reliable methodology. His opinions are without consideration of myriad other factors that contribute to a person's mental health and sense of self-esteem and self-worth. And his singular clinical experience as a hair-restoration physician is

10

limited in important, inherent ways.

Dr. Bauman admits that he only sees patients that choose—and can afford—to pay out-of-pocket for products and services that cost up to $50,000. *Id.* 87:2–24; 167:14–16.[2] Notably, this is unlike Mses. Francis and Earnest (neither of whom sought treatment for hair loss before the litigation) and the vast majority of women in this MDL. *See* § VI.6 of Barbara Earnest (Ex. C) and Tanya Francis (Ex. D)[3] Plaintiff Fact Sheets. Indeed, he readily admits that he has no basis to offer an opinion about women that do not seek treatment:

> **Q**: So you don't have an opinion about --- you don't have a basis for an opinion about what women who don't seek out treatment think or feel, correct?
>
> **A**: How would I have an opinion ---
> …
> **Q**: You don't, right?
>
> **A**: I would not have an opinion about someone I've never spoken with.
>
> **Q**: Or someone who hasn't sought out treatment for hair loss, correct?
>
> **A**: Correct.

Bauman Dep. 168:19-169:7.

Further, even on his limited anecdotal experience with his patients' feelings about their hair, Dr. Bauman admits that he does not assess the psychological condition of his patients through standardized quality of life questionnaires (and does not necessarily even reduce it to writing in

---

[2] The limitations of relying solely on Dr. Bauman's clientele becomes even more apparent when the prevalence of female hair loss is put in context; Dr. Bauman estimates that forty-six million women in America suffer from hair loss. Bauman Dep. 72:6–14.

[3] Ms. Francis's Eighth Amended PFS (Ex. D) describes post-litigation evaluations only.

11

his medical records). *Id.* 121:22–122:12, 176:22–177:6.  He also has not conducted any statistical analysis of his female patient population to support his opinions. *Id.* 175:20–16.  Importantly, Dr. Bauman concedes that there is no way to analyze or test his opinions, which have never otherwise been reduced to a study or scientific paper:

> **Q**: And how can your opinion that's based on clinical experience be tested?
>
> **A**: I don't know. Ask me if it's true.
>
> **Q**: And – so you say it's true, right?
>
> **A**: Correct.
>
> **Q**: *And so that means it's true?*
>
> **A**: *Yes.  It's my word*.

*Id.* 185:24–186:5; *see also id.* 121:22–122:12, 146:11–16.  *See Kumho Tire*, 526 U.S. at 155 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.'"); *see also* Fed. R. Evid. 702 (expert testimony must be "based on sufficient facts or data."); *see also Stewart v. Capital Safety USA*, 867 F.3d 517, 519 (5th Cir. 2017) (affirming district court's exclusion of an expert witness, where the expert "made wide-ranging, blanket statements ... without any data or methodology to back [them] up.").

### c. Dr. Bauman's psychological opinions are not reliably applied to the facts of these cases and will not assist the trier of fact.

Expert opinion evidence may be excluded when an expert fails to explain how his or her experience is reliably applied to the facts of the case. *Burst*, 120 F. Supp. 3d at 550 (the Court must determine whether the expert's reasoning or methodology is relevant. The question here is whether the reasoning or methodology "fits" the facts of the case and will thereby assist the trier of fact to understand the evidence).  Further, the Rule 402 relevance requirement mandates that expert

testimony be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591.

Here, Dr. Bauman's opinions regarding the potential psychological impact of hair loss on women generally satisfy neither requirement because he offers no opinions about the psychological impact of hair loss on Ms. Durden, Ms. Earnest or Ms. Francis (because he knows nothing about them), and Plaintiffs can themselves describe the impact of hair loss, if any, on their lives. *See id.*

Dr. Bauman readily acknowledges that the psychological impact of hair loss will be different for each individual and that numerous other factors can negatively impact a person psychologically. Bauman Dep. 132:6–18; 137:19–138:4. Still, he made no attempt to tie his generic opinions to Plaintiffs. To the contrary, Dr. Bauman knows ***nothing*** about the three bellwether Plaintiffs. *See id.* 34:23–36:1, 90:12–91:4, 98:22–104:11, 104:13–110:17, 110:18–115:2.[4] And he has ***no*** opinions regarding the psychological impact of hair loss on them:

> **Q**: Agree that you couldn't speak to any potential psychological impact that hair loss may or may not have had on Ms. Durden?
>
> **A**: Not her in particular.
>
> **Q**: Because you don't know anything –
>
> **A**: I don't know her.
>
> **Q**:…so you can't offer any opinions specific to Ms. Durden?
>
> **A**: Correct.
>
> **Q**: And you agree that you can't offer any opinions about Ms. Earnest's hair loss or how it has potentially impacted her; is that

---

[4] Of particular relevance, Dr. Bauman does not know Plaintiffs' mental health history, family history of mental illness or medications taken for mental health. *Id.* 98:22–104:11 (Ms. Durden), 104:13–110:17 (Ms. Earnest), 110:18–115:2 (Ms. Francis). He does not know if Ms. Durden, Ms. Earnest, or Ms. Francis have anxiety or depression or how they feel, or have ever felt, about their hair. *Id.*

13

>    fair?
>
>    **A**: In her case, correct.
>
>    **Q**: And do you agree that you can't offer and won't offer any testimony about Ms. Francis's hair loss, or how her hair loss may have impacted Ms. Francis?
>
>    **A**: Not for those particular people in specific.
>
>    **Q**: Right, because you –
>
>    **A**: Because I –
>
>    **Q**: Have no basis?
>
>    **A**: Right, never evaluated them.

*Id.* 115:3–116:1; *see also id.* at 90:12–91:4.

Because expert testimony can be "both powerful and quite misleading," this Court must exclude proffered opinions unless it is convinced that the evidence speaks clearly and directly to an issue in dispute in the case, and that it will not mislead the jury. *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1321 n.17 (9th Cir. 1995) (*Daubert II*) (quoting *Daubert*, 509 U.S. at 595). Here, Dr. Bauman's generalized opinions that hair loss can "potentially" have a negative psychological impact on a woman—that are in no way linked to the specific circumstances of Plaintiffs—are of no use to a jury because they do not help the jury understand the evidence or determine a fact in dispute. *See* Fed. R. Evid. 702 (to be admissible, expert opinion testimony must help the "trier of fact to understand the evidence or to determine a fact in issue). This is particularly true as Plaintiffs can themselves describe to the jury the basis for their claimed emotional distress damages at trial. *See E.E.O.C.*, 2010 WL 3466370, at *17 (social psychology testimony on gender stereotypes was not helpful because the "jury will have the benefit of hearing

14

testimony from claimants [and other witnesses] and can determine based on the evidence…whether the claimants suffered gender/pregnancy discrimination."). Dr. Bauman's general opinions about the psychological impact of hair loss on women must be excluded.

### III. Dr. Bauman's Opinions Regarding the Appropriateness of Hair-Restoration Treatments is Irrelevant and Inadmissible.

The remainder of Dr. Bauman's expert report discusses the "treatment of severe alopecia using CNC Hair & Scalp Cranial Prosthesis." In it, he summarily discusses other hair-restoration options and ultimately opines that in certain circumstances only the CNC system—a very expensive product for which he is only one of a few distributors in the country—is the only available option. But here again, Dr. Bauman's opinions do not fit the facts of the case and should be excluded on that basis alone. *See Burst*, 120 F. Supp. 3d at 551.

Dr. Bauman has never met or evaluated Ms. Durden, Ms. Francis, or Ms. Earnest. Bauman Dep. 99:13–14, 105:21–25, 111:1–4. He does not know how much hair loss, if any, they have, what day-to-day activities they participate in, their tolerance for wearing a semi-permanent prosthesis on their scalp, or whether their scalp can tolerate it. Yet he admits that he would need to know all of these things before he could say whether the CNC system is appropriate for Plaintiffs.[5] *Id.* at 201:22–202:4, 202:17–23, 213:3–21. At the same time, Dr. Bauman summarily discusses other hair-restoration options and why they are inappropriate in certain circumstances, not knowing whether such options are appropriate for Mses. Durden, Francis, or Earnest.

For example, Dr. Bauman claims that topical medications and laser therapy have limited effect "[w]hen hair follicle density is severely depleted." Bauman Rpt. at 3. He opines that hair restoration surgery is contraindicated when "there are not enough viable healthy hair follicles

---

[5] Dr. Bauman also acknowledges that not all patients choose to purchase a CNC. Bauman Dep. 215:1–9.

around the sides and back of the scalp…" *Id.* But he has no idea whether Mses. Durden, Francis, or Earnest have hair follicles that would respond to topical medications or laser therapy. *See, e.g.*, Bauman Dep. 104:8–11 ("Q:…Do you even know if plaintiff has hair loss?...A: Actually, no."). Nor does he know whether Plaintiffs are candidates for hair restoration surgery. Indeed, Dr. Bauman acknowledges that he does not have any opinion regarding the appropriateness of any hair restoration system *for Plaintiffs* (nor could he given his wholesale lack of knowledge). His opinions are untethered to these cases and, thus, irrelevant. *See* Fed. R. Evid. 702.

### IV. Dr. Bauman's Opinion Regarding the Cost of a CNC System is Unreliable and Inadmissible.

In advancing the CNC Scalp and Cranial Prosthesis he sells at his facility, Dr. Bauman opines that the average yearly cost to own an average CNC system is $12,091 a year. Bauman Rpt. at 4. This estimate is built on numerous assumptions, including (1) a cost range of $8,000–15,000,[6] (2) the purchase of two systems per patient,[7] (2) a 2.5–3 year CNC lifespan,[8] (3) $2,000 in repairs,[9] and (4) $250 a month in servicing costs at the salon Dr. Bauman owns.[10] As discussed above, his testimony about the CNC system is in no way tied to the facts of these cases as he does not (and cannot) say that it is appropriate for any of the three Plaintiffs.

---

[6] Even at its most fundamental level, Dr. Bauman's pricing estimates are not based on a reliable methodology. His trichologist provided the $8,000–15,000 cost for a system, but Dr. Bauman conceded that he was unaware if his office offered CNC systems that cost less than $8,000. Bauman Dep. 217:6–11, 217:16–18. He also admitted that its "quite possible" that he offers systems that cost more than $15,000. *Id.* 217:12–15.

[7] Dr. Bauman knows of no literature from the manufacturer that recommends purchasing two systems at once. Bauman Dep. 222:1–4.

[8] Yet on his website he touts a five-year life span, and he has seen the system last up to 15 years. Bauman Dep. 225:20–226:23

[9] Yet Dr. Bauman testified that "[m]any of them don't require any repairs whatsoever." Bauman Dep. 235:1–2.

[10] He also acknowledges that the manufacturer's materials state: "If you would prefer to do this easy cleaning process at home, we offer a simple step-by-step guide." Bauman Dep. 239:14–19.

16

Further, Dr. Bauman's cost estimates are unreliable because he does not know how they were calculated, and they contradict the representations of cost and lifespan made on his website. Dr. Bauman concedes that in his practice—and for the purposes of his litigation-driven report—he is does not calculate the cost of the CNC system or its maintenance. In fact, he does not even know how the calculation in his report was done; nor does he know what data the estimates were based on. Bauman Dep. 232:23–233:2. Indeed, beyond knowing that the systems vary based on size and hair length, he can only say that "some kind of calculation is performed" to determine its price:

> **A**: So pricing is done as an estimate based on hair length and the size of the area that's being replaced, and also the number of systems that are being ordered. So there's – *I think there's some kind of calculation that is performed*.

*Id*. 212:2–6 (emphasis added).

> **Q**: What review of records did you do to – if any, to come up with the expected repair cost?
>
> **A**: So that was based on our patient base who have needed repairs.
>
> **Q**: I'm talking about the amount. You identify $2,000 as the mean repair cost between replacements.
>
> **A**: Yes.
>
> **Q**: What, if any, data, financial data, is that derived from?
>
> **A**: *So I'm not sure what that data is exactly* but I asked my trichologist how much do these repairs cost, and she told me this number.
>
> **Q**: And did you ask how she derived – he or she derived that data? That amount?
>
> **A**: *No, I didn't ask that*. I asked her how much are the average

17

>>repairs costing over the time of the life of the systems.  And so she
>>went back, I'm assuming, to the patients that we have, and look at
>>them, look at their records and determine what the numbers are.
>>
>>**Q**: You didn't do that process?
>>
>>**A**: No, I –
>>
>>**Q**: And you didn't watch her do that process?
>>
>>**A**: No.
>>…
>>**Q**: But you did not ask her specifically how she came up with that
>>figure; is that accurate?
>>
>>**A**: That's true.

*Id.* 232:23–233:14, 234:19–21 (emphasis added).

Dr. Bauman estimates the lifespan of a CNC system between 2.5 to 3 years in his report. Bauman Rpt. at 4.  He admitted, however, that this period is shorter than what he has repeatedly represented to patients on his website:

>>**Q**:…Let me direct you to your language "With monthly
>>maintenance and proper care the prosthesis can last between four to
>>five years."  You disagree that's written in this press release that was
>>posted on your website on September 5th, 2018?
>>
>>**A**: No, I don't disagree?
>>…
>>**Q**: And do you agree that the four to five-year lifespan is longer than
>>what you estimate in your expert report?
>>
>>**A**: I agree.

Bauman Dep. 230:18–25, 231:24–232:2.  Not surprisingly, this difference exponentially increases the CNC cost estimates offered by Dr. Bauman.  The CNC cost estimates in Dr. Bauman's Report are unreliable because not even he can verify or explain how they were calculated, and they are

18

inconsistent with what he represents to patients in his practice. *See E.E.O.C.*, 2010 WL 3466370, at *15 (an expert "must provide some explanation [regarding his methodology] so that it can be evaluated and tested."). Under these circumstances, and given that he has no basis to say that a CNC system is appropriate for the three bellwether Plaintiffs, his testimony concerning the cost of a CNC system is inadmissible.

## **CONCLUSION**

None of Dr. Bauman's opinions assist the jury in understanding the evidence or facts at issue for the three bellwether cases. On that basis alone, they are inadmissible. But Dr. Bauman also purports to opine on psychological distress and the collective views of society, neither of which are within his knowledge, experience, education or expertise. His lack of methodology and ignorance of the facts are just the death knell in his opinions. The Court should exclude the opinions and testimony of Alan Bauman, M.D. in their entirety.

Date:  February 8, 2019

Respectfully submitted,

/s/ *Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE URQUHART & MOORE LLC**
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone:  504-310-2100
Facsimile:  504-310-2120
E-Mail:  dmoore@irwinllc.com


Harley V. Ratliff
Adrienne L. Byard
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, MO 64108-2613
Telephone:  816-474-6550
Facsimile:  816-421-5547
E-Mail:  hratliff@shb.com

*Counsel for Sanofi-Aventis U.S. LLC and Sanofi U.S. Services Inc.*


**CERTIFICATE OF SERVICE**

I hereby certify that on February 8, 2019, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ *Douglas J. Moore*