# EXHIBIT A

Page 1

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF LOUISIANA
2
3               MDL No. 2740
4               SECTION: H
5    IN RE: TAXOTERE (DOCETAXEL)
     PRODUCTS LIABILITY LITIGATION
6
     This Document Relates To:
7
     Antoinette Durden, Case No. 2:16-cv-16635;
8    Tanya Francis, Case No. 2:16-cv-17410;
     Barbara Earnest, Case No. 2:16-cv-17144
9    --------------------------------X
     1450 South Dixie Highway
10   Boca Raton, Florida
     January 14, 2019
11   4:00 p.m. - 10:15 p.m.
12
13      VIDEOTAPED DEPOSITION OF ALAN J. BAUMAN, M.D.
14                    VOLUME I
15                 PAGES 1 - 153
16
17       Taken on behalf of the Defendants before Erinn
18   Green, RPR, Notary Public in and for the State of
19   Florida at Large, pursuant to Notice of Taking
20   Videotaped Deposition in the above cause.
21
22
23
24       Job No. NJ3193460
25

Page 2

1  APPEARANCES:
2  Appearing on behalf of the Plaintiffs
3      VAL PATRICK EXNICIOS, ESQUIRE
4      LISKA, EXNICIOS & NUNGESSER
5      1515 POYDRAS STREET
6      14TH FLOOR, SUITE 1400
7      NEW ORLEANS, LA 70112
8  Appearing on behalf of Sanofi
9      KELLY BIERI, ESQUIRE
10     JASON HARMON, ESQUIRE
11     SHOOK HARDY & BACON L.L.P.
12     2555 GRAND BOULEVARD
13     KANSAS CITY, MISSOURI 64108-2613
14  Appearing on behalf of Sandoz
15     SARA TUCKER, ESQUIRE
16     GREENBERG TRAURIG, LLC
17     Terminus 200
18     3333 Piedmont Road NE
19     Suite 2500
20     Atlanta, GA 30305
21  Appearing Telephonically on behalf of Sun
    Pharmaceuticals
22
23     GEOFFREY COHEN, ESQUIRE
24
25        - - - - - - - - -

Page 3

1            I N D E X
2  WITNESS:                      PAGE
3  ALAN J. BAUMAN, M.D.
4  Direct Examination by MS. BIERI          6
5
6
7
8       DEFENDANT SANOFI'S EXHIBITS
9  NUMBER        DESCRIPTION        PAGE
10 Exhibit 1   CONFIDENTIAL MEMORANDUM    12
   Exhibit 2   DR. BAUMAN'S FOLDER    31
11 Exhibit 3   NOTICE OF VIDEOTAPED    31
             DEPOSITION OF ALAN
12           BAUMAN, M.D.
   Exhibit 4   PLAINTIFFS' OBJECTIONS   33
13           AND RESPONSES
   Exhibit 5   CV          43
14 Exhibit 6   EXPERT REPORT       88
   Exhibit 7   ADDITIONAL REFERENCES    94
15
16
17
18
19
20
21
22
23
24
25

Page 4

1      THE VIDEOGRAPHER:  Good afternoon.  We're
2  going on the record at 4:22 p.m. on the 14th of
3  January, 2019.  Please note that the
4  microphones are sensitive and may pick up
5  whispering private conversations and cellular
6  interference.  Please turn off all cell phones
7  and place them away from the microphones as
8  they can interfere with the deposition audio.
9  Audio and video recording will continue to take
10 place unless all parties agree to go off the
11 record.
12     This is media unit 1 of the video recorded
13 deposition of Alan Bauman, M.D., taken by
14 counsel for defendant in the matter of
15 Antoinette Durden versus Sanofi, Tanya Francis
16 versus Sanofi and Barbara Earnest versus
17 Sanofi.  Filed in the United States District
18 Court Eastern District of Louisiana.
19     This deposition is being held at 1450
20 South Dixie Highway, Boca Raton, Florida.  My
21 name is Travis Newton from the firm Veritext
22 and I'm the videographer.  The court reporter
23 is Erinn Green from the firm Veritext.  I'm not
24 authorized to administer an oath.  I'm not
25 related to any party in this action, nor am I

Page 5

1  financially interested in the outcome.
2      Counsel and all present in the room and
3  everyone attending remotely will now state
4  their appearances and affiliations for the
5  record, and if there are any objections to the
6  proceeding, please state them at the time of
7  your appearance, beginning with the noticing
8  attorney.
9      MS. BIERI:  Kelly Bieri on behalf of
10 Sanofi.
11     MR. HARMON:  Jason Harman on behalf of
12 Sanofi.
13     MS. TUCKER:  Sara Tucker, Greenberg
14 Traurig, on behalf of Defendant Sandoz, Inc.
15     MR. EXNICIOS:  On the phone?  Geoff?
16     MR. COHEN:  Geoffrey Cohen on behalf of
17 Sun Pharmaceuticals.
18     MR. EXNICIOS:  Val Exnicios on behalf of
19 plaintiffs in the PSE.
20     THE VIDEOGRAPHER:  Will the court reporter
21 please swear in the witness?
22
23
24
25

2 (Pages 2 - 5)

Page 6

1 Thereupon
2        ALAN J. BAUMAN, M.D.
3 was called as a witness and, having been first duly
4 sworn and responding "Yes, I do," was examined and
5 testified under oath as follows:
6        THE VIDEOGRAPHER: Thank you. We may
7    proceed.
8        DIRECT EXAMINATION
9 BY MS. BIERI:
10    Q. State your name for the record, please.
11    A. It's Alan J. Bauman.
12    Q. Can you tell us your business address?
13    A. Sure. 1450 South Dixie Highway, Boca
14 Raton, Florida.
15    Q. Dr. Bauman, my name is Kelly Bieri. I
16 introduced myself to you right before we got
17 started. I'm an attorney and I represent Sanofi.
18        What is your understanding of why you're
19 here today?
20    A. I'm here to give my opinion based on my
21 experience as a hair restoration physician for over
22 20 years.
23    Q. Are you here as an advocate?
24    A. I don't know what that means.
25    Q. You don't know what being an advocate

Page 7

1 means?
2    A. No, I'm asked to give my opinion as an
3 expert on hair loss and hair restoration.
4    Q. Are you here as an expert witness for
5 plaintiffs?
6    A. Yes.
7    Q. And you were retained by plaintiffs to
8 serve as an expert in this litigation?
9    A. Correct.
10    Q. Meaning, you're being paid by plaintiffs
11 to offer your opinions here at deposition and at
12 trial, correct?
13    A. That is correct.
14    Q. Have you ever given a deposition before?
15    A. Yes, I have.
16    Q. On how many occasions?
17    A. One other occasion.
18    Q. And I believe you identified in your
19 report a deposition you gave last January. Is that
20 the deposition to which you refer?
21    A. Yes.
22    Q. Okay. Do you have a copy of that
23 deposition transcript?
24    A. No, I don't.
25    Q. Have you ever had a copy of that

Page 8

1 deposition transcript?
2    A. No, I've never seen it.
3    Q. What was the subject matter of your
4 testimony?
5    A. The effect of hair loss on a woman who had
6 experienced significant alopecia after receiving a
7 treatment from a physician, anti-inflammatory
8 treatment.
9    Q. Do you recall the name of the medication
10 she was given, or the treatment she was given?
11    A. It was probably a -- some type of
12 steroidal drug injection. I'm not sure.
13    Q. And was she your patient?
14    A. She was a patient of mine, yes.
15    Q. And did you testify as her treating
16 doctor?
17    A. No.
18    Q. Were you an expert in that litigation?
19    A. Yes.
20    Q. Who were you retained by?
21    A. So I was retained by the -- by her. She
22 was -- she was the plaintiff.
23    Q. And how much did you charge for your
24 testimony in that litigation?
25        MR. EXNICIOS: Objection to the form of

Page 9

1    the question.
2        THE WITNESS: I have no idea. I don't
3    remember.
4 BY MS. BIERI:
5    Q. Do you have any records related to that?
6    A. I'm sure we do.
7    Q. Did you testify just at deposition or also
8 at trial?
9    A. Just at deposition.
10    Q. Did you issue a report in connection with
11 that case?
12    A. No.
13    Q. What was the name of the attorney who
14 retained you?
15        MR. EXNICIOS: Objection to the form of
16    the question.
17        THE WITNESS: I have no idea.
18 BY MS. BIERI:
19    Q. Do you know the name of the law firm?
20    A. No.
21    Q. So what was the opinion that you offered
22 in connection with that deposition?
23    A. My opinion was that the coincidence of
24 time that she received the steroid injection was
25 likely a contributing factor to her alopecia.

3 (Pages 6 - 9)

Page 10

1    Q.  Were there other causes of her alopecia in
2 your opinion?
3    A.  There were other causes of alopecia, yes.
4    Q.  And what were those in this particular
5 patient of yours case?
6    A.  She had significant stress.
7    Q.  Any others that you recall?
8    A.  No.
9    Q.  You've given a deposition.  So you
10 probably understand sort of the procedural rules,
11 but I'll just remind you quickly.  You see that the
12 court reporter is taking down what is being said
13 here.  I think we've done a pretty good job so far
14 of not speaking over each another.  We need to
15 continue to do that.  It's also important that you
16 give oral answers as opposed to nods of the head or
17 shakes of the head.  It's quite hard for the court
18 reporter to take down.
19    A.  Yes.
20    Q.  Also, if you need a break, restroom break
21 or otherwise, let us know.  If there's a question
22 pending, I'll ask that you answer that, but,
23 otherwise, it's not a marathon.
24        If I ask a question that you don't
25 understand, please tell me and I can try to rephrase

Page 11

1 it.  To the extent that you answer a question, I'm
2 going to assume that you understood it.  Is that
3 fair?
4    A.  Sure.
5        MR. EXNICIOS:  Objection to the form.
6 BY MS. BIERI:
7    Q.  And you understand you're under oath
8 today, correct?
9    A.  Yes.
10    Q.  And you're testifying as though you're in
11 a courtroom.  Do you understand that?
12    A.  Yes, I do.
13    Q.  Is there any reason why you can't give
14 your best accurate, truthful testimony?
15    A.  No, not at all.
16    Q.  Okay.  You mentioned providing a
17 deposition in which you were retained as an expert
18 that we've talked about.  Have you ever served as an
19 expert witness on any other occasion?
20    A.  No.
21    Q.  How much are you billing per hour for this
22 deposition?
23    A.  You can see it in my forms that I
24 provided.  I believe it's $650 per hour.
25    Q.  I think, actually, I'll hand you --

Page 12

1        MS. BIERI:  May I have some exhibit
2    stickers, please?
3        THE REPORTER:  Sure.
4        MS. BIERI:  Thank you very much.
5        (Defendant's Exhibit 1 was marked for
6 identification.)
7 BY MS. BIERI:
8    Q.  I'm going to hand you what's been marked
9 as Exhibit Number 1.  Do you know what Exhibit
10 Number 1 is?
11    A.  Yes.
12    Q.  What is it?
13    A.  It says "Memorandum."
14    Q.  "Confidential Memorandum," correct?
15    A.  Sure.
16    Q.  And does it identify your fee structure
17 for providing testimony and your work in this case?
18    A.  Yes, it does.  Well, I mean, this is dated
19 way before obviously today, but, yes.
20    Q.  Does this accurately reflect the hourly
21 charges that you are charging plaintiffs' counsel in
22 this litigation for your work?
23    A.  Yes, I believe that it does.
24    Q.  Okay.  So here it says study, evaluation
25 and report preparation, $650 an hour, correct?

Page 13

1        MR. EXNICIOS:  Objection to the form of
2    the question.
3        THE WITNESS:  Correct.
4 BY MS. BIERI:
5    Q.  There's also a rate of $950 for expert
6 witness testimony out of office?
7        MR. EXNICIOS:  Objection to the form.
8 BY MS. BIERI:
9    Q.  Is that correct?
10    A.  That's what it says.
11    Q.  Okay.  Are you charging -- excuse me, I
12 think I misspoke.  I think I said 950.  It's 975 for
13 expert witness testimony, hourly office or hourly
14 rate.
15        Do you consider your deposition testimony
16 here today to be subject to the $950 an hour rate or
17 will you be charging plaintiffs $650 an hour --
18        MR. EXNICIOS:  Objection to the --
19 BY MS. BIERI:
20    Q.  -- for this deposition?
21        MR. EXNICIOS:  -- form of the question.
22        THE WITNESS:  I think -- I think it just
23    rolls over to a higher rate if it's after
24    hours, to be honest.
25

4 (Pages 10 - 13)

Page 14

1 BY MS. BIERI:
2    Q.   So what hourly rate will you be charging
3 for this deposition?
4    A.   Well, that depends on how late it goes.
5    Q.   What do you -- you said it rolls over
6 after hours.  What does that mean?
7    A.   After my regular business hours.
8    Q.   When --
9    A.   So after 5:00, then it turns to 975.
10   Q.   Okay.  So it's 4:30 now.  So for the first
11 part of your deposition until 5:00, you're going to
12 be charging $650 an hour, and then after 5:00,
13 you'll be charging $975 an hour; is that correct?
14   A.   Yes, I believe that to be correct.
15   Q.   What is your hourly rate outside of
16 litigation?
17   A.   I don't have --
18       MR. EXNICIOS:  Objection to the form.
19       THE WITNESS:  I don't have an hourly rate
20   outside of -- what do you mean?
21 BY MS. BIERI:
22   Q.   Well, do you charge any of your patients?
23   A.   So, patients are billed according to their
24 surgeries, but if you're looking at consultative
25 fees, these are consistent with my consultation

Page 15

1 fees.
2    Q.   So when you have a consultation with a
3 patient, what do you charge them?
4    A.   No, I mean, not consultation with
5 patients, I'm talking about business to business.
6 Other consultative things that we do in the -- you
7 know, as part of Bauman Medical Group, not the
8 patients.
9    Q.   Okay.  Tell me what types of consultative
10 work that you do that you're referring to.
11   A.   So we work with Fortune 500 companies.  We
12 work with medical device manufacturers.
13   Q.   Doing what?
14   A.   Providing them information on how the
15 field of hair restoration is changing.  How their
16 devices, or treatments, or techniques work.
17 Providing them feedback, clinical research.
18   Q.   And what hourly rate do you charge for
19 those consultative services?
20   A.   The same.
21   Q.   $650 an hour --
22   A.   Correct.
23   Q.   -- when it's during business hours and
24 $975 an hour when it's outside of business hours?
25   A.   Yeah, it's pretty much the same.  I mean,

Page 16

1 you know, there may be special occasions where it
2 might be less or it might be more.
3       MR. EXNICIOS:  Objection to the form.
4       THE WITNESS:  It really just depends.
5 BY MS. BIERI:
6    Q.   What percentage --
7    A.   It depends on the nature of the work,
8 really.
9    Q.   Well, can you give me an example of where
10 you would charge more for consultative work an hour?
11   A.   I can't think of anything offhand, but it
12 just would depend on the type of work that we're
13 doing.  Like if, for example, there were multiple
14 people involved.  Like if I had more -- like if I
15 had, you know, staff members, altogether doing
16 something at the same time, then our hourly rate
17 would be higher.
18   Q.   But your personal hourly rate would be
19 what we've discussed; is that correct?
20   A.   Correct.
21   Q.   Okay.  How many hours a week do you work,
22 Doctor?
23       MR. EXNICIOS:  Objection to the form.
24       THE WITNESS:  You know, I have no idea.
25   It depends on the week.  I mean, usually I work

Page 17

1    12-hour days.
2 BY MS. BIERI:
3    Q.   Five days a week?
4    A.   Monday through Friday.  Unless I'm
5 traveling and doing conferences.
6    Q.   Well, and that's what I'm trying to
7 understand.  How much time do you devote to
8 professional endeavors a week?
9       MR. EXNICIOS:  Objection to form.
10 BY MS. BIERI:
11   Q.   And I'm counting conferences as that.
12   A.   I don't know.  It could be -- I don't
13 know.  I guess it depends week by week and month to
14 month.  I mean ...
15   Q.   I'm just trying to understand.  Can you
16 give any estimate?
17   A.   I don't know.  I mean ...
18       MR. EXNICIOS:  Objection to form.
19       THE WITNESS:  I don't know, 80 to 100
20   hours.
21 BY MS. BIERI:
22   Q.   I'm trying to get a sense of how much time
23 per week you devote to the consultative work that
24 you just described.
25       MR. EXNICIOS:  Objection.  Form.

5 (Pages 14 - 17)

Page 18

1 BY MS. BIERI:
2    Q.  How much time per week do you devote to
3 the consultative work that we've just talked about?
4        MR. EXNICIOS:  Same objection.
5        THE WITNESS:  Very little.
6 BY MS. BIERI:
7    Q.  Can you provide an estimate?
8    A.  No, because it depends upon the week or
9 the month.
10    Q.  We -- we'll come back to this as we talk
11 about the full scope of the different things you do
12 in the professional context.
13        You said you never offered testimony at
14 trial; is that correct?
15    A.  That is correct.
16        MR. EXNICIOS:  Objection.  Form.
17 BY MS. BIERI:
18    Q.  So you've never been qualified by a court,
19 state or federal, to offer expert opinions; is that
20 correct?
21        MR. EXNICIOS:  Objection to form.
22        THE WITNESS:  I'm not sure I understand
23    what you mean.
24 BY MS. BIERI:
25    Q.  Other than the expert report you've issued

Page 19

1 in this case, you've never issued an expert report
2 before; is that correct?
3    A.  Correct.
4    Q.  And you've never testified at trial,
5 correct?
6    A.  Correct.
7    Q.  Okay.  When were you first contacted by
8 plaintiffs' counsel regarding this litigation?
9    A.  I have no idea.  Maybe a year ago.
10    Q.  So in January of 2018?
11    A.  I really have no idea.  I do not recall.
12        MR. EXNICIOS:  Object to form.
13 BY MS. BIERI:
14    Q.  Was it more than six months ago?
15        MR. EXNICIOS:  Objection.  Form.
16        THE WITNESS:  Yes, probably more than six
17    months ago.
18 BY MS. BIERI:
19    Q.  Who contacted you?
20    A.  So a local attorney contacted me.
21    Q.  Was it someone named Dean Xenick?
22    A.  Yes, Dean.  Yes, Mr. Xenick.
23    Q.  Do you know what law firm Mr. Xenick --
24 X-e-n-i-e-k [sic] potentially?  Is that right?
25    A.  Yes.

Page 20

1    Q.  Do you know what law firm Mr. Xenick is
2 with?
3    A.  I'd say it starts with a Z or something.
4    Q.  And what did Mr. Xenick say to you?
5    A.  You know, I don't remember exactly.  I
6 don't know.  He told me -- I'm not sure.  Told me
7 about the lawsuit and asked me if I'd known anything
8 about it.
9    Q.  And what did he tell you about the
10 lawsuit?
11    A.  He said there were women who had had
12 unexpected chemotherapy induced alopecia from a
13 particular drug and wanted to know if I'd heard
14 about it.
15    Q.  And had you heard about the litigation at
16 the time that Mr. Xenick had reached out to you?
17    A.  I had not.
18    Q.  Did Mr. Xenick ask you if you wanted to be
19 involved in the litigation?
20    A.  Not at that moment.  You know, he took my
21 card, and, you know, said that he would be in touch.
22    Q.  Did you meet with him in person?
23    A.  Yeah, I did.  I met with him here at the
24 office.
25    Q.  How long did you meet with him?

Page 21

1    A.  Several minutes.  Maybe just ten minutes.
2    Q.  And then how much time passed between your
3 initial contact with Mr. Xenick and your next
4 contact with an attorney for plaintiffs?
5    A.  Gosh, I have -- I don't know.  I mean,
6 maybe a month or two.
7    Q.  Who was your next contact with?
8    A.  I don't remember.
9    Q.  Was it with Mr. Xenick?
10    A.  Well, it was --
11        MR. EXNICIOS:  Objection to form.
12        THE WITNESS:  Mr. Xenick was in contact
13    with me by phone.
14 BY MS. BIERI:
15    Q.  In between the time that you originally
16 spoke to him and this --
17    A.  Yes.
18    Q.  -- month or two later?
19    A.  Yes.
20    Q.  And what was the substance of your phone
21 calls?
22    A.  I don't recall.
23        MR. EXNICIOS:  Objection.  Form.
24 BY MS. BIERI:
25    Q.  Were you talking about potentially working

6 (Pages 18 - 21)

Page 22

1 on the litigation?
2        MR. EXNICIOS: Objection to form.
3        THE WITNESS: (Inaudible.)
4        THE REPORTER: I'm sorry, what was that,
5 Doctor?
6        THE WITNESS: It was about the litigation.
7 BY MS. BIERI:
8     Q. What about the litigation?
9     A. That they were considering looking at
10 different experts who had information about
11 alopecia, hair loss, and the effect on hair loss in
12 women.
13     Q. So you meet with Mr. Xenick. You're
14 having phone calls with him, and about a month or
15 two later, do you have another meeting with the
16 plaintiffs' lawyers, or is it a phone call?
17        MR. EXNICIOS: Objection. Form.
18        THE WITNESS: You know, I don't really
19     recall the -- how the progress occurred, if it
20     was a teleconference or similar meeting.
21 BY MS. BIERI:
22     Q. When was the next -- after you meet with
23 Mr. Xenick for the first time, you have some phone
24 calls on the phone. When is the next time you met
25 with a person, one of plaintiffs' lawyers?

Page 23

1        MR. EXNICIOS: Objection. Form.
2        THE WITNESS: I met with -- I met with Val
3     here at the office at some point.
4 BY MS. BIERI:
5     Q. When was that?
6     A. I don't recall.
7     Q. Was it winter, spring, summer, fall?
8     A. In Florida? Really? I have no idea.
9        MR. EXNICIOS: Objection. Form.
10 BY MS. BIERI:
11     Q. Was anyone else in the meeting besides you
12 and Mr. Exnicios? Whose name I just butchered.
13        MS. BIERI: Sorry, Val.
14        MR. EXNICIOS: I'm used to it.
15        THE WITNESS: No, Val was here by himself,
16     I think.
17 BY MS. BIERI:
18     Q. Were you told anything additional about
19 the litigation from Mr. Exnicios?
20        MS. BIERI: Will you say your name? Hold
21     on. Val, will you say your last name for me?
22        MR. EXNICIOS: Just like delicious,
23     Exnicios.
24        MS. BIERI: Thank you. I'll stop
25     butchering your name now.

Page 24

1        Can you read my question back, please?
2        (The question was read back.)
3        MS. BIERI: Exnicios.
4        MR. EXNICIOS: Very good.
5        THE WITNESS: Exnicios.
6        MR. EXNICIOS: Objection. Form.
7 BY MS. BIERI:
8     Q. You can answer.
9     A. If there was any time between? I'm sorry,
10 I missed the question --
11     Q. No, you said that you had a meeting with
12 Mr. Exnicios?
13     A. Exnicios.
14     Q. Exnicios. Were you told anything else
15 about the litigation during that meeting?
16        MR. EXNICIOS: Objection. Form.
17        THE WITNESS: He told me that it was
18     proceeding and that he was interested in my
19     opinion on the matter.
20 BY MS. BIERI:
21     Q. And did you bill for any of the time that
22 you spent when you met with Mr. Exenek (phonetic)?
23 The first lawyer.
24        MR. EXNICIOS: Xenick.
25

Page 25

1 BY MS. BIERI:
2     Q. Mr. Xenick or the phone calls that you had
3 with Mr. Xenick?
4        MR. EXNICIOS: Objection. Form.
5        THE WITNESS: No, I don't believe I did.
6 BY MS. BIERI:
7     Q. And did you charge for the initial meeting
8 with Mr. Exignos (phonetic)?
9        MR. EXNICIOS: Objection.
10        MS. BIERI: I can't do it --
11        THE WITNESS: I did not charge
12     Mr. Exnicios anything.
13 BY MS. BIERI:
14     Q. You did not charge Mr. Exnicios --
15     A. No.
16     Q. -- anything?
17     A. For that meeting.
18     Q. And how long did that meeting last?
19     A. Fifteen minutes, twenty minutes max.
20     Q. After that meeting, when was your next
21 contact?
22     A. I really have no idea.
23     Q. There is a note in your file that says
24 "7/10 of '18, setting up 30-minute call."
25        Do you know to what that refers? And if

7 (Pages 22 - 25)

Page 26

1 it helps you, your file that you brought is ...
2    A.   Yeah, I mean, the first billable call was
3 probably a conference call on -- with the litigation
4 team.  According to my note.
5    Q.   So then you had another call on 7/13, is
6 that correct, of 2018?
7    A.   That was the call that you're referring
8 to?
9    Q.   Is that correct?
10    A.   Another call?  No, that's 7/13.  That was
11 the 30-minute call.
12    Q.   That is referenced in the 7/10/18, setting
13 up 30-minute call note on your file?
14    A.   That's not a set up.  That's the date of
15 the call.  7/13 is the date of the call.
16    Q.   Sure, and sorry, what I was trying to say
17 is, in your file on the actual file folder there is
18 a note that says 7/10/18, setting up 30-minute call.
19 Is the call that was on 7/13 the call that you
20 set --
21    A.   I have no idea.  That file belonged to my
22 bookkeeper.
23    Q.   When were you retained to work on this
24 matter?
25    A.   That was in July, I believe.

Page 27

1    Q.   Exhibit 1 indicates that "A $5,000
2 retainer was paid to Bauman Medical's consulting
3 division on July 13, 2018"; is that correct?
4    A.   Yes.
5        MR. EXNICIOS:  Objection to form.
6 BY MS. BIERI:
7    Q.   Were you retained prior to July 13th of
8 2018?
9    A.   No.
10    Q.   You were retained on July 13th of 2018?
11    A.   I believe so.  That's when everything
12 got -- it got executed.
13    Q.   That's when you got your retainer check,
14 correct?
15    A.   Correct.
16    Q.   But you had calls prior to that that you
17 did not bill for?
18    A.   Correct.
19    Q.   Okay.  Beyond the calls that you had prior
20 to being retained, did you do any other work prior
21 to being retained?
22    A.   No.
23    Q.   The cover letter of your report states,
24 "Thank you for your request for information
25 regarding female hair loss, alopecia, and the hair

Page 28

1 restoration options commonly prescribed at Bauman
2 Medical."
3        Was that what you were asked to provide
4 information regarding by plaintiffs' counsel?
5    A.   Yes.
6    Q.   How many total hours have you spent
7 working on this litigation?
8    A.   I have no idea.  I didn't add it up, but
9 we could.
10    Q.   Okay.
11    A.   It looks like less than ten.
12    Q.   The calls that you had prior to 7/13
13 aren't included in that, correct?
14    A.   Correct.
15        MR. EXNICIOS:  Objection to form.
16 BY MS. BIERI:
17    Q.   But about ten hours since you've been
18 retained?
19    A.   Yes.
20    Q.   And it looks like you have submitted two
21 invoices in connection with this matter; is that
22 correct?
23    A.   I have no idea.
24    Q.   Feel free to look at your file.  This is a
25 copy on top and the originals are in that folder, if

Page 29

1 that helps you.
2    A.   Sure.  So this original -- the original
3 invoice and then this most recent.
4    Q.   It looks like the two invoices have the
5 same invoice number; is that accurate?  Can you take
6 a look, please?
7    A.   No, it's just a copy.
8    Q.   So, really, there's been one invoice
9 submitted twice; is that accurate?
10    A.   I don't think it's been submitted twice.
11    Q.   This is just an extra copy of the same
12 invoice?
13    A.   Yes, it's the same invoice.
14    Q.   Okay.
15    A.   An additional copy.
16    Q.   And this reflects services for five hours
17 of work, correct?
18    A.   (Nods head.)
19    Q.   So you have another invoice to submit?
20    A.   Well, I just quickly added up the numbers
21 that were on this report.
22    Q.   Do you agree that all of your time isn't
23 captured in the one invoice numbered --
24    A.   Correct --
25    Q.   -- 6295?

8 (Pages 26 - 29)

1    A.  -- yeah, there's one other -- I'm sure
2  there's one other invoice.
3    Q.  Do you think that other --
4    A.  (Inaudible.)
5    Q.  Forgive me for speaking --
6    A.  For today.
7    Q.  Well, do you agree that the invoice Number
8  6295 reflects five hours of work at $650?
9    A.  Yes.
10   Q.  And do you agree that there are more than
11 five hours' worth of work identified on the
12 spreadsheet that says Taxotere Litigation $ 7_2018?
13   A.  Yes.
14      MR. EXNICIOS:  Objection as to form.
15 BY MS. BIERI:
16   Q.  And that --
17   A.  There may not have been an invoice for the
18 first retainer that we -- obviously, it's not in the
19 file, the original invoice, perhaps.
20   Q.  So you --
21   A.  For 7/11/2018, I don't see that invoice.
22   Q.  So you think that there is another invoice
23 that exists that's missing?
24   A.  Yes, it could be another invoice.
25   Q.  But all of your work to date, save the pre

1  7/13/18 phone calls is reflected in deposition
2  Exhibit Number 2?
3    A.  Correct.
4       MR. EXNICIOS:  Do you have another copy of
5    that, or no?
6       MS. BIERI:  I do.  This is the full other
7    copy of his file, and you know what we'll do,
8    this one I think we'll actually mark.  So do
9    you mind looking at that?  We only --
10      MR. EXNICIOS:  No.
11      MS. BIERI:  Or you can look at his
12   original, whichever is easier for you.
13      MR. EXNICIOS:  That's fine.
14      (Defendant's Exhibit 2 was marked for
15 identification.)
16 BY MS. BIERI:
17   Q.  Have you ever worked with any of the
18 plaintiffs' attorneys from the Taxotere litigation
19 before?
20   A.  No.
21   Q.  Did you know Mr. Xenick before he first
22 contacted you regarding this litigation?
23   A.  No.
24      (Defendant's Exhibit 3 was marked for
25 identification.)

1  BY MS. BIERI:
2    Q.  I'm going to hand to you what's been
3  marked as deposition Exhibit Number 3.  You might
4  have two copies.
5       Have you seen deposition Exhibit Number 3
6  before?
7    A.  Yes.
8    Q.  And is that the notice for your
9  deposition?
10   A.  Yes.
11   Q.  You saw that before today?
12   A.  Yes, I did.
13   Q.  And were you aware that the notice asked
14 you to bring certain items with you to the
15 deposition?
16   A.  I'd assume that we had sent everything to
17 you already.
18   Q.  Well, we've never before.  You haven't
19 sent anything to me.
20   A.  Okay.
21   Q.  Or --
22      MR. EXNICIOS:  Objection as to form.
23      THE WITNESS:  In my report.
24 BY MS. BIERI:
25   Q.  Do you mean you thought you had sent

1  everything that was requested in the deposition
2  notice to plaintiffs' counsel?
3    A.  Yes, that and my report.
4    Q.  Let's look at the deposition notice.  If
5  you don't mind turning to Page 6 and 7 at the back.
6  Can you review the request and let me know whether
7  you have any documents that are responsive that are
8  not contained within the file that you brought with
9  you today?
10   A.  Everything that we have is within the
11 file.
12   Q.  Well, let's go through some of these then,
13 and before we do that, I'm going to hand you what's
14 being marked as deposition Exhibit Number 4.
15      (Defendant's Exhibit 4 was marked for
16 identification.)
17 BY MS. BIERI:
18   Q.  Have you ever seen deposition Exhibit
19 Number 4 before?
20   A.  Yes.
21   Q.  Did you help prepare that document?
22   A.  I did not prepare it, but I did review it.
23   Q.  And you signed off on it?
24      MR. EXNICIOS:  Objection as to form.
25      THE WITNESS:  I'm not sure what you mean.

9 (Pages 30 - 33)

Page 34

1 BY MS. BIERI:
2   Q.  Well, I mean, you said you reviewed it?
3   A.  Yes.
4   Q.  Did you agree with what was represented
5 about what you did and did not have in deposition
6 Exhibit Number 4?
7   A.  Yes, I agree with it.
8   Q.  So, for example, request Number 3 in the
9 deposition notice and also the corresponding number
10 in Exhibit 4 says, "Provide a copy of all materials
11 and other media referenced on Page 4, Exhibits &
12 References, of Your Report."
13       And this says, "The PSE will produce
14 materials responsive to this request."
15       Are you aware if that's happened?
16   A.  We have provided everything in the report.
17   Q.  To plaintiffs' counsel, potentially?
18   A.  Correct.
19   Q.  Not to defense counsel?
20       MR. EXNICIOS:  Objection as to form.
21       THE WITNESS:  (No response.)
22 BY MS. BIERI:
23   Q.  In regard to request Number 6, you
24 indicate that you have not rendered any medical
25 treatment to any of the bellwether plaintiffs; is

Page 35

1 that accurate?
2   A.  That is correct.
3   Q.  Never rendered treatment to Ms. Earnest?
4   A.  I don't even know who --
5       MR. EXNICIOS:  Objection as to form.
6 BY MS. BIERI:
7   Q.  You don't even know who Ms. Earnest is?
8   A.  Never met her.
9   Q.  Don't know her first name?
10   A.  (Shakes head.)
11   Q.  Never talked to her?
12   A.  Never.
13   Q.  Do you know who Ms. Durden is?
14   A.  No.
15   Q.  Do you know her first name?
16   A.  No.
17   Q.  Never met her ever?
18   A.  (Shakes head.)
19   Q.  Never talked to her?
20   A.  No.
21   Q.  Do you know who Ms. Francis is?
22   A.  No.
23   Q.  Never met her, never talked to her?
24   A.  Never met her.
25   Q.  Never talked to her?

Page 36

1   A.  Never talked to her.
2   Q.  I'm just going to go through a few
3 additional of these.  Can you look at request Number
4 13?  Do you have any documents responsive to request
5 Number 13?
6   A.  Aside from my report?
7   Q.  Well, I don't think your report mentions
8 cancer, does it?
9   A.  Maybe just in passing as a cause
10 potentially of hair loss.
11   Q.  I'll represent to you I don't think --
12   A.  My expertise is not in cancer treatment.
13   Q.  Correct, and do you agree that the word
14 cancer is not mentioned in your expert report?
15       MR. EXNICIOS:  Objection as to form.
16 BY MS. BIERI:
17   Q.  Feel free to look at it if you'd like.
18   A.  Well, the reference to our cancer patients
19 that we have treated are in the report, yes.
20   Q.  Is the word cancer mentioned anywhere in
21 your report?
22   A.  Yes, it is in the links to my information
23 on our patients who have received, for example, hair
24 and scalp prostatic devices.
25   Q.  In terms of in the -- I'll call it the

Page 37

1 body of your expert report.
2   A.  Okay.
3   Q.  Is the word cancer mentioned?
4   A.  No.
5   Q.  You instead are referring to under the
6 Exhibits & References section the sentence in front
7 of a YouTube link that says, "Dr. Bauman's Brain
8 Cancer Patient, Genny, Receives 3D-Printed CNC Hair
9 Replacement System from Bauman Philanthropic
10 Foundation"?
11   A.  Correct.
12   Q.  And "Cancer survivor, Tim, Receives CNC
13 Hair Replacement from Bauman Philanthropic
14 Foundation"?
15   A.  Exactly.
16   Q.  Those are the only two references?
17   A.  Correct.
18   Q.  And they're references to YouTube links in
19 the Exhibits & References section?
20   A.  That is correct.
21   Q.  Okay.  Exhibit 4 represents that you don't
22 have any documents responsive to request Number 14;
23 is that accurate?
24   A.  That's correct.
25       MR. EXNICIOS:  I'm sorry, you're talking

10 (Pages 34 - 37)

Page 38

1     about Exhibit A in Number 14 now?  I apologize.
2         MS. BIERI:  (Indicating.)
3         MR. EXNICIOS:  Thank you.
4   BY MS. BIERI:
5     Q.   And Exhibit 4 says you do not have any
6   materials responsive to request Number 17 in the
7   deposition notice; is that correct?
8     A.   That is correct.
9     Q.   And is it accurate that you have not
10  reviewed any of the expert reports prepared by
11  plaintiffs' other expert witnesses?
12    A.   I haven't seen any of that.
13    Q.   So you agree with all of the
14  representations in Exhibit 4 about what you do or do
15  not have, correct?
16    A.   Correct.
17        MR. EXNICIOS:  Objection as to form.
18  BY MS. BIERI:
19    Q.   You brought your file with you today,
20  correct?
21    A.   (Nods head.)
22    Q.   Is everything that you have related to
23  this litigation contained in the file that you
24  provided today?
25    A.   Yes.

Page 39

1         MR. EXNICIOS:  Objection as to form.
2   BY MS. BIERI:
3     Q.   Does your file contain any of the
4   materials that you reviewed in forming your
5   opinions?
6     A.   What kind of materials would I need?  No.
7   Nothing -- nothing is added or needed.
8     Q.   So you didn't need -- you did not review
9   any materials in forming your opinions in this case?
10    A.   No, my opinions --
11        MR. EXNICIOS:  Objection as to form.
12        THE REPORTER:  Can you repeat your answer,
13    Doctor?  I'm sorry, when he's speaking, I can't
14    hear you.  Say it again, please.
15        THE WITNESS:  My opinions are based on the
16    20 years of my experience.
17  BY MS. BIERI:
18    Q.   It's not based on any literature?
19        MR. EXNICIOS:  Objection as to form.
20        THE WITNESS:  Well, that's not exactly
21    true.
22  BY MS. BIERI:
23    Q.   Well, explain what you mean, please.
24    A.   So my experience in the field includes
25  information at conferences, information at --

Page 40

1   journals that I have read, opinions from colleagues.
2     Q.   Have you, in preparing your opinions for
3   this case that are in your expert report, did you
4   consider any written literature, or written
5   materials?
6     A.   No, this report is made out of my
7   experience and expertise.
8         MR. EXNICIOS:  Objection as to form.
9   BY MS. BIERI:
10    Q.   So you didn't rely on any literature or
11  studies in forming your expert opinions in drafting
12  your report; is that correct?
13        MR. EXNICIOS:  Same objection.
14        THE WITNESS:  No, there is no -- no, this
15    is based on my experience and expertise.  There
16    are no references other than what have been
17    provided in the expert report.
18  BY MS. BIERI:
19    Q.   And we'll turn to that in just a moment.
20        So in your expert report -- no, we'll turn
21  to that in a moment.
22        What did you do, if anything, to prepare
23  for your deposition today?
24    A.   I got a good night sleep.
25    Q.   Anything else?

Page 41

1     A.   One cup of coffee.
2     Q.   Did you meet with anyone?
3     A.   No, I prepared my expert report.
4     Q.   The cover letter to your expert report is
5   dated August 16, 2018, correct?
6     A.   Correct.
7     Q.   And did you draft and finalize your expert
8   report prior to August 16th, 2018?
9         MR. EXNICIOS:  Objection to form.
10        THE WITNESS:  I'm not sure I understand
11    your question.  The date of the report is the
12    day that I prepared it.
13  BY MS. BIERI:
14    Q.   Okay.  So are you saying that you prepared
15  your expert report on August 16th of 2018?
16    A.   I don't remember when I started it, but
17  the point is that I completed the report on that
18  particular date.
19    Q.   So your expert report was completed on
20  August 16, 2018?
21    A.   Yes, that is correct.
22    Q.   No changes or amendments to it after that?
23    A.   There was one addendum which I provided
24  links and excerpts at your request.
25    Q.   Are you referring to a document titled

11 (Pages 38 - 41)

1 Additional References (Alan J. Bauman, MD|Expert
2 Opinion)?
3    A.  Correct.
4    Q.  Okay.  We'll talk about that in a moment
5 as well.
6       Other than that, as you call it addendum
7 to your report, any other changes to your report
8 since August 16th of 2018?
9    A.  No.
10    Q.  Did you review anything in preparation for
11 your deposition today?
12    A.  Just my expert report.
13    Q.  When did you review that?
14    A.  It was over the weekend.
15    Q.  Nothing else?
16       MR. EXNICIOS:  Objection to form.
17       THE WITNESS:  (No response.)
18 BY MS. BIERI:
19    Q.  Did you talk to plaintiffs' counsel in
20 preparation for this deposition?
21    A.  Just as for scheduling purposes.
22    Q.  Just for scheduling, no substantive
23 discussion?
24    A.  (Nods head.)
25    Q.  Yes or no?  Sorry.  You nodded -- you

1 moved your head instead of an oral response.
2    A.  I'm sorry.  For scheduling purposes?
3    Q.  Did you just speak to plaintiffs' counsel
4 about this deposition for scheduling purposes, or
5 did you have substantive discussion with plaintiffs'
6 counsel in preparation for this deposition?
7       MR. EXNICIOS:  Objection.  Form.
8       THE WITNESS:  There was no other
9    discussion other than what the format would be
10    and the time.
11 BY MS. BIERI:
12    Q.  In connection with your expert report, you
13 provided a CV.
14       MS. BIERI:  Let me mark that as deposition
15    Exhibit Number 5.
16       (Defendant's Exhibit 5 was marked for
17    identification.)
18       MR. EXNICIOS:  Thank you.
19 BY MS. BIERI:
20    Q.  When was the last time you updated
21 deposition Exhibit 5, your CV?
22    A.  I have no idea.  Probably within the past
23 year.
24    Q.  Is it current?
25    A.  Yes.

1    Q.  Is it accurate?
2    A.  Yes.
3    Q.  Does anything need to be changed?
4    A.  No.
5    Q.  When did you graduate from undergraduate?
6    A.  Undergrad in 1991.
7    Q.  And that was from University of
8 California, Riverside?
9    A.  Yes.
10    Q.  Then you got your M.D.  In what year?
11    A.  1995.
12    Q.  Your CV indicates that you did residency
13 in surgery, but you list two institutions for
14 surgical residency.  How long was each?
15    A.  Each one was one year.  PG 1 and PG 2.
16    Q.  Did you complete the surgical residency at
17 Beth Israel?
18    A.  Complete the year?
19    Q.  (Nods head.)
20    A.  Yes, I completed the year.
21    Q.  What was the name of the individual
22 responsible for overseeing your surgical residency
23 at Beth Israel?
24    A.  I have no idea.  We can check the diploma.
25    Q.  Then you did a second year of surgical

1 residency, correct?
2    A.  Correct.
3    Q.  At Mount Sinai?
4    A.  Correct.
5    Q.  And that was a year?
6    A.  Absolutely.
7    Q.  And do you know the name of the person who
8 was responsible for that program?
9    A.  I have no idea.
10    Q.  So you have two years of surgical
11 residency only?
12    A.  Correct.
13    Q.  And is it your understanding that the
14 Mount Sinai program, for example, requires more than
15 two years of a surgical residency?
16    A.  Well, that would depend on the special --
17 For general -- not a specialty, for
18 general surgery.
19       MR. EXNICIOS:  Objection to the form of
20    the question.
21       THE WITNESS:  For general surgery?
22 BY MS. BIERI:
23    Q.  Uh-huh.
24    A.  General surgery is typically five years.
25    Q.  Okay.  And you've done two years, correct?

12 (Pages 42 - 45)

Page 46

1   A.  Correct.
2   Q.  Okay.  No other residencies?
3   A.  No, just fellowship.
4   Q.  You identified that as Eastwood Medical?
5   A.  Correct.
6   Q.  Is that a hospital?
7   A.  No, it's an outpatient facility.
8   Q.  Was that fellowship accredited by the
9 Council for Graduate Medical Education?
10   A.  There's no such thing as that for hair
11 transplantation.
12   Q.  So is the answer to my question no?
13   A.  That would be no.
14   Q.  Any other fellowships?
15   A.  No.
16   Q.  Do you consider yourself to be board
17 certified?
18   A.  Yes.
19   Q.  By whom?
20   A.  The American Board of Hair Restoration
21 Surgery.
22   Q.  Is the American -- is it the American
23 Board of -- is it the American Board of Hair
24 Restoration Surgery or is it the American
25 International Board of Hair Restoration Surgery?

Page 47

1   A.  They are one and the same.
2   Q.  Okay.  Thank you for the clarification.
3     Do you agree that the American Board for
4 Hair Restoration Surgery is a for-profit
5 organization?
6     MR. EXNICIOS:  Objection as to form.
7     THE WITNESS:  I have no idea.
8 BY MS. BIERI:
9   Q.  Are you aware that the American Board of
10 Hair Restoration Surgery is not a part of the
11 American Board of Medical Specialties?
12   A.  That is true.  Not yet.
13     MR. EXNICIOS:  Objection as to form.
14 BY MS. BIERI:
15   Q.  It wasn't at the time that you got your
16 certification by the American Board of Hair
17 Restoration Surgery?
18   A.  No, it's a new subspecialty of medicine.
19     MR. EXNICIOS:  Objection as to form.
20 BY MS. BIERI:
21   Q.  And it's not currently either, correct?
22   A.  Correct.
23     MR. EXNICIOS:  Objection.  Form.
24 BY MS. BIERI:
25   Q.  Do you hold any board certifications by

Page 48

1 the American Board of Medical Specialty --
2 Specialists?
3   A.  No.
4   Q.  And you agree that hair restoration is not
5 recognized by the American Board of Medical
6 Specialists, correct?
7   A.  Correct.
8     MR. EXNICIOS:  Objection as to form.
9 BY MS. BIERI:
10   Q.  But you do agree that the American Board
11 of Medical Specialists offers board certification in
12 general surgery, correct?
13     MR. EXNICIOS:  Objection.  Form.
14     THE WITNESS:  Yes.
15 BY MS. BIERI:
16   Q.  Do you know that?
17   A.  Yes.
18   Q.  And does the American Board of Medical
19 Specialty -- Specialties offer board certification
20 in dermatology?
21     MR. EXNICIOS:  Objection to form.
22     THE WITNESS:  Yes.
23 BY MS. BIERI:
24   Q.  And does the American Board of Medical
25 Specialties offer board certification in plastic

Page 49

1 surgery?
2     MR. EXNICIOS:  Objection.  Form.
3     THE WITNESS:  Yes.
4 BY MS. BIERI:
5   Q.  And does the American Board of Medical
6 Specialties offer board certification in psychiatry?
7     MR. EXNICIOS:  Objection.  Form.
8     THE WITNESS:  Yes.
9 BY MS. BIERI:
10   Q.  In what states are you licensed to
11 practice medicine?
12   A.  In Florida and California.
13   Q.  Any other states?
14   A.  No.
15   Q.  Have you ever had your license suspended
16 or revoked?
17   A.  Never.
18   Q.  Have you ever been sued for malpractice?
19   A.  No.
20   Q.  Have you ever been convicted of a crime?
21   A.  Never.
22     MR. EXNICIOS:  Objection.  Form.
23 BY MS. BIERI:
24   Q.  These are questions that we ask witnesses.
25 I -- don't take it personally.

13 (Pages 46 - 49)

1      Do you subscribe regularly to any medical
2 journals?
3     A.   Yes.
4     Q.   Which ones?
5     A.   Gosh, the Hair Transplant Forum,
6 Dermatologic Surgery, JAMA, Journal of the American
7 Academy of Dermatology.
8     Q.   Do you use or subscribe to any Internet
9 services for current medical information?
10     A.   Research Gate.
11     Q.   Turning back to the journals that you
12 identified as regularly subscribing to, do you
13 consider those journals authoritative?
14     A.   Absolutely.
15     Q.   Do you keep any medical textbooks in your
16 office?
17     A.   I do.
18     Q.   Which ones?
19        MR. EXNICIOS:  Objection.  Form.
20        THE WITNESS:  How much time do you have?
21        MR. EXNICIOS:  Seven hours.
22        THE WITNESS:  Hair Transplant Surgery,
23     Hair and Scalp Diseases, Atlas of Hair and
24     Skin, Dermatologic Pathology, Gray's Anatomy.
25

1 BY MS. BIERI:
2     Q.   Any others?
3     A.   There's Hair Transplantation, there's
4 Atlas of Hair Transplantation, Editions 1 through 5.
5     Q.   You keep all the editions, huh?
6     A.   (Nods head.)
7     Q.   Yes?
8     A.   I wrote chapters in that --
9        MR. EXNICIOS:  Objection to form.
10        THE WITNESS:  -- textbook so, yes, you bet
11     I keep them.
12 BY MS. BIERI:
13     Q.   Do you consider all of the textbooks that
14 you just identified as authoritative?
15     A.   Absolutely.
16     Q.   Have you --
17     A.   Not just because I wrote the chapters in
18 them.
19     Q.   A chapter in one of them, correct?
20     A.   A chapter in multiple.
21     Q.   Have you ever served as a professor at any
22 university or medical school?
23     A.   No.
24     Q.   So you're the CEO of Bauman Medical,
25 correct?

1     A.   Correct.
2     Q.   What businesses fall under that umbrella?
3 Do any businesses fall under that umbrella?
4     A.   The business of Bauman Medical.
5     Q.   Okay.  And then do businesses fall under
6 Bauman Medical?
7     A.   I'm not sure what you mean.
8     Q.   Okay.  You mentioned that you do some
9 consulting work, right?
10     A.   Uh-huh.
11     Q.   And do you have a separate business entity
12 for your consulting work?
13     A.   It's not a separate business entity.  It's
14 a division of Bauman Medical.
15     Q.   What are the divisions of Bauman Medical?
16     A.   There's the consulting division and then
17 there's Bauman Medical.
18     Q.   You --
19     A.   Actually, we also have a 501(c)(3), which
20 is a separate entity.
21     Q.   That's not Bauman Medical?
22     A.   Correct.
23     Q.   That's Bauman Philanthropic, correct?
24     A.   Correct.
25     Q.   Okay.  You have a salon too, correct?

1     A.   Well, it's a room.
2        MR. EXNICIOS:  Objection.  Form.
3 BY MS. BIERI:
4     Q.   It's a room?  B-Boca?
5     A.   SalonB is just a room.  It's not a
6 separate entity.  It's not a separate salon.  It's
7 not a separate business.
8     Q.   And the salonB is located on your premises
9 here, correct?
10     A.   Correct.
11        MR. EXNICIOS:  Objection to form.
12 BY MS. BIERI:
13     Q.   I will say this office is lovely.  How
14 many square feet is it?
15     A.   Thanks for putting that on the record.
16        MR. EXNICIOS:  Objection.  Form.
17 BY MS. BIERI:
18     Q.   It is lovely.
19     A.   It's 12,000 square feet.
20     Q.   Are you the sole owner of Bauman Medical?
21     A.   Yes.
22        MR. EXNICIOS:  Objection.  Form.
23 BY MS. BIERI:
24     Q.   Is Bauman Medical profitable?
25        MR. EXNICIOS:  Objection.  Form.

14 (Pages 50 - 53)

1        THE WITNESS:  Yes.
2  BY MS. BIERI:
3     Q.   What is the primary source of revenue for
4  Bauman Medical?
5        MR. EXNICIOS:  Objection.  Form.
6        THE WITNESS:  Taking care of patients.
7  BY MS. BIERI:
8     Q.   So money is received from patients?
9     A.   A fee for service.
10    Q.   And when you're paid for your work in this
11  case, and your testimony at deposition, and
12  potentially at trial, will that be paid to you
13  personally, to Bauman Medical?
14    A.   It's paid to --
15        MR. EXNICIOS:  Objection.  Form.
16        THE WITNESS:  -- Bauman Medical.
17  BY MS. BIERI:
18    Q.   In terms of sources of patient business
19  for Bauman Medical, what is your -- the primary way
20  you get business?
21        MR. EXNICIOS:  Objection.  Form.
22  BY MS. BIERI:
23    Q.   If you know.  If you track that.
24    A.   Word of mouth.
25    Q.   You do some media advertisements, correct,

1  and media experiences?
2        MR. EXNICIOS:  Objection.  Form.
3        THE WITNESS:  I get asked to be -- for my
4     opinion by the media.
5  BY MS. BIERI:
6     Q.   And you do advertising as well, correct?
7     A.   Very little.
8        MR. EXNICIOS:  Objection.  Form.
9        THE REPORTER:  You said "very little"?
10        THE WITNESS:  Very little.  Sorry.
11  BY MS. BIERI:
12    Q.   I was looking maybe on your website or
13  maybe in your résumé.  You've done a fair amount of
14  media.  Everything from Howard Stern to the Home
15  Shopping Network to the Suzanne Somers show,
16  correct?
17        MR. EXNICIOS:  Objection.  Form.
18  BY MS. BIERI:
19    Q.   On Lifetime?
20        MR. EXNICIOS:  Objection.  Form.
21        THE WITNESS:  Yes.
22  BY MS. BIERI:
23    Q.   So something I was trying to ask you about
24  earlier is how you divide your professional time.
25  It sounds like you go to conferences, you do media

1  appearances, you treat patients, you have a
2  consulting business.  What other activities fall
3  within the realm of your professional work?
4        MR. EXNICIOS:  Objection.  Form.
5        THE WITNESS:  Well, that just about covers
6     it.
7  BY MS. BIERI:
8     Q.   So I'm trying to understand how much of
9  your -- you weren't comfortable telling me on a
10  weekly basis a percentage.  Maybe it's easier if you
11  think about it in terms of 2018 as a whole.  What
12  percentage of your time do you think that you spent
13  in connection with your consulting work?
14        MR. EXNICIOS:  Objection.  Form.
15        THE WITNESS:  It's actually a very small
16     part of the practice.  So it might be, you
17     know, 2 percent in total hours.
18  BY MS. BIERI:
19    Q.   What percent of your time do you think
20  that you've spent in connection with your
21  administrative responsibilities for being the CEO of
22  Bauman Medical?
23        MR. EXNICIOS:  Objection.  Form.
24        THE WITNESS:  Well, I have a very robust
25     team.  So a small percent.  Five percent.  Most

1     of my time is taking care of patients.
2  BY MS. BIERI:
3     Q.   How much time would you say that you spend
4  in connection with doing media appearances or
5  advertising?
6        MR. EXNICIOS:  Objection.  Form.
7        THE WITNESS:  Well, advertising, very
8     little.  None.
9  BY MS. BIERI:
10    Q.   Media experiences?
11    A.   Media experiences, as they come.  Again, a
12  small percent; 2 percent, 3 percent of time.
13    Q.   And I think you also mentioned
14  conferences.  What percent of your time -- are you
15  talking about attending or speaking at conferences?
16    A.   That would be a little bit more.
17    Q.   Okay.
18    A.   Probably, maybe 10 percent of my time.
19    Q.   And then, obviously, there is patient
20  care?
21    A.   Correct.
22    Q.   What other buckets are there of how you
23  spend your professional time?
24    A.   I think that's it.  I can't think of any
25  others.

Page 58

1   Q.   So on your website, you describe yourself
2   as a full-time hair transplant surgeon; is that
3   accurate?
4   A.   Correct.
5   Q.   And you currently practice here in Boca
6   Raton?
7   A.   Uh-huh.
8   Q.   And have you always practiced here in Boca
9   Raton?
10   A.   Yes.
11   Q.   What is the average age of your patient?
12       MR. EXNICIOS:  Objection.  Form.
13       THE WITNESS:  Male or female?
14   BY MS. BIERI:
15   Q.   I was going to do it globally and then
16   break it down.
17   A.   So 39 1/2 is the average age for men, and
18   52 is the average age for women.
19   Q.   I think in your report you said that
20   approximately 50 percent of your patients are
21   female?
22   A.   Correct.
23   Q.   What percentage of your female patients
24   are African American, if you know?
25   A.   I would say it's about 5 percent.

Page 59

1   Q.   What is the average income of your
2   patient?
3   A.   I have no idea.
4       MR. EXNICIOS:  Objection.  Form.
5   BY MS. BIERI:
6   Q.   Do you agree that a large percentage of
7   your practice is doing hair transplant surgery?
8   A.   Yes, I agree.
9       MR. EXNICIOS:  Objection to form.
10   BY MS. BIERI:
11   Q.   And I think I read on your website that
12   98 percent of your cases involve FUE specific
13   transplants; is that accurate?
14   A.   Correct.
15       MR. EXNICIOS:  Objection.  Form.
16   BY MS. BIERI:
17   Q.   So 98 percent of your patients get FUE
18   transplants?
19   A.   Yes.
20       MR. EXNICIOS:  Objection.  Form.
21   BY MS. BIERI:
22   Q.   And then the other 2 percent fall into
23   other treatments; is that accurate?
24   A.   Not really.  You're conflating hair
25   transplant surgery with medical therapies, and

Page 60

1   that's not what goes on.
2   Q.   Okay.  Then explain it.  I want to make
3   sure we get it right.
4   A.   So nearly two-thirds of all patients that
5   come through the door may never need a hair
6   transplant, but of the transplants that we do, 98
7   percent are FUE.  The others are done with
8   alternative methods, strip harvest.
9   Q.   Okay.  So I understand I think the
10   distinction that you're making.
11       What percentage of your patients get hair
12   transplants?
13   A.   Probably about a third.
14   Q.   When you're doing patient consultations,
15   let's start with an initial consultation with a
16   patient, how much does that cost, if anything?
17   A.   A consultation is $250.
18       MR. EXNICIOS:  Objection to form.
19   BY MS. BIERI:
20   Q.   And how long is that consultation?
21       MR. EXNICIOS:  Objection.  Form.
22       THE WITNESS:  Ninety minutes.
23   BY MS. BIERI:
24   Q.   And you wouldn't do any treatments in that
25   initial consultation, correct?

Page 61

1   A.   Correct.
2   Q.   So just to come in and talk, $250?
3   A.   Correct.
4       MR. EXNICIOS:  Objection.  Form.
5   BY MS. BIERI:
6   Q.   For a patient that establishes care with
7   you, what is the average number of times that a
8   patient comes back for a visit at Bauman Medical?
9       MR. EXNICIOS:  Objection.  Form.
10       THE WITNESS:  Well, it could vary.
11   BY MS. BIERI:
12   Q.   I assume it does vary.
13   A.   I have no idea what the -- how many --
14   what the average of patients' follow-up numbers
15   would be.
16   Q.   Is it fair to say that for most of your
17   patients you don't see them -- don't provide a
18   treatment one time and then they're done, they never
19   come back to Bauman?
20   A.   No, most patients are recommended to come
21   in every 90 days.
22   Q.   Okay.
23       MR. EXNICIOS:  Objection.  Form.
24       Just for the record, my objection may come
25   at the end of the response only in deference to

Page 62

1    the witness and for the court reporter so I'm
2    not speaking at the same time as the witness.
3        MS. BIERI:  Well, I think to make sure the
4    objection is timely, you got to get it in
5    before he answers.
6        MR. EXNICIOS:  I appreciate your position,
7    Counsel, but I'm trying to be polite to the
8    court reporter.  So I will continue in my
9    current methodology.
10   BY MS. BIERI:
11       Q.  Well, you know how we can probably make
12   this easier, Dr. Bauman, plaintiffs' counsel may
13   have objections to my question.  So if you wait just
14   a moment before you answer, that will give him time
15   to make his objection.
16       A.  Understood.
17       Q.  Do you know the average amount a patient
18   spends on treatment with you?
19       MR. EXNICIOS:  Objection.  Form.
20       THE WITNESS:  No.
21   BY MS. BIERI:
22       Q.  You don't keep those statistics about what
23   an average patient spend is?
24       MR. EXNICIOS:  Objection.  Form.
25       THE WITNESS:  No, because it's a huge

Page 63

1    variety.
2    BY MS. BIERI:
3        Q.  What is the most a patient has spent with
4    you for treatment?
5        MR. EXNICIOS:  Objection.  Form.
6        THE WITNESS:  In total?
7    BY MS. BIERI:
8        Q.  Uh-huh.  Oh, it could be over a long time.
9    I'm just curious if you happen to know that number
10   since you don't have an average patient spend?
11       A.  It would be a guess.  So I don't know
12   exactly.
13       MR. EXNICIOS:  Objection.  Form.
14   BY MS. BIERI:
15       Q.  So you don't track average patient spend?
16   You don't know the most a patient has ever spent
17   either?
18       MR. EXNICIOS:  Same objection.
19       THE WITNESS:  I'm not prepared to give
20   that information.  I don't have it.  It's not
21   in my report.
22   BY MS. BIERI:
23       Q.  No, it is not in your report.  I agree
24   with that, but it is fair to think you might know
25   that outside of what was in your report.

Page 64

1        A.  I don't know the number offhand.
2        Q.  Okay.  I have seen, I think on your
3    website, a notation.  You have a lot of patients
4    from out of town; is that correct?
5        A.  Correct.
6        Q.  Do you know what percentage of your
7    patients come from out of town?
8        MR. EXNICIOS:  Objection.  Form.
9        THE WITNESS:  About one-third.
10   BY MS. BIERI:
11       Q.  Do you have people come from other
12   countries?
13       A.  Yes.
14       Q.  Where is the farthest you've had someone
15   come from --
16       MR. EXNICIOS:  Objection --
17   BY MS. BIERI:
18       Q.  -- for treatment --
19       MR. EXNICIOS:  -- form.
20       THE WITNESS:  If you go any farther, you
21   start coming back.
22   BY MS. BIERI:
23       Q.  Other countries?
24       MR. EXNICIOS:  Yeah, Japan, Guam.  You
25   know, you go much farther, you start coming

Page 65

1    back.
2    BY MS. BIERI:
3        Q.  You agree that some of your patients spend
4    a lot of money on hair restoration; is that fair?
5        MR. EXNICIOS:  Objection.  Form.
6        THE WITNESS:  Absolutely.
7    BY MS. BIERI:
8        Q.  And do you agree that for many of the
9    treatments that you offer, a patient has to be
10   dedicated to using them to see results?
11       MR. EXNICIOS:  Objection.  Form.
12       THE WITNESS:  That depends on the
13   treatment prescribed.
14   BY MS. BIERI:
15       Q.  Sure.  For some of the treatments that you
16   offer, do you agree that a patient has to be
17   dedicated to using them to see results?
18       A.  Yes.
19       MR. EXNICIOS:  Objection.  Form.
20   BY MS. BIERI:
21       Q.  Is it fair to say that the patients who
22   come to see you are concerned about their hair loss?
23       A.  Yes.
24       Q.  So much so they're willing to spend time
25   and money to address hair loss; is that fair?

17 (Pages 62 - 65)

Page 66

1      A.  Absolutely.
2      Q.  And you agree that in your practice you
3  don't see patients who don't care about hair loss,
4  right?  Those aren't the people who are coming to
5  you?
6      A.  I don't believe those people exist.
7      Q.  You don't think that there are -- okay.
8  Let's break this down.
9          You do hair restoration surgery and the
10  other hair restorations, correct?
11      A.  Correct.
12          MR. EXNICIOS:  Objection.  Form.
13  BY MS. BIERI:
14      Q.  So the people who come to you are seeking
15  out that specific type of treatment, correct?
16      A.  Yes.
17      Q.  Okay.  And do you agree that there are
18  people who have hair loss who don't seek treatment?
19      A.  Yes.
20      Q.  Do you claim any qualification or
21  expertise, experience beyond what's listed on
22  Exhibit 5, on your CV?
23          MR. EXNICIOS:  Objection.  Form.
24          THE WITNESS:  Expertise beyond my CV?
25

Page 67

1  BY MS. BIERI:
2      Q.  Uh-huh.
3      A.  You mean like as a father or husband?
4      Q.  You know what, let me be more specific.
5  Professional expertise.
6      A.  Okay.
7      Q.  Or professional qualifications.
8      A.  I think it's fairly complete.
9      Q.  Do you claim any expertise or
10  qualification professionally beyond what's listed in
11  Exhibit 5?
12          MR. EXNICIOS:  Objection.  Form.
13          THE WITNESS:  No, what you see is what you
14  have here.
15  BY MS. BIERI:
16      Q.  Okay.  I'm going to ask you some
17  questions, and they might seem silly to you, but go
18  with me on this.  Okay?
19      A.  Okay, Kelly.
20      Q.  You're not a cardiologist, correct?
21      A.  Correct.
22      Q.  You're not a pathologist, correct?
23      A.  Correct.
24      Q.  You're not an endocrinologist, correct?
25      A.  Correct.

Page 68

1      Q.  You're not an epidemiologist, correct?
2      A.  Correct.
3      Q.  You're not an oncologist, correct?
4      A.  Correct.
5      Q.  You're not an expert in FDA regulations of
6  chemotherapy drugs, correct?
7      A.  Correct.
8      Q.  You're not an expert in the chemotherapy
9  drug approval process, correct?
10      A.  Correct.
11      Q.  Agree that you're not an expert in
12  pharmacology?
13      A.  Correct.
14      Q.  Agree that you're not an expert in
15  pharmacovigilance?
16      A.  I don't even know what that means.
17      Q.  So I'll take that as a no, you do not
18  claim expertise in pharmacovigilance?
19      A.  Correct.
20      Q.  You're not an expert in the manufacture,
21  testing, marketing of chemotherapy drugs, correct?
22      A.  Correct.
23      Q.  Never prescribed chemotherapy?
24      A.  Never.
25      Q.  And you're not offering any opinions in

Page 69

1  this litigation regarding Taxotere, correct?
2      A.  Correct.
3      Q.  Not offering any opinions at all regarding
4  any chemotherapy drugs, correct?
5      A.  Correct.
6      Q.  You're not a dermatologist, correct?
7      A.  I'm an expert in hair.
8      Q.  Agree that you haven't completed a
9  dermatology --
10      A.  Correct.
11      Q.  -- residency?
12      A.  Agreed.
13      Q.  Agree that you haven't completed a
14  dermatology fellowship?
15      A.  Correct.
16      Q.  Agree that you aren't board certified in
17  dermatology?
18      A.  Correct.
19      Q.  So agree that you're not an expert
20  dermatologist?
21      A.  Correct.
22      Q.  And you're not a dermapathologist either,
23  correct?
24      A.  Correct.
25      Q.  Agree that you're not a psychologist?

18 (Pages 66 - 69)

Page 70

1    A.   Correct.
2    Q.   Agree that you're not a psychiatrist?
3    A.   Correct.
4    Q.   Agree that you're not an expert in
5 sociology?
6    A.   Agree.
7    Q.   Agree that you're not an expert in
8 anthropology?
9    A.   Agree.
10      MS. BIERI:  Can we take a break?
11      MR. EXNICIOS:  Sure.
12      THE VIDEOGRAPHER:  We're going off the
13 record.  This is the end of media unit Number
14 1.  The time is 5:39 p.m.
15      (A recess was taken.)
16      THE VIDEOGRAPHER:  We're back on the
17 record.  This is the beginning of media unit
18 Number 2.  The time is 5:49 p.m.
19 BY MS. BIERI:
20    Q.   Alopecia is the medical term for hair
21 loss, correct?
22    A.   Correct.
23    Q.   And the term alopecia -- well, let me ask
24 you this.  There are many different types of
25 alopecia, right?

Page 71

1    A.   Yes.
2    Q.   And hair loss can present in lots of
3 different ways; is that correct?
4    A.   Well, hair loss can be caused by a number
5 of different things.
6    Q.   I was actually talking -- okay.  So you've
7 got lots of different causes for hair loss.  I'm
8 talking about in terms of presentation.  Hair loss
9 can present as diffuse.  Hair loss can present as
10 patchy.  Hair loss -- that's what I'm getting at --
11    A.   Oh --
12    Q.   -- as presentation.
13    A.   -- yes.
14    Q.   There are many --
15    A.   Presentations, yes.  Many presentations of
16 hair loss, absolutely.
17    Q.   I've seen something referred to on your
18 website that talks about invisible baldness.  What
19 does that mean?
20    A.   Invisible baldness is a term that
21 describes the fact that you can lose 50 percent of
22 your hair without it being noticeable to the naked
23 eye.
24    Q.   So you can have significant hair loss
25 before you might even know you have the hair loss;

Page 72

1 is that correct?
2    A.   That is correct.
3    Q.   There are many causes of alopecia,
4 correct?
5    A.   Yes.
6    Q.   You agree that hair loss is very common in
7 women?
8    A.   Very common.
9    Q.   Thirty million women?
10    A.   Forty-six.
11    Q.   Forty-six million women in America?
12    A.   Yes.
13    Q.   Suffer from hair loss?
14    A.   Correct.
15    Q.   And would you agree that the vast majority
16 of patients that you see come in for male or female
17 patterned hair loss?
18      MR. EXNICIOS:  Objection to form.
19      THE WITNESS:  The majority, yes.
20 BY MS. BIERI:
21    Q.   I was looking at the Hair Loss 101 section
22 of your reports and I think it says, "The vast
23 majority of patients we treat are experiencing mild,
24 moderate or severe hereditary hair loss.  Also known
25 as male or female patterned hair loss, which is the

Page 73

1 most common type of hair loss"; is that accurate?
2    A.   That is accurate.
3    Q.   So is hereditary female patterned --
4    A.   It sounds like something I would say.
5    Q.   And it's accurate?
6    A.   Yes.
7    Q.   Okay.  And is hereditary female hair loss
8 the most common type of hair loss for women?
9    A.   Yes, that's -- yes, that's what we see and
10 treat mostly, as well.
11    Q.   And medications, nutritional factors,
12 thyroid conditions, psychological stress,
13 nutritional deficiencies, hormonal changes; are all
14 of those things that can cause hair loss?
15    A.   Yes.
16    Q.   Among others, I'm sure?
17    A.   Yes.
18    Q.   Let's talk about when a patient comes in
19 to see you for an initial consultation.  What
20 happens?
21    A.   So the first thing that happens is that
22 they are greeted by the front door, my front office
23 staff I should say, and they will fill out a
24 detailed medical history if they haven't done so
25 online.

19 (Pages 70 - 73)

Page 74

1   Q.   And -- so you have a standardized form for
2   that?
3   A.   Yes.
4   Q.   And in that do you ask about general
5   health status?
6   A.   Yes.
7   Q.   Nutritional status?
8   A.   Yes.
9   Q.   Stress management skills?
10  A.   Yes.
11  Q.   Menopausal state?
12  A.   Yes.
13  Q.   For women, I assume?
14  A.   Yes, of course.
15  Q.   Skin and scalp diseases?
16  A.   Well, it could be manopause also.
17  Q.   Mano ...
18  A.   Just a ...
19  Q.   Just kidding?
20  A.   (Nods head.)
21  Q.   Okay.  Skin and scalp diseases, is that
22  something you ask about in your medical
23  questionnaire?
24  A.   Yes.
25  Q.   Anemia?

Page 75

1   A.   We ask about all medical conditions that
2   they have been diagnosed with in the past or
3   presently.
4   Q.   Do you specifically call out anemia --
5   A.   Yes.
6   Q.   -- in a separate category?
7   A.   Yes.
8   Q.   And do you separately call out venereal
9   disease?
10  A.   Yes.
11  Q.   And do you ask about recent weight loss?
12  A.   Yes.
13  Q.   And medications taken?
14  A.   Yes.
15  Q.   And hormonal conditions?
16  A.   Yes.
17  Q.   And allergic reactions?
18  A.   Yes.
19  Q.   Why do you ask about those?
20  A.   Those are all potentially modulators of
21  hair follicle function.
22  Q.   Do you conduct any -- okay.  I won't
23  interrupt.  You said they fill out the medical
24  questionnaire.  What happens next?
25  A.   Then they'll be measured.  So they will

Page 76

1   receive a hair check measurement, which is hair mass
2   index.  Several different areas of the scalp.  At
3   the same time the technicians are getting more
4   information about any areas of concern, other things
5   that maybe need to be fleshed out from the
6   questionnaire.  Microphotograph is performed in the
7   areas where we do the measurements, and then the
8   case is presented to me.
9   Q.   So you said you use Hair Check.  Is that
10  the name of the actual device that you use?
11  A.   It's a cross-sectional hair bundle
12  trochometer.
13  Q.   Do you do blood work for all of your
14  patients?
15  A.   When indicated.
16  Q.   So not for all?
17  A.   Not for all patients.
18  Q.   Okay.  Do your patients in an initial
19  consultation also fill out a hair loss
20  questionnaire?
21  A.   They do.
22  Q.   What do you ask about?
23  A.   Their area of concern.  Which areas
24  they've noticed hair loss.
25  Q.   Do you ask about their family history of

Page 77

1   hair loss?
2   A.   We ask about their genetic family history
3   of hair loss, absolutely.
4   Q.   Do you also ask about their hair care and hair
5   maintenance practices?
6   A.   Yes, we do.
7   Q.   Do you ask about things that they've
8   tried -- that they've used to try to prevent hair
9   loss?
10  A.   Yes.
11  Q.   And do you ask them about their goals?
12  A.   Absolutely.
13  Q.   Because people's goals can be a little bit
14  different; is that fair?
15  A.   Correct.
16  Q.   Any other forms that you use in addition
17  to the medical questionnaire, medical history
18  questionnaire and the health -- excuse me, the hair
19  loss questionnaire during the initial consultation?
20  A.   Consent to treat.
21  Q.   Anything else?
22  A.   No.
23  Q.   Do you create a consultation form in
24  connection with your initial consultation with a
25  patient?

1    A.   Yes.
2    Q.   And is that a standardized form that you
3 fill in with the patient's specific information?
4    A.   It's an electronic document.
5    Q.   And then do you create for that patient a
6 personalized treatment plan?
7    A.   Yes.
8    Q.   And a fee estimate?
9    A.   Correct.
10    Q.   Okay.  Let's talk about the treatments
11 that you offer.  You offer lots of different
12 products and services here, correct?
13    A.   Well, related to hair?
14    Q.   Yes.
15    A.   I don't know how you define lots.  I mean,
16 more than one.
17    Q.   Why don't we just go through them.
18    A.   Okay.
19    Q.   Why don't you tell me about the
20 over-the-counter treatments, products that you --
21 not treatments, products.  The over-the-counter
22 products that you offer here at Bauman Medical.
23 Walk me through those, please.
24    A.   Over-the-counter products?
25    Q.   Meaning the --

1    A.   So nonprescription?
2    Q.   Uh-huh.
3    A.   So nutraceuticals.
4    Q.   And talk to me about which of those you
5 offer.
6    A.   Nutrafol, Viviscal, biotin.
7    Q.   Any others?
8    A.   In the nutraceutical category?
9    Q.   Uh-huh.
10    A.   Hair vitamin complex.
11    Q.   Let's talk about Nutrascal [sic].  Is
12 that -- is it not Nutrascal?  Nutrisil [sic]?
13    A.   There is Nutrafol.
14    A.   Nutrafol.
15    A.   And Viviscal.
16    Q.   Let's talk about Nutrafol.
17    A.   Okay.
18    Q.   Is that in pill form?
19    A.   Yes, it's a capsule, actually.
20    Q.   And how many times a day does a patient
21 take it?
22    A.   Four capsules a day, and they can divide
23 it any which way they like.
24    Q.   How much does a monthly supply of Nutrafol
25 cost?

1         MR. EXNICIOS:  Objection.  Form.
2         THE WITNESS:  I have no idea.  I mean ...
3 BY MS. BIERI:
4    Q.   If you recommend Nutrafol or any of the
5 other nutraceuticals you mentioned to a patient, is
6 it your intent that they stay on them indefinitely?
7    A.   Yes, of course.
8    Q.   Meaning that they need to continue to take
9 them to maintain benefit, correct?
10    A.   Correct.
11    Q.   That's true of all of the nutraceuticals?
12    A.   Yes.
13    Q.   Okay.  Do you know how much a month of
14 Viviscal costs?
15         MR. EXNICIOS:  Objection.  Form.
16         THE WITNESS:  I don't remember exactly.
17 BY MS. BIERI:
18    Q.   Do you know how much a month of biotin
19 costs?
20    A.   Yeah, biotin is about 50 cents a day.
21         MR. EXNICIOS:  Objection.  Form.
22 BY MS. BIERI:
23    Q.   That's probably the lowest end one,
24 correct?
25    A.   Yeah.

1    Q.   By far, right?
2    A.   For sure.
3         MR. EXNICIOS:  Objection.  Form.
4 BY MS. BIERI:
5    Q.   And the hair vitamin complex, do you know
6 the monthly cost of that?
7    A.   No.
8         MR. EXNICIOS:  Objection.  Form.
9 BY MS. BIERI:
10    Q.   Do you agree that you almost always use a
11 multiple therapy approach to female hair loss?
12         MR. EXNICIOS:  Objection.  Form.
13         THE WITNESS:  I would say that that's
14    accurate, yes.
15 BY MS. BIERI:
16    Q.   Okay.  Let's talk about prescription
17 medications or -- well, prescription medications
18 that you offer.  Can you tell me what those are?
19    A.   So we often prescribe -- are you asking
20 for women, or for men, or both?
21    Q.   I think, if I'm not wrong, there's one
22 particular prescription medication that's not
23 indicated for women; is that right?
24    A.   Correct.
25    Q.   Okay.

Page 82

1    A.   So Finasteride.
2    Q.   So straight Finasteride you don't -- women
3  don't use, or is it just ...
4    A.   Well, Finasteride can be used off label in
5  women who are postmenopausal.
6    Q.   And do you use Finasteride for
7  postmenopausal women?
8    A.   When indicated.
9    Q.   Okay.  Other prescription medications?
10    A.   (No response.)
11    Q.   Other prescription medications that --
12    A.   Minoxidil -- Compounded Minoxidil.
13    Q.   Anything else?
14    A.   Dutasteride, also same as Finasteride.
15  Mainly for men.
16        THE REPORTER:  What is it?
17        THE WITNESS:  Mainly for men, Dutasteride.
18  BY MS. BIERI:
19    Q.   Do you also offer Finasteride Minoxidil
20  combinations?
21    A.   Correct.
22        MR. EXNICIOS:  Objection.  Form.
23  BY MS. BIERI:
24    Q.   Do you know -- and for these prescription
25  medications, when you prescribe them to a patient,

Page 83

1  do you believe that for the patient to have the
2  benefit they need to keep using them?
3    A.   Yes.
4    Q.   And do you know the average monthly cost
5  of any of the prescription medications that you
6  prescribe?
7    A.   Let's call it $80 a month.
8    Q.   For any of them?
9    A.   Yeah, that's a good number.
10    Q.   So whether I'm talking about Compounded
11  Finasteride Fin Plus, Compounded Minoxidil Formula
12  82, Topical Finasteride, Minoxidil Formula 82F,
13  Compounded Topical Finasteride 82, all of those
14  you're saying are $80 a month?
15    A.   Pretty much, yes.
16        MR. EXNICIOS:  Objection.  Form.
17  BY MS. BIERI:
18    Q.   What other -- do you offer shampoos and
19  other hair care products?
20        MR. EXNICIOS:  Objection.  Form.
21        THE WITNESS:  Yeah, we do.
22  BY MS. BIERI:
23    Q.   And those are over the counter?
24    A.   Correct.
25    Q.   And do you recommend those for the

Page 84

1  majority of your patients, the shampoo?
2    A.   Well, when --
3        MR. EXNICIOS:  Objection.  Form.
4        THE WITNESS:  -- indicated.
5        THE REPORTER:  Sorry, I didn't hear you.
6        THE WITNESS:  When indicated.
7  BY MS. BIERI:
8    Q.   So we've talked about nutraceuticals,
9  prescription medication, shampoos.  What other
10  products or services do you offer at Bauman Medical?
11        MR. EXNICIOS:  Objection.  Form.
12        THE WITNESS:  We offer low level laser
13    therapy devices.
14  BY MS. BIERI:
15    Q.   And explain what that is.
16    A.   Low level laser therapy is a nondrug, side
17  effect free, at-home treatment for hair regrowth.
18    Q.   So the person buys the laser and can use
19  it at home; is that right?
20    A.   We prescribe and dispense.  The patient
21  leaves with the device and can use it at home,
22  correct.
23    Q.   And how much does one of the low level
24  laser devices cost?
25    A.   Those range between 3,000 and $3,500.

Page 85

1        MR. EXNICIOS:  Objection.  Form.
2  BY MS. BIERI:
3    Q.   What other products or treatments do you
4  offer?
5    A.   We also offer cell therapy.
6    Q.   SEP, S-E-P?
7    A.   Cell, c-e-l-l.  Cell therapy in the form
8  of PRP, platelet rich plasma.
9    Q.   And is that a one-time treatment?
10    A.   No, PRP needs to be repeated typically to
11  maintain the benefit.
12    Q.   With what interval?
13    A.   Most patients need a repeat PRP at around
14  10 to 14 months, the method that we use.
15    Q.   And how much does an individual PRP
16  session cost?
17    A.   $2,600.
18        MR. EXNICIOS:  Objection.  Form.
19  BY MS. BIERI:
20    Q.   What other products or services do you
21  offer?
22    A.   We also offer hair and scalp cranial
23  prosthetic devices.
24    Q.   Are you talking about the CNC scalp and
25  cranial prosthesis?

22 (Pages 82 - 85)

Page 86

1    A.  Correct, medical grade hair replacement.
2    Q.  And that's the focus of at least part of
3  your report.  So we'll talk about that more in a
4  little bit, but I appreciate you noting it in this
5  list.
6        What is the Havogen 5 Anti-DHT Transdermal
7  Patch?
8    A.  Exactly what you said it is.
9    Q.  For the layperson?
10   A.  It's a transdermal patch that delivers
11 nutraceutical through the skin.
12   Q.  And does a person wear it 24 hours a day,
13 7 days a week?
14   A.  Usually 12 on, 12 off.
15   Q.  Do you require -- well, let me ask you
16 this.  For all of the products or therapies that
17 we've talked about so far for these patients, do you
18 have them come in on a 90-day interval to check
19 progress?
20   A.  It's recommended.
21      MR. EXNICIOS:  Objection.  Form.
22 BY MS. BIERI:
23   Q.  And are any of those products, say -- or
24 services, because I don't know if you consider PRP a
25 product or a service.

Page 87

1    A.  Service.
2    Q.  Okay.  Are any of those products or
3  services covered by insurance?
4    A.  No.
5       MR. EXNICIOS:  Objection.  Form.
6  BY MS. BIERI:
7    Q.  And do you also offer various types of
8  hair transplants?
9    A.  Correct.
10   Q.  Have we covered this -- well, are those
11 covered by insurance?
12   A.  No.
13      MR. EXNICIOS:  Objection to form.
14 BY MS. BIERI:
15   Q.  And what is the range of cost for hair
16 transplant surgery?
17      MR. EXNICIOS:  Objection.  Form.
18      THE WITNESS:  That would depend on the
19   size of the session.  Could range anywhere from
20   5 to $50,000.
21 BY MS. BIERI:
22   Q.  Okay.  Have we identified the products and
23 services that you offer in hair restoration?
24   A.  Yes.
25   Q.  Let's look at your report.  I'm going to

Page 88

1  hand you now what's being marked as deposition
2  Exhibit 6.  And I'll represent to you it's the
3  packet of materials we received with your expert
4  disclosure in early November.  It includes a cover
5  letter, your expert report, your exhibits and
6  references, a list of your recent depositions, your
7  fee and retainer information, your CV, and some
8  materials that you provided along with your report
9  which are exclusively related to the CNC product,
10 some documents in Italian regarding the CNC product,
11 a guide regarding the product, and the label and
12 packaging of the product.
13      MR. EXNICIOS:  Deposition Exhibit Number 6
14   for you.
15      (Defendant's Exhibit 6 was marked for
16 identification.)
17 BY MS. BIERI:
18   Q.  Did I accurately state what's in
19 deposition Exhibit Number 6?
20   A.  Yes.
21      MS. BIERI:  Val, do you want a copy?
22      MR. EXNICIOS:  Sure.  Thanks.
23      MS. BIERI:  Of course.
24 BY MS. BIERI:
25   Q.  Did you make it cold in here on purpose?

Page 89

1    A.  Not on purpose, but I was getting hot and
2  Val was sweating.  I'll put it up a degree.
3       MR. EXNICIOS:  Thank you.
4  BY MS. BIERI:
5    Q.  Are you feeling better with the
6  temperature regulated?  I'm freezing.
7    A.  Okay.  I'll give you another degree.
8    Q.  Thank you very much.
9       Are all -- thank you.
10   A.  You're welcome.
11   Q.  Looking at your expert report, are all of
12 the opinions that you are going to offer in this
13 case set forth in your expert report?
14      MR. EXNICIOS:  Objection to form.
15      THE WITNESS:  Yes.
16 BY MS. BIERI:
17   Q.  You're not going to offer any opinions
18 beyond what is in your expert report, correct?
19      MR. EXNICIOS:  Objection.  Form.
20      THE WITNESS:  The report is my report.
21   This is my opinion.
22 BY MS. BIERI:
23   Q.  These are all the opinions that you're
24 going to offer in this case, correct?
25      MR. EXNICIOS:  Same objection.

23 (Pages 86 - 89)

1      THE WITNESS:  Yes.
2 BY MS. BIERI:
3      Q.   Your report doesn't talk about causes of
4 alopecia or diagnosis of alopecia, correct?
5      A.   Correct.
6      Q.   You're not going to offer any opinions
7 about those in this case, correct?
8      A.   Correct.
9      Q.   You don't intend to offer any opinions
10 about Taxotere, correct?
11     A.   Correct.
12     Q.   And you don't intend to offer any opinions
13 about Ms. Earnest specifically, correct?
14     A.   Correct.
15     Q.   Ms. Francis specifically, correct?
16     A.   Correct.
17     Q.   Or Ms. Durden; is that correct?
18     A.   (No response.)
19     MR. EXNICIOS:  Objection to form.
20     MS. BIERI:  I didn't even ask a question.
21     MR. EXNICIOS:  That's to all three of
22 them.
23     MR. HARMON:  There was no response to
24 Durden.
25

1 BY MS. BIERI:
2      Q.   Oh.  Do you intend to offer any opinions
3 in this case regarding Ms. Durden?
4      A.   No.
5      MR. EXNICIOS:  Same objection.
6 BY MS. BIERI:
7      Q.   Are you prepared to discuss all of your
8 opinions in this case today?
9      A.   Yes, I am.
10     Q.   What process did you use to form your
11 opinions?
12     MR. EXNICIOS:  Objection.  Form.
13     THE WITNESS:  I used my experience over
14 the past 20 years in treating patients.
15 BY MS. BIERI:
16     Q.   Anything else?
17     A.   My cumulative experience in treating
18 patients.
19     Q.   I just want to make sure I understand the
20 universe.
21     A.   Yes, my profession.
22     Q.   You'll hear lawyers, so you know, after
23 you say something ask "anything else" to make sure
24 we understand the whole -- the universe.
25     A.   Got it.

1      Q.   So you are relying on your experience to
2 form your opinions in this case; is that correct?
3      A.   That is correct.
4      MR. EXNICIOS:  Objection.  Form.
5 BY MS. BIERI:
6      Q.   Anything else?
7      MR. EXNICIOS:  Objection.  Form.
8      THE WITNESS:  (No response.)
9 BY MS. BIERI:
10     Q.   Do you believe you --
11     MR. HARMON:  There was no verbal response.
12     MS. BIERI:  Can you read the question
13 back, please?
14     (The question was read back.)
15     THE WITNESS:  No.
16     THE REPORTER:  We just didn't hear you.
17     THE WITNESS:  Oh, I'm sorry.
18 BY MS. BIERI:
19     Q.   So in your expert report I'm looking at
20 Page 4 of 5.  In the Exhibits & References section,
21 is this where you list the materials you considered
22 in forming your opinions in this case?
23     A.   These are not references of my opinions.
24 These are -- these are not references on what I base
25 my opinions.  These are the supporting documents for

1 my opinions.
2      Q.   How do you distinguish those two?
3      MR. EXNICIOS:  Objection.  Form.
4      THE WITNESS:  These are not, not something
5      I relied on to form an opinion.  These are the
6      supporting -- this is the supporting
7      information for my opinion.
8 BY MS. BIERI:
9      Q.   In connection with the report that you
10 provided in November of 2018, what is listed in the
11 Exhibits & References section are the only
12 references to any outside documents.  Are you saying
13 that you didn't rely on any documents in forming
14 your expert opinions in this case and in your
15 report?
16     A.   Correct.
17     MR. EXNICIOS:  Objection to the form of
18     the question.
19 BY MS. BIERI:
20     Q.   In terms of materials that you reviewed in
21 preparation of your report, what materials -- strike
22 that.
23     What materials did you consider in the
24 formation of your opinions?
25     MR. EXNICIOS:  Objection to the form.

24 (Pages 90 - 93)

Page 94

1    THE WITNESS:  No materials.  No materials.
2 BY MS. BIERI:
3    Q.   Just a few hours ago, plaintiffs' counsel
4 provided to defense counsel for the first time a
5 document that I'm going to mark as deposition
6 Exhibit Number 7.
7    (Defendant's Exhibit 7 was marked for
8 identification.)
9 BY MS. BIERI:
10   Q.   Have you seen deposition Exhibit Number 7
11 before?
12   A.   Yes.
13   Q.   Did you create deposition Exhibit Number
14 7?
15   A.   Yes, I prepared it.
16   Q.   And this document is dated 1/8 of 2019, in
17 the bottom left-hand corner, correct?
18   A.   Yes.
19   Q.   And is that the date that you created this
20 document?
21   A.   Yes, that is correct.
22   Q.   You didn't rely on any of the materials
23 listed on Exhibit 7 in forming your opinions or
24 creating your expert report, correct?
25   A.   That is correct.

Page 95

1    MR. EXNICIOS:  Objection to form.
2 BY MS. BIERI:
3    Q.   So why did you provide Exhibit 7?
4    A.   I was asked to list the references to my
5 opinions.
6    Q.   What do you mean by references to your
7 opinions?
8    A.   I was -- I received a communication that
9 said there were -- that the references to the people
10 and opinions that I had in my report, that there
11 were -- that there were no -- there were no links to
12 those specific comments, let's say.
13   Q.   Are you talking about on Page 2 of your
14 report where you say, "I concur with the findings of
15 Marianne LaFrance (Yale University) and numerous
16 others (Cash, Olsen, Tosti, Christiano, et al.)"?
17   A.   That is correct.
18   Q.   So you were attempting on January 8th, and
19 which was not provided to us until a few hours ago
20 before your deposition, to identify with any
21 specificity the authors referenced in that paragraph
22 of Page 2 of your expert report?
23   MR. EXNICIOS:  Objection.  Form.
24   THE WITNESS:  I'm not sure I understand
25 your question.

Page 96

1 BY MS. BIERI:
2    Q.   Thank you for clarifying if you don't
3 understand.
4    So in your report you say you concur
5 with --
6    A.   My colleagues.
7    Q.   Okay.  But you didn't rely on their
8 literature or their findings to issue --
9    A.   Correct.
10   Q.   -- your expert opinions?
11   A.   That is correct.
12   Q.   You just believe that these support your
13 opinions?
14   A.   That is correct.
15   Q.   Did you review the materials that are
16 listed on Exhibit 7 in preparation of your report?
17   A.   No, the reverse.
18   Q.   Explain, please.
19   A.   I sought out their published references to
20 support the private conversations and such that I
21 had with them over the years of being in the field.
22   Q.   So you're saying not in connection with
23 preparing this report, but over the years you've
24 talked to --
25   A.   Dr. Tosti.

Page 97

1    Q.   Continue.
2    A.   Dr. LaFrance, Dr. Olsen.
3    Q.   Dr. Cash?
4    A.   Well, I've never met Dr. Cash, but he's
5 very, very well-known in the field.
6    Q.   Have you specifically read and reviewed
7 the materials listed on Exhibit 7, all of them?
8    A.   What I included in my report is -- and the
9 additional references are the links and references
10 to the statements that I made that require
11 clarification.
12   Q.   Now, I don't know if we're saying the same
13 thing.
14    In connection with preparing your opinions
15 in your report in this case, did you review the
16 materials listed on Exhibit 7?
17   A.   No.
18   Q.   But it's your belief that they support
19 your opinions?
20   A.   Absolutely.
21   Q.   You agree that prior -- did you know we
22 were just provided with Exhibit 7 two hours ago?  Is
23 that an accurate -- a few hours before your
24 deposition?
25   A.   No.

25 (Pages 94 - 97)

1      MR. EXNICIOS:  Objection to the form of
2   the question.
3  BY MS. BIERI:
4      Q.   When did you give it to plaintiffs'
5  counsel?
6      A.   I don't remember.  I created it on the 8th
7  and sent it over.
8      Q.   On the 8th?
9      A.   It was either the 8th or the next day.
10     Q.   And you agree --
11     A.   I was surprised to get it, the request for
12  the extra information so close to the deposition,
13  actually.
14     Q.   Are you talking about -- did you
15  receive --
16         Are you talking about receiving a document
17  titled Notice of Expert Materials Not Obtained?
18     A.   Correct.
19     Q.   And you said you were surprised to receive
20  that?
21     A.   Yes.
22     Q.   I'm going to ask you some questions.  Have
23  you reviewed any materials related to Ms. Durden?
24     A.   I don't -- no.
25     Q.   Okay.  You don't know Ms. Durden's first

1  name?
2      A.   No.
3      Q.   You don't --
4      MR. EXNICIOS:  Objection.  Form.
5  BY MS. BIERI:
6      Q.   Do you know how old Ms. Durden is?
7      A.   No.
8      MR. EXNICIOS:  Objection.  Form.
9  BY MS. BIERI:
10     Q.   Ms. Durden is not a patient of yours,
11  correct?
12     A.   Correct.
13     Q.   You've never met with Ms. Durden, correct?
14     A.   Correct.
15     Q.   Never spoken to Ms. Durden, correct?
16     A.   No.
17     MR. EXNICIOS:  Objection.  Form.
18  BY MS. BIERI:
19     Q.   No, that's not correct?
20     A.   I've never spoken with her.  Don't know
21  her.
22     Q.   Never examined Ms. Durden's hair?
23     A.   Never seen her.
24     Q.   Never seen a photograph of Ms. Durden?
25     A.   No.

1      Q.   Do you know anything about Ms. Durden's
2   hair care practices, either prior to or after
3  chemotherapy?
4      A.   I never met her.  Never examined her.
5      Q.   Have you ever reviewed her plaintiff
6  factsheet?
7      A.   I don't even know what that is.
8      Q.   Have you reviewed any of the depositions
9  taken in connection with her case, whether it be her
10  deposition, her oncologist, her healthcare
11  providers, her family or her friends?
12     MR. EXNICIOS:  Objection.  Form.
13     THE WITNESS:  No.
14  BY MS. BIERI:
15     Q.   Have you reviewed any of her oncology,
16  dermatology or other medical records?
17     MR. EXNICIOS:  Objection.  Form.
18     THE WITNESS:  No.
19  BY MS. BIERI:
20     Q.   Have you ever seen any mental health
21  records related to Ms. Durden?
22     MR. EXNICIOS:  Objection.  Form.
23     THE WITNESS:  No.
24  BY MS. BIERI:
25     Q.   Are you aware if she's ever seen a mental

1  health professional?
2      A.   No idea.
3      Q.   Do you know if she's ever taken any
4  medications for anxiety or depression?
5      A.   No.
6      Q.   Do you know if she has any family history
7  of mental illness?
8      A.   No idea.
9      Q.   Do you agree you're not aware of her views
10  on her physical appearance including her hair?
11     A.   I've never met her, never spoken to her.
12     Q.   So do you agree with that statement?
13     A.   I agree.
14     MR. EXNICIOS:  Objection.  Form.
15  BY MS. BIERI:
16     Q.   You never asked Ms. Durden any questions
17  about her personal life, her professional life, or
18  her social activities?
19     MR. EXNICIOS:  Objection.  Form.
20     THE WITNESS:  No.
21  BY MS. BIERI:
22     Q.   You're not aware of any activities that
23  Ms. Durden engaged in either prior to or after
24  chemotherapy?
25     MR. EXNICIOS:  Objection.  Form.

26 (Pages 98 - 101)

1      THE WITNESS: No.
2 BY MS. BIERI:
3      Q.   Are you aware of any of the medications
4 Ms. Durden has taken in the past or is currently
5 taking?
6      MR. EXNICIOS: Objection. Form.
7      THE WITNESS: No.
8 BY MS. BIERI:
9      Q.   Do you know if Ms. Durden is
10 postmenopausal?
11      MR. EXNICIOS: Objection. Form.
12      THE WITNESS: No.
13 BY MS. BIERI:
14      Q.   Do you know if she is obese?
15      MR. EXNICIOS: Objection. Form.
16      THE WITNESS: No idea.
17 BY MS. BIERI:
18      Q.   Do you know if she has hypertension?
19      MR. EXNICIOS: Objection. Form.
20      THE WITNESS: No.
21 BY MS. BIERI:
22      Q.   Do you know if she meets the criteria for
23 metabolic syndrome?
24      MR. EXNICIOS: Objection. Form.
25      THE WITNESS: No.

1 BY MS. BIERI:
2      Q.   Do you know if she has hyperlipidemia?
3      MR. EXNICIOS: Objection. Form.
4      THE WITNESS: No.
5 BY MS. BIERI:
6      Q.   Do you know if she's vitamin deficient?
7      MR. EXNICIOS: Objection. Form.
8      THE WITNESS: No.
9 BY MS. BIERI:
10      Q.   Do you know the chemotherapy regimen she
11 was prescribed?
12      A.   No.
13      Q.   Do you know if she underwent surgery for
14 breast cancer?
15      A.   No.
16      Q.   Do you know if she's on any aromatase
17 inhibitors or Tamoxifen?
18      MR. EXNICIOS: Objection. Form.
19      THE WITNESS: No.
20 BY MS. BIERI:
21      Q.   Do you know if she has history of scalp or
22 skin disorders?
23      MR. EXNICIOS: Objection. Form.
24      THE WITNESS: No.
25

1 BY MS. BIERI:
2      Q.   Do you know if she's ever seen a
3 dermatologist other than after -- other than when
4 she was sent to one by her lawyers?
5      MR. EXNICIOS: Objection. Form.
6      THE WITNESS: No.
7 BY MS. BIERI:
8      Q.   Do you know if plaintiff has hair loss?
9 Ms. Durden even has hair loss?
10      MR. EXNICIOS: Objection. Form.
11      THE WITNESS: Actually, no.
12 BY MS. BIERI:
13      Q.   I'm going to ask you the same questions
14 about Ms. Earnest.
15      A.   I'm sure you will.
16      Q.   Then we're going to do the same thing for
17 Ms. Francis.  I had a feeling you probably guessed
18 that.
19      Do you know Ms. Earnest's first name?
20      A.   No.
21      Q.   Do you know how old Ms. Earnest is?
22      MR. EXNICIOS: Counsel, do you mind if we
23 just have a continuing objection to the other
24 two as I just made for this plaintiff?  Is that
25 okay with you?

1      MS. BIERI: Sure.  If you want to object
2 to the form of my questions regarding the
3 specific plaintiffs that are going to be the
4 same questions that I asked for Ms. Durden, you
5 can have a continuing objection.
6      MR. EXNICIOS: Thank you, Counsel.
7 BY MS. BIERI:
8      Q.   Okay.
9      A.   No.
10      Q.   Excuse me, I didn't even think I had a
11 question pending so I laughed.
12      A.   Oh.
13      Q.   I don't remember what my last question
14 was.
15      MR. EXNICIOS: Her name.  Her first name.
16 BY MS. BIERI:
17      Q.   Do you know Ms. Earnest's first name?
18      A.   No.
19      Q.   Do you know how old Ms. Earnest is?
20      A.   No.
21      Q.   Have you ever had any contact with
22 Ms. Earnest?
23      A.   No.
24      Q.   Never met her?
25      A.   No.

27 (Pages 102 - 105)

1    Q.   Have you ever talked with Ms. Earnest?
2    A.   No.
3    Q.   Never treated her as a patient?
4    A.   Never.
5    Q.   Do you have any knowledge of Ms. Earnest's
6  hair, whether before or after chemotherapy?
7    A.   No.
8    Q.   You've never examined Ms. Earnest's hair?
9    A.   No.
10   Q.   Never seen a picture of her?
11   A.   No.
12   Q.   Ever evaluated her hair loss?
13   A.   No.
14   Q.   Do you know her hair care practices at any
15  time before or after chemotherapy?
16   A.   No.
17   Q.   Have you ever reviewed her plaintiff
18  factsheet?
19   A.   No.
20   Q.   Have you ever reviewed her deposition?
21   A.   No.
22   Q.   Have you ever reviewed the deposition of
23  her oncologist or any of her healthcare providers?
24   A.   No.
25   Q.   Have you ever reviewed the depositions of

1  her family or friends that were taken in her case?
2    A.   No.
3    Q.   Have you ever spoken to any of her family
4  or friends?
5    A.   No.
6    Q.   Have you ever reviewed any of Ms. Durden's
7  oncology, dermatology, or other medical records?
8    A.   No.
9    Q.   Have you ever seen any mental health
10  records related to Ms. Earnest?
11   A.   No.
12   Q.   Are you aware if she's ever seen a mental
13  health professional?
14   A.   No.
15   Q.   Do you know if she's ever taken, prior to
16  or after chemotherapy, any medications for anxiety
17  or depression?
18   A.   No.
19   Q.   Are you aware of whether she has a family
20  history of mental illness?
21   A.   No.
22   Q.   Are you aware of her views on her own
23  physical appearance, on her hair, at any time
24  currently or in the past?
25   A.   No.

1    Q.   You've never asked her any questions about
2  her personal life since you've never spoken with her
3  or met with her, correct?
4    A.   Never.
5    Q.   Not aware of what activities Ms. Earnest
6  participated in prior to chemotherapy or after
7  chemotherapy?
8    A.   No.
9    Q.   Are you aware of any medications that
10  Ms. Earnest currently takes or took at any time in
11  the past?
12   A.   No.
13   Q.   Do you know if Ms. Earnest is
14  postmenopausal?
15   A.   No idea.
16   Q.   Do you know if she has a family history of
17  alopecia?
18   A.   No.
19   Q.   Do you know if she's obese?
20   A.   No.
21   Q.   Do you know if she has hypertension?
22   A.   No.
23   Q.   Do you know if she has hyperlipidemia?
24   A.   No.
25   Q.   When you're saying "no," you mean you

1  don't know, not no, she does not --
2    A.   Correct.
3    Q.   -- correct?
4        Do you know if she --
5    A.   You asked me do I know if she has --
6    Q.   Agreed.  I just wanted to make sure
7  there's no confusion.  I think we're speaking
8  clearly.
9    A.   Okay.
10   Q.   When you're -- when I say "do you know"
11  and you say "no," you mean no, I do not know,
12  correct?
13   A.   Correct.
14   Q.   Okay.  Do you know if she meets the
15  criteria for metabolic syndrome?
16   A.   No idea.
17   Q.   Do you know if she's vitamin deficient?
18   A.   No.
19   Q.   Do you know what chemotherapy regimen she
20  was prescribed?
21   A.   No.
22   Q.   Do you know if she went -- underwent
23  surgery for breast cancer?
24   A.   No.
25   Q.   Do you know if she has taken or currently

28 (Pages 106 - 109)

1 takes Tamoxifen or an aromatase inhibitor?
2     A.  No.
3     Q.  Do you know if she's had any blood work
4 done at any time?
5     A.  No.
6     Q.  Do you know if she's tested positive for
7 any abnormal liver chemistries?
8     A.  No.
9     Q.  Do you know if she has any autoimmune
10 diseases?
11    A.  No.
12    Q.  Do you know if she has ever been treated
13 by a dermatologist for hair loss?
14    A.  No.
15    Q.  Do you know if she's ever sought out
16 treatment by a dermatologist for hair loss?
17    A.  No.
18    Q.  Do you know Ms. Francis's first name?
19    A.  No.
20    Q.  Do you know how old Ms. Francis is?
21    A.  No.
22    Q.  Is Ms. Francis a patient of yours?
23    A.  No.
24    Q.  Has she ever been?
25    A.  Never.

1     Q.  Have you ever spoken to Ms. Francis?
2     A.  Never.
3     Q.  Have you ever met with Ms. Francis?
4     A.  No.
5     Q.  Do you have any knowledge of the condition
6 of Mrs. Francis's hair at any time, whether prior to
7 or after chemotherapy?
8     A.  No idea.
9     Q.  Never seen a photo of her hair?
10    A.  No.
11    Q.  Never evaluated her hair loss?
12    A.  Never.
13    Q.  Do you know anything about Ms. Francis's
14 hair care practices at anytime in the past or
15 currently?
16    A.  No.
17    Q.  Have you ever reviewed Ms. Francis's
18 plaintiff factsheet?
19    A.  No.
20    Q.  Have you ever reviewed the deposition that
21 Ms. Francis gave in this case?
22    A.  No.
23    Q.  Have you ever reviewed the depositions of
24 her family, friends, oncologist, or other healthcare
25 providers?

1     A.  No.
2     Q.  Have you reviewed any medical records
3 whatsoever related to Ms. Francis?
4     A.  No.
5     Q.  Have you ever seen any mental health
6 records of Ms. Francis's?
7     A.  No.
8     Q.  Do you know if she's ever
9 sought medical -- well, treatment from a medical
10 health professional?
11    A.  No, I don't.
12    Q.  Do you know if she has ever taken
13 medications for anxiety or depression?
14    A.  No.
15    Q.  Do you know if she has any family history
16 of mental illness?
17    A.  No.
18    Q.  Are you aware of her views on her physical
19 appearance including her hair at any time in her
20 life?
21    A.  No.
22    Q.  Are you aware of any of the stressors that
23 she has in her life?
24    A.  No.
25    Q.  You've never asked her any personal

1 questions at all since you've never met with her?
2     A.  Never met with her, no.
3     Q.  Are you aware of any of the activities
4 that Ms. Francis liked to engage in prior to
5 chemotherapy?
6     A.  No.
7     Q.  Are you aware of any of the activities
8 Ms. Francis engages in currently?
9     A.  No.
10    Q.  Are you aware of any of the medications
11 that Ms. Francis currently takes or has ever taken
12 at any point in her life?
13    A.  No.
14    Q.  Do you know if she's postmenopausal?
15    A.  No.
16    Q.  Do you know if she has a family history of
17 alopecia?
18    A.  No.
19    Q.  Do you know if she's obese?
20    A.  No.
21    Q.  Do you know if she has hypertension?
22    A.  No.
23    Q.  Do you know if she has hyperlipidemia?
24    A.  No.
25    Q.  Do you know if she meets the criteria for

29 (Pages 110 - 113)

1 metabolic syndrome?
2    A.  No.
3    Q.  Do you know if she's vitamin deficient?
4    A.  No.
5    Q.  Do you know if she has a history of skin
6 or scalp disorders?
7    A.  No.
8    Q.  Do you know what chemotherapy regimen she
9 was prescribed?
10    A.  No.
11    Q.  Do you know if Ms. Francis underwent
12 surgery for breast cancer?
13    A.  No.
14    Q.  Do you know if she's had a hysterectomy?
15    A.  No.
16    Q.  Do you know if she's ever had any blood
17 work done?
18    A.  No.
19    Q.  Do you know if she took or is taking
20 Tamoxifen or an aromatase inhibitor?
21    A.  No.
22    Q.  Do you know if she has any autoimmune
23 diseases?
24    A.  No.
25    Q.  Do you know if she's ever had any

1 treatment for hair loss?
2    A.  No.
3    Q.  Agree that you couldn't speak to any
4 potential psychological impact that hair loss may or
5 may not have had on Ms. Durden?
6    A.  Not her in particular.
7    Q.  Because you don't know anything --
8    A.  I don't know her.
9    Q.  -- about her?
10       So you can't offer any opinions specific
11 to Ms. Durden?
12    A.  Correct.
13    Q.  And agree that you can't offer any
14 opinions about Ms. Earnest's hair loss or how it has
15 potentially impacted her; is that fair?
16    A.  In her case, correct.
17    Q.  And do you agree that you can't offer and
18 won't offer any testimony about Ms. Francis's hair
19 loss, or how her hair loss may have impacted
20 Ms. Francis?
21    A.  Not for those particular people in
22 specific.
23    Q.  Right, because you --
24    A.  Because I --
25    Q.  Have no basis?

1    A.  Right, never evaluated them.
2    Q.  Right, you've never seen a picture?
3    A.  Correct.
4    Q.  You've never talked to them?
5    A.  Correct.
6    Q.  You've never read anything about them?
7    A.  Correct.
8    Q.  And you agree that without having done
9 those things that you can't offer an opinion about
10 their hair loss, or about the impact of their hair
11 loss on them, correct?
12    A.  Well, I can say how hair loss affects
13 people.
14    Q.  Generally?
15    A.  Yes.
16    Q.  But not as to Ms. Durden, correct?
17    A.  Their specific cases, correct.
18    Q.  Not as to Ms. Earnest?
19    A.  Correct.
20    Q.  And not as to Ms. Francis?
21    A.  Yes.
22    Q.  Correct?
23    A.  Correct.
24    Q.  Let's look at your report.  Part of
25 Exhibit 6.  There are two sections in your report,

1 correct?  Female Alopecia at Bauman Medical and
2 Treatment of Severe Alopecia Using CNC Hair & Scalp
3 Cranial Prosthesis, correct?
4    A.  Yes.
5    Q.  That's how you divided your report?
6    A.  Yes, that is correct.
7    Q.  At the outset of -- I'm going to start
8 talking about the first section.
9    A.  Okay.
10    Q.  At the outset of the first section you say
11 that you "developed a clear view," and is the clear
12 view you're talking about based exclusively on your
13 experience over the course of your career treating
14 female hair loss patients?
15    A.  Correct.
16       MR. EXNICIOS:  Objection to the form of
17    the question.
18       THE REPORTER:  What did you say, Doctor?
19       THE WITNESS:  I said, yes.  Correct.
20 BY MS. BIERI:
21    Q.  Moving down you say that, "while alopecia
22 has few physically harmful effects, research and
23 clinical experience has taught us that hair loss is
24 a form of disfigurement that can trigger high levels
25 of anxiety and depression, detrimentally affecting a

Page 118

1 person's ... self and identity."
2     When you say "clinical experience," you're
3 talking about your clinical experience, correct?
4     MR. EXNICIOS: Objection to form.
5     THE WITNESS: Yes.
6 BY MS. BIERI:
7     Q.  Anything else when you're talking about
8 clinical experience?
9     A.  I don't understand your question.
10     Q.  And that may answer the question.
11     You can't talk about any person's doctor's
12 clinical experience?  When you say -- strike that.
13     When you say, "clinical experience has
14 taught," are you talking about your clinical
15 experience?
16     A.  My clinical experience, plus my
17 professional relationships with other experts in the
18 industry.
19     Q.  Well, that's not what this sentence says.
20 This says, "research and clinical experience has
21 taught us."
22     A.  Yes.
23     MR. EXNICIOS: Objection.  Well, I don't
24     know if that's a question there, but objection
25     to form.

Page 119

1     MS. BIERI: It might have been if you let
2     me finish.
3 BY MS. BIERI:
4     Q.  Are you -- whose clinical experience are
5 you referring to when you reference clinical
6 experience in the sentence?
7     A.  My personal clinical experience.
8     Q.  Any other?
9     MR. EXNICIOS: Objection to the form.
10     THE WITNESS: Any other person's clinical
11     experience?
12 BY MS. BIERI:
13     Q.  Right.
14     A.  Well, yes, actually.  If I have a
15 colleague who has his or her clinical experience and
16 they relay that to me, then that becomes part of my
17 experience.
18     Q.  Well, then I'm going to need to understand
19 that a bit more.
20     A.  Okay.
21     Q.  Whose clinical experience besides your own
22 are you referring to?
23     A.  Great example would be Marianne LaFrance.
24     Q.  And you're representing -- well, strike
25 that.

Page 120

1     Any others that you're referring to
2 specifically when you wrote that sentence?
3     A.  Any other?
4     Q.  Person's clinical experience besides yours
5 and LaFrance's.
6     A.  I would say research and clinical
7 experience is the sum total of the field of hair
8 loss and hair restoration.
9     Q.  I'm trying to break them up.  So --
10     A.  So I mentioned a few in the report.
11     Q.  Well, in a different -- talking about a
12 different area of the report in a different sentence
13 in a specific context.  So I'm trying to understand
14 with regard to this sentence, this opinion.
15     A.  Uh-huh.
16     Q.  Putting aside research that we'll talk
17 about in a moment.  I want to talk about the
18 clinical experience portion of the sentence.
19     A.  Okay.
20     Q.  Are you talking about your clinical
21 experience?
22     A.  Yes.
23     MR. EXNICIOS: Objection to form.
24 BY MS. BIERI:
25     Q.  And when you're talking about LaFrance,

Page 121

1 are you really talking about her research or are you
2 talking about her clinical experience?
3     A.  Both.
4     Q.  Her clinical experience is reflected in
5 some research she's done?
6     A.  Yes, as it is with all colleagues of mine
7 who are experts in hair loss.  Their experience is
8 based on their research and their working with
9 patients.  Science plus clinic.
10     Q.  Let me ask you this.  Let's focus on your
11 clinical experience piece first.  Do you have any
12 documentation that you've provided about your
13 experience, your clinical experience, that supports
14 your opinions in this case?
15     MR. EXNICIOS: Objection to the form.
16     THE WITNESS: My clinical experience is my
17     20 years of working with patients.
18 BY MS. BIERI:
19     Q.  You keep records in the course of your
20 medical practice, correct?
21     A.  That is correct.
22     Q.  Okay.  And do you record in those medical
23 records things that support your opinions in this
24 litigation or is it something that's in your brain?
25     A.  It's in my brain.

31 (Pages 118 - 121)

Page 122

1    Q.  Not reduced to paper?
2    A.  No, there's no -- there's no report that's
3  going to be provided that's the sum total.  This is
4  what I've written.
5    Q.  I understand that's what you've written.
6  I'm trying to understand --
7    A.  Where it comes from?
8    Q.  Yeah.
9    A.  Yeah, my brain.
10    Q.  Okay.  So then how do we test that
11  opinion?
12    A.  I don't know.
13        MR. EXNICIOS:  Objection to the form.
14  BY MS. BIERI:
15    Q.  Have you ever published on your clinical
16  experience in a peer review journal?
17        MR. EXNICIOS:  Objection to form.
18        THE WITNESS:  I use my clinical experience
19    to treat patients every single day in my
20    practice.
21  BY MS. BIERI:
22    Q.  Have you ever published in a peer review
23  journal about your clinical experience?
24        MR. EXNICIOS:  Objection to form.
25        THE WITNESS:  I have published in a

Page 123

1    peer -- in a clinical journal about my
2    experience with, for example, laser light
3    therapy.
4  BY MS. BIERI:
5    Q.  Have you ever published either in a peer
6  review journal anything related to your clinical
7  experience that is relevant to your opinions offered
8  in this case?
9    A.  No.
10    Q.  Okay.  In addition to your clinical
11  experience, you also wanted to talk about research
12  and you reference research, and there is no
13  specificity provided in the sentence about what
14  research you're talking about, correct?
15    A.  In that sentence, no.
16    Q.  And there are no -- there's no research
17  listed in the Exhibits & References section of your
18  report, correct?
19    A.  Well, in the addendum there is.
20    Q.  The addendum that was provided today?
21    A.  Yes.
22    Q.  Not in the expert report materials that
23  were provided on November 9th, correct?
24        MR. EXNICIOS:  Objection to form.
25        THE WITNESS:  Correct.

Page 124

1  BY MS. BIERI:
2    Q.  So to what research are you relying --
3  well, are you relying on research for your sentence
4  "research and clinical experience has taught us that
5  hair loss is a form of disfigurement that can
6  trigger high levels of anxiety and depression,
7  detrimentally affecting a person's sense of self and
8  identity"?
9    A.  What is your question?
10    Q.  Are you relying on research for that, the
11  unnamed research, or are you relying on your
12  clinical experience for that?
13    A.  Yes.
14    Q.  You are relying on research for that or --
15    A.  Well, research supports that, as does my
16  clinical experience.
17    Q.  Are you relying on the research, or just
18  on your clinical experience?
19    A.  Well, the research is what we read and the
20  clinical experience is what we experience in the
21  practice, and the sum total of that -- and it allows
22  me to form an opinion.
23    Q.  Okay.  So for that particular opinion,
24  what specific research are you referring to?
25    A.  Well, gosh, there's hundreds of papers

Page 125

1  that talk about the impact of alopecia and hair loss
2  in both men and women, the psychological impact, and
3  just as I have said, anxiety, depression, something
4  that we see very commonly in the practice, as well.
5    Q.  We may be ships passing in the night here.
6  Let me ask you this.  To what research are you
7  referring when you say that hair loss is a form of
8  disfigurement?
9        MR. EXNICIOS:  Objection to the form.
10        THE WITNESS:  Well, gosh, there's plenty
11    of research to support that.  I've given you a
12    few additional references.
13  BY MS. BIERI:
14    Q.  And I'm trying to -- I'm trying to
15  understand which papers --
16    A.  Yeah, I don't have that specific article
17  on the tip of my tongue, or in -- you know, it's a
18  sum total of 20 years of experience and reading
19  thousands and thousands of journal articles that we
20  form opinions.
21    Q.  So you can't identify which research
22  you're saying supports -- which specific research
23  you're saying supports your opinion that hair loss
24  is a form of disfigurement --
25    A.  Oh, I've given you some.  I have given you

32 (Pages 122 - 125)

Page 126

1 some references to support that --
2     MR. EXNICIOS: Objection to the form of
3   the question.
4 BY MS. BIERI:
5   Q.  Are you saying that every single paper
6 listed on Exhibit 7 supports that specific opinion
7 of yours?
8     MR. EXNICIOS: Objection to form.
9     THE WITNESS: Yes.
10 BY MS. BIERI:
11   Q.  So, for example, the Statista website
12 supports that?
13   A.  No, that's a specific request that you
14 made because you couldn't locate the statistics on
15 the hair loss global market.  I provided that for
16 you.
17   Q.  So are you saying that every other
18 document listed on Exhibit 7 supports your specific
19 opinion that hair loss is a form of disfigurement?
20   A.  Yes.
21     MR. EXNICIOS: Objection to the form of
22   the question.
23 BY MS. BIERI:
24   Q.  Now, you understand that today is the
25 first day I've seen Exhibit 7 --

Page 127

1     MR. EXNICIOS: Objection --
2 BY MS. BIERI:
3   Q.  -- correct?
4     MR. EXNICIOS: -- to the form.
5 BY MS. BIERI:
6   Q.  I'll represent to you --
7     MS. BIERI: And, actually, it's probably a
8   good time for me to make this notation for the
9   record.  Today for the first time we were
10   provided with a document titled Additional
11   References (Alan J. Bauman, MD|Expert Opinion).
12   It's identified as Exhibit 7.  We have not ever
13   seen the names, journals, dates of publications
14   or even full author names for any of the
15   materials identified in this Additional
16   References that was provided today, and,
17   obviously, have not had an opportunity to
18   review those and are not prepared to question
19   the witness about the substance of those.  And
20   we will be holding the deposition open
21   requesting additional time for deposition, and
22   I'm happy to meet and confer with plaintiffs'
23   counsel before bringing that to the Judge.
24     MR. EXNICIOS: That's fine.  We served you
25   notice of expert material not obtained on

Page 128

1 January 7th, of the specific items noted in
2 that notice of expert material not obtained
3 filed on January 7th were provided within seven
4 days.
5     MS. BIERI: I'm referring to the general
6   requirements of Rule 26.
7     MR. EXNICIOS: That's fine, Counsel.  I
8   understand your argument.
9 BY MS. BIERI:
10   Q.  To what specific research are you
11 referring that "hair loss can trigger high levels of
12 anxiety that detrimentally affects a person's sense
13 of self and identity"?
14   A.  That's from my own experience.
15   Q.  That's not supported by -- that's not
16 supported by particular literature in Exhibit 7?
17   A.  Well, it's supported in many different
18 areas of literature.
19   Q.  But you're just relying on your clinical
20 experience for that opinion?
21   A.  My clinical experience and knowledge of
22 the -- my awareness of the research in the field.
23     MR. EXNICIOS: Objection.  Form.
24 BY MS. BIERI:
25   Q.  If you're referencing research in the

Page 129

1 field and you say "research supports it," I need to
2 understand what specific research you think supports
3 that sentence.  It's quite a specific sentence.  So
4 I'm trying to understand what specific research
5 you're referring to when you say that "research has
6 taught us that hair loss is a form of disfigurement
7 that can trigger high levels of anxiety and
8 depression."
9     What specific research are you referring
10 to that supports that specific opinion?
11     MR. EXNICIOS: Objection to form.
12     THE WITNESS: Well, I could point to
13 Dr. De Koning here who says that hair loss is a
14 common cause of fear and anxiety in
15 female patients.
16     Elise Olsen also says a "few dermatologic
17 complaints carry as much psychosocial anxiety
18 as hair loss."
19 BY MS. BIERI:
20   Q.  Again, I won't make this throughout the
21 deposition, but I'm not going to be -- because I
22 cannot, because I was provided with this list today,
23 question the witness about the substance of the
24 articles just identified a few hours ago.  I just
25 want to identify the names of the articles to which

33 (Pages 126 - 129)

1 you're referring.  So I understand the basis --
2     A.  Sure, so that's why we provided the
3 addendum.
4     Q.  So you believe the De Koning and Olsen
5 articles support the opinion that "research ... has
6 taught us that hair loss is a form of disfigurement
7 that can trigger high levels of anxiety and
8 depression detrimentally affecting a person's
9 self -- sense of self and identity"?
10     A.  Absolutely.
11     Q.  And you agree that those weren't
12 identified prior to this Additional References list,
13 correct?
14         MR. EXNICIOS:  Objection to form.
15         THE WITNESS:  Well, no, these were
16     identified and form my opinion.
17 BY MS. BIERI:
18     Q.  But identified in writing in your report
19 or otherwise for defendants in the Additional
20 References list, correct?
21         MR. EXNICIOS:  Objection to form.
22         THE REPORTER:  Repeat your answer.
23         THE WITNESS:  Provided as additional
24     references.
25         THE REPORTER:  Thank you.

1 BY MS. BIERI:
2     Q.  You use the term "high levels."  What do
3 you mean by "high levels"?
4     A.  High levels?
5     Q.  Uh-huh.  What's that mean?
6     A.  In regards to?
7     Q.  The sentence you wrote in your report that
8 says, "can trigger high levels of anxiety and
9 depression."
10         What are high levels?  What does that
11 mean?
12     A.  So in my experience in treating women with
13 hair loss, when women have a significant amount of
14 hair loss regardless of the cause, they often reach
15 a level of debilitation that does not allow them to
16 engage in social activities.  Many of them are
17 restricted to the home.  Many of them experience
18 anxiety and depression related to the hair loss
19 situation.
20     Q.  Do you believe this to be true in both men
21 and women?  Is that your experience?
22     A.  Yes.
23     Q.  Have you ever published a peer review
24 article on the potential psychological impact of
25 hair loss?

1     A.  No, I deal with it every day.
2     Q.  Have you ever conducted a scientific or
3 empirical study about the psychological impact of
4 hair loss?
5     A.  No.
6     Q.  So you say -- and I understand you're not
7 a psychologist or a psychiatrist, but you agree that
8 there are numerous things in a person's life that
9 could trigger a high level of anxiety or depression,
10 correct?
11     A.  True.
12     Q.  And agree that something that may trigger
13 a high level of anxiety and depression in one person
14 may not trigger depression or anxiety in another
15 person; is that fair?
16     A.  Fair.
17     Q.  It's specific to the individual, right?
18     A.  Specific to the individual.
19     Q.  And agree that -- do you agree that not
20 all people that have hair loss have high levels of
21 anxiety and depression that affects their sense of
22 self and identity?
23     A.  Well, I think it would be likely that they
24 would have high levels of anxiety and depression.
25     Q.  Do you agree that not all --

1     A.  Not all.  I agree.
2     Q.  And you agree that you don't know whether
3 Ms. Durden has anxiety or depression, correct?
4         MR. EXNICIOS:  Objection to the form.
5         THE WITNESS:  I have no idea.
6 BY MS. BIERI:
7     Q.  Agree that you don't know if Ms. Francis
8 has --
9     A.  I have no idea --
10         MR. EXNICIOS:  Same objection.
11         THE WITNESS:  -- I never met her.
12         MS. BIERI:  I think three of us were
13     literally talking at the same time, and out of
14     respect to the court reporter, I'm going to try
15     to make sure we don't do that.  If plaintiffs'
16     counsel and the witness would too, I think she
17     would be very appreciative.
18 BY MS. BIERI:
19     Q.  You don't have any sense of what does or
20 doesn't trigger anxiety or depression, if anything,
21 in Ms. Earnest, correct?
22     A.  Correct.
23         MR. EXNICIOS:  Objection to the form.
24 BY MS. BIERI:
25     Q.  And you don't have any idea what, if

34 (Pages 130 - 133)

Page 134

1 anything, triggers anxiety or depression in
2 Ms. Francis, correct?
3    A.  That is correct.
4       MR. EXNICIOS:  Objection to form.
5 BY MS. BIERI:
6    Q.  And you have no idea how Ms. Durden views
7 her sense of self or her sense of identity, correct?
8    A.  No.
9       MR. EXNICIOS:  Objection as to form.
10 BY MS. BIERI:
11    Q.  And you have no idea about how Ms. Earnest
12 feels about her identity or her sense of self,
13 correct?
14    A.  No.  No idea.
15       MR. EXNICIOS:  Objection to form.
16 BY MS. BIERI?
17    Q.  No idea?
18    A.  I have no idea.
19    Q.  And do you agree that you have no idea how
20 Ms. Francis feels about herself, her self-identity
21 or her sense of self, correct?
22    A.  I agree.
23       MR. EXNICIOS:  Objection as to form.
24 BY MS. BIERI:
25    Q.  Do you believe that all patients with

Page 135

1 significant alopecia equate their hair loss to the
2 psychological impact of losing someone in their
3 lives?
4       MR. EXNICIOS:  Objection as to form.
5       MS. BIERI:  What's the objection based on?
6       MR. EXNICIOS:  I can't -- according to the
7 Judge, I can't tell you a thing other than I
8 can't explain, I can't say anything other than
9 objection as to form.
10       MS. BIERI:  I bet when Counsel asks,
11 there's an exception to that rule, and note
12 that I don't always ask, but I'm curious about
13 what the problem was with the form of my
14 question.
15       MR. EXNICIOS:  My instructions from my PSE
16 leadership is I'm not able to explain.  I'm not
17 able to do anything other than say, "objection
18 as to form."
19       MS. BIERI:  Okay.  So even when I'm asking
20 so I can cure any form objection, you will --
21       MR. EXNICIOS:  Well, I agree with you,
22 Counsel, and my personal opinion is I think
23 that objection to the form is a pretty useless
24 objection, and there's certainly Article 3
25 judges who agree with that, but it's my

Page 136

1 understanding that our instructions are
2 specifically to do nothing other than object to
3 the form.
4       MS. BIERI:  I'm --
5       MR. EXNICIOS:  So that's what I'm going to
6 do.
7       MS. BIERI:  I'm certainly aware of the
8 Court's position on that and appreciate that
9 you have limited yourself to that.  In this
10 instance I was specifically attempting to cure
11 any form objection that you had.
12       MR. EXNICIOS:  I'll tell you what I'll do,
13 I'll consult with my co-counsel at a break and
14 see if there's an exception noted such that I
15 can respond.
16 BY MS. BIERI:
17    Q.  Let me ask the question again and see if I
18 draw an objection to form.
19       Do you believe that all patients that have
20 significant alopecia equate their hair loss to the
21 psychological impact of losing someone in their
22 lives?
23    A.  No, not all patients.
24    Q.  Is it your opinion that hair loss can be
25 equated with the loss of a loved one?

Page 137

1    A.  Yes.
2    Q.  I understand you're not a psychologist,
3 not a psychiatrist, and not an oncologist, but do
4 you think that a cancer diagnosis can possibly
5 affect a person psychologically?
6       MR. EXNICIOS:  Objection to the form.
7       THE WITNESS:  I have no idea.
8 BY MS. BIERI:
9    Q.  Again, understanding that you're not a
10 psychologist, psychiatrist or oncologist, do you
11 think that a cancer diagnosis could possibly cause
12 high levels of depression or anxiety?
13    A.  I'm not an expert to say.
14    Q.  Again, understanding that you're not a
15 psychologist, psychiatrist or oncologist, do you
16 think a cancer diagnosis could affect a person's
17 self or self-identity?
18    A.  I'm not qualified to say.
19    Q.  Do you think the loss of breast tissue
20 could possibly affect a person psychologically?
21       MR. EXNICIOS:  Objection to the form.
22       THE WITNESS:  I'm sure it could.
23 BY MS. BIERI:
24    Q.  Do you think that it could cause high
25 levels of depression or anxiety?

35 (Pages 134 - 137)

Page 138

1    A.  Yes.
2    Q.  Do you think that it could affect
3  someone's self or self-identity?
4    A.  Yes.
5       MR. EXNICIOS:  Objection to form.
6  BY MS. BIERI:
7    Q.  You write "For women, a healthy full head
8  of hair is an outward visible sign of beauty and
9  youth - linked directly to the identity of the
10  woman."
11       Did I read that correctly?
12    A.  Yes.
13    Q.  You say healthy hair is a sign of youth.
14  Is that because people naturally lose hair as they
15  age?
16    A.  People don't naturally lose hair as they
17  age.
18    Q.  What percent -- do you agree that
19  age-related hair loss is very common?
20    A.  I think you're conflating two ideas.  So
21  could you rephrase the question, please?
22    Q.  Sure.  Just a second.
23       Do you agree that hair loss is common with
24  aging?
25    A.  The longer you live, the more chances are

Page 139

1  you'll have hereditary hair loss that's visible.
2    Q.  The fact that you say that "a healthy full
3  head of hair is an outward sign of visibility [sic]
4  and youth - linked directly to the identity of the
5  woman," you're associating a full head of hair with
6  youth, correct?
7    A.  Yes.
8    Q.  And why do you think people -- or why do
9  you associate a full head of hair with youth?
10    A.  Well, youth and health when you're younger
11  go together and you can, as I said, experience hair
12  loss as you continue to age.  You're more likely to
13  experience hair loss.  So a full, thick head of hair
14  is an outward sign of beauty and youth.
15    Q.  So is hair loss common in people as they
16  get older, particularly women?
17       MR. EXNICIOS:  Objection to form.
18       THE WITNESS:  It's more -- hair loss is
19    more common in women as they get older, as it
20    is in men.
21  BY MS. BIERI:
22    Q.  And have you ever quoted that by the age
23  of 40, more than half of all women will experience
24  age-related hair loss?
25    A.  That is correct.

Page 140

1    Q.  Now, you say that hair is linked directly
2  to the identity of the woman, right?
3    A.  Correct.
4    Q.  On what is your opinion based?
5    A.  My opinion is based on treating thousands
6  of patients.  Women who have come in to see me who
7  say that they remember bonding with their sister or
8  their mother about styling their hair.  They
9  remember youthful times when they had thicker,
10  fuller, healthier hair.  And they relate to me the
11  feelings associated with a thick, full, healthy head
12  of hair that they no longer have.
13    Q.  Do you think all women link their
14  identities to their physical appearance?
15    A.  No.
16    Q.  Do all women link their identities to the
17  condition of their hair?
18    A.  No.
19    Q.  Well, you say that a head of hair is
20  linked directly to the identity of the woman.  I'm
21  asking you, do you think that women, all women, link
22  their identifies to the condition of their hair?
23       MR. EXNICIOS:  Objection as to form.
24       THE WITNESS:  I would say not all, but the
25    vast majority.

Page 141

1  BY MS. BIERI:
2    Q.  So the vast majority of women link their
3  identity to the condition of their hair?
4    A.  Yes.
5    Q.  Do you believe that a woman's identity
6  should be linked to the condition of her hair?
7    A.  I have no idea what it should be linked
8  to.
9    Q.  Do you think that some women derive their
10  self-identify exclusively from nonphysical
11  characteristics?
12    A.  Of course.
13    Q.  Do you think it's inappropriate if a woman
14  doesn't tie her self-identity to her physical
15  appearance?
16       MR. EXNICIOS:  Objection as to form.
17       THE WITNESS:  No.
18  BY MS. BIERI:
19    Q.  Is it your opinion that a woman with less
20  than a full head of hair doesn't have a full
21  identity?
22    A.  No.
23    Q.  Is it your opinion that men with a less
24  than full head of hair still have their identity?
25    A.  They can.

36 (Pages 138 - 141)

1     MR. EXNICIOS:  Objection as to form.
2     THE REPORTER:  Sorry, Doctor?
3     THE WITNESS:  They can.
4 BY MS. BIERI:
5     Q.   Are you --
6     A.   It's less socially acceptable for women to
7 lose their hair.
8     Q.   You mentioned that, actually, that phrase.
9 I think you said it's not socially acceptable at
10 another point in your report, and we'll talk about
11 it as we work our way through, but let me ask you
12 this.  Are you conversant in the number of American
13 women who choose to be bald or to shave their hair
14 in a buzz cut?
15    A.   It's likely a very small percentage.
16    Q.   So are you familiar with the percentage?
17    A.   No.
18    Q.   Are you aware of the literature regarding
19 the psychological impact of that decision?
20    A.   No.
21    Q.   Are you aware of any women who have
22 chemotherapy and who have alopecia who make -- well,
23 actually, take chemotherapy out of it.  Let me ask
24 you a fresh question.
25         Are you aware of any women who have

1 alopecia that make a decision not to use head
2 coverings of any type?
3     A.   Yes.
4     Q.   Are you aware of the literature
5 surrounding the psychological impact of that
6 decision?
7     A.   No.
8         MS. BIERI:  Objection to the form.
9 BY MS. BIERI:
10    Q.   In the next paragraph that starts "In our
11 society," are you describing the behaviors of
12 certain women in a generalized sense as it relates
13 to their hair?
14    A.   Yes.
15    Q.   You talk about a woman's daily beauty
16 regimen.  What is a -- what is a woman's daily
17 beauty regimen?
18    A.   It could be a number of different things,
19 actually.
20    Q.   You think it --
21    A.   It might include grooming, dressing,
22 make-up, hair.
23    Q.   Different for different women, right?
24    A.   (Nods head.)
25         THE REPORTER:  Did you just nod, Doctor?

1         THE WITNESS:  I'm sorry, did I just nod?
2         MR. EXNICIOS:  Is this a good time for a
3 break?
4 BY MS. BIERI:
5     Q.   Would you agree that different women have
6 different grooming practices?
7     A.   Absolutely.  I agree.
8     Q.   And not all of the women do the things
9 that you describe in this paragraph?
10    A.   No, it's a general statement.
11    Q.   Not all women color their hair, correct?
12    A.   Not all.
13    Q.   Not all women visit the salon regularly?
14    A.   Not all.  Especially if they don't have
15 hair.
16    Q.   You agree that there are women who have
17 hair who don't go to the salon regularly, correct?
18    A.   Yes.
19         MR. EXNICIOS:  Objection.  Form.
20 BY MS. BIERI:
21    Q.   And you agree that there are women who
22 don't color their hair, correct?
23    A.   Yes.
24    Q.   Okay.  In this paragraph you also say that
25 it's your opinion that women -- that as women age,

1 they visit the salon regularly and use hair color
2 treatments with the goal of preserving a youthful
3 look.
4         On what is that opinion based?
5     A.   That opinion is based on my experience in
6 treating maybe 10,000 women here in the practice.
7     Q.   And so are you saying that 10,000 women
8 told you that they regularly visited the salon and
9 used hair color treatments with the goal of
10 preserving a youthful look?
11    A.   Well, why else would they color their
12 hair?
13    Q.   Doctor, I'm not here to give my opinions.
14    A.   Yes, so they use -- yes, they'll use every
15 means necessary to preserve a youthful look.
16    Q.   So is it your opinion that the only reason
17 a woman would color her hair is to preserve a
18 youthful look?
19    A.   Well, no.
20    Q.   So there are other --
21    A.   There are other reasons why women might
22 color their hair.
23    Q.   And you haven't attempted to break down
24 the different reasons why a woman would regularly go
25 to a salon or not color her hair, correct?

37 (Pages 142 - 145)

Page 146

1     A.  I have not attempted to break down those
2  reasons.
3     Q.  You've just said that as women age, as a
4  general matter, they visit the salon regularly and
5  use hair color treatments with the goal of
6  preserving a youthful look.
7        MR. EXNICIOS:  Objection to form.
8  BY MS. BIERI:
9     Q.  Correct?
10    A.  That is correct.
11    Q.  And you don't have any statistics to
12 support that, correct?
13    A.  Well, I have my experience in treating
14 women that come and visit me here in the practice.
15    Q.  Okay.  And how can I -- how can we test
16 that opinion?
17       MR. EXNICIOS:  Objection to form.
18       THE WITNESS:  I don't know.
19       MS. BIERI:  I think that Jason, my
20 colleague, handed me a note about 7 minutes
21 ago, maybe 8 that said that the tape was going
22 to run out in 10 minutes.  Is now a good time
23 for a break?  Is that right?
24       Is now a good time for a break for
25 everyone?

Page 147

1        MR. EXNICIOS:  Yeah, I asked five minutes
2  ago.
3        THE VIDEOGRAPHER:  We're going off the
4  record.  This is the end of media unit 2.  The
5  time is 7:11 p.m.
6        (A recess was taken.)
7        (Proceedings Continued in Volume II.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 148

1  RE   : TAXOTERE LITIGATION, et al.
   DEPO OF:  ALAN J. BAUMAN, M.D.
2  TAKEN  : JANUARY 14, 2019
3
4        EXCEPT FOR ANY CORRECTIONS MADE
      ON THE ERRATA SHEET BY ME, I
5  CERTIFY THIS IS A TRUE AND
      ACCURATE TRANSCRIPT.  FURTHER
6  DEPONENT SAITH NOT.
7
8  _____
   ALAN J. BAUMAN, M.D.
9
10
11 STATE OF FLORIDA
              :SS
12 COUNTY OF PALM BEACH
13
14
15    Sworn and subscribed to before me this _____
16 day of _____, 2019.
17 PERSONALLY KNOWN _____ OR I.D. _____.
18
19
      _____
      Notary Public in and for
20    the State of Florida at
      Large.
21
22
23 My commission expires:  January 18, 2020
24
25

Page 149

1        CERTIFICATE OF OATH OF WITNESS
2
3  STATE OF FLORIDA
              :SS
4  COUNTY OF PALM BEACH
5
6
7     I, ERINN GREEN, Florida Professional Reporter,
8  Notary Public in and for the State of Florida at
9  Large, certify that the witness, ALAN J. BAUMAN,
10 M.D., personally appeared before me on January 14,
11 2019 and was duly sworn by me.
12
13    WITNESS my hand and official seal January 18,
14 2019.
15
16
17
18    ERINN L. GREEN, RPR
      Notary Public, State of Florida
19    Commission No. FFP30393
      Expires:  January 18th, 2020
20
21
22
23
24
25

38 (Pages 146 - 149)

Page 150

1        REPORTER'S DEPOSITION CERTIFICATE
2  STATE OF FLORIDA
              :SS
3  COUNTY OF PALM BEACH
4     I, ERINN GREEN, Florida Professional Reporter,
5  certify that I was authorized to and did
6  stenographically report the deposition of ALAN J.
7  BAUMAN, M.D., the witness herein on January 14,
8  2019; that a review of the transcript was requested;
9  that the foregoing pages are a true and complete
10  record of my stenographic notes of the deposition by
11  said witness; and that this computer-assisted
12  transcript was prepared under my supervision.
13     I further certify that I am not a relative,
14  employee, attorney or counsel of any of the parties,
15  nor am I a relative or employee of any of the
16  parties' attorney or counsel connected with the
17  action.
18
19        Dated January 18, 2019.
20
21        _Erinn Green_
           ERINN GREEN, RPR
22
23
24
25

Page 151

1        Veritext Legal Solutions
            290 W. Mt. Pleasant Ave. - Suite 3200
2           Livingston, New Jersey 07039
         Toll Free: 800-227-8440  Fax: 973-629-1287
3
   _____, 2019
4
   Alan Bauman
5  1450 South Dixie Highway
   Boca Raton, Florida 33432
6
   Case Name: Durden, Antoinette v. Sanofi S.A.
7
   Veritext Reference Number: 3193460
8
   Witness: Alan Bauman      Deposition Date:  1/14/2019
9
   Dear Sir/Madam:
10
   Enclosed you will find a transcript of your deposition.
11
   As the reading and signing have not been expressly
12
   waived, please review the transcript and note any
13
   changes or corrections on the jurat/errata sheet
14
   included, indicating the page, line number, change and
15
   reason for the change. Sign at the bottom of the sheet
16
   in the presence of a notary except in California where
17
   you are signing under penalty of perjury and forward
18
   the errata sheet back to us at the address shown above.
19
   If the jurat is not returned within thirty days of your receipt of
20
   this letter, the reading and signing will be deemed waived.
21
   Sincerely,
22
   Production Department
23
24  Encl.
25  Cc:  KELLY BIERI, ESQUIRE

Page 152

1           JURAT
2  CASE NAME: Durden, Antoinette v. Sanofi S.A.
3  ASSIGNMENT NO.: 3193460
4  ASSIGNMENT DATE: 1/14/2019
5     I, Alan Bauman , Vol I, do hereby state under
6  oath that I have read the above and foregoing
7  deposition in its entirety and that the same is a
8  full, true and correct transcription of my testimony
9  so given at said time and place.
10
11     _____
12     Signature of Witness
13
14  (Notary not required in California)
15     Subscribed and sworn to before me, the
16  undersigned Notary Public in and for the State of
17  _____ by said witness, Alan Bauman , Vol I,
18  on this _____day of_____, 2019.
19
20
21
22     _____
23     NOTARY PUBLIC
24     MY COMMISSION EXPIRES:_____
25

Page 153

1     ERRATA SHEET
      VERITEXT CORPORATE SERVICES
         800-567-8658
2     ASSIGNMENT NO. 3193460
3  CASE NAME: Durden, Antoinette v. Sanofi S.A.
4  DATE OF DEPOSITION: 1/14/2019
   WITNESS' NAME: Alan Bauman , Vol I
5
6  PAGE/LINE(S)/   CHANGE        REASON
7  ____/____/_____/_____/_____
8  ____/____/_____/_____/_____
9  ____/____/_____/_____/_____
10  ____/____/_____/_____/_____
11  ____/____/_____/_____/_____
12  ____/____/_____/_____/_____
13  ____/____/_____/_____/_____
14  ____/____/_____/_____/_____
15  ____/____/_____/_____/_____
16  ____/____/_____/_____/_____
17  ____/____/_____/_____/_____
18  ____/____/_____/_____/_____
19  ____/____/_____/_____/_____
20  ____/____/_____/_____/_____
21  ____/____/_____/_____/_____
22  ____/____/_____/_____/_____
23  ____/____/_____/_____/_____
24  ____/____/_____/_____/_____
25

39 (Pages 150 - 153)

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

Page 154

1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
2

3                    MDL No. 2740
4                    SECTION: H
5    IN RE: TAXOTERE (DOCETAXEL)
     PRODUCTS LIABILITY LITIGATION
6

     This Document Relates To:
7

     Antoinette Durden, Case No. 2:16-cv-16635;
8    Tanya Francis, Case No. 2:16-cv-17410;
     Barbara Earnest, Case No. 2:16-cv-17144
9    --------------------------------X
     1450 South Dixie Highway
10   Boca Raton, Florida
     January 14, 2019
11   4:00 p.m. - 10:15 p.m.
12

13      VIDEOTAPED DEPOSITION OF ALAN J. BAUMAN, M.D.
14                     VOLUME I
15                  PAGES 154 - 270
16

17        Taken on behalf of the Defendants before Erinn
18   Green, RPR, Notary Public in and for the State of
19   Florida at Large, pursuant to Notice of Taking
20   Videotaped Deposition in the above cause.
21

22

23

24      Job No. NJ3193460
25

Page 155

1 APPEARANCES:
2 Appearing on behalf of the Plaintiffs
3    VAL PATRICK EXNICIOS, ESQUIRE
4    LISKA, EXNICIOS & NUNGESSER
5    1515 POYDRAS STREET
6    14TH FLOOR, SUITE 1400
7    NEW ORLEANS, LA 70112
8
9 Appearing on behalf of Sanofi
10    KELLY BIERI, ESQUIRE
11    JASON HARMON, ESQUIRE
12    SHOOK HARDY & BACON L.L.P.
13    2555 GRAND BOULEVARD
14    KANSAS CITY, MISSOURI 64108-2613
15
16 Appearing on behalf of Sandoz
17    SARA TUCKER, ESQUIRE
18    GREENBERG TRAURIG, LLC
19    Terminus 200
20    3333 Piedmont Road NE
21    Suite 2500
22    Atlanta, GA 30305
23 Appearing Telephonically on behalf of Sun
   Pharmaceuticals
24
      GEOFFREY COHEN, ESQUIRE
25       - - - - - - - - -

Page 156

1        I N D E X
2 WITNESS:              PAGE
3 ALAN J. BAUMAN, M.D.
4 Continued Direct Examination by Ms. Bieri   157
5 Cross Examination by Mr. Exnicios       250
6 Redirect Examination by Ms. Bieri      258
7
8
9
10      DEFENDANT SANOFI'S EXHIBITS
11 NUMBER      DESCRIPTION         PAGE
12 Exhibit 8   CR LABS BOOKLET        211
   Exhibit 9   PRESS RELEASE INFORMATION   229
13 Exhibit 10  SALONB INFORMATION      238
   Exhibit 11  INFORMATION ON TAXOTERE    243
14       ON BAUMAN WEBSITE
   Exhibit 12  PHOTOGRAPH          245
15
16
17
18
19
20
21
22
23
24
25

Page 157

1        THE VIDEOGRAPHER:  We are back on the
2    record.  This is the beginning of media unit 3.
3    The time is 7:27 p.m.
4 BY MS. BIERI:
5    Q.  What does crowning glory mean?
6    A.  Crowning glory, that's a term that's
7 embedded in the -- in the social -- you know, in
8 the -- the social -- I would say the social --
9 what's the word?  Terminology for thick, full,
10 healthy head of hair.
11    Q.  Embedded in the social terminology.  Whose
12 social terminology?
13    A.  Well, in today's society.  If you say --
14 you know, hair is often referred to as a woman's
15 crowning glory.
16    Q.  Do you believe that a woman's hair defines
17 her beauty?
18    A.  Do I believe?  It's not what I believe.
19 It's what the woman believes that's important,
20 right?
21    Q.  I'm asking -- but I'm just asking about
22 your opinions.
23    A.  Sure.
24    Q.  Do you believe that a woman's hair is her
25 crowning glory?

Page 158

1    A.  A woman's hair is her crowning glory.
2 Absolutely.
3    Q.  Do you think that a woman's hair defines
4 her beauty?
5    A.  Not 100 percent.  It is a part of it.
6    Q.  Do you think that a woman with thin hair
7 is not beautiful?
8    A.  No, I would never say that.
9    Q.  Do you think that a woman with short hair
10 is not beautiful?
11    A.  No.
12    Q.  Do you think that all women view their
13 hair as their crowning glory?
14    A.  No, not all women.
15    Q.  Do you think that there are people who
16 don't think that the most important thing about a
17 woman is their hair?
18    A.  People think all sorts of things.
19    Q.  Do you agree that there are people who
20 don't think that hair is the most important thing
21 about a woman?
22    A.  Sure.
23    Q.  On what do you base your opinion that hair
24 often defines beauty?
25    A.  Well, when we look at -- in the media,

2 (Pages 155 - 158)

1 when we look in, whether it be television or
2 magazines, or entertainment, very often we see
3 fashion described in and shown, you know, in terms
4 of hairstyle, cuts, colors.  And very much engrained
5 within fashion and beauty is cuts, colors and curls
6 and so forth.  Trends.
7      Q.   And is that what supports your opinion
8 that hair often defines beauty?
9      A.   Yes.
10     Q.   Anything else?
11     A.   No, not offhand.
12     Q.   Have you ever done any studies related to
13 the media's portrayal of hair or beauty?
14     A.   No, just relying on only what my patients
15 tell me.
16     Q.   Have you ever published any peer reviewed
17 articles analyzing the media's portrayal of hair or
18 beauty?
19     A.   No.
20     Q.   You next say that "Femininity, sexuality,
21 attractiveness and personality are linked to a
22 woman's hair."
23          What is femininity?
24          MR. EXNICIOS:  Objection to the form.
25          THE WITNESS:  Femininity is a woman's

1    gender.
2 BY MS. BIERI:
3      Q.   What does it mean to be feminine?
4      A.   I don't know.
5      Q.   Well --
6      A.   Kind of a broad question.  So I'm not sure
7 how to answer that.
8      Q.   You say that femininity is linked to a
9 woman's hair.  So I'm trying to understand.
10     A.   So I'll give you an example.  When women
11 come in who have hair loss, they relate stories to
12 me about how they maybe go to either a salon or to
13 each other's homes when they were younger to style
14 their hair, and that was an important part of either
15 bonding with each other as friends, or with their
16 other female family members, such as their mother or
17 grandmother.
18     Q.   So you're saying that for some women, hair
19 care practices are bonding?
20     A.   Absolutely.
21     Q.   Okay.
22     A.   And part of that femininity.
23     Q.   So what does it mean to be feminine?
24     A.   I don't know.
25          MR. EXNICIOS:  Objection to the form.

1 BY MS. BIERI:
2      Q.   Do you agree that views on femininity are
3 subjective?
4      A.   I do.
5      Q.   Do you think femininity is important?
6      A.   Do I personally think it's important?
7      Q.   Uh-huh.
8      A.   I don't know if it's important or not.
9 It's important to my patients.
10     Q.   What do you think is the ideal feminine
11 hair?
12     A.   I don't know.  See, my wife's a teacher
13 and she says, "Don't paint seagulls into your kids'
14 paintings."  And what she means by that is that I
15 don't put ideas into my patients' heads.  So what
16 one woman feels is feminine may be different than
17 another.  But patients typically come to me because
18 they want a thicker, fuller, healthier head of hair.
19 And they're devastated by their hair loss and hair
20 thinning problem, and they relay to me the
21 information that I've described.
22     Q.   So you agree that what one woman may view
23 as femininity is different than another woman?
24     A.   Oh, I'm sure.
25     Q.   And that you can't generalize that

1 statement, correct?
2      A.   Well, I can generalize based on the
3 patients that I've seen over the past 20 years.
4      Q.   And so what do you think is feminine hair?
5          MR. EXNICIOS:  Objection to the form of
6     the question.
7          THE WITNESS:  It can't be defined.
8 BY MS. BIERI:
9      Q.   Well, you just said that you're basing
10 your opinion on your clinical experience and any
11 interactions you've had, and I want to understand
12 what you think that feminine hair is.
13     A.   Well, I think that maybe -- you know, I
14 can't answer what feminine hair is, but what I can
15 say is what my patients tell me.  They want thicker,
16 fuller, healthier hair.  They want to save their
17 hair, protect their hair, or restore their hair.
18     Q.   So you said thicker, fuller, healthier
19 hair is feminine.  Did I understand you right or
20 not?
21     A.   Well, for those women that come in who are
22 concerned about hair loss, yes.  It really doesn't
23 matter what I think.  It's more important what the
24 patients want.
25     Q.   Well, in this particular sentence of your

3 (Pages 159 - 162)

Page 163

1 report it's not tied to what a patient is
2 perceiving. You're saying, "Femininity, sexuality,
3 attractiveness and personality are linked to a
4 woman's hair - more so than for a man."
5       That's not talking about a patient's
6 perspective, is it?
7     A.  Well, that's talking about my experience
8 in treating patients, nearly 20,000 -- maybe 20,000
9 patients, men and women. So I would say in
10 proportion what I have seen and what I've heard is
11 that, absolutely, femininity, sexuality,
12 attractiveness and personality are linked to women's
13 hair. And especially -- and more so than men.
14    Q.  But I -- if you're saying femininity is
15 linked to a woman's hair, I'm trying to understand
16 what femininity is in that sentence.
17    A.  Femininity in that sentence means that for
18 a woman, a full head of hair, a thick head of hair
19 is feminine. There is no -- what I'm getting to is
20 that there's no acceptable option --
21    Q.  That's a later part.
22    A.  -- for women -- for men -- as it is for
23 men.
24       MR. EXNICIOS: Objection to the form.
25

Page 164

1 BY MS. BIERI:
2    Q.  So you're saying for women, a feminine
3 head of hair is a thick, full, healthy head of hair?
4    A.  Yes.
5    Q.  Is that your belief as well?
6    A.  Yes, it is.
7    Q.  Okay. So do you believe that thin hair is
8 less feminine?
9    A.  Well, again, when a woman comes in and
10 wants a thicker, fuller, healthier head of hair,
11 that's what we're here to provide.
12    Q.  You just said that --
13    A.  Well, I think maybe you're asking, you
14 know, in a baldness category. Yes, a baldness
15 category for women, less feminine.
16    Q.  That's your opinion?
17    A.  Yes.
18    Q.  Are there physical characteristics that
19 you believe, other than hair, are what make a woman
20 feminine?
21    A.  I'm not really at liberty to say that.
22 I'm treating women with hair loss.
23    Q.  I'm just asking you if we're talking about
24 femininity linked to hair, what else is femininity
25 linked to in your opinion?

Page 165

1    A.  Eyelashes.
2    Q.  Anything else?
3    A.  No, that's all I can think of at the
4 moment.
5    Q.  Okay. So you say that a woman's hair is
6 linked to her sexuality. What do you mean? Do you
7 mean to her sex life? To her sex appeal to
8 partners? To how she feels about her -- what she
9 thinks about her sexual appeal to her partner or
10 partners?
11    A.  Well, I think we see in society, again,
12 that thick, full, healthy heads of hair are related
13 to sexuality and fertility, and that's probably due
14 to evolution.
15    Q.  Big, sexy, full heads of hair are linked
16 to sexuality. Did I say that right?
17    A.  Yes, I think so, and I think it's based on
18 evolution.
19    Q.  Do you agree that views of sexuality are
20 subjective?
21    A.  Yes.
22    Q.  And do you agree that perception of what
23 is sexy is subjective?
24    A.  Yes.
25    Q.  Do you believe that a woman's sexual

Page 166

1 appeal to another person is based on her hair?
2    A.  I believe that it might be.
3    Q.  Do you think people, women, with less than
4 full heads of long hair are less sexy than those
5 with thick, full heads of hair?
6    A.  Well, that's not for me to say really.
7    Q.  Well, I'm asking your opinion.
8    A.  So what we're talking about is how society
9 judges women, and the soc -- you know,
10 sociologically, what we see out there.
11    Q.  And you're not a sociologist, correct?
12    A.  No.
13    Q.  And --
14    A.  Reporting what I've seen.
15    Q.  And you haven't done any sociological
16 studies, correct?
17    A.  No.
18    Q.  Do you think that there are physical
19 characteristics other than hair that are linked to a
20 woman's sexuality?
21    A.  Of course.
22    Q.  And what are those?
23    A.  I don't know. Could be a number of
24 things, you know, from -- you know, her humor, her
25 wit, her intelligence, to other features physically,

4 (Pages 163 - 166)

1 as well.
2    Q.   Are you saying that a reduction in hair
3 negatively impacts a woman's sexuality?
4    A.   I'm saying that it might.  Absolutely.  My
5 experience is, is that when women come in and they
6 have a thinning or a balding problem, they feel less
7 sexually attractive.
8    Q.   Some women?  Is that fair?
9    A.   Sure.  The ones that have come to see me
10 have voiced that.
11    Q.   Some of the women that have come to see
12 you have voiced that; is that fair?
13    A.   Many.
14    Q.   Do you agree that the women who are coming
15 to see you are women who have -- who are actively
16 seeking out treatment for hair loss?
17    A.   Yes, that's why they're here.
18    Q.   Do you think that any degree of hair loss
19 makes a woman feel less -- or excuse me.
20        Do you think that any degree of hair loss
21 negatively impacts a woman's sexuality?
22    A.   Any degree of hair loss could impact a
23 woman's sexuality.  Absolutely.  Even invisible hair
24 loss.
25    Q.   You think that hair loss that a woman does

1 not notice can impact her sexuality?
2    A.   Oh, no, she notices, but maybe outwardly
3 you can't tell.
4    Q.   The way you described invisible baldness
5 before, is I believe that it's hair loss that a
6 woman doesn't notice yet, right?
7    A.   No, it's not visible from across the room.
8    Q.   Not discernable to the eye, correct?
9    A.   If your ponytail volume is shrinking, you
10 feel it.
11        THE REPORTER:  What was it?
12        THE WITNESS:  If your ponytail volume is
13    shrinking, you feel it.
14 BY MS. BIERI:
15    Q.   So your opinion is based on women that
16 have -- some of the women that have come to see you
17 for hair loss treatment, right?
18    A.   Correct, based on my experience.
19    Q.   So you don't have an opinion about -- you
20 don't have a basis for an opinion about what women
21 who don't seek out treatment think or feel, correct?
22    A.   How would I have an opinion --
23        MR. EXNICIOS:  Objection to the form of
24    the question.
25

1 BY MS. BIERI:
2    Q.   You don't, right?
3    A.   I would not have an opinion about someone
4 I've never spoken with.
5    Q.   Or someone who hasn't sought out treatment
6 for hair loss, correct?
7    A.   Correct.
8    Q.   Okay.  You also say personality is linked
9 to a woman's hair, correct?
10    A.   Yes.
11    Q.   What is the basis for your opinion that a
12 woman's personality is linked to her hair?
13    A.   So very often a woman's hairstyle is an
14 expression of her personality, whether it's the cut,
15 the color, or the curl, the change.  And it's a very
16 important form of expression.  Again, going back to
17 the time of childhood, fixing their hair or curling
18 their hair, styling it.  Even just a simple change
19 in color, or change in a style or cut, can reflect a
20 woman's personality.  It's a very important form of
21 self-expression.  Much like the clothes she wears.
22    Q.   Do you think -- you go on in this
23 paragraph to say that "There is no socially
24 acceptable option for a woman with extensive hair
25 loss."  Correct?

1    A.   Correct.
2    Q.   What research have you done to determine
3 what is socially acceptable and what is not socially
4 acceptable?
5    A.   I've lived 48-and-a-half years, and
6 observed the world.
7    Q.   Is it your opinion that it is -- well, you
8 say -- well, let's start over.
9        What population are you referring to when
10 you describe what is socially acceptable and what's
11 not socially acceptable?
12    A.   The population, for example, of the U.S.
13    Q.   Do you agree that what's socially
14 acceptable could depend on age?
15    A.   Sure.
16    Q.   Do you agree that what's socially
17 acceptable might depend on religion?
18    A.   Yes.
19    Q.   Do you agree that what's socially
20 acceptable might depend on geographic location?
21    A.   Yes, of course.
22    Q.   Do you agree that what's socially
23 acceptable might depend on nationality?
24    A.   Yes.
25    Q.   Do you agree that what's socially

5 (Pages 167 - 170)

1 acceptable might depend on gender?
2    A.   Yes, of course.
3    Q.   Do you agree that what's socially
4 acceptable isn't static?
5    A.   True.
6    Q.   So, for example, you do pubic hair
7 restoration, correct?
8    A.   (Nods head.)
9    Q.   And is it your view that having pubic hair
10 is currently socially acceptable?
11    A.   I would say that the trend is moving away
12 from the laser bare socially acceptable option from
13 years ago, and is now moving back towards more hair.
14    Q.   So for women, women were previously
15 encouraged to shave, wax or otherwise remove their
16 pubic hair; is that your opinion?
17    A.   For sure.
18    Q.   And do you think that female celebrities
19 embracing the natural growth of pubic hair has
20 influenced how society perceives pubic hair for
21 women?
22    A.   Maybe a little bit.
23    Q.   If it's not celebrities or the media, what
24 is it?
25    A.   Well, it's celebrities, media, or the

1 general public.
2    Q.   So you say, "There is no socially
3 acceptable option for a woman with extensive hair
4 loss.  In simple terms, a bald man is socially
5 acceptable, but a bald woman is not."
6       Let's start with the male component of
7 that.  Is it your opinion that it is socially
8 acceptable to be bald as a male?
9    A.   I think it is more socially acceptable to
10 be bald as a male, yes.
11    Q.   And it's your opinion that it's not
12 socially acceptable in any social milieus to be bald
13 as a woman?
14    A.   I can't think of any except if you're in
15 an alopecia support group.
16    Q.   Do you find it socially acceptable for a
17 woman to be bald?
18    A.   Me personally?
19    Q.   Uh-huh.
20       MR. EXNICIOS:  Objection to form.
21       THE WITNESS:  People can do what they
22    want.
23 BY MS. BIERI:
24    Q.   Do you find it socially acceptable?
25       MR. EXNICIOS:  Objection.  Form.

1       THE WITNESS:  They can be, as I said, what
2    they want.
3 BY MS. BIERI:
4    Q.   So you find it socially acceptable for
5 a woman to be bald?
6       MR. EXNICIOS:  Same objection.
7       THE WITNESS:  It's really up to the woman.
8 BY MS. BIERI:
9    Q.   So if it's up to the woman and people can
10 be what they want, are you saying that you find it
11 socially acceptable?
12       MR. EXNICIOS:  Objection.  Form.
13       THE WITNESS:  The -- you know, I really
14    don't know how to answer that, to be honest.
15    Never thought about it.  I don't really have an
16    opinion.
17 BY MS. BIERI:
18    Q.   But it's your opinion -- you don't have an
19 opinion, but you think that every -- that other
20 people do?
21    A.   My opinion is that it's not socially
22 acceptable for women to have extensive hair loss.
23 Their options are very limited in terms of how they
24 can integrate into society as bald women.  It's very
25 difficult.  So, correct, it's not socially

1 acceptable.
2    Q.   And is that just based on your experience
3 in society as a general member of the public?
4    A.   That's my experience based on treating a
5 number of men and women in the course of my career.
6    Q.   Your experience would be with the patients
7 you've treated, right?
8    A.   Correct.
9    Q.   Your experience --
10       MR. EXNICIOS:  Objection as to form.
11 BY MS. BIERI:
12    Q.   Your experience isn't with analyzing
13 societal viewpoints, correct?
14    A.   Well, I feel like I'm pretty well tied
15 into, actually, fashion and beauty, and society in
16 that way as someone who often goes to conferences,
17 for example, in the beauty industry.  And, also, you
18 know, is asked very often to be in public forums to
19 answer questions about thinning hair and hair loss.
20 So I think it's more than just my experience in the
21 clinic, there, and, yes, my experience also outside
22 of the clinic as well interacting with other
23 professionals as well as the general public.
24    Q.   But in terms of research in this area,
25 have you done any?

6 (Pages 171 - 174)

1   A.  No.
2   Q.  And no sociology or anthropologic --
3   A.  I'm not a sociologist.
4   Q.  -- training, correct?
5   A.  Correct.
6   Q.  You say, "It is common that even small
7  degrees of hair loss and hair thinning, e.g., loss
8  of volume, widening of part lines, loss of coverage
9  and receding hair lines have significant
10  psychological impact."
11      Is the basis for your opinion your
12  clinical experience?
13   A.  Yes.
14   Q.  And you say it is common.  How common?
15   A.  Extremely common.
16   Q.  What percentage?
17   A.  Well over 90 percent of patients that have
18  these problems have some psychological impact or
19  motivation.
20   Q.  Well, you say, "It is common that even
21  small degrees of hair loss and hair thinning" have
22  significant psychological impacts.
23   A.  True.
24   Q.  And what I'm trying to understand first
25  is, what is -- have you done a statistical analysis

1  of your patient population, female patient
2  population?
3   A.  It's not a statistical analysis.  It's
4  analysis of treating 20,000 patients over 20 years.
5   Q.  So you don't have specific numbers to
6  support that?
7   A.  No, but 90 percent -- well over 95 percent
8  of patients that come into the office with a
9  thinning hair problem have some psychological issue
10  associated with a hair loss problem.
11   Q.  You just told me that it's not a
12  statistical analysis that you've done, though,
13  correct?
14   A.  Yeah, but it's an easy calculation because
15  of the numbers of patients that I see per month, per
16  week, per year.
17   Q.  And are you basing that on comments that
18  patients that you have who have actively sought out
19  hair loss treatment have made to you in the course
20  of treatment?
21   A.  Yes.
22   Q.  You haven't conducted a standardized,
23  controlled questionnaire study to get to the -- to
24  analyze that opinion, correct?
25   A.  I personally haven't, but --

1      MR. EXNICIOS:  Objection.
2      Go ahead, Doctor.
3      MS. BIERI:  I haven't personally done that
4   research, but there is plenty of quality of
5   life studies on alopecia in the clinical
6   literature.
7  BY MS. BIERI:
8   Q.  But we're talking about your opinion which
9  you said is based on your clinical experience,
10  correct?
11   A.  And my professional experience which is
12  being in places and locations where clinical
13  research is presented and shared.
14   Q.  And so tell me specifically what research
15  supports the specific opinion "that even small
16  degrees of hair loss and hair thinning, e.g., loss
17  of volume, widening of part lines, loss of coverage
18  and receding hair lines have significant
19  psychological impact."
20   A.  Well, we can look at some of my
21  references, but, I mean, that's pretty well
22  established in the -- you know, amongst the
23  professionals who are in the field of hair loss,
24  hair restoration, alopecia, and those that are in
25  the psychological fields.  I mean, that's been

1  studied for decades.  That's not new information.
2   Q.  I'm asking you --
3   A.  Thomas Cash would be the first place I
4  would go for that information.  The psychological
5  impact of hair loss, but there are hundreds of
6  others.
7   Q.  Is there a particular article to which you
8  believe supports your opinion, which you said is
9  based on your clinical experience?
10   A.  Sure, those are listed in the addendum.
11   Q.  Can you identify those?
12   A.  Sure.  For example, Thomas Cash said, "The
13  expression bad" -- here we go.  2001.  "Hair,
14  especially scalp hair, is imbued with greater social
15  and psychological significance than with biological
16  importance.  Hair provides cranial cushioning and
17  shielding from the sun's rays; however, throughout
18  history and across cultures, hair conveys a
19  considerable symbolism.  It can serve as a social
20  signal of gender, age, status, values and group
21  membership.  From monks to skinheads and prisoners
22  of war to warriors, 'bigwig' European aristocrats to
23  the moptop of Beatles, and hippies to head-shaven
24  celebrity athletes, hair makes a statement, whether
25  chosen or imposed.  Beyond sociological meanings,

Page 179

1 hair can become an essential part of self-identity
2 or 'body image'.  Body image is a psychological
3 concept that refers to one's perceptions, thoughts,
4 feelings, and behaviors related to one's physical
5 appearance.  For many people, hair is a physical
6 attribute that expresses individuality and is
7 central to feelings of attractiveness or
8 unattractiveness.  Indeed, scalp hair is rather
9 unique as an actual part of the human body that is
10 readily malleable in altering or managing one's
11 physical appearance.  In ... short time, one can
12 cut, color, curl, restyle one's hair to create the
13 visual image one desires.  In contrast, other bodily
14 transformations require substantial time and effort,
15 et cetera, et cetera.  For many people (and other
16 primates), hair is a focal aspect of a daily
17 grooming ritual.  Preparing one's hair is
18 preparation to face one's social world.  The
19 expression 'bad hair day' is a testimony to the
20 psychological importance of hair.  Hair loss can
21 turn every day into a bad hair day."
22      Q.   And as an initial matter, you were reading
23 from an excerpt on Exhibit 7, which was provided to
24 us for the first time today, and to -- apparently an
25 article that was identified to defendants for the

Page 180

1 first time today.
2           What I'm -- my question for you is, is
3 that what you think supports your opinion in the
4 sentence, "It is common that even small degrees of
5 hair loss and hair thinning, e.g., loss of volume,
6 widening part lines, loss of coverage and receding
7 hair lines have significant sociological impact"?
8      A.   Thomas Cash is one of many.
9      Q.   Is that --
10          MR. EXNICIOS:  Objection to the form of
11     the question.
12          THE WITNESS:  Thomas Cash is one of many
13     researchers in the field who identifies these
14     kinds of issues.
15 BY MS. BIERI:
16      Q.   You say that there's lots of
17 well-established research, but you've never done any
18 of that research, correct?
19      A.   No, I experience it every single day in
20 the office.
21      Q.   But in terms of doing actual empirical
22 research --
23      A.   No.
24      Q.   -- you have not done that?
25      A.   I've not done research on that.

Page 181

1          MR. EXNICIOS:  Objection to the form of
2     the question.
3 BY MS. BIERI:
4      Q.   You don't --
5      A.   No, we don't do research on that.
6      Q.   So you said that roughly half of all women
7 over age 40 suffer from some form of hair loss,
8 right?  Is that accurate?
9      A.   Correct.
10      Q.   Is it your opinion that half of all women
11 over 40 experience significant psychological
12 problems because of hair loss?
13      A.   It's my opinion that they may experience.
14      Q.   It's possible?
15      A.   Possible.  Absolutely possible.
16      Q.   It's possible that they don't?
17      A.   True.
18      Q.   In another portion of your report you say,
19 "Women are taught from a very young age that their
20 image and appearance of which hair plays a role is a
21 precious item."
22           Do you believe that women view their image
23 and appearance as precious?
24      A.   Yes.
25      Q.   You believe that all women think that?

Page 182

1      A.   Many.
2      Q.   Not all?
3      A.   Not all.
4      Q.   And you haven't -- you're just -- you
5 haven't attempted to identify what percent of women
6 do and do not feel that way, correct?
7      A.   No --
8          MR. EXNICIOS:  Objection to the form of
9     the question.
10          THE WITNESS:  No, I have not done any
11     research to identify that.
12 BY MS. BIERI:
13      Q.   Okay.
14      A.   I turn to the data.  For example,
15 $15 billion spent annually on hair care and hair
16 products.
17      Q.   Do you agree --
18      A.   To exemplify the motivation, if you will,
19 in modern society and America specifically to the
20 care of hair in particular.
21      Q.   Do you think that soap for the hair is
22 included in the figure you just gave about the hair
23 care industry?
24      A.   What was that question?
25      Q.   You just gave a figure about the amount

8 (Pages 179 - 182)

Page 183

1  spent in the haircare industry, right?
2     A.  Correct.
3     Q.  Do you think that includes things that
4  involve simply cleaning the hair?
5     A.  Yes, of course.
6     Q.  And maintenance of cutting off split ends?
7     A.  Yes.
8     Q.  You explained before that you're not
9  relying on materials in Exhibit 7, but you later
10 say, "I concur with the findings of ... LaFrance ...
11 and numerous others (Cash, Olsen, Tosti, Christiano,
12 et al.) ... whose research has illuminated the
13 cause-and-effect relationship between the perception
14 of having 'bad hair' and experiencing negative
15 sociological consequences."
16       Are you saying that your experience is
17 based -- or your opinion is based on your clinical
18 experience and you concur with what they found out?
19    A.  Yes.
20       MR. EXNICIOS:  Objection to the form of
21    the question.
22 BY MS. BIERI:
23    Q.  You use the term "worthwhile person" in
24 your report.  What does it mean to be a worthwhile
25 person?

Page 184

1     A.  I'm not sure which part of the report
2  you're referring to.
3     Q.  Look at the second to last paragraph on
4  Page 2.  Do you see it's actually in the last line
5  of that paragraph?
6     A.  Oh, yes.
7     Q.  What does being a worthwhile person mean?
8     A.  Well, similar to self-esteem and
9  self-worth.  When people feel worthless, they feel
10 less of a person.  They feel like a part of them is
11 missing.
12    Q.  So are you saying feeling -- are you
13 saying that feeling like a part of you is missing is
14 synonymous with being a worthwhile person?  Is not
15 synonomous with being a worthwhile person?
16       MR. EXNICIOS:  Objection to the form.
17       THE WITNESS:  When hair loss triggers a
18    feeling of bad hair, it's commonly accompanied
19    by reduced self-esteem, increased social
20    insecurity and a diminished sense of being a
21    worthwhile person.  So a diminished sense of
22    worth, self-worth.
23 BY MS. BIERI:
24    Q.  And is that based on your clinical
25 experience treating women?

Page 185

1     A.  Yes.  Absolutely, and my colleagues,
2  again, would concur.
3     Q.  Have you done any research to support your
4  opinion in that sentence?
5     A.  No.
6       MR. EXNICIOS:  Objection to the form.
7  BY MS. BIERI:
8     Q.  Have you published any peer reviewed
9  literature to support your opinion in that sentence?
10       THE WITNESS:  No, I have not.
11 BY MS. BIERI:
12    Q.  And when you talk about the basis being
13 your clinical experience, how can we know the
14 validity of your statement if you have no documents
15 regarding your clinical treatment of patients?
16       MR. EXNICIOS:  Objection to the form.
17       THE WITNESS:  Well, my experience is that
18    in the vast majority of patients that I've
19    treated, the 20,000 patients over 20 years,
20    that this absolutely reflects the condition
21    that they experience when experiencing hair
22    loss.
23 BY MS. BIERI:
24    Q.  And how can your opinion that's based on
25 clinical experience be tested?

Page 186

1     A.  I don't know.  Ask me if it's true.
2     Q.  And -- so you say it's true, right?
3     A.  Correct.
4     Q.  And so that means it's true?
5     A.  Yes.  It's my word.
6     Q.  Is that fair of all your opinions that are
7  based on your clinical experience to say that
8  there's no way to test them, but you're saying it's
9  true and so it's true?
10       MR. EXNICIOS:  Objection to the form of
11    the question.
12       THE WITNESS:  I don't understand the
13    question, but what I will say is that my
14    opinion is based on my experience in treating
15    patients, and my experience in collaborating
16    with other professionals in the field, whether
17    they be psychiatrists, psychologists, hair
18    restoration physicians, dermatologists and
19    others who also treat alopecia patients.
20    Listening to them, talking to them, reading
21    their clinical research and learning from their
22    experiences as well.
23 BY MS. BIERI:
24    Q.  And you're saying other people's research
25 is in concurrence with your experience, which is the

9 (Pages 183 - 186)

Page 187

1 basis of your opinions, right?
2    A.   Yes.  Absolutely.
3    Q.   And your clinical experience, the basis
4 for your opinions in your report, is based simply on
5 when a patient raises these things with you,
6 correct?
7    A.   Or when asked.
8    Q.   And do you -- you record those mentally,
9 correct?
10    A.   Often in the chart, actually.
11    Q.   And so --
12    A.   But, yes, mentally as well.
13    Q.   What is the methodology that you've used
14 in terms of analyzing what your clinical patients
15 have said to you regarding the impact of hair loss
16 on them?
17    A.   What is the process?
18    Q.   Yeah.
19    A.   I ask them, and then they tell me.
20    Q.   And --
21    A.   And then I repeat that for every patient
22 every time when they come in.
23    Q.   And sometimes you record this in your
24 records, sometimes not, correct?
25    A.   Uh-huh.

Page 188

1    Q.   Maybe you do, maybe you don't?
2    A.   Uh-huh.  Consultations typically take an
3 hour-and-a-half.  So much of that time is spent, not
4 only discussing the physical issues of the hair loss
5 situation, but also the impact it's having
6 psychologically.
7    Q.   So women are reporting to you what they're
8 experiencing?
9    A.   Yes, or my staff.
10    Q.   And do you use a standardized set of
11 written questions when you're discussing their
12 opinions on these topics?
13    A.   We don't have a formal QLA, Quality of
14 Life Assessment.
15    Q.   Okay.
16    A.   But we do get to that question 99 percent
17 of the time.  It's important.
18    Q.   Verbally?
19    A.   Part of the consult.
20    Q.   You say, "We ... know that these patients
21 also tend to search for and dwell on their own
22 personal character flaws that go well beyond their
23 appearance."
24       Are you talking about your patients?
25    A.   Yes.

Page 189

1    Q.   Okay.  And are they telling you "I focus
2 on other" -- what is this opinion based on?  What
3 are your patients telling you?
4    A.   I'll give you an example.  We dealt with a
5 woman who has spent her life, most of her life
6 without hair being burned as a child in a kitchen
7 fire, and going through the multiple surgical
8 procedures and such that she needed to to restore
9 the skin of her scalp through plastic surgery.  And
10 over the years living without hair and trying to put
11 together money to purchase wigs and things like
12 that, she became really detached from society and
13 began to focus on other aspects of her personality
14 that maybe would not have colored her experience as
15 much or really determined her course of life, let's
16 say, socially and professionally, but because of the
17 hair loss issue, these other factors became almost
18 magnified and enlarged psychologically.  She became
19 focused on those things, and embarrassment and shame
20 of the hair loss was compounded by her focus on
21 other character flaws that, you know, were very
22 minor, but overtook her life and impacted it
23 detrimentally.
24    Q.   So --
25    A.   And it was a very, very sad situation, and

Page 190

1 not uncommon in women who experience near complete
2 alopecia.
3    Q.   So are you saying that when you're
4 referring to these patients and what you say in the
5 sentence about finding character flaws that go
6 beyond their appearance, is that based on their
7 reporting to you that they do that?
8    A.   Well, it's not necessarily a report but a,
9 you know, it's you get to know the patients over
10 many, many months and years, and you get to -- we
11 get to know them very -- you know, quite intimately.
12 We very -- you know, get to know their life
13 situation intimately.  And, you know, these things
14 become elucidated through that process that we
15 understand that it goes well beyond the physical
16 disfigurement of the loss of hair.  Actually, this
17 is not uncommon, you know, in other areas of
18 medicine as well, loss of a limb, loss of a bone of
19 the face and things like that that can --
20    Q.   So even if they don't say explicitly, just
21 by talking to them a lot you can tell, you assume
22 that --
23    A.   We don't assume.  We're talking about it.
24 We're elucidating from them what's going on, but
25 we're learning.

10 (Pages 187 - 190)

Page 191

1    Q.  And it's based on their reporting to you?
2    A.  Correct.
3    Q.  Verbal reporting to you?
4    A.  Yes.
5    Q.  That may or may not be reflected in some
6  of your medical records --
7         MR. EXNICIOS: Objection to form.
8  BY MS. BIERI:
9    Q.  It's not based on any standardized
10 questions that you ask them or a quality of life
11 survey, correct?
12   A.  No, our rapport with patients goes beyond
13 what's reflected in the medical record.
14        MR. EXNICIOS: Objection as to form.
15 BY MS. BIERI:
16   Q.  Do you agree that there are people with
17 hair loss who aren't in constant fear of explaining
18 the condition of their hair loss to others?
19   A.  Can you repeat the question, please?
20   Q.  Do you agree that there are people who
21 aren't in constant fear of explaining the condition
22 of their hair to others?
23   A.  Maybe. I can't answer. I don't know.
24   Q.  You've never analyzed that, right?
25   A.  Yeah, I never thought about that.

Page 192

1    Q.  Okay. And you certainly couldn't have an
2  opinion with respect to Ms. Earnest specifically,
3  correct?
4         MR. EXNICIOS: Objection. Form.
5         THE WITNESS: I have no idea who you're
6    talking about.
7  BY MS. BIERI:
8    Q.  Or -- and you couldn't have any specific
9  opinion about Ms. Earnest, specifically?
10   A.  No, I don't have any specific opinion
11 about her.
12        MR. EXNICIOS: Objection. Form.
13 BY MS. BIERI:
14   Q.  And is it fair to say you don't have any
15 specific opinion about Ms. Francis?
16   A.  No specific opinion.
17        MR. EXNICIOS: Objection. Form.
18 BY MS. BIERI:
19   Q.  You say that every single day in your
20 clinic you're "reminded of the effects of the stress
21 and psychological trauma of alopecia patients, which
22 can be see in their personal and professional lives,
23 limiting or ending interpersonal relationships as
24 well as triggering the avoidance of social
25 activities."

Page 193

1         And that's based on your experience in
2  clinic, correct?
3    A.  Absolutely.
4    Q.  And people in clinic at a hair restoration
5  facility?
6    A.  Yes. Where else would they be?
7    Q.  Not at a hair restoration facility. My
8  question is this. Your experience is limited to
9  people who are actively seeking out care and
10 treatment for hair loss, right?
11        MR. EXNICIOS: Objection to the form of
12   the question.
13        THE WITNESS: Yes.
14 BY MS. BIERI:
15   Q.  That's the subset of the population that
16 your experience deals with, correct?
17   A.  Correct.
18   Q.  Okay.
19        MR. EXNICIOS: Objection to the form.
20 BY MS. BIERI:
21   Q.  And you have no idea if Ms. Durden has
22 ever actively sought out treatment for hair loss
23 before being sent to a dermatologist by her lawyer,
24 correct?
25        MR. EXNICIOS: Objection as to form.

Page 194

1         THE WITNESS: I have (inaudible).
2  BY MS. BIERI:
3    Q.  And you have no idea --
4         THE REPORTER: Wait. I'm sorry?
5         THE WITNESS: I have no idea.
6  BY MS. BIERI:
7    Q.  And you have no idea whether Ms. Earnest
8  ever sought ought treatment for hair loss before
9  being sent to a dermatologist, correct?
10        MR. EXNICIOS: Objection. Form.
11 BY MS. BIERI:
12   Q.  By her lawyer?
13   A.  I have no idea.
14   Q.  And you have no idea whether Ms. Francis
15 ever sought out treatment for hair loss before being
16 sent to a dermatologist by her lawyer, correct?
17        MR. EXNICIOS: Objection to form.
18        THE WITNESS: No idea.
19 BY MS. BIERI:
20   Q.  You say that -- well, let's talk actually
21 about the next section of your report for a little
22 bit, and that section of your report is Treatment of
23 Severe Alopecia Using CNC Hair & Scalp Cranial
24 Prosthesis, correct?
25   A.  Yes.

11 (Pages 191 - 194)

Page 195

1   Q.  Okay.  What do you mean in that title when
2 you say severe alopecia?
3   A.  Severe alopecia is alopecia not amenable
4 to other therapies, such as medications, hair
5 transplantation.
6       MS. BIERI:  Can you read his answer back,
7   please?  Thank you.
8       (The question was read back.)
9 BY MS. BIERI:
10   Q.  So do you recommend CNC is only for people
11 who are not responding to and have had no success
12 with other treatment methods?
13   A.  It may not be that they have no success.
14 It just may be that they have no chance of success,
15 depending on their medical condition.
16   Q.  For example, in the case of a burn?
17   A.  Yes.
18   Q.  So for people who have had a burn, you
19 wouldn't try any other treatments?
20   A.  Well, it obviously depends on the size and
21 shape of a burn, but an extensive scalp burn with no
22 available donor supply and weak quality skin, not
23 going to be a good transplant candidate, or flaps,
24 or scalp reduction, or so forth.  Other surgical
25 intervention.  So, yes, she would need a CNC.

Page 196

1   Q.  So you say, "When hair follicle density is
2 severely depleted, traditional treatments that
3 improve hair follicle function such as powerful
4 prescription topical medications, FDA cleared laser
5 therapy devices and so forth, have a limited
6 effect."
7       Before we go into the substance of that,
8 tell me about the topical treatments you offer.
9   A.  So the topical --
10   Q.  Which is the ones -- sorry, I didn't mean
11 to cut you off.  My question is going to be, which
12 of the -- I know you've talked to me about
13 treatments, but I'm not sure which are topical.
14   A.  Topical means applied directly to the
15 scalp.  So Minoxidil would be in that category.
16   Q.  Any others?  Any other topical treatments
17 that you offer?
18   A.  For women?
19   Q.  Yeah, including postmenopausal women?
20   A.  Oh, maybe off label topical Finasteride
21 might be an option as well.
22   Q.  And when you prescribe Minoxidil or
23 Finasteride to a patient, how many times a day are
24 they supposed to apply it to their scalp?
25   A.  Twice a day.

Page 197

1   Q.  Two times a day forever, right?
2   A.  Correct.  As long as they want the
3 response.  As long as they want the result from the
4 treatment.
5   Q.  So if they stop, they won't --
6   A.  The results would go away, yes.
7   Q.  Okay.  Back to the sentence.  What do you
8 mean when you say "follicle density"?  Are you
9 talking about the number of overall follicles?
10   A.  Numbers of hairs per square unit area of
11 the scalp.
12   Q.  You use the term severely depleted.  Okay.
13 What percentage qualifies a severely depleted?
14   A.  Well, it's not an exact number.  It has to
15 do with the ratio of the available follicles in the
16 donor zone versus an area that we're going to try to
17 restore.
18   Q.  Okay.
19   A.  So it's not a number.
20   Q.  It's a ratio?
21   A.  Yeah.
22   Q.  And what do you want to see that ratio at?
23   A.  It's not a number.  It's do you have
24 enough hair to move around to fill another zone.  So
25 it's based on clinical judgment, and the patient's

Page 198

1 goals and expectations.
2   Q.  So it's not an exact number, an exact
3 percentage?
4   A.  No.
5   Q.  You just look at it and you say yes or no?
6 This will work or there isn't enough?
7   A.  Traditionally, yes.  Correct.
8   Q.  So do you agree that even where hair
9 follicle density is severely depleted, that
10 treatments such as prescription topical medications,
11 FDA laser therapy devices have some effect, even if
12 it's limited?
13   A.  Yes.
14   Q.  You use the term so forth.  You say,
15 "Powerful prescription topical medications, FDA
16 cleared laser therapy devices and so forth."
17       What's the so forth?
18   A.  Medical therapy.  So nonsurgical
19 interventions.  For example, self-therapy, PRP, that
20 platelet rich plasma would be another.
21   Q.  Do you agree that if there's enough donor
22 hair, a patient can have a hair transplant?
23   A.  Enough donor versus the demand.  Yeah,
24 supply and demand.
25   Q.  And that's true for female patients?

12 (Pages 195 - 198)

Page 199

1    A.  Yes.
2    Q.  Okay.  Is it your belief that if a
3  transplant isn't appropriate and the other therapies
4  haven't been successful or aren't going to work, for
5  example, in the case of a burn, that the CNC scalp
6  and cranial prosthesis is appropriate; is that
7  right?
8    A.  Yes.
9    Q.  Do you agree that some people choose to
10  wear traditional wigs?
11    A.  Oh, yes.
12    Q.  And --
13    A.  Some people choose to wear a scarf and
14  have no treatment.
15    Q.  No head covering at all?
16    A.  Perhaps.
17    Q.  Do you know the numbers of percentage of
18  the female population that frequently utilizes a
19  wig?
20    A.  I have no idea.
21    Q.  Do you know the percentage of the U.S.
22  population that utilizes weaves?
23    A.  I have no idea.
24    Q.  Do you know the percentage of the U.S.
25  female population that utilizes extensions?

Page 200

1    A.  Probably a lot.
2    Q.  And you agree that there are women who
3  don't have hair loss who choose to wear wigs,
4  correct?
5    A.  Oh, yes.  Of course.
6    Q.  And but you think -- strike that.
7       The CNC is made with real human hair,
8  right?
9    A.  Yes.
10    Q.  Virgin human hair?
11    A.  Uh-huh.  Yes.
12    Q.  Are you aware that there are wigs
13  available that use real virgin hair?  Real human
14  virgin hair?
15    A.  Yes, I'm aware.
16    Q.  Okay.  And are you aware that there are
17  wigs that you can swim in, for example?
18    A.  Yes.
19    Q.  Traditional lace and mesh weave wigs?
20    A.  Yes, methods of attachment.  Uh-huh.
21    Q.  So there are options that are not just the
22  CNC -- a scalp prosthesis --
23    A.  Agreed.
24    Q.  -- that a woman -- a woman can do physical
25  activities such as swimming in, correct?

Page 201

1    A.  Well, to the degree of if, you know, if
2  it's a wig, it depends on the method of attachment.
3  Whether, you know, if she has hair to weave it into
4  or if she doesn't, that may play a big role as to
5  whether she would be a candidate for a cranial
6  prosthesis, or some other type of hair replacement
7  option.
8    Q.  I think we may be ships passing in the
9  night here, and that may be my fault.
10       You say that a limitation of traditional
11  wigs is the activity and lifestyle limiting methods
12  of attachment.
13       Okay?
14    A.  (Nods head.)
15    Q.  What are the methods of attachment you're
16  talking about?
17    A.  So some methods of attachment rely on the
18  existing hair.
19    Q.  Uh-huh.
20    A.  Some methods of attachment are adhesive.
21  Some require a shave of the area.
22    Q.  Do you agree that there are non-cranial
23  scalp prostheses, traditional wigs, that don't have
24  lifestyle limiting effects?
25    A.  Well, every wig has a lifestyle limiting

Page 202

1  effect.
2    Q.  Every prosthesis as well, in your opinion?
3    A.  Every prosthesis as well.
4    Q.  Okay.
5    A.  Yeah.  You know, you cannot give back God
6  given hair.  I mean --
7    Q.  What are ...
8    A.  -- it's impossible.
9    Q.  What are the lifestyle and activities you
10  believe -- are you talking about in this sentence of
11  your report?
12    A.  Well, a traditional wig would be a mesh
13  base or some other is going to sit on the scalp, and
14  it could be limiting in terms of the way that it
15  feels, the way that it anticipates heat, the way
16  that it's attached to the scalp.
17    Q.  And so different women may have
18  different preferences about what they do or don't
19  want on their scalp?
20    A.  Agreed.
21    Q.  Or about how many hours of the day they
22  want something on their scalp or not?
23    A.  Agreed.
24    Q.  So let's talk about the CNC.  It's a
25  prosthesis, correct?  And it's made out of synthetic

13 (Pages 199 - 202)

1 polymer resin?
2    A.   The base is, yes.
3    Q.   And it's glued in place with an adhesive
4 onto the scalp directly and the hair directly too?
5    A.   Scalp and hair, yes.
6    Q.   And it stays on a woman's head 24 hours a
7 day, 7 days a week, right?
8    A.   Correct.
9    Q.   Do you agree that there are other hair
10 prostheses beyond the CNC that are also adhered to
11 the scalp and hair and stay on 24 hours a day, 7
12 days a week?
13    A.   I'm not sure there are others that are
14 adhered to the hair.
15    Q.   So may just be adhered to the scalp?
16    A.   Right, requiring a shave, for example, of
17 whatever hair is left.
18    Q.   So what are the names of those?  The ones
19 that you just mentioned.
20    A.   Oh, you could have a vacuum prosthesis.
21 You could have a, as I said, a bonded system.
22    Q.   I'm talking about other manufacturers of
23 cranial prostheses that stay on the scalp 24/7.
24    A.   I don't know the names of any.
25    Q.   You're aware they exist, though?

1    A.   I mean, I think it would be more -- I
2 think you're conflating the term cranial prosthesis
3 maybe with a hair system.  This is a true hair
4 cranial prosthesis.  This is prosthetic hair and
5 scalp.
6    Q.   Okay.
7    A.   So meaning that it's completely 3D-printed
8 to match the existing scalp.  There's no other
9 3D-printed hair prosthesis in the world.
10    Q.   You used a different term.  Hair -- you
11 said I might be confusing the term of a hair
12 prosthesis and a cranial prosthesis --
13    A.   Like the hair system.
14    Q.   Okay.  Tell me what --
15    A.   A traditional hair system would be
16 something that would be bonded directly to the skin
17 requiring a shave of the hair.  You know, that would
18 be more of a disposal system that would not have a
19 second skin.
20    Q.   Okay.  What are the names of those?
21    A.   I mean, there's Hair Club For Men, Hair
22 Club For Women.
23    Q.   Are you familiar with the Dura Light
24 System?
25    A.   No.

1    Q.   Are you familiar with the Freedom Wig
2 System?
3    A.   Sounds familiar, but I'm not familiar with
4 it.
5    Q.   So you don't know anything about it?  If
6 it's similar to the CNC system?
7    A.   No.
8    Q.   Okay.  How many patients have you
9 prescribed the CNC system to -- well, let me ask you
10 this.
11        When did you start prescribing the CNC
12 system at Bauman Medical?
13    A.   Oh, gosh, you know, I don't remember the
14 exact date.  Maybe five years.
15    Q.   Okay.  So you've been prescribing it for
16 about five years?
17    A.   Yeah, five or six.
18    Q.   And does it have to be prescribed?
19    A.   Well, it is considered a medical device,
20 for example, in Italy.  So --
21    Q.   But not by FDA, correct?
22    A.   Not yet.
23    Q.   It is not currently --
24    A.   Not considered an FDA medical device yet.
25    Q.   How many individuals have you fitted for a

1 CNC scalp and cranial prosthesis?
2    A.   I don't really know that exact number.
3    Q.   Half of your report is about the CNC scalp
4 and cranial prosthesis, right?
5    A.   I would say, you know, hundreds.
6    Q.   Couple hundred?
7    A.   Probably a couple hundred.
8    Q.   Do you keep records that identify that
9 number?
10    A.   Yes.
11    Q.   So before you will give a woman -- strike
12 that.
13    A.   Recommend.
14    Q.   Before you recommend a CNC cranial and
15 scalp prosthesis to a woman, do you require a
16 consultation?
17    A.   Usually a consultation is with me first,
18 but it doesn't have to be.
19    Q.   That can be done --
20    A.   It can be done by a --
21    Q.   A non --
22    A.   Yeah, a licensed cosmetologist who's been
23 trained in the CNC system.
24    Q.   So someone --
25    A.   I have one who's employed in the practice.

14 (Pages 203 - 206)

1    Q.   So a cosmetologist in your office may do
2  it?
3    A.   Yeah, she may do that consultation.
4    Q.   So what occurs during that consultation?
5    A.   It's the train.
6       MS. BIERI:  Can we go off the record?
7       THE VIDEOGRAPHER:  We're going off the
8  record.  The time is 8:34 p.m.  This is the end
9  of media unit 3.
10      (A recess was taken.)
11      THE VIDEOGRAPHER:  We're back on the
12  record.  This is the beginning of media unit 4.
13      The time is 8:44 p.m.
14  BY MS. BIERI:
15    Q.   Doctor, before we took that break, I think
16  I was asking you what goes on at the initial
17  consultation meeting related to a CNC, with either
18  you or the cosmetologist.
19    A.   Right.  So when I'm involved in the
20  consultation, we're looking at the scalp and the --
21  if there's available hair and talking about
22  different options.  Obviously, if they're not a
23  candidate for transplantation, then the idea of
24  nonsurgical hair replacement enters the picture, and
25  we discuss, really, the benefits of the CNC compared

1  to other hair replacement options.  Many times
2  patients have already been through or had used other
3  hair replacement items:  Wigs, weaves, whatever, and
4  that's why they're here.  They're coming to see me
5  for an alternative.  Just like they may have tried
6  other types of treatments and procedures and
7  whatnot, and they come to find me after that.  So
8  it's very common that they already have some
9  experience with hair replacement, and it's amazing
10  to be able to offer the CNC.  There's really nothing
11  else like it in the world.
12    Q.   For some patients do you recommend that
13  they try -- let's say it this way.  For some
14  patients who are potential CNC candidates, do you
15  ever recommend that they try something else, such as
16  laser light therapy, PRP, or hair transplantation if
17  they're the right candidates?
18    A.   Well, absolutely.  I mean, it's a small
19  percentage of overlap, but, yes, I mean, there are
20  cases that we discuss that may -- patients may
21  benefit.  Even while they're wearing a CNC, they may
22  benefit from some adjunctive type of therapy.  Like
23  a PRP treatment, and --
24    Q.   That would allow them to grow hair back?
25    A.   Improve their hair.  Sure.  And there may

1  be cases where we have -- we can use hair
2  transplantation to effect a change in one area, and
3  then use a CNC in a different zone, or another area
4  of alopecia needs to be filled -- you know, could
5  only be filled really with a CNC.  So very often
6  there's a combination of therapies explored at
7  least, if not prescribed.
8    Q.   Do you provide any documents to your
9  patients, written materials, regarding the CNC
10  system?
11    A.   Documents?  They referred to the website
12  typically.  There's -- you know, not much paper goes
13  through.
14    Q.   So you're kind of speaking in generalities
15  and I want to be specific.  Do you give patients any
16  hard copy paper regarding the CNC system?
17    A.   I don't.  Not typically, no.  If they want
18  to learn about the system just like if they want to
19  learn about another type of treatment option,
20  they're referred to the website which has the latest
21  and greatest information and videos and so forth.
22  So it would be very unusual for them to have -- I
23  mean, most of the paperwork's Italian anyway.  So
24  they're not really going to be walking out with some
25  kind of piece of information --

1    Q.   Do --
2    A.   -- about the construction of a CNC.
3  They're going to go and watch the video.
4    Q.   You don't have a brochure that you give
5  them?
6    A.   No, I don't think we have -- well, we have
7  the brochure from Cesare Ragazzi Laboratories that
8  kind of explains a little bit about, you know, the
9  CNC option.  I actually have one of those right
10  here.
11    Q.   May I see that?
12    A.   Yeah.  Sure.
13    Q.   Thank you.  And this brochure that you
14  just handed me, a portion of it talks about the CNC
15  system, correct?
16    A.   I have no idea, actually.  I haven't seen
17  it in a while.
18    Q.   Did you bring something else with you to
19  deposition that's under your phone?
20    A.   Yes, but this is more for -- on the hair
21  product side of things.  Like the types of shampoos
22  and things that are recommended when they use the
23  CNC, or for specific scalp conditions.  They're also
24  from the same company.
25    Q.   Can I see that?

15 (Pages 207 - 210)

Page 211

1    A.  You're welcome to take a peek at it.
2    Q.  And this is from CR Lab.  Do you offer
3  these products referenced in this big, gray booklet?
4    A.  We do carry the Cesare Ragazzi line of
5  products.
6    Q.  But you have additional lines of products
7  that overlap, correct?
8    A.  Yes, for sure.
9    Q.  Let's mark -- do you mind if I mark this?
10    A.  No, go for it.
11    MS. BIERI:  We're going to mark as Exhibit
12  8 the small booklet from CR Labs that discusses
13  in part the CNC system.
14    (Defendant's Exhibit 8 was marked for
15  identification.)
16  BY MS. BIERI:
17    Q.  Although, you said you haven't seen this
18  in a long time, correct?
19    A.  Yeah --
20    Q.  You don't know what it says?
21    A.  (No response.)
22    Q.  Is that accurate?
23    A.  Yeah, I haven't seen it.
24    Q.  Do you have any printed materials about
25  the price of the CNC system that you give to

Page 212

1  patients?
2    A.  So pricing is done as an estimate based on
3  hair length and the size of the area that's being
4  replaced, and also the number of systems that are
5  being ordered.  So there's -- I think there's some
6  kind of a calculation that's performed.
7    Q.  And do you give patients a piece of paper
8  that lays out that information?
9    A.  I personally don't, but I know that they
10  leave here with some kind of written estimate for
11  that.
12    Q.  And who gives that to them, your front
13  desk?
14    A.  It would typically be my trichologist --
15  my cosmetologist.  The one who's trained in the
16  maintenance and the servicing of the CNC.
17    Q.  So when someone comes here for maintenance
18  of the CNC, that's not done by you, right?
19    A.  No.
20    Q.  That's done by a cosmetologist?
21    A.  Correct.
22    Q.  Your employee?
23    A.  Yeah.
24    Q.  So there are written materials that you
25  generate for patients regarding cost, you just don't

Page 213

1  have those here today; is that correct?
2    A.  Correct.
3    Q.  In your opinion, are there any patients
4  for whom the CNC is not appropriate?
5    A.  Well, yes.  I mean, you know, there could
6  be patients who, you know, aren't near enough to
7  either our clinic or another CNC licensee to be
8  serviced appropriately, or on a timely basis.  They
9  may be traveling or they travel internationally or
10  something like that, and it may be difficult.  So
11  logistics --
12    Q.  Any other --
13    A.  -- is an issue.  Dermatic compatibility
14  testing failure.  For example, if we do a
15  dermatology testing on every patient, when they come
16  in for their consultation, if they fail or, you
17  know, they have a reaction from the test kit, then
18  unfortunately they would likely not be a good
19  candidate for obvious reasons; it would cause some
20  kind of an allergic reaction to some of the
21  material, the polymer or whatnot.
22    Q.  If some -- so -- and okay.
23    So if someone had open scalp sores or was
24  prone to scalp infections, would they be a good
25  candidate for a CNC?

Page 214

1    A.  No.  Well, it depends because if we can
2  get the -- sometimes the CNC actually forms a
3  biologic barrier and can actually help the scalp
4  heal.  So we had another patient, for example, who
5  was a burn victim.  She was using wigs and weaves
6  that she was purchasing on her own, and the movement
7  and friction of those wigs was creating an ulcer in
8  the area where she had the very, very thin, friable
9  skin from the burn and reconstruction.  So the use
10  of the CNC over that area, once it was -- once we
11  were able to heal it, actually became protective.
12    Q.  So that's for a situation that was
13  actively being caused by friction from something
14  else on the head?
15    A.  Yes.
16    Q.  But do you agree that there are situations
17  where someone could have a scalp sore, or scalp
18  infectious condition where CNC would not be
19  appropriate?
20    A.  Sure.  Sometimes we need to clear those
21  scalp conditions before we apply the CNC.
22    Q.  But there are instances, correct, where
23  you would not recommend a CNC due to dermo
24  compatibility or scalp issues?
25    A.  Yes, it's possible.

16 (Pages 211 - 214)

1    Q.   Have 100 percent of the people that you
2  consulted and recommended a CNC prosthesis to
3  ultimately bought one from you?
4    A.   Have 100 percent?
5    Q.   (Nods head.)
6    A.   No.
7    Q.   So it's not an option that every patient
8  chooses, correct?
9    A.   No, not every patient.
10   Q.   Okay.  In your report you identify a CNC
11 pricing summary, and you identify the cost of a
12 full-size CNC system at $8,000 to $15,000, and
13 there's a parentheses after it that says full
14 head/long hair.  Let's start at the beginning.  The
15 CNC is offered as a full or partial system, correct?
16   A.   Full -- yes, full or partial system, yes.
17   Q.   And would a partial system be a lower cost
18 than a full system?
19   A.   Yes, based on area.
20   Q.   And you agree that some patients don't
21 need or want a full system?
22   A.   Yes.
23   Q.   And so a partial system is appropriate for
24 certain patients, correct?
25   A.   Correct.

1    Q.   And your pricing estimate is also based on
2  a full head of long hair; is that right?
3    A.   Yes.
4    Q.   What length of hair is contemplated?
5    A.   I guess it can range.  Long hair can range
6  14 to 18 inches, depending.  As you can see, they
7  vary.
8    Q.   So but when you're saying long hair, you
9  mean past the shoulders?  I'm trying to understand
10 what this estimate number that you give of 8 to
11 15,000 for full head/long hair refers to.
12   A.   It's not -- there's not a specific cutoff.
13 I believe that there are -- and, again, I'm not one
14 that creates the estimate.  So I don't know exactly
15 what the number is in terms of how many inches.
16   Q.   So how did you come up with the 8 to
17 $15,000 figure that's in the report?  Did you --
18   A.   I asked my trichologist, and some of the
19 cases that we'd had, like the burn victims and other
20 alopecia patients.
21   Q.   And what did you say?
22   A.   What's the general range.
23   Q.   For a full --
24   A.   For a CNC for full head/long hair.
25   Q.   Okay.  So to be clear, the 8 to 15 is for

1  a full head with long hair?
2    A.   Fifteen will be full head/long hair.
3    Q.   And ...
4    A.   Eight would be more either on the shorter
5  side or a smaller area.
6    Q.   So there is no CNC that you offer that's
7  under $8,000; is that accurate?
8    A.   You know, I can't answer that question.  I
9  have no idea.  I mean ...
10   Q.   You don't know?
11   A.   I don't know.
12   Q.   Are there CNCs that you offer that are
13 above $15,000?
14   A.   I think it's quite possible, but pretty
15 unusual.
16   Q.   So if you have the smallest system with
17 short hair, that can be under $8,000?
18   A.   It's possible.
19   Q.   Are you aware of other sellers of the CNC
20 system?
21   A.   Other sellers of CNC?
22   Q.   Yeah.
23   A.   You mean other licensees?
24   Q.   You're not the only one in the United
25 States who sells the CNC, right?

1    A.   Yes, I'm aware of others.
2    Q.   Okay.  And are you aware of any in New
3  Orleans?
4    A.   I don't know where they're located, to be
5  honest.  I know -- I can think of two others off the
6  top of my head.
7    Q.   Where are the others of which you're
8  aware?
9    A.   New Jersey, and I think there is one in
10 New York.
11   Q.   Some amount of the cost of the CNC is
12 profit to Bauman Medical, right?
13   A.   Hmmm.
14   Q.   It's not just -- you don't prescribe them
15 or offer them for nothing?  You make a profit on
16 them when you sell them?
17   A.   Unless it goes through like, for example,
18 the 501(c)(3) or something like that, you know.
19   Q.   How many of the CNCs that you fitted
20 people with have been done through the 501(c) --
21 501 --
22   A.   501(c)(3).  Maybe like a half a dozen.
23   Q.   Okay.  So you agree there are other
24 sellers of the CNC?
25   A.   Yes.

17 (Pages 215 - 218)

1    Q.   You agree that you make profit on them?
2    A.   Yes.
3    Q.   Are you -- do you agree that the amount of
4  profit that another seller might take is different
5  than yours?
6    A.   Yes, I believe it's really up to them.
7    Q.   Right.  What's your profits margin on a
8  CNC?
9    A.   I don't know offhand.
10    Q.   Approximately?
11    A.   Yeah, I'm not sure offhand.  I don't know.
12    Q.   But you do know you make a profit on them?
13       MR. EXNICIOS:  Objection to the form.
14       THE WITNESS:  Yes.
15  BY MS. BIERI:
16    Q.   Your report --
17    A.   It's a valuable service.
18    Q.   I was asking you to try to understand what
19  the differences in cost between sellers could be,
20  and to understand that I have to understand if there
21  is a profit in it.
22    A.   Sure.
23    Q.   Because if there's no profit in it for the
24  seller, there should be no difference in cost,
25  right?  If you're just a passthrough entity and the

1  cost --
2    A.   Correct.
3    Q.   -- from the manufacturer is the same?
4    A.   Yeah, I think --
5    Q.   There's no variability?
6    A.   It's about the same.  I don't think that
7  there's variability.  I think there's --
8    Q.   On what is that based?  You said you're
9  aware of only two distributors, right?
10    A.   Yeah, but I think that it's --
11    Q.   Are you aware that there are more than 20?
12  So what is your opinion that the quote is -- that
13  the amount is "about the same" based on?
14       MR. EXNICIOS:  Objection to form.
15  BY MS. BIERI:
16    Q.   Just what you assume?
17    A.   Well, I think that it has to do with the
18  training as a licensee.  That there's
19  recommendations that are made based on -- you know,
20  based on the information that we receive from CR
21  Lab, which is Ragazzi Laboratories.
22    Q.   Do you agree that you don't know what any
23  other distributor in the country is selling --
24    A.   I agree they can charge what they want.
25    Q.   Maybe less than you; maybe more than you?

1    A.   Yeah, possible.
2    Q.   Your report provides the cost for two CNC
3  systems at the same time, right?
4    A.   Correct.
5    Q.   Do you have any patients that just buy one
6  CNC at a time?
7    A.   It's pretty unusual because we have
8  learned over the years that having two systems seems
9  to extend the life of each system.  So while one is
10  resting, so to speak, and not being used, the other
11  one is being worn, and the two systems is the method
12  of choice.
13    Q.   In your clinic?
14    A.   As far as I understand.  Yes.
15    Q.   Correct?
16    A.   Yes.  Sometimes for short-term problems we
17  may prescribe just a single CNC.  If it's like we're
18  expecting, let's say, the hair loss situation to be
19  short-term.
20    Q.   You agree that nothing in the CNC
21  materials that you provided recommends or suggests
22  two systems at one time, right?
23    A.   Well, that's based on your clinical
24  experience with the systems, and information from
25  the parent company that also recommends two systems.

1    Q.   In what literature have you seen from CNC
2  that recommends two systems at once?
3    A.   I don't think it was any literature.  I
4  think it was while I was in the factory in Bologna.
5    Q.   But you're not aware of them reducing that
6  to writing anywhere?  That's just a recollection of
7  something that you think was said to you?
8    A.   It was honestly part of the training, I
9  believe.  You know, the instructions.  Just like,
10  for example, how often should they be serviced.
11  It's part of the instructions.
12    Q.   You know CNC has a website, right?  Or CR
13  Labs has a website, right?
14    A.   I'm assuming they do.
15    Q.   Ever been to it?
16    A.   I can't recall.
17    Q.   Do you know any of the representations
18  they make regarding their products on their website?
19    A.   (No response.)
20    Q.   No?
21    A.   No.
22    Q.   Okay.
23    A.   I know it's on my website.
24    Q.   So you have a robust website with lots of
25  press releases and other materials; is that fair?

18 (Pages 219 - 222)

1      MR. EXNICIOS:  Objection to the form of
2   the question.
3 BY MS. BIERI:
4      Q.   Do you agree with that statement?
5      A.   Yes, it's a very educational website.
6 Correct.
7      Q.   And you have press releases, and media
8 statements, and promotional materials too; fair?
9      A.   Patient education materials.
10      Q.   Okay.  Do you -- is everything that goes
11 up on the website approved by you?
12      A.   Yes.
13      Q.   You wouldn't let it go on the website if
14 you didn't agree with it, correct?
15      A.   Correct.
16      Q.   So in your expert report, you indicate
17 that the lifespan of a CNC is between 2.5 to 3.5
18 years, correct?  And is that --
19      MR. EXNICIOS:  Objection to the form.
20 BY MS. BIERI:
21      Q.   And is that the lifespan of your one
22 system or two systems?
23      A.   Well, it varies, honestly.  So when we do
24 our consultation, we explain that depending on
25 lifestyle factors, your CNC could last many, many,

1 many years.  I met a patient actually in Bologna,
2 Italy who had the same CNC for 15 years.  But it's
3 been our clinical experience that with the lifestyle
4 here in South Florida, that you're basically going
5 to get about a little under three years from the two
6 systems.
7      Q.   So the two-and-a-half to three-and-a-half
8 years estimate is based on two systems?  Having two
9 systems --
10      A.   Correct.
11      Q.   -- that you can rotate?
12      A.   Yes, that is correct.
13      Q.   And what are the lifestyle factors that
14 could influence the lifespan of a CNC system?
15      A.   How much time you spend outdoors.  Your
16 activity level.  How you care for the hair at home,
17 you know, with cosmetic products that are
18 recommended.  Your styling habits.  Other factors --
19      Q.   Meaning hot tools or something else?
20      A.   Oh, yes.  Everything from braiding to
21 curling to coloring.  Obviously, it's not growing.
22 So whatever you do to it is going to be pretty
23 permanent and nonrenewable.  There's other factors
24 as well.  Like your scalp chemistry.
25      Q.   Any other factors?

1      A.   How often you have the item serviced.  If
2 you're skipping services.  You know, you're not
3 taking proper care of it, obviously that can impact
4 the lifespan of it as well.
5      Q.   So two-and-a-half to three-and-a-half year
6 lifespan if you have two products at one time.  What
7 is the lifespan if you just have one product and you
8 aren't rotating?
9      A.   I'm not sure.  It's going to depend again
10 on all of those different factors, but certainly
11 it's going to be a little bit less than if you had
12 two.  That I can say with certainty.
13      Q.   On your website you feature a promotional
14 video of a man named Tim who had radiation for
15 breast -- or for brain cancer, correct?
16      A.   Yes.
17      Q.   And you fitted him with a CNC prosthesis,
18 correct?
19      A.   Yes.
20      Q.   Do you remember representing in that video
21 that a CNC prosthesis lasts up to five years?
22      A.   Yes.
23      Q.   And that's longer than what you estimate
24 in your expert report by over a year-and-a-half,
25 correct?

1      A.   Correct.  As I explained, I met a patient
2 who had had a CNC for over a decade.  Maybe 15
3 years.  So, again, it depends.
4      Q.   And there's no mention in that promotional
5 video related to Tim that a second CNC was needed to
6 achieve the five-year lifespan, correct?
7      A.   Well, first of all, I don't think it's a
8 promotional video.  I think it was a video about his
9 story of hair loss and hair replacement.
10      Q.   All right.  Let's take out that word.  Do
11 you agree that in the video featuring Tim there is
12 no mention made that a second CNC system is
13 necessary to achieve the five-year lifespan that you
14 represented in that video?
15      A.   I don't really remember what's in that
16 video.
17      Q.   You disagree that you represented in the
18 video regarding Tim that's on your website that you
19 represented that the CNC system lasts up to five
20 years?
21      A.   I'm not disagreeing.  I'm saying it could.
22 Could last five years.  Could last 15 years.  Could
23 last one year.
24      Q.   And you agree that representing it lasts
25 five years is more than what you estimate in this

19 (Pages 223 - 226)

Page 227

1  expert report that's done for the purposes of a
2  damage calculation in litigation, correct?
3      A.  Well --
4          MR. EXNICIOS:  Objection to the form of
5      the question.
6          THE WITNESS:  This report is based on our
7      current knowledge of how long the CNCs last.
8  BY MS. BIERI:
9      Q.  Okay.  So are you saying Tim's case was a
10  long time ago, so now it's a different ballgame?
11     A.  Well, I don't remember exactly when Tim's
12  case was, but yes, it was a few years back.
13     Q.  Okay.
14     A.  (Inaudible.)
15         MR. EXNICIOS:  Objection to the form of
16     the question.
17         MS. BIERI:  He was in the middle of an
18     answer.  It was not even a question.
19         MR. EXNICIOS:  That's your opinion.  I'm
20     letting him finish his answer, and then I'm
21     objecting to your question.
22  BY MS. BIERI:
23     Q.  Doctor, can you continue to pause so that
24  Mr. -- Val can get his objections in timely, because
25  I notice that he has only been objecting about

Page 228

1  midway through your answer for the vast majority of
2  the deposition.
3      A.  Sure.
4          MR. EXNICIOS:  Objection to your
5      characterization.
6          MS. BIERI:  Noted.
7  BY MS. BIERI:
8      Q.  Okay.  So we talked about the video of Tim
9  and the representation of five-year lifespan.  No
10  mention of the need for a second system to achieve
11  that lifespan.  I also -- but you said that was
12  several years ago and now you know more, right?
13     A.  Yes.
14     Q.  Okay.  So I also looked at another part of
15  your website, and there was a press release from
16  September 5th of 2018 regarding the use of CNCs in
17  connection with alopecia areata patients that
18  features Claudia C.  Are you familiar with that
19  patient?
20     A.  No.
21     Q.  You don't remember your patient Claudia?
22     A.  Not offhand, actually.
23     Q.  I'm going to show you this picture of you
24  smiling with Claudia.  Do you remember her now?
25     A.  So Claudia is not a patient of mine.

Page 229

1      Q.  Not a patient of yours?
2      A.  No.
3      Q.  You've met her, correct?
4      A.  Correct.
5      Q.  And in this photograph --
6          MS. BIERI:  I'm going to mark this as
7      deposition Exhibit Number 9.
8          (Defendant's Exhibit 9 was marked for
9      identification.)
10  BY MS. BIERI:
11     Q.  You're smiling standing with her in front
12  of a backdrop that says Bauman Medical, Bauman
13  Philanthropic Foundation, CR Labs, salonB; is that
14  accurate?
15     A.  Yes.
16     Q.  You know Claudia?
17     A.  Yes, I do.
18     Q.  And do you agree that Exhibit 9 is a press
19  release that was on your website?
20     A.  Yes.
21     Q.  And do you agree it was posted on
22  September 5th of 2018?
23     A.  I seem to remember this being posted much
24  earlier, but ...
25     Q.  I was just going by this posted date --

Page 230

1      A.  I see that.
2      Q.  -- right by the title.
3      A.  Sometimes things on the website get
4  reposted to bring them more current, but this
5  reminds me of the time when we first got started
6  with the CR Lab technology and we launched it here
7  in the United States.
8      Q.  So whether it be posted in the first
9  instance, or what you're suggesting might be the
10  case of being proposed, it was either posted or
11  reposted on September --
12     A.  Understood.
13     Q.  -- 5th of 2008 [sic], correct?
14     A.  Yes.
15     Q.  Okay.  And do you agree that you represent
16  a lifespan for the CNC system in this press release
17  that you posted on your website?
18         Let me direct you to your language.  "With
19  monthly maintenance and proper care the prosthesis
20  can last between four to five years."
21         You disagree that that's written in
22  this press release that was posted on your website
23  on September 5th, 2018?
24     A.  No, I don't disagree.
25     Q.  And do you agree that the press release

20 (Pages 227 - 230)

Page 231

1 was posted on your website about two months after
2 you issued your expert report in this case?
3    A.   As I said, this is a press release from
4 when we first launched the CNC system.  Claudia was
5 a patient from Italy who came to visit us here in
6 Boca Raton, Florida when we did the launch.  So that
7 was the relation of the timing of the press release.
8    Q.   Well --
9    A.   So it is old.
10    Q.   But you reposted it on September 5th of
11 2018, correct?
12    A.   Not me personally, but, you know, these
13 items get reposted on occasion, yes, and the
14 dates get updated, but not by me.
15    Q.   But it's your company's website, right?
16    A.   Yes, understood.
17    Q.   And there is no mention made in this press
18 release that a second scalp prosthesis would be
19 required, correct?
20       MR. EXNICIOS:  Objection to the form.
21       THE WITNESS:  That was not included in
22 this website -- in this press release.
23 BY MS. BIERI:
24    Q.   And do you agree that the four to
25 five-year lifespan is longer than what you estimate

Page 232

1 in your expert report?
2    A.   I agree.
3    Q.   Have you ever had any patients for whom
4 CNC was covered by insurance?
5    A.   No.
6    Q.   You talk about repairs between
7 replacements.  What are the repairs that you're
8 contemplating?
9    A.   Oftentimes patients notice that --
10 depending, again, on their lifestyle and activity
11 regimen, that the system may shed some hair, and
12 repair may include kind of a recharge of addition of
13 additional hair.  So it gets sent back to the
14 factory in Italy for those kinds of repairs.
15    Q.   What review of records did you do to -- if
16 any, to come up with the expected mean repair cost?
17    A.   So that was based on our patient base who
18 have needed repairs.
19    Q.   I'm talking about the amount.  You
20 identify $2,000 as the mean repair cost between
21 replacements.
22    A.   Yes.
23    Q.   What, if any, data, financial data, is
24 that derived from?
25    A.   So I'm not sure what the data is exactly,

Page 233

1 but I asked my trichologist how much do these
2 repairs cost, and she told me this number.
3    Q.   And did you ask how she derived -- he or
4 she derived that data?  That amount?
5    A.   No, I didn't ask that.  I asked her how
6 much are the average repairs costing over the time
7 of the life of the systems.  And so she went back,
8 I'm assuming, to the patients that we have, and look
9 at them, look at their records and determine what
10 the numbers are.
11    Q.   You didn't do that process?
12    A.   No, I --
13    Q.   And you didn't watch her do that process?
14    A.   No.
15    Q.   And you have no idea factually what she
16 did or didn't do, correct?  You're assuming?
17    A.   Well, that was the report to me.
18    Q.   Was, "this is the average cost"?
19    A.   Correct.
20    Q.   You don't know how she came up with that,
21 correct?
22       MR. EXNICIOS:  Objection to form.
23       THE WITNESS:  I just told you how she came
24 up with that.
25

Page 234

1 BY MS. BIERI:
2    Q.   Well, you said I assume she went back to
3 the records.
4    A.   Uh-huh.
5    Q.   That's your assumption of what she would
6 have done?
7    A.   Yes.  Correct.
8    Q.   But you don't know that?
9    A.   Well, I didn't watch her do it.
10    Q.   And she didn't tell you the specific
11 method she used to come up with her $2,000 figure,
12 correct?
13    A.   Well, that's how we would figure this out,
14 is to look at what the costs were for the patients
15 who needed repairs.
16    Q.   That's how you -- okay.  That's how you
17 assume that a person would have done it, correct?
18    A.   (No response.)
19    Q.   But you did not ask her specifically how
20 she came up with that figure; is that accurate?
21    A.   That's true.
22    Q.   And you didn't watch her do it, correct?
23    A.   Correct.
24    Q.   Okay.  Has every CNC that you prescribed
25 required repairs?

21 (Pages 231 - 234)

1    A.  No.  Many of them don't require any
2  repairs whatsoever.
3    Q.  And for those that do require repairs, you
4  agree that some may require less than $2,000 in
5  repairs?
6    A.  Yes, there's a range for sure.  Depending
7  on the size of the system.  How much needs to be
8  refurb'd or redone to that system.
9    Q.  And you're not really involved in that
10  process, are you?  Is that handled by your front
11  office, or by your cosmetologist?
12    A.  It's usually handled, yeah, by my
13  trichologist, yes, and cosmetologist.
14    Q.  Who's sending that system in for repair?
15    A.  Correct.
16    Q.  So that's not something that you're
17  particularly familiar with; is that accurate?
18    A.  Oh, I'm familiar with it, because, you
19  know, if a patient needs repair, first of all, they
20  need -- we need to make sure that they have another
21  system.  So it's critical.
22    Q.  I meant in the logistics of identifying
23  the cost of repair, facilitating --
24    A.  No, I'm not involved with the cost of the
25  repair.  No.

1    Q.  And let's talk about what you call the
2  maintenancing [sic] or -- actually, strike that.
3       You call it servicing?
4    A.  Uh-huh.
5    Q.  And you estimate that at "$200 - $300 long
6  hair," in parentheses after the number 300.  "Every
7  4 weeks; mean $250 x 12 visits = $3,000/yr."
8       Did I read that correctly?
9    A.  Yes.
10    Q.  Okay.  So are your patients spending
11  $3,000 a year on servicing of their CNC systems?
12    A.  Yes.
13    Q.  When you say 2 to $300 for servicing, it's
14  $300 if you have long hair, 200 if you have short
15  hair?
16    A.  It really just depends on how long it
17  takes to remove the system, clean it, and then
18  replace it.  So long hair adds additional time to
19  that service appointment, and that's how those
20  numbers are calculated.
21    Q.  So the -- so there isn't a set rate; it
22  depends on how much time it takes?
23    A.  Yes.
24    Q.  And that could be anywhere from 200 to
25  $300?

1    A.  Correct, and sometimes the scalp actually
2  needs like some additional care.  You know,
3  exfoliation treatment or something else that, you
4  know, could be needed at that time which could
5  increase the cost.
6    Q.  Okay.  So what does -- putting aside if
7  you want to do like an exfoliation service that
8  you're -- that you offer for all kinds of different
9  patients, right?
10    A.  Uh-huh.
11    Q.  I'm just talking about actually servicing
12  of the system.
13    A.  Yes.
14    Q.  That's talked about in your report.  What
15  does that involve?
16    A.  The servicing of the system?
17    Q.  Uh-huh.
18    A.  It's the removal of the existing system.
19  So it's a de-bonding process, a releasing agent.
20  It's an examination of the system that's being
21  removed for any damage, defects or, you know,
22  shedding, or loss of volume.  The scalp is cared for
23  in a particular way.
24    Q.  Cleaned?
25    A.  Cleaned and treated.  There's a number of

1  different products and such that are applied to the
2  scalp to keep it healthy.  And then if it's the same
3  system, if the client just has one system, and then
4  that system is reapplied.  If the client has a
5  second system, then the second one is reapplied, and
6  then styled, of course.
7    Q.  And in this report, is this figure, 2 to
8  $300, contemplating that the maintenance or
9  servicing would be done here at Bauman?
10    A.  Correct.  Yeah, if we have to go elsewhere
11  to service, obviously, there's additional charges.
12    Q.  I'm going to hand you what's being marked
13  as Exhibit 10.
14       (Defendant's Exhibit 10 was marked for
15  identification.)
16       (Discussion off the record.)
17  BY MS. BIERI:
18    Q.  Do you recognize this to be a print-off
19  from your website?
20    A.  Yes.
21    Q.  Okay.  Turn to the back page for me.
22  Yeah, it's the last page.  Do you agree that this
23  identifies a flat rate of $200 for maintenance?
24    A.  Yes.
25    Q.  It doesn't identify a range?

22 (Pages 235 - 238)

1    A.  True.
2    Q.  So you in your report identified it as a
3  range of 2 to $300, but there's a flat rate
4  advertised on your website of $200, correct?
5    A.  (Nods head.)
6    Q.  And that maintenance visit includes a
7  professional blow-dry and hairstyling at the end of
8  the visit, right?
9    A.  Correct.
10    Q.  Okay.  Are you aware that the manufacturer
11  of the product describes the maintenancing [sic]
12  process as simple and specifically advises, "Your
13  second scalp will need to be cleaned periodically
14  and if necessary, the hair can be restyled.  If you
15  would prefer to do this easy cleaning process at
16  home, we offer a simple step-by-step guide"?
17        Were you aware that that's an option that
18  was recommended and advanced by the manufacturer?
19    A.  Yes.
20        MR. EXNICIOS:  Objection to the form.
21  BY MS. BIERI:
22    Q.  Okay.
23    A.  It's not so simple.
24    Q.  Despite that the manufacturer advises that
25  the maintenance can be done at home, you still have

1  an estimated cost of $3,000 for maintenance a year
2  through your salon in your expert report to
3  support damages in this litigation, correct?
4    A.  I will tell you that trying to do
5  maintenance for a full system CNC at home would be
6  extremely difficult and likely damaging.  So we
7  don't recommend that to clients or patients.
8        MS. BIERI:  Move to strike
9    as nonresponsive.
10  BY MS. BIERI
11    Q.  Doctor, my question is, do you agree that
12  despite that the manufacturer advises that the
13  process is simple and can be performed at home, that
14  you in your expert report for this litigation
15  identify $3,000 of maintenance through your salon
16  for a CNC system?
17        MR. EXNICIOS:  Objection to the form.
18        THE WITNESS:  Yes, that's what we
19    recommend.
20  BY MS. BIERI:
21    Q.  Did you tell me at the beginning of the
22  deposition that prior to being contacted -- well,
23  strike that.
24        Who was the first plaintiffs' lawyer
25  related to Taxotere who contacted you?

1    A.  Dean.
2    Q.  Exnicki (phonetic)?
3    A.  Xenick.
4    Q.  Xenick.  Dean Xenick.  He was the first
5  one who contacted you?
6        MR. EXNICIOS:  Objection to form.
7  BY MS. BIERI:
8    Q.  Is that accurate?
9    A.  Yes.
10    Q.  Okay.  And did you tell me that prior to
11  Mr. Xenick contacting you, you hadn't heard of the
12  Taxotere litigation?
13    A.  Correct.
14    Q.  Okay.  We talked a lot about the opinions
15  in the first section of your report, where you offer
16  opinions about the psychological effect of hair loss
17  on certain women and it's based on your clinical
18  experience, right?
19    A.  Yes.
20    Q.  And you said there's lots out there that
21  supports that, right?
22    A.  (Nods head.)
23    Q.  And do you agree that or would you say
24  that it's pretty common knowledge that hair loss
25  could affect someone psychologically?

1    A.  Yes.
2        MR. EXNICIOS:  Objection to the form of
3    the question.
4  BY MS. BIERI:
5    Q.  Let me ask you, when you have a cancer
6  patient who comes in to have a consultation or
7  treatment related to hair, do you track the
8  chemotherapy regimen and identify the
9  chemotherapeutic agents used in your medical
10  records?
11    A.  If they report to us, then it might be in
12  there.
13    Q.  But it's not specifically identified or
14  called out in your medical records to include --
15    A.  Like what -- no.
16    Q.  Xenick?  That's the first lawyer that
17  contacted you?  I'm having a hard time with names
18  today.  I apologize.
19        MR. EXNICIOS:  Xenick.  Dean Xenick.
20        MS. BIERI:  Sorry, you guys.
21        THE WITNESS:  Yeah, Dean Xenick.
22  BY MS. BIERI:
23    Q.  Okay.  Haven't heard of Taxotere
24  litigation before he contacted you, right?
25    A.  Right.

23 (Pages 239 - 242)

1      MR. EXNICIOS:  Objection to form.
2      (Defendant's Exhibit 11 was marked for
3  identification.)
4  BY MS. BIERI:
5      Q.  I'm going to hand you Exhibit 11.  Agree
6  that this is posted on your website?
7      A.  Yes.
8      Q.  And that would have been posted after you
9  were contacted by Mr. Xenick, given that you didn't
10  know about the litigation before you talked to him,
11  correct?
12      A.  I'm not sure I understand your --
13      Q.  Well, you said you had not heard of the
14  litigation before you talked to Mr. Xenick?
15      A.  Right.
16      Q.  So you would have had to have posted this
17  after you talked to Mr. Xenick, correct?
18      A.  Well, I don't really remember when the
19  timing was that I spoke to Dean Xenick and we've put
20  this information --
21      Q.  But you did --
22      A.  -- on the site.
23      Q.  But you did testify three or four separate
24  times here at the beginning and just now in your
25  deposition that you hadn't heard of the litigation

1  until you talked to Mr. Xenick, correct?
2      A.  Right.
3      Q.  Okay.  Who authored deposition Exhibit
4  Number 11?  Did you draft that?
5      A.  I believe I did.
6      Q.  You wrote the words?
7      A.  Yes.
8      Q.  You personally wrote them?
9      A.  I believe I did.  I mean, I don't know who
10  else would write it.  Actually, I think it's a
11  repost of a news story.
12      Q.  You think it's a repost of a news story
13  that specifically references Bauman Medical?
14      A.  I think we added -- like, for example -- I
15  don't think -- maybe I didn't author it, but, you
16  know, we put it in the CNC information at the end.
17  But it's basically a copy, paste of a news story in
18  the middle of the Bauman Medical information.
19      Q.  Do you know whose picture is depicted in
20  Exhibit 11?
21      A.  I have no idea who that is.
22      Q.  Never met this person?
23      A.  No.
24      Q.  Never spoke to that person?
25      A.  No.

1      Q.  Don't know her name?
2      A.  Huh-uh.
3      Q.  Did plaintiffs' counsel encourage you to
4  recruit women to the Taxotere litigation?
5      A.  No.
6      MR. EXNICIOS:  Objection.  Form.
7  BY MS. BIERI:
8      Q.  I'm going to hand you what's being marked
9  as deposition Exhibit Number 12.
10      (Defendant's Exhibit 12 was marked for
11  identification.)
12  BY MS. BIERI:
13      Q.  Do you think the woman depicted in Exhibit
14  11 is the same woman depicted in Exhibit 12?
15      A.  I'm not sure.
16      Q.  Okay.  Same woman or not, do you agree
17  that there's more hair depicted on the woman in
18  Exhibit 12 than Exhibit 11?
19      A.  Yes.
20      Q.  And do you even know if that woman whose
21  name you don't know and is not a patient ever took
22  Taxotere?
23      A.  I don't know who it is.
24      Q.  Okay.  That was just a stock photo; you
25  didn't even pull that photo, correct?

1      A.  Yeah, I ...
2      Q.  Okay.  Have we discussed all of your
3  opinions in this case?
4      A.  I think so.
5      MR. EXNICIOS:  Objection to the form.
6  BY MS. BIERI:
7      Q.  Have we discussed all the bases for your
8  opinions in this case?
9      A.  Yes.
10      Q.  Do you have any additional work planned in
11  the future for this case?
12      A.  No.
13      Q.  If this case goes to trial, do you plan to
14  do any future work?
15      A.  I'm not sure I understand your question.
16      Q.  Beyond testifying --
17      A.  No.
18      Q.  -- at trial, do you have any plan to do
19  any additional work on this case?
20      A.  No.
21      Q.  Do you know when trial is scheduled?
22      A.  No.
23      Q.  Okay.  In your report you state that a
24  variety of full scalp hair systems will be shown.
25  Have you brought those systems with you that you

24 (Pages 243 - 246)

Page 247

1 intend to show at trial?
2      A.   I have them.  They're right here.
3      Q.   And are these the ones behind us, the
4 eight systems?  Are you going to show these at
5 trial?
6      A.   Well, I don't know if they'll be these
7 exact ones.
8      Q.   You know that requested in the deposition
9 notice was that you bring the systems that you refer
10 to and that you intend to show, correct?
11      A.   Okay.
12      Q.   But you just have these systems in the
13 room?
14      A.   Yeah, these are the ones that we had
15 available today.
16      Q.   Do you know the retail pricing on systems
17 that are shown in this deposition room?
18      A.   No, I have no idea.
19      Q.   This is my one chance to ask you
20 questions.
21      A.   Yeah.
22      Q.   Right?  And you can't tell me how much
23 each of these systems would cost?
24      MR. EXNICIOS:  Objection to the form of
25      the question.

Page 248

1      THE WITNESS:  No, I have no idea.
2 BY MS. BIERI:
3      Q.   I may have additional questions for you
4 when I look through my notes.  Let me take a minute
5 to do that.
6      A.   Okay.
7      MS. BIERI:  Thank you for your time.
8      THE REPORTER:  Do you want to go off the
9      record?
10      MS. BIERI:  Oh, yes.
11      May we go off the record?
12      THE VIDEOGRAPHER:  We're going off the
13      record.  The time is 9:35 p.m.
14      (A recess was taken.)
15      THE VIDEOGRAPHER:  Back on the record.
16      It's 9:44 p.m.
17 BY MS. BIERI:
18      Q.   We just showed the video depiction quickly
19 of the CNC systems that you brought with you to
20 deposition, correct?
21      A.   Correct.
22      Q.   And we ask that you bring what you're
23 going to show to the jury.  Are these -- are you
24 going to show something different to the jury?
25      A.   These are representative of a nice variety

Page 249

1 of different systems.
2      Q.   Are you going to show something different
3 to the jury if you testify at trial?
4      MR. EXNICIOS:  Objection to form.
5      THE WITNESS:  We will use ones that are
6      similar.
7 BY MS. BIERI:
8      Q.   So you're saying you will use something
9 different at trial?
10      A.   I mean, it really just depends on when the
11 trial is, to be honest, because, you know, these
12 belong to people.
13      Q.   These are systems that are sold?
14      A.   Yeah.  Every system is custom-made so
15 there's no representative like demo system to the
16 ones that are custom-made.
17      Q.   So when a patient comes in, you don't have
18 a sample that you show her?
19      A.   We show them one that's already been made.
20      Q.   For a different patient?
21      A.   Uh-huh.
22      MS. BIERI:  Doctor, I don't think that I
23      have any further questions for you subject to
24      plaintiffs' counsel's questioning.  I do,
25      again, state that in light of being provided

Page 250

1      for the first time with the additional
2      references list, that we reserve the right to
3      hold the deposition open and seek additional
4      time for your deposition given that the first
5      time that any articles were identified for us
6      by title, journal, or year was today, just a
7      few hours before the deposition.
8      CROSS EXAMINATION
9 BY MR. EXNICIOS:
10      Q.   With that being said, Doctor, I have just
11 a few questions.  Actually, the articles that
12 counsel was just referring to were actually noted in
13 reference in your original report; were they not?
14      A.   Yes, that's correct.
15      (Discussion off the record.)
16 BY MR. EXNICIOS:
17      Q.   All right.  Doctor, is it accurate to say
18 that in addition to the items that you talked about
19 today, your opinions in this case are based upon
20 your education, training and experience both as a
21 medical doctor and as a specialist in the field of
22 hair and hair restoration?
23      MS. BIERI:  Object to form.
24      THE WITNESS:  Yes, that is correct.
25

25 (Pages 247 - 250)

Page 251

1 BY MR. EXNICIOS:
2    Q.  Thank you, Doctor.
3        Earlier in the depo, and I understand
4 we're now ten minutes to ten, Boca Raton time, so I
5 know it was several hours ago, you were asked some
6 questions about relying upon quote, unquote your
7 references in the report, and I think you testified
8 that they, in fact, substantiate your opinions as
9 referenced in your report, correct?
10   A.  That is correct.
11   Q.  All right.  So in that sense at least, you
12 quote, unquote relied upon these references in your
13 formation of your opinions in this case, correct?
14       MS. BIERI:  Object to the form.
15       THE WITNESS:  Yes, that's correct.
16 BY MR. EXNICIOS:
17   Q.  All right.  And, in fact, you were aware,
18 just generally speaking, that there were -- I think
19 you've referenced several times, literally hundreds
20 of articles substantiating the psychological effect
21 of hair loss on women, correct?
22   A.  Absolutely.
23   Q.  All right.  And all you did was go back
24 and get the specific names of specific researchers
25 who have published in the field of the psychological

Page 252

1 effect of hair loss on women, correct?
2    A.  Correct.
3        MS. BIERI:  Object to form.
4 BY MR. EXNICIOS:
5    Q.  And that's what you referenced in
6 particular and then subsequently produced the exact
7 reports, at least as representative samples of
8 typical peer reviewed psychological studies of the
9 effect of hair loss on women, correct?
10       MS. BIERI:  Object to form.
11       THE WITNESS:  Yes.
12 BY MR. EXNICIOS:
13   Q.  Thank you.
14       And you, in fact, read and reviewed the
15 items and articles listed on Exhibit 7 in forming
16 your conclusion that those articles and/or items
17 support your opinions as reflected in your report,
18 correct?
19       MS. BIERI:  Object to form.
20       THE WITNESS:  Yes, that is correct.
21 BY MR. EXNICIOS:
22   Q.  Thank you, Doctor.
23       You were asked a number of questions
24 relative to Page 2 of your expert report, and I'm
25 not going to go over all of them, but I'll go over

Page 253

1 at least one, maybe make reference to a couple.  One
2 statement that was -- you were queried about was "As
3 women age, most will visit a salon regularly as well
4 as use hair color treatments to preserve a youthful
5 look."
6        Do you recall that question?
7    A.  Yes.
8    Q.  In fact, you made it a point, did you not,
9 to qualify your answer via the use of the word most.
10 You didn't say all women in that sentence; you said
11 most women, correct?
12   A.  Correct.
13       MS. BIERI:  Object to form.
14 BY MR. EXNICIOS:
15   Q.  And, likewise, in the next sentence when
16 you were talking about "In the media, hair -
17 referred to as a woman's 'crowning glory' often
18 defines beauty."
19       You didn't make that an absolute statement
20 saying that it always defines beauty, but instead
21 you made it a point to say that it often defines
22 beauty, correct?
23   A.  Correct.
24   Q.  And, likewise, in the next paragraph in
25 the third sentence -- or fourth sentence where you

Page 254

1 say that "It is common that even small degrees of
2 hair loss and hair thinning," for example, "loss of
3 volume, widening part lines, loss of coverage and
4 receding hairlines have significant psychological
5 impact."
6        Again, a qualifying statement that it's
7 common.  You didn't say 100 percent of the time,
8 always.  You just said in your experience it's
9 common, correct?
10   A.  That is correct.
11   Q.  All right.  And, again, in the next
12 paragraph, when you talked about "When hair loss
13 triggers a feeling of 'bad hair' it is commonly
14 accompanied by reduced self-esteem, increased social
15 insecurity and diminished self of -- sense of being
16 a worthwhile person."
17       Again, you qualified that and didn't say
18 all women.  You said commonly, correct?
19       MS. BIERI:  Object to form.
20       THE WITNESS:  Correct.
21 BY MR. EXNICIOS:
22   Q.  Thank you, Doctor.
23       You were asked a question a while back,
24 and I don't recall exactly when, relative to
25 perceptions of beauty being subjective.  Do you

26 (Pages 251 - 254)

Page 255

1 recall that?
2     A.   Yes.
3     Q.   Doctor, are you aware of the research
4 that -- and I'll probably do a bad job of explaining
5 it, but is a certain proportion of facial features,
6 for example, is more attractive to most individuals
7 than others?  There's some kind of --
8     A.   Yes.  Absolutely.
9         MS. BIERI:  Object to form.
10 BY MR. EXNICIOS:
11     Q.   That's fine.
12     A.   Absolutely.  It's called the golden ratio.
13 It was actually by da Vinci, a very well-known
14 Renaissance artist, sculptor and a scientist as
15 well, and he through his work in art basically came
16 up with a mathematical calculation, one-third,
17 one-third, one-third in the vertical esthetically
18 pleasing aspects of the face.
19     Q.   And there's been repeated studies that
20 that golden ratio has, in fact, proven to be true
21 that most people find that golden ratio to be more
22 attractive than something other than that golden
23 ratio, correct?
24         MS. BIERI:  Object to the form.
25         THE WITNESS:  Absolutely correct.  In

Page 256

1     fact, that's the purpose of hair restoration,
2     hairline restoration, typically is to restore
3     that golden ratio.
4 BY MR. EXNICIOS:
5     Q.   And I think my last question, Doctor, is
6 just for clarity sake, I wasn't clear about what
7 counsel was asking you, but certainly if asked
8 whether or not you were going to do additional work,
9 I think your response was in relation to whoever is
10 selected as the first bellweather trial, if asked,
11 you're amenable certainly to doing more work as to
12 other bellweather plaintiffs in the future?
13         MS. BIERI:  Object to form.
14         THE WITNESS:  Yes.
15         MR. EXNICIOS:  And I think that's all I
16     have.  Let me just check my notes for one
17     second.
18 BY MR. EXNICIOS:
19     Q.   Are the articles that you've published
20 listed in your -- and I should know this -- listed
21 in your report?
22     A.   The articles?  Which articles are you
23 referring?
24     Q.   I don't know.  I'm sure you've published
25 in your field.

Page 257

1     A.   Yes.  So in my CV you will find the
2 published articles as well as the published textbook
3 chapters.
4     Q.   Fantastic.  Oh, yeah, I see them.  Listed
5 under Publications.
6         Again, as to Exhibit 7, these additional
7 references, once we received counsel's -- and I'm
8 not sure if this was noted as an exhibit or not, but
9 the notice of expert material not obtained,
10 indicated in your prior testimony, that we had
11 provided you with that document?
12         MS. BIERI:  Object to the form.
13         THE WITNESS:  Yes.
14 BY MR. EXNICIOS:
15     Q.   Correct?
16     A.   Yes.  Absolutely.
17     Q.   And I note on that document is dated
18 January 7th, a week ago today, correct?
19     A.   Yes, that's correct.
20     Q.   All right.  And we in turn sent that to
21 you, and you were kind enough to produce Exhibit
22 Number 7, correct?
23     A.   Correct.
24         MR. EXNICIOS:  All right.  Thank you,
25     Doctor.  That's all the questions I have for

Page 258

1     you.
2         REDIRECT EXAMINATION
3 BY MS. BIERI:
4     Q.   Doctor, you have no additional work
5 currently planned in relation to the Taxotere
6 litigation, correct?
7     A.   No work planned.
8     Q.   You haven't --
9     A.   I --
10     Q.   Go ahead.
11     A.   No work is planned.
12     Q.   And you haven't been asked to do any
13 additional work, correct?
14     A.   Not at this time.
15     Q.   And you have not reviewed any materials
16 related to any of the plaintiffs in the MDL
17 litigation, correct?
18     A.   Correct.
19         MR. EXNICIOS:  Objection to the form.
20 BY MS. BIERI:
21     Q.   Plaintiffs' counsel asked you several
22 questions about times when you used statements of
23 most and common.  Do you remember when he asked you
24 about that?
25     A.   Yes, I do.

27 (Pages 255 - 258)

1    Q.  Do you agree that you haven't provided any
2  actual numbers or statistics related to those
3  comments such as common, many?
4    A.  Well, much of my opinion again is related
5  to my experience as a physician who treats hair loss
6  and alopecia in both men and women, as well as my
7  connections in the industry and my knowledge of the
8  literature.
9      MS. BIERI:  Move to strike as
10    nonresponsive.
11 BY MS. BIERI:
12   Q.  Do you agree that you in using terms like
13 common and many, didn't actually provide any
14 percentages, number, or underlying data to support
15 the frequency associated with those statements?
16     MR. EXNICIOS:  Objection to the form.
17     THE WITNESS:  I agree.
18 BY MS. BIERI:
19   Q.  Counsel also asked you about a document
20 -- well, strike that.  Let me say it again.
21     Do you agree that in your report the only
22 information provided regarding any literature or
23 paper says, the findings of Marianne LaFrance, Yale
24 University and numerous others, Cash, Olsen, Tosti,
25 Christiano, et al.?

1      Is there any other information provided
2  about any study or paper identified in your report
3  or any exhibits in the reference section of your
4  report, or in anything you provided consistent
5  within your Rule 26 disclosure in November of 2018?
6      MR. EXNICIOS:  Objection to the form.
7      THE WITNESS:  What's the question?
8  BY MS. BIERI:
9    Q.  Do you agree that the only mention with
10 any specificity of any report, literature, paper or
11 study in your report says, the findings of Marianne
12 LaFrance, Yale University and numerous others, Cash
13 Olsen, Tosti, Christiano, et al.?
14     MR. EXNICIOS:  Objection to form.
15     THE WITNESS:  My report contains my
16    opinion, plus the references of the -- those
17    folks mentioned.
18 BY MS. BIERI:
19   Q.  Is there any information provided in your
20 report about the name of any article authorized by
21 anyone?
22   A.  I provided some of those references to you
23 in the additional references.
24   Q.  We're not saying the same thing.  I'm
25 talking about in the report that you authored on

1  August 16th of 2018, that was provided to us in your
2  November 9th expert disclosure.  Do you identify any
3  article by name, journal, or year published?
4    A.  No, the only art -- the articles are in
5  the addendum.
6    Q.  When I asked you questions earlier, I
7  believe you said you concurred with those opinions
8  and were with whatever citations you provided in
9  Exhibit 7, but you didn't review them in preparation
10 of your report or your opinions.  Do you remember
11 telling me that?
12   A.  Correct.
13   Q.  And is that accurate?
14   A.  That's accurate.  These citations are to
15 support my opinions.  The knowledge that I have
16 is based on these people that I know personally.
17 These researchers and other prominent members in the
18 field of hair loss, alopecia and psychology.
19   Q.  But you didn't review and rely on the
20 articles in Exhibit 7 when you prepared your opinion
21 and your report in this case, correct?
22     Do you --
23   A.  Yes, I relied --
24     MR. EXNICIOS:  Objection.
25     THE WITNESS:  -- on those articles and

1    then provided you with the citations.
2  BY MS. BIERI:
3    Q.  Today?  You provided citations today?
4    A.  Well, immediately upon request.
5    Q.  I'm going to object to that on several
6  bases.  One, what's happened is not consistent with
7  the Rules of Civil Procedure Number 26 in terms of
8  what you provided with your expert report.  Again, I
9  state that we were only provided with any
10 specificity about these reports today, hours before
11 your deposition.  But I want to understand, did you
12 review materials identified on Exhibit 7 in the
13 preparation of your opinions and report in this
14 case?
15     MR. EXNICIOS:  Objection to the form.
16     THE WITNESS:  I think what you're asking
17    is do I have that knowledge ahead of time.  And
18    I'm aware of all of those, the articles, the
19    information, and the common concepts in hair
20    loss, alopecia, hair restoration, psychology
21    based on my education, my training, my
22    experience, and then provided you with the
23    references to support that.
24 BY MS. BIERI:
25   Q.  I think you asked -- answered a different

28 (Pages 259 - 262)

Page 263

1 question that I didn't ask.
2     Did you -- do you remember telling me
3 earlier in the deposition that you didn't review or
4 rely upon the materials identified in Exhibit 7 in
5 the preparation of your opinions or report in this
6 case?
7 A.  Correct.
8 Q.  And is that accurate?
9 A.  That's accurate.
10 Q.  Your opinions are based on your clinical
11 experience, and you believe that they are in
12 concurrence with other literature; is that a fair
13 summary?
14     MR. EXNICIOS:  Objection to the form of
15 the question.
16     THE WITNESS:  That is correct.
17     MS. BIERI:  I think that's all the
18 questions I have.  Thank you.
19     MR. EXNICIOS:  Yay.  We're off the record.
20     THE VIDEOGRAPHER:  We are off the record
21 at 10:05 p.m.  This concludes today's testimony
22 given by Alan Bauman, M.D.  The total number of
23 media units used was four and will be retained
24 by Veritext.
25

Page 264

1     (The deposition concluded at 10:05 p.m.)
2     (The reading and signing of this
3 deposition is not waived.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 265

1 RE   :  TAXOTERE LITIGATION, et al.
   DEPO OF:  ALAN J. BAUMAN, M.D.
2 TAKEN :  JANUARY 14, 2019
3
4     EXCEPT FOR ANY CORRECTIONS MADE
   ON THE ERRATA SHEET BY ME, I
5 CERTIFY THIS IS A TRUE AND
   ACCURATE TRANSCRIPT.  FURTHER
6 DEPONENT SAITH NOT.
7
8 _____
   ALAN J. BAUMAN, M.D.
9
10
11 STATE OF FLORIDA
        :SS
12 COUNTY OF PALM BEACH
13
14
15   Sworn and subscribed to before me this _____
16 day of _____, 2019.
17 PERSONALLY KNOWN _____ OR I.D. _____.
18
19
   _____
20 Notary Public in and for
   the State of Florida at
   Large.
21
22
23 My commission expires:  January 18, 2020
24
25

Page 266

1     CERTIFICATE OF OATH OF WITNESS
2
3
   STATE OF FLORIDA
4        :SS
   COUNTY OF PALM BEACH
5
6
7   I, ERINN GREEN, Florida Professional Reporter,
8 Notary Public in and for the State of Florida at
9 Large, certify that the witness, ALAN J. BAUMAN,
10 M.D., personally appeared before me on January 14,
11 2019 and was duly sworn by me.
12
13   WITNESS my hand and official seal January 18,
14 2019.
15
16
17
18 _____
   ERINN L. GREEN, RPR
   Notary Public, State of Florida
19 Commission No. FFP30393
   Expires:  January 18th, 2020
20
21
22
23
24
25

29 (Pages 263 - 266)

Page 267

```
 1        REPORTER'S DEPOSITION CERTIFICATE
 2  STATE OF FLORIDA
               :SS
 3  COUNTY OF PALM BEACH
 4     I, ERINN GREEN, Florida Professional Reporter,
 5  certify that I was authorized to and did
 6  stenographically report the deposition of ALAN J.
 7  BAUMAN, M.D., the witness herein on January 14,
 8  2019; that a review of the transcript was requested;
 9  that the foregoing pages are a true and complete
10  record of my stenographic notes of the deposition by
11  said witness; and that this computer-assisted
12  transcript was prepared under my supervision.
13     I further certify that I am not a relative,
14  employee, attorney or counsel of any of the parties,
15  nor am I a relative or employee of any of the
16  parties' attorney or counsel connected with the
17  action.
18
19        Dated January 18, 2019.
20
21        Erinn Green
          ERINN GREEN, RPR
22
23
24
25
```

Page 269

```
 1               JURAT
 2  CASE NAME: Durden, Antoinette v. Sanofi S.A.
 3  ASSIGNMENT NO.: 3193460
 4  ASSIGNMENT DATE: 1/14/2019
 5     I, Alan Bauman , Vol II, do hereby state under
 6  oath that I have read the above and foregoing
 7  deposition in its entirety and that the same is a
 8  full, true and correct transcription of my testimony
 9  so given at said time and place.
10
11     _____
12     Signature of Witness
13
14  (Notary not required in California)
15     Subscribed and sworn to before me, the
16  undersigned Notary Public in and for the State of
17  _____ by said witness, Alan Bauman , Vol II,
18  on this _____day of_____, 2019.
19
20
21
22     _____
23     NOTARY PUBLIC
24     MY COMMISSION EXPIRES:_____
25
```

Page 268

```
 1         Veritext Legal Solutions
          290 W. Mt. Pleasant Ave. - Suite 3200
 2          Livingston, New Jersey 07039
       Toll Free: 800-227-8440  Fax: 973-629-1287
 3
 4  _____, 2019
    Alan Bauman
 5  1450 South Dixie Highway
    Boca Raton, Florida 33432
 6
    Case Name: Durden, Antoinette v. Sanofi S.A.
 7
    Veritext Reference Number: 3193460
 8
    Witness: Alan Bauman , Vol II   Deposition Date: 1/14/2019
 9
    Dear Sir/Madam:
10
    Enclosed you will find a transcript of your deposition.
11
    As the reading and signing have not been expressly
12
    waived, please review the transcript and note any
13
    changes or corrections on the jurat/errata sheet
14
    included, indicating the page, line number, change and
15
    reason for the change. Sign at the bottom of the sheet
16
    in the presence of a notary except in California where
17
    you are signing under penalty of perjury and forward
18
    the errata sheet back to us at the address shown above.
19
    If the jurat is not returned within thirty days of your receipt of
20  this letter, the reading and signing will be deemed waived.
21  Sincerely,
22
    Production Department
23
24  Encl.
25  Cc: KELLY BIERI, ESQUIRE
```

Page 270

```
 1     ERRATA SHEET
       VERITEXT CORPORATE SERVICES
         800-567-8658
 2     ASSIGNMENT NO. 3193460
 3  CASE NAME: Durden, Antoinette v. Sanofi S.A.
 4  DATE OF DEPOSITION: 1/14/2019
    WITNESS' NAME: Alan Bauman , Vol II
 5
 6  PAGE/LINE(S)/   CHANGE        REASON
 7  _____/____/_____/_____
 8  _____/____/_____/_____
 9  _____/____/_____/_____
10  _____/____/_____/_____
11  _____/____/_____/_____
12  _____/____/_____/_____
13  _____/____/_____/_____
14  _____/____/_____/_____
15  _____/____/_____/_____
16  _____/____/_____/_____
17  _____/____/_____/_____
18  _____/____/_____/_____
19  _____/____/_____/_____
20  _____/____/_____/_____
21  _____/____/_____/_____
22  _____/____/_____/_____
23  _____/____/_____/_____
24  _____/____/_____/_____
25
```

30 (Pages 267 - 270)