# EXHIBIT B

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2
      IN RE: TAXOTERE            )
 3    (DOCETAXEL) PRODUCTS       )
      LIABILITY LITIGATION       )
 4                               )   MDL No. 2740
      This Document Relates To: )
 5                               )   SECTION: H
      Antoinette Durden, Case    )
 6    No. 2:16-cv-16635          )
                                 )
 7    Tanya Francis, Case        )
      No. 2:16-cv-17410;         )
 8                               )
      Barbara Earnest, Case      )
 9    No. 2:16-cv-17144          )
10
11    ****************************************************
12              ORAL VIDEOTAPED DEPOSITION OF
13                 LAURA PLUNKETT, PH.D.
14                  DECEMBER 10, 2018
15    ****************************************************
16
17
18         ORAL VIDEOTAPED DEPOSITION OF LAURA PLUNKETT,
      PH.D., produced as a witness at the instance of the
      Defendants and duly sworn, was taken in the
19    above-styled and numbered cause on the 10th day of
      December, 2018, from 9:21 a.m. to 5:22 p.m., before
20    Stephanie Barringer, Certified Realtime Reporter
      (CRR), Registered Professional Reporter (RPR), and
21    Certified Shorthand Reporter (CSR) in and for the
      State of Texas, reported by stenographic means at the
22    offices of Fleming, Nolen & Jez, LLP, 2800 Post Oak
      Blvd., Suite 4000, Houston, Texas  77056, pursuant to
23    the Federal Rules of Civil Procedure and the
      provisions stated on the record or attached hereto.
24
25    Job No. NJ3152742
```

Page 6

1          THE VIDEOGRAPHER:  My name is
2   Jarek Barringer, representing Veritext.
3          The date today is 12/10/18, and
4   the time is approximately 9:21 a.m.  This
5   deposition is being held at Fleming, Nolan and Jez,
6   LLP, located at 2800 Post Oak Boulevard,
7   Suite 4000, Houston, Texas 77056.
8          The caption of this case is
9   Darden, Antoinett versus Sanofi S.A.  The name of
10  the witness is Laura Plunkett, MD.
11         At this time the attorneys
12  present in the room and everyone attending remotely
13  will identify themselves and the parties they
14  represent.
15         MR. MICELI:  The witness' name is
16  Laura Plunkett, Ph.D.
17         And I am David Miceli for PSC.
18         MS. JEFFCOTT:  Emily Jeffcott for
19  the SPC.
20         MR. NOLEN:  Rand Nolen for PSC.
21         MS. SASTRE:  Good morning.  Hildy
22  Sastre with Shook, Hardy & Bacon on behalf of the
23  Sanofi defendants.
24         MR. RATLIFF:  Harley Ratliff on
25  behalf of Sanofi.

Page 7

1          MS. PETERSON:  Torrey Person on
2   behalf of Sanofi with Shook, Hardy.
3          THE VIDEOGRAPHER:  Our court
4   reporter, Stephanie Barringer, representing
5   Veritext, will swear in the witness so we can
6   proceed.
7          LAURA PLUNKETT, PH.D.,
8   having been first duly sworn, testified as follows:
9                  * * *
10              EXAMINATION
11    Q.  (BY MS. SASTRE)  Good afternoon,
12  Dr. Plunkett -- or good morning, I should say.  I
13  already made my first mistake.  Good morning,
14  Doctor.
15    A.  Good morning.
16    Q.  All right.  Counsel who is with you today
17  just indicated that you are a Ph.D., not an M.D.;
18  is that correct?
19    A.  That's correct.
20    Q.  Okay.  And so although we're going to be
21  calling you "Doctor" throughout the course of today
22  as we take your deposition, you are not a medical
23  doctor, correct?
24    A.  That is correct.
25    Q.  Okay.  The doctorate that you have is a

Page 8

1   Ph.D., which is different than a medical doctor?
2    A.  Yes, it is.
3    Q.  Okay.  Very good.
4          So I know I introduced myself to
5   you and we had a chance to talk for a moment or two
6   before we went on the record.  But I would just
7   like to do it again.
8          My name is Hildy Sastre.  I'm
9   with the law firm of Shook Hardy.  And I represent
10  the Sanofi defendants in this case.
11         You understand that we're here
12  today to take your deposition?
13    A.  Yes, I do.
14    Q.  All right.  And I also mentioned this
15  before, but I'll say it again:  I try to break
16  about once an hour.  Sometimes I forget to do that.
17         But if at any point you need a
18  break today, you need to stretch your legs or
19  whatever the case may be, please feel free to let
20  me know.  All right?
21    A.  Okay.  I will.
22    Q.  Okay.  I anticipate we'll spend most if
23  not all of the day together.  So it may be
24  important to take breaks at various times.  All
25  right?

Page 9

1    A.  All right.
2    Q.  Okay.  Now, I know you've been deposed
3   many times in the past, true?
4    A.  Yes.
5    Q.  How many times?
6    A.  A total number, I don't know.  This last
7   year, at least 25 times, I would imagine.
8    Q.  In the past year?
9    A.  Yes.
10    Q.  And so what's your best estimate, since
11  you've been providing expert witness services, how
12  many times you've been deposed?
13    A.  Well over 100 times totally.  I don't
14  have an exact number.  I've been doing this -- my
15  first testimony was back in 1993 when I worked for
16  Environ Corporation.  So hundreds of times,
17  probably, over 20-some years now.
18    Q.  Okay.  And you said you've given
19  25 depositions this year, in 2018?
20    A.  I believe that's true, yes.
21    Q.  And has that rate typically been true
22  for, say, the last ten-year period, about
23  25 depositions a year?
24    A.  Well, it's not just depositions.
25  25 trial and deposition appearances.

3 (Pages 6 - 9)

Page 10

1    Q.  Uh-huh.
2    A.  And that would -- no, not necessarily.
3  Some years, more.  Some years, less.  20 years ago,
4  not as many --
5    Q.  Okay.
6    A.  -- as I do today.
7    Q.  So it's been a busy year for you?
8    A.  Yes.  More things are going to trial now
9  than -- than ever did in, I would say, the last
10  three or four years.
11    Q.  Okay.  So you're no stranger to the
12  litigation process; is that fair?
13        MR. MICELI:  Object to the form.
14    A.  That's true.
15    Q.  (BY MS. SASTRE)  Okay.  And you've either
16  testified at trial and/or been in depositions, you
17  said, hundreds of times, true?
18    A.  In depositions and trials over 20 years,
19  yes, that's probably true.
20    Q.  All right.  When you say "hundreds of
21  times," is it closer to 2- or 300, or is it closer
22  to 7- or 800?
23    A.  Oh, it's closer to a hundred to 200.  I
24  think -- I've had someone count before.  A defense
25  attorney had mentioned a number about 150.  I don't

Page 11

1  know if that's true.  I haven't tried to count.
2    Q.  Okay.  So as you know from your
3  familiarity with this process, there's a lady
4  sitting in between us who's taking down what we
5  say.
6        I will try my best not to speak
7  when you're speaking.  I know that you'll try the
8  same.  Because obviously she can't take down what
9  we're both saying at the same time.
10        And many of the questions that
11  I'm going to ask you are going to call for yes and
12  no answers.  So I would appreciate a direct
13  response to the question and then, of course, any
14  explanation you'd like to offer; is that fair?
15    A.  I will try and do that.
16    Q.  Okay.  Very good.
17        And then finally, ma'am, if
18  there's something that I ask you today which is
19  beyond your expertise as a Ph.D. -- Ph.D.
20  toxicologist, will you let me know that?
21    A.  Yes.  Absolutely.
22    Q.  Okay.  And that's another way of saying
23  if I ask you questions today where you simply don't
24  know the answer, will you tell me that?
25    A.  Yes, I will.

Page 12

1    Q.  Okay.  And if you don't understand any of
2  my questions, will you let me know as well?
3    A.  Oh, absolutely, I will let you know.
4    Q.  Okay.  There will be times, I'm sure,
5  where I'm going to be articulate, but please --
6  inarticulate.  Let me know so I can rephrase.
7    A.  That's fine.  I will.
8    Q.  Okay.  Very good.  All right.
9        So let's go ahead and get
10  started.  I probably should have asked you this
11  first, but can you just state your name for the
12  record, please?
13    A.  My full name is Laura Massey Plunkett.
14    Q.  Okay.  And you have provided an expert
15  report in this matter, correct?
16    A.  Yes.
17    Q.  And you've brought a copy of that with
18  you today?
19    A.  I have.
20    Q.  Okay.  And we'll get into that in a
21  moment.
22        Let me ask you -- I'd like to ask
23  you sort of some general background questions
24  before we start.  Okay?
25    A.  Sure.

Page 13

1    Q.  Concerning Taxotere, which is what you're
2  here to talk about, true?
3    A.  Yes.
4    Q.  Okay.  So you understand that Taxotere is
5  prescribed to patients as a chemotherapy drug?
6    A.  I do.
7    Q.  And it's been prescribed to patients to
8  treat a variety of cancers for over 20 years, true?
9    A.  Yes, that's true.
10    Q.  And you'd agree with me it's been
11  prescribed to millions of patients over the last 20
12  years?
13        MR. MICELI:  Object to form.
14    A.  I don't know a number.
15    Q.  (BY MS. SASTRE)  What's your
16  understanding of approximately how many patients
17  Taxotere's been prescribed to over the last
18  20 years?
19    A.  I haven't done the research, so I can't
20  answer that specifically.
21    Q.  So you have no estimate as you sit here
22  today?
23    A.  I do not.
24    Q.  All right.  Do you have any reason to
25  disagree with my estimate of millions of patients

4 (Pages 10 - 13)

Page 22

1 my report.
2     Q.   (BY MS. SASTRE)  Okay.  Doxorubicin --
3 with regard to doxorubicin, you said that you
4 believed it was not associated with persistent or
5 permanent alopecia, and you referred to the label?
6     A.   Yes.  The FDA-approved labeling for the
7 drug.
8     Q.   Okay.  And my question is:  Is it your
9 testimony today under oath that there are no
10 reports of doxorubicin being associated with
11 persistent or permanent alopecia in the medical and
12 scientific literature?
13          MR. MICELI:  Object to the form.
14     A.   So it would be the same answer I gave
15 you.  Based on the searches that I did and then
16 looking at the labeling for the drug, it is not a
17 drug that has been consistently linked with that.
18 So no.
19          But I can't tell you there's not
20 one report anywhere.  Because, again, it could
21 potentially have been reported within case reports
22 and spontaneous reporting.
23     Q.   (BY MS. SASTRE)  Okay.  All right.  And
24 then the last one, could you tell me the name
25 again?  It was 5...

Page 23

1     A.   Oh, 5 -- we -- if you want the
2 abbreviation, it'd be easier.  5-FU.
3          (Discussion off the record.)
4     Q.   (BY MS. SASTRE)  I do.  Okay.  5-F --
5     A.   U.
6     Q.   5-FU.
7     A.   Which is 5-fluorouracil.
8     Q.   5-fluorouracil.  Okay.  Thank you.
9          And with regard to 5-FU or
10 5-fluorouracil, again, your answer, you referred to
11 the labeling.
12          And so my question to you is:  Is
13 it your opinion, to a reasonable degree of
14 scientific medical probability, that there are no
15 reports in the published literature of 5 --
16 5-fluorouracil being associated with persistent or
17 permanent alopecia?
18          MR. MICELI:  Object to the form.
19     A.   No, that's not what I'm saying.  No.
20 It -- it's -- it has been -- again, there are case
21 reports for that one as well.  But it's not
22 something that has been identified as a risk that's
23 described within the FDA label.
24     Q.   (BY MS. SASTRE)  So you have seen case
25 reports with 5-FU being associated with persistent

Page 24

1 or permanent alopecia?
2     A.   As a -- as a combination therapy, yes.
3 In fact, in the clinical trials performed by
4 Sanofi, they had some of those in the combination
5 therapy but not 5-FU by itself.
6     Q.   Uh-huh.
7          And with regard to doxorubin,
8 you've also seen case reports where it has been
9 associated with permanent or persistent alopecia as
10 part of a combination therapy, true?
11     A.   Yes.  As a combo therapy, which is a
12 different question.
13     Q.   And same question with regard to
14 cisplatin.  You've also seen case reports in the
15 medical literature where it's been associated with
16 permanent or persistent alopecia as part of a
17 combination therapy?
18     A.   Yes.  Again, different question than
19 you -- than I -- I was interpreting from your
20 original question.
21     Q.   And even if we went back to prednisone,
22 the steroid, you'd agree with me you've also seen
23 case reports in the medical literature where it's
24 been associated with permanent or persistent
25 alopecia as part of a combination of medications

Page 25

1 being given to a patient to treat cancer?
2          MR. MICELI:  Object to the form.
3     A.   Yes.  It's the same answer as you
4 originally you asked, that I was looking -- I was
5 talking about the individual drug.  But certainly
6 in combination, there have been case reports.
7     Q.   (BY MS. SASTRE)  Do you understand what
8 adjuvant chemotherapy is?
9     A.   I have a definition for it, yes.  I don't
10 know what your definition is.  But...
11     Q.   And do you understand that all of the
12 plaintiffs in this case received adjuvant
13 chemotherapy?
14     A.   Yes.  That's my understanding for the way
15 the drug was -- and I believe I described that in
16 my report.
17     Q.   And you would agree with me that for
18 adjuvant chemotherapy, multiple chemotherapies are
19 given to a patient?
20     A.   Yes.  That's correct.
21     Q.   And that's true for all the plaintiffs in
22 this matter, correct?
23     A.   Well, I don't know -- I'm not case
24 specific, so I can't answer you for every
25 plaintiff.  But I know certainly that was the issue

7 (Pages 22 - 25)

Page 34

1  Taxotere study in a combination therapy, and then
2  they were -- they were comparing it. And I -- I
3  want to say either 75 or 100 was the -- was the
4  dose. And it was given with a -- as an adjuvant,
5  it was given a very particular time period. And I
6  believe it may have been every three or four weeks.
7      Q.  Okay. So I just want to understand if
8  you have an opinion that there's a certain
9  administration schedule for Taxotere that increases
10 the risk for the development of a patient's
11 permanent hair loss when compared to other
12 chemotherapy medications.
13         If you have that opinion, I'd
14 like to know what that opinion is. What -- what is
15 the administration schedule that you believe
16 increases a patient's risk for permanent alopecia?
17         MR. MICELI:  Object to the form.
18     A.  So I haven't, in my report, formed an
19 opinion that it has to be a specific -- maybe
20 that's the answer to your question. And I don't
21 mean to -- but in my report, when I make a
22 statement about the fact that there's an increased
23 risk as compared to other drugs, I'm not being
24 specific to only one particular treatment schedule
25 or one particular dose.

Page 35

1          However, there is information in
2  the literature to answer that question based on the
3  studies that have been done.
4      Q.  (BY MS. SASTRE)  Sure.
5      A.  But my opinion is -- is a general opinion
6  about the risk of this drug used in combination
7  therapy in patients with -- as an adjuvant for
8  patients with breast cancer versus the others that
9  have been studied.
10         And in addition to that, there is
11 other literature that describes overall the -- the
12 risk of Taxotere when now you go beyond the
13 clinical data and bring in the observational data
14 or case reports or other descriptions within the
15 scientific literature as well.
16     Q.  Okay. So I think -- I think I
17 understand.
18         So your opinion that there is a
19 greater risk of permanent alopecia associated with
20 Taxotere as opposed to other chemotherapy
21 treatments is not dependent upon the administration
22 schedule; is that fair?
23         MR. MICELI:  Object to form.
24     A.  I don't think I'd state it quite that
25 way, no.

Page 36

1      Q.  (BY MS. SASTRE)  How would you state it?
2      A.  I would state it -- I would state it that
3  I believe -- as I've done in my report. And then
4  to understand what the basis of it is, the basis of
5  that report does include data that lists specific
6  treatment schedules and specific regimens.
7          But the problem is there is
8  not -- there's not a wealth of head-to-head data
9  that allows me to identify that every particular
10 comparison would show that. Do you understand what
11 I'm saying?
12         But certainly the data I have
13 allows me to say that indeed Taxotere is different
14 than Taxol and Taxotere is different than other
15 drugs that are used to treat breast cancer. And
16 that's what I think is clear from looking at the
17 information that is there.
18     Q.  Okay. I hear you.
19         But I'm just asking a very
20 specific, limited question. And I know you've
21 referred to your report several times. I read your
22 report many times before I came here today. And
23 you are welcome to go to it and point things out to
24 me.
25         But, again, I just want answers

Page 37

1  to the questions today as opposed to being referred
2  to what you said in your report. Because as you
3  know, it's a long report.
4          So what I'm asking you -- I think
5  it's pretty straightforward, which is:  You have an
6  opinion that you think Taxotere is associated with
7  a greater risk for the development of permanent
8  alopecia as compared to some other chemotherapy
9  medications, true?
10         MR. MICELI:  Object to the form.
11 And object to the colloquy.
12     A.  I would agree that that is -- that is
13 essentially what I've stated in Paragraph 51. Yes,
14 I agree. That is an opinion I have expressed.
15     Q.  (BY MS. SASTRE)  Okay. And my next
16 question is just simply whether that opinion --
17 whether you think it's more likely or there's a
18 greater likelihood for the development of permanent
19 alopecia based upon Taxotere specific
20 administration schedule.
21         And if you don't have an opinion
22 that there's a difference in the likelihood of
23 permanent alopecia developing based upon the
24 administration schedule, then would you please tell
25 me that.

10 (Pages 34 - 37)

Page 38

1    A.  So I can't -- I don't think I can say I
2  do or don't have an opinion.  Because I think some
3  of the information that I've provided you in
4  discussion -- for example, I have a paragraph where
5  I talk about dose.  And I do talk about -- about
6  the fact that there have been statements in the
7  literature about being above 100.  I think that
8  maybe Dr. Tossee has a published paper or someone
9  else that talks about that.
10         But I'm saying to you, as I have
11  expressed the opinions in my paper, my assessment
12  was not limited to a specific dose or a specific
13  treatment schedule.
14         But instead, my opinion is
15  looking at the -- the drug overall as compared to
16  other drugs overall where we have available data.
17  Unfortunately, not every drug has been tested
18  head-to-head or in a manner that would be
19  consistent with making that comparison.
20    Q.  You said that Taxotere -- going to
21  Paragraph 51 of your report, you said that the use
22  is associated with greater risk of irreversible
23  alopecia as compared to some other antineoplastic
24  drug products, including Taxol, right?
25    A.  Yes.

Page 39

1    Q.  Okay.  And let me ask you:  With regard
2  to your use of the word "some," give us the list,
3  if you would, please, of the other antineoplastic
4  drug products where you believe Taxotere has got a
5  greater risk of irreversible alopecia as compared
6  to -- you list Taxol, but that's the only one.
7    A.  So the best -- there's data on Taxol, but
8  there's also data on -- in their own clinical
9  trials, on the comparison of treatment with 5-FU.
10    Q.  Uh-huh.
11    A.  So 5-fluorouracil would be their own
12  clinical study.  I believe it's Study 316.
13    Q.  Uh-huh.
14    A.  So it's -- unfortunately, the reason I --
15  the reason I use the word "some" is because not all
16  comparisons have been done.  And I am focusing on
17  drugs used to treat breast cancer as well.
18    Q.  Okay.  You listed two drugs; Taxol and
19  5-FU, correct?
20    A.  Yes.
21    Q.  Are there other chemotherapy drugs or
22  antineoplastic drug products which you believe, to
23  a reasonable degree of scientific certainty,
24  Taxotere is associated with a greater risk of
25  irreversible alopecia when compared to them?

Page 40

1  Please tell me by name if there's others besides
2  Taxol and 5-FU.
3    A.  So I would point you then to my
4  Paragraph 49 where based upon the information
5  available from the FDA labeling themselves, that
6  you would also add to that list doxorubicin,
7  cyclophosphamide, cisplatin and prednisone.
8    Q.  All right.  With regard to the first
9  medication, you listed Taxol.
10         Would you please tell us all
11  clinical studies that you reviewed for Taxol.
12    A.  I reviewed the head-to-head study that I
13  described in my report that was done by the
14  company, which is Study -- maybe 311, I believe.
15    Q.  You're referring to TX311?
16    A.  Yes.  It's --
17    Q.  And you were --
18    A.  If it's -- it's the single therapy study
19  where they looked at Taxotere alone versus Taxol
20  alone in metastatic breast cancer, yes.
21    Q.  What they did not look at in TX311 was
22  alopecia, correct?
23    A.  They did not --
24         MR. MICELI:  Object to the form.
25         Go ahead.

Page 41

1    A.  They did not have a long enough follow-up
2  to be able to define permanent alopecia, that is
3  true.
4    Q.  (BY MS. SASTRE)  Okay.  So let me ask
5  you -- I'm sorry.  Go ahead.
6    A.  Okay.  And so then -- then -- then what
7  you -- what you -- what I looked at was what is
8  available within the scientific literature
9  generally.
10         So from there, you have the study
11  by -- study by -- study by Sporano, which also
12  doesn't measure persistent alopecia, as part of my
13  weight of the evidence as far as drug -- papers
14  that produced data on the differences on toxicity
15  profile overall for the drugs.
16         And then -- then it's looking at
17  the information that is available within the -- the
18  scientific literature generally where others have
19  done some working looking at irreversible alopecia.
20         Unfortunately, there has not been
21  a long-term follow-up study that allows me to
22  quantify the exact number as far as the percentage
23  for Taxol versus the percentage for Taxotere.
24    Q.  Okay.  Can you please list all clinical
25  studies which you reviewed for Taxol which focused

11 (Pages 38 - 41)

1 on or considered the event of permanent or
2 persistent alopecia?
3         MR. MICELI:  Object to the form.
4     A.  So I don't know without going back and
5 looking at the -- the FDA's clinical summary
6 document.  I did look at that for Taxol to see
7 whether or not that was specifically reported.  I
8 don't recall.
9     Q.  (BY MS. SASTRE)  But let me see if I can
10 ask a more specific question.  I'm talking about
11 actual clinical studies.
12         You know what that means, right,
13 a clinical trial?
14     A.  Well, clinical studies can -- if that's
15 how you want to define it, just as a trial, we can.
16 Absolutely.
17     Q.  Okay.
18     A.  There's other types of studies that are
19 considered clinical.  But certainly if you want to
20 make it a phase three or a phase two or phase one
21 study, absolutely, I can do that.
22     Q.  Perfect.  Okay.  Great.
23         So that's what I'm asking about.
24 So let me kind of rephrase the question, then.
25         So please list for us, if there

1 are any, clinical trials which you reviewed and
2 analyzed as part of your work in this case where
3 Taxotere was being studied -- excuse me -- where
4 Taxol was being studied and particularly with
5 regard to persistent alopecia.
6     A.  I don't think I can point you to a study.
7 But that was the end point that was designated.
8     Q.  Okay.  Can you list any clinical studies
9 for Taxol where alopecia was being studied?
10     A.  So --
11         MR. MICELI:  Excuse me.  Object
12 to the form.
13     A.  So there, you're not limiting to
14 permanent but just alopecia generally?
15     Q.  (BY MS. SASTRE) Uh-huh.
16     A.  Okay.  So there certainly is that
17 information within the clinical studies that I did
18 review that are listed within the -- the -- some of
19 the summary documents from the FDA website.
20     Q.  Okay.
21     A.  Because they do report -- percentages of
22 alopecia can be found within the labeling for the
23 product as well where it talks about the clinical
24 data.
25     Q.  What clinical trials, if any, did you

1 review for Taxol where alopecia was being studied?
2         MR. MICELI:  Object to the form.
3     A.  That's what I'm going to point you to,
4 where it's described -- the clinical data that's
5 described within the label, which -- and some of
6 that is -- is clinical trial data.  It's not all
7 post-marked reporting.
8     Q.  (BY MS. SASTRE)  Okay.  You're referring
9 to clinical trial data in the Taxol label which
10 relates to alopecia?
11     A.  Where they report alopecia in the
12 population.  Yeah, alopecia is a well-known side
13 effect of Taxol, taxanes generally.  So you would
14 see that reported.
15     Q.  You would agree with me that there are
16 clinical trials with regard to Taxol which you did
17 not review?
18     A.  Oh, absolutely.  I did my -- my -- my
19 focus of my review was on -- first on Taxotere.  So
20 my deepest dive or my most complete assessment was
21 what I could find on Taxotere itself.  I looked for
22 clinical trials that were published --
23     Q.  Uh-huh.
24     A.  -- comparing them head-to-head if
25 possible and did not -- did not find anything

1 except the ones I'm describing to you.  And
2 unfortunately, for example, the -- the -- the 311
3 study and the Sporano study do not report permanent
4 alopecia, weren't followed long enough.
5         But I believe alopecia was --
6 was -- would be -- would have been studied in those
7 because it certainly is an endpoint that's
8 typically followed.  But it wasn't recorded in the
9 -- in the papers, for example, or in the -- in the
10 report that I had access to.
11     Q.  Okay.  Other than whatever information
12 may be reported in the Taxol label, you cannot
13 identify any other clinical trial information that
14 you looked at for Taxol as it relates to alopecia,
15 true?
16         MR. MICELI:  Object to the form.
17     A.  If -- if -- if you're making this general
18 alopecia, that's where I would send you, yes.  If
19 you're saying permanent, I don't believe it's even
20 in the labeling for the -- the product at all.
21     Q.  (BY MS. SASTRE)  And you would agree with
22 me that there's clinical trial information which
23 would not be included in the Taxol label?
24     A.  Oh, absolutely.  I mean, I didn't have
25 access to the Taxol NDA, for example.  That would

Page 46

1 be a different company, different discovery. And I
2 don't have that. So, no, it was not available.
3    Q. And why did you not have access to that?
4    A. Different company, protected document,
5 confidential document. So I didn't have access to
6 it.
7    Q. Did you go to the lawyers that hired you
8 in this litigation and say that that would be
9 important information for you to you review?
10       MR. MICELI: Object to the form.
11    A. I don't think I asked them that question,
12 no. Because that's my understanding that obviously
13 the discovery is going to be limited to the -- to
14 the information that's available from Sanofi.
15       I did ask for -- them if there
16 was any additional clinical data that had been --
17 had been conducted by Sanofi that had head-to-head
18 comparisons of Taxol and Taxotere.
19    Q. (BY MS. SASTRE) Uh-huh.
20    A. And all I -- all I was able to identify
21 was the study that I've already described for you.
22    Q. Uh-huh.
23       Because you'd agree that you
24 would have liked to look at clinical trial data for
25 Taxol as it relates to alopecia, true?

Page 47

1       MR. MICELI: Object to the form.
2    A. Not just in alopecia generally, no. I
3 would be most interested if there was permanent
4 alopecia information available. But it doesn't
5 mean that I can't form -- form an opinion without
6 it.
7       Certainly, is there something
8 there that could be within the -- the confidential
9 documents? It's possible. But I don't have access
10 for that.
11       So instead, I looked at what was
12 publicly available. And what was publicly
13 available is what I've described for you in my
14 report.
15    Q. (BY MS. SASTRE) Let me go back.
16       My question was just simply: You
17 would have liked to have looked at Taxol clinical
18 trial data concerning -- I'll use your words --
19 permanent alopecia, true?
20       MR. MICELI: Object to the form.
21    A. Well, I did look for that. I mean, you
22 asked me would I have liked to have looked at their
23 NDA. Not necessarily, no. Because, again, my --
24 that wasn't the focus of what I was doing.
25       I don't -- I guess I don't quite

Page 48

1 understand your question. You're asking me
2 something that's impossible to do without having
3 access to their NDA.
4    Q. (BY MS. SASTRE) My question is that:
5 You would have liked to have had the opportunity to
6 have seen the Taxol clinical trial data concerning
7 permanent alopecia, true?
8       MR. MICELI: Same objection.
9    Q. (BY MS. SASTRE) You would like to have
10 seen that, right?
11    A. So --
12       MR. MICELI: Same objection.
13    A. I tried to answer for you. I don't -- I
14 don't think I said I would have liked to have seen
15 it. If it was available, would I have looked at
16 it? Yes.
17       But like is a different thing.
18 And you're asking me -- asking me a question about
19 what -- what I set out to do and how I did it. And
20 how -- what I did was looking at the available
21 information and -- and forming an opinion based on
22 what was available.
23       And based on what I saw and what
24 was available to me, I felt confident making the
25 opinions that I have. And that's the best I can --

Page 49

1 can say to you. I don't know how else to answer
2 that question.
3    Q. (BY MS. SASTRE) Well, you --
4    A. Because you never have everything.
5 You'll never have everything.
6    Q. (BY MS. SASTRE) You looked for the Taxol
7 clinical trial data concerning alopecia, true?
8    A. That was available publicly, yes, I did.
9    Q. Great.
10       And you looked at it because it's
11 relevant to your opinions, right?
12    A. It was relevant when I wanted to make a
13 comparison, yes. There's different opinions in my
14 report. So certainly there are Taxotere-specific
15 opinions, and then there are opinions where I talk
16 about the -- about the differential and toxicity in
17 the comparison. So certainly I did look at what
18 was -- what was available and known about Taxol.
19    Q. All right. Well, your two primary
20 opinions are that, number one, Taxotere is more
21 toxic than Taxol, right?
22    A. Yes.
23    Q. And then your second primary opinion,
24 also a comparative opinion, is that there's a
25 greater risk for the development of permanent

13 (Pages 46 - 49)

Page 50

1  alopecia with Taxotere as compared to other
2  medications, including Taxol, true?
3      A.   Yes.
4      Q.   And --
5      A.   Based on the information I reviewed.
6      Q.   And both of those are comparative
7  opinions, right?
8      A.   Those do compare, yes.
9      Q.   Right.
10         And so you would need to have
11 information as to what is the risk of the
12 development of permanent alopecia for Taxotere on
13 the one hand, right?
14     A.   Yes.
15     Q.   And then on the other hand, you'd need to
16 have information as to what's the risk for the
17 development of permanent alopecia for Taxol,
18 correct?
19     A.   Yes.  I looked for what was available.
20 That's true.
21     Q.   Okay.  Because if you're going to make a
22 meaningful or a comparison of the two, you would
23 need to have the information on both sides of the
24 equation, right?
25         MR. MICELI:  Object to the form.

Page 51

1      A.   Certainly I looked for what was available
2  on both sides, that is true.
3      Q.   (BY MS. SASTRE)  And you'd agree with me
4  it is unfortunate that you were not able to review
5  the clinical trial data for alopecia with regard to
6  Taxol, correct?
7          MR. MICELI:  Object to the form.
8      A.   I guess you could use the word
9  "unfortunate."  But I would argue that it wasn't
10 limited based upon what I -- what I did have
11 available.  I -- I certainly believe what I had was
12 sufficient to be able to draw the conclusions that
13 I did.
14     Q.   (BY MS. SASTRE)  Well, I believe that you
15 did use that word in your report, that it was
16 unfortunate; isn't that true?
17     A.   It's possible I did.  But as I -- as you
18 asked the question, I tried to -- tried to answer
19 it best I can.
20         What page are you referring to?
21 (Examines document.)
22     Q.   If you look at Paragraph 38, Page 17 of
23 your report, you see that you refer to data for
24 Taxotere.  And then you indicate in the last
25 sentence, "Unfortunately, some more material is not

Page 52

1  available for review with respect to Taxol."
2          Did I read that correctly?
3      A.   Yes, you did.
4      Q.   Okay.  And so, ma'am, I know you said
5  earlier that the documents were, quote,
6  confidential.  How do you know that?  Did you make
7  some legal determination as to that?
8          MR. MICELI:  Object to the form.
9      A.   So based on -- in this case, I signed a
10 protective order.  That's confidential information
11 I'm reviewing.  And every other litigation in drugs
12 I've ever worked on, in order to get access to the
13 kinds of things that are exhibits to depositions, I
14 have to sign a protective order.
15         It's hard for me to believe that
16 that would not be the case.  But you're certainly
17 true; I did not contact the makers of Taxol and ask
18 them for internal documents.  I did not do that.
19     Q.   Well, it's not only that you didn't do
20 that; you didn't even have a single conversation
21 with the lawyers that hired you and specifically
22 said to them, I would like to see the Taxol
23 clinical trial data.  Can you please get that for
24 me.
25         You never said that, right?

Page 53

1          MR. MICELI:  Object to the form.
2          You do not have to answer what
3  you discussed with your lawyers.
4          Look at the comments to Rule 26.
5          MS. SASTRE:  I think you're
6  wrong.  So let me -- let me try to rephrase.
7          MR. MICELI:  Well, we can discuss
8  it off the record later if you'd like.
9          MS. SASTRE:  Yeah.  Well, we can.
10 That's fine.
11         MR. MICELI:  Okay.
12         MS. SASTRE:  Let me see if I can
13 rephrase it.
14     Q.   (BY MS. SASTRE)  And -- so you were
15 provided information by Plaintiffs' counsel, who
16 retained you in this matter, true?
17     A.   Yes, I have been.
18     Q.   Okay.  And were there certain materials
19 that you requested of them to review?
20     A.   I asked for certain materials to be -- to
21 be provided based on the discovery documents, yes.
22     Q.   And did you ever at any time specifically
23 ask Plaintiffs' counsel for Taxol clinical trial
24 data as it relates to permanent or persistent
25 alopecia?

14 (Pages 50 - 53)

Page 54

1    A.   I certainly asked them for what was
2   available in Sanofi's files, yes, regarding Taxol
3   or -- I'm sorry -- Taxotere or any drug it was
4   compared to, yes, by Sanofi.  So I did look for
5   that, yes.
6        Q.   And did you ever get that information?
7        A.   I received information related to
8   Study 311.
9        Q.   Okay.  My question is:  Did you ever get
10   the Taxol clinical trial data that you asked for?
11            MR. MICELI:  Object to the form.
12        A.   I was provided the Taxol data that, it's
13   my understanding, was available within the
14   discovery, which would be Study 311.
15        Q.   (BY MS. SASTRE)  Okay.  But we already
16   agreed Study 311 didn't look at persistent
17   alopecia?
18        A.   Unfortunately, it's not -- it -- they
19   didn't have the follow-up, that is true, yes.
20        Q.   Right.
21            So my question is:  Clinical
22   trial data for Taxol with regard to persistent
23   alopecia, what did counsel tell you about that
24   information?
25            MR. MICELI:  Object to the form.

Page 55

1   Same.
2        A.   So counsel didn't tell me anything.
3   Counsel provided what I asked for.  And I was
4   provided information.  I reviewed it and -- and
5   then drew conclusions based on what I reviewed.
6        Q.   And you agree that randomized controlled
7   clinical trial data would be considered more
8   reliable than a case report?
9        A.   Well, it would highly depend on how that
10   randomized controlled clinical trial was designed.
11   But if properly designed, if you want to add that
12   caveat, it's properly to go after the endpoint of
13   permanent alopecia, yes, it would be -- it would be
14   important data.
15        Q.   And you don't have information today, as
16   you sit here, to tell us that the Taxol trials,
17   clinical trials, were not properly designed, right?
18            MR. MICELI:  Object to the form.
19        A.   So you're asking me about every clinical
20   trial done on Taxol?  I have not done that.  I
21   can't answer that.  I haven't formed an opinion on
22   that.
23        Q.   (BY MS. SASTRE)  Right.
24            You don't know if they're
25   properly designed or not, right?

Page 56

1        A.   I have not had access to every trial
2   they've ever done on Taxol.  So I can't answer
3   that.  But certainly on the trials that I have
4   seen, either in the published literature -- I
5   certainly looked at those from the aspects of how
6   they were designed, yes.
7        Q.   Okay.  My question is just really just
8   general.  You'd agree with me that generally, there
9   is a hierarchy as to what is considered reliable in
10   the world of published medical literature, and what
11   is considered the most reliable, if properly
12   designed, is a randomized controlled clinical
13   trial, true?
14        A.   Again, I'd say that's not a complete
15   statement.  It depends upon which question you're
16   asking.  Are you asking me on the issue of trying
17   to look at -- in a causation analysis, to look at
18   cause and effect and what you -- what conclusions
19   you can draw?  Then I've seen discussions about
20   clinical trial data there, absolutely.
21        Q.   The clinical data which you looked at for
22   Taxotere, did you find it helpful and informative?
23        A.   Yes.  I certainly relied on the -- on --
24   on several of those -- those studies, yes.
25        Q.   And as you sit here today, you'd agree

Page 57

1   with me that it's likely that if you had had
2   clinical trial data for Taxol, that that also would
3   have been helpful and informative, true?
4            MR. MICELI:  Object to the form.
5        A.   I can't answer that without having seen
6   it.  But certainly it's possible, if you want me to
7   answer it that way.  I can tell you it's possible.
8        Q.   (BY MS. SASTRE)  You don't have any basis
9   upon which to tell us that it would not have been
10   helpful or would not have been informative, true?
11            MR. MICELI:  Object to the form.
12        A.   I haven't formed that opinion.
13        Q.   (BY MS. SASTRE)  Okay.  You'd agree with
14   me that all of your opinions in this matter are set
15   forth in your expert report?
16        A.   I have tried to give you all my opinions,
17   yes.  Although, certainly, typically at a
18   deposition like this, depending on how you ask the
19   question, the opinions as expressed may be worded a
20   bit differently.
21            But certainly, yes, I believe
22   I've -- I've provided all the opinions that I would
23   be prepared to express, yes.
24            (Exhibit Number 1 marked for
25   identification.)

15 (Pages 54 - 57)

1    Q.   Okay.  And then there's a list of
2  documents.  It appears to be well over a hundred,
3  if not more, documents.
4            Did you read all those word for
5  word?
6    A.   Probably not word for word.  But, again,
7  I did at least look at each of these documents.  If
8  it's on my list, I would have looked at it.
9    Q.   Do you have anyone help you with review
10 of materials like this?
11   A.   No.  Not for these projects, I don't.
12   Q.   You do for other projects?
13   A.   Well, I do regulatory projects where I
14 hire subcontractors sometimes.  But I don't do that
15 for -- for my litigation work.
16   Q.   Did anyone help you write your report?
17   A.   No.  I wrote my own report.
18   Q.   So word for word, that's your work
19 product?
20   A.   Yes, that's my work product.
21   Q.   And then the list of what's cited or
22 referenced in your report, I believe, is shorter
23 than the list of what you reviewed?
24   A.   Yes.
25   Q.   There's a list of what's cited in your

1  report, what you consider to be the most important?
2    A.   The most important to supporting opinions
3  I've expressed in my report, that's exactly right.
4  Although, some of the documents that aren't cited
5  are also very important documents.
6            But certainly, yes, as far as the
7  opinions I've expressed, these are the ones that I
8  cite for that specific reason.  So they would be
9  important.
10   Q.   You indicated somewhere in your report --
11 I'll have to find it -- that there may be some
12 opinions that you're going to offer in the future
13 on a different topic.
14            Do you recall that?
15   A.   Oh, and I would -- that is a correction
16 to my report we should make.
17   Q.   Okay.  Good.  Because then we'd have to
18 come back and take your deposition again.
19   A.   Right.
20   Q.   And our schedule would be off.
21   A.   You want me to show you what I would
22 strike.
23   Q.   Yes, please.  Thank you.
24   A.   Okay.  So on Page 4, Paragraph 12, I
25 would strike the last sentence:  I intend -- also

1  intend to provide.  Because I will not be doing
2  that.
3    Q.   Why was that in your report since you
4  wrote this yourself?
5    A.   Initially, when I first drafted my first
6  draft of my report, I was -- it was my
7  understanding that they may want me to provide some
8  regulatory opinions, so I put that in with the
9  understanding that later, I may be asked to do
10 that.
11            But it's my understanding now
12 that I will not be asked to do.  They have someone
13 else who will be providing those opinions.
14   Q.   Okay.  So you have not been asked to
15 provide regulatory opinions?
16   A.   No.  Not at this time, I have not.  And
17 so as a result, I -- I -- I don't have an intention
18 to do that at this point in time.
19   Q.   You do not intend to provide regulatory
20 opinions?
21   A.   That's correct.
22   Q.   Okay.  And we just struck out the last
23 sentence of Paragraph 12, Page 4 of your report,
24 true?
25   A.   Yes, that's true.

1    Q.   Great.
2            So you're not going to be
3  offering any opinions as to whether Taxotere
4  complied with FDA regulations or Sanofi did,
5  correct?
6    A.   I am not.  That's correct.
7    Q.   And you have no opinions about Sanofi's
8  conduct, then, with regard to Taxotere, true?
9            MR. MICELI:  Object to the form.
10   A.   So as a regulatory -- as a regulatory
11 opinion, I have not formed those opinions.  And I
12 don't intend to provide that.  That is true.
13   Q.   (BY MS. SASTRE)  Okay.  And you're not
14 going to offer any opinions, then, concerning the
15 adequacy of the Taxotere label, true?
16   A.   That is true.  I am not.
17   Q.   You're not going to be offering any
18 opinions on Sanofi's promotional activities related
19 to Taxotere?
20   A.   Yes, that's true.  Because I consider
21 that to be a regulatory opinion.
22   Q.   And do you intend to offer opinions
23 concerning Taxotere's efficacy in treating breast
24 cancer?
25   A.   I don't believe so.  Because I would -- I

17 (Pages 62 - 65)

Page 66

1  would say that that would be someone who would be
2  focusing just on that issue.  But I certainly have
3  opinion in my report where I talk about efficacy.
4  I talk about what has been shown.  Some of the
5  studies that I reviewed are efficacy studies.
6          But I don't believe that I have
7  or would be asked to do an overview of that.  I
8  believe that that would probably be an oncologist
9  that would do that.
10  Q.  All right.  So you don't have any
11  opinions of head-to-head efficacy comparison in
12  Taxotere's ability to defeat breast cancer versus
13  other chemotherapy drugs; is that fair?
14  A.  That may not be true.  Because I believe
15  I have a statement in my report where I talk about
16  having similar efficacy to Taxol.  I think I talk
17  about that specifically.  And if you want me to
18  look, I believe there's language in one of my
19  paragraphs on that.
20  Q.  Sure.
21  A.  But certainly it's not a -- it's talking
22  about a specific study, not about an overall
23  evaluation.
24  Q.  Okay.  So you --
25  A.  If that helps.

Page 67

1  Q.  Let me see if I understand.  So your
2  testimony is that you state in your report that you
3  believe Taxol and Taxotere have similar efficacy,
4  correct?
5  A.  Yes.
6  Q.  But I think what you're also saying is --
7  let me see if I can ask it this way.
8          You saw that it said that in a --
9  in a study, true?
10  A.  Data showed that in some of the studies
11  that I reviewed, yes.
12  Q.  Okay.  Do you hold an opinion, to a
13  reasonable degree of scientific and medical
14  probability, that Taxotere and Taxol have the same
15  efficacy?
16  A.  I don't know I'd put it quite that way.
17  I would say I believe -- I hold an opinion, to a
18  reasonable degree of scientific certainty, that
19  the -- that the medical literature I reviewed shows
20  that the two drugs are used interchangeably in the
21  treatment of breast cancer.
22  Q.  Okay.
23  A.  So that's -- that is, I think what --
24  that's what I'm referring to in my report.  And I
25  think I say that several times.

Page 68

1  Q.  Okay.  So your opinion, to a reasonable
2  degree of medical certainty, is that there are
3  reports in the literature of the drugs Taxol and
4  Taxotere being used interchangeably?
5          MR. MICELI:  Object to the form.
6  A.  Well, more than that.  There's even
7  guidelines that are put out by -- there's different
8  documents I refer to that are more than just an
9  individual clinical study.
10          But yes, it has to do with that
11  issue of -- I looked at the issue of changeability
12  based upon the -- comparing toxicity profiles of
13  the drugs as well.
14  Q.  (BY MS. SASTRE)  Okay.  But it is -- you
15  do not have an opinion that the efficacy with
16  regard to breast cancer for Taxol and Taxotere is
17  the same, true?
18          MR. MICELI:  Object to the form.
19  A.  I don't think I formed the opinion quite
20  the way you're stating it.  That is true.  I tried
21  to state for you what is in my -- my report.  And I
22  would refer you to my report.
23  Q.  (BY MS. SASTRE)  Okay.  And that's the
24  statement that you believe the drugs are
25  interchangeable, true?

Page 69

1  A.  I believe that the scientific information
2  that I have reviewed and relied upon shows that the
3  drugs are being used interchangeably by physicians,
4  specifically in the treatment of breast cancer,
5  yes.
6  Q.  Okay.  Is it your opinion, though,
7  specifically that Taxol and Taxotere can be used
8  interchangeably in the treatment of breast cancer?
9  Or is it simply something you read and you're
10  repeating for us?
11          MR. MICELI:  Object to the form.
12  A.  As a pharmacologist --
13  Q.  (BY MS. SASTRE)  Uh-huh.
14  A.  -- where I would review the kinds of
15  things I talk about, I have formed that independent
16  opinion.  So as a pharmacologist, as I look at the
17  information available, these drugs indeed have been
18  shown to be -- are able to be used interchangeably.
19          And certainly, that -- I -- I
20  believe, based on what I have seen, that's a --
21  that is a sound -- a sound decision to make.  I am
22  not a physician, so I don't make those decisions
23  for patients, however.
24          So I can only answer that as
25  someone who looks at what is available publicly in

18 (Pages 66 - 69)

Page 70

1 the scientific -- in the scientific information
2 that I have seen.
3    Q.  You have never, as you said, made the
4 decision as to whether a specific patient should be
5 given Taxol or Taxotere, true?
6    A.  That's true.  Because I'm not a
7 physician.
8    Q.  Right.
9        You're not an oncologist?
10    A.  That's true.  I am not.
11    Q.  Right.
12        And other than what you've read,
13 you don't have any information available to you
14 that would tell us exactly how oncologists make
15 that decision, correct?
16    A.  I can't tell you how an oncologist makes
17 that decision, no.  I can tell you what -- what
18 is -- what scientists and the FDA and different
19 individuals that talk about the use of these drugs
20 say.
21        But certainly I'm not an
22 oncologist.  So I can't tell you what oncologists
23 would say.
24    Q.  Okay.  You'd agree with me that no
25 medical or scientific organization anywhere in the

Page 71

1 world has concluded that the risks of Taxotere
2 outweigh its benefits?
3        MR. MICELI:  Object to the form.
4    A.  I can't answer that.  I haven't done a
5 complete review of anywhere in the world.  So I
6 don't think I can answer that question based on
7 what I've reviewed.
8    Q.  (BY MS. SASTRE)  Okay.  You'd agree with
9 me -- well, strike that.
10        You cannot identify a single
11 medical or scientific organization anywhere in the
12 world, the United States or beyond, that's
13 concluded that the risks of Taxotere outweigh its
14 benefits?
15    A.  It's the same answer.  I don't think I
16 can tell you that I've looked at every potential
17 place that -- that I could look.  That wasn't a
18 focus of my assessment.
19        So it's a really broad question
20 you're asking.  And so I -- I don't think what I
21 have done would allow me to answer that yes or no
22 for you.
23    Q.  Let me ask you the question again.
24        You cannot identify a single
25 medical or scientific organization that has

Page 72

1 concluded that the risks of Taxotere outweigh its
2 benefits, true?
3        MR. MICELI:  Same objection.
4    A.  So the answer is I can't -- I can't
5 answer that one way or the other.  I haven't done
6 that specific assessment you're asking.
7    Q.  (BY MS. SASTRE)  Okay.
8    A.  It's much broader than I have done.
9    Q.  Please identify by name all medical and
10 scientific organizations that have concluded that
11 the risks of Taxotere outweigh its benefits?
12    A.  I can't -- I can't answer that for you.
13 That wasn't a focus of my assessment.  That's what
14 I'm trying to tell you.  I didn't go and look for
15 those specific issues.
16        It certainly has -- it certainly
17 is marketed in different countries around the
18 world.  So I'm aware of the fact that certain
19 regulatory bodies have made the decision that for
20 certain indication, certain patient populations and
21 certain uses, the risks -- the risks do not
22 outweigh the benefits.
23    Q.  Okay.  And my question is just simply:
24 Over the course of your research into Taxotere and
25 your review of multiple medical studies, medical

Page 73

1 literature and other scientific papers, you did not
2 see any medical or scientific organizations that
3 concluded the risks of Taxotere outweigh its
4 benefits, true?
5        MR. MICELI:  Same objection.
6    A.  I can't point you to one.  But I also
7 have not done that assessment.
8    Q.  Uh-huh.
9        You certainly did not come across
10 it in what you did, though, true?
11    A.  I didn't -- I can't point you to it, no.
12 I can't tell you that it's not in something I
13 reviewed.  But I -- it was not a focus of my
14 assessment to see whether or not that had happened.
15    Q.  You agree with me the FDA has certainly
16 never concluded that the risks of Taxotere outweigh
17 its benefits?
18    A.  I can't answer that completely because I
19 haven't looked at every FDA -- I don't know whether
20 there's been submissions made where things were
21 considered incomplete and as a result, FDA just
22 said that the information was insufficient.  I
23 can't answer that.
24    Q.  Well, I understand you're saying that
25 you -- there may be FDA materials or documents that

19 (Pages 70 - 73)

Page 74

1 you haven't read.  So let me sort of ask you a
2 different question.
3           As you sit here today, you
4 don't -- you -- you don't have any information
5 which would indicate that FDA has ever said or
6 concluded that the risks of Taxotere outweigh its
7 benefits, true?
8      A.  I could not point you to something.  But,
9 again, the answer is I haven't actually looked.
10 I'd have to do a complete assessment, and I have
11 not done that.
12      Q.  Well, ma'am, you've reviewed FDA
13 documents related to Taxotere, right?
14      A.  I have not reviewed every FDA document
15 related to Taxotere, no.
16      Q.  I didn't ask that.
17      A.  I have reviewed some.  Yes, I have.
18      Q.  And in all the FDA documents you reviewed
19 related to Taxotere, you never saw the statement
20 that FDA's concluded that the risks of Taxotere
21 outweigh its benefits, true?
22      A.  That is what I answered for you.  Based
23 on what I have seen, I can't point you to a
24 document that states that.
25      Q.  And you cannot, likewise, identify any

Page 75

1 peer-reviewed publication that has concluded that
2 the risks of Taxotere outweigh its benefits?
3      A.  I don't recall one based on ones that I
4 have reviewed.
5      Q.  And you'd agree that you cannot identify
6 any regulatory authority anywhere that has
7 concluded that the risks of Taxotere outweigh its
8 benefits, true?
9           MR. MICELI:  Object to the form.
10      A.  The same answer I gave you before.  I
11 haven't done that assessment, so I can't answer
12 that.
13      Q.  (BY MS. SASTRE)  Okay.  My question is
14 different.
15           You cannot identify by name any
16 regulatory authority that's concluded that the
17 risks of Taxotere outweigh its benefits, true?
18           MR. MICELI:  Same objection.
19      A.  I can't -- I have not attempted to do
20 that.  So no, I can't point to one.  No.
21      Q.  (BY MS. SASTRE)  Okay.  In your research
22 of Taxotere, you did not come across any
23 information which would allow to you to even --
24 to -- which would indicate -- let me ask that
25 again.

Page 76

1           Over the course of your research,
2 you did not come across any information which
3 indicated that any regulatory authority has
4 concluded that the risks of Taxotere outweigh its
5 benefits, true?
6      A.  That is true.  But I also did not attempt
7 to do that.
8      Q.  Okay.
9           MS. SASTRE:  Let's go ahead and
10 take a break.
11           THE VIDEOGRAPHER:  We are off the
12 record at 10:29.
13           (Recess taken.)
14           THE VIDEOGRAPHER:  We are back on
15 the record at 10:46.
16      Q.  (BY MS. SASTRE)  Welcome back from break.
17           Dr. Plunkett, before we broke --
18 a few minutes before we broke, you'd given me a
19 list of medications -- there were five of them --
20 where you said that you believe that Taxotere had a
21 greater risk of permanent alopecia as compared to
22 these other chemotherapy treatments.
23           Do you recall that generally?
24      A.  Yes.  Based on the information I
25 reviewed.

Page 77

1      Q.  Of course.
2           And you told me about Taxol,
3 5-FU, doxorubicin, cyclophosphamide, cis- -- you'll
4 have to help me with that one.
5      A.  Cisplatin.
6      Q.  Thank you.
7           Cisplatin and prednisone,
8 correct?
9      A.  Yes.  And did you -- you used the word
10 permanent alopecia in your question, correct, not
11 just alopecia generally?
12      Q.  Yes.
13      A.  That's -- okay.  That's fine.  But -- and
14 I want to be clear because that -- it makes a
15 difference.  So...
16      Q.  Okay.  And with regard to a monotherapy
17 head-to-head treatment with regard to Taxol and
18 Taxotere, you told me about the 311 trial, correct?
19      A.  Yes.  That's the only one that I was able
20 to identify head-to-head.
21      Q.  Okay.  And you agreed with me that that
22 trial was not focused on permanent alopecia, true?
23      A.  I did agree with you on that.
24      Q.  Okay.  Very good.
25           So let me ask you just very

Veritext Legal Solutions
800-227-8440                                           973-410-4040

Page 78

1 quickly similar questions with regard to the other
2 medications you've listed.  All right?
3    A.  Sure.
4    Q.  So did you review any monotherapy
5 clinical trials that compared 5-FU to Taxotere
6 which were focused on permanent alopecia?
7    A.  Not monotherapy, no.
8    Q.  Okay.  Did you review any monotherapy
9 clinical trials between Taxotere and doxorubicin
10 which were focused on permanent alopecia?
11    A.  No.  Not monotherapy.
12    Q.  Did you review any monotherapy clinical
13 trials between Taxotere and cyclophosphamide which
14 focused on permanent alopecia?
15    A.  No, I did not.  Not monotherapy.
16    Q.  Did you review any monotherapy clinical
17 trials for Taxotere and cisplatin which focused on
18 permanent alopecia?
19    A.  No.  Not monotherapy.
20    Q.  And then finally, did you review any
21 monotherapy clinical trials which focused on
22 Taxotere and prednisone and permanent alopecia?
23    A.  No.  Not monotherapy.
24    Q.  Okay.  So 5-FU, doxorubicin,
25 cyclophosphamide, cisplatin and prednisone, to the

Page 79

1 extent that you looked at any clinical trials which
2 considered permanent alopecia, all of those trials
3 involved patients receiving drugs in addition to
4 the ones I've just listed.
5         So they were combo treatment,
6 correct?
7    A.  Yes.  Some of them were -- not all of
8 them were always used together.  But yes, I would
9 agree that all of -- the data I have relied upon
10 has typically been data where patients had -- have
11 received combination.
12         And typically, I was looking at
13 combination with Taxotere and combination as
14 compared to the use of the FAC, or the F-A-C.
15         (Discussion off the record.)
16    Q.  (BY MS. SASTRE)  You said that you looked
17 at interchangeability between Taxol and Taxotere,
18 true?
19         MR. MICELI:  Object to the form.
20    A.  I think I said as a pharmacologist, I
21 looked at that issue.  Yes, I did.
22    Q.  (BY MS. SASTRE)  And you'd agree that
23 Taxotere was an effective chemotherapy for early
24 stage breast cancer?
25    A.  Yes.  It shows efficacy.

Page 80

1    Q.  And you'd agree that the use of Taxotere
2 is within the standard of care for treating early
3 stage breast cancer?
4         MR. MICELI:  Object to the form.
5    A.  So I'm not a physician so I don't for
6 opinions on, quote, unquote, standard of care.  But
7 I would agree that I know that physicians do use it
8 interchangeably.  That's the best I can answer that
9 for you based on what I have reviewed.
10    Q.  (BY MS. SASTRE)  Now, you've told us
11 several times that you are a pharmacologist and a
12 toxicologist, true?
13    A.  Yes.
14    Q.  You told us you are not a medical doctor,
15 true?
16    A.  Yes.
17    Q.  You don't see patients in a clinical
18 setting, correct?
19    A.  That is correct.  I --
20    Q.  Or at all; is that fair?
21    A.  That is correct.  I do not.
22    Q.  Okay.  You've never diagnosed or treated
23 breast cancer, true?
24    A.  That is correct.  I have not.
25    Q.  You've never even -- you've never been in

Page 81

1 the position of having to determine what would be
2 the most appropriate chemotherapy regimen for a
3 given patient?
4    A.  That is correct.  Because I'm not a
5 physician.
6    Q.  Okay.  You're not an expert in the field
7 of oncology?
8    A.  No.  I'm not an oncologist, so I'm not an
9 expert in that field.
10    Q.  You're not an expert in dermatology?
11    A.  No.  Again, I'm not a dermatologist, so I
12 don't consider myself an expert in that field.
13    Q.  Not an expert in pathology?
14    A.  It would be the same answer.  I'm not a
15 pathologist by -- by training.
16    Q.  And you're not an expert in epidemiology,
17 correct?
18    A.  I have expertise in epidemiology.  But I
19 am not a -- I'm not degreed in epidemiology.  So
20 it's a tool I use every day, but it certainly is
21 not my degree.
22    Q.  There are a number of depositions that
23 you reviewed.  Are they all of Sanofi company
24 witnesses or employees?
25    A.  Yes, the ones I have reviewed.

21 (Pages 78 - 81)

Page 86

1    Q.  And with the exception of skin cancer, it
2 is the most common cancer in America for women?
3            MR. MICELI:  Object to the form.
4    A.  That, I can't tell you.  Because I
5 haven't looked to -- to write them one above the
6 other.  But they're both common.  That is true.
7 And they're both common in -- they're both common
8 in women.  That is true.
9    Q.  (BY MS. SASTRE)  And would you agree it's
10 the second leading cause of death of women in
11 America?
12    A.  I can't --
13            MR. MICELI:  Object to the form.
14            THE WITNESS:  I'm sorry.
15            MR. MICELI:  It's okay.
16    A.  I can't tell you if it's the second
17 leading cause of death.  But I certainly know that
18 it does cause significant -- it's a significant
19 cause of death in women, yes.
20    Q.  (BY MS. SASTRE)  Do you know what is a
21 woman's chance of being diagnosed with breast
22 cancer in her lifetime presently in the United
23 States?
24    A.  Well, I think it depends on some of their
25 personal characteristics.  But I can't tell you the

Page 87

1 overall number for the U.S. population, no.
2    Q.  Would you have any reason to disagree
3 with the statement that one out of every eight
4 women will be diagnosed with breast cancer in their
5 lifetime?
6    A.  I -- I couldn't cite you evidence one way
7 or the other.  So no, I wouldn't disagree
8 necessarily.  But I also don't know.  I haven't
9 formed that specific opinion.
10    Q.  Okay.  And are you aware that there are
11 over 250,000 new cases of invasive breast cancer
12 that are diagnosed in women each year?
13    A.  It would be the same answer.  I -- to get
14 to -- I can't agree or disagree with any specific
15 number.  I do know that it is a significant women's
16 health issue, however, yes.
17    Q.  And you'd agree with me that there are
18 over 40,000 women every year that will die of
19 breast cancer, true?
20            MR. MICELI:  Object to the form.
21    A.  I would agree that significant amounts of
22 women die from breast cancer.  But I can't tell you
23 number.  I can't -- I don't know the numbers.
24    Q.  (BY MS. SASTRE)  Are you aware of the
25 fact that the breast cancer death rate has declined

Page 88

1 from 1989 up to 2015?
2    A.  I -- I have no data one way or the other.
3 So I can't -- I don't -- I couldn't answer that yes
4 or no.
5    Q.  And if you were to assume that breast
6 cancer death rates have declined since 1989, you
7 would agree with me that that is in part true --
8 that is in part related to improvements in
9 treatment --
10            MR. MICELI:  Object --
11    Q.  (BY MS. SASTRE)  -- including
12 chemotherapy medications?
13            MR. MICELI:  Excuse me.  Object
14 to the form.
15    A.  I would agree that could be true, yes.  I
16 believe there -- it's probably multifactoral, but I
17 would agree that that could be true, yes.
18    Q.  All chemotherapy drugs have side effects,
19 true?
20    A.  Yes.  They do.
21    Q.  And you agree when it comes to breast
22 cancer and chemotherapy, there is no treatment
23 which is 100 percent risk free?
24    A.  Yes.  I would agree that any -- no
25 chemotherapy drug for any cancer would be

Page 89

1 100 percent risk free.
2    Q.  And the potential for side effect depends
3 upon the type and dose of the drug given?
4            MR. MICELI:  Object to the form.
5    A.  Certainly that is part of the equation,
6 yes.
7    Q.  (BY MS. SASTRE)  It also depends on the
8 length of treatment, true?
9    A.  It can.  I would say that that's probably
10 not the overriding issue for some of the drugs.
11 But certainly that can also be -- be an issue, yes.
12    Q.  Okay.  Chemotherapy medications can
13 affect blood-forming cells on the bone marrow?
14            MR. MICELI:  Object to the form.
15    A.  If you're asking me a general statement
16 about chemotherapy as a class, many of them do.
17 Not all, but many of them do.
18    Q.  (BY MS. SASTRE)  This can lead to an
19 increased chance of infections due to low white
20 blood cell counts?
21    A.  If you're asking generally for
22 chemotherapeutic drugs, that is true.  That can
23 happen.
24    Q.  You agree with me that the American
25 Cancer Society does not guarantee that any

23 (Pages 86 - 89)

1    Q.   Okay.  And you agree with me that the
2 term "alopecia" does not indicate whether someone's
3 hair will grow back, true?
4    A.   I'll need you to be more specific in that
5 question.  Are you -- can I ask -- reword how I --
6 how I think I could answer it more properly?  Or do
7 you want to ask it again?
8    Q.   Well, you provided me with the medical
9 definitions of "alopecia" that you found in your
10 medical dictionary, which was Stedman's, in your
11 pharmacology book, in your toxicology book.  And
12 you described it as either loss of hair or hair
13 loss.
14         So my question is just simply
15 that:  The definitions of that term "alopecia" do
16 not indicate if someone's hair will grow back,
17 correct?
18    A.   Those general definitions do not have a
19 limiting discussion of that.  That is true.
20         However, there are ways that
21 alopecia is described within texts and papers where
22 they are specific to what is drug-induced alopecia
23 and what is permanent alopecia.  So there are
24 different definitions for them.
25         But I would agree, as I would go

1 first to my textbooks, they're not putting the
2 limitation on time.
3    Q.   And the term "alopecia" does not
4 specifically indicate when someone's hair will grow
5 back, correct?
6    A.   I would agree that based on the general
7 discussions in the textbooks, they are not
8 discussing that.  But certainly within the clinical
9 world, as a pharmacologist looking at clinical
10 trials, they actually typically define it
11 specifically based on time.
12    Q.   You'd agree with me that the medical term
13 "alopecia" does not specifically indicate how
14 someone's hair will grow back, true?
15    A.   So what do you mean by "hair"?  Are you
16 asking me -- well, as you asking me about pattern
17 of regrowth or amount of regrowth?  Or do you have
18 something particular in mind?  Or just --
19    Q.   How one's hair will grow back, as you
20 described.
21    A.   Based on how I've described it, generally
22 that is not part of that definition, initial
23 definition.
24    Q.   And you'd also agree that the medical
25 term "alopecia" does not specifically indicate the

1 case of someone's loss, correct?
2    A.   The general term does not.  You can --
3 you can define it with causes.  But no.  That's
4 correct.  The general term, no.
5    Q.   Do you agree that the cause of hair loss
6 can be multifactorial?
7         MR. MICELI:  Object to the form.
8    A.   If by that you mean the general causes
9 within individuals, yes, there can be
10 multifactorial causes.
11    Q.   (BY MS. SASTRE)  And in order to
12 determine what is the cause of a woman's hair loss,
13 it could require a medical evaluation, correct?
14         MR. MICELI:  Object to the form.
15    A.   It could.  It could even require more
16 than that.  It could require a pathological
17 evaluation as well depending upon the situation.
18    Q.   It could require a punch biopsy, for
19 example?
20    A.   Yes.  Or a taking of tissue.  It could be
21 a punch biopsy or some other way.  But enable to --
22 to look at the cellular level, yes.
23    Q.   And hair loss occurs in women as part of
24 the natural aging process as they get older?
25         MR. MICELI:  Object to the form.

1    A.   So not necessarily all women.  But most
2 women, I would agree that that is something that
3 happens.  It's -- it's a thinning process.
4    Q.   (BY MS. SASTRE)  And these changes become
5 more pronounced or evident after menopause?
6         MR. MICELI:  Object to the form.
7    A.   I don't know in all cases.  But I do -- I
8 have seen that discussed, yes.
9    Q.   (BY MS. SASTRE)  And isn't it true that
10 it's lower estrogen levels in women that result in
11 this more pronounced or thinning or loss of hair
12 after menopause?
13         MR. MICELI:  Object to the form.
14    A.   I actually believe it's related to the
15 balance between testosterone and estrogen in the
16 system, not just estrogen always.  But -- based on
17 what I have reviewed.
18    Q.   (BY MS. SASTRE)  Hair loss can be genetic
19 as well?
20    A.   Yes.  There are certain -- there are
21 certain genetic causes, yes.
22    Q.   Thyroid hormone therapies are also
23 associated with hair loss?
24    A.   Thyroid -- thyroid hormone activity can
25 be associated, so either insufficiency or -- or

1 didn't have all your hair for six months, right?
2          MR. MICELI:  Object to the form.
3     A.  I don't -- I don't think I agree with
4 that.  The way I'm using the term is based on the
5 data that I have.  So when you describe the data
6 that I have seen, we have -- we have many patients
7 that were tested in clinical studies that five
8 years and even at ten years, still have hair loss
9 that is still existing.
10          In other words, it was permanent
11 then at the time where the cutoff was taken for the
12 study or the observation.
13          So that's the only reason I'm
14 using the -- the -- the time period -- is I'm
15 trying to define what is available in the
16 literature and what is different than what we call
17 drug-induced alopecia, which is a condition that is
18 reversible and recoverable, as described within the
19 labeling for these drugs.
20     Q.  (BY MS. SASTRE)  Okay.  But you agree
21 with me that the term "permanent," the way that we
22 use it, means forever, it's permanent, true?
23          MR. MICELI:  Object to the form.
24     A.  Well, it depends on the way -- it -- I
25 would say that depends on the situation you're

1 applying it to.  In my -- how I'm applying it, I am
2 saying that this condition is different than
3 drug-induced alopecia and in the studies and the
4 data that's been collected, it has been shown to be
5 permanent in those individuals where it has been
6 examined.
7     Q.  (BY MS. SASTRE)  Okay.  So if a patient
8 has hair loss for less than six months, you would
9 define that as temporary alopecia?
10     A.  I haven't defined it as temporary.  I
11 would say that's not consistent with permanent
12 alopecia as I've defined it.
13     Q.  Do you have a definition of temporary
14 alopecia?
15     A.  I have not defined temporary alopecia,
16 no.
17     Q.  What is your definition, if you have one,
18 for hair loss that's less than six months?
19     A.  It would be consistent with drug-induced
20 alopecia as described in the medical literature.
21 Because it can take some people that long to
22 regrow.
23     Q.  Okay.  And you would agree with me that
24 it can also take some patients longer than six
25 months to regrow hair, true?

1     A.  I would agree that there are reports in
2 the literature, in some of the trials, of some
3 people taking longer, yes.
4     Q.  Okay.  Outside of the work that you've
5 done in the litigation context -- because you also
6 do work that's not related to lawsuits and
7 litigation, true?
8     A.  I do.
9     Q.  And so in that setting, your
10 non-litigation work, have you published any
11 literature or studies on hair loss?
12     A.  No.  Not in the peer-reviewed literature,
13 if that's what you're asking me.  No, I have not.
14     Q.  What about in the non-peer reviewed
15 literature?  Have you published any papers or
16 literature on permanent hair loss?
17     A.  Not that would be publicly available.  I
18 have -- I have looked at hair loss as an endpoint
19 for clients before in different projects I've done
20 and reports for clients but not something that's
21 been made available to the public.
22     Q.  In what setting were you looking at hair
23 loss for clients, generally?
24     A.  So looking at toxicity studies in animals
25 where hair loss is an endpoint that's monitored.

1 Interpreting data.  Also in my patent work, there
2 are different applications I've worked on where the
3 data that I'm evaluating to support the patent
4 application has to be -- do -- has to do with
5 treatments for hair loss.
6     Q.  Okay.  Have you ever presented on
7 permanent hair loss?
8     A.  No.  I've not done a presentation.
9     Q.  Okay.  And have you been published with
10 regard to breast cancer?
11     A.  No.  I don't think I've published a study
12 or presented any -- an abstract at a meeting on
13 that, no.
14     Q.  And have you published a study or
15 presented on the treatment of breast cancer, in
16 particular chemotherapy?
17     A.  No.  Again, I would expect a physician to
18 be the one who would do that.
19          (Discussion off the record.)
20     Q.  (BY MS. SASTRE)  You agree it's well
21 known that chemotherapy can cause hair loss?
22     A.  I would --
23          MR. MICELI:  Object -- excuse me.
24 Object to the form.
25     A.  I would state that it's -- I believe that

28 (Pages 106 - 109)

Page 114

1 me just ask you another question.
2          As you sit here today, you don't
3 have an opinion one way or other as to whether
4 hormone therapy drugs like Arimidex or tamoxifen
5 can contribute to delayed hair regrowth following
6 the completion of chemotherapy?
7     A.  I have not formed that opinion.  That is
8 true.
9     Q.  And you'd agree with me that age can
10 contribute to delayed hair regrowth after
11 chemotherapy?
12          MR. MICELI:  Object to the form.
13     A.  I have not done that assessment either,
14 so I don't have an opinion on that at this point in
15 time.
16     Q.  (BY MS. SASTRE)  You agree that a woman's
17 menopausal status can contribute to delayed hair
18 regrowth after the completion of chemotherapy,
19 true?
20          MR. MICELI:  Object to the form.
21     A.  I have not done that assessment either.
22 But -- and I may have answered a question earlier
23 about that.  But you're asking it in the context of
24 assessment after chemotherapy, and I haven't done
25 that assessment.

Page 115

1     Q.  (BY MS. SASTRE)  And you agree that there
2 are cases of permanent alopecia that are associated
3 with chemotherapy agents besides Taxotere, true?
4          MR. MICELI:  Object to the form.
5     A.  Yes.  I have seen that.
6     Q.  (BY MS. SASTRE)  For what medications?
7     A.  I mentioned in my report there are some
8 reports for cyclophosphamide.  I don't think I
9 mentioned it, but there are some reports for a drug
10 used outside cancer, busulfan.
11          And there are some reports --
12 there is some discussion in the clinical studies
13 that were performed by Sanofi of -- some reports of
14 permanent alopecia in patients that were receiving
15 the combination called FAC, which is the
16 combination of 5-fluorouracil with the other
17 agents.
18     Q.  So it's 5-FU, the combination.  And what
19 are the other agents?
20     A.  I said -- in my report, I tell you about
21 the ones identified for -- for cyclophosphamide.
22 And I am also aware also of reports that -- or
23 these may be ones in my reference list I -- that I
24 didn't list.  There are reports with busulfan as
25 well.  But it's not used as a breast cancer

Page 116

1 treatment, that I'm aware of.
2     Q.  But the combination therapy FAC, what are
3 the agents, please?
4     A.  5-fluorouracil, cyclophosphamide and
5 Adriamycin.
6     Q.  Okay.  All right.  So I'm going to read
7 the list back because I want to make sure I have a
8 complete answer to this question.  And then you
9 tell me if there's any other medications that go on
10 Dr. Plunkett's list of chemotherapy drugs that have
11 been associated with permanent alopecia.  Okay?
12          MR. MICELI:  Object to the form.
13          Go ahead.
14     Q.  (BY MS. SASTRE)  Okay.
15     A.  Go ahead and ask your question.  I may
16 not be able to answer it, but go ahead.
17     Q.  I think you will.  But okay, Doctor, let
18 me ask.
19          So you told us about
20 cyclophosphamide, busulfan, the combination therapy
21 FAC, which is 5-FU, Adriamycin and cyclophosphamide
22 as all being chemotherapy that have all cases of
23 permanent alopecia associated with them, correct?
24     A.  Those are ones that I've identified, but
25 it's not my list.  It's -- it's the list that is

Page 117

1 with -- it's the list I have -- I can tell you
2 based upon the research I have done.
3     Q.  Are there any others besides that list
4 which you have seen cases of permanent alopecia
5 associated with chemotherapy medications?
6     A.  It's possible that there's others.  But
7 I'd have to go back and look at all of the
8 literature in -- within my reference list.  Those
9 are the ones that I focused on based upon the
10 treatment of breast cancer.
11     Q.  Well, you -- Taxol's on that list, too,
12 right?
13     A.  Oh, I'm sorry.  Yeah.  I thought I
14 mentioned Taxol earlier.  I apologize.  Yeah,
15 absolutely.  I discuss that in my report.  Taxol
16 has been associated with it as well.
17     Q.  So we'll add that to your list, right?
18     A.  It's certainly supported by the science,
19 yes.  There are some of those.
20     Q.  All right.  I am going to try to work
21 through your report with you.  And probably -- I'll
22 probably go in order, but we'll see.  There may be
23 some jumping around.  I know we've been jumping
24 around a bit so far.  So let's just kind of work
25 our way through your report.  Okay?

30 (Pages 114 - 117)

Page 126

1 have a recollection one way or another as to
2 whether you analyzed clinical data for any of the
3 chemotherapy patents you worked on?
4      A.   I can only answer with it's possible.
5 Because I don't recall a specific one that you're
6 asking me.  I -- I -- I don't know.
7      Q.   And do you know whether you analyzed any
8 alopecia or hair loss data for any chemotherapy
9 patents you worked on?
10     A.   Again, it's possible.  But I can't recall
11 one as I sit here.
12     Q.   Prior to your involvement with this
13 litigation, had you done any work specifically
14 comparing Taxotere to Taxol?
15     A.   No, I had not.
16     Q.   Had you done any work comparing the
17 safety or efficacy of Taxotere or Taxol?
18     A.   No.  I don't believe I had.
19     Q.   Have you ever done any work
20 professionally where you examined the efficacy or
21 safety profile of other taxanes?
22     A.   Did you preface that with regulatory
23 work?  Or just any work?
24     Q.   Have you ever compared or studied the
25 efficacy or safety profile of other taxanes?

Page 127

1      A.   Yes.  I have done that in the context of
2 my patent work.  So part of that was looking at the
3 information and describing it based upon the data
4 that was collected.  And I have inventors that have
5 used taxanes in combination with other drugs in a
6 utility patent.
7      Q.   And did you specifically look at any hair
8 loss data?
9      A.   I don't remember.  I don't -- don't
10 recall whether I did or not.  But I do recall
11 working specifically with paclitaxel in a couple of
12 the applications that I've worked on.
13     Q.   Other than your work here, have you
14 specifically studied or examined the efficacy or
15 safety profile of any of the chemotherapies that
16 are typically administered in the breast cancer
17 setting, for example, doxorubicin,
18 cyclophosphamide, 5-FU?
19          MR. MICELI:  Object to the form.
20     A.   So in the past and in the work I have
21 done -- and I know on the patent applications I've
22 worked on, 5-FU was often a drug that was described
23 or discussed, and I believe cyclophosphamide as
24 well.
25          I don't recall the details of --

Page 128

1 of the data that I looked at.  But certainly those
2 are drugs that I was -- before I took this project,
3 I was familiar with the pharmacology and toxicology
4 based on some things I had -- I remember having
5 read in the past.
6      Q.   (BY MS. SASTRE)  When did you review
7 these patent applications that you're referring to?
8      A.   It'd be sometime -- well, I mean, the
9 work would have been sometime between 1999 and
10 probably -- I don't think it was the last year or
11 so.  So maybe 2015.
12     Q.   And how many chemotherapy patent
13 applications have you been involved in?
14     A.   I told you I think -- I'm guessing about
15 a dozen.  But I -- I -- I don't know an exact
16 number.
17     Q.   Would you be involved with patent
18 applications for medications if you believed that
19 their risks outweighed their benefits?
20     A.   It's a different issue.  No, I mean,
21 patent applications don't have to do with weighing
22 risks and benefits for patients.  That's -- that's
23 an issue related to either regulatory approval or
24 related to a patient decision.  And a patent
25 application has a different focus altogether.

Page 129

1      Q.   Well, I understand.
2           But my question is:  Would you be
3 involved in patent applications for a group of
4 medications if you believed that their risks
5 outweighed their benefits?
6           MR. MICELI:  Object to the form.
7      A.   And I can only answer the way I did.
8 That isn't a question that you ask as a patent
9 agent.  As patent agent, you're not weighing risks
10 and benefits.  What you're doing is describing the
11 information that you have.
12          The drugs I have worked on, I can
13 tell you are -- are -- have mostly been utility
14 patents for new uses of old combinations.  And I
15 believe these drugs that I've worked on were all
16 ones that are approved by FDA.
17          That's the best I can answer for
18 you.  But it's not a question you ask as a patent
19 agent.
20     Q.   (BY MS. SASTRE)  When -- well, it's not
21 like when you're a patent agent, the rest of your
22 life doesn't exist, right?
23     A.   Well, no, the rest of my life always
24 exists.  But you have different -- you have a total
25 different -- you have a different job --

33 (Pages 126 - 129)

Page 134

1 that question based on the patent work I had done.
2        So I -- I have not worked with a
3 company, that I can recall from one of these drugs
4 in my report, that had to do with initial approval.
5 So I don't recall that from Environ.
6    Q.  (BY MS. SASTRE)  So all of the patents
7 you were involved with had to do with combining
8 medications?
9    A.  Or new uses.  No, not necessarily.
10 Sometimes it was single agents.  Like, I recall --
11 I recall working on maybe paclitaxel for a new -- a
12 different use, not for -- not in combination even.
13    Q.  You agree that all chemotherapies have a
14 unique risk profile?
15    A.  I would agree that's generally true, yes.
16    Q.  And then you're analyzing -- well, strike
17 that.
18        Did you analyze the unique risk
19 profile of Taxotere?
20    A.  So I --
21        MR. MICELI:  I'm sorry.  Go
22 ahead.  I'm not going to object to that one.  Go
23 ahead.
24    A.  That is not how I would describe what I
25 did.  I would say I -- I researched the risk

Page 135

1 profile of Taxotere.  I don't describe it, when I
2 start my analysis, as being unique.  But I
3 certainly looked individually for what I could find
4 on Taxotere itself.
5    Q.  (BY MS. SASTRE)  Did you analyze the risk
6 profile for Taxol?
7    A.  Yes.  Based on what I could -- what I
8 could understand, yes, from what was available.
9    Q.  And when you analyze the risk profiles
10 for Taxotere and Taxol, were you able to isolate a
11 single toxicity to compare them with regard to each
12 of these drugs?
13        MR. MICELI:  Object to the form.
14    A.  So I don't think I quite understand what
15 you mean by a single toxicity.
16        If what -- if what you're asking
17 me, are there studies that focus on an individual
18 toxicity, absolutely there were studies like that.
19 Are you asking me did I -- did I try to only look
20 at a particular toxicity?
21        Which -- which question are you
22 asking me?
23    Q.  (BY MS. SASTRE)  Were you focused on a
24 particular toxicity?
25    A.  I was focused on the difference in the

Page 136

1 drugs on permanent alopecia.  But I also looked
2 generally.  And you should know that from my
3 report.  I -- I started out by looking at the
4 overall risk profile.  Because I -- I give you a
5 background on Taxol and Taxotere and what they are
6 pharmacologically and toxicologically.
7    Q.  Well, you'd agree with me that all
8 chemotherapies have a multitude of toxicities?
9        MR. MICELI:  Object to the form.
10    A.  I think you already asked that, and I
11 told you yes, I agreed.  I do.
12    Q.  (BY MS. SASTRE)  Okay.  And so tell us
13 everything you specifically do to measure or
14 compare each toxicity of Taxol to each toxicity of
15 Taxotere?
16    A.  So I don't know if I can tell you every
17 step I did.  But I can tell you what I -- I can
18 tell you generally what I did.
19        So I did -- I did first basic
20 research on the pharmacology of the drug, starting
21 with what is known in textbooks, then looking at
22 the literature for what is -- you find with the
23 review papers.
24        And then I also looked at the
25 labeling of the drugs to look at the -- what is

Page 137

1 described based on that.  And I also looked for
2 these head-to-head studies in the particular
3 population of interest, breast cancer.  And I talk
4 about the -- the -- the 311 study in my -- in my
5 report.
6        So I looked at what was available
7 publicly in the areas of either the scientific
8 literature within the files of the company that --
9 where there might have been head-to-head data.  I
10 looked -- and then the labeling for the drugs.
11        And I also did go to the FDA
12 websites to look at what I could identify in a
13 summary fashion from FDA.  There was more available
14 on Taxotere than there was based on Taxol.  But
15 there were some summary information on some of the
16 FDA reviews.
17    Q.  Okay.  So did you isolate individual
18 toxicities for Taxol and Taxotere and compare them
19 to one another?
20    A.  The isolated toxicity that I focused on
21 was the issue of alopecia and permanent alopecia.
22    Q.  Uh-huh.
23    A.  Other than that, I looked generally at
24 the profiles to see how they compared.  So I didn't
25 try to determine what the rate of infection overall

35 (Pages 134 - 137)

Page 138

1 was for one drug versus the other. They both carry
2 the risks of infection and neutropenia. They both
3 carry similar -- similar other endpoints of
4 toxicity.
5         But my focus in this was
6 answering questions about whether or not there is a
7 difference in -- in terms of permanent alopecia.
8     Q.  Okay. So you said that you were focused
9 on the toxicity and the risk of permanent alopecia,
10 true?
11     A.  Yes, I was.
12     Q.  Okay. And so other than the risk of
13 permanent alopecia, tell us what other toxicities
14 you isolated and compared, if any, between Taxol
15 and Taxotere.
16     A.  Well, I don't think I isolated anyone
17 else as a focus. But certainly they're all -- they
18 were all within my analysis. So in individual
19 studies, I looked at what was isolated in those
20 studies.
21         So, for example, 311 looks at, I
22 think, mortality. I can pull my paragraph out
23 again. But there are certain ones I mentioned in
24 there. So I looked at those in that study as they
25 were isolated by that particular head-to-head

Page 139

1 comparison.
2         But most of the scientific
3 literature describes a lot of commonality as far as
4 the qualitative description of the risk. It's --
5 where they can differ is in the quantitative
6 description of the risk.
7     Q.  But if we asked you to specifically
8 identify how the cardiac risk between Taxol and
9 Taxotere compared, are you prepared to do that
10 today?
11     A.  I haven't formed a specific opinion to
12 tell you percentage of patients were at risk, no.
13 But certainly they both carry -- they -- they can
14 both carry that risk mostly because they're both
15 used in combination also with both carrying cardiac
16 risk.
17     Q.  Did you -- did you do a ranking or weigh
18 the importance of any of the toxicities of Taxotere
19 and Taxol?
20         MR. MICELI:  Object to the form.
21     A.  I don't believe I did a ranking. But how
22 I -- how I would describe a ranking --
23     Q.  (BY MS. SASTRE)  Uh-huh.
24     A.  Because I wasn't doing a full risk
25 benefit assessment as -- as a doctor would do where

Page 140

1 you might make those decisions for a patient.
2 Because as a pharmacologist, all of those things
3 that can occur toxicologically for a compound can
4 be important -- more important in one patient
5 versus another.
6         So as a pharmacologist and
7 toxicologist, you describe the profile. In this
8 case, I was then asked to look at the issue of one
9 particular endpoint and whether or not there was a
10 difference. And there absolutely does appear to be
11 a difference based on the information that's
12 publicly available.
13     Q.  But my question is that: You did not
14 weigh the importance of one toxicity compared to
15 another, for example, cardiotoxicity to hair loss?
16     A.  True --
17         MR. MICELI:  Object to the form.
18     A.  I think I answered that. I did not rank
19 them individually. Instead, I looked across the
20 profile.
21     Q.  (BY MS. SASTRE)  Okay. You agree that
22 FDA has never requested that permanent alopecia be
23 included in the warning section for Taxotere?
24         MR. MICELI:  Object to the form.
25     A.  I can't answer that they never have.

Page 141

1 Because I haven't done an analysis of all the
2 documents from FDA that are within the files. I'm
3 not aware of it being there.
4     Q.  (BY MS. SASTRE)  Okay. You've seen no
5 documents or materials which would indicate that
6 FDA ever made such a request?
7         MR. MICELI:  Object to the form.
8     A.  Again, based on what I've seen, which is
9 limited -- I only have -- I have seen some limited
10 information about this issue in some of the
11 exhibits to depositions I reviewed. But I -- that
12 was not a focus of my analysis. I -- I was not
13 doing regulatory opinions where I think that would
14 be important.
15     Q.  (BY MS. SASTRE)  Right.
16         MR. MICELI:  Excuse me.
17     Q.  (BY MS. SASTRE)  Putting aside whether
18 something is a focus or not, you did review FDA
19 documents, true?
20     A.  I reviewed some, yes. But not -- I
21 certainly did not do an assessment -- the answer to
22 that question that you've asked me, as a scientist
23 and a pharmacologist and someone who deals with
24 regulatory issues for my clients, what I did would
25 not allow me to answer that question yes or no.

36 (Pages 138 - 141)

Veritext Legal Solutions
800-227-8440                     973-410-4040

1    Q.  Okay.  So when you look at Taxotere being
2  provided in the combination setting, which it was
3  in the studies that you relied upon, you do not
4  have an opinion as to whether it was the Taxotere,
5  the Adriamycin or the cyclophosphamide which was
6  the cause of any specific individual patient's hair
7  loss.
8          You've not done that analysis,
9  true?
10   A.  For specific patients, no.  But I do have
11  an opinion that I've expressed in my report about
12  the issue of the way to interpret the data, for
13  example, in the 316 study.  And I think I have
14  expressed that.
15          But I believe that the
16  information in that study allows you to conclude
17  that Taxotere shows an increased risk of that event
18  as compared to the comparator arm of the study.
19   Q.  But you did not specifically do a
20  causation analysis with regard to Taxotere, true?
21       MR. MICELI:  Object to the form.
22   A.  I answered that.  I'm not the -- it's --
23  I am not the causation expert in these cases.  It's
24  my understanding of that that is not my role.
25   Q.  (BY MS. SASTRE)  And, likewise, Doctor,

1  you did not do a causation analysis with regard to
2  Adriamycin, correct?
3       MR. MICELI:  Same objection.
4   A.  Yes.  That is true.  Again, I am not a
5  causation expert in this litigation.
6   Q.  (BY MS. SASTRE)  And you didn't do a
7  causation analysis with cyclophosphamide, true?
8   A.  Not in the --
9       MR. MICELI:  Same -- excuse me.
10  Same objection.
11   A.  That is true.  Not in the context of what
12  I would consider a causation analysis.  That is
13  true.  I do that sometimes.  But that is not what I
14  was asked to do here.
15   Q.  (BY MS. SASTRE)  You -- you could do it,
16  right?
17       MR. MICELI:  Object to the form.
18   A.  I have done that in other cases I've
19  worked on.  But I have not been asked to do that
20  here.
21   Q.  (BY MS. SASTRE)  Okay.
22   A.  And it was not something that I started
23  out to do even at the beginning of my work.
24   Q.  And when we say causation analysis, just
25  to be clear, we're talking about you have not

1  specifically analyzed causation in terms of
2  Taxotere, Adriamycin and cyclophosphamide being the
3  cause of permanent alopecia, true?
4       MR. MICELI:  Object to the form.
5   A.  That is correct.  Because there, you're
6  talking about specific individuals.  And I have not
7  done that.
8   Q.  Okay.
9       MS. SASTRE:  Let's go ahead and
10  take a break.
11       MR. MICELI:  Okay.
12       MS. SASTRE:  Thanks.
13       THE VIDEOGRAPHER:  We're off the
14  record at 12:14.
15       (Recess taken.)
16       THE VIDEOGRAPHER:  We're back on
17  the record at 12:55.
18   Q.  (BY MS. SASTRE)  Thank you.  Welcome back
19  from lunch.
20          All right.  Dr. Plunkett, before
21  we broke, I was asking you whether you reviewed
22  clinical trials that looked at Taxotere and Taxol
23  in the single drug setting and analyzed a rate for
24  permanent alopecia.
25          Do you recall that question?

1   A.  Yes.  I think we did discuss that.
2   Q.  Okay.  So I'm going to ask you a
3  variation of that question, which is:  Did you
4  review any clinical trials in the combination drug
5  setting that specifically looked at Taxotere plus
6  other chemotherapy drugs and Taxol plus other
7  chemotherapy therapy drugs and specifically looked
8  at hair loss rates?
9   A.  No.  There's no such studies done by the
10  company on either of those issues.
11   Q.  What about another company?
12   A.  I have not seen any in the scientific
13  literature either.
14   Q.  Okay.  And as you sit here today, have
15  you specifically determined what is the incidence
16  rate for permanent alopecia or hair loss for
17  taxanes as a group and non-taxane chemotherapy
18  medications?
19       MR. MICELI:  Object to the form.
20   A.  I have not formed an opinion about one
21  specific rate, no.
22   Q.  (BY MS. SASTRE)  And as you sit here
23  today, have you determined what is the incidence
24  rate for Taxotere when it is given as a single
25  treatment in the incidence for -- strike that.  Let

Page 162

1  me start that question over.
2          Have you determined what is the
3  incidence rate for permanent alopecia when Taxotere
4  is given as a single treatment for monotherapy?
5          MR. MICELI:  Object to the form.
6     A.  If by that question, you are asking me
7  for a specific number, I have not formed an opinion
8  that it is this specific number.
9     Q.  (BY MS. SASTRE)  Okay.  Have you
10 determined -- you said that you looked at an
11 incidence rate that was provided in T-A-X or
12 TAX 316, which was a clinical trial, true?
13    A.  Yes.
14    Q.  And it -- in that trial, Taxotere was
15 given with Adriamycin and cyclophosphamide,
16 correct?
17    A.  Yes.
18    Q.  And have you determined, in the context
19 of TAX 316, what is the specific incidence rate for
20 permanent alopecia for either Adriamycin or
21 cyclophosphamide?
22    A.  Are you asking me in the -- did they do
23 that in the trial?  Is that what you mean by in the
24 context of the trial?
25    Q.  We can start with that.  Did they do it

Page 163

1  in the trial?
2     A.  No, they did not.  Because they only gave
3  combination therapy in --
4     Q.  And --
5     A.  -- in that particular trial.
6     Q.  And are you able to do that today,
7  provide -- have you determined what is the
8  incidence rate for permanent hair loss associated
9  with Adriamycin?
10    A.  I think I answered that for you earlier.
11 I said no, I do not -- I have not formed an opinion
12 on a specific rate.
13    Q.  And nor have you done that with regard to
14 cyclophosphamide, correct?
15    A.  For a specific number, that is true.  I
16 have not.
17    Q.  Okay.  And when Taxol is given in a
18 single drug or monotherapy setting, have you
19 determined what is the incidence rate for Taxol
20 with regard to permanent alopecia?
21    A.  No.  I have not done an analysis to
22 determine what a specific rate would be.
23    Q.  And could you tell me what is the
24 incidence rate for permanent alopecia -- strike
25 that.

Page 164

1          Have you determined what is the
2  incidence rate for permanent alopecia when Taxol is
3  given in the combination drug setting?
4     A.  Not a specific rate, no.
5          MS. SASTRE:  Okay.  Just give me
6  one second.  I'm just going to try to find my
7  place.
8          (Discussion off the record.)
9     Q.  (BY MS. SASTRE)  Have your opinions ever
10 been disqualified by any court?
11    A.  I don't know what you mean by
12 "disqualified."  Are you using it as a legal term
13 or...
14    Q.  Have your opinions ever been limited by
15 any court?
16    A.  I've put -- had limitations on my
17 opinions before, yes.
18    Q.  What litigation was that?
19         MR. MICELI:  Sorry about that.
20    A.  I can't tell you every one.  But the ones
21 I'm aware of, there were limitations placed --
22 let's go as far back as I can recall.  It might be
23 Bay Call litigation back in 2003, 2004.  There were
24 some limitations in that.
25         There were some limitations

Page 165

1  placed on my testimony.  I believe it's been 15
2  documents about the Vioxx litigation.
3          There were some limitations
4  placed on me in -- on one aspect in the -- I'm
5  trying -- I don't remember the name of the case,
6  but it was a case involving children's Motrin and
7  SGS.
8          I believe the Tylenol litigation,
9  there was a limitation placed on one aspect of my
10 testimony.
11    Q.  (BY MS. SASTRE)  Do you recall what the
12 limitations were that were placed on your testimony
13 in these various matters?
14    A.  Generally I can speak to those four.
15 I -- like I said, I don't -- I -- I -- sometimes
16 I'm not aware of if they're placed.  But those
17 four, I have spoken about before, yes.
18    Q.  And what are they generally?
19    A.  So in Bay Call, there was one section of
20 the labeling that I was opining about that the --
21 the judge in Mississippi wanted me to -- did not
22 want me to opine about because he felt that a
23 physician should rewrite that section of the
24 labeling.  And I'm not a physician.  So I was not
25 allowed to do that.

42 (Pages 162 - 165)

Page 178

1 human health risk assessment for any adverse health
2 effects other than permanent alopecia?
3     A.  Well, I formed a general human health
4 risk assessment for overall toxicity as well, to
5 start with, looking at the comparative profiles.
6             And that's where Study 311 is
7 important, because it does a general head-to-head
8 comparison in patients with breast cancer, humans,
9 that allows you to do a head-to-head comparison
10 overall in toxicity.  So yes, I did use that.
11            And that allows us, actually, to
12 quantify because they actually quantified the
13 overall differences between the two drugs in that
14 particular trial.
15     Q.  Okay.  I want you to put aside general
16 toxicity.
17            I'm going to ask you a very
18 specific question, which is:  Did you perform a
19 human health risk assessment for any other specific
20 adverse health effects for Taxotere other than
21 permanent alopecia?
22     A.  No.  That's the -- that's the only other
23 specific -- that's the specific endpoint I looked
24 at within first looking at the risks -- comparative
25 risks overall.

Page 179

1     Q.  With regard to -- strike that.
2             Did you perform a human health
3 risk assessment for permanent alopecia for any
4 other chemotherapy medications besides Taxotere?
5     A.  I did perform a similar assessment with
6 what was available.  Unfortunately I didn't have
7 access to the same level of data for some of the
8 other compounds.  So as a result, my risk
9 assessment there is more restricted in terms of the
10 information that I relied upon.
11            But I certainly did look at the
12 issue of comparative -- comparative risk within the
13 other -- with some of the other agents, relying
14 mainly on discussions in the medical literature or
15 the labeling for the drug versus actually having
16 access to a company's specific data.
17     Q.  Okay.  So for what -- what drugs besides
18 Taxotere did you perform a human health risk
19 assessment for as it relates to the adverse health
20 effect of permanent alopecia?
21     A.  So I did that for Taxol, as I described
22 for you earlier.  I told you that I looked at
23 the -- the issue of -- looked for the issue of what
24 was available on Taxol.  And I certainly talked to
25 you about that.

Page 180

1             The paragraph that I read for you
2 where I -- I may have read it into the record.  The
3 ones that I talk about as far as permanent
4 alopecia, that would be the Paragraph 40 -- if I
5 remember this right -- I don't know --
6 Paragraph 49.
7     Q.  Uh-huh.
8     A.  I talk about that, that issue, as far as
9 comparing the risk --
10     Q.  Okay.
11     A.  -- and what's available.  And
12 unfortunately -- like I said, unfortunately, yes,
13 that's true.  I don't have the same level of data.
14     Q.  Right.
15            But my question -- I -- I know
16 you keep referring me to your report.  And I don't
17 have any issue with you doing that.  But I -- I do
18 need an answer to my question as opposed to just
19 saying, It's in my report.
20            So my question is:  By name,
21 please identify every medication, other than
22 Taxotere, where you performed a human health risk
23 assessment related to the adverse health effect of
24 permanent alopecia.
25            MR. MICELI:  Object to the form.

Page 181

1     A.  So I considered the drugs in
2 Paragraph 49.  I looked at the -- the information
3 that I could find in the published medical
4 literature and/or the labeling for prednisone,
5 cisplatin -- these are the ones we read into the
6 record earlier -- doxorubicin, cyclophosphamide.
7 So those are the ones.
8             And I think -- I think you asked
9 me this question earlier, and I went through these
10 for you.  I said these are the ones that I
11 considered, what was available in the published
12 literature or not and then also what was stated in
13 the label for the -- for the drug.
14     Q.  (BY MS. SASTRE)  Well, I didn't ask you
15 about human health risk assessments before this.
16 So this is a little different.
17            So you performed -- let me see if
18 this list is correct -- a human health risk
19 assessment analyzing the adverse health effect of
20 permanent alopecia for Taxol, doxorubicin,
21 cyclophosphamide, cis-- -- I always have trouble
22 with that one.
23     A.  Cisplatin.
24     Q.  Cisplatin, prednisone and 5-FU, correct?
25     A.  Yes.  I attempted to do that.

46 (Pages 178 - 181)

Page 182

1    Q.  You agree that you didn't do that for any
2  of the hormone inhibitors or modulators like
3  tamoxifen or Arimidex, correct?
4       A.  I did not consider those at this point in
5  time.  That is true.
6       Q.  Why were those excluded from your
7  analysis?
8       A.  They weren't ones that I had seen
9  described within the clinical studies that I had
10 looked at and also weren't ones that came up in my
11 searches for permanent alopecia.
12      Q.  Do you know how many patients in TAX 316
13 were on hormone therapy, please?
14      A.  I'd have to go look.  I'm sure it's
15 reported if they were.  And I'd have to go look.  I
16 don't know off the top of my head.
17      Q.  Can you do that?
18      A.  I'd have to pull the file.  So I would
19 need some assistance with looking at the electronic
20 files.  I don't have the -- I don't have them in
21 front of me.
22      Q.  What's your best estimate as you sit
23 here?  What is the number of patients in TAX 316
24 that were on hormone therapy?
25           MR. MICELI:  Object to the form.

Page 183

1       A.  I can't tell you off the top of my head.
2  I don't know.
3       Q.  (BY MS. SASTRE)  Can -- can you give me
4  an estimate by percentage?
5           MR. MICELI:  Object to the form.
6       A.  I -- I can't do that without looking at
7  the study.
8       Q.  (BY MS. SASTRE)  Okay.  And you did look
9  at the study, though, true?
10      A.  I looked at the study that was available
11 to me, yes, in the clinical study report, yes.
12      Q.  And TAX 316 is an important piece of
13 information that you rely upon for your conclusions
14 in this matter, true?
15      A.  It's one of the pieces, yes, that's
16 correct.
17      Q.  All right.  And as you sit here today,
18 you don't have any estimate whatsoever as to what
19 is the percentage of patients that were taking
20 hormone therapy within TAX 316, true?
21      A.  No.  I would have to look at the study.
22      Q.  And that is true despite the fact that
23 you agree that hormone therapy has been associated
24 with hair loss, true?
25           MR. MICELI:  Object to the form.

Page 184

1       A.  In general with alopecia, yes, it does.
2       Q.  (BY MS. SASTRE)  And with permanent hair
3  loss, true?
4           MR. MICELI:  Object to the form.
5       A.  I -- I don't know that I answered that
6  for you.  I said I hadn't done that assessment, I
7  thought.  I -- I think I probably told you it's
8  hair loss, yes.
9       Q.  (BY MS. SASTRE)  And so to the extent
10 that hormone therapy was a confounding factor or a
11 cause of a patient's hair loss in TAX 316, you're
12 not able to tell us what percentage of patients may
13 have suffered some hair loss from those
14 medications, true?
15           MR. MICELI:  Object to the form.
16      A.  I can't answer any question specifically
17 to percentages of patients with -- with that
18 without looking at the study.
19      Q.  (BY MS. SASTRE)  Right.  Let me --
20      A.  So I can't -- I'd have to -- I would have
21 to look at the study to answer that question.
22      Q.  Right.
23           You -- the question of what role
24 the hormone therapy played with regard to permanent
25 hair loss in TAX 316 is an analysis that you didn't

Page 185

1  perform, true?
2       A.  I have not done a separate analysis.  I
3  would -- but I would point out that if you look at
4  the study itself, the company themselves has done
5  an analysis that links the actual relationship
6  between Taxotere use and permanent hair loss.  I
7  mean, that is the finding of the company when
8  they -- they analyze the data.
9           MR. MICELI:  Excuse me.
10      Q.  (BY MS. SASTRE)  So step one for a human
11 health risk assessment is to identify the hazard,
12 correct?
13      A.  Yes.
14      Q.  And so did you identify permanent hair
15 loss as a hazard of Taxol, 5-FU, doxorubicin,
16 cyclophosphamide, cisplatin and prednisone?
17      A.  Identified alopecia initially.  And then
18 I looked within that for permanent alopecia as
19 well.
20      Q.  Okay.
21      A.  Within the -- and I already told you
22 within some of those drugs, I did not see
23 information that indicated that the hazard would be
24 permanent hair loss for all of those drugs.
25      Q.  But you did see it for Taxol?

47 (Pages 182 - 185)

Page 186

1    A.  Yes, I did.
2    Q.  And you did see it for doxorubicin,
3  correct?
4    A.  Yes.  And for cyclophosphamide.  And I
5  think I told you another one that I looked at that
6  isn't discussed in that paragraph.  I did --
7  because I pulled literature, and there is
8  literature on busulfan, which is not used for
9  breast cancer.  But --
10    Q.  And you -- you also saw it for 5-FU,
11  correct?
12    A.  Yes.  Well, you see it in -- 5-FU in 316,
13  you do see a few cases in combination with
14  Adriamycin and cyclophosphamide.
15    Q.  So it was only for prednisone you did see
16  permanent hair loss; is that fair?  And for all the
17  other medications, you did?
18    A.  Hold on.  I don't think that's true.
19  Hold on.  I'm going to look at what I said
20  specifically.  Let's see.  (Examines document.)
21        So if you're just talking about
22  hazard -- you just want to limit this to hazard,
23  not to -- not to risk?
24    Q.  Well --
25    A.  That's two different things.  So that's

Page 187

1  why my paragraph here addresses more of the issue
2  of risk than just hazard.  But certainly if you
3  want to talk about hazard, I would agree that on
4  the issue of hazard, I considered that a potential
5  hazard for all of those drugs.
6        But then on the next step, you
7  have to look at what information you have and
8  whether or not you believe it is indeed a true
9  risk.
10    Q.  Okay.  Step two of a human health risk
11  assessment is to do a dose response assessment,
12  true?
13    A.  You attempt --
14        MR. MICELI:  Object to the form.
15    A.  You attempt to do that if possible, yes.
16    Q.  (BY MS. SASTRE)  And the goal of that is
17  to find a threshold of exposure beyond which the
18  subject that you're testing will cause the adverse
19  effects, true?
20    A.  Yes.  You attempt to look for that.
21    Q.  And did you do that here for Taxotere?
22    A.  I did attempt to look for that for
23  Taxotere, yes.
24    Q.  And what is the results of your looking?
25    A.  You can't find just one threshold for

Page 188

1  Taxotere.  Although, there does appear to be dose
2  information available.  And I -- I discuss that in
3  a paragraph.  There's at least three pieces of
4  information that provide some information on dose.
5    Q.  So you don't know, in the context of your
6  human health risk assessment, what the dose
7  response is for Taxotere, true?
8    A.  No one has done a definitive study to
9  give us the definitive dose response, no.
10    Q.  Okay.  And do you know --
11    A.  But we do know --
12    Q.  Sorry.  Go ahead.
13    A.  But we do know that the doses that have
14  been used clinically are ones that have been --
15  have been associated with that adverse event.
16    Q.  What's the dose response assessment for
17  Taxol?
18    A.  The dose response assessment of Taxol is
19  I don't have enough information, again, to identify
20  a specific dose.
21        But at the doses approved for use
22  clinically, at least within the studies that are
23  available and some of the things described out
24  there in the clinical literature, in the medical
25  literature, there -- it certainly has been shown to

Page 189

1  occur in some cases.
2    Q.  You'd agree with me you don't know what
3  the dose response assessment is for any of the
4  drugs for which you performed a human health risk
5  assessment, true?
6    A.  I don't believe that the studies have
7  been done that allow you to do that.  That's
8  correct.  So if the studies haven't been done, I
9  can't tell you what that is.
10    Q.  Do you know whether it would be a single
11  dose or a cumulative dose?
12    A.  For what?
13    Q.  Let's start with Taxotere.
14    A.  Are you asking me for permanent alopecia
15  as a whole?
16    Q.  Yes.  With regard to the hazard that you
17  identified and were doing a human health risk
18  assessment for.
19    A.  So the data I have indicates that it
20  would be something that is going to occur with
21  clinical use.  So it would be multiple treatments.
22  I don't think I have a study that they only gave
23  one dose.
24    Q.  But you don't know how many treatments,
25  correct?

48 (Pages 186 - 189)

Page 194

1 studies done by the company were -- were important
2 because they actually have studies where they
3 reported differential risk of permanent alopecia
4 with different drug -- drug comparisons.
5          In the -- in the case of Taxol,
6 the majority of the information that I relied upon
7 is going to be coming from the medical literature
8 or from the labeling for the drug where they
9 describe some of the clinical experience.
10         And for the other drugs, it would
11 be the same answer.  It would be looking at what
12 was available from the scientific literature as
13 well as what I found discussed within in the
14 labeling of the product.
15    Q.  So the single most important piece of
16 evidence that you have for Taxotere were the
17 clinical trials that you listed, TAX 316, TAX 311
18 and GEICAM?
19          MR. MICELI:  Object to the form.
20    A.  I wouldn't say single most important.
21 But it was definitely a very important piece of
22 evidence that I -- that I relied upon because it
23 actually quantified differences between Taxol and
24 compared antineoplastic drugs.
25    Q.  (BY MS. SASTRE)  Okay.  And I'm not sure

Page 195

1 if I said the single.
2          But some of the most important
3 pieces of evidence or information that you relied
4 upon were the studies that you listed, TAX 316,
5 TAX 311 and GEICAM, true?
6    A.  Those were certainly very important
7 pieces of evidence for Taxotere, yes, absolutely.
8    Q.  That clinical trial information, you did
9 not have for any of the other medications or drugs
10 that you studied, including Taxotere, including
11 5-FU, including doxorubicin, cyclophosphamide,
12 correct?
13    A.  I can't say that I had no clinical
14 information.  Because the labeling described
15 clinical information that was available for those
16 drugs.  But certainly I did not have the same
17 access to confidential documents.  So that -- there
18 is a different level of analysis that you can do
19 when I actually have access to the clinical study
20 reports, for example.
21          (Discussion off the record.)
22    Q.  (BY MS. SASTRE)  Okay.  Okay.  Did you
23 assign a specific amount of weight to the
24 information that you relied upon?
25    A.  I don't know what you mean by specific

Page 196

1 weight.  It's not like there's a numerical factor.
2 Is that what you mean by specific weight?
3    Q.  Did you somehow put them in some order as
4 to what was the most important to your opinions to
5 the least important?
6    A.  To some extent, yes, I do do that in any
7 of my weight of the evidence analysis.  So, for
8 example, if I'm looking at something like this,
9 permanent alopecia, which is something that I
10 wouldn't be able to see that specific endpoint
11 demonstrated in animal studies --
12    Q.  Uh-huh.
13    A.  -- instead I would be relying -- I would
14 be looking for human data and human experience,
15 absolutely.  That would be information that would
16 be -- would be of importance to forming that
17 opinion with permanent alopecia.
18          You can get information sometimes
19 on alopecia from animal studies, general alopecia,
20 drug-induced alopecia.  But I've not seen an animal
21 model that would be -- that I have seen used in
22 the -- for the specific endpoint of permanent
23 alopecia.
24    Q.  Okay.  And I guess all I'm saying is that
25 there is hierarchy, how to evaluate medical

Page 197

1 information and scientific information, true?
2    A.  I don't know if there's a hierarchy.  But
3 there is a -- there is a process that has to be
4 considered.  So there's some questions you ask as a
5 human health risk assessor where animals are
6 directly relevant and some cases where they're not.
7 So you have to do that.
8          That is -- it's not so much a
9 hierarchy as an important decision point.  Do
10 you -- can you answer the question you want to
11 answer based on animals and humans?  Or do you
12 really need to rely on the human data?
13          And that's an answer that I --
14 that I came to here.  I needed to have access to
15 human data, which we did.
16    Q.  Do you agree that limitations on studies
17 should affect how you weigh that evidence?
18    A.  They can.  And they do in some cases.  It
19 depends on the aspect of that limitation.  What --
20 what do you mean by the limitation?  There's some
21 limitations that are just inherent in the design of
22 studies.  So you understand that as a scientist,
23 but it's not something that -- you don't discount
24 the study because it's something that you just
25 can't control.

50 (Pages 194 - 197)

1          MR. MICELI:  You can ask a
2  question.
3          Q.  (BY MS. SASTRE)  You understand that I'm
4  entitled to ask you questions about your opinions,
5  right?
6          A.  Yes.  Absolutely.
7          Q.  And you understand that I'm entitled to
8  ask you questions about the bases for those
9  opinions, true?
10         A.  Absolutely.
11         Q.  And you understand that the materials you
12  get to develop and form those opinions are provided
13  to you by the attorneys that retained you, true?
14         A.  No.  Some of them are my own that I
15  searched out of the literature.  But certainly --
16         Q.  Yes.
17         A.  -- I don't disagree that -- on the issue
18  of the clinical studies you're talking about --
19         Q.  Yes.
20         A.  -- those would have been the clinical
21  study reports that were provided by attorneys, yes.
22         Q.  And -- okay.  And as you sit here today,
23  you have no idea whether they were ever sent to you
24  by counsel.  You just don't know?
25         A.  Well, I don't know what you're referring

1  to.  So in order to answer that question --
2          Q.  Okay.
3          A.  -- I need to see what it is you're
4  referring to.
5              (Discussion off the record.)
6          Q.  (BY MS. SASTRE)  You mentioned clinical
7  study reports.
8              Could you tell us what that is?
9          A.  So when a clinical trial is completed,
10  the investigators that participated or sometimes a
11  clinical research organization that was managing
12  the trial writes a clinical study report.
13              And the clinical study report is
14  a -- details all of the information that was
15  collected and gives you the protocol as well as
16  everything that happened during the performance of
17  the study.
18              (Discussion off the record.)
19         Q.  (BY MS. SASTRE)  Okay.  Did you have any
20  clinical study report for Taxol?
21         A.  For Taxol?
22         Q.  Yes, ma'am.
23         A.  No.  Because I did not have access to
24  the -- the confidential documents in the company,
25  which is where those would be -- would be found.

1          Q.  You know, you keep saying that you didn't
2  have access to certain materials.  But I'd like you
3  to tell the jury, please, and tell us every single
4  thing you did, either with the assistance of
5  counsel or on your own, to gain access to these
6  clinical trial materials for either Taxol, 5-FU,
7  doxorubin, cyclophosphamide, cis- --
8          A.  Cisplatin.
9          Q.  Cisplatin.  I'm going to write it better
10  this time.
11              Go ahead.  Tell us everything you
12  did, please.
13         A.  So I started with -- on my own with the
14  published literature, looking for what was
15  published that -- that described either clinical
16  experience or human experience in the area of those
17  drugs and permanent alopecia.
18              I started with the term alopecia,
19  and then I would limit it to permanent alopecia if
20  there were dozens and dozens of articles that came
21  up.  And none of those, did dozens and dozens come
22  up.
23         Q.  Uh-huh.
24         A.  But certainly I did -- I would have done
25  that.

1              And after that, I went to the FDA
2  website, Drugs@FDA.  And I downloaded the labeling
3  for each of those -- each of the drugs that I was
4  looking at.  And I looked -- because that's a
5  source of -- that'll be a source of information
6  about the clinical experience that's put into --
7  that is put into the labeling for the drug.
8              And in addition to that, it's not
9  only a source of clinical experience, but it also
10  will have post-marketing experience.  So many of
11  those post-marketing experience reports are ones
12  that aren't necessarily showing up in the published
13  medical literature.  But you can go there and see
14  what's been reported.
15              And then in addition to that, I
16  looked at Drugs@FDA to look at what types of
17  summary information may have been provided within
18  the -- any of the review documents that were or
19  were not available.
20              Many of the -- of the --
21  information on some of the older drugs, you can't
22  find the actual FDA review documents anymore on the
23  site.  So then you're limited to what's in the
24  medical literature and what is within the FDA
25  labeling or labeling changes made for the drug.

Page 214

1   Q.  But my question is limited to clinical
2 study reports.
3          You'd agree with me that missing
4 from your analysis are Taxol clinical study
5 reports, true?
6          MR. MICELI:  Object to the form.
7   A.  I did not have access to the confidential
8 documents, which is the only place for me to get
9 those clinical study reports in my experience of
10 looking at many, many, many drugs --
11   Q.  Uh-huh.
12   A.  -- and trying to determine what is
13 publicly available.  The only access -- the only
14 potential that I've ever seen -- and I actually
15 have worked on cases where I've made FOIA requests
16 before to FDA.  And sometimes it takes months.
17          My most -- most recent FOIA
18 request to FDA is a year and five months out, and I
19 still haven't gotten a response from them.  So as a
20 result, that's the other access point you can have.
21          When you make a FOIA request,
22 however, those kinds of documents such as the CSRs
23 are not something you'll be sent.  Because, again,
24 those are considered property of the company and
25 their -- their information that's confidential to

Page 215

1 them.
2   Q.  Now, I want you to please put aside all
3 of the reasons, the list of reasons as to why you
4 didn't review the clinical study reports or the
5 clinical trials for Taxol, 5-FU, doxorubicin,
6 cyclophosphamide or cisplatin.  Okay?  I'm not
7 asking you why.
8          My question is just simply:  You
9 would agree with me that you did not analyze the
10 clinical trial data for those drugs and you did not
11 analyze the clinical study reports for those drugs
12 as they relate to permanent alopecia, true?
13          MR. MICELI:  Hold on.  Object to
14 the form.
15   A.  Okay.  I disagree with the first part of
16 your question because the clinical trial data
17 analysis is within the labeling for almost all of
18 those drugs that I just mentioned.  And so that is
19 there.
20          On the issue of the clinical
21 study reports, absolutely.  I already told you I
22 don't have access so, therefore, I did not do that.
23   Q.  (BY MS. SASTRE)  Tell -- tell us
24 everything that the labels for 5-FU, doxorubicin,
25 cyclophosphamide or cisplatin and Taxol say with

Page 216

1 regard to hair loss data from their clinical files?
2   A.  So I brought copies of some of the ones
3 that -- it's not every -- every year, but I looked
4 at multiple years for the drugs.  But you asked me
5 for three of these -- or not you personally.  But I
6 was asked, through my counsel, the defense wanted
7 three of them.  And I did send three of those to
8 someone on the other side.
9          MR. MICELI:  CMO 14 requests in
10 production.
11   A.  Okay.  So this is an example of -- I
12 think this is one you may have asked for, the Taxol
13 label.
14          (Discussion off the record.)
15   A.  So --
16          MR. MICELI:  Let them finish
17 talking.  Because I don't -- I don't want the court
18 reporter to miss what you're saying.
19          (Discussion off the record.)
20          MS. SASTRE:  Yeah, let me --
21          MR. MICELI:  Do you want her to
22 answer the question?
23          MS. SASTRE:  Can I withdraw the
24 question?
25          MR. MICELI:  Okay.  Then strike

Page 217

1 the portion of her answer that she started.
2          MS. SASTRE:  Yes.
3          MR. MICELI:  Okay.
4          MS. SASTRE:  Yeah.
5   Q.  (BY MS. SASTRE)  So let me ask you
6 something more specific.  I'm talking about the
7 information contained within the clinical study
8 report.
9          The information contained within
10 the clinical study report for Taxol 5-FU,
11 doxorubicin, cyclophosphamide and cisplatin as it
12 relates to permanent alopecia is information that
13 you did not consider when rendering your opinions
14 in this matter?
15   A.  That is true if what you're describing is
16 having access to them to look at them.  That is
17 true.  I did not.  I can't confirm that some of the
18 information that's in those is not also in the
19 labeling.  And I would expect some of it to be
20 here.
21   Q.  Okay.  And I think we can agree upon the
22 fact that if you haven't looked at something, you
23 don't know what it says, right?  That's a truth we
24 can agree upon, true?
25   A.  Yes.  That is true.

55 (Pages 214 - 217)

Page 218

1    Q.  Okay.  And so whatever those clinical
2  study repots say for Taxol, 5-FU, doxorubicin,
3  cyclophosphamide or cisplatin, you do not know as
4  you sit here today?
5              MR. MICELI:  Object to the form.
6    Q.  (BY MS. SASTRE)  True?
7    A.  If you're asking me --
8              MR. MICELI:  Same objection.
9              THE WITNESS:  Oh, I'm sorry.
10             MR. MICELI:  I'm sorry.  I --
11             MR. RATLIFF:  She answered it.
12             MS. SASTRE:  You should just have
13  a standing objection to every question.
14             MR. MICELI:  I know.
15             MS. SASTRE:  You could.
16   Q.  (BY MS. SASTRE)  Go ahead.  Go ahead.
17   A.  So if by that question, you were
18  referring to what is actually contained within
19  those reports, that is true.
20   Q.  Okay.
21   A.  I have not seen them.  I can't tell you.
22  What I --
23   Q.  Okay.
24   A.  What I did try to tell you, however, I
25  believe that some of the information in them is the

Page 219

1  labeling.
2              (Discussion off the record.)
3    Q.  (BY MS. SASTRE)  All right.  Is it your
4  opinion that there are similarities between Taxol
5  and Taxotere?
6    A.  If you're asking as a general -- a
7  general --
8    Q.  Yeah.
9    A.  -- a general proposition, yes.
10   Q.  Okay.  And are there similarities in
11  terms of toxicities?
12   A.  Yes, there are some.
13   Q.  What are they?
14   A.  So they both -- they -- they both have
15  the ability to induce drug-induced alopecia.  They
16  both have the ability to be -- both of them are
17  associated with serious toxicity such as
18  neutropenia infections.  They both have been linked
19  to -- and I -- again, my report gives the exact
20  language.  (Examines document.)
21             They both have been linked to
22  drug-induced death.  They both have been linked --
23  linked to -- let's see -- overall increases in
24  adverse events as a group.  They both are linked
25  to -- both -- they're both linked to certain kinds

Page 220

1  of symptoms such as nausea, vomiting,
2  gastrointestinal upset.
3    Q.  Okay.
4    A.  Those are the ones off the top of my
5  head.  And I can pull the -- if you want, the
6  entire overlap list.  I'd have to pull the labels
7  and compare.  Both labels list a very similar
8  sequence of -- of qualitatively similar adverse
9  events and toxicities.
10   Q.  All right.  So you've listed some of the
11  similarities between Taxol and Taxotere.
12             You'd agree with me that there
13  are also some differences, true?
14   A.  Yes.  There are some differences.
15   Q.  Okay.  And there are also some
16  differences when it comes to toxicities, true?
17   A.  Yes, there are.
18   Q.  Okay.  And so can you tell us, in terms
19  of toxicities, what are the differences between the
20  two?
21   A.  That one, I'd have to pull out the -- the
22  label to tell you specifically.
23   Q.  Okay.  And so without doing a
24  label-by-label comparison, which of course anyone
25  can do if they can read, you can't tell us any

Page 221

1  differences in terms of toxicities?
2    A.  Well, they -- they have generally the
3  same basic toxicity profile.  But they -- what they
4  may differ in is some of the rates of -- of --
5  of -- that are reported in the clinical studies
6  that are shown in the labeling.
7              I'm trying to think if there's a
8  very specific one I would pull out that is very
9  different.  And I'd have to look at the label again
10  to answer that for you.
11   Q.  Do you know whether they have different
12  solubility agents?
13   A.  Formulation -- there are different
14  formulations, yes.
15   Q.  Okay.  Do you -- do you know what the
16  difference is in the solubility agents?
17   A.  Oh, I'd have to look at the labeling.
18  But certainly I have seen that before.
19   Q.  Are there certain toxicities which are
20  dose-dependent for Taxotere?
21   A.  Well, all of these drugs.  Both of them,
22  yes.  That's a general -- general principle for
23  these drugs.  There is dose-dependent toxicities,
24  yes.
25   Q.  And that's true for Taxol as well?

56 (Pages 218 - 221)

Page 222

1    A.  Yes, that's true.
2    Q.  And if we were to look at certain
3  toxicities, for example, peripheral neuropathy, you
4  understand that that's a toxicity of both
5  medications, true?
6    A.  Yes.  It's one that's been reported in
7  the clinical experience part.
8    Q.  But do you know what the incidence rate
9  is for peripheral neuropathy for Taxotere versus
10 Taxol?
11   A.  No.  I'd have to go to the labeling to
12 see if they -- if they report that.
13   Q.  Okay.  That's not something you analyzed
14 when you did your toxicity analysis, true?
15   A.  On specific occurrence rates'
16 differences, no, I did not.
17   Q.  Okay.  And what about neutropenia?  Do
18 you know what that is?
19   A.  Yes.  That -- I mentioned that, actually.
20 I thought I did.  I said neutropenia and infection
21 both.
22   Q.  Okay.  So do you know what the incidence
23 rate is for neutropenia for Taxol versus Taxotere?
24   A.  No.  I know it's common in both, but I
25 can't give you the exact incidence rate or the

Page 223

1  differential.  I'd have to look at the labeling.
2    Q.  And you also said you didn't know what
3  the incidence rate was for potential cardiac
4  complications, true?
5    A.  That is true.  Again, I told you I -- I
6  would have to look at the labeling.
7    Q.  All right.  And so despite that, you
8  reached the general conclusion that Taxotere is
9  more toxic than Taxol, correct?
10   A.  Yes.
11   Q.  All right.  And do you do that because
12 you are solely focused on the permanent alopecia
13 issue?
14   A.  No.
15   Q.  So in what way specifically, besides
16 permanent alopecia -- and I want you to list by
17 specific toxicity.  How is Taxotere more toxic than
18 Taxol by condition, please?
19   A.  This is the evidence that comes from the
20 Study 311 where they compared the head-to-head
21 monotherapy, Taxol versus Taxotere.  So it's
22 Sanofi's own data.
23          And if you look at that, the
24 overall toxicity pattern is greater -- in other
25 words, there -- there's more deaths, more overall

Page 224

1  adverse events generally for toxicity seen with
2  the -- the Taxotere versus the Taxol.
3    Q.  Okay.  But my question -- I appreciate
4  you telling me to go look at Study 311.  My
5  question is different.
6          You make a conclusion in your
7  report that is one of two final opinions that you
8  have in your conclusion section, which is one
9  paragraph long.  And you state Taxotere is more
10 toxic than Taxol.
11          And my question is:  With regard
12 to specific adverse health events, other than
13 permanent alopecia, for what specific conditions do
14 you believe Taxotere is more likely to cause that
15 condition as opposed to Taxol?
16          MR. MICELI:  Object to the form.
17   A.  And that's why I was pointing you to
18 Study 311, which has endpoints such as overall
19 toxicity and overall serious adverse events, also
20 deaths.  Those are the things that are reported.
21          If you want me to list them all
22 individually and give the percentages, I will have
23 to pull the study back out.  But certainly I have a
24 paragraph on that.  And I would point you to -- if
25 you want me to point you to the paragraph where I

Page 225

1  give you a specific discussion of that trial, that
2  is in Paragraph 47.
3          And what was important --
4    Q.  (BY MS. SASTRE)  Go ahead.  I'm sorry.
5    A.  What is important about the study, if you
6  look at my paragraph, is what the company stated
7  about the study.
8          (Discussion off the record.)
9          MR. RATLIFF:  Carry on.
10         MR. MICELI:  I don't want the
11 court reporter to get confused.  Because we have
12 three voices going at one time.  I'd like to --
13         MR. RATLIFF:  Yeah.  I -- I move
14 to withdraw my colloquy.  You --
15         THE WITNESS:  Well, I --
16         MR. MICELI:  I'm trying to have
17 the witness answer the question, and there's a side
18 conversation going on.  And I would just ask that
19 the witness be allowed to answer without the side
20 conversation so that the court reporter can get
21 precisely what everybody is saying.
22   A.  And the only reason I'm pausing is I feel
23 like we're having a conversation.  And so I would
24 like us to have a conversation.  And I'm trying to
25 answer your question.

57 (Pages 222 - 225)

Page 226

1      But if -- so I don't mind waiting
2  while you guys have a conversation.  I just want to
3  be able to answer the question.
4      MR. MICELI:  We've been going for
5  an hour and 15 minutes.  Do we want to stop so you
6  guys can chat and --
7      MS. SASTRE:  No.
8      MR. MICELI:  Okay.  That's fine.
9      MS. SASTRE:  We can just go for a
10 few more minutes.
11     MR. MICELI:  Okay.
12     MS. SASTRE:  Thank you.
13   A.  So I'm trying to answer your question by
14 saying that if you look at Paragraph 47 --
15   Q.  (BY MS. SASTRE)  Yes.
16   A.  -- I -- I make a comment:  The company
17 stated that this particular study is the first and
18 only study to directly compare Taxotere and Taxol,
19 a single agent chemotherapy for the treatment of
20 metastatic breast cancer.
21      So to me, that was an important
22 piece, and that's why I keep pointing you to that.
23 And if you read my paragraph, you'll see that
24 indeed what has -- what was concluded at the end of
25 the study was that there was a difference between

Page 227

1  the two agents, with Taxotere showing greater
2  overall toxicity than Taxol.
3      I'll have to pull the study out
4  to answer your questions about specific endpoints,
5  however.  So I'm more than willing to do that.  But
6  I don't have it right here in front of me.
7   Q.  Okay.  Your statement that Taxotere is
8  more toxic than Taxol, as set forth in Paragraph 51
9  of your report, what else is it based upon, if
10 anything, in addition to on TAX 311?
11   A.  So it is also based on the comparison of
12 permanent alopecia specifically as well.  But my --
13 my overall statement -- the reason I made that
14 statement was on the -- on my first issue that I
15 looked at, which is what do we know about Taxotere
16 as compared to the most similar agent, which is
17 Taxol -- and this study was important evidence
18 for -- in support for that.
19      I would also point to the medical
20 literature, though, just in general.  When you look
21 across it, you'll see discussions of some specific
22 endpoints that Taxotere may be worse than Taxol and
23 other cases, Taxol may be worse.
24      But I -- I -- I believe that this
25 overall head-to-head comparison study is important

Page 228

1  for making that general statement about overall
2  toxicity, which is what I'm stating there.
3   Q.  Okay.  You'd agree with me that TAX 311
4  was looking at Taxotere versus Taxol as a single
5  agent for metastatic breast cancer, true?
6   A.  Yes.  That's why I read that into the
7  record.  I wanted you to understand what the study
8  was.
9   Q.  And the plaintiffs in this litigation
10 have taken combination therapy, true?
11   A.  I -- I'm not a plaintiffs' -- I mean, I'm
12 sorry.
13      I'm not a case-specific expert.
14 So I really can't answer that.  I assume that many
15 of them did, but I don't know.
16   Q.  But you know that Taxotere is given in
17 combination with other medications, true?
18   A.  Yes.  But it's given as an adjuvant.  It
19 definitely --
20   Q.  Right.
21   A.  -- would be.
22   Q.  Okay.  So it would be a combination
23 therapy, correct?
24   A.  As an adjuvant, yes.
25   Q.  Okay.  And you understand that in this

Page 229

1  litigation, it would be given as a first-line
2  treatment with regard to breast cancer, true?
3   A.  I'm sorry?
4   Q.  A first-line treatment for --
5   A.  Are you referring to --
6   Q.  -- for breast cancer --
7   A.  Are you --
8   Q.  -- in this litigation.
9   A.  In this litigation?
10   Q.  For the adjuvant therapy, yes.
11   A.  I don't know that I know that for sure.
12 But I assume that's probably true.
13   Q.  Okay.  And in TAX 311, though, you agreed
14 that you understood it was for metastatic breast
15 cancer, true?
16   A.  Yes, that's true.
17   Q.  Okay.  And that means that the patients
18 in the study had previous chemotherapy, true?
19   A.  Not necessarily.  I'd have to look at the
20 study.  You're saying -- you may be confusing two
21 different things.  First-line treatment can be a
22 category of an agent that's used in metastatic
23 breast cancer or non-metastatic breast cancer.
24      Some -- some patients that were
25 in the original trials were patients that did not

58 (Pages 226 - 229)

Page 230

1  have metastatic cancer.  But there can be a
2  first-line agent metastatic cancer as well.
3        So I -- I don't think I quite
4  understand what you're referring to.  Because those
5  terms don't make sense, based on my experience.
6    Q.  Okay.  So in your Paragraph 18, you
7  state:  In a current case, the indication that's
8  issued for Taxotere use is for adjuvant treatment
9  of early stage breast cancer.
10        Those are your words.  Do you
11  agree with that?
12    A.  Yes.  That's my understanding based on my
13  discussion with attorneys, yes.
14    Q.  Right.
15        And that's combination
16  chemotherapy, true?
17    A.  Yes.  That's correct.
18    Q.  Okay.  And that's what your analysis
19  focused on, true?
20    A.  For the overall analysis, yes.  But I --
21    Q.  Yes.
22    A.  -- looked at data that was beyond just
23  the -- the adjuvant use as well.  I looked at what
24  else was available.
25    Q.  All right.  But with regard to the

Page 231

1  treatment for metastatic breast cancer, again,
2  aren't those patients that would have had previous
3  chemotherapy and now their cancer has returned?
4    A.  That, I can't confirm without looking at
5  it.  It's very possible they were.  People that --
6  but it's very -- but I can't confirm that they
7  didn't indeed -- hadn't done -- and I'd have to
8  pull the study back out.
9        Because there are studies of
10  metastatic breast cancer where agents are given as
11  first-line therapy.  So I guess that's where I'm
12  confused.  I think you're probably right, but
13  I'd -- I'd have to pull that out.
14    Q.  Okay.  As you sit here today -- I guess
15  let me put it this way:  Your opinion is that
16  Taxotere is more toxic than Taxol, and the primary
17  basis for that opinion, you said, is TAX 311, true?
18    A.  For the general comparison --
19    Q.  Yes.
20    A.  -- of toxicity, that is true.
21    Q.  Yes.
22        And as you sit here today, you
23  don't know whether the patients in TAX 311 had
24  prior chemotherapy or not?
25    A.  I'm saying to you I believe they probably

Page 232

1  did.  But to confirm, I'd have to pull the study
2  out.
3    Q.  Okay.  So that's different.
4        So your answer is that they
5  probably did but you'd need to reread the study to
6  confirm it; is that fair?
7    MR. MICELI:  Object to the form.
8    A.  I need to look at the study to confirm.
9  I believe that's probably true, but when you're
10  asking me to make -- to agree to an absolute
11  statement and I don't recall the details, I would
12  like to pull it out.
13    Q.  (BY MS. SASTRE)  Okay.  You state in your
14  report, when referring to TAX 316 -- you said that:
15  The increase in toxicity seen in Taxotere-treated
16  patients must be weighted?
17    A.  So where are you?
18    Q.  I am around Paragraph 48 of your
19  report -- or 47.
20    A.  (Examines document.)  So would you repeat
21  your question?
22    Q.  Yeah.
23        You state that:  The increase in
24  toxicity seen in Taxotere-treated patients also
25  must be weighted -- or weighed.

Page 233

1        Do you see that?
2    A.  Oh, I see.  Yes.  I have a sentence that
3  says -- so I'm -- I'm referring to -- it's the
4  sentence after talking about the DDMAC letter
5  and -- and -- and the issue of promotion.  I say:
6  The significant increase in toxicity seen in
7  Taxotere-treated patients also must be weighed,
8  that's correct.
9    Q.  Okay.
10    A.  So efficacy must be weighed with toxicity
11  as well.
12    Q.  And that's something that's done by an
13  oncologist, true, when they're making decisions on
14  treatment for a specific patient?
15    A.  For a specific patient.
16    Q.  Yes.
17    A.  Yes.  It is also done within the context
18  of regulatory approval as well.
19    Q.  Okay.  And the drug remains approved
20  today, true?
21    A.  Yes.  It does.
22    Q.  Okay.
23        (Discussion off the record.)
24        MS. SASTRE:  Why don't we take a
25  break for a minute?

59 (Pages 230 - 233)

Page 234

1      MR. MICELI:  Okay.
2      MS. SASTRE:  All right.
3      THE VIDEOGRAPHER:  We're off the
4  record at 2:16.
5      (Recess taken.)
6      THE VIDEOGRAPHER:  We're back on
7  the record at 2:41.
8  Q.  (BY MS. SASTRE)  Dr. Plunkett, just a
9  little while ago, I was asking you about incidence
10  rates.
11      Do you recall that?
12  A.  Yes, I do.
13  Q.  Okay.  And I just want to go back for a
14  second and then ask you a different question.
15      But to reorient you, I asked you
16  whether you could tell us or whether you had
17  determined what was the incidence rate for the
18  development of permanent alopecia for Taxotere as a
19  single treatment, for Taxol as a single treatment
20  or for Taxol in combination with other medications.
21      Do you recall those questions?
22  A.  Yes.  I think I do.
23  Q.  Okay.  And you said you could not tell us
24  what the exact incidence rate was, true?
25  A.  Yes.  I believe I answered all of those

Page 235

1  that way.
2  Q.  I think that's right.
3      And so just a follow-up question
4  there, which is:  You'd agree with me since you
5  cannot tell us what is the incidence rate for the
6  development of permanent alopecia, when Taxotere is
7  given as a single agent, when Taxol is given as a
8  single agent or when Taxol is given as part of a
9  combination therapy -- you couldn't tell us,
10  whatever that difference may be, whether it's
11  statistically significant or not, true?
12  A.  Well, no.  If I don't have the numbers,
13  you can't do statistics.  So that's true.
14  Q.  Okay.  All right.  So going back to -- to
15  your report.
16      THE REPORTER:  I'm having
17  problems with my computer.
18      MS. SASTRE:  I'm sorry.  You have
19  a problem?
20      THE REPORTER:  I'm having
21  problems with my computer.
22      MS. SASTRE:  Okay.
23      MR. MICELI:  Want to just go off
24  the record a second?
25      (Discussion off the record.)

Page 236

1      THE VIDEOGRAPHER:  We're off the
2  record at 2:42.
3      (Recess taken.)
4      THE VIDEOGRAPHER:  We're back on
5  the record at 2:48.
6  Q.  (BY MS. SASTRE)  All right.  So as you
7  said just a minute ago, Dr. Plunkett, since you
8  don't know the incidence rate for permanent
9  alopecia when Taxotere is given alone and you don't
10  know the incidence rate for Taxol when it's given
11  alone and you said you didn't know whether --
12  whatever the differences were in those rates,
13  whether it's statistically significant, my question
14  is, to you:  As you sit here today, when you say in
15  your report, Taxotere use is associated with a
16  greater risk of irreversible alopecia as compared
17  to some other neoplastic drug products, including
18  Taxol, you cannot tell us to reasonable degree of
19  medical or scientific certainty how great that risk
20  is when compared, true?
21      MR. MICELI:  Object to the form.
22  A.  So I don't think medical certainty on
23  that.  That'd be scientific certainty, number one.
24  Q.  (BY MS. SASTRE)  Uh-huh.
25  A.  But from a reasonable degree of

Page 237

1  scientific certainty, what I can -- I -- what I can
2  tell you is that there is an increased risk.  But I
3  can't tell you whether that risk is twofold,
4  threefold or tenfold.  But I can tell you that the
5  risk is greater based on the weight of the
6  evidence.
7      (Brief interruption.)
8      MS. SASTRE:  Sorry.  We just got
9  you off mute.  Apologize for that.
10      MR. MICELI:  We just started
11  back.  You haven't missed anything.  I apologize.
12  A.  Okay.  So based on -- I'll just finish.
13  Based on the weight of the evidence that I have
14  reviewed.
15  Q.  (BY MS. SASTRE)  Okay.  But based on the
16  evidence that you reviewed, you're not able to tell
17  us, by percentage, the extent to which the risk for
18  developing permanent hair loss is greater in
19  Taxotere versus Taxol, true?
20  A.  No, I can't --
21  Q.  You can't give us a number?
22  A.  I can't give you an exact number.  That
23  is true.
24  Q.  Okay.  And so you can't tell us whether
25  it's 1 percent or 2 percent or 3 percent or

60 (Pages 234 - 237)

Page 238

1 4 percent, true?
2          MR. MICELI:  Object to the form.
3     A.  I can't tell -- well, tell you what is
4 one, two.  I can tell you something about the risk
5 of Taxotere based upon the data that's available.
6 But if you're asking me -- and I know what is
7 reported in the labeling for Taxol.
8          But if you're asking me do I have
9 a study that gives me a direct percentage one
10 versus the other head-to-head, that is not
11 available.  But certainly there are data out there
12 to allow you to attempt to quantify that risk of
13 being an increased risk or not or being the same.
14          Or -- and in my view, when I say
15 increased risk -- and I'm -- I'm forming the
16 opinion that that -- that difference is going to be
17 significant to me as a pharmacologist and a
18 toxicologist.  If I didn't believe it was, I
19 wouldn't form that opinion.
20     Q.  (BY MS. SASTRE)  Well, but my question is
21 just simply -- and I'll use the phrase that you
22 just used.
23          You simply cannot quantify the
24 difference in risk for permanent alopecia between
25 Taxotere and Taxol both given as single agent

Page 239

1 medications, true?
2     A.  I can't give you an exact number to
3 quantify it.  That is true.
4     Q.  And that would be true if we were to
5 compare them as combination regimens as well, true?
6          MR. MICELI:  Object to the form.
7     Q.  (BY MS. SASTRE)  Can't -- can't quantify
8 this increased risk that you talk about, true?
9     A.  I can't give you a specific number to
10 quantify it.  That is true.
11          (Discussion off the record.)
12     Q.  (BY MS. SASTRE)  I asked you before about
13 an incidence rate for a taxane regimen and a
14 non-taxane regimen with regard to the development
15 of permanent alopecia.  But you said you couldn't
16 give me a rate.
17          So same question again:  Are you
18 able to quantify the difference in risk between
19 those two regimens?
20          MR. MICELI:  Object to the form.
21     Q.  (BY MS. SASTRE)  If you think there is a
22 difference.
23     A.  So I do believe there is a difference for
24 Taxotere specifically, even over Taxol.  So if you
25 put the two together, the Taxotere is still in that

Page 240

1 group, it would obviously be higher than the other
2 drugs such as -- that are used in combination.
3          I will -- there is one thing I
4 should point out that I think I stated in here that
5 is a quantification.  It's the idea of whether or
6 not this drug, Taxotere, carries a risk for
7 permanent alopecia that is -- is rare or common.
8          That, we can say based upon what
9 is available from the data on Taxotere.  And that
10 is what is actually stated in the documents where
11 they've looked at the differences in what the
12 clinical data says for Taxotere.
13          In other words, if I talked just
14 about Taxotere, it certainly is not a rare event in
15 the clinical studies where it has been looked at.
16 So that can be quantified.
17          But I can't -- I can't give you
18 whether it's twofold greater or threefold greater
19 or fourfold greater than a particular agent based
20 on a specific number.
21     Q.  Okay.  And just going back to my question
22 now.  I'm just limiting my question to taxane
23 therapy versus non-taxane therapy.
24          You are unable to quantify the
25 difference in risk between the two with regard to

Page 241

1 permanent alopecia, true?
2     A.  By one specific number, no, I cannot do
3 that.
4     Q.  All right.  Let me -- again, I'm just
5 kind of jumping around in the interest of time.
6          In Paragraph 23 of your report,
7 you talk about Taxotere being more potent than
8 Taxol?
9     A.  I don't think Paragraph 23.  Or do you
10 mean it to be somewhere else?
11          MS. SASTRE:  Do I have it
12 somewhere else?
13          MR. MICELI:  I'm not sure if you
14 said Paragraph 23 or Page 23.  But I didn't see it
15 in Page 23.  So I apologize.
16          MS. SASTRE:  Maybe it's Page --
17     A.  It's not in Paragraph 23.
18     Q.  (BY MS. SASTRE)  Well -- well, let me ask
19 you this:  Do you recall stating in your report
20 that you said Taxotere was more potent?  Or do you
21 need us to point it out?
22     A.  I need that language to see with respect
23 to what.  And that's what I'm looking for.
24     Q.  Thank you.  Perfect.
25          MS. SASTRE:  It is Paragraph 23.

61 (Pages 238 - 241)

Page 242

1            (Discussion off the record.)
2    Q.  (BY MS. SASTRE)  Third line down,
3  docetaxel is much more potent than paclitaxel.
4    A.  In this, comparing in vitro cell line
5  data, yes, that is true.
6    Q.  Okay.  Is this an opinion that you hold
7  to a reasonable degree of scientific certainty?
8    A.  Based on that data in -- in -- collected
9  in vitro, yes, that would be true.
10   Q.  Okay.
11   A.  But that is not -- that's not a statement
12  about the ultimate clinical potency.  It's talking
13  about this in vitro data.  But I agree with that.
14   Q.  You mean you agree that in that
15  context -- well, let me back up.
16        You agree that potent doesn't
17  mean toxic, right?
18   A.  It can in certain definitions, but I
19  don't mean it that way here.
20   Q.  Okay.
21   A.  I'm talking about potency as in here to
22  induce the event of apoptotic cell death in vitro,
23  which is a -- it's tied to the mechanism of the
24  drug to produce the effects you're looking for.
25  Although, that can also lead to toxic effects, too.

Page 243

1        So, you know, you kill cells.
2  And if they're in the body, those can be toxic
3  effects.  But we are actually -- we're trying to
4  kill tumor cells.  And that's what's being looked
5  at here.
6    Q.  Okay.  But -- and I think you've answered
7  my question.
8        But when you use the word
9  "potency" in Paragraph 23, you were talking about
10  the ability of the medication to achieve its
11  desired effect?
12        MR. MICELI:  Object to the form.
13   A.  I'm about -- I'm talking about the
14  pharmacological effect specifically discussed here,
15  which is the -- the effect to induce cell death in
16  vitro in cancer cell lines.
17   Q.  (BY MS. SASTRE)  You're not intending to
18  use that word as a synonym for "toxic" in
19  Paragraph 23, fair?
20   A.  In that -- with that regard, no, I'm not.
21   Q.  Okay.  Thank you.
22        All right.  Very good.  So let's
23  go back again to -- we were talking about the use
24  of Taxotere and Taxol.  We talked about some
25  similarities and some differences.

Page 244

1        And you would agree with me that
2  when it comes to a specific patient, these
3  medications, Taxotere and Taxol, are not simply
4  interchangeable, true?
5        MR. MICELI:  Object to the form.
6    A.  Oh, I think -- I don't know that I can
7  answer that question yes or no.  Do you want me to
8  explain why?
9    Q.  (BY MS. SASTRE)  Sure.
10   A.  Or do you want to ask another question?
11   Q.  Sure.  Go ahead.  Go ahead.  I don't want
12  to be ever accused of not letting you explain.
13  Okay?
14   A.  Well, no, I didn't.  And I was just --
15  maybe you can rephrase it and I could answer it.
16  I -- I don't know.
17        Based upon the way you asked it
18  to me, that is a -- a -- a diagnostic decision.
19   Q.  Uh-huh.
20   A.  And so I don't think -- I don't think
21  that is something that's as simple as
22  interchangeability.  I think, however, doctors
23  do use the drugs interchangeably when they make
24  those kinds of decisions.  And that's what is -- I
25  discuss in the literature.

Page 245

1        But I'm not an oncologist.  So
2  I -- I do think that that's something that is
3  probably more correctly described in detail by an
4  oncologist.
5    Q.  Well, let me ask it this way:  Do you
6  have an opinion, to a reasonable degree of
7  scientific certainty, as to whether Taxotere and
8  Taxol are interchangeable treatment options?
9        MR. MICELI:  Object to the form.
10   A.  I can't form that opinion as an
11  oncologist.  As a pharmacologist, based upon the
12  information that I have reviewed, yes, I would --
13  it does indicate that these drugs can be used
14  interchangeably based on their pharmacological
15  uses.
16        But I would absolutely agree with
17  you those treatment decisions from a patient could
18  come to a different conclusion.
19   Q.  (BY MS. SASTRE)  All right.  Because
20  you'd agree with me that the medications have
21  different indications?
22   A.  Oh, yes --
23        MR. MICELI:  Object to the form.
24   A.  -- they do.  That's exactly right.  They
25  do.  They -- they have some.  But -- and, again,

62 (Pages 242 - 245)

Page 286

1 with regard to Taxol that would make permanent
2 alopecia common for it as well, true?
3          MR. MICELI:  Object to the form.
4     A.  I think I disagree with that.  I'd have
5 to see what visit you're referring to.  I -- I
6 don't -- I don't -- I would not have made that
7 statement, no.
8          (Discussion off the record.)
9     Q.  (BY MS. SASTRE)  You told us earlier that
10 you were unable to calculate an incidence rate for
11 Taxol, true?
12     A.  A specific number, that is true.
13     Q.  Okay.  And so on this issue of common, is
14 it your opinion, to a reasonable degree of
15 scientific certainty, that the incidence rate for
16 permanent alopecia associated with Taxol is under
17 1 percent?
18          MR. MICELI:  Object to the form.
19     A.  The same answer.  I haven't formed a
20 specific opinion on a specific number.  I've
21 formed, instead, an opinion about the comparative
22 toxicity.
23     Q.  (BY MS. SASTRE)  Okay.  Doctor, do you
24 agree with the statement that hair loss after
25 Taxotere, whether as a single agent or in

Page 287

1 combination with other chemotherapies which are
2 known to cause hair loss, that the hair loss is
3 usually reversible?
4     A.  Yes.  That is true.  And I state that.  I
5 state that in my report.
6     Q.  Okay.  So it's your opinion that hair
7 loss after Taxotere use is generally reversible,
8 true?
9     A.  It is generally reversible.  But it is
10 more common to have it permanent with Taxotere as
11 compared to other drugs.
12     Q.  All right.  But you would agree when you
13 say it's generally reversible, what you're saying
14 is that after Taxotere use, the hair generally
15 grows back, true?
16          MR. MICELI:  Object to the form.
17     A.  I'm saying it is -- that it is normally
18 reversible, as I state in my report, and that --
19 but there is a -- there is a difference in Taxotere
20 as compared to other drugs.  And permanent alopecia
21 is a significant patient safety issue.
22     Q.  (BY MS. SASTRE)  Right.
23          But you would agree with me that
24 hair loss -- that hair loss after Taxotere use --
25 that it generally grows back, true?

Page 288

1     A.  Based upon the clinical data that they
2 have and you -- if you -- if you talk about the
3 word "generally" as defined by a rate 90 percent,
4 yeah, that is true.  Because that's what the
5 studies show.
6     Q.  Now, I know you told us you did not have
7 a causation opinion, but I just want to make sure
8 that I'm not surprised at trial.
9          So do you have an opinion, to a
10 reasonable degree of scientific certainty, why hair
11 loss after chemotherapy, whether it involved
12 Taxotere or Taxol or another drug -- why it's
13 sometimes not reversible?
14     A.  I have not formed that opinion, no.
15     Q.  Okay.  Very good.
16          Would you agree that the
17 prevalence and severity of hair loss or alopecia
18 depends on the drug used as well as the
19 individual's predisposition?
20     A.  I don't think that I have an opinion one
21 way or the other on that.
22     Q.  Would you agree that combination therapy
23 produces a greater incidence of more severe
24 chemotherapy-induced alopecia than compared to a
25 single agent chemotherapy?

Page 289

1          MR. MICELI:  Object to the form.
2     A.  Are you asking about any specific drugs
3 or just asking general trends in the -- the
4 chemotherapy literature?
5     Q.  (BY MS. SASTRE)  I'm asking you just
6 generally first.
7     A.  So generally, I would agree that that's
8 possible.  But I haven't done the analysis to say
9 for which ones that would be true.  Because I think
10 in some cases, that's not necessarily true.
11          (Discussion off the record.)
12     Q.  (BY MS. SASTRE)  All right.  But just so
13 I am clear, you have not done an analysis where
14 you're able to offer an opinion, to a reasonable
15 degree of scientific certainty, as to whether
16 there's a greater incidence of chemotherapy-induced
17 permanent alopecia with single therapy medications
18 or combination therapy medications?
19     A.  That's correct.  Because the data that I
20 have seen doesn't allow for that analysis.
21     Q.  Okay.  You would agree with me that there
22 are a number of confounding factors with regard to
23 permanent hair loss and chemotherapy, true?
24          MR. MICELI:  Object to the form.
25     A.  If you're asking me in general terms --

73 (Pages 286 - 289)

Page 290

1   Q.  (BY MS. SASTRE)  Uh-huh.
2   A.  -- would studies have considered that?
3   Q.  Yes.
4   A.  Yes.  That is true.
5   Q.  So let's talk about the list of
6   confounding factors that the studies you reviewed
7   considered when they were looking at permanent
8   alopecia and the use of chemotherapy medication.
9        Tell me what they are, please.
10   A.  Okay.  Well, since I was not doing
11   analysis of the epidemiological data, I didn't form
12   a definitive list of any such factors.  However,
13   when I reviewed the clinical studies, I did look
14   for what controls were put into place based on the
15   clinical data that was discussed.
16        And when I looked at the case
17   reports, I looked at how each individual physician
18   described their analysis of that patient and what
19   their limitations were.
20        Confounders were consistently
21   discussed within the case report, literature or in
22   the clinical experience literature.
23        And indeed within the clinical
24   studies, the studies were designed with those kinds
25   of confounders in mind, the idea of using same

Page 291

1   indication, same drugs in the two comparative
2   groups, for example, the TAC and the FAC, looking
3   at the women with the same diagnosis.  So those
4   kind of things were -- were included as factors
5   they looked at.
6        As far as confounders that they
7   identify --
8   Q.  Yes, please.
9   A.  -- certainly there are some patients that
10   would have had prior chemotherapy in some cases,
11   potentially.
12   Q.  Uh-huh.
13   A.  And so were things that you would look at
14   to make sure that when patients came into the
15   study, they didn't already have an issue with
16   alopecia versus who started the study and had no
17   issue with alopecia, for example.
18   Q.  Okay.  But what I'm -- what I'm looking
19   for today is when you reviewed the medical
20   literature, you saw that in the various studies
21   that you looked at, the authors discussed
22   confounding factors, true?
23        MR. MICELI:  Object to the form.
24   A.  So I didn't -- I did not -- did not try
25   to determine a list.  But certainly there is

Page 292

1   discussion in those papers.  Yes, there is.
2   Q.  (BY MS. SASTRE)  That's my first
3   question:  There's discussion in the papers of
4   confounding factors?
5   A.  In some of them, there are, yeah.
6   Q.  Okay.  So as you sit here today, what's
7   your best recollection of the confounding factors
8   discussed in the papers you reviewed, please?
9   A.  So it depends on the type of paper it
10   was.
11   Q.  Okay.
12   A.  That's what I was trying to give you.
13   So, for example, in the clinical trials -- which
14   some of those papers -- papers I looked at were
15   actually publications of these Sanofi studies, for
16   example.  Like, there's a New England Journal of
17   Medicine article.  There's a Journal of Clinical
18   Oncology article.
19        So in there, there was a
20   discussion of the issues of potential confounding
21   that they tried to control for.  Okay.  So that
22   is --
23   Q.  Okay.
24   A.  -- choosing patients that had similar
25   indications, similar -- similar disease,

Page 293

1   controlling for, you know, those time periods.  The
2   confounders would be potentially people that are
3   lost to follow-up, the fact that some patients
4   didn't have as long of a follow-up as others.  That
5   would be a confounder that is discussed.
6        -there is a discussion, I
7   believe, in the papers of the issue of -- generally
8   of the fact that there could be genetic
9   susceptibility in some people.  That's probably
10   something that was discussed regardless of what
11   type of paper it is.
12        In some of the clinical case
13   report papers, the limitations or confounders that
14   are discussed would be lack of information on
15   certain parameters that you would like to see in
16   order to make a final differential diagnosis and a
17   relationship association between the drug and the
18   event.
19        If you want specific ones, I have
20   to pull the papers out.  But that's my -- my
21   recollection of the ones I saw.
22        In the epidemiological, the
23   observational studies, there certainly are
24   confounders discussed on the issue of whether or
25   not there were prior drug exposures.  I know that

74 (Pages 290 - 293)

Page 294

1 one was discussed.
2    Q.   Okay.  So age can be a confounding
3 factor, true?
4         MR. MICELI:  Object to the form.
5    A.   Well, you asked me that earlier.  I
6 certainly agree that age can be associated with
7 hair loss.  And so certainly that would be.  I
8 don't know that I saw that discussed as a
9 significant issue with everyone.  But certainly it
10 can be.
11    Q.   (BY MS. SASTRE)  Menopausal status can be
12 a confounding factor?
13         MR. MICELI:  Object to the form.
14    A.   So you asked me that earlier.  I said I
15 wasn't -- I wasn't aware of the specific effect.
16 But certainly I have seen that discussed, yes.
17    Q.   (BY MS. SASTRE)  Okay.  Prior
18 chemotherapy is a confounding factor?
19    A.   I mentioned that to you already.
20    Q.   Okay.
21    A.   That was one on my list I mentioned.
22    Q.   I'm just looking for a clean question and
23 answer so I don't have to go searching through a
24 long answer.
25         So --

Page 295

1    A.   That is --
2    Q.   -- my question is just simply that:
3 Prior chemotherapy is a confounding factor, true?
4    A.   Yes.  It is a potential confounding
5 factor that is discussed.
6    Q.   Okay.  Combination treatment or
7 chemotherapy is a confounding factor, true?
8    A.   Depending on the design of the study, it
9 could be more important than others.  But certainly
10 it is a potential thing you should consider.
11    Q.   Yes.
12         Family history or genetics are a
13 confounding factor, true?
14    A.   I mentioned that, yes.  And that's
15 something that is -- something that can't typically
16 be controlled for.
17    Q.   And the use of other medications can be a
18 confounding factor, true?
19    A.   Contaminant medications outside of the
20 chemotherapy drugs?  Is that what you're asking me?
21    Q.   For example, some of the hormone
22 medications we discussed?
23         MR. MICELI:  Form.
24    A.   I think it's possible that that could be
25 a confounder, but I think it would depend on the

Page 296

1 drug.
2    Q.   (BY MS. SASTRE)  All right.
3         (Discussion off the record.)
4    Q.   (BY MS. SASTRE)  Take a look at
5 Paragraph 33 of your report, please.
6    A.   (Complies.)
7    Q.   All right.  At the bottom of that
8 paragraph, you state, in reference to a number of
9 papers that you have reviewed -- you said:  In each
10 of these papers and presentations, the authors were
11 describing a new finding of irreversible or --
12 irreversible alopecia that was different than the
13 chemotherapy-induced alopecia that typically had
14 been associated with taxanes previously.  It also
15 appeared to be more common in Taxotere-treated
16 patients.
17         Did I read that correctly?
18    A.   You did.
19    Q.   Okay.  And is it your testimony to
20 reasonable degree of scientific certainty, that
21 prior to Taxotere and Taxol, that there had been no
22 report of chemotherapy-induced permanent alopecia?
23    A.   No.  I haven't --
24         MR. MICELI:  Object to the form.
25    A.   I'm sorry.  No.  That is not the opinion

Page 297

1 I formed.
2    Q.   (BY MS. SASTRE)  Okay.  You don't know
3 whether that's the case or not, right?
4    A.   Well, I would be surprised if it was the
5 case.  But I haven't formed that opinion.
6         (Discussion off the record.)
7    Q.   (BY MS. SASTRE)  Okay.  So -- yeah.  Did
8 you -- did you do research to determine, going back
9 prior to Taxol and Taxotere coming onto the market,
10 as to whether there had been any reports of
11 chemotherapy-induced permanent alopecia?
12         MR. MICELI:  Object to the form.
13    A.   I don't believe I did a focused
14 assessment of that.  But I certainly did look for
15 that in the literature.  I looked for -- using the
16 terms that I had.  But my initial searches were on
17 Taxotere and taxanes.
18         So -- but I did search for
19 individual drugs that were available before that.
20 Some of them, I did not see that occurring, other
21 than I believe maybe busulfan may have occurred
22 before.
23    Q.   (BY MS. SASTRE)  Okay.
24    A.   So I'd have to look at the dates of
25 busulfan to tell you that.  But I think other drugs

75 (Pages 294 - 297)

1 other than taxanes, there may be in my reliance
2 list, so examples that were before these --
3     Q.  Okay.
4     A.  -- that I'm citing here.
5     Q.  Okay.  All right.  I'm trying to move
6 quickly.  So bear with me.
7          (Discussion off the record.)
8     Q.  (BY MS. SASTRE)  All right.
9     A.  If I can, can I point you to something on
10 my reliance list from that last question?
11    Q.  Sure.
12    A.  So Baker 1991 is indeed reporting failure
13 of hair regrowth in -- in 1991.  So that is
14 before --
15    Q.  Okay.
16    A.  -- the taxanes.  So I thought --
17    Q.  Thank you.
18    A.  There may be others in there, too.  But I
19 do -- I thought I recalled that one.
20    Q.  All right.  I appreciate you pointing
21 that out.
22          All right.  So if you'd take a
23 look, please, at Paragraph 38 of your report.
24    A.  (Complies.)  Yes.
25    Q.  And you say:  In reviewing the scientific

1 literature, it's important to understand -- I think
2 there's an extra word in there.  I think you say:
3 Important to understand the relationship of
4 Taxotere to alopecia, including irreversible
5 alopecia, is biologically plausible.
6          Did I read that sentence
7 correctly?
8     A.  No, I don't think there's an extra word.
9 My words were:  To understand that the relationship
10 is biologically plausible.
11    Q.  Okay.  And so is that an opinion that you
12 hold to a reasonable degree of scientific
13 certainty?
14    A.  Yes.  Based upon what I have seen from
15 the scientific literature.
16    Q.  And when you say "biologically
17 plausible," what do you mean by that?
18    A.  It -- what I described -- part of it is
19 what I described down here.  For example, with the
20 free clinical testing of the drug showed hair as a
21 target organ, the follicles as a target organ for
22 toxicity --
23    Q.  Uh-huh.
24    A.  -- in other species.  But as I told you
25 before when I answered the question, you needed to

1 follow that up with human data as well.  But the --
2 you're seeing something in the animals indicating
3 the hair follicles can indeed be targeted by this
4 particular drug, not -- not unexpected based on
5 chemotherapy.
6     Q.  Sure.
7          And so if I understand what
8 you're saying, there is information which you
9 reviewed indicating that hair follicles can be
10 targeted by this medication, Taxotere, causing
11 alopecia, true?
12    A.  Yes, that is true.
13    Q.  Okay.  And my question is a little bit
14 different, which is:  Are you able to take that
15 next step in terms of permanent alopecia and tell
16 us that to a reasonable degree of scientific
17 certainty, you believe permanent alopecia is
18 biologically plausible?
19    A.  That's what I'm telling you here.
20    Q.  Okay.
21    A.  I'm saying based on the literature, which
22 includes -- so -- so that includes the literature
23 where they discussed the mechanism of action of the
24 drug as being one that's -- that's targeting
25 rapidly dividing cells.  It's the animal study

1 showing that the hair follicle is a target organ of
2 mammals generally.
3     Q.  Uh-huh.
4     A.  And then -- then it's followed up by
5 the -- by the clinical observations of that -- that
6 occurring as well.
7     Q.  Uh-huh.
8     A.  So biologic plausibility is built from --
9 up from -- as a pharmacologist and toxicologist,
10 I'd build it from cell studies where you can kill
11 cells up to observations in humans.  It's just one
12 brick in a wall of causal analysis.  But I'm not
13 doing a causal analysis.
14    Q.  Right.
15    A.  I have a brick, which is biologic
16 plausibility, that comes from pharmacology and
17 toxicology.
18          But I am not here -- I want to
19 make sure you know that I'm not here as the
20 causation expert.  But I do believe that, to a
21 reasonable degree of scientific certainty, we can
22 understand that the relationship would be
23 biologically plausible.
24    Q.  And -- sure.
25          And so what you're saying is

76 (Pages 298 - 301)

Page 310

1 mistake.
2    Q.  Okay.
3    A.  It should be case reports of alopecia.
4    Q.  Okay.  Very good.
5         So we'll cross that out,
6 Paragraph 41 of your report, on the fourth line,
7 correct?
8    A.  Yes.
9    Q.  Okay.  Thank you.
10   A.  I made one other typo in my report.  If
11 you want me to point that out now or --
12   Q.  Yeah, sure.
13   A.  So in Paragraph 42 --
14   Q.  Okay.
15   A.  -- you need to delete the parens,
16 9.2 percent of patients.  I had -- had another
17 sentence there that I had deleted in a draft.  And
18 so that -- that was something that I had deleted.  And
19 so that needs to come out.
20   Q.  Okay.  42 --
21   A.  No, no.  42 --
22        MR. MICELI:  No.  Paragraph 42,
23 just below where you were.
24   A.  Yeah, next paragraph.  That's why I'm
25 pointing it out here.  Just in the sentence that --

Page 311

1 two lines up, you see in parentheses 9.2 percent.
2    Q.  (BY MS. SASTRE)  Uh-huh.
3    A.  That -- that should -- that should go.
4 That was meant to be deleted.
5    Q.  Oh, okay.  I got you.  Okay.  Perfect.
6    A.  The sentence, other than that, is fine.
7 But that was meant to be deleted.
8    Q.  Okay.
9         (Discussion off the record.)
10   Q.  (BY MS. SASTRE)  I think I know the
11 answer to this.  I hope I do after spending the
12 better part of -- of a day with you.
13        But if you look at Paragraph 44,
14 you stated in your report -- you talk about what
15 Sanofi should have been aware of?
16   A.  Yes.
17   Q.  On one, two, three -- the fourth line
18 down, you say:  Documents discussed during the
19 deposition show Sanofi should have been aware of
20 risk.
21        And I just want to be clear.
22 Because I believe you told me earlier today a
23 number of times that you're not going to offer any
24 opinions on company conduct, essentially; is that
25 fair?

Page 312

1        MR. MICELI:  Object to the form.
2    A.  So I'm not the regulatory expert.
3    Q.  (BY MS. SASTRE)  Uh-huh.
4    A.  So I'm not going to talk about violation
5 of FDA regulations, those kinds of things.  But in
6 this particular case, on the issue of risk in
7 toxicology and pharmacology, I do have the opinion
8 that on -- that they should have been aware of the
9 risk based on the data that I'm pointing you to.
10        So in that regard, I have formed
11 an opinion based on what I believe the company
12 should have been aware of, absolutely.  And as a
13 result, the company has -- has duties under the
14 regulations.  But I'm not opining on which
15 particular ones those are.  And --
16   Q.  And is your opinion -- go ahead.
17        (Discussion off the record.)
18   Q.  (BY MS. SASTRE)  Yeah.  Are you going to
19 offer an opinion as to what duty they had, if any?
20   A.  I haven't been asked to -- to provide an
21 opinion based on my -- on the regulations
22 themselves.  But certainly based on my experience
23 with that, I would tell them based on my experience
24 in working with clients in the industry, that it's
25 my experience that they had a duty to -- to

Page 313

1 understand that risk and take actions on that risk.
2    Q.  Okay.
3    A.  But that's just based on my experience
4 and working with clients as a consultant over the
5 years.
6         (Discussion off the record.)
7    Q.  (BY MS. SASTRE)  You agree that I asked
8 you earlier this morning that you have no opinions
9 regarding Sanofi's conduct with regard to Taxotere,
10 and you said yes, true?
11        MR. MICELI:  Object to the form.
12   A.  As a regulatory expert, that is true.
13 And I thought that's how we were discussing it.
14 But if not --
15   Q.  (BY MS. SASTRE)  No.
16   A.  And, you know, actually, I forgot about
17 this sentence.  But I certainly -- if -- if you
18 took it to be in any way, then I did not mean that.
19 Because this sentence is I do have this opinion
20 that they should have been aware of the risk.
21   Q.  And it's your opinion that they should
22 have been aware of it and that they should have
23 done what?
24        MR. MICELI:  Object to the form.
25   A.  Taken some action based on that

79 (Pages 310 - 313)

1 awareness.
2    Q.   (BY MS. SASTRE)  Okay.  And --
3    A.   That action can be a variety of different
4 things.
5    Q.   Whatever action Sanofi takes, that would
6 be governed by FDA regulations, correct?
7    A.   Could be --
8         MR. MICELI:  Object to the form.
9    A.   Not necessarily.  Part of it could be
10 governed by their own internal policies and their
11 own standard operating procedures.  I haven't
12 looked at it.
13    Q.   (BY MS. SASTRE)  All right.
14    A.   When you have -- they -- when you have --
15 drug development and selling of drugs is associated
16 with certain duties.  And one of those duties is to
17 be aware of, understand those risks and to take
18 actions on risks.  And those actions can be a
19 variety of different things.
20    Q.   Okay.  Well, I think the record from this
21 morning is going to be very clear.  So I'm not
22 really worried about that.
23         When I look, though, at what you
24 state here, you say, in Paragraph 44:  Documents
25 discussed during a deposition referring to a Sanofi

1 employee Dr. Linda Gustavson, that Sanofi should
2 have been aware of the risk based on information
3 from the published literature in their own clinical
4 trial data.
5         Did I read that correctly?
6    A.   Yes, you did.
7    Q.   Is it your opinion that Sanofi was not
8 aware of the information in their own clinical
9 trial data?  Do you know that?  Is that an opinion
10 you're offering?
11         MR. MICELI:  Object to the form.
12    A.   That I know that they're not aware of
13 their own data?  I certainly --
14    Q.   (BY MS. SASTRE)  You --
15    A.   No, I haven't said that they're not aware
16 of their own data.  But they should have been aware
17 of the risk based on the literature and the data
18 together.  And that's the -- the issue of the risk
19 of permanent alopecia.
20    Q.   Is it your testimony, to a reasonable
21 degree of certainty, that Sanofi was not aware of
22 the risk from the published literature?  Is that
23 what you're telling us?
24    A.   I'm saying that they should have been
25 aware of the risk.  I'm saying exactly what I've

1 said here.
2    Q.   Okay.
3    A.   I'm not trying to say anything else other
4 than that.
5    Q.   Okay.  Well --
6    A.   They should have been aware of the risk.
7 And then you asked me the question about duty.  And
8 I'm saying I guess -- and I'm saying based on this,
9 yes, I do believe they have a duty to take actions
10 based on awareness of the risk.
11    Q.   But you didn't say that anywhere in your
12 report, right?
13    A.   About having a duty to provide?  I'm
14 providing you with that now to tell you where --
15 you asked me where that would go.
16    Q.   All right.
17    A.   And that's where that would go.  I don't
18 know what questions are going to be asked of me at
19 trial.
20    Q.   Okay.
21    A.   By you or -- or by counsel.  But
22 certainly if you ask me that question, what I
23 should do -- is there something they should have
24 done, I'm saying that being aware -- they should
25 have been aware of the risk.  And as a result of

1 being aware of that risk, there were actions that
2 should be taken.
3    Q.   Okay.  Where --
4    A.   As a pharmacologist and toxicologist.
5    Q.   Where in your report, please tell me --
6 well, let me go back.
7         You said you don't know what
8 questions counsel's going to ask you at trial,
9 right?
10    A.   That's true.  I don't.
11    Q.   I don't know what he's going to ask you
12 either.  So what I do know is I get a chance to
13 take your deposition and not be surprised at trial
14 by what you say.
15         And your opinions, you told me,
16 were limited to what you have in this report.  So
17 please tell me where you state -- show me where you
18 state, that paragraph number, anywhere in this
19 report an opinion that you hold that Sanofi should
20 have taken some action with regard to information
21 that it should have known concerning permanent
22 alopecia?
23         MR. MICELI:  Object to the form.
24    Q.   (BY MS. SASTRE)  Is that here?
25    A.   I'm.