# EXHIBIT A

Page 1

            UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF LOUISIANA

                              MDL NO.: 2740
                              SECTION: H

    IN RE:  TAXOTERE (DOCETAXEL)
    PRODUCTS LIABILITY LITIGATION

    This Document Relates To:
    Antoinette Durden, Case No. 2:16-cv-16635;
    Tanya Francis, Case No. 2:16-cv-17410;
    Barbara Earnest, Case No. 2:16-cv-17144.
    _____/

              Thursday, December 13, 2018

         Videotape Deposition of DAVID A.
    KESSLER, MD, taken at the Whitfield Bryson &
    Mason LLP, 5101 Wisconsin Avenue NW, Suite 305,
    Washington, D.C., beginning at 8:55 a.m.,
    before Ryan K. Black, a Registered Professional
    Reporter, Certified Livenote Reporter and Notary
    Public in and for the District of Columbia.



    Job No. NJ3173488

|  | Page 54 |  | Page 56 |
|---|---|---|---|
| 1 | make any opinion. I can tell you that what she | 1 | actually seen the notations from Commander |
| 2 | articulated was that these changes were to be | 2 | Staton making these changes? |
| 3 | made so that -- for safety to be consistent with | 3 | A. Incorrect. |
| 4 | lung cancer indication. And she was doing some, | 4 | If you go to Sanofi_00548526, you will |
| 5 | obviously, formatting sections for consistency. | 5 | see the reasons given by the FDA, by Commander |
| 6 | I can't -- it would -- I am sure | 6 | Staton, specifically, in an e-mail that is dated |
| 7 | shocked Dr. -- Commander Staton that -- if | 7 | on August 11th, and the reasons given is to be |
| 8 | anyone said she prevented the company from | 8 | consistent with the lung cancer indication. So |
| 9 | warning about persistent alopecia. That just | 9 | that's the reason given, so, you know, that's |
| 10 | doesn't make sense. | 10 | what I know. |
| 11 | I mean, the -- the correspondence | 11 | Q. Okay. At the time you prepared your |
| 12 | seems that these changes were -- again, to | 12 | report at Paragraph 176, you didn't know the |
| 13 | be consistent with the lung cancer ind -- | 13 | auth -- the timing and authorship of the changes |
| 14 | indication, and how certain fluid retention, if | 14 | is not clear, right? |
| 15 | you look at the -- there's -- as you said -- as | 15 | A. Um -- |
| 16 | you see it in my excerpt it says that the | 16 | Q. That's what you said in your report. |
| 17 | reasonings for her -- the following statements | 17 | A. I said -- well, I said exactly |
| 18 | reflect the reasonings for FDA's changes to | 18 | -- let's just get it exactly: The draft |
| 19 | Taxotere. | 19 | label used to track -- because the label was |
| 20 | If you go back and look at the e-mail, | 20 | produced in black and white and -- and not in |
| 21 | the -- the reasonings, and I have that, I can | 21 | color, the timing and authorship is not clear. |
| 22 | give you the Bates Number, it says, To be | 22 | That's exactly what I said. |
| 23 | consistent with the lung cancer indication, | 23 | Q. Right. Okay. |
| 24 | please report fluid retention events | 24 | So if the evidence at trial will be |
| 25 | independently as outlined in the table, and | 25 | that the FDA and Commander Staton, in fact, |

|  | Page 55 |  | Page 57 |
|---|---|---|---|
| 1 | please re -- propose warning for description of | 1 | struck this language, is that important to your |
| 2 | leukemia events. | 2 | opinion today? |
| 3 | Those were the reasons given, and | 3 | MS. JEFFCOTT: Object to form. |
| 4 | so it makes no sense to cross out persistent | 4 | THE WITNESS: Is it important? Well, |
| 5 | alopecia if you want to make this consistent | 5 | it's taken into con -- I mean, if that evidence |
| 6 | with the lung cancer indication. Some -- | 6 | -- that's taken into consideration, and my |
| 7 | something's not making sense here. | 7 | opinion is nothing that Commander Staton did |
| 8 | Q. Doesn't make sense to you that | 8 | then, depending on what you can determine from |
| 9 | she would -- that -- that the FDA would strike | 9 | the evidence that she did, in any way prevented |
| 10 | that language? | 10 | Sanofi from warning in the warning section or in |
| 11 | A. It makes no sense to me that a company | 11 | the adverse events section or even coming back. |
| 12 | who wants to warn about a persistent alopecia | 12 | I mean, what's -- what is -- what is |
| 13 | -- well, makes absolute sense to me that a | 13 | odd here is that no -- Sanofi doesn't say, wait, |
| 14 | company who wants to warn about persistent | 14 | hold it. I mean, we want to warn about |
| 15 | alopecia can warn about persistent alopecia in | 15 | persistent alopecia. You crossed that out. |
| 16 | the label. There's no question about that, and | 16 | That's an important warning. That's even in our |
| 17 | there's no question in my mind that any FDA | 17 | CCDS. |
| 18 | official would allow that. | 18 | We have to warn and be consistent, and so that's |
| 19 | How this happened and why this | 19 | not in the record. So I've taken all of that |
| 20 | happened, okay, and this cross-out -- this | 20 | into consideration, and, you know, my opinion is |
| 21 | cross-out was for -- for reasons of consistency | 21 | Sanofi should have warned and could have warned |
| 22 | with the lung -- lung -- lung cancer, best as I | 22 | and nothing in this stopped Sanofi from warning. |
| 23 | can determine from the record. | 23 | BY MR. KEENAN: |
| 24 | Q. You're -- you're surmising that, but | 24 | Q. So your -- your testimony is it would |
| 25 | you have not seen the actual -- you have not | 25 | not be important to your opinion if, in fact, at |

15 (Pages 54 - 57)

Page 262

1 Exhibit 81.
2 (Kessler Deposition Exhibit No. 81, a
3 document Bates Numbered Sanofi_00791478 through
4 Sanofi_00791479, was marked.)
5 THE WITNESS: I know it was closed
6 out, I believe.
7 BY MR. KEENAN:
8 Q. So just a couple quick questions.
9 Take a moment and look at Exhibit 81, if you
10 would.
11 A. Right.
12 Q. In all of your review of the Sanofi
13 witnesses and documents, did you see any
14 evidence that Sanofi was not compliant with the
15 FDA's directive as reflected in Exhibit Number
16 81?
17 A. I'm sorry. Exhibit 81 is an FDA
18 directive.
19 Q. Isn't that --
20 A. That's the sales force.
21 Q. It's -- it's the sales force, yes, it
22 is. It's a directive from the sales force, but
23 it comes in response to -- as you can see in the
24 second paragraph, DDMAC requested Sanofi Aventis
25 immediately cease diss -- dissemination of this

Page 263

1 and all the materials containing the same or
2 similar claims.
3 Do you see where I've read that?
4 A. Yes.
5 Q. So do you understand my question?
6 A. Yeah.
7 Q. Okay.
8 A. So -- so what I have done is, if you
9 look at this -- as I understand -- just I can go
10 into more detail, as I understand, the history
11 was Sanofi comes -- predecessor comes and says,
12 we want to make superiority claims. FDA says,
13 you've gotta submit a supplement. You can't do
14 superiority claims without a supplement.
15 Q. Right.
16 A. And then they refer it over to DDMAC.
17 And I do see -- and I think this is part of
18 the Avile [phonetic], apologize, I can check.
19 It's in my deposition list.
20 If you look at the Avile deposition,
21 what you see, and you look at the Avile call
22 notes for, I think, the Bellwether patient
23 -- Bellwether case, sorry, Earnest, you see
24 efficacy -- superiority of efficacy in those
25 call notes on -- basically, touting the

Page 264

1 secondary endpoints, which DDMAC said was not
2 allowed to the Doc -- to Earnest's Doc, as I
3 read those call notes.
4 Q. Anything other than that?
5 A. Well, you, certainly, have the re --
6 I mean, you have -- what you have is, you've
7 made reference earlier -- if you look at the
8 strategic plans, you made a distinction
9 that 311 was metastatic monotherapy and the
10 Bellwethers were adjuvant. And that wasn't
11 applicable -- 311 wasn't applicable to that.
12 But what you see in the strategic plans is you
13 see the -- the -- sort of, the effort on the
14 part of the company to bridge the superiority of
15 Taxotere, in general. So it wasn't as specific
16 as -- so you had this -- this detailing of
17 superiority to docs, this -- the T is better
18 than P.
19 Q. Okay. Now, let's go back to Exhibit
20 81. My question, specifically, with -- I gave
21 it to you already, Exhibit 81.
22 My question was specifically directed
23 to the destruction of marketing materials. This
24 was sent on April 24th, 2009.
25 Are you with me?

Page 265

1 A. Yes.
2 Q. Okay. And with a focus on the
3 actions in this letter, Exhibit 81, with the
4 destruction of marketing materials, pursuant to
5 the DDMAC, requested Sanofi immediately cease
6 the dissemination of this and all materials
7 containing the same or similar claims to those
8 cited in the letter.
9 Any evidence that this was not
10 complied with by Sanofi in its marketing team?
11 A. I have no opinion whatsoever.
12 Q. Okay. Okay. I understand what you
13 said about the call notes with Ms. Avile. You
14 don't know whether that predated or postdated
15 this -- this letter?
16 A. My sus -- I think it predated.
17 Q. Yeah. I'm not interested in
18 suspicions.
19 A. Well, I'm trying to be truthful.
20 Q. Whatever the document says, it says.
21 A. Exactly. That's fair. I think it
22 -- I think -- I think it predated.
23 Q. Okay. And we've covered this already,
24 you don't have the case-specific depositions of
25 any of the prescribing doctors, of any of the