# EXHIBIT G

```
                                                          Page 1
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF LOUISIANA
 3
 4     IN RE TAXOTERE (DOCETAXEL)        )
       PRODUCTS LIABILITY LITIGATION )   MDL NO. 2740
 5                                       )
       THIS DOCUMENT RELATES TO:         )   SECTION: H
 6                                       )
       ANTOINETTE DURDEN,                )
 7     CASE NO. 2:16-cv-16635            )
       TANYA FRANCIS,                    )
 8     CASE NO. 2:16-cv-17410;           )
       BARBARA EARNEST,                  )
 9     CASE NO. 2:16-cv-17144            )
                                         )
10     _____)
11
12          VIDEOTAPED DEPOSITION OF ELLEN FEIGEL, M.D.
13                  FRIDAY, DECEMBER 7, 2018
14
15
16
17
18     JOB NO. 3151489
19
20     REPORTED BY STEPHANIE J. COHEN,
21     CSR NO. 7920
22
23
24
25     Job No. NJ3151489
```

Page 102

1    MR. THORNTON: Objection; form.
2    THE WITNESS: Let me approach it a
3 different way rather than regulatory.
4    I think there's an ethical responsibility.
5 If you -- if the company is aware of side effects to
6 communicate that so each -- regardless of regulatory
7 issues, there's ethical responsibilities to do that
8 because part of having an informed discussion
9 between physicians and patients is to have the full
10 balanced information about benefits and potential
11 risk.
12 BY MR. KAUFMAN:
13   Q   Are you offering an opinion that Sanofi
14 violated federal regulations with respect to the
15 Taxotere prescribing information?
16   A   Oh, I am not offering that opinion, no.
17   Q   Are you offering -- strike that.
18    You are not offering opinion regarding
19 Sanofi's compliance with FDA regulations or
20 requirements with respect to Taxotere.
21    Fair?
22    MR. THORNTON: Objection; form.
23    Could you please reread the question. We
24 are getting technical here.
25    MR. KAUFMAN: I don't think it's that hard.

Page 103

1 She says right in her report that she is not
2 offering regulatory opinions.
3    MR. THORNTON: I understand. I didn't
4 think it was hard either, but you have asked several
5 questions about it so you seem to have --
6    THE WITNESS: Did you want her to reread
7 it?
8    THE REPORTER: "You are not offering
9 opinion regarding Sanofi's compliance with FDA
10 regulations or requirements with respect to
11 Taxotere. Fair?"
12    THE WITNESS: I would be willing to offer
13 opinions on the responsibility of the company to
14 communicate risk to the FDA, but in terms of
15 violating regulatory requirement, no. I'm not
16 offering any regulatory opinions on that.
17 BY MR. KAUFMAN:
18   Q   I understand you might have opinions that
19 go beyond the scope of the report. Lots of people
20 in this room probably have opinions on a lot of
21 different topics.
22    I am interested in the opinions that you
23 intend to offer the jury at trial in this case.
24 Okay?
25    MR. THORNTON: Objection; form.

Page 104

1    THE WITNESS: I understand your question.
2 I actually don't think what I am saying is outside
3 the scope of my report.
4 BY MR. KAUFMAN:
5   Q   You are commenting on ethical requirement.
6 Putting aside FDA requirement, correct, if that's
7 what you were just discussing?
8    MR. THORNTON: Objection --
9    THE WITNESS: Let me -- I'm just trying to
10 understand because I obviously have opinions about
11 communicating risk and the communication of risk
12 does go through the FDA, so physicians have to get
13 that information somehow.
14    So I am offering from the context of
15 communications of risk need to be -- need to be
16 conducted. I'm not going to comment on violation of
17 regulatory law, no, or regulations.
18    I hope that answers your question.
19 BY MR. KAUFMAN:
20   Q   Your report says you are not offering
21 regulatory opinion about FDA requirements, correct?
22   A   Yes, that's correct, about FDA
23 requirements.
24   Q   So you are not offering any opinions about
25 any requirements that were in place with respect to

Page 105

1 Sanofi or Taxotere, correct?
2    MR. THORNTON: Objection; form.
3    THE WITNESS: What I am trying to get at --
4 sorry to go back and forth so much, but maybe we're
5 from two different cultures, legal and medicine.
6    But what I am trying to get across is
7 communication is a responsibility of the company
8 about risk. There is no other way. The company is
9 the best entity to know everything about their
10 product.
11 BY MR. KAUFMAN:
12   Q   Who establishes the responsibility of the
13 company?
14    MR. THORNTON: Objection; form.
15    THE WITNESS: The company has inherent
16 principles about how they decide to communicate
17 information and the FDA does have regulatory
18 requirements.
19 BY MR. KAUFMAN:
20   Q   So the company's inherent principles and
21 then the FDA requirements. That's who governs
22 company conduct in this regard?
23    MR. THORNTON: Objection; form.
24    THE WITNESS: If you're saying is that
25 all-encompassing, I can't answer that question. I

Page 106
1  do know, obviously, there's FDA requirements for how
2  any investigator and companies have to follow
3  regulations and there's a variety of different
4  compliance issues.
5          There's also a variety in different
6  departments.  There's the office of human research
7  protections.  There's a whole variety of regulations
8  that companies conducting studies have to do.  It's
9  not -- it's not just simply one agency.
10 BY MR. KAUFMAN:
11    Q   Let me go to another subject.
12    A   Sure.
13    Q   You are not offering opinions regarding the
14 adequacy of Sanofi's submissions and communications
15 with FDA regarding Taxotere?
16    A   That's correct.
17    Q   You are not offering opinions regarding the
18 adequacy of Sanofi's promotional claims regarding
19 Taxotere?
20    A   I would not be offering opinions on that.
21    Q   You are not offering opinions about the
22 adequacy of Sanofi's post market surveillance
23 programs, practices and/or actions regarding
24 Taxotere?
25        MR. THORNTON:  Objection; form.

Page 107
1         THE WITNESS:  I'm not sure that's just a
2  regulatory question.  Post marketing surveillance is
3  part of the responsibility of the company.  I'm not
4  going to offer opinions about what they knew and
5  when they knew it.
6  BY MR. KAUFMAN:
7    Q   You are not offering opinions regarding
8  whether the FDA should have approved Taxotere for
9  the treatment of breast cancer?
10   A   No, I'm not.  No.
11   Q   You are not offering opinions regarding
12 FDA's determination of the safety and effectiveness
13 of Taxotere?
14   A   No.
15       THE REPORTER:  Can we take a break?
16       MR. KAUFMAN:  Sure.
17       THE VIDEOGRAPHER:  We are off the record.
18 The time is 12:17 p.m.
19       (Break taken.)
20       THE VIDEOGRAPHER:  We are back on the
21 record.  The time is 12:30 p.m.  Please continue.
22 BY MR. KAUFMAN:
23   Q   Dr. Feigel, turn to Page 1 of your report,
24 Exhibit No. 3.
25   A   Sure.

Page 108
1    Q   The language we were just looking at, "I am
2  not offering regulatory opinions about FDA
3  requirements."
4        Do you see that?
5    A   Yes.
6    Q   Did you write that sentence?
7    A   Yes.
8    Q   Would you agree that to the extent any of
9  your opinions touch on an FDA requirement, you have
10 conceded those opinions in this report?
11   A   I agree.
12   Q   To the extent that your opinions pertain to
13 the communication between Sanofi and doctors and
14 patients, what standards -- strike that.
15       To the extent that your opinions bear on
16 communications between Sanofi and doctors and
17 patients, do you believe Sanofi violated some rule,
18 standard or principle?
19   A   I have no opinion --
20       MR. THORNTON:  Objection; form.  I'm sorry.
21       THE WITNESS:  I have no opinion on whether
22 they violated any FDA regulation or law.
23 BY MR. KAUFMAN:
24   Q   Do you have an opinion as to whether they
25 violated any other standard or principles?

Page 109
1    A   Oh, I can't comment on other standards or
2  principles, but I can certainly say I offer no
3  opinions about whether they did or did not meet FDA
4  requirements, which is consistent with what I did
5  have in my report.
6    Q   And when you say you can't talk on other
7  standards or principles, that means that you don't
8  have any opinions as to whether Sanofi complied with
9  those standards or principles?
10   A   That is not what I said.
11       What I said is I couldn't agree not to have
12 an opinion.  What I'm saying is -- I guess we'll go
13 back.  We can agree that, as stated in my report,
14 that I do not have an opinion on the interactions
15 between Sanofi and the FDA.  I didn't review that.
16       I have no reason to have an opinion there
17 and I will not comment on anything regarding their
18 FDA requirements.
19   Q   Okay.
20   A   Is that -- I think --
21   Q   I think we just made some progress.
22   A   Okay.
23   Q   Good.  I have a different question.
24   A   Okay.
25   Q   As it pertains to Sanofi's communications

28 (Pages 106 - 109)

|  |  |
|---|---|
| Page 110 | Page 112 |
| 1  to doctors, is it your opinion that Sanofi failed<br>2  some obligation, principle or standard in<br>3  communicating to physicians about Taxotere?<br>4      A   I think there was definitely no information<br>5  about permanent alopecia communicated by the company<br>6  in any way whether it was to the FDA or directly to<br>7  doctors or patients.<br>8      Q   Where is that opinion set forth in your<br>9  report?<br>10     A   I set forth that physicians were not aware<br>11 of any of this, even though there were randomized<br>12 clinical trials showing those adverse events, even<br>13 though there were case studies coming in since 2001,<br>14 even though there were over 2,100 cases of permanent<br>15 or irreversible alopecia that the company was<br>16 looking at.<br>17         So I am basing my opinion on the fact that<br>18 there was information that wasn't communicated.  I'm<br>19 not going to opine on what FDA law they did or did<br>20 not follow.<br>21     Q   Is there a single standard you can point me<br>22 to or principle that Sanofi did not meet, satisfy or<br>23 comply with?<br>24     A   I think there's certainly precedent that<br>25 there's expectation that the company, when they | 1  that are very public in terms of it's not a good<br>2  practice not to communicate adverse events.<br>3      Q   I am not looking for examples.  I want to<br>4  know what the source is so that if I'm a company and<br>5  I want to comply with this standard, I want to know<br>6  what the standard says.<br>7         Where can I go to find the standard?<br>8      A   I think --<br>9         MR. THORNTON:  Objection; form.  I'm sorry.<br>10        THE WITNESS:  I think there's certainly<br>11 case precedent for that, but as I said, there's<br>12 obviously language about companies, the timing of<br>13 what the expectations are for that and physicians<br>14 and patients are aware of that expectation.<br>15        So I can't point you to a single<br>16 regulation.  I can't point you to a single<br>17 reference.  I can see if I can find something, but<br>18 it's definitely an expectation that companies should<br>19 share -- it's their responsibility to share<br>20 information about risk to physicians.  That's very<br>21 expected by physicians and patients.<br>22 BY MR. KAUFMAN:<br>23     Q   Would you -- strike that.<br>24        Would you agree that the precedents that<br>25 you are referring to are all based on FDA |
| Page 111 | Page 113 |
| 1  identify adverse events, it is their responsibility<br>2  to investigate it and to communicate that.<br>3      Q   What is the basis of that responsibility?<br>4  Where is that set forth?  What governs that?<br>5      A   Well, I think there's precedence in<br>6  other -- first of all, as you know, I'm not a<br>7  lawyer, but there is precedent for companies being<br>8  responsible for the communication of adverse events<br>9  to patients, and that is charily a principle that is<br>10 entirely expected from physicians and patients<br>11 because there is no way a single treating physician<br>12 could ever know the world's literature on that<br>13 particular product.  It has to come from somewhere.<br>14     Q   Where is that precedent or that standard or<br>15 that requirement written or set forth?<br>16     A   You mean outside -- well, I mean, I think<br>17 that's the standard expectation.  Is it written in<br>18 law?  It's certainly a principle and it's certainly<br>19 a standard that's expected, is that companies will<br>20 provide information about risk to physicians.<br>21     Q   If I'm a company and I want to find out<br>22 more about that standard, where do I go to find it?<br>23     A   I think there's a long history of companies<br>24 being expected to follow that and I think there's a<br>25 lot of examples where companies didn't follow that | 1  enforcement?<br>2         MR. THORNTON:  Objection; form.<br>3         THE WITNESS:  I'm not a lawyer so I<br>4  can't -- I honestly can't answer that question for<br>5  you.<br>6  BY MR. KAUFMAN:<br>7      Q   You have testified extensively about your<br>8  career?<br>9      A   Yes.<br>10     Q   And your experience?<br>11     A   Yes.<br>12     Q   And you are referring to precedent and you<br>13 are referring to examples.  Is that set by FDA<br>14 requirements?<br>15        MR. THORNTON:  Objection; form.<br>16        THE WITNESS:  Yeah, I really can't -- as I<br>17 said, I know many things, but lawyer is not one of<br>18 them so I really can't knowledgeably answer that<br>19 question.<br>20 BY MR. KAUFMAN:<br>21     Q   You can't point me to a single standard or<br>22 principle or objective measure by which a company<br>23 can go to or consult to figure out its obligations<br>24 to communicate to physicians?  You can't point me to<br>25 that? |