# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)                              MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

                                                        SECTION "H" (5)

THIS DOCUMENT RELATES TO:

Antoinette Durden, Case No. 2:16-cv-16635;
Tanya Francis, Case No. 2:16-cv-17410;
Barbara Earnest, Case No. 2:16-cv-17144.

─────────────────────────────────────────────────────────

# SANOFI DEFENDANTS' MOTION TO EXCLUDE
# EXPERT TESTIMONY ON SPECIFIC CAUSATION

─────────────────────────────────────────────────────────

# TABLE OF CONTENTS

LIST OF EXHIBITS ................................................................................................................ II

TABLE OF AUTHORITIES ................................................................................................ III

INTRODUCTION ................................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................. 3

LEGAL STANDARDS ........................................................................................................... 5

I.     ADMISSIBILITY OF EXPERT TESTIMONY ................................................. 5

II.    PROOF OF SPECIFIC CAUSATION .............................................................. 8

ARGUMENT .......................................................................................................................... 9

I.     THE PUNCH BIOPSIES TAKEN BY DR. CLAIBORNE ARE UNRELIABLE. ........... 9

II.    DR. THOMPSON'S OPINIONS ARE UNRELIABLE AND IRRELEVANT. .............. 11

       A.     Dr. Thompson's Opinions are Not Reliable Because They Are Based on
              Unreliable, Litigation-Driven Biopsies. ............................................................. 11

       B.     Dr. Thompson's Methodology Did Not Account for the Specific Facts and
              Circumstances of Each Plaintiff. ........................................................................ 12

       C.     Dr. Thompson's Opinions Will Not Help the Trier of Fact Determine Whether
              Taxotere Caused Each Plaintiffs' Alleged Permanent Alopecia. ......................... 13

III.   DR. TOSTI'S OPINIONS ARE UNRELIABLE AND IRRELEVANT. ....................... 14

       A.     Dr. Tosti's Opinion is Unreliable Because She Relied on Litigation-Manufactured
              Biopsies and Dr. Thompson's Inadmissible Opinions. ........................................ 14

       B.     Dr. Tosti Failed to Rule Out Other Potential Causes. ........................................ 15

              1.     Dr. Tosti Unreliably Rejected the Other Potential Causes of Alopecia,
                     Including Those Diagnosed by Plaintiffs' Non-Litigation Treaters, Based
                     on Nothing More Than *Ipse Dixit*. .......................................................... 16

              2.     Dr. Tosti Cannot Rule Out Other Chemotherapy Medications. ................. 18

              3.     Dr. Tosti Cannot Cite Literature to "Rule In" Taxotere and the Literature
                     Does Not Permit Her to "Rule Out" Other Chemotherapy Drugs. ........... 20

CONCLUSION ...................................................................................................................... 25

## LIST OF EXHIBITS

Ex. A          Thompson Deposition

Ex. B          Tosti Deposition

Ex. C.         Claiborne Deposition

Ex. D.         Durden Plaintiff Fact Sheet

Ex. E.         Durden Deposition

Ex. F.         Earnest Plaintiff Fact Sheet

Ex. G.         Francis Deposition

Ex. H.         Kessler Deposition

Ex. I.         Love Report

Ex. J          Thompson Report

Ex. K.         Tosti Report

Ex. L.         Bickhoff Medical Record

Ex. M.         Mermilliad Deposition

Ex. N.         Ochsner Health System

Ex. O.         Martin Deposition

Ex. P.         Smart Report

Ex. Q.         Slidell Memorial Hospital

Ex. R.         Plunkett Deposition

Ex. S.         Feigal Deposition Vol. I

Ex. T.         Kim et al. (2017)

Ex. U.         Tosti Deposition Ex. 2

Ex. V.         Feigal Deposition Vol. III

Ex. W.         Bosserman Deposition

Ex. X.         Nabholtz (2001)

Ex. Y.         Tallon (2010)

Ex. Z.         Tosti (2013)

Ex. AA.        Madigan Deposition

Ex. BB.        Tallon (2013)

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allen v. Pennsylvania Eng'g Co.*,
  102 F.3d 194 (5th Cir. 1996) ...................................................12

*Am. Honda Motor Co., Inc. v. Allen*,
  600 F.3d 813 (7th Cir. 2010) ...................................................14

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002)...................................................13

*Black v. Food Lion, Inc.*,
  171 F.3d 308 (5th Cir. 1999) ...................................................13

*Braun v. Lorillard Inc.*,
  84 F.3d 230 (7th Cir. 1996) ...................................................12

*Brown v. Burlington N. Santa Fe Ry. Co.*,
  765 F.3d 765 (7th Cir. 2014) ...................................................21

*Burst v. Shell Oil Co.*,
  120 F. Supp. 3d 547 (E.D. La. 2015)...........................................12, 15, 21, 27, 28

*Burst v. Shell Oil Co.*,
  650 F. App'x 170 (5th Cir. 2016) ...................................................28

*Burst v. Shell Oil Co.*,
  No. 14-cv-109, 2015 WL 3755953 (E.D. La. June 16, 2015) ...................................................28

*C.W. ex rel. Wood v. Textron, Inc.*,
  807 F.3d 827 (7th Cir. 2015) ...................................................13

*Capital Funding, VI, LP v. Chase Manhattan Bank USA, N.A.*,
  No. 01-cv-6093, 2005 WL 352697 (E.D. Pa. Feb. 11, 2005)...................................................14

*Comardell v. Pennsylvania Gen. Ins. Co.*,
  76 F. Supp. 3d 628 (E.D. La. 2015)...................................................18

*Cormier v. CITGO Petroleum Corp.*,
  228 So. 3d 770 (La. App. 3 Cir. 2017) ...................................................15

*Demouchet v. Gen. Nutrition Corp.*,
  No. 11-cv-1961, 2014 WL 1652518 (W.D. La. Apr. 24, 2014) ...................................................14

*Gen. Elec. Co.* v. *Joiner*,
    522 U.S. 136 (2007).................................................................13, 20, 23, 30, 31

*Guinn v. AstraZeneca Pharm. LP*,
    602 F.3d 1245 (11th Cir. 2010) ....................................................................21

*Happel v. Walmart Stores, Inc.*,
    602 F.3d 820 (7th Cir. 2010) ........................................................................30

*In re Accutane Prod. Liab. Litig.*,
    511 F. Supp. 2d 1288 (M.D. Fla. 2007).........................................................30

*In re Lipitor Mktg., Sales Practices & Prod. Liab. Litig.*,
    150 F. Supp. 3d 644 (D.S.C. 2015).........................................................23, 24

*In re Mirena IUS Levonorgestrel-Related Prod. Liab. Litig.*,
    341 F. Supp. 3d 213 (S.D.N.Y. 2018).....................................................28, 31

*In re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d Cir. 1994).......................................................................12, 13

*In re Silica Prod. Liab. Litig.*,
    398 F. Supp. 2d 563 (S.D. Tex. 2005) ...........................................................20

*Kemp v. Metabolife Int'l, Inc.*,
    No. 00-3513, 2004 WL 2095618 (E.D. La. Sept. 13, 2004)...........................14

*Kilpatrick v. Breg, Inc.*,
    613 F.3d 1329 (11th Cir. 2010) ....................................................................21

*Knight v. Kirby Inland Marine Inc.*,
    482 F.3d 347 (5th Cir. 2007) .................................................................7, 12, 13

*Konrick v. Exxon Mobil Corp.*,
    No. 14-cv-524, 2016 WL 439361 (E.D. La. Feb. 4, 2016), *aff'd*, 670 F. App'x
    222 (5th Cir. 2016).......................................................................................28

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999).......................................................................................12

*Lasha v. Olin Corp.*,
    625 So. 2d 1002 (La. 1993) ..........................................................................14

*Mercedes-Benz USA v. Coast Auto. Grp.*,
    362 F. App'x 332 (3d Cir. 2010) ...................................................................14

*Nelson v. Tennessee Gas Pipeline Co.*,
    243 F.3d 244 (6th Cir. 2001) ........................................................................13

*Oddi v. Ford Motor Co.*,
   234 F.3d 136 (3d Cir. 2000) .................................................................13

*Porte v. Illinois Cent. R.R. Co.*,
   No. 17-cv-5657, 2018 WL 4404063 (E.D. La. Sept. 14, 2018) ...................21

*Rodriguez v. Stryker Corp.*,
   680 F.3d 568 (6th Cir. 2012) ..............................................................13

*Rutigliano v. Valley Bus. Forms*,
   929 F. Supp. 779 (D.N.J. 1996), *aff'd* 118 F.3d 1577 (3d Cir. 1997) .................31

*Seaman v. Seacor Marine LLC*,
   564 F. Supp. 2d 598 (E.D. La. 2008) ...................................................14

*Slaughter v. S. Talc Co.*,
   919 F.2d 304 (5th Cir. 1990) ..............................................................17

*Soden v. Freightliner Corp.*,
   714 F.2d 498 (5th Cir. 1983) ..............................................................17

*Soldo v. Sandoz Pharm. Corp.*,
   244 F. Supp. 2d 434 (W.D. Pa. 2003) ...................................................14

*Tamraz v. Lincoln Elec. Co.*,
   620 F.3d 665 (6th Cir. 2010) .........................................................21, 23

*Trigon Ins. Co. v. United States*,
   204 F.R.D. 277 (E.D. Va. 2001) ..........................................................25

*Wagoner v. Exxon Mobil Corp.*,
   813 F. Supp. 2d 771 (E.D. La. 2011) .................................................21, 28

*Watkins v. Telsmith, Inc.*,
   121 F.3d 984 (5th Cir. 1997) ..............................................................12

*Wehling v. Sandoz Pharm. Corp.*,
   No. 97-2212, 162 F.3d 1158, 1998 WL 546097 (4th Cir. Aug. 20, 1998) ............12

*Weisgram v. Marley Co.*,
   528 U.S. 440 (2000) ........................................................................12

## Rules

Fed. R. Evid. 702 ................................................................11, 14, 18

Fed. R. Evid. 703 .................................................................8, 15, 17

**Other Authorities**

MedDRA Dictionary.......................................................................................................................10

## INTRODUCTION

Plaintiffs must prove both general causation and specific causation. To establish specific causation, Plaintiffs must prove that Taxotere caused each Plaintiff's alleged permanent alopecia with relevant and reliable expert testimony. Plaintiffs put forward two experts on specific causation: Dr. Curtis Thompson, a pathologist; and Dr. Antonella Tosti, a dermatologist. To determine a specific cause of alopecia, the pathologist and dermatologist must use a reliable differential diagnosis, ruling in and ruling out potential causes. Under *Daubert*, Plaintiffs cannot satisfy their burden unless they can reliably rule out the potential causes other than Taxotere,[1] including the other chemotherapies Plaintiffs received that are admittedly associated with permanent alopecia. Both Dr. Thompson and Dr. Tosti testified they cannot meet this threshold:

> *Q. And so it's fair to say that you are not going to say that any specific chemotherapy drug caused this hair loss seen in these women?*
>
> *A. I'm not in a position to make that distinction or claim.*

Thompson Dep. 50:24-51:3 (emphasis added) (Ex. A).

> Q. So I have read your report that you prepared in this case, and I know it's your opinion that Ms. Francis and Ms. Durden have traction alopecia, but you think that all three women also have persistent chemotherapy-induced alopecia. Right?
>
> A. Yes.
>
> *Q. And in your report, you do not attribute the hair loss to any specific chemotherapy drug, right?*
>
> MR. SCHANKER: Objection to form.
>
> *A. I cannot say which drug is causing the – the hair loss, of course. You can never make these diagnosis for any type of drug-induced hair loss, even for telogen effluvium.*

---

[1] This assumes, for purposes of this Motion, that Plaintiffs may reliably *rule in* Taxotere, *i.e.*, that they are able to overcome the obstacles under *Daubert* of their general causation opinions. *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007) ("Evidence concerning specific causation in toxic tort cases is admissible only as a follow-up to admissible general-causation evidence."). They cannot for the reasons more fully set forth in Sanofi Defendants' Motion to Exclude Expert Testimony on General Causation.

Tosti Dep. 297:17-298:6 (emphasis added) (Ex. B). These admissions are fatal to Plaintiffs' specific causation case.  No expert can reliably attribute each woman's alleged injury to Taxotere as opposed to the other chemotherapy medicines in her multi-drug regimen.

These are not, however, the only problems with the opinions of Drs. Thompson and Tosti. Both Dr. Thompson and Dr. Tosti rely on punch biopsies and a litigation-driven process that falls well outside generally-accepted, reliable medical practices. Plaintiffs' lawyers instructed a local New Orleans dermatologist, Dr. Cole Claiborne, to obtain the punch biopsies. The lawyers did not provide any clinical history to Dr. Claiborne and did not allow him to examine Plaintiffs. He took two biopsies from pre-determined areas of the scalp. The specimens were then sent to the retained pathologist, Dr. Thompson. Without considering any other factors for each woman's hair loss or performing a differential diagnosis, Dr. Thompson issued a pathology report with a uniform conclusion – "consistent with permanent alopecia after chemotherapy" – despite the differences in the biopsies and the differences in the women. Plaintiffs then traveled to Miami, Florida, to see Plaintiffs' other retained expert, Dr. Tosti. Dr. Tosti, relying on the orchestrated pathology report from Dr. Thompson, excluded non-chemotherapy causes without a reliable, evidence-based explanation. But even assuming that Dr. Tosti could narrow down the differential to *chemotherapy* alone, there is no way to say that Taxotere caused each woman's hair loss and not the other chemotherapy medications.

Dr. Thompson's and Dr. Tosti's specific-causation opinions are inadmissible under Federal Rules of Evidence 702 and 703. First, both experts based their opinions on unreliable data—the punch biopsies—rendering their opinions inadmissible. Second, both Dr. Thompson and Dr. Tosti failed to employ proper methodology to determine the cause of each Plaintiff's alleged permanent alopecia. Finally, Dr. Thompson's and Dr. Tosti's opinions are untethered from the particular facts

and circumstances of each case. Their opinions on specific causation should be excluded.

## FACTUAL BACKGROUND

*Alopecia: Multi-Factorial and Multi-Typed.* Alopecia, or hair loss, comes in many different forms with many different causes. Claiborne Dep. 38:15–22 (Ex. C); Thompson Dep. 59:10–25 (Ex. A). According to Plaintiffs' non-testifying dermatologist, Dr. Claiborne, about ninety-something percent of women will have some form of alopecia during her lifetime. Claiborne Dep. 38:6–13 (Ex. C). Potential contributors to alopecia include: age, being post-menopausal, iron deficiencies, vitamin deficiencies, liver disease, kidney disease, hormonal issues, anemias, thyroid problems, certain hair care practices, drugs and medications, stress, surgery, and weight. *Id*. 52:1–53:20 (Ex. C). Each of the three Plaintiffs carry many such risk factors. *See* Durden PFS § IV.1, 10, VIII.4 (Ex. D); Durden Dep. 140:10–17, 143:13–14, 144:2–14 (Ms. Durden is post-menopausal, 66 years old, has been on an endocrine therapy drug known to cause hair loss since 2012, and regularly used harsh hair care treatments for over two decades before chemotherapy) (Ex. E); Earnest PFS § IV.1, .10, VII.8, .12-13 (Ms. Earnest is post-menopausal, 68 years old, lost her hair before beginning treatment with Taxotere while on another two chemotherapy medicines, and has been taking an aromatase inhibitor known to cause hair loss since 2011) (Ex. F); Francis PFS § IV.1, .10, VII.8, .12-13  (Ms. Francis is post-menopausal, 48 years old, regularly used harsh hair care treatments in the decades before chemotherapy, has been taking hormone suppression therapy or an aromatase inhibitor known to cause hair loss since 2009, and has low Vitamin D) (Ex. G).  Because there are so many potential causes of alopecia, one woman can have more than one type of alopecia on her scalp at the same time. Claiborne Dep. 39:4–6 (Ex. C); Thompson Dep. 59:22–25 (Ex. A). This makes diagnosing the true cause of a woman's alopecia difficult for both clinicians and pathologists. Claiborne Dep. 39:1–3, 51:1–5

(Ex. C); Thompson Dep. 60:1–6 (Ex. A).

  ***Recognized Dermatological Method for Diagnosing Alopecia.*** Plaintiffs' experts agree,

however, that there is a recognized, standard dermatological methodology used for diagnosis:

1. First, the dermatologist "take[s] an adequate history" of the patient. Claiborne Dep. 41:14–42:6 (Ex. C).

2. Second, the dermatologist conducts a physical examination. *Id*. 44:19-45:7.

3. Next, the dermatologist comes up with a "differential diagnoses" of what "are going to be the most likely causes" of the patient's alopecia. *Id*. 42:25–43:3. This allows the dermatologist to decide "where the best place to take the biopsy is." Thompson Dep. 73:23–25 (Ex. A); *see also id.* 74:1–76:1.

4. The dermatologist then attempts to rule out causes through diagnostic tools such as:

   a. Taking a blood test to rule out an underlying problem like hormonal issues, anemias, thyroid problems, or iron or vitamin deficiencies that could be contributing to the patient's alopecia. *See* Claiborne Dep. 45:17–46:2, 10–17 (Ex. C); *see also* Thompson Dep. 69:22–71:25 (Ex. A);

   b. Observing the patient over a period of time to get "a comparison to see what changes" are occurring. *See* Claiborne Dep Tr. 43:11–17 (Ex. C); *see also id.* 43:18–44:12; and/or

   c. Taking a punch biopsy. *See* Tosti Dep. Tr. 90:5–90:8 (testifying that to rule out scarring types of alopecia, an initial diagnosis can be made through a clinical examination but a "biopsy confirmation is gold standard") (Ex. B); *see also* Thompson Dep. 60:9-21, 297:5–6 ("the gold standard is really the biopsy") (Ex. A).

If the dermatologist decides to take a punch biopsy, the dermatologist will assess the patient's hair

loss patterns and select biopsy sites from an individual's scalp. Claiborne Dep. 47:17–25 (Ex. C);

*accord* Tosti Dep. 156:6–11(Ex. B). The location of the biopsy is critical, because the biopsy is no

bigger than the end of an eraser, and the biopsy will only reveal what is happening on that portion

of the scalp. Claiborne Dep. 41:4–13 (Ex. C).

  ***No Consensus Standards for Diagnosing "Permanent" Alopecia.*** While there are many

different types of alopecia, there is no medically-accepted definition of "permanent" alopecia. *See*

MedDRA Dictionary (the term "irreversible alopecia" does not exist); *see also* NCI dictionary of Cancer Terms (the phrases "permanent alopecia," "chronic alopecia," "persistent alopecia," "irreversible alopecia," or "long-term alopecia" are not found). Plaintiffs' own regulatory expert admits that the term "irreversible alopecia" cannot be found in any authoritative database. Kessler Dep. 134:11–17 (Ex. H).

The lack of any medically-accepted definition corresponds to the absence of a clear *clinical* consensus on what constitutes permanent alopecia. Kessler Dep. 135:21–136:2 (Ex. H). However, there is consensus on what permanent alopecia is <u>not</u>. Simply put, if the hair ever regrows, the patient's alopecia was not permanent. *Id*. 145:12–13 ("If the hair regrows, we can agree that it wasn't irreversible."). In the absence of follow-up treatment to see if hair regrows, it cannot be said with reasonable medical probability that any alopecia is permanent. Love Report at 15–16 (Ex. I). Moreover, a patient who does not seek treatment cannot know if her alopecia is truly permanent because, with treatment, her hair could regrow. *Id*. Neither of Plaintiffs' experts conducted any follow up on these three Plaintiffs—Dr. Thompson never saw Plaintiffs, and Dr. Tosti only saw each Plaintiff once for around 40 minutes. Thompson Dep. 30:3–5 (Ex. A); Tosti Dep. 437:25–438:3, 412:4–7, 345:6–9 (Ex. B).

## LEGAL STANDARDS

## I.   ADMISSIBILITY OF EXPERT TESTIMONY

Courts must exclude expert evidence that is not "based on sufficient facts or data," that is not "the product of reliable principles and methods," or that has not been "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Under Rule 702, the Court's gatekeeping function involves a two-part inquiry into *reliability* and *relevance*:

> First, the Court must determine whether the proffered expert testimony is reliable. The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence. The reliability inquiry requires the Court to assess

> whether the reasoning or methodology underlying the expert's testimony is valid. The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation.
>
> Second, the Court must determine whether the expert's reasoning or methodology is relevant. The question here is whether the reasoning or methodology "fits" the facts of the case and will thereby assist the trier of fact to understand the evidence.

*Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 550 (E.D. La. 2015) (citations omitted).

The "reliability analysis applies to *all aspects* of an expert's testimony," including "the methodology, the *facts underlying the expert's opinion*, [and] the link between the facts and the conclusion." *See Knight*, 482 F.3d at 355 (emphasis added). Importantly, "the expert's testimony must be reliable at each and every step or else it is inadmissible." *Id.* "[A]ny step that renders the analysis unreliable under the Daubert factors renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994). These "exacting standards of reliability," *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000), provide that "conjecture, hypothesis, subjective belief, or unsupported speculation are impermissible grounds on which to base an expert opinion." *Wehling v. Sandoz Pharm. Corp.*, No. 97-2212, 162 F.3d 1158, 1998 WL 546097, at *5 (4th Cir. Aug. 20, 1998) (Table Decision).

Courts must "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *see Braun v. Lorillard Inc.*, 84 F.3d 230, 234 (7th Cir. 1996); *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 990 (5th Cir. 1997); *Allen v. Pennsylvania Eng'g Co.*, 102 F.3d 194, 198 (5th Cir. 1996). Courts also consider "whether experts are 'proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.'" *Burst*, 120 F. Supp. 3d at 551 (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 43

F.3d 1311, 1317 (9th Cir. 1995) (*Daubert II*)).

Of course, an expert's "conclusions and methodology are not entirely distinct from one another," *Gen. Elec. Co.* v. *Joiner*, 522 U.S. 136, 146 (2007), and the difference between them "has only limited practical import." *Paoli*, 35 F.3d at 746. "When a judge disagrees with the conclusions of an expert, it will generally be because he or she thinks that there is a mistake at some step in the investigative or reasoning process of that expert." *Id.* As part of its gatekeeper function, the court "must examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000). In doing so, a court may "conclude that there is simply too great an analytical gap between the data and the opinion proffered" and preclude the testimony. *Joiner*, 522 U.S. at 146.

"[C]lose judicial analysis of expert testimony is necessary 'because expert witnesses are not necessarily always unbiased scientists.'" *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 252 (6th Cir. 2001) (citation omitted). By "adopting an excessive level of generality in [the] gatekeeping inquiry," courts have "fatally erred by applying [*Daubert*'s] criteria at a standard of meaninglessly high generality rather than boring in on the precise state of scientific knowledge in this case." *Black v. Food Lion, Inc.*, 171 F.3d 308, 313–14 (5th Cir. 1999). Carefully conducting "an in-depth review of the relevant studies" is an approach that "follows the same path blazed by the Supreme Court in *Joiner*." *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 835 (7th Cir. 2015); *accord Knight*, 482 F.3d at 355; *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). "'Courts have a duty to inspect the reasoning of qualified scientific experts' . . . including whether an expert's sources support his conclusions." *Rodriguez v. Stryker Corp.*, 680 F.3d 568, 572 (6th Cir. 2012) (citation omitted).

"'[E]xpert evidence can be both powerful and quite misleading.'" *Daubert*, 509 U.S. at 595 (citation omitted). Plaintiffs, as the proponents of the expert evidence, bear the burden of showing that it is admissible. *Mercedes-Benz USA v. Coast Auto. Grp.*, 362 F. App'x 332, 335 n.2 (3d Cir. 2010). Defendants do not bear the burden of demonstrating its inadmissibility. *Capital Funding, VI, LP v. Chase Manhattan Bank USA, N.A.*, No. 01-cv-6093, 2005 WL 352697, at *3 (E.D. Pa. Feb. 11, 2005); *Soldo v. Sandoz Pharm. Corp.*, 244 F. Supp. 2d 434, 534 (W.D. Pa. 2003).

*Daubert* carefully distinguishes between the threshold reliability inquiry that Plaintiffs must satisfy and the role of cross-examination. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence . . . . These conventional devices . . . are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702." *Daubert*, 509 U.S. at 596 (emphasis added) (citations omitted). "[B]ut the testimony proffered here is not merely shaky: it is unreliable" and "should not be admitted." *Am. Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 818-19 (7th Cir. 2010).

## II.   PROOF OF SPECIFIC CAUSATION

In Louisiana, a plaintiff must prove general causation as well as specific causation. "General causation is whether a substance is capable of causing a particular injury or condition in the general population. Specific causation is whether a substance caused a particular individual's injury." *Seaman v. Seacor Marine LLC*, 564 F. Supp. 2d 598, 600 (E.D. La. 2008) (citing *Knight*, 482 F.3d at 351). If a plaintiff's case involves "complex issues of medical causation that are beyond the realm of knowledge and experience of the ordinary juror," like this one, the plaintiff must present admissible expert testimony to prove causation. *Demouchet v. Gen. Nutrition Corp.*, No. 11-cv-1961, 2014 WL 1652518, at *4 (W.D. La. Apr. 24, 2014); *accord Kemp v. Metabolife Int'l, Inc.*, No. 00-3513, 2004 WL 2095618, at *3 (E.D. La. Sept. 13, 2004). Experts must attest to their

opinions to a reasonable medical probability. *Lasha v. Olin Corp.*, 625 So. 2d 1002, 1005 (La. 1993); *Cormier v. CITGO Petroleum Corp.*, 228 So. 3d 770, 773 (La. App. 3 Cir. 2017).[2]

## ARGUMENT

Dr. Thompson's and Dr. Tosti's opinions are inadmissible under Rule 702, Rule 703, and *Daubert*. The opinions of both experts rest on the foundation of unreliable, litigation-driven biopsies. Both experts failed to account for the facts and circumstances of each Plaintiff. And both experts failed to reliably rule out other causes of Plaintiffs' alleged permanent alopecia, including the women's other chemotherapy medications. This methodology is unreliable and inadmissible.

## I.     THE PUNCH BIOPSIES TAKEN BY DR. CLAIBORNE ARE UNRELIABLE.

Plaintiffs' lawyers asked Dr. Claiborne, the New Orleans dermatologist, to take two punch biopsies from the scalp of each Plaintiff. Claiborne Dep. 11:15–24, 12:19–20 (Ex. C). Both Dr. Thompson and Dr. Tosti, in turn, relied on the punch biopsies for their specific causation opinions. *See generally* Thompson Report (Ex. J); *see also* Tosti Report at 13 (Ex. K). But the method used by Dr. Claiborne was not consistent with his clinical practice. Claiborne Dep. 20:17–20; 58:2–5 ("Q: So outside of a litigation context, what was done with these three women is something that you would never do? A. Correct.") (Ex. C). Dr. Tosti and Dr. Thompson concede that the method was not standard dermatological practice. *See* Tosti Dep. 156:6–11 (Ex. B); Thompson Dep. 135:2–8 (Ex. A). Dr. Claiborne went further, describing it as "a woefully incomplete picture." Claiborne Dep. 22:1–2 (Ex. C). The punch biopsies render unreliable both Dr. Thompson's and Dr. Tosti's opinions. *Burst*, 120 F. Supp. 3d at 551.

When assessing a patient complaining of hair loss, Dr. Claiborne would follow a routine procedure following multiple steps. Claiborne Dep. 41:14–47:25, 47:17–25, 49:19–24, 50:3–6,

---

[2] Because Louisiana law requires expert testimony on specific causation, should Defendants' motion be granted and Plaintiffs' experts' opinions excluded, Defendants would be entitled to judgment as a matter of law.

28:25–29:18 (Ex. C). In this case, however, Dr. Claiborne did not follow that process:

1. Plaintiffs' lawyers did not give him the Plaintiffs' clinical histories;

2. Plaintiffs' lawyers instructed Dr. Claiborne not to conduct a physical examination;

3. Dr. Claiborne did not have the information needed to make a differential diagnosis;

4. To rule out potential causes:

   a. Dr. Claiborne did not run blood tests on any Plaintiff;

   b.  He did not observe them over time to see how they responded to treatment; and

   c. Plaintiffs' lawyers instructed Dr. Claiborne on taking the punch biopsies.

Claiborne Dep. 41:17–42:10; 44:13-18; 45:8–12; 46:25–47:3; 42:25–43:10; 48:1–49:2 (Ex. C).

Most significantly, Plaintiffs' lawyers instructed Dr. Claiborne to take only two biopsies per Plaintiff, the first from an area that looked "normal" and the second from an area that looked "abnormal." Claiborne Dep. 48:1–13 (Ex. C). Dr. Claiborne did not get to examine the Plaintiffs' scalps to determine whether other forms of alopecia were present. *Id*. 48:14–18 ("Q. And so what you did not do with these three women is you did not look at their scalp to determine whether there could be other forms of alopecia processes going on? A. Correct. Q. And you did not take biopsies from those other potential portions of their scalp to determine what the alopecia process might be on that portion of the scalp? A. Yep. I had no other information to know anything else.").

Drs. Thompson and Tosti acknowledge that the method violated standard practice. Thompson Dep. 88:18–23 ("Q. Having a non-medical professional tell a dermatologist where to take the biopsies from on the scalp would not be consistent with standard dermatological practices?" "A. Correct.") (Ex. A). The process used here "hopefully [would] not" be used in a normal day-to-day practice of treating patients. *Id*. at 135:2–8. The standard would be to assess the patient's clinical history and perform a physical examination before taking a biopsy, neither of which were done here. Tosti Dep. 156:6–11 (Ex. B). Dr. Tosti would never accept a plaintiff's

attorney telling her how many biopsies to take, or from where to take them. *Id*. 154:16–21. Following the instruction of Plaintiffs' lawyers, resulted in biopsies that are fundamentally unreliable and should not have been relied upon by Drs. Thompson and Tosti for their opinions.

## II.   DR. THOMPSON'S OPINIONS ARE UNRELIABLE AND IRRELEVANT.

Dr. Thompson read the pathology produced by Dr. Claiborne at Plaintiffs' lawyers direction and rotely concluded that the biopsies were "consistent with PERMANENT ALOPECIA AFTER CHEMOTHERAPY" in all three Plaintiffs. Thompson Report at 2, 4, 7 (Ex. J). Dr. Thompson's opinions must be excluded because (1) unreliable biopsies were the foundation of his entire opinion, (2) Dr. Thompson's methodology failed to account for the specific facts and circumstances of each Plaintiff, and (3) Dr. Thompson's opinion do not answer the relevant question: whether Taxotere, and not something else, caused Plaintiffs' alleged permanent alopecia.

### A.   Dr. Thompson's Opinions are Not Reliable Because They Are Based on Unreliable, Litigation-Driven Biopsies.

The Fifth Circuit has made clear that a "trial court's inquiry into whether [Rule 703's] standard is satisfied … should focus on the reliability of the opinion *and its foundation*[.]" *Soden v. Freightliner Corp*., 714 F.2d 498, 502–03 (5th Cir. 1983). If an expert's underlying data is "not shown to be of a type reasonably relied upon by experts in his field," the court may exclude any opinion dependent on that data. *Id.* at 503; *Slaughter v. S. Talc Co.*, 919 F.2d 304, 307 (5th Cir. 1990) ("bare conclusions derived from erroneous data" are inadmissible). Data prepared "strictly in anticipation of litigation" will be considered unreliable. *Soden*, 714 F.2d at 503.

Dr. Thompson was unaware of the method used by Dr. Claiborne to take the biopsies. Thompson Dep. 117:22–119:3, 122:14–124:20, 126:4–16 (Ex. A). Dr. Thompson was not provided with Dr. Claiborne's deposition testimony describing that process. *See id.* He was not even made aware that Dr. Claiborne had been deposed. *See id.* 117:22–118:4. At points, Plaintiffs'

counsel appeared to be moving to strike her own witness's answers on these subjects. *Id.* 117:3–20, 120:25–121:8 ("A. Well, any time you practice medicine you should have a differential. That's what you learn in the first day of medical school. Q. If the person --MS. ANDREWS: Objection; move to strike."). Dr. Thompson admitted that: (1) the methodology used to take the punch biopsies was not consistent with standard dermatological practices, and (2) the biopsies are not the type of data he would typically expect to rely on in his role as a pathologist. *See id.* 64:4–8, 66:7–10, 68:9–12. Dr. Thompson's opinion based on the punch biopsies—in this case, his entire opinion—must be excluded under Rules 702, 703, and *Daubert*.

### B. Dr. Thompson's Methodology Did Not Account for the Specific Facts and Circumstances of Each Plaintiff.

An expert may not offer a specific causation opinion when his methodology fails to consider the specific facts and circumstances at issue. *See Comardell v. Pennsylvania Gen. Ins. Co.*, 76 F. Supp. 3d 628, 633–35, n.24 (E.D. La. 2015). In other words, the expert will not be permitted to issue a "blanket specific causation opinion" that is "not based on or tied to the specific facts and circumstances" of the particular plaintiff. *Id.* at 634. According to Dr. Thompson, a standard diagnosis requires the dermatologist to consider specific facts from the patient's clinical history. The clinical history is crucial to forming an opinion because "certain clinical information, history could impact how [a dermapatothologist] might read and interpret pathology." Thompson Dep. 95:25–96:3 (Ex. A); *id.* 64:9–12 (testifying that "clinical notes from the dermatologist is especially helpful because the patient's subjective history and the clinician's exam provide useful clues."); Tosti Dep. 97:9–97:14 (testifying that "a very careful clinical history is the most important thing" in "assessing the form of alopecia") (Ex. B).

But Dr. Thompson did not review the Plaintiffs' clinical history before reaching his diagnosis. Thompson Dep. 45:5–16 (Ex. A). He knew only Plaintiffs' ages, genders, and the fact

that they had prior chemotherapy treatment. *Id.* 48:15–50:20. Dr. Thompson could not reliably read the punch biopsies and reach an opinion on the role of chemotherapy without the clinical histories.

One key example makes this point. Dr. Thompson admitted that Plaintiffs' punch biopsies have features consistent with hair loss caused by tamoxifen or aromatase inhibitors, but he does not know whether Plaintiffs took those medications (they all did). Thompson Dep. 252:19–253:10 ("Q. And what does the pathology look like for hair loss caused by tamoxifen or aromatase inhibitors? A. Well, it's the presence of . . . a catagen or telogen shift and the miniaturization . . . there's a low follicular count or density? Q. So basically the features that you're reporting in your demopath reports? A. Oh, yes.) (Ex. A); 148:19–23 ("Q. Do you know whether Ms. Durden, Ms. Earnest, or Ms. Francis took tamoxifen aromatase inhibitors? A. I didn't look at what they took."). Dr. Thompson thus failed to account for the facts and circumstances of each Plaintiff.

### C.   Dr. Thompson's Opinions Will Not Help the Trier of Fact Determine Whether Taxotere Caused Each Plaintiffs' Alleged Permanent Alopecia.

Finally, Dr. Thompson's ultimate opinion that Plaintiffs' punch biopsies were "consistent with" persistent alopecia after "chemotherapy" does not help the trier of fact on specific causation. Dr. Thompson does not plan to testify <u>whether chemotherapy "caused"</u> Plaintiffs' alopecia, let alone whether Taxotere specifically caused each Plaintiff's alopecia:

> Q. And so it's fair to say that you are not going to say that any specific chemotherapy drug caused this hair loss seen in these women?
>
> A. I'm not in a position to make that distinction or claim.

Thompson Dep. 50:24–51:3 (Ex. A). Dr. Thompson additionally cannot opine on what specifically caused each Plaintiff's alopecia because he admittedly knows nothing about each Plaintiff's individual medical history or background. *Id.* 29:19–30:5, 44:1–4, 45:5–12. Dr. Thompson admitted that there was "no way to tell" whether Plaintiffs had components of other

forms of alopecia—androgenetic alopecia, chronic telogen effluvium, or CCCA—occurring elsewhere on their scalp, beyond the two eraser-sized biopsy sites that Plaintiffs' lawyers directed. *Id.* 232:6–233:21. Dr. Thompson likewise could not assess what chemotherapy drug "caused" Plaintiffs' injuries because he does not know what other drugs each Plaintiff took. *Id.* 50:24–51:3, 178:2–4. Because Dr. Thompson's opinions will not help the trier of fact determine what specifically caused each Plaintiff's alleged permanent alopecia, they must be excluded. *See Joiner*, 522 U.S. at 145 (excluding expert testimony in part because the expert relied on studies identifing a correlation between the exposure and injury but "unwilling to say" that the exposure *caused* the injury); *In re Silica Prod. Liab. Litig.*, 398 F. Supp. 2d 563, 630–32 (S.D. Tex. 2005) (concluding that radiographic findings "consistent with" the condition in question could not rule out the other potential causes and that such a differential diagnosis required exposure and medical history).

## III.   DR. TOSTI'S OPINIONS ARE UNRELIABLE AND IRRELEVANT.

Dr. Tosti opines that Ms. Durden, Ms. Earnest, and Ms. Francis "are affected by permanent alopecia after systemic chemotherapy." Tosti Report at 28 (Ex. K). She bases these opinions on Dr. Thompson's dermapathology reports, her own 40-minute exam of each Plaintiff, and certain literature. But Dr. Tosti's opinions must be excluded because she: (1) relied on Dr. Thompson's unreliable opinions; (2) failed to reliably rule out other causes; and (3) relied on literature that is not sufficient to support her ultimate opinion.

### A.   Dr. Tosti's Opinion is Unreliable Because She Relied on Litigation-Manufactured Biopsies and Dr. Thompson's Inadmissible Opinions.

Dr. Tosti's opinions are based on Dr. Claiborne's unreliable punch biopsies and Dr. Thompson's unreliable assessment of those punch biopsies. Tosti Dep. 125:4–13 (Ex. B). Any opinion based on those foundations is inadmissible for the reasons set out above.

### B.     Dr. Tosti Failed to Rule Out Other Potential Causes.

The standard method for assessing specific causation is "a differential diagnosis or a differential etiology." *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 804 (E.D. La. 2011). "In performing a differential diagnosis, a physician begins by 'ruling in' all scientifically plausible causes of the plaintiff's injury. The physician then 'rules out' the least plausible causes of injury until the most likely cause remains." *Wagoner*, 813 F. Supp. 2d at 804 (internal citation and quotation omitted); *accord Porte v. Illinois Cent. R.R. Co.*, No. 17-cv-5657, 2018 WL 4404063, at \*3 (E.D. La. Sept. 14, 2018); *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1342 (11th Cir. 2010). "[S]imply claiming that an expert used the 'differential diagnosis' method is not some incantation that opens the *Daubert* gate." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 674 (6th Cir. 2010) (citation omitted); *see Guinn v. AstraZeneca Pharm. LP*, 602 F.3d 1245, 1253 (11th Cir. 2010); *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 773 (7th Cir. 2014). Here, Dr. Tosti did not start by "'ruling in' all scientifically plausible causes" of Plaintiffs' alopecia. She also did not appropriately rule out the least plausible causes. Instead, Dr. Tosti first read Dr. Thompson's conclusion—that the pathology results were "consistent with permanent alopecia after chemotherapy"—and from that conclusion ruled in only *one* allegedly plausible cause of Plaintiffs' alopecia. Dr. Tosti used her physical examinations solely to confirm her diagnosis—turning the differential diagnosis process on its head. *See* Tosti Report at 13 (Ex. K). This is not a proper or reliable differential diagnosis by Dr. Tosti's own standard procedures. Tosti Dep. 104:22–24 (testifying that in her normal practice, she would get the patients' clinical history, take a clinical examination, and only then take a biopsy if needed) (Ex. B); *Burst*, 120 F. Supp. 3d at 551 (assessing "whether the expert 'is being as careful as he would be in his regular professional work outside his paid litigation consulting'").

1.   **Dr. Tosti Unreliably Rejected the Other Potential Causes of Alopecia, Including Those Diagnosed by Plaintiffs' Non-Litigation Treaters, Based on Nothing More Than *Ipse Dixit*.**

Had Dr. Tosti reliably applied a differential diagnosis she would have appropriately examined the multiple other potential causes of Plaintiffs' condition. For example, with both Ms. Durden and Ms. Francis, other physicians diagnosed them with Central Centrifugal Cicatricial Alopecia ("CCCA") and findings consistent with traction alopecia, both common forms of scarring alopecia in women of skin of color. Outside of this litigation, Ms. Francis went to a dermatologist's office. That treater did not diagnose Ms. Francis as having permanent alopecia caused by chemotherapy. Ms. Francis's alopecia on examination was consistent with traction alopecia: hairless patches around the edges of her head. Janice Birkhoff 17–18 (Ex. L).

Ms. Durden saw two dermatologists outside of litigation: Drs. Mermilliod and Martin. Dr. Mermilliod thought Ms. Durden's hair loss was multifactorial including androgenetic alopecia, CCCA, potential nutritional factors, postmenopausal status, and age. Mermilliod Dep. 64:24–65:23; 48:5–48:23 (Ex. M). Dr. Mermilliod concluded that Ms. Durden's hair loss was <u>not</u> caused by chemotherapy, and agreed that a 66-year-old postmenopausal woman could present with the type of hair loss that Mrs. Durden presented even if she never had chemotherapy. *Id.* 48:17–49:12. Dr. Martin also diagnosed Ms. Durden as having scarring alopecia, which is most likely CCCA, with likely component of female pattern hair loss. Ochsner Health System 2028–2039 (Ex. N). Dr. Martin testified that Ms. Durden's hair loss presentation did not itself point to chemotherapy. Martin Dep. 42:22–43:5 (Ex. O); 54:15–54:25 (noting Ms. Durden's presentation "relatively common" for postmenopausal 67-year-old woman who had never had chemotherapy). Dr. Martin also confirmed numerous other potential factors in Ms. Durden's hair loss, unrelated to chemotherapy, including age, postmenopausal status, vitamin D deficiency, and letrozole (Femara) use. *Id.* 53:4–54:7; *see also* Smart Report at 6, 10, 11–12 (Ex. P).

Dr. Tosti set aside the clinical diagnoses of the Plaintiffs' treating dermatologists on nothing more than her say-so. In describing her methodology, she admitted that it does not really consist of a differential diagnosis, even though she understands that is the accepted method in the United. States. Tosti Dep. 62:23–63:22 ("I may do differently because in the United States, they look at all possible differential diagnosis. That's their way to go to a diagnosis. I started from a European training, so I do differently.") (Ex. B); *id.* 64:6–7 ("I don't put all disease in the differential."). She attributes her deviation from standard U.S. practice to her European training. *Id.* But Dr. Tosti also believes that she is not beholden to follow the practices required of other dermatologists, even while acknowledging that nothing stands out about the presentation of permanent alopecia from chemotherapy compared to other forms of alopecia. *Id.* 272:11–16 ("Q. And there's many forms of alopecia that are not caused by chemotherapy that could present in those patterns, right? A. Absolutely, yes. That's why differential diagnosis of hair disorders is difficult because basically they look all the same.").

> Q. It is possible, though, in seeing patients clinically, to confuse one type of alopecia for another type of alopecia?

> MR. SCHANKER: Objection, form.

> A. **Not for me, but for many dermatologists, absolutely, yes.**

*Id.* at 64:8–13 (emphasis added). Nothing requires the court to admit these opinions on the *ipse dixit* of the expert. *Joiner*, 522 U.S. at 146.

For these very reasons, claiming that an expert performed a differential diagnosis is not an incantation opening the *Daubert* gate. *Tamraz*, 620 F.3d at 674. "If a patient's 'symptoms could have numerous causes,' the expert cannot 'simply pick[] the cause that is most advantageous to [the plaintiff's] claim.'" *In re Lipitor Mktg., Sales Practices & Prod. Liab. Litig.*, 150 F. Supp. 3d 644, 659 (D.S.C. 2015) (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987)).

But that is exactly what Dr. Tosti did here. In the *Durden* case, for example, the pathology was not taken from an appropriate location to confirm or deny whether she had CCCA. *See* Thompson Dep. 256:18–23 (Ms. Durden could have CCCA somewhere on an area of her scalp that was not sampled) (Ex. A); Tosti Report at 22 (Ex. K). While claiming to rule out CCCA on examination of the Plaintiff, Tosti Dep. 448:3–8 (Ex. B), Dr. Tosti admitted that biopsy is the gold standard, *id.* 90:5–90:8 ("This is a scarring alopecia. You can make the diagnosis with dermoscopy, but, as I said before, I think a biopsy confirmation is gold standard."). She resorts to speculation that women of skin of color cannot have both CCCA and androgenetic alopecia. *Id.* 61:4–62:22, 61:10–11 ("There are no real study, but it's absolutely uncommon."). Caucasian women can have overlapping alopecia types, for reasons not explained by Dr. Tosti. *Id.* This race-based distinction is no proper substitute for a reliable differential diagnosis and is not supported by the medical evidence of other doctors who actually treated Ms. Durden *for years*. Mermilliod Dep. 64:24–65:23; 48:5–48:23 (Ex. M); Ochsner Health System 2028–2039 (Ex. N).[3] Dr. Tosti cannot exclude other potential causes in favor of Taxotere on her cursory say so. *Lipitor*, 150 F. Supp. 3d at 659.

## 2.    Dr. Tosti Cannot Rule Out Other Chemotherapy Medications.

In her report, Dr. Tosti does not attribute Plaintiffs' purported permanent alopecia to any specific chemotherapy drug. Tosti Report at 28 ("History, clinical examination, dermoscopy and pathology show that Ms. Durden, Ms. Francis and Ms. Earnest are affected by permanent alopecia after systemic chemotherapy.") (Ex. K). Dr. Tosti should not be allowed to go beyond her report.

---

[3] Similar problems exist with Dr. Tosti's differential diagnosis with Ms. Earnest. While Ms. Earnest never saw a treating dermatologist outside of litigation, there are clinical features that Dr. Tosti ignored that caused her to fail to properly consider androgenetic alopecia in the differential diagnosis. Women can lose up to 50% of scalp hair before hair loss is noticed. This is true in cases of androgenetic alopecia, which can progress slowly. In addition, Ms. Earnest lost her hair fully after her second treatment with Adriamycin and Cytoxan and her hair loss occurred before she received Taxotere. Slidell Memorial Hospital 293–304 (5/3/2011 second A/C Infusion) (Ex. Q); Slidell Memorial Hospital 426–33 (6/22/2011 first Taxotere Infusion) (Ex. Q). Dr. Tosti conceded only that Ms. Earnest did not have any hair when she started taking Taxotere. Tosti Dep. 394:15–22 (Ex. B).

She confirmed the ruling in of other chemotherapy medications and inability to rule them out during the first day of her deposition: "*I cannot say which drug is causing the -- the hair loss, of course. You can never make these diagnoses for any type of drug-induced hair loss, even for telogen effluvium*." Tosti Dep. 297:3–6 (emphasis added) (Ex. B).[4] Dr. Tosti also admits that there are reports of permanent alopecia with a host of chemotherapy medications, including those used in treatment of Plaintiffs here. *Id.* 284:13–288:13 (acknowledging she ignored literature reporting cases of permanent or persistent alopecia with Adriamycin and cyclophosphamide). Therefore, the failure to "rule out" these other medications in a reliable way prevents Plaintiffs from meeting the specific-causation threshold.

On friendly questioning by her counsel on the second day of deposition, Dr. Tosti attempted to change her testimony. Tosti Dep. 466:25–467:5, 481:16–482:8, 484:2–485:3 (Ex. B). The problem, however, is that simply changing testimony after overnight discussion with Plaintiffs' counsel does not satisfy the exacting standards of reliability under *Daubert*. Dr. Tosti cannot attribute Plaintiffs' purported hair loss to any specific chemotherapy drug because there was no *clinical basis* to rule out the other drugs taken by Plaintiffs:

> Q: What, if anything, have you done to rule out Adriamycin and a cyclophosphamide as being a cause of the alopecia seen in Ms. Earnest, Ms. Francis, and Ms. Durden?
>
> * * *
>
> A: *I didn't do any specific exam except for base my opinion – basing my opinion on the existing evidence in the literature*.

---

[4] Dr. Tosti made this admission at the end of the first day of her deposition. After multiple calls and meetings with Plaintiffs' counsel overnight to discuss the ramifications of this admission, Dr. Tosti changed her testimony and feigned a misunderstanding of the question during examination by Plaintiffs' counsel. Tosti Dep. 466:25–467:5, 481:16–482:8, 484:2–485:3 (Ex. B). This cannot alter her clear admission. *Trigon Ins. Co. v. United States*, 204 F.R.D. 277, 295 (E.D. Va. 2001) (stating that "a testifying expert lacks the credibility necessary to be of assistance to the trier of fact" without independence from the party's attorneys).

*Id.* 493:22–494:4 (emphasis added); *see also id.* 489:19–490:3.[5]

> **3.     Dr. Tosti Cannot Cite Literature to "Rule In" Taxotere and the Literature Does Not Permit Her to "Rule Out" Other Chemotherapy Drugs.**

Without a clinical basis for reaching the desired conclusion in these cases, Dr. Tosti deflects from the differential diagnosis method to general causation-type evidence with no clear methodology, let alone a specific causation one, citing only "evidence in the literature." Tosti Dep. 494:4 (Ex. B). The literature does not get Dr. Tosti to a reliable differential diagnosis for these three women, however. Whether one can "rule in" Taxotere does not "rule out" the other chemotherapy drugs. To the extent that her "ruling in" of Taxotere is permitted, this is no substitute for a reliable differential diagnosis. Either way, Dr. Tosti's methodology is unreliable.

***First***, Dr. Tosti's method of "counting" a case report as related to a chemotherapy drug is designed to artificially inflate the number of case reports associated with Taxotere compared to other drugs. In almost all of the case reports in the literature, the patients are treated with multiple chemotherapy drugs. For example, a patient's regimen might include Adriamycin, cyclophosphamide, and Taxotere ("TAC"). If the literature reports a woman with permanent alopecia on TAC, Dr. Tosti counts it as a Taxotere report—not as an Adriamycin or cyclophosphamide report. This means ignoring dozens of reports of alopecia with other drugs while hiking up the Taxotere reports. She also ignores case reports of other chemotherapy drugs.

Kim et al. (2017)[6]—cited by Dr. Tosti—is illustrative. *See* Tosti Dep. Ex. 2 (Ex. U). Dr. Tosti does not count any of the patients from the paper who took Adriamycin, cyclophosphamide

---

[5] Plaintiffs' experts similarly concede that, when looking at reports of alopecia, they have not ruled out each specific chemotherapy drug. Plunkett Dep. 158:1-160:7 (Ex. R); Feigal Dep. Vol. I 214:11-214:17 ("Q: Are you able to rule out Adriamycin and Cyclophosphamide as potential causes of ongoing alopecia in the TAC arm? . . . A: I don't have to rule it out. It's possible they are exacerbating, but I don't see why I would have to rule it out.") (Ex. S).

[6] Kim et al., *Chemotherapy-induced irreversible alopecia in early breast cancer patients*, Breast Cancer Res. Treat. (2017) (Ex. T).

and a taxane (either Taxotere or Taxol) as an Adriamycin or cyclophosphamide report (which would significantly change her counts). *Id.* Worse still, she ignores the *29* patients that developed persistent alopecia who *only* took Adriamycin and cyclophosphamide. Her opinion that "[t]here are only *23*" Adriamycin and cyclophosphamide reports in *all* of the literature rests on flawed methods. Tosti Report at 28 (Ex. K).

*Second*, Dr. Tosti relied on literature selected by Plaintiffs' lawyers, literature she does not "trust." Dr. Tosti relied on abstracts in this litigation, but does not rely on abstracts in her real research. Before realizing that she had used abstracts provided by Plaintiffs' lawyers to tally the number of reports of permanent alopecia in the literature, Dr. Tosti testified:

> Then *I don't look at abstract*, for instance. Or – those, *I don't trust as much as paper* that has been published in a journal that is on PubMed, that has a citation record, okay. That's what I usually utilize when I do my research for any topic.

Tosti Dep. 25:7–12 (Ex. B). She was quick to explain that she likely failed to include reports of permanent alopecia after chemotherapy with other drugs because she didn't include abstracts in her analysis. *Id.* 78:14–20. When she realized that she *had* used abstracts given to her by Plaintiffs' counsel, she confessed that she had used abstracts on Taxotere because they were given to her:

> Q: So the three abstracts that you included in Exhibit 2, those were provided to you by Plaintiffs' counsel?
>
> A: Yes.
>
> …
>
> A: *The only abstracts I – I included is because were given to me*.

*Id.* 81:2–5, 288:1–2. At the same time, Dr. Tosti ignored a host of literature reporting persistent alopecia on other drugs. *Id.* 284:13–288:13 (acknowledging she ignored cases of permanent alopecia with Adriamycin and cyclophosphamide).

This "cherry-picking approach is at odds with principles of sound science" and with Dr.

Tosti's own practice outside litigation. It renders her literature "tally"—upon which her entire opinion is premised—inadmissible. *Burst*, 120 F. Supp. 3d at 551 (in assessing whether a method is reliable, the court looked at "whether the expert 'is being as careful as he would be in his regular professional work outside his paid litigation consulting'"); *In re Mirena IUS Levonorgestrel-Related Prod. Liab. Litig.*, 341 F. Supp. 3d 213, 296 (S.D.N.Y. 2018); *accord Burst v. Shell Oil Co.*, No. 14-cv-109, 2015 WL 3755953, at *13 (E.D. La. June 16, 2015) (expert testimony cherry-picked data and failed to explain contrary results);[7] *Konrick v. Exxon Mobil Corp.*, No. 14-cv-524, 2016 WL 439361, at *7 (E.D. La. Feb. 4, 2016), *aff'd*, 670 F. App'x 222 (5th Cir. 2016) (excluding expert testimony based on cherry-picked data).

***Third***, citing to selected literature does not replace a differential diagnosis and allow Dr. Tosti to conclude that Taxotere caused the alleged permanent alopecia in these specific Plaintiffs. Dr. Tosti purports to attribute a specific drug as the cause of alopecia in a specific person based on literature alone—not an exam of Plaintiffs or differential diagnosis that rules out the other drugs. *Wagoner*, 813 F. Supp. 2d at 804 ("In performing a differential diagnosis, a physician begins by 'ruling in' all scientifically plausible causes of the plaintiff's injury."). At the same time, other chemotherapy drugs must be "ruled in" as potential causes of Plaintiffs' hair loss because:[8]

- The literature also reports cases of permanent alopecia with those drugs, Tosti Dep. 19:22–20:9; 485:12–25; 487:10–489:17 (acknowledging that literature links other chemotherapy drugs taken by Plaintiffs to permanent alopecia) (Ex. B); and

- There is no literature analyzing whether there is an increased rate of persistent alopecia with taxane-containing regimens versus Adriamycin/cyclophosphamide-containing

[7] This decision, *Burst*, 2015 WL 3755953, and *Burst*, 120 F. Supp. 3d 547, are orders on different *Daubert* motions in the same case. The Fifth Circuit affirmed both orders. *Burst v. Shell Oil Co.*, 650 F. App'x 170 (5th Cir. 2016).

[8] Plaintiffs' experts agree that numerous chemotherapies are associated with permanent alopecia. Plunkett Dep. 25:11–20 (non-exhaustive list including cisplatin, doxorubicin, 5-fluorouricil, cyclophosphamide, prednisone, Taxol, and Taxotere) (Ex. R); Feigal Dep. Vol. I 213:7–13 ("Q. You agree that there have been cases of ongoing alopecia with chemotherapy regimens that did not include Taxotere. Do you agree with that? A. I thought I already answered that and I said yes, that has been seen sporadically.") (Ex. S); Feigal Dep. Vol. III 596:2–597:11 (same including Taxol, Adriamycin, Cyclophosphamide, AC, and AC-Taxol) (Ex. V); Bosserman Dep. 142:19–143:18 (conceding there are reported cases of permanent alopecia for every one of the alternative non-Taxotere chemotherapy regimens) (Ex. W).

regimens. *Id.* 493:4-10.

Still, Dr. Tosti failed to rule in or rule out the other chemotherapy drugs for the specific Plaintiffs—even when faced with direct evidence that the other chemotherapy drugs must be considered. Ms. Earnest, for example, had already lost her hair when she took Taxotere, losing her hair on Adriamycin and cyclophosphamide. Tosti Dep. 394:19–22 (Ex. B). Dr. Tosti fails to reliably rule out the other chemotherapy through an appropriate differential diagnosis.

***Finally***, the literature does not support a conclusion that Taxotere can cause permanent alopecia. Dr. Tosti cites to three studies to demonstrate that Taxotere is the only chemotherapy medication "consistently shown to cause Permanent Chemotherapy-Induced Alopecia": Nabholtz (2001), Tallon (2010), Tosti (2013). Tosti Report at 12, n.18 (Ex. K). This lawyer-picked literature does not support Dr. Tosti's conclusion.

The three articles do not distinguish between the different drugs in the studied regimens. Nabholtz analyzed the TAX clinical trial results without distinguishing between Taxotere, Adriamycin, and cyclophosphamide, the three drugs in the regimen. Nabholtz noted that long-lasting partial alopecia was reported in four patients taking the TAC ***regimen***. Nabholtz at 318 (2001) (Ex. X). The remaining two articles discuss a single (1 patient) case report (Tallon (Ex. Y)) and a small case series (7 patients) (Tosti (Ex. Z)). All eight case reports were for patients who had been treated with combination regimens and ***not all of them even included Taxotere***.

- Tosti (2013) cites seven case reports from Palameras (2011) where only 5 of the 7 patients took Taxotere, and where all of the Taxotere patients had combination regimens. (Ex. Z)

- Tallon (2010) reports a patient on a regimen with carboplatin and trastuzumab. Tallon acknowledges permanent alopecia with "busulphan, cyclophosphamide, thiotepa, melphalan, etoposide, carboplatin, docetaxel, and paclitaxel." *Id.* at 334 (Ex. Y).

As Plaintiffs' other experts concede, the existing literature is not sufficient to support causation. Feigal Dep. Vol. I 177:14–22 ("You would not reach a conclusion that Taxotere caused permanent

alopecia just by looking at the studies and the literature [reviewed by Feigal, including the Nabholtz, Tallon, and Tosti articles] because, as you just said, you would want to do further investigation. Fair? . . . A: I think from my own opinion, yes.") (Ex. S); Madigan Dep. 273:6–10 ("Individual case reports are not that terribly useful. When you have randomized clinical trials, case reports are sort of distant, you know, whatever, contributor to any causal assessment.") (Ex. AA); Bosserman Dep. 145:19–21 ("Individual case reports, as I said, could be an indicator. They do not prove causation.") (Ex. W); *id.* 168:16–19 ("Q. And so mere case reports we've already discussed are not scientifically reliable data, right, correct? A. Right.").

The three articles do not conclude Taxotere alone causes permanent alopecia. Indeed, the authors of Tallon (2010) and Tosti (2013) thereafter engaged in a lively debate between Letters to the Editor about whether the specific case reports described could even be considered "specific pathologic findings of chemotherapy induced alopecia" and concluding that "Histopathologic criteria have not been defined."[9] Tallon's letter concludes: "Hopefully additional case reports and continued, long-term follow up will help clarify this conundrum."[10] "It is axiomatic that causation testimony is inadmissible if an expert relies upon studies or publications, the authors of which were themselves unwilling to conclude that causation had been proven.'" *Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 826 (7th Cir. 2010) (quoting *Huss v. Gayden*, 571 F.3d 442, 459 (5th Cir. 2009)). Where a study's authors are "unwilling to say that [the] exposure had caused" the disease in the population "they examined, their study did not support the experts' conclusion" on causation. *Joiner*, 522 U.S. at 145. "When an expert relies on the studies of others, he must not exceed the limitations the authors themselves place on the study. That is, he must not draw overreaching conclusions." *In re Accutane Prod. Liab. Litig.*, 511 F. Supp. 2d 1288, 1291 (M.D.

---

[9] Tosti (2013) (Ex. Z); Tallon (2013) (Ex. BB).
[10] Tallon (2013) (Ex. BB).

Fla. 2007). The "law warns against use of medical literature to draw conclusions not drawn in the literature itself . . . . Reliance upon medical literature for conclusions not drawn therein is not an accepted scientific methodology." *Rutigliano v. Valley Bus. Forms*, 929 F. Supp. 779, 785 (D.N.J. 1996), *aff'd* 118 F.3d 1577 (3d Cir. 1997).

Because there is an impermissible gap between the conclusions of the three articles and Dr. Tosti's conclusion about Taxotere and other chemotherapy regimens, Dr. Tosti's specific causation opinion is inadmissible. *Joiner*, 522 U.S. at 146; *In re Mirena*, 341 F. Supp. 3d at 241 (concluding that "when an expert relies on the studies of others, he must not exceed the limitations the authors themselves place on the study") (internal quotation and alteration omitted).

## CONCLUSION

For all the reasons stated above, the Court should exclude the expert opinions of Dr. Thompson and Dr. Tosti under Federal Rules of Evidence 702 and 703.

Date: February 8, 2019

Respectfully submitted,

*/s/ Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE URQUHART & MOORE LLC**
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: 504-310-2100
Facsimile: 504-310-2120
dmoore@irwinllc.com

Harley Ratliff
Adrienne L. Byard
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
Facsimile: 816-421-5547
hratliff@shb.com
abyard@shb.com

*Counsel for Sanofi-Aventis U.S. LLC and*
*Sanofi U.S. Services Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2019, I electronically filed the foregoing with the Clerk

of the Court using the ECF system which sent notification of such filing to all counsel of record.

*/s/ Douglas J. Moore*

26