# EXHIBIT A

Page 1

1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF LOUISIANA
2
    IN RE:  TAXOTERE (DOCETAXEL)   MDL NO. 2740
3   PRODUCTS LIABILITY LITIGATION  SECTION: H
4   This document relates to:
    Antoinette Durden, Case No. 2:16-cv-16635
5   Tanya Francis, Case No. 2:16-cv-17410
    Barbara Earnest, Case No. 2:16-cv-17144
6   _____
    VIDEOTAPED EXPERT DEPOSITION
7   CURTIS THOMPSON, M.D.
8
    TAKEN IN BEHALF OF DEFENDANTS
9   FRIDAY, NOVEMBER 30, 2018
    at 8:16 A.M.
10
11
    319 Southwest Washington Street, Suite 607
12  Portland, Oregon
13
14  BE IT REMEMBERED THAT, the videotaped expert
    deposition of CURTIS THOMPSON, M.D., was taken before
15  K.M., Court Reporter and Notary Public for the State
    of Oregon, on Friday, November 30, 2018, commencing
16  at the hour of 8:16 a.m., the proceedings being
    reported at 319 Southwest Washington Street, Suite
17  607, Portland, Oregon.
18
19
20
21
22
23     Job No. NJ3132952
24
25

Page 26

1      THE WITNESS:  I think I answered that
2  question.
3  BY MR. SEARS:
4      Q.  The answer is, correct, you're not going
5  to offer any opinion?
6      MS. ANDREWS:  Objection.
7      THE WITNESS:  That's not what I said.
8  BY MR. SEARS:
9      Q.  Okay.
10     A.  I said that you might ask questions that
11  are beyond the scope of what these patient -- these
12  three biopsies show.
13     Q.  Outside of any question I might ask you,
14  at this time, you do not intend to offer any opinion
15  that is not contained in that Rule 26 report,
16  correct?
17     A.  No.  That's not true.
18     Q.  Like I said, this is the one opportunity I
19  have to ask you questions.  And I need to ask you
20  about any opinion that you might offer.  Can you
21  tell me any opinion you plan to offer that is it not
22  contained in the Rule 26 report?
23     A.  I think I answered that question.
24     Q.  Help me out.  What is your answer?
25     MS. ANDREWS:  Objection.

Page 27

1      THE WITNESS:  At this point, no.
2  BY MR. SEARS:
3      Q.  All right.  In that report -- let's just
4  look at Exhibit 3.  Starting on page 9, there's a
5  list of materials consulted.  Do you see that?
6      A.  Yes.
7      Q.  So that's the list of the case-specific
8  materials that you reviewed in this case, correct?
9      A.  Yes.
10     Q.  Have you reviewed any case-specific
11  materials beyond what is listed here?
12     A.  Not to my knowledge.  No.
13     Q.  And then on pages 10, 11, and 12, there's
14  some reference to depositions.  Do you see that?
15     A.  Yes.
16     Q.  Did you review those depositions in their
17  entirety?
18     A.  No.
19     Q.  How was it decided what portions of the
20  depositions you would review?
21     A.  I don't know.
22     Q.  Did plaintiffs' counsel send you limited
23  portions of those depositions for you to review?
24     A.  No.
25     Q.  How did you get the subset of these

Page 28

1  depositions that you refer to in your report?
2      MS. ANDREWS:  Objection.
3      THE WITNESS:  These were shown to me,
4  these clips, and I included them in the report.
5  BY MR. SEARS:
6      Q.  Beyond the clips that were shown to you,
7  you haven't reviewed any other portions of these
8  depositions, correct?
9      A.  No.  No.
10     Q.  When you say these clips were shown to
11  you, plaintiffs' counsel showed you those clips,
12  correct?
13     MS. ANDREWS:  Objection.
14     THE WITNESS:  Yes.
15  BY MR. SEARS:
16     Q.  Do you know who the other experts are that
17  have been listed in this case?
18     A.  Only Dr. Antonella Tosti.
19     Q.  Have you had any conversations with Dr.
20  Tosti about this case?
21     A.  Very limited.  Never about the patients.
22     Q.  What have you and Dr. Tosti talked about
23  with regard to this case?
24     A.  She asked me to do this.  And I think we
25  discussed that I had never done this, anything like

Page 29

1  this before.  And -- and then I think she apologized
2  for getting me into this.
3      Q.  Just to be clear, when you say you've
4  never done anything like this before, are you
5  talking about diagnosing someone with chemotherapy-
6  induced alopecia?
7      MS. ANDREWS:  Objection.
8      THE WITNESS:  No.
9  BY MR. SEARS:
10     Q.  Are you talking about as an expert work?
11     A.  Yes.
12     Q.  Can you tell me about any other
13  conversations you've had with Dr. Tosti about this
14  case?
15     A.  I don't -- I don't -- I think we might
16  have -- she might have said we will -- there's going
17  to be a trial and it will be in New Orleans or
18  something like that.  I think that's about it.
19     Q.  Beyond the plaintiffs' attorneys and Dr.
20  Tosti, have you talked to anyone else about this
21  case?
22     A.  No, not to my knowledge.
23     Q.  So you haven't talked to any of Ms.
24  Durden's, Mr. Francis' or Ms. Earnest's --
25     A.  Oh, no.

8 (Pages 26 - 29)

1   Q.   -- treating physicians?
2   A.   No.
3   Q.   And you haven't talked to Ms. Earnest, Ms.
4   Francis, or Ms. Durden?
5   A.   No.
6   Q.   So this is your first time doing expert
7   litigation work?
8   A.   Yes.
9   Q.   How much do you bill plaintiffs' counsel
10  per hour for your work on this case?
11  A.   $1,300 an hour.
12  Q.   What is your hourly rate outside of
13  litigation?
14  A.   $1,300 is what I earn doing
15  dermatopathology work.
16  Q.   How many hours have you worked on this
17  litigation?
18  A.   I do not know.
19  Q.   How much has plaintiffs' counsel paid you
20  so far in this litigation?
21  A.   I do not know.
22  Q.   Can you give me an estimate?
23  A.   Maybe $15,000.  I don't know.
24  Q.   How many hours have you worked, your best
25  estimate?

1   A.   Best estimate maybe -- now you're going to
2   do the math.  I don't know.  Maybe 30 hours, which
3   is more, right?
4   Q.   So that 30 hours --
5   A.   I think they're sending the bill -- the
6   invoices because I asked for that to be sent.
7   Q.   I just want to be clear I understand what
8   the 30 hours involves.  So that 30 hours involves
9   your review of the medical literature, right?
10  A.   Yes.
11  Q.   It involves the time that you spent
12  reading the pathology?
13  A.   Yes.
14  Q.   It involves the time that you spent
15  preparing the report?
16  A.   Yes.
17  Q.   It involves time that you spent talking to
18  plaintiffs' counsel?
19  A.   Yes.
20  Q.   And it involves the time that you spent
21  reviewing the case-specific materials?
22  A.   Yes.
23  Q.   My math is terrible.  What is that 39 --
24  A.   It's more.
25  Q.   $39,000?

1   A.   We can -- maybe.  They're getting the
2   invoices so --
3        MS. ANDREWS:  Counsel, we'll provide
4   those.
5        THE WITNESS:  Yeah.
6        MS. ANDREWS:  We've just called his office
7   for them.
8        THE WITNESS:  I've asked for them this
9   morning.
10       MS. ANDREWS:  So by break, we'll have
11  them.
12       MR. SEARS:  Thank you.
13  BY MR. SEARS:
14  Q.   All right.  So we're in Oregon.  Are you
15  licensed to practice medicine here?
16  A.   Oh, yes.
17  Q.   Are there any other states you're licensed
18  in?
19  A.   Yes.
20  Q.   Do you practice medicine outside of
21  pathology?
22  A.   No.
23  Q.   What percentage of your practice involves
24  reading hair pathology?
25  A.   My entire group or me?

1   Q.   Just you.
2   A.   Probably 80 percent.
3   Q.   Have you ever published any articles on
4   ongoing chemotherapy associated with -- strike that
5   question.
6        Have you ever published any articles about
7   ongoing alopecia associated with chemotherapy?
8   A.   No.
9   Q.   Do you subscribe to any medical journals?
10  A.   Yes.
11  Q.   Which ones?
12  A.   The Journal of the American Medical
13  Association Dermatology called JAMA Dermatology.
14  The Journal of the American Academy of Dermatology.
15  And I'm on their editorial board.  The Journal of
16  Cutaneous Pathology.  The American Journal of
17  Dermatopathology.  The J-E-A-D-V, which is the
18  Journal of European Academy of Venereology and
19  Dermatology, I think or opposite.  There's other --
20  The Cutis, not by choice.  That just comes.  Somehow
21  I'm subscribed to that.  There are other journals.
22  Journal of, like, Cosmetic Dermatology that I also
23  don't subscribe to but somehow have been subscribed
24  to, anything pathology.  I think that's it.
25  Q.   Are those journals authoritative?

9 (Pages 30 - 33)

1    THE WITNESS:  No.
2 BY MR. SEARS:
3    Q.  And you attached some photographs to your
4 expert report, your Rule 26 report, right?
5    A.  Yes.
6    Q.  And those photographs that you attached to
7 your Rule 26 expert report of Ms. Durden, Ms.
8 Francis, and Ms. Earnest, those were all the
9 photographs that were provided to you, correct?
10    A.  Can you show me the photographs?
11    THE WITNESS:  I knew I was going to get
12 caught up in this.  You need to go wireless.
13    (Off-the-record exchange.)
14    MR. SEARS:  Okay.  So I've marked as
15 Exhibit 4, what was  Exhibit E to your report.  It's
16 called hair loss history Antoinette Durden.  I've
17 marked  Exhibit 5, which was Exhibit F to your
18 report, hair loss history of Barbara Earnest.  And
19 I've marked as  Exhibit 6, Exhibit G to your report,
20 which is called hair loss history of Tanya Francis.
21    (Whereupon, Exhibit E to report was marked
22 as Exhibit 4, Exhibit F to report was marked as
23 Exhibit 5, Exhibit G to report was marked as Exhibit
24 6 for identification.)
25    MS. ANDREWS:  Thank you.  I'm just trying

1 to mark them as you have.
2    THE WITNESS:  Yes.  These are the only
3 pictures -- clinical pictures.
4 BY MR. SEARS:
5    Q.  So those are the only photographs that you
6 reviewed of the three plaintiffs?
7    A.  Yeah.  The only other photographs were the
8 photomicrographs that I prepared myself.  I re-
9 reviewed those.
10    Q.  Okay.  And also in --
11    MS. ANDREWS:  You gave me two Durdens and
12 an Earnest.
13    MR. SEARS:  Here's a Francis.
14    MS. ANDREWS:  Thank you.  And that's 6?
15    MR. SEARS:  Yes.
16 BY MR. SEARS:
17    Q.  Have you reviewed any of the medical
18 records for Ms. Earnest, Ms. Francis, or Ms. Durden?
19    A.  Yes.
20    Q.  All the medical records that you've
21 reviewed have been included either in Exhibit 4, 5,
22 6, or in pages 9 through 12 of your Rule 26 report?
23    A.  Hang on.  Yeah.  The 4, 5, 6, the Dr.
24 Tosti examination.  Do you have those?  4, 5 --
25 those are the only other records.

1    Q.  So beyond the Dr. Tosti exam, have you
2 reviewed any of Ms. Earnest's, Ms. Francis', or Ms.
3 Durden's medical records?
4    A.  No.
5    Q.  Did you ask to review any of their medical
6 records?
7    A.  No.
8    Q.  Would you agree that the medical records
9 might list prior health conditions that they've been
10 having?
11    MS. ANDREWS:  Objection.
12    THE WITNESS:  Hopefully so, yes.
13 BY MR. SEARS:
14    Q.  It might list medications they're taking?
15    A.  Yes.  But I think -- can I see Tosti's
16 reports?  I think they might have also listed these.
17    Q.  Just to make it easier, I'll ask questions
18 and we'll get there eventually, but you would agree
19 that Ms. Durden, Ms. Earnest, and Ms. Francis'
20 medical records would include the medications that
21 they're taking?
22    A.  Yes.
23    Q.  Do you agree that they could include risk
24 factors for alopecia that the three women might
25 have?

1    MS. ANDREWS:  Objection.
2    THE WITNESS:  Yes, they could.  Yeah.
3 Sure.
4 BY MR. SEARS:
5    Q.  And you did not review any of the medical
6 records before preparing your dermopath report,
7 correct?
8    A.  No.
9    Q.  And you did not review any of the Dr.
10 Tosti's examinations before your dermopath report,
11 correct?
12    A.  Did not.
13    Q.  And you did not review any photographs of
14 any of the women before preparing your dermopath
15 report, correct?
16    A.  Correct.
17    Q.  Also, you included some testimony from Dr.
18 Jancich and Dr. Carinder, which we talked about
19 earlier, right?
20    A.  You have to refresh my memory.
21    Q.  On pages 10 through 12 --
22    A.  Oh, yeah, yeah.
23    Q.  -- you list some very limited testimonies
24 from Dr. Jancich and Dr. Carinder, right?
25    A.  I don't know their names.

12 (Pages 42 - 45)

1    Q.   Okay.  Do you know why those depositions -
2  - those subsets of those depositions were provided
3  to you?
4    A.   No.
5    Q.   Did you ask to see the rest of the
6  depositions?
7    A.   No.
8    Q.   Do you know if there have been other
9  depositions taken in these cases?
10    A.   No.
11    Q.   Do you know if Ms. Earnest, Ms. Francis,
12  or Ms. Durden were deposed?
13    A.   No, I don't.
14    Q.   Do you know if any of those women have
15  seen dermatologists before?
16    A.   No.
17    Q.   Do you know if there's dermatology records
18  that exist for those three women?
19    A.   No.
20    Q.   Do you know whether if they did see
21  dermatologists those dermatologists were deposed?
22    A.   Can you say that again?
23    Q.   Do you know whether -- okay.  If Ms.
24  Francis, Ms. Durden, and Ms. Earnest saw
25  dermatologists, do you know whether those

1  dermatologists were deposed?
2    A.   Oh, no.
3        MS. ANDREWS:  Objection.
4  BY MR. SEARS:
5    Q.   Do you think it would be useful to you in
6  having a clinical history and a full clinical
7  picture of these plaintiffs to see all that
8  information?
9    A.   You know, in pathology there's a -- first
10  of all, if we reviewed all the patients' records, we
11  would read about three biopsies a day, and the
12  medical system would come to a grinding halt.  So we
13  really focus on getting the information that's
14  important for each diagnosis and not beyond that.
15  You have to sift through the large amount of data to
16  do this.  And the second part of pathology is you
17  want an objective read.  So you can be swayed in
18  your diagnosis by too much information.
19        So the information necessary for these
20  reads is -- is what I asked for, which is the
21  patient's gender, their age, the site of the biopsy.
22  In hair loss, the most important clinical finding
23  examination feature is whether the hair loss is
24  diffuse all over the head, or whether it's patchy,
25  small, round areas.  This is quite important to

1  know.
2        And then very important in these cases is
3  a history of chemotherapy or not.  The type of
4  chemotherapy to me doesn't matter.  I'm not an
5  expert of oncologic medications, the mechanisms of
6  these medications.  I am not an expert in those.
7  But knowing that there's been prior chemo is quite
8  important in these cases.
9        So the information needed to make the
10  diagnosis was all there.  And in any kind of case
11  that I do like this, if any of that information is
12  missing, we request it.  Get it.  But we don't get
13  the whole medical record and their life -- you know,
14  their life medical record.
15    Q.   Let me unpack some of the stuff that you
16  just said there to make sure that I understand
17  everything.  So at the time that you read the
18  biopsies for these three women, Ms. Earnest, Ms.
19  Durden, and Ms. Francis, did you know their -- you
20  knew their gender?
21    A.   Yes.
22    Q.   You knew their age?
23    A.   Yes.
24    Q.   You said you knew the site of the biopsy,
25  right?

1    A.   Yes.
2    Q.   Did you know whether their hair presented
3  in a diffuse or patchy pattern?
4    A.   I wasn't given that.  I knew there were
5  areas that were more dense and less dense.  I did
6  understand that it was overall a diffuse process.
7    Q.   I feel like you said a couple things
8  there.  At the time you read the biopsies, did you
9  know whether their hair loss presented in a diffuse
10  or patchy pattern?
11    A.   I certainly wasn't given a history of it
12  being patchy.
13    Q.   So the answer is no, you did not know?
14    A.   I can't remember.
15    Q.   Okay.
16    A.   And then all of these other age, site,
17  gender, the report in a CLIA-certified laboratory,
18  like my lab, the case isn't even accessioned and
19  passed through the system until all of this
20  identifying information is provided.  It's part --
21  it's really important for tracking the cases and
22  making sure we have the right patient with the right
23  biopsy.  So all that is taken care of in the
24  laboratory by the processes that we have in place.
25    Q.   I appreciate that.  And really that's what

13 (Pages 46 - 49)

Page 50

1  I'm trying to find out right now is what information
2  you had at the time that you read the biopsy.
3      A.  Yeah.
4      Q.  Okay.  At the time you read the biopsy,
5  did you know whether these women had a history of
6  chemotherapy?
7      A.  Yes.
8      Q.  Did you know what chemotherapy agents they
9  took?
10     A.  No.
11     Q.  Did you know anything else about these
12 women other than their gender, their age, the site
13 of the biopsy, and that they had a history of
14 chemotherapy at the time you read their biopsy?
15     A.  I knew that the -- they had a history of
16 breast cancer and that the chemotherapy was
17 treatment for breast cancer.
18     Q.  Did you know anything else besides what
19 we've just talked about?
20     A.  No, I don't believe so.
21     Q.  A few answers ago you mentioned that the
22 type of chemotherapy doesn't matter to you.
23     A.  No.
24     Q.  And so it's fair to say that you are not
25 going to say that any specific chemotherapy drug

Page 51

1  caused this hair loss seen this these women?
2      A.  I'm not in a position to make that
3  distinction or claim.
4      Q.  And you also said something about the
5  mechanism.  Did I hear that correctly?
6      A.  Of the drugs.
7      Q.  Is it fair to say that you're not in a
8  position to talk about the mechanism for how the
9  chemotherapy drugs might result in ongoing alopecia?
10     MS. ANDREWS:  Objection.
11     THE WITNESS:  Can you restate that?
12 BY MR. SEARS:
13     Q.  Sure.  Really, it's a cause thing.  What
14 I'm trying to understand is there's no scientific
15 literature that establishes the mechanism for
16 whether chemotherapy drugs and how chemotherapy
17 drugs may cause ongoing alopecia?
18     MS. ANDREWS:  Objection.
19     THE WITNESS:  I still don't understand
20 what your -- this a big, big issue.
21     MS. ANDREWS:  Just wait until he has a
22 question pending that you can answer.
23 BY MR. SEARS:
24     Q.  So there's mechanisms of action.
25     A.  Right.

Page 52

1      Q.  And basically that's how something causes
2  something else, right?
3      A.  Correct.
4      Q.  I just want to make sure we're talking
5  about the same thing.
6      A.  Right.
7      Q.  And the mechanism of action for how a
8  chemotherapy drug might result in ongoing alopecia
9  has not been established, correct?
10     MS. ANDREWS:  Objection.
11     THE WITNESS:  It depends on what you mean
12 by established because there's a lot of evidence of
13 the causation -- regardless of the mechanism of the
14 drug that's being used, whether it's a microtubule
15 inhibitor or -- there's still a lot of ideas about
16 the causation of the hair loss that occurs with the
17 initial treatment with the chemotherapeutic agent,
18 and then with the permanent alopecia that can
19 develop weeks to months to years after that.
20     There's a lot information about this.  And
21 as we get more -- and I don't do this research, but
22 as we get more and more information about the
23 biology of the hair follicle, then I think we do --
24 there's whole lot of speculation and investigation
25 hypotheses of the causation of both of these

Page 53

1  processes, the acute hair loss and the permanent
2  hair loss.
3  BY MR. SEARS:
4      Q.  You might have actually just said it
5  better than I could.  So what we have so far are
6  hypotheses and speculation for how a chemotherapy
7  drug might cause persistent hair loss?
8      A.  Well, I don't want to get stuck on the
9  word -- I mean, hypothesis, the way that word is
10 used in science is different from the way we use it
11 in common English.  So hypothesis in common English
12 is more like, oh, it's an idea that has less
13 substantiation.
14     When you talk about hypothesis in science,
15 it's based on accumulating evidence or research.  So
16 -- and I think that exists.  I'm not -- I'm not the
17 -- you know, I don't have a laboratory doing
18 follicular biology.  I know experts who do this type
19 of work and I keep up with what they're doing.  So
20 out of that knowledge, I think we do have a lot of
21 ideas.
22     Q.  Okay.  So you just said ideas, right?
23     A.  See, we're back to this.  Yeah, we do.
24     Q.  Okay.  But they're ideas.  It's not
25 definitive.  Would you agree with that?

14 (Pages 50 - 53)

1 that they might even wax. And they are advancing to
2 where these hair follicles entirely go away or die.
3 And women, even though we're calling this the same
4 process, androgenetic alopecia, seem to progress but
5 they miniaturize and then it kind of stops. You do
6 see some women that get entirely bald, but very,
7 very rarely with this process. And for that reason,
8 these may be different in male and female. We don't
9 know. But at this point, we're calling them the
10 same process. But certainly the way the patients
11 present is different.
12     MR. SEARS: Respectfully, I didn't ask a
13 question. I'm going to move to strike all that.
14     And I've only got seven hours. It would
15 be really helpful if you could focus --
16     THE WITNESS: Okay.
17     MR. SEARS: -- on the question I'm asking
18 and just respond to that.
19 BY MR. SEARS:
20     Q. Okay. So I think I asked you what
21 percentage of women have clinically-significant hair
22 loss during their lifetime. What percentage of
23 women do you agree have clinically-significant hair
24 loss during their lifetime?
25     MS. ANDREWS: Objection.

1     Q. And diagnosing the type of alopecia can be
2 difficult, correct?
3     A. Yes.
4     Q. It can be challenging both for clinicians
5 and for pathologists, correct?
6     A. Yes. This is why I have a job.
7     Q. Well, it's good to have job security.
8     A. Yeah. I have job security.
9     Q. And clinically, one type of alopecia might
10 be confused for another type of alopecia, right?
11     MS. ANDREWS: Objection.
12     THE WITNESS: Well, that's why we do
13 biopsies.
14 BY MR. SEARS:
15     Q. Right. Because one type of alopecia can
16 be confused for another type of alopecia, right?
17     MS. ANDREWS: Objection.
18     THE WITNESS: By the clinician --
19 BY MR. SEARS:
20     Q. Yes, sir.
21     A. -- is that the -- yes, certainly.
22     Q. And even pathologically, one type of
23 alopecia could be confused for another type of
24 alopecia, correct?
25     MS. ANDREWS: Objection.

1     THE WITNESS: I don't know. I don't know
2 that number.
3 BY MR. SEARS:
4     Q. You can't offer anything?
5     A. No, I'm hesitant to -- it depends on the -
6 - I won't overtalk, but it depends on the population
7 you're looking at also, you know. Different ethnic
8 groups, different ages, average age, it just
9 depends.
10     Q. So there's many different forms of
11 alopecia, correct?
12     A. Yes.
13     Q. And there's many different causes of
14 alopecia?
15     A. Yes.
16     Q. And the cause of alopecia can be
17 multifactorial, right?
18     A. Yes.
19     Q. In other words, multifactorial means
20 there's more than one cause?
21     A. Yes.
22     Q. And even on one scalp there can be
23 multiple forms of alopecia occurring at the same
24 time?
25     A. Yes.

1     THE WITNESS: Yes, they can. Yeah. Sure.
2 BY MR. SEARS:
3     Q. Let's do this because we're going to talk
4 about the scalp in a little bit. I just want to
5 make sure we're talking about the same terms. I'm
6 going to give you a piece of paper and could you
7 draw a scalp and label it with the various areas of
8 the scalp?
9     A. No.
10     Q. You can't do that?
11     A. I can't do that. You can show me a
12 picture of the scalp and I'll --
13     Q. How about if I draw it --
14     A. Okay.
15     Q. -- and you tell me if I'm right?
16     A. You draw that.
17     Q. I didn't go to art school.
18     A. Yeah, I'm below you.
19     Q. So this is the frontal region, right?
20     A. Yes.
21     Q. That can also be called the anterior; is
22 that true?
23     A. Sure.
24     Q. I'll draw an ear here. And then on the
25 side it's the temporal, right?

16 (Pages 58 - 61)

Page 62

1    A.   Above the ear and around the ear, sure.
2    Q.   So basically, the temporal goes back and
3 runs into the occipital back here, right?
4    A.   Yes.
5    Q.   So this is the temporal.  Then the
6 occipital is back here?
7    A.   Yes.
8    Q.   And then above the temporal and kind of
9 the mid region is the parietal scalp?
10    A.   Yeah.  Sure.
11    Q.   And then kind of in the back of the head
12 before it hits the occipital is what's known as the
13 vertex, right?
14    A.   Yes.
15    Q.   That can also be called the crown?
16    A.   Sure.  Yes.
17       MR. SEARS:  So I'll go ahead and mark my
18 amazing artwork as Exhibit 7.
19       (Whereupon, Drawing of Scalp was marked as
20 Exhibit 7 for identification.)
21 BY MR. SEARS:
22    Q.   So those are the regions of the scalp,
23 right?
24    A.   Yes.
25    Q.   So let's talk about your everyday practice

Page 63

1 before we talk about this case.  Okay?
2       So we talked about how you're a
3 pathologist, right?
4    A.   I'm board-certified in anatomic pathology.
5    Q.   And so before you get a punch biopsy from
6 a dermatologist, the dermatologist has seen a
7 patient clinically and decided that a punch biopsy
8 is necessary, right?
9       MS. ANDREWS:  Objection.
10       THE WITNESS:  Yes.  They make that
11 decision.
12 BY MR. SEARS:
13    Q.   And before you get a sample from the
14 dermatologist, you would expect that the
15 dermatologist would have taken an initial
16 consultation of the patient, right?
17       MS. ANDREWS:  Objection.
18       THE WITNESS:  Yes.  They're not always
19 dermatologists either.  Primary care doctors do
20 biopsies and ENT surgeons, oncologists, a lot of
21 people will do a biopsy sometimes.
22 BY MR. SEARS:
23    Q.   So whatever the --
24    A.   Podiatrists.
25    Q.   Sure.  Whatever the medical provider is,

Page 64

1 can we just agree that I'm calling it a
2 dermatologist for our purposes?
3    A.   Sure.
4    Q.   So you would expect that before the
5 dermatologist takes a punch biopsy and sends it to
6 you, they get the clinical history from the patient,
7 right?
8    A.   Hopefully, yes.
9    Q.   And you agree that a careful clinical
10 history is essential in evaluating alopecia?
11       MS. ANDREWS:  Objection.
12       THE WITNESS:  Yeah.  Sure.
13 BY MR. SEARS:
14    Q.   And that careful clinical history should
15 be taken before a punch biopsy is ordered, right?
16       MS. ANDREWS:  Objection.
17       THE WITNESS:  Yes.
18 BY MR. SEARS:
19    Q.   And would you agree that the clinical
20 history should also be provided to the pathologist?
21       MS. ANDREWS:  Objection.
22       THE WITNESS:  Elements of it, yes.
23 BY MR. SEARS:
24    Q.   And so when a dermatologist takes a
25 clinical history, they want to ask about risk

Page 65

1 factors for alopecia, right?
2    A.   Yes.
3    Q.   And those can include the patient's
4 medical history, right?
5    A.   Yes.
6    Q.   Can include family history of hair loss?
7    A.   Yes.
8    Q.   And it can include talking about
9 illnesses?
10    A.   Sure.
11    Q.   It can include eating habits?
12    A.   Yes.
13    Q.   It can include medications?
14    A.   Yes.
15    Q.   They would also want to talk about any
16 endocrine abnormalities?
17    A.   Yes.
18    Q.   Part of the examination would be the
19 patient's weight because obesity is a risk factor
20 for alopecia, right?
21       MS. ANDREWS:  Objection.
22       THE WITNESS:  Unless you tie it back to
23 what I'm talking about hyper -- you know, andro --
24 androgen states like polycystic ovary, that can be
25 associated.  But I -- to my knowledge just obesity

17 (Pages 62 - 65)

Page 66

1 alone does not have an impact on the hair.
2 BY MR. SEARS:
3     Q.   They'd want to talk about other risk
4 factors for hair loss like trauma they might have
5 had recently, right?
6     A.   Trauma is a cause of hair loss.
7     Q.   So you would expect that a dermatologist
8 would ask all those questions before ordering a
9 punch biopsy, right?
10     A.   The best they can, yes.
11     Q.   They should also ask about hair care
12 practices, shouldn't they?
13     A.   Yes.
14     Q.   That's because certain hair care practices
15 can result it types of alopecia?
16     A.   Yes.
17     Q.   One of those is traction alopecia, right?
18     A.   Yes.
19     Q.   And another one is what's called CCCA,
20 right?
21     A.   From hair care practices?  We do not know
22 that.  It's not general -- that is not general
23 knowledge.  And attempts to prove that have never
24 proven fruitful.
25     Q.   So all that background clinical

Page 67

1 information is what a dermatologist would do in
2 normal everyday practice, right?
3     A.   Yes.
4     Q.   And part of the reason why it's important
5 for the dermatologist to do that is because it helps
6 the dermatologist come up with what's called a
7 differential diagnosis, right?
8     A.   Yes.
9     Q.   And a differential diagnosis is I'm
10 inspecting -- inspecting this patient, and here as a
11 clinician is what I think their type of alopecia
12 might be?
13     A.   Yes.
14     Q.   Do you expect a dermatologist to give you
15 their differential diagnosis when you are reading
16 the pathology?
17     A.   No, not at all.  But you have to draw a
18 line between hair experts like Dr. Tosti and Dr.
19 Roberts, Dr. Zaire (ph) who see alopecia as their
20 primary specialty.  A differential from these
21 experts is much more valuable than the differential
22 from a board-certified dermatologist because they
23 don't see as many of these patients and so  it
24 depends on who it's coming from.  You have to take
25 it in that context but -- so I would say from the

Page 68

1 general dermatologist, the most important is what we
2 already talked about, the diffuse, patchy, patient's
3 age, you know, that -- those are the most important.
4 Often their  differential can be misleading from the
5 general board-certified dermatologist.
6     Q.   We'll talk more about that in a little
7 bit. Back to what the dermatologists do in everyday
8 practice, though.  That's what I want to talk about
9 right now. Would you expect that before the
10 dermatologist takes the punch biopsy, that they
11 would conduct a physical examination of the patient?
12     A.   Yes.
13     Q.   And the physical examination can be
14 helpful in establishing a clinical diagnosis, right?
15     A.   Yes.
16     Q.   And the physical examination can also be
17 helpful in the dermatologist selecting the biopsy
18 sites?
19     A.   Yes.
20     Q.   And before a dermatologist orders a punch
21 biopsy, would you expect them to order standard
22 blood work?
23     A.   Not necessarily.
24     Q.   Well, let's talk about that a little bit
25 more. Thyroid abnormalities can cause alopecia,

Page 69

1 right?
2         MS. ANDREWS:  Excuse me?
3         MR. SEARS:  Thyroid abnormalities.
4         MS. ANDREWS:  Fibroid?
5         THE WITNESS:  Thyroid.  Yes.
6 BY MR. SEARS:
7     Q.   Having vitamin deficiencies can cause hair
8 loss?
9         MS. ANDREWS:  Objection.
10         THE WITNESS:  On which vitamins?
11 BY MR. SEARS:
12     Q.   Vitamin D, for example?
13     A.   Not to my knowledge.  Hypervitaminosis D
14 can cause hair loss when you're taking too much.
15 These patients that take, like, 50 million units or
16 whatever a day, 50,000 -- I'm sorry, 50,000.  These
17 patients can develop hair loss, but to my knowledge
18 vitamin D doesn't cause hair loss.  We attribute
19 vitamin D deficiency to everything but I don't -- I
20 think that may be -- may be -- not be true.
21 BY MR. SEARS:
22     Q.   But the blood work would show any vitamin
23 deficiencies that a patient might have, right?
24     A.   For vitamin D?
25     Q.   Yes.

18 (Pages 66 - 69)

**Page 70**

1    A.  Yeah, if you trust the vitamin D test.
2  It's very controversial what's a normal and a low
3  and --
4    Q.  Blood work would also show whether there's
5  an iron deficiency?
6    A.  Yes.
7    Q.  Iron deficiencies can cause hair loss?
8    A.  Oh, yes, absolutely.
9    Q.  So basically, blood tests are useful
10 because it helps a clinician rule out various causes
11 of hair loss, right?
12   A.  Yes.  But it, once again, depends on what
13 the clinician is finding in their examination.  We
14 talked about diffuse versus patchy, and it's much
15 more complex than this.  It depends on the age of
16 the patient.  If the patient is five years old and
17 it's patchy, then I'm pretty sure there's going to
18 be no -- no laboratory tests done and -- so it's
19 really much more complex than this, whether lab
20 tests are done or not.
21   Q.  There's also -- autoimmune disorders can
22 cause hair loss, right?
23   A.  Absolutely.
24   Q.  Blood work can help establish whether a
25 patient as has an autoimmune disorder?

**Page 71**

1    A.  Most of the autoimmune disorders that
2  cause hair loss do not have systemic involvement and
3  there are no laboratory tests for that, like lupus
4  erythematosus. The hair loss we mostly see is called
5  discoid lupus erythematosus or alopecic lupus, and
6  this does not have any systemic.  But if a patient
7  has systemic lupus erythematosus, which is a
8  different type of hair loss, then they can have
9  blood abnormalities from those tests.
10      THE VIDEOGRAPHER:  Excuse me.  You need to
11 put your mic back on.
12      THE WITNESS:  I know.  Sorry.
13      (Off-the-record exchange.)
14 BY MR. SEARS:
15   Q.  Blood work is also useful in determining
16 whether a patient might have hormonal imbalances,
17 right?
18   A.  Yes.
19   Q.  So there are benefits to conducting blood
20 work in assessing alopecia, right?
21   A.  In certain patients, yes.  But you don't
22 want to do the same blood work panel on every single
23 patient. Like a six year old coming in with hair
24 loss, they don't need the same blood work as a 65-
25 year-old postmenopausal woman.

**Page 72**

1    Q.  So then the dermatologist gets this
2  clinical picture.  They get this physical
3  examination and then they decide whether a punch
4  biopsy is necessary, right?
5    A.  Yes.  It's their decision.
6    Q.  And the gold standard for a punch biopsy
7  is four millimeters?
8    A.  I think that's true.  Yes.  I think that's
9  commonly accepted.
10   Q.  How deep of a biopsy does it need to be to
11 be useful for you?
12   A.  Well, this is a problem.  Because we like
13 to see the subcutaneous fat, and it's dependent on
14 the technique of the person doing the punch biopsy
15 to push and sample deep enough to get that fat.  And
16 I believe, this is not peer-reviewed literature,
17 that the scalp is such a bloody place to biopsy,
18 that quite often, the clinician is very timid in how
19 deep they go.  And the punch biopsies often don't
20 contain the subcutaneous.  So there's certainly a --
21 the person doing the biopsy, their skill and
22 knowledge of what they need to do is important in
23 this.  And you get a better sample if they push it
24 all the way in.
25   Q.  So to make sure I understood, a deeper

**Page 73**

1  biopsy where you get the subcutaneous fat is more
2  helpful for you in assessing --
3    A.  Well, it makes my job a lot easier.  Yes.
4    Q.  So it's more helpful for you in assessing
5  alopecia?
6    A.  Yes.
7    Q.  So some dermatologists use what's called
8  dermoscopy or trichoscopy?
9    A.  All of them do.
10   Q.  And using trichoscopy or dermoscopy can
11 also be useful in assessing where to biopsy, right?
12   A.  Yes.
13   Q.  And that's because dermoscopy can be
14 helpful to see if there's scarring alopecia versus
15 non-scarring alopecia?
16   A.  Well, it's -- yeah, it magnifies what you
17 can't see with your naked eye.
18   Q.  And the reason that's important is because
19 where you'd want to take a punch biopsy from on the
20 scalp would be contingent upon whether it's presumed
21 scarring versus non-scarring?
22      MS. ANDREWS:  Objection.
23      THE WITNESS:  Well, the clinician has to
24 decide where the best place to take the biopsy is
25 based upon the differential diagnosis.  And, once

19 (Pages 70 - 73)

Page 86

1  BY MR. SEARS:
2     Q.   Yep.
3     A.   The criteria are decrease in size of the
4  hair follicles.  So the normal -- we talk about
5  terminal hair follicles being the large hair
6  follicles, and vellus being the smaller one.  And I
7  think when you're very young then the normal is four
8  large ones for every one small one.  And then as we
9  age, you probably -- two to three is the normal, two
10 large ones for every small one.  And then when we
11 start talking about female pattern hair loss or
12 androgenetic, you're getting down to less than two
13 to one, or even one to one.  One terminal or large
14 one for every one vellus -- and you shouldn't just
15 say vellus.  You should say miniaturized, because
16 they're getting smaller so the miniaturization is
17 taking place.
18       So -- but as I stated earlier, in women
19 they miniaturize, but they don't go away, so they're
20 still there.  You'll still have a normal density of
21 the follicles present, they're just smaller.
22    Q.   So for androgenetic alopecia, you would
23 see an increase in vellus or miniaturization with a
24 decrease in terminal?
25    A.   Yes.

Page 87

1     Q.   And you could see that from two areas on
2  the scalp?
3     A.   Absolutely.
4     Q.   So when you're talking about taking
5  biopsies, you would want to take a biopsy on all
6  parts of the scalp that might have a different
7  alopecia process going on?
8     A.   Say that again.  I'm sorry.  I wasn't --
9     Q.   I'll just read this sentence.  It's
10 actually from a paper you wrote. "A single, four-
11 millimeter punch biopsy is appropriate if the single
12 disease process is suspected.  But additional
13 biopsies may be necessary if there is more than one
14 disease process at play."
15    A.   Yes.
16    Q.   And that's because you would want to
17 assess each disease process individually at a
18 pathological level?
19       MS. ANDREWS:  Objection.
20       THE WITNESS:  Well, the -- it's because a
21 single biopsy may not show both processes.  And the
22 clinical examination can identify where the two
23 different processes are, and then the two biopsies
24 can be done of those two different sites, and you
25 can come up with the two diagnoses.

Page 88

1  BY MR. SEARS:
2     Q.   So a dermatologist shouldn't just
3  arbitrarily limit themselves to a set number of
4  biopsies in assessing a patient?
5     A.   No.
6     Q.   The dermatologist should also decide where
7  to take the biopsy on the patient, right?
8       MS. ANDREWS:  Objection.
9       THE WITNESS:  Yeah.
10 BY MR. SEARS:
11    Q.   And having a person who is not trained in
12 dermatology tell a dermatologist how many biopsies
13 to take would not be consistent with dermatological
14 standards, would it?
15       MS. ANDREWS:  Objection.
16       THE WITNESS:  No, I don't believe so.
17 BY MR. SEARS:
18    Q.   Having a non-medical professional tell a
19 dermatologist where to take the biopsies from on the
20 scalp would also not be consistent with standard
21 dermatological practices?
22       MS. ANDREWS:  Objection.
23       THE WITNESS:  Correct.
24 BY MR. SEARS:
25    Q.   So going back to this paper you wrote

Page 89

1  "Getting the clinical notes from the dermatologist
2  is especially helpful because the patient's
3  subjective history and the clinician's exam provide
4  useful clues."
5     A.   Yes.
6     Q.   "And expert alopecia clinicians can
7  provide very exact differentials."
8     A.   Right.  I already said that.
9     Q.   "And without accurate clinical information
10 it maybe impossible to render an accurate
11 histopathological diagnosis in alopecia."
12    A.   Yes.
13    Q.   So I've talked to some other
14 dermatologists and pathologists and there's
15 something called a requisition form, is that --
16    A.   Yes.
17    Q.   So basically what a requisition form is
18 it's something that a company -- the pathology, when
19 it's sent to you, the pathologist, right?
20    A.   Yes.
21    Q.   And on the requisition form there's
22 usually some clinical history of the patient?
23    A.   Hopefully there is.  Yes.
24    Q.   And it's pretty common for dermatologists
25 to include their clinical diagnoses on the

23 (Pages 86 - 89)

1 line. And then it has to have a signature of who
2 signed it out, and it has the date of the sign-out
3 of the case. Those are the required elements, but
4 then there's non-required elements that we include
5 in our reports.
6    Q.   What are the non-required elements that
7 you include?
8    A.   A microscopic examination is no longer
9 required. And we -- for the hair loss patients, as
10 I said before, these patients really, really are
11 comforted by having a more complete report so we put
12 a photomicrograph on the report. This is not
13 required. And I also put a table in showing counts
14 of the hair size and the different phases of the
15 hair growth, whether there's an inflammatory cell
16 infiltrate. The density of the hairs, the counts of
17 it, and these are all included additionally. These
18 are specific for the alopecia biopsies.
19    Q.   Do you include clinical history sections
20 in your dermopath reports?
21    A.   We only include them if the clinician
22 wants it and they usually use it just to remind
23 themselves of the patient when they get it back. So
24 we have very specific identification where a
25 specific submitting clinician wants that put on the

1 report, otherwise we don't. It's not a required
2 element.
3    Q.   Would including a clinical history section
4 in the report be useful in letting a clinician know
5 the information that you were relying on in
6 assessing the pathology?
7    A.   I don't know how much they -- I've never
8 asked them.
9    Q.   Well, I'm asking you.
10    A.   I don't know whether they -- how they use
11 that. The reason we don't like to put it on the
12 report is because they often have typographical
13 errors in there, and we have to put it in the
14 report. And then they think we made the
15 typographical error, but it was from their office.
16 So it's the number one reason we just stay away from
17 that information.
18    Q.   Let me ask you this: Having certain types
19 of clinical background information might impact how
20 you would read pathology, right?
21    A.   Say that --
22        MS. ANDREWS: Objection.
23        THE WITNESS: Say that again.
24 BY MR. SEARS:
25    Q.   Having certain clinical information,

1 history, could impact how you might read and
2 interpret pathology?
3    A.   Yes.
4    Q.   And to the extent that you were relying on
5 certain clinical information that would impact how
6 you'd read and interpret pathology, wouldn't that be
7 something useful to include in your report?
8    A.   No. It's -- this isn't a clinical report.
9 This is a pathology report. So as I said, the most
10 important thing is diagnosis in the line and then
11 any kind of comment that follows it. Those are the
12 two absolutely most important parts. But we're not
13 providing clinical information back to -- we've
14 never seen the patient so --
15    Q.   So would you agree there's some
16 subjectivity in interpreting pathology?
17    A.   Yes.
18    Q.   Especially in alopecia there can be
19 certain findings on a pathological level that would
20 apply to many different types of alopecia?
21    A.   I don't know if it's many but, yeah,
22 there's definitely -- we call the histologic mimics,
23 where the same image through -- that you see through
24 the microscope can be seen in different processes.
25 Yes, that's true.

1    Q.   And because of that, do you occasionally
2 include differential diagnoses in your pathology
3 reports?
4    A.   Sometimes we do. But the goal of -- as a
5 pathologist your job is to narrow the differential
6 rather than to increase it. And because these --
7 the biopsy is basically being done because they
8 don't know what it is, or they're trying to confirm
9 it and they're trying to distinguish more than one
10 entity. So we really strive to not do that. And
11 really the multiple items in the differential are
12 added in only if we get a case where we're unsure of
13 the diagnosis.
14    Q.   You've talked about some of the, I guess,
15 histopathological things that you look at when
16 assessing alopecia.
17    A.   Uh-huh.
18    Q.   You talked about, I think, hair counts and
19 hair density?
20    A.   Yeah, kind of the same thing.
21        MS. ANDREWS: Hair what?
22        MR. SEARS: Counts.
23        THE WITNESS: Counts. Number of hairs.
24 BY MR. SEARS:
25    Q.   So there's averages for hair counts,

25 (Pages 94 - 97)

Page 114

1 very far to where it's not a problem.  But if it's
2 right within probably half a centimeter of the
3 hairline, there could be a problem.
4    Q.   So you also looked at anagen, catagen, and
5 telogen percentages?
6    A.   Yes.
7    Q.   And normal values for the adult scalp are
8 80 to 90 percent for anagen hair, and 10 to 20
9 percent for telogen hair.
10   A.   80 to 90 for anagen, yes.  And what did
11 you say?  I'm sorry.
12   Q.   Ten to 20 percent for telogen?
13   A.   Yeah.  Zero to -- you know, that's one --
14 that's one of those things that's also changing with
15 my experience.  And now I have been saying 0 to 15 is
16 the normal for catagen/telogen.  And we used to -- I
17 used to try to distinguish catagen from telogen
18 phase follicles, and it's become evident with our
19 better sectioning that at a certain level on one
20 follicle of hair looks like a catagen phase, and at
21 a certain level on the same follicle it can look
22 like a telogen.  So we -- I now have lumped the two
23 together.  But if you look at some of my older
24 reports, I used to try to make this distinction.  So
25 now the catagen/telogen percentage is what I report,

Page 115

1 and I consider 0 to 15 to be the -- probably a
2 normal within the range of normal.
3      (Whereupon, Primary Scalp Alopecia Article
4 was marked as Exhibit 9 for identification.)
5      MR. SEARS:  I'm going to mark as Exhibit 9
6 a paper you co-authored called Primary Scalp
7 Alopecia, New Histopathological Tools, New Concepts
8 and a Practical Guide to Diagnosis.
9      THE WITNESS:  I don't think I've ever seen
10 a print copy of this.
11 BY MR. SEARS:
12   Q.   You're famous.  So page 58, second column,
13 about three-fourths of the way down, it says normal
14 values for adult scalp are 80 to 90 percent for
15 anagen hair and 10 to 20 percent for telogen hair.
16   A.   Yes.
17   Q.   That's what you wrote in 2017.
18   A.   That's when I was published finally.
19 Yeah.
20   Q.   So with androgenetic, you talked about how
21 there's kind of a progressive miniaturization of the
22 hair?
23   A.   Yes.
24   Q.   And so as miniaturization progresses, the
25 length of the follicular cycle shortens, and you see

Page 116

1 more and more catagen and telogen follicles.
2    A.   Slightly more.  Yeah.  If that's the only
3 process going on, then there's a slight increase.
4 This paper actually deals with that issue.  But
5 yeah, they're cycling too fast and it gets shorter.
6 And then as they -- every time they grow back,
7 they're a little bit smaller.  And then when they're
8 a little bit smaller, the clock is a little bit
9 shorter, so you're exactly correct.
10   Q.   Another thing you look at in the biopsy is
11 inflammation, right?
12   A.   Inflammation?  Yes.
13   Q.   And that's because inflammation can be
14 associated with a scarring process?
15   A.   Autoimmune processes.  And you can also
16 just say regular dermatidities, rashes, like
17 seborrheic dermatitis, dandruff.  We see this all
18 the time.  And then the very, very important -- and
19 it's talked about in this paper is alopecia areata,
20 which is autoimmune -- probably autoimmune so, yes.
21   Q.   And then you can also see inflammation
22 with primary scarring alopecias like CCCA?
23   A.   Yes.
24   Q.   So do you know who did the punch biopsies
25 for Ms. Durden, Ms. Earnest, and Ms. Francis?

Page 117

1    A.   No.  I saw their names but I don't know
2 them.
3    Q.   Do you know the name of the doctor that
4 did it?
5    A.   Just on the report I saw their name but I
6 don't know it.
7    Q.   What's the name?
8    A.   I have to look it up.  So I presume it's
9 Dr. Lonon for Tanya Francis.
10   Q.   Doctor who?
11   A.   Who is it?  You know, I really don't know
12 the clinicians.  They were somewhere else.  Carolyn
13 Lonon, Lonon?
14   Q.   That's who you think did the punch
15 biopsies?
16   A.   I don't know.  I don't know who did the
17 biopsies.
18      MS. ANDREWS:  Objection; move to strike.
19      THE WITNESS:  I don't know who did the
20 biopsies.  They were sent to me.
21 BY MR. SEARS:
22   Q.   Do you know if the doctor that did the
23 biopsies was deposed in this case?
24   A.   I don't.
25   Q.   So you haven't looked at his deposition?

30 (Pages 114 - 117)

1    A.  No.  And, in fact, we reported -- when I
2  reported, I put my name as the submitting physician
3  on the final report because I didn't know who had
4  done this.  They're not a client of mine.
5    Q.  So you don't know what process was used to
6  select the biopsy sites, do you?
7    A.  The information I was given when I was
8  told they were going to send two, was there was
9  going to be a slightly more dense area and slightly
10  less dense area for each patient, but beyond that, I
11  don't know.
12    Q.  That was something told to you by the
13  plaintiffs' attorneys?
14    A.  Yes.
15    Q.  So you don't know how the person who took
16  the biopsies decided where to biopsy, do you?
17    A.  No.  I just -- but I saw their site
18  selection.
19    Q.  Do you know how it was decided how much
20  biopsies should be taken for Ms. Durden, Ms.
21  Francis, or Ms. Earnest?
22    A.  The only -- like I said, the only
23  information I was given was that they were going to
24  biopsy a slightly more dense area and slightly less
25  for each of the patients.

1    Q.  And again, that was something that was
2  told to you by the plaintiffs' attorneys?
3    A.  Yeah.
4    Q.  And do you know whether dermoscopy or
5  trichoscopy was used to select the biopsy sites?
6    A.  No, I don't.
7    Q.  And you don't know why the sites that were
8  biopsied were chosen to be biopsied?
9    A.  No, I don't.
10    Q.  You don't --
11    A.  Just so -- I mean, it's back to the same
12  answer that I answered.
13    Q.  Do you know why only two biopsies were
14  taken per woman?
15    A.  Well, I've never seen a -- I've never seen
16  an alopecia biopsy or a patient that had more than
17  two biopsies.
18    Q.  So we talked earlier about how there's a
19  process that a dermatologist goes through in
20  selecting biopsy sites, right?
21    A.  Yes.
22    Q.  And if that process is not used, that
23  could impact the validity of where the biopsies were
24  taken?
25    MS. ANDREWS: Objection.

1    THE WITNESS:  Well, it depends on the
2  disease you're sampling.
3  BY MR. SEARS:
4    Q.  Right.  And you want to take a biopsy from
5  a site that would be consistent with the disease
6  that you suspect?
7    MS. ANDREWS: Objection.
8    THE WITNESS:  Well, that's what you're
9  trying to do any time you do a -- with any pathology
10  sampling.
11  BY MR. SEARS:
12    Q.  And if that was not done, that could
13  impact whether the correct site on the scalp was
14  biopsied?
15    MS. ANDREWS: Objection.
16    THE WITNESS: Sure.  Yes.
17  BY MR. SEARS:
18    Q.  And we talked about this earlier, I think,
19  but when a dermatologist is taking a punch biopsy,
20  you would expect that the dermatologist would also
21  be coming up with a differential diagnosis?
22    MS. ANDREWS: Objection.  These are all
23  questions you've asked a number --
24    THE WITNESS: Yeah.
25    MS. ANDREWS: -- of times, Counsel.  So --

1  use your time how you want but he's not going to
2  answer them more than he already has.
3    THE WITNESS:  Well, any time you practice
4  medicine you should have a differential.  That's
5  what you learn in the first day of medical school.
6  BY MR. SEARS:
7    Q.  If the person --
8    MS. ANDREWS: Objection; move to strike.
9  BY MR. SEARS:
10    Q.  If the person who is not -- if the person
11  who is taking the biopsy is not assessing the scalp
12  for the type of potential alopecia, it can result in
13  error?
14    MS. ANDREWS: Objection; move to strike.
15    THE WITNESS:  Very rarely.  But you know
16  the -- as part of report -- and this is true for any
17  kind of pathology, whether it's alopecia or not, you
18  -- if the findings don't match what was clinically
19  suspected or is clinically observed, then we say
20  maybe this isn't representative and you can go back.
21  And fortunately on the skin, you can go back and
22  sample more.
23  BY MR. SEARS:
24    Q.  Right.  That's why it's important to have
25  a clinician come up with a diagnosis, a clinical

31 (Pages 118 - 121)

1 diagnosis, send that to you and make sure that your
2 pathological diagnosis is somewhat consistent with
3 what they see clinically?
4     A.  Yeah.  You have to --
5         MS. ANDREWS:  Objection.
6         THE WITNESS:  -- have a correlation, yeah.
7 BY MR. SEARS:
8     Q.  It's kind of like a checks and balances
9 system?
10        MS. ANDREWS:  Objection.
11        THE WITNESS:  At some level, yeah, you're
12 doing this.
13 BY MR. SEARS:
14    Q.  Do you know whether the doctor that took
15 the punch biopsies here treated the patients in any
16 capacity beyond taking the biopsy?
17    A.  No, I don't.
18    Q.  Do you know whether the doctor that took
19 the punch biopsy here knew anything about Ms.
20 Francis', Ms. Earnest's, or Ms. Durden's clinical
21 history?
22    A.  I don't know anything about what happened.
23 I know they did a biopsy and sent it to us.
24    Q.  Let me tell you that the doctor that took
25 the punch biopsies was deposed.  Okay?  And the

1 doctor said he did not know anything about the
2 patients' clinical history.  That's not consistent
3 with dermatologists --
4         MS. ANDREWS:  Wait a minute.  Wait.
5         Counsel, hang on.  You're telling us that
6 Dr. Claiborne was deposed?
7         MR. SEARS:  Yeah.
8         MS. ANDREWS:  When?
9         MS. DAVIS:  Uh-huh.
10        MS. ANDREWS:  I'll accept that
11 representation.
12        MR. SEARS:  Okay.
13        MS. ANDREWS:  But I don't have a
14 transcript so you're going to have to show him his
15 words if you're going to ask him questions about it.
16        MR. SEARS:  I disagree.
17        MS. ANDREWS:  Well, then you're just going
18 to have to accept the fact that we're going to
19 object to every question.
20        MR. SEARS:  That's what you've been doing.
21 You can keep on doing it.  You can have a standing
22 objection.  That's fine.
23        MS. ANDREWS:  Thank you, but no.  Go
24 ahead.
25 BY MR. SEARS:

1     Q.  Okay.  So the doctor that took the
2 biopsies, his name is Dr. Claiborne.  Okay?  Dr.
3 Claiborne was deposed.  All right?  Did you know
4 that Dr. Claiborne testified that he knew absolutely
5 nothing about these patients' clinical history?
6         MS. ANDREWS:  Objection.
7         THE WITNESS:  No.
8 BY MR. SEARS:
9     Q.  And that would not be consistent with how
10 a doctor would typically assess a patient and take a
11 biopsy, right?
12        MS. ANDREWS:  Objection.
13        THE WITNESS:  I'd have to see -- I'd have
14 to see the clinic notes on -- this is one where I'd
15 probably ask for clinic notes if I --
16 BY MR. SEARS:
17    Q.  Do you know whether --
18    A.  -- but I don't know --
19    Q.  -- clinic notes exist?
20    A.  No.  I don't know anything about this.
21    Q.  Did Dr. Claiborne send you a requisition
22 form?
23    A.  You know, I don't know where the
24 requisition, like, who filled it out, but, yeah, I
25 presume there was a requisition filled out when the

1 biopsy was done.
2     Q.  Would it surprise you to know that Dr.
3 Claiborne testified that he did not fill out the
4 requisition form?
5         MS. ANDREWS:  Objection.
6         THE WITNESS:  Well, the requisition is
7 often filled out by the staff in the office, so I
8 don't know.
9 BY MR. SEARS:
10    Q.  Do you have a requisition form?
11    A.  I don't -- not with me, no.  Do you?
12        MR. SEARS:  As far as I know, it has not
13 been produced and we would request that it is
14 produced.
15 BY MR. SEARS:
16    Q.  As you sit here today, do you know who
17 filled out the requisition form?
18    A.  Huh-uh.
19        MS. ANDREWS:  Objection.
20        THE WITNESS:  No.  But the requisitions,
21 as I said, are part of the CLIA requirement.  And we
22 have a requirement by CLIA for two years, and
23 College of American Pathologists for ten years to
24 keep these.  They're kept scanned and it's part of
25 the official record.

32 (Pages 122 - 125)

Page 126

1 BY MR. SEARS:
2    Q.  Okay.  Well, we request that it be
3 produced then.  I'm glad that you still have it.
4        Did you know that Dr. Claiborne testified
5 that he did not come up with the clinical diagnosis
6 before conducting a punch biopsy?
7        MS. ANDREWS:  Objection.
8        THE WITNESS:  No, I don't know anything
9 that he testified.
10 BY MR. SEARS:
11    Q.  That would not be consistent with how
12 dermatologists typically practice, right?
13        MS. ANDREWS:  Objection.
14        THE WITNESS:  You know, I don't know
15 anything about what he said or -- I'd have to see
16 the transcript to see exactly or --
17 BY MR. SEARS:
18    Q.  And we've talked about it before
19 but typically what's done is a dermatologist comes
20 up with a clinical diagnosis and then takes the
21 biopsy, right?
22    A.  Usually, yeah, that's what's going on.
23    Q.  And it would not be consistent with how
24 dermatologists operate to just take a biopsy without
25 coming up with a clinical diagnosis?

Page 127

1    A.  But these patients were women seeking help
2 for hair loss as an initial presentation.  They were
3 farther down the road than that, I think.  I don't
4 know, though, anything about them.
5    Q.  Okay.  Well, let me ask you this:  Outside
6 of the litigation setting, have you ever heard of a
7 dermatologist taking a punch biopsy of a woman who
8 he did not conduct a physical examination of, did
9 not come up with a clinical diagnosis, and had no
10 clinical information of the patient?
11    A.  Well, there's instances in dermatology
12 where a patient is referred to the dermatologist for
13 a biopsy.  And it's been determined the patient needs
14 a biopsy for other reasons.  For instance, systemic
15 amyloidosis might require a skin biopsy.  And so in
16 those cases, I think there's much more of a
17 situation like you're describing where a biopsy is
18 being done for a -- you know, by somebody for
19 another reason.  So this exists in -- dermatology is
20 pretty limited though.  But there are occasional
21 times you're looking for, you know, something, some
22 systemic disease usually, where they want the skin
23 biopsy, so the patient goes and gets the biopsy for
24 this reason.
25    Q.  We spent quite a lot of time earlier this

Page 128

1 morning talking about why it's important for a
2 dermatologist to get a clinical history, conduct a
3 physical examination, come up with a differential
4 diagnosis, and then take the biopsy, right?
5    A.  Yeah, in a normal encounter.  Yeah.
6    Q.  We talked about all the reasons why that's
7 important in --
8        MS. ANDREWS:  Objection.
9 BY MR. SEARS:
10    Q.  -- assessing which site to biopsy, right?
11        MS. ANDREWS:  Objection.
12        THE WITNESS:  Well, yeah.  You want to
13 biopsy where the disease is.
14 BY MR. SEARS:
15    Q.  And if Dr. Claiborne testified that he did
16 not do any of that, there's no control to ensure
17 that he biopsied from the site where disease exists,
18 right?
19    A.  Yeah but certainly the pictures that I saw
20 of the sites identified were not, you know, normal
21 scalp so --
22    Q.  But there could be multiple disease
23 processes going on in one scalp, right?
24    A.  Well, that's why a -- I mean two biopsies
25 are done here.  That's why you do biopsies.

Page 129

1    Q.  For instance, if it's CCCA, that typically
2 originates on the vertex, right?
3    A.  Yeah.  It's called central centrifugal
4 cicatricial.  The central is because it's on the top
5 of the scalp.
6    Q.  When assessing that, you'd want to take a
7 biopsy from an active area of scarring, right?
8        MS. ANDREWS:  Objection.
9        THE WITNESS:  Well, scarring is the end of
10 the road.  And as I said before, dermoscopy is very
11 useful to identify areas where there's erythema,
12 redness, or hyperkeratosis.  And I think in this
13 CCCA entity, if it really is, you know, its own
14 entity, the biopsy is important to find one of those
15 areas.
16 BY MR. SEARS:
17    Q.  Right.  You'd want to take the biopsy from
18 the correct site in assessing CCCA?
19    A.  Right.  An active area.
20    Q.  And that's why it would be important for a
21 clinician to do physical examination of the scalp to
22 make sure they are taking a punch biopsy from the
23 right site?
24        MS. ANDREWS:  Objection.
25        THE WITNESS:  Well, as long as it's --

33 (Pages 126 - 129)

1 important for the dermatologist to look at the scalp
2 to assess what forms of alopecia might be occurring,
3 right?
4    A.   Uh-huh.
5    Q.   Uh-huh, yes?
6    A.   (Nods affirmatively.)
7    Q.   We've talked about the things that were
8 done here.  That there was no physical examination.
9 There was no clinical history.  There was no
10 examination to determine the forms of alopecia that
11 were occurring.  And Dr. Claiborne testified that
12 that would not be consistent with his normal day-to-
13 day practice.  Okay?
14         Would you agree that the process that was
15 used would not be consistent with normal day-
16 to-day dermatological practices?
17         MS. ANDREWS:  Objection.
18         THE WITNESS:  You mean the -- well, this
19 is a legal case, right?  So it's not -- as I said
20 already, this wasn't a patient coming to a
21 dermatologist for an evaluation.  This was part of
22 another process.  I mean I did read Dr. Tosti's
23 examination, which is by a hair expert with an
24 assessment of what they had.  And I think that's
25 very in line.

1 BY MR. SEARS:
2    Q.   All I'm asking you is the process that was
3 done here, I understand it's in a litigation
4 setting.  But outside of a litigation setting, it's
5 not what would be done in a normal day-to-day
6 practice of treating patients, right?
7         THE ANDREWS:  Objection.
8         THE WITNESS:  Hopefully not.
9 BY MR. SEARS:
10    Q.   Did you say hopefully no?
11    A.   You mean whether the patient wasn't
12 examined or --
13    Q.   I mean all of it that was done.  Not
14 assessing for clinical history.  Not conducting a
15 physical examination.  Not assessing the punch
16 biopsy site for whether it's the proper site for the
17 type of alopecia that's going on.  That would not be
18 the process that would be used outside of litigation
19 --
20    A.   It would not --
21    Q.   -- in treating a patient?
22         MS. ANDREWS:  Objection.
23         THE WITNESS:  Oh, I agree with that.
24 Yeah. Sure.
25         MR. SEARS:  I am about ready to change

1 topics.  Does anyone need a break?
2         MS. ANDREWS:  No, we're good.
3         Doctor?
4         THE WITNESS:  I'm okay.
5 BY MR. SEARS:
6    Q.   We briefly touched upon this but there's
7 many potential causes of alopecia.  Yeah?
8    A.   Sure.
9    Q.   Hair care practices are a cause of
10 traction alopecia?
11    A.   Yes.
12    Q.   Certain drugs and medications can cause
13 alopecia?
14    A.   Certain -- yeah, really specific types of
15 alopecia, and rarely, and very few drugs.
16    Q.   So there's something called a bilateral
17 oophorectomy.
18         MS. ANDREWS:  Bilateral?
19 BY MR. SEARS:
20    Q.   Oophorectomy.  That's essentially where
21 the ovaries are removed, right?
22    A.   Uh-huh. Yes.
23    Q.   Yes.  And that causes a woman who would be
24 in premenopausal state to go into a postmenopausal
25 state?

1         MS. ANDREWS:  Objection.
2         THE WITNESS:  Sure.  They don't have
3 ovaries anymore.
4 BY MR. SEARS:
5    Q.   Right.  Do you know if any of the women
6 that you looked at the punch biopsies for had that
7 surgery since their chemotherapy --
8    A.   I don't know -- I don't know any of their
9 surgery history.
10    Q.   You don't know the surgery history for any
11 of those women, do you?
12    A.   Don't know.
13    Q.   Do you know whether any of those three
14 women have any medical conditions?
15    A.   No, I don't.
16    Q.   And you don't know the hair care practices
17 for any of those three women?
18    A.   Do not.
19    Q.   You don't know if any of those three women
20 have any nutritional deficiencies or iron
21 deficiencies?
22    A.   Do not. No.
23    Q.   So we briefly touched upon how there's
24 many different types of alopecia, right?
25    A.   Yes.

35 (Pages 134 - 137)

Page 146

1 to stop calling it a disease because it might be
2 considered a -- you know, life. And two, we know
3 that not -- there's an idea that -- or there's a
4 concept that's -- well, it's backed up that we know
5 not all of it is androgen driven.
6      So there was an attempt to take that word
7 out of the clinical world because it makes people
8 overly concerned about androgens, and it may just be
9 bad genetics or, you know, poor luck with your
10 genetics. So -- but we've gone around the block and
11 now I -- if you look at my reports, I've started
12 adding it back in as part of diagnosis, so that's
13 where we've been.
14      Q.   You agree that androgenetic alopecia is
15 the most prevalent form of alopecia seen in women?
16      A.   In my -- in my practice it is, yeah.
17      Q.   Would you agree that it's seen in
18 approximately 50 percent of women in the course of
19 their life?
20      MS. ANDREWS: Objection.
21      THE WITNESS: I don't know if that's --
22 you know, the diagnosis I use for women that are
23 just thinning with age as we already talked about is
24 senescence. So in the reports I issue on these
25 women, I call it female pattern hair loss/senescence

Page 147

1 and I don't use the word "androgenetic." So the
2 true probably androgenetic alopecia that we see in
3 younger women, often as young as 12, coming in that
4 is often inherited. I don't believe that's 50.
5 BY MR. SEARS:
6      Q.   Within androgenetic alopecia you can see
7 hair loss over the entire scalp, right?
8      A.   Yes.
9      Q.   It's thought that androgenetic alopecia is
10 genetic, right?
11      A.   Yes, in general.
12      Q.   It can also be caused by hormonal changes,
13 right?
14      A.   Hyperandrogen states. We talked about
15 polycystic ovary disease, any kind of tumor that's
16 secreting androgens could do this.
17      Q.   What if a woman was taking a drug that
18 blocked estrogen?
19      A.   You know, I don't know. I don't know
20 about that. I haven't had enough experience with
21 it, but I have no idea whether produces -- worsens
22 it.
23      Q.   Do you know whether any of the articles
24 that were in your Exhibit A talked about whether
25 there's hair loss seen with tamoxifen and aromatase

Page 148

1 inhibitors?
2      A.   Oh, gosh. You know, I reviewed them all
3 and they're all -- I don't -- I'd have to look at
4 them again.
5      Q.   Have you seen literature that says there
6 is hair loss associated with tamoxifen and aromatase
7 inhibitors?
8      MS. ANDREWS: Objection.
9      THE WITNESS: I'd have to look at it
10 again, I'm sorry.
11 BY MR. SEARS:
12      Q.   Do you know as you sit here today if
13 tamoxifen and aromatase inhibitors can cause hair
14 loss?
15      MS. ANDREWS: Objection.
16      THE WITNESS: I don't. You know, I'm not
17 the clinician on this.
18 BY MR. SEARS:
19      Q.   Do you know whether Ms. Durden, Ms.
20 Earnest, or Ms. Francis took tamoxifen aromatase
21 inhibitors?
22      A.   I didn't look at what they took. I mean
23 is taxotere -- I'm sorry, can I ask a question?
24      MS. ANDREWS: You can't -- no, you can't
25 ask him a question. He gets to only ask you. The

Page 149

1 only thing you can ask him --
2      THE WITNESS: I'm just wanting --
3      MS. ANDREWS: -- is to ask a better
4 question.
5      THE WITNESS: I'm proving I'm not a
6 clinical clinician. Because is tamoxifen --
7      MS. ANDREWS: Do you need a break, Doctor?
8      THE WITNESS: Yeah, I do.
9      MS. ANDREWS: You're not supposed to talk
10 when he's not asking questions. If you need to take
11 a break, just say so.
12      THE VIDEOGRAPHER: The time is 11:18.
13 We're off the record.
14      (Whereupon, recess taken.)
15      THE VIDEOGRAPHER: We're on the record.
16 The time is 11:36.
17      THE WITNESS: Can I clarify something on
18 this?
19 BY MR. SEARS:
20      Q.   Sure.
21      A.   On the Sperling paper that you presented,
22 the one patient that had ten -- I didn't -- now I
23 see that the top half of the patients are male, and
24 the bottom half are female. So the female patients
25 have an average of 23.2. So it's like I said that I

38 (Pages 146 - 149)

Page 178

1 the subtype.
2     Q.   Do you have any idea what type of
3 chemotherapy drugs they took?
4     A.   No.
5     Q.   Did you include any differential diagnoses
6 on those reports?
7     A.   I'd have to look at them but I don't
8 believe I did.
9     Q.   What differential diagnoses would you
10 include?
11     A.   Well, the goal of pathology is to remove
12 the differential diagnoses.  And if I'm confident in
13 the diagnosis, I don't put in a differential.
14     Q.   What are differential diagnoses for
15 persistent chemotherapy-induced alopecia?
16     A.   It should be female pattern hair loss is
17 probably number one.  Chronic telogen effluvium
18 could potentially be there.  Trichotillomania could
19 possibly but very unlikely.  I would put that way
20 down the list. Rarely diffuse or alopecia areata
21 that's a more diffuse presentation potentially.
22 That's mostly it, I think.
23     Q.   How long ago was it when you first made a
24 diagnosis of a woman having persistent chemotherapy-
25 induced alopecia?

Page 179

1     A.   You know, I don't know.  I've been doing
2 alopecia for maybe 15 years.  And I don't remember
3 when the first came in.  They're very rarely
4 biopsied.
5     Q.   Do you agree that there's some
6 disagreement in the medical literature about whether
7 persistent chemotherapy-induced alopecia occurs?
8     A.   Can you repeat that?
9     Q.   Do you agree that there's disagreement
10 within the medical literature about whether
11 persistent chemotherapy-induced alopecia occurs?
12         MS. ANDREWS:  Objection.
13         THE WITNESS:  I don't -- I haven't picked
14 up on a disagreement that it occurs.  I think in the
15 -- among the experts and even just board-certified
16 dermatologists, 100 percent would say they think
17 that -- they think or know that it occurs.
18 BY MR. SEARS:
19     Q.   So you don't think it's -- that persistent
20 chemotherapy-induced alopecia is kind of a
21 controversial topic for doctors?
22     A.   Well, it's certainly an emerging topic as
23 we're seeing more of it and learning more about it.
24 So the controversy has more to do with the limited
25 experience that people have had.  And even for me,

Page 180

1 because these patients have been through so much
2 already, the last thing they want to do is biopsy
3 and give them a new scar.  So we've all had limited
4 experience with it.  But more and more it's showing
5 up.  In this publication of the two papers in the
6 Journal of the American Academy of Derm, the two
7 seat -- continuing education articles really shows
8 that there's an increased interest in the subject.
9     Q.   So I think you described that the science
10 around persistent chemotherapy-induced alopecia, you
11 said was emerging?
12     A.   Yeah.  I think it's -- it's very limited.
13     Q.   Have you seen disagreement in the medical
14 literature about how persistent chemotherapy-induced
15 alopecia would present pathologically?
16     A.   Have I seen publications of the
17 histopathological features?  Repeat the question.
18     Q.   I looked at your Exhibit A, and I know
19 that you have.  What I'm saying is have you seen
20 disagreement within publications about how
21 persistent chemotherapy-induced alopecia presents
22 pathologically?
23     A.   Very minor disagreement.
24     Q.   The literature that you've reviewed, have
25 you seen that persistent chemotherapy-induced

Page 181

1 alopecia pathologically would appear very similar,
2 if not exact, to androgenetic alopecia?
3     A.   I've seen that statement.
4     Q.   And do you agree with that?
5     A.   No, not at all.
6     Q.   So in that sense there's conflict between
7 publications that talk about persistent
8 chemotherapy-induced alopecia and your opinions?
9         MS. ANDREWS:  Objection.
10         THE WITNESS:  Some of the publications, I
11 disagree with them.  Yes.
12 BY MR. SEARS:
13     Q.   So in that sense there is a conflict
14 within the medical community about how persistent
15 chemotherapy-induced alopecia presents?
16         MS. ANDREWS:  Objection.
17         THE WITNESS:  Presents?  There's
18 differences of opinion on the histologic features.
19 BY MR. SEARS:
20     Q.   That's not a definitive established area
21 of medicine at this point, right?
22         MS. ANDREWS:  Objection.
23         THE WITNESS:  I think the -- there's major
24 and minor histologic features that I think are
25 accepted by the experts.  Then there's no

46 (Pages 178 - 181)

1    A.  Yeah.  That's -- yes, as reported.
2    Q.  That can be consistent with androgenetic
3  alopecia, can't it?
4       MS. ANDREWS:  Objection.
5       THE WITNESS:  It's one of the features of
6  androgenetic alopecia, but the feature that's
7  missing is the low hair density at 1.35.  That's not
8  consistent with androgenetic.
9  BY MR. SEARS:
10   Q.  I read you a portion Dr. Tosti's -- one of
11 her publications.  It talks about the more advanced
12 stages of androgenetic, how trichoscopy can ensure
13 the presence of empty follicular ostia, right?
14   A.  (Nods affirmatively.)
15   Q.  So you can see decreased hair counts in
16 advanced androgenetic alopecia, can't you?
17      MS. ANDREWS:  Objection.
18      THE WITNESS:  Certainly in men with
19 androgenetic alopecia you can.  Typically in women,
20 you don't.  I don't know anything about dermoscopy,
21 though, and what they see.
22 BY MR. SEARS:
23   Q.  It looks like the catagen/telogen ratio is
24 normal for punch biopsy B?
25   A.  It is.  Yeah, it's high normal.  Yes.

1    Q.  The anagen-to-telogen ratio is close to
2  normal?
3    A.  The anagen -- the catagen/telogen ratio?
4       MS. ANDREWS:  If you don't understand his
5  question, just tell him.
6       THE WITNESS:  Yeah, I don't understand.
7  BY MR. SEARS:
8    Q.  The antigen-catagen-telogen ratio is close
9  to normal right?
10   A.  It's high normal in the biopsy, yes.
11   Q.  So in your Rule 26 report, you note that
12 there is diffuse or global involvement.  That can be
13 seen with androgenetic alopecia, can't it?
14   A.  Yes.
15   Q.  That can also be seen with chronic telogen
16 effluvium?
17   A.  What was the question again?  I'm sorry.
18   Q.  Diffuse or global involvement?
19   A.  Oh, yes, absolutely.
20   Q.  We talked earlier about subacute alopecia
21 areata, and there's some findings that are
22 consistent with punch biopsy A.
23      MS. ANDREWS:  Objection.
24 BY MR. SEARS:
25   Q.  Right?

1    A.  The -- the total count of 12 really isn't.
2  The catagen/telogen shift could be.  The
3  miniaturization could be.  So taking it in totality,
4  some features, but the -- all the diagnostic
5  features aren't present.
6    Q.  There could be more than one type of
7  alopecia occurring in the same location that could
8  alter the total hair count, right?
9       MS. ANDREWS:  Objection.
10      THE WITNESS:  In any patients, yes.  Sure.
11 BY MR. SEARS:
12   Q.  For instance, if there's traction alopecia
13 going on in punch biopsy A, that could reduce the
14 total hair count?
15      MS. ANDREWS:  Objection.
16      THE WITNESS:  Could have.  There could
17 have been traction at the site.
18      MS. ANDREWS:  Move to strike.
19      MR. SEARS:  I'm going to move on to a
20 different plaintiff, should we take a quick break?
21      MS. ANDREWS:  Sure.
22      THE VIDEOGRAPHER:  The time is 1:55.  We
23 are off the record.
24      (Whereupon, recess taken.)
25      THE VIDEOGRAPHER:  We're on the record.

1  The time is 2:04.
2  BY MR. SEARS:
3    Q.  So we were looking at all three of these
4  plaintiffs, Ms. Earnest, Ms. Francis, and Ms.
5  Durden.  We've got punch biopsies from them, right?
6    A.  Yes.
7    Q.  But when looking at their scalp in the
8  entirety, they could have other alopecia processes
9  going on, couldn't they?
10      MS. ANDREWS:  Objection.
11      THE WITNESS:  Can you clarify that?
12 BY MR. SEARS:
13   Q.  Sure.  They could have other types of
14 alopecia going on in their scalp in the areas that
15 were not biopsied, right?
16      MS. ANDREWS:  Objection.
17      THE WITNESS:  Yes.
18 BY MR. SEARS:
19   Q.  They could have some component of
20 androgenetic alopecia on their scalp?
21   A.  Yeah.  There's no way to tell.
22   Q.  Right.
23   A.  When you have damage this way?
24   Q.  They could have some form of chronic
25 telogen effluvium going on on their scalp?

59 (Pages 230 - 233)

Page 250

1   A.   Say it again.
2   Q.   Sure.  If we included the catagen/telogen
3   hairs as terminal as opposed to vellus, that would
4   alter the terminal-to-vellus ratio?
5   A.   Yes, some.
6   Q.   For example, biopsy B, if all those
7   catagen/telogen hairs were terminal hairs, then the
8   ratio would be basically one to one?
9   A.   But they're not.
10   Q.   If there's another dermatopathologist that
11   counted them differently and categorized them
12   differently, and included them as terminal instead
13   of vellus, that would be a one-to-one count?
14       MS. ANDREWS:  Objection.
15       THE WITNESS:  Sure.
16   BY MR. SEARS:
17   Q.   And a one-to-one count could be consistent
18   with androgenetic alopecia?
19   A.   But once again, we're talking about one
20   histologic feature of it all.  And when you're
21   taking into account on the biopsy B that 33 percent
22   are in catagen/telogen, which is calculated
23   correctly on that one, and the low follicular
24   density of 1.43 in context with the clinical
25   history, this is -- this is not.

Page 251

1   Q.   And again, we talked about the range of
2   follicular density.  And I think you said that two
3   is normal but there could be a range of what's
4   considered normal for follicular density, right?
5   A.   Well, one thing that's -- that's true, but
6   one thing that's missing there is in these biopsies,
7   which I can show you right here -- let me see if
8   there's a good -- see these -- these are anti-
9   follicular tracts where hairs used to be.  So we're
10   spending a lot of time talking about these exact
11   calculations.  But also, nobody's home; these died.
12   And that's altering the count but it's also altering
13   this catagen/telogen ratio and the terminal/vellus
14   ratio.  And that's not a feature of androgenetic.
15   So there's a feature here of these empty tracts that
16   we also take into account.
17   Q.   We've talked a lot about those empty
18   tracts, and those can be seen in biphasic hair
19   patterns -- or hair loss patterns?
20   A.   If it's permanent, yeah, sure.
21   Q.   And I know we've had some dispute about
22   whether that can be seen in female pattern hair
23   loss, but I think you said it can be seen in male
24   pattern hair loss?
25   A.   I said male pattern hair loss, and it's

Page 252

1   marched toward complete follicular death is more
2   likely to show these.  And it's much less a feature
3   of female pattern and that's because the follicles
4   are still there.
5   Q.   So I know we've talked a little bit about
6   tamoxifen and aromatase inhibitors, and I think you
7   said that you don't know if they can cause alopecia,
8   right?
9   A.   Well, there's the publication of the six
10   cases or ten cases in the reports that -- this is
11   peer-reviewed literature.
12   Q.   Have there been any studies that assess
13   what hair loss caused by tamoxifen or aromatase
14   inhibitors would look like pathologically?
15   A.   The one -- let me pull that -- the one
16   paper, I don't know if it's Miteva or someone else
17   that reports that in specifically those patients,
18   right.  Yes.  So, yes.
19   Q.   And what does the pathology look like for
20   hair loss caused by tamoxifen or aromatase
21   inhibitors?
22   A.   Well, it's the presence of these basaloid
23   bodies, which we can also call a catagen/telogen, a
24   catagen or telogen shift and the miniaturization
25   that we're -- which is because of the loss of the

Page 253

1   large hairs more than because it's a miniaturization
2   process, so they're probably just residual vellus
3   hairs.
4       And then once again, the missing piece
5   that I believe is a big feature and was reported in
6   those cases is that there's a low follicular count
7   or density?
8   Q.   So basically the features that you're
9   reporting on in your dermopath reports?
10   A.   Oh, yes.
11   Q.   So in your Rule 26 report, you note that
12   there is diffuse or global involvement.  And I think
13   we've talked about how that occurs both with
14   androgenetic alopecia or chronic telogen effluvium,
15   right?
16   A.   And other diseases, yes.
17   Q.   And like with Ms. Francis, you did not do
18   the staining for the subacute alopecia areata?
19   A.   No.
20       MR. SEARS:  I think I'm going move on to
21   Ms. Durden, anyone need a break?
22       MS. ANDREWS:  No.
23   BY MR. SEARS:
24   Q.   So at the risk of annoying plaintiffs'
25   counsel, can I assume --

Page 254

1     MS. ANDREWS: I wouldn't be so sure, sir.
2 BY MR. SEARS:
3     Q.  Can I assume that your answer would be the
4 same if Ms. Durden had chemotherapy, what type of
5 hair loss would you diagnose her as having?
6     MS. ANDREWS: Yeah.  I will object to that
7 question forever.
8     THE WITNESS:  Can I see the report?
9     MR. SEARS:  Yeah.  Let me get it pulled
10 out.
11     (Whereupon, Durden Report and Slides was
12 marked as Exhibit 16 for identification.)
13 BY MR. SEARS:
14     Q.  All right.  I'm handing you Exhibit 16,
15 and it is your dermopath report for Ms. Durden along
16 with all of your slides -- photocopies of your
17 slides.
18     MS. ANDREWS: Thank you.
19     THE WITNESS:  So the question was what --
20 BY MR. SEARS:
21     Q.  Right.  In the absence --
22     A.  Can you repeat --
23     Q.  -- of chemo, she never had chemo, what
24 type of hair loss?
25     MS. ANDREWS: Objection.

Page 255

1     THE WITNESS:  Well, as I stated before,
2 the final diagnosis, if I skipped to the end, would
3 end up being a descriptive diagnosis after we
4 verified several ways that she hadn't had
5 chemotherapy, would have said this is low follicular
6 density, catagen/telogen shift, which is quite
7 significant in patients, and then a follicular or a
8 terminal/vellus alteration, which is also quite
9 significant.
10 BY MR. SEARS:
11     Q.  Those additional slides that you would
12 have done, you did not do with Ms. Durden, right?
13     A.  No, we didn't because alopecia areata
14 wasn't a consideration.
15     Q.  Any additional staining that you would
16 have done, you did not do with Ms. Durden, right?
17     A.  No.  These -- I get these chemotherapy
18 biopsies here and there.  When you put them -- we
19 read initially without any clinical.  When you put
20 it under the microscope, you know what it is, and
21 then you look, and they've had chemo.  So we just
22 know that that's what it is based on, these features
23 that I've been talking about and all three of these
24 biopsies look exactly like that. And it's a good
25 thing they did two.

Page 256

1     Q.  So we've talked about this for Ms. Earnest
2 and Ms. Francis, but like with both of them, Ms.
3 Durden could still have an androgenetic process
4 going on her scalp, right?
5     MS. ANDREWS: Objection.
6     THE WITNESS:  She could, yeah, absolutely.
7 She's 67 years old.
8 BY MR. SEARS:
9     Q.  It would not be uncommon to see a 67-year-
10 old with the androgenetic process going on?
11     MS. ANDREWS: Objection.
12     THE WITNESS:  Not uncommon to see that.
13 Yeah.
14 BY MR. SEARS:
15     Q.  Ms. Durden could also have chronic telogen
16 effluvium occurring on her scalp?
17     A.  Yes.
18     Q.  She could also have CCCA occurring on her
19 scalp?
20     MS. ANDREWS: Objection.
21     THE WITNESS:  It's not -- none -- it's not
22 in any of the two biopsies we looked at.  But she
23 could have somewhere else that wasn't sampled.
24 BY MR. SEARS:
25     Q.  So she could have frontal fibrosing

Page 257

1 alopecia as well?
2     A.  Sure.  Yes.
3     Q.  Like with the other women, you note on
4 here that she's a female.  You note her birth date
5 and you note that she has a history of having
6 chemotherapy.  And outside of that, you don't know
7 anything about her clinical history, correct?
8     A.  No, I don't.  At the time that I read the
9 biopsies.
10     Q.  Do you know whether she has a family
11 history of alopecia?
12     A.  No, I don't.
13     Q.  Do you know what medications she takes?
14     A.  No.
15     Q.  Do you know if she is vitamin deficient?
16     A.  No.
17     Q.  Do you know if she's iron deficient?
18     A.  No, I don't.
19     Q.  Do you know anything about her hair care
20 practices?
21     A.  No.
22     Q.  Do you know about any surgeries she may
23 have undergone?
24     A.  No, I don't.
25     Q.  Do you know whether her breast cancer was

65 (Pages 254 - 257)