# EXHIBIT C

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2            EASTERN DISTRICT OF LOUISIANA
 3
 4   IN RE:  TAXOTERE (DOCETAXEL)      MDL No. 2740
 5   PRODUCTS LIABILITY LITIGATION
 6
 7   This Document Relates to:         SECTION: H
 8
 9   Antoinette Durden, Case No. 2:16-cv-16635;
10   Tanya Francis, Case No. 2:16-cv-17410;
11   Barbara Earnest, Case No. 2:16-cv-17144
12
13
14
15
16
17      VIDEOTAPED DEPOSITION OF COLE CLAIBORNE, M.D.
18
19         Taken at the Offices of MD Claiborne
20         Dermatology, 1477 Louisiana Avenue, New
21         Orleans, Louisiana, on Friday, November 2,
22         2018, beginning at 1:00 p.m.
23
24   JOB NO. 3069333
25
```

Page 18

1  you anything?
2    A.  I have not -- I have no idea of what the
3  result of the punch biopsies I performed were.
4  I'm curious.  I would love to know what they were,
5  but I have no idea.
6    Q.  Have they shown you any medical records
7  for any of these three women?
8    A.  Nothing.  That's all -- everything I
9  have.
10   Q.  Have they shown you any photographs of
11 these three women?
12   A.  We took photographs of each site that we
13 chose to biopsy.  That, I believe, should be --
14 Mr. Lambert has them.  They should maybe be in
15 your stack.  If not, I could copy them real quick.
16 But that's about it.
17   Q.  So just to be clear, those were
18 photographs that you took of these three women
19 when they came in?
20   A.  Correct.
21   Q.  So you haven't seen any photographs of
22 these three women or their hair as it may have
23 existed before the time you saw them?
24   A.  No idea.
25   Q.  And you have no idea what their prior

Page 19

1  medical history might have been?
2    A.  Beyond what they put on the paperwork.
3    Q.  I'll ask you more about the paperwork in
4  a minute.  Let me just ask kind of an overarching
5  question.  So in this paperwork, there's some
6  information about their medications and their
7  medical history.  Is all of that information,
8  information that they provided to you?
9    A.  Uh-huh.
10   Q.  You said "uh-huh."
11   A.  As far as I know.  Yes, sorry.
12   Q.  And beyond the information that is
13 contained in these records from when you saw these
14 three women, do you know anything else about the
15 three women?
16   A.  No.
17 MR. SEARS:
18       I'll just go ahead and mark these now
19 before I forget.  So I'm going to mark as Exhibit
20 3 the materials you produced for Ms. Francis.
21         (Exhibit 3 was marked.)
22 MR. SEARS:
23       Exhibit 4, the materials you produced for
24 Ms. Durden.
25         (Exhibit 4 was marked.)

Page 20

1  MR. SEARS:
2       And as Exhibit 5, the materials you
3  produced for Ms. Earnest.
4         (Exhibit 5 was marked.)
5  MR. SEARS:
6    Q.  Let's go back and talk about the two
7  other conversations that you mentioned.  What can
8  you tell me about your conversation with Larry?
9    A.  Larry asked me what my role was with
10 regard to these patients.  And, you know, I simply
11 discussed that I view myself in this instance as a
12 -- I really was not the treating physician.  I've
13 never assessed these patients' hair loss.  I've
14 never prescribed them a single medicine.  And I
15 view myself as a -- utilized as a proceduralist in
16 this instance.
17   Q.  So, in that sense, is what you did with
18 these three women different than what you would do
19 in your normal day-to-day practice?
20   A.  Correct.
21   Q.  And how all does it differ from what you
22 do in your normal, day-to-day practice?
23   A.  We would assess the nature of their hair
24 loss, get a history, you know, of when it began,
25 have they -- what sort -- basically, there could

Page 21

1  be many causes for hair loss, and you've got to
2  get a lot more information.
3    Q.  And that history was not done with these
4  three women?
5    A.  Correct.
6    Q.  It's important to get that history
7  because there's multiple forms of hair loss and
8  there's multiple forms of hair loss all of
9  multiple causes.
10   A.  Correct.  It's very, very complex.
11 Generally, it's one of the most dreaded things
12 someone comes in with because it takes so long.
13   Q.  And so in your everyday clinical
14 practice, do you agree that it's important to see
15 women over time to see how they would respond to
16 various treatments?
17   A.  Typically, yes.  It's not something you
18 can assess in a snapshot in time.
19   Q.  So if a woman comes in one time and
20 doesn't provide you with any sort of medical
21 history, hair history, and you just do a punch
22 biopsy, that wouldn't be particularly helpful for
23 you in assessing their hair loss, would it?
24   A.  It's hard to argue against pathology.  I
25 will say that.  It depends what the pathology

Page 22

1  shows. But, certainly, that's a woefully
2  incomplete picture, to not have more information.
3      Q. We'll talk more about, I guess, the way
4  that clinicians and pathologists interact with one
5  another and the information they share. But with
6  pathology, there's something called differential
7  diagnoses.
8      A. Uh-huh.
9      Q. Can you just explain what a differential
10 diagnosis is?
11     A. Sure. So many, many different skin
12 diagnoses can look the exact same under the
13 microscope, yet have very, very different clinical
14 appearances, you know. So, oftentimes, the
15 pathologists -- we, as a dermatologist, might kind
16 of try to lead them into what we're seeing
17 clinically, and then they can put that kind of
18 into what might fit diagnostically.
19         Some pathologists will simply read
20 exactly what they see under the microscope, and
21 there can be ten different things that have that
22 pattern. Other pathologists might kind of just
23 give you a differential of what it could be and
24 then leave it up to you to kind of guess what the
25 most likely diagnosis is.

Page 23

1          Some pathological specimens are very,
2  very diagnostic in themselves. Others are more
3  like a reaction pattern.
4      Q. And so, essentially, what pathologists
5  are doing is they're looking under a microscope at
6  a biopsy sample.
7      A. Correct.
8      Q. And they're looking at the biopsy sample
9  to identify, I guess, certain markers that more
10 likely occur with certain types of hair loss.
11     A. Correct.
12     Q. And so they do things like have a
13 follicle count?
14     A. Uh-huh.
15     Q. They look at telogen versus antigen
16 ratios?
17     A. Uh-huh.
18     Q. They look to see if it was inflammation?
19     A. Uh-huh, absolutely. They tell you what
20 cells are present. They tell you in what
21 quantity. You know, hair loss is very difficult.
22     Q. But even with a punch biopsy, it's, at
23 times, difficult to establish what the definitive
24 type of hair loss is. Would you agree with that?
25 MR. CENTOLA:

Page 24

1         Objection, form.
2      A. Generally speaking, like anything, the
3  more biopsy gives you more of a complete picture.
4  It's only a small sample of the broader picture.
5  It can, you know, be somewhat variable, depending
6  upon where you biopsy, as well.
7          So, most of the time, the biopsy should
8  lead you to the correct point that you are trying
9  to get to in terms of providing information.
10     Q. I'm sorry. I think I asked a really
11 unclear question, so let me start over again.
12 Even with the biopsy, there could be differential
13 diagnoses. So the biopsy might show that it could
14 be many different types of hair loss. Would you
15 agree with that?
16 MR. CENTOLA:
17         Objection, form.
18     A. I mean, at times, biopsies are not a
19 hundred percent clear, especially with hair loss.
20 So, yeah, you can't always get exactly what you
21 want. You might get features of this, that and a
22 couple things, or it might just be inconclusive.
23 That's about as much as I can say.
24 MR. SEARS:
25     Q. I know you are not a pathologist, but as

Page 25

1  an example, there's something called androgenetic
2  alopecia, and there's another form of alopecia
3  called traction alopecia.
4      A. Uh-huh.
5      Q. Do you know whether those two forms of
6  alopecia can look very similar microscopically?
7      A. Traction, you are going to see some
8  fibrous tracks, probably. It depends on what
9  stage of the traction. The traction is going to
10 be more scarring.
11         Androgenetic, you are going to have some
12 follicular miniaturization. That's going to seem
13 kind of like, if you look at my forehead, I'm
14 starting to recede here. That's androgenetic.
15 That's how men lose hair. Women can have that
16 pattern, as well, you know, but they look quite
17 different clinically. That's where the history
18 comes in. You know, you ask patients, do you wear
19 your hair in tight braids? Classically, traction
20 is going to be African-American patients. Pretty
21 easy to detect that when you talk to them.
22     Q. Is that one of the reasons why it's
23 important for clinicians to provide the
24 pathologist with the clinical history?
25     A. That certain does help. We make sure we

| Page 10 | Page 12 |
|---|---|
| 1  Q. Did you have a chance to review that<br>2 before your deposition?<br>3  A. I believe I did. There are changes, you<br>4 said, with this?<br>5  Q. Just the address was changed.<br>6  A. Okay.<br>7  Q. And then before the depo started, you<br>8 actually gave me some materials in response to<br>9 that, I believe.<br>10  A. Correct.<br>11  Q. You gave me your CV.<br>12  A. Correct.<br>13 MR. SEARS:<br>14    I'll go ahead and mark that as Exhibit 2.<br>15       (Exhibit 2 was marked.)<br>16 MR. SEARS:<br>17  Q. And then you gave me some medical records<br>18 for Ms. Francis.<br>19  A. Correct.<br>20  Q. For Ms. Durden.<br>21  A. Yep.<br>22  Q. And for Ms. Earnest.<br>23  A. Yes.<br>24  Q. And these are the medical records from<br>25 your office? | 1 involved?<br>2  A. Not really, but I've kind of implied<br>3 what's going on.<br>4  Q. What's your understanding of what's going<br>5 on?<br>6  A. These patients had some sort of cancer<br>7 and were treated with a chemotherapy agent that<br>8 has caused them to have some sort of -- they claim<br>9 to have some sort of hair issue as a consequence.<br>10  Q. How many conversations did you have with<br>11 Mr. Lambert about this litigation?<br>12  A. Good question. Not terribly many. I<br>13 don't know. Maybe a maximum of five, but most of<br>14 that was related to logistics with me being<br>15 deposed.<br>16  Q. Based upon what you've told me so far,<br>17 can you tell me any other details about your<br>18 conversations with Mr. Lambert?<br>19  A. Initially, I was approached just to do<br>20 two punch biopsies on each of these plaintiffs. I<br>21 believe -- I had never received a formal<br>22 instruction of what I was -- or in terms of<br>23 something on paper.<br>24    We chose two sites to do punch biopsies<br>25 on within each plaintiff. One was supposed to be |
| **Page 11** | **Page 13** |
| 1  A. Correct.<br>2  Q. And these involve your treatment of these<br>3 three plaintiffs?<br>4  A. They involve specifically the procedures<br>5 that I was asked to perform.<br>6  Q. Who asked you to perform those<br>7 procedures?<br>8  A. I was contacted by Palmer Lambert.<br>9  Q. Who is Palmer Lambert?<br>10  A. He's, I believe, opposing counsel.<br>11  Q. So to the extent of your knowledge,<br>12 Palmer Lambert is a plaintiff's attorney who<br>13 represents one or all three of these patients?<br>14  A. Correct.<br>15  Q. Can you tell me about your conversations<br>16 that you had with Palmer Lambert?<br>17  A. Sure. He initially approached me saying<br>18 -- he actually was -- well, I'll say that I did<br>19 know him prior to this. He was two years below me<br>20 in high school in my brother's class. Beyond<br>21 that, I hadn't had any contact with him for two<br>22 decades. But he knew of our dermatology practice,<br>23 contacted us, asked us to perform punch biopsies<br>24 on these clients.<br>25  Q. Did he tell you what the litigation | 1 from the most normal area of hair, and the other<br>2 area was supposed to be the area, I believe he<br>3 described it as most demonstrative of hair loss.<br>4    And I have never -- I will say this. I<br>5 have never assessed these patients causation for<br>6 their hair loss. I've never treated them beyond<br>7 performing a punch biopsy, so I have very limited<br>8 knowledge of these patients' hair history or<br>9 anything regarding that.<br>10  Q. You referred to, I think, "he" or "him" a<br>11 few times in the last answer. Was that referring<br>12 to Mr. Lambert?<br>13  A. Correct.<br>14  Q. So is it Mr. Lambert who suggested that<br>15 you did two punch biopsies?<br>16  A. Correct.<br>17  Q. And it was Mr. Lambert who suggested<br>18 where the punch biopsies are taken on the scalp?<br>19  A. No. When we were choosing a site, and I<br>20 did ultimately call the shots for where the sites<br>21 were chosen, we had to find an area that had --<br>22 was the most devoid of hair and find an area that<br>23 looked to be the most normal. And those were the<br>24 sites I chose.<br>25  Q. Was it Mr. Lambert's suggestion to -- I |

Page 26

1  tell everybody, this is what we're looking for,
2  tell us yes or no.
3      Q.   For these three women, Ms. Francis,
4  Ms. Durden and Ms. Earnest, do you know who the
5  pathologist was who read the biopsies you took?
6      A.   Not a clue in the world.
7      Q.   Did you provide any clinical information
8  to that pathologist?
9      A.   I don't believe so.  We didn't choose
10 where they went.  You would probably have to talk
11 to Mr. Lambert.
12     Q.   And that's much different than what you
13 would do in your daily practice, isn't it?
14 MR. CENTOLA:
15          Object to the form.
16     A.   Clinically, we try to give everybody what
17 we're thinking diagnostically because it allows
18 pathologists to make better diagnoses.
19 MR. SEARS:
20     Q.   So to make sure I understood, in your
21 daily practice, what you would do is, you would
22 provide the pathologist with the clinical history
23 that you took from the patient.
24     A.   Uh-huh, I would provide them, most of the
25 time, with a differential of what I think it is,

Page 27

1  what I'm looking for.  If I think it's something,
2  skin cancer, I'm going to say, rule out skin
3  cancer, you know.  If I think something is, you
4  know, a fungus, I'm going to say, rule out fungus.
5          Typically, with hair loss, you are going
6  to be in two categories.  You are going to be in
7  scarring, nonscarring alopecia.  That's going to
8  be easy to detect and that's the thing that we
9  often provide to pathologists.  I didn't fill out
10 the path slip for this.  I don't know where it
11 went.  So I don't even think -- I don't know if
12 that was written at all.
13     Q.   One of the reasons why you want to
14 provide the pathologist with that clinical history
15 is so that they can make a more accurate diagnosis
16 of what the type of hair loss is?
17     A.   Yes, sir.
18     Q.   From talking to other dermatologists, is
19 there something called a requisition form that you
20 send to the pathologist?
21     A.   Correct.
22     Q.   And here, you did not fill out the
23 requisition form?
24     A.   I do not believe so.  My nurse usually
25 does all of that.  I'm spoiled.  But to my

Page 28

1  knowledge, I know I didn't fill it out.
2      Q.   So you have no idea who filled out the
3  requisition form?
4      A.   I have no idea.
5      Q.   You have no idea, assuming there was a
6  requisition form, what was on it?
7      A.   My nurse typically does that.  I don't
8  know if she did that in this case, so I have no
9  recollection.
10     Q.   And even if there is a requisition form
11 out there, you have no idea what that form might
12 say?
13     A.   No.  It's usually pathologist dependent.
14 Usually, each different pathologist will have
15 their own requisition form for their -- special
16 for their lab.  And, you know, they didn't use one
17 of the normal ones that we use.  They had somebody
18 where they wanted to send it somewhere else.  So I
19 have no idea.
20     Q.   In your conversations with the
21 plaintiffs' attorneys, do you know why they chose
22 to send the pathology to the pathologist that it
23 was sent to?
24     A.   No.
25     Q.   You mentioned there is multiple types of

Page 29

1  -- or I guess multiple different types of
2  requisition forms, but what information is
3  generally included in the requisition forms?
4      A.   Patient demographics, insurance
5  information, age.  Usually, they'll do -- they'll
6  provide, like, a clinical history, and then they
7  might also ask for, like, a differential
8  diagnosis.  They will also include how the
9  specimen was obtained, via punch, via shave, et
10 cetera.
11     Q.   Is there anything else that would be on
12 the forms?
13     A.   Whether the forms were -- sometimes they
14 ask whether the lesion -- you did a perilesional
15 biopsy or a lesional biopsy.
16     Q.   And, again, all that information is
17 included in the form to help the pathologist make
18 an accurate diagnosis?
19     A.   Yes, sir.
20     Q.   And a requisition form is something that
21 you all would use in your daily practice in
22 sending materials to the pathologist?
23     A.   Correct.
24     Q.   So you talked about how you had the
25 opportunity to talk with Mr. Lambert about five

8 (Pages 26 - 29)

| Page 38 | Page 40 |
|---|---|
| 1   A.  Sure. | 1  know off the top of my head.  I could look.  Four |
| 2   Q.  Would you agree that you are not an | 2  millimeter. |
| 3  expert in oncology when it comes to breast cancer | 3   Q.  About how large is four millimeters? |
| 4  treatments? | 4   A.  Maybe a little larger than an eraser on a |
| 5   A.  Yep. | 5  pencil. |
| 6   Q.  So let's shift gears a little bit and | 6   Q.  So would you just describe how a punch |
| 7  talk about hair loss.  So can you put a percentage | 7  biopsy works? |
| 8  on the percentage of women that will have hair | 8   A.  Sure.  To do a punch biopsy, typically, |
| 9  loss issues during their lifetime? | 9  you will consent the patient.  You will |
| 10 MR. CENTOLA: | 10 anesthetize the area.  Typically, we use lidocaine |
| 11       Objection, form. | 11 with epinephrine, buffered with bicarbonate, as |
| 12   A.  God, I swear, about ninety-something | 12 well.  You inject that area.  You let it sit for a |
| 13 percent. | 13 few minutes.  You take the punch biopsy, which is |
| 14 MR. SEARS: | 14 essentially a cookie cutter like device.  You |
| 15   Q.  We briefly touched upon this, but there's | 15 apply it to the skin with a twisting motion.  It |
| 16 multiple different forms of alopecia? | 16 basically cuts a plug of tissue.  That tissue is |
| 17   A.  Uh-huh. | 17 then elevated.  And then you snip the base and |
| 18   Q.  Is that a yes? | 18 underlying fascia, trying to get as much of |
| 19   A.  Yes. | 19 everything as possible so you have an intact |
| 20   Q.  And there's many different causes of | 20 specimen.  That specimen is immediately placed in |
| 21 alopecia? | 21 formalin.  And then the scalp, in particular, we |
| 22   A.  Correct. | 22 typically use nylon suture.  I use 4-0 in these |
| 23   Q.  And the cause of any type of alopecia | 23 patients' instances, put about two simple stitches |
| 24 could also be multifactorial? | 24 in, give them wound care instructions, and a |
| 25   A.  You would be very hard-pressed to find | 25 Band-Aid, sent them on their merry way. |

| Page 39 | Page 41 |
|---|---|
| 1  something that would be singularly factorial.  And | 1   Q.  So the size of the punch biopsy is about |
| 2  it's quite difficult to delineate a true etiology | 2  the end of an eraser? |
| 3  in a number of patients. | 3   A.  Yep. |
| 4   Q.  So even on one woman's scalp, there could | 4   Q.  So the pathologist is only looking at the |
| 5  be multiple different forms of alopecia going on? | 5  portion of the scalp where that punch biopsy was |
| 6   A.  Correct. | 6  taken from? |
| 7   Q.  And within those multiple forms of | 7   A.  Correct. |
| 8  alopecia, there could be multiple different causes | 8   Q.  So another four millimeters over on the |
| 9  of that alopecia? | 9  scalp, that pathologist would not know what was |
| 10   A.  Yep. | 10 going on there, right? |
| 11   Q.  So while punch biopsies may provide some | 11   A.  Correct. |
| 12 information, there are limitations on the amount | 12   Q.  Or, really, any other part of the scalp? |
| 13 of information that can be derived from a punch | 13   A.  Correct. |
| 14 biopsy? | 14   Q.  Let's talk a little bit about your daily |
| 15   A.  Of course.  It's a limited sample of the | 15 practice.  Let's say a patient comes in who is |
| 16 whole picture. | 16 complaining about hair loss.  What would you do? |
| 17   Q.  And so what is the diameter of a | 17   A.  So, you have to take an adequate history, |
| 18 traditional punch biopsy? | 18 number one.  When did it begin?  How long has it |
| 19   A.  It depends.  I mean, we have them. | 19 been going on?  Do you have any symptoms?  Do you |
| 20 Everybody's office is going to have a variety of | 20 have a family history of hair loss?  Do you -- |
| 21 sizes, as small as two millimeters to as high as | 21 what are your other medical problems?  What |
| 22 eight. | 22 medicines are you on?  Have you seen any other |
| 23   Q.  Do you recall what size you used on these | 23 dermatologists before?  Have you had any biopsies |
| 24 three women? | 24 before?  Have you had any other prescription |
| 25   A.  Probably either three or four.  I don't | 25 treatments?  What else?  Any major stressors in |

Page 42
1  your life?  Have you had any recent illnesses,
2  deaths, anything like that?  What kind of
3  treatments have you performed on your hair, any
4  perms, relaxers?  Do you wear your hair in tight
5  braids or even hair dyes?  That's kind of some of
6  the basics.
7     Q.  So for these three women, Ms. Francis,
8  Ms. Durden and Ms. Earnest, that type of
9  information was not information that you received
10 from them?
11    A.  Correct.
12    Q.  And you want all that information
13 because, as a clinician, it helps you assess what
14 the cause of their hair loss might be?
15 MR. CENTOLA:
16       Objection, form.
17    A.  Correct.
18 MR. SEARS:
19    Q.  And it also helps you assess what the
20 type of alopecia might be?
21    A.  Correct.  It's a lowly procedure when
22 it's without any other information.
23    Q.  So then after you get all that
24 information from the patient, then what do you do?
25    A.  Well, I mean, typically, you kind of

Page 43
1  create a differential diagnosis in your head of
2  what you think what are going to be the most
3  likely causes.  What can you do to improve their
4  symptoms, if any?  What can you do to improve
5  their physical appearance?  And then what
6  objective criteria do you have to establish, one
7  way or the other, the cause of their hair loss?
8     Q.  And, again, with these three women,
9  that's something that was not done?
10    A.  Correct.
11    Q.  So is it helpful, when you have a new
12 patient who comes in complaining of hair loss, is
13 it helpful for you to treat them over a period of
14 time?
15    A.  I think you need to have a Point A and
16 Point B as a comparison to see what changes might
17 occur.
18    Q.  And when a patient comes in that you are
19 treating over time, do you take photographs of
20 their hair over time?
21    A.  Generally, that's a very good practice.
22    Q.  Does that help you see whether they are
23 responding to any type of treatment?
24    A.  Yes, sir.
25    Q.  And, clinically, there's some forms of

Page 44
1  alopecia that will respond to some forms of
2  treatment, but not others?
3     A.  Correct.
4     Q.  And is it useful for you, as a clinician,
5  to treat the patient over time to see if that
6  patient's hair loss is responding to a specific
7  type of treatment?
8     A.  Yep.
9     Q.  And that's because it can help you rule
10 out what the type of alopecia is?
11    A.  Yes.  And you need to gauge the
12 effectiveness of your chosen treatment method.
13    Q.  And with these three women, Ms. Francis,
14 Ms. Durden and Ms. Earnest, that was something
15 that was not done?
16    A.  Correct.  I saw them once, did a biopsy,
17 took the stitches out two weeks later.  No
18 treatment was ever prescribed.
19    Q.  Do you conduct a physical examination of
20 patients when they come in complaining of hair
21 loss?
22    A.  Yep.
23    Q.  What can you tell me about that?
24    A.  So, typically, I assess their pattern
25 areas, where they're complaining of some issues.

Page 45
1  Say, they have symptoms, I'll look specifically,
2  with a device called a dermatoscope, which gives
3  you very, very good identification of hair
4  follicles, where you can see inflammation.  You
5  can see scaling around follicles.  You can see
6  follicular density and diameter, which might lead
7  you down certain diagnostic considerations.
8     Q.  And you did not conduct a clinical
9  examination of these three women, did you?
10    A.  I was instructed not to.
11    Q.  Who instructed you not to?
12    A.  Mr. Lambert.
13    Q.  Did he give you any rationale for why he
14 didn't want you to?
15    A.  I didn't ask that question.  I presumed
16 it was because of this -- why we're here.
17    Q.  Let's talk about tests that you run when
18 a patient comes in complaining of hair loss.
19    A.  Sure.
20    Q.  What sort of testing do you do?
21    A.  Typically speaking, I mean, it depends
22 what I'm thinking is the cause.  You know, if I
23 suspect -- sometimes, it can happen from hormonal
24 issues.  Sometimes, it can happen from underlying
25 problems inside, anemias, thyroid problems, et

| Page 46 | Page 48 |
|---|---|
| 1  cetera.  So sometimes, it's most often blood<br>2  tests.  Sometimes, it's also involving biopsies.<br>3      Q.   So let's talk a little bit more about<br>4  those blood tests.  You mentioned hormonal<br>5  imbalances.<br>6      A.   Uh-huh.<br>7      Q.   When you do the blood test, do you run a<br>8  panel on the hormonal imbalances?<br>9      A.   Sometimes, I do, if I suspect it.<br>10     Q.   For the blood tests, do you run tests to<br>11 determine whether they might be iron deficient or<br>12 vitamin deficient?<br>13     A.   Correct.<br>14     Q.   And you do that because those are causes<br>15 of alopecia?<br>16     A.   They could be contributing causes.  It<br>17 could be isolated causes.<br>18     Q.   As part of the blood test, do you focus<br>19 on thyroid issues?<br>20     A.   I will, oftentimes, order a TSH with a<br>21 free T4, which is a thyroid assessment.<br>22     Q.   And you do that because thyroid<br>23 imbalances can be another cause of hair loss?<br>24     A.   Yep.  You want to rule it out.<br>25     Q.   Again, with these three women, | 1      Q.   And so, again, with these three women,<br>2  Ms. Francis, Ms. Durden and Ms. Earnest,<br>3  Mr. Lambert instructed you how many biopsies<br>4  should be taken?<br>5      A.   Two.<br>6      Q.   And he told you one should be taken from<br>7  the portion of the scalp that looked the most<br>8  normal, right?<br>9      A.   Correct.<br>10     Q.   And one should be taken from the portion<br>11 of the scalp that looks, I guess, most abnormal?<br>12     A.   Most representative of an abnormal<br>13 process.<br>14     Q.   And so what you did not do with these<br>15 three women is you did not look at their scalp to<br>16 determine whether there could be other forms of<br>17 alopecia processes going on?<br>18     A.   Correct.<br>19     Q.   And you did not take biopsies from those<br>20 other potential portions of their scalp to<br>21 determine what the alopecia process might be on<br>22 that portion of the scalp?<br>23     A.   Yep.  I had no other information to know<br>24 anything else.<br>25     Q.   Was Mr. Palmer present when the punch |
| Page 47 | Page 49 |
| 1  Ms. Francis, Ms. Durden and Ms. Earnest, you did<br>2  not do any sort of blood work on them?<br>3      A.   I had no other information.<br>4      Q.   So then if you do decide -- well, let me<br>5  ask you this.  How do you determine when to do a<br>6  punch biopsy on a patient?<br>7      A.   So that's a good question.  Typically<br>8  speaking, ones that either (A) don't respond to<br>9  kind of an initial round of therapy; (B) if they<br>10 have a severe burden disease or if they're just<br>11 very, very worried about their hair loss.  And<br>12 some people, I'll try to -- will only insist on it<br>13 and I try to talk them out of it.  Some people<br>14 will want a definitive tissue diagnosis, and it<br>15 does happen on occasion.  So it's a case-by-case<br>16 basis.<br>17     Q.   And then once the decision is made to do<br>18 a punch biopsy, how do you decide how many punch<br>19 biopsies to do on the scalp?<br>20     A.   Typically, it depends on what it looks<br>21 like.  You may have some people who might have<br>22 more than one alopecia process going on that looks<br>23 different in certain areas, and you might do two<br>24 biopsies.  I've even heard national experts talk<br>25 about as many as four biopsies. | 1  biopsies were taken from these three women?<br>2      A.   Correct, yes, sir.<br>3      Q.   When Mr. Palmer was in the room, did he<br>4  point to the portion of the scalp where he<br>5  actually wanted the punch biopsy taken from?<br>6      A.   I don't recall that.  I ultimately call<br>7  the shots.<br>8      Q.   Did he guide you in any way on<br>9  determining where on the scalp he wanted the punch<br>10 biopsy taken?<br>11     A.   I do not believe so.<br>12     Q.   Do you recall any conversations you had<br>13 with Mr. Palmer when he was in the room with these<br>14 three women about where the punch biopsy should be<br>15 taken?<br>16     A.   I mean, as I said earlier, he told me I<br>17 was just going to pick some areas that looked<br>18 normal, pick some areas that looked most abnormal.<br>19     Q.   And in your everyday practice, if a woman<br>20 came in and the decision was made to do a punch<br>21 biopsy, you would want to take punch biopsies from<br>22 as many places on the scalp that might look like<br>23 they had different alopecia processes going on?<br>24     A.   I would -- I probably would.<br>25     Q.   And that was not done with these three |

Page 50

1 women?
2  A. Correct.
3  Q. Okay. So you get a punch biopsy, you
4 fill out your requisition form, and then it's sent
5 to the pathologist?
6  A. Uh-huh.
7  Q. What do you get back from a pathologist?
8  A. A biopsy report.
9  Q. What all is generally included in that
10 biopsy report?
11  A. It's going to tell you a gross
12 description, so what they see actually when they
13 gross it; the size of the tissue, measurement, et
14 cetera; as well as a microscopic description of
15 what the pathologist actually sees under the
16 microscope. And then, oftentimes, either a
17 leading diagnosis or a differential diagnosis
18 based on a reaction pattern.
19  Q. Would you also see a clinical history
20 section in the report?
21  A. If that was provided to them, yes.
22  Q. And under the actual diagnoses section,
23 would you say, more likely than not, you would see
24 a differential diagnosis in there?
25  A. Yes.

Page 51

1  Q. Do you agree that diagnosing the type of
2 alopecia can be difficult?
3 MR. CENTOLA:
4    Objection, form.
5  A. Alopecia is not an easy diagnosis.
6 MR. SEARS:
7  Q. I'm trying to think of how best to use
8 all of our time. Have you been asked to offer any
9 opinion on what type of hair loss these three
10 women have?
11  A. Nope.
12  Q. That's something you are not going to do?
13  A. I don't have the information.
14  Q. So you are not going to offer any opinion
15 about what the type of hair loss is?
16  A. I have -- I need more information to make
17 any sort of reasonable conclusion.
18  Q. And you are not going to offer any
19 opinion about what the cause of the alopecia is?
20  A. I have -- no.
21  Q. Do you have any information for these
22 three women about what risk factors they have for
23 alopecia?
24  A. I don't have enough historical
25 information.

Page 52

1  Q. Would you agree that age is a risk factor
2 for alopecia?
3  A. Of course.
4  Q. Would you agree that being postmenopausal
5 is a risk factor for alopecia?
6  A. Yep.
7  Q. Would you agree that iron deficiency is a
8 risk factor for alopecia?
9  A. Yep.
10  Q. Would you agree that vitamin deficiencies
11 are a risk factor for alopecia?
12  A. Yes, sir.
13  Q. Would you agree that medical problems,
14 such as liver disease or kidney disease are risk
15 factors for alopecia?
16  A. Sure.
17  Q. There's hair care practices that are risk
18 factors for alopecia?
19  A. Yes.
20  Q. And, in particular, there's hair care
21 practices that result in traction alopecia?
22  A. Uh-huh.
23  Q. Is that yes?
24  A. Yes.
25  Q. And that can be caused by having braids,

Page 53

1 or ponytails, beads, dreadlocks, chemical
2 processing, heat treatment, dyeing, all those
3 things can cause traction alopecia?
4  A. Correct.
5  Q. And there's multiple drugs, medication
6 that can cause alopecia?
7  A. Yes, sir.
8  Q. I think you mentioned this earlier, but
9 there's environmental causes of alopecia, like
10 stress.
11  A. Yep.
12  Q. Or surgery can cause alopecia?
13  A. Yep. That's a stressor.
14  Q. Are you familiar with something called
15 metabolic syndrome?
16  A. Yep.
17  Q. Metabolic syndrome is a risk factor for
18 alopecia?
19  A. Being fat is a risk factor for
20 everything.
21  Q. And so all these things that we just went
22 through, all these multiple causes of alopecia,
23 you don't know whether these three women had those
24 risk factors?
25  A. Nope. I have -- as I said earlier, I do

14 (Pages 50 - 53)

Page 58

1 insurance carrier.
2  Q.  So outside of a litigation context, what
3 was done with these three women is something that
4 you would never do?
5  A.  Correct.
6  Q.  Do you know what a fringe line is?
7  A.  Not necessarily.
8 MR. SEARS:
9     Can we take just a short break?  I'm
10 going to look through these records and see if
11 there's anything else I want to ask you, but I
12 think we're probably pretty close to being done.
13 THE WITNESS:
14     Sure.  Great.
15 VIDEOGRAPHER:
16     We're off the record at 1:53 p.m.
17     (Off the record.)
18 VIDEOGRAPHER:
19     We're back on record at 1:58 p.m.
20 MR. SEARS:
21  Q.  I don't have any more questions for you.
22 The one housekeeping matter I had, is I think you
23 mentioned you had some photographs.
24  A.  Yep.
25  Q.  I didn't see those in the materials you

Page 59

1 provided me.  I was hoping to mark those as an
2 exhibit.
3  A.  Sure.  The actual clinical photos --
4 these are just printouts from what was emailed to
5 me by -- let me see, by someone, I think, from the
6 opposing counsel, so they were probably the
7 highest quality ones, and you may want to actually
8 get those from them.  But I'm happy to provide
9 these copies, but they're poor quality.
10  Q.  So the photographs are photographs that
11 were emailed to you by plaintiffs' counsel?
12  A.  Yes.
13  Q.  They're not photographs that you took
14 here?
15  A.  I did not take them.
16  Q.  If you don't mind, I'd like to go ahead
17 and mark those.
18  A.  Sure.  Digital copies were probably
19 emailed to my office manager, maybe.  That would
20 be one.
21     (Exhibits 6 through 8 were marked.)
22 MR. SEARS:
23     Just to clear up the record, I have
24 marked as Exhibit 6 an email from it looks like
25 Ms. Ennis, to Dr. Claiborne, that has photographs

Page 60

1 of Mrs. Francis.  Exhibit 7 is an email that has
2 photographs of Mrs. Durden.  And Exhibit 8 is an
3 email that has photographs of Ms. Earnest.
4  Q.  Do you have any other emails from
5 plaintiffs' attorneys?
6  A.  Not -- I mean, I'd have to look, but
7 specifics maybe regarding this deposition, that's
8 about it.
9  Q.  Do you have anything that contained
10 anything substantive about what they wanted you to
11 do in this?
12  A.  No.  I mean, I don't -- besides just the
13 deposition, itself.  I didn't even know I was
14 getting deposed until it arrived, so --
15 MR. SEARS:
16     I think that's all of the questions I
17 have for you.  Thank you.  I appreciating you
18 accommodating us here.
19 THE WITNESS:
20     No problem.  Thank you for not making me
21 go downtown.
22 MR. CENTOLA:
23     No questions.
24 VIDEOGRAPHER:
25     We're off the record at 2:00 p.m.

Page 61

1     (Deposition concluded at 2:00 p.m.)

16 (Pages 58 - 61)

Veritext Legal Solutions
800-227-8440                                                973-410-4040