# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)                    MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

                                               SECTION "H" (5)

THIS DOCUMENT RELATES TO:

Antoinette Durden, Case No. 2:16-cv-16635;
Tanya Francis, Case No. 2:16-cv-17410;
Barbara Earnest, Case No. 2:16-cv-17144

---

## SANOFI DEFENDANTS' MOTION TO EXCLUDE
## EXPERT TESTIMONY ON GENERAL CAUSATION

---

# TABLE OF CONTENTS

LEGAL STANDARDS ......................................................................................................... 2

    I.      ADMISSIBILITY OF EXPERT TESTIMONY ..................................................... 2

    II.     PROOF OF GENERAL CAUSATION ................................................................. 3

FACTUAL BACKGROUND ............................................................................................... 6

ARGUMENT ........................................................................................................................ 8

    I.      DR. MADIGAN'S AND DR. FEIGAL'S REPORTS FAIL TO ANALYZE OR SET OUT A METHODOLOGY TO ASSESS GENERAL CAUSATION. ........... 8

          A.     Dr. Madigan Did Not Address General Causation in His Report. .............. 9

          B.     Dr. Feigal Did Not Address General Causation in Her Report ................ 10

    II.     DR. MADIGAN AND DR. FEIGAL ARE NOT QUALIFIED TO OFFER OPINIONS ON GENERAL CAUSATION. ........................................................ 12

          A.     Dr. Madigan is not qualified to testify regarding a "true cause-effect relationship." ............................................................................................ 12

          B.     Dr. Feigal is not qualified to testify regarding a "statistically significant association." ............................................................................................. 13

    III.    DR. MADIGAN'S OPINIONS ARE IRRELEVANT AND UNRELIABLE. .... 13

          A.     Dr. Madigan's review of case reports in the FAERS and Sanofi's internal databases are irrelevant and unreliable to causation. ............................... 14

          B.     Dr. Madigan's adoption of the 2015 Clinical Overview Conclusion is irrelevant and unreliable. ...................................................................... 16

          C.     Dr. Madigan's statistical analysis of the TAX clinical trial results is irrelevant and unreliable. ...................................................................... 17

               1.     Dr. Madigan's analysis was not tied to the facts of this case. ...... 17

               2.     Dr. Madigan's analysis did not use a reliable methodology. ........ 18

    IV.    DR. FEIGAL'S OPINIONS ARE IRRELEVANT AND UNRELIABLE. .......... 20

          A.     Dr. Feigal's interpretation of the 2015 Clinical Overview is irrelevant and unreliable ............................................................................................... 20

B.      Dr. Feigal's review of limited literature is irrelevant and unreliable........ 21

C.      Dr. Feigal's discussion of the TAX clinical trial results is irrelevant and unreliable.................................................................................................. 22

    1.      Dr. Feigal's assessment was not tied to the facts of this case....... 22

    2.      Dr. Feigal's assessment was not based on any reliable methodology. ................................................................................................... 22

CONCLUSION.................................................................................................................. 23

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Brock v. Merrell Dow Pharm., Inc.*, 874 F.2d 307 (5th Cir. 1989) ................................5

*Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 550 (E.D. La. 2015)................................3

*Burst v. Shell Oil Co.*, No. 14-109, 2015 WL 3755953 (E.D. La. June 16, 2015),
    *aff'd*, 650 F. App'x 170 (5th Cir. 2016)............................................................ passim

*Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635 (7th Cir. 2008)....................................10, 11

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)...........................3

*Demouchet v. Gen. Nutrition Corp.*, No. 11-1961, 2014 WL 1652518 (W.D. La.
    Apr. 24, 2014) ............................................................................................................4

*Frischhertz v. SmithKline Beecham Corp.*, Civil Action No. 10-2125, 2012 WL
    6697124 (E.D. La. Dec. 21, 2012) .......................................................................6, 19

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) .............................................................21

*In re Abilify*, 299 F. Supp. 3d 1291, 1361 (N.D. Fla. 2018) ...................................13, 20

*In re Accutane*, 511 F. Supp. 2d 1288 (M.D. Fla. 2007) .........................................16, 20

*In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164 (S.D.N.Y 2009).......................8

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices, and Prods. Liab.
    Litig.*, 227 F. Supp. 3d 452 (D.S.C. 2017) *aff'd* 892 F.3d 624 (4th Cir. 2018) ........8

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.* (No. II), 341 F.
    Supp. 3d 213 (S.D.N.Y. 2018)...........................................................................5, 8, 23

*In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 26 F. Supp. 3d 449,
    455 (E.D. Pa. 2014).......................................................................5, 8, 12, 20, 22

*Jones v. Novartis Pharm. Corp.*, No. 2:13-cv-624, 2017 WL 372246 (N.D. Ala.
    Jan. 26, 2017) *aff'd in part sub nom.*, 720 F. App'x 1006 (11th Cir. 2018)............12

*Kemp v. Metabolife Int'l, Inc.*, No. 00-3515, 2004 WL 2095618 (E.D. La. Sept.
    13, 2004) ....................................................................................................................4

*Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347 (5th Cir. 2007) ................................3

*Konrick v. Exxon Mobil Corp.*, No. 14-524, 2016 WL 439361 (E.D. La. Feb. 4,
    2016), aff'd, 670 F. App'x 222 (5th Cir. 2016) .......................................................21

*Meade v. Parsley*, No. 2:09-00388, 2010 WL 4909435 (S.D. W. Va. Nov. 24, 2010) ..........................................................................................................16

*Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316 (7th Cir. 1996) .............................................1

*Seaman v. Seacor Marine LLC*, 564 F. Supp. 2d 598 (E.D. La. 2008), *aff'd*, 326 F. App'x 721 (5th Cir. 2009) ...................................................................4, 11, 17

*Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434 (W.D. Pa. 2003)....................3, 11

*Tinnus Enterprises, LLC v. Telebrands Corp.*, No. 15-cv-00551, 2016 WL 9245441 (E.D. Tex. Dec. 15, 2016) ...................................................................12

*Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771 (E.D. La. 2011)...........................6

*Wehling v. Sandoz Pharm. Corp.*, No. 97-2212, 162 F.3d 1158, 1998 WL 546097 (4th Cir. Aug. 20, 1998).............................................................................3

*Weisgram v. Marley Co.*, 528 U.S. 440 (2000)..................................................1, 3, 11

*Wells v. SmithKline Beecham Corp.*, No. 06-126, 2009 WL 564303 (W.D. Tex. Feb. 18, 2009) ...................................................................................16, 20

## State Cases

*Cormier v. CITGO Petroleum Corp.*, 228 So. 3d 770 (La. App. 3 Cir. 2017) ..............................4

*In re Accutane Litig.*, 2015 WL 753674 (N.J. Super. L. Feb. 20, 2015), *aff'd*, 234 N.J. 340, 191 A.3d 560 (N.J., Aug. 1, 2018) ...................................................14, 19

*Lasha v. Olin Corp.*, 625 So. 2d 1002 (La. 1993)......................................................4

## Federal: Statutes, Rules, Regulations, Constitutional Provisions

Federal Rule of Evidence 702.............................................................. passim

Federal Rule of Civil Procedure 26(a)(2) ........................................................10

For more than 20 years, Taxotere has saved lives and revolutionized the treatment of breast cancer.  This is undisputed.  Here, Plaintiffs pursue litigation on the theory that Taxotere, while it saves lives, causes permanent alopecia.  To prevail, Plaintiffs must prove general causation—that Taxotere is capable of causing permanent alopecia in the general population—with relevant and reliable expert testimony.  Plaintiffs have not met their burden.

Because the issues are complex, any general causation expert must provide a thorough analysis of the hypothesis, data analyzed, methodology utilized, and resulting opinion such that every step can be scrutinized.  Disclosing numerous experts dedicated to general causation is common in pharmaceutical MDLs.  *See*, *e.g.*, *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.* (No. II), 341 F. Supp. 3d 213, 217 (S.D.N.Y. 2018) ("Plaintiffs [ ] put forward seven expert witnesses on general causation . . .).  Remarkably, Plaintiffs here have offered *no expert* whose report takes on general causation, analyzes all available data, applies a reliable methodology, and demonstrates causation in the general population.  Instead, Plaintiffs try to piece together testimony from two experts (Dr. David Madigan and Dr. Ellen Feigal) who failed to conduct the recognized, two-part test for demonstrating causation and, indeed, are not qualified to do so.[1]  At most, these experts rely on hypothesis-generating data.  In a courtroom, a hypothesis is a scientific starting point, not the conclusion.  "The law lags science; it does not lead it."  *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996).

---

[1] Plaintiffs have offered Dr. Antonella Tosti, a dermatologist, on specific causation.  To the extent Plaintiffs argue that Dr. Tosti is therefore offering a general causation opinion by implication, such an opinion does not meet the standard set forth in Rule 702. Dr. Tosti did not conduct a general causation analysis or describe any such methodology in her report.  A passing reference to causation cannot satisfy the "exacting standards of reliability" required.  *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000).  Sanofi addresses Dr. Tosti and these arguments more fully in its Memorandum in Support of Sanofi Defendants' Motion to Exclude Expert Testimony on Specific Causation and incorporates it herein.

1

Any testimony Dr. Madigan (a statistician) and Dr. Feigal (a consultant) purport to offer on general causation must be excluded for at least three reasons:

First, Dr. Madigan and Dr. Feigal failed to analyze general causation in their reports or even set out a methodology to do so.

Second, neither Dr. Madigan nor Dr. Feigal is qualified to offer a general causation opinion.  Dr. Madigan is a man of statistics, not medicine, and has been precluded from offering general causation opinions in other pharmaceutical litigation.  Dr. Feigal is a consultant, and she has no expertise in the areas necessary to prove causation.

Third, Dr. Madigan's and Dr. Feigal's opinions are not based on reliable and relevant data analyzed pursuant to a reliable and relevant methodology.  Plaintiffs' experts cobble together various data points, none of which (alone or together) demonstrate that Taxotere causes permanent alopecia.  Both Dr. Madigan and Dr. Feigal's purported causation opinions should be excluded.

## LEGAL STANDARDS

## I.      ADMISSIBILITY OF EXPERT TESTIMONY

Federal Rule of Evidence 702 controls the admission of expert testimony.  Under Rule 702, the Court's gatekeeping function first involves determining whether the expert is ***qualified***; then it "involves a two-part inquiry into ***reliability*** and ***relevance***":

> First, the Court must determine whether the proffered expert testimony is reliable. The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence. The reliability inquiry requires the Court to assess whether the reasoning or methodology underlying the expert's testimony is valid. The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation.

> Second, the Court must determine whether the expert's reasoning or methodology is relevant. The question here is whether the reasoning or methodology "fits" the facts of the case and will thereby assist the trier of fact to understand the evidence.

*Burst v. Shell Oil Co*., 120 F. Supp. 3d 547, 550 (E.D. La. 2015) (citations omitted).

The "reliability analysis applies to *all aspects* of an expert's testimony," including "the methodology, the *facts underlying the expert's opinion*, [and] the link between the facts and the conclusion." *See Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (emphasis added). Importantly, "the expert's testimony must be reliable at each and every step or else it is inadmissible." *Id*. These "exacting standards of reliability," *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000), provide that "conjecture, hypothesis, subjective belief, or unsupported speculation are impermissible grounds on which to base an expert opinion," *Wehling v. Sandoz Pharm. Corp.*, No. 97-2212, 162 F.3d 1158, 1998 WL 546097, at *5 (4th Cir. Aug. 20, 1998) (Table Decision). Courts also consider "whether experts are 'proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.'" *Burst*, 120 F. Supp. 3d at 551 (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (*Daubert II*)). Defendants do not bear the burden of demonstrating inadmissibility. *See Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 534 (W.D. Pa. 2003).

As to relevance, the Court must determine, as part of its gatekeeping role, whether the proffered expert testimony is sufficiently tied to the facts in issue that it will aid the jury. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993) (the district court's "gatekeeping role" requires ensuring that the expert testimony "is relevant to the task at hand"). "The question here is whether the reasoning or methodology 'fits' the *facts of the case* and will thereby assist the trier of fact to understand the evidence." *Burst*, 120 F. Supp. 3d at 551 (emphasis added).

## II.    PROOF OF GENERAL CAUSATION

In Louisiana, a plaintiff must prove "general causation as well as specific causation. General causation is whether a substance is capable of causing a particular injury or condition in

the general population.  Specific causation is whether a substance caused a particular individual's injury."  *Seaman v. Seacor Marine LLC*, 564 F. Supp. 2d 598, 600 (E.D. La. 2008), *aff'd*, 326 F. App'x 721 (5th Cir. 2009) (citing *Knight v. Kirby*, 482 F.3d 347, 351 (5th Cir. 2007)).  If a plaintiff's case involves "complex issues of medical causation that are beyond the realm of knowledge and experience of the ordinary juror," like this one, the plaintiff must present expert testimony to prove causation.  *Demouchet v. Gen. Nutrition Corp.*, No. 11-1961, 2014 WL 1652518, at *4 (W.D. La. Apr. 24, 2014); *accord Kemp v. Metabolife Int'l, Inc.*, No. 00-3515, 2004 WL 2095618, at *3 (E.D. La. Sept. 13, 2004).  Experts must attest to their opinions to a reasonable medical probability.  *Lasha v. Olin Corp.*, 625 So. 2d 1002, 1005 (La. 1993); *Cormier v. CITGO Petroleum Corp.*, 228 So. 3d 770, 773 (La. App. 3 Cir. 2017).[2]

The scientific world recognizes the hierarchy of evidence as a "fundamental principle of evidence-based medicine."  Federal Judicial Center, *Reference Manual on Scientific Evidence* at 723 (3d ed. 2011) (Ex. A).  The FDA adheres to it, as do authors of scientific textbooks and medical communities.  *See, e.g.*, FDA, Guidance for Industry: Good Pharmacovigilance Practices and Pharmacoepidemiology Assessment, at 7–9, 12 (Mar. 2005) (describing weaknesses of case analyses and superiority of hypothesis-testing epidemiologic studies) (Ex. B); Federal Judicial Center, *Reference Manual on Scientific Evidence* at 723–25 (3d ed. 2011) (discussing "hierarchy of medical evidence" and noting that case reports "are at the bottom of the evidence hierarchy.") (Ex. A).

At the bottom of the hierarchy are case reports and analyses of spontaneous adverse event reports, like those Plaintiffs' experts rely on here.  A case report describes an individual incident

---

[2] Because Louisiana law requires expert testimony on general causation, should Defendants' motion be granted and Plaintiffs' experts' opinions excluded, Defendants would be entitled to judgment as a matter of law.

or episode, usually keyed to a specific user. *In re Mirena*, 341 F. Supp. 3d at 228. Case reports from healthcare professionals and consumers are voluntary. *Id.* This kind of evidence may be considered for "hypothesis generating"—but not hypothesis testing—and therefore cannot provide a scientifically reliable basis on which to form a causation opinion. *See* Pharmacoepidemiology 21–25 & Table 2.4 (Brian L. Strom ed., 4th ed. 2005) (noting that case reports and case series cannot be used for hypothesis testing) (Ex. C). Case reports are often confounded (*i.e.*, the case involves an adverse event that has possible etiologies other than the product of concern), are often missing information, may be subject to reporting or attribution bias, and lack any comparison group.

At the top of this hierarchy are well-designed, randomized controlled clinical trials. Courts and scientists generally consider epidemiologic studies the best evidence of causation. *See, e.g.*, *Brock v. Merrell Dow Pharm., Inc.*, 874 F.2d 307, 311 (5th Cir. 1989) (concluding in a pharmaceutical case "[u]ndoubtedly, the most useful and conclusive type of evidence in a case such as this is epidemiological studies"); *Burst v. Shell Oil Co.*, No. 14-109, 2015 WL 3755953, at *4 (E.D. La. June 16, 2015), *aff'd*, 650 F. App'x 170 (5th Cir. 2016) ("Epidemiology provides the best evidence of general causation in toxic tort cases.").

Analyzing epidemiology for a "causal relationship" between an agent and a disease involves a two-step process. First, the expert should look for "statistically significant associations between medication exposure and [the injury], which are consistent and replicated across epidemiological studies." *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 26 F. Supp. 3d 449, 455 (E.D. Pa. 2014); *Burst*, 2015 WL 3755953, at *5; RMSE at 552 (Ex. A). In general, statistical significance is satisfied if the identified association is expressed with a 95% confidence interval. *Burst*, 2015 WL 3755953, at *6. Second, the expert must consider whether the

statistically significant association "reflects a true cause-effect relationship." *Id.* at *5; RMSE at 600 (Ex. A). This requires the expert to use a reliable methodology, such as the Bradford-Hill criteria. "[T]he set of criteria known as the Bradford Hill criteria has been widely acknowledged as providing an appropriate framework for assessing whether a causal relationship underlies a statistically significant association between an agent and a disease." *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 803 (E.D. La. 2011); *see also Frischhertz v. SmithKline Beecham Corp.*, Civil Action No. 10-2125, 2012 WL 6697124, at *3 (E.D. La. Dec. 21, 2012); *Burst*, 2015 WL 3755953, at *5. Only after this rigorous analysis can an expert opine that epidemiological data demonstrates general causation—that is, that a substance is capable of causing a particular injury or condition in the general population. Here, no expert has conducted such an analysis, because no consistent and replicated epidemiological evidence exists demonstrating that Taxotere causes permanent alopecia.

## FACTUAL BACKGROUND

Nearly one in eight women in this country will develop invasive breast cancer at some point in their lives.[3] Taxotere is an FDA-approved chemotherapy drug that is usually administered in combination with other anti-cancer agents (*e.g.*, doxorubicin (brand name Adriamycin) and/or cyclophosphamide) to treat breast cancer. FDA approved the use of Taxotere for advanced or metastatic breast cancer in 1996. The World Health Organization recognizes Taxotere as one of "the most efficacious, safe and cost-effective medicines for priority conditions,"[4] and Taxotere

---

[3]   American Cancer Society, *How Common is Breast Cancer?*, https://www.cancer.org/cancer/breast-cancer/about/how-common-is-breast-cancer.html (last visited Jan. 15, 2019) (Ex. D).

[4]   World Health Organization, *WHO Model List of Essential Medicines*, http://www.who.int/medicines/publications/essentialmedicines/EML_2015_FINAL_amended_NOV2015.pdf?ua=1 (amended November 2015) (Ex. E).

continues to be recommended as the standard of care for high-risk breast cancer populations.[5]

Since the FDA's approval over two decades ago, various data regarding Taxotere's efficacy and safety has developed.  Case reports regarding Taxotere—lowest on the scientific hierarchy—can be found in both the FDA's Adverse Events Reporting System (FAERS) and Sanofi's internal pharmacovigilance database.  In terms of epidemiological evidence, Sanofi has conducted clinical trials (such as the TAX316 study and the GEICAM9805/TAX301 study) to compare the efficacy of chemotherapy regimens containing Taxotere to the efficacy of other anti-cancer agents.  Those clinical trials were designed to focus on disease-free survival, not alopecia (Feigal Dep. Vol. III 547:16–548:8 (Ex. I)), although participants also were assessed for "ongoing clinical adverse experiences," including the existence of any type of alopecia, at various checkpoints through January 2010.  In using the term "ongoing," the studies were simply measuring whether any alopecia existed at the time of examination.  Wei Report at 10–11 (Ex. J).  The studies did not assess permanence—indeed, there is no medically agreed definition of what constitutes "permanent alopecia."[6]

The TAX clinical trials did not analyze whether Taxotere causes permanent alopecia.  They were not designed to do so.  All TAX clinical trial participants had taken either TAC (Taxotere/docetaxel in combination with Adriamycin and cyclophosphamide) or FAC (5-fluorouracil in combination with Adriamycin and cyclophosphamide) as part of their treatment regimen.  No participant received Taxotere alone.  Cases of ongoing alopecia have been reported

---

[5] Denduluri (2016) (Ex. F); NCCN Clinical Practice Guidelines in Oncology: Breast Cancer 46 (National Comprehensive Cancer Network, v.2.2017 Apr. 6, 2017) ("NCCN Guidelines") (Ex. G); Senkus, E., et al., "Primary Breast Cancer: ESMO Clinical Practice Guidelines for Diagnosis, Treatment and Follow-up," ANNALS OF ONCOLOGY; 26(Supp5): 2015, p.v8-v30; University of Texas MD Anderson Cancer Center, Breast Cancer–Invasive Practice Algorithm, V14, June 28, 2016 (Ex. H).

[6] See MedDRA Dictionary (the term "irreversible alopecia" does not exist); see also NCI dictionary of Cancer Terms (the phrases "permanent alopecia," "chronic alopecia," "persistent alopecia," "irreversible alopecia," or "long-term alopecia" are not found).

with both Adriamycin and cyclophosphamide, as well as multiple other chemotherapy medications including Carboplatin, Cisplatin, Taxol, and Busulfan.  Glaspy Report at 19–20 (Ex. K).   The TAX clinical trial results do not analyze or conclude that Taxotere causes permanent alopecia, particularly in the absence of other chemotherapy medications and other confounding factors.

This absence of epidemiology is important because adverse events experienced by patients on medications can also be experienced by people in the general population with no exposure to the medication.  That is true here.  Ninety percent of women will have some form of alopecia during her lifetime.  *See* Sanofi Defendants' Motion to Exclude Expert Testimony on Specific Causation at p. 3.  Hair loss has multiple causes.  *Id.*  There are also multiple types of hair loss. *Id.* Women may have more than one type of hair loss with more than one cause.  *Id.*   And the vast majority of women that experience hair loss never took chemotherapy.  For example, the type of hair loss that the Plaintiffs here present with is "relatively common" in women of similar age and hormone status who *never* had chemotherapy.  Martin Dep. 54:15–54:25 (Ex. L).  As Ms. Durden's treating dermatologist testified: "We see it often."  *Id.* at 42:22–43:2.

## ARGUMENT

## I.  DR. MADIGAN'S AND DR. FEIGAL'S REPORTS FAIL TO ANALYZE OR SET OUT A METHODOLOGY TO ASSESS GENERAL CAUSATION.

In a pharmaceutical case like this one, Plaintiffs typically proffer multiple general causation experts.[7]  Yet, Plaintiffs here have not offered a single expert report that takes on general causation, analyzes the data, and applies a step-by-step methodology to demonstrate causality.  Instead, Plaintiffs piece together opinions from Dr. Madigan and Dr. Feigal, which is not enough to meet

---

[7] It is not unusual for courts to strike entire slates of general causation experts in the MDL setting.  *See, e.g.*, *In re Mirena*, 341 F. Supp. 3d at 217; *In re Zoloft*, 176 F. Supp. 3d at 498–99; *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices, and Prods. Liab. Litig.*, 227 F. Supp. 3d 452 (D.S.C. 2017) *aff'd* 892 F.3d 624 (4th Cir. 2018); *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 174 (S.D.N.Y 2009).

Plaintiffs' burden.[8]

## A.     Dr. Madigan Did Not Address General Causation in His Report.

Dr. Madigan is a statistician who analyzed the alleged emergence of "safety signals" about Taxotere.  Safety signals are hypotheses warranting further investigation.  They do not mark statistically significant associations or a true cause-and-effect relationship.  Dr. Madigan concluded that "statistical evidence" "supporting" an association between Taxotere and permanent alopecia was available to Sanofi before 2015.  Madigan Report at 20 ¶ 54 (Ex. R).  Nowhere in his report did Dr. Madigan offer the opinion that Taxotere in fact causes permanent alopecia, much less set forth (i) any methodology used to reach his undisclosed opinion, or (ii) any application of the data he considered, pursuant to such methodology, showing how he reached that opinion.  *See generally id.*

Dr. Madigan's report detailed the four specific research questions he was asked to analyze: (1) investigate any safety signal in the FAERS database; (2) review Sanofi's internal pharmacovigilance database; (3) statistically analyze adverse event rates for TAX316 and GEICAM9805/TAX301; and (4) analyze time-to-resolution for alopecia in TAX316 and GEICAM9805/TAX301.  Madigan Report at 2 ¶¶ 6–9 (Ex. R).  Dr. Madigan conceded at his deposition that he was not asked specifically to investigate whether Taxotere causes irreversible alopecia.  Madigan Dep. 62:16–22 (Ex. S).

At most, Dr. Madigan set out a statistical analysis.  But a statistical analysis, even if a

---

[8] Plaintiffs' nine remaining experts either practice in a field unrelated to general causation in this case (Dr. Alan Bauman (a hair restoration specialist); Dr. Javid Moslehi (a clinical cardiologist); Dr. Kevin Bianchini (a clinical psychologist); and Dr. John Thompson (a psychiatrist)); admit they are not offering general causation opinions here (Dr. Linda Bosserman (an oncologist) Dep. 155:9–12 (causation is "[n]ot my area of expertise to comment on") (Ex. M); Dr. David Kessler (a regulatory expert)  Dep. 269:1–14 ( "I'm not here as a general causation") (Ex. N); Dr. Laura Plunkett (a pharmacologist and toxicologist) Dep. 157: 25 ("I am not doing a causation analysis") (Ex. O); or offer only plaintiff-specific causation opinions (Dr. Antonella Tosti (a dermatologist) Report (Ex. P); Dr. Curtis Thompson (a pathologist) Report (Ex. Q)).

statistical association is found, does not prove causation.  *See Burst*, 2015 WL 3755953 at \*5 ("association, by itself, is not equivalent to causation").  Dr. Madigan's report fails to set forth any reliable, step-by-step analysis or methodology, such as the Bradford Hill criteria, to demonstrate general causation, and he should be prevented from offering any opinion on the issue as a result. *See Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 641 (7th Cir. 2008) ("Failure to comply with Rule 26(a)(2)'s requirements results in sanction: the offending party is not allowed to introduce the expert witness's testimony as "evidence on a motion, at a hearing, or at a trial." [] This sanction is "'automatic and mandatory'" unless the offending party can establish "'that its violation of Rule 26(a)(2) was either justified or harmless.'") (citing Fed. R. Civ. P. 37(c)(1); *Jenkins v. Bartlett*, 487 F.3d 482, 487 (7th Cir. 2007); *Keach v. U.S. Trust Co.*, 419 F.3d 626, 639 (7th Cir. 2005)). (internal citations omitted).

### B.    Dr. Feigal Did Not Address General Causation in Her Report.

Dr. Feigal is a consultant whose report analyzes the treatment options for patients with early stage breast cancer and describes the importance of the risk/benefit discussion between the physician and patient.  *See generally* Feigal Report (Ex. T).  Nowhere in her report did Dr. Feigal offer the opinion that Taxotere causes permanent alopecia.  *Id.*  She also failed to set forth any methodology or analysis showing how she possibly could have reached that opinion.  *See generally id.*

Dr. Feigal's final report defined the scope of her role in this litigation as follows:

> I have been asked to review permanent alopecia in patients with early stage breast cancer who were treated with Taxotere (docetaxel), in the context of the epidemiology, detection, diagnosis and staging of breast cancer, the treatment options, and how decisions regarding the risks and benefits of treatment options are discussed between physicians and their patients.

Feigal Report at 7 (Ex. T).  Dr. Feigal conceded at deposition that general causation was not

included in the written scope of her report, that the scope was correctly written, and that the phrase "general causation" did not once appear in her report.  Feigal Dep. Vol I. 235:21–237:23 (Ex. U).

Yet, Dr. Feigal testified that her methodology and analysis regarding general causation was "throughout" her report, "implied" in her report, and/or that it was "clear" or "obvious" in her report.  *See, e.g.*, Feigal Dep. Vol III 526:16–529:16, 545:8–546:8 (Ex. I).  But Dr. Feigal's report has no mention of general causation, her alleged methodology, her claimed application of the Bradford-Hill factors (temporal relationship, strength of association, dose response relationship, replication of findings, consideration of alternate explanations, specificity of the association, consistency with other knowledge), or her purported consideration of the role of chance, bias, and confounding factors (all of which Dr. Feigal concedes must be considered). *See, e.g.*, Feigal Dep. Vol I  222:11–21, 224:2–13, 224:22–225:6, 225:22–226:1, 228:4–9, 229:23–230:6, 234:7–235:4, 235:5–20 (Ex. U); Feigal Dep. Vol III 526:16–529:16, 540:18–22, 545:8–546:8 (Ex. I).  At most, Dr. Feigal states that permanent alopecia is a "known adverse event of Taxotere-containing regimens" or that there is an "increased risk."   Feigal Report at 42 (Ex. T); Feigal Dep. Vol. I 138:14–16, 213:15–214:9 (Ex. U).   An "adverse event" or "increased risk" does not prove causation.  *Soldo v. Sandoz Pharmaceuticals Corp.*, 244 F. Supp. 2d 434, 537 (W.D. Pa. 2003); *Seaman*, 564 F. Supp. 2d at 602.

Dr. Feigal was unable to identify a single page or paragraph in her report where her methodology and analysis on the issue of general causation was discussed—because it does not exist.  "Implied" methodologies cannot satisfy the "exacting standards of reliability" required. *Weisgram*, 528 U.S. at 455.   Dr. Feigal should be prohibited from offering non-disclosed, unreliable opinions on general causation.  *See Ciomber*, 527 F.3d at 641.

## II.     DR. MADIGAN AND DR. FEIGAL ARE NOT QUALIFIED TO OFFER OPINIONS ON GENERAL CAUSATION.

The two-pronged test to establish general causation requires: (1) proof of a "statistically significant association"; and (2) use of a recognized, reliable methodology (such as the Bradford-Hill criteria) to prove that the identified association "reflects a true cause-effect relationship." *In re Zoloft*, 26 F. Supp. 3d at 455.  Expertise to opine on one half of the analysis does not qualify the expert to opine on the other half.  *See Jones v. Novartis Pharm. Corp.*, No. 2:13-cv-624, 2017 WL 372246, at *29 (N.D. Ala. Jan. 26, 2017) (statistician not qualified to offer general causation opinion) *aff'd in part sub nom.*, 720 F. App'x 1006 (11th Cir. 2018); *Tinnus Enterprises, LLC v. Telebrands Corp.*, No. 15-cv-00551, 2016 WL 9245441, *1 (E.D. Tex. Dec. 15, 2016) ("Expertise in one subject does not necessarily qualify an expert to testify on all issues that could arise from that subject…").

### A.     Dr. Madigan is not qualified to testify regarding a "true cause-effect relationship."

Dr. Madigan's training and experience as a statistician may qualify him to attest to a statistically significant association, but it does not qualify him to conduct the second half of the causation analysis.  Dr. Madigan is not a medical doctor or epidemiologist.  Dr. Madigan concedes that he is not an expert in alopecia or permanent hair loss.  Dr. Madigan also concedes that he is not an expert on the various possible causes of alopecia or any kind of hair loss.  Madigan Dep. 54:24–55:6 ("Q.  You don't hold yourself out as an expert in the various possible causes of alopecia, correct?  A.  I do not.  Q.  Or any kind of hair loss for that matter?  A.  Correct.  Correct, I do not, yes.") (Ex. S).

In a similar pharmaceutical MDL, the court concluded that Dr. Madigan lacked the medical knowledge and experience to offer a general causation opinion:

> Defendants argue that Dr. Madigan lacks the medical knowledge

> and experience to offer a general causation opinion. The Court
> agrees. … He is not a medical doctor, toxicologist, pharmacologist,
> or psychologist. He also has no specialized knowledge of, or clinical
> experience with, pathological gambling or impulse control
> disorders. The Court finds that Dr. Madigan's admitted lack of
> expertise in the aforementioned fields precludes him from offering
> a medical or scientific opinion that Abilify is capable of causing
> pathological gambling and impulse control disorder.

*In re Abilify*, 299 F. Supp. 3d 1291, 1361 (N.D. Fla. 2018).  Without medical knowledge and

experience with the diseases at issue, Dr. Madigan is not qualified to attest to general causation

here either.

      **B.**    **Dr. Feigal is not qualified to testify regarding a "statistically significant association."**

      While Dr. Feigal is a medical doctor, she also is not an epidemiologist.  Dr. Feigal has

never treated a patient with permanent alopecia, and she has never published on that disease.

Further, Dr. Feigal is not a statistician, and she did not determine if any alleged increased risk in

the TAX clinical trial participants was statistically significant.  Feigal Dep. Vol. I 87:21–88:12,

165:23–166:23, 216:18–218:19 (Ex. U).  In fact, Dr. Feigal testified that evidence of statistical

significance is not required to prove general causation.  Feigal Dep. Vol. I 163:23–164:7, 204:11–

13, 216:18–218:19 (Ex. U); Feigal Dep. Vol. III 538:18–540:10, 547:24–548:3 (Ex. I).  Dr. Feigal

is incorrect.  *Burst*, 2015 WL 3755953, at *6 ("studies that 'do not represent statistically significant

results' may not provide a reliable foundation for an epidemiologist's general causation opinion").

Dr. Feigal is not qualified to testify on general causation as a result.

**III.    DR. MADIGAN'S OPINIONS ARE IRRELEVANT AND UNRELIABLE.**

      Even if the Court were to ignore everything else, Dr. Madigan's purported causality

opinion still must be excluded because it is based on irrelevant data and an unreliable methodology.

Dr. Madigan analyzed (1) case reports in the FDA's adverse event report database as well as in

Sanofi's internal database; (2) the 2015 Clinical Overview Sanofi prepared for the FDA; and (3)

Sanofi's TAX clinical trial results. Dr. Madigan admits the first two analyses do not prove causation. Further, the clinical trials did not demonstrate that Taxotere causes permanent alopecia, and Dr. Madigan's analysis of the data is unreliable for that purpose. As the court in *In re Accutane* held when excluding Dr. Madigan: *"Dr. Madigan's opinions aren't 'methodology based,' but rather are conclusion-driven. This is an expert on a mission."* *In re Accutane Litig.*, 2015 WL 753674, at *19 (N.J. Super. L. Feb. 20, 2015), *aff'd*, 234 N.J. 340, 191 A.3d 560 (N.J., Aug. 1, 2018) (emphasis added).[9]

### A. Dr. Madigan's review of case reports in the FAERS and Sanofi's internal databases are irrelevant and unreliable to causation.

First, Dr. Madigan gathered case reports in the FDA's adverse event report database (FAERS) to locate "connection[s]" between Taxotere and irreversible alopecia. But a "connection" is not "causation." Dr. Madigan himself acknowledges that "[t]he nature of the [FAERS] database does not permit definitive causal inferences. . . ." Madigan Report at 16 ¶ 41 (Ex. R); *see also* Madigan Dep. 293:24–294:2 (Ex. S). He is correct. Dr. Madigan admitted that he used no recognized, scientific methodology for conducting his FAERS analysis. In fact, when asked how he chose his methodology, Dr. Madigan testified that he "ran it by Dr. Kessler," Plaintiffs' regulatory expert, and they "didn't come up with a better one." Madigan Dep. 159:3–9 (Ex. S). Most notably, Dr. Madigan admitted that he did not even look at any of the underlying reports that were generated by his search. *Id.* at 117:18–118:25, 131:5–7, 228:2–9. He simply relied on the number of reports that hit on his search terms with no further analysis as to the substance. *Id.* at 167:20–168:2. That does not pass Rule 702 scrutiny.

---

[9] Dr. Madigan analyses of FAERS, the Sanofi database, and the TAX clinical trials have numerous methodological and reliability issues in addition to the issues related to general causation raised here. Those arguments are more fully set out in the separate Memorandum in Support of Sanofi Defendants' Motion to Exclude Expert Testimony of David Madigan, PhD and are incorporated herein.

Second, Dr. Madigan ran a key word search in an attempt to locate case reports in Sanofi's internal pharmacovigilance database.  Just as with the FAERS, Dr. Madigan admits this analysis is not an adequate or appropriate methodology to assess causation.  *Id.* at 294:3–7.  He is again correct.  Further, Dr. Madigan acknowledged that he has no opinion as to whether the search terms he used to locate individual case reports—which were determined by a different expert and provided to Dr. Madigan by Plaintiffs' lawyers—were "appropriate" to locate reports of permanent alopecia.  *Id.* at 223:14–16, 234:16–24.  That is, Dr. Madigan has no opinion about whether his methodology reliably ascertained case reports of the injury at issue here.  And as with FAERS, Dr. Madigan did no substantive analysis of any of the case reports that hit on his search.  *Id.* at 117:17–118:25.  He did not even look at them.  *Id.* at 117:18–118:25; 131:5–7.  That is not a reliable methodology.

Even if the methodology were adequate, neither of these analyses are sufficient to establish general causation.  As Dr. Madigan testified, "[i]ndividual case reports are not that terribly useful," disqualifying both the FAERS and Sanofi's internal database as bases for demonstrating causation.  *Id.* at 273:3–10.  Courts recognize that "[c]ase reports, which anecdotally describe an occurrence, often on an individual basis, cannot establish general causation 'because they simply describe [] reported phenomena without comparison to the rate at which the phenomena occur in the general population or in a defined control group; do not isolate and exclude potentially alternative causes; and do not investigate or explain the mechanism of causation.'" *Burst*, 2015 WL 3755953, at *8 (quoting *Casey v. Ohio Med. Prods.*, 877 F. Supp. 1380, 1385 (N.D. Cal.1995)).

Dr. Madigan cannot rely on his analysis of the FAERS and Sanofi's internal database to support any purported general causation opinion.

**B.     Dr. Madigan's adoption of the 2015 Clinical Overview Conclusion is irrelevant and unreliable.**

Dr. Madigan "agrees" with Sanofi's 2015 Clinical Overview (an assessment of adverse event reports in Sanofi's own internal pharmacovigilance database) completed for the FDA. Madigan Report at 18 ¶ 45 (Ex. R); Madigan Dep. 62:16–63:6 (Ex. S). But Dr. Madigan not only admitted that Sanofi's assessment does not prove causation, he failed to read the deposition transcript of the author of the Clinical Overview to educate himself on its context and meaning. Madigan Report at 17–18 (Ex. R); Madigan Dep. at 223:21–24, 243:16–244:5, 294:3–7 (Ex. S).

A pharmaceutical company's assessment of adverse event reports, like Sanofi's 2015 assessment for the FDA, is "*not a tool for establishing causal attributions between products and adverse events.*" *Wells v. SmithKline Beecham Corp.*, No. 06-126, 2009 WL 564303 (W.D. Tex. Feb. 18, 2009) (emphasis in original) (quoting FDA, Guidance for Industry: Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment, at 112-13 (2005), *aff'd*, 601 F.3d 375 (5th Cir. 2010)). The purpose of an FDA assessment is to "reduce public exposure to harmful substances," not to prove the "particularized inquiry into cause and effect" required by state tort law. *See Burst*, 2015 WL 3755953, at *8 (quoting *Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 198 (5th Cir. 1996)); *Meade v. Parsley*, No. 2:09-00388, 2010 WL 4909435 (S.D. W. Va. Nov. 24, 2010). Company statements—even on drug labels—are "no substitute for expert testimony that established causation in terms of reasonable probability." *Meade v. Parsley*, No. 2:09-00388, 2010 WL 4909435, at *7 (S.D. W. Va. Nov. 24, 2010). This is especially true when the expert makes no "independent inquiry" into the "methodology used by [the pharmaceutical company] in creating the assessment," *In re Accutane*, 511 F. Supp. 2d 1288, 1297 (M.D. Fla. 2007), which Dr. Madigan admittedly did not do. Madigan Dep. 243:22–244:5. Dr. Madigan cannot rely on Sanofi's assessment for the FDA to try to "prove" general causation, as he admits.

### C. Dr. Madigan's statistical analysis of the TAX clinical trial results is irrelevant and unreliable.

Dr. Madigan finally relied on his statistical analysis of the TAX clinical trial results to opine that there is a "causal effect" between Taxotere and permanent alopecia. Dr. Madigan analyzed (1) the number of patients in TAX316 and GEICAM9805/TAX301 who experienced alopecia after being treated with TAC (docetaxel in combination with Adriamycin and cyclophosphamide) versus FAC (5-fluorouracil in combination with Adriamycin and cyclophosphamide), as well as (2) the number of patients in each category whose alopecia had not resolved at various check points. Madigan Report at 19 ¶¶ 49-50, 52 (Ex. R). Dr. Madigan's assessment was irrelevant to the facts at issue here and failed to follow the reliable, well-established, two-part test for proving general causation.

#### 1. Dr. Madigan's analysis was not tied to the facts of this case.

The relevant question is whether Taxotere, and not solely another chemotherapy drug, is capable of causing permanent alopecia in the general population. Dr. Madigan's assessment of the TAX clinical trial studies is not relevant to this question because (1) he did not exclude other chemotherapy drugs, and (2) he has no evidence of permanence.

Dr. Madigan testified that the TAX trial results showed that "TAC causes irreversible alopecia … at a higher rate than FAC," but he admitted that TAC is not Taxotere alone. Madigan Dep. 305:1–17 (Ex. S). An "increased risk" associated with patients taking a variety of medications is irrelevant to proving that a specific medication is capable of causing a specific injury, which is Plaintiffs' burden here. "[A] study that notes 'that the subjects were exposed to a range of substances and then nonspecifically note[s] increases in disease incidence' can be disregarded." *Burst*, 2015 WL 3755953, at *7 (quoting *LeBlanc v. Chevron USA, Inc.*, 396 F. App'x 94, 99 (5th Cir. 2010)); *see also Seaman*, 564 F. Supp. 2d at 602 (E.D. La. 2008) (an

17

increased risk is not causation).

Further, the TAX clinical trials looked only at "ongoing" (not permanent) alopecia, as Dr. Madigan admitted.  Madigan Dep. 247:15–24 (Ex. S).  Although there is no medically accepted definition of permanent alopecia, *see* MedDRA Dictionary (the term "irreversible alopecia" does not exist), if hair regrows, alopecia necessarily is not permanent.  Kessler Dep. 145:12–13 (Ex. N).  The TAX clinical trial participants have not been seen for follow-up since January 2010, and it is unknown whether any have experienced hair regrowth.  Madigan Report at 18 ¶ 47 (Ex. R).  Evidence that a participant had ongoing alopecia at a specific point in time, without further follow-up, is not evidence of permanence.  *See* Wei Report at 23 ¶ 54 (Dr. Madigan's analysis is not relevant to permanence) (Ex. J).  Dr. Madigan's analysis of participants with "ongoing" alopecia is not relevant to the question here—whether Taxotere causes *permanent* alopecia.

## 2.    Dr. Madigan's analysis did not use a reliable methodology.

Dr. Madigan's methodology has several problems: he failed to look at any of the underlying records from the clinical trial to verify his analysis; he did not exclude unrelated forms of alopecia; his statistical results were not sufficient; and he failed to apply the Bradford Hill criteria.  Any opinion based on this methodology must be excluded.

First, in analyzing the clinical trial data, Dr. Madigan failed to look at any of the individual records from the clinical trials.  Madigan Dep. 249:5–15 (Ex. S).  Dr. Madigan accordingly did not verify if these patients even had permanent hair loss as opposed to patients that died, dropped out of the clinical trial, were lost to follow-up, or even had resolved alopecia.  *Id.* at 249:5–15.

Second, Dr. Madigan did not (and cannot based on his training) distinguish between various types of alopecia in the reports.  Only one condition is relevant here—non-scarring alopecia following chemotherapy.  Tosti Report at 11 (Ex. P).  But there are at least a dozen different forms of scarring and non-scarring alopecia distinguishable from the alopecia claimed in

this litigation.  *Id.* at 6–12 (listing twelve different forms of alopecia).  Any of those alopecia types

may have been present in the TAX trial participants.  Dr. Madigan did not limit his searches to

reports of non-scarring alopecia following chemotherapy and did not even analyze the underlying

patient information to make that determination.  Madigan Dep. 69:22–71:5 (Ex. S).  Indeed, he

does not even know what types of alopecia Taxotere might cause.  "I don't know.  It causes

alopecia.  Which type of alopecia it causes, I have not examined whether it's all types, some types.

I don't know."  *Id.* at 283:1–12.  Instead, Dr. Madigan lumped together all reported cases of

ongoing alopecia without analyzing if each was non-scarring alopecia following chemotherapy.

An analysis that "lumps" together all forms of a disease is "not generally accepted by the scientific

community" as a means of assessing the relationship between a drug and the specific problem at

issue in the lawsuit.  *Frischhertz v. SmithKline Beecham* Corp, No. 10-2125, 2012 WL 6697124,

at *5 (E.D. La. Dec. 21, 2012) (holding that the general causation expert's opinion was unreliable

because she "lump[ed]" together all congenital malformations when only limb or heart defects

were at issue).

Third, Dr. Madigan's statistical analysis of the individual clinical trials did not result in

statistical significance.  Madigan Report at 18–20, Table 5 (Ex. R).  Dr. Madigan admitted that the

results were "not statistically very impressive."  Madigan Dep. 256:14–15 (Ex. S).  To try to fix

that problem, Dr. Madigan combined the two statistically insignificant results to achieve a

significant one.  Madigan Report at 19–20 (Ex. R).  The combined data included results from

GEICAM9805/TAX301, which Dr. Madigan otherwise criticized as unreliable.  Madigan Dep.

254:23–255:11 (Ex. S).  This is not "methodology based," but "conclusion-driven."  *In re Accutane

Litig.*, 2015 WL 753674, at *19.

Finally, even if Dr. Madigan had properly conducted the first, statistical step of the

analysis, he cannot—and has not—performed the second step to demonstrate causality. *In re Zoloft*, 26 F. Supp. 3d at 455 (discussing the second step application of the Bradford Hill criteria). In a similar MDL, the court precluded Dr. Madigan from attesting to general causation, noting that "Dr. Madigan is a man of statistics, not medicine," and that he "lacks the medical knowledge and experience to offer a general causation opinion." *In re Abilify*, 299 F. Supp. 3d 1291, 1361 (N.D. Fla. 2018) (internal citations omitted). The same is true here. Dr. Madigan admitted he did not analyze the Bradford-Hill criteria and he did not utilize any other accepted methodology that would allow him to analyze the second step—whether the statistical association he allegedly found was, in fact, causal. Madigan Dep. 273:11–13 (Ex. S). Dr. Madigan lacks the credentials to do so. Without conducting both steps of the recognized test, Dr. Madigan has not proven causation as a matter of law, and his opinions must be excluded.

## IV.    DR. FEIGAL'S OPINIONS ARE IRRELEVANT AND UNRELIABLE.

Like Dr. Madigan, Dr. Feigal's general causation opinion must be excluded because it is based on irrelevant data and unreliable methodology. Dr. Feigal reviewed (1) the 2015 Clinical Overview, (2) cherry-picked literature, and (3) Sanofi's clinical trial results. That review does not meet the standards set out in Rule 702.

### A.    Dr. Feigal's interpretation of the 2015 Clinical Overview is irrelevant and unreliable.

Like Dr. Madigan, Dr. Feigal references Sanofi's 2015 Clinical Overview. But an internal document like the 2015 Clinical Overview is "not a tool for establishing causal attributions between products and adverse events." *Wells*, 2009 WL 564303, at *12. Like Dr. Madigan, Dr. Feigal conducted no independent investigation into the methodology behind the assessment, making any reliance thereon particularly unreliable. *In re Accutane Prods. Liab.*, 511 F. Supp. 2d at 1297. Dr. Feigal did not read the deposition testimony of any Sanofi witness involved in

preparing the assessment.  Feigal Dep. Vol. I 189:17–21 (Ex. U).  Dr. Feigal's opinion is based on her personal interpretation of the 2015 Clinical Overview, which is not a recognized scientific methodology.  *Id.* at 186:18–187:8; *see Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

### B.   Dr. Feigal's review of limited literature is irrelevant and unreliable.

Dr. Feigal highlighted certain cherry-picked literature in "Table 2" of her report, but she admitted the literature does not demonstrate general causation.  "You would not reach a conclusion that Taxotere caused permanent alopecia just by looking at the studies and the literature in Table 2 because, as you just said, you would want to do further investigation. Fair? . . . A: I think from my own opinion, yes."  Feigal Dep. Vol. I 177:14–22 (Ex. U).

Dr. Feigal did not identify any replicable, scientific methodology for her approach to the literature.   Dr. Feigal admitted that she did not keep written records of her searches or methodology, making replication impossible.  *Id.* at 33:25–34:4; Vol II. at 68:10–13 (Ex. V).  Dr. Feigal testified that she exercised her personal judgment to decide what articles to include in her analysis, rather than any objective criteria capable of scrutiny.  *See* Feigal Dep. Vol. I 33:25–34:17 (". . . I think I know how to use good judgment to pick things that are relevant") (Ex. U); Feigal Dep. Vol. II 70:25–71:25, 72:13–73:1, 81:18–82:19 (Ex. V).  Dr. Feigal likewise admitted that she subjectively excluded certain articles even though they hit on her search terms.  *See* Feigal Dep. Vol. II 84:7–91:20, 91:24–106:16 (Ex. V); Feigal Dep. Vol. III 578:3–12, 579:1–582:2, 582:25– 587:6 (Ex. I).  "Cherry picking" is not science.  *Konrick v. Exxon Mobil Corp.*, No. 14-524, 2016 WL 439361, at *13 (E.D. La. Feb. 4, 2016), aff'd, 670 F. App'x 222 (5th Cir. 2016) (excluding expert's general causation opinions, because, *inter alia*, she "cherry-picks data and fails to explain results that contradict her conclusion"; noting such failure "casts doubt on the reliability of her

methodology.").  Dr. Feigal's methodology necessarily fails a Rule 702 analysis.

> **C.    Dr. Feigal's discussion of the TAX clinical trial results is irrelevant and unreliable.**

>> **1.    Dr. Feigal's assessment was not tied to the facts of this case.**

Dr. Feigal claimed that the TAX clinical trial results support her purported general causation opinion, but her analysis is flawed for the same reasons as Dr. Madigan's.  Dr. Feigal claims the results show an increased risk of permanent alopecia in the TAC versus the FAC arm of the studies.  Feigal Dep. Vol. I 213:15–214:9 (Ex. U).  An "increased risk" is not causation, and the clinical trials assessed only ongoing (not permanent) alopecia, *see supra*.  Further, TAC is not Taxotere.  Dr. Feigal claimed there was no need for her to control for the other drugs given with Taxotere.  "Q: Are you able to rule out Adriamycin and Cyclophosphamide as potential causes of ongoing alopecia in the TAC arm? . . . A:  I don't have to rule it out.  It's possible they are exacerbating, but I don't see why I would have to rule it out." *Id.* at 214:11–214:17.  That too was improper.  *Burst*, 2015 WL 3755953, at *7.  Dr. Feigal's assessment is not tied to the question here—is Taxotere, not another chemotherapy, capable of causing permanent alopecia.

>> **2.    Dr. Feigal's assessment was not based on any reliable methodology.**

Dr. Feigal's assessment of the TAX clinical trial results similarly failed to follow the well-established method for proving causation with epidemiological data.  *In re Zoloft*, 26 F. Supp. 3d at 455; *Burst*, 2015 WL 3755953, at *5.  Dr. Feigal failed to undertake the first half of the analysis—statistical significance—and actually (incorrectly) claimed it was not necessary.  Feigal Dep. Vol. I 87:21–88:12, 163:23–164:7, 165:23–166:23, 204:11–13, 216:18–218:19 (Ex. U); Feigal Dep. Vol. III 538:18–540:10, 547:24–548:3 (Ex. I).  Dr. Feigal also could not point to any part of her report addressing the chance, bias, and confounding factors that she admitted were required.  *See id.* 540:18-22, 545:8-546:8.

Dr. Feigal likewise missed the second half of the analysis.  Her report makes no mention of the Bradford-Hill criteria, which must be evaluated to arrive at a reliable causation opinion.  Dr. Feigal testified that she did conduct a Bradford-Hill analysis and that it was "implied" in her report. Feigal Dep. Vol. I 221:25–222:10, 224:2–230:9, 233:22–235:20 (Ex. U).  However, an "implied" analysis of a nine-factor test is insufficient on its face.  Courts are instructed to apply a "hard look" scrutiny to the application of the Bradford-Hill criteria to ensure that experts "rigorously explain how they have weighted the criteria."  *In re Mirena*, 341 F. Supp. 3d at 247.  "Otherwise, such methodologies are virtually standardless and their application to a particular problem can prove unacceptably manipulable."  *Id.* at \*52–3.  Because Dr. Feigal's analysis is "implied" in her report, it was not rigorously explained, cannot be given a "hard look" by the Court, and appears both "standardless" and "manipulable."  It is insufficient under any standard.

## <u>CONCLUSION</u>

For the reasons stated above, the Court should exclude the expert testimony of Dr. Madigan and Dr. Feigal on general causation under Federal Rules of Evidence 702.

Date:  February 8, 2019

Respectfully submitted,

  /s/ Douglas J. Moore
Douglas J. Moore (Bar No. 27706)
IRWIN FRITCHIE  URQUHART & MOORE LLC
400 Poydras Street, Suite 2700
New Orleans, LA  70130
Telephone: 504-310-2100
Facsimile:  504-310-2120
dmoore@irwinllc.com


Harley Ratliff
Adrienne L. Byard
SHOOK, HARDY & BACON L.L.P.
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone:  816-474-6550
Facsimile:  816-421-5547
hratliff@shb.com
abyard@shb.com

*Counsel for Sanofi-Aventis U.S. LLC and
Sanofi U.S. Services Inc.*


## CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2019, I electronically filed the foregoing with the Clerk

of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ *Douglas J. Moore*

24