# EXHIBIT A

# Reference Manual on Scientific Evidence

*Third Edition*

Committee on the Development of the Third Edition of the
Reference Manual on Scientific Evidence

Committee on Science, Technology, and Law
Policy and Global Affairs

FEDERAL JUDICIAL CENTER

NATIONAL RESEARCH COUNCIL
*OF THE NATIONAL ACADEMIES*

THE NATIONAL ACADEMIES PRESS
Washington, D.C.
**www.nap.edu**

caused a harmful effect or disease.[4] Epidemiologic evidence identifies agents that are associated with an increased risk of disease in groups of individuals, quantifies the amount of excess disease that is associated with an agent, and provides a profile of the type of individual who is likely to contract a disease after being exposed to an agent. Epidemiology focuses on the question of general causation (i.e., is the agent capable of causing disease?) rather than that of specific causation (i.e., did it cause disease in a particular individual?).[5] For example, in the 1950s, Doll and Hill and others published articles about the increased risk of lung cancer in cigarette smokers. Doll and Hill's studies showed that smokers who smoked 10 to 20 cigarettes a day had a lung cancer mortality rate that was about 10 times higher than that for nonsmokers.[6] These studies identified an association between smoking cigarettes and death from lung cancer that contributed to the determination that smoking causes lung cancer.

However, it should be emphasized that *an association is not equivalent to causation*.[7] An association identified in an epidemiologic study may or may not be

---

4. *E.g.,* Bonner v. ISP Techs., Inc., 259 F.3d 924 (8th Cir. 2001) (a worker exposed to organic solvents allegedly suffered organic brain dysfunction); Burton v. R.J. Reynolds Tobacco Co., 181 F. Supp. 2d 1256 (D. Kan. 2002) (cigarette smoking was alleged to have caused peripheral vascular disease); *In re* Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig., 524 F. Supp. 2d 1166 (N.D. Cal. 2007) (multidistrict litigation over drugs for arthritic pain that caused heart disease); Ruff v. Ensign-Bickford Indus., Inc., 168 F. Supp. 2d 1271 (D. Utah 2001) (chemicals that escaped from an explosives manufacturing site allegedly caused non-Hodgkin's lymphoma in nearby residents); Castillo v. E.I. du Pont De Nemours & Co., 854 So. 2d 1264 (Fla. 2003) (a child born with a birth defect allegedly resulting from mother's exposure to a fungicide).

5. This terminology and the distinction between general causation and specific causation are widely recognized in court opinions. *See, e.g.,* Norris v. Baxter Healthcare Corp., 397 F.3d 878 (10th Cir. 2005); *In re* Hanford Nuclear Reservation Litig., 292 F.3d 1124, 1129 (9th Cir. 2002) ("'Generic causation' has typically been understood to mean the capacity of a toxic agent . . . to cause the illnesses complained of by plaintiffs. If such capacity is established, 'individual causation' answers whether that toxic agent actually caused a particular plaintiff's illness."); *In re* Rezulin Prods. Liab. Litig., 369 F. Supp. 2d 398, 402 (S.D.N.Y. 2005); Soldo v. Sandoz Pharms. Corp., 244 F. Supp. 2d 434, 524–25 (W.D. Pa. 2003); Burton v. R.J. Reynolds Tobacco Co., 181 F. Supp. 2d 1256, 1266–67 (D. Kan. 2002). For a discussion of specific causation, see *infra* Section VII.

6. Richard Doll & A. Bradford Hill, *Lung Cancer and Other Causes of Death in Relation to Smoking: A Second Report on the Mortality of British Doctors,* 2 Brit. Med. J. 1071 (1956).

7. *See* Soldo v. Sandoz Pharms. Corp., 244 F. Supp. 2d 434, 461 (W.D. Pa. 2003) (Hill criteria [see *infra* Section V] developed to assess whether an association is causal); Miller v. Pfizer, Inc., 196 F. Supp. 2d 1062, 1079–80 (D. Kan. 2002); Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp. 2d 584, 591 (D.N.J. 2002) ("[A]n association is not equivalent to causation." (quoting the second edition of this reference guide)); Zandi v. Wyeth a/k/a Wyeth, Inc., No. 27-CV-06-6744, 2007 WL 3224242, at *11 (D. Minn. Oct. 15, 2007).

Association is more fully discussed *infra* Section III. The term is used to describe the relationship between two events (e.g., exposure to a chemical agent and development of disease) that occur more frequently together than one would expect by chance. Association does not necessarily imply a causal effect. Causation is used to describe the association between two events when one event is a necessary link in a chain of events that results in the effect. Of course, alternative causal chains may exist that do not include the agent but that result in the same effect. For general treatment of causation in tort law

*Reference Manual on Scientific Evidence*

1. Temporal relationship,
2. Strength of the association,
3. Dose–response relationship,
4. Replication of the findings,
5. Biological plausibility (coherence with existing knowledge),
6. Consideration of alternative explanations,
7. Cessation of exposure,
8. Specificity of the association, and
9. Consistency with other knowledge.

There is no formula or algorithm that can be used to assess whether a causal inference is appropriate based on these guidelines.[145] One or more factors may be absent even when a true causal relationship exists.[146] Similarly, the existence of some factors does not ensure that a causal relationship exists. Drawing causal inferences after finding an association and considering these factors requires judgment and searching analysis, based on biology, of why a factor or factors may be absent despite a causal relationship, and vice versa. Although the drawing of causal inferences is informed by scientific expertise, it is not a determination that is made by using an objective or algorithmic methodology.

These guidelines reflect criteria proposed by the U.S. Surgeon General in 1964[147] in assessing the relationship between smoking and lung cancer and expanded upon by Sir Austin Bradford Hill in 1965[148] and are often referred to as the Hill criteria or Hill factors.

---

145. *See* Douglas L. Weed, *Epidemiologic Evidence and Causal Inference*, 14 Hematology/Oncology Clinics N. Am. 797 (2000).

146. *See* Cook v. Rockwell Int'l Corp., 580 F. Supp. 2d 1071, 1098 (D. Colo. 2006) (rejecting argument that plaintiff failed to provide sufficient evidence of causation based on failing to meet four of the Hill factors).

147. Public Health Serv., U.S. Dep't of Health, Educ., & Welfare, Smoking and Health: Report of the Advisory Committee to the Surgeon General (1964); *see also* Centers for Disease Control and Prevention, U.S. Dep't of Health & Human Servs., The Health Consequences of Smoking: A Report of the Surgeon General (2004).

148. *See* Austin Bradford Hill, *The Environment and Disease: Association or Causation?* 58 Proc. Royal Soc'y Med. 295 (1965) (Hill acknowledged that his factors could only serve to assist in the inferential process: "None of my nine viewpoints can bring indisputable evidence for or against the cause-and-effect hypothesis and none can be required as a *sine qua non*."). For discussion of these criteria and their respective strengths in informing a causal inference, see Gordis, *supra* note 32, at 236–39; David E. Lilienfeld & Paul D. Stolley, Foundations of Epidemiology 263–66 (3d ed. 1994); Weed, *supra* note 144.

bine data from multiple randomized trials.[143] In response to the above conditions, "evidence-based medicine" gained prominence in 1992.[144] It is aptly defined as "the conscientious, explicit and judicious use of current best evidence in making decisions about the care of the individual patient. It means integrating individual clinical expertise with the best available external clinical evidence from systematic research."[145]

Evidence-based medicine contrasts with the traditional informal method of practicing based on anecdotes, applying the most recently read articles, doing what a group of eminent experts recommend, or minimizing costs.[146] Rather, it is "the use of mathematical estimates of the risks of benefit and harm, derived from high-quality research on population samples, to inform clinical decision making in the diagnosis, investigation or management of individual patients."[147] In a paper from a joint workshop held by IOM and the Agency for Healthcare Research and Quality[148] that addressed what physicians consider to be sufficient evidence to justify their clinical practice and treatment decisions, Mulrow and Lohr wrote "evidence-based medicine stresses a structured critical examination of medical research literature: relatively speaking, it deemphasizes average practice as an adequate standard and personal heuristics."[149]

### 3. Hierarchy of medical evidence

With the explosion of available medical evidence, increased emphasis has been placed on assembling, evaluating, and interpreting medical research evidence. A fundamental principle of evidence-based medicine (*see also* Section IV.C.5, *infra*) is that the strength of medical evidence supporting a therapy or strategy is hierarchical. When ordered from strongest to weakest, systematic review of randomized trials (meta-analysis) is at the top, followed by single randomized trials, systematic reviews of observational studies, single observational studies,

---

143. *See* Michael D. Green et al., Reference Guide on Epidemiology, Section VI, in this manual; Video Software Dealers Ass'n v. Schwarzenegger, 556 F.3d 950, 963 (9th Cir. 2009) (analyzing a meta-analysis of studies on video games and adolescent behavior); Kennecott Greens Creek Min. Co. v. Mine Safety & Health Admin., 476 F.3d 946, 953 (D.C. Cir. 2007) (reviewing the Mine Safety and Health Administration's reliance on epidemiological studies and two meta-analyses).

144. Evidence-Based Medicine Working Group, *Evidence-Based Medicine. A New Approach to Teaching the Practice of Medicine,* 268 JAMA 2420–25 (1992).

145. David L. Sackett et al., *Evidence Based Medicine: What It Is and What It Isn't,* 312 BMJ 71–72, 71 (1996).

146. Trisha Greenhalgh, How to Read a Paper: The Basics of Evidence-Based Medicine (3d ed. 2006).

147. *Id.* at 1.

148. Clark C. Havighurst et al., *Evidence: Its Meanings in Health Care and in Law,* 26 J. Health Pol., Pol'y & L. 195–215 (2001).

149. Mulrow & Lohr, *supra* note 141, at 253.

physiological studies, and unsystematic clinical observations.[150] An analysis of the frequency with which various study designs are cited by others provides empirical evidence supporting the influence of meta-analysis followed by randomized controlled trials in the medical evidence hierarchy.[151] Although they are at the bottom of the evidence hierarchy, unsystematic clinical observations or case reports may be the first signals of adverse events or associations that are later confirmed with larger or controlled epidemiological studies (e.g., aplastic anemia caused by chloramphenicol,[152] or lung cancer caused by asbestos[153]). Nonetheless, subsequent studies may not confirm initial reports (e.g., the putative association between coffee consumption and pancreatic cancer).[154]

Just as in laboratory experiments, evidence about the benefits and risks of medical interventions arises through repetitive observations. A single randomized controlled trial relies on hypothesis testing, specifically assuming the null hypothesis that a new drug is equivalent to the comparator (e.g., placebo). As conceived nearly 100 years ago, interpreting the trial involved calculating the likelihood of the alpha error (*p*-value) wherein the study suggests that the drug or device is beneficial but the "truth" is that it is not, that is, a false-positive study result. Similarly, a beta error (1 minus power) is the likelihood of a study finding that the drug or device is not beneficial when the "truth" is that it is, that is, a false-negative study result (Table 3).

Table 3. Analogy Between Interpreting a Diagnostic Test and a Drug Study

|  | Truth | |
| --- | --- | --- |
|  | Drug + | Drug − |
| Study + | Power (true positive) | α Type I error (false positive) |
| Study − | β Type II error (false negative) | True negative |

The choice of which specific error rates to use (e.g., false positive or *p*-value or alpha of 0.05) was suppose to depend on a judgment of the relative consequences of the two errors, missing an effective drug (Type II beta error) or

---

150. Gordon H. Guyatt et al., Users' Guides to the Medical Literature: A Manual for Evidence-Based Clinical Practice (2d ed. 2008) (hereinafter "Guyatt"); *see also* Michael D. Green et al., Reference Guide on Epidemiology, in this manual.

151. Nikolaos A. Patsopoulos et al., *Relative Citation Impact of Various Study Designs in the Health Sciences,* 293 JAMA 2362–66 (2005).

152. W.T.W. Clarke, *Fatal Aplastic Anemia and Chloramphenicol*, 97 Can. Med. Ass'n J. 815 (1967) (hereinafter "Clarke").

153. Michael Gochfeld, *Asbestos Exposure in Buildings*, Envtl. Med. 438, 440 (1995).

154. **Brian MacMahon et al.,** *Coffee and Cancer of the Pancreas,* 304 New Eng. J. Med. 630–33 (1981) (hereinafter "MacMahon").

considering an ineffective drug to be effective (Type I alpha error).[155] The null hypothesis, however, assumes equivalence, and so it does not provide any measure of evidence outside of the particular study (e.g., prior studies or biological mechanism or plausibility). Thus, the null hypothesis assumption necessitates abandoning the ability to measure evidence or determine "truth" from a single experiment, so that hypothesis testing is thereby "equivalent to a system of justice that is not concerned with which individual defendant is found guilty or innocent (that is, 'whether each separate hypothesis is true or false') but tries instead to control the overall number of incorrect verdicts."[156] From a Bayesian perspective, the interpretation of a new study depends on whether prior studies showed benefit or harm and on the existence of a biological mechanism or plausibility (e.g., the association between coffee consumption and pancreatic cancer was a "false-positive" result because in further testing the initial finding was not validated and there was no known plausible biological mechanism).[157]

Cumulative meta-analysis of treatments enables the accumulation of randomized trial evidence to examine trends in efficacy or risks, overcoming issues of underpowered trials that have insufficient numbers of patients enrolled to reliably detect a benefit. For example, between 1959 and 1988, 33 randomized trials with streptokinase for acute myocardial infarction involving over 35,000 patients had been published. By combining the results of each trial as they occurred, a cumulative meta-analysis found "a consistent, statistically significant reduction in total mortality" with streptokinase use by 1973.[158] In contrast, for many years, physicians used a drug called lidocaine to prevent life-threatening heart rhythm disturbances, yet none of the randomized trials of lidocaine demonstrated any benefit, and finally cumulative meta-analysis found a trend toward harm. When the results of meta-analysis were compared with comments in textbooks and review articles,

> discrepancies were detected between the meta-analytic patterns of effectiveness in the randomized trials and the recommendations of reviewers [the review article author]. Review articles often failed to mention important advances or exhibited delays in recommending effective preventive measures. In some cases, treatments that have no effect on mortality or are potentially harmful continued to be recommended by several clinical experts.[159]

---

155. Goodman, *supra* note 74, at 998.
156. *Id*. at 998.
157. MacMahon, *supra* note 154, at 630.
158. Joseph Lau et al., *Cumulative Meta-Analysis of Therapeutic Trials for Myocardial Infarction*, 327 New Eng. J. Med. 248–54 (1992).
159. Elliott M. Antman et al., *A Comparison of Results of Meta-Analyses of Randomized Control Trials and Recommendations of Clinical Experts: Treatments for Myocardial Infarction*, 268 JAMA 240, 240 (1992).