# EXHIBIT I

```
 1              UNITED STATES DISTRICT COURT
 2               EASTERN DISTRICT OF CALIFORNIA
 3
 4    IN RE:   TAXOTERE (DOCETAXEL)     )
      PRODUCTS LIABILITY LITIGATION     )
 5                                      )   MDL No. 2740
      This Document Relates To:         )
 6                                      )   Section H
      Antoinette Durden,                )
 7    Case No. 2:16-cv-17735;           )
      Tanya Francis,                    )
 8    Case No. 2:16-cv-17410;           )
      Barbara Earnest,                  )
 9    Case No. 2:16-cv-17144            )
      _____ )
10
11
12
13
14
15
16       VIDEOTAPED DEPOSITION OF ELLEN FEIGAL, M.D.
17                San Francisco, California
18                Friday, January 11, 2019
19                      Volume III
20
21
22    Reported by:
      CARLA SOARES
23    CSR No. 5908
24    Job No. 3189948
25    Pages 384 - 626
```

Page 525

1  a single authority or multiple authorities, but
2  specific authorities, that -- in the published
3  peer-reviewed medical literature that I can use to
4  follow along with the criteria and method you used?
5        MR. THORNTON: Objection. Form.
6        THE WITNESS: There's multiple. I can
7  provide those. I can't provide them right this
8  instant, but I quoted one that you can probably
9  easily find on a website right now because it's so
10 famous.
11       But there's multiple sources for Bradford
12 Hill criteria and how to use permutations of that in
13 causation. So they're -- it's not a checklist.
14 It's actually -- and even in his original talk, if
15 you read it, there's no requirement to go down each
16 of the nine criteria as a checklist, and he himself
17 says that.
18       So I'd be happy to provide that or any
19 subsequent references regarding that.
20 BY MR. KAUFMAN:
21    Q  Are you offering to provide it because you
22 don't cite to it in your report or reliance
23 materials?
24    A  I'm responding to your question. You
25 asked, where is the reference?

Page 526

1     Q  Yeah. And it's not in your report or your
2  reliance materials, correct?
3     A  My whole methodology uses that criteria,
4  but they're not copyrighted by Bradford Hill, as I'm
5  sure you know.
6        So there's permutations of the criteria
7  used throughout. There's permutations that are used
8  by the FDA, by all kinds of agencies, in terms of
9  thinking about criteria for causation.
10    Q  And I'm asking if those sources are cited
11 in your report or your reliance list.
12    A  They're -- they're referenced throughout
13 my report, my methodology, and pages 22 through
14 whatever the last page of my report is for
15 conclusions goes through the methodology of it.
16    Q  Let's go through the report and you can
17 show me exactly where you're talking about. So
18 let's pull out Exhibit 17.
19    A  Which exhibit -- do you want me to go back
20 to Exhibit 17, not 22?
21    Q  Yes. Show me where your methodology is.
22    A  Pages 22 through 34. It's implicit all
23 the way throughout this report.
24    Q  Is it express?
25    A  It's obvious all throughout the report.

Page 527

1     Q  And show me where it's obvious because I
2  want to make sure I can understand.
3     A  There's only so many times I can say pages
4  22 to 34. That's my whole report.
5     Q  Well, your whole report is 1 through --
6     A  Well, if you --
7     Q  -- 44.
8     A  -- look at -- well, there's a lot to say.
9     Q  Okay. So I'm looking at pages 22
10 through --
11    A  Well, on this version, let me see what
12 page it is. It might have changed a page number.
13       Well, on page 22, it starts talking about
14 the issues about Taxotere and its use in early-stage
15 breast cancer. I think it also talks about the
16 clinical trials and all those issues.
17       But, you know, I'm not going to go through
18 it sentence by sentence. My whole report is a
19 causation report.
20    Q  I'm not -- strike that.
21       Where in your report specifically --
22 because you said it's obvious -- is your methodology
23 and the criteria you used to form your causation
24 opinion?
25    A  My whole report is a causation report.

Page 528

1     Q  Is your methodology and the criteria you
2  used to reach your causation opinion expressly
3  stated and set forth in your report?
4        MR. THORNTON: Objection. Form.
5        THE WITNESS: It is -- the interpretation
6  and conclusions are stated throughout the report.
7        MR. KAUFMAN: That's not --
8        Can you read back my question, please?
9        I move to strike that last response as
10 nonresponsive.
11       (Record read as follows:
12       "Question: Is your methodology and the
13    criteria you used to reach your causation
14    opinion expressly stated and set forth in your
15    report?")
16       THE WITNESS: I believe it is.
17 BY MR. KAUFMAN:
18    Q  Where?
19    A  It's throughout my report.
20    Q  You can't point me to a specific section
21 or paragraph or page?
22    A  I can't attach you to a specific sentence.
23    Q  And why is that?
24    A  Because the causation methodology is -- I
25 used a standard scientific approach. I went through

37 (Pages 525 - 528)

Page 529

1 the different -- different types of issues that are
2 important: the timing, exposure, the dose, the
3 biologic plausibility, the consistency of results
4 across the multiple studies. And that is contained
5 within the report.
6  Q  And where in the report does it say that
7 you did those things?
8  A  I did those things throughout the report.
9 Those are the major issues that led me to come to my
10 interpretations about the issues.
11  Q  But where in your report does it say that
12 you did those things?
13  A  I think it's contained throughout the body
14 of the report.
15  Q  Can you point me to a page?
16  A  I'm -- it's the whole report.
17  Q  Can you identify a time when you used the
18 same criteria and methodology to conclude that a
19 drug causes a particular adverse event outside the
20 context of litigation?
21  A  Yeah. I do it all the time. I'm involved
22 in product development. I was involved in industry
23 as I think you know from my qualifications. I
24 worked in industry. I was involved in safety
25 surveillance. That was a part of what I did as

Page 530

1 working within the company.
2       So not only did I work at trying to find
3 more effective products, but I did also evaluate
4 safety issues all the time on a wide variety of
5 products.
6       MR. KAUFMAN: Move to strike as
7 nonresponsive.
8       Can you please read that back?
9       (Record read as follows:
10       "Question: Can you identify a time when
11       you used the same criteria and methodology to
12       conclude that a drug causes a particular
13       adverse event outside the context of
14       litigation?")
15       THE WITNESS: And the answer is yes. I
16 mean, for proprietary reasons, I can't tell you --
17 you know, name that drug.
18       But I certainly did it in terms of a lot
19 of the product development, and I work with -- as
20 you know, I'm a consultant to a multitude of
21 companies. So I am asked to evaluate their data and
22 look at safety and help determine attribution.
23       So, I mean, that's something I do as part
24 of my work activity, you know, for over 30 years.
25 ///

Page 531

1 BY MR. KAUFMAN:
2  Q  So you are refusing to give a specific
3 example of when you applied this criteria and
4 methodology in a specific case with a specific drug
5 that you concluded caused a particular adverse
6 event?
7  A  There's multiple drugs. I mean, I worked
8 at the National Cancer Institute for 12 years. I
9 mean, that was part of what I had to do with
10 development of multiple drugs.
11       You know, I worked with, you know, all
12 kinds of products at the National Cancer Institute.
13 Probably 80 percent of the cancer drugs that are
14 approved in the United States went through the
15 National Cancer Institute.
16       So there's all kinds of cytotoxic
17 chemotherapies, there's biologics therapies, there's
18 molecularly-based therapies.
19       So there's a very long list of products
20 where attribution of safety had to be made, and
21 using the appropriate scientific method and
22 criteria. So it's not just one drug. There's
23 multiple.
24  Q  I move to strike as nonresponsive.
25       Doctor, I'm just asking if you can give me

Page 532

1 a single example of a drug that you concluded caused
2 a particular adverse event using the criteria and
3 the methodology you used to form your opinions in
4 this case.
5  A  Erythropoietin.
6  Q  Okay. Tell me about that.
7  A  Well, it's rather famous, don't you think?
8       But the issue there was in terms of
9 whether or not there would be issues with
10 inadvertent tumor growth in patients who were very
11 early-stage cancer. And so actually that caused a
12 labeling change in terms of safety issues. So it
13 was a very prominent case.
14  Q  What was the body of evidence that you
15 used to reach the conclusion that that drug caused
16 that adverse event?
17  A  Well, there's pharmacovigilance data;
18 there's clinical trials. There's a variety of
19 information that came in that informed those issues.
20  Q  So pharmacovigilance and randomized
21 controlled trials?
22  A  There were quite a few randomized
23 controlled clinical trials, and there were also some
24 laboratory studies that were done to look at the
25 issue.

Page 537

1  A   On this case? I haven't published on this
2  case at all.
3  Q   And I'm asking specifically about the
4  methodology and the criteria you used in this case,
5  not whether you published your findings in this
6  case.
7      Do you understand the distinction?
8  A   Well, to answer your question, I haven't
9  published on the specific methodology I used in this
10 case.
11     I think that was your question, and that
12 is my answer.
13 Q   Okay. When you were forming your
14 causation opinions in this case, did you start with
15 a hypothesis?
16 A   Well, I started with the issue at hand for
17 the litigation, which was, does Taxotere, Taxotere
18 regimens, cause permanent chemotherapy-induced
19 alopecia? So that was the topic I was
20 investigating.
21 Q   Okay. And do you know what a null
22 hypothesis is?
23 A   Yeah.
24 Q   What is a null hypothesis?
25 A   Well, to rule out whether or not something

Page 538

1  occurs -- you know, in a general sense, something
2  occurs by chance alone.
3  Q   Did you utilize a null hypothesis in this
4  case?
5  A   I did look for alternative reasons, and so
6  did consider them.
7      But as I said, what I've looked at is
8  timing, dosing, replication of the consistency of
9  the results and biologic plausibility.
10     And so when I looked at that and the facts
11 of the case, in terms of the -- none of these women
12 had permanent alopecia going into this litigation
13 before they got exposed to the chemotherapy. So
14 there's a context in which I was doing the work.
15 Q   I'm not asking about the methodology. I'm
16 just asking about the hypothesis and the null
17 hypothesis.
18     What was your null hypothesis?
19 A   Well, the issue here is a safety issue.
20 And the issue here is there's a claim that a certain
21 thing caused a safety issue.
22     And so the issue is, are there reasonable
23 things to rule out? It's not a statistical test I
24 have to do. And as I think I explained at the
25 previous deposition, you don't have to show

Page 539

1  statistical significance to show causation or to
2  show safety issues that are relevant to a drug and
3  relevant to causation.
4      There's nothing in the causation
5  principles or criteria that requires statistical
6  tests being done. If you even go back and read the
7  1965 Bradford Hill speech, he opines quite
8  extensively on that topic.
9      So the point is I was looking for
10 substantial evidence that -- in terms of the timing
11 and the exposure, in terms of whether there was a
12 dose response, determining whether there was
13 replication across the various studies, and to
14 determine whether or not there was biologic
15 plausibility.
16     And I did that in a scientifically sound
17 and reliable, non-biased manner to look for that
18 data.
19 Q   Move to strike as nonresponsive.
20     Doctor, what was your null hypothesis in
21 this case?
22     MR. THORNTON: Objection. Form.
23     THE WITNESS: As I said, I didn't have a
24 statistical -- you know, you're talking about
25 whether or not I'm doing a hypothesis testing.

Page 540

1      The testing is really, there's a safety
2  issue, and whether or not Taxotere was causative or
3  causally related or causally associated, whatever is
4  the appropriate term you want me to use. But
5  basically, was it causative in some way for the
6  development of permanent alopecia? That was the
7  topic I was looking at.
8      So I wasn't looking for a statistical test
9  of significance, which is what I think of with a
10 null hypothesis.
11     I was looking for the evidence which is
12 consistent with the principles of causation, to look
13 to see whether or not there's strong, substantial
14 and reliable and consistent evidence that's been
15 evaluated in a scientifically sound and reliable
16 way.
17 BY MR. KAUFMAN:
18 Q   Do you agree that when forming a general
19 causation opinion, a reliable methodology must
20 account for the possible role of chance, bias, and
21 confounding factors?
22 A   I am.
23 Q   And do you agree that your report does not
24 expressly contain a discussion or analysis of
25 chance, bias, or confounding factors?

Page 541

1  A  Well, I think if you look at the facts,
2  the issue is that these women -- this is an issue of
3  general causation, not specific.
4      I think some of the issues you're talking
5  about are more relevant for specific causation and
6  going through the specific cases to see whether or
7  not there might have been other explanations for why
8  this particular product might have caused it in that
9  particular patient because of some confounder.
10     But I think in terms of general causation,
11 what I looked at is that the exposure occurred at
12 the -- exposure occurred before the onset of the
13 permanent alopecia, and it was rapid, occurring two
14 to three weeks, and it was extensive.
15     And that reversible alopecia, I know from
16 being an oncologist for 30 years, is reversible.
17 And that the changes that you get in your hair are,
18 when the hair comes back, is that you get a change
19 in texture, you get a change in color, you may get a
20 change from curly to straight or straight to curly,
21 but the hair comes back.
22     So the facts of the -- you know, it's like
23 doing a differential diagnosis on a patient.  You
24 look at the differential, not an extensive laundry
25 list of anything in the world that can happen, but

Page 542

1  of the things that are relevant for the context for
2  that particular patient.
3      So if a patient comes in with a -- what I
4  call, you know, an allergic reaction and has just
5  taken a drug, I don't need to do a very long
6  differential diagnosis on the types of things that
7  can cause allergic reactions.  I don't look for bee
8  stings.
9      You know, there's a lot of things that can
10 cause a particular reaction.  But I look in my
11 differential for those things that are relevant for
12 that context.
13     So relevant for that context, I'm not
14 aware of any confounder for rapid and extensive hair
15 loss immediately after an exposure.
16     MR. KAUFMAN:  I move to strike as
17 nonresponsive.
18     Can you please read the question back?
19     (Record read as follows:
20     "Question:  And do you agree that your
21     report does not expressly contain a discussion
22     or analysis of chance, bias or confounding
23     factors?")
24     THE WITNESS:  And I was explaining that,
25 that I was looking.  I was giving you an example of

Page 543

1  a differential diagnosis.
2      So I am going to explain this, because I
3  think what you're asking is, there's a lot of things
4  that can cause something.  But what we're trying to
5  do in this case is the context.
6      These are breast cancer patients, and
7  these are breast cancer patients who did not have a
8  history of permanent alopecia before they ever got
9  exposed to their cytotoxic chemotherapy.
10     So I was looking at this in the context of
11 the issue that we're discussing.  And the
12 differential diagnosis or what we can call
13 confounders for, you know, a higher level review of
14 this are those types of issues that you consider
15 that are relevant.
16     And being an oncologist, I know that
17 cytotoxic chemotherapy, it's not confounded with
18 anything else.
19     Cytotoxic chemotherapy causes rapid and
20 extensive hair loss.  And it's not confused with
21 diabetes, it's not confused with hypothyroidism,
22 it's not confused with endocrine therapy, and it's
23 not confused with somebody having a congenital
24 reason for why they may have hair loss.
25     So I'm saying yes, I am aware of other

Page 544

1  things that could potentially cause hair loss, but I
2  have to think of the timing, the exposure, the
3  temporality, and the pharmacology of the inciting
4  agent.
5      So yes, I did consider all those things.
6      MR. KAUFMAN:  Move to strike as
7  nonresponsive.
8   Q  Dr. Feigal, where in your report do you
9  provide a discussion or an analysis of chance, bias,
10 or confounding factors?  Show me in your report.
11  A  I think my whole report is about a
12 causation report.
13  Q  Can you show me where in your report you
14 set forth a discussion or analysis of chance, bias,
15 or confounding factors?
16     MR. THORNTON:  Objection.  Form.
17     THE WITNESS:  I -- it's in my entire
18 report.
19     And as we talked at the last deposition,
20 the controlled clinical trial is a very good way to
21 control for content validity, internal validity, and
22 bias, control for bias.  And so that's a very good
23 way to control for bias.
24     Looking at published paper, prospective
25 protocols that clearly define in a pre-specified way

Page 545

1  what people are going to look at controls for bias.
2        So that's inherent in the criteria that I
3  looked at in the published literature.
4        So yes, I did look at that.  You've seen
5  the way in which it was done and the types of papers
6  that I put in there.
7  BY MR. KAUFMAN:
8     Q   You can't point me to a single page where
9  you set forth a discussion of your analysis of
10 chance, bias, or confounding factors?
11    A   I think it's scattered throughout my
12 report.
13    Q   Is it implied throughout your report or is
14 it expressly stated?
15    A   I think it's clear throughout my report.
16    Q   Is it expressly stated in your report?
17    A   I think it's clear throughout my report.
18        MR. THORNTON:  Objection.  Form.
19 BY MR. KAUFMAN:
20    Q   But not expressly stated?
21    A   I think it's clear throughout my report.
22    Q   Why do you refuse to answer my question as
23 to whether it's expressly stated?
24    A   Because I think responding with the word
25 "clear" is self-explanatory.  It is clear.

Page 546

1     Q   Well, if the answer were "yes," you could
2  point me to the page, right?
3     A   I think the answer is it's clear
4  throughout my report.
5        If you read the report, it's clear that I
6  used sound scientific principles and methodologies
7  and looked for reproducibility results across
8  studies.
9     Q   But you didn't actually state that in your
10 report, right?
11    A   I'm restating for probably the fiftieth
12 time what I did to come to my conclusions in this
13 report.
14    Q   Can we agree that Tax 316 and the Geicam
15 9805 randomized controlled trials were not
16 randomized to control for confounding factors
17 relating to alopecia?
18    A   No.
19    Q   We can't agree?
20    A   No, we can't.
21        Randomization in and of itself is a very
22 important tool for limiting bias.  It's random.  So
23 patients get randomized randomly.
24        So there's no -- you know, if somebody has
25 medical conditions or somebody has a comorbid

Page 547

1  condition, it should be randomly distributed.
2     Q   What were the factors upon which -- were
3  used in Tax 316 and/or Geicam 9805 specific to
4  controlling for alopecia factors?
5     A   Randomization is the standard clinical
6  trial design used to control for bias.
7        I mean, there's additional things you
8  could do in terms of double-blinding and a variety
9  of things, but randomized controlled trials are a
10 standard way for controlling for bias across --
11 whether it's medical conditions, whether it's any
12 kind of comorbidity.
13       It's random.  There's no -- there's no
14 predetermination.  It's a randomized clinical trial.
15 Randomization is the best way to control for bias.
16    Q   And were the endpoints in either Tax 316
17 or Geicam 9805 looking at the issue of persistent or
18 permanent alopecia?
19    A   The objectives of clinical trials where
20 companies are wanting to pursue product development
21 are generally not focused -- they're powered to
22 determine an efficacy endpoint, not a safety
23 endpoint.
24       So the safety endpoint, which I've said
25 multiple times, is not powered on statistical

Page 548

1  significance.  You don't have to have a
2  statistically significant result to report a safety
3  issue.
4        But the clinical trials are most commonly
5  powered to look at efficacy endpoints, and that was
6  true -- looking at disease-free survival was the
7  efficacy endpoint, and that's how they powered the
8  study.
9     Q   You mentioned the Bradford Hill factors a
10 moment ago.  How did you weigh those factors in
11 forming your causation opinion?
12    A   Well, I think that the biggest one for me
13 is exposure in that the event occurs after the
14 exposure.  So I think that's a critical one.
15       I think that the biologic plausibility is
16 also an important one.  We know that Taxotere causes
17 hair loss.  We went through some of the specific
18 issues last time.
19       But regardless of what the biologic
20 plausibility is, there's certainly biologic
21 plausibility for Taxotere to cause hair loss.
22       There's also the consistency across
23 multiple types of studies.  So I looked at
24 prospectively designed randomized clinical trials, I
25 looked at prospective clinical studies, I looked at

Page 577

1 correspondence that I sent to you where I asked
2 the -- because -- not because I read this article,
3 but because I read the original Masidonski and Sohn
4 article, "Are you able to share what taxane you
5 used?"
6     And she said, "Yes. 11 of the 13 were
7 Taxotere."
8     So the bottom line is, I have all these
9 articles and I have them correctly. Yeager actually
10 misstates the results of the Masidonski letter.
11  Q  I'm -- okay. So Crown, Berglund, Jung,
12 Yeager and Yagata, those specific studies, the
13 papers that make up part of Exhibit 19, are not
14 cited in Exhibit -- in Table 2 of your report; can
15 we agree?
16  A  Say that again.
17  Q  Crown, Berglund, Jung, Yeager and Yagata.
18  A  Well, the reason this person isn't in
19 there is because --
20  Q  I'm not -- that's not my question.
21  A  I want to explain.
22  Q  That's not my question.
23  A  It's duplicative of -- she doesn't have
24 any new data. It's a review article. And I already
25 have all the original articles. So there is -- no,

Page 578

1 I don't have this in my table. That's correct.
2  Q  Okay. Can I just get the clean Q and A?
3     The articles written by Crown, Berglund,
4 Jung, Yeager and Yagata are not cited in Table 2 of
5 your report, correct?
6  A  That is correct. But I'm also prepared to
7 go over each and every one of these articles because
8 I have read them. They were provided to me
9 presumably because you thought they were relevant,
10 and so I did take the time to read them, and I did
11 carefully consider them, and I'm able to comment on
12 them. So I'm happy to do that.
13  Q  When were you provided the materials that
14 make up Exhibit No. 19?
15  A  Yesterday, right? I think you provided me
16 Berglund.
17     I mean, they provided these to me before
18 they sent them to you, and I think they were sent to
19 you yesterday.
20     But you had already provided to me -- you
21 had already provided to me the Berglund article on
22 December 7th. You had only provided an English
23 abstract of the Korean article, so I obviously
24 couldn't read that. But they provided me an English
25 translation, and so I did read that.

Page 579

1  Q  Can you pull up Exhibit No. 20 that we
2 marked today?
3  A  Yes.
4  Q  Oh, you've got it right there.
5     And the title of this presentation is
6 "Incidents of permanent alopecia following adjuvant
7 chemotherapy in women with early-stage breast
8 cancer," correct?
9  A  That is correct.
10  Q  And the title of this presentation hit on
11 a couple of the search terms that you used in
12 searching for literature.
13  A  It did, but this did not pull up. I can't
14 tell you why.
15     And just so you know, Exhibit 14 and
16 Exhibit 20 are almost identical. It's the same
17 authors, the same patients.
18  Q  If we look at the results of this
19 presentation, in the middle, it says, "The overall
20 incidence of permanent alopecia for patients
21 receiving docetaxel was 15 percent," correct?
22  A  Yes, in 265 patients. That is correct.
23  Q  Okay. And 3 percent of the docetaxel
24 group experienced grade 2 alopecia, which, on the
25 left-hand side, is identified as severe or total

Page 580

1 hair loss, correct?
2  A  That is correct.
3  Q  And then the next part down, the overall
4 incidence of permanent alopecia for patients
5 receiving anthracyclines was 19 percent, correct?
6  A  Right.
7  Q  And 6 percent of the anthracycline
8 patients experienced grade 2 alopecia, correct?
9  A  Right. And just so --
10  Q  And the overall incidence of permanent
11 alopecia for patients receiving paclitaxel was
12 13 percent, correct?
13  A  I want to comment on --
14  Q  I'm not asking you to comment.
15  A  I know you're not asking me to comment.
16 But as a scientist, I must comment that the arms are
17 disproportionately incredibly different.
18     There's 265 patients on the docetaxel arm.
19 There's 12 patients on the anthracycline and
20 non-taxane arm, and there's 23 patients on the
21 anthracycline and paclitaxel arm.
22     So I'm just saying there's more than a
23 tenfold difference in the numbers of patients. So I
24 want you to be aware of that.
25     MR. KAUFMAN: Move to strike the witness's

```
                                                           Page 581
 1  comment.
 2      Q  Doctor, the overall incidence of permanent
 3  alopecia for patients receiving paclitaxel was
 4  indicated as 13 percent, correct?
 5      A  Right.
 6      Q  And 9 percent of the paclitaxel patients
 7  experienced grade 2 alopecia, correct?
 8      A  So that represents one patient in three
 9  patients.
10      Q  Is that correct?
11      A  Yeah, one patient in three patients is
12  correct.  And the docetaxel is about 39 patients.
13      Q  And based on the data presented by Crown,
14  the highest percentage of grade 2 alopecia is found
15  in the paclitaxel group, correct?
16      A  I don't divorce numbers from percentages.
17  And so to me, it is important how many patients
18  you're actually talking about.
19         So you're talking about -- when you're
20  talking about very small numbers, you're talking
21  about tiny numbers.  When you get to 9 percent of 12
22  patients, you know, you're basically talking about
23  one person.
24      Q  And based on the data presented by Crown,
25  the highest percentage of grade 2 alopecia in this
```

```
                                                           Page 582
 1  study is in the paclitaxel group, correct?
 2      A  Sure, in a small number of patients.
 3         So the other results --
 4      Q  You've answered my question.  Thank you,
 5  Dr. Feigal.
 6      A  Well, I mean, the other important result
 7  is this -- actually, this abstract is very
 8  interesting because it has a dose response for
 9  docetaxel.
10         And it shows that as you go to a higher
11  dose of docetaxel, you have a greater increase and a
12  greater severity of permanent alopecia at the
13  450-milligram-per-meter-squared cumulative dose as
14  compared to 300.
15         So if anything, what I would say is I'd be
16  happy to include this because I think it's very
17  supportive evidence for the increased incidence of
18  alopecia, permanent alopecia, in the
19  docetaxel-containing regimens.
20         MR. KAUFMAN:  Move to strike the
21  nonresponsive portion of the witness's commentary.
22         (Exhibit 24 was marked for identification
23      and is attached hereto.)
24  BY MR. KAUFMAN:
25      Q  I've handed you what's been marked as
```

```
                                                           Page 583
 1  Exhibit No. 24.
 2      A  I don't think I've ever seen this one.
 3      Q  Okay.  And this is by Analee Beisecker and
 4  others.
 5         Do you see that at the top?
 6      A  I do.
 7      Q  And the title is "Side Effects of Adjuvant
 8  Chemotherapy Perceptions of Node-Negative Breast
 9  Cancer in Patients," correct?
10      A  The title is correct.
11      Q  Okay.  And breast cancer was one of your
12  search terms, correct?
13      A  Well, in conjunction with "permanent,
14  persistent, or chronic alopecia."  So I wasn't just
15  looking at breast cancer.  The search terms were
16  "and permanent, persistent" or -- you know, the
17  long-term alopecia.
18      Q  Okay.  And in the summary portion at the
19  very beginning -- one, two, three, four -- five
20  lines down, there's a sentence that starts with
21  "Hair Loss."
22      A  I don't see the adjective "persistent,"
23  permanent," or "irreversible," but I do see a term,
24  "hair loss."
25      Q  Okay.  It says, "Hair loss, fatigue,
```

```
                                                           Page 584
 1  treatment-related problems, nausea and infections,
 2  low blood counts were the most frequently described
 3  problems during the first interviews.  Patients used
 4  coping strategies suggested by physicians and
 5  nurses.  Six months later, hair problems, fatigue,
 6  weight gain, menopausal problems, emotional
 7  problems, and nail problems were the most often
 8  reported."
 9         Did I read that correctly?
10      A  You did, but I don't see anything in here
11  about permanent, persistent or irreversible hair
12  loss.
13         MR. THORNTON:  Objection.  Form.
14         Do you want her to read this article so
15  she can --
16         THE WITNESS:  I mean, I've never seen this
17  article before.
18         MR. THORNTON:  -- comment about it?
19         MR. KAUFMAN:  Sure.  We'll go off the
20  record.
21         THE VIDEO OPERATOR:  Do you want to go
22  off?
23         MR. THORNTON:  Yes.
24         THE VIDEO OPERATOR:  Okay.  Going off the
25  record, the time is 4:26.
```

| | |
|---|---|
| Page 585<br>1  (Recess, 4:26 p.m. - 4:40 p.m.)<br>2  THE VIDEO OPERATOR: Back on the record.<br>3  The time is 4:40.<br>4  BY MR. KAUFMAN:<br>5  Q  Dr. Feigal, we were talking about Exhibit<br>6  No. 24 when we went off the record, correct?<br>7  A  Correct.<br>8  Q  And you've had a chance to review it?<br>9  A  I now have briefly reviewed it.<br>10  Q  Okay. And I'd like to point your<br>11  attention to Table 1 on page 3. And at the bottom<br>12  of Table 1, it lists the chemotherapy regimens that<br>13  were given to the patients as part of this article.<br>14  A  Yes.<br>15  Q  Okay. And those regimens are CMF, CAF,<br>16  and FuVMiC, correct?<br>17  A  Um-hum.<br>18  Q  And none of those involve taxanes; is that<br>19  right?<br>20  A  That is correct.<br>21  Q  The study did involve regimens involving<br>22  Cytoxan and Adriamycin; is that right?<br>23  A  Yes. They gave the percentages of the 21<br>24  patients who received those.<br>25  Q  Okay. And if we turn to Table 2 on | Page 587<br>1  Q  Okay. And you would agree with me that<br>2  the Beisecker study is not listed in Table 2 of your<br>3  report, correct?<br>4  A  I report -- I agree, but I don't see the<br>5  terms "permanent," "irreversible," or -- I don't see<br>6  any of those terms in this paper.<br>7  And actually, if you look at the results<br>8  where it talks about side effects experienced on<br>9  page 88, it says, at time two, the side effects<br>10  associated with their hair, they talked about it<br>11  being a different color, a different texture. It<br>12  was uneven.<br>13  So I don't see anything related to the<br>14  permanency and the lack of growth of their hair<br>15  anywhere in this article.<br>16  Q  Move to strike everything after "I agree"<br>17  as nonresponsive.<br>18  During a break, Dr. Feigal, you kindly<br>19  agreed to tally up some of the numbers from your<br>20  invoices.<br>21  Do you remember?<br>22  A  Yes.<br>23  Q  Okay. And what was the total number that<br>24  you calculated that you and NDA Partners combined<br>25  have made from your role as an expert in the |
| Page 586<br>1  page 6 -- two pages later -- are you with me, Table<br>2  2?<br>3  A  Page 89. Yeah.<br>4  Q  Table 2 is entitled "Side Effects Reported<br>5  in Order of Frequency," correct?<br>6  A  Um-hum.<br>7  Q  And the first one -- the first side effect<br>8  listed is "Hair loss/regrowth," correct?<br>9  A  Correct. It's, slash, regrowth.<br>10  Q  And immediately post-chemotherapy group<br>11  had 21 patients that were considered, and the<br>12  frequency is shown as 20 of the 21 reported side<br>13  effects with respect to hair loss/regrowth, correct?<br>14  A  That is correct, and I think time one was<br>15  one month.<br>16  Q  Okay. And then there's also a six-month<br>17  group right next to it, correct?<br>18  A  Right. Time two is six months, and, yes,<br>19  the -- I see the frequency for hair loss and hair<br>20  regrowth.<br>21  Q  And there were 18 patients who reported<br>22  side effect issues with respect to hair loss and<br>23  regrowth out of all 18, correct?<br>24  A  Correct. It's a combined term, hair loss<br>25  and hair regrowth. | Page 588<br>1  Taxotere litigation?<br>2  A  Well, just to be clear, it's from November<br>3  of 2017 through November of 2018, and includes my<br>4  time before I became an expert and was a consultant<br>5  for a variety of educational issues.<br>6  But the total for NDA Partners and myself,<br>7  the total amount was 156,112.<br>8  Q  $156,112?<br>9  A  That's correct.<br>10  Q  Okay.<br>11  A  For the entire year.<br>12  Q  For November 2017 to November 2018?<br>13  A  Correct. That's a year.<br>14  Q  And so that number does not include any<br>15  billings or invoices with respect to time that you<br>16  spent in December of 2018 for your first deposition<br>17  and today in January of 2019?<br>18  A  It does not include the December invoice.<br>19  That is correct. And it's too early for a January<br>20  invoice.<br>21  Q  Okay. And your testimony is that NDA<br>22  Partners receives 20 percent of your billings, and<br>23  you personally receive the other 80 percent?<br>24  A  Right, which are subject to taxes, as are<br>25  theirs. |

52 (Pages 585 - 588)