# EXHIBIT S

Page 1

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4                          MDL NO.: 2740

                           SECTION: H

5

6    IN RE: TAXOTERE (DOCETAXEL)

     PRODUCTS LIABILITY LITIGATION

7

8    This Document Relates To:

     Antoinette Durden, Case No. 2:16-cv-16635;

9    Tanya Francis, Case No. 2:16-cv-17410;

     Barbara Earnest, Case No. 2:16-cv-17144.

10   _____/

11

12                     December 7, 2018

                        8:13 a.m.

13

14

15        VIDEOTAPED DEPOSITION of DAVID MADIGAN, PHD,

16   held at the offices of Napoli Shkolnik PLLC, located

17   at 360 Lexington Avenue, New York, New York 10017,

18   before Anthony Giarro, a Registered Professional

19   Reporter, a Certified Realtime Reporter and a Notary

20   Public of the State of New York.

21

22

23

24

25     Job No. NJ3151484

Page 54

1  expert on the different kinds of
2  alopecia?
3      A     No.
4      Q     Do you know if there are
5  different kinds of alopecia?
6      A     No, I don't.
7      Q     Do you know if there are
8  different grades or severities of
9  alopecia?
10     A     That, I had seen reference
11  to. I'm not an expert in this.
12     Q     Do you know what the grades
13  are?
14     A     Actually, some of the things
15  I saw were kind of confusing to me. I
16  had understood it was Grades 1, 2, 3 and
17  4. But I did see a document that says
18  it's only Grades 1 and 2 for alopecia.
19  So I'm actually a little confused on that
20  point.
21     Q     Not something you consider
22  within your area of expertise?
23     A     That's correct.
24     Q     You don't hold yourself out
25  as an expert in the various possible

Page 55

1  causes of alopecia; correct?
2      A     I do not.
3      Q     Or any kind of hair loss for
4  that matter?
5      A     Correct. Correct, I do not,
6  yes.
7      Q     Have you ever designed or
8  been involved in a clinical study where
9  the endpoint was alopecia?
10     A     No.
11     Q     Have you ever designed a
12  clinical study at all?
13     A     Yes.
14     Q     How many times?
15     A     Depends on how you define
16  clinical study. So I've been involved in
17  the design -- if you want to restrict it
18  to randomized control trials, three or
19  four over the years. How did you say? A
20  clinical study was the term you used?
21     Q     Yes.
22     A     If you cast the net more
23  broadly, it's dozens.
24     Q     What would that include?
25  Just give me an example.

Page 56

1      A     Observational studies.
2      Q     Had you ever advised the
3  pharmacovigilance department of any
4  company on any issues related to
5  alopecia?
6      A     Alopecia specifically, no.
7      Q     Have you ever been hired to
8  do any kind of work for Sanofi?
9      A     Yes.
10     Q     What context?
11     A     I'll give you my best
12  recollection. I can't swear this is what
13  it is. I think I did a short course at
14  Sanofi about ten years ago.
15     Q     What do you mean a short
16  course?
17     A     I taught a course on
18  pharmacovigilance.
19     Q     About ten years ago, so
20  approximately 2008? You want your CV?
21     A     Yes, please. You know what,
22  this list, it's not here on my CV because
23  at some point, I -- this list became
24  very, very long.
25     Q     You're on page 30 of

Page 57

1  Exhibit 3?
2      A     Correct. So I just -- I
3  only list the ones like in the last seven
4  or eight years. So therefore, I can't
5  pinpoint the date. But, yeah, 2008 or
6  something like that is about right.
7      Q     Where did you teach -- where
8  do you think you taught that short
9  course?
10     A     Bridgewater.
11     Q     Who is your contact person
12  at Sanofi?
13     A     You know what, I can get it
14  for you at a break. I can't remember off
15  the top of my head. Hui-Kuan.
16     Q     And you said it was a short
17  course in pharmacovigilance?
18     A     That's my memory.
19     Q     What is a short course?
20     A     Like a half-day course to
21  their pharmacovigilance folks or a day.
22  I don't remember exactly. But something
23  like that, not a month or something; just
24  a brief.
25     Q     Did you get paid for this?

15 (Pages 54 - 57)

1    Q    You were gracious enough in
2 your report to identify on page 2, four
3 specific research questions; right?
4    A    Yes.
5    Q    And these are the four
6 things you were asked to investigate or
7 research in this case; correct?
8    A    Correct.
9    Q    We're going to go through
10 each of them pretty much in order.
11    A    Okay.
12    Q    Am I correct these are the
13 only four issues you were asked to
14 investigate or evaluate in this case?
15    A    Yes.
16    Q    You were not asked, for
17 example, to investigate whether docetaxel
18 causes irreversible alopecia?
19    A    Not specifically.  I was
20 asked to address these questions.  Then I
21 have a concluding paragraph at the end,
22 summary at the end of the report.
23    Q    I want to make sure we're
24 clear on that.
25        You did not actually

1 investigate whether docetaxel causes
2 irreversible alopecia?  I know you
3 referenced a conclusion from the 2015
4 clinical overview; right?
5    A    Sure.  And I offered an
6 opinion that I agree with that.
7    Q    We'll come back to that in
8 just a minute.
9        You said I was asked to
10 investigate.  Who asked you to
11 investigate these four issues on page 2
12 of your report?
13    A    Mr. Miceli.
14    Q    Let's talk about the first
15 issue.
16    A    Okay.
17    Q    The question of whether a
18 safety signal existed.
19        MR. MICHELMAN:  Off the
20    record.
21        (A short recess was taken.)
22        THE VIDEOGRAPHER:  We went
23    off the record at 9:32 due to a
24    faulty plug in the conference room.
25    The time now is 9:44.  We are back on

1 the record.
2    Q    Doctor, we left off starting
3 to talk about your specific opinions.
4 And in particular, the first thing you
5 looked at here which is, you investigated
6 whether a safety signal existed; right?
7    A    Yes.
8    Q    In looking at safety signals
9 with drugs -- let me rephrase that.
10        In looking for whether there
11 was a safety signal in this case, the
12 first thing is what's called a
13 disproportionality analysis; right?
14    A    Yes.
15    Q    And that's also known as
16 signal detection; correct?
17    A    It's a statistical analysis.
18    Q    And if a signal is detected,
19 what that means is there's something that
20 may warrant additional investigation;
21 true?
22    A    Yeah.  That's fair enough.
23 The context matters --
24    Q    Sure.
25    A    -- in which the signal

1 arises.  But for sure, yeah, if there's a
2 signal, you certainly want to study it
3 and communicate it.
4    Q    The next step would be
5 signal evaluation; right?
6    A    Yeah.  I mean it's --
7 typically, one looks at several -- at
8 different strands of evidence in
9 considering a specific safety issue.  So
10 FAERS would be -- provides one strand of
11 evidence that the FDA looks at all
12 routinely.
13    Q    You want to figure out
14 whether the disproportionality represents
15 a true positive signal; correct?
16    A    Sure.  You look at other
17 strands of evidence, insofar as they're
18 available.
19    Q    In this case, I know you've
20 done the disproportionality analysis;
21 right?
22    A    That's one of the things I
23 did.
24    Q    Did you do that next step of
25 signal evaluation?

17 (Pages 62 - 65)

1    A    Yes, as far as I looked at
2 other strands of evidence that have a
3 bearing on this safety question.
4    Q    Which other strands of
5 evidence would you say fit into that
6 second category of signal evaluation?
7    A    They all do.  I mean, you
8 know, my entire analysis is evaluating a
9 signal.
10    Q    There's a difference,
11 though, between identifying that a signal
12 exists -- correct? -- and then looking at
13 whether the signal is a positive signal;
14 true?
15    A    So what you're describing is
16 reasonable in a pharmacovigilance context
17 where you're looking very broadly,
18 typically, at many drugs and many
19 outcomes.  So if a signal pops up, you
20 know, out of the blue, you certainly want
21 to go ahead and do an evaluation of that
22 signal.
23        Here, this has a slightly
24 different flavor, as does most of the
25 work that the FDA does in this context,

1 which is -- the context here is a
2 specific safety issue.  So you look at
3 the available strands of evidence that
4 have a bearing that are relevant to that
5 safety question.
6        So the FAERS analysis is one
7 leg of that, looking at the internal
8 database is another leg of it, looking at
9 the randomized trials is another leg,
10 part of that -- dimension to that
11 analysis.
12    Q    Is it fair to say you've
13 combined the signal detection and signal
14 evaluation into one step in this case?
15        MR. MICELI:  Object to the
16    form.
17    A    No.  Maybe yes.  I mean --
18 it's not so much that I combined it into
19 one step as I have looked at three -- in
20 particular in this case, three strands of
21 evidence that have a bearing on this
22 safety question.  One of those is
23 disproportionality analysis and logistic
24 regression which is really not
25 disproportionality.

1    Q    We're going to talk about
2 logistic regression.  I can't wait.  It's
3 going to be a little later.
4        The signal you were looking
5 for in this case relates to docetaxel and
6 irreversible alopecia; right?
7    A    That's correct.
8    Q    We talked a little bit about
9 alopecia a few minutes ago.  Let me ask
10 you a couple of more questions, just to
11 make sure I know where you stand on
12 things.
13        Do you know what
14 androgenetic alopecia is?
15    A    No.  I don't believe I do.
16    Q    Do you know what scarring
17 alopecia is?
18    A    Same answer.  And I could
19 hazard a guess based on those words in
20 each case.  But I don't have any
21 expertise in the ins and outs of
22 different kinds of alopecia.
23    Q    Same answer for traction
24 alopecia?
25    A    Yes.

1    Q    Alopecia areata?
2    A    Yes.
3    Q    I have to read them because
4 they're in my outline.
5        Telogen effluvium?
6    A    I can't give you a
7 definition of that term.
8    Q    Or even broadly what it
9 means?
10    A    Correct.
11    Q    Anagen effluvium?
12    A    Same answer.
13    Q    Centrifugal cicatrical
14 alopecia?
15    A    Same answer.
16    Q    Lichen planopilaris, same
17 answer?
18    A    Same answer.
19    Q    Frontal fribrosing alopecia,
20 same answer?
21    A    Same answer.
22    Q    Fair to say that in your
23 work in this case, none of your
24 methodologies distinguish between those
25 different kinds of alopecia?

1    A     That's fair enough, insofar
2  as they are different kinds of alopecia,
3  actually, I should add.
4    Q     Fair enough.
5          The methodology you've
6  employed in this case assumes that all
7  different types of alopecia are grouped
8  together as one disease; true?
9          MR. MICELI:  Object to the
10   form.
11   A     So I look at -- I look at an
12 endpoint which is, you know, in the case
13 of the FAERS analysis, it's the MedDRA
14 higher-term alopecias.  That's what I
15 looked at.  That's what the company used
16 internally.  And I checked with
17 Dr. Kessler that that was a reasonable
18 endpoint to use in that context.  So
19 that's what I looked at.
20   Q     But to the extent there are
21 different kinds of alopecia out there,
22 the methodology you have applied in this
23 case doesn't take that into account;
24 correct?
25   A     Fair enough, insofar as

1  there are different kinds of alopecia.
2  I'm not slicing and dicing it by those
3  types.  I'm doing an analysis of
4  particular endpoints as specified in my
5  report.
6    Q     By the same token, whether
7  an individual patient has 1 percent hair
8  loss or 100 percent hair loss, does your
9  methodology in this case distinguish
10 between those individuals in any way?
11         MR. MICELI:  Object to the
12   form.
13   A     Same answer.  You know, I'm
14 studying specific endpoints in each of
15 the three analysis I do.  It is what it
16 is.
17   Q     So the answer would be no,
18 the methodology does not account for any
19 differences between 1 percent hair loss
20 and 100 percent hair loss?
21         MR. MICELI:  Object to the
22   form.
23   A     I don't distinguish
24 different types of alopecia.  It's
25 crystal clear what I did.

1    Q     Or different severities of
2  alopecia?
3          MR. MICELI:  Objection.
4    A     Yeah, that's correct.  My
5  analysis does not separate out or get
6  into different degrees of severity.
7    Q     The methodology you've
8  applied in this case also doesn't
9  distinguish between patients who were
10 given a medical diagnosis of alopecia and
11 those who were self-diagnosed; correct?
12         MR. MICELI:  You're talking
13   about just the disproportionality
14   analysis?
15         MR. MICHELMAN:  Any
16   analysis.
17         MR. MICELI:  Then object to
18   the form.
19   A     I'm not sure what you mean
20 by medical diagnosis.  You mean a
21 diagnosis by a medical professional?
22   Q     Yes.  Thank you.  Let's make
23 sure that's clear.
24         We're talking in this case
25 about spontaneous reporting systems;

1  right?
2          MR. MICELI:  Object to the
3    form.
4          MR. MICHELMAN:  Thank you.
5    Q     Let me make sure I'm clear
6  about one thing, Doctor.  I never intend
7  to cut you off.  And I realized I did
8  just put up my hand and stopped you from
9  talking.  I never intend to prevent you
10 from finishing an answer.  I was just
11 going to clarify what I meant.
12         So if you feel that you do
13 need to continue answering, please don't
14 ever feel like you can't just tell me.
15 And I apologize if I seemed rude in doing
16 that.
17   A     No.  That's fine.
18   Q     Let's focus right now on
19 FAERS analysis.
20   A     Okay.
21   Q     In the FAERS analysis, your
22 work -- your methodology is based on data
23 that comes from the spontaneous reporting
24 system?
25   A     Correct.

19 (Pages 70 - 73)

1  matter of fact, my analysis is stratified
2  by age, sex and year of report.  So that,
3  I could have done.  But it's not
4  something I said, you know, should I do
5  that.  No, I won't do it.  I never
6  considered doing that.  The breast
7  cancer, maybe, maybe not.  So there's an
8  indication field in the MedWatch form.
9  But it's quite incomplete.  So it's
10 tricky.
11    Q    Do the 31 reports include
12 patients outside the U.S.?
13    A    Could do.  I don't know.
14 They can do.
15    Q    You mentioned the program,
16 this customized program that you wrote:
17 CHIPT5F.PL?
18    A    PL.
19    Q    You couldn't have picked a
20 better, easier --
21    A    No.  It's beautiful.
22    Q    Does it stand for something?
23    A    No.
24    Q    That's a program that you
25 wrote that reaches out and analyzes data

1  from FAERS?
2    A    That's correct.
3    Q    How do you access the FAERS
4  data?
5    A    So I have extracted the
6  FAERS data out of the DrugLogic QSCAN
7  system.  And that's proprietary to
8  DrugLogic, yeah.  Let me just leave it at
9  that.  That's the data I analyzed.
10    Q    Was that data as of a
11 particular date?
12    A    End of 2017.
13    Q    From inception through end
14 of 2017?
15    A    That's right.  I think it's
16 1969, if my memory serves me right.
17    Q    Which certainly predates
18 taxotere?
19    A    Indeed.
20    Q    You said you never
21 considered limiting your analysis to
22 women; right?
23    A    That's right.
24    Q    You agree in a case like
25 this, that would be something that would

1  be important to know --
2        MR. MICELI:  Object to the
3    form.
4    Q    -- whether the effect was
5  the same on women versus men?
6    A    I really have no opinion.  I
7  was asked to address certain questions.
8  I addressed it.  This is the only
9  analysis I did.
10    Q    Nobody helped you perform
11 the actual analysis; right?
12    A    Correct, no.  I did it
13 myself.
14        MR. MICHELMAN:  We took a
15    couple of short breaks earlier for
16    the technical issues.  Do you want to
17    keep going?
18        MR. MICELI:  I was going to
19    suggest in about five minutes, we
20    take a break only because we ordered
21    lunch for you.  And I think it's
22    going to be here around noon.  So I
23    wanted to set it up to where we're
24    finishing the next session around
25    noon.  So if you want to go five more

1    minutes or so and take a ten-minute
2    break and come back.
3        MR. MICHELMAN:  Is that okay
4    with you, Doctor?
5        THE WITNESS:  I'm good.
6    Q    You ran your analysis using
7  your customized program?
8    A    Right.
9    Q    And it generated results;
10 right?
11    A    It did.
12    Q    How did you see those
13 results?  What did they look like?
14    A    They looked like exactly
15 what you're looking at.
16    Q    Exhibit 14?
17    A    Exhibit 14.
18    Q    Is your customized software
19 capable of identifying manufacturer
20 control numbers within reports in the
21 FAERS system?
22    A    Capable of -- sure.
23    Q    Is your customized software
24 capable of identifying FAERS case ID
25 numbers in the database?

30 (Pages 114 - 117)

1     A     Yes.  Maybe I should
2  clarify.  So the version of the FAERS
3  database that I have extracted from
4  DrugLogic, there's a roll for every
5  report in the FAERS database, six million
6  or whatever the number is.  And there's a
7  bunch of columns in each one of those.
8  One of those is the manufacturer control
9  numbers, if it's there.  And the other is
10  the case ID.  But I don't look at them.
11     Q     Why not?
12     A     Why would I?  I'm doing a
13  statistical analysis here.
14     Q     Your analysis tells you
15  there are 31 reports set out as you had
16  them in Exhibit 14; right?
17     A     Yes.
18     Q     For taxotere?
19     A     Right.
20     Q     What's contained in any
21  individual one of those reports other
22  than your required criteria, you have no
23  idea?
24     A     Sitting here this minute, I
25  have no idea.  I can find out.

1     Q     How would you find out?
2     A     I'd go back and change my
3  program and have it print out.  If you
4  want manufacturer's control number, the
5  other fields, it's there.  I can get it.
6  I don't have it.  And I didn't generate
7  it.
8     Q     You could get the line item
9  reports?
10     A     I could, absolutely.
11     Q     And you said you could get
12  the manufacturer control numbers and the
13  FAERS IDs?
14     A     I can.
15     Q     And that would allow you to
16  look at the substance of the underlying
17  reports; right?
18     A     How so?  I don't understand.
19  I'm not supposed to ask questions.  I
20  don't understand.
21     Q     That's all right.
22         Do you know any way using a
23  manufacturer ID number you could obtain
24  the actual adverse event report for that
25  number?

1     A     Sure.  You could do a FOIA
2  request and get the report.  I'm a
3  statistician.  This is way outside my
4  bailiwick.
5     Q     If you had wanted to see
6  what was in these 31 reports, you know
7  how you could have done that; right?
8     A     Careful here.  I mean I have
9  the information I need to do my analysis.
10  I have many, many fields from FAERS -- in
11  the FAERS database that I have.  I use a
12  subset of those fields to do my analysis.
13  They are completely adequate for what I
14  am doing in this context.
15         If I wanted to access the
16  narrative, which I don't, particularly, I
17  would have to issue a FOIA request to get
18  those.  It's the antithese of what I'm
19  doing because here, this is a
20  disproportionality analysis.  If I was to
21  do something with narratives, I'd have to
22  get the narratives for all the reports,
23  not on taxotere, and all the reports that
24  don't hit on my endpoint.
25         So I need every -- if I was

1  to do something with narratives, which is
2  not what I'm doing here, I need -- I
3  wouldn't just need the 31.  I can't do
4  anything with the 31.  I'd need the whole
5  six million.  And even then, I don't
6  exactly know what I'd do other than what
7  I'm doing here, Appendix 4.
8     Q     Thank you for that.
9     A     Okay.
10         MR. MICHELMAN:  Could you
11  read back the question?
12         (The requested portion was
13  read back by the court reporter.)
14     A     Yeah.  And I suppose --
15         MR. MICELI:  Do you want him
16  to answer it again?  He clicked back
17  through a number of pages.
18         MR. MICHELMAN:  Actually, I
19  do want him to answer that question.
20         MR. MICELI:  Then I'll
21  object because I think he did answer
22  it.
23     A     So I believe I have just
24  about -- what I'm stumbling over is just
25  the way you kind of phrased the question.

1    Q    One of them is 31?
2    A    One of them is 31.  But then
3 there's all the other ones.
4    Q    We're going to get there.
5    A    No --
6         MR. MICELI:  Objection.  You
7    have to let him answer the question,
8    please.
9    A    You're suggesting that I
10 could have pulled -- correct me if I'm
11 wrong.  You're suggesting I could have
12 pulled the 31 narratives.  And based for
13 the 31 that are -- there's taxotere
14 listed as a drug.  And they hit on the
15 endpoint as we've been describing.  And I
16 could have gotten the narratives for
17 those.  And maybe -- I don't know.
18 Actually, we might get some insight into
19 temporal questions that you're
20 requesting.  So that's true.  I don't
21 disagree with that.
22         But if you're to do a
23 disproportionality analysis, you can't
24 just do that for taxotere.  You've got to
25 do that for the background as well.  So

1 you have to look at -- for this to be
2 meaningful and non-biased, you would have
3 to do that for every report in the
4 database.
5    Q    Clearly not something you've
6 done?
7    A    No.
8         MR. MICHELMAN:  Let's take a
9    break.
10         THE VIDEOGRAPHER:  Thank
11    you.  The time now is 11:01.  We're
12    going off the record.
13         (A short recess was taken.)
14         THE VIDEOGRAPHER:  The time
15    now is approximately 11:15.  We're
16    back on the record.  This is the
17    beginning of Media 3.
18    Q    Doctor, in Exhibit 14,
19 Appendix 4, there's the column where
20 you're tracking the number of reports;
21 right?
22    A    Yup.
23    Q    And it's cumulative, year
24 over year, quarter over quarter?
25    A    Yes.

1    Q    And all the way up through
2 2011, there are a total of how many
3 reports?
4    A    Through the end of 2011,
5 there are 11 reports with the drug
6 docetaxel.
7    Q    So 11 reports over at least
8 11 years; right?
9    A    Yes.
10    Q    In 2012, you've identified
11 six reports in that year alone; right?
12    A    Yes.
13    Q    If you were looking for
14 reasons why there'd be an increase like
15 that in 2012, one of those reasons would
16 be stimulated reporting; correct?
17         MR. MICELI:  Object to the
18    form.
19    A    That's certainly not what I
20 would look to first.  First of all, it's
21 not particularly remarkable.  It could
22 depend -- I don't know about the usage of
23 the drug, whether that was going up,
24 going down.  And it could also be to do
25 with latency.  So there are -- it is what

1 it is.  There's nothing remarkable about
2 the fact there were six reports in one
3 year.
4    Q    Even if there was an average
5 of one a year before then?
6    A    Yeah.  There's a randomness
7 to the flow of reports into the agency,
8 to the timing of the reports and so on.
9 So I don't find that remarkable at all.
10    Q    Did you look into what, if
11 anything, might have stimulated
12 artificially increased reports in 2012?
13         MR. MICELI:  Object to the
14    form.
15    A    My analysis doesn't go
16 there.  My analysis has nothing to do
17 with the timing of the reports coming
18 into the FDA.  It's simply, had you
19 analyzed the FAERS database in a
20 particular moment in time, here's what
21 you would have found.
22    Q    Just to close this out, in
23 2016, you've identified five reports in
24 that year -- right? -- for taxotere?
25    A    So it seems.

34 (Pages 130 - 133)

Page 158

1    A    Maybe for Dr. Kessler,
2  Dr. Tosti.  In my case, I consulted with
3  Dr. Kessler as to the reasonableness of
4  this endpoint.  I mean the kind of
5  analysis that I'm doing here, this
6  quantitative analysis is completely
7  standard.  These are done routinely by
8  all the pharma companies, by the FDA, by
9  regulators around the world.  They have
10  their limitations.  But people find them
11  useful.
12    Q    The disproportionality
13  analysis is what you're talking about?
14    A    Yes.
15    Q    But the analysis starts with
16  how am I going to reach out in the
17  database and gather my information;
18  right?
19        MR. MICELI:  Object to the
20    form.
21    A    So it begins with defining
22  an exposure and an outcome.  And then to
23  actually do the analysis, you need to be
24  precise about both of those things.  And
25  that's what I did.  And, you know, the

Page 159

1  particular endpoint I used seemed
2  reasonable to me.
3        But I ran it by Dr. Kessler,
4  who is focused on irreversible alopecia.
5  And I'm relying on him to say that is a
6  reasonable analysis to do in this
7  context.  And he didn't come up with a
8  better one; a better endpoint, I should
9  say.
10    Q    You agree, Doctor, that the
11  definition that you have used and the way
12  you've used it, to analyze the FAERS
13  database will likely include reports --
14  let me rephrase that.
15        You agree that the
16  definition you've used, the way you've
17  analyzed the FAERS database may include
18  reports of individuals whose alopecia
19  resolved?
20        MR. MICELI:  Object to the
21    form.
22    A    You asked, is it likely.  I
23  wouldn't absolutely not go so far.  Could
24  that happen?  Sure, that could happen.
25  And it could happen that there are lots

Page 160

1  of people who had irreversible alopecia
2  on taxotere whose report never made it
3  into FAERS.  It cuts both ways.
4    Q    Why do you say it say it
5  happen, but it's not likely that there
6  would be a report where the individual
7  alopecia actually resolved?
8    A    I have no basis for that.  I
9  don't know whether it's likely or not.  I
10  wouldn't know.
11    Q    You said it's not likely.
12    A    No.  Sorry.  I apologize if
13  I said that.  You said do I agree with
14  the position if it's likely that.  And I
15  don't agree with that position.  I don't
16  have an opinion.  Could it happen?  Yes,
17  it could happen.
18    Q    Is that because there is an
19  imperfect fit between the way you have
20  decided to analyze the database and what
21  irreversible alopecia means to an
22  individual patient?
23        MR. MICELI:  Object to the
24    form.
25    A    I wouldn't go so far to say

Page 161

1  it's an imperfect fit; you know, we have
2  a primary -- we're looking at a primary
3  data source for drug safety here that's
4  used, you know, hundreds, thousands of
5  times a year by regulators and by pharma
6  companies and so on.
7        This is -- I'm conducting a
8  quantitative analysis that is also done
9  routinely over and over and over again.
10  You choose -- you define the exposure,
11  you define the outcome.  And the rest of
12  it is math, so to speak, or statistics;
13  you know, the practice I followed here is
14  the same practice I follow over and over
15  in other contexts, which is I consulted,
16  you know, Dr. Kessler about the nature of
17  the endpoint.
18    Q    If you had defined a
19  different exposure, you would likely get
20  different results; right?
21    A    Different exposure, meaning
22  a different drug?
23    Q    Well, you said you defined
24  an exposure and you defined an outcome?
25    A    Yeah.  The exposure's

41 (Pages 158 - 161)

Page 166

1  sit here today, that this report,
2  Exhibit 17, was, in fact, one of the 31
3  that your analysis identified; right?
4      A      Right.  I can't be certain
5  that it was sent to the FDA.  I can't be
6  certain that it's in the FAERS database.
7  And I can't be certain that it was coded
8  to a MedDRA term in the HLT.  Probably
9  was but can't be certain.
10     Q      Anything about this form
11 that suggests to you it would not have
12 been in the FAERS database?
13         MR. MICELI:  Object to the
14     form.
15     A      There wouldn't be anything.
16     Q      Assume this report is one of
17 the 31 your analysis identified --
18     A      Okay.
19     Q      -- how does this report
20 support your methodology for identifying
21 cases of irreversible alopecia?
22         MR. MICELI:  Object to the
23     form.
24     A      How does it support my
25 methodology?  If your assumptions are

Page 167

1  correct and this report is, indeed, in
2  FAERS and if it is coded to alopecia, the
3  MedDRA term, then I would have -- because
4  it has an outcome -- because it is
5  alopecia and because it has the
6  appropriate outcome box checked, I would
7  include this in my analysis.
8      Q      Let me ask that question a
9  little differently.
10         Assuming this is one of your
11 31, granting Mr. Miceli the same
12 objection, how does a report like this
13 support your determination that the way
14 to find instances of irreversible
15 alopecia in FAERS is by looking for
16 alopecia, plus disability or permanent
17 damage?
18         MR. MICELI:  Object to the
19     form.
20     A      It doesn't support my way of
21 determining.  My way of determining is my
22 way of determining.  And then these are
23 the reports that -- given the
24 assumptions, it identifies reports like
25 this one.  That's -- so it doesn't

Page 168

1  support the choice of the endpoint in the
2  first place.
3      Q      Looking at a report like
4  this or even the one we just saw, does it
5  cause you to question at all whether you
6  did the right FAERS analysis?
7          MR. MICELI:  Object to the
8      form.
9      Q      And by that, I mean
10 identifying irreversible alopecia as
11 higher-level term of alopecia, plus
12 outcome of disability or permanent
13 damage.
14     A      No, not one bit.
15     Q      We talked about this on the
16 last one.  Let me ask a couple of quick
17 questions.
18         We have a single outcome,
19 multiple adverse events; right?
20     A      Sorry.  We're still on 17?
21     Q      Yes.
22     A      A single outcome box is
23 checked.  And, yes, there appear to be
24 several adverse events, yes.
25     Q      Your methodology in this

Page 169

1  case assumes that the reporter intended
2  the checked box, persistence of
3  disability or incapacity, to relate to
4  alopecia?
5          MR. MICELI:  Object to the
6      form of the question.
7      A      I'm not assuming that this
8  outcome box pertains to a particular
9  reaction.  It pertains to the report in
10 general.
11     Q      If the reporter intended
12 that checked box to apply very
13 specifically to something other than
14 alopecia, this report would still be
15 included in your results?
16         MR. MICELI:  Same objection.
17     A      Well, I think you're asking
18 me to speculate about the mind of the
19 reporter.
20     Q      No.  I'm asking you to
21 assume --
22         MR. MICELI:  Let's not talk
23     over each other.
24     A      I think I'm going to repeat
25 myself, though.

43 (Pages 166 - 169)

1 looking at Sanofi's internal safety
2 database.
3     A     Okay.
4     Q     Here, you're still trying to
5 identify all reports of irreversible
6 alopecia and docetaxel users; right?
7     A     Yes.  I got a little
8 distracted there.  You asked me this
9 morning if I heard of Dr. Hangai.  I
10 forgot.  I have seen a report offered by
11 Dr. Hangai.  It's referenced in
12 paragraph 45.
13     Q     The 2015 clinical overview?
14     A     Yes.
15     Q     But you have not reviewed
16 her deposition?
17     A     Oh.  Maybe that's what you
18 asked me this morning.  No.  I have not
19 reviewed her deposition.
20     Q     You've identified the search
21 terms that you used to search Sanofi's
22 internal database; right?
23     A     I have, yes.
24     Q     You've listed them on pages
25 16 and 17 of your report?

1     A     Well and Appendix 5, yes.
2     Q     Well, isn't Appendix 5 just
3 the program that incorporates the search
4 terms from pages 16 and 17?
5     A     More or less, it includes --
6 what's in the appendix includes I think
7 what I call linguistic variants on these
8 terms.
9     Q     Do you know Dr. Tosti?
10     A     No.
11     Q     Had you met her or spoken
12 with her before this case?
13     A     No.
14     Q     And you didn't speak
15 directly with her; correct?
16     A     Correct.
17     Q     Did you make a request of
18 Dr. Tosti?
19     A     Yes.
20     Q     What was that request?
21     A     So I was asked to review
22 Sanofi's internal global
23 pharmacovigilance database in relation to
24 this question.  So if I am to do such an
25 analysis, I need a list of terms to

1 search for.
2         And so I said to counsel,
3 whomever the appropriate expert is in
4 this case, can you have them provide me
5 at least a list of terms to search for
6 that capture irreversible alopecia in
7 narratives.  By contrast with my FAERS
8 analysis, we're looking at codes.  Here,
9 I'm looking at narratives.
10     Q     Do you consider all the
11 terms, the search terms to be synonymous
12 with irreversible alopecia?
13     A     I don't have an opinion
14 about this.  These are the terms that
15 were provided by Dr. Tosti and the
16 analysis is the -- the results that you
17 get if you use those search terms.
18     Q     Do you have any reason to
19 believe that Dr. Tosti considered all
20 those terms to be synonyms for
21 irreversible alopecia?
22     A     You'd have to ask Dr. Tosti
23 or Dr. Fiegal or Dr. Plunkett who
24 reviewed these also.
25     Q     Why didn't you search

1 Sanofi's internal database using the same
2 definition of irreversible alopecia used
3 for the FAERS database?
4     A     So there isn't an equivalent
5 outcome according to that database, yeah.
6 That's it, actually.
7     Q     So you had to come up with a
8 different way to search for the same
9 disease endpoint?
10     A     Fair enough, yes.
11     Q     And the way you came up with
12 the search is by using the terms
13 Dr. Tosti provided?
14     A     Yes.
15     Q     Was there any time
16 limitation to the search?
17     A     No.
18     Q     The search you performed,
19 did your search look for these terms,
20 plus linguistic variations anywhere in
21 the narrative of the database?
22     A     Yeah.  Report by report,
23 yes.
24     Q     If a report contained two of
25 the search terms, did that record get

57 (Pages 222 - 225)

Page 226

1  counted twice in your Table 4?
2      A      No.
3      Q      How did you exclude it from
4  being counted twice?
5      A      There's an ID associated
6  with each report.  I'm counting IDs here.
7  Each one only gets counted once, at most
8  once.
9      Q      You have an ID for each of
10 the 291 reports you identified in
11 Table 4?
12             MR. MICELI:  Object to the
13     form.
14     A      I don't.  But my program
15 doesn't spit it out.  But it could.
16     Q      But you looked at the IDs?
17     A      No, never.  My program looks
18 at them.
19     Q      And this is a program you've
20 provided us?
21     A      Yes.  That's the program:
22 Tosti F.PL.
23     Q      How did your program
24 determine that these terms were being
25 used in connection with alopecia?

Page 227

1      A      So the -- it's restricted to
2  reports of alopecia.  So I'm looking
3  in -- in the SITS database.  So the SITS
4  database contains 2,000 plus reports that
5  the company identified as cases of
6  alopecia, using the higher-level term,
7  the MedDRA term that I used for my FAERS
8  analysis.
9             So they identified -- is the
10 number here?  No.  We could -- if we
11 looked at the file, we could figure it
12 out very quickly.  But it's 2,000 plus
13 reports of alopecia in their internal
14 database that were extracted from their
15 central pharmacovigilance database and
16 put in this SITS database.  2,179,
17 actually, I think is the number.  That
18 was my starting point.  And then these --
19 these searches are intended to try and
20 zero in on the irreversible ones.
21     Q      If a record -- if a report
22 mentions alopecia as a higher-level term
23 and anywhere in the report one of these
24 search terms occurs, that report gets
25 counted in your Table 4?

Page 228

1      A      That's right.
2      Q      Did you or anyone look at
3  any of the individual narratives to
4  determine whether the search term
5  actually described the alopecia?
6      A      I didn't.  I just ran the
7  analysis with -- you know, with these
8  terms.  And the code is in the appendix.
9  You can see exactly what I did.
10     Q      So if there's a report with
11 a higher-level term of alopecia and in
12 the narrative, there's a comment that
13 this individual's headache is permanent,
14 that report would be counted as one of
15 your 291 in Table 4?
16     A      I suppose that could happen.
17 I don't know.
18     Q      If the report has a
19 higher-level term of alopecia and the
20 narrative describes the individual having
21 chronic back pain, that report would be
22 counted and included in your Table 4?
23             MR. MICELI:  Object to the
24     form.
25     A      You know, I don't know if

Page 229

1  that ever happened.  That could happen.
2      Q      The methodology you used to
3  search wouldn't prevent that from
4  happening?
5      A      That's true.
6      Q      I want to understand
7  something about how you did this
8  searching.
9             And I understand that you
10 through counsel have provided us several
11 different databases.  And there was some
12 back-and-forth on that.
13     A      On the stick -- the data
14 files that were used for this analysis
15 are on the thumb drive.
16     Q      You performed this search on
17 Sanofi's database using the PERL script
18 that you wrote?
19     A      Right.
20     Q      There was a master data file
21 that had all events, 38,000-some-odd
22 records.
23     A      If you say so.  Okay.
24     Q      And your report ultimately
25 discusses 291 or includes 291 of them?

58 (Pages 226 - 229)

Page 242

1 right or wrong.
2     Q     Same question about the data
3 set or the analysis, the 2015 clinical
4 overview.
5         Are you offering any
6 criticisms of either one, the 2015
7 clinical overview --
8     A     Sorry.  Either one?
9     Q     Let me ask it separately.
10        You're not offering any
11 criticisms of Dr. Hangai's data set that
12 she uses in the 2015 clinical overview?
13    A     So you asked me that before.
14 I'm a little bit uncomfortable.  I'm not
15 offering any criticism of -- she
16 identified 142 reports.  The database --
17    Q     Dr. Palatinski or
18 Dr. Hangai?
19    A     I beg your pardon, yeah.
20 Okay.  117 in the case of Dr. Hangai.
21 I'm not offering any criticism of -- I'm
22 not -- I don't have the expertise to
23 offer criticism of her way of defining
24 irreversible alopecia, separating them
25 into irreversible and others.  I'm not

Page 243

1 offering any criticism of that.
2         It's just the way you were
3 phrasing, any criticism of the data.
4 Well, the data are what the data are.
5 It's the reports that are in their data
6 that hit on alopecias.  I'm not
7 criticizing that.  I'm not blessing it
8 either.  It is what it is.
9     Q     On paragraph 46, you start
10 off referencing the conclusion from the
11 2015 clinical overview; right?
12    A     Yes.
13    Q     The cumulative weighted
14 evidence, that quote?
15    A     Yes.
16    Q     You understand that was
17 written by Dr. Hangai?
18    A     I believe that she is the
19 author, maybe not the only author.  But
20 she's an author, certainly of the 2015
21 document.
22    Q     Since you've not read
23 Dr. Hangai's deposition, fair to say you
24 don't know if Dr. Hangai was asked what
25 she meant by that sentence?

Page 244

1     A     I do not.
2     Q     You also don't know if
3 Dr. Hangai explained what she meant by
4 that sentence?
5     A     I don't know.
6     Q     You say the information
7 available to Sanofi at this time was not
8 appreciably different from what was
9 available at the time of the 2011 report.
10 What does that mean?
11    A     I'm not aware of any
12 significant clinical data that, you know,
13 accumulated between those two dates that
14 would have -- would have moved the
15 needles, so to speak, in terms of a
16 causal assessment.
17    Q     In your Table 4, how many
18 reports do you identify between 2011 and
19 2015?
20    A     Middle column, say, I
21 identify 100 -- whatever that is -- 23
22 reports.  They identified fewer, using
23 their definition, as in the number they
24 identified in 2015 was smaller than the
25 number they identified in 2011.

Page 245

1     Q     You know, though, there were
2 separate durational criteria in those
3 clinical overviews?
4     A     I do.
5     Q     Then you say, "My own
6 analysis in Table 4 using Dr. Tosti's
7 definition shows the number of reports of
8 irreversible alopecia surpassed 117
9 sometime in 2010"; right?
10    A     Yup.
11    Q     Of course, you were using
12 different search parameters from
13 Dr. Hangai and Dr. Palatinski; right?
14    A     That's true.
15    Q     As a statistician, what's
16 the significance of a number of reports
17 passing 117?
18    A     You can take away the
19 as-a-statistician.  It's just a number,
20 not a statistical analysis.  The point in
21 2015, looking at 117 reports, Sanofi
22 concluded that there was -- what's the
23 exact phrase? -- sufficient to support a
24 causal association.  And I'm just
25 pointing out that -- a different

62 (Pages 242 - 245)

1  definition.  I agree with you.  You
2  actually get out to 117 five years
3  earlier.
4      Q      Was Sanofi's conclusion in
5  2015 based solely on the number of
6  reports?
7      A      I believe it was based on
8  the number of reports and the clinical
9  trials.  But the clinical trials, the
10  relevant clinical trials had concluded
11  many years earlier.
12      Q      Did the 2015 clinical
13  overview address any medical literature
14  between 2011 and 2015?
15      A      Some case reports, maybe.
16  That's about it.
17      Q      You're not suggesting that
18  the first 117 cases that you have in
19  Table 4 are the same as the 117 cases
20  that Dr. Hangai referenced, are you?
21      A      I don't know.
22      Q      That's not something you've
23  looked at?
24      A      No.
25      Q      Did you do the same kind of

1  database search for any other
2  chemotherapy drugs?
3      A      I only have this database
4  for this one drug.
5      Q      Let's talk about your third
6  research question, analyzing the adverse
7  event rates in the -- call them TAC and
8  FAC arms of the clinical trials.  I guess
9  to be more specific, you title it
10  Irreversible Alopecia in the TACs 301 and
11  the TACs 316 studies.  In paragraph 49,
12  you note that -- let's talk about TAC 316
13  first.
14      A      Okay.
15      Q      You note that a study
16  completion, 29 of the TAC patients had
17  ongoing alopecia compared with 16 of the
18  FAC patients; right?
19      A      Yes.
20      Q      Ongoing alopecia is, in
21  fact, the term that was used in the
22  study; right?
23      A      I think that's right, yeah,
24  in the clinical study report.
25      Q      When a clinical study is

1  going on, investigators could only
2  document what they see with a given
3  adverse event on a given day?  They can't
4  project what's going to happen with an
5  event in the future?
6      A      Generally not.
7      Q      The patient comes in, the
8  investigator can note for alopecia, does
9  patient still have it today or not?
10      A      Fair enough.
11      Q      No idea what's going to
12  happen tomorrow or next week or a year
13  from now?
14      A      That might or might not be
15  true.  If you had your leg amputated
16  today, you ain't coming back tomorrow.
17      Q      Fair enough.
18          But your hair might?
19      A      Maybe.  I don't know if that
20  could be ruled out or not.  I don't know.
21      Q      Whether a particular adverse
22  event like alopecia is measured again
23  depends on whether there's further
24  follow-up with the patient?
25      A      That's fair enough.

1      Q      And did you review the
2  underlying clinical trial data for TAC
3  316?
4      A      Sure.
5      Q      Did you review the case
6  report forms for any of the 29 patients
7  that had -- that determined to be ongoing
8  alopecia?
9      A      No.  I looked at the
10  quantitative data in the SAS data files.
11      Q      Did you review any of the
12  patient narratives for any of the 29
13  patients?
14      A      I didn't.  I wouldn't.  I
15  don't have them.
16      Q      But you agree at a meeting
17  follow-up of ten years, there is not a
18  statistically significant difference
19  between the two arms of TAC 316 as it
20  relates to ongoing alopecia?
21      A      The P value is .053 or
22  something like that.  It is what it is.
23  If you use .05 as a threshold to apply
24  that sort of tag, then it's not
25  statistically significant.  To me, that's

Page 254

1  alopecia?
2      A     I don't know either.  We can
3  call it Fred or Mary.  But the program
4  that I'm referencing here is utterly
5  black-and-white.  That's what I did.
6      Q     You agree that the TAC 316
7  did not look at irreversible alopecia?
8          MR. MICELI:  Object to the
9      form.
10      A     I don't know.  Does that
11  word appear anywhere in those clinical
12  study reports?  I don't know.
13      Q     Let's talk about TAC 301.
14      A     Okay.
15      Q     I believe this is also known
16  as GECAM.
17          MR. MICELI:  It's actually
18      GECAM 9805.  But for the purposes of
19      the deposition, let's say GECAM.
20          MR. MICHELMAN:  In light of
21      that clarification, which I
22      appreciate, let's stick with TAC 301.
23      Q     You say in paragraph 50,
24  "Unfortunately, the trial data failed to
25  explicitly capture either the

Page 255

1  continuation of alopecia into the
2  follow-up phase or alopecia resolution
3  for the majority of patients"; right?
4      A     Yes.
5      Q     Do you view that as a flaw
6  in the study?
7      A     It's more inexplicable to
8  me, you know, why one study, you know,
9  316, you know, records it for many, many
10  patients and follow-up.  And the other
11  one doesn't.  I just don't understand it.
12      Q     You say, "Given that the
13  patients enrolled in TAC 316 and 301 were
14  very similar, I know of no reason for
15  this striking asymmetry between the two
16  studies."  Same concept?
17      A     Yup.
18      Q     Is that a flaw or a problem
19  in the study?
20      A     I'm not going to go there.
21  I just -- it's inexplicable to me.
22      Q     Table 5, I believe you told
23  us is program-generated?
24      A     That's correct.
25      Q     TAC 301, there are three

Page 256

1  patients in the TAC arm and one patient
2  in the FAC arm identified as having
3  ongoing alopecia?
4      A     Using Sanofi's definition,
5  yes.
6      Q     No statistically significant
7  difference between the TAC and FAC arms
8  of TAC 301 as it relates to ongoing
9  alopecia?
10      A     Looking at 301 alone, not at
11  that moment in time, the P value of 0.3,
12  yeah, there's limited.  And the evidence
13  is pointing towards an increased risk.
14  But it's not statistically very
15  impressive.
16      Q     Same question for TAC 301.
17          How did you determine the
18  number of TAC 301 patients that have
19  irreversible alopecia?
20      A     Are you asking something new
21  there or do you want me to repeat what I
22  said before?
23      Q     I think we talked about TAC
24  316.
25          This is specific to TAC 301?

Page 257

1          MR. MICELI:  Why don't we
2      start with a new question.
3      A     I thought TAC 316 was in
4  your preamble there.  I'm confused.
5      Q     I may have misspoke.
6          How did you determine the
7  number of TAC 301 patients that have
8  irreversible alopecia?
9      A     Same answer.  I used the
10  definition that is baked into the logic
11  in that SAS program.
12      Q     Is your conclusion that in
13  TAC 301, three patients in the TAC arm
14  and one arm in the FAC arm had
15  irreversible alopecia?
16      A     So that's what the data
17  show.  But there's an issue there which
18  is I just don't really know what the
19  follow-up -- the alopecia state is -- for
20  the patients in 43 of the 55 study sites,
21  there's nothing there.  So we don't know.
22      Q     Let's go back and ask the
23  same question for TAC 316 then.
24          Is it your conclusion or
25  your assumption that 29 patients in the

65 (Pages 254 - 257)

1    Q      Yes.
2    A      -- 22 months, 6 months --
3  I'm looking at 316 -- 22 weeks, 6 months,
4  12 months, 24 months, 60 months, the P
5  value is below .05 in every one of those
6  cases.  So individually, they are
7  statistically significant.
8    Q      But not of 120 months?
9    A      It's above .05.  So by this
10  conventional definition, it's not
11  statistically significant.
12    Q      And in TAC 301, there's no
13  statistical significance after six
14  months; right?
15    A      That's right.  It's
16  statistically significant at 22 weeks and
17  at 6 months.  And thereafter, the P value
18  is bigger than .05.
19    Q      Why did you decide to use
20  these different time intervals?
21    A      I can't remember.  I think
22  they were given to me.  I think I was
23  asked by counsel.  I'm not certain of
24  that.  The 12 and the 24 are the -- you
25  know, are in those -- the Sanofi reports.

1  I'm not entirely sure whether these were
2  given to me.  It seemed like a reasonable
3  spread of time points to me.  They're the
4  only ones I looked at.  I can tell you
5  that.
6    Q      Let's talk about your
7  summary on page 20.
8          We talked earlier about the
9  quote you include here from Dr. Hangai's
10  2015 clinical overview; right?
11    A      Yes.
12    Q      And we established that you
13  have no information about how Dr. Hangai
14  explains that quote; right?
15    A      That is black-and-white.
16  She said it's sufficient to support a
17  causal association.  I can't imagine how
18  you can interpret -- how you can
19  interpret that any other way than she
20  thinks there's a causal effect.
21    Q      You told us earlier that you
22  agree with that conclusion?
23    A      Yeah.  It's in my report.
24    Q      Fair enough.  You told us
25  earlier, and it's in your report, that

1  you agree with the conclusion.  I'm not
2  asking if you agree with somebody else's
3  conclusion on the issue.
4          What I want to know is, have
5  you independently done the work necessary
6  to form an independent opinion that
7  taxotere causes irreversible alopecia?
8          MR. MICELI:  Object to the
9    form.
10    A      Sure.  I believe it does.  I
11  believe there is a causal effect
12  established here.
13    Q      And the work that you did to
14  establish that taxotere causes
15  irreversible alopecia includes what
16  elements?
17    A      So the analysis from the
18  randomized trials.  So the meta-analysis
19  of the randomized trials and the analysis
20  of the individual trials, the analysis of
21  the FAERS database and my analysis of the
22  internal database.
23    Q      You've done no review of the
24  published medical literature on this
25  issue; right?

1    A      It's my understanding there
2  are only case reports in the literature.
3    Q      Have you reviewed any of
4  those?
5    A      I may have seen them.
6  Individual case reports are not that
7  terribly useful.  When you have
8  randomized clinical trials, case reports
9  are sort of distant, you know, whatever,
10  contributor to any causal assessment.
11    Q      Did you conduct any analysis
12  using the Bradford Hill criteria?
13    A      No.
14    Q      Why not?
15    A      I've never been terribly
16  persuaded by it.  It's not wrong, it's
17  not right.  It's just some set of
18  criteria.  Here, I looked at the
19  available quantitative strands of
20  evidence that I had at my disposal and
21  analyzed all of those that I had in my
22  disposal.
23    Q      Other than telling us you've
24  looked at the FAERS data and whatever
25  else you listed a moment ago, can you

1    form.
2      A      I don't have an opinion on
3    this matter.
4      Q      As long as the individual's
5    alopecia is permanently irreversible, is
6    it then your opinion that taxotere can
7    cause it?
8            MR. MICELI:  Object to the
9    form.
10     A      Yes.
11     Q      But you've done nothing in
12   your analysis to break down the
13   individual types of alopecia to know if
14   that's correct?
15           MR. MICELI:  Same objection.
16     A      I have not.  That last
17   clause, to know if that's correct, I
18   don't want to imply that that is
19   necessary in order for me to arrive at my
20   conclusion.  I don't believe it is.
21     Q      Let me ask you this.
22   Androgenic alopecia, I want
23   you to assume that is a type of alopecia;
24   okay?
25     A      Okay.

1      Q      Assume someone has
2    androgenic alopecia and it's permanent or
3    irreversible, your opinion is that
4    docetaxel can cause permanent or
5    irreversible androgenic alopecia?
6            MR. MICELI:  Object to the
7    form.
8      A      No.  I don't know.  It
9    causes alopecia.  Which type of alopecia
10   it causes, I have not examined whether
11   it's all types, some types.  I don't
12   know.
13     Q      Wouldn't that be important
14   to know?
15           MR. MICELI:  Object to the
16   form.
17     A      It's interesting.  But it's
18   not what I was asked to look at.  I was
19   not asked to differentiate different
20   types of alopecia.
21     Q      I believe I asked this
22   earlier.  I apologize.
23           Do you have an opinion on
24   whether any other chemotherapies do or
25   don't cause irreversible alopecia?

1            MR. MICELI:  Object to the
2    form.
3      A      I do not.
4      Q      You can't rule out other
5    chemotherapies as causes of irreversible
6    alopecia?
7            MR. MICELI:  Object to the
8    form.
9      A      I can't rule out -- I do not
10   know, one way or another, whether other
11   chemotherapy agents cause irreversible
12   alopecia.
13     Q      We talked about the entirety
14   of your opinions as they relate to
15   docetaxel, causing irreversible alopecia.
16   Have we?
17     A      Yes.  I believe we have.
18     Q      You say in your summary that
19   adequate statistical evidence supporting
20   a causal association was available to
21   Sanofi several years earlier; right?
22     A      I say that, yes.
23     Q      And you're saying several
24   years earlier than 2015?
25     A      That's right.

1      Q      What does several mean?
2      A      Sometime in the 2000s, you
3    know, potentially early 2000s.  So I'm
4    primarily focused on the clinical trials.
5            So based on -- I believe the
6    last patient finished treatment in Study
7    316 in 2000 sometime.  So, you know,
8    looking at my analysis in Table 5, you
9    know, there were certainly evidence --
10   you know, if you looked at various points
11   in time, two years, five years after that
12   time, you're going to see an actual
13   effect, a statistically significant
14   effect.
15           But more important to me,
16   you would see a rate ratio around 2,
17   close to 2.  So that plus -- in the FAERS
18   analysis, depending on which metric you
19   used, there are signals emerging back in
20   the early 2000s.  So I'm not -- I'm
21   not -- I did not attempt to pin this down
22   to, you know, 17th of March on such and
23   such a year.  But it's clear there was --
24   there's evidence of a causal effect
25   dating back many, many years.

72 (Pages 282 - 285)

Page 290

1  for example, paclitaxel.
2       And similarly when you're
3  looking at paclitaxel, the background
4  includes taxotere. The background is
5  millions of reports. So it's not --
6  whether you include taxotere in the
7  background or not, it's not going to make
8  a huge amount of difference. The
9  backgrounds are different on every page
10 of Appendix 4 -- excuse me -- every
11 different drug.
12     Q     You told us that in the
13 early 2000s, there was a signal for taxol
14 or paclitaxel; right?
15     A     I don't think we discussed
16 it. But in any event --
17     Q     Let's make sure we're clear
18 on that.
19          When you ran your analysis,
20 you found a signal for paclitaxel or
21 taxol beginning in 2000 and running all
22 the way to approximately 2010?
23     A     So it begins in 2001 Q1.
24 No. I beg your pardon. It begins
25 in 2001 Q3 because you need -- you need a

Page 291

1  PRR of 2, an observe count of 3 and a
2  CHI-square of 4. So that doesn't happen
3  until Q3 2001.
4      Q     Where the CHI-square is
5  13.7?
6      A     Right. And the observe
7  count is 3. The first quarter, it gets
8  to 3.
9      Q     So there's a signal for
10 taxol, beginning in the third quarter
11 of 2001, and the signal remains through
12 when?
13     A     Q4 2003.
14     Q     And then the signal goes
15 away for?
16     A     For some period of time and
17 then reappears --
18     Q     -- about a year; right?
19     A     In Q1 2005.
20     Q     And it remains until?
21     A     Until Q2 2006.
22     Q     And it's back again in 2008;
23 right?
24     A     That's right, from Q4 2008
25 through Q3 -- no. I beg your pardon.

Page 292

1  Through Q3 2009.
2      Q     Since taxol showed a safety
3  signal during all those time periods you
4  just indicated, is it your opinion that
5  taxol causes irreversible alopecia?
6      A     I wouldn't base a causal --
7  I wouldn't draw a causal inference from
8  an analysis of spontaneous reports alone.
9      Q     And with regard to taxol,
10 you didn't look at any other sources of
11 information that would bear on the
12 causation analysis; right?
13     A     That's correct.
14     Q     You're surely not saying
15 that taxol doesn't cause irreversible
16 alopecia?
17          MR. MICELI: Object to the
18 form.
19     A     I'm not offering an opinion
20 any which way.
21     Q     If two years from now the
22 signal for docetaxel goes away, would you
23 still be of the opinion that docetaxel
24 causes irreversible alopecia?
25          MR. MICELI: Object to the

Page 293

1  form.
2      A     Probably. The primary
3  support for my opinion are the randomized
4  trials. So my opinion is strengthened by
5  the FAERS analysis. So it wouldn't be as
6  strong an opinion. Randomized trials are
7  the highest form of evidence that exists.
8      Q     Does your analysis of the
9  clinical trials alone demonstrate that
10 docetaxel causes irreversible alopecia?
11     A     Yeah. I believe it does.
12 It's a question of degree or strength of
13 evidence. The evidence is strengthened
14 by the other strands.
15     Q     Let me make sure I
16 understand your answer. Let me ask the
17 question again.
18          Does your analysis of the
19 clinical trials alone without any other
20 information demonstrate to your
21 satisfaction that docetaxel causes
22 irreversible alopecia?
23     A     Yes.
24     Q     Does your analysis of the
25 FAERS database alone demonstrate that

74 (Pages 290 - 293)

1 docetaxel causes irreversible alopecia?
2    A    No.
3    Q    Does your analysis of the
4 Sanofi internal database alone
5 demonstrate that docetaxel causes
6 irreversible alopecia?
7    A    No.
8    Q    I want you to assume that
9 irreversible alopecia means a patient's
10 hair never came back; okay?
11    A    Okay.
12    Q    If we want to identify
13 patients whose hair never came back after
14 taking docetaxel, you can't tell us how
15 many of those patients are in the FAERS
16 database; right?
17        MR. MICELI:  Object to the
18    form.
19    A    So out there in the world,
20 there exists a population of people who
21 have taken docetaxel.  And at some point
22 in time thereafter, undefined point in
23 time, they don't have hair.  Okay.  It's
24 an undefined point in time.  Okay.
25 There's some population out there if we

1 chose a time point, we could identify
2 that population.  Are all of those people
3 in FAERS?  Surely not.  That's not the
4 nature of a spontaneous reporting system,
5 the voluntary reporting.
6    Q    Clarify it, I'm not asking
7 whether all patients who have that
8 condition are in FAERS.  I'm asking if we
9 wanted -- within FAERS, how many patients
10 are there who took docetaxel and their
11 hair never came back?  Do you know how
12 many patients that is?
13        MR. MICELI:  Object to the
14    form.
15    A    The only handle I have on
16 that is I applied a definition of
17 irreversible alopecia.  And it shows
18 that -- per that definition, by the end
19 of 2017, it's 31 patients.  I don't have
20 a better definition, a better way of
21 implementing the endpoint.
22    Q    Let's go back to Table 5 on
23 page 19 of your report.
24    A    Okay.
25    Q    TAC 316 and TAC 301 studies.

1 Let's look in the TAC arm.
2    A    Okay.
3    Q    At 22 weeks, there are 178
4 ongoing cases of alopecia; right?
5    A    That's correct.
6    Q    By six months, there are
7 only 112; right?
8    A    That's correct.
9    Q    Do you take that to mean
10 that between 22 weeks and 6 months, 66
11 cases of alopecia resolved?
12        MR. MICELI:  Object to the
13    form.
14    A    That's correct.  I mean
15 there are 66 patients on the TAC arm in
16 the SAS data who have a recording in
17 their -- in that time period that their
18 alopecia had resolved.
19    Q    And between 6 months and 12
20 months, another 59 patients of alopecia
21 resolved?
22    A    In the sense we just talked
23 about, yes.
24    Q    Between 12 months and 24
25 months, 17 patients' alopecia resolved;

1 correct?
2    A    Again, in the sense we
3 talked about, yes.
4    Q    Between 24 months and 60
5 months, 5 patients' alopecia resolved?
6    A    That's right.
7    Q    And between 60 months and
8 120 months, 2 patients'
9 resolved?
10    A    Right.  There's an entry in
11 there for two patients that had alopecia.
12 And it resolved sometime in that window.
13    Q    From 22 weeks to 6 months,
14 for the 66 patients whose alopecia
15 resolved, alopecia was not irreversible
16 as to those patients; right?
17        MR. MICELI:  Object to the
18    form.  I don't think I understand
19    your question.  So I'll object to it.
20        MR. MICHELMAN:  Let me ask
21    it again.
22    Q    Between 22 weeks and 6
23 months, 66 patients' alopecia resolved?
24    A    Apparently, yes.  That's
25 according to the SAS data.

75 (Pages 294 - 297)

1  Adriamycin plus something, it would have
2  excluded it?
3        MR. MICELI:  Object to the
4     form.
5     A     I just don't know sitting
6  here this minute.  We could look at the
7  program.  And we'd know.
8     Q     Oh.  The electronic version?
9     A     Right.  It's possible this
10  is a duplicate report.  It's possible --
11  there are other reasons why it might or
12  might not be in the version that I have.
13  I don't know.
14     Q     Duplicate to what?  Is it
15  possible it might be a duplicate?
16     A     Fair enough.  You're right.
17  That doesn't make sense.  I exclude
18  duplicates.  You're right.  But if there
19  was a duplicate, the duplicate would be
20  in there.  So fair enough.
21     Q     Assuming Exhibit 21 or the
22  report that is represented by Exhibit 21
23  was in the FAERS database, it should have
24  been identified by your analysis; yes?
25        MR. MICELI:  Object to the

1     form.
2     A     It's not even should.  It
3  would.  If you look at the code, it's
4  just completely deterministic what I
5  retrieved from the FAERS database.  So
6  either it's not in there, that's one
7  possibility, I can check, or I'm only
8  picking up Adriamycin -- a drug named
9  Adriamycin, not Adriamycin, space, PFS.
10  I'm not sure.
11     Q     Because you say if it were
12  in there, it would pick it up?
13     A     The programs, they're not
14  moody.  It's just completely
15  deterministic what the program does.  And
16  you have the program.
17     Q     All these questions are
18  going to limit my ability to go back to
19  the LASO analysis.
20     A     Okay.
21     Q     Dr. Madigan, you didn't --
22  as part of your work on this case, you
23  didn't look at any other adverse
24  reactions for docetaxel other than
25  alopecia; correct?

1     A     That's right.
2     Q     You didn't assess the
3  efficacy of docetaxel; correct?
4     A     I did not.
5     Q     You didn't assess the safety
6  of docetaxel; correct?
7        MR. MICELI:  Object to the
8     form.
9     A     This is a safety issue.  I
10  looked at one safety issue.
11     Q     A safety signal?
12     A     I looked at a safety issue.
13  I conducted an analysis and focused on a
14  particular safety concern, a safety
15  issue.  I didn't know there was going to
16  be a signal or not until I did the
17  analysis.
18     Q     You did nothing to evaluate
19  the overall risk-benefit profile of
20  docetaxel?
21        MR. MICELI:  Object to the
22     form.
23     A     No.
24     Q     I want to talk about the
25  clinical trials again.

1        Based on the clinical trial
2  data, is it your opinion that FAC causes
3  irreversible alopecia?
4     A     Nope.
5     Q     Why not?
6     A     So what the clinical trial
7  enables us to see or to infer is that
8  TAC, it's a comparative trial.  It
9  compares TAC with FAC.  So it enables us
10  to conclude that TAC causes irreversible
11  alopecia as defined, as we talked about,
12  you know, at a higher rate than FAC.
13        So counterfactually, had you
14  had TAC rather than FAC, you are at
15  higher risk -- for a patient who had FAC
16  had they had TAC, they would have had a
17  higher risk of irreversible alopecia.
18     Q     You say TAC causes
19  irreversible alopecia; correct?
20     A     Yes.
21     Q     TAC is not docetaxel alone;
22  right?
23     A     That's right.
24     Q     If FAC doesn't cause
25  irreversible alopecia, what's your