# EXHIBIT U

Page 1

1              UNITED STATES DISTRICT COURT
2              EASTERN DISTRICT OF LOUISIANA
3
4     IN RE TAXOTERE (DOCETAXEL)        )
      PRODUCTS LIABILITY LITIGATION )  MDL NO. 2740
5                                       )
      THIS DOCUMENT RELATES TO:         )  SECTION: H
6                                       )
      ANTOINETTE DURDEN,                )
7     CASE NO. 2:16-cv-16635            )
      TANYA FRANCIS,                    )
8     CASE NO. 2:16-cv-17410;           )
      BARBARA EARNEST,                  )
9     CASE NO. 2:16-cv-17144            )
                                        )
10    _____)
11
12         VIDEOTAPED DEPOSITION OF ELLEN FEIGEL, M.D.
13                FRIDAY, DECEMBER 7, 2018
14
15
16
17
18    JOB NO. 3151489
19
20    REPORTED BY STEPHANIE J. COHEN,
21    CSR NO. 7920
22
23
24
25    Job No. NJ3151489

Page 30

1  in July would be in preparation -- from July on to
2  now would be preparation of the report for the
3  purposes of her expert testimony.
4       MR. THORNTON:  We will also agree to catch
5  you up.  There's obviously some filling that hasn't
6  been done and I can get that off to you as well.
7       MR. KAUFMAN:  Great.  Thank you.
8  BY MR. KAUFMAN:
9    Q   If you look back at Exhibit 1, we have
10 asked you for you to bring a variety of materials
11 with you today, and I have been provided with an
12 updated version of your expert report and a couple
13 of invoices.
14      Did you bring any other materials with
15 you --
16   A   Counsel did.
17      MR. THORNTON:  Yeah.  I brought all the
18 materials that have been brought, either brought
19 them or sent them in a Dropbox.  I did not have the
20 witness bring anything independently of that.
21 BY MR. KAUFMAN:
22   Q   Okay.  The first one, first item on Page 6
23 basically asked for a copy your curriculum vitae and
24 that has been provided.  Thank you.
25      No. 2 asked for, "A complete set of medical

Page 31

1  and treatment records relating to the medical care
2  or treatment of the plaintiffs that are in your
3  care, custody or control."
4       Is it your understanding those have all
5  been produced?
6    A   I have none.
7    Q   No. 3, "All forms, documents, templates or
8  other generic records that your staff used in
9  treating or evaluating persons with breast cancer or
10 alopecia."
11      Do you have any of those materials?
12   A   I have none.
13   Q   No. 4 we asked for your entire file however
14 described and maintained in connection with this
15 litigation.
16   A   You have that.
17      MR. KAUFMAN:  Counsel, you would affirm
18 that?
19      MR. THORNTON:  Yes.  I have the -- can we
20 truck simultaneously along with the responses that
21 were provided today?
22      MR. KAUFMAN:  Sure.
23      MR. THORNTON:  Okay.  Great.
24      THE WITNESS:  I don't have that exhibit.
25 / / /

Page 32

1       MR. KAUFMAN:  I am just -- plaintiffs'
2  objections to the deposition notice have repeatedly
3  indicated that the file will be produced and I want
4  to make sure I understand what the scope of that
5  file is.
6       MR. THORNTON:  Right.  I understand.  That
7  may be a good inquiry, but it is my understanding,
8  and it's hard to achieve perfection in this world,
9  that we have produced everything in her file to you
10 in that Dropbox.
11 BY MR. KAUFMAN:
12   Q   Okay.  I am just going to keep going
13 through the list.  Let me know if you either have
14 them or if you have provided them to counsel.  We
15 will continue with No. 5.
16      "All documents, things in writing that you
17 considered in forming your opinions including
18 documents that are not listed on your materials
19 consulted."
20      Have you provided all materials you have
21 reviewed or considered to counsel?
22   A   You're on five, not four; is that correct?
23   Q   Five, yes.
24   A   I have provided everything to John, who has
25 provided them to you.

Page 33

1    Q   That would include No. 6 as well, all
2  native versions of any table, figure or spreadsheet
3  that you have reviewed?
4       MR. THORNTON:  Native versions suggests
5  draft, and as you know, those are expressly
6  prohibited by the Federal Rules and those will not
7  be produced.
8  BY MR. KAUFMAN:
9    Q   Otherwise you have provided those to
10 counsel?
11   A   Yeah.  I did not provide any drafts.
12   Q   The list of search terms that you used to
13 identify the literature cited in Table 2, did you
14 provide this to counsel?
15   A   I provided search terms to counsel, who
16 provided them to you, I believe.
17   Q   And those are stated in the objections?
18   A   Yes.
19      MR. THORNTON:  Yes.  Basically just to be
20 clear, there was no maintained record of search
21 terms, but the witness indicated the terms that had
22 been searched at various searches and I put them in
23 the objections.
24 BY MR. KAUFMAN:
25   Q   Dr. Feigel, did you keep a written record

Page 34

1  of your search terms or methodology used in
2  compiling the literature that is maintained in
3  Table 2?
4     A   No.
5     Q   Why not?
6     A   Because I basically -- there are a lot of
7  different searches that are done using different
8  words.  So what I did was I look at the references
9  and I was able to see whether or not by looking at
10 that whether or not it was relevant for the case.
11         I'm sure -- I know oftentimes with searches
12 there is all kinds of extraneous things that are
13 completely irrelevant, so I used my judgment.  I use
14 searches all the time as part of my work.  I have
15 been doing that for 30 years, so I think I know how
16 to use good judgment to pick things that are
17 relevant.
18    Q   So you did not keep a written record of the
19 search terms that you used; is that correct?
20    A   Correct.
21    Q   No. 8, "Documents and printouts of the
22 searches and results that you used to create
23 Table 2."
24    A   I provided the documents I actually
25 reviewed and used.

Page 35

1     Q   When you say documents, you are talking
2  about literature or the studies?
3     A   The literature and the studies.
4     Q   Did you have any printouts of any of
5  searches themselves?
6     A   No.
7     Q   Drafts -- No. 9, "Drafts, notes or previous
8  versions of your records regarding plaintiffs in
9  this litigation."  Noting plaintiffs' objection --
10        MR. THORNTON:  Right.
11        THE WITNESS:  So, no, I did not provide any
12 drafts.
13 BY MR. KAUFMAN:
14    Q   "Any and all templates or forms that you
15 created or were provided that you reviewed or
16 considered in preparing your report."
17    A   I was not provided any templates and I did
18 not use any templates.
19    Q   Number 11, "Any and all research, education
20 materials, counseling materials or handouts that are
21 in your possession regarding cancer treatment and
22 hair loss including, but not limited to, hair loss
23 as a side effect of cancer treatment, cancer
24 treatment and hair loss prevention, managing hair
25 loss following treatment for cancer and caring for

Page 36

1  hair regrowth following treatment of cancer."
2     A   I provided you everything I reviewed.
3     Q   Number 12, "All documents, including
4  presentations, speeches, slides, notes, handouts or
5  posters regarding any presentation or speech by you
6  concerning Docetaxel and alopecia."
7     A   I have not done any presentations,
8  speeches, slides, notes, handouts or posters
9  regarding Docetaxel and alopecia.
10    Q   Number 13, "Any and all correspondence or
11 communications by and between you and the FDA or any
12 other state, federal or local agency relating to
13 Taxotere and/or Docetaxel and/or hair loss as a side
14 effect of cancer treatment."
15    A   I have no communication between myself and
16 the FDA regarding Docetaxel and hair loss.
17    Q   Number 14, "A list of all articles,
18 publications, abstracts, reports and studies
19 authored or co-authored by you."
20    A   I provided that in my curriculum vitae.
21    Q   Number 15, "Any and all research, education
22 materials, counseling materials or handouts in your
23 possession regarding chemotherapy, including but not
24 limited to, Taxotere and/or Docetaxel."
25    A   That's a pretty broad question.  I'm an

Page 37

1  oncologist for 30 years.  I don't think that's
2  possible to answer that question in a tangible way.
3  It's a very broad question.
4     Q   Are there materials that are responsive to
5  this that come to mind that you did not produce to
6  counsel?
7     A   No, not related to this.  This question
8  No. 15 was much broader.
9     Q   And I am asking if there is anything in
10 your possession that falls within the scope of --
11    A   No.  Sorry.
12    Q   That comes to mind that you have that you
13 have not given to Mr. Thornton?
14    A   No.
15    Q   Number 16, "Any and all research, education
16 materials, counseling materials or handouts in your
17 possession regarding alopecia."
18    A   I provided everything I have in my
19 possession.
20    Q   Number 17, "A list of all expert reports
21 and depositions reviewed by you in connection with
22 your report."
23        Are those contained within the list of
24 materials that you considered?
25    A   I believe it's in the Appendix B, if I

10 (Pages 34 - 37)

Page 86

1  A  No.
2  Q  You are not an endocrinologist?
3  A  You're sort of segmenting things very much.
4  A lot of my patients may have diabetes. A lot of my
5  patients may have other endocrine abnormalities like
6  thyroid disease, so I am very comfortable in
7  treating those conditions and have done so, but I am
8  not a board certified endocrinologist.
9  Q  You are not a pharmacologist?
10  A  I am not a pharmacologist, but I am very
11  familiar in product development with the psychologic
12  issues involved with developing a product including
13  pharmacokinetics, pharmacodynamics, an area under
14  the curve, how to look at drug exposure, so I am
15  very familiar with pharmacological issues as applies
16  to developing product.
17  Q  But you are not a pharmacologist, correct?
18  A  I am not a certified pharmacologist, but I
19  am knowledgeable on the principles because they're
20  relevant for oncology and they are relevant for
21  product development.
22  Q  You are not a toxicologist; is that
23  correct?
24  A  I am not a certified toxicologist, but I
25  would like to let you know as part of product

Page 87

1  development I have to be very familiar with the
2  pre-clinical studies in terms of animal studies,
3  in-vitro studies, lab studies.
4      Actually, a lot of the clients that I work
5  with I have to review that type of material, but no,
6  I am not a certified toxicologist, but I certainly
7  am very familiar with many of the issues.
8  Q  "Yes" or "no," you are not a certified
9  toxicologist?
10  A  I am not a certified toxicologist.
11  Q  You are not a certified psychologist?
12  A  I am not a certified psychologist.
13  Q  You are not a certified psychiatrist?
14  A  I am not a certified psychiatrist.
15  Q  Are you -- strike that.
16      Do you agree you are not an expert or
17  specialist in hair restoration?
18  A  I am not an expert in hair restoration, but
19  that certainly is an issue with cancer patients and
20  so it is an issue I certainly have encountered.
21  Q  You are not a statistician; is that
22  correct?
23  A  I am not a statistician, but actually I'm
24  pretty savvy with the issues involved in designing
25  clinical trials and determining end points and

Page 88

1  sample sizes so I have acquired quite a bit of
2  knowledge.
3      I don't know if you had a chance to look at
4  my CV, but I did head up the division of cancer
5  treatment and diagnosis in which I had biostats. I
6  had developmental therapeutics. I had clinical
7  trials. I had diagnostic imaging, so I did have to
8  be knowledgeable about many of these areas.
9  Q  "Yes" or "no," you are -- strike that.
10      You are not a statistician, correct?
11  A  I am not formally trained as a statistician
12  is the answer.
13  Q  You are not a biostatistician; is that
14  right?
15  A  I am not formally trained as a
16  biostatistician, but I am certainly knowledgeable
17  with many of the issues.
18  Q  You are not formally trained as an
19  epidemiologist; is that correct?
20  A  I am not formally trained as an
21  epidemiologist, but I have been actively involved in
22  epidemiologic studies. I do not hold myself out as
23  an expert in epidemiology.
24  Q  Do you hold yourself out as an expert in
25  pharmacovigilance?

Page 89

1  A  I hold myself out as somebody who is quite
2  expert in pharmacovigilance. I'm not sure of the
3  legal term so that's why I am rephrasing what you
4  asked me.
5  Q  Do you have expertise or specialized
6  training in pharmacovigilance?
7  A  I have experience through years in dealing
8  with product development and surveying landscape in
9  terms of side effects and adverse effects.
10  Q  Do you subscribe to any medical journals?
11  A  Say this again.
12  Q  Do you subscribe to any medical journals?
13  A  Many, yes.
14  Q  Do you subscribe to any medical journals
15  with respect to the treatment of breast cancer?
16  A  Almost all of my medical journals have
17  breast cancer topics as part of the medical journal.
18  Q  You have never met any plaintiff in this
19  litigation?
20  A  Oh, no.
21  Q  You have never treated any plaintiff in
22  this litigation as an oncologist?
23  A  Sorry. No.
24  Q  You have never examined the hair of any
25  plaintiff in this litigation?

23 (Pages 86 - 89)

|     Page 138 | Page 140 |
| --- | --- |
| 1  A  So anyway, the conclusions -- I'm sorry.<br>2     Is there a problem?<br>3     MR. THORNTON: No. I am just saying it's<br>4  in plain black and white. I was reacting. I<br>5  apologize. I withdraw my reaction. Sorry.<br>6     THE WITNESS: Do you want me to continue?<br>7  BY MR. KAUFMAN:<br>8  Q  Please.<br>9  A  In my way of conveying my opinions, I feel<br>10 this did so. If there was -- you know, I think<br>11 there's causally related in terms of exposure to the<br>12 drug, in terms of temporal relationship, in terms of<br>13 the biologic plausibility.<br>14    I think many of the parameters for general<br>15 causation have been met like that and I do feel that<br>16 my conclusions do align with that.<br>17 Q  You would agree with me nowhere in your<br>18 report does it expressly state that it is your<br>19 opinion that a causal alopecia relationship exists<br>20 between Taxotere and permanent alopecia?<br>21    MR. THORNTON: Objection; form.<br>22    THE WITNESS: I think I was clear that I<br>23 explicitly state the company's own data, which I<br>24 agree with, and you wouldn't have had a Table 2<br>25 unless I put it together, so of course I reviewed it | 1     MR. KAUFMAN: We can agree to disagree on<br>2  this point. There's no speaking objections. You<br>3  know that.<br>4     MR. THORNTON: This is not an objection.<br>5  I'm saying you are now harassing this witness, which<br>6  you are not permitted on do.<br>7     MR. KAUFMAN: I don't believe I am<br>8  harassing the witness.<br>9     MR. THORNTON: I think you clearly are.<br>10 The witness has answered your questions. She has<br>11 answered it one, two, three, four, five times.<br>12 There has to be a limit to which you say, "You did<br>13 not give this opinion" and which she says, "I did<br>14 give this opinion."<br>15    You ask it a few times, that's fine, but at<br>16 the point it becomes harassment -- and the courts<br>17 will step in for harassment. I am putting you on<br>18 notice now that -- the FDA questions made sense to<br>19 me. This is beyond the pail. You are harassing<br>20 this witness.<br>21    MR. KAUFMAN: Are you finished?<br>22    MR. THORNTON: I have stated my position.<br>23    MR. KAUFMAN: Okay. And you are on notice,<br>24 and you have been for a long time, that there are no<br>25 speaking objections. |
|     Page 139 |     Page 141 |
| 1  and feel that it supports the causation and I<br>2  reference the randomized clinical trial throughout<br>3  my report.<br>4     So, yes, those different bodies of evidence<br>5  cumulatively provided evidence in my opinion for the<br>6  causation.<br>7  BY MR. KAUFMAN:<br>8  Q  I'm not necessarily asking you for the<br>9  evidence that would support that opinion.<br>10    I am just asking you if you are asserting<br>11 that opinion and whether or not that opinion is<br>12 stated on Pages 44 and 45 of Exhibit 3.<br>13    MR. THORNTON: Objection. Counsel --<br>14    MR. KAUFMAN: No speaking objections,<br>15 Counsel.<br>16    MR. THORNTON: I am going to speak just<br>17 briefly. You have now literally asked this within<br>18 five times a question that directly correlates with<br>19 something that is written on her Rule 26 report.<br>20 This is harassment.<br>21    MR. KAUFMAN: Counsel --<br>22    MR. THORNTON: Counsel, this is harassment.<br>23 If we want to call the court about harassment,<br>24 you've used the language of her report and said,<br>25 "This isn't your opinion." It makes no sense. | 1     MR. THORNTON: You are on notice that I am<br>2  not above calling the court to seek intervention to<br>3  keep a well respected medical expert from being<br>4  harassed in this manner.<br>5     MR. KAUFMAN: I don't believe I am<br>6  harassing the witness and we will continue with the<br>7  examination.<br>8  BY MR. KAUFMAN:<br>9  Q  Dr. Feigel, since you believe that there is<br>10 a causal relationship between Taxotere and permanent<br>11 alopecia, can you tell me at what dose permanent<br>12 alopecia occurs in Taxotere treatment?<br>13 A  I think in some of the studies they do<br>14 point out the dosing relationship. I can't -- so<br>15 they may be slightly different, some of the studies,<br>16 but there are dose response relationships.<br>17    If you would like to turn to the published<br>18 studies, I would be happy to point those out to you.<br>19 Q  Is there a minimum dose that's required for<br>20 Taxotere to cause permanent alopecia?<br>21 A  It depends on the study.<br>22 Q  How does it depend on the study?<br>23 A  Because the studies are not identical and<br>24 it depends on the dosing they used. In some studies<br>25 it appeared to be at one dose. In another study it |

Page 162

1 the company. I'm not going to opine on that because
2 I don't have access to internal documents, as I
3 mentioned previously, so I can't tell you what they
4 knew and when they knew it.
5      I can opine -- I know, obviously, when the
6 clinical trials were conducted, when they did their
7 interim analysis and the fact that they have that
8 information because that's part of due diligence of
9 doing clinical trials. It just wasn't published.
10       When did permanent chemotherapy induced
11 alopecia become a known adverse event of Taxotere
12 containing regimens to the medical community? I
13 don't think it's still known.
14   Q   You still think that is an adverse event
15 that is unknown to the medical community?
16   A   I think it's greatly under known, yes.
17   Q   Just so I am clear, you do not intend to
18 offer an opinion as to when permanent chemotherapy
19 induced alopecia became a known adverse event of
20 Taxotere containing regimens?
21   A   As it impacts on their labeling, no. I
22 don't intend to comment on what they knew, when they
23 knew and when they should have interacted with the
24 FDA and had changes in their labeling. I'm not
25 going to go there.

Page 163

1   Q   Okay.
2   A   But that's different than communicating to
3 physicians.
4   Q   What do you intend to testify to or opine
5 on at trial in that capacity with respect to when
6 permanent chemotherapy induced alopecia became a
7 known event of Taxotere containing regimens?
8   A   Well, the company, obviously, had its own
9 internal documents about the results of their own
10 randomized controlled clinical trials and I know
11 when those were published, and one could postulate
12 some time before that they had the data. So
13 certainly well before 2015 that data was known to
14 the company.
15       I'm not going to opine on when a label
16 change -- as you said, we went through a lot of this
17 earlier, when the label change should have been
18 made, but I can opine as to when I think information
19 was known to the company that wasn't known to
20 physicians.
21   Q   Just because --
22   A   Well -- I'll stop there.
23   Q   Are you opining that a statistically
24 significant association has been identified between
25 permanent alopecia and Taxotere itself alone in the

Page 164

1 adjutant treatment of early stage breast cancer?
2      MR. THORNTON: Objection; form.
3      THE WITNESS: No. I never suggested that
4 now or in my report that it had to show a
5 statistically significant difference. You don't
6 need to show a statistically significant difference
7 for a safety issue.
8 BY MR. KAUFMAN:
9   Q   Why not?
10   A   Because the studies aren't powered to do
11 that. Usually a clinical trial is powered for the
12 primary end point, which is usually for the purposes
13 of early stage breast cancer, disease free survival
14 and overall survival.
15       And you power a study at a certain
16 percentage and you have a sample size because you
17 think there's a certain magnitude of effect you want
18 to see between the control arm and the Taxotere
19 containing arm.
20       For example -- may I go on or do you want
21 me to stop?
22   Q   No. Continue.
23   A   For example, with early stage breast
24 cancer, in general, there have been very large
25 clinical trials of over 1,000 patients because we

Page 165

1 are looking for incremental benefit.
2      If there was a substantial change, you
3 could do a much smaller trial because your event
4 rate would be much more prominent between your
5 control arm and your investigational agent arm. But
6 because other therapies are relatively very good,
7 you are looking for a smaller difference, so you
8 need a bigger study.
9      That's a long-winded way of saying they're
10 powering the study for the efficacy end point,
11 disease-free survival and overall survival. They
12 collect safety information, but in general, you
13 don't power studies to look for a safety signature
14 that you can -- you can even have one really bad
15 event and call that a safety issue.
16       But in this instance what we were looing at
17 is the increased risk on the Taxotere arm compared
18 to the control arm and it was about double the risk
19 on both the studies.
20   Q   I agree that was a long answer so I just
21 want to make sure I understand. You don't -- strike
22 that.
23       You have not seen a statistically
24 significant association between permanent alopecia
25 and Taxotere in and of itself in the literature you

42 (Pages 162 - 165)

Page 166

1  have cited in your report?
2      MR. THORNTON: Objection; form.
3      THE WITNESS: I'm sorry.
4      MR. THORNTON: That's all right.
5      Objection, form.
6      THE WITNESS: I need to pause more.
7      MR. THORNTON: That's all right.
8      THE WITNESS: What the correct answer is if
9  analyses have been done, I haven't seen them. But
10 the other part I was saying is you don't need to
11 show statistical significance to show safety issues
12 and communicate that.
13 BY MR. KAUFMAN:
14   Q   I understand that. You have not seen a
15 statistically significant association in the
16 literature that you have reviewed in the capacity as
17 an expert witness in this litigation?
18   A   What I'm saying is if it was done -- I'm
19 sorry.
20      MR. THORNTON: Objection; form. Thank you.
21      THE WITNESS: Eventually I'll learn, maybe.
22      What I was trying to say is it's possible
23 such analyses have been done. I haven't seen them.
24 BY MR. KAUFMAN:
25   Q   Let's look at Conclusion No. 5. You say

Page 167

1  that it's your opinion to a reasonable degree of
2  certainty that and then No. 5, "Company's own
3  analysis of the data led them to the conclusion that
4  permanent chemotherapy induced alopecia is causally
5  related to Taxotere."
6      Did I read that correctly?
7    A   You did read that correctly.
8    Q   What is the basis for that opinion?
9    A   So the basis of that opinion from reading
10 clinical overview summary is that they looked at
11 their own randomized controlled clinical trials.
12 They looked at the over 2,100 cases that had been
13 recorded by health care providers, physicians and
14 patients and they did a worldwide literature search
15 for cases of permanent alopecia.
16      And once again, based on looking at things
17 we talked about earlier about exposure, about
18 biologic plausibility, the cumulative data supports
19 Taxotere being causally related to permanent
20 chemotherapy induced alopecia, and I agree with that
21 analysis.
22    Q   What you are -- the document you are
23 referring to that contains the information that you
24 just referred to is the 2015 clinical overview?
25    A   It's the one footnoted here.

Page 168

1    Q   And it's -- I'm sorry.
2    A   Page 44, Footnote 92. I don't believe
3  that's a new footnote.
4    Q   The clinical overview?
5    A   If that's -- I'm sorry. It says right
6  here, "Clinical Overview," yeah.
7    Q   When drawing conclusions as to whether or
8  not a causal relationship exists, is it common for
9  folks in the field to rely on a company document to
10 make that ultimate conclusion?
11      MR. THORNTON: Objection; form.
12      THE WITNESS: Well, I didn't. I looked at
13 the randomized control clinical trials and, of
14 course, I have to look at company information on
15 unpublished data, because otherwise I wouldn't see
16 it and if I don't have access to their
17 pharmacovigilance review, there is no other way I
18 can see it.
19      I know those randomized clinical trials
20 were conducted. I know that all these published
21 studies have come in, so I had to rely on some of
22 the company's own data because they didn't publish
23 it.
24 BY MR. KAUFMAN:
25    Q   And is that a methodology that

Page 169

1  practitioners in your field follow, to draw causal
2  relationship conclusions between a drug and an
3  outcome?
4      MR. THORNTON: Objection; form.
5      THE WITNESS: Practitioners in the field,
6  of course, have absolutely zero access to any of
7  that information. They don't have access to the
8  company's pharmacovigilance data. They don't have
9  access to unpublished data from randomized clinical
10 trials that the company has.
11      In order to do the kind of search I did,
12 when you think of a busy physician, they're not
13 going to spend time doing PubMed searches on
14 alopecia, so I would say practitioners wouldn't have
15 access to any of this information.
16 BY MR. KAUFMAN:
17    Q   I am interested in practitioners of your
18 field. I assume you believe that you are qualified
19 to offer an opinion that Taxotere causes
20 chemotherapy induced alopecia, correct?
21    A   Absolutely.
22    Q   Do you agree that other practitioners in
23 your field with your background would rely on a
24 company document such as the 2015 clinical overview
25 to reach a causal relationship conclusion between a

43 (Pages 166 - 169)

Page 174

1  in Table 2 were inadequate or insufficient for you
2  to draw a causal link between Taxotere and permanent
3  alopecia?
4      MR. THORNTON: Objection; form.
5      THE WITNESS: I'm saying -- let me just
6  rephrase it because I don't think we're vastly
7  disagreeing.
8      I think the case studies definitely supply
9  important supportive evidence for causation, but in
10  and of itself, I wouldn't conclude causation solely
11  based on case studies, at least these case studies.
12      There may be other types of adverse events.
13  You could do that, but in this particular case,
14  there's a much fuller body of evidence that I would
15  look at. Since it is available, I would look at
16  that.
17  BY MR. KAUFMAN:
18   Q   When you are referring to the case studies,
19  you are talking about the studies in Table 2,
20  correct?
21   A   Yeah, and they're not all -- some of those
22  are cohort sequential studies. Some of those are
23  clinical trials. They are not just anecdotal
24  testimonials.
25   Q   Why do you believe the reports or

Page 175

1  publications that are contained within Table 2 of
2  your report are not adequate in and of themselves
3  standing alone for you to draw a causal link between
4  Taxotere and permanent alopecia?
5      MR. THORNTON: Objection; form.
6      THE WITNESS: I think they're important
7  pieces of information. It's based on the fact that
8  I know there's other data that I can have access to
9  that make the case stronger.
10      Would I have been able to make it just
11  based on that? It would have looked highly
12  important to further investigate. I'd want to go
13  back in their clinical trials and find out what they
14  had seen.
15      But given that I do have access to
16  randomized clinical trials, given that I do have
17  access to the pharmacovigilance data, together it
18  makes a much stronger case.
19  BY MR. KAUFMAN:
20   Q   Could you conclude to a reasonable medical
21  probability looking only at the studies and
22  publications in Table 2 that a causal relationship
23  existed between Taxotere and permanent alopecia?
24      MR. THORNTON: Objection; form.
25      THE WITNESS: Well, it's a theoretical

Page 176

1  paradigm because I know I have access to all these
2  other things.
3  BY MR. KAUFMAN:
4   Q   I know, but we are putting the clinical
5  overview to the side. We are just focusing on
6  Table 2.
7   A   No. I understand that. I am just saying
8  for me, I'd want to see more data, but do I think
9  there's -- there's already biologic plausibility.
10  There is already exposure. There is already dose
11  response.
12      I think it's potentially feasible that
13  somebody could conclude, you know, come to their
14  conclusion, but for me I would want to see that
15  corroborative evidence from the randomized control
16  trial in the pharmacovigilance surveillance.
17   Q   Without the additional information in the
18  accompanying document that you are referring to, you
19  would not conclude to a reasonable medical
20  probability that the studies in Table 2 show a
21  causal relationship between Taxotere and permanent
22  alopecia?
23      MR. THORNTON: Objection; form.
24  BY MR. KAUFMAN:
25   Q   I believe we're saying the same thing.

Page 177

1   A   Yeah. It's hard for me to work backward.
2  I think it's strong evidence. Would I say if I did
3  not have access to anything else, I think that would
4  be an unusual -- I'm trying to envision a situation
5  where you have all these case reports out there, but
6  you don't have any clinical trial results. I'm just
7  having a hard time envisioning that scenario.
8  That's all.
9      So I'm just saying it would be -- it's not
10  a scenario that I think would happen much. Case
11  studies obviously came from somewhere. So this
12  would have to be company information that would be
13  helpful to see.
14   Q   I agree. You would not reach a conclusion
15  that Taxotere caused permanent alopecia just by
16  looking at the studies and the literature in Table 2
17  because, as you just said, you would want to do
18  further investigation.
19      Fair?
20      MR. THORNTON: Objection; form.
21      THE WITNESS: I think from my own opinion,
22  yes. I can't speak for somebody else.
23  BY MR. KAUFMAN:
24   Q   I am not asking you to.
25   A   Right. Well, you were earlier.

Page 186

1  A   Yes.
2  Q   I am just trying to get the context back.
3  A   Yes.
4  Q   You believe that "causal association" is
5  synonymous with "causally related"? I believe that
6  is how you testified.
7  A   Correct, although -- go ahead.
8  Q   Do you disagree or do you want to change --
9  A   No. My only point is this entire report is
10 about the causation issues. It's not one sentence
11 of a report. They have gone through the entire
12 rationale, reasoning data, and so regardless of what
13 they say, this does provide evidence for causation.
14 Q   But the company has drawn a conclusion and
15 it is in the section entitled, "Discussion and
16 Conclusion," correct?
17 A   Uh-huh.
18 Q   And is it your testimony that the company
19 concluded there is a causal link between Taxotere
20 and permanent alopecia?
21     MR. THORNTON: Objection to form.
22     THE WITNESS: Correct. But even if they
23 had not, I'm reviewing this and I find causal
24 association or causal relatedness. It causes --
25 whatever is the correct term.

Page 187

1  So all I'm saying is they provide all the
2  data here, so it's not just about one sentence. I
3  agree with their conclusion, but I would come to
4  that conclusion regardless.
5  BY MR. KAUFMAN:
6  Q   And that is based on your own personal
7  interpretation of the document marked Exhibit 9?
8  A   Correct.
9      MR. THORNTON: Objection; form.
10 BY MR. KAUFMAN:
11 Q   Do you agree with me that the clinical
12 overview does not use the terms, "Taxotere causes
13 permanent alopecia"?
14     MR. THORNTON: Objection; form.
15     THE WITNESS: I agree they use the term
16 "causal association."
17 BY MR. KAUFMAN:
18 Q   What did you do to determine what the
19 company meant when it used the language "evidence
20 sufficient to support a causal association between
21 Docetaxel and permanent irreversible alopecia"?
22     MR. THORNTON: Objection to form.
23     THE WITNESS: I read this whole document
24 and looked through the studies and the data.
25

Page 188

1  BY MR. KAUFMAN:
2  Q   And when you say "the studies," what are
3  you referring to?
4  A   I looked at everything in this report. I
5  looked at their clinical study report and the
6  incidents of permanent chemotherapy induced
7  alopecia, and as you know, I looked at all published
8  reports that I commented upon in Table 2 and I have
9  come to my conclusion -- I agreed with their
10 conclusion about causation, but that was my
11 conclusion, too.
12 Q   So in order for you to determine what the
13 company meant when it used the language "causal
14 association," you reviewed the entirety of the
15 document, Exhibit 9?
16 A   Correct.
17 Q   You reviewed the Tax 316 clinical study
18 report?
19 A   And the Geicam 9805 and the papers.
20 Q   What evidence do you have that Sanofi had
21 all of the literature that you found from Table
22 20 -- I'm sorry.
23     MR. THORNTON: Objection; form.
24 BY MR. KAUFMAN:
25 Q   Table 2.

Page 189

1  A   What evidence do I have that they had all
2  the papers I had? I don't think I have confirmatory
3  evidence of all their papers.
4  Q   The conclusions that was reached at the
5  bottom of Page 35 of Exhibit No. 9 is based on a
6  review of the data within Exhibit No. 9.
7      Would you agree with that?
8      MR. THORNTON: Objection; form.
9      THE WITNESS: No. I think they said they
10 did worldwide literature review as well and I don't
11 think all of that is contained in this document.
12 BY MR. KAUFMAN:
13 Q   But it is referenced within the document?
14 A   I'm not sure if they gave all their
15 literature reviews. I only see literature review,
16 two papers. Surely, they have more than that.
17 Q   Did you ask plaintiffs' counsel to read the
18 deposition testimony of the Sanofi employees who
19 were involved in preparing what's been marked as
20 Exhibit No. 9?
21 A   I did not see their deposition.
22 Q   Did you ask to review their deposition?
23 A   I don't recall asking to see the
24 deposition.
25 Q   Would you agree that you did not believe

48 (Pages 186 - 189)

Page 202

1  initiation of FEC, she also received Anastrozole and
2  radiation. So some of them do have hormone
3  attribution.
4      Q   Do you know about each of the reported
5  patient medical histories or family histories?
6      A   Do I at this point in time know, no.
7      Q   Can you glean that from the table?
8      A   Can I glean that from the table? Not
9  unless they put it in the "Comments" section.
10     Q   Can you glean from the table if the patient
11 had an underlying or unrelated form of alopecia?
12     A   By definitions, these are all occurring
13 within the treatment of their breast cancer and
14 emerging as an adverse event during it. But no, I
15 can't glean their medical history nor do I know
16 other details of their medical record.
17     Q   You agree it would be possible for a
18 chemotherapy patient to have a form of alopecia
19 unrelated to chemotherapy that exists concurrently
20 with chemotherapy?
21         MR. THORNTON: Objection to form.
22         THE WITNESS: I would say if somebody had
23 another form of alopecia, it should predate the
24 chemotherapy, not suddenly appear at the identical
25 time of chemotherapy.

Page 203

1  BY MR. KAUFMAN:
2      Q   From the table reported here, we don't know
3  that patient's history with respect to underlying
4  alopecia?
5          MR. THORNTON: Objection; form.
6          THE WITNESS: All I'm saying is if the
7  patient had a pre-existing baldness, they probably
8  wouldn't report treatment emergent alopecia.
9  BY MR. KAUFMAN:
10     Q   Is it your testimony that all alopecia has
11 to be bald?
12     A   No.
13         MR. THORNTON: Objection; form.
14         THE WITNESS: No. I'm just saying if they
15 had a pre-existing condition that caused alopecia,
16 it should have been present before they got their
17 chemotherapy.
18         If somebody had hair loss before
19 chemotherapy, they probably wouldn't report
20 treatment emergent alopecia because they already had
21 it.
22 BY MR. KAUFMAN:
23     Q   We just don't know from the reports.
24         Is that fair?
25         MR. THORNTON: Objection; form.

Page 204

1          THE WITNESS: No. I disagree. I have a
2  hard time seeing a physician reporting a case of
3  treatment emergent alopecia if they already had it.
4  BY MR. KAUFMAN:
5      Q   Did you determine whether the 5.3 number
6  represented the 5.3 percent in the clinical
7  overview? Did you determine whether that
8  represented a statistically significant association
9  between Taxotere and permanent alopecia?
10         MR. THORNTON: Objection; form.
11         THE WITNESS: You don't need a
12 statistically significant association to show
13 causation.
14 BY MR. KAUFMAN:
15     Q   I'm asking.
16     A   No. I did not look at it for that. We do
17 have a biostatistical expert who can opine on that
18 for you.
19     Q   Who is "we"?
20     A   Counsel does.
21     Q   Plaintiffs' counsel?
22     A   Correct.
23     Q   You personally did not determine whether
24 the 5.3 percent number represented a statistically
25 significant association between Taxotere and

Page 205

1  permanent alopecia?
2          MR. THORNTON: Objection; form.
3          THE WITNESS: I'm just stating,
4  statistically significant compared to what?
5  BY MR. KAUFMAN:
6      Q   Well, exactly.
7      A   Well, what are you comparing it to? You
8  mean to control? To not getting Taxotere containing
9  regimens? I mean, I have that data from the
10 controlled clinical trials.
11     Q   Okay. So the data here from the adverse
12 event report is inadequate, would you agree, to
13 establish a statistically significant association
14 between Taxotere and permanent alopecia?
15         MR. THORNTON: Objection; form.
16         THE WITNESS: First, I'm not the
17 biostatistician so I suggest you ask that
18 individual, but this is basically looking at the
19 incidence of permanent alopecia among the
20 denominator of cases.
21         I'm having a hard time when you talk about
22 statistical associations, because I usually think of
23 that in terms of comparing it to something else.
24 BY MR. KAUFMAN:
25     Q   You wouldn't do that in this context?

Page 210

1  THE WITNESS: I think this is very strong
2 evidence for causation.
3 BY MR. KAUFMAN:
4  Q  Do you think the information in the 2015
5 clinical overview establishes conclusively causation
6 between Taxotere and permanent alopecia?
7  MR. THORNTON: Objection; form.
8  THE WITNESS: In my opinion, this
9 information, plus their randomized control clinical
10 trials, plus the case studies and there may be other
11 case studies that they have in addition supplies
12 sufficient evidence for a causation.
13 BY MR. KAUFMAN:
14  Q  And to come to a causation or causal
15 relationship conclusion, you would need to consider
16 all of the potential causes, correct?
17  MR. THORNTON: Objection; form.
18  THE WITNESS: You mean alternative reasons
19 why they might have alopecia?
20 BY MR. KAUFMAN:
21  Q  Sure. You would want to consider
22 alternative reasons and rule them out one by one,
23 right?
24  MR. THORNTON: Objection; form.
25  THE WITNESS: You already have evidence in

Page 211

1 randomized controlled clinical trials that this
2 occurs at an increased rate compared to a control
3 that doesn't have Taxotere. That's pretty strong
4 evidence.
5 BY MR. KAUFMAN:
6  Q  So you don't think you need to rule out
7 other potential causes?
8  MR. THORNTON: Objection; form.
9  THE WITNESS: I think it's strong as it
10 stands.
11  MR. THORNTON: Objection; form.
12  THE WITNESS: I think the data is strong as
13 it stands.
14 BY MR. KAUFMAN:
15  Q  In one of the controlled clinical trials,
16 one of the arms was TAC, Taxotere, Adriamycin,
17 Cyclophosphamide. The other arm was FAC?
18  A  Correct.
19  Q  Fluorouracil, Adriamycin and
20 Cyclophosphamide?
21  A  Right.
22  Q  In both arms you would agree that there
23 were a set of patients that experienced persistent
24 alopecia or ongoing alopecia?
25  A  In the control arm?

Page 212

1  Q  In both arms.
2  A  Correct.
3  Q  So ongoing alopecia occurred in the absence
4 of Taxotere in the FAC arm, right?
5  A  You don't have to show that nothing ever
6 happens in another arm. This is showing that it's
7 at least twice the risk, so you don't have to show
8 that it's compared to zero.
9  Q  I understand, but that's not my question.
10  A  I answered your question. Yes, you see
11 permanent alopecia in both arms.
12  Q  And so would you agree that there is
13 evidence that persistent or permanent alopecia
14 occurs with chemotherapy drugs absent Taxotere?
15  MR. THORNTON: Objection; form.
16  THE WITNESS: What I can say is the
17 evidence is very strong for Taxotere because of the
18 randomized clinical trials, the 2,100 cases in the
19 pharmacovigilance and the stack of paper since 2001.
20 I don't have that same level of cumulative evidence
21 for any other chemotherapy agent.
22  I have it for Taxotere. If you would like
23 to show me pharmacovigilance data for all these
24 other chemotherapy regimens or consistently
25 quantitative evidence from other papers, I would be

Page 213

1 more than happy to review it and consider it, but
2 what I've seen is the strong data for Taxotere.
3 BY MR. KAUFMAN:
4  Q  I move to strike as nonresponsive.
5  I am simply asking, there have been
6 cases -- strike that.
7  You agree that there have been cases of
8 ongoing alopecia with chemotherapy regimens that did
9 not include Taxotere. Do you agree with that?
10  MR. THORNTON: Objection; form.
11  THE WITNESS: I thought I already answered
12 that and I said yes, that has been seen
13 sporadically.
14 BY MR. KAUFMAN:
15  Q  And the FAC arm had Adriamycin and
16 Cyclophosphamide, correct?
17  A  Correct.
18  Q  The TAC arm also had Adriamycin
19 and Cyclophosphamide?
20  A  Correct.
21  Q  How do you rule out Adriamycin and
22 Cyclophosphamide as potential causes of ongoing hair
23 loss in the TAC arm?
24  MR. THORNTON: Objection; form.
25  THE WITNESS: There's an increased risk in

54 (Pages 210 - 213)

Page 214

1 the Taxotere containing arm.  I don't have to rule
2 out that there couldn't idiosyncratically be
3 permanent alopecia occurring in some of the other
4 agents.
5         What I don't have is the body of evidence
6 from the controlled clinical trials, the
7 pharmacovigilance data and the stack of papers since
8 2001, so I don't have consistent evidence for these
9 other chemotherapy agents.  That's what I'm saying.
10 BY MR. KAUFMAN:
11   Q   Are you able to rule out Adriamycin and
12 Cyclophosphamide as potential causes of ongoing
13 alopecia in the TAC arm?
14        MR. THORNTON:  Objection; form.
15        THE WITNESS:  I don't have to rule it out.
16 It's possible they are exacerbating, but I don't see
17 why I would have to rule it out.
18 BY MR. KAUFMAN:
19   Q   So is your testimony that you have not or
20 cannot rule it out?
21        MR. THORNTON:  Objection; form.
22        THE WITNESS:  I have no evidence to have an
23 opinion.
24 BY MR. KAUFMAN:
25   Q   Would you agree with me that there are

Page 215

1 reports of ongoing or persistent or permanent
2 alopecia involving Adriamycin regimens?
3        MR. THORNTON:  Objection; form.
4        THE WITNESS:  I have documented that in my
5 table.
6 BY MR. KAUFMAN:
7   Q   So "yes"?
8   A   I think it was 253 to a couple.  I mean,
9 yes, you see some occasionally reported in the
10 literature, but not a consistent replication of that
11 in subsequent papers.  You can find an isolated
12 paper with permanent alopecia with some other
13 chemotherapy agents.
14        What I have not seen -- and if you have it,
15 I would be happy to consider it and review it -- is
16 a consistent spectrum of papers with other
17 chemotherapy agents that show permanent alopecia.
18 Be more than happy to review that.
19   Q   I understand that your position is that you
20 don't have to rule out Adriamycin or
21 Cyclophosphamide as potential causes.  I am asking
22 if you can.
23        Is it possible to do that?
24        MR. THORNTON:  Objection; form.
25        THE WITNESS:  All I have to show is the

Page 216

1 increased risk compared to control that doesn't have
2 Taxotere.
3 BY MR. KAUFMAN:
4   Q   So the answer is, no, you do not have to
5 rule out the other potential causes of permanent
6 alopecia -- strike that.
7        You agree you do not have to rule out in
8 this example Adriamycin and Cyclophosphamide as
9 potential causes of permanent alopecia?
10        MR. THORNTON:  Objection to form.
11        THE WITNESS:  I already have the control
12 arm.  I already have that data from the control arm.
13 It doesn't have Taxotere in it.
14 BY MR. KAUFMAN:
15   Q   And the control arm does have Adriamycin
16 and Cyclophosphamide in it?
17   A   Correct.
18   Q   Do you know if there is a statistically
19 significant difference in the rate of ongoing
20 alopecia between the TAC arm and the FAC arm?
21        MR. THORNTON:  Objection; form.
22        THE WITNESS:  I haven't done that analysis.
23 You might ask the biostatistician that.
24 BY MR. KAUFMAN:
25   Q   You don't know?

Page 217

1   A   I haven't done it.  I haven't seen that
2 kind of analysis from the company either.
3   Q   If there were no statistically significant
4 difference in the rate of ongoing alopecia between
5 the FAC arm and the TAC arm, could you still
6 conclude that Taxotere in a TAC regimen was the sole
7 cause of permanent alopecia?
8        MR. THORNTON:  Objection; form.
9        THE WITNESS:  You don't have to show
10 statistical significance.  You don't need to show --
11 I mean, if you had it, that's great, but you don't
12 need to show statistical significance.
13 BY MR. KAUFMAN:
14   Q   And what basis do you have for taking that
15 position that you don't need to show a statistical
16 significance, what's that based on?
17        MR. THORNTON:  Objection; form.
18        THE WITNESS:  To show a safety issue, you
19 don't need to -- I mean, many -- that's not --
20 BY MR. KAUFMAN:
21   Q   According to what objective standard?
22   A   I haven't ever seen it as a requirement
23 that you needed to show a statistical significant
24 difference.  Maybe you can tell me where you have
25 seen it.

Page 218

1  Q   Well, what is the standard that you need to
2  show in order to draw a causal conclusion?
3  A   Well, we went through some of it earlier
4  about biologic plausibility, about exposure, about
5  whether or not there may be a dose response.
6  Whether or not if you are doing a controlled
7  clinical trial, whether you see an increased risk.
8      I haven't seen anywhere where it requires
9  statistical significant differences.  If you have
10 it, great, but I haven't seen that it's required.
11 Q   That is not the standard that you are using
12 to go draw your conclusions that Taxotere causes
13 permanent alopecia.  You are not using that
14 statistical --
15     MR. THORNTON:  Objection; form.
16     THE WITNESS:  I haven't utilized that in
17 looking at this, and I haven't seen an analysis for
18 that, and I'm not aware that you need it for
19 causation.
20 BY MR. KAUFMAN:
21 Q   The various factors that you just discussed
22 for purposes of drawing the causal conclusion that
23 form the basis of your opinion, where is that
24 discussion set forth in your expert report?
25     MR. THORNTON:  Objection; form.

Page 219

1      THE WITNESS:  I think that I already go
2  through the biologic plausibility with mechanism of
3  action of this drug causing alopecia, so that does
4  address that issue.  I showed you data on dose
5  response.
6      I showed you data on these being treatment
7  emergent with the Taxotere regimen.  I have showed
8  you data that this is increased compared to the
9  control.  So all these factors tie in beautifully
10 with causation issues.
11 BY MR. KAUFMAN:
12 Q   Did you in your expert report present an
13 analysis of those factors to reach your conclusion
14 that Taxotere causes permanent hair loss?
15 A   I believe my text adequately and
16 sufficiently addresses that.
17 Q   Show me where in your report you think that
18 text adequately and sufficiently addresses that.
19 A   It's all throughout my report.
20 Q   Okay.  Give me some examples.
21 A   Well, I have showed you the examples in
22 some papers with the dose response.  I have shown
23 you the data or surely you've seen it with the
24 increased risk in the randomized controlled clinical
25 trial.

Page 220

1  I have text in there about the biologic
2  plausibility given the mechanism of action of
3  Taxotere in causing hair loss.  We have talked and I
4  hypothesized in the report about permanency perhaps
5  being caused or could be caused if they actually
6  destroyed the stem cells, so I think they do address
7  them.  That's my opinion.
8  Q   Okay.  In forming your opinion that
9  Taxotere causes permanent hair loss, did you look
10 for alternate explanations for the association, and
11 if so, what did you look for?
12 A   Well, I mean the randomized controlled
13 trial is a very good way to look at it because those
14 are a variety of variables.  So whatever was done in
15 terms of endocrine therapy, radiation therapy is
16 done in both arms.
17     So seeing an increased risk in a controlled
18 clinical trial is an excellent way to look at
19 increased risk of an adverse event.
20 Q   Were you referring to Tax 316 in that
21 instance?
22 A   I was referring to both trials, Geica
23 9805 -- there's only two randomized clinical trials
24 for which we even have data on permanent alopecia,
25 at least that's all I'm aware of from Sanofi.  If

Page 221

1  they have others, I haven't seen it.
2  Q   In terms of looking for alternate
3  explanations for the association between Taxotere
4  and permanent alopecia, you looked only to the two
5  randomized control clinical studies?
6      MR. THORNTON:  Objection; form.
7      THE WITNESS:  I have looked at the
8  cumulative evidence as what was coming into the
9  pharmacovigilance database with Taxotere emergent
10 permanent alopecia.  I also looked at the papers.
11     You know, I'm sure you have reviewed the
12 papers.  If you look at Sedlosic from 2006, he has a
13 veiny sequential cohort studied where the only
14 instance of permanent alopecia is in the Taxotere
15 containing arm.  I think it was around 6.3 percent
16 and it was zero percent in the other regimens.
17 BY MR. KAUFMAN:
18 Q   Would you agree that you did not apply the
19 Bradford Hill factors to determine whether the
20 association between Taxotere and permanent alopecia
21 was causal?
22     MR. THORNTON:  Objection; form.
23     THE WITNESS:  I don't agree.
24 BY MR. KAUFMAN:
25 Q   You don't agree.  Where in your report do

Page 222

1  you set forth the Bradford Hill factors?
2     A   I don't specifically name Bradford Hill,
3  but I certainly do use the criteria that were used
4  in terms of biologic plausibility, exposure to the
5  agent, the potential of dose response and all of
6  those issues are in there.
7         I don't have the issue of challenge,
8  re-challenge because I am not sure if there were
9  some examples there, but you don't have to meet all
10 criteria.
11    Q   You believe that your expert report
12 provides your analysis and application of the
13 Bradford Hill factors?
14    A   I believe it addresses them.
15    Q   And where in your expert report do you tie
16 the Bradford Hill factors together to reach your
17 conclusion that Taxotere causes permanent alopecia?
18        MR. THORNTON: Objection; form.
19        THE WITNESS: I have the various
20 conclusions, which if you tie them together, will do
21 that.
22 BY MR. KAUFMAN:
23    Q   Which one of your conclusions at the very
24 end do you believe adequately describes your
25 conclusion after applying the Bradford Hill factor

Page 223

1  that Taxotere causes permanent alopecia?
2     A   Well, I have 3. I have 5 and I think those
3  are the main ones.
4     Q   No. 3 and No. 5?
5     A   But those aren't isolated. As I pointed
6  out, I have narrative throughout the entire report
7  that I think addresses this and I have already gone
8  through that with you.
9     Q   Where in your report did you provide a
10 discussion of your analysis on the temporal
11 relationship between Taxotere and permanent
12 alopecia?
13        MR. THORNTON: Objection; form.
14        THE WITNESS: The clinical trials, of
15 course, were all treatment emergent after
16 Taxotere -- with the Taxotere containing regimen.
17 The papers were all Taxotere emergent, the
18 pharmacovigilance. I guess 2,022 as opposed to
19 2,172 were all Docetaxel emergent.
20 BY MR. KAUFMAN:
21    Q   So where in your report do you provide that
22 analysis?
23        MR. THORNTON: Wait. Objection; form.
24        THE WITNESS: Well, they were all exposed.
25 ///

Page 224

1  BY MR. KAUFMAN:
2     Q   Do you use the phrase "temporal
3  relationship" in your report?
4         MR. THORNTON: Objection; form.
5         THE WITNESS: I think it's implied, because
6  they all occurred after treatment with a Taxotere
7  containing regimen.
8  BY MR. KAUFMAN:
9     Q   So you agree the phrase "temporal
10 relationship" is not in your report because it's
11 implied?
12    A   Correct. I believe it's self-evident.
13 These are all patients who received Taxotere.
14    Q   Where in your report is there a discussion
15 or does it set forth your analysis of strength of
16 association between Taxotere and permanent alopecia?
17        MR. THORNTON: Objection; form.
18        THE WITNESS: I said it's based on the
19 cumulative evidence of the randomized clinical
20 trials, the pharmacovigilance data and the papers.
21 BY MR. KAUFMAN:
22    Q   And your analysis of the strength of the
23 association is also implied from your report?
24        MR. THORNTON: Objection; form.
25        THE WITNESS: I believe it's apparent in my

Page 225

1  report, yes.
2  BY MR. KAUFMAN:
3     Q   Does the phrase "strength of association"
4  expressly appear in your report?
5         MR. THORNTON: Objection; form.
6         THE WITNESS: The phrase does not.
7  BY MR. KAUFMAN:
8     Q   You have mentioned a dose response
9  relationship. Does the phrase "dose response
10 relationship" appear in your report?
11        MR. THORNTON: Objection; form.
12        THE WITNESS: I do have dose response for
13 several of these papers.
14 BY MR. KAUFMAN:
15    Q   When you say these papers, you are
16 referring to the papers in Table 2?
17    A   Correct. I give narrative descriptions.
18    Q   So you are summarizing what those
19 publications show?
20    A   Well, I'm showing the data, too, and the
21 dose response relationship, correct.
22    Q   Outside of Table 2 and your summary of the
23 publications within Table 2, does your expert report
24 contain an analysis on dose response relationship or
25 is that also implied?

57 (Pages 222 - 225)

```
                                                       Page 226                                                        Page 228
 1    A   It's also implied.                                       1  of the quantitative increased risk across multiple
 2    Q   The words don't appear?                                  2  avenues.
 3    A   Dose response certainly does appear.                     3  BY MR. KAUFMAN:
 4        MR. THORNTON:  Objection; form.                          4    Q   Do you agree with me the phrase itself
 5  BY MR. KAUFMAN:                                                5  "replication of findings" does not exist in your
 6    Q   Dose response relationship appears --                    6  report?
 7    A   Is used in description of the narrative of               7        MR. THORNTON:  Objection; form.
 8  these papers.                                                  8        THE WITNESS:  I agree I do not have the
 9    Q   Outside the description of the narrative of              9  phrase "replication" in the report.
10  the papers, in your summary of your report, does the          10  BY MR. KAUFMAN:
11  phrase "dose response relationship" appear?                   11    Q   You mentioned biological plausibility a
12        MR. THORNTON:  Objection; form.                         12  couple times.  Is that addressed in your report?
13        THE WITNESS:  I would have to look more                 13        MR. THORNTON:  Objection; form.
14  fully, but the majority of the comments regarding             14        THE WITNESS:  Yes, I noted with mechanism
15  dose relationship would be in relation to Table 2 in          15  of action of Taxotere in terms of the damage during
16  the papers.                                                   16  the anagen phase and the telogen phase as well as
17  BY MR. KAUFMAN:                                               17  comment about the potential of destroying or harming
18    Q   Where in your report do you provide an                  18  the stem cell of the hair follicle and that is in
19  analysis of the replication of findings?                      19  the report.
20        MR. THORNTON:  Objection; form.                         20  BY MR. KAUFMAN:
21        THE WITNESS:  The case report from 2001                 21    Q   Where in your report did you include an
22  onto the present, 2008, the randomized clinical               22  analysis of the consideration of alternative
23  trial and the pharmacovigilance data, those are               23  explanations?
24  ways -- that's how you replicate.  That's how you             24    A   I primarily base that on the randomized
25  show evidence of replication.                                 25  control clinical trial in terms of whatever happens

                                                       Page 227                                                        Page 229
 1  BY MR. KAUFMAN:                                                1  on the control arm is happening in the Taxotere arm.
 2    Q   And so your analysis of the replication of               2  So that's actually an excellent way to control the
 3  findings is also implied from your report?                     3  variables, and I'm also basing it on several of the
 4    A   I think I state it in the report in terms                4  papers that actually get into the fact that none of
 5  of the cumulative evidence across these different              5  this occurred in the arms that didn't contain
 6  factors.                                                       6  Taxotere.  The Sedlosic papers.
 7    Q   Point me to where you state that.                        7        There's some other papers there that show
 8    A   I do say in Conclusions 3 and 5.                         8  permanent alopecia occurred only in the Taxotere
 9    Q   Can you point me -- can you read the                     9  containing arm.
10  language that you feel addresses this?                        10    Q   So in that particular study perhaps, but if
11        MR. THORNTON:  Objection; form.                         11  you are talking about the randomized control TAC
12        THE WITNESS:  "Permanent chemotherapy                   12  versus FAC or ongoing alopecia, actually did appear
13  induced alopecia is a known adverse event of                  13  in the non-Taxotere containing regimen?
14  Taxotere containing regimens in the adjutant                  14    A   The point is the increased risk.  That's
15  treatment of women with early stage, operable breast          15  the point throughout this whole thing.  I'm not
16  cancer as evidenced in the company's sponsored                16  saying it has to be zero in a controller.
17  randomized controlled clinical trials, in post                17    Q   Your analysis of the consideration of
18  marketing surveillance and in multiple cases from             18  alternative explanations is therefore also implied
19  2001 to the present."                                         19  in your report and not expressly stated?
20  BY MR. KAUFMAN:                                               20        MR. THORNTON:  Objection; form.
21    Q   And that is your analysis of the                        21        THE WITNESS:  Repeat the question.
22  replication of findings?                                      22  BY MR. KAUFMAN:
23        MR. THORNTON:  Objection; form.                         23    Q   Does the phrase "consideration of
24        THE WITNESS:  That is my analysis of the                24  alternative explanation" appear in your report?
25  strength of the information and of the consistency            25        MR. THORNTON:  Objection, form.
```

58 (Pages 226 - 229)

Page 230

1  THE WITNESS: Does that phrase appear in my
2 report? No.
3 BY MR. KAUFMAN:
4  Q  Your analysis consideration of alternative
5 explanations, is that implied in your report?
6  A  It is.
7     MR. THORNTON: Objection; form.
8     THE WITNESS: Particularly with the
9 randomized controlled clinical trial.
10 BY MR. KAUFMAN:
11  Q  Would you agree that alopecia has multiple
12 causes?
13     MR. THORNTON: Objection; form.
14     THE WITNESS: That's a very broad question.
15     Could you narrow it down or rephrase.
16 BY MR. KAUFMAN:
17  Q  I will just say it again. Causes of
18 alopecia are multi-factor. Would you agree?
19     MR. THORNTON: Objection; form.
20     THE WITNESS: The topic of this whole
21 discussion is about Taxotere induced permanent
22 chemotherapy alopecia. We're not talking about
23 pediatric cases. We're not talking about people who
24 pull their hair out.
25     Yes, there are other causes of alopecia

Page 231

1 that are really not relevant when you are talking
2 about the context of treating a patient with cancer
3 chemotherapy.
4     THE VIDEOGRAPHER: Your microphone.
5     THE WITNESS: It's on my wrist. Thank you.
6 BY MR. KAUFMAN:
7  Q  Would you agree that chemotherapy is not
8 the only cause of alopecia?
9  A  Any kind of alopecia, sure. I agree with
10 that.
11  Q  Would you agree that chemotherapy is not
12 the only cause of permanent alopecia?
13     MR. THORNTON: Objection; form.
14     THE WITNESS: I have seen case reports of
15 permanent alopecia caused by other types of agents.
16 BY MR. KAUFMAN:
17  Q  What types of agents have you seen?
18  A  I have seen it with biologic agents. None
19 of these patients are -- at least the plaintiff
20 cases are all HER2 negative, so there would be no
21 reason to get other biologic agents.
22  Q  Can you give me some examples of those
23 biologic agents?
24  A  Well, they'd be the anti HER2.
25  Q  Which ones are those?

Page 232

1  A  Well, I mean, there's -- I would have to go
2 back and pull -- because that wasn't really a topic
3 because none of these plaintiffs had HER2 positive
4 cancer.
5  Q  But you have seen cases of permanent
6 alopecia with those biologic agents that are anti
7 HER2?
8     MR. THORNTON: Objection --
9     THE WITNESS: Which are not relevant to the
10 plaintiff cases we're talking about which is why
11 none of that has been discussed in the report.
12 BY MR. KAUFMAN:
13  Q  That is not my question.
14  A  No. I know. I'm answering you.
15  Q  The answer is, yes, you have seen that?
16     MR. THORNTON: Objection; form.
17     THE WITNESS: Have I seen other case
18 reports? Not consistent, replicable case reports,
19 but I have seen isolated case reports.
20 BY MR. KAUFMAN:
21  Q  Where in your expert report do you provide
22 your analysis of the cessation of exposure?
23     MR. THORNTON: Objection; form.
24     THE WITNESS: Are you talking about a
25 challenge, re-challenge? Tell me the framework in

Page 233

1 which you are talking.
2 BY MR. KAUFMAN:
3  Q  If an agent is potentially associated with
4 a disease, then one might expect that cessation of
5 the exposure might reduce the risk.
6     MR. THORNTON: Objection; form.
7     THE WITNESS: Well, I think we have talked
8 about not necessarily -- I mean, part of it depends
9 on the mechanism of action. I mean, if you kill a
10 stem cell, you're not going to get it back.
11     So part of it depends on how it's causing
12 permanent alopecia. So if you only partially
13 destroy it, I mean, I think you have seen it's
14 not -- I haven't discussed it, but people trying to
15 restore hair in patients who have been treated with
16 certain types of chemotherapy either to prevent
17 it -- this is more in the modern day than in the
18 time when the cases occurred.
19     The people trying to restore hair or
20 mitigate the impact of it with scalp cooling and
21 then there's more recently cleared FDA devices.
22  Q  Where in your report do you provide a
23 discussion of the specificity of the association?
24     MR. THORNTON: Objection; form.
25     THE WITNESS: I think the specificity of

Page 234

1 the association is particularly prominent with the
2 randomized control clinical trials and also with the
3 pharmacovigilance which is coming in and also the
4 case reports are predominantly Taxotere containing
5 regimens.
6 BY MR. KAUFMAN:
7   Q   Does the exact phrase "specificity of the
8 association" appear in your report?
9       MR. THORNTON:  Objection; form.
10      THE WITNESS:  It's throughout my report
11 that these are Taxotere containing regimens.
12 BY MR. KAUFMAN:
13  Q   That's not my question.  My question is,
14 does the phrase "specificity of the association"
15 appear in your report?
16      MR. THORNTON:  Objection; form.
17      THE WITNESS:  Once again, I think it's
18 implied because I'm only talking about Taxotere
19 containing regimens.
20 BY MR. KAUFMAN:
21  Q   So your analysis of the specificity of the
22 association is implied.  Would you agree then that
23 the phrase "specificity of the association" does not
24 appear in your report?
25      MR. THORNTON:  Objection; form.

Page 235

1 BY MR. KAUFMAN:
2   Q   To me, it either does or it doesn't.
3   A   I believe I do not have the phrase
4 "specificity."
5   Q   Where in your report do you have an
6 analysis of the consistency with other knowledge?
7   A   I think we've already talked about that in
8 the context of replication results inconsistency and
9 I think it's clearly there's consistency in the --
10 through the papers, through the control trials and
11 through the pharmacovigilance data.
12  Q   Does the phrase "consistency with other
13 knowledge" appear in your report?
14      MR. THORNTON:  Objection; form.
15      THE WITNESS:  Does the exact "phrase
16 consistency with other knowledge," no.
17 BY MR. KAUFMAN:
18  Q   Is that analysis also implied throughout
19 your report?
20  A   I think it is.
21  Q   If we look to Page 7 of your report,
22 there's a section on the scope.  It says, "I have
23 been asked to review permanent alopecia in patients
24 with early stage breast cancer who were treated with
25 Taxotere, Docetaxel in the context of the

Page 236

1 epidemiology detection, diagnosis and staging of
2 breast cancer, the treatment options and how
3 decisions regarding the risks and benefits of
4 treatment options are discussed between physicians
5 and patients."
6       Did I read that correctly?
7   A   I see that.
8   Q   Is that the scope of your report?
9   A   That is the framework for my report and I
10 do think that the other issues we have discussed are
11 implied and are relevant to the causation issues,
12 but you have read the sentence correctly.
13  Q   Okay.  Would you agree that you are not
14 retained by the plaintiffs' counsel in this
15 litigation as an epidemiologist to apply the
16 Bradford Hill factors or other epidemiological
17 weight of the evidence tools to determine if a
18 statistically significant association between
19 Taxotere and permanent alopecia can be classified as
20 causal?
21      MR. THORNTON:  Objection as to the form of
22 the question.
23      THE WITNESS:  I think the scope is correct
24 as written.
25 ///

Page 237

1 BY MR. KAUFMAN:
2   Q   I don't think that is responsive to my
3 question.
4       Would you like me to ask it again?
5   A   I think the scope was implied that I would
6 be able to talk to general causation, but it wasn't
7 specifically limited to general causation.
8   Q   You agree that the scope of your report
9 does not specifically or expressly state that you
10 would be providing an analysis on general causation
11 between Taxotere and permanent alopecia?
12  A   I think it was --
13      MR. THORNTON:  Objection; form.
14      THE WITNESS:  I think it was implied in my
15 interactions with counsel that would be part of what
16 I would be able to do.
17 BY MR. KAUFMAN:
18  Q   But you would agree with me that is not
19 expressly stated in the section entitled, "Scope of
20 This Report"?
21      MR. THORNTON:  Objection; form.
22      THE WITNESS:  I do agree that phrase is not
23 in this report.
24 BY MR. KAUFMAN:
25  Q   I would like to focus on -- let's go back

Veritext Legal Solutions
800-227-8440                                          973-410-4040