**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

In Re: TAXOTERE (DOCETAXEL)    MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

              SECTION "H" (5)

THIS DOCUMENT RELATES TO
*Jacqueline Mills v. Sanofi U.S. Services, Inc. et al.*
Case No. 17-2689

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COME NOW, Plaintiffs Jacqueline Mills and Victor Mills, through the undersigned counsel, and for their Response in Opposition to Defendants' sanofi-aventis U.S. LLC and Sanofi US Services Inc.'s ("Defendants") Motion for Summary Judgment, state as follows:

Plaintiffs allege in their Short Form Complaint (attached hereto as Exhibit 5), that Plaintiff Jacqueline Mills was administered docetaxel[1] chemotherapy, manufactured by Winthrop U.S., in Jonesboro, Georgia on January 6, 2015 and suffered disfiguring permanent alopecia beginning approximately September 2015 and continuing to date.

Plaintiffs asserted claims for Counts I – Strict Products Liability – Failure to Warn, II – Strict Products Liability for Misrepresentation, III – Negligence, IV – Negligent Misrepresentation, V – Fraudulent Misrepresentation, VI – Fraudulent Concealment, VII – Fraud and Deceit, and VIII – Breach of Express Warranty (Sanofi Defendants only) in their Short Form Complaint. (*See*, Ex.5).   However, in accordance with Pretrial Orders No. 61 (Rec. Doc. 877),

---

[1] Docetaxel, manufactured by Winthrop US, is a generic version of Taxotere®.  Winthrop US is a Sanofi company that delivers brand-equal authorized generics of Sanofi products.  See pages from Winthrop U.S.'s website homepage, attached as Exhibit 6.  For ease of reference, Plaintiffs use Taxotere interchangeably with docetaxel.

entered on September 27, 2017, and Pretrial Order No. 73 (Rec. Doc. 1463), entered on January 4, 2018, Counts II and VIII of Plaintiffs' original Short Form Complaint are dismissed.  Therefore, this response will not address Count II – Strict Products Liability for Misrepresentation or Count VIII – Breach of Express Warranty (Sanofi Defendants only.)   Defendants have moved for Summary Judgment on all Counts alleged in Plaintiffs' Short Form Complaint.

## FACTUAL BACKGROUND

### A.  Taxotere and its Labeling

Taxotere is a chemotherapy drug, used in the treatment of various forms of cancer, and is widely used in the treatment of breast cancer.  Second Am. Master Compl. ¶¶ 4, 113. Chemotherapy, including Taxotere, is known to cause temporary and reversible hair loss. *Id*. at ¶174.  However, the manufacturers of Taxotere had knowledge of an increased risk of permanent hair loss[2] associated with the drug and failed to adequately warn physicians and patients of this risk for decades.  *See generally* Second Am. Master Compl.  Since Taxotere's FDA approval in 1996 and until December 11, 2015, Taxotere's label contained no reference or warning regarding permanent hair loss. *Id*. at ¶¶ 124 - 138.  At the time that Ms. Mills was prescribed Taxotere, its label, under "Patient Counseling Information" stated that "side effects such as … hair loss are associated with docetaxel administration." Second Am. Master Compl. ¶ 166.  The "Patient Information" section of the label indicated that the "most common side effects of TAXOTERE include: … hair loss." *Id*.

Defendants mischaracterize the December 2015 change to the Taxotere label as modest, when in fact this label change brought about with it a significant change to the "Patient

---

[2] Plaintiffs use the phrase "permanent hair loss" to refer to non-temporary hair loss or alopecia that is ongoing, persistent, and/or irreversible.

Counseling Information." Rec. Doc. No. 5732-2 at 2, Second Am. Master Compl. ¶138. This

"Patient Counseling Information" section of the label directs physicians as to the information

they should convey to a patient when a counseling discussion is taking place. *See* Ex. 7, Patient

Counseling Information Section of Labeling for Human Prescription Drugs and Biological

Products – Content and Format, FDA (Dec. 2014).  The 2015 amendment to this section reads:

"Explain to patients that side effects such as […] hair loss (cases of **permanent** hair loss have

been reported) are associated with docetaxel administration."  Second Am. Master Compl. ¶138,

emphasis added.  Whereas the pre-December 2015 Taxotere label contained no physician

counseling instructions regarding *permanent* hair loss, the updated label directs physicians to

explain that cases of permanent hair loss have been reported.

### B.  Plaintiff's Informed Consent Regarding Her Chemotherapy Treatment Plan

At the time of Ms. Mills' initial consultation with her oncologist, Dr. Shefali Shah, not

only was she understandably concerned about ridding her body of cancer, but she was also

concerned about the implications of cancer treatment, including chemotherapy. *See* Declaration

of Jacqueline Mills ("Mills Dec.") ¶9, Ex. 8.  Ms. Mills understood that treatment with

chemotherapy could mean that she would lose her hair temporarily. *Id*.  Facing this disfiguring

side effect, even if only temporary, was distressing to her. *Id*.  In fact, Ms. Mills' concern about

hair loss was so prominent in her mind that the only question she recalls asking Dr. Shah during

her initial oncological consultation was whether she would lose her hair as a result of

chemotherapy. *Id*., *see also* Ex. 3, Mills Dep. 97:2-9.

While Ms. Mills' understanding of ER-positive, PR-positive HER2-positive breast cancer

was that it was a "high risk" form of cancer, she also understood that her cancer was considered

early stage. Ex. 3, Mills Dep. 95:19-96:4, Ex. 8, Mills Dec. ¶4.  Although Ms. Mills was fearful

as a result of her cancer diagnosis, she understood that with a diagnosis of Stage 1A, hormone receptor positive breast cancer, her cancer could be treated for cure. Ex. 8, Mills Dec. ¶4. Additionally, Ms. Mills understood that there were several forms of treatment she would undergo in order to combat her cancer: including surgery, chemotherapy, radiation, Herceptin treatment, and long-term hormone therapy. Ex. 8, Mills Dec. ¶5. When presented by her surgeon, Dr. Ahmann, with her surgical treatment options: lumpectomy or mastectomy, Ms. Mills ultimately elected to undergo lumpectomy surgery. Ex. 3, Mills Dep. 67:21-69:25. A lumpectomy is surgery that removes only part of the breast—the part containing and closely surrounding the tumor. *See* Ex. 9, *Mastectomy*, (Mayo Clinic). A mastectomy, by contrast, is surgical removal of the entire breast. *Id*. Ms. Mills' decided to undergo lumpectomy surgery because she thought it was sufficient to give her a good chance of survival. Ex. 3, Mills Dep. 70:12-20. Additionally, Ms. Mills felt that a lumpectomy was a better option aesthetically, because she did not want to appear "one-sided," as she feared she would with a unilateral mastectomy. Ex. 3, Mills Dep.71:20-72:7. Ms. Mills understood that the lumpectomy surgery was a more conservative surgery than mastectomy. Ex. 8, Mills Dec. ¶6.

Ms. Mills was, at the time of her diagnosis and breast cancer treatment, and still is an active participant in the decision-making process of her healthcare. Indeed, she weighed her surgical options and ultimately made an informed decision based on what felt right to her. Ex. 3, Mills Dep. 67:21-69:25. Ms. Mills elected on her own to have a port-a-cath placed rather than continuing to endure needle sticks for blood draws, injections, and chemotherapy infusions during her cancer treatment period. Ex. 8, Mills Dec. ¶12. Ms. Mills also affirmatively decided to seek Neupogen (a bone marrow stimulant) injections in order to treat her chemotherapy-induced neutropenia (low white blood cell count). *Id*. Ms. Mills administered these injections to

4

herself. *Id.* Moreover, she elected not to complete the prescribed six cycles of TCH chemotherapy, and instead opted to cease her TCH chemotherapy treatment after five cycles – thereby attempting to improve her quality of life by avoiding further negative side effects of the chemotherapy. Ex. 3, Mills Dep. 150:21-152:22, 153:22-155:11, Ex. 8, Mills Dec. ¶12. Ms. Mills was not a bystander when it came to her medical care. She was an informed and active participant.

However, Ms. Mills was not given the opportunity to make such an informed decision when it came to developing her chemotherapy treatment plan with her oncologist, Dr. Shah. While Dr. Shah advised Ms. Mills of some of the negative side effects that her chemotherapy would cause, she did not counsel Ms. Mills about the risk of permanent hair loss associated with Taxotere, because Defendants did not warn Dr. Shah about this risk. If Dr. Shah had received the warning that the Taxotere label now bears, she would have advised Ms. Mills that an unknown number of cases of permanent hair loss were associated with Taxotere, and that she could not predict whether Ms. Mills' hair would return after chemotherapy treatment. Ex. 4, Shah Dep. 90:4-25, 99:11-25, 101:1-14. Had this warning been shared with Ms. Mills, Ms. Mills would have been able to make an informed decision about her chemotherapy treatment plan. Critically, after receiving such a warning, Ms. Mills would have asked her doctor for alternative effective treatments to Taxotere and would not have taken the drug in favor of such treatments. Ex. 8, Mills Dec. ¶11.

## ARGUMENT

## I.      SUMMARY JUDGMENT STANDARD

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  To satisfy this initial burden, the movant must inform the court of the basis for the motion and identify the portions of the record that show the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In *Celotex*, the Supreme Court plainly stated:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

*Id.*  Once the moving party has met its burden, the non-moving party must go beyond the pleadings and present affirmative evidence demonstrating a genuine issue for trial.  *Id. at* 324-325. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the Court is to determine whether "there is a genuine issue for trial." *Id.* at 249.  When the non-movant produces evidence contradicting the movant's facts, a motion for summary judgment should be denied because the evidence and all reasonable inferences drawn from the evidence must be viewed in the light most favorable to the non-moving party. *Id.* at 255; *see also Evans v. Stephens*, 407 F.3d 1272, 1284 (11th Cir. 2005).

In accordance with the summary judgment standard, Eleventh Circuit courts have consistently held that the Court must avoid "weighing conflicting evidence or making credibility determinations, for "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences

are to be drawn in his favor." *Damon v. Fleming Supermarkets of Florida, Inc.* 196 F.3d 1354, 1361 (11th Cir. 1999); *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 918 (11th Cir. 1993) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

Summary judgment is to be granted cautiously in order to preserve substantive rights and must be "used sparingly since its prophylactic function, when exercised, cuts off a party's right to present his case to the jury." *Egelston v. State University College at Geneseo*, 535 F.2d 752 (2d Cir. 1976) (quoting *Heyman v. Commerce & Industry Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975)).

## II.  SUMMARY JUDGMENT IS INAPPRORIATE ON PLAINTIFFS' FAILURE TO WARN CLAIMS AS THE PROXIMATE CAUSE OF PLAINTIFF'S INJURY IS A QUESTION OF TRIABLE FACT

### A.  Georgia Law on Strict Liability and Failure to Warn

Generally stated, the purpose of strict liability under Georgia product liability law is to "ensure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market." Charles R. Adams, III, Georgia Law of Torts §25-8, note 4, at 499 (2007 ed.)

Under Georgia law, the failure to warn is a product defect. *Beam v. Omark Industries, Inc.*, 237 S.E. 2d607 (Ga. Ct. App. 1977).  To establish a failure to warn claim under Georgia law, "the plaintiff must show that the defendant had a duty to warn, the defendant breached that duty and the breach was the proximate cause of the plaintiff's injury." *Wheat v. Sofamor, S.M.C.*, 46 F.Supp.2d 1351, 1362 (N.D. Ga. 1999).  "[A] manufacturer has a duty to warn of nonobvious foreseeable dangers from the normal use of its product." *Thornton v. E.I. DuPont de Nemours &*

*Co.*, 22 F.3d 284, 289 (11th Cir. 1994).  The duty to warn arises "whenever the manufacturer knows or reasonably should know of the danger arising from the use of its product." *Chrysler Corp. v. Batten*, 450 S.E.2d 208, 211 (Ga. 1994).  Failure to warn claims can take two forms: (1) The manufacturer fails to adequately communicate the warning to the ultimate user; or (2) The manufacturer fails to provide an adequate warning of the product's potential risks. *Thornton*, 22 F.3d at 289.

Defendants have failed in both respects, although only one is necessary to prevail on the Plaintiffs' product liability claim.  At a minimum, triable issues of material fact exist concerning the claim.

### B.  The Adequacy of Defendants' Warning is a Question for the Jury

Summary judgment should not be granted as to Count I of Plaintiffs' complaint, Strict Products Liability – Failure to Warn.

In cases involving prescriptions medications, Georgia applies the "learned intermediary" doctrine, limiting a drug manufacturer's duty to warn to prescribing physicians.  *E.g.*, *Presto v. Sandoz Pharm. Corp.*, 226 Ga. App. 547, 548 (Ga. Ct. App. 1997).  Under this doctrine, the pharmaceutical company has no duty to warn the patient of the dangers involved with the product, but instead has a duty to warn the patient's doctor, who acts as a learned intermediary between the patient and the manufacturer. *See Catlett v. Wyeth, Inc.*, 379 F.Supp. 2d 1374, 1381 (M.D. Ga. 2004), *Jack v. Glaxo Wellcome, Inc.*, 239 F. Supp. 2d 1308, 1321 (N.D. Ga. 2002).

Some courts adopt a rebuttable presumption known as the "heeding presumption," which instructs the jury that had an adequate warning accompanied the product, they are to presume that the plaintiff or plaintiff's physician would have "heeded" or followed the warning.  This presumption establishes causation by permitting the inference that an adequate warning would

have altered plaintiff's conduct.  However, Georgia has not adopted the "heeding presumption," which means that a prescribing physician will not be presumed to follow or "heed" a different adequate warning had it been given.  *Porter v. Eli Lilly and Co.*, No. 1;06-CV-1297-JOF, 2008 WL 544739 at *10 (N.D. Ga. Feb. 25, 2008).  Under the learned intermediary doctrine, the manufacturer's warnings to the physician must be adequate or reasonable under the circumstances of the case. *McCombs v. Synthes* (U.S.A), 277 Ga. 252, 587 S.E. 2d 594 (2003).

As a threshold issue under a summary judgment standard, the Court should determine whether an adequate warning was given to Plaintiff's physician.  *Wheat*, 46 F.Supp.2d at 1363 citing *Carter v. E.I. DuPont de Nemours & Co., Inc.*, 456 S.E.2d 661, 662 (Ga. Ct. App. 1995). Under Georgia's learned intermediary doctrine, an adequate warning is one that warns of inherent dangers not within knowledge of or obvious to the average learned intermediary. *Zachary v. Dow Corning*, 884. F.Supp. 1061 (M.D. La. 1995).

Indeed, in the instant case, Ms. Mills' prescribing oncologist, Dr. Shefali Shah, testified that she was unaware at the time that she prescribed Taxotere to Ms. Mills, that the drug carried with it a higher risk of permanent hair loss than other chemotherapeutic agents.

> Q:     And it's true that you yourself, you didn't know at the time that Taxotere carried with it a higher risk of permanent hair loss than other drugs, right?
>
> . . .[3]
>
> A:     No.

Ex. 4, Shah Dep. 90:15-20.

Further, Dr. Shah testified that her understanding at the time that she prescribed Taxotere to Ms. Mills was that only "temporary" alopecia was a common known side effect of Taxotere and other cancer medicines.

---

[3] Mr. Keenan:     Object to form.

Q:     And it says:  What is alopecia?  Alopecia is another word for hair loss or thinning of the hair.  It is a common yet temporary side effect of some cancer medicines.
       Was that your understanding of the type of hair loss that your patients could suffer back in 2014-'15 when you prescribed Taxotere?

. . .[4]

A:     Yes.

Q:     And is that generally what you've shared with your patients?

A:     Yes.

Ex. 4, Shah Dep. 94:11-23.

As previously stated, Taxotere's label, prior to December 2015, contained no warning or mention of permanent or irreversible hair loss. Second Am. Master Compl. ¶¶ 124 – 138.  Instead, it simply stated that "alopecia" is one of the most common adverse reactions associated with the drug. *Id*.  Accordingly, Dr. Shah's testimony, along with the label in effect at the relevant period, are sufficient affirmative evidence upon which a jury could reasonably conclude that the warning provided by defendants for Taxotere was inadequate.  Additionally, Plaintiffs' demonstration of facts that support a finding of inadequate warning should bar the use of the learned intermediary doctrine because as a threshold matter, a defendant must show that adequate warning was given before obtaining the benefit of the learned intermediary doctrine.

In *Porter*, 2008 WL 544739, at *9, the court recognized that there is some force to this argument in the "wording of Georgia case law."  Moreover, the *Porter* court recognizes the Northern District of Georgia's prediction of the court's reach on this subject.  Only "[w]here a learned intermediary has actual knowledge of the substance of the alleged warning and would have taken the same course of action even with the information the plaintiff contends should have been

---

[4] Mr. Keenan:     Object to form.

provided, courts typically conclude that the learned intermediary doctrine applies or that the causal link is broken and the plaintiff cannot recover." *Wheat*, 46 F.Supp.2d at 1363-1364.  This holding is inapposite to the facts of the instant case.

First, the learned intermediary in this case (Dr. Shah) did *not* have actual knowledge of the substance of the alleged warning regarding the increased risk of permanent or irreversible hair loss, according to her sworn testimony.  Second, Dr. Shah repeatedly testified that she would have taken a *different* course of action – i.e., counseling her patient on the increased risk of permanent hair loss – had she been provided an adequate warning. Ex. 4, Shah Dep. 90:15-25, 91: 10-22, 99:8-17, 101:1-14, 106:7-16.  Additionally, Dr. Shah testified that she would have respected her patient's wishes, had she expressed a desire to try an alternative treatment to avoid the risk of permanent hair loss. *Id*. at 107:20-108:16. Accordingly, triable issues of material fact exist as to whether defendants provided an adequate warning to Plaintiff's treating physician.

### C. Plaintiffs Have Proffered Sufficient Evidence to Raise a Triable Issue as to Whether Defendants' Inadequate Warning was the Proximate Cause of Ms. Mills' Injury

The second prong of the failure to warn analysis requires that the breach – in this case the inadequate warning as to permanent hair loss – be the proximate cause of the plaintiff's injury. *Wheat*, 46 F.Supp.2d at 1362; *see also In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.*, 711 F. Supp. 2d 1348, 1366 (M.D. Ga. 2010).  Because Georgia courts have refused to apply the heeding presumption to the learned intermediary doctrine, the plaintiff is required to put forth evidence that the prescribing physician would have changed his course of conduct had an adequate warning been provided.  Most often, this comes in the form of prescriber testimony stating that: (1) the prescriber would not have prescribed the drug; (2) *the prescriber would have*

*communicated the adequate warning to plaintiff*; or (3) the prescriber would have monitored the patient while on the drug.  *See Courson v. Wright Med. Tech. Inc.*, No. 5:12-cv-173, 2013 WL 5595973 at *7-10 (M.D. Ga. Oct. 11, 2013); *Weilbrenner v. Teva Pharms. USA, Inc.*, 696 F. Supp. 2d 1329, 1341-42 (M.D. Ga. 2010) (noting that prescriber "might" have treated the patient differently had he received an adequate warning); *See In re Aredia and Zometa Prod. Liab. Lit.*, No. 3-06-MD-1760, 2010 WL 5136148 at *2-3 (M.D. Tenn. Dec. 7, 2010) (applying Georgia law) (denying summary judgment where prescriber testified that she would take a different course of conduct prior to starting the patient on the drug, giving the patient a more informed choice concerning the risks).

In this case, Defendants failed to adequately warn physicians, including Dr. Shah, about the known risk of irreversible or permanent alopecia associated with Taxotere. Rec. Doc. 4407 ¶ 223.  Plaintiffs allege that this failure constitutes a breach of Defendants' duty to warn and proximately caused Plaintiff Mills' injury. *Id.* ¶ 231.  Defendants contend that proximate cause is lacking under the learned intermediary doctrine, because Dr. Shah's testimony indicates that she would have prescribed Taxotere for Ms. Mills, even had she been warned of the increased risk of permanent alopecia, because it was the standard of care at that time. Rec. Doc. 5732-2 at 2-4, Ex. 4, Shah Dep. 18:2-19:13.  However, Defendants assume that if Dr. Shah recommended treatment with Taxotere, that Ms. Mills would follow that recommendation without question.  This assumption ignores the fact that Dr. Shah would have counseled her patient on the risk of permanent hair loss had she been given that information by defendants.  Indeed, in her deposition, Dr. Shah repeatedly testified to the fact that *had* she been warned of the risk of irreversible or permanent hair loss at the time she treated Ms. Mills, she certainly would have counseled her patient regarding that risk. Ex. 4, Shah Dep. 90:15-25, 91: 10-22, 99:8-17, 101:1-14, 106:7-16.

Ms. Mills' actions demonstrate that she is the ultimate decision-maker regarding her health care. After receiving such a warning, Ms. Mills unequivocally would have asked her doctor for alternative effective treatments to Taxotere. Ex. 8, Mills Dec. ¶11.  In the end, she would not have taken Taxotere in favor of such alternative treatments that did not carry the risk of permanent hair loss. *Id.*  It is not a foregone conclusion, as Defendants attempt to assert, that Dr. Shah's decision to prescribe Taxotere, even in the face of a warning regarding permanent hair loss, begets Ms. Mills' consent to such treatment.  The questions of whether Dr. Shah would have changed her course of conduct by counseling her patient on the risk of permanent hair loss associated with Taxotere, and whether Ms. Mills would have taken Taxotere after being warned by her doctor of the risk of permanent hair loss, are questions for a jury to decide and are not appropriate for summary adjudication.  Accordingly, triable issues of material fact exist as to whether Defendants' inadequate warning was the proximate cause of Plaintiff's injury in this case.

### D. The Learned Intermediary Doctrine Does Not Sever the Causal Link to Plaintiff's Injury

Defendants draw upon the unreported case *Porter v. Eli Lilly & Co.* and assert that the application of the learned intermediary doctrine to the instant case defeats proximate causation. This unreported case is easily distinguished.

In *Porter*, a patient was prescribed Prozac by his treating physician in order to treat anxiety. *Porter*, 2008 WL 544739, at *1.  The prescribing doctor testified that he had no actual knowledge of a potential suicide risk associated with Prozac at the time he prescribed the drug.  *Id.* at *9. Unfortunately, the patient (Plaintiff Porter's husband) committed suicide less than two weeks after beginning to take Prozac. *Id.* at *1.   The Plaintiff contended that the drug company's warning regarding suicide risk was inadequate.  *Id.* at *5.  However, the prescribing doctor unequivocally

testified that even had he known of the suggested warning, he would not have treated Mr. Porter with a different medication or in a different manner, because he did not view the patient as a suicide risk. *Id.* at *9. Accordingly, the *Porter* court held that the plaintiff could not establish proximate cause for her causes of action and summary judgment was granted.

In the present and distinct case, Ms. Mills' treating oncologist, Dr. Shah, unequivocally testified that she *would have* treated Ms. Mills in a different manner had she known of the suggested warning regarding increased risk of permanent hair loss. As Dr. Shah testified, had she been adequately warned by Defendants, she would have counseled her patients, including Ms. Mills, regarding the risk of permanent and irreversible hair loss associated with Taxotere.

> Q:    And it's true that you yourself, you didn't know at the time that Taxotere carried with it a higher risk of permanent hair loss than other drugs, right?
>
> . . .[5]
>
> A:    No.
>
> Q:    If you – if you had that information at the time that's certainly information you would have shared with Ms. Mills?
>
> A:    I presume so.

Ex. 4, Shah Dep. 90:15-25.

> Q:    And so I want to just sort of explore – well, let me – let me first follow up. If you knew in your mind that a particular chemotherapy agent could cause total permanent hair loss like what Ms. Mills is presented with today, that's something you would discuss with them in terms of your treatment options, right, just to be clear?
>
> . . .[6]
>
> A:    Yes.
>
> Q:    Because you understand that at least to some patients that would be a big deal, right?

---

[5] Mr. Keenan:     Object to form.
[6] Mr. Keenan:     Object to form.

A:      Yes.

Ex. 4, Shah Dep. 91:10-22.

Q:      Independent of the package insert you've received no information from Sanofi that you should counsel patients about permanent hair loss, correct?

A:      Correct.

Q:      If you had received that information, would you have counseled patients accordingly?

A:      Yes, I assume so.

Ex. 4, Shah Dep. 99:11-17.

Q:      It [referring to the updated 2015 Taxotere label] states:  In most cases normal hair growth should return.  In some cases (frequency not known) permanent hair loss has been observed.

A:      Yes.

Q:      Is that now your understanding –

A:      Yes.

Q:      – about the use of Taxotere?

A:      That there are case reports.

Q:      And that the frequency is not known?

A:      Correct.

Q:      All right.  And if that's information that you had had at the time that you treated Ms. Mills, you would have provided her that information?

A:      Yes.

. . . [7]

A:      I assume so.

Ex. 4, Shah Dep. 101:1-16.

---

[7] Mr. Keenan:      Object to form.

Dr. Shah would have advised Ms. Mills of any other acceptable courses of treatment, and allowed the patient to make the choice.

> Q:   So just to be clear, I just want to clearly ask, my question is you share with her your knowledge now that Taxotere can cause permanent total baldness and she says, Doctor, that's not something that I want, can we – can you at least advise me of other treatments, would you at least advise her and allow her to make the choice?
>
> A:   Yes.  I would give her both options today, and I think this is actually an acceptable regimen in early stage.

Ex. 4, Shah Dep. 106:7-16.

Finally, Dr. Shah would have supported Ms. Mills in seeking a second opinion if confronted with Dr. Shah's recommendation of Taxotere and warning regarding the risk of permanent hair loss associated with the drug.

> Q:   And/or if she said, look, Doctor, I'd like to go get a second opinion, you'd allow her to do that too?
>
> A:   I'd allow all my patients to get a second opinion.  I always tell them, it doesn't hurt my feelings.  This is your life, your body.  For all you know I could be a quack.  Please do so.  Most – I'm serious, I actually say that. And it's true because this is a foreign language to most people.

Ex. 4, Shah Dep. 107:17-25.

The 11th Circuit, in *Toole v. McClintock*, 999 F.2d 1430 (11th Cir. 1993), held that under the learned intermediary doctrine, "the adequacy of [the drug manufacturer's] warning is measured by its effect on the *physician* . . . to whom it owed a duty to warn, and not by its effect on [the patient]." *Id*. at 1433; *see also Stone v. Smith, Kline & French Lab.*, 447 So.2d 1301, 1304-05 (Ala. 1984), *adopting Reyes v. Wyeth Laboratories*, 498 F.2d 1264, 1276 (5th Cir. 1974).  In *Toole*, a patient and her spouse brought suit against the manufacturer of silicone gel breast implants to recover for injuries caused by the rupture of those implants. *Toole*, 999 F.2d 1430.  The plaintiffs'

failure to warn claim against the implant manufacturer survived motion for directed verdict and judgment notwithstanding verdict based on the fact that the jury heard evidence from which it could reasonably conclude that a different warning would have caused the Plaintiff's physician to warn the plaintiff of the inherent risk of rupture associated with the implant.  *Id.* at 1433

Dr. Shah's testimony provides more than sufficient evidence for a jury to conclude that an adequate warning from Defendants regarding permanent hair loss would have altered the physician's risks discussion with Ms. Mills.  Therefore, Plaintiffs can demonstrate factual causation through their evidence supporting the effect an adequate warning would have had on Dr. Shah's treatment practices and presents a triable issue of material fact.

## III.   SUMMARY JUDGMENT IS INAPPROPRIATE ON PLAINTIFFS' ADDITIONAL CLAIMS OF NEGLIGENCE, FRAUDULENT CONCEALMENT AND FRAUD AND DECEIT

Defendants are correct in their assertion that, under Georgia law, the "'learned intermediary rule' encompasses any fraud, fraudulent concealment, misrepresentation, failure to warn or breach of warranty claims related to the sale and use of prescription drugs." *Catlett*, 379 F. Supp. 2d at 1381.  However, this does not require dismissal of Plaintiff's remaining claims for negligent misrepresentation, fraudulent misrepresentation, fraudulent concealment, and fraud and deceit. Ex. 5, SFC ¶ 13.  In *Catlett*, this holding defeated such claims against sales representatives under the learned intermediary doctrine.  However, the Defendants are pharmaceutical drug manufacturers who do ultimately have a duty to warn physicians who will be prescribing the drug to their patients. *Catlett*, 379 F. Supp. 2d at 1381.

### A.  Plaintiffs Have Pled a Prima Facie Claim for Negligence

The law in Georgia and throughout this country is that the essential elements of a cause of action for negligence are (1) a legal duty; (2) a breach of this duty; (3) an injury; and (4) a causal connection between the breach and the injury. *Persinger v. Step by Step Infant Dev. Ctr.*, 253 Ga. App. 768, 769 (Ga. Ct. App. 2002).  In negligence actions, "the duty imposed is the traditional one of reasonable care, and the manufacturer need not provide. . . a product incapable of producing injury."  *Ream Tool Co. v. Newton*, 209 Ga. App. 226, 228 (Ga. Ct. App. 1993).

 Defendants' contention that Plaintiffs have not adduced evidence of negligence in these cases is simply contrary to fact.  First, Plaintiffs clearly assert claims related to Defendants' duty to exercise reasonable care in the design, manufacture, promotion, packaging, sale and/or distribution of Taxotere, including a duty to assure that the product would not cause users to suffer unreasonable, disfiguring, and dangerous side effects.  Second Am. Master Compl. ¶241.  Plaintiffs also assert that Defendants had a duty to disclose to Plaintiffs and their healthcare providers the defective nature of Taxotere, including the heightened risks of disfiguring permanent alopecia.  *Id*. at ¶271.  Plaintiffs also establish Defendants' duty under the Changes Being Effected Regulations to initiate a change to the products' labels to reflect the true levels of risk associated with the product in their factual allegations.  *Id*. at. ¶173.  Finally, Plaintiffs aver Defendants' duty to disseminate truthful information and not to deceive Plaintiffs, Plaintiff's healthcare providers, and/or the public.  *Id*. at. ¶282, 283.  Therefore, a triable issue of material fact exists as to the first element of the prima facie case of negligence.

Second, Plaintiffs plead numerous claims of Defendants' breach of these duties, by putting Taxotere into interstate commerce without adequate warning to Plaintiffs and their healthcare providers, knowing that the product created a high risk of unreasonable, disfiguring, and dangerous

side effects. *Id*. at. ¶242.  Plaintiffs also assert Defendants' breach of duty by willfully and/or recklessly concealing and omitting material facts concerning the safety of Taxotere to cause Plaintiffs and their healthcare providers to rely on the continued use of the drugs to cause them to purchase, prescribe and/or dispense Taxotere. *Id*. at. ¶273.  Plaintiffs also establish Defendants' breach of duty by distributing information containing material misrepresentations of fact and/or omissions.  *Id*. at. ¶284. Accordingly, a triable issue of material fact exists as to the second element of the prima facie case of negligence.

Plaintiffs' injury element of their prima facie negligence case is established clearly in their Short Form Complaint where Plaintiffs allege "disfiguring and permanent alopecia beginning approximately September 2015 and continuing to date."  Ex. 5, SFC ¶ 12. This allegation establishes a triable issue of material fact as to the third element of the prima facie case of negligence.

Finally, the causal connection between Defendants' breach of duty and Plaintiff's injury has been discussed at length in Section II of this brief.  Accordingly, a triable issue of material fact as to the fourth element of the prima facie case of negligence exists.  Moreover, Plaintiffs' negligence claim survived Defendants' motion to dismiss upon entry of this Court's order filed on August, 30, 2017.  *See* Rec. Doc. 784.  Defendants' offer no support for their contention that Plaintiffs have failed to plead a prima facie case for Negligence.

## B. Plaintiffs do not Oppose a Grant of Summary Judgment on their Misrepresentation Claims

Plaintiffs do not intend to continue to pursue a separate claim for "negligent misrepresentation," or "fraudulent misrepresentation," as the viability of such claims in this context has been previously determined by the court in *Brazil v. Janssen Research & Dev. LLC*,

249 F. Supp. 3d 1321, 1340 (N.D. Ga. 2016); *see also Swicegood v. Pliva, Inc.*, 543 F. Supp. 2d 1351, 1357 (N.D. Ga. 2008).   Plaintiffs therefore do not oppose the granting of summary adjudication in favor of Defendants on Counts IV and V.

### C.   Plaintiffs Have Pled a Prima Facie Case for Their Additional Fraud-Based Claims

Under Georgia law, "[t]he tort of fraud has five elements: (1) a false representation or omission of a material fact; (2) scienter; (3) intention to induce the party claiming fraud to act or refrain from acting; (4) justifiable reliance; and (5) damages." *ReMax N. Atlanta v. Clark,* 537 S.E.2d 138, 141 (Ga. Ct. App. 2000).   In the context of fraudulent-concealment claims, the scienter element requires that "the alleged defrauder had actual, not merely constructive, knowledge of the fact concealed." *Id.* at 142. In addition, only the "[s]uppression of a material fact which a party is under an obligation to communicate" can support such a claim. O.C.G.A. § 23–2–53. *McCabe v. Daimler AG,* (N.D. Ga. 2013) 948 F.Supp.2d 1347, 1368.   Additionally, Georgia law extends the "learned intermediary rule" to "encompas[s] any fraud, fraudulent concealment . . . claim related to the sale and use of prescription drugs." *Catlett*, 379 F.Supp.2d 1374.

In the application of this standard to the instant case, Plaintiffs have sufficiently alleged the elements of fraud against Defendants. Second Am. Master Compl. ¶¶ 259-276.  Defendants contend that Plaintiffs cannot satisfy the representation or reliance elements of these fraud claims, due to an absence of evidence regarding representations made by Defendants directly to Plaintiffs.  However, under the learned intermediary doctrine, it is not necessary that Defendants make any express statement or representation directly to Plaintiffs, nor that Plaintiffs rely upon any such alleged statement. *Catlett*, 379 F.Supp.2d 1374.  Rather, the claim requires express statements or representations to Plaintiff's physician, and reliance by Plaintiff's physician on

such alleged statement.  Express statements or representations were indeed made to Plaintiff's physician, Dr. Shefali Shah, through Taxotere's label, prescribing information, and patient counseling information.  Dr. Shah's testimony illustrates her reliance on these representations, specifically as to the temporary nature of the hair loss associated with Taxotere.  Ex. 4, Shah Dep. 94:11-23.

Again, Plaintiffs' complaint is replete with allegations of false representations made by Defendants to Plaintiff's physician regarding Taxotere's safety, efficacy and the nature of Taxotere's side effects. Second Am. Master Compl. ¶¶ 197, 259-276.  Defendants omitted from any representation made to Plaintiff's physician that Taxotere carried a risk of permanent hair loss.  *Id.*  Defendants' fraudulent actions sought to induce Plaintiff's physicians and others to prescribe Taxotere to their patients in order to gain market share. *Id.*  Therefore, triable issues of material fact exist regarding Plaintiffs' claims VI and VII.

## CONCLUSION

WHEREFORE, Plaintiffs respectfully request this Honorable Court DENY Defendant's Motion for Summary Judgment so a jury may hear Plaintiffs' claims I, III, VI, and VII and render a verdict on the disputed issues.

Respectfully Submitted,

/s/ *Lindsay R. Stevens*
John H. Gomez (T.A.)
Ahmed S. Diab
Lindsay R. Stevens
GOMEZ TRIAL ATTORNEYS
655 W. Broadway, Suite 1700
San Diego, CA 92101
T: (619)237-3490
F: (619)237-3496
john@thegomezfirm.com
adiab@thegomezfirm.com
lstevens@thegomezfirm.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 26, 2019, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.


<u>/s/Maria Felix</u>