## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)        MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

                                          SECTION "H" (5)

THIS DOCUMENT RELATES TO

*Deborah Johnson*                         HON. JANE TRICHE MILAZZO
Case No. 16-15607

---

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON STATUTE OF LIMITATIONS GROUNDS AGAINST PLAINTIFF DEBORAH JOHNSON [REC. DOC. 5734]**

---

Plaintiff, Deborah Johnson, Opposes hereby submits this Opposition to Defendants' Motion to Dismiss, and pursuant to LR 56.2, controverts specific statements of undisputed material fact that are irrelevant and non-material or clear misrepresentations of fact and testimony.

### A.      Undisputed Material Facts

1.      Defendants admit that Sanofi-Aventis U.S. LLC and Sanofi US Services, Inc. ("Sanofi") labeled and distributed Taxotere®, a docetaxel product submitted under Section 505(b) of the Federal Food, Drug, and Cosmetic Act ("FDCA"), as well as a docetaxel product submitted under Section 505(b) of the FDCA.   *See* Paragraph 2, Master Answer and Affirmative Defenses ("Master Answer") to Plaintiffs' First Amended Master Long Form Complaint (Doc No. 961)

2.      Sanofi admits that on June 22, 1998, the FDA approved Taxotere® (docetaxel) for the treatment of patients with locally advanced or metastatic breast cancer after failure of prior chemotherapy.  See Paragraph 125, ("Master Answer")

3.      Sanofi admits that on August 2004, FDA approved Taxotere® (docetaxel) in combination with doxorubicin and cyclophosphamide for the adjuvant treatment of patients with operable node-positive breast cancer. *See* Paragraph 131, ("Master Answer")

4.      The 2010 version of the Sanofi Taxotere prescribing information stated under "Patient Counseling Information" that "side effects such as […] hair loss are associated with docetaxel administration." "Patient Information" indicated that the "most common side effects of TAXOTERE include: […] hair loss." The document contains no mention of irreversible or permanent hair loss.  *See* Paragraph 134, First Amended Long Form Complaint (AMC); Doc 5734-10, Exhibit "H", to Defendant's Motion for Summary Judgment.

5.      On May 12, 2010, Ms. Johnson underwent biopsy of her left breast. Her pathology showed left breast invasive ductal carcinoma, diagnosed as T2, N1, M0, HER2/neu negative, ER positive, and PR negative. *See* UMCNO00286–287; 00257–259

6.      Ms. Johnson was treated with Taxotere every three weeks for six cycles from August 12, 2010 to December 30, 2010. See SFC at ¶ 10; PFS § V.12.

7.      The Risks associated with Taxotere, provided by her Physician prior to Deborah Johnson receiving Taxotere, did not include any warning of the *permanency* of hair loss/alopecia

| Risks Identified by the Louisiana Medical Disclosure Panel | | |
|---|---|---|
| • Hair loss<br>• Damage to blood forming organ (bone marrow) which may result in bleeding, infection, anemia, and possible need for transfusion<br>• Damage to brain, heart, kidneys, liver, lungs, nervous system, and skin | • Serious allergic reaction including shock<br>• Sterility<br>• Nausea and/or vomiting<br>• Constipation or diarrhea | • Sores on lips and/or ulcers in the lips, mouth, throat, stomach, rectum.<br>• Loss of lining of intestinal tract from mouth to anus<br>• Secondary cancer (cancers in the future caused by chemotherapy)<br>• Local damage at injection site |

*See* Exhibit "H", page 7 of 8, to Defendant's Motion for Summary Judgment.

8.      Dr. Lewis, Plaintiff's Treating Oncologist, testified that he probably would have mentioned hair loss as a result of chemotherapy to Ms. Johnson the time he prescribed her chemotherapy regime.  Dr. Lewis testified, "*I don't know if I had told her that it would grow back or that there was a chance it wouldn't*".  *See* Exhibit "F" to Defendant's Motion for Summary Judgment, Depo of Dr. Brian Lewis, Doc. 5734-8, page 23 of 40, Depo pages 82-84.

9.      Dr. Lewis testified that when discussing the risks of Chemotherapy with patients today, he would warn their hair would fall out, but that he "maybe" would warn that it could be permanent hair loss, as he has seen commercials on TV linking Taxotere and permanent hair loss.  *See* Exhibit "F" to Defendant's Motion for Summary Judgment, Deposition of Dr. Brian Lewis, Doc. 5734-8, page 23 of 40, Depo page 84.

10.     Deborah Johnson was told that she might lose her hair temporarily after receiving chemotherapy, but she was not told that her hair loss would be permanent.  *See* Exhibit "B" to Defendant's Motion for Summary Judgment, Deposition of Plaintiff, Doc. 5734-4, page 7 of 89, Depo pages 18-19, page 48 of 89, depo page 184.

11.     During the time period immediately prior to Ms. Johnson's use of Taxotere, during Ms. Johnson's use of Taxotere, and at all times subsequent until 308 days prior to the day she filed her lawsuit, Sanofi failed to notify physicians who prescribed Taxotere of the risk of *permanent* alopecia from that use.  *See* Paragraph 134, First Amended Long Form Complaint*;* Document 5734-10, Exhibit "H", to Defendant's Motion for Summary Judgment; Defendants' Statement of Undisputed Material Facts, Statements 6 and 116.[1]

---

[1] 116. In December 2015, Sanofi added a statement to the "Post-Marketing Experiences" section of the label: "Cases of permanent alopecia have been reported." AMC

12.     In December 2015, Sanofi added a statement to the "Post-Marketing Experiences" section of the label: "Cases of permanent alopecia have been reported." AMC ¶ 138.

**B.      Controverted Statements of Disputed Material Fact**

13.     Plaintiff controverts Defendant's Statement of Undisputed Material Facts, Statements 32-37, as being irrelevant and non-material.  Family medical history played no role in the filing of Ms. Johnson's complaint.

14.      Plaintiff controverts Defendant's Statement of Undisputed Material Facts, Statements 64-80, as being irrelevant and non-material; Plaintiff's radiation treatment appointments missed, or fungal foot infection visits made, are not germane to questions of reasonableness of notice as they  relate to permanent alopecia and Sanofi's disclosure of that information.

15.     Plaintiff controverts Defendant's Statement of Undisputed Material Facts, Statements 82-99, as "hair loss" as a stand-alone warning is irrelevant when the issue at bar is the adequacy and timing of applicable warnings of <u>permanent hair loss</u> from Taxotere use, in light of the reasonableness of Plaintiff's pursuit of, and degree of access to, that information.   The fact that most cancer patients know that temporary hair loss will occur as a result of chemotherapy is not a sufficient predicate, in and of itself, for a reasonable person to deduce the need to sue Sanofi.

16.     Plaintiff controverts Defendant's Statement of Undisputed Material Facts, Statement 125, as Louisiana law does not attribute constructive notice to what a plaintiff *could* know, but what they *should reasonably know*.  See the discussion in Plaintiff's Opposition Memorandum.

17.     Plaintiff controverts Defendant's Statement of Undisputed Material Facts, Statements 29-31, 109, 112, 127, and 130 as gross misrepresentations of sworn testimony.

For example, Defendant's Statement of Undisputed Material Facts, Statement 31

states: *"31. She agreed that Taxotere and her chemotherapy regimen is likely a reason*

*she is alive and was able to be present at the deposition. See Dep. Tr. 314:16-315:5."*

However, the actual deposition testimony reads thus:

Q.    As you sit here today, do you know which of the chemotherapeutic agents you believe
      caused your hair loss?

A.    No.

Q.    So you think it could have been one, two, or all three of them.

A.    Right.

Q.    Do you believe that your chemotherapy played any role with the fact that you're
      sitting here today and, for lack of a better word, you beat the cancer, with no
      reoccurrence? Do you believe that the chemotherapy had anything to do with that?

A.    Yes.


So not only did Ms. Johnson <u>not</u> aver a belief that Taxotere is the "likely" reason she was

alive at the deposition[2], she had no idea if Taxotere was involved at all.  She did concede a 'yes'

when asked her belief if chemotherapy played "any role" in her current remission status.

Plaintiff controverts any of defendants' statements of undisputed material fact suggesting

in any way, that in light of Ms. Johnson's education, intelligence, the severity of the symptoms,

and the nature of Sanofi's conduct in withholding warning information on a causal link between

Taxotere use and permanent alopecia, Ms. Johnson was placed on constructive notice of a

failure to warn products liability action more than a year prior to her filing of the instant

complaint.

---

[2] Here, we put aside for the moment the pure irrelevancy of the premise.   Louisiana law does not allow a drug
manufacturer to withhold known side effects of the drug because the drug works well for some, but not others.

## INTRODUCTION

Plaintiff Deborah Johnson, a breast cancer survivor, filed her products liability Complaint against movers-Defendants Sanofi-Aventis U.S., LLC and Sanofi US Services, Inc. ("Sanofi") timely and within the appropriate prescriptive period under La. Civ. Code art. 3492. As such, this Court should deny Defendants' motion for summary judgment.

Throughout their motion, Defendants oversimplify, and thereby mischaracterize, Ms. Johnson's legal claims, causation arguments, and the triggering of prescription. Of central import, Sanofi alleges that Ms. Johnson, a person with a 1975 high school diploma, and some limited vocational technical training, should have deduced not only that she had permanent hair loss after she was treated for breast cancer with a chemotherapy regimen including Taxotere, but that the cause of her permanent hair loss was Taxotere, to the exclusion of any other chemotherapy drug, non-chemotherapy drug, genetic condition, or environmental factor.

Louisiana law firmly establishes that it is the plaintiff's knowledge of the underlying tortious conduct by Defendants that triggers the prescriptive period. The facts of this litigation clearly support a finding that it would <u>not</u> have been reasonable to expect Ms. Johnson (or her treating physicians) to have been placed on notice of a potential cause of action against Defendants simply as a result of Ms. Johnson suffering hair loss after chemotherapy. Plaintiff is responsible for what she *should* know, and the generally accepted medical and scientific belief known to her physicians as it related to hair loss and Taxotere, during all relevant time periods, concerned only temporary hair loss - not permanent hair loss - as a known risk.

Sanofi claims that Ms. Johnson should have figured out the complex pharmacological and epidemiological questions in her use of Taxotere, and known that Taxotere was the cause of her permanent hair loss by 2011. Sanofi claims this despite the fact that no FDA warning label content existed at the time of her treatment that would have

warned her prescribing physicians that Taxotere could cause permeant alopecia. Indeed, Sanofi admits that the warning label accompanying Taxotere at the time it was used by Ms. Johnson in the fall of 2010 did not contain a single reference to either persistent or permanent hair loss.[3] It was not until the FDA forced Sanofi to revise its label to add a warning about permanent hair loss in December of 2015 that Sanofi placed any mention of permanent hair loss on its Taxotere label.[4]

Of note, years after Ms. Johnson first suffered the onset of what turned out to be permanent and persistent hair loss, Sanofi's Global Safety Director -- the most knowledgeable person at Sanofi with regards to the safety and side effects of Taxotere – was *still* informing colleagues within the Sanofi organization (who had inquired about the validity of claims of Taxotere causing permanent hair loss), that scientific literature review "did not support a pathogenetic mechanism for Taxotere to cause persistent alopecia."[5]

Sanofi's Taxotere warning label did not include any mention of permanent alopecia in all of the years <u>after</u> Ms. Johnson's infusion, at least until December 11, 2015. Ms. Johnson filed her complaint within one year of that label change, and as such, her claim is timely.[6]

The facts of this litigation show that it would <u>not</u> have been reasonable for Ms. Johnson to have been placed on notice of a potential cause of action against Defendants Sanofi solely due to hair loss after chemotherapy. It is unreasonable to expect that Ms. Johnson would have learned of this link from her physicians; the Defendants withheld any meaningful warning of permanent hair loss with Taxotere use prior to Johnson's use, during Johnson's use, and

---

[3] See Document 5734-10, Exhibit "H", to Defendant's Motion for Summary Judgment.

[4] "In some cases (frequency not known) permanent hair loss has been observed."

[5] Exhibt #A, Sanofi 04353204.

[6] Plaintiff is not suggesting that the December 11, 2015 product label warning put her on notice. Unless Ms. Johnson had reason to undergo a new round of Taxotere, she would not have learned of the now-disclosed link between Taxotere to permanent hair loss. But the warning label change caused an increase in awareness of that link, and when Plaintiff saw a television ad describing the link between Taxotere and permanent hair loss, she consulted counsel.

after Johnson's use. Plaintiff is responsible for what she *should* know, and the generally accepted medical and scientific belief known to her physicians as it related to hair loss and Taxotere, during all relevant time periods, involved temporary hair loss as a known risk.

As will be shown, Louisiana law establishes that it is the knowledge of the underlying tortious conduct by Defendants that triggers the prescriptive period. At the very least, the facts of this case show the existence of genuine issues of material fact more appropriate for cross examination and consideration by the jury. As such, Defendants' motion should be denied.

## LEGAL STANDARD

Summary judgment is appropriate if the movant shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.[7] "An issue is material if its resolution could affect the outcome of the action."[8] Thus, "when damage is evident but causation is reasonably mysterious, Louisiana courts sometimes pretermit the running of prescription."[9] In deciding whether a fact issue has been created, "the inferences to be drawn from the evidence must be viewed in the light most favorable to the nonmoving party."[10]

The Louisiana Supreme Court recognizes exceptions to the general rules of prescription. "The principles of equity and justice which form the mainstay of the doctrine … demand that under certain circumstances, prescription be suspended because plaintiff was effectually prevented from enforcing his rights for reasons external to his own will."[11] Specifically, the doctrine of *contra non valentem* ("prescription does not run against a party unable to act") suspends prescription in the following circumstances:

---

[7] Fed. R. Civ. P. 56(a).
[8] *Terrebonne Parish Sch. Bd. v. Columbia Gulf Transmission Co.*, 290 F.3d 303, 310 (5th Cir. 2002).
[9] *Id.* at 323.
[10] *Id.*; *Int'l Fid. Ins. Co. v. Sweet Little Mex. Corp.*, 665 F.3d 671, 679 (5th Cir. 2011).
[11] *Wimberly v. Gatch*, 635 So. 2d 206, 211 (La. 1994).

1. Where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action;

2. Where there was some condition coupled with a contract or connected with the proceedings which prevented the creditor from suing or acting;

3. Where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; and

4. Where some cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant.

The fourth category of *contra non valentem* is commonly known as the "discovery rule."[12] "The doctrine itself is based on the theory that when the claimant is not aware of the facts giving rise to his or her cause of action against the particular defendant, the running of prescription is for that reason suspended until the tort victim discovers or should have discovered the facts upon which his or her cause of action is based."[13] The Louisiana Supreme Court has "described the knowledge sufficient to start the running of prescription under the fourth category of *contra non valentem* as constructive knowledge, or the acquisition of sufficient information, which, if pursued, will lead to the true condition of things."[14] Essentially, "[w]hen prescription begins to run depends on the reasonableness of a plaintiff's action or inaction."[15]

There are several reasons why the finder of fact should resolve exceptions to prescription in favor the plaintiff, including the fact that a trial judge cannot make credibility determinations, consider the merits, evaluate the testimony, or weigh the evidence

---

[12] *Wimberly v. Gatch*, 635 So. 2d 206, 211 (La. 1994).
[13] *In re Medical Review Panel of Howard*, 573 So. 2d 472, 474 (La. 1991) (citation omitted).
[14] *Wells v. Zadeck*, 89 So. 3d 1145, 1151 (La. 2012) (citation omitted).
[15] *Jordan v. Employee Transfer Corp.*, 509 So. 2d 420, 423 (La. 1987).

in a motion for summary judgment.[16] The determination of when the prescriptive period begins for any given case is a fact-specific inquiry, so it should not be determined by summary judgment, and instead should be left for the jury to resolve.[17] Only a fact-finder may assess all the pertinent events that surround the relevant injury to determine the reasonableness of the plaintiff to permit or excuse prescription.

For this reason, in a *contra non valentem* case such as this, where a party is presenting evidence of the subjective knowledge of a party, the preference of the courts tends towards denying summary judgment. "As a general rule, a motion for summary judgment is rarely appropriate for a determination based on subjective facts such as intent, motive, malice, knowledge, or good faith."[18] Further, in Louisiana:

> The one-year prescriptive period commences running on the date the injured party discovers or should have discovered the facts upon which his cause of action is based. Constructive knowledge sufficient to commence the running of prescription, however, requires more than a mere apprehension that something might be wrong. Prescription does not run against one who is ignorant of the facts upon which his cause of action is based, as long as such ignorance is not willful, negligent or unreasonable.[19]

## **ARGUMENT**

### I.     **All Three Legs of Defendants' Argument Fail**

Sanofi asserts that: 1) Ms. Johnson's case is untimely, and that untimeliness is apparent from the pleadings; 2) discovery confirms the untimeliness; and 3) Louisiana law does not provide for a tolling of prescription under the unique facts of Ms. Johnson's case.   Defendants

---

[16] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").

[17] *See Cook v. Ingersoll-Rand Co.*, 39 F. Supp. 3d 827, 838 (E.D. La. 2014) (citation omitted) (The application of "contra non valentem is generally a question of fact that may go to the jury for resolution.").

[18] *Sanders v. Ashland Oil,* 696 So. 2d 1031, 1035 (La. App. 1997); *see also Waste Mgmt. of La., L.L.C. v. Parish of Jefferson,* 66 F. Supp. 3d 761, 776 (E.D. La. 2014) ("[S]ummary judgment is seldom appropriate for determinations concerning subjective intent issues such as motive, good faith, and malice.").

[19] *Griffin v. Kinberger,* 507 So. 2d 821, 823 (La. 1987) (citations omitted).

are incorrect factually, and their reading of Louisiana law is misplaced.

Sanofi cites decisions from federal district courts in Pennsylvania and Illinois, the United States Court of Appeal for the Ninth Circuit, and Illinois state court. The Common Law has little or no place in the merits of this motion, as *Erie* demands that Louisiana law, with its singular and jealous adherence to the Civil Code and decisional law interpreting the Civil Code and related statutes, governs this proceeding.

Defendants have the burden of proof in showing that the case is prescribed. Defendants cite *Campo v. Correa* for the proposition that the burden is on Ms. Johnson. That is not so, as the Louisiana Supreme Court in *Bailey v. Khoury*, 891 So.2d 1268 (La. 2005), reaffirmed the rationale in *Campo*, holding:

> [A] The burden of proof on the prescription issue lies with the party asserting it unless the plaintiff's claim is barred on its face, in which case the burden shifts to the plaintiff. Id. See also Campo, 01-2707 at p. 7, 828 So.2d at 508. In Campo, we concluded that "a petition should not be found prescribed on its face if it is brought within one year of the date of discovery and facts alleged with particularity in the petition show that the patient was unaware of the malpractice prior to the alleged date of discovery, and the delay in filing suit was not due to willful, negligent, or unreasonable action of the patient." Id. at 9, 828 So.2d at 509. Applying the rule set forth in Campo, we find that Ms. Bailey's original petition was not prescribed on its face because it "makes a prima facie showing that it was filed 'within one year from the date of discovery' … Id. at 10, 828 So.2d at 509. Thus, defendants bear the burden of proving that Ms. Bailey's claims are barred by prescription. <u>A petition should not be found prescribed on its face if it is brought within one year of the date of discovery and facts alleged with particularity in the petition show that the patient was unaware of the malpractice prior to the alleged date of discovery, and the delay in filing suit was not due to willful, negligent, or unreasonable action of the patient.</u>

*Id.* at 9, 828 So.2d at 509.

The First Amended Master Complaint sets forth in detail sufficient allegations of Fraudulent Misrepresentation, Fraudulent Concealment, and Fraud and Deceit to demonstrate that Ms. Johnson would not have been appraised of the true cause of her permanent hair loss, and that her doctors were also lacking that knowledge, and thus unable to convey that knowledge to Johnson before December of 2015.[20]  Ms. Johnson was unaware of the Defendants' conduct prior to the alleged date of discovery, and any delay in her filing suit was not due to the willful, negligent, or unreasonable action of Ms. Johnson, but due to the orchestrated decision of Sanofi not to disclose the true risks associated with Taxotere.  Accordingly, the burden is on Sanofi to show that Ms. Johnson should have obtained information linking Sanofi with her potential tort.

## II.    Defendants Failed to Show That Ms. Johnson Was Unreasonable In Not Suspecting She Had Been the Victim of a Tortious Act.

Constructive knowledge is a fact-intensive inquiry: "[A] plaintiff's mere apprehension that something may be wrong is insufficient to commence the running of prescription unless the plaintiff knew or should have known through the exercise of reasonable diligence that his problem may have been caused by acts of malpractice."[21] "The ultimate issue is the *reasonableness* of the [plaintiff's] action or inaction, in light of his education, intelligence, the severity of the symptoms, and the nature of the defendant's conduct."[22] In the malpractice context courts recognize that, "[e]ven if a … victim is aware that an undesirable condition developed after medical treatment, *prescription does not run as long as it is reasonable for the victim not to recognize that the condition is related to the alleged negligent act.*"[23]

---

[20] *See* First Amended Master Long Form Complaint and Demand for Jury Trial ("AMC"), Rec. Doc. 689, filed 7/25/17, ¶¶ 258-310.

[21] *Campo v. Corre*a, 828 So. 2d 502, 511 (La. 2002) (citation omitted).

[22]  *See Campo*, at 513 (The court noted that an unsuccessful surgery is not an automatic start of the prescriptive period. In that case, during post-surgery conversations, the physician advised the patient he could experience the same symptoms after surgery that he had endured prior to surgery. Consequently, the court held there had been no reason for the patient to know his condition might have been related to insertion of a shunt until after he was examined by neurosurgeon.).

[23] *Stevenson v. Touro Infirmary*, 640 So.2d 633, 634 (La. App. 1994) (citation omitted) (emphasis added).

The questions and answers selectively highlighted in Defendants' brief fail to demonstrate that Ms. Johnson should have known that her injuries were caused by the manufacturer of one of several chemotherapy agents prescribed to her, alerting her to sue.

The Defendants miss an important fact while emphasizing Ms. Johnson's decision not to seek out dermatologists post-chemotherapy, or to return to her oncologist for information on her persistent hair loss.  Even if Ms. Johnson had inquired about her hair loss, she would not have learned sufficient information to "connect the dots" alerting her to bring a products liability action against the Defendants/makers of her chemotherapy agents.

Ms. Johnson's oncologist, Dr. Brian Lewis, testified regarding his knowledge, or rather lack of knowledge, of the risks of Taxotere and permanent hair loss.

Q.   What is your practice today? What do you tell breast cancer patients about hair loss and chemotherapy?

A.   Uhmm, I guess I don't -- I mean I haven't --let me see. I mean, probably that they would have -- that their hair would fall out; I mean that is for sure. And whether or not it would be permanent or that it would grow  back, and I don't know what I would say regarding that. I see -- **maybe I would it could be permanent. I see the commercials for this on TV**.

Q.   **Maybe you would say it could be permanent today?**

A.   **Right. As a result of the exposure of this.**

Q.   **Do you know whether you would have said that in 2010?**

A.   **I don't know.**

In this case, the sworn testimony of Ms. Johnson's oncologist shows that, had he been asked by Ms. Johnson about the permanence of her hair loss in the years after her chemotherapy, he could <u>not</u> say that he would have supplied her with information linking

Taxotere to her persistent hair loss.  In fact, Dr. Lewis identified television commercials as the source of his current knowledge of the link between Taxotere and permanent hair loss, which is the same source as Ms. Johnson's knowledge.

Defendants repeatedly assert that Ms. Johnson *could have* deduced facts sufficient to put her on notice of a cause of action, despite the fact that her treating physicians were never informed by the Defendants of the link between Taxotere and permanent hair loss.  Louisiana decisions affirm that it is unreasonable to attribute to a plaintiff receiving drugs or medical treatment the same sophisticated medical causation facts known to medical professionals.[24]

In *Young v. Clement et al.,* 367 So. 2d 828 (La. 1979), the Louisiana Supreme Court decided a similar prescription issue, a case where the plaintiff filed suit more than a year from an alleged negligent surgery.  The trial court had sustained an exception of prescription, finding that the plaintiff would have been told of the causal link to the original doctor's malpractice if only Plaintiff had asked a subsequent doctor about her ongoing problem.  In addition, the trial court noted that the original doctor-defendant had read a pathology report to plaintiff, ostensibly putting plaintiff on notice that the likely cause of her injury was a misplaced stitch during the removal of her tubes and ovaries. Thus, the trial court felt that the plaintiff's failure to inquire about the cause of her injury from a subsequent medical provider, coupled with knowledge from a pathology report, constituted constructive knowledge.

The *Young* Court soundly repudiated the trial court's reasoning.  It said:

"Neither doctor, obviously, told the Youngs that the surgeon's negligence caused the blockage. **The record does not support the trial judge's conclusion that the Youngs should lose the right to litigate their claim because they failed to ask Dr. Melton, 'Why the blockage?'**
**Nor should a finding that the Youngs were read the pathologist's report after the removal of the tubes and ovaries justify a conclusion that the**

---

[24]  Or, in this case, for anyone  to attribute facts to Ms. Johnson not even known to her medical professionals.

> **Youngs knew or should have known that the removal was unnecessary and unwarranted…** (Defendant) seemed to take the position that the pathology report justified the operation. **He might be right. But the Youngs cannot be held to a superior ability to interpret the report to mean that he was wrong, and that they must sue within a year or lose their right**." [25]

Ms. Johnson should not lose her right to bring a lawsuit against Defendants because she failed to ask her oncologist, "Why is the hair loss persisting?" under the individual facts of <u>this</u> case.   It is a certainty that Ms. Johnson does not possess "a superior ability to interpret" that her persistent hair loss was due to Taxotere based on what warnings she had received about the risk of <u>temporary</u> hair loss for each of the chemotherapy drugs that she was prescribed.[26]   Defendants try to portray Johnson as a sophisticated user, referencing her work as a certified nursing assistant. As a CNA, Johnson bathed and cleaned patients, and made beds. She testified, "*We didn't really do medications*." Ms. Johnson often employed her other vocational training certification, as a laundry presser.[27]

The Louisiana Supreme Court's rationale in *Young* is not an isolated decision, but in accord with other Louisiana decisions examining the reasonableness of a plaintiff's discovery of their cause of action when they were not initially warned of the medical causation link. *Hoerner v. Wesley-Jensen*, a Fourth Circuit case, is a good example.[28]   The *Hoerner* plaintiff filed suit, claiming she was injured by a severe infection caused by using extended wear contacts.   The defendant alleged that plaintiff possessed "more medical sophistication than average" and therefore had constructive notice of her cause of action.[29]   The Fourth Circuit found that Ms. Hoerner did not possess the requisite medical knowledge or skills in medical

---

[25] *Young*, at 830.

[26] Deposition of Deborah Johnson, Nov.30, 2017, pp. 155-157; attached to Defendant's Motion for Summary Judgment as Exhibit C; Rec. Doc. 5734-5.

[27] Id., page 150-159 of depo (page 40-42 of Document 5734-5)

[28] *Hoerner v Wesley-Jensen, Inc., et al*, 684 So.2d 508 (La. App. 4 Cir. 1997).

[29] The plaintiff was married to a physician, held a bachelor's degree in medical technology, and had worked for her physician husband in his office.   Clearly the Hoerner plaintiff had more relevant education than Deborah Johnson.

fields, as she only did payroll and reception work.

Just as Sanofi claims that Johnson's knowledge of temporary hair loss from chemotherapy placed Johnson on constructive notice of Taxotere induced permanent alopecia, the *Hoerner* defendant claimed that plaintiff's knowledge that wearing contacts can lead to infection placed plaintiff on constructive notice of the connection between corneal infection and use of extended-wear contact lenses.    And, like Sanofi does here, the *Hoerner* defendant alleged that plaintiff's doctor would have told her of an infection/long term contact lens connection, if only she had asked.  The *Hoerner* Court rejected that assertion:

> "Even had she inquired further, it was unlikely that Mrs. Hoerner would have been told in 1987 that extended-wear contact lenses significantly increased the likelihood of eye infections. It was only in 1989 that the medical community recognized the increased risk associatedwith extended-wear contact lenses." [30]

The Sanofi Defendants present no evidence that Ms. Johnson's physicians knew in 2010, or in years thereafter, that Taxotere was the cause of Ms. Johnson's persistent hair loss. This is important, as the *Hoerner* Court noted a distinction between a patient asking for information, and there being information available to answer the inquiry:

> "We turn next to the defendants' assertion that Mrs. Hoerner's doctors would have put her on notice of a possible connection between her use of extended-wear lenses and the infection in her eye in 1987 if she had questioned them. Our review of the physicians' depositions reveals no support for this claim. To the contrary, Dr. Rubin testified in November 1992 that he not only had no recollection of any discussion of causation, but that he probably would not have addressed this issue with Mrs. Hoerner."[31]

In the instant case, Dr. Lewis did not remember warning Ms. Johnson of any link between Taxotere and permanent hair loss.  Nor did Dr. Lewis know of the link himself until

---

[30] 684 So.2d at 514
[31] *Id*.

he saw commercials on television warning of the link between Taxotere and permanent hair loss, years *after* he treated Ms. Johnson.[32]

Here, the record is void of any evidence that Ms. Johnson's treating physicians personally possessed more knowledge than they would have received from the Taxotere product warning label, which failed to warn of permanent hair loss.   The Defendants have failed to identify any witness who would have advised Ms. Johnson that her seemingly temporary hair loss was permanent and due to Taxotere use, nor have they identified anyone who would have provided the specific information that Taxotere's maker should be subject to a products liability lawsuit because that one drug alone caused her injury.   As such, the record before the Court does not support Defendants' contention that sufficient information was available to Ms. Johnson to put her on constructive notice to file a lawsuit.

## III.   <u>Evidence of what Ms. Johnson Could Have Known is Immaterial</u>

Defendants' arguments on prescription misstate Louisiana law and misapply the facts of this case. To prevail, Defendants must prove that Plaintiff had constructive knowledge of not only her condition, but also of the causal link between the tortious act and the damage. Louisiana courts have long made clear that the determination of what constitutes "constructive knowledge" and the "reasonableness" of plaintiff's actions or inactions are all determinations of fact. "As a general rule, a motion for summary judgment is rarely appropriate for a determination based on subjective facts such as intent, motive, malice, knowledge, or good faith."[33]

Sanofi itself, until late 2015, still had not revealed in its label the causal connection between Taxotere and permanent hair loss.  Yet according to Sanofi, it was unreasonable for

---

[32] Deposition of Dr. Lewis, Exhibit F to Defendant's Motion to Summary Judgment, Doc 5734-8, page 23 of 40, pages 82 and 84 of depo.
[33] *Sanders,* 696 So.2d at 1035.

Deborah Johnson not to have deduced that which her oncologist did not know, divined the scientific causation implications, and acted on that knowledge *four years before she filed.*

Defendants have a duty to monitor all things Taxotere, including peer reviewed studies, adverse event reports, and dissatisfied patients blogging about their injuries on social media. Sanofi has that serious continuing duty; a layperson like Ms. Johnson does not.

The United States Supreme Court has so held, affirming that through the many amendments to the Federal Food, Drug, and Cosmetic Act (FDCA) and to the Food and Drug Administration (FDA) regulations, that a central premise of federal drug regulation is that a drug manufacturer bears responsibility for content of its label at all times; the drug manufacturer is charged both with crafting an adequate label and with ensuring that its warnings remain adequate as long as drug is on the market. Federal Food, Drug, and Cosmetic Act, § 1 et seq., 21 U.S.C.A. § 301 et seq.; 21 C.F.R. § 201.80(e). *Wyeth v. Levine*, 555 U.S. 555, 571, 129 S.Ct. 1187, 1198, 173 L.Ed.2d 51 (2009),

Defendants' misplaced theory is that any allegation directed to the liability of Sanofi, a sophisticated international manufacturer of an FDA and European Medicines Agency approved drug, including allegations pertaining to Sanofi's knowledge under relevant regulatory law, is information that should be equally known and interpretable by a layperson like Ms. Johnson.[34] This is an absurd reading of the Master Complaint. While the maker of Taxotere should be monitoring all studies about Taxotere, heeding and studying adverse reports from patients and doctors, and generally paying attention to anything that should make a responsible manufacturer of a drug take notice of all things relating to its product, that same duty is not required of Ms. Johnson. Ms. Johnson does not have to know about pending studies, or regulatory actions, or adverse event reports, nor could Ms. Johnson become

---

[34] *See* Defendant's Statement of Undisputed Material Facts, Statement 125, referencing paragraphs 148-161 of the First Amended Master Long Form Complaint and Demand for Jury Trial.

reasonably aware of such happenings.

In *Hoerner,* the plaintiff did not know of the link between her corneal infection and her extended wear contacts until she read about it in *People* magazine, despite the existence of medical literature on the subject. [35]   Similarly, in *Griffin v Kinberger,* 507 So.2d 821 (La. 1987), plaintiffs sought damages caused by medical malpractice committed years prior to filing suit.[36]   The *Griffin* Court found that despite the passage of years, the plaintiff only obtained reasonable notice of a cause of action when his mother read a newspaper article about a Florida child's blindness resulting from the negligent administration of oxygen after her premature birth, the same facts in the child's (now adult son's) case.

Ms. Johnson and the plaintiffs in *Griffin and Hoerner* all had connect-the-dots moments when they saw TV commercials, or read People magazine, or read the newspapers and saw information about their medical situations that put them on notice of a link between a product and injury.   Their lack of arcane or specialized knowledge tolled their duty to file suit until they obtained constructive notice of facts sufficient to state a cause of action. Constructive knowledge was not attributed to them just because, somewhere, research scientists and other professionals did possess facts not within common knowledge.

A recent decision that discusses the difference between "should have known" and "could have known" is *Lennie v. Exxon Mobil Oil Corporation*, 251 So.3d 637 (La. App. 5 Cir. 2018).   *Lennie* involved a wrongful death and survival claim, where the father of a family died due to alleged exposure to naturally occurring radioactive materials, a hazard of the oil industry.   The facts in *Lennie* are inapposite of Ms. Johnson's facts, as during the years following the death of Mr. Lennie (2010-2014), it was common to hear legal advertisements

---

[35] *Hoerner*, at 509.
[36] The Plaintiff alleged that the negligent administration of oxygen at the time of a child's birth caused retrolental fibroplasia (RLF) in the child's left eye, resulting in total blindness of that eye, and serious injury to the remaining eye.

discussing the link between NORM and cancer.   Also, the college graduate son of the deceased worked in the oil field since 2003, and admitted to learning about NORM in training sessions.   Whether it was disbelief that a Westbank family in the oil field business could not have heard of NORM related issues during that time frame, or the fact that the family did not ask questions of local pulmonologists who were acutely aware of the link between NORM and lung cancer, the appellate court felt the suit to be untimely.

   One aspect of the *Lennie* decision is, however, relevant to the Johnson suit.   The *Lennie* Court discussed the type of facts that *should,* rather than *could*, put a plaintiff on notice of a cause of action.   The trial court's decision contained this language:

> Today, as well as in 2010, the ability to make a connection, if one exists, between two items is at one's fingertips and can be ascertained in a matter of minutes, if not seconds. Never in the history of mankind has information been more accessible. All of the information which could have and would have incited an inquiry of Brett Lennie to pursue further remedy, was available to him, his sister, and his mother in 2010. Consequently, this Court finds the cause of action was reasonably knowable in 2010.  251 So.3d at 245.

The Fifth Circuit Court of Appeals took issue, finding that the trial court's focus on the ''…information out there that the Plaintiffs *could have found*'' (emphasis in original) was erroneous.   The Fifth Circuit stated:

> **While it is not entirely clear to us from the trial court's statement that it was inferring that the availability of information on the internet, *in and of itself*, with nothing more, is sufficient constructive knowledge to put the Lennies on notice of their cause of action,** to the extent that this was the standard the trial court applied to the fourth category of *contra non valentem*, **we agree with the Lennies that this would be legal error.** Id. at 245.

True, it is conceivable that some evidence of Taxotere's long-term alopecia risks "could have [been] found" by a dedicated and sophisticated researcher.   But hypothetical references to unidentified internet sites somewhere on the Globe does not constitute "knowledge" that can be legally charged to Ms. Johnson, and the record is absent of any evidence sufficient to alert her to

take legal action in the immediate aftermath of her "unlucky" hair loss.  No evidence exists that Ms. Johnson – or her treating physicians – had any knowledge that Taxotere could cause permanent hair loss.  It is shocking that Sanofi attempts to hold Ms. Johnson to a higher standard that it seeks to hold itself.  As late as 2015 Sanofi's product warnings told the world that there was no evidence that Taxotere could cause permanent hair loss.  Yet somehow, someway, Ms. Johnson is supposed to have learned that by 2011.   No evidence has been submitted to support that allegation.

**IV.**        **Evidence of what Ms. Johnson Should Have Known is Material**

While Ms. Johnson is not responsible for information that she *could* know, she does have evidence of what she *should have known,* had she asked her doctors. All parties agree that no mention of permanent hair loss was placed in the product warning label at the time Ms. Johnson agreed to her chemotherapy.   Sanofi did not alert her doctors of that risk.

**An internal Sanofi document from 2015 shows Sanofi scrambling to respond to FDA inquiries about permanent alopecia, yet Sanofi itself could not explain why its warning had not been updated after the 10 year TAX316 study[37].   This time period is the same time period that Sanofi claims Ms. Johnson should have found a link between her hair loss and Taxotere.[38]**  Sanofi, tasked with knowing the details of its drug, either intentionally refused to admit that Taxotere could cause permanent hair loss when dealing with regulatory authorities, or, more charitably, still believed that there was no association between Taxotere and permanent hair loss during that pertinent time period.    Under either theory, Ms. Johnson and her medical providers were never advised of any updated warnings once Sanofi knew of the permanent hair loss risks.

It is unreasonable to suggest that a lay person, like Ms. Johnson, should make such a

---

[37] *"Could you please check your files for any internal email communications during the period from 24 September 2010 to 01 January 2013 that could explain why the labeling changes associated with the TAX316 study 10-year follow-up (in Docetaxel CCDS V26) were not submitted to the FDA."*

[38] Exhibit #B, Sanofi_05207927; see also, Record Document 689, page 34 of 68, Paragraph 163.

determination.   This is especially true when Ms. Johnson, not being advised of permanent hair loss risks in the   approved warning label, should be tasked with mastering the complex pharmacological and epidemiological questions associated with linking permanent alopecia to Taxotere use in that knowledge vacuum.   Any delay in Plaintiff's understanding of Defendants' tortious conduct clearly was not due to Ms. Johnson's willful ignorance or negligence.   The constructive knowledge that Defendants claim Ms. Johnson was supposed to have gained between 2010 through 2015 simply did not exist, at least not in an accessible manner which could reasonably be attributable to Ms. Johnson, given the direction of Louisiana law.

The Federal Fifth Circuit in an LPLA case addressed a similar prescription issue in *Chevron USA, Inc. v. Aker Maritime, Inc.,* 604 F.3d 888 (5th Cir 2010).   The Court first noted that the defendant relied on dicta in prior case law in drawing the same erroneous conclusion as defendants herein: that whatever is notice enough to excite attention and put a person on guard and call for inquiry is tantamount to the type of knowledge which would put a reasonable person on inquiry sufficient to start the running of prescription.

The Fifth Circuit repudiated that reasoning, citing sounder and more recent Louisiana law, stating:

> **"This rule would seemingly start prescription as soon as a potential plaintiff suspected     something was wrong. But that is not the law. *Jordan v. Employee Transfer Corp.,* 509 So.2d 420, 423 (La.1987)** ("The court of appeal ... paraphrased the same dicta, as if it had been the rule in Cartwright.  It  was  not."). "Constructive knowledge or notice sufficient to commence the running of prescription ... requires more than a mere apprehension something might be wrong." *Strata v. Patin*, 45 So.2d 1180, 1189 (La.App. 4th Cir.1989). **But when a plaintiff suspects something is wrong, he must "seek out those whom he believes may be responsible for the specific injury." *Jordan,* 509 So.2d at 423. When a plaintiff acts reasonably to discover the cause of a problem, "<u>the prescriptive period [does] not begin to run until [he has] a reasonable basis to pursue a claim against a specific defendant.</u>"** Id. at 424.

Here, Ms. Johnson is accused of not identifying Taxotere as a permanent hair loss cause with sufficient gusto, the implication being, had she asked, she would have found that Taxotere

caused her injury. That is the underlying great fiction of Defendants' theory:  Plaintiff should lose her right to sue because of an alleged failure to inquire - even though her inquiry would have been futile.   Her oncologist did not know of a link between Taxotere and permanent alopecia in 2010, or for years after Ms. Johnson's chemotherapy.   There is no evidence that any medical provider would have advised her of a link between permanent alopecia and Taxotere during the period after her chemotherapy

Moreover, it is unreasonable to suggest that Ms. Johnson should have doggedly pursued the cause of her hair loss year after year, like a consumed Captain Ahab.    Like every woman in this litigation, Ms. Johnson is a cancer survivor.    Like most of her cancer survivor sisters, she was focused on, and encouraged to move past the events and physical damage of her mastectomy and chemotherapy.   Cancer survivors are encouraged not to dwell in the  past, but to focus on their futures.   "[W]hen prescription begins to run depends on the reasonableness of a plaintiff's action or inaction." *Jordan*, Id. at 423.    Ms. Johnson persevered, sought closure for being "unlucky" in so many ways, and moved on with her life. Under these particular facts, given her injuries, and given the complete absence of information linking Taxotere to permanent hair loss after Ms. Johnson's chemotherapy, her decision to sue when she did was reasonable.

## CONCLUSION

Generally, prescription statutes are strictly construed against prescription and in favor of the claim sought to be extinguished by it. *Bouterie v. Crane,* 616 So.2d 657, 660 (La. 1993).  That continues to be the law in Louisiana.  Defendants have failed to show that Ms. Johnson was unreasonable in her delay in filing suit, or that her delay was unreasonable in light of Ms. Johnson's education, intelligence, and the nature of the defendant's conduct.

Ms. Johnson did not possess specialized medical knowledge, nor is there any evidence that she was put on constructive notice of the need to file a lawsuit due to her receipt of

information from medical providers with specialized knowledge.  Her own treating oncologist learned about Taxotere's permanent hair loss-inducing effects around the same time and in the same way as Ms. Johnson – by television advertisements.  The *Young, Hoerner* and *Griffin* decisions, supra, refute the Defendants' claim that the warning of *temporary* hair loss injury from chemotherapy was sufficient to put Ms. Johnson on notice that she had one year to sue Sanofi because of *permanent* injury to her caused by Taxotere.

Of import, the Defendants failed to produce <u>any</u> evidence that Ms. Johnson should have known that Taxotere was the cause of her permanent hair loss - or that Ms. Johnson's medical providers would have apprised her of that link at any time prior to one year before the filing of Ms. Johnson's lawsuit.  As the *Lennie* decision makes clear, it is not what Ms. Johnson *could* have known that is central to constructive notice, but what she reasonably *should* have known that is dispositive.   Exhibits A and B show that during the relevant time period for which Sanofi claims Ms. Johnson should have known to sue Defendants for their permanent-alopecia-producing-product, the Defendants maintained to doctors and the FDA that there was no evidence to support a link between their product and permanent alopecia. Finally, even if *some* incipient evidence of Taxotere's alopecia-causing effects existed before the label change in 2015, a person such as Deborah Johnson, a non-sophisticated end user of Taxotere, would not reasonably have known of that information.

According to the numerous decisions of Louisiana courts defining what constitutes constructive knowledge in situations similar to those Ms. Johnson experienced, Ms. Johnson had no notice sufficient to start the prescription clock.   Sanofi refused to warn the public of the permanent alopecia risks of Taxotere during the exact time frame that Defendants now claim Ms. Johnson should have easily discovered those risks.

As so many facts remain in dispute, a jury should decide these remaining issues.

Defendants' Motion should be denied.

Respectfully submitted,

/s Richard L. Root
Richard L. Root La# 19988
Betsy Barnes La# 19473
Lauren Godshall La# 31465
Morris Bart, LLC
601 Poydras Street,24th Floor
New Orleans, LA 70130
Phone: (504) 525-8000
Fax: (504) 599-3392
Email: rroot@morrisbart.com
bbarnesl@morrisbart.com
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 19th day of March, 2019 a copy of the foregoing Plaintiff's Opposition to Defendants Motion for Summary Judgment was electronically served upon all parties via ecf.

*/s/Richard L. Root*