# EXHIBIT E

```
                                                              Page 1

 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
 2

 3   IN RE:  TAXOTERE (DOCETAXEL)
     PRODUCTS LIABILITY LITIGATION
 4
     This Document Relates To:
 5
     Antoinette Durden, Case No. 2:16-cv-16635;
 6   Tanya Francis, Case No. 2:16-cv-17410;
     Barbara Earnest, Case No. 2:16-cv-17144
 7
     MDL No. 2740
 8   Section: H
 9
          VIDEOTAPED DEPOSITION OF DR. JOHN W.
10   THOMPSON, JR., 1440 CANAL STREET, SUITE
     1000, NEW ORLEANS, LOUISIANA, 70112, TAKEN
11   AT TULANE UNIVERSITY SCHOOL OF MEDICINE,
     DEPARTMENT OF PSYCHIATRY, 1440 CANAL
12   STREET, SUITE 1000, NEW ORLEANS,
     LOUISIANA, 70112, ON WEDNESDAY, THE 16TH
13   DAY OF JANUARY, 2019.
14   APPEARANCES:
15      LISKA, EXNICIOS & NUNGESSER
        ATTORNEYS AT LAW
16      BY:  VAL PATRICK EXNICIOS, ESQUIRE
        BY:  LACY RADCLIFF, ESQUIRE
17      1515 POYDRAS STREET, SUITE 1400
        NEW ORLEANS, LOUISIANA  70112
18
           ATTORNEYS FOR PLAINTIFF
19
        PENDLEY BAUDIN & COFFIN
20      ATTORNEYS AT LAW
        BY:  CHRISTOPHER L. COFFIN, ESQUIRE
21      1100 POYDRAS STREET, SUITE 2505
        NEW ORLEANS, LOUISIANA  70163
22
           ATTORNEYS FOR PLAINTIFF
23
24
25   Job No. NJ3193587
```

Page 146

1  the day of her evaluation, March 30, 2018?
2      A.  Yes.  That's the time I saw
3  her.
4      Q.  And on that day you saw her
5  for about two hours?
6      A.  Yes.  I saw her for about an
7  hour-and-a-half in my office.  And she
8  needed a ride home, so I gave her a ride
9  home and it took about another half hour.
10 So I spent two hours with her total.
11     Q.  Had you completed your
12 evaluation as of one-and-a-half hours?
13     A.  Yes.  I had and but I did talk
14 to her on the way home about some
15 additional stuff and she's -- she doesn't
16 give longwinded answers and so it was
17 helpful just to talk to her about what she
18 does with her daycare and how she takes
19 care of her children at the daycare and
20 those kinds of things.
21         It showed me, you know, I got
22 an idea of what her house looked like and
23 what her little daycare operation looked
24 like.
25     Q.  And did you go in and see her

Page 147

1  house and daycare operation?
2      A.  No.  I could see the yard when
3  I dropped her off, and everything out
4  there was neat and looked very tidy and
5  well-kept.
6      Q.  How long has she operated that
7  daycare center?
8      A.  She said for many, many years.
9  I don't recall the exact number.
10     Q.  It's been since her cancer
11 treatment; correct?
12     A.  Yes.  Correct.
13     Q.  And how many children does she
14 have at a time?
15     A.  Right now I think last time I
16 talked to her, when I talked to her she
17 had about five or six is what she
18 typically keeps.  And it can range from
19 six months to, you know, five or six years
20 which is pretty impressive.
21         And she likes to brag about
22 their math skills and how she gets them
23 started with math and with learning the
24 alphabet and those kinds of things.  And
25 so she's very proud of that.

Page 148

1      Q.  You said the last time you
2  talked to her.  Is it correct you only
3  talked to her on that one occasion in
4  March of 2018?
5      A.  Technically you're correct on
6  that.
7      Q.  Well, when you say technically
8  I'm correct, have you communicated with
9  her in some other form?
10     A.  No, I haven't.  No, I haven't
11 communicated with her separate from that.
12 I saw her that time and I read her
13 depositions and I read her family's
14 depositions.
15     Q.  And you did not read her
16 family's depositions prior to issuing your
17 opinion in this -- your opinion and
18 issuing your report; correct?
19     MR. EXNICIOS:
20        Objection to form.
21 EXAMINATION BY MS. SCHULTZ:
22     Q.  Is that correct?
23     A.  Let me just check real quick.
24     MR. EXNICIOS:
25        Same objection.

Page 149

1     THE WITNESS:
2        Yes.  I just had a deposition of
3  Antoinette Durden at the time of my first
4  evaluation.  No, wait a minute.  I think I
5  had a deposition of Dr. J-a-n-c-i-c-h as
6  well, but that's not a family member.
7  EXAMINATION BY MS. SCHULTZ:
8      Q.  And you said at the time of
9  your first evaluation.
10     A.  Oh, I'm sorry.
11     Q.  Have you conducted any second
12 evaluation?
13     A.  No.  That's just I misspoke.
14     Q.  And did you diagnosis Ms.
15 Durden at the time of your evaluation?
16     A.  The -- I was considering the
17 differential that we talked about before,
18 and I was waiting for testing to come back
19 from Dr. Bianchini to make sure that there
20 wasn't anything more severe in the
21 diagnosis.
22     Q.  Ms. Earnest is not your
23 patient; correct?
24     A.  I think you asked that.  She
25 is not.

| | |
|---|---|
| Page 150 | Page 152 |

Page 150

1  Q. I've been asking you about Ms.
2  Durden.
3  A. Oh, okay. Ms. Durden. We're
4  switching to Ms. Earnest now?
5  Q. Ms. Earnest is not your
6  patient; correct?
7  A. Correct.
8  Q. You met with her because her
9  lawyer asked you to?
10  A. I did.
11  Q. And the first and only time
12  you saw Ms. Earnest was on the day of her
13  evaluation in March 2018?
14  A. Yes, ma'am.
15  Q. And on that day you saw her
16  for about two hours?
17  A. Yes. She probably a little
18  bit longer. She was a little bit more of
19  a talker so I think I saw her a little bit
20  more than two hours. And then I saw her
21  husband for about a half hour. So I think
22  it was a little bit longer than the
23  two-hour period.
24  Q. And you have not seen Ms.
25  Earnest since; correct?

Page 151

1  A. I have not.
2  Q. Have you provided any
3  treatment to either Ms. Durden or Ms.
4  Earnest?
5  A. I have not.
6  Q. Have you spoken to Ms. Earnest
7  at any time since your evaluation?
8  A. I have not.
9  Q. Have you told Ms. Durden and
10  Ms. Earnest about their diagnoses?
11  A. No, I have not. I've provided
12  them in reports to their attorneys, which
13  I did tell them before when we met that I
14  would finalize the report and that I would
15  send it to their attorneys and they could
16  review it with their attorney. So they
17  would have access to the report and have
18  access to the recommendations.
19  It's typically a part of what
20  I do when I first start the evaluation.
21  So I'll tell them about that there -- this
22  is in the context of litigation, that I'm
23  not in the context of treating them. That
24  I will safeguard their medical records
25  until the case is over, and then release

Page 152

1  the medical records back to the attorneys
2  or have them properly destroyed of so that
3  they're not, their medical records aren't
4  floating around.
5  And then I tell them that once
6  the report is completed, that their
7  attorney will have access to it, either
8  through the attorney on the other side if
9  I'm doing a defense case, or through the
10  attorney who hired me on a plaintiff case.
11  Q. Have any of Ms. Durden's
12  treating physicians diagnosed her with an
13  adjustment disorder, to her knowledge?
14  A. No.
15  Q. Have any of Ms. Earnest's
16  treating physicians diagnosed her with an
17  adjustment disorder, to your knowledge?
18  A. No.
19  Q. I'd like you to take a look at
20  the report of Ms. Durden.
21  MS. SCHULTZ:
22  You know what, I've got to find
23  my copy of the report and it's one
24  o'clock. Are you all okay with taking a
25  lunch break right now? And --

Page 153

1  MR. EXNICIOS:
2  It's up to you.
3  MS. SCHULTZ:
4  And I need to get through -- I
5  need to get through the notes and
6  materials that were provided to me this
7  morning as well during that time.
8  THE WITNESS:
9  All right. Are we planning on
10  getting done today?
11  MS. SCHULTZ:
12  Yes.
13  MR. EXNICIOS:
14  Yes, today.
15  MS. SCHULTZ:
16  Yes. We'll stay until we're
17  done. Yes.
18  THE WITNESS:
19  All right. And that's a
20  reasonable time or midnight?
21  MS. SCHULTZ:
22  Oh, no, no. We're only -- we can
23  -- our time on the record is supposed to
24  be seven hours.
25  THE WITNESS:

| Page 230 | Page 232 |
|---|---|
| 1  EXAMINATION BY MS. SCHULTZ:<br>2      Q.   And you still have not<br>3  reviewed all of the depositions; correct?<br>4      MR. EXNICIOS:<br>5          Objection.  Form.<br>6      THE WITNESS:<br>7          Correct.  There is doctor<br>8  depositions that I haven't gotten through<br>9  yet.<br>10 EXAMINATION BY MS. SCHULTZ:<br>11     Q.   And you're still planning to<br>12 do that?<br>13     A.   Yes.<br>14     MR. EXNICIOS:<br>15         Objection.  Form.<br>16 EXAMINATION BY MS. SCHULTZ:<br>17     Q.   Now, your diagnosis of Ms.<br>18 Durden is entitled adjustment disorder<br>19 with depressed mood and anxious features?<br>20     A.   Yes.<br>21     Q.   Correct?<br>22     A.   Yes.<br>23     Q.   And you made that diagnosis<br>24 based on looking at what you called<br>25 guidelines? | 1  she probably has distress that's<br>2  consistent with the severity of the<br>3  stressor.  Meaning, her hair not coming<br>4  back would be a stressor and would be<br>5  significant.<br>6          And then significant and<br>7  apparent and social occupation are other<br>8  areas of functioning.  So I thought that<br>9  based on what I saw when I evaluated her,<br>10 that she had some social impairments and<br>11 in other areas of function she was<br>12 altering her behavior, such as not going<br>13 out without covering her head or wearing<br>14 her wig or those kinds of things.<br>15         It didn't meet criteria for<br>16 any other mental disorder that I could<br>17 find.  And I searched for that in the<br>18 medical records other than what we talked<br>19 about the anxiety associated with<br>20 depression diagnosis at some point in<br>21 time.<br>22         But I wouldn't give her a<br>23 diagnosis of major depression at this<br>24 point.  I didn't think that the symptoms<br>25 represented normal bereavement and E |
| Page 231 | Page 233 |
| 1      A.   Yes.<br>2      Q.   Set forth in the DSM; correct?<br>3      A.   Correct.<br>4      MR. EXNICIOS:<br>5          Objection.  Form.<br>6  EXAMINATION BY MS. SCHULTZ:<br>7      Q.   Can you walk me through how<br>8  you came to that diagnosis in conjunction<br>9  with reviewing the guidelines of the DSM-5<br>10 for adjustment disorder?<br>11     A.   Sure.  Oh, there is -- okay.<br>12 So the development of emotional or<br>13 behavior symptoms in response to an<br>14 identifiable stressor occurring within<br>15 three months of the onset of the stressor.<br>16         So this is an ongoing<br>17 stressor.  I wouldn't think that the three<br>18 months would necessarily apply.  But as<br>19 her -- the stressor of her hair not coming<br>20 back as she's expecting it to come back<br>21 creates some emotional symptoms in her.<br>22         And those symptoms are<br>23 evidenced by, I didn't see she had marked<br>24 distress that was out of proportion to<br>25 severity of the stressor because I think | 1  really didn't apply.<br>2          She reported both depressive<br>3  symptoms as well as anxiety symptoms.  So<br>4  on the DSM-5 it would be referred to as<br>5  mixed anxiety with depressed mood.<br>6          In the previous versions of<br>7  the DSM it would be depressed mood with<br>8  anxious features or similar kinds of<br>9  things.  But it's a mixture of some<br>10 anxiety symptoms and some depressive<br>11 symptoms.<br>12         She also reported some<br>13 posttraumatic stress symptoms which we<br>14 went over before.  And so with that in<br>15 mind, I felt that adjustment disorder with<br>16 depressed mood with anxious features was<br>17 reasonable.<br>18         As I stated earlier given the<br>19 information that I have now, I wouldn't<br>20 think that she would have the most severe<br>21 form of that.  I would think that she<br>22 would probably have a mild form of it.<br>23         And thus, I made<br>24 recommendations for her to have some<br>25 cognitive therapy regarding that |

**Page 246**

1  Q.  Do you know if the statement
2  she made to Dr. Bianchini was correct when
3  she told him she had avoided dating since
4  she had had her treatment?
5     MR. EXNICIOS:
6        Objection to the form of the
7  question.
8     THE WITNESS:
9        No, I don't.
10 EXAMINATION BY MS. SCHULTZ:
11    Q.  Have you seen in any of Ms.
12 Durden's medical records references to her
13 wanting to resume sexual intercourse with
14 her partner?
15    A.  I didn't see anything --
16    MR. EXNICIOS:
17       Objection to form.
18 EXAMINATION BY MS. SCHULTZ:
19    Q.  Pardon me?
20    A.  I didn't see that.
21    Q.  You haven't reviewed any
22 medical record that includes that
23 information?
24    A.  Not that I recall yet.
25    Q.  If Ms. Durden had a desire to

**Page 247**

1  resume sexual intercourse with her partner
2  since having lost her hair, is that
3  something that would be an important
4  consideration to you in terms of assessing
5  her social functioning?
6     A.  Yes.
7     MR. EXNICIOS:
8        Objection to the form.
9        Lori, just timing wise, remember
10 I have to take a break in like five
11 minutes.  I've got to get on the
12 teleconference for four, just to give you
13 a heads up.
14    MS. SCHULTZ:
15       Okay.  Well, we should -- let's
16 go ahead and keep going while we can.
17    MR. EXNICIOS:
18       Yeah.  That's fine.  I was just
19 putting a five-minute warning.
20    MS. SCHULTZ:
21       That's the alarm.
22 EXAMINATION BY MS. SCHULTZ:
23    Q.  All right.  Let's keep walking
24 or wading through your report.  Under your
25 diagnoses there's a heading that says

**Page 248**

1  presence or lack of malingering.
2     A.  Correct.
3     Q.  Correct?
4     A.  Yes.
5     Q.  And you refer to the DSM-5;
6  correct?
7     A.  Yes.  That's correct.
8     Q.  And you state malingering
9  should be strongly suspected if any
10 combination of the following is noted?
11    A.  That's correct.
12    Q.  Correct?  And those are set
13 forth in the DSM-5; correct?
14    A.  Yes.
15    Q.  Now, I take it since your
16 report says malingering should be strongly
17 suspected if any combination of the
18 following is noted, you don't look at
19 these factors 1 through 4 as just
20 guidelines that you may or may not rely
21 on?
22    A.  Sure.  They are all
23 guidelines.  I mean, malingering is a
24 guideline.  So you have to take into
25 consideration -- I mean, you could go

**Page 249**

1  through any forensic report and find that
2  a person's claimed distress or disability
3  might not be exactly how someone else
4  reports their claim distress or
5  disability.
6        So you wouldn't automatically
7  assume they're malingering.  You would
8  take this into consideration and also take
9  into consideration psychological testing,
10 if you had that done, to see if the person
11 is trying to exaggerate symptoms.
12       And so I take all of that into
13 consideration.  People who present in the
14 medical/legal context have a higher rate
15 of malingering and so we take that into
16 consideration under number 1.
17    Q.  And before you get through the
18 rest of them.
19    A.  Uh-huh (affirmative response).
20    Q.  Your first statement,
21 malingering should be strongly suspected
22 if any combination of the following is
23 noted.
24    A.  Right.
25    Q.  That means if more than one of

| | |
|---|---|
| Page 338<br>1  DSM-5, or with the depressed mood and<br>2  anxious features as I put in my report<br>3  based on the transient depressive symptoms<br>4  and anxiety symptoms that she reports when<br>5  she goes out into public.<br>6       EXAMINATION BY MS. SCHULTZ:<br>7       Q.  Now --<br>8       A.  She doesn't meet -- and if I<br>9  can continue.  She doesn't meet depressive<br>10 and anxiety symptoms that would be major<br>11 depressive disorder or posttraumatic<br>12 distress.  So there's a rule out<br>13 component.  And we ruled that out with<br>14 extensive evaluation by me and Dr.<br>15 Bianchini and psychological testing.<br>16           So we would not call her, or<br>17 at least I would not call her anything<br>18 higher than adjustment disorder.  But it's<br>19 my opinion based on my experience and<br>20 training that she has a mild adjustment<br>21 disorder.<br>22      Q.  And an adjustment disorder is,<br>23 I can't think of the word I want.<br>24           In terms of stress-related<br>25 disorders. | Page 340<br>1       EXAMINATION BY MS. SCHULTZ:<br>2       Q.  And she's on the lower end of<br>3  meeting the criteria for an adjustment<br>4  disorder; correct?<br>5       A.  Yes.  I think based on --<br>6  certainly based on the recent interviews<br>7  and depositions of her family members<br>8  where they are reporting that she<br>9  functions at maybe a higher level than I<br>10 was able to get when I interviewed her.<br>11      Q.  And the recent depositions,<br>12 you're referring to depositions you --<br>13      A.  I recently received.<br>14      Q.  And read over this past<br>15 weekend?<br>16      A.  Yes.<br>17      Q.  Back to this first line that I<br>18 was asking you about.<br>19      A.  Okay.<br>20      Q.  Ms. Earnest met criteria for<br>21 an adjustment disorder, it goes on to<br>22 state given that she frequently alters and<br>23 then --<br>24      A.  Yeah.  Because she.<br>25      Q.  My version said she's social |
| Page 339<br>1       A.  Yes.<br>2       Q.  Is an adjustment disorder the<br>3  mildest stress related disorder?<br>4       A.  Yes.  It would be one of the<br>5  milder of the psychiatric disorders in<br>6  general.  So if you had an adjustment<br>7  disorder primarily presented with anxiety,<br>8  then that could either be due to a<br>9  stressor similar to posttraumatic stress<br>10 disorder, but they don't have enough<br>11 criteria.<br>12           Or it could be a stressor that<br>13 might cause a panic attack periodically.<br>14 Or it could be a stressor that causes<br>15 depressive symptoms so or appears to be<br>16 related or associated with those symptoms.<br>17      Q.  So an adjustment disorder is<br>18 one of the milder of psychiatric disorders<br>19 in general; correct?  Is that what you<br>20 said?<br>21      MR. EXNICIOS:<br>22           Objection to the form.<br>23      THE WITNESS:<br>24           It's like Diet Coke compared to<br>25 Coke. | Page 341<br>1  colander and behavior.<br>2       A.  Yeah.  It should be -- sorry<br>3  about that.  Sometimes I make corrections<br>4  that don't get in there.  Her social<br>5  calender.  She's not making spaghetti or<br>6  anything.  It's her social calendar so.<br>7       Q.  So she frequently -- it should<br>8  say given that she frequently alters her<br>9  social calendar and behavior?<br>10      A.  Right.<br>11      Q.  Based on the appearance of her<br>12 hair and how it would be perceived by<br>13 others and herself?<br>14      A.  Correct.  And so, you know,<br>15 some of that would be governed back a<br>16 little bit by what I read in the<br>17 depositions.  So I don't know that she<br>18 frequently alters her social calendar.<br>19           But she does spend a fair<br>20 amount of time deciding how she's going to<br>21 go out in public with reference to her<br>22 appearance.<br>23      Q.  And so that's a change that<br>24 you made since reviewing the depositions<br>25 you reviewed to date; correct? |

Page 342

1  A. Yes. Just on that part of my
2 assessment section where it said should
3 additional information become available, I
4 will take it into consideration and alter
5 my opinion as necessary.
6  Q. And there is still additional
7 information that you now have that you
8 have not yet reviewed; correct?
9  MR. EXNICIOS:
10  Objection to form.
11  THE WITNESS:
12  Yes. I'm not expecting in her
13 records to find any major revelations just
14 because we reviewed I think a big chunk of
15 the medical records, and I haven't seen a
16 lot of references to depression or anxiety
17 in them.
18 EXAMINATION BY MS. SCHULTZ:
19  Q. Well, you've spent more time
20 reviewing Ms. Earnest's medical records
21 over the past three or four days than you
22 did prior to forming your opinions and
23 issuing your report; correct?
24  MR. EXNICIOS:
25  Objection to form.

Page 343

1  THE WITNESS:
2  Well, it's probably more reading
3 depositions because I didn't have a lot of
4 depositions before. So yeah, I have. I
5 mean, just her depositions are 500 pages
6 of depositions and they're condensed. So
7 it's 2,000 pages of deposition. I want to
8 take a week off before I read anymore
9 depositions.
10  Q. How much more time do you
11 anticipate putting into the review of
12 depositions and medical records in the
13 Earnest case?
14  A. I have no idea. It takes what
15 it takes.
16  Q. How much more time do you
17 anticipate putting into the review of
18 medical records and depositions in the
19 Durden case?
20  A. I have no idea. I think I'm
21 about through three quarters of everything
22 on screening, but so maybe another eight
23 or ten. I don't know.
24  Q. Looking at specifically at the
25 DSM criteria --

Page 344

1  MS. SCHULTZ:
2  I tell you what, let's take a
3 just -- can we just take a short break?
4  VIDEOGRAPHER:
5  This is the end of media number
6 4. We're now off the record at 5:58.
7  (Whereupon a recess was taken)
8  VIDEOGRAPHER:
9  This is the beginning of media
10 number 5. We're now back on the record at
11 6:08.
12 EXAMINATION BY MS. SCHULTZ:
13  Q. With respect to your diagnosis
14 of Ms. Earnest, is it your opinion that
15 criteria A of the DSM for adjustment
16 disorder, which is development of
17 emotional or behavioral symptoms in
18 response to an identifiable stressor are
19 occurring within three months of the onset
20 of the stressor does not apply to a
21 situation like Ms. Earnest where it's your
22 opinion that the stressor has not gone
23 away?
24  A. Yes.
25  Q. What is the identifiable

Page 345

1 stressor in Ms. Earnest's case?
2  A. Hair loss.
3  Q. And it's hair loss when going
4 through chemotherapy?
5  A. I think she probably
6 experienced symptoms when going through
7 chemotherapy, and she still has some
8 symptoms that are probably related to that
9 or some memories that are difficult for
10 her to process. She cries when she talks
11 about that.
12  And also with relation to her
13 hair not coming back to where she thought
14 it should come back after chemotherapy.
15  Q. And with respect to the second
16 criteria.
17  A. Uh-huh (affirmative response).
18  Q. The symptoms or behaviors are
19 clinically significant as evidenced by one
20 or both of the following. And the first
21 is marked distress that is out of
22 proportion to the severity or intensity of
23 the stressor?
24  A. I think her distress is
25 consistent with the severity of the

Page 346

1  stressor as I said in Ms. Durden.
2      Q.  All right.
3      A.  And I think her impairment is
4  in other important areas of functioning
5  primarily which have to do with her going
6  out in public.
7      Q.  And so the --
8      A.  And those symptoms are
9  transient.
10     Q.  One or both of the following.
11 The first was distress out of proportion
12 to severity?
13     A.  Right.
14     Q.  The other one is significant
15 impairment in social occupation or other
16 important areas of functioning?
17     A.  Right.
18     Q.  And for purposes of the
19 diagnosis you made in your report, you
20 determined that she suffered from
21 significant impairment in social
22 functioning?
23     A.  Probably other areas more than
24 social functioning.  And that is sort of a
25 preparation to go out would be the most

Page 347

1  likely area that she has to spend more
2  time getting ready to go out or
3  contemplating how to go about out in
4  public.
5           So I didn't see that there
6  were major adjustments in her social
7  calendar as we just discussed.  But she
8  does spend a significant amount of time,
9  in my opinion by her report and by her
10 husband's report, being worried or
11 concerned about how she's going to look
12 when she goes in public and how she's
13 going to dress when she goes in public.
14          And that's, you know, again
15 that would to me meet a threshold for an
16 adjustment disorder, a mild adjustment
17 disorder.
18     Q.  Did you review any of the
19 distress management evaluations that were
20 done on Ms. Earnest on a regular basis
21 when she would go see her oncologist?
22     A.  I saw that those things were
23 -- that she had those documented in the
24 record, but there was, you know, some
25 stress management classes or stress

Page 348

1  evaluation classes.
2           And those could similar -- are
3  very similar to cognitive behavioral
4  therapy or cognitive behavioral treatment.
5      Q.  And I'm not talking about any
6  class.
7      A.  Uh-huh (affirmative response).
8      Q.  I'm referring to evaluations
9  made at the time of an appointment where
10 the patient --
11     A.  Yes.
12     Q.  -- is asked questions about
13 whether they still have normal interests
14 in their usual activities, whether they
15 have any anxiety, whether they have any
16 depression.
17     A.  Correct.  And is that the ones
18 that are filled out by the doctor or the
19 ones that are filled out by the patient?
20     Q.  Well, let's start with ones
21 filled out by the doctor.
22     A.  Okay.
23     Q.  Did you review any of those
24 evaluations that were filled out by the
25 doctor for Ms. Earnest?

Page 349

1      A.  I don't recall specifically
2  those.  There were some PHQ, there was a
3  PHQ-2 I think done which only asks two
4  symptoms.  And there may have been a
5  couple of PHQ-9s in her report.  Ochsner
6  typically puts that in their electronic
7  medical records.
8           So there may be some of those,
9  but she denied those symptoms when she
10 was -- when I saw those documented in the
11 record.  So she did not report that she
12 was having kind of the classic symptoms of
13 depression or classic symptoms of anxiety,
14 but I wouldn't necessarily diagnose her
15 with classic depression or classic
16 anxiety.
17          So I didn't find that to be
18 something that I wouldn't expect.  In
19 fact, for someone like her, I think she
20 would say I'm fine a lot when talking to
21 people unless you really probed about how
22 she felt.
23     Q.  Well, did you review the
24 distress management type of evaluations
25 that were done for Ms. Durden?

88 (Pages 346 - 349)