# EXHIBIT G

Page 158

1        UNITED STATES DISTRICT COURT
2        EASTERN DISTRICT OF LOUISIANA
3
4   * * * * * * * * * * * * * * * * * * * * * * * * *
5   IN RE:  TAXOTERE (DOCETAXEL)          MDL No. 2740
    PRODUCTS LIABILITY LITIGATION
6                                          SECTION: H
7   This Document Relates To:
8   Antoinette Durden, Case No. 2:16-cv-16635;
    Tanya Francis, Case No. 2:16-cv-17410;
9   Barbara Earnest, Case No. 2:16-cv-17144
10  * * * * * * * * * * * * * * * * * * * * * * * * *
11
12              VOLUME II
13
14
15       Videotaped Deposition of KEVIN J. BIANCHINI,
16  PhD, ABPN, taken at Jefferson Neurobehavioral Group,
17  2901 N. I-10 Service Road E., Suite 300, Metairie,
18  Louisiana 70002, on Wednesday, January 9th, 2019, at
19  8:34 a.m.
20
21
22
23
24  By:  Ashlee B. Ancalade
    Registered Professional Reporter
25  Job No. NJ3184809

Page 187

1  BY MS. SCHULTZ:
2  Q   So basically saying that the test results of
3  malingering should not be told to the jury?
4  A   The -- the test results should not be
5  described to the jury as reflective of malingering.
6  Q   And who did you -- who -- who had retained
7  you as an expert in that case?
8  A   It was a lawyer in Baton Rouge, whose name I
9  can't think of right now.
10  Q   Well, who was the party?
11  A   I can't think -- if I could think of the name
12  of the party, I'd know the name of the case, but I
13  can't think of the name of the party.
14  Q   Was the party an individual?
15  A   It was.
16  Q   Was the party the plaintiff?
17  A   Well, yeah.
18  Q   So you --
19  A   I thought that's what you were asking me
20  about.  Maybe I'm wrong.
21  Q   So you -- you'd been retained to -- as an
22  expert to opine on an individual's diagnosis?
23     MR. EXNICIOS:
24        Objection to the form of the question.
25  BY MS. SCHULTZ:

Page 188

1  Q   You gave me a strange look there, so let me
2  reask the question.
3     What -- what had you been retained to do in
4  that case?
5  A   So it was a motor-vehicle accident wherein
6  the plaintiff in the case sustained a traumatic brain
7  injury as a result of the motor-vehicle accident.
8     The -- there was a lawsuit against a party
9  brought by the plaintiff who was injured.
10     I was retained by defendants in the lawsuit
11  and was asked to perform an evaluation of the
12  individual who sustained the injury as it pertained to
13  neuropsychological problems and damages because of the
14  traumatic brain injury.
15  Q   And did you testify in court in that case?
16  A   Yes.
17  Q   And did you give a deposition in that case?
18  A   Yes, I think so.
19  Q   Okay.  Other than the situation you've just
20  described, have you ever been precluded by a court from
21  offering a certain opinion?
22  A   I don't think so.  At least, not that I know
23  of.  Sometimes these things happen, you know, without
24  us knowing it.
25  Q   You provided us with billing records in the

Page 189

1  exhibits we marked yesterday.  Have you billed any
2  additional time on either of these cases that are not
3  reflected in your billing records?
4  A   I don't think so.  Well, I haven't billed any
5  yet.  I may have -- I may have -- you know, there will
6  be additional changes.
7  Q   Have you spent any additional time on these
8  cases that aren't reflected in the billing records
9  you've provided?
10  A   I'm not sure if my review of the expert
11  reports is in there yet.  And -- and also the time I
12  spent going back over the Ochsner record yesterday.
13  Q   How much time did you spend reviewing the
14  expert reports?
15  A   I'm not sure.  Probably two or three hours.
16  Q   And with respect to Ms. Durden, the total
17  amount of time that you spent with Ms. Durden was just
18  a little over an hour; correct?
19     MR. EXNICIOS:
20        Objection to the form of the question.
21  BY MS. SCHULTZ:
22  Q   Let me show you Exhibit 6.  I'm going to show
23  you Exhibit 6, page 3.
24  A   This is Durden?
25  Q   Yes.

Page 190

1  A   Okay.  Durden.
2  Q   It reflects the Legal Pain Psych Eval.
3  A   Right.
4  Q   And is that -- is that one hour that you
5  spend?
6  A   I have the -- I have the amount of time I
7  spent written on the interview sheet, and it's an hour
8  and 15 minutes.
9  Q   Okay.  Well, and then there's additional
10  interview time that you billed for --
11  A   Right.
12  Q   -- .25, which is 15 minutes?
13  A   Correct.
14  Q   So the length of your interview was an hour
15  and 15 minutes?
16  A   Yes.
17  Q   Other than that hour and 15 minutes, have you
18  spent any additional time with Ms. Durden?
19  A   No.
20  Q   Prior to that hour and 15 minutes you spent
21  with her, had you spent any time with Ms. Durden?
22  A   No.
23  Q   Had you talked with Ms. Durden at any time
24  prior to that evaluation?
25  A   No.

| | |
|---|---|
| Page 191 | Page 193 |

Page 191

1  Q   And have you spoken to Ms. Durden at any time
2  since that evaluation?
3  A   I don't think so.  I don't think so.
4  Q   Same question for Ms. Earnest.  And I'm going
5  to hand you Deposition Exhibit 7, and if you'll look
6  here on the -- on the "Legal Pain Psychological
7  Evaluation," it -- there is an additional interview
8  time of .67?
9  A   Right.
10 Q   So did you spend about an hour and 40 minutes
11 with --
12 A   Yeah.  Hour and 40, yes.
13 Q   And that was an hour and 40 minutes you spent
14 with Ms. Earnest for her interview; correct?
15 A   Yes.
16 Q   Did you spend any time with Ms. Earnest prior
17 to that interview?
18 A   I don't believe so, no.
19 Q   Okay.  Have you spent any time with
20 Mrs. Earnest since that interview?
21 A   No.  I don't think so.
22 Q   Okay.  Did you speak with Ms. Earnest at any
23 time prior to or after that interview?
24 A   No.  I don't think so.
25 Q   All right.  Just a couple questions for the

Page 192

1  record about the medical records and other records that
2  you did receive, and let's just do it by case.
3         First of all, on Exhibit 10, it includes
4  the -- it looks like Medical Center of Louisiana and
5  then Ochsner Medical Center records.  You agree?  Or
6  are there any other records?
7  A   So you want me to say what's in there --
8  Q   Well --
9  A   -- other than -- we -- I mean, we've gone
10 over it in my report, but -- but if you want me to go
11 through that --
12 Q   Yeah.
13 A   -- then you need to give me the binder --
14 Q   Yeah.  I'm not asking you to go -- I was just
15 trying to --
16 A   All right.
17 Q   -- work through this --
18 A   Okay.
19 Q   -- in a quicker way.
20 A   I understand.  I -- I'm not in a hur- -- I'm
21 not pushing you.
22 Q   Do you know -- do you know which physicians'
23 records are included in Ms. -- this binder, Exhibit 10,
24 without having to go page by page through the --
25 A   You're asking me from memory?

Page 193

1  Q   Yes.
2  A   I don't have all those physicians memorized,
3  no.
4  Q   Okay.  Did you look when you were reviewing
5  records last night whether or not you had received any
6  records of Ms. Durden's primary-care physician,
7  Dr. Velu?
8  A   I feel pretty confident I did not.
9  Q   Okay.  Do you know how long Ms. Durden had
10 seen Dr. Velu?
11 A   Since I don't have the records, I don't know.
12 It's my understanding those records are being sent to
13 me.
14 Q   So do you agree that without having
15 Ms. Durden's records, you can't make a determination
16 whether or not she has previously complained of similar
17 symptoms as of the kind she told you about?
18     MR. EXNICIOS:
19         Objection to the form of the question.
20 A   Since I haven't seen those records, I -- I
21 can't tell you anything about what's in there,
22 including whether she did or didn't have similar
23 symptoms.
24 BY MS. SCHULTZ:
25 Q   Were you -- based on your review of the --

Page 194

1  the -- the records you did have, did you see any
2  evidence of Ms. Durden complaining of similar symptoms
3  to any of her treating physicians?
4     MR. EXNICIOS:
5         Objection to the form of the question.
6  A   Yeah.  I don't und- -- say that again.
7  BY MS. SCHULTZ:
8  Q   Let me do this.  I'm trying to move us
9  through this quickly, but . . .
10 A   It's all right.
11 Q   Let me see.  Do you have Exhibit 8 in front
12 of you?  It's the Durden report.
13 A   That's 8?  Yep.  And I have my own copy.  Do
14 you want this copy to use?
15 Q   No.  That's all right.  I have --
16 A   You have your own copy.
17 Q   -- my own copy.
18 A   Okay.
19 Q   In your report on page --
20 A   Yes.
21 Q   -- on page 3 of the report, you state that
22 Ms. Durden reported to you the following symptoms that
23 she attributes to her hair loss.
24 A   Uh-huh, yes.
25 Q   And then you list those out, of frustration,

|  |  |
|---|---|
| Page 295<br>1  "clinically significant" means.<br>2      Q    Okay.  So under the second criteria, "B," it<br>3  states:  "These symptoms or behaviors are clinically<br>4  significant as evidenced by one or both of the<br>5  following."  And then it has two specific subcriteria;<br>6  correct?<br>7      A    Yes.<br>8      Q    Okay.  The first one is, "Marked distress<br>9  that is out of proportion to the severity or intensity<br>10 of the stressor, taking into account the external<br>11 context and the cultural factors that might influence<br>12 the symptom severity and presentation"; is that<br>13 correct?<br>14     A    That's what it says.<br>15     Q    And the second is, "Significant impairment in<br>16 social, occupational, or other important areas of<br>17 functioning"; correct?<br>18     A    Yes.<br>19     Q    And then the third criteria, "C," says, "The<br>20 stress-related disturbance does not meet the criteria<br>21 for another mental disorder and is not merely an<br>22 exacerbation of a pre-existing mental disorder";<br>23 correct?<br>24     A    That's what it says.<br>25     Q    And that's -- do you agree that's the third | Page 297<br>1  stressor or its consequences have terminated, the<br>2  symptoms do not persist for more than an additional six<br>3  months"; correct?<br>4      A    Yes.  It says that.<br>5      Q    And that's the . . .<br>6      A    It's "E."<br>7      Q    "E."<br>8           That's the fifth criteria; correct?<br>9      A    That's what it says there, yes.<br>10     Q    And then it indicates that you're supposed to<br>11 specify whether the adjustment disorder is -- and then<br>12 it gives subcategories.<br>13     A    Yes.<br>14     Q    Such as depressed mood.<br>15     A    Right.<br>16     Q    Anxiety.<br>17          And each of those have a separate diagnostic<br>18 number; correct?<br>19     A    Yes.<br>20     Q    All right.  Now, you agree that the symptoms<br>21 reported by Ms. Durden are not out of proportion to the<br>22 severity or intensity of the stressor that she has;<br>23 correct?<br>24     A    Yes.<br>25     Q    And you agree that the symptoms reported by |
| Page 296<br>1  criteria?<br>2      A    I do.<br>3      Q    And the fourth criteria is capital "D."  "The<br>4  symptoms do not represent normal bereavement"; is that<br>5  correct?<br>6      A    Yes.<br>7      Q    What does that mean," The symptoms do not<br>8  represent normal bereavement"?<br>9      A    "Bereavement" means grief.  Like -- like if<br>10 you had a loss and you have grief about the loss.<br>11     Q    So the symptoms don't represent how someone<br>12 would normally be bereaved in that type of situation?<br>13          MR. EXNICIOS:<br>14               Objection to the form.<br>15     A    I -- I don't know.  I mean, it basically<br>16 refers to normal grieving.  So, in other words, if --<br>17 if a woman loses her husband and has a period of time<br>18 where she's sad about the loss of her husband, that's<br>19 not an adjustment disorder.  That's -- that's normal<br>20 bereavement.<br>21 BY MS. SCHULTZ:<br>22     Q    Because that would be a normal reaction to<br>23 the loss of a husband?<br>24     A    Yes.<br>25     Q    And then the last criteria:  "Once the | Page 298<br>1  Ms. Earnest are not out of proportion to the severity<br>2  or intensity of the stressor that she has; correct?<br>3      A    Yes.<br>4      Q    And you agree that the symptoms Ms. Durden<br>5  has represent normal bereavement for the type of<br>6  stressor she has.<br>7           Do you agree?<br>8      A    No.<br>9           MR. EXNICIOS:<br>10               Objection to the form of the question.<br>11     A    I'm sorry.<br>12 BY MS. SCHULTZ:<br>13     Q    Why don't you agree with that?<br>14     A    Well, you skipped over one that you --<br>15 "Significant impairment and social occupational or<br>16 other important areas of functioning."<br>17          So it's my understanding from the history<br>18 that -- that they both actually -- maybe we shouldn't<br>19 talk about both, but they both have impacts on their<br>20 social functioning.<br>21     Q    And that -- the requirement is that it be a<br>22 significant impairment --<br>23     A    Right.<br>24     Q    -- in their social functioning; correct?<br>25     A    Yes. |