# EXHIBIT A

1 | Eva M. Weiler (SBN: 233942)
eweiler@shb.com
2 | SHOOK, HARDY & BACON L.L.P.
5 Park Plaza, Suite 1600
3 | Jamboree Center
Irvine, California 92614
4 | Telephone: (949) 475-1500
Facsimile: (949) 475-0016
5 | eweiler@shb.com

6

7 | Attorneys for Defendants
sanofi-aventis U.S. LLC and
Sanofi U.S. Services Inc.

8

9 | UNITED STATES DISTRICT COURT

10 | CENTRAL DISTRICT OF CALIFORNIA

11 | SHELLY JONES, CHRISTINE     )   Case No.   2:18-cv-8268
AVERY, KAREN CRAWFORD,     )
12 | MARY ALLYN DEXTER, PEGGY    )
ELMS, GWENDOLYN HARTFORD,   )
13 | AISHA INGRAM, DELLA ANN      )
MACIEL, DEBRA POLLACK, LINDA )
14 | PONZI, AMBER SHUBIN, KATRINA )
SMITH, MICHELLE BOBBITT,     )
15 | DONNA JORDAN-PACK,          )
GEORGIANE GAMBOA, TYKESHA   )
16 | WILLIAMS-SAUNDERS,         )

17 |         Plaintiffs,           )

18 |    vs.                 )

19 | SANOFI US SERVICES INC. f/k/a   )
SANOFI-AVENTIS U.S. INC.,     )
20 | SANOFI-AVENTIS U.S. LLC,     )
separately, and doing business as    )
21 | WINTHROP, U.S., ACCORD      )
HEALTHCARE, INC., HOSPIRA    )
22 | WORLDWIDE, LLC f/k/a HOSPIRA )
WORLDWIDE, INC., HOSPIRA, INC., )
23 | SUN PHARMA GLOBAL FZE, SUN   )
PHARMACEUTICAL INDUSTRIES,   )
24 | INC. f/k/a CARACO          )
PHARMACEUTICAL           )
25 | LABORATORIES LTD., and      )
MCKESSON CORPORATION d/b/a   )
26 | MCKESSON PACKAGING,      )

        Defendants.        )

27

28

**NOTICE OF REMOVAL OF ACTION BY DEFENDANTS SANOFI U.S. SERVICES INC. & SANOFI-AVENTIS U.S. LLC UNDER 28 U.S.C. §§ 1332, 1441, AND 1446.**

**DEMAND FOR JURY TRIAL**

[Removed from Los Angeles County Superior Court No. BC717326]

[Filed concurrently with Civil Cover Sheet; Disclosure Statement; Notice of Related Cases; Notice of Pendency of Other Actions; and Notice of Interested Parties]

NOTICE OF REMOVAL

493147 V2

# TABLE OF CONTENTS

I.  THE REMOVED CASE ............................................................................... 1

II.  SANOFI-AVENTIS U.S. LLC AND SANOFI U.S. SERVICES INC. HAVE SATISFIED THE PROCEDURAL REQUIREMENTS FOR REMOVAL ................................................... 2

III.  REMOVAL IS PROPER BECAUSE THIS COURT HAS SUBJECT MATTER JURISDICTION PURSUANT TO 28 U.S.C. §§ 1332 AND 1441 ................................................... 3

    A.  Diversity of Citizenship Exists Between the Properly Joined Defendants ................................................................ 4

    B.  The Citizenship of McKesson Does Not Defeat Diversity Jurisdiction Because McKesson is Fraudulently Joined ..................... 5

    C.  The Amount-in-Controversy Requirement is Satisfied ....................... 9

IV.  CONCLUSION ...................................................................................... 12

NOTICE OF REMOVAL

493147 V2

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aronis v. Merck & Co.*,
　No. CIV. S-05-0486WBSDAD, 2005 WL 5518485 (E.D. Cal. May 3,
　2005) .................................................................................................................. 8

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009) ........................................................................................... 6

*Bailey v. J.B. Hunt Transp., Inc.*,
　No. 06-240, 2007 WL 764286 (E.D. Pa. Mar. 8, 2007) ......................................... 11

*Bell Atl. Corp. v. Twombly*,
　550 U.S. 544 (2007) ....................................................................................... 5, 6

*Bennett v. Allstate Ins. Co.*,
　753 F. Supp. 299 (N.D. Cal. 1990) ...................................................................... 9

*Camara v. Bayer Corp.*,
　No. C 09-06084 WHA, 2010 WL 902780 (N.D. Cal. Mar. 9, 2010) ......................... 6

*Campbell v. Bridgestone/Firestone, Inc.*,
　No. CIVF051499FVSDLB, 2006 WL 707291 (E.D. Cal. Mar. 17,
　2006) ................................................................................................................ 10

*Century Assets Corp. v. Solow*,
　88 F. Supp. 2d 659 (E.D. Tex. 2000) .................................................................. 12

*Combs v. Stryker Corp.*,
　No. 209-CV-02018-JAM-GGH, 2009 WL 4929110 (E.D. Cal. Dec.
　14, 2009) ........................................................................................................... 8

*Emrich v. Touche Ross & Co.*,
　84 F.2d 1190 (9th Cir. 1988) ............................................................................... 3

*Fields v. Jay Henges Enters., Inc.*,
　No. 06-323-GPM, 2006 WL 1875457 (S.D. Ill. June 30, 2006) ............................. 11

*Gomes v. Michaels Stores, Inc.*,
　No. CIV S06-1921 LKK/KJM, 2006 WL 3079024, at *4-7 (E.D. Cal.
　Oct. 27, 2006) .................................................................................................... 9

iii

NOTICE OF REMOVAL

493147 V2

*Gonzalez v. First NLC Fin. Servs.*,
   No. CV 09-4147 AHM, 2009 WL 2513670 (C.D. Cal. Aug. 12, 2009)...................4

*Hunter v. Philip Morris USA*,
   582 F.3d 1039 (9th Cir. 2009) ..........................................................................5

*In re Rezulin Prods. Liab. Litig.*,
   133 F. Supp. 2d 272 (S.D.N.Y. 2001) ...............................................................11

*In re Taxotere (Docetaxel) Prod. Liab. Litig.*,
   MDL 2740, 2016 WL 5845996 (J.P.M.L. Oct. 4, 2016)..........................................1

*In Re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prod. Liab. Litig.*,
   No. 309MD02100DRHPMF, 2010 WL 2402926 (S.D. Ill. June 15, 2010) .................................................................................................7, 8

*In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Relevant Prod. Liab. Litig.*,
   No. 3:09-CV-20003, 2010 WL 3937414 (S.D. Ill. Oct. 4, 2010) ...........................8

*J & J Sports Prods., Inc. v. Torres*,
   No. 6:09CV391-ORL-19DAB, 2009 WL 1774268 (M.D. Fla. June 22, 2009) ..........................................................................................................7

*Jones v. Interstate Recovery Serv.*,
   160 Cal. App. 3d 925 (1984) ............................................................................9

*Kanter v. Warner-Lambert Co.*,
   265 F.3d 853 (9th Cir. 2001) ............................................................................4

*Kantor v. Wellesley Galleries, Ltd.*,
   704 F.2d 1088 (9th Cir. 1983) ..........................................................................4

*Maffei v. Allstate California Ins. Co.*,
   412 F. Supp. 2d 1049 (E.D. Cal. 2006) ..............................................................5

*McCoy v. Gen. Motors Corp.*,
   226 F. Supp. 2d 939 (N.D. Ill. 2002)................................................................11

*Plummer v. Lederle Labs.*,
   819 F.2d 349 (2d Cir. 1987) .............................................................................6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

iv

NOTICE OF REMOVAL

493147 V2

*Quinn v. Kimble*,
  228 F. Supp. 2d 1036 (E.D. Mo. 2002) ...................................................... 11

*Roe v. Michelin N. Am., Inc.*,
  613 F.3d 1058 (11th Cir. 2010) ........................................................ 10, 11

*Shah v. Wyeth Pharm., Inc.*,
  No. CV 04–8652 DT, 2005 WL 6731641 (C.D. Cal. Jan. 18, 2005) ........................ 9

*Simmons v. PCR Tech.*,
  209 F. Supp. 2d 1029 (N.D. Cal. 2002) ...................................................... 10

*Singer v. State Farm Mut. Auto. Ins. Co.*,
  116 F.3d 373 (9th Cir. 1997) ............................................................ 10

*State Farm Mut. Auto. Ins. Co. v. Dyer*,
  19 F.3d 514 (10th Cir. 1994) ............................................................. 4

*U.S. v. Bush*,
  70 F.3d 557 (10th Cir. 1995) ............................................................. 7

*United Computer Sys., Inc. v. AT&T Corp.*,
  298 F.3d 756 (9th Cir. 2002) ............................................................. 3

*Vu v. Ortho-McNeil Pharma., Inc.*,
  602 F. Supp. 2d 1151 (N.D. Cal. 2009) .................................................... 5

*Walton v. Bayer Corp.*,
  643 F.3d 994 (7th Cir. 2011) ............................................................. 5

*Wendell v. Johnson & Johnson*,
  No. C 09-04124 CW, 2012 WL 3042302 (N.D. Cal. July 25, 2012) ........................ 6

**Statutes**

28 U.S.C. § 1332 ................................................................... 1, 3, 4, 12

28 U.S.C. § 1441 ................................................................ 1, 2, 3, 5, 12

28 U.S.C. § 1446 ................................................................... 1, 2, 3, 12

California Code of Civil Procedure § 425 .................................................. 9

v

NOTICE OF REMOVAL

493147 V2

**Rules**

Federal Rule of Civil Procedure 8 ................................................................. 6

NOTICE OF REMOVAL

493147 V2

## NOTICE OF REMOVAL OF CIVIL ACTION

Defendants sanofi-aventis U.S. LLC and Sanofi U.S. Services Inc. remove this action from the Los Angeles County Superior Court to the United States District Court for the Central District of California pursuant to 28 U.S.C. §§ 1332, 1441, and 1446. As set forth in more detail below, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because McKesson Corporation ("McKesson") was fraudulently joined as it has no connection to this case.  Moreover, Plaintiffs failed to adequately plead a cause of action against McKesson.  In support of removal, sanofi-aventis U.S. LLC and Sanofi U.S. Services Inc. state as follows:

## I.    THE REMOVED CASE

1.    Plaintiffs Shelly Jones, Christine Avery, Karen Crawford, Mary Allyn Dexter, Peggy Elms, Gwendolyn Hartford, Aisha Ingram, Della Ann Maciel, Debra Pollack, Linda Ponzi, Amber Shubin, Katrina Smith, Michelle Bobbitt, Donna Jordan-Pack, Georgiane Gamboa, and Tykesha Williams-Saunders ("Plaintiffs") filed this civil action on August 23, 2018, in the Los Angeles County Superior Court, styled *Shelly Jones, et al. v. Sanofi U.S. Services Inc., et al.*, Case No. BC717326.

2.    This case is not an outlier.  There are more than 9,500 similar lawsuits in federal court alleging that Plaintiffs developed permanent alopecia after being treated with docetaxel.   On October 4, 2016, the Judicial Panel on Multidistrict Litigation centralized these actions by transferring them to the United States District Court for the Eastern District of Louisiana for coordinated pretrial proceedings.  *See In re Taxotere (Docetaxel) Prod. Liab. Litig.*, MDL 2740, 2016 WL 5845996 (J.P.M.L. Oct. 4, 2016).  According to the Panel, "[c]entralization will eliminate duplicative discovery; prevent inconsistent pretrial rulings; and conserve the resources of the parties, their counsel, and the judiciary." *Id.* at 1.

3.    Sanofi-aventis U.S. LLC and Sanofi U.S. Services Inc. file this notice of removal based on diversity jurisdiction.  Complete diversity exists because Plaintiffs

NOTICE OF REMOVAL

are citizens of California and the <u>properly joined</u> Defendants are citizens of Delaware, New Jersey, North Carolina, Illinois, and the British Virgin Islands.  (Compl. ¶¶ 21, 46, 67, 87.)  The amount in controversy is satisfied because Plaintiffs allege they suffered "serious and dangerous side effects, severe and personal injuries that are permanent and lasting in nature, and economic and non-economic damages, harms, and losses, including but not limited to: past and future medical expenses; past and future loss of earnings; past and future loss and impairment of earning capacity; permanent disfigurement including permanent alopecia; mental anguish; severe and debilitating emotional distress; increased risk of future harm; past, present, and future physical and mental pain, suffering, and discomfort; and past, present, and future loss and impairment of the quality and enjoyment of life."  (Compl. ¶ 201.)  The complete diversity requirement is met and the forum-defendant rule does not preclude removal because the sole California defendant, McKesson, is fraudulently joined.  There are no plausible factual allegations linking McKesson to the claims at issue here.

4.      Following removal, sanofi-aventis U.S. LLC and Sanofi U.S. Services Inc. intend to file a notice of potential tag-along action to inform the JPML of this case.

## II.    SANOFI-AVENTIS U.S. LLC AND SANOFI U.S. SERVICES INC. HAVE SATISFIED THE PROCEDURAL REQUIREMENTS FOR REMOVAL.

5.      This removal is timely.   Sanofi-aventis U.S. LLC and Sanofi U.S. Services Inc. file this Notice of Removal within 30 days of August 28, 2018, the date of service of the initial pleading upon sanofi-aventis U.S. LLC and Sanofi U.S. Services Inc.

6.      Pursuant to 28 U.S.C. § 1446(a), attached is a copy of all process, pleadings, and orders served upon sanofi-aventis U.S. LLC and Sanofi U.S. Services Inc. *See* **Exhibit A**.

7.      The United States District Court for the Central District of California is the proper venue for removal under 28 U.S.C. § 1441(a) because it is "the district and

2

493147 V2

1  division embracing the place where such action is pending," namely, Los Angeles

2  County, California.

3       8.    Pursuant to 28 U.S.C. § 1446(d), written notice of this removal has been

4  provided simultaneously to all parties and the clerk of the Los Angeles County

5  Superior Court.

6       9.    As discussed below, McKesson was fraudulently joined in this case.

7  Therefore, McKesson's consent is not required for removal.    28 U.S.C.

8  § 1446(b)(2)(A) (requiring the consent for removal only of those defendants "who

9  have been properly joined"); *United Computer Sys., Inc. v. AT&T Corp.*, 298 F.3d

10  756, 762 (9th Cir. 2002) ("[T]he 'rule of unanimity' does not apply to 'nominal,

11  unknown or fraudulently joined parties.'") (*quoting Emrich v. Touche Ross & Co.*, 84

12  F.2d 1190, 1193 fn. 1 (9th Cir. 1988)).

13      10.   Likewise, pursuant to 28 U.S.C. § 1446(b)(2)(A), only defendants that

14  have been properly joined and served must join in or consent to the removal of the

15  action.

16      11.   The remaining properly joined and served defendants have, through

17  counsel, consented to this removal.

18  **III.    REMOVAL IS PROPER BECAUSE THIS COURT HAS SUBJECT**

19  **MATTER JURISDICTION PURSUANT TO 28 U.S.C. §§ 1332 AND 1441.**

20      12.   This  Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)

21  because this is a civil action in which the amount in controversy exceeds the sum of

22  $75,000, exclusive of costs and interest, and is between citizens of different states.

23  Removal under 28 U.S.C. § 1441(b) is appropriate in this matter since complete

24  diversity of citizenship exists between Plaintiffs and all properly joined defendants.

25  Specifically, the citizenship of McKesson is irrelevant for jurisdictional purposes

26  since that defendant, as explained below, was fraudulently joined.

27

28

---

3

NOTICE OF REMOVAL

493147 V2

A.   **Diversity of Citizenship Exists Between the Properly Joined Defendants.**

13.   This Court has diversity jurisdiction over this matter because there is complete diversity of citizenship between Plaintiffs and the properly joined defendants.

14.   According to the Complaint, Plaintiffs are citizens and residents of California. (*See* Compl. ¶¶ 4-19). State citizenship for diversity purposes requires that the individual be domiciled in that state. *Kantor v. Wellesley Galleries, Ltd.*, 704 F.2d 1088, 1090 (9th Cir. 1983). A person's domicile is the place he or she resides with the intention to remain or to which he or she intends to return. *Kanter v. Warner-Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001). A party's place of residence is "prima facie" evidence of domicile. *Gonzalez v. First NLC Fin. Servs.*, No. CV 09-4147 AHM, 2009 WL 2513670, at *2 (C.D. Cal. Aug. 12, 2009) (citing *State Farm Mut. Auto. Ins. Co. v. Dyer*, 19 F.3d 514, 520 (10th Cir. 1994)).

15.   Sanofi-aventis U.S. LLC is now and was at the time Plaintiffs commenced this action, a Delaware limited liability company with its principal place of business in New Jersey. (Compl. ¶ 21.) Sanofi U.S. Services Inc. is the sole member of sanofi-aventis U.S. LLC. Sanofi U.S. Services Inc. is now and was at the time Plaintiffs commenced this action, a Delaware corporation with its principal place of business in New Jersey. Thus, for jurisdictional purposes, sanofi-aventis U.S. LLC is a citizen of Delaware and New Jersey. *See* 28 U.S.C. § 1332(c)(1).

16.   Accord Healthcare, Inc. is a North Carolina corporation with its principal place of business in North Carolina. (Compl. ¶ 46).

17.   Hospira Worldwide, Inc. is a Delaware corporation with its principal place of business in Illinois. (Compl. ¶ 67).

18.   Sun Pharma Global, Inc. is a foreign corporation with a principal place of business Road Town, British Virgin Islands. (Compl. ¶ 87).

NOTICE OF REMOVAL

493147 V2

**B.**   **The Citizenship of McKesson Does Not Defeat Diversity Jurisdiction Because McKesson is Fraudulently Joined.**

19.   McKesson is alleged to be a citizen of California. (*Id.* ¶ 108). "Although an action may be removed to federal court only where there is complete diversity of citizenship one exception to the requirement for complete diversity is where a non-diverse defendant has been fraudulently joined." *Hunter v. Philip Morris USA*, 582 F.3d 1039, 1043 (9th Cir. 2009) (internal quotations omitted). "Joinder is fraudulent if the plaintiff fails to state a cause of action against a resident defendant, and the failure is obvious according to the settled rules of the state." *Id.* "When determining whether a defendant is fraudulently joined, the court may pierce the pleadings, consider the entire record, and determine the basis of joinder by any means available." *Maffei v. Allstate California Ins. Co.*, 412 F. Supp. 2d 1049, 1053 (E.D. Cal. 2006). Under the fraudulent joinder doctrine, the citizenship of resident defendant McKesson should be disregarded for purposes of removal pursuant to 28 U.S.C. § 1441(b)(2). *See, e.g., Vu v. Ortho-McNeil Pharma., Inc.*, 602 F. Supp. 2d 1151, 1154-55 (N.D. Cal. 2009) (disregarding a resident defendant's citizenship under the fraudulent joinder doctrine reasoning defendant was fraudulently joined because she did not market or distribute the product in question).

20.   "Like many legal doctrines, 'fraudulent joinder' is misnamed . . . , proof of fraud, though sufficient, is not necessary for retention of federal jurisdiction—all that's required is proof that the claim against the nondiverse defendant is utterly groundless, and as a groundless claim does not invoke federal jurisdiction." *Walton v. Bayer Corp.*, 643 F.3d 994, 999 (7th Cir. 2011).

21.   In order to state a proper claim against McKesson, Plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face" and allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Legal conclusions and threadbare recitals of elements, supported by mere conclusion, simply do not

NOTICE OF REMOVAL

493147 V2

1   suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This Court is "'not bound to

2   accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S.

3   at 555 (citation omitted). Rather, Federal Rule of Civil Procedure 8 "'contemplate[s]

4   the statement of circumstances, occurrences, and events in support of the claim

5   presented.'" *Id.* at 555 n.3 (citation omitted). Plaintiffs' allegations against

6   McKesson fail to set forth facts to support their legal conclusions and should be

7   dismissed for failure to state a claim. *Id.* at 555; *see also Iqbal*, 556 U.S. at 678-79

8   ("Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing

9   more than conclusions.").

10        22.    Plaintiffs do not assert any specific facts connecting McKesson to any of

11   the individual claims asserted in the Complaint. *See Camara v. Bayer Corp.*, No. C 09-

12   06084 WHA, 2010 WL 902780, at *3 (N.D. Cal. Mar. 9, 2010) (staying case pending

13   transfer to MDL and declining to decide motion to remand because plaintiff's complaint

14   failed "to clearly explain the role of McKesson in the injury of these specific plaintiffs

15   and leaves a suspicion that McKesson could have been added to defeat diversity

16   removal"); *see also Wendell v. Johnson & Johnson*, No. C 09-04124 CW, 2012 WL

17   3042302, at *7 (N.D. Cal. July 25, 2012) ("A plaintiff asserting causes of action for

18   failure to warn must prove not only that no warning was provided or that the warning

19   was inadequate, but also that the inadequacy or absence of a warning caused the

20   plaintiff's injury.") (citing *Plummer v. Lederle Labs.*, 819 F.2d 349, 358 (2d Cir. 1987)

21   (applying California law)).

22        23.    Specifically, Plaintiffs do not plausibly allege that they were treated with

23   docetaxel distributed or manufactured by McKesson. Instead, Plaintiffs suggest that

24   because McKesson has distributed docetaxel, or has manufactured the generic non-

25   bioequivalents of the same, that it must have distributed or manufactured docetaxel

26   specifically used to treat Plaintiffs. But this is a logical fallacy. It is akin to saying that

27   because Walgreens stocks Bayer aspirin, and a plaintiff took some brand of aspirin, she

28   must have not only bought *Bayer* aspirin, but Bayer aspirin *at Walgreens.*

NOTICE OF REMOVAL

493147 V2

24.     The mere fact that McKesson markets, distributes, or manufactures medications generally does not mean that it marketed, distributed or manufactured the exact docetaxel that treated Plaintiffs.  The Complaint appears to acknowledge this by employing the ambiguous phrase "and/or" when alleging distribution by McKesson.[1] (Compl. ¶ 1 (alleging that Defendants "manufactured, marketed, distributed to Plaintiffs and/or their healthcare providers, doxetaxel (TAXOTERE®) and/or generic non-bioequivalent of same ("Taxotere")...".)   What Plaintiffs' use of "and/or" actually signifies is that they have not alleged (1) which product they were administered (2) which Defendant manufactured that product, or (3) if McKesson distributed or manufactured the product.

25.     Similarly ambiguous allegations were addressed in *In Re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prod. Liab. Litig.*, No. 309MD02100DRHPMF, 2010 WL 2402926 (S.D. Ill. June 15, 2010).   There, a California plaintiff filed suit in California Superior Court, alleging personal injuries caused by an oral contraceptive, and naming Bayer and McKesson as defendants. Bayer removed the case and asserted that McKesson was fraudulently joined. The court agreed and denied remand.   On a motion for reconsideration, the Court determined that California pleading standards should apply but noted that "a complaint that fails to state a claim under federal pleading rules, necessarily does not state a claim under California's more stringent pleading rules." *Id.* at *3.  The complaint failed under either standard because the plaintiff only alleged that McKesson was a distributor of the contraceptive:

---

[1] The use of "'and/or' . . . adds a great deal of uncertainty . . . . Such vague language is strongly disfavored." *U.S. v. Bush*, 70 F.3d 557, 562 (10th Cir. 1995).  Allegations that use "and/or" are vague and ambiguous and insufficient to satisfy pleading standards. *See, e.g., J & J Sports Prods., Inc. v. Torres*, No. 6:09CV391-ORL-19DAB, 2009 WL 1774268, at *3 (M.D. Fla. June 22, 2009) (dismissing claims at the pleading stage because of the plaintiff's use of "and/or").

7

1    Alleging that McKesson was *a* distributor of the subject matter drugs is not

2    the equivalent of alleging that McKesson was *the* distributor that supplied

3    the drugs that allegedly caused Plaintiff's injuries. Absent such an

4    allegation, there can be no causal connection between McKesson and

5    Plaintiff's alleged injuries and the Court must conclude that Plaintiff has

6    not sufficiently pled a claim against McKesson.

7    *Id.* at *3 (emphasis in original).

8        26.   In *Combs v. Stryker Corp.*, No. 209-CV-02018-JAM-GGH, 2009 WL

9    4929110 (E.D. Cal. Dec. 14, 2009), the court addressed a motion to dismiss products

10   liability claims relating to anesthetics. The defendants requested dismissal citing an

11   allegation that the plaintiff was administered "Marcaine," a branded medication. *Id.* at

12   *2. However, judicially noticeable public documents showed that the defendants did

13   not distribute or sell "Marcaine." *Id.* The plaintiffs attempted to avoid dismissal by

14   arguing that physicians sometimes use Marcaine as a generic reference to drugs in the

15   "bupivacaine" anesthetic family. *Id.* But the court dismissed the case, explaining that,

16   if that were true, then plaintiff could have been given any one of a number of different

17   drugs by different companies. *Id.* at *3. The same result is warranted here. *See also In*

18   *re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Relevant Prod. Liab. Litig.*,

19   No. 3:09-CV-20003, 2010 WL 3937414, at *18 (S.D. Ill. Oct. 4, 2010) ("Absent an

20   allegation that McKesson supplied the subject drugs, the Court has no choice but to find

21   that McKesson has been fraudulently joined."); *Aronis v. Merck & Co.*, No. CIV. S-05-

22   0486WBSDAD, 2005 WL 5518485 (E.D. Cal. May 3, 2005).

23       27.   On August 30, 2017, Judge Kurt D. Engelhardt, overseeing the Taxotere

24   MDL, denied remand in several removed California state court cases, stating

25   "[c]ounsel failed to provide any individualized information as to how McKesson is

26   connected to each of these . . . plaintiffs. Rather, counsel provided the Court with

27   generalized statements regarding the dates in which McKesson has distributed

28   Taxotere or generic Docetaxel throughout the United States. These types of

8

NOTICE OF REMOVAL

493147 V2

1  nonspecific statements are insufficient to satisfy even the liberal 'upon information

2  and belief' pleading standard that is utilized in the state of California." (8/30/17 MDL

3  Hearing Transcript at 28:2-15 (attached as **Exhibit B**).)

4        28.    Finally, in their causes of action, Plaintiffs makes broad, collective, and

5  conclusory claims against a group generically described as "Defendants." (*See, e.g.*,

6  Compl. ¶¶ 192-201.)   As numerous other courts have concluded, the fact that

7  Plaintiffs' allegations are targeted at "Defendants" generally, rather than McKesson in

8  particular, demonstrates that McKesson was fraudulently joined as a defendant. *See*

9  *Shah v. Wyeth Pharm., Inc.*, No. CV 04–8652 DT (MANx), 2005 WL 6731641, at *3

10  (C.D. Cal. Jan. 18, 2005) ("[A]llegations against 'defendants' collectively are

11  insufficient to warrant remand, especially when Plaintiffs fail to allege any 'particular

12  or specific activity' on the part of each of the non-diverse defendants." (citation

13  omitted)); *see also Gomes v. Michaels Stores, Inc.*, No. CIV S06-1921 LKK/KJM,

14  2006 WL 3079024, at *4-7 (E.D. Cal. Oct. 27, 2006) (dismissing non-diverse

15  defendant and refusing to remand case where plaintiff generally "state[d] that all

16  defendants' acts 'were performed partly within and partly outside the course and scope

17  of their authority and employment'" but did not include any specific allegations about

18  the non-diverse defendant (citing complaint)); *Bennett v. Allstate Ins. Co.*, 753 F. Supp.

19  299, 301 (N.D. Cal. 1990) (denying motion to remand because, *inter alia*, plaintiff's

20  complaint made "no attempt" to "differentiate between the conduct" of the

21  defendants).

22        29.    For these reasons, McKesson is fraudulently joined, and its citizenship

23  must be disregarded for jurisdictional purposes.

24      **C.**    **The Amount-in-Controversy Requirement is Satisfied.**

25        30.    The Complaint does not expressly state the amount in controversy, as

26  California Code of Civil Procedure section 425.10(b) precludes a plaintiff from stating

27  a specific damage claim in a personal injury action. *See Jones v. Interstate Recovery*

28  *Serv.*, 160 Cal. App. 3d 925, 928 (1984). Where, as here, a complaint does not allege

NOTICE OF REMOVAL

493147 V2

a specific amount of damages, "the district court may consider whether it is 'facially apparent' from the complaint that the jurisdictional amount has been satisfied." *Singer v. State Farm Mut. Auto. Ins. Co.*, 116 F.3d 373, 377 (9th Cir. 1997); *see also Simmons v. PCR Tech.*, 209 F. Supp. 2d 1029, 1031 (N.D. Cal. 2002) (same); *accord Roe v. Michelin N. Am., Inc.*, 613 F.3d 1058, 1063 (11th Cir. 2010) (noting that the court "found no case in any other circuit that purports to prohibit a district court from employing its judicial experience or common sense in discerning whether the allegations in a complaint facially establish the jurisdictionally required amount in controversy").

31.    It is facially apparent from the Complaint that the amount in controversy exceeds $75,000.   Plaintiffs allege that, as a result of their use of "docetaxel (TAXOTERE®)," they suffered "serious and dangerous side effects, severe and personal injuries that are permanent and lasting in nature, and economic and non-economic damages, harms, and losses."  (*See* Compl. ¶ 201).  Plaintiffs claim that defendants caused them to suffer damages "including but not limited to: past and future medical expenses; past and future loss of earnings; past and future loss and impairment of earning capacity; permanent disfigurement including permanent alopecia; mental anguish; severe and debilitating emotional distress; increased risk of future harm; past, present, and future physical and mental pain, suffering, and discomfort; and past, present, and future loss and impairment of the quality and enjoyment of life." (*Id.*)

32.    Courts across the country have routinely held that cases involving serious physical injuries, such as those alleged here, satisfy the amount in controversy requirement.    *See, e.g., Campbell v. Bridgestone/Firestone, Inc.*, No. CIVF051499FVSDLB, 2006 WL 707291, at *2 (E.D. Cal. Mar. 17, 2006) (amount-in-controversy requirement satisfied where plaintiffs sought compensatory damages for wage loss, hospital and medical expenses, general damage, property damage, and loss of earning capacity, and alleged "severe [injuries]," including head trauma, a

493147 V2

1   broken right arm, a broken wrist and a deep laceration to the lower left leg); *Bailey v.*

2   *J.B. Hunt Transp., Inc.*, No. 06-240, 2007 WL 764286, at *6 (E.D. Pa. Mar. 8, 2007)

3   (amount-in-controversy requirement satisfied where complaint alleged a "litany of

4   serious, permanent injuries," "surgeries and treatments," and "the allegedly permanent

5   impairment of [the] ability to enjoy life's activities"); *McCoy v. Gen. Motors Corp.*,

6   226 F. Supp. 2d 939, 941 (N.D. Ill. 2002) ("courts have routinely held that when

7   plaintiffs allege serious, permanent injuries and significant medical expenses, it is

8   obvious from the face of the complaint that the plaintiffs' damages exceeded the

9   jurisdictional amount"); *Quinn v. Kimble*, 228 F. Supp. 2d 1036, 1037–38 (E.D. Mo.

10   2002) (holding it was "facially apparent" that amount in controversy requirement

11   satisfied "[g]iven the allegations in the complaint that plaintiffs suffered head, neck,

12   and back injuries; incurred medical expenses and will incur further such expenses;

13   have permanent, progressive, and disabling injuries," even though plaintiffs asserted

14   that their total damages did not exceed \$75,000); *In re Rezulin Prods. Liab. Litig.*, 133

15   F. Supp. 2d 272, 296 (S.D.N.Y. 2001) (finding complaint "obviously asserts a claim

16   exceeding \$75,000" where plaintiff sought damages for alleged "serious and life-

17   threatening medical conditions" and economic losses due to the use of a prescription

18   medication).

19        33.    Sanofi-aventis U.S. LLC and Sanofi U.S. Services Inc. need not

20   confirm through discovery in the state court action that the jurisdictional amount is

21   satisfied.  Indeed, "a defendant who wishes to remove a case to federal court cannot

22   'wait for discovery responses that simply confirm what was obvious from the face of

23   the complaint; in such cases, defendants are not insulated from a remand to state

24   court.' It is not the law that 'cases are not removable until there has been an absolute

25   affirmation via discovery . . . that more than \$75,000 [is] in issue.'" *Fields v. Jay*

26   *Henges Enters., Inc.*, No. 06-323-GPM, 2006 WL 1875457, at *3 (S.D. Ill. June 30,

27   2006) (quoting *McCoy*, 226 F. Supp. 2d at 941); *see also Roe*, 613 F.3d at 1064

28   ("when a district court can determine, relying on its judicial experience and common

11

1 sense, that a claim satisfies the amount-in-controversy requirements, it need not give

2 credence to a plaintiff's representation that the value of the claim is indeterminate . . . .

3 Otherwise, a defendant could wrongly be denied the removal to which it is entitled."); 

4 *Century Assets Corp. v. Solow*, 88 F. Supp. 2d 659, 661 (E.D. Tex. 2000) (holding

5 that a complaint "can facially state a claim over the jurisdictional amount when there

6 are *no* numbers in the [complaint] at all," and that removal was untimely where it was

7 apparent from the complaint that an amount sufficient to satisfy the requirements of

8 diversity jurisdiction was in controversy) (emphasis in original) (collecting cases).

9 **IV.    CONCLUSION**

10         In this civil action, there is complete diversity of citizenship between Plaintiffs

11 and the properly joined Defendants.  The amount in controversy is also satisfied.

12 Thus, this case is removable pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.

13 Defendants sanofi-aventis U.S. LLC and Sanofi U.S. Services Inc. hereby remove the

14 above-captioned action to the United States District Court for the Central District of

15 California.

16

17 Dated:  September 24, 2018                    Respectfully submitted,

18                                              SHOOK, HARDY & BACON L.L.P.

19

20                          By:   /s/   *Eva M. Weiler*
                                  EVA M. WEILER
21

22                                Attorneys for Defendants
                                  sanofi-aventis U.S. LLC & Sanofi
23                                U.S. Services Inc.

24

25

26

27

28

12

493147 V2

1

**DEMAND FOR JURY TRIAL**

2       Defendants demand a trial by jury on all issues that may be tried by a jury.

3

Dated:  September 24, 2018                    Respectfully submitted,

4                                              SHOOK, HARDY & BACON L.L.P.

5

6
                                              By:   /s/   *Eva M. Weiler*
7                                                    EVA M. WEILER

8
                                              Attorneys for Defendants
9                                              sanofi-aventis U.S. LLC and
                                              Sanofi U.S. Services Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

13

NOTICE OF REMOVAL

493147 V2

1

### **PROOF OF SERVICE**

2

3        I am employed in the County of Orange, State of California.  I am over the age of
18 and not a party to the within action.  My business address is 5 Park Plaza, Suite 1600,
Irvine, California, 92614.

4

5        On September 24, 2018, I served on the interested parties in said action the
within:

6

7    **NOTICE OF REMOVAL OF ACTION BY DEFENDANTS SANOFI U.S.
SERVICES INC. & SANOFI-AVENTIS U.S. LLC UNDER 28 U.S.C. §§ 1332,
1441, AND 1446; DEMAND FOR JURY TRIAL**

8

9    by placing a true copy thereof in a sealed envelope(s) addressed as stated on the
attached mailing list.

10

11    ☒    (MAIL) I am readily familiar with this firm's practice of collection and processing
correspondence for mailing.  Under that practice it would be deposited with the
U.S. postal service on that same day in the ordinary course of business.  I am
aware that on motion of party served, service is presumed invalid if postal
cancellation date or postage meter date is more than 1 day after date of deposit for
mailing in affidavit.

12

13

14    ☐    (BY FEDERAL EXPRESS, AN OVERNIGHT DELIVERY SERVICE) By
placing a true and correct copy of the above document(s) in a sealed envelope
addressed as indicated above and causing such envelope(s) to be delivered to the
FEDERAL EXPRESS Service Center, on _____, to be delivered by their
next business day delivery service on _____, to the addressee designated.

15

16

17    ☒    (ELECTRONIC FILING) I provided the document(s) listed above electronically
through the CM/ECF system pursuant to the instructions set forth in the Local
Rules for the United States District Court for the **Central District of California**.

18

19        I declare that I am employed in the office of a member of the bar of this court at

20    whose direction the service was made. I declare under penalty of perjury under the law

21    of the State of California, and the United States, that the foregoing is true and correct.

22        Executed on September 24, 2018, at Irvine, California.

23

24    _____        _____
           Janice Liu                              (Signature)
         (Type or print name)

25

26

27

28                                     -1-

541144 v1

1

## <u>SERVICE LIST</u>

2

3

Lowell W. Finson
FINSON LAW FIRM
126 Westwind Mall
Marina del Rey, CA  90292
Telephone:  (602) 377-2903
Facsimile:  (310) 425-3278
Email:  lowell@finsonlawfirm.com

4

5

6

7

8

Jennifer A. Lenze
Amanda D. McGee
LENZE LAWYERS, PLC
1300 Highland Ave., Suite 207
Manhattan Beach, CA  90266
Telephone:  (310) 322-8800
Facsimile:  (310) 322-8811
Email:  jlenze@lenzelawyers.com
mcgee@lenzelawyers.com

9

10

11

12

13

14

**Attorneys for Plaintiff**

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

SUM-100

**SUMMONS**
*(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

AUG 23 2018

Sherri R. Carter, Executive Officer/Clerk
By: Rita Nazaryan, Deputy

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

SANOFI US SERVICES INC. f/k/a SANOFI-AVENTIS U.S. INC.,
SANOFI-AVENTIS U.S. LLC, (continued on attachment)

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

SHELLY JONES, CHRISTINE AVERY, KAREN CRAWFORD,
MARY ALLYN DEXTER, PEGGY ELMS, (continued on attachment)

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

The name and address of the court is:
*(El nombre y dirección de la corte es):* Los Angeles

CASE NUMBER:
*(Número del Caso)* BC717326

312 N. Spring Street Los Angeles, CA 90012
Stanley Mosk Courthouse

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Jennifer A. Lenze 1300 Highland Ave, #207 Manhattan Beach, CA 90266 T: 310-322-8800

DATE: AUG 23 2018
*(Fecha)*

Clerk, by SHERRI R. CARTER *(Secretario)* RITA NAZARYAN , Deputy
*(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

NOTICE TO THE PERSON SERVED: You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* Sanofi - Aventis U.S. LLC, separately and doing business as Winthrop US

under: ☐ CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
☒ other *(specify):* Corporation Code 17061 (limited liability Company)
4. ☐ by personal delivery on *(date):* 8/28/18

Page 1 of 1

SUMMONS

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

Exhibit A
00014

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Shelly Jones, et al v. SANOFI US SERVICES INC., et al. | |

### INSTRUCTIONS FOR USE

➜ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
➜ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.):*

☐ Plaintiff    ☑ Defendant    ☐ Cross-Complainant    ☐ Cross-Defendant

separately, and doing business as WINTHROP, U.S., ACCORD HEALTHCARE, INC., HOSPIRA WORLDWIDE, LLC f/k/a HOSPIRA WORLDWIDE, INC., HOSPIRA, INC., SUN PHARMA GLOBAL FZE, SUN PHARMACEUTICAL INDUSTRIES, INC. f/k/a CARACO PHARMACEUTICAL LABORATORIES LTD., and MCKESSON CORPORATION d/b/a MCKESSON PACKAGING,

Page 2 of 3

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

### ADDITIONAL PARTIES ATTACHMENT
**Attachment to Summons**

Exhibit A
00015

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Shelly Jones, et al v. SANOFI US SERVICES INC., et al. | |

### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.):*

[✓] Plaintiff     [ ] Defendant     [ ] Cross-Complainant     [ ] Cross-Defendant

GWENDOLYN   HARTFORD, AISHA INGRAM, DELLA ANN MACIEL,  DEBRA POLLACK, LINDA PONZI, AMBER SHUBIN,  KATRINA SMITH, MICHELLE BOBBITT, DONNA JORDAN- PACK, GEORGIANE   GAMBOA, TYKESHA WILLIAMS-SAUNDERS,

Page   3   of   3

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

### ADDITIONAL PARTIES ATTACHMENT
**Attachment to Summons**

Exhibit A
00016

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Jennifer A. Lenze, (CA # 246858) Lowell W. Finson (SBN 275586) LENZE LAWYERS, PLC / FINSON LAW FIRM 1300 Highland Ave, Suite 207 Manhattan Beach, CA 90266 | CONFORMED COPY ORIGINAL FILED Superior Court of California County of Los Angeles |
| TELEPHONE NO.: (310) 322-8800   FAX NO.: (310) 322-8811 | AUG 23 2018 |
| ATTORNEY FOR (Name): Plaintiffs Shelly Jones, et al. | |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles | Sherri R. Carter, Executive Officer/Clerk |
| STREET ADDRESS: 312 N. Spring Street | By: Rita Nazaryan, Deputy |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 312 N. Spring Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Stanley Mosk Courthouse

CASE NAME:
Shelly Jones, et al v. SANOFI US SERVICES INC., et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: BC717386 |
|---|---|---|---|---|
| [✓] Unlimited (Amount demanded exceeds $25,000) | [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter | [ ] Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

BY FAX

1. Check one box below for the case type that best describes this case:

| Auto Tort | Contract | Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403) |
|---|---|---|
| [ ] Auto (22) | [ ] Breach of contract/warranty (06) | [ ] Antitrust/Trade regulation (03) |
| [ ] Uninsured motorist (46) | [ ] Rule 3.740 collections (09) | [ ] Construction defect (10) |
| Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort | [ ] Other collections (09) | [ ] Mass tort (40) |
| [ ] Asbestos (04) | [ ] Insurance coverage (18) | [ ] Securities litigation (28) |
| [✓] Product liability (24) | [ ] Other contract (37) | [ ] Environmental/Toxic tort (30) |
| [ ] Medical malpractice (45) | Real Property | [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41) |
| [ ] Other PI/PD/WD (23) | [ ] Eminent domain/Inverse condemnation (14) | |
| Non-PI/PD/WD (Other) Tort | [ ] Wrongful eviction (33) | Enforcement of Judgment |
| [ ] Business tort/unfair business practice (07) | [ ] Other real property (26) | [ ] Enforcement of judgment (20) |
| [ ] Civil rights (08) | Unlawful Detainer | Miscellaneous Civil Complaint |
| [ ] Defamation (13) | [ ] Commercial (31) | [ ] RICO (27) |
| [ ] Fraud (16) | [ ] Residential (32) | [ ] Other complaint (not specified above) (42) |
| [ ] Intellectual property (19) | [ ] Drugs (38) | Miscellaneous Civil Petition |
| [ ] Professional negligence (25) | Judicial Review | [ ] Partnership and corporate governance (21) |
| [ ] Other non-PI/PD/WD tort (35) | [ ] Asset forfeiture (05) | [ ] Other petition (not specified above) (43) |
| Employment | [ ] Petition re: arbitration award (11) | |
| [ ] Wrongful termination (36) | [ ] Writ of mandate (02) | |
| [ ] Other employment (15) | [ ] Other judicial review (39) | |

2. This case [✓] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [✓] Large number of separately represented parties
   b. [✓] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [✓] Substantial amount of documentary evidence
   d. [✓] Large number of witnesses
   e. [✓] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [✓] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a.[✓] monetary   b.[ ] nonmonetary; declaratory or injunctive relief   c.[✓] punitive
4. Number of causes of action (specify): 7
5. This case [ ] is [✓] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: 8/23/2018
Jennifer A. Lenze
_____          _____
(TYPE OR PRINT NAME)                       (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use Judicial Council of California CM-010 [Rev. July 1, 2007] | CIVIL CASE COVER SHEET | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740; Cal. Standards of Judicial Administration, std. 3.10 www.courtinfo.ca.gov |
|---|---|---|

CM-010

# INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the primary cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

## CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
Medical Malpractice–
Physicians & Surgeons
Other Professional Health Care Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip and fall)
Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
Intentional Infliction of Emotional Distress
Negligent Infliction of Emotional Distress
Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
Negligent Breach of Contract/ Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
Collection Case–Seller Plaintiff
Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court Case Matter
Writ–Other Limited Court Case Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of County)
Confession of Judgment *(non-domestic relations)*
Sister State Judgment
Administrative Agency Award *(not unpaid taxes)*
Petition/Certification of Entry of Judgment on Unpaid Taxes
Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
Declaratory Relief Only
Injunctive Relief Only *(non-harassment)*
Mechanics Lien
Other Commercial Complaint Case *(non-tort/non-complex)*
Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult Abuse
Election Contest
Petition for Name Change
Petition for Relief From Late Claim
Other Civil Petition

**CIVIL CASE COVER SHEET**

Exhibit A
00018

| SHORT TITLE: Shelly Jones, et al v. SANOFI US SERVICES INC., et al. | CASE NUMBER: BC717826 |
|---|---|

## CIVIL CASE COVER SHEET ADDENDUM AND
## STATEMENT OF LOCATION
### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

BY FAX

| This form is required pursuant to Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court. |
|---|

**Item I.** Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? ☑ YES   CLASS ACTION? ☐ YES   LIMITED CASE? ☐ YES   TIME ESTIMATED FOR TRIAL _____ ☐ HOURS/ ☑ DAYS

**Item II. Indicate** the correct district and courthouse location (4 steps -- If you checked "Limited Case", skip to Item III, Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet form, find the main Civil Case Cover Sheet heading for your case in the left margin below, and, to the right in Column **A**, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check **one** Superior Court type of action in Column **B** below which best describes the nature of this case.

**Step 3:** In Column **C**, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Local Rule 2.0.

| Applicable Reasons for Choosing Courthouse Location (see Column C below) |
|---|

1. Class actions must be filed in the Stanley Mosk Courthouse, central district.
2. May be filed in central (other county, or no bodily injury/property damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office

**Step 4:** Fill in the information requested on page 4 in Item III; complete Item IV. Sign the declaration.

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| Auto Tort | Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death -- Uninsured Motorist | 1., 2., 4. |
| Other Personal Injury/Property Damage/Wrongful Death Tort | Asbestos (04) | ☐ A6070  Asbestos Property Damage | 2. |
| | | ☐ A7221  Asbestos - Personal Injury/Wrongful Death | 2. |
| | Product Liability (24) | ☑ A7260  Product Liability (not asbestos or toxic/environmental) | 1., ②, 3., 4., 8. |
| | Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons | 1., 4. |
| | | ☐ A7240  Other Professional Health Care Malpractice | 1., 4. |
| | Other<br>Personal Injury<br>Property Damage<br>Wrongful Death<br>(23) | ☐ A7250  Premises Liability (e.g., slip and fall) | 1., 4. |
| | | ☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1., 4. |
| | | ☐ A7270  Intentional Infliction of Emotional Distress | 1., 3 |
| | | ☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1., 4 |

**CIVIL CASE COVER SHEET ADDENDUM**
**AND STATEMENT OF LOCATION**

Exhibit A
00019

| SHORT TITLE Shelly Jones, et al v. SANOFI US SERVICES INC., et al. | | CASE NUMBER |
|---|---|---|

| | A Civil Case Cover Sheet Category No. | B Type of Action (Check only one) | C Applicable Reasons See Step 3 Above |
|---|---|---|---|
| **Non-Personal Injury/ Property Damage/ Wrongful Death Tort** | Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1., 3. |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1., 2., 3. |
| | Professional Negligence (25) | ☐ A6017  Legal Malpractice | 1., 2., 3. |
| | | ☐ A6050  Other Professional Malpractice (not medical or legal) | 1., 2., 3. |
| | Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 2., 3. |
| **Employment** | Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1., 2., 3. |
| | Other Employment (15) | ☐ A6024  Other Employment Complaint Case | 1., 2., 3. |
| | | ☐ A6109  Labor Commissioner Appeals | 10. |
| **Contract** | Breach of Contract/ Warranty (06) (not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2., 5. |
| | | ☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2., 5. |
| | | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1., 2., 5. |
| | | ☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1., 2., 5. |
| | Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff | 2., 5., 6. |
| | | ☐ A6012  Other Promissory Note/Collections Case | 2., 5. |
| | Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1., 2., 5., 8. |
| | Other Contract (37) | ☐ A6009  Contractual Fraud | 1., 2., 3., 5. |
| | | ☐ A6031  Tortious Interference | 1., 2., 3., 5. |
| | | ☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 8. |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation       Number of parcels_____ | 2. |
| | Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2., 6. |
| | Other Real Property (26) | ☐ A6018  Mortgage Foreclosure | 2., 6. |
| | | ☐ A6032  Quiet Title | 2., 6. |
| | | ☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6. |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2., 6. |
| | Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2., 6. |

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.0
Page 2 of 4

Exhibit A
00020

| SHORT TITLE: Shelly Jones, et al v. SANOFI US SERVICES INC., et al. | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons<br>See Step 3 Above |
|---|---|---|---|
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2., 6. |
| | Petition re Arbitration (11) | ☐ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2., 5. |
| | Writ of Mandate (02) | ☐ A6151  Writ - Administrative Mandamus | 2., 8. |
| | | ☐ A6152  Writ - Mandamus on Limited Court Case Matter | 2. |
| | | ☐ A6153  Writ - Other Limited Court Case Review | 2. |
| | Other Judicial Review (39) | ☐ A6150  Other Writ /Judicial Review | 2., 8. |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect (10) | ☐ A6007  Construction Defect | 1., 2., 3. |
| | Claims Involving Mass Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1., 2., 8. |
| | Toxic Tort Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ A6141  Sister State Judgment | 2., 9. |
| | | ☐ A6160  Abstract of Judgment | 2., 6. |
| | | ☐ A6107  Confession of Judgment (non-domestic relations) | 2., 9. |
| | | ☐ A6140  Administrative Agency Award (not unpaid taxes) | 2., 8. |
| | | ☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax | 2., 8. |
| | | ☐ A6112  Other Enforcement of Judgment Case | 2., 8., 9. |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints (Not Specified Above) (42) | ☐ A6030  Declaratory Relief Only | 1., 2., 8. |
| | | ☐ A6040  Injunctive Relief Only (not domestic/harassment) | 2., 8. |
| | | ☐ A6011  Other Commercial Complaint Case (non-tort/non-complex) | 1., 2., 8. |
| | | ☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1., 2., 8. |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121  Civil Harassment | 2., 3., 9. |
| | | ☐ A6123  Workplace Harassment | 2., 3., 9. |
| | | ☐ A6124  Elder/Dependent Adult Abuse Case | 2., 3., 9. |
| | | ☐ A6190  Election Contest | 2. |
| | | ☐ A6110  Petition for Change of Name | 2., 7. |
| | | ☐ A6170  Petition for Relief from Late Claim Law | 2., 3., 4., 8. |
| | | ☐ A6100  Other Civil Petition | 2., 9. |

LACIV 109 (Rev. 03/11)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM**
**AND STATEMENT OF LOCATION**

Local Rule 2.0
Page 3 of 4

Exhibit A
00021

| SHORT TITLE: Shelly Jones, et al v. SANOFI US SERVICES INC., et al. | CASE NUMBER |
|---|---|

Item III. Statement of Location: Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., **Step 3** on Page 1, as the proper reason for filing in the court location you selected.

| REASON: Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected for this case.<br><br>☐1. ☑2. ☐3. ☐4. ☐5. ☐6. ☐7. ☐8. ☐9. ☐10. | ADDRESS:<br>1024 Golden Meadows |
|---|---|

| CITY:<br>Corona | STATE:<br>CA | ZIP CODE:<br>92882 | |
|---|---|---|---|

Item IV. *Declaration of Assignment:* I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the ___Stanley Mosk___ courthouse in the ___Central___ District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., § 392 et seq., and Local Rule 2.0, subds. (b), (c) and (d)].

Dated: _8/23/2018_

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet, Judicial Council form CM-010.

4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 03/11).

5. Payment in full of the filing fee, unless fees have been waived.

6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

LACIV 109 (Rev 03/11)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.0
Page 4 of 4

Exhibit A
00022

1   Lowell W. Finson (SBN 275586)
2   **FINSON LAW FIRM**
    126 Westwind Mall
    Marina del Rey, CA 90292
3   Telephone: (602) 377-2903
    Facsimile: (310) 425-3278
4   lowell@finsonlawfirm.com
    *Attorneys for Plaintiffs*
5
    Jennifer A. Lenze (SBN 246858)
6   Amanda D. McGee (SBN 282034)
7   **LENZE LAWYERS, PLC**
    1300 Highland Ave, Suite 207
8   Manhattan Beach, CA 90266
    Telephone (310) 322-8800
9   Facsimile (310) 322-8811
    jlenze@lenzelawyers.com
10  mcgee@lenzelawyers.com
11
    *Attorneys for Plaintiffs*
12

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

AUG 23 2018

Sherri R. Carter, Executive Officer/Clerk
By: Rita Nazaryan, Deputy

13              SUPERIOR COURT OF THE STATE OF CALIFORNIA

14                       FOR THE COUNTY OF LOS ANGELES

15  SHELLY JONES,  CHRISTINE AVERY,        Case No.  **BC717326**
16  KAREN CRAWFORD, MARY ALLYN
    DEXTER, PEGGY  ELMS, GWENDOLYN        COMPLAINT AND DEMAND FOR JURY
17  HARTFORD, AISHA INGRAM, DELLA         TRIAL
    ANN MACIEL,  DEBRA POLLACK,
18  LINDA PONZI,  AMBER SHUBIN,           1.    Negligence
19  KATRINA SMITH, MICHELLE BOBBITT,
    DONNA JORDAN- PACK, GEORGIANE         2.    Strict Liability – Failure to Warn
20  GAMBOA, TYKESHA WILLIAMS-
    SAUNDERS,                             3.    Fraudulent Misrepresentation
21
                     Plaintiffs,          4.    Fraudulent Concealment
22
              v.                          5.    Strict Liability – Misrepresentation
23
    SANOFI US SERVICES INC. f/k/a SANOFI- 6.    Fraud and Deceit
24  AVENTIS U.S. INC., SANOFI-AVENTIS
    U.S. LLC, separately, and doing business as  7.  Intentional Infliction of Emotional
25  WINTHROP, U.S.,  ACCORD              Distress
    HEALTHCARE, INC., HOSPIRA
26  WORLDWIDE, LLC f/k/a HOSPIRA                        **BY FAX**
    WORLDWIDE, INC., HOSPIRA, INC., SUN
27  PHARMA GLOBAL FZE, SUN
    PHARMACEUTICAL INDUSTRIES. INC.
28

─────────────────────────────────────────
                                    1
              COMPLAINT AND DEMAND FOR JURY TRIAL

1  f/k/a CARACO PHARMACEUTICAL
   LABORATORIES LTD., and MCKESSON
2  CORPORATION d/b/a MCKESSON
   PACKAGING,
3
                    Defendants.
4

5

6

7                        **INTRODUCTION**

8          Plaintiffs', all residents of the State of California, by and through their attorneys, submit the

9  following Complaint and Jury Demand against Defendants Sanofi U.S. Services Inc. f/k/a Sanofi-

10 Aventis U.S. Inc., Sanofi-Aventis U.S. LLC separately, and doing business as Winthrop U.S.,

11 (collectively "Sanofi"),  Accord Healthcare, Inc. ("Accord"), Hospira Worldwide, LLC f/k/a

12 Hospira Worldwide, Inc., Hospira, Inc. (collectively "Hospira"), Sun Pharma Global FZE, Sun

13 Pharmaceutical Industries, Inc. f/k/a Caraco Pharmaceutical Laboratories Ltd. (collectively "Sun

14 Pharma") and McKesson Corporation d/b/a McKesson Packaging ("McKesson"), and allege the

15 following upon personal knowledge, information and belief, and investigation of counsel.

16                    **JURISDICTION AND VENUE**

17        1.    The California Superior Court has jurisdiction over all Defendants because, based on

18 information and belief, each is a corporation and/or entity and/or person organized under the laws of

19 the State of California, a foreign corporation or association authorized to do business in California

20 and registered with the California Secretary of State, or that has sufficient minimum contacts in

21 California, is a citizen of California, or otherwise intentionally avails itself of the California market

22 so as to render the exercise of jurisdiction over it by the California courts consistent with traditional

23 notions of fair play and substantial justice. Further, each of the named Defendants have

24 manufactured, marketed, distributed to Plaintiffs and/or their healthcare providers, docetaxel

25 (TAXOTERE®) and/or a generic non-bioequivalent of same ("Taxotere"), a chemotherapy drug

26 developed, manufactured, marketed, and distributed by Defendants docetaxel (TAXOTERE®)

27 and/or a generic non-bioequivalent of same ("Taxotere"), a chemotherapy drug developed,

28 manufactured, marketed, and distributed by Defendants.

                              2
                COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit A
00024

2.      Furthermore, Defendant McKesson has purposefully availed itself of the benefits and the protections of the laws within the State of California.  Defendant McKesson has its principal place of business within the state and has had sufficient contact such that the exercise of jurisdiction would be consistent with the traditional notions of fair play and substantial justice.

3.      Venue is proper in this county pursuant to California Code of Civil Procedure 395.5. Defendants transact business in this County.

<u>**PLAINTIFF PARTIES**</u>

4.      Plaintiff Shelly Jones ("Plaintiff Jones", or collectively with other Plaintiffs "Plaintiffs"), is and was all times pertinent, a resident of the State of California, is a breast cancer survivor who was prescribed and administered docetaxel (TAXOTERE®) and/or a generic non-bioequivalent of same ("Taxotere"), a chemotherapy drug developed, manufactured, marketed, and distributed by Defendants.  Although lower potency alternatives have been available for years, Defendants misleadingly promoted Taxotere as having superior efficacy based on self-sponsored clinical trials, even though the FDA called these claims "unsubstantiated."  In fact, Taxotere's increased potency only makes it more toxic than alternatives and causes more severe side effects, including a significantly increased risk of disfiguring *permanent* hair loss.  Although temporary hair loss is a common side effect related to chemotherapy, Taxotere's risk of permanent hair loss is not. Defendants concealed this information from this Plaintiffs' physicians, healthcare providers, and other patients, causing this Plaintiff and thousands of women to suffer permanent hair loss without any additional benefit or warning.

5.      Plaintiff Christine Avery ("Plaintiff Avery", or collectively with other Plaintiffs "Plaintiffs"), is and was all times pertinent, a resident of the State of California, is a breast cancer survivor who was prescribed and administered docetaxel (TAXOTERE®) and/or a generic non-bioequivalent of same ("Taxotere"), a chemotherapy drug developed, manufactured, marketed, and distributed by Defendants.  Although lower potency alternatives have been available for years, Defendants misleadingly promoted Taxotere as having superior efficacy based on self-sponsored clinical trials, even though the FDA called these claims "unsubstantiated."  In fact, Taxotere's increased potency only makes it more toxic than alternatives and causes more severe side effects,

3

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit A
00025

1  including a significantly increased risk of disfiguring *permanent* hair loss.  Although temporary hair
2  loss is a common side effect related to chemotherapy, Taxotere's risk of permanent hair loss is not.
3  Defendants concealed this information from this Plaintiffs' physicians, healthcare providers, and
4  other patients, causing this Plaintiff and thousands of women to suffer permanent hair loss without
5  any additional benefit or warning.

6       6.     Plaintiff Karen Crawford ("Plaintiff Crawford", or collectively with other Plaintiffs
7  "Plaintiffs"), is and was all times pertinent, a resident of the State of California,  is a breast cancer
8  survivor who was prescribed and administered docetaxel (TAXOTERE®) and/or a generic non-
9  bioequivalent of same ("Taxotere"), a chemotherapy drug developed, manufactured, marketed, and
10 distributed by Defendants.  Although lower potency alternatives have been available for years,
11 Defendants misleadingly promoted Taxotere as having superior efficacy based on self-sponsored
12 clinical trials, even though the FDA called these claims "unsubstantiated."  In fact, Taxotere's
13 increased potency only makes it more toxic than alternatives and causes more severe side effects,
14 including a significantly increased risk of disfiguring *permanent* hair loss. Although temporary hair
15 loss is a common side effect related to chemotherapy, Taxotere's risk of permanent hair loss is not.
16 Defendants concealed this information from this Plaintiffs' physicians, healthcare providers, and
17 other patients, causing this Plaintiff and thousands of women to suffer permanent hair loss without
18 any additional benefit or warning.

19      7.     Plaintiff Mary Allyn Dexter ("Plaintiff Dexter", or collectively with other Plaintiffs
20 "Plaintiffs"), is and was all times pertinent, a resident of the State of California,  is a breast cancer
21 survivor who was prescribed and administered docetaxel (TAXOTERE®) and/or a generic non-
22 bioequivalent of same ("Taxotere"), a chemotherapy drug developed, manufactured, marketed, and
23 distributed by Defendants.  Although lower potency alternatives have been available for years,
24 Defendants misleadingly promoted Taxotere as having superior efficacy based on self-sponsored
25 clinical trials, even though the FDA called these claims "unsubstantiated."  In fact, Taxotere's
26 increased potency only makes it more toxic than alternatives and causes more severe side effects,
27 including a significantly increased risk of disfiguring *permanent* hair loss. Although temporary hair
28 loss is a common side effect related to chemotherapy, Taxotere's risk of permanent hair loss is not.

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit A
00026

1   Defendants concealed this information from this Plaintiffs' physicians, healthcare providers, and

2   other patients, causing this Plaintiff and thousands of women to suffer permanent hair loss without

3   any additional benefit or warning.

4          8.    Plaintiff Peggy Elms ("Plaintiff Elms", or collectively with other Plaintiffs

5   "Plaintiffs"), is and was all times pertinent, a resident of the State of California; is a breast cancer

6   survivor who was prescribed and administered docetaxel (TAXOTERE®) and/or a generic non-

7   bioequivalent of same ("Taxotere"), a chemotherapy drug developed, manufactured, marketed, and

8   distributed by Defendants.  Although lower potency alternatives have been available for years,

9   Defendants misleadingly promoted Taxotere as having superior efficacy based on self-sponsored

10  clinical trials, even though the FDA called these claims "unsubstantiated."  In fact, Taxotere's

11  increased potency only makes it more toxic than alternatives and causes more severe side effects,

12  including a significantly increased risk of disfiguring *permanent* hair loss. Although temporary hair

13  loss is a common side effect related to chemotherapy, Taxotere's risk of permanent hair loss is not.

14  Defendants concealed this information from this Plaintiffs' physicians, healthcare providers, and

15  other patients, causing this Plaintiff and thousands of women to suffer permanent hair loss without

16  any additional benefit or warning.

17         9.    Plaintiff Gwendolyn Hartford ("Plaintiff Hartford", or collectively with other

18  Plaintiffs "Plaintiffs"), is and was all times pertinent, a resident of the State of California, is a

19  breast cancer survivor who was prescribed and administered docetaxel (TAXOTERE®) and/or a

20  generic non-bioequivalent of same ("Taxotere"), a chemotherapy drug developed, manufactured,

21  marketed, and distributed by Defendants. Although lower potency alternatives have been available

22  for years, Defendants misleadingly promoted Taxotere as having superior efficacy based on self-

23  sponsored clinical trials, even though the FDA called these claims "unsubstantiated."  In fact,

24  Taxotere's increased potency only makes it more toxic than alternatives and causes more severe

25  side effects, including a significantly increased risk of disfiguring *permanent* hair loss.  Although

26  temporary hair loss is a common side effect related to chemotherapy, Taxotere's risk of permanent

27  hair loss is not. Defendants concealed this information from this Plaintiffs' physicians, healthcare

28

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit A
00027

providers, and other patients, causing this Plaintiff and thousands of women to suffer permanent hair loss without any additional benefit or warning.

10. Plaintiff Aisha Ingram ("Plaintiff Ingram", or collectively with other Plaintiffs "Plaintiffs"), is and was all times pertinent, a resident of the State of California, is a breast cancer survivor who was prescribed and administered docetaxel (TAXOTERE®) and/or a generic non-bioequivalent of same ("Taxotere"), a chemotherapy drug developed, manufactured, marketed, and distributed by Defendants. Although lower potency alternatives have been available for years, Defendants misleadingly promoted Taxotere as having superior efficacy based on self-sponsored clinical trials, even though the FDA called these claims "unsubstantiated." In fact, Taxotere's increased potency only makes it more toxic than alternatives and causes more severe side effects, including a significantly increased risk of disfiguring *permanent* hair loss. Although temporary hair loss is a common side effect related to chemotherapy, Taxotere's risk of permanent hair loss is not. Defendants concealed this information from this Plaintiffs' physicians, healthcare providers, and other patients, causing this Plaintiff and thousands of women to suffer permanent hair loss without any additional benefit or warning.

11. Plaintiff Della Ann Maciel ("Plaintiff Maciel", or collectively with other Plaintiffs "Plaintiffs"), is and was all times pertinent, a resident of the State of California, is a breast cancer survivor who was prescribed and administered docetaxel (TAXOTERE®) and/or a generic non-bioequivalent of same ("Taxotere"), a chemotherapy drug developed, manufactured, marketed, and distributed by Defendants. Although lower potency alternatives have been available for years, Defendants misleadingly promoted Taxotere as having superior efficacy based on self-sponsored clinical trials, even though the FDA called these claims "unsubstantiated." In fact, Taxotere's increased potency only makes it more toxic than alternatives and causes more severe side effects, including a significantly increased risk of disfiguring *permanent* hair loss. Although temporary hair loss is a common side effect related to chemotherapy, Taxotere's risk of permanent hair loss is not. Defendants concealed this information from this Plaintiffs' physicians, healthcare providers, and other patients, causing this Plaintiff and thousands of women to suffer permanent hair loss without any additional benefit or warning.

6

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit A
00028

1   12. Plaintiff Debra Pollack ("Plaintiff Pollack", or collectively with other Plaintiffs

2 "Plaintiffs"), is and was all times pertinent, a resident of the State of California,  is a breast cancer

3 survivor who was prescribed and administered docetaxel (TAXOTERE®) and/or a generic non-

4 bioequivalent of same ("Taxotere"), a chemotherapy drug developed, manufactured, marketed, and

5 distributed by Defendants.  Although lower potency alternatives have been available for years,

6 Defendants misleadingly promoted Taxotere as having superior efficacy based on self-sponsored

7 clinical trials, even though the FDA called these claims "unsubstantiated."  In fact, Taxotere's

8 increased potency only makes it more toxic than alternatives and causes more severe side effects,

9 including a significantly increased risk of disfiguring *permanent* hair loss. Although temporary hair

10 loss is a common side effect related to chemotherapy, Taxotere's risk of permanent hair loss is not.

11 Defendants concealed this information from this Plaintiffs' physicians, healthcare providers, and

12 other patients, causing this Plaintiff and thousands of women to suffer permanent hair loss without

13 any additional benefit or warning.

14   13. Plaintiff Linda Ponzi ("Plaintiff Ponzi", or collectively with other Plaintiffs

15 "Plaintiffs"), is and was all times pertinent, a resident of the State of California, is a breast cancer

16 survivor who was prescribed and administered docetaxel (TAXOTERE®) and/or a generic non-

17 bioequivalent of same ("Taxotere"), a chemotherapy drug developed, manufactured, marketed, and

18 distributed by Defendants.  Although lower potency alternatives have been available for years,

19 Defendants misleadingly promoted Taxotere as having superior efficacy based on self-sponsored

20 clinical trials, even though the FDA called these claims "unsubstantiated."  In fact, Taxotere's

21 increased potency only makes it more toxic than alternatives and causes more severe side effects,

22 including a significantly increased risk of disfiguring *permanent* hair loss. Although temporary hair

23 loss is a common side effect related to chemotherapy, Taxotere's risk of permanent hair loss is not.

24 Defendants concealed this information from this Plaintiffs' physicians, healthcare providers, and

25 other patients, causing this Plaintiff and thousands of women to suffer permanent hair loss without

26 any additional benefit or warning.

27   14. Plaintiff Amber Shubin ("Plaintiff Shubin", or collectively with other Plaintiffs

28 "Plaintiffs"), is and was all times pertinent, a resident of the State of California, is a breast cancer

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit A
00029

1   survivor who was prescribed and administered docetaxel (TAXOTERE®) and/or a generic non-
2   bioequivalent of same ("Taxotere"), a chemotherapy drug developed, manufactured, marketed, and
3   distributed by Defendants.  Although lower potency alternatives have been available for years,
4   Defendants misleadingly promoted Taxotere as having superior efficacy based on self-sponsored
5   clinical trials, even though the FDA called these claims "unsubstantiated."  In fact, Taxotere's
6   increased potency only makes it more toxic than alternatives and causes more severe side effects,
7   including a significantly increased risk of disfiguring *permanent* hair loss.  Although temporary hair
8   loss is a common side effect related to chemotherapy, Taxotere's risk of permanent hair loss is not.
9   Defendants concealed this information from this Plaintiffs' physicians, healthcare providers, and
10  other patients, causing this Plaintiff and thousands of women to suffer permanent hair loss without
11  any additional benefit or warning.

12      15.    Plaintiff Katrina Smith ("Plaintiff Smith", or collectively with other Plaintiffs
13  "Plaintiffs"), is and was all times pertinent, a resident of the State of California,  is a breast cancer
14  survivor who was prescribed and administered docetaxel (TAXOTERE®) and/or a generic non-
15  bioequivalent of same ("Taxotere"), a chemotherapy drug developed, manufactured, marketed, and
16  distributed by Defendants.  Although lower potency alternatives have been available for years,
17  Defendants misleadingly promoted Taxotere as having superior efficacy based on self-sponsored
18  clinical trials, even though the FDA called these claims "unsubstantiated."  In fact, Taxotere's
19  increased potency only makes it more toxic than alternatives and causes more severe side effects,
20  including a significantly increased risk of disfiguring *permanent* hair loss.  Although temporary hair
21  loss is a common side effect related to chemotherapy, Taxotere's risk of permanent hair loss is not.
22  Defendants concealed this information from this Plaintiffs' physicians, healthcare providers, and
23  other patients, causing this Plaintiff and thousands of women to suffer permanent hair loss without
24  any additional benefit or warning.

25      16.    Plaintiff Michelle Bobbitt ("Plaintiff Bobbitt", or collectively with other Plaintiffs
26  "Plaintiffs"), is and was all times pertinent, a resident of the State of California,  is a breast cancer
27  survivor who was prescribed and administered docetaxel (TAXOTERE®) and/or a generic non-
28  bioequivalent of same ("Taxotere"), a chemotherapy drug developed, manufactured, marketed, and

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit A
00030

1  distributed by Defendants.  Although lower potency alternatives have been available for years,
2  Defendants misleadingly promoted Taxotere as having superior efficacy based on self-sponsored
3  clinical trials, even though the FDA called these claims "unsubstantiated."  In fact, Taxotere's
4  increased potency only makes it more toxic than alternatives and causes more severe side effects,
5  including a significantly increased risk of disfiguring *permanent* hair loss.  Although temporary hair
6  loss is a common side effect related to chemotherapy, Taxotere's risk of permanent hair loss is not.
7  Defendants concealed this information from this Plaintiffs'  physicians, healthcare providers, and
8  other patients, causing this Plaintiff and thousands of women to suffer permanent hair loss without
9  any additional benefit or warning.

10      17.      Plaintiff Donna Jordan-Pack ("Plaintiff Jordan-Pack", or collectively with other
11  Plaintiffs "Plaintiffs"), is and was all times pertinent, a resident of the State of California,  is a
12  breast cancer survivor who was prescribed and administered docetaxel (TAXOTERE®) and/or a
13  generic non-bioequivalent of same ("Taxotere"), a chemotherapy drug developed, manufactured,
14  marketed, and distributed by Defendants.  Although lower potency alternatives have been available
15  for years, Defendants misleadingly promoted Taxotere as having superior efficacy based on self-
16  sponsored clinical trials, even though the FDA called these claims "unsubstantiated."  In fact,
17  Taxotere's increased potency only makes it more toxic than alternatives and causes more severe
18  side effects, including a significantly increased risk of disfiguring *permanent* hair loss.  Although
19  temporary hair loss is a common side effect related to chemotherapy, Taxotere's risk of permanent
20  hair loss is not.  Defendants concealed this information from this Plaintiffs'  physicians, healthcare
21  providers, and other patients, causing this Plaintiff and thousands of women to suffer permanent
22  hair loss without any additional benefit or warning.

23      18.      Plaintiff Georgiane Gamboa ("Plaintiff Gamboa", or collectively with  other
24  Plaintiffs "Plaintiffs"), is and was all times pertinent, a resident of the State of California,  is a
25  breast cancer survivor who was prescribed and administered docetaxel (TAXOTERE®) and/or a
26  generic non-bioequivalent of same ("Taxotere"), a chemotherapy drug developed, manufactured,
27  marketed, and distributed by Defendants.  Although lower potency alternatives have been available
28  for years, Defendants misleadingly promoted Taxotere as having superior efficacy based on self-

9

COMPLAINT AND DEMAND FOR JURY TRIAL

1  sponsored clinical trials, even though the FDA called these claims "unsubstantiated." In fact,
2  Taxotere's increased potency only makes it more toxic than alternatives and causes more severe
3  side effects, including a significantly increased risk of disfiguring *permanent* hair loss. Although
4  temporary hair loss is a common side effect related to chemotherapy, Taxotere's risk of permanent
5  hair loss is not. Defendants concealed this information from this Plaintiffs' physicians, healthcare
6  providers, and other patients, causing this Plaintiff and thousands of women to suffer permanent
7  hair loss without any additional benefit or warning.

8        19.     Plaintiff Tykesha Williams-Saunders ("Plaintiff Williams-Saunders", or collectively
9  with other Plaintiffs "Plaintiffs"), is and was all times pertinent, a resident of the State of California,
10  is a breast cancer survivor who was prescribed and administered docetaxel (TAXOTERE®) and/or
11  a generic non-bioequivalent of same ("Taxotere"), a chemotherapy drug developed, manufactured,
12  marketed, and distributed by Defendants. Although lower potency alternatives have been available
13  for years, Defendants misleadingly promoted Taxotere as having superior efficacy based on self-
14  sponsored clinical trials, even though the FDA called these claims "unsubstantiated." In fact,
15  Taxotere's increased potency only makes it more toxic than alternatives and causes more severe
16  side effects, including a significantly increased risk of disfiguring *permanent* hair loss. Although
17  temporary hair loss is a common side effect related to chemotherapy, Taxotere's risk of permanent
18  hair loss is not. Defendants concealed this information from this Plaintiffs' physicians, healthcare
19  providers, and other patients, causing this Plaintiff and thousands of women to suffer permanent
20  hair loss without any additional benefit or warning.

21        20.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered
22  serious and permanent physical and emotional injuries, including permanent hair loss, and seeks
23  damages relating to Defendants' manufacture, distribution, labeling, advertising, marketing,
24  promotion, and sale of Taxotere.

25                  SANOFI, AVENTIS, AND SANOFI-AVENTIS DEFENDANTS

26        21.     Defendant Sanofi-Aventis U.S. LLC is a Delaware limited liability company, which
27  has its principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807.
28  Defendant Sanofi-Aventis U.S. LLC is a subsidiary of Defendant Sanofi S.A. Defendant Sanofi

                    COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit A
00032

1  S.A. is the only member and owns 100% of the membership interest (both financial and voting) of

2  Defendant Sanofi-Aventis U.S. LLC.

3      22.    Defendant Sanofi-Aventis U.S. LLC also sometimes operates, promotes, markets,

4  sells, distributes pharmaceutical products, and does business under the name of Winthrop U.S.,

5  which is not a separately existing legal entity but rather is a business unit or division operating

6  within and part of Sanofi-Aventis U.S. LLC.

7      23.    At all times relevant hereto, Defendant Sanofi-Aventis U.S. LLC has employees in

8  the State of California.

9      24.    At all times relevant hereto, Defendant Sanofi-Aventis U.S. LLC actively marketed

10  docetaxel (TAXOTERE®) within the State of California by providing marketing information about

11  the drug to medical doctors and providers of medical treatment throughout the State of California.

12      25.    At all times relevant hereto, Defendant Sanofi-Aventis U.S. LLC solicited purchases

13  of docetaxel (TAXOTERE®) from within the State of California by soliciting purchases of

14  docetaxel (TAXOTERE®) from medical doctors and providers of medical treatment throughout the

15  State of California.

16      26.    Upon information and belief, at all times relevant hereto, Defendant Sanofi-Aventis

17  U.S. LLC provided product information about docetaxel (TAXOTERE®), and samples of docetaxel

18  (TAXOTERE®) to, medical doctors and providers of medical treatment throughout the State of

19  California and generated in the State of California.

20      27.    At all times relevant hereto, Defendant Sanofi-Aventis U.S. LLC sold docetaxel

21  (TAXOTERE®) within the State of California by marketing and selling the drug to medical doctors

22  and providers of medical treatment throughout the State of California.

23      28.    At all times relevant hereto, Defendant Sanofi-Aventis U.S. LLC shipped docetaxel

24  (TAXOTERE®) to the State of California by shipping the drug to medical doctors and providers of

25  medical treatment throughout the State of California.

26      29.    At all times relevant hereto, Defendant Sanofi-Aventis U.S. LLC expected that

27  docetaxel (TAXOTERE®) would be sold, purchased, and used in the State of California after being

28  labelled and marketed in California.

11

COMPLAINT AND DEMAND FOR JURY TRIAL

1    30.    At all times relevant hereto, Defendant Sanofi-Aventis U.S. LLC purposefully

2    directed its activities towards the State of California.

3    31.    At all times relevant hereto, Defendant Sanofi-Aventis U.S. LLC exercised the

4    privilege of conducting business in the State of California.

5    32.    At all times relevant hereto, Defendant Sanofi-Aventis U.S. LLC enjoyed the

6    benefits and protections of the laws of the State of California.

7    33.    At all times relevant hereto, Defendant Sanofi-Aventis U.S. LLC's activities in the

8    State of California were neither irregular nor casual; rather, those activities were systematic and

9    continuous.

10    34.    Defendant Sanofi-Aventis U.S. LLC had fair warning that it might be subject to

11    personal jurisdiction in the State of California and that it might be brought into court in the State of

12    California with respect to its systematic and continuous activities involved with the marketing,

13    advertising, solicitation of purchases, and sales of docetaxel (TAXOTERE®) in the State of

14    California.

15    35.    Specific personal jurisdiction over Defendant Sanofi-Aventis U.S. LLC in the State

16    of California is reasonable.

17    36.    There is no burden on Defendant Sanofi-Aventis U.S. LLC in litigating the instant

18    case in California as Defendant Sanofi-Aventis U.S. LLC is already licensed to do business in the

19    State of California, regularly systematically and continuously solicits and conducts business in the

20    State of California, and already enjoys the benefits of the protections of the laws of the State of

21    California.

22    37.    The shared interest of the several States in furthering fundamental substantive social

23    policies is maximized by having personal jurisdiction over Defendant Sanofi-Aventis U.S. LLC lie

24    in the State of California; to wit, the State of California – just like the other States – has  a strong

25    interest in seeing that its citizens who are afflicted by crippling diseases such as cancer are protected

26    from the tortious acts of nonresident corporations such as Defendant Sanofi-Aventis U.S. LLC who

27    purposefully direct the sale of cancer treatment drugs into the State.

28

12

COMPLAINT AND DEMAND FOR JURY TRIAL

38. At all times relevant hereto, as set forth more fully *infra*, Defendant Sanofi-Aventis U.S. LLC is a wholly-owned subsidiary of Sanofi S.A. – 100% owned and controlled by Sanofi S.A.

39. At all times relevant hereto, as set forth more fully *infra*, Aventis-Pharma S.A. is a wholly-owned subsidiary of Sanofi S.A.

40. At all times relevant hereto, as set forth more fully *infra*, Aventis-Pharma S.A., a wholly-owned subsidiary of Sanofi S.A., was the patent-holder of docetaxel (TAXOTERE®). Indeed, Aventis-Pharma S.A., along with Defendant Sanofi-Aventis U.S. LLC, prosecutes patent infringement lawsuits with respect to docetaxel (TAXOTERE®) in the United States. *See, e.g.,* Aventis Pharma S.A. and Sanofi-Aventis US LLC v. Hospira, Inc., 743 F. Supp. 2d 305, 322 (D. Del. 2010) aff'd, 675 F.3d 1324 (Fed. Cir. 2012).

41. At all times relevant hereto, Defendant Sanofi-Aventis US LLC was the agent of Sanofi S.A. and its wholly-owned subsidiary Aventis-Pharma S.A. – the patent-holder of docetaxel (TAXOTERE®) for purposes of marketing, advertising, soliciting purchases, and selling docetaxel (TAXOTERE®) in the State of California.

42. At all times relevant hereto, Defendant Sanofi-Aventis US LLC was the alter ego of Sanofi S.A. and its wholly-owned subsidiary Aventis-Pharma S.A. – the patent-holder of docetaxel (TAXOTERE®) for purposes of marketing, advertising, soliciting purchases, and selling docetaxel (TAXOTERE®) in the State of California.

43. Plaintiffs' use of, and ultimately injury by, docetaxel (TAXOTERE®) was caused by actions undertaken in California and was not an isolated occurrence, but arose from the purposeful efforts of Sanofi S.A. and Aventis-Pharma S.A., through Sanofi S.A.'s and Aventis-Pharma S.A.'s agent Defendant Sanofi-Aventis US LLC, to create and serve the market for docetaxel (TAXOTERE®) by the marketing, advertising, soliciting purchases, and selling of docetaxel (TAXOTERE®) from their offices in California.

44. Sanofi S.A. and Aventis-Pharma S.A. placed docetaxel (TAXOTERE®) into the stream of commerce with the intent that it would be marketed, advertised, and sold by their agent and/or alter ego Defendant Sanofi-Aventis US LLC in the State of California.

13

COMPLAINT AND DEMAND FOR JURY TRIAL

45.    At all times relevant hereto, the activities of Defendant Sanofi-Aventis US LLC were of such character as to amount to doing the business of Sanofi S.A. and Aventis-Pharma S.A. – the patent-holder of docetaxel (TAXOTERE®) – in the State of California.

### ACCORD HEALTHCARE INC.

46.    Defendant Accord Healthcare, Inc. ("Accord") is a foreign corporation formed under the laws of North Carolina with a principal office street address of 1009 Slater Road, Suite 210-B, Durham, North Carolina 27703.

47.    This Court has personal jurisdiction over Defendant Accord, which is licensed to conduct and/or is systematically and continuously conducting business in the State of California, including, but not limited to, the marketing, advertising, selling, and distributing of drugs, including a generic non-bioequivalent of docetaxel (TAXOTERE®) – Docetaxel and/or Docetaxel-Anhydrous – to the residents in this State.

48.    As set forth *infra*, Plaintiffs allege that Defendant Accord and/or its agents engaged in the commission of a tortious act within the State of California.

49.    Here, Defendant Accord has sufficient "minimum contacts" with the State of California, so that the imposition of jurisdiction would not violate "traditional notions of fair play and substantial justice."

50.    At all times relevant hereto, Defendant Accord is registered with the California Secretary of State to do business in the State of California and has a registered agent in the State of California.

51.    At all times relevant hereto, Defendant Accord has employees in the State of California.

52.    At all times relevant hereto, Defendant Accord actively marketed Docetaxel and/or Docetaxel-Anhydrous within the State of California by providing marketing information about the drug to medical doctors and providers of medical treatment throughout the State of California.

53.    At all times relevant hereto, Defendant Accord solicited purchases of Docetaxel and/or Docetaxel-Anhydrous within the State of California by soliciting purchases of Docetaxel

1   and/or Docetaxel-Anhydrous from medical doctors and providers of medical treatment throughout

2   the State of California.

3       54.     Upon information and belief, at all times relevant hereto, Defendant Accord

4   provided product information about Docetaxel and/or Docetaxel-Anhydrous and samples of

5   Docetaxel and/or Docetaxel-Anhydrous to, medical doctors and providers of medical treatment

6   throughout the State of California.

7       55.     At all times relevant hereto, Defendant Accord sold Docetaxel and/or Docetaxel-

8   Anhydrous within the State of California by selling the drug to medical doctors and providers of

9   medical treatment throughout the State of California.

10      56.     At all times relevant hereto, Defendant Accord shipped Docetaxel and/or Docetaxel-

11  Anhydrous to the State of California by shipping the drug to medical doctors and providers of

12  medical treatment throughout the State of California.

13      57.     At all times relevant hereto, Defendant Accord expected that Docetaxel and/or

14  Docetaxel-Anhydrous would be sold, purchased, and used in the State of California.

15      58.     At all times relevant hereto, Defendant Accord purposefully directed its activities

16  towards the State of California.

17      59.     At all times relevant hereto, Defendant Accord exercised the privilege of conducting

18  business in the State of California.

19      60.     At all times relevant hereto, Defendant Accord enjoyed the benefits and protections

20  of the laws of the State of California.

21      61.     At all times relevant hereto, Defendant Accord's activities in the State of California

22  were neither irregular nor casual; rather, those activities were systematic and continuous.

23      62.     Defendant Accord had fair warning that it might be subject to personal jurisdiction in

24  the State of California and that it might be brought into court in the State of California with respect

25  to its systematic and continuous activities involved with the marketing, advertising, solicitation of

26  purchases, and sales of Docetaxel and/or Docetaxel-Anhydrous in the State of California.

27      63.     Specific personal jurisdiction over Defendant Accord in the State of California is

28  reasonable.

15

COMPLAINT AND DEMAND FOR JURY TRIAL

64.     Plaintiffs have a substantial interest in containing convenient and effective relief in the State of California.  On the other hand, if personal jurisdiction does not lie in California Plaintiffs will be forced to litigate their case(s) in France and/or the state of incorporation of each individual Defendant.

65.     The interstate judicial system's interest in obtaining the most efficient resolution of controversies is maximized by having personal jurisdiction over Defendant Accord lie in the State of California.

66.     The shared interest of the several States in furthering fundamental substantive social policies is maximized by having personal jurisdiction over Defendant Accord lie in the State of California; to wit, the State of California – just like the other States – has a strong interest in seeing that its citizens who are afflicted by crippling diseases such as cancer are protected from the tortious acts of nonresident corporations such as Defendant Accord who purposefully direct the sale of cancer treatment drugs such as Docetaxel and/or Docetaxel-Anhydrous into the State.

**HOSPIRA WORLDWIDE, INC.**

67.     Defendant Hospira Worldwide, Inc ("Hospira") is a foreign nonprofit corporation formed under the laws of the State of Delaware, with a principal office street address of: 275 N. Field Drive, Lake Forest, Illinois 60045. Defendant Hospira is not a citizen or resident of the State of California.

68.     This Court has personal jurisdiction over Defendant Hospira, which is licensed to conduct and/or is systematically and continuously conducting business in the State of California, including, but not limited to, the marketing, advertising, selling, and distributing of drugs, including a generic non-bioequivalent of docetaxel (TAXOTERE®) – Docetaxel- Anhydrous – to the residents in this State.

69.     As set forth *infra*, Plaintiff alleges that Defendant Hospira and/or its agents engaged in the commission of a tortious act within the State of California.

70.     As alleged *infra*, Plaintiffs' injuries complained of in the instant civil action "arise out of" or "relate to" Hospira's contacts with the State of California.

16
COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit A
00038

71.     Here, Defendant Hospira has sufficient "minimum contacts" with the State of California, so that the imposition of jurisdiction would not violate "traditional notions of fair play and substantial justice."

72.     At all times relevant hereto, Defendant Hospira has employees in the State of California.

73.     At all times relevant hereto, Defendant Hospira actively marketed Docetaxel-Anhydrous within the State of California by providing marketing information about the drug to medical doctors and providers of medical treatment throughout the State of California.

74.     At all times relevant hereto, Defendant Hospira solicited purchases of Docetaxel-Anhydrous within the State of California by soliciting purchases of Docetaxel-Anhydrous from medical doctors and providers of medical treatment throughout the State of California.

75.     Upon information and belief, at all times relevant hereto, Defendant Hospira provided product information about Docetaxel-Anhydrous and samples of Docetaxel-Anhydrous to medical doctors and providers of medical treatment throughout the State of California.

76.     At all times relevant hereto, Defendant Hospira sold Docetaxel-Anhydrous within the State of California by selling the drug to medical doctors and providers of medical treatment throughout the State of California.

77.     At all times relevant hereto, Defendant Hospira shipped Docetaxel-Anhydrous to the State of California by shipping the drug to medical doctors and providers of medical treatment throughout the State of California.

78.     At all times relevant hereto, Defendant Hospira expected that Docetaxel-Anhydrous would be sold, purchased, and used in the State of California.

79.     At all times relevant hereto, Defendant Hospira purposefully directed its activities towards the State of California.

80.     At all times relevant hereto, Defendant Hospira exercised the privilege of conducting business in the State of California.

81.     At all times relevant hereto, Defendant Hospira enjoyed the benefits and protections of the laws of the State of California.

17

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit A
00039

82.   At all times relevant hereto, Defendant Hospira's activities in the State of California were neither irregular nor casual; rather, those activities were systematic and continuous.

83.   Defendant Hospira had fair warning that it might be subject to personal jurisdiction in the State of California and that it might be brought into court in the State of California with respect to its systematic and continuous activities involved with the marketing, advertising, solicitation of purchases, and sales of Docetaxel-Anhydrous in the State of California.

84.   Specific personal jurisdiction over Defendant Hospira in the State of California is reasonable.

85.   There is no burden on Defendant Hospira in litigating the instant case in California as Defendant Hospira is already licensed to do business in the State of California, has a registered agent in the State of California, regularly systematically and continuously solicits and conducts business in the State of California, and already enjoys the benefits of the protections of the laws of the State of California.

86.   The shared interest of the several States in furthering fundamental substantive social policies is maximized by having personal jurisdiction over Defendant Hospira lie in the State of California; to wit, the State of California – just like the other States – has a strong interest in seeing that its citizens who are afflicted by crippling diseases such as cancer are protected from the tortious acts of nonresident corporations such as Defendant Hospira who purposefully direct the sale of cancer treatment drugs such as Docetaxel-Anhydrous into the State.

## SUN PHARMA GLOBAL INC.

87.   Defendant Sun Pharma Global Inc. ("Sun Pharma") is a foreign corporation with a principal office business address of International Trust Building, Road Town, British Virgin Islands and principal mailing address of P.O. Box 659, Road Town, British Virgin Islands.

88.   This Court has personal jurisdiction over Defendant Sun Pharma, which is licensed to conduct and/or is systematically and continuously conducting business in the State of California, including, but not limited to, the marketing, advertising, selling, and distributing of drugs, including a generic non-bioequivalent of docetaxel (TAXOTERE®) - Docefrez - to the residents in this State.

18

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit A
00040

89.     As set forth *infra*, Plaintiffs allege that Defendant Sun Pharma and/or its agents engaged in the commission of a tortious act within the State of California.

90.     Here, Defendant Sun Pharma has sufficient "minimum contacts" with the State of California, so that the imposition of jurisdiction would not violate "traditional notions of fair play and substantial justice."

91.     At all times relevant hereto, Defendant Sun Pharma is registered with the California Secretary of State to do business in the State of California and has a registered agent in the State of California.

92.     At all times relevant hereto, Defendant Sun Pharma has employees in the State of California.

93.     At all times relevant hereto, Defendant Sun Pharma actively marketed Docefrez within the State of California by providing marketing information about the drug to medical doctors and providers of medical treatment throughout the State of California.

94.     At all times relevant hereto, Defendant Sun Pharma solicited purchases of Docefrez within the State of California by soliciting purchases of Docefrez from medical doctors and providers of medical treatment throughout the State of California.

95.     Upon information and belief, at all times relevant hereto, Defendant Sun Pharma provided product information about Docefrez and samples of Docefrez to medical doctors and providers of medical treatment throughout the State of California.

96.     At all times relevant hereto, Defendant Sun Pharma sold Docefrez within the State of California by selling the drug to medical doctors and providers of medical treatment throughout the State of California.

97.     At all times relevant hereto, Defendant Sun Pharma shipped Docefrez to the State of California by shipping the drug to medical doctors and providers of medical treatment throughout the State of California.

98.     At all times relevant hereto, Defendant Sun Pharma expected that Docefrez would be sold, purchased, and used in the State of California.

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit A
00041

99. At all times relevant hereto, Defendant Sun Pharma purposefully directed its activities towards the State of California.

100. At all times relevant hereto, Defendant Sun Pharma exercised the privilege of conducting business in the State of California.

101. At all times relevant hereto, Defendant Sun Pharma enjoyed the benefits and protections of the laws of the State of California.

102. At all times relevant hereto, Defendant Sun Pharma's activities in the State of California were neither irregular nor casual; rather, those activities were systematic and continuous.

103. Defendant Sun Pharma had fair warning that it might be subject to personal jurisdiction in the State of California and that it might be brought into court in the State of California with respect to its systematic and continuous activities involved with the marketing, advertising, solicitation of purchases, and sales of Docefrez in the State of California.

104. Specific personal jurisdiction over Defendant Sun Pharma in the State of California is reasonable.

105. Plaintiffs have a substantial interest in containing convenient and effective relief in the State of California. On the other hand, if personal jurisdiction does not lie in California, Plaintiffs will be forced to litigate their case(s) in France and/or the state of incorporation of each individual Defendant.

106. The interstate judicial system's interest in obtaining the most efficient resolution of controversies is maximized by having personal jurisdiction over Defendant Sun Pharma lie in the State of California.

107. The shared interest of the several States in furthering fundamental substantive social policies is maximized by having personal jurisdiction over Defendant Sun Pharma lie in the State of California; to wit, the State of California – just like the other States – has a strong interest in seeing that its citizens who are afflicted by crippling diseases such as cancer are protected from the tortious acts of nonresident corporations such as Defendant Sun Pharma who purposefully direct the sale of cancer treatment drugs such as Docefrez into the State.

/ / /

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit A
00042

**McKESSON CORPORATION d/b/a McKESSON PACKAGING**

108.    Defendant McKesson Corporation d/b/a McKesson Packaging ("McKesson") is a foreign corporation formed under the laws of the State of Delaware with a principal office street address of One Post Street, San Francisco, California 94104.  Defendant McKesson is a citizen of the State of California.

109.    This Court has personal jurisdiction over Defendant McKesson, which is a citizen of the State of California, and is systematically and continuously conducting business in the State of California, including, but not limited to, the marketing, advertising, selling, and distributing of drugs, including a generic non-bioequivalent of docetaxel (TAXOTERE®) - Docetaxel-Anhydrous – to the residents in this State.

110.    As set forth *infra*, Plaintiff alleges that Defendant McKesson and/or its agents engaged in the commission of a tortious act within the State of California.

111.    At all times relevant hereto, Defendant McKesson has employees in the State of California.

112.    At all times relevant hereto, Defendant McKesson actively marketed Docetaxel-Anhydrous within the State of California by providing marketing information about the drug to medical doctors and providers of medical treatment throughout the State of California.

113.    At all times relevant hereto, Defendant McKesson solicited purchases of Docetaxel-Anhydrous within the State of California by soliciting purchases of Docetaxel-Anhydrous from medical doctors and providers of medical treatment throughout the State of California.

114.    Upon information and belief, at all times relevant hereto, Defendant McKesson provided product information about Docetaxel-Anhydrous and samples of Docetaxel-Anhydrous to, medical doctors and providers of medical treatment throughout the State of California.

115.    At all times relevant hereto, Defendant McKesson sold Docetaxel-Anhydrous within the State of California by selling the drug to medical doctors and providers of medical treatment throughout the State of California.

/ / /

/ / /

Exhibit A
00043

116.   At all times relevant hereto, Defendant McKesson shipped Docetaxel-Anhydrous to the State of California by shipping the drug to medical doctors and providers of medical treatment throughout the State of California.

117.   At all times relevant hereto, Defendant McKesson expected that Docetaxel-Anhydrous would be sold, purchased, and used in the State of California.

118.   At all times relevant hereto, Defendant McKesson purposefully directed its activities towards the State of California.

119.   At all times relevant hereto, Defendant McKesson exercised the privilege of conducting business in the State of California.

120.   At all times relevant hereto, Defendant McKesson enjoyed the benefits and protections of the laws of the State of California.

121.   At all times relevant hereto, Defendant McKesson's activities in the State of California were neither irregular nor casual; rather, those activities were systematic and continuous.

122.   Defendant McKesson had fair warning that it might be subject to personal jurisdiction in the State of California and that it might be brought into court in the State of California with respect to its systematic and continuous activities involved with the marketing, advertising, solicitation of purchases, and sales of McKesson in the State of California.

123.   Specific personal jurisdiction over Defendant McKesson in the State of California is reasonable.

124.   There is no burden on Defendant McKesson in litigating the instant case in California as Defendant McKesson is a citizen of the State of California, has a registered agent in the State of California, regularly systematically and continuously solicits and conducts business in the State of California, and already enjoys the benefits of the protections of the laws of the State of California.

125.   Plaintiff has a substantial interest in containing convenient and effective relief in the State of California.  On the other hand, if personal jurisdiction does not lie in California, Plaintiff will be forced to litigate her case(s) in France and/or the state of incorporation of each individual Defendant.

22

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit A
00044

126.   The interstate judicial system's interest in obtaining the most efficient resolution of controversies is maximized by having personal jurisdiction over Defendant McKesson lie in the State of California.

127.   The shared interest of the several States in furthering fundamental substantive social policies is maximized by having personal jurisdiction over Defendant McKesson lie in the State of California; to wit, the State of California – just like the other States – has a strong interest in seeing that its citizens who are afflicted by crippling diseases such as cancer are protected from the tortious acts of nonresident corporations such as Defendant McKesson who purposefully direct the sale of cancer treatment drugs such as Docetaxel-Anhydrous into the State.

## SANOFI'S OWNERSHIP AND UNITY OF INTEREST

128.   Sanofi S.A. is a French multinational pharmaceutical parent company that operates worldwide through a complex, consolidated, and intermingled web of more than 400 wholly-owned subsidiaries, including Aventis Pharma S.A. and Defendant Sanofi-Aventis U.S. LLC. As of 2013, Sanofi was the world's fifth-largest pharmaceutical company by sales.

129.   At all relevant times, Sanofi S.A. was engaged in the business of researching, analyzing, licensing, designing, formulating, compounding, patenting, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, advertising, and/or selling the prescription drug Taxotere through its numerous wholly-owned subsidiaries in the United States and throughout the world, including Aventis Pharma S.A. and Defendant Sanofi-Aventis U.S. LLC.

130.   Sanofi was founded in 1973 as a subsidiary of Elf Aquitaine, a French oil company, and subsequently grew through a series of international acquisitions. In 1994, Sanofi made a significant venture into the U.S. pharmaceutical market by acquiring Sterling Winthrop and its prescription pharmaceutical business. Sanofi now produces and sells generic products in the United States under the Winthrop label.

131.   Aventis was formed in 1999 when the French company Rhône-Poulenc S.A. merged with the German corporation Hoechst Marion Roussel, which itself was formed from the 1995

Exhibit A
00045

1    merger of Hoechst AG with Cassella, Roussel Uclaf, and Marion Merrell Dow. The merged

2    company was based in Schiltigheim, near Strasbourg, France.

3         132.   Sanofi-Aventis S.A. was formed in 2004 with the merger of Aventis and Sanofi-

4    Synthélabo, each of which had previously been formed through mergers. Sanofi-Aventis changed

5    its name to Sanofi S.A. on May 6, 2011, after receiving approval at its annual general meeting. The

6    reason given by the company for the change was to make its name easier to pronounce in other

7    countries such as China.

8         133.   Sanofi S.A.'s shares are listed on the New York Stock Exchange and the NASDAQ

9    Global Market. Sanofi S.A. is required by law to register its securities in the United States under

10   section 12(g) of the Securities Exchange Act of 1934 on Form 20-F and to file its annual reports on

11   Form 20-F.

12        134.   According to Sanofi S.A.'s Form 20-F filed with the U.S. Securities and Exchange

13   Commission for the fiscal year ended December 31, 2014, Sanofi S.A. owns 100% of the

14   membership and voting interest of Sanofi-Aventis U.S. LLC. Therefore, Sanofi S.A. controls and

15   directs the operations of Sanofi-Aventis U.S. LLC.

16        135.   Sanofi-Aventis U.S. LLC, according to Sanofi S.A.'s Form 20-F, was formed on

17   June 28, 2000 as a Delaware limited liability company whose principal activity was identified as

18   "Pharmaceuticals."

19        136.   Upon information and belief, Aventis Pharma S.A. was formed as a successor in

20   interest to Rhone-Poulenc Rorer, S.A.

21        137.   In 2004, Sanofi acquired the competing pharmaceutical company Aventis to create

22   Sanofi-Aventis S.A. (later shortened to Sanofi S.A.). Sanofi S.A. owns 100% of the shares or

23   financial interest of Aventis Pharma S.A., and therefore directs and controls its operations and

24   activities.

25        138.   Defendant Sanofi-Aventis U.S. LLC is also a wholly-owned U.S. subsidiary of

26   Sanofi S.A. Because Sanofi S.A. owns 100% of its shares or financial interest, Sanofi S.A. controls

27   and directs its operations.

28

24

COMPLAINT AND DEMAND FOR JURY TRIAL

139.   At all material times, Sanofi S.A., Aventis Pharma S.A., and Defendant Sanofi-Aventis U.S. LLC were engaged in the business of, and/or were successors in interest to entities engaged in the business of, researching, analyzing, licensing, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, advertising, and/or selling the prescription drug Taxotere to the general public, including Plaintiff.

140.   At all material times, Sanofi was authorized to do business within California; did in fact transact and conduct business in California; derived substantial revenue from goods and products used in California; supplied Taxotere within California; and purposefully directed these and other related activities to California.

141.   Specifically, Sanofi sponsored and conducted clinical trials of their products in California, including clinical trials of Taxotere. For example, it sponsored a 2005 clinical trial at Stanford University on the efficacy of Taxotere for lung cancer treatment; from 2006 to 2012, Sanofi sponsored a clinical trial at Stanford on the efficacy of Taxotere for breast cancer treatment; from 2006 to 2012, Sanofi sponsored an interventional clinical trial at Stanford of Taxotere in patients with breast cancer; Sanofi also sponsored a large-scale epidemiological study on its drug Lantus at Kaiser Permanente in Northern and Southern California, which terminated in 2012. In addition, Sanofi participates in ongoing research and development collaborations with the University of California, San Francisco.

142.   Additionally, Sanofi employed sales representatives and business managers throughout California who promoted Taxotere as part of a nationwide marketing, promotion and distribution campaign targeting medical professionals and residents in California. Sanofi also contracted with Defendant McKesson Corporation, a California-based pharmaceutical distributor, to distribute, package, label, and promote Taxotere.

143.   Sanofi has also spent large sums on California politics. For example, in 2016 Sanofi contributed $4.15 million to the political action committee Californians Against the Misleading Rx Measure. Sanofi also contributed $1.5 million to the political action committee No On Prop 61 Californians Against the Deceptive Rx Proposition. In 2015, Sanofi gave $115,000 to a campaign

25

COMPLAINT AND DEMAND FOR JURY TRIAL

1   against Measure 15-009. Sanofi has also recently contributed $7,300 total to five assembly-member

2   candidates, and $2,500 to the California Republican Party.  Sanofi also employs Clear Advocacy,

3   LLC, a lobbying firm based in Sacramento.

4          144.    Sanofi S.A., Aventis Pharma S.A. and Sanofi-Aventis U.S. LLC acted jointly at all

5   relevant times, along with other affiliated, related, jointly owned and controlled entities, to develop,

6   market, produce, label, promote, package, advertise, and/or sell Taxotere to the general public,

7   including Plaintiff.  Because they acted jointly, and/or within the course and scope of an agency

8   relationship with one another, with respect to the conduct alleged in this Complaint, any

9   individuality and separateness between them ceased and they became alter-egos of one another and

10  are jointly liable for their misconduct and wrongful acts as alleged herein.

11         145.    Through its web of affiliates, subsidiaries, and predecessor companies, Sanofi S.A.

12  has overseen the invention, development, clinical trials, and strategy for marketing, distributing,

13  selling, and promoting Taxotere in the United States and in over 100 different countries.

14  **SANOFI'S INVOLVEMENT IN THE DEVELOPMENT, PATENTING, TESTING,**

15  **MARKETING, AND SALE OF TAXOTERE (DOCETAXEL)**

16         146.    Docetaxel (TAXOTERE®) is a drug used in the treatment of various forms of

17  cancer, including but not limited to breast cancer. Taxotere is a part of a family of drugs commonly

18  referred to as taxanes.

19         147.    Taxanes are diterpenes produced by the plants of the genus Taxus (yews) featuring a

20  taxadiene core. Taxanes are widely used as chemotherapy agents. Taxane agents include paclitaxel

21  (Taxol®) and Taxotere.

22         148.    Paclitaxel (TAXOL®), which was developed, manufactured, and distributed by

23  Bristol-Myers Squibb and is the main competitor drug to docetaxel (TAXOTERE®), was first

24  approved by the U.S. Food and Drug Administration (FDA) in December 1992.

25         149.    The drug and chemical compound that would become known as docetaxel

26  (TAXOTERE®) was invented and developed by Michel Colin, Daniel Guenard, Francoise

27  Gueritte–Voegelein, and Pierre Potier of Rhone-Poulenc Santé. Docetaxel (TAXOTERE®) was

28  designed as an increased potency Taxane.

26

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit A
00048

1    150.    The initial patent disclosing the formulation and computation of docetaxel

2    (TAXOTERE®) was issued to Rhone-Poulence Santé and subsequently assigned to Aventis

3    Pharma S.A in March 1989. Sanofi S.A. owns 100% of the shares or financial interest of Aventis

4    Pharma S.A., and Sanofi S.A. therefore directs and controls the operations and activities of Aventis

5    Pharma S.A. Since March 1989, Sanofi S.A., through its wholly-owned subsidiary, Aventis Pharma

6    S.A., has controlled the development and been the owner, holder, or assignee of the patents related

7    to docetaxel (TAXOTERE®).

8    151.    In 1989, Sanofi issued the prior art publication F. Lavelle, *Experimental Properties*

9    *of RP 56976*, a taxol derivative. RP 56976 was the number that Rhone-Polunec, Aventis Pharma

10   S.A.'s predecessor, assigned to docetaxel.

11   152.    Sanofi began enrolling patients in Phase I clinical testing trials on June 21, 1990.

12   The study reporting on these trials was called the "TAX 001" study, which continued until May 13,

13   1992. The results from the TAX 001 study were reported on May 24, 1994. Accordingly, Sanofi

14   was not only involved in the patenting and assignment of the compound Taxotere® (docetaxel), but

15   Sanofi was also directly involved in the clinical trials and testing of the compound Taxotere®

16   (docetaxel). Accordingly, Sanofi S.A. and Aventis Pharma S.A. have direct and personal

17   knowledge of the results of those tests and Sanofi S.A., Aventis Pharma S.A., and Sanofi-Aventis

18   U.S. LLC's decisions to withhold information and data from those tests from physicians, healthcare

19   providers, patients, and Plaintiff in the United States.

20   153.    Rhône-Poulenc Rorer S.A., before it was acquired by or merged into Aventis Pharma

21   S.A., initially sought FDA approval for docetaxel (TAXOTERE®) in December 1994. The FDA's

22   Oncologic Drugs Advisory Committee panel unanimously recommended the rejection of Rhône-

23   Poulenc Rorer S.A.'s request for the approval of docetaxel (TAXOTERE®), because docetaxel

24   (TAXOTERE®) was more toxic than its competing drug TAXOL®, which had already received

25   FDA approval, and because more studies of docetaxel's side effects were needed.

26   154.    Docetaxel (TAXOTERE®) was ultimately approved by the FDA on May 14, 1996.

27   According to its product labeling, docetaxel (TAXOTERE®) was "indicated for the treatment of

28   patients with locally advanced or metastatic breast cancer after failure of prior chemotherapy."

27

COMPLAINT AND DEMAND FOR JURY TRIAL

155.    After the initial FDA approval, Sanofi sought and were granted FDA approval for additional indications for docetaxel (TAXOTERE®). Based on self-sponsored clinical trials, Sanofi claimed superiority over other chemotherapy products approved to treat breast cancer. Sanofi's marketing claims included claims of superior efficacy over the lower potency Taxane product paclitaxel (TAXOL®), which was the primary competitor product to docetaxel (TAXOTERE®).

156.    Throughout this period, Defendant McKesson Corporation distributed, packaged, labeled, and promoted Taxotere.  U.S. Oncology, a specialty drug distributor now owned by McKesson, supported research and the subsequent promotion of Taxotere at conferences including at annual meetings for the American Society of Clinical Oncology.  McKesson continued this activity after it acquired U.S. Oncology in 2010.

157.    Contrary to Sanofi S.A., Aventis Pharma S.A., and Sanofi-Aventis U.S. LLC's claims of superior efficacy, post market surveillance has shown that the more potent and more toxic docetaxel (TAXOTERE®) does not in fact offer increased efficacy or benefits over other Taxanes, as Sanofi has claimed and advertised. Sanofi concealed the existence of studies from the FDA, physicians, and patients that refuted Sanofi's claims.

158.    A study of available clinical studies concerning the relative efficacy of Taxanes in the treatment of breast cancer, published in the August 2007 journal *Cancer Treatment Review*, concluded that no significant differences were found in the efficacy and outcomes obtained with TAXOTERE® (docetaxel) or TAXOL® (paclitaxel).

159.    A study published in 2008 in the New England Journal of Medicine, titled *Weekly Paclitaxel in the Adjuvant Treatment of Breast Cancer*, concluded that TAXOL® (paclitaxel) was more effective than TAXOTERE® (docetaxel) for patients undergoing standard adjuvant chemotherapy with doxorubicin and cyclophosphamide.

160.    Despite publication of these studies, Sanofi continued to falsely promote the "superior efficacy" of Taxotere over competing paclitaxel (Taxol). At the June 2008 meeting for the American Society of Clinical Oncology, Sanofi distributed marketing materials comparing the efficacy of Taxotere versus paclitaxel (Taxol). Specifically, Sanofi distributed a "reprint carrier" enclosing a 2005 study ("TAX 311") performed by researchers affiliated with Sanofi and US

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit A
00050

1  Oncology (which is now part of McKesson).  The cover of the reprint carrier claimed, among other
2  things:

3  • "TAX 311: Taxotere demonstrated efficacy benefits vs paclitaxel"

4  • "This phase III study demonstrated that docetaxel is superior to paclitaxel in TTP,
5  response duration, and OS [overall survival]."

6  • "Phase III trial demonstrated improved survival for Taxotere vs paclitaxel in
7  metastatic breast cancer"

8  161.   Whatever the merits of the TAX 311 study may have been, Sanofi's statements on
9  the reprint carrier were false and/or misleading in light of the 2007 and 2008 studies finding that
10  Taxotere was not more effective than Taxol.

11  162.   Whatever the merits of the 2005 JCO study may have been, Sanofi's statements in
12  the "reprint carrier" marketing the conclusions of the 2005 JCO study were false and/or misleading
13  in light of the 2007 and 2008 studies finding that docetaxel (TAXOTERE®) was not more effective
14  than paclitaxel (TAXOL®) in the treatment of breast cancer.

15  163.   As a result of these false and misleading statements, in 2009, the FDA issued a
16  warning letter to Sanofi-Aventis (the same company as Sanofi S.A. before Sanofi-Aventis changed
17  its name in 2011) citing these unsubstantiated claims of superiority over paclitaxel stating:

18  The Division of Drug Marketing, Advertising, and Communications (DDMAC) of
19  the U.S. Food and Drug Administration (FDA) has reviewed a professional reprint
20  carrier [US.DOC.07.04.078] for Taxotere (docetaxel) Injection Concentrate,
21  Intravenous Infusion (Taxotere) submitted under cover of Form FDA 2253 by
22  sanofi-aventis (SA) and obtained at the American Society of Clinical Oncology
23  annual meeting in June 2008. The reprint carrier includes a reprint[1] from the Journal
24  of Clinical Oncology, which describes the TAX 311 study. This reprint carrier is
25  false or misleading because it presents unsubstantiated superiority claims and
26  overstates the efficacy of Taxotere. Therefore, this material misbrands the drug in

27  _____

28  [1] Jones SE, Erban J, Overmoyer B, et al. Randomized phase III study of docetaxel compared with
paclitaxel in metastatic breast cancer. *J Clin Oncol.* 2005;23(24):5542-51.

29

COMPLAINT AND DEMAND FOR JURY TRIAL

1    violation of the Federal Food, Drug, and Cosmetic Act (the Act), 21 U.S.C. 352(a)

2    and 321(n). *Cf.* 21 CFR 202.1(e)(6)(i), (ii) & (e)(7)(ii).[2]

3    . . . .

4    The reference cited in support of these claims . . . does not constitute substantial

5    evidence or substantial clinical experience to support these claims and

6    representations because, among other factors, the study failed to demonstrate

7    statistical significance on the primary endpoint and has not been replicated.1F[3]

8    164.   A Qui Tam lawsuit was also filed against Sanofi-Aventis and its affiliates in the

9    United States District Court for the Eastern District of Pennsylvania by a former employee accusing

10   Sanofi-Aventis and its affiliates of engaging in a fraudulent marketing scheme, paying kickbacks,

11   and providing other unlawful incentives to entice physicians to use docetaxel (TAXOTERE®). *See*

12   *U.S. ex rel. Gohil v. Sanofi-Aventis U.S. Inc.*, Civil Action No. 02-2964 (E.D. Pa. 2015).

13   165.   Beginning in 1996, Sanofi S.A., Aventis Pharma S.A., and Sanofi-Aventis U.S. LLC

14   and their predecessors and affiliates designed, directed, and/or engaged in a marketing scheme that

15   promoted docetaxel (TAXOTERE®) for off-label uses not approved by the FDA. The scheme took

16   two forms: first, Sanofi trained and directed its employees to misrepresent the safety and

17   effectiveness of the off-label use of Taxotere to expand the market for docetaxel (TAXOTERE®) in

18   unapproved settings; and second, Sanofi paid healthcare providers illegal kickbacks in the form of

19   sham grants, speaking fees, travel, entertainment, sports and concert tickets, preceptorship fees; and

20   free reimbursement assistance to incentivize healthcare providers to prescribe docetaxel

21   (TAXOTERE®) for off-label uses. As a direct result of Sanofi's fraudulent marketing scheme,

22   Sanofi dramatically increased revenue on sales of docetaxel (TAXOTERE®) from $424 million in

23   2000 to $1.4 billion in 2004. *U.S. ex rel. Gohil v. Sanofi-Aventis U.S. Inc.*, 96 F. Supp. 3d 504, 508

24   (E.D. Pa. 2015).

25
26   [2] Correspondence signed by Keith Olin, Pharm.D., Regulatory Review Officer in the FDA's Division of Drug Marketing, Advertising and Communications to MaryRose Salvacion, Director of US Regulatory Affairs Marketed Products at sanofi-aventis.

27   [3] Correspondence signed by Keith Olin, Pharm.D., Regulatory Review Officer in the FDA's Division of Drug Marketing, Advertising and Communications to MaryRose Salvacion, Director of US Regulatory Affairs Marketed Products at Sanofi-Aventis.

28

30

COMPLAINT AND DEMAND FOR JURY TRIAL

166. As a direct result of their wrongful conduct and illegal kickback schemes, Sanofi S.A., Aventis Pharma S.A., and Sanofi-Aventis U.S. LLC directly caused thousands of individuals to be exposed to docetaxel's (TAXOTERE®) increased toxicity as compared to other available less toxic products.

167. As a direct result of their aforementioned conduct, Sanofi S.A., Aventis Pharma S.A., and Sanofi-Aventis U.S. LLC caused thousands of individuals to be exposed to increased frequency and more severe side effects, including but not limited to disfiguring permanent alopecia (hair loss).

## DEFENDANTS' COVER UP IN THE UNITED STATES REGARDING THE CAUSAL RELATIONSHIP BETWEEN DOCETAXEL (TAXOTERE®) AND/OR THE GENERIC NON-BIOEQUIVALENTS OF SAME AND PERMANENT AND PERMANENT DISFIGURING HAIR LOSS

168. Although alopecia, or hair loss, is a common side effect related to chemotherapy drugs, permanent alopecia is not. Defendants, through their publications and marketing materials, misled Plaintiff, the public, and the medical community to believe that, as with other chemotherapy drugs that cause alopecia, patients' hair would grow back.

169. Defendants knew or should have known that the rate of permanent alopecia related to docetaxel (TAXOTERE®) and or the generic non-bioequivalents of same was far greater than with other products available to treat the same condition as Defendants' products.

170. Permanent baldness (permanent alopecia) is a disfiguring condition, especially for women. Women who experienced disfiguring permanent alopecia as a result of the use of docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same suffer great mental anguish as well as economic damages, including but not limited to loss of work or inability to work due to significant psychological damage.

171. Although women might accept the possibility of permanent baldness as a result of the use of docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same if no other product were available to treat their cancer, this was not the case. Before Defendants' wrongful conduct resulted in thousands of women being exposed to the side effects of docetaxel

31

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit A
00053

1   (TAXOTERE®) or the generic non-bioequivalents of same, there were already similar products on

2   the market that were at least as effective as docetaxel (TAXOTERE®) and did not subject female

3   users to the same risk of disfiguring permanent alopecia as does docetaxel (TAXOTERE®).

4       172.   Beginning in the late 1990's, Sanofi S.A. and Aventis Pharma S.A. sponsored and/or

5   were aware of a study titled the GEICAM 9805 study. In 2005, Sanofi S.A. and Aventis Pharma

6   S.A. knew that the GEICAM 9805 study demonstrated that 9.2% of patients who took docetaxel

7   (TAXOTERE®) had persistent alopecia, or hair loss, for up to 10 years and 5 months, and in some

8   cases longer, after taking docetaxel (TAXOTERE®). Sanofi S.A. and Aventis Pharma S.A.

9   knowingly, intentionally, and wrongfully withheld these results contained in the GEICAM 9805

10  study from physicians, healthcare providers, patients, and Plaintiff in the United States.

11      173.   Defendants knew or should have known that a Denver-based oncologist in the

12  United States had observed that an increased percentage (6.3%) of his patients who had taken

13  docetaxel (TAXOTERE®) suffered from permanent disfiguring hair loss for years after the patients

14  had stop taking docetaxel (TAXOTERE®) in 2006. Sanofi S.A., Aventis Pharma S.A., and Sanofi-

15  Aventis U.S. LLC chose to ignore the results of this study and failed to warn consumers and the

16  medical community as did the rest of Defendants when they developed generic non- bioequivalents

17  of docetaxel (TAXOTERE®).

18      174.   Despite Defendants' knowledge of the relevant findings from the GEICAM 9805

19  study, as well as reports from patients who had taken docetaxel (TAXOTERE®) and/or the generic

20  non-bioequivalents of same and suffered from permanent disfiguring hair loss, Defendants failed to

21  provide accurate information and proper warnings to physicians, healthcare providers, and patients

22  in the United States, including Plaintiff, that patients who take docetaxel (TAXOTERE®) and/or

23  the generic non- bioequivalents of same are at a significantly increased risk of suffering from

24  permanent disfiguring hair loss.

25      175.   Defendants chose to withhold this information in the United States despite advising

26  physicians, patients, and regulatory agencies in other countries, including the European Union and

27  Canada, that docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same cause an

28  increased risk of permanent disfiguring hair loss. Defendants instead continued to warn or advise

32

COMPLAINT AND DEMAND FOR JURY TRIAL

1   physicians, healthcare providers, patients, and Plaintiff in the United States only with the generic,

2   vague, and insufficient warning that "hair generally grows back" after taking docetaxel

3   (TAXOTERE®) and/or the generic non-bioequivalents of same.

4        176.    Users of docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same

5   were not presented with the opportunity to make an informed choice as to whether the benefits of

6   docetaxel (TAXOTERE®) were worth their associated risks. Defendants engaged in a pattern of

7   deception by overstating the benefits of docetaxel (TAXOTERE®) and/or the generic non-

8   bioequivalents of same as compared to other alternatives while simultaneously failing to warn of

9   the risk of disfiguring permanent alopecia.

10       177.    Although Defendants publish information in other countries to individual patients as

11  well as regulatory agencies related to docetaxel (TAXOTERE®) and/or the generic non-

12  bioequivalents of same and the risk of permanent alopecia, the words permanent alopecia or

13  permanent hair loss do not appear in any information published by Defendants in the United States.

14       178.    As a direct result of Defendants' wrongful and deceptive acts, thousands of women

15  were exposed to the risk of disfiguring permanent alopecia without any warning and without any

16  additional benefit.

17       179.    As a direct result of Defendants' failure to warn patients of the risk of disfiguring

18  permanent alopecia in the United States, thousands of women, including Plaintiff, as well as their

19  health care providers, were deprived of the opportunity to make an informed decision as to whether

20  the benefits of using docetaxel (TAXOTERE®) and/or the generic non- bioequivalents of same

21  over other comparable products was justified.

22       180.    Defendants prayed on one of the most vulnerable groups of individuals at the most

23  difficult time in their lives. Defendants obtained billions of dollars in increased revenues at the

24  expense of unwary cancer victims simply hoping to survive their condition and return to a normal

25  life.

26       181.    Plaintiff Shaneika Graham, as well as numerous other women, were the innocent

27  victims of Defendants' greed, recklessness, and willful and wanton conduct.

28  ///

33

COMPLAINT AND DEMAND FOR JURY TRIAL

1

<u>GENERIC NON-BIOEQUIVALENT DEFENDANTS' CONDUCT</u>

2    182.    Defendants Accord, Hospira, Sun Pharma. and McKesson are hereinafter referred to

3 as the "Generic Non-Bioequivalent Defendants".

4    183.    Defendant Accord filed an NDA with the FDA for a generic non-bioequivalent of

5 docetaxel (TAXOTERE®) – Docetaxel.   The FDA granted Defendant Accord's NDA and

6 Docetaxel produced by Defendant Accord was put onto the market on June 30, 2011.

7    184.    Defendant Accord filed an NDA with the FDA for a generic non-bioequivalent of

8 docetaxel (TAXOTERE®) – Docetaxel-Anhydrous.  The FDA granted Defendant Accord's NDA

9 and Docetaxel-Anhydrous produced by Defendant Accord was put onto the market on July 1, 2012.

10    185.    Defendant Accord filed an NDA with the FDA for a generic non-bioequivalent of

11 docetaxel (TAXOTERE®) – Docetaxel-Anhydrous.  The FDA granted Defendant Accord's NDA

12 and Docetaxel-Anhydrous produced by Defendant Accord was put onto the market on May 15,

13 2013.

14    186.    Defendant Hospira filed a new drug application ("NDA") with the Food and Drug

15 Administration ("FDA") for a generic non-bioequivalent of docetaxel (TAXOTERE®) –

16 Docetaxel-Anhydrous.  The FDA granted Defendant Hospira's NDA on March 8, 2011 and the

17 Docetaxel-Anhydrous produced by Defendant Hospira was put onto the market on March 17, 2011.

18    187.    Defendant Sun Pharma filed an NDA with the FDA for a generic non-bioequivalent

19 of docetaxel (TAXOTERE®) – Docefrez.  The FDA granted Defendant Sun Pharma's NDA and

20 Docefrez produced by Defendant Sun Pharma was put onto the market on May 2, 2011.

21    188.    Defendant McKesson filed an NDA with the FDA for a generic non-bioequivalent of

22 docetaxel (TAXOTERE®) – Docetaxel-Anhydrous.  The FDA granted Defendant McKesson's

23 NDA and Docetaxel-Anhydrous produced by Defendant McKesson was put onto the market on

24 June 8, 2011.

25    189.    On information and belief, the National Drug Code for the specific docetaxel

26 (TAXOTERE®) and/or a generic non-bioequivalent of same administered to Plaintiff appears in

27 McKesson's multi-oncology catalog.

28

_____

34

COMPLAINT AND DEMAND FOR JURY TRIAL

1    190.   Defendants preyed on one of the most vulnerable groups of individuals at the most

2    difficult time in their lives. Defendants obtained billions of dollars in increased revenues at the

3    expense of unwary cancer victims simply hoping to survive their condition and return to a normal

4    life.

5    191.   Plaintiffs, as well as numerous other women, were the innocent victims of

6    Defendants' greed, recklessness, and willful and wanton conduct.

7    **NATURE OF THE CLAIMS**

8    192.   Despite the fact that all Defendants disclosed risks associated with docetaxel

9    (TAXOTERE®) - and/or the generic non-bioequivalents of same - and permanent alopecia to

10    patients and regulatory agencies in other countries, all Defendants failed to either alert Plaintiff, the

11    public, and the scientific community in the United States or perform further investigation into the

12    safety of docetaxel (TAXOTERE®) - and/or the generic non-bioequivalents of same - regarding the

13    side effect of disfiguring permanent alopecia. All Defendants failed to update the warnings for

14    docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same, and they failed to

15    disclose the results of additional studies as they learned new facts regarding the defects and risks of

16    their product.

17    193.   In particular, Defendants

18        (a)    failed to disclose the results of Sanofi, S.A.'s, Aventis Pharma's and Sanofi

19                Aventis U.S., LLC's investigation and research from 2005, including but not

20                limited to the results of the GEICAM 9805 study, and failed to further

21                investigate, research, study, and define fully and adequately the safety profile

22                of docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same

23                in response to these studies;

24        (b)    failed to provide adequate warnings about the true safety risks associated with

25                the use of docetaxel (TAXOTERE®) and/or the generic non-bioequivalents

26                of same;

27        (c)    failed to provide adequate warning regarding the pharmacokinetic and

28                pharmacodynamic variability of docetaxel (TAXOTERE®) and/or the

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit A
00057

1        generic non-bioequivalents of same and their effects on the degree or severity

2        of side effects related to permeant alopecia;

3    (d)    failed to disclose in the "Warnings" Section that permeant alopecia is a

4        frequent side effect associated with the use of docetaxel (TAXOTERE®)

5        and/or the generic non-bioequivalents of same;

6    (e)    failed to advise prescribing physicians, such as Plaintiffs' physicians, to

7        instruct patients that permanent alopecia was a side effect, much less a

8        frequent side effect, linked to docetaxel (TAXOTERE®) and/or the generic

9        non-bioequivalents of same;

10    (f)    failed to provide adequate instructions on how to intervene and/or reduced the

11        risk of permanent alopecia related to the use of docetaxel (TAXOTERE®)

12        and/or the generic non-bioequivalents of same;

13    (g)    failed to provide adequate warnings and information related to the increased

14        risks of permeant alopecia in certain genome groups;

15    (h)    failed to provide adequate warnings regarding the increased risk of permeant

16        alopecia with the use of docetaxel (TAXOTERE®) and/or the generic non-

17        bioequivalents of same as compared to other products designed to treat the

18        same conditions as docetaxel (TAXOTERE®); and

19    (i)    failed to include a **"BOXED WARNING"** related to permanent or persistent

20        alopecia.

21    194.    During the years since first marketing docetaxel (TAXOTERE®) and/or the generic

22  non-bioequivalents of same in the U.S., Defendants modified the U.S. labeling and prescribing

23  information for docetaxel (TAXOTERE®) on multiple occasions. Defendants failed, however, to

24  include any warning whatsoever related to permanent alopecia despite Defendants' awareness of the

25  frequency and severity of this side effect.

26    195.    Before applying for and obtaining approval of docetaxel (TAXOTERE®) and/or the

27  generic non-bioequivalents of same, Defendants knew or should have known that consumption of

28

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit A
00058

1   docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same, was associated with

2   and/or would cause disfiguring side effects including disfiguring permanent alopecia.

3        196.   Despite   knowing   that   docetaxel   (TAXOTERE®)and/or   the   generic   non-

4   bioequivalents of same were likely to result in increased rates of alopecia and disfiguring permanent

5   alopecia, Defendants produced, marketed, and distributed docetaxel (TAXOTERE®) in the United

6   States.

7        197.   All Defendants failed to adequately conduct complete and proper testing of

8   docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same prior to filing their New

9   Drug Application for docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same.

10        198.   From the date all Defendants received FDA approval to market docetaxel

11   (TAXOTERE®) and/or the generic non-bioequivalents of same, all Defendants made, distributed,

12   marketed, and sold docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same

13   without adequate warning to Plaintiff or Plaintiffs' prescribing physicians that docetaxel

14   (TAXOTERE®) and/or the generic non-bioequivalents of same were associated with disfiguring

15   permanent alopecia.

16        199.   All Defendants ignored the association between the use of docetaxel

17   (TAXOTERE®) and/or the generic non-bioequivalents of the same and the risk of disfiguring

18   permanent alopecia.

19        200.   All Defendants failed to disclose information that they possessed regarding their

20   failure to adequately test and study docetaxel (TAXOTERE®) -- and/or the generic non-

21   bioequivalents of same - related to the side effect of disfiguring permanent alopecia. Plaintiff and

22   her healthcare providers could not have discovered all Defendants' false representations and failures

23   to disclose information through the exercise of reasonable diligence.

24        201.   As a result of the foregoing acts and omissions, Defendants caused Plaintiff to suffer

25   serious and dangerous side effects, severe and personal injuries that are permanent and lasting in

26   nature, and economic and non-economic damages, harms, and losses, including but not limited to:

27   past and future medical expenses; psychological counseling and therapy expenses; past and future

28   loss of earnings; past and future loss and impairment of earning capacity; permanent disfigurement

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit A
00059

1  including permanent alopecia; mental anguish; severe and debilitating emotional distress; increased

2  risk of future harm; past, present, and future physical and mental pain, suffering, and discomfort;

3  and past, present, and future loss and impairment of the quality and enjoyment of life.

4  **ESTOPPEL FROM PLEADING STATUTES OF LIMITATIONS OR REPOSE**

5      202.   Plaintiffs incorporates by reference the averments of the preceding paragraphs of the

6  Complaint as if fully set forth at length herein.

7      203.   Plaintiffs are within the applicable statutes of limitations for the claims presented

8  herein because Plaintiff did not discover the defects and unreasonably dangerous condition of

9  Defendants' docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same and the risks

10  associated with their use in the form of disfiguring permanent alopecia, and could not reasonably

11  have discovered the defects and unreasonably dangerous condition of Defendants' docetaxel

12  (TAXOTERE®) and/or the generic non-bioequivalents of same and the risks associated with their

13  use, due to the Defendants' failure to warn, suppression of important information about the risks of

14  the drug, including but not limited to the true risk benefit profile, and the risk of disfiguring

15  permanent alopecia and damages known by Defendants to result from the use of docetaxel

16  (TAXOTERE®) and/or the generic non-bioequivalents of same, and other acts and omissions.

17      204.   In addition, Defendants are estopped from relying on any statutes of limitations by

18  virtue of their acts of fraudulent concealment, affirmative misrepresentations and omissions, which

19  include Defendants' intentional concealment from Plaintiff, Plaintiffs' prescribing health care

20  professionals and the general consuming public that Defendants' docetaxel (TAXOTERE®) and/or

21  the generic non-bioequivalents of same were defective, unreasonably dangerous and carried with

22  them the serious risk of developing the injuries Plaintiffs has suffered while aggressively and

23  continually marketing and promoting docetaxel (TAXOTERE®) and/or the generic non-

24  bioequivalents of same as safe and effective. This includes, but is not limited to, Defendants'

25  failure to disclose and warn of the risk of disfiguring permanent alopecia and injuries known by

26  Defendants to result from use of docetaxel (TAXOTERE®) and/or the generic non-bioequivalents

27  of same, for example, and not by way of limitation, internal concern about reports and studies

28  finding an increased risk of disfiguring permanent alopecia; suppression of information about these

Exhibit A
00060

risks and injuries from physicians and patients, including Plaintiffs; use of sales and marketing documents and information that contained information contrary to the internally held knowledge regarding the aforesaid risks and injuries; and overstatement of the efficacy and safety of docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same.

205. Defendants had a duty to disclose that docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were defective, unreasonably dangerous and that the use of Defendants' docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same carried with them the serious risk of developing disfiguring permanent alopecia as the Plaintiffs has suffered. Defendants breached that duty.

206. Plaintiffs, Plaintiffs' prescribing health care professionals and the general consuming public, had no knowledge of, and no reasonable way of discovering, the defects found in Defendants' docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same or the true risks associated with her use at the time she purchased and used Defendants' docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same.

207. Defendants did not notify, inform, or disclose to Plaintiffs, Plaintiffs' prescribing health care professionals or the general consuming public that Defendants' docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were defective and that their use carried with them the serious risk of developing the injuries Plaintiffs has suffered and complained of herein.

208. Because Defendants failed in their duty to notify Plaintiffs, Plaintiffs' prescribing health care professionals and the general consuming public that their docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were defective and, further, actively attempted to conceal this fact, Defendants should be estopped from asserting defenses based on statutes of limitation.

209. Accordingly, Plaintiffs files this lawsuit within the applicable statutes of limitations, Plaintiffs could not by exercise of reasonable diligence have discovered any wrongdoing, nor could have discovered the causes of her injuries at an earlier time, and when Plaintiffs' injuries were discovered, their causes were not immediately known or knowable based on the lack of necessary

Exhibit A
00061

information, which was suppressed by the Defendants.   Further, the relationship of Plaintiffs' injuries to docetaxel (TAXOTERE®) - and/or the generic non-bioequivalents of same - exposure through the Defendants' drugs was inherently difficult to discover, in part due to the Defendants' knowing suppression of important safety information.   Consequently, the discovery rule should be applied to toll the running of the statutes of limitations until Plaintiffs discovered, or by the exercise of reasonable diligence should have discovered, that Plaintiffs may have a basis for an actionable claim.

### FIRST CLAIM FOR RELIEF

#### (Product Liability for Negligence – Against All Defendants)

210.   Plaintiffs repeats, reiterates, and re-alleges all paragraphs of this Complaint inclusive, with the same force and effect as if fully set forth herein.

211.   Defendants had a duty to exercise reasonable care in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

212.   Defendants failed to exercise reasonable care in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same into interstate commerce in that Defendants knew or should have known that using docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same created a high risk of unreasonable, disfiguring side effects, including personal injuries that are permanent and lasting in nature such as disfiguring permanent alopecia, mental anguish, and diminished enjoyment of life, economic loss, and loss of economic opportunity.

213.   The negligence of Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

Exhibit A
00062

(a) Manufacturing, producing, promoting, formulating, creating, and/or designing docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same without thoroughly testing them;

(b) Manufacturing, producing, promoting, formulating, creating, and/or designing docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same without adequately testing them;

(c) Not conducting sufficient testing programs to determine whether or not docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were safe for use in that Defendants knew or should have known that docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were unsafe and unfit for use by reason of the dangers to their users;

(d) Selling docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same without disclosing their dangers and risks and/or making proper and sufficient tests to determine the dangers and risks to their users;

(e) Negligently failing to adequately and correctly warn Plaintiffs, Plaintiffs' physicians, the public, and the medical and healthcare profession of the dangers of docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same;

(f) Failing to provide adequate instructions regarding safety precautions to be observed by users, handlers, and persons who would reasonably and foreseeably come into contact with, and more particularly, use, docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same;

(g) Failing to test docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same and/or failing to adequately, sufficiently, and properly test docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same;

-41-

COMPLAINT AND DEMAND FOR JURY TRIAL

(h)   Negligently advertising and recommending the use of docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same without sufficient knowledge as to their dangerous propensities;

(i)   Negligently representing that docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were safe for use for their intended purpose, when, in fact, they were unsafe;

(j)   Negligently and falsely representing that docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were superior to other commercially available products designed to treat the same forms of cancer docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were designed to treat;

(k)   Negligently designing docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same in a manner that was dangerous to their users;

(l)   Negligently manufacturing docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same in a manner that was dangerous to their users;

(m)   Negligently producing docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same in a manner that was dangerous to their users;

(n)   Negligently assembling docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same in a manner that was dangerous to their users;

(o)   Concealing information from Plaintiffs, Plaintiffs' physicians, the public, and the FDA in knowing that docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were unsafe, dangerous, and/or non-conforming with FDA regulations; and

(p)   Improperly concealing from and/or misrepresenting information to Plaintiffs, Plaintiffs' physicians, other healthcare professionals, and/or the FDA concerning the severity of risks and dangers of docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same compared to other forms of treatment for breast cancer.

42

COMPLAINT AND DEMAND FOR JURY TRIAL

214.   Defendants underreported, underestimated, and downplayed the serious dangers and risk associated with docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same.

215.   Defendants negligently conveyed that the safety risks and/or dangers of docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were comparable with other forms of treatment for the same conditions for which docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were prescribed to treat.

216.   Defendants were negligent in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same in that they:

(a)   Failed to use due care in designing and manufacturing docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same so as to avoid the aforementioned risks to individuals when docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were used for the treatment of breast cancer;

(b)   Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same;

(c)   Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the risks and dangers associated with docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same;

(d)   Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same;

(e)   Failed to warn Plaintiffs and Plaintiffs' physicians of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity, of the side effects;

(f)   Failed to conduct adequate testing, including pre-clinical and clinical testing and post-marketing surveillance, to determine the safety, dangers, and risks

43

COMPLAINT AND DEMAND FOR JURY TRIAL

1     associated with docetaxel (TAXOTERE®) and/or the generic non-

2     bioequivalents of same;

3     (g)    Failed to warn Plaintiffs and Plaintiffs' physicians before actively

4     encouraging the sale of docetaxel (TAXOTERE®) and/or the generic non-

5     bioequivalents of same, either directly or indirectly, orally or in writing, about

6     the need for more comprehensive and regular medical monitoring than usual

7     to ensure early discovery of potentially serious side effects; and

8     (h)    Were otherwise careless and/or negligent.

9     217.    Despite the fact that Defendants knew or should have known that docetaxel

10 (TAXOTERE®) and/or the generic non-bioequivalents of same caused unreasonably dangerous

11 side effects, Defendants continued and continue to market, manufacture, distribute, and/or sell

12 docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same to consumers, including

13 Plaintiffs.

14     218.    Defendants negligently and improperly failed to perform sufficient tests, forcing

15 Plaintiffs, Plaintiffs' physicians, and/or hospitals to rely on safety information that did not

16 accurately represent the risks and benefits associated with the use of docetaxel (TAXOTERE®)

17 and/or the generic non-bioequivalents of same as compared to other products already commercially

18 available to treat the same types of cancer docetaxel (TAXOTERE®) and/or the generic non-

19 bioequivalents of same were designed to treat.

20     219.    Defendants knew or should have known that consumers such as Plaintiffs would use

21 their product and would foreseeably suffer injury as a result of Defendants' failure to exercise

22 reasonable care, as set forth above.

23     220.    Defendants' negligence was the proximate cause of Plaintiffs' injuries, harms,

24 damages, and losses.

25     221.    As a direct and proximate result of the use of docetaxel (TAXOTERE®) and/or the

26 generic non-bioequivalents of same, Plaintiffs experienced disfiguring permanent alopecia.

27     222.    As a result of the foregoing acts and omissions, Defendants caused Plaintiffs to

28 suffer serious and dangerous side effects, severe and personal injuries that are permanent and

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit A
00066

1   lasting in nature, and economic and non-economic damages, harms, and losses, including but not

2   limited to: past and future medical expenses; psychological counseling and therapy expenses; past

3   and future loss of earnings; past and future loss and impairment of earning capacity; permanent

4   disfigurement including permanent alopecia; mental anguish; severe and debilitating emotional

5   distress; increased risk of future harm; past, present, and future physical and mental pain, suffering,

6   and discomfort; and past, present, and future loss and impairment of the quality and enjoyment of

7   life.

8                          **SECOND CLAIM FOR RELIEF**

9            **(Strict Products Liability – Failure to Warn – Against All Defendants)**

10       223.   The docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same

11   designed, formulated, produced, manufactured, sold, marketed, distributed, supplied and/or placed

12   into the stream of commerce by Defendants were defective in that they failed to include adequate

13   warnings regarding all adverse side effects associated with the use of docetaxel (TAXOTERE®)

14   and/or the generic non-bioequivalents of same. The warnings given by Defendants did not

15   sufficiently and/or accurately reflect the symptoms, type, scope, severity, or duration of the side

16   effects and, in particular, the risks of disfiguring permanent alopecia. As the holder for the RLD of

17   brand-name TAXOTERE®, the Sanofi Defendants supplied the labeling for Winthrop U.S.'s

18   generic version of TAXOTERE®. This labeling was defective because it failed to adequately warn

19   of the risk of disfiguring permanent alopecia.

20       224.   Defendants failed to provide adequate warnings to physicians and users, including

21   Plaintiffs' physicians and Plaintiffs, of the increased risk of disfiguring permanent alopecia

22   associated with docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same, and

23   Defendants aggressively and fraudulently promoted the product to physicians.

24       225.   As a direct and proximate result of Defendants' failure to warn of the potentially

25   severe adverse effects of docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same,

26   Plaintiffs suffered disfiguring permanent alopecia and other conditions.

27       226.   As a result of the foregoing acts and omissions, Defendants caused Plaintiffs to

28   suffer serious and dangerous side effects, severe and personal injuries that are permanent and

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit A
00067

1   lasting in nature, and economic and non-economic damages, harms, and losses, including but not

2   limited to: past and future medical expenses; psychological counseling and therapy expenses; past

3   and future loss of earnings; past and future loss and impairment of earning capacity; permanent

4   disfigurement including permanent alopecia; mental anguish; severe and debilitating emotional

5   distress; increased risk of future harm; past, present, and future physical and mental pain, suffering,

6   and discomfort; and past, present, and future loss and impairment of the quality and enjoyment of

7   life.

8   ### THIRD CLAIM FOR RELIEF

9   ### (Fraudulent Misrepresentation – Against All Defendants)

10      227.   Plaintiffs repeats, reiterates, and realleges all paragraphs of this Complaint, with the

11  same force and effect as if fully set forth herein.

12      228.   Defendants falsely and fraudulently represented to Plaintiffs, Plaintiffs' physicians,

13  the medical and healthcare community, and the public in general that docetaxel (TAXOTERE®)

14  and/or the generic non-bioequivalents of same had been tested and were found to be safe and

15  effective for the treatment of certain forms of cancer.

16      229.   When warning of safety and risks of docetaxel (TAXOTERE®) and/or the generic

17  non-bioequivalents of same, Defendants fraudulently represented to Plaintiffs, Plaintiffs'

18  physicians, the medical and healthcare community, and the public in general that docetaxel

19  (TAXOTERE®) and/or the generic non-bioequivalents of same had been tested and were found to

20  be safe and/or effective for their indicated use.

21      230.   Defendants concealed their knowledge of docetaxel's (TAXOTERE®'s) and/or the

22  generic non-bioequivalents of same's defects from Plaintiffs, Plaintiffs' physicians, and the public

23  in general and/or the medical community specifically.

24      231.   Defendants concealed their knowledge of the defects in their products from

25  Plaintiffs, Plaintiffs' physicians, hospitals, pharmacists, and the public in general.

26      232.   Defendants made these false representations with the intent of defrauding and

27  deceiving Plaintiffs, Plaintiffs' physicians, the public in general, and the medical and healthcare

28  community in particular, and were made with the intent of inducing Plaintiffs, Plaintiffs'

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit A
00068

1  physicians, the public in general, and the medical community in particular, to recommend, dispense,

2  and/or purchase docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same for use

3  in the treatments of various forms of cancer, including but not limited to breast cancer, all of which

4  evidenced a callous, reckless, willful, wanton, and depraved indifference to the health, safety, and

5  welfare of Plaintiffs.

6      233.  Defendants made these false representations with the intent of defrauding and

7  deceiving Plaintiffs, Plaintiffs' physicians, as well as the public in general, and the medical and

8  healthcare community in particular, and were made with the intent of inducing the public in general,

9  and the medical community in particular, to recommend, dispense, and/or purchase docetaxel

10  (TAXOTERE®) and/or the generic non-bioequivalents of same for use in the treatments of various

11  forms of cancer, including but not limited to breast cancer.

12     234.  When  Defendants  made  these  representations,  Defendants  knew  those

13  representations were false, and Defendants willfully, wantonly, and recklessly disregarded whether

14  the representations were true.

15     235.  At the time Defendants made the aforesaid representations, and, at the time Plaintiffs

16  used docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same, Plaintiffs and

17  Plaintiffs' physicians were unaware of the falsity of Defendants' representations, and Plaintiffs and

18  Plaintiffs' physicians reasonably believed them to be true.

19     236.  In reliance upon Defendants' representations, Plaintiffs and Plaintiffs' physicians

20  were induced to and did use and prescribe docetaxel (TAXOTERE®) and/or the generic non-

21  bioequivalents of same, which caused Plaintiffs to sustain severe, permanent, and disfiguring

22  personal injuries.

23     237.  Defendants knew and were aware or should have been aware that docetaxel

24  (TAXOTERE®) and/or the generic non-bioequivalents of same had not been sufficiently tested,

25  were defective in nature, and/or that they lacked adequate and/or sufficient warnings.

26     238.  Defendants knew or should have known that docetaxel (TAXOTERE®) and/or the

27  generic non-bioequivalents of same had a potential to, could, and would cause severe and grievous

28  injury to the users of docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same and

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit A
00069

1    that docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were inherently
2    dangerous in a manner that exceeded any purported, inaccurate, and/or down-played warnings.

3         239.   Defendants brought docetaxel (TAXOTERE®) and/or the generic non-
4    bioequivalents of same to the market and acted fraudulently, wantonly, and maliciously to the
5    detriment of Plaintiffs.

6         240.   As a result of the foregoing acts and omissions, Defendants caused Plaintiff to suffer
7    serious and dangerous side effects, severe and personal injuries that are permanent and lasting in
8    nature, and economic and non-economic damages, harms, and losses, including but not limited to:
9    past and future medical expenses; psychological counseling and therapy expenses; past and future
10   loss of earnings; past and future loss and impairment of earning capacity; permanent disfigurement
11   including permanent alopecia; mental anguish; severe and debilitating emotional distress; increased
12   risk of future harm; past, present, and future physical and mental pain, suffering, and discomfort;
13   and past, present, and future loss and impairment of the quality and enjoyment of life.

14                              **FOURTH CLAIM FOR RELIEF**

15                    **(Fraudulent Concealment – Against All Defendants)**

16        241.   Plaintiffs repeats, reiterates, and realleges all paragraphs of this Complaint, with the
17   same force and effect as if fully set forth herein.

18        242.   At all times during the course of dealing between Defendants and Plaintiffs and
19   Plaintiffs' healthcare providers, Defendants misrepresented the design characteristics and safety of
20   docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same for their intended use.

21        243.   Defendants knew or were reckless in not knowing that their representations were
22   false.

23        244.   In representations made to Plaintiffs and Plaintiffs' healthcare providers, Defendants
24   fraudulently concealed and intentionally omitted the following material information:

25             (a)    that docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of
26                    same were not as safe as other forms of treatment for which docetaxel
27                    (TAXOTERE®) and/or the generic non-bioequivalents of same were
28                    marketed and sold to cancer patients;

                                        48
                        COMPLAINT AND DEMAND FOR JURY TRIAL

(b) that the risks of adverse events with docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were higher than those with other forms of treatment for which docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were marketed and sold to cancer patients;

(c) that the risks of adverse events with docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were not adequately tested and/or known by Defendants;

(d) that Defendants were aware of dangers in docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same, in addition to and above and beyond those associated with other forms of treatment for cancer patients;

(e) that docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were defective in that they caused dangerous side effects as well as other severe and permanent health consequences in a much more and significant rate than other forms of treatment for cancer patients;

(f) that docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were manufactured negligently;

(g) that docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were manufactured defectively;

(h) that docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were manufactured improperly;

(i) that docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were designed negligently;

(j) that Docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were designed defectively; and

(k) that docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were designed improperly.

245. Defendants had a duty to disclose to Plaintiffs, Plaintiffs' physicians, hospitals, and/or healthcare providers the defective nature of docetaxel (TAXOTERE®) and/or the generic

49

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit A
00071

1  non-bioequivalents of same, including but not limited to the heightened risks of disfiguring
2  permanent alopecia.

3      246.   Defendants had sole access to material facts concerning the defective nature of
4  docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same and their propensity to
5  cause serious and dangerous side effects, and therefore cause damage to persons who used
6  docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same, including Plaintiffs, in
7  particular.

8      247.   Defendants' concealment and omissions of material facts concerning the safety of
9  docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were made purposefully,
10  willfully, wantonly, and/or recklessly to mislead Plaintiffs, Plaintiffs' physicians, hospitals, and
11  healthcare providers into reliance on the continued use of Docetaxel (TAXOTERE®) and/or the
12  generic non-bioequivalents of same and to cause them to purchase, prescribe, and/or dispense
13  docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same and/or use docetaxel
14  (TAXOTERE®) and/or the generic non-bioequivalents of same.

15      248.   Defendants knew that Plaintiffs, Plaintiffs' physicians, hospitals, and/or healthcare
16  providers had no way to determine the truth behind Defendants' concealment and omissions,
17  including the material omissions of facts surrounding docetaxel (TAXOTERE®) and/or the generic
18  non-bioequivalents of same set forth herein.

19      249.   Plaintiffs, Plaintiffs' physicians, healthcare providers, and/or hospitals reasonably
20  relied on information revealed by Defendants that negligently, fraudulently, and/or purposefully did
21  not include facts that were concealed and/or omitted by Defendants.

22      250.   As a result of the foregoing acts and omissions, Defendants caused Plaintiffs to
23  suffer serious and dangerous side effects, severe and personal injuries that are permanent and
24  lasting in nature, and economic and non-economic damages, harms, and losses, including but not
25  limited to: past and future medical expenses; psychological counseling and therapy expenses; past
26  and future loss of earnings; past and future loss and impairment of earning capacity; permanent
27  disfigurement including permanent alopecia; mental anguish; severe and debilitating emotional
28  distress; increased risk of future harm; past, present, and future physical and mental pain, suffering,

Exhibit A
00072

1  and discomfort; and past, present, and future loss and impairment of the quality and enjoyment of

2  life.

3  / / /

4  ### FIFTH CLAIM FOR RELIEF

5  ### (Strict Product Liability for Misrepresentation – Against All Defendants)

6  251.  Plaintiffs repeats, reiterates, and re-alleges all paragraphs of this Complaint, with the

7  same force and effect as if fully set forth herein.

8  252.  Defendants sold the docetaxel (TAXOTERE®) and/or the generic non-

9  bioequivalents of same that Plaintiffs' physician prescribed for Plaintiffs and that Plaintiffs used.

10  253.  Defendants were engaged in the business of selling the docetaxel (TAXOTERE®)

11  and/or the generic non-bioequivalents of same for resale, use, or consumption.

12  254.  Defendants misrepresented facts as set forth herein concerning the character or

13  quality of the docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same that would

14  be material to potential prescribers and purchasers or users of the product.

15  255.  Defendants' misrepresentations were made to potential prescribers and/or purchasers

16  or users as members of the public at large.

17  256.  As a purchaser or user, Plaintiffs reasonably relied on the misrepresentation.

18  257.  Plaintiffs was a person who would reasonably be expected to use, consume, or be

19  affected by the docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same.

20  258.  As a result of the foregoing acts and omissions, Defendants caused Plaintiffs to

21  suffer serious and dangerous side effects, severe and personal injuries that are permanent and

22  lasting in nature, and economic and non-economic damages, harms, and losses, including but not

23  limited to: past and future medical expenses; psychological counseling and therapy expenses; past

24  and future loss of earnings; past and future loss and impairment of earning capacity; permanent

25  disfigurement including permanent alopecia; mental anguish; severe and debilitating emotional

26  distress; increased risk of future harm; past, present, and future physical and mental pain, suffering,

27  and discomfort; and past, present, and future loss and impairment of the quality and enjoyment of

28  life.

51

COMPLAINT AND DEMAND FOR JURY TRIAL

## SIXTH CLAIM FOR RELIEF

### (Fraud and Deceit – Against All Defendants)

259.   Plaintiffs repeats, reiterates, and realleges all paragraphs of this Complaint, with the same force and effect as if fully set forth herein.

260.   Defendants committed fraud by omission in applying for and gaining patent protection for docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same resulting in increased sales and market penetration. This increased market penetration was the proximal cause of Plaintiffs' exposure to the side effects of docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same.

261.   Defendants fraudulently claimed superior efficacy over other products designed to treat the same conditions for which docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were designed to treat. These fraudulent representations were the proximal cause of Plaintiffs' exposure to the side effects of docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same.

262.   As a result of Defendants' research and testing, or lack thereof, Defendants intentionally distributed false information, including but not limited to assuring Plaintiffs, Plaintiffs' physicians, hospitals, healthcare professionals, and/or the public that docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were safe and effective for use in the treatment of various forms of cancer, including breast cancer.

263.   As a result of Defendants' research and testing, or lack thereof, Defendants intentionally omitted certain results of testing and/or research to Plaintiffs, Plaintiffs' physicians, healthcare professionals, and/or the public.

264.   Defendants had a duty when disseminating information to Plaintiffs, Plaintiffs' physicians, and the public to disseminate truthful information.

265.   Defendants had a duty when disseminating information to Plaintiffs, Plaintiffs' physicians, and the public not to deceive Plaintiffs, Plaintiffs' physicians, and/or the public.

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit A
00074

266.   The information Defendants distributed to Plaintiffs, Plaintiffs' physicians, and the public, including but not limited to reports, press releases, advertising campaigns, and other forms of media contained material representations of fact and/or omissions.

267.   The information Defendants distributed to Plaintiffs, Plaintiffs' physicians, and the public intentionally included false representations that Defendants' drug docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were safe and effective for the treatment of various forms of cancer, including breast cancer.

268.   The information Defendants distributed to Plaintiffs, Plaintiffs' physicians, and the public intentionally included false representations that Defendants' drug docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same carried the same risks, hazards, and/or dangers as other forms of treatment for the same conditions for which docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were designed to treat.

269.   The information Defendants distributed to Plaintiffs, Plaintiffs' physicians, and the public intentionally included false representations that docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were not injurious to the health and/or safety of their intended users.

270.   The information Defendants distributed to Plaintiffs, Plaintiffs' physicians, and the public intentionally included false representations that docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were no more injurious to the health and/or safety of their intended users as other forms of cancer treatments for which docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were designed to treat.

271.   These representations by Defendants were all false and misleading.

272.   Defendants intentionally suppressed, ignored, and disregarded test results not favorable to Defendants and that demonstrated that docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were not safe as a means of treatment for certain types of cancer for which docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were designed to treat.

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit A
00075

273.   Defendants intentionally made material misrepresentations to Plaintiffs, Plaintiffs' physicians, and the public, including the medical profession, regarding the safety of docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same, specifically but not limited to docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same not having dangerous and serious health and/or safety concerns.

274.   Defendants intentionally made material misrepresentations to Plaintiffs, Plaintiffs' physicians, and the public in general, including the medical profession, regarding the safety of docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same, specifically but not limited to docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same being as safe as other products designed to treat the same conditions docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were designed to treat.

275.   It was Defendants' intent and purpose in making these false representations to deceive and defraud Plaintiffs, Plaintiffs' physicians, and/or the public and to gain the confidence of Plaintiffs, Plaintiffs' physicians, the public, and/or healthcare professionals to falsely ensure the quality and fitness for use of docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same and induce Plaintiffs, Plaintiffs' physicians, and the public, including the medical profession, to purchase, request, dispense, prescribe, recommend, and/or continue to use docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same.

276.   Defendants made the aforementioned false claims and false representations with the intent of convincing Plaintiffs, Plaintiffs' physicians, the public, and/or healthcare professionals that docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were fit and safe for use as treatment for certain types of cancer, including breast cancer.

277.   Defendants made the aforementioned false claims and false representations with the intent of convincing Plaintiffs, Plaintiffs' physicians, the public, and/or healthcare professionals that docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were fit and safe for use as treatment of certain forms of cancer and did not pose risks, dangers, or hazards above and beyond those identified and/or associated with other forms of treatment for which docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were designed to treat.

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit A
00076

278. Defendants made false claims and false representations in their documents submitted to Plaintiffs, Plaintiffs' physicians, the public and healthcare professionals that docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same did not present risks related to disfigurement secondary to permanent alopecia.

279. Defendants made false claims and false representations in their documents submitted to Plaintiffs, Plaintiffs' physicians, the public, and healthcare professionals that docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same did not present health and/or safety risks greater than other forms of treatment for the same conditions docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were designed to treat.

280. Defendants made these and other representations with a pretense of actual knowledge when Defendants had no knowledge of the truth or falsity of these representations, and Defendants made these representations recklessly and without regard to the actual facts.

281. Defendants made these and other representations with the intention of deceiving and defrauding Plaintiffs and Plaintiffs' respective healthcare professionals.

282. Defendants made these and other representations in order to induce Plaintiffs and Plaintiffs' respective healthcare professionals to rely upon the misrepresentations.

283. Defendants' false misrepresentations caused Plaintiffs and/or Plaintiffs' healthcare professionals to purchase, use, rely on, request, dispense, recommend, and/or prescribe docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same.

284. Defendants recklessly and intentionally falsely represented the dangerous and serious health and/or safety concerns of docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same to the public at large, and Plaintiffs and Plaintiffs' physicians in particular, for the purpose of influencing the marketing of a product Defendants knew were dangerous and defective and/or not as safe as other alternatives, including other forms of treatment for cancer.

285. Defendants willfully and intentionally failed to disclose, concealed, and/or suppressed the material facts regarding the dangerous and serious health and/or safety concerns related to docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same.

COMPLAINT AND DEMAND FOR JURY TRIAL

286.  Defendants willfully and intentionally failed to disclose the truth and material facts related to docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same and made false representations with the purpose and design of deceiving and lulling Plaintiffs and Plaintiffs' respective healthcare professionals into a sense of security so that Plaintiffs and Plaintiffs' healthcare professionals would rely on Defendants' representations to purchase, use, dispense, prescribe, and/or recommend docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same.

287.  Defendants, through their public relations efforts, which included but were not limited to public statements and press releases, knew or should have known that the public, including Plaintiffs and Plaintiffs' respective healthcare professionals, would rely upon the information being disseminated.

288.  Plaintiffs and/or Plaintiffs' respective healthcare professionals did in fact rely on and believe Defendants' false representations to be true at the time they were made, and they relied upon Defendants' false representations and superior knowledge of how docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same would treat certain forms of cancer for which docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same were designed to treat.

289.  At the time Defendants' false representations were made, Plaintiff and/or Plaintiffs' respective healthcare providers did not know the truth and were not with reasonable diligence able to discover the truth with regard to the dangerous and serious health and/or safety concerns of docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same.

290.  Plaintiffs and her healthcare providers did not discover the true facts with respect to Defendants' false representations and the dangerous and serious health and/or safety concerns of docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same, and Plaintiffs and her healthcare providers with reasonable diligence could not have discovered the true facts.

291.  Had Plaintiffs and her healthcare providers known the true facts with respect to the dangerous and serious health and/or safety concerns of docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same, Plaintiffs would not have purchased, used, and/or relied on Defendants' drug docetaxel (TAXOTERE®) and/or the generic non-bioequivalents of same.

Exhibit A
00078

1    292.  Defendants' aforementioned conduct constitutes fraud and deceit, and it was

2  committed and/or perpetrated willfully, wantonly, and/or purposefully on Plaintiffs.

3    293.  As a result of the foregoing acts and omissions, Defendants caused Plaintiffs to

4  suffer serious and dangerous side effects, severe and personal injuries that are permanent and

5  lasting in nature, and economic and non-economic damages, harms, and losses, including but not

6  limited to: past and future medical expenses; psychological counseling and therapy expenses; past

7  and future loss of earnings; past and future loss and impairment of earning capacity; permanent

8  disfigurement including permanent alopecia; mental anguish; severe and debilitating emotional

9  distress; increased risk of future harm; past, present, and future physical and mental pain, suffering,

10  and discomfort; and past, present, and future loss and impairment of the quality and enjoyment of

11  life.

12    294.  Plaintiffs are entitled to treble damages, exemplary damages, attorneys' fees, and

13  costs.

14                    **SEVENTH CLAIM FOR RELIEF**

15              **(Extreme and Outrageous Conduct / Intentional Infliction**

16                  **of Emotional Distress – Against All Defendants)**

17    295.  Plaintiffs repeats, reiterates, and realleges all paragraphs of this Complaint, with the

18  same force and effect as if fully set forth herein.

19    296.  Defendants' conduct, as set forth above, was extreme and outrageous.

20    297.  Defendants' actions were done recklessly or with the intent of causing Plaintiffs

21  severe emotional distress; and

22    298.  Defendants' conduct caused Plaintiffs severe emotional distress.

23    299.  As a result of the foregoing acts and omissions, Defendants caused Plaintiff to suffer

24  serious and dangerous side effects, severe and personal injuries that are permanent and lasting in

25  nature, and economic and non-economic damages, harms, and losses, including but not limited to:

26  past and future medical expenses; psychological counseling and therapy expenses; past and future

27  loss of earnings; past and future loss and impairment of earning capacity; permanent disfigurement

28  including permanent alopecia; mental anguish; severe and debilitating emotional distress; increased

COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit A
00079

1  risk of future harm; past, present, and future physical and mental pain, suffering, and discomfort;

2  and past, present, and future loss and impairment of the quality and enjoyment of life.

3  **PRAYER FOR RELIEF**

4          WHEREFORE, Plaintiffs judgment against Defendants Sanofi US Services Inc. f/k/a Sanofi-

5  Aventis U.S. Inc., Sanofi-Aventis U.S. LLC separately, and doing business as Winthrop U.S.,

6  Accord Healthcare, Inc.; Hospira Worldwide, LLC f/k/a Hospira Worldwide, Inc., Hospira, Inc.,

7  Sun Pharma Global FZE, Sun Pharmaceutical Industries, Inc. f/k/a Caraco Pharmaceutical

8  Laboratories Ltd., and McKesson Corporation d/b/a McKesson Packaging in an amount to be

9  determined at trial by the trier of fact for her injuries, harms, damages, and losses as set forth above,

10  special damages, treble damages, costs, expert witness fees, attorneys' fees, filing fees, pre- and

11  post-judgment interest, all other injuries and damages as shall be proven at trial, and such other

12  further relief as the Court may deem appropriate, just, and proper.

13  **JURY DEMAND**

14          Plaintiffs demands a trial by jury on all issues so triable.

15

16  DATED: August 22, 2018                    Respectfully submitted,

17

18

19                                          By: _____

20                                          Jennifer A. Lenze
                                            **LENZE LAWYERS, PLC**
21                                          *Attorneys for Plaintiffs*

22

23                                          Lowell W. Finson (SBN 275586)
                                            **FINSON LAW FIRM**
24                                          126 Westwind Mall
                                            Marina del Rey, CA 90292
25                                          Telephone: (602) 377-2903
                                            Facsimile: (310) 425-3278
26                                          lowell@finsonlawfirm.com
                                            *Attorneys for Plaintiffs*
27

28

58

COMPLAINT AND DEMAND FOR JURY TRIAL

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>111 North Hill Street, Los Angeles, CA 90012 | CONFORMED COPY<br>ORIGINAL FILED<br>Superior Court of California<br>County of Los Angeles<br><br>AUG 2 3 2018<br><br>Sherri R. Carter, Executive Officer/Clerk<br>By: Rita Nazaryan, Deputy |
| NOTICE OF CASE ASSIGNMENT<br><br>UNLIMITED CIVIL – CLASS ACTION/COMPLEX | |
| Your case is assigned for all purposes to the judicial officer indicated below. | CASE NUMBER:<br>BC717326 |

THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

| ASSIGNED JUDGE | DEPT | ROOM | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|
| Hon. Elihu M. Berle | 6 | 211 | | | | |
| Hon. William F. Highberger | 10 | 10 | | | | |
| Hon. John Shepard Wiley, Jr. | 9 | 9 | | | | |
| Hon. Kenneth Freeman | 14 | 14 | | | | |
| Hon. Ann Jones | 11 | 11 | | | | |
| Hon. Maren E. Nelson | 17 | 17 | | | | |
| Hon. Carolyn B. Kuhl | 12 | 12 | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | Hon. Brian S. Currey | 15 | 15 |
| | | | | *Provisional complex (non-class action) case assignment pending complex determination | 14 | Supervising Judge 14 |

Given to the Plaintiff/Cross-Complainant/Attorney of Record

on ___AUG 2 3 2018___

SHERRI R. CARTER, Executive Officer/Clerk of Court

By ___RITA NAZARYAN___, Deputy Clerk

LACIV 190 (Rev 12/17)     **NOTICE OF CASE ASSIGNMENT -- UNLIMITED CIVIL CASE**
LASC Approved 05/06

Exhibit A
00081

<u>INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES</u>

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

## APPLICATION
The Division 7 Rules were effective January 1, 2007. They apply to all general civil cases.

## PRIORITY OVER OTHER RULES
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

## CHALLENGE TO ASSIGNED JUDGE
A challenge under Code of Civil Procedure Section 170.6 must be made within **15 days** after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

## TIME STANDARDS
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

## COMPLAINTS
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

## CROSS-COMPLAINTS
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed. Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

## STATUS CONFERENCE
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint. Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

## FINAL STATUS CONFERENCE
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date. All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference. These matters may be heard and resolved at this conference. At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

## SANCTIONS
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules. Such sanctions may be on a party, or if appropriate, on counsel for a party.

This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction. Careful reading and compliance with the actual Chapter Rules is imperative.

## Class Actions
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

## *Provisionally Complex Cases
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status. If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

Exhibit A
00082

## VOLUNTARY EFFICIENT LITIGATION STIPULATIONS



**Superior Court of California
County of Los Angeles**



**Los Angeles County
Bar Association
Litigation Section**

**Los Angeles County
Bar Association Labor and
Employment Law Section**



**Consumer Attorneys
Association of Los Angeles**



**Southern California
Defense Counsel**



**Association of
Business Trial Lawyers**



**California Employment
Lawyers Association**

LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use

The Early Organizational Meeting Stipulation, Discovery Resolution Stipulation, and Motions in Limine Stipulation are voluntary stipulations entered into by the parties. The parties may enter into one, two, or all three of the stipulations; however, they may not alter the stipulations as written, because the Court wants to ensure uniformity of application. These stipulations are meant to encourage cooperation between the parties and to assist in resolving issues in a manner that promotes economic case resolution and judicial efficiency.

*The following organizations endorse the goal of promoting efficiency in litigation and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases.*

◆**Los Angeles County Bar Association Litigation Section**◆

◆ **Los Angeles County Bar Association
Labor and Employment Law Section**◆

◆**Consumer Attorneys Association of Los Angeles**◆

◆**Southern California Defense Counsel**◆

◆**Association of Business Trial Lawyers**◆

◆**California Employment Lawyers Association**◆

Exhibit A
00083

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | FAX NO. (Optional): | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| STIPULATION – EARLY ORGANIZATIONAL MEETING | CASE NUMBER: |
|---|---|

**This stipulation is intended to encourage cooperation among the parties at an early stage in the litigation and to assist the parties in efficient case resolution.**

**The parties agree that:**

1. The parties commit to conduct an initial conference (in-person or via teleconference or via videoconference) within 15 days from the date this stipulation is signed, *to discuss and consider whether there can be agreement on the following:*

   a. Are motions to challenge the pleadings necessary? If the issue can be resolved by amendment as of right, or if the Court would allow leave to amend, could an amended complaint resolve most or all of the issues a demurrer might otherwise raise? If so, the parties agree to work through pleading issues so that a demurrer need only raise issues they cannot resolve. Is the issue that the defendant seeks to raise amenable to resolution on demurrer, or would some other type of motion be preferable? Could a voluntary targeted exchange of documents or information by any party cure an uncertainty in the pleadings?

   b. Initial mutual exchanges of documents at the "core" of the litigation. (For example, in an employment case, the employment records, personnel file and documents relating to the conduct in question could be considered "core." In a personal injury case, an incident or police report, medical records, and repair or maintenance records could be considered "core.");

   c. Exchange of names and contact information of witnesses;

   d. Any insurance agreement that may be available to satisfy part or all of a judgment, or to indemnify or reimburse for payments made to satisfy a judgment;

   e. Exchange of any other information that might be helpful to facilitate understanding, handling, or resolution of the case in a manner that preserves objections or privileges by agreement;

   f. Controlling issues of law that, if resolved early, will promote efficiency and economy in other phases of the case. Also, when and how such issues can be presented to the Court;

   g. Whether or when the case should be scheduled with a settlement officer, what discovery or court ruling on legal issues is reasonably required to make settlement discussions meaningful, and whether the parties wish to use a sitting judge or a private mediator or other options as

LACIV 229 (Rev 02/15)
LASC Approved 04/11
For Optional Use

**STIPULATION – EARLY ORGANIZATIONAL MEETING**

Page 1 of 2

Exhibit A
00084

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

discussed in the "Alternative Dispute Resolution (ADR) Information Package" served with the complaint;

h.  Computation of damages, including documents, not privileged or protected from disclosure, on which such computation is based;

i.  Whether the case is suitable for the Expedited Jury Trial procedures (see information at *www.lacourt.org* under "*Civil*" and then under "*General Information*").

2.  The time for a defending party to respond to a complaint or cross-complaint will be extended to _____ for the complaint, and _____ for the cross-
        (INSERT DATE)                                                    (INSERT DATE)
complaint, which is comprised of the 30 days to respond under Government Code § 68616(b), and the 30 days permitted by Code of Civil Procedure section 1054(a), good cause having been found by the Civil Supervising Judge due to the case management benefits provided by this Stipulation. A copy of the General Order can be found at *www.lacourt.org* under "*Civil*", click on "*General Information*", then click on "*Voluntary Efficient Litigation Stipulations*".

3.  The parties will prepare a joint report titled "Joint Status Report Pursuant to Initial Conference and Early Organizational Meeting Stipulation, and if desired, a proposed order summarizing results of their meet and confer and advising the Court of any way it may assist the parties' efficient conduct or resolution of the case. The parties shall attach the Joint Status Report to the Case Management Conference statement, and file the documents when the CMC statement is due.

4.  References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day

The following parties stipulate:

Date:

_____                    ➤ _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR PLAINTIFF)

Date:

_____                    ➤ _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR DEFENDANT)

Date:

_____                    ➤ _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR DEFENDANT)

Date:

_____                    ➤ _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR DEFENDANT)

Date:

_____                    ➤ _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR _____)

Date:

_____                    ➤ _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR _____)

_____                    ➤ _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR _____)

LACIV 229 (Rev 02/15)        **STIPULATION -- EARLY ORGANIZATIONAL MEETING**        Page 2 of 2
LASC Approved 04/11

Exhibit A
00085

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.: | FAX NO. (Optional): | |
| E-MAIL ADDRESS (Optional): | | |
| ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **STIPULATION – DISCOVERY RESOLUTION** | CASE NUMBER: |
|---|---|

This stipulation is intended to provide a fast and informal resolution of discovery issues through limited paperwork and an informal conference with the Court to aid in the resolution of the issues.

The parties agree that:

1. Prior to the discovery cut-off in this action, no discovery motion shall be filed or heard unless the moving party first makes a written request for an Informal Discovery Conference pursuant to the terms of this stipulation.

2. At the Informal Discovery Conference the Court will consider the dispute presented by parties and determine whether it can be resolved informally. Nothing set forth herein will preclude a party from making a record at the conclusion of an Informal Discovery Conference, either orally or in writing.

3. Following a reasonable and good faith attempt at an informal resolution of each issue to be presented, a party may request an Informal Discovery Conference pursuant to the following procedures:

    a. The party requesting the Informal Discovery Conference will:

        i. File a Request for Informal Discovery Conference with the clerk's office on the approved form (copy attached) and deliver a courtesy, conformed copy to the assigned department;

        ii. Include a brief summary of the dispute and specify the relief requested; and

        iii. Serve the opposing party pursuant to any authorized or agreed method of service that ensures that the opposing party receives the Request for Informal Discovery Conference no later than the next court day following the filing.

    b. Any Answer to a Request for Informal Discovery Conference must:

        i. Also be filed on the approved form (copy attached);

        ii. Include a brief summary of why the requested relief should be denied;

**STIPULATION – DISCOVERY RESOLUTION**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

    iii.   Be filed within two (2) court days of receipt of the Request; and

    iv.   Be served on the opposing party pursuant to any authorized or agreed upon method of service that ensures that the opposing party receives the Answer no later than the next court day following the filing.

  c.  No other pleadings, including but not limited to exhibits, declarations, or attachments, will be accepted.

  d.  If the Court has not granted or denied the Request for Informal Discovery Conference within ten (10) days following the filing of the Request, then it shall be deemed to have been denied.  If the Court acts on the Request, the parties will be notified whether the Request for Informal Discovery Conference has been granted or denied and, if granted, the date and time of the Informal Discovery Conference, which must be within twenty (20) days of the filing of the Request for Informal Discovery Conference.

  e.  If the conference is not held within twenty (20) days of the filing of the Request for Informal Discovery Conference, unless extended by agreement of the parties and the Court, then the Request for the Informal Discovery Conference shall be deemed to have been denied at that time.

4.  If (a) the Court has denied a conference or (b) one of the time deadlines above has expired without the Court having acted or (c) the Informal Discovery Conference is concluded without resolving the dispute, then a party may file a discovery motion to address unresolved issues.

5.  The parties hereby further agree that the time for making a motion to compel or other discovery motion is tolled from the date of filing of the Request for Informal Discovery Conference until (a) the request is denied or deemed denied or (b) twenty (20) days after the filing of the Request for Informal Discovery Conference, whichever is earlier, unless extended by Order of the Court.

It is the understanding and intent of the parties that this stipulation shall, for each discovery dispute to which it applies, constitute a writing memorializing a "specific later date to which the propounding [or demanding or requesting] party and the responding party have agreed in writing," within the meaning of Code Civil Procedure sections 2030.300(c), 2031.320(c), and 2033.290(c).

6.  Nothing herein will preclude any party from applying *ex parte* for appropriate relief, including an order shortening time for a motion to be heard concerning discovery.

7.  Any party may terminate this stipulation by giving twenty-one (21) days notice of intent to terminate the stipulation.

8.  References to "days" mean calendar days, unless otherwise noted.  If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day.

Exhibit A
00087

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

**The following parties stipulate:**

Date:

_____          ➤  _____
(TYPE OR PRINT NAME)                          (ATTORNEY FOR PLAINTIFF)

Date:

_____          ➤  _____
(TYPE OR PRINT NAME)                          (ATTORNEY FOR DEFENDANT)

Date:

_____          ➤  _____
(TYPE OR PRINT NAME)                          (ATTORNEY FOR DEFENDANT)

Date:

_____          ➤  _____
(TYPE OR PRINT NAME)                          (ATTORNEY FOR DEFENDANT)

Date:

_____          ➤  _____
(TYPE OR PRINT NAME)                          (ATTORNEY FOR _____ )

Date:

_____          ➤  _____
(TYPE OR PRINT NAME)                          (ATTORNEY FOR _____ )

Date:

_____          ➤  _____
(TYPE OR PRINT NAME)                          (ATTORNEY FOR _____ )

Exhibit A
00088

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:            FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | | |

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **INFORMAL DISCOVERY CONFERENCE**<br>(pursuant to the Discovery Resolution Stipulation of the parties) | CASE NUMBER: |
|---|---|

1. This document relates to:

   ☐ Request for Informal Discovery Conference
   ☐ Answer to Request for Informal Discovery Conference

2. Deadline for Court to decide on Request: _____ (insert date 10 calendar days following filing of the Request).

3. Deadline for Court to hold Informal Discovery Conference: _____ (insert date 20 calendar days following filing of the Request).

4. **For a Request for Informal Discovery Conference, <u>briefly</u> describe the nature of the discovery dispute, including the facts and legal arguments at issue.  For an Answer to Request for Informal Discovery Conference, <u>briefly</u> describe why the Court should deny the requested discovery, including the facts and legal arguments at issue.**

**INFORMAL DISCOVERY CONFERENCE**
(pursuant to the Discovery Resolution Stipulation of the parties)

Exhibit A
00089

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:                    FAX NO. (Optional): E-MAIL ADDRESS (Optional): ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| STIPULATION AND ORDER – MOTIONS IN LIMINE | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide fast and informal resolution of evidentiary issues through diligent efforts to define and discuss such issues and limit paperwork.**

**The parties agree that:**

1. At least _____ days before the final status conference, each party will provide all other parties with a list containing a one paragraph explanation of each proposed motion in limine. Each one paragraph explanation must identify the substance of a single proposed motion in limine and the grounds for the proposed motion.

2. The parties thereafter will meet and confer, either in person or via teleconference or videoconference, concerning all proposed motions in limine. In that meet and confer, the parties will determine:

   a. Whether the parties can stipulate to any of the proposed motions. If the parties so stipulate, they may file a stipulation and proposed order with the Court.

   b. Whether any of the proposed motions can be briefed and submitted by means of a short joint statement of issues. For each motion which can be addressed by a short joint statement of issues, a short joint statement of issues must be filed with the Court 10 days prior to the final status conference. Each side's portion of the short joint statement of issues may not exceed three pages. The parties will meet and confer to agree on a date and manner for exchanging the parties' respective portions of the short joint statement of issues and the process for filing the short joint statement of issues.

3. All proposed motions in limine that are not either the subject of a stipulation or briefed via a short joint statement of issues will be briefed and filed in accordance with the California Rules of Court and the Los Angeles Superior Court Rules.

Exhibit A
00090

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

**The following parties stipulate:**

Date: _____

_____
(TYPE OR PRINT NAME)

Date: _____

_____
(TYPE OR PRINT NAME)

Date: _____

_____
(TYPE OR PRINT NAME)

Date: _____

_____
(TYPE OR PRINT NAME)

Date: _____

_____
(TYPE OR PRINT NAME)

Date: _____

_____
(TYPE OR PRINT NAME)

Date: _____

_____
(TYPE OR PRINT NAME)

➢ _____
(ATTORNEY FOR PLAINTIFF)

➢ _____
(ATTORNEY FOR DEFENDANT)

➢ _____
(ATTORNEY FOR DEFENDANT)

➢ _____
(ATTORNEY FOR DEFENDANT)

➢ _____
(ATTORNEY FOR _____)

➢ _____
(ATTORNEY FOR _____)

➢ _____
(ATTORNEY FOR _____)

**THE COURT SO ORDERS.**

Date: _____

_____
JUDICIAL OFFICER

Exhibit A
00091

# Superior Court of California
# County of Los Angeles



# ALTERNATIVE DISPUTE RESOLUTION (ADR)
# INFORMATION PACKET

The person who files a civil lawsuit (plaintiff) must include the ADR information Packet with the complaint when serving the defendant. Cross-complainants must serve the ADR Information Packet on any new parties named to the action together with the cross-complaint.

There are a number of ways to resolve civil disputes without having to sue someone. These alternatives to a lawsuit are known as alternative dispute resolution (ADR).

In ADR, trained, impartial persons decide disputes or help parties decide disputes themselves. These persons are called neutrals. For example, in mediations, the neutral is the mediator. Neutrals normally are chosen by the disputing parties or by the court. Neutrals can help resolve disputes without having to go to court.

LAADR 005 (Rev. 03/17)
LASC Adopted 10-03
Cal. Rules of Court, rule 3.221

Exhibit A
00092

**Advantages of ADR**
- Often faster than going to trial
- Often less expensive, saving the litigants court costs, attorney's fees and expert fees.
- May permit more participation, allowing parties to have more control over the outcome.
- Allows for flexibility in choice of ADR processes and resolution of the dispute.
- Fosters cooperation by allowing parties to work together with the neutral to resolve the dispute and mutually agree to remedy.
- There are fewer, if any, court appearances. Because ADR can be faster and save money, it can reduce stress.

**Disadvantages of ADR** - ADR may not be suitable for every dispute.
- If ADR is binding, the parties normally give up most court protections, including a decision by a judge or jury under formal rules of evidence and procedure, and review for legal error by an appellate court.
- ADR may not be effective if it takes place before the parties have sufficient information to resolve the dispute.
- The neutral may charge a fee for his or her services.
- If the dispute is not resolved through ADR, the parties may then have to face the usual and traditional costs of trial, such as attorney's fees and expert fees.

**The Most Common Types of ADR**

- **Mediation**

  In mediation, a neutral (the mediator) assists the parties in reaching a mutually acceptable resolution of their dispute. Unlike lawsuits or some other types of ADR, the parties, rather than the mediator, decide how the dispute is to be resolved.

  - **Mediation is particularly effective** when the parties have a continuing relationship, like neighbors or business people. Mediation is also very effective where personal feelings are getting in the way of a resolution. This is because mediation normally gives the parties a chance to express their feelings and find out how the other sees things.

  - **Mediation may not be effective** when one party is unwilling to cooperate or compromise or when one of the parties has a significant advantage in power over the other. Therefore, it may not be a good choice if the parties have a history of abuse or victimization.

Exhibit A
00093

◘   **Arbitration**

In arbitration, a neutral person called an "arbitrator" hears arguments and evidence from each side and then decides the outcome of the dispute. Arbitration is typically less formal than a trial, and the rules of evidence may be relaxed. Arbitration may be either "binding" or "non-binding." Binding arbitration means the parties waive their right to a trial and agree to accept the arbitrator's decision as final. Non-binding arbitration means that the parties are free to request a trial if they reject the arbitrator's decision.

Arbitration is best for cases where the parties want another person to decide the outcome of their dispute for them but would like to avoid the formality, time, and expense of a trial. It may also be appropriate for complex matters where the parties want a decision-maker who has training or experience in the subject matter of the dispute.

◘   **Mandatory Settlement Conference (MSC)**

**Settlement Conferences are appropriate in any case where settlement is an option.** Mandatory Settlement Conferences are ordered by the Court and are often held near the date a case is set for trial. The parties and their attorneys meet with a judge who devotes his or her time exclusively to preside over the MSC. The judge does not make a decision in the case but assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement.

The Los Angeles Superior Court Mandatory Settlement Conference (MSC) program is free of charge and staffed by experienced sitting civil judges who devote their time exclusively to presiding over MSCs. The judges participating in the judicial MSC program and their locations are identified in the List of Settlement Officers found on the Los Angeles Superior Court website at http://www.lacourt.org/. This program is available in general jurisdiction cases with represented parties from independent calendar (IC) and Central Civil West (CCW) courtrooms. In addition, on an ad hoc basis, personal injury cases may be referred to the program on the eve of trial by the personal injury master calendar courts in the Stanley Mosk Courthouse or the asbestos calendar court in CCW.

In order to access the Los Angeles Superior Court MSC Program the judge in the IC courtroom, the CCW Courtroom or the personal injury master calendar courtroom must refer the parties to the program.  Further, all parties must complete the information requested in the Settlement Conference Intake Form and email the completed form to mscdept18@lacourt.org.

LAADR 005 (Rev. 03/17)
LASC Adopted 10-03
Cal. Rules of Court, rule 3.221

Exhibit A
00094

## Additional Information

To locate a dispute resolution program or neutral in your community:

- Contact the California Department of Consumer Affairs (www.dca.ca.gov) Consumer Information Center toll free at 800-952-5210, or;
- Contact the local bar association (http://www.lacba.org/) or;
- Look in a telephone directory or search online for "mediators; or "arbitrators."

There may be a charge for services provided by private arbitrators and mediators.

A list of approved State Bar Approved Mandatory Fee Arbitration programs is available at
http://calbar.ca.gov/Attorneys/MemberServices/FeeArbitration/ApprovedPrograms.aspx#19

To request information about, or assistance with, dispute resolution, call the number listed below. Or you may call a Contract Provider agency directly. A list of current Contract Provider agencies in Los Angeles County is available at the link below.

http://css.lacounty.gov/programs/dispute-resolution-program-drp/

County of Los Angeles Dispute Resolution Program
3175 West 6th Street, Room 406
Los Angeles, CA 90020-1798
TEL: (213) 738-2621
FAX: (213) 386-3995

LAADR 005 (Rev. 03/17)
LASC Adopted 10-03
Cal. Rules of Court, rule 3.221

Exhibit A
00095

# Exhibit B

```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
2

3     ******************************************************************

4     IN RE:  TAXOTERE
      (DOCETAXEL) PRODUCTS
5     LIABILITY LITIGATION

6                              CIVIL ACTION NO. 16-MD-2740 "N"
                               NEW ORLEANS, LOUISIANA
7                              WEDNESDAY, AUGUST 30, 3017, 9:30 A.M.

8     THIS DOCUMENT RELATES TO:

9     ALL CASES

10    ******************************************************************

11
                     TRANSCRIPT OF MOTION HEARING PROCEEDINGS
12          HEARD BEFORE THE HONORABLE KURT D. ENGELHARDT
                     UNITED STATES DISTRICT JUDGE
13

14    APPEARANCES:

15

16    FOR THE PLAINTIFFS:       BARRIOS KINGSDORF & CASTEIX
                                BY:  DAWN M. BARRIOS, ESQ.
17                                   BRUCE S. KINGSDORF, ESQ.
                                701 POYDRAS STREET, SUITE 3650
18                              NEW ORLEANS, LOUISIANA 70139

19

20                              GAINSBURGH BENJAMIN DAVID
                                MEUNIER & WARSHAUER
21                              BY:  M. PALMER LAMBERT, ESQ.
                                1100 POYDRAS STREET, SUITE 2800
22                              NEW ORLEANS, LOUISIANA 70163

23

24                              PENDLEY BAUDIN & COFFIN
                                BY:  CHRISTOPHER L. COFFIN, ESQ.
25                              1515 POYDRAS STREET, SUITE 1400
                                NEW ORLEANS, LOUISIANA 70112
```

*OFFICIAL TRANSCRIPT*

Exhibit B
00096

2

```
 1   APPEARANCES CONTINUED:

 2

 3                                  GIBBS LAW GROUP
                                    BY:  KAREN B. MENZIES, ESQ.
 4                                  400 CONTINENTAL BOULEVARD
                                    6TH FLOOR
 5                                  EL SUGUNDO, CALIFORNIA 90245

 6

 7   FOR SANOFI S.A.:               IRWIN FRITCHIE URQUHART & MOORE
                                    BY:  DOUGLAS J. MOORE, ESQ.
 8                                  400 POYDRAS STREET, SUITE 2700
                                    NEW ORLEANS, LOUISIANA 70130
 9

10

11   FOR ACTAVIS PHARMA,
     INC.:                         ULMER & BERNE
12                                  BY:  MICHAEL J. SUFFERN, ESQ.
                                    600 VINE STREET
13                                  SUITE 2800
                                    CINCINNATI, OHIO 45202
14

15   FOR SANDOZ, A NOVARTIS
     DIVISION:                     GREENBURG TRAURIG
16                                  BY:  R. CLIFTON MERRELL, ESQ.
                                    TERMINUS 200
17                                  3333 PIEDMONT ROAD, NE
                                    ATLANTA, GEORGIA 30305
18

19

20   FOR HOSPIRA, INC.,
     HOSPIRA WORLDWIDE, LLC,
     FORMERLY DOING BUSINESS
21   AS HOSPIRA WORLDWIDE,
     INC., AND PFIZER INC.:        CHAFFE MCCALL
22                                  BY:  JOHN F. OLINDE, ESQ.
                                    2300 ENERGY CENTRE
23                                  1100 POYDRAS STREET
                                    NEW ORLEANS, LOUISIANA 70163
24

25
```

*OFFICIAL TRANSCRIPT*

Exhibit B
00097

3

```
 1    APPEARANCES CONTINUED:

 2

 3    FOR PFIZER, INC., AND
      HOSPIRA WORLDWIDE,
 4    LLC:                        QUINN EMANUEL URQUHART & SULLIVAN
                                  BY:  MARA C. GONZALEZ, ESQ.
 5                                51 MADISON AVENUE, 22ND FLOOR
                                  NEW YORK, NEW YORK 1001
 6

 7
      FOR ACCORD HEALTHCARE,
 8    INC.:                       KEOGH COX & WILSON
                                  BY:  CHAD A. SULLIVAN, ESQ.
 9                                701 MAIN STREET
                                  BATON ROUGE, LOUISIANA 70802
10

11

12    OFFICIAL COURT REPORTER:    CATHY PEPPER, CRR, RMR, CCR
                                  CERTIFIED REALTIME REPORTER
13                                REGISTERED MERIT REPORTER
                                  500 POYDRAS STREET, ROOM B-275
14                                NEW ORLEANS, LOUISIANA  70130
                                  (504) 589-7779
15                                Cathy_Pepper@laed.uscourts.gov

16

17    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
      PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

18

19

20

21

22

23

24

25
```

*OFFICIAL TRANSCRIPT*

1                 **I N D E X**

2

3                                  PAGE

4

5   RECORD DOCUMENT NUMBER 489.............................  6

6   DEFENDANTS' MOTION TO DISMISS THE MASTER LONG FORM

7   COMPLAINT.............................................  6

8   PLAINTIFFS' OMNIBUS MOTION TO REMAND CERTAIN CASES

9   TO THE SUPERIOR COURTS OF CALIFORNIA.................. 26

10   RECORD DOCUMENT 469.................................. 26

11   DELAWARE PLAINTIFFS' MOTION TO REMAND TO THE

12   SUPERIOR COURT OF DELAWARE........................... 30

13   RECORD DOCUMENT 673.................................. 30

14

15

16

17

18

19

20

21

22

23

24

25

*OFFICIAL TRANSCRIPT*

Exhibit B
00099

1               P-R-O-C-E-E-D-I-N-G-S

2            M O R N I N G   S E S S I O N

3           WEDNESDAY, AUGUST 30, 2017

4              (COURT CALLED TO ORDER)

5

6

09:34:56  7        THE DEPUTY CLERK:  All rise.

09:34:57  8        THE COURT:  You may be seated.

09:34:58  9             Before we begin with our docket in the *In re:*

09:35:03 10   *Taxotere (Docetaxel) Products Liability Litigation*, MDL 2740, I

09:35:08 11   want to welcome some guests here to our Court.

09:35:12 12             Yesterday, Judge Barbier and Judge Fallon and I

09:35:16 13   had the pleasure of meeting and discussing a variety of things

09:35:21 14   about our court system, but, in particular, multidistrict

09:35:25 15   litigation, with Judge Kang, Judge Mo and Dr. Lee from

09:35:31 16   South Korea.

09:35:32 17             We had a very positive discussion with them about

09:35:36 18   the benefits and detriments of the multidistrict litigation

09:35:41 19   practice.  They are here to gather information.

09:35:44 20             If you gentlemen could stand up, please.  We all

09:35:47 21   welcome you here today.

09:35:48 22             I do have a few things for you.  Well, two

09:35:53 23   different types of Eastern District Court pins, and, of course,

09:35:57 24   our United States Court tumbler for your visit here.

09:36:01 25             Cherie, would you go ahead and give these to

*OFFICIAL TRANSCRIPT*

Exhibit B
00100

09:36:03  1   Dr. Lee, Judge Mo, and Judge Kang.

09:36:06  2            While you're doing that, let me tell you that

09:36:10  3   Judge Kang is the presiding judge of the Seoul High Court.  He

09:36:15  4   is Chief Researcher of the Judicial Policy Research Institute.

09:36:19  5            Judge Mo is also with the Judicial Policy

09:36:22  6   Research Institute, and Dr. Le is also with the Judicial Policy

09:36:28  7   Research Institute, with the Supreme Court of Korea.

09:36:32  8            So we certainly welcome them to our Court, both

09:36:37  9   for this hearing today, and hopefully they will have pleasant

09:36:41 10   travels, notwithstanding the inclement weather that we've

09:36:44 11   experienced.  It looks like things are clearing up a little

09:36:47 12   bit.

09:36:48 13            Welcome, gentlemen.  We appreciate your visit.

09:36:52 14   Also, if there is anything that we could do while you're here,

09:36:54 15   as I said yesterday, to make your visit more pleasant,

09:36:57 16   certainly please call on us.

09:37:04 17            Okay.  We are here today for Record Document

09:37:09 18   Number 489, which is the Defendants' Motion to Dismiss the

09:37:14 19   Master Long Form Complaint.

09:37:16 20            That motion was opposed -- let me make sure I

09:37:23 21   recite all of my relevant documentation -- at

09:37:26 22   Record Document 663, and a reply memo was filed at

09:37:32 23   Record Document 773.

09:37:34 24            Now, counsel, if you would go ahead and make your

09:37:38 25   appearances.  I will tell you, before you do so, that I have

*OFFICIAL TRANSCRIPT*

Exhibit B
00101

09:37:41  1    read all of the briefing in this case, which is very clear and

09:37:45  2    outstanding.  I understand the issues in it.  Then I'll give

09:37:48  3    you a chance to make some remarks.

09:37:50  4              Why don't we go ahead and make our appearances

09:37:53  5    real quick.  Then, Mr. Moore, you can begin.

09:37:54  6         MR. MOORE:  Douglas Moore, defense liaison counsel and

09:37:58  7    counsel for Sanofi.

09:37:59  8         MR. MERRELL:  Cliff Merrell, on behalf of Sandoz, Inc.

09:38:02  9         MR. OLINDE:  Your Honor, it's John Olinde, representing

09:38:06 10    the liaison for the 505(b)(2).  I will not be addressing the

09:38:11 11    Court today.  It will be Mr. Merrell here.

09:38:15 12         MR. COFFIN:  Good morning, Your Honor.  Chris Coffin on

09:38:17 13    behalf of the plaintiffs.

09:38:18 14              Mr. Bruce Kingsdorf will be presenting the

09:38:20 15    argument on behalf of plaintiffs today.

09:38:22 16         THE COURT:  All right.

09:38:23 17         MS. MENZIES:  Good morning, Your Honor.  Karen Menzies,

09:38:24 18    also on behalf of plaintiffs.

09:38:26 19         THE COURT:  Good morning.

09:38:27 20         MR. LAMBERT:  Good morning, Your Honor.

09:38:27 21    Palmer Lambert, co-liaison counsel for the plaintiffs.

09:38:32 22         MS. BARRIOS:  Dawn Barrios, co-liaison counsel for

09:38:35 23    plaintiffs.

09:38:35 24         THE COURT:  Good morning.

09:38:35 25              I would like to follow the usual rule of no

*OFFICIAL TRANSCRIPT*

Exhibit B
00102

09:38:39  1    longer than 20 minutes.  Will that be necessary for me to be

09:38:43  2    the timekeeper up here, or do we believe that we can tackle

09:38:47  3    this without challenging those time limits?

09:38:51  4            MR. MOORE:  I believe that we're going to finish much

09:38:53  5    earlier than that, Judge, at least on the defendants' side.

09:38:56  6            I believe you had indicated during our last

09:38:59  7    liaison counsel meeting that we had 15 minutes, so we have

09:39:01  8    divided our time between myself and Mr. Merrell to meet those

09:39:05  9    restrictions.

09:39:05 10            I think the reason we are able to make our

09:39:10 11    comments in that timeframe is because, obviously, the Court has

09:39:13 12    read our papers, and you're not expecting from me an esoteric

09:39:17 13    discussion on *Twombly* or *Iqbal* or what constitutes plausibility

09:39:22 14    under those Supreme Court decisions.

09:39:24 15            I'd like to focus my remarks this way:  We raised

09:39:28 16    issues in the complaint -- with the complaint in our motion to

09:39:34 17    address all of the counts, issues related to shotgun pleading

09:39:39 18    and whether there are plausible allegations related to

09:39:41 19    causation.

09:39:42 20            I wanted to focus on the allegations of liability

09:39:48 21    for my remarks today.  I think our motion ultimately boils down

09:39:51 22    to this:  This is a failure to warn case.  That's all that it

09:39:56 23    is.

09:39:56 24            The factual allegations in this complaint,

09:39:59 25    Your Honor, begin at page 22, at paragraph 112.  Then they

*OFFICIAL TRANSCRIPT*

Exhibit B
00103

09:40:05  1    conclude on page 46, at paragraph 212.  So roughly 24 pages and

09:40:11  2    a hundred paragraphs of factual allegations related to

09:40:15  3    liability.

09:40:15  4              Each of the eight counts, each of the eight

09:40:19  5    causes of action that are articulated in the complaint, all

09:40:22  6    start off the same way.  They incorporate by reference all of

09:40:25  7    those factual allegations.  I'm not going to recite what the

09:40:29  8    eight counts are because Your Honor is aware of what they are.

09:40:32  9              But what I want to focus on is what I think we're

09:40:36 10    supposed to be doing in the context of a Rule 12 motion raised

09:40:40 11    under Rules 8 and 9, and that is analyze whether those facts

09:40:46 12    alleged support and set forth a plausible claim for relief

09:40:50 13    under the various causes of action that have been asserted.

09:40:53 14              So I really want to focus on two points.  The

09:40:56 15    first is the causes of action that require an express statement

09:41:00 16    by the defendant in order to render liability.  The

09:41:03 17    misrepresentation, the strict liability for misrepresentation

09:41:06 18    claim, the breach of warranty claim, claims that require

09:41:10 19    express statements that are false by the defendant.

09:41:13 20              Then I also want to talk about the claims that

09:41:17 21    require -- that must survive the Rule 9(b) hurdle.

09:41:21 22              So those are the two points I'm going to address.

09:41:24 23              When we look at the factual allegations,

09:41:26 24    paragraphs 112 through 189 are essentially the failure to warn

09:41:34 25    allegations.  It is a recounting of what the science is, what

*OFFICIAL TRANSCRIPT*

09:41:37  1    the clinical trial data shows, what was on the internet, on

09:41:43  2    CBS, and all of those things the plaintiffs take the position

09:41:45  3    establish that there was this increased risk of permanent or

09:41:50  4    persistent alopecia with the use of this medicine, and, as a

09:41:51  5    consequence, we had some obligation to change our warning.

09:41:53  6           We disagree with those allegations, we refute

09:41:56  7    them, but we do not make an argument today that those

09:41:59  8    allegations are insufficient under Rules 8 or 9 -- or Rule 8 to

09:42:03  9    set forth a plausible claim for failure to warn, whether it's

09:42:05 10    under a Products Liability Act, or whether it's part of a

09:42:08 11    negligence count.

09:42:09 12           What we do take issue with, Your Honor, are the

09:42:14 13    allegations related to the specific statements that are

09:42:18 14    articulated in paragraphs beginning at 190 and going through

09:42:25 15    212.  Those are the paragraphs that relate to the affirmative

09:42:29 16    misstatements that we are alleged to have made, upon which they

09:42:33 17    base their misrepresentation and breach of warranty claims.

09:42:35 18    Whether it's strict liability misrepresentation or negligent --

09:42:39 19    or fraudulent misrepresentation, there has to be an express

09:42:44 20    misstatement.

09:42:45 21           The statements that are contained in the

09:42:47 22    complaint relate to, by my count, about four warnings letters

09:42:51 23    from DDMAC.  DDMAC is the Division of Drug Marketing,

09:42:55 24    Advertising and Communication.  It's called something else now.

09:42:58 25           Without getting too far afield, there is a bunch

*OFFICIAL TRANSCRIPT*

Exhibit B
00105

11

09:43:02  1   of things in the complaint that talk about FDA concluded this,

09:43:07  2   and FDA determined that.  They said it was false and

09:43:10  3   misleading.

09:43:12  4           A DDMAC letter is not an agency determination,

09:43:14  5   which will be an issue we'll probably have to litigate a

09:43:16  6   Rule 56 or in the context of the motions in limine.  But I did

09:43:19  7   want to make that comment, that even though these letters have

09:43:22  8   this talismanic language of false and misleading, lacks fair

09:43:26  9   balance, constitutes misbranding -- this language that's in

09:43:30 10   every single DDMAC letter that I've ever seen -- that doesn't

09:43:32 11   mean that the statement that's at issue is untrue, but that's

09:43:37 12   an issue that we'll have to litigate in the case.

09:43:40 13           What I want to focus on is whether these alleged

09:43:43 14   misstatements -- one of them had to do with off-label use of

09:43:45 15   the medicine in combination with other chemotherapy agents.

09:43:50 16   The remainder focus on increased efficacy, greater efficacy for

09:43:56 17   Taxotere versus Taxol or other chemotherapy regimens.

09:44:03 18           The argument is that you took the position that

09:44:05 19   this medicine would be better at eliminating my cancer, and

09:44:08 20   that's the mistake.  That statement alone, in our view,

09:44:12 21   Your Honor, does not set forth a plausible claim for a

09:44:16 22   misrepresentation or warranty count.  That's because those

09:44:19 23   allegations can't stand on their own and establish liability

09:44:24 24   for the injuries that are at issue in this case.

09:44:26 25           This is not a consumer class action, where they

**OFFICIAL TRANSCRIPT**

Exhibit B
00106

09:44:29 1  are taking the position that we overstated some characteristic

09:44:31 2  of the product.  These plaintiffs aren't coming into court

09:44:36 3  saying, you told me this was going to cure my cancer because it

09:44:40 4  was the most potent therapy, and it didn't; and, therefore, I

09:44:43 5  still have cancer, and I'm suing.  That's not what this case is

09:44:46 6  about.

09:44:46 7         These allegations are not related to the side

09:44:49 8  effect that these individuals claim to have suffered.

09:44:52 9         I think the point is best made in looking at the

09:44:56 10 plaintiffs' opposition.  When we raised the point that they

09:44:59 11 don't refer to material misrepresentations -- because they are

09:45:03 12 referring to this issue with the efficacy -- what they state

09:45:06 13 is:  "Plaintiffs have clearly conveyed that defendants did not

09:45:10 14 merely omit warnings about the known risk of permanent

09:45:15 15 alopecia, but specifically positioned Taxotere as a safe and

09:45:20 16 effective treatment that had greater efficacy and survival

09:45:21 17 outcome than its competitors."

09:45:23 18        What they are doing there is, in order to support

09:45:26 19 their misrepresentation or warranty counts, they are coupling

09:45:31 20 it with a failure to warn claim; that the misrepresentation

09:45:35 21 claim cannot stand on its own legs, it has to be coupled with a

09:45:40 22 failure to warn.

09:45:41 23        If there is no failure to warn in this case, the

09:45:45 24 question becomes can they recover for the injuries that are at

09:45:50 25 issue in this case because of the alleged misstatements that

*OFFICIAL TRANSCRIPT*

09:45:52  1    were made.

09:45:52  2             I would give you an example of the point I'm

09:45:55  3    trying to make.  If I sold a car to someone and told that

09:45:59  4    person, express warranty -- express statement, you can put five

09:46:04  5    suitcases in the trunk of this car, and it turns out you can

09:46:07  6    only put four, so it was a false statement.  It was a breach of

09:46:09  7    an express warranty when I said five suitcases in the trunk.

09:46:13  8             Then that person crashes the car, and the air

09:46:16  9    bags don't go off, and they get injured.  Could they then sue

09:46:20 10    me for breach of an express warranty for the injuries they

09:46:22 11    suffered because of defective air bags because you can't put

09:46:24 12    five suitcases in the trunk?

09:46:25 13             I think that's the point that we're trying to

09:46:27 14    make here is that these allegations of increased efficacy and

09:46:34 15    their argument that there is no better survivability, we do not

09:46:37 16    believe they established a plausible claim for relief for the

09:46:42 17    misrepresentation claims.

09:46:43 18             The warranty claim, Your Honor, I would make one

09:46:45 19    more point, and that is this:  When we look at the plaintiffs'

09:46:50 20    opposition, we point out that they have not -- there is no

09:46:54 21    warranties in medicine.  There is no guarantees in

09:46:57 22    pharmaceutical products.

09:47:01 23             The argument they make is that the defendants

09:47:03 24    expressly warranted that the medicine was safe and fit for the

09:47:08 25    use for the purposes intended, that they did not produce any

*OFFICIAL TRANSCRIPT*

Exhibit B
00108

09:47:12  1   dangerous side effects in excess of those risks associated with

09:47:16  2   other forms of treatment for cancer, and the side effects that

09:47:19  3   they did produce were accurately reflected in the warnings.

09:47:22  4   There is no facts supporting -- saying that we said any of

09:47:26  5   those things.

09:47:26  6          Of the 46 pages and 100 paragraphs of their

09:47:29  7   factual allegations, they are not pointing to an express

09:47:32  8   statement, or something in our labeling, or something in our

09:47:35  9   materials, or a promotional item, or something somebody said,

09:47:38 10   that matches what they claim the express warranty was.

09:47:41 11          So for those reasons, Your Honor, we think that

09:47:44 12   the misrepresentation of warranty claims fail under Rule 8.

09:47:48 13          Then I'll quickly make a comment on Rule 9.  We

09:47:52 14   think that bar is set very high for a reason; that, while this

09:47:56 15   claim -- this case -- there is a dispute in this MDL about

09:48:01 16   whether or not the information that was available to the

09:48:06 17   defendant warranted some different warning with respect to this

09:48:09 18   medicine, we do not believe that these allegations come

09:48:12 19   anywhere close to approaching intentional fraudulent conduct,

09:48:17 20   and we don't believe that these allegations satisfy Rule 9(b)

09:48:21 21   in that regard.

09:48:22 22          So I will turn it over to Mr. Merrell.

09:48:24 23          THE COURT:  Thank you, Mr. Moore.

09:48:25 24          Mr. Merrell.

09:48:27 25          MR. MERRELL:  Thank you, Your Honor.  Cliff Merrell on

*OFFICIAL TRANSCRIPT*

Exhibit B
00109

09:48:32  1    behalf of Sandoz, Inc.

09:48:34  2         Sandoz is one of the non-Sanofi 505(b)(2)

09:48:37  3    defendants, so I'm here to provide a few remarks just on behalf

09:48:40  4    of all of the 505(b)(2) defendants, and I don't want to retread

09:48:45  5    any ground either in the brief or what Mr. Moore has already

09:48:48  6    ably covered.

09:48:48  7         I think the important part from our perspective

09:48:52  8    is to understand how the complaint differs in a number of

09:48:54  9    degrees, the Master Complaint, in the allegations as to Sanofi,

09:48:57 10    as opposed to the other 505(b)(2) defendants.

09:49:00 11         If you look at the Master Complaint, there are

09:49:02 12    215 factual allegations preceding the causes of action.  Of

09:49:05 13    those, 75 relate to these six 505(b)(2) defendants.  So there

09:49:10 14    are really only about 13 or 14 total factual allegations as to

09:49:14 15    each 505(b)(2) defendant.

09:49:16 16         These allegations cover issues of when the NDA

09:49:19 17    approval was; the labeling that was provided, the FDA approved

09:49:24 18    labeling; and, where they were incorporated and their principal

09:49:26 19    place of business.  That's really it.  There are no allegations

09:49:28 20    about misrepresentations about FDA warning letters or FDA

09:49:32 21    actions.  None of that is there.

09:49:34 22         There is no allegations about knowledge or

09:49:36 23    participation in the particular studies that are referenced in

09:49:39 24    the complaint.

09:49:39 25         There is really very little in terms of what the

**OFFICIAL TRANSCRIPT**

Exhibit B
00110

09:49:41 1     allegations are as to the 505(b)(2) defendants.  So I wanted to

09:49:45 2     just cover briefly the misrepresentation and fraud issues

09:49:48 3     specifically, and how that deficiency presents an issue, and

09:49:53 4     Motion to Dismiss should be granted here.

09:49:55 5          If you look at the plaintiffs' opposition,

09:49:58 6     particularly at misrepresentation, the portion of the complaint

09:50:01 7     they cite is 190 to 215, which Mr. Moore just discussed.  That

09:50:06 8     particular portion of the complaint deals entirely with Sanofi

09:50:07 9     and its marketing and advertising.  There is no sort of

09:50:11 10    marketing or advertising factual allegations as to the

09:50:17 11    505(b)(2) defendants, and there is nowhere any sort of

09:50:20 12    allegation about FDA warning letters or anything like that.

09:50:23 13         So with respect to the 505(b)(2) defendants,

09:50:27 14    those factual allegations are missing, and that's a substantial

09:50:30 15    deficiency in their complaint.

09:50:31 16         With respect to fraud, similar issue, they raised

09:50:34 17    two issues in their opposition.  One is the -- again, the

09:50:38 18    paragraphs 109 to 215, which discuss actions by Sanofi.  Again,

09:50:44 19    nothing related to advertising, marketing by any of the

09:50:46 20    505(b)(2) defendants.

09:50:48 21         Then the other portion they raise are various

09:50:50 22    studies that were published or news stories that were in the --

09:50:53 23    that were out in the public, but there is no allegation,

09:50:56 24    specific allegation as to a specific 505(b)(2) defendant that

09:51:01 25    they had knowledge, were aware or participated in any of those

*OFFICIAL TRANSCRIPT*

Exhibit B
00111

09:51:03  1    studies.

09:51:04  2              So, Your Honor, we would present that there is --

09:51:07  3    that there is -- that the motion should be granted as to all

09:51:11  4    defendants; but, particularly as to the 505(b)(2) defendants,

09:51:14  5    there simply are not the factual allegations that are necessary

09:51:17  6    to support their causes of action.

09:51:19  7              Thank you, Your Honor.

09:51:19  8         THE COURT:  Thank you, Mr. Merrell.

09:51:22  9         Mr. Kingsdorf.

09:51:25 10    MR. KINGSDORF:  Good morning, Your Honor.  Bruce

09:51:32 11    Kingsdorf on behalf of the plaintiffs.

09:51:34 12              Until I heard Mr. Moore, I was under the belief

09:51:38 13    that defendants were seeking dismissal of all counts of the

09:51:47 14    Master Complaint.  I guess I'm relieved to note that they are

09:51:51 15    not seeking dismissal of all counts.

09:51:53 16              But this case is more than just a failure to warn

09:51:59 17    case.  I think we have gone to great lengths to point out to

09:52:05 18    Your Honor what the misrepresentations were, what the causes of

09:52:09 19    action are and the validity of those causes of action, and the

09:52:14 20    facts at this point which support those causes of action.

09:52:17 21              Your Honor, I know that you have handled a motion

09:52:25 22    to dismiss a master complaint in the past.  It's a slightly

09:52:28 23    different case.  It involved the FEMA trailer litigation, and

09:52:33 24    the laws of only four states were involved, Alabama,

09:52:38 25    Mississippi, Louisiana, and Texas.

*OFFICIAL TRANSCRIPT*

09:52:41  1          The Court, in that analysis, went through

09:52:46  2     whether, for example, the plaintiffs had standing to bring the

09:52:50  3     particular claims at issue, whether the economic loss rule

09:52:56  4     barred, under the laws of those particular states, the claims

09:53:00  5     that were brought.

09:53:00  6          But what came out of Your Honor's reasoning in

09:53:03  7     that case was two points that hit me that I think are pertinent

09:53:07  8     to this litigation.  One of them is that the level of proof

09:53:15  9     that's required to get beyond the speculative level is

09:53:20 10     contextual.  It varies with the complexity of the case.  The

09:53:27 11     more complex the case, the laxer the standard is to get beyond

09:53:34 12     the speculative level.

09:53:36 13          Again, as Your Honor well knows, we don't have to

09:53:38 14     get beyond speculative to probable.  We only have to get to

09:53:46 15     plausible.  We firmly believe that in the 220 fact paragraphs

09:53:52 16     of the complaint, we have gone well beyond the speculative to

09:53:57 17     the plausible.

09:53:59 18          THE COURT:  Well, it has to be a little more than

09:54:02 19     plausible though.  You have to have a reasonable basis to

09:54:05 20     believe each and every allegation.  Isn't that a better way to

09:54:10 21     state what the pleading standard is?  I mean, plausibility is

09:54:15 22     possibility, but it's got to be something that's based upon a

09:54:19 23     reasonable belief.

09:54:22 24          MR. KINGSDORF:  Well, we haven't just simply said that

09:54:26 25     they had a marketing campaign that was defective.  We have said

*OFFICIAL TRANSCRIPT*

Exhibit B
00113

09:54:30  1  that they had a marketing campaign that was based upon this

09:54:32  2  drug being efficacious, that the drug had no greater side

09:54:40  3  effects than other drugs of the same nature.

09:54:42  4          So there are cases cited by the defendants in

09:54:45  5  their reply brief which talk about -- I think it was the Zofran

09:54:50  6  in particular -- that talk about a marketing campaign that

09:54:55  7  simply said this drug is a bad drug, and that was their fraud

09:54:59  8  claim.  That was their representation -- or their

09:55:02  9  misrepresentation.

09:55:03  10         We have gone well beyond that.  We've cited

09:55:07  11  chapter and verse with regard to the advertisements.  We've

09:55:11  12  talked about the letters from the FDA, the DDMAC letters, I

09:55:18  13  believe that were referred to by Mr. Moore.  We've talked about

09:55:20  14  the aggressive marketing campaign that they embarked upon to

09:55:25  15  make sure that the doctors, the learned intermediaries in this

09:55:32  16  case, prescribed this drug without any warning on the label

09:55:36  17  that it led to permanent alopecia.

09:55:41  18         We've also described the fact that all along they

09:55:46  19  had studies, they had adverse event reports, they had

09:55:51  20  information from clinical trials to the effect that, in fact,

09:55:56  21  there was a high percentage of permanent alopecia, none of

09:56:01  22  which was disclosed by either the Sanofi defendants or the

09:56:07  23  505(b)(2) defendants.

09:56:09  24         So, Your Honor, we think we have gone well beyond

09:56:12  25  the merely speculative into the plausible, and almost to the

*OFFICIAL TRANSCRIPT*

Exhibit B
00114

09:56:17 1    probable.

09:56:17 2             The second thing that I've gleaned from your FEMA

09:56:24 3    trailer case is that when issues are fact dependent at the

09:56:31 4    motion to dismiss phase, it's inappropriate to dismiss the

09:56:37 5    claim.  As long as the allegations are made, and properly made,

09:56:41 6    at that point in time, the Court should allow discovery to take

09:56:47 7    place.  Especially in a circumstance where defendants have

09:56:49 8    most, if not all, of the documents, discovery should take

09:56:53 9    place.  Then, at the motion for summary judgment phase, then

09:56:58 10   the Court should entertain the issue of whether there has been

09:57:01 11   a sufficient factual basis to go to the jury, not at the motion

09:57:07 12   to dismiss phase.

09:57:08 13            THE COURT:  Okay.  Thank you.

09:57:11 14            MR. KINGSDORF:  Thank you, Your Honor.

09:57:11 15            THE COURT:  All right.  I don't know if anybody wants

09:57:15 16   to add anything at this point.  Like I said, I understand the

09:57:18 17   issues, I understand the briefing, and I appreciate your

09:57:21 18   remarks here today.

09:57:23 19            Now is the time to speak up.  Otherwise, I'm

09:57:28 20   prepared to go ahead and rule on this motion.

09:57:30 21            All right.  This is with regard to the Motion to

09:57:34 22   Dismiss Plaintiffs' Master Long Form Complaint,

09:57:37 23   Record Document 489, which is presently before the Court.  The

09:57:41 24   Court is prepared to rule on the motion seeking dismissal of

09:57:45 25   the Plaintiffs' Master Long Form Complaint pursuant to Federal

**OFFICIAL TRANSCRIPT**

Exhibit B
00115

09:57:49  1   Rules of Civil Procedure 12(b)(6) and 9(b).

09:57:52  2         Having carefully considered both parties'

09:57:56  3   supporting and opposing submissions, as well as the arguments

09:58:00  4   presented to the Court today, and, of course, the key cases

09:58:02  5   upon which those arguments are based, it's ordered that the

09:58:05  6   Motion is denied with respect to Count 1 and Counts 3 through 7

09:58:08  7   for essentially the reasons contained in the plaintiffs'

09:58:11  8   memorandum in opposition to the defendants' motion to dismiss

09:58:14  9   the long form complaint.

09:58:16 10         However, with respect to Counts 2 and 8 of the

09:58:20 11   Master Long Form Complaint, which allege strict liability for

09:58:24 12   misrepresentation and a breach of express warranty

09:58:29 13   respectively, it's ordered that the plaintiffs shall have

09:58:32 14   14 days to provide counsel and the Court with supplemental

09:58:34 15   briefing or, preferably, an amendment to the Master Long Form

09:58:38 16   Complaint clearly identifying what express statements or

09:58:41 17   language constitute the alleged misrepresentation or warranty.

09:58:45 18         Let me recap the eight claims as I've identified

09:58:50 19   them.  I'm going to state them cryptically, simply by title:

09:58:55 20   One was failure to warn; two, misrepresentation; three,

09:58:58 21   negligence; four, negligent misrepresentation; five, fraudulent

09:59:03 22   misrepresentation; six, fraudulent concealment; seven, fraud

09:59:07 23   and deceit; and, eight, breach of express warranty.  Those are

09:59:10 24   the eight identified claims set forth in the Master Long Form

09:59:13 25   Complaint.

*OFFICIAL TRANSCRIPT*

Exhibit B
00116

09:59:14 1        As a threshold matter, just as the Court in *In*

09:59:21 2 *re:  Zofran* multi-district litigation, which is Multi-District

09:59:24 3 Case Number 2657, noted when explaining the framework or the

09:59:28 4 context within which to consider allegations of fraud within an

09:59:33 5 MDL, "It is true that this case, like most MDL proceedings,

09:59:37 6 employs the device of a master complaint supplemented by

09:59:40 7 individual short form complaints that adopt the master

09:59:45 8 complaint in whole or in part.

09:59:46 9        "It is also true that a master complaint could

09:59:48 10 not possibly be expected to include every case-specific detail

09:59:53 11 such as a particular misleading statement made by a particular

09:59:56 12 sales representative to the physician of an individual

10:00:00 13 plaintiff."

10:00:01 14        The court further explained that "the complaint

10:00:03 15 in each action in this proceeding consists of the master

10:00:06 16 complaint and the individual short form complaint, taken

10:00:11 17 together."  The Court in this case likewise considers, insofar

10:00:15 18 as pleading is concerned, not only the Master Long Form

10:00:19 19 Complaint, but also the short form complaints that have been

10:00:22 20 and will be filed in this case to flesh out the allegations

10:00:25 21 made with regard to particular plaintiffs.

10:00:27 22        While this Court will not allow a lower pleading

10:00:32 23 standard in the matter generally, purely because of the

10:00:33 24 consolidated nature of these proceedings, it is necessary for

10:00:35 25 the Court to recognize the limitations and restrictions on

*OFFICIAL TRANSCRIPT*

10:00:40  1    plaintiffs' counsel in formulating allegations within a Master

10:00:45  2    Long Form Complaint, as well as the administrative function of

10:00:47  3    a master complaint.

10:00:49  4              However, with that being said, specific

10:00:51  5    allegations, particularly with respect to any allegations of

10:00:54  6    fraud, should be perfected within the short form complaints

10:00:59  7    filed in the individual member cases.

10:01:01  8              However, also at this point in the litigation,

10:01:03  9    allowing plaintiffs' claims in Count 1 and Counts 3 to 7 to

10:01:10 10    proceed serves the goals of the MDL.  Just as the Court noted

10:01:12 11    in the *In re:  Trasylol Product Liability Litigation* -- you can

10:01:22 12    find that at 2009 Westlaw 577726 -- this Court finds that it is

10:01:28 13    in the best interest of justice to allow these claims to go

10:01:32 14    forward, and to more appropriately be addressed when we move to

10:01:38 15    the summary judgment phase of the case.

10:01:39 16              Now, with respect to Counts 2 and 8, which allege

10:01:44 17    strict liability for misrepresentation and breach of an express

10:01:47 18    warranty respectively, the Court requires additional

10:01:52 19    information from plaintiffs.

10:01:53 20              The defendants are correct in stating that the

10:01:55 21    plaintiffs have not provided any express statement by the

10:01:57 22    defendants that was either misleading or an express warranty

10:02:01 23    and relied upon by a plaintiff or a particular group of

10:02:05 24    plaintiffs.

10:02:06 25              The Court agrees that plaintiffs cannot state a

*OFFICIAL TRANSCRIPT*

Exhibit B
00118

10:02:08  1    breach of express warranty claim by vaguely referring to a

10:02:14  2    manufacturer's representations about safety and effectiveness,

10:02:16  3    side effects or adequate testing.

10:02:18  4         Therefore, the Court would like the plaintiffs to

10:02:19  5    supplement their complaint with the express language that they

10:02:23  6    reference in Counts 2 and 8 of the master complaint within

10:02:27  7    14 days of today's date.

10:02:28  8         Let me put a little finer point on that.  What I

10:02:32  9    am interested in and what I think the purpose of the Motion to

10:02:35 10    Dismiss is, and the reason the Court is granting it, is that

10:02:40 11    surely, both based upon the individual complaints that have

10:02:44 12    been filed in this case by individual plaintiffs, as well as

10:02:47 13    set forth in the Master Long Form Complaint, plaintiffs'

10:02:50 14    counsel have identified specific statements that were made by

10:02:55 15    the defendants, not by the doctor treating an individual

10:03:00 16    plaintiff -- because we may have doctors who said to a patient,

10:03:04 17    I have used this product on six patients or eight patients, and

10:03:09 18    I have gotten a positive result, or there have been no side

10:03:13 19    effects or -- but that would not be what I'm talking about

10:03:16 20    here.  What I'm talking about here are isolating specific --

10:03:20 21    especially express warranties that plaintiffs have identified

10:03:25 22    and were relied upon by a plaintiff or group of plaintiffs or

10:03:30 23    all plaintiffs in connection with Counts 2 through 8 -- 2 and

10:03:39 24    8, I should say.

10:03:39 25         So we would like those set forth.  Again, those

**OFFICIAL TRANSCRIPT**

Exhibit B
00119

10:03:43  1   have to be statements that were relied upon by plaintiffs or,

10:03:45  2   like you said, the learned intermediary.  I think we ought to

10:03:49  3   be able to identify those statements, since a component part of

10:03:52  4   those claims is reliance.  This would not be something that we

10:03:56  5   could say, well, we're going to go through discovery, and then

10:03:58  6   we're going to find out what the defendant said, and then come

10:04:01  7   back and tell you we relied on it when we made the decision to

10:04:07  8   proceed with use of that particular product.  So I'm interested

10:04:07  9   in identifying those statements.

10:04:11  10           It need not be long.  It could be a list.  I just

10:04:13  11  want to know, and I think the defendants are entitled to know,

10:04:16  12  what specific statements are the basis for Counts 2 and 8.

10:04:21  13           All right.  At this time, I would like to go

10:04:26  14  ahead and rule on a couple of motions that were argued

10:04:30  15  previously relative to jurisdiction.

10:04:33  16           With regard to the remand motions, let me state

10:04:38  17  at the outset that my personal preference, as the presiding

10:04:43  18  judge, would be to have all of the claims in this case here in

10:04:46  19  the MDL.  I think it makes management of the MDL easier.  It

10:04:51  20  makes it easier for counsel to work on the MDL.  It's a

10:04:55  21  preferred vehicle on which to consider all claims, both for

10:05:00  22  litigation purposes, discovery purposes and settlement

10:05:03  23  purposes.

10:05:03  24           However, subject matter jurisdiction is not a

10:05:09  25  mere trifle, and, the Court's preference notwithstanding,

*OFFICIAL TRANSCRIPT*

10:05:13 1    subject matter jurisdiction is a hurdle that must be cleared.

10:05:16 2    It also must be clear on the record that the Court has the

10:05:20 3    authority, the very authority to have such a case pending

10:05:24 4    before it.

10:05:25 5          That's the approach, of course, that I and any

10:05:27 6    federal court, I believe, in courts of limited jurisdiction

10:05:30 7    take in considering subject matter jurisdiction.

10:05:34 8          The Court would rule on the Plaintiffs' Omnibus

10:05:40 9    Motion to Remand Certain Cases to the Superior Courts of

10:05:42 10   California, which is Record Document 469.

10:05:45 11         I note that on July 6th, 2017, the Court held

10:05:49 12   oral argument on the plaintiffs' motion and ordered that the

10:05:51 13   plaintiffs provide the Court with individualized statements

10:05:54 14   regarding what information exists as to McKesson's alleged

10:05:59 15   connection to each plaintiff involved.  That was Record

10:06:04 16   Document 620.

10:06:04 17         In compliance with this Court's order, the

10:06:05 18   plaintiffs filed the Plaintiffs' Supplemental Memorandum in

10:06:08 19   Support of Motion to Remand, which is Record Document 469,

10:06:13 20   which was the plaintiffs' statements on each case regarding

10:06:17 21   McKesson, as ordered by the Court, Record Document 628, to

10:06:20 22   which Sanofi-Aventis US, LLC filed a response at Record

10:06:28 23   Document 646.

10:06:29 24         Having carefully considered the entirety of the

10:06:31 25   parties' supporting and opposing written submissions, the

*OFFICIAL TRANSCRIPT*

Exhibit B
00121

10:06:32  1   parties' oral arguments, the record and the applicable law,

10:06:35  2   it's ordered that the motion is granted in part and denied in

10:06:38  3   part.

10:06:39  4            It's further ordered that counsel shall have ten

10:06:41  5   days to submit supplemental briefing on two of the

10:06:45  6   multi-plaintiff cases, the *Ernys-Kofler v. Sanofi* case and the

10:06:49  7   *McCallister v. Sanofi* case, which I'll discuss in further

10:06:55  8   detail.

10:06:55  9            With regard to plaintiffs Joann Pickrell,

10:06:58 10   Candyse Jenkins and Vera Smith, the Motion to Remand is

10:07:02 11   granted.  It is ordered that these plaintiffs' claims be

10:07:05 12   remanded to California state court.

10:07:08 13            In the plaintiffs' supplemental memorandum filed

10:07:10 14   in response to this Court's order, counsel has provided

10:07:10 15   sufficient information connecting McKesson to the

10:07:14 16   aforementioned plaintiffs, such as evidence that McKesson did

10:07:18 17   distribute Taxotere or generic Docetaxel to the facility in

10:07:22 18   which a particular plaintiff received chemotherapy treatment.

10:07:28 19            While the defendants argue that this information

10:07:28 20   is still insufficient to establish that McKesson actually

10:07:33 21   distributed the Taxotere or Docetaxel that was administered to

10:07:34 22   those particular plaintiffs, the Court finds that this

10:07:38 23   information provided is sufficient to satisfy California's

10:07:42 24   "upon information and belief" pleading standard.

10:07:45 25            However, with respect to the plaintiff Susan

*OFFICIAL TRANSCRIPT*

Exhibit B
00122

| | | |
|---|---|---|
| 10:07:49 | 1 | Fuller, Margarett Wright, Robin Castagnola, Mary Gardner and |
| 10:07:52 | 2 | Judy Johnson, the Motion to Remand is denied.  Counsel failed |
| 10:07:56 | 3 | to provide any individualized information as to how McKesson is |
| 10:08:00 | 4 | connected to each of these remaining plaintiffs.  Rather, |
| 10:08:03 | 5 | counsel provided the Court with generalized statements |
| 10:08:05 | 6 | regarding the dates in which McKesson has distributed Taxotere |
| 10:08:10 | 7 | or generic Docetaxel throughout the United States.  These types |
| 10:08:13 | 8 | of nonspecific statements are insufficient to satisfy even the |
| 10:08:18 | 9 | liberal "upon information and belief" pleading standard that is |
| 10:08:20 | 10 | utilized in the state of California. |
| 10:08:22 | 11 | Plaintiffs have not convinced the Court that |
| 10:08:26 | 12 | McKesson's connection to each of these remaining plaintiffs |
| 10:08:28 | 13 | rises above a speculative level.  Therefore, the Court finds |
| 10:08:32 | 14 | that McKesson has been improperly joined in these particular |
| 10:08:35 | 15 | cases, and remand is not appropriate under such circumstances. |
| 10:08:37 | 16 | Within ten days of this order, counsel shall file |
| 10:08:40 | 17 | a Motion to Dismiss without prejudice as to McKesson. |
| 10:08:46 | 18 | Finally, with respect to the two multi-plaintiff |
| 10:08:49 | 19 | cases -- that's, again, *Ernys-Kofler* and the *McCallister* |
| 10:08:53 | 20 | matters -- it is ordered that counsel shall submit supplemental |
| 10:08:56 | 21 | briefing within ten days of today's date regarding the |
| 10:08:59 | 22 | severance of these multi-plaintiff actions. |
| 10:09:02 | 23 | While it is the Court's desire at this time to |
| 10:09:04 | 24 | sever and remand the claims of plaintiffs Klara Ernys-Kofler, |
| 10:09:11 | 25 | Lisa McCallister, Sandra Isham and Josephine Hicks, a reading |

*OFFICIAL TRANSCRIPT*

10:09:14 1   of 28 USC Section 1332 and 28 USC Section 1441 may well limit

10:09:21 2   the Court's ability to sever and remand the claims of only

10:09:24 3   those plaintiffs who have alleged individualized information as

10:09:27 4   to how McKesson is connected to them.

10:09:29 5        These sections of the United States Code may

10:09:34 6   require that these actions be remanded in their entirety.

10:09:37 7   Therefore, counsel are directed to submit additional briefing

10:09:40 8   in that regard.

10:09:42 9        The Court would also encourage counsel to meet

10:09:45 10  and confer regarding a potential resolution as to remand or not

10:09:49 11  of all or parts of these two multi-plaintiff actions.

10:09:53 12       Again, to put a finer point on it, I am

10:09:57 13  inquiring, the purpose of the additional briefing is for you to

10:10:00 14  tell me whether it is appropriate or whether the Court is

10:10:05 15  authorized to sever plaintiffs in the context of a motion to

10:10:09 16  remand.

10:10:11 17       I've indicated the plaintiffs that I think I

10:10:14 18  would otherwise remand, and, if permitted to do so under the

10:10:19 19  law, if you convince me that I'm authorized to do it under

10:10:22 20  these provisions, my inclination would be to sever those

10:10:25 21  plaintiffs and have their cases remanded, and retain the rest

10:10:28 22  of them here, but I'll leave that up to you for further

10:10:33 23  briefing.

10:10:33 24       Furthermore, in light of the Supreme Court's

10:10:35 25  decision in *Bristol-Myers Squibb v. Superior Court of*

**OFFICIAL TRANSCRIPT**

Exhibit B
00124

| | | |
|---|---|---|
| 10:10:40 | 1 | *California, San Francisco Cty.*, the defendants have urged the |
| 10:10:46 | 2 | Court to dismiss the claims of the nine California plaintiffs |
| 10:10:49 | 3 | in the multi-plaintiff actions.  However, the Court declines to |
| 10:10:54 | 4 | do so at this time, as it will first need to address the issues |
| 10:10:55 | 5 | relating to subject matter jurisdiction as a threshold matter. |
| 10:10:58 | 6 | That argument, of course, can also be made in state court under |
| 10:11:02 | 7 | the jurisprudence that would be equally controlling on the |
| 10:11:05 | 8 | judges there. |
| 10:11:05 | 9 | With regard to the Delaware Plaintiffs' Motion to |
| 10:11:09 | 10 | Remand to the Superior Court of Delaware, which is |
| 10:11:13 | 11 | Record Document 673, the plaintiffs' motion seeks remand, |
| 10:11:16 | 12 | arguing, among other things, that the snap removal effectuated |
| 10:11:21 | 13 | by the defendant was an effort to circumvent the forum |
| 10:11:26 | 14 | defendant rule found in Section 1441(b)(2) of Title 28. |
| 10:11:27 | 15 | On July 6, 2017, the Court held oral argument on |
| 10:11:32 | 16 | this motion as well and took it under advisement.  Having |
| 10:11:35 | 17 | carefully considered the entirety of the parties' supporting |
| 10:11:37 | 18 | and opposing submissions, the comments made in oral argument, |
| 10:11:40 | 19 | the record and the applicable law, including the variety of |
| 10:11:43 | 20 | cases that discuss that type of removal, it's ordered that the |
| 10:11:47 | 21 | motion is granted.  The member cases listed in the schedule |
| 10:11:52 | 22 | attached to plaintiffs' motion shall be remanded to the |
| 10:11:55 | 23 | Superior Court of Delaware. |
| 10:11:56 | 24 | In so finding in favor of remand, the Court |
| 10:11:59 | 25 | places emphasis on the limited jurisdiction of federal courts. |

*OFFICIAL TRANSCRIPT*

10:12:03  1    As you all well know, it is axiomatic that federal courts are

10:12:09  2    courts of limited jurisdiction, possessing only that power

10:12:12  3    authorized by Constitution and statutes.

10:12:17  4          Looking to 28 USC Section 1441(b), these

10:12:21  5    provisions relate to the procedure of removal.  In particular,

10:12:24  6    28 USC Section 1441(b)(2) is temporal in nature, relating to

10:12:28  7    the time period in which a matter can be removed to federal

10:12:31  8    court.  However, this provision does not provide jurisdiction

10:12:34  9    to federal courts in excess of the diversity jurisdiction that

10:12:39 10    Congress had expressly and has expressly provided in

10:12:42 11    Section 1332 of Title 28.

10:12:45 12          In other words, this provision is not an add-on

10:12:47 13    or a clever extension to Congress' provision of diversity

10:12:52 14    jurisdiction.  Section 1441(b) is written with the idea and, in

10:12:56 15    fact, the practice that a defendant can and will be promptly

10:13:01 16    served with process via the provisions of state court

10:13:05 17    procedure.

10:13:05 18          In most states, this process involves the

10:13:08 19    plaintiff having to first request service, court personnel then

10:13:14 20    having to process the proper documentation, and then an

10:13:16 21    authorized person, such as a sheriff, a courthouse employee or

10:13:20 22    a private process server appointed by the Court, having to

10:13:23 23    physically serve the defendant.

10:13:25 24          However, Section 1441(b) does not contemplate a

10:13:28 25    person or entity monitoring court filings by the minute, either

*OFFICIAL TRANSCRIPT*

10:13:33 1  in person or electronically, so as to always have an immediate
10:13:37 2  back door to federal jurisdiction not otherwise provided by
10:13:40 3  Congress.
10:13:41 4        Plaintiffs here have not neglected, delayed,
10:13:46 5  pretermitted or indefinitely postponed or failed to promptly
10:13:48 6  seek service.  Quite to the contrary, had they acted in such a
10:13:53 7  dilatory fashion, that Court might view this issue quite
10:13:57 8  different.
10:13:57 9        By removing the case in the manner that the
10:13:59 10 defendant has done here, the defendant has effectively defeated
10:14:00 11 the plaintiffs' ability to even effectuate service on it.
10:14:04 12 Moreover, by preventing service, the local removing defendant
10:14:08 13 thus creates new grounds for federal jurisdiction for which
10:14:10 14 Congress has made no specific provision.
10:14:13 15       The Court notes that it finds the district
10:14:15 16 court's reasoning and analysis in *Smethers v. Bell Helicopter*
10:14:22 17 *Textron* -- I think these cases are cited in your briefing --
10:14:25 18 2017 WL 1277512 -- that's a case from earlier this year from
10:14:30 19 our friends in the Southern District of Texas; *Laugelle v. Bell*
10:14:39 20 *Helicopter Textron*, 2012 WL 368220 -- that is a district court
10:14:44 21 opinion from Delaware; and *Hawkins v. Cottrell*, 785 F.Supp.2d
10:14:49 22 1361, from the Northern District of Georgia, persuasive.
10:14:53 23       The Court in *Laugelle* explained that "other
10:14:56 24 district courts that have considered this issue have concluded
10:14:59 25 that Congress could not have intended removability to hinge on

***OFFICIAL TRANSCRIPT***

Exhibit B
00127

10:15:02  1   the timing of service... this conclusion makes particular sense

10:15:06  2   today, given the shift to electronic docketing and the

10:15:10  3   increased potential for gamesmanship by savvy defendants who

10:15:15  4   may monitor state court dockets." That's a quote from the

10:15:17  5   *Laugelle* opinion.  This Court agrees.  Therefore, the motion is

10:15:20  6   granted, and these member cases must be remanded to the

10:15:23  7   Superior Court of Delaware.

10:15:24  8        All right.  I had three other motions pending

10:15:28  9   that I would like to clear and was hoping to clear today.  I

10:15:32 10   know you all have been in e-mail communication with the Court.

10:15:35 11   Those three motions that are pending would be

10:15:41 12   Record Document 559, the motion for disclosure of nonparty

10:15:44 13   interested entities or persons filed by the defendant,

10:15:48 14   Sanofi-Aventis US, LLC; and, also, plaintiffs' motion to compel

10:15:53 15   responses to request for production, at Record Document 626;

10:15:58 16   and, the defendants', Sanofi and Aventis Pharma SA, motion for

10:16:03 17   protective order, at Record Document 542.

10:16:08 18        A couple of weeks ago, I had a status conference

10:16:11 19   with liaison counsel.  I discussed all three of these motions

10:16:17 20   in, I think, very clear terms, insofar as what the Court's

10:16:19 21   belief was at the time.  My opinion that I expressed on that

10:16:23 22   occasion hasn't changed with regard to the likelihood of

10:16:26 23   success, such as it is, on either side of those three motions.

10:16:35 24        Counsel, I understand you all, as late as

10:16:38 25   yesterday, were continuing to discuss resolution of those

**OFFICIAL TRANSCRIPT**

Exhibit B
00128

motions based upon the Court's statements.  What is the status
of those discussions?

MR. COFFIN:  Your Honor, Chris Coffin on behalf of the
plaintiffs.

You are correct, Your Honor.  We have endeavored
to reach a resolution on those motions.  At this time, we have
not.

I can tell you, Your Honor, Ms. Menzies and
myself and Mr. Ratliff spent no less than five hours together,
the three of us.  It was either yesterday or the day before.
We have spoken yesterday as well.  We have a planned call again
today.

It's not for lack of effort, I can assure you,
Your Honor.  Ms. Menzies flew in from Los Angeles, Mr. Ratliff
flew in from Kansas City, specifically for the three of us to
sit in a room and hash out the details of what could be an
agreement.

Unfortunately, it is a very important issue on
both sides.

THE COURT:  Are you making progress?  I understand the
importance of all of the issues in this case.  Are you making
progress, or am I going to rule on this in two weeks or a week
from now?

I would have ruled on it today but for the fact
that I understand you all are meeting -- I want you to meet,

*OFFICIAL TRANSCRIPT*

Exhibit B
00129

| | | |
|---|---|---|
| 10:17:59 | 1 | but I also want you to come to an agreement, if it's at all |
| 10:18:04 | 2 | possible, instead of constantly telling me, we're still |
| 10:18:07 | 3 | talking, we're still talking, we're still talking.  Talking |
| 10:18:11 | 4 | isn't cheap, but I can rule on these things, and I tried to |
| 10:18:19 | 5 | give you a heads-up on how I would rule on them. |
| 10:18:22 | 6 | MR. COFFIN:  I think we have made progress in that |
| 10:18:24 | 7 | we've started talking about concrete agreements that we will |
| 10:18:28 | 8 | put in writing. |
| 10:18:29 | 9 | You know, a lot of our discussions have been |
| 10:18:32 | 10 | around basic concepts of what's the -- we didn't understand the |
| 10:18:37 | 11 | plaintiffs' side, what's the real issue.  So Mr. Ratliff |
| 10:18:42 | 12 | explained that to us.  That has helped Ms. Menzies and I go |
| 10:18:46 | 13 | back and say, okay, we understand the real issue.  Let's see if |
| 10:18:48 | 14 | we can come up with some terms that can help get around those |
| 10:18:52 | 15 | issues. |
| 10:18:53 | 16 | So, yes, we've made some progress.  I will say |
| 10:18:56 | 17 | this, Your Honor -- and perhaps this will give the Court some |
| 10:18:59 | 18 | comfort -- and that is, we have agreed that if we haven't |
| 10:19:01 | 19 | reached an agreement by the end of this week, then we'll tell |
| 10:19:07 | 20 | the Court. |
| 10:19:08 | 21 | THE COURT:  Yes, and I'll go ahead and rule.  I mean, |
| 10:19:11 | 22 | that's what I'm here for. |
| 10:19:12 | 23 | In an MDL setting -- and I've said this to |
| 10:19:16 | 24 | liaison counsel, and I will say in it the big meeting -- you |
| 10:19:20 | 25 | know, your opponent is not your enemy.  We expect zealous |

*OFFICIAL TRANSCRIPT*

Exhibit B
00130

10:19:25 1    representation, but your opponent is also your partner in

10:19:29 2    developing the case to the point where it can be presented to a

10:19:33 3    jury or to the judge, if there are certain issues.  But your

10:19:36 4    opponent isn't your enemy.

10:19:38 5            I'm speaking generally, not about this particular

10:19:42 6    discussion.  But we need to come out of our trenches and meet

10:19:47 7    somewhere in the middle, and discuss these issues and try to

10:19:49 8    resolve them, because when we get into an exchange of

10:19:54 9    motions -- I'm here to rule on motions.  I'm happy to rule on

10:19:57 10   whichever ones you want me to rule on.  I'm happy to rule on

10:20:01 11   these.  But at some point, we have got to be able to, as you

10:20:05 12   say, identify what specifically you need from the defendants.

10:20:09 13           I understand that you all have been before the

10:20:11 14   Magistrate.  Let's get to the point where we're exchanging

10:20:14 15   information on a more informal basis, as opposed to battling it

10:20:20 16   out with motions pending and oppositions and protective orders.

10:20:25 17   I'm commenting to everybody that we are at a point in this MDL

10:20:29 18   where we should be able to do this a little easier.

10:20:32 19           MR. COFFIN:  Understood, Your Honor.  We appreciate

10:20:35 20   that, we really do, because we, from the plaintiffs'

10:20:41 21   perspective, couldn't agree more.  We would like things to move

10:20:45 22   along.  We would like to be able to get documents more quickly.

10:20:48 23   We would like to get over this hurdle of either coming to an

10:20:51 24   agreement or having Your Honor rule on the issue of the French

10:20:56 25   entity being in or out.  So let me assure you that by the end

*OFFICIAL TRANSCRIPT*

10:20:57  1    of this week, we will either have an agreement, or we will not.

10:21:01  2             If Your Honor wants us to give you status along

10:21:05  3    the way, I'm happy to do that as well.  I just want you to know

10:21:08  4    that we have made an earnest effort, in good faith tried to

10:21:13  5    reach an agreement, and we just aren't there yet, and maybe we

10:21:18  6    won't.

10:21:18  7             THE COURT:  What about the motion regarding the

10:21:23  8    disclosure of nonparty interested entities, 559?

10:21:29  9             MR. COFFIN:  That motion has been discussed in the

10:21:31  10   context of how we might reach some larger agreement on all the

10:21:36  11   issues.  But, quite frankly, Your Honor, when Ms. Menzies and

10:21:41  12   Mr. Ratliff and I met a day or two days ago, we did not discuss

10:21:46  13   that motion specifically.  We were focused mostly on the French

10:21:52  14   entity issues.

10:21:53  15            THE COURT:  I take it liaison counsel has conveyed to

10:21:57  16   you my thoughts on that motion?  All parties are aware of what

10:22:01  17   I thought a fair resolution was?

10:22:01  18            MR. COFFIN:  Yes.

10:22:02  19            THE COURT:  If I rule on it, that's exactly what it's

10:22:05  20   going to be.  I've thought about it a great deal.

10:22:08  21            MR. COFFIN:  We understand that.  One of the issues is

10:22:12  22   whether or not our agreement on the other two motions has

10:22:17  23   anything to do with the agreement on the third, so.

10:22:21  24            THE COURT:  But it shouldn't.  You see, that's the

10:22:23  25   thing, it shouldn't.

                              *OFFICIAL TRANSCRIPT*

Exhibit B
00132

10:22:24 1       MR. COFFIN:  Understood.

10:22:25 2       THE COURT:  Get some other people involved on the

10:22:27 3   disclosure issue, and you all keep working on the discovery.

10:22:32 4   It shouldn't.  It's a completely separate issue as far as I'm

10:22:35 5   concerned.  I mean, and this business of, well, you know, I'll

10:22:39 6   trade this for you -- it's an unrelated motion.  In other

10:22:45 7   words, it's going to be granted in part and denied in part.

10:22:48 8   It's going to be pretty much what I told liaison counsel.

10:22:53 9          I'll rule on it now, if you'd like.

10:22:54 10      MR. COFFIN:  I expect that by Friday we will have dealt

10:22:54 11  with that motion as well, and we can determine whether or not

10:22:54 12  we're going to have an agreement on all of it.

10:22:59 13      THE COURT:  That's an easy one.  That's an easy one.  I

10:23:01 14  would think you could get some people from each side to hammer

10:23:05 15  out parameters consistent with what I've said to liaison

10:23:10 16  counsel, and get that one done.

10:23:14 17      MR. COFFIN:  We will focus on that as well, Your Honor.

10:23:17 18      THE COURT:  Ms. Menzies.

10:23:19 19      MS. MENZIES:  Yes.  Ms. Menzies for the plaintiffs.

10:23:19 20         Just to add something here too.  We had talked

10:23:27 21  with Mr. Ratliff, as well, about potentially seeking some

10:23:29 22  guidance from you.  This has been somewhat of a complicated

10:23:35 23  negotiation and discussion, and so we had asked your

10:23:37 24  availability for Monday.  We may seek your availability, maybe

10:23:40 25  as early as tomorrow, for some guidance, if we deem it

**OFFICIAL TRANSCRIPT**

Exhibit B
00133

10:23:45  1    necessary.

10:23:45  2         THE COURT:  Yes, I'm willing to do that.  I don't know

10:23:47  3    about my availability, but you can certainly e-mail my clerk,

10:23:51  4    and I'll try to make myself available.

10:23:54  5              As far as guidance is concerned, if there is a

10:23:57  6    particular knot, a Gordian knot that I can help cut, that's

10:24:03  7    fine.  I have given guidance with liaison counsel, I believe,

10:24:06  8    as to what my thoughts were on the motion for protective order

10:24:09  9    and the motion to compel.

10:24:11 10              So I can help you try to fine tune it, but there

10:24:17 11    are certain limits to that.  You know, you're going to have to

10:24:21 12    present both sides to me, and give me some time to think about

10:24:25 13    it.  It's not going to be one of these things where I can just

10:24:28 14    pick up the phone, and I'll give you these pearls of wisdom,

10:24:32 15    and everyone will be happy.  I like to give it some thought.

10:24:35 16              If you do run into a particular problem or set of

10:24:38 17    problems that you think I can tell you one way or the other, do

10:24:40 18    it this way, or do it that way, I'll be happy to do that.

10:24:44 19    Otherwise, I might as well rule.

10:24:47 20         MS. MENZIES:  Certainly.  We wouldn't be looking for

10:24:49 21    some form of resolution from the Court in the context of the

10:24:52 22    negotiated agreement, but just -- even by way of update.

10:24:54 23         THE COURT:  Yes, I'll do whatever I can to help.

10:24:56 24         MS. MENZIES:  Thank you for your time.

10:24:56 25         MR. MOORE:  Your Honor, very briefly.  I was not at the

*OFFICIAL TRANSCRIPT*

10:24:58  1   meeting with Mr. Coffin, but the report that I got is very
10:25:01  2   consistent with his remarks, is that we have gotten away from
10:25:04  3   sort of extraneous demands, and are focusing kind of on what
10:25:09  4   the issues are.
10:25:10  5          That has been a two-way street, that we're --
10:25:15  6   they are getting an understanding of why this is important to
10:25:18  7   us, we're getting an important understanding of why this is an
10:25:22  8   issue for them.
10:25:23  9          It's always been -- and I think it's been
10:25:24 10   discussed in court -- really, accessibility to evidence outside
10:25:28 11   the United States.  So that's where the discussion, I think, is
10:25:30 12   focused, and we're hopeful that we'll be able to tell the Court
10:25:34 13   later this week that we've worked it out.
10:25:36 14          THE COURT:  Good.  Well, we'll wait to hear from you.
10:25:40 15          Mr. Olinde, did you want to say something?  I
10:25:43 16   think you were about to get up.
10:25:43 17          MR. OLINDE:  No, Your Honor, I was just moving in my
10:25:45 18   chair.
10:25:46 19          THE COURT:  Okay.  Well, good.  Thank you all for the
10:25:48 20   briefing on the material we did cover today.  I really
10:25:52 21   appreciate it.  As always in the case, the briefing has been
10:25:54 22   very helpful and very well prepared and researched.  I
10:25:58 23   appreciate that.
10:25:59 24          All right.  Thank you all very much.
         25          (WHEREUPON, at 10:26 a.m., the Court was in recess.)

*OFFICIAL TRANSCRIPT*

41

1                        REPORTER'S CERTIFICATE

2

3          I, Cathy Pepper, Certified Realtime Reporter, Registered

4    Merit Reporter, Certified Court Reporter in and for the State

5    of Louisiana, Official Court Reporter for the United States

6    District Court, Eastern District of Louisiana, do hereby

7    certify that the foregoing is a true and correct transcript to

8    the best of my ability and understanding from the record of the

9    proceedings in the above-entitled and numbered matter.

10

11                              _s/Cathy Pepper_____

12                              Cathy Pepper, CRR, RMR, CCR
                                Certified Realtime Reporter
13                              Registered Merit Reporter
                                Official Court Reporter
14                              United States District Court
                                Cathy_Pepper@laed.uscourts.gov
15

16

17

18

19

20

21

22

23

24

25

                         *OFFICIAL  TRANSCRIPT*

Exhibit B
00136

1

## 1

**1** [2] - 21:6, 23:9
**100** [1] - 14:6
**1001** [1] - 3:5
**109** [1] - 16:18
**10:26** [1] - 40:25
**1100** [2] - 1:21, 2:23
**112** [2] - 8:25, 9:24
**12** [1] - 9:10
**12(b)(6** [1] - 21:1
**1277512** [1] - 32:18
**13** [1] - 15:14
**1332** [2] - 29:1, 31:11
**1361** [1] - 32:22
**14** [3] - 15:14, 21:14, 24:7
**1400** [1] - 1:25
**1441** [1] - 29:1
**1441(b** [3] - 31:4, 31:14, 31:24
**1441(b)(2** [2] - 30:14, 31:6
**15** [1] - 8:7
**1515** [1] - 1:25
**16-MD-2740** [1] - 1:6
**189** [1] - 9:24
**190** [2] - 10:14, 16:7

## 2

**2** [6] - 21:10, 23:16, 24:6, 24:23, 25:12
**20** [1] - 8:1
**200** [1] - 2:16
**2009** [1] - 23:12
**2012** [1] - 32:20
**2017** [4] - 5:3, 26:11, 30:15, 32:18
**212** [2] - 9:1, 10:15
**215** [3] - 15:12, 16:7, 16:18
**22** [1] - 8:25
**220** [1] - 18:15
**22ND** [1] - 3:5
**2300** [1] - 2:22
**24** [1] - 9:1
**26** [2] - 4:9, 4:10
**2657** [1] - 22:3
**2700** [1] - 2:8
**2740** [1] - 5:10
**28** [6] - 29:1, 30:14, 31:4, 31:6, 31:11
**2800** [1] - 1:21, 2:12

## 3

**3** [2] - 21:6, 23:9
**30** [4] - 1:7, 4:12, 4:13, 5:3
**3017** [1] - 1:7
**30305** [1] - 2:17
**3333** [1] - 2:17
**3650** [1] - 1:17
**368220** [1] - 32:20

## 4

**400** [2] - 2:4, 2:8
**45202** [1] - 2:13
**46** [2] - 9:1, 14:6
**469** [2] - 26:10, 26:19
**469...........................
....** [1] - 4:10
**489** [2] - 6:18, 20:23
**489...........................
** [1] - 4:5

## 5

**500** [1] - 3:13
**504** [1] - 3:14
**505(b)(2** [12] - 15:2, 15:4, 15:10, 15:13, 15:15, 16:1, 16:11, 16:13, 16:20, 16:24, 17:4, 19:23
**505(b)(2)** [1] - 7:10
**51** [1] - 3:5
**542** [1] - 33:17
**559** [2] - 33:12, 37:8
**56** [1] - 11:6
**577726** [1] - 23:12
**589-7779** [1] - 3:14

## 6

**6** [3] - 4:5, 4:7, 30:15
**600** [1] - 2:12
**620** [1] - 26:16
**626** [1] - 33:15
**628** [1] - 26:21
**646** [1] - 26:23
**663** [1] - 6:22
**673** [1] - 30:11
**673...........................
....** [1] - 4:13
**6TH** [1] - 2:4
**6th** [1] - 26:11

## 7

**7** [2] - 21:6, 23:9
**701** [2] - 1:17, 3:9
**70112** [1] - 1:25
**70130** [2] - 2:8, 3:14
**70139** [1] - 1:18
**70163** [2] - 1:22, 2:23
**70802** [1] - 3:9
**75** [1] - 15:13
**773** [1] - 6:23
**785** [1] - 32:21

## 8

**8** [10] - 9:11, 10:8, 14:12, 21:10, 23:16, 24:6, 24:23, 24:24, 25:12

## 9

**9** [3] - 9:11, 10:8, 14:13
**9(b** [2] - 9:21, 14:20
**9(b)** [1] - 21:1
**90245** [1] - 2:5
**9:30** [1] - 1:7

## A

**a.m** [1] - 40:25
**A.M** [1] - 1:7
**ability** [3] - 29:2, 32:11, 41:8
**able** [6] - 8:10, 25:3, 36:11, 36:18, 36:22, 40:12
**ably** [1] - 15:6
**above-entitled** [1] - 41:9
**accessibility** [1] - 40:10
**ACCORD** [1] - 3:7
**accurately** [1] - 14:3
**Act** [1] - 10:10
**ACTAVIS** [1] - 2:10
**acted** [1] - 32:6
**ACTION** [1] - 1:6
**action** [10] - 9:5, 9:13, 9:15, 11:25, 15:12, 17:6, 17:19, 17:20, 22:15
**actions** [6] - 15:21, 16:18, 28:22, 29:6, 29:11, 30:3
**add** [3] - 20:16, 31:12,

38:20
**add-on** [1] - 31:12
**additional** [3] - 23:18, 29:7, 29:13
**address** [3] - 8:17, 9:22, 30:4
**addressed** [1] - 23:14
**addressing** [1] - 7:10
**adequate** [1] - 24:3
**administered** [1] - 27:21
**administrative** [1] - 23:2
**adopt** [1] - 22:7
**adverse** [1] - 19:19
**advertisements** [1] - 19:11
**Advertising** [1] - 10:24
**advertising** [3] - 16:9, 16:10, 16:19
**advisement** [1] - 30:16
**afield** [1] - 10:25
**aforementioned** [1] - 27:16
**agency** [1] - 11:4
**agents** [1] - 11:15
**aggressive** [1] - 19:14
**ago** [2] - 33:18, 37:12
**agree** [1] - 36:21
**agreed** [1] - 35:18
**agreement** [11] - 34:17, 35:1, 35:19, 36:24, 37:1, 37:5, 37:10, 37:22, 37:23, 38:12, 39:22
**agreements** [1] - 35:7
**agrees** [2] - 23:25, 33:5
**ahead** [6] - 5:25, 6:24, 7:4, 20:20, 25:14, 35:21
**AIDED** [1] - 3:17
**air** [2] - 13:8, 13:11
**Alabama** [1] - 17:24
**ALL** [1] - 1:9
**allegation** [4] - 16:12, 16:23, 16:24, 18:20
**allegations** [32] - 8:18, 8:20, 8:24, 9:2, 9:7, 9:23, 9:25, 10:6, 10:8, 10:13, 11:23, 12:7, 13:14, 14:7, 14:18, 14:20, 15:9, 15:12, 15:14, 15:16, 15:19, 15:22, 16:1, 16:10, 16:14, 17:5, 20:5, 22:4, 22:20, 23:1, 23:5

**allege** [2] - 21:11, 23:16
**alleged** [7] - 9:12, 10:16, 11:13, 12:25, 21:17, 26:14, 29:3
**allow** [3] - 20:6, 22:22, 23:13
**allowing** [1] - 23:9
**almost** [1] - 19:25
**alone** [1] - 11:20
**alopecia** [4] - 10:4, 12:15, 19:17, 19:21
**amendment** [1] - 21:15
**analysis** [2] - 18:1, 32:16
**analyze** [1] - 9:11
**AND** [2] - 2:21, 3:3
**Angeles** [1] - 34:14
**APPEARANCES** [3] - 1:14, 2:1, 3:1
**appearances** [2] - 6:25, 7:4
**applicable** [2] - 27:1, 30:19
**appointed** [1] - 31:22
**appreciate** [5] - 6:13, 20:17, 36:19, 40:21, 40:23
**approach** [1] - 26:5
**approaching** [1] - 14:19
**appropriate** [2] - 28:15, 29:14
**appropriately** [1] - 23:14
**approval** [1] - 15:17
**approved** [1] - 15:17
**argue** [1] - 27:19
**argued** [1] - 25:14
**arguing** [1] - 30:12
**argument** [9] - 7:15, 10:7, 11:18, 13:15, 13:23, 26:12, 30:6, 30:15, 30:18
**arguments** [3] - 21:3, 21:5, 27:1
**articulated** [2] - 9:5, 10:14
**AS** [1] - 2:21
**asserted** [1] - 9:13
**associated** [1] - 14:1
**assure** [2] - 34:13, 36:25
**ATLANTA** [1] - 2:17
**attached** [1] - 30:22
**AUGUST** [2] - 1:7, 5:3
**authority** [2] - 26:3
**authorized** [4] - 29:15, 29:19, 31:3, 31:21

*OFFICIAL TRANSCRIPT*

Exhibit B
00137

availability [3] - 38:24, 39:3
available [2] - 14:16, 39:4
Aventis [3] - 26:22, 33:14, 33:16
AVENUE [1] - 3:5
aware [3] - 9:8, 16:25, 37:16
axiomatic [1] - 31:1

**B**

B-275 [1] - 3:13
bad [1] - 19:7
bags [2] - 13:9, 13:11
balance [1] - 11:9
bar [1] - 14:14
Barbier [1] - 5:12
barred [1] - 18:4
BARRIOS [3] - 1:16, 1:16, 7:22
Barrios [1] - 7:22
base [1] - 10:17
based [5] - 18:22, 19:1, 21:5, 24:11, 34:1
basic [1] - 35:10
basis [4] - 18:19, 20:11, 25:12, 36:15
BATON [1] - 3:9
battling [1] - 36:15
BAUDIN [1] - 1:24
becomes [1] - 12:24
BEFORE [1] - 1:17
begin [3] - 5:9, 7:5, 8:25
beginning [1] - 10:14
behalf [8] - 7:8, 7:13, 7:15, 7:18, 15:1, 15:3, 17:11, 34:3
belief [5] - 17:12, 18:23, 27:24, 28:9, 33:21
Bell [2] - 32:16, 32:19
benefits [1] - 5:18
BENJAMIN [1] - 1:20
BERNE [1] - 2:11
best [3] - 12:9, 23:13, 41:8
better [3] - 11:19, 13:15, 18:20
between [1] - 8:8
beyond [6] - 18:9, 18:11, 18:14, 18:16, 19:10, 19:24
big [1] - 35:24
bit [1] - 6:12
boils [1] - 8:21

BOULEVARD [1] - 2:4
breach [6] - 9:18, 10:17, 13:6, 13:10, 21:12, 21:23, 23:17, 24:1
brief [2] - 15:5, 19:5
briefing [11] - 7:1, 20:17, 21:15, 27:5, 28:21, 29:7, 29:13, 29:23, 32:17, 40:20, 40:21
briefly [2] - 16:2, 39:25
bring [1] - 18:2
Bristol [1] - 29:25
Bristol-Myers [1] - 29:25
brought [1] - 18:5
BRUCE [1] - 1:17
Bruce [2] - 7:14, 17:10
bunch [1] - 10:25
BUSINESS [1] - 2:20
business [2] - 15:19, 38:5
BY [12] - 1:16, 1:21, 1:24, 2:3, 2:7, 2:11, 2:16, 2:22, 3:4, 3:8, 3:16, 3:17

**C**

California [5] - 26:10, 27:12, 28:10, 30:1, 30:2
CALIFORNIA [1] - 2:5
California's [1] - 27:23
CALIFORNIA............. ... [1] - 4:9
CALLED [1] - 5:4
campaign [4] - 18:25, 19:1, 19:6, 19:14
cancer [4] - 11:19, 12:3, 12:5, 14:2
Candyse [1] - 27:10
cannot [2] - 12:21, 23:25
car [3] - 13:3, 13:5, 13:8
carefully [1] - 21:2, 26:24, 30:17
Case [1] - 22:3
case [32] - 7:1, 8:22, 11:12, 11:24, 12:5, 12:23, 12:25, 14:15, 17:16, 17:17, 17:23, 18:7, 18:10, 18:11, 19:16, 20:3, 22:5, 22:10, 22:17, 22:20, 23:15, 24:12, 25:18,

26:3, 26:20, 27:6, 27:7, 32:9, 32:18, 34:21, 36:2, 40:21
case-specific [1] - 22:10
cases [11] - 19:4, 21:4, 23:7, 27:6, 28:15, 28:19, 29:21, 30:20, 30:21, 32:17, 33:6
CASES [2] - 1:9, 4:8
Cases [1] - 26:9
Castagnola [1] - 28:1
CASTEIX [1] - 1:16
Cathy [2] - 41:3, 41:12
CATHY [1] - 3:12
Cathy_Pepper@laed .uscourts.gov [1] - 41:14
cathy_Pepper@laed. uscourts.gov [1] - 3:15
causation [1] - 8:19
causes [8] - 9:5, 9:13, 9:15, 15:12, 17:6, 17:18, 17:19, 17:20
CBS [1] - 10:2
CCR [2] - 3:12, 41:12
CENTRE [1] - 2:22
certain [2] - 36:3, 39:11
CERTAIN [1] - 4:8
Certain [1] - 26:9
certainly [4] - 6:8, 6:16, 39:3, 39:20
CERTIFICATE [1] - 41:1
CERTIFIED [1] - 3:12
Certified [3] - 41:3, 41:4, 41:12
certify [1] - 41:7
CHAD [1] - 3:8
CHAFFE [1] - 2:21
chair [1] - 40:18
challenging [1] - 8:3
chance [1] - 7:3
change [1] - 10:5
changed [1] - 33:22
chapter [1] - 19:11
characteristic [1] - 12:1
cheap [1] - 35:4
chemotherapy [3] - 11:15, 11:17, 27:18
Cherie [1] - 5:25
Chief [1] - 6:4
Chris [2] - 7:12, 34:3
CHRISTOPHER [1] - 1:24

CINCINNATI [1] - 2:13
circumstance [1] - 20:7
circumstances [1] - 28:15
circumvent [1] - 30:13
cite [1] - 16:7
cited [3] - 19:4, 19:10, 32:17
City [1] - 34:15
CIVIL [1] - 1:6
Civil [1] - 21:1
claim [15] - 9:12, 9:18, 10:9, 11:21, 12:8, 12:20, 12:21, 13:16, 13:18, 14:10, 14:15, 19:8, 20:5, 24:1
claims [18] - 9:18, 9:20, 10:17, 13:17, 14:12, 18:3, 18:4, 21:18, 21:24, 23:9, 23:13, 25:4, 25:18, 25:21, 27:11, 28:24, 29:2, 30:2
class [1] - 11:25
clear [5] - 7:1, 26:2, 33:9, 33:20
cleared [1] - 26:1
clearing [1] - 6:11
clearly [2] - 12:13, 21:16
CLERK [1] - 5:7
clerk [1] - 39:3
clever [1] - 31:13
Cliff [2] - 7:8, 14:25
CLIFTON [1] - 2:16
clinical [2] - 10:1, 19:20
close [1] - 14:19
co [2] - 7:21, 7:22
co-liaison [2] - 7:21, 7:22
Code [1] - 29:5
COFFIN [12] - 1:24, 1:24, 7:12, 34:3, 35:6, 36:19, 37:9, 37:18, 37:21, 38:1, 38:10, 38:17
Coffin [2] - 7:12, 34:3
coffin [1] - 40:1
combination [1] - 11:15
comfort [1] - 35:18
coming [2] - 12:2, 36:23
comment [2] - 11:7, 14:13
commenting [1] - 36:17
comments [2] - 8:11,

30:18
communication [1] - 33:10
Communication [1] - 10:24
compel [2] - 33:14, 39:9
competitors [1] - 12:17
Complaint [12] - 6:19, 15:9, 15:11, 17:14, 20:22, 20:25, 21:11, 21:16, 21:25, 22:19, 23:2, 24:13
complaint [23] - 8:16, 8:24, 9:5, 10:22, 11:1, 15:8, 15:24, 16:6, 16:8, 16:15, 17:22, 18:16, 21:9, 22:6, 22:8, 22:9, 22:14, 22:16, 23:3, 24:5, 24:6
COMPLAINT............. .............................. [1] - 4:7
complaints [4] - 22:7, 22:19, 23:6, 24:11
completely [1] - 38:4
complex [1] - 18:11
complexity [1] - 18:10
compliance [1] - 26:17
complicated [1] - 38:22
component [1] - 25:3
COMPUTER [1] - 3:17
COMPUTER-AIDED [1] - 3:17
concealment [1] - 21:22
concepts [1] - 35:10
concerned [2] - 22:18, 38:5, 39:5
conclude [1] - 9:1
concluded [2] - 11:1, 32:24
conclusion [1] - 33:1
concrete [1] - 35:7
conduct [1] - 14:19
confer [1] - 29:10
conference [1] - 33:18
Congress [4] - 31:10, 32:3, 32:14, 32:25
Congress' [1] - 31:13
connected [2] - 28:4, 29:4
connecting [1] - 27:15
connection [3] - 24:23, 26:15, 28:12
consequence [1] -

10:5
**consider** [2] - 22:4, 25:21
**considered** [4] - 21:2, 26:24, 30:17, 32:24
**considering** [1] - 26:7
**considers** [1] - 22:17
**consistent** [2] - 38:15, 40:2
**consists** [1] - 22:15
**consolidated** [1] - 22:24
**constantly** [1] - 35:2
**constitute** [1] - 21:17
**constitutes** [2] - 8:13, 11:9
**Constitution** [1] - 31:3
**consumer** [1] - 11:25
**contained** [2] - 10:21, 21:7
**contemplate** [1] - 31:24
**context** [6] - 9:10, 11:6, 22:4, 29:15, 37:10, 39:21
**contextual** [1] - 18:10
**CONTINENTAL** [1] - 2:4
**CONTINUED** [2] - 2:1, 3:1
**continuing** [1] - 33:25
**contrary** [1] - 32:6
**controlling** [1] - 30:7
**conveyed** [2] - 12:13, 37:15
**convince** [1] - 29:19
**convinced** [1] - 28:11
**correct** [3] - 23:20, 34:5, 41:7
**Cottrell** [1] - 32:21
**counsel** [25] - 6:24, 7:6, 7:7, 7:21, 7:22, 8:7, 21:14, 23:1, 24:14, 25:20, 27:4, 27:14, 28:2, 28:5, 28:16, 28:20, 29:7, 29:9, 33:19, 33:24, 35:24, 37:15, 38:8, 38:16, 39:7
**Count** [2] - 21:6, 23:9
**count** [3] - 10:11, 10:22, 11:22
**counts** [6] - 8:17, 9:4, 9:8, 12:19, 17:13, 17:15
**Counts** [7] - 21:6, 21:10, 23:9, 23:16, 24:6, 24:23, 25:12
**couple** [2] - 25:14, 33:18

**coupled** [1] - 12:21
**coupling** [1] - 12:19
**course** [4] - 5:23, 21:4, 26:5, 30:6
**Court** [61] - 5:11, 5:23, 5:24, 6:3, 6:7, 6:8, 7:11, 8:11, 8:14, 18:1, 20:6, 20:10, 20:23, 20:24, 21:4, 21:14, 22:1, 22:17, 22:22, 22:25, 23:10, 23:12, 23:18, 23:25, 24:4, 24:10, 26:2, 26:8, 26:11, 26:13, 26:21, 27:22, 28:5, 28:11, 28:13, 29:9, 29:14, 29:25, 30:2, 30:3, 30:10, 30:15, 30:23, 30:24, 31:22, 32:7, 32:15, 32:23, 33:5, 33:7, 33:10, 35:17, 35:20, 39:21, 40:12, 40:25, 41:4, 41:5, 41:6, 41:13, 41:14
**COURT** [26] - 1:1, 3:12, 4:12, 5:4, 5:8, 7:16, 7:19, 7:24, 14:23, 17:8, 18:18, 20:13, 20:15, 34:20, 35:21, 37:7, 37:15, 37:19, 37:24, 38:2, 38:13, 38:18, 39:2, 39:23, 40:14, 40:19
**court** [13] - 5:14, 12:2, 22:14, 26:6, 27:12, 30:6, 31:8, 31:16, 31:19, 31:25, 32:20, 33:4, 40:10
**Court's** [8] - 25:25, 26:17, 27:14, 28:23, 29:2, 29:24, 33:20, 34:1
**court's** [1] - 32:16
**courthouse** [1] - 31:21
**courts** [6] - 26:6, 30:25, 31:1, 31:2, 31:9, 32:24
**COURTS** [1] - 4:9
**Courts** [1] - 26:9
**cover** [3] - 15:16, 16:2, 40:20
**covered** [1] - 15:6
**COX** [1] - 3:8
**crashes** [1] - 13:8
**creates** [1] - 32:13
**CRR** [2] - 3:12, 41:12
**cryptically** [1] - 21:19
**Cty** [1] - 30:1

**cure** [1] - 12:3
**cut** [1] - 39:6

## D

**dangerous** [1] - 14:1
**data** [1] - 10:1
**date** [2] - 24:7, 28:21
**dates** [1] - 28:6
**DAVID** [1] - 1:20
**Dawn** [1] - 7:22
**DAWN** [1] - 1:16
**days** [6] - 21:14, 24:7, 27:5, 28:16, 28:21, 37:12
**DDMAC** [5] - 10:23, 11:4, 11:10, 19:12
**deal** [1] - 37:20
**deals** [1] - 16:8
**dealt** [1] - 38:10
**deceit** [1] - 21:23
**decision** [2] - 25:7, 29:25
**decisions** [1] - 8:14
**declines** [1] - 30:3
**deem** [1] - 38:25
**defeated** [1] - 32:10
**defective** [2] - 13:11, 18:25
**defendant** [14] - 9:16, 9:19, 14:17, 15:15, 16:24, 25:6, 30:13, 30:14, 31:15, 31:23, 32:10, 32:12, 33:13
**defendants** [25] - 12:13, 13:23, 15:3, 15:4, 15:10, 15:13, 16:1, 16:11, 16:13, 16:20, 17:4, 17:13, 19:4, 19:22, 19:23, 20:7, 23:20, 23:22, 24:15, 25:11, 27:19, 30:1, 33:3, 36:12
**DEFENDANTS'** [1] - 4:6
**Defendants'** [1] - 6:18
**defendants'** [2] - 8:5, 21:8, 33:16
**defense** [1] - 7:6
**deficiency** [2] - 16:3, 16:15
**degrees** [1] - 15:9
**Delaware** [5] - 30:9, 30:10, 30:23, 32:21, 33:7
**DELAWARE** [1] - 4:11
**DELAWARE................
..............** [1] - 4:12
**delayed** [1] - 32:4

**demands** [1] - 40:3
**denied** [4] - 21:6, 27:2, 28:2, 38:7
**dependent** [1] - 20:3
**DEPUTY** [1] - 5:7
**described** [1] - 19:18
**desire** [1] - 28:23
**detail** [2] - 22:10, 27:8
**details** [1] - 34:16
**determination** [1] - 11:4
**determine** [1] - 38:11
**determined** [1] - 11:2
**detriments** [1] - 5:18
**developing** [1] - 36:2
**device** [1] - 22:6
**different** [4] - 5:23, 14:17, 17:23, 32:8
**differs** [1] - 15:8
**dilatory** [1] - 29:7
**directed** [1] - 29:7
**disagree** [1] - 16:6
**disclosed** [1] - 19:22
**disclosure** [3] - 33:12, 37:8, 38:3
**discovery** [5] - 20:6, 20:8, 25:5, 25:22, 38:3
**discuss** [6] - 16:18, 27:7, 30:20, 33:25, 36:7, 37:12
**discussed** [4] - 16:7, 33:19, 37:9, 40:10
**discussing** [1] - 5:13
**discussion** [5] - 5:17, 8:13, 36:6, 38:23, 40:11
**discussions** [2] - 34:2, 35:9
**Dismiss** [5] - 6:18, 16:4, 20:22, 24:10, 28:17
**dismiss** [6] - 17:22, 20:4, 20:12, 21:8, 30:2
**DISMISS** [1] - 4:6
**dismissal** [3] - 17:13, 17:15, 20:24
**dispute** [1] - 14:15
**distribute** [1] - 27:17
**distributed** [2] - 27:21, 28:6
**DISTRICT** [3] - 1:1, 1:1, 1:12
**District** [7] - 5:23, 22:2, 32:19, 32:22, 41:6, 41:14
**district** [4] - 22:2, 32:15, 32:20, 32:24
**diversity** [2] - 31:9,

31:13
**divided** [1] - 8:8
**Division** [1] - 10:23
**DIVISION** [1] - 2:15
**DOCETAXEL** [1] - 1:14
**Docetaxel** [4] - 5:10, 27:17, 27:21, 28:7
**docket** [1] - 5:9
**docketing** [1] - 33:2
**dockets** [1] - 33:4
**doctor** [1] - 24:15
**doctors** [2] - 19:15, 24:16
**DOCUMENT** [4] - 1:8, 4:5, 4:10, 4:13
**Document** [13] - 6:17, 6:22, 6:23, 20:23, 26:10, 26:16, 26:19, 26:21, 26:23, 30:11, 33:12, 33:15, 33:17
**documentation** [2] - 6:21, 31:20
**documents** [2] - 20:8, 36:22
**DOING** [1] - 2:20
**done** [2] - 32:10, 38:16
**door** [1] - 32:2
**DOUGLAS** [1] - 2:7
**Douglas** [1] - 7:6
**down** [1] - 8:21
**Dr** [3] - 5:15, 6:1, 6:6
**Drug** [1] - 10:23
**drug** [5] - 19:2, 19:7, 19:16
**drugs** [1] - 19:3
**during** [1] - 8:6

## E

**e-mail** [2] - 33:10, 39:3
**early** [1] - 38:25
**earnest** [1] - 37:4
**easier** [2] - 25:19, 25:20, 36:18
**Eastern** [2] - 5:23, 41:6
**EASTERN** [1] - 1:1
**easy** [2] - 38:13
**economic** [1] - 18:3
**effect** [2] - 12:8, 19:20
**effective** [1] - 12:16
**effectively** [2] - 32:10
**effectiveness** [1] - 24:2
**effects** [5] - 14:1, 14:2, 19:3, 24:3, 24:19
**effectuate** [1] - 32:11

Exhibit B
00139

**effectuated** [1] - 30:12
**efficacious** [1] - 19:2
**efficacy** [5] - 11:16, 12:12, 12:16, 13:14
**effort** [3] - 30:13, 34:13, 37:4
**eight** [7] - 9:4, 9:8, 21:18, 21:23, 21:24, 24:17
**either** [8] - 15:5, 19:22, 23:22, 31:25, 33:23, 34:10, 36:23, 37:1
**EL** [1] - 2:5
**electronic** [1] - 33:2
**electronically** [1] - 32:1
**eliminating** [1] - 11:19
**EMANUEL** [1] - 3:4
**embarked** [1] - 19:14
**emphasis** [1] - 30:25
**employee** [1] - 31:21
**employs** [1] - 22:6
**encourage** [1] - 29:9
**end** [2] - 35:19, 36:25
**endeavored** [1] - 34:5
**enemy** [2] - 35:25, 36:4
**ENERGY** [1] - 2:22
**ENGELHARDT** [1] - 1:12
**entertain** [1] - 20:10
**entirely** [1] - 16:8
**entirety** [3] - 26:24, 29:6, 30:17
**entities** [2] - 33:13, 37:8
**entitled** [2] - 25:11, 41:9
**entity** [3] - 31:25, 36:25, 37:14
**equally** [1] - 30:7
**Ernys** [3] - 27:6, 28:19, 28:24
**Ernys-Kofler** [3] - 27:6, 28:19, 28:24
**esoteric** [1] - 8:12
**especially** [2] - 20:7, 24:21
**ESQ** [11] - 1:16, 1:17, 1:21, 1:24, 2:3, 2:7, 2:11, 2:16, 2:22, 3:4, 3:8
**essentially** [2] - 9:24, 21:7
**establish** [3] - 10:3, 11:23, 27:20
**established** [1] - 13:16
**event** [1] - 19:19

**evidence** [2] - 27:16, 40:10
**exactly** [1] - 37:19
**example** [2] - 13:2, 18:2
**excess** [2] - 14:1, 31:9
**exchange** [1] - 36:8
**exchanging** [1] - 36:14
**exists** [1] - 26:14
**expect** [2] - 35:25, 38:10
**expected** [1] - 22:10
**expecting** [1] - 8:12
**experienced** [1] - 6:11
**explained** [3] - 22:14, 32:23, 35:12
**explaining** [1] - 22:3
**express** [18] - 9:15, 9:19, 10:19, 13:4, 13:7, 13:10, 14:7, 14:10, 21:12, 21:16, 21:23, 23:17, 23:21, 23:22, 24:1, 24:5, 24:21
**expressed** [1] - 33:21
**expressly** [3] - 13:24, 31:10
**extension** [1] - 31:13
**extraneous** [1] - 40:3

## F

**F.Supp.2d** [1] - 32:21
**facility** [1] - 27:17
**fact** [6] - 18:15, 19:18, 19:20, 20:3, 31:15, 34:24
**facts** [3] - 9:11, 14:4, 17:20
**factual** [11] - 8:24, 9:2, 9:7, 9:23, 14:7, 15:12, 15:14, 16:10, 16:14, 17:5, 20:11
**fail** [1] - 14:12
**failed** [2] - 28:2, 32:5
**failure** [8] - 8:22, 9:24, 10:9, 12:20, 12:22, 12:23, 17:16, 21:20
**fair** [2] - 11:8, 37:17
**faith** [1] - 37:4
**Fallon** [1] - 5:12
**false** [4] - 9:19, 11:2, 11:8, 13:6
**far** [3] - 10:25, 38:4, 39:5
**fashion** [1] - 32:7
**favor** [1] - 30:24
**FDA** [7] - 11:1, 11:2,

15:17, 15:20, 16:12, 19:12
**Federal** [1] - 20:25
**federal** [7] - 26:6, 30:25, 31:1, 31:7, 31:9, 32:2, 32:13
**FEMA** [2] - 17:23, 20:2
**few** [2] - 5:22, 15:3
**file** [1] - 28:16
**filed** [8] - 6:22, 22:20, 23:7, 24:12, 26:18, 26:22, 27:13, 33:13
**filings** [1] - 31:25
**finally** [1] - 28:18
**fine** [2] - 39:7, 39:10
**finer** [2] - 24:8, 29:12
**finish** [1] - 8:4
**firmly** [1] - 18:15
**first** [3] - 9:15, 30:4, 31:19
**fit** [1] - 13:24
**five** [5] - 13:4, 13:7, 13:12, 21:21, 34:9
**flesh** [1] - 22:20
**flew** [2] - 34:14, 34:15
**FLOOR** [2] - 2:4, 3:5
**focus** [7] - 8:15, 8:20, 9:9, 9:14, 11:13, 11:16, 38:17
**focused** [2] - 37:13, 40:12
**focusing** [1] - 40:3
**follow** [1] - 7:25
**FOR** [7] - 1:16, 2:7, 2:10, 2:15, 2:19, 3:3, 3:7
**foregoing** [1] - 41:7
**form** [6] - 21:9, 22:7, 22:16, 22:19, 23:6, 39:21
**Form** [9] - 6:19, 20:22, 20:25, 21:11, 21:15, 21:24, 22:18, 23:2, 24:13
**FORM** [1] - 4:6
**FORMERLY** [1] - 1:17
**forms** [1] - 14:2
**formulating** [1] - 23:1
**forth** [6] - 9:12, 10:9, 11:21, 21:24, 24:13, 24:25
**forum** [1] - 30:13
**forward** [1] - 23:14
**four** [4] - 10:22, 13:6, 17:24, 21:21
**framework** [1] - 22:3
**Francisco** [1] - 30:1
**frankly** [1] - 37:11
**fraud** [6] - 16:2, 16:16, 19:7, 21:22, 22:4,

23:6
**fraudulent** [4] - 10:19, 14:19, 21:21, 21:22
**French** [2] - 36:24, 37:13
**Friday** [1] - 38:10
**friends** [1] - 32:19
**FRITCHIE** [1] - 2:7
**Fuller** [1] - 28:1
**function** [1] - 23:2
**furthermore** [1] - 29:24

## G

**GAINSBURGH** [1] - 1:20
**gamesmanship** [1] - 33:3
**Gardner** [1] - 28:1
**gather** [1] - 5:19
**generalized** [1] - 28:5
**generally** [2] - 22:23, 36:5
**generic** [2] - 27:17, 28:7
**gentlemen** [2] - 5:20, 6:13
**Georgia** [1] - 32:22
**GEORGIA** [1] - 2:17
**GIBBS** [1] - 2:3
**given** [2] - 33:2, 39:7
**gleaned** [1] - 20:2
**goals** [1] - 23:10
**GONZALEZ** [1] - 3:4
**Gordian** [1] - 39:6
**granted** [7] - 16:4, 17:3, 27:2, 27:11, 30:21, 33:6, 38:7
**granting** [1] - 24:10
**great** [2] - 17:17, 37:20
**greater** [3] - 11:16, 12:16, 19:2
**GREENBURG** [1] - 2:15
**ground** [1] - 15:5
**grounds** [1] - 32:13
**group** [2] - 23:23, 24:22
**GROUP** [1] - 2:3
**guarantees** [1] - 13:21
**guess** [1] - 17:14
**guests** [1] - 5:11
**guidance** [4] - 38:22, 38:25, 39:5, 39:7

## H

**hammer** [1] - 38:14
**handled** [1] - 17:21
**happy** [5] - 36:9, 36:10, 37:3, 39:15, 39:18
**hash** [1] - 34:16
**Hawkins** [1] - 32:21
**heads** [1] - 35:5
**heads-up** [1] - 35:5
**HEALTHCARE** [1] - 3:7
**hear** [1] - 40:14
**heard** [1] - 17:12
**HEARD** [1] - 1:12
**hearing** [1] - 6:9
**HEARING** [1] - 1:11
**held** [2] - 26:11, 30:15
**Helicopter** [2] - 32:16, 32:20
**help** [4] - 35:14, 39:6, 39:10, 39:23
**helped** [1] - 35:12
**helpful** [1] - 40:22
**hereby** [1] - 41:6
**Hicks** [1] - 28:25
**high** [2] - 14:14, 19:21
**High** [1] - 6:3
**hinge** [1] - 32:25
**hit** [1] - 18:7
**Honor** [31] - 7:9, 7:12, 7:17, 7:20, 8:25, 9:8, 10:12, 11:21, 13:18, 14:11, 14:25, 17:2, 17:7, 17:10, 17:18, 17:21, 18:13, 19:24, 20:14, 34:3, 34:5, 34:8, 34:14, 35:17, 36:19, 36:24, 37:2, 37:11, 38:17, 39:25, 40:17
**Honor's** [1] - 18:6
**HONORABLE** [1] - 1:12
**hopeful** [1] - 40:12
**hopefully** [1] - 6:9
**hoping** [1] - 33:9
**HOSPIRA** [4] - 2:19, 2:20, 2:21, 3:3
**hours** [1] - 34:9
**hundred** [1] - 9:2
**hurdle** [4] - 9:21, 26:1, 36:23

## I

**idea** [1] - 31:14

**identified** [4] - 21:18, 21:24, 24:14, 24:21
**identify** [1] - 25:3, 36:12
**identifying** [2] - 21:16, 25:9
**immediate** [1] - 32:1
**importance** [1] - 34:21
**important** [4] - 15:7, 34:18, 40:6, 40:7
**improperly** [1] - 28:14
**IN** [1] - 1:4
**inappropriate** [1] - 20:4
**INC** [6] - 2:11, 2:19, 2:21, 3:3, 3:8
**Inc** [2] - 7:8, 15:1
**inclement** [1] - 6:10
**inclination** [1] - 29:20
**include** [1] - 22:10
**including** [1] - 30:19
**incorporate** [1] - 9:6
**incorporated** [1] - 15:18
**increased** [4] - 10:3, 11:16, 13:14, 33:3
**indefinitely** [1] - 32:5
**indicated** [2] - 8:6, 29:17
**individual** [7] - 22:7, 22:12, 22:16, 23:7, 24:11, 24:12, 24:15
**individualized** [3] - 26:13, 28:3, 29:3
**individuals** [1] - 12:8
**informal** [1] - 36:15
**information** [13] - 5:19, 14:16, 19:20, 23:19, 26:14, 27:15, 27:19, 27:23, 27:24, 28:3, 28:9, 29:3, 36:15
**injured** [1] - 13:9
**injuries** [3] - 11:24, 12:24, 13:10
**inquiring** [1] - 29:13
**insofar** [2] - 22:17, 33:20
**instead** [1] - 35:2
**Institute** [3] - 6:4, 6:6, 6:7
**insufficient** [3] - 10:8, 27:20, 28:8
**intended** [2] - 13:25, 32:25
**intentional** [1] - 14:19
**interest** [1] - 23:13
**interested** [4] - 24:9, 25:8, 33:13, 37:8
**intermediaries** [1] -

19:15
**intermediary** [1] - 25:2
**internet** [1] - 10:1
**involved** [4] - 17:23, 17:24, 26:15, 38:2
**involves** [1] - 31:18
**Iqbal** [1] - 8:13
**IRWIN** [1] - 2:7
**Isham** [1] - 28:25
**isolating** [1] - 24:20
**issue** [20] - 10:12, 11:5, 11:11, 11:12, 11:24, 12:12, 12:25, 16:3, 16:16, 18:3, 20:10, 32:7, 32:24, 34:18, 35:11, 35:13, 36:24, 38:3, 38:4, 40:8
**issues** [17] - 7:2, 8:16, 8:17, 15:16, 16:2, 16:17, 20:3, 20:17, 30:4, 34:21, 35:15, 36:3, 36:7, 37:11, 37:14, 37:21, 40:4
**item** [1] - 14:9

---

## J

**Jenkins** [1] - 27:10
**Joann** [1] - 27:9
**JOHN** [1] - 2:22
**John** [1] - 7:9
**Johnson** [1] - 28:2
**joined** [1] - 28:14
**Josephine** [1] - 28:25
**judge** [4] - 6:3, 6:5, 25:18, 36:3
**Judge** [8] - 5:12, 5:15, 6:1, 6:3, 8:5
**JUDGE** [1] - 1:12
**judges** [1] - 30:8
**judgment** [2] - 20:9, 23:15
**Judicial** [3] - 6:4, 6:5, 6:6
**Judy** [1] - 28:2
**July** [2] - 26:11, 30:15
**jurisdiction** [13] - 25:15, 25:24, 26:1, 26:6, 26:7, 30:5, 30:25, 31:2, 31:8, 31:9, 31:14, 32:2, 32:13
**jurisprudence** [1] - 30:7
**jury** [2] - 20:11, 36:3
**justice** [1] - 23:13

---

## K

**Kang** [3] - 5:15, 6:1, 6:3
**Kansas** [1] - 34:15
**KAREN** [1] - 2:3
**Karen** [1] - 7:17
**keep** [1] - 38:3
**KEOGH** [1] - 3:8
**key** [1] - 21:4
**kind** [1] - 40:3
**KINGSDORF** [5] - 1:16, 1:17, 17:10, 18:24, 20:14
**Kingsdorf** [3] - 7:14, 17:9, 17:11
**Klara** [1] - 28:24
**knot** [2] - 39:6
**knowledge** [2] - 15:22, 16:25
**known** [1] - 12:14
**knows** [1] - 18:13
**Kofler** [3] - 27:6, 28:19, 28:24
**Korea** [2] - 5:16, 6:7
**KURT** [1] - 1:12

---

## L

**label** [2] - 11:14, 19:16
**labeling** [3] - 14:8, 15:17, 15:18
**lack** [1] - 34:13
**lacks** [1] - 11:8
**LAMBERT** [2] - 1:21, 7:20
**Lambert** [1] - 7:21
**language** [4] - 11:8, 11:9, 21:17, 24:5
**larger** [1] - 37:10
**last** [1] - 8:9
**late** [1] - 33:24
**Laugelle** [3] - 32:19, 32:23, 33:5
**LAW** [1] - 2:3
**law** [3] - 27:1, 29:19, 30:19
**laws** [2] - 17:24, 18:4
**laxer** [1] - 18:11
**Le** [1] - 6:6
**learned** [2] - 19:15, 25:2
**least** [1] - 8:5
**leave** [1] - 29:22
**led** [1] - 19:17
**Lee** [2] - 5:15, 6:1
**legs** [1] - 12:21
**lengths** [1] - 17:17

**less** [1] - 34:9
**letter** [2] - 11:4, 11:10
**letters** [6] - 10:22, 11:7, 15:20, 16:12, 19:12
**level** [4] - 18:8, 18:9, 18:12, 28:13
**liability** [8] - 8:20, 9:3, 9:16, 9:17, 10:18, 11:23, 21:11, 23:17
**LIABILITY** [1] - 1:5
**Liability** [3] - 5:10, 10:10, 23:11
**liaison** [11] - 7:6, 7:10, 7:21, 7:22, 8:7, 33:19, 35:24, 37:15, 38:8, 38:15, 39:7
**liberal** [1] - 28:9
**light** [1] - 29:24
**likelihood** [1] - 33:22
**likewise** [1] - 22:17
**limine** [1] - 11:6
**limit** [1] - 29:1
**limitations** [1] - 22:25
**limited** [3] - 26:6, 30:25, 31:2
**limits** [2] - 8:3, 39:11
**Lisa** [1] - 28:25
**list** [1] - 25:10
**listed** [1] - 30:21
**litigate** [2] - 11:5, 11:12
**Litigation** [2] - 5:10, 23:11
**LITIGATION** [1] - 1:5
**litigation** [7] - 5:15, 5:18, 17:23, 18:8, 22:2, 23:8, 25:22
**LLC** [4] - 2:20, 3:4, 26:22, 33:14
**local** [1] - 32:12
**LONG** [1] - 4:6
**look** [4] - 9:23, 13:19, 15:11, 16:5
**looking** [2] - 12:9, 31:4, 39:20
**looks** [1] - 6:11
**Los** [1] - 34:14
**loss** [1] - 18:3
**LOUISIANA** [9] - 1:1, 1:6, 1:18, 1:22, 1:25, 2:8, 2:23, 3:9, 3:14
**Louisiana** [3] - 17:25, 41:5, 41:6
**lower** [1] - 22:22

---

## M

**MADISON** [1] - 3:5

**Magistrate** [1] - 36:14
**mail** [2] - 33:10, 39:3
**MAIN** [1] - 3:9
**management** [1] - 25:19
**manner** [1] - 32:9
**manufacturer's** [1] - 24:2
**MARA** [1] - 3:4
**Margarett** [1] - 28:1
**marketing** [7] - 16:9, 16:10, 16:19, 18:25, 19:1, 19:6, 19:14
**Marketing** [1] - 10:23
**Mary** [1] - 28:1
**MASTER** [1] - 4:6
**master** [9] - 17:22, 22:6, 22:7, 22:9, 22:15, 23:3, 24:6
**Master** [12] - 6:19, 15:9, 15:11, 17:14, 20:22, 20:25, 21:11, 21:15, 21:24, 22:18, 23:1, 24:13
**matches** [1] - 14:10
**material** [2] - 12:11, 40:20
**materials** [1] - 14:9
**matter** [9] - 22:1, 22:23, 25:24, 26:1, 26:7, 30:5, 31:7, 41:9
**matters** [1] - 28:20
**MCCALL** [1] - 2:21
**McCallister** [3] - 27:7, 28:19, 28:25
**McKesson** [9] - 26:21, 27:15, 27:16, 27:20, 28:3, 28:6, 28:14, 28:17, 29:4
**McKesson's** [2] - 26:14, 28:12
**MDL** [10] - 5:10, 14:15, 22:5, 23:10, 25:19, 25:20, 35:23, 36:17
**mean** [4] - 11:11, 18:21, 35:21, 38:5
**MECHANICAL** [1] - 3:16
**medicine** [6] - 10:4, 11:15, 11:19, 13:21, 13:24, 14:18
**meet** [4] - 8:8, 29:9, 34:25, 36:6
**meeting** [5] - 5:13, 8:7, 34:25, 35:24, 40:1
**member** [3] - 23:7, 30:21, 33:6
**memo** [1] - 6:22

**OFFICIAL TRANSCRIPT**

memorandum [2] - 21:8, 27:13
Memorandum [1] - 26:18
menzies [4] - 34:14, 35:12, 37:11, 38:18
MENZIES [5] - 2:3, 7:17, 38:19, 39:20, 39:24
Menzies [3] - 7:17, 34:8, 38:19
mere [1] - 25:25
merely [2] - 12:14, 19:25
MERIT [1] - 3:13
Merit [2] - 41:4, 41:13
Merrell [7] - 7:8, 7:11, 8:8, 14:22, 14:24, 14:25, 17:8
MERRELL [3] - 2:16, 7:8, 14:25
met [1] - 37:12
MEUNIER [1] - 1:20
MICHAEL [1] - 2:11
middle [1] - 36:7
might [3] - 32:7, 37:10, 39:19
minute [1] - 31:25
minutes [2] - 8:1, 8:7
misbranding [1] - 11:9
misleading [4] - 11:3, 11:8, 22:11, 23:22
misrepresentation [19] - 9:17, 10:17, 10:18, 10:19, 11:22, 12:19, 12:20, 13:17, 14:12, 16:2, 16:6, 19:9, 21:12, 21:17, 21:20, 21:21, 21:22, 23:17
misrepresentations [3] - 12:11, 15:20, 17:18
missing [1] - 16:14
Mississippi [1] - 17:25
misstatement [1] - 10:20
misstatements [3] - 10:16, 11:14, 12:25
mistake [1] - 11:20
Mo [3] - 5:15, 6:1, 6:5
Monday [1] - 38:24
monitor [1] - 33:4
monitoring [1] - 31:25
Moore [7] - 7:5, 7:6, 14:23, 15:5, 16:7, 17:12, 19:13
MOORE [5] - 2:7, 2:7, 7:6, 8:4, 39:25

moreover [1] - 32:12
morning [6] - 7:12, 7:17, 7:19, 7:20, 7:24, 17:10
most [4] - 12:4, 20:8, 22:5, 31:18
mostly [1] - 37:13
MOTION [4] - 1:11, 4:6, 4:8, 4:11
Motion [11] - 6:18, 16:4, 20:21, 21:6, 24:9, 26:9, 26:19, 27:10, 28:2, 28:17, 30:9
motion [31] - 6:20, 8:16, 8:21, 9:10, 17:3, 17:21, 20:4, 20:9, 20:11, 20:20, 20:24, 21:8, 26:12, 27:2, 29:15, 30:11, 30:16, 30:21, 30:22, 33:5, 33:12, 33:14, 33:16, 37:7, 37:9, 37:13, 37:16, 38:6, 38:11, 39:8, 39:9
motions [13] - 11:6, 25:14, 25:16, 33:8, 33:11, 33:19, 33:23, 34:1, 34:6, 36:9, 36:16, 37:22
move [2] - 23:14, 36:21
moving [1] - 40:17
MR [21] - 7:6, 7:8, 7:9, 7:12, 7:20, 8:4, 14:25, 17:10, 18:24, 20:14, 34:3, 35:6, 36:19, 37:9, 37:18, 37:21, 38:1, 38:10, 38:17, 39:25, 40:17
MS [5] - 7:17, 7:22, 38:19, 39:20, 39:24
multi [6] - 22:2, 27:6, 28:18, 28:22, 29:11, 30:3
Multi [1] - 22:2
multi-district [1] - 22:2
Multi-District [1] - 22:2
multi-plaintiff [5] - 27:6, 28:18, 28:22, 29:11, 30:3
multidistrict [2] - 5:14, 5:18
must [4] - 9:21, 26:1, 26:2, 33:6
Myers [1] - 29:25

**N**

nature [3] - 19:3, 22:24, 31:6
NDA [1] - 15:16
NE [1] - 2:17
necessary [4] - 8:1, 17:5, 22:24, 39:1
need [4] - 25:10, 30:4, 36:6, 36:12
neglected [1] - 32:4
negligence [2] - 10:11, 21:21
negligent [2] - 10:18, 21:21
negotiated [1] - 39:22
negotiation [1] - 38:23
NEW [9] - 1:6, 1:18, 1:22, 1:25, 2:8, 2:23, 3:5, 3:14
new [1] - 32:13
news [1] - 16:22
nine [1] - 30:2
NO [1] - 1:6
non [1] - 15:2
non-Sanofi [1] - 15:2
none [2] - 15:21, 19:21
nonparty [2] - 33:12, 37:8
nonspecific [1] - 28:8
Northern [1] - 32:22
note [2] - 17:14, 26:11
noted [2] - 22:3, 23:10
notes [1] - 32:15
nothing [1] - 16:19
notwithstanding [2] - 6:10, 25:25
NOVARTIS [1] - 2:15
nowhere [1] - 16:11
NUMBER [1] - 4:5
Number [2] - 6:18, 22:3
number [1] - 15:8
numbered [1] - 41:9

**O**

obligation [1] - 10:5
obviously [1] - 8:11
occasion [1] - 33:22
OF [4] - 1:1, 1:11, 4:9, 4:12
off-label [1] - 11:14
Official [2] - 41:5, 41:13
OFFICIAL [1] - 3:12
OHIO [1] - 2:13

OLINDE [3] - 2:22, 7:9, 40:17
Olinde [2] - 7:9, 40:15
omit [1] - 12:14
OMNIBUS [1] - 4:8
Omnibus [1] - 26:8
one [12] - 11:14, 13:18, 15:2, 16:17, 18:8, 21:20, 37:21, 38:13, 38:16, 39:13, 39:17
ones [1] - 36:10
opinion [3] - 32:21, 33:5, 33:21
opponent [2] - 35:25, 36:1, 36:4
opposed [3] - 6:20, 15:10, 36:15
opposing [3] - 21:3, 26:25, 30:18
opposition [5] - 12:10, 13:20, 16:5, 16:17, 21:8
oppositions [1] - 36:16
oral [4] - 26:12, 27:1, 30:15, 30:18
ORDER [1] - 5:4
order [7] - 9:16, 12:18, 26:17, 27:14, 28:16, 33:17, 39:8
ordered [9] - 21:5, 21:13, 26:12, 26:21, 27:2, 27:4, 27:11, 28:20, 30:20
orders [1] - 36:16
ORLEANS [7] - 1:6, 1:18, 1:22, 1:25, 2:8, 2:23, 3:14
otherwise [4] - 20:19, 29:18, 32:2, 39:19
ought [1] - 25:2
outcome [1] - 12:17
outset [1] - 25:17
outside [1] - 40:10
outstanding [1] - 7:2
overstated [1] - 12:1
own [2] - 11:23, 12:21

**P**

page [2] - 8:25, 9:1
PAGE [1] - 4:3
pages [2] - 9:1, 14:6
PALMER [1] - 1:21
Palmer [1] - 7:21
papers [1] - 8:12
paragraph [2] - 8:25, 9:1

paragraphs [7] - 9:2, 9:24, 10:14, 10:15, 14:6, 16:18, 18:15
parameters [1] - 38:15
part [8] - 10:10, 15:7, 22:8, 25:3, 27:2, 27:3, 38:7
participated [1] - 16:25
participation [1] - 15:23
particular [19] - 5:14, 15:23, 16:8, 18:3, 18:4, 19:6, 22:11, 22:21, 23:23, 25:8, 27:18, 27:22, 28:14, 31:5, 33:1, 36:5, 39:6, 39:16
particularly [3] - 16:6, 17:4, 23:5
parties [1] - 37:16
parties' [4] - 21:2, 26:25, 27:1, 30:17
partner [1] - 36:1
parts [1] - 29:11
past [1] - 17:22
patient [1] - 24:16
patients [2] - 24:17
pearls [1] - 39:14
pending [4] - 26:3, 33:8, 33:11, 36:16
PENDLEY [1] - 1:24
people [2] - 38:2, 38:14
Pepper [3] - 41:3, 41:11, 41:12
PEPPER [1] - 3:12
percentage [1] - 19:21
perfected [1] - 23:6
perhaps [1] - 35:17
period [1] - 31:7
permanent [4] - 10:3, 12:14, 19:17, 19:21
permitted [1] - 29:18
persistent [1] - 10:4
person [5] - 13:4, 13:8, 31:21, 31:25, 32:1
personal [1] - 25:17
personnel [1] - 31:19
persons [1] - 33:13
perspective [2] - 15:7, 36:21
persuasive [1] - 32:22
pertinent [1] - 18:7
PFIZER [2] - 2:21, 3:3
Pharma [1] - 33:16
PHARMA [1] - 2:10
pharmaceutical [1] - 13:22

phase [4] - 20:4, 20:9, 20:12, 23:15
phone [1] - 39:14
physically [1] - 31:23
physician [1] - 22:12
pick [1] - 39:14
Pickrell [1] - 27:9
PIEDMONT [1] - 2:17
pins [1] - 5:23
place [3] - 15:19, 20:7, 20:9
places [1] - 30:25
plaintiff [13] - 22:13, 23:23, 24:16, 24:22, 26:15, 27:6, 27:18, 27:25, 28:18, 28:22, 29:11, 30:3, 31:19
PLAINTIFFS [1] - 1:16
plaintiffs [39] - 7:13, 7:15, 7:18, 7:21, 7:23, 10:2, 12:2, 12:13, 17:11, 18:2, 21:13, 22:21, 23:19, 23:21, 23:24, 23:25, 24:4, 24:12, 24:21, 24:22, 24:23, 25:1, 26:13, 26:18, 27:9, 27:16, 27:22, 28:4, 28:11, 28:12, 28:24, 29:3, 29:15, 29:17, 29:21, 30:2, 32:4, 34:4, 38:19
Plaintiffs [5] - 20:22, 20:25, 26:8, 26:18, 30:9
plaintiffs' [17] - 12:10, 13:19, 16:5, 21:7, 23:1, 23:9, 24:13, 26:12, 26:20, 27:11, 27:13, 30:11, 30:22, 32:11, 33:14, 35:11, 36:20
PLAINTIFFS' [2] - 4:8, 4:11
planned [1] - 34:11
plausibility [2] - 8:13, 18:21
plausible [9] - 8:18, 9:12, 10:9, 11:21, 13:16, 18:15, 18:17, 18:19, 19:25
pleading [6] - 8:17, 18:21, 22:18, 22:22, 27:24, 28:9
pleasant [2] - 6:9, 6:15
pleasure [1] - 5:13
point [17] - 12:9, 12:10, 13:2, 13:13, 13:19, 13:20, 17:17,

17:20, 20:6, 20:16, 23:8, 24:8, 29:12, 36:2, 36:11, 36:14, 36:17
pointing [1] - 14:7
points [3] - 9:14, 9:22, 18:7
Policy [3] - 6:4, 6:5, 6:6
portion [3] - 16:6, 16:8, 16:21
position [3] - 10:2, 11:18, 12:1
positioned [1] - 12:15
positive [2] - 5:17, 24:18
possessing [1] - 37:2
possibility [1] - 18:22
possible [1] - 35:2
possibly [1] - 22:10
postponed [1] - 32:5
potent [1] - 12:4
potential [2] - 29:10, 33:3
potentially [1] - 38:21
power [1] - 31:2
POYDRAS [6] - 1:17, 1:21, 1:25, 2:8, 2:23, 3:13
practice [2] - 5:19, 31:15
preceding [1] - 15:12
preferably [1] - 21:15
preference [2] - 25:17, 25:25
preferred [1] - 25:21
prejudice [1] - 28:17
prepared [3] - 20:20, 20:24, 40:22
prescribed [1] - 19:16
present [2] - 17:2, 39:12
presented [2] - 21:4, 36:2
presenting [1] - 7:14
presently [1] - 20:23
presents [1] - 16:3
presiding [2] - 6:3, 25:17
pretermitted [1] - 32:5
pretty [1] - 38:8
preventing [1] - 32:12
previously [1] - 25:15
principal [1] - 15:18
private [1] - 31:22
probable [2] - 18:14, 20:1
problem [1] - 39:16
problems [1] - 39:17

procedure [2] - 31:5, 31:17
Procedure [1] - 21:1
proceed [2] - 23:10, 25:8
proceeding [1] - 22:15
PROCEEDINGS [3] - 1:11, 3:16, 5:1
proceedings [3] - 22:5, 22:24, 41:9
process [4] - 31:16, 31:18, 31:20, 31:22
produce [2] - 13:25, 14:3
PRODUCED [1] - 3:17
Product [1] - 23:11
product [3] - 12:2, 24:17, 25:8
production [1] - 33:15
PRODUCTS [1] - 1:4
products [1] - 13:22
Products [2] - 5:10, 10:10
progress [4] - 34:20, 34:22, 35:6, 35:16
promotional [1] - 14:9
promptly [2] - 31:15, 32:5
proof [1] - 18:8
proper [1] - 31:20
properly [1] - 20:5
protective [3] - 33:17, 36:16, 39:8
provide [5] - 15:3, 21:14, 26:13, 28:3, 31:8
provided [7] - 15:17, 23:21, 27:14, 27:23, 28:5, 31:10, 32:2
provision [4] - 31:8, 31:12, 31:13, 32:14
provisions [3] - 29:20, 31:5, 31:16
public [1] - 16:23
published [1] - 16:22
purely [1] - 22:23
purpose [2] - 24:9, 29:13
purposes [4] - 13:25, 25:22, 25:23
pursuant [1] - 20:25
put [6] - 13:4, 13:6, 13:11, 24:8, 29:12, 35:8

Q

quick [1] - 7:5
quickly [2] - 14:13,

36:22
QUINN [1] - 3:4
quite [3] - 32:6, 32:7, 37:11
quote [1] - 33:4

R

raise [1] - 16:21
raised [4] - 8:15, 9:10, 12:10, 16:16
Rather [1] - 28:4
Ratliff [5] - 34:9, 34:14, 35:11, 37:12, 38:21
re [3] - 5:9, 22:2, 23:11
RE [1] - 1:4
reach [3] - 34:6, 37:5, 37:10
reached [1] - 35:19
read [2] - 7:1, 8:12
reading [1] - 28:25
real [3] - 7:5, 35:11, 35:13
really [5] - 9:14, 15:14, 15:19, 15:25, 36:20, 40:10, 40:20
REALTIME [1] - 3:12
Realtime [2] - 41:3, 41:12
reason [3] - 8:10, 14:14, 24:10
reasonable [2] - 18:19, 18:23
reasoning [2] - 18:6, 32:16
reasons [2] - 14:11, 21:7
recap [1] - 21:18
received [1] - 27:18
recess [1] - 40:25
recite [1] - 6:21, 9:7
recognize [1] - 22:25
record [4] - 26:2, 27:1, 30:19, 41:8
Record [13] - 6:17, 6:22, 6:23, 20:23, 26:10, 26:15, 26:19, 26:21, 26:22, 30:11, 33:12, 33:15, 33:17
RECORD [3] - 4:5, 4:10, 4:13
RECORDED [1] - 3:16
recounting [1] - 9:25
recover [1] - 12:24
refer [1] - 12:11
reference [2] - 9:6, 24:6
referenced [1] - 15:23

referred [1] - 19:13
referring [2] - 12:12, 24:1
reflected [1] - 14:3
refute [1] - 10:6
regard [9] - 14:21, 19:11, 20:21, 22:21, 25:16, 27:9, 29:8, 30:9, 33:22
regarding [6] - 26:14, 26:20, 28:6, 28:21, 29:10, 37:7
regimens [1] - 11:17
REGISTERED [1] - 3:13
Registered [1] - 41:3
registered [1] - 41:13
relate [4] - 10:15, 10:22, 15:13, 31:5
related [6] - 8:17, 8:18, 9:2, 10:13, 12:7, 16:19
RELATES [1] - 1:8
relating [2] - 30:5, 31:6
relative [1] - 25:15
relevant [1] - 6:21
reliance [1] - 25:4
relied [4] - 23:23, 24:22, 25:1, 25:7
relief [2] - 9:12, 13:16
relieved [1] - 17:14
remainder [1] - 11:16
remaining [2] - 28:4, 28:12
Remand [5] - 26:9, 26:19, 27:10, 28:2, 30:10
remand [9] - 25:16, 28:15, 28:24, 29:2, 29:10, 29:16, 29:18, 30:11, 30:24
REMAND [2] - 4:8, 4:11
remanded [5] - 27:12, 29:6, 29:21, 30:22, 33:6
remarks [6] - 7:3, 8:15, 8:21, 15:3, 20:18, 40:2
removability [1] - 32:25
removal [3] - 30:12, 30:20, 31:5
removed [1] - 31:7
removing [2] - 32:9, 32:12
render [1] - 9:16
reply [2] - 6:22, 19:5
report [1] - 40:1

Exhibit B
00143

REPORTER [3] - 3:12, 3:12, 3:13
Reporter [7] - 41:3, 41:4, 41:5, 41:12, 41:13, 41:13
REPORTER'S [1] - 41:1
reports [1] - 19:19
representation [2] - 19:8, 36:1
representations [1] - 24:2
representative [1] - 22:12
representing [1] - 7:9
request [2] - 31:19, 33:15
require [4] - 9:15, 9:18, 9:21, 29:6
required [1] - 18:9
requires [1] - 23:18
Research [3] - 6:4, 6:6, 6:7
researched [1] - 40:22
Researcher [1] - 6:4
resolution [5] - 29:10, 33:25, 34:6, 37:17, 39:21
resolve [1] - 36:8
respect [9] - 14:17, 16:13, 16:16, 21:6, 21:10, 23:5, 23:16, 27:25, 28:18
respectively [2] - 21:13, 23:18
response [2] - 26:22, 27:14
responses [1] - 33:15
rest [1] - 29:21
restrictions [2] - 8:9, 22:25
result [1] - 24:18
retain [1] - 29:21
retread [1] - 15:4
rise [1] - 5:7
rises [1] - 28:13
risk [2] - 10:3, 12:14
risks [1] - 14:1
RMR [2] - 3:12, 41:12
ROAD [1] - 2:17
Robin [1] - 28:1
room [1] - 34:16
ROOM [1] - 3:13
ROUGE [1] - 3:9
roughly [1] - 9:1
rule [19] - 7:25, 18:3, 20:20, 20:24, 25:14, 26:8, 30:14, 34:22, 35:4, 35:5, 35:21, 36:9, 36:10, 36:24,

37:19, 38:9, 39:19
Rule [7] - 9:10, 9:21, 10:8, 11:6, 14:12, 14:13, 14:20
ruled [1] - 34:24
Rules [3] - 9:11, 10:8, 21:1
run [1] - 39:16

## S

S.A [1] - 2:7
s/Cathy [1] - 41:11
SA [1] - 33:16
safe [2] - 12:15, 13:24
safety [1] - 24:2
sales [1] - 22:12
San [1] - 30:1
Sandoz [3] - 7:8, 15:1, 15:2
SANDOZ [1] - 2:15
Sandra [1] - 28:25
Sanofi [11] - 7:7, 15:2, 15:9, 16:8, 16:18, 19:22, 26:22, 27:6, 27:7, 33:14, 33:16
SANOFI [1] - 2:7
Sanofi-Aventis [2] - 26:22, 33:14
satisfy [3] - 14:20, 27:23, 28:8
savvy [1] - 33:3
schedule [1] - 30:21
science [1] - 9:25
seated [1] - 5:8
second [1] - 20:2
Section [7] - 29:1, 30:14, 31:4, 31:6, 31:11, 31:24
section [1] - 31:14
sections [1] - 29:5
see [2] - 35:13, 37:24
seek [2] - 32:6, 38:24
seeking [4] - 17:13, 17:15, 20:24, 38:21
seeks [1] - 30:11
sense [1] - 33:1
Seoul [1] - 6:3
separate [1] - 38:4
serve [1] - 31:23
served [1] - 31:16
server [1] - 31:22
serves [1] - 23:10
service [4] - 31:19, 32:6, 32:11, 32:12
service.. [1] - 33:1
set [8] - 9:12, 10:9, 11:21, 14:14, 21:24, 24:13, 24:25, 39:16

setting [1] - 35:23
settlement [1] - 25:22
seven [1] - 21:22
sever [4] - 28:24, 29:2, 29:15, 29:20
severance [1] - 28:22
shall [5] - 21:13, 27:4, 28:16, 28:20, 30:22
sheriff [1] - 31:21
shift [1] - 33:2
short [4] - 22:7, 22:16, 22:19, 23:6
shotgun [1] - 8:17
shows [1] - 10:1
side [10] - 8:5, 12:7, 14:1, 14:2, 19:2, 24:3, 24:18, 33:23, 35:11, 38:14
sides [2] - 34:19, 39:12
similar [1] - 16:16
simply [4] - 17:5, 18:24, 19:7, 21:19
single [1] - 11:10
sit [1] - 34:16
six [3] - 15:13, 21:22, 24:17
slightly [1] - 17:22
Smethers [1] - 30:12
Smith [1] - 27:10
snap [1] - 30:12
sold [1] - 13:3
someone [1] - 13:3
somewhat [1] - 38:22
somewhere [1] - 36:7
sort [3] - 16:9, 16:11, 40:3
South [1] - 5:16
Southern [1] - 32:19
speaking [1] - 36:5
specific [9] - 10:13, 16:24, 22:10, 23:4, 24:14, 24:20, 25:12, 32:14
specifically [5] - 12:15, 16:3, 34:15, 36:12, 37:13
speculative [6] - 18:9, 18:12, 18:14, 18:16, 19:25, 28:13
spent [1] - 34:9
spoken [1] - 34:11
Squibb [1] - 29:25
stand [3] - 5:20, 11:23, 12:21
standard [5] - 18:11, 18:21, 22:23, 27:24, 28:9
standing [1] - 18:2
start [1] - 9:6

started [1] - 35:7
state [10] - 12:12, 18:21, 21:19, 23:25, 25:16, 27:12, 28:10, 30:6, 31:16, 33:4
State [1] - 41:4
statement [8] - 9:15, 11:11, 11:20, 13:4, 13:6, 14:8, 22:11, 23:21
statements [14] - 9:19, 10:13, 10:21, 21:16, 24:14, 25:1, 25:3, 25:9, 25:12, 26:13, 26:20, 28:5, 28:8, 34:1
STATES [2] - 1:1, 1:12
states [1] - 17:24, 18:4, 31:18
States [6] - 5:24, 28:7, 29:5, 40:11, 41:5, 41:14
stating [1] - 23:20
status [3] - 33:18, 34:1, 37:2
statutes [1] - 31:3
STENOGRAPHY [1] - 3:16
still [5] - 12:5, 27:20, 35:2, 35:3
stories [1] - 16:22
street [1] - 40:5
STREET [8] - 1:17, 1:21, 1:25, 2:8, 2:12, 2:23, 3:9, 3:13
strict [4] - 9:17, 10:18, 21:11, 23:17
studies [4] - 15:23, 16:22, 17:1, 19:19
subject [4] - 25:24, 26:1, 26:7, 30:5
submissions [3] - 21:3, 26:25, 30:18
submit [3] - 27:5, 28:20, 29:7
substantial [1] - 16:14
success [1] - 33:23
sue [1] - 13:9
suffered [2] - 12:8, 13:11
SUFFERN [1] - 2:11
sufficient [3] - 20:11, 27:15, 27:23
SUGUNDO [1] - 2:5
suing [1] - 12:5
suitcases [3] - 13:5, 13:7, 13:12
SUITE [5] - 1:17, 1:21, 1:25, 2:8, 2:12
SULLIVAN [2] - 3:4,

3:8
summary [2] - 20:9, 23:15
SUPERIOR [2] - 4:9, 4:12
Superior [5] - 26:9, 29:25, 30:10, 30:23, 33:7
supplement [1] - 24:5
supplemental [4] - 21:14, 27:5, 27:13, 28:20
Supplemental [1] - 26:18
supplemented [1] - 22:6
support [4] - 9:12, 12:18, 17:6, 17:20
Support [1] - 26:19
supporting [4] - 14:4, 21:3, 26:25, 30:17
supposed [1] - 9:10
Supreme [3] - 6:7, 8:14, 29:24
surely [1] - 24:11
survivability [1] - 13:15
survival [1] - 12:16
survive [1] - 9:21
Susan [1] - 27:25
system [1] - 5:14

## T

tackle [1] - 8:2
talismanic [1] - 11:8
Taxol [1] - 11:17
TAXOTERE [1] - 1:4
Taxotere [6] - 5:10, 11:17, 12:15, 27:17, 27:21, 28:6
temporal [1] - 31:6
ten [3] - 27:4, 28:16, 28:21
TERMINUS [1] - 2:16
terms [3] - 15:25, 33:20, 35:14
testing [1] - 24:3
Texas [2] - 17:25, 32:19
Textron [2] - 32:17, 32:20
THE [28] - 1:12, 1:16, 4:6, 4:9, 4:11, 5:7, 5:8, 7:16, 7:19, 7:24, 14:23, 17:8, 18:18, 20:13, 20:15, 34:20, 35:21, 37:7, 37:15, 37:19, 37:24, 38:2,

38:13, 38:18, 39:2, 39:23, 40:14, 40:19
**therapy** [1] - 12:4
**therefore** [5] - 12:4, 24:4, 28:13, 29:7, 33:5
**third** [1] - 37:23
**THIS** [1] - 1:8
**thoughts** [2] - 37:16, 39:8
**three** [7] - 21:20, 33:8, 33:11, 33:19, 33:23, 34:10, 34:15
**threshold** [2] - 22:1, 30:5
**throughout** [1] - 28:7
**timeframe** [1] - 8:11
**timekeeper** [1] - 8:2
**timing** [1] - 33:1
**Title** [2] - 30:14, 31:11
**title** [1] - 21:19
**TO** [7] - 1:8, 4:6, 4:8, 4:9, 4:11, 5:4
**today** [14] - 5:21, 6:9, 6:17, 7:11, 7:15, 8:21, 10:7, 20:18, 21:4, 33:2, 33:9, 34:12, 34:24, 40:20
**today's** [2] - 24:7, 28:21
**together** [2] - 22:17, 34:9
**tomorrow** [1] - 38:25
**took** [2] - 11:18, 30:16
**total** [1] - 15:14
**trade** [1] - 38:6
**trailer** [2] - 17:23, 20:3
**transcript** [1] - 41:7
**TRANSCRIPT** [2] - 1:11, 3:16
**TRANSCRIPTION** [1] - 3:17
**Trasylol** [1] - 23:11
**TRAURIG** [1] - 2:15
**travels** [1] - 6:10
**treating** [1] - 24:15
**treatment** [3] - 12:16, 14:2, 27:18
**trenches** [1] - 36:6
**trial** [1] - 10:1
**trials** [1] - 19:20
**tried** [2] - 35:4, 37:4
**trifle** [1] - 25:25
**true** [3] - 22:5, 22:9, 41:7
**trunk** [3] - 13:5, 13:7, 13:12
**try** [3] - 36:7, 39:4, 39:10
**trying** [2] - 13:3, 13:13

**tumbler** [1] - 5:24
**tune** [1] - 39:10
**turn** [1] - 14:22
**turns** [1] - 13:5
**two** [13] - 5:22, 9:14, 9:22, 16:17, 18:7, 21:20, 27:5, 28:18, 29:11, 34:22, 37:12, 37:22, 40:5
**two-way** [1] - 40:5
**Twombly** [1] - 8:13
**type** [1] - 30:20
**types** [2] - 5:23, 28:7

**U**

**ULMER** [1] - 2:11
**ultimately** [1] - 8:21
**under** [13] - 8:14, 9:11, 9:13, 10:8, 10:10, 14:12, 17:12, 18:4, 28:15, 29:18, 29:19, 30:6, 30:16
**understood** [2] - 36:19, 38:1
**unfortunately** [1] - 34:18
**United** [6] - 5:24, 28:7, 29:5, 40:11, 41:5, 41:14
**UNITED** [2] - 1:1, 1:12
**unrelated** [1] - 38:6
**untrue** [1] - 11:11
**up** [9] - 5:20, 6:11, 8:2, 20:19, 29:22, 35:5, 35:14, 39:14, 40:16
**update** [1] - 39:22
**urged** [1] - 30:1
**URQUHART** [2] - 2:7, 3:4
**US** [2] - 26:22, 33:14
**USC** [4] - 29:1, 31:4, 31:6
**usual** [1] - 7:25
**utilized** [1] - 28:10

**V**

**vaguely** [1] - 24:1
**validity** [1] - 17:19
**varies** [1] - 18:10
**variety** [2] - 5:13, 30:19
**various** [2] - 9:13, 16:21
**vehicle** [1] - 25:21
**Vera** [1] - 27:10
**verse** [1] - 19:11

**versus** [1] - 11:17
**via** [1] - 31:16
**view** [2] - 11:20, 32:7
**VINE** [1] - 2:12
**visit** [3] - 5:24, 6:13, 6:15

**W**

**wait** [1] - 40:14
**wants** [2] - 20:15, 37:2
**warn** [8] - 8:22, 9:24, 10:9, 12:20, 12:22, 12:23, 17:16, 21:20
**warning** [5] - 10:5, 14:17, 15:20, 16:12, 19:16
**warnings** [3] - 10:22, 12:14, 14:3
**warranted** [2] - 13:24, 14:17
**warranties** [2] - 13:21, 24:21
**warranty** [16] - 9:18, 10:17, 11:22, 12:19, 13:4, 13:7, 13:10, 13:18, 14:10, 14:12, 21:12, 21:17, 21:23, 23:18, 23:22, 24:1
**WARSHAUER** [1] - 1:20
**weather** [1] - 6:10
**WEDNESDAY** [2] - 1:7, 5:3
**week** [4] - 34:22, 35:19, 37:1, 40:13
**weeks** [2] - 33:18, 34:22
**welcome** [4] - 5:11, 5:21, 6:8, 6:13
**Westlaw** [1] - 23:12
**WHEREUPON** [1] - 40:25
**whichever** [1] - 36:10
**whole** [1] - 22:8
**willing** [1] - 39:2
**WILSON** [1] - 3:8
**wisdom** [1] - 39:14
**WL** [2] - 32:18, 32:20
**words** [2] - 31:12, 38:7
**WORLDWIDE** [1] - 2:20, 2:21, 3:3
**Wright** [1] - 28:1
**writing** [1] - 35:8
**written** [2] - 26:25, 31:14

**Y**

**year** [1] - 32:18
**yesterday** [5] - 5:12, 6:15, 33:25, 34:10, 34:11
**YORK** [2] - 3:5

**Z**

**zealous** [1] - 35:25
**Zofran** [2] - 19:5, 22:2

*OFFICIAL TRANSCRIPT*