# EXHIBIT A

1

 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3

 4   BARBARA EARNEST,

 5              Plaintiff,

 6   VERSUS              CASE NO. 2:16-cv-17731

 7   SANOFI S.A., SANOFI-AVENTIS
     U.S. L.L.C., SANOFI US SERVICE,
 8   INC., AND AVENTIS-PHARMA,

 9              Defendants.

10

11

12

13              Videotaped deposition of JAMES E.

14   CARINDER, M.D., taken at the offices of NORTHSHORE

15   ONCOLOGY ASSOCIATES, LLC, 1120 Robert Boulevard,

16   Suite 390, Slidell, Louisiana 70458, on Thursday,

17   January 11, 2018, commencing at 1:08 p.m.

18

19

20

21

22

23

24

25    Job No. NJ2757175

2

1                              INDEX

2
                                                Page
3

4    CAPTION..................................1
     APPEARANCES..............................3
5    AGREEMENT OF COUNSEL.....................4
     REPORTER'S CERTIFICATE.................186
6

7

8                          EXAMINATION

9    MS. BIERI................................6
     MR. SCHANKER...........................153
10   MS. BIERI..............................180
11

12

13                           EXHIBITS

     #1......................................35
14   #2......................................42
     #3......................................43
15   #4.....................................149
     #5.....................................157
16   #6.....................................175
17

18

19

20

21

22

23

24

25

25

1          Objection, form.

2          THE WITNESS:

3               It was -- it took a while because

4  we had to retrieve the lady's file.  I hadn't seen

5  her in years.  I can't -- I can't -- without

6  reviewing a chart, I can't remember every detail

7  of every patient's case.

8  EXAMINATION BY MS. BIERI:

9      Q.    That seems fair.

10              Did you discuss the allegations

11  with any more specificity in that meeting?

12     A.    Clarify your question, please.

13     Q.    Absolutely.

14              Did you talk about Taxotere

15  specifically?

16     A.    Yes.

17     Q.    Or docetaxel?

18     A.    Yes.

19     Q.    And what -- what is your recollection

20  of that discussion?

21     A.    At the time that Mrs. Earnest was

22  treated, that was an ASCO-approved, NCCN-approved

23  adjuvant drug.  And you have two taxanes that

24  you're -- basically two taxanes you could use.

25  You had paclitaxel or docetaxel.

1      Q.   (Affirmative response.)

2      A.   At that time, I used docetaxel more

3  because you had less risk of infusion reactions,

4  and you had less neuropathy.  And the efficacy was

5  very similar.  And so in order to avoid infusion

6  reactions and -- and persistent neuropathy, which

7  is daunting for many people we take care of, at

8  that time, I used more docetaxel.

9      Q.   And did they -- so you told them a

10  little bit about your use of paclitaxel and

11  docetaxel?

12      A.   Yes.

13      Q.   Did they tell you anything about

14  Taxotere or docetaxel?

15      A.   With regard to?

16      Q.   To anything.

17           Did they make --

18      A.   No, not really.  I mean, I -- they --

19  they -- the questions I got were basically why

20  were I -- why did -- why was I using that.  Okay?

21  And at the time, like I said, both drugs were

22  proven to have pretty much equivocal evica- --

23  efficacy.  And if I can avoid the neuropathy and

24  the infusion reactions, of course I'm gonna use

25  that.

51

1   1994, and then I did a three-year internal

2   medicine residency at the Cleveland Clinic, and

3   then I did a three-year combined hematology and

4   medical oncology fellowship at the Cleveland

5   Clinic.

6       Q.   And your medical degree was from what

7   university?

8       A.   OSU.

9       Q.   And are you Board Certified, Doctor?

10      A.   Yes.

11      Q.   In what?

12      A.   Medical oncology and hematology.

13      Q.   And are you certi- -- excuse me.

14              Are you -- do you have

15  certification in Louisiana?  Are you Board

16  Certified through the State of Louisiana?

17      A.   I'm Board Certified through the

18  American Board of Internal Medicine; it doesn't

19  matter which state you're in.

20      Q.   And I -- that's a fair point.

21              What I was trying to ask you quite

22  inartfully was do you hold medical licenses in any

23  states?

24      A.   Alabama and Louisiana.

25      Q.   And both are current?

1     A.   Yes.

2     Q.   When were you first Board Certified in

3  medical oncology?

4     A.   2000.

5     Q.   And hematology?

6     A.   2001.

7     Q.   Are you a member of any professional

8  medical organizations?

9     A.   Yes.

10     Q.   Can you tell me what those are, please?

11     A.   American Society of Clinical Oncology,

12  American Society of Hematology.  American College

13  of Physicians, American Medical Association.

14  American Osteopathic Association.  Louisiana

15  Medical Society.

16     Q.   Have you ever taught any courses at a

17  university or any sort of edu- -- educational

18  institution?

19     A.   I was a -- in private practice in

20  Birmingham, but I had an adjunct appointment with

21  UAB's charity hospital, so I precepted fellows

22  over there, oncology and hematology fellows.

23     Q.   So that -- I'm -- was that a clinical

24  setting?

25     A.   Yes.

74

1      Q.    And did she have any nodes positive?

2      A.    Yes.

3      Q.    In one of your notes, I saw a reference

4   to "intermediate or high grade infiltrating ductal

5   carcinoma"?

6      A.    Yes.

7      Q.    What does that mean, the intermediate

8   or high grade component?

9      A.    Well, they look at angiolymphatic

10  invasion.  They look at the Ki-67, which is a

11  proliferative index.  And, I mean, it's how poorly

12  or how well differentiated the tumor is.  Okay?  I

13  mean, hers was in the middle to approaching a

14  higher grade tumor.

15     Q.    And she was HER2 negative, correct?

16     A.    Yes.

17     Q.    And do you recall her ER and PR status?

18     A.    Positive.

19     Q.    What chemotherapy drugs have you used

20  over the course of your career that you are now no

21  longer using?

22     A.    That we don't use anymore?

23     Q.    (Affirmative response.)

24     A.    Nitrogen mustard, thiotepa.  I mean,

25  meclorethamine.  I mean, there are some that are

86

1              Objection, form.

2         THE WITNESS:

3              She got doxorubicin and

4    cyclophosphamide dose-dense, four cycles, and then

5    docetaxel, a hundred milligrams per meter squared,

6    four cycles.  Exact same thing this lady got.

7    EXAMINATION BY MS. BIERI:

8         Q.   And have you talked to your 2005

9    patient regarding the condition of her hair today?

10        A.   She -- she -- no, I don't bring that

11   up, and it doesn't bother her.  In fact, she was

12   here today.

13        Q.   Oh.

14        A.   But she's 80 years old.

15        Q.   Do you warn patients that there are

16   unknowns related to chemotherapy?

17        A.   Yes.

18        Q.   Why?

19        A.   Because you don't know what may come

20   up.  You tell them the most common side effects

21   and what you expect, but there are always

22   idiosyncratic things that can occur with -- that

23   you're -- you may not know about.

24        Q.   Are you aware of any chemotherapy drug

25   that doesn't have a lot of side effects?

87

1          MR. SCHANKER:

2               Objection, form.

3          THE WITNESS:

4               Every drug has side effects.

5    Every chemo drug has side effects.  Some side

6    effect profiles are less harsh than others.

7    EXAMINATION BY MS. BIERI:

8         Q.   Do you warn your patients of every

9    potential side effect, every risk --

10        A.   The most --

11        Q.   -- for the drugs you're --

12        A.   The --

13        Q.   -- prescribing?

14        A.   The common -- the ones that are

15   commonly known, yes.  I do.

16               I'm sorry.  I have to get a cough

17   drop.

18        Q.   No problem at all.

19        A.   I'm listening.  Go ahead.

20        Q.   Okay.  I -- so not every single side

21   effect?

22          MR. SCHANKER:

23               Objection, form.

24          THE WITNESS:

25               Well, if you look in a -- if you

119

1      Q.    When?

2      A.    Again, probably 20 years ago.

3      Q.    Have you read the package insert for

4  Taxotere?

5      A.    Yes.

6      Q.    When?

7      A.    Back when it first came on the market.

8  Whatever --

9      Q.    Be- --

10     A.    -- year that was, I can't remember.

11     Q.    Before 2000?

12     A.    2000, yeah.  1999, 2000.

13     Q.    Ever after that?

14     A.    No.

15     Q.    Today when you talk to breast cancer

16  patients who are going to receive docetaxel --

17     A.    (Affirmative response.)

18     Q.    -- do you warn of the possibility of

19  persistent or permanent hair loss?

20     A.    Yes.

21          MR. SCHANKER:

22               Objection, form.

23  EXAMINATION BY MS. BIERI:

24     Q.    And when did you start doing that?

25     A.    About three years ago when all the news

1        A.   A lot.  A lot, because I -- you know,

2   I've got patients with lung cancer getting it.  No

3   one with prostate cancer getting it.  The patients

4   I have getting docetaxel right now either have

5   lung cancer, or they have breast cancer.

6        Q.   Is --

7        A.   The patients that I have getting --

8   with breast cancer getting docetaxel are

9   predominantly for the most part HER2 positive,

10   because the regimens that we ha- -- established

11   regimens that work very well in HER2-positive

12   disease have docetaxel.  Okay?

13              In -- in a setting like

14   Miss Earnest where you've got estrogen hormone

15   receptor-positive disease, HER2-negative disease,

16   where you're not using a trastuzumab-based

17   regimen, I typically will give them the dose-dense

18   AC; but now I use paclitaxel.  And part of the

19   reason I use paclitaxel is because of the risk for

20   the permanent alopecia.  But we now -- instead of

21   using paclitaxel at a high dose every two weeks or

22   three weeks, we do the 12 weeks of a smaller dose,

23   and the neuropathy tends to be less severe.

24              At the time Miss Earnest was being

25   treated, paclitaxel was given on an every-two-week

130

1  schedule at a high dose, and the neuropathy was --

2  was daunting in a lot of those patients, and plus

3  the infusion reactions because it was a pretty

4  sizeable dose of drug.  Now 12 weeks at a small

5  dose, you don't have the -- the infusion

6  complications really, and you don't -- the

7  neuropathy is not as severe.

8      Q.   You said, I think, that part of the

9  reason that you are now using paclitaxel has to do

10 with the -- the possibility of permanent hair

11 loss.

12              What else?

13     A.   That's -- that's the main reason.

14 That's the main reason.  We didn't have paclitaxel

15 approved for using it weekly back in the day when

16 Miss Earnest was treated.  And like I said, it was

17 approved for using a dose every fift- -- 14 days,

18 but it was a high dose.  And the -- the neuropathy

19 the patients got from that was long-lasting in a

20 lot of cases, and that's -- that's bothersome for

21 people, and plus the infusion reactions were

22 severe.

23     Q.   What -- I -- can you explain to me what

24 that means, the infusion reactions?

25     A.   Do you know why people react to

1   of their treatment.

2        Q.   So why -- today, why do you think that

3   there is a risk of permanent alopecia with

4   docetaxel?

5            MR. SCHANKER:

6                 Objection, form.

7            THE WITNESS:

8                 Because there have been cases that

9   have come forth, and it's been in the news, and --

10  and so you're -- you're pretty -- if you're aware

11  of that, you have to, I think, inform patients of

12  that.  We weren't aware of that at the time we

13  were -- this lady was treated.  We were aware that

14  there was po- -- hair loss was a definite.  Okay?

15                But there was nothing that had

16  been made known to me that she potentially would

17  not get her hair back, you know.

18  EXAMINATION BY MS. BIERI:

19       Q.   Your experience with your one patient,

20  though, correct?

21       A.   Right.

22       Q.   Would you prescribe docetaxel to

23  Miss Earnest again?

24           MR. SCHANKER:

25                Objection, form.

1           THE WITNESS:

2                    Do you mean if she recurred?   If

3    she developed recurrent disease?   No, because

4    she's seen that drug.

5    EXAMINATION BY MS. BIERI:

6        Q.   If she presented to you today having --

7        A.   -- a new case of breast cancer just

8    like her?

9        Q.   Today.

10       A.   No, I would give her paclitaxel.

11       Q.   If --

12       A.   If she had HER2-positive disease, yes,

13   I would give her docetaxel.

14       Q.   Can you say with certainty that

15   Miss Earnest, if she had received paclitaxel,

16   would be alive today?

17           MR. SCHANKER:

18                Objection, form.

19           THE WITNESS:

20                No one can say that with

21   certainty.

22   EXAMINATION BY MS. BIERI:

23       Q.   Can you say with certainty that

24   Miss Earnest's hair wouldn't be in the same level

25   of fullness that it is today?

162

1  information concerning a particular drug?

2          MS. BIERI:

3                Object to the form.

4          THE WITNESS:

5                On occasion, yes.

6  EXAMINATION BY MR. SCHANKER:

7      Q.   Are those -- when you get those kind of

8  letters, are those things that you -- how do you

9  treat them when you receive them?

10     A.   Well, I mean, if it's a black box

11 warning, obviously you're gonna look at it.  You

12 know, I -- I remember getting something in the

13 e-mail with regard to the -- with the hair loss,

14 the permanent hair loss, with -- potential for

15 peterm- -- permanent hair loss with docetaxel, but

16 I don't remember exactly where it came from.

17     Q.   Sure.

18     A.   I mean, this is years ago.

19     Q.   Understand.

20                I- -- if -- if -- if you can

21 answer, Doctor, if you would have received from

22 Sanofi -- and -- and you know Sanofi was the

23 manufacturer of Taxotere, correct?

24     A.   Yes.

25     Q.   If at some point you would have

163

1    received -- and I don't have any information that

2    they sent such a thing out, but if Sanofi had sent

3    out information to you concerning source -- some

4    sort of risk of permanent hair loss in significant

5    patient populations with the use of Taxotere, is

6    that something that you would have reviewed?

7              MS. BIERI:

8                   Object to the form.

9    EXAMINATION BY MR. SCHANKER:

10       Q.   If it would have come to your

11   attention?

12       A.   Yes.

13       Q.   Okay.  And is that something that you

14   would have taken seriously if it would have come

15   to your attention?

16             MS. BIERI:

17                  Object to the form.

18             THE WITNESS:

19                  Yes.

20   EXAMINATION BY MR. SCHANKER:

21       Q.   Is it something that if -- assuming

22   that it appeared substantiated properly and

23   legitimate, that you would have potentially

24   incorporated into your patient advisory if you had

25   received such a thing?

164

1      A.    Well, I do tell them now.

2      Q.    You tell them now?

3                   And if you had received such

4   information previously from a legitimate source,

5   that's something you could would have taken

6   seriously and advised patients accordingly?

7           MS. BIERI:

8                   Object to the form.

9           THE WITNESS:

10                  When you say "previously," you

11  mean prior to Miss Earnest?

12  EXAMINATION BY MR. SCHANKER:

13     Q.    Yes.

14     A.    Yes.

15     Q.    You talked about neuropathy with the

16  use of chemotherapy drugs, in particular docetaxel

17  and paclitaxel, correct?

18     A.    Yes.

19     Q.    The -- and -- and you had said that

20  neuropathy can be daunting, and you were referring

21  to use of paclitaxel, especially with the regimen

22  that involved four- -- treatment every 14 days; is

23  that correct?

24     A.    Yes.

25     Q.    Is -- now, is that neuropathy that

1  you're talking about, you indicated that it could

2  be long lasting, but in most all circumstances, do

3  you see that neur- -- neuropathy resolve?

4          MS. BIERI:

5                  Object to the form.

6          THE WITNESS:

7                  It typically resolves, but it

8  persists for months.  And the s- -- it can range

9  from paresthesias to burning, painful, extremely

10  sensitive, you know, feet and hands.  And it

11  varies from -- you can't predict what kind of

12  neuropathy someone's gonna get.  They want -- they

13  may feel like they've got gravel under their feet

14  all the time, or they may have may numb toes, or

15  they may have, like I said, very exquisitely

16  sensitive burning-type pain.

17  EXAMINATION BY MR. SCHANKER:

18      Q.   Right.

19      A.   Okay?  And that -- that's bothersome

20  for people.

21      Q.   Now, Doctor, is it fai- -- is it -- is

22  it fair to say that back when Miss Earnest was

23  re- -- your patient when she came into your office

24  in 2011, and you were evaluating her for

25  appropriate treatment, that you had no knowledge

```
 1   of a risk of permanent hair loss in significant
 2   patient populations with the use of docetaxel?
 3       A.   No, I did not know that.
 4       Q.   So then I would assume because you did
 5   not know that, you didn't advise Miss Earnest of
 6   that potential side effect, correct?
 7            MS. BIERI:
 8                 Object to the form.
 9            THE WITNESS:
10                 That's correct.
11   EXAMINATION BY MR. SCHANKER:
12       Q.   And that if you had knowledge of that,
13   you would have advised Miss Earnest on that
14   particular potential side effect, correct?
15       A.   Yes.
16            MS. BIERI:
17                 Object to the form.
18   EXAMINATION BY MR. SCHANKER:
19       Q.   And is it fair to say that -- would you
20   have given her other treatment options if sh- --
21   if Miss Earnest voiced a concern over the risk of
22   side effect of permanent hair loss --
23       A.   Yes.
24       Q.   -- associated with docetaxel?
25       A.   Yes.
```

167

1     Q.    That you would have given her a choice?

2           MS. BIERI:

3                 Object to the form.

4           THE WITNESS:

5                 Yes.

6    EXAMINATION BY MR. SCHANKER:

7     Q.   You don't -- you don't make your

8    patients --

9     A.   You can't force patients to do

10   anything.

11    Q.   Right.

12                It's a patient's choice

13   ultimately?

14    A.   Yes.

15    Q.   And it would have been Miss Earnest's

16   choice, correct?

17    A.   My job is to give them information so

18   they can make an informed decision.

19    Q.   Right.

20                And -- and you did that at the

21   time for Miss Earnest, correct?

22    A.   Yes.

23          MS. BIERI:

24                Object to the form.

25   EXAMINATION BY MR. SCHANKER:

1      A.    (Shakes head negatively.)  She was the

2  Taxotere person.

3      Q.    Okay.  Did Ruth Avila -- am I

4  pronouncing that right?

5      A.    Yes.

6      Q.    Did Ruth Avila, the sales

7  representative from Sanofi, to your knowledge,

8  ever advise you or provide you with information

9  concerning this potential side effect of permanent

10 hair loss in association with Taxotere?

11     A.    No.

12          MS. BIERI:

13               Object to the form.

14 EXAMINATION BY MR. SCHANKER:

15     Q.    And if she had provided you with that

16 information and you considered that information

17 legitimate, is that information you would have

18 taken seriously?

19     A.    Yes.

20          MS. BIERI:

21               Object to the form.

22 EXAMINATION BY MR. SCHANKER:

23     Q.    Is that information, if you had

24 received that from Ruth Avila or some sales

25 representative from Sanofi, and you believed it

1   was legitimate, that you would have incorporated

2   in your advisory of your patient?

3        A.   Yes.

4        Q.   Do you recall any Sanofi sales

5   representative ever specifically marketing

6   information or providing you with marketing

7   information concerning neuropathy?  Do you have

8   any recollection of that?

9        A.   No.

10       Q.   Okay.  Do you re- -- recall a sales

11  representative or Sanofi -- specifically Sanofi

12  sales representative or a individual from Sanofi

13  by the name of Michael Gillespie?  Does that ring

14  a bell at all?

15       A.   Yes.

16       Q.   Who -- any -- any -- any specific

17  recollection with regard to Michael Gillespie

18  or --

19            MS. BIERI:

20                 Object to form.

21  EXAMINATION BY MR. SCHANKER:

22       Q.   Do you remember what he -- what --

23       A.   He -- he is -- he was from Jackson,

24  Mississippi, and he was a -- I think he was like

25  Ruth's boss.  He was like a regional person.