UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)
PRODUCTS LIABILITY LITIGATION

MDL NO. 2740

SECTION "H" (5)

THIS DOCUMENT RELATES TO:

Tanya Francis, Case No. 2:16-cv-17410; and
Barbara Earnest, Case No. 2:16-cv-17144

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO SANOFI'S
MOTION TO EXCLUDE TESTIMONY OF DR. LINDA BOSSERMAN

Dr. Linda Bosserman is a medical oncologist specializing in the diagnosis, treatment, and care of patients with breast cancer. She is board certified in internal medicine and oncology. Dr. Bosserman was a Clinical Instructor of Medicine at Stanford University School of Medicine and Harvard University before joining Wilshire Oncology Medical Group in 1990. From 1990 until 2014, she served as a breast cancer specialist and clinical research trial lead seeing as many as 350 – 450 newly diagnosed breast cancer patients each year. (*See* Exhibit A, Dr. Linda Bosserman's Curriculum Vitae).

In 2014, Dr. Bosserman's entire medical group joined City of Hope Medical Foundation— one of 27 cancer centers which comprise the National Comprehensive Cancer Network (NCCN). The NCCN develops recommended practice guidelines for the diagnosis, treatment and care of cancer patients. These Guidelines are based on the best evidence available, updated at least annually and are widely recognized and utilized for breast cancer treatment. (*See* Exhibit B, Report of Dr. Bosserman ("Bosserman Rpt.") at 17). They are likewise available to patients and clinicians at no charge online. Additionally, Dr. Bosserman has served on numerous state and national committees and is currently serving as the chair of the 2019 Oncology Practice Conference.

1

Based on her education, training and experience, Dr. Bosserman has rendered opinions related to the standards for breast cancer diagnosis, treatment and care, generally, and specifically as applied to Plaintiffs Tanya Frances and Barbara Earnest.[1] A copy of Dr. Bosserman's "Taxotere Rule 26 Report" is attached as Exhibit B, with the sources for her opinions annotated. Her opinions are also corroborated by her deposition testimony. (*See* Exhibit C, Dep. Transcript of Dr. Linda Bosserman ("Bosserman Dep."), Dec. 3, 2018).

Dr. Bosserman's testimony will help the jury understand general concepts of medical oncology necessary to evaluate the facts of this case, and relevant concepts surrounding Sanofi's failure to warn of the risk of permanent hair loss associated with the use of Taxotere. Her opinions are based on her education, training, and experience; peer-reviewed literature and studies; and nationally accepted guidelines utilized in the practice of medical oncology. Further, the analysis presented in her opinions is based upon the decades of practice as an expert in the field of medical oncology.

Sanofi does not challenge Dr. Bosserman's qualifications—indeed, her qualifications are impeccable. *See* Exhibit A. Instead, Sanofi challenges Dr. Bosserman's opinions as unreliable, but in doing so misconstrues the rules of evidence. The Federal Rules and *Daubert* empower a court to be a gatekeeper and prevent bogus or unreliable expert testimony from a jury. Nothing in the law, properly understood, suggests that an experienced medical doctor such as Dr. Bosserman should be barred from testifying about oncology, the treatment of cancer and Taxotere. Sanofi's motion is merely a preview of the arguments it will use in Dr. Bosserman's cross-examination. Its motion, then, should be denied.

---

[1] By Order and Reasons entered on February 7, 2019, (Rec. Doc. 6120), Plaintiff Antoinette Durden was removed as a bellwether trial plaintiff. Consequently, no arguments relevant only to Plaintiff Durden have been addressed herein and will be briefed at a later date when her case is re-scheduled for trial.

## **LEGAL STANDARD**

Under Federal Rule of Evidence 702, a witness who is qualified as an expert may testify if (1) the expert's "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (2) the expert's testimony "is based on sufficient facts or data"; (3) the expert's testimony "is the product of reliable principles and methods"; and (4) the principles and methods employed by the expert have been reliably applied to the facts of the case. Fed. R. Evid. 702.  The Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provides the analytical framework for assessing whether an expert's testimony is admissible under Rule 702 by determining whether the testimony is both reliable and relevant. *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004).

Relevancy is "determined on the basis of assisting the trier." Fed. R. Evid. 702 Advisory Comm. Note. Under Rule 401, evidence is "relevant" if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.

Reliability of expert testimony "is determined by assessing whether the reasoning and methodology underlying the testimony is scientifically valid." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007). A nonexclusive set of factors for determining reliability has been developed and include: (1) whether the technique at issue has been tested; (2) whether the technique has been subjected to peer review and publication; (3) the potential error rate; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique is generally accepted in the relevant scientific community. *Burleson*, 393 F.3d at 584. The reliability inquiry must remain "flexible" as "not every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant." *Guy v.*

*Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004). "[A] trial judge has considerable leeway in … determining whether particular expert testimony is reliable," *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *see also Runnels v. Tex. Children's Hosp. Select Plan*, 167 F. App'x 377, 381 (5th Cir. 2006).

"The Fifth Circuit has held that, in determining the admissibility of expert testimony, district courts must accord proper deference to 'the jury's role as the proper arbiter of disputes between conflicting opinions. As a general rule, questions relating to the basis and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.'"[2]

## ARGUMENT

### I. DR. BOSSERMAN'S OPINIONS DEFINE STANDARDS OF CARE FOR MEDICAL ONCOLOGY, INCLUDING SHARED DECISION-MAKING

#### A. Sanofi's Argument is Contradicted by Bosserman's Report and Testimony

Sanofi begins their Motion to Exclude the Testimony of Dr. Bosserman by alleging her opinions are inadmissible because her opinions and supporting methodology are comprised only of "selectively summarizing the deposition testimony of Plaintiffs and their prescribing physicians" and "repeating hearsay." (Mot. at 3-4, Rec. Doc. 6130). If Sanofi's characterization of Dr. Bosserman's opinions and testimony were accurate, then it is conceivable that her testimony could be in jeopardy. However, Dr. Bosserman's opinions and methodology - as clearly set out in her Rule 26 Report and her deposition testimony, go far beyond Sanofi's representations. Each of her opinions is supported by scientifically-reliable evidence and relates directly to the issues presented in this case.

---

[2] *Nagle v. Gusman*, 2016 WL 560688 at *4 (E.D. La. Feb. 12, 2016) *citing U.S. v. 14.38 Acres of Land, More or Less Situated in Leflore Cty, Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).

Dr. Bosserman's Rule 26 Report and deposition testimony detail the medical science behind the diagnosis of breast cancer and the development of a treatment plan - including the available choices of chemotherapy—through the shared decision-making process of the oncologist and patient. By way of example, she explains in detail the following:

- The application of NCCN Practice Guidelines to particular facts regarding a breast cancer diagnosis to determine treatment options (Exhibit B, Bosserman Rpt. at 4);

- Treatment options available to physicians and patients within the applicable standard of care (*id.* at 5-11);

- The standard of care for physicians for informing patients through the shared decision-making process – including the application of NCCN and ASCO Guidelines to this process (*id.* at 11-17, 53);

- Availability, efficacy and risks associated with alternative treatments available to patients (*id.* at 17-23, 53);

- The effect of warning of the risk of PCIA associated with Taxotere on the shared decision-making process (*id.* at 23-29, 51-53);

- Application of these principles to the facts surrounding the individual cases of Plaintiffs Francis and Earnest (*id.* at 29-53).

Dr. Bosserman's deposition testimony also explains the scientifically accepted principles which formed the basis of her opinions. Again, only by way of example, Dr. Bosserman testified concerning the following topics:

- Her involvement in the clinical trials which led to the state of the art NCCN Guidelines (Exhibit C, Bosserman Dep. 101:20 – 103:11);

- Alternative treatment with Taxol without the same risk of permanent hair loss (*id.* at 106: 8-9; 281:12 – 285:18);

- Shared decision-making for treatment by doctor and patient (*id.* at 111:24 – 117:1; 138: 3-17; 168-3 – 170:16; 295:12 – 296:9; 539: 20-25);

- Application of the NCCN Guidelines (*id.* at 126:9 – 127:25);

- Analysis of treatment options available to Plaintiffs Francis and Earnest and impact of warning of PCIA associated with Taxotere on treatment decisions (*id.* at 131:14 – 136:2; 270:19 – 276:15; 351:10-13; 449:5 – 471:5; 487:2 – 518:25);

- Analysis of studies and medical literature regarding disease survival rates and hair loss (*id.* at 171:6 – 172:22; 348:3-20; 363:10 – 365:10)

For Sanofi to allege these opinions are only the product of Dr. Bosserman "summarizing fact-witness testimony" is disingenuous at best.

### B. Sanofi's Argument is Contradicted by Applicable Case Law

Additionally, the case law cited by Sanofi does not support its position. In fact, the very cases cited in Sanofi's Motion provide all the support necessary to find Dr. Bosserman's opinions admissible. In *Peters v. Five Star Marine Service*, 898 F.2d 448 (1990) the Fifth Circuit agreed with the Trial Court's finding that expert testimony about placement of equipment on the deck of a boat during heavy seas was unnecessary and inadmissible because it was within the jury's "common experience and knowledge." However, the *Peters* Court expressly contrasted the inadmissible boating expert's opinions with medical issues for which the jury "would need a physician" to explain issues, facts and opinions not "within the realm of the average juror's knowledge and experience." *Id.* at 450. Dr. Bosserman's opinions and testimony are the type of medical testimony referred to by the *Peters* Court as outside the realm of a juror's knowledge and experience. Her opinions are necessary to aid the jury in understanding the complex facts and issues in this case and are, therefore, relevant and admissible.

The *Jarrow* case cited by Sanofi involved a "civil rights suit aris[ing] out of a high school graduation party gone awry." *Jarrow v. Cupit*, 2000 WL 1537989 (E.D.La. Oct. 17, 2000). The Fifth Circuit excluded expert testimony on "whether or not Defendant's violated Plaintiffs' constitutional rights is a legal opinion or conclusion, and as such, is inadmissible. . . . . [It] is the Court's role, not that of one party's expert witness, to instruct the jury on the law of [the] case." *Id.* at *2. Clearly, Dr. Bosserman's opinions do not invade the province of the Court to instruct the jury on the applicable law. Consequently, *Jarrow* provides no support for Sanofi's argument.

Sanofi also cites *Factory Mutual Insurance Co. v. Alon USA, L.P. et al.* 705 F.3d 518 (2013), and asks the Court to exclude Dr. Bosserman's testimony as "repeating hearsay" because she relied on Plaintiffs' medical records and deposition testimony as well as the deposition testimony of their treatment physicians in forming her opinions in this matter. (Mot. at 4, Rec. Doc. 6130). But in *Factory Mutual*, the court specifically recognized:

> Expert witnesses may base opinions on facts or data that the expert has been made aware of or personally observed. **If the facts and data relied upon are the sort that experts in that field would reasonable rely on, then those facts need not be admissible for the opinion to be admitted.** Accordingly, experts may base their opinions on otherwise-inadmissible information, **such as hearsay**, so long as the information is the sort reasonably relied upon in the experts' field.
>
> The purpose of this rule is largely practical: experts generally base their opinions on information which, to be admissible in court, would entail the expenditure of substantial time in producing and examining various authenticating witnesses. Because experts may use their past experience and professional judgment to make critical decisions on the basis of such information outside of court, Rule 703 was intended to bring the judicial practice into line with the practice of the experts themselves when not in court. Courts nevertheless must serve a gate-keeping function with respect to Rule 703 opinions to ensure the expert isn't being used as a vehicle for circumventing the rules of evidence.
> . . .
> Specifically, the expert must form his own opinions by applying his extensive experience and a reliable methodology to the inadmissible materials.[3]

*Factory Mutual*, 705 F.3d at 524 (emphasis added) (internal quotations and citations omitted).

Dr. Bosserman listed the materials she reviewed and relied upon in developing her opinions and in preparing her report.[4] *See* Exhibit D, Reliance List of Dr. Bosserman. Additionally, Dr. Bosserman testified that she reviewed and relied upon (1) the individual Plaintiffs' medical records

---

[3] The court in *Mejia* also recognized an expert's ability to rely on hearsay material if "consistent with the ordinary practice" of the experts. *United States v. Mejia*, 545 F.3d at 197. Sanofi's reliance on *Mejia* is therefore misplaced.

[4]. In addition, notebooks containing the materials she reviewed and relied upon in forming her opinions—including peer-reviewed medical articles, studies and depositions—were marked as exhibits to her deposition, and the Table of Contents for these materials, are attached as Exhibits F & G.

(*See* Exhibit C, Bosserman Dep. at 75:13-18); (2) depositions of nine different witnesses (*id.* at 75:19-76:8); (3) Dr. Feigal's report rendered in this matter (*id.* at 27:12-22); (4) Plaintiffs' supplemental depositions (*id.* at 355: 1-4); and (5) the deposition of Mr. Earnest (*id.* at 492: 5-19). Sanofi cannot credibly argue that these materials are *not* "the sort reasonably relied upon in the expert's field," and therefore, Sanofi's request for exclusion on this basis should be denied. *See Factory Mutual Ins. Co.*, 705 F.3d at 524.

If the law were otherwise, as Sanofi attempts to argue, no expert witness would be permitted to rely on information not presented in open court. But that is not the law. Here, Dr. Bosserman's expert opinions: (1) relate to matters outside the common knowledge and understanding of the jury; (2) relate to facts and issues presented in this case; and (3) are based on facts and data commonly relied upon by oncologists. Consequently, her opinions and testimony are admissible.

## II.    DR. BOSSERMAN'S OPINIONS ARE RELEVANT ON THE ISSUE OF FAILURE TO WARN

Sanofi also seeks to exclude Dr. Bosserman's opinions under the learned-intermediary doctrine, arguing that "[t]he learned intermediary doctrine turns on the testimony of the Plaintiff's prescribing physicians, not the testimony of a retained expert speculating about what might have happened if the Plaintiff refused her physician's recommendations." Doc. 6130 at 6.    But the case Sanofi cites, *Genier v. Med. Eng'g Corp*, 99 F. Supp. 2d 759, 766 (W.D. La. 2000), does not support this argument, and in fact, on appeal, the Fifth Circuit's opinion stated that "in order to show causation, 'a plaintiff may introduce *either* objective evidence of how a reasonable physician would have responded to an adequate warning, *or* subjective evidence of how the treating physician would have responded.'" *Grenier v. Med. Eng'g Corp*., 243 F.3d 200, 205 n.4 (5th Cir.

2001) (emphasis added) (quoting *Thomas v. Hoffman-LaRoche, Inc.*, 949 F.2d 806, 812 (5th Cir. 1992)). This law fully supports the admission of Dr. Bosserman's opinions,

Dr. Bosserman provides well-supported expert opinions on how a reasonable physician would have responded to an adequate warning of permanent hair loss associated with Taxotere. For example, Dr. Bosserman provided the following opinions:

1) "Medical oncologists have the responsibility to *help patients understand and consider risks* that are important to them so they can make informed choices among options for local and systemic therapy to reduce the risk of local and distant recurrences of breast cancer." (Exhibit B, Bosserman Rpt. at 14 (emphasis added)).

2) Oncologists must *discuss "all risks* that are significant to the patient." (*Id.* at 15).

3) "It is a sacrosanct trust to disclose information to patients in oncology." (Exhibit C, Bosserman Dep. at 138:16-17).

4) The communication of information concerning the risk of PCIA with the use of Taxotere, from Sanofi to the treating physicians . . . via the product label marketing pieces, correspondence and through sales representative that visited the doctors' offices would have changed the discussion and process of informed consent in a real and substantial way. It would have allowed for fully accurate and complete informed consent process and discussions between the physicians and their patients. (Exhibit B, Bosserman Rpt. At 52 (emphasis added)).

5) That given the option of several alternative choices for adjuvant care with relatively similar differences in efficacy profiles yet significantly different toxicity profiles, the patients would have had the opportunity to select among several alternatives that did not present the proven risk of PCIA associated with the use of Taxotere. (*Id.* at 52-53 (emphasis added)).

Furthermore, Dr. Bosserman's expert opinions are corroborated by the "subjective" evidence in this matter, specifically, the testimony of Plaintiffs and their respective treating physicians.

As to Plaintiff Francis:

- "Dr. Verghese testified that if he is aware of a permanent risk that a drug may have, he discloses that risk to his patients." (*Id.* at 42).

9

- "In approximately 2014, Dr. Verghese first learned of the association between Taxotere/docetaxel and permanent hair loss . . ." (*Id.* at 43).

- Plaintiff Francis testified "[k]nowing what she knows now, if Dr. Verghese recommended the same course of treatment, she would have requested other treatment options that did not cause permanent hair loss." (*Id.* at 40).

- Dr. Bosserman's Report cites and summarizes Dr. Verghese's testimony, stating "Dr. Verghese testified that if Ms. Francis had been made aware of the risk of permanent hair loss associated with Taxotere/docetaxel and wanted to use a different regimen, he would have prescribed a Taxol/paclitaxel regimen." (*Id.* at 44).

As to Plaintiff Earnest:

- Dr. Carinder testified that if Ms. Earnest presented today with a new case of breast cancer, he would prescribe AC-Taxol/paclitaxel regimen. Dr. Carinder has changed his practice after learning that Taxotere carried a risk of PCIA, to the highly effective AC-Taxol regimen over the more toxic AC-Taxotere regimen for adjuvant systemic chemotherapy." (Exhibit B, Bosserman Rpt. at 47).

Finally, Sanofi claims Dr. Bosserman's testimony lacks any foundation because she indicated that she does not know what risks the plaintiffs would have accepted. (Mot. at 5, Rec. Doc. 6130). This argument mischaracterizes Dr. Bosserman's testimony. She stated: "I don't know what they [plaintiffs] would have decided *but they clearly were willing to weigh information provided in making their final decision with their oncologist.*" Exhibit C, Bosserman Dep. 136:8-16 (emphasis added)). Of course, Sanofi never provided that information.

Further, in her deposition errata, Dr. Bosserman explained:

Page 136, lines 8 through 22 [of my deposition], sets forth my opinion about whether [Plaintiffs] would have chosen a different course of chemotherapy had they been warned of the risk of permanent alopecia. My report notes that they each testified that they would have chosen a different chemotherapy regimen had they been informed of the risk of permanent chemotherapy-induced alopecia (PCIA). Their medical oncologists each testified that they would have informed their patients of the risk had they been informed by Sanofi. I was asked a number of times in the deposition whether my opinion of whether they would have chosen a different regimen was "speculation" and whether I know "what their decision would have been." As I testified, my expert testimony is properly to help the trier of fact to understand the evidence, so they can determine a fact issue. I have read the deposition testimony of the treating oncologists and discussed it in my report. I

10

> have not talked to the treating oncologists or the patients. My role as an expert does
> not permit me to make this finding of fact. I can say that based on my experience I
> find it credible that these patients would have made the choices they testified they
> would have made to use a non-Taxotere regimen.

(Exhibit E, Dr. Bosserman Dep. Volume 1 Errata at 1).

For these reasons, Dr. Bosserman's testimony on how a *reasonable* physician would have responded to an adequate warning of permanent hair loss associated with Taxotere is admissible, and thus Sanofi's arguments based on the learned-intermediary doctrine fail.

### III.   DR. BOSSERMAN'S OPINIONS RESULT FROM THE APPLICATION OF MEDICAL PRINCIPLES TO THE FACTS OF EACH CASE

Sanofi also argues that Dr. Bosserman's opinions must be excluded as based on "unsupported speculation" and "hing[ing] entirely on the notion that the prescribing physician would have relayed a known risk of permanent hair loss with Taxotere to the plaintiff." (Mot. at 7, Rec. Doc. 6130). To the contrary, Dr. Bosserman sets out the applicable medical oncology standards of care for treatment of these patients, including shared decision-making regarding treatment plans which requires that "all risks that are significant to patients be discussed." (Exhibit B, Bosserman Rpt. at 14-16).

According to Dr. Bosserman, the applicable standard of care requires that patients and doctors "share information, weigh the options, and agree on a treatment plan." (*Id.* at 11). "Medical oncologists have the responsibility to help their patients understand and consider risks that are important to them so they can make informed choices among options for local and systemic therapy to reduce the risk of local and distant recurrences of breast cancer." (*Id.* at 14). As such, oncologists are required to disclose to patients (1) "all risks that are significant to patients," (2) explain the benefit of the proposed treatment, and (3) medically acceptable alternative treatment. (*Id.* at 15). Without question, the standard of care would include the duty of a treating oncologist

11

to inform and discuss with patients any warning received concerning the risk of permanent alopecia associated with Taxotere use.

In applying her analysis to Plaintiffs Francis and Earnest, Dr. Bosserman's opinions are further corroborated by the testimony of the treating physicians outlined in the preceding section, including that both treating physicians (1) warn patients of known risks; (2) would have warned Plaintiffs Francis and Earnest of the risk of permanent hair loss related to Taxotere had they been informed; and (3) since learning of the connection, they warn all patients of this specific risk with Taxotere. (*Id.* at 40, 42, 43 and 47). Additionally, Plaintiff Earnest's treating physician testified that since learning of the risk of permanent hair loss associated with Taxotere, he has changed his practice to utilize Taxol to avoid permanent hair loss. (Exhibit B, Bosserman Rpt. at 47).

Sanofi also argues that Dr. Bosserman's opinions are "speculative" as "there is no certainty that the Plaintiffs would be cancer free today or that they wouldn't have permanent/persistent hair loss today had they survived." (Mot. at 9, Rec. Doc. 6130 (emphasis added)). But Sanofi's suggestion that scientific testimony must be known to a certainty or else it is speculative is not the law. In fact, the Supreme Court in *Daubert* squarely rejected this line of argument: "It would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science." 509 U.S. at 589.

It is of no moment, then, that Dr. Bosserman testified: "I'm not going to say –anything with a hundred percent certainly that you ask me today, because that's absurd." (Exhibit C, Bosserman Dep. 129:18-22). In the practice of medicine, "I don't think there's any doctor that guarantees any patient a specific outcome." (*Id.* at 525: 13-15). "There is no 100 percent of anything in medicine, as we agree." (*Id.* at 121:17-8). None of these statements render Dr. Bosserman's testimony speculative.

## IV.     DR. BOSSERMAN'S OPINIONS ARE BASED ON SOUND REASONING AND METHODOLGY

Next, Sanofi argues that Dr. Bosserman's methodology is flawed, and consequently, her opinions are unreliable and inadmissible. This line of argument does not withstand scrutiny.

In *Konrick v. Exxon Mobil Corp.*, the court performed a detailed analysis of the legal standard applicable for determining admissibility of expert testimony, focusing specifically on whether the expert opinions were reliable.[5] It explained: "The reliability inquiry requires the Court to assess whether the reasoning or methodology underlying the expert's testimony is valid. The aim is exclude expert testimony based merely on subjective belief or unsupported speculation."[6] Thus, the focus is on (1) whether the experts opinions were developed "expressly for the purpose of testifying"; (2) whether the expert has examined and "adequately accounted for obvious alternative explanations"; and (3) "whether the expert 'is being as careful as he would be in his regular professional work outside his paid litigation consulting.'"[7]

As discussed above, Dr. Bosserman's opinions easily pass muster under these considerations. In particular, Dr. Bosserman, in her report and deposition testimony, explicitly references studies, literature, and nationally accepted guidelines that she relied upon in forming her opinions. (*See generally* Exhibit B, Bosserman Rpt. (references throughout), Exhibit C, Bosserman Dep. (references throughout)).[8] What's more, Dr. Bosserman utilized the same type of medical analysis and shared decision-making process that she employs in her medical oncology practice. (Exhibit B, Bosserman Rpt. at 4, 14, 17, 25 and 49-52).

---

[5] *Konrick v. Exxon Mobil Corp.*, 2016 WL 439361 at *2 (E.D. La. Feb. 4, 2016) (finding expert opinions offered by Plaintiff inadmissible as relying on medical "literature that is inconsistent in both subject matter and its results" and "fail[ing] to present a meaningful analysis in which he reconciles the various studies and explains their relevance to the facts of this case.")
[6] *Id. citing Daubert*, 509 U.S. at 590, 592-93.
[7] *Id.* (internal citations omitted).
[8] *See* Ex. B, D and E.

To be sure, Sanofi does not argue that Dr. Bosserman's opinions regarding the general practice of medical oncology, and the standards of care regarding shared-decision making, are inaccurate. Nor could it. With no real basis to challenge Dr. Bosserman, Sanofi can do little more than mischaracterize her testimony.

For example, Sanofi says Dr. Bosserman ignored the "accompanying risks (including a permanent-alopecia risk)" associated with alternative treatments and "did not do any independent research to identifying the nature of such reports or the risk involved." (Mot. at 10, Rec. Doc. 6130). The record establishes otherwise. In a portion of Dr. Bosserman's testimony which Sanofi simply ignores, Dr. Bosserman testified that she considered other risks and examined the relevant literature:

> Q . . . you had not gone and researched what the <u>risk may or may not be for hair loss with other chemotherapy drugs that are not Taxotere</u>?
>
> A. **That is in some of the papers, so I've said I've looked at what the literature is looking at**.

Exhibit C, Bosserman Dep. at 348:5-10 (emphasis added).

> A.. . **. I've done a lot of literature searching**, but I'm most familiar with the **articles that are head-to-head [in comparing hair loss of different chemotherapy drugs]. I look at the head-to-head trials and see what that is and the multiple case reports**.

*Id.* at 348:16-20 (emphasis added).

Contrary to Sanofi's representations, then, Dr. Bosserman performed research on the issue of the risk of permanent hair loss associated with "drugs that are not Taxotere." Additionally, Dr. Bosserman's Report explains in detail the analysis of alternative treatment options. "Medical oncologist have the *responsibility* to help their patients understand and consider risks that are important to them so they can make informed choices among options for local and systemic therapy to reduce the risk of local and distant recurrence of breast cancer." (*Id.*) This requires

physicians to disclose to patients (1) risks significant to patients; (2) the benefit of the proposed treatment; and (3) "*medically acceptable alternatives* must be explained" including "cost, length of recuperation, likely success, *and risks, compared with the proposed treatment*." (*Id.* at 15 (emphasis added)). These "standards of informed consent" are incorporated into the guidelines of ASCO – a "national and global oncology practice quality certification program". (*Id.* at 14).

Next, Sanofi claims Dr. Bosserman "ignores" contrary testimony by Plaintiff Francis' treating oncologist Dr. Verghese and Plaintiff Earnest' husband Ralph Earnest, as well as information contained in an "educational booklet" provided to Plaintiff Earnest. (Mot. at 10-11, Rec. Doc. 6130). As to Dr. Verghese, Plaintiff Francis' treating oncologist, Sanofi contends that statements in Dr. Bosserman's Report are inconsistent with Dr. Verghese's deposition testimony regarding his discussions of hair loss with Plaintiff Francis. Quite the opposite, Dr. Bosserman explicitly testified that she fully reviewed Dr. Verghese's testimony, "and when you put [his statements regarding warning of temporary vs. permanent hair loss] in that context . . . I don't think there is any contradiction in the intent of the discussion, which is what my report is about." (Exhibit C, Bosserman Dep. at 458:13-460:2). She further testified: "I read the intent of the discussions between the physicians and the patients and then extracted, I thought, the relevant parts that discussed what they said about that side effect." (*Id.* at 461:11-14). That testimony is consistent with Dr. Verghese's:

| [Plaintiffs' counsel]: | And at the time that you were treating Ms. Francis in 2009, did you have any reason to believe that Ms. Francis may experience something aside from temporary hair loss? |
|---|---|
| … | |
| [Dr. Verghese]: | No. |

(Exhibit H, Verghese Depo 105:24-106:5).

Regarding Ralph Earnest's testimony about what he and Mrs. Earnest were told about hair loss, Dr. Bosserman stated: "In the tone of [Mr. Earnest's] deposition, I read that as there is no guarantee. Again, it has to be taken in context. And that's why I wouldn't cite it because of the discussion with the doctor and the patient and what all their interpretation was." (Exhibit C, Bosserman Dep. at 495:15-19). With respect to the "educational booklet" provided to Plaintiff Earnest, Dr. Bosserman testified, "[i]t has nothing to do with the informed consent process between her and her doctor discussing it. From what I read from her, she's not sure whether she got it afterwards, but she didn't use it in making any of her decisions or discussion with her doctor." (*Id.* at 510:7-12). Clearly, Dr. Bosserman did not "ignore" either the testimony of Ralph Earnest or the role of an "educational booklet" provided to Plaintiff Earnest in rendering her opinions; rather, she considered and weighed the significance of both.

Lastly, Sanofi argues that Dr. Bosserman ignores "the positive clinical experience of prescribing physicians with Taxotere." (Mot. at 12, (Rec. Doc. 6130). Once again, Sanofi has mischaracterized Dr. Bosserman's testimony. On the issue of individual physicians' observations or "clinical experience," Dr. Bosserman testified:

- "Individual case reports . . . could be an indicator. They do not prove causation." (*Id.* at 145:19-21).

- "Individual experience is irrelevant. It is about the literature and studies that are done carefully to find out what the percentage is." (*Id* at 165:2-4).

- She believes the individual prescribing doctors' experience is irrelevant for hair loss. "That's why we need studies, *why we count on studies* to carefully follow adverse events to *their conclusion and report in a validated, statistical manner to us*. Our own experience over and over has been shown indicative of something, but it is not scientific in any way." (*Id.* at 166:12-24 (emphasis added)).

- "[T]he rules established by ASCO and NCCN and informed consent are that we disclose what *is scientifically validated* . . . ." (*Id.* at 168:4-7 (emphasis added)).

16

Far from *ignoring* clinical experiences Dr. Bosserman explained how to contextualize clinical experiences, and how to weigh them against validated studies. While Sanofi may disagree with Dr. Bosserman's testimony, that disagreement goes to the weight of the evidence, not its admissibility.

## V.   DR. BOSSERMAN'S OPINIONS REGARDING ONLINE TOOLS AND COOLING CAPS ARE RELEVANT AND RELIABLE

Lastly, Sanofi argues that Dr. Bosserman's opinions related to her use of online tools and cooling caps do not "'fit' the facts of these cases and should be limited accordingly." (Mot. at 13-14, Rec. Doc. 6130). Dr. Bosserman's opinions on both these topics are relevant and reliable.

Contrary to Sanofi's position, Dr. Bosserman does not intend to utilize the online tools "to disparage the benefit chemotherapy offered each of these women." (Mot. at 13, Rec. Doc. 6130). Dr. Bosserman instead would use these tools—a version of which was available when Plaintiffs were diagnosed with breast cancer and faced with treatment options—to educate the jury about the relative impact of undergoing chemotherapy on each Plaintiff's ultimate outcome. As Dr. Bosserman's Report states:

> Web-based tools were developed to estimate prognostic benefits of adjuvant chemotherapy for breast cancer patients. Adjuvant! Online was developed in 2001 and was available and used routinely for shared decision making for women with stage I or II breast cancer when Tanya Frances was diagnosed with breast cancer in 2009 and when Barbara Earnest . . . [was] diagnosed in 2011.

(Exhibit B, Bosserman Rpt. at 16).

Although the version of the online tool available in 2009 and 2011 when Plaintiffs Frances and Earnest, respectively, were diagnosed with breast cancer is no longer available, this does not render Dr. Bosserman's opinions on these tools inadmissible. These tools have been scientifically validated and are regularly used by medical oncologists. (Exhibit B, Bosserman Rpt. at 16, n. 10-

17

13). Dr. Bosserman regularly uses these tools "in [her] practice as a tool for patient counseling." (*Id.* at 17). The data produced using this online tool is therefore relevant and reliable. *See Daubert*, 509 U.S. at 592-3. Sanofi is free to explore on cross-examination whether these online tools have materially changed since 2009 and 2011—they have not—but the admissibility of these tools cannot seriously be questioned. *See Konrick*, 2016 WL 439351 at *3.

Sanofi also claims Dr. Bosserman's opinion on the potential use of cold caps to prevent permanent hair loss is irrelevant, because there is no evidence Plaintiffs' treating physicians offered them cold caps. (Mot. at 14, Rec. Doc. 6130). Sanofi's argument misses the mark. Sanofi failed to warn Plaintiffs' treating physicians about Taxotere-induced permanent hair loss. Had treating physicians received such a warning, Dr. Bosserman explained, they would have had reason to discuss the use of cold caps to their patients. Although not FDA approved at that time, these caps were nevertheless arguably the only known preventable measure for hair loss during chemotherapy.

If anything, this testimony is relevant to showing that permanent hair loss is a serious adverse event. When Plaintiffs were treated, cold caps were not approved by the FDA; they were not covered by insurance; they required very expensive cash outlays for patients; they were complicated and inconvenient; they required use 40 minutes prior to, and for an hour after, chemotherapy treatment; they were uncomfortable; they caused side effects including headaches, neck and shoulder discomfort and chills; and the were only 70% effective. (Exhibit B, Bosserman Rpt. at 24-27). Many of Dr. Bosserman's patients, therefore, "declined chemotherapy or chose the CMF regimen[9] which had a much lower chance of total temporary alopecia." (*Id.* at 25 (emphasis added). This testimony is relevant, because it shows that this medical information "would have

---

[9] The "CMF" regimen consists of cyclophosphamide, methotrexate, and fluorouracil.

changed the weighing of risks and benefits for patients, the informed consent process with their medical oncologists, and allowed women to choose or consider choosing different chemotherapy regimens or even avoid chemotherapy altogether." (*Id.* at 29).

## CONCLUSION

For the reasons discussed above, the Court should deny, in its entirety, Sanofi's Motion to Exclude the Testimony of Dr. Bosserman.

Dated: March 29, 2019                                    Respectfully submitted,

*/s/ Christopher L. Coffin*                              */s/ Karen B. Menzies*
Christopher L. Coffin (#27902)                          Karen Barth Menzies (CA Bar #180234)
PENDLEY, BAUDIN & COFFIN, L.L.P.                        Andre Mura (CA Bar # 298541) (on the brief)
1100 Poydras Street, Suite 2505                         GIBBS LAW GROUP LLP
New Orleans, Louisiana 70163                            6701 Center Drive West, Suite 1400
Phone: (504) 355-0086                                   Los Angeles, California 90045
Fax: (504) 355-0089                                     Telephone: 510-350-9700
ccoffin@pbclawfirm.com                                  Facsimile: 510-350-9701
                                                        kbm@classlawgroup.com
*Plaintiffs' Co-Lead Counsel*
                                                        *Plaintiffs' Co-Lead Counsel*

*/s/M. Palmer Lambert*                                  */s/Dawn M. Barrios*
M. Palmer Lambert (#33228)                              Dawn M. Barrios (#2821)
GAINSBURGH BENJAMIN DAVID                               BARRIOS, KINGSDORF & CASTEIX, LLP
MEUNIER & WARSHAUER, LLC                                701 Poydras Street, Suite 3650
2800 Energy Centre, 1100 Poydras Street                New Orleans, LA 70139
New Orleans, LA 70163-2800                              Phone: 504-524-3300
Phone: 504-522-2304                                     Fax: 504-524-3313
Fax: 504-528-9973                                       barrios@bkc-law.com
plambert@gainsben.com
                                                        *Plaintiffs' Co-Liaison Counsel*
*Plaintiffs' Co-Liaison Counsel*

## PLAINTIFFS' STEERING COMMITTEE

Anne Andrews
Andrews Thornton Higgins Razmara, LLP
2 Corporate Park, Suite 110
Irvine, CA 92606
Phone: (800) 664-1734
aa@andrewsthornton.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@atkinsandmarkoff.com

J. Kyle Bachus
Bachus & Schanker, LLC
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Phone: (303) 893-9800
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Phone: 510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, Florida 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

Andrew Lemmon
Lemmon Law Firm, LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

Genevieve Zimmerman
Meshbesher & Spence Ltd.
1616 Park Avenue South
Minneapolis, MN 55404
Phone: (612) 339-9121
Fax: (612) 339-9188
gzimmerman@meshbesher.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 29, 2019, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

*/s/ Dawn M. Barrios*
DAWN M. BARRIOS