UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)　　　　　　　　　　　MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

　　　　　　　　　　　　　　　　　　　　　　　　　　SECTION "H" (5)

THIS DOCUMENT RELATES TO
Tanya Francis, Case No. 2:16-cv-17410

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
SANOFI'S MOTION FOR SUMMARY JUDGMENT
BASED ON THE STATUTE OF LIMITATIONS

# (UNREDACTED MEMORANDUM FILED UNDER SEAL)

MAY IT PLEASE THE COURT:

Sanofi speaks out of both sides of its mouth in the slew of dispositive and Daubert motions it filed against Plaintiff Tanya Francis. In the instant motion, Sanofi alleges that Ms. Francis' claims are prescribed because she should have known her hair loss was permanent and caused by Taxotere at exactly six months after completing her chemotherapy treatment with Taxotere. This six-month trigger, which Sanofi bases off a belabored reading of the PSC's Master Complaint and possesses no factual relation to Ms. Francis, contradicts yet another dispositive motion in which Sanofi claims that Taxotere does not even cause permanent hair loss.

Unable to decide on a strategy, Sanofi throws all but the kitchen sink at Ms. Francis in a muddled effort to dispose of her claims. Luckily, Louisiana law on the issue of prescription is not so fuzzy. Under the established doctrine of *contra non valentum*, prescription is triggered when the tort victim knows, or should have known, of the causal association between the product and the injury.

Contrary to Sanofi's suggestion, permanent hair loss is not an obvious and expected outcome of chemotherapy such that it should be noticeable after six months. The Court recognized this when Sanofi previously sought to impose a six-month trigger for statute of limitations in its omnibus motion to dismiss 850 of the 1,100 then-pending cases, including Ms. Francis' case. The Court deferred ruling on Sanofi's omnibus motion to allow for discovery to proceed before undertaking such a fact-intensive analysis. (*See* Order and Reasons of October 27, 2017 Rec. Doc. 1034).

With discovery complete for Ms. Francis, a fact-intensive analysis is now appropriate. Sanofi, however, chooses to ignore the facts pertaining to Ms. Francis and yet again seeks to dispose Ms. Francis' claims using the six-month trigger date. This is because the facts do not

2

help Sanofi. As explained below, Ms. Francis expected and planned for temporary hair loss from her chemotherapy treatment—she purchased wigs to hide her self-described, and what she believed to be temporary, disfigurement. She was told that her hair might look different when it grew back—it might be curly or of a different texture. But what is key is Ms. Francis expected for her hair to regrow, and she and her physician did not know that her hair loss would be permanent. Left in the dark by Sanofi, Ms. Francis did not learn until 2016 that her hair would never return.

Sanofi should not be permitted to revive a six-month trigger date that is devoid of any connection to Ms. Francis and ignores facts that plainly place her claims within the prescriptive period. Accordingly, Sanofi's motion should be denied.

## LEGAL STANDARD

Summary judgment is improper unless the moving party shows there is no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To satisfy this initial burden, the movant must inform the court of the basis for the motion and identify the portions of the record that show the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In *Celotex*, the Supreme Court plainly stated:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

*Id.*

If the moving party fails to meet this initial burden, the motion for summary judgment must be denied, regardless of the non-movant's response. *See Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). "If the moving party meets the initial burden of showing that

there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir. 1995). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the Court is to determine whether "there is a genuine issue for trial." *Id.* at 249. When the non-movant produces evidence contradicting the movant's facts, a motion for summary judgment should be denied because the evidence and all reasonable inferences drawn from the evidence must be viewed in the light most favorable to the non-moving party. *Id.* at 255; *see also Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528 (5th Cir. 1997).

Generally, the fact finder should resolve exceptions to liberative prescription because the determination of when a prescriptive period accrues is a fact-dependent inquiry dependent on the testimony of the plaintiff and her healthcare providers. *See Chiasson v. Medtronic Inc.*, Nos. 16-789, 16-3552, 16-3721, 2016 WL 4191837, at *6 (E.D. La. August 9, 2016) ("In cases of medical products liability, the accrual of a case and the reasonableness of delay in filing suit often hinge on the testimony of the plaintiff and his or her doctor."); *see also Body by Cook v. Ingersoll-Rand Co.*, 39 F. Supp. 3d 827, 838 (E.D. La. 2014) (The application of "*contra non valentem* is generally a question of fact that may go to the jury for resolution."); *see also Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inference from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").

## ARGUMENT

**I. MS. FRANCIS' LIBERATIVE PRESCRIPTION WAS TOLLED UNTIL SHE DISCOVERED SANOFI'S TORTIOUS ACTIONS.**

In Louisiana, the prescriptive period for delictual actions, including actions under the Louisiana Product Liability Act ("LPLA"), is one year from the day injury or damage is sustained. *See* La Civ. Code art. 3492; *Am. Zurich Ins. Co. v. Caterpillar, Inc.*, 12-270 (La. App. 3 Cir. 10/3/12), 99 So.3d 739, 741 (noting that La. Civ. Code art. 3492 applied to claims under the LPLA). But the equitable tolling doctrine of *contra non valentum* suspends prescription during the period of time in which a reasonable person does not know that she is the victim of a tort. *See In re: Xarelto (Rivaroxaban) Prods. Liab. Litig.*, MDL No. 2592, No. 15-4790, 2017 WL 4517287, at *2 (E.D. La. Oct. 10, 2017). "When the issue of prescription is raised, '[t]he burden of proof generally rests on the party asserting prescription. However, when a complaint reveals on its face that the prescriptive period has lapsed, the plaintiff bears the burden of establishing a suspension or interruption of the prescriptive period.'" *Becnel v. Mercedes-Benz USA, LLC*, No. 14-0003, 2014 WL 1918468, at *4 (E.D. La. May 13, 2014) (quoting *Frank v. Shell Oil Co.*, 828 F. Supp. 2d 835, 842 (E.D. La. 2011)); *see also Campo v. Correa*, 01-2707 (La. 6/21/02), 828 So.2d 502, 508.

According to Sanofi, "Ms. Francis's Complaint establishes that the one-year prescription period commenced in May 2010 (six months after the end of her chemotherapy treatment) because, according to her own allegations, that is when she sustained her alleged injury." (Defs' Mem., Rec. Doc. 6081 at 5). This six-month statute of limitations trigger originates with its misinterpretation of a subordinate clause in the Second Amended Master Complaint. ("AMC") (Rec. Doc. 4407). Paragraph 181 of the Second Amended Master Complaint states in full:

5

> Unlike the temporary and reversible alopecia that ordinarily results from chemotherapy, Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate cause Permanent Chemotherapy Induced Alopecia, which is defined as an absence of or incomplete hair regrowth six months beyond the completion of chemotherapy. The Permanent Chemotherapy Induced Alopecia caused by Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate is not limited to the scalp and can affect hair follicles throughout the body.

(AMC, Rec. Doc. 4407 at ¶ 181.). With this allegation, the Plaintiffs' Steering Committee ("PSC") provided some detail regarding the alopecia-related injuries alleged in this MDL—that is, one way that the condition of permanent alopecia might commonly be described. Importantly, the allegations of this AMC were not alleged to have been known by Ms. Francis at the time of her infusion; rather, the allegations of the AMC are based on facts and allegations known to the Plaintiffs' Steering Committee at the time of filing the AMC with the benefit of hindsight.

Notwithstanding, neither Ms. Francis' Amended Short Form Complaint ("SFC") (2:16-cv-17410, Rec. Doc. 5) nor the Second Amended Master Complaint (AMC, Rec. Doc. 4407), which Ms. Francis incorporates by reference in her SFC, contain allegations that her injuries became known or knowable to her six months after completing chemotherapy treatment.[1] In her

---

[1] Moreover, a plain reading of Plaintiffs' AMC reveals that it more than sufficiently alleges facts giving rise to tolling of the prescriptive period applicable to their claims:

> Plaintiff[s] (sic) file these lawsuits within the applicable statute of limitations period of first suspecting that these drugs caused the appreciable harm they sustained. Plaintiffs could not, by the exercise of reasonable diligence, have discovered the wrongful cause of their injuries as the cause was unknown to Plaintiffs. Plaintiffs did not suspect, nor did they have reason to suspect that they have been injured, the cause of their injuries, or the tortious nature of the conduct causing their injuries until a date prior to the filing of these actions, which is less than the applicable limitations period for filing suit.

(AMC, Doc. 4407 at ¶ 10.). Plaintiffs have likewise alleged tolling of the prescriptive period because of Sanofi's misrepresentation and concealments:

> Additionally, Plaintiffs were prevented from discovering this information at an earlier date because: (1) Defendants misrepresented to the public, the FDA, and the medical profession that Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, and Docefrez, are free from permanent side effects; (2) Defendants failed to disclose to the public, the FDA, and the medical profession their knowledge of the risk of permanent side effects; and (3) Defendants fraudulently

6

SFC, Ms. Francis alleged that she suffered from "[p]ermanent, irreversible and disfiguring alopecia beginning after treatment with Taxotere (docetaxel) and continuing to present." (SFC, 2:16-cv-17410, Rec. Doc. 5 at ¶ 12.). This allegation was formed through Ms. Francis' perception of her injuries at the time she filed her lawsuit. In other words, through knowledge acquired well after completion of chemotherapy treatment, Ms. Francis now knows that her injuries occurred some time after cessation of chemotherapy treatment, which according to her Plaintiff Fact Sheet, occurred in or around May 2010.

## II. THERE ARE GENUINE ISSUES OF MATERIAL FACT CONCERNING WHEN PLAINTIFF DISCOVERED HER INJURIES AND THEIR RELATIONSHIP TO TAXOTERE.

Even if the allegations cited by Sanofi could be interpreted in the manner suggested by Sanofi, which would be contrary to Rule 56, the equitable tolling doctrine of *contra non valentum* applies and inures to Plaintiff's benefit. The Louisiana Supreme Court recognizes four bases for the application of *contra non valentum* including "[w]here the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant." *Marin v. Exxon Mobil Corp.*, 09-2368 (La. 10/19/10), 48 So.3d 234, 245. Prescription is suspended until "a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he or she is a victim of a tort." *Campo*, 828 So. 2d at 510. Constructive knowledge is defined as "whatever notice is enough to excite attention and put the injured party on guard and call for inquiry." *Id.* at 510-11. But constructive knowledge "requires more than a mere apprehension that something might be wrong. Prescription does not run against one who is ignorant of the facts upon which his cause of action is based, as long as

---

concealed facts and information that could have led Plaintiffs to discover the liability of the Defendants.

(AMC, Doc. 4407 at ¶ 11.).

7

such ignorance is not willful, negligence or unreasonable." *Griffin v. Kinberger*, 507 So.2d 821, 823 (La. 1987) (citing *Cardova v. Hardford Accident & Indemnity Co.*, 387 So.2d 571 (La. 1980)).

"[W]hen a plaintiff suspects something is wrong, he must seek out those whom he believes may be reasonable for the specific injury, and when a plaintiff acts reasonably to discover the cause of a problem, the prescriptive period [does] not begin to run until [he has] a reasonable basis to pursue a claim against a specific defendant." *Chevron USA, Inc. v. Aker Mar., Inc.*, 604 F.3d 888, 893-94 (5th Cir. 2010) (citations omitted). "The ultimate issue is the reasonableness of the [plaintiff's] action or inaction, in light of his education, intelligence, the severity of the symptoms, and the nature of the defendant's conduct." *Campo*, 828 So 2d at 511 (citations omitted). "Courts have summarized the *contra non valentem* doctrine as an inquiry into the 'reasonableness' of the victim's behavior in light of his perceived injuries." *Jenkins v. Bristol-Myers Squibb*, 2016 WL 10100281, at *6 (E.D. La. July 8, 2016) (citations omitted).

Sanofi mischaracterizes Plaintiff's legal claims throughout their motion. Ms. Francis does not dispute that she exhibited hair loss following chemotherapy treatment in May 2010. While Ms. Francis alleges that she observed hair loss six months after the cessation of chemotherapy treatment, the permanent nature of the condition was not evident to her or her physicians. Rather, Ms. Francis understood her hair loss as only temporary, and she waited and hoped for its regrowth. (Exhibit A, Tanya Francis Deposition on December 13, 2017 "Francis Dep." at 41:12-16, 236:20-237:02, 267:14-18). Nor does Ms. Francis dispute that her hair did not grow back as she hoped it would in May 2010. Ms. Francis has been painfully aware of her hair loss since that time. Ms. Francis testified in her deposition that her hair began to grow back short and thin approximately six months after her last chemotherapy treatment. (*Id.* at 221:14-

222:14). Ms. Francis now has a bald spot on the top left side of her head and spots of thinner hair on the sides, middle, and top of her head. (*Id.* at 224:10-226:20). Additionally, Ms. Francis' eyelashes and eyebrows have not fully regrown. (*Id.* at 232:15-233:6). Importantly, Ms. Francis believed that her hair would eventually return. (*Id.* at 41:12-16, 236:20-237:02, 267:14-18). Consequently, it was not known to Ms. Francis that her hair loss was permanent, much less why her hair had not returned, until she saw an advertisement on Facebook linking Taxotere with permanent hair loss in approximately 2016. (*Id.* at 28:23-31:16, 42:12-25, 237:13-238:04).

Temporary alopecia is a well-known side effect of chemotherapy treatment. Sanofi has always warned of temporary chemotherapy-induced alopecia in the Taxotere warning label. Thus, Ms. Francis' duty of inquiry was not and could not have been triggered by the mere awareness of hair loss because Ms. Francis had still not perceived her actual injuries, i.e., permanent and irreversible hair loss. Ms. Francis testified that she believed she had temporary hair loss a result of the entire chemotherapy regime because temporary hair loss was a side effect of each chemotherapy agent. (Exhibit A, Francis Dep. at 235:23-238:2). Moreover, it was not unreasonable for Ms. Francis to wait for her hair to return.[2] As a reasonable layperson, Ms. Francis does not know the dermatological definition of permanent alopecia. Even Sanofi has a differing view of the definition of permanent hair loss. Emanuel Palatinsky, Sanofi's Global Safety Officer testified that it would be reasonable to assume that hair loss was permanent after four years.[3]

In fact, Ms. Francis was warned about chemotherapy-induced alopecia by her prescribing oncologist and the nurse who first administered chemotherapy to her. (*Id.* at 39:05-40:13,

---

[2] Plaintiff concedes she had concerns about her hair loss and even sought referral to Dimitri Dermatology in 2017 where her hair loss was treated with injections and ultraviolet light. Francis Dep. at 259:4-265:17.

[3] Exhibit C, Sanofi_05252078 [REDACTED].

9

178:01-10, 179:11-17, 209:16-210:16; *see also* Exhibit B, Dr. Cherian Verghese Deposition "Verghese Dep." at 96:21-97:04). Dr. Verghese testified that he tells his patient "that most of the time, yes, it is likely to come back, even if it may look different and feel different. Majority of the time it does come back." (*Id.* at 105:20-23). What Dr. Verghese did not say is likewise important. Dr. Verghese did not testify that he tells his patients anything specific to Taxotere causing hair loss. Indeed, at the time that Dr. Verghese prescribed Taxotere to Ms. Francis in 2009, he was unaware that Taxotere was associated with the risk of permanent hair loss, and had he been aware of the association, he would have discussed the risk of permanent hair loss with Ms. Francis "because women are very concerned about hair loss." (*Id.* at 105:24-106:14, 121:12-122:8). As such, even if Ms. Francis had been excited (sufficiently under the Louisiana Supreme Court's interpretation in *Campo*) to inquire about her persistent hair loss while treating with Dr. Verghese, she would not have learned sufficient information to alert her to bring a products liability action against the manufacturers of Taxotere.[4]

In addition, Sanofi reliance on Judge Fallon's decision in *In re: Xarelto (Rivaroxaban) Prods. Liab. Litig.,* MDL No. 2592, No. 15-4790, 2017 WL 4517287 (E.D. La. Oct. 10, 2017) is likewise unpersuasive. There, the injury at issue—bleeding—was warned of in the label and was an obvious condition recognizable by expert and lay person alike. Here, the injury suffered by Ms. Francis and other plaintiffs alike—permanent hair loss—is obscured by the fact that temporary hair loss is commonly known side effect of chemotherapy treatment. Ms. Francis had on reason to believe otherwise particularly given, as shown below, Sanofi's decision not to disclose information regarding permanent alopecia to physicians and patients until required by

---

[4] Plaintiff does not highlight Plaintiff's treating physician's deposition testimony to argue that she was unaware that she had a claim against Sanofi because her healthcare provider did not inform her of the link between Taxotere and permanent hair loss. *See Breaux v. Danek Medical, Inc.*, No. 95-1730, 1999 WL 64929, at *6 (E.D. La. Feb. 4, 1999) ("There is no requirement that a patient be informed by an attorney or physician of a possible [claim] before prescription begins to run.").

10

FDA. Additionally, Ms. Francis was not merely ignorant of the extent or duration of her injuries. *See Fontenot v. ABS Ins. Co.*, 95-1707 (La. 6/7/96), 674 So.2d 960, 964 (citations omitted) ("Ignorance or misunderstanding of the probable extent or duration of injuries materially differs from ignorance of actionable harm which delays commencement of prescription."). Temporary hair loss and permanent hair loss are distinct injuries as evidenced by Ms. Francis' testimony. Ms. Francis accepted the risk of temporary hair loss, but she would not have accepted the risk of permanent hair loss. (Exhibit A, Francis Dep. at 191:15-17, 287:13-16). Additionally, failure to warn about the risk of temporary hair loss is not alleged by Ms. Francis in this action.

Respectfully, the Court's analysis should end here. Ms. Francis reasonably believed her hair would return. Sanofi has failed to show that Ms. Francis' behavior was unreasonable in light of the timing of her learning of her injuries and their cause under the jurisprudence interpreting Louisiana's discovery rule under the LPLA. Moreover, the nature of Sanofi's conduct provokes Louisiana's doctrine of equitable tolling of Ms. Francis' liberative prescriptive period in which to bring a claim.

**III.  EVEN IF A DUTY TO INVESTIGATE HAD BEEN TRIGGERED, WHICH PLAINTIFF DENIES, ANY SUCH INVESTIGATION WOULD HAVE BEEN FUTILE BECAUSE OF SANOFI'S ACTIONS TO CONCEAL THE ASSOCIATION BETWEEN ITS PRODUCT AND PERMANENT/IRREVERSIBLE INJURY.**

Sanofi alleges that Ms. Francis should have known that she had permanent hair loss due to her Taxotere use, to the exclusion of any other chemotherapy drug, non-chemotherapy drug, genetic condition, or environmental factor. Sanofi highlights allegations in the AMC concerning public discussions that linked Taxotere and permanent hair loss between 2006 and 2010 (Defs' Mem. at 11-12, 14-15). These allegations, again made with the benefit of hindsight, support the contention that Sanofi knew (but did not disclose) their drug could cause permanent alopecia at

11

the time that Ms. Francis was prescribed Taxotere infusions. Indeed Dr. Verghese's deposition testimony demonstrates Sanofi's successful concealment of the association between Taxotere and permanent hair loss from the medical and scientific community. Plaintiff's board-certified oncologist was prevented from learning of the association between Taxotere and permanent hair loss despite reviewing textbooks, medical journals, and case reports (Verghese Dep. at 13:22-14:7) and discussing side effects of chemotherapy drugs with his colleagues (*Id.* at 55:01-10) on a regular basis. Dr. Verghese never learned of the potential risk of permanent hair loss associated with Taxotere from Sanofi. (*Id.* at 110:20-111:06, 117:03-08). Moreover, because Sanofi did not warn Dr. Verghese of the association of Taxotere and permanent hair loss, Dr. Verghese was prevented from being able to discuss this risk of irreversible disfigurement with Ms. Francis in their discussion of the risks and benefits of chemotherapy treatment using a Taxotere regimen.

The discovery process has supplied evidence of what Sanofi knew and failed to share about permanent hair loss during the same period of time in which Sanofi claims Ms. Francis should have realized she should bring an action against Sanofi. For example, by the time Ms. Francis was administered Taxotere in 2009, Sanofi had received reports of persisting alopecia in patients taking Taxotere.[5] Nonetheless, Sanofi's Global Safety Officer told French health authorities in a January 2011 Taxotere clinical overview that [REDACTED].[6] Likewise, the FDA asked Defendants for a list of all cases reporting permanent/irreversible alopecia in March 2015. Defendants again concluded that there was insufficient evidence to support an association

---

[5] *See, e.g.* Exhibit D, 30(b)(6) Deposition Notice regarding Adverse Events at 4 (listing AERs in a chart). More than 200 AERs have been submitted to Sanofi regarding persisting alopecia, which Plaintiff can provide to the Court for it to review the individual reports.

[6] *See* Exhibit E, Sanofi_043353204.

12

between Taxotere and permanent alopecia.[7] After prompting from FDA, Sanofi changed its position, acknowledging that sufficient evidence of a causal association existed between Taxotere and permanent alopecia and noting "[REDACTED]"[8] Sanofi, tasked with knowing the details of their drug, either refused to acknowledge Taxotere could cause permanent hair loss when dealing with regulatory authorities, or, more charitably, believed that there was no association between Taxotere and permanent hair loss during that pertinent time period.

Consequently, it would be impossible for a lay person, like Ms. Francis, to make such a determination in light of the approved warning label's absence of an adequate warning coupled with the complex pharmacological and epidemiological questions associated with associating permanent alopecia to Taxotere use. Any delay in Plaintiff's understanding of Sanofi's tortious conduct clearly was not due to Ms. Francis' willful ignorance or negligence, and Ms. Francis should not be held to have knowledge of facts <u>either</u> known, disregarded and concealed <u>or</u> not known within Sanofi's organization.

## CONCLUSION

For the foregoing reasons, Ms. Francis' prescriptive period did not commence until she was put on notice by advertisements of the connection between Taxotere and permanent hair loss in 2016. Thereafter, she timely filed suit within one year of this notice after appropriate and diligent investigation triggered by that "excitement" defined by the Louisiana Supreme Court in *Campo*. At the very least, there are genuine issues of material fact to be determined by the fact finder that are necessary to evaluate liberative prescription in light of the AMC and SFC

---

[7] *See* Exhibit F, Sanofi_01267881 at 24.

[8] *See* Exhibit G, Sanofi_05207927.

allegations that support *contra non valentum* and continuing tortious activity. Accordingly, this Court should deny Sanofi's Motion for Summary Judgment Based on Statute of Limitations.

Dated: March 29, 2019                               Respectfully submitted,

*/s/ Christopher L. Coffin*                         */s/ Karen B. Menzies*
Christopher L. Coffin (#27902)                      Karen Barth Menzies (CA Bar #180234)
PENDLEY, BAUDIN & COFFIN, L.L.P.                    GIBBS LAW GROUP LLP
1100 Poydras Street, Suite 2505                     6701 Center Drive West, Suite 1400
New Orleans, Louisiana 70163                        Los Angeles, California 90045
Phone: (504) 355-0086                               Telephone: 510-350-9700
Fax: (504) 355-0089                                 Facsimile: 510-350-9701
ccoffin@pbclawfirm.com                              kbm@classlawgroup.com

*Plaintiffs' Co-Lead Counsel*                       *Plaintiffs' Co-Lead Counsel*

*/s/M. Palmer Lambert*                              */s/Dawn M. Barrios*
M. Palmer Lambert (#33228)                          Dawn M. Barrios (#2821)
GAINSBURGH BENJAMIN DAVID                           BARRIOS, KINGSDORF & CASTEIX, LLP
MEUNIER & WARSHAUER, LLC                            701 Poydras Street, Suite 3650
2800 Energy Centre, 1100 Poydras Street             New Orleans, LA 70139
New Orleans, LA 70163-2800                          Phone: 504-524-3300
Phone: 504-522-2304                                 Fax: 504-524-3313
Fax: 504-528-9973                                   barrios@bkc-law.com
plambert@gainsben.com

*Plaintiffs' Co-Liaison Counsel*                    *Plaintiffs' Co-Liaison Counsel*

**PLAINTIFFS' STEERING COMMITTEE**

Anne Andrews                                        Daniel P. Markoff
Andrews Thornton Higgins Razmara, LLP               Atkins & Markoff Law Firm
2 Corporate Park, Suite 110                         9211 Lake Hefner Parkway, Suite 104
Irvine, CA 92606                                    Oklahoma City, OK 73120
Phone: (800) 664-1734                               Phone: (405) 607-8757
aa@andrewsthornton.com                              Fax: (405) 607-8749
                                                    dmarkoff@atkinsandmarkoff.com

14

J. Kyle Bachus
Bachus & Schanker, LLC
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Phone: (303) 893-9800
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, Florida 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Phone: 510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

| | |
|---|---|
| Andrew Lemmon | Genevieve Zimmerman |
| Lemmon Law Firm, LLC | Meshbesher & Spence Ltd. |
| P.O. Box 904 | 1616 Park Avenue South |
| 15058 River Road | Minneapolis, MN 55404 |
| Hahnville, LA 70057 | Phone: (612) 339-9121 |
| Phone: (985) 783-6789 | Fax: (612) 339-9188 |
| Fax: (985) 783-1333 | gzimmerman@meshbesher.com |
| andrew@lemmonlawfirm.com | |

## CERTIFICATE OF SERVICE

I hereby certify that on March 29, 2019 I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

*/s/ M. Palmer Lambert*
M. PALMER LAMBERT
