# EXHIBIT B

1           UNITED STATES DISTRICT COURT
2            EASTERN DISTRICT OF LOUISIANA
3              ~~~~~~~~~~~~~~~~~~~~~
4
5    TANYA FRANCIS,
6
7              Plaintiff,
8
9        vs.              Case No. 2:16-cv-17410
10
11   SANOFI S.A., SANOFI-AVENTIS U.S.
     L.L.C., SANOFI US SERVICE, INC., and
12   AVENTIS-PHARMA S.A.,
13             Defendants.
14
15             ~~~~~~~~~~~~~~~~~~~~~
16                  Deposition of
17              CHERIAN VERGHESE, M.D.
18
                   January 10, 2018
19                   11:25 a.m.
20
                     Taken at:
21
         University of Toledo Medical Center
22               3000 Arlington Avenue
                     Toledo, Ohio
23
24    Job No. NJ2775665
25              Stephen J. DeBacco, RPR

1     APPEARANCES:
2
3          On behalf of the Plaintiff:
4               Pendley, Baudin & Coffin, by
                JESSICA PEREZ REYNOLDS, ESQ.
5               24110 Eden Street
                PO Drawer 71
6               Plaquemine, Louisiana 70765
                (888) 725-2477
7               jperez@pbclawfirm.com
8
                Lowe Law Group, by
9               MARK D. HESIAK, ESQ.
                6028 South Ridgeline Drive
10              Suite 200
                Ogden, Utah 84405
11              (801) 900-4681
                mark@lowewalgroup.com
12
13
          On behalf of the Defendants:
14
                Shook, Hardy & Bacon, L.L.P., by
15              CONNOR J. SEARS, ESQ.
                HILLARY NICHOLAS, ESQ.
16              2555 Grand Boulevard
                Kansas City, Missouri 64108
17              (816) 474-6550
                csears@shb.com
18              hnicholas@shb.com
19                   ~ ~ ~ ~ ~
20
21
22
23
24
25

Page 13

1    brought with you today?
2         A.   Well, material and information that
3    may be relevant to understanding the side
4    effect that is of concern to Ms. Francis.
5         Q.   Okay.  Aside from the time that you
6    spent meeting with me, have you done anything
7    else to prepare for your deposition here today?
8         A.   Yes.  I have looked at what kind of
9    information was available in terms of this side
10   effect during the initial time of care that
11   Ms. Francis received, and also as to when the
12   relevant information became available, based on
13   publications in medical journals.
14        Q.   What was the initial time period,
15   if you recall, in which you treated
16   Ms. Francis?
17        A.   Well, it has to be prior to 2011 or
18   before.
19        Q.   Okay.  And you said that you
20   reviewed some materials.  Can you tell me more
21   about the materials that you reviewed?
22        A.   I have looked at the chemotherapy
23   handbooks and also the bigger textbooks, in
24   terms of the side effects described for the
25   Taxol-related medicines and its variants,

1  especially with regard to the level of toxicity
2  and when the toxicity tends to resolve by
3  itself.  I have also looked at the case
4  reports, which started coming later on, in
5  terms of prolonged loss of hair, which is a
6  more recent side effect profile added to these
7  two medicines.
8              MR. SEARS:  I'm sorry.  I've just
9  got an objection to state for the record.  We
10 object to anything he's reviewed since his care
11 and treatment of Mrs. Francis that he did not
12 rely on at the time of his care and treatment
13 of Mrs. Francis.  We think that he's limited to
14 treating opinions.  We think that by reviewing
15 things afterwards, he's essentially giving an
16 expert opinion, and he was not disclosed as
17 such.
18              Could I just have a standing
19 objection to any questions that are asked
20 about materials he's reviewed that are outside
21 of his care and treatment for Mrs. Francis?
22             MS. PEREZ REYNOLDS:  I mean, you
23 can certainly make your objection for the
24 record, but I would ask that you limit your
25 objections to the standard objection to form

Page 55

1  Q. If a patient comes to you with
2  questions about an adverse event, how often do
3  you consult with your colleagues about adverse
4  events and what they may know?
5  A. Often.
6  Q. What type of information do you
7  usually share with your colleagues?
8  A. We try to find out from -- what to
9  expect with the treatment of similar patients
10 that they may have seen or they may have read.
11 Q. So if a patient is asking you about
12 a side effect or adverse event that you're not
13 familiar with, would it be your standard
14 practice to discuss that with one of your
15 colleagues?
16 A. We discuss with colleagues, and
17 also we ask the pharmacy people to help us out
18 with it.
19 Q. And then, I know you had talked
20 about earlier that sometimes you may even refer
21 to scientific articles or publications to learn
22 more about adverse events; is that correct?
23 A. Right.
24 Q. How often would you say that you do
25 that, typically, in your practice?

Page 96

1    factors into the discussion.  It's also how it
2    affects your life, even if you're walking
3    around.
4         Q.    And do you believe that making a
5    patient aware of potential permanent side
6    effects is an important piece of information
7    for that patient to have in order to make an
8    informed decision?
9              MR. SEARS:  Objection to form.
10        A.    Yes.
11        Q.    Back in 2009 when you treated
12   Ms. Francis for breast cancer, do you recall
13   what you would have generally educated her
14   about in regards to the regime you had
15   recommended of TAC?
16        A.    I would have gone through the
17   common side effects and compared these four
18   medicines, which are commonly used as adjuvant
19   treatment, and asked her whether she has any
20   concerns.  Not preferences, but concerns.
21        Q.    And during the course of your
22   discussions with Ms. Francis about chemotherapy
23   side effects, would you have discussed hair
24   loss at all with Ms. Francis?
25        A.    Hair loss is a common side effect,

Page 97

1  which always gets into the discussion
2  regardless.
3       Q.   So --
4       A.   So I'm sure I did that part, yes.
5       Q.   You said it's a common side effect
6  that gets into the discussion regardless.  Does
7  that mean if you don't bring it up --
8       A.   The patient always brings it up.
9       Q.   In your experience, is hair loss
10 something that most cancer patients are
11 concerned or curious about?
12           MR. SEARS:  Object to form.
13      A.   In my experience, it's a very
14 variable factor.  There are people who are so
15 concerned about a cancer diagnosis that they
16 don't care, because they want it to be cured.
17 They want everything to be removed.
18           There are patients who talk about
19 side effects in more detail, whether there's
20 hair loss, whether that's going to be
21 permanent.  When does the hair come back?
22 Should I make a wig out of my hair?  So there
23 are people who have a much more detail
24 discussion.  I've not found a certain pattern
25 of people showing the same kind of concerns.

Page 105

1    coming back at all?
2            MR. SEARS:  Objection to form.
3        A.   I tell them that expecting not to
4    lose hair, expecting the hair to look the same,
5    these are all unreal expectations.  We have to
6    treat this, and you will have hair-related
7    problems.  If they tell me -- if they ask me
8    whether their hair loss is going to be
9    permanent, then I tell them, even though there
10   aren't -- I'm not going to take a chance on
11   that, and that's where the wig comes in.
12           So the discussion is a little
13   different from saying it may be permanent
14   or never permanent.  I tell them it's better to
15   take a different approach to some of these side
16   effects.
17       Q.   Do you discuss with your patients
18   at all when they may expect for their hair to
19   start to return?
20       A.   Sure.  I tell them that most of the
21   time, yes, it is likely to come back, even if
22   it may look different and feel different.
23   Majority of the time, it does come back.
24       Q.   And at the time that you were
25   treating Ms. Francis in 2009, did you have any

1    reason to believe that Ms. Francis may
2    experience something aside from temporary hair
3    loss?
4                 MR. SEARS:  Objection to form.
5         A.    No.
6         Q.    In 2009, when you were going
7    through side effects and what to expect when
8    you were counseling Ms. Francis on her
9    treatment, did you ever advise her that as a
10   result of taking Taxotere, she may suffer
11   permanent hair loss?
12                MR. SEARS:  Objection to form.
13        A.    I don't think I would have made a
14   statement like that.
15        Q.    In 2009 when you were treating
16   Ms. Francis, were you aware that there was any
17   potential association between Taxotere and
18   permanent hair loss?
19                MR. SEARS:  Object to form.
20        Q.    Let me ask you another way.
21               In 2009, had anyone ever told you
22   that the use of Taxotere carried with it the
23   risk for potential permanent hair loss or
24   persistent alopecia?
25        A.    No.

Page 110

```
 1        Q.    Would you disagree if an expert
 2   were to give an opinion that the risk of
 3   permanent hair loss is associated with Taxotere
 4   but is not likewise associated with Taxol?
 5              MR. SEARS:  Objection to form.
 6        A.    I would go and find out what
 7   literature we have.  So it's not a simple
 8   disagreement.  And I'll tell the patient, yes,
 9   docetaxel can cause this.  We don't have
10   reports yet of this one.  That doesn't mean
11   that it won't.  So it's still an individualized
12   position.
13        Q.    After learning about this potential
14   risk of permanent hair loss, have you began to
15   counsel or educate your patients about this
16   risk when you review side effects of
17   chemotherapy with them?
18              MR. SEARS:  Objection to form.
19        A.    Yes.
20        Q.    Has anyone from Sanofi ever made
21   you aware of any label changes regarding an
22   association between permanent hair loss and
23   Taxotere?
24              MR. SEARS:  Objection to form.
25        A.    No.
```

Page 111

1  Q. Have you ever been made aware that
2  in 2005, Sanofi changed its Taxotere label in
3  Europe to contain adverse event reports
4  regarding permanent or persistent alopecia?
5           MR. SEARS:  Objection to form.
6  A. No.
7                - - - - -
8           (Thereupon, Deposition Exhibit 8,
9           Annex I: Summary of Product
10          Characteristics, was marked for
11          purposes of identification.)
12               - - - - -
13 Q. Doctor, I'm going to show you what
14 I'm marking for identification purposes as
15 Exhibit 8.  Doctor --
16          MR. SEARS:  Can I please have the
17 same standing objections to this?  Is that nod
18 a yes?
19          MS. PEREZ REYNOLDS:  Yes.  Don't
20 let me forget the basic rules of deposition,
21 here.
22 Q. Doctor, I would represent to you
23 that what this document represents is an
24 excerpt from the European labeling document.  I
25 would also tell you that if I were to give you

Page 117

```
 1           A.    Correct.
 2                 MR. SEARS:  Objection to form.
 3           Q.    At any time since you first began
 4     prescribing Taxotere to treat breast cancer
 5     patients to present, has anyone from Sanofi
 6     ever told you about this potential risk?
 7                 MR. SEARS:  Objection to form.
 8           A.    No.
 9           Q.    Do you recall the last time you may
10     have reviewed the labeling or package insert
11     material for Taxotere?
12           A.    No, I don't recall that, because
13     there are so many updates we do all the time,
14     so I don't.
15           Q.    Would you be surprised to learn
16     that Sanofi updated its labeling for Taxotere
17     in December of 2015 --
18                 MR. SEARS:  Objection to form.
19           Q.    -- to include a warning of
20     permanent hair loss?
21                 MR. SEARS:  Objection to form.
22           A.    I don't know, because I'm glad if
23     they did that, but some of us know of that even
24     before 2015, and it has not made it into even
25     the books, even now.  So this book is from -- I
```

1  good conversation.
2       Q.   Ultimately --
3       A.   I also try to get other people
4  involved, like family members and all these
5  people, because it's potentially curable.  I
6  try to have a frank conversation about why the
7  treatment is more important than the exam.
8       Q.   If your patient ultimately decides
9  not to proceed with the treatment regime that
10 you've recommended, do you respect that
11 patient's choice?
12      A.   I -- yes, I respect it.
13      Q.   At the time that you prescribed
14 Taxotere to Ms. Francis for the treatment of
15 her breast cancer, you were not personally
16 aware of any potential risk or association
17 between Taxotere and permanent hair loss, were
18 you?
19           MR. SEARS:  Objection to form.
20      A.   I don't recall knowing that.
21      Q.   If you had been made aware that
22 Taxotere carried with it the risk of permanent
23 alopecia in 2009, do you believe that's
24 something you would have likely discussed with
25 Ms. Francis?

```
                                                    Page 122

 1         A.    Yes.
 2               MR. SEARS:  Objection to form.
 3         Q.    And you said that very confidently.
 4   What about that would have made it important
 5   enough for you to discuss with her?
 6               MR. SEARS:  Objection to form.
 7         A.    Women are very concerned about hair
 8   loss.
 9         Q.    If you would have had that
10   information in 2009, so let's just assume that
11   you would have known that Taxotere carried with
12   it the potential for permanent hair loss, and
13   you would have disclosed that information to
14   Ms. Francis, if Ms. Francis would have told you
15   that she did not want to take Taxotere due to
16   that potential risk, do you believe you would
17   have respected that decision?
18         A.    Yes.
19               MR. SEARS:  Objection to form.
20         Q.    In Ms. Francis's case, if she would
21   have opted not to take Taxotere, is it your
22   opinion that there were other suitable
23   chemotherapy regimes, which she may have used
24   to treat her cancer at that time?
25               MR. SEARS:  Objection to form.
```