UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)  　　　　　　　　　MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

　　　　　　　　　　　　　　　　　　　　　　　　SECTION "H" (5)

THIS DOCUMENT RELATES TO
Barbara Earnest, Case No. 2:16-cv-17144

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
SANOFI'S MOTION FOR SUMMARY JUDGMENT
BASED ON THE STATUTE OF LIMITATIONS**

# (UNREDACTED MEMORANDUM FILED UNDER SEAL)

1

MAY IT PLEASE THE COURT:

Sanofi first raised the issue of statute of limitations almost two years ago in its May 26, 2017 omnibus motion to dismiss approximately 850 of the 1,100 then-pending cases, including bellwether Plaintiff Barbara Earnest's case. (*See* Mot. to Dismiss, May 25, 2017 Rec. Doc. 494). There, based off a belabored reading of the PSC's Master Complaint, Sanofi claimed that all plaintiffs should know their hair loss is permanent at exactly six months after completing chemotherapy with Taxotere/docetaxel. The Court declined to implement this type of *de facto* trigger date for statute of limitations, deferring ruling on Sanofi's omnibus motion and noting "it is more appropriate to address this type of motion once a flight of plaintiffs has been examined through discovery." (*See* Order and Reasons, Oct. 27, 2017, Rec. Doc. 1034).

With discovery almost complete, Sanofi now moves to dispose of Ms. Earnest's case again, relying on the same inaccurate notion presented in Sanofi's omnibus motion from 2017—namely, that all cancer survivors should know their hair loss is permanent six months after completing chemotherapy with Taxotere/docetaxel. But Sanofi does not even believe this, claiming in another dispositive motion that Taxotere does not cause permanent alopecia. (Mot. Summ. Judg. Rec. Doc. 6132-2 at 9). If a drug company, with all of its internal testing and scientific knowledge, insists that hair loss six months after chemotherapy does not create a corporate expectation that hair is permanently gone, how can that same drug company argue that cancer patients who took their drug should have known after six months that their hair would never grow back? The answer comes in the form of a statute of limitations defense that asks the court to believe that women taking this drug knew more than the drug company who designed, tested, and warned only of temporary hair loss.

Ms. Earnest was aware that her hair fell out as a result of a chemotherapy cocktail administered to her, but she did not know that her scalp had been permanently damaged, with follicles and root structures destroyed to an extent that hair will never regrow, until she was told years later in 2016 through an advertisement concerning Sanofi's failure to disclose information about permanent hair loss. Even assuming *arguendo* a duty to investigate had been triggered by her hair loss, any reasonable investigation would have been futile given Sanofi's continuing concealment of any causal association between Taxotere and permanent hair loss through the end of 2015.

Accordingly, summary judgment is improper because the facts, viewed in light most favorable to the non-movant, demonstrates that Ms. Earnest was not aware of her injuries or their causal relationship to Taxotere more than a year prior to filing her lawsuit.

## LEGAL STANDARD

Summary judgment is improper unless the moving party shows there is no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To satisfy this initial burden, the movant must inform the court of the basis for the motion and identify the portions of the record that show the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In *Celotex*, the Supreme Court plainly stated:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

*Id.*

If the moving party fails to meet this initial burden, the motion for summary judgment must be denied, regardless of the non-movant's response. *See Tubacex, Inc. v. M/V Risan*, 45 F.3d 951,

954 (5th Cir. 1995). "If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir. 1995). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the Court is to determine whether "there is a genuine issue for trial." *Id.* at 249. When the non-movant produces evidence contradicting the movant's facts, a motion for summary judgment should be denied because the evidence and all reasonable inferences drawn from the evidence must be viewed in the light most favorable to the non-moving party. *Id.* at 255; *see also Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528 (5th Cir. 1997).

Generally, the fact finder should resolve exceptions to liberative prescription because the determination of when a prescriptive period accrues is a fact-dependent inquiry dependent on the testimony of the plaintiff and her healthcare providers. *See Chiasson v. Medtronic Inc.*, Nos. 16-789, 16-3552, 16-3721, 2016 WL 4191837, at *6 (E.D. La. August 9, 2016) ("In cases of medical products liability, the accrual of a case and the reasonableness of delay in filing suit often hinge on the testimony of the plaintiff and his or her doctor."); *see also Body by Cook v. Ingersoll-Rand Co.*, 39 F. Supp. 3d 827, 838 (E.D. La. 2014) (The application of "*contra non valentem* is generally a question of fact that may go to the jury for resolution."); *see also Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inference from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").

**ARGUMENT**

I. **MS. EARNEST'S LIBERATIVE PRESCRIPTION WAS TOLLED UNTIL SHE DISCOVERED SANOFI'S TORTIOUS ACTIONS.**

In Louisiana, the applicable statute of limitations—otherwise known as the prescriptive period—for actions under the Louisiana Product Liability Act ("LPLA") is one year from the day injury or damage is sustained. *See* La Civ. Code art. 3492; *Am. Zurich Ins. Co. v. Caterpillar, Inc.*, 12-270 (La. App. 3 Cir. 10/3/12), 99 So.3d 739, 741 (noting that La. Civ. Code art. 3492 applied to claims under the LPLA). But the equitable tolling doctrine of *contra non valentum* suspends prescription during the period of time in which a reasonable person does not know that she is the victim of a tort. *See In re: Xarelto (Rivaroxaban) Prods. Liab. Litig.*, MDL No. 2592, No. 15-4790, 2017 WL 4517287, at *2 (E.D. La. Oct. 10, 2017). "When the issue of prescription is raised, '[t]he burden of proof generally rests on the party asserting prescription. However, when a complaint reveals on its face that the prescriptive period has lapsed, the plaintiff bears the burden of establishing a suspension or interruption of the prescriptive period.'" *Becnel v. Mercedes-Benz USA, LLC*, No. 14-0003, 2014 WL 1918468, at *4 (E.D. La. May 13, 2014) (quoting *Frank v. Shell Oil Co.*, 828 F. Supp. 2d 835, 842 (E.D. La. 2011)); *see also Campo v. Correa*, 01-2707 (La. 6/21/02), 828 So.2d 502, 508.

Again relying on a *de facto* six month trigger date, Sanofi claims that "Ms. Earnest's Complaint establishes that the one-year prescription period commenced in May 2012 (six months after the end of her chemotherapy treatment) because, according to her own allegations, that is when she sustained her alleged injury." (Defs' Mem., Rec. Doc. 6079 at 4). This six-month trigger for statute of limitations originates with Sanofi's misinterpretation of paragraph 181 in the Plaintiffs' Steering Committee's ("PSC") Second Amended Master Complaint. ("AMC") (Rec. Doc. 4407):

5

> Unlike the temporary and reversible alopecia that ordinarily results from chemotherapy, Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate cause Permanent Chemotherapy Induced Alopecia, which is defined as an absence of or incomplete hair regrowth six months beyond the completion of chemotherapy. The Permanent Chemotherapy Induced Alopecia caused by Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate is not limited to the scalp and can affect hair follicles throughout the body.

(AMC, Rec. Doc. 4407 at ¶ 181.). With this allegation, the PSC provided one way the condition of permanent alopecia might be described. Importantly, the allegations of this AMC were not alleged to have been known by Ms. Earnest at the time of her infusion; rather, the allegations of the AMC are based on facts and allegations known to the PSC at the time of filing the AMC with the benefit of hindsight.

Notwithstanding, neither Ms. Earnest's Amended Short Form Complaint ("SFC") (2:16-cv-17144, Rec. Doc. 9) nor the Second Amended Master Complaint (AMC, Rec. Doc. 4407), which Ms. Earnest incorporates by reference in her SFC, contain allegations that her injuries became known or knowable to her six months after completing chemotherapy treatment.[1] In her SFC, Ms. Earnest alleged that she suffered from "[d]isfiguring permanent Alopecia beginning after

---

[1] Moreover, a plain reading of Plaintiffs' AMC reveals that it more than sufficiently alleges facts giving rise to tolling of the prescriptive period applicable to their claims:

> Plaintiff[s] (sic) file these lawsuits within the applicable statute of limitations period of first suspecting that these drugs caused the appreciable harm they sustained. Plaintiffs could not, by the exercise of reasonable diligence, have discovered the wrongful cause of their injuries as the cause was unknown to Plaintiffs. Plaintiffs did not suspect, nor did they have reason to suspect that they have been injured, the cause of their injuries, or the tortious nature of the conduct causing their injuries until a date prior to the filing of these actions, which is less than the applicable limitations period for filing suit.

(AMC, Doc. 4407 at ¶ 10.). Plaintiffs have likewise alleged tolling of the prescriptive period because of Sanofi's misrepresentation and concealments.

> Additionally, Plaintiffs were prevented from discovering this information at an earlier date because: (1) Defendants misrepresented to the public, the FDA, and the medical profession that Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, and Docefrez, are free from permanent side effects; (2) Defendants failed to disclose to the public, the FDA, and the medical profession their knowledge of the risk of permanent side effects; and (3) Defendants fraudulently concealed facts and information that could have led Plaintiffs to discover the liability of the Defendants.

(AMC, Doc. 4407 at ¶ 11.).

treatment with Taxotere (docetaxel) and continuing to present." (SFC, 2:16-cv-17144, Rec. Doc. 9 at ¶ 12). This allegation was formed through Ms. Earnest's perception of her injuries at the time she filed her lawsuit. In other words, through knowledge acquired well after completion of chemotherapy treatment, Ms. Earnest now knows that her injuries occurred some time after cessation of chemotherapy treatment, which according to her Plaintiff Fact Sheet, occurred in or around February 2012.

II. **THERE ARE GENUINE ISSUES OF MATERIAL FACT CONCERNING WHEN MS. EARNEST DISCOVERED HER INJURIES AND THEIR RELATIONSHIP TO TAXOTERE.**

Even if the allegations cited by Sanofi could be interpreted in the manner suggested by Sanofi, which would be contrary to Rule 56, the equitable tolling doctrine of *contra non valentum* applies and inures to Plaintiff's benefit. The Louisiana Supreme Court recognizes four bases for the application of *contra non valentum* including "[w]here the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant." *Marin v. Exxon Mobil Corp.*, 09-2368 (La. 10.19/10), 48 So.3d 234, 245. Prescription is suspended until "a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he or she is a victim of a tort." *Campo*, 828 So. 2d at 510. Constructive knowledge is defined as "whatever notice is enough to excite attention and put the injured party on guard and call for inquiry." *Id.* at 510-11. But constructive knowledge "requires more than a mere apprehension that something might be wrong. Prescription does not run against one who is ignorant of the facts upon which his cause of action is based, as long as such ignorance is not willful, negligence or unreasonable." *Griffin v. Kinberger*, 507 So.2d 821, 823 (La. 1987) (citing *Cardova v. Hardford Accident & Indemnity Co.*, 387 So.2d 571 (La. 1980)).

"[W]hen a plaintiff suspects something is wrong, he must seek out those whom he believes

may be reasonable for the specific injury, and when a plaintiff acts reasonably to discover the cause of a problem, the prescriptive period [does] not begin to run until [he has] a reasonable basis to pursue a claim against a specific defendant." *Chevron USA, Inc. v. Aker Mar., Inc.*, 604 F.3d 888, 893-94 (5th Cir. 2010) (citations omitted). "The ultimate issue is the reasonableness of the [plaintiff's] action or inaction, in light of his education, intelligence, the severity of the symptoms, and the nature of the defendant's conduct." *Campo*, 828 So 2d at 511 (citations omitted). "Courts have summarized the *contra non valentem* doctrine as an inquiry into the 'reasonableness' of the victim's behavior in light of his perceived injuries." *Jenkins v. Bristol-Myers Squibb*, 2016 WL 10100281, at *6 (E.D. La. July 8, 2016) (citations omitted).

      Sanofi mischaracterizes Plaintiff's legal claims throughout their motion. Ms. Earnest does not dispute that she exhibited hair loss following chemotherapy treatment in May 2012. While Ms. Francis alleges that she observed hair loss six months after the cessation of chemotherapy treatment, the permanent nature of the condition was not evident to her or her physicians. Ms. Earnest likewise does not dispute that her hair did not grow back as she hoped it would in May 2012. Ms. Earnest has been painfully aware of her hair loss since that time. Ms. Earnest testified in her deposition that her hair began to grow back on the sides of her head in approximately 2012. (Exhibit A, Plaintiff Barbara Earnest Deposition "Earnest 2017 Dep." at 232:19-234:8, December 21, 2017). However, the hair on the top of her head never grew back, and Ms. Earnest now suffers from hair loss and hair thinning on top of her head. *Id*. Additionally, Ms. Earnest's eyelashes and eyebrows have not grown back. *Id.* at 228:10-17. Importantly, Ms. Earnest believed that her hair would eventually return. *Id.* at 65:15-66:11, 79:20-80:9,195:24-196:6. It was not known to Ms. Earnest that her hair loss was permanent, much less why her hair had not returned, until her brother

told her about an advertisement that he had seen linking Taxotere with permanent hair loss in approximately 2016. *Id.* at 23:7-18, 71:10-23.

Temporary alopecia is a well-known side effect of chemotherapy treatment. Sanofi has always warned of temporary chemotherapy-induced alopecia in the Taxotere warning label. Thus, the duty of inquiry was not and could not have been triggered by the mere awareness of hair loss because Ms. Earnest had still not perceived her actual injuries, i.e., permanent and irreversible hair loss. Ms. Earnest testified that she believed she had temporary hair loss as a result of the entire chemotherapy regime because temporary hair loss was a side effect of each chemotherapy agent. Earnest 2017 Dep. at 82:25-84:1, 91:16-92:25. Likewise, Ms. Earnest's prescribing oncologist testified that he tells his patients that their hair loss will only be temporary based on his experience with other patients. (Exhibit B, Dr. James Carinder Deposition "Carinder Dep." at 96:22-97:3).[2] What Dr. Carinder did not say is equally important. Dr. Carinder did not testify that he tells his patients anything about Taxotere causing permanent hair loss because he did not know that was a potential side effect. *Id.* at 93:5-21, 116:1-14, 165:21-166:10.

Indeed, Ms. Earnest was not warned of the risk of permanent chemotherapy-induced alopecia nor was she warned, more specifically, that Taxotere was known to cause permanent chemotherapy-induced alopecia. *Id.* at 165:21-166:10; Earnest 2017 Dep. at 200:21-201:7. 203:9-25. This is because Ms. Earnest's oncologist was not aware that Taxotere could cause permanent hair loss at the time he prescribed Taxotere to Ms. Earnest. Carinder Dep. at 27:4-9, 41:5-11, 165:21-166:3. Dr. Carinder testified that he began warning his patients of the risk of persistent or permanent hair loss associated with Taxotere in approximately 2015 "when all the news came out

---

[2] Dr. Carinder testified about another patient that he treated with Taxotere in 2005 who did not regrow her hair. Exhibit B, Carinder Dep. at 85:1-22. Dr. Carinder's experience with this one patient did not lead him to believe that Ms. Earnest would not regrow her hair following her use of Taxotere. *Id.* at 137:2-21.

9

that patients were having persistent alopecia." *Id.* at 119:15-120:23, 137:2-17.  As such, even if Ms. Earnest had been excited (sufficiently under the Louisiana Supreme Court's interpretation in *Campo*) to inquire about her persistent hair loss while treating with Dr. Carinder, she would not have learned sufficient information to alert her to bring a products liability action against the manufacturers of Taxotere.

Nor did Ms. Earnest learn that Taxotere was associated with permanent hair loss through a Breast Cancer Treatment Handbook.  Sanofi points to a handbook in Ms. Earnest's possession that associated Taxotere with "rare reports of permanent hair loss," arguing that Ms. Earnest had constructive knowledge of the risk of permanent alopecia. (Defs' Mem., Rec. Doc. 6079 at 9).  To the contrary, a single reference to permanent alopecia in a 200-page handbook does not constitute constructive knowledge. Ms. Earnest testified that she most likely took the handbook from Dr. Carinder's office during chemotherapy treatment and that she did not read the over 200-page handbook cover to cover. (Earnest 2017 Dep. at 98:12-100:22, 202:5-304:18).  Dr. Marie Celeste Lagarde testified that she gave Ms. Earnest the handbook in February 2011. (Exhibit C, Deposition of Marie Celeste Lagarde "Lagarde Dep." at 60:17-61:1).  Dr. Lagarde even testified that she has not read the handbook cover to cover and that she would have only directed Ms. Earnest to the pathology section of the handbook to explain her pathology report and the section of the handbook related to the pros and cons of lumpectomy versus mastectomy.  *Id.* at 60:21-62:18.  Importantly, Dr. Lagarde is a breast surgeon, and she would not have directed Ms. Earnest to any of the sections of the handbook on chemotherapy drugs and side effects "[b]ecause at this time we didn't know what [particular chemotherapy drug(s)] the patient was going to be receiving." *Id.* at 63:18-64:8.

10

Moreover, it was not unreasonable for Ms. Earnest to believe that her hair might return.[3] As a reasonable layperson, Ms. Earnest does not know the dermatological definition of permanent alopecia. Even Sanofi has a differing view of the definition of permanent hair loss. Emanuel Palatinsky, Sanofi's Global Safety Officer testified that it would be reasonable to assume that hair loss was permanent after four years.[4]

In addition, Sanofi reliance on Judge Fallon's decision in *In re: Xarelto (Rivaroxaban) Prods. Liab. Litig.,* MDL No. 2592, No. 15-4790, 2017 WL 4517287 (E.D. La. Oct. 10, 2017) is unpersuasive. There, the injury at issue—bleeding—was warned of in the label and was an obvious condition recognizable by expert and lay person alike. Here, the injury suffered by Ms. Earnest and other plaintiffs alike—permanent hair loss—is obscured by the fact that temporary hair loss is commonly known side effect of chemotherapy treatment. Ms. Earnest had on reason to believe otherwise, particularly given, as shown below, Sanofi's decision not to disclose information regarding permanent alopecia to physicians and patients until required by FDA. Additionally, Plaintiff was not merely ignorant of the extent or duration of her injuries. *See Fontenot v. ABS Ins. Co.*, 95-1707 (La. 6/7/96), 674 So.2d 960, 964 (citations omitted) ("Ignorance or misunderstanding of the probable extent or duration of injuries materially differs from ignorance of actionable harm which delays commencement of prescription."). Temporary hair loss and permanent hair loss are distinct injuries as evidenced by Ms. Earnest's testimony. Ms. Earnest accepted the risk of temporary hair loss, but she would not have accepted the risk of permanent

---

[3] Plaintiff asked her oncologist about her hair loss after the cessation of chemotherapy treatment because she had concerns, and Dr. Carinder informed her "[t]hat it's going to grow back. It takes time." (Exhibit A, Earnest Dep. at 80:21-82:21).

[4] Exhibit D, Sanofi_05252078 [REDACTED].

hair loss. (Earnest Dep. at 203:9-25). Failure to warn about the risk of temporary hair loss is not alleged by Ms. Earnest in this action.

Respectfully, the Court's analysis should end here. However, even if Ms. Earnest had recognized the permanent nature of her hair loss, Ms. Earnest would not have discovered the causal link between Taxotere and permanent hair loss through a reasonable search.

### III. EVEN IF A DUTY TO INVESTIGATE HAD BEEN TRIGGERED, WHICH PLAINTIFF DENIES, ANY SUCH INVESTIGATION WOULD HAVE BEEN FUTILE BECAUSE OF SANOFI'S ACTIONS TO CONCEAL THE ASSOCIATION BETWEEN ITS PRODUCT AND PERMANENT/IRREVERSIBLE INJURY.

Sanofi alleges that Ms. Earnest should have known that she had permanent hair loss due to her Taxotere use, to the exclusion of any other chemotherapy drug, non-chemotherapy drug, genetic condition, or environmental factor. Sanofi highlights allegations in the AMC concerning public discussions that linked Taxotere and permanent hair loss between 2006 and 2010 (Defs' Mem., Rec. Doc. 6079 at 11-12, 14-15). These allegations, again made with the benefit of hindsight, support the contention that Sanofi knew (but did not disclose) their drug could cause permanent alopecia at the time that Ms. Earnest was prescribed Taxotere. Indeed, Dr. Carinder's deposition testimony demonstrates Sanofi's successful concealment of the association between Taxotere and permanent hair loss from the medical and scientific community. Plaintiff's board-certified oncologist was prevented from learning of the association between Taxotere and permanent hair loss despite reviewing peer-reviewed medical journals on a regular basis and attending numerous conferences on medical issues related to breast cancer and breast cancer treatment every year. (Carinder Dep. at 62:8-64:12). Indeed, Dr. Carinder never learned of the potential risk of permanent hair loss associated with Taxotere from Sanofi. *Id.* at 171:6-11. Moreover, because Sanofi did not warn Dr. Carinder of the association of Taxotere and permanent

hair loss, Dr. Carinder was prevented from being able to discuss this risk of irreversible disfigurement with Ms. Earnest in their discussion of the risks and benefits of chemotherapy treatment using a Taxotere regimen. *Id.* at 166:12-167:22, 169:2-5.

The discovery process has supplied evidence of what Sanofi knew and failed to share about permanent hair loss during the same period of time in which Sanofi claims Ms. Earnest should have realized she should bring an action against Sanofi. For example, by the time Ms. Earnest was administered Taxotere in February 2012, Sanofi had received many reports of persisting alopecia in patients taking Taxotere.[5] Nonetheless, Sanofi's Global Safety Officer told French health authorities in a January 2011 Taxotere clinical overview that [REDACTED].[6] Likewise, the FDA asked Defendants for a list of all cases reporting permanent/irreversible alopecia in March 2015. Defendants again concluded that there was insufficient evidence to support a link between Taxotere and permanent alopecia.[7] After prompting from FDA, Sanofi changed its position, acknowledging that sufficient evidence of a causal association existed between Taxotere and permanent alopecia and noting "[REDACTED]"[8] Sanofi, tasked with knowing the details of their drug, either refused to acknowledge Taxotere could cause permanent hair loss when dealing with regulatory authorities, or, more charitably, believed that there was no association between Taxotere and permanent hair loss during that pertinent time period.

Consequently, it would be impossible for a lay person, like Ms. Earnest, to make such a determination in light of the approved warning label's absence of an adequate warning coupled

---

[5] *See, e.g.* Exhibit E, 30(b)(6) Deposition Notice regarding Adverse Events at 4 (listing AERs in a chart). More than 200 AERs have been submitted to Sanofi regarding persisting alopecia, which Plaintiff can provide to the Court for it to review the individual reports.

[6] *See* Exhibit F, Sanofi_043353204 at 44.

[7] *See* Exhibit G, Sanofi_01267881 at 24.

[8] *See* Exhibit H, Sanofi_05207927.

13

with the complex pharmacological and epidemiological questions associated with linking permanent alopecia to Taxotere use. Any delay in Plaintiff's understanding of Sanofi's tortious conduct clearly was not due to Ms. Earnest's willful ignorance or negligence, and Ms. Earnest should not be held to have knowledge of facts <u>either</u> known, disregarded and concealed <u>or</u> not known within Sanofi's organization.

## CONCLUSION

For the foregoing reasons, Plaintiff's prescriptive period did not commence until she was put on notice by advertisements of the connection between Taxotere and permanent hair loss in 2016. Thereafter, she timely filed suit within one year of this notice. At the very least, there are genuine issues of material fact to be determined by the fact finder that are necessary to evaluate liberative prescription in light of the AMC and SFC allegations that support *contra non valentum* and continuing tortious activity. Accordingly, this Court should deny Sanofi's Motion for Summary Judgment Based on Statute of Limitations.

Dated: March 29, 2019                     Respectfully submitted,

<u>/s/ Christopher L. Coffin</u>                  <u>/s/ Karen B. Menzies</u>
Christopher L. Coffin (#27902)            Karen Barth Menzies (CA Bar #180234)
PENDLEY, BAUDIN & COFFIN, L.L.P.          GIBBS LAW GROUP LLP
1100 Poydras Street, Suite 2505           6701 Center Drive West, Suite 1400
New Orleans, Louisiana 70163              Los Angeles, California 90045
Phone: (504) 355-0086                     Telephone: 510-350-9700
Fax: (504) 355-0089                       Facsimile: 510-350-9701
ccoffin@pbclawfirm.com                    kbm@classlawgroup.com

*Plaintiffs' Co-Lead Counsel*             *Plaintiffs' Co-Lead Counsel*

<u>/s/M. Palmer Lambert</u>                    <u>/s/Dawn M. Barrios</u>
M. Palmer Lambert (#33228)                Dawn M. Barrios (#2821)
GAINSBURGH BENJAMIN DAVID                 BARRIOS, KINGSDORF & CASTEIX, LLP
MEUNIER & WARSHAUER, LLC                  701 Poydras Street, Suite 3650
2800 Energy Centre, 1100 Poydras Street   New Orleans, LA 70139

14

New Orleans, LA 70163-2800
Phone: 504-522-2304
Fax: 504-528-9973
plambert@gainsben.com

*Plaintiffs' Co-Liaison Counsel*

Phone: 504-524-3300
Fax: 504-524-3313
barrios@bkc-law.com

*Plaintiffs' Co-Liaison Counsel*

## PLAINTIFFS' STEERING COMMITTEE

Anne Andrews
Andrews Thornton Higgins Razmara, LLP
2 Corporate Park, Suite 110
Irvine, CA 92606
Phone: (800) 664-1734
aa@andrewsthornton.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@atkinsandmarkoff.com

J. Kyle Bachus
Bachus & Schanker, LLC
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Phone: (303) 893-9800
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Phone: 510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944

| | |
|---|---|
| Fax: (713) 495-2331<br>adwyer@kirkendalldwyer.com | Fax: (713) 621-9638<br>rand_nolen@fleming-law.com |
| Emily C. Jeffcott<br>Morgan & Morgan<br>700 S. Palafox Street, Suite 95<br>Pensacola, Florida 32505<br>Phone: (850) 316-9074<br>Fax: (850) 316-9079<br>ejeffcott@forthepeople.com | Hunter J. Shkolnik<br>Napoli Shkolnik PLLC<br>360 Lexington Avenue, 11th Floor<br>New York, NY 10017<br>Phone: (212) 397-1000<br>hunter@napolilaw.com |
| Andrew Lemmon<br>Lemmon Law Firm, LLC<br>P.O. Box 904<br>15058 River Road<br>Hahnville, LA 70057<br>Phone: (985) 783-6789<br>Fax: (985) 783-1333<br>andrew@lemmonlawfirm.com | Genevieve Zimmerman<br>Meshbesher & Spence Ltd.<br>1616 Park Avenue South<br>Minneapolis, MN 55404<br>Phone: (612) 339-9121<br>Fax: (612) 339-9188<br>gzimmerman@meshbesher.com |

## CERTIFICATE OF SERVICE

I hereby certify that on March 29, 2019, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

*/s/ M. Palmer Lambert*
M. PALMER LAMBERT