# EXHIBIT D

Page 380

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF LOUISIANA
2
     IN RE:  TAXOTERE (DOCETAXEL)   MDL NO. 2740
3    PRODUCTS LIABILITY LITIGATION  SECTION: H
4    This document relates to:
     Antoinette Durden, Case No. 2:16-cv-16635
5    Tanya Francis, Case No. 2:16-cv-17410
     Barbara Earnest, Case No. 2:16-cv-17144
6    _____
     CONTINUING VIDEOTAPED EXPERT DEPOSITION
7    CURTIS THOMPSON, M.D.
8
     TAKEN IN BEHALF OF DEFENDANTS
9    WEDNESDAY, APRIL 3, 2019
     at 8:35 A.M.
10
11
     5200 Meadows Drive
12   Lake Oswego, Oregon
13
14   BE IT REMEMBERED THAT, the continuing videotaped
     expert
15   deposition of CURTIS THOMPSON, M.D., was taken before
     K.M, Court Reporter and Notary Public for
16   the State of Oregon, on Wednesday, April 3, 2019,
     commencing at the hour of 8:35 a.m., the proceedings
17   being
     reported at 5200 Meadows Drive, Lake Oswego, Oregon.
18
19
20
21
22
23
24
25

Page 381

```
1  APPEARANCES
2
3  Appearing on behalf of the Plaintiffs:
4  JOHN THORNTON, ESQUIRE
5  LAUREN DAVIS, ATTORNEY AT LAW
6  Andrews Thornton
7  4701 Von Karman Avenue, Suite 300
8  Newport Beach, California 92660
9  (949)748-1000
10 ldavis@andrewsthornton.com
11
12 DARIN SCHANKER, ESQUIRE
13 Bachus & Schanker
14 1899 Wynkoop Street, Suite 700
15 Denver, Colorado 80202
16 (303)893-9800
17
18
19
20
21
22
23
24
25
```

Page 382

```
1
2  Appearing on behalf of Defendant,
3  Sanofi US Services, Inc.
4  CONNOR SEARS, ESQUIRE
5  HILLARY NICHOLAS, ATTORNEY AT LAW
6  Shook, Hardy & Bacon, LLP
7  2555 Grand Boulevard
8  Kansas City, Missouri 64108
9  (816)474-6550
10 csears@shb.com, hnicholas@shb.com
11
12 Appearing Telephonically on behalf of Sun Pharmaceutical:
13 KATHLEEN KELLY, ATTORNEY AT LAW
14 Hinshaw Culbertson
15 53 State Street, 27th Floor
16 Boston, Massachusetts 02109
17 (617) 213-7000
18 kekelly@hinshawlaw.com
19
20
21
22
23
24
25
```

Page 383

```
1  INDEX                        PAGE
2  EXAMINATION OF CURTIS THOMPSON, M.D.
3
4
5  BY MR. SEARS                 381
6  BY MR. THORNTON                --
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 384

```
1            EXHIBITS
2  NO.        DESCRIPTION              PAGE
3  Exhibit 1  Notice of Deposition      381
4  Exhibit 2  Invoice 7                 388
5  Exhibit 3  Invoice 8                 389
6  Exhibit 4  Invoice 9                 389
7  Exhibit 5  Article Primary Scalp Alopecia   396
8  Exhibit 6  Article Lack of Specificity      398
9  Exhibit 7  Email dated 3-22-18       413
10 Exhibit 8  Email dated 4-5-18        420
11 Exhibit 9  Email dated 4-10-18       426
12 Exhibit 10 Email dated 4-11-18       428
13 Exhibit 11 Invoice 1                 438
14 Exhibit 12 Invoice 2                 444
15 Exhibit 13 Invoice 3                 447
16 Exhibit 14 Email dated 8-6-18        473
17 Exhibit 15 Invoice 4                 484
18 Exhibit 16 Invoice 5                 484
19 Exhibit 17 Letter to Taxotere        492
20
21
22
23
24
25
```

2 (Pages 381 - 384)

Page 385

1    CONTINUING VIDEOTAPED EXPERT DEPOSITION
2  DR. CURTIS THOMPSON
3  WEDNESDAY, APRIL 3, 2019
4    THE VIDEOGRAPHER: We're on the record.
5  The time 8:35 a.m. The date is April 3, 2019. This
6  is the beginning of the deposition of Dr. Curtis
7  Thompson. The case caption is Antoinette Durden vs.
8  Sanofi-Aventis US.
9    Will counsel introduce yourselves and
10  state whom you represent.
11    MR. SEARS: This is Connor Sears. I
12  represent Sanofi.
13    MS. NICHOLAS: Hillary Nicholas. I
14  represent Sanofi.
15    MR. THORNTON: John Thornton, the
16  plaintiffs.
17    MS. DAVIS: Lauren Davis, plaintiffs'
18  counsel.
19    MR. SCHANKER: Darin Schanker for the
20  plaintiffs.
21    THE REPORTER: Ms. Kelly?
22    MS. KELLY: Kathleen Kelly for Sun
23  Pharmaceutical Industries Inc.
24    THE VIDEOGRAPHER  The Court reporter will
25  now swear in the witness.

Page 386

1    THE REPORTER: You do swear or affirm
2  under penalty of perjury the testimony you will give
3  will be the truth, the whole truth, and nothing but
4  the truth?
5    THE WITNESS: Yes.
6    THE REPORTER: Thank you.
7  EXAMINATION
8  BY MR. SEARS:
9    Q. Good morning.
10    A. Good morning.
11    Q. It's good seeing you again. Could you go
12  ahead and state your name for the record?
13    A. Curtis Thompson.
14    Q. We've done this drill a couple times so I
15  think you know the process, but as a reminder, if I
16  ask a question that you don't understand, would you
17  please let me know?
18    A. Yes.
19    Q. And is there anything that would prevent
20  you from giving your most, best, accurate testimony
21  today?
22    A. No.
23    Q. I'm going to mark as Exhibit 1 the
24  deposition notice.
25    (Whereupon, Deposition Notice was marked

Page 387

1  as Exhibit 1 for identification.)
2  BY MR. SEARS:
3    Q. Did you have a chance to look over that?
4    A. Yes.
5    Q. Really what I want to ask you about is the
6  list on the last page, Exhibit A. Did you know that
7  plaintiffs' counsel filed some objections to these?
8    A. No.
9    Q. Okay. Let's run through it. I understand
10  they have objected to producing some material and
11  I'm just curious what you have. For the pathology
12  materials, did you do Cytokeratin 15 and Ki-67
13  testing on Ms. Tuyes?
14    A. Yes.
15    Q. Okay. I don't think we have those slides.
16  Do you have them at your shop?
17    A. I have to look. I thought everything was
18  sent.
19    Q. Can you please check on that. And if they
20  haven't been sent, we need those.
21    A. If they haven't been sent, they may not
22  have been done because they were all stored in a
23  single box and we instructed that everything be
24  sent. So it's most likely if they didn't come that
25  they weren't done on that case. That we pulled it

Page 388

1  out by then.
2    Q. Why --
3    MR. THORNTON: Might I -- might I suggest,
4  and it's your deposition, that I don't know when you
5  could call your lab just to confirm because --
6    THE WITNESS: I can call them immediately.
7    MR. THORNTON: Do you want to -- want to
8  adjourn for that process?
9    MR. SEARS: Yeah, let's do that, because I
10  want to talk about it.
11    THE VIDEOGRAPHER: The time is 8:38. We
12  are off the record.
13    (Whereupon, recess taken.)
14    THE VIDEOGRAPHER: The time is 8:40 a.m.
15  and we are on record.
16  BY MR. SEARS:
17    Q. So we just took a break and I believe you
18  called your lab --
19    A. Yes.
20    Q. -- about Ms. Tuyes' pathology materials.
21  What did you find out?
22    A. We did not do the immunos on them because
23  there were -- we did those -- the Ki-67 and the
24  Cytokeratin 15 on the unstained slides. And all of
25  the unstained slides were present for Tuyes, which

3 (Pages 385 - 388)

1 means we didn't use them. And all those were sent,
2 so we don't have any and they weren't performed.
3 Q. Why did you not do the Cytokeratin 15 and
4 Ki-67 staining on Ms. Tuyes' pathology?
5 A. Well, the Cytokeratin 15 and the Ki-67 was
6 just an investigational exercise that I was doing as
7 a researcher in hair loss diseases. And because
8 that biopsy -- the diagnoses of the permanent
9 chemotherapy-induced alopecia was secure on the
10 other three based on just the H&E slides. And it
11 was a secure diagnosis on Tuyes on two biopsies as
12 female pattern hair loss or androgenetic alopecia,
13 and there wasn't evidence of permanent chemotherapy-
14 induced alopecia. So because of this and because it
15 was just an investigational study using research
16 antibodies, I decided not to do it on that case.
17 Q. Were you curious if you'd see any
18 differences in the staining between Ms. Tuyes, who
19 was diagnosed with androgenetic alopecia versus Ms.
20 Earnest, Ms. Francis, and Ms. Durden who you
21 diagnosed with --
22 A. Well, I --
23 Q. -- chemotherapy-induced alopecia?
24 A. As I said, I'm a researcher in hair loss
25 diseases and so the whole reason for doing these

1 stains was out of my investigational interest. I
2 didn't think it was going to show anything and it
3 didn't impact the diagnostics at all because the
4 diagnostics are based only on the H&E slides.
5 Q. So the second item on Exhibit A is the
6 video referred to in your Invoice 3, and I think
7 that's a video of one of plaintiffs' consulting
8 experts. Do you still have access to that video?
9 A. No, I don't believe so.
10 Q. And then number 3 is the summary memo of
11 the video referred to in your Invoice 3. We have an
12 email that we will look at later that discusses that
13 video. Beyond that email, do you have any other
14 summary memo?
15 A. No.
16 Q. Number 4 is all communications or
17 documents regarding the stem cell study as referred
18 to in your invoices. Do you have anything
19 responsive to that?
20 A. Nothing other than the emails I produced.
21 That's everything.
22 MR. THORNTON: Within the bounds of the
23 objection.
24 MR. SEARS: What do you mean?
25 MR. THORNTON: Well, we made -- we

1 produced the emails that have been produced subject
2 to the review of the Magistrate.
3 BY MR. SEARS:
4 Q. So just to make sure I understand, do you
5 have any materials beyond the emails that have been
6 produced?
7 A. No.
8 Q. Number 5, all communications or documents
9 between you and Dr. Tosti regarding these cases
10 and/or stem cells.
11 A. You have it all. It's all been produced,
12 emails.
13 Q. Number 6, all communication or documents
14 between you and the person redacted in your Invoice
15 No. 5. Do you have anything that would be responsive
16 to that?
17 A. No.
18 Q. So you never exchanged any emails with the
19 person --
20 A. I don't believe so. I produced all the
21 emails that I could, searching up and down and back
22 and forth, and I don't believe so, that there was
23 any written communication ever.
24 Q. Number 7 asks for all communication or
25 documents in your possession regarding the person

1 redacted in your email dated August, 6, 2018.
2 A. Is that the same --
3 Q. I don't know if it's the same person.
4 A. Yeah. You have everything.
5 Q. All communications or documents in your
6 possession regarding Dr. Poole, who was referred to
7 in an email sent by Anne Andrews on March 28, 2018
8 at 11:53 a.m. Do you have any correspondence,
9 documents, anything regarding Dr. Poole?
10 A. No, nothing that hasn't been produced.
11 She was just cc'd on things. Dr. Poole was only
12 really involved in shipping the biopsies and
13 arranging that. That was the extent of our
14 interaction with my laboratory.
15 Q. Number 9 is anything in your possession
16 regarding any stem cell study regarding
17 chemotherapy.
18 A. No.
19 Q. Do you have anything beyond what's been
20 produced?
21 A. No.
22 Q. Number 11, communications between you and
23 any third party, other than counsel for plaintiff,
24 including but not limited to plaintiffs' other
25 retained experts relating in any way to the Taxotere

1 litigation. Do you have anything responsive to that
2 that has not been produced?
3    A.  No.
4    Q.  Number 11 is all timesheets. And I know
5 we have your invoices through Invoice 7. Have you
6 created any new ones?
7    MR. THORNTON:  We brought two timesheets
8 today for you.
9    MR. SEARS:  Thank you.
10    MR. THORNTON:  I might just mention for
11 the record that it's my understanding that this
12 deposition is really about the stem cell staining
13 that was done and, unfortunately, the slides that
14 weren't exchanged accidentally. And so it's -- I
15 don't really think that the bills apply to that in
16 any way but -- so we've produced them out of
17 courtesy. But we don't intend to reopen the entire
18 inquiry about his H&E stains and all of that.
19    MR. SEARS:  I understand your position.
20 I'm going to go ahead and mark these new invoices.
21    (Whereupon, Invoice 8 was marked as
22 Exhibit 2 for identification.)
23 BY MR. SEARS:
24    Q.  So we've got Invoice 8 which I'm marking
25 as Exhibit 2. So it looks like you reviewed Dr.

1 Smart's deposition?
2    A.  Yeah. It was sent to me.
3    Q.  And there's an entry February 5th, 2019
4 about identifying follicle phases and sizes of
5 microscopic images; what's that?
6    A.  I was just educating plaintiff attorneys
7 on histopathology. It was nothing more than that.
8    Q.  What aspects of histopathology?
9    A.  They had questions -- they had pictures,
10 histopathologic pictures of the three cases with
11 permanent chemotherapy-induced alopecia, and they
12 asked me what different structures were. Budding
13 pathologists -- budding alopecia pathologists.
14    Q.  Definitely complex. All right. I'm
15 marking as Exhibit 3 Invoice No. 9.
16    (Whereupon, Invoice 9 was marked as
17 Exhibit 3 for identification.)
18 BY MR. SEARS:
19    Q.  So it looks like you had a meeting with
20 one of the plaintiffs' attorneys on February 25,
21 2019 for two-and-a-fourth hours?
22    A.  Yes.
23    Q.  That was the day before your --
24    A.  That last deposition.
25    Q.  -- supplemental.

1    On March 1st, 2019, you had a call
2 planning and discussion with plaintiffs' attorney
3 John Thornton for 1.42 hours. Do you see that?
4    A.  Uh-huh.
5    (Whereupon, Invoice No. 10 was marked as
6 Exhibit 4 for identification.)
7 BY MR. SEARS:
8    Q.  I'm marking as Exhibit 4, Invoice No. 10.
9 There's an entry on March 25, 2019 for 1.75 hours
10 that says phone call, deposition scheduling,
11 telephone call with attorneys and review of emails.
12 What emails were you reviewing?
13    A.  The ones that have been produced. Well --
14 and it was searching, I believe, so that I could
15 produce them, I think.
16    Q.  What were you searching for?
17    A.  Just the request for any communication
18 regarding the immunohistochemical Cytokeratin 15 and
19 Ki-67 staining.
20    Q.  Which email address have you been using
21 when corresponding about this case?
22    A.  Personal? I use the
23 curtisinPortland@gmail.com. I only have one other
24 email so -- that forwards into that.
25    Q.  Did you search the curtisinPortland email

1 address for all the emails associated with
2 Cytokeratin 15 and Ki-67?
3    A.  Up and down, backward and forward, in and
4 out.
5    Q.  Then on March 26, 2019, there's 2.75 hours
6 for review of prior deposition and draft of letter
7 to Judge Milazzo.
8    A.  Yes.
9    Q.  Which prior deposition did you review?
10    A.  The deposition from February 26.
11    Q.  So then it looks like for Invoice 8 you
12 billed $3,367; is that right?
13    A.  Yes.
14    Q.  For Invoice 9 you billed $11,427?
15    A.  Yes.
16    Q.  And Invoice 10, you billed $7,488?
17    A.  Yes.
18    Q.  During your last deposition, we added up
19 your prior invoices and they came out to around
20 70,000. So this is 20,000 more. So you've billed
21 around $90,000 on this case?
22    A.  Yes.
23    Q.  All right. Then on Exhibit A on your
24 notice, the last item is any and all documents or
25 communications, including but not limited to, emails

1 between you and any individuals regarding the
2 studies. Do you have anything responsive to that
3 that has not already been produced?
4     A. No.
5     Q. So let's talk a little about the hair
6 follicle. So you did this staining, the Cytokeratin
7 15 staining and the Ki-67 staining, and essentially
8 what you were looking for was to see whether stem
9 cells were preserved in the bulge region, right?
10     A. No.
11     Q. Well, let's talk about the bulge region.
12 The bulge region, it's a portion of the hair
13 follicle and it's basically attached to the arrector
14 pili muscle to the follicular sheath; is that right?
15     A. They are all near each other, yes.
16     Q. There's stem cells that reside in the
17 bulge region, aren't there?
18     A. Follicular stem cells, yes.
19     Q. And stem cells, they have characteristics
20 like a high proliferative potential, don't they?
21     A. Well, they -- sure. Yes.
22     Q. In other words, they divide pretty
23 quickly?
24     A. Only when they need to, yes. They
25 actually only divide once because then it's off --

1 it's not a stem cell anymore.
2     Q. So you did the Cytokeratin 15 stain. And
3 the Cytokeratin 15 stain is a stain to see if
4 there's stem cells in the bulge region of the hair
5 follicle?
6     A. Not entirely, no.
7     Q. How is that inaccurate?
8     A. It's not a definitive stem cell marker.
9 It stains other cells.
10     Q. The stem cells are present, the
11 Cytokeratin 15 stains are positive, right?
12     A. Yes, that's fair to say.
13     Q. And if the stem cells were destroyed in
14 the bulge region, there would be -- the Cytokeratin
15 15 stain would test negative?
16     A. Probably, yes. It could stain other cells
17 though. I already said it stains other cells other
18 than stem cells. So it stains all basal cells of
19 the follicle. So even if they're destroyed, it could
20 still have staining of other cells. It's not a
21 specific marker.
22     Q. Ki-67 stain is a stain to test to see if
23 cells are dividing, right?
24     A. Growing not dividing.
25     Q. What's the distinction between growing and

1 dividing?
2     A. Growing is growing. And dividing is when
3 a cell is going from one cell into two. It's a
4 specific moment.
5     Q. The thought is with the Ki-67 stain is if
6 the stem cells were not present they would not be
7 growing and so it would test negative, right?
8     A. No.
9     Q. Why did you do the Ki-67 stain?
10     A. This was all part of -- you know, as I
11 said before, I'm a researcher in hair loss, and it
12 was an investigational project, just a pilot project
13 to look at permanent chemotherapy-induced alopecia
14 and what it showed with these stains. If you look
15 at the published research that I do, it's centered
16 around using these non FDA-approved investigational
17 antibodies to look for characteristics of the
18 different diseases.
19     Q. The hypothesis for why you did the Ki-67
20 staining was that if the chemotherapy had killed the
21 stem cell, the Ki-67 would test negative?
22     A. No. No, it's not that. It's more
23 complicated.
24     Q. Can you explain it?
25     A. These -- these antibodies, as I said, are

1 nonspecific. Like the Cytokeratin 15 is not a
2 definitive stem cell marker, and Ki-67 hits any cell
3 that's growing. And you use these and published with
4 the Cytokeratin 15 on other hair diseases, permanent
5 hair diseases. So the interest was in seeing what
6 might be different in this disease than the other
7 diseases.
8         Unfortunately, we don't have, like, all
9 these investigational antibodies. We -- like, 25
10 years ago we had two of them and we got more. But
11 we don't have really good definitive antibodies.
12 And to date, even despite all the work I've done,
13 there's no antibody that has -- one of these non
14 FDA-approved antibodies that has utility in
15 diagnostics.
16     Q. You would expect if a cell was dead, like
17 a stem cell, that the Ki-67 would test negative,
18 right?
19     A. No. Dead cells have antigens too, so they
20 can still stain.
21     Q. They wouldn't be growing if they were
22 dead, would they?
23     A. They could still have these antigens.
24 They could still have the molecule there so --
25     Q. If a cell was not present, the Ki-67 would

6 (Pages 397 - 400)

Page 401

1 test negative for that --
2    A.   If there's no cell there, it can't stain
3 with anything.  That is safe to say.
4    Q.   That would be true if there's no cell
5 there, the Ki-67 and the Cytokeratin 15 would test
6 negative for that cell?
7    A.   Yeah, because it's not there.
8    Q.   Okay.  So you did Cytokeratin 15 staining
9 and Ki-67 staining on Ms. Earnest, Ms. Francis, and
10 Ms. Durden's pathology, right?
11    A.   Yes.
12    Q.   So whose idea was it to do that staining?
13    A.   It was my idea.
14    Q.   So during your first deposition, we talked
15 about mechanisms of action.  Do you remember that?
16    A.   Vaguely, yes.
17    Q.   In your Rule 26 report, you attached a
18 list of literature that you reviewed.  Do you
19 remember that?
20    A.   Yes.
21    Q.   Some of the literature that you relied on
22 in forming your opinions has hypothesized that the
23 theoretical mechanism of action for why a
24 chemotherapy drug could potentially result in
25 persistent hair loss is that it kills the stem cell

Page 402

1 in the bulge region of the hair follicle, right?
2    A.   Yes.
3    Q.   And, in fact, you've published on that as
4 well, haven't you?
5    A.   Speculated.  We don't know, unfortunately.
6 But yeah, we've speculated in a review article.
7    Q.   You speculated that the theoretical
8 mechanism of action for why a chemotherapy drug
9 might result in ongoing hair loss is that it would
10 kill the stem cell in the bulge region, right?
11    A.   In permanent hair loss, not -- yes, that
12 the cells die.
13         (Whereupon, Article Primary Scalp Alopecia
14 was marked as Exhibit 5 for identification.)
15 BY MR. SEARS:
16    Q.   We talked about this article before but
17 I'm going to mark it as Exhibit 5, an article that
18 you wrote called Primary Scalp Alopecia, New
19 Histopathological Tools, New Concepts and a
20 Practical Guide to Diagnosis.
21    A.   Yes.
22    Q.   And really what I want to focus on is page
23 57.4.  What you wrote is "Noncicatricial alopecia
24 cannot be considered as synonymous to reversible
25 hair loss.  Permanent alopecia after chemotherapy is

Page 403

1 both noncicatricial and not reversible due to
2 toxicity of the drug to the follicular stem cells."
3        Did I read that correctly?
4    A.   Yes.
5    Q.   So when you write noncicatricial, that
6 means it's not scarring, right?
7    A.   Right.
8    Q.   And this is the hypothesis for the
9 mechanism of action.  You're hypothesizing that due
10 to the toxicity of the chemotherapy that it somehow
11 impacts the follicular stem cell, and that results
12 in ongoing alopecia after chemotherapy.
13    A.   So what's the question.
14    Q.   It was probably a bad question.  Let me
15 start over again.  Okay.
16        So here what you're proposing as a
17 hypothesis for why a chemotherapy drug would result
18 in ongoing alopecia after completion of chemotherapy
19 is that the toxicity of the drug would somehow harm
20 the follicular stem cell, right?
21        MR. THORNTON:  Objection; form.
22        THE WITNESS:  Okay.  Say that one more
23 time.  I was looking at the words.
24 BY MR. SEARS:
25    Q.   Okay.

Page 404

1    A.   And I started reading.
2    Q.   Sure.  Here's really the point I'm trying
3 to make is what you're hypothesizing here, in this
4 paper that you wrote, is that the mechanism of
5 action -- the theoretical mechanism of action for
6 why a chemotherapy drug would result in ongoing hair
7 loss after the completion of chemotherapy is that
8 there would be some toxicity of the drug that would
9 harm the follicular stem cell, right?
10    A.   Yes.
11    Q.   I think you referred to earlier that
12 you've published on Cytokeratin 15?
13    A.   Several times -- a couple times.
14        (Whereupon, Article was marked as Exhibit
15 6 for identification.)
16 BY MR. SEARS:
17    Q.   So I'm handing you Exhibit 6 which is a
18 reply to Lack of Specificity of Cytokeratin 15 Loss
19 in Scarring Alopecia, and this is something that you
20 wrote along with -- I'm going to butcher this guy's
21 name but Athenos Kolivras.
22    A.   Kolivras, Athanassios.
23    Q.   Okay.  So on the bottom of the first giant
24 paragraph there's CK-15, which that stands for
25 Cytokeratin 15, right?

7 (Pages 401 - 404)

Page 405

1    A.  Yes.
2    Q.  You write "CK-15 loss would also be seen
3  after direct toxicity on the follicular stem cells
4  as seen in permanent alopecia after chemotherapy."
5  Did I read that correctly?
6    A.  Yes.
7    Q.  So you're saying that you would expect to
8  see Cytokeratin 15 loss if the alopecia was caused
9  by the chemotherapy?
10    MR. THORNTON:  Objection; form.
11    THE WITNESS:  It's not possible to -- you
12  have to take this in the context of what this entire
13  reply to a letter that was written to a publication
14  that Dr. Kolivras and I did, which was subsequent to
15  the prior publication I did on Cytokeratin 15, loss
16  expression in a disease called lichen planopilaris.
17  And taking it in the context -- the response to the
18  letter to the publication was a discussion of
19  Cytokeratin 15 expression using immunohistochemistry
20  which is not FDA approved.  It doesn't have
21  specificity, and we're seeing loss in all of the
22  diseases.  And it's not something you can even say
23  this is a red light, green light.  This isn't, like,
24  it's there or it's not.  Because in a single biopsy
25  of normal scalp or of any of these group of

Page 406

1  diseases, you can see positive staining in some of
2  the follicles and not in others.  It just depends on
3  each of these specific things.
4    So this was simply -- and then the second
5  part, which also this review takes into account, is
6  we're challenging -- Dr. Kolivras and I are
7  challenging the existing classification system of
8  alopecia, which has typically been cicatricial/
9  noncicatricial, which is scarring/non-scarring and
10  typically been -- so people think, oh, if it's
11  scarring then it's permanent.  If it's non-scarring,
12  it's not permanent.  And the current classification
13  that's used that we're taking on in this, and then
14  in this series of letters from this other
15  publication, is trying to get people to move into a
16  new thinking about it.  So that's the concept here.
17    So it really doesn't come down to a loss
18  or not loss or stem cell or not stem cell.  As I
19  said before, the big point out of this is that
20  Cytokeratin 15 isn't a stem cell marker.  It
21  highlights stem cells but it highlights other cells.
22  And unfortunately, we don't have other
23  investigational antibodies that specifically hit the
24  stem cells or we would be using them.
25  BY MR. SEARS:

Page 407

1    Q.  The main purpose of Cytokeratin 15 is for
2  staining to see if stem cells are there.  That's
3  what people use it for, right?
4    A.  It's entirely investigational.  And as I
5  just said, the experience that I've had and that Dr.
6  Sperling has had and published even before I got
7  into this world, is that it's not specific.  It hits
8  the entire basalis of the follicle, so
9  unfortunately, it's not.  And as I said, we haven't
10  been able to find any other targets that are
11  specific for the follicular stem cell.
12    Q.  I understand that it's not specific and it
13  might hit things beyond stem cells, but Cytokeratin
14  15 is a stain that's used to test to see if stem
15  cells are present?
16    A.  Investigationally.  Never diagnostically,
17  though.  Because it's -- as I said already, it
18  doesn't just hit -- it just doesn't hit stem cells,
19  it hits other cells, unfortunately.
20    Q.  And so what you're writing here is that to
21  the extent that the Cytokeratin 15 is hitting the
22  stem cells, if chemotherapy is resulting in the
23  alopecia, you would expect to see the Cytokeratin 15
24  loss on the stem cells?
25    A.  What I'm writing is if you go to the

Page 408

1  sentence before, we're saying that what's considered
2  non-scarring alopecias or noncicatricial alopecias,
3  also lose on Cytokeratin 15 marking of cells.  And
4  so these ones that are non-scarring above chronic
5  traction, pattern hair loss, which is androgenetic,
6  chronic alopecia areata, and then systemic lupus
7  erythematosus, these also lose it, even though we
8  consider them non-scarring.  And then we move on to
9  say that the loss in the permanent alopecia after
10  chemotherapy would also not show this.
11    Us saying that it has toxicity in stem
12  cells is speculation.  I haven't done any research
13  in this.  I've never published anything on permanent
14  chemotherapy-induced alopecia.  And I don't -- I
15  don't know anybody who has regarding molecular
16  investigations.
17    Q.  I understand that with other types of hair
18  loss you might see Cytokeratin 15 loss as well, but
19  really all I'm asking you is based upon your
20  proposed hypothetical, speculative mechanism of
21  action, if the chemotherapy is killing the stem
22  cell, your thought is that you would see Cytokeratin
23  15 loss with that?
24    MR. THORNTON:  Objection, form.
25    THE WITNESS:  Well, we'd see -- but we're

8 (Pages 405 - 408)

Page 409

1 seeing loss in all of diseases, so, yes.  And the
2 goal of this article was to stop the madness and
3 kill the hope that Cytokeratin 15 was going to have
4 any utility in any of these diagnostics.
5 BY MR. SEARS:
6     Q.   You wrote this article in April of 2017,
7 didn't you?  It's on the bottom right.
8     A.   That's when it was published in --
9     Q.   So the article was published in April of
10 2017?
11     A.   This a response to a letter that was sent
12 to the -- to a publication.  So this came out a
13 couple months after the initial publication.
14     Q.   So this came out in April of 2017?
15     A.   Yes.
16     Q.   And you did this Cytokeratin 15 and the
17 Ki-67 staining on Ms. Francis, Ms. Earnest, and Ms.
18 Durden after April 2017?
19     A.   A year later, yes.
20     Q.   The reason you were doing that staining
21 was in part to test your hypothesis that if
22 chemotherapy is killing the stem cells in the bulge
23 region that you would see Cytokeratin 15 loss?
24         MR. THORNTON:  Objection; form.
25         THE WITNESS:  It was -- as I said before,

Page 410

1 I've used this -- this publication and the prior
2 lichen planopilaris publication, we've tried
3 Cytokeratin 15 on basically all of the hair loss
4 diseases.  And this publication, specifically this
5 letter to the publication, specifically address the
6 lack of utility.  So I wouldn't say -- as once again
7 I said, this isn't a red light, green light.  It's a
8 staining pattern, and I was just looking to see what
9 the staining pattern showed.  I didn't have any -- I
10 did not enter into it with any idea that it would be
11 a diagnostic utility.
12 BY MR. SEARS:
13     Q.   Your thought for why you wanted to do
14 that, though, is that if chemotherapy is killing the
15 stem cell in the bulge region, and Cytokeratin 15
16 stains stem cells, it could potentially -- the
17 Cytokeratin 15 could potentially stain negative,
18 right?
19         MR. THORNTON:  Objection, form.
20         THE WITNESS:  We're going around the block
21 here a little bit, but as I said before, first of
22 all loss of Cytokeratin 15 expression using this
23 immunohistochemical staining, which is not FDA
24 approved, only tells you that that antigen is not
25 there anymore.  It doesn't tell you whether the

Page 411

1 cell's alive or dead or can divide again or is -- so
2 this not the magic hammer.  It's just one of the
3 limited tools we have in investigation and hair
4 follicle biology and hair loss diseases.
5         So as I said before, it's not a red light,
6 green light.  It's not dead or alive, there or not
7 there. It's looking for patterns of staining,
8 because as I said before, almost all these diseases
9 have positive cells and negative cells.  So it's
10 not, like, you know, it's just a wasteland of
11 absence.  So we're just looking for patterns of it.
12         And it's a little bit of -- these are --
13 we only have a couple hammers, so we when we get a
14 nail, we can only use -- we have to use these
15 limited tools on it. But it's a staining pattern
16 a -- not trying to prove whether a stem cell is
17 there or not or dead or alive. There's really
18 nothing that can be done for that at this time.
19 BY MR. SEARS:
20     Q.   What staining pattern would've you seen
21 that would have made you think that it was caused by
22 chemotherapy if it -- for instance, Cytokeratin 15
23 --
24     A.   I don't know.  I was just throwing it at
25 it and -- to see if there was anything there, just

Page 412

1 like we've done with every other published disease.
2     Q.   I guess the flip side, if it wasn't caused
3 by chemotherapy -- if the alopecia wasn't cause by
4 chemotherapy, what staining pattern would you expect
5 to see with Cytokeratin 15?
6         MR. THORNTON:  Objection, form.
7         THE WITNESS:  Well, they're all different
8 patterns so -- one of the big points in these, as
9 you have said, once the follicle is gone or the cell
10 is gone, there's no staining anymore because there's
11 nothing to stain.  It's not there anymore.  So if
12 it's not there anymore, you can't stain it and
13 that's about the best we do.
14 BY MR. SEARS:
15     Q.   So if the stem cell was gone, it wasn't
16 present, the Cytokeratin 15 would not stain it
17 positively, right?
18         MR. THORNTON:  Objection, form.
19         THE WITNESS:  If the stem cell's gone,
20 there's nothing to stain.
21 BY MR. SEARS:
22     Q.   And so if a chemotherapy drug killed the
23 stem cell in the bulge region and the stem cell is
24 gone, the Cytokeratin 15 would stain negative?
25     A.   But it could still stain --

9 (Pages 409 - 412)

Page 413

1      MR. THORNTON: Objection; form.
2      THE WITNESS: It could still stain other
3 cells.
4 BY MR. SEARS:
5    Q.  But it would not be staining that stem
6 cell, would it?
7      MR. THORNTON: Objection; form.
8      THE WITNESS: If it's gone, no. You can't
9 stain something that's not there anymore.
10 BY MR. SEARS:
11    Q.  And so I know we've kind of gone around
12 the barn a few times, but here's really what I want
13 to ask you about.  We've talked about how you've
14 written about your theory, the speculative theory
15 for mechanism of action is that chemotherapy causes
16 ongoing alopecia after completion of chemotherapy
17 because it is killing the stem cell in the bulge
18 region, right?
19      MR. THORNTON: Objection; form.
20      THE WITNESS: Well, once again, it's not
21 that simple because if you look at this Exhibit 6,
22 we're talking about also exhaustion of the stem
23 cells.  So as hair follicles get smaller and
24 smaller, they eventually lose these cells and lose
25 the staining, it's not there anymore.  So it's

Page 414

1 really not -- but it just makes sense. I mean the
2 speculation based on the chemotherapy -- which this
3 is entirely speculation in this and in the review
4 because I've never done any investigation other than
5 the staining of these three cases on permanent
6 chemotherapy-induced alopecia.  But it's possible it
7 goes away from exhaustion too, just like you see in
8 other diseases so -- that are non-scarring.
9 BY MR. SEARS:
10    Q.  And you're saying exhaustion of the stem
11 cells?
12    A.  Yeah, they go away.
13    Q.  So here's really my question:  You
14 speculated that the mechanism of action for why
15 chemotherapy causes ongoing alopecia after the
16 completion of chemotherapy is because it either
17 kills the stem cells or causes exhaustion of the
18 stem cells in the bulge region, right?
19      MR. THORNTON: Objection; form.
20      THE WITNESS: Well, it just makes sense.
21 Chemotherapy is generally -- older chemotherapy, and
22 a lot of chemotherapy -- I'm not a clinical
23 oncologist.  I'm not an oncologist, but I did take
24 classes in medical school. But in general,
25 historically, chemotherapeutic agents hit cells that

Page 415

1 are growing, which cancers are growing.  So that's
2 why they do that.  And your hair grows.
3 BY MR. SEARS:
4    Q.  So I just want to make sure I understand.
5 Is the answer, yes, that your -- the theoretical,
6 speculative mechanism of action that you proposed in
7 these publications for why chemotherapy causes
8 ongoing alopecia after the completion of
9 chemotherapy is that it somehow kills or exhausts
10 the stem cell in the bulge region?
11    A.  Entirely speculative, yes.
12    Q.  Okay.  Can you think of any other
13 theoretical mechanism of action for why chemotherapy
14 would cause ongoing alopecia after the completion of
15 chemotherapy beyond that speculative mechanism of
16 action?
17      MR. THORNTON: Objection form.
18      THE WITNESS: Why chemotherapy -- I don't
19 know.  I wish I did.
20 BY MR. SEARS:
21    Q.  So the next sentence is --
22    A.  I mean, the speculation, there could be
23 toxicity to other cells that are not -- I mean,
24 there's other stem cells in the hair.  We're -- this
25 is a pretty crude discussion.  We should be limiting

Page 416

1 this to bulge stem cells or keratin stem cells, but
2 there's other stem cells.  There's melanocyte stem
3 cells in the follicle.  So it's quite a bit more
4 complex than who knows what these agents do.  They
5 hit any growing cell usually.
6    Q.  So have you ever published or hypothesized
7 or put forth any other theoretical mechanism of
8 action for why chemotherapy might cause ongoing
9 alopecia --
10    A.  Not to my knowledge, no.
11    Q.  I'm sorry.  Just let me finish the
12 question.
13    A.  Yes.
14    Q.  -- beyond that the chemotherapy would some
15 somehow kill or exhaust the stem cells in the bulge
16 region?
17    A.  Not to my knowledge, no.
18    Q.  And you can't think of anything beyond
19 that either, could you?
20      MR. THORNTON: Objection; form.
21      THE WITNESS: Well, just as I said,
22 there's toxicity to other cells.  You know, the hair
23 follicle is not based off of one single stem cell in
24 the bulge region. It's a complex entity with other
25 cells so it could be toxicity to other cells.

10 (Pages 413 - 416)

1 BY MR. SEARS:
2     Q.   None of that has been proven, has it?
3     A.   None of this has been proven.  And one
4 other -- one other thing we're missing here is that
5 all of the -- a good bit of the cells in a hair
6 follicle are growing all the time.  And actually,
7 they are growing more than the stem cell is.
8 Because the stem cell only divides when it needs to
9 make a new hair.  Where these others have to divide
10 all the time to keep your hair growing, right,
11 That's how our hair grows.  So they're actually much
12 more actively growing, and you'd expect them to be
13 positive for proliferative markers and other things
14 like that, and also be more susceptible to any kind
15 of an agent that stopped it from growing or
16 dividing.
17     Q.   So let's look back at Exhibit 6, and I
18 want to read full two sentences.  "CK-15 loss would
19 also be seen after direct toxicity on the follicular
20 stem cells as seen in permanent alopecia after
21 chemotherapy.  For the above reasons, further debate
22 on this topic is useless.  Our focus should no
23 longer be on whether follicular bulge stem cells are
24 preserved or not but why they are lost."  Did I read
25 that correctly?

1     A.   Yes.
2     Q.   So with that in mind, was your thought for
3 why you wanted to use Cytokeratin 15 staining in
4 these cases was that it could potentially show that
5 the follicular bulge stem cells are not present?
6         MR. THORNTON:  Objection; form.
7         THE WITNESS:  No.  As we've said before,
8 and as this publication -- or this response, the
9 initial publication affirms, is it's not a matter of
10 stem cell death when you're using this
11 investigational tool with an antibody to the
12 Cytokeratin 15 antigen.  It's simply looking for
13 staining pattern changes.
14 BY MR. SEARS:
15     Q.   And your thought was that if there was
16 staining pattern changes seen within the Cytokeratin
17 15 stain, that might have been caused by the
18 chemotherapy impacting the stem cell in the bulge
19 region?
20         MR. THORNTON:  Objection; form.
21         THE WITNESS:  My thought was that staining
22 patterns, and this is the basis of my published
23 research from the last 10 years or so, is that using
24 these -- these immunohistochemical stains, they're
25 not FDA approved.  When I was in training 25 years

1 ago, there were only, like, three of them.  And now
2 we have many, many, many of them, so we are always in an
3 investigational way trying to look for utility and
4 pathology diagnostics.  And the center of my
5 research is looking for diagnostic impasses in hair
6 loss.  So when we can't tell one entity from
7 another, we're hoping that these -- these
8 immunohistochemical stains might help us in making
9 distinctions.
10        So my interest was really not down at a
11 stem cell level.  I hope I made that clear.  It was
12 looking at histopathology as a hair loss pathology
13 expert to see if there is any staining pattern that
14 had any utility in distinguishing it from other
15 diseases.  So it's really at a much more diagnostic
16 level as a pathologist.
17        That being said, everything that I
18 published, which you have it all, has almost
19 entirely failed to find any antibodies that have
20 utility in this.  Most of these antibodies have
21 shown utility in cancer diagnostics, like melanoma.
22 But in inflammatory rashes, dermatitis, and in hair
23 loss disease there has been very little utility.
24 BY MR. SEARS:
25     Q.   So you were doing the Cytokeratin 15

1 staining on Ms. Earnest, Ms. Francis, and Ms. Durden
2 to see if you could find anything that would
3 distinguish it from any other type of alopecia?
4     A.   Yeah, just different staining pattern.
5     Q.   And you did not see anything that
6 distinguished it?
7     A.   No.  And I indicated that, too, quite
8 early in an email.
9     Q.   So let's run through a timeline of when
10 you got the pathology and when you did the testing.
11     A.   Can I get my soda?
12     Q.   Yeah, definitely.
13        (Whereupon, Email dated 3-27-18 was marked
14 as Exhibit 7 for identification.)
15 BY MR. SEARS:
16     Q.   So I've just handed you Exhibit 7, and
17 it's an email exchange that starts on March 27,
18 2018.
19     A.   Yes.
20     Q.   Okay.  So on March 27, 2018 at 4:25 p.m.,
21 Antonella Tosti wrote "Dear Curtis, I will have Anne
22 Andrews to contact you again."  And Anne Andrews is
23 an attorney for the plaintiffs' counsel, right?
24     A.   Yes.
25     Q.   Then it goes on to say "They have

11 (Pages 417 - 420)

Page 421

1 resources and access to many people who have the
2 problem. We're going take many scalp biopsies for
3 pathology and stem cell markers." Do you see that?
4     A. Uh-huh.
5     Q. Is that yes?
6     A. Yes.
7     Q. It's just unclear sometimes on the
8 transcript.
9     A. Yeah, I got it.
10    Q. Okay. So is this -- this is Dr. Tosti and
11 she's a retained expert for plaintiff?
12    A. Uh-huh.
13    Q. Yes?
14    A. Yes.
15    Q. And she's saying that there's going to be
16 pathology available for the plaintiffs and that
17 she's suggesting that you test them with stem cell
18 markers?
19    A. She says important problem for patients
20 and science. She didn't say anything about stem
21 cell did she? Oh, she did say --
22    Q. She said we are going to take --
23    A. Okay.
24    Q. -- many scalp biopsies for pathology in
25 stem cell markers. Do you see that?

Page 422

1     A. Uh-huh.
2     Q. Yes?
3     A. Yes.
4     Q. And so she's suggesting that the pathology
5 be tested for stem cell markers?
6     A. Yes.
7     Q. And the stem cell markers would be the
8 Cytokeratin 15 stain?
9     A. Well, there's other markers too, other
10 than that. As I said, we don't have a marker
11 specific for stem cells. And Dr. Tosti is a
12 clinical dermatologist, not a dermatopathologist.
13 So her knowledge of what we have and what works is
14 more limited. But yeah, she's interested in -- and
15 she and I do research together only. That's our --
16 that's our professional interaction.
17    Q. So what Dr. Tosti is suggesting is that
18 stem cell markers, which include Cytokeratin 15, be
19 used to test the pathology?
20        MR. THORNTON: Objection; form.
21        THE WITNESS: Well, she didn't say
22 Cytokeratin 15. She just said stem cell markers.
23 BY MR. SEARS:
24    Q. And one of those is Cytokeratin 15?
25    A. Yeah, it's one you can use.

Page 423

1     Q. Did you have any discussions with Dr.
2 Tosti about why she suggested using stem cell
3 markers to test the pathology?
4     A. No.
5        MR. THORNTON: Objection; form.
6 BY MR. SEARS:
7     Q. Were you curious at all what her thoughts
8 were on why she wanted to use stem cell markers to
9 test the pathology?
10        MR. THORNTON: Objection; form.
11        THE WITNESS: We do research together so -
12 - I'd never done expert testimony at all so I didn't
13 know if she wanted open a new chapter of research in
14 a new direction. We have multiple projects. None
15 of which was permanent chemotherapy-induced
16 alopecia.
17    Q. When you read this email was your thought
18 that we're testing the pathology of stem cell
19 markers to see whether the stem cells are absent?
20        MR. THORNTON: Objection; form.
21        THE WITNESS: Not me. As I already said,
22 we were looking for staining patterns of these
23 antibodies because these antibodies are not
24 specific. And because the absence of staining is
25 not a red light, green light. It doesn't mean the

Page 424

1 cell is dead or gone. It may just have lost
2 expression and then it's hitting cells other than
3 stem cells. So for me it was, at this point, more
4 of a staining pattern issue.
5        My take on this email was that she wanted
6 these biopsies processed in a laboratory that does
7 hair loss pathology quite a bit. She says we don't
8 want wrong orientation. She's talking about the
9 actual cutting and embedding of the tissue. Because
10 in this type of hair loss, if you mess it up on the
11 very first sections, then they're not very useful,
12 even to a hair pathologist expert. So my take was
13 she wanted these done the right way the first time.
14 BY MR. SEARS:
15    Q. Had you thought about doing stem cell
16 marker testing on the pathology before receiving
17 that email from Dr. Tosti?
18    A. On what?
19    Q. Had you thought about doing stem cell
20 marker testing on the pathology before receiving
21 that email from Dr. Tosti?
22    A. On what pathology?
23    Q. The pathology for Ms. Earnest, Ms. Durden,
24 Ms. Francis --
25    A. Oh, I didn't even have them in my

12 (Pages 421 - 424)

1 possession. So I hadn't thought -- no.
2     Q.  Had you thought about doing stem cell
3 markers on any pathology that you ever had that you
4 thought was -- the alopecia was caused by
5 chemotherapy?
6        MR. THORNTON:  Objection; form.
7        THE WITNESS:  No, not to my knowledge.
8 BY MR. SEARS:
9     Q.  Did you have any discussions with Dr.
10 Tosti about what stem cell markers you were going to
11 use in testing the pathology?
12     A.  Not to my knowledge, I didn't.
13     Q.  Did you have discussions with her that you
14 were going to use Cytokeratin 15 with Ms. Earnest,
15 Ms. Francis, and Ms. Durden's pathology?
16     A.  I don't have any recollection of that.
17 Unless -- I don't think I sent it in an email, and
18 it wasn't one of our working research items.  We
19 have meetings on the phone, and so it's unlikely
20 that we talked about that.  I don't -- I don't have
21 any recollection of that.
22     Q.  Did you talk to Dr. Tosti about the
23 results of the Cytokeratin 15 and Ki-67 staining for
24 Ms. Francis, Ms. Durden, and Ms. Earnest?
25     A.  I think it was limited to the email.  She

1 was cc'd on an email.
2     Q.  You never had any conversations outside of
3 email with her about --
4     A.  I don't believe so.
5     Q.  So we talked about how Anne Andrews was
6 cc'd on that email, right?
7     A.  We didn't, but is she?
8     Q.  She's cc'd on this email string, isn't
9 she?
10    A.  Yes.
11    Q.  And she's an attorney for plaintiff?
12    A.  Yes.
13    Q.  And so based upon this email, she knew
14 that Dr. Tosti proposed that there would be stem
15 cell marker testing on the pathology, right?
16       MR. THORNTON:  Objection; form.
17       THE WITNESS:  Yes.  Yes.
18 BY MR. SEARS:
19    Q.  So then, if we go up to the top of that
20 email, there's an email from Anne Andrews on
21 Wednesday, March 28, 2018 at 11:53 a.m.  Do you see
22 that?
23    A.  Yes.
24    Q.  And she writes "I'm traveling today and
25 tomorrow so hoping to touch base with you, with Dr.

1 Poole, and if necessary, with Dr. Tosti to get
2 instructions from you in how you want to receive the
3 tissue.  They are currently at Dr. Poole's
4 possession in Newport Beach, California, stored and
5 refrigerated.  We are anxious to get them into your
6 hands as soon as possible."  Do you see that?
7     A.  Yes.
8     Q.  Who is Dr. Poole?
9     A.  Dr. Poole was the person in possession of
10 the biopsies who shipped them to us.
11    Q.  Do you know what qualifications Dr. Poole
12 has?
13    A.  No, I don't.
14    Q.  Do you know if Dr. Poole has ever done
15 research into stem cells?
16    A.  I do not know.
17       MR. THORNTON:  Objection; form.
18       THE WITNESS:  I don't know.
19 BY MR. SEARS:
20    Q.  Do you know what company Dr. Poole works
21 for?
22    A.  Well, I always saw it in the emails.
23 AIVITA Biomedical, but I didn't know what this was.
24    Q.  Do you know what that company specializes
25 in?

1     A.  I don't I think ever looked it up.  No, I
2 don't.
3     Q.  So you didn't know that it specializes in
4 stem cell research?
5     A.  Did not know that.
6     Q.  What is your understanding of why Dr.
7 Poole had the pathology for Ms. Earnest, Ms. Durden,
8 and Ms. Francis?
9     A.  I had no idea.  Wondered the same thing.
10    Q.  Did Dr. Poole do any testing or do
11 anything with that pathology besides hold onto it?
12    A.  No, she just preserved it.
13    Q.  You don't know why that pathology was
14 initially sent to Dr. Poole?
15    A.  No.
16    Q.  Did you ever ask anyone why Dr. Poole had
17 it?
18    A.  No.
19    Q.  Were you curious why Dr. Poole had it?
20    A.  Nope.
21       (Whereupon, Email dated 4-5-18 was marked
22 as Exhibit 8 for identification.)
23 BY MR. SEARS:
24    Q.  I'm handing you what's marked as Exhibit
25 8. This is an email exchange between you and Anne

13 (Pages 425 - 428)

1 Andrews, April 5th, 2018, right?
2    A.   Yes.
3    Q.   And Anne Andrews asks "Dr. Thompson, are
4 you ready to receive the biopsies?"  Do you see
5 that?
6    A.   Yes.
7    Q.   And you respond "Yes.  Alexa is going to
8 send them on Monday.  We are ordering the
9 Cytokeratin 15 antibody today."  Do you see that?
10    A.   Yes.
11    Q.   And Alexa, is that the same as Dr. Poole?
12    A.   Yes.
13    Q.   Did you have direct contact with Dr.
14 Poole?
15    A.   I don't believe so.  No.
16    Q.   How did you know that Dr. Poole was going
17 to send you the pathology on Monday?
18    A.   Either my assistant Adam was arranging it
19 or the lab was arranging it.  I think that's most
20 likely what was going on.
21    Q.   Who else besides Adam at your lab would
22 have contact with Dr. Poole?
23    A.   I don't know because we shipped in 300
24 biopsies a day through many, many ways, like FedEx
25 and UPS and couriers.  And the main interest here

1 was in making sure the shipment occurred safely and
2 correctly.  Because when you're shipping from a
3 place that's never shipped to us before, there's
4 more potential for something to go wrong, for it to
5 be lost by FedEx.  So the lab was just trying to get
6 this correct.
7         And I told them when we decided to send
8 the biopsies that the best way to make sure these
9 weren't lost or messed up in any way was to treat
10 them just like a biopsy coming in from any other
11 clinician that we have.  And have it go through the
12 system, be assigned a number.  And the less you try
13 to micromanage and do anything VIP service on things
14 like this, the better it goes.  So there could have
15 been many people involved in the delivery, the
16 accession, the --
17    Q.   So this April 5th email that's referring
18 to the biopsies, in particular the biopsies that's
19 referring to, are those for Ms. Earnest, Ms.
20 Francis, and Ms. Durden, right?
21    A.   And Tuyes.
22    Q.   So the Exhibit 7 that we looked at was a
23 March 28 email, and this is about a week later on
24 April 5th?
25    A.   Uh-huh.

1    Q.   Yes?
2    A.   Yes.
3    Q.   So what discussions between March 28 and
4 April 5th had there been about stem cell testing?
5    A.   I don't --
6         MR. THORNTON:  Objection; form.
7         THE WITNESS:  I don't remember the
8 discussions but we obviously had decided to do -- to
9 use Cytokeratin 15.  And as I said, it's an
10 investigational non FDA-approved antibody that we
11 don't use in our laboratory diagnostically.  So to
12 be able to do this we had to order the antibody and
13 bring it up and running in the laboratory.
14 BY MR. SEARS:
15    Q.   Who did you have discussions with about
16 using Cytokeratin 15?
17         MR. THORNTON:  Objection; form.
18         THE WITNESS:  I think the only discussion
19 was telling Anne Andrews that I was going to do
20 this.  I don't think I discussed with any anybody
21 which ones to do and which -- that was entirely my
22 decision.
23 BY MR. SEARS:
24    Q.   So you were the one that decided which
25 stem cell marker to use to test Ms. Earnest, Ms.

1 Durden, and Ms. Francis' pathology?
2    A.   Yes.  And the Ki-67 antibody also.
3    Q.   And you decided to use Cytokeratin 15 and
4 Ki-67?
5    A.   Yes.
6    Q.   Had you had discussions with Anne Andrews,
7 other plaintiffs' attorneys, any retained experts
8 before this April 5th email about why you decided to
9 use Cytokeratin 15?
10         MR. THORNTON:  Objection; form.
11         THE WITNESS:  I don't believe so.  No.
12 BY MR. SEARS:
13    Q.   Why did you decide to use Cytokeratin 15
14 as opposed to any other stem cell marker?
15         MR. THORNTON:  Objection; form.
16         THE WITNESS:  It's the only
17 investigational antibody that I have experience with
18 that works.  In my prior publications, we tried
19 another system cell marker that didn't work and so I
20 wasn't going to go back to that.  This is very
21 expensive testing to get up running.
22 BY MR. SEARS:
23    Q.   Which stem cell marker had you used
24 previously that didn't work?
25    A.   Well, we just -- we just purchased and

Page 433

1 tried -- this is years ago, one called Nestin, and
2 it didn't work on control tissue at all. So we
3 didn't even -- it was never stained on a single
4 specimen in any organized bigger study.
5    Q. And Cytokeratin 15 works better for
6 staining system cells than Nestin?
7        MR. THORNTON: Objection; form.
8        THE WITNESS: I don't know. I don't know.
9 BY MR. SEARS:
10    Q. I think in your last answer you said you
11 decided to use Cytokeratin 15 because it works. Did
12 I hear that?
13    A. If you'll look in one of the emails that
14 we're probably going to go through or somewhere I
15 said I had tried Nestin before and it didn't work.
16 But this is -- when you buy these antibodies from
17 companies, you never know if they're really -- this
18 is non FDA-approved testing. There's many companies
19 that make these antibodies that aren't doing a good
20 job, and they're not really what they say they are.
21        So you have to prove in your own lab with
22 internal controls that it's as billed that it's
23 doing what it's saying. And the Nestin never made
24 it over that first hump. So I have no idea whether
25 an antibody to Nestin -- I have no idea whether

Page 434

1 there was even antibody in the specimen I bought.
2 But I did say in one email that we had only bought
3 it from one company, so I don't know.
4 BY MR. SEARS:
5    Q. You decided to use the Cytokeratin 15
6 because it works?
7        MR. THORNTON: Objection; form.
8        THE WITNESS: Yes.
9 BY MR. SEARS:
10    Q. So we talked about how Anne Andrews is on
11 these emails, so she knew that you were going to
12 test Ms. Francis, Ms. Earnest, and Ms. Durden's
13 pathology with the Cytokeratin 15, right?
14    A. Yes.
15    Q. Can you think of any other discussions
16 you've are had with anyone about the Cytokeratin 15
17 staining that we haven't talked about?
18    A. No.
19        (Whereupon, Email dated 4-10-18 was marked
20 as Exhibit 9 for identification.)
21 BY MR. SEARS:
22    Q. All right. So I just handed you Exhibit
23 9, and it's an April 10, 2018 email that you sent to
24 Dr. Alexa Poole and Anne Andrews. And the subject
25 is "The specimens have arrived..." -- and then it

Page 435

1 goes on to say "And we will start processing them."
2 Do you see that?
3    A. Yes.
4    Q. When you say you're going to process the
5 specimens, what do you mean?
6    A. It was the -- when the specimens arrive,
7 they are accessioned into the system. They're given
8 an internal number and the paperwork is labeled, the
9 bottles are labeled. And then they go to a tissue
10 grossing station. And these are certified
11 histotechnologists who know how to cut many types of
12 specimens, but in my laboratory they have special
13 expertise in cutting hair loss specimens. Which as
14 I said before, they can get destroyed at this stage
15 if they're not processed carefully.
16        And what we did at this time, the only
17 thing that was out of the normal protocol for the
18 hair loss is because we knew that these were from a
19 legal case, and because we needed to prepare the
20 material in a way that defense experts could also
21 review the material and do what they -- other things
22 with it. We prepared extra unstained slides at the
23 time that the main slides for diagnostics, the
24 hematoxylin and the ES and H&E slides were prepared.
25 So between each slide, we made unstained slides.

Page 436

1 And that's all that happened at that point.
2    Q. I think this is implied, but just so it's
3 clear for the record, the specimens that arrived
4 were the punch biopsy specimens for Ms. Earnest, Ms.
5 Francis and Ms. Durden?
6    A. And Ms. Tuyes.
7    Q. I keep on forgetting Ms. Tuyes.
8    A. Yes. There were two for each.
9        (Whereupon, Email dated 4-11-18 was marked
10 as Exhibit 10 for identification.)
11 BY MR. SEARS:
12    Q. I've handed you Exhibit 10, and it's email
13 exchanges between you and Anne Andrews, Lauren
14 Davis, Dr. Poole, Dr. Tosti that span from April 11,
15 2018 to April 16, 2018. Do you see that?
16    A. Yes.
17        MS. DAVIS: April 10th.
18        THE WITNESS: 10th.
19        MR. SEARS: Thank you for correcting.
20        THE WITNESS: Yeah, April 10th.
21 BY MR. SEARS:
22    Q. So on April 11th, Anne Andrews asks you
23 did the antibody stains also arrive. Do you see
24 that?
25    A. Yes.

15 (Pages 433 - 436)

Page 437

1    Q.   What is the antibody stain that she was
2 referring to?
3    A.   The Cytokeratin 15 antibody.
4    Q.   And you respond "Hello, can I talk to
5 Alexa and you about how to name the biopsy cases
6 this morning?"
7    A.   Yes.
8    Q.   Did you end up talking to Alexa and Anne
9 Andrews about that?
10    A.   I think it was just Alexa, just a single
11 question.
12    Q.   So you talked to Alexa about that?
13    A.   Presumably, yeah.
14    Q.   Did you talk to Dr. Poole about anything
15 else beyond how to name the biopsy cases?
16    A.   No.
17    Q.   What did she suggest about how to name the
18 biopsy cases?
19    A.   Well, my question was whether they need to
20 be -- whether we needed to use the patient's name
21 and date of birth identifying information, or
22 whether we needed to de-identify them and call them
23 Jane Doe 1, Jane Doe 2. That was the simple
24 question, how to enter them into our system.
25    Q.   Why were you wondering if you needed to

Page 438

1 enter them anonymously?
2    A.   Because I'd never ever done any work in a
3 legal case before. And in my research work, we
4 often de-identify cases. And we're a HIPAA-
5 compliant laboratory so we're very careful with
6 this.
7    Q.   So then April 16th, 2018, you send an
8 email to Lauren Davis, Anne Andrews, Bradley East,
9 and they all work with plaintiffs' attorneys?
10    A.   Yes.
11    Q.   Two of them are plaintiffs' attorneys. I
12 think one --
13        MR. SEARS:  Is Brad an attorney too?
14        MR. THORNTON:  Paralegal.
15        MR. SEARS:  Paralegal.
16 BY MR. SEARS:
17    Q.   So Lauren Davis and Anne Andrews are both
18 plaintiffs' attorneys, right?
19    A.   Yes.
20    Q.   And then Brad East is a paralegal that
21 works with the plaintiffs' attorneys?
22    A.   Yes.
23    Q.   And then Dr. Poole was also on that email?
24    A.   Yes.
25    Q.   And then Antonella Tosti is also on that

Page 439

1 email?
2    A.   Yes.
3    Q.   And Antonella Tosti is -- Dr. Tosti is
4 plaintiffs' retained expert?
5    A.   Yes.
6    Q.   So on the second paragraph in your email
7 you write "We are testing the Cytokeratin 15
8 immunohistochemistry test today and hope to stain
9 these cases later tomorrow or Wednesday morning. In
10 the event the Cytokeratin 15 findings do not add to
11 the information, I will issue my reports without
12 that information." Do you see that?
13    A.   Yes.
14    Q.   And you ended up issuing your reports
15 without that information, didn't you?
16    A.   Yes.
17    Q.   When you write add to the information,
18 what were you expecting to see that would add to the
19 information?
20        MR. THORNTON:  Objection; form.
21        THE WITNESS:  Well, the -- I mean, as I
22 said in the last sentence, just to emphasize the
23 findings on the H&E slides alone are quite
24 convincing, shows permanent loss of larger hair
25 follicles. So my -- what did I expect to see? We

Page 440

1 can go back to this. I was looking for staining
2 patterns that might be specific for permanent
3 chemotherapy-induced alopecia.
4        Since this was just investigational
5 probing with -- on three cases, and there were no
6 controls on this, there was no -- this wasn't an
7 official study, it would have been imprudent to even
8 use this in a pathology report. So that's why I put
9 in this last sentence that, you know, this wasn't
10 going to change the findings at all.
11    Q.   So with the Cytokeratin 15 staining, if
12 you saw a pattern that was unique to chemotherapy-
13 induced alopecia, you would have included that in
14 your report, right?
15    A.   No. As I just said, no. It wouldn't --
16 this is a professional, legal interpretation getting
17 entered into the legal record. And we don't use any
18 -- include any information that can't be used based
19 on evidence-based medicine. I might have included
20 it in a report of the findings to say, yes, this is
21 worth setting up a larger study with controls and,
22 you know non chemotherapy-induced alopecia cases,
23 and blow it up into a larger study. But it wouldn't
24 have been the official non pathology interpretation
25 that I issued.

16 (Pages 437 - 440)

1    Q.  Really what I'm focused on is the sentence
2  that says "In the event the Cytokeratin 15 findings
3  do not add to the information, I will issue my
4  reports without that information."
5    A.  Yeah.  I wouldn't have put it in.
6    Q.  We know that you --
7    A.  I promise I wouldn't have.
8    Q.  We know that you issued --
9    A.  And I didn't.
10    Q.  Right.  We know you issued the reports
11  without that information.
12    A.  Right.  And I wouldn't have put
13  Cytokeratin 15.
14    Q.  But you wrote if it did add to the
15  information, you would have included it.  And I just
16  want to make sure I understand what --
17    A.  Yeah, well, I --
18    MR. THORNTON:  Object -- wait.  Objection;
19  form.
20    THE WITNESS:  Go ahead.
21    MR. SEARS:  Let me see if I can correct
22  it. I've got two attorneys objecting to me so it
23  must be really bad.
24    MR. THORNTON:  Yeah.  Sorry.  No, it's
25  just me.  They were reminding me.  Sorry.

1  BY MR. SEARS:
2    Q.  Okay.  So I think you said this in the
3  prior answer, but I just want to make sure I
4  understand.  By add to the information, you were
5  looking to see if there was a specific staining
6  pattern that would have been unique to ongoing
7  alopecia after the completion of chemotherapy?
8    A.  That would have warranted a bigger study.
9    Q.  And you did not see that?
10    A.  No.  I think there's an email that
11  reflects that opinion.
12    Q.  Okay.  So we mentioned this earlier, but
13  this email includes Anne Andrews, who's an attorney
14  for plaintiff, right?
15    A.  Yes.
16    Q.  And she knew that you were doing the
17  Cytokeratin 15 staining, right?
18    A.  Yes.
19    Q.  And this email includes Dr. Tosti, right?
20    A.  Yes.
21    Q.  So Dr. Tosti also knew that you were doing
22  the Cytokeratin 15 staining?
23    A.  Yes.
24    Q.  And she knew that if your findings did not
25  add to the information that you would issue your

1  reports without that information?
2    MR. THORNTON:  Objection; form.
3    THE WITNESS:  Well, if she read the email,
4  then she presumably knew this.
5  BY MR. SEARS:
6    Q.  Did Dr. Tosti ever reach out to you to
7  discuss your findings from the Cytokeratin 15 and
8  Ki-67 staining?
9    A.  No, not to my knowledge.
10    Q.  Did you ever communicate in any way to her
11  what the results were from your Cytokeratin 15 and
12  Ki-67 staining?
13    A.  I have to see if she's cc'd on the email
14  where I gave those.  If that's true, then she was,
15  but I don't believe I verbally, or any other or
16  email, ever mentioned it.
17    Q.  You prepared two types of reports.  You
18  prepared a Rule 26 report --
19    A.  Yes.
20    Q.  -- and then you also prepared
21  dermatopathological reports --
22    A.  Yes.
23    Q.  -- for these three plaintiffs, right?
24    A.  Four.  I did four.
25    Q.  The reason I keep on only limiting it to

1  Earnest, Durden, and Francis is because Ms. Tuyes is
2  no longer --
3    A.  Right.
4    Q.  So you created pathology reports for Ms.
5  Durden, Ms. Francis, and Ms. Earnest, right?
6    A.  Yes.
7    Q.  And in both of those reports, the
8  pathology report, as well as the Rule 26 report, you
9  did not mention that you did any immunohistological
10  staining on the pathology, right?
11    A.  No, I don't mention it.
12    Q.  Did you know that Dr. Tosti relied on your
13  pathology reports in offering her opinion?
14    A.  Yes, I hope so.
15    Q.  Did you think that it would be important
16  for Dr. Tosti to know the results of your
17  immunohistological staining when relying on those
18  pathology reports?
19    A.  No, not at all.  As I said in this last
20  sentence of the April 16th email, just to emphasize
21  the findings in the H&E slides alone are quite
22  convincing.  Shows permanent loss of large hair
23  follicles.  So I didn't think for a second that she
24  would need that information or rely on it.
25    Q.  We saw an email earlier, I think it was in

17 (Pages 441 - 444)

Page 445

1 March, where Dr. Tosti suggested that stem cell
2 markers be conducted on the pathology --
3      A.   Yes.
4      Q.   -- do you remember that?
5      A.   Yes.
6      Q.   With that knowledge that she suggested
7 that stem cell markers be done on the pathology, did
8 you feel like it was important to communicate the
9 results of that testing to her?
10      MR. THORNTON:  Objection; form.
11      THE WITNESS:  Well, if you take the
12 context of her request on that first email, she was
13 trying to get me to sign on to doing this expert
14 witness work.  And she knew I didn't want to do it.
15 And we do research together and so she was trying to
16 turn it into a research direction for this.  So
17 that's the reason she said that she was looking for
18 -- trying to entice me into something more than just
19 reading cases.
20      So I guarantee you, she had no ideation or
21 thoughts that stem cell markers were going to be
22 useful in the clinical diagnoses of these patients.
23 But I do accept and hope that she looked at the
24 pathology reports.  That's why these patients are
25 biopsied is to give definitive diagnoses.

Page 446

1 BY MR. SEARS:
2      Q.   That's speculation on your part for why
3 Dr. Tosti would have included that suggestion that
4 you all do stem cell markers on the pathology, isn't
5 it?
6      A.   It's speculation, but it's true.
7      Q.   So the bottom line is Dr. Tosti suggested
8 that you all do stem cell markers on the pathology.
9 You did stem cell markers on the pathology and you
10 never communicated the results of that stem cell --
11      MR. THORNTON:  Objection; form.
12      THE WITNESS:  I think I did.  We have to
13 see the next email when I told everybody.  The
14 extent of it to her would have just said it has no
15 use.  This doesn't show anything.  That would have
16 been the limit of it.  Because she -- like I said,
17 she's not a dermatopathologist so I don't -- there's
18 not more to explain there to her.
19 BY MR. SEARS:
20      Q.   So you believe that Dr. Tosti knew that
21 the results of your Cytokeratin 15 and Ki-67
22 staining did not point in favor of -- in favor or
23 against ongoing alopecia after the completion of
24 chemotherapy?
25      MR. THORNTON:  Objection; form.

Page 447

1      THE WITNESS:  Yes.
2      (Whereupon, Invoice 1 was marked as
3 Exhibit 11 for identification.)
4 BY MR. SEARS:
5      Q.   I'm handing you Exhibit 11, which is your
6 first invoice.  We talked about this last time but
7 you have all these entries about the
8 immunohistochemical staining for Cytokeratin 15 and
9 Ki-67 for Ms. Earnest, Ms. Francis, and Ms. Durden.
10 Do you see all that?
11      A.   Yes.
12      Q.   And then after you did all that staining
13 and you interpreted it, you had a call with Andrews,
14 Tosti, et cetera, on April 25th, 2018.  Do you see
15 that?
16      A.   Yes.
17      Q.   What was discussed during that telephone
18 call?
19      A.   I think they had already -- so this is
20 after I'd already signed off on all the reports.
21      THE VIDEOGRAPHER:  Excuse me, sir.
22      THE WITNESS:  I'm sorry.  Do you need it
23 higher?  Just don't touch it?
24      THE VIDEOGRAPHER:  No.  We just can't have
25 you touch the top of it.

Page 448

1      THE WITNESS:  Okay.  I don't remember but
2 it was probably just discussing the -- explaining
3 the reports and going through them, you know, that
4 have details in them that -- but I don't remember
5 what was relayed on the call.
6 BY MR. SEARS:
7      Q.   When you're talking about the reports, are
8 you talking about the dermopath reports that you
9 prepared?
10      A.   Yes.  Because they were signed on April
11 24.  I finished them on April 24.
12      Q.   Did you talk about the Cytokeratin 15
13 staining and Ki-67 staining that you did on Ms.
14 Earnest, Ms. Francis, and Ms. Durden's pathology?
15      A.   Likely not, but I don't remember.
16      Q.   Would you have thought --
17      A.   I mean, I have no idea.  I can't remember
18 any. It was only a 15 minute call.
19      Q.   Considering that Dr. Tosti initially
20 suggested that the stem cell markers be done, would
21 you want to communicate the results of that testing
22 to her on that call?
23      MR. THORNTON:  Objection; form.
24      THE WITNESS:  It could have been.  I don't
25 remember.

18 (Pages 445 - 448)

Page 449

1 BY MR. SEARS:
2     Q.  So as you sit here today, you don't
3 remember one way or the other if you talked about
4 the Cytokeratin 15 and Ki-67 staining with Dr. Tosti
5 on that call?
6     A.  Don't remember, no.
7     Q.  Who made the decision not to include the
8 results of the Cytokeratin 15 and Ki-67 staining in
9 both your dermopath reports and your Rule 26 report?
10    A.  I made the decision, for sure, on the
11 dermatopathology reports.  Like I said, I would have
12 -- no matter what they showed, I wouldn't have put
13 that in an unofficial report.  I don't remember --
14 this was months and months later that I started
15 working on the Rule 26 report.  So I don't remember
16 if I queried anybody to say should I put this in
17 there or not.
18        MR. THORNTON:  And I -- just an objection
19 --
20        THE WITNESS:  I don't have any knowledge
21 of it.
22        MR. THORNTON:  -- of that query, about
23 what was -- the contents of the Rule 26 report is
24 now protected under the federal rules, so let's not
25 get into that area.

Page 450

1        THE WITNESS:  Okay.
2 BY MR. SEARS:
3     Q.  We talked about kind of your thought
4 process behind doing the Cytokeratin 15 staining and
5 the Ki-67 staining and how you were looking to see
6 if there were any sort of identifiable patterns.
7     A.  Yes.
8     Q.  Did you think when providing the full
9 picture of what you did in this case, and the
10 testing that you conducted, that it would be
11 important to include the results of the Cytokeratin
12 15 and Ki-67 staining in your Rule 26 report?
13        MR. THORNTON:  Objection; form.
14        THE WITNESS:  Well, I've never prepared a
15 Rule 26 report before.  As an investigational
16 researcher in this area, I think it would be
17 imprudent to write about those findings when you've
18 only stained three cases in a provisional study
19 without any controls.  And, in fact, I'm on the
20 editorial board of the Journal of American Academy
21 of Dermatology, and one of my things I detest are
22 tiny, tiny little studies that people want to
23 publish that have poor controls.  So I actually
24 think it would be a bad idea to put anything in
25 there.  It would lead to conclusions that are not --

Page 451

1 that are not substantiated with positive and
2 negative controls.
3 BY MR. SEARS:
4     Q.  Did you feel as though there's enough
5 worthwhile -- let me just start the question over
6 again.  I don't even know where I was going with
7 that.
8        You ultimately made the decision to do the
9 Cytokeratin 15 and Ki-67 staining with Ms. Earnest,
10 Ms. Francis, and Ms. Durden, right?
11    A.  Right.
12    Q.  So at that point you thought there was
13 some utility in doing the testing, didn't you?
14        MR. THORNTON:  Objection; form.
15        THE WITNESS:  Well, as I -- as we read in
16 the email from Tosti, she was kind of proposing
17 blowing this up into something larger in our
18 investigational world.  So I had an interest in
19 that.  Beyond that I -- it became clear to me pretty
20 quickly that my utility was going to be in properly
21 processing these biopsies and providing a diagnoses
22 on them without this immunohistochemical.  So it
23 didn't -- it never went into the larger
24 investigation that Dr. Tosti was kind of proposing.
25 BY MR. SEARS:

Page 452

1     Q.  When did it become clear to you that the
2 Cytokeratin 15 and Ki-67 staining for Ms. Earnest,
3 Ms. Francis, and Ms. Durden did not have utility?
4     A.  As soon as I looked at them, and there's
5 an email on the day that I think I sent everybody.
6     Q.  But before that, before you looked at
7 them, you thought that there might be some utility
8 in running those tests?
9     A.  Well, it's all we have.  And if you look
10 back at the publication that we were looking at in
11 letter response to, it was chalking up yet another
12 entity into the lack of utility of Cytokeratin 15.
13 It's not very often that you get six biopsies from
14 three patients on permanent chemotherapy-induced
15 alopecia, because these patients by and large don't
16 receive biopsies.  It's the last thing they need is
17 more surgery after what they've been through.  So
18 seeing six biopsies roll in the door all at once is
19 a nice provisional investigation, you know, it's
20 good material to do that with.
21    Q.  So if I understand your answer, you
22 thought that, yes, there was some utility in running
23 the Cytokeratin 15 and Ki-67 staining for Ms.
24 Earnest, Ms. Francis and Ms. Durden?
25    A.  Yeah.  Well ---

19 (Pages 449 - 452)

1      MR. THORNTON: Objection; form.
2      THE WITNESS: -- my own research is to
3 learn more about these diseases and that was the --
4 that was the direction.
5 BY MR. SEARS:
6   Q. I know eventually you concluded that there
7 was not utility in the test.
8   A. Yes.
9   Q. And you concluded -- well, I guess there
10 was the determination even though at one point you
11 thought the test had utility, not to include it in
12 your Rule 26 report?
13      MR. THORNTON: Objection; form.
14      THE WITNESS: Well, the utility was going
15 to be whether it had any utility to blow it up into
16 a larger study. I don't think -- I don't think I
17 had ideations that it was going to have utility in
18 the diagnostics for these particular cases.
19 BY MR. SEARS:
20   Q. If it did have utility, you would have
21 included it in your report, right?
22   A. Not before doing larger studies that had
23 controls.
24   Q. We looked earlier at an email that said if
25 it added to the information, you would have included

1 it in your report.
2   A. Yeah, I wouldn't --
3      MR. THORNTON: Objection; form.
4      THE WITNESS: I would not have.
5      (Whereupon, Invoice No. 2 was marked as
6 Exhibit 12 for identification.)
7 BY MR. SEARS:
8   Q. I'm handing you Exhibit 12, and it's your
9 Invoice No. 2. There's an entry that says scanning
10 Ki-67 and Cytokeratin 15 slides and summarizing on
11 April 27, 2018. Do you see that?
12   A. Yes.
13   Q. Why were you scanning the slides?
14   A. So we could make photographs of them.
15   Q. When you say summarizing, what do you
16 mean?
17   A. Probably annotating the photographs.
18   Q. You still have the annotations for those
19 photographs?
20   A. I think they would be put with the cases.
21 Presumably, I was capturing photographs to send in
22 my scanning system.
23   Q. I'll represent that we do not have any
24 annotations for photographs for Ki-67 and
25 Cytokeratin 15 slides. So to the extent they exist,

1 we ask that --
2   A. Well, they would have been anno- --
3 they're just identified by patient, right? So you
4 take them and name each file. The files that were
5 produced have a name on the file. That's probably
6 what it was.
7   Q. The next entry down is on May 2nd, 2018.
8 It says telephone call. During that telephone call
9 --
10   A. Where is it?
11   Q. On May 2nd, 2018.
12   A. Okay.
13   Q. It says telephone call. During that
14 telephone call was there any discussion about the
15 Ki-67 or Cytokeratin 15 staining that you did?
16   A. Presumably, but I don't remember what it
17 was.
18   Q. Who was that phone call with?
19   A. I don't know.
20   Q. What would've you talked about if you did
21 talk about the Cytokeratin 15 and Ki-67 staining?
22      MR. THORNTON: Objection; form.
23      THE WITNESS: I don't remember. I mean,
24 the other thing that may have been discussed is on
25 April 27, there was a professional interpretation of

1 Tuyes. It's actually much more likely that I was
2 discussing that I didn't find any evidence of
3 permanent chemotherapy-induced alopecia in Lisa
4 Tuyes.
5 BY MR. SEARS:
6   Q. So as you sit here today, do you know one
7 way or the other if you discussed the Cytokeratin 15
8 and Ki-67 staining during that May --
9   A. I don't think --
10   Q. -- 2nd, 2018 call?
11   A. I seriously doubt it. I think it was a
12 Tuyes call.
13   Q. Then on June 11, 2018, there's a meeting
14 with Anne Andrews and John Thornton. During that
15 meeting did you discuss the Ki-67 and Cytokeratin 15
16 staining?
17      MR. THORNTON: Objection; form. I think
18 it's also a protected communication at this point
19 because it's -- as our consultant.
20      THE WITNESS: I think it was consulting
21 advice, professional interpretation of the cases
22 that I'd issued reports on. It was education, too,
23 of them, after the reports had been issued.
24      (Whereupon, Invoice No. 3 was marked as
25 Exhibit 13 for identification.)

Page 457

1 BY MR. SEARS
2     Q.  I've handed you Exhibit 13, which is your
3 Invoice 3.  And the date of that is December 7,
4 2018.  Do you see that?
5     A.  Yes.
6     Q.  So this is almost five months after you
7 did the Cytokeratin 15 and Ki-67 staining?
8     A.  Uh-huh.
9     Q.  Yes?
10    A.  Yes.
11    Q.  By that point had you concluded that there
12 was no utility in stem cell research for determining
13 whether chemotherapy was the cause of the alopecia?
14    A.  Well, in these biopsies, going this
15 direction.
16    Q.  What about beyond the biopsies?
17    A.  I don't know.  I mean, I always have
18 ongoing research and there could be interest in the
19 future in something new.
20    Q.  So there's an entry on August 6, 2018,
21 review of videos of redacted and prep of summary
22 memo.  That video that you reviewed, did it have
23 anything to do with stem cell research?
24    A.  Yes.
25    Q.  What did it have to do with stem cell

Page 458

1 research?
2        MR. THORNTON:  Objection; form.  I think
3 we've already had a ruling on this that the video is
4 work product.  And so any discussion about that --
5 it's nothing that Dr. Thompson did or didn't do.  So
6 -- and I think you've got an email that we have
7 disclosed that may get you there, but I'm going
8 instruct him not to answer the work product
9 protected area.
10 BY MR. SEARS:
11    Q.  I understand you've been instructed not to
12 answer, but if that instruction was not there, would
13 you have information that you could provide?
14    A.  No.  It was mostly just to introduce a
15 stem cell researcher giving a lecture, if I
16 remember.
17    Q.  So plaintiffs sent you a video about a
18 stem cell researcher giving a lecture?
19    A.  Yes.
20        MR. THORNTON:  Objection; form.  And
21 objection, protected work product.  Please don't
22 testify further about any of contents.
23        THE WITNESS:  Okay.
24 BY MR. SEARS:
25    Q.  So we talked earlier today about your

Page 459

1 hypothetical, proposed, speculative mechanism of
2 action for why chemotherapy would cause ongoing
3 alopecia.  And that's that it would somehow destroy
4 stem cells, right?
5        MR. THORNTON:  Objection; form.
6        THE WITNESS:  Or they're exhausted.
7 BY MR. SEARS:
8     Q.  Right.  That it had some sort of impact on
9 the stem cell and the hair follicle?
10        MR. THORNTON:  Objection; form.
11        THE WITNESS:  Well, if the follicle goes
12 entirely away, yes.  Yeah, sure.  Yes.
13 BY MR. SEARS:
14    Q.  And that was one of the reasons why you
15 conducted the Cytokeratin 15 and Ki-67 staining was
16 to look into that theory, right?
17        MR. THORNTON:  Objection; form.
18        THE WITNESS:  Well, we were looking for --
19 with the tools we have, we were looking for the
20 staining patterns that help us distinguish this
21 disease from other diseases that might be in the
22 clinical differential.  As I said, it was more of a
23 -- for me it's more of a diagnostic -- is there a
24 diagnostic tool there.
25 BY MR. SEARS:

Page 460

1     Q.  And that was something that you were
2 looking at was if there would be some sort of
3 diagnostic tool with the Cytokeratin 15 and Ki-67 in
4 assessing stem cells, right?
5     A.  In assessing the diseases.
6     Q.  In relation to stem cells?
7        MR. THORNTON:  Objection; form.
8        THE WITNESS:  No.  It's really -- as we've
9 exhaustively demonstrated, especially in that 2017
10 publication, because we don't have good stem cell
11 markers, we use -- are using -- I'm using the
12 limited tools I have with immunohistochemical
13 staining.  At this point, all you can say is you're
14 looking for staining patterns.  Because, like, you
15 can have a stem cell there and viable, but it's just
16 not staining with the Cytokeratin 15 for some
17 reason.  So -- or other stem cell markers, perhaps,
18 you know, it no longer has that antigen for the time
19 being or something.  We don't know.
20 BY MR. SEARS:
21    Q.  So you're doing this research, your theory
22 is that chemotherapy somehow impacts the stem cell.
23 And you're reviewing a video of someone who is
24 lecturing about stem cells, right?
25        MR. THORNTON:  Objection; form.

21 (Pages 457 - 460)

Page 461

1     THE WITNESS:  Yes.
2 BY MR. SEARS:
3     Q.  Was it your understanding that you were
4 sent that video to, I guess, help or guide in the
5 analysis of whether chemotherapy can somehow impact,
6 kill, harm the stem cell in the hair follicle?
7     MR. THORNTON:  It's protected work product
8 so I'm going to instruct him not to answer.
9     MR. SEARS:  I'm looking for his mental
10 impression, not anyone else's.
11 BY MR. SEARS:
12     Q.  Was it your understanding that you were
13 reviewing that video to assist in the determination
14 of whether chemotherapy harms, kills, or impacts
15 stem cells in the hair follicle?
16     MR. THORNTON:  Objection; form.
17     I'll let you answer that limited question
18 if you understand --
19     THE WITNESS:  I think it was -- no, it was
20 just to make an introduction to this person.  That
21 was -- that was the extent of it was to introduce me
22 to this person.
23 BY MR. SEARS:
24     Q.  At this time, did you still have the
25 speculative hypothesis that the mechanism of action

Page 462

1 for why chemotherapy would cause ongoing alopecia
2 was that it would somehow impact the stem cell and
3 the hair follicle?
4     MR. THORNTON:  Objection; form.
5     THE WITNESS:  Sure.  Yes.
6 BY MR. SEARS:
7     Q.  And is that something you were interested
8 in doing further research on?
9     A.  Yes.
10     Q.  So then on August 15th, 2018, there's a
11 telephone call --
12     A.  Yes.
13     Q.  -- about stem cell study.  Did that call
14 relate to the video that had you watched?
15     A.  Yes.
16     Q.  Was that call about a larger stem cell
17 study to assess whether chemotherapy could impact
18 the stem cell in the hair follicle?
19     MR. THORNTON:  You're asking for the
20 substance of the call and it's protected work
21 product.  Instruct him not to answer.
22 BY MR. SEARS:
23     Q.  Who was that telephone call with?
24     MR. THORNTON:  Objection.  Specifically a
25 protected non-designated expert, non Rule 26 report-

Page 463

1 writing expert, so his identity as a consultant is
2 also protected.  Instruct you not to answer.
3 BY MR. SEARS:
4     Q.  Let me ask you this:  Without telling me
5 the name of the person, was that telephone call with
6 someone that plaintiffs' counsel had retained as a
7 non-testifying expert?
8     A.  Yes, I guess.
9     Q.  You guess?
10     A.  I didn't ask what the relationship was.
11     Q.  Was the call with the same person who was
12 in that video that you watched?
13     A.  Yes.
14     Q.  Did you provide any guidance during that
15 call about criteria that would be useful in
16 implementing a study to assess whether chemotherapy
17 harms or kills stem cells in the hair follicle?
18     MR. THORNTON:  Objection; form.  That's a
19 kind of yes or no answer at this point.  We're on
20 the edge but I'll let you answer --
21     THE WITNESS:  Can you ask --
22     MR. THORNTON:  -- that just with a yes or
23 no.
24     THE WITNESS:  -- it again?
25 BY MR. SEARS:

Page 464

1     Q.  During that telephone call with that
2 person in the video, when discussing the "stem cell
3 study," did you provide any guidance or any thoughts
4 on the study in determining whether chemotherapy
5 would have any impact on stem cells in the hair
6 follicle?
7     A.  No, I didn't.
8     Q.  Did you discuss whether chemotherapy could
9 have any impact on the stem cell in the hair
10 follicle?
11     MR. THORNTON:  Objection.  Now I think
12 that gets into more the substance.  I'm instructing
13 you not to answer that.
14     He's already given his opinions on how he
15 sees the role of stem cells or -- so I don't think
16 the discussion -- any additional testimony about the
17 discussion would only be -- have to do with the
18 consultant and, therefore, I think is work product.
19 BY MR. SEARS:
20     Q.  Do you know what the results were of any
21 stem cell study that was conducted that looked at
22 whether chemotherapy impacted stem cells and the
23 hair follicle?
24     A.  No, I don't.
25     Q.  Would you want to know the results of that

22 (Pages 461 - 464)

Page 465

1 study or literature to either refute or confirm your
2 hypothetical, speculative --
3        MR. THORNTON:  Objection; form.
4 BY MR. SEARS:
5    Q.  -- theory about mechanism of action for
6 how chemotherapy might damage the stem cell, which
7 would cause ongoing alopecia?
8        MR. THORNTON:  Excuse me.  I interrupted,
9 but objection; form.
10       THE WITNESS:  Yes.
11       MR. THORNTON:  Let's take a brief bathroom
12 break, if nothing else.
13       MR. SEARS:  Sure.
14       THE VIDEOGRAPHER:  The time is 10:19 a.m.
15 We are off the record.
16       (Whereupon, recess taken.)
17       THE VIDEOGRAPHER:  The time is 10:33 a.m.
18 We are on the record.
19 BY MR. SEARS:
20    Q.  Exhibit 12, so I had a couple more
21 questions about that that I forgot to ask you.  So
22 we talked earlier about how you didn't do the
23 Cytokeratin 15 and the Ki-67 staining on Ms. Tuyes.
24 Do you recall that?
25    A.  Yes.

Page 466

1    Q.  And so Exhibit 12 lists out the testing
2 that you did for Ms. Tuyes.  Do you see that?
3    A.  Say again.
4    Q.  It lists out the testing that you did for
5 Ms. Tuyes?
6    A.  Yes.
7    Q.  Here's what I'm trying to understand, you
8 talked earlier about how you're looking for patterns
9 and trying to distinguish chemotherapy-induced
10 alopecia versus other types of alopecia.  And you
11 talked about how you diagnosed Ms. Tuyes with
12 androgenetic alopecia.  Would you be curious to see
13 how her pathology would have stained differently
14 from Ms. Earnest, Ms. Francis, and Ms. Durden's
15 pathology?
16       MR. THORNTON:  Objection; form.
17       THE WITNESS:  Well, I probably would have
18 done the staining but the biopsy came a month later
19 or three weeks later, and I had already done the
20 staining on the other three.  Finished them up, and
21 then the slides came out and I saw that it was
22 androgenetic or female pattern hair loss.  So I
23 think it'd be interesting, but I think by then it
24 had become clear to me that the need as an expert
25 was to do a traditional histopathologic assessment.

Page 467

1 So that ship had sailed.  So I just wasn't going
2 back.
3 BY MR. SEARS:
4    Q.  As a researcher were you curious to see if
5 there would be any difference in the Cytokeratin 15
6 and Ki-67 staining with Ms. Tuyes versus Ms.
7 Francis, Ms. Durden, and Ms. Earnest?
8        MR. THORNTON:  Objection; form.
9        THE WITNESS:  Yeah, it would be
10 interesting, for sure.  I didn't think it was
11 prudent to do it in the context of legal expertise
12 work, legal expert work and spend money on any more
13 pilot study, provisional study.
14 BY MR. SEARS:
15    Q.  Did plaintiffs' attorney pay you to do the
16 Cytokeratin 15 and Ki-67 staining on Ms. Earnest,
17 Ms. Durden, and Ms. Francis?
18    A.  Yes.
19    Q.  I think you mentioned earlier that that's
20 expensive staining?
21    A.  It's very expensive because it's an
22 investigational antibody.  It's non FDA approved, so
23 when you buy these, as we've talked about, you have
24 to take them and do assessment of them in your own
25 laboratory before you put it on any tissue, like on

Page 468

1 these patients.  So that's the biggest expense.
2    Q.  And obviously, I'm not a scientist or have
3 any ability to be a scientist and that's why I
4 became an attorney, but you as a scientist, when you
5 test something, don't you go into that test with
6 having a hypothesis?
7    A.  Yes.
8    Q.  And so here's what I'm trying to
9 understand, you've talked about how the Cytokeratin
10 15 and Ki-67 staining is expensive.  So what was
11 your hypothesis about what you were going to see
12 with that staining with Ms. Earnest, Ms. Francis,
13 and Ms. Durden?
14       MR. THORNTON:  Objection; form.
15       THE WITNESS:  The interest -- once again,
16 as I said before and is supported by the
17 publications that I have -- the research projects
18 that I've done and published on other diseases like
19 lichen planopilaris, and then the letter in 2017,
20 have a great interest in staining patterns of these
21 antibodies.  And I've done multiple projects where I
22 take a panel of antibodies and put them on tissue,
23 specifically trying to address diagnostic impasses.
24       So my interest isn't in basic, basic,
25 basic cell biology.  It's in identifying new

23 (Pages 465 - 468)

Page 469

1  molecular tools that might have utility in
2  diagnostics. And the review paper that is Exhibit
3  No. 5 is aimed at this. It's trying to connect
4  traditional histopathologic diagnosis with -- which
5  we got into some of these new concepts of stem cell
6  exhaustion, and then -- but also pulling molecular
7  tools into traditional diagnostics. And then, at
8  the same time, providing a practical guide for other
9  non hair loss expert pathologists to use.
10        Because hair biopsies, hair loss biopsies,
11  believe it or not, are two percent of all skin
12  biopsies performed every day in the United States.
13  And somebody has to read them and I can't read that
14  many. So we need the expertise to be spread
15  broader. So it's -- so it's looking for staining
16  patterns with these investigational antibodies that
17  might help in simplify the diagnostics or allow us
18  to make more accurate diagnostics.
19  BY MR. SEARS:
20    Q. In particular with the Cytokeratin 15 and
21  Ki-67 staining that you did on Ms. Durden, Ms.
22  Earnest, and Ms. Francis, what was your hypothesis
23  about what staining pattern you could see?
24        MR. THORNTON: Objection; form.
25        THE WITNESS: You know, I didn't have a

Page 470

1  lot -- after all the experience with all these other
2  diseases, I didn't have a lot of expectations on it.
3  BY MR. SEARS:
4    Q. Did you expect to see more negative
5  results with the Cytokeratin 15 and Ki-67 stain than
6  you would seen in, I guess, a biopsy of healthy
7  hair?
8        MR. THORNTON: Objection; form.
9        THE WITNESS: Well, the basic diagnostic
10  features of permanent chemotherapy-induced alopecia
11  that we use with the H&E, which is loss of the large
12  hairs, so we only have small hairs left. It's a
13  telogen shift to the resting phase of the hair when
14  they cycle and they shed, there's a moment when the
15  follicular epithelium rests. There's no
16  inflammation present to suggest that it might be an
17  autoimmune disease, so we remove others.
18        And in the context of those features, like
19  I said, this doesn't come -- this isn't a red light,
20  green light thing with these stains, and it's just
21  looking for these patterns. And the Ki-67 in
22  particular, which is really only showing utility in
23  cancer diagnostics, we use it when we're trying to
24  tell a benign mole from a melanoma and we're kind of
25  stuck so it has utility there. It hits the nuclei

Page 471

1  of cells that are proliferating, not dividing, as we
2  said.
3        And, for instance, in the hair follicle,
4  all the cells involved in making a hair shaft are
5  always growing, and that's why you have to have your
6  hair cut. So it has more of a comment on whether the
7  hair is growing or not. It doesn't have very much
8  commentary on a stem cell. Like I told you, a stem
9  cell only divides once and then that cell goes off
10  and makes a new hair. So it's really not growing
11  very much.
12  BY MR. SEARS:
13    Q. Then with the Cytokeratin 15 and Ki-67
14  stains that you did on Ms. Earnest, Ms. Francis, and
15  Ms. Durden, was your hypothesis that you would see
16  more negative stains with that pathology than you
17  would in healthy hair pathology?
18        MR. THORNTON: Objection; form.
19        THE WITNESS: I didn't know. I don't know
20  if there was a hypothesis of that what would come
21  out of it. Like I said, from the prior publications
22  not telling us a lot about all the other scarring
23  and non-scarring diseases, I didn't have a lot
24  expectations.
25  BY MR. SEARS:

Page 472

1    Q. You know, I'm not a dermatopathologist so
2  maybe I'm oversimplifying this, but we've talked
3  about your proposed mechanism of action for how
4  chemotherapy harms stem cells. We've talked about
5  how Cytokeratin 15 is a stem cell marker. Were you
6  thinking with this test I could potentially see more
7  negative Cytokeratin 15 results than I would see
8  with healthy hair?
9        MR. THORNTON: Objection; form.
10        THE WITNESS: No. I didn't know at all.
11  Because like we said -- I've said many times, the
12  Cytokeratin 15 is expressed in all basilar
13  follicular epithelium and not just in the keratin
14  stem cells in the bulge. And it can even show
15  staining up at the surface of the skin epithelial in
16  normal so I didn't really know what this was going
17  to show.
18  BY MR. SEARS:
19    Q. If the results came back and showed that
20  all the Cytokeratin 15 tested negative, would that
21  have been significant to you?
22        MR. THORNTON: Objection; form.
23        THE WITNESS: Well, once again it depends
24  on what you're talking about negative, because it's
25  a pattern of staining. So there are certain

24 (Pages 469 - 472)

1 structures that are positive and certain structures
2 that are negative. I can tell you after the prior
3 publication of where we showed this absence of
4 staining and all these variety of entities, I didn't
5 have any expectations whether it'd be there or not.
6 BY MR. SEARS:
7     Q.  So my understanding of Cytokeratin 15 is
8 if there's a reaction, I mean that the stem cells
9 are present, it turns brown. Is that true?
10     A.  No. Partially true. It can turn red.
11 Depends on how you set up the test.
12     Q.  There's essentially a color change if it
13 tests positive, though?
14     A.  If we have a visible chromogen that we
15 identify it with.
16     Q.  If you do not have that change in color or
17 chromogen, then that could be an indication that
18 stem cells are not present?
19     MR. THORNTON:  Objection; form.
20     THE WITNESS:  It's a -- I'd back up to say
21 it's an indication that there's a lack of staining
22 so it's one piece of evidence, but we don't know.
23 If we did other stem cell markers maybe we could be
24 more specific about it.
25 BY MR. SEARS:

1     Q.  And with Ms. Durden, Ms. Earnest, and Ms.
2 Francis, if you ran that Cytokeratin 15 testing and
3 it all came back without the chromogen, without the
4 color change, would've that had any impact on your
5 opinions?
6     MR. THORNTON:  Objection; form.
7     THE WITNESS:  My professional opinion of
8 the diagnoses of these patients? No, absolutely not
9 at all. This was just a probing, you know, three-
10 patient, six-biopsy investigational study that would
11 need to be expanded into a larger study with proper
12 controls. Quite a bit more would have to be done to
13 show any utility.
14 BY MR. SEARS:
15     Q.  And I think I might have asked a poor
16 question. I understand what your diagnoses are for
17 Ms. Earnest, Ms. Francis, and Ms. Durden. But if
18 the Cytokeratin 15 staining that you ran came back
19 for all three of them showing no color change, no
20 reactivity, would've you thought that somehow
21 bolstered your diagnoses?
22     MR. THORNTON:  Objection; form.
23     THE WITNESS:  No. I think it would be the
24 beginning of further investigation. And like I said
25 in blowing it up into a bigger study, I mean, at

1 that point you take into account what exactly the
2 patient was still taking. You know, after they've
3 had drugs and could the ongoing medication -- you
4 know, I know women with breast cancer often take --
5 my mother did this on another medicine for 10 years
6 after she had her initial treatment.
7     So you'd have to take into account whether
8 ongoing treatment was having an impact on the
9 staining patterns. And it's important because hair
10 is quite sensitive to any -- because it's always
11 growing, always growing, it's quite sensitive and
12 little things can alter this. And we know with a
13 lot of the new molecular drugs that are used for
14 many, many things, like psoriasis and not even
15 cancers, they can quite alter the hair so --
16 BY MR. SEARS:
17     Q.  That ongoing treatment that you're
18 referring to, that would be treatment with Tamoxifen
19 or aromatase inhibitor?
20     A.  I don't know what she took.
21     Q.  It could be, essentially, an estrogen
22 blocker, is that what you're talking about?
23     A.  I think so. Yeah.
24     Q.  And I think you said that if the testing
25 for Ms. Francis, Ms. Durden, and Ms. Earnest for the

1 Cytokeratin 15 stains all came back without any
2 reactivity, that would, I guess, cause you to want
3 to do further research. Did I hear that correctly?
4     MR. THORNTON:  Objection; form.
5     THE WITNESS:  We keep going around on this
6 again and again. It's really a staining pattern
7 because we have structures in the tissue that are
8 positive staining, and other structures not, because
9 hairs grow and cycle and change. And so I really --
10 and if you look back at the studies I've published,
11 you really don't -- it's not a red light, green
12 light. It's more complex than that. So I would say
13 a difference of staining or different staining
14 pattern, something like that, would be much more --
15 better -- better to say it that way.
16 BY MR. SEARS:
17     Q.  So you would've needed to see a difference
18 of staining pattern with the Cytokeratin 15 to think
19 that it warranted further investigation?
20     A.  Yeah.
21     MR. THORNTON:  Objection.
22 BY MR. SEARS:
23     Q.  And that's something that you did not see
24 in their --
25     A.  No.

25 (Pages 473 - 476)

Page 477

1    Q.  -- biopsies?
2    A.  I didn't see any.
3    Q.  So have you been involved in any sort of
4  testing or formulation of testing to determine if a
5  chemotherapy drug harms stem cells?
6    A.  No.
7    Q.  Have you been involved in designing a test
8  to determine if chemotherapy somehow harms stem
9  cells?
10    A.  No.
11    Q.  Have you talked to anyone about designing
12  a test to determine if chemotherapy harms stem
13  cells?
14        MR. THORNTON:  I'm going to object to form
15  and certainly the conversation with the consultant,
16  that is a specifically protected work product
17  description.  So those conversations -- excluding
18  those conversations.
19        THE WITNESS:  Excluding those
20  conversations, no, I don't believe so.
21  BY MR. SEARS:
22    Q.  Without identifying the name of the
23  consultant, did you talk to the consultant about
24  designing a study to determine whether chemotherapy
25  harms stem cells?

Page 478

1        MR. THORNTON:  That's substantive.  I'm
2  not going to let him answer that question.  Once
3  again, it's protected work product.
4  BY MR. SEARS:
5    Q.  Who have you talked to about your
6  hypothetical mechanism of action for why
7  chemotherapy would cause ongoing alopecia?
8    A.  I think the only person I've ever had a
9  discussion with are Dr. Kolivras, just regarding the
10  publications that he and I are on that's your
11  Exhibit No. 5.  And then also the publication and
12  then the reply to the letter, so Exhibit No. 6.  He
13  was a -- he's a physician in Belgium who -- he's a
14  dermatologist and dermatopathologist, and he was
15  getting a PhD for several years and I was his
16  research advisor.  So these publications that we're
17  both on were part of his PhD project.  So we had
18  lots and lots and lots of discussions, and the
19  discussions have a lot to do just with the current
20  classification of hair loss.  We talked about this,
21  the scarring or cicatricial and non-scarring,
22  noncicatricial, and how the current system hampers
23  diagnostics.
24        And this has implications on -- a lot of
25  these entities are autoimmune.  And it's even

Page 479

1  possible that autoimmune targets either include --
2  include stem cells in the bulge area or other
3  entities in that same area of the complicated
4  follicular structure.  So he and I have had
5  discussions but it's generally around his PhD.  And
6  the writing in these papers is his, with my
7  overseeing edits on them.  He's the first author on
8  them.
9    Q.  So during your first deposition, you
10  offered the opinion that Ms. Francis, Ms. Durden,
11  and Ms. Earnest, their alopecia is caused by
12  chemotherapy.
13    A.  Yes.
14    Q.  And we've talked about your proposed
15  mechanism of action for why chemotherapy would cause
16  ongoing alopecia.  In particular, that would somehow
17  harm the stem cell, right?
18    A.  Well, backing --
19        MR. THORNTON:  Objection; form.
20        THE WITNESS:  -- up again, the whole
21  reason of using the Ki-67 stain, which it hits cells
22  that are proliferating, these cells that are
23  positive are much more sensitive to any kind of
24  chemotherapeutic agent because they're actively
25  growing.  And so they're much more of a target of

Page 480

1  chemotherapy.  And to have -- like, our hairs on our
2  head only cycle every five years, that's why they
3  can grow so long, or seven years, and sometimes up
4  to nine, 10 years.  So they're really not in a
5  growth phase very much.  Stem cells aren't -- they're
6  sitting there quietly waiting for the hair to fall
7  out and cycle around.
8        So it's actually the growing hairs of the
9  hair that are just the soldiers making the hair
10  shaft that are much more sensitive.  And we don't
11  know, but it makes sense that they would be much
12  more the target of a chemotherapeutic agent that
13  targets an actively growing cell.
14  BY MR. SEARS:
15    Q.  Would be you interested in any research or
16  testing that is aimed at finding out if and why
17  chemotherapy may cause ongoing alopecia?
18    A.  Yes.
19    Q.  Because that could potentially have an
20  impact on your opinions, couldn't it?
21    A.  Well, it could have a big impact on our
22  reclassification of hair loss and maybe help with
23  the diagnostics.
24    Q.  As well as any opinions that you offer in
25  this case?

26 (Pages 477 - 480)

Page 481

1    A.  Yeah --
2        MR. THORNTON:  Objection; form.
3        THE WITNESS:  -- it could eventually,
4  sure.
5  BY MR. SEARS:
6    Q.  So I think during your second deposition
7  when we were talking about this stem cell study
8  that's referred to on Invoice 3, which is Exhibit
9  13.
10   A.  Okay.
11   Q.  So you've got Exhibit 13 in front of you
12  which talks about the stem cell study and the phone
13  call about the stem cell study.  Do you see that?
14   A.  Yes.
15   Q.  I think you said at your last deposition
16  that there's some discussion about your lab
17  potentially sending that researcher pathology
18  materials?
19   A.  Yes.
20   Q.  Why were you going to send that lab
21  pathology materials?
22       MR. THORNTON:  Let me object.  I think it
23  -- once again, it goes to the substance of the
24  consultant and the consultant's conversation.  I
25  will -- and it's your deposition, I'm not suggesting

Page 482

1  a question but certainly the distinction of whether
2  or not there was an intent  to send these -- whether
3  they involved these three patients and, I think
4  that's certainly a correct area.  And I'll let you
5  explore that or -- but otherwise, whatever project
6  may have been envisioned, I think has specifically
7  been ruled on is to be work product at this point
8  from a non-retained expert.
9        THE WITNESS:  My involvement in it was
10  simply saying I have a large bank of tissue in a
11  CLIA-certified laboratory that -- and I'm a hair
12  loss expert so I have a lot of tissue from many
13  different types of hair loss diseases.  And I simply
14  said that I can provide tissue that has nothing to
15  do with this case for a research project that -- so
16  the project wasn't going to involve me in anything
17  beyond providing tissue.
18  BY MR. SEARS:
19   Q.  The tissue that you would have provided,
20  was that tissue taken from women who you assessed
21  the type of alopecia they had?
22   A.  Yes.  They had all been diagnosed.
23   Q.  And had you diagnosed them with a wide
24  range of alopecias?
25   A.  Yes.

Page 483

1    Q.  Had you diagnosed any of them with ongoing
2  alopecia after chemotherapy?
3    A.  Yes.
4    Q.  And so the discussion was that you could
5  potentially send those pathology samples to this
6  researcher that's referred to in Invoice 3?
7    A.  Yes.
8    Q.  And that researcher that was referred to
9  in Invoice 3 was working with plaintiffs' counsel
10  for litigation purposes, right?
11   A.  I had no idea what the relationship was.
12   Q.  Do you know whether plaintiffs' counsel
13  was paying that researcher for the research that --
14   A.  I never asked or discussed, but I assume
15  so.
16   Q.  And you assumed that that testing was
17  going to be done for litigation purposes?
18   A.  I didn't even know that --
19       MR. THORNTON:  Objection; form.
20       THE WITNESS:  -- but no, I don't know.
21  BY MR. SEARS:
22   Q.  Do you know what the results of that study
23  are?
24       MR. THORNTON:  Objection; form.
25       THE WITNESS:  The tissue was never

Page 484

1  requested.  We just left it as when you need tissue,
2  let me know.  And I never heard anything else.
3  BY MR. SEARS:
4    Q.  Did you have any discussions with anyone
5  or did you provide any guidance about whether that
6  testing should have gone forward?
7        MR. THORNTON:  Objection; form.
8        THE WITNESS:  No.  And I sent an email
9  just saying this is what I've done with Cytokeratin
10  15, and I think I said I had no luck with Nestin
11  years before.  And I just didn't want them to
12  recreate the wheel, redo something that didn't need
13  to be redone.  But that was the extent of my
14  involvement in it.
15       (Whereupon, Email dated 8-6-18 was marked
16  as Exhibit 14 for identification.)
17  BY MR. SEARS:
18   Q.  All right.  So I've handed you Exhibit 14,
19  and it's an email that you sent on August 6, 2018 to
20  Anne Andrews and John Thornton.  Do you see that?
21   A.  Uh-huh.
22   Q.  Is that yes?
23   A.  Yes.  This is the one I just mentioned.
24   Q.  There's some redactions there.  The
25  subject is review of video of redacted by Dr. Curtis

27 (Pages 481 - 484)

Page 485

1 Thompson, right?
2    A.   Yeah.
3    Q.   Was this video and the name that was
4 redacted, is that the same researcher that's
5 referred to in Invoice 3?
6    A.   Yes.
7    Q.   And there's a redaction on the cc line.
8 Did you cc that researcher that was referred to in
9 Invoice 3?
10    A.   Presumably, yes.  I don't know, though.
11 Could have been someone in my office.  I don't know
12 who that was.
13    Q.   So you don't know who the redaction is on
14 the cc line?
15    A.   It's probably the researcher.  I can't
16 think of anyone else.
17    Q.   So the email starts out it says "Anne and
18 John, Here. I have reviewed redacted videos
19 carefully." Do you see that?
20    A.   Yes.
21    Q.   And those are the videos that you refer to
22 in Invoice 3?
23    A.   Yes.
24    Q.   Was there more than one video?
25    A.   I don't remember.

Page 486

1    Q.   When you write "videos," does that make
2 you think there was more than one?
3    A.   Yeah, it does make me think more.
4    Q.   And then it goes on to say "Here are a few
5 points.  One, validation and testing of stem cells
6 on the biopsy samples, redaction, approach is
7 correct with validation of a test and then testing
8 the samples."  Is the redaction the name of the
9 researcher that's referred to in Invoice 3?
10    A.   Presumably, yes.
11    Q.   So when you say validation of a test, what
12 does that mean?
13    A.   It's what I said about when you buy, say,
14 these immunohistochemical antibodies because it's a
15 non FDA-approved test, the onus is on the laboratory
16 to use the antibody on tissue that has -- to show
17 that it really works as purported to.
18    Q.   And is that --
19    A.   So it's positive negative controls on
20 them.
21    Q.   Is that what this researcher did, they
22 validated the antibody to make sure it worked?
23        MR. THORNTON:  Objection.  You're asking
24 what a researcher did.  That has been ruled to be a
25 work product protected consultant.  So what the

Page 487

1 researcher did is -- I won't let him answer, but the
2 general discussion I don't object to.
3 BY MR. SEARS:
4    Q.   Let me ask you this:  When you got the
5 Cytokeratin 15, did you go through that same process
6 of validating it to make sure that it worked?
7    A.   Yes.
8    Q.   And then in this email you say "And then
9 testing the samples."  What does testing the samples
10 mean?
11    A.   Can you show me where?
12    Q.   It's under point 1.
13    A.   Oh.  Oh, oh, oh.  It was a -- just a
14 warning to not do any -- that I agree, you don't do
15 any testing until you've validated the test.
16 Otherwise, you'll waste the samples.  So presumably,
17 the samples were samples pertaining to this case.
18 Or just patients with permanent chemotherapy-induced
19 alopecia.
20    Q.   So what was the test that was done?
21        MR. THORNTON:  Objection.  Don't answer
22 that.  You're saying -- first of all, you're
23 presuming a test was done, but that is -- isn't that
24 specifically the area that we've ruled that whatever
25 was done -- you can ask him what -- this witness,

Page 488

1 Curtis Thompson, what he did or didn't do.  He
2 didn't know anything about what may or may not have
3 been done.  But imprecisely, I think the Magistrate
4 has ruled that the activities of this consultant are
5 work product.  And so I don't think this witness has
6 any information about it, but I instruct him not to
7 give such information as he might potentially have.
8 BY MR. SEARS:
9    Q.   So the next sentence in your email says "I
10 don't know if he had access to my data on this, but
11 I already did this for Cytokeratin 15 on these
12 samples."  Do you see that?
13    A.   Yes.
14    Q.   And when you refer to these samples,
15 you're referring to Ms. Francis, Ms. Earnest, and
16 MS. Durden's --
17    A.   Yes.
18    Q.   -- pathology?
19    A.   Yes.
20    Q.   And that was the same pathology that this
21 researcher was working with, right?
22        MR. THORNTON:  Once again, what the
23 pathology this researcher was working with is a
24 protected work product so I don't want you to
25 testify about that, if you know.

28 (Pages 485 - 488)

Page 489

1    MR. SEARS: So you're -- if I understand
2  it correctly, you're instructing him not to answer
3  whether the test that this person did was on these
4  plaintiffs' pathology?
5    MR. THORNTON: Oh, no. That -- if that's
6  really what you're asking, some foundation whether
7  he has any information about whether any testing by
8  anybody else was ever done, by anyone other than
9  himself, and I think he can answer that question.
10    THE WITNESS: Well, he didn't do it on
11 these three patients because we never sent any
12 material or any material from any other patients.
13 So I presume no testing was ever done.
14    MR. THORNTON: Does that clarify?
15    MR. SEARS: It does. But let me ask some
16 questions because when I just read this in context
17 it doesn't make sense to me.
18 BY MR. SEARS:
19   Q.  So here's what it says, it says
20 "Validation and testing of stem cells and the biopsy
21 samples, blank approach is correct with validation
22 of a test and then testing of the samples." So you
23 watched a video and then you're confirming that the
24 approach and the testing was correct, right?
25   A.  That I agreed with it. Yes.

Page 490

1    Q.  Then you go on to say "I don't know if he
2  had access to my data on this, but I already did
3  this for Cytokeratin 15 on these samples." And the
4  reason I'm emphasizing "these" is because it's the
5  plaintiffs in this case?
6    A.  Right.
7    Q.  And so the way I read those two sentences
8  is that these samples were the same samples that
9  were being tested in the video that you watched?
10   A.  No. The video I watched was simply just
11 proposing a project. No testing had been done at
12 that point. It was just saying this is how it will
13 be done.
14   Q.  So it's your testimony that this
15 researcher that's redacted in this email never
16 tested the pathology for Ms. Francis --
17   A.  No. He never --
18   Q.  -- Ms. Durden, and Ms. Earnest?
19   A.  -- got within a thousand miles of their
20 tissue or any other tissue from my lab.
21   Q.  And it goes on to say "Perhaps I need to
22 meet with him and share this data. As the
23 Cytokeratin 15 was still positive in the basaloid
24 bodies and the pCIA cases, I did not pursue this
25 further." Did I read that correctly?

Page 491

1    A.  Yes.
2    Q.  Did you end up talking to him?
3    A.  No. I don't believe so.
4    Q.  Do you know --
5    A.  He was on a call but I don't know if it
6  was before or after this. Maybe it was after.
7    Q.  So you did talk to this researcher at some
8  point?
9    A.  There was a conference call that he was
10 on. Yeah. I just didn't want him to recreate the
11 wheel here and redo something I'd done and go down a
12 dead end. It didn't seem worth it.
13   Q.  On that call did you have any discussions
14 about stem cell testing?
15   A.  The call was basically the -- what he was
16 going to do and my part was going to be provide
17 tissue, validation tissue, and then potential
18 testing tissue that wouldn't involve patients in
19 this case. We had -- you know, we only had nine
20 unstained slides and we had the three H&Es and we
21 didn't want to compromise these specimens at all.
22   Q.  So in the email you write that the
23 Cytokeratin 15 was still positive in the basaloid
24 bodies. And that refers to the tissue from Ms.
25 Durden --

Page 492

1    A.  Yes.
2    Q.  -- Ms. Francis, and Ms. Earnest?
3    A.  Yes.
4    Q.  So the Cytokeratin 15 tested positive in
5  Ms. Earnest, Ms. Durden, and Ms. Francis' tissue?
6    A.  In these structures, yeah. We use --
7    Q.  You wrote because it tested positive you
8  did not pursue this further, right?
9    A.  Yes.
10   Q.  If it tested negative, would've you
11 pursued it further?
12   A.  Yes.
13   Q.  Because it tested positive in Ms. Earnest,
14 Ms. Francis, and Ms. Durden, is that an indication
15 to you that their stem cells were not damaged?
16    MR. THORNTON: Objection; form.
17    THE WITNESS: No. Because we're talking
18 about these basaloid bodies here. And we don't --
19 there's a whole glob of these cells also called
20 telogen bodies, and they're not stem cells. Maybe
21 one of them is.
22 BY MR. SEARS:
23   Q.  You talked about how if it did test
24 negative, you would have pursued it further.
25 Would've you pursued it further, then, because it

29 (Pages 489 - 492)

1 would have fit with your theoretical mechanism of
2 action for why chemotherapy can result in ongoing
3 alopecia?
4       MR. THORNTON:  Objection to the form.
5       THE WITNESS:  No.  Like you said before,
6 my interest in this level, this using patient
7 tissue, is in looking for staining patterns that are
8 different and specific for diseases.  So these
9 telogen bodies or basaloid bodies, we see them in
10 normal -- we see them in androgenetic.  We see them
11 in permanent chemotherapy-induced alopecia.  We see
12 them in the subacute phase of alopecia areata, hair
13 loss with psoriasis when you have it on your scalp.
14 And they all have to be taken in the context of the
15 other histopathology.  But we do know when you do
16 immunohistochemical staining with the Cytokeratin 15
17 antibody that I purchase and have, it stains these
18 bodies.  And they're one of the features of
19 chemotherapy-induced alopecia, the permanent.
20 BY MR. SEARS:
21       Q.  So if the Cytokeratin 15 tested negative
22 in the pathology samples for Ms. Earnest, Ms.
23 Durden, and Ms. Francis, why would've you pursued it
24 further?
25       MR. THORNTON:  Objection.

1       THE WITNESS:  Because it needs to be
2 investigated in a controlled study with positive and
3 negative controls.  You can't publish something off
4 of six biopsies from three patients.  It's quite a
5 bit more complicated than that.
6 BY MR. SEARS:
7       Q.  And in doing that additional research,
8 would've you been seeking to confirm your hypothesis
9 for why chemotherapy may cause ongoing alopecia
10 after the completion of chemotherapy?
11       MR. THORNTON:  Objection; form.
12       THE WITNESS:  It could eventually lead to
13 that, but my initial investigation, which would
14 probably take years, would be to turn it into a
15 diagnostic tool.
16 BY MR. SEARS:
17       Q.  The next paragraph down in your email says
18 "Perhaps redacted has access or knowledge of other
19 antibodies to the follicular stem cells which I
20 don't know about.  When I first work with
21 Cytokeratin 15, I also tested an antibody toward
22 Nestin, but the staining was nonspecific.  I did
23 only test one source of the Nestin." Did I read that
24 correctly?
25       A.  Yes.

1       Q.  Did you ever learn if that person had
2 access or knowledge of other antibodies?
3       A.  No.
4       Q.  I know we already talked about this a
5 little bit, but on the second page of your email you
6 write "But I do have unstained slides to" --
7       A.  That's supposed to be for the other side,
8 for the defense.
9       Q.  So when you say "But I do have unstained
10 slides for the other side to use if needed.  We can
11 also use these for more stem cell markers in
12 collaborating with redacted and cc'ing him on this
13 email." Do you see that?
14       A.  (Nods affirmatively.)
15       Q.  When you say more stem cell markers, what
16 stem cell markers are you referring to?
17       A.  Any that the researcher came up with that
18 I didn't know about.
19       Q.  Did you ever find out about any more?
20       A.  Huh-uh.
21       Q.  When you say "huh-uh," that means no?
22       A.  No.
23       Q.  And then you conclude your email by saying
24 "I'm happy to discuss all this on the phone if need
25 be." Did you have any discussions on the phone?

1       A.  I don't -- I might -- the one conversation
2 I had with the researcher might have been after
3 this.  I don't remember.  The one where I just said
4 I can send tissue.  It makes sense it was after this
5 but I don't know the -- I'd have to look at a bill.
6       Yes, it would have been after because this
7 is August 6th and the stem -- the telephone call
8 stem cell study was August 15th.
9       Q.  So the call you had with the researcher
10 was after you sent the email that's --
11       A.  This email.
12       Q.  -- marked Exhibit 14?
13       A.  Yes.
14       (Whereupon, Invoice No. 4 was marked as
15 Exhibit 15 for identification.)
16 BY MR. SEARS:
17       Q.  So the only thing I want to ask about this
18 is at the very beginning of the invoice on September
19 7 of 2018, there's an entry that says call with John
20 and Anne, and all this was in context of preparing
21 your report.  Do you recall whether you had any
22 discussion about Cytokeratin 15 and Ki-67 on that
23 call?
24       A.  I don't recall.  No.
25       MR. THORNTON:  This is 15?

30 (Pages 493 - 496)

1      MR. SEARS: Yeah.
2      (Whereupon, Invoice No. 5 was marked as
3 Exhibit 16 for identification.)
4 BY MR. SEARS:
5      Q. All right. So you've got Exhibit 16 and
6 it's your Invoice No. 5. And there's an entry on
7 October 24, 2018, that says organization of slides
8 sent to blank. Is the redacted person in Invoice 5
9 the same person in Invoice 3?
10      A. No.
11      Q. Did the person that's redacted in Invoice
12 5, to your knowledge, do any additional testing on
13 the pathology?
14      A. Did not.
15      Q. Did you send that person the Cytokeratin
16 15 and Ki-67 stain slides for Ms. Earnest, Ms.
17 Durden, and Ms. Francis?
18      A. No.
19      Q. Why not?
20      A. The interest was in this person was just
21 going to look at them from a diagnostic traditional
22 dermatopathology. It wasn't analysis research
23 related. It was just simply the diagnosis of
24 permanent chemotherapy-induced alopecia.
25      Q. Did you have any conversations with the

1 person referred to in Invoice 5?
2      A. No.
3      Q. Did you have any emails with that person
4 referred to in Invoice 5?
5      A. No.
6      Q. So your sole contact with that person was
7 having your lab send that person the pathology?
8      A. The glass slides, the H&E glass slides.
9 Yes.
10      Q. So we initially took your deposition -- I
11 think it was on November 30, 2018. Do you recall
12 that?
13      A. Yes.
14      Q. And during that deposition, you did not
15 mention that you ran Cytokeratin 15 or Ki-67
16 staining on the pathology for Ms. Earnest, Francis,
17 or Durden, right?
18      A. Correct. Yes.
19      Q. And you also didn't mention during that
20 deposition that there's existence of additional
21 pathology material that had not been provided to the
22 defense, right?
23      A. I did not. No, I didn't.
24      Q. And then you were deposed again on
25 February 26, 2019, about your invoices. Do you

1 recall that?
2      A. Yes.
3      Q. And you were asked specific questions
4 about the Cytokeratin 15 and Ki-67 staining entries.
5 Do you recall that?
6      A. Yes.
7      Q. You did not volunteer that the slides had
8 not been produced. It was only through questions
9 that it was determined the slides had not been
10 produced?
11      MR. THORNTON: Objection; form.
12      THE WITNESS: Yes. It wasn't asked.
13 BY MR. SEARS:
14      Q. If the Cytokeratin 15 and Ki-67 stains
15 that were done on Ms. Durden, Ms. Earnest, and Ms.
16 Francis showed that the stem cells were harmed or
17 killed, would've you included that information in
18 your report?
19      MR. THORNTON: Objection; form.
20      THE WITNESS: In which report?
21 BY MR. SEARS:
22      Q. Any of them?
23      A. The -- for sure it wouldn't have been
24 included in the dermatopathology reports because
25 there's no support, published support or even

1 professional experience that these have utility in
2 diagnostics. So it would actually be imprudent to
3 put them in that report.
4      The Rule 26, I had never prepared a report
5 like this, and didn't entirely understand what the
6 utility of it was in a legal case. By that point, I
7 wasn't even thinking about it. It was just simply
8 trying to provide my professional expert opinion of
9 the patient's clinical disease.
10      Q. If you felt like the Cytokeratin 15
11 staining and the Ki-67 staining that you did in any
12 way provided support for your diagnosis of ongoing
13 alopecia after chemotherapy, would've you included
14 that in your Rule 26 report?
15      MR. THORNTON: Objection; form.
16      THE WITNESS: I don't know what's put in
17 reports or not. If the findings had been that these
18 -- this pilot study had been expanded into a study
19 that had proper positive and negative controls and
20 had conclusions, then probably this could've, you
21 know, been -- and I don't have any issue with
22 putting in the Rule 26 report and saying it has no
23 utility. I mean, it's just -- but I think it is --
24 conclusions shouldn't be drawn from it until
25 something larger is done.

31 (Pages 497 - 500)

Page 501

1 BY MR. SEARS:
2      Q.   So if I understand what you said, if you
3 could have drawn the conclusion from it that the
4 staining supported ongoing alopecia after
5 chemotherapy with the proper support, that is
6 something that you would have wanted to include in
7 your report?
8           MR. THORNTON:  Objection; form.
9           THE WITNESS:  After performing a larger
10 study.
11 BY MR. SEARS:
12      Q.   So I think earlier today you mentioned
13 that you thought Dr. Tosti was on an email about the
14 results of the Cytokeratin 15 and Ki-67 staining.
15      A.   I don't know.  But I saw her cc'd on some
16 of them.  I'd have to look at them all.
17      Q.   As you sit here today, can you recall one
18 way or the other if you had either by phone, in
19 person, or by email communicated the results of the
20 Cytokeratin 15 and Ki-67 staining with Dr. Tosti?
21      A.   I don't remember how.  I'm sure it was
22 communicated.
23      Q.   When you say you're --
24      A.   At the level of -- the extent of the
25 discussion with her would have been, like, oh, it

Page 502

1 didn't show any difference of staining in any
2 interesting way.
3      Q.   Do you know whether Dr. Tosti included the
4 results of that staining in her report?
5      A.   No.
6           MR. THORNTON:  Objection; form.
7 BY MR. SEARS:
8      Q.   Have you had any -- well, I know in one of
9 your invoices there was an entry about Dr. Feigel.
10 Do you recall that?
11      A.   Yes.  It's back in here -- it's in one of
12 these, right?
13      Q.   It is.
14      A.   What was the date of it, do you know?
15      Q.   I don't know off the top of my head but
16 the discussion with her was in preparation for
17 science day?
18      A.   Yeah.
19      Q.   When you were having that conversation
20 with her, did you two have any discussions about the
21 proposed mechanism of action for why chemotherapy
22 might result in ongoing alopecia?
23           MR. THORNTON:  Objection; form.
24           THE WITNESS:  I don't have any
25 recollection of that.  There was a whole lot of

Page 503

1 education going on, the histopathology of alopecia
2 and I don't remember what that discussion was.  I
3 seriously doubt it had anything to do with the
4 immunos at this point.  Because we moved just into
5 the histopathologic features.
6 BY MR. SEARS:
7      Q.   And by that question I didn't mean to
8 limit it to the Cytokeratin 15 and Ki-67.  It was a
9 broader question about the potential mechanism of
10 action.
11      A.   Seriously doubt we had any discussion in
12 that direction.
13      Q.   If she mentioned during science day that
14 that was one of theoretical mechanisms of action,
15 would that cause you to think that you two might
16 have discussed it?
17           MR. THORNTON:  Objection; form.
18           THE WITNESS:  No, not necessarily.
19 BY MR. SEARS:
20      Q.   So we looked at your invoices and there's
21 an entry about how the pathology was sent to someone
22 else. Besides that person, has anyone else, to your
23 knowledge, reviewed Ms. Durden, Ms. Earnest, and Ms.
24 Francis' pathology?
25      A.   Since they've been sent to you all, they

Page 504

1 certainly have been looked at.  Yes.
2      Q.   Okay.  Let me rephrase the question.  With
3 the exception of who might have looked at the
4 pathology for the defense, from the plaintiffs' side
5 are you aware of anyone else that has reviewed Ms.
6 Durden, Ms. Francis, and Ms. Earnest's pathology
7 besides you and the person that's referenced in
8 Invoice 5?
9      A.   No.
10      Q.   Do you know if the person that's
11 referenced in Invoice 5 did any additional staining
12 on the pathology?
13      A.   I know --
14           MR. THORNTON:  Objection; form.
15           THE WITNESS:  -- they did not.
16 BY MR. SEARS:
17      Q.   Besides the person that's redacted in the
18 emails and redacted, I think, in Exhibit 3 when you
19 referred to the videos, are you aware of anyone else
20 that has worked with plaintiff on anything having to
21 do with stem cells?
22      A.   No.
23      Q.   When you reviewed the video that was
24 referred to in Invoice 3, what was your
25 understanding about why you were reviewing it?

32 (Pages 501 - 504)

1    MR. THORNTON:  Objection; form.  And I
2 think your state of mind is the question here.
3 That's fine.
4    THE WITNESS:  It was an introduction to
5 this person.
6 BY MR. SEARS:
7    Q.  Beyond that introduction, did you have any
8 understanding for why you were reviewing that video
9 or videos?
10    A.  No.  I understood that this was a
11 researcher retained by the plaintiff attorneys to do
12 work.  That's all I knew.
13    Q.  I think you brought it with you, but you
14 know that there's a letter that was sent to Judge
15 Milazzo?
16    A.  Yeah.
17    Q.  I guess we can go ahead and mark it.  I've
18 got a copy.
19    (Whereupon, Letter to Judge Milazzo was
20 marked as Exhibit 17 for identification.)
21    THE WITNESS:  Just last week, right?
22 Wasn't that last week?
23    MR. THORNTON:  March 27, I think so.
24    THE WITNESS:  I feel like time has ground
25 to a halt here.

1 BY MR. SEARS:
2    Q.  Did you have any assistance in preparing
3 this letter?
4    A.  I wrote the entire thing myself and sent
5 it to the plaintiff attorneys, who made very small
6 edits that -- for typos and single word changes.
7 There wasn't a single substantive suggestion of
8 concept or context.  It was simply cleaning it up.
9 And then it was only a few things, so I wrote it
10 entirely myself.
11    Q.  What changes were made to the letter?
12    A.  They were things like "as" to "an," you
13 know, the little typos.  And there was -- there were
14 single things like -- I'd have to look at it but it
15 was little single words, like "research" to
16 "investigation" or something like that.  They were
17 tiny little things.
18    Q.  So on the fourth paragraph of the first
19 page, it begins with when biopsies from the four
20 patients.  Do you see that?
21    A.  Yes.
22    Q.  So you write about the biopsies from the
23 four patients with possible pCIA that was received
24 by your laboratory.  And then on the paragraph -- I
25 think it's the fourth line down it says "For each

1 biopsy, two of these unstained slides were used for
2 the CK-15" --
3    A.  Yes.
4    Q.  -- "and Ki-67 ICH stains."  Do you see
5 that?
6    A.  Yes.
7    Q.  So you're talking about the four patients,
8 which includes Ms. Tuyes?
9    A.  But it wasn't.  That's incorrect.
10    Q.  Okay.  So that's just an inaccuracy?
11    A.  I didn't -- yeah, that's an inaccuracy.  I
12 didn't realize the Tuyes biopsy arrived three weeks
13 later until seeing the invoices this morning.
14    Q.  And then on the second page of that in the
15 kind of giant paragraph before the last final
16 paragraph, you write "Several months after
17 completing my pathology reports on the biopsied
18 specimens from this case, I reviewed videos from a
19 follicular stem cell researcher that were sent to me
20 by attorney Anne Andrews."  Did I read that
21 correctly?
22    A.  Yes.
23    Q.  Again, it refers to videos.  So does that
24 make you think there's more than one?
25    A.  Yes, it does.

1    Q.  And is this person the same person that's
2 referred to in the emails and Invoice 3?
3    A.  Yes.
4    Q.  And that person is a follicular stem cell
5 researcher?
6    A.  Presumably so.  Yes.
7    Q.  That's what you wrote in the letter?
8    A.  Yes.  I don't know what his qualifications
9 are.  That was the only reason I said that.
10    Q.  So the person whose video you reviewed was
11 a follicular stem cell researcher?
12    A.  Yes.
13    Q.  And then after reviewing the videos, you
14 had a phone call with that stem cell researcher?
15    A.  Yes.
16    MR. SEARS:  All right.  Let me go over my
17 notes and talk to Hillary to find out what I messed
18 up and we'll come back.
19    THE WITNESS:  Sounds good.
20    THE VIDEOGRAPHER:  The time is 11:30 a.m.
21 We are off the record.
22    (Whereupon, recess taken.)
23    THE VIDEOGRAPHER:  The time is 11:37 a.m.
24 We are on the record.
25    MR. SEARS:  That's all the questions I

33 (Pages 505 - 508)

Page 509

1  have for you right now.  I appreciate your time.
2       MR. THORNTON:  I don't think I have any
3  questions.  Give me a second.  I didn't expect that.
4       THE VIDEOGRAPHER:  The time is 11:37 a.m.
5  We are off the record.
6       (Off-the-record discussion.)
7       THE VIDEOGRAPHER:  The time is 11:37 a.m.
8  We are back on the record.
9       MR. THORNTON:  No questions.
10       THE VIDEOGRAPHER:  Mr. Sears is going to
11  receive a copy of the video today.  Did you want to
12  order a copy?
13       MR. THORNTON:  I don't think so.
14       MS. DAVIS:  We would like a rush of this
15  deposition transcript.
16       THE REPORTER:  Okay.  We're off the
17  record.
18       (Whereupon, the continuing videotaped
19  expert deposition of Curtis Thompson M.D. concluded
20  at 11:38 a.m.)
21
22
23
24
25

Page 510

1           CERTIFICATE
2
3     I, K.M., do hereby certify that I reported all
4  proceedings adduced in the foregoing matter
5  and that the foregoing transcript pages constitutes a
6  full, true, and accurate record of said proceedings to
7  the best of my ability.
8
9     I further certify that I am neither related to
10  counsel or any part to the proceedings nor have any
11  interest in the outcome of the proceedings.
12
13     IN WITNESS HEREOF, I have hereunto set my hand this
14  5th day of April, 2019.
15
16
17
18
19
20  /S/  K.M.
21
22
23
24
25

Veritext Legal Solutions
800-227-8440                                                    973-410-4040

**[& - 4-10-18]**

| & | |
|---|---|
| **&** | 381:13 382:6 |

| 0 | |
|---|---|
| **02109** | 382:16 |

**1**

**1** 384:3,13 386:23
387:1 437:23
447:2 487:12
**1.42** 395:3
**1.75** 395:9
**10** 384:12 395:5,8
396:16 418:23
434:23 436:10,12
475:5 480:4
**10:19** 465:14
**10:33** 465:17
**10th** 436:17,18,20
**11** 384:13 392:22
393:4 436:14
447:3,5 456:13
**11,427** 396:14
**11:30** 508:20
**11:37** 508:23
509:4,7
**11:38** 509:20
**11:53** 392:8
426:21
**11th** 436:22
**12** 384:14 454:6,8
465:20 466:1
**13** 384:15 456:25
457:2 481:9,11
**14** 384:16 484:16
484:18 496:12
**15** 384:17 387:12
388:24 389:3,5
395:18 396:2
397:7 398:2,3,11
398:15 400:1,4
401:5,8 404:12,18

404:24,25 405:2,8
405:15,19 406:20
407:1,14,21,23
408:3,18,23 409:3
409:16,23 410:3
410:15,17,22
411:22 412:5,16
412:24 417:18
418:3,12,17
419:25 422:8,18
422:22,24 425:14
425:23 429:9
431:9,16 432:3,9
432:13 433:5,11
434:5,13,16 437:3
439:7,10 440:11
441:2,13 442:17
442:22 443:7,11
446:21 447:8
448:12,18 449:4,8
450:4,12 451:9
452:2,12,23
454:10,25 455:15
455:21 456:7,15
457:7 459:15
460:3,16 465:23
467:5,16 468:10
469:20 470:5
471:13 472:5,7,12
472:20 473:7
474:2,18 476:1,18
484:10 487:5
488:11 490:3,23
491:23 492:4
493:16,21 494:21
496:15,22,25
497:16 498:15
499:4,14 500:10
501:14,20 503:8
507:2

**15th** 462:10 496:8
**16** 384:18 436:15
497:3,5
**16635** 380:4
**16th** 438:7 444:20
**17** 384:19 505:20
**17144** 380:5
**17410** 380:5
**1899** 381:14
**1st** 395:1

**2**

**2** 384:4,14 393:22
393:25 437:23
454:5,9
**2.75** 396:5
**20,000** 396:20
**2017** 409:6,10,14
409:18 460:9
468:19
**2018** 392:1,7
420:18,20 426:21
429:1 434:23
436:15,15 438:7
447:14 454:11
455:7,11 456:10
456:13 457:4,20
462:10 484:19
496:19 497:7
498:11
**2019** 380:9,16
385:3,5 394:3,21
395:1,9 396:5
498:25 510:14
**213-7000** 382:17
**24** 448:11,11 497:7
**25** 394:20 395:9
400:9 418:25
**2555** 382:7
**25th** 447:14
**26** 396:5,10 401:17
443:18 444:8

449:9,15,23
450:12,15 453:12
462:25 498:25
500:4,14,22
**27** 420:17,20
454:11 455:25
505:23
**2740** 380:2
**27th** 382:15
**28** 392:7 426:21
430:23 431:3
**2:16** 380:4,5,5
**2nd** 455:7,11
456:10

**3**

**3** 380:9,16 384:5
384:15 385:3,5
390:6,10,11
394:15,17 456:24
457:3 481:8 483:6
483:9 485:5,9,22
486:9 497:9
504:18,24 508:2
**3,367** 396:12
**3-22-18** 384:9
**3-27-18** 420:13
**30** 498:11
**300** 381:7 429:23
**303** 381:16
**381** 383:5 384:3
**388** 384:4
**389** 384:5,6
**396** 384:7
**398** 384:8

**4**

**4** 384:6,17 390:16
395:6,8 496:14
**4-10-18** 384:11
434:19

**4-11-18**   384:12
  436:9
**4-5-18**   384:10
  428:21
**413**   384:9
**420**   384:10
**426**   384:11
**428**   384:12
**438**   384:13
**444**   384:14
**447**   384:15
**4701**   381:7
**473**   384:16
**474-6550**   382:9
**484**   384:17,18
**492**   384:19
**4:25**   420:20

**5**

**5**   384:7,18 391:8
  391:15 402:14,17
  469:3 478:11
  497:2,6,8,12 498:1
  498:4 504:8,11
**5200**   380:11,17
**53**   382:15
**57.4.**   402:23
**5th**   394:3 429:1
  430:17,24 431:4
  432:8 510:14

**6**

**6**   384:8 391:13
  392:1 404:15,17
  413:21 417:17
  457:20 478:12
  484:19
**617**   382:17
**64108**   382:8
**67**   387:12 388:23
  389:4,5 395:19
  396:2 397:7

398:22 399:5,9,19
  399:21 400:2,17
  400:25 401:5,9
  409:17 425:23
  432:2,4 443:8,12
  446:21 447:9
  448:13 449:4,8
  450:5,12 451:9
  452:2,23 454:10
  454:24 455:15,21
  456:8,15 457:7
  459:15 460:3
  465:23 467:6,16
  468:10 469:21
  470:5,21 471:13
  479:21 496:22
  497:16 498:15
  499:4,14 500:11
  501:14,20 503:8
  507:4
**6th**   496:7

**7**

**7**   384:4,9 391:24
  393:5 420:14,16
  430:22 457:3
  496:19
**7,488**   396:16
**70,000**   396:20
**700**   381:14
**748-1000**   381:9

**8**

**8**   384:5,10 393:21
  393:24 396:11
  428:22,25
**8-6-18**   384:16
  484:15
**80202**   381:15
**816**   382:9
**8198**   510:18

**893-9800**   381:16
**8:35**   380:9,16
  385:5
**8:38**   388:11
**8:40**   388:14

**9**

**9**   384:6,11 392:15
  394:15,16 396:14
  434:20,23
**90,000**   396:21
**92660**   381:8
**949**   381:9

**a**

**a.m.**   380:9,16
  385:5 388:14
  392:8 426:21
  465:14,17 508:20
  508:23 509:4,7,20
**ability**   468:3 510:7
**able**   407:10
  431:12
**absence**   411:11
  423:24 473:3
**absent**   423:19
**absolutely**   474:8
**academy**   450:20
**accept**   445:23
**access**   390:8 421:1
  488:10 490:2
  494:18 495:2
**accession**   430:16
**accessioned**   435:7
**accidentally**
  393:14
**account**   406:5
  475:1,7
**accurate**   386:20
  469:18 510:6
**action**   401:15,23
  402:8 403:9 404:5

404:5 408:21
  413:15 414:14
  415:6,13,16 416:8
  459:2 461:25
  465:5 472:3 478:6
  479:15 493:2
  502:21 503:10,14
**actively**   417:12
  479:24 480:13
**activities**   488:4
**actual**   424:9
**adam**   429:18,21
**add**   439:10,17,18
  441:3,14 442:4,25
**added**   396:18
  453:25
**additional**   464:16
  494:7 497:12
  498:20 504:11
**address**   395:20
  396:1 410:5
  468:23
**adduced**   510:4
**adjourn**   388:8
**advice**   456:21
**advisor**   478:16
**affirm**   386:1
**affirmatively**
  495:14
**affirms**   418:9
**agent**   417:15
  479:24 480:12
**agents**   414:25
  416:4
**ago**   400:10 419:1
  433:1
**agree**   487:14
**agreed**   489:25
**ahead**   386:12
  393:20 441:20
  505:17

**aimed** 469:3
480:16
**aivita** 427:23
**alexa** 429:7,11
434:24 437:5,8,10
437:12
**alive** 411:1,6,17
**allow** 469:17
**alopecia** 384:7
389:9,12,14,19,23
394:11,13 399:13
402:13,18,23,25
403:12,18 404:19
405:4,8 406:8
407:23 408:6,9,14
412:3 413:16
414:6,15 415:8,14
416:9 417:20
420:3 423:16
425:4 440:3,13,22
442:7 446:23
452:15 456:3
457:13 459:3
462:1 465:7
466:10,10,12
470:10 478:7
479:11,16 480:17
482:21 483:2
487:19 493:3,11
493:12,19 494:9
497:24 500:13
501:4 502:22
503:1
**alopecias** 408:2,2
482:24
**alter** 475:12,15
**american** 450:20
**analysis** 461:5
**andrews** 381:6
392:7 420:22,22
426:5,20 429:1,3

431:19 432:6
434:10,24 436:13
436:22 437:9
438:8,17 442:13
447:13 456:14
484:20 507:20
**andrewsthornto...**
381:10
**androgenetic**
389:12,19 408:5
466:12,22 493:10
**anne** 392:7 420:21
420:22 426:5,20
428:25 429:3
431:19 432:6
434:10,24 436:13
436:22 437:8
438:8,17 442:13
456:14 484:20
485:17 496:20
507:20
**anno** 455:2
**annotating** 454:17
**annotations**
454:18,24
**anonymously**
438:1
**answer** 415:5
433:10 442:3
452:21 458:8,12
461:8,17 462:21
463:2,19,20
464:13 478:2
487:1,21 489:2,9
**antibodies** 389:16
399:17,25 400:9
400:11,14 406:23
419:19,20 423:23
423:23 433:16,19
468:21,22 469:16
486:14 494:19

495:2
**antibody** 400:13
418:11 429:9
431:10,12 432:2
432:17 433:25
434:1 436:23
437:1,3 467:22
486:16,22 493:17
494:21
**antigen** 410:24
418:12 460:18
**antigens** 400:19
400:23
**antoinette** 380:4
385:7
**antonella** 420:21
438:25 439:3
**anxious** 427:5
**anybody** 408:15
431:20 449:16
489:8
**anymore** 398:1
410:25 412:10,11
412:12 413:9,25
**appearances**
381:1
**appearing** 381:3
382:2,12
**apply** 393:15
**appreciate** 509:1
**approach** 486:6
489:21,24
**approved** 399:16
400:14 405:20
410:24 418:25
431:10 433:18
467:22 486:15
**april** 380:9,16
385:3,5 409:6,9,14
409:18 429:1
430:17,24 431:4

432:8 434:23
436:14,15,17,20
436:22 438:7
444:20 447:14
448:10,11 454:11
455:25 510:14
**area** 449:25
450:16 458:9
479:2,3 482:4
487:24
**areata** 408:6
493:12
**aromatase** 475:19
**arranging** 392:13
429:18,19
**arrector** 397:13
**arrive** 435:6
436:23
**arrived** 434:25
436:3 507:12
**article** 384:7,8
402:6,13,16,17
404:14 409:2,6,9
**asked** 394:12
474:15 483:14
499:3,12
**asking** 408:19
462:19 486:23
489:6
**asks** 391:24 429:3
436:22
**aspects** 394:8
**assess** 462:17
463:16
**assessed** 482:20
**assessing** 460:4,5
**assessment** 466:25
467:24
**assigned** 430:12
**assist** 461:13

**assistance** 506:2
**assistant** 429:18
**associated** 396:1
**assume** 483:14
**assumed** 483:16
**athanassios**
 404:22
**athenos** 404:21
**attached** 397:13
 401:17
**attorney** 381:5
 382:5,13 395:2
 420:23 426:11
 438:13 442:13
 467:15 468:4
 507:20
**attorneys** 394:6,20
 395:11 432:7
 438:9,11,18,21
 441:22 505:11
 506:5
**august** 392:1
 457:20 462:10
 484:19 496:7,8
**author** 479:7
**autoimmune**
 470:17 478:25
 479:1
**available** 421:16
**aventis** 385:8
**avenue** 381:7
**aware** 504:5,19

**b**

**bachus** 381:13
**back** 391:21
 417:17 432:20
 440:1 452:10
 467:2 472:19
 473:20 474:3,18
 476:1,10 502:11
 508:18 509:8

**backing** 479:18
**backward** 396:3
**bacon** 382:6
**bad** 403:14 441:23
 450:24
**bank** 482:10
**barbara** 380:5
**barn** 413:12
**basal** 398:18
**basalis** 407:8
**basaloid** 490:23
 491:23 492:18
 493:9
**base** 426:25
**based** 389:10
 390:4 408:19
 414:2 416:23
 426:13 440:18,19
**basic** 468:24,24,25
 470:9
**basically** 397:13
 410:3 491:15
**basilar** 472:12
**basis** 418:22
**bathroom** 465:11
**beach** 381:8 427:4
**beginning** 385:6
 474:24 496:18
**begins** 506:19
**behalf** 380:8 381:3
 382:2,12
**belgium** 478:13
**believe** 388:17
 390:9 391:20,22
 395:14 426:4
 429:15 432:11
 443:15 446:20
 469:11 477:20
 491:3
**benign** 470:24

**best** 386:20 412:13
 430:8 510:7
**better** 430:14
 433:5 476:15,15
**beyond** 390:13
 391:5 392:19
 407:13 415:15
 416:14,18 437:15
 451:19 457:16
 482:17 505:7
**big** 406:19 412:8
 480:21
**bigger** 433:4 442:8
 474:25
**biggest** 468:1
**bill** 496:5
**billed** 396:12,14
 396:16,20 433:22
**bills** 393:15
**biology** 411:4
 468:25
**biomedical** 427:23
**biopsied** 445:25
 507:17
**biopsies** 389:11
 392:12 421:2,24
 424:6 427:10
 429:4,24 430:8,18
 430:18 451:21
 452:13,16,18
 457:14,16 469:10
 469:10,12 477:1
 494:4 506:19,22
**biopsy** 389:8
 405:24 430:10
 436:4 437:5,15,18
 466:18 470:6
 474:10 486:6
 489:20 507:1,12
**birth** 437:21

**bit** 410:21 411:12
 416:3 417:5 424:7
 474:12 494:5
 495:5
**blank** 489:21
 497:8
**block** 410:20
**blocker** 475:22
**blow** 440:23
 453:15
**blowing** 451:17
 474:25
**board** 450:20
**bodies** 490:24
 491:24 492:18,20
 493:9,9,18
**bolstered** 474:21
**boston** 382:16
**bottles** 435:9
**bottom** 404:23
 409:7 446:7
**bought** 434:1,2
**boulevard** 382:7
**bounds** 390:22
**box** 387:23
**brad** 438:13,20
**bradley** 438:8
**break** 388:17
 465:12
**breast** 475:4
**brief** 465:11
**bring** 431:13
**broader** 469:15
 503:9
**brought** 393:7
 505:13
**brown** 473:9
**budding** 394:12
 394:13
**bulge** 397:9,11,12
 397:17 398:4,14

402:1,10 409:22
410:15 412:23
413:17 414:18
415:10 416:1,15
416:24 417:23
418:5,18 472:14
479:2
**butcher** 404:20
**buy** 433:16 467:23
486:13

**c**

**california** 381:8
427:4
**call** 388:5,6 395:1
395:10,11 437:22
447:13,18 448:5
448:18,22 449:5
455:8,8,13,14,18
456:10,12 462:11
462:13,16,20,23
463:5,11,15 464:1
481:13 491:5,9,13
491:15 496:7,9,19
496:23 508:14
**called** 388:18
402:18 405:16
433:1 492:19
**cancer** 419:21
470:23 475:4
**cancers** 415:1
475:15
**caption** 385:7
**capturing** 454:21
**careful** 438:5
**carefully** 435:15
485:19
**case** 380:4,5,5
385:7 387:25
389:16 395:21
396:21 435:19
438:3 450:9

480:25 482:15
487:17 490:5
491:19 500:6
507:18
**cases** 391:9 394:10
414:5 418:4 437:5
437:15,18 438:4
439:9 440:5,22
445:19 450:18
453:18 454:20
456:21 490:24
**cause** 412:3
415:14 416:8
457:13 459:2
462:1 465:7 476:2
478:7 479:15
480:17 494:9
503:15
**caused** 405:8
411:21 412:2
418:17 425:4
479:11
**causes** 413:15
414:15,17 415:7
**cc** 485:7,8,14
**cc'd** 392:11 426:1
426:6,8 443:13
501:15
**cc'ing** 495:12
**cell** 390:17 392:16
393:12 398:1,8
399:3,3,21 400:2,2
400:16,17,25
401:2,4,6,25
402:10 403:11,20
404:9 406:18,18
406:20 407:11
408:22 410:15
411:16 412:9,15
412:23,23 413:6
413:17 415:10

416:5,23 417:7,8
418:10,18 419:11
421:3,17,21,25
422:5,7,18,22
423:2,8,18 424:1
424:15,19 425:2
425:10 426:15
428:4 431:4,25
432:14,19,23
445:1,7,21 446:4,8
446:9,10 448:20
457:12,23,25
458:15,18 459:9
460:10,15,17,22
461:6 462:2,13,16
462:18 464:2,9,21
465:6 468:25
469:5 471:8,9,9
472:5 473:23
479:17 480:13
481:7,12,13
491:14 495:11,15
495:16 496:8
507:19 508:4,11
508:14
**cell's** 411:1 412:19
**cells** 391:10 397:9
397:16,18,19
398:4,9,10,13,16
398:17,18,18,20
398:23 399:6
400:19 402:12
403:2 405:3
406:21,21,24
407:2,13,15,18,19
407:22,24 408:3
408:12 409:22
410:16 411:9,9
413:3,23,24
414:11,17,18,25
415:23,24 416:1,1

416:2,3,15,22,25
416:25 417:5,20
417:23 418:5
422:11 423:19
424:2,3 427:15
433:6 459:4 460:4
460:6,24 461:15
463:17 464:5,15
464:22 471:1,4
472:4,14 473:8,18
477:5,9,13,25
479:2,21,22 480:5
486:5 489:20
492:15,19,20
494:19 499:16
504:21
**center** 419:4
**centered** 399:15
**certain** 472:25
473:1
**certainly** 477:15
482:1,4 504:1
**certificate** 510:1
**certified** 435:10
482:11
**certify** 510:3,9
**cetera** 447:14
**chalking** 452:11
**challenging** 406:6
406:7
**chance** 387:3
**change** 440:10
473:12,16 474:4
474:19 476:9
**changes** 418:13,16
506:6,11
**chapter** 423:13
**characteristics**
397:19 399:17
**check** 387:19

**chemotherapeutic**
414:25 479:24
480:12
**chemotherapy**
389:9,13,23
392:17 394:11
399:13,20 401:24
402:8,25 403:10
403:12,17,18
404:6,7 405:4,9
407:22 408:10,14
408:21 409:22
410:14 411:22
412:3,4,22 413:15
413:16 414:2,6,15
414:16,21,21,22
415:7,9,13,15,18
416:8,14 417:21
418:18 423:15
425:5 440:3,12,22
442:7 446:24
452:14 456:3
457:13 459:2
460:22 461:5,14
462:1,17 463:16
464:4,8,22 465:6
466:9 470:10
472:4 477:5,8,12
477:24 478:7
479:12,15 480:1
480:17 483:2
487:18 493:2,11
493:19 494:9,10
497:24 500:13
501:5 502:21
**chromogen** 473:14
473:17 474:3
**chronic** 408:4,6
**cicatricial** 406:8
478:21

**city** 382:8
**ck** 404:24 405:2
417:18 507:2
**clarify** 489:14
**classes** 414:24
**classification**
406:7,12 478:20
**cleaning** 506:8
**clear** 419:11 436:3
451:19 452:1
466:24
**clia** 482:11
**clinical** 414:22
422:12 445:22
459:22 500:9
**clinician** 430:11
**collaborating**
495:12
**color** 473:12,16
474:4,19
**colorado** 381:15
**come** 387:24
406:17 470:19
471:20 508:18
**coming** 430:10
**commencing**
380:16
**comment** 471:6
**commentary**
471:8
**communicate**
443:10 445:8
448:21
**communicated**
446:10 501:19,22
**communication**
391:13,23,24
395:17 456:18
**communications**
390:16 391:8
392:5,22 396:25

**companies** 433:17
433:18
**company** 427:20
427:24 434:3
**completing** 507:17
**completion** 403:18
404:7 413:16
414:16 415:8,14
442:7 446:23
494:10
**complex** 394:14
416:4,24 476:12
**compliant** 438:5
**complicated**
399:23 479:3
494:5
**compromise**
491:21
**concept** 406:16
506:8
**concepts** 402:19
469:5
**conclude** 495:23
**concluded** 453:6,9
457:11 509:19
**conclusion** 501:3
**conclusions**
450:25 500:20,24
**conducted** 445:2
450:10 459:15
464:21
**conference** 491:9
**confirm** 388:5
465:1 494:8
**confirming** 489:23
**connect** 469:3
**connor** 382:4
385:11
**consider** 408:8
**considered** 402:24
408:1

**considering**
448:19
**constitutes** 510:5
**consultant** 456:19
463:1 464:18
477:15,23,23
481:24 486:25
488:4
**consultant's**
481:24
**consulting** 390:7
456:20
**contact** 420:22
429:13,22 498:6
**contents** 449:23
458:22
**context** 405:12,17
445:12 467:11
470:18 489:16
493:14 496:20
506:8
**continuing** 380:6
380:14 385:1
509:18
**control** 433:2
**controlled** 494:2
**controls** 433:22
440:6,21 450:19
450:23 451:2
453:23 474:12
486:19 494:3
500:19
**conversation**
477:15 481:24
496:1 502:19
**conversations**
426:2 477:17,18
477:20 497:25
**convincing** 439:24
444:22

[copy - deposition]

**copy** 505:18
509:11,12
**correct** 430:6
441:21 482:4
486:7 489:21,24
498:18
**correcting** 436:19
**correctly** 403:3
405:5 417:25
430:2 476:3 489:2
490:25 494:24
507:21
**correspondence**
392:8
**corresponding**
395:21
**could've** 500:20
**counsel** 385:9,18
387:7 392:23
420:23 463:6
483:9,12 510:10
**couple** 386:14
404:13 409:13
411:13 465:20
**couriers** 429:25
**court** 380:1,15
385:24
**courtesy** 393:17
**created** 393:6
444:4
**criteria** 463:15
**crude** 415:25
**csears** 382:10
**culbertson** 382:14
**curious** 387:11
389:17 423:7
428:19 466:12
467:4
**current** 406:12
478:19,22

**currently** 427:3
**curtis** 380:7,15
383:2 385:2,6
386:13 420:21
484:25 488:1
509:19
**curtisinportland**
395:23,25
**cut** 435:11 471:6
**cutting** 424:9
435:13
**cv** 380:4,5,5
**cycle** 470:14 476:9
480:2,7
**cytokeratin**
387:12 388:24
389:3,5 395:18
396:2 397:6 398:2
398:3,11,14 400:1
400:4 401:5,8
404:12,18,25
405:8,15,19
406:20 407:1,13
407:21,23 408:3
408:18,22 409:3
409:16,23 410:3
410:15,17,22
411:22 412:5,16
412:24 418:3,12
418:16 419:25
422:8,18,22,24
425:14,23 429:9
431:9,16 432:3,9
432:13 433:5,11
434:5,13,16 437:3
439:7,10 440:11
441:2,13 442:17
442:22 443:7,11
446:21 447:8
448:12 449:4,8
450:4,11 451:9

452:2,12,23
454:10,25 455:15
455:21 456:7,15
457:7 459:15
460:3,16 465:23
467:5,16 468:9
469:20 470:5
471:13 472:5,7,12
472:20 473:7
474:2,18 476:1,18
484:9 487:5
488:11 490:3,23
491:23 492:4
493:16,21 494:21
496:22 497:15
498:15 499:4,14
500:10 501:14,20
503:8

**d**

**damage** 465:6
**damaged** 492:15
**darin** 381:12
385:19
**data** 488:10 490:2
490:22
**date** 385:5 400:12
437:21 457:3
502:14
**dated** 384:9,10,11
384:12,16 392:1
420:13 428:21
434:19 436:9
484:15
**davis** 381:5 385:17
385:17 436:14,17
438:8,17 509:14
**day** 394:23 429:24
452:5 469:12
502:17 503:13
510:14

**de** 437:22 438:4
**dead** 400:16,19,22
411:1,6,17 424:1
491:12
**dear** 420:21
**death** 418:10
**debate** 417:21
**december** 457:3
**decide** 432:13
**decided** 389:16
430:7 431:8,24
432:3,8 433:11
434:5
**decision** 431:22
449:7,10 451:8
**defendant** 382:2
**defendants** 380:8
**defense** 435:20
495:8 498:22
504:4
**definitely** 394:14
420:12
**definitive** 398:8
400:2,11 445:25
**delivery** 430:15
**demonstrated**
460:9
**denver** 381:15
**depends** 406:2
472:23 473:11
**deposed** 498:24
**deposition** 380:6
380:15 384:3
385:1,6 386:24,25
388:4 393:12
394:1,24 395:10
396:6,9,10,18
401:14 479:9
481:6,15,25
498:10,14,20
509:15,19

dermatitis 419:22
dermatologist
  422:12 478:14
dermatology
  450:21
dermatopatholo...
  443:21
dermatopatholo...
  422:12 446:17
  472:1 478:14
dermatopathology
  449:11 497:22
  499:24
dermopath 448:8
  449:9
description 384:2
  477:17
designated 462:25
designing 477:7
  477:11,24
despite 400:12
destroy 459:3
destroyed 398:13
  398:19 435:14
details 448:4
determination
  453:10 461:13
determine 477:4,8
  477:12,24
determined 499:9
determining
  457:12 464:4
detest 450:21
diagnosed 389:19
  389:21 466:11
  482:22,23 483:1
diagnoses 389:8
  445:22,25 451:21
  474:8,16,21
diagnosis 389:11
  402:20 469:4

497:23 500:12
diagnostic 410:11
  419:5,15 459:23
  459:24 460:3
  468:23 470:9
  494:15 497:21
diagnostically
  407:16 431:11
diagnostics 390:3
  390:4 400:15
  409:4 419:4,21
  435:23 453:18
  469:2,7,17,18
  470:23 478:23
  480:23 500:2
die 402:12
difference 467:5
  476:13,17 502:1
differences 389:18
different 394:12
  399:18 400:6
  412:7 420:4
  476:13 482:13
  493:8
differential 459:22
differently 466:13
direct 405:3
  417:19 429:13
direction 423:14
  445:16 453:4
  457:15 503:12
disclosed 458:7
discuss 443:7
  456:15 464:8
  495:24
discussed 431:20
  447:17 455:24
  456:7 483:14
  503:16
discusses 390:12

discussing 448:2
  456:2 464:2
discussion 395:2
  405:18 415:25
  431:18 455:14
  458:4 464:16,17
  478:9 481:16
  483:4 487:2
  496:22 501:25
  502:16 503:2,11
  509:6
discussions 423:1
  425:9,13 431:3,8
  431:15 432:6
  434:15 478:18,19
  479:5 484:4
  491:13 495:25
  502:20
disease 400:6
  405:16 412:1
  419:23 459:21
  470:17 500:9
diseases 389:7,25
  399:18 400:4,5,7
  405:22 406:1
  409:1 410:4 411:4
  411:8 414:8
  419:15 453:3
  459:21 460:5
  468:18 470:2
  471:23 482:13
  493:8
distinction 398:25
  482:1
distinctions 419:9
distinguish 420:3
  459:20 466:9
distinguished
  420:6
distinguishing
  419:14

district 380:1,1
divide 397:22,25
  411:1 417:9
divides 417:8
  471:9
dividing 398:23,24
  399:1,2 417:16
  471:1
docetaxel 380:2
document 380:4
documents 390:17
  391:8,13,25 392:5
  392:9 396:24
doe 437:23,23
doing 389:6,25
  409:20 419:25
  424:15,19 425:2
  433:19,23 442:16
  442:21 445:13
  450:4 451:13
  453:22 460:21
  462:8 494:7
door 452:18
doubt 456:11
  503:3,11
dr 385:2,6 391:9
  392:6,9,11 393:25
  405:14 406:6
  407:5 421:10
  422:11,17 423:1
  424:17,21 425:9
  425:22 426:14,25
  427:1,3,8,9,11,14
  427:20 428:6,10
  428:14,16,19
  429:3,11,13,16,22
  434:24 436:14,14
  437:14 438:23
  439:3 442:19,21
  443:6 444:12,16
  445:1 446:3,7,20

448:19 449:4
451:24 458:5
478:9 484:25
501:13,20 502:3,9
**draft**  396:6
**drawn**  500:24
501:3
**drill**  386:14
**drive**  380:11,17
**drug**  401:24 402:8
403:2,17,19 404:6
404:8 412:22
477:5
**drugs**  475:3,13
**due**  403:1,9
**durden**  380:4
385:7 389:20
409:18 420:1
424:23 425:24
428:7 430:20
432:1 436:5 444:1
444:5 447:9
451:10 452:3,24
467:7,17 468:13
469:21 471:15
474:1,17 475:25
479:10 490:18
491:25 492:5,14
493:23 497:17
498:17 499:15
503:23 504:6
**durden's**  401:10
425:15 434:12
448:14 466:14
488:16

**e**

**earlier**  404:11
442:12 444:25
453:24 458:25
465:22 466:8
467:19 501:12

**early**  420:8
**earnest**  380:5
389:20 401:9
409:17 420:1
424:23 425:14,24
428:7 430:19
431:25 434:12
436:4 444:1,5
447:9 448:14
451:9 452:2,24
466:14 467:7,16
468:12 469:22
471:14 474:1,17
475:25 479:11
488:15 490:18
492:2,5,13 493:22
497:16 498:16
499:15 503:23
**earnest's**  504:6
**east**  438:8,20
**eastern**  380:1
**edge**  463:20
**editorial**  450:20
**edits**  479:7 506:6
**educating**  394:6
**education**  456:22
503:1
**either**  414:16
416:19 429:18
465:1 479:1
501:18
**else's**  461:10
**email**  384:9,10,11
384:12,16 390:12
390:13 392:1,7
395:20,24,25
420:8,13,17
423:17 424:5,17
424:21 425:17,25
426:1,3,6,8,13,20
426:20 428:21,25

430:17,23 432:8
434:2,19,23 436:9
436:12 438:8,23
439:1,6 442:10,13
442:19 443:3,13
443:16 444:20,25
445:12 446:13
451:16 452:5
453:24 458:6
484:8,15,19
485:17 487:8
488:9 490:15
491:22 494:17
495:5,13,23
496:10,11 501:13
501:19
**emails**  390:20
391:1,5,12,18,21
395:11,12 396:1
396:25 427:22
433:13 434:11
498:3 504:18
508:2
**embedding**  424:9
**emphasize**  439:22
444:20
**emphasizing**
490:4
**ended**  439:14
**enter**  410:10
437:24 438:1
**entered**  440:17
**entice**  445:18
**entire**  393:17
405:12 407:8
506:4
**entirely**  398:6
407:4 414:3
415:11 419:19
431:21 459:12
500:5 506:10

**entities**  473:4
478:25 479:3
**entity**  416:24
419:6 452:12
**entries**  447:7
499:4
**entry**  394:3 395:9
454:9 455:7
457:20 496:19
497:6 502:9
503:21
**envisioned**  482:6
**epithelial**  472:15
**epithelium**  470:15
472:13
**erythematosus**
408:7
**es**  435:24
**especially**  460:9
**esquire**  381:4,12
382:4
**essentially**  397:7
473:12 475:21
**estrogen**  475:21
**et**  447:14
**event**  439:10
441:2
**eventually**  413:24
453:6 481:3
494:12
**everybody**  446:13
452:5
**evidence**  389:13
440:19 456:2
473:22
**exactly**  475:1
**examination**  383:2
386:7
**exception**  504:3
**exchange**  420:17
428:25

exchanged   391:18
  393:14
exchanges   436:13
excluding   477:17
  477:19
excuse   447:21
  465:8
exercise   389:6
exhaust   416:15
exhausted   459:6
exhaustion   413:22
  414:7,10,17 469:6
exhaustively
  460:9
exhausts   415:9
exhibit   384:3,4,5,6
  384:7,8,9,10,11,12
  384:13,14,15,16
  384:17,18,19
  386:23 387:1,6
  390:5 393:22,25
  394:15,17 395:6,8
  396:23 402:14,17
  404:14,17 413:21
  417:17 420:14,16
  428:22,24 430:22
  434:20,22 436:10
  436:12 447:3,5
  454:6,8 456:25
  457:2 465:20
  466:1 469:2
  478:11,12 481:8
  481:11 484:16,18
  496:12,15 497:3,5
  504:18 505:20
exhibits   384:1
exist   454:25
existence   498:20
existing   406:7
expanded   474:11
  500:18

expect   400:16
  405:7 407:23
  412:4 417:12
  439:25 470:4
  509:3
expectations
  470:2 471:24
  473:5
expecting   439:18
expense   468:1
expensive   432:21
  467:20,21 468:10
experience   407:5
  432:17 470:1
  500:1
expert   380:6,14
  385:1 419:13
  421:11 423:12
  424:12 439:4
  445:13 462:25
  463:1,7 466:24
  467:12 469:9
  482:8,12 500:8
  509:19
expertise   435:13
  467:11 469:14
experts   390:8
  392:25 432:7
  435:20
explain   399:24
  446:18
explaining   448:2
explore   482:5
expressed   472:12
expression   405:16
  405:19 410:22
  424:2
extent   392:13
  407:21 446:14
  454:25 461:21
  484:13 501:24

extra   435:22

**f**

fact   402:3 450:19
failed   419:19
fair   398:12
fall   480:6
favor   446:22,22
fda   399:16 400:14
  405:20 410:23
  418:25 431:10
  433:18 467:22
  486:15
features   470:10,18
  493:18 503:5
february   394:3,20
  396:10 498:25
federal   449:24
fedex   429:24
  430:5
feel   445:8 451:4
  505:24
feigel   502:9
felt   500:10
female   389:12
  466:22
file   455:4,5
filed   387:7
files   455:4
final   507:15
find   388:21 407:10
  419:19 420:2
  456:2 495:19
  508:17
finding   480:16
findings   439:10,23
  440:10,20 441:2
  442:24 443:7
  444:21 450:17
  500:17
fine   505:3

finish   416:11
finished   448:11
  466:20
first   401:14
  404:23 410:21
  424:11,13 433:24
  445:12 447:6
  479:7,9 487:22
  494:20 506:18
fit   493:1
five   457:6 480:2
flip   412:2
floor   382:15
focus   402:22
  417:22
focused   441:1
follicle   394:4
  397:6,13 398:5,19
  402:1 407:8 411:4
  412:9 416:3,23
  417:6 459:9,11
  461:6,15 462:3,18
  463:17 464:6,10
  464:23 471:3
follicles   406:2
  413:23 439:25
  444:23
follicular   397:14
  397:18 403:2,11
  403:20 404:9
  405:3 407:11
  417:19,23 418:5
  470:15 472:13
  479:4 494:19
  507:19 508:4,11
foregoing   510:4,5
forgetting   436:7
forgot   465:21
form   403:21
  405:10 408:24
  409:24 410:19

412:6,18 413:1,7
413:19 414:19
415:17 416:20
418:6,20 422:20
423:5,10,20 425:6
426:16 427:17
431:6,17 432:10
432:15 433:7
434:7 439:20
441:19 443:2
445:10 446:11,25
448:23 450:13
451:14 453:1,13
454:3 455:22
456:17 458:2,20
459:5,10,17 460:7
460:25 461:16
462:4 463:18
465:3,9 466:16
467:8 468:14
469:24 470:8
471:18 472:9,22
473:19 474:6,22
476:4 477:14
479:19 481:2
483:19,24 484:7
492:16 493:4
494:11 499:11,19
500:15 501:8
502:6,23 503:17
504:14 505:1
**forming**  401:22
**formulation**  477:4
**forth**  391:22 416:7
**forward**  396:3
484:6
**forwards**  395:24
**foundation**  489:6
**four**  443:24,24
506:19,23 507:7

**fourth**  394:21
506:18,25
**francis**  380:5
389:20 401:9
409:17 420:1
424:24 425:15,24
428:8 430:20
432:1 434:12
436:5 444:1,5
447:9 448:14
451:10 452:3,24
466:14 467:7,17
468:12 469:22
471:14 474:2,17
475:25 479:10
488:15 490:16
492:2,5,14 493:23
497:17 498:16
499:16 503:24
504:6
**front**  481:11
**full**  417:18 450:8
510:6
**further**  417:21
458:22 462:8
474:24 476:3,19
490:25 492:8,11
492:24,25 493:24
510:9
**future**  457:19

### g

**general**  414:24
487:2
**generally**  414:21
479:5
**getting**  440:16
478:15
**giant**  404:23
507:15
**give**  386:2 445:25
488:7 509:3

**given**  435:7
464:14
**giving**  386:20
458:15,18
**glass**  498:8,8
**glob**  492:19
**gmail.com.**  395:23
**go**  386:11 393:20
407:25 414:12
426:19 430:4,11
432:20 433:14
435:9 440:1
441:20 468:5
487:5 490:1
491:11 505:17
508:16
**goal**  409:2
**goes**  414:7 420:25
430:14 435:1
459:11 471:9
481:23 486:4
490:21
**going**  386:23
390:2 393:20
399:3 402:17
404:20 409:3
410:20 421:2,15
421:22 425:10,14
429:7,16,20
431:19 432:20
433:14 434:11
435:4 440:10
445:21 448:3
451:6,20 453:14
453:17 457:14
458:7 461:8 467:1
468:11 472:16
476:5 477:14
478:2 481:20
482:16 483:17
491:16,16 497:21

503:1 509:10
**good**  386:9,10,11
400:11 417:5
433:19 452:20
460:10 508:19
**grand**  382:7
**great**  468:20
**green**  405:23
410:7 411:6
423:25 470:20
476:11
**grossing**  435:10
**ground**  505:24
**group**  405:25
**grow**  476:9 480:3
**growing**  398:24,25
399:2,2,7 400:3,21
415:1,1 416:5
417:6,7,10,12,15
471:5,7,10 475:11
475:11 479:25
480:8,13
**grows**  415:2
417:11
**growth**  480:5
**guarantee**  445:20
**guess**  412:2 453:9
461:4 463:8,9
470:6 476:2
505:17
**guidance**  463:14
464:3 484:5
**guide**  402:20
461:4 469:8
**guy's**  404:20

### h

**h**  380:3
**h&e**  389:10 390:4
393:18 435:24
439:23 444:21
470:11 498:8

h&es 491:20
hair 389:7,12,24
 397:5,12 398:4
 399:11 400:4,5
 401:25 402:1,9,11
 402:25 404:6
 408:5,17 410:3
 411:3,4 413:23
 415:2,24 416:22
 417:5,9,10,11
 419:5,12,22 424:7
 424:10,12 435:13
 435:18 439:24
 444:22 459:9
 461:6,15 462:3,18
 463:17 464:5,9,23
 466:22 469:9,10
 469:10 470:7,13
 471:3,4,6,7,10,17
 472:8 475:9,15
 478:20 480:6,9,9
 480:22 482:11,13
 493:12
hairs 470:12,12
 476:9 480:1,8
halt 505:25
hammer 411:2
hammers 411:13
hampers 478:22
hand 510:13
handed 420:16
 434:22 436:12
 457:2 484:18
handing 404:17
 428:24 447:5
 454:8
hands 427:6
happened 436:1
happy 495:24
hardy 382:6

harm 403:19
 404:9 461:6
 479:17
harmed 499:16
harms 461:14
 463:17 472:4
 477:5,8,12,25
head 480:2 502:15
healthy 470:6
 471:17 472:8
hear 433:12 476:3
heard 484:2
hello 437:4 485:18
help 419:8 459:20
 461:4 469:17
 480:22
hematoxylin
 435:24
hereof 510:13
hereunto 510:13
high 397:20
higher 447:23
highlights 406:21
 406:21
hillary 382:5
 385:13 508:17
hinshaw 382:14
hinshawlaw.com
 382:18
hipaa 438:4
histopathologic
 394:10 466:25
 469:4 503:5
histopathological
 402:19
histopathology
 394:7,8 419:12
 493:15 503:1
historically
 414:25

histotechnologists
 435:11
hit 406:23 407:13
 407:18,18 414:25
 416:5
hits 400:2 407:7
 407:19 470:25
 479:21
hitting 407:21
 424:2
hnicholas 382:10
hold 428:11
hope 409:3 419:11
 439:8 444:14
 445:23
hoping 419:7
 426:25
hour 380:16
hours 394:21
 395:3,9 396:5
huh 395:4 421:4
 421:12 422:1
 430:25 457:8
 484:21 495:20,21
hump 433:24
hypothesis 399:19
 403:8,17 409:21
 461:25 468:6,11
 469:22 471:15,20
 494:8
hypothesized
 401:22 416:6
hypothesizing
 403:9 404:3
hypothetical
 408:20 459:1
 465:2 478:6

**i**

ich 507:4
idea 401:12,13
 410:10 428:9

433:24,25 448:17
 450:24 483:11
ideation 445:20
ideations 453:17
identifiable 450:6
identification
 387:1 393:22
 394:17 395:6
 402:14 404:15
 420:14 428:22
 434:20 436:10
 447:3 454:6
 456:25 484:16
 496:15 497:3
 505:20
identified 455:3
identify 437:22
 438:4 473:15
identifying 394:4
 437:21 468:25
 477:22
identity 463:1
images 394:5
immediately 388:6
immunohistoche...
 395:18 410:23
 418:24 419:8
 447:8 451:22
 460:12 486:14
 493:16
immunohistoche...
 405:19 439:8
immunohistolog...
 444:9,17
immunos 388:22
 503:4
impact 390:3
 459:8 461:5 462:2
 462:17 464:5,9
 474:4 475:8
 480:20,21

impacted 464:22
impacting 418:18
impacts 403:11
  460:22 461:14
impasses 419:5
  468:23
implementing
  463:16
implications
  478:24
implied 436:2
important 421:19
  444:15 445:8
  450:11 475:9
imprecisely 488:3
impression 461:10
imprudent 440:7
  450:17 500:2
inaccuracy 507:10
  507:11
inaccurate 398:7
include 422:18
  440:18 449:7
  450:11 453:11
  479:1,2 501:6
included 440:13
  440:19 441:15
  446:3 453:21,25
  499:17,24 500:13
  502:3
includes 442:13,19
  507:8
including 392:24
  396:25
incorrect 507:9
index 383:1
indicated 420:7
indication 473:17
  473:21 492:14
individuals 397:1

induced 389:9,14
  389:23 394:11
  399:13 408:14
  414:6 423:15
  440:3,13,22
  452:14 456:3
  466:9 470:10
  487:18 493:11,19
  497:24
industries 385:23
inflammation
  470:16
inflammatory
  419:22
information
  437:21 439:11,12
  439:15,17,19
  440:18 441:3,4,11
  441:15 442:4,25
  443:1 444:24
  453:25 458:13
  488:6,7 489:7
  499:17
inhibitor 475:19
initial 409:13
  418:9 475:6
  494:13
initially 428:14
  448:19 498:10
inquiry 393:18
instance 411:22
  471:3
instruct 458:8
  461:8 462:21
  463:2 488:6
instructed 387:23
  458:11
instructing 464:12
  489:2
instruction 458:12

instructions 427:2
intend 393:17
intent 482:2
interaction 392:14
  422:16
interest 390:1
  400:5 419:10
  429:25 451:18
  457:18 468:15,20
  468:24 493:6
  497:20 510:11
interested 422:14
  462:7 480:15
interesting 466:23
  467:10 502:2
internal 433:22
  435:8
interpretation
  440:16,24 455:25
  456:21
interpreted
  447:13
interrupted 465:8
introduce 385:9
  458:14 461:21
introduction
  461:20 505:4,7
investigated 494:2
investigation
  411:3 414:4
  451:24 452:19
  474:24 476:19
  494:13 506:16
investigational
  389:6,15 390:1
  399:12,16 400:9
  406:23 407:4
  418:11 419:3
  431:10 432:17
  440:4 450:15
  451:18 467:22

469:16 474:10
investigationally
  407:16
investigations
  408:16
invoice 384:4,5,6
  384:13,14,15,17
  384:18 390:6,11
  391:14 393:5,21
  393:24 394:15,16
  395:5,8 396:11,14
  396:16 447:2,6
  454:5,9 456:24
  457:3 481:8 483:6
  483:9 485:5,9,22
  486:9 496:14,18
  497:2,6,8,9,11
  498:1,4 504:8,11
  504:24 508:2
invoices 390:18
  393:5,20 396:19
  498:25 502:9
  503:20 507:13
involve 482:16
  491:18
involved 392:12
  430:15 471:4
  477:3,7 482:3
involvement 482:9
  484:14
issue 424:4 439:11
  441:3 442:25
  500:21
issued 440:25
  441:8,10 456:22
  456:23
issuing 439:14
it'd 466:23 473:5
item 390:5 396:24
items 425:18

## j

**jane** 437:23,23
**job** 433:20
**john** 381:4 385:15
  395:3 456:14
  484:20 485:18
  496:19
**journal** 450:20
**judge** 396:7
  505:14,19
**june** 456:13

## k

**k.m** 380:15
**k.m.** 510:3,20
**kansas** 382:8
**karman** 381:7
**kathleen** 382:13
  385:22
**keep** 417:10 436:7
  443:25 476:5
**kekelly** 382:18
**kelly** 382:13
  385:21,22,22
**keratin** 416:1
  472:13
**ki** 387:12 388:23
  389:4,5 395:19
  396:2 397:7
  398:22 399:5,9,19
  399:21 400:2,17
  400:25 401:5,9
  409:17 425:23
  432:2,4 443:8,12
  446:21 447:9
  448:13 449:4,8
  450:5,12 451:9
  452:2,23 454:10
  454:24 455:15,21
  456:8,15 457:7
  459:15 460:3

465:23 467:6,16
468:10 469:21
470:5,21 471:13
479:21 496:22
497:16 498:15
499:4,14 500:11
501:14,20 503:8
507:4
**kill** 402:10 409:3
  416:15 461:6
**killed** 399:20
  412:22 499:17
**killing** 408:21
  409:22 410:14
  413:17
**kills** 401:25
  414:17 415:9
  461:14 463:17
**kind** 413:11
  417:14 450:3
  451:16,24 463:19
  470:24 479:23
  507:15
**knew** 426:13
  434:11 435:18
  442:16,21,24
  443:4 445:14
  446:20 505:12
**know** 386:15,17
  387:6 388:4 392:3
  393:4 399:10
  402:5 408:15
  411:10,24 413:11
  415:19 416:22
  423:13 427:11,14
  427:16,18,20,23
  427:24 428:3,5,13
  429:16,23 433:8,8
  433:17 434:3
  435:11 440:9,22
  441:6,8,10 444:12

444:16 448:3
451:6 452:19
453:6 455:19
456:6 457:17
460:18,19 464:20
464:25 469:25
471:19,19 472:1
472:10,16 473:22
474:9 475:2,4,4,12
475:20 480:11
483:12,18,20,22
484:2 485:10,11
485:13 488:2,10
488:25 490:1
491:4,5,19 493:15
494:20 495:4,18
496:5 500:16,21
501:15 502:3,8,14
502:15 504:10,13
505:14 506:13
508:8
**knowledge** 416:10
  416:17 422:13
  425:7,12 443:9
  445:6 449:20
  494:18 495:2
  497:12 503:23
**knows** 416:4
**kolivras** 404:21,22
  405:14 406:6
  478:9

## l

**lab** 388:5,18
  429:19,21 430:5
  433:21 481:16,20
  490:20 498:7
**labeled** 435:8,9
**laboratory** 392:14
  424:6 431:11,13
  435:12 438:5
  467:25 482:11

486:15 506:24
**lack** 384:8 404:18
  410:6 452:12
  473:21
**lake** 380:12,17
**large** 444:22
  452:15 470:11
  482:10
**larger** 439:24
  440:21,23 451:17
  451:23 453:16,22
  462:16 474:11
  500:25 501:9
**lauren** 381:5
  385:17 436:13
  438:8,17
**law** 381:5 382:5
  382:13
**ldavis** 381:10
**lead** 450:25
  494:12
**learn** 453:3 495:1
**lecture** 458:15,18
**lecturing** 460:24
**left** 470:12 484:1
**legal** 435:19 438:3
  440:16,17 467:11
  467:12 500:6
**letter** 384:19
  396:6 405:13,18
  409:11 410:5
  452:11 468:19
  478:12 505:14,19
  506:3,11 508:7
**letters** 406:14
**level** 419:11,16
  493:6 501:24
**liability** 380:3
**lichen** 405:16
  410:2 468:19

light  405:23,23
  410:7,7 411:5,6
  423:25,25 470:19
  470:20 476:11,12
limit  446:16 503:8
limited  392:24
  396:25 411:3,15
  422:14 425:25
  460:12 461:17
limiting  415:25
  443:25
line  446:7 485:7
  485:14 506:25
lisa  456:3
list  387:6 401:18
lists  466:1,4
literature  401:18
  401:21 465:1
litigation  380:3
  393:1 483:10,17
little  397:5 410:21
  411:12 419:23
  450:22 475:12
  495:5 506:13,15
  506:17
llp  382:6
long  480:3
longer  417:23
  444:2 460:18
look  387:3,17
  390:12 399:13,14
  399:17 413:21
  417:17 419:3
  433:13 452:9
  459:16 476:10
  496:5 497:21
  501:16 506:14
looked  428:1
  430:22 445:23
  452:4,6 453:24
  464:21 503:20

504:1,3
looking  397:8
  403:23 410:8
  411:7,11 418:12
  419:5,12 423:22
  440:1 442:5
  445:17 450:5
  452:10 459:18,19
  460:2,14 461:9
  466:8 469:15
  470:21 493:7
looks  393:25
  394:19 396:11
lose  408:3,7
  413:24,24
loss  389:7,12,24
  399:11 401:25
  402:9,11,25 404:7
  404:18 405:2,8,15
  405:21 406:17,18
  407:24 408:5,9,18
  408:18,23 409:1
  409:23 410:3,22
  411:4 417:18
  419:6,12,23 424:7
  424:10 435:13,18
  439:24 444:22
  466:22 469:9,10
  470:11 478:20
  480:22 482:12,13
  493:13
lost  417:24 424:1
  430:5,9
lot  414:22 470:1,2
  471:22,23 475:13
  478:19,24 482:12
  502:25
lots  478:18,18,18
louisiana  380:1
luck  484:10

lupus  408:6

**m**

m.d.  380:7,15
  383:2 509:19
madness  409:2
magic  411:2
magistrate  391:2
  488:3
main  407:1 429:25
  435:23
making  419:8
  430:1 471:4 480:9
march  392:7
  395:1,9 396:5
  420:17,20 426:21
  430:23 431:3
  445:1 505:23
mark  386:23
  393:20 402:17
  505:17
marked  386:25
  393:21 394:16
  395:5 402:14
  404:14 420:13
  428:21,24 434:19
  436:9 447:2 454:5
  456:24 484:15
  496:12,14 497:2
  505:20
marker  398:8,21
  400:2 406:20
  422:10 424:16,20
  426:15 431:25
  432:14,19,23
  472:5
markers  417:13
  421:3,18,25 422:5
  422:7,9,18,22
  423:3,8,19 425:3
  425:10 445:2,7,21
  446:4,8,9 448:20

460:11,17 473:23
  495:11,15,16
marking  393:24
  394:15 395:8
  408:3
massachusetts
  382:16
material  387:10
  435:20,21 452:20
  489:12,12 498:21
materials  387:12
  388:20 391:5
  481:18,21
matter  418:9
  449:12 510:4
mdl  380:2
meadows  380:11
  380:17
mean  390:24
  414:1 415:22,23
  423:25 435:5
  439:21 448:17
  454:16 455:23
  457:17 473:8
  474:25 486:12
  487:10 500:23
  503:7
means  389:1 403:6
  495:21
mechanism
  401:23 402:8
  403:9 404:4,5
  408:20 413:15
  414:14 415:6,13
  415:15 416:7
  459:1 461:25
  465:5 472:3 478:6
  479:15 493:1
  502:21 503:9
mechanisms
  401:15 503:14

**medical** 414:24
**medication** 475:3
**medicine** 440:19
  475:5
**meet** 490:22
**meeting** 394:19
  456:13,15
**meetings** 425:19
**melanocyte** 416:2
**melanoma** 419:21
  470:24
**memo** 390:10,14
  457:22
**mental** 461:9
**mention** 393:10
  444:9,11 498:15
  498:19
**mentioned** 442:12
  443:16 467:19
  484:23 501:12
  503:13
**mess** 424:10
**messed** 430:9
  508:17
**micromanage**
  430:13
**microscopic** 394:5
**milazzo** 396:7
  505:15,19
**miles** 490:19
**mind** 418:2 505:2
**minute** 448:18
**missing** 417:4
**missouri** 382:8
**mole** 470:24
**molecular** 408:15
  469:1,6 475:13
**molecule** 400:24
**moment** 399:4
  470:14

**monday** 429:8,17
**money** 467:12
**month** 466:18
**months** 409:13
  449:14,14 457:6
  507:16
**morning** 386:9,10
  437:6 439:9
  507:13
**mother** 475:5
**move** 406:15
  408:8
**moved** 503:4
**multiple** 423:14
  468:21
**muscle** 397:14

**n**

**nail** 411:14
**name** 386:12
  404:21 437:5,15
  437:17,20 455:4,5
  463:5 477:22
  485:3 486:8
**near** 397:15
**necessarily** 503:18
**necessary** 427:1
**need** 387:20
  397:24 437:19
  444:24 447:22
  452:16 466:24
  469:14 474:11
  484:1,12 490:21
  495:24
**needed** 435:19
  437:20,22,25
  476:17 495:10
**needs** 417:8 494:1
**negative** 398:15
  399:7,21 400:17
  401:1,6 410:17
  411:9 412:24

451:2 470:4
471:16 472:7,20
472:24 473:2
486:19 492:10,24
493:21 494:3
500:19
**neither** 510:9
**nestin** 433:1,6,15
  433:23,25 484:10
  494:22,23
**never** 391:18
  407:16 408:13
  414:4 423:12
  426:2 430:3 433:3
  433:17,23 438:2
  446:10 450:14
  451:23 483:14,25
  484:2 489:11
  490:15,17 500:4
**new** 393:6,20
  402:18,19 406:16
  417:9 423:13,14
  457:19 468:25
  469:5 471:10
  475:13
**newport** 381:8
  427:4
**nice** 452:19
**nicholas** 382:5
  385:13,13
**nine** 480:4 491:19
**nods** 495:14
**non** 399:16 400:13
  406:9,11 408:2,4,8
  414:8 431:10
  433:18 440:22,24
  462:25,25 463:7
  467:22 469:9
  471:23 478:21
  482:8 486:15

**noncicatricial**
  402:23 403:1,5
  406:9 408:2
  478:22
**nonspecific** 400:1
  494:22
**nope** 428:20
**normal** 405:25
  435:17 472:16
  493:10
**notary** 380:15
**notes** 508:17
**notice** 384:3
  386:24,25 396:24
**november** 498:11
**nuclei** 470:25
**number** 390:10,16
  391:8,13,24
  392:15,22 393:4
  430:12 435:8

**o**

**object** 441:18
  477:14 481:22
  487:2
**objected** 387:10
**objecting** 441:22
**objection** 390:23
  403:21 405:10
  408:24 409:24
  410:19 412:6,18
  413:1,7,19 414:19
  415:17 416:20
  418:6,20 422:20
  423:5,10,20 425:6
  426:16 427:17
  431:6,17 432:10
  432:15 433:7
  434:7 439:20
  441:18 443:2
  445:10 446:11,25
  448:23 449:18

450:13 451:14
453:1,13 454:3
455:22 456:17
458:2,20,21 459:5
459:10,17 460:7
460:25 461:16
462:4,24 463:18
464:11 465:3,9
466:16 467:8
468:14 469:24
470:8 471:18
472:9,22 473:19
474:6,22 476:4,21
479:19 481:2
483:19,24 484:7
486:23 487:21
492:16 493:4,25
494:11 499:11,19
500:15 501:8
502:6,23 503:17
504:14 505:1
**objections** 387:7
**obviously** 431:8
  468:2
**occurred** 430:1
**october** 497:7
**offer** 480:24
**offered** 479:10
**offering** 444:13
**office** 485:11
**official** 440:7,24
**oh** 406:10 421:21
  424:25 487:13,13
  487:13,13 489:5
  501:25
**okay** 387:9,15
  401:8 403:15,22
  403:25 404:23
  415:12 420:20
  421:10,23 442:2
  442:12 448:1

450:1 455:12
458:23 481:10
504:2 507:10
509:16
**older** 414:21
**once** 397:25 410:6
  412:9 413:20
  452:18 468:15
  471:9 472:23
  478:2 481:23
  488:22
**oncologist** 414:23
  414:23
**ones** 393:6 395:13
  408:4 431:21
**ongoing** 402:9
  403:12,18 404:6
  413:16 414:15
  415:8,14 416:8
  442:6 446:23
  457:18 459:2
  462:1 465:7 475:3
  475:8,17 478:7
  479:16 480:17
  483:1 493:2 494:9
  500:12 501:4
  502:22
**onus** 486:15
**open** 423:13
**opinion** 442:11
  444:13 474:7
  479:10 500:8
**opinions** 401:22
  464:14 474:5
  480:20,24
**opposed** 432:14
**order** 431:12
  509:12
**ordering** 429:8
**oregon** 380:12,16
  380:17

**organization**
  497:7
**organized** 433:4
**orientation** 424:8
**oswego** 380:12,17
**outcome** 510:11
**outside** 426:2
**overseeing** 479:7
**oversimplifying**
  472:2

**p**

**p.m.** 420:20
**page** 383:1 384:2
  387:6 402:22
  495:5 506:19
  507:14
**pages** 510:5
**panel** 468:22
**paper** 404:4 469:2
**papers** 479:6
**paperwork** 435:8
**paragraph** 404:24
  439:6 494:17
  506:18,24 507:15
  507:16
**paralegal** 438:14
  438:15,20
**part** 399:10 406:5
  409:21 446:2
  478:17 491:16
  510:10
**partially** 473:10
**particular** 430:18
  453:18 469:20
  470:22 479:16
**party** 392:23
**pathologist** 419:16
  424:12
**pathologists**
  394:13,13 469:9

**pathology** 387:11
  388:20 389:4
  401:10 419:4,12
  420:10 421:3,16
  421:24 422:4,19
  423:3,9,18 424:7
  424:16,20,22,23
  425:3,11,15
  426:15 428:7,11
  428:13 429:17
  432:1 434:13
  440:8,24 444:4,8
  444:10,13,18
  445:2,7,24 446:4,8
  446:9 448:14
  466:13,15 471:16
  471:17 481:17,21
  483:5 488:18,20
  488:23 489:4
  490:16 493:22
  497:13 498:7,16
  498:21 503:21,24
  504:4,6,12 507:17
**patient** 455:3
  474:10 475:2
  493:6
**patient's** 437:20
  500:9
**patients** 421:19
  445:22,24 452:14
  452:15 468:1
  474:8 482:3
  487:18 489:11,12
  491:18 494:4
  506:20,23 507:7
**pattern** 389:12
  408:5 410:8,9
  411:15,20 412:4
  418:13,16 419:13
  420:4 424:4
  440:12 442:6

466:22 469:23
472:25 476:6,14
476:18
**patterns** 411:7,11
412:8 418:22
423:22 440:2
450:6 459:20
460:14 466:8
468:20 469:16
470:21 475:9
493:7
**pay** 467:15
**paying** 483:13
**pcia** 490:24
506:23
**penalty** 386:2
**people** 406:10,15
407:3 421:1
430:15 450:22
**percent** 469:11
**performed** 389:2
469:12
**performing** 501:9
**perjury** 386:2
**permanent** 389:8
389:13 394:11
399:13 400:4
402:11,25 405:4
406:11,12 408:9
408:13 414:5
417:20 423:15
439:24 440:2
444:22 452:14
456:3 470:10
487:18 493:11,19
497:24
**persistent** 401:25
**person** 391:14,19
391:25 392:3
427:9 461:20,22
463:5,11 464:2

478:8 489:3 495:1
497:8,9,11,15,20
498:1,3,6,7 501:19
503:22 504:7,10
504:17 505:5
508:1,1,4,10
**personal** 395:22
**pertaining** 487:17
**pharmaceutical**
382:12 385:23
**phase** 470:13
480:5 493:12
**phases** 394:4
**phd** 478:15,17
479:5
**phone** 395:10
425:19 455:18
481:12 495:24,25
501:18 508:14
**photographs**
454:14,17,19,21
454:24
**physician** 478:13
**picture** 450:9
**pictures** 394:9,10
**piece** 473:22
**pili** 397:14
**pilot** 399:12
467:13 500:18
**place** 430:3
**plaintiff** 392:23
394:6 421:11
426:11 442:14
504:20 505:11
506:5
**plaintiffs** 381:3
385:16,17,20
387:7 390:7
392:24 394:20
395:2 420:23
421:16 432:7

438:9,11,18,21
439:4 443:23
458:17 463:6
467:15 483:9,12
489:4 490:5 504:4
**planning** 395:2
**planopilaris**
405:16 410:2
468:19
**please** 386:17
387:19 458:21
**point** 404:2 406:19
424:3 436:1
446:22 451:12
453:10 456:18
457:11 460:13
463:19 475:1
482:7 487:12
490:12 491:8
500:6 503:4
**points** 412:8 486:5
**poole** 392:6,9,11
427:1,8,9,11,14,20
428:7,10,14,16,19
429:11,14,16,22
434:24 436:14
437:14 438:23
**poole's** 427:3
**poor** 450:23
474:15
**portion** 397:12
**position** 393:19
**positive** 398:11
406:1 411:9
417:13 451:1
473:1,13 476:8
479:23 486:19
490:23 491:23
492:4,7,13 494:2
500:19

**positively** 412:17
**possession** 391:25
392:6,15 425:1
427:4,9
**possible** 405:11
414:6 427:6 479:1
506:23
**potential** 397:20
430:4 491:17
503:9
**potentially** 401:24
410:16,17 418:4
472:6 480:19
481:17 483:5
488:7
**practical** 402:20
469:8
**prep** 457:21
**preparation**
502:16
**prepare** 435:19
**prepared** 435:22
435:24 443:17,18
443:20 448:9
450:14 500:4
**preparing** 496:20
506:2
**present** 388:25
398:10 399:6
400:25 407:15
412:16 418:5
470:16 473:9,18
**preserved** 397:9
417:24 428:12
**presumably**
437:13 443:4
454:21 455:16
485:10 486:10
487:16 508:6
**presume** 489:13

**presuming** 487:23
**pretty** 397:22
 415:25 451:19
**prevent** 386:19
**previously** 432:24
**primary** 384:7
 402:13,18
**prior** 396:6,9,19
 405:15 410:1
 432:18 442:3
 471:21 473:2
**probably** 398:16
 403:14 433:14
 448:2 454:17
 455:5 466:17
 485:15 494:14
 500:20
**probing** 440:5
 474:9
**problem** 421:2,19
**proceedings**
 380:16 510:4,6,10
 510:11
**process** 386:15
 388:8 435:4 450:4
 487:5
**processed** 424:6
 435:15
**processing** 435:1
 451:21
**produce** 395:15
**produced** 390:20
 391:1,1,6,11,20
 392:10,20 393:2
 393:16 395:13
 397:3 455:5 499:8
 499:10
**producing** 387:10
**product** 458:4,8
 458:21 461:7
 462:21 464:18

477:16 478:3
 482:7 486:25
 488:5,24
**products** 380:3
**professional**
 422:16 440:16
 455:25 456:21
 474:7 500:1,8
**project** 399:12,12
 478:17 482:5,15
 482:16 490:11
**projects** 423:14
 468:17,21
**proliferating**
 471:1 479:22
**proliferative**
 397:20 417:13
**promise** 441:7
**proper** 474:11
 500:19 501:5
**properly** 451:20
**proposed** 408:20
 415:6 426:14
 459:1 472:3
 479:14 502:21
**proposing** 403:16
 451:16,24 490:11
**protected** 449:24
 456:18 458:9,21
 461:7 462:20,25
 463:2 477:16
 478:3 486:25
 488:24
**protocol** 435:17
**prove** 411:16
 433:21
**proven** 417:2,3
**provide** 458:13
 463:14 464:3
 482:14 484:5
 491:16 500:8

**provided** 482:19
 498:21 500:12
**providing** 450:8
 451:21 469:8
 482:17
**provisional** 450:18
 452:19 467:13
**prudent** 467:11
**psoriasis** 475:14
 493:13
**public** 380:15
**publication**
 405:13,15,18
 406:15 409:12,13
 410:1,2,4,5 418:8
 418:9 452:10
 460:10 473:3
 478:11
**publications** 415:7
 432:18 468:17
 471:21 478:10,16
**publish** 450:23
 494:3
**published** 399:15
 400:3 402:3
 404:12 407:6
 408:13 409:8,9
 412:1 416:6
 418:22 419:18
 468:18 476:10
 499:25
**pulled** 387:25
**pulling** 469:6
**punch** 436:4
**purchase** 493:17
**purchased** 432:25
**purported** 486:17
**purpose** 407:1
**purposes** 483:10
 483:17

**pursue** 490:24
 492:8
**pursued** 492:11,24
 492:25 493:23
**put** 416:7 440:8
 441:5,12 449:12
 449:16 450:24
 454:20 467:25
 468:22 500:3,16
**putting** 500:22

**q**

**qualifications**
 427:11 508:8
**queried** 449:16
**query** 449:22
**question** 386:16
 403:13,14 414:13
 416:12 437:11,19
 437:24 451:5
 461:17 474:16
 478:2 482:1 489:9
 503:7,9 504:2
 505:2
**questions** 394:9
 465:21 489:16
 499:3,8 508:25
 509:3,9
**quickly** 397:23
 451:20
**quietly** 480:6
**quite** 416:3 420:7
 424:7 439:23
 444:21 474:12
 475:10,11,15
 494:4

**r**

**ran** 474:2,18
 498:15
**range** 482:24

**rashes** 419:22
**reach** 443:6
**reaction** 473:8
**reactivity** 474:20
  476:2
**read** 403:3 405:5
  417:18,24 423:17
  443:3 451:15
  469:13,13 489:16
  490:7,25 494:23
  507:20
**reading** 404:1
  445:19
**ready** 429:4
**realize** 507:12
**really** 387:5
  392:12 393:12,15
  400:11 402:22
  404:2 406:17
  408:19 411:17
  413:12 414:1,13
  419:10,15 433:17
  433:20 441:1,23
  460:8 470:22
  471:10 472:16
  476:6,9,11 480:4
  486:17 489:6
**reason** 389:25
  409:20 443:25
  445:17 460:17
  479:21 490:4
  508:9
**reasons** 417:21
  459:14
**recall** 465:24
  496:21,24 498:11
  499:1,5 501:17
  502:10
**receive** 427:2
  429:4 452:16
  509:11

**received** 506:23
**receiving** 424:16
  424:20
**recess** 388:13
  465:16 508:22
**reclassification**
  480:22
**recollection**
  425:16,21 502:25
**record** 385:4
  386:12 388:12,15
  393:11 436:3
  440:17 465:15,18
  508:21,24 509:5,6
  509:8,17 510:6
**recreate** 484:12
  491:10
**red** 405:23 410:7
  411:5 423:25
  470:19 473:10
  476:11
**redacted** 391:14
  392:1 457:21
  484:25 485:4,18
  490:15 494:18
  495:12 497:8,11
  504:17,18
**redaction** 485:7
  485:13 486:6,8
**redactions** 484:24
**redo** 484:12
  491:11
**redone** 484:13
**refer** 485:21
  488:14
**referenced** 504:7
  504:11
**referred** 390:6,11
  390:17 392:6
  404:11 481:8
  483:6,8 485:5,8

486:9 498:1,4
  504:19,24 508:2
**referring** 430:17
  430:19 437:2
  475:18 488:15
  495:16
**refers** 491:24
  507:23
**reflects** 442:11
**refrigerated** 427:5
**refute** 465:1
**regarding** 390:17
  391:9,25 392:6,9
  392:16,16 395:18
  397:1 408:15
  478:9
**region** 397:9,11,12
  397:17 398:4,14
  402:1,10 409:23
  410:15 412:23
  413:18 414:18
  415:10 416:16,24
  418:19
**relate** 462:14
**related** 497:23
  510:9
**relates** 380:4
**relating** 392:25
**relation** 460:6
**relationship**
  463:10 483:11
**relayed** 448:5
**relied** 401:21
  444:12
**rely** 444:24
**relying** 444:17
**remember** 401:15
  401:19 431:7
  445:4 448:1,4,15
  448:17,25 449:3,6
  449:13,15 455:16

455:23 458:16
  485:25 496:3
  501:21 503:2
**remembered**
  380:14
**reminder** 386:15
**reminding** 441:25
**remove** 470:17
**reopen** 393:17
**rephrase** 504:2
**reply** 404:18
  405:13 478:12
**report** 401:17
  440:8,14,20
  443:18 444:8,8
  449:9,13,15,23
  450:12,15 453:12
  453:21 454:1
  462:25 496:21
  499:18,20 500:3,4
  500:14,22 501:7
  502:4
**reported** 380:17
  510:3
**reporter** 380:15
  385:21,24 386:1,6
  509:16
**reports** 439:11,14
  441:4,10 443:1,17
  443:21 444:4,7,13
  444:18 445:24
  447:20 448:3,7,8
  449:9,11 456:22
  456:23 499:24
  500:17 507:17
**represent** 385:10
  385:12,14 454:23
**request** 395:17
  445:12
**requested** 484:1

research 389:15
399:15 408:12
418:23 419:5
422:15 423:11,13
425:18 427:15
428:4 438:3
445:15,16 453:2
457:12,18,23
458:1 460:21
462:8 468:17
476:3 478:16
480:15 482:15
483:13 494:7
497:22 506:15
researcher 389:7
389:24 399:11
450:16 458:15,18
467:4 481:17
483:6,8,13 485:4,8
485:15 486:9,21
486:24 487:1
488:21,23 490:15
491:7 495:17
496:2,9 505:11
507:19 508:5,11
508:14
reside 397:16
resources 421:1
respond 429:7
437:4
response 405:17
409:11 418:8
452:11
responsive 390:19
391:15 393:1
397:2
resting 470:13
rests 470:15
result 401:24
402:9 403:17
404:6 493:2

502:22
resulting 407:22
results 403:11
425:23 443:11
444:16 445:9
446:10,21 448:21
449:8 450:11
464:20,25 470:5
472:7,19 483:22
501:14,19 502:4
retained 392:25
421:11 432:7
439:4 463:6 482:8
501:11
reversible 402:24
403:1
review 391:2
395:11 396:6,9
402:6 406:5 414:3
435:21 457:21
469:2 484:25
reviewed 393:25
401:18 457:22
485:18 503:23
504:5,23 507:18
508:10
reviewing 395:12
460:23 461:13
504:25 505:8
508:13
right 394:14
396:12,23 397:9
397:14 398:11,23
399:7 400:18
401:10 402:1,10
403:6,7,20 404:9
404:25 407:3
409:7 410:18
412:17 413:18
414:18 417:10
420:23 424:13

426:6,15 429:1
430:20 434:13,22
438:18 440:14
441:10,12 442:14
442:17,19 443:23
444:3,5,10 451:10
451:11 453:21
455:3 459:4,8,16
460:4,24 479:17
483:10 484:18
485:1 488:21
489:24 490:6
492:8 497:5
498:17,22 502:12
505:21 508:16
509:1
role 464:15
roll 452:18
rule 401:17 443:18
444:8 449:9,15,23
450:12,15 453:12
462:25 500:4,14
500:22
ruled 482:7
486:24 487:24
488:4
rules 449:24
ruling 458:3
run 387:9 420:9
running 431:13
432:21 452:8,22
rush 509:14

**s**

s 510:20
safe 401:3
safely 430:1
sailed 467:1
samples 483:5
486:6,8 487:9,9,16
487:17,17 488:12
488:14 489:21,22

490:3,8,8 493:22
sanofi 382:3 385:8
385:12,14
saw 427:22 440:12
444:25 466:21
501:15
saying 405:7 408:1
408:11 414:10
421:15 433:23
482:10 484:9
487:22 490:12
495:23 500:22
says 395:10
421:19 424:7
441:2 454:9 455:8
455:13 485:17
488:9 489:19,19
494:17 496:19
497:7 506:25
scalp 384:7 402:13
402:18 405:25
421:2,24 493:13
scanning 454:9,13
454:22
scarring 403:6
404:19 406:9,9,11
406:11 408:2,4,8
414:8 471:22,23
478:21,21
schanker 381:12
381:13 385:19,19
scheduling 395:10
school 414:24
science 421:20
502:17 503:13
scientist 468:2,3,4
search 395:25
searching 391:21
395:14,16
sears 382:4 383:5
385:11,11 386:8

387:2 388:9,16
390:24 391:3
393:9,19,23
394:18 395:7
402:15 403:24
404:16 406:25
409:5 410:12
411:19 412:14,21
413:4,10 414:9
415:3,20 417:1
418:14 419:24
420:15 422:23
423:6 424:14
425:8 426:18
427:19 428:23
431:14,23 432:12
432:22 433:9
434:4,9,21 436:11
436:19,21 438:13
438:15,16 441:21
442:1 443:5 446:1
446:19 447:4
448:6 449:1 450:2
451:3,25 453:5,19
454:7 456:5 457:1
458:10,24 459:7
459:13,25 460:20
461:2,9,11,23
462:6,22 463:3,25
464:19 465:4,13
465:19 467:3,14
469:19 470:3
471:12,25 472:18
473:6,25 474:14
475:16 476:16,22
477:21 478:4
480:14 481:5
482:18 483:21
484:3,17 487:3
488:8 489:1,15,18
492:22 493:20

494:6,16 496:16
497:1,4 499:13,21
501:1,11 502:7
503:6,19 504:16
505:6 506:1
508:16,25 509:10
**second** 390:5
406:4 439:6
444:23 481:6
495:5 507:14
509:3
**section** 380:3
**sections** 424:11
**secure** 389:9,11
**see** 389:17 395:3
397:8 398:3,22
405:8 406:1 407:2
407:14,23 408:18
408:22,25 409:23
410:8 411:25
412:5 414:7
419:13 420:2,5
421:3,25 423:19
426:21 427:6
429:4,9 435:2
436:15,23 439:12
439:18,25 441:21
442:5,9 443:13
446:13 447:10,14
450:5 454:11
457:4 466:2,12
467:4 468:11
469:23 470:4
471:15 472:6,7
476:17,23 477:2
481:13 484:20
485:19 488:12
493:9,10,10,11
495:13 506:20
507:4

**seeing** 386:11
400:5 405:21
409:1 452:18
507:13
**seeking** 494:8
**seen** 405:2,4
411:20 417:19,20
418:16 470:6
**sees** 464:15
**send** 429:8,17
430:7 438:7
454:21 481:20
482:2 483:5 496:4
497:15 498:7
**sending** 481:17
**sense** 414:1,20
480:11 489:17
496:4
**sensitive** 475:10
475:11 479:23
480:10
**sent** 387:18,20,21
387:24 389:1
392:7 394:2
409:11 425:17
428:14 434:23
452:5 458:17
461:4 484:8,19
489:11 496:10
497:8 503:21,25
505:14 506:4
507:19
**sentence** 408:1
415:21 439:22
440:9 441:1
444:20 488:9
**sentences** 417:18
490:7
**september** 496:18
**series** 406:14

**seriously** 456:11
503:3,11
**service** 430:13
**services** 382:3
**set** 473:11 510:13
**setting** 440:21
**seven** 480:3
**shaft** 471:4 480:10
**share** 490:22
**shb.com** 382:10,10
**sheath** 397:14
**shed** 470:14
**shift** 470:13
**ship** 467:1
**shipment** 430:1
**shipped** 427:10
429:23 430:3
**shipping** 392:12
430:2
**shook** 382:6
**shop** 387:16
**show** 390:2 408:10
418:4 446:15
472:14,17 474:13
486:16 487:11
502:1
**showed** 399:14
410:9 449:12
472:19 473:3
499:16
**showing** 470:22
474:19
**shown** 419:21
**shows** 439:24
444:22
**side** 412:2 495:7
495:10 504:4
**sign** 445:13
**signature** 510:18
**signed** 447:20
448:10

**significant** 472:21

**simple** 413:21
437:23

**simplify** 469:17

**simply** 406:4
418:12 482:10,13
490:10 497:23
500:7 506:8

**single** 387:23
405:24 416:23
433:3 437:10
506:6,7,14,15

**sir** 447:21

**sit** 449:2 456:6
501:17

**sitting** 480:6

**six** 452:13,18
474:10 494:4

**sizes** 394:4

**skin** 469:11
472:15

**slide** 435:25

**slides** 387:15
388:24,25 389:10
390:4 393:13
435:22,23,24,25
439:23 444:21
454:10,13,25
466:21 491:20
495:6,10 497:7,16
498:8,8 499:7,9
507:1

**small** 470:12
506:5

**smaller** 413:23,24

**smart's** 394:1

**soda** 420:11

**soldiers** 480:9

**sole** 498:6

**somebody** 469:13

**soon** 427:6 452:4

**sorry** 416:11
441:24,25 447:22

**sort** 450:6 459:8
460:2 477:3

**sounds** 508:19

**source** 494:23

**span** 436:14

**special** 435:12

**specializes** 427:24
428:3

**specific** 398:21
399:4 406:3 407:7
407:11,12 422:11
423:24 440:2
442:5 473:24
493:8 499:3

**specifically** 406:23
410:4,5 462:24
468:23 477:16
482:6 487:24

**specificity** 384:8
404:18 405:21

**specimen** 433:4
434:1

**specimens** 434:25
435:5,6,12,13
436:3,4 491:21
507:18

**speculated** 402:5,6
402:7 414:14

**speculation**
408:12 414:2,3
415:22 446:2,6

**speculative** 408:20
413:14 415:6,11
415:15 459:1
461:25 465:2

**spend** 467:12

**sperling** 407:6

**spread** 469:14

**stage** 435:14

**stain** 398:2,3,3,15
398:16,22,22
399:5,9 400:20
401:2 407:14
410:17 412:11,12
412:16,20,24,25
413:2,9 418:17
422:8 437:1 439:8
470:5 479:21
497:16

**stained** 433:3
450:18 466:13

**staining** 389:4,18
393:12 395:19
397:6,7,7 398:20
399:20 401:8,9,12
406:1 407:2
409:17,20 410:8,9
410:23 411:7,15
411:20 412:4,10
413:5,25 414:5
418:3,13,16,21
419:13 420:1,4
423:22,24 424:4
425:23 433:6
434:17 440:1,11
442:5,17,22 443:8
443:12 444:10,17
446:22 447:8,12
448:13,13 449:4,8
450:4,5,12 451:9
452:2,23 455:15
455:21 456:8,16
457:7 459:15,20
460:13,14,16
465:23 466:18,20
467:6,16,20
468:10,12,20
469:15,21,23

**spread** 472:15,25 473:4
473:21 474:18
475:9 476:6,8,13
476:13,18 493:7
493:16 494:22
498:16 499:4
500:11,11 501:4
501:14,20 502:1,4
504:11

**stains** 390:1
393:18 398:9,11
398:17,18 399:14
410:16 418:24
419:8 436:23
470:20 471:14,16
476:1 493:17
499:14 507:4

**stands** 404:24

**start** 403:15 435:1
451:5

**started** 404:1
449:14

**starts** 420:17
485:17

**state** 380:16
382:15 385:10
386:12 505:2

**states** 380:1
469:12

**station** 435:10

**stem** 390:17
391:10 392:16
393:12 397:8,16
397:18,19 398:1,4
398:8,10,13,18
399:6,21 400:2,17
401:25 402:10
403:2,11,20 404:9
405:3 406:18,18
406:20,21,24
407:2,11,13,14,18

407:22,24 408:11
408:21 409:22
410:15,16 411:16
412:15,19,23,23
413:5,17,22
414:10,17,18
415:10,24 416:1,1
416:2,2,15,23
417:7,8,20,23
418:5,10,18
419:11 421:3,17
421:20,25 422:5,7
422:11,18,22
423:2,8,18,19
424:3,15,19 425:2
425:10 426:14
427:15 428:4
431:4,25 432:14
432:23 445:1,7,21
446:4,8,9,10
448:20 457:12,23
457:25 458:15,18
459:4,9 460:4,6,10
460:15,17,22,24
461:6,15 462:2,13
462:16,18 463:17
464:2,5,9,15,21,22
465:6 469:5 471:8
471:8 472:4,5,14
473:8,18,23 477:5
477:8,12,25 479:2
479:17 480:5
481:7,12,13 486:5
489:20 491:14
492:15,20 494:19
495:11,15,16
496:7,8 499:16
504:21 507:19
508:4,11,14
**stop**  409:2

**stopped**  417:15
**stored**  387:22
  427:4
**street**  381:14
  382:15
**string**  426:8
**structure**  479:4
**structures**  394:12
  473:1,1 476:7,8
  492:6
**stuck**  470:25
**studies**  397:2
  450:22 453:22
  476:10
**study**  389:15
  390:17 392:16
  433:4 440:7,21,23
  442:8 450:18
  453:16 462:13,17
  463:16 464:3,4,21
  465:1 467:13,13
  474:10,11,25
  477:24 481:7,12
  481:13 483:22
  494:2 496:8
  500:18,18 501:10
**subacute**  493:12
**subject**  391:1
  434:24 484:25
**subsequent**  405:14
**substance**  462:20
  464:12 481:23
**substantiated**
  451:1
**substantive**  478:1
  506:7
**suggest**  388:3
  437:17 470:16
**suggested**  423:2
  445:1,6 446:7
  448:20

**suggesting**  421:17
  422:4,17 481:25
**suggestion**  446:3
  506:7
**suite**  381:7,14
**summarizing**
  454:10,15
**summary**  390:10
  390:14 457:21
**sun**  382:12 385:22
**supplemental**
  394:25
**support**  499:25,25
  500:12 501:5
**supported**  468:16
  501:4
**supposed**  495:7
**sure**  391:4 397:21
  404:2 415:4 430:1
  430:8 441:16
  442:3 449:10
  459:12 462:5
  465:13 467:10
  481:4 486:22
  487:6 499:23
  501:21
**surface**  472:15
**surgery**  452:17
**susceptible**  417:14
**swear**  385:25
  386:1
**synonymous**
  402:24
**system**  406:7
  430:12 432:19
  433:6 435:7
  437:24 454:22
  478:22
**systemic**  408:6

**t**

**take**  405:12
  414:23 421:2,22
  424:5,12 445:11
  455:4 465:11
  467:24 468:22
  475:1,4,7 494:14
**taken**  380:8,15
  388:13 465:16
  482:20 493:14
  508:22
**takes**  406:5
**talk**  388:10 397:5
  397:11 425:22
  437:4,14 448:12
  455:21 477:23
  491:7 508:17
**talked**  401:14
  402:16 413:13
  425:20 426:5
  434:10,17 437:12
  447:6 449:3 450:3
  455:20 458:25
  465:22 466:8,11
  467:23 468:9
  472:2,4 477:11
  478:5,20 479:14
  492:23 495:4
**talking**  413:22
  424:8 437:8 448:7
  448:8 472:24
  475:22 481:7
  491:2 492:17
  507:7
**talks**  481:12
**tamoxifen**  475:18
**tanya**  380:5
**target**  479:25
  480:12
**targets**  407:10
  479:1 480:13

taxotere   380:2
384:19 392:25
telephone   395:11
447:17 455:8,8,13
455:14 462:11,23
463:5 464:1 496:7
telephonically
382:12
tell   410:25 419:6
470:24 473:2
telling   431:19
463:4 471:22
tells   410:24
telogen   470:13
492:20 493:9
test   398:15,22
399:7,21 400:17
401:1,5 407:14
409:21 421:17
422:19 423:3,9
431:25 434:12
439:8 453:7,11
468:5,5 472:6
473:11 477:7,12
486:7,11,15
487:15,20,23
489:3,22 492:23
494:23
tested   422:5
472:20 490:9,16
492:4,7,10,13
493:21 494:21
testify   458:22
488:25
testifying   463:7
testimony   386:2
386:20 423:12
464:16 490:14
testing   387:13
420:10 423:18
424:16,20 425:11

426:15 428:10
431:4 432:21
433:18 439:7
445:9 448:21
450:10 451:13
466:1,4 474:2
475:24 477:4,4
480:16 483:16
484:6 486:5,7
487:9,9,15 489:7
489:13,20,22,24
490:11 491:14,18
497:12
tests   452:8 473:13
thank   386:6 393:9
436:19
theoretical   401:23
402:7 404:5 415:5
415:13 416:7
493:1 503:14
theory   413:14,14
459:16 460:21
465:5
thing   417:4 428:9
435:17 452:16
455:24 470:20
496:17 506:4
things   392:11
406:3 407:13
417:13 430:13
435:21 450:21
475:12,14 506:9
506:12,14,17
think   386:15
387:15 390:2,6
393:15 395:15
404:11 406:10
411:21 415:12
416:18 425:17,25
428:1 429:19
431:18,20 433:10

434:15 436:2
437:10 438:12
442:2,10 444:15
444:23,25 446:12
447:19 450:8,16
450:24 452:5
453:16,16 454:20
456:9,11,17,20
458:2,6 461:19
464:11,15,18
466:23,23 467:10
467:19 474:15,23
475:23,24 476:18
478:8 481:6,15,22
482:3,6 484:10
485:16 486:2,3
488:3,5 489:9
498:11 500:23
501:12 503:15
504:18 505:2,13
505:23 506:25
507:24 509:2,13
thinking   406:16
472:6 500:7
third   392:23
thompson   380:7
380:15 383:2
385:2,7 386:13
429:3 458:5 485:1
488:1 509:19
thornton   381:4,6
383:6 385:15,15
388:3,7 390:22,25
393:7,10 395:3
403:21 405:10
408:24 409:24
410:19 412:6,18
413:1,7,19 414:19
415:17 416:20
418:6,20 422:20
423:5,10,20 425:6

426:16 427:17
431:6,17 432:10
432:15 433:7
434:7 438:14
439:20 441:18,24
443:2 445:10
446:11,25 448:23
449:18,22 450:13
451:14 453:1,13
454:3 455:22
456:14,17 458:2
458:20 459:5,10
459:17 460:7,25
461:7,16 462:4,19
462:24 463:18,22
464:11 465:3,8,11
466:16 467:8
468:14 469:24
470:8 471:18
472:9,22 473:19
474:6,22 476:4,21
477:14 478:1
479:19 481:2,22
483:19,24 484:7
484:20 486:23
487:21 488:22
489:5,14 492:16
493:4,25 494:11
496:25 499:11,19
500:15 501:8
502:6,23 503:17
504:14 505:1,23
509:2,9,13
thought   387:17
399:5 408:22
410:13 418:2,15
418:21 423:17
424:15,19 425:1,2
425:4 448:16
450:3 451:12
452:7,22 453:11

474:20 501:13
**thoughts** 423:7
445:21 464:3
**thousand** 490:19
**three** 389:10
394:10 414:5
419:1 440:5
443:23 450:18
452:14 466:19,20
474:9,19 482:3
489:11 491:20
494:4 507:12
**throwing** 411:24
**time** 385:5 388:11
388:14 403:23
411:18 417:6,10
424:13 435:16,23
447:6 460:18
461:24 465:14,17
469:8 505:24
508:20,23 509:1,4
509:7
**timeline** 420:9
**times** 386:14
404:13,13 413:12
472:11
**timesheets** 393:4,7
**tiny** 450:22,22
506:17
**tissue** 424:9 427:3
433:2 435:9
467:25 468:22
476:7 482:10,12
482:14,17,19,20
483:25 484:1
486:16 490:20,20
491:17,17,18,24
492:5 493:7 496:4
**today** 386:21
393:8 426:24
429:9 439:8 449:2

456:6 458:25
501:12,17 509:11
**told** 430:7 446:13
471:8
**tomorrow** 426:25
439:9
**tool** 418:11 459:24
460:3 494:15
**tools** 402:19 411:3
411:15 459:19
460:12 469:1,7
**top** 426:19 447:25
502:15
**topic** 417:22
**tosti** 391:9 420:21
421:10 422:11,17
423:2 424:17,21
425:10,22 426:14
427:1 436:14
438:25 439:3,3
442:19,21 443:6
444:12,16 445:1
446:3,7,20 447:14
448:19 449:4
451:16,24 501:13
501:20 502:3
**touch** 426:25
447:23,25
**toxicity** 403:2,10
403:19 404:8
405:3 408:11
415:23 416:22,25
417:19
**traction** 408:5
**traditional** 466:25
469:4,7 497:21
**training** 418:25
**transcript** 421:8
509:15 510:5
**traveling** 426:24

**treat** 430:9
**treatment** 475:6,8
475:17,18
**tried** 410:2 432:18
433:1,15
**true** 401:4 443:14
446:6 473:9,10
510:6
**truth** 386:3,3,4
**try** 430:12
**trying** 404:2
406:15 411:16
419:3 430:5
445:13,15,18
466:7,9 468:8,23
469:3 470:23
500:8
**turn** 445:16
473:10 494:14
**turns** 473:9
**tuyes** 387:13
388:20,25 389:4
389:11,18 430:21
436:6,7 444:1
456:1,4,12 465:23
466:2,5,11 467:6
507:8,12
**two** 389:11 393:7
394:21 399:3
400:10 417:18
436:8 438:11
441:22 443:17
469:11 490:7
502:20 503:15
507:1
**type** 420:3 424:10
482:21
**types** 408:17
435:11 443:17
466:10 482:13

**typically** 406:8,10
**typos** 506:6,13

**u**

**uh** 395:4 421:4,12
422:1 430:25
457:8 484:21
495:20,21
**ultimately** 451:8
**unclear** 421:7
**understand**
386:16 387:9
391:4 393:19
407:12 408:17
415:4 441:16
442:4 452:21
458:11 461:18
466:7 468:9
474:16 489:1
500:5 501:2
**understanding**
393:11 428:6
461:3,12 473:7
504:25 505:8
**understood**
505:10
**unfortunately**
393:13 400:8
402:5 406:22
407:9,19
**unique** 440:12
442:6
**united** 380:1
469:12
**unofficial** 449:13
**unstained** 388:24
388:25 435:22,25
491:20 495:6,9
507:1
**ups** 429:25
**use** 389:1 395:22
400:3 407:3

411:14,14 418:3
422:25 423:8
425:11,14 431:9
431:11,25 432:3,9
432:13 433:11
434:5 437:20
440:8,17 446:15
460:11 469:9
470:11,23 486:16
492:6 495:10,11
**useful** 424:11
445:22 463:15
**useless** 417:22
**usually** 416:5
**utility** 400:14
409:4 410:6,11
419:3,14,20,21,23
451:13,20 452:3,7
452:12,22 453:7
453:11,14,15,17
453:20 457:12
469:1 470:22,25
474:13 500:1,6,23

**v**

**vaguely** 401:16
**validated** 486:22
487:15
**validating** 487:6
**validation** 486:5,7
486:11 489:20,21
491:17
**variety** 473:4
**verbally** 443:15
**versus** 389:19
466:10 467:6
**viable** 460:15
**video** 390:6,7,8,11
390:13 457:22
458:3,17 460:23
461:4,13 462:14
463:12 464:2

484:25 485:3,24
489:23 490:9,10
504:23 505:8
508:10 509:11
**videographer**
385:4,24 388:11
388:14 447:21,24
465:14,17 508:20
508:23 509:4,7,10
**videos** 457:21
485:18,21 486:1
504:19 505:9
507:18,23 508:13
**videotaped** 380:6
380:14 385:1
509:18
**vip** 430:13
**visible** 473:14
**volunteer** 499:7
**von** 381:7
**vs** 385:7

**w**

**wait** 441:18
**waiting** 480:6
**want** 387:5 388:7
388:7,10 402:22
413:12 415:4
417:18 424:8
427:2 441:16
442:3 445:14
448:21 450:22
464:25 476:2
484:11 488:24
491:10,21 496:17
509:11
**wanted** 410:13
418:3 423:8,13
424:5,13 501:6
**warning** 487:14
**warranted** 442:8
476:19

**waste** 487:16
**wasteland** 411:10
**watched** 462:14
463:12 489:23
490:9,10
**way** 392:25 393:16
419:3 424:13
430:8,9 435:20
443:10 449:3
456:7 476:15
490:7 500:12
501:18 502:2
**ways** 429:24
**we've** 386:14
393:16,24 402:6
410:2 412:1
413:11,13 418:7
458:3 460:8
467:23 472:2,4
479:14 487:24
**wednesday** 380:9
380:16 385:3
426:21 439:9
**week** 430:23
505:21,22
**weeks** 466:19
507:12
**went** 451:23
**wheel** 484:12
491:11
**wide** 482:23
**wish** 415:19
**witness** 385:25
386:5 388:6
403:22 405:11
408:25 409:25
410:20 412:7,19
413:2,8,20 414:20
415:18 416:21
418:7,21 422:21
423:11,21 425:7

426:17 427:18
431:7,18 432:11
432:16 433:8
434:8 436:18,20
439:21 441:20
443:3 445:11,14
446:12 447:1,22
448:1,24 449:20
450:1,14 451:15
453:2,14 454:4
455:23 456:20
458:23 459:6,11
459:18 460:8
461:1,19 462:5
463:21,24 465:10
466:17 467:9
468:15 469:25
470:9 471:19
472:10,23 473:20
474:7,23 476:5
477:19 479:20
481:3 482:9
483:20,25 484:8
487:25 488:5
489:10 492:17
493:5 494:1,12
499:12,20 500:16
501:9 502:24
503:18 504:15
505:4,21,24
508:19 510:13
**women** 475:4
482:20
**wondered** 428:9
**wondering** 437:25
**word** 506:6
**words** 397:22
403:23 506:15
**work** 400:12
432:19,24 433:2
433:15 438:2,3,9

445:14 458:4,8,21
461:7 462:20
464:18 467:12,12
477:16 478:3
482:7 486:25
488:5,24 494:20
505:12
**worked** 486:22
487:6 504:20
**working** 425:18
449:15 483:9
488:21,23
**works** 422:13
427:20 432:18
433:5,11 434:6
438:21 486:17
**world** 407:7
451:18
**worth** 440:21
491:12
**worthwhile** 451:5
**would've** 411:20
455:20 474:4,20
476:17 492:10,25
493:23 494:8
499:17 500:13
**write** 403:5 405:2
439:7,17 450:17
486:1 491:22
495:6 506:22
507:16
**writes** 426:24
**writing** 407:20,25
463:1 479:6
**written** 391:23
405:13 413:14
**wrong** 424:8 430:4
**wrote** 402:18,23
404:4,20 409:6
420:21 441:14
492:7 506:4,9

508:7
**wynkoop** 381:14

**y**

**yeah** 388:9 392:4
394:2 401:7 402:6
414:12 420:4,12
421:9 422:14,25
436:20 437:13
441:5,17,24
452:25 454:2
459:12 467:9
475:23 476:20
481:1 485:2 486:3
491:10 492:6
497:1 502:18
505:16 507:11
**year** 409:19
**years** 400:10
418:23,25 433:1
475:5 478:15
480:2,3,4 484:11
494:14

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

# VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **IN RE: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION** | **MDL No. 2740** |
| | **SECTION: H** |
| **This Document Relates To:** | |
| **Antoinette Durden, Case No. 2:16-cv-16635; Tanya Francis, Case No. 2:16-cv-17410; Barbara Earnest, Case No. 2:16-cv-17144** | |

<u>**NOTICE OF VIDEOTAPED DEPOSITION OF CURTIS THOMPSON, M.D.**</u>

PLEASE TAKE NOTICE that, in accordance with Rule 30 of the Federal Rules of Civil Procedure, Defendants sanofi-aventis U.S. LLC and Sanofi US Services Inc. will take the deposition upon oral examination of Curtis Thompson, M.D. on April 3, 2019 at 9:00 am at Meadows Executive Office Suites, 5200 SW Meadows Road, Suite 150, Lake Oswego, OR 97035. The deposition shall be videotaped and recorded stenographically, and will continue from day to day until completed before a person duly authorized to administer oaths who is not counsel of record or interested in the events of this case.  The attorney contact for the deposition is:

> Connor Sears
> Shook, Hardy & Bacon LLP
> 2555 Grand Blvd.
> Kansas City, MO 64108
> Tel:  (816) 474-6550
> Email: csears@shb.com

1



EXHIBIT

DEPONENT NAME: DR Thompson   DATE: 4/3/19

Date: March 28, 2019

Respectfully submitted,

*/s/ Connor Sears*
Connor Sears
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, Missouri 64108
Tel:  (816) 474-6550
Fax:  (816) 421-5547
Email: csears@shb.com

*Attorney for Defendants*

2

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of March, 2019, a true and correct copy of the Notice of Videotaped Deposition of Curtis Thompson, M.D. was served upon the following by E-mail:

Dawn M. Barrios
Barrios, Kingsdorf & Casteix, LLP
One Shell Square
701 Poydras St.
Suite 3650
New Orleans, LA 70139-3650
Phone: (504) 524-3300
Email: barrios@bkc-law.com
*Attorney for Plaintiff*

Matthew Palmer Lambert
Gainsburgh, Benjamin, David, Meunier & Warshauer
Energy Centre
1100 Poydras St.
Suite 2800
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Email: plambert@gainsben.com
*Attorney for Plaintiff*

Douglas J. Moore
Irwin Fritchie Urquhart & Moore, LLC
400 Poydras St.
Suite 2700
New Orleans, LA 70130
Phone: (504) 310-2100
Email: dmoore@irwinllc.com
*Attorney for Defendants*

John Francis Olinde
Chaffe McCall LLP
Energy Centre
1100 Poydras St.
Suite 2300
New Orleans, LA 70163-2300
Phone: (504) 585-7000
Email: olinde@chaffe.com
*Attorney for Defendants*

/s/ *Connor Sears*
Connor Sears

3

## DEFINITIONS AND INSTRUCTIONS FOR EXHIBIT "A"

A.      As used herein, the term "CHEMOTHERAPY" shall mean any and all forms of chemotherapy.

B.      As used herein, the term "PATIENT(S)" or "PLAINTIFF(S)" shall mean and refer to Antoinette Durden, ███████ ; ███████ ; Barbara Earnest, ███████ ; ███████ ; and Tanya Francis, ███████

C.      As used herein, the terms "YOU" and "YOUR" refer to Curtis Thompson, M.D. and all persons acting for You or on Your behalf.

D.      The singular of any word shall include the plural, and the plural shall include the singular.

E.      The words "AND" and "OR" as used in this request shall be interpreted as conjunctive, disjunctive, or both, depending on context, so that the fullest production of information is provided.

F.      The "DOCUMENTS" to be produced pursuant to these Requests are to be produced as they are kept in the usual course of business so that one can ascertain the files in which they were located, their relative order in the files and how the files were maintained.

G.      "STUDIES" or "STUDY" means any study or survey, whether published or not, that You have cited, reviewed, been provided, or been involved with about chemotherapy-induced alopecia.

H.      "COMMUNICATION" means the transmittal of information or a request for information (in the form of facts, ideas, inquiries, or otherwise), whether by written, oral, electronic, or other means. Communications include, but are not limited to all discussions, conversations, meetings, conferences, telephone conversations, interviews, voicemails, negotiations, agreements, understandings, letters, correspondence, facsimiles, electronic mail, or other forms of written or verbal interchanges, however transmitted or stored, including reports, notes, memoranda, lists, agendas and other records of communications.

I.      "CONCERN" or "CONCERNING" means referring to, describing, evidencing, constituting, pertaining to, containing, connecting with, describing, embodying, mentioning, supporting, corroborating, demonstrating, proving, evidencing, showing, refuting, disputing, rebutting, controverting, contradicting, regarding, or relating to; and each such term shall incorporate the others, so that the fullest production of information is provided.

J.      "DOCUMENT" is used in the broadest sense consistent with the terms of the Federal Rules of Civil Procedure, and includes, without limitation, every writing, record, photograph, piece of electronically stored information, and tangible thing of every type and description, however produced or reproduced, whether written, printed, typed, recorded, taped or electronically or magnetically recorded or stored, or recorded upon any tangible thing, or stored in any retrievable form, by any means of communication, representation or

4

data generation or retention, including without limitation: writings; correspondence; records; tables; charts; graphs; reports; notes; telegrams; telexes; telefax transmittals; telecopy, facsimile or fax transmittals or transmissions; cables; messages; e-mails; electronic messages; electronically stored or transmitted documents; diaries; diary entries; invoices; canceled checks; memoranda, including without limitation intra- and inter-office memoranda; intra- and inter-office communications; accounts; financial statements; papers; brochures; articles; statements; letters; memoranda, notes or jottings of telephone conversations, other conversations, discussions, agreements, acts, meetings, conferences or activities of any kind or nature; log books; computer tapes; computer disks or printouts; tape recordings; books; accounting records; work papers; minutes; affidavits; contracts; opinions; evaluations; analyses; studies; summaries; notices; agreements; microfilms; microfiches; records kept by any photographic, mechanical, magnetic or electronic means; any notes, summaries, or drafts relating to any of the foregoing; and any and all other tangible things or media containing information or from which information can be obtained. The term "documents" as used herein further means and includes the original and every non-identical or non-exact copy of such documents of whatever date; copies containing any commentary or notations of any kind that do not appear in the original; drafts; revisions; handwritten and typed versions; and earlier or later versions.

5

## EXHIBIT "A"

## ITEMS TO BE PRODUCED

1.    All pathology materials in your possession for Ms. Earnest, Ms. Francis, Ms. Durden, and Ms. Tuyes.

2.    The "video" referred to in your invoice 3.

3.    The "summary memo" of the "video" referred to in your invoice 3.

4.    All communication or documents regarding the stem cell study that is referred to in your invoices.

5.    All communication or documents between you and Dr. Tosti regarding these cases and/or stem cells.

6.    All communication or documents between you and the person redacted in your invoice 5.

7.    All communication or documents in your possession regarding the person redacted in your email dated August 6, 2018 sent at 10:50 AM.

8.    All communication or documents in your possession regarding Dr. Poole who is referred to in the email sent by Anne Andrews on March 28, 2018 at 11:53 AM.

9.    Anything in your possession regarding any stem cell study regarding chemotherapy.

10.   All communications between the witness and any third party other than counsel for the Plaintiffs, including but not limited to Plaintiffs' other retained experts, relating in any way to the Taxotere litigation.

11.   All time sheets, time records, billing records, and documents reflecting the time You spent in connection with Your work on the Taxotere litigation and the amounts invoiced or to be invoiced for that time.

12.   Any and all documents or communications, including, but not limited to, emails between you and any individual regarding the Studies.

6



**CURTIS THOMPSON, MD & ASSOCIATES**
Skin, Hair and Nail Pathology Experts

| REMITTANCE TO: | |
|---|---|
| **Curtis Thompson MD & Associates** | DBA CTA LAB |
| PO BOX 230577 | |
| Tigard, Oregon 97281 | |
| TAX ID 20-4465223 | |

| Date | Invoice # |
|---|---|
| 2/5/2019 | 8 |

| Bill To: |
|---|
| Andrews & Thornton |
| 4701 Von Karman Ave., Suite 300 |
| Newport Beach, CA 92660 |

| Terms | Due upon receipt |
|---|---|
| Project | PROFESSIONAL |

| Description | Date | Quantity | Rate/Hour | Amount |
|---|---|---|---|---|
| Deposition scheduling; emails w/ Bradley East | 1/27/2019 | 0.17 | $1,300.00/hour | $221.00 |
| Deposition scheduling email correspondence | 1/28/2019 | 0.17 | $1,300.00/hour | $221.00 |
| Review of Dr. Smart deposition | 2/4/2019 | 0.75 | $1,300.00/hour | $975.00 |
| Identifying follicle phases and sizes on microscopic images | 2/5/2019 | 1.5 | $1,300.00/hour | $1,950.00 |
| | | | Total Due | $3,367.00 |

**EXHIBIT**

2

DEPONENT NAME: DR Thompson   DATE: 4/3/15



**REMITTANCE TO:**

| | |
|---|---|
| **Curtis Thompson MD & Associates** | DBA CTA LAB |
| PO BOX 230577 | |
| Tigard, Oregon 97281 | |
| TAX ID 20-4465223 | |

| Date | Invoice # |
|---|---|
| 3/6/2019 | 9 |

**BILL TO:**

**Andrews & Thornton**
4701 Von Karman Ave., Suite 300
Newport Beach, CA 92660

| Terms | Due upon receipt |
|---|---|
| Project | PROFESSIONAL |

| Description | Date | Quantity | Rate/Hour | Amount |
|---|---|---|---|---|
| Deposition scheduling via email | 2/12/2019 | 0.17 | $1,300/hour | $221.00 |
| Deposition meeting/planning | 2/21/2019 | 0.42 | $1,300/hour | $546.00 |
| Reviewing report of Dr. Smart | 2/24/2019 | 1 | $1,300/hour | $1,300.00 |
| Meeting with Lauren Davis | 2/25/2019 | 2.25 | $1,300/hour | $2,925.00 |
| Deposition | 2/26/2019 | 3.25 | $1,300/hour | $4,225.00 |
| Material Shipment Coordination | 2/27/2019 | 0.17 | $1,300/hour | $221.00 |
| Preparation of slides sent to opposing counsel; digital slide image pulled and sent to Bradley East (Adam Harris) | 2/28/2019 | 0.52 | $95/hour | $49.40 |
| Irwin Fritchie Urquhart & Moore UPS Next Day Air Shipment; 1Z46R4190199635897 (Receipt attached) | 2/28/2019 | 1 | $93.78 | $93.78 |
| Call planning and discussion w/ John Thornton | 3/1/2019 | 1.42 | $1,300/hour | $1,846.00 |
| | | | **Total Due** | **$11,427.18** |

**EXHIBIT**

3

DEPONENT NAME: Dr Thompson     DATE: 4/13/19



**CURTIS THOMPSON, MD & ASSOCIATES**
Skin, Hair and Nail Pathology Experts

| REMITTANCE TO: | |
|---|---|
| **Curtis Thompson MD & Associates** | DBA CTA LAB |
| PO BOX 230577 | |
| Tigard, Oregon 97281 | |
| TAX ID 20-4465223 | |

| Date | Invoice # |
|---|---|
| 4/1/2019 | 10 |

| BILL TO: |
|---|
| **Andrews & Thornton** |
| 4701 Von Karman Ave., Suite 300 |
| Newport Beach, CA 92660 |

| Terms | Due upon receipt |
|---|---|
| Project | PROFESSIONAL |

| Description | Date | Quantity | Rate/Hour | Amount |
|---|---|---|---|---|
| Arranging deposition | 3/19/2019 | 0.17 | $1,300/hour | $221.00 |
| Scheduling deposition | 3/22/2019 | 0.17 | $1,300/hour | $221.00 |
| Phone call and deposition scheduling; telephone call with attorneys and review of emails | 3/25/2019 | 1.75 | $1,300/hour | $2,275.00 |
| Review of prior deposition and draft of letter to Judge Milazzo | 3/26/2019 | 2.75 | $1,300/hour | $3,575.00 |
| Final editing of letter; arranging meeting for deposition | 3/27/2019 | 0.92 | $1,300/hour | $1,196.00 |
| | | | Total Due | $7,488.00 |



EXHIBIT
4

DEPONENT NAME: DR Thompson   DATE: 4/3/19

J Cutan Pathol 2017: 44: 53–69
doi: 10.1111/cup.12822
John Wiley & Sons. Printed in Singa



© 2016 John Wiley & Sons A/S.
Published by John Wiley & Sons Ltd

Journal of
**Cutaneous Pathology**

Review

# Primary scalp alopecia: new histopathological tools, new concepts and a practical guide to diagnosis

The diagnosis of primary scalp alopecia remains one of the most challenging fields in dermatopathology. In this review, we would like to connect the established classification of primary alopecia into scarring (cicatricial) and non-scarring (non-cicatricial) with current concepts. We introduce a simplified pathway for the diagnosis of the most common causes of alopecia, including a discussion of tissue processing techniques and use of immunohistochemistry.

**Athanassios Kolivras[1,2] and Curtis Thompson[3,4,5]**

[1]Department of Dermatology, Saint-Pierre, Brugmann and Queen Fabiola Children's University Hospitals, Université Libre de Bruxelles, Brussels, Belgium, [2]Department of Dermatopathology, Saint-Pierre, Brugmann and Queen Fabiola Children's University Hospitals, Université Libre de Bruxelles, Brussels, Belgium, [3]Department of Biomedical Engineering, Oregon Health Sciences University, Portland, OR, USA, [4]Department of Pathology, Oregon Health Sciences University, Portland, OR, USA, and [5]Department of Dermatology, Oregon Health Sciences University, Portland, OR, USA

Athanassios Kolivras, MD, PhD
Departments of Dermatology and
Dermatopathology, Saint-Pierre, Brugmann and
Queen Fabiola Children's University Hospitals,
Université Libre de Bruxelles, 129 boulevard de
Waterloo, 1000 Brussels, Belgium
Tel: +32 2 5354379
Fax: +32 2 5354381
e-mail: kolivras@gmail.com

Accepted for publication September 20, 2016

*Keywords:* non-scarring (non-cicatricial ) alopecia, primary scalp alopecia, scarring (cicatricial) alopecia

Kolivras A, Thompson C. Primary scalp alopecia: new histopathological tools, new concepts and a practical guide to diagnosis.
J Cutan Pathol 2017; 44: 53–69. © 2016 John Wiley & Sons A/S.
Published by John Wiley & Sons Ltd

The diagnosis of primary scalp alopecia remains a challenge for both clinicians and dermatopathologists. New scalp grossing techniques have made this challenge easier, but there are still challenges in the utility of the currently established classification of alopecia (i.e. cicatricial vs. non-cicatricial).[1,2] In this manuscript, we will attempt to improve this classification by introducing new concepts on alopecia and a simple 2-step method for the diagnosis of the most common causes of alopecia based upon a review of the current knowledge and our experience in diagnostics of alopecia.

## Tissue processing

Classical grossing of skin biopsies with vertical sections may be useful for cicatricial alopecia, but they are often not helpful for non-scarring processes, such as female pattern hair loss (androgenetic), which is the most common diagnosis of alopecia in women (Fig. 1).[3,4] Vertical sections show a limited number of follicular hair units (2–3 in a 4 mm punch biopsy),[5] and the cuts of the follicles are often tangential, since hairs often grow at an angle. Vertical sections also do not give information

**Review**



*Fig. 1.* Female pattern hair loss. Assessment of terminal (T) to vellus (V) hair ratio is possible only in horizontal sections.

concerning follicular density, hair cycle and hair miniaturization (terminal-to-vellus hair ratio), making interpretation of non-scarring, diffuse alopecia difficult.[6–8] Numerous studies have assessed horizontal vs. vertical sectioning, with variable conclusions.[7,9–12] In our opinion, all of the scalp grossing techniques work well only if the specimen is handled by experienced staff technicians. The key remaining problem, however, is the lack of implementation of proper grossing techniques by laboratories that are not familiar with alopecia.

New grossing techniques, which provide both horizontal and vertical sections, have dramatically improved histopathological diagnoses. Headington revolutionized histopathological evaluation of alopecia in 1984 by emphasizing the value of a follicular morphometric approach by transverse sectioning the scalp biopsy.[5] Surprisingly, the transverse sectioning of the scalp, similarly to the Headington technique, had already been proposed in the 19th century.[13] Following the technique proposed by Headington and later by Whiting[9], a single transverse section is performed 1 mm below the epidermal surface. Both cut sides of the specimen are embedded down in the cassette, so that the levels become progressively more superficial in one half of the specimen and deeper in the other half.[14] Improving this technique, Frishberg & Sperling proposed trisection or quadrisection, rather than the standard bisection, thereby allowing an even more thorough analysis of the tissue segment. To accomplish this, a 4 mm scalp biopsy specimen is cut transversely into three or four disks, and the deep surfaces are inked with their inked side placed down in the cassette.[15] In our opinion, these techniques were not universally adopted because pathologists were alarmed by the inability to easily analyze the surface epidermis. Elston proposed the performance of two biopsies, with one specimen being sectioned horizontally and the other specimen being sectioned vertically submitting half for direct immunofluorescence and half for vertical sections within the same block as the specimen for horizontal sections.[14,16] The inconvenience with this approach was the requirement of two scalp biopsies.

An interesting solution to the limits of the aforementioned techniques was the Tyler technique, which involves first vertically sectioning the entire specimen, followed by transverse sectioning of one half. Thus, one half of the specimen shows transverse sections and the other half vertical. As with aforementioned transverse sectioning techniques, serial cuts produce levels both towards the subcutaneous fat and the epidermal surface (Fig. 2).[8,17] The limitation of this technique is that fewer follicles are visualized transversely, limiting the evaluation of hair density, terminal-to-vellus hair (T : V) ratio and catagen/telogen (CT) hair count.

We have employed the novel HoVert (Horizontal & Vertical) technique, introduced in 2011, which provides both horizontal and vertical sections from a single biopsy. In our experience, this procedure has improved and simplified diagnostics, mostly because fewer level sections are necessary.[18] A single 4 mm punch biopsy is appropriate if a single disease process is suspected, but additional biopsies may be necessary if there is more than one disease process at play.[19] Important to note, the HoVert technique is ideal for specimens obtained with the 4 mm punch tool used in the United States. However, the 4 mm punch tool used in Europe is smaller and HoVert sectioning is more difficult. In our experience, one solution is to send the specimen through overnight fixation before sectioning, so the tissue is firmer and easier to section precisely. Alternatively, clinicians can seek out a larger punch tool. The HoVert technique involves trisecting the specimen, once just below the epidermis and once at the dermal–subcutaneous junction. If the biopsy is too thin (i.e. little subcutis present), the specimen should be bisected rather than trisected (the specimen is not sectioned horizontally at the dermosubcutaneous junction). The HoVert technique allows both a vertical examination of the interfollicular epidermis, follicular ostium, superficial infundibulum and papillary dermis, and a transverse examination of the superficial and deep reticular

Review



*Fig. 2.* The Tyler technique. This technique involves vertical sectioning of the specimen, followed by transverse sectioning of one half. The two resulting half circles are embedded facing one another, fresh cut side down.



*Fig. 3.* The HoVert (Horizontal Vertical) technique. A) HoVert grossing. a) A 4 mm scalp biopsy specimen is processed. b) The biopsy specimen is transected horizontally (transversely) approximately 1 mm below the skin surface to create an epidermal disc and a lower portion. c) The epidermal disc is bisected and embedded vertically. d) The upper surface of the dermal/subcutaneous portion is inked. e) The dermal/subcutaneous portion is bisected horizontally (transversely) at the dermosubcutaneous junction. The upper surface of the newly formed subcutaneous portion is inked. The two inked surfaces are embedded down. B) The HoVert technique provides both horizontal and vertical sections from a single biopsy. a) Two vertical sections allowing visualization of the entire interfollicular epidermis, the dermoepidermal junction, the papillary dermis and superficial portion of the hair follicles. b) Horizontal section at the superficial reticular dermis, allowing visualization of all the follicular units and the superficial reticular dermis. c) Horizontal section at the dermosubcutaneous junction allowing visualization of all the hair follicles, the deep reticular dermis and the upper subcutis. C) If the biopsy is too thin, the specimen should be bisected (left slide) rather than trisected (right slide). The procedure for the bisected HoVert is the same as the trisected Hovert, apart that the dermal/subcutaneous portion of the specimen is not sectioned horizontally at the dermosubcutaneous junction.

dermis and the subcutis of a single punch biopsy (Fig. 3).[18] Of note, HoVert does not allow some of the tissue to be available for direct immunofluorescence, which may aid in the diagnosis.

Immunohistochemistry has classically been limited to experimental and research settings.[20] However, with our recent studies,[21–23] we have identified a few new indications for immunohistochemistry in specific diagnostic impasses. In our experience, obtaining a few unstained sections with the initial hematoxylin and eosin (H&E) sections allows for this application, since diagnostic changes in alopecia may be quite focal and since refacing the tissue block may produce sections without diagnostic features.

CD3, CD123 and treponema immunostains can be useful in alopecia diagnosis:

### CD3 immunostain in subacute and chronic alopecia areata

Diagnosis of acute alopecia areata is easy because of the presence of the peribulbar 'hive-of-bees' lymphocytic infiltrate. However, subacute (and chronic) alopecia areata often do not show this peribulbar infiltrate and a distinction from pattern hair loss may not be possible because both disorders are characterized by follicular miniaturization and an increased CT hair count. CD3+ T lymphocytes within the empty follicular fibrous tracts, which are often not obvious on H&E sections, make the distinction between pattern hair loss and alopecia areata possible.[21]

### CD123 immunostain in lupus alopecia

Clusters of plasmacytoid dendritic cells are found in skin biopsies from patients with

**Review**

systemic lupus erythematosus (LE), Jessner's lymphocytic infiltrate (lupus tumidus) and subcutaneous LE.[24-27] The presence of clusters of at least five CD123+ plasmacytoid dendritic cells helps distinguish alopecic LE from lichen planopilaris (LPP) in challenging cases, which may have only a superficial lymphocytic infiltrate and an unaffected interfollicular epidermis.[22] A stain for interstitial mucin, such as colloidal iron stain, may also be quite helpful, though the normal scalp has more interstitial mucin than most other cutaneous sites.

Treponema immunostaining in syphilis

The presence of plasma cells in the inflammatory component and psoriasiform epidermal changes should raise the question of syphilis. H&E features of syphilitic alopecia are described further in this manuscript.

Of note, though the loss of cytokeratin 15+ follicular bulge stem cells is important in the disease progression of lichen planopilaris,[28,29] the loss of this immunostaining does not appear to have any diagnostic value because it is observed within affected follicles in other cicatricial alopecias.[23]

**Current alopecia classifications and their limitations**

Alopecia is classically divided into cicatricial (scarring) and non-cicatricial (non-scarring). Cicatricial alopecia may be either primary or secondary in nature. Secondary scarring of localized areas of the scalp may result from trauma, burns, radiation dermatitis, cutaneous malignancies, sarcoidosis, scleroderma, necrobiosis lipoidica, cutaneous tuberculosis and other infections of bacterial, mycotic or viral origin. In these circumstances, the follicle is affected in a non-specific manner. Primary cicatricial alopecia reflects a disease specifically involving the hair follicle.[14,30-34]

For the pathologist, primary cicatricial alopecia represents a heterogenous group of hair disorders all characterized by having, as final outcome, the destruction of the follicular and sebaceous epithelium and its replacement by fibrous tissue (follicular scarring). In contrast, in non-cicatricial alopecia the follicular and sebaceous epithelium are preserved and the hair loss is potentially reversible.[30,35] Primary cicatricial alopecia results in the destruction of the bulge zone, which corresponds to the non-cycling portion of the follicle and the location of the follicular stem cells. Destruction of the bulge zone

therefore results in an irreversible hair loss.[35-38] In acute (rapid) cicatricial alopecia the follicular and sebaceous epithelium are destroyed, but the hair shafts remain 'naked', often surrounded by a granulomatous infiltrate. In chronic (biphasic) alopecia (see below) the whole follicular unit is replaced by scarring tissue.[14,30]

The classification of primary cicatricial alopecia, defined by the North American Hair Research Society (NAHRS) in 2001, remains a core of alopecia diagnostics.[1,2] The NAHRS classification groups diseases based upon the composition of the inflammatory infiltrate, as 'lymphocytic', 'neutrophilic' and 'mixed'. A more simplified classification scheme for primary cicatricial alopecia has been proposed by Sperling, with less emphasis on the nature of the inflammatory infiltrate, removing pseudopelade of Brocq (considered as a non-specific end-stage scarring alopecia) and merging folliculitis decalvans with central centrifugal cicatricial alopecia (CCCA).[14]

The new grossing techniques allowing examination of both vertical and horizontal sections enable not only more precise diagnostics but also revealed some limitations of the current classifications. Of note are the following:

1. Follicular scarring is the replacement of the hair follicle by connective tissue with no follicular epithelium left at all. Cicatricial alopecia implies that the follicular unit has been permanently replaced by scar tissue. However, when there is follicular drop out in long-standing alopecia, all that is left is an empty fibrous tract, which is histopathologically similar to the follicular scarring resulting from cicatricial alopecia. This process has been described as 'biphasic alopecia', since the early process has no scarring, but the later process results in total follicular loss. This follicular stem cell exhaustion and permanent hair loss, may be seen in pattern hair loss, particularly in males (Fig. 4), alopecia areata and traction alopecia.[14,30] In other words, follicular scarring should not only be seen as inflammation selectively attacking the hair follicle, but also as follicular deletion in chronic alopecia, even in the absence of apparent inflammation. Thus, all alopecias, whether classified as cicatricial or non-cicatricial, may, in the end, be scarring, with complete loss of the follicular epithelium and permanent hair loss.

2. It is nearly impossible to distinguish the follicular scarring from the fibrous tracts seen

Review

below miniaturized follicles (vellus hair) or below CT follicles. As the miniaturized follicles and the CT hairs are not long enough to extend down to the deep dermis and subcutis, the fibrous tracts in a deep section can be misdiagnosed as follicular scarring. Cases with marked decrease in the T : V ratio and/or increase in the CT count should therefore not be interpreted as cicatricial alopecia, particularly in deep horizontal dermal sections (Fig. 5).

3. We believe that classifying cicatricial alopecia in function of the nature of the infiltrate[2,39,40] may be misleading, because it lumps together clinically disparate disorders. The 'neutrophilic' primary cicatricial alopecias include folliculitis decalvans and dissecting cellulitis of the scalp. Both of these conditions have a mixed inflammatory infiltrate composed of lymphocytes, plasma cells, histiocytes and a variable number of neutrophils. In our experience, neutrophils may be sparse in folliculitis decalvans (Fig. 6). Acne keloidalis was classified as 'mixed', but it is histopathologically similar to folliculitis decalvans and distinction is based on clinical grounds. Sperling has proposed a new classification of primary cicatricial alopecia without taking into consideration the nature of the inflammatory infiltrate. In this classification, poorly defined entities such as Brock pseudopelade and CCCA have been withdrawn.[14] However, this classification joined diseases remaining controversial. Particularly, we are not convinced that folliculitis decalvans is the 'neutrophilic equivalent' of CCCA. Folliculitis decalvans has a mixed inflammatory infiltrate, arranged both around and between follicular units (Fig. 7) and it mostly affects Caucasian men. On the contrary, CCCA resembles LPP histologically (Fig. 8) with an infundibuloisthmic perifollicular lymphocytic infiltrate and it mostly affects the vertex of women of African descent.

4. Non-cicatricial alopecia cannot be considered as synonymous to reversible hair loss. Permanent alopecia after chemotherapy is both non-cicatricial and not reversible due to a toxicity of the drug to the follicular stem cells.[41–43]

Thus, we believe that the currently established classifications are not practical enough in our everyday alopecia diagnostics. We therefore wish to propose a new approach, which would be



*Fig. 4.* Follicular dropout in male pattern hair loss.



*Fig. 5.* Follicular fibrous tracts in horizontal deep dermal section.

different than the conventional separation of alopecia into cicatricial and non-cicatricial.

## A practical guide to diagnosis

A practical way to assess the scalp biopsies is (1) getting the clinical clues, (2) examining the biopsy specimen and (3) applying our two-step algorithm.

### Getting the clinical clues

Getting the clinic notes is especially helpful because the patient's subjective history and the clinician's exam may provide useful clues. Expert alopecia clinicians can provide very exact differentials. On the contrary, clinicians who

Review



*Fig. 6.* Folliculitis decalvans with sparse neutrophils.



*Fig. 8.* Central centrifugal cicatricial alopecia with perifollicular fibrosis identical to lichen planopilaris.



*Fig. 7.* Folliculitis decalvans with mixed inflammatory cell infiltrate arranged both around and between follicular units.

see fewer alopecia patients often do not provide sufficient clinical information, often only indicating 'hair loss'. Additionally, most of dermatopathologists are geographically far from the clinics. Without accurate clinical information, however, it may be impossible to render an accurate histopathological diagnosis in alopecia. The most important clinical clue to obtain from the dermatologist is whether the alopecia is diffuse or patchy or whether it is present in a 'special' context.

Table 1 separates diagnoses, based upon 'Diffuse' or 'Patchy' loss and a 'Usual' or 'Special' clinical context. 'Special clinical context' entities may be diffuse or patchy, but they are listed separately, because the clinical history and presentation are unique and usually make the diagnosis obvious. It is important to note that alopecia areata and LPP may present with either diffuse or patchy alopecia, and systemic LE and

syphilis may induce a telogen effluvium and present with diffuse alopecia.

A positive or negative hair pull (traction) test is a helpful clinical clue in the interpretation of diffuse or patchy alopecia. Clinicians routinely perform this test, in order to determine the severity and the location of the hair loss. Additionally, hair experts usually examine microscopically the pulled hair for diagnostic purpose. This test is useful for pathologists in order to indicate whether alopecia is active or non-active. Pulling more than 5–6 hairs after having grasped 50 to 60 hairs between the thumb, index and middle fingers is considered a positive hair pull test; a positive hair pull test indicates an active alopecia, and a negative test indicates a non-active alopecia.[44,45] Microscopic examination of the hair roots reveals terminal anagen hair (with a darkly pigmented and triangular-shaped bulb and preserved inner root sheath) and terminal telogen hair (with a lightly pigmented club-shaped bulb and without inner root sheath) (Fig. 9). Normal values for adult scalp are >80%–90% for anagen hair and <10%–20% for telogen hair. Increase in telogen hair in both fronto-parietal and occipital areas is observed in telogen effluvium and in subacute alopecia areata (both telogen effluvium and subacute alopecia areata show increase of the CT hair count). Pattern hair loss should be suspected if the increase of telogen hair is higher in the fronto-parietal area in combination with a variation of the hair shaft diameter. An increase in anagen hair can be found in anagen effluvium (indicating a toxic agent and chemotherapy) and in acute alopecia areata (the hair sheds in anagen phase because of the acute peribulbar infiltrate). Trichotillomania is

Table 1. Diffuse and patchy alopecia in common and a special clinical context

| Clinical context | Diffuse alopecia | Patchy alopecia |
|---|---|---|
| Common entities | Alopecia areata | Acne keloidalis |
| | Fibrosing alopecia in a pattern | Alopecia areata |
| | Distribution | Central centrifugal scarring alopecia |
| | Lichen planopilaris | Dissecting cellulitis |
| | Pattern hair loss (female and male) | Folliculitis decalvans |
| | Telogen effluvium (acute and chronic) | Lichen planopilaris |
| | | Lupus erythematosus (discoid and non-scarring) |
| | | Syphilis |
| | | Traction alopecia (early and chronic) |
| | | Trichotillomania |
| Special entities | Chemotherapy-related alopecia | Frontal fibrosing alopecia |
| |   Anagen effluvium | Loose anagen syndrome |
| |   Permanent alopecia after chemotherapy | Post-operative (pressure-induced) alopecia |
| | Loose anagen syndrome | Psoriatic alopecia and drug-induced psoriasiform alopecia |
| | Short anagen syndrome | Triangular alopecia |



*Fig. 9.* Microscopic examination of the pulled hair. A) Anagen hair preserve their inner root sheath (arrow) and have a darkly pigmented and triangular-shaped bulb. B) Telogen hair are devoid of inner root sheath and have a lightly pigmented club-shaped bulb.

characterized by broken hair (anagen hair with a sharp horizontal proximal end).[14,46,47]

We should also always make the distinction between common and rare causes. While there are many causes of alopecia, a few entities provide the bulk of diagnoses, and a focus on the common causes will lead to more accurate diagnoses. Finally, the frequency of a particular diagnoses may vary widely depending upon the patient population being seen in a particular clinic.

### Examine the biopsy specimen

The evaluation of the total number of hairs, of the overall size of hairs, of the total terminal telogen hairs and of the amount of the inflammation has already been integrated in a helpful four-step method by Sperling.[14] The following items should be assessed when examining the scalp biopsy.

*Density*

A normal 4-mm punch in a Caucasian patient has 25–30 terminal hairs in a transverse section through the deep dermis and five additional vellus hairs through the superficial dermis. Individual variations of the total hair count can range from 19 to 59 with an average of 38 follicles.[9,14] African-American patients have fewer follicles with an average of 21 hairs and Koreans (and presumably Asians) an even lower average of 16 hairs.[14,48,49] A 4 mm punch biopsy has $12.56\,mm^2$ so dividing a count of the follicles from one mid-dermal cross section by 12.56, produces the hair density result (example 36 total follicles/$12.56\,mm^2 = 2.86$ follicles/$mm^2$).

*Follicular size*

Follicles with shafts less than or equal to the thickness of the adjacent inner root sheath, or less than 0.03 mm in diameter are vellus hairs, those with shafts between 0.03 mm and 0.06 mm in diameter are indeterminate hairs and those with shafts larger than 0.06 mm in diameter are terminal hairs.[5,14] A normal T : V ratio is over 3 : 1, and in patients older than 50 years old 2 : 1 (senescence).[14,50] A ratio 2 : 1 or less is diagnostic of miniaturization. When assessing the T : V ratio, the major difficulty lies in counting the indeterminate hairs.[14] In our experience,

Review



*Fig. 10.* The terminal hair count should be obtained in the superficial subcutis (left horizontal section) and the vellus hair count in the mid-dermis (right horizontal section).



*Fig. 11.* Blue/gray-staining perifollicular fibrosis.



*Fig. 12.* Follicular ostium resembling compound follicle.

assessing extension into the subcutis provides the easiest way to assess the T : V ratio. The terminal hair count should be obtained in the superficial subcutis, where adipocytes and collagen bundles are admixed. The vellus hair count should be obtained in the mid-dermis where either CT follicles or sebaceous lobules are present (Fig. 10). The number of hairs in the deep reticular dermis at the dermo-hypodermal junction reflects the number of terminal hairs and the difference between upper and lower reticular dermis reflects the number of vellus hairs. CT follicles also vary in size, so large CT follicles may be considered as terminal hair and small CT follicles considered as vellus hair. Of note, a biopsy near the frontal, lateral or posterior hair line will have many more vellus (miniaturized) follicles as a normal feature, as the scalp merges into adjacent skin, which is populated with vellus follicles.

*Catagen and telogen percentage*

For ease of diagnostics, CT phase follicles can be grouped, especially because they can be histologically similar depending on the level at which they are sectioned. It is important to search all sections for the dermal level with the most CT phase follicles. Of note, CT follicles are present in markedly different percentages. Catagen phase follicles should be <2.5% of the total, so seeing >1 per biopsy is diagnostics of a catagen shift. Telogen phase follicles may be seen normally up to 10%–15% and a count over 20% is abnormal.[9,14,51] Of note, as miniaturization progresses, the length of the follicular cycle shortens, and more and more CT follicles are present. Thus, a CT count of over 15%–20% may be seen in a miniaturizing process, such as pattern hair loss and subacute or chronic alopecia areata.

*Perifollicular scarring*

A diagnosis of true perifollicular scarring should be reserved for blue/gray-staining fibrosis (Fig. 11), since follicles normally have onion skin-like collagen around them (fibrous root sheath). If only a single follicle with perifollicular fibrosis is identified, this could be a resolving acneiform lesion rather than real cicatricial alopecia. Blue/gray-staining perifollicular fibrosis involving more than one follicle is usually seen in LPP, CCCA and folliculitis decalvans. In our experience, this process of perifollicular scarring is less prominent in LE. Of note, normal follicles often group as they exit the ostium, and a transverse section may appear to be a compound (tufted) follicle, when it is actually a normal finding (Fig. 12).

*Inflammatory infiltrate*

The composition of an inflammatory cell infiltrate should be noted. However, it should be correlated with the above-discussed features

rather than being used as the primary feature for a diagnosis. Sometimes, active inflammation will not be identified on a biopsy, though other features will still lead to a definitive diagnosis. Sampling variability produces a wide variety of features for a single disease. A granulomatous component may surround the naked hair shafts in all acute alopecias in which the follicular epithelium is destroyed.

*Follicular fibrous tracts*

As previously mentioned, fibrous tracts or stela may either be seen below viable follicles (vellus hair and CT follicles) or correspond to the follicular scarring replacing the dropped-out follicles. The fibrous tract below a viable follicle has, perhaps, more vascularity, but, in our experience, this feature is subtle and difficult to assess.

Apply the two-step algorithm

After obtaining the clinical information of diffuse or patchy hair loss and after the histopathological examination, the diagnosis can be obtained following the below simple two-step algorithm (Figs. 13 and 14):

1 Presence or absence of follicular miniaturization?
2 Increased or normal CT count?

## Diffuse alopecia

Diffuse alopecia with follicular miniaturization

1. **Female/male pattern hair loss (androgenetic).** Follicular miniaturization without any other findings is most certainly pattern hair loss. Female pattern hair loss seems to progress to a certain degree and then ceases, whereas male pattern hair loss will progress to complete follicular loss.[4,52] This is not a diagnostic problem, however, because male pattern hair loss is uncommonly biopsied and generally only in the early stages. Seborrheic dermatitis is often also present, characterized by superficial dermal, especially perifollicular lymphocytes. Of note, seborrheic dermatitis on the scalp does not always have perifollicular parakeratosis as seen on the face. Sebaceous lobules are preserved but reduced in sized in relation to the miniaturized follicles.[1,8,14]

2. **Female/male pattern hair loss (androgenetic) with superimposed chronic telogen effluvium.** Pattern hair loss is often unmasked by a chronic telogen effluvium. Follicular miniaturization with a CT shift over 20% in both involved and normal-appearing scalp is most consistent with the co-existence of these two entities.[19]

3. **Subacute alopecia areata.** Miniaturization with a dramatic CT shift is usually subacute alopecia areata. Profound miniaturization with a T : V ratio of <1 : 4 most likely is subacute alopecia areata, and <1 : 7 always is subacute alopecia areata. A CT shift of 50%–100% often secures a diagnosis, since only few diseases cause such a profound CT shift (see alopecia areata-like pattern below).[11,53] Lymphocytes may be quite limited, with the peribulbar 'hive-of-bees' being absent. As discussed above, CD3 IHC may identify deep dermal or subcutaneous lymphocytes in follicular tracts. This is particularly helpful in cases where the T : V ratio is between 1 : 1 and 1 : 7 and the CT count is between 20% and 50%, a range found in both pattern hair loss and subacute alopecia areata. Diagnosing so-called 'alopecia areata incognita' may be aided with CD3 IHC.[21] Though eosinophils are useful in diagnosing alopecia areata, in our experience, they are not commonly present in the subacute form. Another useful histologic feature is the so-called 'nanogen' follicles, which are abnormal, miniaturized follicles resulting from rapid cycling.[14] Rarely, there may be a granulomatous component.[54,55]

4. **Permanent alopecia after chemotherapy.** With a history of chemotherapy, this entity is not difficult to diagnose, though it is rarely biopsied. Histologic sections show miniaturization and a CT shift resembling pattern hair loss or alopecia areata. Basaloid structures resembling telogen phase follicles have been described as a unique feature, but these may simply be follicles arrested in telogen phase.[41,42] With the basaloid, telogen-like structures, it may not be possible to histologically distinguish this from alopecia areata on H&E sections alone. CD3 IHC studies could be helpful in making this distinction.[21]

Diffuse alopecia without follicular miniaturization

*Diffuse alopecia without follicular miniaturization and with increased CT count*

1. **Chronic telogen effluvium.** The term 'telogen effluvium' should always be preceded

**Review**



*Fig. 13.* Diagnostic algorithm for diffuse primary scalp alopecia.

by the word 'acute' or 'chronic', since acute telogen effluvium and chronic telogen effluvium are entirely different entities. Acute telogen effluvium is rarely biopsied, and the clinical history of a dramatic, acute shedding usually secures the diagnosis. The dramatic shedding typically occurs 2–3 months after an insult, such as high fever, operations, general anesthesia, crash diets, accidents, trauma, psychological stress, thyroid dysfunction and drugs, in which a majority of follicles cycle prematurely into catagen phase. Shedding, however, does not occur until the follicles re-enter anagen phase and the new hair shaft pushes out the old hair shaft. Thus, a biopsy of acute telogen effluvium may show nearly 100% anagen phase follicles. Chronic telogen effluvium, on the other hand, is quite common and is defined as an increased shedding of hair on the entire scalp for longer than 6 months.[51] A clinical evaluation may identify a nutritive deficiency of some sort, such as protein or iron deficiency, hypothyroidism, chronic infection, connective tissue disease, malignancy and drug intake.[46] A biopsy is often performed to distinguish it from pattern hair loss. Chronic telogen effluvium alone should not show follicular miniaturization and there is a catagen/telogen shift of >20%. This percentage however rarely exceeds 50% and it can be variable because of the waxing and waning course.[14,31,56,57]

2. **Anagen effluvium.** Following an exposure to a toxicity agent (chemotherapy, high dosage of vitamin A, radiation), the anagen phase is abruptly interrupted and the hair falls out 2–4 weeks after the initiating event without entering catagen and telogen phases.[46,58,59] Since the anagen hair will shed, in skin biopsy we will observe the remaining CT hair, which will appear to be increased over 15%–20%. The clinical history and positive pull test with anagen hair make the diagnosis obvious.

3. **Short anagen and loose anagen syndromes.** In short anagen syndrome there is a persistent hair shedding and an impression that the hair does not grow due to the abnormal short anagen phase duration.[60–62] Loose anagen hair syndrome is due to a defective anchorage of the hair shaft to the follicle, resulting in easily pluckable hair.[63,64] In both these disorders, anagen hairs are shed and the remaining CT hairs in the skin biopsy would appear to be increased.

*Diffuse alopecia without follicular miniaturization and with normal CT count*

1. **Acute telogen effluvium.** As previously mentioned, massive shedding in acute telogen effluvium occurs when the new anagen hair shafts push out the prior shafts (2–3 months after the initiating trigger). Thus, despite the name, a biopsy will show a very low CT count of 0%–5%.

2. **Lichen planopilaris.** LPP is usually patchy, but occasional cases present with diffuse loss. LPP is discussed further below.

Review



*Fig. 14.* Diagnostic algorithm for patchy primary scalp alopecia.

## Patchy alopecia

### Patchy alopecia with follicular miniaturization

*Patchy alopecia with follicular miniaturization and with increased CT count*

1. **Alopecia areata**. As the patients are often young and the diagnosis of patchy alopecia areata is obvious clinically, a biopsy is often not obtained initially. As discussed above in the diffuse presentation of alopecia areata, a biopsy of early, acute alopecia areata is generally not problematic, and the peribulbar 'hive-of-bees' infiltrate of lymphocytes is often identified. Eosinophils are helpful but

often not present. Subacute alopecia areata, in which there has been significant miniaturization may be more challenging because of the absence of the peribulbar infiltrate and requires CD3 immunostaining as described above.

2. **Frontal fibrosing alopecia**. Frontal fibrosing alopecia, which may be a form of LPP, has a typical clinical presentation with loss of the frontal hairline and/or eyebrows. Smaller follicles, such as vellus and eyebrow follicles appear to be targeted, which may account for the loss of the frontal hairline, a location where the T : V ratio is decreased normally as the scalp transitions into the

**63**

**Review**

forehead. Biopsy findings are discrete with minimal perifollicular inflammation at the level of the infundibulum/isthmus, subtle vacuolar change and limited blue/gray-staining perifollicular fibrosis.[65−68] Since the eyebrow hairs cycle so frequently, they may disappear without developing any perifollicular fibrosis, and the biopsy may only show lymphocytes with no remaining follicles. A definitive diagnosis relies on careful histologic analysis in the correct clinical setting. Even with HoVert sections, the inflammatory foci are often difficult to find, with level sections through the tissue block being necessary.

3. **Fibrosing alopecia in a pattern distribution**. This entity is reported to have miniaturization similarly to pattern hair loss, with additional focal vacuolar interface dermatitis of the upper portion of the follicular epithelium and a variably dense perifollicular lymphocytic infiltrate and perifollicular fibrosis. Reports of this entity are sparse and it is still debated whether it consists of diffuse LPP, or of a diffuse presentation of frontal fibrosing alopecia, or of LPP with superimposed pattern hair loss, or of a particular manifestation of advanced pattern hair loss. Similarly to LPP, both vellus and terminal hairs may be inflamed, whereas in frontal fibrosing alopecia only vellus hairs are affected.[14,69,70] We suspect that fibrosing alopecia in a pattern distribution may really be diffuse LPP and that miniaturization results from dropout of the terminal follicles.

4. **Psoriatic alopecia**. In the presence of psoriasis, there may be subjacent follicular miniaturization with an increased CT shift approaching 100%, simulating alopecia areata. The differential diagnosis between psoriatic alopecia and alopecia areata may be impossible. Hair regrowth may or may not occur after treatment of the psoriasis. Epidermal changes are not requisite for diagnosis of psoriatic alopecia, as the patients may have received treatment, but it is usually present.[14,71]

5. **Tumor necrosis factor (TNF)-alpha inhibitor associated (drug-induced) psoriasiform alopecia**. Closely related to psoriatic alopecia is TNF-alpha inhibitor associated alopecia. For diagnostic purposes, it can be considered to be the same as psoriatic alopecia. Subtle histologic differences have been reported with increased superficial and deep lymphocytic inflammation, presence of plasma cells and eosinophils, as well as focal follicular destruction.[72−74] This diagnosis should not be confused with TNF inhibitor-induced alopecia areata.[75,76]

6. **Syphilitic alopecia**. Syphilis is another simulator of alopecia areata showing pronounced follicular miniaturization and CT increase over 50%, even approaching 100%. Syphilis may produce different patterns of alopecia, and the histologic findings are diverse. Usual features of secondary syphilis may be present, or the syphilis may also induce a chronic telogen effluvium. Though plasma cells may normally be present in the scalp, the presence of easily found plasma cells in the infiltrate of an alopecia biopsy should raise the possibility.[14,31,77]

7. **Non-scarring alopecia of systemic lupus erythematosus**. LE may also simulate alopecia areata with marked follicular miniaturization and CT shift superior to 50%. Vacuolar interface changes, perivascular, periadnexal and perieccrine lymphocytes and plasma cells, increased mucin and positive direct immunofluorescence are clues in favor of non-scarring alopecia of systemic LE. The presence of eosinophils could also be considered as finding in favor of alopecia areata, however occasional eosinophils may also be found in LE.

8. **Comment on 'alopecia areata-like' pattern**. Of note, in addition to psoriasis, syphilis and systemic LE, findings of follicular miniaturization and increase of CT hair over 50% simulating alopecia areata have also been reported in tick bite alopecia.[78] We suspect that this alopecia areata-like process may be non-specific and associated with acute inflammation, and we believe that the pathologists should be wary of diagnosing these cases as alopecia areata.

*Patchy alopecia with follicular miniaturization and with normal CT count*

1. **End-stage traction alopecia**. End-stage traction alopecia also shows decrease T : V ratio, but this is mostly due to a selective loss of terminal hairs rather than follicular miniaturization. Typically, in end-stage traction alopecia most of the follicular units still have associated sebaceous glands.[31]

2. **Triangular alopecia**. This hamartomatous lesion is easily diagnosed because of the typical clinical presentation of a lancet-shaped

bald spot. Histology shows almost exclusively vellus hairs because of the hamartomatous origin and not because of miniaturization. Fibrous tracts are thus absent helping the distinction from end-stage traction alopecia, in which they are preserved.[79,80]

Patchy alopecia without follicular miniaturization

*Patchy alopecia without follicular miniaturization and with increased CT count*

1. **Trichotillomania/early (acute) traction alopecia.** Clinical information often points toward this diagnosis from the start. The presence of CT phase follicles is the most sensitive finding in trichotillomania and traction, also known collectively as 'trichotillosis'. The changes follow a spectrum from acute to chronic. A dramatic catagen shift involving the terminal follicles is the hallmark, and there are variable hair shaft changes (trichomalacia). Pigment casts, which occur from release of melanin from the hair shaft, may be present, but they may also be seen in other processes, particularly alopecia areata, especially when the hair is very dark. The popular 'Hamburger' sign, with a fracture in the hair shaft and pink-staining material in the middle, is only rarely found.[81] Histologic knife cutting chatter may also produce fractures in the hair shaft, simulating external trauma. Hemorrhage may be present, but punch biopsies also have biopsy-associated hemorrhage.[81,82] There may be superimposed lichen simplex chronicus. As previously mentioned, there may be a decreased T : V ratio in older lesions associated with a low follicular count.[31]

2. **Post-operative (pressure-induced) alopecia.** Post-operative alopecia is usually obvious because of the clinical history. A biopsy shows CT shift, which can sometimes exceed 50%. Alopecia areata is in the differential, and the absence of miniaturization, presence of vascular thrombosis and fat necrosis help this distinction.[14,83,84] Once again, a CD3 immunostaining study could be helpful in ruling out alopecia areata.

3. **Loose anagen hair syndrome.** Loose anagen hair syndrome may be both diffuse or patchy (on parietal areas).[63,64] This disorder has been previously mentioned.

4. **Dissecting cellulitis of the scalp.** CT hairs may be increased in dissecting cellulitis of the scalp because the intense inflammation triggers the conversion of anagen into CT hairs. This disorder will be discussed further.

*Patchy alopecia without follicular miniaturization and with normal CT count*

1. **Lichen planopilaris.** LPP is a very common entity, and the diagnostic features are usually easily found. Early cases, however, may have only focal findings, and level sections through the tissue block may be necessary. There is almost always blue/gray-staining perifollicular fibrosis confined to the level of the infundibulum and superficial isthmus with subtle interface change and squamatization of the basalis. Peripheral to the fibrosis, there is a perifollicular lymphocytic cell infiltrate, which varies in density, and sometimes the lymphocytes scatter into the follicle. The interfollicular epidermis is almost never affected in LPP, and the presence of such should raise a strong suspicious of lupus alopecia. Of great aid in the diagnosis is the reduction or absence of sebaceous glands.[85–87] A useful diagnostic feature is the near absence of CT phase follicles in lichen planopilaris, which has been credited to early destruction of the cytokeratin15+ follicular stem cells in the bulge.[28] Of note, often a resolving acneiform lesion, which may be incidentally biopsied in a variety of alopecic processes, may show changes identical to lichen planopilaris. For this reason, we believe that the changes should be seen in two separate foci in a biopsy before a diagnosis of LPP is rendered.

2. **Central centrifugal cicatricial alopecia.** In our experience, CCCA is nearly histologically identical to LPP. In CCCA, similarly to LPP, there is almost always blue/gray-staining perifollicular fibrosis at the infundibuloisthmic portion of the hair follicle. Interface changes are subtle or absent and confined to the follicular epithelium.[14] As with LPP, CCCA has more pronounced squamatization of the basal layer than lupus alopecia. Both CCCA and LPP have a perifollicular lymphocytic infiltrate, which is closely associated with the infundibuloisthmic area of fibrosis, with no

**Review**

deep dermal component. In our experience, compound follicles (the 'google' follicles typically described in CCCA) are seen in both disorders, and the eccentric epithelial atrophy described as a feature of CCCA may also be seen in LPP. Traction alopecia and trauma, which may be components of CCCA, may also produce this feature.[88] In addition, we have observed the premature desquamation of the internal root sheath not only in CCCA but also in LPP. Premature desquamation may also be artifactually created with knife chatter during tissue sectioning.[14,89] Sperling has published that the premature desquamation of the inner root sheath is specific for CCCA only in early disease.[90] Of note, less inflammatory CCCA has been called 'follicular degeneration syndrome'.[91,92] We hypothesize that the reported diffuse and non-inflammatory manifestations of CCCA may be a manifestation of diffuse LPP.[93] Clinically, CCCA is identical to diffuse LPP and the additional crusting and pustule formation may be due to bacterial superinfection. LPP is commonly seen in women of African descent, and we suspect that CCCA may be a particular manifestation of diffuse LPP seen in the vertex of black African women, induced and intensified by chemical relaxers for styling purposes, caustic cosmetics, hot combs and chronic traction.

3. **Lupus erythematosus**. Lupus alopecia shows the usual histologic features similar to discoid lupus elsewhere on the body. Lupus alopecia almost always has vacuolar change in the surface epidermis and a superficial and deep lymphoplasmacytic infiltrate. Thus, most cases of lupus alopecia are easily distinguished from LPP, because of the surface interface change and the deep infiltrate. As with other sites on the body, a diagnosis of LE may be more challenging if the interfollicular interface change is absent.[94,95] Occasionally, a distinction between LE and LPP is difficult. As described above, we have reported the utility of CD123 immunostaining.[13] In contrast to LPP, lupus alopecia usually has minimal perifollicular fibrosis. The absence of CT follicles is a usual feature of LPP but not of lupus alopecia.[28] As discussed above, non-cicatricial alopecia of systemic LE may have a markedly increased CT count, simulating alopecia areata. Increased interstitial mucin is helpful, but the normal scalp has more interstitial mucin than other sites. Plasma cells, a hallmark of lupus, are less helpful in the scalp, because they may be present in any scalp dermatitis. Syphilitic alopecia may be excluded with immunohistochemistry or serologic studies. Occasionally, direct immunofluorescence studies may be helpful in making a distinction between LPP and lupus alopecia. Other histopathological clues in favor of LPP and against lupus alopecia are mucinous perifollicular fibroplasia and superficial wedge shaped scar destroying only the upper portion of the elastic sheath.[44,96,97]

4. **Folliculitis decalvans/dissecting cellulitis/acne keloidalis**. Formerly known as the 'pustulofollicular'-type of scarring alopecia, the entities in this group of diseases must be distinguished based upon clinical grounds. It is the function of the pathologist to make a diagnosis of this group, and the onus is on the clinician to make a specific diagnosis. Thus, for a histopathological diagnosis, we prefer to group folliculitis decalvans with dissecting cellulitis (perifolliculitis capitis abscedens et suffodiens) and acne keloidalis. Folliculitis decalvans represents the variant with more superficial and follicular centered inflammation, whereas dissecting cellulitis has deeper and widespread inflammation. Acne keloidalis is closely related to folliculitis decalvans but the clinical presentation is very distinctive. Generally, all of the entities involve the presence of clinical pustules, though dissecting cellulitis is typically deeper with the formation of suppurative tracts. It would be better with the NAHRS classification to group these under 'mixed cell type' because the infiltrate varies and neutrophils, which are essentially always present, may be quite few in number. The driving feature of these diagnoses is not only perifollicular inflammation and fibrosis but also interstitial involvement between the follicular units. All eventuate in compound follicles, which are often tufted (having multiple follicles). Of note, in dissecting cellulitis, in contrast to most other cicatricial alopecias, sebaceous glands are preserved because of the deep follicular involvement.[14,98,99]

5. **Tinea capitis**. In all the aforementioned diseases, in which neutrophils are present among the inflammatory cells, a PAS stain should always be performed to rule out tinea capitis. Of note, a biopsy from a child with

a scarring process should be examined very carefully for tinea, including multiple PAS stains, as the fungal forms may be rare and difficult to find.

6. **Pseudopelade of Brocq.** Pseudopelade of Brocq is not a distinct clinical entity and causes ongoing debate among experts. Adding further confusion, the term 'pseudopelade' has also been used to describe patients with CCCA.[14] Pseudopelade of Brocq may be considered to be end-stage, primary cicatricial alopecia, for which there is no established specific diagnosis.[14,100,101] The classic description as 'footprints in the snow' refers to cutaneous hypopigmentation and atrophy. With the use of horizontal sections, this entity has progressively disappeared, likely because horizontal sectioning finds foci of peri-infundibular inflammation and a diagnosis of LPP or CCCA is rendered.[100,102,103] In support of this is the observation that when mild inflammation is identified, there is also perifollicular erythema and hyperkeratosis, as seen in LPP. Pseudopelade of Brocq limited to the crown and vertex may correspond to burned out CCCA, which is possibly a variant of LPP. Thus, we recommend abandoning this diagnosis.

## Conclusion

With this review we have attempted to move away from the established cicatricial (scarring) vs. non-cicatricial (non-scarring) classification to a more simplified pathway, which we hope will allow a more exact diagnosis of alopecia; by starting with a diffuse versus patchy clinical presentation, we rely on follicular size (miniaturization) and phase (catagen/telogen count). In addition, a number of alopecic entities can be diagnosed by correlating the histopathological findings with very obvious clinical presentations. In our experience, the new HoVert grossing technique, offering both vertical and horizontal studies in one biopsy, greatly simplifies diagnostics, mostly by reducing analysis time and limiting the need for step level sections. Finally, we have described the utility of immunohistochemistry in a few diagnostic situations.

## References

1. Olsen EA, Bergfeld WF, Cotsarelis G, et al. Summary of North American Hair Research Society (NAHRS)-sponsored Workshop on Cicatricial Alopecia, Duke University Medical Center, February 10 and 11, 2001. J Am Acad Dermatol 2003; 48: 103.

2. Olsen EA, Stenn K, Bergfeld W, et al. Update on cicatricial alopecia. J Investig Dermatol Symp Proc 2003; 8: 18.

3. Messenger AG, Sinclair R. Follicular miniaturization in female pattern hair loss: clinicopathological correlations. Br J Dermatol 2006; 155: 926.

4. Olsen EA, Hordinsky M, Roberts JL, Whiting DA. Dermatologic consortium for women's health. Female pattern hair loss. J Am Acad Dermatol 2002; 47: 795.

5. Headington JT. Transverse microscopic anatomy of the human scalp. A basis for a morphometric approach to disorders of the hair follicle. Arch Dermatol 1984; 120: 449.

6. Stefanato CM. Histopathology of alopecia: a clinicopathological approach to diagnosis. Histopathology 2010; 56: 24.

7. Miteva M. A comprehensive approach to hair pathology of horizontal sections. Am J Dermatopathol 2013; 35: 529.

8. Elston DM, Stratman EJ, Miller SJ. Skin biopsy. Biopsy issues in specific diseases. J Am Acad Dermatol 2016; 74: 1.

9. Whiting DA. Diagnostic and predictive value of horizontal sections of scalp biopsy specimens in male pattern androgenetic alopecia. J Am Acad Dermatol 1993; 28: 755.

10. Whiting DA. Histopathology of alopecia areata in horizontal sections of scalp biopsies. J Investig Dermatol 1995; 104: 26S.

11. Elston DM, Ferringer T, Dalton S, Fillman E, Tyler W. A comparison of vertical versus transverse sections in the evaluation of alopecia biopsy specimens. J Am Acad Dermatol 2005; 53: 267.

12. Elston DM. Vertical vs transverse sections: both are valuable in the evaluation of alopecia. Am J Dermatopathol 2005; 27: 353.

13. Flotte TJ. Transverse sectioning of the scalp (Headington technique) in the 19th Century. J Cutan Pathol 2008; 35: 82.

14. Sperling LC, Cowper SE, Knopp EA. An Atlas of Hair Pathology with Clinical Correlations, 2nd ed. Boca Raton: Taylor and Francis Group, 2012.

15. Frishberg DP, Sperling LC, Guthrie VM. Transverse scalp sections: a proposed method for laboratory processing. J Am Acad Dermatol 1996; 35: 220.

16. Elston DM, McCollough ML, Angeloni VL. Vertical and transverse sections of alopecia biopsy specimens: combining the two to maximize diagnostic yield. J Am Acad Dermatol 1995; 32: 454.

17. Elston DM. The 'Tyler technique' for alopecia biopsies. J Cutan Pathol 2012; 39: 306.

18. Nguyen JV, Hudacek K, Whitten JA, Rubin AI, Seykora JT. The HoVert technique: a novel method for the sectioning of alopecia biopsies. J Cutan Pathol 2011; 38: 401.

19. Wohltmann WE, Sperling LC. Histopathologic diagnosis of multifactorial alopecia. J Cutan Pathol 2016; 43: 483.

20. LaSenna C, Miteva M. Special stains for immunohistochemical stains in hair pathology. Am J Dermatopathol 2016; 38: 327.

21. Kolivras A, Thompson C. Distinguishing diffuse alopecia areata from pattern hair loss using CD3+ T cells. J Am Acad Dermatol 2016; 74: 937.

22. Kolivras A, Thompson C. Clusters of CD123+ plasmacytoid dendritic cells help distinguish lupus alopecia from lichen planopilaris. J Am Acad Dermatol 2016; 74: 1267.

23. Kolivras A, Thompson C. Loss of cytokeratin-15 expression is not specific for lichen planopilaris. J Am Acad Dermatol 2016; 75: 428.

24. Tomasini D, Mentzel T, Hantschke M, et al. Plasmacytoid dendritic cells: an overview of their presence and distribution in different inflammatory skin diseases, with special emphasis on Jessner's lymphocytic infiltrate of the skin and subcutaneous lupus erythematosus. J Cutan Pathol 2010; 37: 1132.

25. Brown TT, Choi E-YK, Thomas DG, Hristov AC, Chan MP. Comparative analysis

## Review

of rosacea and cutaneous lupus erythematosus: histopathologic features. T-cell subsets and plasmacytoid dendritic cells. J Am Acad Dermatol 2014; 71: 100.

26. McNiff JY, Kaplan DH. Plasmacytoid dendritic cells are present in cutaneous dermatomyositis lesions in a pattern distinct from lupus erythematosus. J Cutan Pathol 2008; 35: 452.

27. Liau JY, Chuang SS, Chu CY, Ku WH, Tsai JH, Shih TF. The presence of clusters of plasmacytoid dendritic cells is a helpful feature for differentiating lupus panniculitis from subcutaneous panniculitis-like T-cell lymphoma. Histopathology 2013; 62: 1057.

28. Habashi-Daniel A, Roberts JL, Desai N, Thompson C. Absence of catagen/telogen phase and loss of cytokeratin 15 expression in hair follicles in lichen planopilaris. J Am Acad Dermatol 2014; 71: 969.

29. Mobini N, Tam S, Kamino H. Possible role of the bulge region in the pathogenesis of inflammatory scarring alopecia: lichen planopilaris as the prototype. J Cutan Pathol 2005; 32: 675.

30. Sperling LC, Solomon AR, Whiting DA. A new look at scarring alopecia. Arch Dermatol 2000; 136: 235.

31. Sperling LC, Lupton GP. Histopathology of non-scarring alopecia. J Cutan Pathol 1995; 22: 97.

32. Gordon K, Tosti A. Alopecia: evaluation and treatment. Clin Cosmet Investig Dermatol 2011; 4: 101.

33. Tan E. Update on primary cicatricial alopecias. J Am Acad Dermatol 2005; 53: 1.

34. Otberg N. Primary cicatricial alopecias. Dermatol Clin 2013; 31: 155.

35. Rongioletti F, Christana K. Cicatricial (scarring) alopecias: an overview of pathogenesis, classification, diagnosis, and treatment. Am J Clin Dermatol 2012; 13: 247.

36. Pozdnyakova O, Mahalingam M. Involvement of the bulge region in primary scalp alopecia. J Cutan Pathol 2008; 35: 922.

37. Al-Refu K, Edward S, Ingham E, Goodfield M. Expression of hair follicle stem cells detected by cytokeratin 15 stain: implications for pathogenesis of the scarring process in cutaneous lupus erythematosus. Br J Dermatol 2009; 160: 1188.

38. Al-Refu K. Stem cells and alopecia: a review of pathogenesis. Br J Dermatol 2012; 167: 479.

39. Mesa KR, Rompolas P, Greco V. The dynamic duo: niche/stem cell interdependency. Stem Cell Reports 2015; 4: 961.

40. Pincus LB, Price VH, McCalmont TH. The amount counts: distinguishing neutrophil-mediated and lymphocyte-mediated cicatricial alopecia by compound follicles. J Cutan Pathol 2011; 38: 1.

41. Miteva M, Misciali C, Fanti PA, Vincenzi C, Romanelli P, Tosti A. Permanent alopecia after systemic chemotherapy: a clinicopathological study of 10 cases. Am J Dermatopathol 2011; 33: 345.

42. Tallon B, Blanchard E, Goldberg LJ. Permanent chemotherapy-induced alopecia: case report and review of the literature. J Am Acad Dermatol 2010; 63: 333.

43. Tallon B. Permanent chemptherapy-induced alopecia: histopathologic criteria still to be defined. J Am Acad Dermatol 2013; 68: 151.

44. Mubki T, Rudnicka L, Olszewska M, Shapiro J. Evaluation and diagnosis of the hair loss patient. J Am Acad Dermatol 2014; 71: 415.

45. Piraccini BM. Evaluation of hair loss. Curr Probl Dermatol 2015; 47: 10.

46. Shapiro J, Otberg N. Hair Loss and Restoration, 2nd ed. Boca Raton: Taylor and Francis Group, 2015.

47. Blume-Peytavi U, Orfanos CE. Microscopy of the hair—the trichogram. In Serup J, Jemec GBE, Grove GL, eds. Handbook of Non-Invasive Methods and the Skin, 2nd ed. Taylor and Francis Group: Boca Raton, 2006; 875.

48. Sperling LC. Hair density in African Americans. Arch Dermatol 1999; 135: 656.

49. Lee HJ, Ha SJ, Lee JH, Kim JW, Kim HO, Whiting DA. Hair counts from scalp biopsy specimens in Asians. J Am Acad Dermatol 2002; 46: 218.

50. Kligman AM. The comparative histopathology of male-pattern baldness and senescent baldness. Clin Dermatol 1988; 6: 108.

51. Whiting DA. Chronic telogen effluvium: increased scalp hair shedding in middle-aged women. J Am Acad Dermatol 1996; 35: 899.

52. Sinclair R, Jolley D, Mallari R, et al. Morphological approach to hair disorders. J Investig Dermatol Sym Proc 2003; 8: 56.

53. Whiting DA. Histopathologic features of alopecia areata: a new look. Arch Dermatol 2003; 139: 1555.

54. Paniz Mondolfi AE, Cressey BD, Ahmad A, Tapia-Centola B, Cohen LM, Mahmoodi M. Granulomatous alopecia: a variant of alopecia areata? J Cutan Pathol 2013; 40: 357.

55. Wik M, Zelger BG, Zelger B. Granulomatous alopecia areata. J Cutan Pathol 2014; 41: 329.

56. Bittencourt C, Ferraro DA, Soares TCB, Moraes AM, Cintra ML. Chronic telogen effluvium and female pattern hair loss are separate and distinct forms of alopecia: a histomorphometric and immunohistochemical analysis. Clin Exp Dermatol 2014; 39: 868.

57. Whiting DA. Update on chronic telogen effluvium. Exp Dermatol 1999; 8: 305.

58. Reyes-Habito CM, Roh EK. Cutaneous reactions to chemotherapeutic drugs and targeted therapies for cancer. J Am Acad Dermatol 2014; 71: 217.

59. Choi M, Kim PS, Park SY, et al. Clinical characteristics od chemotherapy-induced alopecia in childhood. J Am Acad Dermatol 2014; 70: 499.

60. Avashia N, Woolery-Lloyd H, Tosti A, Ramanelli P. Short anagen syndrome in an African American woman. J Am Acad Dermatol 2010; 63: 1092.

61. Antaya RJ, Sideridou E, Olsen EA. Short anagen syndrome. J Am Acad Dermatol 2005; 53: S130.

62. Giacomini F, Starace M, Tosti A. Short anagen syndrome. Pediatr Dermatol 2011; 28: 133.

63. Mirmirani P, Uno H, Price VH. Abnormal inner root sheath of the hair follicle in the loose anagen hair syndrome: an ultrastructural study. J Am Acad Dermatol 2011; 64: 129.

64. Tosti A, Piraccini BM. Loose anagen hair syndrome and loose anagen hair. Arch Dermatol 2002; 138: 521.

65. Vano Galvan S, Molina-Ruiz AM, Serrano-Falco C, et al. Frontal fibrosing alopecia: a multicenter review of 355 patients. J Am Acad Dermatol 2014; 70: 670.

66. Conde Fernandes I, Selores M, Machado S. Frontal fibrosing alopecia: a review of eleven patients. Eur J Dermatol 2011; 21: 750.

67. Tosti A, Piraccini BM, Iorizzo M, Misciali C. Frontal fibrosing alopecia in postmenopausal women. J Am Acad Dermatol 2005; 52: 55.

68. Poblet E, Jiménez F, Pascual A, Piqué E. Frontal fibrosing alopecia versus lichen planopilaris: a clinicopathological study. Int J Dermatol 2006; 45: 375.

69. Zinkernagel MS, Trüeb RM. Fibrosing alopecia in a pattern distribution: patterned lichen planopilaris or androgenetic alopecia with a lichenoid tissue reaction pattern? Arch Dermatol 2000; 136: 205.

70. Chiu H-Y, Lin S-J. Fibrosing alopecia in a pattern distribution. J Eur Acad Dermatol Venereol 2010; 24: 1113.

71. Runne U, Kroneisen-Wiersma P. Psoriatic alopecia: acute and chronic hair loss in 47 patients with scalp psoriasis. Dermatology 1992; 185: 82.

72. Doyle LA, Sperling LC, Baksh S, et al. Psoriatic alopecia/alopecia areata—like reactions secondary to anti–tumor necrosis factor-α therapy: a novel cause of non-cicatricial alopecia. Am J Dermatopathol 2011; 33: 161.

73. Shabrawi-Caelen El L, La Placa M, Vincenzi C, Haidn T, Muellegger R, Tosti A. Adalimumab-induced psoriasis of the scalp with diffuse alopecia: a severe potentially irreversible cutaneous side effect of TNF-alpha blockers. Inflamm Bowel Dis 2010; 16: 182.

74. Grinblat B, Scheinberg M. The enigmatic development of psoriasis and psoriasiform lesions during anti-TNF therapy: a review. Semin Arthritis Rheum 2008; 37: 251.

75. Tosti A, Pazzaglia M, Starace M, Bellavista S, Vincenzi C, Tonelli G. Alopecia areata during treatment with biologic agents. Arch Dermatol 2006; 142: 1653.

76. Katoulis AC, Alevizou A, Bozi E, et al. Biologic agents and alopecia areata. Dermatology 2009; 218: 184.

77. Jordaan HF, Louw M. The moth-eaten alopecia of secondary syphilis. A histopathological study of 12 patients. Am J Dermatopathol 1995; 17: 158.

78. Lynch MC, Milchak MA, Parnes H, Ioffreda MD. Tick bite alopecia: A report and review. Am J Dermatopathol 2016; DOI: 10.1097 / DAD.0000000000000598 [Epub ahead of print].

79. Trakimas C, Sperling LC, Skelton HG, Smith KJ, Buker JL. Clinical and histologic findings in temporal triangular alopecia. J Am Acad Dermatol 1994; 31: 205.

80. Trakimas CA, Sperling LC. Temporal triangular alopecia acquired in adulthood. J Am Acad Dermatol 1999; 40: 842.

81. Royer MC, Sperling LC. Splitting hairs: the "hamburger sign" in trichotillomania. J Cutan Pathol 2006; 33: 63.

82. Walsh KH, McDougle CJ. Trichotillomania. Presentation, etiology, diagnosis and therapy. Am J Clin Dermatol 2001; 2: 327.

83. Boyer JD, Vidmar DA. Postoperative alopecia: a case report and literature review. Cutis 1994; 54: 321.

84. Hanly AJ, Jorda M, Badiavas E, Valencia I, Elgart GW. Postoperative pressure-induced alopecia: report of a case and discussion of the role of apoptosis in non-scarring alopecia. J Cutan Pathol 1999; 26: 357.

85. Mehregan DA, Van Hale HM, Muller SA. Lichen planopilaris: clinical and pathologic study of forty-five patients. J Am Acad Dermatol 1992; 27: 935.

86. Assouly P, Reygagne P. Lichen planopilaris: update on diagnosis and treatment. Semin Cutan Med Surg 2009; 28: 3.

87. Tandon YK, Somani N, Cevasco NC, Bergfeld WF. A histologic review of 27 patients with lichen planopilaris. J Am Acad Dermatol 2008; 59: 91.

88. Ackerman AB, Walton NW, Jones RE, Charissi C. Hot comb alopecia/follicular degeneration syndrome in African-American women is traction alopecia. Dermatol Pract Concept 2000; 6: 6.

89. Horenstein MG, Simon J. Investigation of the hair follicle inner root sheath in scarring and non-scarring alopecia. J Cutan Pathol 2007; 34: 762.

90. Sperling LC. Premature desquamation of the inner root sheath is still a useful concept!. J Cutan Pathol 2007; 34: 809.

91. Sperling LC, Skelton HG, Smith KJ, Sau P, Friedman K. Follicular degeneration syndrome in men. Arch Dermatol 1994; 130: 763.

92. Sperling LC, Sau P. The follicular degeneration syndrome in black patients. 'Hot comb alopecia' revisited and revised. Arch Dermatol 1992; 128: 68.

93. Miteva M, Tosti A. Central centrifugal cicatricial alopecia presenting with irregular patchy alopecia on the lateral and posterior Scalp. Skin Appendage Disord 2015; 1: 1.

94. Fabbri P, Amato L, Chiarini C, Moretti S, Massi D. Scarring alopecia in discoid lupus erythematosus: a clinical, histopathologic and immunopathologic study. Lupus 2004; 13: 455.

95. Hordinsky M. Cicatricial alopecia: discoid lupus erythematosus. Dermatol Ther 2008; 21: 245.

96. Elston DM, McCollough ML, Warshaw KE, Bergfeld WF. Elastic tissue in scars and alopecia. J Cutan Pathol 2013; 27: 147.

97. Elston CA, Kazlouskaya V, Elston DM. Elastic staining versus fluorescent and polarized microscopy in the diagnosis of alopecia. J Am Acad Dermatol 2013; 69: 288.

98. Stites PC, Boyd AS. Dissecting cellulitis in a white male: a case report and review of the literature. Cutis 2001; 67: 37.

99. Badaoui A, Reygagne P, Cavelier-Balloy B, et al. Dissecting cellulitis of the scalp: a retrospective study of 51 patients and review of literature. Br J Dermatol 2015; 174: 421.

100. Amato L, Mei S, Massi D, Gallerani I, Fabbri P. Cicatricial alopecia; a dermatopathologic and immunopathologic study of 33 patients (pseudopelade of Brocq is not a specific clinico-pathologic entity). Int J Dermatol 2002; 41: 8.

101. Moure ERD, Romiti R, Machado MCDMR, Valente NYS. Primary cicatricial alopecias: a review of histopathological findings in 38 patients from a clinical university hospital in Sao Paolo, Brazil. Clinics (Sao Paulo) 2008; 63: 747.

102. Silvers DN, Katz BE, Young AW. Pseudopelade of Brocq is lichen planopilaris: report of four cases that support this nosology. Cutis 1993; 51: 99.

103. Annessi G, Lombardo G, Gobello T, Puddu P. A clinicopathologic study of scarring alopecia due to lichen planus: comparison with scarring alopecia in discoid lupus erythematosus and pseudopelade. Am J Dermatopathol 1999; 21: 324.





## Reply to: "Lack of specificity of cytokeratin-15 loss in scarring alopecias"

*To the Editor:* We read with great interest the letter by Mahalingam[1] supporting our published findings concerning the lack of specificity of loss of cytokeratin-15 (CK15) in affected follicles in cicatricial (scarring) alopecia.[2] Because of the limited authorized number of references in research letters in the *Journal*, we were unable to cite the multiple relevant publications, including the 2 studies authored by Pozdnyakova and Mahalingam[3] and Hoang et al.[4] It is nowadays obvious that bulge stem cell exhaustion cannot have any discriminating value in lymphocytic cicatricial alopecias because isthmic outer root sheath injury is nonspecifically seen in lichen planopilaris, frontal fibrosing alopecia, lupus erythematosus, and central centrifugal cicatricial alopecia. Neutrophil-poor folliculitis decalvans could be added to the aforementioned differential diagnosis. Use of this immunostain in the so-called "neutrophilic" cicatricial alopecia is without interest because the inflammatory infiltrate in dissecting cellulitis is deeper than in folliculitis decalvans and does not affect the follicular isthmus. We also find it pointless to further explore CK15 in biphasic alopecias (eg, chronic traction alopecia, pattern hair loss, chronic alopecia areata, and nonscarring alopecia of systemic lupus erythematosus) because in these disorders permanent follicular dropout results from follicular stem cell exhaustion. CK15 loss would also be seen after direct toxicity on the follicular stem cells, as seen in permanent alopecia after chemotherapy.[5] For the above reasons, further debate on this topic is useless; our focus should no longer be whether follicular bulge stem cells are preserved on not, but why they are lost.

Expanding knowledge on hair follicle immunology stresses our need to step away from the conventional North American Hair Research classification of scarring alopecia based on the nature of the inflammatory infiltrate.[6] Lichen planopilaris and the related frontal fibrosing alopecia can clearly be regarded as follicular bulge immune privilege (IP) collapse disorders. The bulge is a target for an interferon-gamma–induced immune injury, similarly to the anagen hair bulb IP collapse seen in alopecia areata.[7,8] Studying the follicular suppression of major histocompatibility complex class I antigens, the accumulation of no danger signals (such as CD200) and the accumulation of IP guardians could contribute to better delineate the spectrum of follicular bulge IP collapse disorders, as well as positioning fibrosing alopecia in a pattern distribution and central centrifugal cicatricial

alopecia in this spectrum. Current knowledge has also revealed the coexistence of the activated hair germ cells engaging in the follicular growth and the quiescent bulge stem cells maintaining the long-term stem cell pool. The follicular stem cell and dermal papilla niche interdependency has also shifted our attention from the former to the critical role of the latter.[9] We wish that our research letter would be considered as concluding remark concerning the limited value of bulge stem cell marker immunostaining and a challenge to the researchers to focus their interest on hair follicle immunology and follicular cell kinetics.

*Athanassios Kolivras, MD, PhD,[a,b] and Curtis Thompson, MD[c,d,e]*

*Departments of Dermatology[a] and Dermatopathology,[b] Saint-Pierre, Brugmann and Queen Fabiola Children University Hospitals, Université Libre de Bruxelles, Brussels, Belgium, and the Departments of Biomedical Engineering,[c] Pathology,[d] and Dermatology,[e] Oregon Health Sciences University, Portland, Oregon*

*Funding sources: None.*

*Conflicts of interest: None declared.*

*Correspondence to: Athanassios Kolivras, MD, PhD, Departments of Dermatology and Dermatopathology, Saint-Pierre, Brugmann and Queen Fabiola Children University Hospitals, Université Libre de Bruxelles, 129 boulevard de Waterloo, Brussels 1000, Belgium*

*E-mail: kolivras@gmail.com*

### REFERENCES

1. Mahalingam M. Lack of specificity of cytokeratin-15 loss in scarring alopecias. *J Am Acad Dermatol.* 2017;76:e135-e136.
2. Kolivras A, Thompson C. Loss of cytokeratin-15 (CK15) expression is not specific for lichen planopilaris (LPP). *J Am Acad Dermatol.* 2016;75:428-429.
3. Pozdnyakova O, Mahalingam M. Involvement of the bulge region in primary scarring alopecia. *J Cutan Pathol.* 2008;35: 922-925.
4. Hoang MP, Keady M, Mahalingam M. Stem cell markers (cytokeratin 15, CD34 and nestin) in primary scarring and nonscarring alopecia. *Br J Dermatol.* 2009;160:609-615.
5. Kolivras A, Thompson C. Primary scalp alopecia: new histopathological tools, new concepts and a practical guide to diagnosis. *J Cutan Pathol.* 2017;44:53-69.
6. Olsen EA, Bergfeld WF, Cotsarelis G, et al. Summary of North American Hair Research Society (NAHRS)-sponsored Workshop on Cicatricial Alopecia, Duke University Medical Center, February 10 and 11, 2001. *J Am Acad Dermatol.* 2003;48: 103-110.
7. Harries MJ, Meyer K, Chaudhry I, et al. Lichen planopilaris is characterized by immune privilege collapse of the hair follicle's epithelial stem cell niche. *J Pathol.* 2013;231: 236-247.

**e138** *Notes & Comments*

J Am Acad Dermatol
April 2017

8. Harries MJ, Meyer KC, Paus R. Hair loss as a result of cutaneous autoimmunity: frontiers in the immunopathogenesis of primary cicatricial alopecia. *Autoimmun Rev.* 2009;8:478-483.

9. Mesa KR, Rompolas P, Greco V. The dynamic duo: niche/stem cell interdependency. *Stem Cell Reports.* 2015;4:961-966.

http://dx.doi.org/10.1016/j.jaad.2016.12.010

██████████████

| | |
|---|---|
| **From:** | Anne Andrews |
| **Sent:** | Wednesday, March 28, 2018 11:53 AM |
| **To:** | antonella tosti; curtisinportland@gmail.com; Bradley East |
| **Cc:** | alexa@aivitabiomedical.com; ███████████████; Lauren Davis |
| **Subject:** | Re: slides and permanent alopecia |

Dr Thompson
I'm traveling today and tomorrow so hoping to touch base with you with Dr. Poole and if necessary Dr. Tosti to
get instructions from you on how you want to receive the tissue . They are currently at Dr. Pooles possession in
Newport Beach California stored and refrigerated but we're anxious to get them into your hands soon as possible.
When you have time still looking forward to our call to discuss the matter.
Look forward to hearing from you .
Regards
Anne Andrews
Managing partner
Andrews & Thornton
Newport Beach , California


Sent from my iPhone

On Mar 27, 2018, at 5:31 PM, Anne Andrews <aa@andrewsthornton.com> wrote:

> Dr Thompson
> When is a good time to talk ?
> Cell number is ███████
> Regards
> Anne
>
>
> Sent from my iPhone
>
> On Mar 27, 2018, at 5:27 PM, antonella tosti <antonellatosti1@gmail.com> wrote:
>
>
>> Antonella Tosti
>>
>> Begin forwarded message:
>>
>>> **From:** Curtis Thompson <curtisinportland@gmail.com>
>>> **Date:** 27 March 2018 at 19:40:05 GMT-4
>>> **To:** antonella tosti <antonellatosti1@gmail.com>
>>> **Subject: Re: slides and permanent alopecia**
>>>
>>> Perfect. I look forward to speaking with Anne.
>>>
>>> Thanks,

EXHIBIT

7

DEPONENT NAME: DR Thompson   DATE: 4/3/19

1

Curtis

On Tue, Mar 27, 2018 at 4:25 PM, antonella tosti
<antonellatosti1@gmail.com> wrote:

Dear Curtis, I will have Anne Andrews to contact you again, I think
this is an important problem for patients and also for science. They
have resources and access to many people who have the problem. We
are going to take many scalp biopsies for pathology and stem cell
markers now and we need a good lab for processing, they already
have a few biopsies and don't want wrong orientation, and a great hair
pathologist, which should be you! I copy her in cc!

Antonella Tosti

On 27 Mar 2018, at 19:01, Curtis Thompson
<curtisinportland@gmail.com>

Yes, I can work with you and with my lab.

Thanks,

Curtis

2

**From:**       Curtis Thompson <curtisinportland@gmail.com>
**Sent:**       Thursday, April 05, 2018 1:50 PM
**To:**         Anne Andrews
**Subject:**    Re: Biopsies

Yes, Alexa is going to send them on Monday.  We are ordering the Cytokeratin 15 antibody today.

And Adam (My assistant ) wants to get the information from you all so we can get you a W-9.

Thanks,

Curtis

On Thu, Apr 5, 2018 at 11:43 AM, Anne Andrews <aa@andrewsthornton.com> wrote:
Dr Thompson
Are you ready to receive the biopsies?
Anne

Sent from my iPhone



EXHIBIT
8
DEPONENT NAME:          DATE:
DR Thompson   4/3/19

1

**From:**        Curtis Thompson <curtisinportland@gmail.com>
**Sent:**        Tuesday, April 10, 2018 2:15 PM
**To:**          Alexa Poole; Anne Andrews
**Subject:**     The specimens arrived . . .

. . . and we will start processing them.

And I am reviewing the Expert/consultant work agreement.

Thanks,

Curtis



1

**John Thornton**

| | |
|---|---|
| **From:** | Curtis Thompson <curtisinportland@gmail.com> |
| **Sent:** | Friday, March 01, 2019 1:43 PM |
| **To:** | John Thornton |
| **Subject:** | Fwd: Update from Dr. Thompson on the 3 alopecia cases |

**Curtis T. Thompson, MD**
Medical Director and Dermatopathologist, CTA Lab
Affiliate (Clinical) Professor of Dermatology and Pathology, OHSU
T: 503.906.7300 | C/What'sApp: 503.997.8920 | F: 503.245.8219
E: curtisinportland@gmail.com
CTA Lab | www.cta-lab.com
PO Box 230577, Portland, OR 97281

> **EXHIBIT**
>
> 10
>
> DEPONENT NAME: Dr Thompson   DATE: 4/3/19

---------- Forwarded message ----------
From: Curtis Thompson <curtisinportland@gmail.com>
Date: Mon, Apr 16, 2018 at 1:11 PM
Subject: Update from Dr. Thompson on the 3 alopecia cases
To: Lauren Davis <ldavis@andrewsthornton.com>
Cc: Anne Andrews <aa@andrewsthornton.com>, Alexa Poole <alexa@aivitabiomedical.com>, Bradley East
<BEast@andrewsthornton.com>, Antonella Tosti <antonellatosti1@gmail.com>

Hello,  We processed the 3 biopsies, and I have examined the initial H&E sections, which do all show features consistent
with permanent alopecia after chemotherapy.

We are testing the cytokeratin 15 immunohistochemistry test today and hope to stain these cases later tomorrow or
Wednesday morning.  In the event that the cytokeratin 15 findings do not add to the information, I will issue my reports
without that information.  But, just to emphasize, the findings on the H&E slides alone are quite convincing--shows
permanent loss of larger hair follicles.

Thanks,

Curtis Thompson

On Mon, Apr 16, 2018 at 1:03 PM, Lauren Davis <ldavis@andrewsthornton.com> wrote:
 Hi Dr. Thompson,

 Just following up on the slides and report. Thank you!

 Sincerely,
 Lauren

 Sent from my iPhone

 On Apr 11, 2018, at 8:27 AM, Anne Andrews <aa@andrewsthornton.com> wrote:

1

Thanks Dr. Thompson for the call. Looking forward to talking to you again soon.
Anne

Sent from my iPhone

On Apr 11, 2018, at 8:11 AM, Curtis Thompson <curtisinportland@gmail.com> wrote:

> I am at my office now.
>
> 503 906 7300
>
> thanks,
>
> curtis
>
> On Wed, Apr 11, 2018 at 7:49 AM, Anne Andrews <aa@andrewsthornton.com> wrote:
> Alexa
> Are you available? I am?
>
> Sent from my iPhone
>
> On Apr 11, 2018, at 7:48 AM, Curtis Thompson <curtisinportland@gmail.com> wrote:
>
>> Hello. Can I talk to Alexa and you about how to name the biopsy cases
>> this morning?
>>
>> Thanks
>>
>> Curtis
>> 503 997 8920 cell
>>
>>
>> On Wed, Apr 11, 2018, 07:38 Anne Andrews
>> <aa@andrewsthornton.com> wrote:
>> Thank you Curtis did the antibody stain also arrive?
>> I really appreciate you keep me posted on the progress and any
>> issues that arise since we're on a tight deadline.
>> Anne
>>
>> Sent from my iPhone
>>
>> > On Apr 10, 2018, at 12:15 PM, Curtis Thompson
>> <curtisinportland@gmail.com> wrote:
>> >
>> > . . . and we will start processing them.
>> >
>> > And I am reviewing the Expert/consultant work agreement.
>> >
>> > Thanks,
>> >
>> > Curtis



**CURTIS THOMPSON, MD & ASSOCIATES**
Skin, Hair and Nail Pathology Experts

REMITTANCE TO:
**Curtis Thompson MD & Associates**          DBA CTA LAB
PO BOX 230577
Tigard, Oregon 97281
TAX ID 20-4465223

| Date | Invoice # |
|------|-----------|
| 4/27/2017 | 1 |

| | |
|------|-----------|
| Terms | Due within 14 days |
| Project | TECHNICAL |
| Cycle | 30-Apr-18 |

Bill To:
Andrews & Thornton
4701 Von Karman Ave., Suite 300
Newport Beach, CA 92660

| Description | Date | Quantity | Rate | Amount |
|-------------|------|----------|------|--------|
| Telephone Call (Andrews, Anne) | 4/17/2018 | 0.25 | $1,300/hr | $325.00 |
| Telephone Call (Andrews, Anne) | 4/18/2018 | 0.25 | $1,300/hr | $325.00 |
| Reintroduction of cytokeratin 15 in lab | 4/18/2018 | 1 | $3,700.00 | $3,700.00 |
| Immunohistochemical Technical staining cytokeratin 15 (Francis, Tanya) | 4/19/2018 | 1 | $345.00 | $345.00 |
| Immunohistochemical Professional Interpretation of cytokeratin 15 (Francis, Tanya) | 4/19/2018 | 1 | $225.00 | $225.00 |
| Immunohistochemical Technical staining cytokeratin 15 (Durden, Antoinette) | 4/19/2018 | 1 | $345.00 | $345.00 |
| Immunohistochemical Professional Interpretation of cytokeratin 15 (Durden, Antoinette) | 4/19/2018 | 1 | $225.00 | $225.00 |
| Immunohistochemical Technical staining cytokeratin 15 (Ernest, Barbara) | 4/19/2018 | 1 | $345.00 | $345.00 |
| Immunohistochemical Professional Interpretation of cytokeratin 15 (Ernest, Barbara) | 4/19/2018 | 1 | $225.00 | $225.00 |
| Immunohistochemical Technical staining Ki-67 (Francis, Tanya) | 4/20/2018 | 1 | $345.00 | $345.00 |
| Immunohistochemical Professional Interpretation of cytokeratin 15 (Francis, Tanya) | 4/20/2018 | 1 | $225.00 | $225.00 |
| Immunohistochemical Technical staining Ki-67 (Durden, Antoinette) | 4/20/2018 | 1 | $345.00 | $345.00 |
| Immunohistochemical Professional Interpretation of Ki-67 (Durden, Antoinette) | 4/20/2018 | 1 | $225.00 | $225.00 |
| Immunohistochemical Technical staining Ki-67 (Ernest, Barbara) | 4/20/2018 | 1 | $345.00 | $345.00 |
| Immunohistochemical Professional Interpretation of Ki-67 (Ernest, Barbara) | 4/20/2018 | 1 | $225.00 | $225.00 |
| Standard H&E (Francis, Tanya) | 4/24/2018 | 1 | $325.00 | $325.00 |
| Professional Interpretation (Francis, Taylor) | 4/24/2018 | 1 | $245.00 | $245.00 |
| Standard H&E (Durden, Antoinette) | 4/24/2018 | 1 | $325.00 | $325.00 |
| Professional Interpretation (Durden, Antoinette) | 4/24/2018 | 1 | $245.00 | $245.00 |
| Standard H&E (Ernest, Barbara) | 4/24/2018 | 1 | $325.00 | $325.00 |
| Professional Interpretation (Ernest, Barbara) | 4/24/2018 | 1 | $245.00 | $245.00 |
| Telephone call (Andrews, Tosti, etc.) | 4/25/2018 | 0.25 | $1,300/hr | $325.00 |
| | | | **Total Due** | **$9,805.00** |

EXHIBIT

11

DEPONENT NAME:
DR Thompson          DATE: 4 /3 /19



**CURTIS THOMPSON, MD & ASSOCIATES**
Skin, Hair and Nail Pathology Experts

REMITTANCE TO:
**Curtis Thompson MD & Associates**          DBA CTA LAB
PO BOX 230577
Tigard, Oregon 97281
TAX ID 20-4465223

| Date | Invoice # |
|------|-----------|
| 7/31/2018 | 2 |

Bill To:
Andrews & Thornton
4701 Von Karman Ave., Suite 300
Newport Beach, CA 92660

| Terms | Due within 14 days |
|-------|--------------------|
| Project | TECHNICAL |
| Cycle | 31-Jul-18 |

| Description | Date | Quantity | Rate | Amount |
|-------------|------|----------|------|--------|
| | | | Balance | -$5,195.00 |
| Telephone Call | 4/27/2018 | 0.25 | $1,300.00 | $325.00 |
| Standard H&E (Tuyes, Lisa) | 4/27/2018 | 1 | $325.00 | $325.00 |
| Professional Interpretation (Tuyes, Lisa) | 4/27/2018 | 1 | $245.00 | $245.00 |
| Scanning Ki-67 and Cytokeratin-15 slides and summarizing | 4/27/2018 | 0.5 | $1,300.00 | $650.00 |
| Telephone Call | 5/2/2018 | 0.25 | $1,300.00 | $325.00 |
| Preparaing Microphotographs of 4 cases to send to Bradley East | 5/30/2018 | 0.75 | $1,300.00 | $975.00 |
| Meeting Anne Andrews and John Thomton | 6/11/2018 | 2.75 | $1,300.00 | $3,575.00 |
| Preparation for Science Day - Review of slides and phone call | 6/25/2018 | 0.5 | $1,300.00 | $650.00 |
| Search for Experts for Anne Andrews | 6/25/2018 | 0.5 | $1,300.00 | $650.00 |
| Consultation with Ellen G. Feigel Prep for Science Day | 6/25/2018 | 0.5 | $1,300.00 | $650.00 |
| Answering questions from Anne Andrews about telogen effluvium | 7/25/2018 | 0.75 | $1,300.00 | $975.00 |
| Setting meeting for group discussion | 7/25/2018 | 0.25 | $1,300.00 | $325.00 |
| Phone call with multiple attorneys | 7/31/2018 | 1.15 | $1,300.00 | $1,625.00 |
| | | | Total | $6,100.00 |



EXHIBIT
12
DEPONENT NAME:
DR Thompson      DATE: 4/3/19



**CURTIS THOMPSON, MD & ASSOCIATES**
Skin, Hair and Nail Pathology Experts

| REMITTANCE TO: | |
|---|---|
| **Curtis Thompson MD & Associates** | DBA CTA LAB |
| PO BOX 230577 | |
| Tigard, Oregon 97281 | |
| TAX ID 20-4465223 | |

| Bill To: |
|---|
| Andrews & Thornton |
| 4701 Von Karman Ave., Suite 300 |
| Newport Beach, CA 92660 |

| Date | Invoice # |
|---|---|
| 9/7/2018 | 3 |

| Terms | Due upon receipt |
|---|---|
| Project | PROFESSIONAL |

| Description | Date | Quantity | Rate | Amount |
|---|---|---|---|---|
| Editing Draft Memo Rule 26 Report Preparation pCIA | 8/6/2018 | 0.5 | $1,300.00 | $650.00 |
| Review of Videos of REDACTED and prep of summary memo | 8/6/2018 | 0.75 | $1,300.00 | $975.00 |
| Analysis of cost for routine pCIA biopsies | 8/9/2018 | 0.25 | $1,300.00 | $325.00 |
| Telephone call stem cell study | 8/15/2018 | 0.75 | $1,300.00 | $975.00 |
| Planning stem cell study at CTA Lab | 8/15/2018 | 0.25 | $1,300.00 | $325.00 |
| Review of PATHOLOGY PROTOCOL MISSOURI-#8877221-v3-Taxotere_-_Pathology_Protocol and reply email | 9/3/2018 | 0.5 | $1,300.00 | $650.00 |
| Email regarding normal hair samples for stem cell study | 9/3/2018 | 0.25 | $1,300.00 | $325.00 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | **Total Due** | $4,225.00 |

**EXHIBIT**

13

DEPONENT NAME: DR Thompson   DATE: 4/3/19

**John Thornton**

| | |
|---|---|
| **From:** | Curtis Thompson <curtisinportland@gmail.com> |
| **Sent:** | Friday, March 01, 2019 1:46 PM |
| **To:** | John Thornton |
| **Subject:** | Fwd: Review of videos of ███████████ by Dr. Curtis Thompson |

**Curtis T. Thompson, MD**
Medical Director and Dermatopathologist, CTA Lab
Affiliate (Clinical) Professor of Dermatology and Pathology, OHSU
T: 503.906.7300 | C/What'sApp: 503.997.8920 | F: 503.245.8219
E: curtisinportland@gmail.com
CTA Lab | www.cta-lab.com
PO Box 230577, Portland, OR 97281

```
EXHIBIT
    14
DEPONENT NAME:              DATE:
  DR Thompson   4 /3 /19
```

---------- Forwarded message ----------
From: Curtis Thompson <curtisinportland@gmail.com>
Date: Mon, Aug 6, 2018 at 10:50 AM
Subject: Review of videos of ███████████ by Dr. Curtis Thompson
To: Anne Andrews <aa@andrewsthornton.com>, John Thornton <jct@andrewsthornton.com>
Cc: ██████████████████

Anne and John,

Hello, I have reviewed ██████ videos carefully.

Here are a few points:

1. Validation and Testing of Stem Cells on the biopsy samples-- ████████████ approach is correct with validation of a test and then testing of the samples.

I don't know if he had access to my data on this, but I already did this for cytokeratin 15 on these samples. Perhaps I need to meet with him and share this data. As the cytokeratin 15 was still positive in the 'basaloid bodies' in the pClA cases, I did not pursue this further.

Perhaps ████ has access or knowledge of other anibodies to the follicular stem cells which I don't know about. When I first worked with cytokeratin 15, I also tested an an antibody toward NESTIN, but the staining was nonspecific. I did only test one source of the nestin.

2. H&E analysis opposing counsel--I think it is best if the same slides that I read are reviewed, so we know that both sides examined the same slides. But we do have unstained slides that they can have and use.

I say this because different H&E slides can have different findings (though in these cases, I do not anticipate there being much of a difference).

But I do have unstained slides to the other side to use if needed.  And we can also use these for more stem cells markers in collaborating with ███████ .  I am cc'ing him on this email.

I am happy to discuss all of this on the phone if need be.

Thanks so much,

Curtis Thompson
503 997 8920 cell/text
curtisinportland@gmail.com

2



**CURTIS THOMPSON, MD & ASSOCIATES**
Skin, Hair and Nail Pathology Experts

| REMITTANCE TO: | |
|---|---|
| **Curtis Thompson MD & Associates** | DBA CTA LAB |
| PO BOX 230577 | |
| Tigard, Oregon 97281 | |
| TAX ID 20-4465223 | |

| Date | Invoice # |
|---|---|
| 10/8/2018 | 4 |

| Bill To: | |
|---|---|
| Andrews & Thornton | |
| 4701 Von Karman Ave., Suite 300 | |
| Newport Beach, CA 92660 | |

| Terms | Due upon receipt |
|---|---|
| Project | PROFESSIONAL |

| Description | Date | Quantity | Rate | Amount |
|---|---|---|---|---|
| Call w/ John and Anne | 9/7/2018 | 0.75 | $1,300.00 | $975.00 |
| Preparation of biopsy report | 9/20/2018 | 1.75 | $1,300.00 | $2,275.00 |
| Preparation of biopsy report | 9/21/2018 | 2.25 | $1,300.00 | $2,925.00 |
| Arranging review of report | 9/21/2018 | 0.25 | $1,300.00 | $325.00 |
| Review of literature sent by John Thornton | 9/24/2018 | 0.75 | $1,300.00 | $975.00 |
| Telephone call re: biopsy report draft | 9/25/2018 | 0.5 | $1,300.00 | $650.00 |
| Report preparation | 9/29/2018 | 1.5 | $1,300.00 | $1,950.00 |
| Final report preparation | 10/1/2018 | 1 | $1,300.00 | $1,300.00 |
| Review of patient photos and information | 10/3/2018 | 0.75 | $1,300.00 | $975.00 |
| Telephone call re: deposition | 10/5/2018 | 0.3 | $1,300.00 | $390.00 |
| Email: Proposing dates for deposition | 10/5/2018 | 0.25 | $1,300.00 | $325.00 |
| | | | | |
| | | | | |
| | | | Total Due | $13,065.00 |

EXHIBIT

15

DEPONENT NAME: DR Thompson   DATE: 4/3/19



**CURTIS THOMPSON, MD & ASSOCIATES**
Skin, Hair and Nail Pathology Experts

REMITTANCE TO:
**Curtis Thompson MD & Associates**      DBA CTA LAB
PO BOX 230577
Tigard, Oregon 97281
TAX ID 20-4465223

| Date | Invoice # |
|------|-----------|
| 11/9/2018 | 5 |

| Terms | Due upon receipt |
|-------|------------------|
| Project | PROFESSIONAL |

Bill To:
Andrews & Thornton
4701 Von Karman Ave., Suite 300
Newport Beach, CA 92660

| Description | Date | Quantity | Rate | Amount |
|-------------|------|----------|------|--------|
| Telephone Deposition Planning | 10/15/2018 | 0.25 | $1,300.00 | $325.00 |
| Emails re: Deposition Planning | 10/18/2018 | 0.25 | $1,300.00 | $325.00 |
| Call w/ John Thornton and Lauren Davis | 10/23/2018 | 0.25 | $1,300.00 | $325.00 |
| Review of clinical case histories and reports | 10/24/2018 | 1.25 | $1,300.00 | $325.00 |
| Organization of slides sent to ██████████████ | 10/24/2018 | 0.33 | $1,300.00 | $429.00 |
| Call w/ John Thornton | 10/25/2018 | 0.25 | $1,300.00 | $325.00 |
| Deposition Prep: Review of alopecia textbook and literature | 10/26/2018 | 2.42 | $1,300.00 | $3,146.00 |
| Review of Miteva et al Publication | 11/2/2018 | 0.42 | $1,300.00 | $546.00 |
| Review of cases and photography of cases; Images uploaded and sent to Attorney Lauren Davis | 11/3/2018 | 3.25 | $1,300.00 | $4,225.00 |
| Sending photomicrographs to Lauren Davis | 11/4/2018 | 0.25 | $1,300.00 | $325.00 |
| Call w/ Anne Edwards | 11/4/2018 | 0.25 | $1,300.00 | $325.00 |
| Scheduling deposition | 11/4/2018 | 0.42 | $1,300.00 | $546.00 |
| Literature search and partial review | 11/4/2018 | 1.25 | $1,300.00 | $1,625.00 |
| Review of compendium from John Thornton | 11/6/2018 | 0.5 | $1,300.00 | $650.00 |
| Conference call John Thornton re: finalizing report | 11/6/2018 | 0.33 | $1,300.00 | $429.00 |
| Review of appendix material for Rule 2 report (literature) prior to conference call | 11/7/2018 | 1.42 | $1,300.00 | $1,846.00 |
| Phone call John Thornton and David Micelli | 11/7/2018 | 0.33 | $1,300.00 | $429.00 |
| Review of final report and email Marco Galindo | 11/9/2018 | 0.5 | $1,300.00 | $650.00 |
| | | | Total Due | $16,796.00 |

**EXHIBIT**

*16*

DEPONENT NAME: DR Thompson    DATE: 4 13 19



CURTIS THOMPSON, MD & ASSOCIATES
Skin, Hair and Nail Pathology Experts

March 27, 2019

<u>**Via Email**</u>
The Honorable Jane Triche Milazzo
United States District Judge
500 Poydras Street
Room C206
New Orleans, Louisiana 70130



Re: Requested Letter; Taxotere MDL

Dear Judge Milazzo,

Please accept this letter explaining my actions regarding stem cell investigations. As an expert witness of hair loss pathology in this case, I was initially asked to investigate permanent chemotherapy-induced alopecia (pCIA) in any way possible. As an anatomic pathologist and an expert in hair loss pathology who had never provided legal expert opinion before, I identified any possible tool available for further investigation of pCIA, including immunohistochemical (IHC) stains.

Of note, IHC is the primary molecular tool used in routine pathology diagnostics, however, there is little practical application of IHC at this time in hair loss pathology. At this time, there is no known utility of assessing follicular stem cells for diagnostic purposes, and there is no accepted mechanism of follicular stem cell damage or death related to the variety of hair loss diseases. Evaluation of biopsies for hair loss is currently limited to standard sectioning and traditional staining with H&E-stained level sections. The same protocol is followed for all biopsies received for pathological evaluation of hair loss.

Before any biopsies were received, I proposed to the attorneys to use two of the IHC stains, cytokeratin 15 (CK15) and Ki-67, to further investigate pCIA. CK15 and Ki-67, however, do not have any known utility for diagnostic purposes in hair loss pathology. Positive or negative staining by both of these antibodies is not known to support or refute any particular hair loss diagnosis.

When biopsies from the four patients with possible pCIA were received by my laboratory, the biopsies were processed in the usual manner for diagnostic purposes, including the preparation of 9 unstained slides for each biopsy. The unstained slides were prepared for possible use by an expert for the defense or for further stains needed for diagnostic or investigational purposes. For each biopsy, two of these unstained slides were used for the CK15 and Ki-67 (IHC) stains. These stains were prepared at the same time as the H&E slides were prepared. The IHC took only a few hours to perform.

The biopsies were assessed for diagnostic purposes at the same time that the two IHC slides were also reviewed. In assessing the findings of the H&E slides and preparing the reports which I issued for each biopsy, I determined that the CK15 and Ki-67 were of no utility for diagnostic purposes, either in supporting or refuting a particular pathological diagnosis in all eight of the biopsy slides from the four

12254 SW Garden Pl., Tigard OR 97223                PHONE: (503) 906-7300
www.cta-lab.com                                                           FAX: (503) 245-8219



patients. As noted above, neither CK15 nor Ki-67 is used diagnostically in hair loss pathology. In assessing the CK15 and Ki-67, I did not take notes and did not issue a report.

I notified the attorneys that I did not believe that the CK15 and Ki-67 had any diagnostic or investigational utility in any way in this case, and we decided to stop any further investigation using IHC and to simply issue traditional pathology reports based upon my interpretation as an expert in hair loss pathology. At this time follicular stem cell damage or death has no known utility in hair loss pathology. The presence of absence of staining with CK15 and Ki-67 may not be used as definitive evidence of follicular stem cell damage or death.

I do not know who Drs. Laura Plunkett or Dr Ellen Feigal are and have no recollection of speaking with them. Based upon my invoices in this case, I did relay the pathological findings to Dr. Feigal by telephone on June 25, 2018, however, I do not recall this call or any pertinent discussion. Dr. Antonella Tosti was cc'd on an email that I sent to the attorneys explaining my assessment that the IHC stained slides had no utility in the case, however, I did not ever discuss the IHC slides with Dr. Tosti.

Several months after completing my pathology reports on the biopsied specimens from this case, I reviewed videos from a follicular stem cell researcher that were sent to me by attorney Anne Andrews. Anne sent me these videos prior to introducing this researcher to me. Please note that review of these videos did not have any impact on the interpretation of either H&E slides or the IHC stains in this case. I had already issued the pathology reports for all of the biopsies from this case long before I viewed the videos, and the reports were never altered. After reviewing the videos, I had a single phone call with the stem cell researcher, however, the discussion was limited to agreeing to provide archived scalp biopsy tissue from cases of hair loss not related to this legal case to the researcher for his own investigations. As required by CLIA regulations, my laboratory maintains an archival tissue bank. My proposal was to only provide the archival tissue for the researcher's own investigations. This tissue was not going to be from any biopsies taken in this particular legal case. The researcher never contacted me to request the tissue, and no tissue was ever sent.

I hope that this summary provides clarification of my performance of CK15 and Ki-67 IHC studies on the biopsies in this legal case. Of note, I have provided all of these IHC studies and unstained slides to the defense counsel.

Thank you very much,

**Curtis T. Thompson, MD**
Medical Director and Dermatopathologist, CTA Lab
Affiliate (Clinical) Professor of Dermatology and Pathology, OHSU
T: 503.906.7300 | C: 503.997.8920 | F: 503.245.8219
E: curtisinportland@gmail.com