UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **IN RE: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION**<br><br>**This Document Relates To:**<br>**ALL CASES** | **MDL No. 2740**<br><br>**SECTION: H (5)** |

**MEMORANDUM IN SUPPORT OF SANOFI DEFENDANTS'
MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND TESTIMONY OF DR.
CURTIS THOMPSON RELATED TO STEM CELL STUDY**

Pursuant to the Court's April 11, 2019, Minute Entry (Rec. Doc. 6726), Defendant Sanofi moves to compel additional deposition testimony and documents regarding the "stem cell study" described in Dr. Curtis Thompson's invoices, as well as related documents from AIVITA Biomedical. Dr. Thompson's discussions with another expert regarding the development of a stem cell study, as well as certain additional materials referenced in invoices and deposition testimony, were considered by Dr. Thompson in forming his opinions, and must therefore be disclosed. Plaintiffs' disclosure of facts and information supplied by their consulting expert to their testifying expert rendered this information discoverable. Therefore, Defendant respectfully requests the Court order Plaintiffs to produce the documents requested below within 7 days, and order an additional 4-hour deposition of Dr. Thompson regarding this information and the questions to which the witness was previously instructed not to answer.

1

## STATEMENT OF FACTS[1]

In September 2016, Dr. Thompson published his hypothesis that the theoretical mechanism of action for why a chemotherapy drug could potentially cause permanent hair loss is that it kills the stem cell in the bulge region of the hair follicle. *See* Thompson Dep. Vol. III. 401:21– 402:2; *see also* Thompson Dep. Vol. III, Ex. 5. Dr. Thompson speculated that "[n]on-cicatricial alopecia cannot be considered as synonymous to reversible hair loss. Permanent alopecia after chemotherapy is both non-cicatricial and not reversible *due to a toxicity of the drug to the follicular stem cells*." *See* Thompson Vol. III, Ex. 5 at 57.4 (emphasis added). In April 2017, Dr. Thompson further hypothesized that cytokeratin-15 (CK15) staining could be used to prove this theory by showing the loss of follicular bulge stem cells "after direct toxicity on the follicular stem cells, as seen in permanent alopecia after chemotherapy." Thompson Dep. Vol. III., Ex. 6. Dr. Thompson believes he is the only person who has ever published CK15 "research on a hair loss disease." Thompson Dep. Vol. II 342:25–343:7.

Dr. Thompson had not yet tested his stem cell theory on biopsy samples when, in March 2018, Plaintiffs' retained expert Dr. Antonella Tosti "enticed" him to join the Taxotere litigation as an expert witness with reference to a future tissue bank with "many scalp biopsies" to be tested for both "pathology and stem cell markers." *See* Thompson Dep. Vol. III, Ex. 7, at 2; Thompson Dep. Vol. III 445:11–25 ("trying to entice me into something more than just reading cases").

Shortly after agreeing to serve as an expert, Dr. Thompson discussed stem cell marker testing with Plaintiffs' attorneys. *See* Thompson Vol. III, Ex. 11; *see also* Thompson Dep. Vol. III 434:10–18. Dr. Thompson decided to use the same CK15 staining that he hypothesized would

---

[1] These facts are taken from Dr. Thompson's March 27, 2019 letter to the Court, **Ex. A**, his Rule 26 Report, **Ex. B**, and Dr. Thompson's most recent depositions taken on February 26, 2019, **Ex. C**, and on April 3, 2019, **Ex. D**.

2

show loss of the follicular bulge stem cells following chemotherapy, because it is "the only investigational antibody that [he had] experience with that works." *See* Thompson Dep. Vol III 434:5–8. He also performed Ki-67 staining on Plaintiffs' scalp biopsies. In April, Dr. Thompson charged $3,700 to reintroduce stem cell marker testing to the lab. Thompson Dep. Vol. III, Ex. 11. Dr. Thompson indicated to Dr. Tosti and Plaintiffs' attorneys that, "[i]n the event that the cytokeratin 15 findings do not add to the information, I will issue my reports without that information." *See* Thompson Vol. III, Ex. 10 at 1.[2]

Dr. Thompson testified that he "thought" the stem cell staining "might give information into the pCIA" and that the stains might be a "window into understanding that." Thompson Dep. Vol. II 341:19–342:3. Dr. Thompson received the scalp biopsies for Ms. Francis, Ms. Earnest, and Ms. Durden, and conducted stem cell staining. *See* Thompson Ltr. at 1. For all three Plaintiffs, the stem cell staining did not show a loss of stem cells in the bulge region of the hair follicle—the stem cells were present and proliferating—contrary to Dr. Thompson's hypothesized mechanism of action in this case. Dr. Thompson then discussed the results of this stem cell staining with other testifying experts in the case. *See* Thompson Dep. Vol. II 331:3–10 (testifying that he told Dr. Tosti about his impressions from the trial Plaintiffs' stem cell stains); *see also* Tosti Dep. 541:5–542:4 (Dr. Tosti testifying that Dr. Thompson mentioned the results of the stem cell staining in a

---

[2] Dr. Thompson explained that he conducted the initial stem cell staining on Ms. Francis, Ms. Earnest, and Ms. Durden as "investigational probing." *See* Thompson Dep. Vol. III 440:4−10. Despite this minimization, he did not test the scalp biopsy of Ms. Tuyes, because her hair loss was consistent with androgenetic alopecia, and he "didn't think it was prudent to do it in the context of legal expertise work, legal expert work and spend money on any more pilot study, provisional study." Thompson Dep. Vol. III 46:10−13. In other words, the testing was clearly outcome-driven given the decision against probing, however investigationally, what would have constituted a control case.

phone call); Thompson Dep. II 334:23–335:10 (testifying that he believes he discussed his findings from trial Plaintiffs' stem cell stains with Dr. Feigal).³

According to Dr. Thompson, the results of the stem cell stains did not "add to [his] interpretation" of the pathology. *See* Thompson Dep. Vol. II 342: 14–21. Dr. Thompson testified that in "assessing the [stem cell] stains" and "deciding whether to do more," he ultimately concluded that the stem cell stains had "no utility" and recommended ceasing further stem cell studies in this case. *See* Thompson Dep. Vol. II 343:8–19. Dr. Thompson then did not include any reference to the stem cell staining in his Rule 26 reports. *See* Thompson Dep. Vol. III 441:1–9; *see also* Rule 26 Report of Dr. Thompson.⁴ None of the stem cell slides were turned over in November 2018 with the others.

Plaintiffs' also consulted with a medical research firm – AIVITA Biomedical – about the development of a stem cell study. AIVITA Biomedical specializes in stem cell research.⁵ Plaintiffs' biopsies were originally sent there, not to a traditional dermatopathologist, before being forwarded on to Dr. Thompson. *See* Thompson Dep. Vol. III 426:24– 427:23. Plaintiffs' attorneys later sent Dr. Thompson a video from an expert at AIVITA Biomedical about developing another study. In the video, the expert proposed developing a larger stem cell study and discussed its possible protocols. *See* Thompson Dep. Vol. III 490:10–13. In an August 6, 2018, email Dr.

---

³ Despite the deposition testimony to the contrary, Dr. Thompson's March 27, 2019, letter to the Court represents that he never discussed the stem cell slides with Dr. Tosti, and that he does not know who Dr. Feigal is.

⁴ The relationship between the results of Dr. Thompson's stem cell staining and the decision to forego additional stem cell testing by Plaintiffs is clear. If his initial testing had offered positive results, Dr. Thompson testified that he may have included such findings in his Rule 26 reports to indicate it was "worth setting up a larger study with controls and . . . non-chemotherapy induced alopecia cases, and blow it up into a larger study." Thompson Dep. Vol. III 440:19–25.

⁵ "AIVITA Biomedical is an Irivne, CA based company focused on the advancement of commercial and clinical-stage programs utilizing curative and regenerative medicines. We leverage our unique expertise in stem cell growth and directed, high-purity differentiation to develop safe, efficient and economical manufacturing processes for therapeutic treatment." *See* AIVITA Biomedical, *Who We Are*, https://aivitabiomedical.com/ (last visited April 15, 2019).

4

Thompson questioned the decision to move forward with such a study given the results of his staining. He wrote:

> **I don't know if he** [the non-testifying expert] **had access to my data on this**, but I already did this for cytokeratin 15 on these samples. Perhaps I need to meet with him and share this data. **As the cytokeratin 15 was still positive in the 'basaloid bodies' in the pCIA cases, I did not pursue this further.**

Thompson Dep. Vol. III, Ex. 14. Dr. Thompson suggested this expert might have "access or knowledge of other anibodies [sic] to the follicular stem cells which I don't know about," and that Dr. Thompson had slides that could be used "for more stem cells markers in collaborating with [REDACTED]." Thompson Dep. Vol. III, Ex. 14. Dr. Thompson's invoices describe the preparation of a "summary memo," which has not been produced.

In a later telephone conference, Dr. Thompson discussed the stem cell study's protocol with the non-testifying expert directly. Thompson Dep. Vol. III 491:7–12. Dr. Thompson did not want the non-testifying expert to "recreate the wheel and redo something . . . and go down a dead end." Thompson Dep. Vol. III 491:7–12. Dr. Thompson not only offered advice on the study's protocol, he was asked to take a key role in the study itself:

> Q. On that call did you have any discussions about stem cell testing?
>
> A. The call was basically the - - what he was going to do and my part was going to be provide tissue, validation tissue, and then potential testing tissue that wouldn't involve patients in this case. We had – you know, we only had nine unstained slides and we had the three H&Es and we didn't want to compromise these specimens at all.

*See* Thompson Dep. Vol. III 491:15–21. Despite his involvement, when Dr. Thompson was asked about this study (and its possible validation or protocols) during his April 2018, deposition, he was instructed by counsel not to answer. *See, e.g.*, Thompson Dep. Vol. III 487:21–488:7.

Other invoices reference additional work on the stem cell study, documentation related to which has not been produced and about which the witness has been instructed not to answer:

- August 15, 2018: Planning on stem cell study at CTA Lab
- September 3, 2018: Email regarding normal hair samples for stem cell study
- October 24, 2018: Organization of slides sent to [REDACTED]

Thompson Dep. Vol. III, Ex. 13; Ex. 14.

In sum, the result of Dr. Thompson's stem cell staining on the trial Plaintiffs' biopsies was linked to possible further investigation that Plaintiffs' counsel considered but decided not to pursue. Thompson Dep. Vol. III 474:15–25 (explaining that if Plaintiffs' staining had come back negative, he would have wanted to investigate further); Thompson Dep. Vol. III 480:15–4 (explaining that *any* research aimed at finding out if and why chemotherapy may cause ongoing alopecia would have interested him and could have impacted his opinions in this case); Thompson Dep. Vol. III 484:8–14 (Dr. Thompson "sent an email" explaining the results of the stem cell staining he performed to Plaintiffs' counsel and Plaintiffs' non-testifying expert witness). With respect to any further study done by AIVITA Biomedical, if the study went forward, Dr. Thompson testified that he would want to know the results to confirm or refute his own hypothetical theory about the mechanism of action for how chemotherapy might damage the stem cell and cause ongoing alopecia. Thompson Dep. Vol. III 464:25–10. No documentation memorializing a decision to forego further study has been produced.

## ARGUMENT

Rule 26(a)(2)(B) requires experts to disclose the "data or other information" the expert "considered" in forming his opinions. This provision serves to "impose[] on parties a duty to disclose without awaiting formal discovery requests, certain basic information that is needed in

6

most cases to prepare for trial or make an informed decision about settlement." *In re Vioxx Prods.*, MDL No. 1657, 2007 WL 1558700, at *3 (E.D. La. May 30, 2007) (citing Fed. R. Civ. P. 26 advisory committee's note).

I. **DOCUMENTS, MATERIALS, AND OTHER CORRESPONDENCE FROM THE NON-TESTIFYING EXPERT REGARDING STEM CELL STUDIES BECAME DISCOVERABLE WHEN CONSIDERED BY THE TESTIFYING EXPERT.**

   **A. The documents, correspondence, and information considered by Dr. Thompson in forming his opinions are not privileged.**

Under Rule 26, the relevant inquiry for whether expert materials are subject to discovery is whether the testifying expert *considered* the materials. *See* Fed. R. Civ. P. 26(a)(2)(B)(ii) (a testifying expert is required to disclose in his Rule 26 report the facts or data he "considered" in forming his opinions), (b)(4)(C)(ii) (communications between a party's attorney and a testifying expert that "identify facts or data" the expert "considered" are subject to discovery). Notably, these provisions have been interpreted to require disclosure of <u>any</u> materials a testifying expert considers, even where that information comes from an attorney or non-testifying expert whose work product generally is not subject to discovery. *See* Fed. R. Civ. P. 26(b)(4)(C)(ii) (communications identifying facts or data a party's attorney provides and the expert considered are subject to discovery); *see also In re Shell Oil Refinery*, 132 F.R.D. at 443 ("During the period set aside for expert discovery, the parties can discover the basis for each other's each other's expert conclusions, including information received from non-testifying experts."); *see also Fast Memory Erase, LLC v. Spansion, Inc.*, No. 3-08-cv-0977, 2009 WL 4884091, at *1 (N.D. Tx. Dec. 16, 2009) ("If materials and documents prepared by a non-testifying expert are disclosed to and considered by a testifying expert, such materials and documents lose their protected status."); *Herman v. Marine Midland Bank*, 207 F.R.D. 26, 30–32 (W.D.N.Y. 2002); *Johnson v. Gmeinder*,

7

191 F.R.D. 638, 647 (D. Kan. 2000) ("In sum, the policy reasons, the plain language of amended Rule 26(a)(2)(B), the Advisory Committee Note, and the weight of authority supports this Court's conclusion that any type of privileged material, including materials or documents prepared by a non-testifying expert, lose their privileged status when disclosed to, and considered by, a testifying expert.").

The only reason materials sent or received between both testifying and non-testifying experts would be protected is if there was no reason to believe that Dr. Thompson considered them in forming his opinions. *See In re Shell Oil Refinery*, Nos. 88-1935, 88-7219, 1992 WL 75150, at *1 (E.D. La. March 20, 1992) (ruling that tests were not subject to discovery because there was "no reason to believe [the expert] considered the tests," emphasizing the ruling would be reconsidered if "evidence later develop[ed] that [the expert] considered the other tests in forming his opinions" or "other trial experts reviewed the results[.]"). That is not the case here.

Plaintiffs recruited Dr. Thompson, in part, to look at stem cell markers related to his hypothesized mechanism of action—and Plaintiffs' theory of causation—in this litigation. *See* Thompson Dep. Vol. III. 401:21–402:2; *see also* Thompson Dep. Vol. III, Ex. 5. When Dr. Thompson's testing produced contrary results, however, he stopped testing Plaintiffs' scalp biopsies. *See* Thompson Dep. Vol. III 440:19–25. Dr. Thompson admits that had the results of this initial testing reflected stem cell loss he would have suggested the development of a larger study. *See* Thompson Dep. Vol. III 440:19–25.

It so happened, however, that Plaintiffs *were* developing a larger study, which was of interest to Dr. Thompson's opinions in this litigation because it offered further testing of his hypothesized mechanism of action. *See* Thompson Dep. Vol. III, Ex. 14 ("Perhaps [REDACTED] has access or knowledge of other anibodies[sic] to the follicular stem cells which I don't know

8

about."). Plaintiffs' counsel sent Dr. Thompson a video of the non-testifying expert discussing this study and its protocols. *See* Thompson Dep. Vol. III 490:10–13. Dr. Thompson then exchanged advice, data, correspondence, and documents—including emails, telephone calls, and a summary memo—with the expert regarding the development of this study. *See* Invoices 1–5 (Ex. to Vol III). To date, this information has been withheld.

Because this information was shared with a testifying expert—Dr. Thompson—their discoverability rests on whether Dr. Thompson *considered* these materials in forming his opinions. From his deposition testimony, it is clear he did. *See* Thompson Dep. Vol. III 441:1–9 (reading from Thompson's email: "In the event this [IHC staining] finding does not add information I will issue my report without that information"); *see also* Thompson Dep. Vol. III 449: 7–10 ("I made the decision [not to include the result of this IHC staining] for sure on the dematopathology reports."); Ltr. at 1–2 ("The biopsies were assessed for diagnostic purposes at the same time that the two IHC slides were also reviewed. In assessing the findings of the H&E slides and preparing the reports which I issued for each biopsy, I determined that the [IHC stains] were of no utility for diagnostic purposes, either in supporting or refuting a particular pathological diagnosis in all eight of the biopsy slides from the four patients."); Thompson Dep. Vol. III 492:7–12 (Q. "You wrote because [the trial Plaintiffs' slides] tested positive [you] did not pursue this any further right? A. Yes. If it tested negative would you have pursued further? A. Yes.").[6] Had this larger study moved forward, Dr. Thompson admits the results would affect his opinions in this case, because they

---

[6] In addition to advice and data, Dr. Thompson also shared the negative results of his initial testing with Plaintiffs' expert, and discussed his decision to "not pursue [his own study] further." Thompson Dep. Vol. III, Ex. 14; *see also* Thompson Dep. Vol. III 491:15–21. Plaintiffs ultimately made the decision not to pursue the larger study either. *See* Thompson Dep. Vol. III 483:25–484:2.

would confirm or refute his own hypothetical theory about the mechanism of action, which would in turn have affected his Rule 26 Report. *See* Thompson Dep. Vol. III 464:25–10.

Dr. Thompson's discussions regarding this study were considered in forming his opinions on the trial Plaintiffs' biopsies—including his opinion that no further stem cell testing should be conducted. He admits the results (or lack thereof) from any future stem cell study would have impacted his opinions in this case. As a result, all information and documents referenced in Dr. Thompson's invoices in connection with any stem cell study, even those involving non-testifying experts, are discoverable. Defendants respectfully request this Court Order Dr. Thompson to comply with his Rule 26(a) duty to produce all documents considered by him in forming his opinions in this case and to answer the questions about this work posed to him at deposition– including regarding any stem cell of which he was aware.

### B. Documents and correspondence referenced in Dr. Thompson's invoices are discoverable and not privileged.

Dr. Thompson also considered further documents and correspondence referenced in his invoices in forming his opinions in this case, and that information is therefore discoverable and should be produced. The legal standard asks not whether the testifying expert *relied* on the materials but whether he *considered* them. *See* Fed. R. Civ. P. 26(a)(2)(B)(ii), (b)(4)(C)(ii). "'[C]onsidered,' which simply means 'to take into account,' clearly invokes a broader spectrum of thought than the phrase 'relied upon.'" *In re Vioxx Prods.*, 2007 WL 1558700, at *3 (citing *Karn v. Ingersoll-Rand Co.*, 168 F.R.D. 633, 635 (N.D. Ind. 1996)). Fed. R. Civ. P. 26 advisory committee's note provides:

> The report is to disclose the data and other information *considered* by the expert and any exhibits or charts that summarize or support the expert's opinions. Given this obligation of disclosure, litigants should no longer be able to argue that materials furnished to their experts to be used in forming their opinions-*whether or*

> *not ultimately relied upon by the expert*-are privileged or otherwise protected from disclosure when such persons are testifying or being deposed.

Indeed, this Court has interpreted the rule to require disclosure of <u>*any*</u> materials that were provided to a testifying expert for his consideration in forming opinions in the case. *See In re Vioxx Prods.*, 2007 WL 1558700, at *4. After all, this Court has reasoned, "inquiries into whether or not an expert considered any given document that was provided to [him] are necessarily fraught with difficulties." *Id.* In other words, if the materials were given to a testifying expert for his consideration, and they are for his work in the case, they are discoverable.

The material referenced by Dr. Thompson in his invoices and during his deposition are not routine attorney-expert communications that would defy discovery. Thus, even though this Court determined that certain materials produced *in camera* were privileged (Order, Rec. Doc. 6616), the Court should overrule Plaintiffs' objection and instructions not to answer questions regarding the underlying facts and data contained within this material. At his deposition, Dr. Thompson testified that the videos he watched were related to stem cell research—the same research he was performing on the trial Plaintiffs' slides with the stem cell staining. Thompson Dep. Vol. III 457:20–24 (Dr. Thompson testified at his deposition that the video is related to stem cell research); Thompson Dep. Vol. III 458:17–19 ("Q. So plaintiffs sent you a video about a stem cell researcher giving a lecture. A. Yes."); Thompson Dep. Vol. III 460:21–461:1 ("Q. So you're doing this research your theory is that chemotherapy somehow impacts stem cell. And you're reviewing video [of] someone who is lecturing about stem cells right? [objection] A. Yes."). Moreover, Dr. Thompson testified that the result of his stem cell staining on the trial Plaintiffs' biopsies was linked to possible further investigation that Plaintiffs' counsel considered but decided not to pursue. Thompson Dep. Vol. III 474:15–25 (explaining that if Plaintiffs' staining had come back

negative, he would have wanted to investigate further); Thompson Dep. Vol. III 480:15–4 (explaining that *any* research aimed at finding out if and why chemotherapy may cause ongoing alopecia would have interested him and could have impacted his opinions in this case); Thompson Dep. 484:8–14 (Dr. Thompson "sent an email" explaining the results of the stem cell staining he performed to Plaintiffs' counsel and Plaintiffs' non-testifying expert witness); Thompson Dep. Vol. III 492: 10–12 ("If [the stem cell stains] tested negative, would've you pursued it further? A. Yes.").

Therefore, because counsel provided information and data to Dr. Thompson for his consideration in forming his opinions in the case—including Dr. Thompson's ultimate opinion that no further testing should be conducted—that information is subject to discovery and should be produced. *See In re Vioxx Prods.*, 2007 WL 1558700, at *4. Defendants respectfully request this Court Order Plaintiffs' to produce Dr. Thompson for testimony on the information and data that Dr. Thompson considered in forming his opinions.

**II.   THE CIRCUMSTANCES OF PLAINTIFFS' DECISION TO STOP FURTHER STEM CELL MARKER TESTING, IN RELIANCE ON DR. THOMPSON'S INITIAL TESTING AND RECOMMENDATION, IS NECESSARY FOR DEFENDANT'S PREPARATION FOR TRIAL AND JUSTIFIES DISCOVERY.**

Plaintiffs' decision to *stop* the stem cell study is just as relevant to Sanofi's defense, as the results of any stem cell study that had moved forward. "A testifying expert must disclose and therefore retain whatever materials are given to him to review in preparing his testimony, even if in the end he does not rely on them in formulating his expert opinion, because such materials often contain effective ammunition for cross-examination." *Fid. Nat'l Title Ins. Co.*, 412 F.3d 745, 751 (7th Cir. 2005). "[U]seful cross examination and possible impeachment can only be accomplished by gaining access to all of the information that shaped *or potentially*

*influenced* the expert witness's opinion." *In re Vioxx Prods.*, 2007 WL 1558700, at *4 (citing *Karn*, 168 F.R.D. at 639) (emphasis added). It is the expert's consideration of information, and decision *not to rely upon* that information, that is "useful in cross examination, not that the expert has reviewed particular information . . . ." *Allstate Ins. Co. v. Electrolux Home Prods., Inc.*, 804 F. Supp. 2d 1072, 1080 (N.D. Ill. 2012).

Further, litigation-driven study, financed by the Plaintiffs' bar, and medical intervention on plaintiffs amidst their cases, has become a lightning-rod in mass tort fraud and abuse, evidence of which the jury is entitled to hear. *See, e.g.*, *In re Propulsid Prods. Liab. Litig. v. Johnson & Johnson, et al.*, 261 F. Supp. 2d 603 (E.D. La 2003).[7]

The information at issue here addresses a testifying expert's findings on a central issue in this case: general causation—Plaintiffs must present admissible expert testimony to establish that Taxotere is capable of causing permanent alopecia. *See Seaman v. Seacor Marine LLC*, 564 F. Supp. 2d 598, 600 (E.D. La. 2008), *aff'd*, 326 F. App'x 721 (5th Cir. 2009) (citing *Knight v. Kirby*, 482 F.3d 347, 351 (5th Cir. 2007)). So far, Plaintiffs have not been able to do this. *See, e.g.*, Feigal Dep. 149:10–150:13 (hypothesizing that Taxotere is capable of causing permanent alopecia "probably" by attacking stem cells, but conceding that it has not been proven); *see also* Plunkett Rpt. at ¶ 39 (opining that Taxotere arrests cell division but offering no opinions about an affect

---

[7] *See also* Lester Brickman, *The Use of Litigation Screenings in Mass Torts: A Formula for Fraud?*, 61 S.M.U. L. REV. 1221 (2008); Gina Kolata & Barry Meier, *Implant Lawsuits Create a Medical Rush to Cash In*, N.Y. TIMES (Sept. 18, 1995); Berkeley Rice, *Do these doctors give medicine a black eye?*, 80 MED. ECON. 58 (Dec. 19, 2003); *In re: Diet Drug Litigation,* No. 13379-04, 2005 WL 1253991 (N.J. Super. L.) (May 9, 2005); *Robert Lenzner & Michael Maiello, The $22 Billion Gold Rush*, FORBES (Mar. 24, 2006); *Mississippi Attorney Guilty in Scheme to Create Fraudulent Records*, 10 MEALEY'S LIT. REP.: FEN-PHEN/REDUX 6 (April 2007)); Roger Parloff, *Diagnosing for Dollars: A COURT BATTLE OVER SILICOSIS SHINES A HARSH LIGHT ON MASS MEDICAL SCREENERS--THE SAME PEOPLE WHOSE DIAGNOSES HAVE COST ASBESTOS DEFENDANTS BILLIONS*, FORTUNE MAG. (Jun, 13, 2005); Alison Frankel & Jessica Dye, *The Lien Machine: New breed of investor profits by financing surgeries for desperate women patients*, REUTERS (Aug. 18, 2015).

after treatment has ended).  Thus, documents or conversations memorializing Plaintiffs' decision not to move forward with any stem cell study—either because it would be discoverable or because the results might not turn in Plaintiffs' favor, or even because it might not withstand *Daubert* scrutiny—is evidence that undermines Plaintiffs' claims.

For example, Plaintiffs' Second Amended Master Complaint (Rec. Doc. 4407) references several publications that discuss the stem cell theory as evidence that Sanofi knew or should have known about the risk of permanent alopecia. *See, e.g.*, Second Amended Master Long Form Complaint ("AMC") (Rec. Doc. 4407) ¶ 157–159. Plaintiffs cited a similar list as Exhibit C to their March 22, 2019 submission.  *See* PSC Ltr. to Court, Ex. C (March 22, 2019) (**Ex. E**). The fact that the hypotheticals in these articles have been *rebutted* by Dr. Thompson's initial testing, and as a result Plaintiffs' themselves declined further study of the issue, directly undermines Plaintiffs' allegations that: (1) any unreasonable conduct occurred on the part of Sanofi; and (2) that Taxotere is the cause of Plaintiffs' hair loss. That the best scientific minds today have been unable to support a hypothesis that Plaintiffs believe pointed to a need for an earlier, different warning (in 1999, or 2006, or 2009, or 2010), absolves Sanofi from liability.

Ultimately, the materials provided influenced Dr. Thompson and Plaintiffs' decision not to pursue this stem cell testing any further.  Without "access to all of the information that shaped or potentially influenced" Dr. Thompson's opinions, Sanofi will be unable to fully cross-examine or impeach Plaintiffs' key witness on this key issue.  *See In re Vioxx Prods.*, 2007 WL 1558700, at *4 (citing *Karn*, 168 F.R.D. at 639).  Dr. Thompson consulted on the development of a stem cell study that would further test his hypothetical mechanism of action in this litigation, the initial results of his own review were negative for his theory, and Dr. Thompson decided not to move forward with further testing. Sanofi is entitled to know what testing Plaintiffs' testifying expert

performed—including what testing was proposed, started, but ultimately abandoned—when Plaintiffs' testifying expert and his opinions in this case were inextricably involved in these decisions and discussions.

## CONCLUSION

Defendant is entitled to collect all relevant and discoverable material considered by Dr. Thompson when forming his opinions in this matter. Accordingly, Defendant respectfully requests this Court order Plaintiffs to provide the following documents, all of which was requested in the subpoena duces tecum for Dr. Thompson's depositions (*See* **Ex. F**):

- Any documents, correspondence, or materials regarding Dr. Thompson's decision not to conduct stem cell staining on Ms. Tuyes's biopsy samples;

- The identity of the person or entity redacted from Dr. Thompson's 8/9/2018 invoice entry;

- The "summary memo" referenced in Dr. Thompson's 8/6/2018 invoice, and all related documents, correspondence, or materials;

- Any documents, correspondence, or materials regarding the "telephone call stem cell study" referenced in Dr. Thompson's 8/15/2018 invoice entry;

- Any documents, correspondence, or materials regarding the "planning" of the "stem cell study at CTA Lab" referenced in Dr. Thompson's 8/15/2018 invoice entry;

- Any documents, correspondence, or materials regarding the development of any stem cell study – including the protocol itself – of which Dr. Thompson was aware;

- Any documents, correspondence, or materials related to the "email regarding normal hair samples for stem cell study," including the email itself, referenced in Dr. Thompson's 9/3/2018 invoice entry;

- Any documents, correspondence, or materials related to the literature sent by John Thornton referenced in Dr. Thompson's 9/24/2018 invoice entry;

- Any documents, correspondence, or materials related to "organization of slides sent to REDACTED" referenced in Dr. Thompson's 10/24/2018 invoice entry;

- The identity of the person or entity redacted from Dr. Thompson's 10/24/2018 invoice entry;

15

- Any documents, correspondence, or materials regarding the "Videos," referenced in Dr. Thompsons's 8/9/2018 invoice entry; and

- Any additional documents, correspondence, or materials that have not yet been provided regarding the development of any stem cell study of which Dr. Thompson was aware.

Finally, Plaintiffs' objection to examination of Dr. Thompson on these topics should be overruled and Sanofi should be entitled to depose Dr. Thompson about them.

Date: April 15, 2019

Respectfully submitted,

| | |
|---|---|
| /s/ Douglas J. Moore | Harley Ratliff |
| Douglas J. Moore (Bar No. 27706) | Adrienne L. Byard |
| **IRWIN FRITCHIE URQUHART & MOORE LLC** | **SHOOK, HARDY & BACON L.L.P.** |
| 400 Poydras Street, Suite 2700 | 2555 Grand Boulevard |
| New Orleans, LA 70130 | Kansas City, Missouri 64108 |
| Telephone: 504-310-2100 | Telephone: 816-474-6550 |
| Facsimile: 504-310-2120 | Facsimile: 816-421-5547 |
| dmoore@irwinllc.com | hratliff@shb.com |
| | abyard@shb.com |

*Counsel for Sanofi-Aventis U.S. LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2019, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record who are ECF participants.

/s/ Douglas J. Moore