## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)                    MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

THIS DOCUMENT RELATES TO:                      SECTION "H" (5)
*Antoinette Durden*, Case No. 2:16-cv-16635;
*Barbara Earnest*, Case No. 2:16-cv-17144;
*Tanya Francis*, Case No. 2:16-cv-17410.

---

### PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF
### MOTION TO EXCLUDE SANOFI'S EXPERT DAVID SPIEGEL, M.D.

---

Sanofi bears the burden of establishing that Dr. David Spiegel's opinions are reliable and admissible. *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). Rather than meeting that burden, Sanofi instead seeks to blame Plaintiffs' experts' testimony, as if their opinions have any bearing on the reliability or admissibility of Dr. Spiegel's opinions.

Keeping the focus where it belongs, Dr. Spiegel opines (among other things) that Plaintiffs are *malingerers*—a damning conclusion that he reaches without personally evaluating these women. Sanofi defends his opinion on the theory that a doctor need not always examine a Plaintiff to form an opinion. But that is certainly not true for the "medical" opinion that Dr. Spiegel provides: that Plaintiffs are liars. Whether Plaintiffs are telling the truth is a credibility question reserved for the jury, and the cold paper record that Dr. Spiegel reviewed—and cherry-picked from—does not suffice to allow the introduction of his medical opinion these women are liars. Couching such testimony as medical opinion is not only prejudicial and confusing—it also is not reliable expert testimony.

While these flaws permeate all of Dr. Spiegel's opinions, *at a minimum*, the Court should exclude his unreliable and prejudicial opinion that the Plaintiffs are liars.

1

## ARGUMENT

### I.   DR. SPIEGEL'S CASE-SPECIFIC OPINIONS ARE UNRELIABLE AND THERFORE MUST BE EXCLUDED

Despite Sanofi's argument to the contrary, Dr. Spiegel did not comply with the guideline requirements of the American Psychological Association's ("APA") *Ethical Principles of Psychologists and Code of Conduct*. Under the provisions of APA *Ethics Code* 9.01(c), a psychologist who conducts a record review must fully explain the reason[1] why an individual examination is unwarranted. *See* APA *Ethics Code* 9.01(c). Although stating in his case-specific reports that he did not conduct an in-person examination of each of the Plaintiffs, Dr. Spiegel failed to provide *any* reasoning for why a personal evaluation was unnecessary to perform. (*See generally* Dr. Spiegel's Report re: Antoinette Durden ("Spiegel Durden Rpt."), Doc. 6140-5 and Dr. Spiegel's Report re: Barbara Earnest ("Spiegel Earnest Rpt."), Doc. 6140-6).

Notably, Sanofi attempts to shift the focus onto Plaintiffs for not questioning Dr. Spiegel's decision to perform in-person examinations. But it is not Plaintiffs' responsibility to question Dr. Spiegel's motivation. Under the guidelines provided by the APA, he was obligated to disclose his reason for declining an individual examination of the Plaintiffs. That he failed to comply with this requirement irreparably deems his expert reports unreliable and inadmissible.

Not only did he fail to provide an explanation for why he chose to forego an in-person examination of the Plaintiffs, but Dr. Spiegel also failed to adequately review the records upon which he claimed to have replied. Instead, he cherry-picked portions of available medical records and deposition transcripts solely to discredit Plaintiffs' testimony. In fact, Dr. Spiegel's case-

---

[1] (c) "When psychologists conduct a **record review** or provide consultation or supervision **and an individual examination is not warranted or necessary for the opinion, psychologists explain this** and the sources of information on which they based their conclusions and recommendations." *Ethical Principles of Psychologists and Code of Conduct*, AM. PSYCHOL. ASS'N, https://www.apa.org/ethics/code/. (Emphasis added).

specific reports merely summarize the testimony he found "relevant" to his litigation-developed opinions. (*See* Spiegel Durden Rpt. at 10, Doc. 6140-5; Spiegel Earnest Rpt. at 6, Doc. 6140-6).

    A.   *Dr. Spiegel's Case-Specific Report – Antoinette Durden*

In Dr. Spiegel's report, he alleged Ms. Durden's testimony contradicts the evidence in the record. Yet many of Dr. Spiegel's assertions are purposefully misleading. According to Dr. Spiegel, Ms. Durden's visits to her dermatologist were for her skin problems, and not for concerns due to her hair loss. (*See* Spiegel Durden Rpt. at 13, Doc. 6140-5). This statement clearly fails to take into account several entries in her medical records that state the opposite.

For example, as early as December 2013, Ms. Durden sought medical care from her dermatologist for hyperpigmentation *and* hair loss. (*See* Thompson Durden Rpt. at 14, Doc. 6140-9). On June 30, 2014, Ms. Durden again visited her dermatologist, this time seeking a special shampoo to regrow her hair prior to an upcoming wedding—that she did not attend because she could not style her hair. (*See id.* at 22-23.) Even as late as January 2017, Ms. Durden expressed concern that her hair loss was not being properly addressed. (*See* Thompson Durden Rpt. at 14, Doc. 6140-9).

Dr. Spiegel continued his false narrative by claiming Ms. Durden had "never advised any of her doctors that her hair is causing her anxiety, depression or marked distress." (*See* Spiegel Durden Rpt. at 15, Doc. 6140-5). Yet three of Ms. Durden's physicians testified in stark contrast of this statement. According to Dr. Julie Martin, Ms. Durden was "very anxious to try something" for her hair loss. (*See* Thompson Durden Rpt. at 26, Doc. 6140-9). Her oncologist, Dr. Sophy Janich, testified that she specifically remembered Ms. Durden asking her about hair loss— especially given that prior to 2011, Dr. Janich had never had a patient whose hair did not regrow. (*See* Thompson Durden Rpt. at 28-29, Doc. 6140-9). Finally, Ms. Durden contacted her primary

care physician, Dr. Velu, with concerns about hair loss and her appearance.[2] (*See* Spiegel Durden Rpt. at 5, Doc. 6140-5). Dr. Spiegel audaciously tries to victim-shame Ms. Durden by attempting to shift blame away from Sanofi. (*See id.* at 15) ("Thus, it appears that if Ms. Durden had been more distressed about her hair, she would not have failed to seek and comply with treatment recommendations that were improving her hair loss."). Evidently, Dr. Spiegel did not carefully review the records which plainly demonstrate Ms. Durden's repeated attempts to seek treatment to regrow the hair she lost as a result of Sanofi's product.

B. *Dr. Spiegel's Case-Specific Report – Barbara Earnest*

Despite Mrs. Earnest's own admission that her hair loss was both "traumatic" and "humiliating," Dr. Spiegel discredited her testimony by focusing on the fact that she never sought treatment for her hair loss. Yet not once did he disclose Mrs. Earnest's own reasoning—that she had lost hope that her hair would grow back, resigning herself into believing there was nothing that could be done. (*See* Thompson Earnest Rpt. at 27, Doc. 6140-10). Her decision to forego treatment should not, however, diminish the emotional distress she constantly endures.

Based on testimony of her family members, Mrs. Earnest was clearly suffering emotionally as a result of her hair loss. Despite Sanofi's claims as to the validity of Dr. Spiegel's reports, he failed to include relevant testimony from Mrs. Earnest's husband. According to Mr. Ralph Earnest, he can tell that when his wife is getting ready to go out, or is invited to a special event, she struggles over the decision of whether to wear a wig or turban. (*See id.* at 8-9) ("It has been distressing to her. She can't fix her hair and that is what women do.").

---

[2] Even Dr. Spiegel admits in his report, "In May 2013, Ms. Durden told Dr. Velu that she was 'worrying about her appearance' and wanted 'something to help regain [ ] hair loss.' The diagnoses include 'hyperpigmentation of skin' and 'hair loss.'" *See* Spiegel Durden Rpt., at 5, Doc. 6140-5.

Moreover, her son Michael knew the devastation that hair loss caused his mother, even though Mrs. Earnest never expressed her feelings to him. (*See* Spiegel Earnest Rpt. at 6, Doc. 6140-6). Without being aware of the lawsuit, he understood the anxiety and emotional distress that his mother continues to experience. (*See id.*) ("Michael did not know his mother had filed a lawsuit until he was asked to give a deposition. Michael claims he 'know[s] how my mother feels. . . . It's just my mother doesn't feel like a woman anymore without her hair.' His mother has never expressed that to him.").

## II.  DR. SPIEGEL'S GENERAL OPINIONS ARE IRRELEVANT AND THEREFORE INADMISSIBLE

Dr. Spiegel's generalized opinions[3] are inadmissible. While his testimony focuses on his experience treating breast cancer patients, Dr. Spiegel fails to effectively offer an opinion as to the effect hair loss can have on women. In his report, Dr. Spiegel briefly concedes alopecia can cause social embarrassment for women. (*See* Spiegel General Rpt. at 5, Doc. 6594-6). Yet hair loss, especially permanent hair loss, can cause severe and disabling emotional distress.

According to Plaintiffs' expert Dr. Alan Bauman,[4] women experiencing hair loss "often reach a level of debilitation that does not allow them to engage in social activities," with many experiencing "anxiety and depression related to [their] hair loss situation." (*See* Bauman Dep. at 131:7-19, Ex. A; *see* Bauman Rpt. at 2, Ex. B) (Hair loss is often seen as a type of "disfigurement," and "can trigger high levels of anxiety and depression, detrimentally affecting a person's sense of self and identity."). Furthermore, women increasingly associate hair with their identity and

---

[3] In its opposition, Sanofi did not dispute the fact that Dr. Spiegel's report contains numerous factual and scientific inaccuracies. *See* Plts. Mot., at 15-19. As a result, Dr. Spiegel's general report should be excluded.

[4] Dr. Bauman is one of the world's leading experts on female hair loss and restoration. *See International Hair Loss Expert Dr. Alan Bauman to Reveal New Hair Loss Treatments on The Balancing Act TV Show July 24*, BAUMAN MEDICAL, *available at* https://www.baumanmedical.com/international-hair-loss-expert-dr-alan-bauman-reveal-new-hair-loss-treatments-balancing-act-tv-show-july-24/.

personality. (*See* Bauman Dep. at 140:1-12; 169:11-21, Ex. A; Bauman Rpt. at 2, Ex. B) ("Femininity, sexuality, attractiveness and personality are linked to a woman's hair – more so than for a man."). Thus, women who suffer hair loss will often develop crippling self-consciousness. (*See* Bauman Rpt. at 2, Ex. B). Tellingly, Dr. Spiegel's general report fails to mention just how many of his patients experienced permanent hair loss, like the Plaintiffs in this litigation.

Moreover, Dr. Spiegel's testimony is vague and overbroad, offering sweeping statements with no evidence to support his abstract "opinions." (*See e.g.*, Spiegel General Rpt. at 4-5, Doc. 6594-6).[5] These statements are grossly misleading and attempts to shift blame onto breast-cancer survivors. In so doing, Dr. Spiegel ignores Sanofi's own wrongdoing of failing to properly inform doctors and patients of the risk of permanent hair loss. Plaintiffs may have consented to the risks of chemotherapy. But, without proper warnings from Sanofi, they were prevented from consenting to the risk of *permanent* hair loss.

Sanofi further claims Dr. Spiegel's general testimony will assist the trier of fact's understanding of why Plaintiffs chose their specific treatment options. Yet Dr. Spiegel's case-specific reports imply that Plaintiffs made their decisions unilaterally, based on an irrational fear. (*See* Spiegel Durden Rpt. at 11, Doc. 6140-5; Spiegel Earnest Rpt. at 7-8, Doc. 6140-6). Neither Plaintiff began treatment without consulting with their physicians. Ms. Durden discussed all surgical options with her doctors and felt it was best to perform a bilateral mastectomy. (*See* Thompson Durden Rpt., at 10, Doc. 6140-9). Although the medical records do not state why this procedure was chosen, Dr. Spiegel could easily have ascertained an answer from Ms. Durden

---

[5] Statements include: "In addition, women with a family history of cancer are understandably more fearful of cancer and choose more aggressive treatments"; "Risks are difficult to assess, and the ability to assess them changes over time"; "Assigning responsibility for a decision, either directed toward oneself (guilt) or towards a treating physician (blame) can have the effect of reducing helplessness because someone can be held responsible and the decision might have been different, even a decision that represented a rational assessment of risks vs. benefits".

herself during an in-person examination. As for Mrs. Earnest, her regimen of taking four cycles of doxorubicin with cyclophosphamide was recommended by her physicians due to her family history. (*See* Thompson Earnest Rpt. at 15, Doc. 6140-10). Thus instead of speaking directly with the Plaintiffs, Dr. Spiegel projected his own preconceived, litigation oriented notions onto them. Dr. Spiegel may have experience treating breast cancer patients, but he has no basis to opine on the psychological impact hair loss may, or may not have, had on these particular patients.

Sanofi criticizes Plaintiffs' own experts for the amount of time spent consulting with the individual Plaintiffs. (*See* Def. Motion at 6). But in-person examinations are useful in situations where patients self-report symptoms to their physicians. *See, e.g.*, *Bergman v. Fed. Express Corp. Long Term Disability Plan*, 2017 U.S. Dist. LEXIS 160230, at *11 (S.D. Cal. Sept. 27, 2017) (finding that an in-person examination would have been more appropriate in a case where Plaintiff had many "self-reported" or subjective complaints). Dr. Bauman, a hair loss expert, follows an established methodology of assessing the psychological condition of his patients after personal one-on-one consultations. (*See* Bauman Dep., 187:13-188:19, Ex. A) ("Consultations typically take an hour-and-a-half. So much of that time is spent, not only discussing the physical issues of the hair loss situation, but also the impact it's having psychologically."). Perhaps if Dr. Spiegel chose to personally evaluate each Plaintiff, he would not need to rely on mere generalizations.

### III.   DR. SPIEGEL'S REBUTTAL OPINIONS ARE UNRELIABLE AND THERFORE INADMISSIBLE

Finally, Sanofi's half-hearted attempt to discredit the opinions of Plaintiffs' experts through the use of Dr. Spiegel is fundamentally flawed. Contrary to Sanofi's allegations, Plaintiffs' experts did gather factual evidence based upon a review of the medical records and deposition

transcripts.[6] In addition, Dr. Thompson and Dr. Bianchini each examined both Ms. Durden and Mrs. Earnest and considered their direct personal interactions as part of their evaluations. This is because only Ms. Durden and Mrs. Earnest can truly articulate the severe emotional distress and anxiety experienced on a daily basis as a result of their permanent hair loss.

Dr. Spiegel, on the other hand, completely dismissed Plaintiffs' testimony as "subjective representations" since their personal accounts contradicted his own general opinion of breast cancer survivors. (*See* Def. Mot. at 8.) In his general report, he describes breast cancer patients as "beset by intrusive fears" and "irritable," with a "generally negative outlook" on their diagnosis without distinguishing between women with early stage versus metastatic cancer. (*See* Spiegel General Rpt. at 3, 5, Doc. 6594-6). Accordingly, Dr. Spiegel selectively chose portions of the record that fit this biased viewpoint. And while Sanofi claims Dr. Spiegel relied upon objective evidence, his testimony is contradicted by Plaintiffs' own fact witnesses.[7]

Further, Dr. Thompson and Dr. Bianchini's opinions were not out of proportion with the DSM-5's criteria for adjustment disorder. Published by the American Psychiatric Association, the DSM is a "guiding force used by clinicians and psychiatrists to diagnose psychiatric illnesses." *United States v. Thompson*, 709 Fed. App'x. 758, 764 n.1 (5th Cir. 2017) (emphasis added). That said, while DSM-5 is meant to be used as a guide when diagnosing symptoms, those criteria are not absolute: "[t]he criteria are there to guide clinicians in making their diagnosis, but the

---

[6] Both Dr. Thompson and Dr. Bianchini were provided with additional documents by Plaintiffs' Counsel. They have had an opportunity to review the record and have not made any supplemental changes to their expert reports. Their opinions have remained the same.

[7] Several fact witnesses testified that permanent hair loss *has* had an impact on Plaintiffs' lives. *See, e.g.*, Thompson Durden Rpt., at 21, Doc. 6140-9 (Ms. Durden's daughter (Anesha Prier) "saw the emotional distress her mother went through"); Thompson Dep., 226:2-5, Ex. C (Ms. Durden's brother (Darryl Durden) "verified that, that she won't go out of the house without a covering on her head."); Thompson Earnest Rpt., at 8-9, Doc. 6140-10 (Mrs. Earnest's husband (Ralph Earnest) has stated that "[i]t has been distressing to her. She can't fix her hair and that is what women do."); Spiegel Earnest Rpt., at 6, Doc. 6140-6 (Mrs. Earnest's son (Michael Earnest) testified that "[i]t's just my mother doesn't feel like a woman anymore without her hair.").

clinician's clinical judgment always trumps DSM-5." (*See* Thompson Dep., 135:5-8; *see* 134:22-135:3, Ex. C).

When diagnosing patients in a forensic setting, it is imperative that psychiatrists are mindful of the symptoms being presented. Adjustment disorder can vary widely in presentation, with some patients exhibiting mild symptoms and others exhibiting much more significant symptoms. (*See* Thompson Dep., 137:13-25, Ex. C; Bianchini Dep., 201:6-16, Ex. D). Therefore, psychiatrists utilizing DSM-5 in their forensic evaluations would be mindful to avoid narrowly shoehorning diagnoses in order to fit standardized criteria. (*See* Thompson Dep., 135:25-136:18; 138:7-11, Ex. C) ("So within the diagnosis of adjustment disorder, there's a lot of variability and you have to take your clinical experience into consideration when you're making these diagnoses."); (*see also* Bianchini Dep. at 237:17-238:22, Ex. D).

Although Sanofi finds it unnecessary to discuss the DSM's application in Dr. Spiegel's case-specific reports, Plaintiffs disagree. As a means of refuting Plaintiffs' experts, Dr. Spiegel argues that Plaintiffs suffer from "normative stress reaction" rather than adjustment disorder. This diagnosis is clearly erroneous. "Normative stress reaction" is defined in the DSM-5 as an ordinary response to stress; "when bad things happen, most people get upset." (Spiegel Durden Rpt., at 15, Doc. 6140-5; Spiegel Earnest Rpt., at 10-11, Doc. 6140-6). However, Plaintiffs' permanent alopecia surpasses the bounds of a normal stressor. Both women were deceived as a result of Sanofi's deceptive warnings. Told their hair would eventually return, they are now permanently scarred—reminded each day of their cancer diagnosis and the possibility of its recurrence.

In response to her hair loss, Ms. Durden worries when she goes out in public. She goes to great lengths to make sure her head in covered in a certain way in order to feel comfortable around strangers. (*See* Thompson Dep., 111:16-19; 222:24-223:7, Ex. C). Ms. Durden testified that, due

to her hair loss, she suffers from "low self-esteem" and feels like she doesn't "belong in this world." (*See* Thompson Durden Rpt. at 22, Doc. 6140-9; *see* Bianchini Durden Rpt. at 2, Doc. 6140-7). She remains self-conscious about her appearance; after a recent incident in which her wig slipped off in public, she is now embarrassed to go outside and fears it could happen again. (*See* Thompson Durden Rpt. at 38, Doc. 6140-9; *see* Bianchini Durden Rpt. at 2, Doc. 6140-7).

Similarly, a psychiatric review of her symptoms revealed that Mrs. Earnest experiences "transient depressed moods" when deciding whether to wear a wig or a turban. (*See* Thompson Earnest Rpt., at 5, Doc. 6140-10). Each time she makes the decision, she is reminded that her hair will never come back. (*See* Thompson Earnest Rpt. at 5, Doc. 6140-10; Thompson Dep., 331:21-332:2, Ex. C).[8] The experience of losing her hair has been "traumatic," and she feels like a part of her has died and no amount of money will bring her hair back. (*See* Thompson Earnest Rpt., at 27, Doc. 6140-10).

In contrast to Sanofi's arguments, it is clear that Dr. Spiegel arbitrarily reviewed the record for "facts" that supported his opinions. In so doing, he utterly dismissed Plaintiffs' personal testimonies as nothing more than litigation-driven narratives. By choosing to ignore portions of the evidence, his expert opinions have been rendered unreliable and must therefore be excluded.

## **CONCLUSION**

Sanofi has failed to satisfy their burden of proving the admissibility of Dr. Spiegel's opinions under the Federal Rules of Evidence 702. For the forgoing reasons, Plaintiffs' respectfully request that this Court grant their motion to exclude Dr. Spiegel's expert testimony.

---

[8] She feels singled out by strangers coming up to her on the street and asking if she still has cancer. (*See* Thompson Earnest Rpt. at 26, Doc. 6140-10; Thompson Dep., 289:8-290:5, Ex. C; Bianchini Earnest Rpt. at 3, Doc. 6140-8). She is humiliated by being out in public, and becomes depressed when she has to get ready. (*See* Thompson Earnest Rpt. at 27, Doc. 6140-10; Thompson Dep., 11:1-4, Ex. C) ("[S]he does seem to be super fearful of people seeing her other than her family without her turban on.").

Dated: April 16, 2019                    Respectfully submitted,

### FOR THE PLAINTIFFS' STEERING COMMITTEE

/s/ Christopher L. Coffin
Christopher L. Coffin (#27902)
PENDLEY, BAUDIN & COFFIN, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

*Plaintiffs' Co-Lead Counsel*

/s/ Karen B. Menzies
Karen Barth Menzies (CA Bar #180234)
GIBBS LAW GROUP LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Telephone: 510-350-9700
Facsimile: 510-350-9701
kbm@classlawgroup.com

*Plaintiffs' Co-Lead Counsel*

/s/M. Palmer Lambert
M. Palmer Lambert (#33228)
GAINSBURGH BENJAMIN DAVID
MEUNIER & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: 504-522-2304
Fax: 504-528-9973
plambert@gainsben.com

*Plaintiffs' Co-Liaison Counsel*

/s/Dawn M. Barrios
Dawn M. Barrios (#2821)
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: 504-524-3300
Fax: 504-524-3313
barrios@bkc-law.com

*Plaintiffs' Co-Liaison Counsel*

### PLAINTIFFS' STEERING COMMITTEE

Anne Andrews
Andrews & Thornton
4701 Von Karman Ave., Suite 300
Newport Beach, CA 92660
Phone: (800) 664-1734
aa@andrewsthornton.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@atkinsandmarkoff.com

J. Kyle Bachus
Bachus & Schanker, LLC
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Phone: (303) 893-9800
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, Florida 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Phone: 510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

Andrew Lemmon
Lemmon Law Firm, LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Genevieve Zimmerman
Meshbesher & Spence Ltd.
1616 Park Avenue South
Minneapolis, MN 55404
Phone: (612) 339-9121
Fax: (612) 339-9188
gzimmerman@meshbesher.com

**CERTIFICATE OF SERVICE**

I hereby certify that on April 16, 2019, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

/s/ M. Palmer Lambert
M. PALMER LAMBERT