# EXHIBIT D

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF LOUISIANA
 3
 4   * * * * * * * * * * * * * * * * * * * * * * * * *
 5   IN RE:  TAXOTERE (DOCETAXEL)           MDL No. 2740
     PRODUCTS LIABILITY LITIGATION
 6                                          SECTION: H
 7   This Document Relates To:
 8   Antoinette Durden, Case No. 2:16-cv-16635;
     Tanya Francis, Case No. 2:16-cv-17410;
 9   Barbara Earnest, Case No. 2:16-cv-17144
10   * * * * * * * * * * * * * * * * * * * * * * * * *
11
12                         VOLUME II
13
14
15         Videotaped Deposition of KEVIN J. BIANCHINI,
16   PhD, ABPN, taken at Jefferson Neurobehavioral Group,
17   2901 N. I-10 Service Road E., Suite 300, Metairie,
18   Louisiana 70002, on Wednesday, January 9th, 2019, at
19   8:34 a.m.
20
21
22
23
24   By:  Ashlee B. Ancalade
     Registered Professional Reporter
25   Job No. NJ3184809
```

```
                                                    Page 159
 1                  A P P E A R A N C E S
 2
     REPRESENTING PLAINTIFFS BARBARA EARNEST, ANTOINETTE
 3   DURDEN:
 4
 5        LISKA, EXNICIOS & NUNGESSER
          BY:  VAL PATRICK EXNICIOS, ESQ.
 6        BY:  WARREN "MIKE" NEWTON, ESQ.
          1515 POYDRAS STREET
 7        SUITE 1400
          NEW ORLEANS, LOUISIANA 70112
 8        504.410.9611
          VPEXNICIOS@EXNICIOSLAW.COM
 9
10
11   REPRESENTING DEFENDANTS SANOFI-AVENTIS
     U.S., LLC, AND SANOFI US SERVICES, INC.:
12
13        SHOOK, HARDY & BACON, LLP
          BY:  LORI SCHULTZ, ESQ.
14        BY:  MADISON HATTEN, ESQ.
          2555 GRAND BOULEVARD
15        KANSAS CITY, MISSOURI 64108
          816.474.6550
16        LSCHULTZ@SHB.COM
17
18
19
20   ALSO PRESENT:  THE VIDEOGRAPHER
21
22
23
24
25
```

Page 160

1                     I N D E X

2

3                                                   Page

4    Caption..........................................158

5    Appearances......................................159

6    Agreement of Counsel.............................161

7    Examination By Ms. Schultz: .....................167

8    Examination By Mr. Exnicios: ....................341

9    Examination By Ms. Schultz: .....................360

10   Reporter's Certificate...........................374

11

12

13

14                   * * * EXHIBITS * * *

15

16

17   Exhibit 14  Excerpt from DSM-5 Section   ..........282

18               entitled "Trauma- and

19               Stressor-Related Disorders"

20

21   Exhibit 15  Excerpt from DSM-5 Section   ..........306

22               entitled "Other Conditions that May

23               be a Focus of Clinical Attention"

24

25

```
 1      A    I don't know that.
 2      Q    Did you ask her when that was?
 3      A    No.
 4      Q    Why not?
 5      A    It didn't -- it didn't seem important.
 6      Q    Well, isn't it important to your diagnosis as
 7   to when any adjustment disorder began?
 8           MR. EXNICIOS:
 9                Objection to the form.
10      A    I mean, it can be.  If -- well, it can be
11   because adjustment disorders have a typical time period
12   when there's a kind of isolated stressor.  However,
13   when there's an ongoing stressor, you can have the
14   problem as long as you have the stressor.  So it
15   becomes less important when she had a problem that was
16   going to be ongoing.
17   BY MS. SCHULTZ:
18      Q    Well, and -- and in this case, her stressor
19   was when she realized the hair loss was going to be --
20   what word did you use, "permanent"?
21      A    "Permanent."
22      Q    "Permanent."
23           So in this case, the stressor was when she
24   realized her hair loss was going to be permanent;
25   correct?
```

1  A  Yes.
2  Q  And what is the DSM?
3  A  Diagnostic and Statistical Manual of -- it's
4  the -- basically just the list of conditions and
5  disorders and -- and their -- some diagnostic criteria
6  for them.
7  Q  So the DSM is the Diagnostic and Statistical
8  Manual of Mental Disorders?
9  A  Yes.
10 Q  And is it now the DSM-5?
11 A  I think so, yes, uh-huh.
12 Q  Do you know whether it's in the fifth edition
13 or not yet?
14 A  No.  I think it is -- I think the one we're
15 using now is the fifth.  There's probably a revision in
16 progress.
17 Q  For Ms. Durden, can you walk me through how
18 you came to a diagnosis of adjustment disorder with
19 mixed anxiety and depressed mood under the DSM
20 criteria?
21 A  It's just simply the -- an adjustment
22 disorder is an onset of emotional symptoms, and -- and
23 that can include depression symptoms, anxiety symptoms,
24 and other symptoms, like anger symptoms, you know, with
25 some temporal link to the stressor.  And, you know,

1  it's not a major depressive disorder.  It's not
2  something -- it's not other major mental conditions.
3              So, you know, she had -- she had those
4  symptoms, and there was a temporal link described in
5  her history, and that's how I came to the diagnosis.
6              And -- and -- and then, also, when we did --
7  we did testing, she didn't have severe emotional
8  symptoms on her testing.  She didn't -- she, in fact,
9  didn't have clinical elevations on her MMPI.  She
10 didn't show any indication of exaggeration.
11             So, to the degree possible, we ruled out, you
12 know, malingering or exaggeration for purposes of the
13 litigation.  Of course, that's never possible to do
14 perfectly, but we -- we ruled -- you know, we looked at
15 it pretty rigorously and didn't find any -- you know,
16 didn't find -- didn't find evidence of that, evidence
17 that would lead to a diagnosis of it.
18             And so the -- that combination of the -- the
19 symptoms temporally linked to the stressor with the
20 forensic context and absence of findings -- absence of
21 a conclusion of malingering based on an examination of
22 that supported a diagnosis of adjustment disorder.
23      Q   Did you take any other steps in reaching your
24 opinion that Ms. Durden had an adjustment disorder?
25      A   Yes.  I -- I looked at the records.  I -- I