April 8, 2019

<u>**Via Email Only**</u>
The Honorable Jane Triche Milazzo
United States District Judge
500 Poydras Street, Room C206
New Orleans, Louisiana 70130

<u>**Via Email Only**</u>
The Honorable Michael B. North
United States District Judge
500 Poydras Street, Room B419
New Orleans, Louisiana 70130

RE:     In re: *Taxotere (Docetaxel) Products Liability Litigation*, MDL No. 2740
-------------------------------------------------------------------------------------------------------

Dear Judge Milazzo and Magistrate Judge North,

Sanofi's submission on Friday, suggesting that the PSC intentionally hid the existence of a stem cell study and that Judge North abused his discretion in rejecting Sanofi's request to turn over protected work product, contains numerous inaccuracies and lacks support for all of the inferences it draws. Sanofi's submission is also remarkable for what it doesn't say: Not *once* does Sanofi quote from last Wednesday's deposition transcript of Dr. Curtis Thompson. Not a single citation.

Sanofi demanded a third deposition of Dr. Thompson. But now that Dr. Thompson's latest testimony—like his earlier testimony and his letter to the Court—does not fit Sanofi's storyline that the PSC buried a "study," Sanofi draws wild inferences and conclusions based on selective excerpts from documents.

As explained below, nothing from Dr. Thompson's third deposition should disturb Judge North's determination that the *in camera* production of certain PSC communications with its experts are privileged. Moreover, Sanofi has created a narrative to claim that the PSC employed a laboratory "for the express purpose of creating a scientific study upon which the litigation would be based," further characterizing it as a "deliberate effort to manufacture science." Sanofi's Letter, at 1. These are strong accusations that must be addressed.

Consider the following claims made in Sanofi's letter to the Court:

- "In April 2017, Dr. Thompson published a hypothesis about stem cell death with chemotherapy causing permanent hair loss, and the capability of the staining technique (the same technique that he performed in this case) to test pathology specimens." Sanofi's Letter, at 1.

Not so. Dr. Thompson testified that he and a colleague published a "Letter to the Editor" in April 2017 that expressly disclaimed the utility of this staining technique in diagnosing chemotherapy induced permanent hair loss. *See* Exhibit A, Thompson Dep. 409:06-410:11, April 3, 2019; *see also* Exhibit B, Thompson Dep. Ex. 6, at 1 ("We wish our research letter would be considered as concluding remark concerning the limited value of bulge stem cell marker immunostaining …").

Sanofi then represents:

- "Plaintiffs' expert dermatologist, Dr. Antonella Tosti, recruited pathologist Dr. Curtis Thompson on the premise of taking scalp biopsies for Pathology and "stem cell markers." Sanofi's Letter, at 1.

Again, this is inaccurate. Sanofi here quotes from a March 2018 email exchange in which Dr. Thompson agreed to provide his dermatopathological expertise and laboratory for use in this litigation. Dr. Tosti introduced the PSC to Dr. Thompson.[1] Drs. Tosti and Thompson, however, had minimal, if any, discussions about stem cell markers, and Dr. Thompson believes that Dr. Tosti mentioned "stem cell markers" to peak his interest and entice him into doing expert work, which he had been reluctant to do.[2] Exhibit A, Thompson Dep. 423:01-426:01; 444:25-445:25. Thompson's testimony resolves this, which may be why Sanofi ignores it: "[I]t became clear to me pretty quickly that my utility was going to be in properly processing these biopsies and providing a diagnoses on them without this immunohistochemical [stem cell marking]. So it didn't -- it never went into the larger investigation that Dr. Tosti was kind of proposing." *Id.* at 451:15-24.

Sanofi continues with this statement:

- After biopsies were taken from the Plaintiffs' scalps, the very first place that they were sent was a stem cell research laboratory, which is the same group later working with Dr. Thompson on a "stem cell study." Sanofi's Letter, at 1.

False. Sanofi selectively quotes from a single invoice, ignoring its own questioning about this exhibit, which revealed that Dr. Thompson did *not* offer "any guidance or any thoughts on the study" and was unaware of the results of the study. Exhibit A, Thompson Dep. 464:01-465:10. In fact, no results exist because there was no study. Further, as noted in the attached declaration affidavit, the biopsies were sent to the facility, AIVITA Biomedical, for the sole purpose of utilizing a reliable facility to safely and properly store the biopsy material. Exhibit D, Poole Decl.

Sanofi next states:

- "Dr. Thompson and the PSC discussed in April 2018 that if his stem cell staining did not 'add to the information' then he would 'issue [his] reports without that information.' See Thompson Dep. Ex. 10, at 1, Apr. 3, 2019;" "In the slides of three trial plaintiffs' scalp biopsies, however, the stem cells remained present and proliferating;" and "The slide results were inconsistent with the theory of Taxotere causing permanent alopecia by destroying stem cells in the hair follicle." Sanofi's Letter, at 1-2.

---

[1] It is not uncommon for experts to introduce attorneys to other potential experts. Indeed, one of Sanofi's experts testified that she was introduced to Sanofi by way of another expert. *See* Exhibit C, Smart Dep. 30:19-31:07.

[2] Because the PSC has nothing to hide, it agreed to a limited deposition so Sanofi can ask questions about an email like this.

This is incorrect. Sanofi ignores basic stem cell science and Dr. Thompson's testimony. As explained by Dr. Thompson, there is no staining that definitively marks the stem cells in the hair follicle, and staining of nearby cells or even antigens in dead cells can produce what are essentially false positives for the presence of stem cells in the hair follicle. Exhibit A, Thompson Dep. 397:11-400:24. Thus, while a negative stem cell result is evidence that the hair follicle is dead, a positive result does not necessarily mean the hair follicle is alive. Indeed, Dr. Thompson testified he was not looking to see whether stem cells were preserved in the bulge region of the follicle. *Id.* at 397:05-10. More importantly, however, individual plaintiffs do not need proof of hair follicle death in order to establish causation. Contrary to Sanofi's suggestions otherwise, proving the mechanism of action of an injury is not a required element of causation – indeed, a *proposed* mechanism of action is sufficient to "'lend[ ] credence to an inference of causality' drawn from other, more substantial evidence." *In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 299 F. Supp. 3d 1291, 1344 (N.D. Fla. 2018) (quoting Reference Manual on Scientific Evidence at 604). Finally, these statements by Sanofi describing the science of the case are inappropriate. The status of the science shouldn't be dictated by lawyers, and Sanofi offers no expert or other factual support for its incorrect conclusions. Indeed, if this alleged study could be used to prove that plaintiffs' hair loss is not permanent, then why hasn't Sanofi conducted the study itself—it has had the opportunity to do so since November.

Sanofi next states:

- "Plaintiffs now criticize the scientific reliability (lack of FDA approval) for this very expensive testing that they performed and which—regardless of whether it would have been admissible—was their most advanced theory of causation (mechanism of action)." Sanofi's Letter, at 2.

Again, false. The PSC does not "now" criticize the reliability of the staining; Dr. Thompson's April 2017 letter to the editor, discussed above, confirms as much. Further, it is well-established that plaintiffs are not required to prove the causal mechanism of action. *See, e.g.*, *Drake v. Allergan, Inc.*, 2014 WL 5392995, *7 (D. Vt. Oct. 23, 2014) ("[I]t is not necessary for an expert to know the exact mechanism of how a drug causes an injury in order for her opinion on causation to be reliable and admissible."); *In re Chantix (Varenicline) Prod. Liab. Litig.*, 889 F. Supp. 2d 1272, 1301–02 (N.D. Ala. 2012) ("Absent is any argument that the plaintiff must prove the biological means of injury, because no such requirement exists."); *In re Traylsol Prod. Liab. Litig.*, 2010 WL 4102247, *4 (S.D. Fla. 2010) ("[B]iological plausibility is a factor to be considered in making this determination, and that a causal relationship can be established even when the mechanism of action is unknown."); *In re Fosamax Prod. Liab. Litig.*, 645 F. Supp. 2d 164, 183 (S.D.N.Y. 2009) ("That the mechanism remains unknown does not mean that the one proposed by the PSC's experts is not widely accepted as plausible."); *In re PPA Prods. Liab. Litig.*, 289 F. Supp. 2d 1230, 1247 (W.D. Wash. 2003) ("The fact that the mechanism remains unclear does not call the reliability of the opinion into question.").[3]

---

[3] As it has before, Sanofi uses its letter to the Court as a soap box in which to challenge plaintiffs' evidence and raise issues more appropriate for analysis under Fed. R. Evid. 702. Here, Sanofi inaccurately claims that plaintiffs must provide the biological mechanism of injury in order to establish causation. In another letter submitted to the Court last month, Sanofi claimed that Dr. Kessler has disclaimed offering an opinion on causal association. To the

Sanofi continues with this next point:

- "Dr. Thompson reviewed validation and testing for another, different stem cell study by another plaintiff expert at the stem cell research laboratory, but in doing so questioned whether the expert had been made aware that his slide results were positive for stem cells, which is why he did "not pursue this further." *See* Thompson Dep. Ex. 14, at 1, Apr. 3, 2019." Sanofi's Letter, at 2.

Not accurate. Sanofi not only ignores Dr. Thompson's sworn testimony but also misstates the referenced exhibits. Specifically, Dr. Thompson did not state that the biopsy slide results "were positive for stem cells." Rather, Dr. Thompson stated that the staining was positive in the "basaloid bodies," which are not stem cells. Exhibit A, Thompson Dep. 407:01-11; 491:22-493:19; *see also* Exhibit E, Thompson Dep. Ex. 14, at 1. Sanofi's speculative conclusion as to why a study was not pursued has no bearing on the matters of privilege, as no such study was ever done.

Sanofi continues:

- "The decision not to conduct another stem cell study supports Sanofi's defenses about the reasonableness of its actions, and the state of scientific understanding about whether Taxotere is capable of causing permanent hair loss, compared to other chemo medicines and other established factors." Sanofi's Letter, at 2.

Again, untrue. There was not one, let alone multiple studies. Moreover, Sanofi has not demonstrated a substantial need for any internal work product between the PSC and its experts. The PSC has never received any emails between Sanofi and its experts or non-testifying consultants about theories Sanofi's attorneys may have asked about but not developed, including any theories related to stem cells. This is because the work product protection exists to "promote the adversary system by safeguarding the fruits of an attorney's trial preparations from the discovery attempts of an opponent." *Shields v. Sturm, Ruger & Co.*, 864 F.2d 379, 382 (5th Cir. 1989).

Sanofi then represents:

- "It is still not clear whether Plaintiffs conducted another, different stem cell study; whether that study was conducted on specimens from other plaintiffs besides these three; or whether that study was conducted some other way, i.e., through a tissue bank. When confronted with this question, Plaintiffs' response is continually tied back to further study on these slides, which is not responsive to the question of whether other, discoverable information not exclusive to this set of slides has been withheld." Sanofi's Letter, at 2.

---

contrary, Dr. Kessler has comprehensively walked through the Bradford Hill causation criteria, which parallel FDA Guidance for establishing causal association.

False. The PSC has repeatedly and consistently told Sanofi—and the Court—that it did not conduct any stem cell studies. The fact of the matter is there is no need for the PSC to conduct any such study.  The data from Sanofi's own clinical trial program, Sanofi's own analysis of the data, and the scientific literature all demonstrate causality.

All in all, the "decisive points" that Sanofi claims demonstrate the PSC's intention to "manufacture" junk science are completely unsupported. Worse, Sanofi's claims have not only been refuted, but ignored: Sanofi demanded the deposition of Dr. Thompson to investigate this very issue and then cited *none* of his testimony.

Dr. Thompson did not rely on the results of the CK15/Ki-67 staining in issuing his opinions.  Exhibit F, Thompson Letter at 1-2.  Furthermore, Dr. Thompson never shared these stained slides with any other expert—consulting or testifying; Dr. Thompson never collaborated with anyone about these slides; Dr. Thompson never authored a report regarding these slides. Indeed, Sanofi's insistence on re-deposing Drs. Feigal and Plunkett because of this alleged stem cell study is completely unsupported—in reality, Dr. Thompson briefly spoke to Dr. Feigal before Science Day on a matter unrelated to stem cells, and Dr. Thompson has never spoken to Dr. Plunkett and does not even know who she is.  *Id.*

Sanofi relates this to the *Propulsid* MDL, but the facts in that case could not be more different. In *Propulsid*, the drug had been taken off the market and limited data existed regarding the injury at issue to support causation.  Because it would have been unethical to study the drug, one of the *Propulsid* plaintiffs' experts developed a study using nine-plaintiffs selected by that PSC, and then relied upon the study in forming their opinions. Here no study was conducted, no expert relied on the recently produced biopsy slides, and no expert addressed the slides in their reports.  Nor would any expert need to do such a study in this case—as will be shown, the available data is more than sufficient for causation.

Finally, it should not go unremarked that Sanofi's latest submission—and its willingness to bend facts—disserves the Court, which is understandably trying to get to the bottom of the matter. That is why Dr. Thompson's third deposition was allowed. But then it was ignored by Sanofi, as was Dr. Thompson's letter to Your Honor, because the facts were inconvenient to Sanofi's narrative.

While the PSC has been more than accommodating in terms of agreeing to a four-month continuance of the trial date to allow reasonable supplemental discovery, it cannot sit idly as Sanofi attacks its members and attempts to unnecessarily augment this supplemental discovery.

The PSC consists of appointed counsel who are officers of the court and well-respected in this district and elsewhere, and we take our obligations of candor to this Court very seriously. We have consistently represented the truth to Sanofi and this Court concerning Sanofi's suspicion of a stem cell study.  These representations are supported by the evidence and testimony.  If these insinuations of malfeasance continue, the PSC will seek sanctions.
For the reasons discussed, there is no basis to find that Judge North abused his discretion in rejecting Sanofi's request to invade the PSC's work product.

Respectfully submitted,

/s/ Christopher L. Coffin
Christopher L. Coffin (#27902)
PENDLEY, BAUDIN & COFFIN, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

Plaintiffs' Co-Lead Counsel

/s/ Karen B. Menzies
Karen Barth Menzies (CA Bar #180234)
Andre Mura ((CA Bar # 298541) (on the brief)
GIBBS LAW GROUP LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Telephone: 510-350-9700
Facsimile: 510-350-9701
kbm@classlawgroup.com

Plaintiffs' Co-Lead Counsel

/s/M. Palmer Lambert
M. Palmer Lambert (#33228)
GAINSBURGH BENJAMIN DAVID
MEUNIER & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: 504-522-2304
Fax: 504-528-9973
plambert@gainsben.com

Plaintiffs' Co-Liaison Counsel

/s/Dawn M. Barrios
Dawn M. Barrios (#2821)
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: 504-524-3300
Fax: 504-524-3313
barrios@bkc-law.com

Plaintiffs' Co-Liaison Counsel

**PLAINTIFFS' STEERING COMMITTEE**

Anne Andrews
Andrews & Thornton
4701 Von Karman Ave., Suite 300
Newport Beach, CA 92660
Phone: (800) 664-1734
aa@andrewsthornton.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@atkinsandmarkoff.com

J. Kyle Bachus
Bachus & Schanker, LLC
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Phone: (303) 893-9800
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, Florida 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

Karen Barth Menzies
Andre M. Mura *(on the brief)*
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Phone: 510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com
amm@classlawgroup.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

Andrew Lemmon
Lemmon Law Firm, LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Genevieve Zimmerman
Meshbesher & Spence Ltd.
1616 Park Avenue South
Minneapolis, MN 55404
Phone: (612) 339-9121
Fax: (612) 339-9188
gzimmerman@meshbesher.com

# Exhibit A

Page 380

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF LOUISIANA
2
     IN RE:  TAXOTERE (DOCETAXEL)   MDL NO. 2740
3    PRODUCTS LIABILITY LITIGATION   SECTION: H
4    This document relates to:
     Antoinette Durden, Case No. 2:16-cv-16635
5    Tanya Francis, Case No. 2:16-cv-17410
     Barbara Earnest, Case No. 2:16-cv-17144
6    _____
     CONTINUING VIDEOTAPED EXPERT DEPOSITION
7    CURTIS THOMPSON, M.D.
8
     TAKEN IN BEHALF OF DEFENDANTS
9    WEDNESDAY, APRIL 3, 2019
     at 8:35 A.M.
10
11
     5200 Meadows Drive
12   Lake Oswego, Oregon
13
14   BE IT REMEMBERED THAT, the continuing videotaped
     expert
15   deposition of CURTIS THOMPSON, M.D., was taken before
     K.M, Court Reporter and Notary Public for
16   the State of Oregon, on Wednesday, April 3, 2019,
     commencing at the hour of 8:35 a.m., the proceedings
17   being
     reported at 5200 Meadows Drive, Lake Oswego, Oregon.
18
19
20
21
22
23
24
25

```
                                              Page 381

 1   APPEARANCES

 2

 3   Appearing on behalf of the Plaintiffs:

 4   JOHN THORNTON, ESQUIRE

 5   LAUREN DAVIS, ATTORNEY AT LAW

 6   Andrews Thornton

 7   4701 Von Karman Avenue, Suite 300

 8   Newport Beach, California 92660

 9   (949)748-1000

10   ldavis@andrewsthornton.com

11

12   DARIN SCHANKER, ESQUIRE

13   Bachus & Schanker

14   1899 Wynkoop Street, Suite 700

15   Denver, Colorado 80202

16   (303)893-9800

17

18

19

20

21

22

23

24

25
```

Page 382

1

2    Appearing on behalf of Defendant,

3    Sanofi US Services, Inc.

4    CONNOR SEARS, ESQUIRE

5    HILLARY NICHOLAS, ATTORNEY AT LAW

6    Shook, Hardy & Bacon, LLP

7    2555 Grand Boulevard

8    Kansas City, Missouri 64108

9    (816)474-6550

10   csears@shb.com, hnicholas@shb.com

11

12   Appearing Telephonically on behalf of Sun Pharmaceutical:

13   KATHLEEN KELLY, ATTORNEY AT LAW

14   Hinshaw Culbertson

15   53 State Street, 27th Floor

16   Boston, Massachusetts 02109

17   (617) 213-7000

18   kekelly@hinshawlaw.com

19

20

21

22

23

24

25

1   between you and any individuals regarding the

2   studies.  Do you have anything responsive to that

3   that has not already been produced?

4        A.   No.

5        Q.   So let's talk a little about the hair

6   follicle.  So you did this staining, the Cytokeratin

7   15 staining and the Ki-67 staining, and essentially

8   what you were looking for was to see whether stem

9   cells were preserved in the bulge region, right?

10       A.   No.

11       Q.   Well, let's talk about the bulge region.

12  The bulge region, it's a portion of the hair

13  follicle and it's basically attached to the arrector

14  pili muscle to the follicular sheath; is that right?

15       A.   They are all near each other, yes.

16       Q.   There's stem cells that reside in the

17  bulge region, aren't there?

18       A.   Follicular stem cells, yes.

19       Q.   And stem cells, they have characteristics

20  like a high proliferative potential, don't they?

21       A.   Well, they -- sure.  Yes.

22       Q.   In other words, they divide pretty

23  quickly?

24       A.   Only when they need to, yes.  They

25  actually only divide once because then it's off --

1    it's not a stem cell anymore.

2        Q.    So you did the Cytokeratin 15 stain.  And

3    the Cytokeratin 15 stain is a stain to see if

4    there's stem cells in the bulge region of the hair

5    follicle?

6        A.    Not entirely, no.

7        Q.    How is that inaccurate?

8        A.    It's not a definitive stem cell marker.

9    It stains other cells.

10        Q.    The stem cells are present, the

11    Cytokeratin 15 stains are positive, right?

12        A.    Yes, that's fair to say.

13        Q.    And if the stem cells were destroyed in

14    the bulge region, there would be -- the Cytokeratin

15    15 stain would test negative?

16        A.    Probably, yes.  It could stain other cells

17    though.  I already said it stains other cells other

18    than stem cells.  So it stains all basal cells of

19    the follicle. So even if they're destroyed, it could

20    still have staining of other cells.  It's not a

21    specific marker.

22        Q.    Ki-67 stain is a stain to test to see if

23    cells are dividing, right?

24        A.    Growing not dividing.

25        Q.    What's the distinction between growing and

Page 399

1   dividing?

2        A.   Growing is growing.  And dividing is when

3   a cell is going from one cell into two.  It's a

4   specific moment.

5        Q.   The thought is with the Ki-67 stain is if

6   the stem cells were not present they would not be

7   growing and so it would test negative, right?

8        A.   No.

9        Q.   Why did you do the Ki-67 stain?

10       A.   This was all part of -- you know, as I

11  said before, I'm a researcher in hair loss, and it

12  was an investigational project, just a pilot project

13  to look at permanent chemotherapy-induced alopecia

14  and what it showed with these stains.  If you look

15  at the published research that I do, it's centered

16  around using these non FDA-approved investigational

17  antibodies to look for characteristics of the

18  different diseases.

19       Q.   The hypothesis for why you did the Ki-67

20  staining was that if the chemotherapy had killed the

21  stem cell, the Ki-67 would test negative?

22       A.   No.  No, it's not that.  It's more

23  complicated.

24       Q.   Can you explain it?

25       A.   These -- these antibodies, as I said, are

1   nonspecific.  Like the Cytokeratin 15 is not a

2   definitive stem cell marker, and Ki-67 hits any cell

3   that's growing. And you use these and published with

4   the Cytokeratin 15 on other hair diseases, permanent

5   hair diseases.  So the interest was in seeing what

6   might be different in this disease than the other

7   diseases.

8            Unfortunately, we don't have, like, all

9   these investigational antibodies.  We -- like, 25

10  years ago we had two of them and we got more.  But

11  we don't have really good definitive antibodies.

12  And to date, even despite all the work I've done,

13  there's no antibody that has -- one of these non

14  FDA-approved antibodies that has utility in

15  diagnostics.

16       Q.   You would expect if a cell was dead, like

17  a stem cell, that the Ki-67 would test negative,

18  right?

19       A.   No.  Dead cells have antigens too, so they

20  can still stain.

21       Q.   They wouldn't be growing if they were

22  dead, would they?

23       A.   They could still have these antigens.

24  They could still have the molecule there so --

25       Q.   If a cell was not present, the Ki-67 would

1      Q.   The main purpose of Cytokeratin 15 is for

2  staining to see if stem cells are there.  That's

3  what people use it for, right?

4      A.   It's entirely investigational.  And as I

5  just said, the experience that I've had and that Dr.

6  Sperling has had and published even before I got

7  into this world, is that it's not specific.  It hits

8  the entire basalis of the follicle, so

9  unfortunately, it's not.  And as I said, we haven't

10  been able to find any other targets that are

11  specific for the follicular stem cell.

12      Q.   I understand that it's not specific and it

13  might hit things beyond stem cells, but Cytokeratin

14  15 is a stain that's used to test to see if stem

15  cells are present?

16      A.   Investigationally.  Never diagnostically,

17  though.  Because it's -- as I said already, it

18  doesn't just hit -- it just doesn't hit stem cells,

19  it hits other cells, unfortunately.

20      Q.   And so what you're writing here is that to

21  the extent that the Cytokeratin 15 is hitting the

22  stem cells, if chemotherapy is resulting in the

23  alopecia, you would expect to see the Cytokeratin 15

24  loss on the stem cells?

25      A.   What I'm writing is if you go to the

Page 409

1  seeing loss in all of diseases, so, yes.  And the

2  goal of this article was to stop the madness and

3  kill the hope that Cytokeratin 15 was going to have

4  any utility in any of these diagnostics.

5  BY MR. SEARS:

6      Q.   You wrote this article in April of 2017,

7  didn't you?  It's on the bottom right.

8      A.   That's when it was published in --

9      Q.   So the article was published in April of

10  2017?

11     A.   This a response to a letter that was sent

12  to the -- to a publication.  So this came out a

13  couple months after the initial publication.

14     Q.   So this came out in April of 2017?

15     A.   Yes.

16     Q.   And you did this Cytokeratin 15 and the

17  Ki-67 staining on Ms. Francis, Ms. Earnest, and Ms.

18  Durden after April 2017?

19     A.   A year later, yes.

20     Q.   The reason you were doing that staining

21  was in part to test your hypothesis that if

22  chemotherapy is killing the stem cells in the bulge

23  region that you would see Cytokeratin 15 loss?

24          MR. THORNTON:  Objection; form.

25          THE WITNESS:  It was -- as I said before,

Page 410

1    I've used this -- this publication and the prior

2    lichen planopilaris publication, we've tried

3    Cytokeratin 15 on basically all of the hair loss

4    diseases.  And this publication, specifically this

5    letter to the publication, specifically address the

6    lack of utility.  So I wouldn't say -- as once again

7    I said, this isn't a red light, green light.  It's a

8    staining pattern, and I was just looking to see what

9    the staining pattern showed.  I didn't have any -- I

10   did not enter into it with any idea that it would be

11   a diagnostic utility.

12   BY MR. SEARS:

13       Q.   Your thought for why you wanted to do

14   that, though, is that if chemotherapy is killing the

15   stem cell in the bulge region, and Cytokeratin 15

16   stains stem cells, it could potentially -- the

17   Cytokeratin 15 could potentially stain negative,

18   right?

19            MR. THORNTON:   Objection, form.

20            THE WITNESS:  We're going around the block

21   here a little bit, but as I said before, first of

22   all loss of Cytokeratin 15 expression using this

23   immunohistochemical staining, which is not FDA

24   approved, only tells you that that antigen is not

25   there anymore.  It doesn't tell you whether the

1    Q.   Did you have any discussions with Dr.

2  Tosti about why she suggested using stem cell

3  markers to test the pathology?

4    A.   No.

5         MR. THORNTON:  Objection; form.

6  BY MR. SEARS:

7    Q.   Were you curious at all what her thoughts

8  were on why she wanted to use stem cell markers to

9  test the pathology?

10        MR. THORNTON:  Objection; form.

11        THE WITNESS:  We do research together so -

12 - I'd never done expert testimony at all so I didn't

13 know if she wanted open a new chapter of research in

14 a new direction.  We have multiple projects.  None

15 of which was permanent chemotherapy-induced

16 alopecia.

17   Q.   When you read this email was your thought

18 that we're testing the pathology of stem cell

19 markers to see whether the stem cells are absent?

20        MR. THORNTON:  Objection; form.

21        THE WITNESS:  Not me.  As I already said,

22 we were looking for staining patterns of these

23 antibodies because these antibodies are not

24 specific.  And because the absence of staining is

25 not a red light, green light. It doesn't mean the

Page 424

1    cell is dead or gone.  It may just have lost

2    expression and then it's hitting cells other than

3    stem cells.  So for me it was, at this point, more

4    of a staining pattern issue.

5             My take on this email was that she wanted

6    these biopsies processed in a laboratory that does

7    hair loss pathology quite a bit.  She says we don't

8    want wrong orientation.  She's talking about the

9    actual cutting and embedding of the tissue.  Because

10   in this type of hair loss, if you mess it up on the

11   very first sections, then they're not very useful,

12   even to a hair pathologist expert.  So my take was

13   she wanted these done the right way the first time.

14   BY MR. SEARS:

15       Q.   Had you thought about doing stem cell

16   marker testing on the pathology before receiving

17   that email from Dr. Tosti?

18       A.   On what?

19       Q.   Had you thought about doing stem cell

20   marker testing on the pathology before receiving

21   that email from Dr. Tosti?

22       A.   On what pathology?

23       Q.   The pathology for Ms. Earnest, Ms. Durden,

24   Ms. Francis --

25       A.   Oh, I didn't even have them in my

Page 425

1    possession. So I hadn't thought -- no.

2        Q.    Had you thought about doing stem cell

3    markers on any pathology that you ever had that you

4    thought was -- the alopecia was caused by

5    chemotherapy?

6            MR. THORNTON:  Objection; form.

7            THE WITNESS:  No, not to my knowledge.

8    BY MR. SEARS:

9        Q.    Did you have any discussions with Dr.

10   Tosti about what stem cell markers you were going to

11   use in testing the pathology?

12       A.    Not to my knowledge, I didn't.

13       Q.    Did you have discussions with her that you

14   were going to use Cytokeratin 15 with Ms. Earnest,

15   Ms. Francis, and Ms. Durden's pathology?

16       A.    I don't have any recollection of that.

17   Unless -- I don't think I sent it in an email, and

18   it wasn't one of our working research items.  We

19   have meetings on the phone, and so it's unlikely

20   that we talked about that.  I don't -- I don't have

21   any recollection of that.

22       Q.    Did you talk to Dr. Tosti about the

23   results of the Cytokeratin 15 and Ki-67 staining for

24   Ms. Francis, Ms. Durden, and Ms. Earnest?

25       A.    I think it was limited to the email.  She

Page 426

1    was cc'd on an email.

2        Q.   You never had any conversations outside of

3    email with her about --

4        A.   I don't believe so.

5        Q.   So we talked about how Anne Andrews was

6    cc'd on that email, right?

7        A.   We didn't, but is she?

8        Q.   She's cc'd on this email string, isn't

9    she?

10       A.   Yes.

11       Q.   And she's an attorney for plaintiff?

12       A.   Yes.

13       Q.   And so based upon this email, she knew

14   that Dr. Tosti proposed that there would be stem

15   cell marker testing on the pathology, right?

16           MR. THORNTON:  Objection; form.

17           THE WITNESS:  Yes.  Yes.

18   BY MR. SEARS:

19       Q.   So then, if we go up to the top of that

20   email, there's an email from Anne Andrews on

21   Wednesday, March 28, 2018 at 11:53 a.m.  Do you see

22   that?

23       A.   Yes.

24       Q.   And she writes "I'm traveling today and

25   tomorrow so hoping to touch base with you, with Dr.

Page 444

1   Earnest, Durden, and Francis is because Ms. Tuyes is

2   no longer --

3        A.   Right.

4        Q.   So you created pathology reports for Ms.

5   Durden, Ms. Francis, and Ms. Earnest, right?

6        A.   Yes.

7        Q.   And in both of those reports, the

8   pathology report, as well as the Rule 26 report, you

9   did not mention that you did any immunohistological

10  staining on the pathology, right?

11       A.   No, I don't mention it.

12       Q.   Did you know that Dr. Tosti relied on your

13  pathology reports in offering her opinion?

14       A.   Yes, I hope so.

15       Q.   Did you think that it would be important

16  for Dr. Tosti to know the results of your

17  immunohistological staining when relying on those

18  pathology reports?

19       A.   No, not at all.  As I said in this last

20  sentence of the April 16th email, just to emphasize

21  the findings in the H&E slides alone are quite

22  convincing. Shows permanent loss of large hair

23  follicles.  So I didn't think for a second that she

24  would need that information or rely on it.

25       Q.   We saw an email earlier, I think it was in

Page 445

1    March, where Dr. Tosti suggested that stem cell

2    markers be conducted on the pathology --

3            A.    Yes.

4            Q.    -- do you remember that?

5            A.    Yes.

6            Q.    With that knowledge that she suggested

7    that stem cell markers be done on the pathology, did

8    you feel like it was important to communicate the

9    results of that testing to her?

10                MR. THORNTON:  Objection; form.

11                THE WITNESS:  Well, if you take the

12   context of her request on that first email, she was

13   trying to get me to sign on to doing this expert

14   witness work.  And she knew I didn't want to do it.

15   And we do research together and so she was trying to

16   turn it into a research direction for this.  So

17   that's the reason she said that she was looking for

18   -- trying to entice me into something more than just

19   reading cases.

20                So I guarantee you, she had no ideation or

21   thoughts that stem cell markers were going to be

22   useful in the clinical diagnoses of these patients.

23   But I do accept and hope that she looked at the

24   pathology reports.  That's why these patients are

25   biopsied is to give definitive diagnoses.

Page 451

1   that are not substantiated with positive and

2   negative controls.

3   BY MR. SEARS:

4       Q.   Did you feel as though there's enough

5   worthwhile -- let me just start the question over

6   again. I don't even know where I was going with

7   that.

8           You ultimately made the decision to do the

9   Cytokeratin 15 and Ki-67 staining with Ms. Earnest,

10  Ms. Francis, and Ms. Durden, right?

11      A.   Right.

12      Q.   So at that point you thought there was

13  some utility in doing the testing, didn't you?

14          MR. THORNTON:  Objection; form.

15          THE WITNESS:  Well, as I -- as we read in

16  the email from Tosti, she was kind of proposing

17  blowing this up into something larger in our

18  investigational world.  So I had an interest in

19  that.  Beyond that I -- it became clear to me pretty

20  quickly that my utility was going to be in properly

21  processing these biopsies and providing a diagnoses

22  on them without this immunohistochemical.  So it

23  didn't -- it never went into the larger

24  investigation that Dr. Tosti was kind of proposing.

25  BY MR. SEARS:

1      Q.   During that telephone call with that
2   person in the video, when discussing the "stem cell
3   study," did you provide any guidance or any thoughts
4   on the study in determining whether chemotherapy
5   would have any impact on stem cells in the hair
6   follicle?
7      A.   No, I didn't.
8      Q.   Did you discuss whether chemotherapy could
9   have any impact on the stem cell in the hair
10   follicle?
11           MR. THORNTON:  Objection.  Now I think
12   that gets into more the substance.  I'm instructing
13   you not to answer that.
14           He's already given his opinions on how he
15   sees the role of stem cells or -- so I don't think
16   the discussion -- any additional testimony about the
17   discussion would only be -- have to do with the
18   consultant and, therefore, I think is work product.
19   BY MR. SEARS:
20      Q.   Do you know what the results were of any
21   stem cell study that was conducted that looked at
22   whether chemotherapy impacted stem cells and the
23   hair follicle?
24      A.   No, I don't.
25      Q.   Would you want to know the results of that

1    study or literature to either refute or confirm your

2    hypothetical, speculative --

3            MR. THORNTON:  Objection; form.

4    BY MR. SEARS:

5        Q.    -- theory about mechanism of action for

6    how chemotherapy might damage the stem cell, which

7    would cause ongoing alopecia?

8            MR. THORNTON:  Excuse me.  I interrupted,

9    but objection; form.

10            THE WITNESS:  Yes.

11            MR. THORNTON:  Let's take a brief bathroom

12    break, if nothing else.

13            MR. SEARS:  Sure.

14            THE VIDEOGRAPHER:  The time is 10:19 a.m.

15    We are off the record.

16            (Whereupon, recess taken.)

17            THE VIDEOGRAPHER:  The time is 10:33 a.m.

18    We are on the record.

19    BY MR. SEARS:

20        Q.    Exhibit 12, so I had a couple more

21    questions about that that I forgot to ask you.  So

22    we talked earlier about how you didn't do the

23    Cytokeratin 15 and the Ki-67 staining on Ms. Tuyes.

24    Do you recall that?

25        A.    Yes.

1      A.    Yes.

2      Q.    Did you end up talking to him?

3      A.    No.  I don't believe so.

4      Q.    Do you know --

5      A.    He was on a call but I don't know if it

6  was before or after this.  Maybe it was after.

7      Q.    So you did talk to this researcher at some

8  point?

9      A.    There was a conference call that he was

10  on. Yeah.  I just didn't want him to recreate the

11  wheel here and redo something I'd done and go down a

12  dead end.  It didn't seem worth it.

13      Q.    On that call did you have any discussions

14  about stem cell testing?

15      A.    The call was basically the -- what he was

16  going to do and my part was going to be provide

17  tissue, validation tissue, and then potential

18  testing tissue that wouldn't involve patients in

19  this case.  We had -- you know, we only had nine

20  unstained slides and we had the three H&Es and we

21  didn't want to compromise these specimens at all.

22      Q.    So in the email you write that the

23  Cytokeratin 15 was still positive in the basaloid

24  bodies.  And that refers to the tissue from Ms.

25  Durden --

Page 492

1      A.   Yes.

2      Q.   -- Ms. Francis, and Ms. Earnest?

3      A.   Yes.

4      Q.   So the Cytokeratin 15 tested positive in

5   Ms. Earnest, Ms. Durden, and Ms. Francis' tissue?

6      A.    In these structures, yeah.  We use --

7      Q.   You wrote because it tested positive you

8   did not pursue this further, right?

9      A.   Yes.

10      Q.   If it tested negative, would've you

11   pursued it further?

12      A.   Yes.

13      Q.   Because it tested positive in Ms. Earnest,

14   Ms. Francis, and Ms. Durden, is that an indication

15   to you that their stem cells were not damaged?

16          MR. THORNTON:  Objection; form.

17          THE WITNESS:  No.  Because we're talking

18   about these basaloid bodies here.  And we don't --

19   there's a whole glob of these cells also called

20   telogen bodies, and they're not stem cells.  Maybe

21   one of them is.

22   BY MR. SEARS:

23      Q.   You talked about how if it did test

24   negative, you would have pursued it further.

25   Would've you pursued it further, then, because it

Page 493

1    would have fit with your theoretical mechanism of

2    action for why chemotherapy can result in ongoing

3    alopecia?

4              MR. THORNTON:  Objection to the form.

5              THE WITNESS:  No.  Like you said before,

6    my interest in this level, this using patient

7    tissue, is in looking for staining patterns that are

8    different and specific for diseases.  So these

9    telogen bodies or basaloid bodies, we see them in

10   normal -- we see them in androgenetic.  We see them

11   in permanent chemotherapy-induced alopecia.  We see

12   them in the subacute phase of alopecia areata, hair

13   loss with psoriasis when you have it on your scalp.

14   And they all have to be taken in the context of the

15   other histopathology.  But we do know when you do

16   immunohistochemical staining with the Cytokeratin 15

17   antibody that I purchase and have, it stains these

18   bodies. And they're one of the features of

19   chemotherapy-induced alopecia, the permanent.

20   BY MR. SEARS:

21       Q.   So if the Cytokeratin 15 tested negative

22   in the pathology samples for Ms. Earnest, Ms.

23   Durden, and Ms. Francis, why would've you pursued it

24   further?

25              MR. THORNTON:  Objection.

# Exhibit B



EXHIBIT

6

DEPONENT NAME:  DR Thompson   DATE: 4/3/19

## Reply to: "Lack of specificity of cytokeratin-15 loss in scarring alopecias"



*To the Editor:* We read with great interest the letter by Mahalingam[1] supporting our published findings concerning the lack of specificity of loss of cytokeratin-15 (CK15) in affected follicles in cicatricial (scarring) alopecia.[2] Because of the limited authorized number of references in research letters in the *Journal*, we were unable to cite the multiple relevant publications, including the 2 studies authored by Pozdnyakova and Mahalingam[3] and Hoang et al.[4] It is nowadays obvious that bulge stem cell exhaustion cannot have any discriminating value in lymphocytic cicatricial alopecias because isthmic outer root sheath injury is nonspecifically seen in lichen planopilaris, frontal fibrosing alopecia, lupus erythematosus, and central centrifugal cicatricial alopecia. Neutrophil-poor folliculitis decalvans could be added to the aforementioned differential diagnosis. Use of this immunostain in the so-called "neutrophilic" cicatricial alopecia is without interest because the inflammatory infiltrate in dissecting cellulitis is deeper than in folliculitis decalvans and does not affect the follicular isthmus. We also find it pointless to further explore CK15 in biphasic alopecias (eg, chronic traction alopecia, pattern hair loss, chronic alopecia areata, and nonscarring alopecia of systemic lupus erythematosus) because in these disorders permanent follicular dropout results from follicular stem cell exhaustion. CK15 loss would also be seen after direct toxicity on the follicular stem cells, as seen in permanent alopecia after chemotherapy.[5] For the above reasons, further debate on this topic is useless; our focus should no longer be whether follicular bulge stem cells are preserved on not, but why they are lost.

Expanding knowledge on hair follicle immunology stresses our need to step away from the conventional North American Hair Research classification of scarring alopecia based on the nature of the inflammatory infiltrate.[6] Lichen planopilaris and the related frontal fibrosing alopecia can clearly be regarded as follicular bulge immune privilege (IP) collapse disorders. The bulge is a target for an interferon-gamma—induced immune injury, similarly to the anagen hair bulb IP collapse seen in alopecia areata.[7,8] Studying the follicular suppression of major histocompatibility complex class I antigens, the accumulation of no danger signals (such as CD200) and the accumulation of IP guardians could contribute to better delineate the spectrum of follicular bulge IP collapse disorders, as well as positioning fibrosing alopecia in a pattern distribution and central centrifugal cicatricial

alopecia in this spectrum. Current knowledge has also revealed the coexistence of the activated hair germ cells engaging in the follicular growth and the quiescent bulge stem cells maintaining the long-term stem cell pool. The follicular stem cell and dermal papilla niche interdependency has also shifted our attention from the former to the critical role of the latter.[9] We wish that our research letter would be considered as concluding remark concerning the limited value of bulge stem cell marker immunostaining and a challenge to the researchers to focus their interest on hair follicle immunology and follicular cell kinetics.

*Athanassios Kolivras, MD, PhD,[a,b] and Curtis Thompson, MD[c,d,e]*

*Departments of Dermatology[a] and Dermatopathology,[b] Saint-Pierre, Brugmann and Queen Fabiola Children University Hospitals, Université Libre de Bruxelles, Brussels, Belgium, and the Departments of Biomedical Engineering,[c] Pathology,[d] and Dermatology,[e] Oregon Health Sciences University, Portland, Oregon*

*Funding sources: None.*

*Conflicts of interest: None declared.*

*Correspondence to: Athanassios Kolivras, MD, PhD, Departments of Dermatology and Dermatopathology, Saint-Pierre, Brugmann and Queen Fabiola Children University Hospitals, Université Libre de Bruxelles, 129 boulevard de Waterloo, Brussels 1000, Belgium*

*E-mail: kolivras@gmail.com*

## REFERENCES

1. Mahalingam M. Lack of specificity of cytokeratin-15 loss in scarring alopecias. *J Am Acad Dermatol.* 2017;76:e135-e136.
2. Kolivras A, Thompson C. Loss of cytokeratin-15 (CK15) expression is not specific for lichen planopilaris (LPP). *J Am Acad Dermatol.* 2016;75:428-429.
3. Pozdnyakova O, Mahalingam M. Involvement of the bulge region in primary scarring alopecia. *J Cutan Pathol.* 2008;35:922-925.
4. Hoang MP, Keady M, Mahalingam M. Stem cell markers (cytokeratin 15, CD34 and nestin) in primary scarring and nonscarring alopecia. *Br J Dermatol.* 2009;160:609-615.
5. Kolivras A, Thompson C. Primary scalp alopecia: new histopathological tools, new concepts and a practical guide to diagnosis. *J Cutan Pathol.* 2017;44:53-69.
6. Olsen EA, Bergfeld WF, Cotsarelis G, et al. Summary of North American Hair Research Society (NAHRS)-sponsored Workshop on Cicatricial Alopecia, Duke University Medical Center, February 10 and 11, 2001. *J Am Acad Dermatol.* 2003;48:103-110.
7. Harries MJ, Meyer K, Chaudhry I, et al. Lichen planopilaris is characterized by immune privilege collapse of the hair follicle's epithelial stem cell niche. *J Pathol.* 2013;231:236-247.

**e138**  *Notes & Comments*

J AM ACAD DERMATOL
APRIL 2017

8. Harries MJ, Meyer KC, Paus R. Hair loss as a result of cutaneous autoimmunity: frontiers in the immunopathogenesis of primary cicatricial alopecia. *Autoimmun Rev.* 2009;8: 478-483.

9. Mesa KR, Rompolas P, Greco V. The dynamic duo: niche/stem cell interdependency. *Stem Cell Reports.* 2015;4:961-966.

http://dx.doi.org/10.1016/j.jaad.2016.12.010

# Exhibit C

1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4     IN RE:  TAXOTERE (DOCETAXEL)     )

      PRODUCTS LIABILITY LITIGATION    )

5                                      )   MDL No. 2740

                                       )   SECTION: "H"

6                                      )   Judge Milazzo

      This Document Relates To:        )   Mag. Judge North

7     ALL CASES                        )

                                       )
      _____)

8

9

10

11                  VIDEOTAPED DEPOSITION OF

12                    CHANDRA SMART, M.D.

13

14

15                 Tuesday, February 5, 2019

16                  10:10 A.M. TO 2:47 P.M.

17

18                 Santa Monica, California

19

20

21

22

23              Golkow Litigation Services

                      www.Golkow.com

24

25

Chandra Smart, M.D.

```
 1                 MR. SEARS:  Object to form.

 2        A.   Can you repeat that question one more time?

 3   BY MR. THORNTON:

 4        Q.   Sure.

 5             So this case, the review you're doing, the

 6   legal, what we call medical legal work you're doing

 7   today --

 8        A.   Uh-huh.

 9        Q.   -- would be the first time that you have

10   analyzed the issues in your professional practice of

11   whether or not chemotherapy caused permanent hair

12   loss in a patient?

13                 MR. SEARS:  Objection.  Form.

14        A.   So this case would be the first time I've

15   actually reviewed slides to make that diagnosis.

16             I have read articles before about it.  But

17   actually reviewing slides, I have not.

18   BY MR. THORNTON:

19        Q.   How did you first become involved in this

20   case?

21        A.   One of the -- one of my former fellows

22   referred Mr. Sears, gave him my name of someone who

23   enjoys and has some experience with alopecia.  So

24   she gave him my number -- or my e-mail, my contact

25   information, and he contacted me.
```

Chandra Smart, M.D.

1    Q.   All right.  I don't think there's any

2    confidentiality about that.

3          Who was it that referred Mr. Sears?

4          MR. SEARS:  I do object to that.  We have

5      a consulting expert relationship with that

6      woman, so I do object to her disclosing her

7      identity.

8          MR. THORNTON:  I'll move on.

9          MR. SEARS:  Okay.

10   BY MR. THORNTON:

11   Q.   When you were asked to take this

12   medical/legal assignment, was your first reaction

13   that you were interested in taking on the

14   assignment?

15   A.   Was my -- I wanted to hear more about the

16   assignment before -- before I make any -- I want to

17   make -- hear more about it before I made any

18   decision.

19   Q.   Did you recommend any other

20   dermatopathologist to any of the attorneys that were

21   asking you about this question?

22   A.   No, I did not.

23         MR. THORNTON:  I'll try to keep the

24      exhibits over here.

25         THE REPORTER:  Thank you.  That would be

# Exhibit D

## DECLARATION OF DR. ALEKSANDRA J. POOLE

I, Aleksandra J. Poole PhD, declare as follows:

1.      I am and was at all times discussed herein Vice President, Research and Development at AIVITA Biomedical, Inc.

2.      I have a PhD in molecular genetics and Biochemistry from University of Illinois, College of Medicine Chicago.

3.      AIVITA Biomedical, Inc performed a single function of handing of pathology biopsies received from a physician named Claiborne and transferring those slides to a pathologist in Oregon, Curtis Thompson. The pathology slides were from four patients: Lisa Tuyes, Antoinette Durden, Barbara Earnest, Tanya Francis.

4.      Neither I or anyone else at AIVITA Biomedical did anything with the biopsy samples other than receipt, storage and sending them as directed by the law firm of Andrews & Thornton.

5.      It is my understanding that there is a question of whether any testing or analysis of any kind of the biopsy samples was conducted by me or by anyone connected with AIVITA Biomedical.  I can testify that nothing else was done to the pathology biopsies, and nothing else was requested to be done, other than receipt storage and shipment as set forth herein above.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on April _6_, 2019 at San Marcos, California.


_____
Aleksandra J. Poole, PhD

# Exhibit E

**John Thornton**

| | |
|---|---|
| **From:** | Curtis Thompson <curtisinportland@gmail.com> |
| **Sent:** | Friday, March 01, 2019 1:46 PM |
| **To:** | John Thornton |
| **Subject:** | Fwd: Review of videos of ████████████ by Dr. Curtis Thompson |

**Curtis T. Thompson, MD**
Medical Director and Dermatopathologist, CTA Lab
Affiliate (Clinical) Professor of Dermatology and Pathology, OHSU
T: 503.906.7300 | C/What'sApp: 503.997.8920 | F: 503.245.8219
E: curtisinportland@gmail.com
CTA Lab | www.cta-lab.com
PO Box 230577, Portland, OR 97281

```
                                              ┌─────────────────────────────────┐
                                              │           EXHIBIT               │
                                              │             14                  │
                                              │ DEPONENT NAME:        DATE:      │
                                              │  DR Thompson      4 /3/ 19       │
                                              └─────────────────────────────────┘
```

---------- Forwarded message ---------
From: Curtis Thompson <curtisinportland@gmail.com>
Date: Mon, Aug 6, 2018 at 10:50 AM
Subject: Review of videos of ████████████ by Dr. Curtis Thompson
To: Anne Andrews <aa@andrewsthornton.com>, John Thornton <jct@andrewsthornton.com>
Cc: ████████████████████

Anne and John,

Hello, I have reviewed ██████ videos carefully.

Here are a few points:

1. Validation and Testing of Stem Cells on the biopsy samples--████████████ approach is correct with validation of a test and then testing of the samples.

I don't know if he had access to my data on this, but I already did this for cytokeratin 15 on these samples. Perhaps I need to meet with him and share this data. As the cytokeratin 15 was still positive in the 'basaloid bodies' in the pCIA cases, I did not pursue this further.

Perhaps ████ has access or knowledge of other anibodies to the follicular stem cells which I don't know about. When I first worked with cytokeratin 15, I also tested an an antibody toward NESTIN, but the staining was nonspecific. I did only test one source of the nestin.

2. H&E analysis opposing counsel--I think it is best if the same slides that I read are reviewed, so we know that both sides examined the same slides. But we do have unstained slides that they can have and use.

I say this because different H&E slides can have different findings (though in these cases, I do not anticipate there being much of a difference).

1

But I do have unstained slides to the other side to use if needed.  And we can also use these for more stem cells markers in collaborating with ████████ .  I am cc'ing **him** on this email.

I am happy to discuss all of this on the phone if need be.

Thanks so much,

Curtis Thompson
503 997 8920 cell/text
curtisinportland@gmail.com

# Exhibit F



March 27, 2019

**<u>Via Email</u>**
The Honorable Jane Triche Milazzo
United States District Judge
500 Poydras Street
Room C206
New Orleans, Louisiana 70130

Re: Requested Letter; Taxotere MDL

Dear Judge Milazzo,

Please accept this letter explaining my actions regarding stem cell investigations. As an expert witness of hair loss pathology in this case, I was initially asked to investigate permanent chemotherapy-induced alopecia (pCIA) in any way possible. As an anatomic pathologist and an expert in hair loss pathology who had never provided legal expert opinion before, I identified any possible tool available for further investigation of pCIA, including immunohistochemical (IHC) stains.

Of note, IHC is the primary molecular tool used in routine pathology diagnostics, however, there is little practical application of IHC at this time in hair loss pathology. At this time, there is no known utility of assessing follicular stem cells for diagnostic purposes, and there is no accepted mechanism of follicular stem cell damage or death related to the variety of hair loss diseases. Evaluation of biopsies for hair loss is currently limited to standard sectioning and traditional staining with H&E-stained level sections. The same protocol is followed for all biopsies received for pathological evaluation of hair loss.

Before any biopsies were received, I proposed to the attorneys to use two of the IHC stains, cytokeratin 15 (CK15) and Ki-67, to further investigate pCIA. CK15 and Ki-67, however, do not have any known utility for diagnostic purposes in hair loss pathology. Positive or negative staining by both of these antibodies is not known to support or refute any particular hair loss diagnosis.

When biopsies from the four patients with possible pCIA were received by my laboratory, the biopsies were processed in the usual manner for diagnostic purposes, including the preparation of 9 unstained slides for each biopsy. The unstained slides were prepared for possible use by an expert for the defense or for further stains needed for diagnostic or investigational purposes.  For each biopsy, two of these unstained slides were used for the CK15 and Ki-67 (IHC) stains. These stains were prepared at the same time as the H&E slides were prepared.  The IHC took only a few hours to perform.

The biopsies were assessed for diagnostic purposes at the same time that the two IHC slides were also reviewed. In assessing the findings of the H&E slides and preparing the reports which I issued for each biopsy, I determined that the CK15 and Ki-67 were of no utility for diagnostic purposes, either in supporting or refuting a particular pathological diagnosis in all eight of the biopsy slides from the four



12254 SW Garden Pl., Tigard OR 97223          PHONE: (503) 906-7300
www.cta-lab.com                                FAX: (503) 245-8219



patients. As noted above, neither CK15 nor Ki-67 is used diagnostically in hair loss pathology. In assessing the CK15 and Ki-67, I did not take notes and did not issue a report.

I notified the attorneys that I did not believe that the CK15 and Ki-67 had any diagnostic or investigational utility in any way in this case, and we decided to stop any further investigation using IHC and to simply issue traditional pathology reports based upon my interpretation as an expert in hair loss pathology. At this time follicular stem cell damage or death has no known utility in hair loss pathology. The presence of absence of staining with CK15 and Ki-67 may not be used as definitive evidence of follicular stem cell damage or death.

I do not know who Drs. Laura Plunkett or Dr Ellen Feigal are and have no recollection of speaking with them. Based upon my invoices in this case, I did relay the pathological findings to Dr. Feigal by telephone on June 25, 2018, however, I do not recall this call or any pertinent discussion. Dr. Antonella Tosti was cc'd on an email that I sent to the attorneys explaining my assessment that the IHC stained slides had no utility in the case, however, I did not ever discuss the IHC slides with Dr. Tosti.

Several months after completing my pathology reports on the biopsied specimens from this case, I reviewed videos from a follicular stem cell researcher that were sent to me by attorney Anne Andrews. Anne sent me these videos prior to introducing this researcher to me. Please note that review of these videos did not have any impact on the interpretation of either H&E slides or the IHC stains in this case. I had already issued the pathology reports for all of the biopsies from this case long before I viewed the videos, and the reports were never altered.  After reviewing the videos, I had a single phone call with the stem cell researcher, however, the discussion was limited to agreeing to provide archived scalp biopsy tissue from cases of hair loss not related to this legal case to the researcher for his own investigations. As required by CLIA regulations, my laboratory maintains an archival tissue bank. My proposal was to only provide the archival tissue for the researcher's own investigations. This tissue was not going to be from any biopsies taken in this particular legal case. The researcher never contacted me to request the tissue, and no tissue was ever sent.

I hope that this summary provides clarification of my performance of CK15 and Ki-67 IHC studies on the biopsies in this legal case. Of note, I have provided all of these IHC studies and unstained slides to the defense counsel.

Thank you very much,

Curtis T. Thompson, MD
**Curtis T. Thompson, MD**
Medical Director and Dermatopathologist, CTA Lab
Affiliate (Clinical) Professor of Dermatology and Pathology, OHSU
T: 503.906.7300 | C: 503.997.8920 | F: 503.245.8219
E: curtisinportland@gmail.com

