UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates To:<br>ALL CASES. | MDL No. 2740<br><br>SECTION: "H" (5) |

**SUR-REPLY IN SUPPORT OF MOTION FOR REVIEW OF DISCOVERY ORDER REGARDING PSC'S *IN CAMERA* CORRESPONDENCE AND VIDEOS**

Plaintiffs' Sur-Reply in Opposition to Sanofi's Motion for Review of Discovery Order (Rec. Doc. 6947-1) ("Sur-Reply in Opp.") underscores the necessity of a basic inventorying of the facts and data provided to Dr. Curtis Thompson, including a privilege log outlining what has been withheld, and what has been provided (or not) to Magistrate Judge North. Ignoring the legal arguments raised in Sanofi's Motion for Review of Discovery Order (Rec. Doc. 6744), Plaintiffs have instead provided a relevant, non-privileged, document—that was not produced to Magistrate Judge North for *in camera* review—as evidence that Plaintiffs have previously produced the entirety of the documents related to the facts and data considered by Dr. Thompson. *See* Sur-Reply in Opp. at 1-2. This logic does not follow. Under the guise of transparency, Plaintiffs' now request the Court issue a ruling regarding the privileged status of documents submitted for *in camera* review, by producing a document that they admittedly did not provide to Magistrate Judge North for *in camera* review.

Plaintiffs' suggest that the September 3, 2018, email between Dr. Thompson and a consulting expert at AIVITA Biomedical is irrelevant to this litigation because, at some pass, their stem cell research discussions—focused on hair loss after chemotherapy—continued on without

1

the Plaintiffs' lawyers. Its discoverability does not turn on whether the September 3rd email concerns "independent research." However, even on that, the one-line entry in Dr. Thompson's invoice alone—"E-mail regarding normal hair samples for <u>stem cell study</u>"—plainly contradicts Plaintiffs' assertion. *See* Sur-Reply in Opp. at 2 (emphasis added). Dr. Thompson's own testimony further confirms the email's relevance.

Dr. Thompson explained during his April 3, 2019, deposition that the "researcher" on the videos referenced in Plaintiffs' Opposition was a "follicular stem cell researcher," who proposed additional stem cell research, "and [Dr. Thompson's] part was going to be provide tissue, validation tissue, and then potential testing tissue that wouldn't involve patients in this case. We had – you know, we only had nine unstained slides and we had the three H&Es and we didn't want to compromise [Plaintiffs'] specimens at all." *See* Thompson Dep. Vol. III 491:13-21. Dr. Thompson and this consulting expert, or follicular stem cell researcher, discussed the proposed research by email and conference call. Dr. Thompson explained, "I just didn't want him to recreate the wheel here and redo something I'd done and go down a dead end. It didn't seem worth it." *See* Thompson Dep. Vol. III 491:9-12. When asked if this research—and any results from a further stem cell study - would be relevant to Dr. Thompson's opinions in this litigation, he explicitly stated "yes." *See* Thompson Dep. Vol. III 464:20-465:10.[1]

It appears that this same "independent research" was discussed in the September 3rd email provided by Plaintiffs as Exhibit A to their Sur-Reply in Opposition. When Sanofi asked about the specifics of this research—or the contents of any videos or correspondence exchanged by Dr.

---

[1] "Would you want to know the results of that study or literature to either refute or confirm your hypothetical, speculative . . . theory about mechanism of action for how chemotherapy might damage the stem cell, which would cause ongoing alopecia?" . . . "Yes." *See* Thompson Dep. Vol. III 464:20-465:10.

Thompson and this follicular stem cell researcher—Plaintiffs' counsel objected based on the work-product privilege. *See, e.g.*, Sanofi's Reply in Support of Motion for Review of Discovery Order (Rec. Doc. 6928-2), at 4. As previously argued, it is clear from Dr. Thompson's testimony that his discussions with this consulting expert contained facts and data regarding some form of proposed stem cell marker testing. *See id.* The decision not to move forward with the "proposed" independent research, or failure to "cc" Plaintiffs' attorneys on an email, does not render the exchange of information or related documents irrelevant. Indeed, the *absence* of the lawyers' involvement eviscerates any question of privilege found to protect the other documents in the discovery ruling.

In addition, on May 9, 2019, Plaintiffs' produced a set of emails between Dr. Alexa Poole (a follicular stem cell researcher at AIVITA Biomedical) and Dr. Thompson, in response to a subpoena served on AIVITA Biomedical. While the PSC claims that the initial email in this April 17, 2018, thread was provided to Magistrate Judge North as part of the *in camera* review, the following emails were not—and they were not provided prior to Dr. Thompson's deposition, despite a subpoena duces tecum requesting their production. Plaintiffs have since clawed back the initial email. Notably, the emails following Dr. Thompson's initial communication contain facts and data, provided by Dr. Poole (a non-attorney), that directly discuss Plaintiffs' biopsies and the initial results of Dr. Thompson's analysis. *See* **Ex. A** (AB000011).

Further, compared to Plaintiffs' counsel's representations, the emails suggest AIVITA Biomedical, and Dr. Poole, knew (presumably on reviewing them) what the results of Dr. Thompson's slides would show. *See, e.g.*, Transcript of Status/Discovery Conference Proceedings at 31 (Mar. 27, 2019) (**Ex. B**) ("the consulting expert has never seen those particular slides and has not touched or seen the plaintiffs or touched their pathology or seen their pathology."). The

3

prejudgment of the slide results by Plaintiffs' experts is certainly relevant fodder for cross-examination.

As for its discoverability under Rule 26(a)(2)(B)(ii), the April 17, 2018, communications contain facts and data, provided by a non-attorney, which Dr. Thompson considered in his analysis of Plaintiffs' pathology. In particular, for his dermatopathology reports, Dr. Thompson cut, stained, and analyzed two biopsy specimens from each Plaintiffs' scalp. In the April 17th emails, two days before Dr. Thompson issued his dermatopathology reports, Dr. Poole provided Dr. Thompson with the location of Plaintiffs' biopsies on their scalps, as well as a comment about Dr. Thompson's analysis of Plaintiffs' pathology. *See* **Ex. A**. Dr. Thompson responds with his initial conclusions regarding the same. *See* **Ex. A**.

> On Tue, Apr 17, 2018 at 6:56 AM, Alexa Poole <alexa@aivitabiomedical.com> wrote:
> Good morning!
> Yes - one biopsy is from the area of patients scalp that had hair and the other one is from where the hair was completely missing.
> I'm sure you see that on H&E.
> Exciting results!

Further, Sanofi is surprised that the initial April 17, 2018, communication would be deemed privileged or irrelevant if it was provided for Magistrate Judge North's review, because it does not contain mental impression of counsel and is directly relevant to: (1) Dr. Thompson's expert opinions in this litigation; (2) Sanofi's *Daubert* motions; and (3) the underlying facts and data Dr. Thompson <u>relied on</u>—not just considered—in forming his opinions in this case. For example, Dr. Thompson was asked during his November 30, 2018, deposition about where and how the biopsy sites for each Plaintiff were selected, and Dr. Thompson testified:

> Q: Do you know how it was decided how much biopsies should be taken for Ms. Durden, Ms. Francis, or Ms. Earnest?
>
> A: The only - - like I said, the only information I was given was that they were going to biopsy a slightly more dense area and slightly less for each of the patients.

4

> Q: And again, that was something that was told to you by the plaintiffs' attorneys?
>
> A: Yeah.

*See* Thompson Dep. Vol. I 118:19-119:3.

Dr. Thompson was also asked during his November 30, 2018, deposition about the importance of where Plaintiffs' biopsies were taken, specifically, from their scalps, in forming his opinions in this litigation:

> Q: So because there's such, I guess, divergence in what can be considered normal hair counts, would it be more accurate in assessing normal density to take two punch biopsies on one scalp, one from a normal area and one from a diseased area and compare those two?
>
> A: Helpful for the diagnosis of the disease?
>
> Q: In calculating density and what the density is for any individual person.
>
> A: You know, I don't know. Occasionally, I'll recommend this if I'm -- if I think there's low density that might be a normal variant of a patient. Or I'll just put in a note that there can be some variable density of hair follicles and, you know, maybe they accidentally sampled an area, you know, where there's less.

*See* Thompson Dep. Vol. I 107:20-108:10.

The April 17th communications also contradict Dr. Thompson's testimony during his April 3, 2019, deposition regarding Dr. Poole, and documents requested in Sanofi's subpoena duces tecum:

> Q: All communications or documents in your possession regarding Dr. Poole, who was referred to in an email sent by Anne Andrews on March 28, 2018 at 11:53 a.m. Do you have any correspondence, documents, anything regarding Dr. Poole?
>
> A: No, nothing that hasn't been produced. She was just cc'd on things. Dr. Poole was only really involved in shipping the biopsies

and arranging that. That was the extent of our interaction with my laboratory.

*See* Thompson Dep. Vol. III 392:5-14.

> Q: Do you know what company Dr. Poole works for?
>
> A: Well, I always saw it in the emails. AIVITA Biomedical, but I didn't know what this was.
>
> Q: Do you know what that company specializes in?
>
> A: I don't think I ever looked it up. No, I don't.
>
> Q: So you don't know that it specializes in stem cell research?
>
> A: Did not know that.
>
> Q: What is your understanding of why Dr. Poole had the pathology for Ms. Earnest, Ms. Durden, and Ms. Francis?
>
> A: I had no idea. Wondered the same thing.
>
> Q: Did Dr. Poole do any testing or do anything with that pathology besides hold onto it?
>
> A: No, she just preserved it.
>
> Q: Did you ever ask anyone why Dr. Poole had it?
>
> A: No.
>
> Q: Were you curious why Dr. Poole had it?
>
> A: Nope.
>
> . . . .
>
> *Q: Did you have direct contact with Dr. Poole?*
>
> ***A: I don't believe so. No.***
>
> . . . .
>
> Q: And you respond, "Hello, can I talk to Alexa and you about how to name the biopsy cases this morning?

A: Yes.

Q: Did you end up talking to Alexa and Anne Andrews about that?

A: I think it was just Alexa, just a single question.

Q: So you talked to Alexa about that?

A: Presumably, yeah.

***Q: Did you talk to Dr. Poole about anything else beyond how to name the biopsy cases?***

***A: No.***

*See* Thompson Dep. Vol. III 427:20-428:20; 429:13-15; 437:4-437:16 (emphasis added).

Had Plaintiffs produced the April 17th email chain before Dr. Thompson's November 30, 2018, deposition, Sanofi would have asked him about his use of the facts supplied by Dr. Poole and their exchange on the predetermination of the slide results, as well as their impact on his analysis of Plaintiffs' scalp biopsies—and ultimate opinion in this litigation. In turn, this exchange would likely have had an impact on Sanofi's *Daubert* motion to exclude Dr. Thompson's testimony, as well as other testifying experts who relied on Dr. Thompson's analysis.

## CONCLUSION

Shortly after Sanofi discovered Plaintiffs' testifying expert had conducted additional stem cell testing without disclosing or including the information in his expert report, Plaintiffs submitted a set of documents to Magistrate Judge North for *in camera* review. Given the truncated nature of the discovery, it is now clear that there are additional relevant, non-privileged documents that were not produced to Magistrate Judge North. In addition, Sanofi respectfully argues that the documents Plaintiffs did produce to Magistrate Judge North are discoverable under Federal Rule of Civil

Procedure 26. Plaintiffs' recent production of the September 3rd and April 17th emails serves to further highlight the importance of Sanofi's requested relief.

Respectfully submitted,

| | |
|---|---|
| */s/ Douglas J. Moore* | Harley Ratliff |
| Douglas J. Moore (Bar No. 27706) | Adrienne L. Byard |
| **IRWIN FRITCHIE URQUHART & MOORE LLC** | **SHOOK, HARDY & BACON L.L.P.** |
| 400 Poydras Street, Suite 2700 | 2555 Grand Boulevard |
| New Orleans, LA  70130 | Kansas City, Missouri 64108 |
| Telephone: 504-310-2100 | Telephone: 816-474-6550 |
| Facsimile:  504-310-2120 | Facsimile:  816-421-5547 |
| dmoore@irwinllc.com | hratliff@shb.com |
| | abyard@shb.com |

*Counsel for Sanofi-aventis U.S. LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on May 17, 2019, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ *Douglas J. Moore*