UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)           MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

         SECTION "H" (5)

THIS DOCUMENT RELATES TO:

Tanya Francis, Case No. 2:16-cv-17410;
Barbara Earnest, Case No. 2:16-cv-17144.

---

**SANOFI DEFENDANTS' SUPPLEMENT IN SUPPORT OF ITS MOTION TO EXCLUDE EXPERT TESTIMONY ON GENERAL CAUSATION**

---

**INTRODUCTION**

In its opening Motion to Exclude Expert Testimony on General Causation (Doc. # 6163), Sanofi demonstrated that Plaintiffs have not proven general causation for multiple reasons. First, Plaintiffs failed to prove a statistically significant association between ***Taxotere***—not another type of chemotherapy—and ***permanent alopecia***—not another type of alopecia. Second, Plaintiffs failed to prove, through a qualified expert using a reliable methodology like the Bradford-Hill criteria, that a causal relationship exists. Despite the foundational nature of general causation to all of Plaintiffs' claims, neither of Plaintiffs' experts (Dr. Madigan and Dr. Feigal) performed the extensive analysis necessary to prove general causation at trial.

Developments in the last three months demonstrate that Plaintiffs were aware of the holes in their evidence and tried but failed to fill them. *First*, the recent disclosure of abandoned stem cell testing indicates Plaintiffs knew they needed to undertake a Bradford-Hill analysis, which includes an analysis of biological plausibility, to prove causality. Plaintiffs acknowledge that the biological mechanism by which chemotherapy (let alone Taxotere) allegedly causes permanent alopecia has not been proven, but they theorize that chemotherapy damages stem cells in the hair follicles. In an apparent effort to prove that theory and support their causation case, Plaintiffs' experts tested whether these Plaintiffs' biopsies showed damaged stem cells. When the results showed that Plaintiffs' stem cells were not damaged, testing was abandoned and the results not disclosed. Despite this revelation, Dr. Feigal claims she still will testify that the hypothesized biological mechanism by which chemotherapy causes permanent alopecia is damage to stem cells—without explaining that these Plaintiffs' stem cells were tested and without explaining how the abandoned stem cell results contradict her opinion. Dr. Feigal's biological mechanism opinion is unreliable and inadmissible under Rule 702. *Second*, Plaintiffs acknowledged in recent

1

pleadings that general causation can only be proven with a statistically significant association between the exact condition being studied and the precise agent at issue—an admission that contradicts their repeated reliance on the TAX study results. These recent developments further confirm that Plaintiffs cannot meet their burden of proof on general causation.

Fundamentally, the targeted, "large-scale" epidemiological studies that Plaintiffs' experts admit are necessary to prove general causation with "substantial evidence" do not exist for Taxotere and permanent alopecia. And the secondary sources Plaintiffs' experts cite—adverse event reports that Dr. Madigan admits are unreliable and limited literature that Dr. Feigal admits discuss only a hypothesized mechanism of action—are both contradicted by Plaintiffs' own stem-cell testing and insufficient to meet their burden of proof.

## ADDITIONAL STEM CELL TESTING

Plaintiffs' experts concede that no mechanism of action has been proven that would explain how chemotherapy (let alone Taxotere) could cause permanent alopecia. Feigal Dep. Vol. IV 650:20–24 ("Q: . . . there's no proven mechanism of action for why a chemotherapy drug would result in persistent, ongoing, irreversible or permanent alopecia. A. So, the statement is correct that I'm not aware of any proven biologic mechanism . . . .") (Ex. A); Tosti Dep. Vol. III 522:3–7 ("Q. You don't know whether chemotherapy has any impact on the stem cells, do you? [objection] A. Nobody knows. This disease, we don't know.") (Ex. B). However, as written in the PSC's March 22, 2019 letter to Judge Milazzo, "the *theory* that certain chemotherapy agents can affect the hair growth cycle" by damaging stem cells "has appeared in the scientific literature for over a decade." PSC 3-22-19 Letter to Judge Milazzo re Liaison Counsel Meeting with the Court at 5 (Ex. C) (emphasis added); *see also* Tosti Dep. Vol. III 523:16–19 (Ex. B); Thompson Dep. Vol. III

401:21–402:6 (Ex. D).  Dr. Tosti explained that large-scale testing would be necessary to prove whether this hypothesis is correct.  Tosti Dep. Vol. III 564:23–566:9 (Ex. B); *id.* 566:11–14.

With no proven mechanism of action, Plaintiffs' experts could not prove one of the key Bradford-Hill criteria—biological plausibility.  (*See* Doc. # 6163 at 5-6, 23).  In an apparent effort to fill that hole, Plaintiffs' counsel funded expensive staining of Plaintiffs' stem cells.  They must have hoped that the staining would show that Plaintiffs' stem cells were damaged, thus bolstering their claim of biological plausibility, and thereby also strengthening their claim of general causation.  There would otherwise be no motivation for Plaintiffs' counsel to fund such expensive testing.  Thompson Dep. Vol. III 467:15–468:1 (Dr. Thompson testified that stem cell staining is "very expensive" and that Plaintiffs' counsel paid him to do it.) (Ex. D).

To test the stem cell theory, Dr. Thompson stained Plaintiffs' biopsies with Cytokeratin 15 and Ki-67, which would test to see (1) if there were stem cells in the bulge region of the hair follicle (Cytokeratin 15), and (2) if cells were still growing (Ki-67).  Thompson Dep. Vol. III 398:2–16, 398:22–24, 401:8–13 (Ex. D).  Negative stains might support Plaintiffs' theory that chemotherapy (but not specifically Taxotere) damages stem cells and also caused these Plaintiffs' permanent alopecia.  *Id.* 400:16–401:7.  Positive stains would contradict Plaintiffs' causation theories because they indicate the continued presence of growing stem cells.  *Id.* 412:15–20 ("Q: So if the stem cell was gone . . . the Cytokeratin would not stain it positively, right? [objection] A. If the stem cell's gone, there's nothing to stain.").  *All of Plaintiffs' stains came back positive*— meaning the stem cells were still present and growing.  *Id.* 492:4–9.

Because the results were not helpful to Plaintiffs' theories, further testing was abandoned: "Q: You wrote because it tested positive you did not pursue this further, right? A. Yes." Thompson Dep. Vol. III 492:7–9 (Ex. D).  Dr. Thompson instructed Plaintiffs' counsel to discourage their

3

consulting expert from further staining.  Thompson Dep. Vol. III 388:20–389:2; 490:21–491:12; Aug. 6, 2018 Email from Dr. Thompson to Anne Andrews and John Thornton ("[P]erhaps I need to meet with [the consulting expert] and share this data.  As the Cytokeratin 15 was still positive in the . . . pCIA cases, I did not pursue this further.") (Ex. E).  Dr. Thompson also admitted that, if the stains were negative (showing the absence of or lack of growth in stem cells), further testing would have been conducted:  "Q: If it tested negative, would've you pursed it further? A. Yes." *Id.* 492:10-12.

Plaintiffs' purported specific causation experts—Dr. Thompson and Dr. Tosti—did not mention the testing results in their reports or at their initial depositions.  Thompson Dep. Vol. III 439:14–16, 498:14–18 (Ex. D); Tosti Dep. Vol. III 539:22–540:1 (Ex. B).  And neither of them shared the results with Dr. Feigal.  Feigal Dep. Vol. IV 637:3-6 (testifying that she did not know whether Plaintiffs' pathologies had been stained) (Ex. A); *id.* at 652:12-653:19.  This plan was established before staining ever began.  Dr. Thompson noted in a pre-staining e-mail that, if the stains were positive—meaning stem cells were present and growing—he would not include them in his report.  Thompson Vol. III Dep. 439:6–13 (Dr. Thompson email to Plaintiffs' attorneys, cc'ing Dr. Tosti) (Ex. D).

Sanofi only learned about the staining during Dr. Thompson's follow-up deposition when Sanofi's counsel inquired about unexplained time entries on Dr. Thompson's produced invoices.  Thompson Dep. Vol. II 327:21–328:25 (Ex. F).  After the staining was discovered, the PSC claimed that "[c]ontrary to Sanofi's suggestions otherwise, proving the mechanism of action of an injury is not a required element of causation – indeed, a *proposed* mechanism of action is sufficient to 'lend[ ] credence to an inference of causality' drawn from other, more substantial evidence."  PSC Letter Brief to Judge Milazzo and Magistrate Judge North, at 3 (April 8, 2019) (Ex. G).  But

4

here there is no proof of general causation "drawn from other, more substantial evidence." Further, Dr. Feigal cannot testify regarding a "proposed" mechanism of action without disclosing that these Plaintiffs' stem cells were stained and without explaining how the stains showing present, growing stem cells impact her theory. While Plaintiffs cannot prove general causation for the multiple reasons set forth in Sanofi's opening motion, these recent revelations further undermine the reliability of their experts' work and theories.

## ARGUMENT

### I.   DR. FEIGAL'S OPINION ON BIOLOGICAL PLAUSIBILITY IS UNRELIABLE.

Dr. Feigal admits that no mechanism of action has been proven that would explain how Taxotere could cause permanent alopecia. Feigal Dep. Vol. IV 650:20–24 ("Q: . . . there's no proven mechanism of action for why a chemotherapy drug would result in persistent, ongoing, irreversible or permanent alopecia. A. So, the statement is correct that I'm not aware of any proven biologic mechanism . . . .") (Ex. A). Despite this lack of proof, and despite the recently revealed stem cell results, Dr. Feigal stated at her most recent deposition that she intends to testify that Taxotere could cause permanent alopecia by damaging stem cells. *Id.* 647:20-24.

Biological plausibility is a single factor in the nine-factor Bradford-Hill analysis that must be utilized to prove general causation. Dr. Feigal did not undertake a Bradford-Hill analysis—her report does not even mention the Bradford-Hill criteria let alone attempt to analyze them. (*See* Doc. # 6163 at 23). Regardless, Dr. Feigal admits that her opinion regarding biological plausibility is an unproven hypothesis. In *In re Accutane Prods. Liab.*, 511 F. Supp. 2d 1288, 1296 (M.D. Fla. 2007), the Court held the expert's biological plausibility opinion was inadmissible because: (1) the three possible mechanisms had not been tested or proven; and (2) the literature acknowledged that the mechanism was unknown:

> While [Plaintiffs'] biological theory may be exactly right, at this point it is merely plausible, not proven, and biological possibility is not proof of causation. . . . When a theory has not been verified by testing, it obviously has not been peer-reviewed. Without verification, [Plaintiffs'] theory remains an educated guess. It is not generally accepted and has no known potential rate of error.

*Id.*; *accord In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.*, 341 F. Supp. 3d 213, 270-71 (S.D.N.Y. 2018) (excluding an expert opinion on a biological mechanism it relied on "too many unsupported leaps" and such testimony "would invite the jury to guess as to the validity of a novel and untested theory based essentially on his say-so").

The same is true here. Dr. Feigal's opinion rests on a single article by Dr. Tallon. Feigal Dep. Vol. IV 644:11-19, 647:1-13 (Ex. A). The article merely described a case study, hypothesized about potential stem cell mechanisms, and then concluded that the mechanism is "unknown and requires further research." Tallon (2010) (Ex. G). Dr. Feigal further admitted that she "didn't do a comprehensive, exhaustive literature review" or "cite it" because "[t]hat really wasn't what I was asked to do." Feigal Dep. Vol. IV 648:17-19; *id.* 644:1-10 (Ex. A). Citing to cherry-picked literature discussing an untested hypothesis is not a reliable methodology for demonstrating biological plausibility. *Konrick v. Exxon Mobil Corp.*, No. 14-524, 2016 WL 439361, at *13 (E.D. La. Feb. 4, 2016), aff'd, 670 F. App'x 222 (5th Cir. 2016) (excluding expert's general causation opinions founded on cherry-picked data).

Plaintiffs recently argued the fact that the mechanism is merely hypothetical is irrelevant—as long as other "substantial evidence" exists proving causation. "Proving the mechanism of action of an injury is not a required element of causation – indeed, a *proposed mechanism* of action is sufficient to lend[ ] credence to an inference of causality drawn from *other, more substantial evidence*." PSC Letter Brief to Judge Milazzo and Magistrate Judge North, at 3 (April 8, 2019) (Ex. G) (internal citations omitted) (emphasis added). But here there is no "more substantial

6

evidence" from which to infer causality, as described in detail in Sanofi's opening motion (Doc. # 6163). Neither Dr. Feigal nor Dr. Madigan considered the other eight factors in the Bradford-Hill analysis. No replicated epidemiological study has assessed whether Taxotere causes permanent alopecia. The TAX clinical trial did not isolate either the disease or the agent. The adverse event reports are unreliable, as Dr. Madigan admits. And limited, cherry-picked literature is not "substantial evidence" sufficient to prove causation.

Plaintiffs' position that Dr. Feigal may still testify regarding stem-cell damage as a "proposed mechanism of action" is further undermined by Plaintiffs' abandoned stem cell testing. While Dr. Feigal was not involved with the testing, negative stains might support her biological plausibility theory that chemotherapy damages stem cells. On the other hand, positive stains contradict that theory because present and growing stem cells were detected. When the stains came back positive, Dr. Thompson abandoned any further testing, did not disclose the results in his report, and did not share them with Dr. Feigal. Though the testing and results have now been discovered, Dr. Feigal still intends to testify that chemotherapy could cause permanent alopecia by damaging stem cells—without explaining that these tests showed that Plaintiffs' stem cells were still present and growing, and without explaining how those results contradict her theory. This Court has held that an expert's testimony is not sufficiently reliable and is therefore inadmissible under *Daubert* in cases where: (1) the expert "exhibits a willingness to disregard contrary or inconsistent results," *Konrick v. Exxon Mobil Corp.*, No. 14-524, 2016 WL 439361, at *10 (E.D. La. Feb. 4, 2016), (2) the expert "fails to explain contrary results," and (3) the expert's methodology includes "cherry-picked data," *Burst v. Shell Oil Co.*, No. 14-109, 2015 WL 3755953, at *13 (E.D. La. June 16, 2015). Dr. Feigal's failure to address the results of these

Plaintiffs' stem cell stains hits on all three of these indicia of unreliability—providing even greater reason to exclude any opinion she intends to offer on this hypothesized mechanism of action.

## II. NEITHER DR. MADIGAN NOR DR. FEIGAL MAY RELY ON THE TAX CLINICAL TRIAL RESULTS.

Setting the stem cell testing aside, Plaintiffs' recent filings also support Sanofi's position that neither Dr. Madigan nor Dr. Feigal may rely on the TAX clinical trial results to support their purported general causation opinions. As an initial matter, Dr. Madigan may not offer a general causation opinion because he did not disclose it in his report, he is not qualified to undertake (and did not undertake) a Bradford-Hill analysis, and he admits that two of his data sources—FDA's adverse event report databases and an internal Sanofi clinical overview—are insufficient to prove causation. (*See* Doc. # 6163 at 12-20). Like Dr. Madigan, Dr. Feigal volunteered a general causation opinion at her deposition, but she failed to disclose that opinion in her report and has done none of the rigorous analysis necessary to support such an opinion, claiming instead that the nine-step Bradford-Hill analysis is "implied" in her report and citing to limited literature. (*See* Doc. # 6163 at 20-23).

Both Dr. Madigan and Dr. Feigal also improperly relied on the TAX clinical trial data. The TAX results cannot reliably support a general causation opinion for two fundamental reasons: (1) the clinical trial only assessed whether a patient had any type of alopecia and not whether a patient had "permanent" non-scarring alopecia following chemotherapy, and (2) the clinical trial only measured the effects of TAC (three chemotherapy treatments given in combination), not Taxotere alone. Studies with these limitations should be disregarded as unreliable. *See Frischhertz v. SmithKline Beecham* Corp, No. 10-2125, 2012 WL 6697124, at *5 (E.D. La. Dec. 21, 2012) (general causation expert's opinion was unreliable because she relied on data that "lump[ed]" together multiple injuries and did not isolate the injury at issue); *Burst*, 2015 WL 3755953, at *7

(quoting *LeBlanc v. Chevron USA, Inc.*, 396 F. App'x 94, 99 (5th Cir. 2010)) ("[A] study that notes 'that the subjects were exposed to a range of substances and then nonspecifically note[s] increases in disease incidence' can be disregarded.").

In Plaintiffs' more recent filings, they explicitly acknowledge that a study is only relevant and reliable here if it specifically measures whether a particular agent causes permanent chemotherapy-induced alopecia and isolates other diseases. (Doc. # 6147, Fonseca Opp. at 17-19).[1] The TAX trial did not. Relying on that study to "prove" that Taxotere causes permanent alopecia, as Plaintiffs concede, is "exactly the sort of unreliable, junk-science that *Daubert* forbids." (Doc. # 6147, Fonseca Opp. at 19).

Plaintiffs also appear to concede that studies of combination treatments do not allow for reliable causation conclusions about only one portion of the treatment. In challenging Defendants' experts, Plaintiffs argued that a study that examines the exposure of patients to two different treatments (chemotherapy and endocrine therapy) cannot establish a causal relationship between endocrine therapy and hair loss. (Doc. # 6147, Fonseca Opp. at 18, n.2). Yet the TAX clinical study did not isolate Taxotere from the other two treatments given simultaneously, and so (consistent with Plaintiffs' arguments) cannot be used to assess general causation related to Taxotere alone. Rather, as Dr. Tosti recently explained, "large-scale testing" would be necessary to prove with "substantial evidence" the hypothesis that Taxotere specifically causes permanent alopecia. Tosti Dep. Vol. III 564:23–566:9 (Ex. B); *id.* 566:11–14. But no such evidence exists.

---

[1] As Sanofi's opposition to the Fonseca motion demonstrates (Doc. # 6593), Plaintiffs improperly place the burden of establishing the cause of Plaintiffs' purported alopecia on Defendants. However, Plaintiff's Fonseca motion also repeatedly demonstrates Plaintiffs' understanding that the party bearing the burden of proof on general causation may not rely on irrelevant studies that do not isolate either the condition or the agent at issue.

## CONCLUSION

For the reasons stated above as well as in Sanofi Defendants' Motion to Exclude Expert Testimony on General Causation (Doc. # 6163), the Court should exclude the expert testimony of Dr. Madigan and Dr. Feigal on general causation under Federal Rule of Evidence 702.

Respectfully submitted,

*/s/ Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE URQUHART & MOORE LLC**
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: 504-310-2100
Facsimile: 504-310-2120
dmoore@irwinllc.com

Harley Ratliff
Adrienne L. Byard
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
Facsimile: 816-421-5547
hratliff@shb.com
abyard@shb.com

*Counsel for Sanofi-Aventis U.S. LLC and Sanofi U.S. Services Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2019, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

*/s/ Douglas J. Moore*