# EXHIBIT D

Page 380

```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF LOUISIANA
 2
     IN RE:   TAXOTERE (DOCETAXEL)    MDL NO. 2740
 3   PRODUCTS LIABILITY LITIGATION   SECTION: H
 4   This document relates to:
     Antoinette Durden, Case No. 2:16-cv-16635
 5   Tanya Francis, Case No. 2:16-cv-17410
     Barbara Earnest, Case No. 2:16-cv-17144
 6   _____
     CONTINUING VIDEOTAPED EXPERT DEPOSITION
 7   CURTIS THOMPSON, M.D.
 8
     TAKEN IN BEHALF OF DEFENDANTS
 9   WEDNESDAY, APRIL 3, 2019
     at 8:35 A.M.
10
11
     5200 Meadows Drive
12   Lake Oswego, Oregon
13
14   BE IT REMEMBERED THAT, the continuing videotaped expert
15   deposition of CURTIS THOMPSON, M.D., was taken before
     K.M, Court Reporter and Notary Public for
16   the State of Oregon, on Wednesday, April 3, 2019,
     commencing at the hour of 8:35 a.m., the proceedings
17   being
     reported at 5200 Meadows Drive, Lake Oswego, Oregon.
18
19
20
21
22
23
24
25
```

1  out by then.
2       Q.   Why --
3            MR. THORNTON:  Might I -- might I suggest,
4  and it's your deposition, that I don't know when you
5  could call your lab just to confirm because --
6            THE WITNESS:  I can call them immediately.
7            MR. THORNTON:  Do you want to -- want to
8  adjourn for that process?
9            MR. SEARS:  Yeah, let's do that, because I
10 want to talk about it.
11           THE VIDEOGRAPHER:  The time is 8:38.  We
12 are off the record.
13           (Whereupon, recess taken.)
14           THE VIDEOGRAPHER:  The time is 8:40 a.m.
15 and we are on record.
16 BY MR. SEARS:
17      Q.   So we just took a break and I believe you
18 called your lab --
19      A.   Yes.
20      Q.   -- about Ms. Tuyes' pathology materials.
21 What did you find out?
22      A.   We did not do the immunos on them because
23 there were -- we did those -- the Ki-67 and the
24 Cytokeratin 15 on the unstained slides.  And all of
25 the unstained slides were present for Tuyes, which

Page 389

```
 1   means we didn't use them.  And all those were sent,
 2   so we don't have any and they weren't performed.
 3        Q.   Why did you not do the Cytokeratin 15 and
 4   Ki-67 staining on Ms. Tuyes' pathology?
 5        A.   Well, the Cytokeratin 15 and the Ki-67 was
 6   just an investigational exercise that I was doing as
 7   a researcher in hair loss diseases.  And because
 8   that biopsy -- the diagnoses of the permanent
 9   chemotherapy-induced alopecia was secure on the
10   other three based on just the H&E slides.  And it
11   was a secure diagnosis on Tuyes on two biopsies as
12   female pattern hair loss or androgenetic alopecia,
13   and there wasn't evidence of permanent chemotherapy-
14   induced alopecia.  So because of this and because it
15   was just an investigational study using research
16   antibodies, I decided not to do it on that case.
17        Q.   Were you curious if you'd see any
18   differences in the staining between Ms. Tuyes, who
19   was diagnosed with androgenetic alopecia versus Ms.
20   Earnest, Ms. Francis, and Ms. Durden who you
21   diagnosed with --
22        A.   Well, I --
23        Q.   -- chemotherapy-induced alopecia?
24        A.   As I said, I'm a researcher in hair loss
25   diseases and so the whole reason for doing these
```

Page 398

1  it's not a stem cell anymore.
2      Q.  So you did the Cytokeratin 15 stain.  And
3  the Cytokeratin 15 stain is a stain to see if
4  there's stem cells in the bulge region of the hair
5  follicle?
6      A.  Not entirely, no.
7      Q.  How is that inaccurate?
8      A.  It's not a definitive stem cell marker.
9  It stains other cells.
10     Q.  The stem cells are present, the
11 Cytokeratin 15 stains are positive, right?
12     A.  Yes, that's fair to say.
13     Q.  And if the stem cells were destroyed in
14 the bulge region, there would be -- the Cytokeratin
15 15 stain would test negative?
16     A.  Probably, yes.  It could stain other cells
17 though.  I already said it stains other cells other
18 than stem cells.  So it stains all basal cells of
19 the follicle. So even if they're destroyed, it could
20 still have staining of other cells.  It's not a
21 specific marker.
22     Q.  Ki-67 stain is a stain to test to see if
23 cells are dividing, right?
24     A.  Growing not dividing.
25     Q.  What's the distinction between growing and

Page 400

1   nonspecific.  Like the Cytokeratin 15 is not a
2   definitive stem cell marker, and Ki-67 hits any cell
3   that's growing. And you use these and published with
4   the Cytokeratin 15 on other hair diseases, permanent
5   hair diseases.  So the interest was in seeing what
6   might be different in this disease than the other
7   diseases.
8           Unfortunately, we don't have, like, all
9   these investigational antibodies.  We -- like, 25
10  years ago we had two of them and we got more.  But
11  we don't have really good definitive antibodies.
12  And to date, even despite all the work I've done,
13  there's no antibody that has -- one of these non
14  FDA-approved antibodies that has utility in
15  diagnostics.
16      Q.   You would expect if a cell was dead, like
17  a stem cell, that the Ki-67 would test negative,
18  right?
19      A.   No.  Dead cells have antigens too, so they
20  can still stain.
21      Q.   They wouldn't be growing if they were
22  dead, would they?
23      A.   They could still have these antigens.
24  They could still have the molecule there so --
25      Q.   If a cell was not present, the Ki-67 would

1   test negative for that --
2        A.   If there's no cell there, it can't stain
3   with anything.  That is safe to say.
4        Q.   That would be true if there's no cell
5   there, the Ki-67 and the Cytokeratin 15 would test
6   negative for that cell?
7        A.   Yeah, because it's not there.
8        Q.   Okay.  So you did Cytokeratin 15 staining
9   and Ki-67 staining on Ms. Earnest, Ms. Francis, and
10  Ms. Durden's pathology, right?
11       A.   Yes.
12       Q.   So whose idea was it to do that staining?
13       A.   It was my idea.
14       Q.   So during your first deposition, we talked
15  about mechanisms of action.  Do you remember that?
16       A.   Vaguely, yes.
17       Q.   In your Rule 26 report, you attached a
18  list of literature that you reviewed.  Do you
19  remember that?
20       A.   Yes.
21       Q.   Some of the literature that you relied on
22  in forming your opinions has hypothesized that the
23  theoretical mechanism of action for why a
24  chemotherapy drug could potentially result in
25  persistent hair loss is that it kills the stem cell

Page 402

1   in the bulge region of the hair follicle, right?
2        A.   Yes.
3        Q.   And, in fact, you've published on that as
4   well, haven't you?
5        A.   Speculated.  We don't know, unfortunately.
6   But yeah, we've speculated in a review article.
7        Q.   You speculated that the theoretical
8   mechanism of action for why a chemotherapy drug
9   might result in ongoing hair loss is that it would
10  kill the stem cell in the bulge region, right?
11       A.   In permanent hair loss, not -- yes, that
12  the cells die.
13            (Whereupon, Article Primary Scalp Alopecia
14  was marked as Exhibit 5 for identification.)
15  BY MR. SEARS:
16       Q.   We talked about this article before but
17  I'm going to mark it as Exhibit 5, an article that
18  you wrote called Primary Scalp Alopecia, New
19  Histopathological Tools, New Concepts and a
20  Practical Guide to Diagnosis.
21       A.   Yes.
22       Q.   And really what I want to focus on is page
23  57.4.  What you wrote is "Noncicatricial alopecia
24  cannot be considered as synonymous to reversible
25  hair loss. Permanent alopecia after chemotherapy is

Page 412

1  like we've done with every other published disease.
2      Q.   I guess the flip side, if it wasn't caused
3  by chemotherapy -- if the alopecia wasn't cause by
4  chemotherapy, what staining pattern would you expect
5  to see with Cytokeratin 15?
6           MR. THORNTON:  Objection, form.
7           THE WITNESS:  Well, they're all different
8  patterns so -- one of the big points in these, as
9  you have said, once the follicle is gone or the cell
10 is gone, there's no staining anymore because there's
11 nothing to stain.  It's not there anymore.  So if
12 it's not there anymore, you can't stain it and
13 that's about the best we do.
14 BY MR. SEARS:
15     Q.   So if the stem cell was gone, it wasn't
16 present, the Cytokeratin 15 would not stain it
17 positively, right?
18          MR. THORNTON:  Objection, form.
19          THE WITNESS:  If the stem cell's gone,
20 there's nothing to stain.
21 BY MR. SEARS:
22     Q.   And so if a chemotherapy drug killed the
23 stem cell in the bulge region and the stem cell is
24 gone, the Cytokeratin 15 would stain negative?
25     A.   But it could still stain --

1   email?
2       A.   Yes.
3       Q.   And Antonella Tosti is -- Dr. Tosti is
4   plaintiffs' retained expert?
5       A.   Yes.
6       Q.   So on the second paragraph in your email
7   you write "We are testing the Cytokeratin 15
8   immunohistochemistry test today and hope to stain
9   these cases later tomorrow or Wednesday morning.  In
10  the event the Cytokeratin 15 findings do not add to
11  the information, I will issue my reports without
12  that information."  Do you see that?
13      A.   Yes.
14      Q.   And you ended up issuing your reports
15  without that information, didn't you?
16      A.   Yes.
17      Q.   When you write add to the information,
18  what were you expecting to see that would add to the
19  information?
20          MR. THORNTON:  Objection; form.
21          THE WITNESS:  Well, the -- I mean, as I
22  said in the last sentence, just to emphasize the
23  findings on the H&E slides alone are quite
24  convincing, shows permanent loss of larger hair
25  follicles.  So my -- what did I expect to see?  We

1  So that ship had sailed.  So I just wasn't going
2  back.
3  BY MR. SEARS:
4      Q.   As a researcher were you curious to see if
5  there would be any difference in the Cytokeratin 15
6  and Ki-67 staining with Ms. Tuyes versus Ms.
7  Francis, Ms. Durden, and Ms. Earnest?
8           MR. THORNTON:  Objection; form.
9           THE WITNESS:  Yeah, it would be
10 interesting, for sure.  I didn't think it was
11 prudent to do it in the context of legal expertise
12 work, legal expert work and spend money on any more
13 pilot study, provisional study.
14 BY MR. SEARS:
15     Q.   Did plaintiffs' attorney pay you to do the
16 Cytokeratin 15 and Ki-67 staining on Ms. Earnest,
17 Ms. Durden, and Ms. Francis?
18     A.   Yes.
19     Q.   I think you mentioned earlier that that's
20 expensive staining?
21     A.   It's very expensive because it's an
22 investigational antibody.  It's non FDA approved, so
23 when you buy these, as we've talked about, you have
24 to take them and do assessment of them in your own
25 laboratory before you put it on any tissue, like on

1   these patients. So that's the biggest expense.
2        Q.   And obviously, I'm not a scientist or have
3   any ability to be a scientist and that's why I
4   became an attorney, but you as a scientist, when you
5   test something, don't you go into that test with
6   having a hypothesis?
7        A.   Yes.
8        Q.   And so here's what I'm trying to
9   understand, you've talked about how the Cytokeratin
10  15 and Ki-67 staining is expensive.  So what was
11  your hypothesis about what you were going to see
12  with that staining with Ms. Earnest, Ms. Francis,
13  and Ms. Durden?
14            MR. THORNTON:  Objection; form.
15            THE WITNESS:  The interest -- once again,
16  as I said before and is supported by the
17  publications that I have -- the research projects
18  that I've done and published on other diseases like
19  lichen planopilaris, and then the letter in 2017,
20  have a great interest in staining patterns of these
21  antibodies.  And I've done multiple projects where I
22  take a panel of antibodies and put them on tissue,
23  specifically trying to address diagnostic impasses.
24            So my interest isn't in basic, basic,
25  basic cell biology.  It's in identifying new

1  Q.  Then you go on to say "I don't know if he
2  had access to my data on this, but I already did
3  this for Cytokeratin 15 on these samples."  And the
4  reason I'm emphasizing "these" is because it's the
5  plaintiffs in this case?
6  A.  Right.
7  Q.  And so the way I read those two sentences
8  is that these samples were the same samples that
9  were being tested in the video that you watched?
10  A.  No.  The video I watched was simply just
11  proposing a project.  No testing had been done at
12  that point.  It was just saying this is how it will
13  be done.
14  Q.  So it's your testimony that this
15  researcher that's redacted in this email never
16  tested the pathology for Ms. Francis --
17  A.  No.  He never --
18  Q.  -- Ms. Durden, and Ms. Earnest?
19  A.  -- got within a thousand miles of their
20  tissue or any other tissue from my lab.
21  Q.  And it goes on to say "Perhaps I need to
22  meet with him and share this data.  As the
23  Cytokeratin 15 was still positive in the basaloid
24  bodies and the pCIA cases, I did not pursue this
25  further."  Did I read that correctly?

Page 491

1   A.   Yes.
2   Q.   Did you end up talking to him?
3   A.   No.  I don't believe so.
4   Q.   Do you know --
5   A.   He was on a call but I don't know if it
6   was before or after this.  Maybe it was after.
7   Q.   So you did talk to this researcher at some
8   point?
9   A.   There was a conference call that he was
10  on. Yeah.  I just didn't want him to recreate the
11  wheel here and redo something I'd done and go down a
12  dead end.  It didn't seem worth it.
13  Q.   On that call did you have any discussions
14  about stem cell testing?
15  A.   The call was basically the -- what he was
16  going to do and my part was going to be provide
17  tissue, validation tissue, and then potential
18  testing tissue that wouldn't involve patients in
19  this case.  We had -- you know, we only had nine
20  unstained slides and we had the three H&Es and we
21  didn't want to compromise these specimens at all.
22  Q.   So in the email you write that the
23  Cytokeratin 15 was still positive in the basaloid
24  bodies.  And that refers to the tissue from Ms.
25  Durden --

1      A.   Yes.

2      Q.   -- Ms. Francis, and Ms. Earnest?

3      A.   Yes.

4      Q.   So the Cytokeratin 15 tested positive in

5  Ms. Earnest, Ms. Durden, and Ms. Francis' tissue?

6      A.   In these structures, yeah.  We use --

7      Q.   You wrote because it tested positive you

8  did not pursue this further, right?

9      A.   Yes.

10     Q.   If it tested negative, would've you

11 pursued it further?

12     A.   Yes.

13     Q.   Because it tested positive in Ms. Earnest,

14 Ms. Francis, and Ms. Durden, is that an indication

15 to you that their stem cells were not damaged?

16          MR. THORNTON:  Objection; form.

17          THE WITNESS:  No.  Because we're talking

18 about these basaloid bodies here.  And we don't --

19 there's a whole glob of these cells also called

20 telogen bodies, and they're not stem cells.  Maybe

21 one of them is.

22 BY MR. SEARS:

23     Q.   You talked about how if it did test

24 negative, you would have pursued it further.

25 Would've you pursued it further, then, because it

Page 498

1  person referred to in Invoice 5?
2       A.   No.
3       Q.   Did you have any emails with that person
4  referred to in Invoice 5?
5       A.   No.
6       Q.   So your sole contact with that person was
7  having your lab send that person the pathology?
8       A.   The glass slides, the H&E glass slides.
9  Yes.
10      Q.   So we initially took your deposition -- I
11 think it was on November 30, 2018.  Do you recall
12 that?
13      A.   Yes.
14      Q.   And during that deposition, you did not
15 mention that you ran Cytokeratin 15 or Ki-67
16 staining on the pathology for Ms. Earnest, Francis,
17 or Durden, right?
18      A.   Correct.  Yes.
19      Q.   And you also didn't mention during that
20 deposition that there's existence of additional
21 pathology material that had not been provided to the
22 defense, right?
23      A.   I did not.  No, I didn't.
24      Q.   And then you were deposed again on
25 February 26, 2019, about your invoices.  Do you