UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)            MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

SECTION "H" (5)

THIS DOCUMENT RELATES TO:

Tanya Francis, Case No. 2:16-cv-17410;
Barbara Earnest, Case No. 2:16-cv-17144.

---

**SANOFI DEFENDANTS' SUPPLEMENT IN SUPPORT OF ITS MOTION TO EXCLUDE EXPERT TESTIMONY ON SPECIFIC CAUSATION**

---

**INTRODUCTION**

In its Motion to Exclude Expert Testimony on Specific Causation (ECF Doc. 6162), Sanofi demonstrated that Plaintiffs cannot prove specific causation (as they must to prevail) for multiple reasons. Since filing its motion, Sanofi has learned that both Plaintiffs' experts who purport to offer specific causation opinions—Dr. Curtis Thompson and Dr. Antonella Tosti—were involved in stem cell testing of Plaintiffs' biopsies. When the results did not support their causation theory, testing was abandoned and the results not disclosed. Both Doctors instead relied only on other allegedly favorable, albeit unreliable, data from other sources in forming their opinions. Dr. Thompson's and Dr. Tosti's decision to cherry-pick data favorable to their ultimate conclusion, while ignoring and failing to explain inconsistent data, reinforces the conclusion that their opinions are unreliable and inadmissible under the Federal Rules of Evidence. *Konrick v. Exxon Mobil Corp.*, No. 14-524, 2016 WL 439361, at *10 (E.D. La. Feb. 4, 2016) (an expert who "highlight[s] only data that supports his position . . . undermines the reliability of his methodology."); *In re Mirena lus Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp.3d 213, 241–42 (S.D.N.Y. 2018) (A witness may be excluded "if his or her proposed methodology is not sufficiently rigorous," and one of the principles that should "guide a court's assessment of reliability" is whether the expert "pick[s] and choose[s] from the scientific landscape.") (internal quotation marks and citations omitted). Plaintiffs' failure to produce reliable expert testimony proving that Taxotere caused Plaintiffs' alleged injury is fatal to Plaintiffs' claims.

**ADDITIONAL STEM CELL STAINING**

Unrelated to their chemotherapy treatment, both Plaintiffs in this case carry several risk factors for alopecia including their age, post-menopausal status, and years of hormone suppression therapy. *See* ECF Doc. 6162 at 3 (citing Plaintiffs' Fact Sheets ("PFS")). And even though both Plaintiffs received two other chemotherapy drugs besides Taxotere (Adriamycin and

Cyclophosphamide), both Plaintiffs blame Taxotere alone for their injury. Francis PFS § V.11–12, Ex. A; Earnest PFS § V.11–12 Ex. B.[1] Plaintiffs can only prevail by adducing reliable expert testimony proving that Taxotere, and not one of Plaintiffs' other risk factors or one of the other chemotherapy drugs they received, caused their alleged permanent alopecia (sometimes referred to as "pCIA"—or permanent chemotherapy-induced alopecia).

Plaintiffs cannot do so. Dr. Thompson admits he can't: "Q: And so it's fair to say that you are not going to say that any specific chemotherapy drug caused this hair loss seen in these women? A. *I'm not in a position to make that distinction or claim*." Thompson Dep. Vol. I. 50:24–51:3, Ex. C (emphasis added). Dr. Tosti also admitted that she also could not prove that Taxotere caused Plaintiffs' injuries: "*I cannot say which drug is causing the—the hair loss, of course. You can never make these diagnosis for any type of drug induced hair loss*[.]" Tosti Dep. Vol. I 297:17–298:5, Ex. D (emphasis added). It was only upon questioning by Plaintiffs' counsel that Dr. Tosti later changed her testimony, insisting she could reach an opinion that Taxotere specifically caused Plaintiffs' alleged injuries by counting the number of reported cases in the medical literature. Tosti Dep. Vol. II. 493:22–494:4, Ex. E (admitting that she did not do any "specific exam" to rule out the other chemotherapy drugs as causing Plaintiffs' injury, but claiming that she bases her "opinion on the existing evidence in the literature."). This does not meet Plaintiffs' burden of proof. Medical literature reporting on other individual's injuries is not evidence that Taxotere specifically caused *these Plaintiffs'* alopecia. *Seaman v. Seacor Marine LLC*, 564 F. Supp. 2d 598, 600 (E.D. La. 2008) ("[S]pecific causation is whether a substance caused a <u>particular individual's</u> injury.") (citing *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 351 (5th Cir. 2007) (emphasis added)).

---

[1]   Citations to Francis's PFS refers to her Eighth Amended PFS; citations to Earnest's PFS refers to her Fourth Amended PFS.

To try to fill this decisive hole in their evidence, Plaintiffs' counsel funded expensive staining to see if Plaintiffs' stem cells had been damaged. While it has not been proven how chemotherapy might cause permanent alopecia, as written in the PSC's March 22, 2019 letter to Judge Milazzo, "the *theory* that certain chemotherapy agents can affect the hair growth cycle" by damaging stem cells "has appeared in the scientific literature for over a decade." PSC 3-22-19 Letter to Judge Milazzo at 5, Ex. F (emphasis added). Both Dr. Thompson and Dr. Tosti have speculated on this hypothesized mechanism of action.[2] Both must have hoped that the stem cell staining would show that chemotherapy was the cause of Plaintiffs' injuries—there would otherwise be no motivation for Plaintiffs' counsel to fund such expensive testing. Thompson Dep. Vol. III 467:15–468:1 (Dr. Thompson testified that stem cell staining is "very expensive" and that Plaintiffs' counsel paid him to do it), Ex. G.

To test the stem cell theory, Dr. Thompson stained Plaintiffs' biopsies with Cytokeratin 15 and Ki-67, which would test to see (1) if there were stem cells in the bulge region of the hair follicle (Cytokeratin 15), and (2) if cells were still growing (Ki-67). Thompson Dep. Vol. III 401:8–13, 398:2–16, 398:22–24, Ex. G. Negative stains would support Plaintiffs' theory that chemotherapy (but not specifically Taxotere) caused these Plaintiffs' permanent alopecia by damaging their stem cells. Thompson Dep. Vol. III 400:16–401:7, Ex. G. On the other hand, positive stains would contradict Plaintiffs' causation theories. Thompson Dep. Vol. III 412: 15–20 ("Q: So if the stem cell was gone . . . the Cytokeratin would not stain it positively, right?

---

[2]   Thompson Dep. Vol. III 402: 5–12, 404:2–10 (Dr. Thompson hypothesized in a paper that the "theoretical mechanism of action for why a chemotherapy drug would result in ongoing hair loss after the completion of chemotherapy is that there would be some toxicity of the drug that would harm the follicular stem cell."), Ex. G; Tosti Dep. Vol. I 27:10–17 ("It's not been established, but we've–there is a way we think [chemotherapy drugs cause persistent alopecia], okay? And what we think is that the stem cells . . . may be damaged by the chemotherapy. That's what, for instance, the researcher in the field of hair suggests."), Ex. D.

[objection] A. If the stem cell's gone, there's nothing to stain."), Ex. G; Tosti Dep. Vol. III Errata Sheet ("[M]y understanding of how the staining is proposed to work; it is to stain positive for stem cells."), Ex. H. *Here, all of Plaintiffs' stains came back positive*—meaning the stem cells were still present and growing. Thompson Dep. Vol. III 492:4–9, 398:2–16, 398:22–399:4, Ex. G.

Because the results were not helpful to Plaintiffs' theory, further testing was abandoned: "Q: You wrote because it tested positive you did not pursue this further, right? A. Yes." Thompson Dep. Vol. III 492:7–12, Ex. G. Dr. Thompson also instructed Plaintiffs' counsel to discourage their consulting expert from further staining. Thompson Dep. Vol. III 490:21–491:12 (Email from Dr. Thompson to Plaintiffs' counsel regarding Plaintiffs' consulting expert: "perhaps I need to meet with [the consulting expert] and share this data. As the Cytokeratin 15 was still positive in the . . . pCIA cases, I did not pursue this further."), Ex. G. Dr. Thompson finally admitted that, had the results been negative, additional testing would have been pursued: "Q: If it tested negative, would've you pursed it further? A. Yes." Thompson Dep. Vol. III 492:7–12, Ex. G.

Neither Dr. Thompson nor Dr. Tosti included any reference to the Cytokeratin 15 or Ki-67 staining in their reports, or tried to explain them as results contrary to their opinions, and neither mentioned the staining in their initial depositions. Thompson Dep. Vol. III 439: 14–16, 498:14–18, Ex. G; Tosti Dep. Vol. III 539:22–540:1, 557:8–14, Ex. I. Sanofi only learned about the staining during Dr. Thompson's follow-up deposition when Sanofi's counsel inquired about unexplained time entries on Dr. Thompson's produced invoices. Thompson Dep. Vol. II 327:21–328:25, Ex. J.

After the staining was discovered, the PSC claimed there "is no known [diagnostic] utility" to stem cell staining and pCIA in hair loss pathology. Dr. Thompson 3-27-19 Letter to Judge Milazzo, at 2, Ex. K. Dr. Thompson claimed that "while a negative stem cell result is evidence

4

that the hair follicle is dead [consistent with a diagnosis of pCIA], a positive result does not necessarily mean the hair follicle is alive." PSC 4-08-19 Letter to Judge Milazzo and Judge North at 3, Ex. L. Dr. Thompson's position seems to be that there *is* diagnostic utility to stem cell testing, as long as the results are favorable to Plaintiffs' causation theory. While Sanofi disagrees with that position, the more fundamental issue addressed here is both experts' failure to disclose the staining results or to explain in their reports how the positive (unfavorable) stains were or were not consistent with their ultimate conclusions. Discovery of the undisclosed staining results further undermines the reliability of Plaintiffs' experts' work, their failure to adhere to established scientific principles, and the litigation-driven nature of the methodologies employed.

## ARGUMENT

### I. DR. THOMPSON'S AND DR. TOSTI'S METHODOLOGIES WERE UNRELIABLE AND LITIGATION-DRIVEN.

While a proponent of expert testimony need not prove to the judge that the expert's testimony "is correct," the proponent must prove "that the testimony is reliable." *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (emphasis added). This Court has held that an expert's testimony is not sufficiently reliable and is therefore inadmissible under *Daubert* in cases where: (1) the expert "exhibits a willingness to disregard contrary or inconsistent results," *Konrick v. Exxon Mobil Corp.*, No. 14-524, 2016 WL 439361, at *10 (E.D. La. Feb. 4, 2016), (2) the expert "fails to explain contrary results," and (3) the expert's methodology includes "cherry-picked data," *Burst v. Shell Oil Co.*, No. 14-109, 2015 WL 3755953, at *13 (E.D. La. June 16, 2015).

By abandoning and failing to disclose the stem cell testing, Plaintiffs' experts hit on all three of these indicia of unreliability. Plaintiffs' counsel agreed to pay for expensive stains to test the "decade[s]" old theory that chemotherapy (but not Taxotere) causes pCIA. PSC 3-22-19 Letter to Judge Milazzo at 5, Ex. F; Thompson Dep. Vol. III 432:16–21, 467:15–468:1, Ex. G. Plaintiffs'

5

experts stained Plaintiffs' biopsies hoping the stains would come back negative, revealing that their stem cells had been destroyed, and thus "proving" that chemotherapy (but not Taxotere) was the cause of Plaintiffs' injuries. *See* PSC 4-08-19 Letter to Judge Milazzo and Judge North at 3, Ex. L. Before the testing was conducted, Dr. Thompson told both Dr. Tosti and Plaintiffs' counsel that he would not include the results if they were positive:

> We are testing the Cytokeratin 15 immunohistochemistry test today and hope to stain these cases later tomorrow or Wednesday morning. **In the event the Cytokeratin 15 findings do not add to the information, I will issue my reports without that information.**

Thompson Vol. III Dep. 439:6–13 (Dr. Thompson email to Plaintiffs' attorneys, cc'ing Dr. Tosti), Ex. G. When the stains came back positive—showing the stem cells were still present and growing—further testing was abandoned and, as already decided, neither the testing nor the results were disclosed by Dr. Thompson in his report. Thompson Dep. Vol. III 498: 14–23, Ex. G.

Dr. Thompson was required to disclose the testing and results, explain his theory regarding the utility of testing and negative versus positive stains, and explain how the staining results were consistent with (or irrelevant to) his opinions. Dr. Thompson did not do so, choosing instead not to mention either the testing or the results in his report or initial deposition. Dr. Thompson made that decision despite admitting in his subsequent deposition that if the results had been "negative" (showing the stem cells were destroyed and supporting Plaintiffs' causation theory) he would have pursued further testing. Thompson Dep. Vol. III 492:7 – 12, Ex. G. In other words, Dr. Thompson seems to have taken the position that the results of the stem cell tests are relevant to this litigation *only if* the results are negative (helpful) and not positive (unhelpful). The scientific community would reject such a position in any legitimate, non-litigation-based experiment. Dr. Thompson must be held to the same standard here. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (part of the Court's gatekeeping requirement "is to make certain that an expert, whether

6

basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.").

Like Dr. Thompson, Dr. Tosti also did not mention either the testing or the results in her Rule 26 report, though she was told about the results before her report was issued. Thompson Dep. Vol. III 425:22–426:1, 446:12–447:1, Ex. G; Tosti Dep. Vol. III 534:23–25, 540:18–20, Ex. I. Dr. Tosti even testified in her initial deposition that she believes chemotherapy causes persistent alopecia by harming stem cells, Tosti Dep. Vol. I 27:6–17, Ex. D, *without ever mentioning* that Dr. Thompson had tested Plaintiffs' stem cells or that the results were inconsistent with her theory. After Sanofi learned about the testing, upon further questioning, Dr. Tosti stated that she had not mentioned the stem cell testing because she did not think it was "relevant." Tosti Dep. Vol. III 557:8–14, Ex. I. But Dr. Tosti was not permitted to make this unilateral determination—rather, she was required to make the disclosure and explain why the positive stem cell results were not "relevant" pursuant to her theories. *Kumho*, 526 U.S. at 152.

Dr. Thompson's and Dr. Tosti's positions are inconsistent with sound science. An experiment cannot be relevant only if a certain result is achieved. Contradictory test results cannot be disregarded without explanation. And experts cannot rely only on "cherry-picked" data helpful to their conclusion. Both experts' actions with respect to the stem cell staining bear multiple hallmarks of unreliability and litigation-driven methodology. Because both Dr. Thompson and Dr. Tosti employed unreliable methodologies, their specific causation opinions do not pass scrutiny under Rule 702 and *Daubert* and must be excluded.

**II.   DR. THOMPSON'S AND DR. TOSTI'S OPINIONS ARE NOT BASED ON SUFFICIENT FACTS OR DATA.**

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen.*

7

*Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*  The results from the stem cell stains further support the conclusion that neither Dr. Thompson nor Dr. Tosti's specific causation opinions are based on sufficient facts or data.

Dr. Thompson opines that Plaintiffs' injury is "consistent with" (not caused by) "PERMANENT ALOPECIA AFTER CHEMOTHERAPY" (not Taxotere).  Thompson Report at 2, 4, 7, Ex. M.  That conclusion does not answer the only question at issue here—whether *Taxotere caused* these Plaintiffs' injuries.  Dr. Thompson in fact admitted that he cannot testify that Taxotere caused these Plaintiffs' injuries—an admission that renders his "specific causation" opinion irrelevant.  Thompson Dep. Vol. I. 50:24–51:3, Ex. C.

Recent events further confirm that Dr. Thompson's opinion is not supported by sufficient facts or data.  Dr. Thompson previously admitted that he did not review Plaintiffs' clinical history before forming his opinion.  *See* ECF Doc. 6162 at 12–13.  And, despite asserting that he could distinguish features in Plaintiffs' biopsies from androgenetic alopecia, Dr. Thompson could not cite any legitimate basis for his opinion, instead testifying that he "can't really remember" any literature that supports his belief that pCIA is distinguishable from androgenetic alopecia.  Thompson Dep. Vol. I 239: 23–240:16, Ex. C.  In his most recent deposition, Dr. Thompson admitted that he did not see anything in the Cytokeratin 15 and Ki-67 stains that distinguished Plaintiffs' biopsies from any other type of alopecia.  Thompson Dep. Vol. III 419:25–420:8, Ex. G.  Taken together, Dr. Thompson has provided no basis upon which to testify that these Plaintiffs have permanent alopecia caused by chemotherapy and not another form of alopecia with a different

8

cause.[3] There is "too great an analytical gap between the data and [Dr. Thompson's] opinions" to be admissible. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Dr. Tosti's ultimate opinion that Taxotere, and not any other chemotherapy drug or risk factor, caused Plaintiffs' alleged injuries is based on reports in the medical literature. As noted above, counting cases in medical literature—cases that involve different patients, receiving different regimens, with different health histories and risk factors—is not a tool for diagnosing whether a particular substance is causing "a particular individual's injury." *See Seaman v. Seacor Marine LLC*, 564 F. Supp. 2d 598, 600 (E.D. La. 2008) (emphasis added). Moreover, as detailed in Sanofi's opening motion, Dr. Tosti failed to perform a reliable differential diagnosis to rule out other possible causes of Plaintiffs' alopecia. *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 804 (E.D. La. 2011) (the standard method for assessing specific causation is first "'ruling in' all scientifically plausible causes of the plaintiff's injury . . . then 'rul[ing] out' the least plausible causes of injury until the most likely cause remains."). Dr. Tosti started with the assumption that Plaintiffs suffered from pCIA after reading Dr. Thompson's dermatopathology report rather than first ruling in all plausible causes as standard methodology (and her typical practice) requires. *See* Tosti Report at 13, Ex. N; *see also* Tosti Dep. Vol. I 104:22–24, Ex. D.

---

[3] In her Dep. Vol. III Errata Sheet, Dr. Tosti refers to "accepted diagnostic criteria" for "conditions known to cause hair loss" which she discusses in her report, asserting these criteria "do not depend on a complete understanding of the cellular biologic mechanisms." Tosti Dep. Vol. III Errata Sheet, Ex. H. It is unclear what "accepted diagnostic criteria" Dr. Tosti is referring to, as the literature she relies on in her report specifically notes that "the histopathologic criteria for [pCIA patients] are scant and not entirely defined." Tosti Dep. Vol. I 292: 2–16, Ex. D. Further undermining Dr. Tosti's belief that "accepted diagnostic criteria" for pCIA exist is Dr. Thompson's ultimate unwillingness to opine that Plaintiffs' biopsies were *caused* by chemotherapy at all. *See* Thompson Report at 2, 4, 7 (Dr. Thompson opines only that Plaintiffs' injury is "consistent with PERMANENT ALOPECIA AFTER CHEMOTHERAPY"), Ex. M.

It is also now apparent that Dr. Tosti failed to explain, or even consider, the positive stem cell results as part of her differential diagnosis, even though those results may have been consistent with other forms of alopecia. This further demonstrates that Dr. Tosti's purported differential diagnosis was not conducted pursuant to reliable, recognized methodology. *See Wagoner*, 813 F. Supp. 2d at 804 (E.D. La. 2011). As with Dr. Thompson, there is "too great an analytical gap" between the data and Dr. Tosti's opinions to be admissible. *Joiner*, 522 U.S. at 146.

## CONCLUSION

For all the reasons stated above, and in Sanofi's Motion to Exclude Expert Testimony on Specific Causation (ECF Doc. 6162), the Court should exclude the expert opinions of Dr. Thompson and Dr. Tosti under Federal Rules of Evidence 702 and 703.

Respectfully submitted,

*/s/ Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE URQUHART & MOORE LLC**
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: 504-310-2100
Facsimile: 504-310-2120
dmoore@irwinllc.com

Harley Ratliff
Adrienne L. Byard
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
Facsimile: 816-421-5547
hratliff@shb.com
abyard@shb.com

*Counsel for Sanofi-Aventis U.S. LLC and Sanofi U.S. Services Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 4, 2019, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ Douglas J. Moore