# EXHIBIT D

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MDL NO.: 2740

SECTION: H

IN RE: TAXOTERE (DOCETAXEL)
PRODUCTS LIABILITY LITIGATION

This Document Relates To:

Antoinette Durden, Case No. 2:16-cv-16635;
Tanya Francis, Case No. 2:16-cv-17410;
Barbara Earnest, Case No. 2:16-cv-17144.
_____/

255 Alhambra Circle, Penthouse
Coral Gables, Florida 33134
Tuesday, 9:18 a.m. - 5:25 p.m.
December 4, 2018

VIDEOTAPED DEPOSITION OF

ANTONELLA TOSTI, M.D.

VOLUME 1
Pages 1 through 300

Taken on behalf of the Defendant before Gina Rodriguez, RPR, CRR, Notary Public in and for the State of Florida at Large, pursuant to Second Amended Notice of Taking Videotaped Deposition filed in the above cause.

Page 27

1  something else, right?
2      A.  Yes.  But to be honest, we don't know the
3  mechanism of action of most -- the cause of most
4  diseases, so this mechanism of action is the ideal
5  thing we would like to have.
6      Q.  And there's no mechanism of action that has
7  been established for a chemotherapy drug causing
8  persistent alopecia, right?
9          MR. SCHANKER:  Objection, form.
10     A.  No, I think you're wrong.  It's not been
11 established, but we've -- there is a way we think it
12 happens, okay?  And what we think is that the stem
13 cells that are, you know, the cell that we regenerate
14 the follicle, either in the -- in the bulge or in the
15 dermal papilla may be damaged by the chemotherapy.
16 That's what, for instance, the researcher in the
17 field of hair suggests.
18 BY MR. SEARS:
19     Q.  Right, that's a hypothesis, correct?
20         MR. SCHANKER:  Objection, form.
21     A.  It's a very likely.  It's a very likely
22 hypothesis.
23 BY MR. SEARS:
24     Q.  It's a hypothesis that has not been proven,
25 right?

Page 104

1  that.
2           In discoid lupus, I either -- you know,
3  this is quite technical.  An area that has these
4  raised dots or an area that has a keratotic plugs,
5  or an area that has, again, the peripilar casts, and
6  if it's possible, CCCA, I take -- it's called the
7  peripilar great white halo, it's a halo that
8  surround the -- the hair.
9           Why?  Because if I don't take the biopsy
10 like that, I just get from the pathologist, scarring
11 alopecia.  Because when it's scarring, the
12 pathologist cannot tell you which disease caused the
13 scar.  Okay?  He can see the scar, but he cannot
14 say:  This is lichen planopilaris, this is central
15 centrifugal alopecia.  And the treatments are
16 different.  So that's the reason why we develop the
17 dermoscopy guided biopsy.
18      Q.   So you want to get a clinical history and
19 conduct a physical examination before you decide to
20 biopsy a patient, right?
21           MR. SCHANKER:  Objection, form.
22      A.   I do the clinical history, yes.  I take a
23 clinical examination, and then I take the biopsy, if
24 needed.
25

Electronically signed by Gina Rodriquez (201-182-126-9514)
Electronically signed by Gina Rodriquez (201-182-126-9514)
72ecbdd8-9ed6-4d44-ae56-8b8592170e9b

Page 292

1  don't think we have the evidence-based data for that.
2      Q.   So one of the papers that you cite to is by
3  Dr. Fonia, and we talked about it a little bit, but
4  it's the paper "Permanent alopecia in patients with
5  breast cancer after taxane chemotherapy and adjuvant
6  hormonal therapy:  Clinicopathologic findings in a
7  cohort of 10 patients."
8           And it was written in 2016, right?
9      A.   Yes.
10          MR. SCHANKER:  Objection, form.
11 BY MR. SEARS:
12     Q.   And one of the statements in that is that:
13 "The histopathologic criteria for this particular
14 subset population are scant and not entirely defined.
15 This may be in part a reflection of these patients
16 presenting with advanced end-stage alopecia."
17          So based upon that statement in this
18 paper, at least Dr. Fonia thinks that the
19 pathological findings for persistent
20 chemotherapy-induced alopecia are not entirely
21 defined, right?
22          MR. SCHANKER:  Objection, form.
23     A.   No, this is a pathological study, and I'm
24 not a pathologist.  We discussed that before.  What
25 they think, what they discussed in that study is

Electronically signed by Gina Rodriquez (201-182-126-9514)
Electronically signed by Gina Rodriquez (201-182-126-9514)
72ecbdd8-9ed6-4d44-ae56-8b8592170e9b

Page 297

1  based on theory.  It's not based -- they're not
2  discussing the existence of the disease, the clinical
3  features of the disease.  They are discussing why
4  this happens.  We don't know.  Disagreement is what
5  makes people working and then finding something.
6  BY MR. SEARS:
7      Q.   You wrote a letter to the editor in 2011
8  called "Permanent chemotherapy-induced alopecia:  A
9  review," right?
10     A.   Yes.
11     Q.   And in that you wrote:  "In
12 tamoxifen-CIPAL, hair loss started three months after
13 initiation of the treatment and was expressed as
14 complete or androgenetic-type alopecia," right?
15     A.   Probably I wrote because it's more evident
16 on the androgen-dependent scalp.
17     Q.   So I have read your report that you
18 prepared in this case, and I know it's your opinion
19 that Ms. Francis and Ms. Durden have traction
20 alopecia, but you think that all three women also
21 have persistent chemotherapy-induced alopecia.
22 Right?
23     A.   Yes.
24     Q.   And in your report, you do not attribute
25 the hair loss to any specific chemotherapy drug,

Electronically signed by Gina Rodriquez (201-182-126-9514)
Electronically signed by Gina Rodriquez (201-182-126-9514)

72ecbdd8-9ed6-4d44-ae56-8b8592170e9b

Page 298

1  right?

2           MR. SCHANKER:  Objection, form.

3       A.  I cannot say which drug is causing the --
4  the hair loss, of course.  You can never make these
5  diagnosis for any type of drug-induced hair loss,
6  even for telogen effluvium.

7           MR. SEARS:  You know, I think I'm -- with a
8       couple of areas I might clean up tomorrow, I
9       think I'm about ready to switch over to
10      case-specific.  So you guys just want to break
11      for the day or . . .

12          MR. SCHANKER:  Why don't we take a break
13      for a moment and talk about it.

14          MR. SEARS:  Okay.

15          THE VIDEOGRAPHER:  Off the record.  The
16      time is 5:25 p.m.

17          (The proceedings concluded for the day at
18      5:25 p.m., and will continue in Volume 2.)

19

20

21

22

23

24

25

Electronically signed by Gina Rodriquez (201-182-126-9514)
Electronically signed by Gina Rodriquez (201-182-126-9514)

72ecbdd8-9ed6-4d44-ae56-8b8592170e9b