# EXHIBIT G

Page 380

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF LOUISIANA
2
     IN RE:  TAXOTERE (DOCETAXEL)   MDL NO. 2740
3    PRODUCTS LIABILITY LITIGATION   SECTION: H
4    This document relates to:
     Antoinette Durden, Case No. 2:16-cv-16635
5    Tanya Francis, Case No. 2:16-cv-17410
     Barbara Earnest, Case No. 2:16-cv-17144
6    _____
     CONTINUING VIDEOTAPED EXPERT DEPOSITION
7    CURTIS THOMPSON, M.D.
8
     TAKEN IN BEHALF OF DEFENDANTS
9    WEDNESDAY, APRIL 3, 2019
     at 8:35 A.M.
10
11
     5200 Meadows Drive
12   Lake Oswego, Oregon
13
14   BE IT REMEMBERED THAT, the continuing videotaped expert
15   deposition of CURTIS THOMPSON, M.D., was taken before
     K.M, Court Reporter and Notary Public for
16   the State of Oregon, on Wednesday, April 3, 2019,
     commencing at the hour of 8:35 a.m., the proceedings being
17   reported at 5200 Meadows Drive, Lake Oswego, Oregon.
18
19
20
21
22
23
24
25

Page 398

1    it's not a stem cell anymore.

2        Q.   So you did the Cytokeratin 15 stain.  And

3    the Cytokeratin 15 stain is a stain to see if

4    there's stem cells in the bulge region of the hair

5    follicle?

6        A.   Not entirely, no.

7        Q.   How is that inaccurate?

8        A.   It's not a definitive stem cell marker.

9    It stains other cells.

10       Q.   The stem cells are present, the

11   Cytokeratin 15 stains are positive, right?

12       A.   Yes, that's fair to say.

13       Q.   And if the stem cells were destroyed in

14   the bulge region, there would be -- the Cytokeratin

15   15 stain would test negative?

16       A.   Probably, yes.  It could stain other cells

17   though.  I already said it stains other cells other

18   than stem cells.  So it stains all basal cells of

19   the follicle. So even if they're destroyed, it could

20   still have staining of other cells.  It's not a

21   specific marker.

22       Q.   Ki-67 stain is a stain to test to see if

23   cells are dividing, right?

24       A.   Growing not dividing.

25       Q.   What's the distinction between growing and

1  dividing?

2      A.   Growing is growing.  And dividing is when

3  a cell is going from one cell into two.  It's a

4  specific moment.

5      Q.   The thought is with the Ki-67 stain is if

6  the stem cells were not present they would not be

7  growing and so it would test negative, right?

8      A.   No.

9      Q.   Why did you do the Ki-67 stain?

10      A.   This was all part of -- you know, as I

11  said before, I'm a researcher in hair loss, and it

12  was an investigational project, just a pilot project

13  to look at permanent chemotherapy-induced alopecia

14  and what it showed with these stains.  If you look

15  at the published research that I do, it's centered

16  around using these non FDA-approved investigational

17  antibodies to look for characteristics of the

18  different diseases.

19      Q.   The hypothesis for why you did the Ki-67

20  staining was that if the chemotherapy had killed the

21  stem cell, the Ki-67 would test negative?

22      A.   No.  No, it's not that.  It's more

23  complicated.

24      Q.   Can you explain it?

25      A.   These -- these antibodies, as I said, are

1   nonspecific.  Like the Cytokeratin 15 is not a

2   definitive stem cell marker, and Ki-67 hits any cell

3   that's growing. And you use these and published with

4   the Cytokeratin 15 on other hair diseases, permanent

5   hair diseases.  So the interest was in seeing what

6   might be different in this disease than the other

7   diseases.

8            Unfortunately, we don't have, like, all

9   these investigational antibodies.  We -- like, 25

10  years ago we had two of them and we got more.  But

11  we don't have really good definitive antibodies.

12  And to date, even despite all the work I've done,

13  there's no antibody that has -- one of these non

14  FDA-approved antibodies that has utility in

15  diagnostics.

16       Q.   You would expect if a cell was dead, like

17  a stem cell, that the Ki-67 would test negative,

18  right?

19       A.   No.  Dead cells have antigens too, so they

20  can still stain.

21       Q.   They wouldn't be growing if they were

22  dead, would they?

23       A.   They could still have these antigens.

24  They could still have the molecule there so --

25       Q.   If a cell was not present, the Ki-67 would

Page 401

1    test negative for that --

2         A.    If there's no cell there, it can't stain

3    with anything.  That is safe to say.

4         Q.    That would be true if there's no cell

5    there, the Ki-67 and the Cytokeratin 15 would test

6    negative for that cell?

7         A.    Yeah, because it's not there.

8         Q.    Okay.  So you did Cytokeratin 15 staining

9    and Ki-67 staining on Ms. Earnest, Ms. Francis, and

10   Ms. Durden's pathology, right?

11        A.    Yes.

12        Q.    So whose idea was it to do that staining?

13        A.    It was my idea.

14        Q.    So during your first deposition, we talked

15   about mechanisms of action.  Do you remember that?

16        A.    Vaguely, yes.

17        Q.    In your Rule 26 report, you attached a

18   list of literature that you reviewed.  Do you

19   remember that?

20        A.    Yes.

21        Q.    Some of the literature that you relied on

22   in forming your opinions has hypothesized that the

23   theoretical mechanism of action for why a

24   chemotherapy drug could potentially result in

25   persistent hair loss is that it kills the stem cell

Page 402

1   in the bulge region of the hair follicle, right?

2       A.   Yes.

3       Q.   And, in fact, you've published on that as

4   well, haven't you?

5       A.   Speculated.  We don't know, unfortunately.

6   But yeah, we've speculated in a review article.

7       Q.   You speculated that the theoretical

8   mechanism of action for why a chemotherapy drug

9   might result in ongoing hair loss is that it would

10  kill the stem cell in the bulge region, right?

11      A.   In permanent hair loss, not -- yes, that

12  the cells die.

13          (Whereupon, Article Primary Scalp Alopecia

14  was marked as Exhibit 5 for identification.)

15  BY MR. SEARS:

16      Q.   We talked about this article before but

17  I'm going to mark it as Exhibit 5, an article that

18  you wrote called Primary Scalp Alopecia, New

19  Histopathological Tools, New Concepts and a

20  Practical Guide to Diagnosis.

21      A.   Yes.

22      Q.   And really what I want to focus on is page

23  57.4.  What you wrote is "Noncicatricial alopecia

24  cannot be considered as synonymous to reversible

25  hair loss. Permanent alopecia after chemotherapy is

1        A.    And I started reading.

2        Q.    Sure.  Here's really the point I'm trying

3    to make is what you're hypothesizing here, in this

4    paper that you wrote, is that the mechanism of

5    action -- the theoretical mechanism of action for

6    why a chemotherapy drug would result in ongoing hair

7    loss after the completion of chemotherapy is that

8    there would be some toxicity of the drug that would

9    harm the follicular stem cell, right?

10        A.    Yes.

11        Q.    I think you referred to earlier that

12    you've published on Cytokeratin 15?

13        A.    Several times -- a couple times.

14             (Whereupon, Article was marked as Exhibit

15    6 for identification.)

16    BY MR. SEARS:

17        Q.    So I'm handing you Exhibit 6 which is a

18    reply to Lack of Specificity of Cytokeratin 15 Loss

19    in Scarring Alopecia, and this is something that you

20    wrote along with -- I'm going to butcher this guy's

21    name but Athenos Kolivras.

22        A.    Kolivras, Athanassios.

23        Q.    Okay.  So on the bottom of the first giant

24    paragraph there's CK-15, which that stands for

25    Cytokeratin 15, right?

Page 412

1    like we've done with every other published disease.

2          Q.    I guess the flip side, if it wasn't caused

3    by chemotherapy -- if the alopecia wasn't cause by

4    chemotherapy, what staining pattern would you expect

5    to see with Cytokeratin 15?

6                MR. THORNTON:  Objection, form.

7                THE WITNESS:  Well, they're all different

8    patterns so -- one of the big points in these, as

9    you have said, once the follicle is gone or the cell

10   is gone, there's no staining anymore because there's

11   nothing to stain.  It's not there anymore.  So if

12   it's not there anymore, you can't stain it and

13   that's about the best we do.

14   BY MR. SEARS:

15         Q.    So if the stem cell was gone, it wasn't

16   present, the Cytokeratin 15 would not stain it

17   positively, right?

18               MR. THORNTON:  Objection, form.

19               THE WITNESS:  If the stem cell's gone,

20   there's nothing to stain.

21   BY MR. SEARS:

22         Q.    And so if a chemotherapy drug killed the

23   stem cell in the bulge region and the stem cell is

24   gone, the Cytokeratin 15 would stain negative?

25         A.    But it could still stain --

Page 419

1  ago, there were only, like, three of them.  And now

2  we have many, many of them, so we are always in an

3  investigational way trying to look for utility and

4  pathology diagnostics.  And the center of my

5  research is looking for diagnostic impasses in hair

6  loss.  So when we can't tell one entity from

7  another, we're hoping that these -- these

8  immunohistochemical stains might help us in making

9  distinctions.

10        So my interest was really not down at a

11  stem cell level.  I hope I made that clear.  It was

12  looking at histopathology as a hair loss pathology

13  expert to see if there is any staining pattern that

14  had any utility in distinguishing it from other

15  diseases.  So it's really at a much more diagnostic

16  level as a pathologist.

17        That being said, everything that I

18  published, which you have it all, has almost

19  entirely failed to find any antibodies that have

20  utility in this.  Most of these antibodies have

21  shown utility in cancer diagnostics, like melanoma.

22  But in inflammatory rashes, dermatitis, and in hair

23  loss disease there has been very little utility.

24  BY MR. SEARS:

25        Q.   So you were doing the Cytokeratin 15

Page 420

1    staining on Ms. Earnest, Ms. Francis, and Ms. Durden

2    to see if you could find anything that would

3    distinguish it from any other type of alopecia?

4        A.   Yeah, just different staining pattern.

5        Q.   And you did not see anything that

6    distinguished it?

7        A.   No.  And I indicated that, too, quite

8    early in an email.

9        Q.   So let's run through a timeline of when

10   you got the pathology and when you did the testing.

11       A.   Can I get my soda?

12       Q.   Yeah, definitely.

13           (Whereupon, Email dated 3-27-18 was marked

14   as Exhibit 7 for identification.)

15   BY MR. SEARS:

16       Q.   So I've just handed you Exhibit 7, and

17   it's an email exchange that starts on March 27,

18   2018.

19       A.   Yes.

20       Q.   Okay.  So on March 27, 2018 at 4:25 p.m.,

21   Antonella Tosti wrote "Dear Curtis, I will have Anne

22   Andrews to contact you again."  And Anne Andrews is

23   an attorney for the plaintiffs' counsel, right?

24       A.   Yes.

25       Q.   Then it goes on to say "They have

1    possession. So I hadn't thought -- no.

2        Q.   Had you thought about doing stem cell

3    markers on any pathology that you ever had that you

4    thought was -- the alopecia was caused by

5    chemotherapy?

6            MR. THORNTON:  Objection; form.

7            THE WITNESS:  No, not to my knowledge.

8    BY MR. SEARS:

9        Q.   Did you have any discussions with Dr.

10   Tosti about what stem cell markers you were going to

11   use in testing the pathology?

12       A.   Not to my knowledge, I didn't.

13       Q.   Did you have discussions with her that you

14   were going to use Cytokeratin 15 with Ms. Earnest,

15   Ms. Francis, and Ms. Durden's pathology?

16       A.   I don't have any recollection of that.

17   Unless -- I don't think I sent it in an email, and

18   it wasn't one of our working research items.  We

19   have meetings on the phone, and so it's unlikely

20   that we talked about that.  I don't -- I don't have

21   any recollection of that.

22       Q.   Did you talk to Dr. Tosti about the

23   results of the Cytokeratin 15 and Ki-67 staining for

24   Ms. Francis, Ms. Durden, and Ms. Earnest?

25       A.   I think it was limited to the email.  She

Page 426

1    was cc'd on an email.

2        Q.   You never had any conversations outside of

3    email with her about --

4        A.   I don't believe so.

5        Q.   So we talked about how Anne Andrews was

6    cc'd on that email, right?

7        A.   We didn't, but is she?

8        Q.   She's cc'd on this email string, isn't

9    she?

10       A.   Yes.

11       Q.   And she's an attorney for plaintiff?

12       A.   Yes.

13       Q.   And so based upon this email, she knew

14   that Dr. Tosti proposed that there would be stem

15   cell marker testing on the pathology, right?

16            MR. THORNTON:  Objection; form.

17            THE WITNESS:  Yes.  Yes.

18   BY MR. SEARS:

19       Q.   So then, if we go up to the top of that

20   email, there's an email from Anne Andrews on

21   Wednesday, March 28, 2018 at 11:53 a.m.  Do you see

22   that?

23       A.   Yes.

24       Q.   And she writes "I'm traveling today and

25   tomorrow so hoping to touch base with you, with Dr.

Page 432

1    Durden, and Ms. Francis' pathology?

2         A.    Yes.  And the Ki-67 antibody also.

3         Q.    And you decided to use Cytokeratin 15 and

4    Ki-67?

5         A.    Yes.

6         Q.    Had you had discussions with Anne Andrews,

7    other plaintiffs' attorneys, any retained experts

8    before this April 5th email about why you decided to

9    use Cytokeratin 15?

10             MR. THORNTON:  Objection; form.

11             THE WITNESS:  I don't believe so.  No.

12   BY MR. SEARS:

13        Q.    Why did you decide to use Cytokeratin 15

14   as opposed to any other stem cell marker?

15             MR. THORNTON:  Objection; form.

16             THE WITNESS:  It's the only

17   investigational antibody that I have experience with

18   that works.  In my prior publications, we tried

19   another system cell marker that didn't work and so I

20   wasn't going to go back to that. This is very

21   expensive testing to get up running.

22   BY MR. SEARS:

23        Q.    Which stem cell marker had you used

24   previously that didn't work?

25        A.    Well, we just -- we just purchased and

Page 439

1    email?

2         A.   Yes.

3         Q.   And Antonella Tosti is -- Dr. Tosti is

4    plaintiffs' retained expert?

5         A.   Yes.

6         Q.   So on the second paragraph in your email

7    you write "We are testing the Cytokeratin 15

8    immunohistochemistry test today and hope to stain

9    these cases later tomorrow or Wednesday morning.  In

10   the event the Cytokeratin 15 findings do not add to

11   the information, I will issue my reports without

12   that information."  Do you see that?

13        A.   Yes.

14        Q.   And you ended up issuing your reports

15   without that information, didn't you?

16        A.   Yes.

17        Q.   When you write add to the information,

18   what were you expecting to see that would add to the

19   information?

20             MR. THORNTON:  Objection; form.

21             THE WITNESS:  Well, the -- I mean, as I

22   said in the last sentence, just to emphasize the

23   findings on the H&E slides alone are quite

24   convincing, shows permanent loss of larger hair

25   follicles.  So my -- what did I expect to see?  We

1    BY MR. SEARS:

2        Q.    That's speculation on your part for why

3    Dr. Tosti would have included that suggestion that

4    you all do stem cell markers on the pathology, isn't

5    it?

6        A.    It's speculation, but it's true.

7        Q.    So the bottom line is Dr. Tosti suggested

8    that you all do stem cell markers on the pathology.

9    You did stem cell markers on the pathology and you

10   never communicated the results of that stem cell --

11            MR. THORNTON:  Objection; form.

12            THE WITNESS:  I think I did.  We have to

13   see the next email when I told everybody.  The

14   extent of it to her would have just said it has no

15   use.  This doesn't show anything.  That would have

16   been the limit of it.  Because she -- like I said,

17   she's not a dermatopathologist so I don't -- there's

18   not more to explain there to her.

19   BY MR. SEARS:

20       Q.    So you believe that Dr. Tosti knew that

21   the results of your Cytokeratin 15 and Ki-67

22   staining did not point in favor of -- in favor or

23   against ongoing alopecia after the completion of

24   chemotherapy?

25            MR. THORNTON:  Objection; form.

Page 447

1           THE WITNESS:  Yes.

2           (Whereupon, Invoice 1 was marked as

3    Exhibit 11 for identification.)

4    BY MR. SEARS:

5      Q.   I'm handing you Exhibit 11, which is your

6    first invoice.  We talked about this last time but

7    you have all these entries about the

8    immunohistochemical staining for Cytokeratin 15 and

9    Ki-67 for Ms. Earnest, Ms. Francis, and Ms. Durden.

10   Do you see all that?

11     A.   Yes.

12     Q.   And then after you did all that staining

13   and you interpreted it, you had a call with Andrews,

14   Tosti, et cetera, on April 25th, 2018.  Do you see

15   that?

16     A.   Yes.

17     Q.   What was discussed during that telephone

18   call?

19     A.   I think they had already -- so this is

20   after I'd already signed off on all the reports.

21           THE VIDEOGRAPHER:  Excuse me, sir.

22           THE WITNESS:  I'm sorry.  Do you need it

23   higher?  Just don't touch it?

24           THE VIDEOGRAPHER:  No.  We just can't have

25   you touch the top of it.

Page 467

1    So that ship had sailed.  So I just wasn't going

2    back.

3    BY MR. SEARS:

4        Q.   As a researcher were you curious to see if

5    there would be any difference in the Cytokeratin 15

6    and Ki-67 staining with Ms. Tuyes versus Ms.

7    Francis, Ms. Durden, and Ms. Earnest?

8            MR. THORNTON:  Objection; form.

9            THE WITNESS:  Yeah, it would be

10   interesting, for sure.  I didn't think it was

11   prudent to do it in the context of legal expertise

12   work, legal expert work and spend money on any more

13   pilot study, provisional study.

14   BY MR. SEARS:

15       Q.   Did plaintiffs' attorney pay you to do the

16   Cytokeratin 15 and Ki-67 staining on Ms. Earnest,

17   Ms. Durden, and Ms. Francis?

18       A.   Yes.

19       Q.   I think you mentioned earlier that that's

20   expensive staining?

21       A.   It's very expensive because it's an

22   investigational antibody.  It's non FDA approved, so

23   when you buy these, as we've talked about, you have

24   to take them and do assessment of them in your own

25   laboratory before you put it on any tissue, like on

1   these patients. So that's the biggest expense.

2         Q.    And obviously, I'm not a scientist or have

3   any ability to be a scientist and that's why I

4   became an attorney, but you as a scientist, when you

5   test something, don't you go into that test with

6   having a hypothesis?

7         A.    Yes.

8         Q.    And so here's what I'm trying to

9   understand, you've talked about how the Cytokeratin

10  15 and Ki-67 staining is expensive.  So what was

11  your hypothesis about what you were going to see

12  with that staining with Ms. Earnest, Ms. Francis,

13  and Ms. Durden?

14              MR. THORNTON:  Objection; form.

15              THE WITNESS:  The interest -- once again,

16  as I said before and is supported by the

17  publications that I have -- the research projects

18  that I've done and published on other diseases like

19  lichen planopilaris, and then the letter in 2017,

20  have a great interest in staining patterns of these

21  antibodies.  And I've done multiple projects where I

22  take a panel of antibodies and put them on tissue,

23  specifically trying to address diagnostic impasses.

24              So my interest isn't in basic, basic,

25  basic cell biology.  It's in identifying new

```
1        Q.    Then you go on to say "I don't know if he
2   had access to my data on this, but I already did
3   this for Cytokeratin 15 on these samples."  And the
4   reason I'm emphasizing "these" is because it's the
5   plaintiffs in this case?
6        A.    Right.
7        Q.    And so the way I read those two sentences
8   is that these samples were the same samples that
9   were being tested in the video that you watched?
10       A.    No.  The video I watched was simply just
11  proposing a project.  No testing had been done at
12  that point.  It was just saying this is how it will
13  be done.
14       Q.    So it's your testimony that this
15  researcher that's redacted in this email never
16  tested the pathology for Ms. Francis --
17       A.    No.  He never --
18       Q.    --  Ms. Durden, and Ms. Earnest?
19       A.    -- got within a thousand miles of their
20  tissue or any other tissue from my lab.
21       Q.    And it goes on to say "Perhaps I need to
22  meet with him and share this data.  As the
23  Cytokeratin 15 was still positive in the basaloid
24  bodies and the pCIA cases, I did not pursue this
25  further."  Did I read that correctly?
```

Page 491

1      A.    Yes.

2      Q.    Did you end up talking to him?

3      A.    No.  I don't believe so.

4      Q.    Do you know --

5      A.    He was on a call but I don't know if it

6   was before or after this.  Maybe it was after.

7      Q.    So you did talk to this researcher at some

8   point?

9      A.    There was a conference call that he was

10  on. Yeah.  I just didn't want him to recreate the

11  wheel here and redo something I'd done and go down a

12  dead end.  It didn't seem worth it.

13     Q.    On that call did you have any discussions

14  about stem cell testing?

15     A.    The call was basically the -- what he was

16  going to do and my part was going to be provide

17  tissue, validation tissue, and then potential

18  testing tissue that wouldn't involve patients in

19  this case.  We had -- you know, we only had nine

20  unstained slides and we had the three H&Es and we

21  didn't want to compromise these specimens at all.

22     Q.    So in the email you write that the

23  Cytokeratin 15 was still positive in the basaloid

24  bodies.  And that refers to the tissue from Ms.

25  Durden --

```
 1        A.   Yes.

 2        Q.   -- Ms. Francis, and Ms. Earnest?

 3        A.   Yes.

 4        Q.   So the Cytokeratin 15 tested positive in

 5   Ms. Earnest, Ms. Durden, and Ms. Francis' tissue?

 6        A.    In these structures, yeah.  We use --

 7        Q.    You wrote because it tested positive you

 8   did not pursue this further, right?

 9        A.   Yes.

10        Q.    If it tested negative, would've you

11   pursued it further?

12        A.   Yes.

13        Q.   Because it tested positive in Ms. Earnest,

14   Ms. Francis, and Ms. Durden, is that an indication

15   to you that their stem cells were not damaged?

16             MR. THORNTON:  Objection; form.

17             THE WITNESS:  No.  Because we're talking

18   about these basaloid bodies here.  And we don't --

19   there's a whole glob of these cells also called

20   telogen bodies, and they're not stem cells.  Maybe

21   one of them is.

22   BY MR. SEARS:

23        Q.   You talked about how if it did test

24   negative, you would have pursued it further.

25   Would've you pursued it further, then, because it
```

1    person referred to in Invoice 5?

2         A.   No.

3         Q.   Did you have any emails with that person

4    referred to in Invoice 5?

5         A.   No.

6         Q.   So your sole contact with that person was

7    having your lab send that person the pathology?

8         A.   The glass slides, the H&E glass slides.

9    Yes.

10        Q.   So we initially took your deposition -- I

11   think it was on November 30, 2018.  Do you recall

12   that?

13        A.   Yes.

14        Q.   And during that deposition, you did not

15   mention that you ran Cytokeratin 15 or Ki-67

16   staining on the pathology for Ms. Earnest, Francis,

17   or Durden, right?

18        A.   Correct.  Yes.

19        Q.   And you also didn't mention during that

20   deposition that there's existence of additional

21   pathology material that had not been provided to the

22   defense, right?

23        A.   I did not.  No, I didn't.

24        Q.   And then you were deposed again on

25   February 26, 2019, about your invoices.  Do you