## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)                          MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

                                                     SECTION "H" (5)

THIS DOCUMENT RELATES TO:

Barbara Earnest, Case No. 2:16-cv-17144.

---

### SUPPLEMENTAL MEMORANDUM IN SUPPORT OF SANOFI DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. JOHN W. THOMPSON, JR.

---

Dr. Thompson's opinions are inadmissible for the reasons set forth in Sanofi's initial Motion to Exclude Expert Testimony of Dr. John W. Thompson, Jr. (Rec. Doc. 6141). Since the filing of that Motion, on April 17, 2019, Dr. Thompson sat for a supplemental deposition during which he testified that he considered new information following his January 16, 2019 deposition, including thousands of pages of medical records and deposition testimony, and a second interview of Mrs. Earnest conducted the afternoon before his supplemental deposition. While Dr. Thompson does not believe any of this new information he considered warrants a supplemental expert report, the testimony he gave at his supplemental deposition provides additional reasons why Dr. Thompson's opinions are inadmissible.

First, regarding his lack of qualifications to testify about Mrs. Earnest's psychological condition, Dr. Thompson's supplemental deposition revealed that he conducted a second interview of Mrs. Earnest because he did not know (and had not thought to inquire) about issues critical to his diagnosis, which were first raised by Sanofi's counsel at his January 16, 2019 deposition. The fact that Dr. Thompson lacked answers to important diagnostic questions until after a lawyer

brought them to his attention plainly demonstrates his lack of expertise to opine on the alleged psychological symptoms and disorder at issue in this case.

Second, Dr. Thompson's supplemental deposition confirmed his opinions are unreliable. Dr. Thompson failed to apply his own stated standards of forensic practice to his review of the new information. He cherry-picked facts and ignored information, including medical records and psychological test results, that were contrary to his original opinion and diagnosis, and he failed to recognize that the interview statements he relies on for his opinion and diagnosis directly contradict Mrs. Earnest's sworn deposition testimony. Such opinions are inadmissible under Rule 702.

For these additional reasons, the Court should grant Sanofi's Motion and exclude the expert testimony of Dr. Thompson.

## **ARGUMENT**

### I.   **DR. THOMPSON'S OPINIONS ARE INADMISSIBLE BECAUSE THEY ARE OUTSIDE HIS AREA OF EXPERTISE.**

At his January 16, 2019 deposition, questioning by Sanofi's counsel revealed that Dr. Thompson did not know (and had not thought to inquire) about two issues critical to his diagnosis: (1) when Mrs. Earnest's alleged adjustment disorder began, and (2) whether Mrs. Earnest met the first DSM-5 adjustment disorder criterion – *i.e.* development of symptoms within three months of the identifiable stressor (in this case, the realization that her alleged hair loss was permanent). *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-5") at 286-87 (5th ed. 2013); Thompson Dep. Vol. I 287:4-14; 287:16-20; 288:8-18; 290:1-11 (Ex. A).

Dr. Thompson then set out to find the answers to those two questions; he held a second interview with Mrs. Earnest the afternoon before his April 17, 2019 supplemental deposition to "clarify" both when she thought her alleged hair loss was permanent and when her symptoms began – issues he was previously unaware were critical to his diagnosis.  Thompson Dep. Vol. III 59:1-60:1 (Ex. B).  Dr. Thompson still does not know when Mrs. Earnest's alleged "emotional or behavioral symptoms" began and whether they have changed in severity over time.  *See id.* at 59:2-66:5.  The fact that Dr. Thompson did not ask, and, therefore, had no answers to these questions until after a lawyer brought them to his attention – even though the  answers are directly relevant to the applicable DSM-5 criteria and required for an adjustment disorder diagnosis  – is illustrative of his lack of expertise.  The Court should exclude his opinions under Rule 702.  *See, e.g.*, *Mancuso v. Consol. Edison Co. of New York*, 967 F. Supp. 1437, 1445 (S.D.N.Y. 1997) (excluding expert based on lack of qualifications, including "his inability to answer basic questions" about the subject matter of his opinion).

## II.     DR. THOMPSON'S OPINIONS ARE INADMISSIBLE BECAUSE THEY ARE UNRELIABLE.

### A.     Dr. Thompson "cherry picked" certain facts and ignored others that contradicted or failed to support his original opinion and diagnosis.

Courts have consistently excluded expert opinions that "cherry pick" facts and fail to explain results that contradict their conclusions.  *See, e.g*, *Burst v. Shell Oil Co.*, 2015 WL 3755953, at *13 (E.D. La. 2015), *aff'd*, 650 F. App'x 170 (5th Cir. 016) (excluding expert's opinion because, *inter alia*, he "cherry-picks data from studies in several significant instances and fails to explain contrary results in a manner that belies the reliability of his methodology");  *Konrick v. Exxon Mobil Corp*., 2016 WL 439361, at *13 (E.D. La. Feb. 4, 2016), *aff'd*, 670 F.

App'x 222 (5th Cir. 2016) (excluding expert's opinions, because, *inter alia*, she "cherry-picks data and fails to explain results that contradict her conclusion"; noting such failure "casts doubt on the reliability of her methodology");   *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig*. (No. II), 341 F. Supp. 3d 213, 296 (S.D.N.Y. 2018) (excluding opinion because the expert's "cherry-picking approach is at odds with principles of sound science");   *Barber v. United Airlines, Inc*., 17 F. App'x 433, 437 (7th Cir. 2001) ("Because in formulating his opinion Dr. Hynes cherry-picked the facts he considered to render an expert opinion, the district court correctly barred his testimony because such a selective use of facts fails to satisfy the scientific method and *Daubert*, and it thus fails to 'assist the trier of fact.'").   Such is the case with Dr. Thompson's opinions:

### i. Dr. Thompson ignored collateral objective evidence that was inconsistent with Mrs. Earnest's reported symptoms and diagnosis.

Dr. Thompson testified that a forensic psychiatrist should "carefully review collateral records to assess specific symptoms, their severity and their time course."  Thompson Dep. Vol. I 126:2-14 (Ex. A).  In doing so, he "typically look[s] at the story the person gives me versus . . . information on the medical record" to see if the version of events is "consistent" (*id.* at 92:3-9), and, specific to Mrs. Earnest, he would determine "if there were any other references in the medical records to other psychiatric issues or to hair loss . . ."  *Id.* at 25:1-6.  Upon review of the medical records, Dr. Thompson testified "there was nothing in the record about her seeking out care for emotional symptoms that I could find."  Thompson Dep. Vol. III 83:4-12 (Ex. B).   Instead of considering that fact (*i.e.* the absence of any evidence in the medical records that Mrs. Earnest sought out care for emotional distress) in forming his opinions, he ignored it and instead decided

4

to go solely with Mrs. Earnest's subjective version of events regarding her alleged emotional symptoms.  Such cherry picking of facts and data renders his opinion inadmissible.

Dr. Thompson likewise ignored the results of psychiatric testing and his stated requirement that psychological testing back up interview statements.  *Id.* at 75:22-23; 77:20-24.  Despite testifying that "testing is more objective than sitting down with a person discussing issues with them or trying to determine that subjectively" (*id.* at 91:16-20), and that "this is a case where I wanted to make sure that in addition to whatever I found in my evaluation, that there was testing to back what we found in the evaluation" (*id.* at 77:20-24), Dr. Thompson disregarded the objective results of Mrs. Earnest's psychological testing – results that showed no impaired social functioning and no depressive or anxious features.  Thompson Earnest Rpt. (Ex. C); Bianchini Earnest Rpt. and MMPI-2 Testing (Ex. D).

Because Dr. Thompson failed to consider contrary objective evidence and failed to follow his guidelines and those set forth in the psychiatric community, his opinions are unreliable and should be excluded.

### ii. Dr. Thompson's opinion is premised on "facts" directly refuted by Mrs. Earnest's own sworn deposition testimony.

Mrs. Earnest's sworn deposition testimony directly contradicts the very interview statements on which Dr. Thompson now relies for his opinions and diagnosis.  Dr. Thompson agreed that Mrs. Earnest did not complain to her primary care physician about her hair until July 26, 2018 – nearly seven years after chemotherapy and after filing her lawsuit.  Thompson Dep. Vol. III 115:15-117:3 (Ex. B).  Yet, he did not ask Mrs. Earnest why she never complained until after she had filed her lawsuit because he "wasn't thinking about that at the time" he diagnosed

5

Mrs. Earnest.  *Id.* at 88:20-25; 118:24-119:5.  Hence, another reason for his second interview of Mrs. Earnest was to determine why she never complained about or sought treatment for her hair loss if in fact she was suffering from the significant emotional symptoms she reported to him: "That's why I did a second interview. I just wanted clarification on that.  So I can't ask every single question.  I don't do perfect interviews.  I do good enough interviews." *Id.* at 87:10-88:1.

At the outset of the second interview, Dr. Thompson specifically asked Mrs. Earnest why she did not complain or seek treatment for her alleged hair loss until after filing her lawsuit.  *Id.* at 59:1-60:1.  Mrs. Earnest told him "she knew she was taking Arimidex and that could cause some hair thinning or had a hair side effect; and so maybe it was due to that and that some day [sic] it might come back." *Id.* at 59:13-17.  She told him that up until the time she saw a television commercial in 2015 or 2016, she was taking Arimidex and thought her hair loss could be from the Arimidex.  *Id.* at 60:2-6.  However, Mrs. Earnest's sworn deposition testimony directly contradicts both her statement that she knew Arimidex can cause hair loss and that she did not seek treatment because she thought her hair loss may be due to Arimidex:

288
23 Q.  Mrs. Earnest, did any doctor ever talk to
24 you about the risks or benefits of Arimidex?
25 A.  Not that I recall.
289
 1 Q.  Do you remember anybody telling you about
 2 side effects of Arimidex?
 3 A.  They could have. I don't know what they
are right now.
. . .
291
1 Q.  Have you ever thought it possible that
2 Arimidex is contributing to the condition, the
3 current condition of your hair?
4 A.  No.

6

5 Q.   But you've never done any research on it
6 either, correct?
7 A.   No.
8 Q.   You've always thought the condition of
9 your hair was related to chemotherapy, correct?
10 A.   Correct.

Earnest Dep. at 288:23-289:3; 291:1-10 (Ex. E).

Dr. Thompson's reliance on Mrs. Earnest's interview statements in order to maintain his original opinions and diagnosis of an adjustment disorder is not the product of reliable principles and methods and should be excluded.  *See* FED. R. EVID. 702(c)-(d).

**B.  Dr. Thompson's diagnosis is based on an improper application of the DSM-5 Adjustment Disorder criteria.**

Dr. Thompson concedes he does not have knowledge of the data or information necessary to evaluate the second DSM-5 criterion for an adjustment disorder diagnosis of Mrs. Earnest – "[m]arked distress that is out of proportion to the severity or intensity of the stressor . . . ."  DSM-5 at 286-87.  Dr. Thompson admits it is unclear to him what a normal reaction to persistent hair loss after chemotherapy would be, stating "I don't know one way or the other" whether or not Mrs. Earnest's level of distress is any different than what most people would experience.  Thompson Dep. Vol. III 71:20-72:11; 135:15-136:14 (Ex. B).  Without knowledge of the information necessary to apply the DSM criteria, Dr. Thompson cannot reliably make a differential diagnosis or determine if Mrs. Earnest's symptoms satisfy the criteria.

## CONCLUSION

For the foregoing additional reasons, the Sanofi Defendants respectfully request that the Court exclude the opinions and testimony of Dr. John W. Thompson, Jr., in their entirety from the

above-captioned case.

Date:  June 4, 2019

Respectfully submitted,

/s/ Douglas J. Moore
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE  URQUHART & MOORE LLC**
400 Poydras Street, Suite 2700
New Orleans, LA  70130
Telephone: 504-310-2100
Facsimile:  504-310-2120
dmoore@irwinllc.com

Harley Ratliff
Adrienne L. Byard
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
Facsimile:  816-421-5547
hratliff@shb.com
abyard@shb.com

*Counsel for Sanofi-Aventis U.S. LLC and
Sanofi U.S. Services Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2019, I electronically filed the foregoing with the
Clerk of the Court using the ECF system which sent notification of such filing to all counsel of
record.

/s/ Douglas J. Moore