**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

In Re: TAXOTERE (DOCETAXEL)                    **MDL NO. 2740**
PRODUCTS LIABILITY LITIGATION

                                               **SECTION "H" (5)**

THIS DOCUMENT RELATES TO
Antoinette Durden, Case No. 2:16-cv-16635

<u>**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO**</u>
<u>**SANOFI'S MOTION FOR SUMMARY JUDGMENT**</u>
<u>**BASED ON THE STATUTE OF LIMITATIONS**</u>

MAY IT PLEASE THE COURT:

Sanofi first raised the issue of statute of limitations almost two years ago in its May 26, 2017 omnibus motion to dismiss approximately 850 of the 1,100 then-pending cases, including bellwether Plaintiff Antoinette Durden's case.  (*See* Mot. to Dismiss, May 25, 2017 Rec. Doc. 494).  There, based off a belabored reading of the PSC's Master Complaint, Sanofi claimed that all plaintiffs should know their hair loss is permanent at exactly six months after completing chemotherapy with Taxotere/docetaxel.  The Court declined to implement this type of *de facto* trigger date for statute of limitations, deferring ruling on Sanofi's omnibus motion and noting "it is more appropriate to address this type of motion once a flight of plaintiffs has been examined through discovery." (*See* Order and Reasons, Oct. 27, 2017, Rec. Doc. 1034).

Sanofi now moves to dispose of Ms. Durden's case again, relying on the same inaccurate notion presented in Sanofi's omnibus motion from 2017—namely, that all cancer survivors should know their hair loss is permanent six months after completing chemotherapy with Taxotere/docetaxel.  But Sanofi does not even believe this, claiming in another dispositive motion that Taxotere does not cause permanent alopecia. (Mot. Summ. Judg. Rec. Doc. 6132-2 at 9).  If a

1

drug company, with all of its internal testing and scientific knowledge, insists that hair loss six months after chemotherapy does not create a corporate expectation that hair is permanently gone, how can that same drug company argue that cancer patients who took their drug should have known after six months that their hair would never grow back? Sanofi raises a statute of limitations defense that asks the court to hold the Plaintiffs at a higher scientific standard of knowledge than the drug company that designed, tested, and warned only of temporary hair loss.

Ms. Durden was obviously aware that her hair had not regrown following her use of a chemotherapy cocktail.  However, she had been counseled, prior to undergoing chemotherapy, that her hair loss would be temporary.  When Ms. Durden's hair grew back around the sides of her scalp, but remained bald with sparse hairs on the top of her scalp, she held out hope based on her doctor's warning that her hair loss would be temporary in nature.  In hopes of accelerating her hair regrowth, Ms. Durden sought the assistance of various physicians, none of whom informed Ms. Durden that she was suffering from permanent hair loss caused by Taxotere.  It was not until 2016, when she saw an advertisement concerning Sanofi's failure to disclose information about permanent hair loss associated with the use of Taxotere, that Ms. Durden first became aware that she had been harmed by Sanofi's drug.   Even assuming *arguendo* a duty to investigate had been triggered by her hair loss, the facts show that Ms. Durden conducted a reasonable investigation through visits to multiple doctors that proved futile because of Sanofi's continuing concealment of any causal association between Taxotere and permanent hair loss through the end of 2015. Regardless of any investigation she may have done, the result would be the same.

Accordingly, summary judgment is improper because the facts, viewed in light most favorable to the non-movant, demonstrates that Ms. Durden was not aware of her injuries or their causal relationship to Taxotere more than a year prior to filing her lawsuit.

**LEGAL STANDARD**

Summary judgment is improper unless the moving party shows there is no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  To satisfy this initial burden, the movant must inform the court of the basis for the motion and identify the portions of the record that show the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In *Celotex*, the Supreme Court plainly stated:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

*Id.*

If the moving party fails to meet this initial burden, the motion for summary judgment must be denied, regardless of the non-movant's response.  *See Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995).  "If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir. 1995).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the Court is to determine whether "there is a genuine issue for trial." *Id.* at 249.  When the non-movant produces evidence contradicting the movant's facts, a motion for summary judgment should be denied because the evidence and all reasonable inferences drawn from the evidence must be viewed in the light most favorable to the

non-moving party. *Id.* at 255; *see also Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528 (5th Cir. 1997).

Generally, the fact finder should resolve exceptions to liberative prescription because the determination of when a prescriptive period accrues is a fact-dependent inquiry dependent on the testimony of the plaintiff and her healthcare providers. *See Chiasson v. Medtronic Inc.*, Nos. 16-789, 16-3552, 16-3721, 2016 WL 4191837, at *6 (E.D. La. August 9, 2016) ("In cases of medical products liability, the accrual of a case and the reasonableness of delay in filing suit often hinge on the testimony of the plaintiff and his or her doctor."); *see also Body by Cook v. Ingersoll-Rand Co.*, 39 F. Supp. 3d 827, 838 (E.D. La. 2014) (The application of "*contra non valentem* is generally a question of fact that may go to the jury for resolution."); *see also Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inference from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").

## ARGUMENT

### I.   MS. DURDEN'S LIBERATIVE PRESCRIPTION WAS TOLLED UNTIL SHE DISCOVERED SANOFI'S TORTIOUS ACTIONS.

In Louisiana, the applicable statute of limitations—otherwise known as the prescriptive period—for actions under the Louisiana Product Liability Act ("LPLA") is one year from the day injury or damage is sustained. *See* La Civ. Code art. 3492; *Am. Zurich Ins. Co. v. Caterpillar, Inc.*, 12-270 (La. App. 3 Cir. 10/3/12), 99 So.3d 739, 741 (noting that La. Civ. Code art. 3492 applied to claims under the LPLA). But the equitable tolling doctrine of *contra non valentum* suspends prescription during the period of time in which a reasonable person does not know that she is the victim of a tort. *See In re: Xarelto (Rivaroxaban) Prods. Liab. Litig.*, MDL No. 2592, No. 15-4790, 2017 WL 4517287, at *2 (E.D. La. Oct. 10, 2017). "When the issue of prescription is raised,

'[t]he burden of proof generally rests on the party asserting prescription. However, when a complaint reveals on its face that the prescriptive period has lapsed, the plaintiff bears the burden of establishing a suspension or interruption of the prescriptive period.'" *Becnel v. Mercedes-Benz USA, LLC*, No. 14-0003, 2014 WL 1918468, at *4 (E.D. La. May 13, 2014) (quoting *Frank v. Shell Oil Co.*, 828 F. Supp. 2d 835, 842 (E.D. La. 2011)); *see also Campo v. Correa*, 01-2707 (La. 6/21/02), 828 So.2d 502, 508.

Again relying on a *de facto* six month trigger date, Sanofi claims that "Ms. Durden's Complaint establishes that the one-year prescription period commenced in September of 2012 (six months after the end of her chemotherapy treatment) because, according to her own allegations, that is when she sustained her alleged injury." (Defs' Mem., Rec. Doc. 6077 at 5). This six-month trigger for statute of limitations originates with Sanofi's misinterpretation of paragraph 181 in the Plaintiffs' Steering Committee's ("PSC") Second Amended Master Complaint. ("AMC") (Rec. Doc. 4407):

> Unlike the temporary and reversible alopecia that ordinarily results from chemotherapy, Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate cause Permanent Chemotherapy Induced Alopecia, which is defined as an absence of or incomplete hair regrowth six months beyond the completion of chemotherapy. The Permanent Chemotherapy Induced Alopecia caused by Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate is not limited to the scalp and can affect hair follicles throughout the body.

(AMC, Rec. Doc. 4407 at ¶ 181.). With this allegation, the PSC provided one way the condition of permanent alopecia might be described. Importantly, the allegations of this AMC were not alleged to have been known by Ms. Durden at the time of her infusion; rather, the allegations of the AMC are based on facts and allegations known to the PSC at the time of filing the AMC with the benefit of hindsight.

5

Notwithstanding, neither Ms. Durden's Amended Short Form Complaint ("SFC") (2:16-cv-16635, Rec. Doc. 7) nor the Second Amended Master Complaint (AMC, Rec. Doc. 4407), which Ms. Durden incorporates by reference in her SFC, contain allegations that her injuries became known or knowable to her six months after completing chemotherapy treatment.[1]  In her SFC, Ms. Durden alleged that she suffered from "[d]isfiguring permanent Alopecia beginning after treatment with Taxotere (docetaxel) and continuing to present."  (SFC, 2:16-cv-16635, Rec. Doc. 7 at ¶ 12).  This allegation was formed through Ms. Durden's perception of her injuries at the time she filed her lawsuit.  In other words, through knowledge acquired well after completion of chemotherapy treatment, Ms. Durden now knows that her injuries occurred sometime after cessation of chemotherapy treatment, which according to her Plaintiff Fact Sheet, occurred in or around February 2012.

## II.     THERE ARE GENUINE ISSUES OF MATERIAL FACT CONCERNING WHEN MS. DURDEN DISCOVERED HER INJURIES AND THEIR RELATIONSHIP TO TAXOTERE.

---

[1] Moreover, a plain reading of Plaintiffs' AMC reveals that it more than sufficiently alleges facts giving rise to tolling of the prescriptive period applicable to their claims:

> Plaintiff[s] (sic) file these lawsuits within the applicable statute of limitations period of first suspecting that these drugs caused the appreciable harm they sustained.  Plaintiffs could not, by the exercise of reasonable diligence, have discovered the wrongful cause of their injuries as the cause was unknown to Plaintiffs.  Plaintiffs did not suspect, nor did they have reason to suspect that they have been injured, the cause of their injuries, or the tortious nature of the conduct causing their injuries until a date prior to the filing of these actions, which is less than the applicable limitations period for filing suit.

(AMC, Doc. 4407 at ¶ 10.).  Plaintiffs have likewise alleged tolling of the prescriptive period because of Sanofi's misrepresentation and concealments.

> Additionally, Plaintiffs were prevented from discovering this information at an earlier date because: (1) Defendants misrepresented to the public, the FDA, and the medical profession that Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, and Docefrez, are free from permanent side effects; (2) Defendants failed to disclose to the public, the FDA, and the medical profession their knowledge of the risk of permanent side effects; and (3) Defendants fraudulently concealed facts and information that could have led Plaintiffs to discover the liability of the Defendants.

(AMC, Doc. 4407 at ¶ 11.).

Even if the allegations cited by Sanofi could be interpreted in the manner suggested by Sanofi, which would be contrary to Rule 56, the equitable tolling doctrine of *contra non valentum* applies and inures to Plaintiff's benefit.  The Louisiana Supreme Court recognizes four bases for the application of *contra non valentum* including "[w]here the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant." *Marin v. Exxon Mobil Corp.*, 09-2368 (La. 10.19/10), 48 So.3d 234, 245.  Prescription is suspended until "a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he or she is a victim of a tort." *Campo*, 828 So. 2d at 510.  Constructive knowledge is defined as "whatever notice is enough to excite attention and put the injured party on guard and call for inquiry." *Id.* at 510 -11.  But constructive knowledge "requires more than a mere apprehension that something might be wrong.  Prescription does not run against one who is ignorant of the facts upon which his cause of action is based, as long as such ignorance is not willful, negligence or unreasonable." *Griffin v. Kinberger*, 507 So.2d 821, 823 (La. 1987) (citing *Cardova v. Hardford Accident & Indemnity Co.*, 387 So.2d 571 (La. 1980)).

"[W]hen a plaintiff suspects something is wrong, he must seek out those whom he believes may be reasonable for the specific injury, and when a plaintiff acts reasonably to discover the cause of a problem, the prescriptive period [does] not begin to run until [he has] a reasonable basis to pursue a claim against a specific defendant." *Chevron USA, Inc. v. Aker Mar., Inc.*, 604 F.3d 888, 893-94 (5th Cir. 2010) (citations omitted).  "The ultimate issue is the reasonableness of the [plaintiff's] action or inaction, in light of his education, intelligence, the severity of the symptoms, and the nature of the defendant's conduct." *Campo*, 828 So 2d at 511 (citations omitted).  "Courts have summarized the *contra non valentem* doctrine as an inquiry into the 'reasonableness' of the victim's behavior in light of his perceived injuries." *Jenkins v. Bristol-Myers Squibb*, 2016 WL

10100281, at *6 (E.D. La. July 8, 2016) (citations omitted).

Sanofi mischaracterizes Plaintiff's legal claims throughout their motion. Ms. Durden does not dispute that she exhibited hair loss following chemotherapy treatment in September 2012. While Ms. Durden alleges that she observed hair loss six months after the cessation of chemotherapy treatment, the permanent nature of the condition was not evident to her or her treating physicians. Ms. Durden likewise does not dispute that her hair did not grow back as she hoped it would in September 2012. Ms. Durden has been painfully aware of her hair loss since that time. Sanofi's repeated assertion that Ms. Durden was aware that she suffered from permanent alopecia in 2012, and likewise knew of its potential connection to Taxotere by 2013, is simply not correct. Defs' Mem., Rec. Doc. 6077 citing to Durden Depo at 32:1-13. As Ms. Durden clarified during the course of her deposition, she did not learn of the potential association between Taxotere and permanent hair loss until she saw a television advertisement in 2016. (Exhibit A, Plaintiff Antionette Durden's Deposition, "Durden 2017 Depo," at 358:15-366:25).

Ms. Durden testified in her deposition that her hair began to grow back on the sides of her head following chemotherapy treatment. (Durden 2017 Depo at 28:1-14; 46:11-48:14; 59:3–60:22, December 13, 2017). However, the hair on the top of her head never fully returned, and Ms. Durden now suffers from hair loss and extreme hair thinning on top of her head. *Id*. Ms. Durden describes the hair on the top of her head as little strings and a large bald spot. *Id*. Additionally, Ms. Durden's eyelashes and eyebrows have not grown back. *Id*. at 104:16-24. Importantly, Ms. Durden remained "hopeful" that her hair would eventually return following chemotherapy treatment as she had been advised that her chemotherapy induced hair loss would be temporary. *Id.* at 209:19-211:21; 273:19-275:11; 355:22-357:12. When her hair did not regrow as quickly as she had hoped, Ms. Durden began seeking out different treatments to encourage her

hair to regrow faster and consulted with various doctors.  *Id* at 209:19-211:21; 273:19-275:11; 288:18-290:9; 296:16-297:1; 301:7-302:23; 303:11-305:20; 305:5-309:11; 313:1-314:19; 358:15-366:25.  Ms. Durden had no knowledge that her hair loss was permanent, much less why her hair had not returned, until she saw an advertisement linking Taxotere with permanent hair loss in approximately 2016.  *Id* at 56:24-57:7; 358:15-366:25.

Temporary alopecia is a well-known side effect of chemotherapy treatment.  Sanofi has always warned of temporary chemotherapy-induced alopecia in the Taxotere warning label.  Thus, the duty of inquiry was not and could not have been triggered by the mere awareness of hair loss because Ms. Durden had still not perceived her actual injuries, i.e., permanent and irreversible hair loss.  Ms. Durden testified that she believed she had temporary hair loss as a result of the entire chemotherapy regime because temporary hair loss was a side effect of each chemotherapy agent.  Durden 2017 Dep. at 273:19-275:11.  Likewise, Ms. Durden's prescribing oncologist testified that during the time period she prescribed Taxotere to Ms. Durden in 2011, she warned patients their hair loss from chemotherapy would be temporary.  (Exhibit B, Dr. Sophy Jancich Deposition, Volume 2 "Jancich Dep., Vol. 2" at 174:24-176:4; 262:17-263:14; 270:6-271:18; 273:16-275:10; 283:3-284:5).  As Dr. Jancich clearly testified in her deposition, her prescribing habits have now changed based on knowledge she has gained through research, professional conferences, package inserts, and her own clinical experience which have demonstrated that Taxotere can cause permanent hair loss.  *Id* at 207:4-209:21; 216:22-217:22. Since 2017, Dr. Jancich now warns patients that Taxotere may cause permanent hair loss.  *Id*.  Unfortunately, Dr. Jancich was not aware of this risk at the time she prescribed Taxotere to Ms. Durden in 2011.

Indeed, Ms. Durden was not warned of the risk of permanent chemotherapy-induced alopecia nor was she warned, more specifically, that Taxotere was known to cause permanent

chemotherapy-induced alopecia.   Durden 2017 Depo at 21:5-25:20; 213:25-215:23; 273:19-275:11; 355:22-357:12.   This is because Ms. Durden's oncologist was unaware that Taxotere could cause permanent hair loss at the time she prescribed Taxotere to Ms. Durden.   Jancich Depo, Vol. 2 at 278:7-279:9.   Dr. Jancich testified that she began warning her patients of the risk of persistent or permanent hair loss associated with Taxotere in approximately early 2017. Specifically, Dr. Jancich now warns patients who are considering taking Taxotere "that hair loss may be permanent…it may not grow back."   *Id* at 207:9-17.   As such, even if Ms. Durden had been excited (sufficiently under the Louisiana Supreme Court's interpretation in *Campo*) to inquire about her persistent hair loss while treating with Dr. Jancich, from 2011 to 2015, she would not have learned sufficient information to alert her to bring a products liability action against the manufacturers of Taxotere.

Moreover, it was not unreasonable for Ms. Durden to believe that her hair might return. As a reasonable layperson, Ms. Durden does not know the dermatological definition of permanent alopecia.   Even Sanofi has a differing view of the definition of permanent hair loss.   Emanuel Palatinsky, Sanofi's Global Safety Officer testified that it would be reasonable to assume that hair loss was permanent after four years.[2]

In addition, Sanofi reliance on Judge Fallon's decision in *In re: Xarelto (Rivaroxaban) Prods. Liab. Litig.,* MDL No. 2592, No. 15-4790, 2017 WL 4517287 (E.D. La. Oct. 10, 2017) is unpersuasive.   There, the injury at issue—bleeding—was warned of in the label and was an obvious condition recognizable by expert and lay person alike.   Here, the injury suffered by Ms.

---

[2] Exhibit C, Sanofi_05252078 ("Even if we make the reasonable assumption that persistent alopecia after more than 4 years is consistent with 'permanent' alopecia, I cannot estimate the general incidence rate of permanent alopecia when docetaxel is administered in combination with other chemotherapy agents on the basis of two studies (both using the adjuvant TAC regimen in breast cancer)").

Durden and other plaintiffs alike—permanent hair loss—is obscured by the fact that temporary hair loss is commonly known side effect of chemotherapy treatment. Ms. Durden had no reason to believe otherwise, particularly given, as shown below, Sanofi's decision not to disclose information regarding permanent alopecia to physicians and patients until required by FDA. Additionally, Plaintiff was not merely ignorant of the extent or duration of her injuries. *See Fontenot v. ABS Ins. Co.*, 95-1707 (La. 6/7/96), 674 So.2d 960, 964 (citations omitted) ("Ignorance or misunderstanding of the probable extent or duration of injuries materially differs from ignorance of actionable harm which delays commencement of prescription."). Temporary hair loss and permanent hair loss are distinct injuries as evidenced by Ms. Durden's testimony. Ms. Durden accepted the risk of temporary hair loss, but she would not have accepted the risk of permanent hair loss. Durden Depo at 21:5-25:20; 213:25-215:23; 355:22-357:12. Failure to warn about the risk of temporary hair loss is not alleged by Ms. Durden in this action.

Respectfully, the Court's analysis should end here. However, even if Ms. Durden had recognized the permanent nature of her hair loss, Ms. Durden would not have discovered the causal link between Taxotere and permanent hair loss through a reasonable search.

III.   **EVEN IF A DUTY TO INVESTIGATE HAD BEEN TRIGGERED, WHICH PLAINTIFF DENIES, ANY SUCH INVESTIGATION WOULD HAVE BEEN FUTILE BECAUSE OF SANOFI'S ACTIONS TO CONCEAL THE ASSOCIATION BETWEEN ITS PRODUCT AND PERMANENT/IRREVERSIBLE INJURY.**

Sanofi alleges that Ms. Durden should have known that she had permanent hair loss due to her Taxotere use, to the exclusion of any other chemotherapy drug, non-chemotherapy drug, genetic condition, or environmental factor. Sanofi highlights allegations in the AMC concerning public discussions that linked Taxotere and permanent hair loss between 2006 and 2010 (Defs' Mem., Rec. Doc. 6079 at 11-12, 14-15). These allegations, again made with the benefit of

hindsight, support the contention that Sanofi knew (but did not disclose) their drug could cause permanent alopecia at the time that Ms. Durden was prescribed Taxotere.  Indeed, Dr. Jancich's deposition testimony demonstrates Sanofi's successful concealment of the association between Taxotere and permanent hair loss from the medical and scientific community.  Plaintiff's board-certified oncologist was prevented from learning of the association between Taxotere and permanent hair loss despite reviewing peer-reviewed medical journals on a regular basis, reviewing labeling information on electronic platforms such as UpToDate, reviewing prescribing guidelines and package inserts, and attending numerous conferences on medical issues related to breast cancer and breast cancer treatment every year.  (Jancich Depo, Vol. 2 at 155:11-156:15; 205:16-206:17).  Indeed, Dr. Jancich never learned of the potential risk of permanent hair loss associated with Taxotere from Sanofi.  *Id.* at 252:23-254:14.  Moreover, because Sanofi did not warn Dr. Jancich of the association of Taxotere and permanent hair loss, Sanofi prevented Dr. Jancich from being able to discuss this risk of irreversible disfigurement with Ms. Durden in their discussion of the risks and benefits of chemotherapy treatment using a Taxotere regimen.  *Id.* at 254:9-257:10.

Although Plaintiff's duty to investigate was not triggered, Ms. Durden nonetheless sought out remedies to encourage hair regrowth and she sought answers concerning why her hair was taking longer than expected to return from additional providers beyond her oncologist.  In May of 2013, Ms. Durden consulted with her primary care physician, Dr. Velu.  During the course of her visit with Dr. Velu, Ms. Durden complained of the condition of her hair and requested information about shampoos that might be helpful in encouraging hair regrowth.  *Id* at 288:18-290:9.  At no time during the course of that encounter did Dr. Velu ever tell Ms. Durden that she believed she suffered from permanent hair loss or that such hair loss might be caused by Taxotere. *Id*.  Ms.

Durden next consulted with a dermatologist, Dr. Julie Mermilliod for complaints of an itchy scalp and hyperpigmentation. During the course of her exam, Dr. Mermilliod noted that Ms. Durden appeared to be suffering from scaring alopecia and female pattern hair loss. *Id* at 301:7-302:22. However, Dr. Mermilliod never evaluated Ms. Durden for permanent chemotherapy induced alopecia as Dr. Mermilliod herself was not aware of any potential association between permanent hair loss and Taxotere and was unable to factor it into her diagnosis. (Exhibit D, Dr. Julie Mermilliod 2018 Depo at 61:13-62-21). Ms. Durden continued to search for a physician who could explain the cause of her hair loss and prescribe a treatment. She returned to Dr. Velu and asked for another dermatology referral. In early 2017, Ms. Durden consulted with a second dermatologist, Dr. Julie Martin. Like Dr. Mermilliod, Dr. Martin was unaware of the association between Taxotere and permanent hair loss and therefore did not take into consideration permanent chemotherapy induced alopecia as part of her differential diagnosis (Exhibit E, Dr. Julie Martin 2018 Depo at 62:1-65:1). As a result, Ms. Durden consulted four separate physicians, Dr. Jancich, Dr. Velu, Dr. Mermilliod, and Dr. Martin from the time period of 2012 to 2017 without ever once being told that she may have been suffering from permanent hair loss induced by her use of Taxotere.

The discovery process has supplied evidence of what Sanofi knew and failed to share about permanent hair loss during the same period of time in which Sanofi claims Ms. Durden should have realized she should bring an action against Sanofi. For example, by the time Ms. Durden was administered Taxotere in October 2011, Sanofi had received many reports of persisting alopecia in patients taking Taxotere.[3] Nonetheless, Sanofi's Global Safety Officer told French health

---

[3] *See, e.g.* Exhibit F, 30(b)(6) Deposition Notice regarding Adverse Events at 4 (listing AERs in a chart). More than 200 AERs have been submitted to Sanofi regarding persisting alopecia, which Plaintiff can provide to the Court for it to review the individual reports.

authorities in a January 2011 Taxotere clinical overview that there was insufficient evidence to determine that Taxotere caused permanent alopecia.[4] Likewise, the FDA asked Defendants for a list of all cases reporting permanent/irreversible alopecia in March 2015.  Defendants again concluded that there was insufficient evidence to support a link between Taxotere and permanent alopecia.[5]  After prompting from FDA, Sanofi changed its position, acknowledging that sufficient evidence of a causal association existed between Taxotere and permanent alopecia and noting "[t]his is going to be fun submitting >4 year old labeling changes to the FDA now."[6] Sanofi, tasked with knowing the details of their drug, either refused to acknowledge Taxotere could cause permanent hair loss when dealing with regulatory authorities, or, more charitably, believed that there was no association between Taxotere and permanent hair loss during that pertinent time period.

Consequently, it would be impossible for a lay person, like Ms. Durden, to make such a determination in light of the approved warning label's absence of an adequate warning coupled with the complex pharmacological and epidemiological questions associated with linking permanent alopecia to Taxotere use.  Any delay in Plaintiff's understanding of Sanofi's tortious conduct clearly was not due to Ms. Durden's willful ignorance or negligence, and Ms. Durden should not be held to have knowledge of facts either known, disregarded and concealed or not known within Sanofi's organization.

## CONCLUSION

---

[4] *See* Exhibit G, Sanofi_043353204 at 44.

[5] *See* Exhibit H, Sanofi_01267881 at 24.

[6] *See* Exhibit I, Sanofi_05207927.

For the foregoing reasons, Plaintiff's prescriptive period did not commence until she was put on notice by advertisements of the connection between Taxotere and permanent hair loss in 2016.  Thereafter, she timely filed suit within one year of this notice. At the very least, there are genuine issues of material fact to be determined by the fact finder that are necessary to evaluate liberative prescription in light of the AMC and SFC allegations that support *contra non valentum* and continuing tortious activity.   Accordingly, this Court should deny Sanofi's Motion for Summary Judgment Based on Statute of Limitations.


 Dated: June 11, 2019                              Respectfully submitted,


                                        */s/ Christopher L. Coffin*
                                        Christopher L. Coffin (#27902)
                                        Jessica A. Perez (#34024)
                                        PENDLEY, BAUDIN & COFFIN, L.L.P.
                                        1100 Poydras Street, Suite 2505
                                        New Orleans, Louisiana 70163
                                        Phone: (504) 355-0086
                                        Fax: (504) 355-0089
                                        ccoffin@pbclawfirm.com

                                        *Attorneys for Plaintiff*

                          **CERTIFICATE OF SERVICE**

     I hereby certify that on June 11, 2019, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

                                        */s/ Christopher L. Coffin*
                                        CHRISTOPHER L. COFFIN