UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


| | | |
|---|---|---|
| IN RE:  TAXOTERE (DOCETAXEL) | * | 16-MD-2740 |
| PRODUCTS LIABILITY LITIGATION | * | |
| | * | Section H |
| | * | |
| Relates to:  All Cases | * | May 22, 2019 |
| | * | |
| | * | 10:00 a.m. |
| * * * * * * * * * * * * * * * * * * | | |


ORAL ARGUMENT BEFORE
THE HONORABLE JANE TRICHE MILAZZO
UNITED STATES DISTRICT JUDGE


<u>Appearances</u>:


For the Plaintiffs:          Barrios Kingsdorf & Casteix, LLP
                             BY:  DAWN M. BARRIOS, ESQ.
                             701 Poydras Street, Suite 3650
                             New Orleans, Louisiana 70139


For the Plaintiffs:          Pendley Baudin & Coffin, LLP
                             BY:  CHRISTOPHER L. COFFIN, ESQ.
                             1515 Poydras Street, Suite 1400
                             New Orleans, Louisiana 70112


For the Plaintiffs:          Morgan & Morgan, P.A.
                             BY:  EMILY C. JEFFCOTT, ESQ.
                             700 S. Palafox Street, Suite 95
                             Pensacola, Florida 32502


For the Plaintiffs:          Bachus & Schanker, LLC
                             BY:  DARIN L. SCHANKER, ESQ.
                             1899 Wynkoop Street, Suite 700
                             Denver, Colorado 80202

<u>Appearances</u>:

For the Plaintiffs:          Fleming Nolen & Jez, LLP
                             BY:  RAND P. NOLEN, ESQ.
                             2800 Post Oak Blvd., Suite 4000
                             Houston, Texas 77056


For the Plaintiffs:          Gainsburgh Benjamin David Meunier
                               & Warshauer, LLC
                             BY:  M. PALMER LAMBERT, ESQ.
                             1100 Poydras Street, Suite 2800
                             New Orleans, Louisiana 70163


For the Sanofi               Irwin Fritchie Urquhart
Defendants:                    & Moore, LLC
                             BY:  DOUGLAS J. MOORE, ESQ.
                             400 Poydras Street, Suite 2700
                             New Orleans, Louisiana 70130


For the Sanofi               Shook Hardy & Bacon, LLP
Defendants:                  BY:  HARLEY V. RATLIFF, ESQ.
                                  ADRIENNE L. BYARD, ESQ.
                                  JON A. STRONGMAN, ESQ.
                             2555 Grand Boulevard
                             Kansas City, Missouri 64108


Official Court Reporter:     Toni Doyle Tusa, CCR, FCRR
                             500 Poydras Street, Room B-275
                             New Orleans, Louisiana 70130
                             (504) 589-7778



Proceedings recorded by mechanical stenography using
computer-aided transcription software.

## <u>INDEX</u>

<u>Page</u>

Oral Argument

    Adrienne L. Byard, Esq. — 4

    Emily C. Jeffcott, Esq. — 23

    Adrienne L. Byard, Esq. — 33

    Harley V. Ratliff, Esq. — 35

    Darin L. Schanker, Esq. — 53

    Harley V. Ratliff, Esq. — 65

    Jon A. Strongman, Esq. — 71

    Rand P. Nolen, Esq. — 83

    Jon A. Strongman, Esq. — 93

    Douglas J. Moore, Esq. — 95

    M. Palmer Lambert, Esq. — 100

1       **MORNING SESSION**

2       **(May 22, 2019)**

3               **THE COURT:**  Just give me a second.  You-all can sit

4       down.

5               **MR. MOORE:**  Thank you.  Good morning, Your Honor.

6       Douglas Moore, defendants' liaison counsel and local counsel

7       for Sanofi.

8               Very quickly on the batting order for today's

9       motions.  Thank you, Your Honor, for allowing us to proceed

10      with the motion to exclude the expert testimony of Dr. Linda

11      Bosserman.  First, Ms. Byard will be arguing that.  We will

12      then proceed with the learned intermediary motions, which

13      Mr. Ratliff will argue.  We will present our position on those

14      two motions, and then the plaintiffs will present their

15      position on those two motions for the interest of lack of

16      repetition and efficiency.

17              We will do the same thing with the statute of

18      limitations, which Mr. Strongman will present for the

19      defendants, and then the presentation will be made on those two

20      motions by the plaintiffs.  Then I will address the Rule 72

21      motion and will do so in five minutes or less.

22              **THE COURT:**  Thank you.

23              Ms. Byard.

24              **MS. BYARD:**  Good morning, Your Honor.  Adrienne Byard

25      for defendant Sanofi.

1           We are here today on an expert challenge because
2   the prescribing doctors in this case did not testify in a
3   manner that would convincingly persuade a jury that Sanofi
4   misled them to prescribe Taxotere to Tanya Francis and Barbara
5   Earnest.   Instead Dr. Carinder described Taxotere as a good
6   drug, Dr. Verghese described Taxotere as a drug that's
7   effective, and both doctors reiterated that they still use the
8   medicine today.
9           So what do you do when you are not able to
10   elicit testimony from the local doctors accountable to the
11   patients who are the plaintiffs in this case?  Well, in an
12   ingenious move by our opponents, you find a doctor to dress up
13   as the prescribing physicians and offer expert testimony that
14   substitutes what was actually said with what in a different
15   world, under different facts and counterfactual hypotheticals,
16   a doctor might have said.
17           Unfortunately for the admissibility of this
18   specific informed consent opinion of Dr. Bosserman, the best
19   and only accurate evidence that the jury should hear comes from
20   the horse's mouth.  It comes from Dr. Carinder and it comes
21   from Dr. Verghese.
22           The only opinion that's at issue in our motion,
23   Your Honor, is that of informed consent.  The opposition, the
24   briefing in this case, is sort of like ships passing in the
25   night.  I'm not quibbling with Dr. Bosserman's credentials, her

1  qualifications.

2           THE COURT:  Okay.

3           MS. BYARD:  Yes.  We are not.  We will certainly

4  cross-examine her at trial about this endeavor to make cancer

5  treatment profitable and her background in that regard; but for

6  the purposes of the motion, we are not seeking to exclude her

7  on that basis.

8           We are also not saying that Dr. Bosserman can't

9  come in and talk to the jury about the background of this

10  medical issue.  We are not saying that she can't come in to

11  talk about treatment, about diagnosis, about treatment options.

12  It's this case-specific informed consent opinion that we think

13  offers a counterfactual hypothesis that cannot be tested and

14  that is extremely misleading to the jury.

15           Basically, Your Honor, what she does is she says

16  if this risk truly exists, this thing of permanent alopecia --

17  she's not saying that it does.  She's not saying that Taxotere

18  causes permanent alopecia.  But if you take the assumption that

19  it does and then if you assume that Sanofi knew about it -- she

20  is not offering that opinion, that's not her -- and then you

21  assume that the doctor didn't know about a risk that existed --

22  and she is not offering that opinion -- had the doctor then

23  relayed that risk information to the patient, had the patient

24  then refused to take Taxotere, had the doctor then offered an

25  alternative, what would the patient ultimately have chosen to

10:23

1   do.  It's on that house of cards that this informed consent,

2   this case-specific informed consent opinion rests, and that's

3   the narrow basis for which we are challenging Dr. Bosserman.

4           What is, Your Honor, this informed consent

5   methodology?  I will candidly tell you that in 12 years of

6   doing pharmaceutical defense, I have not seen an informed

7   consent expert in a product liability case.  I would offer that

8   if the Court were to search the product liability precedent,

9   there will not be a published standard for an informed consent

10   opinion; that this informed consent opinion is an animal on

11   alien soil in the product liability context.  It's not a

12   methodology that's published somewhere.  It doesn't have a rate

13   of error.  I can't test it.  There's no checks and balances on

14   the opinion.

15           We asked Linda Bosserman, then, we said, "What

16   is this methodology?" and she conceded that she's just

17   summarizing what she has read in the depositions.  That's the

18   method that she is applying.  Sure, she has the background, the

19   experience, but the method for coming to an informed consent

20   opinion is just reading and summarizing.

21           As far as we can discern -- and I will show this

22   to you later -- this method might as well be fortune-telling.

23   We would offer to you that the conclusions that --

24         **THE COURT:**  I'm just curious.

25         **MS. BYARD:**  Yes.  Yes.

10:24

1    **THE COURT:**  There is a standard of care regarding

2    elicitation of informed consent.

3    **MS. BYARD:**  That's right.

4    **THE COURT:**  Okay.

5    **MS. BYARD:**  That's right, and it comes from the --

6    **THE COURT:**  I know this is not --

7    **MS. BYARD:**  Yes.

8    **THE COURT:**  -- the case before us --

9    **MS. BYARD:**  Yes.

10    **THE COURT:**  -- that these motions are based, but

11    indeed if the oncologist were deceased --

12    **MS. BYARD:**  Yes.

13    **THE COURT:**  -- would there be an argument that this

14    sort of opinion testimony would be appropriate?  Because there

15    would be at least, well, this is objectively what the standard

16    of care is and this is what they should have been done.

17    **MS. BYARD:**  So there definitely is a line of

18    precedent for an objective standard for what a reasonable

19    doctor would have done with an adequate label.  There are cases

20    that allow you either to do it objectively or subjectively, but

21    the precedent that we pointed you to and that we found has not

22    allowed that objective evidence in.  Moreover, Dr. Bosserman's

23    opinion doesn't fit that objective standard.  She does not come

24    out and say that a reasonable doctor --

25    **THE COURT:**  I understand.

10:26

1          **MS. BYARD:**  She doesn't do that.  She doesn't say

2     Dr. Verghese was unreasonable if he would have decided not to

3     warn her about permanent hair loss.  Because what Dr. Verghese

4     says is that he would have warned her of the risk of permanent

5     hair loss with Taxotere or Taxol, which is what Dr. Bosserman

6     is saying he could have offered her.

7          **THE COURT:**  Right.

8          **MS. BYARD:**  So even if you allow objective evidence

9     about what a reasonable doctor would do, there's not an

10    indictment by Dr. Bosserman that what they had to do was warn

11    of the risk and then not prescribe this medicine or not default

12    to the patient preference.  She doesn't go that far.  So it

13    doesn't fit the exceptions where there might be some room for a

14    counseling role in our product liability doctrine.

15          Because really what our product liability

16    doctrine turns on, Your Honor, is the label.  It's a question

17    of me, Sanofi, as a manufacturer, the warnings that I passed

18    along to that doctor, were they good enough, were they strong

19    enough.  So we pulled the jury instructions from *Xarelto* as an

20    example, and you will see here that it's an adequate warning or

21    instruction.

22          Then we go on to show you how deep in the weeds

23    the issue really for the jury legally is this label.  More jury

24    instructions from *Xarelto*:  The label must contain language

25    that's adequate to reasonably inform the prescribing or

10:27

1    treating physician.  And then we talk here about communicating

2    the warning or instruction through a label or package insert or

3    other communications or literature.

4             What Linda Bosserman doesn't do is she doesn't

5    offer a labeling opinion.  She didn't rely on the label.  She

6    didn't reference the label.  She looked at the label through

7    Dr. Feigel's report, but she says, "I'm not a labeling expert.

8    I'm not offering any labeling opinions.

9             Unfortunately, because she's not actually

10   addressing the label in any way, shape, or form, the precedent

11   that you have to look to -- that I think you are probably

12   referencing too -- is med mal.  It's a med mal standard.  It's

13   not a product liability standard.  They are asking us to accept

14   expert testimony where there are no standards for product

15   liability.

16            So at the end of the day I say let's hear it

17   from the horse's mouth.  Let's hear it from the doctors, the

18   local doctors who were accountable to these patients and these

19   women, and let's not dress it up as expert testimony.  Let's

20   let the jury make the inferences that Dr. Bosserman would like

21   to decide for them.

22            So I would like to do a little song and verse on

23   "you know you have a problem when" as sort of the catchphrase.

24   I would submit to you that you know you have a problem when

25   your expert submits an errata to a simple, single question and

10:28

1    answer that is paragraphs and paragraphs and paragraphs long.
2    I wish I could tell you that this was the only question that
3    elicited this type of an errata response, but it's not.

4              Okay.  So let's back up for a second.  Here's
5    the question that's posed by Jon Strongman, my partner:

6         "QUESTION:  It's speculative to know what risks
7         Ms. Earnest or Ms. Durden or Ms. Francis really would have
8         accepted back in 2009 and 2011, correct?

9         "ANSWER:  I don't know what they would have decided,
10        but they clearly were willing to weigh information
11        provided in making their final decision with their
12        oncologist."

13             Very straightforward to me.  "I can't say what
14   they would have decided.  They would have had more
15   information."  Big deal.  The jury can come to that conclusion
16   on their own.  Here is the errata that we get.  If I were the
17   Micro Machine Man, I couldn't read this in response to that
18   question in that deposition.

19             What's really fascinating is this line:  "As I
20   testified, my expert testimony is properly to help the trier of
21   fact to understand the evidence so they can determine a fact
22   issue."  She goes on to say, too, earlier -- she says they
23   would have chosen a different chemotherapy regime had they been
24   informed of the risk of PCIA, permanent chemotherapy-induced
25   alopecia.  That's not the doctor's testimony.  That's not.  But

10:30

1  this certainly wasn't the answer that Mr. Strongman heard back

2  in response to his very, very simple question.

3           For a medical doctor to say, "Oh, I'm properly

4  helping the trier of fact understand the evidence so they can

5  determine a fact issue," you know you have a problem when the

6  errata sheet has to say, "We are not drawing the ultimate

7  conclusion that it's the jury's position to draw.  That's not

8  what we are doing."  It's sort of a "lady doth protest too

9  much."  If you are having to say, "I'm just trying to help the

10 jury understand the facts.  I'm not drawing the ultimate

11 conclusion for them," they are saying that because that's

12 precisely what Linda Bosserman is trying to do.

13          If this were the only example of her errata

14 sheet -- this is just Volume 1, paragraphs and paragraphs with

15 this "assist the trier of fact," "help the jury" legalese.

16 Volume 2, she gave us another eight, nine, ten paragraphs long

17 about her testimony, trying to undo what she did, which was

18 render her testimony inadmissible on informed consent.

19          I would like to take an indulgence to step aside

20 for a moment and talk about why we care more about what the

21 local doctors say than Linda Bosserman and why it's misleading

22 to offer her testimony as an substitute for theirs or even in

23 an additive way.

24          So Tanya Francis, at the time that she goes to

25 sit down with Dr. Verghese, a woman in her situation, she has

10:31

1    either felt a lump, her partner has felt a lump, she has felt

2    discharge or heat from the area.  She has been worried.  She

3    has talked to family.  She has gone to her general

4    practitioner, who's referred her for secondary care.  They have

5    given her a mammogram.  She knows she has breast cancer.

6              She sits down and she is staring down the barrel

7    of radiation, surgery, chemo, and she is talking to her doctor

8    about what she can do to live.  They are talking about what her

9    options are with her past medical history.  They are talking

10   about where she is in her life and what matters to her.  They

11   are talking about her anxiety, her fear.  They are talking

12   about the palliative care that's available to her.

13             They are weighing all the sources of information

14   that the doctor has, all of his clinical experience about what

15   her best chance for survival is, and what the alternative side

16   effects are.  Sure, there may be hair loss, but what about

17   leukemia?  What about septic death?  What about neuropathy?

18   Are you a violin player or a cellist?  What is your life like?

19   Do you have a history of diabetes?  What are the risk factors

20   in your personal medical care that I need to weigh in making

21   this decision?  It's a personal moment, and it's an

22   individualized medical judgment.

23             That's why the proposition in this intensive

24   risk counseling scenario of substituting an expert for the

25   local doctor is not one that we should allow.  It's within this

10:33

1   context that this proposition that Bosserman offers, of simply
2   subbing out Taxotere for Taxol, is too speculative and
3   something that we have to instead just rely on what the doctor
4   said, the local doctor.

5           We'll see, from the testimony that Mr. Ratliff
6   will talk about in more detail, that at the time that Barbara
7   Earnest was being treated by Dr. Carinder, for example, the way
8   that we dose Taxol was not every week.  It wasn't approved, and
9   so we dose Taxol less frequently with a very, very, very high
10  dose.

11          So at the time, based on the medicine available
12  for administration, neuropathy was a concern for Dr. Carinder
13  that he would not have prescribed that medicine to Barbara
14  Earnest.  Why are we going to hear from Linda Bosserman about
15  today's standards, today's available medicines, what could be
16  done today when we have Dr. Carinder's testimony saying that in
17  2011 Taxol was not an option?  Really for our purposes what I
18  think matters most is at the end of the day, like Dr. Verghese,
19  he would warn of the risk of permanent alopecia with both, with
20  Taxol or with Taxotere.

21          So we asked Linda Bosserman.  We said:
22      "QUESTION:  And as we have discussed, you certainly
23      cannot say that had Ms. Francis received AC-Taxol that she
24      wouldn't have permanent hair loss today, correct?
25      "ANSWER:  Correct."

1    We asked about Earnest:

2         "QUESTION:  You can't say with certainty that if

3    Ms. Earnest had been prescribed AC-Taxol that she wouldn't

4    have permanent hair loss today, correct?

5         "ANSWER:  Correct."

6              So instead of substituting in this rich, this

7    personal, this individualized patient-doctor relationship from

8    the local prescribing doctor, we cannot allow Dr. Bosserman to

9    parachute in and put her expert gloss on what would have been

10   done in her hypothetical facts that don't exist in the case.

11             Informed consent, I think to your point,

12   Your Honor, does have --

13        THE COURT:  I think what my concern was, if in this

14   circumstance the treating physician were unavailable for a

15   variety of reasons -- it could be illness, it could be just for

16   a variety of reasons -- would it be appropriate to have an

17   expert to provide some objective standard about what would be

18   appropriate in terms of having the physician have these very

19   frank discussions regarding the potential benefits and risks

20   with any chemotherapy treatment?

21        MS. BYARD:  Yes.

22        THE COURT:  I know we are talking about --

23        MS. BYARD:  Yes.

24        THE COURT:  -- very specific --

25        MS. BYARD:  Yes.

10:36

1    THE COURT:  -- plaintiffs --

2    MS. BYARD:  Yes.

3    THE COURT:  -- whose physicians are indeed available.

4    MS. BYARD:  Right.

5    THE COURT:  Are you telling me --

6    MS. BYARD:  Yes.

7    THE COURT:  -- that there are no circumstances -- and

8  that's probably an unfair question because that's not before

9  me --

10    MS. BYARD:  We have to look at it.

11    THE COURT:  -- where perhaps there would be a need to

12  have an objective expert say the treating oncologist should

13  indeed provide the basis of informed consent, and that would

14  require the treating physician give this information?

15    MS. BYARD:  Yes.  Yes.  I think --

16    THE COURT:  I know that's not what's before me today.

17    MS. BYARD:  Yes.  We would have to look at it in

18  context.

19    THE COURT:  Yes.

20    MS. BYARD:  We would have to look at it in context.

21  I would have to think through it in a different way, but I

22  think we can set aside that issue.

23    THE COURT:  I understand, but that has --

24    MS. BYARD:  And only because Linda Bosserman doesn't

25  do that objective test.  She does not apply the objective

10:36

1    standard in her testimony.  She doesn't say a reasonable

2    physician with an adequate labeling would not have done X, Y,

3    or Z.  She doesn't second-guess.

4            THE COURT:  I just want to make sure.

5            MS. BYARD:  Yes.

6            THE COURT:  I want to go back and make sure I

7    understand that there is no objection -- and I think you said

8    clearly --

9            MS. BYARD:  Yes.

10           THE COURT:  -- you had no objection to her

11   credentials and --

12           MS. BYARD:  Correct.

13           THE COURT:  -- the appropriateness of her testimony

14   regarding fundamentals of breast cancer treatment --

15           MS. BYARD:  Absolutely.

16           THE COURT:  -- describing the various forms of

17   treatment, how that generally plays out over the course of

18   breast cancer treatment.  So there's no objection to --

19           MS. BYARD:  On the same page.  On the same page.

20   There is not an objection.  It's the case-specific informed

21   consent opinion.

22               So I kind of did this exercise in an old-school

23   way, you know, with my paper calendar sitting beside me.  If I

24   was thinking about what of her report came in, for instance,

25   Your Honor, I didn't cross through anything until we get 16

10:37

1     pages into her report.  So there's the entire background that I

2     don't think is touchable.  I don't think her credentials lend

3     any credence to the idea that those opinions should be

4     excluded.  I certainly intend to offer Dr. Glaspy or

5     Dr. Miletello on our part to come through and do a lot of that

6     same -- hopefully not repetitive, but that same legwork.

7                  To the point of the reasonable medical care and

8     what a doctor would do with an adequate label, we wanted to

9     make sure the issues in the case were narrowed through the

10    written discovery.  As an example, Tanya Francis, we asked her

11    does she contend that she received inadequate medical care from

12    any of the practitioners she saw; unequivocal no.  We asked her

13    if she contends that Dr. Verghese failed to properly warn her

14    of the possible complications related to the use of Taxotere;

15    unequivocal no.

16                  The scenario, I think, that Your Honor envisions

17    where there might be a link in the chain or some objective

18    testimony that a reasonable doctor wouldn't have done what they

19    did in these circumstances, you know, that they were hoodwinked

20    by Sanofi, that they were hoodwinked and they wouldn't have

21    done it had they had an adequate label, that's not the claim

22    that's being made in the case.  Really in the LID context,

23    Your Honor, what we are talking about is the label.

24                  **THE COURT:**  Wait a minute.

25                  **MS. BYARD:**  Yes.

10:39

1        **THE COURT:**  Go back.  Possible complications related

2   to the use of Taxotere, I guess that is assuming that he

3   related the complications that were part of the labeling.

4        **MS. BYARD:**  So I think to make the plaintiffs' case,

5   you have to say that, sure, the link between Sanofi and the

6   doctor, that duty was not fulfilled.

7        **THE COURT:**  Right.

8        **MS. BYARD:**  But then you have to say, by consequence,

9   the link in the chain between the doctor and the patient wasn't

10  reasonably fulfilled either.  Now, it could be because of

11  virtue of the information that was available.

12       **THE COURT:**  Right.  Right.  Okay.

13       **MS. BYARD:**  That's what I'm asking her in the written

14  discovery, if that's the claim.  That's a question and answer.

15       **THE COURT:**  All right.

16       **MS. BYARD:**  So we go to the label.

17       **THE COURT:**  Let's proceed.

18       **MS. BYARD:**  So we go to the label in the

19  pharmaceutical context, and I would have expected --

20  Mr. Strongman asked this question of Dr. Bosserman eight times

21  more often than I would have felt comfortable because I thought

22  for sure at some point she would say, "Well, I do have an

23  opinion on the adequacy of the label, actually."  Maybe she

24  answered it in the negative the first four times, but the fifth

25  or sixth time she needs to, for her testimony to come in on

10:40

1    this, and she doesn't.

2              She keeps saying over and over again, "No, not

3    on the label, not me.  I'm not the expert.  I'm not about the

4    label."  She says that over and over and over again.  Again,

5    the jury instructions, that's what we are here about; we are

6    about the label.  So what she is doing, then, in the end,

7    Your Honor, is dressing up as the doctor and trotting out this

8    hypothetical with different risk information that may or may

9    not actually be the case, might actually be true.

10             I would tell you, Your Honor, that I would love

11   to bring in a very well-credentialed female oncologist to redo

12   the prescriber testimony and fit my theory of the case.  I

13   would love to hire out the fact witness testimony nine times

14   out of ten and control it, but that's not the case that we have

15   to try.  The case that we have to try is rich.  It's factually

16   nuanced.  The doctors' experiences are varied.  Their knowledge

17   of the literature is different.  It's not a hired-out opinion.

18             We asked Dr. Bosserman:

19        "QUESTION:  Is the best place to understand what

20        Ms. Earnest would have done in this situation, what

21        Dr. Carinder would have done, is it to go to Dr. Carinder?

22        Is it to go to Barbara Earnest?

23             "ANSWER:  Yes, yes, yes, go to the horse's mouth."

24             Dr. Bosserman can't pretend to stand in for that

25   testimony.

10:42

1          Here's a concrete example.  So applying

2  technology that's only available now in 2019, she uses online

3  calculators.

4       **THE COURT:**  I think you might want to reserve a

5  little time.

6       **MS. BYARD:**  Okay.  Okay.  These cool caps that

7  weren't available -- so here's my "you know you have a problem

8  when," and I will speed through the rest of these.  You know

9  you have a problem when, number two, the sequel, instead of

10  just offering the doctor's testimony, she says:

11          "I'm reading the intent of the discussions."

12          "I'm extracting in the tone of Mr. Earnest's

13  deposition."

14          "I'm taking it in context."

15          "I'm looking at what all their interpretation of

16  the situation is."

17          This is what the jury does with the testimony.

18  This is what the jury does with the testimony of Ms. Earnest's

19  husband.  This is what they do with the testimony of the

20  doctor.  She cannot stand up and testify for the jury what the

21  intent was, how they should contextualize it, how they should

22  weigh it.  That is 100 percent supplanting the role of the

23  jury.

24          You know you have a problem when the opposition

25  in this case relies time and time again not on the facts of the

10:43

1    testimony of the doctors themselves, but on Dr. Bosserman's
2    reiteration of it.  Here is an example.  In her report
3    Dr. Bosserman says that the oncologists have testified that
4    they would have used a Taxol regimen had their patients
5    expressed a preference based on the risk of PCIA.  That's not
6    what the doctors actually said.
7              That's the second problem.  So they're
8    supplanting the jury, but she is also misleading the jury by
9    trying to parrot this testimony, because what he says is both
10   of them cause hair loss.  He says, "If there's a report of one
11   being permanent, I would apply it to the other one too."  He
12   doesn't say he would have given her Taxol.  He says, "If
13   permanent hair loss is a concern with one, it's a concern with
14   the other, and I would have warned her of both."
15             **THE COURT:**  Okay.
16             **MS. BYARD:**  More examples, okay, and I will --
17             **THE COURT:**  Ms. Byard, I think --
18             **MS. BYARD:**  Yes.  Okay.  Perfect.
19             So the last thing we would point out,
20   Your Honor, is how she has cherry-picked examples from the
21   testimony.  The *Grenier* decision we have talked about.  That's
22   where you can do an objective test, but I would implore the
23   facts of that case to both.  The *Grenier* case says it would
24   have been fine if it had come from the doctor who treated the
25   plaintiff.  It didn't come from the doctor.  It came from the

expert.  The *Huffman* decision is similar.

So let's just look at her ultimate opinions, and I will conclude with this.  So her ultimate opinion, Your Honor, is that this information about these risks of permanent chemotherapy-induced alopecia, that had they been communicated via the product label, the marketing pieces, the correspondence, or the sales representative, it would have changed the discussion.  That's what she says, it would have changed the discussion.  The problem is, Your Honor, she didn't look at the product label.  She didn't look at our marketing pieces.  She didn't look at any correspondence or sales rep -- the doctors said that they didn't rely on sales representatives.

Then she says it would have changed the discussion.  The only way that she can say it would have changed the discussion is by supplanting the jury's job and weighing the doctor's testimony.  The only way she does it is by shaping the facts of that testimony in a way that is not consistent with the record evidence.

For all those reasons, we would say the case-specific informed consent opinion ought to be excluded.  Thank you.

**THE COURT:**  Thank you.

**MS. JEFFCOTT:**  Good morning, Your Honor.  May it please the Court.  My name is Emily Jeffcott.  I'm here on

10:46

1  behalf of the plaintiffs.

2          Your Honor, I don't believe there's too much

3  dispute here.  As you mentioned, defendants have conceded two

4  important points:  (1) that Dr. Bosserman is qualified to be an

5  expert in these cases; and (2) defendants don't challenge

6  Dr. Bosserman's general opinions.

7          Specifically, I point to page 3 of Sanofi's

8  reply.  Defendants don't challenge Dr. Bosserman's opinions on

9  the science of cancer, the development of treatment plans and

10 that "decision-making process of oncologists and their

11 patients."  What it appears that Sanofi challenges is the

12 application of those general opinions to the facts of these

13 cases.  Specifically, Sanofi claims that --

14          **THE COURT:**  Ms. Jeffcott, I have to tell you.  I

15 think as I read the report -- because I like to do that before

16 I read the briefing -- I thought this is very beneficial, the

17 initial part that lays out the diagnosis, the formation of a

18 treatment plan, and the decision-making process.  I think

19 that's important.  What does Dr. Bosserman bring to us when she

20 begins basically summarizing the plaintiffs' testimony?

21          We have the doctors that are going to say, "This

22 is the conversation I had."  What does Dr. Bosserman do?  We

23 have got these people, and they are going to testify, "This is

24 the conversation I had with my patient.  If I knew that

25 permanent alopecia was indeed a risk, I would have told her

1    that, and then we would have had another conversation."

2    Bosserman was not in that room, so tell me what she brings.

3         **MS. JEFFCOTT:**  Sure, Your Honor.  That really

4    actually brings me to my first point, which is regarding the

5    relevancy of Dr. Bosserman's opinion --

6         **THE COURT:**  That's what I want to know.

7         **MS. JEFFCOTT:**  -- regarding these specific

8    plaintiffs.

9              Sanofi wants to make this about common sense,

10   that it's within the common sense of the jury, of the

11   layperson, to understand the treatment options and these

12   treatment discussions between Ms. Francis and Ms. Earnest and

13   their oncologists, and that they can listen to the testimony

14   and that they can understand essentially the progress of

15   events.

16              Now, I think the reality before us, though,

17   Your Honor, is that breast cancer, its varying diagnoses, the

18   various treatment options available to them and the application

19   and discussion of those treatment options and how and what

20   Ms. Francis and Ms. Earnest, in the discussion with their

21   oncologists, what they ultimately decided, that's a lot of

22   information.  It's complicated and it's not common sense.

23              Your Honor, Sanofi cites to the *Peters* case in

24   support of their decision.  In the *Peters* case, there the

25   expert sought to opine that off-loading a vessel during a

10:49

1    rainstorm with 4- to 5-foot waves, where diesel fuel had

2    spilled all over the deck, was dangerous, and the court there

3    said, you know, it's within the common sense --

4            THE COURT:  I want to go back to my initial question,

5    which is we've got -- I have to tell you.  As I was thinking

6    about this, I thought there are circumstances where I could see

7    this is absolutely relevant.  That would be if the oncologist

8    were unavailable.  So we would then have to have somebody to

9    come in and say, "This is what an oncologist would do under

10   these circumstances," but we have the actual oncologist that

11   had that discussion.

12            While it's complicated, I don't know if the

13   discussion that these two oncologists had with their patients

14   is more -- maybe it's the same discussion.  That's where I'm at

15   a loss.  We have the people that had the discussion.  Very

16   frankly, they had to have a discussion in a manner that their

17   patients understood it.  Why wouldn't a jury understand that?

18            MS. JEFFCOTT:  I have two responses to that.  The

19   first one, I want to refer back to Judge Fallon's decision in

20   *Xarelto* regarding the *Orr* case.  I argued that and I

21   participated in that trial.

22            There was a unique circumstance where the

23   prescriber testified that he wasn't sure whether or not he

24   would follow the instruction and do the additional testing.

25   That was what we wanted added to the label.  So Judge Fallon

10:51

1  permitted us to bring an expert who would provide essentially

2  that reasonable person standard in order to provide that

3  objective information to the jury about what a reasonable

4  doctor would have done in those circumstances.  That certainly

5  didn't supplant but it added to the context of what the doctor

6  in that case could and should have done.

7           The second part of the response, Your Honor, is

8  that the issue of the diagnosis and the various treatment

9  options, as I said before, is complicated.  I want to point to,

10 for example, Ms. Francis' diagnosis.

11          There she was diagnosed based on pathology

12 reports of Stage 1 tubulolobular breast cancer that was

13 progesterone and estrogen positive receptor, along with being

14 HER2 negative and having a low grade Ki-67.  Your Honor, to

15 me -- and I think to a lot of people -- that could be

16 considered alphabet soup, word salad.  Without breaking that

17 down, without explaining that diagnosis, there can be a

18 misapplication, a misunderstanding of the significance and

19 severity of what that diagnosis means.

20          **THE COURT:**  I don't think they are objecting to her

21 explaining it.

22          **MS. JEFFCOTT:**  Respectfully, Your Honor, I do think

23 they are objecting to explaining what that diagnosis is in the

24 context of Ms. Francis.  They are seeking to exclude all of her

25 opinions with respect to anything specific to Ms. Francis.  It

10:52

1  goes beyond just explaining her diagnosis, Your Honor, but it's

2  also explaining the various treatment options available to

3  Ms. Francis.

4  This is where, I think, also her testimony

5  becomes all the more important because Sanofi wants to make

6  this case about life and death; that without Taxotere these

7  women would have faced essentially certain death and,

8  therefore, it would be unreasonable for an oncologist and their

9  patients to weigh the risk of permanent alopecia against taking

10 Taxotere.

11 Respectfully, this isn't a zero-sum game.  There

12 were other treatment options available to these women, and

13 Dr. Bosserman will provide context of that by going through the

14 NCCN Guidelines, which she has done, and applying the

15 discussions that Ms. Francis and Ms. Earnest had with their

16 oncologist, that it conformed to those discussions, that

17 back-and-forth.

18 That's particularly important because to a

19 layperson -- who may come to this case with their own

20 understandings about breast cancer.  They may think breast

21 cancer means the Komen foundation, and they may have people

22 that have survived or loved ones that have died.  But the

23 reality is that there is a big difference between metastatic

24 breast cancer and early stage breast cancer.  In particular,

25 there is a difference between the different treatment options

10:54

1    that these women had available to them and understanding those
2    different treatment options and how all of those pieces fit
3    together.
4            Now, Sanofi spent some time, I believe,
5    discussing the learned intermediary doctrine and how that
6    applies in this case.  My colleague, Mr. Schanker, will next up
7    go into further detail, but I do want to mention -- and there
8    was some discussion of case law before, Your Honor, that wasn't
9    mentioned in the briefing or the reply brief.
10           In the cases that were cited in the *Daubert*
11   motion, none of those stand for the proposition that a
12   plaintiff who decides not to take a drug based on an adequate
13   warning and informs her physician of that, that that's
14   somehow --
15           **THE COURT:**  I'm really trying not to conflate and,
16   frankly, that's a different matter.
17           **MS. JEFFCOTT:**  I understand, Your Honor.
18           **THE COURT:**  As to these specific plaintiffs, the
19   treatment options available, wouldn't that be left to the
20   treating oncologist as to what they would have done as opposed
21   to some independent oncologist to say, "Well, this is what I
22   would have done"?  Because the reality is when Ms. Francis
23   visited her physician, if indeed he had the information and he
24   conformed his behavior and changed his behavior and said, "I'm
25   going to tell you that this runs a risk of permanent alopecia,"

10:55

1    and she says, "I need to know what other options are out

2    there," wouldn't we look to the options that he would have

3    offered her as opposed to some independent expert?  If that's

4    the case, that we are going to look to what those physicians

5    would have recommended, why would we need Dr. Bosserman to tell

6    us that?

7              **MS. JEFFCOTT:**  Absolutely.  We are not arguing that

8    Dr. Bosserman is going to substitute or wear the dress of a

9    doctor.  Dr. Bosserman is more focused on the exchange between

10   the patient and the oncologist, the back-and-forth, that

11   discussion of treatment options and how those conform to

12   NCCN Guidelines.

13              That's particularly important in this case,

14   Your Honor, because I think typically to the layperson the

15   discussion between a patient and their physician can be

16   one-sided.  When I go to a doctor, my doctor will make a

17   recommendation, I take it.  But when it comes to breast cancer

18   and the NCCN Guidelines, which Dr. Bosserman was integral in

19   implementing, it's much more than that.

20              We see it with both plaintiffs that there were

21   discussions back and forth, multiple meetings in which

22   treatment options were discussed.  It's that focus, that narrow

23   focus in which Dr. Bosserman wishes to explore.  She's not

24   substituting her judgment for that of the doctors.  What she

25   did -- and this actually brings me to my second point regarding

10:57

1    the reliability of her opinions.

2                Sanofi states that she is cherry-picking

3    testimony to conform to her opinions.  That's not what she did.

4    She testified that she reviewed all of the plaintiff depos,

5    their treating oncologists, and even additional depos.  She

6    also reviewed the pathology reports, the surgical reports, and

7    she took that information, extracted the parts about that

8    decision-making process, and evaluated whether that

9    decision-making process conformed to NCCN Guidelines.

10               That's what makes her opinions not only

11   reliable, but relevant, because it demonstrates the exchange,

12   the back-and-forth, the discussion of treatment options, the

13   discussion of side effects; that it's not just about life and

14   death, that it's a discussion of toxicities, it's a discussion

15   of side effects, what these women were willing to weigh.

16   That's the totality of her opinion.

17               Now, in a seeming contradiction, Sanofi argues

18   then that not only did she somehow cherry-pick, but then she

19   just summarized the depos and the medical records.  If you look

20   at the footnotes that Sanofi references for that claim -- it's

21   footnotes 11 and 12 in their motion -- and you read them, it

22   states much more than that.

23               As I said before, she reviewed all the

24   depositions, she extracted the parts that she believed about

25   that decision-making process, she compared them to NCCN

10:58

1    Guidelines, and then she even went a step further and validated

2    those opinions -- those of her own and of the methodology

3    employed by the oncologist -- against those online database

4    tools, which a similar version existed at the time that these

5    women were being treated.  That's much more than merely

6    summarizing depo testimony and medical records.

7                Now, in Sanofi's brief -- I'm not sure Ms. Byard

8    mentioned it, but Sanofi states that Dr. Bosserman's opinions

9    are unreliable because she acknowledges that there are case

10   reports of permanent alopecia with other chemotherapy drugs,

11   including Taxol.  Your Honor, to me that actually is a hallmark

12   of the reliability of her report that she is considering these

13   additional drugs and evaluating whether or not there could be

14   an instance of permanent alopecia and whether or not that would

15   be at issue.  She found that, based on those case reports,

16   that's not something that she would rely on.

17               Furthermore, regardless of whether other drugs

18   have instances of chemotherapy [verbatim] is not an issue

19   that's at bar before the Court.  This is a failure to warn case

20   under Louisiana law.  The focus is on Taxotere and whether or

21   not it caused permanent alopecia in these plaintiffs.

22               We are not alleging a design defect.  We are not

23   alleging that there had to be a safer alternative design.  Here

24   the focus is squarely on Taxotere.  If we are required to go

25   beyond that, we are allowing trials to turn into mini trials.

11:00

1    Your Honor, for those reasons Dr. Bosserman's testimony is not
2    only reliable, but relevant.  Thank you.
3              **THE COURT:**  Thank you.
4              **MS. BYARD:**  So, Your Honor, we feel like there's
5    again ships passing in the night.  I think Your Honor
6    understands we are not challenging the general opinions, the
7    background, the diagnosis, the treatment options at all; it's
8    just the case-specific informed consent opinion.  I think we
9    would be remiss if we didn't point out a couple things about
10   opposing counsel's argument.
11             When I hear "more focused," I hear "better
12   credentialed."  It doesn't mean that we substitute in the
13   doctor's testimony for that of their hired expert.
14             Unlike *Xarelto*, Your Honor, Dr. Bosserman is not
15   offering a reasonable doctor standard.  You won't see that
16   standard applied anywhere in her report.  She does not say a
17   reasonable doctor in this situation with an adequate label
18   would have done X and that would have been different than what
19   these doctors did.  It's just not anywhere in her report.  It's
20   not anywhere in her testimony.  It's not *Xarelto* and it's not
21   admissible.
22             She suggested to you that Dr. Bosserman
23   conformed her opinions to the NCCN Guidelines and that part of
24   this idea of what the prescribing decision should have been was
25   running it up against the NCCN Guidelines.  I think, as the

11:01

1    record makes clear from the actual local doctors, that at the
2    time to dose Taxol weekly was not an option.
3            What Dr. Bosserman comes up with in her machine
4    from 2018 as the treatment recommendation was not something
5    that NCCN Guidelines would have allowed those doctors to do at
6    the time.  So it's not true that her testimony was validated as
7    a methodology against some objective standards because the
8    standards that would have allowed her treatment recommendation
9    today are not the ones that applied at the time.
10           Finally, Dr. Bosserman did not even read the
11   consent forms in these cases.  So to say that she has applied a
12   reliable methodology applying reliable standards that speak to
13   the informed consent standards that have been created by the
14   medical community or that are appropriate within NCCN
15   Guidelines, to suggest that method --
16           **THE COURT:**  Let me ask you a question.
17           **MS. BYARD:**  Yes.
18           **THE COURT:**  Is there any objection to Dr. Bosserman
19   speaking to the specific diagnoses of Ms. Francis or
20   Ms. Earnest in terms of whether or not they were estrogen
21   receptors, progesterone receptors, and what does that mean?
22           **MS. BYARD:**  No.
23           **THE COURT:**  I think I asked that question and then --
24   okay.
25           **MS. BYARD:**  Yes.  No.  No, it's truly the

11:03

1    case-specific risk information, what different risk information

2    would have led to different prescribing opinions.  This

3    case-specific informed consent opinion that she offers is the

4    heart of our challenge.

5                I think that's it, Your Honor, unless you have

6    further questions.

7                **THE COURT:**  Thank you.  No.

8                **MS. BYARD:**  Thank you.

9                **THE COURT:**  I think now we are going to learned

10   intermediary.

11               I will tell you-all we have an en banc meeting

12   at noon and I have to go.

13               **MR. RATLIFF:**  Are you telling me to be quick,

14   Judge Milazzo?

15               **THE COURT:**  Yes.  We were supposed to tell you-all

16   that there were seven minutes per side per argument, and

17   apparently that memo didn't get out.

18               **MR. COFFIN:**  Your Honor, to be clear, we were aware

19   of the five minutes per side on the Rule 72, but there was not

20   a communication --

21               **THE COURT:**  I know.  So we may have to just take a

22   break for an hour.  I'm sorry.

23               **MR. COFFIN:**  We can try to shorten it.

24               **THE COURT:**  I have to be at this one.

25               **MR. RATLIFF:**  Give me a minute, Your Honor, to get

11:04

1    the slide deck up.

2                    Your Honor, Harley Ratliff for Sanofi.  As

3    Mr. Moore indicated, I'm going to cover the learned

4    intermediary for Earnest and Francis.  I have conferred with

5    Mr. Schanker.  He is going to cover them when I'm done with

6    both of them, so I will try and move through both of these as

7    quickly as possible.

8                    THE COURT:  Okay.

9                    MR. RATLIFF:  Your Honor, as you know and as

10   Ms. Jeffcott said, this is a failure to warn case.

11                   THE COURT:  Right.

12                   MR. RATLIFF:  The crux of the allegation is Sanofi

13   failed to warn of a particular side effect; therefore, all

14   12,000 plaintiffs have a particular injury.  That would be the

15   case for Ms. Earnest.  That would be the case for Ms. Francis.

16   That puts us squarely into, as you know from our discussion on

17   the *Mills* argument, the learned intermediary.

18                    In Louisiana, in this district, it's a two-prong

19   test.  Plaintiffs must satisfy both of those prongs:  (1) that

20   the warning was inadequate, the warning that was given at the

21   time of the treatment was inadequate, and the doctor did not

22   know of the risk; and (2) that the failure to warn, Sanofi's

23   failure to warn, was the cause in fact and the proximate cause.

24   So but for the inadequate warning, the treating physician would

25   not have used Taxotere.

11:05

1    **THE COURT:**  Is it would not have used or would have

2    conformed his conduct?

3    **MR. RATLIFF:**  Your Honor -- and this was a discussion

4    we had during the *Mills* argument -- I would say that the great

5    weight of the evidence in this district and in the Fifth

6    Circuit is that it's not use the product; that but for the

7    inadequate warning, the doctor would not have used the product.

8    Now, the plaintiffs cite two cases they say are

9    opposite of that, that it would change the conduct in terms of

10   the counseling information or that the doctor would have

11   provided a different warning.

12   **THE COURT:**  I tell you why I think about that,

13   Mr. Ratliff.  When I go to the doctor and I have an earache, he

14   might give me amoxicillin or Rocephin.  We don't have a

15   discussion.

16   **MR. RATLIFF:**  Right.

17   **THE COURT:**  The people that I know that took

18   chemotherapy, that's a very different discussion that you have

19   with your doctor for, I think, very obvious reasons.  There is

20   a very rich conversation about risks and benefits and what this

21   may mean to you long term, what are the downsides.

22   I understand learned intermediary.  Would he

23   have prescribed the same thing?  Well, yes, if I thought

24   something, I might still prescribe amoxicillin.  But in my

25   view -- and maybe you need to just explain this to me -- I

11:07

1   would think when you are prescribing a chemotherapy regime,

2   there is a more robust conversation between oncologist and

3   patient.

4        **MR. RATLIFF:**  Your Honor, that may very well be the

5   case.  There may be a more robust discussion.  I don't think

6   that point, though, is necessarily relevant to the learned

7   intermediary doctrine.

8        **THE COURT:**  But doesn't it go to conforming your

9   behavior, whereas when a doctor looks at the risks associated

10  with a chemotherapy drug and --

11       **MR. RATLIFF:**  Your Honor, I think all that goes to is

12  the decisional calculus of the doctor and what they are going

13  to convey to a particular patient on an individualized basis.

14       **THE COURT:**  Okay.  Fair enough.  What they would have

15  conveyed to the patient.

16       **MR. RATLIFF:**  What they would have -- and that's in

17  the doctor's discretion.

18       **THE COURT:**  Then the patient makes an informed

19  decision.

20       **MR. RATLIFF:**  Correct, Your Honor.  That's part and

21  parcel of the learned intermediary is the doctor is the one who

22  takes that information and forms their "decisional calculus."

23  That's the language that's used.

24       **THE COURT:**  Because sometimes, I have to tell you,

25  when you read about learned intermediary, the question is,

11:08

1    well, would the doctor have prescribed it.  Well, maybe it
2    would have been his first recommendation.  The question as to
3    whether or not he would have prescribed it is whether he had
4    buy-in from his patient and consent to proceed down that road.
5          MR. RATLIFF:  I agree, Your Honor.  I do think that
6    we talked about this a little bit last time, as it talks about
7    what goes on in that discussion.
8          THE COURT:  Sure.
9          MR. RATLIFF:  We are talking about chemotherapy, and
10   no one has asserted in any of these pleadings that either one
11   of those patients simply would have refused chemotherapy or any
12   option.  So this isn't a situation of --
13         THE COURT:  Right.
14         MR. RATLIFF:  -- "Mr. Ratliff, you can take an
15   anticholesterol drug with all these side effects or maybe you
16   should run more and have a better lifestyle."
17         THE COURT:  Right.  Right.
18         MR. RATLIFF:  These are my two options.  Take it or
19   don't take it.  So I think we are a little bit different there.
20              All I would say is that the great weight of the
21   law in this district talks about it in it would not -- the
22   doctor would not have prescribed the product.  The two cases
23   that the plaintiff cite saying, no, Sanofi's construction of
24   that is too narrow, one was *Xarelto*, which that is different
25   than this case.  The doctors testified that, yes, they still

11:09

1   would have prescribed Xarelto, but that's not the issue.  The

2   issue is if they had known about this PT test, they would have

3   used that PT test, still prescribed Xarelto, but avoided the

4   injury.

5           The other case they cite, *Frischertz*, was the

6   one outlier case that says, "I would have given a stronger

7   warning," and most importantly -- and this is a point that is

8   missing in the *Earnest* case -- "I would have given a stronger

9   warning," and the patient came forward with affirmative

10  evidence that if given that warning, they absolutely would have

11  not taken that drug.

12          **THE COURT:**  Right.

13          **MR. RATLIFF:**  Your Honor, I would say that is not the

14  standard in this district.  I would say even if you accepted

15  that case as applicable here, it's not applicable to these

16  particular facts as it relates to Ms. Earnest and Ms. Francis.

17          So getting back to the idea of was the Taxotere

18  label inadequate, was it adequate, I don't think that's a

19  discussion that we have to resolve here today.  We think it's

20  adequate.  We think it's always warned of hair loss.  There's

21  never been any restrictions on it.  Fine counsel here think I

22  am wrong.

23          In this issue, though, for Ms. Earnest, we don't

24  have to get to that point because whether the label was

25  adequate, whether it was inadequate, was it the medical or

11:10

1    legal cause of Ms. Earnest's injury, and the issue here,

2    Your Honor, is this.  Dr. Carinder, her oncologist, testified

3    that he had read the Taxotere label once, when it first came

4    out on the market.  That was 1996.  He estimated it to be '99

5    or 2000.  So in the 10 years, the 11 years, maybe the 12 years

6    between the one time he read the label, where the warnings

7    would be about hair loss -- whatever that adequate warning

8    plaintiffs' counsel say it should be, whatever FDA has said it

9    should be -- he never read the label.  That, Your Honor, gets

10   us into no matter what was in the label, no matter what Sanofi

11   put in the label --

12              **THE COURT:**  He did read it one time.

13              **MR. RATLIFF:**  He read it one time, Your Honor.  What

14   plaintiffs do not put in their opposition, nor can they, is

15   that reading it one time in 2000, that there should have been a

16   warning in 2000 about permanent hair loss or whatever they

17   might say it is.  They don't make that argument in their

18   opposition, Your Honor.  They certainly cannot because their

19   own labeling expert, Dr. Kessler, says best case scenario the

20   label should have been updated in 2006, as late as 2009.

21   That's why you do not see that in their argument, this idea

22   that, well, sure, you read it in 2000, that's good enough.

23              The reality, Your Honor, is this.  Between 2000

24   and 2011, Sanofi could have put a black box warning in bold

25   print, "Taxotere causes permanent hair loss."  Dr. Carinder

11:12

1    would not have reviewed it.  Sanofi could have cribbed directly

2    from the master complaint and said, "Taxotere causes severe,

3    disfiguring, permanent alopecia and hair loss."  Dr. Carinder

4    would not have read it.  Your Honor, Sanofi could have put in

5    the warning any time between 2000 and 2011, "Don't give this

6    drug to Ms. Earnest.  It's going to cause all of her hair to

7    fall out and it's never going to come back."  Dr. Carinder

8    wouldn't have read it or conveyed that to Ms. Earnest.

9            Case after case after case, Your Honor, has said

10   that plaintiffs' presumption, the heeding presumption that they

11   talk about in their opposition, it's a rebuttable presumption.

12           **THE COURT:**  Right.

13           **MR. RATLIFF:**  One of the things that rebuts it is if

14   the warning -- the stronger warning, the more adequate warning,

15   whatever that might be, if it would have been futile.  So if a

16   doctor doesn't read it, it's futile; they lose.  If the doctor

17   even knows of the risk but doesn't read the warning, they lose.

18   If the doctor doesn't know of the risk but doesn't read the

19   warning, they lose.

20           I believe it's the third case down.  Even if the

21   doctor just says, "I don't recall reading the label," courts

22   have said routinely that breaks the causal chain, and that's a

23   fact the plaintiffs' opposition concedes.  This is from

24   plaintiffs' opposition, the "presumption may be rebutted with

25   evidence showing that an adequate warning would have been

11:13

1   futile under the circumstances," just as here.

2           I would like to thank plaintiffs' counsel for

3   citing a case that we did not cite, which is *Bloxom v. Bloxom*,

4   which is the classic case in Louisiana of a person whose Camaro

5   burned down, filed a lawsuit, and the court said, "That's all

6   great and wonderful, but there's no evidence that you ever read

7   the owner's manual.  There's no evidence you read the warning.

8   Case cannot go forward."

9           That's exactly the case that we have here with

10  Ms. Earnest and, as I will talk about more briefly, with

11  Ms. Francis as well.  This issue right here, Dr. Carinder's

12  unwillingness to read the label, no matter what that warning

13  would have been, is dispositive.

14          Now, Your Honor, even if you want to take that

15  aside, you want to put it over here and say, "Mr. Ratliff, I

16  get you.  I want to move on to what happened," plaintiff must

17  still show that Dr. Carinder, her oncologist, would not have

18  prescribed Taxotere to Ms. Earnest in 2011 -- that's our

19  relevant time, 2011 -- had he received an adequate warning.

20  Your Honor, there is simply no evidence before you that

21  Dr. Carinder has ever testified that he would have changed his

22  prescribing decision in 2011 before he prescribed this to

23  Ms. Earnest.  That evidence is devoid from the record.

24          Now, the plaintiffs, their whole opposition,

25  what it rests on, Your Honor, what is cited time and time again

11:15

1    on page 137 and 138 of Dr. Carinder's deposition, is his

2    response to this question:

3            **"QUESTION:**  Would you prescribe Taxotere to

4        Ms. Earnest again if she presented with you today?"

5            In fairness to Dr. Carinder, he said:

6        **"ANSWER:**  No.  I would give her a different drug

7        today, partially because of what I have heard on the media

8        of permanent hair loss, but partially because there is now

9        an alternative treatment available, Taxol every one week,

10       which reduces the risk of neuropathy."

11           Your Honor, while it is fascinating what

12   Dr. Carinder would do today, what he might do tomorrow, what he

13   might have done last year, that is not the question before us.

14   It's would he have changed his prescribing decision in 2011.

15   You can read through his entire deposition, and you will not

16   find any of that testimony.  That's because the plaintiffs did

17   not ask the question they should have asked.

18           They should have taken the 2015 label, the

19   current label that says cases of permanent alopecia have been

20   reported, shown that to Dr. Carinder and said if that had been

21   the label, the current FDA-approved label that mentions

22   permanent alopecia -- "If that had been the label in 2011,

23   would you have prescribed Ms. Earnest a different product?

24   Would you have given her a different chemotherapy?"  And even,

25   Your Honor, to be generous to what you mentioned, "Would you

11:16

1    have changed your counseling decision?  Would you have given

2    her a different warning?"  That question, Your Honor, was not

3    asked, that evidence is not here, and that is a threshold issue

4    as it relates to Barbara Earnest's case.

5              The other thing that is left out of plaintiffs'

6    opposition, Your Honor, is -- and we talked about this last

7    time in the *Mills* argument -- was there a safe and effective

8    alternative in 2011.  Dr. Carinder testified there was not.

9    There are two options -- we have now heard about them a lot --

10   Taxotere, Sanofi's product, and there's Taxol, the other

11   taxane.  Those are the two options in adjuvant chemotherapy.

12             Here is what Dr. Carinder said in 2011,

13   Your Honor.  Not today.  2011.  "We didn't have paclitaxel

14   approved for using it weekly back in the day when Ms. Earnest

15   was treated."  That's changed now.  That indication is approved

16   now.  He said, "I used docetaxel more because you had less risk

17   of infusion reactions, a severe side effect, and you had less

18   neuropathy.  If you can avoid the neuropathy and the infusion

19   reactions, of course I'm going to use Taxotere."

20             Do you know who had severe neuropathy then and

21   who has severe neuropathy now?  Ms. Earnest.  So at the time

22   the regimen that was available was Taxotere.  The regimen

23   plaintiffs say she should have been given, Dr. Bosserman says

24   she should have been given, was not available and not approved,

25   and came with significant side effects.

11:17

1      Likewise, Your Honor, Dr. Carinder conceded even

2  if she had received a different option, there's no way to say

3  she would be alive today.  Even if she was given a different

4  chemotherapy regimen, there's no way to say her hair would be

5  any different than it is today.  There is no evidence that

6  there was a viable option that was equally efficacious that

7  also might not have produced the same hair loss that

8  Ms. Earnest is alleging she has today as a result of Taxotere.

9      This gets to the other question that you were

10 asking about, which is if you change your counseling decision,

11 step one.  That's the *Frischertz* case that they rely on.  The

12 second part of that, Your Honor, is the patient has to come

13 forward with evidence that they would have changed their

14 decision.

15         **THE COURT:**  Right.

16         **MR. RATLIFF:**  They would not have taken Taxotere.

17 You will find nowhere in plaintiffs' opposition, because it is

18 not in the evidence, that Ms. Earnest has ever testified that

19 she would have done something different, and by doing something

20 different meaning not taking Taxotere.  Not that "I would have

21 thought about things" or "I might have considered different

22 side effects," that doesn't get you there; that you would not

23 have taken the product.  That's the evidence that was submitted

24 in the *Frischertz* case that got them over that hurdle.

25         Here is what Ms. Earnest said about what she

11:19

1    would have done or what she did do.  She said, "I was going to
2    do whatever I was told.  I would do whatever Dr. Carinder told
3    me to do."  She was not asking follow-up questions.  "If you
4    tell me I'm taking this, if you tell me I'm doing radiation, if
5    you tell me I'm doing chemotherapy, I'm doing what Dr. Carinder
6    tells me to do."

7            These are the risks that Ms. Earnest consented
8    to when she took Taxotere.  She knew it could cause death.  She
9    knew it could cause paraplegia.  She knew it could cause brain
10   damage, cause bleeding.  It could cause damage to vital organs.
11   She accepted all of those risks when she took Taxotere.  She
12   knew they were significant, she accepted them, and she went
13   forward with Taxotere.

14           One of the things, Your Honor, that you
15   mentioned previously or we talked about previously was the idea
16   that a patient now 10 years out from taking chemotherapy can
17   look back in hindsight and say, "Well, if I had known this,
18   accepting all of these risks, that would have changed my mind.
19   This one risk would have changed my mind," the benefit of
20   hindsight bias.  But Louisiana has articulated -- and certainly
21   this isn't a med mal situation -- that you have to use an
22   objective standard.  You have to use a reasonable patient
23   standard.

24           That's something to be thinking about both in
25   this case and in the *Francis* case.  It's not necessarily what

11:20

1   the patient says 10 years down the road when they are cancer

2   free and they can look back at the risks and say, "That would

3   have changed my mind."  It's what would an objective patient do

4   at the time when presented with all these risks --

5           **THE COURT:**  Is that something to be decided at

6   summary judgment?  I understand what you are saying, and that's

7   a really good argument to make at trial of this matter.  But if

8   I have testimony from someone saying, "I would have done

9   something different.  I would have sought a second opinion" --

10          **MR. RATLIFF:**  Your Honor, this is just a cherry on

11  top of my argument right here.  So this is what Ms. Earnest

12  actually testified to:  She said she was concerned about

13  neuropathy, which is what Dr. Carinder testified was a worry

14  with Taxol; she did not seek a second opinion for chemotherapy

15  treatment; and she does not know that she would have taken an

16  alternative chemotherapy, even if presented with the option,

17  based on the side effects of that drug.

18          The answer she gave was:  "I don't know what I

19  would have done.  I don't know if I would have taken a

20  different drug."  That's the missing element of the one case

21  they rely on in this district that says a change in the

22  counseling will get you over the hump as long as you have a

23  change in what the patient would do.

24          **THE COURT:**  Right.

25          **MR. RATLIFF:**  So anyways, Your Honor, I would say

11:21

1    plaintiffs bear the burden to show that a proper warning would

2    have changed the decision of Dr. Carinder in 2011.  That

3    evidence is not here, and that's not even considering the fact

4    that he doesn't read the label and has not read the label in

5    the last 11 years.

6         I get to Ms. Francis.  I will try and race

7    through this because I know plaintiffs' counsel wants to talk

8    too.  The same two-part test.  Dr. Verghese -- which Ms. Byard

9    talked about.  Many of the issues here are the same, but there

10   are some subtle differences between this and *Earnest*, one

11   particular one.

12        One, we have the same issue of Dr. Verghese

13   testifying he does not recall the last time he read the label.

14   Importantly, he doesn't consider what's in the label

15   "meaningful" to treatment.  So the idea that he has not read

16   the label gets us right back to the courts that have said any

17   adequate warning, any stronger warning, whatever plaintiffs

18   might suggest the warning should be, that makes it futile.

19        That's one part of it.  He has never read the

20   Taxotere label in its entirety.  He doesn't think it's relevant

21   to treatment.  He doesn't recall the last time he read it.

22   That alone, we believe, is going to be dispositive in *Francis*

23   just as it was in *Earnest*.

24        The other thing that we have seen in plaintiffs'

25   opposition is the idea that sales reps can come in and somehow

11:23

1    circumvent the learned intermediary doctrine.  Dr. Verghese

2    addressed that to plaintiffs' counsel's question and said, "I

3    don't rely on sales reps from drug companies to tell me what

4    are meaningful side effects.  I get those on my own."  So if

5    you look at he doesn't read the label, he doesn't rely on sales

6    reps, that right there would not change whatever warning Sanofi

7    put into the label.

8              The second part, Dr. Verghese was certainly

9    aware of and warned patients that their hair may not grow back.

10   He knew of the risk.  He knew there was a risk with

11   chemotherapy.  When a prescribing physician was aware of the

12   possible side effects of the drug yet chose to use them

13   regardless of the label, as a matter of law the warning was not

14   the proximate cause of the plaintiffs' injury.

15             This is a situation where Dr. Verghese was asked

16   by plaintiffs' counsel, "Is it your general understanding with

17   Taxotere that alopecia is temporary?"

18             He says, "It's common, but I would not call it

19   temporary.  I never tell people it's temporary.  *Temporary* is

20   not the word I would use when I counsel patients, patients like

21   Ms. Francis, about the side effects of hair loss with Taxotere

22   or any chemotherapy."

23             He describes what his counseling procedure is.

24   He says, "It's not appropriate to expect normal hair growth.  I

25   don't use the word *temporary*."  In fact, he goes so far as to

1    say, "You know what you should do -- because you don't know if

2    your hair is going to grow back because I only see 80 to 90

3    percent of patients' hair grow back -- you should go out and

4    take preventative measures and make yourself a wig because your

5    hair may return differently."  So he certainly was aware that

6    there was a risk with multi-agent chemotherapies, the same type

7    of multi-agent chemotherapies Taxotere is used with and that it

8    was used with Ms. Francis.

9         Similarly to Ms. Earnest, there is not the

10   testimony in this case, in the *Francis* case from Dr. Verghese,

11   that had there been a different warning, he would not have

12   prescribed the product, he would not have given her a different

13   product.  That question, just like in the *Earnest* deposition,

14   was never asked.

15        "Dr. Verghese, here is the current label.  Here

16   is the FDA-approved label that mentions permanent alopecia.

17   Would you have changed your prescribing decision?"  The

18   question was not asked and there's no testimony on it and

19   there's no evidence in the record for Your Honor to consider.

20   That is something that the plaintiffs must show, that they

21   would have changed their prescribing decision.

22        What Dr. Verghese did testify to was that the

23   Taxotere regimen that he prescribed was the most studied, it

24   was the preferred treatment, it had gone to a tumor board with

25   10 oncologists who said this was Ms. Francis' best option, and

11:25

1    this is the one he would recommend to Ms. Francis for the best
2    case of survival.
3         So was there a safe and effective alternative
4    option for Ms. Francis?  Your Honor, there's no question about
5    it.  When Ms. Francis testified in her deposition, she said,
6    "If he had told me that Taxotere causes hair loss, I would have
7    sought a second option."  I'm not going to pretend like that
8    testimony does not exist, but there is a salient point here
9    that I think Ms. Byard brought up, which is Dr. Verghese said
10   she had three options:  the Taxotere option, which he found to
11   be the preferred, best option; a dose-dense AC followed by
12   Taxol, which he said was -- I forget the exact words --
13   debilitating; and then an AC followed by weekly Taxol, a third
14   option.
15        I think what is paramount here and what is
16   important to consider is that Dr. Verghese testified repeatedly
17   that if there was a risk of permanent hair loss with Taxotere,
18   that same risk would be present with the only other option, the
19   Taxol option, and he would give the same warning as it related
20   to Taxotere or as it related to Taxol.
21        So when we talk about the patient counseling
22   decision, if you want to take the learned intermediary that
23   far -- if you want to say it just doesn't require changing the
24   product but changing the patient counseling information -- I
25   think what balances out against Ms. Francis' deposition

11:27

1  testimony that was not available when her deposition was taken

2  is that her prescribing oncologist's opinion was, "If it

3  appears in one taxane, I'm going to give the same warning to

4  the other taxane."

5          So now Ms. Francis is presented with the issue

6  of there are two options.  And to Dr. Verghese, her prescribing

7  physician, they both have the same risk of permanent hair loss

8  to him.  I think that is sort of the unique element to this

9  case, that even though the case that plaintiffs cite we believe

10  is an outlier -- we do not think it's accurate, we don't think

11  it is what tracks the majority of the Eastern District and

12  Fifth Circuit about using the product versus counseling

13  information -- the reality is she would have got the same

14  counseling information as to both alternatives.  There was not

15  an alternative, Your Honor, that didn't have a risk of hair

16  loss, permanent hair loss.  That, Your Honor, I would say is

17  what gets us, the defendants, over the hump and is dispositive

18  of the learned intermediary as it relates to the *Francis* case.

19  Thank you, Your Honor.

20          **THE COURT:**  Thank you.

21              Mr. Schanker.

22          **MR. SCHANKER:**  Good morning, Your Honor.

23          **THE COURT:**  Good morning.

24          **MR. SCHANKER:**  I'm Darin Schanker on behalf of

25  Barbara Earnest and Tanya Francis.

11:29

1          Your Honor, your questions really

2    demonstrated -- you hit the nail on the head.  Defense is

3    conflating this concept of a prescribing doctor recommending a

4    drug and actually prescribing a drug.  There's a big difference

5    between that.  What the defense is really kind of trying to

6    gloss over is ignoring the important concept, which you touched

7    on in your questions, of patient choice.  You can't dismiss

8    patient choice from the Louisiana interpretation of the learned

9    intermediary doctrine, and really that's what the defense is

10   doing.

11          As we break down their argument here, you can

12   see that that is the big flaw in their legal analysis, which I

13   would like to go through, and then there's a couple of factual

14   inaccuracies that are clear in the record that I would like to

15   make sure and clarify for the Court.

16          I will try to stay organized and clear with

17   regard to Tanya Francis and Barbara Earnest since we are making

18   both of these arguments at the same time.  By the way,

19   Dr. Verghese is the way we pronounce the prescribing doctor for

20   Tanya Francis.

21          **THE COURT:**  I'm glad to know that because I didn't

22   know.

23          **MR. SCHANKER:**  Yes.  We have heard several different

24   pronunciations and Dr. V, but Dr. Verghese is how we pronounce

25   it.

1    So really what defense has put forward is this

2 overly strict interpretation of the learned intermediary

3 doctrine that we saw in the briefs and heard in the courtroom.

4 Really what they would have you believe, the defense would in

5 their arguments, is if Dr. Verghese, if Dr. Carinder today

6 prescribed Taxotere, then we can't satisfy the learned

7 intermediary doctrine, and that's simply not what the doctrine

8 is.

9    Specifically, the cases that are cited in the

10 briefs -- the *Willett* case, the *Huffman* case, the *Rhodes*

11 case -- the learned intermediary doctrine under Louisiana law

12 basically says that if the doctor is given an adequate warning

13 that the doctor would not have prescribed the drug.  Would not

14 have prescribed the drug.  It's not using the word *recommended*.

15 It's would not have actually prescribed the drug.

16    Looking back retrospectively in this specific

17 case, in the *Francis* case and in the *Earnest* case, when we walk

18 down the logical steps of the record, would the doctor actually

19 have prescribed the drug or not?  Clearly there's a question of

20 fact on this issue, and that's why these motions should be

21 denied.

22    Specifically, we also heard counsel for the

23 defense dismiss the *Xarelto* case and the *Frischertz* case, at

24 least in the *Frischertz* case claiming it's an outlier, when the

25 fact is that those cases are clearly interpreting what went on

11:31

1    in the situations we have here with *Francis* and *Earnest*.  They

2    get into the nuance of the heeding presumption which we heard

3    mentioned, that particular analysis that's laid out in those

4    important cases -- that are district court cases right out of

5    this courthouse, Your Honor -- and that's that the doctor would

6    have acted differently, changed his or her advisory, deferred

7    to the patient's wishes.  That gets into this patient choice

8    concept, which the defense has been ignoring.

9              So specifically what I would like to do is go

10   through the record on both Francis and Earnest, walk through

11   the record specifically on Francis and Earnest just step by

12   step and see do we satisfy learned or not.

13         **THE COURT:**  What do we do, Mr. Schanker, with

14   Ms. Earnest's physician -- I don't remember his name -- who

15   said, "I don't read the labels"?

16         **MR. SCHANKER:**  Right.  So Dr. Carinder read the label

17   in 1999, 2000, in his mind when he started using the drug

18   Taxotere.  It doesn't mean that he doesn't stay updated.  In

19   the 21st century, how the doctors stay updated, are we

20   expecting the doctors on a yearly basis are going to go back

21   and read the label of every single drug that they prescribed?

22   Or might it be, as Dr. Carinder lays out clearly, that doctors

23   in the 21st century get updates?  Online updates from ASCO is

24   what Dr. Carinder specifically refers to.  That's the American

25   Society of Clinical Oncologists.

11:33

1          Dr. Carinder explains that he get updates on
2    label changes in that specific manner.  As a matter of fact,
3    that's how he found out in 2015, the record is clear, that as
4    well as media attention, how he determined that the label had
5    changed and that there had been a warning of permanent
6    irreversible hair loss associated with Taxotere.
7          That right there is evidence of how Dr. Carinder
8    would have -- let's say that that label would have been
9    changed, as the plaintiffs claim it should have been, years and
10   years earlier, prior to 2011, when he provided this treatment
11   to Barbara Earnest.  Dr. Carinder would have had knowledge and
12   would have warned accordingly.
13         By the same token, Dr. Verghese, it was brought
14   up by counsel -- if I may, Your Honor, since we are on that
15   topic -- that Dr. Verghese doesn't read the entire label.  You
16   had the privilege of having the label in the record, the
17   hundred-plus pages of the label.  What Dr. Verghese explains is
18   there's really important stuff in that label from an
19   oncologist's standpoint and then there's stuff that's not so
20   important.
21         What Dr. Verghese does is he reads the important
22   parts of the label, that that goes to risk/benefit analysis and
23   effectiveness, efficacy for a patient, and also that he knows
24   about updates to the label as well.  Dr. Verghese claims that
25   he knew that this information about permanent hair loss had

11:35

1  started to surface in -- he estimated four years prior to his
2  deposition.  The deposition was in 2018.  So Dr. Verghese
3  learned sometime around 2014 or so of this risk of permanent
4  hair loss and then began advising patients accordingly.  So the
5  factual argument that the label change would have made no
6  difference is in no way supported by the record, and there's
7  certainly a question of material fact that survives summary
8  judgment on that particular factual issue.

9          The defense goes on to articulate with regard to
10 the *Tanya Francis* case -- we heard this -- that Dr. Verghese
11 did not know about permanent -- oh, specifically, I'm sorry,
12 that Dr. Verghese had knowledge of permanent hair loss -- that
13 Dr. Verghese had knowledge of permanent hair loss, the defense
14 claims, back at the time that he treated Tanya Francis in 2009.
15 Black and white, the record of Dr. Verghese's deposition is
16 clear to the contrary.

17         Specifically, on pages 105 and 106 of his
18 deposition, Your Honor, Dr. Verghese is asked by counsel:
19     "QUESTION:  At the time you were treating Ms. Francis
20     in 2009, did you have any reason to believe that
21     Ms. Francis may experience something aside from temporary
22     hair loss?
23     "ANSWER:  No."
24         Clear question on the issue:
25     "QUESTION:  Did you have knowledge about permanent

11:36

1    hair loss?

2        "ANSWER:  No."

3            So as we work through that analysis of the steps

4    of learned intermediary specifically for Tanya Francis, if

5    Dr. Verghese had been informed by Sanofi, by the defendant, if

6    Dr. Verghese knew, what would he have done with that

7    information?  Would he have advised the patient, which is what

8    the standard of learned intermediary law lays out?

9            Dr. Verghese says on page 48 of his deposition,

10   "Yes, I would have advised the patient."  How do we know that?

11   Because Dr. Verghese specifically explains that if he is aware

12   of a permanent side effect, that's a big deal, and he tells the

13   patient about that.  So clearly, following the logical steps,

14   if Dr. Verghese had been informed by Sanofi that there's this

15   permanent risk, this hair loss permanent risk associated with

16   Taxotere, he would have advised the patient.

17           So the next step in the learned intermediary

18   analysis then is, okay, so Tanya Francis is informed.  What

19   does she do with that information?  Tanya Francis specifically

20   states that she would have told -- on page 287 of her

21   deposition that she would have said, "I want another option."

22   She was interested in an option that doesn't cause this risk of

23   permanent loss.  That was important to her.

24           Dr. Verghese then explains that he would have

25   advised her of other options.  This is very important, other

11:37

1    options, because we heard defense counsel basically put a false

2    choice before you, that it's either Taxotere or Taxol.

3              Now, Taxol is a viable option for Tanya Francis

4    on the NCCN Guidelines -- which, by the way, there are a dozen

5    other combination therapies that are listed aside from the one

6    that Tanya Francis took, and you have this in the record.  I

7    believe it's Exhibit B, Your Honor, the 2009 NCCN Guidelines

8    for Tanya Francis.  Of those dozen or so options, half a dozen

9    of those don't involve Taxotere, and there are three of those,

10   three or four, that don't involve Taxotere or Taxol.

11             So to try to put forward a concept that there

12   were no options available other than Taxotere or some concept

13   of some other drug that might cause hair loss is just not what

14   the record supports in this case.  Tanya Francis had other

15   options available to her.  Dr. Verghese explains if a patient

16   asks about it, he actually goes and does the research.  The

17   research, the record is clear that there is nothing in there

18   containing side effects of permanent hair loss with other drugs

19   aside from Taxotere.  Dr. Verghese would have honored Tanya

20   Francis' request.

21             So the long and short of it, when you go back to

22   the legal analysis, is would Dr. Verghese then have made a

23   different prescribing decision.  As we walk through the steps,

24   it's clear that Dr. Verghese would have recommended and then

25   ultimately prescribed a different drug than a Taxotere-based

11:39

1    combination and, therefore, summary judgment is survived in

2    this case, the motion.

3              A similar analysis, Your Honor, for Barbara

4    Earnest and, again, patient choice here.  It's not a situation

5    where the doctors are holding these women down and injecting

6    them with the drug against their will.  It's a choice.  So

7    Dr. Carinder makes it clear.  Dr. Carinder did not know about

8    the risk of permanent hair loss.  On page 41 of his deposition,

9    the question is asked:

10             "QUESTION:  In 2011, were you aware of any

11        chemotherapy drugs at all that carried a risk of permanent

12        hair loss?

13             "ANSWER:  No."

14             Dr. Carinder had no knowledge that Taxotere

15   caused permanent hair loss when he prescribed it back in 2011,

16   contrary to assertions by the defense.

17             So what would Dr. Carinder have done with this

18   information?  He indicates if he knew about it, he would have

19   warned Barbara Earnest.  That's on page 166 of his deposition.

20   Page 166, 167, he says he would have given her a choice.

21             Now, we heard about this choice of Taxol, and

22   Dr. Carinder does say that today, looking back

23   retrospectively -- on page 138 in his deposition, looking back

24   retrospectively, today he would prescribe Taxol.  He also says

25   that the dosages that were available back in 2011 might have

11:41

1  led to neuropathy, and he would have advised the patient of

2  that, but then that's patient choice again.  He doesn't say

3  that Taxol was off the table, that a Taxol-based therapy was

4  off the table.  Dr. Carinder says, "I would have given her the

5  choice."

6          Barbara Earnest then, contrary to what we had

7  asserted by counsel -- in the record that you have, in her

8  deposition, Barbara Earnest specifically addresses the issue of

9  what she would have done if she had been given the information

10 by Dr. Carinder.  I'll just read that, Your Honor.  That's

11 specifically on page 102 of her deposition, the record that you

12 have, this question to Barbara Earnest:

13         "QUESTION:  Did you tell Dr. Bianchini that if you

14     had known this treatment caused permanent baldness, you

15     would have asked if there was another drug that could cure

16     your cancer that did not cause permanent baldness?

17         "ANSWER:  Yes.  If I knew that it caused -- if I knew

18     that drug I was taking caused permanent baldness, anybody

19     would.

20         "QUESTION:  And that's something you told

21     Dr. Bianchini?

22         "ANSWER:  Yes.

23         "QUESTION:  And so it's your opinion in 2018 that

24     that's something you would have said to Dr. Carinder in

25     2011?

11:42

1        "**ANSWER:**  Yes."

2              So the record is clear Barbara Earnest indicates

3    that she would have asked for another option that didn't carry

4    with it the risk of permanent hair loss.

5              Then working through the exchange, Dr. Carinder

6    indicates he would have honored that request.  We get to the

7    same point again that the prescribing medication would have

8    been different than Taxotere.  From a factual standpoint,

9    learned intermediary is satisfied, and we survive summary

10   judgment.

11             Your Honor, we heard counsel make a distinction

12   specifically between lines of cases that were cited, the

13   *Xarelto* case and the *Frischertz* case.  In their reply brief,

14   for the first time they raise the distinction between, you may

15   recall, a preventible risk and an unavoidable risk, and claim

16   that in this case what we are dealing with is an unavoidable

17   risk, which I found interesting being that we have *Daubert*

18   motions that have been filed that say that there is no

19   causation with regard to Taxotere, but now in this motion we

20   have an argument that Taxotere causes an unavoidable risk.

21             Aside from that, as we move forward on that

22   issue, if we even accept that law that they cite, which is

23   *Thomas v. Hoffmann-La Roche*, a 1992 Fifth Circuit case

24   interpreting Mississippi law not Louisiana law -- but if we

25   even accept the unavoidable risk compartment that they are

11:43

1    trying to place this analysis in, the analysis specifically

2    asks the question:  Was the risk high enough that it would have

3    changed the treating physician's decision to prescribe the

4    product in this case?  So was it a high enough risk that the

5    docs would have acknowledged it, done something about it,

6    advised about it, and potentially changed the prescribing

7    pattern, the drug that was prescribed?

8            We have evidence in this case, again, from both

9    doctors that certainly the risk was high enough.  They have

10   indicated, both Dr. Carinder and Dr. Verghese, that if they

11   knew about this risk of permanent hair loss that they would

12   have advised the client of it, so that risk is absolutely

13   satisfied.

14           A couple other points, Your Honor.  We heard

15   about sales reps and sales reps making visits, and we saw some

16   testimony on Dr. Verghese's opinion concerning sales

17   representatives.  In the record you also have testimony from

18   Dr. Carinder concerning sales reps.

19           We see Dr. Verghese says, "I don't listen to

20   sales reps," and certainly that's his prerogative.

21           Specifically with regard to Dr. Carinder,

22   Dr. Carinder indicates that if it's a respected sales rep --

23   and in his depo in the record you have he is talking about Ruth

24   Avila, a particular sales representative that he had a

25   professional relationship with that visited him often -- that

11:45

1    he would absolutely accept that information.  If Ruth Avila,

2    sales representative, had told Barbara Earnest's prescribing

3    doctor, Dr. Carinder, about this risk of permanent hair loss,

4    that's something he would have taken seriously.

5                   So he indicates that is another avenue -- we

6    have this kind of narrow perception the defense is trying to

7    create that the doctors have to be poring over these labels on

8    a regular basis to stay updated, ignoring the fact that in the

9    21st century there's other avenues for them to get updates,

10   other avenues for drug companies to let them know what's going

11   on with regard to a label.

12                  Your Honor, basically that covers the issues

13   that I saw as important and imperative.  If you don't have any

14   questions or comments, then thank you for your time.  On behalf

15   of Barbara Earnest and Tanya Francis, plaintiffs respectfully

16   request that you deny defendants' motion for summary judgment.

17   Thank you, Your Honor.

18                  **THE COURT:**  Thank you.

19                  **MR. RATLIFF:**  Your Honor, may I address just a few

20   quick points?

21                  **THE COURT:**  Quick points.

22                  **MR. RATLIFF:**  Yes.  Your Honor, to address the point

23   that Mr. Schanker raised about the fact that Dr. Verghese and

24   Dr. Carinder, while they may not have read the label -- and in

25   Dr. Carinder's case hadn't read the label for a decade -- that

11:46

1    there are other avenues of information, anticipating that, I

2    wanted to read back to you something from one of the cases that

3    we cited about this exact issue that Mr. Schanker raised.

4             "Plaintiff instead speculates about other ways

5    an adequate warning might have reached Dr. Collini and altered

6    her decision.  She suggests, for example, that a modification

7    to MCP's warning label might have come up in conversations with

8    other physicians or have been discussed at a continuing

9    education seminar.  Certainly those scenarios are possible.

10   Ultimately, however, without any summary judgment evidence to

11   support them, they remain nothing more than possibilities."

12             That's exactly what we have here, Your Honor.

13        **THE COURT:**  Isn't that a little different from

14   Dr. Verghese's testimony saying, "I was aware of this because

15   of notices on ASCO's website," which talks about warnings from

16   the manufacturers?  That's a little different to say, "I might

17   have talked about it at a cocktail party after some continuing

18   education seminar."

19        **MR. RATLIFF:**  For example, Dr. Carinder, I know it

20   was represented that he learned about the label change from

21   ASCO.  There's nothing in the testimony that says he learned

22   about a label change.  He said, "I heard about permanent

23   alopecia from media reports, from litigation, and I followed up

24   with ASCO," whatever it might be, but nothing about the actual

25   substance of the label.  So what he is hearing from attorney

11:48

1   advertisements is not a substitute for actually reviewing the

2   label back in 2011.

3          With Dr. Verghese, I would say it is the same

4   thing.  He learned about something from ASCO.  I don't know how

5   the testimony you are looking at -- I don't recall him saying,

6   "I learned about the label change.  I learned about a

7   difference in the label."

8          "I just learned that there was a risk of

9   permanent alopecia or a potential risk of permanent alopecia

10  with Taxotere," which he says was in 2014.  The label for

11  Sanofi, for Taxotere, to add permanent alopecia was added on

12  December 12, 2015.  So whatever he is learning from ASCO is not

13  something that's coming from Sanofi and is not something that

14  is derived from the label.

15         The only other point, I think, Your Honor, I

16  would make is this.  At the fundamental level, the duty of the

17  manufacturer, the duty of Sanofi, runs to the doctor.  The duty

18  to warn runs through the doctor.  The idea of just "informed

19  consent, informed consent," that undoes the entire learned

20  intermediary doctrine is not accurate.  Here's what I say.

21  Simply because you would have asked for other options, that

22  doesn't get you down the road to saying, "I would have taken

23  another drug that would not have produced the injury I'm

24  alleging here."

25         That maybe gets you a little bit down the way,

11:49

1    but it doesn't get you to the point of saying, "Had I been able

2    to get another drug, there was another drug that had not this

3    risk and, therefore, I don't have that risk."  So simply the

4    constant use of "informed consent, informed consent" as if it

5    is an elixir for the heavy burden of learned intermediary, it

6    just does not get plaintiffs to that point.

7            The last thing I will say, Your Honor, and then

8    I will close is I think one thing you need to be aware of

9    certainly in the *Earnest* motion and the testimony that was

10   elicited about the sales rep, Ruth Avila, elicited from

11   Dr. Carinder about would he have changed his warning at the

12   time -- and you will see this in the opposition and you will

13   see it as well in the depositions -- all of those questions

14   were asked to Dr. Carinder in the opposition with a qualifier.

15           "If you had been told that Taxotere causes

16   permanent hair loss in a significant patient population, would

17   you have given a different warning?  If Ruth Avila had told you

18   that Taxotere causes permanent alopecia in a significant

19   patient population, would you have listened to Ruth Avila?"

20           Well, Your Honor, plaintiffs have not quantified

21   what a "significant patient population" is or even what that

22   term means.  To the doctor, does it mean 90 percent?  Does it

23   mean 80 percent?  Does it mean 50 percent?  That's certainly

24   not the language that is in the label today, which just says

25   cases of permanent alopecia have been reported, not that

11:50

1  Taxotere causes permanent alopecia in a significant patient

2  population, whatever that might be.  So there is no evidence to

3  support what are essentially counterfactual hypotheticals posed

4  to Dr. Carinder.

5              I could probably walk into any doctor's office

6  and say, "Well, if you knew Drug X caused you to all grow a

7  third eye in 100 percent of patients, would you advise

8  patients?"  Well, certainly a doctor is going to say that.  So

9  I want you to be aware of that when you are looking back

10  through the briefs and looking at the evidence that's done, is

11  that much of that testimony in the *Earnest* case is built upon

12  sort of a hypothetical foundation that doesn't comport with the

13  evidence and doesn't comport with reality.

14              **THE COURT:**  Thank you.

15              **MR. RATLIFF:**  Thank you, Your Honor.

16              **THE COURT:**  Who is handling the prescription issue?

17              **MR. COFFIN:**  Mr. Nolen is for us, Your Honor.

18              **THE COURT:**  I am sorry.  We dropped the ball.  I

19  should have told you that there were going to be time limits

20  and that didn't happen.  I have got to be at this meeting.

21  It's from 12:00 to 1:00.  We are going to be at recess until

22  five after 1:00.  Is anybody catching a plane before then?

23  Maybe that will make you talk faster.  Do you have a plane to

24  catch?

25              **MR. NOLEN:**  At 3:30, Your Honor.

11:52

1         THE COURT:  Oh, you will be out.

2         MR. STRONGMAN:  My flight is at 3:30 too.

3         THE COURT:  Okay.  You see, you guys are really going

4    to talk quickly.  I'll be back as soon as I can.  1:00.  Court

5    is at recess.

6              (Lunch recess.)

7                              * * *

1  <u>**AFTERNOON SESSION**</u>

2  **(May 22, 2019)**

3  **THE COURT:**  Court is in session.

4  Mr. Strongman.

5  **MR. STRONGMAN:**  Thank you.  Good afternoon.  Again, I

6  will try my best to be brief.

7  **THE COURT:**  Especially since you have a flight.

8  **MR. STRONGMAN:**  Absolutely.  Thank you, Your Honor.

9  Jon Strongman on behalf of Sanofi.

10  Your Honor, these two cases present very similar

11  prescription questions, both in terms of the facts and the law.

12  Frankly, they parallel the same types of prescription questions

13  that we already addressed in the *Johnson* argument, very similar

14  situations with both Ms. Earnest and Ms. Francis as we saw with

15  Ms. Johnson; namely, Ms. Earnest and Ms. Francis were both, as

16  they say in the briefs, painfully aware of their hair loss

17  within six months after stopping chemotherapy.  That's

18  undisputed.  That's in 2012 and 2010 respectively.

19  Both Ms. Earnest and Ms. Francis always believed

20  that chemotherapy was the cause of their hair loss.  Again,

21  that's undisputed.  Both Ms. Earnest and Ms. Francis also knew

22  that Taxotere was part of the chemotherapy regimen that they

23  received.  Despite the fact that they were painfully aware of

24  their hair loss, Ms. Earnest and Ms. Francis did not do

25  anything to investigate the injury or the damage for many

01:03    1    years.

2               THE COURT:  Let me ask you something, Mr. Strongman.

3               MR. STRONGMAN:  Yes, of course.

4               THE COURT:  I read Ms. Francis' deposition with care.

5    It seems to me she says, "I knew my hair wasn't growing back.

6    I went to my oncologist appointment.  I talked to the PA, and

7    she said, 'You need to see your family doctor.'  I see my

8    family doctor and she says, 'Maybe you need to see your

9    dermatologist.'  The dermatologist says, 'I think there's

10   things we can do for this,'" and she is taking these shots.

11              It doesn't seem that she has an awareness that

12   it's permanent.  She knows she's lost her hair, but she is

13   still thinking, from the way I read her deposition, that,

14   Listen, this is not over yet and this could still be a

15   temporary condition.  I'm taking these shots, and I don't know

16   if the shots -- I don't know what they are.  I don't know.

17   Maybe they were B12 shots -- that if you could just get your

18   body healthier, your hair will grow back.  How is that a

19   recognition that this is a permanent condition?

20              MR. STRONGMAN:  Well, there's two things to that.  So

21   the first thing, Ms. Francis ultimately sought some

22   treatment --

23              THE COURT:  Yes.

24              MR. STRONGMAN:  -- after she filed her lawsuit.  So

25   Ms. Francis claims in the briefing and in her deposition

01:04

1   testimony that what triggered her notice, as they would argue
2   in their brief, was a lawyer advertisement.  So whether or not
3   Ms. Francis has a firm belief that her hair loss is permanent
4   or that it could improve or that her hair has continued to grow
5   back -- which it has.  She has a significant amount of hair.
6   So the fact she hasn't come to a firm conclusion as to the full
7   extent of it is not what the law requires.
8              The law requires that when she is aware that
9   there is something that isn't right, she must do what she needs
10  to to investigate.  I think the quote under Louisiana law is
11  "plaintiff is responsible to seek out who may be responsible"
12  once you know something isn't right.  So Ms. Francis may have
13  determined that her hair has some opportunity to improve, which
14  it very well may and maybe it is improving.  That doesn't mean
15  she wasn't on notice to bring a lawsuit.
16             **THE COURT:**  Well, I guess my question is -- because
17  this is a little different.  This case isn't somebody that got
18  run over by a Coca-Cola truck and lost their arm, where we know
19  that's one thing.  This lawsuit is:  When did you understand it
20  wasn't temporary?  That's what my concern is, at what point did
21  it change from this may not be a temporary condition, this is a
22  permanent condition, and I think that's a continuum and why
23  prescription issues -- we call it prescription issues --
24             **MR. STRONGMAN:**  Understood.  Right.
25             **THE COURT:**  Prescription issues are so fact intensive

01:06

1    in this case.

2           **MR. STRONGMAN:**  So I think when you look at both

3    Ms. Earnest's case and Ms. Francis' case -- so we are going

4    back to, for Ms. Francis, 2010, when she had stopped using

5    chemotherapy; for Ms. Earnest, 2012.

6           **THE COURT:**  Right.

7           **MR. STRONGMAN:**  They both testified and knew that

8    their hair was not as they wished it would be.

9           **THE COURT:**  Right.

10           **MR. STRONGMAN:**  They knew that their hair regrowth

11    was not what they wanted.  So at that point, while I understand

12    there's a continuum towards what your final conclusion may be,

13    the reality is once you have determined that what your

14    expectation was and what has happened are apart, you were on

15    notice to investigate.

16                So the fact that there may be a continuum

17    between what we are in here today calling temporary and

18    permanent, the reality is plaintiffs in this litigation don't

19    either have all their hair or no hair.  That isn't the

20    circumstances that any of these plaintiffs present with.

21           **THE COURT:**  Right.

22           **MR. STRONGMAN:**  What they are presenting with is a

23    claim that their hair is not what they believed it would be.

24    So when there is a reasonable constructive knowledge, I think

25    would be the word to use under the law, that your hair has not

1   grown back to your expectation and you knew that the reason

2   your hair was missing was because of chemotherapy that you were

3   then on notice to do an investigation.

4           What we know for both Ms. Earnest and

5   Ms. Francis is that that investigation did not happen until

6   after they filed the lawsuit.  So clearly it can't take filing

7   a lawsuit to trigger the statute of limitations or the

8   prescription period.  That doesn't make any sense.

9           So what we know is that there was certainly

10  enough -- and I think in the brief the word that is used by

11  both plaintiffs is "painfully" aware of their circumstance with

12  their hair, going back to 2010 for Ms. Francis and 2012 for

13  Ms. Earnest.  So you're talking about years.  We are not

14  talking about missing the prescription period by a day or a

15  month.  We are talking about years.

16          Certainly there's evidence in the record that

17  makes it clear that both Ms. Francis and Ms. Earnest understood

18  that their hair was not as they expected and that they knew

19  something was wrong and that that triggers under Louisiana law

20  a duty to investigate, and neither plaintiff did.

21          The other thing that's critical is Louisiana law

22  has actually addressed this temporary/permanent distinction in

23  some regard.  We have cited to you in our briefs the *Fontenot*

24  case.  This quote is out of there, where the plaintiff's

25  contention is largely that "The doctor told me that this was

01:09   1   temporary, but if it's permanent, it's different," and the
        2   court said --
        3           THE COURT:  The gravamen of this complaint --
        4           MR. STRONGMAN:  Right.
        5           THE COURT:  -- is that it wasn't temporary; it was
        6   permanent.
        7               Again, I read the *Fontenot* case, and I know that
        8   was a back surgery gone bad.  I think they dropped a drill.
        9   This case, that's what this case is, when did it cease becoming
       10   temporary, and now that's the issue.  So I think that's
       11   distinguishable.
       12               Everybody loses their hair in chemotherapy.
       13   Well, we can say the vast majority of women that undergo
       14   chemotherapy, and men too -- I shouldn't say just women -- will
       15   lose their hair.  The crux of this case is that it's permanent,
       16   and so the question in my mind is at what point did you realize
       17   this is no longer a temporary problem, but it's a permanent
       18   problem.  That was not the case in *Fontenot*.  The facts, I
       19   think, make that very different.
       20           MR. STRONGMAN:  So the other issue at play here is
       21   the standard.  Under Louisiana law the standard is an objective
       22   one, not a subjective one.  So it deals with what a reasonable
       23   person would think or believe or feel the need to investigate.
       24           THE COURT:  Right.
       25           MR. STRONGMAN:  Plaintiffs cannot overcome the

01:10   1   prescription period just by saying, "Well, I have this enduring
2   hope that my hair will come back."  That's not reasonable after
3   four years, five years, six years.  So a reasonable
4   interpretation, a reasonable person would be on notice to
5   investigate, if nothing else, under the terms of the complaint
6   as it's pled, which defines the injury here.
7           The plaintiffs' complaint, it defines the injury
8   as an incomplete hair growth six months after the cessation of
9   chemotherapy.  So to take those allegations on their face as
10  the definition of the injury, you are at least into a territory
11  where you have triggered a notice to do an investigation.
12  **THE COURT:**  Let me ask this question.  This is
13  interesting to me because we have 11,000 cases, give or take.
14  There is this master complaint.  When you look at the face of
15  the complaint, yes, but do we do any individualized assessment,
16  where we look at the facts beyond that complaint to what the
17  subjective knowledge was of the plaintiff and then whether or
18  not their belief was reasonable, before we make a determination
19  as to when prescription runs as to that particular plaintiff?
20  Is that awkwardly worded?
21  **MR. STRONGMAN:**  Absolutely.
22  **THE COURT:**  I'm just hoping it was clear.
23  **MR. STRONGMAN:**  I certainly understand and do not
24  disagree with the Court that this is not an issue that we are
25  asking you to decide for every single case at one time.

01:12

1          **THE COURT:**  Okay.

2          **MR. STRONGMAN:**  I understand that.

3          **THE COURT:**  Let's go back to Ms. Francis.  I guess

4    this is because I'm seeing she is actively receiving treatment

5    thinking this treatment should be successful.  "My hair is

6    going to come back, and so I'll going to wait it out longer."

7    Then I wonder when is the magic point where you realize this is

8    as good as it's going to get and --

9          **MR. STRONGMAN:**  I understand that.  I think the

10   critical component for Ms. Francis' treatment is that it didn't

11   happen until after she filed her lawsuit.  So we are talking

12   about a situation where that is not what she did to investigate

13   whether or not she had a claim.  It's not what she did to try

14   to figure out what was going on.  She already filed a lawsuit,

15   and the same goes for Ms. Earnest.  There is a timing component

16   to it.

17               Certainly what we know is that both

18   plaintiffs -- I think this is an important issue that plays

19   into this, too, specifically with Louisiana law, is that both

20   plaintiffs' claims, as the Louisiana law sets out, are

21   prescribed on their face, which means that the plaintiffs bear

22   the burden of showing that we have an exception.

23         **THE COURT:**  Right.

24         **MR. STRONGMAN:**  So the types of questions that

25   Your Honor has asked, frankly, are questions that the other

01:14

1    side has the burden of answering, not the defendants.  So when

2    you're dealing with Louisiana law and that burden shift, which

3    we have at play here, it's different.  It really is a question

4    that when there's an absence of evidence and when there is an

5    open question about when this happened or when that temporary

6    to permanent shift happened, that has to cut against the

7    plaintiff's claim when it's prescribed on its face, which we

8    have here due to the fact that the injury, as defined, occurred

9    years and years before the plaintiffs filed their respective

10   lawsuits.

11            So that's another reality that Louisiana law

12   presents that I think is an important one to consider when

13   trying to answer that question, but I certainly understand that

14   there are and can be fact-specific issues that come up in every

15   case that have a bearing on this question.  Certainly Sanofi

16   isn't asking you to disregard or discount that reality.

17            A couple of points I wanted to make.  We covered

18   the law with the *Johnson* case last time.  I don't think there's

19   much we need to cover on that again unless Your Honor has some

20   questions.

21            Just for the record, a couple of points on

22   Ms. Earnest:

23            "QUESTION:  Again, did you ever think your hair loss

24       is due to anything other than chemotherapy?

25            "ANSWER:  No.

01:15

1          "QUESTION:  You always thought the condition of your

2      hair was related to the chemotherapy, correct?

3          "ANSWER:  Correct."

4          The wrinkle with Ms. Earnest's case that,

5      frankly, makes the statute of limitations motion in her case

6      perhaps stronger for the defense than even in the *Francis* case

7      is that Ms. Earnest had notice in her possession before she

8      started chemotherapy of, at least as described in the

9      information that she had, rare reports of permanent hair loss,

10     which is essentially the same information that the plaintiffs

11     claim triggered the whole litigation by being added to the

12     Taxotere label.

13         So Ms. Earnest was provided this handbook by her

14     doctor before chemotherapy.  Now, it's very clear right here if

15     you were to go look through the handbook -- it is a big

16     handbook, but if you look through the index, it's not hard to

17     navigate.  If you want to know information about the drugs that

18     you are taking, it's easy to find.  Ms. Earnest had this

19     handbook.  She knew she was taking Taxotere and certainly was

20     on notice that there were rare reports of permanent hair loss

21     based on this book.

22         Now, Ms. Earnest may claim that she doesn't

23     remember reading it, "I didn't read it cover to cover," etc.,

24     but I think the law supports -- and in some ways, again, to

25     come back to the *Riviera* case a little bit -- when the

01:17

1    plaintiff is in possession of knowledge, the fact that it's in

2    a drawer or hidden but not looked at doesn't entirely eliminate

3    the fact that it exists and that it was available to them.  So

4    the Ms. Earnest case is, if anything, even stronger on the

5    statute of limitations because she had information at her

6    fingertips.  Just like Ms. Francis, Ms. Earnest didn't

7    investigate for years.

8              There were a couple of points that I saw in the

9    briefing that I wanted to address, one being Dr. Carinder.  So

10   there's a lot of talk in the hypothetical about, well,

11   Dr. Carinder didn't know X or Y; so had Ms. Earnest gone and

12   talked to Dr. Carinder, he wouldn't have had any information to

13   share with her.  First of all, the Louisiana law says that

14   isn't a requirement.  You don't need a doctor to tell you you

15   have a claim.  That's first.

16             Second, this conversation never happened in

17   reality.  Ms. Earnest never went to Dr. Carinder and asked this

18   kind of question, and you can see it here.  Ms. Earnest was

19   asked point-blank:

20             "QUESTION:  You never had a conversation with

21        Dr. Carinder where he said, 'I didn't know that persistent

22        hair loss with docetaxel was a possibility'?

23             "ANSWER:  No, I never had a conversation with him

24        like that.

25             "QUESTION:  You never had a conversation with anyone

1      outside of the attorney-client relationship to that

2      effect, correct?

3          **"ANSWER:**  Correct."

4              So what we know for both Ms. Francis and

5      Ms. Earnest is that they sat and passively waited for years.

6      The only thing that changed was a lawyer told them that they

7      may be entitled to benefits.  That's the only thing that

8      changed, lawyer advertising.

9              We certainly can't be in a situation where the

10     plaintiffs' lawyers can drive the entirety of the prescription

11     question in every lawsuit simply by putting out advertisements

12     when they choose to.  We know that under the law of Louisiana

13     you don't have to wait and sit on your hands until the lawyer

14     tells you you have a claim.  That is well-settled, but that is

15     exactly what happened in both of these cases.

16             I'm happy to answer any questions that

17     Your Honor has, but at the end of the day the burden of proof

18     is on the plaintiff to prove an exception; namely, the

19     discovery rule.  What we have here is a situation where both

20     plaintiffs knew of their injury and damage.  They waited years

21     before filing suit and didn't do an investigation in the

22     interim like Louisiana law requires.  As a result, because of

23     those realities and the burden on the plaintiff, both claims

24     are prescribed and were filed well outside of the one-year

25     prescription period.

01:20

1          **THE COURT:**  Thank you.

2          **MR. NOLEN:**  Good afternoon, Your Honor.  Rand Nolen

3    for Tanya Francis and Barbara Earnest.

4               To start with, Your Honor, I would just say

5    this.  If we are to logically follow what Mr. Strongman just

6    told the Court, we know that at some point prior to 2009 Sanofi

7    changed their labeling for Taxotere and put in the label that

8    it causes permanent hair loss and then went out and told

9    doctors across the United States and perhaps the entire world

10   that that was true so that they could tell patients, but they

11   didn't.  Those aren't the facts at all.

12              In fact, even today Sanofi in both briefs say

13   that they don't even concede that Taxotere causes permanent

14   hair loss, and yet Ms. Francis and Ms. Earnest are supposed to

15   know that Taxotere ingestion caused their hair loss.  That's

16   what the argument is.  They are supposed to be on some sort of

17   notice that they have permanent hair loss as a result of taking

18   Taxotere, yet in both cases neither of their chemotherapy

19   doctors ever told them that was the case.

20              In fact, they both testified -- Dr. Verghese

21   testified that he did not warn of a risk of permanent hair loss

22   because he didn't know Taxotere was associated with permanent

23   hair loss.  In Ms. Earnest's case, her oncologist,

24   Dr. Carinder, testified that he did not discuss permanent hair

25   loss with Barbara because he didn't know that permanent hair

01:22

1   loss was associated with Taxotere.

2           **THE COURT:**  Yes, but I think the question is:  When

3   were these plaintiffs aware that "I have sustained permanent

4   hair loss"?  I think they both have said that they related it

5   to chemotherapy at the time.

6           **MR. NOLEN:**  Right.

7           **THE COURT:**  The law in Louisiana is you can't sit on

8   your hands; you have to do something.  My question is:  When

9   did you realize that it was permanent and what did you do?

10          **MR. NOLEN:**  In both cases, Your Honor, the plaintiffs

11  have testified that they knew that they had hair loss

12  associated with their chemotherapy use and that it was

13  temporary.  In both instances, that's their testimony.  They

14  believed that it was temporary.  In both instances, Your Honor,

15  they started regrowing some amount of hair after their

16  chemotherapy ended just as they thought and had been told by

17  their doctors would occur.

18               So what then happened, though, was that time

19  passed and their hair didn't come back in very thick.  It

20  didn't come back in nearly the same.  In fact, they have

21  permanent hair loss on their scalps, they don't have eyebrows,

22  and they don't have eyelashes.  So you have almost a signature

23  injury with the eyelashes and the eyebrows, and yet that's not

24  warned of anywhere in the Taxotere label.

25               Under the doctrine of *contra non valentem*, the

01:23

1   issue is when the tort victim knows or should know of the

2   causal association between the product and the injury and know

3   that they are the victim of a tort.  That would be impossible

4   in this situation.  So you have tort impossibility because the

5   manufacturer has consistently denied, at least up until 2015

6   when they made a change to their own labeling in December, that

7   their product was associated with or caused permanent hair

8   loss.

9              So why is it that the tort victims in these

10  instances aren't entitled to rely upon what the manufacturer

11  says?  Should they just presume that the manufacturer is not

12  telling the truth?  Should they just presume that their

13  doctors, when they told them their hair loss was temporary,

14  either didn't know or had been lied to?  We can't just presume

15  that.

16             There is a big distinction, Your Honor.  I know

17  the Court wants to ask me a question.  I don't mean to cut off

18  the Court, but they raised the *Fontenot v. ABC Insurance* case.

19  That's a completely separate case.  That's a bad back case,

20  just as the Court observed, where the drill slipped.  The

21  doctor tells the plaintiff that the drill slipped, says that

22  you have some --

23             **THE COURT:**  I know.  I already went through that with

24  Mr. Strongman.  This is my issue.

25             **MR. NOLEN:**  Okay.

01:24

1    **THE COURT:**  I don't think under Louisiana law there

2    is a requirement that a manufacturer fess up and say, "We did

3    something wrong," for prescription to run.  That's just not the

4    law at all.  I think that the question is when are you on

5    notice that you have sustained an injury or an event.

6         That's what, as I appreciate it, this complaint

7    is:  We were never told that permanent alopecia was a side

8    effect of Taxotere chemotherapy treatment.  We weren't told

9    that, but it happened.  We should have been told that so that

10   we could make an informed decision as to whether or not we

11   wanted to choose that course of treatment.

12        I think the issue in my mind is when did these

13   people understand that this was no longer a temporary

14   condition, it was a permanent condition, and then it triggers,

15   if you will, a duty to investigate.  That's the law, as I

16   appreciate it, unless you have hidden something or it is

17   impossible to discover, and that's when *contra non valentem*

18   comes in.  *Contra non valentem* doesn't excuse the duty to

19   investigate.

20        **MR. NOLEN:**  Your Honor, back to that impossibility

21   issue, how would a plaintiff know what is in the files of

22   Sanofi when it's not disclosed and it's not in the label and

23   when it's not being promulgated to the medical community?

24        **THE COURT:**  She shows up at her doctor's office and

25   says, "What do you mean?  My hair didn't grow back.  You said

01:26

1  it would."

2       MR. NOLEN:  Right.

3       THE COURT:  That's an investigation.

4       MR. NOLEN:  Let me go a little farther than that,

5  then.  So that's the "excite the attention" that's described in

6  *Campo v. Correa*.  So what the Louisiana Supreme Court said in

7  *Campo* is, "We cannot expect that patients will self-diagnose,"

8  a direct quote from there.  The plaintiff cannot be in the

9  position of self-diagnosis.

10      THE COURT:  Right.

11      MR. NOLEN:  So in this instance, in these two cases,

12  Your Honor, you don't have any evidence at all that a doctor

13  told them that they were going to have permanent hair loss.

14  That doesn't occur.  We have almost exhausted -- I think we

15  have exhausted discovery in the cases.  You don't have any

16  evidence that any of the physicians that they saw ever told

17  them they were going to have permanent hair loss.  You don't

18  have any instance where the manufacturer ever publicized a risk

19  of permanent hair loss or that people would have permanent hair

20  loss.

21           In Ms. Francis' case, you have her going to her

22  doctor in 2012, actually, and saying, "Doctor, can we do

23  something to help me hair grow back?" which would indicate -- I

24  can tell you I've got this giant bald spot back here.  I'm very

25  painfully aware of it because my wife points it out to me

01:28

1    regularly.  I don't go to the doctor asking for some kind of

2    medicine to put on it because I understand that I have male

3    pattern baldness and I'm bald in the back.  I know not to go

4    and ask, "Is there anything out there for me, Doctor?" because

5    I know that that's not something that can be cured at this

6    point in medical science.

7                 That is the opposite of what Ms. Francis did,

8    where she goes and says, "My hair is not coming back exactly

9    like I thought it would.  Can you help me?" and nobody gave her

10   any solution, nor did they tell her ever that it was a

11   permanent condition.  The reason, of course, they didn't tell

12   her that it was a permanent condition is because nobody had

13   told them.

14                 Now, I saw the Court writing down something

15   during the Barbara Earnest part of Mr. Strongman's

16   presentation, particularly when he put up the little handbook,

17   that nurse handbook that has that indication in there about

18   reports of Taxotere, and several things about that.

19                 One, that is over a 200-page book.  The doctor,

20   who was a surgeon, who had provided that to Ms. Earnest did

21   not, in fact, read the entire book himself.  In fact, his

22   testimony is, "I never read the entire book."  What he did do

23   was refer her to the pathology section, which she got --

24                 **THE COURT:**  Right.

25                 **MR. NOLEN:**  -- which she actually reviewed, but she

01:29

1    didn't have a clear recollection of that.  She knew she had not

2    read the entire publication.  It's like a textbook in some

3    ways, and it deals with a lot of different issues.

4              We know that that didn't happen because that's

5    her testimony.  So we have testimony to that effect, that she

6    didn't read it.  We have testimony from the doctor who gave it

7    to her who said that he didn't read it.  We have got that, so

8    then the issue becomes why does that book say that.  I don't

9    know.  I don't know that anybody knows why it says that;

10   because at the time that it would have been given out, that was

11   not something that had been widely reported in either the

12   medical literature and was not being said by the manufacturer.

13             So what I think we can probably presume is that

14   report comes from some sort of anecdotal understanding that

15   that nurse practitioner who wrote the book had.  But otherwise

16   there's no evidence, Your Honor, that Ms. Earnest ever saw that

17   or understood it to mean that she wasn't going to have her hair

18   grow back.  That was an issue that had been raised.

19             The other case that was cited as sort of the

20   case in Louisiana law that was going to be problematic was this

21   *Carter v. Matrixx* case.  It's a Zicam case that was decided on

22   undisputed facts.  Curiously, in that case the plaintiff

23   actually doesn't raise the issue that when *contra non valentem*

24   is raised that it typically turns on fact issues and,

25   therefore, is a determination that the jury should make.

01:31

1    In the opinion itself, what the court says is
2    these are really undisputed facts and the individual, the lady
3    who suffered from a Zicam injury -- which was she took Zicam
4    and lost her sense of smell and sense of taste -- admitted that
5    she, in fact, had lost it immediately after and over any period
6    of time it had never returned.  She sought treatment for that
7    early on and told doctor after doctor -- I think there's three
8    doctors in that case that she went to and said, "I seem to have
9    permanent loss of senses as a result of taking Zicam."  So
10   that's a major difference.
11           We do not have in this case just as in the
12   *Fontenot* case.  We don't have the same situation where in
13   *Fontenot* the plaintiff was going to different doctors saying
14   that he had suffered a nerve injury that was not resolved, a
15   permanent nerve injury, and he wrote it down in two different
16   places more than a year after he had suffered the injury.
17           In Zicam we had that instance where she is going
18   and seeking treatment saying, "I seem to have permanently lost
19   my sense of smell and my sense of taste."  We don't have that
20   in this case.  You cannot point to anywhere where these ladies
21   are admitting that they somehow know, have divined that they
22   have permanent hair loss.
23           It's counterintuitive also.  If they were
24   seeking any treatment for a permanent condition, then it's
25   counterintuitive.  Right?  Because you don't go to the doctor

01:33

1   if your arm has been cut off and say, "I need some treatment

2   because I want my arm to grow back."

3           **THE COURT:**  Are you telling me that prescription,

4   then, never runs?

5           **MR. NOLEN:**  Well, the courts of Louisiana have

6   answered that question on many occasions.  They have imposed

7   prescription on pretty much every case that I'm aware of that's

8   been reported.  It seems to me, though, that in certain

9   circumstances where you have an affirmative hiding of

10   information, nondisclosure, that for at least during the period

11   of time that that information is being withheld, not provided,

12   then the answer is prescription shouldn't run.  There are a

13   multitude of cases where when you have sort of that affirmative

14   withholding of information and not disclosing that something is

15   a permanent condition versus a temporary condition that

16   prescription does not run because you have information that is

17   being withheld.

18           In fact, in the case that we just talked about,

19   the *Fontenot v. ABC Insurance* case, the Court specifically

20   found that the surgeon had not committed a fraud or deception

21   because the surgeon had fessed up immediately that there was

22   this accident and told the gentleman that he thought that it

23   would resolve over time.  It did not resolve, and the

24   individual kept going and trying to seek treatment to help with

25   his permanent nerve injury.  It did not resolve.

01:35

1          In that case, though, the man knew that he had

2    been the victim of a tort of negligence, because the drill had

3    slipped, the day after his surgery where the drill had slipped.

4    He knew he was the victim potentially of a tort, so that's why

5    the one-year prescription period runs against that individual.

6    This is a different case because we have even until now the

7    defendant saying that "Our product does not cause permanent

8    hair loss" and not until the end of 2015 warning about it.

9          Now, in both these cases the suits were filed

10   within that period of time, in the 2016 time period, but the

11   point of it is that there is an impossibility point here,

12   because it's not being widely reported by anybody that there's

13   permanent hair loss associated with this drug.  The

14   manufacturer is not putting that in the label.  The

15   manufacturer is not telling physicians.  Their detail people

16   aren't telling physicians.

17        THE COURT:  So I'm going back to, I think, the first

18   question I asked based upon what you are arguing.  Are you

19   telling me that prescription didn't run until they changed the

20   label?  Is that the position you are taking?

21        MR. NOLEN:  No, I'm not taking that position because

22   we actually --

23        THE COURT:  When does it start running?

24        MR. NOLEN:  We actually know in both instances how

25   these individuals, Ms. Francis and Ms. Earnest, learned about

01:36

1 the potential for permanent hair loss, and it wasn't the label

2 change.  In both instances it was an advertisement, an attorney

3 advertisement.  Ms. Francis, she saw it on Facebook.  In

4 Ms. Earnest's case, I think she saw it on TV.

5    That would have been their first notice because

6 that's the first time they had any idea that their hair was

7 never going to come back.  That was the first possible notice

8 that they had because there's no evidence of any other notice

9 to them.  I'm not tying it to the label change at all.  They

10 didn't even know about the label change.

11    Does the Court have any other questions?

12    **THE COURT:**  No.  I think I'm good.  Thank you.

13    **MR. NOLEN:**  Happy to answer them.

14    **MR. STRONGMAN:**  Your Honor, just one minute.

15    A couple of points I wanted to make.  Now, with

16 regard to Ms. Francis, her hair has continued to grow back and

17 change over time, so that's one circumstance.  Ms. Earnest, I

18 believe, has been clear that her hair condition has remained

19 the same since 2012, so that's an entirely different

20 circumstance altogether.

21    I know that you're wrestling with the idea of

22 this line between temporary and permanent, and the reality is

23 that we don't need to make a determination on that exact issue

24 today for everybody because what we know is that these two

25 cases -- you know, whether that line is one year, two years,

01:38

1   three years, in both of these cases it's beyond that.

2         THE COURT:  I think that's an individualized

3   assessment, what somebody thinks after you have a surgery

4   and -- I've got this ongoing problem with my foot.  I might

5   give it two years before I go to the doctor because I just am

6   the eternal optimist, and I have friends that would be there

7   the next week.  At the point that you realize this is as good

8   as it's going to get --

9         MR. STRONGMAN:  Again, under the reasonableness

10  standard, waiting four years, six years is not reasonable to

11  make that inquiry.

12         I know Mr. Nolen talked about self-diagnosis.

13  Well, the curiosity here is that what we --

14         THE COURT:  I know what you are going to say.

15         MR. STRONGMAN:  Well, I will say it anyway.  What we

16  have here is not self-diagnosis; we have lawyer diagnosis.

17  What we certainly can't have in the law is something where all

18  it takes is a lawyer telling you you have something for the

19  statute to run and for people to file lawsuits.

20         So it is clear, based on these cases, that the

21  plaintiffs have the burden, and they just can't meet it, to

22  prove any kind of exception.  They are barred under the

23  prescription on their face, and there isn't anything under the

24  law to save them.

25         THE COURT:  Thank you.

01:39

1          I know you-all have flights to catch.  Please

2    feel free to leave.

3          **MR. MOORE:**  You have given me five minutes to make

4    this argument, Judge, and I intend to keep my remarks within

5    that limit.  Douglas Moore on behalf of Sanofi.  I am

6    addressing the Rule 72 motion as it relates to Judge North's

7    minute entry on an in camera inspection on documents related to

8    the stem cell issue.

9          I think I can speak for all counsel in this room

10   that we are all impressed and appreciate very much Judge

11   North's management of discovery in MDL 2740.  He has approached

12   it with diligence, with commitment, and he renders his rulings

13   with unmistakable clarity.  It has been a Herculean task, and

14   both sides have received rulings that they do not agree with.

15   This is one of those for Sanofi.

16         We didn't know it at the time, but the stem cell

17   saga in this case really relates back to the time that the

18   plaintiffs filed a Rule 72 motion on Judge North's ruling as it

19   relates to the pathology production.  You affirmed that ruling

20   under sort of different reasoning, but you reached the same

21   result.

22         In this Rule 72 motion, we are asking you to

23   reach a different result.  We think that the issue in this case

24   is very simple:  Are we entitled to the discovery of facts and

25   data provided to Dr. Thompson related to the work that he was

01:41

1    doing in this case?  We think the case law is unequivocal.  We

2    think the answer to that question is yes.  We have two issues

3    with Judge North's ruling, which was rendered without the

4    benefit of any briefing.  It was simply an in camera review

5    because we were on a tight time frame.

6              It's apparent from the minute entry and also

7    from his ruling on our motion to compel, which was cited in

8    their opposition, that Judge North views any communication

9    involving a lawyer, as it relates to experts, to be off limits

10   following the 2010 amendments to FRCP 26.

11             We don't think that's the correct law.  We think

12   that there are numerous exceptions.  We have cited them in our

13   papers.  One of those is a circumstance when facts or data are

14   considered and contained in the communication from the lawyer,

15   that communication becomes discoverable.

16             That's the second issue that we have with the

17   minute entry.  Judge North determined that information

18   contained in some of the materials that he looked at were not

19   discoverable because Dr. Thompson did not rely on them.

20   Reliance is not the standard, under Rule 26, for disclosure of

21   an attorney communication that includes facts or data

22   considered.

23             Consideration is a much lower standard than

24   reliance.  The case law that we cited to the Court establishes

25   it basically means that they looked at it, that they reviewed

1  it, that they were provided that information for their

2  consideration.  So if an attorney says, hey, expert, look at

3  this article, look at this information, review these materials,

4  that becomes discoverable at that time.  It doesn't matter if

5  the expert says:  I don't like it; or I don't cite it; or I'm

6  not going to include it in my opinion.

7        So those are the two problems.  There is no

8  carte blanche rule against disclosure of attorney

9  communications after the 2010 amendments, and the second is

10  that the standard is consideration and not reliance.  We think

11  that's where the minute entry is incorrect.

12        So how does all of that apply to the materials

13  submitted in camera?  Well, for most of it, I have no idea

14  because we weren't given a privilege log.  We weren't given

15  really a lot of information about what it was because of the

16  timeline that we were on.  But there is some information that

17  we received both before and after Judge North's ruling that

18  makes us firmly believe that there is information contained

19  within the in camera production that contains facts and data

20  that should have been produced to us.

21        I'm specifically referring to the video that was

22  shown to Dr. Thompson.  We asked him at his deposition, after

23  Judge North's ruling, what that was about.  He testified:

24       "QUESTION:  So plaintiffs sent you a video about a

25    stem cell researcher giving a lecture?

01:44

1              "**ANSWER:**  Yes."

2                    The issue of stem cells is obviously at issue in

3      this case.  Dr. Thompson tested the plaintiffs' tissue for the

4      presence of stem cells.  He was obviously shown this video of a

5      lecture from a consulting expert.  When you link up a

6      consulting expert and provide information to a testifying

7      expert, the provision of that information becomes discoverable.

8                    It doesn't matter if he doesn't think it's

9      relevant.  It doesn't matter that he doesn't rely upon it.  If

10     he is provided information, if he reviews it, if he looks at

11     it, if he thinks about it, that becomes discoverable and

12     something that we should have.

13                   I haven't seen the videos.  All I know is what

14     Dr. Thompson said in his sworn testimony.  It's a video of a

15     stem cell researcher giving a lecture, and we know that stem

16     cells are at issue in this case.  So we would ask, at a

17     minimum, that the videos be produced to the extent that they

18     are conveying facts and information to Dr. Thompson.

19                   I have 15 seconds, and in those 15 seconds I

20     make one more request, and that is that in the surreply

21     provided by the plaintiffs, they included a September 3 email

22     that was not given to Judge North.  It was identified in his

23     invoices.  We knew about it.  We asked about it.  They said

24     they couldn't find it.  The expert that it was sent to had a

25     copy of it, and they gave that to you.

1    **THE COURT:**  Yes.

2    **MR. MOORE:**  We have not seen it.  Judge North hasn't

3    seen it.  Judge North hasn't ruled upon it.

4    **THE COURT:**  I will tell you this is the situation,

5    because Judge North contacted me about that and said --

6    **MR. MOORE:**  We raised it with him.

7    **THE COURT:**  We spoke.

8    He said, "This is on appeal to you.  I don't

9    know if you have reviewed it.  There is this other issue.  Do

10   you want me to handle it and then send it to you?"

11   I said, "I think that's the antithesis of

12   judicial efficiency.  If I've got it, give it all to me at this

13   point," and he happily agreed.

14   **MR. MOORE:**  Okay.  That was the question we had for

15   him, and he indicated he was going to raise that with you.

16   **THE COURT:**  We visited about that, and so that's how

17   it ended before me.  I know that he has not seen it.

18   **MR. MOORE:**  So the 10 seconds on why we think we are

19   entitled to that email, they admit that it is an email that

20   does not involve a lawyer.  It is not privileged.  Their

21   argument for not producing it is that, well, it's about a

22   different study that these two experts were talking about, and

23   that's not relevant to the opinions that were issued in the

24   case.

25   It's clearly about stem cell research.  Our

01:46

1    experts had to give over discovery about other research that
2    they had done outside of the case because it may be relevant to
3    the opinions they were rendering, and we furnished that
4    information.  That should apply to this communication as well.
5             We think that if it's about stem cells, stem
6    cells were obviously considered by Dr. Thompson.  He tested for
7    them, didn't like the results, so he didn't put them in his
8    report.  We still think that's relevant, and we think we should
9    have access to that as well.  Thank you.
10            **THE COURT:**  Thank you.
11            Mr. Lambert, let's see if you can go five
12   minutes without breathing.
13            **MR. LAMBERT:**  Good afternoon, Your Honor.  Palmer
14   Lambert from Gainsburgh Benjamin, co-liaison counsel for
15   plaintiffs.
16            In Magistrate Judge North's order of April 1,
17   Rec. Doc. 6616, His Honor correctly determined that the work
18   product protections of Rule 26 apply to protect the documents
19   submitted in camera by the PSC.  Because Judge North's legal
20   conclusions were not incorrect and because his application of
21   law to facts was not clearly erroneous, the Court should not
22   reverse his decision.
23            The 2010 amendments to Rule 26 are clear.
24   Sanofi is only entitled to facts or data considered by the
25   witness in forming the opinions to be expressed.  Those last

01:48

1    few words about "forming the opinions to be expressed" are

2    generally omitted from all of the citations in Sanofi's

3    position.

4                It goes without saying, Your Honor, the PSC is

5    frustrated with the allegations of impropriety that permeate

6    the original memorandum, the reply memorandum, and the

7    sur-surreply memorandum submitted by Sanofi.  I do want to

8    address some of the issues that are raised in those briefs.

9                In February of this year, it became apparent

10   that the PSC's dermatopathology expert made a mistake.  He

11   admitted to making a decision on his own to withhold six slides

12   that were stained with cytokeratin and Ki-67.  The PSC had no

13   reason to believe these slides had been sent to Sanofi as we

14   produced Dr. Thompson's bills two months before, in December,

15   that identified these stained slides.

16               On January 11, Sanofi's dermatology and

17   dermatopathology experts issued their reports without any

18   mention of the cytokeratin and Ki-67 slides.  Since the PSC was

19   made aware of this mistake, the PSC agreed to a four-month

20   continuance of the trial, to put up four of its experts for

21   supplemental depositions, answered numerous questions posed by

22   counsel regarding the handling of these six slides, provided

23   certain email communications -- including lawyers on them -- to

24   document the chain of custody, and provided declarations of two

25   consultants regarding the same, regarding their handling or

01:50

1    nonhandling of these materials.  After all of that supplemental

2    discovery, it remains clear that there is no stem cell study

3    that was conducted by the PSC.

4              Sanofi suggests three invoices, line items

5    related to August 15, September 3, and October 24 emails,

6    provide support for its contentions.  However, when the

7    timeline of events is considered, it is clear Dr. Thompson did

8    not consider any such communications in forming his opinions.

9              Dr. Curtis Thompson issued his dermatopathology

10   reports in April of 2018.  All of these communications which

11   are complained about in Sanofi's position postdate that report.

12   None of the PSC's experts, including Dr. Thompson, considered

13   these six stem cell slides in forming their opinions.  The

14   existence of these slides and discussion surrounding these

15   slides is completely irrelevant to any of the plaintiffs'

16   experts and their opinions in this case.

17             In his April 3 deposition -- oh, that's really

18   small.  I'm sorry, Your Honor -- Dr. Thompson addressed the

19   reason why these slides are irrelevant and not appropriate for

20   any opinion.  He said, "For sure, it wouldn't have been

21   included in the dermatopathology reports because there's no

22   support, published support, even professional experience that

23   these have any utility in diagnosis."

24             Dr. Tosti also was deposed.  We do not have that

25   transcript in the record, but she also stated that these six

01:52

 1   slides have no utility without a full study that has controls

 2   and hundreds of participants.

 3           Despite all of this, Sanofi continues to

 4   preargue *Daubert* issues throughout this briefing, including

 5   making incorrect statements about what plaintiffs must prove to

 6   meet their general causation burdens.

 7           As late as this past Sunday, we had a six-hour

 8   deposition of Dr. Jerry Shapiro, defendants' dermatology

 9   expert.  He admitted he is not an expert in stem cells or stem

10   cell staining, never ordered cytokeratin-15 or Ki-67 staining,

11   didn't know whether such staining had any reliability, and had

12   not done any research regarding the utility of those stains.

13   Such testimony corroborates both Dr. Thompson's and Dr. Tosti's

14   testimony that these stem cell slides have no utility in this

15   case.

16           Sanofi also incorrectly states that Dr. Thompson

17   shared this information with Dr. Feigel.  It's just not true.

18   The deposition testimony that they cite for that premise says,

19   "I just remember talking about the -- my findings again, my

20   professional interpretation of the slides, and nothing beyond

21   that.  It was simply pathology discussion."

22           What he was talking about on page 335 of his

23   February 26, 2019, deposition is the H&E slides, not the

24   cytokeratin and Ki-67 slides.  When he was deposed again on

25   April 3, he was asked the same line of questioning.  I'll just

01:54

1  skip to the end of the line.  He says on page 503 at line 11

2  "seriously doubt we had any discussion in that direction."  The

3  suggestion is that he testified that he believes he discussed

4  his findings from trial plaintiffs' stem cell stains with

5  Dr. Feigel.  It's just not true.  That's not what the

6  deposition testimony says.

7            In fact, the day before the April 17 email that

8  they suggest Dr. Poole is providing information that

9  Dr. Thompson somehow relied upon, the day before that email, on

10 April 16 -- which happens to be my birthday -- he says, "We

11 processed the three biopsies, and I have examined the initial

12 H&E sections, which all do show features consistent with

13 permanent alopecia after chemotherapy."

14            I have included Dr. Poole's affidavit here

15 because she also says that she never even looked at these

16 slides of the plaintiffs.  She was just asked to receive them

17 and then send them over to Dr. Curtis Thompson.

18            The August 15, 2018, invoice entry is another

19 issue that Sanofi raises.  The line item says "planning a stem

20 cell study at CTA Labs."  Well, CTA Labs is Curtis Thompson's

21 lab, and there were discussions with the PSC about what could

22 possibly be done.  That's part of the PSC's diligent

23 investigation of this case, and it's not something that Sanofi

24 should be allowed to invade.

25            All of the circumstances surrounding these

01:56

1    emails and the discussions about stem cells can only be

2    characterized as the PSC's diligent investigation of issues

3    surrounding hair loss.  The sanctity of the work product

4    privilege over communications between lawyers and their experts

5    should not be invaded in this case.

6              **THE COURT:**  Thank you.

7              **MR. LAMBERT:**  Unless Your Honor has any questions,

8    that's all I have.

9              **MR. MOORE:**  I reserved no time, Judge, so I have

10   nothing further.

11             **THE COURT:**  Thank you.  Let's meet in the jury room.

12   I know you-all mentioned some concerns with Sam, and maybe we

13   can resolve that now.  Court is adjourned.

14             **THE DEPUTY CLERK:**  All rise.

15             (Proceedings adjourned.)

16                           * * *

17                      <u>**CERTIFICATE**</u>

18             I, Toni Doyle Tusa, CCR, FCRR, Official Court

19   Reporter for the United States District Court, Eastern District

20   of Louisiana, certify that the foregoing is a true and correct

21   transcript, to the best of my ability and understanding, from

22   the record of proceedings in the above-entitled matter.

23

24

25                       <u>*/s/ Toni Doyle Tusa*</u>
                         Toni Doyle Tusa, CCR, FCRR
                         Official Court Reporter