UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)           MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

                                                                       SECTION "H" (5)

THIS DOCUMENT RELATES TO:

Tanya Francis, Case No. 2:16-cv-17410;
Barbara Earnest, Case No. 2:16-cv-17144

---

**PLAINTIFFS' OPPOSITION TO SANOFI'S MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. LAURA PLUNKETT**

---

## I.    INTRODUCTION

Dr. Plunkett is an extensively credentialed and experienced pharmacologist and toxicologist. She has performed countless risk and toxicity assessments over her career. Utilizing well-recognized tools commonly employed by pharmacologists and toxicologists, including a human health risk assessment and a "weight-of-the-evidence" assessment, Dr. Plunkett evaluated and examined the available scientific information for the products at issue, which included confidential documents produced during this litigation, studies, literature, and regulatory documents, and reached the following opinions:

- Taxotere is more toxic than Taxol; and
- Taxotere use is associated with a greater risk of irreversible alopecia as compared to some other anti-neoplastic drug products, including Taxol.

The risk of permanent alopecia caused by Taxotere, and the nature of the relationship between Taxotere and Taxol are directly at issue in this litigation—indeed, Sanofi has repeatedly told the Court in summary judgement arguments that there is no alternative to Taxotere that is as safe and

effective. (*See, e.g.,* Ex. A, Mills Mot. Hr'ing 18:02-05, April 4, 2019.)  Dr. Plunkett's opinions therefore would assist the jury in understanding and determining this very issue.

Sanofi's attacks on Dr. Plunkett's opinions are nothing more than disagreements with her ultimate conclusions—criticisms that are more appropriate for cross-examination.  Sanofi takes issue with Dr. Plunkett's methodology but does so by mischaracterizing her report and deposition testimony.  Admittedly and appropriately, Dr. Plunkett focused her analysis primarily on Taxotere, and Sanofi has not identified any specific study or scientific data that is pertinent to the issues in this case that has not been considered by Dr. Plunkett.  Instead, Sanofi speaks in hypotheticals about what she may have found had she examined confidential internal company documents pertaining to other products, including Taxol—documents that that she does not, and could not, have access to.  But she does not need this information—Dr. Plunkett had sufficient scientific information to conduct her risk assessment through scientifically valid and accepted methodologies to reach her opinions.  Whether access to additional information may have changed her opinion relates to the soundness of her conclusions, not her methodology.  This may be fodder for cross-examination, but it is not grounds for excluding her testimony.

Plaintiffs concede that Dr. Plunkett will not be offering opinions pertaining to causation, regulatory compliance, promotional activities related to Sanofi and Taxotere, or Taxotere's efficacy.  Dr. Plunkett's opinions will be limited to those identified above, and there is no reason for exclusion.  Accordingly, the Court should deny Sanofi's Motion.

## II.     BACKGROUND

Dr. Laura Plunkett is an expert in the fields of pharmacology[1] and toxicology.[2]  As a pharmacologist and toxicologist, Dr. Plunkett examined the drug at issue in this litigation, Taxotere, and its risk of causing permanent alopecia in comparison to other drugs used to treat cancer, including a similar drug known as Taxol.  Dr. Plunkett also examined the toxicity of Taxotere and how its toxicity compared to that of Taxol.

Taxotere (docetaxel) and Taxol (paclitaxel) are both human prescription drugs used to treat cancer, including breast cancer. (Ex. A to Defs' Mot., Rec. Doc. 6155-1, Plunkett Report at 4-7 (¶¶ 13, 16-17).)  Both products are "taxanes," which means they are anti-mitotic drugs that arrest cell mitosis. (*Id.* at 7-8 (¶¶ 19-20).)  Taxotere is a derivative of Taxol, and it has been suggested by some in the medical community that the products are interchangeable.  (*Id.* at 6,10 (¶¶ 16, 24).) The structure of Taxotere differs from Taxol at two positions: (1) the hydroxyl functional group on carbon 10 in Taxotere is an acetate ester in Taxol; and (2) a ter-butyl carbamate ester is found on the phenylpropionate side chain of Taxotere, which is the benzamide in Taxol.  (*Id.* at 6 (¶16).)

As these drugs are considered "interchangeable" by some within the medical community, it is important to understand whether there are critical differences between the two, including differences pertaining to the risk of permanent alopecia and general toxicity.   This is information a jury would consider in determining whether Sanofi in this case provided doctors and their

---

[1] Pharmacology is defined as "(1) the science of drugs including their origin, composition, pharmacokinetics, therapeutic use, and toxicology, and (2) the properties and reactions of drugs especially with relation to their therapeutic value."  MERRIAM-WEBSTER ONLINE DICTIONARY, 2019, https://www.merriam-webster.com/dictionary/pharmacology.

[2] Toxicology is defined as "a science that deals with poisons and their effect and with the problems involved (such as clinical, industrial, or legal problems).  MERRIAM-WEBSTER ONLINE DICTIONARY, 2019, https://www.merriam-webster.com/dictionary/toxicology.

patients sufficient information on the true risks and toxicity associated with Taxotere, especially as it compares to an available similar, and potentially interchangeable product that a doctor could use for treatment, Taxol. Dr. Plunkett's analysis and opinions directly help with this determination.

### III.   LEGAL STANDARD

Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), govern the admission of expert testimony. Under this framework, the district court acts as a "gatekeeper" to ensure a proposed expert is qualified as such, and his or her testimony is both reliable and relevant. *Daubert*, 509 U.S. at 596-97; *Williams v. Manitowac Cranes*, L.L.C. 898 F.3d 607, 623 (5th Cir. 2018); *In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*, 2017 WL 1352860 at *1 (E.D. La. Apr. 12, 2017) (Fallon, J.).

One can be qualified as an expert on the basis of "knowledge, skill, experience, training or education." FED. R. EVID. 702. "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009). "Although an expert's qualifications may be less-than-sterling, she may still be certified." *Williams*, 898 F.3d at 623. "Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Huss*, 571 F.3d at 452.

The reliability inquiry focuses on the reasoning or methodology underlying the testimony. *See Daubert*, 509 U.S. at 592-93. This inquiry is not concerned with whether the expert's testimony is correct. *See MM Steel L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 850 (5th Cir. 2015). The focus is on whether the testimony is based upon reasoning and methodology that is "scientifically valid." *Daubert*, 509 U.S. at 595; *MM Steel L.P.*, 806 F.3d at 850-51. "The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation." *Burst*

4

*v. Shell Oil Co.*, 120 F. Supp. 3d 547, 550 (E.D. La. 2015) (*citing Daubert*, 509 U.S. at 590). The test of reliability is "flexible." *Daubert*, 509 U.S. at 594. "[T]he law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kuhmo Tire Co.* 526 U.S. at 142 (emphasis in original). "Thus, whether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id.* at 253.

The Court's relevancy determination focuses on whether the proposed testimony "will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. 592. To be relevant, "the expert's 'reasoning or methodology [must] be properly applied to the facts at issue.'" *Puga v. RCX Solutions, Inc.*, 914 F.3d 976, 985 (5th Cir. 2019) (quoting *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012)). "When performing this analysis, the court's main focus should be on determining whether the expert's opinion will assist the trier of fact." *Puga*, 914 F.3d at 985.

The gatekeeper role, while essential, "is not intended to supplant the adversary system or the role of the jury; rather, vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. "[T]he court's role … is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role…." *Puga*, 914 F.3d at 985. Under this system, "'[r]ejection of expert testimony is the exception rather than the rule.'" *Id.* (quoting FED. R. EVID. 702 advisory committee notes).

IV.   **ARGUMENT**

    A.   **Dr. Plunkett is Qualified to Render the Opinions at Issue**

Dr. Plunkett is a pharmacologist and toxicologist with over 20 years of experience. (Plunkett Report at 1 (¶¶ 1-2).) She has a Ph.D. in pharmacology from the University of Georgia,

she is a board-certified Diplomate of the American Board of Toxicology, and she has worked in both government and academic research. (*Id.* at 1 (¶¶ 2-3).) She has taught pharmacology and toxicology at both the undergraduate and postgraduate level. (*Id.* at 1 (¶2).) She is also a registered patent agent and has extensive experience consulting and advising on products and processes regulated by the United States Food and Drug Administration (FDA). (*Id.* at 1-2 (¶¶ 1, 6); Ex. B, Plunkett CV at 1.)

Dr. Plunkett's experience has required her to examine risks associated with exposure to drugs of all types, including drugs to treat cancer. (Plunkett Report at 2 (¶ 7).) She has worked on many projects involving mechanisms of carcinogenesis and ways that drugs and chemicals can affect those mechanisms. (*Id.*) She also has expertise in pharmacokinetics, including the differences in the pharmacokinetics of drugs when they are administered by routes other than oral ingestion. (*Id.*)

Dr. Plunkett has written dozens of peer-reviewed articles related to pharmacology, toxicology, and pharmacokinetics, including articles dealing specifically with the pharmacological impact of prescription drugs on the body. (Ex. B, Plunkett CV.) Most of these articles involve a study of the actions of pharmaceuticals. (*Id.*) These studies include animal (pre-clinical) studies, human studies, and *in vitro* studies. (*Id.*) She has given numerous lectures and written several book chapters in her areas of expertise. (*Id.* at 12-15.)

Dr. Plunkett served as an Assistant Professor of Pharmacology and Toxicology at the University of Arkansas for Medical Sciences from 1986-1989, which involved both teaching and research in these fields. (Plunkett Report at 2 (¶ 5).) Her research involved studying drugs of all classes, and her work was directed towards understanding the biologic mechanisms of drug actions, both the therapeutic and toxic effects of drugs. (*Id.*)

Between 1989 and 1997, Dr. Plunkett consulted with pharmaceutical and medical device

companies and other entities regulated by the FDA, designing preclinical and clinical studies for both efficacy and safety, advising clients on issues related to statements in product labeling regarding efficacy and warnings based on FDA regulations. (*Id.* at ¶ 6.) Her responsibilities included assessing the risk of certain side-effects with prescription drug treatment and advising clients on the manner in which the FDA regulations dictated the communication of such information. (*Id.*) Since 1997, Dr. Plunkett has acted as a private consultant to a variety of clients in the areas of pharmacology, toxicology, risk assessment and regulatory strategy. (Ex. B, Plunkett CV at 1.) Her focus is on products regulated by the FDA. (*Id.*)

In its Motion, Sanofi sets forth what it seemingly asserts as shortcomings in Dr. Plunkett's credentials, such as the fact that she is not a medical doctor, but none of these alleged "shortcomings" disqualify her from testifying in this case. The analysis she conducted related to pharmacology and toxicology, areas in which she clearly has expertise. Dr. Plunkett has previously been recognized by numerous courts as an expert qualified in the fields of pharmacology and toxicology, and this Court should reach the same result in this litigation. *See e.g., In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*, 2017 WL 1352860 at *2 (E.D. La. Apr. 12, 2017) (Fallon, J.); *In re Gadolinium-Based Contrast Agents Prods. Liab. Litig.*, 2010 WL 1796334 at *14 (N.D. Ohio May 4, 2010) (Polster, J.); *In re Seroquel Prods. Liab. Litig.*, 2009 WL 3806435 at **3-4 (M.D. Fla. June 23, 2009) (Conway, J.).

> **B.  Dr. Plunkett's Opinions are Based Upon Sufficient Facts and Data, are the Product of Scientifically Valid Reasoning and Methodology, and are Relevant.**
>
> > **1.  *Dr. Plunkett's Opinion that Taxotere Poses a Greater Risk of Permanent Alopecia is Reliable and Relevant***

Dr. Plunkett's opinion that Taxotere use is associated with a greater risk of irreversible alopecia as compared to some other anti-neoplastic drug products, including Taxol, is based on

7

sufficient facts and data and is the product of a scientifically valid reasoning and methodology. To reach this opinion, Dr. Plunkett used the standard methods she applies in her work as a pharmacologist and toxicologist in litigation and non-litigation contexts. This involved using her training and experience to review, examine, and evaluate studies, scientific literature relating to the pharmacology and toxicology of taxane drug products (including Taxotere and Taxol), product labeling for Taxotere and Taxol, publicly available documents related to Taxotere and Taxol's approval by the FDA, regulatory submissions that describe the pharmacology and toxicology of Taxotere, and confidential documents produced during this litigation.

The particular methods that Dr. Plunkett used are known as a human health risk assessment and a "weight-of-the evidence" assessment. (Plunkett Report at 3-4 (¶¶ 10-11).) The human health risk assessment performed by Dr. Plunkett has been used for decades by a wide variety of governmental bodies and is a standard tool used by pharmacologists and toxicologists when they are trying to understand the benefits and risks associated with a drug. (*Id.* at 3-4 (¶ 10).) The weight-of-the-evidence analysis performed by Dr. Plunkett is described in the *Reference Manual on Scientific Evidence* as a tool used by experts in the process of evaluating a body of data or studies. (*Id.* at 4 (¶ 11).)

As outlined in her report, Dr. Plunkett reviewed all pertinent data that was available and conducted her assessment in the same fashion she would in conducting her work as a pharmacologist and toxicologist for companies outside the litigation context. (*Id.* at 3-4 (¶ 10).) The following is a sampling of the wide array of facts, data, and scientific literature she considered in conducting her analysis:

- The first report of docetaxel-induced irreversible hair loss appeared in the scientific literature as early as 2001, when a paper authored by an investigator for Sanofi, Dr. Nabholtz, discussed a Phase II clinical study that placed the percentage of docetaxel patients with irreversible alopecia at 7.4% (*Id.* at 13-14 (¶ 31));

- During a presentation during a 2006 Breast Cancer Symposium, Dr. S.M. Sedlacek reported that alopecia associated with docetaxel therapy as an adjuvant to doxorubicin/cyclophosphamide chemotherapy was irreversible in some patients—the rate reported for the three different treatment groups in his study were 6.3% permanent persistent alopecia in women administered doxorubicin plus Taxotere, 0% in women administered doxorubicin plus Taxol, and 0% in women administered doxorubicin without a taxane (*Id.* at 14 (¶ 32));

- At least two clinical studies performed by Sanofi with Taxotere provided important information concerning irreversible alopecia, TAX 316 and TAX 301 (GEICAM, wherein a group of patients received Taxotere and a group of patients did not (*Id.* at 19-20 (¶¶ 45-46)):

    - TAX 316 was a phase III clinical study of Taxotere in node positive breast cancer patients. The study involved a comparison of two groups—(i) the TAC group, where Taxotere was used as an adjuvant in combination with doxorubicin and cyclophosphamide, and (ii) the FAC group, where patients received 5-fluorouracil in combination with doxorubicin and cyclophosphamide, and the data of the study indicated that Taxotere-treated patients were nearly twice as likely to experience irreversible alopecia (3.9% TAC group v. 2.2 % FAC group);

    - TAX 301 (GEICAM was a similar phase III clinical study, but the patients were node negative breast cancer patients. The rate of irreversible alopecia was originally reported as 6.1%[3] in the TAC group, which Dr. Plunkett admits is not necessarily accurate given serious problems with the follow-up of patients in this study, but it does provide additional important evidence when combined with TAX 316, showing that irreversible alopecia is not a rare event with Taxotere use in women;

- Sanofi itself found that "[t]he cumulative weighted evidence is sufficient to support a causal association between Docetaxel and Permanent/Irreversible alopecia in patients who receive docetaxel" (*Id.* at 18 (¶ 40));

- Sanofi's 2014 Company Core Data Sheet for Taxotere identified alopecia as the most common adverse event that persisted into the follow-up period, with a median of over 10 years (*Id.* at 18 (¶ 42));

- In 2015, the FDA found that it and Sanofi "concur that the available evidence supports a potential causal association between docetaxel and permanent alopecia and that the label should be updated to alert clinicians and patients of this responsibility;" (*Id.* at 18 (¶ 41));

---

[3] Dr. Plunkett identifies this figure as 6.7% in her report but explained it should have read 6.1% in her deposition. (Ex. C, Plunkett Dep. 148:8-148:17, Dec. 10, 2018.)

- The reports in the medical literature linking Taxotere to permanent alopecia have been more frequent than Taxol, and that the scientific literature supports that it is high dose use of docetaxel that is more likely associated with irreversible alopecia (*Id.* at 23 (¶ 50)).

Using her knowledge, experience and training as a pharmacologist and toxicologist, Dr. Plunkett was able to review, examine and evaluate this information (along with all of the other information she identified in her report), assess and weigh the evidence, and conclude that Taxotere has a "greater risk" of permanent alopecia than other anti-neoplastic drugs, including Taxol. This is the same standard technique she uses in both her litigation and non-litigation work and, as indicated above, is a recognized method of risk assessment in the fields of pharmacology and toxicology.

While Sanofi purports to attack Dr. Plunkett's methodology and the relevancy of her "greater risk" opinion, Sanofi's contentions in this regard are nothing more than disagreements with her conclusions. For example, Sanofi criticizes Dr. Plunkett's "greater risk" opinion because she cannot quantify the exact "greater risk" of Taxotere versus other cancer drugs, namely Taxol. But a precise quantification is not required under *Daubert*. The Supreme Court explained "it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty." *Daubert*, 509 U.S. at 590; *see also Primiano*, 598 F.3d at 565 ("Lack of certainty is not, for a qualified expert, the same thing as guesswork."). Moreover, Dr. Plunkett does quantify the risk, just not in a numerical fashion. Dr. Plunkett quantified the risk as "increased." This is the quantification that is significant from a pharmacological standpoint in making a risk assessment, not necessarily a numerical quantification, as that may not be possible. As Dr. Plunkett explained, "what I can tell you is there is an increased risk . . . I can tell you the risk is greater based on the weight of the evidence." (Ex. C, Plunkett Dep. 237:1-6.) Dr. Plunkett further explained that while there may not be sufficient data to determine an exact percentage of the increased risk:

> [C]ertainly there are data out there to allow you to attempt to quantify that risk of being an increased risk or not or being the same. Or – and in my view, when I say increased risk . . . I'm forming the opinion that that –**that difference is going to be significant to me as a pharmacologist and a toxicologist**.

(*Id.* at 238:11-19 (emphasis added).) This is an acceptable approach where the available scientific evidence is insufficient to identify a numerical quantification. *See Horan v. Dilbet, Inc.*, No. CIV.A. 12-2273, 2015 WL 5054856, at *16 (D.N.J. Aug. 26, 2015) ("[T]he experts' opinions are drawn from what little scientific data and research may be available … That Plaintiffs' experts remain unable to quantify the amount of the increase does not render their opinions so speculative as to be inadmissible." (internal quotations omitted)). Indeed, in a recent *Daubert* decision from the Roundup MDL, the court permitted an expert to discuss generally, without quantifying, the increased cancer risk associated from exposure to glyphosphate in Roundup. *See In re Roundup Prod. Liab. Litig.*, 358 F. Supp. 3d 956, 961-62 (N.D. Cal. 2019).

In sum, Dr. Plunkett used accepted and recognized principles of pharmacology and toxicology to make a reasoned determination that the increase in risk was significant from a pharmacology and toxicology perspective, and Sanofi can point to no authority stating more is required. While her inability to numerically quantify the increased risk may be a topic for cross-examination, it does not render it inadmissible.

Sanofi's other criticisms with Dr. Plunkett's testimony are equally misguided. While Sanofi faults Dr. Plunkett for not identifying a specific dosing schedule for Taxotere associated with an increased risk of hair loss, Dr. Plunkett made clear that her "assessment was not limited to a specific dose or a specific treatment schedule." (Ex. C, Plunkett Dep. 38:11-13.) Her opinion looked at "the drug overall as compared to other drugs overall where we have available data." (*Id.* at 38:15-16.) Sanofi also takes issue with the existence of other confounding factors contributing to hair loss, but Dr. Plunkett took those confounding factors into account in her analysis. (*Id.* at

11

290:5-296:1.) Similarly, and contrary to Sanofi's suggestion, Dr. Plunkett thoroughly accounted for the fact that most patients take Taxotere in combination therapy. (*Id.* at 152:1-156:3.) None of these critiques render her opinions unreliable or inadmissible. They are simply further grounds for cross-examination.

Sanofi likewise asserts that Dr. Plunkett's "greater risk" opinion is unreliable based on the self-selected data that she reviewed, insinuating that she has done little more than author a book report for the jury. To the contrary, Dr. Plunkett did exactly what pharmacologists and toxicologists do in these types of real-world risk analyses: she examined and evaluated the scientific literature and data that was available to her and was able to reach a conclusion to a reasonable degree of scientific certainty. Dr. Plunkett is not regurgitating the conclusions of another—she reached her own conclusions based on her evaluation of the scientific information and data available. As Judge Stengel opined regarding similar opinions offered by Dr. Plunkett in *In re: Tylenol (Aceminophen) Marketing, Sales Practices, and Prods. Liab. Litig.*, "I see nothing unreliable about Dr. Plunkett's explanations. . . She is a toxicologist who specializes in studying how the body processes drugs. She has reviewed the medical literature and interpreted it based on her knowledge of toxicity, pharmacology, and pharmacokinetics." 2016 WL 4039329 (E.D. Pa. July 28, 2016) (Stengel, J.). This is precisely what Dr. Plunkett has done in the present case.

The fact that Dr. Plunkett did not review information she did not have access to, such as internal clinical studies for Taxol, does not render her testimony inadmissible. She examined and evaluated the information that was available, which was sufficient for her to reach her opinions. As Judge Fallon has explained in addressing a similar argument:

> [I]t is far from clear that an expert must review all of the available studies simply to cross the threshold of admissibility. Under Rule 702, an expert must, at the least, indicate that his or her theory "can be (and has been) tested." . . . In view of "the 'liberal thrust' of the Federal Rules [of Evidence] and their 'general approach of

> relaxing the traditional barriers to opinion testimony,' the Court finds that the presence of studies that cut against the expert's opinion and that are not accounted for by the expert is a subject for cross-examination, not a barrier to admissibility.
> . . .
>
> To the extent that they did not take into account every study that is relevant to the question of general causation or otherwise exhibited bias in rendering their opinion, those issues go to the weight of their opinion, and not the question of admissibility.

*Wagoner v. Exxon Mobil Corp.,* 813 F. Supp. 2d 771, 803 (E.D. La. 2011) (internal citations omitted).  Perhaps most telling, Sanofi cannot point to any specific facts or data that might change Dr. Plunkett's conclusions.  Rather, Sanofi speaks in hypotheticals that such data may exist in documents she has not reviewed.  This is, once again, nothing more than a potential area of cross-examination, not a basis for exclusion.

Finally, Sanofi asserts that Dr. Plunkett's "greater risk" opinion is irrelevant and unhelpful because the jury would not know how to interpret her non-numerically quantified risk assessment.  For the reasons set forth above, her quantification of the risk as "increased" is scientifically significant.  As it speaks directly to an issue in dispute, i.e., the risk of permanent alopecia posed by Taxotere, it would help the jury in its determination.

### 2. Dr. Plunkett's Opinion that Taxotere is "More Toxic" than Taxol is Reliable and Relevant

Dr. Plunkett's opinion that Taxotere is more toxic than Taxol is also based on sufficient facts and data and is the product of a scientifically valid reasoning and methodology.  She reached this opinion as part of her overall analysis, as more fully set forth above, using the standard methods she applies in all of her work as a pharmacologist and toxicologist in both litigation and non-litigation contexts.  Among the materials Dr. Plunkett reviewed in her analysis included Sanofi's own clinical studies, including TAX 311 that indicated an increased general toxicity for Taxotere over Taxol.  (Plunkett Report at 21-22 (¶ 47).)  While Sanofi appears to criticize Dr. Plunkett for not isolating any toxicities beyond permanent alopecia in her analysis, Dr. Plunkett

13

made clear in her testimony that her analysis took them all into account and she looked across the toxicity profile. (Ex. C, Plunkett Dep. 138:12-140:20.) As with her "greater risk," opinion, her "more toxic" opinion is reliable and is the product of a scientifically valid reasoning and methodology. She reached this conclusion as part of pharmacological and toxicological analysis of the data available as outlined in her report. Sanofi may disagree with her conclusion, but this is simply another area for cross examination, not exclusion.

Finally, this opinion is relevant. Indeed, Sanofi has made this opinion relevant by repeatedly claiming that there is no alternative to Taxotere. Although Plaintiffs are not required to establish a safer alternative design as Plaintiffs have not alleged a design defect claim, should Sanofi claim during trial that there is no alternative to Taxotere, this opinion becomes relevant. As explained above, Taxotere and Taxol are similar drugs that many within the medical community consider to be interchangeable products. If Taxotere has an increased risk of permanent alopecia over Taxol, a critical fact that doctors and patients would want to know is how it relates to Taxol on the issue of overall toxicity. If Taxotere has a greater risk of permanent alopecia but Taxol is otherwise more toxic, doctors and patients may still elect to use Taxotere. However, if Taxotere has a greater risk of permanent alopecia and is also more toxic generally, obviously, that usage analysis would change, for both the doctor and the patient. Accordingly, and depending upon Sanofi's claims at trial, Dr. Plunkett's opinion regarding the overall toxicity of Taxotere is relevant.

## **CONCLUSION**

For the reasons set forth above, the Court should deny Sanofi's Motion to Exclude Expert Testimony of Laura Plunkett. Dr. Plunkett is qualified to render the opinions at issue, the opinions are based upon sufficient data and facts, they are the product of a scientifically valid reasoning and

methodology, and they will assist jury in understanding and determining facts at issue in this case. The grounds on which Sanofi seeks to exclude Dr. Plunkett's testimony are topics properly addressed on cross-examination.

Dated: June 26, 2019

Respectfully submitted,

<u>/s/ Christopher L. Coffin</u>
Christopher L. Coffin (#27902)
PENDLEY, BAUDIN & COFFIN, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

*Plaintiffs' Co-Lead Counsel*

<u>/s/ Karen B. Menzies</u>
Karen Barth Menzies (CA Bar #180234)
GIBBS LAW GROUP LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Telephone: 510-350-9700
Facsimile: 510-350-9701
kbm@classlawgroup.com

*Plaintiffs' Co-Lead Counsel*

<u>/s/M. Palmer Lambert</u>
M. Palmer Lambert (#33228)
GAINSBURGH BENJAMIN DAVID MEUNIER & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: 504-522-2304
Fax: 504-528-9973
plambert@gainsben.com

*Plaintiffs' Co-Liaison Counsel*

<u>/s/Dawn M. Barrios</u>
Dawn M. Barrios (#2821)
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: 504-524-3300
Fax: 504-524-3313
barrios@bkc-law.com

*Plaintiffs' Co-Liaison Counsel*

## PLAINTIFFS' STEERING COMMITTEE

Anne Andrews
Andrews & Thornton
4701 Von Karman Ave., Suite 300
Newport Beach, CA 92660
Phone: (800) 664-1734
aa@andrewsthornton.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@atkinsandmarkoff.com

J. Kyle Bachus
Bachus & Schanker, LLC
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Phone: (303) 893-9800
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, Florida 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Phone: 510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

| | |
|---|---|
| Andrew Lemmon<br>Lemmon Law Firm, LLC<br>P.O. Box 904<br>15058 River Road<br>Hahnville, LA 70057<br>Phone: (985) 783-6789<br>Fax: (985) 783-1333<br>andrew@lemmonlawfirm.com | Genevieve Zimmerman<br>Meshbesher & Spence Ltd.<br>1616 Park Avenue South<br>Minneapolis, MN 55404<br>Phone: (612) 339-9121<br>Fax: (612) 339-9188<br>gzimmerman@meshbesher.com |

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2019, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

<i>/s/ M. Palmer Lambert</i><br>
M. PALMER LAMBERT