**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

In Re:  TAXOTERE (DOCETAXEL)                    MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

                                                SECTION "H" (5)

THIS DOCUMENT RELATES TO:

Tanya Francis, Case No. 2:16-cv-17410;
Barbara Earnest, Case No. 2:16-cv-17144

---

**PLAINTIFFS' OPPOSITION TO SANOFI'S MOTION TO EXCLUDE EXPERT**
**TESTIMONY OF DAVID A. KESSLER, M.D., J.D.**

---

## I.      INTRODUCTION

Plaintiffs have designated David Kessler, M.D., J.D., to testify about regulatory and labeling issues, including the inadequacy of the Taxotere labels relevant to these cases.  As a medical doctor, former dean of two medical schools, and former commissioner of the Food and Drug Administration ("FDA"), Dr. Kessler is extremely well-qualified to render his opinions on the matters detailed in his report.  As documented extensively in his report, Dr. Kessler has conducted a detailed and thorough analysis of relevant documents and scientific literature.  His opinions are well-supported, reliable and admissible.

Given his background, Dr. Kessler has extensive knowledge and experience understanding and applying the regulatory framework governing Taxotere labeling to the facts and data underlying his opinions.  While Sanofi takes particular issue with Dr. Kessler speaking in terms of the regulatory warning standard of "reasonable evidence of a causal association," as opposed to medical causation, this subtle distinction makes Dr. Kessler's opinions all the more relevant.  This litigation involves failure to warn claims and one of Sanofi's primary defenses in this litigation is

the learned intermediary doctrine.  This regulatory standard for warnings determines what doctors should have been warned of in deciding whether to use Taxotere.  Indeed, Dr. Kessler's opinions pertain to the exact information the physicians would have considered in determining whether to use Taxotere or a comparable, and potentially safer, product.

For the reasons set forth more fully below, Dr. Kessler is qualified to render the opinions at issue, he reached his opinions by way of proper methodology, and his opinions are relevant to the issues involved in this litigation.[1]  That Sanofi disagrees with Dr. Kessler's conclusions or that Sanofi has a different interpretation of the evidence simply does not warrant exclusion of his testimony under *Daubert v. Merrill Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993), Accordingly, the Court should deny Sanofi's Motion to Exclude.

## II.   LEGAL STANDARD

Rule 702 and *Daubert* govern the admission of expert testimony.  Under this framework, the district court acts as a "gatekeeper" to ensure a proposed expert is qualified as such, and his or her testimony is both reliable and relevant.  *Daubert*, 509 U.S. at 596-97; *Williams v. Manitowac Cranes*, L.L.C. 898 F.3d 607, 623 (5th Cir. 2018); *In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*, 2017 WL 1352860 at *1 (E.D. La. Apr. 12, 2017) (Fallon, J.).

One can be qualified as an expert on the basis of "knowledge, skill, experience, training or education."  Fed. R. Evid. 702.  "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue."  *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009).  "Although an expert's qualifications may be less-than-sterling, she may still be certified."

---

[1] Sanofi repeats arguments made in its Motion to Exclude Improper Expert Testimony—namely, that Dr. Kessler should be precluded from offering testimony as to legal conclusions.  Plaintiff does not address those arguments herein and respectfully refers the Court to Plaintiffs' opposition to that motion.

*Williams*, 898 F.3d at 623.  "Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility."  *Huss*, 571 F.3d at 452.

The reliability inquiry focuses on the reasoning or methodology underlying the testimony.  *See Daubert*, 509 U.S. at 592-93.  This inquiry is not concerned with whether the expert's testimony is correct.  *MM Steel L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 850 (5th Cir. 2015).  The focus is on whether the testimony is based upon reasoning and methodology that is "scientifically valid."  *Daubert*, 509 U.S. at 595; *MM Steel L.P.*, 806 F.3d at 850-51.  "The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation."  *Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 550 (E.D. La. 2015) (*citing Daubert*, 509 U.S. at 590).

In *Daubert*, the Supreme Court set forth a non-exhaustive list of factors to consider in determining the scientific reliability of expert testimony: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) the general acceptance of the methodology in the scientific community.  *Daubert*, 509 U.S. at 593-94.

However, this is not a "definitive checklist or test."  Whether some or all these factors apply in a particular case depends on the nature of the issue, the expert's particular expertise, and the subject of his testimony.  *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999).  Indeed, the test of reliability is "flexible."  *Daubert*, 509 U.S. at 594.  "[T]he law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination."  *Kuhmo Tire Co.* 526 U.S. at 142 (emphasis in original).  "Thus, whether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine."  *Id.* at 253.

The Court's relevancy determination focuses on whether the proposed testimony "will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. 592.  To be relevant, "the expert's 'reasoning or methodology [must] be properly applied to the facts at issue.'" *Puga v. RCX Solutions, Inc.*, 914 F.3d 976, 985 (5th Cir. 2019) (*quoting Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012).   "When performing this analysis, the court's main focus should be on determining whether the expert's opinion will assist the trier of fact."  *Puga*, 914 F.3d at 985.

The gatekeeper role, while essential, "is not intended to supplant the adversary system or the role of the jury; rather, vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596.  "[T]he court's role . . . is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role …"  *Puga*, 914 F.3d at 985.  Under this system, "'[r]ejection of expert testimony is the exception rather than the rule.'"  *Id*. (quoting Fed. R. Evid. 702 advisory committee notes).

## III.   ARGUMENT

### A.   Dr. Kessler is Qualified to Render the Opinions at Issue

Although Sanofi does not directly take issue with Dr. Kessler's qualifications, Sanofi makes multiple derogatory statements towards Dr. Kessler, referring to him as a "professional witness" and that "[a]lthough he holds himself as a regulatory expert, Dr. Kessler is more aptly described as a professional litigation consultant." (Mot. at 3.)

Dr. Kessler has devoted his life to public service and deserves respect.  Appointed as Commissioner of the FDA by President George H. Bush and then reappointed by President Bill Clinton, Dr. Kessler is one of the longest serving FDA Commissioners, serving from 1990 to 1997. (Ex. A, Kessler CV.)  He has contributed important publications on a variety of regulatory and

scientific matters. And his testimony in trial courts and contributions before the U.S. Supreme Court have advanced public understanding of the fact "that state law offers an additional, and important, layer of consumer protection that complements FDA regulation." *Wyeth v. Levine*, 555 U.S. 555, 579 & n.12 (2009) (citing approvingly Brief for Former FDA Commissioners Drs. Donald Kennedy and David Kessler as Amici Curiae; Kessler & Vladeck, A Critical Examination of the FDA's Efforts To Preempt Failure-To-Warn Claims, 96 Geo. L.J. 461, 463 (2008)). So while Sanofi may wish to spin Dr. Kessler's work promoting access to justice as a negative, this work is unfortunately necessary because Sanofi and other drug companies regularly claim immunity from state tort law based on flawed understandings of federal drug law.

To expand on his qualifications, Dr. Kessler has an M.D. from Harvard Medical School and a J.D. from the University of Chicago Law School.[2] He completed a residency in pediatrics and received specialized training in pharmacoepidemiology at Johns Hopkins Hospital.[3] Dr. Kessler later served as dean of the Yale Medical School,[4] University of California San Francisco Medical School[5] and taught food and drug law at Columbia University Law School.[6]

As the Commissioner of the FDA, Dr. Kessler had "ultimate responsibility for implementing and enforcing the United States Food, Drug, and Cosmetic Act"[7] – the very act governing the approval, manufacture and marketing of pharmaceutical drugs like Taxotere. Dr. Kessler's FDA responsibilities and achievements while Commissioner of the FDA included:

- Overseeing five separate centers within the FDA, including the Center for Drug Evaluation and Research;[8]

- Overseeing the FDA's Division of Drug Marketing, Advertising, and

---

[2] Ex. A to Defs' Mot., Rec. Doc. 6146-1, Kessler Report at ¶1.
[3] *Id.* at ¶¶2,4.
[4] Exhibit A, Kessler CV.
[5] *Id.*
[6] Kessler Report at ¶4.
[7] *Id.* at ¶3.
[8] *Id.* at ¶5.

Communications.[9]

- Launching numerous programs, including the MEDWatch program for reporting adverse events; and

- Launching the Office of Criminal Investigation within the FDA to investigate suspected criminal violations of the Food, Drug, and Cosmetic Act, FDA regulations and other related laws.[10]

Dr. Kessler also has served on the regulatory compliance boards for pharmaceutical companies.[11]

In addition to his vast work experience, Dr. Kessler has published numerous articles in medical and scientific journals regarding the federal regulation of food, drugs and medical devices.[12]  He has published articles regarding drug promotion and marketing practices.[13] Dr. Kessler has also published books relating to psychiatric illnesses.[14]

Dr. Kessler's opinions are central to the key issue in this case – whether Sanofi failed to provide adequate warnings regarding Taxotere's permanent hair loss.  These opinions necessarily involve an analysis of the federal regulatory framework and whether Sanofi complied with the parameters set forth by that regulatory framework.  His opinions are well-founded and will undoubtedly aid the jury in determining whether the Taxotere labels at issue in these cases were inadequate.  Dr. Kessler's opinions are rooted not only in a review of literature and documents related to this case, but also in his extensive education and experience in the medical and regulatory arena.

Sanofi takes issue with the fact that Dr. Kessler lacks the expertise of a dermatologist and oncologist, claiming that Dr. Kessler does not have the specialized medical expertise to determine

---

[9] *Id.*
[10] *Id.* at ¶5.
[11] *Id.* at ¶6.
[12] *Id.* at ¶4.
[13] *Id.*
[14] Exhibit A, Kessler CV.

that Taxotere's label should have included language regarding "irreversible alopecia."  But this type of expertise is not required for Dr. Kessler's opinions in this case.  His medical training and experience allow him to interpret and apply the medical definition of "irreversible alopecia" and apply the signaling data to the regulatory requirements.  As Dr. Kessler's opinions are regulatory in nature, particular expertise in dermatology and oncology would play no role in reaching his conclusions.

In sum, Dr. Kessler is abundantly qualified to render the opinions at issue in this case.   To the extent Sanofi takes issue with the fact that Dr. Kessler is not a dermatologist or oncologist, this is an issue for Sanofi to argue regarding the weight the jury should give his testimony, not admissibility.  *See Huss*, 571 F.3d at 452.

### B.        Dr. Kessler's Opinions are Reliable

FDA regulations dictate whether a label must include a warning for a particular adverse event.  Specifically, prescription drug "labeling must be revised to include a warning about **a clinically significant hazard** as soon as there is **reasonable evidence of a causal association with a drug**; a causal relationship need not have been definitely established."  21 C.F.R. § 201.57 (c)(6)(i) (emphasis added).  To make this determination, the FDA's 2011 "Guidance for Industry on Warnings and Precautions, Contraindications, and Boxed Warning Sections of Labeling for Human Prescription Drug and Biological Products – Content and Format," provides guidance to drug manufacturers on "how to decide which adverse reactions or other potential safety hazards are significant enough to warrant inclusion in the WARNINGS AND PRECAUTIONS Section."  (Ex. B to Defs' Mot., Rec. Doc. 6146-2, FDA Guidance.)[15]

---

[15] Contrary to Sanofi's suggestions, Dr. Kessler is not alone in his utilization of FDA's guidance documents in evaluating the adequacy of drug labeling. (Mot. at 13.)  Courts, plaintiffs, and defendants alike have utilized FDA Guidelines as a means to analyze and interpret FDA regulatory requirements, including the adequacy of drug labeling. *See, e.g., Christison v. Biogen Idec Inc.*, 199 F. Supp. 3d 1315, 1323–24 (D. Utah 2016); *McDowell v. Eli*

In determining that the Taxotere label should have included a warning regarding irreversible alopecia as early as 2009, Dr. Kessler utilized his expertise and applied this applicable regulatory framework to the available and pertinent facts.  His methodology matched and utilized the methods called for by FDA in determining (1) causal association and (2) the existence of a clinically significant hazard.

### 1.    *Dr. Kessler's Causal Association Opinion is Reliable*

The FDA Guidance provides the following seven factors to be considered in assessing whether there is reasonable evidence of a causal association:

(1)    the frequency of reporting;

(2)    whether the adverse event rate in the drug control group exceeds the rate in the placebo and active control group in controlled trials;

(3)    evidence of a dose-response relationship;

(4)    the extent to which the adverse event is consistent with the pharmacology of the drug;

(5)    the temporal association between drug administration and the event;

(6)    existence of dechallenge and rechallenge experience; and,

(7)    whether the adverse event is known to be caused by related drugs.

Notably, the use of the seven factors described above dates well back before 2011. (Kessler Report at 33-35 (¶¶ 101-101.6).)    As early as 1992, the FDA defined "causality assessment" in its "Guideline for Postmarketing Reporting of Adverse Event Experiences" as a determination that involved similar factors.   The epidemiological literature has utilized many of these factors in assessing the relationship between a drug and an adverse event for decades as well.  (*Id*. at 36-37 (¶103).)   There is recognition on the part of the FDA and the scientific

---

*Lilly & Co.*, 58 F. Supp. 3d 391, 406 (S.D.N.Y. 2014); *In re Neurontin Mktg., Sales Practices, & Prod. Liab. Litig.*, 612 F. Supp. 2d 116, 136–37 (D. Mass. 2009).

and epidemiological community that not all of these factors must be present in order for there

to be "reasonable evidence of a causal association such that a Warning is warranted."  (*Id*. at

37-38 (¶ 107).)

In his analysis, and as fully set forth and detailed in his report, Dr. Kessler analyzed the

available facts and data under each of these factors.   (*Id*. at 39-54 (¶¶ 110-163).)  Based on this

analysis, Dr. Kessler reached the conclusions that:

> [A] substantial number of the seven factors provided by the FDA to consider in
> assessing whether there is reasonable evidence of a causal association were satisfied
> to establish reasonable evidence of a causal association between Taxotere and
> irreversible alopecia by as early as 2009,

and, further, that

> [B]ecause a substantial number of the factors provided by the FDA to consider in
> assessing whether there is reasonable evidence of a causal association were satisfied
> as to Taxotere and irreversible alopecia by as early as 2009, and because
> irreversible alopecia is a serious and/or clinically significant adverse event, a
> Warning regarding irreversible alopecia was warranted by as early as 2009.

(*Id*. at 54 (¶¶ 164-165).)

Sanofi's criticisms of Dr. Kessler's methodology in reaching these conclusions are

unpersuasive.   Sanofi challenges Dr. Kessler's failure to use a recognized methodology

sufficient for determining medical causation, his case definition of a six-month cut off for an

event being considered "irreversible alopecia," his use of data that purportedly did not exist in

2009, his reliance on a statistical analysis performed Plaintiff's expert biostatistician, Dr. David

Madigan, and that his definition of irreversible alopecia as a serious and/or clinically significant

event contradicts the FDA Guidance he uses to reach his conclusions.

> (a)      Dr. Kessler is Not Testifying to Medical Causation, and Even if
>               he Were, His Methodology is Nonetheless Sound

Sanofi asks the Court "to preclude Dr. Kessler from offering any medical causation

testimony," (Mot. at 8), but Dr. Kessler is not offering any opinions on medical causation.  He

is offering opinions on whether there is sufficient evidence of a "causal association" as required by the federal regulations for a Warning to be included in a drug label.[16]   The regulations themselves make clear that this standard differs from medical causation in that "a causal relationship need not have been definitely established."  21 C.F.R. § 201.57 (c)(6)(i).

Dr. Kessler's opinions relate to Sanofi's duty to warn and failure to do so, not to medical causation.  While this may be a lower standard than medical causation, it is the appropriate standard to determine whether a Warning needed to include a particular serious and/or clinically significant adverse event.  As this is the regulatory standard that determines whether a serious and/or clinically significant adverse event needs to be included in the warning under the Federal Regulations (as opposed to the definitive standard for medical causation), Dr. Kessler appropriately used the methodology called for by the FDA in making that determination, *i.e.* the seven factors contained in FDA Guidelines.  If Dr. Kessler, the FDA, and drug manufacturers only had to warn if a serious and/or clinically significant adverse event met the medical causation standard, that would be for the FDA to set forth this distinct standard and analytical framework.  Accordingly, Dr. Kessler used the proper standard for making the determination in this context, i.e., the same standard that Sanofi should have used in whether irreversible alopecia should have been included in the Warnings section of the Taxotere label.

Regardless, Dr. Kessler's causative analysis, even under medical causation standards, is sound.  Contrary to Sanofi's suggestion, Dr. Kessler's epidemiological analysis revealed a statistically significant increased risk of permanent alopecia with Taxotere—a conclusion which Dr. Madigan likewise confirmed.  (Ex. B, Kessler Dep. 137:9-138:5, 212:4-14, 244:13-

---

[16] Evidence of a causal association is only required for a warning to appear in Section 5 of the label, which is the "Warnings" section.  Evidence of causal association is not required for a warning to appear in Section 6, which is the Adverse Reactions section of the label. *See* 21 C.F.R. § 201.57(c)(7).

19, 250:17-252:1, Dec. 20, 2018; Kessler Report at 45-46 (¶¶129-131).)  In addition, Dr.

Kessler's analysis of FDA's seven factors overlaps and is strikingly similar to the application

of the Bradford Hill criteria, (Ex. B, Kessler Dep. 66:8-18, Dec. 20, 2018; Kessler Report at

36-37 (¶¶103-107)), which has been recognized in numerous courts as a reliable method in

which to establish causation. *See, e.g., In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 299 F.

Supp. 3d 1291, 1351-52 (N.D. Fla. 2018); *In re Roundup Prod. Liab. Litig.*, No. 16-MD-02741-

VC, 2018 WL 3368534, at *18 (N.D. Cal. July 10, 2018) ("To the extent the *Daubert* question

is whether consideration of the Bradford Hill factors is a reliable method for determining

causation as a general matter, the answer is yes."); *In re Testosterone Replacement Therapy*

*Prod. Liab. Litig. Coordinated Pretrial Proceedings*, No. 14 C 1748, 2018 WL 4030585, at *5

(N.D. Ill. Aug. 23, 2018).

> (b)  Sanofi Criticism of Dr. Kessler's Definition of Permanent
> Alopecia is an Issue Properly Addressed in Cross Examination

Dr. Kessler's analysis is not flawed on the basis that he accepted six months as

indicative of "irreversible alopecia."  As Dr. Kessler explains and cites, the medical literature

has generally defined "irreversible alopecia" as the "complete loss of growth or partial regrowth

at least 6 months after chemotherapy."   (Kessler Report at 20 (¶81).)  While Sanofi may

disagree with Dr. Kessler's definition, this is a medically accepted time period and definition.

Indeed, Sanofi itself has defined "irreversible alopecia" multiple ways over the past decade.

(*Id*. at 21 (¶82).)  As Dr. Kessler has used a medically accepted definition for irreversible

alopecia, Sanofi may challenge his use of this time period on cross-examination, but it is not a

basis for exclusion.

> (c)  Dr. Kessler's Opinions are Supported by Sanofi's pre-2009
> Clinical Studies

Sanofi is simply incorrect in its contention that Dr. Kessler reached his conclusions by

relying on data that was not available in 2009.  While Dr. Kessler certainly considered post 2009 data, his report thoroughly explains and sets forth the up-to-2009 data that allowed him to reach the conclusion that 2009 is the date by which Sanofi knew or should have known of reasonable causal association between Taxotere and irreversible alopecia.  For example, as Dr. Kessler explains, "[t]he 2004 interim data and 2009 final data from two of Sanofi's clinical trials (TAX 316 and TAX 301/GEICAM 9805) identified an incidence rate or rate of occurrence ranging from 3.2%-9.2%," and "Sanofi's 2015 Causation analysis cited to these clinical trial studies and the reports of irreversible alopecia reported to support its conclusion that 'the cumulative weighted evidence is sufficient to support a causal association between docetaxel and permanent/irreversible alopecia in the patients who received docetaxel'" (*Id.* at 42-43 (¶ 123).)  Indeed, Dr. Kessler testified during his deposition that his opinion could be supported as early as 2006 based on the Sedlacek study, which was published in 2006. (Ex. B, Kessler Dep. 250:17-252:1.)  The mere fact that Dr. Kessler looked at data beyond 2009 does not render his opinion any less reliable.  To be thorough, Dr. Kessler had to look at all the data.  Based on that analysis, 2009 was the data he determined was critical.

Regardless, Dr. Kessler did rely on pre-2009 for the majority of the factors: 1st factor: frequency of reporting (Kessler Report at ¶¶118, 123); 2nd factor: adverse event rate exceeds comparator (*id.* at 41, 43 (¶¶128-131)); 4th factor: biologic plausibility (*id.* at 49, 50, 56-57 (¶¶144, 147 n. 170)); 5th factor: temporal association between drug and adverse event (*id.* at 51 (¶152)); 7th factor: causal association with other drugs (*id.* at 53 (¶161)).  This is more than sufficient under FDA's Guidelines and the Bradford Hill analysis, which do not require that only a majority of criterion be met to establish causation.

(d)    Dr. Kessler Properly Utilized Dr. Madigan's Analysis

Likewise, it was in no way improper for Dr. Kessler to utilize a statistical analysis by

Dr. Madigan in reaching his conclusions.  He did not simply parrot the report or opinions of Dr. Madigan.  Dr. Kessler analyzed the work of Dr. Madigan, recognized that Dr. Madigan used an appropriate methodology, and used Dr. Madigan's statistical analysis as part of the data Dr. Kessler used to reach his own, independent opinions.  (*Id.* generally.)

Despite Sanofi's contention to the contrary, it is quite appropriate and common for an expert to utilize a statistical analysis of another expert as part of the facts and data he considers in reaching his own opinions.   Rule 703 of the Federal Rules of Evidence provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. . . .

FED. R. EVID. 703.   As the Court explained in rejecting a similar argument involving both Dr. Kessler and Dr. Madigan:

> The Defendants do not challenge Dr. Kessler's epidemiological conclusions, *rather, question his ability to discuss the fact that he relied on Dr. Madigan's meta-analysis in reaching his conclusions.* It is without question, the facts and data upon which an expert may base his or her opinion(s) are admissible on that basis alone; Dr. Kessler needn't be a statistician to rely on statistics and analyses conducted by a statistician, particularly within this factual context when statistical analysis is, in part, one of the foundations upon which epidemiological analyses and conclusions are based and when epidemiological analyses and conclusions have, within the motion practice, been shown to be at the center of the scientific debate at hand. The Defendants' argument as presented, is, again, unsupported and unpersuasive and, therefore, the objection is OVERRULED.

*In re Actos (Pioglitazone) Products Liability Litigation*, 2014 WL 120973 at * 17 (W.D.La., 2014).  *See also*, *In re Vioxxx Products Liability Litigation*, 2016 WL 8711273 at *8 (E.D. La. 2016) ("Under Federal Rule of Evidence 703, an expert may base opinions on facts or data he has been made aware of during the case. . .Thus, Dr. Egilman's conclusions based on Dr. Madigan's report are admissible."); *Christopherson v. Allied Signal Corp.*, 939 F.2d 1106, 1111 (5th Cir. 1991), abrogated on other grounds by Merrell Dow Pharm., Inc., 509 U.S. 579 (1993);

*Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1320-22 (Fed. Cir. 2014), overruled on other grounds by *Williamson v. Citrix Online*, LLC, 792 F.3d 1339 (Fed. Cir. 2015) ("Experts routinely rely upon other experts hired by the party they represent for expertise outside of their field. . . Rule 703 explicitly allows an expert to rely on information he has been made aware of "if experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." This Rule does not predicate admissibility on the source of the facts or data or, in particular, on whether the source is employed by either of the parties.") (internal citations omitted); *Monsanto Co. v. David*, 516 F.3d 1009, 1015 (Fed. Cir. 2008) ("[N]umerous courts have held that reliance on scientific test results prepared by others may constitute the type of evidence that is reasonably relied upon by experts for purposes of Rule of Evidence 703); *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94 (2d Cir. 2000) ("Xerox's primary argument is that plaintiffs' experts failed to conduct their own tests and relied only on data provided by Xerox's own experts and the DEC. However, an expert may rely on data that she did not personally collect."). Indeed, all Dr. Kessler did here was exactly what was his practice both as FDA Commissioner and in his academic appointments, and it is standard for regulatory experts, i.e., to use the work of biostatisticians where appropriate. (*Id.* at ¶ 113.)

(e)     Dr. Kessler's Opinion Regarding the Seriousness and Clinical Significance of Permanent Alopecia is Reliable

Finally, Sanofi's assertion that Dr. Kessler's definition of irreversible alopecia as a serious and/or clinically significant event contradicts the FDA Guidance he uses to reach his conclusions is wholly devoid of merit for the reasons set forth above.

As Dr. Kessler thoroughly explains in his report, under the FDA regulations, the Warnings and Precautions section of a drug's label must include serious and/or clinically significant adverse events. 21 C.F.R. § 201.57(c)(6). According to 21 C.F.R. § 314.80, a serious

adverse drug experience includes the following outcomes "death; a life-threatening adverse event; inpatient hospitalization or prolongation of existing hospitalization; a persistent or significant incapacity or substantial disruption of the ability to conduct normal life functions; or a congenital anomaly or birth defect." The FDA's 2011 Guidance on Warnings in labeling also states, "Adverse reactions that do not meet the definition of a serious adverse reaction, but are otherwise clinically significant because they have implications for prescribing decisions or patient management, should also be included in the WARNINGS AND PRECAUTIONS section." (FDA Guidance at p. 4).

In determining if an adverse reaction is otherwise clinically significant, the drug's indication (i.e. the relative seriousness of the disease or condition treated) and incidence of an adverse reaction should be considered. (*Id*.) With respect to incidence, the FDA's Guidance provides, "A high absolute risk or rate of occurrence of an adverse reaction can be a factor in deciding whether to include the reaction in this section." (*Id*.) The FDA instructs that the following adverse reactions could otherwise be considered clinically significant:

> (1) an adverse reaction that may lead to a potentially serious outcome unless the dosage or regimen is adjusted, the drug is discontinued, or another drug is administered to prevent the serious outcome; (2) an adverse reaction that could be prevented or managed with appropriate patient selection, monitoring, or avoidance of concomitant therapy, and prevention or management of the adverse reaction is needed to avoid a potentially serious outcome; (3) an adverse reaction that can significantly affect patient compliance, particularly when noncompliance has potentially serious consequences.

(*Id*.)

In the context of this regulatory frame work and utilizing his expertise in understanding and applying the same to a particular situation, Dr. Kessler reached the conclusion that "irreversible alopecia" constitutes a serious and/or clinically significant adverse event. In doing so, Dr. Kessler examined the pertinent medical literature discussing alopecia and irreversible

alopecia, which described the distressing nature of this injury and its profound impact on mental health, physical, psychosocial and psychological distress, quality of life, patient compliance, and patient willingness to undergo chemotherapy or instead choose a different therapy or treatment.  (Kessler Report at 23 (¶ 93).)

In reaching this opinion, Dr. Kessler also examined the evidence from this case demonstrating that Sanofi itself recognized the serious and significant nature of irreversible alopecia and its potential impact on patient compliance and patient willingness to undergo a particular chemotherapy or instead choose a different therapy or treatment, and that regulatory authorities have concluded and corresponded with Sanofi regarding the serious and significant nature of irreversible alopecia.  (*Id.* at 29-30 (¶¶ 94-95.3).)  Dr. Kessler likewise reviewed data from medical literature and Sanofi's clinical trials regarding the incidence rate or rate of occurrence for irreversible alopecia associated with Taxotere.  (*Id.* at 30 (¶96).)  The medical literature provides an incidence rate of occurrence ranging from 6.3% - 10.6% (or higher), and the 2004 and 2009 final data from two of Sanofi's clinical trials provide an incidence rate or rate of occurrence ranging from 3.2% to 9.2%.  (*Id.* at 30-31 (¶¶96.1-96.2).)  In light of these affects, information and incidence rates, Dr. Kessler uses his regulatory expertise to conclude that irreversible alopecia meets the criteria for seriousness or otherwise clinically significant.  (*Id.* at 31 (¶97).)

Sanofi's basis for challenging this conclusion by Dr. Kessler is completely devoid of merit.  Sanofi seizes on a certain explanatory example contained within the 2011 FDA Guidance and mischaracterizes this example as a conclusion by the FDA that a side effect of alopecia with cancer treatment is never considered a serious adverse and/or clinically significant event.  This is simply untrue.

16

The language Sanofi relies upon as a purported "conclusion" by the FDA is as follows:

> For example, non-serious adverse reactions (e.g., nausea, pruritus, alopecia) caused by drugs intended to treat minor, self-limiting conditions (e.g., allergic rhinitis, cosmetic conditions, transient insomnia) may be considered clinically significant. However, those same adverse reactions caused by drugs intended to treat serious or life-threatening conditions (e.g., cancer) may be considered much less clinically significant and not appropriate for inclusion in this section.

(FDA Guidance at p. 4).  This section is far from a definitive conclusion by the FDA that alopecia is *never* a clinically significant adverse reaction for a cancer treatment.  All this language does is provide an example of a situation where a side effect *may* not be a serious and/or clinically significant adverse event in a particular situation.  The example simply does not grant a pharmaceutical company carte blanche to determine that alopecia should never be considered a serious and/or clinically significant adverse event without first applying the appropriate analytical framework, and especially not in the presence of evidence to the contrary.  More importantly, the language Sanofi relies upon speaks as to alopecia generally, not irreversible alopecia, which are two critically different situations.  In sum, the FDA Guidance does not provide Sanofi with the pass it seeks for failing to properly include warnings about irreversible alopecia in its labeling.

Dr. Kessler's opinions are sufficiently reliable for admission as they are based on scientifically valid reasoning and methodology.  In reaching his opinions regarding reasonable evidence of a causal association between Taxotere use and irreversible alopecia existing as early as 2009 such that a Warning should have provided in the Taxotere label, Dr. Kessler analyzed and applied the FDA's own standards to the pertinent facts and data to make this determination.

### 2.      Dr. Kessler's Opinions are Relevant and Necessary

Dr. Kessler's opinion that reasonable evidence of a causal association between Taxotere and irreversible alopecia necessitating a warning existed as early as 2009 is highly relevant to facts at issue in this litigation.  This litigation involves failure to warn claims and a learned intermediary defense.  Accordingly, exactly what information should have been included in the Warnings section of the label and available to physicians to consider, and when that information should have been included, is abundantly relevant.

Sanofi argues that because Dr. Kessler's opinions speak to the regulatory standard for including a serious and/or clinically significant adverse event in the Warnings section of a product label (i.e., reasonable evidence of a causal association), as opposed to medical causation, Dr. Kessler's opinions should be excluded on the grounds the jury may be confused.

However, the fact that there is a subtle distinction between these two standards actually highlights the importance of expert testimony to guide the jury in understanding the importance of this distinction, the distinction in the analyses, and aid in understanding the results of this regulatory analysis in this context.  The FDA itself has consistently contented that the determination of whether reasonable evidence of a causal association between a product and adverse event exists calls for expertise.  *See Dobbs v. Wyeth Pharmaceuticals*, 797 F.Supp.2d 1264, 1267 (W.D. Okla. 2011) ("The FDA has consistently defined reasonable evidence of a causal association as 'when evidence exists on the basis of which experts qualified by scientific training and experience can reasonably conclude that the hazard is associated with the use of the drug.").  Obviously, this determination involves an analysis beyond the understanding of a lay jury and the expertise of someone such as Dr. Kessler is entirely appropriate.  Any concerns regarding jury confusion can be addressed by Sanofi on cross-examination where it is free to explore the differences between the two causation standards with Dr. Kessler.

Sanofi points to a number of cases in the Reclast litigation where Dr. Suzanne Parisian was generally precluded from offering purportedly similar testimony.  However, a primary concern of the Courts in many of those cases was whether Plaintiffs were attempting to use Dr. Parisian's opinions on reasonable evidence of a causal association as a back-door way of establishing medical causation.  That is clearly not the case in the present litigation.  When this "back-door" medical causation concern is not present or valid, courts have allowed such causation opinions.  *See In re Xarelto (Rivaroxaban) Products Liability Litigation*, 2017 WL 1352860 at *3 (E.D. La. 2017) (rejecting Defendants' attempt to challenge Dr. Parisian's opinions regulatory causation); *In re:  Tylenol (Acetaminophen) Marketing, Sales Practices, and Products Liability Litigation*, 2016 WL 4039286 (E.D. Pa. 2016).

Further, Dr. Kessler has a different background than Dr. Parisian.  As explained above, Dr. Kessler is a medical doctor, attorney, Former Commissioner of the FDA, a Professor of Biostatistics and trained in pharmacoepidemiology.  The importance of this distinction can be seen when reviewing why Dr. Parisian's attempt to offer opinions on reasonable evidence of causal association was rejected in *In re Mirena Products Liability Litigation*.  As the Court explained in excluding similar opinions by Dr. Parisian in that litigation:

> This means Dr. Parisian will not be permitted to testify that the Mirena label should have been changed to warn of secondary perforation, **because she is not qualified to say either that that risk was clinically significant or that there was reasonable evidence of causal association. Although she could in theory have relied on the opinions of other experts in that regard, and gone on to explain what Defendants should have done when confronted with reasonable evidence of causal association between the device and a clinically significant risk, she did not do so here**; indeed, she did not read the reports of any of the other experts prior to writing her report. (Parisian Dep. at 60:7–15, 92:17–93:3.) Dr. Parisian included Dr. Zambelli–Weiner's report in her list of documents considered, but she acknowledged that she had not actually seen the report. (*Id.* at 60:20–61:6.) Accordingly, Dr. Parisian may testify as to what Defendants should have done in terms of investigation based on the post-marketing information available to them,

but may not opine that that information amounted to evidence of causal association sufficient to warrant a label change.

169 F. Supp.3d 396, 476, n. 76 (S.D.N.Y. 2016) (emphasis added).  In the present case, unlike in *In re Mirena*, Dr. Kessler is clearly qualified based on his education and experience, as set forth above, to perform the analysis as to whether the risk of irreversible alopecia is clinically significant and whether there is reasonable evidence of causal association.  Amongst other things, Dr. Kessler understands and applied the FDA's factors for making this determination, properly utilized and considered the statistical analysis performed by Dr. Madigan, and Dr. Kessler explains what Sanofi should have done when confronted with reasonable evidence of a causal association between Taxotere and irreversible alopecia.  This is an issue that calls for expert testimony, will assist the jury, and was arrived at based upon scientifically valid methodology and reasoning.  Therefore, there is no basis for excluding this opinion.

Finally, Sanofi's assertion that Dr. Kessler's opinions are unhelpful because he does not opine on what the label language should have been is not grounds for exclusion.   Dr. Kessler makes the assertion that the Warning for Taxotere should have included "irreversible alopecia," but did not.  Otherwise, it hardly matters for purposes of admissibility whether the label should have said permanent hair loss or irreversible alopecia or some similar language. The exact content of the label exceeds what is necessary for admissibility and provides no basis to prevent Dr. Kessler from testifying.

## CONCLUSION

For the reasons set forth above, the Court should deny Sanofi's Motion to Exclude Expert Testimony of David Kessler, M.D., J.D.

Dated: June 26, 2019

Respectfully submitted,

*/s/ Christopher L. Coffin*
Christopher L. Coffin (#27902)
PENDLEY, BAUDIN & COFFIN, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

*Plaintiffs' Co-Lead Counsel*

*/s/M. Palmer Lambert*
M. Palmer Lambert (#33228)
GAINSBURGH BENJAMIN DAVID
MEUNIER & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: 504-522-2304
Fax: 504-528-9973
plambert@gainsben.com

*Plaintiffs' Co-Liaison Counsel*

*/s/ Karen B. Menzies*
Karen Barth Menzies (CA Bar #180234)
GIBBS LAW GROUP LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Telephone: 510-350-9700
Facsimile: 510-350-9701
kbm@classlawgroup.com

*Plaintiffs' Co-Lead Counsel*

*/s/Dawn M. Barrios*
Dawn M. Barrios (#2821)
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: 504-524-3300
Fax: 504-524-3313
barrios@bkc-law.com

*Plaintiffs' Co-Liaison Counsel*

## PLAINTIFFS' STEERING COMMITTEE

Anne Andrews
Andrews & Thornton
4701 Von Karman Ave., Suite 300
Newport Beach, CA 92660
Phone: (800) 664-1734
aa@andrewsthornton.com

J. Kyle Bachus
Bachus & Schanker, LLC
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Phone: (303) 893-9800
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@atkinsandmarkoff.com

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, Florida 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

Andrew Lemmon
Lemmon Law Firm, LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Phone: 510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

Genevieve Zimmerman
Meshbesher & Spence Ltd.
1616 Park Avenue South
Minneapolis, MN 55404
Phone: (612) 339-9121
Fax: (612) 339-9188
gzimmerman@meshbesher.com

**CERTIFICATE OF SERVICE**

I hereby certify that on June 26, 2019, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

*/s/ M. Palmer Lambert*
M. PALMER LAMBERT