UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)
PRODUCTS LIABILITY LITIGATION          MDL NO. 2740

SECTION "H" (5)

THIS DOCUMENT RELATES TO:

Tanya Francis, Case No. 2:16-cv-17410; and
Barbara Earnest, Case No. 2:16-cv-17144

### PLAINTIFFS' OPPOSITION TO SANOFI'S MOTION
### TO EXCLUDE TESTIMONY OF DR. DAVID MADIGAN

I.  INTRODUCTION

Dr. David Madigan is an exceedingly qualified expert whose opinions on biostatistical, statistical, and pharmacovigilance issues have been admitted by numerous courts.[1] Here, Dr. Madigan opines that there is a causal association between Taxotere and permanent/irreversible alopecia after applying a reliable methodology that mirrors the approach he has used in other cases

---

[1] *See, e.g.*, *In re Actos (Pioglitazone) Prod. Liab. Litig.*, No. 12-CV-00064, 2013 WL 6796461, at *2 (W.D. La. Dec. 19, 2013) (allowing Madigan's opinion that Actos is capable of causing and/or promoting bladder cancer); *Rheinfrank v. Abbott Labs., Inc.*, No. 1:13-CV-144, 2015 WL 13022172, at *12–13 (S.D. Ohio Oct. 2, 2015), *aff'd*, No. 16-3347, 2017 WL 680349 (6th Cir. Feb. 21, 2017) (finding Madigan's testimony relevant and sufficiently reliable to assist the trier of fact in determining if Depakote could cause developmental delay); *In re Pfizer Inc. Securities Litig.*, Nos. 04 Civ. 9866 (LTS)(JLC), 05 md 1688 (LTS), 2010 WL 1047618, at *4 (S.D.N.Y. Mar. 22, 2010) (finding Madigan amply qualified, with the assistance of clinical experts, to testify that Celebrex is causally associated with an increased risk of cardiovascular events); *In re Zimmer NexGen Knee Implant Prod. Liab. Litig.*, 218 F. Supp. 3d 700, 708 (N.D. Ill. 2016) (assuming Madigan's testimony that NexGen Flex implants cause a higher risk of revision than standard devices is admissible); *In re Vioxx Prod.Liab. Litig.*, MDL No. 1657, 2016 WL 8711273, at *3-5 (E.D. La. September 16, 2016) (allowing Madigan's testimony that Vioxx is causally associated with a significantly increased risk of cardiovascular thrombotic events); *Hunt v. McNeil Consumer Healthcare et al.*, 2:11-cv-00457 (E.D. La. Jan. 8, 2014) (denying Defendants' motion to exclude Madigan's testimony regarding the total number of skin-related adverse events associated with pediatric ibuprofen); *In re Fosamax (Alendronate Sodium) Prod. Liab. Litig.*, No. CIV.A. 08-08, 2013 WL 1558690, at *8–9 (D.N.J. Apr. 10, 2013) (admitting Madigan's testimony and finding the methodology employed in his FAERS analysis was sufficiently reliable because it is generally accepted in the scientific community); *In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Prod. Liab. Litig.*, No. 3:09-MD-02100-DRH, 2011 WL 6302573, at *17 (S.D. Ill. Dec. 16, 2011) ("The methodology that he employed, as well as his published articles and other articles that rely on this methodology, have been tested, subjected to peer review and publication and are accepted in the general scientific community… Further, the Court concludes that Madigan's testimony is sufficiently reliable and will assist the trier of fact in understanding the use of adverse event reports in the proper context, as required by Rule 702.").

in which his testimony was admitted and an approach utilized by both the FDA and even Sanofi. In seeking to exclude Dr. Madigan, it is important to acknowledge what Sanofi does not argue: Sanofi does not allege that Dr. Madigan is unqualified to render his opinions. Rather, Sanofi attempts to disclaim Dr. Madigan's opinions by calling his methodology unreliable and his conclusions irrelevant. However, Dr. Madigan's opinions will undoubtedly assist the trier of fact, and they are supported by Dr. Madigan's education, training, and experience; his analysis identifying safety signals in the FDA's FAERS database, his analysis of Sanofi's internal pharmacovigilance database and the TAX 316 and TAX 301 clinical trials; and is consistent with Sanofi's own internal assessment and conclusions. Respectfully, Sanofi's motion should be denied.

## II.     STANDARD OF REVIEW

Under Federal Rule of Evidence 702, a witness who is qualified as an expert may testify if (1) the expert's "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (2) the expert's testimony "is based on sufficient facts or data"; (3) the expert's testimony "is the product of reliable principles and methods"; and (4) the principles and methods employed by the expert have been reliably applied to the facts of the case. Fed. R. Evid. 702. The Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provides the analytical framework for assessing whether an expert's testimony is admissible under Rule 702 by determining whether the testimony is both reliable and relevant. *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004).

Relevancy is "determined on the basis of assisting the trier." Fed. R. Evid. 702 Advisory Committee Note. Under Rule 401, evidence is "relevant" if "(a) it has any tendency to make a fact

more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.

Reliability of expert testimony "is determined by assessing whether the reasoning and methodology underlying the testimony is scientifically valid." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007). A nonexclusive set of factors for determining reliability has been developed and include: (1) whether the technique at issue has been tested; (2) whether the technique has been subjected to peer review and publication; (3) the potential error rate; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique is generally accepted in the relevant scientific community. *Burleson*, 393 F.3d at 584. The reliability inquiry must remain "flexible" as "not every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004). "[A] trial judge has considerable leeway in … determining whether particular expert testimony is reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *see also Runnels v. Tex. Children's Hosp. Select Plan*, 167 F. App'x 377, 381 (5th Cir. 2006).

"The Fifth Circuit has held that, in determining the admissibility of expert testimony, district courts must accord proper deference to 'the jury's role as the proper arbiter of disputes between conflicting opinions. As a general rule, questions relating to the basis and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.'" *Nagle v. Gusman*, 2016 WL 560688 at *4 (E.D. La. Feb. 12, 2016) (internal citation omitted). As such, "rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Committee Notes (2000).

### III.   ARGUMENT

#### A.   Dr. Madigan Utilized a Widely Accepted and Reliable Approach in Analyzing FAERS Data

Dr. Madigan conducted a disproportionality analysis of the FDA's FAERS database to determine whether a safety signal existed between permanent/irreversible alopecia and Taxotere. The FDA has long recognized the usefulness of these techniques for the detection of safety signals. Indeed, as Dr. Madigan explained in his report, statistical review of information in FAERS is part of the industry standard for pharmacovigilance, practiced by the drug companies themselves as well as the FDA. (Ex. A to Defs' Mot., Rec. Doc. 6144-1, Madigan Report at 5 (¶14).) In fact, the specific signal detection algorithms he employed are precisely those suggested by the FDA. Moreover, the role and importance of these techniques in detecting safety signals has been recognized in a wealth of published, peer-reviewed literature.[2] Dr. Madigan himself has published articles in peer-reviewed journals based on this same methodology.[3] And other published articles rely on, and validate, this methodology for the generation of safety signals.[4]

---

[2] *See, e.g.,* Caster, O., Noren, G.N., Madigan, D., and Bate, A. (2010). Large-Scale Regression-Based Pattern Discovery: The Example of Screening the WHO Global Drug Safety Database. Statistical Analysis and Data Mining, 3, 197-208; Deshpande, G., Gogolak, V., Weiss Smith, S. Data Mining in Drug Safety: Review of Published Threshold Criteria for Defining Signals of Disproportionate Reporting. Pharmaceutical Medicine. 24(1):37-43, February 1, 2010; Pearson, R.K., Hauben, M., Goldsmith, D., Gould, A.L., Madigan, D., O'Hara, D.J., Reisinger, S., and Hochberg, A. (2009). Influence of the MEDDRA hierarchy on pharmacovigilance data mining results. International Journal of Medical Informatics, to appear; Hochberg, A., Hauben, M., Pearson, R.K., O'Hara, D., Reisinger, S., Goldsmith, D.I., Gould, A.L., and Madigan, D. (2009). An Evaluation of Three Signal Detection Algorithms Using a Highly Inclusive Reference Event Database. Drug Safety, 32, 509-525; Hauben, M., Madigan, D., Reisinger, S., Hochberg, A., and O'Hara, D. (2007). Data Mining in Pharmacovigilance: Computational Cost as a Neglected Performance Parameter. International Journal of Pharmaceutical Medicine, 21, 319-323.; Hauben, M., Madigan, D., Gerrits, C., and Meyboom, R. (2005). The role of data mining in pharmacovigilance. Expert Opinion in Drug Safety, 4(5), 929-948.

[3] *See, e.g.*, Madigan, D. (2018), Drospirenone-containing oral contraceptives and venous thromboembolism: an analysis of the FAERS database. Open Access Journal of Contraception, 9(29-32).

[4] *See, e.g.,* Kubota, K., Koide, D., Hirai T. Comparison of data mining methodologies using Japanese spontaneous reports. Pharmacoepidemiology and Drug Safety, 13, (2004) 387-394.; Evans, SJW, Waller, D, Davis, D. Use of proportional reporting ratios (PRRs) for signal generation from spontaneous adverse drug reaction reports. Pharmacoepidemiology and Drug Safety, 10,(2001) 483-486. Szarfman, A., Machado, S.G., O'Neill, R.T.: Use of screening algorithms and computer systems to efficiently signal higher-than-expected combinations of drugs and events in the US FDA's spontaneous reports database. Drug Safety (2002) 25(6):381-392; Deshpande, G., Gogolak,

The bulk of Sanofi's argument focuses on the potential biases in FAERS data and that FAERS disproportionality analysis is not sufficient, standing alone, to establish general causation. Dr. Madigan acknowledges this—as does the FDA and the many courts that have reviewed and accepted FAERs data and analysis. Indeed, while the courts, the FDA, and Dr. Madigan all recognize the limitations of FAERS disproportionality analysis, the courts, the FDA and Dr. Madigan all appropriately consider this type of evidence in assessing causation and identifying safety signals.[5]

Sanofi puts forth a similar straw man when it criticizes Dr. Madigan for not reviewing individual, underlying case reports. Such an undertaking is not contemplated as part of FAERS disproportionality analysis because the methodology inherently centers on a review of this FDA database without possible access to the underlying case reports. As such, any effort by Dr. Madigan to seek to obtain access to these case reports and subjectively review them would be inappropriate. Further, as Dr. Madigan explained, any analysis of individual case reports would also require the similar review of *every* case report contemplated in the entire FAERS database, as each event is viewed against the background rate of all other events included in the database. (Ex. B, Madigan Dep. 129:02 – 131:04, Dec. 7. 2018.) Such a review is not only impractical, but impossible.

Sanofi also misstates Dr. Madigan's testimony regarding the relevance of individual case reports. This is a red herring. As explained above, a proper FAERS analysis doesn't consider a subjective review of individual case reports. Hence, Dr. Madigan's testimony that reviewing such

---

V., Weiss Smith, S. Data Mining in Drug Safety: Review of Published Threshold Criteria for Defining Signals of Disproportionate Reporting. Pharmaceutical Medicine. 24(1):37-43, February 1, 2010.

[5] In fact, Sanofi's FRCP, Rule 30(b)(6) designee on safety signals, Michael Kopreski, MD, recognized that Sanofi should be proactive, not reactive, in terms of safety signal detection. (Ex. A, Kopreski 30(b)(6) Dep. Vol II 402:23 – 403:07, Dec. 13, 2018.) The FAERS database exists to allow for a thorough and readily available source of data for early signal detection.

individual case reports would not be "terribly useful" to his opinions here supports the propriety of his methodology because his opinions are not based on a review of these reports.

Further, Dr. Madigan details in his report how limitations in FAERS means that invariably there can be over-counting and under-counting. Dr. Madigan conducted a disproportionality analysis that compared a Taxotere rate in the numerator with a background rate in the denominator. In doing so, the potential exists for over-counting and under-counting both in the numerator (Taxotere) and the denominator (the background rate). This potential is contemplated in the methodology Dr. Madigan uses. Despite this fact, Sanofi takes issue with Dr. Madigan's report by cherry-picking certain underlying case reports to try and illustrate over-counting in the numerator. Curiously, however, Sanofi never mentions or acknowledges that similar examples likely exist in the denominator or how, as noted in Dr. Madigan's report, there is a well-documented concern of under-reporting.

Indeed, the same type of FAERS analysis Dr. Madigan performed in this case has been routinely admitted by other courts. *See, e.g.*, *Rheinfrank v. Abbott Labs., Inc.*, No. 1:13-CV-144, 2015 WL 13022172, at *12–13 (S.D. Ohio Oct. 2, 2015), *aff'd*, No. 16-3347, 2017 WL 680349 (6th Cir. Feb. 21, 2017); *In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Prod. Liab. Litig.*, No. 3:09-MD-02100-DRH, 2011 WL 6302573, at *17 (S.D. Ill. Dec. 16, 2011); *see also In re Phenylpropanolamine (PPA) Prod. Liab. Litig.*, 289 F. Supp. 2d 1230, 1242–43 (W.D. Wash. 2003) (allowing experts' testimony taking into consideration all lines of evidence, including FAERS data and one epidemiology study). Dr. Madigan's FAERS methodology is reliable and generally accepted in the scientific community. *See Rheinfrank*, 2015 WL 13022172, at *13; *In re Fosamax (Alendronate Sodium) Prod. Liab. Litig.*, No. CIV.A. 08-08, 2013 WL 1558690, at *8– 9 (D.N.J. Apr. 10, 2013). His methodology is also highly similar to that used not only by the FDA,

but by Sanofi itself on multiple occasions, including in submissions to FDA to support new drug indications for its products and in publications authored by the company.[6]

---

[6] *See* Colilla, S. (2017). Validation of New Signal Detection Methods for Web Query Log Data Compared to Signal Detection Algorithms Used With FAERS. Drug Safety DOI 10.10007/s40264-017-0507-4 (article **published by Sanofi** personnel in global pharmacoepidemiology, global safety sciences noting "[s]ignal detection algorithms (SDAs), such as disproportionality and Empirical Bayes geometric mean (EBGM) metrics, have been used as the primary tools to detect signals in spontaneous AE reporting systems such as FAERS."); Kurzinger, M. (2018). Web-Based Detection Using Medical Forums Data in France: Comparative Analysis. Journal of Medical Internet Research, vol. 20(iss. 11) (article **authored by Sanofi** personnel in epidemiology and benefit risk evaluation department using PRR, EBGM, EB05 from FAERS database to analyze rates of reporting); *see also* **the following Sanofi submissions to the FDA**: Sanofi NDA 208471 to FDA for Adlyxin injection, Other Review(s), 2016, *available at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/208471Orig1s000OtherR.pdf ("For the disproportionality analysis in the AWARE database, Sanofi used the proportional reporting ratio (PRR) with corresponding chi-square value "to compare the observed count for a product-event combination with an 'expected' count." A signal is considered to be positive if the threshold of PRR>2, PRR chi-square>4, and the number of reports ≥ 3 are met."); Sanofi NDA 201613 to FDA for Fexofenadine HCI, Medical Review(s), 2010, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/201373Orig1s000MedR.pdf ("The Sponsor [Sanofi] performed a data mining analysis of the FDA AERS database from 01 February 1969 (the beginning of the database) to 30 June 2009 … . It is a disproportionality method used to identify drug-event combinations reported more frequently than expected based on overall rates of drug-event associations in the database. The program calculates adjusted reporting ratio values, or "Empirical Bayes Geometric Mean" (EBGM) values, together with the lower and upper bounds of 95% confidence limits for these values, denoted EB05 and EB95 respectively. The EBGM values indicate the strength of the reporting relationship between a particular drug and adverse event, using the adjusted ratios of observed-to-expected counts for drug-event combinations. Signal scores (EBGM05) are defined to screen for potential safety signals. A threshold of 2 is currently used, which means that for any drug-event combination with signal scores greater than or equal to 2, that particular combination is reported at least twice as often as expected. …The Sponsor performed only the data mining analysis of the AERS and WHO databases and did not review the narrative case reports unless they were reported to Sanofi-aventis directly."); Sanofi NDA 201373 to FDA for Fexofenadine for Children, Other Review(s), 2011, *available at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/201373Orig1s000OtherR.pdf. ("Methodology: Empirica Signal® software and the Multi-item Gamma Poisson Shrinker (MGPS) datamining algorithm quantifies reported drug-event associations by producing a set of values or scores that indicate varying strengths of reporting relationships between drugs and events. These scores, denoted as Empirical Bayes Geometric Mean (EBGM) values, provide a stable estimate of the relative reporting rate of an event for a particular drug relative to all other drugs and events in the database being analyzed. MGPS also calculates lower and upper 90% confidence limits for the EBGM values, denoted EB05 and EB95, respectively. Limitations: The association between fexofenadine and the particular event in AERS is a result of the relative reporting for various events among all drugs in the database. … The exact degree of risk or causality for the various associations between benzonatate and these HLTs (in all patients ever exposed to the drug worldwide) cannot be elicited from this data mining analysis alone, because obviously the association scores (EBGM values) are generated from AERS which consists of spontaneous adverse events reports. Finally, reporting and detection biases can occur in AERS and effects of concomitant illnesses or therapy cannot be fully controlled in data mining analyses using MGPS. Because of the spontaneous nature of reporting, the results of this analysis should not be interpreted as a formal comparison of treatment groups or of their relative risks.")

Regardless of how Sanofi mischaracterizes Dr. Madigan's report and opinions, Dr. Madigan's actual opinion with respect to his FAERS disproportionality analysis is that clear safety signals emerged in the early 2000s regarding the risk of permanent alopecia with Taxotere, and the safety signals were sufficiently greater for Taxotere than other comparator and concomitant drugs. His methodology was based on the FDA's own guidance and utilized terms supported by Plaintiffs' regulatory expert, Dr. David Kessler, as most reasonable to capture the injury at issue. Based on this analysis, Dr. Madigan concluded that "the nature of the [FAERS] database does not permit definitive causal inferences but the evidence therein nonetheless forms an important component of any drug safety investigation [detecting a safety signal]." (Madigan Report at 16.) As noted in his report, while these safety signals, in and of themselves, do not imply causation, the FDA guidelines explain that such signals necessitate communication and further investigation.[7] (Madigan Report at 5-6.) The conclusions and the methodology Dr. Madigan employed are widely accepted and reliable, and Sanofi's argument should be denied.

**B.    Dr. Madigan's Analysis of Sanofi's Internal Pharmacovigilance Database is Reliable**

Sanofi next criticizes the reliability of Dr. Madigan's analysis of Sanofi's own internal pharmacovigilance database.

First, Dr. Madigan's analysis of Sanofi's pharmacovigilance database is consistent with the methodology utilized by Sanofi in both 2011 and 2015 when Sanofi itself sought to review evidence regarding the potential causal association between Taxotere and permanent alopecia. Indeed, in both 2011 and then again in 2015, Sanofi selected certain key words and performed a search of this database. As Dr. Madigan notes, based in part on these results, Sanofi concluded in

---

[7]  Sanofi agrees that it is important for the company to investigate and validate safety signals that arise. (Ex. A, Kopreski 30(b)(6) Dep. Vol II 413:16 – 414:7.)  It is axiomatic then that signal detection is likewise important, and appropriate.

2015 that the "cumulative weighted evidence is sufficient to support a causal association between docetaxel and permanent/irreversible alopecia." (Madigan Report at 18.)

Nevertheless, Sanofi now takes issue with the reliability of the search terms Dr. Madigan used to conduct his review of the same database. Dr. Madigan is admittedly not a dermatologist or qualified to select the appropriate key words to use in conducting this analysis. This is why Dr. Madigan relied upon three qualified experts to assist him in determining which key words to use in his analysis (Drs. Antonella Tosti, Feigal, and Plunkett). It is worth noting that the terms utilized by Dr. Madigan were either included in Sanofi's pharmacovigilance database or are synonyms for these terms. That Sanofi disagrees with some of the key terms utilized by Dr. Madigan in his analysis is not grounds for exclusion of his opinions. The methodology is reliable, and any disagreement is fair game for cross-examination during trial.

Sanofi also seems to take issue with Dr. Tosti not being a biostatistician as a basis for questioning the reliability of Dr. Madigan's analysis. But neither Plaintiffs, Dr. Tosti, nor Dr. Madigan claim that Dr. Tosti is a biostatistician or otherwise qualified to statistically analyze Sanofi's internal pharmacovigilance database. She never performed such an analysis and will not be providing any opinions in this regard. If Sanofi's argument is taken at face value, only an expert dermatologist biostatistician would be qualified to review and analyze Sanofi's internal pharmacovigilance database. Clearly, this is not the law and any argument suggesting so should be disregarded by the Court.

**C. Sanofi's Criticisms of Dr. Madigan's Analysis of TAX 316 and TAX 301 are Misplaced**

Sanofi also criticizes the reliability of Dr. Madigan's review of Sanofi's TAX 316 and TAX 301 (also referred to as GEICAM 9805) clinical trials, claiming the data is irrelevant, unhelpful and unfairly prejudicial. This argument is at odds with several of Sanofi's other motions, including

9

motions seeking to preempt all Plaintiffs' lawsuits as well as exclude other experts. Indeed, Sanofi relies upon its 2004 submission to the FDA wherein they allegedly provided certain interim data from TAX 316 to purportedly demonstrate they attempted to warn prescribers about the risk of permanent alopecia with Taxotere. Now, here, Sanofi takes the position that this same clinical trial data is irrelevant. If the data was irrelevant on the one hand, then how, on the other hand, was this data sufficient to potentially alert prescribers regarding the risk of permanent alopecia with Taxotere?

Even so, Dr. Madigan's analysis of Sanofi's clinical trial data is again consistent with Sanofi's own assessments. Much like the evidence Sanofi cited from its internal pharmacovigilance database, Sanofi's 2015 report included a review and analysis of the TAX 316 and TAX 301 (GEICAM) clinical trial data, and Sanofi cited this data to support, in part, its conclusion that there is a causal association between docetaxel and permanent/irreversible alopecia.

Notwithstanding its own reliance on this clinical trial data, Sanofi argues that Dr. Madigan's analysis of the data is unhelpful and will unfairly prejudice Sanofi. Sanofi attempts to support this point by first claiming statistical significance must be found in each of the individual clinical trials. There is no requirement that statistical significance be parsed out in this manner in order to provide an opinion analyzing certain underlying clinical trial data—nor has Sanofi cited anything to support such an argument. Regardless, in an effort to help the jury understand what information was available to Sanofi, Dr. Madigan analyzed various points in time after treatment in which the alopecia event was unresolved. (Madigan Report at 19-20.) All of these time periods for TAX 316 were statistically significant except the final period reviewed.

Sanofi next argues that Dr. Madigan's meta-analysis is improper by misquoting the

Reference Manual on Scientific Evidence and the accepted standards and rationale for performing meta-analyses. As part of this argument, Sanofi takes issue with Dr. Madigan questioning Sanofi's follow-up of patients from the TAX 301 (GEICAM) clinical trial as a basis to question the reliability of his data. So, according to Sanofi, its abject failure to follow-up with patients in its own clinical trial and investigate the true incidence of women suffering from permanent alopecia now provides a basis to exclude Plaintiffs from utilizing the data Sanofi did collect to nevertheless support Plaintiffs' claims. The Court should reject this baseless argument.

Even so, Sanofi's argument (and citation to support the argument) that courts have held meta-analyses are admissible only when used to reduce the numerical instability on existing statistically significant differences is simply wrong.[8] (*See* Defs' Mot., Rec. Doc. 6144, at 18.) Meta-analyses are a widely recognized methodology for aggregating results across studies, and courts routinely permit expert testimony of meta-analyses. *See, e.g.*, *In re Bextra and Celebrex Marketing Sales Practices and Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1174, 1184 (N.D. Cal. 2007) (holding that "[a] meta-analysis of all available published and unpublished randomized clinical trials" of certain pain-relief medicine was admissible). Moreover, the appropriateness of Dr. Madigan's meta-analysis here is precisely contemplated in the Reference Manual on Scientific Evidence. As the Manual notes, "[i]n view of the fact that studies may disagree and that often many of the studies are small and lack the statistical power needed for definitive conclusions, the technique of meta-analysis was developed, initially for clinical trials." Federal Judicial Center, Reference Manual on Scientific Evidence at 607 (3d ed. 2011). The Manual defines the technique of a meta-analysis as one "used to combine the results of several studies to enhance the precision

---

[8] It is unclear where in the Reference Manual on Scientific Evidence Sanofi is citing to support this argument. The cite Sanofi provides (361-62 fn. 76) contains nothing about meta-analyses. And while there are comments about meta-analyses, as described below in this response, there is nothing to support Sanofi's erroneous argument regarding some need for statistical significance of underlying studies in a meta-analysis.

of the estimate of the effect size and reduce the plausibility that the association found is due to random sampling error." *Id.* at 624.  Here, Dr. Madigan performed a meta-analysis of clinical trial data to account for the lack of statistical power caused by Sanofi's poor follow-up of patients in its TAX 301 study.  Dr. Madigan's use of a meta-analysis and methodology are appropriate and helpful to the trier of fact.

Finally, Sanofi attempts to exclude Dr. Madigan's summary opinion that adequate statistical evidence supporting a causal association between permanent/irreversible alopecia and Taxotere existed several years before Sanofi itself reached this conclusion in 2015.  According to Sanofi, Dr. Madigan's failure to pinpoint an exact date renders this opinion vague and unhelpful.  To the contrary, Dr. Madigan provided specific dates.

The question in this case is whether Sanofi adequately warned Plaintiffs' prescribers regarding the true risk of permanent alopecia associated with Taxotere at the time these two Plaintiffs were prescribed the drug—2009 and 2011.  Dr. Madigan testified during his deposition that adequate statistical evidence to support his conclusion existed in the early 2000s.  Both his deposition and report pinpoint dates on which such evidence existed, including several references to signals existing prior to 2009 and 2011 (*See, e.g.*, Madigan Report at 12 (noting a PRR signal for docetaxel in 2000); *id.* at 14 (showing a SEBGM signal in 2008)) and multiple specific dates on which there was a statistically significant increased risk of permanent alopecia for women in the Taxotere arm versus the comparator arm in Sanofi's TAX 316 clinical trial (22 weeks, 6 months, 12 months, 24 months, 60 months)).  Clearly, Dr. Madigan is not vague in his summary opinion, but in any event, Sanofi's qualms with Dr. Madigan's summary are not a basis for exclusion, but are more appropriately handled in cross-examination.

## CONCLUSION

For the reasons discussed above, the Court should deny, in its entirety, Sanofi's Motion to Exclude the Testimony of Dr. Madigan.

| | |
|---|---|
| Dated: June 26, 2019 | Respectfully submitted, |
| */s/ Christopher L. Coffin* | */s/ Karen B. Menzies* |
| Christopher L. Coffin (#27902) | Karen Barth Menzies (CA Bar #180234) |
| PENDLEY, BAUDIN & COFFIN, L.L.P. | GIBBS LAW GROUP LLP |
| 1100 Poydras Street, Suite 2505 | 6701 Center Drive West, Suite 1400 |
| New Orleans, Louisiana 70163 | Los Angeles, California 90045 |
| Phone: (504) 355-0086 | Telephone: 510-350-9700 |
| Fax: (504) 355-0089 | Facsimile: 510-350-9701 |
| ccoffin@pbclawfirm.com | kbm@classlawgroup.com |
| *Plaintiffs' Co-Lead Counsel* | *Plaintiffs' Co-Lead Counsel* |
| */s/M. Palmer Lambert* | */s/Dawn M. Barrios* |
| M. Palmer Lambert (#33228) | Dawn M. Barrios (#2821) |
| GAINSBURGH BENJAMIN DAVID MEUNIER & WARSHAUER, LLC | BARRIOS, KINGSDORF & CASTEIX, LLP |
| 2800 Energy Centre, 1100 Poydras Street | 701 Poydras Street, Suite 3650 |
| New Orleans, LA 70163-2800 | New Orleans, LA 70139 |
| Phone: 504-522-2304 | Phone: 504-524-3300 |
| Fax: 504-528-9973 | Fax: 504-524-3313 |
| plambert@gainsben.com | barrios@bkc-law.com |
| *Plaintiffs' Co-Liaison Counsel* | *Plaintiffs' Co-Liaison Counsel* |

### PLAINTIFFS' STEERING COMMITTEE

| | |
|---|---|
| Anne Andrews | Daniel P. Markoff |
| Andrews & Thornton | Atkins & Markoff Law Firm |
| 4701 Von Karman Ave., Suite 300 | 9211 Lake Hefner Parkway, Suite 104 |
| Newport Beach, CA 92660 | Oklahoma City, OK 73120 |
| Phone: (800) 664-1734 | Phone: (405) 607-8757 |
| aa@andrewsthornton.com | Fax: (405) 607-8749 |
| | dmarkoff@atkinsandmarkoff.com |

13

J. Kyle Bachus
Bachus & Schanker, LLC
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Phone: (303) 893-9800
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, Florida 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Phone: 510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

| | |
|---|---|
| Andrew Lemmon<br>Lemmon Law Firm, LLC<br>P.O. Box 904<br>15058 River Road<br>Hahnville, LA 70057<br>Phone: (985) 783-6789<br>Fax: (985) 783-1333<br>andrew@lemmonlawfirm.com | Genevieve Zimmerman<br>Meshbesher & Spence Ltd.<br>1616 Park Avenue South<br>Minneapolis, MN 55404<br>Phone: (612) 339-9121<br>Fax: (612) 339-9188<br>gzimmerman@meshbesher.com |

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2019, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

*/s/ M. Palmer Lambert*
M. PALMER LAMBERT
