UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)　　　　　　　　　　MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

　　　　　　　　　　　　　　　　　　　　　　　　　SECTION "N" (5)

THIS DOCUMENT RELATES TO:

All Cases.

---

**SANOFI DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY THAT RELIES UPON DEFENDANT'S EMPLOYEE DR. MICHAEL KOPRESKI**

---

Sanofi's TAX316 study demonstrated the disease-free survival of patients prescribed Taxotere for treating adjuvant breast cancer. The study served as the basis for FDA to approve the drug for this new indication. TAX316 was significant for its size and duration—1,480 patients over ten years.

As part of this study, clinical investigators tracked 69 different "ongoing" adverse events, including alopecia. "Ongoing" for purposes of the study had a broad meaning—it included a patient as having an "ongoing" condition if the condition was present at the time the patient died, for instance, or if the condition was present at the time the patient switched to another chemotherapy drug.

Casting a broad net was a deliberate effort to help understand the safety profile of the drug. Using this expansive definition, the study showed ongoing alopecia in 3.9% of the patients receiving a Taxotere-containing chemotherapy regimen and ongoing alopecia in 2.2% of patients receiving a non-Taxotere chemotherapy regimen. Importantly, the data reflects only "ongoing"

alopecia, present at a specific point in time. The study did not examine whether the alopecia seen in either chemotherapy arm (Taxotere or non-Taxotere) was permanent.

Plaintiffs used a 30(b)(6) Notice to seek a Sanofi witness to testify about TAX316, with a focus on those patients who experienced not "ongoing" or "permanent" but rather "persistent alopecia"—using a definition Magistrate North articulated: "alopecia which remains six months after chemotherapy ended and without resolution." Because the definition of "persistent" is more narrow than the definition of "ongoing" as used in TAX316, Sanofi's witness, Dr. Michael Kopreski, an oncologist, re-examined the study results and determined the cases of "persistent" alopecia to be less than 1%.

This 30(b)(6) exercise—which Sanofi dutifully carried out pursuant to its obligations to ascertain information known or reasonably available to the organization to answer Plaintiffs' questions on the matters for examination—lead to a conclusion that Plaintiffs did not expect. Though Plaintiffs had access to all of the underlying data produced in the depositions, as well as Dr. Kopreski's analysis, none of their eleven experts did their own review. Instead, they rely on the recording of "ongoing" alopecia at single follow-up appointments within the clinical study trial period, and widely cite the 3.9% figure as a basis for an opinion about *permanent* alopecia, which is not the calculation reported from the study. Plaintiffs also seek to exclude Dr. Kopreski's analysis of "persistent" alopecia, though they are the ones who requested his analysis.

Plaintiffs' motion should be denied for at least three reasons:

<u>First</u>, Dr. Kopreski's analysis of the TAX316 data was reliable. Data from a controlled clinical trial is inherently reliable and Dr. Kopreski's analysis of that data was likewise reliable.

<u>Second</u>, Dr. Kopreski's analysis was necessary in order to answer Plaintiffs' 30(b)(6) requests. Plaintiffs cannot now disavow the analysis they requested as "litigation-driven."

Third, because Dr. Kopreski's analysis was reliable and not litigation-driven, Sanofi's experts may reasonably rely on it.

## FACTUAL BACKGROUND

**I.     THE TAX316 STUDY**

    **A.     Design of the TAX316 Study**

In 2004, the U.S. Food & Drug Administration ("FDA") approved Taxotere as adjuvant therapy for operable, node-positive breast cancer based on findings from the TAX316 study. Arrowsmith Rpt. ¶ 108 (Ex. A). TAX316 was a multicenter Phase III randomized clinical trial, performed by the Breast Cancer International Research Group, Ltd., and sponsored by Sanofi as part of its post-marketing commitment to FDA. Sanofi worked closely with FDA in designing and executing the TAX316 study. *Id.* at ¶ 110. The TAX316 protocol and statistical analysis plan were submitted to, reviewed by, and approved by FDA prior to implementation, and FDA was actively involved in all aspects of protocol development and modification. *Id.*

TAX316 had two treatment arms. *See* Kopreski Oct. Dep. Vol. II 723:23–724:8 (Ex. B). The first arm was called TAC. *See id.* 723:24–724:1. Patients in the TAC arm received Taxotere, Adriamycin, and Cyclophosphamide. *See id.* 670:19–22. The second arm was called FAC. *See id.* 724:4–8. Patients in the FAC arm received Fluorouracil, Adriamycin, and Cyclophosphamide. *See id.* 670:23–671–3; 724:4–8. Both regimens were administered for a total of six cycles unless treatment was precluded by cancer relapse, patient refusal, or unacceptable toxicities.

The primary objective of the study was to compare disease-free survival after treatment with TAC versus FAC in operable breast cancer patients with positive axillary lymph nodes. Wei Rpt. ¶ 26 (Ex. C). The secondary objectives were to compare overall survival, toxicity, and quality of life between the TAC and FAC arms, and to evaluate pathologic and molecular markers for predicting efficacy. *Id.* Enrollment for the TAX316 study began in 1997 and concluded in 1999.

A total of 1,480 patients (744 TAC / 736 FAC) were enrolled.

The study was designed so that 10 years of follow-up data on study subjects could potentially be collected—but that does not mean it was. Pursuant to the study protocol, after the completion of their study chemotherapy, patients were to be seen every three months for the first two years of follow-up, every six months for years three through five of follow-up, and once a year for years six through ten. *See* TAX316 Clinical Study Report, Sanofi_02649521 (Ex. D) at 172. Not every patient in the study, however, was actually seen for 10 years. Kopreski Dec. Dep. Vol. II at 556:21-560:21 (Ex. E). In a long-term study like TAX316 there are numerous reasons why patients will not be seen for the entire follow-up period, including:

- Death during the follow-up period. In the TAX316 study, 431 patients died during the follow-up period. *See* TAX316 Clinical Study Report (Ex. D) at 44.

- Patients lost to follow-up (meaning that at one point in time the patient was actively participating in the study, but was lost by being unreachable later in the study or for some other reason). In the TAX316 study, 82 of the 1,480 patients treated with study drugs were lost to follow-up. *See* Wei Rpt. ¶ 27 (Ex. C).[1]

- Patients may have a reoccurrence of their breast cancer and receive new or additional medical treatments. Kopreski Dec. Dep. Vol. II at 556:21-560:21 (Ex. E). If a patient in the TAX316 study experienced a relapse or reoccurrence of her breast cancer and received additional, non-study chemotherapy, the adverse events for that patient, including alopecia, were no longer followed to determine if the adverse event resolved. *See* TAX316 Clinical Study Report (Ex. D) at 251. ("It should be noted, with respect to resolution of TEAEs that were present at the start of the follow-up phase, if further chemotherapy was initiated, the TEAEs for those subjects were no longer followed.").[2] There were 480 patients in the TAX316 study who experienced a relapse or reoccurrence of their breast cancer and switched to new or additional treatments. *Id.* at

---

[1]   The Statistical Analysis Plan for the TAX316 study notes that "[a] patient lost to follow-up is a patient who never came back to the hospital and for whom repeated attempts to contact the patients has failed." *See* TAX316 Clinical Study Report (Ex. D) at 3316.

[2]   This explains why a patient could be seen in follow-up for over 10 years while only being followed for her alopecia for a fraction of that time. For example, patient 40104 received only three cycles of TAC and then switched to another chemotherapy regimen. She was followed for over 10 years to assess her overall survival, but she was no longer followed for her alopecia because she was taking different chemotherapy medications.

4

36581.

- <u>Patients may be withdrawn from the study</u> due to adverse events (unrelated to alopecia) experienced while taking study medication. In TAX316, 53 patients were withdrawn from the study due to adverse events.

- <u>Patients may withdraw their consent.</u> Thirty-four patients in the TAX316 study withdrew their consent. *See* TAX316 Clinical Study Report (Ex. D) at 262.

In addition to its primary and secondary objectives, the TAX316 study was designed to report on the rate of 69 different "ongoing" adverse events, including alopecia. Wei Rpt. ¶ 28 (Ex. C). "Ongoing" in this context did not mean the adverse event persisted for more than six months after the completion of chemotherapy (the Court's definition) and certainly did not mean that alopecia was "permanent." Kopreski Dec. Dep. Vol. II at 556:21-560:21 (Ex. E). Instead, "ongoing" in the TAX316 study meant only that at a patient's last follow-up visit, that patient was still experiencing alopecia. *See id.* As Dr. Kopreski explained:

> [Ongoing] means that if the patient had alopecia at the time that they died, it would be considered ongoing. If they had alopecia at the time that they removed their informed consent, it would be considered ongoing. If they had alopecia at the time they switched therapy to another chemotherapy and were no longer seen, that would be considered ongoing.

*Id.* at 560:10-21.

### B. Efficacy Findings

The TAX316 study demonstrated the efficacy of Taxotere-containing chemotherapy regimens in the adjuvant treatment of operable node-positive breast cancer. At the 55-month interim follow-up, disease-free survival was 75% among TAC-treated patients compared to 68% among FAC-treated patients. This represented a 28% reduction in the risk of relapse. These findings were published in 2005 in the New England Journal of Medicine. *See* Martin, Miguel, et al. "Adjuvant Docetaxel for Node-Positive Breast Cancer." The New England Journal of Medicine,

5

352:2302-12 (2005). Both the 55-month and 10-year reports demonstrated that TAC, as compared to FAC, significantly improves the rates of disease-free and overall survival among women with operable node-positive breast cancer.

### C. Findings Related to Alopecia

Both the 55-month and 10-year TAX316 analyses reported on rates of "ongoing"—not persistent or permanent—alopecia. Wei Rpt. ¶ 28 (Ex. C). In the 10-year report, 3.9% (29/744) of TAC patients and 2.2% of FAC patients were recorded as having ongoing alopecia at the final follow-up visits for those patients. *Id.* at ¶¶ 25, 28. There was not a statistically significant difference between the rates of "ongoing" alopecia in the TAC versus FAC arms, meaning that the TAX316 study does not provide any evidence of a safety signal of a new or unexpected risk of "ongoing" alopecia with Taxotere use compared to Fluorouracil use. Wei Rpt. ¶ 29. Sanofi reported data related to "ongoing" alopecia to the FDA. However, because the TAX316 study was not designed to and did not evaluate "persistent," "permanent," or "irreversible" alopecia, no such information was collected, analyzed, or reported.[3]

## II.   DR. KOPRESKI'S BACKGROUND AND QUALIFICATIONS

Dr. Kopreski is uniquely qualified to analyze the TAX316 data for the injury relevant to this litigation because he is both highly trained in pharmacovigilance and a board certified medical doctor in internal medicine and oncology. Kopreski Oct. Dep. Vol. II 648:23–24, 650:7–13,

---

[3]   *See also* Sanofi_02368838 at 02368845 ("The "Ongoing" columns of Tables 7 and 9 present data in regards to those AEs that were persisting or starting during the follow-up period and that were present at the last follow-up visit (whenever this visit occurred – starting 30 days after the last IV treatment and up to the end of the 10-year follow-up). Thus, "ongoing" does not necessarily mean that these AEs were ongoing for the entire 10-year follow-up period; rather, it means that they were noted as ongoing at the last follow-up visit.") (Ex. F).

650:17–20 (Ex. B). Dr. Kopreski understands cancer, *id.* at 652:15–654:9, cancer treatment, *id.* at 656:6–657:19, 661:9–664: 24, side effects from cancer treatment, *id.* at 657:20–659:19, 661:9–664:24, 665:8–668:2, and clinical trial data. *Id.* at 650:1–7.

Between completing his internal medicine residency, oncology fellowship, and joining Sanofi, Dr. Kopreski worked for the National Cancer Institute as a senior investigator and in clinical development for a pharmaceutical company. *Id.* at 649:14–17, 650: 1–7, 649:5–15. For the last fifteen years, Dr. Kopreski has worked in pharmacovigilance at Sanofi, including during the TAX316 clinical trial, addressing drug safety and identifying adverse events.

Dr. Kopreski's training and experience as a medical doctor, oncologist, and pharmacovigilance specialist qualify him to examine the TAX316 data to locate evidence of "persistent" alopecia as defined by the Court. *See In re Fosamax Prod. Liab. Litig.*, 645 F. Supp. 2d 164, 193-95 (S.D.N.Y. 2009) (holding medical doctor with experience in drug safety and clinical trials qualified to review and interpret clinical trial data).

## III. DR. KOPRESKI'S ANALYSIS OF THE TAX316 STUDY

### A. Why Dr. Kopreski Performed His Analysis

Dr. Kopreski has been deposed by Plaintiffs three times as a Sanofi corporate representative. Those depositions spanned six days and over 25 hours of testimony on the record. Plaintiffs' first 30(b)(6) Notice requested a witness to testify on the identity of each patient who reportedly experienced "Persisting Alopecia" while enrolled in the TAX316 study. *See* Depo. Notice No. 1, Topic No. 3 (Ex. G). The second notice requested a witness to testify on the "findings regarding alopecia as a TEAE persisting into the 10-year follow-up period of TAX316" so that it could be determined whether there were any cases of "persisting alopecia." *See* Depo Notice No. 2, Topic Nos. 1 and 12 (Ex. H).

Sanofi objected to Plaintiffs' first 30(b)(6) Notice on the grounds that Plaintiffs failed to

adequately define the term "persisting alopecia." Even though Plaintiffs had previously defined the injury at issue in this litigation as "incomplete hair regrowth six months beyond completion of chemotherapy" (*see* Second Amended Master Long Form Complaint (Rec. Doc. 4407) ("AMC") at ¶ 181)), they refused to include any such durational element in their 30(b)(6) Notice. The parties briefed the issue before Judge North, who concluded that, for purposes of the 30(b)(6) deposition, "the term 'persistent alopecia' shall mean that which remains six months after chemotherapy ended and without resolution." Order Doc. 3473. Sanofi agreed to produce Dr. Kopreski subject to the Court's definition.

Plaintiffs' statements that "Sanofi and Dr. Kopreski use their own definition of 'Persistent Alopecia'" and that "the Court has never issued any ruling defining 'persistent alopecia' for any substantive purpose in this litigation" are simply wrong. *See* Plaintiffs' Memorandum in Support ("MIS") at 6. Judge North's July 19, 2018 Order did just that. Plaintiffs' fundamental misunderstanding of the Court's Order appears to be the entire basis for their motion to exclude Dr. Kopreski's analysis. Plaintiffs also misleadingly refer to Dr. Kopreski's work as a "reanalysis" of the TAX316 data. Dr. Kopreski did not reanalyze TAX316, as the study did not analyze "persistent alopecia." Instead, Dr. Kopreski applied the definition of persisting alopecia provided by the Court to the available TAX316 data—something that had not been done until Plaintiffs requested it from Sanofi in this litigation. *See* Arrowsmith Dep. at 117:10-12 (Ex. I) ("So it's not a reanalysis of data. It is an analysis of available data using a specific previously unspecified case definition.").

### B. How Dr. Kopreski Performed His Analysis

Because the TAX316 study did not report on cases of "persistent" alopecia, Dr. Kopreski turned to the underlying clinical trial data to determine which patients, if any, experienced "persistent" alopecia as defined by the Court—alopecia remaining "six months after chemotherapy

8

ended and without resolution." Order Doc. 3473. Dr. Kopreski reviewed all available data on the 29 TAC patients identified as having "ongoing" alopecia. This dataset included:

- the TAX316 Clinical Study Reports (both the 55-month and 10-year reports);

- the data tables from the 55-month interim report that include information on when the patients received study medication;[4]

- the frequency of follow-up visits;

- information on the onset and resolution of all adverse events (including alopecia), and;

- when available, patient case report forms. A case report form ("CRF") is filled out by the study investigator and provides all the patient data, including information on follow-up visits and information on adverse events. Kopreski Oct. Dep. Vol. II at 745:23-746:16 (Ex. B); Kopreski Dec. Dep. Vol. II at 496:20-497:21 (Ex. E). Case report forms were available for 13 of the 29 TAC patients that experienced ongoing alopecia. The available CRFs included both CRFs from the 55-month interim review and the 10-year report.[5]

Dr. Kopreski's criteria for finding "persistent" alopecia—rather than "ongoing" alopecia—followed the criteria set forth by the Court. Dr. Kopreski looked at how many patients had documentation of alopecia six months after their last chemotherapy treatment, and whether there was documentation of the alopecia's subsequent resolution. *See* Kopreski Oct. Dep. Vol. II at 729:7–18 (Ex. B). If a patient had documentation of alopecia six months after chemotherapy, without evidence of subsequent resolution, that patient had "persistent alopecia" as defined by the Court. *See id.* at 729:22–730:3; Kopreski Dec. Dep. Vol. II at 560:23-563:11 (Ex. E). If there was evidence of alopecia resolution, that patient did not have persistent alopecia as defined by the Court. Kopreski Dec. Dep. Vol. II at 563:1-5 (Ex. E).

Applying this criteria, Dr. Kopreski identified only six of the 29 patients with reported

---

[4] There is not a similar data table in the 10-year Clinical Study Report.

[5] Plaintiffs wrongly suggest that Dr. Kopreski only looked at documentation from 2003 or earlier. *See* MIS at 9. In fact, Dr. Kopreski reviewed the 10-year CRFs when available.

9

"ongoing" alopecia to have evidence of "persistent" alopecia.[6] As an example, in the TAC arm, Patient 22702 was identified as having ongoing alopecia in the final TAX316 Clinical Study Report. *See* Kopreski Oct. Dep. Vol. II at 747:14–20; 748:21–23 (Ex. B). Dr. Kopreski evaluated Patient 22702's materials and concluded that Patient 22702 did not meet the Court's definition of persistent alopecia because there was no documentation of alopecia for Patient 22702 in any of her follow-up appointments beyond six months of her last chemotherapy date. *See id.* at 755:8–12; 757:4–18. Even though Patient 22702 had "ongoing" alopecia as defined in the TAX316 study (because she had alopecia at one or more follow-ups), Patient 22702 did not meet the Court's definition for persistent alopecia. Similar conclusions were reached for 22 additional patients who were reported as having "ongoing" alopecia in the TAX316 result. Dr. Kopreski's findings tracked the Court's definition of "persistent alopecia," were reliable, and were appropriately referenced by Sanofi's experts Dr. Janet Arrowsmith, Dr. John Glaspy, and Mr. Justin Victoria.

## LEGAL STANDARDS

Rule 703 provides the standard under which the Court should analyze this issue.[7] The Fifth Circuit has made it clear that a "trial court's inquiry into whether [Rule 703's] standard is satisfied … should focus on the reliability of the opinion *and its foundation*[.]" *Soden v. Freightliner Corp.*, 714 F.2d 498, 502–03 (5th Cir. 1983). If an expert's underlying data is "not shown to be of a type reasonably relied upon by experts in his field," the district court may exclude any opinion dependent on them. *Id.* at 503.

---

[6] Importantly, Dr. Kopreski considered these patients to have persistent alopecia regardless of whether the patient was taking another drug, such as Tamoxifen, which could have been causing the lack of hair regrowth. *See* Kopreski Oct. Dep. Vol. II at 730:1–3 (Ex. B).

[7] Rule 703 provides that: "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type <u>reasonably relied upon by experts in the particular field</u> in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." Fed. R. Evid. 703.

10

**ARGUMENT**

I.  **DR. KOPRESKI'S ANALYSIS IS RELIABLE**

Plaintiffs do not challenge Dr. Kopreski's methodology. They acknowledge that what Dr. Kopreski did here—analyze how many patients had documentation of alopecia six months after their last chemotherapy treatment and whether there was documentation of the alopecia's subsequent resolution—was a reasonable and reliable way to ascertain whether TAX316 patients meet the Court's criteria for persisting alopecia. Plaintiffs also must admit that Dr. Kopreski's analysis was a reasonable way to satisfy the Rule 30(b)(6) categories about which Plaintiffs requested testimony. Accordingly, Plaintiffs can only mount meritless challenges to the reliability of Dr. Kopreski's analysis.

**A.  Dr. Kopreski Reviewed Reliable Material**

Data from clinical trials like TAX316 is considered "gold standard" and at the top of the scientific hierarchy of evidence. *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prod. Liab. Litig.*, 174 F. Supp. 3d 911, 915–16 (D.S.C. 2016). TAX316 was closely controlled, and Plaintiffs cannot argue that the data Dr. Kopreski analyzed was unreliable. Rather, Plaintiffs argue that Dr. Kopreski did not review *enough* data to render his conclusions reliable. That is incorrect.

Dr. Kopreski reviewed TAX316 data for all 29 of the TAC patients who were reported as having experienced "ongoing" alopecia in the TAX316 study. Dr. Kopreski reviewed the 13 CRFs that were available. The CRFs were filled out by the TAX316 study investigators and provided all the patient data, including information on follow-up visits and information on adverse events. Kopreski Oct. Dep. Vol. II at 745:23-746:16 (Ex. B); Kopreski Dec. Dep. Vol. II at 496:7-497:21 (Ex. E). Contrary to Plaintiffs' assertion, Dr. Kopreski reviewed CRFs from both the 55-month

interim review and the 10-year report.[8] For the patients where CRFs were not available, Dr. Kopreski reviewed the TAX316 study data tables. These tables were created using data from the CRFs, and Dr. Kopreski correctly considered them reliable. Kopreski Dec. Dep. Vol. II at 656:12-657:5 (Ex. E).

Plaintiffs claim that Dr. Kopreski's analysis is unreliable because he did not review the 10-year patient data for all 29 of the TAC patients identified as experiencing ongoing alopecia. Plaintiffs fail to recognize that he did review 10-year data when it was available and, when not available, he reviewed the TAX316 study data tables created using data from the CRFs. Plaintiffs also fail to consider that the 10-year data would not have changed Dr. Kopreski's analysis. For example, eight of the 29 patients were treated with alternative chemotherapy due to relapse within six months of completing TAC treatment. Per the TAX316 study protocol, those eight patients were no longer followed for their alopecia as soon as they began alternative chemotherapy treatment. The 10–year CRFs for those patients could not have changed Dr. Kopreski's analysis, as they would not have provided any more information on alopecia associated with TAC usage. Additionally, there were three patients who either died, withdrew their consent, or were lost to follow up prior to the end of the 55-month interim analysis. Ten-year CRFs for those patients likewise would not change Dr. Kopreski's analysis.

Plaintiffs highlight only one TAX316 patient, patient 22702, to support their claim that Dr. Kopreski failed to review an appropriate dataset. However, even though patient 22702 was followed for over 10 years, she was only followed for her alopecia for approximately two months. *See* Sanofi_02368838 at 02368847 (Ex. F) (noting that patient 22702 had her last follow-up visit

---

[8] Plaintiffs wrongly suggest that Dr. Kopreski only looked at documentation from 2003 or earlier. *See* MIS at 9. In fact, Dr. Kopreski reviewed the 10-year CRFs when available.

for alopecia on December 14, 1998). Patient 22702 was withdrawn from the study after receiving two cycles of TAC because during her second infusion the patient experienced a moderate allergic reaction and moderate dyspnea. She was therefore started on another chemotherapy regimen in January 1999. *See* Exhibit A to Sanofi's Objections and Responses to Plaintiffs' Second Notice of Deposition of Sanofi for "Table 2" Reports (Ex. J). At that point, per the TAX316 study protocol, patient 22702 was not followed for her alopecia because she began a new non-study chemotherapy regimen. *See* TAX316 Clinical Study Report (Ex. D) at 251 ("It should be noted, with respect to resolution of TEAEs [treatment emergent adverse events] that were present at the start of the follow-up phase, if further chemotherapy was initiated, the TEAEs for those subjects were no longer followed."). Since patient 22702 was no longer being followed for alopecia beginning in January 1999, CRFs from beyond that date could not have changed Dr. Kopreski's persisting-alopecia analysis.

Dr. Kopreski reviewed all available information in conducting his analysis. Plaintiffs did not point to a single instance where alleged "missing" or "incomplete" data would have altered Dr. Kopreski's analysis.

### B. Dr. Kopreski's Analysis Is Not Litigation-Driven

Dr. Kopreski's analysis could not be "litigation driven," as Plaintiffs suggest, because he performed his analysis pursuant to Plaintiffs' Rule 30(b)(6) requests to Sanofi.

In their Rule 30(b)(6) deposition notice, Plaintiffs demanded that Sanofi produce a corporate representative to provide information on patients from the TAX316 study who experienced "persisting alopecia," as defined by the Court. Sanofi was required by Rule 30(b)(6) to "designate one or more officers" or other individuals to testify on the requested topics. Dr. Kopreski is uniquely qualified to analyze the TAX316 data for the injury relevant to this litigation because he is both highly trained in pharmacovigilance and a board certified medical doctor in

13

internal medicine and oncology. Kopreski Oct. Dep. Vol. II at 648:23–24, 650:7–13, 650:17–20 (Ex. B). Because the TAX316 study did not analyze "persisting alopecia" as defined by the Court, Dr. Kopreski took on the cumbersome task of reviewing all available patient-level data to determine which of those patients had alopecia "which remains six months after chemotherapy ended and without resolution." *See* Order.

Plaintiffs demanded this analysis from Sanofi, and Sanofi was required to provide it under the Federal Rules. Plaintiffs cannot now move to exclude Dr. Kopreski's analysis as "litigation-driven," simply because they do not like the results.

## II. IT WAS REASONABLE FOR SANOFI'S EXPERTS TO RELY ON DR. KOPRESKI'S ANALYSIS

Three of Sanofi's experts—Dr. John Glaspy, Dr. Janet Arrowsmith, and Mr. Justin Victoria—reference or rely on Dr. Kopreski's TAX316 analysis. Each expert either has personal knowledge regarding the TAX316 study results or independently reviewed Dr. Kopreski's testimony to ensure it was reliable. Each is accordingly permitted to testify on the subjects disclosed in their expert reports.

As an initial matter, Dr. Glaspy is a practicing medical oncologist, a professor of oncology, and a researcher in that area. Glaspy Rpt. at 2 (Ex. K). He has worked on numerous clinical trials involving chemotherapy drugs, including the TAX316 trial. *Id.*; Glaspy Dep. at 117:12-17 (Ex. L). He is familiar with clinical trials and how researchers record data in those trials. Glaspy Dep. at 118:1-119:6 (Ex. L). While Dr. Glaspy references Dr. Kopreski's analysis in his expert report, Dr. Glaspy did not need to see that analysis to know that reports of "ongoing" alopecia identified in the TAX316 study did not mean that those patients had alopecia remaining six months after chemotherapy ended and without resolution. Glaspy Rpt. at 26 (Ex. K); Glaspy Dep. at 118:1-119:6 (Ex. L). Dr. Glaspy knew those facts independently given his personal knowledge and

14

experiences with TAX316 and is permitted to testify about them under Rule 702.

Dr. Arrowsmith reviewed Dr. Kopreski's testimony, data summary, and the case definition Dr. Kopreski used for "persisting alopecia" and deemed it appropriate. Arrowsmith Dep. at 121:10-122:14 (Ex. I). And while Dr. Arrowsmith did not attempt to replicate Dr. Kopreski's findings, she independently examined the patient data for two TAX316 patients and reached the same conclusions as Dr. Kopreski. *See* Arrowsmith Rpt. ¶¶ 124-125 (Ex. A). Dr. Arrowsmith appropriately concluded that Dr. Kopreski's analysis was reliable. Arrowsmith Dep. at 116:23-117:18 (Ex. I).

Mr. Victoria analyzed multiple days of Dr. Kopreski's deposition testimony, the data summary, and notes that supported Dr. Kopreski's findings. Victoria Dep. 80:21-81:20; 82:9-11 (Ex. M). Mr. Victoria agreed that Dr. Kopreski's analysis was scientifically valid. *Id.* at 103:25-104:13. Dr. Kopreski's analysis was consistent with analyses Mr. Victoria has done over the course of his career when looking at data to identify potential safety issues. *Id.* at 104:14-19.

Plaintiffs are wrong to suggest that Dr. Arrowsmith and Mr. Victoria are not permitted to rely on the information provided by Dr. Kopreski. *See Justin Brands, Inc. v. Lucchese, Inc.*, Civil Action No. 4:04-CV-054-Y, 2005 WL 8159158, *3 (N.D. Tex. Aug. 29, 2005) ("An expert may rely upon information supplied by a third party in formulating his opinions."). As Courts in the Fifth Circuit have made clear, "an expert's reliance on third-party information only runs afoul of *Daubert* where that expert blindly relies upon the projections of a third party." *Id.* (citing *Legier & Matherne, APAC v. Great Plains Software, Inc.*, Civil Action No. 03-278, 2004 WL 1488597, at *8 (E.D. La. June 30, 2004)). Where an expert independently examines the third party's analysis to insure its reliability, *Daubert* is satisfied. *Legier*, 2004 WL 1488597, at *3.

15

Here, Dr. Arrowsmith and Mr. Victoria did not "blindly" rely on Dr. Kopreski. Indeed, each expert independently reviewed Dr. Kopreski's testimony explaining his methodology and the data summary he produced about the TAX316 patients. And while none of the experts attempted to replicate Dr. Kopreski's full analysis—because they did not need to do so—they each independently verified that Dr. Kopreski's methodology was reasonable and that he relied on appropriate data. *See* Arrowsmith Rpt. ¶¶ 124-125 (Ex. A); Arrowsmith Dep. at 116:23-117:18 (Ex. I); Victoria Dep. 82:9-11, 103:25-104:13 (Ex. M). This is not "blind" reliance but instead comports with *Daubert*.

The cases cited by Plaintiffs are not persuasive. The Court's holding in *Montgomery Cty. v. Microvote Corp.*, for example, does not apply to this case for several reasons. In *Montgomery Cty.*, the Court excluded defendant's expert witness because the expert based his opinion on an unreliable document prepared by a company witness without knowing what the document was, who created it, or how it was created. 320 F.3d 440, 448-49 (3d Cir. 2003). In addition, the company witness admitted that his analysis was a "guestimate." *Id.* at 448.

Here, unlike *Montgomery Cty.*, Sanofi's experts have reviewed Dr. Kopreski's testimony and understand how Dr. Kopreski reviewed the TAX316 data in question. Dr. Kopreski's underlying review and testimony was not a guestimate. Dr. Kopreski spent hundreds of hours reviewing adverse event data to identify the adverse events that qualified as persistent alopecia per the Court's definition, and he explained his methodology to Plaintiffs' Counsel at his deposition.

In addition to *Montgomery Cty.*, Plaintiffs rely on a New Jersey District Court decision, *Crowley v. Chait*, which is also distinguishable from this case. In *Crowley*, the Court excluded one of plaintiffs' expert's opinions because it relied solely on a summary of select deposition testimony prepared by plaintiffs' attorneys. 322 F. Supp. 2d 530, 545-47 (D.N.J. 2004). Here, Sanofi's

16

attorneys did not draft a summary of the underlying data recording adverse events for Dr. Kopreski. Unlike the expert in *Crowley*, Dr. Kopreski reviewed all available clinical trial data to make a determination on whether alopecia persisted for more than 6 months without resolution following the conclusion of chemotherapy. And despite having more than 20 hours to cross-examine Dr. Kopreski on his review of the TAX316 adverse events, Plaintiffs have not cited a single document that undermines the results of Dr. Kopreski's review or demonstrates that his review was wrong.

Plaintiffs primary complaint appears to be that Sanofi's attorneys selected documents for Dr. Kopreski to review that were responsive to the 30(b)(6) Notice. Such practice is common and appropriate when preparing a company witness to testify on discrete issues. It would be unreasonable to expect Dr. Kopreski to sort through the more than 6 million documents produced in this litigation to identify documents responsive to Plaintiffs' 30(b)(6) deposition notice.

## CONCLUSION

For the reasons stated above, the Court should deny Plaintiffs' Motion to Exclude Expert Testimony that Relies on Defendant's Employee Dr. Michael Kopreski.

Date: June 26, 2019

Respectfully submitted,

 /s/ *Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE URQUHART & MOORE LLC**
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: 504-310-2100
Facsimile: 504-310-2120
dmoore@irwinllc.com

Harley Ratliff
Adrienne L. Byard
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
Facsimile: 816-421-5547
hratliff@shb.com
abyard@shb.com

*Counsel for Sanofi-Aventis U.S. LLC and Sanofi U.S. Services Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 26, 2019, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ *Douglas J. Moore*