UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)                    MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

SECTION "H" (5)

THIS DOCUMENT RELATES TO:

Barbara Earnest, Case No. 2:16-cv-17144;
Tonya Francis, Case No. 2:16-cv-17410.

---

**SANOFI DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE DEFENDANTS' EXPERTS JERRY SHAPIRO, M.D., AND CHANDRA SMART, M.D.**

---

Dr. Shapiro and Dr. Smart's opinions related to the stem cell tests that *Plaintiffs' experts ordered and deemed to "work[] as purported"* are admissible under Rule 702 and *Daubert*. First, Dr. Shapiro and Dr. Smart are qualified to render their opinions. Each is board certified in their field—dermatology and dermatopathology, respectively—and both read and interpret scalp biopsies and biopsy reports in their daily practice. Both know from personal experience what positive stem cell tests mean (stem cells are present), as well as the implications of negative results (stem cells are absent). Second, Dr. Shapiro and Dr. Smart's opinions are reliable. Indeed, it was Plaintiffs' expert who decided to utilize the Cytokeratin-15 and Ki-67 stains and validated them in the laboratory to assure they "work[ed] as purported." Finally, Dr. Shapiro and Dr. Smart's opinions will help the jury determine a fact at issue—whether Plaintiffs have proven that Taxotere caused *these Plaintiffs'* permanent hair loss. Plaintiffs' motion to exclude Dr. Shapiro's and Dr. Smart's testimony related to the stem cell testing that Plaintiffs' expert conducted should be denied.

1

**BACKGROUND**

According to Plaintiffs, "the theory that certain chemotherapy agents can affect the hair growth cycle" by damaging stem cells "has appeared in the scientific literature for over a decade." PSC 3-22-19 Letter to Judge Milazzo at 5, Ex. A.  The existence of this "theory" is the only plausible explanation for Plaintiffs' counsels' decision to fund Cytokeratin-15 and Ki-67 testing—stains that assess if stem cells on Plaintiffs' scalp were (1) present (Cytokeratin-15 stain), and (2) still growing (Ki-67 stain).  Thompson Dep. Vol. III 401:8–13, 398:2–16, 398:22–24, 432:16–21, Ex. B.  The tests are expensive to get "up running" and required independent validation in the lab to make sure they were "work[ing] as purported to." Thompson Dep. Vol. III 432:16–21, 486:13–17, Ex. B.

Plaintiffs' experts admitted that negative stains would support the theory that chemotherapy damaged Plaintiffs' stem cells and is causing their persistent alopecia.  Thompson Dep. Vol. III 400:16–401:7, Ex. B.  Positive stains, on the other hand, necessarily contradict Plaintiffs' theory.  Thompson Dep. Vol. III 492: 7–12 ("Q: You wrote because it tested positive you did not pursue this further, right? A. Yes. Q. If it tested negative, would've you pursued it further? A. Yes."), Ex. B; Tosti Dep. Vol. III Errata Sheet ("[M]y understanding of how the staining is proposed to work; it is to stain positive for stem cells."), Ex. C.  When the tests came back positive—indicating that stem cells were present and proliferating—Plaintiffs abandoned further testing and did not disclose the results in their experts' reports.  Thompson Dep. Vol. III 492:7–12 ("Q: You wrote because it tested positive you did not pursue this further, right? A. Yes."), Ex. B.  Now, after the results from the stem cell staining have been discovered, Plaintiffs try to minimize the significance of the results, discredit the tests their retained experts' ordered

and validated as "unreliable," and prevent Defendants' experts from opining on how the results impact Plaintiffs' own causation theories.

## ARGUMENT

**I.   Dr. Shapiro and Dr. Smart are Qualified to Read and Interpret Plaintiffs' Stem Cell Stains.**

Both Dr. Shapiro and Dr. Smart read and interpret immunohistochemical tests as part of their day-to-day practice. Shapiro Dep. 91:1–4, 115:19–23; 149:10–18, 151:1–9 (biopsies have long been a part of Shapiro's practice, although he does not rely on them as frequently anymore due to his access to other technology), Ex. D. Smart Dep. Vol. II 157:4–8, 179:24–180:16 (Dr. Smart is an expert "in reviewing immunohistochemical stains on tissue," including "keratin 15 in the hair follicle" and she uses Ki-67 in her daily practice), Ex. E.

Plaintiffs contend that because neither Dr. Shapiro nor Dr. Smart holds themselves out as a "stem cell expert," neither is qualified to read and opine on the results of Plaintiffs' stem cell tests.[1] But reading and understanding the results from Plaintiffs' stem cell stains does not require a "stem cell expert." Dr. Smart is a dermapathologist, qualified to read the stain results. Smart Dep. Vol. II 157:4–8 (Dr. Smart is an expert "in reviewing immunohistochemically stains on tissue," including "keratin 15 in the hair follicle.") 157:9–14 (Dr. Smart knows how to read to see whether cytokeratin 15 is positive or negative), Smart Dep. Vol. II 179:24–180:16 (Dr. Smart uses Ki-67 stains in her daily practice to detect proliferating, malignant, tumors), Ex. E. Both Dr. Smart

---

[1] Plaintiffs hang their hat on the fact that Dr. Shapiro stated he would "have to defer to a dermatopathologist" to read the slides to argue that Dr. Shapiro is not qualified. Plaintiffs' Motion at 4. But it is standard industry practice for a dermatologist to send their biopsies to a dermatopathologist and then use the dermatopathologist's report as part of their clinical diagnosis. Plaintiffs' experts did the same. *See, e.g*, Tosti Dep. Vol. I 125:4–13 (Plaintiffs' dermatology expert, Dr. Tosti, reviewed Plaintiffs' Dermatopathologist's biopsy reports in forming her opinion), Ex. F. Dr. Shapiro, as a board certified dermatologist, is qualified to read Dr. Smart's report on what the biopsies show and use the results as part of his overall opinion.

and Dr. Shapiro know from their experience what positive stains mean—that stem cells are present and proliferating.  Shapiro Dep. 213:22–214:8 (Dr. Shapiro knows from three decades of experience that these immunohistochmeical tests are used to look for present and proliferating stem cells); 213:3–6 (he knows that when a Cytokeratin-15 "stain was done, people are looking for stem cells"), Ex. D.  Plaintiffs' experts—also a dermatopathologist (Dr. Thompson) and a dermatologist (Dr. Tosi) similarly qualified to Dr. Smart and Dr. Shapiro—reached the same conclusions.  Thompson Dep. Vol. III 492:4–9, 398:2–16, 398:22–399:4, Ex. B.

Moreover, "specialization" is not required for admissibility.  *See Vedros v. Northrop Grumman Shipbuilding, Inc.*, 119 F. Supp. 3d 556, 562 (E.D. La. 2015) (citing *United States v. Wen Chyu Liu*, 716 F.3d 159, 168 (5th Cir. 2013) ("A lack of specialization should generally go to the weight of the evidence, rather than its admissibility.")).  Neither Dr. Thompson nor Dr. Tosi has a specialty in stem cells, Thompson CV, Ex. G; Tosi CV, Ex. H, but Plaintiffs relied on both doctors to test and interpret Plaintiffs' biopsies for stem cells.  Sanofi's two experts are likewise qualified to opine on the impact of positive stem cell stains on Plaintiffs' theories.

**II.     Dr. Shapiro and Dr. Smart's Opinions are Reliable.**

None of Plaintiffs' arguments against the reliability of Dr. Shapiro and Dr. Smart's opinions have merit.  First, Plaintiffs contend that Ki-67 and Cytokeratin 15 staining is not a reliable method for identifying stem cells in the bulge region of the hair follicle.  But it was Plaintiffs' expert, Dr. Thompson, who decided to use those tests.  Thompson Dep. Vol. III 401:12–13, 434:5–8, Ex. B.  Dr. Thompson testified that he and his colleagues had to specially validate the stains in his lab to ensure they "work[ed] as purported to." Thompson Dep. Vol. III 486:4–17, 467:21–468:1 ("you have to take them and do assessment of them in your own laboratory before you put it on any tissue[.]"), 433:13–434:8 ("you have to prove in your own lab with internal

4

controls that it's as billed that it's doing what it's saying."), Ex. B. Dr. Thompson also specifically testified that he chose Cytokeratin 15 because "it works." Thompson Dep. Vol. III 434:5–8, Ex. B.

Dr. Thompson further admitted that, had the results been negative (as hoped), he would have pursued further testing—indicating negative results would have been reliable. Thompson Dep. Vol. III 492: 10–12 ("Q. If it tested negative, would've you pursued it further? A. Yes."), Ex. B. Because the stains were positive (the stem cells were present and proliferating) and contradicted Plaintiffs' causation theory, further testing by Plaintiffs' experts was abandoned. But the staining results cannot be deemed useful and reliable only if they support Plaintiffs' theory. The scientific community would reject such a position in any legitimate, non-litigation-based experiment, and it should be rejected here as well. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

Dr. Thompson finally testified that Cytokeratin 15 and Ki-67 are "all we have" to assess stem cell damage in the hair follicle—that is why he ordered them and was interested in the results. Thompson Dep. Vol. III 452:6–9 ("[B]efore you looked at [the results] you thought there might be some utility in running those tests? A. Well, it's all we have."), Ex. B. In other words, the results from the stem cell stains are "good grounds based on what is known." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993) ("Proposed testimony must be supported by appropriate validation—*i.e.,* 'good grounds,' based on what is known."). Plaintiffs cannot now argue the stains are unreliable.

Second, Plaintiffs contend that the presence of stem cells in the bulge region does not mean hair loss is not permanent. Plaintiffs appear to take issue with Dr. Shapiro and Dr. Smart's conclusion—not the reliability of their methodology. This misses the point. The focus of the *Daubert* inquiry is not on the expert's conclusions. *Daubert v. Merrell Dow Pharm., Inc.*, 509

U.S. 579, 595 (1993) ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."). Plaintiffs can present their own expert to testify about what the positive stem cell tests may or may not mean—they chose not to do so. But this is not a basis for excluding Sanofi's experts on this issue.

Finally, Plaintiffs try to argue that neither Dr. Shapiro nor Dr. Smart relied on any medical literature in forming their opinions, and relied in part on Dr. Tosti's deposition testimony. Plaintiff's Motion at 7. Both Dr. Smart and Dr. Shapiro know the implication of stem cell testing based on their background and experience. Shapiro Dep. 213:22–214:8, Ex. D; Smart Dep. Vol. II 159:22–160:9, Ex. E. Dr. Smart testified that she has seen medical literature discussing Cytokeratin-15 as a reliable stain to determine if stem cells are present in the bulge region of the hair follicle. Smart Dep. Vol. II 181:21–182:1, Ex. E. And, as Dr. Smart explained, she analyzes slides every day to assess whether they are positive or negative. Smart Dep. Vol. II 161:22–162:7, Ex. E. Interpreting slides is "something that [she] do[es] daily," and it is not something she needs to supplement with literature. Smart Dep. Vol. II 182: 19–183:3, Ex. E. Dr. Shapiro likewise testified that he knows based on three decades of experience that the tests are used to look for present and proliferating stem cells. Shapiro Dep. 213:22–214:8, Ex. D. *See* Fed. R. Evid. 702 (an expert may be qualified by "knowledge, skill, *experience*, training, or education"); *Santana Marine Service, Inc. v. McHale*, 346 F.2d 147, 148 (5th Cir. 1965) (a "person may become qualified as an expert by practical experience[.]"). "[W]here an expert otherwise reliably utilizes scientific methods to reach a conclusion [as here], lack of textual support may 'go to the weight, not the admissibility' of the expert's testimony." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 354 (5th Cir. 2007). Plaintiffs' arguments regarding the alleged need to cite literature—or to

supplementally review literature already within the experts' background education and experience—are inaccurate statements of the admissibility standards.

### III. Dr. Shapiro and Dr. Smart's Opinions Will Help the Jury Understand a Fact at Issue.

Contrary to Plaintiffs' characterization, neither Dr. Shapiro nor Dr. Smart relies on the positive stem cell tests to opine that Plaintiffs' do not have purported "pCIA." Causation is not Sanofi's burden of proof. Rather, Dr. Shapiro and Dr. Smart will opine on what Plaintiffs' stem cell testing *did not show* and *does not support*. Dr. Shapiro opines that the tests results "do not support a finding" of pCIA for Ms. Earnest. Shapiro Supplemental Report at 4, Ex. I. Dr. Smart's Report opines that the test results do not support Plaintiffs' stem-cell theories and do not support a finding that any alopecia Plaintiffs suffered is permanent. Smart Supplemental Report at 6, Ex. J. The stem cells biopsies are the product of tests that *Plaintiffs* ordered to see if they would support their theory that chemotherapy damages stem cells and that these Plaintiffs have suffered so-called "pCIA." When the results did not support those theories, Plaintiffs failed to disclose them. Plaintiffs' expert admitted that, had the results been negative, he would have pursued further testing. Thompson Dep. Vol. III 492: 10–12, Ex. B. Further, Dr. Feigal still intends to testify about the theory that chemotherapy damages stem cells. Feigal Dep. Vol. I 148:1–149:1, 149: 10–24, 150:7–12, 219:21–220:7, Ex. K. Sanofi's experts must be permitted to discuss the fact that Plaintiffs' only test to support their causation theory contradicted it. *Huss v. Gayden*, 571 F.3d 442, 456 (5th Cir. 2009) (abuse of discretion to exclude expert's testimony that would have demonstrated that Plaintiffs' theory had been contradicted).

### **CONCLUSION**

Plaintiffs have relied (and continue to rely) on the theory that chemotherapy causes so-called "pCIA" by damaging stem cells. Plaintiffs ordered the stem cell tests at issue here to test

7

that theory, and when the tests came back the opposite of what Plaintiffs had hoped, Plaintiffs failed to disclose them. Plaintiffs now move to exclude Sanofi's experts from relying on the same tests because the tests are "unreliable." Plaintiffs' actions are ironic, but more importantly, they have asserted no legitimate basis for excluding Dr. Shapiro and Dr. Smart's opinions under Rule 702 and *Daubert*. For all the reasons stated above, Sanofi requests the Court deny Plaintiffs' motion.

Dated: June 26, 2019

        Respectfully submitted,

        /s/ *Douglas J. Moore*
        Douglas J. Moore (Bar No. 27706)
        **IRWIN FRITCHIE URQUHART &**
        **MOORE LLC**
        400 Poydras Street, Suite 2700
        New Orleans, LA 70130
        Telephone: 504-310-2100
        Facsimile: 504-310-2120
        dmoore@irwinllc.com

        Harley Ratliff
        Adrienne L. Byard
        **SHOOK, HARDY& BACON L.L.P.**
        2555 Grand Boulevard
        Kansas City, Missouri 64108
        Telephone: 816-474-6550
        Facsimile: 816-421-5547
        hratliff@shb.com
        abyard@shb.com

        ***Counsel for Sanofi-Aventis U.S. LLC and Sanofi U.S. Services Inc.***

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 26, 2019, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ *Douglas J. Moore*