UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)                            MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

                                                       SECTION "H" (5)

THIS DOCUMENT RELATES TO:

Barbara Earnest, Case No. 2:16-cv-17144

---

MEMORANDUM IN OPPOSITION TO SANOFI'S MOTION TO EXCLUDE EXPERT
TESTIMONY OF DR. KEVIN BIANCHINI

---

## I.      INTRODUCTION

Dr. Kevin Bianchini, a clinical psychologist and neuropsychologist, will testify that
Plaintiff Barbara Earnest's Taxotere-induced permanent hair loss caused her to suffer a chronic
psychological condition—specifically, an adjustment disorder with mixed anxiety and depressed
mood. Dr. Bianchini made this medical diagnosis after personally examining Mrs. Earnest,[1] her
husband, and after reviewing her medical histories and other materials.

Sanofi seeks to strike Dr. Bianchini's testimony, but Federal Rule of Evidence 702 and
*Daubert* pose no bar to the admission of his qualified medical opinion. Dr. Bianchini is a board-
certified neuropsychologist with over 20 years of experience and professional training. He easily
meets the threshold for admissibility established by evidentiary rules, and it is up to the jury to
decide how much weight to give his testimony.

Dr. Bianchini's methodology is also reliable. Sanofi disagrees, arguing that his review of
medical records is not as fulsome as it could have been; that he failed to apply the Diagnostic and

---

[1] Sanofi's Motion related to the then-existing trial picks. Because Ms. Durden as is no longer a potential trial plaintiff, the Motion no longer relates to Ms. Durden and thus, this opposition does not address arguments specific to her.

Statistical Manual of Mental Disorders (DSM) criteria for an adjustment disorder; and that he failed to rule out certain alternative causes of Plaintiffs' psychological distress.  But these criticisms are wrong because, by any reasonable measure of reliability, Dr. Bianchini's methodology is scientifically valid.  Sanofi's arguments are otherwise misdirected because they go to the weight assigned to Dr. Bianchini's methodology rather than to the admissibility of his opinions and testimony.

In sum, Dr. Bianchini is an experienced clinical psychologist and neuropsychologist who applied accepted methods to diagnose Mrs. Earnest with an adjustment disorder. Because Sanofi does not come close to showing that Dr. Bianchini lacks experience or is peddling junk science, its request to bar him from testifying should be denied.

## II.    LEGAL STANDARD

The admissibility of expert witness testimony is governed by Federal Rule of Evidence 702:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experiences, training, or education, may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court interpreted the evidentiary hearing associated with Rule 702 as a "flexible one," focused "solely on principles and methodology, not on the conclusions that they generate." *Id*. at 594-95. The admissibility of expert evidence trains on whether the "testimony both rests on a reliable foundation and is relevant to the task at hand."  *Id.* at 597.

In the Fifth Circuit, "[t]o qualify as an expert, 'the witness must have such knowledge or experience in [his] field or calling as to make it appear that his opinion or inference will probably

aid the trier in his search for truth.'" *United States v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004) (quoting *United States v. Bourgeois*, 950 F.2d 980, 987 (5th Cir. 1992)). Additionally, Rule 702 states that an expert may be qualified based on "knowledge, skill, experience, training, or education." *Hicks*, 389 F.3d at 524; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 151 (1999) (discussing witnesses whose expertise is based purely on experience).

In its bid to exclude Dr. Bianchini, Sanofi describes evidentiary rules as erecting a high bar for admissibility. To the contrary: "[T]he trial court's role as gatekeeper [under *Daubert*] is not intended to serve as a replacement for the adversary system. … [V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002) (internal quotations and citations omitted).

Properly understood, then, the evidentiary rules do *not* establish a high threshold for the admissibility of expert testimony. For one, "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009); *see Daubert*, 509 U.S. at 596. For another, *Daubert* does not require that the testimony be "'known' to a certainty [as] arguably, there are no certainties in science." 509 U.S. at 590. Instead, in order to be deemed reliable, proposed testimony must be "supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known." *Id*. Expert testimony, then, may be based on the expert's "personal observations, professional experience, education and training." *Pipitone*, 288 F.3d at 247; *Kumho Tire*, 526 U.S. at 151 ("an expert might draw a conclusion from a set of observations based on extensive and specialized experience"); Fed. R.

Evid. 702, Advisory Committee's Note (2000 amendments) ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.").

What's more, *Daubert*'s factors are not "a definitive checklist or test[,]" as "[m]any factors will bear on the inquiry." 509 U.S. at 593. The Supreme Court in *Kumho Tire* stressed this point, noting that the trial court's gatekeeping inquiry "must be tied to the particular facts [of a case] … [t]hose factors may or may not be pertinent to assessing reliability." 526 U.S. at 139 (internal citation omitted). As such, trial courts retain wide latitude to decide which *Daubert* factors to apply in any given case. *Id*.

On these points, courts agree: "A review of case-law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Committee's note (2000 amendments); *see also Clarke v. LR Sys.*, 219 F. Supp. 2d 323, 332 (E.D.N.Y. Sept. 6, 2002); *Colon v. BIC USA, Inc*., 199 F. Supp. 2d 53, 75 (S.D.N.Y. Dec. 19, 2001) (citations omitted).

## III.    ARGUMENT

### A.    Dr. Bianchini is Well Qualified to Offer Expert Testimony Regarding Adjustment Disorder

Sanofi contends that Dr. Bianchini lacks the necessary experience to offer testimony on "the psychic [sic] or emotional impact of hair loss on cancer patients," because he is a neuropsychologist whose practice focuses on individuals with traumatic brain injuries and chronic pain. That argument misconceives the record and *Daubert* and thus should be rejected.

First, Dr. Bianchini is a board-certified, licensed, clinical psychologist with a specialty in clinical neuropsychology. (Ex. D to Defs' Mot., (Rec. Doc. 6151-4), "Bianchini CV" at 1.) He obtained his B.A. in psychology in 1980 from St. Joseph's University, his M.A. in Psychology/Behavioral Medicine in 1983 from the University of Tennessee, and his Doctorate in

Clinical Psychology from the University of Miami in 1992. (*Id.* at 2.) He later completed his postdoctoral education in his field, having served as an adjunct assistant professor for Tulane Medical School since October 1996, an adjunct assistant professor for the University of New Orleans since January 1996, and an adjunct assistant professor for Louisiana State University School of Medicine since July 2004. (*Id.*)

Dr. Bianchini has been a neuropsychologist with the Jefferson Neurobehavioral Group since April 1994. (Bianchini CV at 2.) He also served as a clinical psychologist from 1999 to 2006 with this group. (*Id.* at 3.) From 2000 to 2005, he was director of neuropsychology with Bancroft Neurohealth, a residential rehabilitation facility that treats adults with brain injuries. (*Id.*) Dr. Bianchini has authored over 80 peer-reviewed psychological or neuropsychologist studies since 1985, nine textbook chapters, and approximately 40 published abstracts and presentations. (*Id.* at 8-21.) Particularly relevant here, Dr. Bianchini has authored numerous publications related to malingering and validity of psychological testing.[2] (*Id.*)

Despite this wealth of clinical and academic experience, Sanofi argues that Dr. Bianchini lacks the requisite qualifications to address the jury. According to Sanofi, Dr. Bianchini lacks experience in the treatment of cancer patients. But Sanofi misquotes his testimony. Dr. Bianchini testified that he *has* treated patients adjusting to a *cancer* diagnosis.

Q.    What is your professional experience in treating individuals with cancer?

A.    . . . I worked in hospitals for a long time and - and treated some patients there that had – that had cancer. Typically, that was in the context [of] rehabilitations[.]   I also, because I'm a neuropsychologist, have over the years been asked to evaluate and/or treat patients that have brain cancers.  . . . I never worked on a dedicated

---

[2] As discussed further below, Sanofi's criticism rests largely on Dr. Bianchini's alleged failure to adequately corroborate clinical interviews with Mrs. Earnest. Yet in making this criticism, Sanofi fails to acknowledge that Dr. Bianchini is an expert in the narrow subfield of measurement validity and malingering (reporting fabricated symptoms for secondary gain).

cancer unit, but I've worked in medical setting and in collaboration with medical doctors.

…

I have seen some patients with chemotherapy-related cognitive issues. There's a new term people have talked about, like "chemo brain" or "chemo fog" or whatever. And then we have done a little bit – "we" including me – have done a little bit having to do with kind of adjustment to illness and that with cancer patients.

…

Q.     Have you ever – I believe you said you may have treated patients that were having problems dealing with a cancer diagnosis?

A.     Yes.

(Ex. A, Bianchini Dep. Vol. I 46:23-48:4, 48:22-25, Jan. 8, 2019.) In no sense, then, is Dr. Bianchini—in his many years as a clinical neuropsychologist—a stranger to cancer patients.

Sanofi nevertheless blinds itself to these facts and argues that Dr. Bianchini disclaimed such expertise and thus may be excluded.  Sanofi cites no precedent in support of this argument. As shown above, however, Dr. Bianchini made no disclaimer, but rather, he testified that he did have clinical experience with cancer patients.

In the same vein, Sanofi asserts that Dr. Bianchini lacks knowledge, in the form of research and publications, to opine as an expert in this case. Not so. Dr. Bianchini researched the psychological impact of cancer, cancer treatment, and cancer diagnosis, utilizing numerous studies and literature in forming his opinions.  (Ex. A, Bianchini Dep. Vol. I 38:8-12 ("Q.  And what did you learn about psychological symptoms and hair loss from your research and literature review? A. That women with hair loss commonly report emotional psychological symptoms."); *id.* at 40:21-41:8.)  Moreover, this criticism falls flat, as it is well-settled that an expert opinion need not have as its sole basis professional studies.  *See Hendrix v. Evenflo Co., Inc.*, 609 F.3d 1183, 1196-97 (11th Cir. 2010) (holding that an expert opinion regarding medical causation need not have as

its sole basis professional studies; opinions based in part on case studies and clinical experience may also be reliable).

Furthermore, Dr. Bianchini has published widely in the areas of psychology and clinical neuropsychology. His academic experience—as a scholar and teacher—*includes* research on mental disorders in patients with serious medical issues. To suggest, as Sanofi does, that Dr. Bianchini lacks experience because he has not published specifically on mental disorders in patients with cancer, would be slicing the baloney too thin—particularly since Dr. Bianchini has clinical experience with cancer patients. *See United States v. Wen Chyu Liu*, 716 F.3d 159, 168-69 (5th Cir. 2013) ("[A]n expert witness is not strictly confined to his area of practice, but may testify concerning related applications.").  After all, Rule 702 "does not rank academic training over demonstrated practical experience," *Circle J Dairy, Inc. v. A.O. Smith Harvestore Prods., Inc.*, 790 F.2d 694, 700 (8th Cir. 1986), and knowledge can be gained purely from experience.  *See Fox v. Dannenberg*, 906 F.2d 1253, 1256 (8th Cir. 1990) ("[A]n individual can qualify as an expert where he [or she] possesses sufficient knowledge gained from practical experience, even though he [or she] may lack academic qualifications in the particular field of expertise.").

Dr. Bianchini is well qualified to testify for another reason: He personally examined Mrs. Earnest and rendered his opinions based on his years of experience as a clinical psychologist and neuropsychologist.  Sanofi ignores this—quite obviously because its own experts never personally examined Mrs. Earnest. Dr. Bianchini's personal examination, however, gives ballast to his qualifications and hence the admissibility of his opinions.

Lastly, even assuming for argument's sake that Sanofi's criticism of Dr. Bianchini's experience has any purchase, the criticism goes to the weight assigned to Dr. Bianchini's testimony, not its admissibility.  *See Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 354 (5th

Cir. 2007) (observing that "there is no requirement 'that a medical expert must always cite published studies on general causation in order to reliably conclude that a particular object caused a particular illness'")(citing *Bonner*, 259 F.3d at 929).

### B.    Dr. Bianchini's Opinions are Based on Reliable Methodology

Sanofi is also critical of psychosocial impairment expert testimony, but such testimony is routinely admissible in the Fifth Circuit.  *See Lopez*, 2006 WL 1663374, at *6 (allowing expert testimony regarding adjustment disorder and PTSD diagnoses where experts' methods were "consistent with generally accepted psychotherapy practices"); s*ee also Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 618 (5th Cir. 1999) (affirming district court's admission of expert's PTSD diagnosis where expert "testified to his experience, to the criteria by which he diagnosed [patient], and to standard methods of diagnosis in his field" and there was no indication expert utilized "junk science" prohibited by *Daubert*). And as explained below, Dr. Bianchini's testimony is certainly admissible here, because Dr. Bianchini testified to and relied upon his experience and education, and he discussed at length the methods he used to diagnose both Plaintiffs, including using DSM-5 criteria.

### 1.    *Dr. Bianchini Considered All Relevant Evidence in Rendering His Opinions.*

Dr. Bianchini engaged in an appropriate methodology in forming his conclusions.  Dr. Bianchini personally examined Mrs. Earnest and reviewed her medical records, (Ex. B, Bianchini Dep. Vol. II 257:7-258:13, Jan. 9, 2019), several depositions (*id.*), clinical studies relating to hair loss and the emotional issues that stem from it, (*id*. at 261:2-262:8), and he relied on his extensive training and experience.

During his evaluation of Mrs. Earnest, Dr. Bianchini discussed the psychological issues relating to Mrs. Earnest's hair loss with Mrs. Earnest denying emotional problems throughout the

duration of her surgery, chemotherapy, and radiation treatment. (Earnest Report at 2.) Dr. Bianchini determined that, after the chemotherapy, Mrs. Earnest initially reported feeling "more sick than depressed" and it was not until she realized her hair was not growing back after she completed her chemotherapy that she began to experience psychological complications. (*Id.*) From his examination, Dr. Bianchini assessed that as Mrs. Earnest began to gain back the weight she had lost during her chemotherapy treatment, she expected her hair would also begin to grow back in, but it did not, and she now wears a turban or scarf at all times. (*Id.*) As a result, according to Dr. Bianchini, Mrs. Earnest experiences anxiety and avoidance that impact her social functioning. (*Id.* at 10.) Dr. Bianchini's report also provides specific examples of how her alopecia has affected her daily life. (*See id.* at 3.)

Despite this thorough examination, Sanofi argues that Dr. Bianchini's review of materials for Mrs. Earnest is incomplete. But many of the medical records Sanofi suggests are "missing" have little or no relevance to Dr. Bianchini's opinions. This includes records of Pan American Life Insurance Group, CVS Caremark Pharmacy, Walmart Pharmacy, and Dr. Michael Feldman (Mrs. Earnest's orthopedist), among others. While Sanofi maintains these records would have somehow made a difference in Dr. Bianchini's opinions, it can point to nothing in these records to substantiate that theory and is merely speculating.

Sanofi also complains that Dr. Bianchini failed to detail any external or collateral evidence of Mrs. Earnest's social or psychological impairment outside of her own account. (Mot. at 18-19). But Dr. Bianchini simply did not see any collateral evidence of Mrs. Earnest's psychological symptoms when he looked for them in her applicable medical records. (*See* Ex. B, Bianchini Dep. Vol. II. 257:13-18.) Moreover, and as noted above, Dr. Bianchini is an expert in the narrow

subfield of measurement validity and malingering, and as such, has the unique ability to evaluate psychological impairments.

In its Supplemental Motion, which largely repeats the issues in its initial Motion, Sanofi claims that Dr. Bianchini ignored the results of his own MMPI testing of Mrs. Earnest, choosing to rely only on his personal interviews with her to reach his diagnosis. But Dr. Bianchini testified that he incorporated Mrs. Earnest's MMPI results into his diagnosis, and in fact, even integrated those scores into his summary.

> Q.   And so with her depression, anxiety, and social introversion [MMPI] scores all being within the normal range, what – what did that tell you?
>
> A.   Just that she doesn't have higher scores on those scales than other people her – you know, her age.
>
> Q.   How did that impact your assessment of her?
>
> A.   Well, that's already kind of in – as some people like to say, "cooked in the cake."  That's already in my report. You know, I included that in my – in my, you know, assessment, in my diagnosis.  In fact, it's described in and even integrated in my – in my summary.

(Ex. C, Bianchini Dep. Vol. III 70:8-20, May 14, 2019; *see also* Ex. B to Defs' Mot., Rec. Doc. 6151-2, "Earnest Report" at 9) (summarizing the MMPI findings and their relevance to his diagnosis).  Furthermore, even if Dr. Bianchini had not included the MMPI scores in his results, he clearly testified that a diagnosis of an adjustment disorder does not require clinically elevated scores on the MMPI scale.  (*See* Ex. C, Bianchini Dep. Vol. III 71:8-72:1.)  Likewise, Dr. Bianchini testified that the MMPI method is simply one method to be potentially assessed in making a diagnosis, and that it was not the absolute, exclusive method to be used.  (*Id.* at 87:3-14) (testifying that the MMPI was not the absolute method of making these diagnosis).

Sanofi also claims in its Supplemental Motion that Dr. Bianchini "cherry picked" facts and evidence in support of his opinions, and therefore, his opinions are unreliable.  But Sanofi itself

"cherry picks" the portions of Dr. Bianchini's testimony that it likes, while *entirely* ignoring the parts it does not like.  For example, Sanofi again argues that Dr. Bianchini ignored the "absence" of any other collaborating evidence of adjustment disorder.  But Dr. Bianchini addressed this exact criticism of "cherry picking" in his prior depositions, though it was in the context of his diagnosis of Mrs. Durden—another plaintiff in this litigation.  (*See* Ex. B, Bianchini Dep. Vol. II 256:12-20) (indicating that other physicians generally do not look for evidence of adjustment disorder or psychological issues, so the absence of such symptoms in a patient's medical records is non-dispositive).  And when asked the same question regarding corroborating evidence for Mrs. Earnest at his third deposition, Dr. Bianchini again confirmed that even MMPI symptoms may not be reported on by other physicians, because other physicians do not necessarily seek out this kind of information.  (*See* Ex. C, Bianchini Dep. Vol. III 102:11-15) ("Q. Would you expect an impairment that rises to that level of significantly impairing her social functioning to be reflected in her testing?  A.  No, not necessarily.  Different way of getting at the information.")   This is because the MMPI testing method may not be specific enough to reflect the symptoms Mrs. Earnest suffers from.  (*Id.* at 102:16-103:25) (discussing corroborating evidence from Mrs. Earnest's husband of Mrs. Earnest's adjustment disorder, and discussing that the MMPI questions do not contain specifics questions relating to Mrs. Earnest's symptoms).

Sanofi also claims that Dr. Bianchini lacks basic knowledge of Mrs. Earnest, going so far as to imply he did not know she was married. But the testimony reveals otherwise: "Q.  Mrs. Earnest is married.  A.  I'm sorry.  I'm mixing up Durden and Earnest.  So, right, Mrs.  Earnest is married." (Ex. B, Bianchini Dep. Vol. II 259:4-6.)  Dr. Bianchini also testified, that an additional interview may or may not have relevance to his opinions here.  (*Id.* at 259:12-19) ("Q.  [It] would be very helpful to your review and reaching opinions regarding Mrs. Earnest to read the deposition

of a husband of 40 years.  Do you agree? … A.  [I] mean, it can be – it certainly can be helpful.  It may or may not be depending on what is contained therein . . .")); *see also Lopez v. City of Houston*, No. H-03-2297, 2006 WL 1663374, at *9 (S.D. Tex. June 12, 2006) (concluding that psychological expert's alleged failure to interview additional witnesses was matter for the jury to consider in weighing the expert testimony where there was no evidence that any plaintiff misrepresented their medical history and medical professionals could reasonably rely on plaintiffs' self-reported history).

In any event, Sanofi's criticisms of Dr. Bianchini do not render his opinions inadmissible. Questions relating to the "bases and sources of an expert's opinion affect the weight to be assigned to the opinion, rather than its admissibility and should be left for the jury's consideration." *Lofton v. McNeil Consumer & Specialty Pharms.*, No. 3:05-CV-1531-L (BH), 2008 WL 4878066, at *4 (N.D. Tex. July 25, 2008) (*quoting Viterbo v. Dow Chemical Co*., 826 F.2d 420, 422 (5th Cir. 1987); *see also In Re: Actos (Pioglitazone) Prods. Liab. Litig.*, No. 6:11-md-2299, 2014 WL 12653759, at *12 (W.D. La. Jan 14, 2014) ("the question of the doctor's analysis and conclusions, again, is better left to cross-examination at trial. The objection is overruled."). As such, Sanofi's arguments that Dr. Bianchini should have considered certain medical records or deposition transcripts are properly reserved for the finder of fact.

### 2.    *Dr. Bianchini Properly Utilized DSM-5 Criteria*

It is Dr. Bianchini's opinion that Mrs. Earnest suffers from Adjustment Disorder as a result of permanent hair loss.   According to the DSM-5, the following criteria are listed under "Adjustment Disorder":

A.    The development of emotional or behavioral symptoms in response to an identifiable stressor(s) occurring within 3 months of the onset of the stressor(s).

B.    These symptoms or behaviors are clinically significant, as evidenced by one or both of the following: Marked distress that is out of proportion to the severity

or intensity of the stressor, taking into account the external context and the cultural factors that might influence symptom severity and presentation. Significant impairment in social, occupational, or other important areas of functioning.

C.     The stress-related disturbance does not meet the criteria for another mental disorder and is not merely an exacerbation of a preexisting mental disorder.

D.     The symptoms do not represent normal bereavement.

E.     Once the stressor or its consequences have terminated, the symptoms do not persist for more than an additional 6 months.[3]

Sanofi contends that Dr. Bianchini failed to consider factors relevant to the DSM-5 when evaluating and diagnosing Mrs. Earnest with "Adjustment Disorder."  (Mot. at 19.)  To the contrary, Dr. Bianchini testified that he did in fact use these criteria.  He also testified that applying the DSM is not especially complicated.  (Ex. B, Bianchini Dep. Vol. II at 249:4-13).  Sanofi tries to spin that testimony into some sort of concession that Dr. Bianchini failed to apply the DSM at all, but no such concession was made.

In addition, Sanofi contends Dr. Bianchini was not certain of the precise time of Mrs. Earnest's onset, and therefore could not have properly assessed her under the DSM-5 criteria. Dr. Bianchini was directly asked by Sanofi's counsel how he could make a diagnosis of adjustment disorder without knowing the precise timing of Mrs. Earnest's symptomatic onset.  His response adequately answered this criticism:

Q.     Well, how can you make an adjustment disorder diagnosis for Mrs. Earnest if you don't know whether or not her symptoms began within three months of the identifiable stressor?
        . . .

A.     Because the stressor is ongoing, and  - and so, in other words, she has hair loss that's persistent.    So, you know, it's possible that she could develop an adjustment disorder in response to that anywhere along the way.   It

---

[3] *See* Diagnostic and Statistical Manual of Mental Disorders (5th ed.), APA (Washington, DC, 2013); *See also* http://www.psychiatry.org/psychiatrists/practice/dsm.

wouldn't have to – coincide – to be an adjustment disorder – for an adjustment disorder to be linked to hair loss, it would just be – have to link in time with hair loss.  **It wouldn't necessarily have to be linked in time with the immediate onset of the hair loss. . . .** and I don't know the precise time there, but it is still temporally linked to hair loss.

Q.    And all that matters for an adjustment disorder is if there's some sort of temporal linkage to the stressor?

A.    There's temporal linkage to the stressor, yes.

Q.    All right.

(Ex. B, Bianchini Dep. Vol. II 233: 15-234:20) (emphasis added).

Likewise, in its Supplemental Motion, Sanofi claims that Dr. Bianchini failed to identify the timing of Mrs. Earnest's hair loss and therefore Dr. Bianchini could not have followed DSM-5 criteria.  This is inaccurate.  First, Sanofi incorrectly argues that DSM-5 *requires* a diagnosis within 3 months of the identifiable stressor, which Dr. Bianchini expressly refuted.   (See Ex. C, Bianchini Dep. Vol. III 51:7-14)(Q. "The fact that the onset of the symptoms must occur within three months of the identifiable stressor in order to be – have a diagnosis of an adjustment disorder under the DSM?  A.  I mean, that – you said "must."  I mean, it's – that's the guideline, and in the DSM, it talks about the – the [DSM] criteria being guidelines.  And so I wouldn't use the word "must" there . . .").  Moreover, the Diagnostic and Statistical Manual of Mental Disorders (5th ed.) is a "***guiding force*** used by clinicians and psychiatrists to diagnose psychiatric illnesses." *United States v. Thompson*, 709 Fed. Appx. 758, 764 n.1 (5th Cir. 2017) (emphasis added).  Exacting compliance with DSM-5 criteria is not required, and in fact, is expressly warned against. *See Cautionary Statement for Forensic Use of DSM-5*, *in* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (5th ed.), APA (Washington, DC, 2013), http://www.psychiatry.org/psychiatrists/practice/dsm.

Moreover, the suggestion that Dr. Bianchini *never* had a timeline of the onset of Mrs. Earnest's symptoms is simply incorrect. Sanofi attempts to manipulate Dr. Bianchini's efforts to simply clarify the timeline of Mrs. Earnest's symptoms into some systemic failure of his methodology. But his testimony on this point was clear – he already had enough information previously to determine the timeline, but he wanted some additional information to further support his opinions. (Ex. C, Bianchini Dep. Vol. III 54:4-17) (Q. And I- what I'm confused about is that you issued your report over a year ago with your diagnosis, and why are you just this morning trying to find out when her anxiety symptoms began? A. Well because – well, the history that I have – that I had at the time of my interview was sufficient, in my view, to make a diagnosis of adjustment disorder. And her presentation to me was quite clearly someone who had an adjustment disorder, but there's . . . questions about that by your expert, Dr. Spiegel, and I think you asked some questions about that too, and so I just wanted to get more precise information.") Dr. Bianchini certainly did not "concede" that he was unaware of the timing of her symptoms began, as Sanofi expressly states. (Supp. Mot. at 3-4.)

### 3. Dr. Bianchini did Assess Potential Alternative Causes, and Further, a Differential Diagnosis is not Required for his Opinions.

Finally, Sanofi argues that Dr. Bianchini failed to exclude all other possible alternative causes of the plaintiffs' adjustment disorder, and thus his methodology is unreliable. Sanofi is wrong on the facts and the law. But courts "do not require experts to eliminate all other possible causes of a condition for the expert's testimony to be reliable." *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1199 (9th Cir. 2014). "It is enough that the proposed cause 'be a substantial causative factor.'" *Id.*; *see also Heller v. Shaw Industries*, 167 F.3d 146, 156 (3d Cir. 1999) ("A medical expert's causation conclusion should not be excluded because he or she has failed to rule

out every possible alternative cause of a plaintiff's illness.").[4]  Here, **Dr. Bianchini** relied on his clinical experience, and he studied the significant body of medical literature on the relationship between permanent hair loss and anxiety or depression.  It cannot be said, then, that Dr. Bianchini's diagnosis is so unreliable as to be bogus.

Contrary to Sanofi's submission, Dr. Bianchini testified that he looked for alternative explanations for the adjustment order diagnoses for both Plaintiffs, such as malingering, intentional exaggeration, psychosocial (relationship) issues, the mere fact of having been diagnosed with cancer, prior psychological history, and other potential psychological factors.  (*See* Ex. A, Bianchini Dep. Vol. I 105:21-106:25.)  In doing so, Dr. Bianchini relied on his "extensive clinical experience as a basis for ruling out a potential cause of the disease," which is entirely appropriate. *See Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1237 (9th Cir. 2017), *cert. denied sub nom. Teva Pharm. USA, Inc. v. Wendell*, 138 S. Ct. 1283 (2018).

Moreover, Sanofi's suggestion that Dr. Bianchini may have failed to rule something— anything—out is pure speculation.  Even assuming an alternative cause exists, it would "affect the weight that the jury should give the expert's testimony and not the admissibility of that testimony." *Heller*, 167 F.3d at 157; *see also Porte v. Ill. Cent. R.R. Co.*, No. 17-5657, 2018 WL 4404063, at *3, (E.D. La.  Sept. 14, 2018) ("The alternative causes suggested by a defendant affect the weight that the jury should give the expert's testimony and not the admissibility of that testimony.").

---

[4] As Professor Capra, Reporter to the Advisory Committee on the Federal Rules of Evidence, has put it: "[T]o require the experts to rule out categorically all other possible causes for an injury would mean that few experts would ever be able to testify . . . Obvious alternative causes need to be ruled out. All possible causes, however, cannot be and need not be eliminated before an expert's testimony will be admitted." Daniel J. Capra, *The* Daubert *Puzzle,* 32 Ga. L. Rev. 699, 728 (1998).

In its Supplemental Motion, Sanofi argues that Dr. Bianchini did not assess Mrs. Earnest's "contradictions" in her testimony relating to her understanding of the permanence of her hair loss. Specifically, Dr. Bianchini, when asked, testified that he believed Mrs. Earnest testified that Arimidex, another breast cancer treatment drug, contributed to her hair loss.[5]  Therefore, Sanofi argues, because Dr. Biachini testified that he believes Mrs. Earnest did attribute her hair loss to Arimidex at one point prior to learning that Taxotere may have caused her permanent hair loss, Dr. Bianchini's opinions are unreliable and should be stricken.  Dr. Bianchini's understanding is consistent with Mrs. Earnest's testimony, which is not contradictory. Dr. Bianchini testified that the reason Mrs. Earnest did not seek treatment for her hair loss early on was because (1) she initially suspected her hair loss was associated with her continued use of Arimidex; and (2) she did not understand it to be permanent until she heard of the reported association with Taxotere. (Id. at 126:16-127:10). Regardless, it is unclear what this line of argument has to do with the admissibility of Dr. Bianchini's opinions under Rule 702 at all. It is beyond argument that Dr. Bianchini's concern as a neuropsychologist is not to ascertain the cause of her alopecia, but rather to evaluate whether Mrs. Earnest suffered from a psychological disorder, and if so, the cause of that condition.

As with all of Sanofi's criticisms of Dr. Bianchini, these supposed contradictions go to the weight assigned his testimony, not its admissibility.  Questions relating to the "bases and sources of an expert's opinion affect the weight to be assigned to the opinion, rather than its admissibility and should be left for the jury's consideration." *Lofton v. McNeil Consumer & Specialty Pharms.*,

---

[5] The gamesmanship of Defense counsel on this point must be noted.  Counsel for Sanofi demanded extremely specific information from Dr. Bianchini regarding Mrs. Earnest's testimony, without actually showing Dr. Bianchini the testimony in question, functionally conducting a memory test upon Dr. Bianchini.  The obvious intent there was not to actually get appropriate testimony regarding Mrs. Earnest's testimony, but instead, a sound bite for this supplemental motion to strike.  (Bianchini Dep. Vol. III at 130:1-131:2)

No. 3:05-CV-1531-L (BH), 2008 WL 4878066, at *4 (N.D. Tex. July 25, 2008) (*quoting Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987)); *see also In Re: Actos (Pioglitazone) Prods. Liab. Litig.*, No. 6:11-md-2299, 2014 WL 12653759, at *12 (W.D. La. Jan 14, 2014) ("the question of the doctor's analysis and conclusions, again, is better left to Cross-examination at trial. The objection is overruled.").

## IV.    CONCLUSION

For all these reasons, the Sanofi's Defendant's motion to strike the opinions and testimony of Dr. Kevin Bianchini should be denied in full.

Dated: June 26, 2019                          Respectfully submitted,

*/s/ Christopher L. Coffin*                    */s/ Karen B. Menzies*
Christopher L. Coffin (#27902)                Karen Barth Menzies (CA Bar #180234)
PENDLEY, BAUDIN & COFFIN, L.L.P.              GIBBS LAW GROUP LLP
1100 Poydras Street, Suite 2505              6701 Center Drive West, Suite 1400
New Orleans, Louisiana 70163                 Los Angeles, California 90045
Phone: (504) 355-0086                        Telephone: 510-350-9700
Fax: (504) 355-0089                          Facsimile: 510-350-9701
ccoffin@pbclawfirm.com                       kbm@classlawgroup.com

*Plaintiffs' Co-Lead Counsel*                 *Plaintiffs' Co-Lead Counsel*


*/s/M. Palmer Lambert*                         */s/Dawn M. Barrios*
M. Palmer Lambert (#33228)                    Dawn M. Barrios (#2821)
GAINSBURGH   BENJAMIN   DAVID                 BARRIOS, KINGSDORF & CASTEIX, LLP
MEUNIER & WARSHAUER, LLC                      701 Poydras Street, Suite 3650
2800 Energy Centre, 1100 Poydras Street      New Orleans, LA 70139
New Orleans, LA 70163-2800                   Phone: 504-524-3300
Phone: 504-522-2304                          Fax: 504-524-3313
Fax: 504-528-9973                            barrios@bkc-law.com
plambert@gainsben.com

                                             *Plaintiffs' Co-Liaison Counsel*
*Plaintiffs' Co-Liaison Counsel*

## PLAINTIFFS' STEERING COMMITTEE

Anne Andrews
Andrews Thornton Higgins Razmara, LLP
2 Corporate Park, Suite 110
Irvine, CA 92606
Phone: (800) 664-1734
aa@andrewsthornton.com

J. Kyle Bachus
Bachus & Schanker, LLC
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Phone: (303) 893-9800
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@atkinsandmarkoff.com

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Phone: 510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, Florida 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

Andrew Lemmon
Lemmon Law Firm, LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

Genevieve Zimmerman
Meshbesher & Spence Ltd.
1616 Park Avenue South
Minneapolis, MN 55404
Phone: (612) 339-9121
Fax: (612) 339-9188
gzimmerman@meshbesher.com

**CERTIFICATE OF SERVICE**

I hereby certify that on June 26, 2019, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

*/s/ Dawn M. Barrios*
Dawn M. Barrios