UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)　　　　　　　　　　　　　MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

　　　　　　　　　　　　　　　　　　　　　　　　　　　SECTION "H" (5)

THIS DOCUMENT RELATES TO:

Barbara Earnest, Case No. 2:16-cv-17144

PLAINTIFFS' OPPOSITION TO SANOFI'S MOTION TO EXCLUDE EXPERT
TESTIMONY OF DR. JOHN W. THOMPSON, JR.

## I.　　INTRODUCTION

Sanofi moves to exclude the testimony of Plaintiffs' psychiatry expert, Dr. John W. Thompson, Jr., claiming that he is unqualified to testify on issues related to the diagnosis of adjustment disorder resulting from hair loss and that his testimony is unreliable based on the methodology that he employed. As detailed below, Dr. Thompson is more than qualified to render his opinions in this case. He has been qualified numerous times as an expert in both civil and criminal state and federal courts throughout Louisiana, including the Eastern District of Louisiana. He has been a licensed psychiatrist for over thirty years and is board certified in Adult Psychiatry by the American Board of Psychiatry and Neurology, with specialized qualifications in Forensic Psychiatry. Dr. Thompson's opinions are likewise reliable. Dr. Thompson formulated his expert opinions after a thorough, personal evaluation of Ms. Earnest,[1] focusing his analysis on whether she exhibited psychiatric symptoms as a direct result of their permanent hair loss. He also reviewed her corresponding medical records and deposition transcripts, and he requested and obtained

---

[1] Sanofi's Motion related to the then-existing trial picks. Because Ms. Durden is no longer a potential trial plaintiff, the Motion no longer relates to Ms. Durden and thus this opposition does not address arguments specific to her.

1

additional records to confirm that he had a complete understanding of Ms. Earnest's symptoms. Contrary to Sanofi's suggestions, Dr. Thompson properly referred to the DSM-5 as a guide for clinical assessment in forensic evaluations, and he likewise considered alternative causes to Plaintiffs' emotional distress symptoms. Based on his evaluation and the application of a reliable methodology, Dr. Thompson determined that permanent hair loss was the primary causative factor of her emotional distress. Accordingly, Plaintiffs respectfully request that Sanofi's Motion be denied.

## II. LEGAL STANDARD

Under *Daubert*, the Court is provided with an analytical framework to determine the admissibility of expert testimony pursuant to Rule 702 of the Federal Rules of Evidence. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243 (5th Cir. 2002). Acting as gatekeepers, courts must ensure that the proffered expert testimony is both relevant and based on reliable methodologies. *Daubert*, 509 U.S. at 589; *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 378 (5th Cir. 2010); *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007). While this "gatekeeper" role is essential, it is not intended to supplant the adversarial system or the role of the jury.

The threshold inquiry in any *Daubert* assessment is whether a particular expert is qualified to testify through "knowledge, skill, experience, training or education." *See Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 881 (5th Cir. 2013); *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999). Courts have wide discretion when navigating the expert-qualification process. *See Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141-42, 153 (1999); *Williams v. Monitowoc Cranes, L.L.C.*, 898 F.3d 607, 625 (5th Cir. 2018); *Roman v. Western Mfg.*, 691 F.3d 686, 692 (5th Cir. 2012). While many factors identified in *Daubert* bear on admissibility, the courts' inquiry is

"flexible" in nature; "the factors . . . may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Pipitone*, 288 F.3d at 245.

This Court's responsibility is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152. Accordingly, the Fifth Circuit has continuously upheld the admission of expert testimony based on the expert's specialized knowledge and first-hand observations when supported by solid evidence in the scientific community. *See St. Martin v. Mobil Exploration & Producing U.S., Inc.*, 224 F.3d 402, 406-07 (5th Cir. 2000) (holding that first-hands observation combined with expertise is sufficiently reliable to form the basis of a causal opinion); *Skidmore v. Precision Printing and Packaging, Inc.*, 188 F.3d 606, 618 (5th Cir. 1999) (holding that the testimony of a psychiatrist who diagnosed plaintiff was properly admitted because the psychiatrist "testified to his experience, to the criteria by which he diagnosed [the plaintiff], and to the standard methods of diagnosis in his field").

## III.   ARGUMENT

### A.   Dr. Thompson is Well-Qualified to Offer Expert Opinions on Plaintiffs' Emotional Damages Resulting From Permanent Alopecia

Dr. Thompson is well-qualified to render opinions as an expert in psychiatry. Dr. Thompson received extensive training in the areas of mental health disorders, diagnosis, and treatment, and utilized that experience in his practice of more than thirty years. (Ex. B, Thompson Dep. 136:9-18, Jan. 16, 2019.) He is board certified in Adult Psychiatry by the American Board of Psychiatry and Neurology, with added specialized qualifications in Forensic Psychiatry. (Ex. B to Defs' Mot., Rec. Doc 6141-2, "Thompson Earnest Rpt." at 2; Ex. A, Thompson CV at 1.)

3

Currently, he serves as the Director of Forensic Neuropsychiatry and Vice-Chairman of the department of Psychiatry and Neurology at Tulane University School of Medicine, where he divides his time between teaching, performing forensic evaluations, and overseeing clinical responsibilities. (Ex. B, Thompson Dep. 61:16-67:15.) In addition, Dr. Thompson is the founding Director of the Tulane Fellowship in Forensic Psychiatry. In this capacity, he is also the Director of the planning committee for the Department's annual Forensic Symposium, a program designed to explore and teach the most recent updates in forensic psychiatry. Dr. Thompson is actively involved in professional societies, including the American Psychiatric Association (APA), the American Academy of Psychiatry and the Law (AAPL), and the American Academy of Forensic Sciences (AAFS). (Ex. A, Thompson CV at 2.) He is well-published on a wide-array of topics in the discipline of psychiatry, having authored fourteen peer-reviewed articles, four non-peer-reviewed publications, and four book chapters. (Ex. A, Thompson CV at 17-19.) He has also lectured at over one-hundred-seventy (170) symposiums and presented eighteen abstracts. (Ex. A, Thompson CV at 3-17.) Both civil and criminal, state and federal courts throughout Louisiana have accepted him numerous times as an expert in the field of forensic psychiatry including this District.[2] (Ex. A, Thompson CV.)

Sanofi erroneously claims that Dr. Thompson's testimony is not within his expertise because he is not a cancer specialist and has not specifically evaluated patients claiming emotional distress specifically from hair loss. (Mot. at 3-4.) *Daubert* does not require that an expert be specialized in the exact factual parameters of a given case. *See Williams*, 898 F.3d at 625 (holding it was not an abuse of discretion if the court qualifies an expert "on the basis of an imprecise match

---

[2] *See, e.g., Howard v. Offshore Liftboats, LLC*, 2016 U.S. Dist. LEXIS 14163 (E.D. La. February 5, 2016) (allowing Dr. Thompson's testimony to be admitted into evidence).

between the expert's qualifications and the issue she planned to testify about");[3] *Roman*, 691 F.3d at 693 (5th Cir. 2012) ("The conception of expertise urged by [defendant], by which [the experts] could not testify about a stucco pump because stucco is not their trade, could make expert certification decisions a battle of labels—label the needed expertise narrowly and the offered expert's field broadly."); *see Huss v. Gayden*, 571 F.3d 442, 455-56 (5th Cir. 2009). So long as there is "sufficient indicia" that an individual will "provide a reliable opinion" on a subject, courts may qualify that individual as an expert. *Williams*, 898 F.3d at 625.

In its Supplemental Motion, Sanofi essentially repeats this argument, citing *Mancuso v. Consol. Edison Co. of New York* 967 F.Supp. 1437, 1445 (S.D.N.Y. 1997). (Supp. Mot. at 3.) But *Mancuso* is distinguishable. There, the court excluded an expert because he lacked "formal training and credentials in general or PCB toxicology, or in environmental or occupational medicine, [and] his inability to answer basic questions about PCB toxicology." *Mancuso,* 967 F. Supp. at 1445. This is not the case with Dr. Thompson. The PSC offers Dr. Thompson as an expert in the field of psychiatry, and—as discussed above—he is experienced and well qualified in this field.

Also in its Supplemental Motion, Sanofi argues that Dr. Thompson's opinions are outside his area of expertise because Dr. Thompson did not inquire when "Mrs. Earnest's alleged adjustment began." (Supp. Mot. at 2-3.) Sanofi has misstated the record. Dr. Thompson's report on Mrs. Earnest includes a detailed patient history with regard to cancer diagnosis, alopecia, and adjustment disorder. (Thompson Earnest Rpt. at 3-9; Ex. B, Thompson Dep. Vol. I 288:8-14.) But even if Dr. Thompson's report said none of this, Sanofi's criticisms go to the weight of Thompson's testimony rather than his qualifications as Sanofi claims, and thus provides no basis

---

[3] The court rejected defendant's argument stating the following: "The absurdity of this approach is apparent here: [Defendant] seeks to exclude a mechanical engineer with a background in warnings and small-crane design from testifying as an expert about warnings for a crawler crane. We decline to adopt this approach." *Williams*, 898 F.3d at 625.

5

for exclusion. *See Williams v. Monitowoc Cranes, L.L.C.*, 898 F.3d 607, 625 (5th Cir. 2018); *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009).

In sum, Dr. Thompson is fully qualified to offer an opinion based on his psychiatric evaluation of Mrs. Earnest. Sanofi's criticisms of Dr. Thompson's qualifications, then, are better suited as arguments against the weight of Dr. Thompson's testimony, rather than its admissibility.

### B. Dr. Thompson's Opinions are Reliable and Admissible

Courts often describe the field of psychiatry as a "soft" social science, an area of expertise "in which research, theories, and opinion cannot have the exactness of hard science methodologies." *Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287, 1297 (8th Cir. 1997); *see also United States v. Simmons*, 470 F.3d 1115, 1123 (5th Cir. 2006). "In such instances, other indicia of reliability are considered under *Daubert*, including professional experience, education, training, and observations." *See Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 247 (5th Cir. 2002). To that end, the court's focus must be on the expert's principles and methodology, rather than the conclusions generated. *See Daubert*, 509 U.S. at 595; *Konrick v. Exxon Mobil Corp.*, 2016 U.S. Dist. LEXIS 13478 *14-15 (E.D. La. Feb. 4, 2016) ("A court cannot exclude expert testimony simply because it disagrees with the expert's conclusions.")

#### 1. Dr. Thompson Considered All Relevant Evidence in Rendering His Opinions.

Dr. Thompson's opinions are based on a reliable methodology. He personally evaluated Mrs. Earnest and Mrs. Earnest's husband, he reviewed her medical records, relevant deposition testimony, and other supporting documentation. Based on his review of her symptoms, Dr. Thompson determined that Mrs. Earnest experiences "transient depressed moods" when deciding whether to wear a wig or a turban. (Thompson Earnest Rpt. at 5.) Dr. Thompson concluded—again, based on his review of the records and his personal evaluation of Mrs. Earnest—that each time

Mrs. Earnest makes the decision to wear a wig, she is reminded that her hair will never come back. (Thompson Earnest Rpt. at 5; Ex. B, Thompson Dep. Vol. I 331:21-332:2.)

In addition, in reviewing her deposition testimony, Dr. Thompson determined that Mrs. Earnest is "very frustrated" by the fact that her hair is not growing back. (Thompson Earnest Rpt. at 25.) Based on his review, Dr. Thompson concluded that Mrs. Earnest feels singled out and intimidated by strangers coming up to her on the street and asking if she still has cancer, (Thompson Earnest Rpt. at 26; Ex. B, Thompson Dep. Vol. I 289:8-290:5), describing Mrs. Earnest's experience of permanently losing her hair as "traumatic." (Thompson Earnest Rpt. at 27.) According to Dr. Thompson, Mrs. Earnest is humiliated when out in public and becomes depressed when she prepares to go into public. (Thompson Earnest Rpt. at 27; Ex. B, Thompson Dep. Vol. I 11:1-4 ("[S]he does seem to be super fearful of people seeing her other than her family without her turban on.").

As noted above, Dr. Thompson also conducted an interview of Mrs. Earnest's husband in order to understand his perspective on his wife's condition. (Thompson Earnest Rpt. at 8.) According to Dr. Thompson's evaluation of Mr. Earnest, Dr. Thompson determined that Mr. Earnest can tell when his wife is getting ready to go out, or is invited to a special event, he sees her struggling over the decision of how to disguise her hair loss, by a wig or turban. (Thompson Earnest Rpt. at 8-9 ("It has been distressing to her. She can't fix her hair and that is what women do."))

In Sanofi's Supplemental Motion, Sanofi make a series of unsupported or factually inaccurate arguments to create the appearance Dr. Thompson did not review critical records. For instance, Sanofi claims that Dr. Thompson did not adequately consider the MMPI-2 testing contained in the expert report of Dr. Kevin Bianchini, Ph.D. Not so—Dr. Thompson expressly

7

stated that he reviewed and considered Bianchini's report. (Thompson Earnest Rpt. at 3.) Indeed, Dr. Bianchini's report corroborated Dr. Thompson's opinion.

Sanofi also alleges that Dr. Thompson relied on statements that are contradictory to those selected by Sanofi from Mrs. Earnest's deposition. No such contradictions exist. Dr. Thompson stated that Mrs. Earnest was originally under the mistaken belief that the "hair thinning" or "hair side effect" may have been due to her use of Arimidex, another drug to treat breast cancer. (Ex. C, Thompson Dep. Vol. II 59:13-17) Nevertheless, Dr. Thompson's concern as a forensic psychiatrist is not to ascertain the cause of the hair loss (Taxotere or Arimidex), but rather, to evaluate whether Mrs. Earnest suffered from a psychiatric condition, and if so, the cause of that condition.

Finally, it is also worth noting that this District has previously allowed Dr. Thompson's testimony under similar circumstances. In *Howard v. Offshore Liftboats, LLC*, No. CV 13-4811, 2016 WL 483164 (E.D. La. Feb. 5, 2016), the opposing party argued that Dr. Thompson's opinions should be excluded since he had not reviewed a "substantial" amount of the patient's medical records. *Id.* at *3. In response, the party seeking to admit his testimony pointed to Dr. Thompson's expert report which revealed he relied on a number of medical records, depositions, and other supporting documents in forming his opinions. *Id.* According to Judge Morgan, the inquiry was a matter properly dealt with on cross-examination; "[w]hether Dr. Thompson relied on adequate information goes to the weight to be assigned his testimony, as it involves the bases and sources upon which Dr. Thompson relied in reaching his conclusions in this case." *Id*. Just as in *Howard*, Sanofi's criticisms here go to the weight of the evidence not its admissibility.

### 2. Dr. Thompson Adhered to the Guidelines Provided by the DSM-5.

Published by the American Psychiatric Association, the Diagnostic and Statistical Manual of Mental Disorders (5th ed.) is a "***guiding force*** used by clinicians and psychiatrists to diagnose psychiatric illnesses." *United States v. Thompson*, 709 Fed. Appx. 758, 764 n.1 (5th Cir. 2017)

(emphasis added). According to the DSM-5, the following criteria are listed under "Adjustment Disorder":

> A. The development of emotional or behavioral symptoms in response to an identifiable stressor(s) occurring within 3 months of the onset of the stressor(s).
>
> B. These symptoms or behaviors are clinically significant, as evidenced by one or both of the following: Marked distress that is out of proportion to the severity or intensity of the stressor, taking into account the external context and the cultural factors that might influence symptom severity and presentation. Significant impairment in social, occupational, or other important areas of functioning.
>
> C. The stress-related disturbance does not meet the criteria for another mental disorder and is not merely an exacerbation of a preexisting mental disorder.
>
> D. The symptoms do not represent normal bereavement.
>
> E. Once the stressor or its consequences have terminated, the symptoms do not persist for more than an additional 6 months.[4]

Sanofi contends that Dr. Thompson failed to consider factors relevant to the (DSM-5) when evaluating and diagnosing Mrs. Earnest with "Adjustment Disorder." Here, Dr. Thompson used the DSM-5 as a guiding principle to diagnose Mrs. Earnest with adjustment disorder. Based on his analysis, Dr. Thompson determined that an exact onset date cannot be determined for Mrs. Earnest—Mrs. Earnest testified that she began to lose her hair during the third and fifth rounds of chemotherapy in 2011 (Thompson Earnest Rpt. at 26), and her oncology records report "resolving alopecia" and a small regrowth of her hair between April 2012 and February 2013. (Thompson Earnest Rpt. at 16.) As noted in Dr. Thompson's Report, in photographs from March 2016 and April 2017, Mrs. Earnest is almost completely bald on the crown of her head. (Thompson Earnest Rpt. at 21-22.) But as stated in his report, Mrs. Earnest testified that she did not think she "would be bald forever," (Thompson Earnest Rpt. at 29) and that she finds it distressing to look in the

---

[4] *See* Diagnostic and Statistical Manual of Mental Disorders (5th ed.), APA (Washington, DC, 2013); *See also* http://www.psychiatry.org/psychiatrists/practice/dsm.

mirror each day, only to be reminded that her hair loss is permanent. (Ex. B, Thompson Dep., 289:4-24.).

Dr. Thompson likewise noted that Mrs. Earnest is "super fearful" of people seeing her without her turban on. (Ex. B, Thompson Dep., 110:25-111:4; Thompson Earnest Rpt. at 30.) According to Dr. Thompson, because of her permanent alopecia, Mrs. Earnest adjusts her social schedule and interactions with people, (Ex. B, Thompson Dep. Vol. I 111:9-11; 112:16-113:1) and reminders of her hair loss contribute to her anxiety and depressive symptoms. (Ex. B, Thompson Dep., Vol. I 331:17-332:2.) Based upon his evaluation, the medical records, depositions, and interviews, Dr. Thompson determined that Mrs. Earnest's symptoms satisfy the DSM-5 criteria for a diagnosis of low-end adjustment disorder.[5]

In its Supplemental Motion, Sanofi misquotes Dr. Thompson to claim that his opinions should be excluded because he "concedes" he is unable to identify "[m]arked distress that is out of proportion to the severity or intensity of the stressor . . . ." (Supp. Mot. at 7.) The quote used by Sanofi in which Dr. Thompson states "I don't know one way or the other" is in response to a question regarding whether most people would cover their head when they go outside of the house. (Ex. C, Thompson Dep. Vol. II, 72:6-11.) Contrary to Sanofi's assertion, it was not a statement as to whether Mrs. Earnest's level of distress is any different than what most people would experience. As Dr. Thompson has made clear, Mrs. Earnest exhibits a range of abnormal symptoms directly caused by her hair loss. (*See, e.g.,* Ex. C, Thompson Dep. Vol. II, 71:6-19.)

---

[5] Criteria C, D, and E would not apply to Mrs. Earnest's symptoms. Under Criteria C, there are no past mental disorders listed in her medical records. Criteria E would not apply for the sole reason that the stressor (hair loss) is still ongoing. Arguably, Criteria D could apply, since her sister passed away approximately four years after her cancer diagnosis. However, Dr. Thompson did consider this factor and believed Mrs. Earnest had already gone through the bereavement process. (Ex. B, Thompson Dep. Vol. I 358:13-23.)

Even if Dr. Thompson had not considered all of the DSM-5 criteria, that would not render his opinions unreliable. Pursuant to the DSM-5 Cautionary Statement,[6] use of the reference manual in forensic settings has clear limitations:

> Although the DSM-5 diagnostic criteria and text are primarily designed to assist clinicians in conducting clinical assessment, case formulation, and treatment planning, DSM-5 is also used as a reference for the courts and attorneys in assessing the forensic consequences of mental disorders. *As a result, it is important to note that the definition of mental disorder included in DSM-5 was developed to meet the needs of clinicians, public health professionals, and research investigators rather than all of the technical needs of the courts and legal professionals.*
> . . .
> However, the use of DSM-5 should be informed by an awareness of the risks and limitations of its use in forensic settings. *When the DSM-5 categories, criteria, and textual descriptions are employed for forensic purposes, there is a risk that diagnostic information will be misused or misunderstood.*
>
> *These dangers arise because of the imperfect fit between the questions of ultimate concern to the law and the information contained in a clinical diagnosis.* In most situations, the clinical diagnosis of a DSM-5 mental disorder…does not imply that an individual with such a condition meets legal criteria for the presence of a mental disorder or a specified legal standard (e.g., for competence, criminal responsibility, or disability). For the latter, additional information is usually required beyond that contained in the DSM-5 diagnosis, which might include information about the individual's functional impairments and how these impairments affect the particular abilities in question. *It is precisely because impairments, abilities, and disabilities vary widely within each diagnostic category that assignment of a particular diagnosis does not imply a specific level of impairment or disability.*

(emphasis added). Dr. Thompson recognized the dangers of strictly applying the DSM-5 criteria, testifying "[t]he criteria are there to guide clinicians in making their diagnosis, but the clinician's clinical judgment always trumps DSM-5." (Ex. B, Thompson Dep. 134:22-135:8.) When diagnosing patients in a forensic setting, psychiatrists identify and evaluate the symptoms being presented. Adjustment disorder can vary widely in presentation, with some patients exhibiting mild symptoms and others exhibiting much more significant symptoms. (Ex. B, Thompson Dep. Vol. I

---

[6] *Cautionary Statement for Forensic Use of DSM-5*, *in* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (5th ed.), APA (Washington, DC, 2013), http://www.psychiatry.org/psychiatrists/practice/dsm.

11

137:13-25.) Therefore, psychiatrists utilizing the DSM-5 in their forensic evaluations are aware to avoid narrowly shoehorning diagnoses in order to fit standardized criteria.

### 3. Dr. Thompson Considered Alternative Causes to Plaintiff's Adjustment Disorder.

Dr. Thompson considered alternative causes to Mrs. Earnest's symptoms in addition to hair loss. A reliable differential diagnosis may be evidenced by the performance of physical examinations and the taking of medical histories. *See In re Paoli R.R. Yard Pcb Litig.*, 35 F.3d 717, 756-759 (3d Cir. 1994) (holding that a "differential diagnosis is an ongoing process of making judgments about causation and then adapting those judgments as new information is acquired."); *see also Peteet v. Dow Chem. Co.*, 868 F.2d 1428, 1431-32 (5th Cir.), *cert. denied*, 493 U.S. 935 (1989) (allowing a doctor to testify as to causation based on an examination of medical records, of the plaintiff's deposition, and of the medical literature).

Essentially, a differential diagnosis requires an expert to "at least consider alternative causes," *In re Paoli*, 35 F.3d at 759, and in performing his forensic evaluation, Dr. Thompson did just this. He examined Mrs. Earnest to evaluate her respective functioning, both prior to taking Taxotere and subsequent to her hair loss. (Thompson Earnest Rpt. at 3-5. He obtained relevant medical history, psychiatric history, medication use, and past substance and alcohol abuse from Mrs. Earnest to eliminate alternative causes. (Thompson Earnest Rpt. at 6-8.) Importantly, he conducted an analysis as to whether there was any malingering in the Plaintiffs' accounts. (Thompson Earnest Rpt. at 9.) Based on his evaluation, and in accordance with his review of Plaintiffs' respective medical records and deposition testimonies, Dr. Thompson properly determined that long-term hair loss was the primary causative factor of Plaintiffs' emotional distress.

As he does with every patient, Dr. Thompson considered alternative causes to Mrs. Earnest's emotional distress, including her cancer-related neuropathy, and concluded that Mrs. Earnest's emotional distress was *primarily* related to her hair loss. (Ex. B, Thompson Dep. Vol. I 356:5-16; 358:4-10.) While additional stressors were also factored into his evaluation, none were considered by Dr. Thompson to have substantially contributed to Mrs. Earnest's emotional distress. (Ex. B, Thompson Dep. Vol. I 358:13-23 (in regard to the loss of her sister: "I think the loss of her sister was very important for her . . . . But I think there's enough time that's passed to where she's gone through the normal bereavement process and she's processed that to the extent she can"), 359:3-21 (considered age and weight as additional stressors)). As discussed supra, Dr. Thompson's evaluation is replete with instances in which hair loss has had a direct impact on Mrs. Earnest's social functioning. (*See, e.g., id.* at 331:21-332:2.) Tellingly, Defendants fail to address a single example.

Finally, even if Dr. Thompson had not considered alternative causes, the lack of a differential diagnosis is not fatal. "A medical expert's causation conclusion should not be excluded because he or she has failed to rule out every possible alternative cause of a plaintiff's illness." *Heller v. Shaw Industries*, 167 F.3d 146, 156 (3d Cir. 1999). The alternative causes suggested by a defendant "affect the weight that the jury should give the expert's testimony and not the admissibility of that testimony." *Id.* at 157. As such, Dr. Thompson's expert testimony in this matter is properly within the confines of *Daubert*.

## CONCLUSION

Dr. Thompson is qualified to offer testimony based on his psychiatric evaluation of Mrs. Earnest. His opinions are reliable as they are based upon his professional experience, education, training, and observations. Dr. Thompson's testimony is, therefore, amply supported by the totality

of the evidence. For the forgoing reasons, Plaintiffs' respectfully request this Court deny Sanofi's Motion to Exclude Dr. Thompson's testimony.

Dated: June 26, 2019

*/s/ Christopher L. Coffin*
Christopher L. Coffin (#27902)
PENDLEY, BAUDIN & COFFIN, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

*Plaintiffs' Co-Lead Counsel*

*/s/M. Palmer Lambert*
M. Palmer Lambert (#33228)
GAINSBURGH BENJAMIN DAVID MEUNIER & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: 504-522-2304
Fax: 504-528-9973
plambert@gainsben.com

*Plaintiffs' Co-Liaison Counsel*

Respectfully submitted,

*/s/ Karen B. Menzies*
Karen Barth Menzies (CA Bar #180234)
GIBBS LAW GROUP LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Telephone: 510-350-9700
Facsimile: 510-350-9701
kbm@classlawgroup.com

*Plaintiffs' Co-Lead Counsel*

*/s/Dawn M. Barrios*
Dawn M. Barrios (#2821)
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: 504-524-3300
Fax: 504-524-3313
barrios@bkc-law.com

*Plaintiffs' Co-Liaison Counsel*

## PLAINTIFFS' STEERING COMMITTEE

Anne Andrews
Andrews Thornton Higgins Razmara, LLP
2 Corporate Park, Suite 110
Irvine, CA 92606
Phone: (800) 664-1734
aa@andrewsthornton.com

J. Kyle Bachus
Bachus & Schanker, LLC
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Phone: (303) 893-9800
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@atkinsandmarkoff.com

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Phone: 510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, Florida 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

Andrew Lemmon
Lemmon Law Firm, LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

Genevieve Zimmerman
Meshbesher & Spence Ltd.
1616 Park Avenue South
Minneapolis, MN 55404
Phone: (612) 339-9121
Fax: (612) 339-9188
gzimmerman@meshbesher.com

**CERTIFICATE OF SERVICE**

    I hereby certify that on June 26, 2019, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

                                               */s/ Dawn M. Barrios*
                                               Dawn M. Barrios