# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION | MDL NO. 2740 |
| | SECTION "H" (5) |

THIS DOCUMENT RELATES TO
ALL CASES

## PLAINTIFFS' OPPOSITION TO SANOFI'S MOTION TO EXCLUDE EXPERT TESTIMONY ON SPECIFIC CAUSATION

The work of pathologist Curtis Thompson, MD, and dermatologist, Antonella Tosti, MD, tracks all relevant standards for medical diagnostic work and thus may be presented to a jury. Both are respected experts experienced in the diagnosis and treatment of permanent chemotherapy-induced alopecia (PCIA) through clinical work pre-dating this case. There is no basis to exclude their specific causation testimony, and thus Sanofi's motion should be denied. (Rec. Doc. 6162.)

## BACKGROUND

Plaintiffs' primary specific-causation expert, Dr. Antonella Tosti, is a world-renowned, hair-specializing clinical dermatologists who has studied PCIA for years. (*See* Ex. A, Tosti Rep. at 1, Nov. 7, 2018; Ex. B, Tosti Dep. Vol. I 21:4-9, Dec. 4, 2018.) She sees and treats many women suffering from PCIA and has made important contributions to the medical literature on the condition. (Ex. B, Tosti Dep. Vol. I 33:2-34:2; Ex. C Tosti CV.) Dr. Tosti examined the Plaintiffs herself and synthesized the component work of Plaintiffs' other specific-causation experts. (*See id.* at 12-13.) Dr. Tosti thus can opine that Taxotere (docetaxel) caused the Plaintiffs' irreversible alopecia. (*Id.* at 28; *see, e.g.*, Ex. B, Tosti Dep. Vol. I 21:14-19.)

Because Dr. Tosti often relies on pathology in diagnosing alopecia, she recommended a respected colleague in dermatopathology, Dr. Thompson, to analyze the pathology for each Plaintiff at his lab in Oregon. (Ex. D, Thompson Dep. Vol. I 10:14-23, Nov. 30, 2018.) The Plaintiffs, who all reside in New Orleans, then visited local dermatologist Dr. Cole Claiborne, who performed scalp biopsies for Dr. Thompson's pathology analysis. (Ex. E, Claiborne Dep. 12:16-

13:7, 18:12-13, Nov. 2, 2018.) Plaintiffs' counsel asked Dr. Claiborne to take a 4mm round sample from the most and least affected areas of each Plaintiff's scalp. (*Id.* at 12:24–13:3,13:17–24, 39:17–40:2.) Dr. Claiborne (not counsel) determined where to biopsy; he performed and documented the process. (*See id.* at 13:17-24.) Tissue samples and photos were sent to Dr. Thompson, who made slides for analysis. (*See* Ex. F, C. Thompson Rep. at 1, 3, 5-6.) He performed a differential diagnosis from that pathology, ruling out all other conditions but PCIA. (*Id.* at 1-9.)

The trial plaintiffs then visited Dr. Tosti for a personal examination. Dr. Tosti took their clinical histories and examined their scalps both with a "pull test"—a standardized procedure for diagnosing various kinds of alopecia—and with a dermatoscope (or "dermoscope" or "trichoscope"), which magnifies a patient's scalp 10-20x. (Ex. A, Tosti Rep. 12-16.) Dr. Tosti also reviewed Dr. Thompson's pathology findings. (*Id.* at 13.) Her report includes nearly 16 pages of Plaintiff-specific differential diagnoses. (*Id.* at 12 - 28.) Like Dr. Thompson, Dr. Tosti concluded that Plaintiffs have PCIA caused by docetaxel. (*Id.* at 28.)

## ARGUMENT

## I.   Doctors Agree on the Existence and Diagnostic Features of PCIA

Sanofi's Rule 702 motion contends there is "no medically accepted definition of 'permanent' alopecia" (Doc. 6162 at 11–12) or "consensus on what constitutes permanent alopecia." (*Id.* at 12). Sanofi's counsel even suggested (at depositions) that the medical community does not recognize PCIA as a condition, and PCIA has no distinguishing diagnostic signature.

To the contrary, there is global agreement in the dermatological community that PCIA is a recognized condition, with "clear" clinical features, and a "unique" identifying pathology. As Plaintiffs' experts testified, there is "absolutely" "reliable scientific evidence" of PCIA. (Ex. G, Dep. C. Thompson, Vol. II 373:12-19.) "[A]mong the experts and even just board-certified dermatologists," Dr. Thompson confirmed, "100 percent would say they think that — they think or know that [PCIA] occurs." (Ex. D, Thompson Dep. Vol. I 179:9–17.) Dr. Tosti agreed: "[T]he medical community, they all agree this is a disease." (Ex. B, Tosti Dep. Vol. I 38:16–17.) "[T]he disease is established." (*Id.* at 38:21–25; *accord id.* at 168:15–16 ("[A]ll the dermatologists

2

involved in the hair . . . know this [condition]."); *id.* at 168:10–18.) There is "debate" over PCIA's "precise anatomical" mechanism, which remains "unknown," "but not of [PCIA's] existence." (*Id.* at 29:4–17, 38:12–16; *accord id.* at 294:12–295:17, 296:8–297:4.) That debate, however, call into question "the existence of the disease," or its "clinical features." (*See id.* at 296:24–297:4.)

There is also global consensus about those clinical features. The "clinical presentation [of PCIA] is very clear," Dr. Tosti explained, "and . . . all people involved in hair disorders agree on that . . . . [I]t's a very, very clear condition." (*Id.* at 38:1–5; *see id.* at 272:17–25.) PCIA has "characteristic" features: a "big reduction in the number of the hair follicles" and "the severe reduction in the number of the terminal hair." (*Id.* at 273:17–19, 293:15–18.)

PCIA also has a unique pathological thumbprint—another point on which scientists agree. (*Id.* at 282:15–21.) The disease involves "less follicles without fibrosis," and that is "unique." (*Id.* at 282:21–24.) "[P]athologists know" this. (*Id.*) Dr. Thompson confirmed that PCIA has a "specific histopathological pattern." (Ex. G, Thompson Dep. Vol. II 373:13–374:5.) He has seen nothing in the medical literature arguing that PCIA lacks unique characteristics. (*Id.* at 357:14–358:5.)[1] Dr. Thompson explained that there is only "[v]ery minor disagreement" in the literature over PCIA's histopathology. That disagreement involves "some of the [disease's] more subtle features." (Ex. D, Thompson Dep. Vol. I 181:23–182:2.) Both "major and minor histologic features" of PCIA, however, "are accepted by the experts." (*Id.* at 181:23–25.)[2]

## II.   Dr. Claiborne's Punch Biopsies Are Reliable

According to Sanofi, because Dr. Claiborne's work was limited to the taking of biopsies rather than a full course of medical treatment and examination, that work is unreliable and litigation-driven. (Doc. 6162 at 16–17.) These criticisms do not withstand scrutiny. In fact, Sanofi's experts agree that the biopsies were sound and sufficiently allowed them to assess Plaintiffs' conditions.

---

[1] Sanofi brought to Dr. Tosti's attention that in a non-final, draft version of a book chapter she is preparing, there is a mention that the "histopathological features" of PCIA are "not specific." Dr. Tosti immediately recognized the drafting error and said she would "correct . . . the proofs." (Ex. B, Tosti Dep. Vol. I 281:3–282:6.)

[2] *Pathology*, *histology*, and *histopathology* are used interchangeably to refer to the microscopic examination of the plaintiffs' scalp tissue for evidence of disease.

*See* Section III.B.

## III.    Dr. Claiborne Is Not a Treating Physician or Causation Expert

Sanofi misrepresents Dr. Claiborne's limited role in this case, proceeding as though Dr. Claiborne were the Plaintiffs' treating physician or causation expert. His only role was to take the Plaintiffs' biopsies. As Dr. Claiborne explained: He was "not the treating physician" but rather a "proceduralist in this instance," retained for the limited purpose of taking biopsies for the other experts' review. (Ex. E, C. Claiborne Dep. 20:12–16.) Nor was he asked to provide any opinion about the Plaintiffs' conditions. (*Id.* at 51:8–20.) Plaintiffs did not go to him for "treatment," and he was clearly not retained for this purpose.

It is accepted practice, especially where any complex causation mechanism is involved, that experts can and will rely on other experts. Here, obtaining the biopsies fell to Dr. Claiborne as the local physician; pathology fell to the expertise of Dr. Thompson; and the overall synthesizing analysis went to Dr. Tosti, who has spent years studying all forms of alopecia, including PCIA. Nothing about this division of labor is problematic or controversial.

### A.  Contrary to Sanofi's Suggestion, Plaintiffs' Experts Performed All Necessary Work.

Another fatal flaw in Sanofi's criticism is that the work that Sanofi contends Dr. Claiborne should have done *was in fact done*. Dr. Tosti took the Plaintiffs' clinical histories, physically examined them, and considered Dr. Thompson's pathology reports. On these bases, she considered the possible causes of their hair loss and reached appropriate differential diagnoses. Further, Dr. Claiborne did not say that his work here was "woefully incomplete," as Sanofi claims. (*See* Doc. 6162 at 16.) What Dr. Claiborne said was that cutting a biopsy would be "woefully incomplete" if that were all *he* did to diagnose and treat a new patient complaining of hair loss. (*See* Ex. E, C. Claiborne Dep. 21:19–22:2.) But he was not a treater here, and Plaintiffs' experts did much more than just cut biopsies. Dr. Thompson addressed these arguments at his deposition:

> Q.  [T]here was no physical examination. There was no clinical history. There was no examination to determine the forms of alopecia that were occurring. And Dr. Claiborne testified that that would not be consistent with his normal day-to-day

4

practice. Okay? Would you agree that the process that was used here would not be consistent with normal day-to-day dermatological practices?

A. [W]ell, this is a legal case, right? So it's not — as I said already, ***this wasn't a patient coming to a dermatologist for an evaluation***. This was part of another process. I mean I did read ***Dr. Tosti's examination, which is by a hair expert with an assessment of what they had. And I think that's very in line.***

(Ex. D, Thompson Dep. Vol. I 134:8–25.)

Sanofi never explains how the tissue samples are made unreliable by the sharing of work among medical professionals, and there is no basis in the record to so conclude. In fact, the record suggests the opposite: All the experts agree that Dr. Claiborne's biopsies were analytically sufficient. *See* Section III.B.

### B.  Dr. Claiborne —Not Plaintiffs' Counsel—Chose the Biopsy Sites.

Sanofi also argues that the pathology results were purposely skewed or are otherwise unreliable because (according to Sanofi) Plaintiffs' counsel strategically selected the portions of each Plaintiff's scalp to sample. (Doc. 6162 at 10.) This is false. Dr. Claiborne chose the location of each biopsy based on the part of the scalp he considered "[m]ost representative of an abnormal process" and the part he considered most normal. (Ex. E, C. Claiborne Dep. 48:6–13.) Dr. Claiborne expressly denied that Plaintiffs' counsel guided him in determining where on the scalp these biopsies should be taken:

Q. And it was Mr. Lambert [Plaintiffs' counsel] who suggested where the punch biopsies are taken on the scalp?

A. No. When we were choosing a site, and ***I did ultimately call the shots for where the sites were chosen***, we had to find an area that had — was the most devoid of hair and find an area that looked to be the most normal. ***And those were the sites I chose.***

\*   \*   \*

Q. When Mr. Palmer [Plaintiffs' counsel] was in the room, did he point to the portion of the scalp where he actually wanted the punch biopsy taken from?

A. I don't recall that. I ultimately call the shots.

Q. Did he guide you in any way on determining where on the scalp he wanted the punch biopsy taken?

5

A.  I do not believe so.

(*Id.* at 13:17–24, 49:3–11 (emphasis added).)

Sanofi is otherwise wrong to suggest that Dr. Claiborne's work was incomplete. As Dr. Tosti testified, "Even if he . . . didn't do a clinical examination, if you are a dermatologist, you see the scalp . . . ." (Ex. B, Tosti Dep. Vol. I 161:25–162:2.) "[H]e didn't take a biopsy . . . with blinded . . . eyes. You — you saw the scalp. And most dermatologists, the clinical examination, they just look at the scalp." (*Id.* at 162:2-8.)

## IV.   The Biopsies Are Reliable Evidence of the Processes Occurring on Plaintiffs' Scalps.

Nothing about the way in which Dr. Claiborne chose the biopsy sites or performed the biopsies suggests that the tissue samples are in any way unreliable.

### A.  Two Biopsies is Sufficient for a Reliable Diagnoses

The proper biopsy procedure to confirm a diagnosis of PCIA does not require multiple samples from throughout the scalp, as Sanofi suggests. (*See* Doc. 6162 at 17.) Sanofi's argument is misinformed and contraindicated by modern medical standards. As Dr. Thompson explained, "especially" in "mostly diffuse" processes like PCIA, "it doesn't really matter where they biopsy." (Ex. D, Thompson Dep. Vol. I 76:14–18, 84:7–16, 177:9–16.) His only instruction to the person taking the biopsy would be not to sample the hairline (*id.* at 83:24–84:5), where terminal scalp hairs morph into the tiny vellus hairs of the skin (*id.* at 76:18–21). And while each Plaintiff gave two biopsies, Dr. Thompson testified that, because diffuse processes generally involve the whole scalp, only one biopsy is needed. (*See id.* at 82:9–83:11.) He further explained that while "different hair loss experts . . . [and] pathologists . . . practice differently," over the last 20 years the testing standard no longer suggests taking two biopsies "because of different and better sectioning techniques and to reduce patients' suffering." (*Id.* at 82:25 – 83:11.) "[T]here have been great attempts to try to reduce the biopsies back to one," he testified, because "these women suffer greatly emotionally . . . [and] psychosocially from their hair loss" and "adding scars to their already bald head isn't a good thing." (*Id.* at 83:1–11.) Dr. Thompson has never seen an alopecia patient

6

with more than two biopsies. (*Id.* at 119:13–17.) He added that on the "very rare[]" chance that pathology findings do not match clinical observations, "you can [then] go back and sample more." (*Id.* at 121:10-22.)

This approach is consistent with, if not more rigorous than, the process of Sanofi's dermatology expert, Dr. Jerry Shapiro, who suggested "one 4-mm punch biopsy including subcutaneous tissue should be taken from a clinically active area, processed for horizontal sections and stained with hematoxylin and eosin [H&E] . . . . Usually ***only one biopsy from the affected area is necessary*** for the diagnosis of a nonscarring alopecia." Otberg & Shapiro, "Diagnostic Techniques for Evaluating Hair Growth Disorders," *in Fitzpatrick's Dermatology in General Medicine* (8th ed. 2012)) (emphasis added). Nevertheless, Sanofi insists that pathology of only a sample area is not reliable because hypothetically there could be additional process *outside* the biopsy site. (Doc. 6162 at 10.) That argument is pure speculation. Here, the biopsies were taken from the *most affected region* of each Plaintiff's scalp. If any other condition were responsible for Plaintiffs' inability to regrow hair in a way that is most obvious and psychologically damaging, that condition would necessarily appear within the sampled area, which represents the "worst" of the alopecic condition. Yet in each sampled area, both Dr. Thompson and Dr. Tosti found only signs consistent with PCIA. Second, Dr. Tosti's examination included dermoscopy that allowed her to examine the *entire scalp* to find any additional process outside the biopsied sites. Dr. Tosti testified:

> [T]hat's why I love dermoscopy, because that's a big difference. If I use my dermoscopy, I check the whole scalp. So I can tell for sure this is not scarring on the whole scalp. . . .
> . . . .
> If a scalp has different form of alopecia and you take a biopsy on a form of alopecia, the biopsy tells you that form of alopecia.
>
> But with trichoscopy — that's why you have to associate things. With trichoscopy, you can check and see if there are other forms of alopecia and — because you cannot take ten biopsies. People hate to have their scalp biopsied.

(Ex. B, Tosti Dep. Vol. I 128:9–12, 128:20–129:2.)

7

Sanofi's expert Dr. Shapiro's agreed that dermoscopy can rule out scarring alopecia[3]:

Q. [I]t's my understanding that in your current practice, you generally can make a diagnosis of scarring alopecia without biopsy because of the technology available with the tri -- trichoscopy?

A. Correct.

Q. Is that right?

A. Yes. I use trichoscopy to determine whether the holes, whether the ostia are present or not. But sometimes even with trichoscopy you can't tell. Usually you can. But if you can't, then you may need to do a biopsy. But I can usually tell whether something's scarring or not scarring using trichoscopy which magnifies the scalp.

(Ex. H, Shapiro Dep. 46:10-47:8, May 19, 2019.)

### B. Experts Agree That the Biopsies Were Reliable

No expert has suggested that the biopsied tissue was lacking in any way that would yield an unreliable conclusion. To the contrary: both Plaintiffs' and Defendants' dermatological and dermatopathological experts agree that the tissue samples were sufficient for their analyses. Dr. Tosti testified that she was able to use the biopsies taken by Dr. Claiborne to effectively reach her dermatological conclusions. (Ex. I, Tosti Dep. Vol. II 471:15–472:3.) Sanofi's expert dermatologist, Dr. Love, agreed that Dr. Claiborne properly performed the biopsies, and that these were medically appropriate. (*See* Ex. J, Love Dep. Vol. II 320:7–20, 330:2–23, 328:17–329:3, Feb. 23, 2019.)

Likewise, Dr. Chandra Smart, Defendants' dermatopathologist who examined the tissues, acknowledged that the pathology material she was given to analyze from Dr. Claiborne's biopsies was sufficient. In fact, she testified that the original slides were "all [she] needed to do [the] review and make a diagnosis." (Ex. L, Smart Dep. Vol. I 13:20–24, Feb. 5, 2019.). After reviewing Ms. Francis's biopsy slides, Dr. Smart did not rule out the possibility of centrifugal cicatricial alopecia (CCCA), a scarring alopecia, as a diagnosis. (*See* Ex. M, Smart Rep. at Ex. C (p. 6), Jan. 11,

---

[3] PCIA is characterized as a non-scarring alopecia. *See* Mariya Miteva, MD *et al,*, *Permanent Alopecia After Systemic Chemotherapy: A Clinicopathological Study of 10 Cases*, 33(4) AM. J. DERMATOPATHOL. 345 (2011).

2019.).[4] She has said that an additional biopsy of the crown might have been useful to confirm or rule out that condition. However, Dr. Smart never requested additional tissue and agrees with Dr. Tosti that dermatologists—and not pathologists— make the decision of the location(s) to biopsy. Dr. Tosti, who fully evaluated Ms. Francis, determined that a biopsy of the crown was unnecessary because her trichoscopy examination effectively ruled out CCCA.[5] Dr. Smart, who is not a dermatologist and has never examined Ms. Francis's scalp, is not qualified to offer her conjecture that alternative processes might have appeared if one were to biopsy additional spots. In any event, Dr. Love never examined Ms. Francis and never requested an additional biopsy. (Ex. J, Love Dep. Vol. II 264:18 – 266:5, 268:21-25.) And speculation aside, Dr. Love is on the record that the biopsies Sanofi now challenges were taken were from "appropriate places." (*Id.* at 325:20-22.)

## V.    Dr. Thompson's Pathology Work Is Reliable and Will Assist the Trier of Fact

Sanofi next criticizes Dr. Thompson's dermatopathological methodology by highlighting additional sources of information beyond the samples that he did not have at the time of his analysis. Sanofi, however, does not explain why that information would be important or useful to someone in his field, whose job is to get "an objective read" on tissue samples. (Ex. D, Thompson Dep. Vol. I 47:5–18.).

Dr. Thompson, who has significant experience identifying PCIA in biopsies (Ex. G, Thompson Dep. Vol. II 370:5–12) testified that "the information needed to make the diagnosis" in this case "was all there." (Ex. D, Thompson Dep. Vol. I 48:9–10.) He "was provided with information of the patient's age, the sex, the site. . . . And the history of chemotherapy and then the photos provided that showed alopecia that was more diffuse." (*Id.* at 130:18–22.) Importantly, Dr. Thompson was given photos showing the "clinically relevant, alopecic areas" on the scalp from which each biopsy was taken. (*Id.* at 130:6–8.) He further explained that a patient's full clinical history is neither necessary nor desirable for a pathologist to have:

---

[4] It is noteworthy that Dr. Smart includes PCIA on her differential diagnosis for Ms. Francis and Ms. Earnest. (*See id.* at 4, 6.)

[5] Again, Dr. Shapiro agreed that he "can usually tell whether something's scarring or not scarring using trichoscopy, which magnifies the scalp." (Ex. H, Shapiro Dep. Vol. I 46:10-47:8.)

[I]n pathology . . . first of all, if we reviewed all the patients' records, we would read about three biopsies a day, and the medical system would come to a grinding halt. So we [pathologists] really ***focus on getting the information that's important for each diagnosis and not beyond that***. . . . [T]he second part of pathology is ***you want an objective read. So you can be swayed in your diagnosis by too much information***. ... [T]he information necessary for these reads is — is what I asked for, which is the patient's gender, their age, the site of the biopsy.

(Ex. D, Thompson Dep. Vol. I 47:9–21 (emphasis added).)

Sanofi contends that the pathology slides of Ms. Francis and Ms. Earnest have features that are found in other types of alopecia caused by hormonal changes during treatment with tamoxifen and aromatase inhibitors. (Doc. 6162 at 20.) This contention by no means discredits Dr. Thompson's opinions. As discussed, Dr. Smart agrees with Dr. Thompson that the pathology is consistent with PCIA. In any event, Sanofi neglects to mention either that Dr. Thompson testified that he does not agree that "histopathological findings for PCIA are indistinguishable" from this form of androgenetic alopecia (Ex. G, Thompson Dep. Vol. II 364:18-25), or that, in a differential diagnosis, Dr. Thompson would not expect to find the follicular loss present in these patients in alopecia that is caused by tamoxifen or aromatase inhibitors (*Id.* at 252:19 – 253:10.)

For her part, Dr. Tosti utilized Dr. Thompson's expertise in this case in a way fully consistent with her normal practice outside the courtroom. When requesting a pathology analysis, Dr. Tosti sends the pathologist limited information—only what the latter needs. She thus generally gives only a presumptive diagnosis that "a good pathologist" can confirm or reject and "come back to you if he thinks it's something different." (Ex. B, Tosti Dep. Vol. I 135:20–23.) Dr. Thompson's work, then, was normal under clinical standards, scientifically and medically proper, and reliable.

## VI.   Dr. Thompson's Opinions Will Help the Factfinder Determine Whether Taxotere Caused Plaintiffs' Permanent Alopecia

Dr. Thompson was not retained to opine on whether Taxotere caused the Plaintiffs' alopecia, but rather to help inform Dr. Tosti in that diagnostic process. Dr. Tosti is uniquely qualified to opine on what precisely caused Plaintiffs' alopecia because she is one of the world's leading hair researchers and experts. She has extensively researched PCIA, written peer-reviewed articles on PCIA from Taxotere chemotherapy, and seen patients in her clinical practice who have

experienced permanent hair loss after undergoing chemotherapy with Taxotere. (*See* Ex. C, Tosti CV.) Both Dr. Tosti and Dr. Thompson have diagnosed PCIA in their clinical practices, outside of litigation. (*See* Ex. B, Tosti Dep. Vol. I 33:2 – 34:2; *see* Ex. G,Thompson Dep. Vol. II 370:5–12.) By contrast, Dr. Smart had never reviewed pathology slides pertaining to PCIA prior to her retention by Sanofi for litigation. (*See* Ex. L, Smart Dep. Vol. I 30:5-17.)

Here, Dr. Thompson's examination and analysis of the tissues helped Dr. Tosti confirm a suspected diagnosis of PCIA and to rule out other causes of the hair loss. (Ex. A, Tosti Rep. 23, 25, 28.) His involvement in this matter is consistent with the role pathologists typically play in the clinical context. Accordingly, Dr. Thompson need not opine that Taxotere caused the Plaintiffs' alopecia for his testimony to be helpful. Testimony about the pathology methods he used to rule in (or out) certain disease processes will help the jury understand Dr. Tosti's specific-causation opinions and is therefore admissible under Rule 702.

## VII.   Dr. Tosti's Opinions Are Reliable

### A.  Dr. Tosti Did Not Analyze Backward from Dr. Thompson's Conclusions

Sanofi contends that Dr. Tosti merely accepted Dr. Thompson's conclusions, and built a retrospective analysis to support them. (Doc. 6162 at 22.) This is incorrect. There is nothing about Dr. Tosti's report—including page 13 that Sanofi cites—that supports the idea that she "ruled in only *one* . . . cause of Plaintiffs' alopecia," or otherwise "used her physical examination solely to confirm" a preexisting conclusion, as Sanofi claims. (Doc. 6162 at 22); *see* (Ex. A, Tosti Rep. 13). Dr. Tosti explained instead that "the biopsies confirmed my clinical evaluation." (Ex. I, Tosti Dep. Vol. II 471:19–20.)

Dr. Tosti did not take Dr. Thompson's conclusions as "starting points" for her own opinions. Rather, as explained in her report and depositions, Dr. Tosti worked from the ground floor in her evaluations, in which she:

1. Reviewed each Plaintiff's medical records and photographs (Ex. I, Tosti Dep. Vol. II 337:11 – 338:20);

2. Read the entire deposition for each Plaintiff's treating doctors and nurses (Ex. _B, Tosti

Dep. Vol. I 73:22–23);

3. Obtained a "good clinical history" by interviewing each Plaintiffs (*id.* at 73:23-24), which asked about topics like family history and personal hair-care practices (Ex. I, Tosti Dep. Vol. II 327:11–19, 334:5–335:15);

4. Performed an exam that inspected each Plaintiff's scalp's hair density and hair-loss distribution, as well as hair on the face and other body areas (Ex. A, Tosti Rep. 13-14);

5. Assessed hair shedding with a "pull test," a standardized procedure for diagnosing various causes of alopecia (*id.* at 15);

6. Performed scalp dermoscopy to examine the entire scalp at a 10x or 20x magnification to assess hair density, thickness, and breakage; follicular openings; scarring, and other features important for diagnosis (*id.* at 15-16); and

7. Reviewed biopsy-site photographs and pathology results (Ex. I, Tosti Dep. Vol. II 352:13-15, 368:3-9, 453:14-16).

Sanofi nonetheless accuses Dr. Tosti of not following her "own standard procedure." (Doc. 6162 at 22.) Quite the opposite, her work here is *more* rigorous and *more reliable* than her "standard procedure." (Ex. B, Tosti Dep. Vol. I 85:23–25, 104:18–24) Last, the fact that Dr. Thompson read Plaintiffs' pathology *before* Dr. Tosti undertook her own full physical assessment does not legitimately bear on the validity of her methodology. Nothing indicates that she *analyzed* backward from his conclusions, that she "ruled in only" what he had pointed toward, or that her work was "to confirm" his assessments. Sanofi's argument to the contrary is thus meritless.

### B. Dr. Tosti Reliably Identified Docetaxel as the Cause of the Plaintiffs' Hair Loss and Reliably Ruled Out Other Drugs

Dr. Tosti specifically named docetaxel as the cause of the Plaintiffs' PCIA. She did so on the basis of the weight of the medical literature, her own research, and her clinical experience. From the outset of her deposition, Dr. Tosti laid out this opinion with clarity:

Q. Based upon your research, there's multiple chemotherapy drugs that have been reported to cause persistent chemotherapy-induced alopecia, right?

A. No, absolutely, not. There is basically one chemotherapy drug that has been reported by many authors to cause chemotherapy-persistent alopecia, and that's the drug I've been — I have been seen causing this problem in my personal experience, and that is docetaxel.

(Ex. B, Tosti Dep. Vol. I 21:10–19.). Discussing a PCIA diagnosis, Dr. Tosti testified:

> I believe that docetaxel caused the permanent alopecia because this is — has been consistently reported in the literature, and so I believe I have seen cases of the same problem in patients of myself. And I published on this topic years ago, and it's a condition that is not uncommon in my experience.

(Ex. I, Tosti Dep. Vol. II 455:12–18.) For both Ms. Francis and Ms. Earnest, Dr. Tosti named docetaxel as the cause of alopecia. (*Id.* at 456:17–22, 457:21–25.) Dr. Tosti considered no fewer than 17 published studies, (Ex. A, Tosti Report at Exhibit E) including her own, regarding PCIA in the treatment of breast cancer.[6] In the aggregate, these studies show hundreds of cases of PCIA in chemotherapy treatments that included Taxotere, and inconsistently and rarely from in treatments that excluded Taxotere. To provide some context: Taxotere, like other chemotherapy drugs, is almost always administered in combination with others, together called a regimen. There are well-recognized effective regimens for early stage breast cancer with and without Taxotere, as set forth in the National Comprehensive Cancer Network's (NCCN) widely used, evidence-based guidelines. (*See* Ex. N, NCCN Guidelines Version 3.2012, "Adjuvant Chemotherapy," at BINV-K.) NCCN regimens with Taxotere typically include the chemotherapy drug cyclophosphamide (Cytoxin) and, in some regimens, doxorubicin (Adriamycin, which is classified as an anthracycline). (*Id.*) These regimens are often described by initials: cyclophosphamide ("C") and/or Adriamycin ("A") with Taxotere ("T").

All three of these drugs commonly cause temporary hair loss, and after chemotherapy is finished, patient hair regrowth is typically well underway within 6 months. However, Taxotere regimens have been consistently shown to cause the hair lost during chemotherapy not to regrow.[7] Evidence of this is seen in the studies considered by Dr. Tosti that compared Taxotere-based

---

[6] Sanofi incorrectly asserts that Dr. Tosti only considered three studies: Nabholtz (2001), Tallon (2010), and Tosti (2013); and ignores the comprehensive listing of medical literature on her reliance list. (Doc. 6162 at 30.)

[7] Sanofi's internal medical analysis acknowledges that Taxotere regimens are causally associated with the permanent loss of patients' hair: [T]he cumulative weighted evidence is sufficient to support a *causal association* between docetaxel and permanent/irreversible alopecia in the patients who received docetaxel. (Ex. O, "Clinical Overview: Docetaxel and Permanent Alopecia," Sanofi_00829563 (emphasis added.)

regimens to non-Taxotere regimens.[8]

Sanofi also contends that Dr. Tosti's methodology is flawed because she did not "rule out" the potential causative role of the other chemotherapy drugs in Plaintiffs' regimens, Adriamycin and cyclophosphamide. For this alternative causation to be valid, Sanofi would have to demonstrate that Dr. Tosti overlooked reliable evidence that cyclophosphamide and/or Adriamycin are causally associated with PCIA when administered without Taxotere. But as Dr. Tosti has testified, there is no reliable evidence that either drug causes PCIA when administered without docetaxel in the treatment of early-stage breast cancer. When used together or combined with other non-Taxotere chemotherapy agents, doxorubicin and cyclophosphamide have only sporadically, at best, been associated with PCIA.[9] (Ex. I, Tosti Dep. Vol. II 487:13-20.) Dr. Tosti explained: "[T]he literature on these drugs" is "very scant." (*Id.* at 487:13–20.) Only a "few cases" have shown even a simple link between these drugs and PCIA. (*Id.* at 489:16–17.)

A simple look back at the studies considered by Dr. Tosti shows that in the few instances alopecia appeared with the non-Taxotere regimens, these cases were eclipsed by the markedly disproportionate incidence of alopecia with Taxotere regimens. For instance, Kang et al. (2018), *supra*, was a prospective cohort study designed for the very purpose of investigating whether anthracycline and cyclophosphamide-based regimens, with and without Taxotere, cause PCIA.[10] The patient groups received one of three regimens: 1) AC (doxorubicin plus cyclophosphamide),

---

[8] *See, e.g.,* Bourgeois et al. (2010), which found 104 cases of PCIA after Taxotere regimens compared with 4 in AC regimens without Taxotere; Kang et al., *supra*, which found 23 cases of PCIA after Taxotere regimens compared with 3 in AC regimens without Taxotere; Martín et al., which found 36/358 (10.06%) cases of severe PCIA after Taxotere regimens compared with no cases of severe alopecia (0%) in AC regimens without Taxotere; Masidonski & Mahon, which found 11 cases of PCIA after Taxotere regimens compared with 2 in AC regimens without Taxotere; Sedlacek, which found 7/116 (6.3%) cases of PCIA after Taxotere regimens compared to 0/258 (0%) in AC regimens without Taxotere.

[9] Masidonski & Mahon, *supra*; Bourgeois et al. (2010)*;* Mi Young Jung, MD & Dong Youn Lee, MD, PhD, *A Clinical Study of Chemotherapy-Induced Permanent Alopecia*, 51(12) Korean J. Dermatol. 933-38 (2013); Yagata et al.,*;* Gun Min Kim et al., *Chemotherapy-Induced Irreversible Alopecia in Early Breast Cancer Patients*, 163 Breast Cancer Res. Treat. 527–33 (2017); Crown et al., *supra;* Kang et al., *supra*.

[10] Additionally, the investigators ruled out a number of potential risk factors: "Patients with alopecia, atopic dermatitis, psoriasis, or infectious skin diseases, as well as patients who were taking steroids, antihistamines, antidepressants, or anticonvulsants were excluded from the study." *Id.*

2) FAC (fluorouracil plus cyclophosphamide and doxorubicin), or 3) AC-T (cyclophosphamide and doxorubicin followed by Taxotere). *Id.* at 2. The first two regimens included the drugs Sanofi contends that Dr. Tosti failed to consider in her analysis. The study results demonstrated that the Taxotere patients showed "[a]bout eight times higher odds of PCIA 3 years after completion of chemotherapy (8.01; 95% CI, 1.20 – 53.26) adjusting for age, hair density, and thickness at diagnosis." *Id.* at 3. This and other studies considered by Dr. Tosti in her years of clinical practice consistently show PCIA from Taxotere regimens and inconsistently and rarely from Adriamycin (doxorubicin) and/or cyclophosphamide without Taxotere. It is therefore unsurprising that Sanofi's own experts cannot point to any articles that "establish substantial evidence of a causal relationship" between PCIA and Adriamycin (doxorubicin) or cyclophosphamide—indeed, no such evidence exists. (*See* Ex. K, Love Dep. Vol. I 176:4-7.)

The only cases arguably supporting Sanofi's position are found in one article *read and considered by Dr. Tosti*: Kim et al., *supra*. This study did find 29 patients that developed PCIA after taking Adriamycin and cyclophosphamide. However, this study is truly an outlier. The percentage of patients reporting permanent alopecia was extraordinarily high: 46% (122 of 265 questionnaire respondents). Kim et al., *supra*, at 530. The group that received Taxotere with Adriamycin (doxorubicin) and cyclophosphamide had a 60.8% rate of PCIA (93 of 153 patients), with 10.5% reporting grade 2 (severe) alopecia. By contrast, the patients not receiving Taxotere had less than half the incidence, 25.9% (29 of 112 patients), with only 2.7% reporting grade 2 alopecia. Thus, the only study possibly supporting Sanofi's alternate causation theory nonetheless shows a staggering increase in PCIA with Taxotere—over double the risk than without it. Again, these 29 cases account for nearly all reported cases of PCIA without Taxotere. Sporadic reports of PCIA with non-Taxotere regimens do not establish causation, especially where, as Sanofi readily argues, it is possible for patients to manifest alopecia after chemotherapy that is not caused by chemotherapy. As Dr. Tosti has pointed out: "Case reports [are] different from evidence." (Ex. I,

Tosti Dep. Vol. II 487:22–488:1.)[11]

Overall, what Sanofi offers is not sound medical or Rule 702 analysis — but mere disagreement with Dr. Tosti's conclusion. "The focus" of the Rule 702 inquiry, however, "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993). Based on her clinical experience evaluating patients with PCIA from Taxotere regimens, her own research into the subject, and her analysis of the literature, Dr. Tosti reliably ruled out other drugs – including Adriamycin and cyclophosphamide – as likely causes of the Plaintiffs' permanent hair loss. Indeed, it is Sanofi—not Dr. Tosti—who ignores medical literature.[12]

### C. Dr. Tosti's Analyses Are Not Unreliable Because Other Treating Generalists Reached   Different Diagnoses.

Sanofi argues that Dr. Tosti's opinions are unreliable because (according to Sanofi) she "ignored," or in any event reached conclusions different from, the diagnoses of other healthcare providers — including a nurse practitioner — who treated Ms. Francis. (Doc. 6162 at 23–25.) For example, Sanofi argues that Dr. Tosti failed to account for the fact that "other physicians" diagnosed Ms. Francis with CCCA and traction alopecia, "both common forms of scarring alopecia." (*Id.* at 23.) This is inaccurate. First, as Dr. Tosti explained, it is possible to clinically confuse scarring and non-scarring alopecias. (Ex. B, Tosti Dep. Vol. I 85:6–10.) Much depends on the experience and quality of the dermatologist (*id.* at 198:14–199:2; *see also id.* at 306:5–307:5),

---

[11] Of the six articles that Sanofi introduced as exhibits to Dr. Tosti's deposition, three (Kang, Jung, and Berglund) contained materially incorrect or insufficient information to be useful in a causation analysis, as discussed by Dr. Feigal. (Ex. P, Feigal Dep. Vol. III, 575:14 – 576:11) (discussing Kang); *id.* at 607:21-25 (discussing Crown); see also (Ex. B, Tosti Dep. Vol. I 289:22 – 290:8, 291:11-15). Lastly, one article that Sanofi's expert Dr. Love relies upon to associate cyclophosphamide with permanent alopecia (Ex. Q, Love Rep. 14 n. 33, Dec. 10, 2018) in fact, specifically *rules out* cyclophosphamide's role in pCIA. *See* M.E. DeJonge et al., *Relationship Between Irreversible Alopecia and Exposure to Cyclophosphamide, Thiotepa and Carboplatin (CTC) in High-Dose Chemotherapy*, 30 Bone Marrow Transplantation 593–97 (2002).

[12] Dr. Tosti has also explained that Tallon et al. (2010) and Tosti et al. (2013) (Doc. 6162 at 30) pertain to PCIA after high doses of busulfan chemotherapy in the context of bone marrow transplantation and not in the context of breast cancer chemotherapy. (*See* Ex. A, Tosti Rep. 11-12 (PCIA "is a severe long-term side effect of chemotherapy that has been associated with high doses of chemotherapy in the context of bone marrow transplantation and, in recent years, has been identified in the context of adjuvant chemotherapy regimens containing TAxotere/docetaxel for breast cancer."), citing Antonella Tosti, MD et al., *Permanent Alopecia After Busulfan Chemotherapy*, 152 BRIT. J. DERMATOL. 1056 (2005)).

few of whom are hair-loss specialists like Dr. Tosti. Far from ignoring these possible diagnoses, though, Dr. Tosti examined the plaintiffs' scalps with a dermoscope and determined that both women lacked scarring alopecia. (Ex. A, Tosti Rep. 17, 23.) Second, contrary to Sanofi's assertions, in both her report and deposition, Dr. Tosti *agreed* that Ms. Francis had localized traction alopecia above the ears. (*Id.* at 17, 22 ("marginal parietal scalp"); *see* Ex. B, Tosti Dep. Vol. I 334:5–15). Overall, Dr. Tosti did "appropriately examine[] the multiple other potential causes of Plaintiffs' condition" (Doc. 6162 at 23) — she just reached conclusions that Sanofi does not like, which is not a legitimate basis for excluding her work.

### D. Dr. Tosti's testimony is clear: docetaxel can cause PCIA

Dr. Tosti plainly stated her opinion that docetaxel can cause PCIA just minutes into her first deposition. (Ex. B, Tosti Dep. Vol. I 21:10 – 22:10 ("There is basically one chemotherapy drug that has been reported by many authors to cause chemotherapy-persistent alopecia, and [. . .] that is docetaxel.").) Sanofi nevertheless seizes on testimony from the end of that first day, to suggest that Dr. Tosti does not believe she can attribute Plaintiffs' hair loss to any one chemotherapy drug. (*See* Doc. 6162 at 26.) But the full testimony dispels that myth, and in fact Dr. Tosti explained at length that Sanofi had misapprehended her testimony:

> Q. So at the end of the day yesterday, I asked you about whether you could say that when a woman is given a multi-drug chemotherapy regimen, whether you'd ever attribute the hair loss to a specific drug in that regimen. Do you remember that? . . . .
>
> A. I said if you have a woman who has chemotherapy and has hair loss, meaning with chemotherapy, every person has hair loss. So you have acute alopecia from chemotherapy. I cannot tell which drug it is, because all of them can be. But then, *if the hair do[es] not regrow, which is different [from] having hair loss, then it's a different situation*. And I believe that *permanent alopecia*, *which is hair not regrowing, it's not hair loss, is caused by docetaxel*. . . . .
>
> Hair loss is different from alopecia, okay? So I cannot attribute hair loss [to docetaxel], because probably all of them [chemotherapy drugs] cause hair loss. But the *hair not regrowing is something different than hair loss. This is something that's very important to keep separate*. . . . .
>
> [M]y answer is correct, and the question was clear. You said "the hair loss." And I said I cannot say which drug caused the hair loss, because the hair loss is the acute chemotherapy. You lose the hair because of the chemotherapy in the

acute phase.

(Ex. I, Tosti Dep. Vol. II 482:9–485:3; *see* Ex. A, Tosti Rep. 13, 28.) In sum, this case is not about acute hair loss that occurs after chemotherapy; it is about permanent alopecia—which Dr. Tosti attributes solely to docetaxel.

### E.   Dr. Tosti Performed Full Differential Diagnoses Ruling Out Other Forms of Alopecia for Francis and Earnest.

Sanofi's argument that Dr. Tosti failed to rule out other potential causes of the Plaintiffs' alopecia effectively ignores the comprehensive differential diagnoses contained in *16 pages* of her report. That report describes a complete differential diagnosis for each Plaintiff, which considers and rules out other potential causes of the given Plaintiff's alopecia. (Ex. A, Tosti Rep. 22–28.) Dr. Tosti details why other potential causes and types of alopecia—such as traction alopecia, CCCA, telogen effluvium, female-pattern hair loss (androgenetic alopecia), alopecia areata, and anagen effluvium—cannot be reliably diagnosed. (*Id.*)

In summary, Dr. Tosti's inspection of Ms. Francis's scalp revealed reduced hair density across the entire scalp, including in the occipital (rear) section. (Ex. A, Tosti Rep. 13.) The hairs that did regrow after her chemotherapy (nearly 10 years ago) are notably shorter than before, measuring a maximum of 5 cm at front and 9.5 cm at the vertex. (*Id.*) Ms. Francis's hair loss was diffuse, rather than patterned, with associated marginal alopecia. (*Id.* at 14.) She displayed a loss of (but not patchy) eyebrows and eyelashes and near-complete loss of axillary (underarm) hair. (*Id.* at 13-14.) She did not complain of excess shedding and had negative pull tests in the four scalp areas tested. (*Id.*) Her trichoscopy showed a lack of scarring, reduced follicular density, and variability in the hair-shaft diameter. (*Id.* at 16.)

Further, Dr. Tosti found reduced hair density across Ms. Earnest's whole scalp, including in the occipital (rear) section. (*Id.* at 13.) The hairs that did regrow after her chemotherapy are notably very short with  a maximum length of 3 cm in the frontal scalp and 10 cm in the occipital scalp. (*Id.*) Dr. Tosti observed Ms. Earnest's hair loss to be diffuse across the scalp. (*Id.* at 14.) She displayed loss of hair (but not patchy) on the eyebrows and eyelashes, complete alopecia of the

underarms, very sparse pubic hair, and loss of hair in the limbs. (*Id*.) Trichoscopy showed a lack of scarring, reduced follicular density, and variability in the hair-shaft diameter. (*Id*. at 16.)

**Scarring Alopecia / Traction Alopecia / CCCA**. For Ms. Francis, Dr. Tosti noted alopecia occurring at the marginal parietal scalp (above the ears) bilaterally in a pattern "sufficiently apparent" to allow classification as traction alopecia without further examination for confirmation. (*Id.* at 22.) Traction alopecia, which is "very, very easily seen," was not present elsewhere on the scalp. (Ex. I, Tosti Dep. Vol. II 353:4-8.) The diffuseness of her alopecia "without any patch of hair loss in the top of the scalp" was not consistent with CCCA, which "starts in the center or in the anterior part of the scalp and spreads centrifugally . . . ." (Ex. A, Tosti Rep. 22–23.) Dr Tosti's dermoscopy did not show the characteristic features of CCCA ( an increased number of irregularly distributed pinpoint white dots and white patches that correspond to the areas of scarring," and, in 94% of cases of CCCA, "a peripilar white/gray halo" surrounding the remaining hairs) but instead a reduced hair density with no signs of scarring (*Id.* at 23.) Further, Ms. Francis's loss of eyebrows and eyelashes are inconsistent with scarring alopecia. Dr. Thompson's pathology report also ruled out scarring alopecia ("primary cicatricial disease") on account of the minimal inflammation found, and because follicular loss was diffuse across the scalp. (Ex. F, Thompson Rep. 2–3.)

Dr. Tosti's dermoscopy of Ms. Earnest's scalp revealed reduced hair density with very thin hairs but without the lost follicular openings that is characteristic of these alopecias. (*Id.* at 25.) Ms. Earnest's loss of hair on the eyebrows and eyelashes, and her loss of axillary, pubic, and limb hair are inconsistent with and not attributable to scarring alopecia. (*Id.*) These findings were consistent with Dr. Thompson's pathology report, which ruled out scarring alopecia ("primary cicatricial" disease) because the follicular loss was diffuse across the scalp (having been observed consistently in both areas biopsied), and because of the minimal inflammation found in the biopsy. (*See* Ex. F, Thompson Rep. 5.) As Dr. Tosti notes, a diagnosis of scarring alopecia requires a finding of fibrosis in a pathologic examination, which was absent here. (Ex. A, Tosti Rep. 25.) As such, Dr. Tosti reliably excluded scarring alopecia.

**Telogen Effluvium**. Dr. Tosti "ruled in" telogen effluvium after noting that Ms. Francis is

taking some drugs that can be associated with the disease. (Ex. A, Tosti Rep. 23 and Ex. P.) However, Dr. Tosti ultimately ruled out this type of hair loss for several reasons. First, acute telogen effluvium results in a positive pull test, which Ms. Francis did not have. (*Id.*) Nor did Ms. Francis complain of excessive shedding. (*Id.*) More importantly, Ms. Francis's biopsy revealed a reduced number of hair follicles, whereas in telogen effluvium the number of follicles is normal. (*Id.*) Finally, Ms. Francis's dermoscopy did not observe another important feature of telogen effluvium, "numerous short regrowing hair[s] of normal thickness." (*Id.*) For these reasons, Dr. Tosti — like defense experts Dr. Smart and Dr. Love — reliably ruled out telogen effluvium. (Ex. K, Love Dep. Vol. II 256:15-257:8; Ex. L, Smart Dep. 79:19-21; Ex. Q, Love Rep. 20.)

Dr. Tosti "ruled in" telogen effluvium after noting that Ms. Earnest is taking some drugs that can be associated with the disease. (Ex. A, Tosti Rep. 26 and Ex. Q.) Dr. Tosti then ruled out this type of hair loss for several reasons. First, Ms. Earnest had a negative pull test and did not complain of excessive shedding. (*Id.* at 26.) More importantly, Ms. Earnest's pathology revealed a reduced number of thin hair follicles, whereas in telogen effluvium the number of follicles is normal. (*Id.*) Finally, Ms. Earnest's dermoscopy did not observe an important feature of telogen effluvium: "numerous short regrowing hair[s] of normal thickness." (*Id.*) Accordingly, Dr. Tosti reliably ruled out telogen effluvium.[13] Dr. Smart agrees. (Ex. L, Smart Dep. Vol. I 79:19-21.)

**Female Pattern Hair Loss (FPHL) / Androgenetic Alopecia.** Dr. Tosti "ruled in" female-pattern hair loss (FPHL) — which is the expression in females of androgenetic alopecia — partly because Ms. Francis has been on endocrine therapy since 2009. (Ex. A, Tosti Rep. 24.) Many factors observed in Ms. Francis, however, exclude this diagnosis. (Recall that Ms. Francis reports that she developed alopecia during chemotherapy and her hair, eyebrows, and eyelashes have not grown back normally but are very sparse. This is different from AGA where patients report progressive and gradual thinning of the hair over years.) First, FPHL is *patterned* hair loss (at the

---

[13] Dr. Tosti's report explains that the overall presentation of telogen effluvium is typically much different from Ms. Earnest's presentation, as "hair does not typically become noticeably thin" in most cases. Further, Ms. Earnest's biopsy showed a reduced number of hair follicles, "which is not seen in telogen effluvium where the number of follicles is normal." (*Id.* at 26.)

top of scalp), not diffuse hair loss, does not affect eyebrows and eyelashes, and does not cause loss of hair follicles as seen in Ms. Francis. (*Id.*) Second, FPHL "takes place over the course of years" (Ex. A, Tosti Rep. 24), and although Ms. Francis has had endocrine therapy for nearly a decade, her hair loss was sudden. (*Id.*) Fourth, the patchy eyebrows and eyelashes and the loss of underarm hair (all of which Ms. Francis has) "is not a feature of androgenetic alopecia." (*Id.*) Dr. Tosti thus ruled out FPHL in Ms. Francis.

Dr. Tosti considered FPHL partly because Ms. Earnest has been on endocrine therapy since 2011, which can cause an FPHL type of condition. (*Id.* at 27.) Many factors observed in Ms. Earnest, however, exclude this diagnosis. (Recall also that Ms. Earnest reports that she developed alopecia during chemotherapy and that after the end of chemotherapy her hair, eyebrows and eyelashes have not grown  back normally but very sparse.) First, FPHL does not involve the loss of hair follicles (seen in Ms. Earnest). (*Id.*) Second, FPHL does not cause such diffuse hair loss. (*Id.*) Third, the loss of eyebrows and eyelashes, and the loss of pubic, axillary, and body hair are not features of FPHL. (*Id.*) Dr. Shapiro concedes that loss of eyebrows is not caused by FPHL (androgenic). Given these differences, Dr. Tosti reliably ruled out FPHL in Ms. Earnest.

**Alopecia Areata and Anagen Effluvium**. Dr. Tosti fully considers whether Ms. Francis exhibits alopecia areata but rules out the condition after considering the many stark differences between the hallmarks of that condition and Ms. Francis's presentation. "The main diagnostic feature of alopecia areata is the presence of bald patches on the scalp that are completely devoid of hair." (*Id.* at 25.) These patches are round and appear suddenly. (*Id.*) Ms. Francis has no round-shaped bald patches but rather diffuse hair loss. (*Id.*) Alopecia areata can appear diffusely, though rarely; and in that case will result in a positive pull test and dermoscopy that shows broken hairs appearing like "exclamation marks," with a thick, dark tip. (*Id.*) Ms. Francis's pull test was negative, and dermoscopy revealed no broken "exclamation mark" hairs. Accordingly, Dr. Tosti reliably ruled out alopecia areata. With respect to anagen effluvium, this condition does not involve the loss of hair follicles and results in a positive pull test. Given Ms. Francis's loss of hair follicles, negative pull test, and long period since chemotherapy, Dr. Tosti reliably ruled out

anagen effluvium. (*Id.* at 25.)

Dr. Tosti ruled but excluded alopecia areata after considering the many differences between its characteristic features and what she observed in Ms. Earnest. (*See* Ex. A, Tosti Rep. 28.) "The main diagnostic feature of alopecia areata is the presence of bald patches on the scalp surrounded by small 'exclamation mark' hairs." (*Id.*) These patches, which appear suddenly, are round, smooth, and "completely devoid of hair." (*Id.*) Dr. Tosti notes that Ms. Earnest has no round-shaped bald patches and diffuse hair loss. (*Id.*) Alopecia areata can appear diffusely, though it does so rarely; but it will then result in a positive pull test and dermoscopy showing broken hairs with thick, dark tips. (*Id.*) Ms. Earnest's pull test was negative, and her scalp dermoscopy revealed no broken hairs. (*Id.*) Dr. Tosti thus reliably ruled out alopecia areata.

Likewise, anagen effluvium does not involve the loss of hair follicles and will result in a positive pull test. (*Id.* at 28.) Dr. Tosti reliably ruled out anagen effluvium given Ms. Earnest's loss of hair follicles, negative pull test, and long period since treatment with chemotherapy. (*Id.*)

**Permanent Chemotherapy-Induced Alopecia (PCIA).** Ms. Francis exhibits all the features of PCIA. She lost her hair during chemotherapy and experienced incomplete hair regrowth. (*Id.* at 13.) She has reduced hair density over her whole scalp, including the occipital (rear) area, and her scalp hairs are considerably reduced in length from before chemotherapy. (*Id.*) Further, Ms. Francis has non-patchy loss of the eyebrows and eyelashes and a near-complete loss of underarm hair. (*Id.*) Her hair loss is diffuse, except for some marginal alopecia, which Dr. Tosti classified as traction alopecia, a condition that is "very, very easily seen" and did not appear elsewhere on the scalp. (*Id.* at 14, 22; Ex. I, Tosti Dep. Vol. II 353:4-8.) Trichoscope examination of Ms. Francis showed a lack of scarring, reduced follicular density, and variability in the hair-shaft diameter. (Ex. A, Tosti Rep. 16.) Importantly, the pathology shows a loss of follicles— a characteristic that, outside of scarring alopecias, appears consistently only in PCIA. (*See id.* at 12.) Thus, Dr. Tosti was easily able to "rule in"—and could not rule out — a diagnosis of PCIA.

Ms. Earnest also exhibits all the features of PCIA. She lost her hair during chemotherapy and has experienced incomplete regrowth. (*Id.* at 13.) She exhibits reduced hair density over the whole

scalp, including the occipital area, and her scalp hairs are considerably reduced in length. Her frontal hair has a length of 3 cm without having been cut which is a unique feature described only in PCIA. (*Id.*) Further, Ms. Earnest has non-patchy loss of the eyebrows and eyelashes and a complete loss of underarm hair, very sparse pubic hair, and loss of hairs on the limbs. (*Id.* at 14.) Her hair loss is diffuse, which is consistent with PCIA. (*Id.* at 12, 14.) Her trichoscopy showed a lack of scarring, reduced follicular density, and variability in the hair-shaft diameter. (*Id.* at 16.) Importantly, the pathology shows a loss of follicles (*id.* at 27)—a characteristic that, outside of scarring alopecias, appears only in PCIA. Given all this, Dr. Tosti was easily able to "rule in"—and unable to rule out—a diagnosis of permanent chemotherapy-induced alopecia.

## CONCLUSION

For these reasons, the Court should deny Sanofi's motion to exclude the Plaintiffs' specific-causation evidence.


Dated: June 26, 2019                                        Respectfully submitted,

*/s/ Christopher L. Coffin*                              */s/ Karen B. Menzies*
Christopher L. Coffin (#27902)                   Karen Barth Menzies (CA Bar #180234)
PENDLEY, BAUDIN & COFFIN, L.L.P.       GIBBS LAW GROUP LLP
1100 Poydras Street, Suite 2505                  6701 Center Drive West, Suite 1400
New Orleans, Louisiana 70163                     Los Angeles, California 90045
Phone: (504) 355-0086                               Telephone: 510-350-9700
Fax: (504) 355-0089                                   Facsimile: 510-350-9701
ccoffin@pbclawfirm.com                           kbm@classlawgroup.com
*Plaintiffs' Co-Lead Counsel*                      *Plaintiffs' Co-Lead Counsel*


*/s/M. Palmer Lambert*                              */s/Dawn M. Barrios*
M. Palmer Lambert (#33228)                      Dawn M. Barrios (#2821)
GAINSBURGH BENJAMIN DAVID             BARRIOS, KINGSDORF & CASTEIX, LLP
MEUNIER & WARSHAUER, LLC             701 Poydras Street, Suite 3650
2800 Energy Centre, 1100 Poydras Street    New Orleans, LA 70139
New Orleans, LA 70163-2800                     Phone: 504-524-3300
Phone: 504-522-2304                                Fax: 504-524-3313
Fax: 504-528-9973                                   barrios@bkc-law.com
plambert@gainsben.com                            *Plaintiffs' Co-Liaison Counsel*
*Plaintiffs' Co-Liaison Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2019, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

*/s/ M. Palmer Lambert*
M. Palmer Lambert
