**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

In Re: TAXOTERE (DOCETAXEL)     MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

                  SECTION "H" (5)

THIS DOCUMENT RELATES TO
ALL CASES

**PLAINTIFFS' OPPOSITION TO SANOFI'S**
**MOTION TO EXCLUDE EXPERT TESTIMONY ON GENERAL CAUSATION**

**INTRODUCTION**

Plaintiffs in this MDL are more than 10,000 breast cancer survivors who suffered permanent hair loss because of Defendant Sanofi's chemotherapy drug Taxotere. Sanofi now denies a causal relationship between Taxotere and permanent hair loss, but this stance is untenable. In 2015, Sanofi told the Food and Drug Administration (FDA) that the "cumulative weighted evidence is sufficient to support a causal association between docetaxel and permanent alopecia."

Further dooming Sanofi's long-shot motion to exclude is the comprehensive, well-supported, and focused testimony of Plaintiffs' experts on general causation. These leading scientists had no difficulty reaching the same conclusion as Sanofi in 2015 that sufficient evidence supports a causal association between Taxotere and permanent hair loss. Specifically, David Madigan, a biostatistics and pharmacovigilance expert, and Ellen Feigal, an oncology and clinical development expert, draw on their knowledge, experience, and training in their respective fields and on reliable methods utilized within those fields, including biostatistical analysis and the application of widely accepted epidemiology principles. Their analyses consider every category of available and relevant data and employ the methodologies that FDA and Sanofi have utilized and are admissible.

**STANDARD OF REVIEW**

The familiar Federal Rule of Evidence 702 and *Daubert* standards are discussed at length in other briefing and incorporated here by reference. Relevant here, for scientific causation, certain epidemiological considerations known as the "Bradford Hill" factors are often employed in an expert's methodology. These are merely "factors or lenses that guide epidemiologists in making judgments about causation." *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1098 (D. Colo. 2006) (citing *Ref. Guide on Epidemiology* at 375). There is "no authority, scientific or legal, that compliance with all, or even one, of these factors is required" for an expert's methodology and conclusions to be deemed sufficiently reliable to be admissible under Rule 702." *Id.*; *see also Burst v. Shell Oil Co.*, No. CIV.A. 14-109, 2015 WL 3755953, at *5 (E.D. La. June 16, 2015), *aff'd*, 650 F. App'x 170 (5th Cir. 2016). As such, an expert's opinion on the issue of general causation is not required to address each Bradford Hill factor but may be based "on the totality of the evidence." *In re Testosterone Replacement Therapy Prod. Liab. Litig.*, 2017 WL 1833173, at *11 (N.D. Ill. May 8, 2017). Relatedly, "[i]t would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science." *McClellan v. I-Flow Corp.*, 710 F. Supp. 2d 1092, 1101 (D. Or. 2010). Even medical literature that supports merely an association between an agent and an event can reliably support a causation opinion. *Id.* at 1100–01 ("[E]xperts' testimony should not be excluded if they adequately explain why the association is valid and how causation can be inferred from it.").

**ARGUMENT**

**I.    Plaintiffs' Experts Have Properly Disclosed Their Causation Opinions.**

Sanofi first argues that Dr. Madigan's and Dr. Feigal's opinions on general causation are inadequately disclosed and thus must be kept from the jury. To the contrary, Dr. Madigan's and

Dr. Feigal's Rule 26 reports set forth in detail their opinions on Taxotere's ability to cause permanent alopecia. In fact, each expert has described pertinent experience and the methodology behind the analysis in his or her respective report. What's more, Sanofi has fully explored the opinions of these experts through lengthy depositions. Thus, there are no surprises here, and no basis to exclude this expert testimony as somehow undisclosed.

### A. Dr. Madigan's Report Discloses His General Caution Opinion.

Dr. David Madigan is an expert in biostatistics and pharmacovigilance who performed statistical analyses on Sanofi's clinical trial data (TAX316/ GEICAM 9805), Sanofi's internal pharmacovigilance databases and  FDA's Adverse Event Reporting System (FAERS) database, to determine whether safety signals existed for Taxotere and when. In his report, Dr. Madigan explained the background statistical concepts and methods found and utilized therein. As pertinent to general causation, Dr. Madigan concluded:

> As referenced above, Sanofi concluded in 2015 that the "cumulative weighted evidence is sufficient to support a causal association between docetaxel and permanent alopecia." While I agree with Sanofi's conclusion as of 2015, based on my education, training and experience, and the data analyzed herein, including the identification of safety signals in FAERS in the 2000's, my analyses of Sanofi's internal pharmacovigilance database and the results from Sanofi's TAX 316 and TAX 301 ... clinical trials, adequate statistical evidence supporting a causal association between Taxotere (docetaxel) and permanent alopecia was available to Sanofi several years earlier.

(Ex. R to Defs' Mot., Rec. Doc. 6163-18, "Madigan Rep." 20 (emphasis added).) At Dr. Madigan's deposition, counsel for Sanofi acknowledged this opinion:

> Q      You told us earlier that you agree with [Sanofi's 2015] conclusion?
>
> A      Yeah. It's in my report.
>
> Q      Fair enough. You told us earlier, and it's in your report, that you agree with the conclusion. I'm not asking if you agree with somebody else's conclusion on the issue.

What I want to know is, have you independently done the work necessary to form an independent opinion that [T]axotere causes irreversible alopecia?

A       Sure. I believe it does. I believe there is a causal effect established here.

Sanofi then examined Dr. Madigan's methodology:

Q       And the work that you did to establish that [T]axotere causes irreversible alopecia includes what elements?

A       So the analysis from the randomized trials. So the meta-analysis of the randomized trials and the analysis of the individual trials, the analysis of the FAERS database and my analysis of the internal database.

        [   *   *   *   ]

        Here, I looked at the available quantitative strands of evidence that I had at my disposal and analyzed all of those that I had in my disposal.

Q       Other than telling us you've looked at the FAERS data and whatever else you listed a moment ago, can you explain the methodology by which you came to your conclusion that [T]axotere causes irreversible alopecia?

A       The exact same methodology that I applied. And the context that is applied at the FDA when they convene an advisory committee to look at a safety issue which is to say you look at the strands of information that may provide—shed light on the causal question. The dominant one here is the randomized trials. But routinely, as I did, the FDA would also look at FAERS analysis. And they also look at other databases.

(Ex. A, Madigan Dep. 272:13-274:17 (objections omitted).)

   **B.  Dr. Feigal's Report Also Discloses Her General Caution Opinion.**

According to Sanofi, Dr. Feigal did not state in her report that Taxotere causes permanent

alopecia. (Mot. at 15.) Not true. Sanofi simply ignores what Dr. Feigal has written:

   [I]t is my opinion to a reasonable degree of certainty that ... Permanent chemotherapy-induced alopecia is a known adverse event of Taxotere-containing regimens in the adjuvant treatment of women with early stage operable breast cancer (Stages I, IIA, IIB, IIIA), as evidenced in the company-sponsored randomized controlled clinical trials and in postmarketing surveillance and multiple case studies from 2001 to the present.
                              [ *  *  *]

4

> Company's own analysis of the data led them to the conclusion that permanent
> chemotherapy-induced alopecia is causally related to Taxotere.

(Ex. T to Defs' Mot., Rec. Doc. 6163-20, "Feigal Rep." 42.)

Dr. Feigal arrives at this opinion after about ten pages of discussion of permanent chemotherapy induced alopecia (PCIA), in which she examines evidence, including clinical trial data, in support of her conclusion on causation. (*Id.* at 32–42.) That discussion includes eight pages on the design, methodology, and quantitative findings of 16 studies that consider 253 reports of permanent alopecia considered in forming her opinion. (*Id.* at 35–42.)

Sanofi fully understood Dr. Feigal's causation opinion when deposing her; the deposition testimony on this topic spans 120 pages. (*See* Ex. B, Feigal Dep. Vol. I, 136-237; Ex. C, Feigal Dep. Vol. II 324-334.) Dr. Feigal testified, consistent with her report, that she based her causation opinion on her review of the TAX 316 and GEICAM 9805 clinical studies, the pharmacovigilance referenced in Sanofi's 2015 Clinical Overview, and 16 case study reports generated from her search for relevant terms. (Ex. B, Feigal Dep. Vol. I 156:17-158:18, 188:4-16.) Further, Dr. Feigal applied several Bradford Hill factors in her analysis (including dose rate, temporality, alternative explanations, and biologic plausibility). (*Id.* at 219:12-220:7, 221:25-222:10, 223:9-13, 225:8-21, 228:11-19, 228:21-229:9, 232:21-233:10, 235:5-20).[1]

### C. Sanofi Is Fully on Notice of Dr. Madigan's and Dr. Feigal's Opinions.

Given these fulsome reports, Sanofi has no basis to complain that these expert opinions are insufficiently clear. But even if that were not so, Sanofi's request for exclusion would still fail because Sanofi cannot show that the admission of these opinions would prejudice it. The absence

---

[1] Sanofi elevates form over substance when it criticizes Dr. Feigal for not incanting Bradford Hill by name in her report, but ignores that she did apply his criteria: "I certainly do use the criteria that were used in terms of biologic plausibility, exposure to the agent, the potential of dose response and all of those issues in there. I don't have the issue of challenge, re-challenge because I am not sure if there were some examples there, but you don't have to meet all criteria." (*Id.* at 221:25-222:10.)

of prejudice is dispositive here. "[T]he exclusion remedy is unavailable if the violation is harmless." *Cont'l Motors, Inc. v. Jewell Aircraft, Inc.*, No. CIV.A. 12-0221-WS-C, 2013 WL 5670915, at *2–3 (S.D. Ala. Oct. 17, 2013). Here, Sanofi exhaustively examined these experts on general causation. It therefore "knows *exactly* what these witnesses' opinions are, the bases and reasons for same, and all of the other categories of information specified at Rule 26(a)(2)." *Id.*

## II.   Dr. Madigan and Dr. Feigal are Qualified to Opine on General Causation.

Sanofi's request for exclusion also misapplies relevant legal standards. Contrary to Sanofi's arguments, there is no requirement in Louisiana that experts "must attest to their opinions to a reasonable medical probability," and it appears nowhere in the Louisiana Supreme Court jurisprudence cited by Sanofi. (*See* Mot. at 4).[2] While Louisiana law may require specific medical causation testimony if causation is not obvious to a layperson, this requirement can be met through specific causation testimony from a clinician. Here, Dr. Tosti, applying a differential diagnosis, provides that testimony.

Further, Sanofi is wrong to insist that there is a "two-pronged test to establish general causation" in the case law, including *In re* Zoloft, 26 F. Supp. 3d 449, 456 (E.D. Pa. June 27, 2014), and *Burst v. Shell Oil Co.*, 2015 WL 3755953 (E.D. La. June 16, 2015). The court in *In re Zoloft* held that an expert's "reliance on trends in non-statistically significant data to draw conclusions about" causation was a novel methodology that did not warrant exclusion but simply required application and analysis through the *Daubert* standard because it did not "derive[] from principles and techniques of 'uncontroverted validity.'"  26 F. Supp. 3d at 456. In *Burst*, the court noted its "considerable discretion to admit or exclude expert testimony under Rule 702,"

---

[2] The phrase "reasonable medical probability" appears only once in the second case cited by Sanofi, *Cormier v. CITGO Petroleum Corp.*, 228 So. 3d 770, 773 (La. App. 3 Cir. 2017), a Louisiana appellate opinion quoting the district court's bench ruling, which in turn appears to quote the testifying expert. A Louisiana district court—let alone an expert testifying in that district court—may not set evidentiary precedent for a U.S. District Court sitting in diversity, and especially not in contravention of the Federal Rules of Evidence.

*Burst* at *1. The court further explained that "district courts must have considerable leeway in deciding a particular case how to go about determining whether expert testimony is reliable," for instance by examining whether the expert has adequately accounted for obvious alternative explanations. *Id.* Here, as explained *infra,* neither *In re Zoloft* nor *Burst* is dispositive as neither Dr. Madigan nor Dr. Feigal rely solely on trends of non-statistically significant data and both considered alternative causes and published data from other chemotherapy drugs.

Sanofi also suggests that any witness offering a general causation opinion must be a statistician and an epidemiologist and a medical practitioner with experience diagnosing the relevant malady in her regular practice. For instance, Sanofi objects to the qualifications of Dr. Madigan, a biostatistician, because he is not also a medical doctor. But Dr. Madigan is not opining on matters that absolutely require him to be a medical doctor, and courts have widely accepted his experience in biostatics as sufficient to testify on general causation.[3]

Dr. Madigan is a Professor of Statistics, a former university Statistics departmental chair, and a former Dean of the Faculty of Arts and Sciences at Columbia University. (Madigan Rep. 1.) He is also formerly a Professor and the Dean of Physical and Mathematical Sciences at Rutgers University, as well as Director of its Institute of Biostatistics. (*Id.*) He has published over 180 papers on topics such as Bayesian statistics, biostatistics, and pharmacovigilance, and cites drug safety as a "significant research interest"—particularly "the development and application of

---

[3] *See, e.g.*, *Rheinfrank v. Abbott Labs., Inc.*, No. 1:13-CV-144, 2015 WL 13022172, at *12–13 (S.D. Ohio Oct. 2, 2015), *aff'd*, No. 16-3347, 2017 WL 680349 (6th Cir. Feb. 21, 2017) (finding Madigan's testimony relevant and sufficiently reliable to assist the trier of fact in determining if Depakote could cause developmental delay); *In re Zimmer NexGen Knee Implant Prod. Liab. Litig.*, 218 F. Supp. 3d 700, 708 (N.D. Ill. 2016) (assuming Madigan's testimony that NexGen Flex implants cause a higher risk of revision than standard devices is admissible); *In re Vioxx Prod.Liab. Litig.*, MDL No. 1657, 2016 WL 8711273, at *3-5 (E.D. La. September 16, 2016) (allowing Madigan's testimony that Vioxx is causally associated with a significantly increased risk of cardiovascular thrombotic events); *In re Actos (Pioglitazone) Prod. Liab. Litig.*, No. 12-CV-00064, 2013 WL 6796461, at *2 (W.D. La. Dec. 19, 2013) (allowing Madigan's opinion that Actos is capable of causing and/or promoting bladder cancer); *In re Pfizer Inc. Securities Litig.*, Nos. 04 Civ. 9866 (LTS)(JLC), 05 md 1688 (LTS), 2010 WL 1047618, at *4 (S.D.N.Y. Mar. 22, 2010) (finding Madigan amply qualified, with the assistance of clinical experts, to testify that Celebrex is causally associated with an increased risk of cardiovascular events).

statistical methods for pharmacovigilance," an area in which he has published in several journals, including *Drug Safety*, *Therapeutic Advances in Drug Safety*, *Epidemiology*, and the *American Journal of Epidemiology*. (*Id.*) Dr. Madigan has consulted on safety issues for the FDA and, within the last few years, for Merck, Lilly, Novartis, Pfizer, and others. (*Id.*) Further, he was a Principal Investigator for a private-public FDA partnership that conducted a multi-year initiative to research methods that are feasible and useful to analyze existing healthcare databases to evaluate post-marketing drug safety and benefit issues. (*Id.*) As such, Dr. Madigan is qualified to opine on the pharmacovigilance issues in his report and any evidence of causation arising from his statistical analysis—which he need not be a physician to do.

Sanofi's sole objection to Dr. Feigal's qualification to offer a causation opinion is that she is not a statistician and epidemiologist and cannot testify as to statistical significance in the clinical trials. Experience as a statistician or epidemiologist is simply not necessary for an expert to offer causation testimony in a case like this. *See, e.g.*, *Watson v. Dillon Companies, Inc.* 797 F. Supp. 2d 1138, 1150 (D. Colo. 2011). Dr. Feigal is Board Certified in Internal Medicine and in Medical Oncology and holds a master's degree in biology, specifically in the fields of molecular biology and biochemistry. (Feigal Rep. 1.) She worked for 12 years in research at the National Cancer Institute, as the Division of Cancer Treatment and Diagnosis's Acting Director, Deputy Director, and as a Senior Investigator. (*Id.* at 1-2.) Dr. Feigal has worked in clinical research-related leadership positions in both the non-profit and for-profit sectors, including as Chief Medical Officer and as Executive Medical Director at pharmaceuticals companies (*id.* at 3-6), and now consults on product development and regulatory issues to medical product developers (*id.* at 6-7). She was the founding Director of the American Course on Drug Development and Regulatory Sciences at University of California, San Francisco, and is currently an adjunct professor

teaching FDA law at Arizona State University. (*Id.* at 4, 7.) Dr. Feigal is "savvy with the issues involved in designing clinical trials and determining end points and sample sizes," and has "acquired quite a bit of knowledge" from her 12 years at the National Cancer Institute, where she headed the Division of Cancer treatment and diagnosis and was in charge of biostatistics, developmental therapeutics, clinical trials, and diagnostic imaging. (Ex. B, Feigal Dep. Vol. I. 87:21-88:8.) Given this professional experience, and her years of clinical development on behalf of drug makers since that time, Dr. Feigal is certainly qualified to analyze the scientific evidence and opine on Taxotere's ability to cause permanent alopecia.[4]

### III.    Dr. Madigan's Opinions are Relevant and Reliable

Sanofi's relevance and reliability arguments regarding Dr. Madigan either misstate the law, mischaracterize his methodology and opinions, or attempt to stretch the concepts of Rule 702 beyond recognition. As an initial matter, Sanofi's insistence that, to survive a *Daubert* challenge, an expert must "prove" causation has no merit and is simply another attempt to raise the evidentiary bar on plaintiffs' experts.[5]  *See McClellan v. I-Flow Corp.*, 710 F. Supp. 2d 1092, 1101 (D. Or. 2010) (collecting authorities). Next, Sanofi pretends that Dr. Madigan drew a causation conclusion *solely* from his analysis of adverse events (AEs) from pharmacovigilance database searches, even though Dr. Madigan's testified that he reached this conclusion independently, and that his conclusion is the same as Sanofi's. In any event, Sanofi's criticism ignores that courts have approved the use of such data in support of causation opinions.

---

[4] Dr. Feigal's review includes, among other sources, the clinical trial data, studies, and Sanofi's own data from its 2015 Taxotere Clinical Overview.

[5] *See* Mot. at 2 ("Dr. Feigal ... has no expertise in the areas necessary to prove causation"); *id* at 9-10 ("But a statistical analysis, even if a statistical association is found, does not prove causation."); *id.* at 11 ("An 'adverse event' or 'increased risk' does not prove causation."); at 14 ("Dr. Madigan admits the first two analysis do not prove causation."); *id.* at 16 ("Dr. Madigan not only admitted that Sanofi's assessment does not prove causation ..."); *id.* at 16 ("Dr. Madigan cannot rely on Sanofi's assessment for the FDA to try to 'prove' general causation, as he admits."); *id.* at 20 ("Dr. Madigan has not proven causation as a matter of law, and his opinions must be excluded.").

**A. Dr. Madigan's Analysis of the FAERS / Sanofi's Database Is Relevant and Reliable.**

Sanofi challenges Dr. Madigan's opinions by mischaracterizing them. In particular, Sanofi pretends that Dr. Madigan's causation opinion is grounded *solely* in his statistical analysis of case reporting (AEs) from the FDA's and Sanofi's pharmacovigilance databases. This is not true. Dr. Madigan has made clear that these analyses do not alone give rise to a causal association:

> Q  Does your analysis of the FAERS database alone demonstrate that docetaxel causes irreversible alopecia?
>
> A  No.
>
> Q  Does your analysis of the Sanofi internal database alone demonstrate that docetaxel causes irreversible alopecia?
>
> A  No.

(Ex. A, Madigan Dep. 293:24-294:7.) Dr. Madigan's opinion instead is grounded in his analysis of the TAX 316 and GEICAM 9805 studies—randomized trials that "are at the top of the heap in terms of ... shedding light on causal questions" (*id.* at 276:17-20, 293:18-23). "[I]n order of importance ..., the randomized trials, the FAERS analysis, the internal database, they are all pointing in the same direction." (*Id.* at 276:12-16.) He explained his methodology thusly:

> Here, I looked at the available quantitative strands of evidence that I had at my disposal and analyzed all of those … , the context that is applied at the FDA when they convene an advisory committee to look at a safety issue[,] which is to say you look at the strands of information that may provide-shed light on the causal question. The dominant one here is the randomized trials. But routinely, as I did, the FDA would also look at FAERS analysis. And they also look at other databases.

(*Id.* at 273:18-274:17.) Dr. Madigan reiterated: "The primary support for my opinion are the randomized trials. So my opinion is strengthened by the FAERS analysis." (*Id.* at 293:2-5, 293:8-14 ("The evidence is strengthened by the other strands.").)

Next, Sanofi criticizes Dr. Madigan's FAERS analysis for reasons disconnected from the field of statistics and in a way that shows Sanofi's misunderstanding of the role of the statistician. Sanofi says this analysis is fatally flawed because when Dr. Madigan ran his searches of available data from his search terms, he did not perform a *qualitative* review of the underlying case reports associated with results. (Mot. at 14-15.)  But Sanofi's proposed qualitative inquiry is simply outside the *quantitative* focus of statistics:

> [W]e're looking at a primary data source for drug safety here that's used, you know, hundreds, thousands of times a year by regulators and by pharma companies and so on. This is— I'm conducting a quantitative analysis that is also done routinely over and over and over again … [Y]ou define the exposure, you define the outcome. And the rest of it is math, so to speak, or statistics[.]

(Ex. A, Madigan Dep. 161:2-12.) When repeatedly questioned about underlying case report narratives, Dr. Madigan explained:

> Careful here. I mean I have the information I need to do my analysis. I have many, many fields ... in the FAERS database that I have. I use a subset of those fields to do my analysis. They are completely adequate for what I am doing in this context.
>
> If I wanted to access the narrative, which I don't particularly, I would have to issue a FOIA request to get those. It's the antithesis of what I'm doing because here, this is a disproportionality analysis. If I was to do something with narratives, I'd have to get the narratives for all the reports, not on [T]axotere ... I wouldn't just need the 31. I can't do anything with the 31. I'd need the whole six million. And even then, I don't know exactly what I'd do other than what I'm doing here …

(*Id.* at 120:8-121:7.) Sanofi's suggestion that Dr. Madigan review and exclude any of the hits from his FAERS search on the basis of qualitative information would have resulted in a *less reliable* methodology for a statistician. Showing an expert statistician individual case study narratives and grilling him on the qualitative information therein might make for good theater, but it does not make for good (or reliable) statistics practice. Additionally, Dr. Madigan's

quantitative approach is precisely how Sanofi's biostatistics department approaches the analysis of its data. (*See* Ex. D, Mancini Dep. Vol. I, 64:8-68:3, 104:22-105:2.)

Sanofi attacks Dr. Madigan's analysis of its internal database on the same grounds addressed above, including that he relied on or collaborated with Dr. Antonella Tosti, a dermatologist specializing in hair loss, and Dr. David Kessler, a biostatistician who was formerly the Commissioner of the FDA, to formulate the end points used to identify irreversible alopecia in the pharmacovigilance databases. Sanofi's logic for this attack is unclear. It is hardly objectionable, however, that Dr. Madigan looked to these highly qualified experts in crafting his methodology—and Sanofi cannot show otherwise. In the final analysis, Sanofi can raise no real objection to the endpoints Dr. Madigan utilized, and is simply left quoting colloquial testimony that reveals no error whatsoever. (Mot. at 14 (*e.g.*, "ran it by Dr. Kessler," "didn't come up with a better one".)) As to both narratives and endpoints, Sanofi's arguments are built entirely on faulting Dr. Madigan for not doing things that statisticians simply do not do.[6] Accordingly, the Court should "conclude[] that these alleged shortcomings do not provide a basis for barring [his] testimony, but obviously provide ample areas for cross-examination." *Kluppelberg v. Burge*, 2016 WL 6821138, at *4.

Finally, case reports may be relied on in expert reports to establish causation when "the opinions provided by the experts also rel[y] upon published or sponsored studies and published case series." *Lofton v. McNeil Consumer & Specialty Pharm.*, 2008 WL 4878066, at *4

---

[6] *See Kluppelberg v. Burge*, No. 13 C 3963, 2016 WL 6821138, at *4 (N.D. Ill. Sept. 16, 2016) (rejecting "Defendants' specific arguments [that] merely identify limitations of [expert's] methodology, not that it is unreliable..."); *see also DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998) ("But their *cri de coeur* is not backed up by references to any body of scientific knowledge. What tests do engineers use to resolve questions of the kind Syson addressed? What tests should he have performed? What data did he overlook? Counsel apparently want appellate judges to make a priori judgments about how scientific inquiry should be conducted. That way quackery lies. A profession resolves questions of method in the same way it reaches conclusions about other empirical issues; which method is best is a question itself subject to scientific inquiry.").

(N.D.Tex. July 25, 2008), *aff'd*, 672 F.3d 372 (5th Cir. 2012) (citing *Ref. Manual on Scientific Evidence* at 475 ("causation based on case studies may be carefully considered in light of other information available")). As noted by Sanofi, Dr. Madigan recognizes some of the shortcomings of "individual case reports" and considers them to be "not terribly useful" on their own and, again, as only a "sort of distant ... contributor to any causal assessment." (Ex. A, Madigan Dep. 273:5-10.)

### B.  Contrary to Sanofi, Dr. Madigan Does Not Base His Opinion on Sanofi's Causation Conclusion.

When Dr. Madigan says in his report and testimony that he agrees with the conclusions in Sanofi's 2015 Clinical Overview, he plainly means he arrived at the same conclusion after his own analysis. He did not "adopt" or otherwise base his opinion on Sanofi's conclusions therein, nor did he rely at any point on Sanofi's "assessment of adverse event reports" as a "tool for establishing causal attributions between products and adverse events." (Mot. at 16.) Instead, Dr. Madigan's report makes clear that he came to an independent conclusion based on his "identification of safety signals in FAERS in the 2000's," his "analyses of Sanofi's internal pharmacovigilance database[,] and the results from Sanofi's TAX 316 and TAX 301 ... clinical trials." (Madigan Rep. 20.)

> Q    What I want to know is, have you independently done work necessary to form an independent opinion that [T]axotere causes irreversible alopecia?
>
> A    Sure. I believe it does. I believe there is a causal effect established here.
>
> Q    And the work that you did to establish that [T]axotere causes irreversible alopecia includes what elements?
>
> A    So the analysis from the randomized trials. So the meta-analysis of the randomized trials and the analysis of the individual trials, the analysis of the FAERS database and my analysis of the internal database.

(Ex. A, Madigan Dep. 272:4-21.)

To the extent Dr. Madigan's report discusses the methodology and results of Sanofi's 2015 global pharmacovigilance database, these considerations are relevant to his opinion that Sanofi was on notice of roughly the same information by 2010 or earlier that led it to make its causation conclusion years later. (*See* Madigan Rep. 18 ("The information available to Sanofi at this time was not appreciably different from what was available at the time of the 2011 report. In fact, that report used a different definition of irreversible alopecia that yielded a *larger* number of cases.").) Dr. Madigan's reliance on the Clinical Overview is clearly limited to Sanofi's failure to take certain actions sooner. To the extent Dr. Madigan considers Sanofi's assessments of AEs at all, it is effectively a critique of them.[7]

### C.  Dr. Madigan's Analysis of the Clinical Trial Results is Relevant and Reliable

In an attempt to minimize the causation evidence available in the FDA's and Sanofi's safety databases, Sanofi repeatedly highlights the law's and science's preference for "well-designed, randomized controlled clinical trial," which it says is "the best evidence of causation." (*See* Mot. at 5 (citing *Brock*, 874 F.2d 307, 311 (5th Cir. 1989)). In its next breath, however, Sanofi disclaims its own clinical trials, TAX316 and GEICAM, as unreliable and irrelevant bases for evaluating Taxotere's ability to cause permanent alopecia, even though Sanofi itself relied on the data from these trials in 2015 when it concluded that Taxotere can cause permanent hair loss. (*See id.* at 17–18.) These trials may not have been performed with the adverse event of permanent alopecia as a primary endpoint, they nonetheless tracked alopecia into the follow-up period in both the Taxotere and control groups and showed marked prevalence with Taxotere use. In TAX 316, 29 of 744 Taxotere patients (3.9%) were noted to have alopecia at the end of follow up versus 16 of 736 of patients (2.2%) on 5-fluorouracil. And in GEICAM, 3 of 49 Taxotere

---

[7] Dr. Madigan's general causation opinion is confirmed not only by Sanofi's 2015 Clinical Overview but also by the testimony of Sanofi's employees. *See, e.g.*, Ex. E, Fierro Dep. 89:22-90:1; Ex. F, Hangai Dep. 17:22-18:2; Ex. G, Jen Dep. 68:18-23.

patients followed (6.1%) were noted to have alopecia at the end of follow up versus 1 of 35 of the followed patients (2.9%) on 5-fluorouracil. These figures amount to a 77% higher incidence of permanent alopecia in the Taxotere arm versus control arm in TAX 316, and a 210% higher incidence in the Taxotere arm versus control arm in GEICAM.

Sanofi responds that the results do not speak to Taxotere's capacity to cause permanent alopecia because the participants also took doxorubicin ("A") and cyclophosphamide ("C"), which Sanofi argues could have caused their permanent alopecia. However, in both studies, the participants in both the Taxotere and control arms received the same regimen of doxorubicin and cyclophosphamide. The only differing factor between the two groups that could ostensibly account for the increased incidence was the presence of Taxotere instead of 5-fluorouracil. It is precisely this aspect of the studies' designs that allowed Sanofi to claim Taxotere's superiority over fluorouracil for disease-free survival—for instance, a 25.7% overall reduction in the risk of relapse with Taxotere in TAX 316.

Sanofi also argues that because TAX 316 followed AEs, including "ongoing" alopecia, for only 10 years after treatment, the study cannot speak to the "permanent" alopecia claimed by plaintiffs—only to alopecia lasting up to 10 years.[8] In other words, because TAX 316 does not show what number of patients have not regrown hair to this day, the trial is only a snapshot in time irrelevant to the "permanent" injury at issue in this litigation. But Dr. Madigan has explained the import of the different descriptors employed in the clinical trials and adverse event reporting: "They're all capturing the concept of irreversible alopecia. That's the intention." (Ex. A, Madigan Dep. 277:25-278:2.) It is simply not credible for Sanofi to claim that the term "ongoing" alopecia has zero bearing on the injuries alleged in this MDL.  Indeed, the European

---

[8] If it cannot be known whether alopecia lasting 10 years is a permanent injury, as Sanofi seems to claim, then all of its statute of limitations motions are dead on arrival.

Medical Authority recognized that alopecia that is ongoing at the end of follow-up should be considered permanent. (Ex. H, EMA Email re Definition of Irreversible Alopecia, Sanofi_01363130 at 2, Sept. 3, 2013.)

Next, in challenging the reliability of Dr. Madigan's general causation methodology, Sanofi repeats some of the arguments addressed above. To the extent Sanofi argues that Dr. Madigan's reliance on TAX 316 / GEICAM is unreliable because he did not confirm irreversible alopecia through individual patient records, plaintiffs again note that Dr. Madigan, a statistician, is concerned only with quantitative data and would not have those patients' narratives. (Ex. A, Madigan Dep. 249:5–15.)[9] Moreover, as explained above, Dr. Madigan used Sanofi's own data from the clinical studies in his report. Sanofi's next retread argument—that Dr. Madigan may not offer a general causation opinion because he did not apply and is not qualified to apply the Bradford Hill criteria—again raises the bar for experts' causation methodologies beyond that which is required under the law. *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1098 (D. Colo. 2006) (noting Bradford Hill factors "are not tests for determining the reliability of any study or the causal inferences drawn from it") (citing *Ref. Guide on Epidemiology* at 375); *see also In re Testosterone Replacement Therapy Prod. Liab. Litig.*, 2017 WL 1833173, at *11 (N.D. Ill. May 8, 2017) ("an expert's opinion on the issue of general causation may be based 'on the totality of the evidence' and is not required to address each Bradford Hill factor").

Sanofi further argues that Dr. Madigan did not distinguish among various types of alopecia in the clinical study reports. To the contrary, Dr. Madigan did not "lump together" anything, but proceeds using data exactly in the way it was presented in Sanofi's clinical study reports and

---

[9] Indeed, when Sanofi came to its 2015 conclusion about causation, it relied on the statistical data presented in the clinical study reports for TAX316 and GEICAM, not the underlying patient narratives. Furthermore, when Sanofi finally updated its label to include the 10-year TAX316 data in 2018 (only seven years after Sanofi voted to include the data but then never did for reasons unknown), it included the same statistical data relied on by Dr. Madigan, not any re-analysis on individual case files.

terms to capture permanent alopecia. For Sanofi, and for the purposes of safety endpoints in its own studies' protocols, it was enough simply to know that a patient's hair did not regrow following chemotherapy treatment. Thus, it is appropriate that Dr. Madigan did so here. Sanofi's insistence now that Dr. Madigan "analyze if each was non-scarring alopecia" amounts to requiring a differential diagnosis for each subject of Sanofi's clinical trials, something that Sanofi never did, ,although it had the ability to do during TAX 316's 10-year follow-up period. How it now expects Dr. Madigan, *a statistician*, to do this now—an *additional* 10 years later—is a mystery. Sanofi is simply criticizing its own data.

Regarding the statistical significance of permanent alopecia in TAX316, Dr. Madigan has acknowledged that the 0.053 p-value of TAC and FAC comparison at 120 months is marginally higher than the threshold value of 0.05 often used to mark statistical significance, but that the difference is unimportant to him. Dr. Madigan is of the opinion that although the 0.05 threshold is fairly standard in the statistics world, it is also "completely arbitrary." (Ex. A, Madigan Dep. 250:10-13.) Importantly, there is no requirement in failure-to-warn cases that an expert rely only on studies with a p-value below 0.05, or any other number. Further, logic dictates that qualified expert statisticians be allowed to rely on their own professional judgment when determining the level of trust they will extend to one statistical analysis versus another. *Cf. Smith v. City of Bos.*, 144 F. Supp. 3d 177, 199 (D. Mass. 2015), *on reconsideration*, 267 F. Supp. 3d 325 (D. Mass. 2017) (collecting authorities) ("while the 0.05 cut-off for finding of statistical significance is generally accepted, such thresholds are not hard-line rules in disparate impact cases"). To the extend Sanofi disagrees, it can cross-examine Dr. Madigan his opinions regarding the soundness of such studies. *See In re Testosterone*, 2018 WL 4030585, at *3 ("Dr. Rinder explains that

whether a study informs his opinions depends not on whether it reports statistically significant results, but rather on the soundness of the study's methodology.").

Lastly, Sanofi' simply has no basis to request exclusion of Dr. Madigan's random effects meta-analysis on Sanofi's TAX316 and TAX301 / GEICAM studies, which demonstrated a statistically significant increase in the risk of permanent alopecia with Taxotere. (Madigan Rep. 20.) Meta-analysis is a "technique used to combine the results of several studies to enhance the precision of the estimate of the effect size" for the measurement of interest (here, the relationship between Taxotere and permanent alopecia), and to "reduce the plausibility that the association found is due to random sampling error." Michael D. Green *et al.*, "Reference Guide on Epidemiology" *in* Fed. Judicial Ctr., *Reference Manual on Scientific Evidence* 624 (3d ed. 2011)[10] Accordingly, meta-analyses are often used to assess medical causation. *See*, *e.g.*, *In re Bextra Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1174–76, 1184 (N.D. Cal. 2007) (admitting and using meta-analyses to discuss alleged adverse-event risk); *In re Vioxx Prods. Liab. Litig.*, No. MDL 1657, 2010 WL 2649513, at *5 (E.D. La. June 29, 2010) (same).

Dr. Madigan's meta-analysis found a significantly increased risk of permanent alopecia for patients who received Taxotere rather than FAC (the other drug combination involved in Sanofi's studies). Specifically, Taxotere patients had an 85% greater chance of developing permanent alopecia. This finding has a 95% confidence interval (1.04, 3.31) and a *p*-value of 0.04—in other words, this finding is statistically significant and reliable. (Madigan Rep. 20; Ex. A, Madigan Dep. 262:8–263:16, 266:18–21.)   Thus, although statistical significance is not required for causation, it is nonetheless present when Taxotere is compared to FAC.

---

[10] *See generally* S. Serghiou & S.N. Goodman, "Random-Effects Meta-analysis: Summarizing Evidence With Caveats," 321(3) *JAMA* 301, 301–02 (2019) ("Meta-analysis is the process of quantitatively combining study results into a single summary estimate and is a foundational tool for evidence-based medicine. Random-effects meta-analysis is the most common approach.").

IV.    **Dr. Feigal's Opinions are Both Relevant and Reliable.**

**A.  Dr. Feigal's Opinions are Confirmed by Sanofi's 2015 Clinical Overview**

Dr. Feigal's causation testimony does not unreliably lean on Sanofi's 2015 Taxotere Clinical Overview to establish causation, as Sanofi suggests. Although, as she notes, this Overview did conclude that sufficient evidence existed to support of a causal association between Taxotere and permanent alopecia, Dr. Feigal's opinion was concerned less with that conclusion, and more so with "the basis of that opinion"—*i.e.*, the data that led Sanofi there. (Ex. B, Feigal Dep. Vol. I 167:9.) Indeed, she "looked at everything in this report" for underlying evidence that might inform her own causation determination: "their own randomized controlled clinical trials"; "over 2,100 cases that had been recorded"; and Sanofi's proffered statements on biological plausibility. (*Id.* at 167:9-21.) This information is important to Dr. Feigal because it includes "information from pharmacovigilance that was available only to the company," which she had no other way of seeing except in this format. (*Id.* at 168:12-18; Ex. I, Feigal Dep. Vol. III 446:4-13.) This includes the company's search of its own global pharmacovigilance database, which revealed that 5.3% of reported cases of alopecia were actually permanent alopecia. (Ex. J, Clinical Overview 2015 11–13; Ex. B, Feigal Dep. Vol. I 195:2-198:23.) Dr. Feigal found the document to be "clear about the data that they used and interpretation and their conclusions." (*Id.* at 191:25-192:2.) There is no reason the data should require any additional "context" from Sanofi employee depositions, contrary to the suggestions of Sanofi's counsel. (*Id.* at 191:16-21.) The data rather stands for itself.

In sum, Dr. Feigal's analysis is hardly the under-informed "personal interpretation" of the Clinical Overview that Sanofi paints it as. Rather, she considers some of the data therein—particularly Sanofi's internal pharmacovigilance search—in her overall causation assessment, which she makes clear also included her analysis of the randomized clinical trial data and the 16

studies responsive to her query of the literature. (*Id.* at 173:19-23.) Dr. Feigal's approach here, understandably, was to review as much information as she could find on this question. (*Id.* at 174:15-16 ("Since it is available, I would look at that.").) As set forth *supra*, this approach is approved by the case law, which requires no rigid, one-size-fits-all methodology for assessing causation, but rather approves of consideration of the "totality of the evidence." And the "totality of the evidence" here certainly includes— in a proper fashion— Sanofi's own conclusion as to causation and the data forming the basis thereof.

### B.  Dr. Feigal Appropriately Utilizes Studies from the Scientific Literature

Dr. Feigal's methodology for collecting and considering studies from the medical literature was logically devised and reliably executed. Dr. Feigal first ran searches for relevant studies in the medical literature using the following search terms: "breast cancer," "alopecia," "chemotherapy," "permanent," "persistent," "irreversible," "chronic," "Docetaxel," "Paclitaxel," "Cyclophosphamide," "Adriamycin," and, possibly, "chemically induced." (Ex. C, Feigal Dep. Vol. II 338:25-339:9.)[11] She elaborated that in conducting her literature search, she was looking for published studies that contained quality, usable information—that is, that the material had to have sufficient information to be interpretable. (Ex. I, Feigal Dep. Vol. III 405:13-408:1.)  The literature she selected was representative and fair:

> I have not ever cherry picked information. I look at the issues and I use my good judgment in terms of evaluating it and giving an honest and complete answer … I look at all the information and express my opinions based on that review of the information.

(Ex. B, Feigal Dep. Vol. I 11:21-12:7.) Dr. Feigal readily acknowledges that literature searches, such as the one she performed for this case, are not "100 percent perfect," but that hers was a

---

[11] She did not keep a list of permutations and combinations of these terms used in each search, but rather used her judgment, based in 30 years of experience doing the same, to select papers that appeared relevant in the search results. (Ex. C, Feigal Dep. Vol. II 339:10-13, 341:25-342:6; Ex. B, Feigal Dep. Vol. I 34:11-17.)

sound, comprehensive, scientific review of the literature. (*See* Ex. I, Feigal Dep. Vol. III 412:4-413:14.) She also obtained additional papers ("a minority") from another expert in this case. (Ex. C, Feigal Dep. Vol. II 341:18-24.) Dr. Feigal then interpreted each of the published studies consistently with her training and education. (Ex. I, Feigal Dep. Vol. III 517:13-18.) Her methodology here was first to separate instances of permanent alopecia following chemotherapy between taxanes and non-taxanes (*id.* at 570:2-20),[12] and then to distinguish between Taxol and Taxotere patients.[13] Other drugs in the patients' regimens are listed in the literature summaries in her Report, but not on the chart, which is concerned primarily with taxanes.[14] (*Id.* at 567:15-25.)

At her deposition, Sanofi's counsel questioned Dr. Feigal about four papers that she had not found and not included in her expert report to cast doubt on her methodology and conclusions.[15] (Ex. I, Feigal Dep. Vol. III 578:2-5.) The first paper, by the author Crown, was an abstract that Dr. Feigal had not previously seen and that she testified she would include in her analysis. (*Id.* at 582:15-19.) The second, by Beisecker, studied non-taxanes and had also not been in Dr. Feigal's search results. (*Id.* at 585:10-587:15.) However, Dr. Feigal explained that it would not have come up in her results because it did not contain the terms "permanent" or "irreversible," and

---

[12] Two of the studies Dr. Feigal relied upon are particularly noteworthy because they involved controlled studies designed specifically to learn whether chemotherapy drugs including Taxotere can cause PCIA: the perspective cohort study of Kang (2018); and the comparative study of Martin (2018). The Kang study looked at whether anthracycline and cyclophosphamide-based regimens with and without Taxotere cause PCIA. The study results demonstrated that Taxotere was the chemotherapy drug that was strongly causally associated with PCIA—patients with Taxotere-based treatment had "about eight times higher odds of PCIA 3 years after completion of chemotherapy (8.01; 95% CI, 1.20–53.26) adjusting for age, hair density, and thickness at diagnosis." *Id.* at 3. There were 23 cases of PCIA in the Taxotere group and only 3 with the cyclophosphamide and Anthracycline groups. *Id.* The Martín study examined patients from three major cancer institutions. The study found grade 2 alopecia in 10% of patients "receiving docetaxel regimens" with a standard cumulative dose (CD) of more than or equal to 400 mmg/m2. *Id.* at 4.  Ms. Earnest and Ms. Francis both had a CD of Taxotere of at least 400 mmg/m2.  The findings of the study were statistically expressed as "(36/358, 10.06%, 95% CI 7.36–13.61)." *Id.* By contrast, the patients receiving regimens with Adriamycin and/or cyclophosphamide had no cases of grade 2 alopecia. *Id.*

[13] In performing this analysis, Dr. Feigal contacted at least two authors for clarification of relevant issues in their studies, including which taxane was used. (*See, e.g.*, Ex. I, Feigal Dep. Vol. III, 575–577, 612:10-23.)

[14] The cases of alopecia from the 16 studies considered by Dr. Feigal break down as: 253 Taxotere only, 1 Taxol only, 2 Taxotere + Taxol, 93 unspecified taxane, and 38 non-taxane. (Feigal Rep. 35-37.)

[15] Counsel for Sanofi initially introduced six papers, but Dr. Feigal clarified that data from two of them was already represented on her table. (Ex. I, Feigal Dep. Vol. III 575:8 –578:12.)

that, if it had, she nonetheless would not have considered it because it considered cases of regrowth of a different color or texture—not a lack of regrowth. (*Id.*) The third paper, by Berglund, had also not come up in her searches, but she again testified that she would not have included it because of methodological and plausibility problems.[16] The fourth article, by Jung, also would have been excluded by Dr. Feigal because (1) it did not specify what chemotherapy drug was received; (2) it did not specify whether the breast cancer was metastatic, early stage, or both; and (3) it suggested that metastatic patients receiving bone marrow transplants and radiation to the brain—treatments long known to cause permanent alopecia—had been included. (*Id.* at 609:4-610:15.)

Despite the care that Dr. Feigal took to explain the serious methodological flaws in and/or irrelevance of three of these four studies, Sanofi still accuses Dr. Feigal of "cherry picking" her data. (Mot. at 21.) Worse yet, Sanofi faults Dr. Feigal here for doing exactly what it faults Dr. Madigan for *not doing*—conducting a qualitative review of search results to ensure their relevance.[17] Three of the four papers proffered by Sanofi's counsel did nothing to "contradict her conclusion." Rather, they provided unusable, unreliable, or irrelevant data that Dr. Feigal would have been right to exclude for any of those reasons, including to control for confounding factors. And the remaining paper (Crown), which Dr. Feigal agreed to adopt, actually supports her finding of a significantly increased prevalence of permanent alopecia in Taxotere users—adding 39 to the Taxotere column and 4 to the non-taxane column.

---

[16] Specifically, these problems included: (1) it collected patients' responses about 32 different symptoms 10 years after therapy without any clarity as to when these symptoms actually occurred or whether they had in fact been persisting; and (2) it discussed hair loss in patients who had only received localized radiation therapy to the breast (which should not cause hair loss). (Ex. I, Feigal Dep. Vol. III 605:5-607:8.)

[17] The reason this difference is proper is because Dr. Madigan is a statistician and such qualitative reviews are not properly part of a statistical analysis.

Finally, Dr. Feigal did not put undue reliance on studies because she too bases her causation opinion largely on clinical trial data. Dr. Feigal, similarly to Dr. Madigan with case reports, does not consider the papers found in the literature standing alone provide sufficient to support a conclusion of medical causation,[18] but she does believe they "definitely supply important supportive evidence for causation." (Ex. B, Feigal Dep. Vol. I, 174:8-15; 174:25-175:9; 175:15-18, 176:12-16.) For all of these reasons, Sanofi's argument that Dr. Feigal's review of the medical literature is irrelevant and unreliable must be rejected.

### C.  Dr. Feigal Properly Relies on Sanofi's Own Clinical Studies

Sanofi's arguments relating to Taxotere's clinical studies largely echo those made as to Dr. Madigan and should be denied for the same reasons. Moreover, Dr. Feigal has explained in her own words why they must fail. When challenged that she could not rule out doxorubicin (A) and cyclophosphamide (C) in the clinical studies' TAC arms, she pointed out that she does not have to *rule out* their involvement to consider the trial data meaningful evidence of Taxotere's causative property and noted that the other agents could possibly be exacerbating. (Ex. B, Feigal Dep. Vol. I, 214:11-17.)[19] As Dr. Feigal explains, she started from the hypothesis that other chemotherapy agents might have an association with permanent alopecia, but only saw it occasionally reported with no "consistent replication of that in subsequent papers." (*Id.* at 214:25-215:13.) For instance, she noted anecdotal reports of permanent hair loss associated with drugs including but not limited to Taxol, anthracycline/cyclophosphamide, and Adriamycin. (Ex. I, Feigal Dep. Vol. III 596:2-597:9; *see also* Feigal Rep. 35-44.) However, these anecdotal reports do not rise to the same, high level of association with permanent alopecia as they do with

---

[18] Dr. Feigal notes, however, that not all of these are "just anecdotal testimonials," but rather some are cohort sequential studies or clinical trials. (Ex. B, Feigal Dep. Vol. I, 174:21-24.)

[19] Again, given Sanofi's adoption of the TAX 316 results as strong evidence of efficacy of Taxotere in combination with doxorubicin and cyclophosphamide, its attempt to disclaim the study's results as to risks are suspect.

Taxotere, and accordingly do not change Dr. Feigal's opinions on general causation. What Dr. Feigal has never seen—but stated that she would be happy to consider and review if it exists—is a consistent spectrum of papers that shows permanent alopecia occurring with other chemotherapy agents in the way they do for Taxotere. (Ex. B, Feigal Dep. Vol. I 215:14-18.) Aside from the highly questionable or otherwise irrelevant case literature marked by Sanofi's counsel at deposition, Sanofi has presented Dr. Feigal with no such evidence. Accordingly, Sanofi's relevance challenges should be rejected.

Sanofi's argument that Plaintiffs cannot draw any conclusions from TAX 316 because the results are 0.03 from statistical significance should again be rejected. First, as established above, Dr. Feigal—who has herself designed clinical drug trials—is certainly qualified to review a study's results and assess any statistical concerns that are arguably present. Second, Sanofi's brief incorrectly argues that statistical significance is required to find a mere link between a drug and an adverse event. As explained by Dr. Feigal, there are multiple reasons why clinical studies may not regularly offer statistically significant results as to safety endpoints despite being the best available evidence of them. TAX 316, for instance, "is powered for the efficacy end points, disease-free survival and overall survival" and "in general, you don't power studies to look for a safety signature." (Ex. B, Feigal Dep. Vol. I 165:9-15.) That the 10-year safety information for TAX 316 falls just outside of the 0.05 mark is not important here, where "what we were looking at is the increased risk on the Taxotere arm compared to the control arm"—"about double the risk in both studies." (*Id.* at 165:16-19.)

Next, Sanofi's suggestion that Dr. Feigal did not consider potential bias, chance, or confounding factors in the data she considered is also inaccurate. In accordance with the *Daubert* guideposts, Dr. Feigal is of the opinion that a reasonable causation methodology must account

for the possible role of chance, bias and confounding factors. (Ex. I, Feigal Dep. Vol. III 540:18-22.) She testified that "[t]he controlled clinical trial is a very good way to control for content validity, internal validity, and bias ..." (*Id.* at 544:19-23.) To control for confounding factors relating to alopecia, TAX 316 and GEICAM were randomized, which "in and of itself is a very important tool for limiting bias" because any "medical conditions" or "comorbid condition ... should be randomly distributed. (*Id.* at 546:14-547:1.) Although Dr. Feigal did recognize the follow-up limitations of the GEICAM study (*id.* at 561:2-562:15), she noted that the limited data nonetheless "are going in the same trend," albeit with smaller numbers (*id.* at 564:7-12). She explained that despite any follow-up issues, they are "still usable data because it's still a randomized controlled trial" and that she has no "reason to believe that missing data was missing in some biased way"—*i.e.*, that follow-up issues depressed the reporting of alopecia in the control group more than in the TAC group. (*Id.* at 564:21-24.)

She is likewise confident of her vetting of the studies for any internal bias issues, which was on display in real time during her deposition. "You've seen the way in which it was done and the types of papers that I put in there." (*Id.* at 545:4-6.) In her review of the literature. Dr. Feigal selected studies with sound scientific principles and methodologies, noting that these studies control for bias with "prospective protocols that clearly define in a pre-specified way what people are going to look at" (*id.* at 544:23-545:1) and that in collecting her data she looked for "reproducibility of results across studies" (*id.* at 546:5-8, 548:22-23). In sum, Sanofi's statistical arguments are once again without merit.

### D. Dr. Feigal's Opinions are Further Supported by Her Application of the Bradford Hill Criteria

Finally, Dr. Feigal's opinion uses reliable methodology, including the applicable Bradford Hill factors, which are instructive but not required for a causation opinion. First, Dr. Feigal

considered mechanism, or biologic plausibility, in her report (referencing discussing irreversible

stem cell damage) and at length in her deposition:

> I think it's well-known that Taxotere is a cytotoxic chemotherapy agent that can attack the hair in two different ways. It's a systemic drug, so it circulates all throughout the body. Because you have blood vessels in the scalp, the scalp gets exposed. The hair follicles get exposed to the drug. It is known there's two ways that chemotherapy can lead to hair loss. It can attack during the growth phase of the hair, but it can also cause thinning of the hair shaft during the telogen phase and so it breaks off and you only get these little baby hairs. That is what's thought in terms of permanent alopecia. And I have experience with stem cells in another part of the type of work I do, is that cells in your body have what's called stem cells that can renew and replicate. The thought is that it may be poisoning the stem cells so that once that hair is lost, it's lost. You don't have a renewal capability.

(Ex. B, Feigal Dep. Vol. I 148:1-149:1.) She added, alternatively, that the drug was "perhaps

interfering with [the stem cell's] signaling pathway so that it can't do what it needs to do." (*Id.* at

149:20-24.) Dr. Feigal sees a "very strong biologic plausibility based on Taxotere's ability to kill

hair follicles …" (*Id.* at 150:5-12, 228:11-19.) Second, Dr. Feigal considers the timing of the

adverse event to the exposure the "biggest" Bradford Hill factor applicable here—"a critical

one." (Ex. I, Feigal Dep.Vol. III, 548:12-14; Ex. B, Feigal Dep. Vol. I, 223:9-13.) In all the

relevant cases, "exposure occurred before the onset of permanent alopecia, and it was rapid,

occurring two to three weeks, and it was extensive." (Ex. I, Feigal Dep. Vol. III 541:10-14.) Dr.

Feigal reasoned that "if somebody had another form of alopecia, it should predate the

chemotherapy, not suddenly appear at the identical time of chemotherapy." (Ex. B, Feigal Dep.

Vol. I 202:17-25.)  Further, alopecia prior to chemotherapy would not be reported as treatment-

emergent. (*Id.* at 203:18-21.) Before coming to her conclusion, Dr. Feigal also considered dose-

response (*Id.* at 141:13-142:4, 142:18-143:11, 219:21-22, 225:8-21; Ex. I, Feigal Dep. Vol. III,

445:14-19), alternative explanations (Ex. B, Feigal Dep. Vol. I 220:12-19, 221:7-16, Ex. I, Feigal

Dep. Vol. III 543:25-544:4), reproducibility of findings (*id.* at 519:8-12), and consistency with

other knowledge regarding chemotherapy and hair loss (*id.* at 543:19-24.) Dr. Feigal made her consideration of these factors clear time and again at her deposition. (Ex. B, Feigal Dep. Vol. I 138:9-13, 176:7-11, 218:3-7, 219:1-10, 222:2-6, Ex. I, Feigal Dep. Vol. III 443:18-24.)

Overall, Dr. Feigal has expressed her methodology clearly and confidently. She "looked at prospective clinical studies, prospectively designed cohort studies, [and] retrospective studies, some of which did have some predetermined protocols even though they were looking at retrospective data, and looked at case studies." (*Id.* at 548:24-549:6.) Recognizing the "hierarchy of evidence," she found consistency across all of these types of studies. (*Id.* at 549:6-7.) Admittedly, this is not "a mathematical calculation." (*Id.* at 549:16-17.) What she did was "look at the triangulation of issues across the controlled clinical studies, the published papers and the pharmacovigilance data" for "evidence which is consistent with the principles of causation, to look to see whether or not there's strong, substantial, and reliable and consistent evidence that's been evaluated in a scientifically sound a reasonable way." (*Id.* at 540:11-16, 549:16-20.) Dr. Feigal recounts being "struck by the cumulative body of evidence" because, to her, "the consistency across multiple kinds of studies ... was one of the strongest lines of evidence." (*Id.* at 549:25-550:6.) Her approach is thorough, her methodology reliable, and her opinions admissible.

## V.    SANOFI'S SUPPLEMENTAL ARGUMENTS ARE WITHOUT MERIT.

Sanofi has filed a supplemental brief that badly misstates the availability of stem-cell science for diagnosing permanent hair loss and the parties' and scientific community's work in this regard.

### A.  Dr. Thompson's Stem Cell Investigations

As the Court is aware, Dr. Curtis Thompson, Plaintiffs' expert dermatopathologist, began and soon after abandoned some investigative steps into stem cells pathology in the trial plaintiffs. This work was initiated not by Plaintiffs' counsel but at his own suggestion during his early work

as a consulting expert, when he had been asked to investigate PCIA "in any way possible." (Ex. K, Thompson Dep Vol. II, 328:12-19; Ex. L, Thompson Letter to Milazzo 3/27/19 at 1.) Specifically, Dr. Thompson had published about one IHC stain, CK15, and wondered whether this or similar stains might provide clues to stem cells in pCIA. (Ex. K, Thompson Dep. Vol. II, 341:11-15.) Dr. Thompson testified that neither he nor anyone else uses the CK15 or Ki-67 stains in the interpretation of hair loss biopsies outside of the research context. (*Id.* at 341:15-18.)

Dr. Thompson used the CK 15 and Ki-67 on slides from the three trial plaintiffs to see whether they tested positive (meaning the samples were reactive to the stains) or negative (meaning they were not). While a negative CK 15 or Ki-67 test result would indicate that the patient's follicular stem cells were absent or not growing, a positive test result indicates nothing because CK 15 and Ki-67 are not definitive follicle stem cell markers. For instance, CK 15 stains stem cells, so that if the stem cell is present, the CK15 stain will be positive. (Ex. M, Thompson Dep. Vol. III at 398:10-12.) However, the converse is not true, CK15 may also stain other cells in the absence of stem cells. (*Id.* at 398:2-9.) As Dr. Thompson explained: "[I]t stains all basal cells of the follicle. So even if [stem cells] are destroyed, it could still have staining of other cells. It's not a specific marker." (*Id.* at 398:16-21.) Likewise, Ki-67 is not a definitive stem cell marker and "hits any cell that's growing." (*Id.* at 400:1-3.) So, if a Ki-67 stains tests negative, it means that the stem cell is not growing. However, a stem cell that is not growing can still give a positive result on account of some other cells' growth. (*Id.* at 399:19-23.) Both Dr. Thompson's CK15 and Ki-67 stains were positive for each of the three trial plaintiffs, and therefore could not indicate anything about the stem cells. With these results, he determined that the IHC stained slides had no utility in this case. (Ex. L, Thompson Letter to Milazzo 3/27/19 at

2.) Notably, Sanofi's expert dermatopathologist, Dr. Chandra Smart, agrees with Dr. Thompson in this regard. (Ex. N, Smart Dep. 182:11-183:19.)

**B.  A Positive IHC Stain Does Not Mean There Is No Stem Cell Damage.**

As shown immediately *supra*, the fact that any one plaintiff's basal follicular tissue reacted with a CK15 and/or Ki-67 stain by no means indicates that her follicular stem cells are healthy and growing. And as also shown immediately *supra*, Dr. Thompson fully explained this to counsel for Sanofi during his deposition just months ago. Nonetheless, Sanofi's argument exhibits either a troublesome inability to comprehend or a stubborn refusal to correct the logical flaws on which its two 10-page supplemental memoranda are built. To be clear, and as Dr. Thompson has previously explained to the Court, "The presence [or] absence of staining with CK15 and Ki-67 may not be used as definitive evidence of follicular stem cell damage or death," and "Positive or negative staining by both of these antibodies is not known to support or refute any particular hair loss diagnosis." (Ex. L, Thompson Letter to Milazzo 3/27/19 at 1.) Again, Sanofi's expert Dr. Smart agrees with Dr. Thompson on this. (Ex. N, Smart Dep. 182:11-183:19.)

**C.  The Results of the Plaintiffs' IHC Stains Cannot Be Used to Make General Causation Conclusions on Biological Plausibility.**

Even if the IHC stains did mean what Sanofi misrepresents them to mean (they do not), test results from three patients could not reliably impugn Taxotere's widely hypothesized mechanism of action for causing permanent alopecia through damage to stem cells. Again, it is remarkable that Sanofi argues in one breath that a 1,480-member clinical trial with 10-year follow-up is an irrelevant and unreliable basis for a general causation opinion and then, in the next breath, that test results from *three patients* undermines the scientific consensus on mechanism of action. It is not true, as Sanofi suggests, that had the trial plaintiffs' IHC stains come back negative plaintiffs

would have used them to bolster their general or specific causation cases. As Dr. Thompson testified:

> [T]he state of the stem cell research is very separate from the current pathology interpretation and it's still in much more of a theoretical area. It doesn't have any application to interpretation, pathological interpretation, treatment, anything in the clinical hair loss alopecia world. It's very basic science. And there hasn't been any kind of, they call it bench to bedside, there hasn't been any kind of connection yet.

(Ex. K, Thompson Dep. Vol. II 338:4-15.) Rather, when pressed on whether he or other experts would have used hypothetical negative IHC results in plaintiffs' cases, Dr. Thompson responded that the science would have first needed to be "investigated in a controlled study with positive and negative controls." (Ex. M, Thompson Dep. Vol. III 493:21-494:5.) "You can't publish something off of six biopsies from three patients. It's quite a bit more complicated than that." (*Id.*) Results showing damage to the plaintiffs' follicular stem cells "wouldn't have been included in [his] dermatopathology reports because there's no support, published support or even professional experience that these have utility in diagnostics." (*Id.* at 499:23-500:3.) Accordingly, no matter what the IHC stains showed, "it would actually be imprudent to put them in [his] report." (*Id.* at 500:1-3.) It is likewise imprudent for Sanofi to rely on them here, and the Court should reject it for this reason alone.

### D.  A Proven Mechanism of Action Is Not a Prerequisite for Admissibility.

Finally, any argument by Sanofi for exclusion of expert general causation opinion for failure to "describe the mechanism by which" Taxotere causes permanent alopecia are "wrong as a matter of law" and should be categorically rejected. *McBride v. Houston Cty. Health Care Auth.*, 2015 WL 3648995, at *3 (M.D. Ala. June 11, 2015). There is simply no requirement in the law

that a plaintiff must prove the biological means of an injury.[20]  Here, Dr. Feigal has duly considered this commonly used Bradford Hill criterion and identified a plausible biological mechanism: "the hair follicle being permanently damaged ... thought to be likely due to irreversible damage of the stem cells." (Feigal Rep. 33.) This proposed mechanism aligns with that proffered by Sanofi itself in the 2015 Clinical Overview finding a causal association: "The pathophysiology of permanent alopecia remains unknown, with hypotheses involving toxic damage to stem cells/hair matrix cells of the hair bulb or disturbance of the signaling pathway to the secondary hair germ." (Ex. J, 2015 Clinical Overview 33.) Accordingly, Dr. Feigal's causation opinion was never lacking for failure to consider biological plausibility in any way that necessitated or motivated IHC stain testing by an unrelated specific causation expert.

## CONCLUSION

For the foregoing reasons, Sanofi's motion to exclude plaintiff's general causation testimony should be denied.


Dated: July 1, 2019                          Respectfully submitted,


/s/ Christopher L. Coffin                     /s/ Karen B. Menzies
Christopher L. Coffin (#27902)               Karen Barth Menzies (CA Bar #180234)
PENDLEY, BAUDIN & COFFIN, L.L.P.             Andre Mura (CA Bar # 298541) (on the brief)
1100 Poydras Street, Suite 2505              GIBBS LAW GROUP LLP
New Orleans, Louisiana 70163                 6701 Center Drive West, Suite 1400
Phone: (504) 355-0086                        Los Angeles, California 90045
Fax: (504) 355-0089                          Telephone: 510-350-9700
ccoffin@pbclawfirm.com                       Facsimile: 510-350-9701
                                             kbm@classlawgroup.com

---

[20] *See In re Chantix (Varenicline) Prod. Liab. Litig.*, 889 F.Supp.2d 1272, 1301-02 (N.D. Ala. 2012); *see McBride v. Houston Cty. Health Care Auth.*, 2015 WL 3648995, at *3 (M.D. Ala. June 11, 2015) ("Indeed, such a stringent standard would eliminate testimony on even well known cause-effect relationships."); *see In re Traylsol Products Liability Litigation*, 2010 WL 4102247, *4 (S.D.Fla. 2010) ("biological plausibility is a factor to be considered in making this determination, and ... a causal relationship can be established even when the mechanism of action is unknown").)

*Plaintiffs' Co-Lead Counsel*

*Plaintiffs' Co-Lead Counsel*

<u>/s/M. Palmer Lambert</u>
M. Palmer Lambert (#33228)
GAINSBURGH BENJAMIN DAVID
MEUNIER & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: 504-522-2304
Fax: 504-528-9973
plambert@gainsben.com

<u>/s/Dawn M. Barrios</u>
Dawn M. Barrios (#2821)
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: 504-524-3300
Fax: 504-524-3313
barrios@bkc-law.com

*Plaintiffs' Co-Liaison Counsel*

*Plaintiffs' Co-Liaison Counsel*

## PLAINTIFFS' STEERING COMMITTEE

Anne Andrews
Andrews Thornton Higgins Razmara, LLP
2 Corporate Park, Suite 110
Irvine, CA 92606
Phone: (800) 664-1734
aa@andrewsthornton.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@atkinsandmarkoff.com

J. Kyle Bachus
Bachus & Schanker, LLC
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Phone: (303) 893-9800
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Phone: 510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, Florida 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

Andrew Lemmon
Lemmon Law Firm, LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

Genevieve Zimmerman
Meshbesher & Spence Ltd.
1616 Park Avenue South
Minneapolis, MN 55404
Phone: (612) 339-9121
Fax: (612) 339-9188
gzimmerman@meshbesher.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2019, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

*/s/ Dawn M. Barrios*
Dawn M. Barrios
