UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION | MDL NO. 2740 |
| | SECTION "H" (5) |

THIS DOCUMENT RELATES TO:

Barbara Earnest, Case No. 2:16-cv-17144.

---

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. JOHN W. THOMPSON, JR.**

---

Plaintiff's Opposition does not establish the admissibility of Dr. Thompson's opinions under Rule 702. The Court should exclude his testimony because he lacks the necessary qualifications to testify about emotional distress in this context, and he failed to use a reliable methodology to evaluate Ms. Earnest and arrive at his opinions.

## ARGUMENT

**I. DR. THOMPSON'S OPINIONS ARE INADMISSIBLE BECAUSE THEY ARE OUTSIDE HIS AREA OF EXPERTISE.**

Plaintiff touts Dr. Thompson's various "credentials" to argue he is "well-qualified to offer expert opinions on plaintiffs' emotional damages resulting from permanent alopecia." Pl. Opp. at 3. Yet, none of his purported training, board certifications, involvement with professional societies, publications, or research relates to evaluating cancer patients or, more importantly, patients claiming emotional distress from hair loss. Dr. Thompson has never researched or published in this area and admits that he does not consider himself a specialist in treating cancer patients. *See* Exhibit C to Memorandum in Support of Sanofi Defendants' Motion to Exclude Expert Testimony of Dr. John W. Thompson Jr. (Rec. Doc. 6141) (Thompson Dep. Vol. I at 67:17-

69:12).  Moreover, Ms. Earnest (and Ms. Durden) were the only two patients he has ever evaluated with alleged emotional distress from hair loss.  *See* Ex. C to Rec. Doc. 6141 (*Id.* at 69:13-18).

In their Opposition, Plaintiff argues that *Mancuso* is distinguishable because Dr. Thompson is being offered "as an expert in the field of psychiatry."  Pl. Opp. at 5.  But Dr. Thompson is not offering opinions on psychiatry generally – he is offering opinions regarding a cancer patient claiming emotional distress from cancer treatment, an area in which he has no expertise.  Being a psychiatrist does not qualify Dr. Thompson to opine on every conceivable psychological issue. *See Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1112-13 (5th Cir. 1991) (concluding that an "M.D. degree . . . alone is not enough to qualify [an expert] to give an opinion on every conceivable medical question.").

Moreover, Dr. Thompson's analysis in this case also reveals that, when evaluating Ms. Earnest and forming his opinions (opinions that he never supplemented or changed after reviewing the full record), he was painfully unaware of multiple factors related to the applicable DSM-5 criteria for an adjustment disorder, namely: (1) when Plaintiff's alleged adjustment disorder began; (2) whether Plaintiff developed symptoms within three months of the "identifiable stressor"; and (3) whether any "[m]arked distress" was "out of proportion to the severity or intensity of the stressor."  Plaintiff contends that "Dr. Thompson's report on Ms. Earnest includes a detailed patient history with regard to cancer diagnosis, alopecia, and adjustment disorder."  That, however, is irrelevant. Despite a follow-up interview with Ms. Earnest to address the factors noted above, Dr. Thompson still does not know the answers to these DSM-5 emblematic questions.

Finally, Plaintiff argues that because Dr. Thompson has been accepted "as an expert in the field of forensic psychiatry" in previous cases, he thus should be accepted here.  Pl. Opp. at 4. That is not a valid argument under Rule 702.  Rather, the Court must conduct a fact-specific inquiry

and determine whether the opinions proffered by Dr. Thompson are admissible *in this case*, considering the nature of the claims and the subject matter *here* – not simply defer to fact that there are other cases in which Dr. Thompson has been permitted to testify. *See Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 372 (5th Cir. 2000) (application of *Daubert* factors is a fact-specific inquiry and depends on "nature of the issue at hand, the witness's particular expertise and the subject of the testimony.").

## II. DR. THOMPSON'S OPINIONS ARE INADMISSIBLE BECAUSE THEY ARE UNRELIABLE.

### A. Dr. Thompson Did Not Consider All Relevant Evidence in Forming His Opinions.

When Dr. Thompson initially rendered his opinions in this case, he had reviewed only a small portion of Ms. Earnest's medical records and, of all the numerous depositions available to him, he had only reviewed Ms. Earnest's 2017 deposition. *See* Exhibit B to Memorandum in Support of Sanofi Defendants' Motion to Exclude Expert Testimony of Dr. John W. Thompson Jr. (Rec. Doc. 6141). Even after being provided all of the medical records, all of the depositions, and purportedly reviewing the full record, Dr. Thompson's diagnosis of Ms. Earnest did not change, notwithstanding the fact that this collateral information directly contradicted his opinions regarding Ms. Earnest's social functioning. Instead, Dr. Thompson cherry-picked certain information – while ignoring other information – to fit with his pre-determined diagnosis of Ms. Earnest.

As he testified, there was nothing in the record about Ms. Earnest seeking out treatment for her hair loss or care for any alleged emotional symptoms related to hair loss. Thompson Dep. Vol. III 83:1-13[1] (Ex. A). Dr. Thompson, however, ignores these objective facts. Instead, he relies

---

[1] "Q. Now, when you say that you didn't see a lot in the records about seeking out treatment for her hair loss -- A. Right. Q. – there's nothing in any of the records about her seeking out treatment for her hair loss; correct? A. Yes, ma'am. That's a figure of speech of mine. I apologize. There was nothing in the record about her seeking out care

3

<u>entirely</u> on Ms. Earnest's subjective interviews with him, which were made in a medico-legal context.[2]

Plaintiff also claims that "no such contradictions exist" between Ms. Earnest's interviews with Dr. Thompson and other collateral evidence. Pl. Opp. at 8. This is simply untrue. To the contrary, the fact that Ms. Earnest did not seek treatment for her alleged hair loss until after she filed her lawsuit warranted Dr. Thompson conducting a supplemental interview. Thompson Dep. Vol. III 55:1-9 (Ex. A) ("I thought there were some questions that either needed clarifying or I couldn't answer"). In November 2017, Ms. Earnest testified that she did not believe Arimidex was contributing to her alleged hair loss and she has only ever attributed her hair loss to chemotherapy. Earnest Dep. Vol. I 291:1-10; 240:18-20 (Ex. B). Yet, in April 2019 she told Dr. Thompson that she did not seek treatment for her alleged hair loss because she thought it was caused by the Arimidex and could eventually grow back. Thompson Dep. Vol. III 63:6-9 (Ex. A). In rendering his opinion, Dr. Thompson ignored these discrepancies. And while Dr. Thompson may not be ascertaining the *cause* of Ms. Earnest's hair loss, to reliably diagnose an adjustment disorder (per the applicable DSM-5 criteria), he does need to know *when* her emotional symptoms began. These conflicting stories also call into question the veracity of Plaintiff's interview statements.

Dr. Thompson did not conduct "any analysis as to whether there was any malingering in the Plaintiffs' accounts." Pl. Opp. at 12. Both the objective evidence of the medical records and the MMPI-2 testing results, as well as the significant contradictions in Ms. Earnest's sworn testimony, were wholly ignored by Dr. Thompson.

---

for her hair loss and there was nothing in the record about her seeking out care for emotional symptoms that I could find. It may be in there, but I didn't see it."

[2] This is evident by Plaintiff citing exclusively to Dr. Thompson's report and deposition testimony in section B.1, as opposed to objective evidence.

Finally, and contrary to Plaintiff's assertion that Dr. Thompson "reviewed and considered Bianchini's report,"[3] including the MMPI-2 testing (*see* Pl. Opp. at 7-8), it is clear that Dr. Thompson ignored such results. Ms. Earnest's MMPI-2 testing showed no impaired social functioning and no "elevated levels of emotional, psychological symptoms": no depressive or anxious features, no anxiety, and no symptoms of social avoidance, social introversion, social discomfort, low self-esteem, self-consciousness, antisocial attitudes, or antisocial behavior. Bianchini Vol. III 69:5-70:7; 74:7-77:24; 78:20-79:2 (Ex. C). Further, the testing showed that Ms. Earnest was not minimizing or denying psychological symptoms in her responses. *Id.* at 82:25-83:5 (Ex. C). Dr. Thompson, however, ignores the results of objective testing evidence, choosing instead to instead rely solely on Ms. Earnest's interviews with him. For these reasons, his opinions are inadmissible. *See*, *e.g.*, *Burst v. Shell Oil Co.*, 2015 WL 3755953, at *13 (E.D. La. 2015), *aff'd*, 650 F. App'x 170 (5th Cir. 016) (excluding expert's opinion because, *inter alia*, he "cherry-picks data from studies in several significant instances and fails to explain contrary results in a manner that belies the reliability of his methodology"); *Konrick v. Exxon Mobil Corp.*, 2016 WL 439361, at *13 (E.D. La. Feb. 4, 2016), *aff'd*, 670 F. App'x 222 (5th Cir. 2016) (excluding expert's opinions, because, *inter alia*, she "cherry-picks data and fails to explain results that contradict her conclusion"; noting such failure "casts doubt on the reliability of her methodology.").

**B. Dr. Thompson Did Not Adhere to the DSM-5 Adjustment Disorder Criteria.**

Plaintiff claims psychiatry is a "soft" social science, and that the DSM-5 is simply a "guiding force" that Dr. Thompson used as a "guiding principle to diagnose Ms. Earnest." Pl. Opp. at 6, 8-9. Notwithstanding Plaintiff's misrepresentation of what the DSM-5 is – a book that

---

[3] Plaintiff's assertion does not address Sanofi's argument. Sanofi does not argue that Dr. Thompson never reviewed or considered the MMPI-2 testing results. Sanofi instead argues that he failed to assess the testing results and explain why he ignored the fact that the testing shows no emotional distress.

5

"defines and classifies mental disorders in order to improve diagnoses, treatment, and research" and that "is the product of more than 10 years of efforts by hundreds of international experts in all aspects of mental health" – it is clear that Dr. Thompson did not consider or apply the DSM-5 criteria when diagnosing Ms. Earnest with an adjustment disorder.

Plaintiff concedes that "an exact onset date cannot be determined for Ms. Earnest." Pl. Opp. at 9. If Dr. Thompson cannot ascertain when Ms. Earnest's alleged adjustment disorder began or what is even her "identifiable stressor," then his opinions regarding any such adjustment disorder are unreliable. For example, did an adjustment disorder begin when she initially lost her hair during chemotherapy (before she was even treated with docetaxel)? Or did it start when she saw a television commercial for the Taxotere litigation in 2015/2016? Or might it have started when she told by her lawyers that docetaxel allegedly causes permanent hair loss? Without knowing when her alleged adjustment disorder started, Dr. Thompson cannot educate the fact-finder on when such damages began.

In footnote 5 to their Opposition, Plaintiff claims that "Criteria C, D, and E would not apply to Ms. Earnest's symptoms." This statement is without support. In the DSM-5, criterion C for an adjustment disorder – that "[t]he stress-related disturbance does not meet the criteria for another mental disorder . . ." – applies. As an expert, Dr. Thompson must perform a differential diagnosis and rule out alternative causes for Ms. Earnest's purported emotional symptoms. Plaintiff's concession that "Criteria C" does not apply is further proof that Dr. Thompson's opinions are unreliable. Indeed, the DSM-5 lists several differential diagnoses for an adjustment disorder, including "major depressive disorder," "posttraumatic stress disorder and acute stress disorder," "personality disorders," "psychological factors affecting other medical conditions," and "normative stress reactions." *See* American Psychiatric Association: Diagnostic and Statistical

6

Manual of Mental Disorders, Fifth Edition. Arlington, VA, American Psychiatric Association, 2013 (relevant pages attached as Ex. D). Because Dr. Thompson did not properly apply the DSM-5 criteria to Ms. Earnest, his opinions are unreliable.

### C. Dr. Thompson Did Not Consider Alternative Causes for Plaintiff's Adjustment Disorder.

There was no analysis performed by Dr. Thompson regarding differential diagnoses for Ms. Earnest's alleged adjustment disorder, including whether what she is experiencing in a "normative stress reaction." In the DSM-5, a normative stress reaction is defined as follows:

> When bad things happen, most people get upset. This is not an adjustment disorder. The diagnosis should only be made when the magnitude of the distress (e.g., alterations in mood, anxiety, or conduct) exceeds what would normally be expected (which may vary in different cultures) or when the adverse event precipitates functional impairment.

*See* Ex. D. Dr. Thompson admitted it is unclear to him what a normal reaction to persistent hair loss after chemotherapy would be, stating Ms. Earnest's reaction is "not out of the ordinary" and that "I don't know one way or the other" whether her level of distress is any different than what most people with hair loss would experience. Thompson Dep. Vol. III 71:20-72:11[4]; 135:15-136:14 (Ex. A). Dr. Thompson did not testify that Ms. Earnest "exhibits a range of abnormal symptoms" as Plaintiff claims.[5] Pl. Opp. at 10. Without knowing "what would normally be

---

[4] Sanofi does not misquote Dr. Thompson as Plaintiff claims:

> Q. And -- but as a psychiatrist, you agree that her reported reactions to not having hair are not out of the ordinary? A. **I wouldn't say they are** -- they are – **I wouldn't say they -- they are not bizarre or – or completely unusual; right**? But they -- and, **no, they are not out of the ordinary, that's true.** Q. How would most people react to having lost their hair and having it not grow back? A. I think it would be an emotional experience for most people. **Q. And for most people, they would want to cover their head when they go outside of the house or do you know one way or the other? A. I don't know one way or the other. I would assume they would, but I don't know one way or the other.**

Thompson Dep. Vol. III 71:20-72:11 (Ex. A).

[5] The testimony cited by Plaintiff actually states: "And I think the percentage of time, the -- the next question down the line was, you know, well, what percentage of time are you not doing stuff that you would normally do or not doing

7

expected," he could not rule out whether Ms. Earnest is simply experiencing a "normative stress reaction."[6] Dr. Thompson further testified that he could not rule out Ms. Earnest's age, neuropathy, or initial cancer diagnosis and fear of cancer returning as factors that impact Ms. Earnest's social functioning. *See* Exhibit C to Memorandum in Support of Sanofi Defendants' Motion to Exclude Expert Testimony of Dr. John W. Thompson Jr. (Rec. Doc. 6141) (Thompson Dep. Vol. I 358:4-10; 358:24-359:7; 360:22-361:7).

Ms. Earnest's sworn deposition testimony and medical records do no reveal impaired social functioning or distress over hair loss. *See* Earnest Dep. Vol. II 169:7-24 (attending sister's 80th birthday party in November 2014); *id.* at 172:1-18 (looking at Christmas lights in City Park in December 2014); *id.* at 174:2-175:3 (attending annual holiday party at friend's home in December 2016); *id.* at 181:3-11 (trip to Disney World in February 2018); *id.* at 198:18-199:4 (trip to Silver Dollar City in October 2018) (Ex. E); *see also* Slidell Radiation Center 5-7 (Ex. F) (first complaint of hair loss to treating physician not made until February 20, 2017). Thus, Plaintiff's argument that "Defendants fail to address a single example" of "instances in which hair loss has had a direct impact on Ms. Earnest's social functioning" (*see* Pl. Opp. at 13.) is because any such example is only contained in her subjective interviews with her own experts.

Because Dr. Thompson did not "rule in the suspected cause of an injury and rule out other causes or determine which of the remaining explanations is most likely the cause," his opinions

---

it in a similar fashion that you would normally do it; and she said, 'About half of the time. About 50 percent of the time, am not doing what I would normally do.' And she said, 'Almost 100 percent of the time, I don't go to Walmart because I don't want people still thinking I'm a cancer patient.' And that's, you know, the anxiety component of the adjustment disorder, that she doesn't -- she doesn't want people to still think she's a cancer patient when she's actually cured of cancer for all intents and purposes." Thompson Dep. Vol. III 71:6-19 (Ex. A).

[6] Plaintiff's citation to the DSM-5 "Cautionary Statement" misses the point. Pl. Opp. at 11. Here, the adjustment disorder criteria is not being using to establish a specific element of a legal claim.

must be excluded as unreliable. *See Hooks v. Nationwide Housing Systems, LLC*, No. 15-cv-729, 2016 WL 3667134, at *15 (E.D. La. 2016).

## CONCLUSION

For the foregoing reasons, the Sanofi Defendants respectfully request that the Court exclude the opinions and testimony of Dr. John W. Thompson, Jr., in their entirety from the above-captioned case.

Date: July 12, 2019

Respectfully submitted,

*/s/ Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE URQUHART & MOORE LLC**
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: 504-310-2100
Facsimile: 504-310-2120
dmoore@irwinllc.com

Harley Ratliff
Adrienne L. Byard
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
Facsimile: 816-421-5547
hratliff@shb.com
abyard@shb.com

*Counsel for Sanofi-Aventis U.S. LLC and Sanofi U.S. Services Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on **July 12, 2019**, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

/s/ *Douglas J. Moore*
Douglas J. Moore