# EXHIBIT A

Page 25

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

* * * * * * * * * * * * * * * * * * * * * * * * *

IN RE: TAXOTERE (DOCETAXEL)  MDL No. 2740

PRODUCTS LIABILITY LITIGATION

SECTION: H

This Document Relates To:

Barbara Earnest, Case No. 2:16-cv-17144

* * * * * * * * * * * * * * * * * * * * * * * * *

VOLUME III

Videotaped Deposition of JOHN W. THOMPSON, JR., MD, taken at Tulane University School of Medicine Department of Psychiatry and Behavioral Sciences, 1440 Canal Street, New Orleans, Louisiana 70112, on Thursday, April 18th, 2019, at 9:09 a.m.

By: Ashlee B. Ancalade

Registered Professional Reporter

Page 55

1    Q    And when did you decide that you needed a
2    second interview of Ms. Earnest?
3    A    As I was reviewing the materials to prepare
4    for this deposition, I saw -- I went over some of the
5    questions that were raised in the first deposition.  I
6    went back over her reports, and I thought there were
7    some questions that either needed clarifying or I
8    couldn't answer; and I assumed you would ask those
9    again this time.  So I wanted to clarify them with her.
10   Q    So things I had asked you in your first
11   deposition, you couldn't answer, and you wanted to
12   contact Ms. Earnest in order to obtain that information
13   so that you could answer them today?
14   A    Yes.
15           MR. EXNICIOS:
16                Objection to the form of the question.
17   BY MS. SCHULTZ:
18   Q    Did you believe that you needed a second
19   interview of Ms. Earnest prior to your first
20   deposition?
21   A    No.  Because those questions weren't posed
22   or -- either they weren't posed or I hadn't thought of
23   them in detail before that time.
24   Q    And why did you have the interview of
25   Ms. Earnest on the telephone instead of in person?

1           And she said, Well -- she said, "Well, I
2    don't know exactly other than I thought, you know,
3    maybe it could be due to this and maybe it will come
4    back some day."  So she was holding out hope, even
5    though it had been a long time.
6         Q    So one of the reasons she had not sought
7    treatment was because she thought her hair loss may be
8    from the Arimidex and it may come back some day?
9         A    Yes.
10        Q    Did you ask her any questions about any
11   differences in her symptoms prior to the time that she
12   determined her hair loss was permanent and versus after
13   that time?
14        A    Yeah.  We talked about that in general, and
15   basically her symptoms have been pretty much
16   consistent.  You know, so I asked her, you know -- I
17   don't think I clarified that particular question.  I
18   know you had asked me that before, but she couldn't
19   specifically talk about a mental health symptom or
20   different types of mental health symptoms.
21             She said basically since she's lost her hair
22   that there are issues that come up on a daily basis
23   where she has to make a decision about whether she's
24   going to walk around the house without any turban on or
25   hair on.  So she has to make that decision.  That's

Page 71

1  might act this way because of her appearance; right?
2  But the -- the emotional response that she has to it,
3  you know, you could say, oh, well, that's normal too;
4  but it does impair her social functioning to the point
5  where I think it qualifies for an adjustment disorder.
6          And I think the percentage of time, the --
7  the next question down the line was, you know, well,
8  what percentage of time are you not doing stuff that
9  you would normally do or not doing it in a similar
10 fashion that you would normally do it; and she said,
11 "About half of the time.  About 50 percent of the time,
12 I am not doing what I would normally do."  And she
13 said, "Almost 100 percent of the time, I don't go to
14 Walmart because I don't want people still thinking I'm
15 a cancer patient."  And that's, you know, the anxiety
16 component of the adjustment disorder, that she
17 doesn't -- she doesn't want people to still think she's
18 a cancer patient when she's actually cured of cancer
19 for all intents and purposes.
20     Q    And -- but as a psychiatrist, you agree that
21 her reported reactions to not having hair are not out
22 of the ordinary?
23     A    I wouldn't say they are -- they are -- I
24 wouldn't say they -- they are not bizarre or -- or
25 completely unusual; right?  But they -- and, no, they

1  are not out of the ordinary, that's true.
2       Q    How would most people react to having lost
3  their hair and having it not grow back?
4       A    I think it would be an emotional experience
5  for most people.
6       Q    And for most people, they would want to cover
7  their head when they go outside of the house or do you
8  know one way or the other?
9       A    I don't know one way or the other.  I would
10 assume they would, but I don't know one way or the
11 other.
12           I mean, some -- some people, after a certain
13 period of time, might just say, you know, this is the
14 way I am; I'm beautiful this way; I'm just going to go
15 bald.  And, you know, there are women who go bald.  I
16 mean, you know, if they are comfortable with their
17 sense of self-esteem, they might do that over a period
18 of time.
19           I mean, after five or seven years, they might
20 just say this is who I'm going to be, you know.  And
21 so -- but she hasn't reached that point yet.
22      Q    And Ms. Durden and Ms. Earnest are the only
23 two individuals that you have ever evaluated who have
24 had persistent hair loss; correct?
25      A    Yeah.  For the -- yes.

1    Q    Now, when you say that you didn't see a lot
2  in the records about seeking out treatment for her hair
3  loss --
4    A    Right.
5    Q    -- there's nothing in any of the records
6  about her seeking out treatment for her hair loss;
7  correct?
8    A    Yes, ma'am.  That's a figure of speech of
9  mine.  I apologize.  There was nothing in the record
10 about her seeking out care for her hair loss and there
11 was nothing in the record about her seeking out care
12 for emotional symptoms that I could find.  It may be in
13 there, but I didn't see it.
14   Q    Since she made the determination that her
15 hair loss was caused by Taxotere, have you asked her
16 whether or not she's interested in seeking out
17 treatment for her hair loss that she believes was
18 caused by Taxotere?
19   A    I didn't ask her that question.
20   Q    You make a note here with respect to the
21 50 percent of the time when -- when she's making
22 decisions?
23   A    Yeah.
24   Q    And you've written two notes here about two
25 different weddings; correct?

1  diagnosis.
2       It's adjustment disorder not adjustment
3  order.
4  BY MS. SCHULTZ:
5       Q    Did I say that?
6       A    You did.
7       Q    So it's a consideration in making a diff- --
8  differential diagnosis of an adjustment disorder as to
9  whether the individual is having a Norman -- normal
10 nonpathological reaction to stress?
11          MR. EXNICIOS:
12              Objection to the form of the question.
13 BY MS. SCHULTZ:
14      Q    Is that correct?
15      A    Yes.  That's one of the considerations.
16      Q    And is it correct that that is something that
17 you were not able to do, make that kind of a
18 differential diagnosis because it was unclear to you as
19 to what a normal reaction to persistent hair loss after
20 chemotherapy would look like?
21      A    It makes it more difficult, but it doesn't
22 preclude me from making the diagnosis, okay.  Again, we
23 are going back to the check box diagnosis of an
24 adjustment disorder.  I don't do it that way.  I take
25 the different components into consideration and --

```
 1   before I make the diagnosis.
 2           But I would consider, is it a normal reaction
 3   for someone to have some of the symptoms that she's had
 4   with the length of time that she's had alopecia; but it
 5   is hard to find a group of people or large group of
 6   people to compare that with, and so . . .
 7       Q   And so that's something that you would
 8   normally do but under the circumstances of this case
 9   and Ms. Earnest's case, it isn't possible to do it?
10           MR. EXNICIOS:
11               Objection to the form.
12       A   No.  I wouldn't say -- I wouldn't say it
13   isn't possible.  It's something to take into
14   consideration when you are making the diagnosis.
15   BY MS. SCHULTZ:
16       Q   And you have already testified as to the
17   manner in which you took that into consideration?
18       A   I believe so.
19       Q   Are there any other opinions that you intend
20   to offer with respect to Ms. Earnest that we have not
21   discussed in your deposition or that are not in your
22   report?
23       A   At the risk of going three and a half hours
24   again, I would say no.
25           MS. SCHULTZ:
```