UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **In Re: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION** | **MDL NO. 2740** |
| | **SECTION "H" (5)** |
| **THIS DOCUMENT RELATES TO:** | |
| Barbara Earnest, Case No. 2:16-cv-17144. | |

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION TO EXCLUDE EXPERT TESTIMONY OF DAVID MADIGAN, PhD**

To survive *Daubert*, an expert's opinion must be reliable as to the method and underlying data, and their link to the opinions. It was Plaintiffs' burden to prove Dr. David Madigan's "safety signal" testimony is admissible. *Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 550 (E.D. La. 2015). Far from meeting their burden, Plaintiffs concede or ignore the flaws in Dr. Madigan's methodology, rendering his opinions inadmissible. Plaintiffs instead misdirect the Court to certain instances where Dr. Madigan's testimony has been admitted. But those decisions have no bearing on whether Dr. Madigan used appropriate methodology to examine reliable data and provide relevant opinions *in this case*.

In their Response (Rec. Doc. 7469) ("Pls.' Opp."), Plaintiffs admit, or wholly ignore, the essential points in Sanofi's Motion (Rec. Doc. 6144) ("Defs.' Br."), including:

- Unlike the cases in which he has been admitted, Dr. Madigan here did not search using a MedDRA preferred term for the injury alleged because there is not one—instead he resorted to an ad hoc search without proven parameters. Defs.' Br. at 10–12.

- Dr. Madigan's litigation-driven FAERS analysis consisted of finding case reports that listed "Taxotere" as a medication, "alopecia" as an adverse event, and an "Outcome" of "disability or permanent damage." That does not mean, however, that alopecia *was* the patient's "disability or permanent damage" or that the disability was *linked* to Taxotere. Defs.' Br. at 9–12.

- Dr. Madigan did not review (or ask a qualified expert to review) *any* of the underlying cases used for any of his analyses—FAERS, Sanofi's Internal Pharmacovigilance, or the TAX Clinical Trials. Pls.' Opp. at 5.

- Dr. Madigan's FAERS methodology did not isolate adverse event reports involving the injury alleged and admittedly included cases that did not involve reports of patients with permanent alopecia allegedly caused by chemotherapy. Any statistical analyses based on such data thus would be unreliable. Pls.' Opp. at 6.

- Dr. Madigan's FAERS methodology did not distinguish between the different types, severity, or duration of alopecia, and this "lumping" is not reliable. Defs.' Br. at 9–10.

- FAERS data is inherently limited, even when accurately collected for the specific alleged injury–which it was not here. Pls.' Opp. at 5–6.

1

- Dr. Madigan's method for analyzing Sanofi's Internal Pharmacovigilance database is unreliable because he included cases that hit on at least one of his search terms—even if the term was unrelated to alopecia and, thus, not a case of permanent alopecia. Defs.' Br. at 13–14.

- Dr. Madigan's analysis did not reveal a statistically significant *higher* association with Taxotere compared to other chemotherapies, so he was forced to resort to an ad hoc meta-analysis without proven parameters. Defs.' Br. at 17–18.

- Dr. Madigan's reliance on the TAX Clinical Trials ignores that both examined multi-drug regimens. Dr. Madigan claims the trial results showed that "TAC causes irreversible alopecia … at a higher rate than FAC," but admitted that TAC is not Taxotere alone. Dr. Madigan did not rule out the potential causal association with other drugs carrying reports of permanent alopecia. Defs.' Br. at 14–15.

- Dr. Madigan criticizes the unreliability of the GEICAM9805/TAX301 Clinical Trial data, yet relies on the same data for his meta-analysis. Pls.' Opp. at 11.

- Neither Dr. Madigan's TAX316 nor his GEICAM9805/TAX301 Clinical Trial analyses yielded statistically significant results. Pls.' Opp. at 10.

- Neither of the TAX Clinical Trials analyzed permanent alopecia and the final "on-going" alopecia data was over-inclusive to include patients who dropped out of the clinical trials, were lost to follow-up, or died. Defs.' Br. at 15–16.

Each of these points and concessions independently renders Dr. Madigan's opinions unreliable.

**ARGUMENT**

**I.  DR. MADIGAN'S FAERS ANALYSIS WAS NOT RELIABLE.**

Plaintiffs' burden was to prove that Dr. Madigan's analysis of the FAERS database was reliable. *Burst*, 120 F. Supp. 3d at 550. Plaintiffs contend that Dr. Madigan "conducted a disproportionality analysis of the FDA's FAERS database to determine whether a safety signal existed between permanent/irreversible alopecia and Taxotere." Pls.' Opp. at 4. Plaintiffs do not and cannot dispute, however, that the adverse event reports that Dr. Madigan collected for his analysis were not necessarily cases of "permanent alopecia." Defs.' Br. at 8–12. Instead, Dr. Madigan pulled case reports that listed "alopecia" as one of the reported adverse events and also included "disability or permanent damage" as an "outcome." *Id*. Dr. Madigan invented a

2

methodology for this litigation because he, along with Dr. Kessler (Plaintiffs' proffered regulatory expert), "didn't come up with a better one." *See* Exhibit B to Motion to Exclude Testimony of Madigan (Rec. Doc. 6144-2), Madigan Dep. 159:3–9.  When asked if he could point to any literature accepting his chosen methodology by the scientific community, Dr. Madigan replied "Not sitting here, I can't.  But maybe it exists.  I don't know." Madigan Dep. 35:1–6; 97:10–98:4; 173:16–19 (Attached as Ex. A).

Dr. Madigan further admitted his analysis included and relied on case reports that did not involve patients with permanent alopecia allegedly caused by Taxotere.  *See* Madigan Dep. 112:16–113:7, 114:11–14, 159:15–160:17 (Rec. Doc. 6144-2).  Plaintiffs admit that Dr. Madigan "over-counted" cases by including reports that did not involve permanent alopecia (*see* Defs.' Br. at 10–11), but they hypothesize that cases were also "under-counted," thus somehow balancing the scale.  Pls.' Br. at 6.  Lawyer speculation, however, does not render Dr. Madigan's method scientifically reliable.  To the contrary, it further underscores the unreliability and inaccuracy of the data Dr. Madigan analyzed—making the opinion itself unreliable.  *See Soden v. Freightliner Corp.*, 714 F.2d 498, 503 (5th Cir. 1983) (citing *Bauman v. Centex Corp.*, 611 F.2d 1115, 1120 (5th Cir. 1980)).

Similar flaws warranted the exclusion of another biostatistician's opinion in the Lipitor diabetes litigation.  *See In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices, & Prods. Liab. Litig. (No. II)*, MDL 2502, 892 F.3d 624, 633–34 (4th Cir. 2018).  Plaintiffs there "offered the testimony of Dr. Nicholas Jewell to establish a statistical association between Lipitor and new-onset diabetes." *Id*. at 632.  Like Dr. Madigan here, Dr. Jewell relied for his statistical analysis in part on patient data that admittedly did not necessarily correlate with, much less equate to, the actual alleged injury – there, elevated blood glucose levels, which "may, but do not necessarily,

3

indicate that a patient is diabetic." *Id*. at 632–33.  And like Dr. Madigan here, Dr. Jewell "was not a clinician," he "did not 'quite know' what new-onset diabetes meant" and, as the district court found, "was simply not qualified to make determinations about which patients' data should have alerted Pfizer to a possible association between its drug and diabetes." *Id*. at 633.  The same shortcomings render Dr. Madigan's methodology "too tainted with potential bias and error to pass *Daubert* muster" here.  *Id*. at 633.  In *Lipitor*, too, Dr. Jewell assumed all hits were relevant, "an obviously false assumption" − that every clinical trial patient with a reported increased blood glucose level, "regardless of whether they actually experienced any significant increase in glucose from baseline," should be included in his count of patients used to show that Pfizer was on notice of a risk of diabetes with Lipitor.  *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig.*, No. 2:14–md–02502, 2016 WL 827067, at *2–3 (D.S.C. Feb. 29, 2016).  Here too, Dr. Madigan relies on the admittedly false assumption that each FAERS report that hit on his three search criteria "counts" without verification.  "Allowing testimony based on an obviously false assumption … would be abdicating this Court's role as a gatekeeper under *Daubert*."  *Id*.

The two decisions on which Plaintiffs rely are inapposite.  Pls.' Opp. at 6.[1]  In both, Dr. Madigan used a MedDRA "Preferred Term" to search for the *exact injury* alleged.  *Id*.  Here, in sharp contrast, there is no MedDRA "Preferred Term" for "permanent alopecia."  Madigan Dep.

---

[1] *See Rheinfrank v. Abbott Labs., Inc.*, No. 1:13-cv-144, 2015 WL 13022172, at *12–13 (S.D. Ohio Oct. 2, 2015), *aff'd*, No. 16-3347, 2017 WL 680349 (6th Cir. Feb. 21, 2017) (Dr. Madigan searched the FAERS database "for reports containing the MedDRA **preferred term** "developmental delay"") (emphasis added); *In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Prod. Liab. Litig.*, No. 3:09-md-02100, 2011 WL 6302573 (S.D. Ill. Dec. 16, 2011), Dr. Madigan's Report attached as exhibit 1 to Rec. Doc. 2024, *see In re: YASMIN and Yaz (Drospirenone) Marketing, Sales Practices and Products Liability Litigation.*, No. 3:09-md-02100, 2011 WL 7639878, ¶ 29 (S.D. Ill.) (searched the FAERS database for the "MedDRA **preferred terms** that related to [the] defined medical condition" at issue in the case) (emphasis added).

4

90:13–22 (Ex. A) (Q. …There's no standardized coding for irreversible alopecia, that term itself; right?  A. I don't believe so.  Q. Did you check MedDRA for that term?  A. I did.  Q. It doesn't exist there; right?  A. Correct."). Given that, Dr. Madigan crafted a methodology solely for litigation and conducted a search that admittedly over-counted the number of reports for "permanent alopecia."  Because Dr. Madigan's methodology was invented for this case it necessarily has not been tested, peer-reviewed, or approved by the scientific community and accordingly does not pass *Daubert* scrutiny.

Finally, Plaintiffs—citing no authority—argue that a review of the individual case reports is not required.  Yet, Dr. Kessler, on whose input Dr. Madigan purports to rely for his FAERS methodology (*see* Pls.' Opp. at 8), admitted both that the only way to ensure reliability of a FAERS analysis was to analyze the underlying case reports and that no one had done so here.  *See* Exhibit C to Motion to Exclude Testimony of Madigan (Rec. Doc. 6144-3), Kessler Dep. 159:18–20 ("But I, specifically, asked for the underlying case reports in the FAERS database, and I didn't get them.").  Dr. Madigan's FAERS analysis was litigation-driven, and unreliable and inadmissible for multiple reasons.

## II.  DR. MADIGAN'S ANALYSIS OF SANOFI'S INTERNAL PHARMACOVIGILANCE DATABASE WAS NOT RELIABLE.

Plaintiffs concede that Dr. Madigan's analysis of Sanofi's Internal Pharmacovigilance database also involved compiling adverse event reports through search terms supplied by other Plaintiffs' experts without using a uniform MedDRA adverse event term or conducting any review of the reports pulled as search term "hits."  As with his FAERS analysis, Dr. Madigan's methodology was developed solely for litigation and did not attempt to control for or correct its admitted over-counting of cases.  *See, e.g.*, Defs.' Br. at 13.

5

Plaintiffs do not and cannot cite a single decision supporting the reliability, testing, peer review, or scientific acceptance of the method Dr. Madigan used to analyze Sanofi's Internal Pharmacovigilance database. Dr. Madigan's method consisted of search terms determined by other experts with, again, no analysis of underlying case reports. Dr. Madigan had no opinion regarding whether the search terms provided by the other experts were appropriate. Madigan Dep. 224:10–17; 234:19–24 (Rec. Doc. 6144-2). Plaintiffs ignored—and therefore conceded—that Dr. Madigan's method necessarily hit on case reports that did not involve permanent alopecia, thus rendering his conclusions unreliable. Defs.' Br. at 13–14. Plaintiffs likewise ignored—and therefore conceded—that a review of the underlying case reports was necessary to weed out false hits. *Id.*

Plaintiffs stake their reliability argument on an internal Sanofi document applying a different standard, with a different method, based on data from a different timeframe. Pls.' Opp. at 8–9. The fact that Dr. Madigan's analysis hinges on an "agreement" with a company document demonstrates that its purpose is to mislead the jury. The 2015 document is irrelevant to Ms. Francis's and Earnest's claims, whose treatment ended six and four years before to the document's creation. (Rec. Doc. 6163 at 3). Regardless, courts have consistently found that company statements are "no substitute for expert testimony." *Meade v. Parsley*, No. 2:09-cv-00388, 2010 WL 4909435, at *7 (S.D. W. Va. Nov. 24, 2010). That is particularly true when the expert, like Dr. Madigan here, failed to analyze the method used by the company in making its assessment. Madigan Dep. 24:5–10; 243:16–244:5 (Ex. A); *see In re Accutane Prods. Liab.*, 511 F. Supp. 2d 1288, 1296 (M.D. Fla. 2007) (excluding testimony of expert who relied, in part, on company's internal documents without further analysis); *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986,

991–92 (8th Cir. 2001) (same). A post-dated document applying a different standard and (unanalyzed) method, does not spare Dr. Madigan the burden of applying a reliable methodology.

## III. DR. MADIGAN'S ANALYSIS OF THE TAX CLINICAL TRIALS WAS NOT RELIABLE.

Dr. Madigan analyzed both the TAX316 and GEICAM9805/TAX301 data and admitted that neither analysis, standing alone, showed statistical significance. *See* Exhibit A to Motion to Exclude Testimony of Madigan (Rec. Doc. 6144-1), Madigan Report at 19–20, Table 5; Madigan Dep. 249:16–250:13; 256:6–15 (Ex. A). Plaintiffs ignored—and therefore conceded—that: (1) TAX316 included multi-drug regimens that did not isolate Taxotere; (2) TAX316 did not track permanent alopecia; and (3) Dr. Madigan declared the GEICAM9805/TAX301 results unreliable. Defs.' Br. at 14–18. These concessions alone merit the exclusion of Dr. Madigan's opinions.

Plaintiffs argue that, because Sanofi relies upon the TAX316 interim data for its Preemption Motion, Dr. Madigan's reliance, methodology, and opinions related to the TAX316 study must be acceptable. Pl.'s Opp. at 9–10. However, Sanofi's submission of the TAX316 results to the FDA in 2004 included a suggested label change related to alopecia as a "persistent reaction" to the TAC and FAC regimens. That submission did not state that Taxotere alone causes permanent alopecia, nor could it. TAX316 did not track permanent alopecia and it did not isolate Taxotere from the other co-administered chemotherapy drugs. Madigan Dep. 247:20–249:15 (Ex. A). Dr. Madigan likewise did not isolate either the disease or the drug in his analysis. Madigan Dep. 284:4–12 (Rec. Doc. 6144-2) ("Q. You can't rule out other chemotherapies as causes of irreversible alopecia? … A. I can't rule out -- I do not know, one way or another, whether other chemotherapy agents cause irreversible alopecia."). Plaintiffs, however, incorrectly suggest Dr. Madigan should be allowed to use such data for that very purpose. "[A] study that notes 'that the subjects were exposed to a range of substances and then nonspecifically note[s] increases in disease

7

incidence' can be disregarded." *See Burst v. Shell Oil Co.*, No. 14-cv-109, 2015 WL 3755953, at *7 (E.D. La. June 16, 2015), *aff'd*, 650 F. App'x 170 (5th Cir. 2016) (quoting *LeBlanc v. Chevron USA, Inc.*, 396 F. App'x 94, 99 (5th Cir. 2010)).

Left without a foundation for Dr. Madigan's opinions, Plaintiffs pooled data from a second clinical trial, and Dr. Madigan performed a "meta-analysis" of both trials' data. But Dr. Madigan contended that the results of that second trial, GEICAM9805/TAX301, are not reliable. Madigan Report at 19 ¶ 50 (Rec. Doc. 6144-1); Madigan Dep. 254:23–255:11 (Rec. Doc. 6144-2); Pls.' Opp. at 11. Plaintiffs cite no authority allowing Dr. Madigan to nonetheless rely on GEICAM9805/TAX301 in reaching his litigation-driven opinion. Indeed, courts have found meta-analyses inadmissible when the underlying data is unreliable. *See E.R. Squibb & Sons, Inc. v. Stuart Pharms.*, No. 90-cv-1178, 1990 WL 159909, at *15 (D.N.J. Oct. 16, 1990) (acknowledging the utility of a meta-analysis but rejecting its use in that case because one of the two studies analyzed was poorly performed); *In re Baycol Prod. Litig.*, 532 F. Supp. 2d 1029, 1041 (D. Minn. 2007) (excluding plaintiffs' expert's meta-analyses due to the insufficiency of the underlying data). Even Dr. Madigan has testified that meta-analyses are inappropriate when the underlying studies have problems. *See In re Accutane Litig.*, 234 N.J. 340, 365 (N.J. 2018) ("Dr. Madigan also took the position that a meta-analysis of the studies would be improper…because a meta-analysis will inherit the flaws, biases, and structural problems of the studies upon which it is based.").

Plaintiffs additionally argue statistical significance in each of the TAX Clinical Trials is not required and that meta-analyses are, somehow, always admissible.[2] Pls.' Opp. at 11. Both positions are incorrect. Caselaw instructs that meta-analyses should only be performed where the

---

[2] Plaintiffs argue that Sanofi misquoted the RMSE. Pls.' Opp. at 11. Sanofi attaches an excerpt to the RMSE *2nd* Edition, p. 361–362, 380–381 as a reference. (Attached as Ex. B).

8

expert has identified a specific, scientific rationale for doing so—such as the existence of numerous epidemiologic studies that disagree or are small and lack the statistical power needed for definitive conclusions. RMSE 2nd at 380 (Ex. B); *In re: Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.*, No. 12-md-2342, 2015 WL 7776911, at *15 (E.D. Pa. Dec. 2, 2015), *aff'd* 858 F.3d 787 (3d Cir. 2017) (the court excluded an expert statistician in part because he "failed to present a scientific rationale for combining [] two data sets in a meta-analysis" and did "not demonstrate that the studies, standing alone, lacked the statistical power" to examine the question at issue, thus the need for a meta-analysis.). Such was the case in the opinion Plaintiffs rely upon—*In re Bextra and Celebrex Marketing Sales Practices and Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1173–74 (N.D. Cal. 2007) ("Sometimes randomized controlled studies and observational studies of the same drug will have *conflicting results*; some will show a statistically significant association while others will not. A meta-analysis pools the results of various studies to arrive at a single figure to represent the totality of the studies reviewed.") (emphasis added). That said, meta-analyses are not to be used as a means to achieve statistical significance where it does not exist—as Dr. Madigan did here. *In re: Zoloft,* 2015 WL 7776911, at *16 ("It is improper for an expert to take a results-driven approach to a question, molding his methodology and selectively relying upon data so as to confirm his preconceived opinion."). Defs.' Br. at 16–18. Plaintiffs have cited no authority holding the methodology employed here was reliable. To the contrary, in *In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 299 F. Supp. 3d 1291, 1367 (N.D. Fla. 2018), Dr. Madigan's testimony was excluded because his methodology relied upon "statistically insignificant data" that would "tend to confuse the issues and mislead the jury." The same conclusion must be reached here.

**IV. DR. MADIGAN'S CONCLUSION THAT A SAFETY SIGNAL EXISTED "SEVERAL YEARS EARLIER" THAN 2015 IS UNHELPFUL.**

Dr. Madigan was unable to identify *when* the alleged "safety signal" emerged. Plaintiffs argue that Dr. Madigan pinpointed "dates" throughout his report. Pls.' Opp. at 12. Assuming the methodology for each of the analyses is reliable (which they are not), Dr. Madigan identifies the following dates as "safety signals":

- **2000** – PRR Analysis of the FAERS Data;
- **2008** – SEBGM Analysis of the FAERS Data;
- **2009** – Final results of the TAX301/GEICAM data;
- **2010** – Lasso Logistic Regression Analysis of the FAERS Data;
- **2010** – Analysis of Sanofi's Internal Pharmacovigilance Database;
- **2010** – Final results of the TAX316 data;
- **2010** – Meta-analysis of the 10-year TAX Clinical Trials;
- **2012** – SEB05 Analysis of the FAERS Data.

Madigan Report at 13, Figure 1; 14, Figure 2; 15, Figure 3; 16, Table 3; 18 ¶ 46; 20 ¶ 53 (Rec. Doc. 6144-1). Identifying five different years, based on eight different analyses, spanning thirteen years is not helpful to the trier of fact. Further, Dr. Madigan identifies the 2012 SEB05 measure as the primary focus of the FDA and UK Healthcare Products Regulatory Agency. Madigan Report at 7–8 ¶ 24 (Rec. Doc. 6144-1). That alleged "signal" resulted *after* treatment of both Plaintiffs.

Presenting this imprecise information to the trier of fact will result in juror confusion. Plaintiffs cite to no authority supporting their contrary position, failing to meet their burden of proof on admissibility.

### CONLUSION

In light of the foregoing, Defendants respectfully request that this Court exclude the proposed expert testimony by Dr. Madigan.

10

Date:  July 10, 2019

        Respectfully submitted,

        /s/ *Douglas J. Moore*
        Douglas J. Moore (Bar No. 27706)
        **IRWIN FRITCHIE URQUHART & MOORE LLC**
        400 Poydras Street, Suite 2700
        New Orleans, LA 70130
        Telephone: 504-310-2100
        Facsimile: 504-310-2120
        dmoore@irwinllc.com

        Harley Ratliff
        Adrienne L. Byard
        **SHOOK, HARDY & BACON L.L.P.**
        2555 Grand Boulevard
        Kansas City, Missouri 64108
        Telephone: 816-474-6550
        Facsimile: 816-421-5547
        hratliff@shb.com
        abyard@shb.com

        *Counsel for Sanofi-Aventis U.S. LLC and Sanofi U.S. Services Inc.*

### CERTIFICATE OF SERVICE

I hereby certify that on **July 12, 2019**, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

        /s/ *Douglas J. Moore*
        Douglas J. Moore