# EXHIBIT A

Page 1

1         UNITED STATES DISTRICT COURT
2         EASTERN DISTRICT OF LOUISIANA
3
4                                MDL NO.: 2740
                                 SECTION: H
5
6   IN RE: TAXOTERE (DOCETAXEL)
    PRODUCTS LIABILITY LITIGATION
7
8   This Document Relates To:
    Antoinette Durden, Case No. 2:16-cv-16635;
9   Tanya Francis, Case No. 2:16-cv-17410;
    Barbara Earnest, Case No. 2:16-cv-17144.
10  _____/
11
12                   December 7, 2018
                     8:13 a.m.
13
14
15      VIDEOTAPED DEPOSITION of DAVID MADIGAN, PHD,
16   held at the offices of Napoli Shkolnik PLLC, located
17   at 360 Lexington Avenue, New York, New York 10017,
18   before Anthony Giarro, a Registered Professional
19   Reporter, a Certified Realtime Reporter and a Notary
20   Public of the State of New York.
21
22
23
24
25   Job No. NJ3151484

Page 24

1    same question, have you read
2    Dr. Palatinski's deposition?
3         A     Yes.  It's been a while.  I
4    think I read that one more completely.
5         Q     Did you read Dr. Hangai's
6    deposition?
7         A     I don't believe so.
8         Q     Do you know who Dr. Hangai
9    is?
10        A     No.
11        Q     We've marked, Doctor,
12   Exhibit 11, the flash drive that you
13   provided that should contain the
14   documents we just discussed, some of them
15   more complete versions; correct?
16        A     That's correct.
17        Q     Is there anything on the
18   flash drive, Exhibit 11, that is not in
19   the stack?
20              Let me rephrase that.
21              Is there anything on the
22   flash drive that is not either in the
23   stack we just marked or listed in your
24   Reliance material?
25        A     I'm not totally sure.  But

1      Q      So in your opinion, you
2  thought the right search to do was to
3  combine a higher-level term of alopecias,
4  plus the outcome of disability or
5  permanent damage?
6      A      Yup.
7      Q      And then after you came up
8  with that approach, you asked Dr. Kessler
9  if he thought it was appropriate?
10     A      Yup.  That's fair enough,
11 yes.
12     Q      And he agreed?
13     A      Yes.
14     Q      How many conversations did
15 you have with Dr. Kessler?
16     A      None.
17     Q      Was all the information you
18 just described from Dr. Kessler obtained
19 through plaintiffs' counsel?
20     A      Yeah.  Please ask
21 Dr. Kessler the following question.  And
22 then a response goes back.
23     Q      Do you know Dr. Kessler?
24     A      I've never actually met him.
25 I've spoken to him on the phone, not in

```
 1        Q         In a narrative.
 2        A         I guess so.
 3        Q         Can that cause any problems
 4   as it relates to identifying information
 5   within the FAERS database?
 6                  MR. MICELI:  Object to the
 7       form.
 8        A         Can it cause problems?  I'm
 9   not analyzing the narratives.  I'm
10   analyzing the coded data.  Am I answering
11   your question?
12        Q         I think so.
13                  There's no standardized
14   coding for irreversible alopecia, that
15   term itself; right?
16        A         I don't believe so.
17        Q         Did you check MedDRA for
18   that term?
19        A         I did.
20        Q         It doesn't exist there;
21   right?
22        A         Correct.
23        Q         Did you check WHOART for
24   that term?
25        A         No.  The FAERS database is
```

1      A      Not a conversation, a
2   communication.
3           MR. MICHELMAN:  Was that
4      your objection?
5           MR. MICELI:  Yes.
6      Q      You've already described the
7   extent to which Dr. Kessler was involved
8   in that process?
9      A      I believe I have, yes.
10     Q      Can you point me to any
11  literature, scientific or otherwise, that
12  says the way to analyze FAERS for
13  irreversible alopecia is to combine
14  higher-level term of alopecias plus an
15  outcome of disability or permanent
16  damage?
17     A      Not sitting here, I can't.
18  But maybe it exists.  I don't know.
19     Q      Other than your work in this
20  case, are you aware of anybody anywhere
21  who has determined that the appropriate
22  way to analyze the FAERS database for
23  irreversible alopecia is to combine the
24  higher-level term of alopecias, plus an
25  outcome of disability or permanent

Page 98

1    damage?
2         A      I'm not.  But it's not
3    something I've looked for.  Good question
4    for Dr. Kessler.
5         Q      In your methodology in this
6    case, do you make any assumptions about
7    how people filling out the adverse event
8    reports interpret the term disability or
9    permanent damage?
10        A      Do I make any assumptions
11   about that?
12        Q      Do you assume for your
13   opinions in this case that everyone who
14   checks the box for disability or
15   permanent damage means the same thing by
16   checking that box?
17               MR. MICELI:  Object to the
18        form.
19        A      In my analysis, you know,
20   the endpoint is irreversible alopecia.
21   And how I identify that mechanically is
22   higher-level term alopecias in the MedDRA
23   codes on the form and that the box is
24   checked.  That's what my analysis looks
25   like precisely.

Page 173

1    way.  That's for sure.  I think it is the
2    best way.
3        Q       Even if it will identify
4    reports where there is no evidence in the
5    narrative that the alopecia was ongoing?
6               MR. MICELI:  Object to the
7        form.
8        A       I don't accept the
9    proposition that these are necessarily
10   examples of what you're talking about.
11   But these kinds of analysis have
12   limitations.  They're discussed at length
13   in my report.  There's underreporting.
14              So there are many --
15   probably, you know, many cases that were
16   never reported to this database.  And can
17   there be errors in what was reported in
18   the database?  There can be.  Are there?
19   I don't know.  There are limitations to
20   these kind of analysis that are
21   well-understood.  Just leave it at that.
22       Q       If you want to understand
23   how many instances there were of hair
24   loss that never came back, wouldn't you
25   be interested in knowing if the analysis

```
 1   offering any criticism of that.
 2                It's just the way you were
 3   phrasing, any criticism of the data.
 4   Well, the data are what the data are.
 5   It's the reports that are in their data
 6   that hit on alopecias.  I'm not
 7   criticizing that.  I'm not blessing it
 8   either.  It is what it is.
 9        Q       On paragraph 46, you start
10   off referencing the conclusion from the
11   2015 clinical overview; right?
12        A       Yes.
13        Q       The cumulative weighted
14   evidence, that quote?
15        A       Yes.
16        Q       You understand that was
17   written by Dr. Hangai?
18        A       I believe that she is the
19   author, maybe not the only author.  But
20   she's an author, certainly of the 2015
21   document.
22        Q       Since you've not read
23   Dr. Hangai's deposition, fair to say you
24   don't know if Dr. Hangai was asked what
25   she meant by that sentence?
```

1  A    I do not.
2  Q    You also don't know if
3  Dr. Hangai explained what she meant by
4  that sentence?
5  A    I don't know.
6  Q    You say the information
7  available to Sanofi at this time was not
8  appreciably different from what was
9  available at the time of the 2011 report.
10 What does that mean?
11 A    I'm not aware of any
12 significant clinical data that, you know,
13 accumulated between those two dates that
14 would have -- would have moved the
15 needles, so to speak, in terms of a
16 causal assessment.
17 Q    In your Table 4, how many
18 reports do you identify between 2011 and
19 2015?
20 A    Middle column, say, I
21 identify 100 -- whatever that is -- 23
22 reports.  They identified fewer, using
23 their definition, as in the number they
24 identified in 2015 was smaller than the
25 number they identified in 2011.

1    database search for any other
2    chemotherapy drugs?
3         A        I only have this database
4    for this one drug.
5         Q        Let's talk about your third
6    research question, analyzing the adverse
7    event rates in the -- call them TAC and
8    FAC arms of the clinical trials.  I guess
9    to be more specific, you title it
10   Irreversible Alopecia in the TACs 301 and
11   the TACs 316 studies.  In paragraph 49,
12   you note that -- let's talk about TAC 316
13   first.
14        A        Okay.
15        Q        You note that a study
16   completion, 29 of the TAC patients had
17   ongoing alopecia compared with 16 of the
18   FAC patients; right?
19        A        Yes.
20        Q        Ongoing alopecia is, in
21   fact, the term that was used in the
22   study; right?
23        A        I think that's right, yeah,
24   in the clinical study report.
25        Q        When a clinical study is

```
 1    going on, investigators could only
 2    document what they see with a given
 3    adverse event on a given day?  They can't
 4    project what's going to happen with an
 5    event in the future?
 6         A      Generally not.
 7         Q      The patient comes in, the
 8    investigator can note for alopecia, does
 9    patient still have it today or not?
10         A      Fair enough.
11         Q      No idea what's going to
12    happen tomorrow or next week or a year
13    from now?
14         A      That might or might not be
15    true.  If you had your leg amputated
16    today, you ain't coming back tomorrow.
17         Q      Fair enough.
18                But your hair might?
19         A      Maybe.  I don't know if that
20    could be ruled out or not.  I don't know.
21         Q      Whether a particular adverse
22    event like alopecia is measured again
23    depends on whether there's further
24    follow-up with the patient?
25         A      That's fair enough.
```

1    Q      And did you review the
2    underlying clinical trial data for TAC
3    316?
4    A      Sure.
5    Q      Did you review the case
6    report forms for any of the 29 patients
7    that had -- that determined to be ongoing
8    alopecia?
9    A      No.  I looked at the
10   quantitative data in the SAS data files.
11   Q      Did you review any of the
12   patient narratives for any of the 29
13   patients?
14   A      I didn't.  I wouldn't.  I
15   don't have them.
16   Q      But you agree at a meeting
17   follow-up of ten years, there is not a
18   statistically significant difference
19   between the two arms of TAC 316 as it
20   relates to ongoing alopecia?
21   A      The P value is .053 or
22   something like that.  It is what it is.
23   If you use .05 as a threshold to apply
24   that sort of tag, then it's not
25   statistically significant.  To me, that's

1    a giant so what.
2         Q       Well, are you offering an
3    opinion whether there was -- well, are
4    you offering an opinion that there was a
5    statistically significant difference
6    between the two arms as it relates to
7    ongoing alopecia?
8         A       Not if you use .05 as the
9    threshold which many people do.
10        Q       And that's fairly standard
11   in the statistics world; right?
12        A       Sure.  It's a completely
13   arbitrary threshold.
14        Q       Just like 2.0 as a threshold
15   for signal in the PRR signals; right?
16        A       It's a little worse than
17   that.  So a 2 is a doubling of the risk.
18   A doubling of the risk in a given context
19   has a clinical meaning, whereas .05 in
20   and of itself mean nothing.  It depends
21   on the sample size.  Bigger samples,
22   smaller P values.  You're completely
23   independent of the clinical context.
24   These are very different.  You can't
25   level the same criticism at the

Page 256

1  patients in the TAC arm and one patient
2  in the FAC arm identified as having
3  ongoing alopecia?
4       A       Using Sanofi's definition,
5  yes.
6       Q       No statistically significant
7  difference between the TAC and FAC arms
8  of TAC 301 as it relates to ongoing
9  alopecia?
10      A       Looking at 301 alone, not at
11 that moment in time, the P value of 0.3,
12 yeah, there's limited.  And the evidence
13 is pointing towards an increased risk.
14 But it's not statistically very
15 impressive.
16      Q       Same question for TAC 301.
17              How did you determine the
18 number of TAC 301 patients that have
19 irreversible alopecia?
20      A       Are you asking something new
21 there or do you want me to repeat what I
22 said before?
23      Q       I think we talked about TAC
24 316.
25              This is specific to TAC 301?