# EXHIBIT B

# Reference Manual on Scientific Evidence

*Second Edition*

Federal Judicial Center 2000

This Federal Judicial Center publication was undertaken in furtherance of the Center's statutory mission to develop and conduct education programs for judicial branch employees. The views expressed are those of the authors and not necessarily those of the Federal Judicial Center.

An electronic version of the *Reference Manual* can be downloaded from the Federal Judicial Center's site on the World Wide Web. Go to

**http://air.fjc.gov/public/fjcweb.nsf/pages/16**

For the Center's overall homepage on the Web, go to

**http://www.fjc.gov**

# Summary Table of Contents

A detailed Table of Contents appears at the front of each chapter

- v   Preface,
  Fern M. Smith
- 1   Introduction,
  Stephen Breyer
- 9   The Supreme Court's Trilogy on the Admissibility of Expert Testimony, Margaret A. Berger
- 39   Management of Expert Evidence,
  William W Schwarzer & Joe S. Cecil
- 67   How Science Works,
  David Goodstein
- 83   Reference Guide on Statistics,
  David H. Kaye & David A. Freedman
- 179   Reference Guide on Multiple Regression,
  Daniel L. Rubinfeld
- 229   Reference Guide on Survey Research,
  Shari Seidman Diamond
- 277   Reference Guide on Estimation of Economic Losses in Damages Awards, Robert E. Hall & Victoria A. Lazear
- 333   Reference Guide on Epidemiology,
  Michael D. Green, D. Mical Freedman & Leon Gordis
- 401   Reference Guide on Toxicology,
  Bernard D. Goldstein & Mary Sue Henifin
- 439   Reference Guide on Medical Testimony,
  Mary Sue Henifin, Howard M. Kipen & Susan R. Poulter
- 485   Reference Guide on DNA Evidence,
  David H. Kaye & George F. Sensabaugh, Jr.
- 577   Reference Guide on Engineering Practice and Methods,
  Henry Petroski
- 625   Index

*Reference Manual on Scientific Evidence*

critical of using strict significance testing, which rejects all studies with an observed *p*-value below that specified level. Epidemiologic studies have become increasingly sophisticated in addressing the issue of random error and examining the data from studies to ascertain what information they may provide about the relationship between an agent and a disease, without the rejection of all studies that are not statistically significant.[74]

Calculation of a confidence interval permits a more refined assessment of appropriate inferences about the association found in an epidemiologic study.[75] A confidence interval is a range of values calculated from the results of a study, within which the true value is likely to fall; the width of the interval reflects random error. The advantage of a confidence interval is that it displays more information than significance testing. What a statement about whether a result is statistically significant does not provide is the magnitude of the association found in the study or an indication of how statistically stable that association is. A confidence interval for any study shows the relative risk determined in the study as a point on a numerical axis. It also displays the boundaries of relative risk

---

and their use as an alternative to statistical significance in *DeLuca v. Merrell Dow Pharmaceuticals, Inc.*, 911 F.2d 941, 948–49 (3d Cir. 1990). *See also* Turpin v. Merrell Dow Pharms., Inc., 959 F.2d 1349, 1357 (6th Cir.) ("The defendant's claim overstates the persuasive power of these statistical studies. An analysis of this evidence demonstrates that it is possible that Bendectin causes birth defects even though these studies do not detect a significant association."), *cert. denied,* 506 U.S. 826 (1992); *In re* Bendectin Prod. Liab. Litig., 732 F. Supp. 744, 748–49 (E.D. Mich. 1990) (rejecting defendant's claim that plaintiff could not prevail without statistically significant epidemiologic evidence); Berry v. CSX Transp., Inc., 709 So. 2d 552, 570 (Fla. Dist. Ct. App. 1998) (refusing to hold studies that were not statistically significant inadmissible).

Although the trial court had relied in part on the absence of statistically significant epidemiologic studies, the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), did not explicitly address the matter. The Court did, however, refer to "the known or potential rate of error" in identifying factors relevant to the scientific validity of an expert's methodology. *Id.* at 594. The Court did not address any specific rate of error, although two cases that it cited affirmed the admissibility of voice spectrograph results that the courts reported were subject to a 2%–6% chance of error owing to either false matches or false eliminations. One commentator has concluded, "*Daubert* did not set a threshold level of statistical significance either for admissibility or for sufficiency of scientific evidence." *Developments in the Law, supra* note 66, at 1535–36, 1540–46. The Supreme Court in *General Electric Co. v. Joiner,* 522 U.S. 136, 145–47 (1997), adverted to the lack of statistical significance in one study relied on by an expert as a ground for ruling that the district court had not abused its discretion in excluding the expert's testimony.

74. *See* Sanders, *supra* note 13, at 342 (describing the improved handling and reporting of statistical analysis in studies of Bendectin after 1980).

75. Kenneth Rothman, Professor of Public Health at Boston University and Adjunct Professor of Epidemiology at the Harvard School of Public Health, is one of the leaders in advocating the use of confidence intervals and rejecting strict significance testing. In *DeLuca,* 911 F.2d at 947, the Third Circuit discussed Rothman's views on the appropriate level of alpha and the use of confidence intervals. In *Turpin*, 959 F.2d at 1353–54 n.1, the court discussed the relationship among confidence intervals, alpha, and power. The use of confidence intervals in evaluating sampling error more generally than in the epidemiologic context is discussed in David H. Kaye & David A. Freedman, Reference Guide on Statistics § IV.A, in this manual.

*Reference Guide on Epidemiology*

consistent with the data found in the study based on one or several selected levels of alpha or statistical significance. An example of two confidence intervals that might be calculated for a study is displayed in Figure 4.

Figure 4. Confidence Intervals



The confidence interval shown in Figure 4 represents a study that found a relative risk of 1.5, with boundaries of 0.8 to 3.4 for alpha equal to .05 (equivalently, a confidence level of .95) and boundaries of 1.1 to 2.2 for alpha equal to .10 (equivalently, a confidence level of .90). Because the boundaries of the confidence interval with alpha set at .05 encompass a relative risk of 1.0, the study is not statistically significant at that level. By contrast, since the confidence boundaries for alpha equal to .10 do not include a relative risk of 1.0, the study does have a positive finding that is statistically significant at that level of alpha. The larger the sample size in a study (all other things being equal), the narrower the confidence boundaries will be (indicating greater statistical stability), thereby reflecting the decreased likelihood that the association found in the study would occur if the true association is 1.0.[76]

---

76. Where multiple epidemiologic studies are available, a technique known as meta-analysis (*see infra* § VI) may be used to combine the results of the studies to reduce the numerical instability of all the studies. *See generally* Diana B. Petitti, Meta-analysis, Decision Analysis, and Cost-Effectiveness Analysis: Methods for Quantitative Synthesis in Medicine (2d ed. 2000). Meta-analysis is better suited to pooling results from randomly controlled experimental studies, but if carefully performed it may also be helpful for observational studies, such as those in the epidemiologic field. *See* Zachary B. Gerberg & Ralph I. Horwitz, *Resolving Conflicting Clinical Trials: Guidelines for Meta-Analysis*, 41 J. Clinical Epidemiology 503 (1988).

In *In re Paoli Railroad Yard PCB Litigation*, 916 F.2d 829, 856–57 (3d Cir. 1990), *cert. denied*, 499 U.S. 461 (1991), the court discussed the use and admissibility of meta-analysis as a scientific technique. Overturning the district court's exclusion of a report using meta-analysis, the Third Circuit observed that meta-analysis is a regularly used scientific technique. The court recognized that the technique might be poorly performed, and it required the district court to reconsider the validity of the expert's work in performing the meta-analysis. *See also* E.R. Squibb & Sons, Inc. v. Stuart Pharms., No. 90-1178, 1990 U.S. Dist. LEXIS 15788, at ★41 (D.N.J. Oct. 16, 1990) (acknowledging the utility of meta-analysis but rejecting its use in that case because one of the two studies included was poorly performed); Tobin v. Astra Pharm. Prods., Inc., 993 F.2d 528, 538–39 (6th Cir. 1992) (identifying an error in the performance of a meta-analysis, in which the Food and Drug Administration (FDA) pooled data from

# VI. What Methods Exist for Combining the Results of Multiple Studies?

Not infrequently, the court may be faced with a number of epidemiologic studies whose findings differ. These may be studies in which one shows an association and the other does not, or studies which report associations, but of different magnitude. In view of the fact that epidemiologic studies may disagree and that often many of the studies are small and lack the statistical power needed for definitive conclusions, the technique of meta-analysis was developed.[125] Meta-analysis is a method of pooling study results to arrive at a single figure to represent the totality of the studies reviewed. It is a way of systematizing the time-honored approach of reviewing the literature, which is characteristic of science, and placing it in a standardized framework with quantitative methods for estimating risk. In a meta-analysis, studies are given different weights in proportion to the sizes of their study populations and other characteristics.[126]

Meta-analysis is most appropriate when used in pooling randomized experimental trials, because the studies included in the meta-analysis share the most significant methodological characteristics, in particular, use of randomized assignment of subjects to different exposure groups. However, often one is confronted with non-randomized observational studies of the effects of possible toxic substances or agents. A method for summarizing such studies is greatly needed, but when meta-analysis is applied to observational studies—either case-control or cohort—it becomes more problematic. The reason for this is that often methodological differences among studies are much more pronounced than they are in randomized trials. Hence, the justification for pooling the results and deriving a single estimate of risk, for example, is not always apparent.

A number of problems and issues arise in meta-analysis. Should only published papers be included in the meta-analysis, or should any available studies be used, even if they have not been peer reviewed? How can the problem of differences in the quality of the studies reviewed be taken into account? Can the results of the meta-analysis itself be reproduced by other analysts? When there

---

125. *See In re* Paoli R.R. Yard PCB Litig., 916 F.2d 829, 856 (3d Cir. 1990), *cert. denied*, 499 U.S. 961 (1991); Hines v. Consolidated Rail Corp., 926 F.2d 262, 273 (3d Cir. 1991); Allen v. International Bus. Mach. Corp., No. 94-264-LON, 1997 U.S. Dist. LEXIS 8016, at ★71–★74 (meta-analysis of observational studies is a controversial subject among epidemiologists). Thus, contrary to the suggestion by at least one court, multiple studies with small numbers of subjects may be pooled to reduce the possibility that sampling error is biasing the outcome. *See In re* Joint E. & S. Dist. Asbestos Litig., 827 F. Supp. 1014, 1042 (S.D.N.Y. 1993) ("[N]o matter how many studies yield a positive but statistically insignificant SMR for colorectal cancer, the results remain statistically insignificant. Just as adding a series of zeros together yields yet another zero as the product, adding a series of positive but statistically insignificant SMRs together does not produce a statistically significant pattern."), *rev'd*, 52 F.3d 1124 (2d Cir. 1995); *see also supra* note 76.

126. Petitti, *supra* note 76.

are several meta-analyses of a given relationship, why do the results of different meta-analyses often disagree? Another consideration is that often the differences among the individual studies included in a meta-analysis and the reasons for the differences are important in themselves and need to be understood; however, they may be masked in a meta-analysis. A final problem with meta-analyses is that they generate a single estimate of risk and may lead to a false sense of security regarding the certainty of the estimate. People often tend to have an inordinate belief in the validity of the findings when a single number is attached to them, and many of the difficulties that may arise in conducting a meta-analysis, especially of observational studies like epidemiologic ones, may consequently be overlooked.[127]

# VII. What Role Does Epidemiology Play in Proving Specific Causation?

Epidemiology is concerned with the incidence of disease in populations and does not address the question of the cause of an individual's disease.[128] This question, sometimes referred to as specific causation, is beyond the domain of the science of epidemiology. Epidemiology has its limits at the point where an

---

127. Much has been written about meta-analysis recently, and some experts consider the problems of meta-analysis to outweigh the benefits at the present time. For example, Bailar has written the following:

> [P]roblems have been so frequent and so deep, and overstatements of the strength of conclusions so extreme, that one might well conclude there is something seriously and fundamentally wrong with the method. For the present . . . I still prefer the thoughtful, old-fashioned review of the literature by a knowledgeable expert who explains and defends the judgments that are presented. We have not yet reached a stage where these judgments can be passed on, even in part, to a formalized process such as meta-analysis.

John C. Bailar III, *Assessing Assessments*, 277 Science 528, 529 (1997) (reviewing Morton Hunt, How Science Takes Stock (1997)); *see also Point/Counterpoint: Meta-analysis of Observational Studies,* 140 Am. J. Epidemiology 770 (1994).

128. *See* DeLuca v. Merrell Dow Pharms., Inc., 911 F.2d 941, 945 & n.6 (3d Cir. 1990) ("Epidemiological studies do not provide direct evidence that a particular plaintiff was injured by exposure to a substance."); Smith v. Ortho Pharm. Corp., 770 F. Supp. 1561, 1577 (N.D. Ga. 1991); Grassis v. Johns-Manville Corp., 591 A.2d 671, 675 (N.J. Super. Ct. App. Div. 1991); Michael Dore, *A Commentary on the Use of Epidemiological Evidence in Demonstrating Cause-in-Fact,* 7 Harv. Envtl. L. Rev. 429, 436 (1983).

There are some diseases that do not occur without exposure to a given toxic agent. This is the same as saying that the toxic agent is a necessary cause for the disease, and the disease is sometimes referred to as a signature disease (also, the agent is pathognomonic), because the existence of the disease necessarily implies the causal role of the agent. *See* Kenneth S. Abraham & Richard A. Merrill, *Scientific Uncertainty in the Courts*, Issues Sci. & Tech., Winter 1986, at 93, 101. Asbestosis is a signature disease for asbestos, and adenocarcinoma (in young adult women) is a signature disease for in utero DES exposure. *See In re* "Agent Orange" Prod. Liab. Litig., 597 F. Supp. 740, 834 (E.D.N.Y. 1984) (Agent Orange allegedly caused a wide variety of diseases in Vietnam veterans and their offspring), *aff'd*, 818 F.2d 145 (2d Cir. 1987), *cert. denied*, 484 U.S. 1004 (1988).