**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**In Re: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION**

**MDL NO. 2740**

**SECTION "H" (5)**

**THIS DOCUMENT RELATES TO:**

**Barbara Earnest, Case No. 2:16-cv-17144.**

---

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION TO EXCLUDE EXPERT TESTIMONY OF DAVID A. KESSLER, M.D., J.D.**

---

Plaintiffs cannot save Dr. Kessler's labeling opinions for the following reasons:

First, Dr. Kessler did not reliably define "irreversible alopecia." While he defines it as hair loss lasting at least six months after chemotherapy, Dr. Kessler's definition does not distinguish between well-understood and expected temporary hair loss from chemotherapy (which can often exist more than six months after treatment) and purported "irreversible" hair loss. As such, his definition necessarily miscounts cases of temporary hair loss as "irreversible," making it thus unreliable. Further, in many instances, the data upon which Dr. Kessler relied lacked information regarding hair loss at six months, making it impossible for him to have accurately applied his definition to that incomplete data. Given his definition and subsequent application, Dr. Kessler cannot reliably give an opinion as to when there first was "reasonable evidence" of a casual association between "irreversible alopecia" and Taxotere sufficient to warrant a label change.

Second, Dr. Kessler's opinion will confuse the jury on medical causation (*i.e*. the question of whether Taxotere alone caused Plaintiffs' hair loss). Plaintiffs argue that Dr. Kessler's opinion—when there was "reasonable evidence" of a causal association—will assist the jury in understanding regulatory requirements. To the contrary, this testimony conflates the lower level

of evidence required for labeling changes with the higher level of evidence required for proving medical causation—as Plaintiffs must do here.

Dr. Kessler may educate the jury on the regulatory standards for updating a product label. But it is the jury's responsibility—only after considering testimony from experts who have *reliably employed a scientifically acceptable methodology*—to determine and weigh evidence on medical causation. If Dr. Kessler gives a labeling opinion couched in causation language, it impermissibly invites the jury to conclude that "reasonable evidence of a causal association" in the regulatory setting is also sufficient to conclude that Taxotere caused Plaintiffs' hair loss.

## ARGUMENT

### I. Plaintiffs' Opposition Demonstrates That Dr. Kessler Did Not Reliably Define "Irreversible Alopecia" Or Apply That Definition to the Data.

As an initial matter, Dr. Kessler primarily relies on data after Plaintiff's treatment date to support his opinion that there was reasonable evidence of a causal association before she received Taxotere. To mask this analytical misstep, Plaintiffs, in their Opposition, selectively cite a few, discrete data points that existed prior to Mrs. Earnest's treatment. *See* Pls.' Opp. at 11-12. But it is not the Court's job to recreate Dr. Kessler's *ad hoc* analysis and then determine what opinions would be appropriate based on the acceptable timeframe at issue. Dr. Kessler only arrived at his opinions by relying on data that post-dates the period when Mrs. Earnest was treated and post-dates the period when he states the label should have changed. This flaw was baked into his methodology and renders his opinion ill-suited to the facts of this case.

Likewise, the definition Dr. Kessler crafted to apply to the data is unreliable. Dr. Kessler defined "irreversible alopecia" as "complete loss of growth or partial regrowth at least six months after chemotherapy." Kessler Rpt. at ¶ 81 (emphasis added) (*See* Exhibit A to Motion to Exclude Testimony of Kessler (Doc. 6146-1). Dr. Kessler then conceded that hair regrowth following

chemotherapy can take more than six months. Kessler Dep. 216:17-19 (Ex. A). Indeed, the first source cited in Dr. Kessler's Report warns that a six-month cutoff is too short to define irreversible alopecia.[1] Put simply, Dr. Kessler's definition neither reliably captures the injury alleged in this litigation nor distinguishes that injury from temporary hair loss after chemotherapy.

This alone is sufficient to exclude Dr. Kessler's opinions. But Dr. Kessler then failed to apply this unreliable definition to the data relied upon. At a basic level, to offer an opinion about labeling, the data analyzed must be data about irreversible alopecia. Here, it was not.

### A. Dr. Madigan's FAERS Analysis Does Not Identify Cases of Alopecia Six Months After Chemotherapy.

Dr. Kessler relies on Dr. David Madigan's FAERS analysis. This analysis, however, does not support Dr. Kessler's opinion on irreversible alopecia because Dr. Madigan did not address whether alopecia lasted more than six months after chemotherapy. Madigan Dep. 38:6–8 (Ex. C) ("Q. Is there a durational component to that? A. Not necessarily."). Instead, Dr. Madigan searched the FDA's adverse event database (FAERS) for case reports that included: (1) "alopecia" as a listed adverse event; (2) "Taxotere" or "docetaxel" as one of the listed drugs; and (3) "disability or permanent damage" listed as an "Outcome." Madigan Dep. 34:5–10; 94:15–95:5; Madigan Rpt. at ¶¶ 35-36 (Ex. D). From this, Dr. Madigan identified 31 supposed cases of "irreversible alopecia" between 2000 and 2017. Madigan Rpt. at App. 4.

For those 31 reports, Dr. Kessler testified that analyzing the case narratives was necessary to determine if they actually showed "irreversible alopecia." Kessler Dep. 157:18-19 ("We would

---

[1] *See* Kessler Rpt. at ¶ 81, FN 79. Gun Min Kim, et al. *Chemotherapy-induced Irreversible Alopecia in Early Breast Cancer Patients*, 163.3 Breast Cancer Res Treat 527, 532 (2017) (Ex. B) ("[A]bout 60% of patients needed 6–12 months period from the end of chemotherapy to the recovery of current hair regardless of CIIA or not. These findings imply that 6-month period may be short to define permanent alopecia. The further research for recovery time from chemotherapy is warranted.") (emphasis added).

have to look at those -- that -- those data tapes"). Indeed, he requested Plaintiffs' Counsel to provide him such narratives. They did not. Kessler Dep. 159:18–20 ("But I, specifically, asked for the underlying case reports in the FAERS database, and I didn't get them."). Dr. Madigan also neglected to review the case reports for conformity to the definition.[2] Because Dr. Kessler never reviewed the FAERS reports, he does not know what they say or, importantly, whether they record what he defines as "irreversible alopecia" (*i.e.* alopecia six months after chemotherapy). *See* Kessler Dep. 158:9-159:20. This analysis does not meet Dr. Kessler's injury definition and he cannot reliably use it to support his opinions.

**B. The GEICAM 9805/TAX301 Clinical Trial Data Also Does Not Address Whether Alopecia Persisted Six Months After Chemotherapy.**

Plaintiffs argue that Dr. Kessler relied on data from GEICAM 9805/TAX301 to support his opinion, which Plaintiffs claim demonstrated a 9.2% rate of irreversible alopecia in patients treated with Taxotere in combination with Adriamycin and cyclophosphamide (or "TAC"). *See* Pls.' Opp. at 12; Kessler Rpt. at ¶ 123. Yet the data cited by Dr. Kessler only reflects the number of patients reporting alopecia 31 days after their last chemotherapy treatment—not hair loss continuing on after Dr. Kessler's own, arbitrary six-month cutoff. *See* Sanofi_01412260, at Sanofi_01412290 (Ex. E).

In GEICAM 9805/TAX301, 514 of the 532 patients treated with TAC experienced alopecia during chemotherapy. Sanofi_00724381, at Sanofi_00724490 (Ex. F). Forty-nine patients (9.2%) reported alopecia at the beginning of the follow up period (*i.e.* 31 days). *Id*. Dr. Kessler, however,

[2] Additionally, neither Dr. Madigan nor Dr. Kessler reviewed the underlying reports to see if the "Disability and Permanent Damage" designation in the FAERS database corresponded to a report of alopecia. Kessler Dep. 156:9-159:20; Madigan Dep. 118:1-13. Because multiple adverse events can be associated with each case, Dr. Kessler does not know whether the "Disability and Permanent Damage" designation on the adverse event forms cited in Dr. Madigan's analysis describes alopecia, as opposed to another adverse event reported with the case (e.g., death). *See* Madigan Dep. 106:6–108:9; *see also* 148:6-149:17.

does not know whether each of the 49 patients still had alopecia more than six months after chemotherapy, as required by his definition. In fact, GEICAM 9805/TAX301 documented that alopecia subsequently resolved for 46 of the 49 patients.[3]

**C. The TAX316 Study Data Cited by Dr. Kessler Does Not Support His Opinion.**

Plaintiffs next assert that Dr. Kessler relied on alopecia data from TAX316 to support his conclusion that the rate of "irreversible alopecia" associated with Taxotere is 3.2%. Pls.' Opp. at 12. As with GEICAM 9805/TAX301, the TAX316 trial also did not examine whether a patient's hair loss lasted for more than six months after chemotherapy. Instead, this study only recorded patients reporting hair loss at their last follow up visit—not "irreversible alopecia." Rec. Doc. 7471 at 5. Patients could have died, had a reoccurrence of cancer, or become lost to follow up before six months had elapsed. In such cases, the patient's alopecia would have been described as "ongoing," regardless of whether and when the patient's hair grew back. *Id*. at 4-5. At Plaintiffs' request, Sanofi produced a corporate witness, Dr. Kopreski, to address this issue. *Id*. at 2. Dr. Kopreski reviewed the patients with "ongoing alopecia" as reported in TAX316. He testified that most of the patients with "ongoing alopecia" did not have alopecia for more than six months. *Id*.

At his deposition, Dr. Kessler admitted the timing of each patient's final follow-up visit was essential to determine if it met his definition of "irreversible alopecia." Kessler Dep. 209:22-23 ("Well, if it's ongoing in the first week, it may – may come back"). Nevertheless, Dr. Kessler conceded that he did not know or analyze this timing because he did not review the patient narratives. Kessler Dep. 208:5-12 (". . . I don't have a specific recollection of reviewing the narrative – of those cases."). Likewise, Dr. Kessler did not review Dr. Kopreski's analysis of

[3] Plaintiffs' own Oncology and Biostatistics Experts even recognize that the 9.2% rate cited by Dr. Kessler only represents the number of patients with alopecia thirty-one days after treatment. *See* Madigan Rpt. at 19-20; Feigal Rpt. at 34 (noting that the 9.2% rate pertained to reports of alopecia "31 days after the last cycle of chemotherapy.").

TAX316. Kessler Dep. 222:5-12. Dr. Kessler's analysis of the TAX316 data does not use his definition of irreversible alopecia and thus does not form a reliable basis for labeling opinions on irreversible alopecia.[4]

**D. Dr. Madigan's Pharmacovigilance Analysis Does Not Address Whether Alopecia Lasted For Six Months.**

In their Opposition, Plaintiffs cite Dr. Madigan's analysis of Sanofi's pharmacovigilance database to support the first and fifth factors of Dr. Kessler's seven-factor test. Pls.' Opp. at 12. Dr. Madigan, however, did not determine whether alopecia lasted more than six months after chemotherapy. Madigan Dep. 38:6–8; 233:13–18. To identify 291 cases of "irreversible alopecia," Dr. Madigan—*employing a completely different definition than Dr. Kessler*—searched for terms such as "chronic" or "hair never grew back." Madigan Rpt. at 16-17. If any adverse event hit on these terms, Dr. Madigan declared it a case of "irreversible alopecia" without further investigation. Madigan Dep. 227:21-228:9. As he readily admitted, that is not his expertise. Madigan Dep. 232:22-25; 234:5-14 ("When . . . you saw a report where the individual alopecia completely resolved, did you do anything to exclude that from your search? That wasn't my purpose. I don't have the expertise to classify these documents -- these reports as irreversible alopecia or not irreversible alopecia.").

Although he relies on the 291 cases of "irreversible alopecia" purportedly identified by Dr. Madigan, Dr. Kessler apparently also performed no review of these cases to see if they each met his definition (they do not). Dr. Madigan himself noted that, in 28 cases, the database recorded that alopecia recovered—highlighting the problem of Dr. Kessler's definition and demonstrating

[4] In support of Dr. Kessler's second factor, Plaintiffs cite to a meta-analysis performed by Dr. Madigan analyzing the "ongoing" alopecia end-points from the GEICAM 9805 and TAX316 clinical trials together. Pls.' Opp. at 12. For the same reasons mentioned in this section, Dr. Madigan's meta-analysis did not look at alopecia lasting six months after chemotherapy.

the methodological impropriety of Dr. Kessler's reliance on Dr. Madigan's analysis. *See* Madigan Rpt. at 17, Table 4; Madigan Dep. 236:7-237:13.

In sum, it is unreliable for Dr. Kessler to rely on Dr. Madigan's analysis because Dr. Madigan used a different definition for "irreversible alopecia." Dr. Kessler also did not apply his own definition when reviewing this data—he rotely incorporated from Dr. Madigan the 28 cases where patients' hair loss actually resolved. Finally, the fact that Dr. Madigan's keyword search pulled in 28 cases of resolved alopecia demonstrates the unreliability of this search method. Because Dr. Madigan's analysis did not look at whether alopecia lasted more than six months, his data was not reliable for Dr. Kessler to determine when, whether, and how the label should have changed.

**E. The Sedlacek Abstract is Insufficient to Support Dr. Kessler's Opinion.**

Plaintiffs also argue that the *Sedlacek* abstract from 2006 justifies Dr. Kessler's opinion. The *Sedlacek* abstract is only cited in Footnote 146 of Dr. Kessler's Report to support the first factor of his causal association analysis: frequency of reporting.[5] Dr. Kessler, however, does not provide any explanation for its relevance other than to say "the publicly available medical literature disclosed reports of irreversible alopecia associated with Taxotere." Kessler Rpt. at ¶ 124. This abstract, which has never been published in a peer reviewed scientific journal, is a retrospective cohort analysis of one physician's observations using Taxotere in combination with other

[5] At his deposition, Dr. Kessler referred to a Fisher exact test that he ran on the *Sedlacek* case reports, but like so many of Plaintiffs' expert opinions, this test and his opinions regarding this test are not included in his Report. *See* Kessler Dep. 251. Because Dr. Kessler did not express this opinion in his expert report nor disclose the Fisher exact testing before his deposition, the Court should strike and/or exclude this information. *See* Fed. R. Civ. P. 26(a)(2)(B); Fed. R. Civ. P. 37(c)(1); *Hill v. Koppers Indus.*, 2009 WL 3246630, at *3 (N.D. Miss. Sept. 30, 2009) ("[I]t is not proper federal practice to assume that one can submit an incomplete expert report only to provide new opinions and/or new information during the deposition. The deposition itself does not supplement the report.").

chemotherapies at higher than the labeled dose and without long-term follow up. It reports only seven cases of "persistent alopecia" after Taxotere. Dr. Kessler does not explain how these case reports by themselves satisfy his seven-factor causal association analysis.

## II. Dr. Kessler Should Not Be Permitted to Testify About Reasonable Evidence of a Causal Association Because He Did Not Perform a Medical Causation Analysis and His Opinions Would Only Confuse The Jury.

Finally, Dr. Kessler's testimony on what constitutes reasonable evidence of a causal association will confuse the jury about the standard of proof for medical causation. Plaintiffs argue that couching Dr. Kessler's opinion in causation language is necessary and relevant. It is not. Dr. Kessler may educate the jury on the regulatory standards for updating product labeling, while deferring the question of whether the scientific and medical evidence met that standard to experts who have *reliably employed a scientifically acceptable methodology*.

In the *Zoloft* MDL, plaintiffs argued to allow similar back-door causation testimony from Dr. Kessler at the summary judgment stage. The Court, recognizing the limitations of Dr. Kessler's regulatory opinions, disregarded his testimony about "positive evidence" of causation. *In re Zoloft (Sertralinehydrochloride) Products Liability Litigation*, 176 F. Supp. 3d 483, 496 (April 5, 2016) ("Dr. Kessler's own statement demonstrates that he has not conducted the analysis that the Court has explained in its earlier opinions that *Daubert* requires in this litigation."). The Court also determined that Dr. Kessler's opinions on causation evidence would only serve to confuse the jury. *Id*. at 496-97 ("Dr. Kessler's opinion . . . would serve to confuse a jury, particularly given that there is no evidence that Dr. Kessler himself has reconciled the contrary studies using scientifically acceptable methodology."). When an expert is not qualified to opine on medical causation, like here, or did not perform the required analysis to establish medical causation, like here, Courts have excluded regulatory expert opinions that there was "reasonable

evidence" of a causal association to avoid jury confusion. *See, e.g., Georges v. Novartis Pharm. Corp.*, No. 06-cv-5207, 2012 WL 9064768, at *10 (C.D. Cal. Nov. 2, 2012) ("The Court is not convinced by Plaintiff's arguments distinguishing medical causation from causal association. [Plaintiff's Expert's] attempt to draw this distinction is confusing at best and would almost certainly confuse or mislead the jury."); *Stanley v. Novartis Pharm. Corp.*, No. 11-cv-03191, 2014 WL 12573393, at *4 (C.D. Cal. May 6, 2014) (stating Plaintiff's Expert's testimony on reasonable evidence of a causal association "would impermissibly allow the jury to rely on [her] opinion regarding the cause of Plaintiff's [injury]").

Here, the Court should exclude Dr. Kessler's testimony because he did not employ a reliable methodology under *Daubert* and any testimony on "reasonable evidence" of a causal association would only mislead and confuse the jury. Rec. Doc. 6146. By his own admission, Dr. Kessler did not perform a reliable general causation analysis under *Daubert* and he does hold himself out as a general causation expert. Kessler Dep. 122:5-123:18; Kessler Dep. 268:19-22 ("Your focus, and it's not identified in your report, is not one of a general medical causation expert. . . . Exactly, sir.").

**CONCLUSION**

The Court should preclude Dr. Kessler's opinion that there was reasonable evidence of a causal association between Taxotere and irreversible alopecia prior to Plaintiffs' treatment date warranting a label change. Dr. Kessler should be precluded from testifying beyond general regulatory requirements.

Date: July 12, 2019

Respectfully submitted,

*/s/ Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE URQUHART & MOORE LLC**
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: 504-310-2100
Facsimile: 504-310-2120
dmoore@irwinllc.com

Harley Ratliff
Adrienne L. Byard
**SHOOK, HARDY& BACON L.L.P.**
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
Facsimile: 816-421-5547
hratliff@shb.com
abyard@shb.com

***Counsel for Sanofi-Aventis U.S. LLC and Sanofi U.S. Services Inc.***

## CERTIFICATE OF SERVICE

I hereby certify that on **July 12, 2019**, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

/s/ *Douglas J. Moore*
Douglas J. Moore