UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)       MDL NO. 2740
PRODUCTS LIABILITY LITIGATION
                                  SECTION "H" (5)
THIS DOCUMENT RELATES TO
ALL CASES

### REPLY IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE DEFENDANT'S EXPERT TESTIMONY IN RELIANCE ON DEFENDANT'S EMPLOYEE KOPRESKI

### INTRODUCTION

As the Court knows, TAX316 is Sanofi's major clinical trial showing a 77% higher incidence of "ongoing" alopecia with Taxotere.[1] Sanofi has included these findings in submissions to the FDA, most recently in 2018. Sanofi has never informed the FDA that this incidence rate is somehow wrong or miscalculated.

During this litigation, Sanofi decided this percentage rate is right for the FDA but wrong for a jury. So, the company hired a former employee, Dr. Kopreski, to reimagine TAX316's incidence rate. Dr. Kopreski worked to whittle off enough of the 29 patients in the Taxotere group (TAC) to bring the incidence rate closer to that seen in the control group (FAC). Sanofi then rushed this reappraisal to its proposed experts Dr. Arrowsmith, Dr. Glaspy, and Dr. Victoria, so their opinions could be based on this new incidence rate rather than on TAX316 as presented to the FDA. In their reports, Dr. Arrowsmith and Dr. Victoria accepted Dr. Kopreski's reimagined incidence rate as gospel. Neither questioned it, let alone examined it. These experts cannot say *how* Dr. Kopreski reimagined the incidence rate or *why* his rate is reliable.

But the bigger problem for Sanofi is: Neither can anyone else. Sanofi never designated Dr. Kopreski as an expert, so he produced no written report explaining his qualifications or the bases

---

[1] The final TAX316 data, which Sanofi adopted internally and submitted to the FDA, showed 29 of the 744 Taxotere patients were observed to have ongoing alopecia at the end of follow-up, versus 16 of the 736 patients given 5-fluorocil. (Clinical Study Report TAX316 (EFC6041/BCIRG001) p. 37 ("2010 CSR") (excluding appendices), attached as Ex. G to Mem. in Supp. of Pls' Mot. to Exclude Def's Expert Testimony Re Kopreski (hereinafter "Pls' Br."), Doc. No. 6160-1 (filed under seal).)

1

for his opinions about TAX316. *See* Fed. R. Civ. P. 26(a)(2). There is no basis, then, to find that Dr. Kopreski—a layperson—is qualified to offer an expert opinion, and no basis to allow other experts to rely on Dr. Kopreski's analysis as though he were a qualified expert.

Confronted with the fact that Dr. Kopreski is an undisclosed expert, Sanofi's opposition brief says—nothing. Sanofi instead attempts to rehabilitate Dr. Kopreski by lauding his qualifications and the reliability of his expert analysis. While Sanofi may prefer to debate Dr. Kopreski's qualifications and the reliability of his opinions, that puts the cart before the horse. Because Dr. Kopreski is not an expert, he cannot introduce an expert opinion on how TAX316's incidence rate should be recalculated—and then pass that baton to other experts. But even *if* the law permitted Dr. Kopreski to offer an expert opinion solely through deposition testimony (as a corporate witness, no less), his recalculation of TAX316 is firmly unreliable—so much so that Sanofi cannot even bring itself to tell the FDA about this new incidence rate.

Seeking to salvage Dr. Kopreski's analysis and the expert opinions adopting it, Sanofi blames both Plaintiffs for how they framed a deposition topic and Judge North's rulings on the scope of discovery for forcing the company to bring Dr. Kopreski back from retirement so that he could take TAX316 as provided to the FDA and repurpose the incidence rate so that it is lower. These excuses are even less believable than the opinions they hope to save. Regardless, no discovery request or ruling can excuse Sanofi's failure to abide by mandatory prerequisites for the admission of expert testimony. Sanofi failed to present a recalculated incident rate through an expert, and the lay testimony Sanofi seeks to present as expert opinion is not procedurally or substantively admissible. The Court should thus grant Plaintiffs' motion to exclude the opinions of any experts who rely on Dr. Kopreski's reimagined incident rate.

## ARGUMENT

**I.    Sanofi's Failure to Designate Kopreski as an Expert Cannot Be Excused.**

Faced with the credible accusation that Dr. Kopreski's reimagining of TAX316 is litigation-driven, Sanofi contends that Plaintiffs' discovery requests are the reason why Dr. Kopreski offered his expert opinion. That explanation does not wash.

2

Plaintiffs learned of Sanofi's experts' substantive reliance on Dr. Kopreski's opinion for use at trial barely a week after it first emerged in response to Plaintiffs' Second Notice of Deposition of Sanofi U.S. Specifically, Plaintiffs' noticed Topic No. 12 regarded "findings regarding alopecia as a TEAE [treatment-emergent adverse experience] as provided in the Clinical Study Report ["CSR"] on September 9, 2010 [. . . .]" (*See* Pls' 2nd Am. Not. of Videotaped Dep. of Sanofi U.S. at 12 ¶, Nov. 20, 2018 ("Pls' 2nd Am. Notice"), attached as Ex. I to Pls' Br.) Plaintiffs did not ask about "persisting alopecia" here or use any other allegedly "vague" term that would require retroactive application of a new definition, but rather used near-exact language from the document: alopecia "persisting into the 10-year follow-up period." (Compare *id.* to 2010 CSR 36-37.) Plaintiffs' expressly stated objective here, as with the other studies, case reports, or articles referenced in the 30(b)(6) notice, was to cross-reference patient IDs from that document with Plaintiffs' running list of adverse event reports. (Pls' 2nd Am. Notice 12 ¶12.)

Sanofi's response fully demonstrated that it understood that Plaintiffs' inquiry was limited to the 2010 CSR's contemporaneous findings:

> Sanofi objects to the extent Plaintiffs seek information *beyond what is contained within the document* on the grounds that they have not set out any additional matters for examination with reasonable particularity. Sanofi states that *the findings regarding alopecia are contained within the document* cited in Topic 12. The TAX316 final study report includes its findings on page Sanofi_00724298.

(Defs' Objections and Responses to Pls' 2nd Not. of Dep. of Sanofi U.S. at 20-21, Dec. 4, 2018, attached as Ex. J to Pls' Br. (emphasis added).) Sanofi then went on to list the Subject IDs of patients whose alopecia had been reported as "ongoing" at the close of the study, consistently with what it had done with other articles and studies referenced in Plaintiffs' Notice. (*Id.* at 21.) But rather than stop there, and despite its position that the TAX316 findings speak for themselves, Sanofi then appended the results of Dr. Kopreski's re-opened analysis into TAX316, which claimed in hindsight that 23 of the 29 cases of "ongoing" alopecia reported to the FDA were done

3

so erroneously. This opinion—provided *a propos* of nothing—was clearly formulated to advance Sanofi's litigation position that its clinical study did not reveal an increased incidence of permanent or irreversible alopecia. In short, Sanofi commissioned Dr. Kopreski's analysis not in order to be responsive to Plaintiffs' discovery but rather for self-interested use through its experts in its case at trial. Any assertion to the contrary is disingenuous.

Regardless, only a qualified expert "may testify in the form of an opinion or otherwise if" (among other things) the testimony is based principles and methods that are reliably applied to sufficient facts and data. *See* Fed. R. Evid. 702. Dr. Kopreski is not designated as an expert and thus he has produced no expert report setting forth principles and methods for re-examining TAX316's incidence rate. Whatever the reason for Sanofi's litigation strategy, Dr. Kopreski cannot slip an expert opinion into this case for the benefit of the company's other experts.

## II.  There Is No Basis for Finding Kopreski Qualified or His Opinions Reliable

Sanofi asserts that Dr. Kopreski is qualified to offer the expert-style opinions on which its other experts rely while ignoring the fundamental fact that, having never followed any of the requirements of Rule 26, he remains a lay witness[2] whose conclusions have not and cannot be shown to be reliable. None of Sanofi's arguments satisfactorily address why this should be permitted, especially after the many reasons why his litigation-driven work is unreliable are brought into focus. Sanofi illogically reasons that, because clinical trial data is considered the "gold standard" of causation evidence, any testimony *on the subject of* clinical trials is therefore

---

[2] Dr. Kopreski, at Sanofi's Rule 30(b)(6) deposition, acknowledged repeatedly that his role here was that of Sanofi's corporate representative. For instance, "Just so this understanding is clear, you know, questions and responses within the scope of the notice, I'll be acting as a representative of Sanofi, but should any questions exceed the scope of the notice that I respond to, I will not be acting as a representative of Sanofi, but rather giving my own personal testimony." (Rule 30(b)(6) Dep. of Michael Kopreski, M.D., 35:10-19, Sept. 6, 2018, attached hereto as Ex. A); *see also id.* at 33:3-12 ("So to ensure that I understand this correctly, that—my understanding is that I am designated by Sanofi to be the representative for this deposition with regard to the subject matter of [. . .] this notice [. . .] [a]nd any questions that go outside of that scope that I respond to, is not as a representative of Sanofi.").) Considering Sanofi's insistence in its Opposition, discussed *supra*, that the Kopreski re-analysis was "demanded" by Plaintiffs in their 30(b)(6) deposition notices and that Sanofi was merely responding to discovery, this analysis (as well as all testimony about it) is technically Sanofi's own. (*See* Defs' Br. 7-8, 13-14; *see also id.* at 17 ("Plaintiffs['] primary complaint appears to be that Sanofi's attorneys selected documents for Dr. Kopreski to review that were responsive to the 30(b)(6) Notice. Such practice is common and appropriate when preparing a company witness to testify on discrete issues.").)

inherently reliable. It does so despite that fact that Dr. Kopreski failed to consider data mandated under the trial's FDA-approved protocols—data that unsurprisingly contradicts his conclusions. This *ad hoc* approach was not overseen, tested, or reviewed by anyone in the scientific community, at the FDA, or even at Sanofi.[3] Rather, it was devised and overseen by Sanofi's counsel for use solely in this litigation, based on data hand-picked by attorneys. And, importantly, the conclusions of Dr. Kopreski were not independently verified by Sanofi's experts, who have parroted his conclusions in reports containing nearly verbatim language.

**A.  Sanofi has never qualified Dr. Kopreski as an expert whose opinions are reliable.**

Dr. Kopreski, who has never been designated as an expert, has produced no written report explaining his qualifications or the bases for his opinions about TAX316.[4] The work of articulating his back-of-the-napkin calculations instead has fallen to Sanofi's attorneys—in an opposition brief, no less. There, for the first time, Sanofi contends that Dr. Kopreski's qualifications to provide what is essentially expert testimony are unchallenged, so the Court must deem him qualified to opine on such matters and also allow other experts to rely on his analysis. That misses the point.

There is a difference between permissible lay opinion testimony under Federal Rule of Evidence 701 and expert opinion testimony under Rule 702. Only expert opinions may be deemed reliable under *Daubert* or Rule 702. Yet Sanofi has provided no report substantiating Dr. Kopreski's qualifications or bases for opining on such complex matters. There is no basis, then, to find that he is anything but a lay witness. Sanofi rushes past these fundamental deficiencies, straight to the merits of Dr. Kopreski's reconsidered TAX316. Sanofi is thus left to argue that Dr. Kopreski's lay opinions are reliable enough under *Daubert* to be used—or adopted wholesale—

---

[3] Sanofi's expert, Dr. Victoria, acknowledged that unlike TAX316, which was conducted pursuant to prospective protocols, Dr. Kopreski's post-hoc parsing of its data was conducted under methodologies never adopted by the drugmaker—or even committed to paper. (Dep. of Justin R. Victoria 73:11-14, 74:1-3, 74:14 – 75:1, 75:9-12, 77:25 – 78:19, Jan. 18, 2019 ("Victoria Dep."), attached hereto as Ex. B.)

[4] Although Dr. Kopreski was once a Sanofi employee, he left the company at the end of 2017. (*See* Dep. of Michael Kopreski, M.D. 520:10-23, Dec. 13, 2018, ("2nd Kopreski Dep. Vol. II"), attached hereto as Ex. C.) He was not involved in any data analysis effort in the TAX316 study and was not part of the Sanofi team that authored the 2010 CSR before it was submitted to the FDA (*id.* at 490:21-24). Rather, he considered TAX316 data for the first time in 2018 at the request of Sanofi's attorneys. (*Id.* at 492:4-10.)

by its designated experts. But because there is no expert report from Dr. Kopreski setting forth findings and conclusions on this issue, it is entirely speculative whether such an expert opinion would have survived an independent *Daubert* or Rule 702 challenge. Accordingly, there is simply no basis to allow other experts to rely on his analysis as though he were a qualified expert.

> **B. That Dr. Kopreski's opinion concerns a clinical trial is not alone sufficient to make it reliable.**

Controlled trials are a preferred category of data in the eyes of the law (above retrospective studies and individual reports) because of their rigorous design and controls, prospective focus, and typically large scale. But opinions like Dr. Kopreski's are not inherently reliable just because they *repackage* this kind of data. And for good reason: Here, Dr. Kopreski selectively considered data (*e.g.,* the 55-month interim data was included, but not the 10-year line item data in the 2010 CSR); Sanofi's attorneys determined what data to provide him; and the methodologies Dr. Kopreski used were untethered to the controlled study's strict protocols or statistical analysis plan. (*See* Pls' Br. 6 - 12.)[5] Sanofi's argument that Dr. Kopreski's opinion derives reliability simply because it is *on the topic of* a clinical trial is thus meritless.

> **C. Kopreski admits he failed to consider all available TAX316 data, contrary to the study's prospective Statistical Analysis Plan (SAP).**

Sanofi's assertion that Plaintiffs have not challenged Dr. Kopreski's methodology is false. (Defs' Br. 11.) Plaintiffs have absolutely objected to Dr. Kopreski's methodology; indeed, it is central to their motion. (*See, e.g.*, Pls' Br. 17 - 18, 21 - 22.) Dr. Kopreski's "*ad hoc*" approach to the re-analysis has been well noted and criticized as sufficient grounds for its exclusion. (*Id.* at 18 ("Dr. Kopreski's reanalysis of TAX316 seeks to find the incidence of a condition that he himself has defined, through the application of criteria devised only by him, pursuant to a methodology that has never been reviewed—let alone committed to paper."); *see id.* (methodologies "were not

---

[5] Prior to conducting any safety analysis on its data for a clinical study report, Sanofi has a "data lock" whereby the safety data is fixed, or locked. (Dep. of Pierre Mancini 364:12-366:25, Oct. 12, 2018, attached hereto as Ex. D.) What Sanofi seeks to do with Dr. Kopreski is unlock the clinical trial data, select what it desires for the reimagined analysis and discard the rest, then conduct an analysis devised by Dr. Kopreski and Sanofi's counsel, untethered to any pre-specified protocol.

overseen, tested, reviewed, published, or accepted by anyone in the scientific community," including Sanofi); *see also id.* at 21-22 (contrary evidence was "defined out" contrary evidence from consideration in his analysis).)

This criticism extends to Dr. Kopreski's selective consideration of the available data,[6] in contravention of TAX316's governing protocols and SAP. Plaintiffs' opening brief documents that Dr. Kopreski was in no position to confirm the completeness of the data he reviewed, all of which was supplied by Sanofi's attorneys. (Pls' Br. 6 - 7.) He had case report forms (CRFs) for far fewer than all of the 29 TAC-arm patients reported to have ongoing alopecia at the end of follow-up; and he could not verify that other important underlying documents had been provided to him. (*Id.* at 7.) Most importantly, Dr. Kopreski testified that he did not review several years of follow-up data that are in conflict with his conclusions, even though the study's SAP required that the analysis be based on no less than the full ten-year period. (*Id.* at 3 - 4, 8 - 11, 19 - 20.) Plaintiffs' argument has made clear that "Dr. Kopreski's re-analysis covered only a portion of the records, from a portion of the patients, for a portion of the trial's duration." (*Id.* at 20.)[7]

Sanofi's arguments for the reliability of this reimagining of TAX316 do nothing to save his opinion. Dr. Kopreski failed to so much as review the 10-year CSR report data. Sanofi brazenly denies this but can cite nothing in the record to substantiate its position—and in fact Dr. Kopreski's testimony directly contradicts the company's position. (*See, e.g.*, Defs' Br. 9 ("This data set included: the TAX316 Clinical Study Reports (both the 55-month and 10-year reports")") (lacking citation).) Elsewhere, the best Sanofi can do is to argue that Dr. Kopreski reviewed at least *some* data (in the form of several, but far from all, patients' CRFs) from after the interim period, thus excusing his failure to consider follow-up line item data sheets after 2003 showing different or additional data. (*See id.* at 11-12 ("Contrary to Plaintiffs' assertion, Dr. Kopreski reviewed CRFs

---

[6] Sanofi's Opposition again misleadingly uses the term "datasets" to refer to any data considered by Dr. Kopreski, despite that term's specialized meaning within Sanofi's biostatistics department. (*See* Pls' Br. 8 at n. 7.)

[7] Indeed, part of the reason Dr. Kopreski's depositions were lengthy was that Plaintiffs' counsel, without Rule 26 report showing his reliance materials, was forced to uncover through questioning not only Dr. Kopreski's opinion, but from what data it was actually derived. Although Dr. Kopreski presented his testimony as though he had issued a Rule 26 report, his testimony—essentially an "oral report"—is all that is available on these important questions.

from both the 55-month interim review and the 10-year report"); *id.* at 12 n. 8 ("Plaintiffs wrongly suggest that Dr. Kopreski only looked at documentation from 2003 or earlier. In fact, Dr. Kopreski reviewed the 10-year CRFs when available.").) In sum, Dr. Kopreski's failure or refusal to consider all the data available to Sanofi at the conclusion of the follow-up period and required by the study's protocols is well documented in his testimony. (*See* Ex. C, 2nd Kopreski Dep. Vol. II at 649:6 – 657:19.)

Sanofi's alternative argument is that Dr. Kopreski's failure to consider the TAX316 data is irrelevant because, had he done so, the result would have been the same. While this argument hardly inspires confidence in Dr. Kopreski's methodology, it is also misplaced. The relevant inquiry of reliability for an expert (assuming Dr. Kopreski had been so designated) would train on what the expert did to ensure reliability. Here, instead, we have arguments of counsel, specifically, new and unsupported factual claims (for instance) about changes in chemotherapy treatments. (*See* Defs' Br. 12 ("Additionally, there were three patients who either died, withdrew their consent, or were lost to follow up prior to the end of the 55-month interim analysis.") (lacking citation).) These assertions suggest patient outcomes that were never considered—let alone testified to—by Dr. Kopreski during his depositions.[8] Accordingly, they are at best irrelevant to the reliability of his methodology and, at worst, serve only to underscore that this entire project is litigation driven rather than the independent analysis of a fully informed and qualified expert.

In conclusion, Sanofi's poorly-cited argument rests on assertions that Dr. Kopreski considered data that he in fact did not, that he considered "enough" data from the 10-year follow-up period, and that the gaps in his data would not have mattered anyway—for reasons Sanofi essentially asks the Court to take its word on. These arguments should be rejected.

### D. Sanofi's argument improperly twists a discovery ruling into a substantive one.

Sanofi's opposition argues that this entire dispute arises from Plaintiffs' "fundamental understanding" of Magistrate Judge North's discovery orders, which Sanofi contends defines

---

[8] Again, under the circumstances, Dr. Kopreski's depositions are the closest Plaintiffs and the Court have to a Rule 26 report.

8

"persistent alopecia" in a way that has substantive import here and which justifies—indeed, compels—the company's evidentiary gambit. To the contrary, this Court made no ruling that defines the injury of "persistent alopecia" for any evidentiary purpose (such as or admissibility) or any other substantive use. Judge North merely accepted "persisting alopecia" with a six-month durational component as appropriate for discovery purposes. No party, however, was commanded or authorized to manufacture expert opinion through lay testimony. Simply put, Judge North's discovery orders provide no cover for Sanofi's litigation-driven analysis.[9]

### III.  Sanofi's Experts' Reliance on Dr. Kopreski's Re-Analysis Is Improper.

Plaintiffs' opening brief sets forth the failure of Sanofi's testifying experts to apply any scrutiny to the opinion, which at least two of the experts, Drs. Glaspy and Arrowsmith simply regurgitate in their reports:

| [T]he TAX316 study only reported *on* "ongoing" alopecia, it did not report *on* "permanent" or "persistent" alopecia. The distinction is important, *because* for the majority of patients identified as having "ongoing" alopecia, there is no *documentary evidence to support any claim* that those patients had alopecia more than six months after chemotherapy. (Expert Report of John Glaspy, M.D. 26, attached as Ex. O to Pls' Br.) | [T]he TAX316 study only reported "ongoing" alopecia; it did not report "permanent" or "persistent" alopecia. The distinction is important, *since* for the majority of patients identified as having "ongoing" alopecia, there is no *documentation* that those patients had alopecia *lasting* more than six months after *completion of* chemotherapy. (Expert Report of Janet B. Arrowsmith 48 ¶117, attached as Ex. M to Pls' Br.) |

Sanofi's arguments do nothing to save its experts' parroting of Kopreski's opinion, which does not meet the standards of Rule 702. First, general familiarity with or knowledge of clinical trials does not permit an expert to adopt a litigation-driven analysis after only a cursory review. The act of reviewing Dr. Kopreski's analysis and deeming it "appropriate" falls far short of the threshold requirement that an expert must *independently verify* information given by a party or its counsel before relying on it. *See State Farm Fire & Cas. Co. v. Electrolux Home Prod., Inc.*, 980 F. Supp.

---

[9] Regardless, as discussed, Plaintiffs' Topic 12 makes no mention of "persistent alopecia," only referencing the TAX316 findings in the clear terms employed and defined by Sanofi itself in its 10-year CSR ("persisting into follow-up").

2d 1031, 1047–51 (N.D. Ind. 2013); *see also Orthoflex, Inc. v. ThermoTek, Inc.*, 986 F. Supp. 2d 776, 798–99 (N.D. Tex. 2013). Sanofi's brief does not address these holdings, but instead attempts to distinguish authorities Plaintiffs have cited on an unrelated point—why Dr. Kopreski cannot rely solely on select data provided by Sanofi's counsel. A mere "review" of Dr. Kopreski's attorney-commissioned analysis is insufficient for Dr. Arrowsmith's wholesale acceptance of its conclusions (Defs' Br. 15), and Dr. Victoria has testified that he does not know exactly what data Dr. Kopreski used, where it came from, or even the duration of the alopecia in each of the 29 TAC-arm patients Dr. Kopreski was said to evaluate. (Ex. B, Victoria Dep. at 103:3-11, 131:16-20, 131:21 – 132:10; 162:1-21.)

Second, it should be clear that conclusions from a party's (or its retained analyst's) litigation-driven analysis of data is not "the kinds of facts or data" reasonably relied on by experts in the fields of epidemiology, regulatory compliance, and oncology, and certainly not without their independent verification. *See In re H & M Oil & Gas, LLC*, 511 B.R. 408, 421–22 (Bankr. N.D. Tex. 2014) ("there is nothing in the [. . .] record to indicate that experts in the field of valuation 'reasonably rely' on valuation reports without taking any steps to verify the accuracy of such reports."); *see also Lyman v. St. Jude Med. S.C., Inc.*, 580 F. Supp. 2d 719, 726–27 (E.D. Wis. 2008) (expert "should have independently verified the reliability of the data before opining [. . .], as opposed to accepting it at the word of [. . .] counsel"). It bears repeating that the rules of evidence do not permit what Sanofi attempts here: a circumvention of the prohibitions on hearsay that allows a party's commissioned opinion evidence to evade scrutiny as Rule 703 reliance materials. The Court should not permit it here.

## CONCLUSION

For the foregoing reasons, the Court should exclude any testimony from Sanofi's experts relying on Dr. Kopreski's reimagined TAX316.

| | |
|---|---|
| Dated: July 12, 2019 | Respectfully submitted, |
| /s/ Christopher L. Coffin<br>Christopher L. Coffin (#27902)<br>PENDLEY, BAUDIN & COFFIN, L.L.P.<br>1100 Poydras Street, Suite 2505<br>New Orleans, Louisiana 70163<br>Phone: (504) 355-0086<br>Fax: (504) 355-0089<br>ccoffin@pbclawfirm.com<br><br>*Plaintiffs' Co-Lead Counsel* | /s/ Karen B. Menzies<br>Karen Barth Menzies (CA Bar #180234)<br>Andre Mura ((CA Bar # 298541) (on the brief)<br>GIBBS LAW GROUP LLP<br>6701 Center Drive West, Suite 1400<br>Los Angeles, California 90045<br>Telephone: 510-350-9700<br>Facsimile: 510-350-9701<br>kbm@classlawgroup.com<br><br>*Plaintiffs' Co-Lead Counsel* |
| /s/M. Palmer Lambert<br>M. Palmer Lambert (#33228)<br>GAINSBURGH BENJAMIN DAVID<br>MEUNIER & WARSHAUER, LLC<br>2800 Energy Centre, 1100 Poydras Street<br>New Orleans, LA 70163-2800<br>Phone: 504-522-2304<br>Fax: 504-528-9973<br>plambert@gainsben.com<br><br>*Plaintiffs' Co-Liaison Counsel* | /s/Dawn M. Barrios<br>Dawn M. Barrios (#2821)<br>BARRIOS, KINGSDORF & CASTEIX, LLP<br>701 Poydras Street, Suite 3650<br>New Orleans, LA 70139<br>Phone: 504-524-3300<br>Fax: 504-524-3313<br>barrios@bkc-law.com<br><br>*Plaintiffs' Co-Liaison Counsel* |

**PLAINTIFFS' STEERING COMMITTEE**

| | |
|---|---|
| Anne Andrews<br>Andrews & Thornton<br>4701 Von Karman Ave., Suite 300<br>Newport Beach, CA 92660<br>Phone: (800) 664-1734<br>aa@andrewsthornton.com | Daniel P. Markoff<br>Atkins & Markoff Law Firm<br>9211 Lake Hefner Parkway, Suite 104<br>Oklahoma City, OK 73120<br>Phone: (405) 607-8757<br>Fax: (405) 607-8749<br>dmarkoff@atkinsandmarkoff.com |
| J. Kyle Bachus<br>Bachus & Schanker, LLC<br>1899 Wynkoop Street, Suite 700<br>Denver, CO 80202<br>Phone: (303) 893-9800<br>Fax: (303) 893-9900<br>kyle.bachus@coloradolaw.net | Abby E. McClellan<br>Stueve Siegel Hanson LLP<br>460 Nichols Road, Suite 200<br>Kansas City, MO 64112<br>Phone: (816) 714-7100<br>Fax: (816) 714-7101<br>mcclellan@stuevesiegel.com |

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, Florida 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

Andrew Lemmon
Lemmon Law Firm, LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Phone: 510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

Genevieve Zimmerman
Meshbesher & Spence Ltd.
1616 Park Avenue South
Minneapolis, MN 55404
Phone: (612) 339-9121
Fax: (612) 339-9188
gzimmerman@meshbesher.com

## CERTIFICATE OF SERVICE

    I hereby certify that on July 12, 2019, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

                                                  */s/ M. Palmer Lambert*
                                                  M. PALMER LAMBERT