# EXHIBIT B

Michael S. Corrigan

```
1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3

4    * * * * * * * * * * * * * * *

5    IN RE:  TAXOTERE           * MDL NO. 2740

6    (DOCETAXEL) PRODUCTS       *

7    LIABILITY                  *

8    * * * * * * * * * * * * * *

9    THIS DOCUMENT RELATES TO

10   ALL CASES

11

12     VIDEOTAPED DEPOSITION OF MICHAEL S. CORRIGAN

13           SHEEHAN, PHINNEY, BASS & GREEN

14                1000 Elm Street

15            Manchester, New Hampshire

16            June 7, 2019     8:18 a.m.

17

18

19

20

21          Maryellen Coughlin, RPR/CRR

22

23

24

25
```

Michael S. Corrigan

1  have to get the direct -- the exact verbiage,

2  that's not what I'm prepared to discuss today.

3  It's not within the scope of the discussion, as I

4  read it, from Judge North.

5          Q.      You understand you're testifying on

6  behalf of the defendant Sanofi U.S. Services,

7  Inc. f/k/a Sanofi-Aventis U.S., Inc. and

8  Sanofi-Aventis U.S., LLC, correct?

9          A.      I do.

10          Q.      And you understand that pursuant to

11  a stipulation of terms, related to the defendants

12  Sanofi S.A., Aventis Pharma S.A., entered by our

13  court on November 3rd, 2017, record Doc. 1072,

14  that Sanofi S.A. and Aventis Pharma S.A.,

15  Sanofi's French entities, as well as the Sanofi

16  defendants have agreed that Sanofi when

17  responding to discovery will include -- which

18  includes this deposition -- will include foreign

19  sources and locations, and Sanofi agrees to

20  cooperate in good faith to respond to discovery

21  and produce documents, information and witnesses

22  and to do so in a timely fashion.

23          A.      Mm-hmm.

24          Q.      Are you aware of that stipulation?

25                  MR. McCULLY:  Object to form.

Michael S. Corrigan

1       A.      I am.

2       Q.      As the Sanofi-designated witness to

3   testify on behalf of the company, will you follow

4   the stipulation as entered by the court?

5               MR. McCULLY:  Object to form.

6       A.      Will I follow the stipulation as

7   entered by the court?  As outlined in the

8   statement that you made previously, just a moment

9   ago; is that what you're asking me?

10      Q.      Yes.

11      A.      To the best of my ability within

12  the scope of the order from Judge North that has

13  been provided.

14      Q.      Do you understand the answers to

15  these questions may be used in court?

16      A.      Of course, yes.

17      Q.      Do you understand that your answers

18  to our questions will be presented to a jury in

19  this court?

20      A.      Yes, I do.

21      Q.      So as you testify today on behalf

22  of Sanofi, you will include information from

23  foreign sources and locations?

24              MR. McCULLY:  Object to form.

25      A.      I have reviewed documents that did

Michael S. Corrigan

1   include information with respect to any kind of

2   accusation against Sanofi from a foreign source

3   and location, but I do not believe that it's

4   within the scope of the order given by Judge

5   North for discussion today, so I could only

6   provide limited information with respect to it.

7         Q.      Can you explain what you mean by --

8   it sounds like you're limiting your testimony on

9   scope with foreign entities.  You said you don't

10  believe it's within the scope.  Can you explain

11  what you're -- what you're talking about?

12        A.      Well, I'm talking about any kind of

13  correspondence, and I'll read it again.  The

14  order from Judge North stipulates that for

15  discussion, communications between Sanofi and

16  Taxotere patients relating to the possibility of

17  legal actions for ongoing alopecia similar to

18  those identified in the exhibits that have been

19  provided, and those exhibits I have reviewed

20  extensively, and any reviews, investigations,

21  report of cases or incidents related to ongoing

22  alopecia by risk management as noted in other

23  exhibits that have been provided, which again

24  I've reviewed extensively and am happy to

25  discuss.  Questions, specifically questions

Michael S. Corrigan

1   concerning retention policies for such documents

2   are outside the scope of this order.  And then in

3   another section, 10 legacy files referenced in

4   the PCS case emailed to the court and counsel as

5   of February 4th, 2019.  Questions regarding

6   retention policies or schedules for these files

7   is outside the scope of this order.

8           As much as -- you know, if I could

9   accommodate you in other areas, what I came

10  prepared to discuss is what -- and what I was --

11  and what I discussed and reviewed with Sanofi's

12  legal team to be prepared to have a good, you

13  know, a productive discussion with you today --

14      Q.      How long have you been employed by

15  Sanofi?

16      A.      -- is not what, is not within the

17  scope of this order.

18          So what you're asking me to discuss

19  I believe is beyond the scope of the order, this

20  order, and you might have to discuss with

21  Sanofi's legal team further before I could say,

22  yes, this is what I would agree to.

23      Q.      How long have you been working for

24  Sanofi?

25      A.      As of June 1st, 20 years.

Michael S. Corrigan

1      Q.      And you were involved with working

2   on Taxotere?

3      A.      I was, yeah.

4      Q.      And you were -- have testified

5   twice now in litigation related to the marketing

6   of Taxotere?

7      A.      Yes, I have.

8      Q.      Once as a fact witness and once as

9   a company designated corporate witness, correct?

10     A.      That's correct.

11     Q.      Okay.  Where you testified on

12  behalf of the company related to allegations

13  against Sanofi related to Taxotere, correct?

14     A.      That is correct, yes.

15     Q.      And I've asked you if you are

16  willing to follow the stipulation that's been

17  entered into by the parties into the record by

18  the court that you will include in your testimony

19  today information from foreign sources and

20  locations.  Are you willing to do that?

21             MR. McCULLY:  Object to form.

22     Q.      If you're -- I need to know whether

23  you are or not.  And if you're limiting your

24  testimony to only stuff within the U.S., I need

25  to know that.

Michael S. Corrigan

1        A.        Okay.  Well, according -- the way I

2    understand it, according to Judge North's order,

3    that is what the testimony would be limited to,

4    that discovery has already been completed in all

5    those other areas.

6        Q.        Okay.  So your position is that you

7    are going to limit your testimony today based on

8    a scope objection to information from foreign

9    sources and locations; is that correct?

10       A.        Can you repeat that, please?

11               MR. McCULLY:  Object to form.

12       Q.        Your position today is that you're

13   going to limit your testimony based on a scope

14   objection to only U.S. evidence and you will not

15   be including information from foreign sources and

16   locations; is that correct?

17               MR. McCULLY:  Object to form.

18       A.        That's what I understood the scope

19   of the order from Judge North was to contain.

20       Q.        So is that a, yes, you're going to

21   limit your testimony in that fashion?

22               MR. McCULLY:  Same objection.

23       A.        I would -- as I read Judge North's

24   order here, I would say, yes, I have to.

25       Q.        Have you been instructed by your

Michael S. Corrigan

1   assertion without proof or documentation.

2       Q.      So let's assume with me that there

3   are women outside of the U.S. who had

4   communications with Sanofi about Taxotere and

5   ongoing alopecia, you are not going to testify

6   about any of those women here today because you

7   have not been prepared for that because your

8   position is that, you or Sanofi, your position is

9   that it is outside the scope of the judge's order

10  for this deposition; is that correct?

11              MR. McCULLY:  Object to the form.

12      A.      I've stated a few times that the

13  one case that you or the one -- it's not a case.

14  It's a claim that had been made against Sanofi

15  involving Shirley Ledlie.  Didn't, as I

16  understand it, result in any kind of legal

17  action, and I've been provided that sort of

18  background knowledge so that I have an

19  understanding of what we were prepared to discuss

20  today.  But in terms of what I was prepared to

21  discuss in detail, I have to adhere to Judge

22  North's order -- Judge North's order.

23      Q.      As interpreted by Sanofi?

24              MR. McCULLY:  Object to form.

25      A.      As, as interpreted by the

Michael S. Corrigan

1  statements that he made, and I think I've

2  explained that.

3       Q.      So it's an improper objection to a

4  30(b)(6) witness to limit the scope of testimony

5  that is relevant to the topic, and so we are --

6  you can assert the objection to questions.

7       A.      Okay.

8       Q.      You can assert the objection to

9  questions that you believe in your interpretation

10 of the judge's order is outside of the scope of

11 the 30(b)(6) topic, but you can't instruct them

12 not to answer those questions.  We're still

13 entitled to those questions.  And you've been an

14 employee for Sanofi for almost 20 years, as you

15 just told us, and you've been a witness as a fact

16 witness related to the marketing of Taxotere, and

17 you've been a corporate representative witness

18 related to claims against Sanofi as it relates to

19 Taxotere.

20      A.      Yeah.

21      Q.      So there's going to be information

22 that you have that your lawyers may consider

23 outside the scope of the 30(b)(6), but you still

24 need to answer those questions, and then that

25 objection will be registered and addressed by the

Michael S. Corrigan

 1    court at a later time.

 2              So I'm asking --

 3              MR. McCULLY:  I don't disagree with

 4    that.  Obviously, if he's answering those, it

 5    would be in his individual capacity until we --

 6    until you get a ruling from the court that that

 7    would have been one that he was designated to

 8    testify on today.

 9              MS. MENZIES:  Okay.  And then I

10    need to -- we are going to need to get a court

11    ruling today to -- because, as I understand it,

12    the witness, one, has been provided some

13    background information about patients

14    communicating with Sanofi related to permanent

15    alopecia and Taxotere outside the U.S., but he

16    has not been prepared to speak on behalf of the

17    company in that regard because you are limiting

18    the scope based on your interpretation of the

19    order.  We need clarification from that order.

20    And so I think --

21              MR. McCULLY:  I'm fine to get that.

22    Again, you're misstating your own notice.  It's

23    not just communications between patients and

24    Sanofi about ongoing alopecia.  It's

25    communications regarding the possibility of legal

Michael S. Corrigan

1   action.  So that's the first qualification.  It's

2   not just anybody who, who communicates with the

3   company.  It has to be a communication about

4   possibility of legal action.  And as I stated

5   before, as we -- as we go through and identify

6   those, the number of instances, quite frankly, is

7   very small.  There are a couple within, within

8   the U.S.  The witness was provided information

9   regarding Shirley Ledlie as background.  There's

10  a subsequent order from Judge North that has not

11  yet been entered as an exhibit to this deposition

12  that says we're done talking about Shirley

13  Ledlie.  So that's why the witness is not

14  testifying further and didn't do any further

15  review with respect to Ms. Ledlie following the

16  entry of that order.  We're fine to go visit with

17  the court, if we need to, to get clarification on

18  this.

19          MS. MENZIES:  Okay.  And,

20  obviously, this is for the record, counsel is

21  making comments and interpretations of orders and

22  rulings that the PSC does not agree with, but we

23  can address that with the court.

24          MR. McCULLY:  I'm just commenting

25  on your interpretation which we don't agree with,

Michael S. Corrigan

1  obviously.

2          MS. MENZIES:  Well, why don't we --

3  if you aren't going to instruct him not to answer

4  testimony that he knows about patients outside

5  the U.S., then why don't we go ahead and at least

6  get the information that he has.  We may need to

7  call the court for clarification on this.

8  Obviously, we're going to have the court address

9  the objection.  And I just want to make sure that

10 I understand very clearly that as we move forward

11 in today's questioning when I ask you about

12 patients who have communicated with Sanofi about

13 ongoing alopecia and Taxotere that you have not

14 been prepared by the company to speak to those

15 matters for women outside the U.S., correct?

16          MR. McCULLY:  That's not -- we're

17 not going to instruct him not to answer questions

18 unless they call for privilege, and we haven't

19 instructed him not to answer.

20          So to the extent that he has

21 background information based on his review prior

22 to the judge's order with respect to Ms. Ledlie,

23 certainly you can ask him those questions subject

24 to our objection, and he can respond.

25 BY MS. MENZIES:

1   alopecia.  But, again, and maybe we need to refer

2   to the documents that everybody here has agreed

3   to that are part of the exhibit lineup that the

4   claim being made is alopecia.

5        Q.    We haven't agreed to exhibits for

6   this topic.

7        A.    Oh, okay.

8        Q.    We were just given this morning a

9   list of documents that you reviewed for this

10  topic, so the record's clear.

11       A.    Oh, okay.

12       Q.    Let me just take a break for a

13  second 'cause I can't find my notice.

14            THE VIDEOGRAPHER:  The time is 9:12

15  a.m.  We're off the record.

16            (A break was taken.)

17            THE VIDEOGRAPHER:  The time is 9:30

18  a.m.  We're back on the record.

19  BY MS. MENZIES:

20       Q.    Okay, we're going to go ahead and

21  continue, but just for the record, we have set

22  forth the stipulation related to the French

23  entity and discovery from sources beyond the U.S.

24  Clearly we have a dispute on that for purposes of

25  today's deposition and the scope, but we will

Michael S. Corrigan

1    move forward and get testimony today related to

2    what you've agreed to provide and that's related

3    to domestic patients within the U.S.,

4    communications and otherwise, with Sanofi talking

5    about ongoing alopecia, okay?

6         A.      Okay.  Thank you.

7         Q.      And then we'll reserve that for an

8    issue to be addressed with the court at a later

9    time.

10        A.      Okay.

11    (Whereupon, Deposition Exhibit 3,

12        Plaintiff's Amended Notice of Deposition of

13        Sanofi U.S. Pursuant to Fed. R. Civ. P.

14        30(b)(6) and Court Order Dated

15        February 6, 2019,

16        was marked for identification.)

17    BY MS. MENZIES:

18        Q.      I'm going to hand you what we've

19    marked as Exhibit 3 to your deposition.  Have you

20    seen this document before?

21        A.      I have.

22        Q.      And what is this document?

23        A.      This document as it's stated is the

24    Plaintiff's Amended Notice of Deposition of

25    Sanofi U.S. Pursuant to Civ. P. 30(b)(6) and the

Michael S. Corrigan

 1   on, was the fact that one of the plaintiffs, Pam,

 2   so I'll just say Kirby, from Oklahoma, stated

 3   both in writing to him or in writing to him that

 4   she at no time had sought legal counsel and did

 5   not have an attorney when speaking with him

 6   regarding the claim that she had and that was

 7   confirmed.

 8              With Mark Gaydos, the information

 9   centered around the process, the legal process,

10   and how that was followed through all of this,

11   and as we wanted to make certain that protocol

12   was followed at each step of the way and

13   appropriate, and in an appropriate manner, as

14   this claim was pursued by the patient.

15        Q.     When you say we wanted to make sure

16   that protocol was followed, why is that?

17        A.     Well, if -- because, you know,

18   there are certain rules.  You know, I guess

19   I'd -- for lack of a better term, I guess rules

20   of engagement with a patient that has a -- may

21   have a claim.  So much so that even this case has

22   a section in it about, quote/unquote, pending

23   legal action, whether or not legal action was

24   actually pending when it was claimed to have

25   been.

Michael S. Corrigan

1           So, you know, there are certain

2   rules and certain letters that are generated when

3   certain communication is made on the part of a

4   patient engaging various departments within the

5   Sanofi organization.

6           So, again, to be specific, we

7   wanted to make sure that those rules were being

8   adhered to.

9      Q.    Okay.  From your investigation, did

10  you find that the protocol was followed?

11     A.    Yes.

12     Q.    Any concerns about the protocol in

13  the instance of Pam Kirby not being followed?

14     A.    Not, not concerns.  You know, I

15  think I mentioned yesterday that maybe a couple,

16  you know, a few words, in certain letters had a

17  tendency to maybe affect a patient that might be

18  emotional in a way that wouldn't be ideal.  But,

19  again, in terms of protocol or the rules that we

20  needed to follow from, you know, a policy

21  standpoint, no, no concerns.

22     Q.    What are you thinking of when you

23  say there may have been letters that had a

24  tendency to maybe affect a patient that might be

25  emotional?

Michael S. Corrigan

1      Q.      That was part of your review for

2   preparation of today's testimony?

3      A.      Within the context of the documents

4   that were provided, yes.  And that's a broad

5   statement, but what it's -- what it's meant to

6   capture is third-party clinical trials, training

7   documents, some marketing material, all to

8   provide context as to how Taxotere was positioned

9   within its indication in the market and also some

10  perspective on the company's understanding as to

11  any associated side effects for treatment with

12  Taxotere.

13     Q.      Okay, and let me just -- again, I'm

14  going to remind you that I'm limiting my

15  questions to Topic 2 at this point.  Mr. Griffin

16  will ask you about broader stuff.

17             MR. McCULLY:  Topic 1.

18     A.      Topic 1.

19     Q.      Did I say -- thank you.  Topic 1.

20     A.      Yeah.  Okay.

21     Q.      So let me just ask that again.

22             What did -- what was the process

23  that Sanofi's lawyers did to investigate,

24  investigate documents relevant to Topic 1 for the

25  deposition testimony today?

Michael S. Corrigan

1      A.      So, you know, to be clear, what I

2  referenced probably applied more to Topic 2 than

3  Topic 1.

4      Q.      Maybe I was confused.

5      A.      Yeah.  But for Topic 1, you know,

6  we talked about it a little bit.  We pulled the

7  risk management communication between Sanofi and

8  a patient making alopecia claims -- patients

9  making alopecia claims and all related

10  communication that we could find with respect to

11  that.  And we also were in contact with the risk

12  management director that was involved in the

13  communication surrounding the claim.

14      Q.      So the communications you're

15  referring to when you say risk management and the

16  patient making alopecia claims, you're referring

17  to Pam Kirby?

18      A.      Yes, I am.

19      Q.      Did you do a similar investigation

20  for any other patients who were making claims

21  about Taxotere and ongoing alopecia?

22      A.      Yes, we did.  There was a patient,

23  and I forget her name.  I don't even know if the

24  name was shared with me.  She's out of New

25  Jersey, that had a communication to Sanofi risk

Michael S. Corrigan

1   management as well.

2        Q.      Okay.  And did you investigate

3   communications made to any other patients that

4   made a claim to Sanofi related to Taxotere and

5   ongoing alopecia?

6        A.      Those were the documents that were

7   provided within the scope of the judge's order.

8              So the documents that we reviewed,

9   the communication and the exhibit documents that

10  were reviewed.

11       Q.      Okay.  So you didn't look at any

12  other documents, communications related to any

13  other patients for purposes of today's deposition

14  other than those of the Oklahoma patient and the

15  New Jersey patient, correct?

16       A.      Well, when you say --

17             MR. McCULLY:  Object to form and

18  object on the grounds of privilege to the extent

19  that the question is calling for what search did

20  the lawyers -- I'm sorry, did Sanofi legal do for

21  documents responsive to Topic 2.  If you can

22  answer without revealing any privileged

23  communications.

24             THE WITNESS:  Okay.

25             I wouldn't characterize that as

Michael S. Corrigan

1  correct.  When you said documents, I was thinking

2  letters or correspondence between a patient and

3  Sanofi risk management in the way of making a

4  claim, but there was also -- there were also

5  documents with respect to social media posts and

6  some claims -- or I shouldn't say claim but some

7  allegations of alopecia associated with Taxotere

8  use that, based on my review of those documents

9  that were published via social media, social

10  media type blogs, were referred to U.S.

11  pharmacovigilance.

12       Q.    So I'm going to ask it again.

13             What steps were taken by Sanofi to

14  investigate documents relevant to Topic 1 in the

15  notice of this deposition?

16             MR. McCULLY:  Again, object to the

17  extent that that calls for privileged

18  communication or work product of the lawyers.  To

19  the extent you can answer that question regarding

20  steps taken to procure documents without getting

21  into those areas, you may.

22             MS. MENZIES:  So just so we're

23  clear, we don't -- this is not privileged.  That

24  what the company did to investigate documents

25  related to this topic is not privileged, and so

Michael S. Corrigan

1    we disagree with that objection, and we'll have

2    to address it later --

3                    MR. McCULLY:  Okay.

4                    MS. MENZIES:  -- if he's not

5    willing to answer.

6                    MR. McCULLY:  I'm not sure he has

7    an answer one way or the other, but I'm stating

8    my objection for the record.

9         A.      I can -- I can only state that, you

10   know, within the scope of the judge's order, I

11   reviewed all documents, and it did appear that

12   those claims -- I reviewed all documents

13   pertaining to the communication between the

14   patients and risk management, and it did appear

15   that those cases, to the extent that those

16   patients wished to pursue those claims, were

17   thoroughly investigated and closure was brought

18   about in that process.

19        Q.      What was done to find responsive

20   documents for this inquiry?

21        A.      What was done to define?

22        Q.      To find.

23        A.      Oh, to find.  To find --

24        Q.      -- documents relevant to this

25   deposition.

1              MR. McCULLY:  With respect to
2    Topic 1.
3         A.     I can only --
4              MS. MENZIES:  Topic 1, yes.
5         A.     I can only speculate.  Those
6    documents were provided to me.
7         Q.     Okay.  So you don't know as you sit
8    here today what Sanofi did or its lawyers did to
9    obtain, investigate documents relevant to today's
10   testimony for Topic 1, correct?
11        A.     I can only say that I'm prepared to
12   thoroughly review the documents that were
13   provided for this deposition today.  I don't know
14   what other investigations did or did not occur.
15        Q.     Okay.  So you're relying entirely
16   on what the attorneys gave you for purposes of
17   investigating documents relevant to Topic 1 in
18   today's testimony, right?
19        A.     For purposes of preparing for this
20   discussion, yes.
21        Q.     So you don't know who participated
22   in the search for the documents, or do you?
23        A.     No, I don't.
24        Q.     Do you know who provided the
25   information or documents relevant for today?

Michael S. Corrigan

1       Q.      Okay, I'm going to hand you -- let

2   me make sure I don't give you the one I wrote on.

3               I'm going to hand you what we've

4   marked as Exhibit 5 to your deposition testimony

5   today, and if you can flip through that and let

6   us know if this is what -- if this is the -- if

7   these are the documents that Sanofi produced to

8   us two days ago that they found in preparation

9   for your deposition testimony today?

10              MR. McCULLY:  Object to form.

11      A.      I just need one more minute,

12   please.  Yes, that is correct.

13      Q.      Okay.  So what is Exhibit 5?

14              MR. McCULLY:  Object to form.

15      A.      So Exhibit 5 looks to me to be the

16   correspondence between Ms. Kirby and Craig Clark

17   from Sanofi risk management regarding a claim to

18   address alopecia that she associated with

19   Taxotere use.

20      Q.      Okay.  And for the record, these

21   documents are responsive to requests submitted to

22   Sanofi on July 11th, 2017, and for the first time

23   we received them two days ago.

24              And Sanofi's lawyers -- well, let

25   me ask you that.  You reviewed these documents in

Michael S. Corrigan

 1    preparation for your deposition testimony today?

 2         A.      I did.

 3         Q.      And when's the first time you saw

 4    them?

 5         A.      Yesterday in detail.

 6         Q.      And who provided the documents to

 7    you?

 8         A.      Rob and Matt.

 9         Q.      Did you have those documents for

10    use when you were discussing the matters for your

11    deposition testimony today with Mr. Clark and

12    Mr. Gaydos?

13         A.      I did.

14         Q.      When were these documents

15    discovered?

16                 MR. McCULLY:  Object to form.

17         A.      I don't know.

18         Q.      How were they found?

19                 MR. McCULLY:  Object to form.

20         A.      I don't know.

21         Q.      So you didn't find them?

22         A.      I didn't find them.

23         Q.      Do you know whether Mr. Clark or

24    Mr. Gaydos did?

25         A.      I would only be able to speculate.

Michael S. Corrigan

```
1        Q.      Do you know who conducted the
2   search for these documents?
3               MR. McCULLY:  Object to form.
4        A.      I don't know who did.
5        Q.      What were you told to assume about
6   these particular documents?
7               MR. McCULLY:  Object to form.
8        A.      I wasn't told to assume anything
9   about these documents.  I was told to review
10  them.
11       Q.      What is Sanofi's subjective belief
12  about what these documents -- what these
13  communications show?
14              MR. McCULLY:  Object to form.
15       A.      The subjective belief.  Well, and
16  what these communications show.  Are you
17  referring to any specific communication within
18  them or just the general process of communication
19  back and forth?
20       Q.      The general process of the
21  communication with Pam Kirby, what is Sanofi's
22  interpretation of what these documents show?
23              MR. McCULLY:  Object to form.
24       A.      In summary, a patient had
25  approached our risk management department, made a
```

Michael S. Corrigan

1    testimony today?

2         A.        I did more as part of background

3    knowledge for this case, not anything overly

4    specific.  I mean, there was some spreadsheet

5    reporting tied to a couple of the patients making

6    the claim but nothing that was any different than

7    what was discussed in the letters.

8         Q.        So your understanding of the SIEBEL

9    information that was provided to you for your

10   deposition testimony today, what did it relate

11   to?

12        A.        It related to the nature of the

13   reporting system, and there was a certain amount

14   of information in it that I reviewed that was

15   tied to Ms. Kirby.

16        Q.        Do you understand that SIEBEL is a

17   call center database which tracks customer

18   service calls, questions and complaints?

19        A.        I hadn't -- I had -- I don't

20   disagree with that.  I just also had understood

21   that it was -- there was also -- it was an

22   information gathering type resource where there

23   was -- these reports were tracked as well.

24        Q.        Okay.  So that description I just

25   gave you, a call center database which tracks

Michael S. Corrigan

1    customer service calls, questions and complaints,

2    is the description of SIEBEL that was provided by

3    litigation attorneys for Sanofi.

4         A.     You know what, I think I might be

5    confusing SIEBEL with another acronym that we had

6    prepared, SIOMS, I think, and that's what I was

7    referring to in my earlier discussion.  So I'll,

8    I'll defer to you with respect to SIEBEL.  I

9    apologize.

10         Q.     Okay.  Well, so the record is

11    clear, I'm not Sanofi.  You are.  So do you agree

12    that -- SIEBEL database is a call center

13    database, correct?

14              MR. McCULLY:  Object to form.

15         A.     I would have to agree.  I don't

16    have direct experience with that aspect of it,

17    so.

18         Q.     Okay, so let me just ask you.  As

19    you sit here today speaking on behalf of Sanofi,

20    do you have an understanding of what SIEBEL is?

21              MR. McCULLY:  Object to form.

22         A.     Just top line, you know, in

23    terms -- so -- but I'm going to say that that's

24    not what I came here prepared to discuss at

25    length.

Michael S. Corrigan

1    A.        Can you repeat that one more time,

2  please?

3    Q.        Sure.  Does risk management engage

4  in communications with patients who threaten

5  litigation against Sanofi based on a product

6  complaint?

7            MR. McCULLY:  Object to form.

8    A.        If they -- and this is pretty well

9  documented in the evidence provided and some of

10  the exhibits provided, but if a patient threatens

11  litigation, they, risk management, sends a

12  communication to that patient asking to confirm

13  whether or not they've sought legal counsel in a

14  case.  And if so, then communication terminates

15  between that patient and risk management and that

16  patient is referred to, as you would say, general

17  counsel, but in this case, it would be North

18  American legal, Sanofi legal.

19    Q.        Okay.  So let's back up a bit.

20            Who handles the first-line

21  communications with patients that are making a

22  claim to Sanofi?

23    A.        Well, I guess that I would say it

24  depends but -- you know, 'cause many times those

25  patients are reporting an adverse event or -- and

Michael S. Corrigan

1    letter related -- from Craig Clark to a woman in

2    Old Bridge, New Jersey?

3         A.      I can't -- I don't recall that.  I

4    can't confirm that, so.

5         Q.      Do you, do you remember -- so as

6    you sit here today, you don't remember whether

7    you've seen this document or not?

8         A.      Again, we've got 25 documents on

9    the list.  Your -- if you -- you've submitted a

10   few documents that weren't on the list.  So if

11   there was one sent to another patient -- I'm just

12   doing my due diligence.  I have seen a lot of

13   documents that look a lot like this one, if

14   not -- if this isn't the one to Ms. Kirby.

15        Q.      So the documents, the

16   communications you saw from Craig Clark to

17   patients include only the documents that were

18   provided to you by Sanofi, correct?

19        A.      That is correct.

20        Q.      Do you know whether or not there

21   were additional letters like this, form letters,

22   from Craig Clark or anyone else in risk

23   management sent to patients who had contacted

24   Sanofi about Taxotere and ongoing alopecia?

25        A.      Only from --

Michael S. Corrigan

1               MR. McCULLY:  Object to form.

2        A.      Only from Craig Clark himself

3   yesterday when he said this looks a lot like our

4   standard letter that we would issue if a patient

5   does suggest that they might be getting in touch

6   with a lawyer.

7        Q.      Okay.  And so do you know -- you

8   were provided documents from legal counsel.

9        A.      Yeah.

10       Q.      Do you know whether there are other

11  form letters similar to Exhibit 10, Exhibit 4,

12  Craig Clark letters to patients related to

13  Taxotere and ongoing alopecia?

14               MR. McCULLY:  Object to form.

15       A.      No, I don't know that.

16       Q.      And in preparation for your

17  deposition testimony today, did Sanofi --

18  Sanofi's lawyers tell you whether there are other

19  letters, Craig Clark type letters, from risk

20  management to patients related to Taxotere and

21  ongoing alopecia?

22       A.      No.

23       Q.      Did Sanofi's lawyers in preparation

24  for your deposition testimony today tell you --

25       A.      Oh, I'm sorry, there was another

Michael S. Corrigan

1    letter that we reviewed.  I apologize, there was

2    another letter that we reviewed that was similar

3    to this one to another patient on the part

4    of a -- that had made a claim.  But there was

5    no -- I'm going on memory here, but there was no

6    follow-up from that patient as to whether or not

7    to pursue the claim.

8         Q.      Okay.  Do you know -- how do you

9    identify that patient that you're thinking of?

10        A.      This was a patient from New Jersey.

11        Q.      Okay.  Is it possible --

12        A.      So there was a patient from a

13   Oklahoma.  There was a patient from New Jersey.

14   So, okay, you know what, now we're -- now I'm

15   grounded in it.  My apologies.

16               MR. McCULLY:  Eureka.

17        A.      I was still thinking we were on

18   Pamela Kirby.

19        Q.      No problem.  They are very similar.

20   Yes, I will give you that.

21        A.      Got it.

22        Q.      So you agree that Exhibit 10 --

23        A.      My apologies.

24        Q.      That's okay.  You're okay.  You

25   agree that Exhibit 10 is a document that was

Michael S. Corrigan

```
 1   provided to you by Sanofi's attorneys in

 2   preparation for your deposition testimony today,

 3   correct?

 4        A.      I do agree.

 5        Q.      And as you sit here today, you

 6   don't know whether there are other similar Craig

 7   Clark type letters from risk management to

 8   patients related to Taxotere and ongoing

 9   alopecia, correct?

10             MR. McCULLY:   Object to form.

11        A.      Yeah, I don't know that, no.

12        Q.      Do you know whether anyone at

13   Sanofi or its attorneys investigated whether

14   there were additional letters from risk

15   management to patients related to Taxotere and

16   ongoing alopecia?

17        A.      No.  I'd refer back to the scope of

18   the order and what was, you know, planned to be

19   reviewed today, so I'd have to say no.

20        Q.      Did you ask Craig Clark when you

21   spoke with him yesterday whether he had sent any

22   other letters to other patients related to

23   Taxotere and ongoing alopecia than the two we've

24   referred to from New Jersey and Oklahoma?

25        A.      No, the discussion with Craig was
```

Michael S. Corrigan

1    limited to the scope of the court order so that I

2    could prepare to talk within that, from that

3    vantage point.

4         Q.     Do you -- do you know whether

5    Sanofi or its attorneys investigated or asked

6    Craig Clark for any other letters similar to

7    Exhibit 4 and 10 related to patients claiming

8    Taxotere and ongoing alopecia?

9         A.     No, I don't know that.

10        Q.     So what is your position as to why

11   similar letters to these would not be within the

12   scope of this deposition and the court's order?

13             MR. McCULLY:  Object to form.

14        A.     I can -- I can only speak to what I

15   had been given guidance to plan for within the

16   context of the court order and the appropriate

17   documentation.  Those letters were, were part of

18   what we were ordered to discuss today.  The

19   letters that is that are tied to Sanofi_05442744

20   and 054427 -- yeah, same number.

21        Q.     Okay.  So looking at this letter,

22   it looks like it's -- Mr. Clark, similar to what

23   we saw with Ms. Kirby, says to the patient in New

24   Jersey, "Since you mentioned the possibility of

25   taking legal action in your telephone

Michael S. Corrigan

```
 1                 MR. McCULLY:  There you go.
 2                 MS. MENZIES:  I asked if he was
 3    ready.
 4                 I'm going to hand you what we're
 5    marking as the next exhibit to your deposition
 6    which will be No. 12.
 7      (Whereupon, Deposition Exhibit 12,
 8       Report from the SIEBEL database
 9      (Sanofi_00792534),
10       was marked for identification.)
11    BY MS. MENZIES:
12        Q.     I've tagged a page in there just
13    for ease of reference for all of us.
14        A.     Okay.
15        Q.     But I will represent to you that
16    this was provided to us in response to requests
17    for documents in this litigation from Sanofi
18    related to patients who made claims or complaints
19    or requests for information about Taxotere and
20    ongoing hair loss --
21        A.     Mm-hmm.
22        Q.     -- and a variety of other things.
23    And, anyway, this is a report that we understand
24    was generated again from the SIEBEL database
25    which is just a different form --
```

Michael S. Corrigan

1          A.        Okay.

2          Q.        -- than the last document that we

3     looked at.

4                    So there's a lot of information in

5     this form.  Let me just confirm.  This is not a

6     document that you've seen before today, correct?

7          A.        Yeah, that is correct.

8          Q.        So for the record, this is Sanofi

9     Bates No. 00792534.

10                   So you were not -- you did not look

11    at this document in preparation for your

12    deposition testimony today?

13         A.        I did not.

14         Q.        In this document, you can see just

15    sort of the format of it.  Again, it's kind of

16    broken up because it's a PDF of some version of a

17    database.

18         A.        Mm-hmm.

19         Q.        But you can kind of see dates and

20    references, and there's some information that we

21    understand are summaries of the conversations

22    with individuals who had contacted the company.

23    Again, this is the call center.  It includes

24    conversations from patients, doctors, nurses,

25    anybody, a variety of people who have contacted

Michael S. Corrigan

1    the company.

2         A.      Yes.

3         Q.      In this document, it makes

4    references to emails, faxes and letters, okay?

5                 And I want to ask you, as you sit

6    here today, are you prepared -- you're not

7    prepared to tell us whether or not Sanofi has the

8    underlying communications that are referenced,

9    referenced in this SIEBEL database report,

10   correct?

11                MR. McCULLY:  Object to form.

12        A.      I think, as I've stated before, I'm

13   prepared to speak in terms of the scope of Judge

14   North's order.  I can answer as well as I can

15   based off of what you're referring to in this

16   document here, and I can speak with respect to

17   Taxotere and its clinical profile and potential

18   side effects, but I'm not sure what other aim you

19   would have in mind in terms of my response to the

20   content of this document, so you might have to

21   clarify that.

22        Q.      Let's look at the page I flagged

23   for you.

24        A.      Sure.

25        Q.      It's -- just so the record's clear,

Michael S. Corrigan

1    this is a native document, so there are no page

2    numbers on it.  But if you count numerically,

3    it's Page 15 in this set of documents, but I've

4    flagged it for counsel and the witness so that we

5    can focus quickly on one particular example.

6          A.      Okay.

7          Q.      If you look in the middle of the

8    page, do you see the date June 15th, 2009?

9          A.      I see June 5th, 2009.

10          MR. McCULLY:  You're on the wrong

11   page.

12          THE WITNESS:  Oh.  Oh, okay.  Now I

13   see the June 15th, 2009, yes.

14          Q.      Okay.  And it has the time stamp it

15   looks like of 13:15?

16          A.      I see that.

17          Q.      And then we have a number there

18   1-212529869.  Do you see that there?

19          A.      I do.

20          Q.      And you're not prepared to tell us

21   about what the significance of that number is,

22   correct?

23          A.      No, I'm not.

24          Q.      Okay.  Next to it, it says

25   "Consumer."  Do you see that there?

Michael S. Corrigan

1      A.      I see it.

2      Q.      And then we have "Phone Taxotere,"

3  following that same line, correct?

4      A.      Yes.

5      Q.      Okay.  And then the language that's

6  in this call center entry says, "She would like

7  to speak to Monica about her Taxotere," and then

8  it gives the inquiry number, the same one I just

9  read.  Oh, no, a different -- a different one.

10  Excuse me.  1-21285636.  "Caller says that she

11  could not read the email that was sent; to please

12  fax.  Caller also mentioned that she has been on

13  some forums and some women says that three to

14  five years after taking Taxotere their hair still

15  has not grown back."  Did I read that correctly?

16      A.      Yes.

17      Q.      Okay.  And it gives us some

18  information, and it follows up with some more

19  numbers and things like that.  You're not

20  prepared to tell us what those -- that

21  information is today, correct?

22      A.      No, I'm not.

23      Q.      And then, what I want to clarify,

24  she refers to she could not read the email that

25  was sent.  You understand that's an email sent by

Michael S. Corrigan

1  Sanofi.  Does that seem apparent --

2              MR. McCULLY:  Object to form.

3       Q.       -- in this document?

4              MR. McCULLY:  I'm sorry.  Object to

5  form.

6       A.       I don't know if I could confirm

7  that --

8       Q.       Okay.

9       A.       -- based on what I'm seeing here.

10  I don't know if I could confirm that based on

11  what I'm seeing here.

12       Q.       But she says she cannot read the

13  email that was sent, please fax it.  Based on the

14  references in this SIEBEL document reflecting

15  entries in a call center log, are you able to

16  tell us today whether or not this email that was

17  sent to this patient is available to us?

18       A.       No, I wouldn't be able to.

19       Q.       Who would we go to to find that

20  out?

21              MR. McCULLY:  Object to form.

22       A.       I wouldn't be able to direct you.

23  I could only speculate.

24       Q.       Can you pull back up for me

25  Exhibit No. 4?

Michael S. Corrigan

1         A.        Mm-hmm.

2         Q.        This is the Craig Clark to Pam

3    Kirby letter that was referenced in the court's

4    order and the notice.

5         A.        Exhibit 4 you said, right?

6         Q.        Yes.  So, again, this is a letter

7    dated January 16, 2008, from Craig Clark to

8    Pamela Kirby, presumably, although I think we've

9    established that.

10        A.        Yes.

11        Q.        Is that your understanding?

12        A.        It's from Craig Clark, and you

13   know, it's redacted, so I'd have to assume that

14   it's to Pamela Kirby, yes.

15        Q.        Did you see an un-redacted version

16   of this letter in preparation for your deposition

17   testimony?

18        A.        I believe I did, yes.

19        Q.        Okay.

20        A.        So yes.

21        Q.        And this letter to Pamela begins,

22   "Since you mentioned the possibility of taking

23   legal action in your telephone conversation of

24   earlier this week, your case has been referred to

25   Risk Management."  Did I read that correctly?

Michael S. Corrigan

1        A.        Yes.

2        Q.        So this letter to Pam Kirby

3   occurred about two months after the Craig Clark

4   letter we saw to the patient from New Jersey,

5   correct?

6        A.        That is correct, yes.

7        Q.        And it uses basically the exact

8   same opening sentence, correct?

9        A.        Mm-hmm.  Yes, it appears to.

10       Q.        And you understand that Ms. Kirby

11  was complaining about permanent hair loss as

12  well, correct?

13                 MR. McCULLY:  Object to form.

14       A.        I remember the details of the

15  complaint center around alopecia, yes, hair loss.

16       Q.        Okay.  You understand that she was

17  complaining that it was ongoing alopecia,

18  correct?

19       A.        Yes, that statement, ongoing

20  alopecia, is correct.

21       Q.        So Ms. Kirby's complaint about

22  ongoing alopecia and her threat of potential

23  litigation was made about two months after the

24  unknown New Jersey claim that made a similar

25  complaint, correct?

Michael S. Corrigan

1              MR. McCULLY:  Object to form.

2       A.      That appears to be the case, yes.

3       Q.      So it looks like

4   Ms. Kirby initial -- I'm sorry.

5       A.      So let me make sure I'm tracking

6   with you.

7              So you're saying that there's a

8   letter that's issued that's very similar to the

9   patient -- and maybe we'd say the patient in New

10  Jersey, the patient from Oklahoma so that we

11  track well.  And in both cases, there were -- and

12  if you don't mind, could you refer me to the

13  exhibit where the patient -- the letter to the

14  patient from New Jersey is?

15      Q.      Yes, that's Exhibit 10.

16      A.      Exhibit 10.  I just want to make

17  sure I'm tracking with you.  Oh, did I miss it.

18  That's 9.  8.

19      Q.      Did I write the number wrong?

20      A.      I might have buried it.  There's

21  Exhibit 10, right here.  It's just helpful to me

22  to look at both letters just so I can track with

23  you.

24      Q.      Fair enough.  So these are similar

25  letters, correct?

Michael S. Corrigan

1          A.       Yes, the date on -- the date on the

2    letter to the patient in New Jersey is

3    November 8th, 2007.  The date on the letter to

4    the patient in Oklahoma is January 16th, 2008.

5    These letters look very close to being the

6    same --

7          Q.       Okay.

8          A.       -- if not identical.

9          Q.       And we talked earlier that

10   presumably the communication from New Jersey, the

11   New Jersey patient, came in to -- one of the

12   avenues directly to the company and then was

13   referred to risk management, correct?

14         A.       Which, which patient?

15         Q.       The New Jersey patient.

16         A.       Oh, the New Jersey patient.  And,

17   yes, I believe the way we tracked it, based on

18   the evidence provided, was it came in through

19   U.S. -- a referral from U.S. pharmacovigilance.

20         Q.       And from the document,

21   Exhibit No. 4, to Ms. Kirby --

22         A.       Mm-hmm.

23         Q.       -- presumably that communication

24   from Ms. Kirby originated in a similar fashion,

25   go through medical information or

Michael S. Corrigan

1  pharmacovigilance, and then was referred to risk

2  management, correct?

3      A.      Yes, I believe so, yeah.

4      Q.      And Mr. Clark says in there that

5  your case was transferred to him, him in risk

6  management, based on the fact that Ms. Kirby

7  mentioned the possibility of taking legal action,

8  correct?

9      A.      That's what it states in each of

10 the letters.

11     Q.      Okay.  And as we looked at the SOPs

12 earlier, that's kind of similar to the path that

13 we see before, patient contacts the company

14 through the call center or whatever manner, and

15 then if it refers to the possibility of legal

16 action, it gets referred to risk management?

17     A.      For the record, I would state in

18 both letters it says "since you mentioned the

19 possibility," and "in light of that possibility

20 of legal action."  So this is not a threat of

21 legal action.  This is not potential legal

22 action.  This is simply a possibility of legal

23 action.

24     Q.      What's the difference between the

25 possibility of legal action referred to in the

Michael S. Corrigan

1  Craig Clark letter and the potential of legal

2  action referred to in the SOPs in Sanofi's

3  opinion?

4          MR. McCULLY:  Object to form.

5      A.      So the possibility means that

6  there's a chance of it, that that patient may

7  have mentioned that there is a chance they may

8  take legal action.  But potential or threatening

9  legal action would be more in line with I've

10 consulted with an attorney, I am going to sue,

11 and/or -- or possibly even Sanofi being contacted

12 by that patient's attorney, which in turn, as

13 we've discussed before during this deposition,

14 that patient would be referred over to North

15 American legal.

16      Q.      Exactly.  So at this point in time

17 when Sanofi refers the patient to the risk

18 management department, it doesn't know whether

19 the patient's actually going to take legal action

20 or not, correct?

21      A.      That is correct.

22      Q.      But it is possible and it appears

23 to be possible that the patient -- they're on

24 notice that the patient might take legal action,

25 correct?

Michael S. Corrigan

1          A.        They are on notice that there's a

2    possibility, but as the letters, both letters

3    state, you know, what is a certainty is that

4    there's a, or that there's a claim being

5    discussed, and the course of action that's

6    suggested is that if you are not seeking legal

7    action against Sanofi that, you know, that the

8    claim would continue to be reviewed by risk

9    management.

10         Q.        But nonetheless, the contact by

11   Ms. Kirby was referred to Craig Clark and risk

12   management, correct?

13         A.        It was.

14         Q.        Let's take a look at the next

15   document we'll mark as Exhibit 13.

16       (Whereupon, Deposition Exhibit 13,

17        Excerpt from SIEBEL database

18       (Sanofi_01299161),

19        was marked for identification.)

20   BY MS. MENZIES:

21         Q.        This is another one of our awkward

22   exhibits.

23         A.        Thank you.

24         Q.        Sure.  If I can direct your

25   attention -- okay, so for the record, we've just

Michael S. Corrigan

1    marked as Exhibit 13 an excerpt from the SIEBEL

2    database that is in an Excel format.  We've

3    pasted the pages together so that it is readable,

4    and if you could look at the middle of that page

5    where it says No. 10055.

6         A.      I see it, yes.

7         Q.      And under "A" we see a patient

8    number 1-142719720.  Do you see that there?

9         A.      I do.

10        Q.      And then the PV -- the USPV number

11   identification is 2008 --

12        A.      Yes.

13        Q.      -- 10318US.  Did I read that

14   correctly?

15        A.      I see that, yup.

16        Q.      And then we have Taxotere,

17   potential side effect.  Serious the answer is no.

18   Potential adverse event, yes.  Potential PTC it

19   says no.  Opened, and we have a date of January

20   15th, 2008, at 13:30, correct?

21        A.      I see that, yes.

22        Q.      Okay.  And then we have the first

23   company date of 1/15/2008, and then the date that

24   the pharmacovigilance department received that as

25   1/15/2008, correct?

Michael S. Corrigan

 1        A.        Yes.

 2        Q.        And as you sit here today, you have

 3   not been prepared by counsel for Sanofi to

 4   testify on Sanofi's behalf regarding this entry

 5   to the SIEBEL document, correct?

 6                  MR. McCULLY:  Object to form.

 7        A.        That's correct.  It's not in the

 8   scope of the discussion that I understood.

 9        Q.        Okay.  And then we have -- now the

10   receipt date from the company and the date it was

11   opened is one day before the date of the letter

12   from Craig Clark to Pam Kirby, correct?

13        A.        Can you repeat that one more time,

14   please?

15        Q.        Sure.  The entry date in

16   Exhibit 13, the first company date is

17   January 15th, 2008, which is one day before

18   Exhibit 4's letter of January 16th, 2008, from

19   Craig Clark to Pam Kirby, correct?

20        A.        Yes.  I'm tracking with that, yes.

21        Q.        Okay.  And under Column L it says,

22   "Case deemed non-serious, CFV/USPV/15January2008.

23   USPV," and then it says, "Was on Taxotere (D/C,"

24   probably discontinued, in two thousand -- I'm

25   sorry, "in February 2007 and experienced hair

Michael S. Corrigan

1  loss.  To date hair has not come back, wants to

2  know why.  She also lost her nails which have

3  come back.  USPV/NB 1/15/08."  Did I read that

4  correctly?

5       A.      You did.

6       Q.      So according to this information,

7  it looks like the patient contacted the company

8  on January 15, 2008, she stopped taking Taxotere

9  in February of 2007, and reports that her hair

10  has not come back.  So that's almost a year

11  later, correct?

12       A.      Based on what the data is showing

13  there, that would be the right assumption to

14  make, I guess.

15       Q.      Okay.  But for preparation for your

16  testimony today, you are not able to answer

17  questions for us on behalf of Sanofi related to

18  this entry, correct?

19              MR. McCULLY:  Object to form.

20       A.      I'd have to refer back to Judge

21  North's order and answer that no.

22       Q.      The next -- the question was in

23  Column L.  The response is in Column M, and it

24  says, "Redacted - PII."  Do you see that there?

25       A.      I do.

Michael S. Corrigan

1        Q.        Okay.  Do you know why that was

2   redacted?

3        A.        No, I wouldn't know that.

4        Q.        And you've not seen this

5   information before today?

6        A.        I had seen a similar report just as

7   part of background knowledge but not to be

8   prepared to discuss today, no.

9        Q.        A similar report, what are you

10   referring to?

11        A.        Oh, I had seen this report but only

12   as part of background knowledge, not to be

13   prepared to discuss today, so.

14        Q.        Let me make sure I understand.  You

15   had seen this report, and by "this report,"

16   you're referring to what exactly?

17        A.        This, this spreadsheet with this

18   patient summary, but only within the context that

19   this was a call that came in from a patient where

20   it was reported to the company, so.

21        Q.        Oh, so -- and you're talking

22   specifically about this January 15th, 2008,

23   entry?

24        A.        Yeah.  Yes, these entries, this

25   whole report.

Michael S. Corrigan

1    Q.       Can you tell us if this is Pam

2  Kirby?

3    A.       No, I couldn't conclude that that

4  was Pam Curry.

5    Q.       Kirby.

6    A.       Kirby.  Excuse me.  Because the

7  dates are different.  And the discussion that I

8  had to prepare for this really just centered

9  around the engagement between Sanofi risk

10 management and the patient, not any, any type of

11 report -- internal reporting where something was

12 documented and then referred to risk management.

13   Q.       So you saw this case information

14 from the SIEBEL database in preparation for your

15 deposition testimony today, correct?

16   A.       I did.  We glanced at it.  This --

17 I think I spent all of a minute looking at this,

18 so.

19   Q.       And did Sanofi's counsel or anyone

20 advise you on who this patient was?

21   A.       No.

22   Q.       So they didn't tell you it was Pam

23 Kirby?

24   A.       They said that these are patient

25 reports.  These are, you know, examples of

Michael S. Corrigan

1   patient-documented reports that had -- were

2   recorded as part of call center reporting.

3        Q.      How many examples of patient

4   reports that were part of the call center did you

5   review in preparation for your deposition

6   testimony today?

7        A.      Well, I wouldn't really

8   characterize it as a review, and I wouldn't

9   characterize it as anything where we connected

10  the dots saying this is this patient's letter

11  that was a dialogue between Craig -- you know,

12  that included a dialogue between Craig and risk

13  management and the patient in this report.

14              This report -- this report and the

15  other report that you listed as -- you

16  characterized as the eye chart as well,

17  Exhibit No. 11, I think we looked at just very

18  briefly, no more than five minutes at the end of

19  the day yesterday, just saying these are other

20  reports or these are reports that tie in to

21  patient calls that then get referred, so.

22       Q.      And were you informed that those

23  are reports of patients related to alopecia,

24  ongoing alopecia and Taxotere?

25       A.      Well, I read enough to see that at

Michael S. Corrigan

 1   least one, if not more, had, you know, referred

 2   to alopecia, yes, so.

 3        Q.    What was the format that you were

 4   shown this information from the SIEBEL database?

 5        A.    The format?  How do you mean?

 6        Q.    Yeah, was it an Excel or printed

 7   out or what did it look like?

 8        A.    I think it was on a piece of paper.

 9   It was on a piece of paper like this.

10        Q.    Did it have -- did it have the

11   boxes like this is?

12        A.    Oh, it was an Excel spreadsheet, so

13   yeah.

14        Q.    And it was printed out as an Excel

15   spreadsheet?

16        A.    Yes.

17        Q.    Okay.  And when you reviewed --

18   when you were shown this information by counsel

19   for Sanofi, did it have all the columns in it?

20        A.    Yeah, I believe so.

21        Q.    How big was the document?

22        A.    No larger than what you're showing

23   here.

24        Q.    Well, this is just one page.  So

25   how many pages approximately was the SIEBEL

Michael S. Corrigan

1   report that you reviewed yesterday in preparation

2   for your deposition?

3        A.      It wasn't any different than this.

4        Q.      It was one page?

5        A.      Yes.

6        Q.      It was only one page?

7        A.      Yeah.  Well, it was a lot the same

8   as what you're showing here.

9        Q.      How many entries were on the page

10  of the SIEBEL report that you looked at?

11       A.      It looked virtually the same as

12  this.  So the entries were the same.  The number

13  of entries were the same.

14       Q.      What patients were included on --

15       A.      The number of patients?

16       Q.      Yeah.  Like, how can we

17  determine -- we need to know what patients you

18  reviewed in the SIEBEL database on the one page

19  excerpt that you looked at for your deposition

20  testimony today.

21       A.      Well, if there -- I mean, we'll

22  just have to use deductive reasoning.  We don't

23  know if there was more than one patient call

24  logged.  So for all we know, this could have

25  been, you know, unless we look at it a little bit

Michael S. Corrigan

1   more closely, the same patient or two patients

2   with another two on top of it, but it was, it

3   was -- I don't know if I can answer that question

4   'cause I'm not familiar with the reporting system

5   as to how this was all logged.

6           Within the scope of this case, if a

7   call or a patient is logged as making a claim,

8   then they're referred from this system to the

9   risk management system which is where we can, you

10  know, we can start keeping tabs on things truly

11  and be able to discuss what is in scope with what

12  the judge ordered.  So we might be chasing

13  rabbits in all of this.

14      Q.      Well --

15      A.      Which is probably why the judge

16  ordered not to have this in scope.

17      Q.      -- these aren't rabbits to us.

18  These are patients.

19          Yeah, so these are patients, and we

20  understand that this is a report from the SIEBEL

21  database about patients contacting Sanofi about

22  Taxotere and ongoing alopecia, okay?

23      A.      Right.

24      Q.      They're not rabbits.

25      A.      Oh, well, please don't characterize

Michael S. Corrigan

1   my statement as me saying a patient is anything

2   other than what we value as an outstanding

3   patient.  We're grateful that they've lived and

4   had the good quality of life that they've had as

5   a result of their treatment.  And as a result,

6   you know, these are issues that we have to talk

7   about rather than their early passing.

8        Q.      Do you know if Ms. Kirby is alive?

9        A.      I don't.

10       Q.      Exactly.

11       A.      I had heard something anecdotally,

12  but I don't know.

13       Q.      I'm going to object to the

14  non-responsive portion of that answer.  Move to

15  strike.

16               We need to know what you reviewed

17  exactly yesterday from the SIEBEL database for

18  purposes of your deposition testimony, including

19  every single one of the patients that were

20  included on this one page printout.  Do you have

21  a copy of it?

22       A.      I don't have a copy of it with me,

23  no.  It was, it was --

24       Q.      Was it part of the materials that

25  were provided to you ahead of your deposition?

Michael S. Corrigan

1          A.          It was something -- again, you

2    know, in all perfect honesty, it was two

3    documents that were shown to me briefly at the

4    end of the discussion today -- yesterday.

5          Q.          Okay.  And I think we've

6    established that you were not prepared to talk to

7    us substantively about what the information in

8    this document means, including what the numbers

9    refer to, whether the underlying communications

10   that are reflected in this summary, whether any

11   of that is available to Sanofi, if Sanofi

12   investigated for purposes of your deposition or

13   anything.  You're not prepared to do that today,

14   correct?

15               MR. McCULLY:  Object to form.

16         A.          No, it wasn't within the scope of

17   the judge's order.

18         Q.          Okay, so if you guys -- it looks

19   like counsel might be looking for this for us.

20               MR. McCULLY:  Yeah, it's listed --

21   it's listed on the list of documents.

22               MS. MENZIES:  So it is listed.

23               MR. McCULLY:  But it's in native

24   format.  So to find the particular pages, give us

25   a couple minutes.

Michael S. Corrigan

1          MS. MENZIES:  Okay.

2          Do you -- in the SIEBEL documents,

3    the excerpts that we've provided to you in the

4    course of the deposition today and any excerpts

5    that counsel for Sanofi has provided today, do

6    you know whether there was any effort or

7    investigation made by the lawyers from Sanofi to

8    determine whether the patients in those call

9    center entries were complaining about

10   potential -- excuse me, permanent hair loss and

11   Taxotere.

12          MR. McCULLY:  Object to form.  If

13   the -- hold on.

14      A.     To repeat what you said, do I know

15   if any Sanofi lawyers made investigations as to

16   the claims of the patients that, that reported

17   into the SIEBEL customer reporting center as to

18   whether or not they reported permanent hair loss.

19          I think -- I think it's been well

20   documented that in the cases that were reviewed

21   within the scope of the judge's order that the

22   referral would have been made either to U.S.

23   pharmacovigilance or to risk management unless

24   those patients had sought counsel and were

25   threatening a lawsuit.

Michael S. Corrigan

1    Q.      What did Sanofi do to investigate

2    whether any of the patients that are reflected in

3    the SIEBEL reports we looked at were threatening

4    the possibility of litigation to Sanofi?

5              MR. McCULLY:  Object to form.

6    A.      The investigation -- well, the

7    process, as we've stated multiple times, is that

8    those patients would have been referred to risk

9    management, at which point it would have been

10   determined whether or not they've sought counsel

11   and are looking to -- you know, threatening to

12   sue, and then at that point the dialogue would

13   have been between Sanofi legal and that patient's

14   lawyer.

15   Q.      What inves- -- *are you aware, do

16   you have any idea what investigation Sanofi's

17   lawyers did to determine whether any of the

18   patients that are included in the SIEBEL reports

19   that we've now shown you, Exhibit 11, 13 and 12,

20   whether they in fact threatened Sanofi with legal

21   action?

22             MR. McCULLY:  Objection to form.

23   A.      That's what I'm trying to explain,

24   is that stating in a customer service reporting

25   center that they may or may not seek counsel or

Michael S. Corrigan

1    they may or may not sue would not have prompted a

2    legal investigation at that time.  It would have

3    prompted the patient to be referred to risk

4    management, at which point those statements would

5    be qualified.

6           MS. MENZIES:  Can you please read

7    back the question that I asked and see if we can

8    get an answer to that?

9               (*The preceding question was read.)

10          MR. McCULLY:  Karen, it's clear to

11   me from his response that he reads your question

12   as talking about at the time of the report.  I

13   think you're probably asking questions about what

14   did we do in the last month.  So maybe you can

15   clarify your question to see if you're talking

16   about the time of the report or if you're talking

17   about discovery on discovery.

18          MS. MENZIES:  Move to strike

19   counsel's conversation, and please don't use your

20   objections to coach the witness.

21          Can you please read back the

22   question?

23          MR. McCULLY:  And I'm not coaching

24   the witness.  I'm trying to move the deposition

25   along.

Michael S. Corrigan

 1                    (*The preceding question was read.)

 2                    MR. McCULLY:  Object to form.

 3          A.       At the time those reports were

 4   taken, there was no qualification that would or

 5   no statement that would indicate a patient had

 6   sought counsel or was -- sought counsel with

 7   respect to any claim.  Therefore, that claim

 8   would have been referred to risk management.  So

 9   just by logical deduction, at that time, at the

10   time the report was taken, no investigation by

11   Sanofi legal would have occurred as, as indicated

12   by the SOPs that you submitted for evidence.

13          Q.       You said at the time those reports

14   were taken --

15          A.       Yes.

16          Q.       -- there was no qualification that

17   would indicate a patient had sought counsel.

18   What's the basis of that statement?

19          A.       I don't recall.  You know, and,

20   again, I've only seen this very briefly but.  And

21   correct me if I'm wrong, but I don't see in this

22   report any statement that I have sought an

23   attorney and am suing Sanofi for my experience --

24   as a result of my experience with Taxotere and

25   alopecia.

Michael S. Corrigan

1          Q.        And that's because you haven't seen

2      the communications, the underlying

3      communications, correct?

4          A.        Well, all I've seen is what is in

5      the scope of the report and the underlying

6      communications from risk management to the

7      patient which is what the judge ordered me to

8      review as far as I understood it.

9          Q.        *All you have seen is what Sanofi's

10     lawyers have presented to you which is what you

11     testified to earlier.

12                    *Would it be helpful to you to have

13     seen the actual communications between the

14     patients and Sanofi related to the entries in the

15     SIEBEL exhibits, 11, 12 and 13, to understand

16     what was in fact communicated?

17                    MR. McCULLY:  Object to form.

18         A.        Well, the SIEBEL exhibits were not

19     in scope, as I understand it, in the judge's

20     order.  When I look at the order, what I

21     understood is that communications between you and

22     Taxotere patients related to the possibility of

23     legal action for ongoing alopecia similar to

24     those identified, and any interviews, reports or

25     cases or incidents of ongoing alopecia by risk

Michael S. Corrigan

1    management, by risk management, as noted in

2    Sanofi, and there's the exhibit number.  So that

3    is the scope that I understood we were going to

4    be speaking within.

5        Q.    Move to strike as non-responsive to

6    my question.

7              Can you please read back my

8    question?

9              (*The preceding question was read.)

10             MR. McCULLY:  Object to form.

11       A.    The judge's order states that

12   investigations, reports and cases reviewed by

13   risk management should be discussed.

14       Q.    Does that mean it wouldn't have

15   been helpful for you to see those underlying

16   communications or it would have been helpful for

17   you to see them?

18             MR. McCULLY:  For purposes --

19   object to form.  Come on guys, it's time to move

20   on.

21             THE WITNESS:  So do I answer that

22   question?

23             MR. McCULLY:  Yeah, try it one more

24   time.

25             THE WITNESS:  Okay.

Michael S. Corrigan

1                    The judge's order states that

2       communications between Sanofi and patients -- and

3       Taxotere patients for on -- for the possibility

4       of legal action for ongoing alopecia similar to

5       those identified in the exhibits within this

6       case.  Reviews, reports and cases of incidents

7       related to ongoing alopecia by risk management.

8                    So the content of the discussion

9       between the patient and Sanofi's risk management

10      department are what are helpful to me to be able

11      to discuss to bring closure to the judge's order

12      in my opinion.

13           Q.     Okay.  And so the way -- the best

14      way to determine what the content of those

15      communications are that you just described as

16      what would be helpful would be to look at the

17      actual communications, correct?

18           A.     As the order states, the

19      communications between the patient and Sanofi

20      risk management.  That's what it states.

21      Otherwise, I would be looking at communication --

22      possible anecdotal communication that occurred

23      between a patient and a representative, a patient

24      and a manager, a patient and U.S.

25      pharmacovigilance, a patient and a variety of

Michael S. Corrigan

1    sources that you've already spelled out.

2              So while we take very seriously the

3    treatment of our patients, their care, their

4    support, we cannot allow ourselves to go chasing

5    what could possibly be, if we drilled down from

6    this further, anecdotal communications that may

7    or may not be verifiable.

8         Q.    Are you testifying as -- on behalf

9    of Sanofi that a patient's communication to

10   Sanofi related to Taxotere and ongoing alopecia

11   that was sent prior to it going to risk

12   management is not relevant?

13             MR. McCULLY:  Object to form.

14        A.    That is, that is not what I'm

15   testifying.

16        Q.    Okay.

17        A.    What I'm testifying is that what I

18   came here to discuss via court order is the

19   communication between the Sanofi patients and

20   risk management.

21        Q.    Correct, okay.  But when you say

22   risk management, that's what I'm asking about,

23   'cause we've already established very clearly

24   that most, if not all, the patients who contact

25   the company don't have a direct line into Craig

Michael S. Corrigan

1    Clark, and so they contact the call center, for

2    example.

3         A.       Mm-hmm.

4         Q.       That contact to the call center,

5    the communications between the call center that

6    we saw in Exhibit 12 that refers to an email that

7    was sent, are you telling me that that patient's

8    communication, if it ultimately went into the

9    risk management rep, that initial communication

10   is not relevant for your consideration for

11   purposes of today?

12        A.       It's not relevant for -- within the

13   scope of the court order that was established

14   which led to the deposition that we're having

15   today as I understood it.

16        Q.       So the initial contact by Pam

17   Kirby, for example, in your testimony would not

18   be relevant to the court's order in the

19   deposition testimony?

20        A.       It appears that Judge North would

21   determine that it is not relevant.

22        Q.       I'm just asking your interpretation

23   of it.  Your interpretation, if I understand what

24   you just said, the woman from New Jersey, the

25   woman from Yardley, Pennsylvania, Pam Kirby, the

Michael S. Corrigan

1    examples of letters from risk management, Craig

2    Clark, to patients who contacted the company,

3    you're saying that that patient's initial

4    communication to the company and any response by

5    the company before it went to risk management or

6    any other time would not be relevant to your

7    testimony today?

8              MR. McCULLY:  Object to form.

9        A.      I want to be clear with this

10   answer.  Speaking on behalf of the company,

11   patients' communications are valued which is why

12   we have departments like U.S. pharmacovigilance,

13   which is why we have the customer reporting

14   center, as you've outlined, in place to begin

15   with, which is why we have the risk management

16   department, which, which -- all, all of this

17   infrastructure that we've built is designed to

18   support, and, you know, and the patients that we

19   look to serve.

20              Judge North in the scope of his

21   order today or his order for today stipulated

22   that we speak on communication between the Sanofi

23   patients and risk management.  That is what Judge

24   North has determined is relevant, not me.

25              MS. MENZIES:  Okay.  So the

Michael S. Corrigan

1   record's clear, we'll go ahead and raise this

2   with Judge North, our position is that the

3   initial communications that came into the call

4   center that eventually were routed to risk

5   management by any patient is relevant to the

6   analysis, to this deposition or to the court's

7   order, and we will request clarification from the

8   court on that front?

9           MR. McCULLY:   And I'm reading from

10  the transcript of the hearing where the judge

11  said, "I think it's appropriate to ask a designee

12  about those communications and how they were

13  handled, that being risk management, but not

14  about retention policies of any documents, forms

15  or other sorts of documentation that would have

16  been created as a result of those

17  communications."

18          So I think our position is clear,

19  and it's clear in the order that we are talking

20  about the communications between -- he refers

21  specifically to a document that is communications

22  with the risk management department.  That's what

23  the notice says, that's what the order says.

24  You're right, we'll take it up -- we'll have to

25  take it up with the judge.

Michael S. Corrigan

```
 1                   MS. MENZIES:  Yeah, we need to take
 2    it up with the judge because -- and what our
 3    position is, is that it certainly isn't limited
 4    to initial communications or any communications
 5    that another department had with that particular
 6    patient and --
 7                   MR. McCULLY:  I understand you --
 8    I'm sorry.
 9                   MS. MENZIES:  And what we've been
10    asking this witnessing and he hasn't been
11    prepared to respond to and that is whether we can
12    actually see the content of those communications,
13    whether those communications even exist, 'cause
14    obviously to us the best way to determine whether
15    those communications threaten the possibility of
16    litigation, potential litigation that would need
17    to be sent to risk management, we can't do that
18    unless we see the communication.  It's not
19    indicated in the SIEBEL documents.  It's not
20    indicated in the summaries.  And so for -- our
21    position is that, one, we need to know whether
22    those documents exist, and we would like to get
23    them produced so that we can see them, and we'll
24    take it up with the judge.
25                   MR. McCULLY:  I understand.  Those
```

Michael S. Corrigan

1    are arguments you made before, and this is the

2    order we received.

3    BY MS. MENZIES:

4         Q.     Let's see.  In document -- in

5    Exhibit 12 --

6         A.     Yes.

7         Q.     -- which was the big exhibit, and

8    this is, again, as we understand it, a report

9    from SEIBEL of patients who contacted the company

10   related to Taxotere and hair loss.

11              Are you able to tell us as you sit

12   here today whether any of these patients

13   contacted Sanofi and threatened litigation?

14        A.     And I could read through all of

15   this report, but you know, the bottom line is the

16   discussion between risk management and patients

17   that had a claim are included in the

18   exhibit lists that are summarized there, and the

19   course of action that was determined as a result

20   of that patient feedback, confirmation that they

21   did not seek counsel from an attorney, that they

22   were not pursuing litigation against Sanofi, was

23   also well documented, and the outcomes were as

24   described in the evidence.  So this line of

25   questioning with this, this Exhibit 12, appears

Michael S. Corrigan

1    off scope to me.

2        Q.      Well, it's well documented for one

3    patient, and it was better documented as of two

4    days ago where Sanofi found additional documents

5    related to the communications with Pam Kirby.

6            Do you know where Sanofi went to

7    get those additional communications for purposes

8    of your deposition today?

9            MR. McCULLY:  Object to form.

10       A.      Where they went?

11           MR. McCULLY:  Object to form and

12   object to the extent it calls for privileged

13   communication.  You can answer if you can do it

14   without privilege and if you know.

15       A.      Yeah, I don't know.

16       Q.      And do you know whether for any

17   of -- any other patient that was referred or

18   transferred over to risk management whether

19   there's that kind of documentation of the

20   communications between risk management and the

21   patient?

22           MR. McCULLY:  Object to the form.

23       A.      The documentation that I'm aware of

24   is what has been provided in the document list.

25       Q.      And you don't know whether Sanofi

Michael S. Corrigan

1    conducted a search for all communications by

2    Craig Clark to any patients related to Taxotere

3    and ongoing hair loss between 2008 - 2015,

4    correct?

5            MR. McCULLY:  Object to form.

6    Object to the extent it calls for a privilege.

7        A.      Yeah, I can't answer that question.

8    I'm not in the position to know.

9        Q.      And you don't -- and is there a way

10   from Exhibit 12 for us to determine whether any

11   of these patients were referred to risk

12   management?

13       A.      It doesn't --

14              MR. McCULLY:  Object to form.  Go

15   ahead.

16       A.      It doesn't look like based on this

17   exhibit, Exhibit 12, that that was the purpose of

18   the documentation here.  It looks like it simply

19   is a document that records the content of a

20   patient conversation into Sanofi.  That's all

21   that -- and that's just from a top line.  As you

22   know, you showed this to me for the first time

23   today.  So just glancing at it, that's what I can

24   surmise from this.

25       Q.      From the SIEBEL documents that

Michael S. Corrigan

1    counsel showed you yesterday, is there any way to

2    tell whether the patients that were listed in

3    those SIEBEL entries were referred to risk

4    management?

5        A.      Again, I didn't look at those

6    documents for any longer than five minutes, and I

7    didn't see anything in them that would document

8    threats or -- of any kind of litigation or

9    threats, or not threats but requests for a claim,

10   so I couldn't tell you one way or another based

11   on that.

12       Q.      And you didn't see any of the

13   underlying communications that were the basis of

14   those entries, correct?

15       A.      Any of the underlying

16   communications?

17       Q.      Correct.

18       A.      When you say underlying

19   communications, there's -- you got the SIEBEL

20   reports.  Are there -- is there any other

21   reporting that you have that?  'Cause you

22   continue to refer to that, underlying

23   communications, so I'm not sure what you're

24   referring to.

25       Q.      Well, we looked at Exhibit 12, and

Michael S. Corrigan

1    it referred to an email that was sent to a

2    patient, and she requested a fax instead 'cause

3    she couldn't read the email.

4           A.      Oh, yes, yeah.

5           Q.      So there's a variety of

6    communications reflected in Exhibit 12, correct?

7           A.      Ah, okay.

8           Q.      And just so the record's clear --

9    you know, you can flip through this and look all

10   you want to, but these entries in Exhibit 12 from

11   the SIEBEL report, those are summaries of the

12   contacts from the patients, to and from the

13   patients.  Those aren't the actual

14   communications, correct?

15          A.      Again, this is the first I've seen

16   it today, so, you know, I can't verify that.

17          Q.      So you don't know one way or the

18   other?

19          A.      I wouldn't know one way or another,

20   no, given my prep for the scope within this case.

21          Q.      And similarly, you don't know

22   whether these patients were transferred over to

23   risk management, correct, the patients in

24   Exhibit 12?

25          A.      The patients that were referred

Michael S. Corrigan

1    over to risk management and that had

2    communication with risk management are documented

3    within the evidence, the exhibits that were

4    included in this case.

5         Q.    How do you know that?  How do you

6    know that that includes every single patient that

7    was transferred to Craig Clark?  I thought you

8    testified that you didn't ask whether Craig Clark

9    ever sent any other letters to any other

10   patients.

11        A.    The assumption would be that any

12   communication would be provided, correct?

13        Q.    Well, who would know the answer?

14   Let me ask you that.

15              Since you're not able to answer

16   this and you weren't prepared to answer these

17   questions I'm asking about the SEIBEL database,

18   fair enough?

19        A.    Un-huh.

20        Q.    What we need to know for purposes

21   of this deposition and our understanding of what

22   we're allowed to get -- our understanding of what

23   we're permitted to get through this discovery is

24   that we want to know whether these patients were

25   transferred over to risk management, these

Michael S. Corrigan

1   patients being referred to in Exhibit 12 as one

2   example.

3        A.        Right.

4        Q.        Who would we go to to ask that

5   information?  How would we find that out?

6                  MR. McCULLY:  Object to form.

7        A.        The first place that -- you know,

8   just coming from a perspective of trying to help,

9   the first place that an attorney or anyone else

10  would go is where you already went, to the SOP.

11  If a patient is going -- is contacting Sanofi and

12  reporting an adverse event, it would go to U.S.

13  pharmacovigilance.  If a patient is reporting an

14  adverse event and also requesting -- has a claim

15  in some way, it would go to both U.S.

16  pharmacovigilance and risk management.  If a

17  patient is discussing the possibility of legal

18  action, that patient would be referred also to

19  risk management.  Finally, if the patient had

20  sought counsel and was stating that they intended

21  to sue Sanofi, that patient would be referred to

22  North American legal, the Sanofi legal

23  department, and that patient's attorney would be

24  put in touch with Sanofi legal's legal team.

25        Q.        Okay.  My question, if you look at

1    Exhibit 12, and you can flip to any page --

2         A.      Yes.

3         Q.      -- just as an example.

4         A.      Any page?

5         Q.      Well, let's look at the first page.

6    How about that?

7         A.      Okay.

8         Q.      And about three-fourths of the way

9    down --

10        A.      Yup.

11        Q.      -- there's an entry dated

12   September 16th, 2010.

13        A.      Yup.

14        Q.      And we have a number there, and it

15   says "Consumer" and it says "Web."

16        A.      Mm-hmm.

17        Q.      And then it says, "Nothing will be

18   done but I NEVER got my hair back after its been

19   2 years since my last chemo of Taxotere and I was

20   never given a choice or a warning of this.  You

21   must warn people of it.  Its makes part of us

22   dead but its all about money and you are not

23   being fair to find out why it does this to so

24   many people."  Then we've got some Closed Home

25   Office, Yes, No, some dates, some more numbers,

Michael S. Corrigan

1   Web Inquiry, Forwarding to USPV.  I can see it

2   was forwarded to USPV.  Where in this entry can I

3   determine whether this patient was referred to

4   risk management?

5        A.     Where does it say -- let me -- I

6   want to track with you where it says that it was

7   reported to USPV.

8        Q.     It says --

9        A.     Oh, here.  Okay, "Forwarding to

10  USPV," okay.  And that aligns with the SOP that

11  you submitted as evidence.

12       Q.     Yes, indeed.

13       A.     And that -- and it aligns with the

14  content of this discussion.

15       Q.     So now how do we find out whether

16  this patient was also, 'cause you said sometimes

17  it could go to both, whether this patient was

18  also referred to risk management?

19       A.     Well --

20       Q.     If you don't know that, who would?

21       A.     No, and I think I was very clear

22  that if a claim -- if a patient was making a

23  claim, that is when they would be referred to

24  risk management.  If a patient had been making a

25  claim within many of these statements, it's very

Michael S. Corrigan

1  likely that right next to forwarding to USPV you

2  would have seen documented, I would assume,

3  forwarding to risk management as well.

4      Q.      Are you speculating right now?

5      A.      Well, I would have to speculate but

6  I -- but there is -- it's supported with some

7  evidence because --

8      Q.      Listen, you're talking on behalf of

9  the company today.  We don't want you to

10 speculate.  That's not even fair to you to do

11 that.

12     A.      Okay.

13     Q.      This is a SIEBEL document.  You've

14 been very clear to us that you have not been

15 prepared to testify on behalf of the company in

16 this regard to SIEBEL, to the SIEBEL document.

17 So I don't want you to speculate on -- what I'm

18 asking you is whether you can tell -- well, I

19 guess that's what I'm asking, how will we know,

20 and if you don't know, who would we ask.  How

21 would we find out whether this patient was

22 referred to risk management?

23          MR. McCULLY:  So you're asking him

24 to testify to Exhibit 12.  Please finish your

25 answer.

Michael S. Corrigan

1       A.       My best answer for you would be to

2   refer to the SOP and reiterate that if a patient

3   was reporting an adverse event, which is what the

4   patient was doing here, it would be referred to

5   USPV.  If they were making a claim, it would be

6   referred to risk management.  If they were -- if

7   they had sought legal counsel and were going to

8   be litigating against Sanofi, they would be

9   referred to our legal department.  That is what

10  has been done.  There is no evidence to suggest

11  otherwise, and -- that I can understand or that I

12  can see, and all of this, and again, I struggle

13  with why we're spending so much time here when we

14  have qualified evidence in other areas that

15  involve direct communication between risk

16  management and the patient that we haven't

17  touched upon yet.

18       Q.       Object to the portion that's

19  non-responsive.  Move to strike.

20            How many patients that called into

21  Sanofi, wrote into Sanofi, posted on their

22  website, contacted Sanofi about Taxotere and

23  ongoing alopecia, how many of those patients were

24  referred to risk management?

25       A.       Patients that were making a claim

Michael S. Corrigan

1   would be referred to risk management.

2         Q.      Correct.  How many?  Do you have

3   any idea?

4         A.      No, no.

5         Q.      Okay.  And you aren't prepared

6   today to testify about that?

7         A.      Well, in all honesty, that number

8   would be different today than it was two weeks

9   ago, right?

10        Q.      Fair enough.  Were you prepared by

11  counsel for Sanofi today to testify to us on the

12  number of patients that were contacting -- that

13  were communicating to Sanofi about Taxotere and

14  ongoing alopecia that were transferred to risk

15  management?

16        A.      I was well prepared by Sanofi to

17  discuss communications between Sanofi and

18  Taxotere patients related to the possibility of

19  legal action for ongoing alopecia similar to

20  those identified in the exhibits that have been

21  submitted; reviews, investigative reports and

22  cases and incidents related to ongoing alopecia

23  by risk management as noted in the exhibits we've

24  provided.

25        Q.      Are you aware of any communications

Michael S. Corrigan

1   by risk management to patients other than the

2   documents that were shown to you by your lawyers

3   in preparation for this deposition testimony?

4        A.        The communications that I'm aware

5   of have been included in the exhibits.

6        Q.        And going back to Exhibit 12 where

7   used that example of the entry.

8        A.        Yes.

9             MR. McCULLY:  So we're going to

10  continue to ask him about this document that you

11  don't want him to talk about?

12            MS. MENZIES:  Counsel, can I

13  please finish my --

14            MR. McCULLY:  We're going to have

15  to move on at some point, folks.

16            MS. MENZIES:  Oh, wow.  Rob, I can

17  continue, continue my deposition; is that all

18  right with you?

19            MR. McCULLY:  What's that?

20            MS. MENZIES:  May I continue with

21  my deposition?

22            MR. McCULLY:  You may, yeah.

23            MS. MENZIES:  Thank you.

24            MR. McCULLY:  We are stopping at

25  eight hours, I can tell you that.

Michael S. Corrigan

1    BY MS. MENZIES:

2        Q.      Exhibit 12 we were just talking

3    about a patient contact into the call center on

4    September 16th, 2010, remember?

5        A.      Yes.

6        Q.      And then just below that entry we

7    have a redaction.  Do you see that there?  It

8    says, "Privileged - Work Product."  Do you see

9    that redaction?

10       A.      Yes, I do.

11       Q.      Any idea what the basis of that

12   redaction is?

13       A.      No.

14              MR. McCULLY:  Objection to form.

15       Q.      Do you have the SIEBEL document

16   that you reviewed?

17              MR. McCULLY:  We'll take a break

18   before we produce that.  I'd like to look at it.

19              MS. MENZIES:  Okay.

20              THE VIDEOGRAPHER:  The time is 2:14

21   p.m.  This concludes Tape 3.  Off the record.

22              (A break was taken.)

23              THE VIDEOGRAPHER:  The time is 2:34

24   p.m.  This is the beginning of Tape 4.  We're

25   back on the record.

Michael S. Corrigan

```
 1        (Whereupon, Deposition Exhibit 14,
 2         Excerpts from the SIEBEL database
 3         (Sanofi_00792534),
 4         was marked for identification.)
 5        (Whereupon, Deposition Exhibit 15,
 6         Excerpts from the SIEBEL database
 7         (Sanofi_01299161),
 8         was marked for identification.)
 9    BY MS. MENZIES:
10        Q.      Okay, we took a break to get from
11    counsel the excerpts from the SIEBEL database
12    that you reviewed yesterday in preparation for
13    your deposition testimony.  So I'm going to hand
14    you what's marked as 14 and 15.  No?  Did I do it
15    wrong?
16                I'm going to hand you 14 for now
17    and 15 in a second.  And if you can review those,
18    and do those appear to be accurate copies of the
19    excerpts from the SIEBEL call center database
20    that were provided to you by counsel for Sanofi
21    in preparation for your deposition testimony
22    yesterday?
23        A.      If you give me a moment.  Sorry,
24    another second.  Yes, this is accurate.
25        Q.      Okay.  That's Exhibit -- both of
```

Michael S. Corrigan

1    them, Exhibit 14 and 15, those are the excerpts

2    from the SIEBEL database that were shown to you

3    by counsel yesterday in preparation for your

4    deposition testimony?

5         A.     Yeah.  Yes.

6         Q.     Thank you.  Why did you review

7    those documents in preparation for your testimony

8    today?

9         A.     Well, again, like I had stated, it

10   was a brief review of these documents, and it was

11   only for background-related information as it's

12   out of the scope of the judge's order.

13        Q.     And you -- were you informed by

14   Sanofi's counsel on who any of those patients

15   were that are listed in the excerpts?

16        A.     No, I wasn't.

17        Q.     Did you see -- did you see any

18   underlying communications between Sanofi and

19   these patients related to those entries?

20        A.     Again, I reviewed these entries

21   within minutes.  You know, you kind of saw me do

22   exactly that again just now.  So it was just a

23   top-line review, and it wasn't done in the

24   context of this patient aligns with this

25   communication within the risk management.  It was

Michael S. Corrigan

1   just an example of documentation of information

2   that was collected when patients call into a call

3   center.

4        Q.     Okay.  And so as you sit here

5   today, you don't know whether any of the patients

6   referred to by numbers in documents 14 and 15

7   threatened legal action against Sanofi, correct?

8        A.     When you say "threatened," I need a

9   better definition of what you mean.

10        Q.     I'm using the language from Sanofi,

11   so using Sanofi's language.

12        A.     Okay.  Well, then in terms of there

13   being a possibility or a, quote/unquote, threat

14   of legal action, that is not a I've sought an

15   attorney and am suing Sanofi.  That is a I am

16   considering doing something in the way of

17   taking -- I'm considering doing it which may or

18   may not be the case.

19             If that is the case, as we've said

20   repeatedly through the course of the day today, a

21   threat is not actual confirmation that legal

22   action is being taken which would mean that a

23   patient would be referred to risk management.

24        Q.     Mr. Corrigan, we have limited time,

25   and we're trying to use it as best we can.  I

Michael S. Corrigan

1   need you to answer the question that I asked.  It

2   was a simple question.

3              All I'm asking is, in Exhibits 14

4   and 15 -- let me re-read the question.  As you

5   sit here today, you don't know whether any of the

6   patients that were referred to by numbers in the

7   Exhibits 14 and 15 threatened legal action

8   against Sanofi, correct?

9       A.      I don't because I prepared for the

10  judge's order, the scope of the judge's order.

11      Q.      I'm going to hand you what we're

12  marking as Exhibit 16.

13    (Whereupon, Deposition Exhibit 16,

14     Privilege Log Excerpts Re Litigation

15     References, was marked for identification.)

16  BY MS. MENZIES:

17      Q.      These are -- this is -- I will

18  represent to you they're excerpts from Sanofi's

19  initial privilege logs that were later amended on

20  November 5th, 2018.

21      A.      I don't know.  You're saying

22  privilege log excerpts, so this is from the

23  customer reporting?

24      Q.      No.  Let me, let me -- I'm not

25  trying to throw you off.  I'm just stating for