UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  TAXOTERE (DOCETAXEL)        *        16-MD-2740
PRODUCTS LIABILITY LITIGATION       *
                                    *        Section H
                                    *
Relates to:  16-CV-17144            *        July 25, 2019
                                    *
                                    *        10:00 a.m.
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *


ORAL ARGUMENT BEFORE
THE HONORABLE JANE T. MILAZZO
UNITED STATES DISTRICT JUDGE


<u>Appearances</u>:


For the Plaintiffs:            Barrios Kingsdorf & Casteix, LLP
                               BY:  DAWN M. BARRIOS, ESQ.
                               701 Poydras Street, Suite 3650
                               New Orleans, Louisiana 70139


For the Plaintiffs:            Pendley Baudin & Coffin, LLP
                               BY:  CHRISTOPHER L. COFFIN, ESQ.
                               1515 Poydras Street, Suite 1400
                               New Orleans, Louisiana 70112


For the Plaintiffs:            Morgan & Morgan, P.A.
                               BY:  EMILY C. JEFFCOTT, ESQ.
                               700 S. Palafox Street, Suite 95
                               Pensacola, Florida 32502


For the Plaintiffs:            Gainsburgh Benjamin David Meunier
                                 & Warshauer, LLC
                               BY:  M. PALMER LAMBERT, ESQ.
                               1100 Poydras Street, Suite 2800
                               New Orleans, Louisiana 70163

<u>Appearances</u>:

For the Plaintiffs:              DAVID F. MICELI, LLC
                                 BY:  DAVID F. MICELI, ESQ.
                                 Post Office Box 2519
                                 Carrollton, Georgia 30112


For the Plaintiffs:              Williams Hart Boundas Easterby,
                                 BY:  BRIAN A. ABRAMSON, ESQ.
                                 8441 Gulf Freeway, Suite 600
                                 Houston, Texas 77017


For the Sanofi                   Irwin Fritchie Urquhart
Defendants:                        & Moore, LLC
                                 BY:  DOUGLAS J. MOORE, ESQ.
                                 400 Poydras Street, Suite 2700
                                 New Orleans, Louisiana 70130


For the Sanofi                   Shook Hardy & Bacon, LLP
Defendants:                      BY:  HARLEY V. RATLIFF, ESQ.
                                      ADRIENNE L. BYARD, ESQ.
                                      JON STRONGMAN, ESQ.
                                      CONNOR J. SEARS, ESQ.
                                      CHRIS MCRAE, ESQ.
                                 2555 Grand Boulevard
                                 Kansas City, Missouri 64108


Official Court Reporter:         Toni Doyle Tusa, CCR, FCRR
                                 500 Poydras Street, Room B-275
                                 New Orleans, Louisiana 70130
                                 (504) 589-7778



Proceedings recorded by mechanical stenography using
computer-aided transcription software.

<u>**INDEX**</u>

                                                        <u>Page</u>

Motion Re: Dr. Kopreski (Doc. 6160)

    David F. Miceli, Esq.                           4
    Adrienne L. Byard, Esq.                        10
    David F. Miceli, Esq.                          21


Motion Re: Dr. Shapiro and Dr. Smart (Doc. 7322)

    M. Palmer Lambert, Esq.                        24
    Connor J. Sears, Esq.                          26
    M. Palmer Lambert, Esq.                        35


Motion Re: Dr. Madigan (Doc. 6144)

    Chris McRae, Esq.                              37
    Brian A. Abramson, Esq.                        43
    Chris McRae, Esq.                              48


Motion Re: Dr. Kessler (Doc. 6146)

    Harley V. Ratliff, Esq.                        49
    Emily C. Jeffcott, Esq.                        58
    Harley V. Ratliff, Esq.                        63


Motion Re: General Causation (Doc. 6163)

    Jon A. Strongman, Esq.                         64
    David F. Miceli, Esq.                          79
    Jon A. Strongman, Esq.                         90

## PROCEEDINGS

### (July 25, 2019)

THE COURT:  Good morning.  Are we ready to proceed?

MR. COFFIN:  Yes, Your Honor.

THE COURT:  The first motion we are going to deal with is the motion to exclude the testimony that relies upon defendants' employee, Dr. Kopreski.

MR. MICELI:  We are moving to exclude any reliance on Dr. Kopreski's analysis.

Before we get started, Your Honor, there are a number of cases that we are going to discuss and I didn't know -- I brought copies for you.  I brought copies of different documents that are cited in the briefs that relate to persisting alopecia.  I could hand them up; or if you don't need them, I don't need to do that, Your Honor.

THE COURT:  Well, were the cases cited in the briefing?

MR. MICELI:  Yes, Your Honor.

THE COURT:  We probably already have those printed --

MR. MICELI:  All right.

THE COURT:  -- but any documents you want to refer to, that might be helpful, unless you just want to use it on -- oh, you already have them.

MR. MICELI:  I'm going to hand this up, Your Honor.

By the way, we haven't had the opportunity.  I'm

10:05

1   David Miceli, and I will be arguing this motion.

2                   **THE COURT:**  Thank you, Mr. Miceli.

3                   **MR. MICELI:**  Is the clock ready to get started?

4                   **THE DEPUTY CLERK:**  It's ready.

5                   **MR. MICELI:**  Thank you, Your Honor.  May it please

6   the Court.  My name is David Miceli, as I just introduced

7   myself, and I'm here to discuss our motion to exclude

8   Dr. Kopreski in his reanalysis and reimagining of some of the

9   TAX316 information.

10                  It starts really, Your Honor, with a series of

11  events that begin in 2010.  TAX316 was a clinical study that

12  Sanofi conducted with a 10-year follow-up.  At the end of that

13  10-year follow-up, after one year of putting it together, a

14  clinical study report was completed.

15                  The clinical study report is on the screen,

16  Table 7 is, and you will see that alopecia ongoing -- and the

17  testimony has been ongoing at the end of the follow-up period,

18  that's the 10-year period -- 29 individuals (4.2 percent).

19                  Defendant has argued or proposed that

20  Dr. Kopreski was necessary to tease out the word "persisting"

21  from "ongoing."  However, that's not the case because in 2013

22  Sanofi did that themselves.

23                  You will see in this agency request for

24  information the EMA, the European equivalent of the FDA,

25  requested that Sanofi provide information about long-term,

10:07

1    permanent alopecia, and on that point Sanofi responded that by

2    the end of the follow-up period 29 patients (4.2 percent) still

3    had persistent alopecia.  You can see at the top of that

4    blowout this is referring again to TAX316.

5                    In the binder that I handed up, Item 2 is an

6    email string that includes Emanuel Palatinsky, a medical

7    officer in pharmacovigilance, and Pierre Mancini, who is the

8    head of biostatistics for oncology.  On page 3 of Tab 2, you

9    will see that Emanuel Palatinsky says that for answering the

10   question of permanent, long-term alopecia, insert the

11   information from Table 7.  That's Tab 1, and that's what I have

12   already shown you.

13                   In 2018 Sanofi repeated this assertion of 29

14   ongoing (3.9 percent).  It's not necessary to explain right

15   now, I don't believe, but there was a change in the denominator

16   to take it from 4.2 to 3.9 percent.

17                   For the first time in this litigation, Sanofi

18   comes up with the explanation that Dr. Michael Kopreski, an

19   oncologist, performs on his own a statistical re-examination of

20   part of the study results from TAX316.  It's cited in our

21   brief, and the deposition testimony is clear he only looked at

22   information up to and including 2004.  He never looked at the

23   long-term follow-up data.

24                   It's important because Sanofi has to defend this

25   case, and we are alleging that they didn't warn.  There's

10:09

1   something called CIOMS, the Council for International
2   Organizations of Medical Sciences.  When a percentage of
3   incidence rate is between 1 and 10 percent, you must warn.  You
4   must warn doctors; you must warn patients.
5            4.2 or 3.9, whichever one we pick, falls into
6   the clinical study report, the FDA 2018 submission -- excuse
7   me, Your Honor -- by Sanofi to the FDA and the 2013 submission
8   to EMA.  They represent multiple times -- before this
9   litigation ever gets started and once during this litigation --
10  that 3.9 percent common is the rate.  However, for the first
11  time here in this courtroom and nowhere else they find a
12  nonstatistician, an oncologist, to come up with this 1 percent.
13           Why is that important?  Well, one thing, the
14  reason it's important is this is an expert opinion.  We have
15  put forth a statistician, the head of biostatistics at Columbia
16  University, the former dean of arts and sciences, who has put
17  together a very well-thought-out, organized report that sets
18  out how you look at statistical measures.
19           The defendants have hired a statistician.  They
20  go and get a former employee, sequester him from the rest of
21  the company -- nobody else at Sanofi has seen this, or at least
22  there's no evidence that they have -- and he comes up with a
23  new rate for this litigation.  He is not a statistician, he
24  didn't follow protocols, he received all of his information
25  from counsel, and he didn't review the long-term safety

10:11

1    information.  Sanofi's experts just simply can't be allowed to

2    rely upon this.  It's not what experts normally rely on.  It

3    doesn't have the indicia that *Daubert* requires of reliability.

4    When you look at what their experts tell us:

5                 Dr. Arrowsmith, I mean, I looked at his table

6    that he set up.  I don't know who compiled the data that he

7    reviewed.

8                 Mr. Victoria, a regulatory individual, admits

9    that there is no written protocol.

10               **THE DEPUTY CLERK:**  You are at five.

11               **MR. MICELI:**  Thank you.

12                 He doesn't know the source of it, but he assumes

13   it's counsel.

14                 Dr. Glaspy is really without excuse, Your Honor,

15   because he becomes a study investigator in August of 2005.  He

16   had to sign off on the protocols and the statistical analysis

17   plan where he understood the meticulous nature and the detailed

18   way to collect, validate, and analyze data.  The way our expert

19   does it is the way that Pierre Mancini, their internal head of

20   biostatistics, does it.  Dr. Glaspy knew better.  He can't rely

21   upon a small bite out of a very large chunk of data.

22                 How did the authors of the TAX316 10-year

23   follow-up describe it?  In *The Lancet Oncology*, Dr. Mackey, who

24   was the chief author of the 10-year follow-up publication, says

25   that few patients were lost to follow-up, and it allows for an

10:12

1    unbiased comparison of both efficacy and safety.  The
2    compliance with the protocol was high.  The authors disagree
3    with Sanofi's position in this courtroom.
4              Dr. Kopreski's analysis has no predefined
5    protocol, it has limited information he reviewed, spoonfed to
6    him by counsel, and he reaches a different conclusion than
7    Sanofi itself has reached in 2010?
8              THE COURT:  Has Dr. Kopreski shared the results of
9    this analysis outside of this litigation?
10             MR. MICELI:  No, Your Honor.
11             THE COURT:  Was there any peer review of anything --
12   I mean, if he is reevaluating a case that's become part of
13   Sanofi's study, was there any publication of this anywhere
14   outside of this litigation?
15             MR. MICELI:  Your Honor, there's no publication
16   outside this litigation.  There's no peer review.  When I was
17   questioning Mr. Victoria, he said that he didn't see that
18   anybody at Sanofi had ever even seen Dr. Kopreski's analysis.
19   It is totally for purposes of this litigation.  It disagrees
20   with how Sanofi evaluated the data in 2010, 2013, 2015 -- we
21   will hear about that a little bit more this morning -- and
22   2018.  Sanofi's counsel is attempting to rewrite history for
23   purposes of the defense of this litigation.
24             If Dr. Kopreski is correct and the appropriate
25   incidence rate is less than 1 percent, then during the course

10:14

1    of this litigation Sanofi has submitted incorrect information

2    to FDA.  But because it hasn't been shared outside of this

3    litigation, what we know is that for now this is Sanofi's

4    little secret just for this litigation.

5                    Thank you, Your Honor.

6              **THE COURT:**  Thank you.

7              **MS. BYARD:**  Your Honor, Adrienne Byard for defendant

8    Sanofi.

9                    Many people are not familiar with clinical

10   trials, Your Honor, which is the reason why it does not

11   surprise me that the terms of art that are used in that context

12   are being misconstrued in the public sphere and in this

13   courtroom.

14                   What ongoing meant in the study was that women

15   reported alopecia after they stopped taking the study medicine.

16   That's all it meant, and it is no surprise to anyone here that

17   30 days after chemotherapy treatment ended some women said, "I

18   still have alopecia."  Those were the women that were counted

19   if that was their last follow-up visit and that is it.  It is

20   not a study on permanent alopecia nor has it ever been

21   represented by Sanofi to be a study on permanent alopecia.

22                   What plaintiffs asked our witness to do was to

23   say, "Look at the data and tell us if these are cases of

24   permanent alopecia," and so that's what Dr. Kopreski did.

25                   What happened, Your Honor, is that when patients

10:15

1  were enrolled in the study, they were marked for 69 adverse

2  events.  If they reported any one of those adverse events,

3  including alopecia, they were marked.  They were tracked.  They

4  were kept count of.

5         So what Dr. Kopreski was able to do on

6  plaintiffs' deposition notice for 30(b)(6) testimony, Sanofi's

7  corporate position on the issue, is tell us which one of these

8  women meet the criteria for the thing that we are all here to

9  talk about.  That's not what the early study analysis did at

10  all.  It was just counting women who said, "This is what I'm

11  experiencing."  It wasn't studying or trying to understand this

12  phenomena that they are here to tell you exists today, which is

13  permanent alopecia.  I will look at this more closely with you.

14         **THE COURT:**  You understand, Ms. Byard, this is not

15  what was presented to the FDA.  Dr. Kopreski, as I understand

16  it, has not issued an expert report.  He is not going to be

17  called to testify.  It creates a bit of a problem, if you will,

18  and maybe we need to talk about where that problem arises in

19  the context of this litigation.

20         **MS. BYARD:**  Well, I will show you, Your Honor.  We

21  actually have done this analysis.  Sanofi actually has done

22  this analysis for outside agencies before and we will look at

23  that.

24         To the extent Your Honor feels like Dr. Kopreski

25  hasn't been discovered well enough, we have actually been

10:17

1    before Magistrate Judge North about the parameters and the

2    burden that was imposed on him as Sanofi's corporate

3    representative almost a half dozen times.

4              The man has sat for a deposition seven times.

5    He has been our corporate representative three times.  He was

6    deposed for over 35 hours on the record, and there are over

7    2,000 pages of deposition testimony about this issue and about

8    his analysis.  So to suggest that this isn't a well-vetted

9    opinion, it certainly is.

10             The real problem, Your Honor, is that the

11   plaintiffs' experts haven't done the work that Dr. Kopreski

12   did, and there's no reason why they couldn't.  It would just

13   take time and it would just take money.  Dr. Kopreski has done

14   that caliber of analysis.  He has.  That's what's different

15   about Dr. Kopreski.  He was a statistician at our company,

16   Sanofi, for 15 years, a pharmacovigilance scientist, so he is

17   dealing with safety data.  What Dr. Kopreski adds to the

18   equation is that he is a medical oncologist.

19             So when we talk about these 29 women, it's not

20   just an "I reported it once.  Count me."  He traced each woman

21   through the clinical trial for 10 years to see:  Did she have

22   this thing that we are all here to talk about?  Is this

23   permanent alopecia when she said, "I have alopecia and I'm in a

24   follow-up period"?  Was that this permanent alopecia thing, as

25   the plaintiffs have defined it, using their definition?  He

1  said no, and he individually traced each woman.

2              This is different than what Dr. Kessler did.

3  Dr. Kessler could have done it.  He could have looked at the

4  case report forms for each one of these women and looked at

5  them and saw what they were experiencing and when they were

6  doing it.  He wouldn't have done it with the background of an

7  oncologist.  Dr. Madigan didn't do it either.  And that's

8  actually why we are here is that they didn't do the work that

9  Dr. Kopreski did.  They could have.

10             We are here because be careful what you wish

11  for.  They gave us a 30(b)(6) deposition notice.  They asked

12  for Sanofi's corporate position on the topic of what happened

13  to these 29 women -- what happened to them -- and Dr. Kopreski

14  sat down and he told us what happened to each individual one of

15  them and that all but six of them could not meet this

16  definition that they have come up with for this lawsuit.

17             Here is the notice, Your Honor.  There's not an

18  expert report because it's corporate position testimony.  They

19  asked for our corporate position, and what we do under a

20  30(b)(6) is we go to the information known or reasonably

21  available to the organization.

22             We defined persistent alopecia.  There's a

23  protocol.  There's pages and pages of transcript about the

24  protocol because North has had to hear from us about it until

25  we are all blue in the face.  It's written.  It's published.

10:19

1    It's on PACER.  We have all talked about what the parameters of

2    this exercise would be, and we have done it for 2,000 pages of

3    depo transcript.

4              **THE DEPUTY CLERK:**  Ms. Byard, you are at five

5    minutes.

6              **MS. BYARD:**  Here's the issue, and this is what's most

7    critical.  Every single time my opponent stands up here and

8    says Sanofi told FDA the rate was blank, the rate we are

9    talking about is ongoing alopecia.  It is not permanent

10   alopecia.  It's a rate of women that at some point when they

11   were last followed in the study for that adverse event said,

12   "Count me.  I still have alopecia."  It wasn't necessarily

13   women who have permanent alopecia.

14              Plaintiffs' experts have misconstrued the data

15   and they have said that it means that it was permanent.  Every

16   time they talk to you about the TAX316 clinical trial, they

17   tell this Court, they will tell a jury that that rate of

18   ongoing, "Just count me.  It's 30 days after.  Count me," that

19   that means permanent alopecia, and it does not.  That's how

20   they have misconstrued it time and time again.

21              Ongoing, Your Honor, means that there are

22   patients who were in the study and they had recurrence of the

23   cancer.  So their hair didn't grow back because they succumbed

24   to the illness.  That's not who we are here to talk about as

25   far as does this medicine do this thing.  It's not patients who

1   succumb to the illness, whose hair never regrows because they

2   died during follow-up.

3           If that woman was last seen two months after she

4   stopped chemotherapy, she is counted for all time in Sanofi's

5   numbers because the last time we were able to check on her she

6   still had alopecia; but because she succumbed to the illness

7   and she died, that isn't necessarily a rate of permanent

8   alopecia.  It's just two months after chemo.  That's the best

9   we knew, but we continued to count her.  We say she is ongoing

10  into the follow-up period.  We count her.

11          This is what Dr. Kopreski did.  He traced each

12  one of those individual 29 women and said, "When we last

13  checked in on you, did you have alopecia, and was that six

14  months after chemo?"  Because if it was less time than that

15  because you died during follow-up or you decided to withdraw

16  from the study, you are ongoing.  So, sure, you're in that

17  4.2 percent rate of women who are ongoing, but that's not

18  permanent alopecia.  That's not what we are here to talk about.

19          I wish we would have known when we were working

20  on TAX316 that this is how this data would be misconstrued.

21  Sanofi certainly would have done that analysis, but that's not

22  what the analysis was.  That's not what anyone was saying that

23  number meant.  It's a clinical trial.  Most people aren't used

24  to it, but this term "ongoing into follow-up," that's all it

25  means.

10:22

1      Here is an example of the analysis, Your Honor,
2  and he gives you an example of a patient.  There's one patient,
3  for instance, who is counted.  She is on the list.  She had to
4  stop taking Taxotere because she had an infusion site reaction.
5  She had a reaction to the medication.  She has breast cancer,
6  relapses, and she dies.
7      She is on the list of ongoing alopecia because
8  we count her for having had alopecia when she was taking our
9  medicine.  She is on Taxol.  We don't know what happens with
10 her alopecia after that because we don't continue to follow you
11 once you start taking another medicine.
12     When you look at the analysis, when you trace
13 the women, it's just six women that meet their definition.
14     You had asked about publicizing this, and this
15 is the last point that I will make.  Health Canada actually
16 asked Sanofi this very, very question.  They said:  Does
17 ongoing mean permanent?  Does ongoing mean that these are women
18 whose hair didn't grow back?  We explained to Health Canada --
19 this is the question, can you clarify what it means, and we
20 said ongoing does not necessarily mean that those AEs were
21 ongoing for the entire 10-year follow-up period; it just means
22 as of their last visit it was being reported.
23     Now, that last visit could have been at two
24 months post chemo or it could have been at 10 years; but if it
25 was just at two months, you are going to be in that 29.  You

10:24

1    are sure not in that six, the six cases of women that we know

2    about from this study that actually meet the definition that

3    they gave us to answer on our corporate position.

4                This is all of the information that we submitted

5    to Health Canada in 2012.  That column that I'm highlighting

6    here, that's how long the women experienced alopecia.

7                THE COURT:  Okay.  I think we're probably beyond, so

8    I'm going to give Mr. Miceli extra time.

9                MS. BYARD:  Perfect.

10               THE COURT:  I'm not a statistician, so I'm almost

11   afraid to ask this question.

12               MS. BYARD:  That's fine.  I'm not either.  We will do

13   our best.

14               THE COURT:  Okay.  This is something that I find

15   particularly troublesome.  We have this group of 29 women that

16   had ongoing alopecia --

17               MS. BYARD:  Yes, ongoing.

18               THE COURT:  -- some of whom died --

19               MS. BYARD:  Right.

20               THE COURT:  -- within the six months.

21               MS. BYARD:  Yes.

22               THE COURT:  So now it's 28 women --

23               MS. BYARD:  Exactly.

24               THE COURT:  -- who have persistent alopecia.  Are

25   they part of the original number?  Because it seems to me that

10:25

1    gets a little skewed.  Do you see what I'm saying?  So if you
2    have 100 women -- let's make it easy because I went to law
3    school for a reason.
4               **MS. BYARD:**  Same.
5               **THE COURT:**  Okay.  We have 100 women that are in your
6    study.  At the conclusion of two months, 10 have ongoing
7    alopecia and then two die.  So you say we have 100 in our
8    group.  Eight have persistent alopecia.  Isn't that a bit
9    skewed?  Because you are still counting in the 100 those two
10   that we can never know if it was going to be persistent.  So
11   does the number go back and now we have 98 and, of that 98,
12   eight have persistent alopecia?
13              **MS. BYARD:**  It's actually fairer than that because we
14   don't drop them out of the 10.
15              **THE COURT:**  What?
16              **MS. BYARD:**  We don't drop them out of the 10.
17              **THE COURT:**  So they stay in --
18              **MS. BYARD:**  We counted them as 10.  They stay at 10
19   even though they passed away.  We keep counting them.
20              **THE COURT:**  So it stays 10 if they have changed
21   treatment because there's been a recurrence or they die --
22              **MS. BYARD:**  That's exactly right.
23              **THE COURT:**  So the only way they are removed from the
24   10 is if their hair returns to where it was before?
25              **MS. BYARD:**  While we are still following them,

1    absolutely right.

2                THE COURT:  Within that six months?

3                MS. BYARD:  Yes.  If at their last follow-up visit

4    they had alopecia, we are still counting them.  We are counting

5    them when we are doing the analysis in 2005.  We are still here

6    talking about them today.

7                THE COURT:  We are counting them as persistent?

8                MS. BYARD:  We are counting them as persistent.  We

9    are counting them as ongoing into the follow-up period.  They

10   were in the follow-up period.  They had alopecia at their last

11   visit.  They are counted.  They are part of that 29, and they

12   stay there for all time.

13               THE COURT:  Okay.  So they are now persistent?

14               MS. BYARD:  They are persistent.  Their last

15   follow-up visit --

16               THE COURT:  Okay.

17               MS. BYARD:  Yes.

18               THE COURT:  I have to tell you, I was having trouble.

19               MS. BYARD:  No, absolutely, and that's why it's fair

20   and that's why it's reliable.  Any one of their experts could

21   do what Dr. Kopreski did.  It's going to take a lot of time and

22   it's going to take a lot of money to get there, but any one of

23   them could do it.

24                    The data is the data.  It's not a reanalysis.

25   We weren't studying permanent alopecia.  We weren't.  We didn't

10:27

1   know that this would be how the data would be misconstrued.  We

2   were asked about it in a lawsuit for a 30(b)(6) deposition:

3                "What is Sanofi's corporate position on this

4   issue?"

5                We go, "That's not what the data is.  That's not

6   what those 29 women are.  They are just as of the last time we

7   saw them they had alopecia."

8              **THE COURT:**  You understand the difficulty with having

9   Dr. Kopreski's reanalysis.  I understand what you are saying is

10  that he sat for a 30(b)(6) and he was deposed.  He is going to

11  issue new opinions that are now going to be relied on by other

12  experts, but he is not going to be called as an expert.

13             **MS. BYARD:**  He is a corporate representative.  He is

14  not a lay witness.  That's not fair.

15             **THE COURT:**  Right.

16             **MS. BYARD:**  He is a fact witness and he is a

17  corporate representative.

18             **THE COURT:**  And he will be testifying.

19             **MS. BYARD:**  I think that remains to be seen on how

20  the case comes in.  Some of this stuff we have said they

21  shouldn't be able to confuse the jury about to begin with.

22             **THE COURT:**  Right, right, right.  Okay.

23             **MS. BYARD:**  Thank you, Your Honor.

24             **MR. MICELI:**  Your Honor, we have been going for a

25  little while.  Can I have some rebuttal time?

10:28

1    **THE COURT:**  That's what I said.  I'll give you a

2    little rebuttal time.

3    **MR. MICELI:**  Thank you, Your Honor.

4    **THE COURT:**  We have a lot to do today.

5    **MR. MICELI:**  We do have a lot to do, Your Honor.  I

6    will be very brief.

7    **THE COURT:**  Okay.

8    **MR. MICELI:**  I can help you understand this.  If you

9    look at Tab 1 of that binder that I handed up to you, what

10   Ms. Byard had explained about what ongoing in the follow-up

11   means, if you start at line 1 that says "Alopecia" and you move

12   across, there's a number that you come to.  The column is

13   headed "Ongoing."

14   **THE COURT:**  Right.

15   **MR. MICELI:**  Excuse me, not "Ongoing."  "Persisting

16   into follow-up."  That's 687 women.  That's the number of woman

17   who had alopecia at the end of the 31st day after their last

18   treatment.  That represents the number of women who enter

19   follow-up with alopecia.

20   **THE COURT:**  Right.  Right.

21   **MR. MICELI:**  The 29 has been compiled pursuant to the

22   protocols that were written back in 1997.  The plaintiffs did

23   not come in and decide how this study was going to be conducted

24   and how you would count those 29 women.  What I would encourage

25   Your Honor to do is look at Dr. Kopreski's second volume of his

10:29

1    deposition, Exhibit 39, and it lists the 29 individuals and how

2    long they had their alopecia ongoing.

3            If you look at -- I believe it's either Tab 8 or

4    9.  I don't have my binder in front of me because I don't want

5    to fumble through papers while I'm standing here.  If you look

6    at that, it's a series of emails that begins with one from

7    Camille Vleminckx from the EMA.  She mentions to Sanofi that at

8    the end of the 10-year follow-up, with an average follow-up of

9    these 29 women of 8.7 years, that Sanofi should consider those

10   29 women as being permanent and irreversible alopecia.  That's

11   how the regulatory agency looked at it.  The data was collected

12   the way Sanofi decided it would be collected, not the way we

13   decided it would be collected.

14           She says Dr. Kopreski did this tremendous work.

15   He did some quick work.  He gave a deposition in September, the

16   end of September, and he gives another deposition in the

17   beginning of December, and we are not told that he does this.

18   This is sprung on us at a deposition within a week of when the

19   defendants give us their expert reports.  So we realize in this

20   deposition that their experts -- we learn five days later that

21   their experts relied upon something that we didn't learn about

22   until just a few days prior.

23           Our deposition notice does not define what

24   alopecia is.  Magistrate Judge North did not define for all

25   time what alopecia would mean.  There was an agreement as to

10:31

1    how they would collect data.  Please read the deposition notice

2    because what it says is we want to talk to you about the people

3    on this chart and what you used to compile this chart.  It was

4    their chart, their people.  We didn't ask them to do anything.

5    We certainly didn't request the post hoc, litigation-driven,

6    spoonfed-by-attorneys analysis that Dr. Kopreski did.

7                So he is not an expert, didn't give us a report,

8    we learn about it at the last minute before we have to start

9    preparing to depose their experts, never published, not

10   peer-reviewed, and it is not the type of evidence that experts

11   in the statistical field -- he is not a statistician.  He is

12   doing the job in one month's time or two months' time that a

13   team from Sanofi -- we heard this throughout this litigation, a

14   multidisciplinary, cross-functional team from Sanofi in a

15   third-party research organization called the Breast Cancer

16   International Research Group (BCIRG).  It's on all the

17   documents.  A team of statisticians, epidemiologists, and

18   doctors put together the TAX316 report, and one man who is not

19   a statistician comes in and takes one bite out of a very large

20   bundle of information and says, "I have figured this out, but

21   let's keep it a secret for this litigation."

22               **THE COURT:**  Thank you.

23               **MR. MICELI:**  Thank you.

24               **THE COURT:**  Mr. Lambert.

25               **MR. LAMBERT:**  Yes, Your Honor.  We are ready to

10:33

1  proceed on the second motions?

2        THE COURT:  Yes.

3        MR. LAMBERT:  I'll try to keep this one short.

4              Good morning, Your Honor.  Palmer Lambert from

5  Gainsburgh Benjamin on behalf of plaintiff.  May it please the

6  Court.

7              Plaintiff, Barbara Earnest, seeks exclusion of

8  the supplemental opinions of doctors Shapiro and Smart

9  regarding stem cells.  To make it clear, we are not seeking

10  exclusion of these experts' original general and case-specific

11  reports.  The reason we did not seek exclusion of those initial

12  opinions, although we disagree with them, is that they related

13  to the analysis of tissue biopsies through medically accepted

14  and reliable dermatopathology staining.  That's H&E staining.

15              However, the supplemental opinions submitted by

16  Dr. Shapiro and Dr. Smart regarding stem cell staining and its

17  alleged impact on diagnosis of permanent chemotherapy-induced

18  alopecia: (1) lack any indicia of reliability; (2) have no

19  foundation in science; and (3) are contradicted by their own

20  deposition testimony.

21              First, Dr. Smart agrees with Dr. Thompson that

22  the IHC (immunohistochemical) stains cytokeratin-15 and Ki-67

23  are nonspecific and they stain more than just follicular stem

24  cells.  Dr. Smart makes no attempt to differentiate the

25  particular types of follicular stem cells from other stem cells

10:34

1    and other cells that she acknowledges to be present in the

2    scalp tissue.

3            Dr. Shapiro's supplemental opinion purports to

4    ascribe meaning to the, quote, positive CK-15 and Ki-67

5    staining, yet his deposition testimony says, in response to the

6    question of what it means:

7            "I would have to defer to a dermatopathologist.

8    I'm a dermatologist, not a stem cell expert.  I'm not a stain

9    expert.  This is not what I do.  I have never ordered that test

10   in over three decades."

11           Dr. Smart's supplemental opinions also are

12   contradicted by her deposition testimony.  Her opinion states

13   that because the stem cells in the bulge region are present

14   that Ms. Earnest doesn't have permanent alopecia.  Well, in her

15   deposition testimony she says there's no established evidence

16   in the literature to state whether or not -- and I'm

17   paraphrasing -- stem cells being present or absent have

18   anything to do with permanent chemotherapy-induced alopecia.

19           Dr. Smart further undermines her opinion with

20   this additional statement that if she had thought those stains

21   would add or subtract from her initial diagnosis, she would

22   have used them.  This question and answer suggests that she

23   didn't think they were needed in her original report.

24           I have this slide in here about the *Pipitone*

25   case.  An equivocal opinion does not make any fact more or less

10:36

probable and is irrelevant under the Rules of Evidence.
Dr. Shapiro admitted he is unqualified to offer opinions on
stem cells.  Dr. Smart has testified that the stem cell
staining, positive or negative, does not have anything to do
with permanent chemotherapy-induced alopecia.  These opinions
do not make any fact more or less probable.

In conclusion, Your Honor, in the PSC's
collective years of practice, we have never seen expert reports
that lack a single citation to medical or scientific literature
and, on top of that, experts who completely contradict and walk
back those unsupported opinions.  For those reasons,
Ms. Earnest respectfully requests that the supplemental
opinions of doctors Shapiro and Smart be excluded from trial.

Unless Your Honor has questions, I'm through.

**THE COURT:**  I don't think so.

Mr. Sears.

**MR. SEARS:**  Good morning, Your Honor.

**THE COURT:**  Good morning.

**MR. SEARS:**  Connor Sears.  It's nice to meet you.

Your Honor, what plaintiffs are doing here is
they are moving to exclude evidence that they paid their
experts to create.  It was very expensive testing and it's
testing that their experts, if it was favorable for them, would
have relied on, included in their reports, and included in
their analysis.  They paid for it, it turned out to be bad for

10:38

1   them, and so now they are trying to disregard it and claim it's

2   unreliable.

3          There's really two points that Mr. Lambert

4   brought up that I want to respond to.  The first is the

5   reliability of cytokeratin-15 testing and the Ki-67 testing,

6   and the second is Dr. Smart and Dr. Shapiro's ability to rely

7   on the testing and offer expert opinions about it.  So let me

8   start off by giving some background how all this came to be.

9          I have deposed Dr. Tosti and Dr. Thompson.

10  Dr. Tosti is a dermatologist and Dr. Thompson is a

11  dermatopathologist.  So one of the issues in this case is,

12  well, their claim is that Taxotere causes ongoing alopecia, so

13  how does that happen?  What's the mechanism of action?

14         So I asked Dr. Tosti that, I asked Dr. Thompson

15  that, and both of them said, "Well, it's hypothetical, but we

16  think the mechanism of action is that it somehow damages or

17  kills the stem cells in a very specific region of the hair

18  follicle called the bulge region, and by doing that it causes

19  ongoing alopecia."

20         So what happened very early on in this

21  litigation is --

22       **THE COURT:**  We are not going there again, the video

23  and -- go ahead.  I'm sorry.  I just don't want to go over the

24  same ground that we go over pretty much every month.

25       **MR. SEARS:**  I understand.

10:39

1          So what happened is Dr. Tosti, their
2   dermatologist, and Dr. Thompson, their dermatopathologist,
3   exchanged some emails.  Dr. Tosti said, "Well, let's take some
4   biopsies and let's test them for stem cells," and so that's
5   what Dr. Thompson did.
6          I asked him, "Whose idea was it to do the
7   staining?"
8          He said, "it was my idea."
9          THE COURT:  Right.
10          MR. SEARS:  He is the one who choose the
11   cytokeratin-15 and the Ki-67.
12          THE COURT:  Right.
13          MR. SEARS:  So I deposed him and I asked him, "Well,
14   why did you choose cytokeratin-15?"
15          What he said is, "It's the only investigational
16   antibody that I have experience with that works."
17          So this is their own expert saying that "I chose
18   cytokeratin-15," which is an immunohistochemical stain that's
19   used to detect whether stem cells are present in the bulge
20   region, and he did that because it works.
21          THE COURT:  Does the fact that this testing was
22   negative somehow or another prove that this wasn't
23   chemotherapy-induced alopecia?
24          MR. SEARS:  It's kind of a --
25          THE COURT:  I'm just trying to figure out, what does

10:40

1    this testimony give us?

2              **MR. SEARS:**  I understand.

3              **THE COURT:**  We have three people that were tested.  I

4    don't think we can say that that's a study.  Are you telling me

5    that the fact that this testing produced negative results

6    somehow says that the alopecia suffered by Ms. Earnest is not

7    related to chemotherapy?  Just tell me, what does this give me?

8              **MR. SEARS:**  I understand.

9              **THE COURT:**  Bottom line.

10             **MR. SEARS:**  Bottom line.  Okay.  There's two things:

11                  One, it proves that the mechanism of action, if

12   that's correct, it's not chemotherapy because the stem cells

13   are present, the stem cells are not damaged, and they are

14   proliferating.  So if their mechanism of action theory is that

15   chemotherapy kills the stem cells, then this shows that can't

16   be true.

17                  The second thing is that if the stem cells are

18   present, hair loss is not permanent.  The stem cells are what

19   causes the hair to grow.  If the stem cells are there, the hair

20   loss can be reversible and the hair can still grow.  So that's

21   why it's relevant to this litigation.

22             **THE COURT:**  So when is it permanent?

23             **MR. SEARS:**  Hair loss is permanent if the stem cells

24   are not present.  If the stem cells have been damaged, then the

25   hair follicle couldn't regenerate and could not grow.

10:42

1      **THE COURT:**  So are those cases that were dismissed
2  because of statute of limitations -- I'm just trying to figure
3  out when we figure out when is it permanent.  If they can
4  regrow, what -- go ahead.
5          To me it's a bit of a difficult place that we
6  find ourselves because what I'm hearing is six months post we
7  consider that persistent, not permanent.  If there are stem
8  cells present, then it's not permanent.  How long is this claim
9  open for and when do we decide it's permanent?  Do we have to
10 test for stem cells and as long as there's any stem cells --
11     **MR. SEARS:**  Hair loss is very multifactorial, so it's
12 difficult to say when hair loss is permanent.  Generally
13 speaking, there's two types of hair loss.  There's nonscarring
14 and scarring hair loss.
15     **THE COURT:**  Right.
16     **MR. SEARS:**  Scarring hair loss is when the follicle
17 is no longer present, and that's permanent.  Nonscarring hair
18 loss, in theory, is reversible.
19          That's kind of interesting in this case because
20 Ms. Earnest never took any sort of drugs or tried anything to
21 regrow her hair.  There's something called minoxidil, and you
22 can either take it by pill or you can apply it to your head.
23 If she did that, because the stem cells are present, the hair
24 could regrow.  We just don't know because she never did that.
25          So ultimately it's relevant because this goes to

10:43

1    their mechanism of action theory, which their experts still

2    intend to talk about, and it shows the stem cells are there, so

3    the hair loss is not permanent.

4              So back to the reliability point, we have their

5    own expert, their dermatopathologist, Dr. Thompson, saying he

6    chose cytokeratin-15 because it works.  We also know from --

7    there's another point I wanted to make.  Not only did he know

8    that it works, but he validated it in his lab before using it

9    on Ms. Earnest.  He got the stain in, he tested it on something

10   else to make sure it worked, and then he used it on

11   Ms. Earnest's pathology.  So he chose it because it worked, he

12   validated it to make sure it worked, and then he used it.  It

13   shows it's reliable.

14             There's more emails and more testimony from

15   Dr. Thompson that shows that if the tests came back showing

16   that the stem cells were not there, damaged or killed, they

17   would have used it in the reports and would have used it in

18   their opinions.

19             So he wrote:  "In the event that the

20   cytokeratin-15 findings do not add to the information, I will

21   issue my reports without the information."  The clear

22   implication is if it helps their case, they would have included

23   it.

24             So I asked Dr. Thompson about that during his

25   deposition:

10:45

1        "QUESTION:  So the cytokeratin-15 tested positive in

2    Ms. Earnest's tissue?

3        "ANSWER:  Yes."

4            And by "positive" it means the stem cells were

5    there and proliferating.

6        "QUESTION:  You wrote because it tested positive you

7    did not pursue this further, right?

8        "ANSWER:  That's right.

9        "QUESTION:  If it tested negative, you would have

10    pursued it further?

11        "ANSWER:  Yes."

12            So basically what's going on is these experts

13    conducted this testing for their mechanism of action theory.

14    If the test results were good for them, they would have relied

15    on them, would have included them in the reports.  But it's bad

16    for them, it disproves their mechanism of action theory and

17    shows that the hair loss is not permanent, and so they are

18    saying all of a sudden, "It's not reliable.  We can't rely on

19    it."

20            So the second thing I want to talk about is

21    their claim that Dr. Shapiro and Dr. Smart are not qualified to

22    talk about this.

23            Dr. Smart, she is a board-certified

24    dermatopathologist.  She was deposed and she was asked about

25    this, and she said that she has the qualifications to read

cytokeratin-15 stains.  She testified that she reads Ki-67
stains almost daily, which are the proliferation staining.
Dr. Shapiro is a board-certified dermatologist.

It's interesting to talk about that and then
compare it to their experts.  Dr. Tosti is also a
board-certified dermatologist and Dr. Thompson is a
board-certified dermatopathologist, and so think about that.
If these tests came back favorable for them, they would have
had their experts, who have the same qualifications as our
experts, rely on them and talk about them.  But because it hurt
them and it's not helpful for their case, they are saying that
our experts don't have the ability to talk about that when they
have the same qualifications.

Mr. Lambert, I think, mentioned that Dr. Shapiro
and Dr. Smart both said that they are not experts in stem
cells, but think about what a pathologist does.  A pathologist
looks at tissue, and they identify the tissue and the
underlying disease process or mechanism that might be occurring
in the tissue.

**THE COURT:**  Sure.

**MR. SEARS:**  They diagnose cancers, but they are not
an expert in the underlying cancer.  Their job is to look at
the tissue and make the analysis, which is what they did here.

The interplay between Dr. Smart and Dr. Shapiro
is consistent with how dermatologists and dermatopathologists

10:47

1 work together.  The dermatopathologist reads the slide and

2 prepares a report, which is what Dr. Smart did, and sends it to

3 Dr. Shapiro to rely on, which is what happened here.

4         Mr. Lambert also -- there's a few points I wrote

5 down when he was talking.  He said it can stain other cells,

6 and so I asked Dr. Smart about that.  It can stain other cells,

7 but what you are looking for is a pattern of staining.  There's

8 a very specific region, the bulge region.  While it can stain

9 the other cells, you can still tell that the stem cells are

10 present based upon the pattern of staining.  So it's kind of a

11 red herring.

12         He also mentioned the case about equivocal

13 opinions.  Dr. Smart and Dr. Shapiro's opinions are not

14 equivocal.  They are saying --

15         **THE COURT:**  I'm sorry, what?

16         **MR. SEARS:**  He talked about a case saying equivocal

17 opinions --

18         **THE COURT:**  Oh, okay.  I just couldn't hear you.

19         **MR. SEARS:**  Sorry.  I mumble sometimes.

20         Here their opinions are not equivocal.  They are

21 saying definitively that the stem cells are present and

22 proliferating based upon these stains.

23         So the bottom line is this is testing they paid

24 for.  It was very expensive testing.  They paid for it because

25 they thought it helped their case.

10:48

1    **THE COURT:**  I got that.  I don't mean to cut you

2    short.  I've heard that a lot.  Okay.

3    **MR. SEARS:**  Well, I'll sit down, then.  Thank you.

4    **THE COURT:**  Thank you.

5    Briefly.

6    **MR. LAMBERT:**  Very, very short, Your Honor, three

7    quick points based on Mr. Sears' argument.

8    **THE COURT:**  What about Mr. Sears' argument that if

9    there are stem cells proliferating, this is not permanent hair

10   loss or persistent hair loss, whatever we call it?

11   **MR. LAMBERT:**  Your Honor, I will direct back to this

12   slide, and I have cited the record documents, deposition

13   testimony.

14   Dr. Smart agrees that the tests are not reliable

15   in terms of what these stains are actually showing, and what

16   counsel is assuming is that the present cells or the positive

17   stains are support for the conclusion when there's no

18   scientific support for that.

19   What you don't see in the expert report, I

20   think, is very important.  You don't see Dr. Smart saying, "I

21   see follicular stem cells."  She just says she sees stem cells.

22   The fact is that cytokeratin-15 and Ki-67 are

23   nonspecific.  They stain a bunch of things.  Ki-67 stains

24   anything that's growing, not necessarily a stem cell.

25   Your Honor, the fact that we paid our experts --

10:50

1    THE COURT:  I don't want to talk about that.

2    MR. LAMBERT:  -- it's a red herring.

3    THE COURT:  I really don't want to talk about that.

4    MR. LAMBERT:  I will move on, but --

5    THE COURT:  Good.  That's a good idea.  Well, you

6 know we have talked about that in multiple motions.

7    MR. LAMBERT:  Ad nauseam.

8    THE COURT:  Ad nauseam.

9    MR. LAMBERT:  Yes, Your Honor.

10    THE COURT:  So I don't need anybody to remind me.

11    MR. LAMBERT:  One of the things that Mr. Sears

12 mentioned was that he would have proceeded further.  Well,

13 Dr. Tosti says that for the biopsies of three patients to be

14 meaningful for anything, they would have to be part of a

15 thousand-person study with controls and whatnot, and it's

16 simply not there.

17         And the fact that there is a mechanism of action

18 theory, that one of those theories is stem cells doesn't mean

19 that these stains are somehow reliable.  There's just no

20 scientific support for it.  All of the experts agree that the

21 stem cell mechanism of action is theory, and it's been theory

22 since the 1990s.

23         Your Honor, I think that completes it unless you

24 have additional questions.

25    THE COURT:  No, I'm good.

10:51

1    **MR. LAMBERT:**  Thank you, Your Honor.

2    **THE COURT:**  Can I get you all to come up here,

3    whoever is arguing.

4    (Off the record.)

5    **THE DEPUTY CLERK:**  All rise.

6    (Recess.)

7    **THE DEPUTY CLERK:**  Court is back in session.  You may

8    be seated.

9    **MR. MCRAE:**  My name is Chris McRae and I represent

10    Sanofi.  I'm here today to discuss Sanofi's motion to exclude

11    the testimony of Dr. David Madigan.

12    **THE COURT:**  Thank you.

13    **MR. MCRAE:**  Thank you for your patience, Your Honor.

14    **THE COURT:**  No problem.  Thank you for yours.

15    **MR. MCRAE:**  I'm here to argue Sanofi's motion to

16    exclude the testimony of Dr. David Madigan.

17    Dr. Madigan performed three different analyses

18    in his work on this litigation and the same fundamental flaw

19    underlies all three of these analyses, and that is simply he

20    didn't check his work.  He never actually looked to see if the

21    cases he was identifying doing these analyses were actually

22    cases of a medical condition at issue in this litigation,

23    permanent or irreversible alopecia following chemotherapy.

24    I'm going to start by talking about

25    Dr. Madigan's analysis of the FDA database.  Dr. Madigan went

11:07

1    into the FDA database and he had three search criteria.  He had
2    three things he was looking for.
3              The first thing was he was looking for a report
4    involving Taxotere or docetaxel.  Fair enough.  We don't have
5    any quibble with that.
6              Then he was looking for, as the adverse event, a
7    case of alopecia, and there is where the trouble starts because
8    he was not searching for cases of permanent or irreversible
9    alopecia.  And he couldn't because the FDA database actually
10   doesn't allow him to perform such a search.
11             So instead he had to search for alopecia and
12   after that create this novel third search criteria where if an
13   outcome listed on the report was "disability or permanent
14   damage," Dr. Madigan would say, "Well, okay.  It's an alopecia
15   report.  There's a box checked on the form that says
16   'disability or permanent damage.'  I'm going to call that
17   permanent or irreversible alopecia."
18             Now, the problem is -- and we will actually see
19   an example of this in a second -- that Dr. Madigan admits that
20   there can be multiple adverse events listed on one of these
21   forms, meaning you can have a report of alopecia and then a
22   report of numerous other medical conditions.
23             Dr. Madigan also admits that there's nothing in
24   the report tying an outcome of disability or permanent damage
25   to alopecia.  You might have that box checked on the form, you

11:08

1    might have 10 different adverse events listed, but there's

2    nothing you can do looking at FDA's database to say, "Aha.  I

3    know that 'disability or permanent damage' is actually talking

4    about alopecia."

5                Now, importantly, Dr. Madigan can't point us to

6    anything that says this is the right way to search in FDA's

7    database for cases of irreversible or permanent alopecia.  He

8    can't point us to a learned treatise.  He can't point us to a

9    scientific publication.  He can't point us to FDA guidance that

10   says this is the right way to do it.

11               Now, that being said, Dr. Madigan found 31 cases

12   that meet this criteria, but what he didn't do was ever

13   actually look at those cases to see if this was actually a case

14   of permanent or irreversible alopecia.  That's what we are

15   going to do right now.

16               This is a MedWatch report, meaning this is a

17   form in the FDA's database, and this is the same database that

18   Dr. Madigan was searching.  We see here it's a report of

19   docetaxel, so Dr. Madigan's first search criteria is met.  It

20   involves the right medicine.

21               We see here that it reports as an adverse event

22   alopecia.  You can also see here it reports 10 or 11 different

23   adverse events including, I believe, fatal lung cancer.  Again,

24   it's a report involving docetaxel, alopecia, so we have met

25   Dr. Madigan's first two search criteria.

11:10

1          And then finally we see on the report here the
2     box next to "disability" is checked along with a number of
3     other outcomes, meaning this report itself meets all three of
4     the criteria Dr. Madigan used in searching FDA's database.
5          What Dr. Madigan didn't actually do is look at
6     this report to see what it's actually saying, to see if this
7     was a case of permanent or irreversible alopecia following
8     docetaxel use.  When you actually do that, you see that this
9     patient for the first time received docetaxel in October 2002
10    and received it again in December and then passed away by the
11    end of 2002.
12         This is a report of a patient three months after
13    docetaxel who had alopecia and then who passed away.  There
14    isn't an expert in this litigation who would say alopecia three
15    months after chemotherapy use constitutes permanent or
16    irreversible alopecia, but this is one of the cases Dr. Madigan
17    counted.  That's exactly what he is saying.  He is saying, "I
18    can tell that there's a relationship between docetaxel and
19    irreversible alopecia on the basis of a report like this," hair
20    loss three months after using the medicine.
21         The same thing is true for Dr. Madigan's search
22    of the Sanofi adverse event database.  Again, he looked for
23    reports of alopecia and then he looked for these keywords.  He
24    ran a keyword search, basically, looking for these words or
25    variants thereof, so "permanent" or "chronic" or "persistent."

11:11

1  Again, Dr. Madigan never actually looked at his search results.

2  He never actually looked at one of these cases to see, "Well,

3  my search hit on this, but is this actually a case of permanent

4  or irreversible alopecia?"

5         When you actually do start looking -- this is

6  from Sanofi's internal database.  This is a report from it.

7  You see here it's alopecia involving docetaxel use, so we have

8  met that search criteria.

9         Then you see on the next slide, when you

10  actually read the narrative of the report, it actually says

11  that the hair loss had resolved and his hair has been growing

12  back.  But then in the next sentence it says, in talking about

13  a different adverse event, that adverse event had persisted.

14  That's why Dr. Madigan's search identifies this report, because

15  of that word "persisted," but it's not even talking about the

16  alopecia.  It's talking about an entirely different adverse

17  event, and yet again this is evidence that Dr. Madigan uses to

18  establish a relationship and that's simply inappropriate.

19         **THE DEPUTY CLERK:**  You are at five minutes.

20         **MR. MCRAE:**  The last thing Dr. Madigan did was he

21  reviewed Sanofi's clinical trial data.  Dr. Madigan admits that

22  the Taxotere clinical trials only looked at ongoing and not

23  permanent alopecia, and yet again he didn't review any of the

24  underlying data to determine if the cases he was relying on

25  were actually cases of permanent or persistent alopecia,

1   meaning he relies on this patient here from the TAX316 study,

2   this patient who first received docetaxel in August 1998.  Then

3   November 2, 1998, at her first follow-up visit, she had

4   alopecia, but she was put on another chemotherapy medication

5   and she was no longer followed for her alopecia.

6               So, again, we have three months of data.  This

7   patient took docetaxel, had alopecia from August to November,

8   and Dr. Madigan is relying on this as evidence that Taxotere

9   causes permanent or irreversible alopecia.  But, again, no

10  expert in this litigation would say hair loss three months

11  after taking docetaxel means it's permanent or irreversible.

12              I just leave you with this quote from the

13  *Accutane* judge in the New Jersey litigation who, after

14  reviewing Dr. Madigan's work there, concluded that Dr. Madigan

15  was "an expert on a mission."

16              Well, the same thing is true here.  Dr. Madigan

17  was looking for a relationship between Taxotere and permanent

18  alopecia, and he crafted analyses in order to find that

19  relationship.  That analysis is unreliable and relies on,

20  frankly, irrelevant data that doesn't have anything to do with

21  permanent or irreversible alopecia, and for that reason his

22  opinion should be excluded.

23              **THE COURT:**  Thank you.

24              Mr. Abramson.

25              **MR. ABRAMSON:**  Thank you, Your Honor.  Brian Abramson

11:14

1    for the plaintiff.  May it please the Court.

2                So I want to first direct the Court's attention

3    to what Sanofi is not criticizing here.  They are not disputing

4    Dr. Madigan's qualifications, his expertise, his experience,

5    and they are not contesting the general acceptance of the

6    methodologies he used.  Rather, all of their arguments are

7    basically conflating the role of a biostatistician, what

8    Dr. Madigan was hired to do, and how to apply the scientific,

9    peer-reviewed methods that he employed in this case.  They went

10   through the three analyses.  I would like to talk about each of

11   those as well.

12               The first is this FAERS database, the FDA's

13   adverse event reporting database.  Your Honor, this is a

14   spontaneous reporting system, so it collects electronically

15   millions of adverse events.  There are certain algorithmic

16   methods.  They are called disproportionality analyses.  They

17   have been developed because drug companies and regulators, they

18   use these on a daily basis to survey drug data, to try to look

19   for new safety signals and potential new concerns.  That's what

20   Dr. Madigan did here.  He looked and he tried to analyze

21   whether and, if so, when a safety signal existed within the

22   FAERS database.

23               Now, Sanofi's concerns, they raise two primary

24   ones: (1) about the search parameters; and (2) about him not

25   looking at the underlying case reports.

1            First, Your Honor, these issues have come up in
2    every case in which Dr. Madigan has done a FAERS analysis,
3    every one.  With respect to the FAERS analysis, they are always
4    denied and here's why.  One, with respect to search parameters,
5    yes, it's true, there is no single predefined term for the
6    words "permanent alopecia."  I guess, according to Sanofi, we
7    throw our hands up, we end the inquiry right there, and that's
8    it.  That's not how this works.

9            Dr. Madigan went to Dr. Kessler, the former FDA
10   commissioner, and asked for his input on what the best and most
11   reasonable way would be to identify cases of permanent alopecia
12   within the database.  Dr. Madigan relied on Dr. Kessler's input
13   and he ran that search.

14            This is very similar to exactly what Dr. Madigan
15   did in the *Rheinfrank* case -- which involved Depakote and
16   developmental delay, where there were multiple search terms and
17   multiple outcomes to look for -- and in the *Yaz* case -- we
18   cited both these in our papers -- where they actually looked at
19   94 different adverse events to look for venous thrombosis.  He
20   relied in part on experts, regulatory experts, just like he did
21   here.

22            Regarding the review of specific underlying case
23   reports, that's not only inappropriate, it would be
24   impractical.  Sanofi is just focusing on the disproportionality
25   analysis part, which is the numerator.  So a disproportionality

11:17

1    analysis looks at the foreground, which is the numerator, and

2    then the background, which is the denominator.

3                    So Sanofi would have us just look at the

4    foreground.  But, in reality, to do what they want, you

5    actually have to look at all of the background reports too, all

6    of the adverse event reports, probably tens of thousands of

7    case reports that identify alopecia with all other drugs

8    because that's what it's being compared to.  Clearly, you can't

9    do this.  Even if you could, you need a FOIA request.  These

10   are not publicly available documents, and that goes to the

11   point of what this analysis is for.  It's not even

12   contemplated.

13                   So before moving on, I also want to address the

14   *Fosamax* case, which is also cited in our papers.  The same two

15   issues were brought up.  Multiple search terms were used in

16   that case, and the defendant there also raised the issue of

17   Dr. Madigan's analysis is not reliable because he didn't look

18   at the case reports.  The court there rejected both of the

19   arguments, and I'm going to quote.  It says:

20                   "This argument is inappropriate on a *Daubert*

21   motion.  Dr. Madigan's testimony will be subject to

22   cross-examination, and the credibility of his opinion will be

23   ultimately determined through the adversarial process.

24   Dr. Madigan's methodology is sufficiently reliable because it

25   is generally accepted in the scientific community and,

11:18

1   therefore, plaintiffs have satisfied the second prong of

2   *Daubert*."

3           The same reasoning applies here.  FAERS analysis

4   was developed as a quantitative method.  It doesn't call for a

5   qualitative, subjective analysis by a biostatistician.  He

6   reasonably applied these standards, and Dr. Madigan found a

7   signal with Taxotere starting in 2000, getting stronger with

8   more conservative estimates over the years.  It was unequivocal

9   and, except for one brief exception, it lied exclusively with

10  Taxotere as opposed to the other comparator drugs.

11          I'm not going to spend much time on the

12  pharmacovigilance database.  Frankly, Dr. Madigan relied on

13  three other experts to define the terms because his role is not

14  to say what it is.  Sanofi disagrees with those terms.  That's

15  understandable.  They did their own analysis in 2011 and 2015.

16  They chose those search terms.  That's subject for

17  cross-examination if they don't agree with those terms.

18          With the clinical trial data, yes, Dr. Madigan

19  analyzed TAX316 and 301 both individually and together.  Sanofi

20  takes issue with the fact that they say TAX316 didn't track

21  permanent alopecia, it didn't isolate Taxotere, and then they

22  claim that Dr. Madigan shouldn't be able to rely on TAX301

23  because he said it was unreliable.

24          Ironically, Sanofi's 2015 clinical review cited

25  to both TAX316 and TAX301, and they concluded the data was

11:19

evidence supporting a causal association between Taxotere --
not the combination TAC -- and permanent alopecia as opposed to
any other descriptor.  That's their words.

Let me address these critiques, though, anyway.
One, with respect to the combination, both arms of TAX316 and
301 looked at TAC versus FAC.  They both have AC, so it's
comparing the causal affect of T versus F.

**THE COURT:**  Right.

**MR. ABRAMSON:**  With respect to the permanent
alopecia, the reality is there has to be some cut-off period
that can be reasonably applied.  Otherwise, there's no way to
measure it.  It's kind of what Your Honor alluded to earlier
with Mr. Miceli.

Finally, Dr. Madigan never criticized TAX301 as
unreliable.  What he said is that because Sanofi failed to
follow up with almost 80 percent of the study centers, the
results of the study were small and they were underpowered,
which is exactly why Dr. Madigan performed a meta-analysis.
The point of a meta-analysis is to take results from multiple
trials, some which may be small and underpowered, to obtain a
more reliable result.

If you look at the levels of evidence hierarchy
pyramid, at the very top is a meta-analysis of randomized
controlled trials.  That's exactly what he used here.  This is
far from litigation-driven.  It's the gold standard.

11:20

1    **THE DEPUTY CLERK:**  You have passed five minutes.

2    **MR. ABRAMSON:**  Thank you.

3    Let me just finish up.  If Dr. Madigan did what

4    Sanofi claims he should have, his methodologies would have been

5    inappropriate and his opinions would actually be far less

6    reliable.  He is an expert biostatistician.  His role is to

7    take available data as it existed and perform quantitative

8    statistical analyses to assist the trier of fact in evaluating

9    that data.  That's what he did here.  If anything, the

10   criticisms lodged by Sanofi simply go to the weight, not the

11   admissibility of this evidence, and are more appropriate for

12   cross-examination and for the jury's consideration.  For those

13   reasons, Your Honor, we would ask the Court to deny Sanofi's

14   motion to exclude Dr. Madigan.

15   **THE COURT:**  Thank you.

16   **MR. MCRAE:**  Your Honor, two points on rebuttal, if I

17   may.

18   So counsel for plaintiff started off by talking

19   about Dr. Madigan's qualifications.  I would posit to you that

20   the entire reason we have gate-keeping, the reason we are

21   having this hearing today is to prevent otherwise qualified

22   experts from getting in front of a jury and offering opinions

23   that are unreliable or not relevant to the case.  That's

24   exactly what is happening here.  Dr. Madigan's qualifications

25   don't matter.  What matters is what he did in this situation.

11:21

1          THE COURT:  Right.  There are two findings I have to
2     make, he is qualified to say it and whether or not his
3     methodology --
4          MR. MCRAE:  Sure.  We don't quibble with
5     Dr. Madigan's qualifications.
6               The second point I would say is that counsel for
7     plaintiff said that the FDA database review that Dr. Madigan
8     performed is generally accepted, and he quoted you some cases
9     where that has been admitted.  I would say in response to that
10    that this case is distinguishable because, again, of the search
11    criteria Dr. Madigan had to concoct in order to find cases of
12    irreversible alopecia.
13              He had to search for alopecia, and then he had
14    to find situations where there is a box checked on the form
15    that is permanent or disabling.  In none of those other
16    situations did Dr. Madigan, in those other cases, have to do
17    such a search.  He could actually search for the medical
18    condition at issue in the FDA database.  He couldn't do that
19    here, and that's why this situation is different.
20              That's all I have.  Thank you, Your Honor.
21         MR. RATLIFF:  Good morning, Your Honor.  Harley
22    Ratliff on behalf of Sanofi.  Is the Court ready?
23         THE COURT:  I'm trying to get my notes.
24              Okay.  Thank you.  I was getting my notes out.
25         MR. RATLIFF:  Thank you, Your Honor.  I'm here to

11:23

1 discuss the purported expert opinion of David Kessler, who is

2 plaintiffs' regulatory and labeling expert, although probably

3 should be better discussed as a, quote, causation expert.

4     The key opinion that we are here to challenge,

5 Your Honor, is this.  Dr. Kessler's opinion is that in 2009

6 Sanofi should have added some type of warning regarding

7 irreversible alopecia to a specific section of the label,

8 what's known as the warnings and precautions section.

9 Dr. Kessler will call that the big "Capital W" warning.  That

10 is Dr. Kessler's opinion.  That is what we are here to

11 challenge.

12     Now, why did Dr. Kessler pick 2009?  Why did he

13 settle on 2009 as the date by which Sanofi should have put this

14 warning in the warnings and precautions section?  He did that

15 because that was the date he was directed to do by plaintiffs'

16 counsel to slip in under the wire of our three bellwether

17 plaintiffs, Antoinette Durden, Tanya Francis, and Barbara

18 Earnest, who were diagnosed or treated with Taxotere in 2009,

19 2009, and 2011.

20     Your Honor, one, that is the hallmark of a

21 litigation results-driven opinion, but implicit in that

22 opinion -- and you will hear more about that in two weeks when

23 we talk about preemption.  Implicit in Dr. Kessler's opinion

24 that this label should have been updated in 2009 is that for

25 the 3,000 other women who were treated before 2009 with

11:24

1    Taxotere who are plaintiffs in this litigation, the label, per

2    Dr. Kessler's opinion, has to have been adequate.

3              The other part about Dr. Kessler's opinion which

4    I think is important to understand as we talk about his

5    methodology -- because that is where we have the real

6    problem -- is that Dr. Kessler's opinion that there should have

7    been this warning in the warnings and precautions section in

8    2009, Your Honor, is an artificial construct that is divorced

9    from what has happened in the real world.

10             At no point in the 23 years that Taxotere has

11   been on the market has the FDA ever made the same determination

12   that Dr. Kessler did, that there needed to be a warning in the

13   warnings and precautions section of the Taxotere label.  FDA

14   did not make that determination in 2015 when they requested a

15   minor update to the Taxotere label based on the exact same data

16   that Dr. Kessler looked at.  FDA did not make that

17   determination that there needed to be a warning and precaution

18   about permanent alopecia in 2018 when the label was updated.

19             In fact, not even in Dr. Kessler's seven years

20   at FDA, when Taxotere was under his remit and responsibility,

21   was there ever a suggestion that there should be a warning and

22   precaution, one of the highest warnings that can be made in a

23   label, about irreversible alopecia.

24             So what Dr. Kessler wants to do is say, "In my

25   world," in this hypothetical world, "there should have been

11:26  1   this warning in 2009."  Whereas in the real world with FDA, the
2   agency that is responsible for the label, this has never
3   happened.

4   How does Dr. Kessler get there?  How does
5   Dr. Kessler got to this particular opinion?  Well, to get to
6   that opinion, Your Honor, he has to go through methodological
7   gymnastics to reverse engineer a date in time that best fits
8   the facts of the particular plaintiffs in this litigation or
9   for these bellwether plaintiffs, which is now just down to
10   Ms. Earnest, and he does this by doing a seven-factor test
11   which he takes from the FDA guidance.

12   Dr. Kessler, per his own words, says, "I have to
13   reach the substantial majority of these factors."  Here are the
14   two problems with his analysis and his methodology -- because
15   we are not just challenging his ultimate opinions just being
16   wrong, but the methodology being right.  That would be subject
17   to cross-examination.  We are talking about his methodology and
18   how he got here.

19   Factor 6, he has no evidence about that.  We can
20   take that off the radar.

21   For three of his other factors, Dr. Kessler
22   relies on data and analysis that occurs after 2009, a 2018
23   article, a 2017 article, a 2014 article.  Your Honor, courts
24   time and time again have said you cannot take post-injury data
25   to impose a duty on a defendant pre-injury.  For factors 3, 4,

11:27

1   and 5, that is the type of data that Dr. Kessler relied on to

2   get to his opinion, post-injury data that wouldn't have been

3   available to either Sanofi or FDA at the time he says a label

4   should have been updated.

5           So what about the remaining three factors?  For

6   the remaining three factors -- and plaintiffs make a point of

7   this in their opposition -- they say, "Well, there was pre-2009

8   data."  Let's talk about that pre-2009 data.

9           The real problem is Dr. Kessler has taken a

10  definition of permanent alopecia which he says, per plaintiffs'

11  complaint, is partial or incomplete hair growth six months from

12  chemotherapy.  Your Honor, we have no quibble with that

13  definition.  That's the definition they have chosen, although

14  Dr. Kessler readily concedes that there will be numerous cases

15  that fall outside of his definition.  Hair may regrow after six

16  months.  He says when you are talking about a year-plus, that's

17  when you start talking about irreversibility.  Because he

18  recognizes that his hard cut-off has some wiggle room, I think,

19  Your Honor, that imposes on Dr. Kessler an obligation to do a

20  more thorough investigation to see if his narrow definition

21  meets the data sets to which he applied it to.  These are the

22  data sets that plaintiffs talk about.

23          GEICAM 9805, one of the big clinical trials you

24  are going to hear a lot about at this trial, there plaintiffs'

25  experts concede that the data from there says that all of the

11:28

1    9.2 percent of ongoing alopecia cases were 31 days after

2    chemotherapy.  What Dr. Kessler does not know and what

3    Dr. Kessler did not endeavor to do is to figure out which of

4    those patients, if any, had alopecia that met his definition.

5    He does not know that.

6                   The same with TAX316, which we talked about with

7    Dr. Kopreski.  Dr. Kessler recognized that he would need to

8    know the last date of the follow-up visit when alopecia was

9    reported.  Was that last follow-up visit at two weeks?  Was it

10   at two months?  Was it at six months?  Was it at five years?

11   Was it at ten years?  That would be the only way for him to

12   take his definition of permanent alopecia and apply it to that

13   data.  Dr. Kessler did not do that.

14                   The remaining two options would be the FAERS

15   analysis, and that's what Mr. McRae just talked about.

16   Dr. Kessler takes Madigan's analysis.  He does nothing further

17   than what Madigan did.  He looks at the numbers.  He doesn't

18   pop the hood on what those numbers mean and whether those cases

19   actually meet his definition of permanent alopecia.  So he

20   takes his definition, applies it to data, but doesn't do the

21   next step of the analysis, Your Honor, to see if those cases --

22   those cases of what he calls permanent alopecia -- actually

23   meet his definition of permanent alopecia to meet his remaining

24   factors.  When you think about that methodology, Your Honor --

25                   Well, one other thing.  The last point here is

11:30

1     the plaintiffs rely on in their opposition that Dr. Kessler

2     testified at his deposition that he could rely on a single

3     two-paragraph abstract of 2016 called the Sedlacek abstract.

4     If you look in his report, Your Honor, Dr. Sedlacek is

5     mentioned one time, buried in this footnote, without any

6     discussion from Dr. Kessler about its relevance, its

7     importance, or how it meets any one of his seven factors.

8                   So when you take those pieces of evidence and

9     that methodology, the unreliable application of a definition to

10    the data sets he relied on, you can take out 1, 2, and 7.  None

11    of the substantial majority of factors are met when you look at

12    his actual methodology.

13                  Did he actually do the work to make sure that

14    his definition of permanent alopecia met the data sets that he

15    applied them to, which would get him to this idea that there

16    should have been a label change in the warnings and precautions

17    section in 2009 -- which did not happen then and has not

18    happened as we sit here today despite the fact that, to step

19    back just a second, FDA had GEICAM 9805, they had TAX316, they

20    had their own adverse events, and they had Sanofi's adverse

21    events.  Based on that same data, FDA has never reached the

22    same conclusion that Dr. Kessler would like to come in to the

23    jury and tell them about what should have happened versus what

24    really happened.

25                  This gets to the last point, Your Honor, I want

11:31

1    to make.  This is an important point, which is Dr. Kessler

2    testified time and time again he is not here as a specific

3    causation expert, that he is not qualified, nor is he giving a

4    medical causation opinion, Your Honor.  But what we have seen

5    in these litigations and what I can assure you we will see in

6    this courtroom is that Dr. Kessler will come in under the

7    auspice of giving regulatory opinions only to try to insert

8    causation opinions to supplant the causation analysis of the

9    jury.

10           If you look at his report, Your Honor, and if

11   you look at his deposition, it is replete with not just a

12   regulatory causation -- a reasonable possibility of a causal

13   association, which is a regulatory term at a lower level -- his

14   testimony is replete with causation opinions.

15           So on one hand he wants to disclaim those

16   opinions; on the other hand, he wants to come in and couch

17   those opinions in terms of a regulatory opinion to be able to

18   get that into evidence.  That is the type of testimony that

19   will be confusing and prejudicial to the jury.

20           It is also the type of testimony that has been

21   regularly precluded by other similar experts trying to do the

22   exact same path, which is to give a regulatory opinion, but

23   implicit in that opinion is actual causation testimony.  That's

24   why Dr. Kessler is on their will-call list and their causation

25   experts, Dr. Madigan and Dr. Feigal, are on their may-call

11:33   1    list.

2              So, for example, this is what Dr. Kessler says

3    in his deposition, Taxotere is the causative agent.  "It's

4    Taxotere.  That's the causative agent here."

5              Your Honor, that is not regulatory testimony.

6    That is someone trying to give a causation opinion couched

7    under the rubric of being a regulatory opinion.

8              So our challenges to Dr. Kessler are two

9    parts: (1) the methodology that he used to try to kind of

10    create this artificial world; (2) the fact that if he is

11    allowed to come in and talk about reasonable causation, causal

12    association.  That is going to lead the jurors to rely on him

13    as the causation expert for plaintiffs, and courts time and

14    time again have said they are not going to allow that.

15              Now, Dr. Kessler, we are not fussing with his

16    qualifications.  There's no doubt he worked at the FDA.

17    Plaintiffs spent five to six pages of their opposition touting

18    his qualifications even though we didn't spend any time

19    challenging them.

20              So if Dr. Kessler wants to come in and explain

21    the complex regulatory scheme related to FDA, how that works,

22    how labeling works, we are not here to challenge that

23    Your Honor.  What we are here to challenge is the idea that he

24    can insert the opinion that Sanofi should have done something

25    that FDA never did.  That is why his opinion should be

11:34

1  precluded both in terms of his unreliable methodology but also

2  the prejudice and confusion it is going to cause the jury.

3            In fact --

4       **THE DEPUTY CLERK:**  You are at 11 minutes.

5       **MR. RATLIFF:**  Okay.

6            This is Dr. Kessler's own words:  "Some people

7  confuse that with causation."  That is why his opinion should

8  not come in.

9            Thank you, Your Honor.

10      **THE COURT:**  Thank you.

11           Ms. Jeffcott.

12      **MS. JEFFCOTT:**  May it please the Court.  My name is

13  Emily Jeffcott.  I'm here on behalf of plaintiffs.

14           Your Honor, I'm a little frustrated.  I spent

15  this weekend preparing from Dr. Feigal's *Daubert* opposition

16  only to have it taken off on Monday, and then in this argument

17  just now I heard a number of arguments that pertain to

18  preemption.  Preemption is not at issue.  That will be argued

19  in a few weeks.  Specifically, what the FDA knew and when and

20  the Sedlacek argument, those were both raised in terms of the

21  preemption motion, and I prepared for Dr. Kessler's *Daubert*

22  opposition.  So those other arguments we will reserve until

23  that time.

24           Your Honor, defendants' motion to exclude

25  Dr. Kessler's opinions in this case should be denied.

11:35

1          **THE COURT:**  Let me ask, is Dr. Kessler giving

2     causation testimony?

3          **MS. JEFFCOTT:**  No, Your Honor.  Dr. Kessler has

4     explicitly stated that he is not.  Sanofi objects to

5     Dr. Kessler giving medical causation testimony but also to his

6     opinion about a causal association.  That's one of the points

7     that I wanted to raise.

8               To opine regarding the adequacy of a label, his

9     overarching opinion that the Taxotere label should have

10    included a warning about permanent alopecia requires that

11    predicate opinion regarding causal association.  FDA guidelines

12    and FDA regulations state to provide a warning there must be

13    reasonable evidence of a causal association.

14              Now, contrary to Mr. Ratliff's statement, they

15    do challenge his qualifications regarding his ability to give

16    that causal association testimony.  As we know, Dr. Kessler is

17    the former FDA commissioner.  He is a medical doctor, the

18    former dean of two medical schools, a lawyer.  He is perfectly

19    qualified to opine on matters of causal association as it

20    pertains to the regulatory construct.

21              Indeed, he has offered this type of opinion

22    about causal association before.  In the *Actos* case, he opined

23    there that bladder cancer should have been warned of in the

24    Actos label, and that considered that causal association

25    predicate opinion.  It's a necessary, to reach that opinion

11:37

1    whether or not there's a causal association, in order to opine

2    on, too, that larger opinion regarding the adequacy of the

3    label.

4              In the briefing they cite to a number of cases

5    against Novartis.  Well, those were specific to Dr. Parisian.

6    In those cases Dr. Parisian was found not to be qualified based

7    on her own experience and then also based on the analysis, the

8    methodology that she applied.  For instance, one thing that was

9    cited is that she merely mentioned that there was literature

10   supporting a causal association and that the clinical trials

11   also supported those causal associations without going into

12   depth as to why.

13             In this case Dr. Kessler has gone through in his

14   report to explain how the medical literature, as you saw the

15   references to the medical literature, and also how the clinical

16   trials and Dr. Madigan's analysis all pertain to the issue of

17   causal association.

18             I want to put something up.  Mr. Ratliff states

19   that Dr. Kessler didn't rely on pre-2011 data.  That 2011 date

20   is the year that Ms. Earnest was treated.  Well, to the

21   contrary, the scientific literature supported and Dr. Kessler's

22   report has multiple, if not many, instances of literature

23   establishing the relationship between permanent alopecia and

24   Taxotere.

25             The same things for Sanofi's own clinical trial

11:39

1   data -- the TAX316, TAX301 -- the pooled analysis done by

2   Dr. Madigan, as well as the FAERS and the internal

3   pharmacovigilance databases that Dr. Madigan also reviewed.

4   All of those have pre-2011 data that establish a relationship,

5   that causal association between Taxotere and permanent

6   alopecia.

7              Sanofi also takes issue with Dr. Kessler's

8   definition.  Your Honor, quite frankly, I was a little bit

9   confused by Sanofi's argument.  In their original brief, Sanofi

10  seemed to complain that Dr. Kessler didn't apply a consistent

11  definition, that he had multiple definitions going on, and then

12  in their reply brief -- and Mr. Ratliff kind of cleared this

13  up -- it's more about the six-month definition.

14             I think what I'm going to start out with is

15  there isn't really a Dr. Kessler definition, and I think what

16  would be good is to look really at how he defined it in his

17  report.  I'll zoom in.

18             Dr. Kessler looked at multiple sources for the

19  definition of permanent alopecia, and here we start with the

20  medical literature.  The medical literature, based on

21  Dr. Kessler's review, was consistent to show that six months

22  equated with permanent alopecia.  But as Sanofi correctly

23  pointed out in their reply brief, there is other medical

24  literature out there that says a year, two years is, in fact,

25  sufficient for that determination of permanent alopecia.

11:40

1          Among all the definitions present, Dr. Kessler
2    went with six months from the medical literature.  However, he
3    also looked at the definitions provided by Sanofi internally,
4    and that was four years by Dr. Palatinsky, which is Sanofi's
5    global safety officer.  In addition, Sanofi reported in their
6    safety report -- which I believe was provided to multiple
7    regulatory agencies -- that alopecia is persistent at
8    12 months, and then in 2015 Sanofi used two years.  So
9    Dr. Kessler considered multiple definitions.
10         In fact, in his analysis of the incidence rates
11   of permanent alopecia, he didn't just apply six months.  He
12   considered these multiple definitions to ensure that the
13   reliability of his analysis was consistent no matter how you
14   defined it, and that's the point.  When he looked at it using
15   six months, a year, two years, 55 months, eight years,
16   ten years, it all came back to a sufficient incidence rate to
17   warrant inclusion of a warning of permanent alopecia in the
18   Taxotere label.
19         Now, there's one final point I would like to
20   make, Your Honor.  Ms. Byard brought this up in her initial
21   arguments regarding whether or not Dr. Kessler had the
22   capability to look at each individual case report to assess
23   whether or not it should have been included, but the reality is
24   under a proper methodology you don't do that.
25         Specifically, FDA guidance says when you are

11:42

1    looking at adverse reaction rates, when you are looking at the
2    incidence rate, you don't want to go through and look at each
3    individual entry because that introduces bias and inconsistency
4    in the results.  You look at it at an objective level without
5    going to that root cause analysis.
6              **THE DEPUTY CLERK:**  You are at about eight minutes.
7              **MS. JEFFCOTT:**  Your Honor, for those reasons,
8    defendants' motion to exclude Dr. Kessler's *Daubert* motion
9    should be denied.
10                   Thank you so much.
11             **THE COURT:**  Thank you.
12             **MR. RATLIFF:**  Your Honor, may I address two quick
13   points?  Under a minute.
14             **THE COURT:**  You have already had about 15 minutes.
15             **MR. RATLIFF:**  One minute.  Two minutes.
16             **THE COURT:**  Twenty seconds.
17             **MR. RATLIFF:**  Your Honor, everything Ms. Jeffcott
18   said didn't address the fundamental issue we have with
19   Dr. Kessler.  Ms. Jeffcott referenced, well, he actually used
20   lots of definitions or he looked at lots of definitions, but
21   she never talked about did he reliably apply those definitions
22   to the data set to determine if those data sets met his
23   definitions.
24                   She also said, well, he reviewed a lot of
25   clinical trials.  We have no dispute that Dr. Kessler reviewed

11:43

1  those clinical trials.  Our challenge, Your Honor, and the

2  underlying of our challenge is what he did not do was take

3  those clinical trials and apply them to his definition to make

4  a determination to get to his ultimate opinion that a change in

5  the label should have happened in 2009, a warnings and

6  precautions change, which has never happened and has never been

7  mandated by FDA.

8              Thank you, Your Honor.

9        **THE COURT:**  I think we have two causation arguments.

10 I need to go get my binders in the back, so we will be at

11 recess for a couple minutes.

12       **THE DEPUTY CLERK:**  All rise.

13       (Recess.)

14       **THE DEPUTY CLERK:**  Court is back in session.  You may

15 be seated.

16       **THE COURT:**  Mr. Strongman, give me a minute.

17       **MR. STRONGMAN:**  Take your time.

18       **THE COURT:**  Ready.

19       **MR. STRONGMAN:**  Are you ready to proceed?

20       **THE COURT:**  I am.  Thank you.

21       **MR. STRONGMAN:**  Your Honor, Jon Strongman on behalf

22 of Sanofi.  I will be arguing Sanofi's motion to exclude

23 plaintiffs' proposed expert testimony on general causation.

24            In this case the plaintiffs do not get to take

25 general causation for granted.  They must put forward a

11:50

1   specific expert witness or witnesses on this issue, those
2   witnesses must put forward specific and reliable evidence, and
3   they must do it by a reliable methodology.  The particulars
4   matter.

5              In this case the plaintiffs have tried to patch
6   together an after-the-fact general causation opinion from two
7   witnesses.  The first is Dr. Madigan, who is a safety signal
8   statistician.  The second is Dr. Feigal, who plaintiffs have
9   put forward as an informed consent witness.  Both of these
10  experts -- both of them -- stated that they weren't even
11  specifically asked to address general causation within the
12  scope of their expert report.  Think about that.  In this
13  litigation, when you look through all of the expert reports
14  that the plaintiffs provided, you couldn't even tell who
15  plaintiffs' general causation experts were.

16       **THE COURT:**  Mr. Strongman, in Louisiana are they
17  required to show general and specific causation, or is it
18  sufficient in Louisiana to show specific causation and then
19  whether or not there's a causal analysis for purposes of FDA
20  compliance?

21       **MR. STRONGMAN:**  Your Honor, I would point you
22  directly to a case that I think provides a road map to a lot of
23  the issues that I want to talk about today, and that is the
24  *Burst* case.

25              So the *Burst* case was decided right here in this

11:52

Court by Judge Vance.  The *Burst* case involved an analysis as
to whether or not benzene in gasoline caused the plaintiff's
cancer.  What Judge Vance stated was under the law plaintiff
must show: general causation, that gasoline containing benzene
can cause AML; and specific causation, that defendants'
products caused Mr. Burst's AML.

So the answer to your question is yes.  In fact,
what Judge Vance went on to say is that the court may only
admit specific causation evidence after the plaintiff had
produced admissible evidence on general causation.  That is why
the particulars matter.  That is why, under *Daubert*, the Court
must delve into those particulars: who are the witnesses; what
are their qualifications; what do they rely on; and what
methodology do they use?  When you delve into the particulars
in this case, what you see is that plaintiffs cannot meet their
burden.

So the *Burst* case which I just referenced sets
out a process for doing this, and it includes two steps.  The
first is to identify an association between an agent and a
disease, and then the second is to go through a process to
determine whether or not that association is causal, which here
we call the Bradford Hill criteria.

In this case the plaintiffs have not identified
one single epidemiological study showing a statistically
significant association between Taxotere and permanent

11:54

alopecia.  Not one.  Even assuming that an association could be established -- which it cannot -- not one of plaintiffs' two experts that theoretically are opining on general causation has applied any kind of Bradford Hill criteria in a methodology that's set out in a report that's understandable and that is explained.  They simply didn't do their work.

When you look at the *Burst* case, what the plaintiffs were left with there is very similar to what the plaintiffs are left with here, which is case reports, it's clinical studies with statistically insignificant results, and it's ultimately with an expert that manipulates the data by combining it together.  The *Burst* court said that that is unreliable and that that must be excluded.

I want to touch on these two witnesses briefly. We have heard about Dr. Madigan, and I think some context is important here.  My partner, Mr. McRae, argued about Dr. Madigan's opinions regarding safety signals.  When you look in these databases, when does a safety signal pop up?  That's a statistical analysis.  What Mr. McRae and what the lawyers arguing Dr. Madigan's motion were not talking about is general causation.

So we don't quibble with Dr. Madigan's qualifications as a statistician, but he is not a medical doctor.  He is not qualified to give a general causation opinion.  This issue has been addressed specifically by a court

11:56

1    just in the last year.  So while we can argue about the FAERS
2    analysis, about the statistics, when it comes down to really
3    knowing is there a causation issue here, a general causation
4    issue here, Dr. Madigan cannot carry that water.

5            He is a man of statistics, not medicine, and
6    just as the court here said:  "Defendants argue that
7    Dr. Madigan lacks the medical knowledge and experience to offer
8    a general causation opinion.  The Court agrees."  Again, this
9    is just within the last year.

10           The plaintiffs, with regard to Dr. Madigan,
11   regularly say, well, what he did was quantitative: numbers.
12   What he didn't do was qualitative: quality, substance.  While
13   that may work for a signal-type analysis -- we argue it
14   doesn't.  But while that may be one way to go about it, when
15   you get to general causation, the quality matters, the
16   substance matters, and the particularities matter.  What we
17   know is that Dr. Madigan did not do that work.

18           When you look at his expert report, he sets out
19   the questions that he was asked.  They are all safety signal
20   questions.  They are not causation questions.  He was
21   specifically asked:

22       "QUESTION:  You were not asked, for example, to
23       investigate whether docetaxel causes irreversible
24       alopecia?

25       "ANSWER:  Not specifically."

11:57

1          But yet the plaintiffs, trying to fill a void

2     that they realized that they had, went through with Dr. Madigan

3     his three pieces of data.  You have heard about these three

4     pieces of data already, the two databases and the clinical

5     trials.  So with regard to the two databases, Dr. Madigan

6     readily admits that these are merely --

7               **THE COURT:**  Who was that?

8               **THE DEPUTY CLERK:**  The people listening.

9               **THE COURT:**  Okay.  Would you please put your phones

10    on mute.

11              Hello?  Would you please put your phones on

12    mute.

13              Please proceed, Mr. Strongman.

14         **MR. STRONGMAN:**  Thank you, very much.

15              So with regard to the two databases that

16    Dr. Madigan looked at, what he readily admitted is that these

17    are not causation pieces of evidence.  Do these alone

18    demonstrate causation?  No.  No.  He admits that.  These are

19    for safety signals.  They are really not causation evidence.

20    So two of the three pieces of data that Dr. Madigan analyzed he

21    realizes and admits are not causation evidence.

22              So he is stuck with the clinical trials, and we

23    have talked some about the clinical trials.  What's important

24    is -- again, not for safety signal, but for causation -- what

25    do these clinical trials look at?  They do not isolate

11:59   1   Taxotere, for one.  We know that.

2                When you look at the *Burst* case, this is

3   addressed.  Specifically, Judge Vance stated that a study that

4   notes that the subjects were exposed to a range of substances

5   and then nonspecifically notes increases in disease incidence

6   can be disregarded when you are looking at a specific --

7           **THE COURT:**  Weren't the two studies dealing with TAC

8   and FAC -- I'm not going to try to pronounce all of the --

9           **MR. STRONGMAN:**  I'm with you.

10          **THE COURT:**  Okay.  We can say the ACs were given to

11   both populations --

12          **MR. STRONGMAN:**  Correct.

13          **THE COURT:**  -- and the only difference was whether or

14   not they were administered Taxotere in conjunction or the other

15   medication.

16          **MR. STRONGMAN:**  Correct.  Correct.

17          **THE COURT:**  Does that not at least -- it seems to me

18   that you are isolating Taxotere.

19          **MR. STRONGMAN:**  Well, let me give you a couple of

20   examples on this.  Okay?

21          **THE COURT:**  Please.

22          **MR. STRONGMAN:**  So I want to set aside the whole

23   ongoing alopecia versus is that really persistent.  We have

24   talked about this.  Let's just set that aside.

25          **THE COURT:**  Let's just talk about the populations, if

1    you will.

2                MR. STRONGMAN:   So at most what that study would show

3    you, assuming that it's looking at permanent alopecia -- which

4    we don't believe it does, but assuming it is.  At most what

5    that study is telling you it that it may happen more in one

6    population exposed to T versus a population exposed to F.

7                THE COURT:   Right.

8                MR. STRONGMAN:   When you look at general causation --

9    and, again, Judge Vance talks about this in her opinion in

10   *Burst*.   When you do epidemiology for general causation, what

11   you are looking for is an increase in your exposed group over

12   the incidence in the general population.

13                What we have here is absolutely no evidence

14   about the incidence rate of what we are calling permanent

15   alopecia in the general population.  So you are not comparing

16   apples to apples for general causation purposes with these

17   clinical trials; you are merely comparing one chemotherapy

18   regimen to another.

19                I just want to give you a hypothetical.  I'm not

20   saying this is factual, but let me give you a hypothetical.

21   Let's say that in the population irreversible hair loss or

22   permanent alopecia occurs in 10 percent of people.  We know it

23   occurs for a whole host of reasons with many women.

24                THE COURT:   Right.  Right.

25                MR. STRONGMAN:   Let's say it occurs in 10 percent of

12:00

12:01

1    people.  What we see in the clinical studies, even going by

2    plaintiffs' misguided definition, is that it's occurring in

3    9 percent or 4 percent.  That could theoretically be less than

4    the general population.  We don't know.  So the point is the

5    plaintiffs have not done their work to actually put forward

6    clinically significant data that shows any statistical increase

7    when you are exposed to Taxotere when you get the outcome of

8    permanent alopecia.  It simply isn't there.

9              The other point that's really important for this

10   also is that when you look at the clinical studies -- this is a

11   quote out of the *Burst* case as well.  It's my favorite case

12   today.

13          **THE COURT:**  I see that.

14          **MR. STRONGMAN:**  What the Court had to say was that

15   studies that do not represent statistically significant results

16   may not provide a foundation for general causation.

17             So when Dr. Madigan did his analysis on the

18   Taxotere clinical trials -- so we have TAX316 on the one hand,

19   we have GEICAM on the other -- both were clinically not shown

20   to have a statistically significant result.  They were

21   statistically not significant.

22             What we know from *Burst* is under the Fifth

23   Circuit law, which is what we are operating under here, you

24   cannot use a clinical study with a result that was not

25   statistically significant to prove general causation.  So even

12:03

1    if you take it to the step that comparing the T to the F has

2    some value, it was not statistically significant.

3                   So what Dr. Madigan then did, he said, "Well,

4    all right.  That's not going to work for me.  So what I'm going

5    to have to do is I'm going to have to combine the data.  I'm

6    going to have to put it together."  The plaintiffs are calling

7    this a meta-analysis, a pooled analysis.

8                   What we also know from the *Burst* case is that

9    the expert there combined the data to get a statistically

10   significant result where one didn't already exist, and the

11   court said you can't do that.  You have to have a reason to

12   combine data.  You can't get an F on one test, get an F on

13   another test and say, "Well, when I combine them, I get an A."

14   It doesn't work that way in science.  This was Dr. Madigan's

15   admission, "not statistically very impressive."  That's what we

16   are dealing with.

17                  The other point I wanted to make on this, too,

18   with regard to Dr. Madigan, he has a lot of criticisms of the

19   GEICAM study.  He doesn't like it.  He thinks it was poorly

20   done, follow-up was not accurate.  He has a lot of criticisms

21   of it, but yet he takes it and he pools it together to get his

22   result that he needed.

23                  Well, in the *Accutane* litigation, he had an

24   opportunity to do that too.  If he had pooled them together, he

25   would have gotten a result that was unfavorable to the

12:04

plaintiffs.  What do you think he said?  "I can't do that
because when you combine two studies, I bring with it the flaws
and the biases, etc."  So he is doing it here; he won't do it
there.  What we know is that the court there said, again, this
is an expert on a mission that wants a particular conclusion,
period.  That doesn't work in science, and it doesn't pass
muster under *Daubert*.

Briefly on Dr. Feigal -- I know I'm using up my
time.  Dr. Feigal likewise did not offer a general causation
opinion in her report.  What she had to say was -- here's her
scope.  This is about informed consent.  This is what she was
asked to address, discussions between physicians and patients
in light of the information available on hair loss and
Taxotere.

When she was asked in her deposition, "Well, are
you giving a general causation opinion?" she says she thinks it
was implied in her interactions with the lawyers that she would
be able to talk about this.  General causation is a threshold
matter.  It is a critical matter.  It is not one based on
expert implications.  Implications alone are not enough.

So the data that Dr. Feigal looked at and
ultimately in her deposition had to put forward as any kind of
support for a missing general causation opinion in her report
were these.  She looked at studies in the literature, but yet
she admitted that those studies alone can't prove causation.

1   She admitted that.

2             "You would not reach a conclusion that Taxotere

3   caused permanent alopecia just by looking at the studies and

4   the literature in the table that you put forward?"

5             She said, "I think from my own opinion, yes."

6             What we also know is that when you look at

7   Dr. Madigan, their other general causation expert, he was

8   asked, "Did you review the public medical literature?"

9             He really didn't, but he said, "My understanding

10   was that there were only case reports in the literature."

11             "Have you reviewed any of those?"

12             "I may have seen them.  Individual case reports

13   are not that terribly useful."

14             So Dr. Madigan, on the one hand, didn't even

15   bother to look at the studies because they were not useful, and

16   yet it's one of the three-legged stool, if you will, that

17   Dr. Feigal puts forward.  There is an internal contradiction

18   between the plaintiffs' two experts.

19             The next thing that I am sure Mr. Miceli is

20   going to stand up here and talk about is Sanofi's own internal

21   2015 clinical overview analysis.  So what they say is that

22   Dr. Feigal didn't exactly rely on Sanofi's conclusion in this

23   document but how they came about it.  Repeatedly, in every

24   brief that you see, the plaintiffs cite this document, this

25   2015 clinical overview document, and in it you have to

12:07   1   understand the context.

2                So the clinical overview document was dealing in

3   the regulatory context with a question of labeling, and we just

4   heard the argument on Dr. Kessler, the exact same reality here,

5   which is:  Is Dr. Kessler offering a general causation opinion?

6   The answer is no because he is talking about labeling in this

7   regulatory context.

8                So was Sanofi offering a general causation

9   opinion when they are talking about the same regulations that

10   Dr. Kessler is in their internal document?  The answer to that

11   is no, they were not.  How do we know that it doesn't pass

12   muster?  Again, I'm going to quote from the *Burst* case.

13                So in the *Burst* case what we had were various

14   regulatory agencies that had chimed in on the issue, and this

15   is what the judge said:  "As noted by the Fifth Circuit,

16   regulatory bodies apply a lower threshold of proof in

17   determining issues of causation than 'is appropriate in tort

18   law,'" and they cite the *Allen* case, which is a Fifth Circuit

19   case.  Regulatory bodies, lower threshold of proof on causation

20   than is appropriate in tort law, and that's what we have here.

21                When you look at the documents that the FDA

22   actually has -- we cited them in our briefs and in our expert

23   reports.  When you actually look at what the FDA said about our

24   2015 clinical overview, this is what they said:  "It is

25   impossible to determine whether the permanence of alopecia was

12:09   1   due to docetaxel."  That is the clinical reviewer of the FDA,
2   "impossible to determine."  When you have a situation where it
3   is impossible to determine whether or not there's a causal
4   link, you ultimately have to rule that that evidence is
5   inadmissible in tort.
6           The last leg that we have for Dr. Feigal is
7   again the Taxotere GEICAM clinical trials.
8           She was asked, "Do you even know if there is a
9   statistically significant difference in the two arms?"
10           She said, "I have not done that analysis.  You
11   might go ask the biostatistician."
12           So how can Dr. Feigal rely on clinical data when
13   she doesn't even know if it's clinically significant or
14   statistically significant?  She can't, and we know that based
15   on the Fifth Circuit law.
16           So the last thing that Dr. Feigal does is falls
17   back on what she calls the weight of the evidence.  She says
18   she triangulated it.  I don't know what that means, but it
19   sounds to me like the *ipse dixit* of an expert who says,
20   "Because I look at it, I feel like it's enough" -- the weight
21   of the evidence without any methodology -- "I'm going to say I
22   think there's causation," but courts have spoken about the
23   weight of the evidence.
24           This is from the *Mirena* decision just in the
25   last year as well, another MDL.  What that court said is that

12:11

1    if you are going to use the weight of the evidence, you have to
2    go through each step of it to show us why and how; because if
3    you don't, methodologies like the weight of the evidence are
4    "virtually standardless" and "unacceptably manipulable."
5            We know that the methodologies that the
6    plaintiffs used were standardless, they were manipulable, and
7    they were manipulated.  They took what they viewed as
8    unreliable evidence in the literature, unreliable evidence in
9    the databases, unreliable evidence in the clinical studies --
10   because they weren't statistically significant -- and they
11   jammed them all together.  When you jam together three pieces
12   of unreliable evidence, you don't somehow get a reliable
13   opinion.  You just don't.  The plaintiffs did not do their work
14   here.
15           We know -- again, this is out of the *Burst* case,
16   citing a Seventh Circuit case -- that this Court has an
17   obligation to delve into the particulars.  It has an obligation
18   to eliminate scientific guesswork.  And while there may be
19   sympathies involved -- there always are -- in this courtroom
20   the law lags science.
21           If there is no epidemiological evidence, there
22   is no proof that Taxotere causes permanent hair loss based on
23   what the plaintiffs' experts have done, our motion must be
24   granted, sympathies aside, because that's what's required under
25   *Daubert*.

12:12

1          Thank you, Your Honor.

2          THE COURT:  Thank you.

3              Mr. Miceli.

4          MR. MICELI:  Thank you.  Your Honor, if I can, I want

5   to get a little bit situated here before I get started.  I had

6   a feeling --

7              Are you ready to get started?

8          THE COURT:  I am.

9          MR. MICELI:  Thank you.  I had a feeling we were

10  going to hear about the *Burst* case, and we can talk about that.

11  I want to start, however, with the *Accutane* case, where they

12  cited some criticisms of Dr. Madigan.  What they failed to do

13  is inform the Court that the 2015 case was overruled in 2017.

14  So the criticisms, as they are, were the court's.  It has been

15  reversed.

16              The *Burst* case, I want to start off with -- and

17  I'm going to get into my argument that I planned for

18  seven minutes, but I'm assuming it will be a little longer, as

19  my opponent's was.

20          THE COURT:  Well, causation I anticipated would take

21  a long time.

22          MR. MICELI:  Thank you.  Thank you, Your Honor.

23              The *Burst* case is easy to distinguish from this

24  case.  The *Burst* case is a benzene case.  It involves a

25  gentleman that worked in a car garage, and he was trying to

12:14

1    relate the benzene exposure in gasoline to his AML leukemia.

2            THE COURT:  Right.

3            MR. MICELI:  The court there said, look, there are a

4    lot of solvents that are in a shop.  You're ripping apart

5    brakes.  There's oil changes.  There's other fluids.  There's

6    other exposures.  In that case the expert that they tried to

7    put forward looked at all these different exposures to

8    different chemicals and said this is the one.

9            We don't have that here.  One thing that *Burst*

10   does not have that we have the benefit of in this case is that

11   we have two randomized controlled trials that, as the Court

12   correctly pointed out, distinguishes one difference between the

13   two populations, Taxotere and fluorouracil.  I practiced that,

14   Your Honor.

15           THE COURT:  Well, I got as far as Taxotere that I

16   can --

17           MR. MICELI:  Right.  So we have a randomized

18   controlled trial, and the key word there is randomization.

19   When you put two populations and compared them one against the

20   other, the only difference was one got T and one got F and

21   that's it.

22           Now, Mr. Strongman says, well, we don't know

23   what the background rate is because it's against another

24   comparator.  Well, it's unethical.  Sanofi's own witnesses say

25   you cannot take a study and do one and give one person

12:15

1    chemotherapy and one person nothing when they have cancer.

2    That is simply unethical.  So the best evidence is this

3    randomized controlled trial T against F and that's it.

4            So with the benzene cases -- and there's a

5    number of them that they cite in their brief.  It's like

6    benzene on parade, I think.  It's a very different chemical.

7    It's a toxic tort case where people are exposed to a multitude

8    of chemicals in a noncontrolled setting, and then their expert

9    comes in and says, "I'm going to lump all toxic substance A

10   through Z together.  I'm going to say because these toxic

11   substances cause problems, my opinion is benzene -- the one in

12   the gasoline, not the benzene in these three others -- caused

13   this person's injury."  That's 180 degrees from what we have in

14   this case.  We have a controlled study that isolates two

15   variables, Taxotere and fluorouracil, and that's why it's

16   important.

17           Mr. Strongman points out the TAX316 is not

18   statistically significant standing alone, neither is TAX301,

19   the GEICAM study, but it's appropriate -- and I'm going to jump

20   around in my presentation.  I apologize, but I feel I need to

21   address these things right up front.

22           This screen, Your Honor, summarizes when it's

23   most appropriate to do a meta-analysis.  That first bullet

24   point, "Meta-analysis is most appropriate when used in pooling

25   randomized experimental trials because the studies included in

1   the meta-analysis share the most significant methodological

2   characteristics, in particular, use of randomized assignment of

3   subjects to different exposure groups," that is exactly what we

4   are dealing with here, precisely what we are dealing with.

5           When I talked to the clinical trial manager,

6   Ms. Kim Bassi, we compared the TAX301 and the TAX316 protocols.

7   They are virtually the same study.  One study measures the

8   effect of the drug, the safety and efficacy of the drug in

9   women who have node-positive early stage breast cancer; one is

10  node-negative.

11          Other than that, you have a population of women

12  who were randomized -- and, again, we went over this earlier

13  this morning when we talked about how the clinical authors

14  described -- the published authors on the TAX316 study, what

15  they say is that -- and I'm sorry, Your Honor, I didn't have it

16  in this PowerPoint, but I'm going to read to the Court again

17  that because patients who have been lost to follow-up is low --

18  roughly .5 percent per year in treatment group, which allows

19  for unbiased comparisons of both efficacy and safety -- there

20  is no doubt that this trial was not designed to try to hurt

21  women and try to take their hair from them.  It was designed in

22  order to see if this drug worked to help women's cancer not to

23  reoccur after they have had surgery to remove the cancer from

24  their body.

25          They predefined that they would track not just

12:19   1   alopecia, but whether or not alopecia was reversible.  This is

2   the statistical analysis plan that was done -- I may be

3   mistaken, Your Honor, but I think this is 2002.  It's in our

4   brief.

5          2002, before the follow-up period ever ended,

6   Sanofi decided -- and they committed to writing that the

7   reversibility of certain adverse events will be analyzed -- and

8   this is quoted out of a deposition so you see the line numbers,

9   Your Honor -- and the very first one listed is alopecia.  The

10   head statistician, the worldwide, global head of biostatistics

11   and data mining, Pierre Mancini, said yes.  He also said that

12   you would not be statistically analyzing the reversibility of

13   alopecia unless the adverse event was "long-standing,

14   persisting or permanent."  He agreed with that.

15          So they decided, Sanofi -- not the plaintiffs.

16   We didn't make this up.  Sanofi decided long before our clients

17   ever received Taxotere that they were going to study the

18   reversibility of this drug as it relates to alopecia -- excuse

19   me, the reversibility of alopecia.

20          So when you look at *Burst v. Shell Oil* that is

21   the unicycle that the defense is riding around today, it

22   doesn't stand.  It is a categorically different type study and

23   easily distinguishable from what you have before Your Honor.

24          Now, one of the other things, a big criticism

25   that they make, is that Dr. Madigan is not capable of providing

12:20

1  testimony in this case, and they quoted you to the *Abilify* MDL
2  decision where they said he was excluded from testifying.  He
3  was excluded, Your Honor, from giving medical testimony.
4  Thankfully, we are not asking him to give medical testimony in
5  this case, and there's no reason for the Court to consider it.
6  There's no reason for an order to issue excluding his ability
7  to offer medical opinion because he is not giving medical
8  opinion.

9          If you read what Mr. Strongman quoted from, that
10  "Dr. Madigan is a man of statistics, not medicine.  He is not a
11  medical doctor, toxicologist, pharmacologist, or psychologist.
12  He also has no specialized knowledge of or clinical
13  experience," and it goes on, but what they didn't put on that
14  screen is the next two pages of this opinion that begins
15  thusly:

16          "Nevertheless, the Court finds Dr. Madigan amply
17  qualified to offer a biostatistical analysis of the evidence in
18  this case, as well as opinions related to pharmacovigilance and
19  clinical trials generally, as his credentials in this field are
20  well beyond reasonable challenge."

21          He did exactly in the *Abilify* MDL what we are
22  asking him to do here, a FAERS database.  The *Abilify* court
23  endorses him to do that.  He does an analysis of internal
24  pharmacovigilance databases.  The *Abilify* court said
25  Dr. Madigan is perfectly qualified to do that, to look at

12:22

1   clinical trials and to do a meta-analysis.  He is perfectly

2   qualified to do that, and that's exactly what we are asking him

3   to do here.

4           The challenge that is somehow offered in the

5   selection of two witnesses for this motion -- there's motions

6   against Dr. Feigal individually and there's motions against

7   Dr. Madigan individually.  This motion we see as a second bite

8   at the apple, and they are asking to look at them again.  Well,

9   they have been looked at by other courts and they found it to

10  be valid.

11          Now, Dr. Madigan certainly has testified in his

12  deposition that individual case reports in and of themselves

13  are not particularly helpful, but he does state that they point

14  in the same direction as the randomized controlled trials that

15  when you do a meta-analysis yields a statistically significant

16  result.  That is what a statistician does.

17          We have already looked at what the reference

18  manual says on pooling studies.  It's not uncommon for studies

19  that are powered for safety -- which you want a share of safety

20  in 20, 30, 40 percent of the people that use it -- need fewer

21  people than to demonstrate a risk that is going to be seen in

22  4.2, 3.9, 6.1.  There's various numbers that pop up in this

23  case.  You have to combine well-designed, well-controlled

24  clinical trials that standing alone are not statistically

25  significant are given the power to see the true result.

12:24

1        The other criticism about case reports,

2  Dr. Kopreski -- who we believe whose analysis needs to be

3  excluded and doesn't need to be relied upon by other experts --

4  he agreed that when you see case reports in groups as small as

5  five and six, that can be a trend.  Case reports are on the

6  lower rung of the hierarchy --

7        **THE COURT:**  Right.

8        **MR. MICELI:**  -- but, Your Honor, they are not to be

9  thrown away.  As an example, if I were to give you a quarter

10 today, would you call yourself rich?  No.  But if I filled this

11 room with quarters, would you be rich?  Yes, you would.  That's

12 the way that adverse event reports work.  That's why you do a

13 disproportionality analysis.

14       Dr. Madigan explained the limitations of it, but

15 you look at the background rate of all other drugs and how many

16 get reported with this drug and you see the difference.  He

17 didn't do it just for Taxotere.  He did it for paclitaxel or

18 Taxol.  He did it for Adriamycin.  He did it for

19 cyclophosphamide.  He looked at the background rates of those

20 other drugs, and the only one that shows a consistent

21 disproportional rate of reporting, starting long before what

22 the defendants may stand up later and say is stimulated

23 reporting, has been consistent.  Patients that use Taxotere

24 disproportionately report permanent, irreversible alopecia.

25       Now, I've gotten off track a little bit with the

12:25

1    seven-minute presentation that I had planned this week coming

2    into today, but I do want to touch on a couple of other cases

3    that are in the defendants' brief because they cite them as if

4    they are actually supportive of their position when I believe

5    they are actually supportive of the plaintiffs' position for

6    the admission of Dr. Madigan and Dr. Feigal.

7              The *Wells v. SmithKline Beecham* case -- it's a

8    2009 case out of the district court in the Western District of

9    Texas -- in that particular case, the plaintiff offered a

10   disproportionality analysis internal to the company to

11   demonstrate general causation.  Dr. Madigan admits that his

12   disproportionality analysis does not prove general causation.

13   It's just another piece of evidence that points in the same

14   direction.

15             The same is true when the defendants cite to

16   *Meade v. Parsley*.  In that particular case, they cite it for

17   the proposition that we can't rely upon company documents in

18   order to establish general causation, which is simply nowhere

19   in the law.  What *Parsley* stands for is -- there was a

20   plaintiff who took a drug called metoclopramide, who then had a

21   doctor that said it might cause tardive dyskinesia --

22             **THE COURT:**  Right.

23             **MR. MICELI:**  -- an involuntary movement condition,

24   and that's it.  They couldn't say that it did cause it in this

25   person; it might cause it.  Then they said, "Well, if you look

12:27

1  at the label, the label has tardive dyskinesia in it as a

2  potential adverse effect so, therefore, that's how I'm going to

3  prove my general causation."

4          This case is categorically different.  We have

5  covered the waterfront with a toxicologist who discussed it,

6  Dr. Plunkett, whose oral argument was withdrawn but whose

7  motion is still before Your Honor.  We have a biostatistician

8  that has gone through various strands of evidence.

9          We have Dr. Feigal, who I haven't even really

10 addressed yet, but she goes through the same various strands of

11 evidence but from a different perspective.  When you look at

12 her perspective -- Your Honor has met Dr. Feigal.

13         I know it's not Science Day.  I'm not allowed to

14 say that, am I?

15         Dr. Feigal is actually a very unique person in

16 this case because she has experience in academia, she has

17 experience in industry as an executive medical officer, and she

18 has 12 years at the National Cancer Institute where she headed

19 up the largest division of that portion of the Institutes of

20 Health.  She controlled over a billion dollars in clinical

21 study funding and performed clinical studies.  She did the same

22 thing with the California Institute for Regenerative Medicine

23 except there it was about $4 billion worth of clinical trials

24 that she was overseeing.

25         She is uniquely qualified to render her opinions

12:28

1    in this case.  Without going into the granular detail, her

2    report sets out and the deposition sets out and our briefing

3    sets out the pains that she went to to go through various

4    strands of evidence.  It is precisely what other courts have

5    criticized experts for not doing.

6              The toxic torts are simply inapplicable because

7    they don't have the randomized controlled trials that we do.  I

8    can continue to talk about --

9         **THE COURT:**  I don't think we need to talk about the

10   qualifications of Dr. Madigan or Dr. Feigal.

11        **MR. MICELI:**  Thank you, Your Honor.  I have this one

12   screen here and I only put it up and I'm going to hit it from

13   about 30,000 feet, Your Honor.

14             They challenge methodology, lack of

15   qualifications -- we just discussed that and I don't need to go

16   through those -- and that the opinions are irrelevant and

17   unreliable.

18             Your Honor, the difference between saying that a

19   label says something and it says a word like "tardive

20   dyskinesia" proves general causation and an in-depth analysis

21   by a medical doctor internal at Sanofi that reviews the

22   clinical trial data, the worldwide pharmacovigilance database,

23   the medical literature, biologic plausibility evidence, and the

24   adverse events internal to the company and then comes to the

25   conclusion that there is reasonable evidence to establish a

12:30

1    causal association -- and those are terms of art that mean

2    general causation -- that it is reasonable evidence of a causal

3    association between Taxotere were her words -- not TAC,

4    Taxotere -- and permanent, irreversible alopecia, that's

5    Sanofi's employee's position.  Our experts have done their

6    individual thorough investigation and come to the same

7    conclusion and confirm it.

8              The fact that all compass points point north in

9    this -- their investigation points to it, our investigation

10   points to it, the research outside of Sanofi that is published,

11   the published medical literature points to it -- tells you that

12   north is where the needle is pointing and that's at Taxotere.

13             Thank you, Your Honor.

14        **THE COURT:**  Short, short, short.

15        **MR. STRONGMAN:**  I appreciate your indulgence,

16   Your Honor.

17             I do want to start with one clarification too.

18   Mr. Miceli indicated that the *Accutane* case was reversed.  If

19   you look at our slide, we actually cite the fact that while the

20   intermediate court did, it was ultimately affirmed by the

21   New Jersey Supreme Court.  It is good law, and Dr. Madigan was

22   roundly criticized in that case.

23             A couple of other points.  Mr. Miceli used the

24   analysis about quarters in the courtroom and if you got enough

25   of them you would be rich.  The problem with that is that it

12:32

1   ignores the Fifth Circuit law.  Fifth Circuit law is

2   straightforward.  Again, it's cited by Judge Vance:

3   "Case reports, which anecdotally describe an

4   occurrence, often on an individual basis, cannot establish

5   general causation 'because they simply describe reported

6   phenomena without comparison to the rate at which the phenomena

7   occur in the general population or in a defined control group;

8   do not isolate and exclude potentially alternative causes; and

9   do not investigate or explain the mechanism of causation.'"

10   Case reports don't cut it.  What we know is that

11   at the end of the day, the TAX clinical studies were not

12   statistically significant.  Mr. Miceli doesn't dispute that.

13   Dr. Madigan doesn't dispute that.  Instead, he says he put them

14   together and that's reliable.  I challenge the plaintiffs to

15   point to a case that says you can create statistical

16   significance out of whole cloth by putting two statistically

17   insignificant results together.  It doesn't exist, and we cite

18   law to the contrary in our briefs, including the *Zoloft* case.

19   With regard to the second bite at the apple, I

20   want to make clear what we are doing here, why the framework of

21   our motions exists the way it does.

22   **THE COURT:**  Actually, I wondered about that myself,

23   to be honest.

24   **MR. STRONGMAN:**  When you read Dr. Madigan's report --

25   which I'm sure you will or have -- he is offering opinions on

12:33

1  safety signals.  We filed a motion attacking Dr. Madigan's

2  opinion on safety signals.

3             When you read Dr. Feigal's report, she is

4  offering general oncology opinions and opinions about the

5  informed consent process, so we filed a motion attacking her

6  informed consent opinions.

7             When you read their reports, you do not see

8  opinions about general causation.  So when we went and took

9  depositions of all of these witnesses, we asked them:

10             "Are you the general causation expert?"

11             "Are you the general causation expert?"

12             "No."

13             "No."

14             "No."

15             Dr. Kessler:  "No."

16             The only two that said yes were Dr. Madigan and

17  Dr. Feigal, so that's why we had to attack them in a general

18  causation brief.

19             The plaintiffs, in essence, are trying to patch

20  together something that they didn't put forward in the four

21  corners of their report to begin with, and it's simply not

22  enough.

23             Thank you.

24        **THE COURT:**  Thank you.

25             Mr. Miceli and Mr. Strongman, can I get y'all to

12:34

1   come up here because I don't want to have 18 people.

2               (Off the record.)

3               **THE COURT:**  Okay.  We are going to continue the

4   specific causation argument to the same date as we are doing

5   the preemption argument, and that is what day?  That's what I

6   just talked to Mr. Strongman and -- those people, I think, that

7   were arguing that will be available.  I'm just a bit

8   distracted.  We will argue the specific causation on the same

9   date as we do the preemption.

10               I am still going to meet with the trial team

11   after this.  I just didn't want to bring 50 people up here to

12   have this conversation.  So we are done for today except those

13   members of liaison counsel and trial team.

14               Court is adjourned.  We will have that argument

15   on that date.  Since we will be returning to argue preemption,

16   we can do specific causation at that time.

17               **THE DEPUTY CLERK:**  All rise.

18             (Proceedings adjourned.)

19                              * * *

20

21

22

23

24

25

1    **<u>CERTIFICATE</u>**

2         I, Toni Doyle Tusa, CCR, FCRR, Official Court

3    Reporter for the United States District Court, Eastern District

4    of Louisiana, certify that the foregoing is a true and correct

5    transcript, to the best of my ability and understanding, from

6    the record of proceedings in the above-entitled matter.

7

8

9                          */s/ Toni Doyle Tusa*
                          Toni Doyle Tusa, CCR, FCRR
10                         Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25