UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)          MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

SECTION "H" (5)

**THIS DOCUMENT RELATES TO:**
Barbara Earnest, Case No. 2:16-cv-17144.

SANOFI'S OPPOSITION TO PLAINTIFF'S MOTION *IN LIMINE* NO. 2
TO EXCLUDE EVIDENCE OF HEALTHCARE COSTS AND INSURANCE
<u>AS A COLLATERAL SOURCE</u>

Plaintiff seeks to exclude evidence of certain healthcare costs associated with her care and treatment for breast cancer, persisting alopecia, and mental health care under Louisiana's collateral source rule. While Sanofi does not intend to present evidence that runs counter to Louisiana law on this issue[1]—*e.g.*, evidence of healthcare costs paid by a true collateral source, such as medical insurance or Medicaid—evidence of an *attorney's* payment of his client's medical bills is not protected under the rule.[2] *See Vaughn v. Progressive Security Ins. Co.*, 896 So.2d 1207, 1215 (La. App. 3d Cir. Mar. 2, 2005). Moreover, evidence of an attorney's involvement in the payment of such costs is relevant and admissible on the issue of bias. *See Rogers v. Crosby Tugs, Inc.*, No. Civ. A. 11-2453, 2016 WL 9406114, at *1 (E.D. La. Jan. 22, 2016) (citing *Butler v. Rigsby*, No. Civ. A. 96-2453, 1998 WL 164857, *2 (E.D. La. Apr. 7, 1998); *Woodard v. Diamond Offshore Drilling, Inc.*, No. Civ. A. 99-1661, 2000 WL 275797, *1 (E.D. La. Mar. 9, 2000) (citing *United

---

[1] *See Bozeman v. State*, 879 So. 2d 692, 699 (La. 2004).

[2] Should Plaintiff assert that she could not afford medical care related to her alopecia or mental health, Sanofi reserves the right to introduce evidence of Plaintiff's health insurance coverage. *See, e.g.*, *Lawson v. Trowbridge*, 153 F.3d 368, 380 (7th Cir. 1998) (recognizing that direct examination testimony of "financial weakness" puts that matter at issue in the trial) (citing *Kroning v. State Farm Automobile Ins., Co.*, 567 N.W.2d 42, 46 (Minn. 1997) ("when a plaintiff, through either the use of misleading statements or outright false statements, falsely conveys to the jury that he or she is destitute or in dire financial straits, the admission of evidence of collateral source payments received by the plaintiff is permitted.").

1

*States v. Abel*, 105 S. Ct. 465, 466 (1984)).  As such, the Court should deny Plaintiff's Motion to permit the introduction of evidence that does not contravene Louisiana's collateral source rule.

      **A.    The Collateral Source Rule Does Not Apply to Healthcare Costs Paid By Plaintiff's Counsel For Plaintiff's Visits to Drs. Cole Claiborne, Antonella Tosti, Kevin Bianchini, and John Thompson.**

Plaintiff's case relies on two medical conclusions: (1) that she suffers from permanent alopecia, and (2) that she experiences significant emotional distress related to her hair loss. However, both conclusions were drawn by dermatologists and mental health professionals who have special financial relationships with Plaintiff's counsel.  Plaintiff never sought medical treatment for her persisting hair loss in the years following her chemotherapy treatment. Nor did Plaintiff seek any medical or mental health care for her alleged emotional distress. Indeed, the entirety of Plaintiff's alopecia and mental health care was organized and paid for by Plaintiff's counsel for the purpose of this litigation.

More specifically, on March 26 and April 9, 2018, Plaintiff attended appointments with Dr. Cole Claiborne for a scalp biopsy.[3]  Plaintiff's appointments with Dr. Claiborne were coordinated, scheduled, and paid for by her attorneys—not at the recommendation of her oncologist or treating physician.[4]  Indeed, Plaintiff had no idea why she was receiving a biopsy during her visit with Dr. Claiborne.[5]  Approximately two months after her biopsy, Plaintiff flew

---

[3]  B. Earnest Dep. at 45:1-8 (Nov. 5, 2018) ("Q. On how many occasions did you meet with Dr. Claiborne?  A. Twice, two.  Q. Are – were your visits on March 26th and April 9th of 2018 the only times you have met with or spoken to Claiborne?  A. Yes."); *id.* at 49:9-15 ("Q. What was your understanding of the reason you were going to see Dr. Claiborne? . . . [A.] Biopsy.")

[4]  *Id.* at 48:13-49:1 ("Q. Do you remember the notebook you kept of your medical appointments? A. Yes, ma'am.  Q. And do you remember writing 'for attorney' in connection with your appointment with Dr. Claiborne?  A. Yes, I did.  Q. And it was your understanding that your lawyer had directed you to go see Dr. Claiborne, correct? . . . [A.] Yes."); *id.* at 49:3-8 ("Q. None of your doctors referred you to Dr. Claiborne, correct? . . . No. No doctors referred me."); *id.* at 50:3-5 ("Q. Did you personally set up the appointment?  A. No.").

[5]  *Id.* at 49:17-25 ("Q. What do you understand the purpose of the biopsy to be?  A. I don't know. They didn't discuss that with me.  He did not tell me anything other than he was there to do a biopsy.  Q. So you don't know why the biopsy was taken?  A. No.").

with her husband to Miami, Florida to meet with Dr. Antonella Tosti (Plaintiff's expert dermatologist in this case).[6] Plaintiff was referred to Dr. Tosti, not by her treating physicians, but again by her attorneys who scheduled the appointment and paid for (1) Plaintiff and her husband to fly from New Orleans to Miami, (2) their hotel accommodations, and (3) costs associated with the hour-long appointment with Dr. Tosti.[7] Plaintiff received no other assessment or care for her persisting alopecia.

At the direction of her counsel, Plaintiff also attended an appointment with Dr. Kevin Bianchini, a psychologist.[8] Plaintiff's appointment with Dr. Bianchini lasted for three or four hours, during which time they discussed topics including Plaintiff's feelings about her hair loss.[9] Plaintiff was never billed for this appointment because all costs were paid by Plaintiff's counsel.[10]

---

[6] *Id.* at 67:19-68:9; 69:1-69:3 ("Q. How long did you meet with Tosti in June of 2018 on that single visit? A. Maybe an hour. . . . .Q. And did you meet with her in Miami? A. Yes. Q. In her office? A. Yes. It was a doctor's office, so I'm sure it's hers. Q. How did you get to Miami? A. Flew. . . . Q. Did you travel with someone down to Miami? A. My husband.").

[7] *Id.* at 68:10-68-19 ("Q. Did you pay for your plane ticket down there? A. Um, I guess it was set up through the lawyer's office. Q. So did you pay for your plane ticket down there? A. I didn't pay for it. Q. Do you think your attorneys paid for that? A. Yes"); *id.* at 69:17-70:15 (Q. Did any physician refer you to Dr. Tosti? A. No. Q. You were referred by your lawyers; correct? A. Yes. . . . Q. Did you set up the appointment – A. No. Q. – with Tosti? It's you understanding that your lawyer set that up? A. (Witness nods head). Yes."); *id.* at 77:20-78:14 ("Q. Have you ever received or do you remember if you provided Dr. Tosti with your insurance card? A. I don't remember. I don't think I did. Q. Have you ever received a bill from Dr. Tosti? A. No. Q. Have you ever seen an insurance claim form? A. No. Q. Come through related to that visit? A. No. Q. Do you expect to see any bill come through for that visit? . . . . [A]. No.").

[8] *Id.* at 85:24-87:2 ("Q. Do you know how you came to see Dr. Bianchini? . . . . [A] Through the lawyers. . . . Q. You weren't referred to him by a doctor, correct? A. No. Q. You were referred to him by your lawyers, correct? A. Yes. . . . Q. Did you set the appointment – A. No. Q. – with Dr. Bianchini? That was set up for you by your lawyers? A. Yes.").

[9] *Id.* at 88:5-9 ("Q. How long did you meet with Dr. Bianchini? A. Um, the first himself was about maybe three hours, three or four hours. I'm not sure of the exact time."); *id.* at 95:19-96:6 ("Q. Did you talk to Dr. Bianchini about anxiousness? . . . . [A.] I don't know. I talked to him about – like I say, I don't know how he interpreted what I was saying. If he – you know, he – All I know is that I tried to make him understand that it bothers me to go out in public with a turban on all the time.").

[10] *Id.* at 122:17-123:13 (Q. Have you received any bill from Dr. Bianchini? A. No. Q. Do you anticipate you're going to receive a bill from Dr. Bianchini? . . . [A.] No. Q. Is it your understanding that your lawyers are paying for the time you spent with Dr. Bianchini or for the visit? A. I guess. I don't know. Q. Well, if your lawyers referred you there and you

Similarly, Plaintiff met with Dr. John Thompson, a psychiatrist, at the request of her counsel.[11] Although her appointment with Dr. Thompson lasted for two or three hours, Plaintiff asserts that she doesn't know why her attorney instructed her to see a psychiatrist.[12] Plaintiff never independently sought mental health care related to her alleged emotional distress.

Any money paid by Plaintiff's counsel for Plaintiff's visits to Dr. Claiborne, Dr. Tosti, Dr. Bianchini, and Dr. Thompson (or any other medical treatment) is not protected under Louisiana's collateral source rule and is therefore admissible. *See Vaughn*, 896 So.2d at 1215 ("prepayment of medical expenses by [plaintiff's] attorney does not satisfy the collateral source rule" where there is no evidence to prove that Plaintiff was not obligated to reimburse her attorney for those expenses). Accordingly, Plaintiff's Motion *in Limine* should be denied to the extent it seeks to exclude evidence that counsel paid for Plaintiff's healthcare costs, including her visits to Dr. Tosti and Dr. Bianchini.

      **B.    Evidence That Plaintiff's Counsel Paid for Plaintiff's Healthcare Costs Is Also Admissible To Show Bias.**

Evidence of attorney involvement in the payment of Plaintiff's healthcare expenses is also admissible to show bias, regardless of whether it qualifies as collateral source evidence. *See Rogers*, 2016 WL 9406114 at *1 ("Evidence of a special relationship between an expert witness and legal counsel is relevant to demonstrate the possible bias of the expert witness. . . ."); *Woodard*, 2000 WL 275797 at *1 ("A party clearly has the right to inquire as to the bias or prejudice of any

---

    haven't gotten a bill, it is your assumption that your lawyers are going to be paying for that? . . . . [A.] I guess.").

[11] *Id.* at 129:17-19 ("Q. Did you also meet with Dr. John Thompson for your lawyers? A. Yes."); *id.* at 130:21-25 ("Q. You were referred to Dr. Thompson by your lawyers? A. Yes. Q. Not by a doctor, correct? A. Not by a doctor.").

[12] *Id.* at 131:19-132:1 ("Q. How long did you meet with Dr. Thompson, John Thompson, in March of 2018? A. Um I want to say two or three hours. I – I don't think it was that long like the others. Q. So do you think it was two to three hours? A. Yeah."); *id.* at 133:6-12 ("Q. And why do you think you were going to see a psychiatrist at the direction of your attorney? . . . [A.] I don't know.").

witness.") (citing *United States v. Abel*, 105 S. Ct. 465, 466 (1984) (holding that impeachment of a witness for purposes of establishing bias was permissible under the Federal Rules of Evidence)).[13]

Accordingly, evidence that counsel paid healthcare (and related) costs associated with Plaintiff's visits to Dr. Claiborne, Dr. Tosti, Dr. Bianchini, and Dr. Thompson are relevant to show these doctors' biases regarding their assessment of Plaintiff and the credibility of their opinions in this case. Indeed, the entirety of Plaintiff's alopecia care and mental health counseling in this case was directed and funded by her attorneys, and Sanofi should be allowed to introduce such evidence to the jury.

### C. Conclusion

For the foregoing reasons, the Court should deny Plaintiff's Motion *In Limine* No. 2 to the extent it seeks to exclude evidence of Plaintiff's counsel's payment of her healthcare costs.

Date: August 6, 2019

---

[13] Courts in this Circuit have recognized exceptions to Louisiana's collateral source rule in the past. *See Global Petrotech, Inc. v. Engelhard Corp.*, 58 F.3d 198, 202-203 (5th Cir. 1995) (holding that "the collateral source rule does not require in all circumstances that the collateral benefit (insurance) be excluded from the evidence introduced at trial."); *Savoie v. Otto Candies, Inc.*, 692 F.2d 363 (5th Cir. 1982) (admitting evidence of maintenance benefits made by the employer to the plaintiff to show the plaintiff's status as a seaman at the time of his injury); *Bozeman v. State*, 879 So.2d 692, 700 (jointly admitted evidence of collateral source payments showing the amount of plaintiff's medical bill written off by the heath care provider).

        Respectfully submitted,

/s/ *Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE URQUHART & MOORE LLC**
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: 504-310-2100
Facsimile: 504-310-2120
dmoore@irwinllc.com

Harley V. Ratliff
Adrienne L. Byard
Kelly Bieri
**SHOOK, HARDY& BACON L.L.P.**
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
Facsimile: 816-421-5547
hratliff@shb.com
abyard@shb.com
kbieri@shb.com

*Counsel for Sanofi-Aventis U.S. LLC and Sanofi U.S. Services Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on **August 6, 2019**, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

        /s/ *Douglas J. Moore*
        Douglas J. Moore