# EXHIBIT A

```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF LOUISIANA
 2
     IN RE:   TAXOTERE (DOCETAXEL)    MDL NO. 2740
 3   PRODUCTS LIABILITY LITIGATION   SECTION: H
 4   This document relates to:
     Antoinette Durden, Case No. 2:16-cv-16635
 5   Tanya Francis, Case No. 2:16-cv-17410
     Barbara Earnest, Case No. 2:16-cv-17144
 6   _____
     CONTINUING VIDEOTAPED EXPERT DEPOSITION
 7   CURTIS THOMPSON, M.D.
 8
     TAKEN IN BEHALF OF DEFENDANTS
 9   WEDNESDAY, APRIL 3, 2019
     at 8:35 A.M.
10
11
     5200 Meadows Drive
12   Lake Oswego, Oregon
13
14   BE IT REMEMBERED THAT, the continuing videotaped
     expert
15   deposition of CURTIS THOMPSON, M.D., was taken before
     K.M, Court Reporter and Notary Public for
16   the State of Oregon, on Wednesday, April 3, 2019,
     commencing at the hour of 8:35 a.m., the proceedings
17   being
     reported at 5200 Meadows Drive, Lake Oswego, Oregon.
18
19
20
21
22
23
24
25
```

1  nonspecific.  Like the Cytokeratin 15 is not a
2  definitive stem cell marker, and Ki-67 hits any cell
3  that's growing. And you use these and published with
4  the Cytokeratin 15 on other hair diseases, permanent
5  hair diseases.  So the interest was in seeing what
6  might be different in this disease than the other
7  diseases.
8         Unfortunately, we don't have, like, all
9  these investigational antibodies.  We -- like, 25
10 years ago we had two of them and we got more.  But
11 we don't have really good definitive antibodies.
12 And to date, even despite all the work I've done,
13 there's no antibody that has -- one of these non
14 FDA-approved antibodies that has utility in
15 diagnostics.
16      Q.   You would expect if a cell was dead, like
17 a stem cell, that the Ki-67 would test negative,
18 right?
19      A.   No.  Dead cells have antigens too, so they
20 can still stain.
21      Q.   They wouldn't be growing if they were
22 dead, would they?
23      A.   They could still have these antigens.
24 They could still have the molecule there so --
25      Q.   If a cell was not present, the Ki-67 would

1  test negative for that --
2        A.   If there's no cell there, it can't stain
3  with anything.  That is safe to say.
4        Q.   That would be true if there's no cell
5  there, the Ki-67 and the Cytokeratin 15 would test
6  negative for that cell?
7        A.   Yeah, because it's not there.
8        Q.   Okay.  So you did Cytokeratin 15 staining
9  and Ki-67 staining on Ms. Earnest, Ms. Francis, and
10 Ms. Durden's pathology, right?
11       A.   Yes.
12       Q.   So whose idea was it to do that staining?
13       A.   It was my idea.
14       Q.   So during your first deposition, we talked
15 about mechanisms of action.  Do you remember that?
16       A.   Vaguely, yes.
17       Q.   In your Rule 26 report, you attached a
18 list of literature that you reviewed.  Do you
19 remember that?
20       A.   Yes.
21       Q.   Some of the literature that you relied on
22 in forming your opinions has hypothesized that the
23 theoretical mechanism of action for why a
24 chemotherapy drug could potentially result in
25 persistent hair loss is that it kills the stem cell

1  in the bulge region of the hair follicle, right?
2       A.   Yes.
3       Q.   And, in fact, you've published on that as
4  well, haven't you?
5       A.   Speculated.  We don't know, unfortunately.
6  But yeah, we've speculated in a review article.
7       Q.   You speculated that the theoretical
8  mechanism of action for why a chemotherapy drug
9  might result in ongoing hair loss is that it would
10 kill the stem cell in the bulge region, right?
11      A.   In permanent hair loss, not -- yes, that
12 the cells die.
13           (Whereupon, Article Primary Scalp Alopecia
14 was marked as Exhibit 5 for identification.)
15 BY MR. SEARS:
16      Q.   We talked about this article before but
17 I'm going to mark it as Exhibit 5, an article that
18 you wrote called Primary Scalp Alopecia, New
19 Histopathological Tools, New Concepts and a
20 Practical Guide to Diagnosis.
21      A.   Yes.
22      Q.   And really what I want to focus on is page
23 57.4.  What you wrote is "Noncicatricial alopecia
24 cannot be considered as synonymous to reversible
25 hair loss. Permanent alopecia after chemotherapy is

1     A.    And I started reading.
2     Q.    Sure.  Here's really the point I'm trying
3  to make is what you're hypothesizing here, in this
4  paper that you wrote, is that the mechanism of
5  action -- the theoretical mechanism of action for
6  why a chemotherapy drug would result in ongoing hair
7  loss after the completion of chemotherapy is that
8  there would be some toxicity of the drug that would
9  harm the follicular stem cell, right?
10    A.    Yes.
11    Q.    I think you referred to earlier that
12 you've published on Cytokeratin 15?
13    A.    Several times -- a couple times.
14          (Whereupon, Article was marked as Exhibit
15 6 for identification.)
16 BY MR. SEARS:
17    Q.    So I'm handing you Exhibit 6 which is a
18 reply to Lack of Specificity of Cytokeratin 15 Loss
19 in Scarring Alopecia, and this is something that you
20 wrote along with -- I'm going to butcher this guy's
21 name but Athenos Kolivras.
22    A.    Kolivras, Athanassios.
23    Q.    Okay.  So on the bottom of the first giant
24 paragraph there's CK-15, which that stands for
25 Cytokeratin 15, right?

1          A.   Yes.
2          Q.   You write "CK-15 loss would also be seen
3     after direct toxicity on the follicular stem cells
4     as seen in permanent alopecia after chemotherapy."
5     Did I read that correctly?
6          A.   Yes.
7          Q.   So you're saying that you would expect to
8     see Cytokeratin 15 loss if the alopecia was caused
9     by the chemotherapy?
10              MR. THORNTON:  Objection; form.
11              THE WITNESS:  It's not possible to -- you
12     have to take this in the context of what this entire
13     reply to a letter that was written to a publication
14     that Dr. Kolivras and I did, which was subsequent to
15     the prior publication I did on Cytokeratin 15, loss
16     expression in a disease called lichen planopilaris.
17     And taking it in the context -- the response to the
18     letter to the publication was a discussion of
19     Cytokeratin 15 expression using immunohistochemistry
20     which is not FDA approved.  It doesn't have
21     specificity, and we're seeing loss in all of the
22     diseases.  And it's not something you can even say
23     this is a red light, green light.  This isn't, like,
24     it's there or it's not.  Because in a single biopsy
25     of normal scalp or of any of these group of

Page 425

1  possession. So I hadn't thought -- no.
2       Q.   Had you thought about doing stem cell
3  markers on any pathology that you ever had that you
4  thought was -- the alopecia was caused by
5  chemotherapy?
6            MR. THORNTON:  Objection; form.
7            THE WITNESS:  No, not to my knowledge.
8  BY MR. SEARS:
9       Q.   Did you have any discussions with Dr.
10 Tosti about what stem cell markers you were going to
11 use in testing the pathology?
12      A.   Not to my knowledge, I didn't.
13      Q.   Did you have discussions with her that you
14 were going to use Cytokeratin 15 with Ms. Earnest,
15 Ms. Francis, and Ms. Durden's pathology?
16      A.   I don't have any recollection of that.
17 Unless -- I don't think I sent it in an email, and
18 it wasn't one of our working research items.  We
19 have meetings on the phone, and so it's unlikely
20 that we talked about that.  I don't -- I don't have
21 any recollection of that.
22      Q.   Did you talk to Dr. Tosti about the
23 results of the Cytokeratin 15 and Ki-67 staining for
24 Ms. Francis, Ms. Durden, and Ms. Earnest?
25      A.   I think it was limited to the email.  She

Page 426

1  was cc'd on an email.
2      Q.  You never had any conversations outside of
3  email with her about --
4      A.  I don't believe so.
5      Q.  So we talked about how Anne Andrews was
6  cc'd on that email, right?
7      A.  We didn't, but is she?
8      Q.  She's cc'd on this email string, isn't
9  she?
10     A.  Yes.
11     Q.  And she's an attorney for plaintiff?
12     A.  Yes.
13     Q.  And so based upon this email, she knew
14 that Dr. Tosti proposed that there would be stem
15 cell marker testing on the pathology, right?
16         MR. THORNTON:  Objection; form.
17         THE WITNESS:  Yes.  Yes.
18 BY MR. SEARS:
19     Q.  So then, if we go up to the top of that
20 email, there's an email from Anne Andrews on
21 Wednesday, March 28, 2018 at 11:53 a.m.  Do you see
22 that?
23     A.  Yes.
24     Q.  And she writes "I'm traveling today and
25 tomorrow so hoping to touch base with you, with Dr.

Page 433

1  tried -- this is years ago, one called Nestin, and
2  it didn't work on control tissue at all.  So we
3  didn't even -- it was never stained on a single
4  specimen in any organized bigger study.
5       Q.   And Cytokeratin 15 works better for
6  staining system cells than Nestin?
7            MR. THORNTON:  Objection; form.
8            THE WITNESS:  I don't know.  I don't know.
9  BY MR. SEARS:
10      Q.   I think in your last answer you said you
11 decided to use Cytokeratin 15 because it works.  Did
12 I hear that?
13      A.   If you'll look in one of the emails that
14 we're probably going to go through or somewhere I
15 said I had tried Nestin before and it didn't work.
16 But this is -- when you buy these antibodies from
17 companies, you never know if they're really -- this
18 is non FDA-approved testing.  There's many companies
19 that make these antibodies that aren't doing a good
20 job, and they're not really what they say they are.
21           So you have to prove in your own lab with
22 internal controls that it's as billed that it's
23 doing what it's saying.  And the Nestin never made
24 it over that first hump.  So I have no idea whether
25 an antibody to Nestin -- I have no idea whether

1   there was even antibody in the specimen I bought.
2   But I did say in one email that we had only bought
3   it from one company, so I don't know.
4   BY MR. SEARS:
5       Q.   You decided to use the Cytokeratin 15
6   because it works?
7           MR. THORNTON:  Objection; form.
8           THE WITNESS:  Yes.
9   BY MR. SEARS:
10      Q.   So we talked about how Anne Andrews is on
11  these emails, so she knew that you were going to
12  test Ms. Francis, Ms. Earnest, and Ms. Durden's
13  pathology with the Cytokeratin 15, right?
14      A.   Yes.
15      Q.   Can you think of any other discussions
16  you've are had with anyone about the Cytokeratin 15
17  staining that we haven't talked about?
18      A.   No.
19           (Whereupon, Email dated 4-10-18 was marked
20  as Exhibit 9 for identification.)
21  BY MR. SEARS:
22      Q.   All right.  So I just handed you Exhibit
23  9, and it's an April 10, 2018 email that you sent to
24  Dr. Alexa Poole and Anne Andrews.  And the subject
25  is "The specimens have arrived..." -- and then it

1  BY MR. SEARS:
2      Q.   That's speculation on your part for why
3  Dr. Tosti would have included that suggestion that
4  you all do stem cell markers on the pathology, isn't
5  it?
6      A.   It's speculation, but it's true.
7      Q.   So the bottom line is Dr. Tosti suggested
8  that you all do stem cell markers on the pathology.
9  You did stem cell markers on the pathology and you
10 never communicated the results of that stem cell --
11     MR. THORNTON:  Objection; form.
12     THE WITNESS:  I think I did.  We have to
13 see the next email when I told everybody.  The
14 extent of it to her would have just said it has no
15 use.  This doesn't show anything.  That would have
16 been the limit of it.  Because she -- like I said,
17 she's not a dermatopathologist so I don't -- there's
18 not more to explain there to her.
19 BY MR. SEARS:
20     Q.   So you believe that Dr. Tosti knew that
21 the results of your Cytokeratin 15 and Ki-67
22 staining did not point in favor of -- in favor or
23 against ongoing alopecia after the completion of
24 chemotherapy?
25     MR. THORNTON:  Objection; form.

1             THE WITNESS:  Yes.
2             (Whereupon, Invoice 1 was marked as
3    Exhibit 11 for identification.)
4    BY MR. SEARS:
5        Q.   I'm handing you Exhibit 11, which is your
6    first invoice.  We talked about this last time but
7    you have all these entries about the
8    immunohistochemical staining for Cytokeratin 15 and
9    Ki-67 for Ms. Earnest, Ms. Francis, and Ms. Durden.
10   Do you see all that?
11       A.   Yes.
12       Q.   And then after you did all that staining
13   and you interpreted it, you had a call with Andrews,
14   Tosti, et cetera, on April 25th, 2018.  Do you see
15   that?
16       A.   Yes.
17       Q.   What was discussed during that telephone
18   call?
19       A.   I think they had already -- so this is
20   after I'd already signed off on all the reports.
21            THE VIDEOGRAPHER:  Excuse me, sir.
22            THE WITNESS:  I'm sorry.  Do you need it
23   higher?  Just don't touch it?
24            THE VIDEOGRAPHER:  No.  We just can't have
25   you touch the top of it.

Page 452

1  Q. When did it become clear to you that the
2  Cytokeratin 15 and Ki-67 staining for Ms. Earnest,
3  Ms. Francis, and Ms. Durden did not have utility?
4  A. As soon as I looked at them, and there's
5  an email on the day that I think I sent everybody.
6  Q. But before that, before you looked at
7  them, you thought that there might be some utility
8  in running those tests?
9  A. Well, it's all we have. And if you look
10 back at the publication that we were looking at the
11 letter response to, it was chalking up yet another
12 entity into the lack of utility of Cytokeratin 15.
13 It's not very often that you get six biopsies from
14 three patients on permanent chemotherapy-induced
15 alopecia, because these patients by and large don't
16 receive biopsies. It's the last thing they need is
17 more surgery after what they've been through. So
18 seeing six biopsies roll in the door all at once is
19 a nice provisional investigation, you know, it's
20 good material to do that with.
21 Q. So if I understand your answer, you
22 thought that, yes, there was some utility in running
23 the Cytokeratin 15 and Ki-67 staining for Ms.
24 Earnest, Ms. Francis and Ms. Durden?
25 A. Yeah. Well ---

1  research?
2         MR. THORNTON: Objection; form. I think
3  we've already had a ruling on this that the video is
4  work product. And so any discussion about that --
5  it's nothing that Dr. Thompson did or didn't do. So
6  -- and I think you've got an email that we have
7  disclosed that may get you there, but I'm going
8  instruct him not to answer the work product
9  protected area.
10 BY MR. SEARS:
11     Q. I understand you've been instructed not to
12 answer, but if that instruction was not there, would
13 you have information that you could provide?
14     A. No. It was mostly just to introduce a
15 stem cell researcher giving a lecture, if I
16 remember.
17     Q. So plaintiffs sent you a video about a
18 stem cell researcher giving a lecture?
19     A. Yes.
20        MR. THORNTON: Objection; form. And
21 objection, protected work product. Please don't
22 testify further about any of contents.
23        THE WITNESS: Okay.
24 BY MR. SEARS:
25     Q. So we talked earlier today about your

1  So that ship had sailed.  So I just wasn't going
2  back.
3  BY MR. SEARS:
4      Q.  As a researcher were you curious to see if
5  there would be any difference in the Cytokeratin 15
6  and Ki-67 staining with Ms. Tuyes versus Ms.
7  Francis, Ms. Durden, and Ms. Earnest?
8          MR. THORNTON:  Objection; form.
9          THE WITNESS:  Yeah, it would be
10 interesting, for sure.  I didn't think it was
11 prudent to do it in the context of legal expertise
12 work, legal expert work and spend money on any more
13 pilot study, provisional study.
14 BY MR. SEARS:
15     Q.  Did plaintiffs' attorney pay you to do the
16 Cytokeratin 15 and Ki-67 staining on Ms. Earnest,
17 Ms. Durden, and Ms. Francis?
18     A.  Yes.
19     Q.  I think you mentioned earlier that that's
20 expensive staining?
21     A.  It's very expensive because it's an
22 investigational antibody.  It's non FDA approved, so
23 when you buy these, as we've talked about, you have
24 to take them and do assessment of them in your own
25 laboratory before you put it on any tissue, like on

Page 468

1   these patients. So that's the biggest expense.
2       Q.   And obviously, I'm not a scientist or have
3   any ability to be a scientist and that's why I
4   became an attorney, but you as a scientist, when you
5   test something, don't you go into that test with
6   having a hypothesis?
7       A.   Yes.
8       Q.   And so here's what I'm trying to
9   understand, you've talked about how the Cytokeratin
10  15 and Ki-67 staining is expensive.  So what was
11  your hypothesis about what you were going to see
12  with that staining with Ms. Earnest, Ms. Francis,
13  and Ms. Durden?
14          MR. THORNTON:  Objection; form.
15          THE WITNESS:  The interest -- once again,
16  as I said before and is supported by the
17  publications that I have -- the research projects
18  that I've done and published on other diseases like
19  lichen planopilaris, and then the letter in 2017,
20  have a great interest in staining patterns of these
21  antibodies.  And I've done multiple projects where I
22  take a panel of antibodies and put them on tissue,
23  specifically trying to address diagnostic impasses.
24          So my interest isn't in basic, basic,
25  basic cell biology.  It's in identifying new

1      Q.    When you write "videos," does that make
2   you think there was more than one?
3      A.    Yeah, it does make me think more.
4      Q.    And then it goes on to say "Here are a few
5   points.  One, validation and testing of stem cells
6   on the biopsy samples, redaction, approach is
7   correct with validation of a test and then testing
8   the samples."  Is the redaction the name of the
9   researcher that's referred to in Invoice 3?
10     A.    Presumably, yes.
11     Q.    So when you say validation of a test, what
12  does that mean?
13     A.    It's what I said about when you buy, say,
14  these immunohistochemical antibodies because it's a
15  non FDA-approved test, the onus is on the laboratory
16  to use the antibody on tissue that has -- to show
17  that it really works as purported to.
18     Q.    And is that --
19     A.    So it's positive negative controls on
20  them.
21     Q.    Is that what this researcher did, they
22  validated the antibody to make sure it worked?
23           MR. THORNTON:  Objection.  You're asking
24  what a researcher did.  That has been ruled to be a
25  work product protected consultant.  So what the

1      A.   Yes.
2      Q.   -- Ms. Francis, and Ms. Earnest?
3      A.   Yes.
4      Q.   So the Cytokeratin 15 tested positive in
5   Ms. Earnest, Ms. Durden, and Ms. Francis' tissue?
6      A.   In these structures, yeah.  We use --
7      Q.   You wrote because it tested positive you
8   did not pursue this further, right?
9      A.   Yes.
10     Q.   If it tested negative, would've you
11  pursued it further?
12     A.   Yes.
13     Q.   Because it tested positive in Ms. Earnest,
14  Ms. Francis, and Ms. Durden, is that an indication
15  to you that their stem cells were not damaged?
16          MR. THORNTON:  Objection; form.
17          THE WITNESS:  No.  Because we're talking
18  about these basaloid bodies here.  And we don't --
19  there's a whole glob of these cells also called
20  telogen bodies, and they're not stem cells.  Maybe
21  one of them is.
22  BY MR. SEARS:
23     Q.   You talked about how if it did test
24  negative, you would have pursued it further.
25  Would've you pursued it further, then, because it

Page 498

1  person referred to in Invoice 5?
2       A.   No.
3       Q.   Did you have any emails with that person
4  referred to in Invoice 5?
5       A.   No.
6       Q.   So your sole contact with that person was
7  having your lab send that person the pathology?
8       A.   The glass slides, the H&E glass slides.
9  Yes.
10      Q.   So we initially took your deposition -- I
11 think it was on November 30, 2018.  Do you recall
12 that?
13      A.   Yes.
14      Q.   And during that deposition, you did not
15 mention that you ran Cytokeratin 15 or Ki-67
16 staining on the pathology for Ms. Earnest, Francis,
17 or Durden, right?
18      A.   Correct.  Yes.
19      Q.   And you also didn't mention during that
20 deposition that there's existence of additional
21 pathology material that had not been provided to the
22 defense, right?
23      A.   I did not.  No, I didn't.
24      Q.   And then you were deposed again on
25 February 26, 2019, about your invoices.  Do you