# EXHIBIT I

**In re: Taxotere (Docetaxel) Products Liability Litigation**
**(MDL No. 2740)**
**Expert Report of Gerald Miletello, M.D.**
**December 14, 2018**

### INTRODUCTION

I have been asked to apply my clinical experience, along with the medical literature, to offer opinions on the patient counseling, patient treatment options, and prescribing decision for Ms. Durden, Ms. Francis, and Ms. Earnest, three women who claim alopecia after treatment with multiple chemotherapeutic drugs, including Taxotere. I have also been asked to provide my opinions with respect to plaintiff's expert reports addressing these issues for each woman, as well as with respect to chemotherapy and breast cancer patients generally. I have treated over a thousand women with breast cancer in my career and I am familiar with alopecia in women treated with chemotherapy.

All of my opinions expressed in this report are stated to a reasonable medical probability and are based on my review of the relevant literature, my education, training, and decades of experience as a practicing medical oncologist.

My *Curriculum Vitae*, which lists my publications for over the last 10 years, is attached as **Exhibit A**. A list of my deposition and trial testimony for the last four years is attached as **Exhibit B**. My hourly rate is $750 per hour. My compensation is not contingent on the opinions expressed in this report or the outcome of this litigation.

### EDUCATION AND PROFESSIONAL BACKGROUND

I am a medical oncologist at Hematology/Oncology Clinic, LLC in Baton Rouge, Louisiana. My clinical practice, for nearly 35 years, has been the treatment of breast, lung, colon, and other cancers, including multiple myeloma, melanoma, renal cell cancer, and lymphoma.

I received a Bachelor of Science degree from Louisiana State University in 1975, and I earned an M.D. from LSU Medical School in 1979. Following medical school, I completed an internship at Earl K. Long Hospital in Baton Rouge. Following my internship, I completed a residency in internal medicine. I then completed a two-year fellowship in oncology at Louisiana State University Medical School. I am board-certified in internal medicine and medical oncology.

### REVIEW AND OPINIONS

**Materials Reviewed**

I have reviewed the medical records, photographs, discovery responses, and deposition transcripts set forth in **Exhibit C**, as well as the pertinent medical and scientific literature indicated there.

I. **Summary of Cancer Diagnosis, Treatment, and Clinical History for Antoinette Durden, Tanya Francis, and Barbara Earnest**

A. **Antoinette Durden**

Ms. Antoinette Durden is a 68-year-old post-menopausal African American female with obesity,

high blood pressure, and heart murmur, with additional medical history that I discuss where pertinent below.

Diagnosed with breast cancer in 2011 when she was 60 years old, Ms. Durden had left breast ductal carcinoma measuring 2.5 cm, was ER+, PR+, and HER2-, and had one lymph node that tested positive for cancer. Ms. Durden needed surgery and chemotherapy for her cancer. Considering her family history and high risk of breast cancer,[i] and seeking to eliminate the possibility that cancer would develop in her right breast, Ms. Durden elected to have a prophylactic right mastectomy in addition to a left simple mastectomy because she did not want to worry about the cancer coming back.[ii]

Following surgery, Ms. Durden received TC every 21 days for six cycles.

After chemotherapy, Dr. Jancich prescribed endocrine therapy with letrozole beginning on February 23, 2012.[iii] Ms. Durden took letrozole for more than 5 years, ending on April 21, 2017.[iv]

### B. Tanya Francis

Ms. Tanya Francis is a 46-year-old African American female. In July 2005, one of Tanya Francis's physicians discovered a lump in her breast. The doctor who discovered the lump recommended that Ms. Francis follow-up with her primary care physician to have the lump examined. Approximately 3 ½ years later, when she was 38-years old, Ms. Francis was diagnosed with a lobular carcinoma in her left breast on March 17, 2009. The tumor measured 2 cm. Ms. Francis' cancer was ER+, PR+ and HER2-. She had one positive lymph node. Before undergoing chemotherapy, Ms. Francis had surgery. She was given the option between a lumpectomy and mastectomy and opted for a mastectomy. In her deposition, she noted that, "I'd prefer to lose a breast than my life."[v]

After surgery, her medical oncologist prescribed 6 cycles of TAC every 21 days (which was endorsed by the Tumor Board) starting on July 22, 2009.

Based on her estrogen and progesterone positive status, on November 18, 2009, Ms. Francis started Tamoxifen.[vi] Ms. Francis's morbid obesity, hypertension, lipid abnormalities, and pre-diabetes culminated in diagnosis of metabolic syndrome. She underwent a total hysterectomy in 2012, which created a post-menopausal state. In July 2012, Ms. Francis saw her oncologist, Dr. Collins-Burrow, for a follow-up appointment and discussed her recent hysterectomy. It was determined she would stop taking Tamoxifen, as she had been surgically rendered postmenopausal, and instead would begin Arimidex daily.[vii] After five years on hormone therapy, Ms. Francis discussed the risks and benefits of continuing hormone therapy with her oncologist and opted to continue hormone therapy to lower the risk of recurrence.[viii]

### C. Barbara Earnest

Mrs. Barbara Earnest is a 68-year-old Caucasian female with morbid obesity, and pre-diabetes. She has a strong family history of diabetes and coronary artery disease in first and second-generation family members.

In 2011 at 60 years old, Ms. Earnest was diagnosed with invasive ductal breast cancer, which was ER+, PR+, and HER2-. She had a lumpectomy on March 10, 2011. One lymph node tested positive for cancer.

After surgery, her medical oncologist, Dr. James Carinder, prescribed four cycles of dose-dense doxorubicin and cyclophosphamide, followed by four cycles of docetaxel given every 21 days.[ix] Ms. Earnest lost her hair shortly after her second infusion with A/C (doxorubicin and cyclophosphamide) – before ever taking docetaxel.

After A/C, Ms. Earnest received docetaxel every three weeks for four cycles. The labeled dosage for docetaxel is 75 mg/m2. Thus, as labeled, Ms. Earnest would have been administered a dose of 156-159mg per cycle (her weight fluctuated during treatment between 239-248.5lbs, changing her total body surface area and dosing accordingly). However, as prescribed, Ms. Earnest was administered 210mg a cycle of docetaxel. Her total cumulative dose of docetaxel was 840mg. Ms. Earnest was given a higher dose of docetaxel than is labeled.

Following chemotherapy, between October 3, 2011 and November 21, 2011, Ms. Earnest underwent 33 radiation treatments to the breast.[x] She then starting in November 2011 took an estrogen-modulating therapy, Arimidex, because her cancer was hormone positive.[xi,xii] She will continue with this therapy, as planned, for 10 years.[xiii]

## II.   <u>Breast Cancer: The Initial Consultations</u>

I am a medical oncologist with over three decades of experience treating breast cancer patients. Being a medical oncologist means that the patient's first appointment with me is usually with biopsy results in hand, but before surgery. By that point, the patient has already been through a difficult pass.

Many women suspect they have breast cancer because they (or their doctor) detect a lump or mass in their breast that feels different from surrounding tissue. She may have experienced other symptoms including changes in the breast or nipple, such as peeling, flaking, or discharge. She will have undergone an MRI, and a biopsy, and then, after multiple medical appointments about whether she has breast cancer, she arrives to me at my office.

At that moment, the patient knows from her biopsy that she has breast cancer. When I first meet with the patient, we know the hormone status of her cancer and whether it is HER2+ or HER2-. We do not yet know definitively the cancer's size, lymph node involvement, or if it has metastasized, but we do generally have a good idea about the cancer's stage and course of treatment. I am the filter for her fear of the situation. The point of emphasis is on making appropriate treatment-related decisions, which requires managing the patient's fears. Complimentary, though, coming to those decisions will help moderate the fear.

Cancer is a collection of diseases involving the uncontrolled growth of a single cell. Breast cancer is the single most common cancer among U.S. women. One in every eight women (12%) will face breast cancer in her lifetime. This is a risk for women of any age, but the strongest risk factor for breast cancer *is age*, with diagnosis most common at age 61. Factors increase a women's risk for breast cancer, including: family history of breast cancer, reproductive history, environmental factors (smoking, chemicals), hormonal changes, prior history of breast cancer, and previous radiation therapy to the chest or breast areas.

Approximately 55,000 women will die each year from this disease. This is a number larger than the population of Thibodaux, Gretna, and Mandeville combined. It is my job to identify and recommend the single most effective weapon against her breast cancer. I counsel the patient about the treatment plan and next steps in her treatment. I advise her about survival outcomes—with or without chemotherapy. No one campaigns for chemotherapy, but medical oncologists

look to save lives and chemotherapy does that.

Before the 1950s, a cancer diagnosis was considered a death sentence. Overall survival rates rested under 30%. Death rates remained nearly unchanged for 40 years until 1995. Treatment options and earlier detection, with patient education, have improved survival. Over 80% of women will survive 10-years after a breast cancer diagnosis and 90% will survive 5-years after finding out they have cancer of the breast.

The primary goal when treating breast cancer is effectiveness, cure, and survival. While side effects are taken into account, they are secondary to the primary considerations. This is in part because if the breast cancer recurs, the survival rates diminish significantly. Once the cancer returns, the five-year survival rate is approximately 16% and the 10-year survival rate is approximately 6%. Because of this, I reassure the patient that her chance of recurrence and death decreases dramatically if she takes chemotherapy in an adjuvant setting.

As a medical oncologist, what is most paramount is the overall survival and disease free survival benefits that I can offer my patients. Side effects are also important to the long-term quality of life survival offers them, but it is only once they survive that the side effects begin to matter. Make no mistake, side effects matter, but some side effects are not on the same level as the question of saving the patient's life. I would not recommend that a patient take a less effective chemotherapy regimen due to potential appearance-related side effects. The primary goal of chemotherapy is to improve survival rates.

I counsel the patient about the benefits and risks of chemotherapy before making a recommendation for her chemotherapy. We cannot warn a patient of all potential chemotherapy side effects. A clinician must decide of which side effects to warn. The focus is usually on life-threatening side effects and regular or common side effects. Unless the side effect is life threating, clinicians do not warn of rare effects. Clinicians do not warn of side effects not proven to occur.

After surgery, I again meet to counsel the patient. By then, we know about involvement of lymph nodes, tumor size, and if the cancer has metastasized. I finalize my chemotherapy recommendation for the adjuvant setting and again discuss the potential benefits and risks. In the majority of circumstances, the patient accepts my recommended treatment plan.

My experience and opinions also span patient reactions to cancer diagnosis, discussions with patients regarding treatment and side effects, and the patient decision-making processes. Based on my clinical practice, survival is the central priority for women who are diagnosed with breast cancer. Initial reactions range from disbelief and grief to sorrow and anger. The reaction is normal, not unexpected, and "healthy." They reflect on the needs of their children, partners, and loved ones almost immediately. Their very distant, secondary concern is side effects.

Women often, with their doctors, elect treatments with appearance-related impacts, such as prophylactic bilateral mastectomy where the data does not support an overall survival rate increase compared to significant risks. Nevertheless, women sometimes opt for that procedure for peace of mind, consistent with the primary focus of treatment being on survival.

## III.   **Treatment Options in Chemotherapy**

With considerations of surgery and radiation, chemotherapy is a third component of breast cancer treatment. Chemotherapy arrests the disease-producing cells. Chemotherapy can be given as a single agent or multi-drug regimen. The vast majority of breast cancer patients need

4

chemotherapy. There has been an evolution over time of the chemotherapy regimens to treat breast cancer as new drugs become available through clinical trials showing improved efficacy and acceptable side effect profile. Currently, taxane-containing regimens are the most effective adjuvant chemotherapy regimens.

## A.  The Role of NCCN Guidelines in the Oncologist's Prescribing Decision

The National Comprehensive Cancer Network (NCCN) consists of 27 cancer centers across the United States. The NCCN issues recommendations for adjuvant breast cancer chemotherapy regimens based on breast cancer tumor markers. The guidelines change over time as new clinical trial data becomes available and include "preferred" and non-preferred, "other" regimens. Taxane containing regimens are listed under the preferred regimens. This is because they are more effective than the "other" regimens. While numerous regimens are listed in the NCCN guidelines, many of those regimens are included for insurance coverage purposes. Those regimens are not the standard of care. Only taxane-containing regimens are the standard of care for adjuvant breast cancer chemotherapy regimens.

Lower overall survival rates are seen with the older non-taxane containing regimens, including CMF, FEC and AC. Because it diminishes her overall survival chances, I do not at the outset recommend that a woman take a non-taxane containing chemotherapy regimen, absent strong patient-specific considerations.

Mammaprint and Oncotype DX tests have only very recently been used to help assess whether very low risk breast cancer patients may benefit from adjuvant chemotherapy. They remain limited in use to a very small subset of breast cancer patients and are no substitute for the clinical judgment of a medical oncologist.

For Antoinette Durden, she was given the NCCN-preferred TC regimen as prescribed by Dr. Jancich. TC was a NCCN-preferred regimen in 2011, and remains a NCCN-preferred regimen today.[xiv] The other two options each consist of dose-dense Adriamycin and Cytoxan ("AC") followed by Taxol.[xv] In 2011, TC was the only NCCN-preferred regimen for treatment of HER2-negative breast cancer that did not include Adriamycin. Even today, TC remains the only available, effective regimen for a patient like Ms. Durden who refuses Adriamycin or who should not have Adriamycin.

TC has a well-established overall survival benefit compared with AC.[xvi] AC, in turn, has both proven survival benefits and a more favorable side effect profile than older generation treatment regimens like CMF (cyclophosphamide, methotrexate, and 5-fluoorouracil).

Ms. Francis was also given a regimen that was NCCN preferred at the time it was prescribed to her in 2009: TAC. As with TC versus AC, TAC has a survival advantage over AC. AC followed by Taxotere was not among the NCCN preferred regimens at the time it was prescribed to Ms. Earnest in 2011.

## B.  Weighing the Benefits and Risks of Various Chemotherapy Options Depending on the Patient's Breast Cancer Type and Staging, Along with Her Relevant Medical History

For chemotherapy regimens in HER2- breast cancer, my preferred chemotherapy regimen is TC (Taxotere, Cyclophosphamide). Some doctors use the AC-T (Adriamycin and Cyclophosphamide followed by Taxol) regimen for HER2- breast cancer. While both regimens have similar efficacy,

I prefer the TC regimen because of the risk profile associated with AC-T. Women who are obese, pre-diabetic, diabetic, or have heart issues should not be given Taxol-containing regimens because they put them at risk of neuropathy and cardiac toxicity. Most crucially, because the AC-T regimen contains Adriamycin, it carries potentially fatal cardiac toxicity[xvii] and leukemia side effects. The risk of cardiac toxicity is increased in patients of advanced age or those with a prior history of heart disease, and it may not appear until decades after treatment has ended. For these reasons and because of its color, Adriamycin is often called the "red devil" or "red death." These risks of cardiac toxicity and leukemia are not present with the TC regimen.

Taxol and Taxotere are both taxanes, but they are not the same. Taxotere-containing regimens can offer benefits over Taxol-containing regimens. They are prescribed for different patients in different situations depending on various clinical considerations. Chemotherapy regimens come out of clinical trial studies, making it unusual to substitute one drug for another within any well-studied chemotherapy regimen. If an Adriamycin-containing regimen is used, I prefer the TAC (Taxotere, Adriamycin, Cyclophosphamide) regimen over AC-T for various reasons:

First, Taxol has a higher risk of neuropathy than Taxotere. Both Taxotere and Taxol are mitotic chemotherapy medication. But the risk of neuropathy is lower with Taxotere than Taxol. TAC reduces a patient's risk of neuropathy. Neuropathy is a side effect of chemotherapy. Neuropathy can be permanent. Neuropathy occurs in approximately 20% of patients who receive Taxol. Further, for patients that are diabetic and already at an increased risk of neuropathy, Taxol is not preferred. Because Taxol has higher rates of neuropathy than Taxotere, diabetics and pre-diabetics generally or often should not be given Taxol.

Second, Taxol and Adriamycin are not given at the same time. Taxotere can be administered concurrently (at the same time) with Adriamycin. Taxol cannot because the co-administration with Adriamycin increases cardiotoxicity. Thus, the patient receives Adriamycin and Cyclophosphamide cycles first, followed by Taxol. As discussed below, cardiac complications during the AC cycles can delay or preclude administration of the taxane.

Third, Taxol and Taxotere-containing regimens (AC-T v TAC) are also given on different dosing schedules. A patient must only go in for TAC every three weeks, whereas a patient on must be seen to undergo chemotherapy weekly with AC-T. Undergoing chemotherapy less frequently with larger breaks for recovery translates into a better quality of life for my patients during treatment. Medically, one problem with weekly therapy is patients receiving more corticosteroids associated with toxicities such as sleep disturbances, allergic reactions, delirium, immune suppression and infections, weakness, psychosis, stomach ulcers and gastritis, elevated blood pressure/blood sugar, and osteoporosis. Consequently, treatment every three weeks is preferable, with less corticosteroid exposure.

Fourth, when Adriamycin-containing regimens are given, oncologists must order cardiac tests on the patient before administering the regimen. If the patient's ejection fraction is below 50-55%, the patient should not be given Adriamycin. The risk of Adriamycin-induced cardiotoxicity increases for patients who are female, of advanced age and post-menopausal, and for patients with cardiac disease or cardiac risk factors, including obesity, hypertension, family history of heart disease, diabetes, abnormal lipids, smoking, and metabolic syndrome, or who have a family history of heart disease. The risk of cardiac toxicity with Adriamycin is dose-dependent: the more Adriamycin given, the greater the risk of left ventricular failure. However, there is no minimum anthracycline threshold. Cardiotoxicity can occur at any dose.

In sum, the side effect profiles of the Taxotere and Taxol-containing regimens are not the same

and consideration must be given to the option of a non-Adriamycin-containing choice. Adriamycin can cause irreversible heart damage and fatal leukemia. [xviii] Patients can avoid those potentially lethal side effects by taking Taxotere regimens and not taking Adriamycin.

For Antoinette Durden, because she had a history of heart disease and multiple cardiac risk factors, Dr. Jancich made a reasonable prescribing decision to avoid Adriamycin.  More specifically, Ms. Durden has had a long history of hypertension, requiring multiple medications to treat her high blood pressure, including Verapamil.  An x-ray of her chest and echocardiogram during treatment showed atherosclerotic calcification of the aorta – heart disease that takes many years to develop and which was existing at the time of her cancer diagnosis.  She was also diagnosed with concentric left ventricular hypertrophy and a 3/6 systolic ejection murmur prior to treatment.  In addition, she was at increased risk of Adriamycin-induced cardiac toxicity due to her age, gender, post-menopausal status and multiple additional cardiac risk factors, including obesity, an extensive family history of heart disease and high glucose readings.  Moreover, after treatment, she was diagnosed with high cholesterol.  Ms. Durden's existing heart disease and cardiac risk factors placed her at an even greater risk of cardiac toxicity if she took Adriamycin.  By avoiding Adriamycin and taking TC, she avoided the risk of cardiac toxicity and leukemia.

Ms. Durden is pre-diabetic.  Because Taxol has higher rates of neuropathy than Taxotere and she was already at an increased risk of neuropathy, Ms. Durden's risk of developing neuropathy was lowered by taking Taxotere.

For Tanya Francis, she has health issues that make Taxotere-containing regimens a better choice for her over Taxol-containing regimens.  Notably, Ms. Francis has diabetes, which puts her at a greater risk of neuropathy.[xix]  Because Taxol has a greater rate of neuropathy than Taxotere, Ms. Francis would have had a higher risk of neuropathy if she were given Taxol.  In addition, Taxol-containing regimens placed Ms. Francis at risk of delaying the administration of taxane therapy if cardiotoxicity developed during AC cycles.  Weekly administration with corticosteroids increased health risks (those I outline above) to her as well.

For Barbara Earnest, Dr. Carinder made the right decision in recommending docetaxel over paclitaxel.  Neuropathy was, and continues to be, a risk with patients taking paclitaxel.  But in patients like Ms. Earnest, who are at a higher risk of developing debilitating permanent neuropathy, paclitaxel should be avoided if possible.  Because the risk of severe neuropathy with Taxol, Ms. Earnest's previous history with shingles, and a significant family history of diabetes,[xx] docetaxel was preferred.  Her neuropathy likely would have been worse if she took a Taxol-containing regimen.[xxi]  The risks posed to her by weekly corticosteroid use would have been increased too.

One very important, final difference between Taxol and Taxotere is that patients' cancers can respond differently to the two drugs.  In other words, one patient's cancer may respond to treatment with Taxotere but may not respond to treatment with Taxol.  As such, after a woman has taken a Taxotere-containing regimen and is cancer free, it is impossible to say that woman would have remained cancer free if she took a Taxol-containing regimen.  Here we know that Ms. Durden, Ms. Francis, and Ms. Earnest remain cancer-free now seven to nine years after their initial diagnoses.

## IV.  Patient Counseling About the Relative Risks of Various Side Effects

I will discuss side effects of chemotherapy drugs, how clinicians weigh side effects, and how and what side effects are communicated to the patient.  As a clinician, I warn about common side

effects and side effects that are life threatening, as well as the risk of infertility. Because chemotherapy treatment is targeted at overcoming the patient's otherwise potentially fatal cancer and given that some, unfortunate, side effects of the medicines themselves also may risk death, I am much more concerned with those considerations than other potential side effects. It is not possible to warn the patient of all potential side effects. There are also unknown side effects with chemotherapy, which is also something that I tell patients. The other important issue is that in counseling patients, it is impossible to tell each patient which specific side effects she may actually experience compared to other women and amongst the host of possible consequences of arresting her cancer. Side effects can vary greatly from woman to woman, as can the severity of the side effects experienced from woman to woman.

By agreeing to undergo chemotherapy on the recommendation of her doctor, the patient is accepting the risk of very serious side effects, including the risk of death. These therapies also carry well-known side effect risks including heart damage, bladder/kidney problems, infection/neutropenia, nerve or muscle problems, fertility issues, fatigue, nausea, alopecia, diarrhea, weight changes, mood changes, constipation, and skin and nail changes. Permanent side effects can include damage to the heart, lungs, kidneys, or reproductive organs, or a second cancer.

It is common for oncologist to not mention non-life-threatening and rare risks to patients – even if the oncologist has seen it firsthand. Oncologists have a unique and difficult job of educating patients about their treatment options while reassuring them on the possibilities of success and providing hope that the patient will survive. In Ms. Earnest's doctor, Dr. Carinder's, words, if you provide too much information about rare side effects "You're gonna lose them."[xxii] Indeed, a patient likely only retains 10% of the information told to them during the initial consultations.

In the women that I see in my practice, hair loss is not uncommon. By age 55 to 65, many of my patients have experienced hair loss with age and changes in hormonal status before ever receiving chemotherapy or other treatment. With chemotherapy, there is an acute loss of hair from whatever was the patient's baseline. This specific type of alopecia is a common side effect of almost every chemotherapy drug. It is called Anagen Effluvium. Hair loss occurs because chemotherapy targets rapidly dividing cells, such as cancer.

Because of the acute arrest of the woman's hair growth cycle, when her hair does begin to regrow after chemotherapy, her hair may be different as if years have passed (as years of hair that had been grown has been lost). Chemotherapy often pushes women through menopause. Likewise, chemotherapy can speed up the aging process and age-related hair loss. More specifically, chemotherapy can alter a woman's hormonal status, resulting in age-related hair loss. Over half of women undergoing chemotherapy then see differences in texture, thickness, or hair color.[xxiii] In addition, stress and surgery are known causes of alopecia.

Cases of delayed hair regrowth or incomplete hair regrowth have been reported with many chemotherapy drugs including Adriamycin,[xxiv] Carboplatin, Cisplatin, Taxol,[xxv] Epirubicin, 5-Fluorouracil, Melphalan, and Cyclophosphamide.[xxvi]

I have known that alopecia after chemotherapy is a potential side effect of chemotherapy regimens as long as I have used chemotherapy to treat breast cancer. This experience does not suggest some hidden, especial problem with Taxotere. Taxotere containing regimens can include Adriamycin, Herceptin, Carboplatin, and Cyclophosphamide. Because Taxotere is given as part of a regimen and not as a single agent, it is impossible to conclude that Taxotere alone causes permanent alopecia. With hormone positive breast cancer where either Tamoxifen or Aromatase Inhibitors

are given, there is the additional consideration that alopecia has occurred with them.

While attributing alopecia after chemotherapy to the chemotherapy itself can be impossible, in my clinical experience, alopecia long after chemotherapy is rare.  In over 33 years of treating approximately a thousand women with breast cancer, I have observed only 2 cases of persistent alopecia that may have been related to chemotherapy, one of which was in a patient on Taxol.

Women cannot avoid the potential risk of ongoing alopecia, though, by avoiding a Taxotere-containing regimen.  The only other regimens available with similar efficacy are Taxol-containing regimens, which are not without their own reports of persistent alopecia.  This is true in Taxol-containing regimens, but also in patients given Adriamycin or Cyclophosphamide, one, or the other, or both of which would be prescribed in addition to (or in any regimen in lieu of) the taxane option.

For example, in the case of Ms. Francis, Dr. Verghese testified that if Ms. Francis had requested a Taxol-containing regimen and raised a concern with Taxotere and hair loss, Dr. Verghese would have counseled her that "both of them cause hair loss. Even though one may be more than the other, both cause hair loss. So if I were to see hair loss in one, I would predict hair loss in the other one too, so my recommendation is just to make a wig all the time."[xxvii]  I agree with this appraisal, specifically, that there is no promise of better hair regrowth with paclitaxel over Taxotere.

For Antoinette Durden, for example, there was some suggestion from the plaintiff lawyer's examination of Dr. Sophy Jancich about whether she would have warned Ms. Durden about a risk of permanent alopecia with Taxotere and then honored her decision not to take the medicine.[xxviii]  In my practice, I would not change my prescribing recommendation for a patient like Ms. Durden based on any risk of permanent hair loss with Taxotere given the better chance of survival with the medicine and the unproven extent of this risk.  In my professional opinion, Dr. Jancich made the right prescription in 2011 and the best proof is Ms. Durden's disease free survival seven years later.

Side effects are not unique to chemotherapy medicines, but are also present in endocrine-based therapy options.  Women who have hormone positive breast cancer are given either Tamoxifen or Aromatase Inhibitors.  Currently, the recommendation is that women use those medications for 5-10 years.  Both Tamoxifen and Aromatase Inhibitors lower a woman's estrogen level.  When a woman's estrogen level is lowered, her androgen level rises.  With hormone treatments, estrogen levels are lowered in both pre and post-menopausal women.  This puts her at risk for alopecia.[xxix, xxx]

Before prescribing Tamoxifen to Ms. Francis, Dr. Verghese discussed the risks and benefits of the medication – including hair thinning.[xxxi]  As to Ms. Earnest, Dr. Carinder acknowledged hair thinning is a side effect of Arimidex and that he had seen patients who have had significant hair thinning from Arimidex.[xxxii]

In my own practice, I see alopecia with Tamoxifen and Aromatase Inhibitors very frequently.  Breast cancer patients often lose all of their hair with chemotherapy.  Afterwards, women with ER+ or PR+ cancers will take either Tamoxifen or an Aromatase Inhibitor, which can then be responsible for a woman's hair not regrowing.

Tamoxifen and Aromatase Inhibitors have significant side effects.  Tamoxifen increases a woman's risk of endometrial cancer quite significantly.  Aromatase Inhibitors cause loss in bone density.  Other side effects of Tamoxifen and Aromatase Inhibitors include: joint pain, nausea,

9

hot flashes, fatigue, mood swings, headache, depression, chest pain, weakness, and loss of libido. These side effects can significant diminish a woman's quality of life. Yet, the vast majority of women are willing to endure the side effects to improve their chances of survival.

### A.   Antoinette Durden

Ms. Durden first met with Dr. Jancich and discussed chemotherapy on August 29, 2011. Initially, Dr. Jancich offered Ms. Durden enrollment in the clinical trial S0221. S0221 was a phase III trial comparing four dosing schedules of doxorubicin and cyclophosphamide (AC) followed by paclitaxel. Dr. Jancich and her clinical trial nurse, Vanessa Truxillo, discussed the details of the trial with Ms. Durden and her daughter over the course of several visits.

One of the chemotherapy agents involved in the S0221 trial—doxorubicin (Adriamycin)—is widely known as the "Red Devil" due to its severe side effects. These side effects, of which Dr. Jancich, Ms. Durden, and her daughter[xxxiii] were aware, include a significant risk of potentially fatal cardiotoxicity, as well as risks of severe nausea, vomiting, and fatigue. It also has the risk of leukemia.

Ms. Durden had an extensive family history of heart disease.[xxxiv] One of her sisters had had breast cancer and undergone treatment, only to die of a myocardial infarction. Ms. Durden herself had been treated for hypertension for years prior to her cancer diagnosis—as long as her daughter could remember—and had other cardiac concerns.[xxxv] Given Ms. Durden's extensive family and personal history of heart disease, her daughter was particularly concerned about Adriamycin's potentially fatal cardiotoxicity.

In the record of her encounter with Ms. Durden on September 27, 2011, Dr. Jancich explained that Ms. Durden and her daughter were "adamant that they do not want to receive Adriamycin containing regimen."[xxxvi] Again, on October 7, 2011, Dr. Jancich noted: "[Ms. Durden]'s daughter is in the healthcare field. [Ms. Durden]'s daughter and [Ms. Durden] have elected not to receive Adriamycin-containing regimen due to potential adverse side effects. After detailed discussion regarding potential adverse side effects, [Ms. Durden] is adamant about not receiving Adriamycin-containing regimen."[xxxvii]

The NCCN Guidelines were a source that Ms. Durden's medical oncologist, Dr. Sophy Jancich, relied on when making prescription decisions for her cancer patients in 2011.[xxxviii] At the time of Ms. Durden's cancer treatment in 2011, the operative NCCN Guidelines identified five "preferred" regimens for adjuvant treatment of HER2-negative breast cancer. All of the "preferred" regimens that contained Taxol (paclitaxel) also contained Adriamycin. The only "preferred" regimen that did not include Adriamycin was the "TC" regimen, consisting of Taxotere (docetaxel) and Cytoxan (cyclophosphamide). Therefore, based on refusal of Adriamycin, the only available, effective regimen was TC. Dr. Jancich testified that if Ms. Durden refused Adriamycin and Taxotere she would not have other options to recommend to Ms. Durden. [xxxix]

Ms. Durden testified that she would not have foregone chemotherapy treatment entirely.[xl] When Ms. Durden refused Adriamycin, Dr. Jancich opted for TC.[xli] This was the only remaining taxane option, and, if Ms. Durden were given a chemotherapy regimen that did not contain a taxane, she would have reduced her odds of survival. I therefore concur with Dr. Jancich's decision to prescribe TC and decline to second-guess it seven years after it has proven successful in treating Ms. Durden's cancer.

Ms. Durden gave her informed consent to Dr. Jancich for chemotherapy notwithstanding its risks.

Prior to receiving chemotherapy, Ms. Durden signed a Consent to Administration of Chemotherapy form identifying docetaxel and cyclophosphamide as the drugs Ms. Durden consented to receive.[xlii] "Hair loss" was the first of the "risks and discomforts" listed as associated with chemotherapy treatment.[xliii] "Hair loss" was listed directly alongside many potentially severe and long-lasting side effects including "[d]amage to bone marrow (blood forming organ)," "[d]amage to body organ such as brain, heart kidneys, liver, lungs, nervous system, skin," "[s]terility," "[l]oss of lining of the intestinal tract from mouth to anus," "[s]econdary cancer (a cancer in the future that may be caused by chemotherapy)," and "[d]eath."[xliv]

In addition to the written consent, Ms. Durden was informed verbally and in writing that in some cases, hair does not grow back after chemotherapy. At the time of Ms. Durden's treatment, Dr. Jancich told patients that "hair generally grows back" after chemotherapy treatment.[xlv] She testified she would never have told patients that their hair would grow back one hundred percent.[xlvi] Further, Ms. Durden was provided with a booklet from the American Cancer Society describing chemotherapy and its side effects. Regarding hair loss, the booklet stated: "In most cases, hair grows back after chemo."[xlvii] No medical record, and none of the materials provided to Ms. Durden at the time of her chemotherapy treatment—including her consent form and materials from chemocare and the American Cancer Society—suggest that Ms. Durden was advised that her hair loss would be "temporary."

This is also supported by Ms. Durden's family member's experience with chemotherapy. Ms. Durden testified that at least a year prior to her chemotherapy, one of her nieces had been treated with Taxotere and had experienced permanent hair loss. Ms. Durden testified that this was not a factor in her decision to undergo chemotherapy.[xlviii]

Dr. Jancich testified that she did not look directly at chemotherapy drug labels when prescribing, but obtained label information from UpToDate "very often."[xlix] As such, there is not indication of Dr. Jancich relying on the Taxotere label for her patient counseling of Ms. Durden or in her prescribing recommendation.

Ms. Durden was appropriately informed of the potential risks prior to choosing to undergo chemotherapy with Taxotere. The benefits outweighed the risks for her and she was appropriately counseled on the potential risks and complications of the treatment. Further, it would have been medically inappropriate to suggest to the patient that paclitaxel (or cyclophosphamide or Adriamycin) did not have a risk of permanent alopecia but Taxotere did.

### B.   Tanya Francis

Ms. Francis gave her informed consent to chemotherapy notwithstanding its risks. In consenting to chemotherapy, Ms. Francis accepted many significant potential side effects, including the possibly of death.

Dr. Verghese testified that his practice is to have a "comprehensive discussion" with patients regarding side effects and he discusses the "major things, because a lot of people want to know what the common side effects are," and then he provides a "copy of all the side effects" for the patient to review at her home.[l] No matter the discussion, Dr. Verghese tells patients that there may also be "new side effects that we don't know of."[li]

Before receiving chemotherapy, Ms. Francis was warned of the risk of alopecia. Dr. Verghese, Ms. Francis' treating oncologist, was aware of the possibly of alopecia and warned Ms. Francis regarding alopecia. Further, before her first chemotherapy treatment, Ms. Francis again reviewed

the side effects of chemotherapy with Nurse Celeste Keller.[lii] This discussion included the management of nausea and vomiting, unusual fever, bleeding, bruising, neutropenia, infusion related reactions, and thrombocytopenia.

At the time Dr. Verghese prescribed Taxotere for Ms. Francis, it was his understanding that alopecia was a common side effect and he "never tell[s] people that it's temporary."[liii] Instead, Dr. Verghese tells patients that hair loss: "depends on multiple factors, your other medical problems, your deficiencies. You may be vitamin deficient. We don't know anything about these things. So multiple factors go into how you react, how deep the reaction is, and how long it takes for things to turn around. Even though all these people say it's temporary and all that, there's multiple factors involved, so I don't use the word temporary. I even tell them, you know, hair may come back, and it may look totally different."[liv]

Dr. Verghese sets the expectations of his patients clearly: "I tell them that expecting not to lose hair, expecting the hair to look the same, these are all unreal expectations. We have to treat this, and you will have hair-related problems. If they tell me - -  if they ask me whether their hair loss is going to be permanent, then I tell them, even though there aren't - - I'm not going to take a chance on that, and that's where the wig comes in.  So the discussion is a little different from saying it may be permanent or never permanent. I tell them it's better to take a different approach to some of these side effects.[lv]

Dr. Verghese also testified that he read the package insert (or labeling) for Taxotere "at some time or the other, yes"[lvi] but does not remember reading the Taxotere label in its entirety.  In addition, Ms. Keller advised Ms. Francis that "total hair loss" would occur in 2-3 weeks, and suggested she purchase wigs and scarfs or hats.[lvii]

While all chemotherapy has risks and potential complications, Ms. Francis was appropriately informed of these risks prior to choosing to undergo chemotherapy with Taxotere. The benefits outweighed the risks for her and she was appropriately counseled on the potential risks and complications of the treatment.  Further, it would have been medically inappropriate to suggest to the patient that paclitaxel (or cyclophosphamide or Adriamycin) did not have a risk of permanent alopecia but Taxotere did.

### C.    Barbara Earnest

Ms. Earnest gave her informed consent to chemotherapy notwithstanding its risks.  In consenting to chemotherapy, Ms. Earnest accepted many significant potential side effects, including the possibly of death, brain damage, quadriplegia, paraplegia, and loss of organ function.

On March 31, 2011, Ms. Earnest first discussed the risks of chemotherapy with Dr. Carinder.  Dr. Carinder testified that he warns his patients about the most common side effects.  He also always warns about the unknowns with chemotherapy: "Because you don't know what may come up.  You tell them the most common side effects and what you expect, but there are always idiosyncratic things that can occur with – that you're – you may not know about."[lviii]

Ms. Earnest was informed verbally and in writing that in some cases, hair does not grow back after chemotherapy.  Ms. Earnest's husband, Ralph, who was at the March 31, 2011 appointment with Dr. Carinder explicitly remembers Dr. Carinder telling them that "it was possible [her hair] would never grow back."[lix]  Although Dr. Carinder did not recall at deposition what he specifically said to Ms. Earnest about hair loss other than that her hair would fall out,[lx] he testified that at the time of Ms. Earnest's treatment, Dr. Carinder's practice was not to tell his patients that their hair will

absolutely regrow.[lxi]  Further, before ever meeting with an oncologist, Ms. Earnest saw a surgeon, Dr. Celeste LaGarde, regarding her cancer.   Dr. LaGarde provided Ms. Earnest with educational breast cancer book in February 2011 is titled: "Breast Cancer Treatment Handbook."  This book discusses potential side effects and specifically states that there have been "rare reports of permanent hair loss" with Taxotere (docetaxel).[lxii]

On March 31, 2011, after discussing the benefits and risks of chemotherapy with Dr. Carinder and Lisa Reso (Penzato), Barbara Earnest signed a chemotherapy informed consent that warned of side effects from chemotherapy.  Hair loss is the first side effect identified, and is included with the serious identified side effects such as death, brain damage, quadriplegia, paraplegia, loss of organ function, loss of an arm, and loss of a leg.  Ms. Earnest testified that she understood and all of these risks because she wanted to give herself the best chance of survival.  In addition, in the form, Ms. Earnest acknowledged that she "understand[s] there is a risk of very uncommon, rare, or previously unknown side effects developing because of the use of these drugs."[lxiii]  Ms. Earnest testified that she specifically understood that there was a risk of unknowns with chemotherapy.[lxiv]

Ms. Earnest's treating oncologist was fully aware of the risk of hair loss with chemotherapy and Dr. Carinder has treated hundreds of breast cancer patients over the course of his career.[lxv]  Although there was testimony at Dr. Carinder's deposition indicating he did not know of the risk of permanent or persistent hair loss at the time of Ms. Earnest's treatment, he also testified that he had seen a case of complete and permanent hair loss with the AC- T regimen in a patient who had received the same chemotherapy regimen as Ms. Earnest six years earlier.[lxvi]

When asked whether he had read the package insert (or labeling) for Taxotere, Dr. Carinder testified that he had read it "back when it went on the market," before the year 1999 or 2000.[lxvii]  In other words, he had last read the label at least 11 years before Ms. Earnest's treatment.  He had not read it ever again since then.[lxviii]  As is true with many oncologists, he had not read the label in over a decade. Instead, he relied on his experience with other patients to determine how to warn them about side effects, specifically the risk of hair loss. Even though he had a patient in 2005 who developed persistent hair loss, he chose not to talk to patients about that risk unless asked. Where a medical oncologist does not or has not read an updated label, it is not incorporated into the prescribing recommendation or patient counseling.

While all chemotherapy has risks and potential complications, Ms. Earnest was appropriately informed of these risks prior to choosing to undergo chemotherapy with Taxotere. The benefits outweighed the risks for her and she was appropriately counseled on the potential risks and complications of the treatment.  Dr. Carinder knew from his clinical experience of another patient with alopecia after chemotherapy.  Further, it would have been medically inappropriate to suggest to the patient that paclitaxel (or cyclophosphamide or Adriamycin) did not have a risk of permanent alopecia but Taxotere did. Likewise, Barbara Earnest was fully informed of the risk of developing rare or unknown side effects.  She was even specifically warned that there had been cases of persistent or permanent hair loss, by Dr. Carinder himself (according to Mr. Earnest's testimony), and by the book she received from Dr. LaGarde before meeting with Dr. Carinder.

## V.   **The Chemotherapy Drug Label and the Many Other Sources of Information Available to Medical Oncologists**

As a practicing medical oncologist, my opinion is that alopecia has always been appropriately warned of in the Taxotere label.  Other chemotherapy drugs' prescribing information contain warnings about alopecia.  Doxorubin states, "Your hair may re-grow after your treatment."

Information regarding alopecia has always been included on the Taxotere label. Whether the label listed "Alopecia," as it did in 2003, or stated, "Once you have completed all of your treatments, hair generally grows back," as it did in patient labeling from 2004 to 2010, there is an understanding as a medical oncologist that there can be circumstances where the hair may not grow back. "Alopecia" is a medical term, which simply means hair loss without constraint temporally, by duration, or in severity. The Taxotere label has always been consistent with the known side effect risk profile for Taxotere.

Very frequently, side effects from chemotherapy drugs emerge after clinical trials and FDA approval which oncologists typically learn about these side effect from other oncologists, their own clinical experience, medical literature, and meetings, not the label or the manufacturer. An example of a post-marketing side effect was the cardiac toxicity seen from Adriamycin. The benefit/risk profile of Taxotere remains the same despite modifications to the language on alopecia in the label over time.

## CONCLUSION

**Antoinette Durden:** I believe to a reasonable degree of medical probability that Ms. Durden was an appropriate candidate for chemotherapy with Taxotere. Ms. Durden needed chemotherapy. A Taxotere-containing regimen was the best choice for her treatment. She needed to take a taxane-containing regimen to prevent recurrence. And she needed to take Taxotere over paclitaxel in order to avoid Adriamycin. In addition, Ms. Durden is pre-diabetic. Because Taxol has higher rates of neuropathy than Taxotere and she was already at an increased risk of neuropathy, Ms. Durden's risk of developing neuropathy was lowered by taking Taxotere. The same is true for the increased health risks associated with weekly corticosteroid and chemotherapy administration. While all chemotherapy has risks and potential complications, Ms. Durden was appropriately informed of these risks prior to choosing to undergo chemotherapy with Taxotere. I feel that the use of Taxotere for Ms. Durden's breast cancer was not only appropriate, but also successful in ridding Ms. Durden of cancer. If Ms. Durden was given a different chemotherapy regimen, it may not have been effective, and she may not have been cured.

**Tanya Francis:** I believe to a reasonable degree of medical probability that Ms. Francis was an appropriate candidate for chemotherapy with Taxotere. Ms. Francis needed chemotherapy. A Taxotere-containing regimen was the best choice for her treatment. She needed to take a taxane-containing regimen to prevent recurrence. Because Ms. Francis was pre-diabetic, increased or worsened neuropathy with Taxol was a valid concern weighing in favor of Taxotere. The same is true for the increased health risks associated with weekly corticosteroid and chemotherapy administration. The benefits of Taxotere outweighed the risks for her, and she was appropriately counseled on the potential risks of chemotherapy with Taxotere. I feel that the use of Taxotere for Ms. Francis's breast cancer was not only appropriate, but also successful in ridding Ms. Francis of cancer. This treatment was part of giving her back the more than seven years Ms. Francis has lived since her diagnosis.

**Barbara Earnest:** I believe to a reasonable degree of medical probability that Ms. Earnest was an appropriate candidate for chemotherapy with docetaxel. Ms. Earnest needed chemotherapy. A docetaxel-containing regimen was the best choice for her treatment. This treatment is responsible for giving her back the more than seven years Ms. Earnest has lived since her diagnosis. It is not credible to second-guess whether Ms. Earnest should have been given Taxol in 2011. She needed to take docetaxel over paclitaxel because of the neuropathy risk posed had she taken paclitaxel. Dr. Carinder made the right decision in 2011. Ms. Earnest is currently cancer free. Her docetaxel -containing regimen was effective. Ms. Earnest may not have been cured if

14

she took another regimen. The benefits of docetaxel outweighed the risks for her, and she was appropriately counseled on the potential risks of chemotherapy with docetaxel. While all chemotherapy has risks and potential complications, Ms. Earnest was appropriately informed of these risks prior to choosing to undergo chemotherapy with Taxotere. Dr. Carinder was aware of the risk of hair loss with chemotherapy. And he was specifically aware of the rare risk of permanent or persistent hair with the AC-T regimen. Moreover, even if the docetaxel label had said something different about hair loss, it would have made no difference on how Dr. Carinder talked to Ms. Earnest about hair loss. As is true with many oncologists, he had not read the label in over a decade. Instead, he relied on his experience with other patients to determine how to warn them about side effects, specifically the risk of hair loss. Like most cancer patients, Ms. Earnest knowingly and voluntarily took very serious risks in an effort to treat her breast cancer. She knew that she might develop rare or unknown side effects with the AC- T regimen, but took that risk so she could effectively treat her cancer. That was the right choice.

Gerald Miletello, M.D.
Baton Rouge, Louisiana                    December 14, 2018

[i] Ms. Durden had an extensive family history of serious and fatal cancer, including breast cancer. Two nieces and her sister Gwendolyn had had breast cancer. Ochsner Health System 2570-2575; Durden Dep. Tr. 88:21-89:2; 107:25-108:3. One of Ms. Durden's aunts had died of lung cancer, and her brother George was recently diagnosed with bone cancer. Ochsner Health System 2571; Durden Dep. Tr. 108:11-108:16.
[ii] Durden Dep. Tr. 239:15-240:14.
[iii] Ochsner Health System 2951-2953.
[iv] Ochsner Health System 2341-2352; Ochsner Medical Center 1203-1222.
[v] Francis Dep. Tr. 155:3-11.
[vi] University Medical Center New Orleans 481-482; Tulane Cancer Center Clinic 127-131.
[vii] Tulane Cancer Center Clinic 127-131.
[viii] Tulane Breast and Surgery Clinic 5-9.
[ix] Northshore Oncology Associates 233, 222-224.
[x] Slidell Radiation Center 23-25 (radiation consultation); Slidell Radiation Center 15-22; PPR 1752-53.
[xi] Northshore Oncology Associates 233, 222-224.
[xii] Northshore Oncology Associates 251-52 (initial recommendation and prescription by Dr. Carinder).
[xiii] Slidell Radiation Center 5-7 ("She is on Arimidex, which she will be taking for a grand total of 10 years.").
[xiv] 2011 NCCN Guidelines, at § BINV-K; 2018 NCCN Guidelines, at § BINV-K.
[xv] 2018 NCCN Guidelines, at § BINV-K.
[xvi] Steven Jones et al., *Docetaxel with Cyclophosphamide Is Associated with an Overall Survival Benefit Compared with Doxorubicin and Cyclophosphamide: 7 Year Follow-up of U.S. Oncology Research Trial 9735*, 27 J. Clin. Oncol. 1177-83 (2009); *see also* Steven Jones et al., *Phase III Trial Comparing Doxorubicin Plus Cyclophosphamide with Docetaxel Plus Cyclophosphamide as Adjuvant Therapy for Operable Breast Cancer,* 24(34) J. Clin Oncol. 5381-87 (2006).
[xvii] P.J. Barrett-Lee et al., *Expert Opinion on the Use of Anthracyclines in Patients with Advanced Breast Cancer at Cardiac Risk*, 20 Annals of Oncology 816-827 (2009).
[xviii] *See* Mary Pinder et al., *Congestive Heart Failure in Older Women Treated with Adjuvant Anthracycline Chemotherapy for Breast Cancer*, 25(25) J. Clin. Oncol. 3808-3815 (2007) at 3808; Eleni Diamandidou et al., *Treatment-Related Leukemia in Breast Cancer Patients Treated with FEC Combination Adjuvant Chemotherapy*, 14(10) J. Clin. Oncol. 2722-2730 (1996).
[xix] Bertrand Tillery 89-90.

[xx] Slidell Memorial Hospital 239-41; PPR 1625-26; Barbara Earnest Dep. Tr. 107:25; 108:1-19 (testifying that mother died of "heart trouble and diabetes"); 109:20-21 (testifying that father died of diabetes); 137:6-11 (testifying that 4 of her siblings have been diagnosed with diabetes).

[xxi] Ms. Earnest has neuropathy to this day and continues to takes Gabapentin to treat it. PPR Taxotere Records Bianchini and Thompson 4543-4573. Her neuropathy likely would have been worse if she took a Taxol-containing regimen. The risk of developing such neuropathy is something that Ms. Earnest would have wanted to know before deciding to take a Taxol-containing regimen. Barbara Earnest Dep. Tr. 109:7-18; 111:1-25; 112:1-9.

[xxii] James Carinder Dep. Tr. 88:24.

[xxiii] Analee E. Beisecker, *Side Effects of Adjuvant Chemotherapy: Perceptions of Node-Negative Breast Cancer Patients*, 6(2) Psycho-Oncology, 85-93 (1997) at 88; D. Batchelor, *Hair and Cancer Chemotherapy: Consequences and Nursing Care—A Literature Study*, 10 Euro. J. Cancer Care 147-163 (2001) at 151.

[xxiv] John Crown et al., *Incidence of Permanent Alopecia Following Adjuvant Chemotherapy in Women with Early Stage Breast Cancer*, 35(15) J. Clin. Oncology Supp. Abstract e21576 (2017); *Mi Yung Jung and Dong Youn Lee*, A Clinical Study of Chemotherapy-Induced Permanent Alopecia, 51(12) Korean J. Derm. 933-938 (2013); Caroline Yeager and Elise Olsen, *Treatment of Chemotherapy-Induced Alopecia*, 24(4) Dermatologic Therapy 432-442 (2011) at 428; Pat Masidonski, *Letter to the Editor: Permanent Alopecia in Women Being Treated for Breast Cancer*, 13(1) Clin. J. of Oncology Nursing 13-14 (2009).

[xxv] Danbee Kang et al., *Incidence of Permanent Chemotherapy-Induced Alopecia in Patients with Breast Cancer: A Three-Year Prospective Cohort Study*, 23 The Oncologist 1-7 (2018); John Crown et al., *Incidence of Permanent Alopecia Following Adjuvant Chemotherapy in Women with Early Stage Breast Cancer*, 35(15) J. Clin. Oncology Supp. Abstract e21576 (2017); Xinyi Yang and Keng-Ee Thai, *Treatment of Permanent Chemotherapy-Induced Alopecia with Low Dose Oral Minoxidil*, 57(4) Australasian J. Derm. E130-e132 (2016); Mi Yung Jung and Dong Youn Lee, *A Clinical Study of Chemotherapy-Induced Permanent Alopecia*, 51(12) Korean J. Derm. 933-938 (2013); Mariya Miteva et al., *Permanent Alopecia After Systemic Chemotherapy: A Clinicopathological Study of 10 Cases*, 33(4) Am. J. Dermopathol. 345-350 (2011) at 345; Ioulios Palamaras et al., *Letter to Editor: Permanent Chemotherapy-Induced Alopecia: A Review*, 2011 J. Am. Acad. Derm. 604-606 (2011); Caroline Yeager and Elise Olsen, *Treatment of Chemotherapy-Induced Alopecia*, 24(4) Dermatologic Therapy 432-442 (2011) at 438; Chris Prevezas, *Irreversible and Severe Alopecia Following Docetaxel and Paclitaxel Cytotoxic Therapy for Breast Cancer*, 160(4) Brit. J. Derm. 883-885 (2009).

[xxvi] Mi Yung Jung and Dong Youn Lee, *A Clinical Study of Chemotherapy-Induced Permanent Alopecia*, 51(12) Korean J. Derm. 933-938 (2013); Caroline Yeager and Elise Olsen, *Treatment of Chemotherapy-Induced Alopecia*, 24(4) Dermatologic Therapy 432-442 (2011) at 438; M.E. de Jonge et al., *Relationship b/w Irreversible Alopecia and Exposure to Cyclophosphamide, Thiotepa and Carboplatin (CTC) in High-Dose Chemotherapy; Relationship Between Irreversible Alopecia and Exposure to Cyclophosphamide, Thiotepa, and Carboplatin in High-Dose Chemotherapy*, 30(9) Bone Marrow Transplantation 593-597 (2002); Gunilla Berglund et al., *Late Effects of Adjuvant Chemotherapy and Postoperative Radiotherapy on Quality of Life Among Breast Cancer Patients*, 27(9) Eur. J. Cancer 1075-81 (1991) at 1078.

[xxvii] Cherian Verghese Dep. Tr. 109:2-12.

[xxviii] *See* Jancich Dep. Tr. 254:23-257:10.

[xxix] Lisa Gallicchio, *A Prospective Study of Aromatase Inhibitor Therapy Initiation and Self-Reported Side Effects*, 25(9) Support Care Cancer 2697-2705 (2017); Athina Fonia et al., *Permanent Alopecia in Patients with Breast Cancer After Taxane Chemotherapy and Adjuvant Hormonal Therapy: Clinicopathologic Findings in a Cohort of 10 Patients*, 76(5) J. Am. Acad. Dermatol. 948-57 (2017) at 956; Jin Park et. al, *Pattern Alopecia During Hormonal Anticancer Therapy in Patients with Breast Cancer*, 26(6) Annals of Dermatology 743-46 (2014); Lisa Gallicchio et al., Aromatase Inhibitor Therapy and Hair Loss Among Breast Cancer Survivors, 142(2) Breast Cancer Research and Treatment 435-443 (2013); Ioulios Palamaras et al., *Letter to Editor: Permanent Chemotherapy-Induced Alopecia: A Review*, 2011 J. Am. Acad. Derm. 604-606 (2011); Fabio Puglisi et al., *Letter to the Editor: Tamoxifen-Induced Total Alopecia*, 143(12) Annals of Internal Medicine 1154-55 (2001).

[xxx] Aromatase inhibitors such as Letrozole, Raloxifene, Toremifene, Anastrozole, and Exemestane all warn of the risk of alopecia on their labels.

[xxxi] Cherian Verghese Dep. Tr. 160:19 - 162:24.

[xxxii] James Carinder Dep. Tr. 109: 5-9; 110:14-16.

16

xxxiii Ms. Durden's daughter, Anesha Prier, worked as a cancer navigator for the Louisiana Breast and Cervical Health Program ("LBCHP"), then part of Louisiana State University hospital.  Ms. Prier was familiar with Adriamycin and its side effects through her work as a cancer navigator, and she did not want her mother, Ms. Durden, to experience these side effects.  Prier Dep. Tr. 50:9-53:2.

xxxiv Prier Dep. Tr. 54:18-58:16; Durden Dep. Tr. 88:1-3; 88:18-20; Ochsner Health System 2543-2548 (mother, father and brother all had hypertension and died of heart attacks).

xxxv See, e.g., Walgreens 65; Ochsner Health System 2543-2548 ("significant for hypertension for several years" and on benazepril, verapamil, and atenolol); Ochsner Health System 2590-2593 (3/6 systolic ejection murmur); Ochsner Health System 2594 (mild concentric left ventricular hypertrophy); Prier Dep. Tr. 58:7-58:16.

xxxvi Ochsner Health System 2607-2609.

xxxvii Ochsner Health System 2616-2618.

xxxviii Jancich Dep. Tr. 187:18-187:24.

xxxix Jancich Dep. Tr. 258:2-21.

xl Durden Dep. Tr. 216:11-216:15 ("Q. [...] are you saying that you would have just risked going without chemotherapy? A. Oh, I wouldn't. No, I would have did chemotherapy.").

xli Ochsner Health System 2616-2618.

xlii Ochsner Health System 2673-2674.

xliii Ochsner Health System 2673-2674.

xliv Ochsner Health System 2673-2674.

xlv Jancich Dep. Tr. 129:17-130:12.

xlvi Jancich Dep. Tr. 238:17-239:2.

xlvii PPR 973.

xlviii Jancich Dep. Tr. 81:8-81:15.

xlix Jancich Dep. Tr. 119:19-120:20; 126:6-127:10.

l Cherian Verghese Dep. Tr. 143:15-144:18.

li Cherian Verghese Dep. Tr. 144:6-12.

lii University Medical Center New Orleans 518.

liii Cherian Verghese Dep. Tr. 102:17 - 103:5.

liv Cherian Verghese Dep. Tr. 103:7-18.

lv Cherian Verghese Dep. Tr. 104:23 - 105:16.

lvi Cherian Verghese Dep. Tr. 41:21-24.

lvii University Medical Center New Orleans 518.

lviii James Carinder Dep. Tr. 19-23.

lix Ralph Earnest Dep. Tr. 147:24-148:13.

lx James Carinder Dep. Tr. 115:16-116:14.

lxi James Carinder Dep. Tr. 96:13-16.

lxii PPR 001972 (page 195 of Handbook).

lxiii Northshore Oncology Associates, 315-16.

lxiv Barbara Earnest Supp. Dep. Tr. 41:2-5; Northshore Oncology Associates, 315-16.

lxv James Carinder Dep. Tr. 61:13-25; 62:1-7.

lxvi James Carinder Dep. Tr. 182:9-13 (discussing a patient who developed persistent alopecia in 2005); see also James Carinder Dep. Tr. 124:17-19; 86:3-6.

lxvii James Carinder Dep. Tr. 119:3-14.

lxviii James Carinder Dep. Tr. 119:13-14.