# EXHIBIT B

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

```
IN RE:  TAXOTERE (DOCETAXEL)      *      16-MD-2740
PRODUCTS LIABILITY LITIGATION     *
                                  *      Section H
                                  *
Relates to:  16-CV-17144          *      July 25, 2019
                                  *
                                  *      10:00 a.m.
* * * * * * * * * * * * * * * * * *
```

ORAL ARGUMENT BEFORE
THE HONORABLE JANE T. MILAZZO
UNITED STATES DISTRICT JUDGE

Appearances:

| | |
|---|---|
| For the Plaintiffs: | Barrios Kingsdorf & Casteix, LLP<br>BY:  DAWN M. BARRIOS, ESQ.<br>701 Poydras Street, Suite 3650<br>New Orleans, Louisiana 70139 |
| For the Plaintiffs: | Pendley Baudin & Coffin, LLP<br>BY:  CHRISTOPHER L. COFFIN, ESQ.<br>1515 Poydras Street, Suite 1400<br>New Orleans, Louisiana 70112 |
| For the Plaintiffs: | Morgan & Morgan, P.A.<br>BY:  EMILY C. JEFFCOTT, ESQ.<br>700 S. Palafox Street, Suite 95<br>Pensacola, Florida 32502 |
| For the Plaintiffs: | Gainsburgh Benjamin David Meunier<br>  & Warshauer, LLC<br>BY:  M. PALMER LAMBERT, ESQ.<br>1100 Poydras Street, Suite 2800<br>New Orleans, Louisiana 70163 |

10:17

1 before Magistrate Judge North about the parameters and the
2 burden that was imposed on him as Sanofi's corporate
3 representative almost a half dozen times.
4     The man has sat for a deposition seven times.
5 He has been our corporate representative three times.  He was
6 deposed for over 35 hours on the record, and there are over
7 2,000 pages of deposition testimony about this issue and about
8 his analysis.  So to suggest that this isn't a well-vetted
9 opinion, it certainly is.
10     The real problem, Your Honor, is that the
11 plaintiffs' experts haven't done the work that Dr. Kopreski
12 did, and there's no reason why they couldn't.  It would just
13 take time and it would just take money.  Dr. Kopreski has done
14 that caliber of analysis.  He has.  That's what's different
15 about Dr. Kopreski.  He was a statistician at our company,
16 Sanofi, for 15 years, a pharmacovigilance scientist, so he is
17 dealing with safety data.  What Dr. Kopreski adds to the
18 equation is that he is a medical oncologist.
19     So when we talk about these 29 women, it's not
20 just an "I reported it once.  Count me."  He traced each woman
21 through the clinical trial for 10 years to see:  Did she have
22 this thing that we are all here to talk about?  Is this
23 permanent alopecia when she said, "I have alopecia and I'm in a
24 follow-up period"?  Was that this permanent alopecia thing, as
25 the plaintiffs have defined it, using their definition?  He

10:21

1  succumb to the illness, whose hair never regrows because they
2  died during follow-up.
3        If that woman was last seen two months after she
4  stopped chemotherapy, she is counted for all time in Sanofi's
5  numbers because the last time we were able to check on her she
6  still had alopecia; but because she succumbed to the illness
7  and she died, that isn't necessarily a rate of permanent
8  alopecia.  It's just two months after chemo.  That's the best
9  we knew, but we continued to count her.  We say she is ongoing
10 into the follow-up period.  We count her.
11       This is what Dr. Kopreski did.  He traced each
12 one of those individual 29 women and said, "When we last
13 checked in on you, did you have alopecia, and was that six
14 months after chemo?"  Because if it was less time than that
15 because you died during follow-up or you decided to withdraw
16 from the study, you are ongoing.  So, sure, you're in that
17 4.2 percent rate of women who are ongoing, but that's not
18 permanent alopecia.  That's not what we are here to talk about.
19       I wish we would have known when we were working
20 on TAX316 that this is how this data would be misconstrued.
21 Sanofi certainly would have done that analysis, but that's not
22 what the analysis was.  That's not what anyone was saying that
23 number meant.  It's a clinical trial.  Most people aren't used
24 to it, but this term "ongoing into follow-up," that's all it
25 means.

12:07

1  understand the context.
2  So the clinical overview document was dealing in
3  the regulatory context with a question of labeling, and we just
4  heard the argument on Dr. Kessler, the exact same reality here,
5  which is: Is Dr. Kessler offering a general causation opinion?
6  The answer is no because he is talking about labeling in this
7  regulatory context.
8  So was Sanofi offering a general causation
9  opinion when they are talking about the same regulations that
10  Dr. Kessler is in their internal document? The answer to that
11  is no, they were not. How do we know that it doesn't pass
12  muster? Again, I'm going to quote from the *Burst* case.
13  So in the *Burst* case what we had were various
14  regulatory agencies that had chimed in on the issue, and this
15  is what the judge said: "As noted by the Fifth Circuit,
16  regulatory bodies apply a lower threshold of proof in
17  determining issues of causation than 'is appropriate in tort
18  law,'" and they cite the *Allen* case, which is a Fifth Circuit
19  case. Regulatory bodies, lower threshold of proof on causation
20  than is appropriate in tort law, and that's what we have here.
21  When you look at the documents that the FDA
22  actually has -- we cited them in our briefs and in our expert
23  reports. When you actually look at what the FDA said about our
24  2015 clinical overview, this is what they said: "It is
25  impossible to determine whether the permanence of alopecia was

12:09

1  due to docetaxel."  That is the clinical reviewer of the FDA,
2  "impossible to determine."  When you have a situation where it
3  is impossible to determine whether or not there's a causal
4  link, you ultimately have to rule that that evidence is
5  inadmissible in tort.
6             The last leg that we have for Dr. Feigal is
7  again the Taxotere GEICAM clinical trials.
8             She was asked, "Do you even know if there is a
9  statistically significant difference in the two arms?"
10            She said, "I have not done that analysis.  You
11 might go ask the biostatistician."
12            So how can Dr. Feigal rely on clinical data when
13 she doesn't even know if it's clinically significant or
14 statistically significant?  She can't, and we know that based
15 on the Fifth Circuit law.
16            So the last thing that Dr. Feigal does is falls
17 back on what she calls the weight of the evidence.  She says
18 she triangulated it.  I don't know what that means, but it
19 sounds to me like the *ipse dixit* of an expert who says,
20 "Because I look at it, I feel like it's enough" -- the weight
21 of the evidence without any methodology -- "I'm going to say I
22 think there's causation," but courts have spoken about the
23 weight of the evidence.
24            This is from the *Mirena* decision just in the
25 last year as well, another MDL.  What that court said is that