# EXHIBIT D

```
                UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF OHIO
                     EASTERN DIVISION

LARRY OGLE MOODY,                )
                                 )
          PLAINTIFF,             )  CASE NO. 2:15-CV-803
                                 )
     vs.                         )  JANUARY 9, 2017
                                 )
E. I. du PONT de NEMOURS AND COMPANY, )  9:00 A.M.
                                 )
          DEFENDANT.             )
_____)


  TRANSCRIPT OF THE PROCEEDINGS OF THE FINAL PRETRIAL CONFERENCE
         BEFORE THE HONORABLE EDMUND A. SARGUS, JR.
              UNITED STATES DISTRICT CHIEF JUDGE
                       COLUMBUS, OHIO

APPEARANCES:

FOR THE PLAINTIFF:

   Levin Papantonio Thomas Mitchell Rafferty & Proctor, P.A.
   By:  Christopher G. Paulos, Esq.
        Timothy M. O'Brien, Esq.
        Jeff R. Gaddy, Esq.
   316 South Baylen Street, Suite 316
   Pensacola, Florida  32502

   Douglas & London, P.C.
   By:  Michael A. London, Esq.
        Rebecca G. Newman, Esq.
   59 Maiden Lane, 6th Floor
   New York, New York  10038

   The Lamb Firm, L.L.C.
   By:  Archie C. Lamb, Jr., Esq.
   2900 1st Avenue, South
   Birmingham, AL  35233

   The Pennock Law Firm
   By:  Shannon M. Pennock
   411 Lafayette Street
   New York, NY 10003
```

```
APPEARANCES CONTINUED:

   Taft Stettinius & Hollister
   By:  Robert A. Bilott, Esq.
   1800 Firstar Tower
   425 Walnut Street
   Cincinnati, OH  45202


FOR THE DEFENDANT:

   Squire Patton Boggs, L.L.P.
   By:  D. Patrick Long, Esq.
        Alvin B. Davis, Esq.
        Aaron T. Brogdon, Esq.
        Aneca E. Lasley, Esq.
        Dante A. Marinucci, Esq.
        Nathan A. Leber, Esq.
        Sarah K. Rathke
   4900 Key Tower
   127 Public Square
   Cleveland, Ohio  44114
                       - - -






    Proceedings recorded by mechanical stenography;
transcript produced by computer.

                   DARLA J. COULTER, RMR/CRR
                OFFICIAL FEDERAL COURT REPORTER
                 85 MARCONI BOULEVARD, ROOM 120
                     COLUMBUS, OHIO  43215
                 TELEPHONE NUMBER: (614) 719-3245
```

---

                                                                3
                     MONDAY MORNING SESSION

                        JANUARY 9, 2017
                             - - -

    Thereupon, the following proceeding was held in the conference room with all counsel present:

        THE COURT:  Welcome to all of you.

    So Mr. Long asked to be excused.  He's been here quite a bit the last few weeks.  Will he be part of the trial team as well?

        MR. DAVIS:  He will be.  He was ordered by a judge to take a deposition today.

        THE COURT:  Okay.  Well, he called and we arranged this ahead of time so he's fine.  Plus, he's seen enough of me for the last few weeks.

        MR. DAVIS:  He said he would miss you.

        THE COURT:  I'm sure.

    Anyway, well, I have a few -- you know, we just finished up a case and, by the way, for those of you who had coffee with me, I'm violating my own two-week rule, if you've noticed.  I mentioned that I try to stay away from lawyers for two weeks after a verdict, but in this case it wasn't possible.  But you all seem on good behavior right now so I appreciate that.

    But I had a few things to go over in terms of what we're going to do maybe just a little bit differently in the upcoming trial.  I hope we all learned a little bit from the last few

                                                                4
trials.  Too bad Mr. Mace isn't here because we debated for a long time the appropriate number of jurors, and he's going to win one here.

    We have started with eight in every trial.  That's been pretty much what every judge in the building does, but I note for the record we've never finished with eight.  In fact, the last time we finished with six, which is too close for comfort.  So my view is we'll do nine this time.  We probably still will have an eight-person decision, which would be my goal, but I think eight cuts it too close.

    I assume this trial is going to be pretty much the same length as the others?

        MR. O'BRIEN:  That's what we anticipate.  Obviously with the -- it being a four-day week --

        THE COURT:  Right.  The same number of days, maybe a different number of weeks perhaps.

        MR. O'BRIEN:  Yes, Your Honor.

        THE COURT:  And let's talk about that for a second.  I mentioned to you at one of the last conferences before this case went to verdict that we were going to do a four-day-a-week trial, and I think I heard from the plaintiff's side that you'd prefer Friday to be the off day.

        MR. DAVIS:  We do as well.

        THE COURT:  All right.  So that's what we'll do, Monday through Thursday.

Control No.: 18071126

74

```
 1        MR. O'BRIEN:  But Your Honor has also not let us get
 2  into kidney cancer cancerphobia.  And so I believe in the
 3  Vigneron case the ruling was this is a cancerphobia case about
 4  testicular cancerphobia, and so they can't come in and say,
 5  well, now you've got this -- what about being afraid of --
 6        THE COURT:  One of the things you had to prove in all
 7  these cases was that, first, that there was a statistical
 8  increase in likelihood of testicular cancer.
 9        MR. O'BRIEN:  Right.
10        THE COURT:  And that the plaintiff had to be aware of
11  that.
12        MR. O'BRIEN:  Right.
13        THE COURT:  I don't remember any proffered testimony
14  that someone with testicular cancer would have been advised of
15  the risk of getting kidney cancer, for example.
16        MR. O'BRIEN:  Right.  And so that same logic applies
17  to the cigarette smoking so you have the reasonableness of the
18  fear and the statistical likelihood.  That one element is
19  lacking on cigarette smoking and testicular cancer.
20        THE COURT:  I assume you can bring out that doctors
21  have told him not to smoke and his risk of cancer goes up when
22  he smokes.
23        MR. DAVIS:  And he testified that he knows that
24  there's a risk of cancer.
25        MR. BROGDON:  It goes to reasonableness, Your Honor.
```

```
 1  It's not reasonable to fear something when you're not taking
 2  appropriate actions to prevent what you know will cause the
 3  same sort of thing.
 4        MR. O'BRIEN:  That's a different argument.  That's an
 5  entirely different argument to say, well, once a risk taker,
 6  aways a risk taker.  He doesn't drive with a seatbelt so how
 7  afraid of death is he?  This is such a hot button issue, Judge.
 8  When you've got the experts agreeing that it is not on the
 9  horizon even as a risk factor and then to say, well, he should
10  be afraid of testicular cancer from smoking when there's not
11  the statistical likelihood.  So it's the fear of other things
12  beyond what this case is about.  This case is about testicular
13  cancer and its metastases to his nodes, and cigarette smoking
14  has absolutely nothing to do with it.  This is one time where
15  we have really good agreement between the two experts who have
16  actually researched the issue on the topic.
17        THE COURT:  Well, let me take another look at this.
18  Right now, because you have to prepare for next week, I'm
19  probably inclined to let this in.  I'm not going to make a
20  final decision at this point.  I'm going to look at the cases
21  again.  But that's my inclination at this point, but it's not a
22  final ruling and we'll meet again and talk about this.
23        MR. O'BRIEN:  And that inclination is on the
24  cancerphobia claim, that it's relevant to the cancerphobia
25  claim?
```

75

```
 1        THE COURT:  And at the same time, because there's no
 2  medical dispute here, you'd get an instruction if I do this
 3  that there is no linkage between testicular cancer and smoking.
 4  But, again, I want to take a look at the cases on this before I
 5  make a final decision.  You've given me a lot of homework.
 6        All right.  I believe that 13 and 14 you'll be getting a
 7  Daubert opinion on so we'll hold on those.
 8        And I think 15 relates to the issue we just talked about
 9  so that will be covered as well.
10        17, I don't think there's a dispute, is there?  This has
11  to do with --
12        MR. DAVIS:  You skipped over 16.
13        THE COURT:  16?  Oh, I'm sorry.  Yes, this is
14  another -- that will be the last one we address.  That's an
15  interesting one, too.  So let's jump ahead.  We're holding on
16  16.  17 --
17        MR. MARINUCCI:  You're right, Your Honor, there's no
18  issue.
19        THE COURT:  -- there's no issue there.
20        And 18, we had this issue.  Mr. Long a couple times
21  referred to "us" when he referred to DuPont and we had that
22  discussion at sidebar.  He apologized several times, but I
23  think we all understand that issue, right?
24        MR. DAVIS:  Yes.
25        MR. BROGDON:  One point to make there, Your Honor.  In
```

76

```
 1  discussing this we do want to make sure it's clear we have no
 2  present intention of doing that, but that can be something
 3  that's a slip.  And if there's a reference to us or a we, it
 4  will have been a slip.
 5        THE COURT:  Right.  But work on it because it's hard
 6  to unring that bell.
 7        MR. BROGDON:  We will.  We will absolutely endeavor to
 8  do that, Your Honor.  We're mindful of that.  But I've found
 9  myself doing that before in common speech about clients, and I
10  don't want there to be some inference or punitive action
11  because there's a slip.  We'll be very, very careful of that.
12        THE COURT:  You know, it comes up a lot in criminal
13  cases, and actually it's a pretty serious issue and oftentimes
14  it leads to mistrials because you don't have an individual as a
15  client.  The government is not an individual, DuPont is not an
16  individual so it's more important than might otherwise be --
17  I'm not suggesting the plaintiffs would want to say we; you
18  don't want to do that either.  But it's a little different when
19  you have an individual.  So on both sides you'll want to avoid
20  this at all costs.
21        MR. BROGDON:  We'll be careful.  It sometimes
22  colloquially bleeds in from discussions with the client, but
23  we'll be very careful, Your Honor.
24        MR. O'BRIEN:  I watched Mr. Long's opening and
25  closing, and it was like he was testifying and I can't
```

Control No.: 18071126

                                                                78

```
 1  cross-examine him.  And I'm not going to say and there we were
 2  lying in the hospital, you know, because you can't do that.  It
 3  just doesn't make sense.
 4          MR. BROGDON:  We're clear, Your Honor, yes.
 5          MR. DAVIS:  We'll make Mr. Long available for
 6  cross-examination.
 7          MR. O'BRIEN:  You know, I might accept that.
 8          THE COURT:  Well, I notice you're making that without
 9  him here.
10          MR. DAVIS:  Good luck to you.
11          MR. PAULOS:  Or if DuPont wants to use the term
12  Mr. DuPont, we'll let them do that.
13          THE COURT:  Just so you know, when Mr. Gall was here
14  and Mr. Long wasn't, he volunteered Mr. Long for all sorts of
15  things and then vice versa.
16      So Mr. Moody's -- the tobacco issue we're going to hold,
17  but alcohol and marijuana?
18          MR. DAVIS:  We're not going into that.
19          THE COURT:  All right.  So that's all out?
20          MR. DAVIS:  Yes.
21          THE COURT:  That makes it easy.
22          MR. DAVIS:  And the fact that he beat up his sister a
23  few times.
24          THE COURT:  Okay.
25          MR. O'BRIEN:  That's out.
```

```
 1          MR. DAVIS:  That's out.
 2          THE COURT:  Speaking of Latin, that's a word that I
 3  think Mr. London got us all familiar with, praeteritio; not
 4  mentioning something while you mention it.  That's a figure of
 5  speech with a Latin phrase attached to it.
 6      All right.  And number 20 I think we've pretty much --
 7  that's covered, right?
 8          MR. DAVIS:  Right.
 9          THE COURT:  Now we go back to motion number 16.  This
10  is always interesting.  So there was initially a claim for high
11  cholesterol that has been withdrawn, and now the defendant
12  wants to use that on issues of credibility.
13          MR. DAVIS:  Yes, indeed, we do.  Because we're going
14  to go after Dr. Bahnson, as you might suspect, and he lists
15  that he has high cholesterol in his report.
16          THE COURT:  Let me ask you a simpler way of looking at
17  this.  So, you know, we can splice and dice here or we can not.
18  Putting something in a report that you claim to be inaccurate
19  is fair game, but there's another issue when you bring up a
20  dismissed claim.  One is purely evidentiary, the other one
21  implicates where the pleadings are, what the triable issues
22  are.  It's a broader question.
23      So are you -- in other words, if you were permitted to
24  say you put in your report high cholesterol but it turns out
25  there's no evidence of that or words to that effect, does that
```

                                                                79

```
 1  satisfy you?  Or do you want to get into more are we talking
 2  about examining Mr. Moody as well?
 3          MR. DAVIS:  Yes.
 4          THE COURT:  All right.
 5          MR. DAVIS:  Because Mr. Moody, I mean, in these
 6  interrogatories testified that -- when we asked the question of
 7  what are your damages, he testified -- he swore -- he signed
 8  the interrogatories, verified them as true that he has high
 9  cholesterol and that he expects to be dealing with that for the
10  rest of his life.  That's the answer.
11          THE COURT:  Just to be clear, does he have high
12  cholesterol?
13          MR. DAVIS:  No.
14          THE COURT:  He's got normal --
15          MR. DAVIS:  And -- and, Dr. Bahnson says when I said
16  where does that come from, because in his deposition Mr. Moody
17  says I do not have high cholesterol, we asked him what the
18  basis of it was, and he said he got a letter when he
19  participated in the C-8 blood testing that said, you know, come
20  in, you have high cholesterol.  We asked for the letter, he
21  never produced it.  That was one of the documents we said we
22  wanted that he said I can't find it.  That's the only reference
23  that he has to high cholesterol.
24      Now, Dr. Bahnson testified that he found that there was
25  a diagnosis in his medical records as support for why it was in
```

                                                                80

```
 1  his report, and there is no diagnosis in his medical records
 2  for cholesterol.
 3      So it goes both to his credibility, it goes to the
 4  manner in which his report was prepared, it goes into his --
 5  his veracity as a witness and so I think it is very relevant
 6  that here's a claim that he doesn't have any basis for that he
 7  claims there is a basis for.  You look at the records that he's
 8  claiming there's a basis for, there's nothing in there.  And I
 9  said did you read his deposition?  He said I read his
10  deposition, and his deposition says I do not have high
11  cholesterol.  So we're entitled to go after his credibility, to
12  go after his report for all the reasons that I mentioned in the
13  argument that's causing you to reconsider, but I think for all
14  those reasons we're entitled to go after both.
15      And there are other things in Mr. Moody's testimony as
16  well.  I mean, he testifies -- Dr. Bahnson says he's going to
17  require screening and blood testing the rest of his life.
18  Mr. Moody hasn't had that done since 2004.
19          THE COURT:  Well, sure.  As I mentioned to you,
20  anything in the report that you believe is inaccurate, that
21  seems to me to be completely independent of this motion.
22  That's fair game.
23      It's really dismissing a claim.  If you want to use
24  that, that's where we're not talking about a medical report
25  anymore, we're talking about a claim that was brought and then
```

Control No.: 18071126