# EXHIBIT I

**CHANDRA N. SMART, MD**
ANATOMIC PATHOLOGY, DERMATOPATHOLOGY
RONALD REAGAN UCLA MEDICAL CENTER,
LOS ANGELES, CALIFORNIA

**EXPERT REPORT OF DR. CHANDRA N. SMART**
*IN RE: TAXOTERE (DOCETAXEL) PRODS. LIAB. LITIG., MDL NO. 2740*

I have been asked to prepare this report to review the pathological findings for Antoinette Durden, Tanya Francis, and Barbara Earnest. I have also been asked to address the aspects of the opinions of plaintiffs' experts Dr. Curtis Thompson and Dr. Antonella Tosti dealing with dermatopathology, as well as to review the method of obtaining the plaintiffs' punch biopsies by Dr. Cole Claiborne. The opinions and analysis set forth herein are made to a reasonable degree of medical and scientific probability. This means I believe them to be true, based on all available data and reasonable scientific and medical principles. I have used the same type of scientific rigor in the analysis and reasoning here, that I use every day in my professional work.

## I.   BACKGROUND AND QUALIFICATIONS

I am an Associate Professor in the Department of Pathology and Laboratory Medicine at the UCLA/David Geffen School of Medicine. I joined the UCLA Department of Pathology as an assistant clinical professor in 2008 and am a board certified dermatopathologist who completed both my anatomic/clinical pathology residency and dermatopathology fellowship training at UCLA. I have special interests in diseases of the scalp and cutaneous lymphomas, with an emphasis on the diagnosis of mycosis fungoides and its variants. I have an active teaching role in the Pathology and Dermatology departments. In addition to my dermatopathology board certification from the American Board of Pathology in 2008, I became board certified in Anatomic and Clinical Pathology in 2007. My medical degree is from the Drew/UCLA School of Medicine in 2003.

My professional experience, awards, honors, and other professional activities, including lectures, are listed in my curriculum vitae attached hereto as **Exhibit A**.

## II.   DISCLOSURES

I am being compensated in connection with this matter at my customary rate of $1,100 per hour for consultation, records review, deposition, and trial testimony.

During the proceeding four years, I have not testified as an expert at any trial or by deposition.

Because I have reviewed ample medical and scientific literature over my continued education in pathology, it is not possible to list all of the material informing my opinions. I am, however, attaching a list of references that I have reviewed as **Exhibit B**. By including

1

literature on this list, it does not imply that I place any particular emphasis on the reference or that I agree with all of the content in any particular publication. In addition, I am attaching a list of case-specific materials that I have reviewed as **Exhibit B**.

At the time of trial, I may use pathology slides, microphotographs, photographs, or other records or graphics to assist with the illustration of my opinions. I may also amend and further supplement my opinions based on additional material provided to me after the date of this report.

### III. OPINIONS

#### A. ALOPECIA GENERALLY

I will offer opinions regarding various forms of alopecia as well as causes of alopecia. There are many forms of alopecia and many causes of alopecia. For all three of these women—Ms. Francis, Ms. Earnest, and Ms. Durden—they all could present with the alopecia they have even if they never had chemotherapy.

#### B. Understanding Pathology

I will offer opinions on pathology, dermatopathology, and the interplay between a dermatologist and pathologist. I will offer opinions specific to these three cases on how scalp biopsies should be conducted, how the pathology should be handled, and impressions from the pathology. I will offer opinions on how forms of alopecia present both clinically and histopathologically in comparison and contrast to the slides for the pathology here.

Pathologists examine tissue removed from the human body either surgically or via biopsy and provide a report describing visual findings and reaching diagnoses based on those findings. Dermatopathology is the study of skin pathology. It is a subspecialty of dermatology and pathology. A dermatopathologist must be trained in either dermatology or pathology. I am a dermatopathologist trained in pathology. Dermatologists treat patients, while dermatopathologists receive biopsy specimens, examine the tissue, and make the diagnoses.

#### C. The Role and Importance of Pathology to Diagnosing Hair Loss

Alopecia presents in many different ways and may have many different causes. While dermatologists can make clinical diagnoses, at times dermatologists will send pathology samples to pathologists to either confirm or reject clinical diagnoses.

Dermatologists should have a detailed clinical history for the patient before conducting a scalp biopsy. Additionally, before sending pathology samples to a pathologist, dermatologists will typically conduct various blood tests to rule out certain causes of alopecia, including vitamin deficiencies, iron deficiencies, nutritional deficiencies, hormonal imbalances, autoimmune disorders, or thyroid conditions. Neither Ms. Durden, Ms. Francis,

nor Ms. Earnest had blood tests performed in the evaluations ordered by their lawyers, so the factors for alopecia that may be seen with blood tests cannot be ruled out.

While pathological findings for various types of alopecia may overlap and not all biopsies will establish a definitive diagnosis, the gold standard for diagnosing the type of alopecia is a scalp biopsy.

There are established protocols in dermatology that are used when performing scalp biopsies. Before performing the biopsy, the dermatologist should obtain a full clinical history and conduct a physical examination. Both a clinical history and physical examination are of great importance in the process because both assist the dermatologist in making a clinical differential diagnosis, which is necessary to have before performing the biopsy.

After making a clinical diagnosis, the dermatologist should determine where on the scalp to biopsy and how many biopsies to perform. Because a single patient may experience multiple forms of alopecia at the same time, biopsies should be taken from any portion of the scalp that may appear to have a different disease process.

In addition, whether the dermatologist believes that the alopecia is scarring or non-scarring, impacts the location from which the biopsy is taken on the scalp as well as the number of biopsies taken.

When assessing certain forms of alopecia, such as androgenetic alopecia, a biopsy should be taken from the "normal" portion of the scalp for comparison to the "abnormal" biopsy. This is useful in establishing a baseline for that patient because there can be great variability among people in what is considered normal for hair counts, as well as other pathological factors.

Trichoscopy examines the scalp at magnification. Trichoscopy can be useful in deciding which portions of the scalp to biopsy. While trichoscopy can be useful in establishing clinical differential diagnoses, it cannot replace a biopsy.

A 4 mm punch biopsy is the standard. The biopsy should be of sufficient depth to allow an inspection of the entire dermis and superficial subcutis.

The dermatologist should carefully document the location from where the punch biopsy was taken to communicate to the pathologist.

After a dermatologist performs a biopsy, it is sent to a pathology lab where it is processed and slides are created for the dermatopathologist to review. When a dermatologist sends a pathology specimen to the pathologist, it is accompanied by a requisition form. The requisition form should provide sufficient clinical history about the patient as well as the dermatologist's clinical differential diagnoses.

Without this material and information, a pathologist is limited in their ability to accurately interpret the biopsy, provide accurate pathological differential diagnoses, and risks error.

After reviewing the slides, pathologists create reports. Those reports will include a clinical history section. In addition, most pathology reports include differential diagnoses. This is because there are many forms of alopecia that will have overlapping pathological findings. I will discuss the findings included in pathology reports as well as the pathological features associated with various forms of alopecia.

Dermatologists will review those reports after clinically assessing a patient. If a dermatologist reviewed a pathology report before conducting a full clinical and physical examination, it could potentially bias the dermatologist's conclusions.

While some scalp biopsies contain pathological features that can establish a definitive diagnosis, it is very common that a pathology report will include a differential diagnosis. In addition, for many types of alopecia, pathologists are generally unable to establish a definitive cause of the alopecia.

### D. Dr. Claiborne Did Not Follow His Standard Practice in Obtaining Punch Biopsies from Ms. Durden, Ms. Francis, and Ms. Earnest

Dr. Claiborne testified that the process that was used here to obtain punch biopsies from Ms. Durden, Ms. Francis, and Ms. Earnest was "woefully incomplete."[1] Dr. Claiborne stated that he would never use the process that he did here in his practice[2] and would never use the process that was used here outside of litigation.

Dr. Claiborne ordinarily would determine the number of biopsies to take and where to take them. But here, Dr. Claiborne was told by the plaintiffs' attorney to only take two biopsies,[3] and the lawyer decided on the strategy for the location of the biopsies.[4] (Figures 1 – 4) As such, unlike his normal practice where Dr. Claiborne would take a biopsy from each location that could have a different alopecia process,[5] here, that was not done.

Dr. Claiborne would take a clinical history from the patient and conduct a physical examination in his normal practice.[6] But here, Dr. Claiborne was told by Ms. Durden's, Ms. Earnest's, and Ms. Francis' attorney not to conduct a clinical examination[7] or physical examination,[8] and he did not receive any of the clinical information he would get in his practice,[9] such as the symptoms these women may have had or what risk factors they may have had for alopecia.[10] Likewise, in his normal practice, Dr. Claiborne would run blood tests

---

[1] Claiborne Dep. 21:19-22:2.
[2] Claiborne Dep. 20:17-20, 57:19-21.
[3] Claiborne Dep. 11:15-24.
[4] Claiborne Dep. 48:6-13.
[5] Claiborne Dep. 49:19-50:2.
[6] Claiborne Dep. 20:21-21:2., 41:14-42:6
[7] Claiborne Dep. 45:8-16.
[8] Claiborne Dep. 45:8-16.
[9] Claiborne Dep. 42:7-11.
[10] Claiborne Dep. 13:4-6, 18:25-19:1, 53:21-54:2.

when assessing a woman's alopecia [11] but that was not done here.[12] Ultimately, Dr. Claiborne did not have clinical differential diagnoses before taking the punch biopsies, which is inconsistent with his normal practice.[13]

Dr. Claiborne ordinarily would send a requisition form that would include the patient's clinical history to the pathologist.[14] In this case, Dr. Claiborne did not know what pathologist was used and did not provide any clinical information.[15]

The process that was used here is not consistent with standards of dermatology or pathology.

### E. Dr. Thompson Did Not Receive Sufficient Clinical Information and Made Errors in His Report

Plaintiffs' lawyer decided to send the pathology to a doctor in Portland, Oregon, Dr. Curtis Thompson. From the gross specimens, his lab created H&E stained slides. Dr. Thompson then reviewed the slides and generated pathology reports. I will discuss Dr. Thompson's report and his opinions.

Dr. Thompson's reports are missing a clinical history section as well as differential diagnoses. In my practice, I include a clinical history section, and I typically include differential diagnoses after I state my histologic findings. That is consistent with standards of dermatopathology. Dr. Thompson should have provided the clinical history and a differential diagnosis in his pathology reports.

As discussed in more detail below, in his report, Dr. Thompson incorrectly described, calculated, or recorded some of his findings. It is my opinion that Dr. Thompson was not provided with sufficient clinical history.

### F. HAIR COUNTS

I will discuss hair counts. What is considered a normal hair count can vary quite extensively between races, as well as individuals within that race. When assessing what is a "normal" hair count, it is useful to compare the hair counts seen in the abnormal looking portion of the scalp with the hair counts seen in the normal portion of the scalp. The counts seen within the normal portion of the scalp are representative for what is normal for that specific patient.

In addition, African Americans have lower hair counts seen in a 4 mm punch biopsy than Caucasians. For African American hair, the average total range is 10 to 32, average terminal

---

[11] Claiborne Dep. 45:17-46:24.
[12] Claiborne Dep. 46:26-47:3.
[13] Claiborne Dep. 48:14-43:10.
[14] Claiborne Dep. 50:3-21.
[15] Claiborne Dep. 26:3-11.

range is 10 to 31, and average vellus range is 0 to 7.[16]  For Caucasian hair, the average total range is 26 to 45, average terminal range is 18 to 42, and average vellus range is 1 to 12.[17] These counts and ratios can change, though, with age and other normal processes.

### G.  SCARRING AND NON-SCARRING ALOPECIA

There are many different types of alopecia.  Alopecia can be multifactorial.  As such, one patient could be experiencing multiple forms of alopecia at one time.  The types of alopecia are scarring and non-scarring alopecia.  Hair loss can be diffuse or focal, and vary in severity, depending on the type of alopecia.

Androgenetic alopecia is a common form of non-scarring alopecia.  Ranging from minimal to complete, androgenetic alopecia is varied in its severity by patient, and hair loss seen with androgenetic alopecia can occur all over the scalp.  Risk factors for androgenetic alopecia can include genetics, age, being post-menopausal, and hormone imbalances.

One common form of scarring hair loss for African American women is Central Centrifugal Cicatricial Alopecia ("CCCA").  CCCA is a progressive form of alopecia that usually begins on the crown and spreads in a centrifugal fashion.  CCCA can resemble androgenetic alopecia.

I will discuss the pathological findings seen with various types of alopecia.  When looking at slides, a pathologist can assess whether the alopecia is scarring or non-scarring.  There are also forms of alopecia that are biphasic.  In other words, while the alopecia is a non-scarring alopecia, over time, there can be follicular drop out.  This can be seen both with traction and androgenetic alopecia.  A reduced follicular count with preservation of sebaceous glands can be seen in androgenetic alopecia and traction alopecia.  Additionally, for both androgenetic alopecia and traction alopecia, vellus hairs can be seen, and there can be reduced hair density as well as shortened hair length.

### H.  TAMOXIFEN AND AROMATASE INHIBITORS

Alopecia can be caused by both Tamoxifen and Aromatase Inhibitors.  There have been no definitive studies assessing how hair loss caused by Tamoxifen or Aromatase Inhibitors presents pathologically.  As such, any woman who has alopecia and is taking either Tamoxifen or an Aromatase Inhibitor, may have alopecia caused by those medications.

### I.  THERE ARE NO DEFINED PATHOLOGICAL FINDINGS ASSOCIATED WITH ONGOING ALOPECIA AFTER CHEMOTHERAPY

The first case reports by pathologists of persistent alopecia after chemotherapy were published in 2010.  Following that, a small number of subsequent publications reported other cases, by pathologists, of alopecia after chemotherapy.   But none of these publications

---

[16] Sperling, Leonard C. "Hair density in African Americans." *Archives of dermatology* 135.6 (1999): 656-658.
[17] Sperling, Leonard C. "Hair density in African Americans." *Archives of dermatology* 135.6 (1999): 656-658.

discussing persistent alopecia after chemotherapy report pathologic findings from a controlled study.

Even if alopecia could be attributed to chemotherapy, it would be impossible to attribute it to any specific drug in a multi-drug regimen. Pathology cannot establish that any specific chemotherapy drug caused the alopecia. Moreover, to this day, there are no agreed upon pathologic diagnostic criteria for "persistent chemotherapy induced alopecia."[18, 19] In the reverse, and as described in the medical literature, persistent alopecia after chemotherapy presents as non-scarring. We can thus deduce from any scalp biopsy showing scarring alopecia that it would not be a chemotherapy-induced alopecia.

Additionally, no study has established a clear mechanism by which Taxotere or chemotherapy can cause alopecia after chemotherapy has ended.

### J. PATHOLOGICAL ASSESSMENTS OF MS. EARNEST, MS. DURDEN, AND MS. FRANCIS

I have reviewed the pathology slides available for Ms. Earnest, Ms. Durden, and Ms. Francis. Should any additional slides become available, I reserve the right to supplement this report. I've attached my Surgical Pathology Reports for Ms. Earnest, Ms. Francis, and Ms. Durden as **Exhibit C**.

The slides were viewed in the usual and customary manner by microscope. I had a full clinical history for Ms. Earnest, Ms. Francis, and Ms. Durden at the time I viewed their slides. At the time of trial, I intend to offer the opinion to a reasonable medical probability that chemotherapy, including chemotherapy with Taxotere cannot be established as the definitive cause of Ms. Durden's, Ms. Francis', or Ms. Earnest's alopecia.

#### i. MS. EARNEST

Ms. Earnest is a 68 year-old, post-menopausal, Caucasian woman. She has a medical history that includes pre-diabetes, obesity, hypertension, high cholesterol, and vitamin and iron deficiencies. In addition to a lumpectomy, she received a multi-drug chemotherapy regimen to treat her breast cancer. She lost her hair before ever taking Taxotere.[20] After her chemotherapy, she received radiation. In addition, because her cancer was hormone

---

[18] Yang, Xinyi, and Keng-Ee Thai. "Treatment of permanent chemotherapy-induced alopecia with low dose oral minoxidil." *Australasian Journal of Dermatology* 57.4 (2016): e130-e132.

[19] Tallon, Ben, Elizabeth Blanchard, and Lynne J. Goldberg. "Permanent chemotherapy-induced alopecia: histopathologic criteria still to be defined." *Journal of the American Academy of Dermatology* 68.5 (2013): e151-e152.

[20] PFS § VI.5. (stating that diffuse thinning started May 1, 2011); Barbara Earnest Dep. 222:23–25 ("So your hair began to fall out when you were taking Adriamycin and Cytoxan, correct? A: Uh-huh. Yes."); Northshore Oncology Associates (May 10, 2011) 260 ("There is alopecia secondary to cytotoxic chemotherapy."); Northshore Oncology Associates (May 31, 2011) 259 ("There is alopecia secondary to cytotoxic chemotherapy."); Northshore Oncology Associates 258 ("There is alopecia secondary to cytotoxic chemotherapy.").

receptor positive, since her chemotherapy she has taken an Aromatase Inhibitor.[21] She also takes other medications that are known to cause alopecia.

Ms. Earnest has many risk factors for alopecia, including health conditions, age, being post-menopausal, medications, vitamin deficiencies, and use of Aromatase Inhibitors.

After reviewing Ms. Earnest's available slides, I make the following pathological findings:
**CASE #CT18-8612**
**Biopsy A, Left vertex of scalp:**
Terminal anagen hairs:  0
Terminal catagen/telogen hairs:  0
Vellus/miniaturized hairs:  16
Total hairs (all phases):  16
Terminal: vellus ratio:  0: 16
Inflammatory infiltrate:  Focal, mild, superficial, peri-follicular chronic inflammation present at the level of the infundibulum
Fibrosis:  Not identified
Additional features noted:
Numerous follicular streamers present
Focal areas of follicular dropout noted

**Biopsy B, Right occipital scalp:**
Terminal anagen hairs:  4
Terminal catagen/telogen hairs:  2
Vellus/miniaturized hairs:  11
Total hairs (all phases):  17
Terminal: vellus ratio:  6: 11
Inflammatory infiltrate:  Focal, mild, superficial, peri-follicular chronic inflammation present at the level of the infundibulum
Fibrosis:  Not identified
Additional features noted:
Scattered follicular streamers present

Both of Ms. Earnest's biopsies show features consistent with androgenetic alopecia. Androgenetic alopecia is the most prevalent form of alopecia seen in women.  Her clinical presentation and pathology are consistent with androgenetic alopecia.  It is my opinion that Ms. Earnest has androgenetic alopecia, which likely is worsened by her Aromatase Inhibitor use.  However, given this patient's history of chemotherapy, alopecia secondary to aforementioned treatment cannot be excluded.

### ii.   Ms. Durden

Ms. Durden is a 68 year-old, post-menopausal, African American woman. Her medical history is noteworthy in that she has a history of obesity, HTN, heart murmur, vitamin D deficiency,

---

[21] Northshore Oncology Associates 251–52; Bridgette Collins-Burow 6-9.

and anemia. In addition to a mastectomy, she received a multi-drug chemotherapy regimen to treat her breast cancer. After chemotherapy, because Ms. Durden's cancer was hormone positive, she was treated with an Aromatase Inhibitor.[22] She also takes other medications that are known to cause alopecia.

Ms. Durden has many risk factors for alopecia, including health conditions, age, being post-menopausal, medications, vitamin deficiencies, and Aromatase Inhibitors.

After reviewing Ms. Durden's available slides, I make the following pathological findings:
**CASE #CT18-8611**
**Biopsy A, Right anterior scalp**
Terminal anagen hairs:  4
Terminal catagen/telogen hairs:  3
Vellus/miniaturized hairs:  7
Total hairs (all phases):  14
Terminal: vellus ratio:  1: 1
Inflammatory infiltrate:  Mild, superficial, peri-vascular chronic inflammation
Fibrosis:  Focal peri-follicular fibrosis present
Additional features noted:
Scattered follicular streamers present

**Biopsy B, Right parietal scalp**
Terminal anagen hairs:  6
Terminal catagen/telogen hairs:  3
Vellus/miniaturized hairs:  2
Total hairs (all phases):  11
Terminal: vellus ratio:  9: 2
Inflammatory infiltrate:  Mild, superficial, peri-vascular chronic inflammation
Fibrosis:  Not identified
Additional features noted:
Rare hair follicle with distorted follicular anatomy and intra-follicular hemorrhage

Ms. Durden's biopsy B is tangentially sectioned and cannot be used as a standard for comparison to "normal." In addition, Dr. Thompson's hair counts for biopsy B are inaccurate.

Ms. Durden's punch biopsy A shows features consistent with both traction and androgenetic alopecia. Ms. Durden's punch biopsy B shows features suggestive of traction alopecia.

Ms. Durden's pathological finding of features suggestive of traction alopecia is consistent with her hair-care practices. Photographs of her show that her hair was straightened by heat or chemical processing. Likewise, photographs of her depict her hair placed into tight buns and cornrow hair styles. In addition to photographs, her friends' and family's deposition

---

[22] Ochsner Health System 2951-2953 (noting prescription); Ochsner Medical Center 1203-1222 (noting discontinuation).

testimony shows that Ms. Durden used chemical and heat straightening, buns, braids, and ponytails.[23]

Ms. Durden should have had a biopsy taken from her crown area to assess for scarring alopecia, where the appearance of hair loss is suggestive of CCCA.

Ms. Durden has seen numerous treating dermatologists. None of those dermatologists have diagnosed Ms. Durden as having hair loss due to chemotherapy. Ms. Durden was treated by Dr. Mermilliod and Dr. Martin. Both doctors were deposed. Both doctors diagnosed Ms. Durden as having scarring alopecia with a likely component of female pattern hair loss.[24] Dr. Martin noted the scarring process is most likely CCCA. Dr. Mermilliod noted that "a 66-year-old postmenopausal woman could present with the type of hair loss that Mrs. Durden presented even if she never had chemotherapy."[25] Likewise, Dr. Martin also confirmed numerous other potential factors in Ms. Durden's hair loss, unrelated to chemotherapy, including age, postmenopausal status, vitamin D deficiency, and letrozole (Femara) use.[26]

Ms. Durden's clinical presentation is consistent with traction, CCCA, and androgenetic alopecia. Her pathology is consistent with traction and androgenetic alopecia. I also cannot rule out CCCA.

### iii. Ms. Francis

Ms. Francis is a 48 year-old, African American woman. She is in a state of surgically-induced menopause. Her past medical history is significant in that she has a history of metabolic syndrome, HTN, high cholesterol, obesity, pre-diabetes, and vitamin D deficiency. In addition to a mastectomy, she was treated with a multi-drug chemotherapy regimen. Because her cancer was hormone positive, Ms. Francis has taken both Tamoxifen and Aromatase Inhibitors after she completed her chemotherapy. Ms. Francis takes other medications that are known to cause alopecia.

Ms. Francis has many risk factors for alopecia, including health conditions, age, being post-menopausal, medications, vitamin deficiencies, and Aromatase Inhibitors.

After reviewing Ms. Francis' available slides, I make the following pathological findings:
**CASE #CT18-8610**
**Biopsy A, Left parietal scalp**
Terminal anagen hairs: 5
Terminal catagen/telogen hairs: 2
Vellus/miniaturized hairs: 4
Total hairs (all phases): 11

---

[23] Dorothy Durden 23:24-24:4; 24:25-25:18; Darryl Durden 115:16-25; 117:24-118:5; 121:4-9; 124:13-18; 130:25-131:8.
[24] Julie Mermilliod 6-19; Ochsner Health System 2028-2039.
[25] Mermilliod 48:17-49:12.
[26] Martin 53:4-54:7.

Terminal: vellus ratio:  7: 4
Inflammatory infiltrate:  Focal, peri-follicular chronic inflammation
Fibrosis:  Focal peri-follicular fibrosis noted
Additional features noted:
Rare hair follicle with distorted follicular anatomy and a distorted inner root sheath
Rare hair follicles with eccentric epithelial atrophy
Focal follicular drop-out

**Biopsy B, Left vertex of scalp**
Terminal anagen hairs:  17
Terminal catagen/telogen hairs:  0
Vellus/miniaturized hairs:  1
Total hairs (all phases):  18
Terminal: vellus ratio:  17: 1
Inflammatory infiltrate:  Peri-follicular chronic inflammation
Fibrosis:  Prominent peri-follicular fibrosis noted
Additional features noted:
Polytrichia present
Scattered hair follicles with eccentric epithelial atrophy
Rare follicle with a collapsed inner root sheath and intra-follicular hemorrhage

Dr. Thompson incorrectly read punch biopsy B.  His hair count is inaccurate, and he did not mention the presence of a scarring process.

Ms. Francis' punch biopsy A is consistent with a finding of traction alopecia or androgenetic alopecia and shows findings consistent with scarring alopecia as well, which could be CCCA or LPP.  Her punch biopsy B shows features consistent with scarring alopecia, which could be CCCA or LPP.  Additionally, the identification of the collapsed root sheath and intra-follicular hemorrhage shows findings consistent with pulling or traction.

Ms. Francis' past hair-care practices support a finding of traction alopecia.  In particular, Ms. Francis has a history of heat processing, hair straightening, chemical straighteners, hair coloring, hair relaxers, braids, weaves, extensions, and perms.[27]

Ms. Francis has seen a nurse practitioner.  That nurse practitioner's findings were consistent with traction alopecia.  In particular, the nurse noted hairless patches around the edges of Ms. Francis' head.[28]  When deposed, the clinician explained that edges meant "frontal, temporal edges, and forehead edges" on the right and left sides of scalp.  Additionally, the nurse practitioner could not rule out Ms. Francis's hormone therapy as a cause of her hair thinning.[29]  When seeing this clinician, Ms. Francis did not mention chemotherapy as a possible cause of her hair loss.[30]

---

[27] PFS, § VII.13 at p. 21-22; Francis Dep. 278:1-11; W. Mathis Dep. 116:5-19.
[28] Janice Birkhoff Dep. 42:1-7.
[29] Janice Birkhoff Dep. 43:5-18; Janice Birkhoff Dep. 44:17-25.
[30] Janice Birkhoff Dep. 88:3-8.

- 12 -

Ms. Francis' clinical presentation is consistent with traction, CCCA, and androgenetic alopecia. Her pathology shows features of traction, androgenetic alopecia, and scarring alopecia.

### K. Conclusion

Based on the objective histological findings present in the slides of the Plaintiffs' punch biopsies, one cannot say to a reasonable degree of medical and scientific probability that Ms. Durden, Ms. Francis, and Ms. Earnest have alopecia caused by Taxotere.

Signed:

*Chandra Smart, MD*

_____
Chandra N. Smart, M.D.
Los Angeles, California
January 11, 2019

FIGURE 1 - Durden Photographs Emailed by Plaintiffs' Counsel to Dr. Claiborne on October 26, 2018 [Claiborne Dep. Exh. 7]



FIGURE 2 – Francis Photographs Emailed by Plaintiffs' Counsel to Dr. Claiborne on October 26, 2018 [Claiborne Dep. Exh. 6]



FIGURE 3 – Earnest Photographs Emailed by Plaintiffs' Counsel to Dr. Claiborne on October 26, 2018 [Claiborne Dep. Exh. 8]



FIGURE 4 – Scalp Anatomy for Describing Characteristics of Hair Loss and Recording Locations of Biopsy

