# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)                    MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

                                               SECTION "H" (5)

THIS DOCUMENT RELATES TO:
Deborah Johnson, 2:16-cv-15607
Tanya Francis, 2:16-cv-17410


**MEMORANDUM IN SUPPORT OF PLAINTIFF DEBORAH JOHNSON'S AND PLAINTIFF TANYA FRANCIS' MOTION FOR RECONSIDERATION OR, IN THE ALTERNATIVE, FOR CLARIFICATION/AMENDMENT OF JUDGMENTS (DOCS. 7697 AND 7698) BASED ON ORDER AND REASONS (DOC. 7571)**


MAY IT PLEASE THE COURT:

Plaintiffs, Deborah Johnson and Tanya Francis, through the Plaintiffs' Steering Committee ("PSC"), respectfully seek the Court's reconsideration of the Judgments (Docs. 7697 & 7698) dismissing their cases with prejudice based on the Court's Order and Reasons ("Order") (Doc. 7571) granting Sanofi's motions for summary judgment based on the statute of limitations. When the administrative allegations of the plaintiffs' master complaint are read as appropriately modified by the individual allegations of Plaintiffs, along with drawing reasonable inferences, the allegations of Ms. Johnson and Ms. Francis are not prescribed on their face and, therefore, no shifting of the timeliness burden was appropriate. Moreover, there are significant material facts in dispute regarding the timing of Plaintiff's notice under Louisiana's liberative prescription jurisprudence, as well as the application of contra non valentem. Accordingly, based on the allegations, the case specific testimony, and reasonable inferences therefrom, Plaintiffs respectfully request that Sanofi's motions for summary judgment based on the statute of limitations (Docs. 5734 & 6081) be denied on reconsideration.

Alternatively, Plaintiff seeks clarification and/or amendment of the Order because it seems to adopt Sanofi's mischaracterization of the Second Amended Master Long Form Complaint ("AMC") (Doc. 4407) and fails to consider Plaintiffs' education and intelligence and Sanofi's actions when analyzing the application of contra non valentem. Should the Court determine that reconsideration is inappropriate, the Order should be corrected insofar as its application of allegations of the AMC (specifically, the definitional paragraph numbered 181).

I.     **THE HINDSIGHT, DEFINITIONAL ALLEGATIONS OF THE PLAINTIFFS' ADMINISTRATIVE MASTER COMPLAINT DO NOT REPRESENT DEBORAH JOHNSON'S OR TANYA FRANCIS' KNOWLEDGE, ACTUAL OR CONSTRUCTIVE, AT THE TIME OF HER INJURY.**

A.   This District's interpretation of administrative master complaints.

As far back as 2002, Judge Fallon was confronted with how to characterize a master complaint in an MDL. Should it be treated as an ordinary complaint subject to standard rules; or should it be treated as a different animal? He decided upon the latter as memorialized in an Order in the *Propulsid* MDL:

> Master complaints … seem to be grounded instead in the general provisions of Rule 42(a) of the Federal Rules of Civil Procedure. Rule 42(a) broadly authorizes district courts to consolidate actions pending before the court and to make such orders "as may tend to avoid unnecessary costs or delay." Courts have interpreted Rule 42(a) to authorize the filing of a unified or master complaint in cases consolidated both for pretrial discovery and for trial. (C)onsolidation is intended only as a procedural device used to promote judicial efficiency and economy.
>
> If the master complaint in the present case were to be treated as a traditional complaint, many significant and perhaps unintended consequences would follow. First, it would make applicable Louisiana's choice-of-law rules even though the class action for which class certification is sought was filed in Indiana. Second, it would complicate the matter of the subsequent remand of the individual MDL actions back to the transferor court by introducing confusion as to which court is the transferor court in light of the fact that two substantive complaints—one in Louisiana and one in

> Indiana—have been filed. Indeed, taking this to the extreme, a master complaint, if given the status of a traditional complaint, could be used to circumvent the remand requirement of 28 U.S.C. § 1407 by substituting itself for all individual actions filed in the MDL and thereby frustrate the intended effect of that statute as recognized in the Supreme Court's decision in *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach,* 523 U.S. 26, 39, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998). *In light of these concerns the master complaint should not be given the same effect as an ordinary complaint. Instead, it should be considered as only an administrative device to aid efficiency and economy.* [1]

Since Judge Fallon's holding in *Propulsid* that master complaints "should be considered as only an administrative device to aid efficiency and economy," many other district courts have followed suit.[2]

Recently, the Supreme Court has also recognized that a master complaint, which is not intended to supersede all individual pleadings, "is not meant to be a pleading with legal effect but only an administrative summary of the claims brought by all the plaintiffs."[3]

The Second Amended Master Long Form Complaint ("AMC") in this MDL expressly provides that it is "intended to achieve efficiency and economy by presenting certain common allegations and common questions of fact and law that generally pertain to Plaintiffs adopting this Complaint." Doc. 4407 at ¶2. The allegations therein are pled in "the broadest sense, pursuant to all applicable laws and pursuant to choice of law principles, including the law of the

---

[1] In re Propulsid Prod. Liab. Litig., 208 F.R.D. 133, 141-42 (E.D. La. 2002) (emphasis added) (internal footnotes and some authorities omitted).

[2] *See e.g.*, In re Trasylol Products Liability Litig., 2009 WL 577726, at *8 (S.D. Fla. 2009) (concluding the master complaint was a document drafted as a "compromise and attempt at efficiency…."); and In re Nuvaring Products Liability Litig., 2009 WL 2425391, at *2, (E.D. Mo. 2009) (finding the master complaint "was simply meant to be an administrative tool to place in one document all of the claims at issue in the litigation.").

[3] Gelboim v. Bank of America Corp., 135 S.Ct. 897, 904 fn. 3 (2015), quoting In re Refrigerant Compressors Antitrust Litigation, 731 F. 3d 586, 590-592 (6th Cir. 2013). Although there are some cases holding that a master complaint supersedes all individual complaints, these are primarily antitrust or mass disaster cases, where, from a logical perspective, the master complaint should control. See e.g. In re Refrigerant Compressors Antitrust Litigation, 731 F. 3d at 590; and In re Katrina Canal Breaches Litig., 309 Fed. Appx. 836, 838 (5th Cir. 2009).

each Plaintiff's home state." The master complaint was not intended to provide individualized

factual allegations:

> 3. This Second Amended Master Complaint does not necessarily
> include all claims asserted in all of the transferred actions to this
> Court. It is anticipated that individual Plaintiffs will adopt this
> Second Amended Master Complaint and selected causes of action
> herein through the use of a separate Short Form Complaint. Any
> individual facts, jurisdictional allegations, additional legal claims
> and/or requests for relief of individual Plaintiffs may be set forth as
> necessary in the Short Form Complaint filed by the respective
> Plaintiffs.

As the Taxotere AMC was never intended to supplant all individual pleadings, and as

evidenced by the required filing of individual short form complaints by each MDL Plaintiff, the

Taxotere AMC is simply an "administrative device to aid efficiency and economy" in this

litigation.  Thus, the Order's adoption of Sanofi's interpretation of the allegation in paragraph

181 of the AMC, morphing a hindsight scientific definition of a 6-month time period related to

permanent hair loss into an across-the-board for every MDL Plaintiff allegation of notice,

without individual inquiry, was improper.

> B. Specific allegations of the AMC should be interpreted in light of its administrative
> role, and not in isolation from other paragraphs of the AMC or short form
> complaints.

In its memoranda in support of motions for summary judgment (*see, e.g.,* Francis, Doc.

6081 at 1; Johnson, Doc. 5734-2 at 1), Sanofi twists the language of the AMC  to conclude  that

each Plaintiff in this MDL claims they were aware of permanent/irreversible hair loss (failure to

grow back) 6 months after completion of chemotherapy. Sanofi does this by using paragraph 181

of the AMC which provides, in hindsight, one view of the medical definition of "permanent

chemotherapy induced alopecia," and improperly characterizes that time period as each

Plaintiff's case-specific factual allegation. Sanofi disregards and ignores each Plaintiff's

responses in her Short Form Complaint which do not adopt a specific time when she actually or constructively knew of her injury.

Sanofi's insinuations that every MDL Plaintiff's alopecia became permanent at 6 months post chemotherapy are incorrect and become evident when comparing its arguments to the pleadings. Sanofi makes these arguments as one of the first points in its memoranda briefs. Sanofi's memorandum in support of its motion for summary judgment[4] against Ms. Francis states:

> Here, the pleadings and undisputed evidence establish that Ms. Francis was aware of her alleged injury and its potential relationship to her Taxotere chemotherapy regimen in 2010, more than six years before she filed suit in December 2016.

Sanofi cites as support a cherry-picked and one-sided conflating paragraph 181 of the AMC, with portions of the required short form complaint[5] and required  PFS responses.  The cited source is, at best, a stretch for the proposition that it stands. And for Ms. Johnson Sanofi made almost identical allegations:

> Here, the pleadings and undisputed evidence establish that Ms. Johnson was aware of her alleged injury in 2010 or, at the latest, June 2011, more than five years before she filed suit in October 2016.

The very same leaps and inferences are made to reach that conclusory statement, which appears nowhere in, and is inconsistent with, the pleadings when read as a whole.[6]

The general allegation in paragraph 181 of the AMC upon which Sanofi relies is clearly an after-the-fact allegation of one medical definition of "Permanent Chemotherapy Induced Alopecia"[7] at the time the AMC was filed.

---

[4] Doc. 6081 at 1-2.
[5] PTO 15, ¶C.b. (Doc. 230).
[6] See Doc. 5734-2 at 1-2.

181.   Unlike the temporary and reversible alopecia that ordinarily results from chemotherapy, Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate cause Permanent Chemotherapy Induced Alopecia, which is defined as an absence of or incomplete hair regrowth six months beyond the completion of chemotherapy. The Permanent Chemotherapy Induced Alopecia caused by Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate is not limited to the scalp and can affect hair follicles throughout the body.

Ms. Francis' short form complaint (Doc. 6081-2 at 5) and Ms. Johnson's amended short form complaint (Doc. 5734-4 at 10) both allege that their permanent, irreversible and disfiguring alopecia began at some unspecified  time after treatment.  Plaintiffs' Short Form Complaint allegations and Plaintiffs' Fact Sheet responses describe their injuries based on knowledge at the time the SFC was filed in consultation with her attorneys. All the Plaintiffs knew was that the hair didn't grow back after chemotherapy.

The responses can be construed in multiple lights.For example, section 12 of the exemplar short form complaint does not say "Nature and extent of alleged injury (including duration, approximate date of [*first knowledge of*] onset (if known), and description of alleged injury." Nor does it say [*in hindsight now knowing what you know*] or [*in hindsight knowing what the PSC knew at that time*]. Since a reasonable jury could construe the response in either fashion, the factual allegation must be read in light of Plaintiffs' hindsight recollection. Plaintiffs' credibility is not an issue here.

---

[7] Other paragraphs in section IV of the Second AMC (Taxotere, Docefrez, Docetaxel Injection, and Docetaxel Injection Concentrate Caused Permanent Alopecia in Many Breast Cancer Patients) were not known by individual plaintiffs at the time of their chemotherapy or even in the months and years following chemotherapy. For example, paragraph 175 provides a hindsight medical definition, that, if known in the months following chemotherapy, may have caused incitement of a duty to inquire. However, the allegation clearly is a hindsight definition based on knowledge and information the PSC is presenting through a common, administrative set of allegations:

175. There are 100,000 hair follicles on the scalp that typically grow about 0.3 to 0.4 mm a day or about six inches a year. For hair production, hair follicles undergo a cycle that consists of three phases: the anagen phase (growth), the catagen phase (transition), and the telogen phase (resting). During the anagen phase, the cells at the root of the hair follicle are dividing rapidly and an entire hair shaft from tip to root is formed. The matrix cells, which build the hair shaft, have a cell cycle length of approximately 18 hours. Approximately 90 percent of the hair on the scalp is normally in the anagen phase.

The same principle applies to their PFS responses. Apparently, the Court construed the responses as temporal knowledge of when her injury became permanent or began.[8] The relevant question, PFS, §IV.2, asks for "age at time of your alleged injury.". It does not ask "age at time [the lack of hair re-growth became permanent]". The question and its responses may reasonably be construed in multiple ways by the ultimate fact finder. It is far too general and lacks precision. As such, ambiguous responses should not be the grounds for a dismissal, especially considering the multiple different length of times Sanofi pin points when the alopecia is permanent.

      C.  <u>Respectfully, the Court's interpretation of Louisiana's "duty to inquire" both ignores the continuing tort/fraudulent concealment allegations of the AMC and would result in a unconscionable result based on the Court's concurrent finding in the *Mills* case that Sanofi's statements to doctors, through the label, provide (at the very least) a factual question for the jury in terms of fraud/misrepresentation.</u>

As the Court addressed the *Mills* case in the Order:

> . . . the inquiry is whether Defendants made a false representation to Dr. Shah and whether Dr. Shah relied on this. . . .
>
>                * * *
>
> Defendants made express statements to Dr. Shah through Taxotere's label. In their Motion, Defendants admit that while the Taxotere label has since its inception warned of hair loss, it did not warn of permanent hair loss until December of 2015. Further, Dr. Shah's testimony provides evidence tending to show that she did rely on Defendants' representation. In reliance on the Taxotere/docetaxel label, she did not warn her patient, Ms. Mills, of permanent hair loss.

Order at 18-19.

This same logic applies to Plaintiffs Ms. Francis and Ms. Johnson. Sanofi withheld a warning of the permanency of hair re-growth until December 2015.  Since Plaintiffs' physicians infused them with Taxotere in 2009 (Ms. Francis) and 2010 (Ms. Johnson), the doctors had no knowledge that the hair's failure to re-grow would be forever. The testimony of the prescribing

---

[8] *See* Order at n. 38.

physicians of Plaintiffs is similar to Dr. Shah's, in that they acknowledge, or at the very least an inference may reasonably be drawn, that they were not aware of a permanency risk related to hair loss at the time they prescribed Taxotere.  Sanofi has not alleged otherwise.

Since the AMC is an administrative pleading, the AMC provisions Sanofi quoted and the Court adopted cannot be read in isolation and must be construed along with all other allegations as well as the numerous time periods Sanofi used to determine permanency of alopecia- 4 years after chemotherapy, 12 months after chemotherapy, and more than 2 years after chemotherapy.[9] All of these periods are longer than the 6 months used by Sanofi in its briefing and arguments, and seemingly adopted by the Court.

Additionally, the Court should reconsider its ruling and find that the permanent/irreversible injury was not known or reasonably knowable to Plaintiffs because of the actions of the defendants:

> 10. Plaintiffs could not, by the exercise of reasonable diligence, have discovered the wrongful cause of their injuries as the cause was unknown to Plaintiffs. Plaintiffs did not suspect, nor did they have reason to suspect that they had been injured, the cause of their injuries, or the tortious nature of the conduct causing their injuries until a date prior to the filing of these actions, which is less than the applicable limitations period for filing suit.
>
> 11. Additionally, Plaintiffs were prevented from discovering this information at an earlier date because: (1) Defendants misrepresented to the public, the FDA, and the medical profession that Taxotere, Docetaxel Injection, Docetaxel Injection Concentrate, and Docefrez, are free from permanent side effects; (2) Defendants failed to disclose to the public, the FDA, and the medical profession their knowledge of the risk of permanent side effects; and (3) Defendants fraudulently concealed facts and information that could have led Plaintiffs to discover the liability of the Defendants.

AMC, ¶10-11.

---

[9] *See* Motion filed herewith.

Therefore, it appears an unconscionable result if Plaintiffs' allegations in one AMC paragraph forms the basis of dismissals with prejudice. The evidence is sufficient for a jury to determine that Sanofi may have concealed the risk of permanent hair loss. This factual jury determination is irreconcilable with an order that a Plaintiff's case is prescribed for not attempting to determine the causal link Sanofi concealed until December 2015. It also is inapposite with the Court's holding in the *Mills* case; although *Mills* was governed by Georgia law, the underlying facts are just as applicable to Louisiana law.

## II.   PRESCRIPTION AND CONTRA NON VALENTEM

Sanofi claims both Ms.  Francis and Ms. Johnson have brought untimely lawsuits. (Doc. 6081 and 5734, respectively). The Court dismissed both the *Francis* and the *Johnson* cases with prejudice based upon prescription, finding the doctrine of contra non valentem unavailable to them. Plaintiffs urge the Court to reconsider its Order and findings as contra non valentem protects their claims from dismissal.

Ms. Francis and Ms. Johnson also ask that the Court reconsider its conclusion that their complaints are prescribed on their faces and the burden is shifted to the Plaintiffs to show that their complaints are timely.   The AMC sets forth in detail sufficient allegations of misrepresentation and concealment to demonstrate that Sanofi knew of the permanent risks of Taxotere but failed to admit those risks to the American physicians or change the label to reflect what it knew. Plaintiffs also allege and the discovery shows their doctors were likewise kept in the dark on those risks.   Without that knowledge, the physicians were unable to warn their patients before December of 2015. Since both Plaintiffs filed their complaints in 2016 (less than one year after the label change), their cases are not prescribed on their face.   Accordingly, the burden is on Sanofi to show that the cases have prescribed.

"Liberative prescription is a mode of barring of actions as a result of inaction for a period of time." La. Civ. Code Ann. art. 3447.[10] "*Contra non valentem agere nulla currit praescriptio* ('prescription does not run against the party unable to act') is an exception to La. C.C. art. 3467, which states that prescription runs against all persons unless an exception is established by legislation."[11] "[T]he doctrine may be invoked in this state, as a cause for suspending the course of prescription, in cases where the debtor has concealed the fact of the obligation or has committed other acts which tend to hinder, impede or prevent the creditor from ascertaining knowledge of the existence of the debt."[12]

The Court's Order relied on Louisiana's law on contra non valentem as articulated in *Campo*.[13] However, the Court's analysis did not address all considerations necessary for a full contra non valentem inquiry. Quoting *Campo*, the Court stated:

> The ultimate issue is the reasonableness of the [plaintiff's] action or inaction, in light of his education, intelligence, the severity of the symptoms, and the nature of the defendant's conduct.

The Court's analysis of contra non valentem for Ms. Johnson and Ms. Francis neither examined Plaintiffs' education or intelligence nor Sanofi's conduct. The Order focused only on the "inquiry" about a claim to start the running of prescription, and ignored the  reasonableness of an "inquiry" in light of the defendant's conduct and the plaintiffs' intelligence and

---

[10] *See also* Giroir v. S. Louisiana Med. Ctr., Div. of Hosps., 475 So. 2d 1040, 1045 (La. 1985) ("The fundamental purpose of prescription statutes is only to afford a defendant economic and psychological security if no claim is made timely, and to protect him from stale claims and from the loss of non-preservation of relevant proof. They are designed to protect him against lack of notification of a formal claim within the prescriptive period, not against pleading mistakes that his opponent makes in filing the formal claim within the period.")

[11] In re Med. Review Panel of Gerard Lindquist, 18-444 (La. App. 5 Cir. 5/23/19) (citing Lennie v. Exxon Mobil Corp., 17-204 (La. App. 5 Cir. 6/27/18), 251 So. 3d 637, 643, writ denied, 2018-1435 (La. 11/20/18), 256 So. 3d 994).

[12] Cruze v. Life Ins. Co. of Virginia, 184 So. 735, 738 (La. Ct. App. 1938) (citing Hyman v. Hibernia Bank & Tr. Co., 139 La. 411, 416, 71 So. 598 (1916)).

[13] Campo v. Correa, 828 So. 2d 502 (La. 2002)

education.[14] The jurisprudence requires an examination of whether "it was reasonable for the plaintiff not to recognize that the condition might be treatment related."[15] To measure the reasonableness of plaintiff's inaction, a Court must analyze it in light of the plaintiff's education and intelligence, and the defendant's conduct.[16]

Based upon this law, the Louisiana Supreme Court, citing its earlier case of *Marvin*,[17] posed the following inquiry:

> As plaintiffs took no further action upon learning that sugarcane would not grow in certain areas, that something in the soil was causing the sugarcane not to grow, and that Exxon was responsible for this damage, was their inaction reasonable in light of their education, intelligence, and the nature of the defendant's conduct?

It is often difficult to identify a precise point in time at which any Plaintiff becomes aware of sufficient facts to begin the running of prescription.[18] This case epitomizes the difficulty of pinpointing the exact point in time the Plaintiffs realize that they are the victims of a tort, especially since neither Sanofi nor medical science has yet to agree upon a precise time period to declare the failure of the hair to regrow as permanent. If experts in drugs don't know when to declare the failure of re-growth permanent, how can any non-expert Plaintiff?

A Plaintiff must know or should have known of a wrongful act (here, failure to warn), and its damages (here, failure of hair to re-grow), and the connection between the two.[19] Information about the wrongful act directed to professionals (here, the label change in

---

[14] *See* Wells v. Zadeck, 89 So.3d 1145 (La. 2012).

[15] *Campo*, 828 So. 2d at 511 (emphasis omitted); Griffin v. Kinberger, 507 So. 2d 821 (La. 1987).

[16] *Campo*, 828 So. 2d at 511.

[17] Marin v. Exxon Mobil Corp., 09–2368 (La. 10/19/10), 48 So.3d 234.

[18] In re Medical Review Panel of Howard, 573 So.2d 472 (La. 1991).

[19] See Johnson v. Lifecell Corp., 2012 WL 5473152 (E.D. La. 2012), Palmer, Ventures, L.L.C. v. Deutsche Bank, AG, 2008 WL 11351622 (W.D. La. 2008).

December), and not to non-professionals, is insufficient to put Plaintiffs on notice to investigate the tort.[20] In *Palmer Ventures*, the Middle District held in a failed tax shelter damage case:

> Additionally, the Court finds that the IRS Notices 2000–44 and 2002–2 were insufficient to put Plaintiffs on notice that an investigation into the possibility of fraud was necessary, and thus start the ticking of the prescriptive clock. According to Plaintiffs, both notices were directed to "tax professionals," not ordinary taxpayers. Thus, this court declines to impute constructive notice to Plaintiffs on this Motion to Dismiss.[21]

A.  Ms. Johnson's education and intelligence.

Deborah Johnson is a married, but separated, African American woman.[22] Her physician diagnosed her with breast cancer when she was 53. She received radiation, chemotherapy, and had a left mastectomy at University Medical Center in 2010.[23]

She graduated from Booker T. Washington High School in 1975.[24]. Ms. Johnson then attended Americo Vocational School on Broad Street for 6 months and in 1982 received a certificate as a nursing assistant.[25] In 1983 another vocational school awarded her a certificate for completing her course in pressing.[26] Ms. Johnson worked full time for a cleaners on Oak Street for 3 years.[27] She also worked for 2 nursing homes where her duties centered on bathing, cleaning, changing bandages, making beds, and exercising patients.[28] She never handled

---

[20] Palmer Ventures, L.L.C. v. Deutsche Bank, AG, 2008 WL 11351622 (W.D. La. 2008).

[21] *Id.* at *4 (footnote omitted).

[22] She applied for disability after her cancer treatment since she had no income. Ex. C to Defs' Mot., Rec. Doc. 5734-5, Johnson Dep. at 164:4-11.

[23] Ex. D to Defs' Mot., Rec. Doc. 5734-6, Johnson PFS at10, Sec. V.3.J

[24] Johnson Dep. at 148:18-149:2.

[25] Johnson Dep. at 149:3-150:6.

[26] Johnson Dep. at 152:9-15

[27] Johnson Dep. at p. 152:22-153:7.

[28] Johnson Dep. at 153:8-154:20. Ms. Johnson received annual re-certification each year to be a nursing assistant. The certifications included bathing patients, how to treat patients, patient rights, feeding patients, weighing patients, using a lift for patients and some basic blood pressure information.

medications.[29] At one time she did some home health work.[30] She routinely rotated jobs as a nursing assistant and as a presser, and also did dry cleaning.[31]

It is abundantly clear, and Sanofi does not argue otherwise, that Ms. Johnson was a high school graduate with less than 1 year vocational training as a nurse's aid and a presser in a dry cleaners. Certainly, Ms. Johnson had no pertinent medical expertise and was not a sophisticated consumer.

B. Ms. Francis' education and intelligence.

Ms. Francis is a married African American woman diagnosed with breast cancer in 2009, at the age of 38.[32] Her oncologist, Dr. Verghese recommended a left side mastectomy and chemotherapy.[33] She received treatment at University Medical Center and Tulane Cancer Center.[34]

Ms. Francis is a high school graduate and works at Harrah's Casino as a server.[35] As a result of her breast cancer and treatment she made a disability claim, and received disability payments from 2009-2010. Ms. Francis does not have college or post-doctoral training, nor any medical, pharmaceutical or oncology knowledge.

C. Inquiries made by Ms. Francis and Ms. Johnson.

The doctrine of contra non valentem affords plaintiff a grace period when she is unaware that her injury was caused by a tort. Stated differently, the doctrine is applicable as an exception to prescription when the plaintiff/reasonable person believes she is a victim. The PSC submits that neither Ms. Francis nor Ms. Johnson ever even suspected she was a victim. Ms. Francis

---

[29] Johnson Dep. at 156:24-157:1
[30] Johnson Dep. at 158:24-159:16.
[31] Johnson Dep. at 157:20-158:6
[32] Ex. B to Defs' Mot., Rec. Doc. 6081-3, Francis PFS at 2, Sec. I.20; 3, Sec. II.1; and 7, Sec. IV.2
[33] Francis PFS at 10, Secs. V.3 and V.4
[34] Francis PFS at 10-11, Sec. V.5
[35] Francis PFS at 4, Sec. II.6

learned of the possibility that Taxotere caused her hair's failure to re-grow from the news feed on her Facebook page sometime in 2016. She filed suit on December 14, 2016, within one year of learning of the possibility Taxotere was the reason her hair didn't grow back. Ms. Johnson learned when she saw a television advertisement by a local attorney in the summer of 2016.[36] She filed suit on October 14, 2016, within one year of learning of the possibility Taxotere was the reason her hair didn't grow back.

There is no evidence of Ms. Johnson or Ms. Francis having any scientific or medical training in the areas of oncology, chemotherapy, dermatology, or dermatopathology which would incite either to know they were victims of a tort.

### 1. *Ms. Francis*

Despite Ms. Francis' limited education and intelligence, she did inquire about her hair; she did computer research on the chemotherapy drugs, particularly researching their side effects, she reviewed pamphlets and printed documents received from the hospital, and attended a program at the hospital "Look Good, Feel Better" (which discussed dealing with alopecia).[37]

She learned from her physician and the hospital, and from her research that she would have temporary hair loss.[38] When she realized her hair didn't grow back, she thought it was just a process, since she received no information indicating that it would never grow back. She was told it was temporary, and she believed it was, and that it would grow back.[39] She believed it was a process to re-grow.[40]

---

[36] Johnson Dep. at 22:13-23:13
[37] Ex. A to Opp., Rec. Doc. 6610-2, Francis Dep. at 39:13-23, 40:7-18
[38] Francis Dep. at 39:5-13, 210:3-15.
[39] Francis Dep. at 41:13-16, 224:4-6
[40] Francis Dep. at 224:4-6

Ms. Francis changed oncologists in 2012 to Dr. Bridgette Collins.[41] At one of her visits she asked Dr. Collins' nurse practitioner about her hair failing to grow back, and he told her to follow up with her primary care physician.[42] Making the inquiry to her new oncologist 2 years after chemotherapy was reasonable for this high school graduate who thought that full hair re-growth was a process.

Ms. Francis made subsequent inquiries to her primary care physician, Dr. Tillery, about her hair failing to grow back.[43] During several visits she asked Dr. Tillery the same question, and he promised to refer her to a dermatologist, but never did.[44] However, based upon her persistence, Dr. Tillery ultimately gave her the name of a dermatologist.

The first inkling Ms. Francis learned that her hair loss may be related to Taxotere was in 2016 when she saw something on Facebook's news feed page.[45].

> When I read the thing, post, on Facebook about Taxotere causing permanent hair loss, it changed, meaning that it wasn't the other drugs. It was that specific drug.[46]

She filed suit that same year.

Ms. Francis must be held to the standard of a reasonable person in her same situation, having the same depth of knowledge. Ms. Francis hoped her hair would re-grow. She thought it was a process. After all, every physician, nurse, pamphlet, printout, and meeting attended taught her that the hair would grow back. No medical professional could have ever told her that her hair would never grow back since no one knew except for Sanofi. And, Ms. Francis has had no medical training whatsoever.

---

[41] Francis Dep. at 259:4-9
[42] Francis Dep. at 259:17-22
[43] Francis Dep. at 260:16-23
[44] Francis Dep. at 261:3-6
[45] Francis Dep. at 260:18-261:3
[46] Francis Dep. at 236:7-10

Ms. Francis could have quit her waitressing job at the casino and investigated as best as a high school graduate could, but that is not required under Louisiana law. All that was required was a reasonable inquiry to her physician, which provided no reasonable basis to pursue a claim against Sanofi. Ms. Francis had no reason to suspect anything other than an unfortunate side-effect of her treatment, not that Sanofi failed to notify her doctor of a known defect in the drug.

### 2. *Ms. Johnson.*

Ms. Johnson asked her oncologist, Dr. Lewis about the condition of her hair after her chemotherapy was completed.[47] The discussion with Dr. Lewis yielded no further information other than that the hair loss was temporary. The Court's finding that she took no action until she saw the advertisement is factually incorrect.[48] To require a patient to seek a second opinion from another physician is unreasonable.

Imposing a higher duty to investigate a medical concept that every medical professional either Plaintiff came into contact with didn't know, or have any idea of the failure of the hair to re-grow after Taxotere treatment, is patently unfair and not the law.

What could Ms. Francis or Ms. Johnson have possibly learned even with the utmost diligence? Neither could have learned the information Sanofi had, but hid or, in the light most favorable to Sanofi, failed to disclose, even to physicians prescribing Taxotere. Since prescribers in the US didn't know until the 2015 label change that Taxotere caused permanent hair loss and that Sanofi failed to warn of that loss, how would Ms. Francis or Ms. Johnson, based on education and training, have learned of the very hidden facts that make them victims? Unless either had subpoenaed internal documents from Sanofi, neither would have known she was a

---

[47] Johnson Dep. at 19:25-20:22
[48] *Id.*

victim of a tort. Exercising reasonable diligence by women of limited education and sophistication was done when each inquired of their physicians.

### 3. *Sanofi's Conduct.*

If a defendant conceals the risk of harm from the Plaintiffs, the doctrine of contra non valentem mandates that the Defendant's actions interrupt prescription.[49] Your Honor found and Sanofi admitted[50] that it failed to disclose the risk of permanent hair loss until 2015 when it updated its label. How long did Sanofi know this risk and fail to disclose it?

Around the same time Plaintiffs were administered Taxotere, the European Medicines Agency ("EMA") asked Sanofi to examine the issue of Taxotere and irreversible alopecia. In January 2011 Sanofi responded and denied that the evidence supported a link between Taxotere and permanent hair loss.[51] They did nothing to alert doctors to warn American woman of this risk.

Eventually in 2015, the FDA asked Sanofi to examine permanent hair loss after Taxotere use. Fran Polizzano, PharmD, was Sanofi's regulatory affairs employee in charge of Taxotere in the US at the time that the FDA told it to update the label to add permanent hair loss as a risk. In reviewing the history of the US label, she realized that Sanofi had not included the 10-year TAX316 data that showed permanent hair loss was a common side effect of Taxotere use, which data was available back in 2010. She searched to find why it was not included, but she could find no answer. Here is her response to her predecessor when no reason could be found:[52]

---

[49] Carter v. Haygood, 04–0646 (La. 1/19/05), 892 So.2d 1261, 1267; *Campo*, 828 So 2d at 511.
[50] Order at 19.
[51] Ex. A to Johnson Opp, Rec. Doc. 6536-1, Sanofi's 2011 Response to EMA.
[52] Ex. B to Johnson Opp, Rec. Doc. 6536-1, November 9, 2015 Polizzano Email.

| From: | Polizzano, Frances R&D/US |
|---|---|
| Sent: | Monday, November 09, 2015 7:53 PM |
| To: | Vestea, Gina GZ/US |
| Subject: | RE: Taxotere - FDA request regarding permanent/ irreversible alopecia - CO with my comments |

I had a feeling you were going to say that. It appears that Vanina did not find anything either. Well this is going to be fun submitting > 4 year old labeling changes to the FDA now. Thanks for looking.

It denied to the EMA that there was a problem in 2011. It gave the same denial of a problem to the FDA in 2015, and the FDA rejected it too.

Ms. Francis' brief summarized these actions:

> Sanofi's Global Safety Officer told French health authorities in a January 2011 Taxotere clinical overview that there was insufficient evidence to determine that Taxotere caused permanent alopecia. Likewise, the FDA asked Defendants for a list of all cases reporting permanent/irreversible alopecia in March 2015. Defendants again concluded that there was insufficient evidence to support an association between Taxotere and permanent alopecia. After prompting from FDA, Sanofi changed its position, acknowledging that sufficient evidence of a causal association existed between Taxotere and permanent alopecia and noting **"[t]his is going to be fun submitting >4 year old labeling changes to the FDA now."** Sanofi, tasked with knowing the details of their drug, either refused to acknowledge Taxotere could cause permanent hair loss when dealing with regulatory authorities, or, more charitably, believed that there was no association between Taxotere and permanent hair loss during that pertinent time period.[53]

In short, Sanofi hid the risk of permanent hair loss, which it knew about, from American women and their doctors. It denied that there was a problem at every turn. Yet now Sanofi wants to impose on American women disfigured by its product a duty to discover the issue it buried at every turn. What chance did Ms. Francis or Ms. Johnson have trying to discover what Sanofi hid?

---

[53] Mem. in Opp. at 12-13 (Doc. 6610) (emphasis added)(internal footnotes omitted).

### III.    CONCLUSION

At what point during Plaintiff's recovery was she on sufficient notice that <u>Taxotere</u> specifically caused her hair not to regrow (as distinguished from general knowledge that chemotherapy and radiation causes hair to fall out) and that her hair loss was permanent and irreversible? And, was Sanofi's interference in patients' ability to discover the link between its drug and a risk of permanent hair loss a factor in tolling Plaintiff's liberative prescription? On reconsideration of the evidence presented, and in light of Sanofi's statements describing the various times it believes alopecia can become permanent, Plaintiffs respectfully ask the Court to set aside the Judgments granting summary judgment based on liberative prescription. A jury should be allowed to weigh the testimony set forth herein against that cited by Sanofi in support of its request to liberate the company from a "stale" lawsuit. Plaintiffs pray that this Court respectfully reconsider its determination that there are no material facts in dispute regarding these questions.

In the alternative, the Court's Order should be corrected to reflect the testimony highlighted herein, along with the correction to the Court's findings related to paragraph 181 of the Second Amended Master Complaint.

Accordingly, Plaintiffs respectfully ask that this Court reconsider its decision in light of these arguments and material facts, and deny Sanofi's motions for summary judgment.

Dated: August 6, 2019

Respectfully submitted,

/s/ Richard L. Root
Betsy J. Barnes # 19473
Richard Root #19988
Morris Bart, LLC
601 Poydras Street, 24th Floor
New Orleans, LA 70130
Phone: (504) 525-8000
Fax: (504) 599-3392
bbarnes@morrisbart.com
rroot@morrisbart.com

*Counsel for Plaintiff, Deborah Johnson*

/s/ T. Aaron Stringer
T. Aaron Stringer (UT #12681)
LOWE LAW GROUP
6028 S. Ridgeline Dr., Suite 200
Ogden, UT 84405
Phone: (385) 298-0175
Fax: (801) 656-0997
aaron@lowelawgroup.com

*Counsel for Plaintiff, Tanya Francis*

/s/ Christopher L. Coffin
Christopher L. Coffin (#27902)
PENDLEY, BAUDIN & COFFIN, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

*Plaintiffs' Co-Lead Counsel*

/s/ Karen B. Menzies
Karen Barth Menzies (CA Bar #180234)
GIBBS LAW GROUP LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Telephone: 510-350-9700
Facsimile: 510-350-9701
kbm@classlawgroup.com

*Plaintiffs' Co-Lead Counsel*

/s/M. Palmer Lambert
M. Palmer Lambert (#33228)
GAINSBURGH BENJAMIN
DAVID MEUNIER & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: 504-522-2304
Fax: 504-528-9973
plambert@gainsben.com

*Plaintiffs' Co-Liaison Counsel*

/s/Dawn M. Barrios
Dawn M. Barrios (#2821)
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: 504-524-3300
Fax: 504-524-3313
barrios@bkc-law.com

*Plaintiffs' Co-Liaison Counsel*

## PLAINTIFFS' STEERING COMMITTEE

Anne Andrews
Andrews & Thornton
4701 Von Karman Ave., Suite 300
Newport Beach, CA 92660
Phone: (800) 664-1734
aa@andrewsthornton.com

J. Kyle Bachus
Bachus & Schanker, LLC
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Phone: (303) 893-9800
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@atkinsandmarkoff.com

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Phone: 510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, Florida 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

Andrew Lemmon
Lemmon Law Firm, LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

Genevieve Zimmerman
Meshbesher & Spence Ltd.
1616 Park Avenue South
Minneapolis, MN 55404
Phone: (612) 339-9121
Fax: (612) 339-9188
gzimmerman@meshbesher.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 6, 2019, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

*/s/ Dawn M. Barrios*
DAWN M. BARRIOS