UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re:  TAXOTERE (DOCETAXEL)             MDL No. 2740
PRODUCTS LIABILITY LITIGATION

SECTION: "N" (5)

THIS DOCUMENT RELATES TO:

*Kelly Gahan*
Case No.:2:16-cv-15283

### PLAINTIFF'S OPPOSING FACTUAL STATEMENT TO SANOFI DEFENDANTS STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Plaintiff Kelly Gahan submits the following Opposing Factual Statement to Sanofi Defendant's Statement of Undisputed Facts in Support of Their Motion for Summary Judgment, pursuant to Local Rule 56.2:

**I.     Response to Sanofi's Statement of Facts**

1. Admitted.

2. Admitted.

3. Admitted.

4. Admitted that Dr. Gahan testified this was her thought process at the time of her diagnosis.

5. Admitted.

6. Admitted.

7. Admitted that Dr. Borges and Dr. Gahan initially discussed treatment options on January 22, 2013.  Admitted that Dr. Borges' preferred regimen was TCH.  Admitted that Dr. Borges also provided an alternative of ACTH.  Plaintiff disputes that the second opinion

1

unequivocally recommended TCH. First, the medical record relied upon by Defendant is inadmissible hearsay. Second, Dr. Gahan testified that it was her understanding after her visit with Dr. Conlon that she recommended either TCH or ACTH. (**Ex. 1**; Depo. Kelly Gahan; 180:4-25).

8. Admitted.

9. Admitted.

10. Plaintiff admits that she performed research regarding her chemotherapy options prior to beginning chemotherapy. Plaintiff admits that she came across the Taxotears website prior to beginning chemotherapy. Plaintiff admits that she conducted additional specific research into Taxotere and permanent hair loss prior to beginning chemotherapy.

11. Plaintiff admits she researched and reviewed three articles or abstracts related to permanent alopecia. The first was an article about permanent hair loss in women taking FEC-T, a completely different chemotherapy regiment that also contains Taxotere. (**Ex. 1**; 25:8-16) Plaintiff reviewed a dermatology study based on ten (10) case reports. Id. Plaintiff found and reviewed the Sedlacek abstract based on case reports from a single oncologist. (**Ex. 1**, 25:20 – 26:9) Plaintiff was unable to find or review any large randomized clinical studies identifying a statistically significant link between permanent alopecia and the use of Taxotere. (**Ex. 1**; 26:21 – 27:1).

12. Admitted.

13. Admitted.

14. Admitted that Dr. Borges' advised Dr. Gahan of three patients in her practice who reported permanent alopecia after finishing Taxotere. (**Ex. 2**, Depo. Virginia Borges, Vol.I; 51:16-19).

15. Admitted that ACTH does not contain Taxotere. Admitted that Dr. Borges recommended TCH. Dr. Borges prefers TCH or ACTH because; (a) she believes it has a superior safety profile due to decreased side effect risks of cardiomyopathy and secondary leukemia (**Ex. 2**, 31:3-7); and (b) she admires the "rational design" of the regimen as designed by Dennis Slamon's laboratory at UCLA. (**Ex. 2**, 33:10-23). At the time, there was no consensus in the medical community with respect to whether TCH or ACTH was the preferred regimen for Dr. Gahan's type of cancer. Id.

16. Admitted.

17. Admitted in part. The testimony cited by Defendant indicates that Dr. Borges first became aware of one of her patients experiencing permanent alopecia after TCH in 2011.

18. Admitted that, beginning in 2016, Dr. Borges conducted a retrospective review of the rate of permanent alopecia in patients administered Taxotere regimens. (**Ex. 2**; 29:1-6). The results of that study demonstrated seven patients out of approximately 142 (or 6%) in the study group showing permanent alopecia after TCH (**Ex. 2**; 28:23 – 29:21; 31:17-24). Admitted that Dr. Borges has provided adjuvant treatment for breast cancer to hundreds of patients and still recommends TCH and TCHP regimens – with the use of cold caps. Id.

19. Admitted that TCH with cold caps is still Dr. Borges' recommendation for adjuvant breast cancer chemotherapy, because she has not seen an incident of permanent alopecia with

3

TCH and cold caps. (**Ex. 2**; 31:20-24). Admitted that TCH was Dr. Borges' preferred chemotherapy regimen for patients with Dr. Gahan's type of breast cancer in 2013.

20. Admitted that Dr. Borges warned "a few" patients of the risk of permanent alopecia associated with Taxotere prior to her treatment of Dr. Gahan (**Ex. 2**;50:21 – 51:12).

21. Admitted that Dr. Borges testified she advised Dr. Gahan of her experience with three prior patients experiencing permanent alopecia after taking TCH. Disputed whether Dr. Borges provided Scot Sedlacek's abstract to Dr. Gahan. Dr. Gahan testified that she found the Sedlacek abstract and asked Dr. Borges about it (**Ex. 1**; 26:3-9). Undisputed that both Dr. Borges and Dr. Gahan were aware of the Sedlacek abstract prior to Dr. Gahan commencing chemotherapy. Dr. Borges testified that Sedlacek's abstract, while a valid report of his experiences, did not constitute the type of evidence-based medicine she would recommend her patients base treatment decisions upon. (**Ex. 2**; 48:5-15). Dr. Gahan testified that Dr. Borges communicated her skepticism regarding the validity of Sedlacek's conclusions when discussing Dr. Gahan's concerns of the connection between TCH and permanent alopecia. (**Ex. 1**; 26:3-9).

22. Disputed. Defendant mischaracterizes Dr. Gahan's testimony. Dr. Gahan testified that she was weighing the "theoretical risk" of circulating cancer cells presented by utilizing cold-caps against preserving her hair *while undergoing chemotherapy*. (**Ex. 1**, 251:2 – 253:2). Dr. Gahan was not weighing the theoretical risk of circulating cancer cells against the risk of losing her hair permanently. (**Ex. 1**, 249:11-20).

23. Disputed. Dr. Borges testified that she considered TCHP to be superior to ACTHP. (**Ex. 2**; 34:11-21). Neither regimen was available in 2013 when Dr. Borges was advising Dr. Gahan. To the extent Defendant intended to infer Dr. Borges considered TCH superior to

4

ACTH, Dr. Borges testified "It was my preferred regimen. ACTH and TCH were considered equivalent by the field." (**Ex. 2**, 121:3-4).

24. Admitted.

25. Admitted that Dr. Borges disclosed her knowledge of three prior patients who experienced permanent hair loss after treatment with TCH. Admitted that Dr. Borges believes Dr. Gahan consented to treatment with TCH. No informed consent form was completed by Dr. Gahan. (**Ex. 1**; 212:20-22)

26. Admitted. The portions of Dr. Borges' deposition cited by Defendants in their motion, however, do not support the proposition for which it is relied. Plaintiff believes Defendant intended to cite to pages 76-77 of Dr. Borges' deposition.

27. Admitted.

28. Admitted.

29. Admitted. Dr. Borges' recommendation that Plaintiff utilize "cold caps" must be placed in context. Dr. Borges did not "prescribe" a cold cap and could not offer a cold cap device. (**Ex. 2**; 152:19 – 153:2). At the time, Dr. Borges' clinic did not have cold cap technology integrated into their infusion center, but could offer an accommodation for cold-cap devices if the patient wished to obtain such a device at her own expense. Id.

30. Admitted that Dr. Borges would still have recommended TCH and cold caps. But the full context of Dr. Borges response should be noted:

> Q.    And no matter what the label change that might have happened for the Taxotere label would not have changed your recommendation [of TCH].

> A. Not for the use of the chemotherapy regimen. I do think it might have swayed her decision to use the cold caps had I been able to give her real information as opposed to three anecdotal cases.

31. Disputed. First, Defendants unreasonably stretch Dr. Borges' testimony by omitting both the general context and the specific question she was answering:

> Q. Are you saying that before you would accept that there's a risk of permanent chemotherapy-induced alopecia, you would need to see a randomized clinical trial or NCCN guidelines?
>
> Mr. Schanker: Objection. Form.
>
> A. No. But you asked about choosing a chemotherapy regimen. That's a different thing.
>
> Q. (By Mr. Sears) So, then, whether there's persistent alopecia associated with the chemotherapy regimen, that would not impact your choice of regimen?
>
> Mr. Schanker: Objection. Form.
>
> A. It to date has not changed my use of the TCH or TCHP regimens, other than I have taken steps to initiate what I believed would be a potential protective mechanism [cold caps], pushed my institution like a bat out of hell to get them to provide this to my young patients without resources would be able to access it, and have also done my own research project to figure out what the hell is going on. But, no, I would not forego life-saving chemotherapy for any risk. I would manage it, just like I manage neuropathy, lacrimal stenosis, the nail stuff.

(**Ex. 2**, 48:16 – 49:14).

Dr. Borges did not testify that she would continue to recommend TCH in the face of <u>any</u> risk of permanent alopecia. She testified that she continues to recommend TCH and TCHP because, after treating Dr. Gahan, she has found a way to eliminate permanent alopecia as a side-effect (through dosage control and utilization of cold-caps). The question posed by counsel did not specifically relate to "labeling" or her recommendation to Dr. Gahan, but asked generally about the risk of permanent alopecia and Dr. Borges' recommendation of a regimen. Dr. Borges does not believe she is answering a question

6

related specifically to labeling or to her recommendations of TCH to Dr. Gahan in 2013. Instead, it appears she is answering whether she would alter her recommendation that a patient undergo chemotherapy at all in the face of a risk of permanent hair loss (i.e. "I would not *forego* life-saving chemotherapy for any risk").

Second, when asked about her treatment recommendations for Dr. Gahan, and how she would have couched her recommendations to Dr. Gahan if she had been aware of a scientifically reliable causal effect between permanent alopecia and the use of Taxotere, the nature of Dr. Borges' testimony is quite different. Upon being confronted with the deposition testimony of Sanofi's global safety officer that Sanofi was aware of a causal connection between Taxotere and permanent hair loss as early as 2006, Dr. Borges testified that she would have advised Dr. Gahan of such a causal connection (or Sanofi's acknowledgment of the causal connection) when counseling her regarding her choice of regimen. (**Ex. 3**, Borges Depo. Vol.II, 212:20 – 218:9; **Ex. 4**, Depo of Amy Freedman, 194:9 – 196:21). When shown Sanofi's confidential clinical trial reports TAX 316 and TAX 301, demonstrating a risk of permanent alopecia between 6.9 and 8.4 percent, Dr. Borges indicated that she would have conveyed such information to her patients, including Dr. Gahan, if Sanofi had made the rate of the side effect available to her, through the label or other means. (**Ex. 2**; 126:21 – 129:13; **Ex. 3**; 207:15 – 209:25). Dr. Borges acknowledged that her advice to Dr. Gahan was based on her anecdotal clinical experience of three patients experiencing on-going alopecia, and that her advisement of the known risk profiles of TCH versus ACTH would have been different if she was aware of the causal connection between Taxotere and permanent alopecia, along with the rates of occurrence demonstrated in Sanofi's own clinical trials. (**Ex. 3**; 210:18 – 212:17). All of this various

7

information would have gone into Dr. Borges' advisement to Dr. Gahan regarding the risks and benefits of TCH versus ACTH. (**Ex. 3**; 219:6-22).

Finally, Dr. Borges testified that she would not have used the TCH regimen to treat Dr. Gahan's breast cancer if that was the decision reached by Dr. Gahan. Dr. Borges testified that her patient advisements are centered around teaching patients to understand risk assessment. (**Ex. 2**: 102:21 – 103:5). Dr. Borges teaches patients to weigh the curative value of treatment vs. the temporary or possibly permanent risks of the treatments she recommends. Id. Her objective is to try to guide the patient so that she can make the best-informed decision for herself. Id. While her recommendation that Dr. Gahan use TCH may not have changed, Dr. Borges would have respected a decision by Dr. Gahan to treat with ACTH, and would have administered the ACTH regimen under her care. (**Ex. 3**; 219:23 – 220:15).

## II.     Plaintiff's Statement of Additional Relevant Facts

32. At the time Dr. Borges prescribed the TCH regimen to Dr. Gahan in January 2013, Taxotere's label contained no reference or warning regarding permanent hair loss. Second Am. Master Comp., ¶¶ 124-138. At the time Dr. Gahan was prescribed Taxotere, its label, under "Patient Counseling Information" stated that side effects such as … hair loss are associated with docetaxel administration." Secon Am. Master Comp.. ¶ 166. The "Patient Information" section of the label indicated that the "most common side effects of TAXOTERE include:…hair loss." Id.

33. Dr. Gahan was actively involved in obtaining information related to her cancer diagnosis and treatment options. (**Ex. 1**;151:10-23). Dr. Gahan testified that it was important for her to be informed regarding her treatment, and she wanted input, but that she was cautious

8

about attempting to dictate her care, due to Dr. Borges' advice against "being your own doctor." Id.

34. In Dr. Gahan's opinion, Dr. Borges always had a clear preference for TCH over ACTH. (**Ex. 1**; 281:16-25). Consequently, Dr. Gahan did not feel comfortable in overriding Dr. Borges recommendation she use TCH without some rational, scientific basis demonstrating the nature and scope of the risk of hair loss. (**Ex. 1**; 120:23 – 121:3). When Dr. Gahan raised concerns about Taxotere and permanent alopecia in her chemotherapy consultation, Dr. Borges told her of the three previous patients who experienced permanent hair loss after receiving TCH, but that she did not believe the incidence rate was clinically significant enough to justify basing treatment decisions on it. (**Ex**. **1**; 156:19 – 157:9). Dr. Gahan testified Dr. Borges encouraged her to discount the Sedlacek abstract due to its lack of scientific reliability (**Ex. 1**; 26:3-9).

35. Dr. Gahan reviewed the label for Taxotere because she was concerned about the potential risk of permanent alopecia (**Ex. 1**, 53:8-13).

36. In making her choices for her cancer treatment, Dr. Gahan was balancing effectiveness of treatment and quality of life concerns. (**Ex. 1**; 109:1-18). For example, Dr. Gahan opted to under go a "nipple sparing" double mastectomy, even though it was her understanding that option slightly increased the risk of cancer reoccurrence. (**Ex. 1**; 107:5-12). She also chose to undergo egg harvesting for future IVF treatment, even though she understood that the estrogen treatment would potentially increase the risk of her cancer spreading. (**Ex. 1**; 107:13-18).

37. Dr. Gahan also considered that she was willing to accept a certain degree of risk related to the differential side effects associated with taking ACTH. For example, Dr. Gahan testified

that she did not consider the increased risk of impaired myocardial function as a compelling reason not to take ACTH, because she believed the true risk for her age and health cohort was significantly less than for the breast cancer population as a whole. (**Ex. 1**; 169:5-16).

38. Dr. Gahan believes that she expressed a preference for ACTH to Dr. Borges in their second pre-chemo therapy meeting, as well as to Dr. Borges' nurse practitioner at her chemotherapy training session. (**Ex. 1**; 120:2 – 121:24). Dr. Gahan acknowledges that she may not have been forceful enough in expressing her preference for ACTH because she could not adequately quantify the risk of permanent hair loss from Taxotere to justify overriding Dr. Borges' preferred treatment regimen. (**Ex. 1**; 122:7-13).

39. Dr. Borges recalls that Dr. Gahan asked a lot of different questions about the pros and cons of the two proposed regimens, but ultimately chose TCH. (**Ex. 3**; 190:21 – 191:6). According to Dr. Borges, Dr. Gahan went "around and around" in her decision-making between the two regimens. (**Ex. 3**; 193:1-8). Dr. Borges recalls that Dr. Gahan was weighing the risks of cardiomyopathy and leukemia associated with ACTH against the risk of permanent hair loss associated with TCH. (**Ex. 3**; 191:7 – 192:16).

40. Dr. Gahan testified that losing her hair would be such a devastating side effect of chemotherapy that any definite evidence demonstrating a causal connection between a regimen and permanent alopecia would have affected her choice of regimen. (**Ex. 1**, 232:18 – 233:3). If both regimens included a risk a permanent hair loss, she would have been inclined to choose the regimen with the lower risk. (**Ex. 1**, 233:9-16). Dr. Gahan believes that if she had known the incidence rate for permanent alopecia was as high as 3% with Taxotere, she would certainly have definitively expressed her preference for the ACTH regimen to Dr. Borges. (**Ex. 1**; 175:17 – 176:4).

Respectfully Submitted,

/s/ *Darin L. Schanker*
Darin L. Schanker
Scot C. Kreider
BACHUS & SCHANKER, LLC
1899 Wynkoop Street
Ste. 700
Denver, CO 80202
(303)899-9800
F: (303)893-9900
d.schanker@coloradolaw.net
scot.kreider@coloradolaw.net

## CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2019, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/Darin L. Schanker