IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

_____

VIDEO DEPOSITION OF VIRGINIA BORGES, VOLUME II
August 1, 2019
_____

KELLY GAHAN,                    )
                                )
Plaintiff,                      )
                                )
vs.                             ) Case No. 2:16-cv-15283
                                )
SANOFI-AVENTIS U.S. LLC and     )
SANOFI US SERVICES INC.,        )
                                )
Defendants.                     )
_____

APPEARANCES:

    BACHUS & SCHANKER, LLC
        By Darin Schanker, Esq.
           1899 Wynkoop Street, Suite 700
           Denver, Colorado  80202
              Appearing on behalf of Plaintiff.

    SHOOK, HARDY & BACON, LLP
        By Connor Sears, Esq.
           2555 Grand Boulevard
           Kansas City, Missouri  64108
              Appearing on behalf of Defendants.

    Also Present:  Maryvonne Tompkins, Videographer

1     A    Yes.

2     MR. SCHANKER: Just so I'm on the same
3 page because I don't have exactly what you -- I mean,
4 I have them all. How does this one start, Connor?

5     MR. SEARS: It starts with, "So I tried
6 the hair" --

7     MR. SCHANKER: Okay. Thank you.

8     MR. SEARS: You bet.

9     Q   (By Mr. Sears) So on the fourth line down
10 she wrote, "I'm sure you have a lot of patients and
11 don't remember all of your conversation but you never
12 even hinted that AC was an option. Not only did you
13 not give me the option for AC but you specifically
14 denied my request for AC on 3 separate occasions. My
15 mother was with me on all three occasions and
16 specifically remembers you saying absolutely not to
17 the AC because I had been so thoroughly obsessing
18 about it." Did I read that correctly?

19     MR. SCHANKER: Objection to form.

20    A    You have read that correctly.

21    Q   (By Mr. Sears) Did Dr. Gahan tell you
22 that she wanted AC?

23     MR. SCHANKER: Objection to form.

24    A    Kelly had asked a lot of different
25 questions about the pros and cons of both regimens

1  and a lot of questions about what I had seen women
2  experience with the cold caps.  When I had asked her
3  to give me a decision because her starting date that
4  she had selected was coming up, it is my recollection
5  that she chose the TCH regimen, and she did that
6  after fully evaluating all of her choices.
7      Q    (By Mr. Sears)  What were the side effect
8  profiles between the two regimens that she was
9  debating?
10          MR. SCHANKER:  Objection to form.
11     A    The concern with the ACTH regimen is the
12 cardiomyopathy and the secondary leukemia that we've
13 discussed.  There are other side effects about that
14 regimen that are also different and can be very
15 problematic for women, but they are of typically a
16 temporary and reversible nature.  We were mostly
17 focused on the big, long-term outcomes.
18          And then on the TCH, she was concerned
19 about the hair loss issue.  And I don't remember
20 anything -- I mean, the neuropathy issues are the
21 same between the two.  I know we had discussed that,
22 but I don't recall it being anything of significance
23 that she was worried over.
24     Q    (By Mr. Sears)  When you say, "the hair
25 loss issue," what you're referring to is the ongoing

Page 192

1  permanent persistent hair loss associated with
2  chemotherapy?
3      A    Well, at the time that --
4           MR. SCHANKER:  Objection to form.
5           Sorry.
6           THE DEPONENT:  I should just learn to wait
7  and let you do that.
8      A    At the time, the way I was able to
9  describe it to her is that I had seen it in three
10 patients.  And it was a concern because those three
11 patients had gotten the TCH regimen, and that was a
12 relatively newer regimen than what we were using in
13 the adjuvant treatment for HER2+ breast cancer.  That
14 is what I mean.  At that point in time, I wouldn't
15 have used the words permanent chemotherapy-induced
16 alopecia because I learned them later.
17     Q    (By Mr. Sears)  When you're describing the
18 condition of the three patients, what was the
19 condition that they had?
20          MR. SCHANKER:  Objection to form.
21          Go ahead.
22     A    They have had an incomplete regrowth of
23 hair.  And the hair that did regrow is very abnormal
24 looking, coarse.  It doesn't -- you can't achieve any
25 length, patches of baldness interspersed.

Page 193

1   Q   (By Mr. Sears)  Did Dr. Gahan tell you
2   that she wanted the AC regimen to avoid that
3   potential side effect?
4       MR. SCHANKER:  Objection to form.
5   A   She had gone around and around in her
6   decisionmaking.  But at the time that I said I needed
7   a choice, I recall that she chose TCH, and that's the
8   orders I put in for her.
9   Q   (By Mr. Sears)  Did she ever tell you that
10  she was considering the AC regimen to avoid the
11  potential side effect of incomplete hair regrowth?
12      MR. SCHANKER:  Objection to form.
13  A   That was, in part, her consideration of
14  why she was going back and forth in her thinking
15  about the two options.  But after the visit where I
16  believed we had decided on the TCH, I did not hear
17  from her again that she had changed her mind or
18  wanted to do something different.
19  Q   (By Mr. Sears)  On the third page of that
20  E-mail, on the carryover paragraph, it's four lines
21  down.  She writes, "I also feel like you did not give
22  adequate weight to my concerns over the hair loss."
23  Do you see that?
24  A   Sorry.  Where are you?
25  Q   It's the fourth line down about halfway

1  here. It's 815. Do you see that in the lower right
2  corner?
3      A    I do.
4      Q    And do you see the adverse reactions
5  section there?
6      A    I do.
7      Q    And I'll let you review that first
8  paragraph, and you'll note that the word "alopecia"
9  appears in there.
10     A    Correct.
11     Q    What does the word "alopecia" mean to you
12 as a medical professional?
13     A    Hair loss.
14     Q    Would you agree based on your
15 understanding of the word "alopecia" that that word
16 alone doesn't speak to duration, meaning whether it's
17 permanent or whether it's temporary? Does the word
18 "alopecia" mean any of that to you, or does it just
19 mean hair loss?
20          MR. SEARS: Objection to form.
21     A    As a medical oncologist, it had always
22 meant reversible hair loss.
23     Q    (By Mr. Schanker) Okay. And I'll direct
24 your attention to again those little Bates stamps in
25 the lower right corner to Page 851. Let me know when

1   all things in being a medical oncologist, you want to
2   do the best you can to try and cure the patient from
3   the cancer that they've had.  You don't want to give
4   them more therapy than is warranted based on the risk
5   of that cancer.
6          At the same time, I don't want to leave my
7   patients with permanent side effects.  That's a huge
8   part of how we manage what we do.  So I would not
9   want a patient to forego potentially curative best
10  therapy for something, particularly back then when my
11  knowledge of it was pretty rudimentary in comparison
12  to, you know, the detailed understanding of
13  cardiomyopathy or leukemia that we had known about
14  for decades.
15       Q    Would it be fair to characterize your
16  knowledge at that time that you had just based on
17  those three patients as anecdotal?
18       A    Yes.
19            MR. SEARS:  Objection to form.  Sorry.
20       Q    (By Mr. Schanker)  And using that
21  definition of common as greater than 1 percent and
22  less than 10 percent, if you had information that
23  there were clinical trials conducted by Sanofi that
24  indicated that the incidence of PCIA, permanent
25  chemotherapy-induced alopecia, fell in that common

1   percentile, is that information that you would have
2   wanted to have as a prescribing physician?
3       A    Yes.
4            MR. SEARS:  Objection to form.
5       Q    (By Mr. Schanker)  And tell me why.
6       A    It's a permanent side effect.  We've not
7   come up with a solution.  It is not a side effect
8   that can be easily ignored.  It is a very painful
9   side effect for the women who have experienced it.
10  And like I've said before, we're used to managing
11  side effects.  We figure out a way.  The cold caps
12  actually really appear to work with expense but no
13  other big downside to the patient.
14           And so what I ended up doing as a result
15  of my ongoing experience with patients directly
16  developing PCIA and my own personal lookback over my
17  young women's breast cancer cohort and finding an
18  incidence of 6 percent, which I've still not written
19  that up or published it, I would have pushed my
20  institution a lot harder to get the cold cap
21  technology as something that we could have supported
22  better as a resource.  We eventually did do that, but
23  it was after more patients were affected.
24      Q    And I want to ask you -- I want to explore
25  with you the managing of the regimen as well as the

```
 1   entire prescription, including the cold caps that
 2   you're talking about.  Specifically, though, Doctor,
 3   if you had had information concerning clinical --
 4   I'll use the example of the clinical trials of
 5   Sanofi; that they had conducted those and there was
 6   information indicating that permanent chemotherapy
 7   alopecia was a common side effect, then your
 8   knowledge no longer would have just been anecdotal,
 9   correct?
10            MR. SEARS:  Objection to form.
11       A    Correct.
12       Q    (By Mr. Schanker)  And that information
13   that you indicated you would have wanted concerning
14   those clinical trial outcomes and indications of
15   permanent chemotherapy-related alopecia being a
16   common side effect, would you have conveyed that
17   information to a patient?
18            MR. SEARS:  Objection to form.
19       A    Yes.
20       Q    (By Mr. Schanker)  If you had that
21   knowledge at the time that you were jointly working
22   through a prescribing decision with Kelly Gahan,
23   would you have conveyed that information to
24   Ms. Gahan?
25       A    Yes.
```

1                MR. SEARS:  Objection to form.
2         Q      (By Mr. Schanker)  Based on your
3    recollection of the interactions with Ms. Gahan, do
4    you believe that that would have been information
5    that Ms. Gahan would have wanted to have?
6                MR. SEARS:  Objection to form.
7         A      Yes.
8         Q      (By Mr. Schanker)  Based on your
9    interactions with Ms. Gahan and your experiences with
10   her, do you believe that that information reasonably
11   may have changed her -- the ultimate prescribing
12   decision?
13               MR. SEARS:  Objection to form.
14        A      I don't know if I'm accurate, but I
15   believe it would have made her use the cold caps
16   would be my guess if I had to think back as to where
17   we were when I was in those conversations with her.
18        Q      (By Mr. Schanker)  And you gave Kelly
19   Gahan the option.  And as you've indicated here in
20   your testimony, basically you discussed, I should
21   say, two different regimens it sounds like with her,
22   the TCH regimen, which she received.  And then the
23   other regimen was the ACTH regimen; is that correct?
24        A      That is correct.
25        Q      And at the time back in 2013, those two

1   regimens were considered equivalent by the field,
2   correct?
3           MR. SEARS:  Objection to form.
4       A   In terms of preventing metastatic
5   recurrence, yes.
6       Q   (By Mr. Schanker)  And when you consulted
7   Kelly Gahan back in 2013 about this important
8   decision, you were weighing the known risk profiles
9   of ACTH and TCH as you knew them at that time,
10  correct?
11      A   Correct.
12      Q   But you were not aware of any clinical
13  trials that I've referenced earlier that Sanofi may
14  have had that indicated that there was a potential
15  common side effect of permanent chemotherapy-induced
16  alopecia with the use of a Taxotere based regimen,
17  correct?
18          MR. SEARS:  Objection to form.
19      A   That is correct.
20      Q   (By Mr. Schanker)  That information did
21  not go into your risk profile analysis because you
22  didn't have it, right?
23          MR. SEARS:  Objection to form.
24      A   Correct, only my anecdotal experience.
25      Q   (By Mr. Schanker)  Now, you've since had

1    an opportunity to review parts of those follow-up --
2    the follow-up clinical trial that I've referenced,
3    the Tax 301 study and the Tax 316 study, correct?
4        A    Correct.
5        Q    And in a meeting that's what I provided to
6    you?
7        A    That is correct.
8        Q    And are you aware, Doctor, those documents
9    have been produced in this case in a confidential
10   manner, and they're not available to medical
11   professionals or the public outside of this case?
12           MR. SEARS:  Objection to form.
13       A    Yes.
14       Q    (By Mr. Schanker)  So there was no way you
15   could have accessed those documents back prior to
16   treating Kelly Gahan, correct?
17       A    That is correct.
18           MR. SEARS:  Objection to form.
19           (Exhibit 29 marked.)
20       Q    (By Mr. Schanker)  I'll hand you what's
21   marked Exhibit 29.  What you have here are two pages
22   of a deposition.  This was a deposition taken in this
23   case of Amy Freedman.  She's a Sanofi employee.  She
24   was actually the global safety officer for Sanofi
25   back in the 2000s.  I'm assuming you're not familiar

1   with Amy Freedman; is that correct?
2       A    Not to my knowledge.
3       Q    Okay.  I just want to show you one portion
4   of this deposition and then ask you a question about
5   it.
6       A    Okay.
7       Q    If we turn to the second page of the two
8   stapled pages here, this is just a portion of this
9   deposition.  You see how the numbering goes here, and
10  you see where Page 195 is in the upper right-hand
11  corner?
12      A    Yes.
13      Q    And then as we work our way down to
14  Line 20 of this deposition, there's questions from a
15  lawyer in this case, and the answers are provided by
16  the global safety officer in this case.  As I told
17  you, that was Amy Freedman.  She was Sanofi's, quote,
18  safety officer.  And I'll read this question to you
19  and the answer:  "Just going back, my question was,
20  to make sure I have the question actually answered on
21  the record, based upon your knowledge at Sanofi in
22  2006, Sanofi knew that Taxotere could cause
23  irreversible alopecia in 2006, correct?"
24           And do you see -- what's the answer there?
25      A    "Yes."

Page 214

1    Q    Were you aware back in 2006 that Sanofi
2  could cause, as she says, irreversible alopecia?
3         MR. SEARS:  Objection to form.
4    A    Do you mean was I aware in 2006 that
5  Taxotere could --
6    Q    (By Mr. Schanker)  Yes.
7    A    -- cause irreversible alopecia?
8    Q    Strike that.  Let me ask it again.
9         Were you aware back in 2006, first of all,
10 that Taxotere could cause irreversible alopecia?
11   A    No.
12   Q    So I'm assuming, then, that you had no
13 knowledge that Sanofi, pursuant to global safety
14 officer Amy Freedman, knew back in 2006 that Taxotere
15 could cause permanent, irreversible alopecia?
16        MR. SEARS:  Objection to form.
17   Q    (By Mr. Schanker)  You didn't know that,
18 did you?
19   A    I did not know that.
20   Q    Is that information you would have liked
21 to have had?
22   A    Yes.
23        MR. SEARS:  Objection to form.
24   Q    (By Mr. Schanker)  And tell me why.
25   A    We would have figured out how to manage it

1  sooner.
2      Q    (By Mr. Schanker)  And you've mentioned
3  that several times, and I told you that I wanted to
4  get to it, and I think now is a good time.  And it
5  appears that you're emotional at this time; is that
6  correct?
7      A    I'm okay.
8           MR. SEARS:  Object to form.  Thank you,
9  though.
10     Q    (By Mr. Schanker)  Are you -- do you need
11 to take a break?
12     A    No.  I'm okay.
13     Q    Is this information -- and it's okay if it
14 is or not -- is it upsetting to you to learn?
15     A    It's hard to read.
16          MR. SEARS:  Objection.
17     Q    (By Mr. Schanker)  And if you could share
18 with us why it's hard for you to read.
19     A    Because the long-term effect that patients
20 I have taken care of will be dealing with was,
21 according to this, something we could have known,
22 they could have been warned about, we could have
23 tried to prevent.  Maybe we would have, maybe we
24 wouldn't have, but it wouldn't be what it was for
25 them.  And, I mean, I gave you Kelly's E-mails.  You

1   can see her pain.
2       Q    I want to ask you about the managing that
3   you do, that you believe you could have done.  And
4   let me see if I understand.  You've used the phrase
5   manage around the side effects.  I believe you used
6   that when we were here for the prior deposition.
7   Explain to us what you mean by that.
8       A    Anytime any drug that is a worthwhile drug
9   that we need to give our patients to protect them
10  against their cancer has dangerous, particularly
11  permanent side effects, we figure out ways to manage
12  those side effects.  For the hair loss issue, it's
13  pretty rudimentary.  The idea is if you prevent the
14  hair from falling out in the first place, you
15  potentially prevent it from being able to be
16  permanently gone.
17           When I started counseling women about the
18  cold caps, I didn't know if that logic was correct.
19  I didn't know that if you stopped it falling out in
20  the first place that it would prevent the permanent
21  effect.  And so I couldn't say to patients, Look, you
22  need to do this, because it's expensive, it's
23  cumbersome, it's uncomfortable.  And at that I time
24  had an exceptionally limited experience with the cold
25  cap technologies, and they were not that readily

1  available.
2          Fast forward to today, and we have -- you
3  know, there's now FDA-approved devices.  We have
4  three of them.  I treat all my patients with this
5  regimen using them, and we've not, knock on wood, had
6  another case since.  And so, you know, like I said
7  before, never in a million years would I have stopped
8  giving women this drug.  It's a great drug.  It's
9  been one of my favorite breast cancer drugs since I
10 first started using it back when I was a fellow in
11 oncology.
12         We figure it out.  And if we can't figure
13 it out, we at least warn them so that if it happens,
14 they can be accepting of the fact that they made this
15 choice with the best information provided to them.  I
16 have had women who have opted to go forward with the
17 regimens that we know can put them at risk and not
18 use the cold caps for a variety of reasons.  Usually
19 it's resources.  But they know.  If it happens, they
20 made the choice, you know.
21     Q    Doctor, Exhibit 29 that I just showed you,
22 which was the deposition testimony of Amy Freedman
23 concerning Sanofi's knowledge back in 2006 that
24 Taxotere could cause permanent irreversible hair
25 loss, if you had that information, which you

1   indicated you didn't, would that have been
2   information that you would have conveyed to a
3   patient?
4           MR. SEARS:  Objection to form.
5       A   Yes.
6       Q   (By Mr. Schanker)  And you would have
7   conveyed that information to Kelly Gahan, correct?
8           MR. SEARS:  Objection to form.
9       A   Correct.
10      Q   (By Mr. Schanker)  Now, is there anything
11  to your knowledge that physically prevented Kelly
12  Gahan from utilizing cold caps?  She could have done
13  it, right?
14      A   Yes.
15      Q   And as we sit here today, do you believe
16  based on your experiences with patients like Kelly
17  Gahan, that you are successful in managing around the
18  hair loss issue with the use of the cold caps?
19      A   Yes.  So far since we've employed that
20  technology for our patients, we've not had another
21  case of permanent hair loss.
22      Q   And to your knowledge, that technology
23  that you're employing was available -- understanding
24  maybe not on-site, but was available in the medical
25  community in 2013 when Kelly Gahan received her

1  prescription?
2      A    Oh, even earlier.  I had had a patient who
3  had moved from France who had been using it years ago
4  back in Boston.  So the cold caps have been around
5  for a long time.
6      Q    So is it fair to say if you would have had
7  the -- just the bits of information, the important
8  bits, according to what you've indicated, concerning
9  clinical trials that Sanofi had done, Sanofi's
10 conclusion about Taxotere causing permanent
11 chemotherapy-induced alopecia, you would have
12 conveyed that information to the patient, correct?
13          MR. SEARS:  Objection to form.
14     A    (Deponent nodded head.)
15     Q    (By Mr. Schanker)  And you may not have
16 changed your recommendation of TCH, but is it fair to
17 say you would have -- that information would have
18 gone into your explanation of the risk/benefit
19 analysis of the TCH combination therapy versus the
20 ATCH (sic) combination therapy?
21          MR. SEARS:  Objection to form.
22     A    Yes.
23     Q    (By Mr. Schanker)  And you, as you did, as
24 you indicated on the record you did, if you had this
25 additional information we discussed, the clinical

1   trial data, Tax 301, and Tax 316, as well as
2   information concerning Sanofi's knowledge of
3   permanent chemotherapy-induced alopecia back prior to
4   2013, if Kelly Gahan would have opted to choose the
5   ACTH regimen, you would have respected that decision,
6   correct?
7           MR. SEARS:  Objection to form.
8       A   Correct.
9       Q   (By Mr. Schanker)  And you would have
10  administered it to her if she had -- or permitted it
11  to be administered to her under your guidance and
12  leadership; is that correct?
13          MR. SEARS:  Objection to form.
14      A   Yes.  That's what I would have ordered for
15  her.
16      Q   (By Mr. Schanker)  We understand and you
17  indicated earlier there's no guarantees in medicine,
18  correct?
19      A   There are none.
20      Q   But based on your knowledge of survival
21  rates and Kelly Gahan's profile, do you believe
22  within a reasonable degree of medical probability
23  that if Dr. Gahan had opted for the ACTH regimen it's
24  more likely true than not that she would be
25  cancer-free today just based on the numbers,