# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)                    MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

                                                SECTION "H" (5)

THIS DOCUMENT RELATES TO:

Tanya Francis, Case No. 16-17410;
Deborah Johnson, Case No. 16-15607.

**SANOFI'S OPPOSITION TO PLAINTIFF JOHNSON'S AND PLAINTIFF FRANCIS'S
MOTION FOR RECONSIDERATION OR, IN THE ALTERNATIVE, FOR
CLARIFICATION/AMENDMENT OF JUDGMENTS (DOCS. 7697 AND 7698)
<u>BASED ON ORDER AND REASONS (DOC. 7571)</u>**

If the arguments in Plaintiffs' Motion are to be credited, their cases are not only subject to summary judgment on timeliness grounds, but also for failure of proof. The injury they allege—"permanent chemotherapy induced alopecia"—must have a definition, be ascertainable, and be diagnosable. The Court did not err in applying the definition Plaintiffs have put forward, maintained and used to their own advantage throughout this litigation, to find their cases time-barred. However, Plaintiffs' insistence that this injury is vague, subjective, and inherently malleable squarely points to the need for objective medical evidence of injury in these cases and throughout MDL 2740.

Nearly three years into this MDL, first-round trial pool Plaintiffs Deborah Johnson and Tanya Francis find themselves at odds with their own pleadings, experts, testimony, and attestations. In each of their cases, the undisputed record shows that (1) Plaintiffs' alleged injuries occurred six months after they completed chemotherapy; (2) they promptly appreciated those injuries and attributed them to chemotherapy; yet (3) they failed to reasonably investigate any potential claims for multiple years before filing suit. Consequently, Plaintiffs' incorrect argument

that a Plaintiff in multi-district litigation cannot be held to the allegations of a master complaint she has expressly adopted and incorporated is of no moment. As this Court's Order addressed at length, the specific facts of the *Johnson* and *Francis* cases show their claims are time-barred. Accordingly, summary judgment is appropriate.

In opposing this inexorable conclusion, Plaintiffs mount a sweeping assault on their own premise underlying this entire litigation—that "permanent chemotherapy induced alopecia" is a distinct, cognizable injury capable of definition, appreciation, and diagnosis. Plaintiffs' arguments run counter to three years of this Court's and the parties' efforts toward coherent, administrable claims capable of meaningful adjudication and resolution. The heart of Plaintiffs' argument not only contests their **own** definition of "permanent chemotherapy induced alopecia"—hair loss persisting six months after completion of chemotherapy treatment—but undermines the very idea that this injury is cognizable and recoverable. If accepted, these arguments do not make Ms. Johnson's and Ms. Francis's claims *timely*—but their Motion does highlight fundamental failures of proof in their own claims, as well as numerous other plaintiffs in MDL 2740. Accordingly, Plaintiffs' Motion for Reconsideration or, in the Alternative Clarification/Amendment ("Plfs.' Mot.") (Rec. Doc. 7857) should be denied, and the Court should enter a pre-trial order requiring all MDL Plaintiffs to submit a diagnosis of injury, as previously proposed by Sanofi.

## ARGUMENT

### I.   LEGAL STANDARD

"Reconsideration of a judgment after its entry is an extraordinary remedy that should be used sparingly." *Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004). "Rule 59(e) serves the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence." *Id.* (citation and brackets omitted). The movant has the burden of

"clearly establish[ing]" any manifest error.  *In re Life Partners Holdings, Inc.*, 926 F.3d 103, 128 (5th Cir. 2019) (citation omitted).  Rule 59(e) motions "cannot be used to raise arguments which could, and should, have been made before the judgment issued."  *Id.*

## II.   THE COURT'S ORDER AND REASONS AND JUDGEMENT WARRANT NO RECONSIDERATION, CLARIFICATION OR AMENDMENT.

### A.   Plaintiffs Have Not Briefed or Met the High Standard for Relief Under Rule 59(e).

This Court should reject Plaintiffs' Motion out of hand.  Plaintiffs have failed to argue—much less demonstrate—that their asserted grounds for relief clearly establish a manifest error in the Court's summary judgment ruling.  Tellingly, Plaintiffs' Motion itself—a five page document laying out their essential arguments—does not cite a single source of law under which the Court's judgment is purportedly in error.  The Court should weigh this defect heavily in rendering its decision.  *See, e.g.*, *Faciane v. Sun Life Assurance Co. of Can.*, No. 18-30918, 2019 WL 3334654, at *8 (5th Cir. July 25, 2019) ("Our court routinely dismisses arguments as abandoned when parties fail to brief them.  The same is suitable here, given [appellant's] lack of briefing on the Rule 59(e) standard." (citations omitted)).

Moreover, Plaintiffs' arguments are not based on any newly-discovered evidence.  Each of the arguments Plaintiffs make in behalf of their Motion could have been made in opposition to Sanofi's requests for summary judgment—and many of them were.  *See, e.g.*, Memorandum in Supp. of Plfs.' Motion ("Plfs.' Mem.") (Rec. Doc. 7857-1) at 2-7 (arguing that the Court should ignore Plaintiffs' own definition of their injury because it was pled in "hindsight"); Plf.'s Mem. in Opp. to Def.'s Mot. for Summ. J Based on Statute of Limitations ("Francis SOL Opp.") (Rec. Doc. 6610) at 6 (same); Plfs.' Mem. at 7-9 (arguing that Plaintiffs' fraudulent concealment allegations are sufficient to avoid summary judgment, without citing any record evidence of concealment);

Francis SOL Opp. at 6 n.1 (same).  Plaintiffs are not entitled to a redo of the extensive summary judgment briefing simply because the outcome was not to their liking.  After all, Plaintiffs' Motion and Memorandum exclusively cite information that has been in their possession for more than a year—and in the case of stem cell tests, information that they strove to exclude from discovery, and which they now claim is irrelevant to their claims.  *See* Plfs.' Mot. to Exclude Dr. Shapiro's & Dr. Smart's Stem Cell Ops. (Rec. Doc. 7322) at 7 (noting that stem cell explanation of PCIA was theoretical and "scientific theory cannot serve as the basis to a reliable opinion.").  Plaintiffs identify no extraordinary circumstances that justify revisiting the Court's statute of limitations decision.  Their motion should be denied.

## B.   The Court's Decisions in *Francis* and *Johnson* Was Correct on the Merits.

The pleadings and undisputed evidence show that Plaintiff Deborah Johnson was aware of her alleged injury in 2010 or, at the latest, June 2011, and that Plaintiff Tanya Francis was aware of her alleged injury and its potential relationship to her Taxotere chemotherapy regimen in 2010.  Neither Plaintiff filed suit until 2016.  Defendants' Motion for Summary Judgment cited undisputed evidence establishing that each Plaintiff's injury arose years before she brought suit and that each attributed the injury to chemotherapy, triggering the prescriptive period:

(1) The Second Amended Master Long Form Complaint ("SAMC") (Rec. Doc. 4407) alleged "disfiguring, permanent alopecia" that occurred "six months beyond the completion of chemotherapy."  SAMC ¶ 181.

(2) Ms. Johnson alleged in her verified Fact Sheet that "after six (6) months of discontinuing Taxotere … [t]here [we]re visible bald spots on [her] head no matter how [she] style[d] [her] hair."  Fifth Am. Plf. Fact Sheet ("Johnson PFS") (Rec. Doc. 5734-6) at 16.  Similarly, Ms. Francis alleged in her verified Fact Sheet that "after six (6) months of discontinuing Taxotere® … [t]here is noticeable hair loss[.]" Eighth Am. Plf. Fact Sheet ("Francis PFS") (Rec. Doc. 6081-3) at 16.  They alleged that their injuries began in August and May 2010, respectively.

(3) Ms. Johnson conceded that, by the time her radiation treatment ended in 2010, "I just figured I was just the unlucky one, that it wasn't going to come back."  Johnson Dep. at 307:13-309:11.  Ms. Francis admitted at deposition that she had believed her chemotherapy

regimen "put together," *i.e.*, including Taxotere, had caused her incomplete hair regrowth. Francis Dep. at 236:20-238:2.

Thus, as the Court correctly found, Plaintiffs' claims are barred by Louisiana's one-year statute of limitations, which begins "to run from the day injury or damage is sustained," *Asbestos v. Bordelon, Inc.*, 726 So. 2d 926, 974 (La. Ct. App. 1998) (quoting La. Civ. Code Ann. art. 3492), and is tolled only "in cases where a plaintiff's ignorance [of her injury] is not negligent or unreasonable," *id.* at 976. Louisiana case law is clear that the doctrine of *contra non valentem* does not save these claims. That doctrine merely suspends prescription until the plaintiff has "actual or constructive knowledge of a causal relationship between the object or product and the injury." *In re: Xarelto (Rivaroxaban) Prods. Liab. Litig.*, MDL No. 2592, No. 15-4790, 2017 WL 4517287, at *2 (E.D. La. Oct. 10, 2017) (emphasis added). For purposes of the doctrine, "[c]onstructive knowledge is whatever notice is enough to excite attention and put the injured party on guard and call for an inquiry." *Campo v. Correa*, 828 So. 2d 502, 510-11 (La. 2002).

In light of the undisputed evidence, Plaintiffs' strategy is to claim their backgrounds and education were inadequate for them to know they may have claims. *See* Plfs.' Mem at 20-26. The Court already considered and rejected this argument. *See* Order & Reasons (Rec. Doc. 7571) at 10. Plaintiffs did know about their alleged injury (*i.e.*, that their hair was not regrowing), and the possible cause of it, and admitted as much in discovery. Moreover, Plaintiffs' cited cases do not support their arguments. As in their summary judgment briefing, Plaintiffs misguidedly rely on numerous medical malpractices cases, which are governed by a different prescription statute than Plaintiffs' delictual actions. *See* Plfs.' Mem. at 10-12. In *Marin v. Exxon Mobil Corp.*, 48 So. 3d 234 (La. 2010), cited by Plaintiffs, the Louisiana Supreme Court held that plaintiffs' claims had accrued and prescribed based on their lay observation that their crops *had not regrown as expected*. As in *Marin*, here Plaintiffs' injuries were readily apparent to them, as they admitted at deposition.

5

That is all that Louisiana law requires for prescription.  "[T]he prescriptive period commences when there is enough notice to call for an inquiry about a claim, not when an inquiry reveals the facts or evidence that specifically outline the claim." *Luckett v. Delta Airlines, Inc.*, 171 F.3d 295, 300 (5th Cir. 1999) (citing *Terrel v. Perkins*, 704 So. 2d 35, 39 (La. Ct. App. 1997)).  The Court considered these arguments and correctly held that Plaintiff Francis's and Plaintiff Johnson's[1] claims are time-barred.

> ### 1. The Court Correctly Applied the Definition of "Permanent Chemotherapy-Induced Alopecia" Pleaded by Plaintiffs, to Which They Personally Attested, and on Which Their Experts Rely.

Though inapposite under the facts of these cases, Plaintiffs argue that a master complaint in multi-district proceedings is merely an "administrative tool"—*i.e.*, that the allegations therein cannot be applied or attributed to specific plaintiffs' cases.  This argument is without merit here. MDL Courts regularly "treat the master complaint as an operative pleading" for purposes of dispositive motions.  *In re Refrigerant Compressors Antitrust Litig.*, 731 F.3d 586, 590 (6th Cir. 2013) (collecting authority); *see also In re Katrina Canal Breaches Litig.*, 309 F. App'x 836, 838 (5th Cir. 2009) (per curiam); *In re Zofran (Ondansetron) Prods. Liab. Litig.*, No. 1:15-md-2657, 2017 WL 1458193, at *5-6 (D. Mass. Apr. 24, 2017) (explaining that each plaintiff's complaint "consists of the master complaint *and* the individual short-form complaint, taken together.").  The procedural history and evidentiary record in these cases demonstrate that the master and short form

---

[1] Sanofi respectfully reserves objections for purposes of trial and appeal to the Court's ruling denying summary judgment as to Plaintiff Barbara Earnest, who is not subject to Plaintiffs' Motion for Reconsideration.  In particular, the Court found that Earnest's claim did not begin to run until she associated Taxotere with permanent alopecia in 2016 because six months after completing her chemotherapy, she became concerned that her hair had not grown back as expected, prompting her to ask her oncologist, Dr. James Carinder, about it.  *See* Rec. Doc. 7571, at 8-9. Ms. Earnest testified that she recalled discussion "[t]hat it's going to come back. It just takes time. So I just kept waiting." *Id.* at 8. Sanofi submits that this single inquiry in 2011 or 2012 was insufficient to toll her claims and satisfy her duty to investigate for the many additional years before she filed suit.  Ms. Earnest had a reasonable basis to pursue her claim at some point in the subsequent four years during which she claims her hair remained unchanged, yet she did nothing more.

complaints together constitute Plaintiffs' operative pleadings. The SAMC expressly presents

"certain common allegations and common questions of fact and law that generally pertain to

Plaintiffs adopting this Complaint" and "anticipate[s] that individual Plaintiffs will adopt th[e]

Master Complaint and selected causes of action … through the use of a separate Short Form

Complaint." Master Long Form Compl. ("Master Compl.") (Rec. Doc. 312) ¶¶ 2-3; *see also*

SAMC ¶¶ 2-3 (same).[2] Indeed, Ms. Johnson's and Ms. Francis's Short Form Complaints ("SFCs")

expressly "incorporate by reference the Master Long Form Complaint and Jury Demand," which

includes the allegation that "Permanent Chemotherapy Induced Alopecia ... is defined as an

absence of or incomplete hair regrowth six months beyond the completion of chemotherapy." *See*

SAMC ¶ 181; Johnson SFC (Rec. Doc. 5734-4); Francis SFC (Rec. Doc. 6081-2). Neither Ms.

Francis, Ms. Johnson, nor any other MDL plaintiff has ever sought to amend or disavow paragraph

181[3]—and any post hoc attempt to do so now would be untimely and grossly prejudicial. *See, e.g.*,

*infra* pp. 10-11 (noting Plaintiffs advance and benefit from this definition outside the prescription

context).

Plaintiffs' argument also fails because it does not make sense. Ms. Francis's and Ms.

Johnson's Short Form Complaints, standing alone, do not purport or come close to stating a claim

---

[2] The cases Plaintiffs cite on this issue are unhelpful. *No* case cited holds that substantive allegations set forth in a master complaint expressly adopted by an individual plaintiff *do not apply to that plaintiff*. Instead, each case involved requests to *dismiss* or *disregard* allegations in master complaints or individual pleadings. *See In re Propulsid Prod. Liab. Litig.*, 208 F.R.D. 133, 142 (E.D. La. 2002) (declining to find Indiana class complaint superseded by master complaint for choice of law purposes); *In re Trasylol Products Liability Litig.*, 2009 WL 577726, at *8 (S.D. Fla. 2009) (declining to dismiss counts of master complaint as to all plaintiffs); *In re Nuvaring Products Liability Litig.*, 2009 WL 2425391, at *2, (E.D. Mo. 2009) (declining to dismiss master complaint in full under Fed. R. Civ. P. 12(b)(6) and 9(b)); *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405 (2015) (holding that dismissal of individual action in MDL was final and appealable, notwithstanding other actions using same master complaint).

[3] Plaintiffs have repeatedly reaffirmed this allegation. Plaintiffs' Original, First Amended, and Second Amended Master Complaints all set forth the same verbatim six months post-treatment definition of their claimed injury. *See* Master Compl. ¶ 181; First Am. Master Compl. (Rec. Doc. 689) ¶ 180 (July 25, 2017); SAMC ¶ 181. Plaintiffs Johnson and Francis filed their current Short Form Complaints incorporating the Master Complaint in its entirety on December 12, 2017. *See* Johnson SFC & Francis SFC. To date, more than 11,000 SFCs have been filed in MDL 2740 expressly incorporating the allegations and claims set forth in the Master Complaint.

for which relief may be granted.  *See* Fed. R. Civ. P. 12.  If the general allegations of the master complaint are not substantively applied to define their claims, then Plaintiffs have no claims.[4] Plaintiffs' reliance on the general fraudulent concealment allegations of the Master Complaint in opposing summary judgment in Ms. Johnson's and Ms. Francis's specific cases underscores this point.  *See* Plfs.' Mem. at 7-9 (arguing that the fraudulent concealment allegations of the Master Complaint apply in *Johnson* and *Francis*); Johnson SOL Opp. (Rec. Doc. 6536) at 12 (same); Francis SOL Opp. at 6 & n.1 (same).  Plaintiffs cannot selectively disavow paragraph 181 of their own Master Complaint exclusively for purposes of summary judgment briefing.  Their arguments lack support in law or logic and should be rejected.  *See also Refrigerant Compressors*, 731 F.3d at 591 (treating master complaint as operative pleading where, *inter alia*, "[t]he court fixed the deadline for the defendants to answer by looking at the date of the master complaint's filing," the plaintiffs "treated the master complaint as a real complaint when they asked the [Court] for leave to amend it," and "the parties and the court looked only at the master complaint" when "arguing about or adjudicating the defendants' motion to dismiss").

Moreover, Plaintiffs' six months post-chemotherapy injury definition is far from a stray allegation in "one AMC paragraph."  *See* Plfs.' Mem. at 9.  Plaintiffs put forward and rely on the same definition throughout this litigation to support their claims.  For example, Plaintiffs' own experts repeatedly cite the six-month mark as the definition of permanent or irreversible hair loss— and offer no other definition.  *See, e.g.*, Kessler Rep. (**Ex. A**) ¶ 81 (citing definition of "irreversible alopecia" as the "complete loss of growth or partial regrowth at least 6 months after

---

[4]  The singular and self-defeating interpretation of the Amended Master Complaint that Plaintiffs urge would also raise Due Process concerns.  Defendants were not given the opportunity to answer or move to dismiss Plaintiffs' SFCs, standing alone, under Rule 8, Rule 12 or on any other grounds.  Given the anemic content of the SFCs, treating them as the sole basis for Plaintiffs' case-specific claims would deny defendants "fair notice of what the ... claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted; omission in original).

chemotherapy."), ¶ 121 n.141 (criticizing counts of hair loss persisting 12 or 24 months after chemotherapy as underinclusive for excluding hair loss persisting six months after chemotherapy), ¶ 185 n.212 (same);[5] Feigal Rep. (**Ex. C**) at 39 (citing literature calculating the "incidence of persistent significant alopecia at 6 months after the last course of chemotherapy"); Plunkett Rep. (**Ex. D**) at ¶ 30 (citing definition of "irreversible alopecia" as "hair loss that is still seen six months after treatment has ended."); Tosti Rep. (**Ex. E**) at 11-12 (contrasting "Permanent Chemotherapy-Induced Alopecia" with reversible chemotherapy-induced alopecia, where "complete regrowth after approximately 6 months" occurs).

Similarly, Ms. Johnson and Ms. Francis attest in their verified Plaintiff Fact Sheets ("PFSs") to injuries beginning six months after completion of chemotherapy—and years before they filed suit. *See, e.g.*, Johnson PFS at 16 (reporting "[s]ignificant thinning of the hair on your head after six (6) months of discontinuing Taxotere"); Francis PFS at 16 (reporting "[m]oderate thinning" for the same timeframe); *see also* Defs.' Mem. of Law in Supp. of Mot. for Summ. J. Based on Statute of Limitations against Plf. Johnson (Rec. Doc. 5734-2) at 1-2, 6-7 (listing PFS injury allegations dated to 2010, or latest, June 2011); Defs.' Mem. of Law in Supp. of Mot. for Summ. J. Based on Statute of Limitations against Plf. Francis (Rec. Doc. 6081) at 1-2, 6-7 (same). Plaintiffs Johnson and Francis are not alone: more than 10,000 plaintiffs in MDL 2740 have submitted verified Fact Sheets attesting to hair loss injuries beginning "after six (6) months of discontinuing Taxotere."

---

[5] In his Report, Dr. Kessler criticizes the use of 12- and 24-month periods to calculate incidences of persistent or permanent alopecia in certain Sanofi analyses. *See* Kessler Rep. ¶¶ 121, 185. In their Motion, Plaintiffs now argue use of these periods proves their injury is incapable of objective definition for purposes of claim accrual. Neither is correct—or apropos. Sanofi's analyses were conducted under the direction of government health authorities. *See, e.g.*, Sanofi_03643994 (letter from French health authority citing cases of alopecia persisting more than 12 months and requesting further review) (**Ex. B**). The analyses assessed product safety, and do not address when a reasonable person experiencing hair loss would have notice that it was persisting. Moreover, Plaintiff Johnson's and Plaintiff Francis's claims were untimely by more than five years, and would remain untimely under any injury definition cited in Plaintiffs' Motion. Reconsideration could yield no different result, and is unwarranted.

It is not by happenstance that Plaintiffs define their injury as incomplete hair regrowth six months beyond the completion of chemotherapy.  Plaintiffs rely on this definition throughout this litigation as advantageous for multiple reasons.  First and most fundamentally, Plaintiffs rely on this definition to distinguish their alleged injury from hair loss experienced *during chemotherapy*, which they admit is well-known (and for which they cannot claim a failure to warn).  *See, e.g.*, SAMC ¶ 174 ("Chemotherapy is known to cause temporary and reversible hair loss" and "hair follicles are some of the most likely cells to be damaged by chemotherapy.").  In fact, Plaintiffs offer their definition for the purpose of drawing this distinction, which is essential to their claims. *Id.* ¶ 181 ("Unlike the temporary and reversible alopecia that ordinarily results from chemotherapy, Taxotere … cause[s] Permanent Chemotherapy Induced Alopecia, which is defined as an absence of or incomplete hair regrowth six months beyond the completion of chemotherapy.").

Secondly, as Dr. Kessler made clear in his report, measuring "irreversible alopecia" from six months after completion of chemotherapy increases the number of reported incidents.  *See* Kessler Rep. (**Ex. 1**) ¶ 121 (noting that the shorter the time period used to define irreversible alopecia, the "more cases" would be reported).  It is the quantity of reports which Plaintiffs argue constituted a "safety signal."  This definition specifically underlies Dr. Kessler's conclusion that a different hair loss warning was warranted, as well as Plaintiffs' claims regarding the "true risks" of the injuries they allege.  *See* SAMC ¶ 173.

Finally, the six months post-treatment injury definition generates more claims.  It dubiously allows Plaintiffs in MDL 2740 to file suit within months of their chemotherapy treatment or even their cancer diagnosis.  *See, e.g.*, Blumlo SFC ¶ 10 (treatment ended July 2016, filed suit Dec. 2016) (**Ex. F**); D. Hall SFC ¶ 10 (treatment ended Apr. 2016, filed suit Dec. 2016) (**Ex. G**); Fulcher SFC ¶ 10 (treatment ended Feb. 2016, filed suit Oct. 2016) (**Ex. H**); Zenon SFC ¶ 10 (treatment

ended Mar. 2016, filed suit Dec. 2016) (**Ex. I**); C. Turner SFC ¶ 10 (treatment ended Feb. 2016, filed suit Dec. 2016) (**Ex. J**).  The PSC's position during conferences on adverse event reports, serial 30(b)(6) depositions of Dr. Michael Kopreski, and on these types of cases, has been that *delayed* (as opposed to "permanent") hair regrowth is itself a cognizable injury. More filings mean more leverage and, in the view of some, allows lawsuit filings without proper vetting—to the benefit of Plaintiffs Johnson, Francis, and others with untimely or otherwise defective claims. *See* Def.'s Mot. for Summ. J. on Statute of Limitations Grounds against Plf. Suzanne Mink (Rec. Doc. 4687) (outlining Plaintiffs' discussions on delaying filing of time-barred claims to file *en masse* and thereby avoid scrutiny).

Relying on the definition of their alleged injury as commencing six months beyond the completion of chemotherapy to set out and support their claims, Plaintiffs should not be heard to disclaim it where it bars their claims in the context of prescription.  The Court correctly applied this definition in finding Plaintiffs' claims time-barred, and need not reconsider or amend its well-reasoned Order.

> ### 2.    The Court Correctly Found Plaintiffs Francis and Johnson Did Not Meet Their Duty to Reasonably Investigate Their Alleged Injuries.

After full briefing by the parties on precisely this issue, this Court correctly concluded that Plaintiffs Johnson and Francis each "had a duty to investigate [their injuries] and failed to do so," and thus that *contra non valentem* did not apply to save their claims.  *See* Order & Reasons at 7, 10.  Plaintiffs identify no manifest error and present no newly discovered evidence to support their criticisms of the Court's decision.  Instead, Plaintiffs attempt to re-cast—and mischaracterize— Plaintiff testimony in order to manufacture "investigations" that they previously indicated did not happen because they would have been futile.  Specifically, Ms. Johnson argued that inquiry "would have been futile," so she "sought closure for being 'unlucky' in so many ways, and moved on with

her life." *See* Johnson SOL Opp. at 23.  Similarly, Ms. Francis "waited and hoped" for her hair to regrow until she saw a Facebook advertisement.  Francis SOL Opp. at 8-9; *see also id.* at 13 (Plaintiff conducted a "diligent investigation" only *after* she saw the advertisement that she claims triggered her duty to inquire).

The record in *Johnson* overwhelmingly establishes that Plaintiff did not conduct any investigation into her hair loss after concluding that her hair was not going to grow back:

> Q.  And at the time of your last radiation in 2010, at that point, you said to yourself, My hair is not going to grow back anymore?
>
> A.  Right.
>
> Q.  Okay.  And you did not go and talk to anyone about that, right?
>
> A.  No.  I was devastated and depressed.

Johnson Dep. at 309:7-309:14; *see also id.* at 313:1-21 ("Q. [….] In all the years that have passed, why have you not gone to see someone about your hair loss? A. I just [figured] it wasn't coming back."); Johnson PFS § VII.5 (reporting no discussions with any healthcare provider about her hair loss).  The single testimony excerpt Plaintiff cites, long available but referenced for the first time in the instant Motion for Reconsideration, refers to a discussion about hair loss "[a]fter I had my surgery, June the 10th"—which was before Ms. Johnson began chemotherapy.[6]

Similarly, the record in *Francis* reveals no investigation of or treatment sought for Plaintiff's alleged injury prior to her filing suit—and Plaintiff likewise cites no contrary evidence. It is true that in June 2017, more than six months *after* filing suit (and more than seven years after

---

[6] Ms. Johnson's account of the timing of the conversation is varied—in testimony not cited by Plaintiff, she does once suggest this conversation took place after chemotherapy, but four times states that it was in fact after her *surgery*, and provides only the date of June 10 [2010] (before chemotherapy).  Elsewhere, Ms. Johnson testifies in no uncertain terms that she did not discuss hair loss with Dr. Lewis or anyone else after beginning chemotherapy.  *See id.* at 290:16-293:8 (Q: "[…] did you discuss it with any of your medical providers?  A. No."); 309:7-309:14; 313:1-313:21.  Plaintiff cannot manufacture a dispute of fact by testimony promptly and repeatedly corrected.

her alleged injury), Plaintiff saw a dermatology nurse on referral from primary care.  Plaintiff concedes she sought this referral after filing suit in 2016.  *See* Francis SOL Opp. at 9 n.2 ("Plaintiff concedes she … <u>sought</u> referral to Dimitri Dermatology in 2017") (emphasis added).  In short, Ms. Francis's newly cited (but not newly discovered) testimony provides no evidence that Plaintiff made any investigation of her injury *prior* to filing suit, but merely confirms actions taken *after* filing which were already briefed to the Court and are irrelevant to prescription.  *See id.*

Plaintiffs' arguments regarding their education and intelligence are misplaced.   No specialized education, intelligence or "scientific or medical training" are necessary to perceive that hair has not regrown.  Indeed, no medical evidence of Plaintiffs' injuries was sought or obtained prior to their filing complaints—and the notice required for a claim to accrue cannot exceed that needed to file suit.  Plaintiffs have alleged they were well aware of their incomplete hair regrowth and always associated it with chemotherapy, *see* SAMC ¶¶ 6, 173, 215-217; Johnson Dep. 314:5-8; Francis Dep. 237:17-23—no more is required for inquiry notice.

The evidence in the *Johnson* and *Francis* cases not only meets, but exceeds the standard for summary judgment on prescription grounds under Louisiana law.  Here, the record shows Plaintiffs *subjectively* perceived their injuries and potential causes years before filing suit—and that perception was an *objectively* reasonable prompt to investigate.   But under Louisiana limitations law, only one is necessary: prescription is triggered by <u>either</u> "actual <u>or</u> constructive knowledge of a causal relationship between the object or product and the injury."  *In re: Xarelto (Rivaroxaban) Prods. Liab. Litig.*, 2017 WL 4517287, *2 (E.D. La. Oct. 10, 2017) (emphasis added); *see also* Order & Reasons at 6 (citing *Xarelto*).  In light of the injury alleged in MDL 2740, all that is necessary for a claim to accrue is that an objectively reasonable person in the Plaintiff's shoes would have observed that her hair loss was persisting, and attributed the condition of her

hair to chemotherapy due to the alleged temporal link.  Indeed, that alleged temporal link remains the only basis for Plaintiffs' claims of causation even today, years after they have filed suit.

III.     **PLAINTIFFS' ARGUMENTS CONFIRM THE NEED FOR A MEDICAL DIAGNOSIS PTO IN MDL 2740.**

A.     **Plaintiffs' Stem Cell Arguments Confirm the Court's Decision Was Correct, but Highlight Failures of Proof in Plaintiffs' Claims.**

Though otherwise steadfastly insisting that Dr. Curtis Thompson's findings of stem cell presence and proliferation for Plaintiffs Earnest, Francis, and Durden are irrelevant in this litigation, Plaintiffs here cite these tests as evidence "that the question of when hair loss becomes permanent after use of Taxotere has not been firmly established through the existing science." Plfs.' Mot. at 2.  **This is not helpful to Plaintiffs.**

First, to the extent Plaintiffs argue that confirmation of stem cell damage is necessary for definitive proof of permanent hair loss, Plaintiffs claims remain time-barred because they did not seek such confirmation in the many years after they subjectively concluded that their hair would not regrow.  Ms. Johnson has never undergone such testing.  Moreover, Ms. Francis's testing confirmed that stem cells were present and proliferating in her scalp tissue—meaning she *still* lacks pathological confirmation of permanent hair loss.  If testing showing stem cell damage is a prerequisite for claim accrual, these Plaintiffs' claims would still not have accrued—suggesting (like many of Plaintiffs' arguments) the untenable proposition that a claim can be filed and maintained for years without ever accruing.

Second, the fact that Plaintiffs' hair loss may be proved non-permanent via stem cell testing years into litigation cannot make untimely claims timely—but it does point up the need for objective medical evidence of the injuries alleged for every Plaintiff in MDL 2740.  A medical diagnosis of permanent alopecia is not necessary for Plaintiffs' claims to accrue.  "It is not the rule

14

in Louisiana […] that the prescriptive period does not begin until conclusive dispositive proof of a causal connection between the suspected injury and the putative tortfeasor is established." *Carter v. Matrixx Initiatives, Inc.*, 391 F. App'x 343, 345-46 (5th Cir. 2010); *see also Xarelto*, 2017 WL 4517287, *2 ("There is no requirement that a patient be informed by an attorney or physician of a possible [claim] before prescription begins to run.").   But in litigation alleging a distinct medical injury characterized by a single attribute—permanence—medical evidence of that injury <u>is</u> necessary to maintain and ultimately resolve such claims.   Given the presence and proliferation of stem cells on some Plaintiffs' scalp tissue indicating that regrowth could be stimulated (*i.e.*, that hair loss is not "irreversible" or "permanent")—qualified medical evidence is necessary to distinguish truly permanent hair loss from the reversible alopecia that Plaintiffs admit is known and warned of.   *See* SAMC ¶ 174 ("Chemotherapy is known to cause temporary and reversible hair loss").   All four Trial 1 Plaintiffs sought and produced such evidence in preparing to try their claims, and the proof required of non-trial plaintiffs in a personal injury MDL should be no less. All cases should be maintained only on an actual diagnosis of injury.   Accordingly, the Court should enter a pre-trial order requiring all MDL Plaintiffs to submit a diagnosis of injury, as previously proposed by Sanofi.

> **B.**   **Plaintiffs' Admissions That Their Alleged Injuries Are Subjective and Indeterminate Underscores the Need for a Medical Diagnosis PTO.**

Though utterly irrelevant to the question of claim accrual in *Johnson*, *Francis*, or any other case, Plaintiffs' insistence that their alleged injury lacks a clinically-defined and accepted definition or presentation points to the need for qualified medical evidence of injury for every Plaintiff in this MDL.   In behalf of their misplaced request for Reconsideration of this Court's correct decisions in the *Johnson* and *Francis* cases, Plaintiffs concede that:

- "[T]he timing of permanency is difficult to determine and is subject to numerous interpretations."  Plfs.' Mot. at 2.

- "[T]he question of when hair loss becomes permanent after use of Taxotere has not been firmly established through the existing science." *Id.*

- Each Plaintiff's SFC does "not adopt a specific time when she actually or constructively knew of her injury." Plfs.' Mem. at 5

- It cannot be said "that every MDL Plaintiff's alopecia became permanent at 6 months post chemotherapy." *Id.*

- Plaintiffs' SFCs "allege that their permanent, irreversible and disfiguring alopecia began at some unspecified time after treatment." *Id.* at 6.

- Plaintiffs' PFS responses regarding the timing of their alleged injurys (*i.e.*, permanent alopecia) "may reasonably be construed in multiple ways" and are "far too general and lack[] precision."  *Id.* at 7.

Though immaterial to prescription in the *Johnson* and *Francis* cases, these concessions raise serious proof of injury questions in MDL 2740.  For example:

- If the timing of permanency cannot be determined, how can the fact of permanency be determined?

- If there is no consensus definition of permanent alopecia, how can it be known whether an individual's alopecia is permanent?

- How can claims be adjudicated without defining the alleged injury?

- How can claims be adjudicated without medical evidence substantiating the alleged medical injury?

Plaintiffs cannot argue, on the one hand, that their claims cannot accrue without a medical diagnosis of their alleged injury and, on the other hand, file and maintain suit for years without ever seeking or producing such a diagnosis.  In fact, the opposite is true—although a diagnosis is not necessary for a Plaintiff to perceive that her hair loss has persisted longer than she expected following chemotherapy—thus exciting her attention and putting her on inquiry notice of potential claims—a Plaintiff simply cannot prosecute her claims to resolution without some medical

16

evidence of a distinct, cognizable injury.  Accordingly, the Court should enter a pre-trial order requiring all MDL Plaintiffs to submit a medical diagnosis of injury, as previously proposed by Sanofi.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Reconsideration or, in the Alternative, for Clarification/Amendment of Judgments (Rec. Doc. 7857) should be denied, and the Court should enter a pre-trial order requiring all MDL Plaintiffs to submit a medical diagnosis of injury.

Date: August 20, 2019

Respectfully submitted,

/s/ *Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE URQUHART &**
**MOORE LLC**
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: 504-310-2100
Facsimile: 504-310-2120
dmoore@irwinllc.com

Harley V. Ratliff
Adrienne L. Byard
Kelly Bieri
**SHOOK, HARDY& BACON L.L.P.**
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
Facsimile: 816-421-5547
hratliff@shb.com
abyard@shb.com
kbieri@shb.com

***Counsel for sanofi-aventis U.S. LLC and Sanofi***
***U.S. Services Inc.***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on **August 20, 2019**, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

/s/ *Douglas J. Moore*
Douglas J. Moore