# EXHIBIT 1

168

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
_____

VIDEO DEPOSITION OF VIRGINIA BORGES, VOLUME II
August 1, 2019
_____

KELLY GAHAN,                     )
                                 )
Plaintiff,                       )
                                 )
vs.                              ) Case No. 2:16-cv-15283
                                 )
SANOFI-AVENTIS U.S. LLC and      )
SANOFI US SERVICES INC.,         )
                                 )
Defendants.                      )
_____

APPEARANCES:

    BACHUS & SCHANKER, LLC
        By Darin Schanker, Esq.
            1899 Wynkoop Street, Suite 700
            Denver, Colorado  80202
              Appearing on behalf of Plaintiff.

    SHOOK, HARDY & BACON, LLP
        By Connor Sears, Esq.
            2555 Grand Boulevard
            Kansas City, Missouri  64108
              Appearing on behalf of Defendants.

    Also Present:  Maryvonne Tompkins, Videographer

**189**

1    A    Well, there's never any guarantees in
2    cancer.
3    Q    (By Mr. Sears)  I think that's all I have
4    to ask you except for potentially some of these
5    E-mails.  So can we take a break, and I'll just read
6    these as quickly as I can?
7         MR. SCHANKER:  Sure.
8    A    It's okay with me.
9         THE VIDEOGRAPHER:  The time is 9:53.  We
10   are going off the record.
11        (Recess from 9:53 a.m. to 10:06 a.m.)
12        (Exhibit 21 marked.)
13        THE VIDEOGRAPHER:  The time is 10:06.  We
14   are back on the record.
15   Q    (By Mr. Sears)  You ready to keep going?
16   A    Yep.
17   Q    So what I tried to do with the E-mails is
18   break them apart into separate E-mails.  So I'll hand
19   you Exhibit 21.  This is a string of E-mails between
20   you and Dr. Gahan.  It looks like the dates are
21   May 11, 2014, through May 17, 2014.  Do you see that?
22   A    Yes.
23   Q    So on the second page of that is the
24   E-mail that Dr. Gahan initially sent you that's dated
25   May 11, 2014?

**190**

1    A    Yes.
2         MR. SCHANKER:  Just so I'm on the same
3    page because I don't have exactly what you -- I mean,
4    I have them all.  How does this one start, Connor?
5         MR. SEARS:  It starts with, "So I tried
6    the hair" --
7         MR. SCHANKER:  Okay.  Thank you.
8         MR. SEARS:  You bet.
9    Q    (By Mr. Sears)  So on the fourth line down
10   she wrote, "I'm sure you have a lot of patients and
11   don't remember all of your conversation but you never
12   even hinted that AC was an option.  Not only did you
13   not give me the option for AC but you specifically
14   denied my request for AC on 3 separate occasions.  My
15   mother was with me on all three occasions and
16   specifically remembers you saying absolutely not to
17   the AC because I had been so thoroughly obsessing
18   about it."  Did I read that correctly?
19        MR. SCHANKER:  Objection to form.
20   A    You have read that correctly.
21   Q    (By Mr. Sears)  Did Dr. Gahan tell you
22   that she wanted AC?
23        MR. SCHANKER:  Objection to form.
24   A    Kelly had asked a lot of different
25   questions about the pros and cons of both regimens

**191**

1    and a lot of questions about what I had seen women
2    experience with the cold caps.  When I had asked her
3    to give me a decision because her starting date that
4    she had selected was coming up, it is my recollection
5    that she chose the TCH regimen, and she did that
6    after fully evaluating all of her choices.
7    Q    (By Mr. Sears)  What were the side effect
8    profiles between the two regimens that she was
9    debating?
10        MR. SCHANKER:  Objection to form.
11   A    The concern with the ACTH regimen is the
12   cardiomyopathy and the secondary leukemia that we've
13   discussed.  There are other side effects about that
14   regimen that are also different and can be very
15   problematic for women, but they are of typically a
16   temporary and reversible nature.  We were mostly
17   focused on the big, long-term outcomes.
18        And then on the TCH, she was concerned
19   about the hair loss issue.  And I don't remember
20   anything -- I mean, the neuropathy issues are the
21   same between the two.  I know we had discussed that,
22   but I don't recall it being anything of significance
23   that she was worried over.
24   Q    (By Mr. Sears)  When you say, "the hair
25   loss issue," what you're referring to is the ongoing

**192**

1    permanent persistent hair loss associated with
2    chemotherapy?
3    A    Well, at the time that --
4         MR. SCHANKER:  Objection to form.
5         Sorry.
6         THE DEPONENT:  I should just learn to wait
7    and let you do that.
8    A    At the time, the way I was able to
9    describe it to her is that I had seen it in three
10   patients.  And it was a concern because those three
11   patients had gotten the TCH regimen, and that was a
12   relatively newer regimen than what we were using in
13   the adjuvant treatment for HER2+ breast cancer.  That
14   is what I mean.  At that point in time, I wouldn't
15   have used the words permanent chemotherapy-induced
16   alopecia because I learned them later.
17   Q    (By Mr. Sears)  When you're describing the
18   condition of the three patients, what was the
19   condition that they had?
20        MR. SCHANKER:  Objection to form.
21        Go ahead.
22   A    They have had an incomplete regrowth of
23   hair.  And the hair that did regrow is very abnormal
24   looking, coarse.  It doesn't -- you can't achieve any
25   length, patches of baldness interspersed.

7 (Pages 189 to 192)

217

1  available.
2      Fast forward to today, and we have -- you
3  know, there's now FDA-approved devices. We have
4  three of them. I treat all my patients with this
5  regimen using them, and we've not, knock on wood, had
6  another case since. And so, you know, like I said
7  before, never in a million years would I have stopped
8  giving women this drug. It's a great drug. It's
9  been one of my favorite breast cancer drugs since I
10 first started using it back when I was a fellow in
11 oncology.
12     We figure it out. And if we can't figure
13 it out, we at least warn them so that if it happens,
14 they can be accepting of the fact that they made this
15 choice with the best information provided to them. I
16 have had women who have opted to go forward with the
17 regimens that we know can put them at risk and not
18 use the cold caps for a variety of reasons. Usually
19 it's resources. But they know. If it happens, they
20 made the choice, you know.
21     Q   Doctor, Exhibit 29 that I just showed you,
22 which was the deposition testimony of Amy Freedman
23 concerning Sanofi's knowledge back in 2006 that
24 Taxotere could cause permanent irreversible hair
25 loss, if you had that information, which you

218

1  indicated you didn't, would that have been
2  information that you would have conveyed to a
3  patient?
4      MR. SEARS:  Objection to form.
5      A   Yes.
6      Q   (By Mr. Schanker)  And you would have
7  conveyed that information to Kelly Gahan, correct?
8      MR. SEARS:  Objection to form.
9      A   Correct.
10     Q   (By Mr. Schanker)  Now, is there anything
11 to your knowledge that physically prevented Kelly
12 Gahan from utilizing cold caps?  She could have done
13 it, right?
14     A   Yes.
15     Q   And as we sit here today, do you believe
16 based on your experiences with patients like Kelly
17 Gahan, that you are successful in managing around the
18 hair loss issue with the use of the cold caps?
19     A   Yes.  So far since we've employed that
20 technology for our patients, we've not had another
21 case of permanent hair loss.
22     Q   And to your knowledge, that technology
23 that you're employing was available -- understanding
24 maybe not on-site, but was available in the medical
25 community in 2013 when Kelly Gahan received her

219

1  prescription?
2      A   Oh, even earlier.  I had had a patient who
3  had moved from France who had been using it years ago
4  back in Boston.  So the cold caps have been around
5  for a long time.
6      Q   So is it fair to say if you would have had
7  the -- just the bits of information, the important
8  bits, according to what you've indicated, concerning
9  clinical trials that Sanofi had done, Sanofi's
10 conclusion about Taxotere causing permanent
11 chemotherapy-induced alopecia, you would have
12 conveyed that information to the patient, correct?
13     MR. SEARS:  Objection to form.
14     A   (Deponent nodded head.)
15     Q   (By Mr. Schanker)  And you may not have
16 changed your recommendation of TCH, but is it fair to
17 say you would have -- that information would have
18 gone into your explanation of the risk/benefit
19 analysis of the TCH combination therapy versus the
20 ATCH (sic) combination therapy?
21     MR. SEARS:  Objection to form.
22     A   Yes.
23     Q   (By Mr. Schanker)  And you, as you did, as
24 you indicated on the record you did, if you had this
25 additional information we discussed, the clinical

220

1  trial data, Tax 301, and Tax 316, as well as
2  information concerning Sanofi's knowledge of
3  permanent chemotherapy-induced alopecia back prior to
4  2013, if Kelly Gahan would have opted to choose the
5  ACTH regimen, you would have respected that decision,
6  correct?
7      MR. SEARS:  Objection to form.
8      A   Correct.
9      Q   (By Mr. Schanker)  And you would have
10 administered it to her if she had -- or permitted it
11 to be administered to her under your guidance and
12 leadership; is that correct?
13     MR. SEARS:  Objection to form.
14     A   Yes.  That's what I would have ordered for
15 her.
16     Q   (By Mr. Schanker)  We understand and you
17 indicated earlier there's no guarantees in medicine,
18 correct?
19     A   There are none.
20     Q   But based on your knowledge of survival
21 rates and Kelly Gahan's profile, do you believe
22 within a reasonable degree of medical probability
23 that if Dr. Gahan had opted for the ACTH regimen it's
24 more likely true than not that she would be
25 cancer-free today just based on the numbers,

14 (Pages 217 to 220)

**221**

1  statistics as you understand them?
2  A     Yes.
3  Q     And with regard to ACTH, it's my
4  understanding based on your continued deposition and
5  what you were asked previously, in your patient
6  population at the time you were treating Ms. Gahan,
7  you hadn't seen permanent alopecia in that ACTH
8  population, correct?
9  A     Correct.
10       MR. SEARS:  Objection to form.
11 Q     (By Mr. Schanker)  And so again, based
12 upon that just logically, would it be reasonable to
13 surmise within a reasonable degree of medical
14 probability that if Kelly had, if given full
15 information -- and I understand that she could have
16 gone a different direction, too.  But if Kelly would
17 have opted for the ACTH regimen, is it more likely
18 true than not that she'd be cancer-free today and
19 would have had her hair regrow based on your
20 experiences and your knowledge of the data?
21       MR. SEARS:  Objection to form.
22 A     Yes.  That is an accurate statement.
23 Q     (By Mr. Schanker)  And you talked about
24 what sounds like you're successfully accomplishing it
25 in your practice today based on the information that

**222**

1  you learned, the managing around so that you can use
2  what you've indicated is an important combination
3  therapy, the TCH.  Doctor, do you believe within a
4  reasonable degree of medical probability that if you
5  had the information that you didn't have at your
6  disposal, the clinical trials that we've discussed
7  that Sanofi had done as well as Sanofi's position on
8  Taxotere causing permanent chemotherapy-induced
9  alopecia, and based upon that information that you
10 would have conveyed to Kelly Gahan, as you testified,
11 that if Ms. Gahan had elected to take the TCH regimen
12 and utilize the cold caps, based on your knowledge
13 and experience, the data, and clinical experience,
14 that within a reasonable degree of medical
15 probability Kelly Gahan would be cancer-free today
16 and also have her hair?
17       MR. SEARS:  Objection to form.
18 A     Yes.  I agree that that statement is true.
19 Q     (By Mr. Schanker)  Now, in the first part
20 of your deposition you were asked questions by
21 defense counsel about -- because it showed up in the
22 medical records -- this concept of hair preservation.
23 And you had some discussions, as you've testified,
24 with Kelly about utilization using the cold caps for
25 hair preservation.

**223**

1  A     Correct.
2  Q     Now, I'll represent to you that -- and I
3  think you know -- that Kelly Gahan had her deposition
4  taken in this case.
5  A     You've told me -- or I think you told me
6  that the last time I was deposed.
7  Q     Right.  I think you may have actually seen
8  part of it in this deposition, in that, and she was
9  asked about the hair preservation issue.  And I'll
10 represent to you that in her deposition that based
11 upon you doing what you did, which was sharing with
12 her your clinical and professional experiences with
13 the three patients who had suffered what now you
14 understand to be permanent chemotherapy-induced
15 alopecia, and then the research that you did, which
16 it sounds like was limited, and you found the
17 Sedlacek abstract you've indicated, that based upon
18 that information, you had this hair preservation
19 conversation with Ms. Gahan; is that correct?
20 A     Yes.
21 Q     And you also talked with Ms. Gahan about
22 utilizing the cold caps, correct?
23 A     Correct.
24 Q     And that Ms. Gahan expressed a concern
25 about scalp metastasis?

**224**

1  A     Correct.
2  Q     And I'll represent to you that in her
3  deposition that Kelly Gahan felt she was making a
4  determination of temporary hair loss with regard to
5  hair preservation and scalp metastasis versus hair
6  preservation of a permanent nature and scalp
7  metastasis.  Do you understand the different -- the
8  distinction and difference that I'm attempting to
9  make?
10 A     I think so.
11 Q     Okay.  What I mean is, Kelly was weighing
12 the risks -- or so she represents in her deposition
13 of, okay, I could lose my hair temporarily and it's
14 growing to grow back, or I might have a scalp
15 metastasis, however slim or nonscientifically based
16 that fear was of hers.  And therefore, she chose not
17 to take -- not to utilize the cold caps.  Does that
18 make sense?
19 A     I can't speak to what Kelly was thinking
20 because obviously from the medical record and my
21 E-mails I've shared with you, there was a disconnect
22 between my understanding of those events and hers at
23 that time.  I had conveyed to Kelly that the three
24 patients that I had outlined to her had not had their
25 hair grow back in the years into the future.

15 (Pages 221 to 224)