UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

```
IN RE:  TAXOTERE (DOCETAXEL)    *        16-MD-2740
PRODUCTS LIABILITY LITIGATION   *
                                *        Section H
                                *
Relates to:  16-CV-17144        *        August 16, 2019
             17-CV-2689         *
                                *        9:30 a.m.
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

ORAL ARGUMENT BEFORE
THE HONORABLE JANE T. MILAZZO
UNITED STATES DISTRICT JUDGE

<u>Appearances</u>:

| | |
|---|---|
| For the Plaintiffs: | Pendley Baudin & Coffin, LLP<br>BY:  CHRISTOPHER L. COFFIN, ESQ.<br>1100 Poydras Street, Suite 2505<br>New Orleans, Louisiana 70163 |
| For the Plaintiffs: | Gibbs Law Group, LLP<br>BY:  ANDRE M. MURA, ESQ.<br>6701 Center Drive West, Suite 1400<br>Los Angeles, California 90045 |
| For the Sanofi<br>Defendants: | Irwin Fritchie Urquhart<br>  & Moore, LLC<br>BY:  DOUGLAS J. MOORE, ESQ.<br>400 Poydras Street, Suite 2700<br>New Orleans, Louisiana 70130 |
| For the Sanofi<br>Defendants: | DLA Piper, LLP<br>BY:  ILANA H. EISENSTEIN, ESQ.<br>1650 Market Street, Suite 5000<br>Philadelphia, Pennsylvania 19103 |

```
Official Court Reporter:        Toni Doyle Tusa, CCR, FCRR
                                500 Poydras Street, Room B-275
                                New Orleans, Louisiana 70130
                                (504) 589-7778




Proceedings recorded by mechanical stenography using
computer-aided transcription software.
```

## <u>INDEX</u>

|  | <u>Page</u> |
|---|---|
| Oral Argument | |
| Ilana H. Eisenstein, Esq. | 4 |
| Andre M. Mura, Esq. | 10 |
| Ilana H. Eisenstein, Esq. | 15 |
| Douglas J. Moore, Esq. | 18 |
| Christopher L. Coffin, Esq. | 24 |
| Douglas J. Moore, Esq. | 28 |

1                               **PROCEEDINGS**

2                             **(August 16, 2019)**

3         **MR. MOORE:**  Douglas Moore, defense liaison counsel

4 and local counsel to Sanofi.

5                 We have two motions pending before Your Honor

6 this morning, a motion for a certification under § 1292 of

7 Your Honor's summary judgment ruling on learned intermediary

8 and a second motion on a motion to adjourn the trial date.  I

9 will be addressing the motion to continue.  My colleague, Ilana

10 Eisenstein, from DLA Piper in Philadelphia, will be addressing

11 the § 1292.  We would like to proceed with the § 1292 first, if

12 that's acceptable with the Court.

13         **THE COURT:**  I think that's appropriate.

14         **MS. EISENSTEIN:**  Good morning, Your Honor.

15 Ilana Eisenstein.  Thank you for welcoming a new member of the

16 team representing Sanofi, defendant.

17                 Your Honor, I'm here to speak on the § 1292

18 motion and why an interlocutory appeal should be granted on the

19 learned intermediary question presented, particularly as it

20 relates to a proximate causation decision in the *Earnest* and

21 the *Mills* decision.

22                 Your Honor, I think that the first thing to

23 address is the three factors for interlocutory appeal, and in

24 our view each of them are met and easily met.  The first is

25 whether this presents a controlling issue of law, the second is

09:25

1   whether the courts can reasonably or substantially differ on

2   that, and the third is whether the resolution of this will

3   materially advance the litigation.

4              I think that, on the controlling issue of law

5   piece -- and I know that Your Honor had mentioned Judge

6   Proctor's decision in *Blue Cross Blue Shield* as one that you

7   wanted us to address.

8         **THE COURT:**  Well, I just asked if they had read it

9   because I think he does a nice outline of the law.

10        **MS. EISENSTEIN:**  I agree, Your Honor, and I think

11   that that actually really underscores why this case is

12   different from that case and why this is a controlling issue of

13   law.  In that case the issue was whether there was personal

14   jurisdiction, and there were three independent grounds for a

15   decision, one of which was already controlled by prevailing and

16   binding circuit precedent.

17             Whereas here, as I think Your Honor has

18   recognized, the proximate causation issue is not governed by

19   binding precedent in the sense that Your Honor has developed

20   and applied a unique rule in the chemotherapy context that

21   departs from the traditional, standard rule and the learned

22   intermediary doctrine, which is that the doctor's prescribing

23   decision is where the proximate causation chain ends.

24             When the doctor has testified that he or she

25   would not have changed the prescribing decision as a result --

09:26

1          **THE COURT:**  Let me ask you:  In the other cases that
2     you cite to that say, listen, the doctor would not have changed
3     his prescribing decision, did any of those cases require signed
4     informed consent by the patient, and isn't chemotherapy
5     different?
6          **MS. EISENSTEIN:**  So, Your Honor, I can't speak to
7     whether signed informed consent was required, but I believe
8     that informed consent is a doctrine that underlies a doctor's
9     responsibility to his or her patient in every case in all of
10     those jurisdictions that I'm aware of.  I think that's a
11     prevailing standard of care for physicians, but that's really
12     the point.
13          In every traditional sense that we're aware of,
14     the standard for learned intermediary stops, proximate
15     causation stops and ends with a change to the doctor's
16     prescribing decision.  It doesn't run to a patient's
17     decision -- intentionally doesn't run to a patient's decision
18     to potentially reject that choice or to choose something else
19     based on the patient's own decision-making.
20          That's potentially a doctrine that Your Honor
21     might disagree with and has disagreed with here, but it's
22     something that certainly presents a difference of opinion on
23     which reasonable judges could differ.  That's the really key
24     question here.  Standing here today, we are not asking you to
25     reconsider your decision whether or not the proximate causation

09:28

1   standard was met.  What we are asking is -- we think that this

2   is a critical question, one that will control and dispose of

3   significant numbers of cases in this litigation and one in

4   which reasonable judges can disagree and that, I think,

5   Your Honor would recognize --

6            THE COURT:  Oh, I understand --

7            MS. EISENSTEIN:  -- is different from the traditional

8   role of learned intermediary.

9            THE COURT:  I'm not willing to go that far.

10           MS. EISENSTEIN:  Okay.

11           THE COURT:  I will tell you this.  If I should grant

12  this, then what does that do to the case that has been worked

13  up?  I know you have set this up in two motions.  Why wouldn't

14  we proceed, try the case, and if you lose you bring an entire

15  case to the Fifth Circuit?  Your only problem is if you win.

16           MS. EISENSTEIN:  That's exactly the problem,

17  Your Honor.  As you're, I'm sure, painfully aware, this is the

18  MDL bellwether, the first bellwether case.

19           THE COURT:  I understand.

20           MS. EISENSTEIN:  The purpose of the bellwether in

21  large part, of course, is to address Ms. Earnest's case, but

22  why it's a bellwether case is to test the legal and factual

23  theories that will help the parties continue to move forward

24  and resolve and better evaluate the cases in the multidistrict

25  litigation as a whole.  If we win, none of these -- this

09:30

1    controlling issue will not be resolved at this juncture.

2            If you look at some of the prior MDLs that have

3    extended on beyond the time that they might have, in those

4    cases it was the cases where the defendants have won the

5    bellwether cases consistently.  Of course, we believe we are

6    going to win this case.  Your Honor will have your own opinion

7    about that, I'm sure, and the jury will have its opinion about

8    that when the case gets tried.  But if we win the case or if

9    it's otherwise resolved, this issue will remain out there.

10           We have a substantial disagreement on the

11   controlling legal question, and we believe it's one of central

12   importance.  It's not only an essential element of the claim.

13   It's one that's really at the heart of this litigation, which

14   is what is the effect of the warning that plaintiffs assert we

15   should have given.

16           So if we don't resolve this at an early stage of

17   the litigation -- and these cases present really ideal vehicles

18   for this question, and that's because the doctors in these

19   cases were quite clear that they would have prescribed Taxotere

20   irrespective of a change in the permanent alopecia warning.  I

21   think Ms. Mills' physician was particularly strong in that she

22   had no doubt that this was the appropriate treatment.  Really,

23   it was the patient's lack of certainty as to that question that

24   I believe led Your Honor, in your decision, to find there was a

25   genuine issue of material fact.

09:31

1          So this is an ideal vehicle for this controlling

2  issue.  It's one that we can tee up at an early stage.  If we

3  don't take this opportunity now to certify these questions, it

4  will be a long time -- and maybe never -- before this issue

5  will be resolved.

6          Mr. Moore is going to address the issues of

7  adjournment and continuance, and we certainly think that it is

8  appropriate to stay and adjourn the *Earnest* trial pending a

9  decision in this case.  I also want to urge Your Honor that you

10  don't necessarily have to view it that way.  You can decouple

11  this.

12          *Mills* is also a vehicle to consider, in terms of

13  interlocutory appeal, that's not set for trial.  We think,

14  nevertheless, when you are looking at the *Earnest* case and

15  trying that case through and what would be the instructions

16  given to the jury on proximate causation -- because the

17  standard instructions include the formulation of law that the

18  defense has advocated.  The standard instruction is the

19  warnings causation depends on the physician's prescribing

20  decision.

21          So kind of each phase from the opening to the

22  instructions are going to be guided potentially by what that

23  proximate causation standard is.  So it would be, in our view,

24  not an efficient use of time to move forward with the *Earnest*

25  trial under what we think is at least an unsettled proposition

09:33

1    of law with respect to a key essential element of the claim.

2                    If there's nothing further, Your Honor, thank

3    you.

4                **THE COURT:**  Mr. Mura.

5                **MR. MURA:**  Good morning, Your Honor.  Andre Mura for

6    the plaintiffs.

7                    I wanted to respond first to the point that a

8    stay of *Earnest* would be modest.  The reason we think the stay

9    of *Earnest* is effectively a stay of the entire MDL is because

10   if you were to grant the interlocutory appeal and then stay

11   *Earnest*, what's going to happen is the next bellwether trial

12   proximate cause is going to be an issue.  Sanofi is going to

13   move for summary judgment --

14               **THE COURT:**  Let me ask you:  Could I separate that

15   out and certify *Mills*?

16               **MR. MURA:**  No.  We don't think you can because you

17   would have to write a certification order that says that this

18   is an exceptional circumstance and that each of the three

19   elements are met.  If you write that order, then it's not

20   appropriate to go forward in *Earnest*.  These two issues can't

21   be decoupled.  I don't believe the Court can be having a trial

22   in one case at the same time that it's suggesting that the

23   *Mills* case should go up to the Fifth Circuit.  That would be

24   very confusing for the Fifth Circuit.  It's sort of a race to

25   see who goes first.

09:34

1          I will say that with respect to the *Earnest*
2   case, I don't think the problem is that if Sanofi loses then
3   there isn't an opportunity.  If Sanofi loses, that shows that
4   there were genuine issues of disputed fact that the jury
5   resolved in Sanofi's favor, and that shows that this isn't an
6   appropriate appeal for the Fifth Circuit to hear.  If you look
7   at the cases cited in our brief --
8          THE COURT:  You know what they mean.  If Sanofi wins
9   this case --
10         MR. MURA:  Right, right, right, if Sanofi wins.
11         THE COURT:  If Sanofi loses --
12         MR. MURA:  Yes.
13         THE COURT:  -- certainly --
14         MR. MURA:  Right, right.
15         THE COURT:  -- the Fifth Circuit has an opportunity
16   to review all of my rulings.
17         MR. MURA:  That's right.
18         THE COURT:  If Sanofi wins, therein lies the problem.
19         MR. MURA:  Which is the final judgment rule and the
20   established standard.
21         THE COURT:  Right.
22         MR. MURA:  You really have to have an exceptional
23   circumstance to warrant an immediate interruption in the trial
24   proceedings, and here you don't have that met.  It will not
25   materially advance the litigation to pause when we are about to

09:35

1  go to trial.  The cases show you should go to trial.  You

2  should have a full record.  You will have jury findings and you

3  will have an opportunity, then, if there is an adverse judgment

4  to Sanofi, for Sanofi to take a single appeal in which it could

5  raise all the appellate issues.  That's the traditional model.

6  What I was saying is Sanofi said -- they keep

7  arguing that there's a controlling question of law.  My point

8  was if Sanofi prevails at trial, they will be prevailing under

9  the instructions that the Court gives on the law.  If Sanofi

10  prevails, that shows exactly what the Court said, that there

11  are genuine disputes of material fact.  The jury would simply

12  be resolving those genuine disputes in Sanofi's favor.  That

13  goes to show that this isn't an appropriate appeal because it's

14  not presenting a pure question of law.

15  Now, I have looked at the cases that Sanofi has

16  mentioned.  I don't believe any of those -- I think it's

17  overstating sort of the implications of this Court's ruling.

18  All this Court said was that context matters, and a lot of the

19  other cases context mattered.  It mattered what the context of

20  the prescribing physician's decision was, and so I don't think

21  there's anything unorthodox about that.

22  The cases say that you can't show a controlling

23  question of law when you have genuine disputes of fact.

24  There's a line of Fifth Circuit cases saying if a party is

25  going to be insisting on arguing that there are genuine issues

09:37

1   of disputed fact, then we don't even have jurisdiction to

2   resolve that issue.

3        Now, I don't know that you need to go there

4   because I think nevertheless it sort of dovetails with the

5   analysis for the three factors, but I think if you look at

6   their reply brief on page 3, note 1, Sanofi says, "No, no, we

7   are presenting a pure question of law," but then they continue

8   to argue the facts.  What they say there is that neither doctor

9   testified with certainty, so they are continuing to argue about

10  what the record says about what the doctor testified.  So this

11  isn't an appropriate appeal in which there is sort of a clean

12  record and a pure question of law on which the Fifth Circuit

13  could even rule.

14        Now, as to substantial disagreement, the case

15  law is clear that mere disagreement with a decision is not an

16  appropriate basis to allow an interlocutory appeal.  If you

17  look at Judge Proctor's order, what he was really looking for

18  was a conflict, a conflict in the circuits, a conflict between

19  the courts.  They have not shown a clear conflict between any

20  decision of any other court and this Court's on this particular

21  set of facts.

22        You don't have a clean sort of disagreement

23  where you could even say, "I disagree with this other court,"

24  which applied some opposite rule.  The Court merely applied the

25  standards for learned intermediary, which are familiar, and a

09:38

1    misapplication of facts to law does not present a controlling

2    question on which there is a substantial disagreement.

3            I think the Court can write an opinion just like

4    in *David v. Signal*, where the judge there said, look, the party

5    asking for an interlocutory appeal has to show all three

6    elements are met.  So if any one of those elements are not met,

7    then the interlocutory appeal fails.  In that case it was

8    obvious that an interlocutory appeal would not materially

9    advance the litigation.

10            Here I believe that's crystal clear because we

11   are so close to trial in the *Earnest* case.  A stay of the

12   *Earnest* case is functionally a stay of the entire MDL because

13   this issue is going to repeatedly come up, and we will never be

14   able to try any other bellwether case.  The ordinary rules for

15   final judgment support the conclusion that we should go to

16   trial, have a record, and then allow an appeal if there is a

17   needed appeal at that stage.

18            Unless the Court has any other questions --

19        **THE COURT:**  No.

20        **MR. MURA:**  Oh, I will mention that in *Blue Cross*

21   *Blue Shield*, after Judge Proctor said no, he finally said yes,

22   and then the Eleventh Circuit said no.  So it was a great waste

23   of time.  There's a strong risk that the Fifth Circuit could

24   simply say no here, and we will be paused and waiting.  Given

25   how close we are to trial, that's not sort of a judicious way

09:40    1    to proceed.

2                    Thank you so much.

3            **THE COURT:**  Thank you.

4            **MS. EISENSTEIN:**  Can I just respond to a couple of

5    points, Your Honor?

6            **THE COURT:**  Sure.

7            **MS. EISENSTEIN:**  Let me start with the controlling

8    issue of law question.  Certainly there are facts that underlie

9    the proximate causation question, but the controlling issue of

10    law is what standard is applied to determine whether proximate

11    causation has been established by plaintiffs.  Here the

12    controlling issue of law is whether it is the physician's

13    prescribing decision that would have changed or, to quote the

14    Court's decision, whether the jury might decide whether the

15    plaintiff's ultimate decision would have changed.  Here those

16    are dispositive questions that have to be applied to the facts.

17            **THE COURT:**  I don't want to relitigate my prior

18    decision.  Perhaps I'm missing something, but I don't think I

19    upended all of this law.  As I read the learned intermediary

20    doctrine, the duty of a manufacturer is satisfied when he warns

21    the physician, and that is his duty.

22                    If for some reason the physician determines not

23    to convey that risk because he doesn't believe that his patient

24    falls within that risk, such as the suicide patient -- and I

25    don't remember the case -- then causation is broken.  But in

09:41

1    the circumstance where the physician conveys the risk to the

2    patient and says, "I still make the same recommendation," I

3    don't think learned intermediary takes the patient outside of

4    the equation and requires the patient to take this medication.

5              **MS. EISENSTEIN:**   Your Honor, I respectfully disagree

6    because if you look at the jury instructions that are given as

7    to warnings, causation is a standard matter.  The jury is

8    typically instructed that causation is broken if the

9    physician's prescribing decision wouldn't have changed.

10             So if the patient wants to get up and walk out

11   of the office based on the information that she has learned or

12   walk out of the hospital against doctor's advice, even though

13   it is a "but for" causation matter in fact that may have broken

14   the chain of causation, as a matter of law, as a legal

15   principle, courts have not recognized it as such.

16             So I understand that there may be some factual

17   change to the counseling decision as a matter of informed

18   consent or just as the practice that the physician engages in,

19   but as a legal matter under the doctrine, that is not how

20   juries are instructed.  That's not how courts typically apply

21   the causation analysis.  They stop with the physician and so

22   that is -- the cases we have cited, you know, are Georgia law,

23   Louisiana law, but that's typical of the sort of restatement

24   majority approach to learned intermediary doctrine as we

25   understand it.

09:43

1           So I think that that is a different approach.
2     We have seen some more recent cases where they have taken the
3     approach that Your Honor has in the summary judgment ruling,
4     where they have evaluated more closely patient choice, but I
5     think it really is a core issue on which reasonable judges
6     could differ, at minimum.  We think that it's an issue on which
7     we would prevail, but we don't have to decide that today.

8           I think that the main question is here it's
9     controlling because it's case dispositive.  The fact that there
10    may be ultimately facts that need to be evaluated in light of
11    that legal decision doesn't mean it's not a controlling issue
12    of law, and that's the *Cantu* decision.

13          This is a legal issue antecedent to the factual
14    question.  You have to first decide how do you evaluate
15    proximate causation, and then here is a great example of it.
16    If you stop with the physicians, the case would be over.  If
17    you evaluate what the patients say they would have or might
18    have done in light of the warning, then Your Honor has found a
19    genuine issue of material fact.  You don't get to a factual
20    dispute unless the legal standard is, as the Court has held it
21    to be, to evaluate patient choice.

22          Just a word on the *David* case.  That was a
23    discovery order that the court resoundingly and probably
24    rightfully said had no chance of advancing the litigation.  In
25    fact, if the protective order in that case had been something

09:44

1   other than what the Court held, it would have delayed the case

2   enormously.  This is an MDL with, as Your Honor knows,

3   thousands of cases, and this legal question is one that

4   underlies each and every one of them.

5           So the fact that *Mills* and *Earnest* present this

6   question is no surprise.  All of these cases that don't get

7   resolved on some other ground are going to ultimately be --

8   this will be a necessary aspect of that case.  So I don't think

9   that the cases cited on advancing the litigation by plaintiffs

10  really inform the Court.

11          I think that you have to look at the facts in

12  this MDL, the set of cases in this MDL, and it's easy to see

13  that this question is core to a substantial fraction of the

14  cases.  Resolving it in an early stage of the litigation will

15  materially advance the ability of the parties to ultimately

16  resolve this case at an earlier stage.

17          Thank you, Your Honor.

18      **THE COURT:**  Mr. Moore.

19      **MR. MOORE:**  Thank you, Judge.  Douglas Moore on

20  behalf of Sanofi.

21          I want to first thank the Court for your

22  patience in hearing oral argument in these last couple of

23  weeks.  I think this might be the last time we are making an

24  oral argument in front of you for at least a couple of weeks.

25      **THE COURT:**  Mr. Moore.

09:46

1      **MR. MOORE:**  At least until we get to our motions

2  in limine at the pretrial conference.

3              I wanted to start off by making an observation

4  to this idea that the whole MDL would be stayed and that would

5  be something that would be prejudicial or bad.  As it relates

6  to the § 1292 motion, if Your Honor is inclined to agree with

7  us that this is a controlling issue and that it should be

8  presented to the Fifth Circuit without delay, then we would be

9  asking for an adjournment of the *Earnest* trial to allow that to

10  work its way through the appellate court.

11              I don't think that that outcome would be

12  inconsistent with what we are supposed to be doing in an MDL,

13  which is pretrial proceedings.  We are supposed to be doing

14  everything except trying cases.  So I don't feel like the idea

15  that allowing this issue to proceed to the court of appeal

16  would necessarily be inconsistent with § 1407.

17              That said, I want to make it clear to the Court

18  and clear to our adversaries -- because I don't think it's

19  clear from either opposition -- that our purpose of filing this

20  motion is not because we want to avoid the *Earnest* trial or

21  avoid a trial altogether.

22          **THE COURT:**  I don't think you need to do that.  I

23  have to tell you, Mr. Moore, though, I am not inclined to

24  adjourn the *Earnest* trial.  The parties have been keying up for

25  this.  I got it.

09:48

1    **MR. MOORE:**  Let me make two points that I think are

2    important for Your Honor to consider in evaluating whether good

3    cause exists to adjourn this trial date, to continue it.  We

4    are not asking that it be bumped off forever.  We are just

5    asking for sufficient time for us to receive your pretrial

6    rulings, to evaluate those rulings, to apply those rulings to

7    the evidence that's been gathered in the case, and prepare

8    ourselves to defend it at trial.

9         We filed this motion because as the first

10   bellwether in an MDL, we think we should have an opportunity to

11   do that for the significant issues that remain.  As we saw the

12   issues stacking up and looking at their volume balanced against

13   the time that we have left, we became concerned there's simply

14   too much to do with too little time.

15        They have taken the position in their opposition

16   that, "Well, discovery is done.  Discovery is done."  Do you

17   know what they are doing today at 1:00?  They are deposing one

18   of our experts for the *Earnest* case.  You know what they did

19   last week?  Last week they went in front of Judge North and

20   asked him for an order compelling us to give another 30(b)(6)

21   deposition even though discovery against us was supposed to

22   close in December of 2018.  We just had a conferral with Palmer

23   this morning about discovery we are requesting of them,

24   deposition examination.  Those things are still things we are

25   doing and still things we are discussing and fighting with them

09:49

1    about.  So the idea that discovery is over, Judge, we are

2    ready, is not really correct.

3                Another point -- and I think this is the most

4    significant one.  We don't know really what the case is that we

5    are trying in light of what happened at this lectern eight days

6    ago.  You said in your preemption ruling defendants have failed

7    to demonstrate that FDA prohibited Sanofi from using stronger

8    language in Taxotere's label.  We disagree, but we are not

9    going to argue that.

10               My question is this:  What is the stronger

11   language that they are going to stand in front of this jury and

12   tell this jury that we should have implemented before

13   Ms. Earnest used this medicine?  From jump street in this MDL,

14   it has been their position that the December 2015 label change

15   is inadequate.

16               That has been their position up until eight days

17   ago.  That was the opinion that was articulated in

18   Dr. Kessler's report.  That is the case that we have prepared

19   to defend.  That's the case we submitted a preemption motion

20   on.  That's the case we submitted our countervailing expert

21   reports on.  Never once have they taken the position that this

22   warning was inadequate because we failed to include a single

23   sentence on page 33 of a 60-some-page label, and there's a

24   reason for that.

25               I've deposed some of the oncologists in the

09:50

1   bellwether cases, and so I show them the label.  I flip to

2   page 33 and I show them the sentence where it says, "Cases of

3   permanent alopecia have been reported."  And I ask them, "The

4   addition of that sentence on page 33, in the postmarket

5   experience section of this label, does that materially alter

6   your risk/benefit decision for this medicine?"  "No."

7              So the plaintiffs' case has always been, "But

8   wait, Doctor.  What if it was a 'Capital W' warning?  That's

9   more significant, right?  That's a bigger deal, right?  That

10  has to be on the front page of the label.  That would impact

11  your risk/benefit decision for this medicine, right?"  That has

12  been their case from the beginning.

13             What we heard eight days ago from Mr. Mura is

14  that Dr. Kessler is going to get up on the stand in this trial

15  and say, "Oh, no, it could have been in the adverse events

16  section of the label," even though they have always said that

17  the December 2015 label change that put this in the adverse

18  events section is inadequate.  The reason they have always said

19  that is because they would lose so many cases.  Everybody who

20  took the medicine after December 2015, they would be admitting

21  that those cases have no merit.  So that's why it's always been

22  about the "Capital W" warning.  That's what Kessler's report

23  is.

24             What we heard eight days ago and what they put

25  in their opposition to our motion was, "Oh, no, no, no.  You

09:52

1    can look at it.  If you look at paragraph 109 and paragraph 123

2    and 133," and whatever they are -- I've read them.  None of

3    them say that the 2015 label is inadequate.  He gets to the end

4    of his report, he says, "My opinions are as follows:  Permanent

5    alopecia is a serious adverse event, a life-altering adverse

6    event that should have been in the warnings section as early as

7    2009."

8                 When we says that, he is saying it's inadequate

9    to put it in the adverse events section, which is where it was

10   put in December of 2015.  So now we are hearing him say, "Oh,

11   no, no, no.  It could be in the adverse events section.

12   Defendants, you should have known that from piecing it together

13   through the tealeaves of reading these six or seven paragraphs

14   out of a 208-paragraph report."

15                That's not the way Rule 26 is supposed to work.

16   If he is going to get up there and give this new opinion, this

17   new failure to warn theory, then we need more time to prepare

18   for that because that's not the way Rule 26 is supposed to

19   work.  You can't change horses at the starting gate.  If they

20   are going to be permitted to change their horse, they are going

21   to take out the "Capital W" warnings horse and put in the 2015

22   label change horse, then we need to move back the post time.

23                So that's our position, Your Honor.  We think

24   that good cause exists in this case.  We would ask that

25   Your Honor adjourn the trial date.  We are not asking for a

09:53

1  stay as it relates to the issues I just discussed.  We think

2  that we could try this case on November 4, on December 1, use

3  the extra time to get the pretrial rulings done, allow us to

4  address and find out from them -- maybe Mr. Coffin will tell us

5  right now whether the December 2015 label change was adequate

6  or whether Dr. Kessler is going to say that or something else

7  on the stand.  We think we have the right to know that before

8  we try this case.

9       **THE COURT:**  Thank you.

10       **MR. COFFIN:**  Good morning, Your Honor.  Chris Coffin

11  on behalf of the PSC.

12       I would like to first address a couple of the

13  issues that Mr. Moore brought up, and then I will talk more

14  generally about the standard of good cause for the Court to

15  move this trial date.

16       Mr. Moore stated that we are supposed to be

17  doing everything in this MDL except trying cases.  I think that

18  is contrary to what the panel believes.  I think that's

19  contrary to what the *Manual for Complex Litigation* believes.

20  Practically, as this Court is well aware, we have to get cases

21  to trial in order to help us with the ultimate goal of this

22  MDL, which is resolution of over 11,000 cases, women who have

23  been diagnosed with cancer, some of whom unfortunately we now

24  know, Your Honor, are dying during the pendency of this

25  litigation.

09:54

1          The panel and the *Manual for Complex Litigation*

2     certainly would not support foregoing trials or continuing

3     trials in the circumstances we have here.  The facts of this

4     particular case, Ms. Earnest's case, is it was filed about

5     2 1/2, almost 3 years ago.  We have to look at that, but we

6     also, I think, equally as important have to look through the

7     lens of the MDL overall.

8          As Your Honor is well aware, there's over 11,000

9     cases.  When Judge Engelhardt had this MDL, the case was

10     originally set for trial in September of 2018.  There was a

11     continuance, understandably.  Your Honor came on the bench and

12     moved it to May, I believe, of 2019 -- or no.  Yes, May and now

13     September of 2019.  This would be the third continuance in this

14     MDL.  It is prejudicial to Ms. Earnest and, looking through the

15     broader lens, to the 11,000.

16          **THE COURT:**  What about Mr. Moore's concern about a

17     changing expert opinion?

18          **MR. COFFIN:**  Your Honor, Dr. Kessler's opinion, first

19     of all, has been --

20          **THE COURT:**  I thought I was clear in my preemption

21     motion.  I did not deal with the 2015 label at all.

22          **MR. COFFIN:**  Understood.

23          **THE COURT:**  Ms. Earnest received her infusions in

24     2011.  I'm pretty sure --

25          **MR. COFFIN:**  2011?  No, it was earlier than that,

09:56   1   actually.  I think it was -- 2011.  You are correct.

2           **THE COURT:**  So I was looking at a label, as I recall,

3   that was formulated in 2002 and subsequent studies in 2004 and,

4   I believe, 2006 that indicated upticks in permanent alopecia

5   and then some case reports.  I thought you-all saw that that's

6   what my ruling was based upon.  I was very clear not to say

7   these comments have anything to do with a review of the 2015

8   label at all.  That was not before me.

9           **MR. COFFIN:**  Understood.

10          **THE COURT:**  Mr. Moore's argument is, "Wait a minute."

11              I'm not sure what Dr. Kessler is going to say,

12  but if he has changed his opinion, we have a problem.

13          **MR. COFFIN:**  Dr. Kessler has not changed his opinion,

14  Your Honor.

15          **THE COURT:**  Okay.

16          **MR. COFFIN:**  As this Court has stated, the experts

17  are going to be held to what is in the four corners of their

18  report and presumably their testimony as it's been given in

19  deposition.  If they want to cross-examine -- and I'm confident

20  they will -- Dr. Kessler all day long as to whether he somehow

21  changed his opinions in his report or his testimony was

22  different and he wants to show that to the jury, that he is now

23  switching things around and it's not a supportable opinion for

24  Ms. Earnest's case, okay, fine.

25          **THE COURT:**  Why are we taking depositions now?

09:57

1          **MR. COFFIN:**  I'm glad you asked that, Your Honor.

2          **THE COURT:**  Good.

3          **MR. COFFIN:**  The issue of the 30(b)(6) in front of

4     Magistrate Judge North that Mr. Moore referenced, that's

5     because we have had to go back to Magistrate Judge North to

6     compel the defendants to comply with where we feel they have

7     not complied with the initial 30(b)(6) notice, and we have had

8     to go back and back.  That's a contested issue.  That's because

9     we believe they haven't complied with it.  That's not because

10    of something we did.

11          Dr. Shapiro is being deposed today because there

12    were scheduling conflicts that existed long ago, and by

13    agreement we agreed to put off the deposition.

14          Now, to the fact that the defendants want to

15    take additional depositions now, that is a problem, Your Honor,

16    there's no doubt about it, but that's not before Your Honor.

17    We are happy to have them tell you, tell us, why they should be

18    entitled to depositions at this point, especially one of their

19    own former company employees, at this late stage in the game,

20    but that's not before you, Your Honor.

21          If they want to bring those arguments later,

22    they think discovery should be reopened, okay, fine, but

23    discovery is closed except for those issues that are either

24    before Magistrate Judge North or by agreement have been moved.

25          So the thrust of their argument, Your Honor, at

09:59

1    least it was in their papers, is that Your Honor needs more

2    time, this Court needs to have thoughtful analysis of these

3    issues -- as if you wouldn't -- and they are concerned,

4    presumably, that you're not going to have the time and, I

5    guess, the ability to thoroughly analyze things in the time

6    that you have.

7            I think since they have even filed their motion

8    for a continuance you have disproved that.  That assumption is

9    just false.  You issued a preemption opinion.  You just gave us

10   opinions in chambers, Your Honor.  I think that fails.  I think

11   the prejudice to the plaintiffs is very obvious not only for

12   the time frame, but the type of diagnosis these women have,

13   some of them who have passed away already.

14           Quite frankly, Your Honor, we have all known the

15   rules of this Court for preparing for this trial for a long

16   time.  We negotiated heavily on this schedule.  We have gone

17   over and above to prepare experts for the date of September 16.

18   It would be definitively prejudicial to the plaintiffs if we

19   have to move this, especially in light of the larger lens we

20   are looking through with the MDL and the experts that we have

21   set up.

22           Thank you, Your Honor.

23       **THE COURT:**  Thank you.

24       **MR. MOORE:**  One minute, Your Honor.

25           Our work in defending a case begins when we get

1   the pretrial rulings.  What I think I just heard Mr. Coffin say
2   from the stand is that you should permit Dr. Kessler to render
3   an opinion that he did not express in the section of his report
4   where he says, "My opinions are as follows," and his suggested
5   remedy for that is that we get to cross him in front of the
6   jury on the fact that it wasn't in his report.  An opinion
7   that's not in the report, an opinion that's not stated as an
8   opinion, that we are not put on notice of, is not one that
9   should be presented in front of the jury.  If they are going to
10  present a new failure to warn case, as I said, we need time to
11  defend ourselves.

12          The last observation I would make, Judge, stems
13  around this idea of prejudice.  This is the first of five
14  bellwether trials.  We are not moving any of the other
15  bellwether trials.  The second one is not until March.  There
16  is literally no difference in anyone's world for this MDL if
17  this case is tried on September 16 or November 4 or December 1.
18  There really isn't.  We have plenty of time to get ready for
19  the second trial.  It just gives us more time to get through
20  the work that we have to do before the first one.  That's all.

21          Thank you, Your Honor.

22          **THE COURT:**  We are going to try our case in
23  September.  We are going to try this case in September.  I
24  think Mr. Strongman heard that yesterday.

25          I will tell you, because we are sitting on the

10:03

1   cusp of significant decisions, that I need to let you know what

2   my thoughts are.  I am not inclined to grant an interlocutory

3   appeal, and let me tell you.  I do think it requires some

4   factual determinations for the appellate court.  The circuit

5   cautions us all the time, "Don't send us things piecemeal," and

6   so I think we need to try this case.  We may have to look at

7   these issues.  Let's see where this trial takes us, and that's

8   as much as I will say today.

9              I know you need a decision, but you probably are

10  going to get a paragraph this afternoon.  We are going to

11  proceed with trial in September.  I'm going to deny the

12  interlocutory appeal at this juncture.  We will see what

13  happens after the course of our first trial because it may be

14  that we will be sending up a complete case for the

15  Fifth Circuit to review.  That's my ruling.

16             I know you need something written addressing

17  those three factors that I have not just now other than that.

18  Now that you know, that's really going to go on the bottom of

19  the list.

20         **MS. EISENSTEIN:**  Can I ask Your Honor if you might

21  consider at least reserving decision on interlocutory appeal of

22  the *Mills* case, which I think is not necessarily hinging on the

23  *Earnest* decision and whether or not you --

24         **THE COURT:**  What I said and what I'm comfortable

25  saying is, at this juncture, no.  I think we need to get

10:06

1   through this first trial and perhaps send up a complete case to

2   the Fifth Circuit.

3           **MR. COFFIN:**  Thank you, Your Honor.

4           **MR. MOORE:**  Thank you, Your Honor.

5           **THE DEPUTY CLERK:**  All rise.

6           (Proceedings adjourned.)

7                               * * *

8                           <u>**CERTIFICATE**</u>

9           I, Toni Doyle Tusa, CCR, FCRR, Official Court

10  Reporter for the United States District Court, Eastern District

11  of Louisiana, certify that the foregoing is a true and correct

12  transcript, to the best of my ability and understanding, from

13  the record of proceedings in the above-entitled matter.

14

15

16                          */s/ Toni Doyle Tusa*
                            Toni Doyle Tusa, CCR, FCRR
17                          Official Court Reporter

18

19

20

21

22

23

24

25