```
                    UNITED STATES DISTRICT COURT

                    EASTERN DISTRICT OF LOUISIANA


IN RE:  TAXOTERE (DOCETAXEL)      *     16-MDL-2740
PRODUCTS LIABILITY LITIGATION     *
                                  *
                                  *     Section H
                                  *
Relates To All Cases              *     September 17, 2019
                                  *
*************************************************************

               REPORTER'S OFFICIAL TRANSCRIPT OF THE

                        STATUS CONFERENCE

              BEFORE THE HONORABLE MICHAEL NORTH,
                 UNITED STATES MAGISTRATE JUDGE.

*************************************************************


APPEARANCES:



For the Plaintiffs:

Andrew Lemmon, Esq.                  Jason Fraxedas, Esq.
Larry Centola, Esq.                  Lindsay Stevens, Esq.



For the Defendants:

Julie Callsen, Esq.                  Mara Cusker Gonzalez, Esq.
R. Clifton Merrell, Esq.             John Olinde, Esq.
Beth Toberman, Esq.                  Karina Pundeff, Esq.
Chad Vacarella, Esq.




REPORTED BY:    Mary V. Thompson, RMR, FCRR
                500 Poydras Street, Room B-275
                New Orleans, Louisiana  70130
                (504)589-7783
```

**OFFICIAL TRANSCRIPT**

```
 1                    P R O C E E D I N G S
 2
 3           THE COURT:  Hello everybody.  Y'all can have a seat.
 4           All right.  Who's got this issue for Accord -- the two
 5   issues for Accord?
 6           MS. CALLSEN:  Me.
 7           THE COURT:  All right.
 8           MR. LEMMON:  Lindsay, are you on the phone?
 9           THE COURT:  Is anyone there?
10           MS. STEVENS:  Yes, I'm here.  I had my phone on mute
11   because I believe Andrew is going to be doing the majority of our
12   argument.
13           THE COURT:  All right.  So I have a couple of
14   questions.
15           You-all say Accord performs pharmacovigilance functions
16   pursuant to regulatory responsibility.
17           MS. CALLSEN:  Correct.
18           THE COURT:  Does it rely in any way on the information
19   that's contained in this Lambda database in doing that?
20           MS. CALLSEN:  Not --
21           THE COURT:  I have to believe the answer is "yes."
22           MS. CALLSEN:  Not really. I mean, the thing is, Lambda
23   evaluates the adverse events that we, meaning Accord, provides to
24   them.  They then provide their analysis to Accord in the adverse
25   event reports themselves as well as the PADER, which are the
```

| | |
|---|---|
| | 1 periodic updates as well as the quarterly reports. |
| | 2         So that data -- that's what Accord relies upon. |
| | 3         THE COURT:  That data is what comes back from Lambda? |
| | 4         MS. CALLSEN:  Correct. |
| 02:07:35 | 5         I have a PADER, as an example.  It is a 222-page |
| | 6 document, and it goes through the analysis of each adverse event |
| | 7 report with respect to docetaxel that Lambda has analyzed and |
| | 8 sent back to us. |
| | 9         Then Accord takes that and finalizes it into the report |
| 02:07:55 | 10 that's required -- into the format for the report that's required |
| | 11 by the FDA and submits it. |
| | 12         THE COURT:  And what you-all are looking for is the raw |
| | 13 material in the Lambda analysis? |
| | 14         MR. LEMMON:  Right.  We need to be able to peek at the |
| 02:08:10 | 15 data and reach our own conclusions which may be different. |
| | 16         And Accord -- you know, the pharmacovigilance |
| | 17 obligation is a non-delegable responsibility, and it is with |
| | 18 Lambda -- I'm sorry, it is with Accord.  And Accord seems to be |
| | 19 saying that they're attempting, basically, to delegate it to |
| 02:08:27 | 20 Lambda and all they get is a report, and then they turn in the |
| | 21 report and that's that, and we can't then go and find out what |
| | 22 goes on before the report gets prepared.  That's what we're |
| | 23 trying to see. |
| | 24         MS. CALLSEN:  That's not true.  Lambda does the actual |
| 02:08:43 | 25 medical affairs analysis of the report.  We collect the reports. |

OFFICIAL TRANSCRIPT

1  We submit them to this third party who then analyzes the data.
2  They take a look at whether it's the -- the whole summary that's
3  in our PADERs.  They look at the label; assess whether it is --
4            THE COURT:  But they are looking for all the
02:09:02  5  information that is used to get to the --
6            MS. CALLSEN:  Correct.  So the raw data Accord never
7  sees.  Accord sees the analysis and they analyzes that data and
8  they then submit it to the FDA.
9            THE COURT:  You told me initially that the raw data is
02:09:16  10 sent from Accord to Lambda; that's how they get it.
11           MS. CALLSEN:  Right.  Well, they submit the actual
12 adverse report.
13           THE COURT:  Right.
14           MS. CALLSEN:  But in the format that Lambda puts it
02:09:28  15 into, whatever database they maintain, we never see that.
16           So if Accord gets an adverse event, they submit it to
17 Lambda to do the analysis and summary.
18           Lambda also, on their own, does literature reviews, and
19 if there's an adverse event reported in the literature, they then
02:09:47  20 look at that, they summarize it, and they provide it back to
21 Accord.
22           THE COURT:  There's just no way that that stuff is not
23 discoverable.
24           MS. CALLSEN:  We've already provided --
02:09:56  25           THE COURT:  No, you've provided your documents created

```
 1  on the basis of an analysis that you received back from a third
 2  party --
 3          MS. CALLSEN:  Correct.
 4          THE COURT:  -- that is, in turn, based on raw data that
 5  you have provided to them, and all you have produced is your
 6  final report.
 7          MS. CALLSEN:  Anything that we provided to Lambda we
 8  also provided.  So if the adverse event comes to us, we've
 9  provided the individual standalone adverse event as it related to
10  alopecia.
11          THE COURT:  So what's missing?
12          MR. LEMMON:  Well, what would be, in addition to what
13  Accord U.S. provided, is the literature that she was just
14  speaking of.
15          So they did a literature search which goes into their
16  knowledge, it goes into their pharmacovigilance obligation.
17  These are the things that go into signal detection to determine
18  whether or not the label needs to be changed, and so we should be
19  able to see what the literature says.
20          THE COURT:  I agree with that.  I think --
21          MS. CALLSEN:  The literature -- Your Honor, the
22  literature is in this PADER that we produced to them.  There's
23  literature analyzed from Japan here --
24          THE COURT:  They are entitled to -- they are entitled
25  to be able to traverse whatever is being shot out at the end of
```

OFFICIAL TRANSCRIPT

```
 1  this process by Accord.
 2              MS. CALLSEN:  That's what's in here (indicating).
 3              THE COURT:  That's what you say -- I mean, what they
 4  don't know is what you received from Lambda when you put that
 5  together.  That's your document, right?  That's a document
 6  created by Accord?
 7              MS. CALLSEN:  Right.  Yeah, Lambda prepares the
 8  analysis of the adverse events, but then we just put it into the
 9  format for the FDA.
10              Accord does not employ medical affairs specialists to
11  review.  They just don't have that staff.  So the analysis in
12  here (indicating), Accord doesn't touch that.  They just take it
13  and put it in the format that the FDA requires and submits it.
14              THE COURT:  I don't know how you can resist discovery
15  of this stuff.  I just don't.
16              MS. CALLSEN:  Well, it's not our stuff, for one thing.
17  It's a third party --
18              THE COURT:  Well, it's not their stuff.  I mean,
19  they're working for Accord.  They're your contractor.
20              MS. CALLSEN:  Right.
21              THE COURT:  They're your -- whatever they are, they are
22  not doing this on their own.  They're doing it because you're
23  paying them to do it.
24              MS. CALLSEN:  Correct.
25              THE COURT:  So it is your stuff because you're giving
```

```
02:12:20


02:12:34



02:12:48



02:13:04




02:13:14
```

1  it to them to begin with.  They're doing some analysis and then
2  sending it back to you.  And what happens in the interim is
3  discoverable.  It has to be.
4          MS. CALLSEN:  There's nothing in addition that they
5  would get from Lambda that they don't already have in the adverse
6  event reports.
7          THE COURT:  Well, I mean, I don't know if there is or
8  not, but that sort of goes to the next point, which is the
9  proportionality argument.  If there's nothing in addition, how
10 can it be disproportionate to the needs of the case for you to go
11 ask them for it?
12         MS. CALLSEN:  Well, again, they're not ours to ask, for
13 one thing.  It's a database.  And it's a third party.  They can
14 subpoena the third-party database just as we could.
15         THE COURT:  Well, that may be what you have to do.
16         MR. LEMMON:  If that's what we have to do --
17         THE COURT:  I mean, at the end of the day in any case,
18 if I'm telling you-all that information is discoverable and you
19 should be able to obtain it, I would think that the most
20 foolproof method for obtaining it is to obtain it directly from
21 that source.
22         MR. LEMMON:  That --
23         THE COURT:  And they can object, but I don't know on
24 what grounds they would object because I'm going to issue a
25 minute entry that says I think the information is discoverable.

```
02:13:38

02:13:55

02:14:11

02:14:24

02:14:38
```

1            MR. LEMMON:  The foreign database -- you know, the
2   foreign information -- the information that Accord is obligated
3   to review, to know about, and is apparently delegating to Lambda,
4   includes all information, foreign and domestic.  And I know that
5   there are some studies from Japan, but there is also some history
6   of other adverse event reports from other countries that would be
7   contained in there as well.
8            THE COURT:  I think you need to send them a subpoena.
9   I don't know -- I mean, I think that -- I think you've raised a
10  good point.  I don't really know --
11           MR. LEMMON:  Yeah.
12           THE COURT:  -- practically how they would go obtain
13  this information as a litigant from a non-litigant contractor.  I
14  mean, I think the safest bet would be to try to subpoena the
15  information from Lambda.
16           MR. LEMMON:  I think that that's certainly a way to do
17  it.  And, you know, it's a foreign company.  It's not in the U.S.
18  at all so that creates those problems, but we can navigate
19  through that.
20           THE COURT:  Hopefully.
21           MR. LEMMON:  Hopefully, right.
22           But it just struck us that Lambda has a -- I mean,
23  Accord has this non-delegable responsibility --
24           THE COURT:  I get what you're saying and I'm agreeing
25  with you.

OFFICIAL TRANSCRIPT

|  |  |
|---|---|
| 02:14:52 | 1  MR. LEMMON: And if the FDA said, I want to see the<br>2  data and not just the PADER, they would surely go and get it.<br>3  THE COURT: I think it's all discoverable. On this<br>4  topic, on the database, this Lambda database, I think it's<br>5  discoverable and I'm going to issue a minute entry that says it's<br>6  discoverable. And we have discussed you-all are going to try to<br>7  obtain it directly from that company through a subpoena, and if<br>8  there is some issue with that, we'll come back and talk about how<br>9  to get it. |
| 02:15:06 | 10  MR. LEMMON: Sure. That sounds fair.<br>11  THE COURT: Now, on this labeling issue, I have<br>12  somewhat of a different view.<br>13  I'm not sure that you've sufficiently linked the<br>14  domestic defendant company to any of these other foreign entities |
| 02:15:25 | 15  that either are responsible for foreign labeling or would have<br>16  foreign labeling in their possession, because in the letter I got<br>17  from Accord, they're telling me -- there's a statement in there<br>18  that says they are not in possession of any foreign labeling.<br>19  MS. CALLSEN: Correct. |
| 02:15:40 | 20  THE COURT: Which means if I were to order them to<br>21  produce it, I would be ordering them to go out and obtain foreign<br>22  labeling that they do not have, and I'm not sure that there is a<br>23  basis for me to do that, particularly -- this is another issue --<br>24  if you can do it without them. |
| 02:15:56 | 25  MR. LEMMON: I know that Sanofi produced its foreign |

```
02:16:17




02:16:29




02:16:41





02:16:56




02:17:14
```

1 labels, and I know there was a separate deal that was made in
2 that regard.  And, you know, the interrelationship between the
3 companies would constitute, back and forth, their full knowledge
4 of the effects of this drug.
5          THE COURT:  I don't know that that's the case.
6          MS. CALLSEN:  Yeah.  We are structured totally
7 different than Sanofi and any of these other defendants.
8          THE COURT:  That's why I made the initial point which
9 is I am not satisfied that you-all have sufficiently linked these
10 companies --
11          MR. LEMMON:  Okay.
12          THE COURT:  -- to where whatever is happening in
13 another country label-wise can somehow be imputed to this company
14 or, you know, that for discovery purposes I should have them
15 going out and doing that work to gather material they don't
16 already have.
17          MR. LEMMON:  We were limited in some way early on as
18 far as the discovery of the structures of the organizations and
19 the other organizations that they are part of, but we'll do that
20 discovery and --
21          THE COURT:  What is EMEA?
22          MS. CALLSEN:  EMEA is the European Medical Evaluation
23 Association.
24          THE COURT:  I looked all over and all I found was EMEA.
25          MS. CALLSEN:  Yeah.

OFFICIAL TRANSCRIPT

|   |   |
|---|---|
| 02:17:20 | 1  THE COURT:  They say you can get this stuff from EMEA; |
|   | 2  that it's publicly available. |
|   | 3  MR. LEMMON:  Okay. |
|   | 4  MS. CALLSEN:  That's how I found it. |
|   | 5  THE COURT:  Yeah.  I'm not going to order -- I'm not |
|   | 6  going to order this defendant to go obtain and produce foreign |
|   | 7  labeling. |
|   | 8  MR. LEMMON:  We did do the Google searches and whatnot |
|   | 9  to try to find that, and we did find some labels, but we didn't |
| 02:17:35 | 10 find all of the periods that we're interested in. |
|   | 11 THE COURT:  Keep trying. |
|   | 12 MR. LEMMON:  It just wasn't available. |
|   | 13 So maybe it is available.  If it is, she's probably a |
|   | 14 better Googler than I am. |
| 02:17:48 | 15 MS. CALLSEN:  I just went to EMEA.org, I think. |
|   | 16 THE COURT:  All right.  Try that. |
|   | 17 So the minute entry will reflect that I think that the |
|   | 18 database information from Lambda is discoverable, and that you |
|   | 19 are going to try to obtain it by subpoena. |
| 02:18:01 | 20 I'm not going to order Accord to produce any foreign |
|   | 21 labeling information. |
|   | 22 The only other issue is the issue of this discovery |
|   | 23 deadline.  I'm not ready to make any moves on any deadlines.  I'm |
|   | 24 not extending any deadlines right now. |
| 02:18:14 | 25 MR. LEMMON:  There is not one set and so that's the -- |

OFFICIAL TRANSCRIPT

```
02:18:24

02:18:32

02:18:43

02:18:55

02:19:07
```

1    THE COURT:  I thought you-all had agreed on one.
2    MR. LEMMON:  We did not.
3    MS. CALLSEN:  We agreed on December 2019.
4    MR. LEMMON:  No, we did not.
5    THE COURT:  Hold on.  Hold on.
6    MR. LEMMON:  We did not.
7    THE COURT:  Hold on.
8    MR. LEMMON:  So I can give you the whole history.
9    THE COURT:  I don't want --
10   MR. LEMMON:  The history is not correct in the
11 submission.
12   THE COURT:  Okay.  Well, hold on.
13   MS. CALLSEN:  Just one thing, Your Honor, I do want to
14 say.  We've been at discovery for almost 20 months.  This is the
15 first time we've had to appear in front of you, so I think we
16 deserve some accolades because we have worked everything else
17 out.
18   THE COURT:  Absolutely.
19   MR. LEMMON:  I don't think any of us is saying that
20 anything is anybody else's fault.  That's not what we're here to
21 talk about.
22   MS. CALLSEN:  That was not my point.  It was to say we
23 have worked together.
24   THE COURT:  Just to be clear, so Hospira's letter to me
25 says that the 16-month CMO 7 discovery window for them began in

OFFICIAL TRANSCRIPT

```
 1   November 2017 and ended -- or would have ended in March of 2019.
 2   Is that right or wrong?
 3           MR. LEMMON:  It's correct that when it was -- it
 4   began -- it started on that date and then the trial was
 5   continued.  And so that was-- no one -- there was nothing done.
 6   There were no documents offered.  There were no depositions
 7   taken.  There were some documents that were produced.
 8           THE COURT:  Was there an agreement to extend the
 9   deadline to July 2019?
10           MR. LEMMON:  There was not.
11           MS. CUSKER GONZALEZ:  We submitted it to Ms. Menzies.
12           MR. LEMMON:  We had a discussion about the deadlines,
13   what was the deadline going to be, and we agreed that the
14   earliest that the deadline could be was July, and that we would
15   report back to the Court in April.  That's what we agreed to, and
16   that's all we agreed to.
17           THE COURT:  This says after the Sanofi trial was
18   continued, Hospira -- am I pronouncing that right?
19           MS. CUSKER GONZALEZ:  Yes.
20           THE COURT:  -- Hospira was willing to extend the
21   deadline another five months to December 2019.  It does not say
22   that there's an agreement, but it does say that they offered to
23   do that.
24           MR. LEMMON:  They offered to do that.
25           THE COURT:  And y'all --
```

OFFICIAL TRANSCRIPT

|    |    |
|----|----|
|  | 1    MR. LEMMON:  Well, the other way around.  We offered |
|  | 2  90 days before trial.  They offered December 20th.  We offered |
|  | 3  120 days before trial.  That's the end of the discussion. |
|  | 4    THE COURT:  What is 120 days before trial? |
| 02:20:38 | 5    MR. LEMMON:  It would be April.  That's the full extent |
|  | 6  of the negotiation. |
|  | 7    MS. CUSKER GONZALEZ:  Your Honor, Mara Cusker Gonzalez |
|  | 8  for Hospira. |
|  | 9    The dates are as you laid out.  We started discovery in |
| 02:20:56 | 10  late 2017.  We were producing documents, I think all three |
|  | 11  defendants, starting in early 2018.  At the same time we were |
|  | 12  working up some cases in the trial pool.  Eventually a number of |
|  | 13  those cases dropped out for various reasons, but we continued |
|  | 14  discovery. |
| 02:21:11 | 15    We've all now been added to another trial pool.  We |
|  | 16  have been working up cases.  We've been doing a lot of work on |
|  | 17  our side and we've been continuing productions. |
|  | 18    The broader schedule did shift out, and that's why we |
|  | 19  agreed, yes, of course we'll extend to July.  Ms. Menzies |
| 02:21:24 | 20  submitted a letter to Your Honor memorializing that agreement. |
|  | 21  Everybody reserved their rights, of course, but there was an |
|  | 22  agreement out through July. |
|  | 23    The schedule shifted again.  We again agreed to move |
|  | 24  it, but we think it really needs to fall before expert reports |
| 02:21:39 | 25  are due, and that's really the way it has been working. |

OFFICIAL TRANSCRIPT

```
02:21:56




02:22:06



02:22:22




02:22:37




02:22:48
```

1       THE COURT:  So before you say anything, I agree with
2  what was just said.  I think that the general discovery deadline
3  needs to fall before expert reports are due.  That's the key
4  part.
5       MR. CENTOLA:  We don't know if there's a Hospira trial.
6  We don't have a date for a Hospira trial yet.
7       THE COURT:  Do you have a date for any expert reports?
8       MS. CUSKER GONZALEZ:  Yes, sir.
9       MR. CENTOLA:  It is only depending on what defendant is
10 going to trial in August.
11      THE COURT:  So that's going to be decided in October?
12      MR. CENTOLA:  Correct.  And if it is not Hospira, there
13 is no reason to have a discovery deadline of December 2019 when
14 it is so obvious there is a lot of discovery left to do.
15      THE COURT:  And I don't disagree with that.
16      My main concern is that we not wind up back in the
17 situation we were in at the beginning of this case and having
18 expert reports being written and you-all paying experts a bunch
19 of money with discovery still going on.
20      MR. CENTOLA:  Sure.  I understand.
21      THE COURT:  I don't want that to happen.
22      MR. CENTOLA:  Understood.
23      THE COURT:  So I think -- what y'all are telling me is
24 that there is no current deadline except perhaps for the one that
25 has already lapsed.

```
 1            MR. LEMMON:  That's right.
 2            MS. CUSKER GONZALEZ:  That's right.
 3            MR. CENTOLA:  No.  Because one fact that they are not
 4  telling you is that there were bellwether cases that were in the
 5  trial pool, and then those were removed, as Ms. Gonzalez said,
 6  and at that point Hospira said, You are not allowed to do
 7  discovery.  We are going to shut you off and completely --
 8            THE COURT:  Here is what we are going to do.
 9            MR. CENTOLA:  There is no deadline.
10            THE COURT:  We're going to get an answer in October as
11  to what is going to happen, and then you-all are going to sit
12  down and talk about a discovery plan that makes sense vis-a-vis
13  expert disclosures.  If you still can't come to an agreement,
14  then you can get on the phone with me or come see me and we'll
15  work that out.
16            MR. CENTOLA:  Yes, sir.
17            THE COURT:  Just keep in mind that I don't want to have
18  this jacked-up situation where y'all are taking expert
19  depositions and still doing fact discovery, and now we've got an
20  avalanche of supplemental reports and re-depositions and all of
21  that.  I don't want any of that.
22            MR. LEMMON:  None of us want that either.
23            MS. CUSKER GONZALEZ:  Your Honor, just to correct the
24  record, we did say that we think discovery as to us should be
25  stayed as we don't have a case in this pool.  They disagreed.  We
```

OFFICIAL TRANSCRIPT

```
 1  said fine.  We served our responses to interrogatories.  We've
 2  continued discovery throughout the last two years.
 3            THE COURT:  I don't know why you would want to stay
 4  discovery.
 5            MS. CUSKER GONZALEZ:  And we did not.  We agreed to --
 6            THE COURT:  Sooner or later you're going to do it so
 7  you might as well do it now.
 8            MS. CUSKER GONZALEZ:  And we agreed.
 9            MR. CENTOLA:  But they pushed depositions off.  We are
10  not here to cast aspersions.  We understand what you are saying.
11  We understand Your Honor's position on this, and it will be
12  dependent on what cases are selected to move forward.
13            THE COURT:  So you-all -- the first thing that happens
14  after Judge Milazzo makes that decision is you-all get together
15  and try to come up with a plan that makes sense, and, you know,
16  you don't have to involve me unless you have to involve me.
17            MR. CENTOLA:  Absolutely.
18            MR. LEMMON:  Our next status conference I understand is
19  going to be the --
20            MR. OLINDE:  We have one other issue.
21            MR. LEMMON:  -- the 18th of October, which is a week
22  after.
23            THE COURT:  A week later.
24            MR. LEMMON:  Perhaps if the hearing were set in the
25  afternoon, maybe that morning we could get together and try and
```

OFFICIAL TRANSCRIPT

```
 1  come up with something.
 2          THE COURT:  Just talk to Blanca about when the hearing
 3  is set.  I stopped trying to do that.
 4          MR. LEMMON:  I didn't mean to interrupt, if there is
 5  something else.
 6          MR. OLINDE:  You are part of this.
 7          THE COURT:  Come on.
 8          MR. OLINDE:  We sent you an e-mail.  We sent you an
 9  e-mail, Judge, on Thursday.
10          THE COURT:  There is a pretty good chance I didn't see
11  it.
12          MR. OLINDE:  I figured that is what the case was.
13          THE COURT:  Well, I don't like people that make those
14  excuses, but in this case we just changed our entire e-mail
15  system over the weekend and all kinds of crazy stuff has
16  happened.  So there is an actual reason why I might not have seen
17  it.
18          MR. OLINDE:  You were in a settlement conference.  I
19  know Andrew called.  We were on the phone.  We said we would like
20  to have a chance to chat with you about it.
21          This was one specific issue which we have an agreement
22  on, and we just needed you to bless it, which is that there is
23  a --
24          THE COURT:  I don't need to know what it is.
25          MR. OLINDE:  You bless it.  Okay.
```

OFFICIAL TRANSCRIPT

```
02:25:58

02:26:20

02:26:38

02:26:53

02:27:05
```

1                THE COURT:  No, go ahead and tell me.
2                MR. OLINDE:  I have a loan -- no.
3                Well, the -- this is a case.  It is the Dora Sanford
4   case.  It is in the third trial pool.  There is -- the Phase I
5   discovery ends September 20th.  The problem is that the doctor,
6   the treating physician, the prescribing physician, who is
7   Dr. Judd Patten, is retired, and we're not really sure where he
8   is.  We've tried to locate him.  We've jointly sent some letters
9   to him because both sides want to take his deposition.
10               So we think we might have an address for him in
11  Baton Rouge, and we want to try to subpoena him in Baton Rouge,
12  but there is no way we could get that completed by the 20th of
13  September.  So what we suggested in our e-mail was can you, for
14  the specific purpose of taking this deposition, extend the
15  September 20th deadline to October 10th?
16               And so I can give you -- well, I've written all over my
17  e-mail here, but I can send it to you again.
18               THE COURT:  Send it to me again and I'll act on it.
19               MR. OLINDE:  I gave you the civil action number.
20               But it is just to make -- for that one particular
21  purpose.  And so we're going to go ahead and try to subpoena.
22  And if we can't get the doctor, we may come back to you and try
23  to figure out what to do at that point.
24               THE COURT:  If you'd resend me the e-mail because I
25  might not be able to find it.

**OFFICIAL TRANSCRIPT**

```
02:27:16
```

1    MR. OLINDE:  Is it the same e-mail address?
2    THE COURT:  Yes.  It's just a whole new program.
3    MR. OLINDE:  I will do that.
4    THE COURT:  How they manage to get almost everything
5 from one to the other, I don't know.
6    MR. LEMMON:  So we're good with that.
7    THE COURT:  Okay.  Very good.  Thank you-all.
8                   (Proceedings adjourned.)
9
10                       * * *
11                    **CERTIFICATE**
12
13     I hereby certify this 18th day of September, 2019, that
14 the foregoing is, to the best of my ability and understanding, a
15 true and correct transcript of the proceedings in the
16 above-entitled matter.
17
18                              /s/ Mary V. Thompson
19                           _____
                                Official Court Reporter
20
21
22
23
24
25

**OFFICIAL TRANSCRIPT**