## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)                    MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

                                               SECTION "H" (5)

THIS DOCUMENT RELATES TO:

Barbara Earnest, Case No. 2:16-cv-17144.

### DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR JUDGMENT AS A MATTER OF LAW

At the close of Plaintiff's evidence, Defendants Sanofi-Aventis U.S. LLC and Sanofi U.S. Services Inc. move the Court for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) on Plaintiff's only cause of action: that Taxotere was unreasonably dangerous because of an inadequate warning or instruction under La. Rev. Stat. Ann. § 2800.57.

### LEGAL STANDARD

"Judgment as a matter of law is proper if 'a party has been fully heard on an issue during a jury trial and . . . a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 614 (5th Cir. 2018) (citing Fed. R. Civ. P. 50(a)). "A mere scintilla of evidence is insufficient to present a question for the jury." *Rutherford v. Harris Cty.*, 197 F.3d 173, 179 (5th Cir. 1999). "There must be a conflict in substantial evidence to create a jury question." *Id.* "The decision to grant a directed verdict ... is not a matter of discretion, but a conclusion of law based upon a finding that there is insufficient evidence to create a fact question for the jury." *Burch v. Coca-Cola Co.*, 119 F.3d 305, 313 (5th Cir. 1997) (citation and internal quotation marks omitted).

## PLAINTIFF'S BURDEN OF PROOF

In order to prevail, Plaintiff was required to prove, during her case in chief, each of the following elements by a preponderance of the evidence:

1. ***Failure to warn under the LPLA***: That Defendants failed to warn (or inadequately warned) Dr. Carinder of a risk of "permanent chemotherapy induced alopecia" associated with Taxotere—that was not otherwise known to him—and that but for that failure to warn, he would not have made the prescribing decision that thereby caused Plaintiff's alleged injury;

2. ***Contra non valentem***: That Plaintiff lacked actual and constructive knowledge of a relationship between her "permanent chemotherapy-induced alopecia" and her use of Taxotere prior to December 12, 2015.

3. ***General Medical Causation***: That Taxotere can cause "permanent chemotherapy-induced alopecia"; and

4. ***Specific Medical Causation***: That Taxotere caused Plaintiff's "permanent chemotherapy-induced alopecia."

Plaintiff failed to meet her burden on any of these elements, and Defendants are entitled to judgment as a matter of law.

## ARGUMENT

## I.    PLAINTIFF DID NOT MEET HER BURDEN TO PROVE FAILURE TO WARN UNDER THE LPLA.

A reasonable jury would not have a legally sufficient evidentiary basis to find for Plaintiff on her warnings claim, under either Fifth Circuit authority or the Court's learned-intermediary framework. (Defendants respectfully maintain that the Court's learned-intermediary framework is erroneous for the reasons set forth in Defendants' Motion to Certify the Court's July 9, 2019 Summary Judgment Order for Interlocutory Appeal (Rec. Doc. 7783), and address what Defendants maintain are the correct standards below in Parts A-D.  Defendants, however, acknowledge that the Court's framework is law of the case and address that standard in Part E below.)

**A. Dr. Carinder had actual knowledge that the particular Taxotere regimen he selected for Plaintiff posed a risk of permanent hair loss.**

The Fifth Circuit has articulated a two-pronged test for failure-to-warn claims involving prescription medicines:

> First, the plaintiff must show that the defendant failed to warn (or inadequately warned) the physician of a risk associated with the product that was not otherwise known to the physician.

> Second, the plaintiff must show that this failure to warn the physician was both a cause in fact and the proximate cause of the plaintiff's injury.

*Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 265-66 (5th Cir. 2002) (internal citation omitted).

As to the first prong, under the applicable section of the LPLA, a manufacturer is not required to provide an adequate warning about its product when:

> (1) The product is not dangerous to an extent beyond that which would be contemplated by the ordinary user or handler of the product, with the ordinary knowledge common to the community as to the product's characteristics; or

> (2) The user or handler of the product already knows or reasonably should be expected to know of the characteristic of the product that may cause damage and the danger of such characteristic.

La. Stat. Ann. § 9:2800.57.

Here, when Dr. Carinder chose Plaintiff's chemotherapy regimen in March 2011, he was *already aware*, based on his own clinical experience and research, that the particular Taxotere regimen he selected for Plaintiff posed a risk of permanent hair loss.

<u>First</u>, Dr. Carinder testified that, in 2005, one of his patients suffered permanent hair loss after using the same chemotherapy regimen as Plaintiff.  *See* Trial Tr. 1532:9-1533:6.  Dr. Carinder confirmed that he "always" told patients, including Plaintiff, about the 2005 patient and the possibility of permanent hair loss with that regimen:

> Q.  [Y]ou would agree with me, you always told your patients if they were on dose-dense AC followed by Taxotere, you would tell them about the prior patient true?

3

A.  Yes.

Q.   As you sit here today, sir, you don't have any reason that you deviated from that practice when it came to Ms. Earnest, right?

A.  No.

Q.  So you would have told her about that patient, correct?

A.  Yes.

Q.   After having heard about that patient and after learning about the possibility that her hair might not grow back, you would agree with me that Mrs. Earnest accepted your treatment plan and agreed to proceed with the same regimen of dose-dense AC followed by Taxotere, true?

A.  Yes.

*Id*. at 1537:13-1538:5.

Second, Dr. Carinder also testified that he read the 1999 label in its entirety ("all of it"), including a statement concerning "hair loss" on page 31: "Once you have completed all of your treatments hair generally grows back."  Trial Tr. 1541:22-24, 1542:11-24.  Dr. Carinder agreed the label meant hair grows back "usually or most of the time," but not "always."  *Id*. at 1542:25-1543:3.  Dr. Carinder confirmed he would not have forgotten those exact words from the 1999 label when prescribing for Plaintiff in March 2011.  *Id*. at 1544:7-9.  If Dr. Carinder had read the 2004 label (he did not), he would have seen that in the adjuvant setting "hair generally grows back" and shared with Plaintiff that hair usually grows back, but not every time.  *Id.* at 1544:18-1545:24.

Third, Dr. Carinder testified he had read the Nabholtz article (published in 2001), in which he "learned of Taxotere, Adriamycin, and Cytoxan being associated with four reports of persistent hair loss[.]"  *Id*. at 1556:16-20 (Dr. Carinder testified he did not share that piece of information from the Nabholtz article with Plaintiff, *id.* at 1556:25-1557:2, which implies he read that article at some point before he treated Plaintiff in March 2011).

On this record, Dr. Carinder was already aware of the "characteristic" that Plaintiff claims

Defendants should have disclosed, and therefore Defendants were not required under the LPLA to provide a warning concerning that characteristic.  La. Stat. Ann. § 9:2800.57(B); *Vincent v. Sofamor Danek Nevada, Inc*., 237 F.3d 630, at *2 (5th Cir. 2000).[1]

### B.  Plaintiff elicited no testimony from Dr. Carinder that any different warning would have changed his decision to prescribe Taxotere to Plaintiff.

With respect to the second prong of the Fifth Circuit's test, this Court has observed "the law is well established that, to prove causation, '*the plaintiff must show that a proper warning would have changed the decision of the treating physician*, i.e. that but for the inadequate warning, the treating physician would not have used or prescribed the product.'" Order, Rec. Doc. 7571 at 20 (emphases added).

At trial, Plaintiff failed to elicit ***any*** testimony from Dr. Carinder that a different warning would have changed his decision to prescribe Taxotere to Plaintiff.  In fact, Dr. Carinder unequivocally testified that "today" he stands by the decision he made in March 2011 to prescribe Taxotere to Plaintiff, Trial Tr. 1612:2-17, and that even with all of the risks he now knows and would weigh, back in 2011, he still would have recommended the Taxotere regimen to Plaintiff. *Id.* at 1533:3-6.  Backing up that decision, Dr. Carinder testified that the dose-dense Taxotere regimen he selected for Plaintiff in March 2011 was "the most effective option," *id.* at 1513:21, it was the only option he presented to Plaintiff, *id.* at 1520:18-25, and that such regimen was in Plaintiff's "best interest." *Id.* at 1599:18-1600:1.

Where, as here, Plaintiff's treater testifies that he or she would have made the same prescribing decision, even with knowledge of the information Plaintiff claims should have been

---

[1] This failure of proof also defeats warnings causation.  *See, e.g., Hall v. Sinn, Inc.*, 102 F. App'x 846, 849 (5th Cir. 2004) ("[Plaintiff's treating physician's] affidavit acknowledges that . . . he was aware of the risks of the drug independently of Wyeth's labels; therefore, Wyeth's warning (adequate or inadequate) played no role in the events leading to Hall's injury").

disclosed, there is no legally sufficient basis for a reasonable jury to find causation. *See Ackermann v. Wyeth Pharm.*, 526 F.3d 203, 212 (5th Cir. 2008) (affirming summary judgment based on treater's testimony that he would have prescribed drug to plaintiff even if he had been given plaintiff's proposed stronger warning); *see also Eschete ex rel. Eschete v. Roy*, 554 F. Supp. 2d 628, 634 (E.D. La. 2008) ("Dr. Roy testified that even if a different warning had been supplied, he would not have changed his decision to prescribed the drug. . . . This attestation by Dr. Roy defeats Plaintiffs' inadequate warning . . . claim, pursuant to the Fifth Circuit's *Ackermann* decision.").[2]

### C. Plaintiff elicited no evidence that choosing another chemotherapy regimen not containing Taxotere would have avoided her injury.

As to the second prong, Plaintiff also must prove that she would not have sustained permanent hair loss "but for" Taxotere. Plaintiff must accordingly adduce evidence that a treatment regimen existed that did not pose the risk of her injury. *See generally Stahl*, 283 F.3d at 265-66. Plaintiff has not done so. No expert testified that, if Plaintiff had taken a different regimen, she would not have suffered hair loss. Dr. Plunkett identified permanent hair loss as a risk with Taxol, Trial Tr. 861:3-6, Adriamycin, 861:7-10, Cytoxan, 873:20-25, and 5-FU, 874:19-21. Dr. Tosti identified reports of permanent alopecia with anthracyclines generally, *id.* at 1030:23-1031:3, Adriamycin, 1030:6-14, Cytoxan, 1031:11-16, and reports of persistent alopecia with FEC, 1058:20-23. The same was true for Plaintiff's expert Dr. Ellen Feigal on Taxol, *id.* at 1218:5-9, Cyclophosphamide, 1219:4-6, Adriamycin, 1219:7-9, the AC regimen, 1219:14-16, and the AC Taxol regimen, 1219:17-24. Finally, if Dr. Carinder knew there were reports of persistent

---

[2] Additionally, Plaintiff elicited no testimony from Dr. Carinder, or any of her experts, that an *additional* non-disclosed risk was sufficiently high to have changed Dr. Carinder's decision to prescribe Taxotere to Plaintiff—as required under Fifth Circuit precedent: "***The burden remains on the plaintiff to demonstrate that the additional non-disclosed risk was sufficiently high that it would have changed the treating physician's decision to prescribe the product for the plaintiff.***" *Thomas v. Hoffman-LaRoche, Inc.*, 949 F.2d 806, 814 (5th Cir. 1992) (applying Mississippi law); *see also Stafford v. Wyeth*, 411 F. Supp. 2d 1318, 1322 (W.D. Okla. 2006). Absent evidence of some additional non-disclosed risk (*i.e.*, one of which Dr. Carinder was not already aware), no reasonable jury could find that Dr. Carinder would have changed his decision to prescribe Taxotere.

hair loss with Taxol, Adriamycin, and Cytoxan, he would have shared that information with Mrs. Earnest too. *Id.* at 1548:16-1549:5.  There was no witness who testified that Plaintiff would not have suffered hair loss if she had taken Taxol, AC, FAC, or FEC.  Instead, the evidence identified competing, severe risks and a lower chance of survival with other regimens.

Dr. Carinder testified that he would have urged the addition of a taxane to any regimen he prescribed to Plaintiff because of its benefit in minimizing breast cancer recurrence (and, therefore, increasing the chance of survival).  Trial Tr. 1512:2-15, 1519:1-1524:23, 1526:13-17.  If Taxotere were not an option, there is no evidence that Plaintiff would not have suffered permanent hair loss with the other taxane option—Taxol.  Indeed, Dr. Tosti admitted at trial that her 2019 publication demonstrated a higher correlation between *Taxol* (versus Taxotere) and permanent alopecia (*id.* at 1053:21-1054:4) and that—even if Taxotere were a cause of grade 2 alopecia—she could not disprove that *Taxol can cause it too*.  *Id.* at 1128:24-1129:2.  Given that testimony, Plaintiff did not meet her burden to prove that but for her use of *Taxotere*, Plaintiff would not have been injured because the other option available would have posed this risk as well.

### D.  There is no evidence that Dr. Carinder read updated labeling before prescribing Taxotere to Plaintiff.

No reasonable jury could find in Plaintiff's favor on "but for" causation since the unrefuted evidence at trial was that Dr. Carinder did not read in their entirety (or on alopecia specifically) any of the versions of Taxotere labeling that came out after 1999.  Trial Tr. 1545-46.  Thus, Plaintiff cannot rely on any heeding presumption to establish that any inadequacies in Taxotere labeling after 1999 played a causal role in Dr. Carinder's decision; an adequate warning or instruction would have been futile under the circumstances.  *See, e.g.*, *Pustejovsky v. Pliva, Inc.*, 623 F.3d 271, 277 (5th Cir. 2010) ("Dr. Collini did not recall ever reading the package insert for the drug . . . .  Her lack of memory, of course, does not preclude the possibility that she had read

7

these materials, but neither can sustain [plaintiff]'s burden."); *accord Bloxom v. Bloxom*, 512 So.2d 839, 841 (La. 1987), *superseded on other grounds*, 56 So.3d 229 (La. 2011); *Felice v. Valleylah, Inc.*, 520 So.2d 920, 927 (La. App. 1987).  Further, Dr. Kessler was the FDA Commissioner when Taxotere was initially approved by FDA in 1996 and he testified that both the 1996 and 2004 labels were adequate.  Trial Tr. 434:9-12; 435:6-10. These labels contain the same hair loss warning that Dr. Carinder reviewed. No warning that Dr. Carinder actually read was inadequate, by Plaintiff's expert's own concession, and therefore cannot form the basis for liability under the first prong and could not have caused Plaintiff's injury under the second prong.

### E. Plaintiff cannot establish warnings causation under the Court's learned-intermediary framework.

No reasonable jury could find for Plaintiff under the Court's learned-intermediary framework either.  In the Court's decision denying summary judgment on warnings causation grounds, the Court stated that, in the case of chemotherapy:

> The question is not simply "what would the doctor have prescribed" but whether and how ***the doctor would have advised the patient of the risk of permanent alopecia associated with Taxotere***, whether the patient would have inquired about other options, what the doctor would have recommended, and what decision the plaintiff would have ultimately made. The Court will consider these questions with the goal being to assess what the doctor and the patient would have decided together. While a doctor may testify that his or her recommendation would not have changed, the issue is whether the plaintiff's ultimate decision would have changed.

Order, Rec. Doc. 7571 at 16.  Plaintiff cannot carry her evidentiary burden under the Court's formulation of the learned-intermediary doctrine.  (Defendants reassert their objection to the Court's learned intermediary test for warnings causation and maintains that the learned intermediary doctrine should consider only whether a different warning would have changed the *physician*'s prescription decision, not whether it would have changed her informed-consent conversation with the patient or affected the *patient*'s treatment choice.)

On the first element ("whether and how the doctor would have advised the patient of the

8

risk of permanent alopecia associated with Taxotere"), Dr. Carinder was already aware that the particular Taxotere regimen he selected for Plaintiff posed a risk of permanent hair loss, and thus no reasonable jury could find that Defendants had a duty to warn of such risk, *see* La. Stat. Ann. § 9:2800.57(B), or that a warning conveying that risk would have played any causal role in his decision whether to "advise" Plaintiff regarding that risk.   In fact, Dr. Carinder's testimony regarding the 1999 label shows that, had he received a proper warning, he would not have "advised" Plaintiff any differently.   *See supra*, part I.A.   Dr. Carinder conceded that Taxotere's 1999 label, which stated that "hair generally grows back," meant that hair does not always grow back.   Trial Tr. at 1542:25-1543:16.   Dr. Carinder, however, did not tell Plaintiff that.

On the second element ("whether the patient would have inquired about other options"), Dr. Carinder testified he advised Plaintiff about the possibility of permanent hair loss by telling her about the 2005 patient.   *See supra*, part I.A.   Dr. Carinder testified that after he explained that risk to Plaintiff, she accepted his recommendation and did not ask about other options.   Trial. Tr. 1537:13-1538:3.   Plaintiff also could not testify definitively about whether Dr. Carinder did, in fact, warn her.   Trial Tr. 1813:12-23 ("If he did tell me I don't remember it. Let me put it that way. If he did. He could have. I really don't know if he told me.").   Plaintiff also testified that she asked no questions about any of the significant, life threatening and disabling adverse events listed in her consent form.   (D. Ex. 2058).   For example, the consent form specifically indicated that the medicines could have resulted in the permanent loss of a limb.   *Id.*   The consent form also identified the possible risk of brain damage and death, which Plaintiff testified she accepted and did not ask Dr. Carinder for a different option.   Trial Tr. 1795:6-22.   No reasonable jury could conclude that Plaintiff would have inquired about other options if she had been told that Taxotere was associated

with rare cases of permanent alopecia.[3]

On the third element ("what the doctor would have recommended"), no evidence established that Dr. Carinder would have made a different decision if the Taxotere label included a permanent alopecia warning. Dr. Carinder unequivocally testified that the Taxotere option was the only option he presented to Plaintiff in 2011, *id.* at 1520:18-22, and "today" he stands by that decision, 1612:2-17. Dr. Carinder further testified he would not have presented Plaintiff with various regimens from which Plaintiff could choose; rather, Dr. Carinder testified that he made a single treatment recommendation to Plaintiff in this case and would have followed the same practice even if the permanent alopecia warning had been added. *Id.* at 1529:21-1530:7. Dr. Carinder stands by his decision to prescribe Taxotere and there is no evidence that he would have recommended another chemotherapy regimen.

As to the final element ("what decision the plaintiff would have ultimately made"), Plaintiff has no legally sufficient evidence to meet her burden. Plaintiff's counsel wholly failed to elicit the necessary testimony to carry their burden under the Court's very specific learned intermediary framework. The Court specifically required that Plaintiff prove that Dr. Carinder would have recommended, and that Plaintiff would have accepted, a non-Taxotere containing regimen after being advised of the risks of those other regimens. Order, Rec. Doc. No. 7571 at 21. At trial, the only non-Taxotere regimens discussed by Dr. Carinder were Taxol-based regimens that carried a ***higher risk of worse neuropathy***, Trial Tr. 1525:11-14, as well as a ***greater chance of developing a severe infusion-related reaction***, *id.* at 1528:21-24, and non-taxane regimens (FAC, FEC) which had a ***lower survival rate***, *id.* at 1523-34. And, significantly, the record is replete with evidence,

---

[3] In fact, nearly three months after Plaintiff completed her chemotherapy treatment, Dr. Carinder prescribed Arimidex to Plaintiff to help prevent her breast cancer from reoccurring by blocking estrogen. Trial Tr. 1590:5-16. At that time, despite being warned of Arimidex's risk of hair loss, Plaintiff accepted that risk to help prevent her cancer from returning. *Id.* 1592:16-1593:3.

from Plaintiff's experts, that **each of these other regimens contain medicines that have also been associated with cases of persisting alopecia**. *See supra*, Part I.C.

Plaintiff's own testimony is not a legally sufficient ground to find in Plaintiff's favor on any element of her claim.[4]  When Defendants questioned Plaintiff about whether she would have accepted the risks associated with non-Taxotere regimens, she did not testify that she would have taken them.  Plaintiff repeatedly testified that she "did not know" what decision she would have ultimately made had Dr. Carinder discussed these other options.  Plaintiff repeatedly disclaimed the question as too hypothetical to answer.  Trial Tr. 1801:22-1803:7; 1816:2-11 ("It's hard to say. I may have went to another doctor. I don't know.").

There was no evidence that a "reasonable patient in the plaintiff's position" would have ultimately rejected the Taxotere regimen in favor of the three alternatives Plaintiff suggested, given the lower survival rates and risk of worse neuropathy, discussed above.  This Court has recognized, in granting a Rule 50 motion, that "no reasonable jury could find that Plaintiff has established causation [including because] Plaintiff did not testify that a different warning label would have changed her decision to administer Children's Motrin to M.H., nor was she ever asked questions to this effect by counsel."  *Hunt v. McNeil Consumer Healthcare*, 2014 WL 1779471, at *3 (E.D. La. May 5, 2014).  On these facts, no reasonable jury could find that a "reasonable patient in the plaintiff's position" would have declined the Taxotere regimen in favor of less efficacious regimens that also carried the risk of permanent alopecia.  *See supra*, Part I.C.

No reasonable jury could find Plaintiff met her burden to prove warnings causation.

---

[4] *See Snider v. La. Med. Mut. Ins. Co.*, 130 So. 3d 922, 930 n.7 (La. 2013) ("Because of the likelihood of a patient's bias in testifying in hindsight on this hypothetical matter, this court and others have adopted an objective standard of causation: whether a reasonable patient in the plaintiff's position would have consented to the treatment or procedure had the material information and risks been disclosed."); *Hondroulis v. Schuhmacher*, 553 So. 2d 398, 412 (La. 1988) (same).

Judgment as a matter of law is appropriate on that basis.

## II.   PLAINTIFF DID NOT MEET HER BURDEN TO PROVE THAT HER CASE IS NOT TIME BARRED.

In Louisiana, the prescription period for products liability claims is one year from the day the injury or damage is sustained.  *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 2019 WL 2995897, at *2 (E.D. La. July 9, 2019).   And, where the face of the complaint shows the prescriptive period has already run, the plaintiff bears the burden of showing that an exception to the one-year prescription period applies.  *Hoerner v. Wesley-Jensen*, 684 So. 2d 508, 510 (La. App. 4 Cir. 1996) (citing *Wimberly v. Gatch*, 635 So. 2d 206, 211 (La. 1994)).  As the Court has already ruled, Plaintiff's complaint is prescribed on its face, *see In re Taxotere*, 2019 WL 2995897, at *2, and thus Plaintiff had the burden at trial to present evidence from which a reasonable jury could conclude that an exception to the prescription period applied.

Under the *contra non valentem* doctrine, the Court—in "exceptional circumstances"—may suspend the prescription period.  *Marin v. Exxon Mobil Corp.*, 48 So. 3d 234, 245 (La. 2010).  On summary judgment, Plaintiff argued that one exception to prescription applied—"[w]here the cause of action is not known or reasonably knowable by the plaintiff, even though [her] ignorance is not induced by the defendant," the prescription period is tolled.  *Id.*  But, prescription starts to run when plaintiff has "actual or constructive knowledge of facts indicating to a reasonable person that he or she is the victim of a tort."  *In re Taxotere*, 2019 WL 2995897, at *2.  That is, the prescriptive period commences "when there is enough notice to call for an inquiry about a claim, not when an inquiry reveals the facts or evidence that specifically outline the claim."  *Id.*

Previously, the Court entered its Order denying Defendants' summary judgment motion, which argued the prescription period had run on Plaintiff's claim.  Rec. Doc. 7571.  Defendants contend that the ruling was erroneous because Plaintiff's injury was reasonably knowable (and she

had constructive knowledge of her injury) by at least 2012, yet Plaintiff failed to investigate until 2016.  Further, based on the facts presented at trial, judgment as a matter of law on prescription grounds is proper.  *Black v. J.I. Case Co.*, 22 F.3d 568, 571 (5th Cir. 1994).  Plaintiff did not meet her burden to prove that "exceptional circumstances" exist such that the prescription period was tolled on her claims until at least December 12, 2015 (one year before Plaintiff filed suit).

### A. Plaintiff adduced no evidence that it was reasonable to wait four years to investigate whether her hair loss was permanent.

In its previous Order denying summary judgment against Plaintiff on prescription grounds, the Court relied on *Hoerner v. Wesley-Jensen*, 684 So. 2d 508 (La. App. 4 Cir. 1996).  In *Hoerner*, the plaintiff suffered an eye infection.  *Id.* at 510.  The plaintiff's doctors told her a germ—and not her extended-wear contact lenses—caused the infection.  *Id.*  So, the plaintiff remained ignorant of the fact of her potential tort claim against the contact lens manufacturer until she read a medical analysis in the *New England Journal of Medicine* several years later.  *Id.*

But at trial in this case, Dr. Carinder testified that he never told Plaintiff that her hair loss was anything but a result of her chemotherapy treatment, which included Taxotere.  Trial Tr. 1566:6-23; *see Averette v. Bayer Healthcare Pharm. Inc.*, 2014 WL 1246851, at *4 (E.D. La. Mar. 25, 2014) ("Unlike the plaintiff in *Hoerner*, [plaintiff] knew that her symptoms were caused by the Mirena device rather than by some other harm present throughout the environment and experienced by those who were not using the Mirena device.").  *Hoerner* examines prescription when a party believes her injury was produced by Cause 1 (a common germ), when Cause 2 (contact lenses) is to blame.  *See Hoerner*, 684 So. 2d at 514.  But, here, Plaintiff knew her hair loss was caused by her treatment.  Plaintiff failed to prove at trial that it was reasonable for Plaintiff to wait four years to investigate the damage or injury—*i.e.*, whether her hair loss was permanent.

Importantly, the trial evidence did not establish Plaintiff's summary judgment claim that

Dr. Carinder told her hair was going to come back—which was a dispositive fact underlying this Court's summary judgment ruling. *See* Order, Rec. Doc. 7571 at 8 ("[Plaintiff] inquired with her doctor about her injury, and she was led to believe that she had no actionable injury."). Contrary to Plaintiff's position at summary judgment, Dr. Carinder testified that he warned Plaintiff that her lack of hair growth six months after treatment was uncommon:

> Q.  And if a patient didn't get their hair back six months after chemotherapy that would be an amount of time you would start to be concerned?
>
> A.  That would be unusual.
>
> Q.  Did you discuss with Mrs. Earnest after she had gone about six months after chemotherapy without her hair returning was there a discussion between you and her that this is unusual?
>
> A.  Yes.
>
> Q.  And did you tell her you were concerned that her hair hadn't grown back after chemotherapy?
>
> A.  I said, "It's not common. It's uncommon to see the hair take this long to come back."
>
> Q.  Approximately when would you start to have that conversation with the patient, at what period after treatment?
>
> A.  I would say six to eight months.
>
> Q.  You believe you had that conversation here with Mrs. Earnest?
>
> A.  Yes.

Trial Tr. 1587:11-1588:5. Far from assuring Plaintiff that her hair would eventually grow back, Dr. Carinder's assertion that the lack of hair growth was "uncommon" would have alerted a reasonable person to investigate further. But Plaintiff failed to investigate until 2016. And, even if Plaintiff's testimony at trial is credited—*i.e.*, Dr. Carinder told Plaintiff in 2012 that her hair would grow back—it was still unreasonable as a matter of law for Plaintiff to rely on this statement for four years before investigating further. Plaintiff acknowledged that (1) she was told her hair

could come back, Trial Tr. 1799:1-3; (2) it didn't come back, *id.*, and (3) she understood that chemotherapy caused her hair loss, *id.* at 1866:1-4.  And, as Plaintiff testified, her hair loss has remained the same since 2012, but Plaintiff never asked Dr. Carinder—or anyone else—to investigate whether her hair loss was permanent.  Trial. Tr. 1865:10-18.  Based on these facts, no reasonable juror could find that Plaintiff was reasonable in failing to investigate her claim, and Defendants are entitled to judgment as a matter of law.

### B.  Plaintiff did not meet her burden to show she lacked constructive knowledge.

The Court also should enter judgment as a matter of law in Defendants' favor because Plaintiff had constructive knowledge of the risk that Taxotere caused permanent hair loss starting in 2011.  Possession of documents evidencing a potential claim constitutes constructive notice for prescription to run, whether or not the claimant has read the documents.  *See Rivera v. Huntington Ingalls, Inc.*, 2018 WL 6326451, at *3-4 & n.60 (E.D. La. Dec. 3, 2018); *In re Mann*, 2009 WL 10702299, at *11 (W.D. Tex. Sept. 28, 2009).  In the Court's Order denying summary judgment, the Court concluded that Plaintiff did not have constructive knowledge of a connection between Taxotere and permanent hair loss.  Rec. Doc. 7571 at 8-9.  Specifically, the Court relied in part on summary judgment evidence indicating that Dr. Lagarde gave Plaintiff a handbook covering cancer diagnoses.  And, although the handbook listed "rare reports of permanent hair loss" as a side effect of Taxotere, the summary judgment evidence indicated that Dr. Lagarde would have directed Plaintiff to two sections of the handbook—sections that did not cover Taxotere's side effects.  *Id.*  This fact was also key to the Court's ruling denying Defendants' motion.

The evidence presented at trial, however, was different.  Dr. Lagarde testified that she left the handbook at the desk of her office for Plaintiff to pick up.  And, because she left the book at the desk for pick-up, Dr. Lagarde testified that she could not have directed Plaintiff to *any* specific

section of the handbook:

> Q.  Okay.  And so do you have any way of knowing or telling this jury that, for certain, any particular pages or passages would have dog-eared [sic] or highlighted for Ms. Earnest when she picked it up?
>
> A.  No.

Trial Tr. 1385:6-10.  The evidence at trial also demonstrated that Plaintiff picked up the book before meeting with her oncologist, Dr. Carinder, on March 31, 2011, when Dr. Carinder prescribed Plaintiff a chemotherapy regimen that included Taxotere.  *Id.* at 1386:13-16, 1520:13-1521:6.  Accordingly, the key basis for the Court's order denying summary judgment was not proven at trial.  Plaintiff was not directed to any specific section of the handbook, and it was unreasonable for Plaintiff not to read the handbook sections on Taxotere both after she learned Taxotere would be used in her chemotherapy and when her hair did not grow back over a four-year period.  Based on the facts presented at trial, and under the *Rivera* decision, the Court must find that Plaintiff had constructive knowledge of a relationship between her "permanent chemotherapy-induced alopecia" and her use of Taxotere in 2011.  Her claim thus expired in 2012, and Defendants are entitled to judgment as a matter of law.

## III.   PLAINTIFF DID NOT MEET HER BURDEN ON GENERAL CAUSATION.

In order to prevail, Plaintiff was required to prove general causation—that Taxotere is capable of causing "permanent chemotherapy induced alopecia." Order, Rec. Doc. 8094 at 5.  As this Court recognized, proving general causation requires proof of both elements of a two-prong test: (1) statistically significant association, and (2) a true causal relationship.  *Id.*

### A.  Plaintiff did not prove a statistically significant association through Dr. Madigan.

Dr. Madigan's testimony did not establish the first prong of the general causation test—a statistically significant relationship.  Dr. Madigan admits that neither of the studies he reviewed (TAX316 and TAX301) showed a statistically significant relationship between Taxotere and

permanent alopecia.  Trial Tr. at 705:8-14; 709:5-11.  Rather, Dr. Madigan was able to find a significant relationship only after combining the two studies into a "meta-analysis."  But Plaintiff never proved that Dr. Madigan's methodology was reliable or his analysis admissible.

In ruling on Defendants' *Daubert* motion, the Court incorrectly placed the burden of proving inadmissibility of the meta-analysis on Defendants and did not assess whether Plaintiff proved admissibility.  Order, Rec. Doc. 8094 at 10.  But the burden lies with Plaintiff.  *Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 550 (E.D. La. 2015); *see also Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).  Plaintiff, in fact, cannot demonstrate that Dr. Madigan's purported "meta-analysis" was appropriate or necessary.  *See Kelley v. Am. Heyer-Schulte Corp.*, 957 F. Supp. 873, 879 (W.D. Tex. 1997).  In *Kelley*, the court rejected plaintiff's expert's meta-analysis of one of only two reliable studies, neither of which showed statistical significance.  *Id.* at 879.  The court held this was inadmissible, noting that the expert made improper assumptions about the study's data without verifying whether those assumptions were correct and finding that, because there was no reason the underlying study could not stand on its own, the expert's "statistical reanalysis amounts to little more than playing with numbers."  *Id.*

Dr. Madigan's purported "meta-analysis" likewise amounts to "little more than playing with numbers" and he too did nothing to check the accuracy of the underlying data.  Dr. Madigan in fact admitted that some of his assumptions about the data could have been incorrect and that he likely included false hits in his conclusions.  Trial Tr. 677:10-678:11; 679:17-680:5; 685:21-687:1; 687:4-694:10; 702:23-704:3.  Dr. Madigan's purported "meta-analysis" also addressed only TAC versus FAC and did nothing to isolate Taxotere.  That too was improper, particularly considering that permanent alopecia has been reported in connection with both Adriamycin and Cytoxan.  *See Burst v. Shell Oil Co.*, 2015 WL 3755953, at *7 (E.D. La. June 16, 2015).

Similarly, in *Zoloft*, the court recognized that a meta-analysis should not be performed absent a "scientific explanation" for why two studies should be combined. *In re Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.*, 2015 WL 7776911, at *15 (E.D. Pa. Dec. 2, 2015), *aff'd* 858 F.3d 787 (3d Cir. 2017). Dr. Madigan testified at trial that he "couldn't care less whether [TAX316 and TAX301] are statistically significant or not because I'm going to do a meta-analysis that looks at the totality of the evidence, and that's what I care about." Trial Tr. 705:18-25. He further testified that it was "[a]bsolutely" appropriate to combine the two studies here because TAX316 and TAX301 are "similar." *Id.* at 648:16-20. That is not a "scientific explanation" for why the statistically insignificant results from TAX316 and TAX301 should not stand on their own. Dr. Madigan's purported "meta-analysis" should not have been put before the jury. Without it, Plaintiff has no proof of statistical significance and did not meet her burden.

**B.  Plaintiff did not prove a causal relationship through Dr. Feigal.**

Dr. Feigal did not present a legally sufficient evidentiary basis for the jury to find in Plaintiff's favor on the second prong of the general causation test—that a causal relationship exists. Dr. Feigal's opinion was demonstrated through a chart that purported to detail the results of her research regarding the TAX clinical trials and reports in the literature. Trial Tr. 1189. The chart purported to count the number of "publications on permanent alopecia in the treatment of breast cancer," and, in a column labeled "Taxotere," listed 347 clinical study participants and patients referenced in publications who allegedly had permanent alopecia caused by Taxotere. On cross-examination, however, Dr. Feigal admitted that if a publication concerned a patient who took Taxotere plus Adriamycin (A) and Cytoxan (C) ("TAC"), she counted that publication as demonstrating causation related to Taxotere. *Id.* at 1229:6-25. When asked why Dr. Feigal did not clarify the fact that her "Taxotere" column actually counted cases involving combination

regimens, Dr. Feigal testified "the only reason I didn't put Taxotere-containing regimen with the anthracycline and cyclophosphamide [Adriamycin and Cytoxan] is it doesn't fit on a column header.  So the implication is those are Taxotere-containing regimens.  I wasn't trying to be nontransparent.  I just can't fit all of those words on a column."  *Id.* at 1230:14-20.  Dr. Feigal's chart was not only misleading but cannot, as a matter of law, demonstrate that Taxotere causes permanent alopecia.  *Burst*, 2015 WL 3755953, at *7, 11 (stating that studies that only analyze exposure to a combination of substances can be disregarded in assessing general causation of one of those substances (citing *LeBlanc v. Chevron USA, Inc.*, 396 F. App'x 94, 99 (5th Cir. 2010))).

Dr. Feigal further admitted that, for a patient taking a combination regimen including AC (Adriamycin (A) and Cytoxan (C)), either the A or the C or both could have caused that patient's "permanent alopecia."  Trial Tr. 1236:12-22.  Yet all participants in the TAX clinical trials—the key basis for Dr. Feigal's opinion—took a combination regimen that included both A and C. Further, as demonstrated on cross, hundreds of the patients relied upon by Dr. Feigal as reports of permanent alopecia concerned patients who took combination regimens including A and C—more patients, in fact, than the number of patients who had taken "Taxotere"-containing regimens, according to her count.  *Id.* at 1229:19-1231:25.  Most importantly, Dr. Feigal admitted that the cause of the alopecia reported in the FAC arm of the studies, where Taxotere was not administered, "could be either A or C or both."  *Id.* at 1235:22-1236:22.  Given these concessions, Plaintiff did not prove a legally sufficient evidentiary basis that Taxotere (and not TAC or A or C or both A and C) causes permanent alopecia.

## IV.   PLAINTIFF DID NOT MEET HER BURDEN ON SPECIFIC CAUSATION.

Plaintiff also must prove specific causation, which requires proof that: (a) Plaintiff sustained the injury she alleges, (b) Plaintiff would not have sustained permanent hair loss "but for" taking Taxotere, and (c) taking Taxotere, in natural and continuous sequence, unbroken by

any intervening cause, produced Plaintiff's permanent hair loss.  *See Seaman v. Seacor Marine LLC*, 564 F. Supp. 2d 598, 600 (E.D. La. 2008); *Demouchet v. Gen. Nutrition Corp.*, 2014 WL 1652518, at *4 (W.D. La. Apr. 24, 2014).

### C.  Plaintiff did not meet her burden to prove permanent injury.

Plaintiff must prove that she actually suffers from the injury she alleges in her Complaint—hair loss that is "permanent," "irreversible," and will not grow back.  *See, e.g.*, *Wainwright v. Fontenot*, 774 So. 2d 70, 77 (La. 2000).  But the only dermatologist who testified in Plaintiff's case stated that she *could not say* whether Plaintiff's hair loss would ever improve.  Trial Tr. 1102:5-7.  Dr. Tosti testified that she treats patients with alopecia persisting after chemotherapy, and that many of her patients experience improvement with products like Rogaine and Minoxidil. *Id.* at 1101:5-20.  Plaintiff testified that in the eight years since she lost her hair, she has never tried any medication or treatment to see if she could get her hair to come back.  *Id.* at 1868:2-8 ("No. I haven't done anything.").  Without ever having tried a product that could improve her hair regrowth, no reasonable juror could find that Plaintiff has proven that her hair will never grow back—*i.e.*, that it is *permanent*.

Second, there was no evidence that Plaintiff was diagnosed with permanent or irreversible alopecia by one of her treating physicians.  Contrary to Plaintiff's counsel's characterization in opening statements, there was no evidence that anyone who has ever treated or examined Plaintiff has concluded that Plaintiff's hair *will not grow back*.  *Id.* at 167:1-5; 171:4-6; 173:20-21.  Plaintiff herself testified that no doctor has ever told her she has permanent alopecia, and that she has never asked.  *Id.* at 1865:10-18.

Finally, Dr. Tosti affirmatively testified that the only testing done on Plaintiff's scalp to see if Plaintiff's hair *might* regrow, revealed that there are stem cells—or the "cells that can

regenerate[]—most part of the body"— present on Plaintiff's scalp.  *Id.* at 1001:17-19; 1004:5-15.

Although Dr. Tosti testified that the positive stem cell results did not tell her that "the stem cells

work," she did not testify that the testing revealed that the stem cells *could not work*.  No reasonable

juror could find that Plaintiff has proven that her hair loss is, in fact, permanent.

### D. No reasonable jury could find that Plaintiff would not have sustained permanent hair loss "but for" Taxotere.

Not only has Plaintiff failed to produce sufficient evidence that her hair loss is permanent,

none of Plaintiff's experts testified that Plaintiff would not have sustained permanent hair loss *but*

*for* taking Taxotere.  While Dr. Tosti said that she believes that, of all the chemotherapy drugs and

subsequent endocrine therapy Plaintiff has received, Taxotere caused Plaintiff's permanent

chemotherapy-induced alopecia, Trial Tr. 1005:11-14, the jury never should have heard Dr. Tosti's

conclusion because it is not based on a reliable methodology.  *See Comardelle v. Pa. Gen. Ins.*

*Co.*, 76 F. Supp. 3d 628, 634-35 (E.D. La. 2015) (excluding the "kind of blanket specific causation

opinion [that] is not based on or tied to the specific facts and circumstances" of the Plaintiff,

specifically noting that relying on "a broad array of cases, studies," and other materials fails to

"plug the impermissible gap" between the "general causation proposition" and the "specific

causation opinion.").  Just as in her report and deposition, at trial, Dr. Tosti testified that the basis

for her conclusion that Taxotere ultimately caused Plaintiff's injury is her "personal experience

with [her] literature review."  Trial Tr. 1005:15-18.  A review of the literature—which discusses

*other* individuals with *other* medical histories and other risk factors—is not sufficient evidence of

*specific* causation related to Plaintiff.  *See* Rec. Doc. 7612 at 6-10.  In ruling on Defendants'

Motion to Exclude Expert Testimony on Specific Causation, Rec. Doc. 8095, the Court incorrectly

turned the burden on Defendants to prove that Dr. Tosti's reliance on medical literature was

*unreliable*.  But it was Plaintiff's burden to prove that Dr. Tosti's reliance on medical literature to

rule out other drugs was reliable. *See, e.g.*, *Burst*, 120 F. Supp. 3d at 550; *Moore*, 151 F.3d at 276; *Comardelle*, 76 F. Supp. 3d at 635. Had Dr. Tosti's testimony been properly excluded, Plaintiff would have no medical expert testimony on specific causation, and Defendants would be entitled to judgment as a matter of law. *Demouchet*, 2014 WL 1652518, at *4; *Smith v. Glaxosmithkline Corp.*, 2008 WL 4938426, at *2 (E.D. La. Nov. 17, 2008).

Second, even if Dr. Tosti's specific causation opinion was admissible, it still must be sufficient to allow a reasonable juror to conclude that her opinion, more likely than not, is true. *See Daubert*, 509 U.S. at 596 (explaining that "in the event the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to direct a judgment."). Here, no reasonable juror could conclude that Taxotere, and not Adriamycin (A) or Cytoxan (C), caused Plaintiff's alleged injury when Dr. Tosti admitted during her testimony that her literature review—which formed the basis of her ultimate specific causation conclusion—revealed cases of persistent alopecia in patients who received A- or C-based chemotherapy regimens *without* Taxotere. Trial Tr. 1030:25-1031:16; 1035:8-13. In other words, the most a reasonable juror could conclude from Dr. Tosti's testimony is that Taxotere, A, C, or some combination thereof, each *could* be the cause of Plaintiff's alleged injury. That does not meet Plaintiff's burden to prove that *Taxotere* caused her injury.

### E.  Dr. Tosti did not rule out Arimidex as an intervening cause.

Finally, Plaintiff failed to adduce evidence reliably ruling out Arimidex, which Plaintiff began taking three months after completing chemotherapy and has been taking now for eight years, as an intervening cause. Dr. Tosti testified that Arimidex is known to cause persistent hair loss. Trial Tr. 1034 at 1-9. Where "an accident results from two negligent acts, 'one more remote and

22

one an intervening cause, the presence of the intervening cause prevents a finding of liability on the one responsible for the more remote cause.'"  *Pickett v. RTS Helicopter*, 128 F.3d 925, 929 (5th Cir. 1997) (citing *Sutton v. Duplessis*, 584 So. 2d 362, 365 (La. App. 1991)).  In her testimony, Dr. Tosti purports to rule out Arimidex as the direct cause of Plaintiff's injury because Plaintiff did not have hair when she started taking the endocrine therapy.  Trial Tr. 980:12-14 ("[Plaintiff] had no hair when she started the medication, and the situation remained the same."); 1127:13-23.[5] According to Dr. Tosti, Plaintiff's hair would have needed to start regrowing after chemotherapy in order for Arimidex to be causing her persistent hair loss.  *Id.* at 1127:13-15 ("First, the hair should have start to regrow. But then, to make a diagnosis of endocrine induced alopecia, you have to start with hair. You know, it's a diagnostic criteria."). Putting aside the illogical nature of Dr. Tosti's basis for ruling out Arimidex, by Dr. Tosti's own testimony, Plaintiff's hair *had* begun to grow back after chemotherapy.  *See id.* at 967:9-11 (acknowledging that after chemotherapy, Plaintiff's hair had grown back to the little bit she has today); 977:8-10 (acknowledging that Plaintiff has some "fuzzy hair"); 1071:8-21 (acknowledging that in Plaintiff's April and August 2011 records, Dr. Carinder had noted "alopecia resolving").  By Dr. Tosti's own testimony, Plaintiff meets the diagnostic criteria for endocrine-induced alopecia because her hair *was* growing back *until* she began taking Arimidex, and no reasonable jury could find that Dr. Tosti reliably ruled out Arimidex as an intervening cause.  Plaintiff accordingly failed to meet her burden on specific medical causation.

---

[5]    According to Dr. Tosti, it is a "criteria for diagnosis" that patients with "endocrine-induced alopecia" have hair before they begin therapy.  Trial Tr. 1127:13-23.  Dr. Tosti did not offer whether she could rule out endocrine-induced alopecia if the patient began Arimidex before her hair had a chance to fully grow back, as with Plaintiff.

## V.   DEFENDANTS' PRE-TRIAL MOTIONS

Defendants previously moved the Court for orders on evidentiary issues.  In addition to the arguments raised above, Defendants hereby renew these motions and preserve for post-trial review the Court's orders on the following *Daubert* motions and motions in limine.

- Expert Testimony of Dr. Linda Bosserman (Rec. Doc. 6130; Rec. Doc. 7807);
- Expert Testimony of David Madigan (Rec. Doc. 6144; Rec. Doc. 8094);
- Expert Testimony David A. Kessler (Rec. Doc. 6146; Rec. Doc. 8153);
- Expert Testimony of Ellen Feigal (Rec. Doc. 6149; Rec. Doc. 8094);
- Expert Testimony of Dr. Plunkett. (Rec. Doc. 6155; Rec. Doc. 8097);
- Improper Expert Testimony (Omnibus) (Rec. Doc. 6158; Rec. Doc. 8142);
- Expert Testimony of Specific Causation (Rec. Doc. 6162; Rec. Doc. 8095);
- Expert Testimony of General Causation (Rec. Doc. 6163; Rec. Doc. 8094);
- Purported Moral or Ethical Duties of Pharmaceutical Drug Manufacturers (Rec. Doc. 7720-1; Rec. Doc. 8206);
- Purported Legal Duties and Conclusions (Rec. Doc. 7720-1; Rec. Doc. 8206);
- Other Lawsuits, Claims, or Investigations Against Sanofi and/or Other Sanofi Entities.  (Rec. Doc. 7720-1; Rec. Doc. 8206);
- Complaints and Lawsuits Against Other Manufacturers of Docetaxel.  (Rec. Doc. 7720-1, at 10-12; Rec. Doc. 8206);
- Adverse Event Reports Involving Patients Other Than Plaintiffs.  (Rec. Doc. 7720-1; Rec. Doc. 8216 & Hr'g Tr. Sept. 5, 2019);
- Argument Regarding the Presence, Absence, or Identity of Defendants' Corporate Representative at Trial (Rec. Doc. 7720-1; Rec. Doc. 8206);
- Defendants' Executive and Employee Compensation (Rec. Doc. 7720-1; Rec. Doc. 8206);
- Cost of Taxotere and Prescription Drug Pricing Generally (Rec. Doc. 7720-1; Rec. Doc. 8206);
- Defendants' Corporate Finances and Employment Decisions (Rec. Doc. 7720-1; Rec. Doc. 8206);
- Expert Opinions That Exceed the Scope of Plaintiffs' Rule 26 Expert Disclosures.  (Rec. Doc. 7720-1; Rec. Doc. 8206);
- Argument Concerning Defendants' Corporate Intent, Motives, or State of Mind.  (Rec. Doc. 7720-1, at 31-33; Rec. Doc. 8206);
- Argument Concerning Defendants' Corporate Integrity Agreements, Gov't Investigations or Settlements, or Any Other Alleged "Bad Acts" Unrelated to Taxotere (Rec. Doc. 7720-1; Rec. Doc. 8206);
- Specific Litigation Conduct (Rec. Doc. 7720-1; Rec. Doc. 8206);
- Argument Concerning Alleged Fraud on the FDA (Rec. Doc. 7720-1; Rec. Doc. 8206);
- What Treatment Dr. Carinder Would Prescribe to Plaintiff Today (Rec. Doc. 7657-1; Rec. Doc. 8206);
- What Plaintiff Would Have Done Differently If She Had Been Given Different Risk

Information (Rec. Doc. 7657-1; Rec. Doc. 8206);

- Sanofi Marketing Material Not Possessed or Relied on By Plaintiff or Her Prescribing Physician (Rec. Doc. 7657-1; Rec. Doc. 8201);
- Non-Expert Causation Opinions (Rec. Doc. 7657-1; Rec. Doc. 8206);
- Argument Concerning Plaintiffs' Motive and/or Mental State (Rec. Doc. 7657-1; Rec. Doc. 8206);
- Argument Concerning Sanofi Sales Representatives (Rec. Doc. 7657-1; Rec. Doc. 8201);
- Evidence Concerning DDMAC Correspondence with Sanofi (Rec. Doc. 7658; Rec. Doc. 8201);
- Referring to Sanofi as a "French" or "Foreign" Company (Rec. Doc. 7662; Rec. Doc. 8206);
- References that the "High Toxicity" of Taxotere Causes or is Associated with Alopecia.  (Rec. Doc. 7664; Rec. Doc. 8206);
- Foreign Labeling and Regulatory Actions (Rec. Doc. 7666; Rec. Doc. 8201);
- Argument that TAX316 and GEICAM 9805 "Ongoing Alopecia" Clinical-Trial Data Represents Evidence of "Persistent," "Permanent," or "Irreversible" Alopecia (Rec. Doc. 7668; Rec. Doc. 8207);
- Reference to Shirley Ledlie and "Taxotears" or other Third Party Advocacy or Communications Group or Members (Rec. Doc. 7670; Rec. Doc. 8201);
- Company Conduct that Post-Dates Chemotherapy (Rec. Doc. 7671; Rec. Doc. 8201); and
- FDA's Jan. 2011 Warning Letter to Sanofi and Corresponding 483 Inspection (Rec. Doc. 7673; Rec. Doc. 8216).

## <u>CONCLUSION</u>

For the reasons stated above, the Court should grant Defendants' motion for judgment as a matter of law.

Date:  September 25, 2019

Respectfully submitted,

*/s/ Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE URQUHART & MOORE LLC**
400 Poydras Street, Suite 2700
New Orleans, LA  70130
Telephone: 504-310-2100
Facsimile: 504-310-2120
dmoore@irwinllc.com

Jon Strongman
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
Facsimile: 816-421-5547
jstrongman@shb.com

Hildy Sastre
**SHOOK, HARDY & BACON L.L.P.**
201 S. Biscayne Blvd., Suite 3200
Miami, Florida 33131
Telephone: 305-358-5171
Facsimile: 305-358-7470
hsastre@shb.com

Ilana H. Eisenstein
**DLA PIPER LLP (US)**
1650 Market St., Suite 5000
Philadelphia, PA 19103
Telephone: 215-656-3351
Facsimile: 215-606-3351
Ilana.Eisenstein@dlapiper.com

*Counsel for sanofi-aventis U.S. LLC and Sanofi US Services Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 25, 2019, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

*/s/ Douglas J. Moore*