## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)                          MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

SECTION "H" (5)

THIS DOCUMENT RELATES TO:

Barbara Earnest, Case No. 2:16-cv-17144.

---

**DEFENDANTS SANOFI-AVENTIS U.S. LLC AND SANOFI US SERVICES INC.'S**
**MEMORANDUM IN SUPPORT OF THEIR**
**MOTION FOR JUDGMENT AS A MATTER OF LAW ON PREEMPTION**

---

### PRELIMINARY STATEMENT

The Sanofi Defendants ("Sanofi") request that the Court grant judgment as a matter of law on preemption grounds in Plaintiff Barbara Earnest's case.  At trial, Ms. Earnest's only warnings expert, Dr. David Kessler, testified that Sanofi should have "clearly and prominently" warned of permanent alopecia in the Taxotere label at some point between 2006 and 2009.  *See* Trial Tr. (Sept. 17, 2019) 387:1-2.  This is the only theory of liability Ms. Earnest has put forth at trial.  However, Dr. Kessler's opinion went well beyond the warning FDA ultimately determined was appropriate in 2015, after reviewing all available data on permanent or persistent alopecia.  FDA requested and approved specific language about alopecia in the Post-Marketing Experience section of the label after a thorough analysis of that data.  Where, as here, FDA itself approved label language that is not even arguably "clear[] and prominent[]," impossibility preemption is triggered.

Although the Court previously denied Sanofi's motion for summary judgment on preemption grounds, that summary judgment ruling does not resolve the merits of Sanofi's affirmative defense.  In *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1679-80 (2019),

the Supreme Court clarified that this Court must make the preemption determination as a matter of law, including the "meaning and effect" of the U.S. Food and Drug Administration's ("FDA") decisions and resolution of the predicate factual question whether the manufacturer submitted all material information to the FDA. That process has not yet occurred in this case: the Court applied the summary judgment standard and, in doing so, viewed the facts in the light most favorable to Ms. Earnest as the non-movant, rather than apply the *Albrecht* standard. The Court also lacked the full benefit of the regulatory record at the summary judgment stage.

Because preemption is an affirmative defense, the Court must permit Sanofi to present its evidence of impossibility preemption under the *Albrecht* standard and in light of Ms. Earnest's theory at trial and the regulatory record. The administrative record demonstrates that, prior to Ms. Earnest's treatment, Sanofi fully informed FDA of the relevant data and analyses regarding permanent alopecia, yet FDA rejected Sanofi's proposal to warn of persistent alopecia and affirmatively preserved the alopecia label language as is. This record demonstrates that Sanofi could not have unilaterally modified the label to add a more prominent warning of that risk.[1]

On multiple occasions from 1996, when FDA first approved Taxotere, through 2011, when Ms. Earnest was treated with Taxotere, FDA expressly considered the description of alopecia in the Taxotere label and repeatedly declined to include a prominent permanent alopecia warning, which is exactly what Ms. Earnest now advocates. When FDA first approved Taxotere in 1996, it considered the alopecia risk and settled on listing alopecia as an Adverse Reaction with the advice that, after treatment ends, "hair generally grows back." Sanofi_01380011, at 01380048.

---

[1] In addition to the exhibits attached to this motion, Sanofi is filing with the Clerk of Court a CD that contains documents from the regulatory record. *See* Ex. A. This CD is submitted for the Court's convenience because the voluminous collection of documents are organized by date and titled with the beginning bates number. Sanofi will file these documents on ECF or deliver paper copies to the Court if so directed by the Court.

Thereafter, FDA took specific actions to eliminate references to the potential persistence of that condition.  For example, in 2004, FDA deleted Sanofi's proposal to add alopecia to the "Other persistent reactions" section of the label after an extensive exchange on the issue and Sanofi's submission of the four-year data collected in the TAX316 clinical study reflecting the study's reported instances of ongoing alopecia.  *See* Sanofi_00548479, at p. 34; *see also* Trial Tr. (Sept. 17, 2019) 528:12-533:23 (following the close of Dr. David Kessler's testimony, Sanofi proffered Defense Exhibits 76, 102, and 272, which establish that Sanofi proposed adding the 55-month alopecia data results from the TAX316 clinical study in the persistent reactions section, and FDA struck the proposed addition).  Similarly, on May 13, 2010, as part of a class-wide labeling change for all taxane labels, FDA decided to *remove* the phrase "hair generally grows back" from the Taxotere product labeling, and instead added "hair loss" as a common adverse reaction. Sanofi_00169041, at 00169043, 00169108.   Between 2010 and 2015, FDA maintained the alopecia labeling through numerous label changes.

Even after a comprehensive review of permanent alopecia data collected through 2015, FDA concluded "it's impossible to determine whether the permanence of alopecia was due to docetaxel" and found that Sanofi's proposed "simple statement [in the Adverse Reactions section] that permanent cases have been reported is all that can reliably be said given the tremendous limitations of the available data."  FDA Correspondence dated Dec. 4, 2015, at 2 (attached as Ex. B, Trial Ex. D-478).  Those agency decisions foreclose and preempt Ms. Earnest's claim that Sanofi should have clearly and prominently warned of the risk of permanent alopecia because the agency considered this issue and found insufficient evidence to support a stronger—much less more prominent—label warning.

Meanwhile, Ms. Earnest's pleadings, the trial evidence, and the regulatory record did not

reveal *any* available and material information, data, or analysis regarding the risk of permanent alopecia that Sanofi failed to submit to the FDA when it made these determinations.  Likewise, *no* additional information existed that would have allowed Sanofi to unilaterally modify its label using the Changes Being Effected ("CBE") process.  Rather, Ms. Earnest's claim hinges on whether Sanofi should have alerted FDA about a statistical test, conducted by Plaintiff's expert, Dr. David Madigan, for the purposes of this litigation, that did not exist during the relevant time period.  Thus, the evidence demonstrates the Ms. Earnest's failure-to-warn claim is preempted as a matter of law.

## **FACTUAL BACKGROUND**

Before trial, Sanofi moved for summary judgment on preemption grounds.  *See* Rec. Doc. 6131-2 (filed under seal).  On August 14, 2019, this Court denied Sanofi's motion as the Plaintiff Barbara Earnest.[2]  Rec. Doc. 7973.  The Court's summary judgment ruling applied the traditional summary judgment standard, which viewed facts in the light most favorable to the plaintiff, did not include a review of the regulatory record, and did not consider Ms. Earnest's theory of failure-to-warn liability as presented at trial.  Based on that more limited record, the Court concluded that the evidence did not demonstrate that "Sanofi fully informed the FDA of the justifications for a stronger warning on the risk of permanent alopecia and that the FDA, in turn, decided that it would not approve a change to the label that included the warning."  *Id.* at 8.

The administrative record evidence submitted with this motion establishes that the FDA had all material information before it when it repeatedly rejected warning of permanent or persistent alopecia and then affirmatively preserved the alopecia labeling "as is" until 2015.  Even when FDA ultimately accepted Sanofi's proposed alopecia label change in 2015, FDA found a

---

[2] The Court deferred its decision on Sanofi's motion as it related to other claims pending in this MDL.  Rec. Doc. 7973, at 10.

lack of causal evidence between Taxotere and permanent alopecia and, therefore, approved only a "simple statement" that advised patients that "cases of permanent alopecia have been reported"— not the "clear[] and prominent[]" alopecia warning sought by Ms. Earnest.

The agency has thus repeatedly reaffirmed, in official agency actions such as labeling approvals and modifications, that a prominent permanent alopecia warning was inappropriate. The relevant administrative actions include the following:

1. **The 1996 labeling stated that ". . . hair generally grows back."** In 1996, FDA approved the use of Taxotere for locally advanced or metastatic breast cancer. Sanofi_01380011. Prior to FDA's initial approval, on July 27, 1994, Sanofi submitted its first proposed Taxotere labeling to FDA through its New Drug Application ("NDA"). Expert Report of Janet B. Arrowsmith, M.D. ("Arrowsmith Rpt.") ¶ 62 (attached as Ex. C). FDA's Division of Oncology and Pulmonary Drug Products reviewed the NDA for clinical safety and efficacy. Expert Report of Justin R. Victoria ("Victoria Rpt.") 43 (attached as Ex. D). The Oncologic Drugs Advisory Committees ("ODAC") also reviewed the proposed label twice before approval. *Id.* The review considered the safety profile of Taxotere along with the risk of alopecia. *Id.* In particular, the risk of alopecia was presented during the 1994 and 1995 ODAC meetings, but none of the concerns raised by ODAC included the risk of alopecia. *Id.*

The initial labeling approved by the FDA in 1996 included information about the risk of alopecia, listing it in the Adverse Reactions section of the physician United States Package Insert, referred to here as the label, in a tabular listing of adverse events. Sanofi_01380011, at 01380035. This FDA-approved language in the patient package insert concerning "Hair Loss" was the same from the time of Taxotere's initial approval in 1996 until May 2010: it advised that Taxotere causes hair loss and noted that "hair generally grows back." Arrowsmith Rpt. ¶¶ 65, 72 (Ex. C); *see*

Sanofi_01380011, at 01380048.

    **2.**    **2004 FDA rejection of proposed alopecia labeling under "*Other persistent reactions*."**  On March 17, 2004, Sanofi submitted a supplemental NDA to FDA for Taxotere's use in combination with doxorubicin and cyclophosphamide for the treatment of patients with operable node-positive breast cancer.  Victoria Rpt. 48 (Ex. D); *see also* Sanofi_01296737.  Sanofi included the 55-month results from the TAX316 clinical study in that submission.  Victoria Rpt. 49-53 (Ex. D).  The TAX316 clinical study report noted, under "persistent adverse reactions," that "3.2% of the TAC treated patients showed alopecia ongoing into the follow-up period."  *Id.* at 49 (Ex. D); Sanofi_02673277, at p. 169.  With its NDA, Sanofi proposed revisions to the Taxotere label to reflect the new proposed indication and information from the TAX316 clinical study.  Sanofi_05525092, at 05525093.  In addition to the table listing alopecia in the Adverse Reactions section of the physician labeling, Sanofi further proposed to *add* information to the Adverse Reactions section of the labeling about persistent alopecia.  Sanofi's labeling proposal stated:

> **Other persistent reactions**
>
> The following events were observed to be ongoing in TAC-treated patients at the median follow-up time of 55 months; *alopecia* (22/687), amenorrhea (133/233), neurosensory (9/73) and peripheral edema (18/112). These events were also observed in the FAC arm during the follow-up period: alopecia (9/642), amenorrhea (101/186), neurosensory (2/15) and peripheral edema (3/19).

Sanofi_05525092, at 05525118 (emphasis added).  Sanofi resubmitted this exact labeling proposal to FDA on June 23, 2004, August 5, 2004, and August 9, 2004.  *See* Sanofi_00355202; Sanofi_00354861; Sanofi_04817146.  After an extensive series of communications between FDA and Sanofi, FDA sent its comments on the proposed labeling to Sanofi on August 11, 2004.  Victoria Rpt. 54 (Ex. D); Sanofi_00548479.  In those comments, the FDA reviewer *deleted* Sanofi's proposal to add information about "Other persistent reactions" and removed that section,

including the reports of ongoing alopecia.  Sanofi_00548479, at p. 34.  No reason was provided.

*See id.*  FDA approved the supplemental NDA on August 18, 2004 *without* the "Other persistent

reactions" language Sanofi repeatedly proposed.  Arrowsmith Rpt. ¶ 70 (Ex. C); Sanofi_00548479,

at p. 34; Sanofi_05506899, at 05506927.

    **3.**    **Sanofi's 2009 submission of the GEICAM study.**  On November 30, 2009, Sanofi

submitted to the FDA its Proposed Package Insert for the GEICAM 9805 Indication.

Sanofi_00215728; Sanofi_00384722.  Enclosed with that submission were the results of GEICAM

9805.  Sanofi_04800854 (full study).[3]  Although ultimately withdrawn, Sanofi also proposed a

reference to alopecia in the "Other persistent reactions" section for the proposed indication.

Sanofi_00384722, at 00384747.

    **4.**    **The 2010 FDA deletion of "hair generally grows back" from the Taxotere**

**labeling and addition of "hair loss" as an Adverse Reaction.**  In May 2010, FDA proposed

class-wide changes to patient labeling in the taxane therapeutic category.  Consistent with FDA

proposals for other drugs in this category, FDA proposed significant revisions to the Taxotere

patient labeling, including:

- Starting the Patient Counseling Information section with advice to the physician to "[e]xplain to patients that side effects such as nausea, vomiting, diarrhea, constipation, fatigue, excessive tearing, infusion site reactions, and ***hair loss*** are associated with docetaxel administration."

- FDA rewrote the patient labeling section and deleted the statement that "***hair***

---

[3] This Court's summary judgment decision focused on the GEICAM supplement in 2009, but Sanofi did not argue that its submission of this data to FDA constituted the full analyses and evaluation of the issue in dispute.  Sanofi's submission of this data, including data on alopecia persisting into the follow-up period, simply constitutes one additional exchange between FDA and Sanofi on the "evidence" to which Ms. Earnest points in making her general causation and failure-to-warn case.  *See, e.g.*, Mem. in Supp. of Sanofi's Mot. to Exclude Expert Test. of Dr. David Madigan 9-12 (Rec. Doc. 6144); Reply Mem. in Supp. of Mot. to Exclude Expert Test. of Dr. David Kessler 4-5 (Rec. Doc. 7616).  The record reflects that FDA was fully apprised of the GEICAM study results, including the reports of ongoing alopecia.

> *generally grows back*," and proposed a single bullet point listing **hair loss** as one of the most common side effects and added: "Tell your doctor if you have any side effect that bothers you or does not go away."

Sanofi_00169041, at 00169043, 00169102-08 (emphases added); *see also* Victoria Rpt. 63-64 (Ex. D). On May 13, 2010, FDA approved these labeling changes. Sanofi_00793355; *see also* Trial Tr. (Sept. 17, 2019) 306:17-310:25, 319:15-323:4 (admitting into evidence and discussing Plaintiff's Exhibit 396, the May 2010 Taxotere label).

     **5.**     **Sanofi's 2011 submission of Clinical Overview on persistent alopecia to FDA and foreign labeling changes.** From 2010 to 2011, Sanofi made two submissions to FDA. On September 24, 2010, Sanofi submitted an updated clinical study report for TAX316 containing 10-year follow-up data to fulfill Sanofi's post-marketing commitment to FDA. Sanofi_01288423-33; Sanofi_02649521 (full study). That study reflected that 4.2% of the TAC-treated patients reported alopecia that remained ongoing in the follow-up period. Sanofi_02649521, at p. 37. Sanofi did not propose a labeling revision based on the 10-year follow-up data because it was statistically consistent with the interim data submitted from the 2004 TAX316 clinical study. Victoria Rpt. 55 (Ex. D); *see* Sanofi_00724262, at 00724266, 00724332.

     On January 27, 2011, Sanofi submitted to FDA the Periodic Safety Update Report ("PSUR") for docetaxel. Sanofi_00197757; Sanofi_00201968. Sanofi identified persistent alopecia in the Executive Summary as a specific safety topic under review. Sanofi_00197757, at 00197759 ("Cumulative reviews were performed on . . . persistent alopecia[.]"). Sanofi identified a request by a French regulatory authority for an analysis of the Sanofi safety database and a literature search for reports of persistent alopecia associated with Taxotere. Sanofi_00197757, at 00197839 ("[T]he French Health Products Safety Agency (AFSSAPS) has analyzed National Pharmacovigilance database and found cases of irreversible alopecia following breast cancer

chemotherapy with docetaxel[.]").  The resulting "Clinical Overview Docetaxel – Persistent Alopecia" was included in the PSUR to FDA; it included a comprehensive clinical analysis (Sanofi_00197757, at 00201045-90), an appendix including all 142 adverse reaction reports Sanofi received and analyzed (Sanofi_00197757, at 00201091-1450), and an appendix that  attached full copies of the relevant scientific literature (Sanofi_00197757, at 00201451-1489).  This analysis of persistent alopecia (cases of alopecia persisting for 12 months or more after completion of chemotherapy) was comprehensive of the Sanofi global pharmacovigilance adverse event database and was augmented by a cumulative literature search.  *See id.*; Victoria Rpt. 60 (Ex. D).

As part of these FDA submissions, Sanofi evaluated the resulting 142 reports of persistent alopecia in its pharmacovigilance database.  Sanofi concluded these reports did not constitute evidence of a causal relationship between permanent alopecia and Taxotere because the data was confounded by:

- Co-administration of multiple anticancer agents known to cause alopecia,
- Multiple co-morbidities associated with the onset of alopecia,
- The time lag from the last dose of Taxotere and the onset of alopecia was occasionally prolonged, and
- The onset of alopecia occasionally pre-dated the administration of Taxotere.

Victoria Rpt. 61 (Ex. D); Sanofi_00201057, at 00201063-88.  Sanofi concluded, "alopecia occurs very commonly [with Taxotere], though its persistence cannot be predicted and the available evidence does not show that irreversible alopecia is caused by docetaxel alone." Sanofi_00197757, at 00201968.

**6.      Repeated FDA approvals of Taxotere's labeling from 2011 to 2014.[4]** On at least

---

[4] Although the Court has precluded presentation to the jury of evidence that post-dates Ms. Earnest's treatment, the Court is in a position "to evaluate the nature and scope of an agency's determination," *Albrecht*, 139 S. Ct. at 1680, which includes: evidence of the FDA's formal decisions, the cumulative information presented to FDA, and FDA's regulatory decisions following Ms. Earnest's treatment.  The submission of this evidence to the Court does not implicate

six occasions over the next several years, FDA formally approved Taxotere labeling changes, each time preserving the alopecia labeling information as is.  This included the following label approvals:

- **September 7, 2011:** FDA formally approved Taxotere labeling changes to the Highlights of Prescribing Information, Dosage and Administration; and Full Prescribing Information, Dosage and Administration, and Preparation and Administration sections of the Taxotere label for Taxotere's One-vial formulation, and FDA preserved the alopecia labeling language as is.  *See* Sanofi_00168503, at 00168504, 00168528-29.  On September 23, 2011, FDA responded to the TAX316 clinical study submission, concluding that Sanofi's post marketing commitment was fulfilled.  Sanofi_00837658, at p. 1. FDA did not request any change to the Taxotere labeling based on the information provided.  *See id*.

- **December 15, 2011:** Formal FDA approval of Taxotere labeling changes related to the Highlights: Recent Major Changes; Table of Contents: 5.7 Cutaneous Reactions, 6.1 Clinical Trial Experience, 14.1 Locally Advanced or Metastatic Breast Cancer, 14.4. Hormone Refractory Prostate Cancer, and Full Prescribing Information sections of the Taxotere labeling, and preserved the alopecia labeling language as is.  *See* Sanofi_03066744-46.

- **April 13, 2012:** Formal FDA approval of Taxotere labeling changes related to the addition of a 160 mg/8 mL presentation, extension of infusion solution hold time and storage conditions, and change in the residual solvents specification and analytical procedure for the excipient, polysorbate 80.  *See* Sanofi_00612476, at p. 1.

- **June 26, 2013:** Formal FDA approval of Taxotere labeling changes related to Highlights of Prescribing Information and Respiratory Events in the Adverse Reactions section of the Full Prescribing Information.  *See* Sanofi_00612347, at 00612347-48.

- **December 13, 2013:** Formal FDA approval of Taxotere labeling changes related to the Warnings and Precautions and Adverse Event Sections of the Prescribing Information and the Patient Information.  *See* Sanofi_00261420, at 00261420-21.

- **November 14, 2014:** Formal FDA approval of Taxotere labeling changes related to Alcohol Content in the Warnings and Precautions section.  *See* Sanofi_00261952, at 00261952-53.

---

the Court's previous *in limine* rulings about the temporal scope of evidence at trial.  The Court's *in limine* ruling barred introduction of the 2015 label under Federal Rule of Evidence 408, which prevents use of subsequent remedial measures to establish liability.  That rule has no bearing on use of subsequent regulatory history to establish impossibility preemption.  *See* Fed. R. Evid. 408.

7.      **FDA finds lack of causal evidence in 2015 and concludes that only a "simple"**
**statement that "cases of permanent alopecia have been reported" is appropriate.**  In March
2015, FDA requested "a summary of cases of permanent partial or total alopecia associated with
docetaxel use."  Sanofi_01574962, at 01574965; Arrowsmith Rpt. ¶ 76 (Ex. C).  On April 10,
2015, Sanofi submitted the requested response, which included Sanofi's search of its global
pharmacovigilance database for reports of long-standing alopecia (*e.g.*, permanent, persistent,
irreversible, chronic) associated with Taxotere use, searching as far back as the introduction of
Taxotere to the market in 1996.  Sanofi_01574962-63; Victoria Rpt. 68 (Ex. D).

Following FDA's review, FDA requested that Sanofi "provide any additional information
regarding permanent or irreversible alopecia," and "[a]mend the package insert in Section 6.2
(Postmarketing Experience) (and patient information, if appropriate) to add information on
permanent or irreversible alopecia."  Sanofi_00805353.

On November 24, 2015, Sanofi responded to provide an updated clinical overview of
docetaxel and permanent alopecia and to update the Adverse Reactions section of the physician
insert and the patient labeling insert.  Sanofi_03333249.  Sanofi proposed that the label add the
following statements:

- "Cases of permanent alopecia have been reported," to the Post-Marketing
  Experience section of the Adverse Reactions section of the physician insert;

- "[C]ases of permanent hair loss have been reported," to the Patient Counseling
  Information for Physicians section of the label; and

- Listing of hair loss in the patient labeling: "In most cases normal hair growth should
  return.  In some cases (frequency not known) permanent hair loss has been
  observed."

Victoria Rpt. 69-70 (Ex. D).  FDA concurred with Sanofi that "it's impossible to determine
whether the permanence of alopecia was due to docetaxel."  FDA Correspondence dated Dec. 4,
2015, at 2 (Ex. B).  The FDA reviewer commented, "I think the Sponsor's simple statement that

permanent cases have been reported is all that can reliably be said given the tremendous limitations of the available data." *Id.*; *see also* Victoria Rpt. 72 (Ex. D). On December 11, 2015, FDA approved this revised labeling for Taxotere with permanent alopecia labeled as an Adverse Reaction. Sanofi_00836220; *see also* Victoria Rpt. 71 (Ex. D). There is not a causality statement in the approved label. The "post-marketing experiences" section of the Taxotere label was revised to include the following language: "[c]ases of permanent alopecia have been reported." Sanofi_00836220, at 00836254. This change had no impact on the risk-benefit profile of Taxotere. Nor did FDA advise doctors to change their prescribing practices or avoid using the drug in certain classes of patients.[5]

## ARGUMENT

### I.   Ms. Earnest's Failure-to-Warn Claim Is Preempted by FDA's Formal Taxotere Labeling Decisions

#### A.   Preemption Standard Under *Albrecht*

Federal law preempts state-law failure-to-warn claims under the Supremacy Clause if "it is impossible for a private party to comply with both state and federal requirements." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 618 (2011) (internal quotation marks omitted). Impossibility preemption is a demanding defense. *Wyeth v. Levine*, 555 U.S. 555, 573 (2009). In the pharmaceutical context, the manufacturer bears responsibility for the product's label. *Id.* at 570-71.

Failure-to-warn claims may not be premised on the adequacy of the label as approved by FDA. *See* 21 U.S.C. § 355(b)(1)(F); 21 C.F.R. § 314.50(c)(2)(i) (setting out FDA labeling requirements). Such state law claims are preempted. *Utts v. Bristol-Myers Squibb Co.*, 226 F. Supp. 3d 166, 184 (S.D.N.Y. 2016). FDA has explained that: "The centerpiece of risk management

---

[5] Sanofi reserves its right in other pending cases to introduce evidence that post-dates 2015.

for prescription drugs generally is the labeling which reflects thorough FDA review of the pertinent scientific evidence and communicates to health care practitioners the agency's formal, authoritative conclusions regarding the conditions under which the product can be used safely and effectively." *Requirements of Content and Format of Labeling for Human Prescription Drug and Biological Products*, 71 Fed. Reg. 3922, 3934 (Jan. 24, 2006).

After FDA approves the relevant label, the manufacturer continues to bear responsibility for the label. *Levine*, 555 U.S. at 570-71. Manufacturers effectuate their duty by, among other things, performing pharmacovigilance (monitoring adverse events), reporting adverse events to FDA, and communicating with FDA about subsequent label changes. If a manufacturer could comply with its obligations under state law by making a unilateral change to the relevant label, a state-law claim is still preempted if there is "clear evidence that FDA would not have approved [the] change" that the plaintiff alleges is required. *Id.* at 571. Put differently, a plaintiff's failure-to-warn claim is federally preempted where the FDA was "fully informed . . . of the justifications for the warning" that plaintiffs propose, and rejected, or clearly would reject, the plaintiff's proposed label. *Albrecht*, 139 S. Ct. at 1678.

The Supreme Court in *Albrecht* held that judges must make a legal determination about whether clear evidence demonstrates that FDA would not have approved the label change the plaintiff proposes. *Id.* at 1679-80. In conjunction with that legal determination, the trial court is empowered to determine the "meaning and scope" of FDA's decisions based on "what information the FDA had before it" and may resolve disputes over "whether the drug manufacturer submitted all material information to the FDA." *Id.* at 1680. Such "factual questions [are] subsumed within an already tightly circumscribed legal analysis." *Id.* The Court may consider the regulatory record evidence on the papers or in a *Markman*-type evidentiary hearing, which may be conducted during

13

or after trial.  *See id.* (citing *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388 (1996));

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837-38 (2015).[6]

The FDA can express its disapproval of a label warning through a variety of official agency

actions.  Under *Albrecht*, the Court examines the regulatory record to determine whether the

agency disapproved of the plaintiff's proposed label change.  139 S. Ct. at 1679.  Agency action

disapproving a label change may entail any action "taken pursuant to the FDA's congressionally

delegated authority," which includes a broad range of agency actions including label changes

requested by the agency.  *Id.*

> **B.**    **The Regulatory Record Contains Clear Evidence That FDA Would Not
> Have Accepted The "Prominent" Warning Advocated by Ms. Earnest**

FDA repeatedly reaffirmed the alopecia language in the Taxotere label between 1996,

when FDA first approved Taxotere, until 2011, when Ms. Earnest was prescribed Taxotere as part

of her chemotherapy regimen.  Indeed, even to the present day, FDA has consistently declined to

include a prominent permanent alopecia warning in the Taxotere label.  In each instance, FDA

acted within its congressionally delegated authority to affirm the alopecia labeling language with

the benefit of all available, material information regarding the risk of permanent alopecia.

Now that Ms. Earnest has presented her failure-to-warn theory at trial, it is appropriate for

this Court to consider the regulatory record, which demonstrates that Sanofi provided

comprehensive and formal analyses of persistent or permanent alopecia to FDA well *before* Ms.

Earnest was prescribed Taxotere.  Yet, FDA's formal agency actions demonstrate clearly that it

---

[6] The Court in *Albrecht* left open the question of how, procedurally, a movant requests dismissal of a preempted claim. Here, Sanofi requests judgment as a matter of law under Rule 50(a) because preemption is a legal question that precludes any finding of liability on Ms. Earnest's claim. *See, e.g.*, *Byrd v. Janssen Pharm., Inc.*, 333 F. Supp. 3d 111, 114 (N.D.N.Y. 2018) (noting that defendant moved for judgment as a matter of law on preemption grounds). Accordingly, judgment should be entered in Sanofi's favor under Rule 54(c).

"would not approve changing the drug's label to include th[e] warning" and that FDA "made an affirmative decision to preserve" the relevant alopecia warning as it was. *Albrecht*, 139 S. Ct. at 1678 (citing *Wyeth*, 555 U.S. at 578).

The longstanding Taxotere label, first approved in 1996, referenced alopecia and included a statement in the patient information section that informed patients of the risk of hair loss and advised that "hair ***generally*** grows back." Arrowsmith Rpt. ¶¶ 65, 72 (Ex. C); *see* Sanofi_01380011, at 01380048 (emphasis added). The FDA maintained those alopecia warnings on the Taxotere label until 2010, when FDA modified the alopecia language on a class-wide basis to remove the phrase "hair generally grows back." Arrowsmith Rpt. ¶¶ 65, 72-75 (Ex. C); Sanofi_00169041, at 00169043, 00169108; Sanofi_00793355.

In the meantime, FDA rebuffed Sanofi's proposals to make the alopecia labeling for Taxotere stronger. For example, on March 17, 2004, FDA *deleted* alopecia from the list of "persistent reactions" after Sanofi formally proposed to FDA that it add information regarding alopecia, among other things, to the Adverse Reactions section of the label. Arrowsmith Rpt. ¶ 69 (Ex. C); Sanofi_05525092, at p. 27. This decision was made only after extensive communications between FDA and Sanofi about this section of the label. Arrowsmith Rpt. ¶ 70 (Ex. C); *see* Sanofi_00548479, at p. 34.

From 2010 to 2011, Sanofi made two submissions to FDA that provided comprehensive analyses of the risk of permanent alopecia, including submission of the TAX316 clinical study's 10-year follow-up data that showed 4.2% of the TAC-treated patients reported alopecia as ongoing in the follow-up period. Victoria Rpt. 55-56 (Ex. D); Sanofi_02649521, at p. 37. Sanofi did not propose a labeling revision based on the 10-year follow-up data because it was consistent with the interim data submitted from the TAX316 clinical study, and FDA had already considered that

15

information and rejected inclusion of alopecia in the persistent reactions section.  Victoria Rpt. 55 (Ex. D).

In 2011, Sanofi also submitted its Clinical Overview Docetaxel – Persistent Alopecia to FDA, which was a comprehensive analysis of the Sanofi global pharmacovigilance adverse event database and augmented by a cumulative literature search, which showed 142 reports of persistent alopecia.  *Id.* at 60 (Ex. D).  Sanofi evaluated those 142 reports.  Sanofi_00197757, at 00201045-489.  The report submitted to FDA by Sanofi concluded, "alopecia occurs very commonly (with Taxotere), though its persistence cannot be predicted and the available evidence does not show that irreversible alopecia is caused by docetaxel alone." *Id.*  Nonetheless, between 2011 and 2015, FDA repeatedly approved changes to the Taxotere label and each time, reaffirmed the alopecia warning.

Even as late as 2015—well after Ms. Earnest's treatment—FDA considered Sanofi's comprehensive submissions on the risk of permanent alopecia and agreed with Sanofi that there was a lack of evidence that Taxotere caused permanent alopecia.  FDA thus accepted Sanofi's proposed label change that added to the Taxotere label only the simple statement that "cases of permanent alopecia have been reported."  Sanofi_00836220, at 00836254.

In reaching each of these determinations, FDA acted within its congressionally delegated authority to reject the "clear[] and prominent[]" permanent alopecia warning that plaintiff now advances.  Trial Tr. (Sept. 17, 2019) 387:1-2 (Dr. Kessler's testimony).  In so doing, FDA had before it all the available, material information regarding the permanent alopecia risks, and indeed, expressly and carefully considered the specific risks and question at issue.  Moreover, the regulatory record shows that Sanofi did not just "inundate" FDA with evidence, rather Sanofi and FDA each analyzed the available evidence of permanent alopecia.  After conducting its own

analysis, FDA found that the cumulative evidence—through even 2015—did not establish a causal connection between Taxotere and permanent alopecia and that such evidence did not warrant a more prominent permanent alopecia warning.  Thus, FDA approved only the simple statement of cases reporting permanent alopecia.

Dr. Kessler's warning opinion went well beyond the label language FDA ultimately determined was appropriate in 2015, after reviewing all available data on permanent or persistent alopecia.  This is precisely the circumstances where impossibility preemption applies.  *See Albrecht*, 139 S. Ct. at 1679 (noting that agencies may demonstrate their disapproval of a proposed label through a range of formal agency action, including "by formally rejecting a warning label that would have been adequate under state law" (citing 21 C.F.R. §§ 314.110(a), 314.125(b)(6))).  FDA repeatedly attended to the issue of permanent alopecia, including at Sanofi's urging, and rejected the warning Ms. Earnest now seeks both before and well after her treatment.  FDA requested and approved specific language about alopecia in the Post-Marketing Experience section of the label after a thorough analysis of that data.  Where, as here, FDA itself approved label language that is not even arguably "clear[] and prominent[]," impossibility preemption is triggered.

### C.     The CBE Process Does Not Salvage Ms. Earnest's Claim

Under these circumstances, the CBE process was not an appropriate or available vehicle for Sanofi unilaterally to add a "prominent" alopecia warning.  To avoid preemption, a plaintiff must allege a plausible route for a pharmaceutical manufacturer to comply with the CBE regulation set forth in 21 C.F.R. § 314.70(c)(6)(iii).  *See id.* § 314.70(c)(3).  Courts have implemented that requirement because a unilateral labeling change may be made only pursuant to the CBE procedure.  The CBE regulations permit a manufacturer to make a label change in response to

"newly acquired information" that provides "evidence of a causal association" sufficient for inclusion on the label. *Id.* § 314.70(c)(6)(iii)(A).

FDA regulations define reasonable evidence of a causal association as "when evidence exists on the basis of which experts qualified by scientific training and experience can reasonably conclude that the hazard is associated with the use of the drug." *Seufert v. Merck Sharp & Dohme Corp.*, 187 F. Supp. 3d 1163, 1175 (S.D. Cal. 2016) (quoting 44 Fed. Reg. 37434, 374634 (June 26, 1979)). While this standard "fall[s] short of requiring definitive proof of a casual association, *see* 21 C.F.R. § 201.57(c)(6)(i), [it] demand[s] more than an indeterminate or inconclusive relationship. *Id.*; *see also Mason v. SmithKline Beecham Corp.*, 596 F.3d 387, 392 (7th Cir. 2010) ("It is technically a violation of federal law to propose a CBE that is not based on reasonable evidence." (citing 18 U.S.C. § 1001)).

There are two stages to analyzing preemption in the CBE context. First, the plaintiff must show that there existed "newly acquired information" such that the defendants could unilaterally change the label pursuant to the CBE regulation without prior FDA approval.[7] *Utts v. Bristol-Myers Squibb Co.*, 251 F. Supp. 3d 644, 661 (S.D.N.Y. 2017). "Newly acquired information" is (i) "new," (ii) has not been previously submitted to the FDA, and (iii) reveals risks of a different type or greater severity or frequency than previously included in submissions to FDA. 21 C.F.R. § 314.3(b). Second, even if a plaintiff can prove there was such new, previously undisclosed,

---

[7] Congress amended the CBE regulation in 2008 to clarify the application of FDA's long-standing rule that the CBE process could only be used to strengthen warnings if the applicant became aware of newly acquired information. *See New Drug and Antibiotic Regulations*, 47 Fed. Reg. 46,622 (proposed Oct. 19, 1982) (explaining the pre-2008 CBE process); *see also* U.S. Amicus Br. Supp. Pet'r 9, 21, *Wyeth v. Levine*, No. 06-1249, 2008 WL 2308908 (U.S. June 2, 2008) ("If manufacturers were free to make unilateral changes to labeling the day after FDA's approval, based on information that was previously available to FDA, the approval process would be undermined and the agency's careful balancing of risks and benefits as reflected in the labeling would be thwarted.").

greater risk information, a manufacturer may still establish an impossibility defense through "clear evidence that the FDA would not have approved a change" to the label.  *Utts*, 251 F. Supp. 3d at 661 (internal quotation marks omitted).

In a failure-to-warn claim, it is the *plaintiff*'s obligation to plead facts that plausibly point to newly acquired information that warranted the labeling change.  *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 779 F.3d 34, 41 (1st Cir. 2015) (affirming dismissal on preemption grounds); *Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699, 708 (2d Cir. 2019); *Dolin v. GlaxoSmithKline LLC*, 901 F.3d 803, 812 (7th Cir. 2018); *Klein v. Bayer HealthCare Pharm. Inc.*, No. 18-01424, 2019 WL 3945652, at *4-5 (D. Nev. Aug. 21, 2019); *McGrath v. Bayer HealthCare Pharm. Inc.*, No. 18-2134, 2019 WL 2582530, at *3-4 (E.D.N.Y. June 24, 2019).  Although these cases were decided at the pleadings stage, their principles apply just as strongly where, as here, the factual record has already been developed.

Ms. Earnest has pointed to no newly acquired information that would have permitted Sanofi to utilize the CBE process to make an alopecia label change.  The only evidence she cites is a re-analysis performed by Dr. David Madigan for the purposes of this litigation.  This analysis did not exist in 2009.  *Levine*, 555 U.S. at 569.  And, as asserted in Sanofi's *Daubert* motion, this analysis was based on unreliable methods.  Dr. Madigan's post-hoc analysis is insufficient to establish that Sanofi could have utilized the CBE process.  Rather, the standard is whether Sanofi submitted the available information, data, and analyses material to the FDA because pharmaceutical manufacturers cannot possibly be required to re-assess and pool data in ways that it views as scientifically unreliable, simply to forward it on to the FDA.

For example, the TAX316 10-year results submitted to FDA in 2010 showed reported rates of ongoing alopecia that were consistent with the TAX316 55-month data submitted to FDA in

2004.  After receiving the TAX316 55-month data in 2004 and Sanofi's proposed label changes, FDA *deleted* Sanofi's request to list alopecia as a "persistent reaction" and rejected presentation of the TAX316 55-month case reports of ongoing alopecia.  Because the TAX316 10-year data showed a rate of ongoing alopecia that was consistent with the information Sanofi already submitted in 2004, it was not "newly acquired information" that could permit Sanofi to utilize the CBE process; nor would it be reasonable to believe that FDA would reverse its prior decision without new information about the relevant risk.  *See* 21 C.F.R. § 314.3(b) (defining "newly acquired information" to be that which reveals risks of a different type or greater severity or frequency than previously included in submissions to FDA).  FDA's repeated reaffirmation of the existing alopecia warning further confirms this point.  Thus, it was clear from FDA's official labeling determinations that Sanofi was not permitted to make any unilateral or independent labeling change through the CBE process as of 2011.  *See Albrecht*, 139 S. Ct. at 1678; 21 C.F.R. § 314.70(c)(6)(iii)(A).

Similarly, FDA found in 2015 that the accumulated data did not establish a causal connection between Taxotere and permanent alopecia.  That finding forecloses Ms. Earnest's argument that Sanofi could have changed the label.  To the contrary, it would violate FDA regulations to change the label based on case reports that fail to show reasonable evidence of a causal association.  The evidence here, including the administrative record submitted with this brief, distinguishes this case from *Albrecht*, where "Merck conceded that the FDA's CBE regulation would have permitted Merck to try to change the label to add a warning before 2010." 139 S. Ct. at 1675.  Unlike *Albrecht*, here, FDA not only rejected Sanofi's proposed inclusion of alopecia among the "persistent" risks of Taxotere, but FDA also unilaterally changed the alopecia label in 2010 on a taxane-wide basis, and decided repeatedly to keep the labeling

language about alopecia in place as is after receipt of Sanofi's 2011 Clinical Overview.  These decisions were made in close and extensive communication with Sanofi on the precise issues in question.  Such evidence clearly demonstrates that Sanofi was foreclosed from changing its label to provide the "prominent" permanent alopecia warning sought by Ms. Earnest.

> **D.    A Hearing on the Merits of Sanofi's Claim Is Appropriate Under *Markman* If Ms. Earnest Claims That Factual Disputes Exist About What Evidence Sanofi Submitted to the FDA**

Although preemption is a question of law for this Court, the Supreme Court in *Albrecht* anticipated that the Court may need to resolve narrow predicate factual questions to determine the scope and effect of the federal agency decisions, including determinations about what information was submitted to FDA and before the agency when it made the relevant labeling determinations. Those factual decisions may be made on the papers; however, the Court in *Albrecht* noted that a court could also conduct a *Markman*-style hearing to make the relevant factual findings.

Since the Supreme Court decided *Albrecht*, trial courts have not yet had an opportunity to address how preemption hearings should be conducted.  In patent cases, courts schedule *Markman* hearings before, at, or after trial to construe the patent's terms and, when appropriate, validity. *See, e.g.*, *Abbott Labs. v. Diamedix Corp.*, 969 F. Supp. 1064, 1072 (N.D. Ill. 1997) (declining to construe claims before trial and stating that "[a]t trial, the court will have more information upon which to make these legal determinations"); *Lucas Aerospace, Ltd. v. Unison Indus., L.P.*, 890 F. Supp. 329, 331 (D. Del. 1995).  The Federal Circuit is in accord with the Fifth Circuit about the need for a developed record: "like juries, judges may err in claim construction."  *Metaullics Sys. Co., L.P. v. Cooper*, 100 F.3d 938, 939 (Fed. Cir. 1996), *abrogated on other grounds by Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448 (Fed. Cir. 1998).  The remedy to this potential for error is more, rather than less evidence.  "[W]e are likely to construe claims better when considering, rather than wanting, a developed record."  *Id.*  This Court should accordingly consider the

administrative record evidence submitted with this brief and, if necessary, hold a hearing to resolve any outstanding factual disputes about which information FDA had before it at the time of such decisions.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Sanofi judgment as a matter of law on its preemption defense.

Date:  September 25, 2019

Respectfully submitted,

*/s/ Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE URQUHART & MOORE LLC**
400 Poydras Street, Suite 2700
New Orleans, LA  70130
Telephone: 504-310-2100
Facsimile: 504-310-2120
dmoore@irwinllc.com

Jon Strongman
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
Facsimile: 816-421-5547
jstrongman@shb.com

Hildy Sastre
**SHOOK, HARDY & BACON L.L.P.**
201 S. Biscayne Blvd., Suite 3200
Miami, Florida 33131
Telephone: 305-358-5171
Facsimile: 305-358-7470
hsastre@shb.com

Ilana H. Eisenstein
**DLA Piper LLP (US)**
1650 Market St., Suite 5000
Philadelphia, PA 19103
Telephone: 215-656-3351
Facsimile: 215-606-3351
Ilana.Eisenstein@dlapiper.com

*Counsel for sanofi-aventis U.S. LLC and Sanofi
US Services Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2019, I electronically filed the foregoing with the

Clerk of the Court using the ECF system which sent notification of such filing to all counsel of

record.

*/s/ Douglas J. Moore*