# EXHIBIT C

**EXPERT REPORT OF JANET B. ARROWSMITH, M.D., F.A.C.P, F.A.C.E.**
**IN RE TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION**
**SUBMITTED DECEMBER 31, 2018**

## I.      BACKGROUND

1.      I earned my undergraduate degree in zoology from Duke University in 1972 and my medical degree in 1979 from Tulane University School of Medicine.

2.      I am board-certified in Internal Medicine and licensed to practice medicine in the State of New Mexico. I am an epidemiologist, trained through the Epidemic Intelligence Service (EIS) of the U.S. Centers for Disease Control and Prevention (CDC). I am an elected Fellow of the American College of Physicians and an elected Fellow of the American College of Epidemiology.

3.      As part of the CDC training, I was assigned to the postmarket safety surveillance division of the U.S. Food and Drug Administration's (FDA) Center for Drug Evaluation and Research (CDER).  As an EIS officer and later as an FDA medical epidemiologist and medical officer, I received training and experience in the application of the laws and regulations that govern the pre-market development, review, approval, labeling and postmarket safety review for pharmaceutical products intended for the U.S. market. I became very familiar with FDA's practices in the review, approval, and labeling of drugs intended for the U.S. market.  My training and experience through the CDC program and at FDA provided me with the skills and knowledge necessary to practice pharmacoepidemiology, a subspecialty of the science of epidemiology having to do with assessing the safety of marketed pharmaceutical products.

4.      The CDC training program encompassed two years from July 1, 1984 through June 30, 1986, during which I received training in food, drug, biological product and medical

device laws and regulations.  Following completion of my training program, I was hired as a

medical epidemiologist in the Office of Epidemiology and Biostatistics at CDER.  The work I

did at CDER from 1984-1988 resulted in numerous labeling changes for pharmaceutical products

available on the U.S. market.  My additional experience at FDA included serving from 1988-

1990 as Deputy Director of the program known as the Office of Special Health Issues within the

Office of the Commissioner of FDA.  This Office was previously known as the AIDS

Coordination Staff and then Office of AIDS and Special Health Issues.  From 1991-1993, I also

served as a Medical Review Officer in the Division of Anti-Viral Drug Products within CDER.

At CDER, I reviewed Investigational New Drug Exemption Requests and a crucial portion of a

New Drug Application as it related to safety and labeling for didanosine, the second antiviral

drug approved in the U.S. for use in the treatment of HIV and AIDS.

     5.     From 1993-1995, I served as the Acting Director of the Office of Surveillance and

Biometrics in the FDA Center for Devices and Radiological Health (CDRH).  In that capacity,

my staff and I were responsible for monitoring the safety and potential problems associated with

all medical devices marketed within the U.S. as well as providing statistical support for the

premarket medical device review divisions within the Office of Device Evaluation in CDRH. I

was responsible for decisions affecting the continued market availability of medical devices in

the U.S.

     6.     Following my tenure at CDRH, I chose to move from the Acting Director position

in CDRH to the Center for Biologic Evaluation and Research (CBER), where I served as a

Medical Review Officer in the Division of Blood and Blood Products from 1995-1996. I

remained in that position until moving to New Mexico, where I was assigned as a primary care

provider at the Mescalero Apache Indian Health Service Hospital. I served two years in that

position before accepting a position in 1998 as an internal medical physician with full hospital

and ICU privileges at the Lincoln County Medical Center in Ruidoso, New Mexico, where I

remained in full-time adult medical practice until late 1999.

   7.  I am a peer reviewer for the *Annals of Internal Medicine* and the *Annals of*

*Epidemiology*. I also have been an abstract reviewer for the American College of Epidemiology,

the International Society of Pharmacoepidemiology, and served on the Editorial Board for the

*Journal of Pharmacoepidemiology*. I have numerous publications in the peer-reviewed literature,

as well as book chapters addressing postmarket safety surveillance of medical products and

outlining the legal and regulatory history of the U.S. Food and Drug Administration. I served as

coauthor on a chapter entitled "A View From a Regulatory Agency" for the first two editions of

the textbook "Pharmacoepidemiology"; I was sole author and then senior author for a textbook

chapter addressing postmarket surveillance of medical products in the U.S. in "Principles and

Practices of Public Health Surveillance."  My peer-reviewed publications generally address

postmarket safety surveillance and provide the results of epidemiologic studies related to

infectious diseases and potential safety issues associated with pharmaceutical products.  Citations

for these publications, and other information regarding my experience and qualifications, are

listed in my curriculum vitae provided as Attachment A. I have lectured regularly for various

continuing medical education (CME) courses around the country.

   8.  While serving at FDA, CDC and the Indian Health Service, I was a

Commissioned Officer in the U.S. Public Health Service (USPHS), with service dates from

July 1984 through February 1998, attaining the Navy rank of Captain (0-6). I received an

honorable discharge in 1998.  From 1986-1996, I also was a clinical instructor in the Department

of Medicine at Georgetown University Medical Center in Washington, DC.  Since 1999, I have

served as a consultant and independent contractor.  Among other entities and organizations, I have consulted with the National Institute on Drug Abuse (NIDA), Division of Research and Development, National Institutes of Health (NIH) and the National Institute of Allergy and Infectious Diseases, NIH.  My work with NIDA involved the review of investigational new drug proposals and providing recommendations for candidate products for further development by NIDA in support of its mission to reduce drug abuse in the U.S. I also served as a peer-reviewer for contract proposals submitted to NIAID and the Division of AIDS for AIDS-related therapeutic product development and for companies providing international clinical trial support in developing interventions to combat organisms with the potential for use in bioterrorism.

9.     My opinions are based upon my extensive training and experience as a physician, epidemiologist and my tenure at FDA, as reflected in my curriculum vitae, which is attached as Exhibit A.

10.     My opinions also are based on the documents I have reviewed and my independent research. I have reviewed a substantial number of documents concerning advertising and promotional materials.  Some of the documents I reviewed are referenced in this report. I cannot cite all the materials I have ever reviewed which may support my opinions, as these would include documents, regulations, medical literature and texts that I reviewed over the course of my career and prior to my being retained by Sanofi. I may also rely on additional documents to respond to the testimony of other experts or witnesses, and supplement the opinions set forth in this report.  A bibliography of some of the documents I have considered is included in Exhibit B.  My testimony from the last four years is provided in Exhibit C.

11.     My hourly fee for document review, testimony and other activities in this matter is $750.00 per hour. I have testified on behalf of both defendants and plaintiffs in products

liability litigation.  I hold all opinions expressed in this report to a reasonable degree of expert

certainty or probability.

## II.     SUMMARY OF FINDINGS AND OPINIONS

a.   *Taxotere was appropriately developed and evaluated by Sanofi's predecessor manufacturer. The necessary and complete data set was provided to FDA.*

b.   *FDA thoroughly reviewed the preclinical and clinical Taxotere data throughout the development process and twice requested outside consultation on the Taxotere NDA from the Oncology Drugs Advisory Committee.*

c.   *The initial and subsequent approvals and the approved labeling for Taxotere were appropriate and based on good science and good regulatory principles.*

d.   *Information on alopecia has been included in Taxotere labeling beginning with the initial approval through the present. Inclusion of "alopecia" in the Adverse Reactions section was and is appropriate as alopecia does not meet the regulatory definition of a serious adverse reaction as provided in 21 C.F.R. 312.32 and in 21 C.F.R. 314.80.*

e.   *From initial approval up to 2010, the Taxotere Patient Package Insert, which undergoes review and approval by FDA, indicated that hair loss associated with the use of Taxotere "generally grows back".  This statement was removed by FDA during a 2010 labeling review.  The exact reason for FDA's edits is unclear, although FDA made similar changes to the Patient Package Insert for other taxanes in the same time period.*

f.   *In 2004, based on clinical trials data, Sanofi included a statement in draft labeling that proposed listing what it termed "Other persistent reactions", which included alopecia among the several listed with Taxotere chemotherapy regimens. FDA removed this section from the labeling without further comment. In my opinion, Sanofi's inclusion of this statement was appropriate; FDA's reasoning for its removal is unclear and was within its regulatory authority for control of medical product labeling.*

g.   *The 2011 Sanofi document "Clinical Overview Docetaxel – Persistent Alopecia" was methodologically and scientifically appropriate in responding to the request by the French regulatory agency for a review of reports of persistent alopecia.*

h.   *Regulatory and labeling decisions may vary from country to country. In my experience, FDA makes independent regulatory decisions and is not bound to follow decisions made by other, non-U.S. regulatory agencies. For instance, in 2011, both the 10-year TAX 316 data and the Sanofi clinical overview of*

*persistent alopecia were submitted to FDA. FDA did not require a labeling
change addressing persistent alopecia based on those data.*

i.   *Plaintiffs' experts' causation opinions are based on case reports and review of
FAERS case report data, the weakest forms of scientific evidence. The currently
available scientific evidence does not support an unequivocal causal role for
Taxotere alone in persistent or permanent alopecia; in my opinion, the data are
too confounded to make such an assertion with any scientific or medical certainty.*

## III.   STATEMENT OF OPINIONS

### FDA'S REGULATION OF PRESCRIPTION DRUGS

12.    FDA is the federal regulatory agency charged with protecting the public health by
assuring that pharmaceutical products, medical devices including devices that use and emit
radiation, biological products, veterinary products, tobacco and tobacco products, and foods and
cosmetics are safe and that the therapeutic products are effective for their intended uses. To
accomplish its public health mission, FDA employs over 10,000 people nationwide. Among
FDA's employees are several thousand scientists and other professionals, as well as support
staff.

13.    There are currently seven Centers within FDA, including the toxicology research
center located in Arkansas. CDER, the pharmaceutical product regulatory center, is the largest
drug regulatory body in the world. Based on the laws and regulations that FDA enforces and
applies, virtually all aspects of the clinical research and development, manufacturing, evaluation,
labeling, distribution, promotion, and postmarket safety surveillance of drugs in the United
States fall under FDA's regulatory authority.

14.    Within CDER, there are several offices and multiple divisions and branches
within those offices. There have been numerous reorganizations of CDER over time with
changes in regulatory and scientific assignments and new organizational designations. The
premarket review offices and divisions within CDER, which are generally organized by

therapeutic classes of drugs, have been reorganized and renamed based on changes in therapeutic

class assignments or regulatory procedures. Within the premarket Office of New Drugs are the

Offices of Drug Evaluation I through IV, the Office of Antimicrobial Products and the Office of

Hematology and Oncology Products.  Additional Offices within CDER include the Office of

Prescription Drug Promotion, the Office of Epidemiology and Biostatistics, the Office of the

Center Director, and the Office of Regulatory Policy, among other scientific and management

divisions responsible for the support of pharmaceutical product regulation in the U.S.

15.     However the regulatory assignments are distributed, and premarket divisions

designated, FDA professionals within review divisions have responsibility for the review and

approval of proposed new drug products as well as the continued review, approval, ongoing

labeling and postmarket safety review for drugs approved for marketing in the U.S. In my

experience, CDER employees are dedicated professionals who are committed to their role in

protecting the public health through thorough and ongoing reviews and monitoring of the safety

and effectiveness of pharmaceutical products on the U.S. market.

**THE DRUG APPROVAL PROCESS**

16.     Investigational New Drug Application: FDA regulations generally require that a

drug manufacturer submit to FDA an Investigational New Drug Application (IND), also known

as an investigational new drug exemption request, prior to use of a new, unapproved drug

product in a human being in the U.S.  The IND or "exemption request" is so called because it is a

request of FDA by the company for exemption from the prohibition against introducing or

delivering for introduction into interstate commerce a pharmaceutical product that is not in

compliance with FDA's drug approval requirements - in other words, a pharmaceutical product

that is an unapproved drug.  When a new IND is submitted to FDA, a team of scientists including

physicians, chemists, pharmacologists, and toxicologists is assigned to review the data submitted

7

in the IND.  The IND must contain, among other things, extensive information on the manufacture of the drug; animal studies of pharmacology and toxicology, which serve to estimate the potential safety of the drug product for humans; an investigator's brochure serving as labeling for the investigational new drug product; and one or more protocols for the initial studies in humans.  The scientific review of the IND by FDA forms the basis for determining whether the drug product is safe enough for testing in humans, based on the data and study protocols included in the IND submission.

17.     If an IND is allowed to proceed, the safety information derived from the initial studies, generally conducted in healthy volunteers, is used to determine if further drug development is appropriate.  Once some level of safety assurance for human subjects is provided from the early clinical trials, the drug product may be studied in more extensive clinical trials to establish effectiveness while data on safety for the intended population continues to accrue.  The IND stage of drug development represents the gateway to further development.  FDA can and sometimes does place a hold on further clinical development at the IND stage when the safety of the product for use in humans is in question.  The foremost consideration for FDA in clinical drug development is safety for the clinical trial participants and then ultimately for the indicated population.

18.     New Drug Application Review: When a sponsor feels that it has collected sufficient information to demonstrate that its new drug product is safe and effective for a particular indication, the company then submits a New Drug Application to FDA.  It is important to understand that FDA scientists are actively involved in the design, review and assessment of clinical trials throughout drug product development and prior to submission of the NDA.  The FDA has described a range of study designs in its regulations that can serve as "adequate and

well-controlled investigations" upon which claims of effectiveness for a new drug or new indication for an approved drug may be based.  These phase III, pivotal trial study designs can provide "substantial evidence" in support of product approval for a specific indication.  As noted in 21 C.F.R. § 314.126 (b)(2)(ii), an acceptable pivotal trial design might include two or more dose comparisons of the investigational product plus either a placebo or an active control arm. An active treatment study design is one in which the test drug is compared with a known effective therapy when the condition treated is such that administration of placebo would be contrary to the interests of the patient.  (21 C.F.R. § 314.126(b)(2)(iv).)  Use of an active control arm in clinical trials is appropriate to avoid negative health consequences for patients if effective drug treatment must be withheld for extended periods of time.

19.     Under FDA regulations, an NDA must contain, among other things: (i) reports of all investigations (pre-clinical and clinical) pertinent to the proposed use; (ii) summaries of the safety and efficacy data; (iii) detailed descriptions of the composition of the drug; (iv) description and identification of the methods and facilities used in the manufacture of the drug; (v) product samples (upon request from FDA); and (vi) proposed labeling.

20.     The NDA is then rigorously reviewed by FDA scientists and regulatory experts, including supervisory scientists, Office and Division Directors and other officials of FDA, to determine whether the information is sufficient to establish that the drug meets FDA's safety and efficacy requirements.  FDA is well acquainted with a drug when the NDA is submitted because it has followed the drug in the prior IND developmental process.  FDA offers significant input on the development process, including comments on and requirements for alterations in clinical trial design.  In general, the same team of scientists and physicians who reviewed and followed development of data during the IND process conducts a careful review of the NDA and prepares

detailed reports on their findings.  FDA also may convene an Advisory Committee to obtain

additional recommendations and opinions on safety and efficacy, particularly when considering

approval for a drug product in a novel therapeutic or chemical class.  After intensive review by

the FDA team and their supervisors, FDA then issues a letter to the sponsor informing them of

the Agency's decision on approval.  Prior to July 2008, the letter would indicate whether the

drug product is approved for marketing, approvable, or not approvable.  If the NDA was

considered approvable, the letter would indicate what additional submissions were required to

permit the product to gain approval for marketing.  Since August 11, 2008, FDA has provided

the sponsor with either an approval letter or, if FDA determines that it will not approve the

application in its current form, a "complete response" letter describing the specific deficiencies

that FDA has identified in the application.  (21 C.F.R. § 314.110.)

      21.     All drugs, including prescription drugs, involve risks to patients who use the

drugs to benefit their health.  When FDA approves an NDA, it means that the scientists and

regulatory experts considering approval have reached a decision that the drug has been shown to

be safe and effective when used as recommended in the approved labeling.  (21 C.F.R.

§§ 314.105, 314.125.)  In other words, approval for marketing means that the FDA has found

that the anticipated benefits of the drug generally outweigh the known risks when used in

accordance with the approved labeling.  Approval for marketing also recognizes the inherent and

practical limitations of studying a drug prior to approval.  In the absence of known, class-related

adverse events likely associated with a new member of the class, long-term safety studies with

adverse events as primary endpoints are not required prior to approval. Such a trial, focused only

on detection of undefined potential adverse events, would not be considered an ethical study

design.  Risk-benefit assessment is an essential part of the drug approval process and involves

judgment on the part of the reviewers.  No drug is completely safe, and no drug is expected to be effective in treating every patient. Similarly, the option of offering no treatment for a clinical condition may confer health risks that must also be recognized and appreciated by patients and physicians or other care providers.

### PRESCRIPTION DRUG LABELING

22.     As required by 21 C.F.R. § 314.50(e)(2)(ii), "Content and Format of an NDA," a drug sponsor must submit draft labeling for its proposed new drug product as part of the NDA submission.  The labeling for a drug is intended to provide the essential information a physician or other prescriber needs to know in order to safely and effectively prescribe the drug for his or her patient.  Information in the product labeling is derived from the NDA and from other information available about the specific drug or similar drug products.  The final product labeling emerges from discussions between the company and the review team at FDA, based generally on the draft labeling submitted by the company with its NDA.  The labeling that is approved with the approval of the drug product is usually the result of extensive discussions between the company and FDA.  However, in all instances, FDA makes the final determination on the content and language of the labeling, as well as the placement of information in the labeling, based on its independent review of the supporting data and in accordance with its regulations.  (21 C.F.R. §§ 314.125(b)(2)-(8).)

23.     General Labeling Requirements:  FDA's labeling requirements for prescription drugs are set out in various regulations including, but not limited to, 21 C.F.R. § 201.56 and 21 C.F.R. § 201.57.  The exact format and sequence of information for prescription drug labeling is described in 21 C.F.R. §§ 201.56 and 201.57, with the older version of the labeling requirements now contained at 21 C.F.R. § 201.80.

11

24.     Prior to the 2006 revisions to sections 201.56 and 201.57, the regulations required the Warnings section of the labeling to include information about "serious adverse reactions and potential safety hazards, limitations in use imposed by them, and steps that should be taken if they occur."  (21 C.F.R. § 201.57(e) (April 1, 2005).)  A serious adverse reaction, as used in section 201.57, has been defined as "[a]ny adverse drug experience occurring at any dose that results in any of the following outcomes: Death, a life-threatening adverse drug experience, inpatient hospitalization or prolongation of existing hospitalization, a persistent or significant disability/incapacity, or a congenital anomaly/birth defect.  Important medical events that may not result in death, be life-threatening, or require hospitalization may be considered a serious adverse drug experience when, based upon appropriate medical judgment, they may jeopardize the patient or subject and may require medical or surgical intervention to prevent one of the outcomes listed in this definition." (21 C.F.R. § 314.80; 21 CFR § 312.32.)

25.     Prior to the 2006 revisions, the section of the labeling entitled "Precautions" contained information that did not merit inclusion in the Warnings, including "information regarding any special care to be exercised by the practitioner for safe and effective use of the drug, e.g., precautions not required under any other specific section or subsection of the labeling." (21 C.F.R. § 201.57(f)(1) (April 1, 2005).)

26.     The requirements governing the format of the labeling were revised in 2006.  The preambles to the Proposed Rule and Notice of Final Rule published in the Federal Register contain FDA's comments on the nature and role of prescription medication labeling as well as the labeling process.  (65 Fed. Reg. 81082 (Dec. 22, 2000); 71 Fed. Reg. 3922 (Jan. 24, 2006).) These comments shed light on the processes and reasoning FDA employs when drafting and revising labeling.  In the preamble to the Final Rule, FDA stated:

The centerpiece of [FDA's] risk management for prescription drugs generally is the labeling which reflects thorough FDA review of the pertinent scientific evidence and communicates to health care practitioners the agency's formal, authoritative conclusions regarding the conditions under which the product can be used safely and effectively. FDA carefully controls the content of labeling for a prescription drug, because such labeling is FDA's principal tool for educating health care professionals about the risks and benefits of the approved product to help ensure safe and effective use. FDA continuously works to evaluate the latest available scientific information to monitor the safety of products and to incorporate information into the product's labeling when appropriate.

(71 Fed. Reg. 3934.)

27.     As a result of the 2006 revisions, the Warnings and Precautions sections of the labeling were combined. The agency concluded that "observations and suggestions from the physician focus groups…, combined with FDA's experience, have convinced the agency that the distinction between warnings and precautions is perceived by prescribers as being relatively arbitrary and frequently not clinically meaningful." (65 Fed. Reg. 81082 at 81092.)

28.     It is my opinion, based on my experience at FDA and my regulatory work since leaving the Agency, that in determining which adverse reactions may be "important medical events" but do not meet the strict regulatory definition of a serious adverse reaction, the Agency considers a variety of factors such as the indication, the relative seriousness of the disease or condition treated, and the incidence of the adverse reaction. (FDA Guidance for Industry: Warnings and Precautions, Contraindications, and Boxed Warning Sections of Labeling for Human Prescription Drug and Biological Products: Content and Format (Oct. 2011), http://www.fda.gov/downloads/drugs/guidances/ucm075096.pdf. Accessed 10/22/2018) Thus medical and regulatory judgement are necessary in determining what "important medical events" are of clinical significance and should be included in the "Warnings" or "Warnings and Precautions" section of the labeling. As previously noted, FDA's primary concern during drug

13

development and postmarket regulation is patient safety, including alerting physicians and patients to important safety and effectiveness information.

29.     Approved product labeling is reviewed by FDA and the sponsor on an ongoing basis after drug approval for possible revisions based on new postmarket safety data, changes in the regulatory or scientific knowledge bases, or new information obtained either by the company or by FDA from other sources.  Although "a causal relationship need not have been definitively established," the Warnings and Precautions section of labeling "must be" revised to include a warning about a "clinically significant hazard as soon as there is reasonable evidence of a causal association with a drug."  (21 C.F.R. § 201.57(c)(6)(i).)  In this context, reasonable evidence of a causal association means a signal is confirmed and is not merely a "weak" or "potential" signal referred for further evaluation.  FDA can and does regularly request postmarket revisions to the labeling, and, under section 505(o)(4) of the FD&C Act, FDA has authority to require safety labeling changes if the agency becomes aware of "new safety information" that it believes should be included in the labeling of a drug.  In determining when and where new safety information should appear in the labeling, FDA employs its scientific and regulatory judgment.  As the Agency has noted, "interpreting postmarketing safety data is complex, involving analysis of post-approval clinical data and detailed review of a wide range of potentially relevant information, including adverse drug experience reports, pertinent controlled clinical trials and epidemiologic studies, active surveillance efforts, estimates of drug usage and adverse drug experience reporting rates, estimates of background rates of the adverse event, and other relevant information.  Decisions about how to address a safety concern often are a matter of judgment, about which reasonable and adequately informed persons with relevant expertise may disagree." (Draft FDA Guidance: FDA's Communication to the Public (Mar. 2012)

http://www.fda.gov/downloads/drugs/guidancecomplianceregulatoryinformation/guidances/ucm
295217.pdf. Accessed 10/22/2018)

30.    Each time the FDA approves a labeling change, the agency reaffirms that the drug
is safe and effective when used in accordance with the labeling.  Again, FDA scientists and
regulatory experts make the final determination of the appearance, location and language of any
labeling changes.  While acknowledging that pharmaceutical manufacturers have an obligation to
assure that their drugs' labeling is not false or misleading, FDA may determine that certain
information should be included in the product labeling.  "[I]t is irrelevant whether FDA makes
that determination before or after approval. . . If the agency were not permitted to revise required
labeling based on the product's market experience, its ability to protect the public health would
be seriously undermined."  (63 Fed. Reg. 66378 at 66383 (Dec. 1, 1998).)

31.    Non-indicated Uses:  As it has acknowledged repeatedly, FDA is aware of off-
label use, and has recognized that in certain contexts, off-label uses may constitute a standard of
care.  FDA does not generally regulate off-label use since off-label use reflects the practice of
medicine, which FDA does not regulate.  As a general proposition and in the absence of
information suggesting a drug commonly prescribed for an off-label use is associated with a
clinically significant risk or hazard to patients, manufacturers cannot amend labeling to add
information about findings in non-indicated (off-label) populations.  If FDA has information
indicating that a particular off-label use poses a significant risk to patients and there is
information indicating that the particular off-label use is ineffective, the agency can require that
the manufacturer include a statement in the labeling specifically citing the additional risk, lack of
efficacy, or unfavorable benefit/risk expectation when the product is used off-label.  (21 C.F.R.
§§ 201.57(c), (e) (Apr. 1, 2005); 21 C.F.R. 201.57 §§ (c)(2)(ii), (c)(6)(i) (Apr. 1, 2016).)

32.     Changes Being Effected:  As a general matter, sponsors cannot implement post-approval changes to approved product labeling without prior FDA approval.  One limited exception to this rule is known as a Changes Being Effected ("CBE") Supplement.  (21 C.F.R. § 314.70(3)(c) (2006) and subsequent changes.)  The governing regulations state that FDA may designate a category of changes in which the holder of an approved application may begin distribution of the subject drug product with new labeling immediately upon the Agency's receipt of a CBE sNDA (CBE-0).  The CBE-0 type changes permitted under this regulation include:

> (iii) Changes in the labeling to reflect newly acquired information, except for changes to the information required in § 201.57(a) of this chapter (which must be made under paragraph (b)(2)(v)(C) of this section), to accomplish any of the following:
>
> (A)     To add or strengthen a contraindication, warning, precaution, or adverse reaction for which the evidence of a causal association satisfies the standard for inclusion in the labeling under § 201.57(c) of this chapter;
>
> (B)     To add or strengthen a statement about drug abuse, dependence, psychological effect, or overdosage;
>
> (C)     To add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product;
>
> (D)     To delete false, misleading, or unsupported indications for use or claims for effectiveness; or
>
> (E)     Any labeling change normally requiring a supplement submission and approval prior to distribution of the drug product that FDA specifically requests be submitted under this provision.

(21 C.F.R. § 314.70 (c)(6)(iii) (2006).)

33.     A so-called CBE-0 supplement may be used by a manufacturer to add to the labeling "newly acquired" safety information.  As noted above, the proposed labeling change

16

submitted to FDA as a CBE-0 sNDA may be implemented upon FDA's receipt of the CBE-0

sNDA.  (21 C.F.R. § 314.70(c)(6); 73 Fed. Reg. 2848 at 2849 (Jan. 16, 2008).)  The CBE-0

labeling change may be used only to implement labeling changes to Contraindications, Warnings

and Precautions, or Adverse Reactions when there is "reasonable evidence of a causal

association" between exposure to the drug product and onset of the adverse clinical event.  (21

C.F.R. § 314.70 (c)(6)(iii)(A) and 21 C.F.R. § 201.57(c)(6)(i).)  The sponsor also must revise all

advertising and promotional materials to make them consistent with the newly implemented

labeling changes.

      34.    FDA revised the CBE regulations in 2008 "to reaffirm its longstanding position

that a supplemental application submitted under [21 C.F.R. § 314.70] is appropriate to amend the

labeling for an approved product only to reflect newly acquired information, as well as to clarify

that such a supplemental application may be used to add or strengthen a contraindication,

warning, precaution or adverse reaction only if there is sufficient evidence of a causal association

with the drug, biologic, or device."  (73 Fed Reg. 2848; 73 Fed Reg. 49603 at 49604 (Aug. 22,

2008).)

      35.    FDA has several options in response to a CBE submission.  For instance, FDA

may notify the manufacturer that the proposed sNDA requires prior approval before

implementation or may deny approval of the language, placement, or inclusion of the proposed

changes submitted as a CBE.  (21 C.F.R. §§ 314.7(b), (c)(7).)  If the manufacturer has already

instituted the labeling changes and shipped its product with the new labeling and FDA

determines that use of the CBE mechanism or the specific language or placement of the new

information is not appropriate, the manufacturer may be subject to regulatory action based on a

possible assessment of misbranding.  Thus, whether to authorize a change remains "squarely and

solely FDA's" decision.  (71 Fed. Reg. 3922 at 3934.)  In practice, therefore, manufacturers typically consult with FDA before making any labeling changes.  (73 Fed. Reg. 2848 at 2849; 71 Fed. Reg. 3922 at 3934.)

36.     Patient Directed Labeling:  The professional package insert, or labeling, is intended for the prescriber and other health professionals and is not written for or intended to be used by consumers.  Since 1968, FDA may require, or a manufacturer may request, development of patient-directed labeling, written in non-technical language, to be included in the package insert or as separate labeling provided to the patient at the time the product is dispensed by a pharmacist.  The intent of this patient information is to alert patients to appropriate use of and adverse reactions associated with the drug product or to provide other important information about the use of the drug such as its contraindications, precautions, and effectiveness.  (60 Fed. Reg. 44184 (Aug. 24, 1995).)  Regulations located at 21 C.F.R. § 208.1 specifically provide that FDA may require a medication guide where it determines that the nature of the risks and benefits is such that patient labeling is necessary for the safe and effective use of the prescribed product.

**FDA AMENDMENTS ACT (FDAAA)**

37.     As part of the FDA Amendments Act of 2007 (FDAAA), additional authorities were granted to FDA.  These authorities, which are discussed in detail throughout this report, include the ability to mandate labeling changes for new safety information, the ability to require REMS, and the ability to institute Post Marketing Requirements (PRMs), including randomized clinical trials and observational studies.  From the effective date of FDAAA forward, FDA has unquestionable authority to mandate labeling changes based on new safety information.

**FDA ADVISORY COMMITTEES**

38.     FDA can and does convene panels of outside experts when seeking advice on product approval, labeling, safety, risk/benefit assessments and other scientific and regulatory

matters.  (21 C.F.R. § 14.1 *et seq.*)  Advisory committee members are generally physicians, statisticians, epidemiologists, and other scientists, as well as consumer and industry representatives.  These advisory committee members are experts in their fields and provide FDA with advice on a wide variety of questions and concerns.  Like the review divisions in CDER's Office of New Drugs, CDER's advisory committees generally are organized by drug type or disease area so that each panel is populated by scientists who have particular expertise in the drug products addressed by that committee; in addition, there are advisory committees such as the risk management committee that address particular regulatory issues independent of any specific review division.

39.     Most advisory committee meetings are open and public.  Background, data and analyses from a sponsor and from FDA are provided to committee members prior to the meeting and may be made available to interested parties on FDA's website.  Discussion among committee members, question and answer sessions between the committee members and presenters from industry and FDA, as well as comments or testimony by members of the public, are essential parts of the advisory committee process.  The committee considers all available information in its deliberations and when making recommendations to the FDA.  While FDA carefully considers the recommendations and deliberations of advisory committees, these recommendations and considerations are not binding on the Agency.

**REGULATION OF MARKETED DRUGS**

40.     The FDA has authority over advertising and promotion of prescription pharmaceutical products.  Regulations addressing advertisements for approved prescription pharmaceuticals are in 21 C.F.R. § 202.1.  In general, promotional materials and advertising pieces that include the brand name of the product and any explicit or implied claims must be consistent with the currently approved labeling and must show fair balance in the presentation of

19

benefits and risks.  Generally, FDA approval of the material is not required prior to publication

or use of an advertisement issued after initial marketing approval.  (21 C.F.R. § 202.1(j)(1).)

Product-specific (branded) advertisements generally must be submitted to FDA "at the time of

initial publication."  (21 C.F.R. § 314.81(b)(3)(i).)  This is true for every iteration or change in a

proposed marketing piece, irrespective of the media through which it will appear or the audience

to which it is directed.  Pharmaceutical product sponsors may voluntarily seek pre-publication or

pre-use review of advertisements at any time during marketing or may be directed by FDA to

submit such materials for review prior to use.  (21 C.F.R. § 202.1(j)(4).)  The main

organizational unit within FDA that reviews advertising for prescription medications is the

Office of Prescription Drug Promotion (OPDP), formerly known as the Division of Drug

Marketing Advertising and Communications (DDMAC) in CDER.  OPDP has several review

teams that focus on specific therapeutic classes of products and specific types of advertising.

The professional review groups evaluate materials intended for prescribers and other health care

professionals

41.    OPDP states that its mission is:

> To protect the public health by ensuring that prescription drug
> information is truthful, balanced, and accurately communicated.
> This is accomplished through a comprehensive surveillance,
> enforcement and education program, and by fostering better
> communication of labeling and promotional information to both
> healthcare professionals and consumers.

(FDA: Office of Prescription Drug Promotion,

http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDER/uc

m090142.htm. Accessed 10/15/2018).

42.    In addition to its review of submitted ads, FDA conducts its own monitoring of

promotional activities, including by attendance at professional meetings and events.  OPDP also

may become aware of potentially violative advertising or promotional activities from competing manufacturers; from consumer groups, physicians, pharmacists; or from other sources who complain to the Agency.  In fact, FDA has created a program called "Bad Ad" to encourage prescribers to alert the Agency to potentially violative advertising and promotional activities of which they become aware. (FDA: Truthful Prescription Drug Advertising and Promotion, Bad Ad,

https://www.fda.gov/drugs/guidancecomplianceregulatoryinformation/surveillance/drugmarketin gadvertisingandcommunications/ucm209384.htm. Accessed 12/20/2018).

43.     If OPDP determines that an advertisement—whether branded or unbranded—is not in compliance with the regulations, it has several options, including written correspondence ("untitled" and "warning" letters), injunctions and consent decrees, referrals for criminal investigation and prosecution, and seizures of violative materials.  Untitled letters are used for less serious violations, such as overstating the effectiveness of a drug, while Warning Letters are used for serious situations including repeated violations or violations that may affect a significant health and safety risk.  Untitled letters and Warning Letters are reviewed by the FDA Office of the Chief Counsel before issuance and are intended to serve as a precursor to further enforcement action if the violation is not remedied.  If the violation continues, civil or criminal actions may be initiated based upon the nature and circumstances surrounding the violation.  (Statement of Janet Woodcock, M.D., Director for Center for Drug Evaluation and Research, FDA, before the Senate Special Committee on Aging, 108th Cong. (Jul. 22, 2003) (https://wayback.archive-it.org/7993/20170112233711/http://www.fda.gov/NewsEvents/Testimony/ucm115080.htm.)

44.     Warning letters and untitled letters addressing advertising and promotional materials or other inspection and compliance activities are published and publicly available on

the FDA website.  (FDA: Inspections, Compliance, Enforcement, & Criminal Investigations, www.fda.gov/ICECI/EnforcementActions/WarningLetters/default.htm.)  Such letters may serve to alert manufacturers of FDA's current concerns in relation to advertising and promotion.  The language used in these letters (false, misleading, misbranded) reflects the regulatory language of 21 C.F.R. §200, 201 and 202, that allows CDER to comment upon and initiate regulatory actions based on review of advertising, labeling or marketing materials. In the past, DDMAC (now OPDP) publicly indicated that among its priorities in reviewing and monitoring advertising and promotion are materials concerning newly approved products or products with new indications; DTC TV and radio advertisements; promotional materials about which FDA has received complaints from competitors, healthcare providers or consumers; and promotional materials concerning products and companies that have been the recent focus of compliance actions.  Thus, manufacturers may find guidance regarding FDA's monitoring practices and priorities based on the content of untitled or warning letters to other manufacturers of similar pharmaceutical products and may proactively review or revise their own materials based on recent compliance actions published on the FDA website.

45.     Off Label Use of Marketed Pharmaceutical Products: "Off-label" use of marketed pharmaceutical products generally means that the product is used in treating a patient population, condition, or disease not described in the current "Indications and Usage" or using a dose or dosing interval not provided for in the "Dosage and Administration" section of the approved product labeling.  Off-label prescribing is a very common practice in the U.S., especially among pediatric physicians.  Approved medications frequently are used for indications or in populations which are not included in the product labeling.

46.     FDA has long maintained that off-label use of an approved pharmaceutical product is a matter of the practice of medicine and that FDA does not regulate the practice of medicine.  As such, the decision about prescribing a particular product for an individual patient rests with the prescribing physician and the patient, whether or not the patient's health condition is addressed by the product label.

47.     While FDA does not have authority over a physician's or a patient's off-label use of an approved product, it does regulate the product sponsor's advertising, promotion and marketing of approved products and views promotion of off-label uses of pharmaceutical products as inconsistent with its regulations.  However, there are circumstances in which such information may be provided to a physician, along with the currently approved product labeling.

48.     Distribution of Scientific Articles:  Manufacturers may disseminate medical and scientific information on unapproved uses of drugs and medical devices, so long as the publication and its dissemination meet certain criteria, including that the publication is peer-reviewed, is in the form of a complete and unabridged document, is neither false nor misleading, that the proposed off-label use does not pose a significant risk to the public health, and the article or publication is accompanied by the full, approved labeling for the drug or medical device, and provides certain disclaimers.  "FDA recognizes that the public health can be served when health care professionals receive truthful and non-misleading scientific and medical information on unapproved uses of approved or cleared medical products."  (FDA Guidance for Industry:  Good Reprint Practices for the Distribution of Medical Journal Articles and Medical or Scientific Reference Publications on Unapproved New Uses of Approved Drugs and Approved or Cleared Medical Devices (Jan. 2009); *Washington Legal Foundation v. Henney*, 56 F. Supp. 2d 81 (D.D.C. 1999).)

**POSTMARKET SAFETY SURVEILLANCE**

49.     Under 21 C.F.R. § 314.80, the FDA has established a systematic approach to postmarket safety surveillance using, among other data sources, reports of adverse events associated with the use of approved drugs marketed in U.S, whether the events occurred domestically or during the course of foreign marketing of the product.  The regulations addressing postmarket safety surveillance, which were promulgated in 1985 and have been updated since then, are based on federal law and sound scientific principles.

50.     Basically, postmarket safety surveillance provides information to FDA and to the sponsoring company about the safety profile of an approved product following its market introduction.  It is an accepted fact that neither the full safety nor effectiveness profile of a pharmaceutical product can be known at the time of product approval.  (Draft FDA Guidance: FDA's Communication to the Public (Mar. 2012) available at http://www.fda.gov/downloads/drugs/guidancecomplianceregulatoryinformation/guidances/ucm 295217.pdf.)  Generally, preapproval clinical trials are in a relatively small number of patients for a relatively short duration.  Often the population is a well-defined patient population with few comorbidities and few concomitant medications.  Once a drug enters the marketplace, physicians are free to prescribe it to patients for indications and at doses which they believe appropriate for their patients.  Following market introduction, information about real-world use in a larger and more diverse group of patients and for longer time periods than in the initial clinical trials becomes available.  Thus, with a wider population exposure, it is not unexpected that a newly approved pharmaceutical product may be found to be associated with potential new adverse events, drug interactions, and uses not seen in the pre-approval trials.

51.     FDA regulations anticipate the need to continually review and assess the safety profile of marketed drugs.  Under 21 C.F.R § 314.80(b), FDA requires that companies review

spontaneously reported adverse events received by the company from all sources. These sources may include reports submitted by physicians and other healthcare providers, by patients, or by other individuals or other manufacturers.  Both the manufacturer and FDA review the published medical literature, unpublished clinical data, postmarket clinical trials, and adverse events reports from use of the product both within and outside of the U.S. to determine if new safety information about a drug may be emerging.  Companies are required to submit quarterly safety update reports for the first three years after marketing and annually thereafter to provide FDA with their assessment and analysis of the available safety data from all sources.  (21 C.F.R § 314.80(c)(ii).)  Adverse event reports submitted to the FDA are generally evaluated by two groups within the Agency.  One group responsible for the review, coding and processing of such reports, formerly known as the Office of Epidemiology and Biostatistics, includes physicians, epidemiologists, pharmacists and other scientists.  The other group monitoring postmarket safety reports is the review team responsible for approval and labeling of the drug.  Adverse Events (AEs) are evaluated and may be independently coded by FDA and entered into a computerized, automated database.  Review of AEs associated with the use of specific drug products or product classes can be conducted using AE data alone or in combination with information from other sources.

52.    Under 21 C.F.R. § 314.80(c), the FDA has established a triage system for reviewing adverse event reports.  Serious, unlabeled events received from any source must be reported to the FDA by the manufacturer within 15 days from "initial receipt" of the information by the applicant.  Serious labeled reactions do not routinely fall under the 15-day reporting requirement.  Other reporting requirements include submission of periodic reports (either annually or quarterly), listing those reports identified in 21 C.F.R. § 314.80(c)(2) and submission

of annual reports covering information specified in 21 C.F.R. § 314.81(b)(2).  Upon request, FDA may agree to permit manufacturers to submit Periodic Safety Update Reports (PSURs) required under the European Union postmarket reporting scheme in lieu of the annual Periodic Adverse Drug Event Reports.

53.     The purpose of the adverse event review engaged in by FDA is to determine if any new safety signals (i.e., new information suggesting an association between an event and a drug) may be emerging in the postmarketing experience.  "*[S]afety signal* refers to a concern about an excess of adverse events compared to what would be expected to be associated with a product's use. . . . Signals generally indicate the need for further investigation, which may or may not lead to the conclusion that the product caused the event."  (FDA Guidance: Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment at 4 (Mar. 2005) http://www.fda.gov/downloads/RegulatoryInformation/Guidances/UCM126834.pdf.)  Signal detection may occur in a number of ways.  Periodically, FDA will analyze its entire adverse event and medication error database (FAERS) looking for rare and unexpected events or any events occurring at unexpected rates.  This kind of statistical analysis is done by FDA not for a specific drug or class of drugs, but across the entire universe of approved products.  A second form of signal detection may result from a reviewer's or reporter's observation of even a small number of unusual, rare or essentially unique events, typically for a specific drug or class of drugs.  A signal also may be detected from review of the medical or scientific literature, including clinical trials or observational epidemiological data.

54.     It should be emphasized that while FDA uses adverse events for signal generation, it does not use them to assess causation.  This is consistent with good pharmacovigilance practices and how epidemiologists—both inside FDA and throughout the

26

scientific community—approach the hierarchy of evidence. Case reports like those submitted as adverse event or adverse experience reports are generally considered the lowest form of scientific evidence. While they are useful for hypothesis generating, they often lack or incorrectly convey important clinical information, are subject to reporting and attribution biases, and otherwise are too unreliable for the purposes of determining cause and effect relationships.

55. Among the well-recognized limitations of reported adverse events is that they are often confounded by reporting and attribution biases. For example, identifying, attributing and reporting potential adverse drug events may be influenced by how recently a drug has been introduced to the market, how long a patient has been on a drug, the presence of publicity concerning the product or a specific event (including from litigation), the seriousness of the event, and characteristics of the patient population such as age, pregnancy, or co-morbid conditions.

56. The greatest utility of case reports in the regulatory postmarket setting, as in epidemiology generally, is to bring to the attention of a manufacturer or regulatory agency a potential new problem that may be associated with the use of a marketed medical product. Generally, case reports alone cannot be used to establish a causal relationship between a product and an outcome nor can postmarket adverse event reports be used in determining a rate of occurrence in the exposed population. Case reports submitted to FDA or a manufacturer as adverse event reports may be used to generate a postmarket safety signal requiring further assessment and evaluation based on the hypothesis that there may be a causal association. In developing an hypothesis to test in outside data sources, a case definition must be developed based on the available case-related information. A case definition is often critical to a rigorous assessment of safety signals because it allows reviewers to have a pre-determined and thus less

biased means of deciding whether what they are seeing reported aligns with the potential risk

signal they are looking for.  Further evaluation and risk assessment may be accomplished

through pharmacoepidemiologic studies, registries or surveys, or in some cases, from double-

blind, randomized controlled clinical trials, depending on the nature of the event, the suspect

drug, and the population in which the drug is used.  However, as the FDA has noted, "Clinical

trials are impractical in almost all cases when the event rates of concern are less common than 1:

2000 to 3000."  (FDA Guidance: Good Pharmacovigilance Practices and

Pharmacoepidemiologic Assessment at 13 (Mar. 2005)

(https://www.fda.gov/downloads/drugs/guidancecomplianceregulatoryinformation/guidances/uc

m071696.pdf).

57.     In general, appropriately analyzed data from prospectively designed clinical

studies (specifically randomized, double-blind, multi-center, controlled clinical trials) are

considered the most reliable source of information on estimating the safety and effectiveness of

any medical product or intervention.  Next in order of scientific validity would be data from

other types of prospectively designed clinical trials, then data from observational studies, from

case series, and, finally, from individual case reports, which are the least reliable and, as

mentioned, absent rare circumstances, not useful in assessing causality.

58.     It is my opinion that the FDA's regulations and requirements for reporting and

review of adverse events, signal monitoring and detection, including assessment of observational

and clinical trial data, are based on good science and sound judgment accepted generally in the

scientific community.

**FDA's REGULATION OF DOCETAXEL (Taxotere®)**

<u>Initial Approval</u>

59.     The IND for Taxotere® was submitted to FDA's Division of Oncology Drug Products October 2, 1990.  The New Drug Application was submitted July 27, 1994. Initial indications were for metastatic breast cancer patients in whom previous chemotherapy, including an anthracycline (unless otherwise contra-indicated), had failed. Taxotere was granted accelerated approval review status and taken to ODAC for consideration on December 13, 1994. Initially, ODAC did not recommend approval of Taxotere, in part due to the apparent increased rate of febrile neutropenia among breast cancer patients assigned to the docetaxel arm as compared to paclitaxel (Taxol®) -exposed patients. The ODAC panel raised additional issues including concerns about performance status, fluid retention and sepsis-related deaths in docetaxel-exposed patients.  ODAC's concerns did not involve alopecia.

60.     Following denial of the marketing application for Taxotere by ODAC, FDA and RPR entered into discussion about the ODAC meeting.  RPR clarified that the difference in rates of febrile neutropenia among docetaxel versus paclitaxel patients was due to a broader definition of "febrile neutropenia" in the docetaxel clinical trials than had been used in the paclitaxel NDA. The company provided additional data for septic deaths and fluid retention, which satisfied FDA's questions the toxicity profile.  (Sanofi_00399197, Sanofi_001687*)*.

61.     The Taxotere NDA went back to ODAC October 17, 1995 and the committee recommended approval for metastatic, treatment-failure breast cancer.  Dexamethasone pre-treatment was recommended to reduce the risk for fluid retention.

62.     FDA subsequently found the Taxotere NDA approvable on October 27, 1995. (Sanofi_00502775).  The Taxotere NDA was originally approved on May 14, 1996, for the

treatment of patients with locally advanced or metastatic breast cancer who have progressed during anthracycline-based therapy or have relapsed during anthracycline-based adjuvant therapy. (Sanofi_01380011). The Taxotere NDA was reviewed and approved under FDA's accelerated approval provision.  (Sanofi_01380011).  These provisions are for drug products that treat serious or life-threatening illnesses and that provide patients with meaningful therapeutic benefit as compared to existing treatments.  (21 C.F.R. 314.500, 21 C.F.R. 314.510).

63.      Prior to approval, FDA thoroughly reviewed the safety profile for Taxotere, including the risk of alopecia.  (Sanofi_00654998).  The risk of alopecia was also presented at both the 1994 and 1995 ODAC meetings.  (Sanofi_001317, Sanofi_001445, Sanofi_001687*))*.

Adequacy of the Taxotere Label

64.      It is my understanding that Plaintiffs in this litigation allege that Taxotere caused them to develop permanent alopecia and that the Taxotere labeling is inadequate because it does not contain a warning about permanent alopecia.  It is my opinion that Taxotere has always been appropriately labeled during its marketing history in the United States.  The FDA-approved Taxotere label has always warned of alopecia in both the physician- and patient-package inserts.

65.      The initial FDA-approved Taxotere label included hair loss in physician- and patient package inserts. The initial label included a patient package insert that stated:

> Loss of hair occurs in most patients taking Taxotere (including the hair on your head, underarm hair, pubic hair, eyebrows and eyelashes.)  Hair loss will begin after the first few treatments and varies from patient to patient. Once you have completed all of your treatments, hair generally grows back.

(Sanofi_000003).  The language in the patient package insert concerning "Hair Loss" was the same from the time of initial approval until 2010 when FDA made changes to that section of the patient information leaflet.

66.     The initial FDA-approved physician United States Package Insert ("USPI") provided rates of "alopecia" in Taxotere treatment. Alopecia occurred in 80% of patients and was severe in 61.8% of patients.

67.     Information concerning alopecia associated with Taxotere was in the "Adverse Reactions" section of the physician USPI and was provided in the patient package insert or patient information leaflet in a section entitled "*What are the possible side effects of Taxotere?*". The "Adverse Reactions" section of the physician-directed labeling is and was the appropriate place to include the term alopecia. Alopecia is an adverse reaction as defined in 21 C.F.R. § 201.57(c)(7). According to the labeling regulations, an adverse reaction is an "undesirable effect, reasonably associated with use of a drug, that may occur as part of the pharmacological action of the drug or may be unpredictable in its occurrence." Alopecia is neither unexpected in the course of treatment with a cancer chemotherapeutic agent nor does it meet the regulatory definition of a serious adverse event. It would have been inappropriate to include "alopecia" in the "Warnings" or "Warnings and Precautions" section of the USPI.

68.     The Taxotere USPI has at all times appropriately provided physicians and prescribers with information on the risk of alopecia associated with its use. The clinical definition of alopecia is simply "hair loss." It does not mean, as Plaintiffs have repeatedly suggested, "temporary hair loss." Alopecia is a term that encompasses all forms of hair loss, temporary or permanent, widespread or patchy. There is no consensus definition by regulation for "ongoing," "persistent," "permanent," or "irreversible" alopecia. While the Medical Dictionary for Regulatory Activities (MedDRA), the dictionary FDA uses and requires companies to use to code adverse events, contains an entry for the term "alopecias," it does not contain entries for "ongoing," "persistent," "permanent," or "irreversible" alopecia . For these

31

reasons, it is my opinion that the term "alopecia" appropriately characterized the hair loss associated with docetaxel use.

69.     On March 17, 2004, Sanofi submitted sNDA S-029 seeking an indication for Taxotere use in combination with doxorubicin and cyclophosphamide for patients with operable node-positive breast cancer.  (Sanofi_00427233).  With this submission, Sanofi proposed revisions to the Taxotere USPI relating to the new proposed indication and other information from the TAX 316 study.  With respect to alopecia, Sanofi proposed updating the Adverse Reaction section of the USPI to add a subsection:

> **Other persistent reactions**
> The following events were observed to be ongoing in the TAC-treated patients at the median follow-up time of 55 months: alopecia (22/687), amenorrhea (133/233), neurosensory (9/73) and peripheral edema (18/112).  These events were also observed in the FAC arm during the follow-up period: alopecia (9/642), amenorrhea (101/186), neurosensory (2/15) and peripheral edema (3/19).

(Sanofi_01296737).  In addition to the original submission in March, Sanofi resubmitted this labeling proposal to FDA in June and August 2004.  (Sanofi_00355202; Sanofi_00354861; Sanofi_04817146).

70.     FDA had multiple internal meetings to discuss the Taxotere labeling for the adjuvant breast indication.  (Sanofi_04817147).  After a series of labeling discussions between Sanofi and FDA, FDA deleted Sanofi's proposal to add the "**Other persistent reactions**" subsection to the USPI.  Based on available documents, it is clear that Ann Staten at FDA deleted the "**Other persistent reactions**" subsection in edits made on August 10, 2004.  (Sanofi_04539472).  There was no reason provided for the deletion. The revised label reflecting FDA's revisions was sent to Sanofi on August 11, 2004.  (Sanofi_04817139).  FDA approved

NDA supplement s-029 on August 18, 2004 without the "**Other persistent reactions**"
information Sanofi proposed.  (Sanofi_04539390).

71.     Additional indications for Taxotere were approved after appropriate data
development by Sanofi and thorough review by FDA.  In 1998, Taxotere was approved for
treatment of locally advanced or metastatic breast cancer after failure of prior chemotherapy. In
1999, Taxotere was approved for the treatment of locally advanced or metastatic non-small cell
lung cancer after failure of prior platinum-based chemotherapy.  In 2002, Taxotere was approved
for use in combination with cisplatin for the treatment of unresectable, locally advanced or
metastatic non-small cell lung cancer in patients who had not previously received chemotherapy
for that condition. In May 2004, Taxotere was approved for use in combination with prednisone
for the treatment of patients with androgen independent (hormone-refractory) metastatic prostate
cancer.  In August 2004, Taxotere was approved for use in combination with doxorubicin and
cyclophosphamide for the adjuvant treatment of patients with operable, node-positive breast
cancer.  In March 2006, Taxotere was approved in combination with cisplatin and fluorouracil
for the treatment of advanced gastric adenocarcinoma, including adenocarcinoma of the
gastroesophageal junction, who had not previously received chemotherapy for advanced disease.
In October 2006, Taxotere was approved for use in combination with cisplatin and fluorouracil
in the induction treatment of patients with inoperable locally advanced squamous cell carcinoma
of the head and neck.  With each approval, FDA reviews the entire label and there is an
opportunity for FDA to require changes to any part of the label.

72.     As discussed earlier, the language in the patient-package insert concerning "Hair
Loss" was the same from the time of initial approval until May 2010 when FDA made what
appear to be class-wide changes to that section of the patient information leaflet.  As part of its

review of Sanofi's sNDA S-059 to update the Pediatric Use and Human Pharmacokinetics sections of the Taxotere labeling, FDA modified the Taxotere patient labeling.  During that labeling review and modification, FDA rewrote the patient information section, including the discussion of hair loss.  FDA proposed to include a single bullet point listing hair loss as one of the most common side effects of Taxotere and to add advice to the patient to "Tell your doctor if you have any side effect that bothers you or does not go away."  FDA also proposed to include a listing of the common adverse reactions from Taxotere, including hair loss, at the beginning of the Adverse Reactions section of the labeling.

73.     A similar change was made to the Taxol label in August 2010, indicating what appears to be class-type labeling changes for the taxane labels.  In 2000, the Taxol patient labeling included a similar description of hair loss as the 2000 Taxotere patient labeling.  In August 2010, the Taxol patient labeling was changed to address hair loss as a single bullet point as one of the most common side effects of Taxol, mirroring the FDA-initiated change to the Taxotere patient labeling approved in May 2010.  (Taxol, NDA 20-262, approved August 13, 2010).

74.     Abraxane, another taxane in the same class as Taxotere, went through a similar label change.  When Abraxane was first approved in 2005, the Patient Information noted in the "Hair Loss" section that: "*Hair generally grows back after you've finished your ABRAXANE treatment*."  (Abraxane, NDA 21-660, approved January 7, 2005).  The Abraxane labeling approved June 26, 2009 contained that same language.  (Abraxane, NDA 21-660/s-022).  By 2011, the Abraxane patient labeling was changed to address hair loss as a single bullet point as one of the most common side effects of Abraxane, just as in the FDA-initiated change to the

Taxotere patient labeling and the change in the Taxol labeling in August 2010. (Abraxane, NDA 21-660/s-025).

75.     Given these class-wide changes, it was reasonable for Sanofi to accept FDA's proposed changes to the Taxotere patient labeling, including the changes involving the bulleted mention of hair loss.

76.     On March 23, 2015, FDA requested that Sanofi provide, by April 10, 2015, a summary of cases of persistent total or partial alopecia associated with docetaxel use. (Sanofi_01574962).  Sanofi submitted a timely Response to Agency Request on April 10, 2015. The content of the response is discussed in more detail below.

77.     On October 2, 2015, FDA requested that Sanofi "Provide any additional information regarding permanent or irreversible alopecia," and "Amend the package insert in Section 6.2 (Postmarketing Experience) (and patient information, if appropriate) to add information on permanent or irreversible alopecia," within 60 days. (Sanofi_00805353).

78.     On November 24, 2015, Sanofi provided a response to FDA, which included an updated clinical overview evaluating docetaxel and permanent alopecia.  Sanofi also provided a CBE labeling supplement to update the Postmarketing Experiences in the Adverse Reactions section of the Taxotere labeling and an update to the patient information.  Sanofi proposed adding to the USPI "Cases of permanent alopecia have been reported" under "Cutaneous" in Postmarketing Experiences in the USPI.

79.     Sanofi also proposed adding in the Patient Information a bullet point under "The most common side effects of TAXOTERE include: "hair loss: in most cases normal hair growth should return.  In some cases (frequency not known) permanent hair loss has been observed." (Sanofi_03333249).

80.     FDA's Medical Reviewer agreed with Sanofi's labeling proposal.  (NDA 20-449, s-075, Medical Review, Prowell, T., December 7, 2015).  FDA's clinical reviewer stated: "While alopecia occurs in virtually all patients who receive docetaxel, there have only been 2,172 reports to the Sponsor of alopecia, and therefore the true incidence of permanent alopecia is unknown and cannot be reliably estimated given the limitations of the available data.  The Sponsor and FDA concur that the available evidence supports a potential causal association between docetaxel and permanent alopecia and that the label should be updated to alert clinicians and patients of this possibility."  (NDA 20-449, s-075, Medical Review, Prowell, T., December 7, 2015).

81.     On April 11, 2018, Sanofi submitted a Supplemental New Drug Application providing for the addition of certain safety-related information to the Taxotere USPI. Specifically, Sanofi proposed the addition of "Enterocolitis and Neutropenic Colitis" to Section 5 "Warnings and Precautions" as well as updates to "Hypersensitivity Reactions" in that same section.  The sNDA also proposed updating Sections 6 "Adverse Reactions", 6.2 "Postmarketing Experience", and 17 "Patient Counseling" to reflect the changes made to Section 5. Some of these labeling changes are intended to distinguish between the risk of adverse events observed over the course of the 8-year median follow-up for TAX 316 and adverse events that were persistent following completion of the trial. The persistent adverse events included peripheral neuropathy, alopecia, amenorrhea, peripheral edema, lymphedema, asthenia, and myelodysplastic syndrome/acute myeloid leukemia.  (NDA 20-449/s-079, FDA Approval Letter, October 5, 2018).

82.     With respect to alopecia, Sanofi proposed, and FDA approved, the addition of the following language in Section 6.1 "Clinical Trials Experience" of the Taxotere USPI:

*Skin and subcutaneous tissue disorders*

In study TAX316, alopecia persisting into the follow-up period after the end of chemotherapy was reported in 687 of 744 TAC patients (92.3%) and 645 of 736 FAC patients (87.6%). At the end of the follow-up period (actual median follow-up time of 8 years), alopecia was observed to be ongoing in 29 TAC patients (3.9%) and 16 FAC patients (2.2%).

83.     This is an appropriate labeling update with respect to alopecia. At all times, the FDA-approved Taxotere label has been reasonable, adequate, and truthful.

84.     On September 24, 2010, Sanofi submitted to FDA the final clinical study report for TAX 316, containing 10-year follow-up data. (Sanofi_01288423). That final study report contained the same data on alopecia that was eventually added to the Taxotere USPI in 2018. (Sanofi_0264952). At the time Sanofi submitted the final clinical study report, Sanofi did not propose a labeling change because the safety and efficacy data from the TAX 316 final analysis were consistent with the known profile of docetaxel and the TAC regimen. (Sanofi_02649521, Gustavson Dep. at 247 ("I think that the reason that the labeling change was not warranted is it was not deemed to – needed to be helpful as prescribing information."). Given the consistency of the TAX 316 data, I agree that it was reasonable and appropriate for FDA and Sanofi not to update the alopecia information in the Taxotere USPI, especially since FDA had struck a similar proposed label change in 2004.

85.     FDA reviewed the TAX 316 final clinical data and on September 23, 2011, concluded that Sanofi had fulfilled its postmarketing commitment with respect to the TAX 316 study. FDA could have, but did not, request or require a label change based on the updated TAX 316 data. (Sanofi_00262024).

Taxotere European Label

86.     Plaintiffs in this litigation claim that the Taxotere USPI was somehow inadequate because it did not contain the same information on alopecia as the Taxotere European label, also known as the Summary of Product Characteristics (SmPC).  This claim ignores the fact that it is not unusual for regulatory and labeling decisions to vary from country to country. In my experience, FDA makes independent regulatory decisions and is not bound to follow decisions made by other, non-U.S. regulatory agencies.

87.     For example, while FDA rejected the language Sanofi proposed adding to the Taxotere USPI in 2004 about "Other persistent reactions," the European Medicines Agency (EMA) approved the same language and it was therefore added to the SmPC.

88.     In addition, both the 10-year TAX 316 data and the Sanofi 2011 clinical overview of persistent alopecia were submitted to FDA and EMA.  While FDA did not request or require a labeling change addressing persistent alopecia based on those data, EMA requested that additional information about the possible irreversibility of alopecia be added to the SmPC. (Sanofi_01094525).  It was the EMA's request that led to the addition of the language "Cases of persisting alopecia have been reported" to the SmPC in 2011.  (Sanofi_05413055).

89.     For these reasons, I disagree with any claim that the Taxotere USPI was inadequate because it did not contain identical language to the SmPC.

**DDMAC LETTERS**

89.     I have reviewed the enforcement letters from FDA's DDMAC (now OPDP) that Sanofi received relating to its promotion of Taxotere.  None of those letters involved the promotion of Taxotere for the adjuvant treatment of breast cancer.   In addition, none of the

letters involved the discussion of the risk of alopecia or persistent or permanent alopecia from
Taxotere use.

### ALOPECIA MONITORING AND REPORTING

90.     As discussed in more detail above, good pharmacovigilance practices are
described in FDA regulations and an FDA Guidance.  One component of postmarketing safety
surveillance is the collection, maintenance, reporting, and evaluation of spontaneous
postmarketing adverse event data.  Although it is important to collect and analyze these data, as
such reports may provide a signal indicating areas for further investigation, adverse event reports
cannot be used to determine causality.

91.     Based on my review of the materials in this case, Sanofi met or exceeded its
regulatory obligations in its Taxotere periodic reporting to FDA.  Periodic reports were
submitted in a timely fashion.  Those reports summarized all necessary adverse event reports,
included extensive information about serious adverse events when possible, and contained
periodic analyses of specific adverse events.  Sanofi also submitted expedited reports as required
for all cases of serious and unexpected adverse events, both foreign and domestic.

92.     It is important to note that postmarketing reports of alopecia do not meet the
criteria for expedited reporting, as alopecia is neither a serious adverse event (as defined in the
regulations), nor is it unexpected.  As previously noted, information on alopecia has always been
in the FDA-approved USPI for Taxotere, including in the patient information materials, which
are approved by FDA.

93.     With respect to its reporting of non-serious labeled adverse events like alopecia,
Sanofi received a waiver from FDA in May 2000 stating that Taxotere-related periodic safety
reports did not need to include copies of case reports for those events.  (Sanofi_00259029).  FDA

encourages sponsors to seek such waivers for non-serious labeled events.  (FDA Draft Guidance for Industry, Postmarketing Safety Reporting for Human Drug and Biological Products Including Vaccines, March 2001).

94.     Sanofi repeatedly evaluated cases of persistent, ongoing, or permanent alopecia it received either as spontaneous or literature reports or reported as part of the reporting requirements for ongoing clinical trials. Discussion of those cases is included in the periodic reports.  In 2011 and 2015, Sanofi conducted signal analyses of persistent, ongoing, or permanent alopecia adverse event reports.  These analyses are discussed below.

2011 Clinical Overview

95.     In 2011 at the request of the French drug regulatory agency (AFSSAPS), Dr. Emanuel Palatinsky, the Taxotere Global Safety Officer for Sanofi, conducted a comprehensive signal assessment of "persistent" alopecia (Sanofi_02994797).  Sanofi submitted these findings to FDA as part of PSUR 28 on January 27, 2011.  (Sanofi_00201968; Sanofi_00197757).

96.     For purposes of the analysis, a cumulative search was conducted in the Sanofi global pharmacovigilance adverse event database, using MedDRA version 13.1 to detect all cases, from all report sources, with the diagnosis of persistent alopecia associated with docetaxel. That search revealed at total of 1,620 cases, including solicited and unsolicited cases.  Of the 1,620 potential cases of persistent alopecia, 1,060 of these reports were reported as having an unknown or unreported outcome, meaning these cases could not unequivocally be defined as cases of permanent alopecia.  Of the remaining 560 cases of possible permanent alopecia, 348 cases were reported as Recovered/Recovering/Recovered with sequelae; 212 remaining reports of alopecia were reported as "Not recovered".  There were 142 cases which could be determined to meet the definition of "persistent alopecia", meaning hair loss persisting for 12 months or

longer following the last dose of chemotherapy. Further analysis of these 142 cases revealed 24 reports of persistent alopecia that did not have sufficient information to allow a medical assessment of the reports as potentially related to docetaxel.

97.     After a careful review of these cases, Sanofi concluded that there is no evidence of a causal relationship between docetaxel and persistent alopecia and that "the available evidence does not show that irreversible alopecia is caused by docetaxel alone."  This conclusion was supported by the fact that the cases were confounded by (1) exposure to multiple anticancer agents each known to cause alopecia; (2) multiple co-morbidities associated with the onset of alopecia; (3) lag time between the last dose of docetaxel and the onset of alopecia greater than two months; (4) the onset of alopecia predated the first administration of docetaxel; or (5) persistent alopecia was reported as resolved in three patients who did not have characteristics differing from other patients where the alopecia was reported as irreversible.

98.     Contrary to the claims of Plaintiffs' regulatory expert (Kessler Report at para. 190), this 2011 clinical overview was submitted both to FDA and the European Medicines Agency ("EMA").  FDA did not respond to or require any labeling changes based on the clinical overview.  FDA could have followed-up with Sanofi or requested revised labeling, but did not do so.  The EMA reviewed the clinical overview and agreed with Sanofi's conclusion that "On the basis of this safety review, it is effectively difficult to conclude that docetaxel alone is able to induce persistent alopecia."  (Sanofi_01113662).  That said, the European Rapporteur recommended an update to the European label to address the possible risk of persistent alopecia more clearly.  (Sanofi_01113662).  In September 2011, Sanofi proposed additions to the Taxotere Summary of Product Characteristics, specifically a statement that "Cases of persistent alopecia have been reported" in the Undesirable Effects postmarketing section and a statement in

the patient information that "Hair loss (in most cases hair growth should resume)."
(Sanofi_01112272, Sanofi_05413055).  This change was endorsed by the European health
authority in December 2011.  (Sanofi_00813022).

       2015 Response to Agency and 2015 Clinical Overview

       99.     On March 23, 2015, Frank Cross, Jr., Senior Regulatory Health Project Manager
at FDA, emailed Sanofi and requested "a summary of cases of permanent partial or total alopecia
associated with docetaxel use."  Sanofi provided its response to FDA on April 10, 2015.
(Sanofi_00265619).  In preparing its response, Sanofi conducted a cumulative search of its
Global Pharmacovigilance adverse event database using MedDRA version 17.1 to detect cases
reported from any source included a diagnosis using the high-level term "alopecia."
(Sanofi_00265624).  A total of 89 cases reported the verbatim term "alopecia" and the word
"permanent" or "irreversible," or reported alopecia persisting for more than two years with the
outcome of Not Recovered/Recovering/UNK. Sanofi provided a summary of those cases to
FDA.  Most cases were female patients with breast cancer and the majority of patients were
treated with combination anticancer treatments.  Sanofi concluded that "alopecia occurs very
commonly.  Permanent alopecia is mostly reported in the female patients with breast cancer.
The available evidence does not show that permanent alopecia is caused by docetaxel alone."

       100.    Approximately six months later, on October 2, 2015, FDA provided its response
to Sanofi's April submission.  FDA requested that Sanofi "[p]rovide any additional information
regarding permanent or irreversible alopecia" and "[a]mend the package insert in Section 6.2
(Postmarketing Experience) (and patient information, if appropriate) to add information on
permanent or irreversible alopecia."  (Sanofi_00805353).

101.    On November 24, 2015 Sanofi provided FDA with its response to this request entitled "Clinical Overview: Docetaxel and Permanent Alopecia". (Sanofi_03333249). The Clinical Overview evaluated the potential association between docetaxel and permanent alopecia and included a Changes Being Effected labeling supplement proposing to update both the Postmarketing Experiences section of the USPI and the patient labeling with information on permanent alopecia.

102.    In this Clinical Overview, Sanofi provided background information on docetaxel, alopecia, the incidence of alopecia with anti-cancer agents and an updated review of its global pharmacovigilance database. (Sanofi_01268143). Sanofi identified 117 cases of alopecia that included either "permanent" or "irreversible," as descriptors or that reported alopecia lasting more than two years and with an outcome of Not Recovered/Recovering/Unknown. Again, the vast majority of cases were female patients treated for breast cancer, and 70% of the cases received confirmed combination chemotherapy regimens. Sanofi provided to FDA a summary of these cases and its analysis of the 117 cases, along with results from the TAX 316 and GEICAM 9805 studies, and the results from its literature review.

103.    Sanofi wrote that "the cumulative weighted evidence is sufficient to support a causal association between docetaxel and permanent/irreversible alopecia in the patients who received docetaxel."   Sanofi concluded that "[t]he positive causal association between docetaxel and permanent/irreversible alopecia does not affect the benefit-risk relationship. Docetaxel has been widely used and proven effective as a chemotherapeutic agent. The benefits of docetaxel continue to outweigh the risks, including permanent alopecia."

104.    In my opinion, Sanofi provided a thorough analysis of the available postmarket and clinical trials data on alopecia. FDA generally does not require or encourage sponsors to

43

make causality assessments based on postmarket data.  Sanofi's use of certain phrases should not

be construed as an unequivocal statement of causality, especially in light of their proposed

labeling changes. Further, I believe that the data analyses are complicated by the absence of an

established and widely agreed upon case definition for "permanent alopecia", by case-patient

exposure to other chemotherapeutic agents known to cause alopecia, and by the practical

limitations of using postmarket data to make causality assessments. Thus, the reading of the

language in the Clinical Overview must be tempered by consideration of the significant

limitations in using postmarket case reports for assessing causality.

105.    Therefore, while I understand that Plaintiffs use Sanofi's 2015 Clinical Overview

to assert that Sanofi concluded that docetaxel causes permanent alopecia, I believe that this is

inappropriate for the reasons listed above.  To me, Sanofi's conclusion means that, based on the

available data and a possible biological explanation for alopecia following docetaxel exposure,

Sanofi's pharmacovigilance department determined that the cumulative evidence could support a

potential relationship between Taxotere exposure and the reported cases of permanent alopecia,

but not to the exclusion of other causes.  (Jen Deposition, September 21, 2018, pp. 385-386,

Hangai Deposition, February 1, 2018, pp. 18, 194, 275-276.).  Because of other confounding

factors, such as use of previous and concomitant medications (such as doxorubicin,

cyclophosphamide, etc.), age, family history, possible Tamoxifen use and other factors, Sanofi

did not and could not conclude that docetaxel causes permanent alopecia.

106.    My view is consistent with FDA's review of the 2015 Clinical Overview.  After

reviewing the Sanofi overview, FDA's Medical Reviewer stated: "The Sponsor and FDA concur

that the available evidence supports a **potential** causal association between docetaxel and

permanent alopecia and that the label should be updated to alert clinicians and patients of this

possibility." (NDA 20-449, s-075, Medical Review, Prowell, T., December 7, 2015) (emphasis added). The same FDA Medical Reviewer also stated: "In 70% of these reported cases, patients had received docetaxel as part of combination chemotherapy, so it's impossible to determine whether the permanence of alopecia was due to docetaxel, which may have implications for labeling of numerous cytotoxic agents. In any case, I think the Sponsor's simple statement that permanent cases have been reported is all that can reliably be said given the tremendous limitations of the available data." (2015 Prowell, T. to Diggs, F., et al., Congressional Response Letter – Taxotere Adverse Events, December 4, 2015). If a positive causal assessment had actually been made, the labeled language update could have reflected that conclusion. It did not.

### TAXOTERE CLINICAL TRIALS

107.    Taxotere was initially approved as a single agent chemotherapy regimen for the treatment of metastatic anthracycline/anthracenedione resistant breast cancer. Metastatic breast cancer is cancer that has spread to other parts of the body. Anthracycline or anthracenedione resistant breast cancer is cancer that has progressed despite treatment with what was at that time the most effective and most commonly used chemotherapeutic agent for the treatment of breast cancer. The four phase II clinical trials that formed the basis for this initial approval were multi-center, active-control clinical studies. A total of 162 patients were enrolled, 134 of whom were documented as treatment resistant due to a lack of response or progression of disease on treatment. The four pivotal trials were conducted in the U.S. (83 patients) and in Europe (79). Five additional phase II studies enrolling a total of 154 patients and conducted primarily outside the U.S provided additional supporting documentation of Taxotere's effectiveness and safety profile. The overall response rate in this population of women with advanced breast cancer ranged from 35% to 68%.

TAX 316

108.     In 2004, FDA approved docetaxel as adjuvant therapy for operable, node-positive breast cancer based on the findings from the TAX 316 study.  The TAX 316 study (also known as EFC6041/BCIRG001), is "A multicenter phase III randomized trial comparing docetaxel in combination with doxorubicin and cyclophosphamide (TAC) versus 5-fluorouracil in combination with doxorubicin and cyclophosphamide (FAC) as adjuvant treatment of operable breast cancer patients with positive axillary lymph nodes."

109.     The primary objective of the TAX 316 study was to compare disease-free survival (DFS) in operable breast cancer patients with positive axillary lymph nodes after treatment with Taxotere (docetaxel) combined with doxorubicin and cyclophosphamide (TAC) versus disease free survival following treatment with 5-fluorouracil in combination with doxorubicin and cyclophosphamide (FAC). The secondary goals were to compare overall survival (OS), toxicity, and quality of life between the two treatment arms and to evaluate pathologic and molecular markers for predicting efficacy.

110.     Sanofi worked closely with FDA in designing and executing the TAX 316 study. As FDA notes in its Medical Review of the TAX 316 second interim analysis, the protocol for the study was submitted to FDA on August 13, 1997, in full compliance with the principles of the Declaration of Helsinki.  (Sanofi_01254309).  The statistical analysis plan as well as subsequent TAX 316 protocol amendments were submitted to, reviewed and approved by FDA prior to implementation.  (Sanofi_01254309).  FDA was actively involved in all aspects of protocol development and modification.

111.     I agree with FDA's assessment of the efficacy and safety profile demonstrated by the TAX 316 study.  In reviewing the TAX 316 second interim analysis, FDA's Medical

Reviewers concluded that "the docetaxel (TAC) arm demonstrated statistically significant and clinically relevant superiority in the traditional oncology endpoint of interest in the treatment of adjuvant breast cancer (disease free survival), and also prolonged survival as measured against an accepted control arm (FAC)." (Sanofi_012554305).   In addition, FDA concluded that "[t]he safety profile of Docetaxel given as a combination therapy is consistent with the toxicities described in the label for the individual study drugs." (Sanofi_01254307).

112.    Similar efficacy and safety results were reported in the final clinical study report for TAX 316, completed in September 2010.  The final results from the TAX 316 10-year follow-up "continue to support the use of TAC as an appropriate adjuvant chemotherapy option in women with operable, node-positive breast cancer." (Sanofi_02649521).

113.    With respect to "ongoing alopecia," there were 29 cases (4.2%) in the TAC arm and 16 (2.5%) cases in the FAC arm from the TAX 316 final clinical study report.  These results do not constitute a signal of an increased risk for an association between TAC and "ongoing alopecia" as there is not a statistically significant difference between the incidence of "ongoing alopecia" in the two arms.

114.    I have reviewed the protocols, statistical analysis plan, and clinical study reports for the TAX 316 study.  It is my opinion that this trial was appropriately designed and conducted.  It is also my opinion that the results of the TAX 316 study, both the 2004 interim analysis and the 2009 final analysis, were appropriately submitted to FDA in compliance with federal regulations and good regulatory practices.

115.    Sanofi could not have conducted a clinical trial with a primary endpoint of permanent or irreversible alopecia.  As stated earlier in my report, long-term safety studies with adverse events as primary endpoints are not required and generally are not considered to be

47

ethical study designs.  That is true here.  It would not have been an ethical study design to have a clinical trial administering docetaxel in cancer patients using permanent or irreversible alopecia as the primary endpoint, especially considering the severity of the disease for which the drug was developed and approved.  To propose such a study would be absurd.

116.     Plaintiffs claim that the results of the TAX 316 study provide support for the proposition that docetaxel causes permanent alopecia.  For a number of reasons, that is incorrect. First, as I've already stated, there were reports of "ongoing" alopecia in both the Taxotere and non-Taxotere arms of the study, meaning that patients who were not administered Taxotere also reported to have "ongoing" alopecia.  Importantly, there was not a statistically significant difference between the incidence of "ongoing alopecia" in the TAC as compared to the FAC arm of the study.  In addition, alopecia is not an unexpected event with virtually all types of chemotherapy. Based on the TAX 316 study, it is impossible to say that there was a meaningful difference in the rates of ongoing alopecia between the two arms of that study.

117.     Second, the TAX 316 study only reported "ongoing" alopecia; it did not report "permanent" or "persistent" alopecia.  The distinction is important, since for the majority of patients identified as having "ongoing" alopecia, there is no documentation that those patients had alopecia lasting more than six months after completion of chemotherapy.  (Deposition of Michael Kopreski, M.D., 10/11/18, pp. 737-759; Ex. A to Sanofi's Responses to Plaintiffs' Notice of 30(b)(6) Deposition - Table of TAX316 Patients).

118.     Third, all patients who were recorded as having persistent alopecia were also treated with doxorubicin and cyclophosphamide, both of which are associated with reports of persistent alopecia in the absence of concurrent Taxotere treatment.  (*See* <u>Masidonski, Pat, and Suzanne M. Mahon. "Permanent alopecia in women being treated for breast cancer." *Clinical*</u>

*journal of oncology nursing* 13.1 (2009): 13-14; Yagata, Hiroshi, et al. "Abstract P5-15-17: National survey of long-term recovery from chemotherapy-induced hair loss in patients with breast cancer." (2015): P5-15).

119.     I have reviewed the analysis of the TAX 316 final data performed by Dr. Michael Kopreski, an oncologist and former manager in Sanofi's pharmacovigilance department.  Dr. Kopreski concludes that of the 29 patients who received Taxotere and were identified as having "ongoing" alopecia, only six had any evidence of alopecia more than six months after chemotherapy.  For the remaining 23 patients, there was simply a report of alopecia into the follow-up period, reporting which may have occurred as soon as three months following chemotherapy treatment. It is important to note again that alopecia following cancer chemotherapy is not unexpected and certainly does not constitute, at 3 months post treatment, "permanent" or "irreversible" alopecia.  Similarly, of the 16 patients who received the FAC regimen, and were reported with "ongoing" alopecia, only three had evidence of alopecia more than six months after chemotherapy.

120.     It is therefore simply incorrect for Plaintiffs' experts to suggest that the results of the TAX 316 study demonstrate that approximately 4% of Taxotere patients experience "permanent" or "irreversible" alopecia.  In actuality, fewer than 1% of the Taxotere patients in the TAX 316 study had alopecia more than six months after chemotherapy.

121.     Dr. Kopreski explained that of the 744 patients who received Taxotere, 29 were identified as having evidence of "ongoing" alopecia at the end of the study.  However, "ongoing" does not mean the same as "persistent", as it has been defined by Plaintiffs' experts.  (Kopreski Dep. Tr. at 725:12–15.)  Instead, "ongoing" simply means that the last time the patient was

assessed, the patient had some degree of hair loss, or alopecia.  *See* Kopreski Dep. Tr. at 725:16–19.

122.    In order to determine how many of the 29 identified cases of "ongoing" alopecia in the TAC arm had evidence of "persistent" alopecia as it has been defined, Dr. Kopreski closely reviewed the TAX 316 study.  Dr. Kopreski's criteria for finding "persistent" alopecia—rather than "ongoing" alopecia—was simple.  *See* Kopreski Dep. Tr. at 729:9–11.  Dr. Kopreski looked at how many patients had documentation of alopecia six months after their last chemotherapy treatment, and whether there was documentation of the alopecia's subsequent resolution.  *See* Kopreski Dep. Tr. at 729:7–18.  If a patient had documentation of alopecia six months after chemotherapy, without evidence of subsequent resolution, Dr. Kopreski considered that patient to have persistent alopecia.  *See* Kopreski Dep. Tr. at 729:22–730:3.

123.    Applying this criterion, Dr. Kopreski identified only 6 of the 29 patients with reported "ongoing" alopecia to have evidence of "persistent" alopecia.  (Ex. A to Sanofi's Responses to Plaintiffs' Notice of 30(b)(6) Deposition - Table of TAX316 Patients). Importantly, Dr. Kopreski considered these patients to have persistent alopecia regardless of whether the patient was taking another drug, such as Tamoxifen, which could have been affecting the lack of hair regrowth.  *See* Kopreski Dep. Tr. at 730:1–3.

124.    When the actual TAX 316 patient data is reviewed, it becomes apparent that such data does not support a finding of causation for persistent alopecia and Taxotere exposure.  For example, patient 15002 is one of the 29 patients in the TAC arm with "ongoing" alopecia.  That patient received one cycle of TAC, administered on 8/26/98. (Sanofi_02649521, p.7383).  The patient developed alopecia after this treatment cycle. (Sanofi_05503627).  She was withdrawn from the study after developing gastrointestinal mucositis following TAC administration.

50

(Sanofi_02649521, p.343).  On 9/23/98 the patient began alternative chemotherapy treatment with AC. (Sanofi_05503640).  At her first follow up visit on 11/3/98, alopecia was recorded as ongoing and "No longer followed due to new chemotherapy regimen started." (Sanofi_05503639, 05503641).  No further alopecia assessments were made for this patient.  After a distant breast cancer relapse, the patient began treatment with Taxol on 8/31/99. (Sanofi_05503649).  She was lost to follow up since 12/22/99.   (Sanofi_05503594) and was recorded as deceased due to breast cancer on an unknown day in 8/01. (Sanofi_05503655).

125.    Similarly, patient 15006 is one of the 29 patients in the TAC arm with "ongoing" alopecia.  That patient received one cycle of TAC, administered on 12/23/98.  The patient developed alopecia after this treatment cycle. (Sanofi_05503700).  She was withdrawn from the study after developing anaphylaxis during TAC administration. (Sanofi_002649521, p.344).  On 1/12/99 the patient began alternative chemotherapy treatment with AC. (Sanofi_05503707).  At her first follow up visit on 2/23/99, alopecia was recorded as ongoing and "No longer followed due to new chemotherapy regimen started." (Sanofi_05503711, 05503716).  No further alopecia assessments were made for this patient.  After a distant breast cancer relapse, the patient began treatment with vinorelbine on 8/10/99. (Sanofi_05503719).

126.    For these reasons, the results of the TAX 316 study cannot be used to determine that docetaxel causes permanent hair loss.  The results of the TAX 316 study instead demonstrate less than a 1% rate of alopecia six months after chemotherapy, based on the carefully reviewed available information.  Even in that 1%, it is impossible to rule out other potential causes of the patients' absence of full and complete hair regrowth after chemotherapy, including the co-administration of other chemotherapeutic agents among the reports of permanent alopecia.

GEICAM 9805

127.     The GEICAM 9805 study (also known as TAX.ESI.301) was "A multicenter Phase 3 randomized trial comparing docetaxel in combination with doxorubicin and cyclophosphamide (TAC) versus 5-fluorouracil in combination with doxorubicin and cyclophosphamide (FAC) as adjuvant treatment of high risk, operable breast cancer patients with negative axillary lymph nodes."

128.     The primary goal of the study was a comparison of disease-free survival after adjuvant treatment with either TAC or FAC among patients with high risk, operable breast cancer and negative axillary lymph nodes. The secondary goals were to compare overall survival, toxicity, and quality of life between the two groups, and to evaluate pathologic markers for predicting efficacy.

129.     The first patient was enrolled in the study on June 21, 1999 and the final report cut-off date for patients followed for at least 5 years was March 4, 2009. The follow-up report cut-off date was April 22, 2013.

130.     The clinical study report, dated September 15, 2009, reported that TAC was associated with a statistically significantly 32% reduction in the rate of relapse as compared to FAC.  There was also a non-significant improvement in overall survival with TAC compared to FAC.  (Sanofi_00724383).  The safety profile of TAC was consistent with the known toxicity of the individual drugs and the TAC combination and was consistent with the toxicity findings of the TAX 316 study. (Sanofi_00724385).

131.     The same report noted in the analysis of TEAEs persisting into the follow-up period that "alopecia remained ongoing in 3 of 49 (6.1%) of TAC patients compared with 1 of 35 (2.9%) FAC patients."  (Sanofi_00724490).

132.     On November 30, 2009, Sanofi submitted the results of GEICAM 9805 as a

supplemental NDA s-060 to FDA for the new indication of adjuvant chemotherapy among

patients with high risk, operable breast cancer and negative axillary lymph nodes.  As part of s-

060, Sanofi also provided its proposed changes to the Taxotere label, reflecting the findings from

GEICAM 9805.  As it had done with the 2004 TAX 316 submission, Sanofi proposed adding to

the Adverse Reactions section of the USPI the subsection "**Other persistent reactions**…The

following events were observed to be ongoing in TAC-treated patients at the median follow-up

time of 77 months; alopecia (n=3/49), amenorrhea (n=7/18), lymphoedema (4/5), peripheral

sensory neuropathy (3/10)."  (Sanofi_00384656).

133.     After a number of discussions with FDA, Sanofi withdrew the GEICAM 9805

efficacy supplement, citing changes in the standards of care for high-risk node-negative breast

cancer patients from the time the GEICAM 9805 study was initiated in 1999 to when the efficacy

supplement was filed in 2009.  (Sanofi_03242136).

## EPIDEMIOLOGY AND CAUSATION

134.     Epidemiology is the study of the patterns of disease in populations. Epidemiologic

studies record the outcomes and exposures of individuals, using specific study designs and

statistical methods to estimate the risk of disease associated with an exposure or other potential

risk factor.  The statistical analyses estimate the uncertainty in that correlation and can serve to

estimate the likelihood that such a correlation may be causal.

135.     In estimating the risk of a disease associated with an exposure, certain

epidemiologic data and studies are considered to be more reliable than other types of information.

The gold standard for estimating health effects associated with a specific exposure is the

prospectively designed, randomized, placebo-controlled, adequately powered clinical trial – an

epidemiologic study where a specific exposure, like a pharmaceutical agent, is randomly assigned to the selected population of enrolled human subjects. Random assignment of one or more exposure within the patient population is intended to distribute the potential for benefit randomly within the identified study population. As noted above, it is not ethical to design or conduct clinical trials in order to determine risk alone.  In terms of estimating risks for uncommon conditions like persistent/permanent hair loss, observational studies that follow participants in clinical trials over time or registries that enroll large numbers of individuals receiving the treatment of interest are generally more useful than other forms of non-clinical evidence such as animal studies and in vitro testing or expert opinion.  Prospectively designed epidemiologic studies can provide population-based information on risks in an exposed human population with similar overall risk factors such as similar rates of a variety of underlying illnesses.  Thus, the risk of an uncommon outcome like persistent alopecia can be estimated.  Such studies cannot prove causation, but can be useful in estimating risks with identified exposures and reported illnesses or medical conditions.

136.    There is a widely accepted "hierarchy of evidence" that is used by virtually all scientific bodies charged with determining the outcomes of exposures or the causes of disease. This hierarchy is described in the Reference Manual on Scientific Evidence (3rd edition) published jointly by the Federal Judicial Center and the National Academy of Sciences as a guide for courts in evaluating the strength and validity of scientific evidence. It is reflected in the following paragraph from that document:

> <u>Hierarchy of medical evidence</u>
>
> *With the explosion of available medical evidence, increased emphasis has been placed on assembling, evaluating, and interpreting medical research evidence. A fundamental principle of evidence-based medicine (see also Section IV.C.5, infra) is that the strength of medical evidence supporting a therapy or strategy is*

> *hierarchical. When ordered from strongest to weakest, systematic review of randomized trials (meta-analysis) is at the top, followed by single randomized trials, systematic reviews of observational studies, single observational studies, physiological studies, and unsystematic clinical observations.[1] [Reference Manual, 3rd Edition, P. 723].*

137.    I have reviewed the causation opinions of Plaintiffs' experts and note that Plaintiffs' experts reach their causation opinions in large part by relying on case reports.  Case reports are the lowest and least reliable for of scientific evidence. Case reports generally have little evidentiary value in establishing general causation.  Case reports are often confounded (*i.e.*, the case involves an adverse event that has possible etiologies other than the product of concern), are often missing information, may be subject to reporting or attribution bias and lack any comparison group.  That is why FDA has stated:

> For any individual case report, it is rarely possible to know with a high level of certainty whether the event was caused by the product. To date, there are no internationally agreed upon standards or criteria for assessing causality in individual cases, especially for events that often spontaneously (e.g. stroke, pulmonary embolism). Rigorous pharmacoepidemiologic studies, such as case-controls studies and cohort studies with appropriate follow-up, are usually employed to further examine the potential association between a product and an adverse event.

FDA Guidance for Industry, Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment.

138.    Plaintiffs' experts also rely on analyses of the FAERS database used by FDA.  As stated earlier in my report, spontaneous adverse event reporting is designed to raise questions to be investigated in formal epidemiologic studies. Spontaneous reports are more often than not incomplete, are notoriously under-reported to FDA or other postmarket surveillance databases, and can be influenced by litigation or publicity.  Use of FAERS data to make causal inferences is not generally considered scientifically reliable.

139.     Based on my review of the available scientific evidence, plaintiffs' experts' causation claims are unreliable.  It is my opinion that the currently available scientific evidence does not support an unequivocal causal role for Taxotere alone in persistent or permanent alopecia. As noted by FDA, the data are too confounded to make such an assertion.

**CONCLUSIONS**

140.     FDA reviewed and analyzed a tremendous amount of data related to the safety and efficacy of Taxotere.  In accordance with its regulations, FDA's overall positive assessment of Taxotere is reflected in its repeated approvals of new indications, in Taxotere's being granted accelerated approval status for several indications, and in labeling that shows no change to the safety profile of the product, particularly concerning the risk of persistent/permanent alopecia.

141.     Sanofi and FDA have appropriately evaluated the safety and effectiveness data for Taxotere throughout product development, during the approval processes, and through careful postmarket safety surveillance.  The labeling has been repeatedly updated to reflect new safety and effectiveness data, as needed.  Sanofi's postmarket studies and safety surveillance of Taxotere is consistent with the good pharmacovigilance and pharmacoepidemiologic assessments and practices recommended by FDA.  Sanofi complied with FDA regulations and with industry standards in its review and submission of information supporting its NDA and sNDAs.  Through its postmarket safety submissions, labeling submissions, and clinical study submissions, Sanofi repeatedly and appropriately shared the information it had on alopecia with FDA.

142.     FDA analyzed relevant safety and effectiveness data during the development, approval and postmarket surveillance of Taxotere. Both premarket and postmarket scientists and regulatory personnel were involved in the review of these data.  FDA's regulatory decisions were

56

based on a thorough and attentive appraisal of the data for Taxotere. FDA clearly relied on its

experience and resources for drug product decision-making in general, including drug product

approval and labeling as well as its experience and knowledge of both Taxotere specifically and

of taxanes more generally.  Sanofi conducted appropriate studies of Taxotere after marketing

approval in order to further evaluate the efficacy and safety of the product.  The doctor and

patient labeling for Taxotere have at all times complied with FDA regulations and provided the

essential information to patients and prescribers for the safe and effective use of the product.

### REVIEW OF PLAINTIFFS' EXPERTS' REPORTS

143.    Before addressing the specifics of Plaintiffs' experts' reports, it should be noted

that Plaintiffs' experts conflate reports of alopecia with reports of "permanent" or "irreversible"

alopecia.  This conflation is present in their analysis of the clinical trial data, the adverse event

data, and of the medical literature.  After treating reports of alopecia as if they were reports of

"permanent" or "irreversible" alopecia, Plaintiffs' experts conclude that there was a "safety

signal" for Taxotere and permanent or irreversible alopecia, that Taxotere may pose an increased

risk of permanent or irreversible alopecia apart from other breast cancer chemotherapeutic

agents, and that Taxotere may have been the more consistent or likely cause of alopecia among

patients exposed to Taxotere for the treatment of the cancers for which it is approved.  None of

these opinions are reliably drawn due in large part to the experts' conflating of alopecia with

permanent or irreversible alopecia.

144.    As stated earlier in my report, alopecia is not an unexpected event in approved

breast cancer chemotherapy.  Alopecia is not an unexpected event in clinical trials evaluating

proposed new chemotherapy agents for use in treating breast cancer.  With virtually every

chemotherapeutic agent used or proposed for use in treating breast cancer, and in any clinical

57

study of the same, there are likely to be reports of alopecia during treatment, during the study, and in follow up.  In the simplest of terms, patients in clinical trials for the treatment of breast are likely to experience some degree of alopecia, either before the study begins due to prior chemotherapy treatment or during the trial.  They may experience slow or incomplete hair re-growth after completing the trial.  There may be great variability in the rate of hair regrowth following completion or the trial and they may experience changes in their hair following chemotherapy as compared to prior to chemotherapy.

145.    There is uncertainty in the precise meaning of "ongoing" and "persistent" in regard to adverse events that may occur in the clinical trial context.  Whether an adverse event is ongoing or persistent is measured at a fixed period in time and may not be measured again if a patient drops out of a trial or completes the trial and does not return for follow-up specifically to address the presence of a particular adverse event, like hair loss or alopecia.  For those patients, reports of an "ongoing" or "persistent" adverse event does not mean that hair loss was "irreversible" or "permanent."

146.    None of the adverse event reports or clinical study data can appropriately be characterized as cases of "permanent" or "irreversible" alopecia, let alone connected to chemotherapy at the exclusion of other causes, without such specific clinical evaluation.  Sibaud et al. made this point in observing that the terms "CIPAL" or "PCIA" should not include the term "permanent" because no long term, controlled studies have been performed which specify continued evaluation and documentation of the degree or duration of alopecia among breast cancer patients in clinical trials and the final clinical outcome of most reports is unknown.  (V Sibaud, et al., Dermatological adverse events with taxane chemotherapy, Eur. J. Dermatol. (2016) Oct. 1; 26(5); 427-443).

David Madigan, Ph.D.

147.     I have reviewed Dr. Madigan's Report entitled "Docetaxel and Irreversible Alopecia".  Among other tasks, Dr. Madigan claims to address the question of whether a safety signal was present for docetaxel and "irreversible alopecia" and when a signal might have appeared. He claims to have reviewed Sanofi's internal pharmacovigilance database "in relation to docetaxel and irreversible alopecia" and he claims to have performed various statistical analyses of clinical trials data.

148.     First, I will address the issue of a safety signal for "irreversible alopecia", which appears to be confined to breast cancer patients treated with docetaxel in combination with other cancer chemotherapy agents.

149.     Dr. Madigan acknowledges many of the well-known limitations in the use of spontaneously reported postmarket adverse events reports, including incomplete reports, under-reporting of adverse events by physicians and others, and includes FDA's own statement that "[c]aution must be exercised in evaluating spontaneous reports, especially when comparing drugs."  As further noted in the quoted FDA Guidance, "…AERS…data may be affected by the submission of incomplete or duplicate reports, under-reporting, *or reporting stimulated by publicity or litigation.* As reporting biases may differ by product and change over time … it is not possible to predict their impact on data mining scores."  (emphasis added) (FDA Guidance: Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment (Mar. 2005) (https://www.fda.gov/downloads/drugs/guidancecomplianceregulatoryinformation/guidances/ucm071696.pdf.)  The guidance goes on the indicate that "many other factors affect the reporting rate of product-related adverse events (e.g., publicity, newness of the product to the market) and these factors should be considered when interpreting a high reporting rate."  (2005 Guidance at

page 12. *See also Pharmacoepidemiology* 5th edition; B Strom Ed. Wiley-Blackwell publisher;

page 151 and van Hunsel F, van Puijenbroek E, van den Berg LD; van Grootheest K. Media

attention and the influence on reporting odds ratio in disproportionality analysis: An example of

patient reporting of statins. *Pharmacoepidemiol Drug Safe.* 2010; 19: 26-32). In its 2005

Guidance FDA recommends that "sponsors calculate crude adverse event reporting rates as a

valuable step in the investigation and assessment of adverse events."  Further discussion

indicates the need to estimate reporting rates using U.S. cases as a numerator and estimates of

national patient exposure to the product as the denominator.

150.    With that brief background on methodology and the limitations of spontaneously

reported adverse event data, I want to respond to some of Dr. Madigan's statements.  First,

signals cannot be used to establish causality.  For the reasons noted above, patient and physician

reporting of adverse events is affected by a number of unquantifiable biases including recency of

product approval and publicity concerning a specific adverse event.

151.    Dr. Madigan cites the 2005 Guidance for the proposition that "[c]omparisons of

reporting rates and their temporal trends can be valuable..." but fails to incorporate the

subsequent cautionary comment: "However, such comparisons are subject to substantial

limitations in interpretation because of the inherent uncertainties in the numerator and

denominator used".  Dr. Madigan offers no estimated denominator in his comparisons of

reporting rates for docetaxel as compared to paclitaxel or other cancer chemotherapeutic agents

nor does he address that while these chemotherapy agents are all used to treat malignancies, their

spectrum of usage and duration of time on the U.S. market are widely divergent, further

undermining the validity of his comparative reporting rates assessments.  This does not mean

that there are not differential reporting rates and that comparisons might be informative, but it

does mean that any interpretation of those rates must be viewed with great caution due to uncertainty about the effect of factors that might affecting report rates, like notoriety or recency of approval.  (FDA Guidance: Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment at 4 (Mar. 2005)).

(https://www.fda.gov/downloads/drugs/guidancecomplianceregulatoryinformation/guidances/ucm071696.pdf).

152.    Dr. Madigan claims in paragraph 28 of his report that he "removed duplicates defined as having identical manufacturer and control codes" (sic). Matching reports with identical manufacturer control numbers (MCN) does not address the problem of duplicate reports. It may identify the initial and subsequent or follow-up reports but will not detect truly duplicated reports.   Duplicate reports may arise from more than one person submitting a report on the same patient and same adverse event or submitting the same report to different entities, such as FDA and the manufacturer.  Duplicate reports are eliminated by reviewing each report to identify the same patient and event being reported two or more times by different reporters or to different databases.  For example, a physician, nurse, patient or patient relative each might submit separate reports for the same individual.  Or a prescribing physician might submit a report both to FDA and the manufacturer.  It is by comparing age, gender, location and other factors that one eliminates duplicates, not via the simple expediency of matching MCNs. Dr. Madigan does not appear to appreciate the complexity and care needed to accurately review and assess adverse event reports prior to conducting statistical "analyses".

153.    FDA has frequently made the point that the most reliable adverse event reports are those received from healthcare providers, particularly physicians.  While Dr. Madigan

indicates that the excluded reports from lawyers (paragraph 30), he does not discuss reports from other sources such as consumers.

154.    In his section 4, entitled "Docetaxel FAERS Analysis", Dr. Madigan describes his statistical analysis of adverse event reports for docetaxel which he describes as indicating the presence of a clinical entity he refers to as "irreversible alopecia".  First, there is no such term in the MedDRA coding system, which FDA and other regulatory agencies and entities use for the purpose of coding reported adverse events. He claims to have defined this clinical entity he calls "irreversible alopecia" by combining the MedDRA term "Alopecia" with the outcome of "Disability or Permanent Damage".  Unfortunately, it is not clear whether he reviewed the retrieved reports to be certain that alopecia was the only reported adverse event.  If there were other events included in the report, there would be no way to be certain that the outcome of "Disability or Permanent Damage" referred to alopecia or some other adverse event term.  It is not at all clear that his methodology as described would have resulted in identification of cases of alopecia that were coded by the reporter as resulting in disability or permanent damage.  Thus, his case identification methodology appears to either be flawed or poorly described.

155.    Dr. Madigan's disregard of the potential influence of either litigation or notoriety (e.g. web-based support group entitled "Taxotears") is a glaring deficiency in his methodology. Despite his identification of published material discounting the effect that publicity of various sorts may have on adverse event reporting, it is clear that there is a visible inflection point in the 2009 – 2010 timeframe, which is neither acknowledged nor evaluated by Dr. Madigan in his report.  This is the putative timeframe in which the Taxotears web group became active, promoting the allegations of excessive numbers of patients with permanent alopecia after receiving combination cancer chemotherapy that included Taxotere.  To ignore this inflection

point runs counter to FDA's assessment of such inflection points as indicating stimulated

reporting.  Stimulated reporting renders the FAERS or other spontaneously reported adverse

event databases useless in assessing comparative reporting rates.

 (Pariente, A., Gregoire, F., et al, Impact of Safety Alerts on Measures of Disproportionality in

Spontaneous Reporting Databases: The Notoriety Bias, Drug Safety, 891 (2007); FDA,

Executive Summary Memorandum, Metal-on-Metal Hip Implant Systems, Appendix I:

Summary of Medical Device Adverse Event Reports (June 27-28, 2012 at

http://www.fda.gov/downloads/AdvisoryCommittees/CommitteesMeetingMaterials/MedicalDevi

ces/MedicalDevicesAdvisoryCommittee/OrthopaedicandRehabilitationDevicesPanel/UCM3094

06.pdf., Hazell and Shakir pg. 386).  In addition, the absence of an estimated denominator further

hampers a fuller interpretation of the adverse event reporting data in Dr. Madigan's analyses.

### David Kessler, J.D., M.D.

156.    I have reviewed Dr. Kessler's report in this matter.  Dr. Kessler is insistent that

alopecia can be considered a serious adverse event under the FDA regulations (21 C.F.R. 312 or

314.80).  I disagree.  While patients may report that the failure of their hair to regrow or regrow

either completely or in a manner indistinguishable from hair growth, distribution, texture or other

characteristics of their pre-cancer chemotherapy hair, FDA has clearly not determined that this

type of incomplete hair regrowth or persistent alopecia is a serious adverse event under its

regulations.  FDA has not instructed Sanofi or other taxane manufacturers to place such

information on alopecia in the Warnings and Precautions section. Information on alopecia

appears in the Clinical Trials, Postmarketing Adverse Events, Patient Counseling and the Patient

Package insert sections of the product labeling.  Despite Dr. Kessler's personal opinion, it is

clear that the regulators at FDA, whose job it is review and approve prescription drug labeling

including the Taxotere labeling, do not agree. As noted in the preamble to the new labeling

regulations (FR Vol.71 No, 15 January 24, 2006 Final Notice January 24, 2006; page 3968):

> FDA carefully controls the content of prescription drug labeling, because such labeling is FDA's principal tool for educating health care practitioners about the risks and benefits of the approved product to help ensure safe and effective use. As FDA noted in the preamble accompanying the December 2000 proposed rule amending the 1979 physician labeling regulations:

> The part of a prescription drug product's approved labeling directed to health care practitioners * * * is the primary mechanism through which FDA and drug manufacturers communicate essential; science-based prescribing information to health care professionals. This part of approved labeling is a compilation of information based on a thorough analysis of the new drug application (NDA) or biologics license application (BLA) submitted by the applicant *** [T]he primary purpose of prescription drug labeling is to provide practitioners with the essential information they need to prescribe the drug safely and effectively for the care of patients."

157.    Further clarification of the appropriate information to be included in the Warnings

and Precautions section is provided in the for the new Structured Product Labeling regulations

(id page 3988):

> (c)(6) *Warnings and precautions.* i. *General.* This section must describe clinically significant adverse reactions (including any that are potentially fatal, are serious even if infrequent, or can be prevented or mitigated through appropriate use of the drug), other potential safety hazards (including those that are expected for the pharmacological class or those resulting from drug/drug interactions), limitations in use imposed by them (e.g., avoiding certain concomitant therapy), and steps that should be taken if they occur (e.g., dosage modification).

158.    I believe that this simple fact – that persistent alopecia is not considered to be a

serious adverse event under FDA's regulations by FDA reviewers and regulatory personnel and

obviously is not appropriate for inclusion in the *Warnings and precautions* section – renders

further discussion of Dr. Kessler's theses on alopecia and the Taxotere labeling merely moot and

not of substance.

159.     At his deposition, Dr. Kessler placed significant emphasis on a 2006 abstract for a poster presentation by Dr. SM. Sedlacek, suggesting that the abstract should have required that Sanofi update the Taxotere labeling.  (Kessler Deposition, December 20, 2018, p. 253).  I disagree.  Sanofi submitted to FDA the cases of "persistent alopecia" identified in the Sedlacek abstract and those cases were part of Sanofi's 2011 Clinical Overview (Palatinsky Deposition, August 9, 2018, p. 300). Therefore, FDA was aware of the specific cases which were the subject of the abstract.  While the Sedlacek abstract is relevant to the subject of Sanofi's pharmacovigilance practices and regulatory reporting, the limited data available, the off-label nature of his treatment regimen, and the absence of a peer-reviewed publication providing further detail about these patients limits its utility and reliability.

160.     Dr. Kessler's Section X, which is a discussion of "Sanofi's Marketing and promotional efforts to differentiate Taxotere versus Taxol/paclitaxel misled physicians and doctors and put patients at an increased risk of harm", is of no regulatory significance. Internal marketing discussion are not regulatory documents and have no relevance to FDA's actions unless those documents are translated into actual promotional/marketing materials or statements. As an aside, I am somewhat confused by the inclusion of both physicians and doctors in the title of his section X, as though doctors and physicians are two different classes of prescribers. However, apart from the marketing and promotional materials actually used in print, verbal or other representations, such documents and presentations do not constitute a regulatory record and will not be further addressed in this report.

Laura Plunkett, Ph.D.

161.     In response to the expert report of Dr. Plunkett, I refer back to the patient labeling for Taxotere.  From initial approval through 2010, the patient package insert stated that alopecia

was a common side effect of Taxotere treatment and that "hair generally grows back", clearly indicating that hair does not grow back in all cases. FDA's reasoning for removing that clause is not clear.  The Agency provided no rationale.  In 2004, based on TAX 316, Sanofi added a section to the Adverse Reactions section of the physician's package insert entitled "Other Persistent Reactions", which would have included peripheral neuropathy, alopecia, amenorrhea, peripheral edema, lymphedema, asthenia, and myelodysplastic syndrome/acute myeloid leukemia. As noted above, FDA's Ann Staten removed this labeling addition without comment. Sanofi repeatedly evaluated its clinical trials data as well as its postmarketing data and submitted those evaluations and the data to FDA.  The suggestions and claims by Drs. Plunkett and Kessler that Sanofi failed to inform physicians (and doctors) of the risk of persistent alopecia or hair loss is simply not true.  Sanofi provided information in its labeling indicating that hair does not always grow back.  In at least two instances, FDA removed that specific language without indicating the reasoning behind its deletions.  This fact again renders the allegations by Drs. Plunkett and Kessler moot in that the question was answered by FDA and Sanofi was required to comply with FDA's decisions on labeling in order to legally market Taxotere in the U.S.

162.    I hold these opinions to a reasonable degree of medical, scientific and regulatory probability. I reserve the right to respond to additional Plaintiff expert reports, rebuttal reports, deposition or trial testimony.

Janet B. Arrowsmith, M.D.
Corrales New Mexico