# EXHIBIT D

# Expert Report

# Justin R. Victoria

JR Victoria Consulting LLC
1 Farmhouse Lane
Mendham, NJ  07945
jrvictoriaconsulting@gmail.com
December 28, 2018

I, Justin R. Victoria, have been retained as an expert in the Taxotere litigation by sanofi-aventis U.S. LLC and Sanofi US Services Inc. (Sanofi).  If asked, I am prepared to testify at trial regarding the matters set forth in this report.

## I.  <u>Qualifications</u>

Since November of 2009, I have served as the founder and owner of JR Victoria Consulting LLC, a consulting firm specializing in providing advice to healthcare companies on regulatory affairs issues, including the design and implementation of regulatory compliant product development programs to facilitate regulatory review and approval, financial communication issues, and pharmaceutical product litigation.

Before beginning my consulting work, I worked for 32 years in the pharmaceutical industry in the United States, including nearly twenty years in positions of increasing responsibility and functional leadership in regulatory affairs, two years in project management, and nine years in a leadership position in Investor Relations.

I received a Bachelor of Science degree in Biochemistry from Rensselaer Polytechnic Institute in Troy, New York in 1976.  I received a Master of Science degree in Biochemistry from the State University of New York at Buffalo in 1977 based upon work at the Roswell Park Memorial Cancer Research Institute.  I also received a Master of Business Administration degree in Pharmaceutical Marketing and Management from Fairleigh Dickinson University in Teaneck, New Jersey in 1983.

I started working in the pharmaceutical industry in 1977 at Hoffmann La-Roche (Roche), where my initial position was in basic research in immunology.  In 1978, I transferred to a

clinical research position at Roche, where I contributed to the design of clinical studies, monitored conduct of the trials at the investigator sites in the field, and participated in interpretation and reporting of the resulting clinical data, leading to the approval of New Drug Applications (NDAs) by the United States Food and Drug Administration (FDA) for new therapies.

In 1980, I transferred to the Regulatory Affairs department at Roche.  My initial position was that of a Technical Coordinator where I had responsibility to review and transmit biomedical data to the FDA in accordance with the relevant Investigational New Drug (IND) and NDA regulations.  I had responsibility for direct communication and follow-up with the FDA to resolve any inquiries associated with such filings.  Over the course of the next four years, I gained additional responsibilities in regulatory affairs at Roche, progressing to the lead position for the Anti-Infective work team in the department, where I had full regulatory responsibility for products in this category.

In 1984, I transferred to the Regulatory Affairs department of Ayerst Laboratories (Ayerst Laboratories was a Division of American Home Products in New York, NY.  It was subsequently combined with another division, Wyeth Laboratories, in 1988 to form Wyeth-Ayerst Laboratories in Philadelphia, PA.  The parent, American Home Products was later renamed Wyeth, then based in Madison, NJ.), where I served as regulatory liaison for several therapeutic categories of investigational and marketed prescription drug products and the Ayerst line of over-the-counter (OTC) drug products.

In 1988, I transferred to the newly combined Wyeth-Ayerst Laboratories in Philadelphia, PA and by 1989 I was promoted to the position of Director, U.S. Regulatory Affairs, when I assumed leadership of the regulatory affairs function for all Wyeth-Ayerst domestic products, including investigational products, products pending review and marketed products.  In this role, I was responsible for supervision and oversight of a staff of approximately 50 regulatory professionals and the associated administrative staff.  I was the senior-most regulatory officer for Wyeth-Ayerst responsible for FDA liaison, including direct communications with senior leadership at FDA.  During my tenure in regulatory affairs, I participated in dozens of meetings with FDA, serving as the chair for Wyeth-Ayerst in many.  I continued in that role until 1995.

2

For a two-year period in 1995-1996, I was assigned to lead the Project Management department for Wyeth-Ayerst, to oversee the coordination of the global development projects for the Wyeth-Ayerst Research and Development (R&D) portfolio.  In this role, I was responsible for portfolio management of the R&D projects, including selection of projects for development and prioritization among development projects.

In 1997, I returned to leadership of the domestic regulatory effort at Wyeth-Ayerst, adding responsibility for oversight of the worldwide regulatory function in 1998.   In the worldwide regulatory function, I was responsible for the direct oversight of a staff of 180 regulatory professionals who managed the regulatory responsibilities for products in more than 130 countries around the world.  In addition to direct interface with senior officials at FDA, when I assumed responsibility for worldwide regulatory affairs, I interacted with senior regulatory officials at the European Medicines Agency (EMEA), the European Committee for Proprietary Medicinal Products (CPMP), the Canadian Health Protection Branch (HPB) and other national health authorities.

During my tenure in regulatory affairs at Ayerst/Wyeth-Ayerst, I was directly and personally involved with the regulatory activities associated with dozens of investigational compounds and I contributed to the approval of more than two dozen new drugs in multiple therapeutic categories.

I was responsible for making submissions to FDA for investigational and marketed compounds and interacting with FDA officials on such filings to ensure they were found acceptable for review.  I advised company functions on regulatory requirements to develop and market products in a fashion consistent with regulations and FDA guidelines and policies.  I contributed to company training programs in that regard.

I was responsible for review of proposed promotional materials to ensure such materials were compliant with FDA regulations and the policies and practices of the Division of Drug Marketing, Advertising and Communications (DDMAC).  In that capacity, I served on Wyeth-Ayerst Copy Clearance Committees and the Copy Clearance Executive Committee, collaborating with representatives of legal, medical and marketing to ensure the truthfulness, scientific/medical accuracy and regulatory compliance of proposed promotional materials.  I was involved in preclearance of introductory promotional

3

campaigns, both professional and direct-to-consumer (DTC), by DDMAC for a number of products.  I was also responsible for communications and resolution of issues raised by DDMAC relating to Wyeth-Ayerst promotional materials.

I collaborated with medical staff at Wyeth-Ayerst on decisions relating to regulatory requirements for reporting of safety information, including safety reports on investigational drugs, and Adverse Drug Experience (ADE) reports and Periodic Adverse Drug Experience Reports (PADERs) for marketed products.

I was involved in developing initial product labeling during NDA submission, review and approval, and subsequent labeling updates, including regulatory decision-making as to the appropriate filing strategy for labeling changes.  In that regard, I participated in various labeling committees at Wyeth-Ayerst.

I participated in preparing for and presenting to FDA Advisory Committees.

I developed a scientific understanding to contribute to discussions of clinical, pharmacokinetic, chemistry, pharmacologic, toxicologic and statistical issues with company and FDA staff.

During the course of my tenure in regulatory affairs, I was an active, contributing member to regulatory professional societies including the Regulatory Affairs Professionals Society (RAPS), The Drug Information Association (DIA), the Food and Drug Law Institute (FDLI) and the Delaware Valley Regulatory Affairs Forum (DVRAF), presenting on various topics relating to regulatory affairs and FDA processes.

Based upon my experience in the regulatory affairs area, I am familiar with FDA regulations, procedures and policies, the underlying food and drug law, and the obligations, responsibilities and practices of regulated pharmaceutical companies.

During my tenure at Ayerst/Wyeth-Ayerst, I also served on several R&D oversight committees responsible for guiding drug discovery, drug development, and overall R&D portfolio management efforts.  On these committees, I contributed to discussions and evaluation of preclinical studies and data to determine whether to transition investigational

compounds into clinical development, choices of development projects and pathways to NDA filing and approval, and portfolio emphasis between new and life-cycle projects.

In 2000, I become Vice President of Investor Relations at Wyeth.  In that role, I was responsible for communications with investors and securities analysts, describing financial and operational performance and future opportunities at Wyeth to address questions for investment decision-making.  Oftentimes, these questions related to drug development and regulatory issues.  During my tenure in Investor Relations, I continued to serve as an active member of Wyeth R&D governance committees, overseeing the clinical progress of compounds in development and the status of FDA review, and contributing to decision-making relating to the overall portfolio of R&D projects.

My current resume, which describes my qualifications and professional experience in greater detail, is attached as Exhibit A.  A list of the testimony I have given in the last seven years is attached as Exhibit B.

## II.  **Materials Reviewed**

A listing of the materials reviewed in the preparation of this report is attached as Exhibit C together with any other materials specifically referenced in the body of this report.

The materials include documents related to the development, review, labeling and promotion of Taxotere, transcripts and exhibits from depositions, and materials related to the regulation of prescription drug development, labeling and promotion.

I have also reviewed the expert report of David Madigan, Ph. D. dated November 2, 2018, the expert report of Laura Plunkett, Ph. D. dated November 4, 2018 and the expert report of David Kessler, M.D. dated November 6, 2018.

III. **FDA Regulations and Role in Development, Approval, and Labeling of Prescription Drugs**

A. **Overview of FDA and Its Role in Drug Development**

1. **The FDA**

The FDA is responsible for protecting the US public health by assuring the safety, efficacy, and security of human and veterinary drugs, vaccines and other biological products, medical devices, the food supply, cosmetics, and products that emit radiation, and by regulating the manufacture, marketing, and distribution of tobacco products. The FDA is also responsible for helping healthcare professionals and the public get the accurate, science-based information they need to use medicines and foods to improve health. To meet these responsibilities, FDA has a staff of over 16,000 personnel and an annual operating budget of nearly $5 billion.[1]

FDA's organization consists of the Office of the Commissioner and four groups overseeing the core functions of the agency: Medical Products and Tobacco, Foods and Veterinary Medicine, Global Regulatory Operations and Policy, and Operations.

Within the abovementioned Office of Medical Products and Tobacco, the Center for Drug Evaluation and Research (CDER) is the organization within FDA responsible for ensuring that safe and effective drugs are made available to the American public. The FDA's authority to do so comes from the Federal Food, Drug, and Cosmetic Act of 1938 (the Act) and its subsequent amendments. FDA promulgates regulations, policy statements, guidelines, guidances and other pronouncements to guide the pharmaceutical industry and other stakeholders in how to implement the specific provisions of the Act. FDA, through CDER, has the responsibility to review and approve new drugs and for post-approval oversight of marketed drugs. FDA's authority over drug products includes drugs under development but not yet approved, as well as drugs that have been approved by FDA.

---

[1] https://www.hhs.gov/about/budget/fy2017/budget-in-brief/fda/index.html#overview.

### 2.  **New Drug Development and Regulatory Review Processes**

The process to bring a new drug to market is a complex, highly regulated and time consuming one.  In brief, drug companies seeking approval to sell a drug in the United States must test it in a number of ways.   First, the drug company or sponsor performs laboratory and animal tests to discover how the drug works and whether it's likely to be safe and work well in humans. Next, a series of tests in humans is begun to determine whether the drug is safe when used to treat a disease and whether it provides a valid health benefit. The company then sends the results of these tests to FDA in a New Drug Application (NDA)[2] so that the agency can evaluate the drug.  The NDA review process can take from six to twelve months or longer to complete.  If this review establishes that a drug's health benefits outweigh its known risks, the drug is approved for sale and the manufacturer may make it available to the market in the United States, consistent with the FDA-approved labeling.

Looking at this process in more depth, the first step in identifying new compounds to treat a disease or condition in the discovery process is to develop an understanding about the underlying cause of the disease or condition.  Researchers must first identify a "target," (usually a gene or protein), determine if the target can interact with drug candidates, and confirm that it is involved in the disease through the conduct of laboratory and animal tests ("target validation").  Researchers then synthesize many compounds to be tested to find potential "lead compounds" that act on the target and that may alter the course of the disease.  The lead compounds are subjected to a series of additional exploratory tests to evaluate the "activity" of the compound, or how well the compound binds to and acts on the target.

Following the synthesis of potential drug candidates, the next stage of the drug development process is preclinical testing.  During preclinical testing, researchers evaluate a drug development candidate's pharmacologic,[3] pharmacokinetic,[4] and toxicological effects through in vitro ("within the glass," i.e., in a test tube or petri dish-laboratory tests) and in vivo (animal models) testing.

---

[2] 21 CFR 314.

[3] Pharmacological activity refers to the effects of a compound, preferably the desired activity, in living systems.

[4] Pharmacokinetics is how the organism handles and processes a drug after its administration.

Researchers perform early toxicity tests to determine whether the compound is toxic or potentially carcinogenic and to identify the doses at which the compound first shows indicators of toxicity and what these signs of toxicity are.

Short-term animal studies are then used to test the efficacy or effectiveness of the compound in affecting the disease or condition in animal models in what is termed preclinical pharmacology.  Depending on the target, after the early exploratory laboratory studies, researchers may test efficacy in a succession of animal models, including mice, rats, dogs, and other mammals.  Evidence of the desired effect in animal models is needed to support continued development.

Researchers later perform a series of longer-duration pharmacokinetic, toxicologic and pharmacologic tests in a progression of animal models, still within the preclinical testing phase.  These tests define the drug development candidate's "therapeutic window," or the range of dosages that are both effective and safe.  Ideally, a drug development candidate will exhibit a wide therapeutic window in multiple animal models (i.e. a large range of doses that show effectiveness with few, if any, indicators of toxicity until higher doses are achieved).  Severe side effects, side effects at the therapeutic dose (narrow therapeutic window), early indications of carcinogenic potential, or poor or inconsistent pharmacokinetics across species can all derail development of a drug candidate at this stage.

During the preclinical development stage, researchers also study how the lead compound may be formulated into a drug product for delivery to humans.  The physiochemical properties of a drug candidate dictate the drug's potential to be put into a stable dosage form in which it can be consumed and delivered as an effective drug.  For example, researchers test for solubility, compatibility with inactive ingredients, and stability.   The drug product must be stable to provide the defined dose after storage in adverse conditions.  The dosage form must be acceptable to patients (e.g. palatable).  The dosage form must be able to be consistently manufactured at large scale.  Lack of success in any of those factors can serve as a reason to discontinue the development of a drug candidate.

The discovery and preclinical development processes are long, costly, complex and highly challenging.  In a 2006 study of the drug discovery, development and review processes by

the United States Government Accountability Office (GAO),[5] the GAO projected that only five compounds would successfully proceed into clinical trials from 10,000 compounds initially screened for the drug discovery and preclinical testing processes.  That represents a probability of success of 0.05% or the converse rate of failure of 99.95%.  This process is not only likely to yield failure, it is also time consuming in that the average time of the discovery and preclinical development processes collectively is about 6.5 years before trials in humans can even begin.

If all of the preclinical drug development has proceeded successfully, the Investigational New Drug Application (IND)[6] is filed by the company that will take responsibility for developing a drug (the sponsor) to show the FDA the results of preclinical testing they've done in laboratory animals and what they propose to do for human testing.  At this stage, the FDA decides whether it is reasonably safe for the company to move forward with testing the drug in humans.

These tests in humans to develop the data necessary to evaluate the safety and effectiveness of drugs prior to marketing of a new product in the United States are divided into three phases.   Phase 1 studies[7] are usually conducted in healthy volunteers. The goal here is to determine what the drug's most frequent side effects are and, often, how the drug is metabolized and excreted. The number of participants typically ranges from 20 to 80.

Phase 2 studies[8] begin if Phase 1 studies don't reveal unacceptable safety risks. While the emphasis in Phase 1 is on safety, the emphasis in Phase 2 is on effectiveness. This phase aims to obtain preliminary data on whether the drug works in people whom have a certain disease or condition. For controlled trials, patients receiving the drug are compared with similar patients receiving a different treatment--usually an inactive substance (placebo), or a different drug. Safety continues to be evaluated, and short-term side effects are studied. Typically, the number of patients in Phase 2 studies ranges from a few dozen to about 300.

---

[5] United States Government Accountability Office, New Drug Development 8, available at http://www.gao.gov/new.items/d0749.pdf.
[6] 21 CFR 312.
[7] 21 CFR 312.21(a).
[8] 21 CFR 312.21(b).

Phase 3 studies[9] begin if evidence of effectiveness is shown in Phase 2. These studies gather more information about safety and effectiveness, studying different populations and different dosages and using the drug in combination with other drugs. The number of patients usually ranges from several hundred to about 3,000 people or more.

As described in the abovementioned GAO report, the clinical development of a new drug, encompassing Phase 1, 2 and 3 studies, typically takes about seven years to complete.[10] Once the data from these clinical studies are collected and analyzed, the company files a New Drug Application (NDA).[11]  This is the formal step a drug sponsor takes to ask that the FDA consider approving a new drug for marketing in the United States.  FDA regulations define the required content and structure of the submission of an NDA.[12] An NDA includes the animal and human data from studies conducted by the sponsor or from other sources (e.g., published scientific literature) and analyses of the data, as well as information about how the drug behaves in the body, how it is manufactured and an initial proposal from the manufacturer for product labeling.

   3.  **FDA Review of an NDA**

When an NDA is submitted, the FDA has 60 days to decide whether to file it so that it can be reviewed.[13]  The FDA can refuse to file an application[14] that is incomplete or not formatted in a fashion that will permit its review.  For example, some required studies might be missing.

Once a new drug application is filed, an FDA review team from the various divisions within the Office of New Drugs (OND) within CDER--medical doctors, chemists, statisticians, microbiologists, pharmacologists, epidemiologists, supervisory review officers, Division Directors, Office Directors and other experts--evaluates whether the studies the sponsor submitted show that the drug is safe and effective for its proposed use.  No drug is absolutely safe; all drugs have side effects. "Safe" in this sense means that the benefits of the

---

[9] 21 CFR 312.21(c).
[10] GAO 2006 at 8.
[11] 21 CFR 314.
[12] 21 CFR 314.50.
[13] 21 CFR 314.101.
[14] 21 CFR 314.101(d).

drug appear to outweigh the risks.

In certain instances, FDA calls upon external resources to review the safety and efficacy of a proposed new drug in the form of an FDA Advisory Committee.  The Advisory Committee is principally comprised of medical experts in the relevant field and they recommend approval or disapproval of a drug's marketing application.[15]  For oncology drugs such as Taxotere, the relevant advisory committee is the Oncologic Drugs Advisory Committee (ODAC).  ODAC "reviews and evaluates data concerning the safety and effectiveness of marketed and investigational drug products for use in the treatment of cancer and makes appropriate recommendations to the Commissioner of Food and Drugs."[16]

In addition to the data and information submitted by the sponsor in the NDA, the FDA reviewers will also rely on other information that may be relevant to their review of the drug in question such as the published scientific and medical literature.  Also, importantly, for a drug such as Taxotere, FDA will also call upon its historical knowledge of the development, clinical studies, safety profile, and post-marketing surveillance of similar drugs in the same therapeutic class.  This knowledge forms a foundation to which the reviewers compare a new entry to the therapeutic class, such as Taxotere, to ensure that the benefit/risk ratio of the new product is acceptable.  This was done in comparing the therapeutic profile of Taxotere with the previously approved drug Taxol by the FDA reviewers and the FDA Advisory Committee in their consideration of Taxotere for approval in 1994 – 1996 as will be discussed later in this report.

The review team analyzes study results and looks for possible issues with the application, such as weaknesses of the study design or analyses of the underlying data.  The review process can take from six to twelve months or longer to complete.  There are usually many communications back and forth between FDA and the sponsor[17] to clarify information and to provide additional information to allow for FDA to complete its review of the application.  Reviewers determine whether they agree with the sponsor's results and conclusions, or

---

[15]
https://www.fda.gov/advisorycommittees/committeesmeetingmaterials/drugs/default.htm.
[16]
https://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/OncologicDrugsAdvisoryCommittee/default.htm.
[17] 21 CFR 314.102.

whether they need any additional information to make a decision.

Each reviewer prepares a written evaluation containing conclusions and recommendations about the application.  The clinical review is described in a Medical Officer Review (MOR). These evaluations are then considered by team leaders, division directors, and office directors, depending on the type of application for a consensus decision on the approvability of the application.

As FDA considers whether the benefits of a drug outweigh the risks, if there are problems with the NDA or if more information is necessary to make that determination, the FDA may issue a complete response letter.[18]

Common issues in the review of an NDA that would be cited in a complete review letter include unexpected safety issues that crop up or failure to demonstrate a drug's effectiveness. A sponsor may need to conduct additional studies--perhaps studies of more patients, different types of patients, or for a longer period of time.  FDA can refuse to approve the drug until those studies are done to address any questions about its safety or effectiveness.

If there are such questions to be resolved, the FDA outlines these issues and the justification for its decision on an NDA in the complete response letter to the drug sponsor and CDER gives the sponsor a chance to meet with agency officials to discuss the deficiencies. At that point, the sponsor can choose to ask for a hearing, or correct any deficiencies and submit new information, or they can withdraw the application.

If upon completion of its review, FDA finds that the data contained in the NDA provides evidence of the drug's safety and substantial evidence of its effectiveness for its proposed use from adequate and well-controlled clinical trials, it approves the NDA and permits the marketing and distribution of the drug in the US.

The process through clinical development and FDA review leading to approval and the market entry of a new drug product in the United States is challenging, unpredictable and fraught with uncertainty.  The early indications of success from animal models often are not

---

[18] 21 CFR 314.110.

good predictors of success in humans.  In oncology drug development this is particularly noteworthy.  Noted authorities in the field have observed that positive studies in animals have not been reflective of safety and efficacy in man on numerous occasions.  Dr. Richard Klausner of the National Cancer Institute has commented, "The history of cancer research has been a history of curing cancer in the mouse.  We have cured mice of cancer for decades, and it simply didn't work in humans."[19]  Additionally, a safe and effective dosing regimen has to be identified and confirmed in the clinical studies.  Few drugs that begin development actually succeed in receiving NDA approval.  For instance, the 2006 report on drug development by the GAO referenced above found that only 1 in 5 drugs that make it to the clinical trials phase is ultimately successful in completing all three clinical testing phases.[20] A more recent 2014 report by the Tufts Center for the Study of Drug Development reports that the success rate of drugs and biologics from Phase 1 through marketing approval is less than 12 percent.[21]  The most recent data from the KMR Group as reported by Dr. Tim Anderson of Bernstein (characterized as "best-in-class data because the input come directly from the companies themselves") was that it takes 11.8 phase 1 compounds to yield one marketed product, for a success rate of 8.5%.[22]  Thus, from 80% to as many as 93% of the drugs entering clinical trials fail to reach market, demonstrating how daunting the process of clinical development and regulatory review is.

The information in this section of the report has described a standard FDA NDA review process.  Because the standard processes for development and FDA review of a new drug are time-consuming, the FDA has developed mechanisms to expedite drug development and approval to make therapeutically significant drugs for serious diseases available earlier.[23] These mechanisms include Breakthrough Therapy status, Fast Track status, Priority Review and Accelerated Approval.[24]  These approaches to drug development and approval work in different ways and are applicable at different times in the process, but they do not relax the rigorous standards for efficacy and safety needed for drug approval in the U.S.  Substantial

---

[19] http://askuswhy.com/cancer.htm.
[20] GAO 2006 at 7.
[21] Tufts Center for the Study of Drug Development, Briefing:  Cost of Developing a New Drug 17, November 18, 2004.
[22] Bernstein, Global Pharmaceuticals:  Ten charts on latest R&D productivity trends – the most important fundamental attribute, November 28, 2017.
[23] https://www.fda.gov/ForPatients/Approvals/Fast/default.htm.
[24] Ibid.

evidence of effectiveness and safety from adequate and well-controlled clinical studies is still required to be presented to FDA to support drug approval.  The Accelerated Approval process is oftentimes used in the first-time approval of new therapies for oncology[25] as that process allows for drugs for serious conditions (cancers) that fill an unmet medical need to be approved based on a surrogate endpoint (e.g., tumor response) that is reasonably likely to predict clinical benefit, such that FDA may approve these drugs and make them available to treat cancer patients faster than they might otherwise.[26]  FDA then requires confirmatory clinical studies to demonstrate that the evidence of effect on the surrogate endpoint is ultimately verified in clinical benefit (e.g., survival benefit).[27]  Approval of the drug may be withdrawn or the labeled indication changed if the follow-up trials fail to verify the clinical benefit.[28]  As will be discussed later in this report, the initial FDA approval of Taxotere in May 1996 for advanced breast cancer was via the accelerated approval process.[29]

### 4.  **FDA Review of Labeling**

During the review of the NDA, the FDA also reviews the sponsor's proposed draft labeling for the product and makes revisions to the language to ensure that the labeling contains accurate information reflecting the data obtained from the clinical trials and other sources of clinical data, is consistent with labeling regulations, and provides adequate directions for use and warnings about the use of the drug.   Those labeling revisions are discussed with the sponsor, with final labeling text determined by FDA at the time of approval.  The goal is to ensure that the scientific and medical information available to both the medical/scientific experts of the sponsor and FDA, and the judgment of both as to how to best characterize that information in the framework of the FDA labeling regulations, are considered.   If FDA does not agree with the sponsor on the specific labeling language, it will not approve the labeling and, thus, not approve the drug.

In order for the new drug to be approved for marketing in the United States, the FDA must determine that the data contained in the NDA provides evidence of the drug's safety and

---

[25] Johnson, J., et. al., *Accelerated Approval of Oncology Products:  The Food and Drug Administration Experience*, J Natl Cancer Inst 2011;103: 1-9.
[26] https://www.fda.gov/ForPatients/Approvals/Fast/ucm405447.htm.
[27] Ibid.
[28] Ibid.
[29] Sanofi_01380011-15.

substantial evidence of its effectiveness for use from adequate and well-controlled clinical trials,[30] and that the labeling contains a summary of the essential scientific information needed for the safe and effective use of the drug.[31]  If these standards are met, and there are no other reasons to deny approval, FDA approves the NDA[32], approves the labeling and, thus, approves the drug for market.   As will be described in the next section of the report below, FDA then continues to review the adequacy of the labeling throughout the life of the product in the market.  FDA recognizes that a drug's labeling cannot contain everything that is known about a drug.  Such labeling would be too voluminous to be useful.[33]  It is meant to provide a summary of the actions of the drug in humans and relevant safety, efficacy and use information so that a health professional can appropriately weigh the benefits and risks of the drug for individual patients.[34]

### 5.  **Post-Marketing Surveillance**

After the drug is approved, the FDA continues to monitor a drug's safety profile and the adequacy of its labeling.  This is done by the medical experts in the Office of New Drugs that originally reviewed the NDA, as well as experts from the Office of Surveillance and Epidemiology (OSE), a group trained specifically to evaluate information relating to the safety of drug products.  FDA has the authority to require changes to a drug's labeling after it is approved, just as it does before approval.  If the sponsor does not make the required changes to the labeling, FDA could consider the drug misbranded and subject to regulatory action, including removal from the market.

To facilitate this oversight, the sponsor continues to monitor the safety of the drug in the marketplace and provides post-approval update reports to FDA.[35,36] In an NDA Annual Report[37] the sponsor is to summarize significant new information that it has received or otherwise obtained during the previous year that might affect the safety, effectiveness or

---

[30] 21 CFR 314.126.
[31] 21 CFR 201.56.
[32] 21 CFR 314.125.
[33] Guidance for Industry – Adverse Reactions Section of Labeling for Human Prescription Drug and Biological Products – Content and Format, January 2006, pp. 2, 5.
[34] 21 CFR 201.56(a).
[35] 21 CFR 314.80.
[36] 21 CFR 314.81.
[37] 21 CFR 314.81(b)(2).

labeling of the drug product, and to describe the actions it intends to take; for example, to submit a change to the labeling via a supplemental application – sNDA.[38]  The NDA Annual report is to provide distribution data and describe any authorized generic products,[39] as well as Chemistry, Manufacturing and Controls information about the physical drug itself. [40] Internal or published reports of nonclinical laboratory (animal) studies are to be included.[41] Additionally, the sponsor is to monitor the published literature about its drug and provide published clinical studies and reports of unpublished (sponsor) clinical studies, providing FDA with an update on available clinical data on the drug after its review of the original NDA.[42]  Copies of current labeling and a description of changes in labeling since the last report are to be included.[43]  Thus, even in the absence of changes to the labeling in the course of the year, the sponsor resubmits its labeling to FDA for its consideration on at least an annual basis.  Lastly, the NDA Annual Report is to include a status report of post-marketing study commitments and a log of outstanding regulatory business.[44]

Safety information for marketed prescription drug products is handled in its own unique process.  All safety information from any source, foreign or domestic, including information derived from commercial marketing experience, postmarketing clinical investigations, postmarketing epidemiological/surveillance studies, reports in the scientific literature, and unpublished scientific papers is to be collected, assessed and submitted by the sponsor in accordance with the FDA regulations at 21 CFR 314.80.  The safety information is evaluated by the manufacturer for safety "signals": new potential associations between drug products and adverse events.  Reports of adverse drug experiences from domestic and foreign postmarketing experience (spontaneous reports), from post-marketing clinical studies or from the scientific literature that are serious and unexpected (not labeled) are to be reported to FDA on an expedited (15-day) basis.[45]   Accordingly, the FDA-approved US product label serves as the reference of "expectedness" for post-approval safety assessments under 21 CFR 314.80.

---

[38] 21 CFR 314.81.
[39] 21 CFR 314.81(b)(2)(ii).
[40] 21 CFR 314.81 (b)(2)(iv).
[41] 21 CFR 314.81 (b)(2)(v).
[42] 21 CFR 314.81(b)(2)(vi).
[43] 21 CFR 314.81 (b)(2)(iii).
[44] 21 CFR 314.81(b)(2)(vii) and (viii) and (ix).
[45] 21 CFR 314.80(c)(1) and 314.80(d).

The post-marketing safety reporting regulations also call for follow-up investigation and reports of such serious and unexpected adverse experiences to be submitted on an expedited, 15-day basis.[46]  FDA clarifies this requirement in its various guidances on this topic.  "FDA recommends that sponsors make a reasonable attempt to obtain complete information for case assessment , . . . especially for serious events."[47]  "FDA suggests that the intensity and method of case follow-up be driven by the seriousness of the event reported, the report's origin , . . .  and other factors.  FDA recommends that the most aggressive follow-up efforts be directed towards serious adverse event reports, especially of adverse events not known to occur with the drug."[48] "For serious adverse experiences, applicants should exercise due diligence in obtaining follow-up information for the purposes of completing all the applicable elements for an individual case safety report.  For adverse experiences that are determined to be non-serious… additional follow-up is not necessary."[49]  Thus, FDA considers that good pharmacovigilance practices will include follow-up investigation and reporting for serious and principally unlabeled adverse events, not for non-serious events, employing good medical and pharmacovigilance judgment.

Additionally, the sponsor is to summarize and analyze postmarketing safety information in a Periodic Adverse Drug Experience Report (PADER).[50]   PADERs are to be submitted on a quarterly basis for the first three years after a drug is approved and then annually thereafter.[51]  The PADER is to include a summary and analysis of all the included safety information, an analysis of the reports of serious and unexpected adverse drug experiences submitted since the previous PADER, an index and individual case study reports for all serious and expected, and non-serious adverse drug experiences (reports of serious and expected, and all non-serious adverse drug experiences from foreign marketing experience,

---

[46] 21 CFR 314.80(c)(1)(ii).
[47] Guidance for Industry, Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment, March 2005, p. 4.
[48] Ibid, p. 5.
[49] Guidance for Industry, Postmarketing Safety Reporting for Human Drug and Biological Products Including Vaccines, Draft Guidance, March 2001, pp. 16.
[50] 21 CFR 314.80(c)(2).
[51] 21 CFR 314.80(c)(2).

scientific literature and post-marketing studies are <u>not</u> to be reported to FDA[52]) and a history of actions taken since the last PADER because of adverse experience reports (e.g., labeling changes).[53]   FDA also encourages sponsors to seek a waiver of the requirement to include the individual case reports of the adverse experience reports for serious and expected, and all non-serious adverse drug experiences in the PADER.[54]  Sanofi sought, and on May 25, 2000, FDA approved such a waiver for Taxotere such that the PADERs and PSURs would no longer include copies of case reports for adverse experiences that are non-serious and labeled.[55]  Sanofi continued to provide case reports for adverse experiences that are serious and expected.  If a sponsor fails to establish appropriate safety monitoring and record-keeping processes and/or does not make the appropriate safety reports outlined above, FDA may withdraw the NDA approval and prohibit continued marketing of the drug.[56]

This process of post-marketing safety surveillance and reporting is called pharmacovigilance.   Through this process, both the sponsor and FDA continue to monitor the safety of the use of the product in the marketplace to make sure the product labeling continues to provide adequate directions for the safe use of the product.  If either the FDA or the sponsor determines that a change to the label is warranted, discussions as to the appropriate revisions to the labeling language ensue and a supplemental NDA is filed for FDA to approve the labeling change.  [There is a provision in the regulations for a sponsor to submit a labeling change for FDA review, but to implement it immediately while the FDA review is ongoing via a Special Supplement – Changes Being Effected (CBE), for labeling changes that add or strengthen a contraindication, warning, precaution or adverse reaction for the product. [57]   While FDA recognizes this provision in the labeling regulations, it notes that, "in practice, manufacturers typically consult with FDA prior to adding any risk information to labeling" since "the determination whether labeling revisions are necessary is, in the end, squarely and solely FDA's under the act."[58]   When the FDA review of the CBE

---

[52] 21 CFR 314.80(c)(2)(iii), and Guidance for Industry, Postmarketing Safety Reporting for Human Drug and Biological Products Including Vaccines, Draft Guidance, March 2001, p. 20.
[53] 21 CFR 314.80(c)(2)(ii).
[54] Guidance for Industry, Postmarketing Safety Reporting for Human Drug and Biological Products Including Vaccines, Draft Guidance, March 2001, pp. 6, 15, 32.
[55] Sanofi_00259029.
[56] 21 CFR 314.80(k).
[57] 21 CFR 314.70(c)(6)(iii)(A).
[58] 71 FR 3934.

labeling change is completed, FDA may accept (approve) or reject the change.  If FDA rejects the labeling change, the manufacturer will be required to return to the previous approved label in the market.]

To facilitate the global pharmacovigilance process, the International Conference on Harmonization (ICH), an initiative among the United States, European and Japanese regions to harmonize drug regulation across these three regions, implemented a guideline in 1996 to harmonize the periodic safety reporting requirement to the global regulatory authorities in a standard format called the Periodic Safety Update Report (PSUR).[59]  The focus of the PSUR is on post-marketing safety information.  With the finalization of this ICH guideline, FDA allowed sponsors to submit waivers to submit post-marketing safety reports under 21 CFR 314.80 in the format of a PSUR instead of the PADER format.[60]  Sanofi sought, and on January 21, 2006, FDA approved such a waiver for the Taxotere NDA such that Sanofi submitted PSURs for Taxotere in place of Periodic Adverse Experience Reports from that point forward.[61]  The PSUR is to include:

> Title Page
>
> Table of Contents
>
> 2.1  Introduction
>
> 2.2  Worldwide Market Authorization Status
>
> 2.3  Update of Regulatory Authority or MAH Actions Taken for Safety Reasons
>
> 2.4  Changes to Reference Safety Information
>
> 2.5  Patient Exposure
>
> 2.6  Presentation of Individual Case Histories
>
> > 2.6.1  General considerations
> >
> > 2.6.2  Cases presented as line listings
> >
> > 2.6.3  Presentation of the line listing

---

[59] International Conference on Harmonization of Technical Requirements for Registration of Pharmaceuticals for Human Use, ICH Harmonized Tripartite Guideline, Periodic Benefit-Risk Evaluation Report (PBRER), E2C(R2), December 17, 2012, p. 1.
[60] Guidance for Industry, Providing Postmarketing Periodic Safety Reports in the ICH E2C(R2) Format (Periodic Benefit-Risk Evaluation Report), November 2016, p. 3.
[61] Sanofi_00201968.

2.6.4   Summary tabulations

2.6.5   MAH's analysis of individual case histories

2.7   Studies

2.7.1   Newly analyzed company-sponsored studies

2.7.2   Targeted new safety studies planned, initiated, or continuing during the reporting period

2.7.3   Published safety studies

2.8   Other Information

2.8.1   Efficacy-related information

2.8.2   Late-breaking information

2.9   Overall Safety Evaluation

2.10   Conclusion[62]

While the ICH PSUR outline is more detailed than the regulatory description of the PADER, the primary purpose and content is much the same in requiring the sponsor to provide the regulatory authority with listings and reports of adverse experiences from post-marketing surveillance and reports from the published literature and the sponsor's analysis and evaluation of such reports to provide this periodic opportunity for an overall safety reevaluation.[63]

To facilitate the evaluation of the post-marketing safety information by the global regulatory authorities, the PSUR guideline called for the sponsor to prepare a reference safety information document based upon the cumulative knowledge regarding the safety of the product called the Company Core Safety Information (CCSI).  The CCSI facilitates the objective of a PSUR to establish whether information received during the reporting period is in accord with previous knowledge on the drug's safety and to determine whether changes should be made to product information.[64]  Since product labeling can vary between the ICH regions, the CCSI provides a common reference source for the safety evaluation.

---

[62] 62 FR 27472-75.
[63] 62 FR 27471.
[64] 62 FR 27472.

The CCSI is to contain a defined set of data and advice that the company intends to have reflected in the national labeling worldwide, except where the local regulatory authority requires a modification.[65],[66] The CCSI is not negotiated between the sponsor and the regulatory authorities.[67] Thus, the CCSI serves as an internal foundation or basis for safety-related labeling discussions between the local affiliates of the sponsor company and the local regulatory authority.[68] But, the local national regulatory agency retains the authority to determine the ultimate content of the local label.   Thus, "Compared to the CCSI, the national/regional HP labeling may contain more, less or different safety information."[69]

Sanofi adopted the PSUR format for post-marketing safety reporting and included in its PSURs for docetaxel as the PSUR-required company Reference Safety Information, the Sanofi Company Core Safety Information including all the mandatory and non-mandatory safety information but also additional information such as the indications, dosing, pharmacokinetics and pharmacodynamics and information about the physical properties of the drug itself. [See for example Docetaxel Company Core Safety Information, Version 24, December 14, 2009.[70]]  The specific safety information content contained in the Sanofi docetaxel CCSIs is described later in this report.

The pharmacovigilance environment has evolved such that the regulatory authorities have recognized that the assessment of risks of drug products is most meaningful when considered in light of its benefits.[71]   Accordingly, the ICH has now expanded the PSUR to include benefits as well as risks in a new format called the Periodic Benefit-Risk Evaluation Report (PBRER).[72]   While the main focus of the PBRER remains the evaluation of relevant new safety information from the available data sources, this information is to be placed

---

[65] International Conference on Harmonization of Technical Requirements for Registration of Pharmaceuticals for Human Use, ICH Harmonized Tripartite Guideline, Periodic Benefit-Risk Evaluation Report (PBRER), E2C(R2), December 17, 2012, p. 26.

[66] MedDRA and Product Labeling:  "Best Practices" Recommendations, MSSO-DI-8381-3.0.0, April 15, 2005, p. 2

[67] Ibid.

[68] Ibid.

[69] Ibid.

[70] Sanofi_00197905-44.

[71] International Conference on Harmonization of Technical Requirements for Registration of Pharmaceuticals for Human Use, ICH Harmonized Tripartite Guideline, Periodic Benefit-Risk Evaluation Report (PBRER), E2C(R2), December 17, 2012, p. 1.

[72] Ibid.

within the context of any pertinent efficacy/effectiveness information that may have become available since the last report.[73]  Thus, the PBRER includes provisions for the reporting of efficacy/effectiveness information for benefit evaluation and a concluding integrated benefit/risk evaluation that was not part of the predecessor PSUR.

FDA has indicated its intent to accept the PBRER format as an acceptable approach for postmarketing periodic safety reports.[74] Sanofi sought, and on July 19, 2013, FDA approved such a waiver for the Taxotere NDA such that the Sanofi submitted PBERs for Taxotere in place of Periodic Adverse Experience Reports from that point forward.[75]  The PBRER is to include:

> Title Page
>
> Executive Summary
>
> Table of Contents
>
> 1. Introduction
> 2. Worldwide Marketing Approval Status
> 3. Actions Taken in the Reporting Period for Safety Reasons
> 4. Changes to Reference Safety Information
> 5. Estimated Exposure and Use Pattern
>> 5.1  Cumulative Subject Exposure in Clinical Trials
>> 5.2  Cumulative and Interval Patient Exposure from Marketing Experience
> 6. Data in Summary Tabulations
>> 6.1  Reference Information
>> 6.2  Cumulative Summary Tabulations of Serious Adverse Events from Clinical Trials
>> 6.3  Cumulative and Interval Summary Tabulations from Post-Marketing Data Sources
> 7. Summaries of Significant Findings from Clinical Trials during the Reporting Period
>> 7.1  Completed Clinical Trials

---

[73] Ibid, p. 3.
[74] Guidance for Industry, Providing Postmarketing Periodic Safety Reports in the ICH E2C(R2) Format (Periodic Benefit-Risk Evaluation Report), November 2016, p. 4-7.
[75] Sanofi_00268919.

7.2   Ongoing Clinical Trials

7.3   Long-Term Follow-up

7.4   Other Therapeutic Use of Medicinal Product

7.5   New Safety Data Related to Fixed Combination Therapies

8.   Findings from Non-Interventional Studies

9.   Information from Other Clinical Trials and Sources

10. Non-Clinical Data

11. Literature

12. Other Periodic Reports

13. Lack of Efficacy in Controlled Clinical Trials

14. Late Breaking Information

15. Overview of Signals:  New, Ongoing or Closed

16. Signal and Risk Evaluation

16.1   Summary of Safety Concerns

16.2   Signal Evaluation

16.3   Evaluation of Risks and New Information

16.4   Characterization of Risks

16.5   Effectiveness of Risk Minimization (if applicable)

17. Benefit Evaluation

17.1   Important Baseline Efficacy/Effectiveness Information

17.2   Newly Identified Information on Efficacy/Effectiveness

18. Integrated Benefit-Risk Analysis for Approved Indications

18.1   Benefit-Risk Context – Medical Need and Important
         Alternatives

18.2   Benefit-Risk Analysis Evaluation

19. Conclusions and Actions

20. Appendices[76]

To allow for the inclusion of benefits in the supporting reference document to facilitate the benefit/risk evaluation of the PBRER, the CCSI has been expanded to include the approved indications for the product in the three ICH regions and information on dosing,

---

[76] International Conference on Harmonization of Technical Requirements for Registration of Pharmaceutical for Human Use, ICH Harmonized Tripartite Guideline, Periodic Benefit-Risk Evaluation Report (PBRER), E2C(R2), December 17, 2012.

pharmacology and other issues beyond the core safety information in what is termed as a Company Core Data Sheet (CCDS).[77]  As noted above, the Sanofi docetaxel CCSI already included such information.

### a.  **FAERS Database**

When the sponsor submits adverse experience reports (AERs) regarding its marketed drug products to FDA in accordance with its safety surveillance efforts described above, FDA enters this information into a database called the FDA Adverse Event Reporting System (FAERS).[78]  FDA also receives reports of adverse events and medication errors directly from healthcare professionals such as physicians, nurses or pharmacists, or from consumers such as patients, family members or lawyers.  These reports are also entered into FDA's FAERS database.

FDA utilizes the FAERS database in support of its efforts in post-marketing safety surveillance of drug products, such as looking for new safety concerns arising from the use of a drug product in the marketplace and responding to external requests for safety information.  FAERS is a searchable tool for FDA in its postmarketing surveillance efforts. FDA reviewers in CDER evaluate reports from the FAERS database to determine if additional evaluation of a safety issue is required. This post-marketing surveillance of drugs in the marketplace continues at FDA throughout the life of the product.

While the FAERS is a useful tool to support FDA in its safety surveillance activities, it has limitations.[79]  FDA does not require that a direct causal relationship between the reported event and the suspect drug be established before a report is submitted and entered into the FAERS database.  Thus, there is no certainty that the reported event was actually due to the product.  Reports also do not always contain enough detail to properly evaluate an event. Factors such as the time a product has been on the market, adverse events with similar products or publicity about a safety issue can all impact the reporting of adverse events to

---

[77] Ibid.
[78]http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Surveillance/AdverseDrugEffects/default.htm.
[79]
http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Surveillance/AdverseDrugEffects/default.htm.

FDA.  Additionally, there is a generally recognized bias of underreporting of adverse events, as FDA does not receive reports for every adverse event or medication error that occurs with a product.  For these reasons and others, the FAERS data cannot be reliably used to calculate the incidence of an adverse event in the population nor can it be considered definitive in establishing the causal relationship between an adverse experience and a suspect drug.

### b.  Trackable Safety Issues

In January 2007, CDER launched a new information technology platform called the Document Archiving, Reporting, and Regulatory Tracking System (DARRTS) which allows CDER reviewers to share information, project plans, document reviews and recommendations for regulatory action across all disciplines within CDER.[80]  DARRTS allows for a collaborative review of information about potential drug safety issues across CDER review disciplines.  If the safety issue is determined to be a significant safety issue, one that has the potential to lead to:

- Withdrawal of an approved drug from the market
- Withdrawal of an approved indication
- Limitations on use in a specific population or subpopulation
- Additions or modifications to the Warnings and Precautions, or Contraindications sections of the labeling, or the Medication Guide or other required Patient Package Insert, including safety labeling changes required under the Food and Drug Administrative Amendments Act (FDAAA)
- Establishment of or changes to the proprietary name/container label/labeling/packaging to reduce the likelihood of medication errors
- Establishment or modification of a risk evaluation and mitigation strategy (REMS)
- A requirement that a sponsor conduct a safety-related postmarketing trial or study
- The conduct of a safety-related observational epidemiological study by FDA,

CDER then creates a Trackable Safety Issue (TSI) within DARRTS to follow the evaluation of

---

[80] Guidance – Classifying Significant Postmarketing Safety Issues, Draft Guidance, March 2012.

the issue throughout the Center.[81]  Such TSIs can be opened within DARRTS by the original

NDA OND reviewers or by OSE staff based upon monitoring the FAERS database or other

sources of postmarketing safety information.  When a TSI is opened, the sponsor is notified

and the public is subsequently notified through the posting of a quarterly listing of all new

TSIs on the FDA AERS website.[82]

Once the CDER reviewers complete their evaluation and determine what regulatory action

is warranted, if any, then that action is implemented in concert with the drug manufacturer

and the TSI is closed. [83]

A recent example of a TSI posted on the AERS website is the finding from an FDA review of

an international clinical study of oral fluconazole that demonstrated an increased risk of

miscarriage.[84]  FDA notes that its review of additional data is ongoing and that its

conclusions and recommendations will be communicated when the evaluation is complete.

## 6. <u>Advertising and Promotion</u>

Another component of FDA's oversight of marketed prescription drug products is its

surveillance of the advertising and promotion of such products to ensure that they are

truthful, balanced, not misleading, and consistent with the FDA-approved labeling.

Promotion and advertising that is regulated by the FDA include information that

pharmaceutical companies generate and provide to healthcare professionals, such as

physicians, and to consumers to educate about its products.  Such promotional materials

include, for example, brochures, mailing pieces, detailing pieces, advertisements in journals,

newspapers, magazines and other periodicals, websites, and broadcast advertisements on

---

[81]
http://www.fda.gov/downloads/aboutfda/centersoffices/officeofmedicalproductsandtoba
cco/cder/manualofpoliciesprocedures/ucm164967.pdf.
[82]
http://www.fda.gov/downloads/aboutfda/centersoffices/officeofmedicalproductsandtoba
cco/cder/manualofpoliciesprocedures/ucm248882.pdf.
[83]
http://www.fda.gov/downloads/aboutfda/centersoffices/officeofmedicalproductsandtoba
cco/cder/manualofpoliciesprocedures/ucm164967.pdf.
[84] http://www.fda.gov/Drugs/DrugSafety/ucm497482.htm.

television, radio and through other electronic media.[85]  A pharmaceutical company's requirements for compliance with the FDA advertising and promotion regulations relate to these and other types of promotional materials disseminated by or on behalf of the company.[86]

Scientific and medical information discussing a particular disease or health condition that may be provided externally by sponsors, but which is not specific to a particular drug product (Unbranded or Disease-Awareness advertisements), are <u>not</u> considered promotional materials under these regulations.[87]

The FDA prescription drug advertising regulations in 21 CFR Part 202 do not prescribe the specific content and presentation that is appropriate for promotional materials, but rather describe a more philosophical characterization of what promotional materials should not do.  The basic tenet is that promotional materials should not be false, lacking in fair balance (of product benefits and risks) or be misleading.[88]

Prescription drug advertising and promotion must present information about a drug to convey a "fair balance" of the benefits and risks of the use of the product."[89]  The characterization of the benefits and risks is to be a "[t]rue statement of information in brief summary relating to side effects, contraindications, and effectiveness."[90]

Promotional materials must be consistent with the information included in the FDA-approved labeling.  This long-standing regulatory policy was recently confirmed in an FDA guidance.[91]  The words in the promotional materials are not required to be identical to the FDA-approved labeling.

---

[85] 21 CFR 202.1(l)(1) and (2).
[86] 21 CFR 202.1.
[87] Guidance for Industry – "Help-Seeking" and Other Disease Awareness Communications by or on Behalf of Drug and Device Firms, Draft Guidance, January 2004, p. 1.
[88] 21 CFR 202.1(e).
[89] 21 CFR 202.1(e)(5)(ii).
[90] 21 CFR 202.1(e).
[91] Guidance for Industry – Medical Product Communications That Are Consistent With the FDA-Required Labeling – Questions and Answers, Draft Guidance, January 2017.

Promotional materials may arise from any and all sections and information in the product label and the studies that support those sections of the labeling; however, the entire labeling information is not required to be included in the body of promotional pieces.[92]  For example, promotion can address, "Information about the onset of action of the product for its approved/cleared indication and dosing/use regimen,"[93] which would reflect the Clinical Pharmacology and Dosage and Administration sections of the labeling.  Promotion can address, "product convenience"[94] which could reflect the Dosage Forms and Strengths and How Supplied sections of the labeling.  The required "brief summary relating to side effects, contraindications,"[95] may include information from the Adverse Reactions and Contraindications sections of the labeling, but also the Warnings and Precautions, Limitations of Use, and potentially other labeling sections such as Pharmacokinetics, Drug Interactions, Use in Specific Populations, Overdosage, or Drug Abuse and Dependence.  Also, "Advertising and promotion make frequent use of statements or data appearing in the CLINICAL STUDIES section."[96]  Essentially, any section of the prescription drug label may support promotional statements so long as such statements are consistent with that labeling section, are truthful and not misleading.

Promotional materials directed to physicians differ from those directed to consumers.  For example, Direct-to-the Consumer (DTC) promotional materials should be written in consumer-friendly language.[97]  DTC promotional materials for prescription drug products are designed to educate consumers and stimulate them to see their physician about their conditions and initiate a dialogue on treatment options, since only a healthcare professional can prescribe such products.

---

[92] But either the full prescribing information (the label) or a "brief summary of Full Prescribing Information" with reference to the Full Prescribing Information accompanies written promotional materials.

[93] Guidance for Industry – Medical Product Communications That Are Consistent With the FDA-Required Labeling – Questions and Answers, Draft Guidance, January 2017, p. 6.

[94] Ibid, p. 7.

[95] 21 CFR 202.1(e)(1).

[96] Guidance for Industry – Clinical Studies Section of Labeling for Human Prescription Drug and Biological Products – Content and Format, January 2006, p. 11.

[97] Guidance for Industry – Brief Summary and Adequate Directions for Use:  Disclosing Risk Information in Consumer-Directed Print Advertisements and Promotional Labeling for Prescription Drugs, Revised Draft Guidance, August 2015, p. 6.

As noted above, disease awareness communications include recommendations or other statements about screening and treatment of a disease or health condition in primary care settings without mentioning a specific drug product.[98]  FDA has said that "disease awareness communications should be designed with certain principles in mind" and that "in general, disease awareness communications should:

a.  be disease- or health condition-specific;

b.  enhance consumer or health care practitioner education;

c.  be clear and accurate;

d.  identify the population at risk or affected by the disease or health condition; and

e.  contain a responsible public health message (i.e., information on the prevention, diagnosis or treatment of a disease or condition)."[99]

FDA also has said that disease awareness communications aimed at consumers should "refer consumers to a qualified health care practitioner for more information; and avoid encouraging self-diagnosis and self-treatment."[100] A disease awareness communication that conveys the message, "There is help for a particular medical condition; see your doctor" is a proper communication.[101]

The group within FDA that is responsible for reviewing and evaluating promotional materials and for issuing guidance documents describing policies and issues relating to compliance with the FDA prescription drug advertising regulations is the Office of Prescription Drug Promotion (OPDP) (formerly the Division of Drug Marketing, Advertising and Communications (DDMAC)).  Promotional materials used in the marketplace by the manufacturer are typically not pre-cleared or approved by FDA,[102] but are to be submitted to DDMAC/OPDP at the time of their dissemination or publication date to facilitate FDA's oversight of promotional materials.[103]  (For drug products for the treatment of serious or life-threatening illnesses and that provide meaningful benefit to patients over existing treatments that are approved by FDA under the accelerated approval regulations – 21 CFR 314.500 – promotional materials are to be submitted to FDA prior to dissemination for

---

[98] Ibid, p. 4.
[99] Ibid, p. 5.
[100] Ibid.
[101] Ibid.
[102] FD&C Act, section 502(n).
[103] 21 CFR 314.81(b)(3)(i).

FDA's consideration.[104])  DDMAC/OPDP is expected to review the promotional materials submitted and advise the pharmaceutical company if the materials violate FDA regulations.[105]  If DDMAC/OPDP finds materials that it believes are inconsistent with the product labeling or otherwise violate the prescription drug advertising regulations, it will take enforcement action and issue "Untitled Letters" or "Warning Letters" to the manufacturer requesting revisions, corrections or withdrawals of promotional materials.[106] These FDA enforcement letters reflect DDMAC's interpretation of the promotional materials and how they are believed to violate the advertising and promotion regulations.  Thus, these letters typically open with phraseology such as, "These materials violate the Federal Food, Drug, and Cosmetic Act and its implementing regulations," and, "these materials are false and misleading", and "these materials misbrand the product," indicating not that such frank determinations have been established, but that such is DDMAC's belief based upon their interpretation of the promotional materials.   FDA also has available other enforcement tools including initiation of misbranding proceedings and product seizure.   If DDMAC/OPDP does not take enforcement action, it is reasonable for the manufacturer to understand that DDMAC/OPDP does not object to the promotional materials it has submitted to FDA.

Although not a standard practice, a sponsor may submit new promotional materials to OPDP for review and comment on a voluntary basis so that OPDP may review those materials in conjunction with the FDA-approved product labeling and provide comments back to the sponsor about the acceptability of the materials before the promotional materials are implemented in the marketplace.[107]  OPDP's advisory comments are not representative of any type of enforcement action given that the materials are merely drafts that have not been disseminated to the public or healthcare providers.

---

[104] 21 CFR 314.550.

[105] https://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDER/ucm090142.htm.

[106] Ibid.

[107] Guidance for Industry – Providing Regulatory Submissions in Electronic and Non-Electronic Format – Promotional Labeling and Advertising Materials for Human Prescription Drugs, Draft Guidance, April 2015, p. 8.

Competitors of a manufacturer also may submit complaints to FDA about the manufacturer's promotional materials, which may provoke additional review of a manufacturer's promotional materials and possible enforcement actions by FDA.[108]  Those kinds of competitor complaints are not uncommon, particularly in the case of multiple manufacturers of products in a therapeutic class.  Doctors and other health care professionals and consumers also can submit complaints to DDMAC/OPDP about a manufacturer's promotional materials.[109]

It is important to note here that it is paramount to consider the entirety of the promotional piece to evaluate its promotional message both with respect to the risk information in the advertisement and how the information about the indicated use of the product, or efficacy, is characterized throughout the <u>entire</u> promotional piece, not just on one page or even in one heading. [110]  FDA expanded on this concept in a recent draft guidance, "It is important to emphasize that when FDA evaluates the risk communication in a promotional piece, FDA looks not just at specific risk-related statements, but at the ***net impression*** i.e., the message communicated by all elements of the piece as a whole.  The purpose of the evaluation is to determine whether the piece ***as a whole*** conveys an accurate and non-misleading impression of the benefits and risks of the promoted product."[111]   The promotional message is, oftentimes, built through the entire piece to fully describe the appropriate uses of the product and the limitations and risks associated with such uses.

### B.  FDAAA Amendments of 2007

In September 2007 the Federal Food Drug and Cosmetic Act was amended with the Food and Drug Administration Amendments Act (FDAAA) of 2007.[112]   FDAAA had numerous provisions including reauthorization of User Fees for drugs and medical devices and several

---

[108] https://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDER/ucm090142.htm.

[109] Ibid.

[110] 21 CFR 202.1(e)(3).

[111] Guidance for Industry – Presenting Risk Information in Prescription Drug and Medical Device Promotion, Draft Guidance, May 2009, p. 4.

[112] https://www.fda.gov/regulationinformation/lawsenforcedbyfda/significantamendmentstothefdcact/foodanddrugadministrationamendmentsactof2007/default.htm

provisions to facilitate studies of drugs with use in children and to support the development of important new safety, effectiveness and dosing information for drugs used in children.[113] Other provisions addressed food safety, the use of advisory committees, clinical trial registries, and multiple approaches to enhance drug safety.

One particular provision of FDAAA to note in this report is section 505(o)(4) of the Federal Food, Drug, and Cosmetic Act, which was added by section 901 of FDAAA.  This section authorizes FDA to require certain drug application holders to make safety-related labeling changes to prescription drug products if FDA becomes aware of new safety information that FDA believes should be included in the labeling of the drug.[114]  New safety information is defined as information derived from a clinical trial, and adverse event report, a post-approval study, peer-reviewed biomedical literature, data derived from postmarket risk identification and analysis, or other scientific data deemed appropriate by FDA about a serious risk or an unexpected serious risk associated with use of the drug that FDA has become aware of since the drug was approved.[115]  Prior to FDAAA, if FDA identified important new safety risks it would request that the manufacturer make an appropriate labeling change.  In most cases, the sponsor would respond to these requests for labeling changes by negotiating the appropriate labeling language with FDA and then submitting the corresponding labeling supplement for FDA review and approval.  FDAAA gives FDA the authority to order a label change in the face of new safety information to expedite such a change if warranted and the corresponding enforcement tools to ensure timely implementation.

### C.  <u>Labeling Format Change – PLR Labeling (2006)</u>

As noted above, prescription drug labeling must contain a summary of the essential scientific information needed for the safe and effective use of the drug.[116]  On January 24, 2006 FDA published an amended regulation on the content and format of prescription drug labeling.[117]  This revised format and content regulation became known as the Physician

---

[113] Ibid.
[114] Guidance for Industry – Safety Labeling Changes – Implementation of Section 505(o)(4) of the FD&C Act, July 2013.
[115] Ibid.
[116] 21 CFR 314.56(a)(1).
[117] 71 FR 3922-3997.

Labeling Rule (PLR).

The new labeling format requires that prescription drug labeling include a Highlights section, a Table of Contents, and a description of Recent Major Changes to the label, and reordered certain labeling sections in an effort to make it easier for prescribers to read and use the labeling information to enhance the safe and effective use of drug products and reduce adverse reactions.[118]

With respect to clinical safety information in prescription drug labeling, while certain safety information is included in the Highlights section, and the Warnings section and Precautions section in the previous labeling regulation was consolidated into one combined Warnings and Precautions section, the essential content of the safety information in the Contraindications, the Warnings and Precautions, and the Adverse Reactions sections of the prescription drug labeling regulations is little changed from the previous version of the prescription drug labeling content and format implemented in 1979.[119]  For example, the new PLR regulation retains the same definition of an adverse reaction as before; "(a)n adverse reaction is an undesirable effect, reasonably associated with the use of a drug, that may occur as part of the pharmacological action of the drug or may be unpredictable in its occurrence," but adds that, "This definition does not include all adverse events observed during use of a drug, only those adverse events for which there is some basis to believe there is a causal relationship between the drug and the occurrence of the adverse event."[120] Thus, the listing of an adverse reaction for a drug product under this regulation does not establish that a definitive causal relationship between the product and the adverse reaction has been established, only that there is a reasonable association between the two.  Similarly, even a drug Warning is to be listed where "there is reasonable evidence of a causal association with a drug; a causal relationship need not have been definitely established."[121] Importantly, FDA "emphasizes that reviewer and applicant **<u>judgment</u>** remain critical in assessing **<u>how</u>** or **<u>whether</u>** to present information on an adverse reaction"[122] (emphasis added).

---

[118] 71 FR 3922.
[119] 44 FR 37434-37467.
[120] 21 CFR 201.57(b)(7).
[121] 21 CFR 201.57(b)(6).
[122] Guidance for Industry:  Adverse Reactions Section of Labeling for Human Prescription Drug and Biological Products – Content and Format, January 2006, p. 1.

The PLR labeling regulation describes which types of adverse reactions should be characterized in the Warnings and Precautions section of the labeling, "This section must describe *clinically significant adverse reactions* (including any that are potentially fatal, are serious even if infrequent, or can be prevented or mitigated through appropriate use of the drug), other potential safety hazards (including those that are expected for the pharmacologic class or those resulting from drug/drug interactions), limitations in use imposed by them (e.g., avoiding certain concomitant therapy), and steps that should be taken if they occur (e.g., dosage modification)."[123]   The FDA Guidance for Labeled Warnings notes that, "The WARNINGS AND PRECAUTIONS section is intended to identify and describe a discrete set of adverse reactions and other potential safety hazards that are *serious* or *otherwise clinically significant* because they have implications for prescribing decisions or patient management."[124]   Adverse reactions that are serious are those that result in death, a life-threatening adverse experience, inpatient hospitalization or prolongation of existing hospitalization, a persistent or significant disability/incapacity, or a congenital anomaly/birth defect.[125]   This is, purposefully, a high threshold to consider an adverse reaction to be serious.   FDA references the ICH E2A Guideline, "which states that a serious adverse drug experience is based on events that pose a threat to a patient's life or functioning and not on events of relatively minor medical significance."[126]   To demonstrate this high threshold, FDA provides an example of a serious adverse drug experience that results in a significant or persistent disability/incapacity as "persons incarcerated because of actions allegedly caused by a drug (e.g., psychotropic drugs and rage reactions) have sustained a substantial disruption in their ability to conduct normal life functions."[127]   Adverse reactions that are otherwise clinically significant are those that have a "significant impact on clinical use of the drug," and "those that have significant impact on therapeutic decision-making."[128]   FDA clarifies that the seriousness of the disease treated and the seriousness of the adverse reaction must both be considered in what is essentially a benefit-

---

[123] 21 CFR 201.57(b)(6).
[124]  Guidance for Industry – Warnings and Precautions, Contraindications, and Boxed Warning Sections of Labeling for Human Prescription Drug and Biological Products – Content and Format, October 2011, p. 3.
[125] 21 CFR 314.80(a).
[126] 62 FR 52242.
[127] Guidance for Industry, Postmarketing Safety Reporting for Human Drug and Biological Products Including Vaccines, Draft Guidance, March 2001, p. 7.
[128] 71 FR 3946.

risk judgment to determine if an adverse reaction is otherwise clinically significant…"The relative seriousness of the disease or condition treated should be considered.  For example, non-serious adverse reactions (e.g., nausea, pruritis, alopecia) caused by drugs intended to treat minor, self-limiting conditions (e.g., allergic rhinitis, cosmetic conditions, transient insomnia) may be considered clinically significant.  However, those same adverse reactions caused by drugs intended to treat serious or life threatening conditions (e.g., cancer) may be considered much less clinically significant and not appropriate for inclusion in this section,"[129] (that is, the Warnings section of the label).

It is telling that FDA describes the exact circumstance for Taxotere labeling in its example of not labeling alopecia as a Warning for a drug used to treat cancer where the benefit is survival.  This, in my opinion, is true whether the labeling of the adverse reaction is for alopecia, for total or partial alopecia, for persistent or persisting alopecia, for chronic alopecia, ongoing alopecia, long-term alopecia, or for permanent or irreversible alopecia. Hair loss - total, even persistent or irreversible - may very well be a troubling side effect to affected breast cancer patients, but it does not meet the regulatory standards of a serious or otherwise clinically significant adverse drug reaction to constitute a labeled Warning for a product where the corresponding benefit is survival.  Describing the risk of alopecia in any form in the labeling of a drug such as Taxotere for the treatment of breast cancer is appropriate in the Adverse Reactions section of the labeling, not in the Warnings section. That has been the judgment of FDA and Sanofi throughout the labeling history of Taxotere, irrespective of how the alopecia was characterized.   Importantly, it was also the judgment of the medical reviewers at FDA that labeling for the risk of alopecia with Taxotere was appropriate in the Adverse Reactions section of the label, as will be discussed further in this report.  Even when FDA determined in 2015 that the Taxotere labeling should be revised to note that cases of permanent alopecia have been reported, as discussed in Section IV. H. of this report, FDA did not require a labeled Warning, but required additional language to be labeled as a potential Adverse Reaction.  Similarly, when the European regulators required that the European SmPC (labeling) be revised to include a potential risk of persistent alopecia, as will be addressed later in this report, even "given the serious psychological consequences of this adverse effect,"[130] the European Medicines Agency (EMEA) and the

---

[129] Guidance for Industry – Warnings and Precautions, Contraindications, and Boxed Warning Sections of Labeling for Human Prescription Drug and Biological Products – Content and Format, October 2011, p. 4.
[130] Sanofi_04864365, Sanofi_04864366.

French Health Products Safety Agency (AFSSAPS) required that additional language be added in the Undesirable effects section of the label, not the Special warnings and precautions for use section of the SmPC. (The European Summary of Product Characteristics, the SmPC, is analogous to the US product labeling or package insert. "The SmPC is the basis of information for healthcare professionals on how to use the medicinal product safely and effectively."[131] The Undesirable effects section of the SmPC is analogous to the US labeling for Adverse Reactions. "This section (Undesirable effects) should include all adverse reactions from clinical trials, post-authorization safety studies and spontaneous reporting for which, after a thorough assessment, a causal relationship between the medicinal product and the adverse event is at least a reasonable possibility."[132] That section is contrasted with the SmPC Special warnings and precautions for use section (similar to the US Warnings and precautions section of the label) which includes the "serious adverse reactions to which the healthcare professionals need to be alerted."[133])

Thus, consistent with the FDA and European guidances governing labeling of adverse reactions and warnings, it was the medical judgment of the medical pharmacovigilance and labeling experts at Sanofi, the medical experts at FDA and at EMEA and AFSSAPS that the risk of alopecia, of persisting alopecia, of persistent alopecia or permanent or irreversible alopecia was appropriately labeled for Taxotere in the Adverse Reactions section of the label and that a labeled Warning was not appropriate.

In a similar circumstance, FDA was petitioned to include a labeled boxed warning for risperidone products used for the treatment of significant psychotic disorders, including schizophrenia and bipolar disorder, products known and labeled for the risk of adverse reactions of hyperprolactinemia (elevated prolactin blood levels) and its associated clinical effects, including gynecomastia (breast enlargement)[134], a condition characterized by the petitioner as chronic and psychologically "devastating" to impacted young male patients.[135] In its response to the petition, FDA declined to require a boxed warning for risperidone

---

[131] European Commission, A Guideline on Summary of Product Characteristics (SmPC), September 2009, p. 2.
[132] Ibid, p. 15.
[133] Ibid, p. 11.
[134] Citizen Petition, FDA-2012-P-0857, Sheller, P.C., August 27, 2012.
[135] Ibid, p. 14.

products for gynecomastia because "Gynecomastia is a common clinical manifestation of hyperprolactinemia...and does not represent a serious adverse event as defined in 21 CFR 312.23(a)."[136]   Thus, FDA declined to include a labeled warning for a chronic, psychologically devastating adverse reaction since such reaction did not meet the clinical regulatory criteria as a serious adverse event.  FDA added that the risk of gynecomastia was "well known" and that "We would expect prescribers and patients to discuss these potential risks (together with the potential benefits) before and during treatment, consistent with the applicable standard of care."[137]

The FDA's Guidance for Industry; Warnings and Precautions, Contraindications, and Boxed Warning Sections of Labeling for Human Prescription Drug and Biological Products – Content and Format, notes a number of factors to be considered when determining whether there is reasonable evidence of a causal association. These include:

- The frequency of reporting
- Whether the adverse event rate in the drug treatment group exceeds the rate in the placebo and active-control group in controlled trials
- Evidence of a dose-response relationship
- The extent to which the adverse event is consistent with the pharmacology of the drug
- The temporal association between drug administration and the event
- Existence of dechallenge and rechallenge experience
- Whether the adverse event is known to be caused by related drugs.[138]

The related FDA Guidance for the Adverse Reactions section of the labeling references the same factors, but only requires that there is some basis to believe there is a causal relationship between the drug and the event.  It also states that "[d]ecisions on whether there is some basis to believe there is a causal relationship **are a matter of judgment**."[139]

---

[136] Citizen Petition, FDA-2012-P-0857, FDA response, November 25, 2014, p. 7.
[137] Ibid, pp 6-7.
[138]  Guidance for Industry:  Warnings and Precautions, Contraindications, and Boxed Warning Sections of Labeling for Human Prescription Drug and Biological Products – Content and Format, October 2011, p. 3.
[139]  Guidance for Industry:  Adverse Reactions Section of Labeling for Human Prescription Drug and Biological Products – Content and Format, January 2006, p. 8.

Additionally, the FDA Guidance on Good Pharmacovigilance Practices notes factors which may suggest a causal relationship between the use of a product and an adverse event:

- Occurrence of the adverse event in the expected time

- Absence of symptoms related to the event prior to exposure

- Evidence of positive dechallenge or positive rechallenge

- Consistency of the event with the established pharmacological/toxicological effects of the product

- Consistency of the event with the known effects of other products in the class

- Existence of other supporting evidence from preclinical studies, clinical trials, and/or pharmacoepidemiological studies

- Absence of alternative explanations for the event (e.g., no concomitant medications that could contribute to the event; no co- or pre-morbid medial conditions).[140]

When determining causal association of an adverse event associated with a product, many factors are evaluated in making a determination as to whether that event is appropriate for the adverse reaction or warning section.   That assessment is a complex medical judgment that is undertaken by the medical experts at the sponsoring company and the FDA.  There is no formula.

Thus, the multiple FDA guidances for causality assessments describe a complex set of criteria to be considered which will then be evaluated through the medical judgment of the reviewers both at FDA and the sponsor to make a determination if labeling of that event is warranted and how the adverse reaction is to be characterized.  Relevant to this report, alopecia during chemotherapy is known and expected.  For this reason, from the initial approval of Taxotere, and throughout its time on the market, alopecia has been labeled for Taxotere.  How information about alopecia was developed and how the labeling characterized alopecia over time is described throughout this report.

Returning to the PLR content and format regulation, it requires that the adverse reactions "must be categorized by body system, by severity of the reaction, or in order of decreasing

---

[140] Guidance for Industry:  Good Pharmacovigilance and Pharmacoepidemiologic Assessment, March 2005, pp. 6-7.

frequency, or by a combination of these, as appropriate."[141]  In practice, the frequency of occurrence of adverse reactions in the clinical trials has become the predominant aspect of characterizing and presenting adverse reactions in labeling.  The regulation[142] calls for a listing of adverse reactions that occurred at or above a specified rate appropriate to the safety database and that the rate of adverse reactions seen with active or placebo comparators also be presented.  This section of the regulation also contemplates listing of certain adverse reactions that occurred in a frequency below the specified rate, but that they would be reported in a separate listing.  The regulation further notes the need to include adverse reactions reported in postmarketing experience[143], but these are listed in practice just as a reflection of their occurrence, not their frequency (due to the limitations of postmarketing surveillance data in determining frequency of events as described above).

The characterization of safety information in the labeling is, as noted above, a summary of the essential information to allow for the safe use of the drug.  There is not a simple, formulaic approach to determine such labeling.  Prescription drug labeling instead reflects the complex, collaborative medical judgment of both the FDA and the sponsor.  For example, in one of FDA's accompanying labeling guidance documents, the Agency notes "reviewer and applicant judgment remain critical in assessing how or whether to present information on an adverse reaction."[144]  However, the FDA remains the ultimate arbiter.  This is clearly described in the preamble to the PLR labeling rule, "Under the Act, FDA is the expert Federal public health agency charged by Congress with ensuring that drugs are safe and effective, and that their labeling adequately informs users of the risks and benefits of the product and is truthful and not misleading," and "In fact, the determination whether labeling revisions are necessary is, in the end, squarely and solely FDA's under the act."[145]

The safety information in the FDA-approved labeling reflects the FDA's assessment and evaluation of the sponsor's submitted clinical data, of the sponsor's evaluation of those data, of the determination of the frequency of the occurrence of the adverse reactions (not the establishment of a definitive causality), and of the sponsor's proposed labeling.  In the

---

[141] 21 CFR 201.57(b)(7)(ii).
[142] 21 CFR 201.57(b)(7)(ii)(A).
[143] 21 CFR 201.57(b)(7)(ii)(B).
[144] Guidance for Industry – Adverse Reactions Section of Labeling for Human Prescription Drug and Biological Products – Content and Format, January 2006, p. 1.
[145] 71 FR 3934.

course of that assessment and evaluation by FDA there is dialog and a sharing of opinions between the sponsor and FDA in what can be considered a collaborative process. But, at the end of the process, FDA has the ultimate authority and makes the ultimate decision on what is in the FDA-approved labeling.

### D.  Other Labeling Conventions

### 1.  Summary of Product Characteristics (SmPC)

In the European regulatory environment, approved prescription drug labeling is included in the Summary of Product Characteristics or SmPC. "The SmPC is the basis of information for healthcare professionals on how to use the medicinal product safely and effectively."[146]  The SmPC has labeling sections similar to that called for in the US product label:

1.  Name of Medicinal Product

2.  Qualitative and Quantitative Composition

3.  Pharmaceutical Form

4.  Clinical Particulars

   4.1.  Therapeutic indications

   4.2.  Posology (dosing) and method of administration

   4.3.  Contraindications

   4.4.  Special warnings and precautions for use

   4.5.  Interaction with other medicinal products and other forms of interaction

   4.6.  Fertility, pregnancy and lactation

   4.7.  Effects on ability to drive and use machines

   4.8.  Undesirable effects

   4.9.  Overdose

5.  Pharmacological Properties

   5.1  Pharmacodynamic properties

   5.2  Pharmacokinetic properties

   5.3  Preclinical safety data

6.  Pharmaceutical Particulars

---

[146] European Commission, A Guideline on Summary of Product Characteristics (SmPC), September 2009, p. 2.

> 6.1  List of excipients
>
> 6.2  Incompatibilities
>
> 6.3  Shelf life
>
> 6.4  Special precaution for storage
>
> 6.5  Nature and contents of container
>
> 6.6  Special precautions for disposal of a used medicinal product or waste materials derived from such medicinal product and other handling of the product

7.  Marketing Authorization Holder

8.  Marketing Authorization Number

9.  Date of First Authorization/Renewal of the Authorization

10. Date of Revision of the Text[147]


## 2. __Company Core Data Sheet (CCDS), Company Core Safety Information (CCSI)__

As described above, the Company Core Safety Information and the Company Core Data Sheet are internal documents, not true labeling, that serve as a foundation for discussions with local regulatory authorities to develop approved product labeling for that region. These documents also serve as a basis in postmarketing pharmacovigilance to determine the "expectedness" of reported adverse events.

The Company Core Safety Information (CCSI) is to reflect the cumulative knowledge regarding the safety of the product and is to contain a defined set of safety data and advice that the company intends to have reflected in the national labeling worldwide, except where the local regulatory authority requires a modification.[148,149] The CCSI is not negotiated

---

[147] European Commission, A Guideline on Summary of Product Characteristics (SmPC), September 2009.

[148] International Conference on Harmonization of Technical Requirements for Registration of Pharmaceuticals for Human Use, ICH Harmonized Tripartite Guideline, Periodic Benefit-Risk Evaluation Report (PBRER), E2C(R2), December 17, 2012, p. 26.

[149] MedDRA and Product Labeling:  "Best Practices" Recommendations, MSSO-DI-8381-3.0.0, April 15, 2005, p. 2

between the sponsor and the regulatory authorities.[150]  Thus, the CCSI serves as an internal foundation or basis for safety-related labeling discussions between the local affiliates of the sponsor company and the local regulatory authority.[151]  But, the local national regulatory agency retains the authority to determine the ultimate content of the local label.   Thus, "Compared to the CCSI, the national/regional HP labeling may contain more, less or different safety information."[152]

The pharmacovigilance environment has evolved such that the regulatory authorities have recognized that the assessment of risks of drug products is most meaningful when considered in light of its benefits.[153]   To allow for the inclusion of benefits in the supporting reference document, the CCSI or reference safety information concept has been expanded to include the approved indications for the product in the three ICH regions and information on dosing, pharmacology and other issues beyond the core safety information in the Company Core Data Sheet (CCDS).[154]

Sanofi included in its PSURs for docetaxel as the PSUR-required Company Reference Safety Information, the Sanofi Company Core Safety Information including all the mandatory and non-mandatory safety information but also additional information such as the indications, dosing, pharmacokinetics and pharmacodynamics and information about the physical properties of the drug itself. [See for example Docetaxel Company Core Safety Information, Version 24, December 14, 2009.[155]]  Sanofi prepared more comprehensive internal Docetaxel Core Data Sheets that were not provided to the regulatory authorities in the pharmacovigilance process.  These CCDSs contained all the core safety information contained in the docetaxel CCSIs, both mandatory and non-mandatory, but the CCDSs further served as an internal reference for the company affiliates in that they also included additional information on the product preparation, storage and handling, container-closure systems, pharmacokinetics and pharmacodynamics, and provided significant more detail on docetaxel clinical studies, principally related to efficacy analyses, since the full safety

---

[150] Ibid.

[151] Ibid.

[152] Ibid.

[153] International Conference on Harmonization of Technical Requirements for Registration of Pharmaceuticals for Human Use, ICH Harmonized Tripartite Guideline, Periodic Benefit-Risk Evaluation Report (PBRER), E2C(R2), December 17, 2012, p. 1.

[154] Ibid.

[155] Sanofi_02400213.

information was already fully presented in the CCSIs.  The specific content of the Sanofi docetaxel CCSI and CCDS documents is described later in this report.

## IV.  Approval, Postmarketing Surveillance, and Advertising and Labeling History of Taxotere

### A.  Initial NDA Approval and Labeling

The Taxotere NDA, NDA 20-449, was submitted to FDA on July 27, 1994 by Rhone Poulenc Rorer (RPR) (Rhone Poulenc Rorer merged with Hoechst Marion Roussel in 1999 to form Aventis, Aventis merged with Sanofi Synthelabo in 2004 to form sanofi-aventis = Sanofi) for the proposed treatment of "patients with locally advanced or metastatic breast carcinoma in whom previous therapy has failed; prior therapy should have included an anthracycline unless clinically contraindicated."[156]  (The initial NDA also proposed an indication for the treatment of "patients with locally advanced or metastatic non-small cell lung cancer even after failure of platinum-based chemotherapy."  This report will focus solely on the breast cancer indications for Taxotere and will not address other possible uses of the product.)

The NDA was reviewed for clinical safety and efficacy in the Division of Oncology and Pulmonary Drug Products by the Medial Officer, Dr. Julie Beitz, and other reviewers including Division Director, Dr. Robert Justice.[157]  The NDA application was also considered by the FDA Oncologic Drugs Advisory Committee twice before approval: on December 13, 1994 and later on October 17, 1995.  The NDA was originally approved on May 14, 1996 for the treatment of patients with locally advanced or metastatic breast cancer who have progressed during anthracycline-based therapy or have relapsed during anthracycline-based adjuvant therapy.[158]

During the review of the NDA by FDA, the safety profile of Taxotere was considered thoroughly, including the risk of alopecia.[159]  The risk of alopecia associated with Taxotere was also presented to the 1994 and 1995 ODAC meetings as part of the presentation of the

---

[156] Sanofi_00654954, at Sanofi_00654999.
[157] Ibid.
[158] Sanofi_01380011-15.
[159] Sanofi_00654954, at Sanofi_00655002 and Sanofi_00655011.

safety profile of the product.[160,161]  Concerns were raised by the FDA reviewers and the 1994 ODAC committee members about the approvability of Taxotere, including concerns about its safety profile and how it compared to the safety profile of Taxol; however, those concerns did not include the risk of alopecia, let alone persistent alopecia.  The concerns were characterized as:  toxic deaths, febrile neutropenia and infection, fluid retention, performance status of patients included in Taxotere clinical trials, and multicenter nature of Taxotere clinical trials.[162]  After Rhone Poulenc Rorer addressed the concerns of the FDA reviewers and those of the 1994 ODAC through the submission of additional data, analyses and other clarifying information, ODAC supported approval, FDA found the NDA approvable[163] and the NDA was approved under FDA's provisions for accelerated approval which address drug products for serious or life-threatening illnesses and that provide meaningful therapeutic benefit to patients over existing treatments[164] on May 14, 1996.[165] (Sanofi subsequently submitted the required clinical data to verify the clinical benefit of Taxotere in the treatment of locally advanced or metastatic breast cancer to FDA on December 22, 1997 and FDA noted the fulfillment of the post-approval commitment and removal of the accelerated approval conditions in a June 22, 1998 letter.[166])

The initial labeling approved on May 14, 1996 included information about the risk of alopecia with its listing in the Adverse Reactions section of the label in a tabular listing of adverse events.  As described above, the Adverse Reactions section was and is an appropriate section of the labeling to advise of the risk of alopecia.   Alopecia is an adverse reaction as defined in the labeling regulations, "an undesirable effect, reasonably associated with use of a drug, that may occur as part of the pharmacological action of the drug or may be unpredictable in its occurrence."[167]  This Adverse Reaction labeling provides "information that would be useful to health care practitioners making treatment decisions and monitoring and advising patients."[168]  The labeling advises of the risk of alopecia as an

---

[160] Sanofi_001317, at Sanofi_001358.
[161] Rhone Poulenc Rorer, Taxotere Specific Safety Analysis, March 9, 1995, Appendix V, p. 3.
[162] Ibid, p. 3.
[163] Sanofi_01866065.
[164] 21 CFR 314.500, 21 CFR 314.510.
[165] Sanofi_01380011-15.
[166] NDA 20-449/S-005 approval letter, Temple to Martin, June 22, 1998.
[167] 21 CFR 201.57(c)(7).
[168] Guidance for Industry – Adverse Reactions Section of Labeling for Human Prescription Drug and Biological Products – Content and Format, January 2006, p. 2.

adverse reaction associated with Taxotere.  It does not limit that advice to whether alopecia might be partial or total, mild or severe, the timing of its onset or whether it be temporary, chronic or permanent.   This was explained by the Sanofi Global Safety Officer Dr. Emanuel Palatinsky, "Q- Alopecia, the word 'alopecia' accounts for irreversible alopecia?  A – It includes also irreversible,"[169] and "A – They were warned about persistent alopecia because the concept of persistent alopecia is inherent to alopecia.  A physician reading the USPI and a patient reading the patient – the product information leaflet will know that alopecia is reversible or it might not be reversible."[170]

Moreover, alopecia means "hair loss."  There is no consensus definition for "ongoing," "persistent," "permanent," or "irreversible" alopecia.  The Medical Dictionary for Regulatory Activities (MedDRA), for example, is the single standardized international medical terminology that can be used for regulatory communication and evaluation.[171]  FDA has mandated that companies code adverse events observed in clinical trials in accordance with the MedDRA dictionary.[172]  Further, FDA uses MedDRA terminology for all adverse event reporting in the FAERS database.[173]  MedDRA contains an entry for the term "Alopecia." It does not, however, recognize entries for "ongoing," "persistent," "permanent," or "irreversible" alopecia.  Accordingly, Sanofi's use of the term "alopecia" in its physician labeling appropriately characterized the risk of hair loss with the use of docetaxel.

As described above, the labeling of alopecia as an Adverse Reaction and not a Warning is appropriate in that the occurrence of alopecia, even permanent alopecia, would not meet the regulatory criteria of a serious or otherwise clinically significant adverse event; criteria

---

[169] Palatinsky deposition, August 9, 2018, p. 220.
[170] Palatinsky deposition, August 10, 2018, p. 432.
[171] *Vision for MedDra*, MEDICAL DICTIONARY FOR REGULATORY ACTIVITIES, https://www.meddra.org/about-meddra/vision (last visited November 12, 2018).
[172] Electronic Study Data Submission; Data Standards; Support for Version Update of the Medical Dictionary for Regulatory Activities, 82 FR 41416, 41416 – 41417 (August 31, 2017).
[173] *Questions and Answers on FDA's Adverse Event Reporting System (FAERS)*, U.S. FOOD AND DRUG ADMIN., https://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Surveillance/AdverseDrugEffects/default.htm (last updated June 4, 2018).

to be met to be listed in the Warnings and Precautions section of drug labeling.[174]  Adverse reactions are serious if they result in death, are life-threatening, require in-patient hospitalization or prolongation of an in-patient hospitalization, create a persistent or significant incapacity or substantial disruption of the ability to conduct normal life functions, or are a congenital anomaly or birth defect.[175]  "Adverse reactions that are otherwise clinically significant include those that may lead to a potentially serious outcome unless the dosage or regimen is adjusted, the drug is discontinued, or another drug is administered to prevent the serious outcome; those that could be prevented or managed with appropriate patient selection, monitoring, or avoidance of concomitant therapy, and prevention or management of the adverse reaction is needed to avoid a potentially serious outcome; and those that can significantly affect patient compliance, particularly when noncompliance has potentially serious consequences."[176]  Even when FDA requested an update to the Taxotere label to describe reports of permanent alopecia in 2015, as described later in this report, it required that such risk information be included in the Adverse Reactions and Patient Labeling sections, not the Warnings and Precautions section of the label.[177] Thus, it is my opinion that alopecia was reasonably and appropriately labeled as an Adverse Reaction for Taxotere in the treatment of metastatic breast cancer.

Furthermore, in the initial Taxotere patient labeling approved on May 14, 1996, it is noted, "*What are the possible side effects of Taxotere?* **Hair Loss** – Loss of hair occurs in most patients taking Taxotere (including the hair on your head, underarm hair, pubic hair, eyebrows and eyelashes). Hair loss will begin after the first few treatments and varies from patient to patient.  Once you have completed all your treatments, hair generally grows back."[178]   Here the patient is advised that hair loss occurs in most patients, is significant-to-total, persists through the duration of treatment, and may be permanent as it is noted that even after discontinuation of therapy, hair *generally* (not always) grows back.  This was also clarified by Dr. Palatinsky, "It doesn't say 'will return,'" and "It says 'Hair growth should

---

[174] Guidance for Industry:  Warnings and Precautions, Contraindications, and Boxed Warning Sections of Labeling for Human Prescription Drug and Biological Products – Content and Format, October 2011, p. 3.
[175] Ibid.
[176] Ibid, p. 4.
[177] Sanofi_00805353.
[178]  Sanofi_000001, at Sanofi_000003.

occur'…which means it may or may not."[179]  Dr. Palatinsky added, "That's an important statement.  It tells the reader that after treatment, the hair growth should return to normal.  But it might not necessarily return to normal," and "It tells me that this document is communicating to the reader that in a majority of patients, the hair loss will recover, and in a minority of patients, it may not."[180]

This characterization of hair loss associated with chemotherapy agents ("hair generally grows back"), such as with Taxotere, was widely employed by FDA, essentially as class labeling for oncology products.  As described in section IV. E. of this report, the labeling for Taxol, a product also with reports of irreversible hair loss[181], noted that "Hair generally grows back after you've finished your Taxol treatment."[182]  Similarly, the labeling for Abraxane, another paclitaxel formulation, noted that "Hair generally grows back after you've finished your Abraxane treatment."[183]  Also, the labeling for doxorubicin noted the potential for hair loss, but added, "your hair may re-grow after your treatment."[184]  Accordingly, such labeling about the potential regrowth of hair after treatment with such cytotoxic agents was/is not considered by FDA to be misleading.

Thus, the initial FDA-approved labeling for Taxotere advised both healthcare providers and patients of the risk of hair loss or alopecia.  The labeling advice for the risk of alopecia has remained in the Taxotere labeling through to the current time.  The variations of this advice of risk of alopecia through time are described later in this report.

The FDA review of Taxotere was comprehensive, employing multiple review disciplines including Chemistry, Pharmacology, Biopharmaceutics, Statistics and most relevant to this report, the Medical review of both safety and efficacy.  There were multiple Medical reviews that lead to the FDA decision to approve Taxotere, which were verified and confirmed by the Division Director.  These reviews were supplemented by two reviews by the ODAC.  The reviews were thorough and detailed with the total time from NDA submission to FDA approval taking nearly two years.

---

[179] Palatinsky deposition, August 9, 2018, pp. 163-64.
[180] Palatinsky deposition, August 10, 2018, pp. 497, 501.
[181] Prevezas, c., et. al., Irreversible and severe alopecia following docetaxel or paclitaxel cytotoxic therapy for breast cancer.  Br. J. Dermatol.  160(4):883-885.
[182] NDA 20-262, Labeling Review, March 4, 2002.
[183] NDA 21-660, S-022, approved June 26, 2009.
[184] NDA 50-629, S-019, approved September 26, 2011.

The FDA and ODAC reviewed the data and analyses presented by Rhone Poulenc Rorer in their evaluation of the safety and efficacy of Taxotere in metastatic breast cancer, but also relied upon their experience in reviewing other cancer drugs in general and agents for the treatment of metastatic breast cancer specifically; most importantly, Taxol which had been approved just two years earlier.[185]  The determination was made that the benefit/risk of Taxotere for metastatic breast cancer was positive; the benefits outweighed the potential risks and the labeling provided adequate directions for the safe use of the product for its intended uses.  That determination was first made for Taxotere in the May 14, 1996 initial approval and was reaffirmed time and again as FDA reviewed and approved revised labeling for Taxotere with each labeling supplement (see below) attesting to the adequacy of that labeling to allow for the continued safe and effective use of Taxotere.

It is my opinion that the decision on the part of FDA to approve and label Taxotere for the treatment of metastatic breast cancer was reasonable and appropriate from a regulatory perspective given the solid anti-tumor efficacy consistently demonstrated by Taxotere in clinical trials and the safety profile in metastatic breast cancer patients which was shown to be similar to that of other agents in the field, agents that were well-studied, familiar to FDA and ODAC, and already subject to significant use in the market in a large treatment population.

## B. <u>TAX316 – Taxotere in Combination with Doxorubicin and Cyclophosphamide for the Adjuvant Treatment of Patients with Operable Node-Positive Breast Cancer</u>

On March 17, 2004, Sanofi submitted Taxotere supplemental NDA S-029 to FDA to provide for Taxotere to be used in combination with doxorubicin and cyclophosphamide for the treatment of patients with operable node-positive breast cancer (node positive breast cancer).  Included in that submission was Clinical Study Report RP56976V – 316, "A Multicenter Phase III Randomized Trial Comparing Docetaxel in Combination with Doxorubicin and Cyclophosphamide (TAC) versus 5-Flurouracil in Combination with Doxorubicin and Cyclophosphamide (FAC) as Adjuvant Treatment of Operable Breast

---

[185] NDA 20-262, approved December 29, 1992.

Cancer Patients with Positive Axillary Lymph Nodes," (TAX316).  The report presented results of the second interim analysis of this study with 55 months median patient post-treatment follow-up.  Unlike earlier clinical studies with Taxotere in the treatment of metastatic breast cancer in patients having failed prior chemotherapy, this study allowed for significant post-therapy follow-up of the patients because of the good post-therapy prognosis in this population.  The study was designed for patients to be treated with six cycles of therapy and then followed for up to 10 years post-treatment.  Thus, the study design allowed for the analysis of long term-safety of those adverse events persisting into this follow-up period.   This was possible because the 5-year overall survival of the TAC treated patients was 87%.[186]  This is in contrast to the Taxotere previously-treated metastatic breast cancer trials in the original NDA where the survival of patients was much shorter, generally ranging about one year in duration.[187] The TAX316 clinical study report (CSR) from the second interim analysis at 55 months median follow-up noted in its analysis of "persistent adverse reactions" that 3.2% of the TAC treated patients showed alopecia ongoing into the follow-up period.[188]  This finding was presented in both text and tabular displays in the Study Synopsis, Safety Results, Safety Summary and Discussion sections of the CSR.[189]

To provide some context to this finding, the 3.2% of TAC treated patients with alopecia still ongoing into the follow-up period represented 22 of the 687 TAC treated patients who demonstrated alopecia at the start of the follow-up period from among the 744 patients in the TAC-treated group overall.[190]  This does not represent a frequency of "persistent alopecia,"[191] let alone a frequency of permanent or irreversible alopecia.  In his October 11, 2018 deposition, Michael Kopreski, M.D., an oncologist and former pharmacovigilance officer at Sanofi, testified that upon conducting a thorough re-evaluation of the information from each of the patients recorded as presenting ongoing alopecia, he instead found a 0.9% frequency of persistent alopecia in the TAC group from the TAX316 study at the 55-moth

---

[186] Sanofi_00355622.
[187] Sanofi_00655001.
[188] Sanofi_00798650.
[189] Ibid.
[190] Ibid.
[191] It is my understanding that the Court defined "persistent alopecia" for purposes of the Kopreski depositions as alopecia "that which remains six months after chemotherapy ended without resolution."

follow-up point.[192]  Dr. Kopreski arrived at this frequency of persistent alopecia of less than 1%, or 7 patients of the 744 patients in the TAC group, through his review of the individual patient data to ensure that the patient met the criteria of persistent alopecia, that is alopecia that was documented to be present at least six months after the last dose of chemotherapy and where there was no documentation of subsequent resolution in the follow-up period.[193] That is, there needed to be documented evidence of the ongoing nature of the alopecia (absence of evidence of ongoing nature is not evidence of persistence) at least six months following the completion of therapy and evidence that it the alopecia is related to docetaxel therapy to be considered a report of persistent alopecia.  Through the same approach, Dr. Kopreski determined a frequency of persistent alopecia in the FAC arm in TAX316 at the 55-month follow-up point of 0.4%.

The TAX316 study represents the best source of information on the frequency of persistent alopecia associated with Taxotere therapy.  It was a large controlled clinical study with a population of nearly 1500 patients enrolled, followed for a period of up to 10 years.[194]  Dr. Kopreski characterized the TAX316 study as "a very well designed and controlled study. And part of the endpoints of the study was to look at the long-term assessment...of safety, of safety issues, including alopecia."[195]  FDA notes that estimations of the frequency of adverse reactions best come from "adequate and well-controlled clinical studies,"[196] and not from postmarketing experience with the drug.[197]  Published case reports and studies involving smaller groupings of patients will not be as robust as a large, controlled clinical study such as TAX316 and, consequently, adverse reaction frequency estimates will not be feasible or

---

[192] Kopreski deposition, October 11, 2018, p. 728.
[193] Ibid, p. 729.
[194] Sanofi_01288423.
[195] Kopreski deposition, October 11, 2018, pp. 727-728.
[196] 44 FR 3746;  71 FR 3951, "precise percent figures would be appropriate if there is scientific evidence from well-controlled trials substantiating such figures,"; and Guidance, Classifying Significant Postmarketing Drug Safety Issues, Draft Guidance March 2012, p. 6, "When CDER staff identify a new safety issue, unless the information is derived from a clinical trial or pharmacoepidemiology study, precise and reliable information may be lacking about the frequency of the adverse event,"
[197] 71 FR 3950, "postmarketing experience, although more closely reflective of clinical practice, lacks the structure of a clinical trial setting that permits increase precision.  For postmarketing reporting...the frequency with which a suspected adverse reaction is reported and the number of exposures to the drug, compared to the number of suspected reactions reported are unknown, making estimation of incidence calculations difficult."

will be less reliable.  For comparisons of adverse reactions between drugs, "any claim comparing the drug to which the labeling applies with other drugs in terms of frequency, severity or character of adverse reactions must be based on adequate and well-controlled studies."[198]

This determination (less than 1% persistent alopecia) represents the best estimate of the frequency of persistent alopecia seen in patients receiving the TAC combination regimen from the most robust source of information to make such a determination; better than estimates derived from postmarketing spontaneous reports and published reports of case reports and smaller clinical studies.   And, the relevant TAC vs FAC comparison for the frequency of persistent alopecia from this study at 55 months of follow-up is 0.9% vs 0.4%, a relatively small difference.   To state that the frequency of irreversible alopecia seen with the TAC group in TAX316 at the 55-month follow-up is 3.2%, as does Dr. Kessler,[199] is inaccurate, false and misleading.  The 3.2% frequency is the frequency of ongoing alopecia. Dr. Kopreski calculates a frequency of persistent alopecia of less than 1%.  Even a frequency of persistent alopecia provides an over-estimate of the frequency of irreversible alopecia as will be described later in this report at section IV. D. as Sanofi identified cases of persistent alopecia (determined using an even more conservative definition than employed by Dr. Kopreski – persisting for 12-months post-therapy as opposed to 6 months post-therapy) that nonetheless subsequently resolved.[200]  (Later, Sanofi identified cases of alopecia persisting even more than 2 years after the completion of therapy that subsequently resolved,[201] questioning whether even 2 years is an adequate cut-off threshold of persistence to qualify such a report as "irreversible", let alone a threshold of 6-month persistence.)  Thus, such cases of persistent alopecia are not cases of truly irreversible alopecia and any calculated frequency of irreversible alopecia determined from such true cases of irreversible alopecia will be less than the frequency of persistent alopecia.

Similarly, when evaluating spontaneous reports of adverse reactions of alopecia, an appropriately robust set of criteria must be established to identify those reports which are truly "irreversible."  Dr. Madigan identified reports from the FAERs database with the adverse reaction term of alopecia and any report tagged with the outcome of "Disability or

---

[198] 21 CFR 201.57(c)(7)(iii).
[199] See Kessler expert report, paragraphs 96.2, 123.
[200] Sanofi_00201089.
[201] Sanofi_01259408 at p. 6.

Permanent Damage" as reports of "irreversible" alopecia.  No consideration of duration, persistence, chronicity or outcome of the report of alopecia was undertaken.  Alopecia that was short term or subsequently resolved might still be marked with an outcome of a "Disability" by the reporter (healthcare professional or patient) because of the impact of the adverse reaction on the patient, irrespective of the regulatory definition of such terms. Additionally, alopecia may have been reported as part of a group of adverse events. Therefore the "Disability or Permanent Damage" tag in the FAERS database may apply to a different adverse event reported concomitantly with alopecia. Thus, such a catchment of reports may include reports of alopecia that are not truly irreversible and, thus, related conclusions about frequency or signal detection from such reports may be inflated and biased.  This point, that the definition of irreversible alopecia needs to represent a high threshold and not include alopecia events that will subsequently resolve and thus not be truly irreversible, is further reflected in the analysis by Dr. Madigan where nearly 10% of the reported cases identified as "irreversible" alopecia were subsequently resolved.[202] Similarly, analyses of internal safety databases, such as Sanofi's global pharmacovigilance database, to identify reports of "irreversible" alopecia also need to employ rigorous criteria that include an assessment of the timeframe of the alopecia to determine, as was done by Sanofi in 2011 and 2015 as will be discussed below, if such reports are to accurately represent ongoing, or persistent or irreversible alopecia.

Thus, in light of Dr. Kopreski's calculation of a frequency of persistent alopecia in the TAC group in TAX316 of less than 1%, the 3.2% rate of ongoing alopecia from the 55-month interim analysis of TAX316 in TAC-treated patients, as reported, represents an overestimate of the actual frequency of persistent alopecia found in this study.   Dr. Kopreski stated that much of the persistent alopecia seen with the TAC group from TAX316 might be a contribution from the adriamycin and cyclophosphamide (AC) components of the TAC therapy, and not from Taxotere.[203]  Thus, the frequency of ongoing alopecia seen with the TAC group from TAX316 at 55 months of follow-up of 3.2% is an inappropriate, inflated figure for the frequency of persistent alopecia, let alone for the frequency or irreversible alopecia.

---

[202] Madigan expert report at paragraph 43.
[203] Kopreski Deposition, October 11, 2018, p. 764.

Sanofi completed a 10-year follow-up for the TAX316 study as will be described below.  The TAX316 10-year follow-up analysis showed that 4.2% of the TAC-treated patients demonstrated alopecia that remained ongoing in the follow-up period.[204]  This report also noted that 2.5% of the FAC-treated patients demonstrated alopecia that remained ongoing in the follow-up period.[205]  Dr. Kopreski completed a thorough re-evaluation of the individual patient data for the TAX316 10-year follow-up and employed the same criteria as described above for the 55-month interim follow-up (alopecia documented to be present at least 6 months after the completion of chemotherapy and where there was no documentation of subsequent resolution in the follow-up period).  Through this analytical approach, testifying on behalf of Sanofi as its corporate representative, Dr. Kopreski determined a frequency of persistent alopecia in the TAC group at the 10-year follow-up of 0.8% (6/744), or again, less than 1%.[206]  Dr. Kopreski determined a frequency of persistent alopecia in the FAC-treated group at the 10-year follow-up of 0.4% (3/736).[207]  Thus, this confirms that the best estimate for the frequency of persistent alopecia in the TAC group for the TAX316 study is less than 1%.

With this March 17, 2004 supplemental NDA submission, Sanofi proposed revisions to the Taxotere label to reflect this new proposed indication for adjuvant therapy and other information from the clinical study.  Specifically, in addition to another tabular listing of alopecia in the Adverse Reactions section of the labeling, Sanofi proposed to add to the Adverse Reactions section of the label (not the Warnings section, see above) information about adverse reactions that persisted into the follow-up period of the study.  Sanofi's labeling proposal for the Adverse Reactions section of the label was to add a subsection, "**Other persistent reactions**…The following events were observed to be ongoing in TAC-treated patients at the median follow-up time of 55 months; alopecia (22/687), amenorrhea (133/233), neurosensory (9/73) and peripheral edema ((18/112)…"[208] (The patient labeling information about the risk of hair loss as described above was to be retained as is.) This labeling proposal was resubmitted to FDA on June 23, 2004 in response to an FDA request.  Once again, RPR resubmitted this labeling proposal on August 5, 2004 and again

---

[204]  Sanofi_00724262, p. 37.
[205] Ibid.
[206] Kopreski Deposition (Rough Transcript), December 13, 2018, p. 148.
[207] Kopreski Deposition (Rough Transcript), December 13, 2018, p. 148.
[208] Sanofi_00355202, p. 30.

on August 9, 2004 in response to additional FDA requests.[209]

After a thorough review by FDA of the submission, reflected in an extensive series of communications between FDA and RPR, principally related to evaluation of individual patients in the study, FDA sent their comments on the proposed labeling to RPR on August 11, 2004.[210]  In those comments, FDA deleted RPR's proposal to add information to the Adverse Reactions section of the Taxotere label information about "Other persistent reactions", including alopecia.[211]  It was FDA's deletion of Sanofi's proposed labeling as evidenced by the Track Changes format in Sanofi_04539472.doc, which attributes the deletion to FDA's Ann Staten.[212]  In FDA's appended statement of "reasoning for the FDA's changes to the TAXOTERE label," no basis for the deletion of the Other persistent reactions labeling was provided.  FDA provided updated revisions to RPR on August 12, 2004, still proposing to delete the Other persistent reactions labeling.[213]  After several additional exchanges between RPR and FDA, FDA retained its position with respect to deleting the proposed labeling of Other persistent reactions and approved the supplemental NDA on August 18, 2004, granting the indication for Taxotere in combination with doxorubicin and cyclophosphamide for the adjuvant treatment of patients with operable node-positive breast cancer without RPR's proposal to include Other persistent reactions, including a description of persisting alopecia, in the Adverse Reactions section of the label.[214]  The patient labeling description of the risk of hair loss remained unchanged from that described above.

Thus, in this supplemental NDA submission, RPR provided clear analysis of the clinical data, describing the persistence of alopecia into the follow-up period after conclusion of treatment of patients with Taxotere.  Additionally, RPR proposed on several occasions to include in the Taxotere label information about persistent alopecia in the Adverse Reactions section of the label.  Despite these analyses and labeling proposals, FDA approved Taxotere for this node positive breast cancer use, did not require revised labeling for persistent or irreversible alopecia in the Adverse Reactions section of the label, confirmed the adequacy

---

[209] Sanofi_00354861; Sanofi_04817146.
[210] Sanofi_04817139.
[211] Sanofi_04539472.doc.
[212] Ibid.
[213] Sanofi_00548387.
[214] Sanofi_04539390.

of the Taxotere labeling to describe the adverse reaction as alopecia without further qualification,  did not propose a labeled Warning for persistent or irreversible alopecia and, in fact, specifically deleted Sanofi's proposal for Adverse Reactions labeling of persistent alopecia.

Later, on September 24, 2010 Sanofi-aventis submitted an updated clinical study report for TAX316 containing 10-year follow-up data to fulfill a post-marketing commitment to FDA.[215]  Prior to this submission, in September 2009 a determination was made by Sanofi Regulatory, Statistics and Project Direction that the filing would not include a proposal for revised labeling from Sanofi.[216]  Sanofi's Dr. Gustavson explained the rationale in her deposition, "In this case, the amount of information getting - - provided in the CSR did not warrant a label update,"[217] and, "I think that the reason that the labeling change was not warranted is it was not deemed to - - needed to be helpful as prescribing information."[218] Sanofi's Clinical Development and Medical Affairs office, Dr. Barrett Childs further explained, "We had included that information in our label change request with the five-year data.  The FDA did not feel that needed to be included in the product label.  So the FDA struck that from the revised product label.  So we assumed that it was not – if the five-year data was not – if the five-year data was not that important, than the ten-year data would not be that important,"[219]  and "And the data at the five-year follow-up was available at that time.  And when we negotiated the label with FDA, and they did not feel that it was important to include that…There would have been no reason to expect that the FDA would have wanted them to revise the label."[220] (As noted above, Dr. Kopreski determined that the frequency of persistent alopecia in the TAC group in this study was less than 1%).  This determination was reflected in the conclusion of the clinical study report for the 10-year follow-up to TAX316, "The safety profile of TAC was manageable and <u>consistent with the known toxicity</u> of the individual drugs and of the TAC regimen."[221]  The TAX316 10 year follow-up analysis showed 4.2% of the TAC treated patients demonstrated alopecia that

---

[215] Sanofi_01288423.
[216] Gustavson Deposition, May 3, 2018, pp. 215-265 and Exhibit 12.
[217] Gustavson Deposition, May 3, 2018, p. 246,
[218] Ibid, p. 247.
[219] Childs deposition, October 26, 2018, pp. 318-319.
[220] Ibid, p. 330.
[221] Sanofi_00724262, pp. 5, 71.

remained ongoing in the follow-up period.[222]   This is another example of Sanofi clearly sharing data with FDA about persistent alopecia seen in patients treated with Taxotere alongside other chemotherapy agents.  On September 23, 2011, FDA responded that it had reviewed the submission of the TAX316 final report with 10 year follow-up data, that the report fulfilled Sanofi's postmarketing commitment, and did not request any change to the Taxotere labeling as a result of its review of the report.[223]

Subsequently, after the Taxotere US label had been revised to reflect the potential risk of permanent alopecia in 2015 (see section IV, H of this report, below), on May 28, 2017 Sanofi submitted a supplemental NDA to, among other changes, update the Taxotere label to add the information from the 10-year follow-up to TAX316.[224]  After a significant exchange between Sanofi and FDA, on October 5, 2018 FDA approved the updated Taxotere label to add information from the 10-year follow-up to TAX316, including a description of persisting alopecia in the Adverse Reactions section of the label, but did not require a labeled Warning for persistent alopecia.[225]

While FDA was reviewing the RPR supplemental NDA application for TAX316 node positive breast cancer, RPR also submitted an application to add that indication to the approved uses of Taxotere in Europe.  The Committee for Medicinal Products for Human Use (CHMP), the European Medicine's Agency (EMA) regulatory committee responsible for human drugs, approved Taxotere for adjuvant treatment of node positive breast cancer in 2004.[226]  While the CHMP acted to approve Taxotere for node positive breast cancer based on the results of TAX316, just as FDA did, unlike FDA, the CHMP also approved RPR's proposal to add to the Taxotere SmPC labeling information about adverse reactions persisting into the follow-up period, including ongoing alopecia.[227]  That risk information was added to the Undesirable effects (adverse reactions), not the Special Warnings and precautions section of the SmPC. Thus, at this point in time, the US and European labeling for Taxotere diverged on this point as a result of the decisions made not by Sanofi, but by the local regulatory authorities.

---

[222] Sanofi_00724262.
[223] Sanofi_00262024.
[224] Sanofi_05967367.
[225] NDA 20-449/S-079, approval letter, Kordestani to Doty, October 5, 2018 and Taxotere label revised 10/2018.
[226] Sanofi 05173852.
[227] Sanofi_01094524.

56

This represents an example of how different regulatory authorities presented with the same data and information, can reach different decisions on appropriate product labeling.

## C. <u>GEICAM 9805 - Taxotere in Combination with Doxorubicin and Cyclophosphamide for the Adjuvant Treatment of Patients with Operable Node-Negative Breast Cancer</u>

On November 30, 2009, Sanofi submitted Taxotere supplemental NDA S-060 to FDA to provide for Taxotere to be used in combination with doxorubicin and cyclophosphamide for the treatment of patients with operable node-negative breast cancer (node negative breast cancer). Included in that submission was clinical safety and efficacy data from the Phase III study [GEICAM 9805 or TAX301] "A Multicenter Phase III Randomized Trial Comparing Docetaxel in Combination with Doxorubicin and Cyclophosphamide (TAC) versus 5-Flurouracil in Combination with Doxorubicin and Cyclophosphamide (FAC) as Adjuvant Treatment of High Risk Operable Breast Cancer Patients with Negative Axillary Lymph Nodes".[228] This study also allowed for significant post-therapy follow-up of the patients because of the good post-therapy prognosis in this population. The study was designed for patients to be treated with six cycles of therapy and then followed for up to 10 years post-treatment. Thus, this study design also allowed for the analysis of long term-safety of those adverse events persisting into the follow-up period. This was possible because the overall survival of the TAC treated patients was 95.2% with a median follow-up time of 77 months.[229] This is in contrast to the Taxotere previously-treated metastatic breast cancer trials in the original NDA where the survival of patients was much shorter, generally ranging about one year in duration.[230] The supplemental NDA Clinical Summary of Safety noted in its analysis of TEAEs persisting into the follow-up period that "alopecia remained ongoing in 3 of 49 (6.1%) of TAC patients compared with 1 of 35 (2.9%) FAC patients."[231] The follow-up in GEICAM9805 was not as robust as the follow-up in TAX316 as "TEAEs (treatment emergent adverse events) were followed into the follow-up period at the discretion of the investigator."[232] Thus, the number of reported ongoing events was

---

[228] Sanofi_00215728.
[229] Sanofi_00384946.
[230] Sanofi_00655001.
[231] Sanofi_00385012.
[232] NDA S-060, Clinical Summary of Safety, September 10, 2009, p. 34.

markedly smaller and the ability to determine frequencies of ongoing, or persistent, or irreversible alopecia from this study was minimized as compared to the TAX316 study.

With this November 30, 2009 supplemental NDA submission, Sanofi again proposed revisions to the Taxotere label to reflect this new proposed indication (node negative breast cancer) and other information from the clinical study. Specifically, in addition to another tabular listing of alopecia in the Adverse Reaction section of the labeling, Sanofi again proposed to add to the Adverse Reactions section of the label information about adverse reactions that persisted into the follow-up period of the study. Sanofi's labeling proposal for the Adverse Reactions section of the label was to add a subsection, "**Other persistent reactions**…The following events were observed to be ongoing in TAC-treated patients at the median follow-up time of 77 months; alopecia (n=3/49), amenorrhea (n=7/18), lymphoedema (4/5), peripheral sensory neuropathy (3/10)."[233] (The patient labeling information about the risk of hair loss as described above was to be retained as described above.)

This Sanofi labeling proposal was not implemented because during the course of the review of the supplemental NDA, FDA raised concerns about the evolving standards of care in this patient population that occurred after the initiation of the study which would impact the approvability of the indication based upon the GEICAM 9805 study. That ultimately led to Sanofi's withdrawal of the supplement.[234]

Despite the withdrawal of the supplement, this represents another example of Sanofi presenting a clear analysis of data demonstrating the persistence of alopecia into a long-term follow-up period, well after the completion of Taxotere treatment. Additionally, it represents a further example of Sanofi advocating to FDA to include information in the Taxotere label describing persisting alopecia.

In Europe, Sanofi also submitted an application to include the node negative breast cancer indication for Taxotere based on the results of the GEICAM 9805 study. Unlike FDA, the European CHMP recommended the use of Taxotere in combination with doxorubicin and

---

[233] Sanofi_00384656, p. 26.
[234] Sanofi_00205084.

cyclophosphamide for adjuvant treatment of patients with operable node negative breast cancer node negative breast cancer as supported by GEICAM 9805 on May 20, 2010 (endorsed by the European Commission on July 6, 2010).[235]  The SmPC was amended later to add information about ongoing alopecia seen in this study in the Undesirable effects section as well.

This is a further example of different regulatory authorities making different decisions when presented the same data and information.  Here the different decision-making is not just related to different labeling presentations, but the decision to actually approve or reject an indication in a critical clinical setting.

## D. __Periodic Safety Update Report for Docetaxel, January 21, 2011__

In meeting its post-marketing pharmacovigilance obligations, on January 27, 2011 Sanofi submitted to FDA the January 21, 2011 PSUR for docetaxel.[236]  The report included PSUR numbers 27 and 28 with a bridging summary covering the period of December 1, 2009 through November 30, 2010.[237] PSUR 28 provided worldwide safety information relating to Taxotere for the June 2010 to November 2010 time period.[238]

In the report, Sanofi identified persistent alopecia as a specific safety topic under review.[239] Sanofi identified a request by the French Health Products Safety Agency (AFSSAPS) for an analysis of the Sanofi safety database and a literature search for reports of persistent alopecia associated with Taxotere.[240]  The resulting Clinical Overview Docetaxel – Persistent Alopecia was included in the PSUR.[241]  This robust analysis of persistent alopecia (cases of alopecia persisting for 12 months or more after completion of chemotherapy) seen with Taxotere was a comprehensive analysis of the Sanofi global pharmacovigilance adverse event database augmented by a cumulative literature search.

---

[235] Sanofi_01095353.
[236] Sanofi_00201968.
[237] Ibid.
[238] Sanofi_00197757.
[239] Sanofi_00197759, Sanofi_00197839.
[240] Sanofi_00201052.
[241] Sanofi_00201046.

Sanofi performed a cumulative search from 1996 to 2010 of its global pharmacovigilance database including adverse events from Sanofi clinical studies (source = SS – sponsored study) as well as spontaneous reports (source = HCP – health care provider or Con - consumer) to detect all reports of alopecia.[242] Those reports were reviewed to identify cases reporting an outcome of alopecia at least 12 months following the last dose of chemotherapy including docetaxel which were considered cases of persistent alopecia.[243] The twelve-month "cut-off" to measure persistent alopecia was selected by Sanofi as to be consistent with the request from the AFSSAPS, which noted a majority of cases of persistent alopecia ongoing more than 12 months after the end of chemotherapy.[244]  That was taken by Sanofi as "a clue that (persisted for longer than twelve months) could be one definition."[245] The twelve-month cut-off was not a bright line threshold.  Reports with sufficient information to evince that the alopecia had not recovered for "11 months", or "about 1 year", "almost 1 year," etc. were considered sufficiently close to the 12 months needed for the definition of persistent alopecia to be included[246] "just to be on the safe side."[247]  The author of the Clinical Overview, Dr. Palatinsky, explained, "I didn't want to have any chance to miss any potential cases of interest that could have had, for example, 11 months of follow-up...So I wouldn't be limited to the twelve months."[248]  Dr. Palatinsky noted that in determining the 12 month criteria, "What I did was to search the literature…But there is no standardized definition of persistent alopecia,"[249] and "There is no medical definition of (persistent alopecia).  The literature is not consistent or uniform in regards of giving a specific number or months or weeks for alopecia to be determined to be irreversible."[250] The methodology employed by Sanofi in this analysis was transparent and clearly articulated in the submitted Clinical Overview, identifying cases that were included in and excluded from the analysis.

The use of other criteria for persistent alopecia, such as alopecia persisting only for six

---

[242] Sanofi_00201056.
[243] Sanofi_00201057.
[244] Sanofi_03643994.
[245] Palatinsky deposition, August 9, 2018, p 515.
[246] Sanofi_00201057.
[247] Palatinsky deposition, August 9, 2018, pp. 291-292.
[248] Ibid, pp. 515-516.
[249] Ibid, p. 515.
[250] Ibid, p. 293.

months following chemotherapy, at that time was not considered since the medical literature that has employed that potential definition of persistent alopecia is relatively recent, with the vast majority of the publications addressing that issue having been published subsequent to this 2011 analysis (e.g., Kim, G., et. al., Br Can Res Treat 163:527-533 (2017); Namini, S., J Clin Case Rep 6(8) (2016); Haider, M., et. al., J Cut Med & Surg 17(1):55-61 (2013), Kluger, N., et. al., Ann of Oncol 23(11):2879-2884 (2102)).

The AFSSAPS could have objected to such criteria and required Sanofi to complete a different analysis with different criteria for persistent alopecia, but did not do so.

Those reports of persistent alopecia were evaluated to determine if there was sufficient information for a medical assessment[251] and for factors such as age, diagnosis, concurrent anti-cancer treatment or other co-morbidities, time (or time lag) of onset of alopecia related to time of docetaxel administration,  and ultimate recovery of alopecia.[252]   The literature search was also comprehensive, surveying several recognized literature databases from 1996 to 2010 for literature reports of persistent alopecia with docetaxel.[253]   When asked about the exclusion of the Nabholz and Sedlacek publications from the literature review, Dr. Palatinsky explained, "The cases from the articles you mentioned are in our safety database. So they will be better analyzed in the body of the report without the need to duplicate them as literature review."[254]

Sanofi evaluated the resulting 142 reports of persistent alopecia in its pharmacovigilance database and reported no evidence of a causal relationship with Taxotere alone because of co-administration of multiple anticancer agents known to cause alopecia, multiple co-morbidities associated with the onset of alopecia were reported, the time lag from the last dose of Taxotere and the onset of alopecia was occasionally prolonged, and the onset of alopecia occasionally pre-dated the administration of Taxotere.  Sanofi concluded, "alopecia occurs very commonly (with Taxotere), though its persistence cannot be predicted and the available evidence does not show that irreversible alopecia is caused by docetaxel alone."[255]

---

[251] Sanofi_00201057.
[252] Sanofi_00201057, Sanofi_00201063, Sanofi_00201087.
[253] Sanofi_00201055.
[254] Palatinsky deposition, August 9, 2108, p. 300.
[255] Sanofi_00197757, p. 3,333.

Importantly, Sanofi also noted that three cases of persistent alopecia of at least one year in duration were reported as subsequently resolved in patients who were not otherwise different from those patients where the alopecia was reported as irreversible.[256]  Thus, caution must be applied when considering cases of persistent alopecia as representative of irreversible alopecia since some cases of persistent alopecia were subsequently resolved and, accordingly, are not truly cases of irreversible or permanent alopecia.   Thus, considering reports of alopecia persisting only six months after the conclusion of therapy as irreversible is too conservative and to characterize such results as irreversible would be inaccurate, biased and misleading.   Any reported frequency of irreversible alopecia derived from such a definition would be artificially inflated and also misleading.  Indeed, Table 5 in Dr. Madigan's report notes that patients had resolution of alopecia after 12 months, after 24 months, and even after 60 months.

It is my opinion that this 2011 analysis by Sanofi of persistent alopecia with docetaxel was a thorough, reasonable, adequate and appropriate response to the French Health Product Safety Agency inquiry for such, consistent with applicable regulations and industry standards, and that it was also reasonable and appropriate for Sanofi to provide and highlight this analysis in its pharmacovigilance PSUR submission to FDA on January 27, 2011.

This same analysis of persistent alopecia was submitted to the European regulatory authority, the EMEA, on January 26, 2011.[257]  The Rapporteur (reviewer) concurred with Sanofi's assessment, "On the basis of the safety review, it is effectively difficult to conclude that docetaxel alone is able to induce persistent alopecia."[258]  Nonetheless, the Rapporteur recommended, "Given the number of cases reported in the post marketing surveillance, the EU SmPC should therefore be updated in order to address this risk more clearly."[259]  On September 28, 2011 Sanofi submitted proposed changes to the SmPC to include a statement that "Cases of persisting alopecia have been reported," in the Undesirable effects post-marketing experience section and a statement in the Patient Leaflet section on Possible

---

[256] Ibid, p. 3,332.
[257] Sanofi_01923983-94.
[258] Sanofi_01113662.
[259] Ibid.

effects, "Hair loss (in most cases hair growth should resume)."[260]  On December 15, 2011, the CHMP endorsed Sanofi's proposed changes to the SmPC regarding persisting alopecia.[261]

Unlike the European regulatory authorities, after receipt of this analysis of persistent alopecia FDA did not require Sanofi to make any labeling revisions to the US Taxotere label describing persistent alopecia at that time.

This is an example of the reasonable and appropriate postmarketing pharmacovigilance process by Sanofi and yet another example of Sanofi providing a thorough analysis of persistent alopecia to FDA.  The issue of persistent alopecia was identified in the Executive Summary of the PSUR, was called out as a Specific Safety Topic Under Review in the Overall Safety Evaluation section of the report, and the full Clinical Overview was included as an appendix to the PSUR.  This is a fulsome and forthright approach in presenting this issue and its analysis to FDA.

## E.  2010 Labeling Change

On November 12, 2009, Sanofi submitted supplemental NDA S-059 to update the Taxotere labeling Pediatric Use and Human Pharmacokinetics sections of the labeling to incorporate the findings of pediatric studies.[262]  Included in that supplement were Sanofi's proposed revisions to the Taxotere label, which contemplated no changes to the Taxotere Patient Labeling.  On May 3, 2010, FDA provided its recommendations on the Taxotere pediatric labeling proposal.[263]  In its recommendations FDA proposed revisions to the Sanofi labeling proposals for the Pediatric Use and Human Pharmacokinetics sections of the labeling, but also suggested significant revisions to the Taxotere Patient Labeling.  FDA proposed to start the Patient Counseling Information section of the label with advice to the physician to, among other issues, "Explain to patients that side effects such as nausea, vomiting, diarrhea, constipation, fatigue, excessive tearing, infusion site reactions, and hair loss are associated with docetaxel administration."[264]  Additionally, FDA proposed a major re-write of the patient labeling including a deletion of the information about hair loss: "*What are the*

---

[260] Sanofi_01112272, Sanofi_05413055.
[261] Sanofi_00813022-23.
[262] Sanofi_00793355.
[263] Sanofi_02986067.
[264] Ibid, 62-70.

*possible side effects of Taxotere?* **Hair Loss** – Loss of hair occurs in most patients taking Taxotere (including the hair on your head, underarm hair, pubic hair, eyebrows and eyelashes). Hair loss will begin after the first few treatments and varies from patient to patient.  Once you have completed all your treatments, hair generally grows back."  In its place, FDA proposed to include a single bullet point listing hair loss as one of the most common side effects of Taxotere and to add advice to the patient to "Tell your doctor if you have any side effect that bothers you or does not go away."  FDA also proposed to include a listing of the most common adverse reactions from Taxotere, including alopecia, at the beginning of the Adverse Reactions section of the labeling.[265]  The Clinical Trial Experience section of Adverse Reactions was otherwise unchanged as it addressed the reports of alopecia in the Taxotere clinical trials.[266]  After a series of exchanges between FDA and Sanofi, FDA approved this revised labeling, including the revised patient labeling proposed by FDA as described above, for Taxotere on May 13, 2010.[267]

To offer perspective on this FDA-initiated patient labeling change, it is noted that a similar labeling revision was implemented for Taxol (paclitaxel) in the same time frame.  This likely reflects an approach at FDA to harmonize labeling for oncology agents, particularly taxanes, as possible.  In its exchange with Sanofi described above, FDA noted, "It is a Division policy to maintain consistency for all cancer drug labels."[268]

For Taxol, the Patient Labeling as of July 2000 was similar to that of Taxotere, "Hair Loss. Complete hair loss, or alopecia, almost always occurs with Taxol.  This usually involves the loss of eyebrows, eyelashes and pubic hair, as well as scalp hair.  It can occur suddenly after treatment has begun, but usually happens 14 to 21 days after treatment. *Hair generally grows back after you've finished your Taxol treatment.*"[269]  In the subsequent August 2010 version of the Taxol labeling, approved, August 13, 2010, the patient labeling addressed hair loss as a single bullet point as one of the most common side effects of Taxol just as in the FDA-initiated change in the Taxotere patient labeling.[270]

---

[265] Ibid, p. 19.
[266] Ibid, pp. 19 – 38.
[267] Sanofi_00793355.
[268] Sanofi_00168582, p. 5.
[269] NDA 20-262, S-037, Labeling Review, March 4, 2002.
[270] NDA 20-262, S-048, approved August 13, 2010.

Another taxane formulation then on the market, Abraxane, showed a similar contemporaneous labeling change.  In the Patient Labeling for Abraxane as of May, 2009 it was noted that '"Complete hair loss, or alopecia, almost always occurs with Abraxane.  This usually involves the loss of eyebrows, eyelashes, and pubic hair, as well as scalp hair.  It can occur suddenly after treatment has begun, but usually happens 14 to 21 days after treatment.  *Hair generally grows back after you've finished your Abraxane treatment.*"[271]  In the subsequent December 2011 version of the Abraxane labeling, approved December 23, 2011, the patient labeling addressed hair loss as a single bullet point as one of the most common side effects of Abraxane just as in the FDA-initiated change in the Taxotere patient labeling.[272]

It is my opinion that it was reasonable for Sanofi to accept FDA's proposed Patient Labeling changes respecting the Agency's regulatory authority, particularly given that such labeling changes were implemented throughout the therapeutic category.

## F.  Taxotere European Labeling

As noted above, with the European approval of revised Taxotere labeling to reflect a new use for adjuvant treatment of node positive breast cancer based upon TAX316, in 2004, the SmPC then included information about persisting alopecia.[273]  Later the European authorities approved the use of Taxotere for adjuvant treatment of node negative breast cancer based on GEICAM 9805.  Subsequently, the SmPC was amended to include the results of GEICAM 9805 as they related to ongoing alopecia.  As described above, in December 2011, the SmPC was amended to note that "Cases of persisting alopecia have been reported," in the Post-marketing experience (Undesirable effects) section of the label.[274] Following several clarifying exchanges between Sanofi and the European regulators about the results of TAX316 and GEICAM 9805, the SmPC was updated by July 2015 to include a tabulated list of adverse reactions for adjuvant therapy with Taxotere including, "Alopecia (persisting: <3%)(very common)."[275]  In each of these labeling revisions, the European regulators required Sanofi to describe the risk of persisting alopecia in the Undesirable

---

[271] NDA 21-660, S-022, approved June 26, 2009.
[272] NDA 21-660, S-029, approved December 23, 2011.
[273] Sanofi_01094524
[274] Sanofi_05413055.
[275] Sanofi_00829529.

effects section of the SmPC, not the Special warnings and precautions section.

Such differences in labeling between the European and US labels are not unusual, reflecting the individual regulatory review and approval processes and their independent evaluation of the underlying data.

## G.  Sanofi Company Core Data Sheet/Company Core Safety Information Versions

The first version (Version 1.0) of the Sanofi Taxotere Company Core Data Sheet issued after the May 14, 1996 US NDA approval, listed alopecia as an undesirable effect or an adverse reaction seen with an incidence of 79% in the initial clinical studies of locally advanced or metastatic breast cancer who have progressed during anthracycline-based therapy or who have relapsed during anthracycline-based adjuvant therapy.[276]  [The safety information included in the versions of the Sanofi docetaxel CCDS was mirrored in the corresponding CCSI version.] That information remained essentially unchanged through Version 10.0, dated December 10, 2003.

With Version 11.0 of the Corporate Safety Data Sheet of February 5, 2004, Sanofi added to the CCDS section on Adverse Reactions, the information from TAX316 described above about Other persistent reactions, alopecia 22/687 observed ongoing at the median follow-up time of 55 months.[277]  This 2004 addition represents the first inclusion of information about persisting alopecia in the Taxotere reference safety documents.  Despite FDA's rejection of Sanofi's proposed labeling for Taxotere to include this information about persisting alopecia in August 2004 as described above, Sanofi retained this information in the CCDS/CCSI in subsequent versions into 2009.

With Version 22 of the docetaxel CCDS dated September 9, 2009, Sanofi added to the CCDS section on Adverse Reactions, the information from GEICAM 9805 described above about Other persistent reactions, alopecia 3/49 observed ongoing at the median follow-up time of 77 months.[278] The information from TAX316 about persisting alopecia remained

---

[276] Sanofi_04798108.
[277] Sanofi_01264126-42.
[278] Sanofi_03277176-240.

unchanged.

With version 26 of the docetaxel CCDS dated June 28, 2011, Sanofi updated the Adverse Reactions section to reflect the language from the 10-year follow-up report of TAX316 described above noting that the most common adverse reactions persisting into the follow-up period in TAC treated patients were alopecia (92.3%).[279]  The information in the CCDS from GEICAM 9805 about persisting alopecia as described above remained unchanged.

With Version 29 of the docetaxel CCDS dated November 12, 2014, Sanofi updated the Adverse Reactions section to reflect the language from the 10-year follow-up report of GEICAM 9805 noting the most common adverse events persisting into the follow-up period (median follow-up time of 10 years and 5 months) were alopecia (49 patients, 9.2%).[280]  Also, that alopecia related to study drug started or worsened during the follow-up period in 42 patients (7.9%).[281]

With Version 30 of the docetaxel CCDS dated November 16, 2015, Sanofi updated the Post-Marketing Experiences section of the Adverse Reactions section to note that "Cases of permanent alopecia (frequency not known) have been reported."[282]

With Version 33 of the docetaxel CCDS dated March 16, 2017, Sanofi updated the Adverse Reactions section for persisting alopecia seen with TAX316 to note that 92.3% of the patients reported alopecia persisting into the follow-up period, but that 3.9% remained ongoing at the end of the follow-up period.[283]  The Adverse Reaction language for GEICAM 9805 was updated similarly to note that 9.2% of the patients reported alopecia persisting into the follow-up period, but that 0.6% remained ongoing at the end of the follow-up period.[284]

Thus, the Sanofi Taxotere CCDS and CCSI have always included alopecia as an adverse event and since 2004 the Taxotere CCDS and CCSI have consistently described data on persistent

---

[279] Sanofi_00805192.
[280] Sanofi_02399458-534.
[281] Ibid.
[282] Sanofi_01199744.
[283] Sanofi_02399259-335.
[284] Ibid.

alopecia in patients treated with Taxotere alongside other chemotherapy agents.

## H. **2015 Labeling Change**

On March 23, 2015, FDA contacted Sanofi and requested a "summary of cases of permanent partial or total alopecia associated with docetaxel use," by April 10, 2015.[285]  No other perspective was provided by FDA at that time.  On April 10, 2015, Sanofi submitted the requested response.[286]  The response included Sanofi's search of its global pharmacovigilance database for reports of long-standing alopecia (e.g., permanent, persistent, irreversible, chronic) associated with Taxotere use, searching as far back as the introduction of Taxotere to the market in 1996.   The search found 89 cases of "permanent alopecia (verbatims including terms such as "permanent", "chronic" and "irreversible" and cases with alopecia lasting more than 2 years). [287] Even with these rigorous criteria, Sanofi identified cases of such "permanent" alopecia where the alopecia subsequently recovered, questioning the adequacy of even two years of post-therapy follow-up to determine the "permanence" or "irreversibility" of such reports of alopecia.[288]  There were also numerous confounding factors in these cases.  Sanofi concluded that "alopecia occurs very commonly. Permanent alopecia is mostly reported in female patients with breast cancer.  The available evidence does not show that permanent alopecia is caused by docetaxel alone."[289]

FDA performed its own independent analysis of Sanofi's Response. At a minimum, it reviewed Sanofi's submission and presented the data to two breast cancer review teams in May 2015.[290] FDA determined "that virtually all of the described cases of alopecia were confounded by use of other cytotoxic agents, which are also known to cause alopecia."[291] Nonetheless, after further internal discussions and "due to the possibility that permanent alopecia **may be** associated with docetaxel use," FDA decided to request a Prior Approval Supplement from Sanofi to "update the docetaxel label, which already lists alopecia as a

---

[285] Sanofi_01574962.
[286] Ibid.
[287] Sanofi_01259408.
[288] Ibid, at p. 6.
[289] Ibid, at p. 24.
[290] Prowell, T. to Diggs, F., et. al., Congressional Response Letter – Taxotere Adverse Events, November 22, 2015.
[291] Ibid.

known adverse drug reaction, to indicate that alopecia may be permanent."[292]

Six months after Sanofi's initial submission, on October 2, 2015, FDA requested that Sanofi "[p]rovide any additional information regarding permanent or irreversible alopecia," and "[a]mend the package insert in Section 6.2 (Adverse Reactions - Postmarketing Experience)(and patient information, if appropriate) to add information on permanent or irreversible alopecia," within 60 days.[293]  In FDA's judgment, the Taxotere labeling was to be revised to reflect reports of permanent alopecia in the Adverse Reactions section of the label, not the Warnings section.  It should be noted that FDA did not require this new safety labeling under the provisions of Section 505(o)(4) of the FD&C Act (FDAAA) as a serious risk or unexpected serious risk.[294]

On November 24, 2015, Sanofi provided its response.[295]  Sanofi's response included an updated Clinical Overview that evaluated docetaxel and permanent alopecia, reports with a verbatim event that included either "permanent" or "irreversible" or reports of alopecia that lasted more than 2 years with an outcome of not recovered/recovering/unknown.[296]  These 2015 requests from FDA were for a different analysis, for permanent alopecia, different from the 2010 request from the AFSSPAS for an analysis of persistent alopecia as described in section IV. D. of this report, that resulted in the 2011 PSUR.  The 2011 analysis of persistent alopecia identified cases that persisted for at least 12 months following therapy, but then resolved such that such cases of persistent alopecia were not all true cases of permanent alopecia.  Accordingly, different criteria, longer, more stringent criteria, were employed in the 2015 analysis of permanent alopecia.  FDA could have objected to those criteria of permanent alopecia, but did not.  Sanofi's November 25, 2015 response also included, as requested by FDA, a Changes Being Effected (21 CFR 314.70(c)) labeling supplement to update the Post-Marketing Experiences in the Adverse Reactions section of the Taxotere labeling and a further update to the Patient Counseling and Patient Information labeling.  The labeling proposal from Sanofi was to add "Cases of permanent alopecia have been reported," to the Post-Marketing Experience section of the Adverse

---

[292] Ibid.
[293] Sanofi_00805353.
[294] Guidance for Industry, Safety Labeling Changes – Implementation of Section 505(o)(4) of the FD&C Act, July 2013, p.3.
[295] Sanofi_03333249.
[296] Sanofi_01268143, at p. 12.

Reactions section of the label; to add that "cases of permanent hair loss have been reported," to the Patient Counseling Information for Physicians section of the label; and to add to the listing of hair loss in the Patient Labeling, "In most cases normal hair growth should return.  In some cases (frequency not known) permanent hair loss has been observed."

In the updated Clinical Overview, Sanofi provided additional background on alopecia and its occurrence with anti-cancer agents and updated its review of the Sanofi global pharmacovigilance database to report 117 cases of "permanent alopecia," the majority of which were treated with combination treatments including other agents known to induce alopecia.[297]  Sanofi also reiterated the results of TAX316 and GEICAM 9805 relative to persisting alopecia and reviewed the literature for pertinent studies.  Sanofi conclusions included:

> Alopecia is a very common adverse reaction of docetaxel.

> Upon review of the safety database, 117 cases were considered permanent alopecia.

> Of those cases, the majority received combination chemotherapy and/or hormonal therapy also known to cause alopecia.[298]

> The frequency of permanent/irreversible alopecia is unknown as the number of patients exposed to docetaxel is unknown in post-marketing surveillance.

After having received FDA's determination that a labeling change for Taxotere for permanent alopecia was to be implemented, Sanofi concluded that the cumulative weighted evidence was sufficient to support a causal association between docetaxel and permanent/irreversible alopecia, but that the benefit-risk relationship remains unchanged; the benefits of docetaxel continue to outweigh the risks, including permanent alopecia.[299] The contributing Sanofi pharmacovigilance experts, Dr. Shang Jen and Dr. Nanae Hangai, explained in their respective depositions that this conclusion means that the evidence could not rule out the role of docetaxel in contributing to the occurrence of permanent alopecia in patients who receive therapy, mostly in combination with other chemotherapeutic agents, and that the conclusion does not mean that Taxotere is a proven cause of permanent

---

[297] Ibid.
[298] Ibid, p.35.
[299] Ibid, pp. 35-36.

alopecia.[300]  (A - "That information shows that docetaxel often isn't given alone, and because of that you can't fully rule out that docetaxel may have the chance of causing it, but there's also a lot of concomitant medications and confounding factors that cause alopecia – permanent or irreversible alopecia as well. So the company takes a more conservative point – stance, and says that, you know, we can't completely rule it out, and that's why there's a causal relationship."  Q-  'Does that mean that docetaxel alone causes permanent alopecia?" A – "No, it does not.  As I mentioned, based on the review, you know, we know that docetaxel oftentimes isn't used alone, so that's why we still state the causal association."  Q – "And does that conclusion mean that Taxotere is a proven cause of permanent alopecia?"  A – "No, it does not."[301])  That is, Sanofi did not conclude medical causation for Taxotere and permanent alopecia.  This position was echoed by Dr. Kopreski in his deposition testimony on the significant contribution of adriamycin and cyclophosphamide (AC) to the occurrence of persistent alopecia seen in patients treated with TAC.[302]

Again, FDA reviewed the data from the Clinical Overview. FDA concurred with Sanofi's conclusion, "it's impossible to determine whether the permanence of alopecia was due to docetaxel,"[303] and "The Sponsor and FDA concur that the available evidence supports a **potential** causal association between docetaxel and permanent alopecia,"[304] (emphasis added).

Three weeks later, on December 11, 2015, FDA approved this revised labeling for Taxotere with no further change.[305]  FDA continued to judge that the Taxotere labeling was adequate to allow for the safe use of the drug even with permanent alopecia labeled as an Adverse Reaction, not requiring it to be labeled as a Warning.

In terms of background on this labeling change, the FDA Medical Review notes that FDA's March 23, 2015 request to Sanofi was stimulated by contact with oncology patient

---

[300] Jen deposition, September 21, 2018, pp. 385-386, Hangai deposition, February 1, 2018, pp. 18, 194, 275-276.
[301] Jen deposition, September 21, 2018, pp. 385 – 386.
[302] Kopreski deposition, October 11, 2018, p. 764.
[303] Prowell, T. to Diggs, F., et. al., Congressional Response Letter – Taxotere Adverse Events, December 4, 2015.
[304] NDA 20-449, S-075, Medical Review, Prowell, T., December 4, 2015.
[305] Sanofi_00836220.

advocates who acknowledged that the Taxotere label described alopecia as a common adverse reaction, but did not reflect that alopecia could be permanent.[306]  The Medical Review notes the concurrence of the reviewer with Sanofi's interpretation of the available evidence as described above, principally that the reports of permanent alopecia with Taxotere were confounded by the use of other cytotoxic agents which are also known to cause alopecia and "that the available evidence supports a <u>potential</u> causal association between docetaxel and permanent alopecia."[307]  FDA also notes, "the true incidence of permanent alopecia is unknown and cannot be reliably estimated given the limitations of the available data."[308]  The Medical Review also noted its agreement with Sanofi's labeling proposal.[309]  Ultimately, the medical reviewer specifically commented about the labeling proposal, "**<u>I think the Sponsor's simple statement that permanent cases have been reported is all that can reliably be said given the tremendous limitations of the available data</u>**."[310]

It is my opinion that Sanofi acted as a reasonable and responsible pharmaceutical sponsor in its response to FDA on this issue.  Its analyses were timely, thorough, detailed and clear and based on appropriate pharmacovigilance systems and processes.  The analyses provided a detailed assessment of the individual spontaneous adverse event reports as well as an assessment of those reports in aggregate and closed with Sanofi's overall analysis of the information.  Sanofi's statement that the cumulative weighted evidence was sufficient to support a causal association between docetaxel and permanent/irreversible alopecia was intended to convey that because of the occurrences of such reports with Taxotere in combination therapy, the role of Taxotere as a potential causative agent could not be ruled out – medical causation for Taxotere alone and permanent alopecia was not determined.  It is my opinion, and the stated opinion of the FDA, that Sanofi's assessment of the evidence was a reasonable and appropriate analysis of permanent alopecia associated with Taxotere administration, and that the analysis was confounded by the co-administration of other agents known to cause alopecia.   It is also my opinion, and the stated opinion of FDA, that the labeling revision proposed by Sanofi to describe the potential risk of permanent

---

[306] NDA 20-449, S-075, Medical Review, Prowell, T., December 4, 2015.
[307] Ibid.
[308] Ibid.
[309] Ibid.
[310] Prowell, T. to Diggs, F., et. al., Congressional Response Letter – Taxotere Adverse Events, December 4, 2015.

alopecia with Taxotere was reasonable and appropriate and "all that can reliably be said given the tremendous limitation of the available data."

Drs. Madigan and Kessler address the statement from Sanofi that the "cumulative weighted evidence is sufficient to support a causal association between docetaxel and permanent/irreversible alopecia," and opine that this statement concludes a defined signal of causal association of Taxotere alone and irreversible alopecia (which it does not as described above) and that such a conclusion was available "several years earlier"[311] or "as early as 2009."[312]  Given the information presented in this report, I disagree.   In 2004, Sanofi reported the results of the 55-month interim follow-up to TAX316 and reported on the frequency of ongoing alopecia following therapy in this study.[313]  Sanofi did not find this to be a signal of a causal association between Taxotere and irreversible alopecia.  It did propose to include information about ongoing alopecia, not irreversible alopecia, in the Taxotere labeling.[314]  FDA did not judge this information to be a signal of a causal association of Taxotere with irreversible alopecia as it did not require labeling of Taxotere as such, and did not even support inclusion in the labeling information about ongoing alopecia.[315]  The EMEA also did not judge this information to be a signal of a causal association between Taxotere and irreversible alopecia, but did support inclusion of information in the European labeling for Taxotere to describe ongoing alopecia.[316]  Before and after the submission of the TAX316 55-month follow-up data, Sanofi conducted its pharmacovigilance of Taxotere as described in Section IV. J. of this report.  Sanofi monitored for safety signals for alopecia.  Dr. Palatinsky clarified, "We assess safety signals all the time, and not only persistent alopecia,"[317]…"our duty is to keep monitoring what happens in relation to docetaxel," and "we were looking at irreversible alopecia, among other adverse events."[318]   Sanofi did not identify a signal of a casual association of Taxotere with irreversible alopecia and did not recommend labeling for Taxotere to such effect.  The regulatory authorities (FDA and EMEA) continued to evaluate this pharmacovigilance

[311] Madigan expert report, November 2, 2108, para. 54.
[312] Kessler expert report, November 6, 2018, para 208.
[313] Sanofi_05597232.
[314] Sanofi_00355202.
[315] Sanofi_04539472.doc.
[316] Sanofi_01094524.
[317] Palatinsky deposition, August 9, 2018, pp. 279-280.
[318] Palatinsky deposition, August 10, 2018, p. 551.

information and also did not identify a signal of Taxotere associated with irreversible alopecia nor recommend labeling for Taxotere as such. In 2011, Sanofi evaluated the available information for an association of Taxotere with persistent alopecia, a less rigorous threshold than for irreversible alopecia, and concluded that the available evidence did not show that irreversible alopecia is caused by docetaxel alone.[319]  FDA did not judge this information as a signal of a casual association between Taxotere and irreversible alopecia. EMEA also did not judge this information to be a signal of a causal association between Taxotere and irreversible alopecia, but did require labeling for Taxotere to describe persisting alopecia.[320]  By 2011, the pharmacovigilance of Taxotere for longer term alopecia largely reflected the impact of stimulating factors for such reports including the 2009 "media reports,"[321] the 2009 Bourgeois publication, the survey of French oncologists for persistent alopecia in breast cancer chemotherapy[322] and the label change in Europe to describe persistent alopecia.[323]   Finally, only in 2015, when Sanofi evaluated the available information for Taxotere and irreversible alopecia, did Sanofi and FDA concur that it was "impossible to determine whether the permanence of alopecia was due to docetaxel" and "the available evidence supports a <u>potential</u> causal association between docetaxel and permanent alopecia."[324]  The Taxotere labeling was updated to reflect this potential casual association between Taxotere and permanent alopecia despite the significant impact of confounding factors in this analysis.  Thus, Sanofi continuously evaluated the available information for a signal for Taxotere and a potential causal association with longer term alopecia, including irreversible alopecia, as did the FDA and European regulators and no potential signal of a casual association between Taxotere and irreversible alopecia was identified until the 2015 analysis.   To opine that such a signal was available in 2009 or several years earlier than 2015 is not consistent with this evidence.

Dr. Sedlacek's abstract, published in 2006, does not change this analysis.  Dr. Sedlacek's findings, while important and the subject of follow up by Sanofi pharmacovigilance and regulatory reporting, cannot be interpreted as a signal of irreversible alopecia. The abstract's limited data set must be measured against the more fulsome data sets discussed

---

[319] Sanofi_00197757, p. 3,333.
[320] Sanofi_01113662.doc.
[321] Palatinsky deposition, August 10, 2018, pp. 437-444.
[322] Bourgeois, H., et. al., Cancer Research 2009, 69(24 Suppl): Abstract nr 3174.
[323] Sanofi_00813022.doc.
[324] NDA 20-449, S-075, Medical Review, Prowell, T., December 4, 2015.

above.

# I.   Overall Labeling Changes for Taxotere

As described above, Sanofi worked in concert with FDA during the course of the FDA review of the original NDA for Taxotere to develop labeling that would provide adequate directions for use to allow for the safe and effective use of Taxotere for its intended use in the treatment of breast cancer.  However, drug product labeling is a dynamic entity with changes being proposed, reviewed, approved by FDA and implemented in the market as a result of new information becoming available to the drug product sponsor and FDA.

Sanofi was actively engaged with FDA in evolving the labeling for Taxotere after its initial introduction into the market.  For example, after the initial approval for Taxotere on May 14, 1996, Sanofi has received FDA approval on twenty-eight additional supplemental NDA revisions to the labeling[325] to keep this information up-to-date, reflecting current information and knowledge about Taxotere to allow for its safe and effective use prior to the 2015 labeling change described above.

Collectively, these actions demonstrate the willingness of Sanofi to evaluate new information that becomes available to it and to request and secure FDA approval of labeling changes to ensure that its labeling remains adequate and appropriate to facilitate the safe use of Taxotere.  In any of those instances, FDA could have required Sanofi to update the Taxotere labeling with new Adverse Reactions labeling to describe the potential risk of persistent or irreversible alopecia.  It did not.  In any of those instances, FDA could have required a new Warning to describe persistent or irreversible alopecia.  It did not.  Sanofi's judgment was that the Taxotere label and its description of the potential risk of alopecia was appropriate and provided adequate directions for the safe use of the product.  That judgment was offered time and again to FDA and FDA did not disagree.

This process also reflects Sanofi's postmarketing surveillance activities and the translation of those activities into actions to revise the Taxotere label to ensure current information is

---

[325] https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=020449.

included in product labeling following medical evaluation by the sponsor and concurrence by FDA.

Specifically, during the 1996 - 2015 timeframe Sanofi provided to FDA a summary and analysis of the safety information obtained from the spontaneous postmarketing adverse event reports and a description of the actions taken, such as labeling changes or a recommendation that no labeling changes were warranted, based upon those reports on an annual basis in its periodic adverse drug experience report (PADER) for Taxotere. Additionally, in its NDA annual reports to FDA Sanofi summarized the safety information that became available to it during the previous year from preclinical studies, from clinical studies, or from the published scientific literature and its recommendations for any labeling revisions based on the information or its recommendation that no labeling changes were warranted.

FDA could have but did not recommend updated labeling for Taxotere in either the Adverse Reactions section or the Warnings section of the label to reflect persistent alopecia based upon its review of the Sanofi Taxotere PADERs, PSURs and NDA Annual Reports.  In fact, as described above, FDA rejected Sanofi's proposals to label Taxotere for the potential risk for persisting alopecia on several occasions, as early as 2004.

Thus, Sanofi continued to assess, evaluate and analyze the safety information available to it through its ongoing pharmacovigilance efforts, and recommend appropriate labeling revisions to FDA or to offer its medical judgment to endorse the continuing adequacy of the Taxotere labeling to FDA for its consideration throughout the time of Taxotere on the market since 1996.

## J.   Sanofi's Post-Marketing Surveillance

After the initial NDA approval for Taxotere in May 1996, Sanofi began its post-marketing surveillance or pharmacovigilance activities to meet its obligations under the regulations for postmarketing reporting of adverse drug experiences[326] and other postmarketing reports.[327]  At the time of the initial NDA approvals, in the approval letters FDA could have,

---

[326] 21 CFR 314.80.
[327] 21 CFR 314.81.

but did not establish any extraordinary requirements for postmarketing surveillance (e.g., REMS) for Taxotere.  FDA also did not require any specific Phase IV commitments to further explore the safety of Taxotere after its entry into the market or even after Sanofi reported persisting alopecia seen in the TAX316 and GEICAM 9805 studies.

In its pharmacovigilance following the initial approval of Taxotere, Sanofi noted reports of alopecia and even reports of persistent alopecia in patients taking Taxotere and reported those findings in its postmarketing safety reports.  Since the initial labeling for Taxotere as it was introduced to the market included alopecia as a labeled adverse reaction, reports of alopecia were considered expected under 21 CFR 314.80(a) and would not require a postmarketing 15-day Alert Report under 21 CFR 314.80(c)(1)(i), but would rather be reported in the periodic adverse drug experience report (PADER) as per 21 CFR 314.80(c)(2).

In its postmarketing reporting, Sanofi provided a summary of the information obtained from spontaneous postmarketing adverse event reports and a description of recommended labeling actions or a recommendation for no changes to the labeling as described above in section III. A. 5. of this report.

Thus, it is my opinion that Sanofi's postmarketing surveillance and evaluation of reports of alopecia and persistent alopecia associated with Taxotere therapy from the introduction of the product to the market in 1996, up to the time of the 2015 US labeling revision and through the life of the product to address permanent alopecia were thorough, appropriate, reasonable and in keeping with applicable regulations and industry standards.

## K.  Taxotere Advertising and Promotion Oversight

From the time of its initial approval on May 14, 1996 until the present, Sanofi (and its predecessor companies) has received several enforcement letters from FDA's DDMAC relating to its promotion of Taxotere.  None of those enforcement letters addressed the promotion of Taxotere in combination with doxorubicin and cyclophosphamide for the adjuvant treatment of patients with operable node-positive breast cancer ("adjuvant use") and the focus of those enforcement actions was not related to the discussion of the risk of alopecia or persistent or permanent alopecia in Taxotere promotional materials.

One enforcement action from DDMAC warrants comment.  This DDMAC enforcement letter regarding Taxotere promotion was an Untitled Letter and was issued on April 16, 2009 to Sanofi.[328]  In this letter DDMAC claims that Sanofi presented unsubstantiated superiority claims vs. paclitaxel and overstates the efficacy of Taxotere in locally advanced or metastatic breast cancer in a reprint carrier describing the published results of study TAX 311.[329] DDMAC noted that the study did not demonstrate a statistically significant advantage for Taxotere vs. paclitaxel on the primary study endpoint (overall response rate in the intent-to-treat population), that the promotional claims of superiority were based upon secondary endpoints and that the study had not been replicated as required to support a promotional claim for superiority.[330]  DDMAC requested Sanofi to cease dissemination of the reprint carrier and to respond in writing to its letter.[331]

Sanofi responded on April 29, 2009 with a significant review of the prior correspondence between Sanofi and FDA on the use of TAX 311 (a study conducted to fulfill a FDA post-marketing commitment to compare Taxotere and paclitaxel in metastatic breast cancer) data in promotional materials.[332]  The reprint carrier and the publication of the results of the TAX311 study demonstrated the "efficacy advantages for Taxotere over paclitaxel, including a significant improvement in the primary endpoint of objective response rate in the evaluable population, significant advantages in the secondary endpoint of time-to-progression in both the intent-to-treat and evaluable populations, and significant advantages in the secondary endpoint of survival in both the intent-to-treat and evaluable populations."[333] The primary study endpoint, which was the focus of the DDMAC letter, was the objective response rate in the intent-to-treat study population.[334]  In the cited reprint, the authors noted that, "the overall response rate (ORR, 32% vs 25%; P = .10) was higher for docetaxel."[335]  The authors concluded, "docetaxel demonstrated superior efficacy compared with paclitaxel, providing significant clinical benefit in terms of survival and time to disease progression, with a numerically higher response rate and manageable

[328] Sanofi_00337551.
[329] Ibid.
[330] Ibid.
[331] Ibid.
[332] Sanofi_04744172.
[333] Ibid, p. 26.
[334] Sanofi_00337551, p. 3.
[335] Jones, S., et. al., J Clin Oncol 23:5542-5551.

toxicities."[336]   Thus, Sanofi believed this information was important to "fully characterize this important drug so that prescribers can use it in as safe and efficacious manner as possible…helping them understand how to use Taxotere," and "that the TAX311 data are consistent with our approved prescribing information," and that the information was appropriate for promotional dissemination. [337]

In its April 29, 2009 response, Sanofi also noted that FDA had accepted TAX 311 to fulfill a post-marketing commitment requested by FDA, that Sanofi had advised FDA that it intended to employ TAX 311 in promotion of Taxotere since the data are consistent with the approved labeling for Taxotere in the treatment of metastatic breast cancer and that it had attempted to meet with FDA on several occasions to explore this issue, and that due to logistical issues associated with the age of study TAX 311, Sanofi could not file a labeling supplement to include the results of study TAX 311 in the Taxotere label.[338]   Nonetheless, Sanofi agreed to discontinue the reprint carrier and other promotional materials that include superiority claims for Taxotere vs. paclitaxel based on TAX 311, but would continue to disseminate information about the results of TAX 311 that avoids the claims of superiority vs. paclitaxel since Sanofi believes that the TAX 311 results are consistent with the FDA-approved Taxotere labeling.[339]

DDMAC responded on August 4, 2009, advised Sanofi to submit proposed promotional materials for Taxotere that contain claims based on TAX 311 for advisory comments and noted that, given Sanofi's actions to discontinue use of the reprint carrier and related promotional materials, the matter was considered closed.[340]

In the intervening nine years, there have been no further FDA enforcement letters to Sanofi relating to the promotion of Taxotere, including any citations of inappropriate promotional comparisons with paclitaxel.  It is my opinion that the receipt of only several enforcement letters over the course of 22 years that Taxotere has been on the market in a highly competitive, technically and medically complex field, is not indicative of a violative, non-complaint promotional approach.   The enforcement citations for Taxotere promotion that

---

[336] Sanofi_04744172.
[337] Sanofi_04744174.
[338] Ibid.
[339] Ibid.
[340] Sanofi_00356704.

were made by DDMAC were not related to its use in the adjuvant breast cancer treatment setting, the use of focus in this litigation, and the citations did not claim inadequate disclosure of the potential risk of persistent or permanent or irreversible alopecia associated with Taxotere use.  Given the above and the absence of DDMAC enforcement action for Taxotere for adjuvant breast cancer use despite extensive promotion for such use, it is my opinion that the promotion of Taxotere, particularly for its use in the adjuvant breast cancer treatment setting, has been reasonable, appropriate, consistent with industry standards and applicable FDA regulations.

## L.  Multiple Submissions of Data/Analyses of Persistent Alopecia Seen with Taxotere Reported to FDA by Sanofi

Sanofi provided many submissions of data and analyses of the occurrence of persisting or persistent alopecia seen with Taxotere treatment before the 2015 revision to the label to note the occurrence of cases of permanent hair loss.  Such submissions included:

- o   The March 17, 2004 submission of Taxotere supplemental NDA S-029 for Taxotere use in combination with doxorubicin and cyclophosphamide as adjuvant treatment of operable node-positive breast cancer, including the clinical study report for TAX316 which noted an analysis of persistent adverse reactions, including the finding that 3.2% of TAC-treated patients showed alopecia that remained ongoing in the follow-up period for the patients in this interim analysis.[341]  These results were presented in the Study Synopsis, Safety Results, Safety Summary and Discussion sections of the CSR in both tabular and text descriptions.[342]  As described above in Section IV. B. of this report, Sanofi also proposed (in several filings) to include this description of persisting alopecia in the Taxotere labeling at this time,[343] a proposal that was rejected by FDA.[344]

- o   The November 30, 2009 submission of Taxotere supplemental NDA S-060 for Taxotere use in combination with doxorubicin and cyclophosphamide as

---

[341] Sanofi_00798650.
[342] Ibid.
[343] Sanofi_00355202.
[344] Sanofi_04817139, Sanofi_04539472.doc.

adjuvant treatment of operable node-negative breast cancer, including the clinical study report for GEICAM 9805 which noted an analysis of persistent adverse reactions including the finding that 3 of 49 (6.1%) of the TAC treated patients showed alopecia that remained ongoing in the follow-up period for the patients in this interim analysis.[345]  Once again, the analysis of persisting alopecia was highlighted and presented in the Clinical Overview and the Clinical Summary of Safety included in the submission as well as in the clinical study report.  As described in section IV. C. of this report, Sanofi again proposed to include a description of persisting alopecia in the Taxotere labeling with this filing.[346]  Sanofi's labeling proposal was not implemented because Sanofi subsequently withdrew the supplement as a result of FDA's concerns about the interpretability of the study given evolving standards of care in this patient population.[347]

o   The September 24, 2010 submission[348] of an updated clinical study report for TAX316 containing the 10-year follow-up data including an analysis that showed that 4.2% of the TAC treated patients demonstrated alopecia that remained ongoing in the follow-up period.[349]  Again, these results were presented in the Study Synopsis, Safety Results, Safety Summary and Discussion sections of the CSR in both tabular and text descriptions to provide a fulsome presentation of this information pertaining to persisting alopecia.[350]

o   The January 27, 2011 submission of the January 21, 2011 PSUR for docetaxel.  As described in Section IV. D. of this report, this PSUR identified persistent alopecia as a specific safety topic under review[351] and provided a thorough and detailed analysis of the Sanofi global pharmacovigilance adverse event database augmented by a cumulative literature search for

---

[345] Sanofi_00215728.
[346] Sanofi_00384656.
[347] Sanofi_03242135.
[348] Sanofi_01288423.
[349] Sanofi_00724262.
[350] Ibid.
[351] Sanofi_00197757.

reports of persistent alopecia in patients treated with Taxotere.[352]  Sanofi concluded that the available evidence did not show that irreversible alopecia was caused by docetaxel alone.[353]

o   The January 27, 2011 submission of the January 21, 2011 PSUR 28 also included, as part of the PSUR, the Sanofi Docetaxel Company Core Safety Information Version 24, dated December 14, 2009 as the reference safety information for Taxotere.[354]  This CCSI included the results of TAX316 and GEICAM 9805 regarding persisting alopecia.[355]

o   The January 27, 2011 submission of the July 23, 2010 PSUR 27 also included, as part of the PSUR, the Sanofi Docetaxel Company Core Safety Information Version 23, dated October 1, 2009 as the initial reference safety information for Taxotere.[356]  This CCSI also included the results of TAX316 and GEICAM 9805 regarding persisting alopecia.

o   The March 20, 2006 submission of PSURs 17 and 18 for Taxotere NDA 20-449.[357]  These PSURs included Sanofi CCSI Versions 13 (dated August 25, 2004), 14 (dated December 22, 2004), and 15 (dated July 20, 2005) as the reference safety information for Taxotere at that time.[358]  These CCSIs included the results of TAX316 regarding persisting alopecia.[359]

o   The January 25, 2007, submission of PSURs 19 and 20 for Taxotere NDA 20-449.[360]  These PSURs included the Sanofi CCSI Versions 15(dated July 20, 2005) and 16 (dated April 5, 2006) as the reference safety information for

---

[352] Ibid.
[353] Ibid, p. 3333.
[354] Sanofi_00197904-44.
[355] Sanofi_00197924, 26.
[356] Sanofi_00194855.
[357] Sanofi_00338117.
[358] Sanofi_02399899, Sanofi_02399918, Sanofi_02399863.
[359] Sanofi_02399911, Sanofi_02399930, Sanofi_02399876.
[360] Sanofi_00337958.

Taxotere at that time.[361]  These CCSIs included the results of TAX 316 regarding persisting alopecia.[362]

o   The January 28, 2008 submission of PSURs 21 and 22 for Taxotere NDA 20-449.[363]  These PSURs included the Sanofi CCSI Versions 17 (dated December 7, 2006), 18 (dated February 14, 2007), and 19 (dated November 26, 2007) as the reference safety information for Taxotere at that time.[364]  These CCSIs included the results of TAX 316 regarding persisting alopecia.[365]

o   The January 28, 2009 submission of PSURs 23 and 24 for Taxotere NDA 20-449.[366]  These PSURs included the Sanofi CCSI Versions 19 (dated November 26, 2007), 20 (dated August 26, 2008) and 21 (dated October 23, 2008) as the reference safety information for Taxotere at that time.[367]  These CCSIs included the results of TAX 316 regarding persisting alopecia.[368]

o   The January 28, 2010 submission of PSURs 25 and 26 for Taxotere NDA 20-449.[369]  These PSURs included the Sanofi CCSI Versions 21 (dated October 23, 2008), 22 (dated September 9, 2009) and 23 (dated October 1, 2009) as the reference safety information for Taxotere at that time.[370]  These CCSIs included the results of TAX 316 and GEICAM 9805 regarding persisting alopecia.[371]

o   The January 26, 2012 submission of PSURs 29 and 30 for Taxotere NDA 20-449.[372]  These PSURs included the Sanofi CCSI Versions 24 (dated December

---

[361] Sanofi_00288689, Sanofi_00286018.
[362] Sanofi_02399876, Sanofi_00288775.
[363] Sanofi_00337580.
[364] Sanofi_00387684, Sanofi_00385608.
[365] Sanofi_00387776, Sanofi_00387799, Sanofi_00385723.
[366] Sanofi_00231192.
[367] Sanofi_00231203, Sanofi_00233554.
[368] Sanofi_00231292, Sanofi_00233676, Sanofi_00233707.
[369] Sanofi_00207641.
[370] Sanofi_00207658, Sanofi_00210524.
[371] Sanofi_00207778, Sanofi_00210673, Sanofi_00210706.
[372] Sanofi_00183764.

14, 2009), 25 (dated April 4, 2011), and 26 (dated June 28, 2011) as the reference safety information for Taxotere at that time.[373]  These CCSIs included the results of TAX 316 and GEICAM 9805 regarding persisting alopecia.[374]

o   The January 28, 2013 submission of PSURs 31 and 32 for Taxotere NDA 20-449.[375]  These PSURs included the Sanofi CCSI Versions 26 (dated June 28, 2011) and 27 (dated July 17, 2012) as the reference safety information for Taxotere at that time.[376]  These CCSIs included the results of TAX 316 and GEICAM 9805 regarding persisting alopecia.[377]

o   The February 7, 2014 submission of the Periodic Benefit-Risk Evaluation Report (December 01, 2012 – November 30, 2013) for Taxotere NDA 20-449.[378]  This PBRER included the Sanofi CCSI Version 28, dated March 5, 2013 as the reference safety information for Taxotere at that time.[379]  This CCSI included the results of TAX 316 and GEICAM 9805 regarding persisting alopecia.[380]

o   The February 6, 2015 submission of the Periodic Benefit-Risk Evaluation Report (December 01, 2013 – November 30, 2014) for Taxotere NDA 20-449.[381]  This PBRER included the Sanofi CCSI Version 29, dated November 12, 2014 as the reference safety information for Taxotere at that time.[382]  This CCSI included the results of TAX 316 and GEICAM 9805 regarding persisting alopecia.[383]

---

[373] Sanofi_00183790, Sanofi_00180262.
[374] Sanofi_00183926, Sanofi_00183966, Sanofi_00180442.
[375] Sanofi_00174095.
[376] Sanofi_00380160, Sanofi_00174101.
[377] Sanofi_00380304, Sanofi_00174289.
[378] Sanofi_00268919.
[379] Sanofi_00172097.
[380] Sanofi_00172288.
[381] Sanofi_00266009.
[382] Sanofi_00170301.
[383] Sanofi_00170443.

At any of these instances, FDA could have, but did not determine that information on persisting or persistent or permanent or irreversible alopecia constituted a serious or otherwise clinically significant adverse experience such that a Warning would be appropriate to allow for the safe use of Taxotere.  The labeling in effect describing alopecia in the Adverse Reactions section of the labeling was determined to be appropriate and to provide adequate directions for the safe use of Taxotere in the treatment of varying forms of breast cancer.

Based upon this extensive, thorough reporting to FDA on persisting and persistent alopecia and Taxotere, it is my opinion that Sanofi acted reasonably and appropriately and provided a fulsome and forthright reporting of this issue to FDA well before the 2015 US labeling change, beginning as early as 2004.  FDA continued to accept the adequacy and appropriateness of the Taxotere labeling to allow for the safe use of the product, with alopecia described in the Adverse Reactions section of the labeling, without further characterization of the adverse reaction as chronic or persistent or permanent or irreversible, despite continued presentation of clinical data, spontaneous adverse events and CCSIs as core reference safety information describing reports of persisting and persistent alopecia, until it required the 2015 labeling change for cases of permanent alopecia having been reported.

## V.  <u>Conclusion/Opinions</u>

Based upon the above review, it is my opinion that Sanofi acted reasonably and appropriately in managing and conveying data and reports of alopecia and persistent or permanent alopecia and Taxotere, employing appropriate pharmacovigilance processes, in compliance with FDA regulations and consistent with pharmaceutical industry best practices.

It is also my opinion that, from the very beginning of the market introduction of Taxotere, that Sanofi consistently and comprehensively reported data on alopecia to FDA in a fulsome and forthright manner, consistent with the practices of a reasonable and responsible pharmaceutical sponsor to allow FDA to meet its role in the collaborative, ongoing safety assessment of the product.

It is also my opinion that Sanofi acted reasonably, appropriately and with urgency to clearly respond to regulatory authority inquiries about the potential risk of alopecia and persistent or permanent alopecia with Taxotere.

It is also my opinion that Sanofi reasonably and appropriately labeled for alopecia in Taxotere labeling at all times as an Adverse Reaction, not a Warning, consistent with pharmaceutical product labeling regulations and with the judgment of the regulatory authorities to provide adequate directions for the product to be safely used for its approved indications and that Sanofi demonstrated a willingness to consider appropriate labeling revisions at all times with the regulatory authorities.

It is also my opinion that Sanofi reasonably and appropriately promoted Taxotere for adjuvant breast cancer treatment consistent with the labeling described above, in compliance with FDA regulations and consistent with industry practices.

This report represents the opinions I have formed in this matter to date.  It reflects my review of the materials listed in Exhibit C and my experience in drug development and regulatory affairs in the pharmaceutical industry.  I reserve the right to revise or amend my opinions based upon new information that might arise in the course of this case or my continuing assessment of the materials already reviewed.  If called to testify at trial, I may further explain the opinions, principles, and terminology contained in this report and the cited materials reviewed. The opinions offered herein are made to a reasonable degree of professional regulatory probability.

Submitted,

_____

Justin R. Victoria

December 28, 2018

86