UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION | MDL NO. 2740 |
| | SECTION "H" (5) |
| THIS DOCUMENT RELATES TO Barbara Earnest, Case No. 2:16-cv-17144 | |

**Memorandum of Law in Support of Plaintiff Earnest's Motion for New Trial**

### Introduction

"The whole case fails once you look at what's under the hood with TAX 316." Exhibit A, Tr. 2201-3:4 (Sanofi's Closing Argument). "And the only person in this case that did that was Dr. Kopreski." Tr. 2200:19-20 (same).

There lies the problem. Dr. Kopreski is not an expert witness; he is a corporate witness. The Court permitted Sanofi's expert witnesses to rely on Dr. Kopreski's re-analysis at trial—but only because the Court credited Sanofi's representation that its experts would testify that they had independently reviewed Dr. Kopreski's work. Order at 5 (Rec. Doc. 7974). The ability of such experts "to testify of [their] own knowledge as to the nature and extent of the source from which statistics were gathered," and to be cross-examined about their own knowledge, was the lynchpin of this Court's *Daubert* ruling. *See* Order at 5 & n.19 (citation omitted).

At trial, however, Dr. John Glaspy—Sanofi's sole testifying expert—stated unequivocally that he could *not* independently verify Dr. Kopreski's re-analysis: "I will say again that if the data that Dr. Kopreski put in that table isn't accurate, then my analysis is flawed. If it is accurate, I will stand by it." Tr. 2073:5-7. When cross-examined about the methodology behind this re-

1

analysis, Dr. Glaspy could say nothing because he had done nothing to independently verify Dr. Kopreski's re-analysis.

Because "[i]t is only when the expert undertakes some independent investigation of the underlying opinions that his testimony may be considered reliable," *Hunt v. McNeil Consumer Healthcare*, 297 F.R.D. 268, 275 (2014) (Milazzo, J.); Order at 5 & 19, and because there was no such independent investigation here, Sanofi's expert testimony about TAX 316 was unreliable and hence inadmissible. *See Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) ("expert's testimony must be reliable at each and every step or else it is inadmissible").

The erroneous admission of unreliable expert evidence violated Plaintiff Earnest's substantial rights. The jury returned a verdict for Sanofi on specific causation. Sanofi's evidence and argument that re-tooled data from TAX 316 refutes causation—"the whole case fails"—thus cannot be considered harmless error.

The Court should therefore grant Plaintiff Earnest a new trial and vacate the judgment entered for Sanofi.

## Background

Periodically since 2010 and as recently as 2018, Sanofi has reported to the FDA that about 4 percent of patients receiving Taxotere, who were followed for ten years as part of a clinical trial called TAX 316, had experienced "ongoing alopecia." At 4 percent, persistent alopecia is considered a common side effect of Taxotere. Tr. 817:7-818:24. The company would later include that information in its drug label.

After Plaintiff filed this failure-to-warn suit, however, Sanofi decided this percentage rate is wrong for a jury—even as it remains right for the FDA and the company's drug label. In fact, Sanofi has never told the FDA that its final clinical trial data—as conclusively analyzed under

2

the company's own protocols—is somehow wrong. Nevertheless, it has argued before this Court that Dr. Kopreski's re-analysis is reliable evidence, and also that Sanofi's experts can independently verify this re-analysis.

### A. Sanofi's attorneys work in secret with a former employee to re-analyze locked data and introduce their findings at a 30(b)(6) deposition.

Sanofi designated Michael S. Kopreski, M.D., a former employee, to be its 30(b)(6) representative on the issue of notice of alopecia, including alopecia that persisted into the 10-year follow-up period in TAX 316 as provided in its final Clinical Study Report ("CSR") on September 9, 2010. In the CSR for TAX 316, Sanofi reported 29 patients in the Taxotere-arm that had alopecia ongoing at the end of the 10-year study. Tr. 644:645:4. When deposed on this topic, however, Dr. Kopreski testified that he had performed a re-analysis of the TAX 316 data that, in his view, eliminated 22 of the 29 originally reported experiences of "ongoing" alopecia in the Taxotere-arm. Mot. to Exclude at 7 (Rec. Doc. 6160).

At his deposition, Dr. Kopreski admitted that he was not involved in the data analysis effort in the TAX 316 study before the study's final submission to the FDA. Exhibit B, Kopreski Dep. Vol. II 490:21-24, Dec. 13, 2018. He also admitted that his re-analysis of TAX 316 was not done as part of any regulatory submission to the FDA. *Id.* at 491:4-492:11. Rather, Dr. Kopreski undertook such efforts at the behest of Sanofi's attorneys at Shook, Hardy & Bacon. *Id.* at 492:17-493:2. As such, Dr. Kopreski reviewed only what "his" attorneys were willing to show him: 55-month data as opposed to 77-month or 10-year follow-up data. When questioned about the completeness of his review, Dr. Kopreski deflected: That "would be a question to refer to my attorneys." *Id.* at 492:17-493:2. Dr. Kopreski further admitted that he had only "received specific documentation towards – regarding the question" of the observance of persistent alopecia within

3

the study. Kopreski Dep. Vol. II 495:22-496:6, Dec. 13, 2018. In other words, the limited documentation and data he reviewed was restricted to those that Sanofi's lawyers cherry-picked.

Regarding the Taxotere (or "TAC") arm of TAX 316, Dr. Kopreski acknowledged that the only patient data he was given pertained to the 29 reports of ongoing alopecia, and not the full 744 participants. *Id*. at 493-494:7. And even as to those 29 patients, he could not verify the completeness of the data given to him. *Id.* Rather, Dr. Kopreski recalled that for some of the 29, he was not given a case report form (or CRF) (*id.* at 496:7-21), which was required under the protocol for each individual patient in the study (*id*. at 508:18-509:3),and is "the form that's filled out as part of the study to provide patient data with regard to the study," (*id.* at 496:20-497:2) that includes "various data points that the study has collected" like "information on adverse events in terms of timing, in terms of outcome." *Id.* at 497:3-12 Dr. Kopreski also could not verify the completeness of the patient "information request forms" (IRFs), documents that demonstrate a change to the status of a report of alopecia—for instance, if alopecia was incorrectly reported to have reversed but the physician wishes to verify a change to "ongoing" as of a follow-up date. *Id.* at 497:8-21, 510:23-513:8.

At no point in time has Dr. Kopreski provided a list of reliance materials for his re-analysis of the portions of TAX 316 materials that Sanofi's counsel selected. Neither has he at any time provided a written report setting forth his opinions, methodology, facts and data he considered, or experience.

**B. Plaintiffs move to exclude expert testimony that relies on Dr. Kopreski's re-analysis, including Dr. Glaspy's.**

Dr. Kopreski was not put forth as an expert witness, so Plaintiff Earnest could not formally move to exclude him under Fed. R. Civ. Evid. 702 and *Daubert*. But because Sanofi's other

experts relied upon Dr. Kopreski's re-analysis, Plaintiff targeted this expert testimony for exclusion.

One such expert was Dr. Glaspy, an oncologist. Dr. Glaspy opined that the incidence of ongoing alopecia in TAX 316 is less than 1%, a conclusion he reached solely based on Dr. Kopreski's opinion. At his deposition, Dr. Glaspy confirmed that he had not looked behind this conclusion but merely accepted it as correct. Mot. To Exclude at 24-25 (Rec. Doc. 6160) (discussing deposition). Plaintiff thus moved to exclude Dr. Glaspy's testimony insofar as it relied upon this re-analysis. *See id*.

### C. The Court denies Plaintiff's motion to exclude but sets ground rules.

After briefing and oral argument, the Court ruled that Sanofi's experts could rely on Dr. Kopreski's re-analysis. Accepting Sanofi's representation that its "experts conducted independent reviews of Dr. Kopreski's work," the Court reasoned that Sanofi's "experts' reliance on Dr. Kopreski's analysis, therefore, passes muster." Order at 5 (Rec. Doc. 7974). That decision was based on case law holding that "[i]n order for an expert to base his opinion on a study it is necessary that he be able to testify of his own knowledge as to the nature and extent of the source from which statistics were gathered." Order at 5 n. 19 (citation omitted).

### D. In her case in chief, Plaintiff's experts opine on causation.

To prove specific causation, Plaintiff brought to trial a world-renowned dermatologist, Dr. Antonella Tosti. The jury heard Dr. Tosti's qualifications, including that she is an expert in the diagnosis of alopecia—and in particular, permanent chemotherapy induced alopecia (Tr. 932:3-16; 933:18-934:1), that she gives lectures all around the world on this very topic (*id.* at 934:20-935:16), and that she invented a process known as a dermoscopy to assist her and other dermatologists in diagnosing this topic. *Id.* at 934:2-4. Using her teaching background, Dr. Tosti

5

educated the jury on the "basics" of hair, including the difference between hair and hair follicles (*id.* at 943:13-19, 944:1-7), the anatomy of a hair follicle (*id.* at 944:1-7), the different types of hair follicles (*id.* at 944:21-945:7; 945:25-946:10), and the hair cycle. *Id.* at 946:11-947:21. Dr. Tosti likewise educated the jury on her typical clinical process for diagnosing hair loss and the condition causing the hair loss.

First, Dr. Tosti visually examined the patient and obtains the clinical history of patients by asking the patients an array of questions depending upon the nature of the hair loss. Tr. 948:13-949:18. According to Dr. Tosti, this is critical, "[y]ou cannot make a diagnosis without seeing the patient. Because this is very, very important, in my personal experience, to talk with the patient and to learn from the patient, because sometimes the patient knows much more than everybody else." *Id.* at 948:13-21.

Next, Dr. Tosti explained to the jury that she performs a clinical examination of the patient, which includes performing a pull test to determine whether the patient is losing more hair than normal. *Id.* at 949:20-950:5. Dr. Tosti also examines the scalp, looking at whether the hair loss is patchy, diffuse, on top of the scalp, or complete. *Id.* at 951:9-23. As part of her scalp examination, Dr. Tosti performs a dermoscopy, a process she invented to magnify the hair follicles that allows her to determine whether the hair loss is from scarring. *Id.* at 952:5-18; 934:2-4.

After the dermoscopy, Dr. Tosti may elect to take a biopsy and perform laboratory tests on the biopsied skin. Tr. 953:1-13. A biopsy, however, is not always necessary and depends on the presentation of the hair loss. *Id.* Likewise, Dr. Tosti explained to the jury that she may obtain bloodwork from certain patients—for example, if a woman has unusual hair growth on her face,

6

Dr. Tosti will perform lab work to determine if the patient has an issue with her hormones. *Id.* at 953:14-19.

Dr. Tosti applied her normal clinical routine in evaluating Mrs. Earnest and determined by a differential diagnosis that Mrs. Earnest suffers from permanent chemotherapy induced alopecia caused by Taxotere.  Tr. 953:20-954:6, 962:17-963:10.  Specifically, Dr. Tosti testified that she took photos of Mrs. Earnest's scalp (*id.* at 955:7-15), she performed a physical evaluation of the scalp and a pull test (*id.* at 955:21-956:11; 956:12-22), she performed a dermoscopy (*id.* at 956:23; 959:10-960:9), and she reviewed Mrs. Earnest's biopsy results (though she did not believe a biopsy was necessary). *Id.* at 962:5-16.  Dr. Tosti did not order bloodwork because she did not find any symptoms that suggested a hormonal issue. *Id.*  Applying this clinical examination, Dr. Tosti testified that she found Mrs. Earnest's hair loss "to be very severe and diffuse alopecia that involves all the top and the back of her scalp and the side" with "very very thin eye brows and eyelashes" and "no hair in the arms and legs and no hair in the armpits, almost no pubic hair." *Id.* at 955:21-956:11.

After arriving at her conclusion that Mrs. Earnest's hair loss is diffuse, which Dr. Tosti defined as "when you have almost no hair left," Dr. Tosti then evaluated the conditions that could cause diffuse alopecia. Tr. 963:22-964:11. Specifically, Dr. Tosti identified the following conditions as causing diffuse alopecia: telogen effluvium, anagen effluvium, androgenetic alopecia, alopecia areata, endocrine-induced alopecia, and permanent chemotherapy induced alopecia ("PCIA").  Dr. Tosti then walked the jury through each of these conditions, ruling out all of them except PCIA.

First, Dr. Tosti considered telogen effluvium, explaining to the jury that it is a condition characterized by excessive shedding with a typical patient complaining about finding hair

7

everywhere. *Id.* at 964:12-22, 965:2-17. In addition, a patient with telogen effluvium will have a positive pull test and the dermoscopy will show new hair growing on the scalp. *Id.* at 964:19-22, 965:12-17. For Mrs. Earnest, Dr. Tosti ruled out this condition because Mrs. Earnest's pull test was negative and her history presented differently than a patient with telogen effluvium. *Id.* at 965:24-967:4.

Second, Dr. Tosti evaluated anagen effluvium, which is the hair loss caused by chemotherapy. As Dr. Tosti described to the jury: "most patients in chemotherapy, they lose their hair, and this happens usually two, three weeks after starting the chemotherapy" and it usually resolved three months after chemotherapy. *Id.* at 966:13-967:4. Dr. Tosti ruled out this condition, telling the jury that because Mrs. Earnest's hair did not regrow following chemotherapy, she could exclude anagen effluvim. *Id.* at 967:5-16.

Third, Dr. Tosti walked the jury through androgenetic alopecia, a common condition known as female pattern hair loss. Dr. Tosti testified that this condition is slow to develop and progresses over years with baldness typically on the top of the scalp. Tr. 967:17-968:25. Dr. Tosti explained she has never seen androgenetic alopecia affecting hair on the back of the scalp or the eyebrows, eyelashes, underarms, or other hair on the body. *Id.* at 970:11-971:1. Because of Mrs. Earnest's lack of hair regrowth in areas beyond the top of the scalp and no history of female pattern hair loss in Mrs. Earnest's family, Dr. Tosti concluded to the jury that Mrs. Earnest does not have androgenetic alopecia. *Id.* at 971:2-12, 971:19-972:16, 973:17-974:14, 976:19-21, 1112:7-15, 1112:22-1113:3.

Fourth, Dr. Tosti considered alopecia areata, also a common condition that causes patches of hair loss, and in some cases, complete hair loss. Tr. 976:25-977:15. Dr. Tosti testified that she does not believe that Mrs. Earnest has alopecia areata because Mrs. Earnest has fuzzy hair on her

8

scalp whereas someone with alopecia areata would have no hair on the skin, i.e. smooth skin. *Id*. at 977:20-978:3, 978:20-23.

Next, Dr. Tosti described the condition of endocrine induced alopecia, which is hair loss caused by anti-estrogen medications, such as aromatase inhibitors, given to patients after chemotherapy. *Id*. at 978:24-979:17. During treatment with these medications, hair growth is impacted similar to that of a patient with androgenetic alopecia (female pattern hair loss). *Id*. As described by Dr. Tosti, endocrine induced alopecia has a unique presentation—specifically, that when aromatase inhibitors are started, a patient's hair loss from chemotherapy has, at least in part, recovered, and the addition of the aromatase inhibitors slowly causes the hair to fall out. *Id*. at 980:8-14. Dr. Tosti ruled out this condition, explaining to the jury that Mrs. Earnest had no regrowth prior to starting Arimidex, which is an aromatase inhibitor, and that the severity of Mrs. Earnest's hair loss does not align with endocrine induced alopecia. *Id*. at 979:17-980:14, 981:1-982:24.

Finally, Dr. Tosti reached the last condition in her differential diagnosis: PCIA. Dr. Tosti described PCIA to the jury, noting "[i]t is a type of alopecia that occurs after chemotherapy with certain drug and is characterized by diffuse alopecia involving almost the whole scalp, and the hair are very short and miniaturized." Tr. 985:13-986:1. Dr. Tosti further explained, "[t]he classical diagnosis depends on history that is incomplete hair regrowth size months after the end of chemotherapy" with eyebrows and eyelashes becoming very thin and a negative pull test. *Id*. at 986:7-18, 986:19-22, 986:23-987:1. Based on her examination of Mrs. Earnest, Dr. Tosti testified that her differential diagnosis is that Mrs. Earnest has PCIA caused by Taxotere (*id*. at 994:23-995:2), and that this diagnosis comports with the medical literature on PCIA. *Id*. at 987:2-17, 988:12-989:17, 992:2-994:22.

9

Dr. Tosti also explained to the jury her basis for attributing Mrs. Earnest's PCIA to Taxotere and not the Cytoxan or Adriamycin that she took as part of her chemotherapy treatment. Dr. Tosti recounted for the jury the medical literature demonstrating that permanent alopecia is eight times more likely to occur with Taxtoere than other chemotherapy agents. Likewise, Dr. Tosti testified that literature reporting permanent alopecia with treatments involving Cytoxan or Adriamycin were based on a study involving Korean patients or lacked enough information to determine whether Adriamycin or Cytoxan could be attributed to the permanent alopecia. Tr. 1017:15-22, 1018:22-1019:2, 1019-21, 1019:22-1020:9.

Sanofi presented no witness or expert to dispute Dr. Tosti's opinions regarding specific causation, and in fact, in its cross examination of Dr. Tosti, Sanofi took no issue with the process she used to clinically evaluate and reach a differential diagnosis for Mrs. Earnest's hair loss. Likewise, Sanofi did not address on cross examination Dr. Tosti's diagnosis of Mrs. Earnest's hair loss as diffuse or that Dr. Tosti ruled out telogen effluvim, anagen effluvium, and alopecia areata as the cause of Mrs. Earnest's diffuse hair loss. Rather, counsel for Sanofi focused their cross examination on whether Mrs. Earnest's permanent hair loss could have been caused by her other chemotherapy drugs—Adriamycin or Cytoxan—or her ongoing use of Arimidex, an aromatase inhibitor. But Dr. Tosti easily overcame these insinuations. Dr. Tosti testified that reports of persistent hair loss on Cytoxan are very rare, and that persistent hair loss has only been reported with Adriamycin following high doses in the treatment of other cancers. *Id.* at 1030:15-20, 1031:11-16. With regard to Arimidex, counsel for Sanofi attempted multiple times to equate Arimidex with Tamoxifen, a different anti-estrogen medication given to pre-menopausal women. *Id.* at 1061:7-22. Mrs. Earnest did not take Tamoxifen, and as Dr. Tosti explained, reports of endocrine induced permanent hair loss have only been seen in Tamoxifen—not Armidex. *Id.*

10

Furthermore, Dr. Tosti testified that Mrs. Earnest's hair loss did not present in a way that aligns with endocrine induced alopecia. *Id.* at 1084:1-1085:2.

In addition, Dr. Tosti's opinion that it was Mrs. Earnest's usage of Taxotere, and not her other chemotherapy medications, that caused her permanent hair loss is supported by Plaintiff's experts—specifically, Dr. Laura Plunkett's risk assessment of Taxotere as compared to other chemotherapy agents and Dr. David Madigan's analysis of FDA's FAERs database and Sanofi's clinical trial data. Dr. Plunket, who the Court recognized as an expert qualified in the areas of pharmacology, toxicology and risk assessment, testified that she evaluated Taxotere, Adriamycin, and Cytoxan (among other medications) as it relates to permanent hair loss and found that only Taxotere had clinical trial data, observational data, and case reports related to permanent hair loss. Tr. 823:1-824:21, 887:5- 889:14.  Likewise, Dr. Madigan, who the Court recognized as an expert qualified in biostatistics, statistics, and pharmacovigilance, testified that in evaluating reports of permanent alopecia in FDA's FAERS database, neither Adriamycin nor Cytoxin showed a signal for permanent alopecia whereas Dr. Madigan identified a signal for Taxotere in as early as 2000. *Id.* at 646:6-652:24, 654:11-658:15, 658:15-660:12.  Further still, Dr. Madigan explained to the jury that his analysis of Sanofi's final clinical trial data from TAX 316 and TAX 301 demonstrated a statistically significant increased risk of permanent hair loss with Taxotere in combination with Adriamycin and Cytoxan as compared to Fluorouracil in combination with Adriamycin and Cytoxan. *Id.*  at 645:6-646:6, 648:7-649:5.  Importantly, Dr. Madigan explained to the jury that he performed his analysis of Sanofi's clinical trial data using their final data, which is "locked" at the completion of the study after having been reviewed for quality control and reliability. *Id.* at  634:3-19, 640:8-641:25.  Dr. Madigan made clear that any

sort of retrospective re-analysis of clinical trial data (such as was done by Dr. Kopreski) is inappropriate and not good science. *Id.* at 640-641:4.

But Sanofi's counsel overlooked this and sought to create their own "evidence" otherwise through the questions they asked. Time and time again, counsel for Sanofi asked Plaintiff's experts how their opinion would change if the results from TAX 316 regarding ongoing alopecia were to be far less than reported in the CSR. *See, e.g.,* Tr. 479:13-484:12, 702:23-704:3, 718:6-720:23, 904:15-906:5, While Plaintiff's experts countered this unsupported hypothetical, there can be little doubt that by the time Dr. Kopreski's testimony was played in Sanofi's case-in-chief, the jury was already preconditioned to, if not waiting for, any "evidence" to support the insinuations of Sanofi's counsel—no matter how unreliable.

### E. In its defense-in-chief, Sanofi contests causation based on Dr. Kopreski's re-analysis.

Sanofi called only two witnesses in its case: Dr. Kopreski and Dr. Glaspy. Sanofi was allowed to play Dr. Kopreski's deposition video in which he described his re-analysis of TAX 316. During that video testimony, Sanofi inappropriately displayed to the jury an exhibit representing Dr. Kopreski's handiwork. That drew an objection, which the Court sustained.[1]

Next Sanofi presented Dr. Glaspy. Sanofi's counsel asked if he had "reviewed" Dr. Kopreski's work; Dr. Glaspy responded only that he was "aware of his testimony." Tr. 2030:5-12. As Sanofi's counsel began to inquire further about the substance of Dr. Kopreski's analysis, Plaintiff again objected, noting (among other things) that Dr. Glaspy's report did not substantiate such testimony and that he should not be permitted to opine on such matters, including as to

---

[1] Sanofi also played portions of Dr. Kopreski's deposition discussing hair loss associated with Tamoxifen, and even showed a picture of a women whose hair loss was caused by Tamoxifen (a picture Sanofi showed the jury during Dr. Tosti's cross-examination). *See generally* Tr. 1958-1961 (bench conference). This also violated the Court's evidentiary rulings. The Court thus gave a curative instruction that Tamoxifen was not at issue in this case. Tr. 1961.

statistical significance. *See* Tr. 2032-2039. Dr. Glaspy was nonetheless permitted to opine about Dr. Kopreski's re-analysis, and in particular whether "based upon [his] review of the TAX 316 information, including Dr. Kopreski's analysis," there [were] actually 29 cases of permanent alopecia in the TAC arm." Tr. 2040:20-22. Dr. Glaspy testified that these 29 cases of ongoing alopecia could not be credited, thus substantiating Sanofi's argument that TAX 316's reported rate of ongoing hair loss was overstated and could not be taken at face value.

On cross-examination, Dr. Glaspy testified that he could not independently verify Dr. Kopreski's work, stating "I admitted and told you in my deposition … if the data that's in [Kopreski's re-analysis] table is incorrect, then none of my opinions are valid." Tr. 2060:13-16, 2061:15-18, 2073:5-7. In response to Plaintiff's question, asking "You didn't make the chart. You didn't do anything to validate it either, did you?" Dr. Kopreski replied: "That's correct." Tr. 2062:3-5. And he further testified that he could not address the methodology behind Dr. Kopreski's re-analysis. Tr. 2062:3-9, 2063:1-2064:16.

On re-direct, Sanofi's counsel returned to Dr. Kopreski's re-analysis, asking: "Has the plaintiff in this case pointed you to one single piece of data in Dr. Kopreski's analysis that was inaccurate?" Tr. 2132:8-9. Dr. Glaspy answered: "No." Tr. 2132:10.

Sanofi then argued to the jury in closing that Dr. Kopreski was the only one to look behind TAX 316, and that the jury should credit his re-analysis:

> If you want to know what was going on with those 29 patients and those 16 patients, you have to look at the underlying information on each one of them to see did they truly report ongoing alopecia or permanent hair loss. The only person in this trial to do that was Dr. Kopreski, and he did it at plaintiff's request. Dr. Kopreski told you that he looked at the underlying data patient by patient, record by record, and what do you find when you do that? It's not 29 patients with ongoing alopecia in the Taxotere arm. It's six. And it's not 16 in the FAC arm. It's four. And remember, this is out of over 700 patients on each one of these sides.
>
> …

13

> But if you want to know what really happened with TAX 316, just like a book, you have to read the book to know how the story ends. And the only person in this case that did that was Dr. Kopreski.

Tr. 2200:1-20.

### F. Plaintiff's move for a mistrial, which the Court denies, and the jury returns a verdict for Sanofi, finding no specific causation.

After Sanofi rested but before closing argument, Plaintiff moved for a mistrial in part because Dr. Glaspy could not independently verify Dr. Kopreski's re-analysis and therefore this evidence was unreliable and inadmissible.[2] Tr. 2149-2151. The Court then denied the motion from the bench because it had instructed the jury that Dr. Kopreski is not an expert and that Plaintiff had been given an opportunity to cross-examine Dr. Glaspy. Tr. 2152-2153.

After closing argument, during which Sanofi's counsel urged the jury to find no causation because Plaintiff's "whole case" falls apart when you examine TAX 316 as Dr. Kopreski had,[3] the jury returned with a unanimous verdict for Sanofi, finding no specific causation.

### Argument

This Court's evidentiary ruling only permitted Sanofi's experts to rely on Dr. Kopreski's re-analysis because Sanofi represented that each of its experts had independently verified his work. But Dr. Glaspy could not deliver that testimony. He did not look "under the hood" of TAX 316. *See* Tr. 2200:19-20 (statement of Sanofi's counsel admitting that "the only person in this case that did that was Dr. Kopreski"). Dr. Glaspy merely parroted Dr. Kopreski's re-analysis, which was largely Sanofi's counsel's work product.

---

[2] In addition to Dr. Glaspy's failure to independently verify Dr. Kopreski's reanalysis, counsel for Plaintiff also moved for mistrial based on multiple *in limine* violations that occurred during Sanofi's presentation of Dr. Kopreski's testimony, including Dr. Kopreski's non-expert opinions about medications that Mrs. Earnest did not take, sequence of dosing, and demonstratives related to the Kopreski analysis. *See* Tr. 1956, 2149-2151.
[3] Plaintiff also objected to Sanofi's closing argument. Tr. 2225-2226.

The erroneous admission of expert evidence that affects a party's substantial rights is grounds for a new trial. *See* Fed. R. Civ. P. 59(a)(1)(A); *see generally Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985). Thus, in *Carlson v. Bioremedi Therapeutic Sys.*, 822 F.3d 194 (5th Cir. 2016), the Fifth Circuit granted a new trial because the jury heard unreliable expert testimony that affected plaintiff's substantial rights. *Id*. at 201-202  Likewise, in *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51 (Fed. Cir. 2012), "[a] new trial [wa]s required because the jury's verdict was based on an expert opinion that [found] no support in the facts in the record." *Id*. at 81. And in *Apple Inc. v. Wi-LAN, Inc.*, No. 14CV2235 DMS (BLM), 2019 WL 4248899 (S.D. Cal. Jan. 3, 2019), the court granted remittitur or alternatively a new trial because an expert's opinion on damages lacked sufficient factual basis and other experts had inappropriately relied upon this deficient expert opinion. *Id*. at *5.

Doubtless, this Court would not have allowed any of Sanofi's experts to testify about Dr. Kopreski's re-analysis of TAX 316 absent independent verification. In *Hunt v. McNeil Consumer Healthcare*, 297 F.R.D. 268 (E.D. La. 2014), this Court prohibited an expert from opining on general and specific causation in part because that expert "did not undertake the kind of independent evaluation that *Daubert* and Rule 702 require. He merely parroted the opinions and conclusions of other experts whose testimony is shielded from cross examination." *Id*. at 275. The Court cited with approval the Third Circuit's decision in *In re TMI Litigation*, 193 F.3d 613 (3d Cir.1999), which concluded that an "expert's failure to assess the validity of the opinions of the experts he relied upon together with his unblinking reliance on those experts' opinions, demonstrates that the methodology he used to formulate his opinion was flawed under *Daubert* as it was not calculated to produce reliable results." *Id*. at 715–16.

Doubtless as well, the admission of Dr. Kopreski's re-analysis was not harmless but affected Plaintiff's substantial rights. In the Fifth Circuit, courts must make "sure, after reviewing the entire record, that the error did not influence the jury or had but a very slight effect on its verdict." *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 202 (5th Cir. 2016) (quoting *Kelly v. Boeing Petroleum Servs., Inc.*, 61 F.3d 350, 361 (5th Cir. 1995)). On this record, it is simply not possible to characterize the admission of Dr. Kopreski's re-analysis as harmless.

That is so for several reasons. Here, "[t]he prominence and probative value of [Dr. Kopreski's] testimony weighs in favor of finding prejudice." *Crew Tile Distribution, Inc. v. Porcelanosa Los Angeles, Inc.*, 763 F. App'x 787, 798 (10th Cir. 2019) (unpublished); *see Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1089 (10th Cir. 2000) (finding prejudice where wrongfully admitted "testimony was a large part of plaintiff's case because it helped to establish the . . . causal link between the incident [at issue] ... and the alleged ... injury"). Just as TAX 316 figured prominently in Plaintiff's case-in-chief, Dr. Kopreski's re-analysis was the centerpiece of Sanofi's defense. The company highlighted this in closing, telling the jury that Plaintiff's "whole case fails once you look at what's under the hood with TAX 316." Tr. 2201:3-4.

Further, the wrongly admitted expert testimony was the only testimony substantiating Dr. Kopreski's re-analysis. This is not a situation, then, in which "the record contain[s] independent, admissible evidence establishing the same proposition to which the expert had testified." *Crew Tile*, 763 F. App'x at 799 (citation omitted).

There are no countervailing reasons to find the admission of this evidence harmless. For one, the Court's instruction to the jury that Dr. Kopreski was not tendered or accepted as an expert did not cure the prejudice. Even if the jury followed that instruction, Dr. Glaspy *was* accepted as an

16

expert and he was allowed to rely upon Dr. Kopreski's unverified work. The instruction thus did not cure the prejudicial effect of having an expert opine on TAX 316 based on Dr. Kopreski's re-analysis, when that expert himself had not independently evaluated the work.

The opportunity to cross-examine Dr. Glaspy did not cure the prejudice, either. If cross-examination were the cure for an expert's failure to independently examine evidence, then courts would not demand such verification as a condition of admissibility but would allow a jury to make a credibility determination. That is not the law. *See Hunt*, 297 F.R.D. at 275 (a court "cannot allow [such] testimony into evidence without abdicating its role as gatekeeper").

Cross-examination in such circumstances is not an antidote because an expert who has no independent knowledge but merely parrots the opinion of another witness (here, a non-expert) cannot answer basic questions about the underlying work. This Court thus recognized in *Hunt* that such evidence is not admissible because it is otherwise "shielded from cross examination." *Id*.

And so it was here. Dr. Glaspy could not answer basic questions but simply took the re-analysis as a given. Tr. 2072 (Dr. Glaspy admitting he did not review underlying data). The prejudice to Plaintiff was then compounded on re-direct when Sanofi's counsel capitalized on the fact that Plaintiff's counsel could not explore the substance of Dr. Kopreski's veiled re-analysis. Tr. 2132:8-9 (Sanofi's counsel asking whether Plaintiff was able to identify inaccuracies in Dr. Kopreski's re-analysis).

For these reasons, it is not credible to suggest on this record that this wrongly admitted evidence "did not influence the jury or had but a very slight effect on its verdict." *Carlson*, 822 F.3d at 202.

**Conclusion**

Plaintiff's disagreement with the Court's *Daubert* ruling aside, this Court drew a line in the sand that Sanofi repeatedly crossed during trial, on an issue that is at the heart of this case and that obviously impacted the jury. Sanofi knew full well that Dr. Glaspy could not validate Dr. Kopreski's re-analysis—though it told the Court the opposite pre-trial. When Dr. Glaspy could not deliver, Sanofi fell back on its belief that no independent verification is even necessary, Tr. 2152:11-14, a position the Court had already squarely rejected. Consequently, the jury was led to believe that Dr. Kopreski's re-analysis was a valid basis to discount Plaintiff's specific causation evidence, even though that reanalysis is unreliable and inadmissible.

This violation is too serious and prejudicial to ignore. The Court should thus grant Plaintiff Earnest a new trial and vacate the judgment in favor of Sanofi.

Dated: October 25, 2019                                  Respectfully submitted,

*/s/ Christopher L. Coffin*
Christopher L. Coffin (#27902)
PENDLEY, BAUDIN & COFFIN, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

*Plaintiffs' Co-Lead Counsel*

*/s/ Karen B. Menzies*
Karen Barth Menzies (CA Bar #180234)
Andre Mura (CA Bar # 298541)
GIBBS LAW GROUP LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Telephone: 510-350-9700
Facsimile: 510-350-9701
kbm@classlawgroup.com

*Plaintiffs' Co-Lead Counsel*

/s/ M. Palmer Lambert
M. Palmer Lambert (#33228)
GAINSBURGH BENJAMIN DAVID
MEUNIER & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: 504-522-2304
Fax: 504-528-9973
plambert@gainsben.com

*Plaintiffs' Co-Liaison Counsel*

/s/ Dawn M. Barrios
Dawn M. Barrios (#2821)
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: 504-524-3300
Fax: 504-524-3313
barrios@bkc-law.com

*Plaintiffs' Co-Liaison Counsel*

### PLAINTIFFS' STEERING COMMITTEE

Anne Andrews
Andrews & Thornton
4701 Von Karman Ave., Suite 300
Newport Beach, CA 92660
Phone: (800) 664-1734
aa@andrewsthornton.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@atkinsandmarkoff.com

J. Kyle Bachus
Bachus & Schanker, LLC
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Phone: (303) 893-9800
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Phone: 510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

| | |
|---|---|
| Christopher L. Coffin<br>Pendley, Baudin & Coffin, L.L.P.<br>1100 Poydras Street, Suite 2505<br>New Orleans, Louisiana 70163<br>Phone: (504) 355-0086<br>Fax: (504) 355-0089<br>ccoffin@pbclawfirm.com | David F. Miceli<br>David F. Miceli, LLC<br>P.O. Box 2519<br>Carrollton, GA 30112<br>Phone: (404) 915-8886<br>dmiceli@miceli-law.com |
| Alexander G. Dwyer<br>Kirkendall Dwyer LLP<br>440 Louisiana, Suite 1901<br>Houston, TX 77002<br>Phone: (713) 522-3529<br>Fax: (713) 495-2331<br>adwyer@kirkendalldwyer.com | Rand P. Nolen<br>Fleming, Nolen & Jez, L.L.P.<br>2800 Post Oak Blvd., Suite 4000<br>Houston, TX 77056<br>Phone: (713) 621-7944<br>Fax: (713) 621-9638<br>rand_nolen@fleming-law.com |
| Emily C. Jeffcott<br>Morgan & Morgan<br>700 S. Palafox Street, Suite 95<br>Pensacola, Florida 32505<br>Phone: (850) 316-9074<br>Fax: (850) 316-9079<br>ejeffcott@forthepeople.com | Hunter J. Shkolnik<br>Napoli Shkolnik PLLC<br>360 Lexington Avenue, 11th Floor<br>New York, NY 10017<br>Phone: (212) 397-1000<br>hunter@napolilaw.com |
| Andrew Lemmon<br>Lemmon Law Firm, LLC<br>P.O. Box 904<br>15058 River Road<br>Hahnville, LA 70057<br>Phone: (985) 783-6789<br>Fax: (985) 783-1333<br>andrew@lemmonlawfirm.com | Genevieve Zimmerman<br>Meshbesher & Spence Ltd.<br>1616 Park Avenue South<br>Minneapolis, MN 55404<br>Phone: (612) 339-9121<br>Fax: (612) 339-9188<br>gzimmerman@meshbesher.com |

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 25, 2019, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

           */s/ Dawn M. Barrios*
           DAWN M. BARRIOS