# EXHIBIT A

1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4

5    IN RE:   TAXOTERE (DOCETAXEL)
              PRODUCTS LIABILITY
6             LITIGATION
                                      Docket No.: 16-MD-2740
7                                     Section "H(5)"
                                      September 16, 2019
8                                     New Orleans, Louisiana

9
     *Relates To*:  *Barbara Earnest*,
10   *Case No.: 16-CV-17144*

11
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
12

13                    DAY 1, MORNING SESSION
                 TRANSCRIPT OF JURY TRIAL PROCEEDINGS
14          HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
                    UNITED STATES DISTRICT JUDGE
15

16
     APPEARANCES:
17
     For the Plaintiffs:        Barrios, Kingsdorf & Casteix, LLP
18                              BY:  DAWN BARRIOS, ESQ.
                                701 Poydras Street
19                              Suite 3650
                                New Orleans, Louisiana 70139
20

21
     For the Plaintiffs:        Gainsburgh, Benjamin, David,
22                               Meunier & Warshauer, LLC
                                BY:  PALMER LAMBERT, ESQ.
23                              2800 Energy Centre
                                1100 Poydras Street
24                              New Orleans, Louisiana 70163-2800

25

                         ***OFFICIAL TRANSCRIPT***

DAVID KESSLER - CROSS

3:31PM   1   pointing to something else.

3:31PM   2   **Q.**   Let's go back to this real quick.  We talked about this

3:31PM   3   definition, "six months" was -- most of the time, was your most

3:31PM   4   common definition; correct?

3:31PM   5   **A.**   That was certainly one of the definitions.

3:31PM   6   **Q.**   Okay.  And you would have to agree with me that, in order

3:31PM   7   to know whether or not somebody actually had hair loss more

3:31PM   8   than six months after treatment, that patient would have to be

3:31PM   9   evaluated more than six months after treatment; correct?

3:31PM   10  **A.**   Exactly.

3:31PM   11  **Q.**   That's just logic; right?

3:31PM   12  **A.**   That's what 316 did.

3:32PM   13  **Q.**   Doctor, do you know -- in the work that you did reviewing

3:32PM   14  materials, looking at information in this case, do you know how

3:32PM   15  many of the 29 patients were actually evaluated more than six

3:32PM   16  months?

3:32PM   17  **A.**   That data is available.  It's not front of mind.  But it

3:32PM   18  is in the clinical study report, and I think you can -- at one

3:32PM   19  point, I did know the average follow-up period for that.

3:32PM   20  **Q.**   And I'm not talking about the average follow-up.

3:32PM   21      I'm talking about -- can you tell me how many people

3:32PM   22  of the 29 were actually followed up more than six months?

3:32PM   23  **A.**   It was a ten-year study.  We could pull that table.  It's

3:33PM   24  in your clinical study report.  You have it.

3:33PM   25      And I'm almost certain that -- certainly, in 316 --

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:33PM  1    it was a ten-year study.  It went well beyond six months, the
3:33PM  2    follow-up.
3:33PM  3    Q.    So, Doctor, if you've looked at the data, you would know
3:33PM  4    that only 21 -- no.  Let me ask that again.
3:33PM  5          You would know if you looked at the data that 21 of
3:33PM  6    these patients were followed for six months or less; correct?
3:33PM  7    A.    After the initial period?
3:33PM  8    Q.    After the treatment.
3:33PM  9    A.    So the treatment was X number of weeks, and the six
3:33PM  10   months -- the clinical study report, if you pull the table, it
3:33PM  11   will tell you it was a ten-year study.
3:33PM  12   Q.    Let me just ask it this way:  Are you aware that 21 of
3:34PM  13   these 29 patients were never seen to determine whether or not
3:34PM  14   they have hair loss after six months after they finished their
3:34PM  15   treatment?  Do you know that?
3:34PM  16   A.    I don't know that.  I looked at the table.  If that's the
3:34PM  17   case, then there's a big problem with the study because it was
3:34PM  18   represented as a ten-year study.
3:34PM  19   Q.    Well, Doctor, if that's the case, setting aside whether
3:34PM  20   you think there's a big problem with the study, it would be a
3:34PM  21   big problem for you concluding that there were 29 cases of
3:34PM  22   permanent alopecia; correct?
3:34PM  23   A.    Not at all.  Because you have Sedlacek that found seven
3:34PM  24   cases in that arm and zero in the other arm.  So it's
3:34PM  25   replicable.  You don't even have to rely on 316.  There is

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:34PM 1   other data that supports the fact that Taxotere causes

3:34PM 2   permanent alopecia.

3:35PM 3   **Q.**   Doctor, do you remember looking, in all of the documents

3:35PM 4   that you looked at, at a table that included data on follow-up

3:35PM 5   duration?

3:35PM 6   **A.**   In 316.

3:35PM 7   **Q.**   Correct.   Sorry.   Thank you for the clarification.

3:35PM 8   **A.**   Great.

3:35PM 9   **Q.**   Do you remember looking at that patient by patient?

3:35PM 10  **A.**   I did -- I looked at many patients -- pulling out some of

3:35PM 11  the patient -- individual patient stuff here, I looked at some

3:35PM 12  of the patients.   But, again, the clinical study report is some

3:35PM 13  37,000 pages.   And I will represent that I did not look at

3:35PM 14  every single patient.

3:35PM 15  **Q.**   And I'm just saying, did you look at any data anywhere

3:35PM 16  that stratifies the follow-up duration for each one of these

3:35PM 17  29 patients and each one of these 16 patients?

3:35PM 18  **A.**   I did look.   And at one point in time, I had that in my

3:36PM 19  memory, and I'm -- I'm sure, if you have it, you can show it.

3:36PM 20        **MR. STRONGMAN:**   May I approach, Your Honor?

3:36PM 21        **THE COURT:**   Yes, you may.

3:36PM 22  **BY MR. STRONGMAN:**

3:36PM 23  **Q.**   Doctor, I just want you to look, I'm just going to ask you

3:36PM 24  a question.   Take your time and look at that table.

3:36PM 25  **A.**   I am looking at that table.

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 3:36PM | 1 | **Q.**   And does this refresh your recollection as to how many of |
| 3:36PM | 2 | these 29 patients that you said had permanent alopecia were |
| 3:36PM | 3 | actually not even evaluated longer than six months? |
| 3:36PM | 4 | **A.**   No, it does not.  Because the study's represented as a |
| 3:37PM | 5 | ten-year follow-up. |
| 3:37PM | 6 | **Q.**   So that does not refresh your recollection that, in fact, |
| 3:37PM | 7 | what you told the jury this morning about these people, the 29, |
| 3:37PM | 8 | being followed up at ten-year mark for hair loss is actually |
| 3:37PM | 9 | not the case?  That doesn't refresh your recollection as to |
| 3:37PM | 10 | that? |
| 3:37PM | 11 | **A.**   It refreshes my recollection.  I'm very aware of this |
| 3:37PM | 12 | data, but that 29 off Table 7 is your lock data -- it's the |
| 3:37PM | 13 | company data that I took that 29 off of, ongoing after the |
| 3:37PM | 14 | ten-year study. |
| 3:37PM | 15 | So it's your data, not mine, where I got that 29.  If |
| 3:37PM | 16 | that's not reliable, then you have a problem.  But it's the |
| 3:37PM | 17 | company data that I used.  I didn't make up that 29. |
| 3:37PM | 18 | **Q.**   Doctor, look at the table in front of you. |
| 3:37PM | 19 | **A.**   I am looking at it. |
| 3:37PM | 20 | **Q.**   Can you agree with this:  .5 years is six months?  Do you |
| 3:38PM | 21 | agree with that? |
| 3:38PM | 22 | **A.**   Correct. |
| 3:38PM | 23 | **Q.**   Do you see on the right, the very right of the chart -- |
| 3:38PM | 24 | **A.**   I see that. |
| 3:38PM | 25 | **Q.**   -- "Follow-up Duration"; correct? |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:38PM  1   **A.**   I'm not sure where I see .5.

3:38PM  2   **Q.**   I'm just saying do you see "Follow-up Duration"?

3:38PM  3   **A.**   Correct?

3:38PM  4   **Q.**   And it's listed as a decimal point.

3:38PM  5        Do you see that?

3:38PM  6   **A.**   I see some are saying 10.04.  Some are saying 2.96.  Some

3:38PM  7   are saying 0.14.

3:38PM  8   **Q.**   So, Doctor, what I'd like you to do is count up, of those

3:38PM  9   29, how many were followed up for a duration of .5 or more in

3:38PM  10  the TAC arm and the FAC arm.

3:38PM  11  **A.**   (Witness complies.)

3:38PM  12       I get five -- actually, that's not correct.  Let me

3:39PM  13  do it again.  Bear with me.

3:39PM  14       One, two, three, four, five, six -- I have about six.

3:39PM  15  **Q.**   What about -- what about the FAC arm?

3:39PM  16  **A.**   I haven't looked at that.  I'm happy do that.

3:39PM  17  **Q.**   How many in the FAC arm?

3:39PM  18  **A.**   That were greater than .05?  One, two, three -- I see

3:39PM  19  three in the FAC arm -- actually, hold on a second.  One, two,

3:40PM  20  three, four -- I see four.

3:40PM  21  **Q.**   Four?

3:40PM  22  **A.**   Yes.

3:40PM  23  **Q.**   A couple of very simply math questions, Doctor.

3:40PM  24       29 is different than 6; correct?

3:40PM  25       **MR. NOLEN:**  Objection, Your Honor.  I think the FAC

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| 3:40PM | 1 | side is incorrect.  It's actually wrong. |
| 3:40PM | 2 | THE COURT:  The witness said four. |
| 3:40PM | 3 | MR. NOLEN:  No, the top number, 19. |
| 3:40PM | 4 | MR. STRONGMAN:  16.  Sorry.  Thanks.  Getting messy. |
| 3:40PM | 5 | Thank you.  I had the 9 wrong. |
| 3:41PM | 6 | BY MR. STRONGMAN: |
| 3:41PM | 7 | Q.   29 and 16, right. |
| 3:41PM | 8 | So, Doctor, would you agree with me, simple question, |
| 3:41PM | 9 | 29 is not 6; correct? |
| 3:41PM | 10 | A.   That, I'll agree with you. |
| 3:41PM | 11 | Q.   16 is not 4? |
| 3:41PM | 12 | A.   Correct. |
| 3:41PM | 13 | Q.   And here's my next question:  Have you done any |
| 3:41PM | 14 | statistical analysis or have you asked Dr. Madigan to do any |
| 3:41PM | 15 | statistical analysis using the number six for the TAC arm and |
| 3:41PM | 16 | the number four for the FAC arm?  Yes or no? |
| 3:41PM | 17 | A.   No. |
| 3:41PM | 18 | MR. STRONGMAN:  Your Honor, could I have that -- may |
| 3:41PM | 19 | I approach, Your Honor? |
| 3:41PM | 20 | THE COURT:  Yes, you may. |
| 3:41PM | 21 | BY MR. STRONGMAN: |
| 3:42PM | 22 | Q.   So the medical literature, I think that was the next |
| 3:42PM | 23 | category of stuff that you talked about; fair? |
| 3:42PM | 24 | A.   Yeah. |
| 3:42PM | 25 | Q.   And, Doctor, you also talked about the Sedlacek study. |

OFFICIAL TRANSCRIPT

1    what happened to them.  In our particular case here, there is

2    lengthy followup of the patients.

3             The final piece of it is the quality of the data.  So

4    in the conduct of these trials -- and I've been involved in

5    many trials -- the data are gathered typically using what are

6    called *case report forms* during the conduct of the study, but

7    then they are checked and double-checked and triple-checked

8    against source medical records and various other avenues.  So

9    they are very heavily curated data.

10            So, at the end of the day, when you lock the data --

11   maybe we can talk about locked, what that means, in a few

12   minutes -- but when you lock the data at the end of the study,

13   you're highly confident that the data are accurate.  They are

14   verified.  They are reliable.  You can -- you can be sure that

15   what's in there is what actually happened.

16            That's a lengthy process, that curation process.  You

17   know, pharmaceutical companies devote, you know, hundreds of

18   people, thousands of people to that process to ensure that you

19   have very high quality data at the end of the day.

20            So these five things together are why randomized

21   controlled trials, particularly multiple randomized control

22   trials, are at the top of the heap in terms of, you know, the

23   best possible science in pharmaceutical science.

24   Q.   Thank you.

25            Just one thing, Doctor.  I tend to talk fast.  You

*OFFICIAL TRANSCRIPT*

1          I may have said this.  I just want to make sure whose
2     statistical analysis plan we're talking about.
3          Down at the bottom, right underneath the plaintiff's
4     exhibit sticker, is the name Sanofi, correct?
5     A.   At the top, as well.
6     Q.   I don't think there is any argument about that.  I just
7     wanted to make it clear.
8          Can you describe the data that you reviewed in
9     preparation for forming your opinions and reaching your
10    conclusions in this case?
11    A.   Sure.  So I asked for and received the locked data for the
12    two studies.  So I mentioned that term earlier.  Maybe I should
13    just explain it a little bit.
14         So as a trial takes place, over many years in some
15    cases, like here, the data are flowing into the company,
16    typically on these case report forms, and they are keyed in.
17    Then there is a process of validation and verification and
18    checking that goes on extensively.
19         But there comes a moment in time after -- they call
20    it *last patient out*, right, after the last patient is finished
21    in the study, and sometime after that, there comes a moment in
22    time where you sort of have to say:  Okay, we're done.  This is
23    it.  Right?  The study is done.  These are the data.  Okay.
24         It's sacrosanct.  This is not just -- I'm not just
25    talking about Sanofi.  This the industrywide.  This is

*OFFICIAL TRANSCRIPT*

1    worldwide.  It's common sense.  Right?  You have to say:  Okay,

2    we're done, at a certain moment in time.  And then we can reach

3    certain conclusions and move forward.  You can't go back at

4    that point and open it up again and change your mind.

5              So I asked for and received the locked data for both

6    TAX316 and TAX301.

7    Q.   When you say you reviewed the data, is that like pages and

8    pages of documents, or is it electronic?

9    A.   It's all electronic.

10   Q.   Okay.  So because of the terminology that the jury may

11   hear throughout this trial, that locked data that you referred

12   to, was that the final clinical trial data?

13   A.   Yes.

14   Q.   Okay.  Just so when we hear those terms -- I may say it

15   differently when I speak to you, but the locked data you're

16   referring to is the final clinical study trial data?

17   A.   Yes.

18   Q.   Thank you.

19             What importance do you place on having that locked

20   data, that final clinical trial study data?

21   A.   It is the definitive representation of what happened.  So

22   if you want to know, you know, what do these two studies tell

23   you about an issue, like irreversible hair loss, this is -- you

24   know, the locked data, frozen file some people call it, is the

25   definitive representation of what happened in that trial.

**OFFICIAL TRANSCRIPT**

1   familiar with how Sanofi recorded data?

2   A.    Sure.

3   Q.    Is that represented in their final clinical study trial

4   data, that locked set that you were talking about?

5   A.    Yes.

6   Q.    How many patients did Sanofi record in the final

7   clinical study data, the locked data, with ongoing persistent

8   or permanent alopecia as of the end of the ten-year followup in

9   TAX316?

10   A.    So in 316, on the T arm, the Taxotere arm, there are

11   29 patients in there who had -- they refer to it in their

12   documents as *ongoing alopecia*.  So that was -- yeah, at the end

13   of the study.

14   Q.    Were you able to reproduce those numbers when you ran

15   analyses based upon how Sanofi did them as well?

16   A.    Yes, I can absolutely reproduce the numbers in their

17   clinical study report.

18   Q.    Were you able to verify the length of followup for these

19   patients with ongoing persist permanent hair loss?

20   A.    Yes.

21   Q.    How many of those patients were represented in the final

22   clinical study data as having followup less than six months?

23   A.    So of the 29 patients with ongoing hair loss at the end of

24   the study, of the 29 one of those patients had a followup of

25   less than six months.  It was 117 days for one patient.

**OFFICIAL TRANSCRIPT**

1    Q.    Now, is that the 29 that are represented in that -- I want

2    to make sure I get the term right -- the definitive

3    representations of Sanofi?

4    A.    Yes.

5    Q.    Thank you.

6          Dr. Madigan, now that we have Sanofi's final verified

7    clinical study trial data, and you understand how they were

8    recording it, are there statistical tools that provide you an

9    opportunity to get some level of certainty in what you're

10   looking at is actually a real effect?

11   A.    Yes.  So there's -- in this particular context, because

12   there is more than one trial -- which is typical -- the

13   particular type of statistical analysis that is appropriate is

14   something called a *meta-analysis*.

15         So I conducted a meta-analysis of the trials to

16   estimate the treatment effect, the effect of Taxotere.

17   Q.    Once you do that, is there a way that you can look to

18   see -- you talked about play of chance and such earlier.  Is

19   there a way you can rule out play of chance?

20   A.    Yes.  So --

21   Q.    How -- I'm sorry.  Please explain that.

22   A.    So the meta-analysis that I conducted the analysis of, the

23   clinical trials, shows an effect size -- something called a

24   relative risk of 1.85.  So it's close to a doubling of the risk

25   of irreversible hair loss on Taxotere, as compared with the

*OFFICIAL TRANSCRIPT*

1    other arm of the study.

2         This finding was statistically significant.  So it

3    is -- by conventional standards, you cannot attribute this to

4    the play of chance.  The difference between the two arms is

5    large enough that that can't be chance alone.  There is a real

6    causal effect here.

7    Q.   That's in the TAX316 data?

8    A.   No, that's the meta-analysis.

9    Q.   Oh, that's the meta-analysis.  I'm sorry.  You're going to

10   learn just how bad my handwriting is.

11        Now, the meta-analysis was of TAX316 and TAX301?

12   A.   Yes, the totality of the evidence -- of the studies.

13   Q.   So TAX316, you said they had -- in the TAC arm, they had

14   29?

15   A.   Correct.

16   Q.   Am I able to get all that on there?

17        And in the FAC arm, you had 16?

18   A.   That's correct.

19   Q.   This is based on what you referred to as the definitive --

20   make sure I get this right -- definitive representation of

21   Sanofi, correct?

22   A.   Yes.

23   Q.   Now, the TAX301, did you determine what the definitive

24   representation of Sanofi was there in the final clinical study

25   data that was locked?

*OFFICIAL TRANSCRIPT*

1   A.   So the numbers -- the equivalent numbers for TAX301 -- the

2   followup was more limited in 301, so the equivalent numbers are

3   3 on TAC and 1 on FAC.

4   Q.   You said they were a little bit more limited.  And I'm

5   just going to put "DR," definitive rep of Sanofi.

6          Now, you said something about more limited followup.

7   Let me ask you:  Did you determine how many clinical study

8   centers there were that conducted TAX301?

9   A.   Sure.  So both of these are, I suppose, called multicenter

10  studies.  When you're trying to recruit a thousand-plus

11  patients, you generally have to recruit patients from all over

12  the world, from different centers.  So there were actually 55

13  different -- for 301, there were 55 different sites or centers

14  from around the world where they recruited and randomized

15  patients.

16  Q.   Did you investigate how many of those centers followed

17  patients and reported adverse events, including permanent

18  alopecia?

19  A.   Of the 55 centers, only 12 of them report anything about

20  hair loss in followup.

21  Q.   So only 12 of 55 are reported, right?

22  A.   That's correct.

23         MR. MICELI:  Sorry, Judge.

24  EXAMINATION BY MR. MICELI:

25  Q.   Is it with these numbers, these definitive represented

*OFFICIAL TRANSCRIPT*

1   numbers, that you conducted your meta-analysis?

2   A.   Yes.  There are other numbers involved as well, but these

3   are the primary inputs to the meta-analysis.

4   Q.   Of the individuals that reported persisting permanent

5   ongoing hair loss, these were the numbers of those patients?

6   A.   Yes.

7   Q.   Now, before we sort of move on to talk more about these,

8   is meta-analysis a recognized statistical tool in your

9   industry?

10   A.   Absolutely.

11   Q.   Is it something you teach at the college level?

12   A.   It's something I teach.  It's something I published about.

13   It's something I do in my consulting for pharmacology

14   companies.  Meta-analysis of sets of randomized trials, that's

15   as good as it gets in terms of the quality of evidence.

16   Q.   Now, we're looking at two studies put together in a

17   meta-analysis.  Is it appropriate in this particular

18   circumstance to combine these two studies into a meta-analysis?

19   A.   Absolutely.  They are about as similar a pair of studies

20   as you're likely to encounter.

21   Q.   Please tell the jury the results of your meta-analysis.

22   A.   As I said already, there was a statistically significant

23   elevated risk of irreversible hair loss on Taxotere; and from

24   this, I infer that Taxotere causes irreversible hair loss.

25   Q.   Okay.  Dr. Madigan, when you say you infer that Taxotere

*OFFICIAL TRANSCRIPT*

1   causes permanent hair loss, because what we're going to hear in

2   this courtroom, have you reached an opinion to a reasonable

3   degree of scientific certainty that Taxotere causes permanent

4   hair loss?

5   A.   Absolutely, yes.

6   Q.   I'm going to move up the road a little bit from the

7   meta-analysis.  I want to go to your next item, which is the

8   FAERS analysis.  You mentioned earlier you conducted an

9   analysis of the FAERS database.  Can you tell the jury what

10  that is?

11  A.   Maybe as a kind of preamble, the analysis of the

12  randomized controlled trials is the centerpiece of what I did,

13  but it's good statistical practice to look at other sources of

14  evidence.  What we're about to talk about, FAERS, is one of

15  those.  But it's supportive.  It's not in and of itself

16  definitive, unlike the clinical trials.  It's qualitatively

17  different from the clinical trials.  It's limited in various

18  ways, which I'm happy to talk about, but that side you asked --

19  what is it, I suppose, is what you asked.

20  Q.   Let's try to slow down.  I want to make sure, because I'm

21  with you, I talk fast, Dr. Madigan.  But can you explain to us

22  what the -- first just explain to us what the FAERS database

23  is.

24  A.   Sure.  It's a voluntary adverse event reporting system.

25  So if you take a medication and you believe it has caused a

*OFFICIAL TRANSCRIPT*

1   side effect, you can submit that information on a form to this

2   database.  It's maintained by the government, by the FDA.  But

3   it's publicly available.

4        If you go to your doctor or nurse or whatever, then

5   that person might submit a report and, in particular, if you

6   call or your doctor calls the pharmaceutical companies, they

7   have a duty to report to this database.

8        So reports flow into FAERS, the FDA Adverse Event

9   Reporting System.  Reports flow in over time.  As of the end of

10  June, there is about 13 million reports in this database, so

11  it's a very important data source for public health and for

12  understanding drug safety.

13       And statistical techniques for analyzing these data

14  have been developed by people like me and others over a number

15  of years that are now widely used, you know, by -- every

16  pharmacology company, essentially, is analyzing -- uses these

17  statistical methods to analyze these data.

18       There's kind of two major use cases that you might

19  distinguish.  One is pharmaceutical companies use these

20  databases prospectively to identify potential signals, meaning

21  they will look at a broad range of drugs and adverse events to

22  see:  Is anything popping up?  Is there anything we should be

23  worrying about?  That's one use of these data.  That's

24  perfectly legitimate.

25       A different use that is more akin to what I'm doing

*OFFICIAL TRANSCRIPT*

1   here is retrospectively.  If an issue arises from one source or

2   another that you're concerned about, it's routine practice to

3   look -- to analyze the FAERS database to see:  What does that

4   database have to say about this issue?

5          That's more akin to -- that's the nature of what I'm

6   doing here.  That's a specific concern.

7   Q.   Is the use of the FAERS database for the purposes you just

8   mentioned, is that limited to the United States?

9   A.   No.

10  Q.   People from all over the world can use it?

11  A.   Absolutely.  The data are on the FDA website.  You can

12  download them.

13  Q.   How do you perform your safety investigation in the FAERS

14  database?  How do you actually go about doing it?

15  A.   So, to conduct a kind of analysis I'm doing here, which is

16  very routine, you need to define an outcome.  What is the issue

17  that you're concerned about.  You need to define -- it's called

18  a *target outcome*.  You need to define a target drug, the drug

19  that you're studying.

20         And then typically, and certainly in my practice and

21  the one that I published about, you typically also look at some

22  comparator drugs.  You also look at the relationship between

23  related drugs and the outcome, for various reasons.

24  Q.   And what -- do you just select any term you want to look

25  at through the FAERS database?

*OFFICIAL TRANSCRIPT*

1    A.    For the outcome?

2    Q.    Yes.

3    A.    So, maybe I should explain a bit.  So the reports -- when

4    they flow into the database, the reports, you know, have

5    descriptions in natural language of what happens -- what

6    happened to the patient.  So the FDA and pharmaceutical

7    companies actually more typically, they code the narrative.

8          There is a dictionary called MedDRA, which is a list

9    of tens of thousands of terms.  There is a term for fever.

10   There is a term for alopecia.  There is a term for heart

11   attack.

12         What the pharmaceutical companies do is they assign

13   to the description in text, they will assign codes.  So if

14   somebody said, you know, I had a temperature of 104, the code

15   *fever* might get attached -- would -- presumably would get

16   attached to that report.

17         So the version of the data that are publicly

18   available and have these codes, so they don't actually have the

19   narratives.  The FDA does not release the narratives for

20   privacy reasons, at least not en masse.

21         The kind of analysis I did and the kind of analysis

22   that is done every day of the week across essentially every

23   pharmaceutical company is a statistical analysis of these codes

24   and how they relate to the drugs.  Maybe I went off.

25   Q.    I think that's what I wanted to learn.

**OFFICIAL TRANSCRIPT**

1        Is every term that you want to search for in that

2   dictionary that you were discussing?

3   A.   No.  So, there are many reasons why it's not as simple as

4   find the term in the dictionary and just analyze that.

5   Sometimes -- actually, I published a study recently where I had

6   to use a whole collection of terms to capture the clinical

7   concept that I was studying.  I didn't choose them; a physician

8   chose them.

9        And other times, you have to combine terms -- like,

10  for example, supposing you're concerned about cardiovascular

11  mortality.  Well, there is no MedDRA term for that, but there

12  is a box on the form -- MedWatch is the name of the form.

13  There is a box on the MedWatch form for *death.*  So an analysis

14  I've done, this kind of analysis you might do, is to look for

15  cardiovascular events and the box checked for *death.*

16        So in this particular case, which I think to head off

17  your next question, there is no code, there no MedDRA-preferred

18  term for irreversible alopecia or hair loss.  There is a term

19  for alopecia, that is a preferred -- it's a preferred term, and

20  there is actually -- let me use that.  We can get into that.

21        There is a term for *alopecia*, so I used that.  And

22  then there is a term -- there is a box on the form for

23  *permanent or disabled*.  It's for the outcome.  If the outcome

24  is permanent or disabled, then that's what I looked for.

25        I looked for a code for *alopecia* and the box

**OFFICIAL TRANSCRIPT**

1   *permanent or disabled* checked on the form.  And this is -- you

2   know, this is not perfect, but this is -- this is, you know, a

3   reasonable way to capture the concept of irreversible alopecia.

4   Q.   I just want to make sure we're clear for the jury.  We're

5   talking about one box that says *disability [sic] or permanent*,

6   not two boxes, choice between the two words?

7   A.   That's right.  There is five choices for -- I think it's

8   for the outcome, one of which is -- it's slightly different

9   names on different forms, but *permanent or disabled*.

10   Q.   Thank you.

11       So, you run this analysis.  Then what do you do with

12   the information?

13   A.   So I -- the statistical analysis computes -- it's

14   essentially a measure of association, how strong is the

15   association between your target drug and your target outcome.

16       There are a number of statistics in use.  I think I

17   ran basically all of the metrics that are in common use.  And

18   they all basically say the same thing, they all point in the

19   same direction, which is to say that there is a striking

20   association between Taxotere and irreversible alopecia.  And

21   that isn't present for the comparator drugs.  It's certainly

22   very spotty for the other drugs.

23   Q.   Because you mentioned the other the drugs, you didn't just

24   do it on Taxotere only?

25   A.   No.  So I also did it -- I used as the comparator drugs --

1    in consultation with some of the physicians, I used A and C,

2    the two other ones that are in the clinical trial, Adriamycin

3    and cyclophosphamide, and then I also did Taxol, and I did

4    5-FU.

5    Q.   I think you've already made this point, but I want to make

6    sure I'm clear.  Are these types of investigations or tools and

7    investigating this database, is this widely accepted in the

8    pharmacovigilance industry?

9    A.   This is completely routine.

10   Q.   I'm sorry, you've answered some of my questions as parts

11   of others.  So, I'm going to try to shorten this.

12           Did you chart your findings for your FAERS analysis

13   graphically for me?

14   A.   Sure.  It's routine to plot these things -- or I guess

15   you're going to show one in a second.  It's routine to plot

16   these things over time because it's of interest.  And I've done

17   this over and over.  And it's routine.

18           It's of interest just to see how this developed, how

19   it evolved over time, and also to look at what it would have

20   shown had you looked at a particular moment in time.  It's

21   routine to plot these things with time on the horizontal axis

22   and the vertical axis is the statistic, the measure.

23           THE COURT:  Have you reviewed that with Mr. Strongman?

24           MR. STRONGMAN:  No objection.

25           MR. MICELI:  May I approach the witness?

*OFFICIAL TRANSCRIPT*

1          THE COURT:  Yes.

2    EXAMINATION BY MR. MICELI:

3    Q.    You'll see it on the screen, but I wanted you to have that

4    as well, Doctor.  Doctor, is this one of the graphically

5    depicted -- graphic depictions of one of the analyses you did?

6    A.    Yes.

7    Q.    Can you explain what we're looking at here?

8    A.    This is what I was talking about.  I don't need a pointer.

9    Q.    Excuse me, is there a way we can activate his pointer?

10          THE COURT:  You can.

11          THE WITNESS:  With this?

12          THE COURT:  Yes?  You should be able to -- try it now,

13   Doctor.

14          THE WITNESS:  So time is on the horizontal axis, so

15   here it begins in 2000, and this particular one is limited to

16   the end of 2011.  In fact, we have data beyond that, but for

17   the purposes of this litigation, I think it's restricted to

18   2011.

19          So the vertical axis is a particular statistic;

20   the SEBGM, which I'm happy to explain.  And you can think of

21   this -- when I teach this -- actually, this is exactly what I

22   was teaching, the short course, at Sanofi.  When I teach this,

23   I often tell people think of this like a Richter scale that

24   measures the strength of earthquakes.  So the bigger the

25   number, the more the concern.

                    ***OFFICIAL TRANSCRIPT***

1        In this particular case -- well, 2 -- you see up

2   on a horizontal line here at the value 2.  So 2 is -- this is

3   not God-given, but 2 is widely considered to be a threshold

4   that -- above 2 is a concern.  So, you're worried about it.

5        So what I'm showing here is that for docetaxel,

6   for Taxotere, which is the red one, the colors aren't so clear,

7   but it's the one on the top, so it was above 2 in the first

8   quarter of 2000.  And then it dropped below 2, then it peaked

9   above 2, then it went below 2.  And then sometime actually in

10  Q2, the second quarter of 2008, it went above 2, and it's been

11  above 2 consistently since that time.

12       So it's a signal.  This is evidence of a concern.

13  And for the comparator drugs, they don't -- they don't rise to

14  that level of -- they never get to that level of concern.

15  Q.   You may have pointed to this, but you're referring to the

16  dotted lines.  We have the legend there for paclitaxel,

17  fluorouracil, doxorubicin and cyclophosphamide.

18       All those are well below the 2 line?

19  A.   Right.  So, this one up here is Taxotere.  And then these

20  ones down here are the other drugs, and they are coded.  So

21  this one is Taxol, it's paclitaxel.  The other ones are bunched

22  together down below.

23  Q.   Looking at the data that you did in the FAERS database,

24  what conclusions do you draw from this from a statistical point

25  of view?

*OFFICIAL TRANSCRIPT*

1    A.    In and of itself, this does not establish causation, but

2    it's supportive.  It's pointing in the same direction.  It's

3    suggesting that there is an issue here and a potential causal

4    association between Taxotere and irreversible alopecia.  So it

5    is supportive evidence for the randomized trial analysis.

6    Q.    If you're looking -- well, why do you chart it over time

7    like this?

8    A.    It's a conventional thing to do.  It's just to see how the

9    signal -- people use the term *signal* in this context -- how it

10    has evolved over time.  And as I said before, it enables you to

11    look -- see -- everything is cumulative here.  So, you know, if

12    you -- my arrow is pointed here is about -- is about 2010, so

13    that's what it look have looked like had you done the analysis

14    in 2010.  So it's a historical perspective.

15    Q.    And what conclusions do you draw with regard to Taxotere

16    versus the other drugs that are listed on this graphic

17    depiction concerning a safety signal?

18    A.    So there is a safety signal for Taxotere that is not

19    present for the other drugs.  The picture for other metrics --

20    this isn't the only metric that people use, the thing on the

21    vertical axis.  Some of the others periodically and

22    sporadically signal, but the only one that is consistently

23    signalling over time is Taxotere.

24    Q.    We're using a term *signal*, and we all take signal --

25    traffic signal, everything else, but what does a signal mean to

*OFFICIAL TRANSCRIPT*

1    a statistician who is doing a safety investigation in a

2    database like the FAERS database?

3    A.    So a safety signal -- if you were doing this

4    prospectively, a safety signal would be -- you know, raise a

5    red flag, this is something you should look at and be concerned

6    about.

7            In the context here, there is a particular issue that

8    we're studying, which is irreversible alopecia.  So here the

9    fact that it's above the signalling level is saying, this is

10   supportive of the idea that there is a causal effect here.

11   Q.    Now, you explained at the very beginning, and I should

12   have asked this then, but since I didn't, I'll ask it now, you

13   talked about sort of the imperfection in the terms and

14   dictionary that you get to use.  Did you use the same exact

15   terms in searching for safety signals with paclitaxel,

16   fluorouracil, doxorubicin and cyclophosphamide that you used in

17   doing it with Taxotere?

18   A.    Yes.  So, there are real limitations to this kind of

19   analysis.  These are voluntary reports, but the playing field

20   is entirely level.  It's actually the same computer program

21   that does the analysis for Taxotere as for the other four

22   drugs.  It's the exact same analysis using the same definition

23   of the target outcome.

24   Q.    Do you teach this process and these methods to your

25   students?

*OFFICIAL TRANSCRIPT*

1   A.   Yes, you betcha.

2   Q.   Do you teach them and speak of them in publishing in your

3   professional career on this?

4   A.   Absolutely.

5   Q.   If contacted by a drug company to say this is what's being

6   shown for our product, what would you tell them?

7   A.   I would tell them this -- well, in light of the

8   clinical trials, I would say to them, we've established there

9   is a causal effect here, and it is supported by this analysis.

10  Q.   And can you tell that to this jury, again, to a reasonable

11  degree of scientific certainty in your profession?

12  A.   Yes.

13  Q.   All right.  Now, we've talked -- we're going down the

14  road.  We're done with your qualifications.  We're done with

15  the randomized controlled trials.  We've talked about the FAERS

16  database.

17          And we're now at the fourth sign on this road.  And

18  that is the Sanofi database.  Did you look at the Sanofi

19  pharmacovigilance database?

20  A.   Yes, I did.  So this is kind of the counterpart to FAERS.

21  So FAERS is national, somewhat international.  Reports are

22  flowing in constantly --

23  Q.   Doctor, if I could interrupt you, and I apologize for

24  this, because when I removed my document, your highlighting

25  remained.

*OFFICIAL TRANSCRIPT*

DAVID MADIGAN - CROSS

1:32PM  1   **A.**   Okay.  If you say so.

1:32PM  2   **Q.**   Or "irreversible."

1:32PM  3          But here's my question, Doctor:  If you actually look

1:32PM  4   in TAX 316 or TAX 301, is the word "irreversible alopecia"

1:32PM  5   reported there?

1:32PM  6   **A.**   No.  They call it "ongoing."

1:32PM  7   **Q.**   They call it "ongoing."

1:32PM  8   **A.**   Yeah.

1:32PM  9   **Q.**   Do you know the definition of "ongoing" as it related to

1:32PM  10  TAX 316?

1:33PM  11  **A.**   Meaning the --

1:33PM  12  **Q.**   Do you know?

1:33PM  13  **A.**   Yeah.  The adverse event is persistent.

1:33PM  14  **Q.**   Do you know how that term is actually defined and followed

1:33PM  15  up on as the study moves on in TAX 316?

1:33PM  16  **A.**   Their protocol says that, at every follow-up, you check

1:33PM  17  for if side effects have reversed or are continuing, clinical

1:33PM  18  adverse events that started on treatment.

1:33PM  19  **Q.**   And I have a similar question as it relates to TAX 316 and

1:33PM  20  TAX 301, those -- the 29 and the 16 in TAX 316.

1:33PM  21          Are you with me?

1:33PM  22  **A.**   Yes.

1:33PM  23  **Q.**   Did you actually pull any of the clinical information on

1:33PM  24  any of those patients and look at them?

1:33PM  25  **A.**   I did not.  I'm doing a statistical analysis, as any

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1:33PM 1  biostatistician would do, of the frozen, locked clinical trial

1:33PM 2  data.  That's not the nature of my analysis or of any analysis

1:33PM 3  that one would do like this.

1:34PM 4  Q.   And so you didn't open the bag on any of those 29 or those

1:34PM 5  16 to look underneath and see do any of these individuals

1:34PM 6  actually have alopecia that lasted longer than six months?

1:34PM 7  A.   The database says -- states that they do.  It's the frozen

1:34PM 8  file.  It is what happened in the clinical trial.  That's what

1:34PM 9  I look at.

1:34PM 10  Q.   That wasn't my question.

1:34PM 11  A.   I thought I answered your question.

1:34PM 12  Q.   My question was did you actually pull the clinical

1:34PM 13  information on each one of those patients and evaluate it to

1:34PM 14  determine whether or not any of them --

1:34PM 15       MR. MICELI:  Your Honor, this has been asked and

1:34PM 16  answered.  Object.

1:34PM 17       THE COURT:  I'm going to let him finish the question

1:34PM 18  because I think -- finish your question.

1:34PM 19  BY MR. STRONGMAN:

1:34PM 20  Q.   Doctor, did you actually pull --

1:34PM 21       THE COURT:  Overruled.

1:34PM 22  BY MR. STRONGMAN:

1:34PM 23  Q.   -- any of the clinical medical information that gives the

1:34PM 24  narrative about each one of those individual patients in the 29

1:34PM 25  or the 16?

DAVID MADIGAN - CROSS

| | | |
|---|---|---|
| 1:34PM | 1 | **A.**   That's not what I do.  It's not what a statistician does. |
| 1:35PM | 2 | It's not the nature of my analysis.  It's -- I'm conducting a |
| 1:35PM | 3 | statistical analysis of the locked clinical trial data. |
| 1:35PM | 4 | **Q.**   And then what you did was you did these analyses, and |
| 1:35PM | 5 | Mr. Miceli talked to you about a meta-analysis; correct? |
| 1:35PM | 6 | **A.**   Sure. |
| 1:35PM | 7 | **Q.**   And you did an analysis, actually, of each of the two |
| 1:35PM | 8 | studies individually; correct? |
| 1:35PM | 9 | **A.**   Sure.  As part -- on the way to -- to doing a |
| 1:35PM | 10 | meta-analysis, which is the totality of the evidence. |
| 1:35PM | 11 | **Q.**   And when you did your analysis on each individual study, |
| 1:35PM | 12 | you set a parameter for statistical significance, a P value; |
| 1:35PM | 13 | correct? |
| 1:35PM | 14 | **A.**   I computed a P value.  Is that what you mean?  Are we |
| 1:35PM | 15 | agreeing? |
| 1:35PM | 16 | **Q.**   Well, you know what P value .05 means; right? |
| 1:35PM | 17 | **A.**   So if the P value is less than .05, typically, it's not |
| 1:36PM | 18 | right or wrong but, typically, call that statistically |
| 1:36PM | 19 | significant. |
| 1:36PM | 20 | **Q.**   So, Doctor, at the end of the TAX 316 study, you ran an |
| 1:36PM | 21 | analysis between the 29 and the 16 to see if there was a |
| 1:36PM | 22 | statistically significant difference between the two at that |
| 1:36PM | 23 | point in time; correct? |
| 1:36PM | 24 | **A.**   No.  That wasn't the purpose of why I did the analysis.  I |
| 1:36PM | 25 | did the analysis to estimate the effect size.  I computed a key |

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1:54PM 1      THE COURT:  And then he may explain it.

1:54PM 2           So I believe the question --

1:54PM 3 BY MR. STRONGMAN:

1:54PM 4 Q.   And I'm sure Mr. Miceli will give you opportunities to

1:54PM 5 explain anything that you feel like you need to explain.

1:54PM 6      THE COURT:  I think the question was, now can you go

1:54PM 7 through and add up how many of the 29 were followed up for more

1:54PM 8 than six months?

1:54PM 9      THE WITNESS:  The answer is I can.  And he made

1:54PM 10 Dr. Kessler do it yesterday, and I'm sure Dr. Kessler did it

1:55PM 11 correctly.  I wanted to take a few minutes to do it.  I can do

1:55PM 12 it.  But they're not follow-up times.

1:55PM 13 BY MR. STRONGMAN:

1:55PM 14 Q.   I'm just saying --

1:55PM 15      THE COURT:  Just answer the question.

1:55PM 16 BY MR. STRONGMAN:

1:55PM 17 Q.   Can you just go through --

1:55PM 18 A.   I answered the question.  The question was can I do it?

1:55PM 19 The answer is yes, I can.

1:55PM 20 Q.   Will you do it for me, please.

1:55PM 21 A.   Pretty please.  Sure.

1:55PM 22      So they're not follow-up times, but okay.  The

1:55PM 23 question is, how many are less -- or more than .5?

1:55PM 24 Q.   More than six months.

1:55PM 25 A.   I count five.  Five of the these numbers that are not

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1:55PM  1   follow-up times are greater than .5.
1:56PM  2   **Q.**   Now, I got six.
1:56PM  3   **A.**   Oh, I'm sorry.
1:56PM  4   **Q.**   Can we go with six?
1:56PM  5          I think Dr. Kessler got six too.  I'll give you an
1:56PM  6   extra one.
1:56PM  7   **A.**   You're right, six.  I misspoke.
1:56PM  8   **Q.**   And if you --
1:56PM  9   **A.**   I totally contest what you just put up on the flip chart.
1:56PM  10  **Q.**   I understand.  I understand that you have responses and
1:56PM  11  whatnot.
1:56PM  12         **THE COURT:**  I think we're just going to have to
1:56PM  13  answer his questions, and then --
1:56PM  14         **THE WITNESS:**  Right.  But he's putting something on
1:56PM  15  there as if that's what I said.  That's not what I said.
1:56PM  16         **THE COURT:**  I appreciate that, but you just need to
1:56PM  17  answer the question, Dr. Madigan.
1:56PM  18         **THE WITNESS:**  Okay.
1:56PM  19  BY MR. STRONGMAN:
1:56PM  20  **Q.**   Doctor, can you go through and add up the numbers in the
1:56PM  21  FAC arm, and will you do that for me, please?
1:56PM  22  **A.**   Yes, to both.
1:56PM  23         I count four.  I think that's what Dr. Kessler got,
1:57PM  24  too.
1:57PM  25  **Q.**   Doctor, here's my question.  I want you to make some

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1:57PM  1   assumptions with me.  Okay?
1:57PM  2   **A.**   Okay.
1:57PM  3   **Q.**   I want you to assume, for purposes of an analysis, that
1:57PM  4   TAX 316 showed six in the TAC arm and four in the FAC arm.
1:57PM  5        Okay?  Are you with me so far?
1:57PM  6   **A.**   I am.  It's counterfactual, but okay.
1:57PM  7   **Q.**   And that TAX 301 was the same, three and one?
1:57PM  8   **A.**   The same.  Okay.
1:57PM  9   **Q.**   Are you with me?
1:57PM  10  **A.**   I'm with you.
1:58PM  11  **Q.**   And, Doctor, under that hypothetical, sitting here today,
1:58PM  12  you cannot say that your meta-analysis would show a
1:58PM  13  statistically significant difference between the Taxotere side
1:58PM  14  and the non-Taxotere side; correct?
1:58PM  15       **MR. MICELI:**  Your Honor, objection to the
1:58PM  16  inappropriate -- inappropriate hypothetical.
1:58PM  17       **THE COURT:**  I think he can ask this expert witness a
1:58PM  18  hypothetical, and he can answer it.  You will have an
1:58PM  19  opportunity to clear that up.  This is an expert witness that
1:58PM  20  can answer hypothetical questions.
1:58PM  21       **MR. MICELI:**  Thank you, Your Honor.
1:58PM  22       **THE WITNESS:**  You asked me would it be statistically
1:58PM  23  significant under that hypothetical.  Probably not.
1:58PM  24  **BY MR. STRONGMAN:**
1:58PM  25  **Q.**   And I'll write up here "hypo."  This is my hypothetical.

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

4:25PM  1    of patients.  Even though they're clinical studies, they're not

4:25PM  2    as large as the Phase III studies which are much more

4:25PM  3    controlled and much more robust in the way the data is

4:25PM  4    collected.  But those two were very informative to start out,

4:25PM  5    and they were early publications, some of the earliest

4:25PM  6    information in the scientific literature.

4:26PM  7    Q.   Did you determine whether or not permanent hair loss

4:26PM  8    associated with Taxotere is a common side effect?

4:26PM  9    A.   Yes, I did.

4:26PM  10   Q.   And what is your opinion in that regard?

4:26PM  11   A.   Based upon the information that's available in the medical

4:26PM  12   literature as well as in the clinical trial information that's

4:26PM  13   been collected, that permanent alopecia, irreversible alopecia,

4:26PM  14   permanent hair loss, whatever name you want to use, is not

4:26PM  15   rare; it's common.  That's because it's occurring in more than

4:26PM  16   1 percent of the people in many of the reports that are out

4:26PM  17   there.

4:26PM  18        So you rank things as being rare or common or

4:26PM  19   frequent in the medical literature based upon whether it's less

4:26PM  20   than 1 percent, more than 1 percent, more than 10 percent of

4:26PM  21   the people that are being studied at that time.  Rare is less

4:26PM  22   than 1 percent.

4:27PM  23   Q.   And, Doctor, let me stop you just for a second.

4:27PM  24        Is the ranking that you just provided WHO also?

4:27PM  25   A.   Yes.  That's another -- that's where you can find it.  The

OFFICIAL TRANSCRIPT

4:27PM  1   World Health Organization also has published sort of this

4:27PM  2   standard for how you rank -- use names.  All the scientists in

4:27PM  3   the clinical literature, if they see the word "rare," they

4:27PM  4   should understand that that should be something that occurs

4:27PM  5   less than 1 percent of time.

4:27PM  6   Q.   All right.  Doctor, I'm going to put in front of the

4:27PM  7   jury -- publish to the jury something that's already been shown

4:27PM  8   as part of the opening about frequency of reactions.

4:27PM  9        Is this the WHO ranking scale?

4:27PM  10  A.   Yes, that's correct.

4:27PM  11  Q.   All right.  And so you were explaining a moment ago about

4:27PM  12  common.

4:27PM  13       Can you tell us, looking at this scale, what it is

4:27PM  14  you're talking about there?

4:27PM  15  A.   So the second bar at the top here, this here, so if it's

4:27PM  16  greater than 1 in 100, it's greater than 1 percent; less than

4:28PM  17  1 in 10, so it's between 1 and 10 percent of the people in the

4:28PM  18  study or the people in the population that you're talking

4:28PM  19  about.

4:28PM  20       So each -- each piece of literature I looked at, I

4:28PM  21  could look and see whether or not it was showing percentages

4:28PM  22  that would fit common or rare, for example.  If you look at

4:28PM  23  rare, it's going to be less than 1 percent.  Where it says less

4:28PM  24  than 1 in 100, that means less than 1 percent.

4:28PM  25  Q.   Okay.  So aside from Nabholz and Sedlacek, which I think

LAURA MASSEY PLUNKETT - DIRECT

4:34PM 1  **Q.**   Now, Doctor, did you review any of the other cancer agents
4:34PM 2  on the market to determine whether or not there was a permanent
4:34PM 3  toxic effect of hair loss?
4:34PM 4  **A.**   Yes.  I did a general survey, as part of my work, to look
4:34PM 5  first for literature on persistent alopecia and didn't limit it
4:34PM 6  just to one drug, looked across the literature to see what I
4:34PM 7  could find.
4:34PM 8  **Q.**   Did you find, through the literature that you did look at,
4:34PM 9  whether any other drug has, as a common toxic effect, permanent
4:34PM 10 hair loss?
4:34PM 11 **A.**   I did look for that, yes.
4:34PM 12 **Q.**   And what did you find?
4:34PM 13 **A.**   I found that the database of information that's available
4:34PM 14 for Taxotere looks very different than the kind of information
4:34PM 15 for any other drug that may have a report.
4:34PM 16        And the difference is, for Taxotere, you have all
4:34PM 17 three buckets of evidence we -- I showed on that.  You have
4:35PM 18 clinical trial data, you have observational data, and you have
4:35PM 19 case reports that are consistently showing that Taxotere has
4:35PM 20 been linked to or associated with permanent alopecia or
4:35PM 21 irreversible hair loss.
4:35PM 22        For some of the other drugs that are out there, I see
4:35PM 23 a few case reports for some of them, but I don't see all three
4:35PM 24 types of evidence that's available for me to look at publicly.
4:35PM 25 It just isn't there.

LAURA MASSEY PLUNKETT - DIRECT

4:35PM 1        Even drugs -- and I focused, actually, on some of the

4:35PM 2   drugs that were being used in combination with Taxotere,

4:35PM 3   because I wanted to know about doxorubicin and I wanted to know

4:35PM 4   about cyclophosphamide and 5-fluorouracil.  So I really paid

4:35PM 5   attention to those.  And the database of information that's

4:35PM 6   available looks very different than it does for Taxotere.

4:35PM 7   Q.   And based -- did you utilize your weight-of-the-evidence

4:35PM 8   analysis to come to your conclusions regarding permanent hair

4:35PM 9   loss and Taxotere?

4:36PM 10  A.   Yes.

4:36PM 11  Q.   And so if you were looking at it and weighing the

4:36PM 12  evidence, how do you come down ultimately on that issue?

4:36PM 13  A.   I come down that there's a difference.  Taxotere looks

4:36PM 14  different.  My opinion is that Taxotere has a -- carries a

4:36PM 15  greater -- an increased risk of being associated with permanent

4:36PM 16  alopecia in patients as compared to the other drugs that I was

4:36PM 17  able to review and that I saw reviewed or discussed within the

4:36PM 18  scientific literature.  And that included Taxol as well.

4:36PM 19  Q.   Is it close?

4:36PM 20  A.   No, it wasn't close.  And that was, I think -- what was --

4:36PM 21  it jumps out when you look across the published literature.

4:36PM 22        MR. NOLEN:  Thank you.  I'll pass the witness.

4:36PM 23        MS. SASTRE:  Your Honor, may we approach?

4:36PM 24        (WHEREUPON, the following proceedings were held at

4:36PM 25  the bench.)

6:13PM 1   A.   I think I did.  I didn't hear the second time he --
6:13PM 2   someone did it.  Maybe that was --
6:13PM 3   Q.   Someone tried.  All right.  I'm going to try too.  Okay?
6:13PM 4   A.   Sure.
6:13PM 5   Q.   So a hypothetical.  Okay?  So instead of bags, let's say
6:13PM 6   we have five baskets up here.  Okay?  And we're going to put
6:13PM 7   apples into each one of baskets.  Okay?  And it's going to be a
6:13PM 8   different number of apples in each one of the five baskets.
6:13PM 9        Are you with me so far?
6:13PM 10  A.   I can't think I am, but go ahead and finish your
6:13PM 11  hypothetical before I tell you whether I think you can do that.
6:13PM 12  But okay.
6:13PM 13  Q.   Well, I can put a different number of apples in each
6:13PM 14  basket; right?
6:13PM 15  A.   You certainly can do that, physically, yes.
6:13PM 16  Q.   Okay.  And if I asked you, "Dr. Plunkett, please tell me
6:13PM 17  how many apples are in each basket," the way that you would
6:13PM 18  need do that would be to come out here and count the apples in
6:13PM 19  each basket; true?
6:13PM 20  A.   If I'm only counting apples, yes, that is true.
6:14PM 21  Q.   Right.  And here you're not counting anything because you
6:14PM 22  don't have any numbers to count; true?
6:14PM 23  A.   I disagree.  What I'm counting instead is you have -- in
6:14PM 24  each basket, you have apples, oranges, and grapefruit.  The
6:14PM 25  apples are the clinical trial evidence.  The oranges are the

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

6:14PM 1    observational evidence.  The grapefruit are the case reports.

6:14PM 2            And when I look across the risk issue, the only

6:14PM 3    basket I have all three of those in is the Taxotere basket.  So

6:14PM 4    as a result, that tells me there's something different than the

6:14PM 5    others.  And that's what risk assessors do.

6:14PM 6            They can't always quantify it with an actual rate.

6:14PM 7    In fact, drug companies don't even do that when they do their

6:14PM 8    studies.  They list things in their label that aren't

6:14PM 9    necessarily backed up by rates.

6:14PM 10           That just is the way science is develop -- in drug

6:14PM 11   development and often in these kinds of things.

6:14PM 12           So a risk assessor can come in and look at a body of

6:15PM 13   evidence and make a statement whether or not there's a

6:15PM 14   difference in the risk profile of agents.  And that's what I've

6:15PM 15   done.  And that's grapefruit, oranges, and apples; just not

6:15PM 16   apples.

6:15PM 17   Q.   Okay.  So, again, going back to my example.

6:15PM 18           If you wanted to know how many apples were in each

6:15PM 19   basket, you would agree with me the best way to know that would

6:15PM 20   be to count them; right?

6:15PM 21   A.   That's the only way to know how many.  You have to count

6:15PM 22   them unless you wanted to the guess.

6:15PM 23   Q.   Right.  And what you're doing instead, Doctor, is you're

6:15PM 24   coming up and you're lifting each one of them and you're seeing

6:15PM 25   which one feels heavier.  And then you're trying to make a

LAURA MASSEY PLUNKETT - CROSS

6:15PM  1   determination as to which one has more apples; true?  That's

6:15PM  2   your weight-of-evidence analysis here?  You're doing a

6:15PM  3   weighing; true?

6:15PM  4   A.   Not necessarily.  Some of those pieces of fruit have

6:15PM  5   greater weight than others.  So if you're telling me I'm going

6:15PM  6   to then -- it is true.  If I would say -- I should reverse it,

6:15PM  7   then.  The grapefruit weigh more than the oranges and the

6:15PM  8   apples.

6:15PM  9        So, yes, the basket that has the most grapefruit in

6:15PM  10  it, obviously, is going to weigh the most.  That's the clinical

6:16PM  11  trial data.

6:16PM  12       So if we reverse it, I would agree that's what you

6:16PM  13  would be doing.  But you have to segregate the quality of the

6:16PM  14  information.  It's not just counting things up.

6:16PM  15  Q.   Okay.  Let's move on from the fruit.  Okay?

6:16PM  16  A.   Sure.

6:16PM  17  Q.   Okay.  So in this case, there is a definition for

6:16PM  18  persistent alopecia that your using; correct?

6:16PM  19  A.   Well, based upon studies I'm reviewing, that's correct.

6:16PM  20  Q.   Okay.  And in this case, the way that you define

6:16PM  21  persistent alopecia is where a patient has hair loss longer

6:16PM  22  than six months after chemotherapy treatment?

6:16PM  23  A.   Yes.  Because the scientific studies I rely upon use that

6:16PM  24  definition, typically.

6:16PM  25  Q.   Okay.  And so whether we use the term "permanent" or

OFFICIAL TRANSCRIPT

6:34PM  1   weight of evidence, but I didn't try to discern whether there
6:34PM  2   were problems that would change any of the numbers in the
6:35PM  3   study.  That, I did not do.  That would be analysis, and I
6:35PM  4   didn't do that.
6:35PM  5   Q.   Okay.  Good.  Maybe we're making progress.
6:35PM  6        So you did not do an analysis to determine if there
6:35PM  7   are any issues with the numbers in the study; correct?
6:35PM  8   A.   No.  I understood other experts were addressing issues
6:35PM  9   with that in the study.
6:35PM  10  Q.   But yet your opinions that you've come in here and
6:35PM  11  expressed to the jury, to a reasonable degree of scientific
6:35PM  12  certainty, are, in fact, based upon those numbers; true?
6:35PM  13  A.   Yes.  Like FDA, I'm relying upon the numbers as being an
6:35PM  14  accurate reflection of results of study, absolutely.
6:35PM  15  Q.   Okay.  Well, let me ask you a specific question.
6:35PM  16       There may be patients included within group of 29,
6:35PM  17  right, who were part of the TAC arm and are listed as having
6:35PM  18  ongoing alopecia at the end of the study at the ten years, and
6:36PM  19  that those are patients who contact may have been lost with
6:36PM  20  them after a period of months; true?
6:36PM  21  A.   I haven't done that analysis.  I can't answer that.  But,
6:36PM  22  again, I would say that I relied upon the results as you
6:36PM  23  reported -- not you -- as the company reported them to FDA as
6:36PM  24  being an assessment of how many people had ongoing alopecia in
6:36PM  25  each arm.

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

| | | |
|---|---|---|
| 6:36PM | 1 | Q.   So I think, if I understand you, what I hear you saying is |
| 6:36PM | 2 | that it is possible that there are patients that were not |
| 6:36PM | 3 | followed the entire ten years; correct? |
| 6:36PM | 4 | A.   There are -- it's also possible patients were followed -- |
| 6:36PM | 5 | were all were.  I can't answer that.  You're asking to do |
| 6:36PM | 6 | analysis -- that's what I'm saying to you.  I didn't tear apart |
| 6:36PM | 7 | the numbers.  I relied upon the numbers as reported in the |
| 6:36PM | 8 | study that, indeed, was the same study and the numbers that |
| 6:36PM | 9 | were given to FDA and used in their assessment. |
| 6:36PM | 10 |        So that's what I did.  I used it as a valid piece of |
| 6:36PM | 11 | scientific evidence for me to rely upon. |
| 6:36PM | 12 | Q.   But, Doctor, I really just need an answer to my question |
| 6:37PM | 13 | first. |
| 6:37PM | 14 | A.   I tried to always answer your question first if I can.  I |
| 6:37PM | 15 | apologize if I'm not.  I really try to do that. |
| 6:37PM | 16 | Q.   Okay.  So my question, Doctor, was that there may be |
| 6:37PM | 17 | patients included within the group of 29 who reported |
| 6:37PM | 18 | persistent alopecia in the Taxotere arm and contact may have |
| 6:37PM | 19 | been lost with them after six months; true? |
| 6:37PM | 20 | A.   I think I answered it is possible, but it is also possible |
| 6:37PM | 21 | that is not true. |
| 6:37PM | 22 | Q.   And if somebody was lost to follow-up in the first six |
| 6:37PM | 23 | months, you certainly are not telling this jury that you know |
| 6:37PM | 24 | what their hair would look like after two years; right? |
| 6:37PM | 25 | A.   Well, I don't think I formed that opinion, no.  I haven't |

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

6:37PM  1    tried to tell you what any individual patient's hair would look

6:38PM  2    like in this study, no.

6:38PM  3           But the data that Dr. Madigan read that I heard is

6:38PM  4    the majority of these patients in this 29 were followed for at

6:38PM  5    least five years, if not ten.

6:38PM  6    Q.   My question was simply:  You are not telling us that you

6:38PM  7    know what a patient's hair would look like at two years if they

6:38PM  8    were lost to follow-up in the first six months; correct?

6:38PM  9    A.   I said I agree.  I haven't done that.

6:38PM  10   Q.   Okay.

6:38PM  11   A.   But then I explained my answer.  I apologize.  I think

6:38PM  12   context is important.

6:38PM  13   Q.   You would agree with me that you also don't know how many

6:38PM  14   of the patients within the 29 who were listed as having ongoing

6:38PM  15   alopecia in the TAC arm, you don't know how many of them were

6:38PM  16   taking hormone therapy; true?

6:38PM  17   A.   That, I may be able to find within this study.  Do you

6:38PM  18   want me to look and see?  Because they typically give you

6:38PM  19   inclusion/exclusion criteria and also characteristics of the

6:38PM  20   patients.  Do you want me to look and see if I can find that?

6:39PM  21          I did not look for that, though, in formulating any

6:39PM  22   opinions.

6:39PM  23   Q.   Right.  My question -- let me try to ask it a little bit

6:39PM  24   better.

6:39PM  25          My question is that you did not determine how many of

OFFICIAL TRANSCRIPT

09:17:45  1   as a dermatologist?

09:17:45  2   A.    More than 30 years.

09:17:48  3   Q.    Just so we're all clear, do you have a specialty within

09:17:50  4   dermatology?

09:17:51  5   A.    I have a specialty in hair and nail disorders.

09:17:54  6   Q.    How long have you had that specialty?

09:17:56  7   A.    You know, I started becoming interested in hair very soon,

09:18:01  8   as soon as I finished my residency --

09:18:05  9   Q.    Okay.

09:18:06  10  A.    -- so more than 30 years.

09:18:07  11  Q.    You indicated that you practice -- you see patients in

09:18:12  12  Miami, as well as in Italy?

09:18:15  13  A.    Yes.  I do.

09:18:17  14  Q.    Could you estimate how many patients you've seen in your

09:18:21  15  lifetime?

09:18:22  16  A.    Thousands.

09:18:25  17  Q.    As far as why, just so the jury understands, why you have

09:18:28  18  a practice both in Italy and in Miami?

09:18:32  19  A.    Because I was working in Italy.  When I moved to the

09:18:35  20  United States, my practice was very successful, and I thought I

09:18:40  21  will keep it.  You know, I don't know what's going to happen

09:18:45  22  with the university.  That's the main reason.  I love my

09:18:48  23  patients in Italy, so I keep both.

09:18:50  24  Q.    In addition to practicing and seeing patients, do you do

09:18:55  25  research?

*OFFICIAL TRANSCRIPT*

09:19:00  1    A.    Yes, I do clinical research, and I teach.  That's what I
09:19:04  2    really love to do.
09:19:05  3    Q.    Since you brought up your teaching, let's talk about that.
09:19:08  4          Before we do that, just briefly, let's make sure the
09:19:12  5    jury understands when you got your degree, and take us through
09:19:16  6    where you went to school and that process, your higher
09:19:18  7    education, if you would.
09:19:20  8    A.    Yes, I had my degree at University of Bologna, and I did
09:19:24  9    my residency at University of Bologna.  I was full professor of
09:19:29 10    dermatology at the University of Bologna.  I also was director
09:19:33 11    of the residency school.
09:19:36 12          Then, at one point, I decide to move.  I needed
09:19:40 13    something maybe new in my life.  I moved to Miami, to the
09:19:45 14    United States.
09:19:45 15    Q.    That's what brought you to Miami?
09:19:47 16    A.    That's when I moved to Miami.  Then, you know, I start
09:19:57 17    working at University of Miami.
09:19:57 18    Q.    We were talking about your work as researcher.  You
09:20:01 19    indicated -- you specified for me clinical researcher.  Could
09:20:05 20    you explain to the jury what you mean by that?
09:20:07 21    A.    That means that, you know, I may publish papers about
09:20:14 22    treatment and diagnosis of hair disorders.
09:20:19 23          For instance, I first recognized a new hair disorder
09:20:23 24    in my life.  You know, that's something -- that's clinical
09:20:29 25    research, to describe new things, so the other doctors reading

**OFFICIAL TRANSCRIPT**

09:20:37 1    the paper learn either how to diagnose or how to treat.

09:20:41 2            I developed this technique, which is called

09:20:46 3    *dermoscopy* or *trichoscopy*, to look at the scalp very close, and

09:20:51 4    that is very helpful for diagnosis.

09:20:52 5    Q.   Doctor, with regard to your research -- and we'll come

09:20:57 6    back to the dermoscopy or trichoscopy that you developed, but

09:21:00 7    with regard to your research, in your résumé it lists many,

09:21:13 8    many pages.  Do you know how many peer-reviewed articles you

09:21:14 9    have published?

09:21:17 10   A.   You know, I've published a lot.  More than 600.

09:21:21 11   Q.   Of those, how many are on the topic of hair,

09:21:22 12   approximately?

09:21:22 13   A.   I would say one-third.

09:21:23 14   Q.   With regard to being a clinical researcher, why do you do

09:21:29 15   it?

09:21:30 16   A.   That's what I love to do.  You know, it's complicated.  I

09:21:35 17   cannot even explain why I like to write papers and I like to

09:21:39 18   research.  It's something that you probably are born with.  As

09:21:45 19   you like to draw, I like to research.

09:21:47 20   Q.   In addition to being a clinician seeing patients, being a

09:21:54 21   researcher, do you also teach?

09:21:57 22   A.   Yes.  That's also something I like.  That's why I've been

09:22:02 23   always at university all my life.

09:22:04 24            I teach all over the world.  I have fellows coming --

09:22:12 25   for instance, now in Miami, they come to spend one year with me

*OFFICIAL TRANSCRIPT*

09:22:14 1   to learn hair and nail disorders and go back.  We have a

09:22:19 2   special fellowship at university for that.

09:22:23 3         I have people from Brazil, from South Arabia, from

09:22:29 4   Mexico, from Italy, of course, from many, many countries.

09:22:31 5   Q.   So you teach at the University of Miami?

09:22:34 6   A.   Yes, I teach at the University of Miami.  I teach

09:22:38 7   students, residents, and fellows.

09:22:40 8   Q.   The fellows you're taking about, are these doctors who

09:22:44 9   come?

09:22:44 10  A.   They are already dermatologists that want to specialize in

09:22:52 11  hair disorders.  There are not many people that are really

09:22:53 12  trained in the world.  There are some countries, they don't

09:22:55 13  have anybody, so they decide to come and be trained.

09:22:58 14  Q.   In addition to the formal, that style of teaching, whether

09:23:06 15  students or other doctors, do you do lectures?

09:23:08 16  A.   I do a lot of lectures, yes, all over the world.

09:23:11 17  Q.   Just briefly, make sure the jury understands what type of

09:23:17 18  lectures you do, where you do them, those sorts of things.

09:23:19 19  A.   You know, most of these lectures are either on hair

09:23:23 20  disorders, on diagnosis or treatment, or on nail disorders.

09:23:30 21        A lecture means that I have a title, and I explain

09:23:35 22  the audience, the topic that -- may be various topics.

09:23:46 23  Q.   Of those, being a practicing doctor, being a researcher

09:23:50 24  and a teacher, what -- do you have a favorite of those?

09:23:54 25  A.   You know, I like all of them.  I like my patients.  I

*OFFICIAL TRANSCRIPT*

09:34:37 1    Q.    Would you share with the jury what conclusion you reached

09:34:42 2    in regards to our client, Barbara Earnest.

09:34:45 3    A.    My conclusion about Barbara is that she is affected by

09:34:51 4    permanent alopecia due to chemotherapy from Taxotere.

09:34:55 5    Q.    Doctor, are you prepared to give the jury some basics on

09:35:06 6    hair facts?

09:35:07 7    A.    Sure.

09:35:07 8    Q.    Doctor, what is it that we're looking at here on this

09:35:19 9    diagram?  If you could just familiarize and orient the jury.

09:35:23 10           THE COURT:  Dr. Tosti, if it helps, you have a pen.

09:35:28 11           THE WITNESS:  I saw that yesterday.  I will use when I

09:35:31 12   need, because I am afraid to make mistakes.

09:35:34 13           So what you see here is the hair follicle.  The

09:35:39 14   hair follicle that you see is something that is into the skin

09:35:42 15   and produce the hair.

09:35:44 16           So the hair is, in reality, a dead structure.  So

09:35:49 17   the hair is dead.  The cell into the hair shaft don't reply.

09:35:58 18   It's the hair follicle that has cells that reply and produce

09:36:00 19   the hair.

09:36:01 20   EXAMINATION BY MR. SCHANKER:

09:36:01 21   Q.    Ask you what might seem like a basic question, but where

09:36:05 22   is the hair on the human body?

09:36:07 23   A.    It's everywhere except for our palms and soles.

09:36:10 24   Q.    Explain what you mean, it's everywhere.

09:36:15 25   A.    All our skin except for palms and soles.

*OFFICIAL TRANSCRIPT*

09:36:20 1    Q.    With regard to the hair -- and you've used this term

09:36:27 2    *hair follicles* -- what is the difference between the hair and

09:36:31 3    the hair follicle?

09:36:32 4    A.    The hair follicle is the organ that produce the hair.

09:36:34 5    It's a very complicate organ.  You know, this is the

09:36:38 6    hair follicle here.  This is all the hair follicle.  This is

09:36:43 7    the hair that comes out from the skin.

09:36:45 8    Q.    Doctor, before we get into more depth on that, obviously,

09:36:52 9    humans have different colors of hair, right?

09:36:54 10   A.    Yes.  Depending on the genetics and race.

09:36:59 11   Q.    Are the number of hair follicles different depending

09:37:04 12   typically on the color of hair?

09:37:05 13   A.    The number of bodies, with race, for instance,

09:37:12 14   African American have less and with color.  Blonde people have,

09:37:14 15   you know, more hair, but it's thinner.

09:37:19 16   Q.    You indicated -- you indicated, Doctor, that there is

09:37:28 17   hair follicles that are found basically everywhere on the human

09:37:32 18   body except for our palms and the soles of our feet; is that

09:37:32 19   correct?

09:37:36 20   A.    Correct.

09:37:36 21   Q.    Now, explain that to us, because we may not see hair all

09:37:42 22   over our body.

09:37:43 23   A.    Because there are two types of follicles.  You see these

09:37:48 24   slides.  There are those follicles that are all called *vellus*

09:37:55 25   *follicles*.  These are very small, and they produce hair that is

**OFFICIAL TRANSCRIPT**

09:37:57  1   not really seen.  The hair we have our cheeks, on your

09:38:04  2   forehead.  Think of it, you have more hair on your face than on

09:38:07  3   our scalp, because there are many, many of those vellus

09:38:12  4   follicles.

09:38:14  5           Then we have the terminal follicles that produce hair

09:38:15  6   that are long and thick, like the hair of the scalp, the

09:38:20  7   eyebrows, the eyelashes.

09:38:21  8   Q.   So these vellus follicles that are all over our body, do

09:38:27  9   they have a color?

09:38:28 10   A.   The vellus hair, you mean?

09:38:28 11   Q.   Yes.

09:38:30 12   A.   Because the vellus follicles produce the vellus hair --

09:38:30 13   Q.   Thank you for the clarification.

09:38:34 14   A.   -- which is usually transparent.  It's very, very blonde.

09:38:38 15   You don't see.

09:38:38 16   Q.   So, those are the vellus follicles.  Could you please

09:38:45 17   explain to the jury -- we probably have an idea, but just so

09:38:48 18   we're clear -- what from the terminal follicles?

09:38:50 19   A.   The terminal follicles is the one on the right.  They

09:38:55 20   produce -- they are bigger and produce hair that are pigmented

09:38:59 21   and thick and long.

09:39:00 22   Q.   Where are the terminal follicles found on our body?

09:39:06 23   A.   On your scalp, on your eyebrows and eyelashes.  On men, in

09:39:12 24   other area, like the beard, those are terminal follicles.

09:39:16 25   Q.   As human beings go through puberty, is there a transition

*OFFICIAL TRANSCRIPT*

09:39:21  1   from one follicle to the other?

09:39:23  2   A.   Yes, those follicles make change.  So vellus follicle can

09:39:30  3   become terminal follicles.  For instance, at puberty, when men

09:39:33  4   develop the beard, it's vellus follicle that became terminal

09:39:38  5   follicle.  And the opposite can happen, as well.

09:39:41  6   Q.   Tell us about that.

09:39:42  7   A.   The opposite is what happens in baldness, for instance.

09:39:49  8   Okay.  So men that look bald, in reality, they have some

09:39:54  9   follicle, but they are just not visible, because they become

09:39:59 10   thin like the vellus follicle that you have on the face.

09:40:06 11   Q.   Doctor, we may have heard of a concept called the *hair*

09:40:09 12   *cycle*.  Are you prepared to explain to the jury what the hair

09:40:11 13   cycle is?

09:40:12 14   A.   Yes, absolutely.  You know, it looks complicate, but I try

09:40:19 15   to make it simple.

09:40:20 16        So we say the follicle produce the hair.  But this is

09:40:25 17   not continuous.  The follicle has period when it produces the

09:40:29 18   hair and periods of rest.  So it's not working all the time.

09:40:35 19   Take some rest.

09:40:36 20        So that when the follicle produce the hair, this is

09:40:42 21   called *anagen*, *anagen phase*.  The name from Latin.  So the

09:40:48 22   anagen phase, the follicle produce the hair.  So it's a very,

09:40:52 23   very active organ.  The anagen phase is the longest phase of

09:40:57 24   the hair cycle.

09:40:58 25        So, for instance, in women, the anagen phase usually

*OFFICIAL TRANSCRIPT*

09:41:03  1    lasts from three to seven years.  That's why the hair become

09:41:06  2    long.  In men, usually last less.  Men cannot usually grow hair

09:41:12  3    as long as women.

09:41:13  4    Q.    So what happens after the anagen phase, or how does it

09:41:16  5    transition?

09:41:17  6    A.    After the anagen phase, the follicle go to rest.  So there

09:41:25  7    is this catagen phase, which is very, very short, lasts like

09:41:29  8    days.

09:41:30  9          Then there is the telogen phase.  You see in that

09:41:34  10   picture.  The follicle rests, and rests usually for three

09:41:37  11   months.  After three months, the follicle start producing a new

09:41:45  12   hair that push out the old one.  So, usually, when you would

09:41:48  13   shed the hair, the new one is already growing.

09:41:51  14         The follicles don't work -- are not all together in

09:41:58  15   the same phase.  You know, for instance, cats or dogs, all the

09:42:03  16   follicles are in the same phase, so they lose all the hair

09:42:07  17   altogether.  In humans, they are not.  So we lose some hair

09:42:11  18   every day.  Normally, the normal shedding is about 80 hair

09:42:18  19   every day.  You mostly lose when you shampoo, when you brush,

09:42:23  20   of course, because friction make it easy for the hair to fall

09:42:27  21   out.

09:42:27  22   Q.    So is that why cats and dogs and some other animals go

09:42:32  23   through what we call *shedding*, but, as human beings, we do not.

09:42:35  24   A.    Exactly, because they have -- the cycle is synchronized,

09:42:39  25   and our hair cycle, they are not synchronized.

***OFFICIAL TRANSCRIPT***

09:42:42 1   Q.   So hair loss, can you begin to educate the jury about

09:42:51 2   hair loss.

09:42:52 3   A.   You know, there are many conditions that cause hair loss.

09:42:58 4   Hair loss is like fever.  So we have a hair loss.  We have to

09:43:02 5   find out what's causing.  Then you have to distinguish between

09:43:05 6   hair loss and failure of hair to grow, meaning alopecia.

09:43:12 7   Q.   So let me stop you there.  I believe you said you have to

09:43:18 8   distinguish between hair loss and failure of hair to regrow.

09:43:23 9   Are those two different things?

09:43:27 10  A.   Maybe together sometimes.  Sometimes are two different

09:43:32 11  things.  So you have -- this is a very important part of the

09:43:35 12  examination and the history of the patient.

09:43:38 13  Q.   So, examination and history of a patient, is that -- that

09:43:44 14  is an important part, an aspect in determining the cause of

09:43:50 15  hair loss, is it?

09:43:50 16  A.   Absolutely.  This is important in any field of medicine.

09:43:54 17  You cannot make a diagnosis without seeing the patient and

09:43:59 18  talking to the patient, you know.  Because this is very, very

09:44:02 19  important, in my personal experience, to talk with the patient

09:44:07 20  and to learn from the patient, because sometimes the patient

09:44:11 21  knows much more than everybody else.

09:44:14 22  Q.   You mentioned a clinical evaluation.  I want to talk to

09:44:20 23  you about that.  Are there steps to a clinical evaluation?

09:44:26 24  A.   You know, everybody has his own steps.  So for patients

09:44:31 25  with hair disorder, for instance, the first thing I want to do

*OFFICIAL TRANSCRIPT*

09:44:35  1   is to look at the patient, briefly, but to understand what he

09:44:38  2   may have.

09:44:39  3            So I ask the questions that are important depending

09:44:43  4   on what I see.  Because, you know, any hair disorder may

09:44:48  5   require different studies, different questions.  Then --

09:44:52  6   Q.   So just so we're clear, you said you ask the patient, you

09:44:59  7   talk to the patient?

09:45:00  8   A.   I start by saying, can you please have a seat.  Can I

09:45:03  9   please look at you one moment.  I want to understand how --

09:45:06  10  what she has.  Then I go and start my clinical history, which

09:45:13  11  is, as I said, very, very important.  But the question I ask

09:45:17  12  depends on what I see, because if I see a patient with partial

09:45:22  13  alopecia, I ask questions that are different if I see a patient

09:45:26  14  who is bald, you know.

09:45:27  15  Q.   So I want to take you through each of these steps, but is

09:45:33  16  it fair to say, do you first do the history, you talk to the

09:45:35  17  patient?

09:45:36  18  A.   Uh-huh (affirmative response).  Yes.

09:45:37  19  Q.   Then you mentioned a clinical exam; is that right?

09:45:41  20  A.   Yes.

09:45:42  21  Q.   Let's go ahead and talk about the clinical exam, because

09:45:45  22  you just began to touch on that.  What is it that you're

09:45:50  23  looking for and what exactly do you do in a clinical exam?

09:45:54  24  A.   I first look at the scalp of the patient.  I do something

09:46:00  25  that is called a *pull test*.  This is to see if the patient is

*OFFICIAL TRANSCRIPT*

09:46:05  1    losing more hair than normal.

09:46:06  2             So I take, like, a tuft, usually it should be 50

09:46:12  3    hair, and I pull gently.  If I find hair in my hands, that

09:46:16  4    means that is shedding more than normal.  And this is important

09:46:21  5    because gives me some information.

09:46:25  6    Q.   I want to take you back to the clinical exam.  You started

09:46:29  7    to touch on something, and I may have interrupted you.  So just

09:46:32  8    so we're all clear, the clinical exam, you're sitting with the

09:46:35  9    patient; is that right?

09:46:36 10    A.   I stand up and the patient is sitting.

09:46:39 11    Q.   Thank you.

09:46:40 12             And when you're doing that, this is a patient that's

09:46:44 13    presented to you with some issue or condition typically, I'm

09:46:47 14    assuming?

09:46:48 15             MS. SASTRE:  Objection, Your Honor.

09:46:50 16             THE COURT:  Let me just -- approach a little bit --

09:46:50 17    approach.

09:46:50 18             (WHEREUPON, at this point in the proceedings, there was

09:47:05 19    a conference held at the bench.)

09:47:05 20             THE COURT:  I'm going to let her -- I think because of

09:47:14 21    her pretty thick accent, I might let a little bit of follow-up

09:47:19 22    because sometimes I'm having to look at realtime, and I know

09:47:23 23    the jury can't --

09:47:24 24             MR. SCHANKER:  I'll do my best not to --

09:47:27 25             THE COURT:  Sometimes it's just "you said that."  I'm

*OFFICIAL TRANSCRIPT*

09:47:30 1   going to allow some of that simply because -- just a pretty

09:47:35 2   thick accent.  I'm not going to let him testify.

09:47:38 3           MR. SCHANKER:  They don't want to hear from me.

09:47:41 4           THE COURT:  All right.  Thank you.

09:47:41 5           (WHEREUPON, at this point in the proceedings, the bench

09:47:41 6   conference concluded.)

09:47:59 7           THE COURT:  Please proceed.

09:48:01 8   EXAMINATION BY MR. SCHANKER:

09:48:01 9   Q.   Yes.  Clinical evaluation, what are you looking for?  Are

09:48:08 10  there conditions -- hair conditions that you're looking for in

09:48:12 11  that clinical -- that initial clinical evaluation?

09:48:16 12  A.   I look at the pattern of the hair loss.  If it's patchy,

09:48:21 13  if it's diffuse, if it affects certain area of the scalp.  I

09:48:26 14  look, you know, like the pull test, as I said.  You see some

09:48:32 15  example of patchy, you see a patch.

09:48:36 16  Q.   If you could, because these are probably new terms or

09:48:40 17  scientific terms here, let's just make sure we drill down on

09:48:45 18  these, Dr. Tosti.  You mentioned patchy alopecia --

09:48:46 19  A.   You see here is a patch; that you don't have a complete

09:48:50 20  loss all over the scalp.  You have patches.  And here you have

09:48:55 21  a kind of diffuse, you know.  And here, in this one, the

09:49:01 22  hair loss is on the top of the scalp.  We call *pattern*

09:49:04 23  *alopecia*.

09:49:04 24  Q.   Doctor, you indicated -- you explained to us what the pull

09:49:13 25  test was.  And then we have a dermoscopy.  You shared with us

*OFFICIAL TRANSCRIPT*

09:49:22  1    about the dermoscopy.  Just explain in detail what you're doing

09:49:26  2    with the dermoscopy or trichoscopy -- are those words

09:49:32  3    interchangeable?

09:49:33  4    A.    Yes.

09:49:34  5    Q.    What you're doing with the dermoscopy, what you're looking

09:49:36  6    for, what you can accomplish with that tool.

09:49:39  7    A.    The first thing I want to see, if it's a scarring

09:49:45  8    alopecia, meaning that the hair follicle is being destroyed by

09:49:52  9    a scar and so there are now openings of the follicles or if

09:49:59 10    it's a nonscarring alopecia, meaning that the follicle are

09:50:02 11    small, but are there, because that makes a big change in term

09:50:05 12    of treatment.

09:50:05 13    Q.    Just to make sure that I haven't skipped over a step, is

09:50:10 14    the dermoscopy, is it basically a magnifier, like a microscope?

09:50:16 15    What is it?

09:50:17 16    A.    It's a very big magnifier.  With my instrument, I can go

09:50:22 17    from 20 times to, you know, even 100 time the size of the area

09:50:32 18    that I want to see.

09:50:33 19    Q.    Just so the jury understands, is this a big, giant machine

09:50:41 20    or a small device, the dermatoscope?

09:50:44 21    A.    I have a small device.  You can have a small device that

09:50:47 22    most doctors have, because they look at the moles with that

09:50:53 23    device.  If you have a skin check, your doctor look with that

09:50:56 24    device at your skin.  But I also have very big instruments, I

09:51:01 25    can take pictures.

*OFFICIAL TRANSCRIPT*

09:51:01 1  Q.   So after you use that -- do the dermoscopy, what's next as

09:51:07 2  far as your clinical evaluation?

09:51:08 3  A.   You know, you may need to take a biopsy.  You may need to

09:51:15 4  take a piece of skin and look under the microscope.  And you

09:51:20 5  may need the laboratory tests, depending on the diagnosis.  So,

09:51:24 6  when you have an idea what you think the patient may have, you

09:51:29 7  go ahead.

09:51:30 8  Q.   And let's go back through those.  You indicated that you

09:51:33 9  might need to take a biopsy.  Is that always the case?

09:51:40 10  A.   You know, very often the patient has seen somebody else

09:51:47 11  before you, because patients often go to many doctors, and they

09:51:51 12  may already have a biopsy.  And you don't always need to have a

09:51:55 13  biopsy.  It depends on the situation.

09:51:57 14  Q.   And then you talked about the laboratory results.  The lab

09:52:01 15  results.  Is that just a blood test?

09:52:03 16  A.   Yes, blood test.  If somebody is shedding hair, I will do

09:52:08 17  a blood test and check if he has any disease that can cause

09:52:12 18  that.  If I see a woman with hair on her face, I will check

09:52:19 19  labs to be sure she doesn't have some problem with hormones.

09:52:24 20  Q.   Doctor, in this case, did you perform a clinical

09:52:32 21  evaluation of Barbara Earnest?

09:52:34 22  A.   Yes.  Absolutely, yes.  She came to Miami, and I saw her.

09:52:39 23  Q.   So we understand that the first step on the clinical

09:52:50 24  evaluation is history.  You indicated that you saw

09:52:55 25  Barbara Earnest.  Specifically with regard to Barbara Earnest,

*OFFICIAL TRANSCRIPT*

09:53:04  1    you took a history; is that correct?

09:53:06  2    A.   Yes.  I had her medical records in advance because this

09:53:11  3    was a kind of a very long history, but I -- then I spoke with

09:53:17  4    her, and we -- she explained me what happened, and I did a

09:53:25  5    clinical exam.  I did the pull test.  I did the dermoscopy.

09:53:29  6    She already had the pathology results with her.

09:53:34  7    Q.   So what I would like to do is go ahead and go through each

09:53:37  8    of those steps specifically that you did with Barbara.  Is that

09:53:43  9    fair?

09:53:43  10   A.   Yes.

09:53:43  11   Q.   Could you take us through your history, what you gathered

09:53:48  12   in regard to Barbara's case?

09:53:50  13   A.   The most important aspect of her history is that she

09:53:53  14   didn't regrow hair after chemotherapy.  So she had

09:54:00  15   breast cancer.  She had chemotherapy.  At the end of

09:54:05  16   chemotherapy, the hair didn't grow back.  Okay.  Usually when

09:54:09  17   you have chemotherapy, we know you lose hair, but then the hair

09:54:14  18   grow back.  In this situation, didn't.

09:54:16  19   Q.   Now, Doctor, during this history, were you made aware of

09:54:20  20   the drugs that Barbara Earnest took, the chemotherapy drugs, as

09:54:26  21   well as the order that she took those drugs in?

09:54:28  22   A.   Yes, of course I did.  So she first had the two

09:54:33  23   chemotherapy therapy together, that is called *AC*, and she had

09:54:37  24   that chemotherapy.  During that chemotherapy, had she had

09:54:42  25   hair loss and lost all her hair.

*OFFICIAL TRANSCRIPT*

09:54:44  1          After that, she had docetaxel, Taxotere.  When she
09:54:52  2   had Taxotere, she had no hair at that moment.  After Taxotere,
09:54:56  3   the hair didn't grow back.
09:55:01  4   Q.   You indicated that you performed a physical exam of
09:55:06  5   Barbara; is that correct?
09:55:06  6   A.   Yes.
09:55:07  7   Q.   Did you take photographs of Barbara's scalp?
09:55:10  8   A.   Yes, I did, because with this instrument, you need to take
09:55:12  9   also photographs to take the dermoscopy.  So I did.
09:55:17 10   Q.   So you took the dermoscopy photos, correct?
09:55:21 11   A.   I took both.
09:55:22 12   Q.   Both.  And by *both*, you mean you took just regular
09:55:27 13   photographs as well?
09:55:28 14   A.   This instrument that does the dermoscopy, you need first
09:55:33 15   to take a regular photo and then to do the dermoscopy.
09:55:36 16   Q.   And with Barbara's permission, as part of you explaining
09:55:44 17   her condition, I'm going to show us all photographs of
09:55:49 18   Barbara's scalp.  Would that assist you in explaining to the
09:55:53 19   jury what you did?
09:55:54 20   A.   Yes.  If she's okay with that.
09:56:06 21          So, what you can see here is that she has a very
09:56:12 22   severe and diffuse alopecia that involves all the top and the
09:56:17 23   back of her scalp and the side.  She has just a very minimal
09:56:24 24   hair that's on the occipital and the parietal scalp.
09:56:31 25   Q.   Can you slow down right there.  You just used a couple of

*OFFICIAL TRANSCRIPT*

09:56:36  1   scientific words that we may not understand.  So if you could

09:56:39  2   go over those again, please.

09:56:40  3   A.    So, she has some remaining hair in the back here and on

09:56:44  4   the lateral side here.  But the top is almost -- very thin,

09:56:53  5   fuzzy hair.  And her longest hair was 10 centimeter, you know,

09:57:00  6   which is very, very typical, we'll discuss later, of her

09:57:06  7   problem.

09:57:06  8         And she also lost -- had very, very thin eyebrows and

09:57:15  9   eyelashes.  And I also examined other body areas.  So she had

09:57:19 10   no hair in the arms and legs and no hair in the armpits, almost

09:57:27 11   no pubic hair.  So all the hair is basically gone.

09:57:34 12   Q.    Doctor, you indicated that you performed a pull test.  You

09:57:43 13   demonstrated for the jury what that was.  As part of your

09:57:47 14   clinical exam -- or as part of your clinical evaluation,

09:57:50 15   rather, did you do that in Barbara's case?

09:57:53 16   A.    Yes, but you couldn't get even one hair.  She doesn't have

09:57:58 17   almost hair, so it's very difficult to get hair in this

09:58:01 18   situation.  But negative, it was negative.

09:58:04 19   Q.    So the pull test --

09:58:05 20   A.    Was negative.

09:58:06 21   Q.    -- just so I'm clear, was negative?

09:58:07 22   A.    Was negative.

09:58:08 23   Q.    Okay.  And then did you use the dermatoscope on Barbara's

09:58:17 24   scalp?

09:58:17 25   A.    Yes.

*OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 10:01:37 | 1 | THE COURT:  And if during the course of your testimony |
| 10:01:42 | 2 | you're called to look upon your prior deposition, if they skip |
| 10:01:47 | 3 | over the mention of those other two women, I'm going to ask you |
| 10:01:50 | 4 | to ignore that. |
| 10:01:52 | 5 | THE WITNESS:  Okay.  Thank you very -- |
| 10:01:54 | 6 | THE COURT:  Thank you. |
| 10:01:54 | 7 | (WHEREUPON, at this point in the proceedings, the bench |
| 10:01:54 | 8 | conference concluded.) |
| 10:01:54 | 9 | EXAMINATION BY MR. SCHANKER: |
| 10:02:15 | 10 | Q.   So you indicated that you performed the dermoscopy, and at |
| 10:02:23 | 11 | Step Number 4, what's the jury looking at, Doctor? |
| 10:02:25 | 12 | A.   They are looking at a small area of the scalp that is |
| 10:02:32 | 13 | magnified.  So you can see very well the hair, and you can see |
| 10:02:35 | 14 | what's very evident is that the density of the hair is reduced. |
| 10:02:39 | 15 | So normally you have much more hair and less space between the |
| 10:02:43 | 16 | hair. |
| 10:02:46 | 17 | They are all very thin.  And you see these yellow |
| 10:02:49 | 18 | dots.  You see those yellow dots.  Those correspond to the |
| 10:02:53 | 19 | upper part of the follicle that is full of sebum because in -- |
| 10:03:01 | 20 | the follicle has these glands that produce the oil that may |
| 10:03:06 | 21 | have on the scalp, and usually sebum is pushed out by the hair, |
| 10:03:11 | 22 | but here there are no hair, and so you have those yellow dots. |
| 10:03:15 | 23 | Q.   So I want to ask you about a couple of those things that |
| 10:03:20 | 24 | you just mentioned.  You said low hair density.  Could you |
| 10:03:26 | 25 | please explain to the jury what you mean by *low hair density*? |

**OFFICIAL TRANSCRIPT**

10:03:30 1    A.    You see here that you have a space between the hair.

10:03:34 2    Normally you should have one hair close to the other one.

10:03:41 3    Q.    You also mentioned hair thinning.  Is there a distinction

10:03:45 4    between hair density and hair thinning?

10:03:48 5    A.    You know, they may go together, but here you see that you

10:03:53 6    have less hair -- let's see if I can make it -- this area that

10:03:56 7    have no hair.  Okay?  And then you see that this hair, for

10:04:00 8    instance, is much thinner than this one.  So, you have some

10:04:04 9    hair that became very loose, that became thinner, miniaturized.

10:04:04 10         THE REPORTER:  What did you say?

10:04:04 11         THE WITNESS:  Miniaturized.

10:04:13 12   EXAMINATION BY MR. SCHANKER:

10:04:13 13   Q.    So we see some -- just so I'm clear, too, along with

10:04:19 14   Cathy, we see some hairs that are miniaturized; is that right?

10:04:24 15   A.    Yes.  Then we see all these yellow dots are openings

10:04:27 16   without the hair.  The hair is so small that you don't see it.

10:04:31 17   Q.    Doctor, working through the steps --

10:04:39 18         MS. SASTRE:  Objection.

10:04:39 19         THE COURT:  Yes.  I think we need to approach.  Was

10:04:39 20   there an objection?

10:04:39 21         MS. SASTRE:  Yes.

10:04:39 22         (WHEREUPON, at this point in the proceedings, there was

10:04:50 23   a conference held at the bench.)

10:04:50 24         MS. SASTRE:  The yellow dots was taken out of the

10:04:50 25   slide.  It was my understanding she was told not to talk about

**OFFICIAL TRANSCRIPT**

10:06:02  1    conference concluded.)

10:06:02  2            THE COURT:  Please proceed.

10:06:05  3            MR. SCHANKER:  Thank you, Your Honor.

10:06:05  4    EXAMINATION BY MR. SCHANKER:

10:06:07  5    Q.    So working our way through the clinical evaluation,

10:06:10  6    Dr. Tosti, after the dermoscopy and analyzing your findings,

10:06:17  7    what -- what did you do next as far as your analysis?  What are

10:06:23  8    the steps?  What came next?

10:06:25  9    A.    After that, I -- she already had biopsy results because

10:06:29 10    she had the biopsy before, so I looked at her biopsy results.

10:06:34 11    And I didn't order any lab because she was not shedding hair or

10:06:38 12    she had no features that suggested any hormonal problem.

10:06:46 13    Q.    We'll talk about those biopsy results later.  But what I

10:06:50 14    would like to move on to now -- and just to clarify, you didn't

10:06:55 15    order the lab tests?

10:06:56 16    A.    No, I did not because she didn't need.

10:06:59 17    Q.    Doctor, are you familiar with a phrase *differential*

10:07:16 18    *diagnosis*?

10:07:16 19    A.    Yes, I do.

10:07:17 20    Q.    And could you please explain to the jury what -- for a

10:07:23 21    medical doctor, what a differential diagnosis is.

10:07:25 22    A.    You know, when you see a patient, you see a condition in

10:07:29 23    your head came, all the conditions that may look similar, and

10:07:34 24    you have -- one by one, compare and decide.  This is all in

10:07:40 25    medicine for any type of problem.

                                    *OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 10:07:42 | 1 | Q.   And just so I'm clear, is that -- how does a doctor use a |
| 10:07:49 | 2 | differential diagnosis in her practice? |
| 10:07:53 | 3 | A.   To -- use a differential diagnosis to rule out the other |
| 10:07:57 | 4 | possible diseases.  Because you have, for instance, somebody |
| 10:08:01 | 5 | who complains that he has pain in the chest, and you have to |
| 10:08:06 | 6 | rule out all possible causes of chest pain.  The same is for |
| 10:08:11 | 7 | hair.  I see a diffuse alopecia, I have to exclude the other |
| 10:08:16 | 8 | possible causes of diffuse alopecia. |
| 10:08:18 | 9 | Q.   And did you perform a differential diagnosis on Barbara? |
| 10:08:24 | 10 | A.   Yes, I did. |
| 10:08:24 | 11 | Q.   And just so we're clear, I understand you were educated in |
| 10:08:29 | 12 | Europe as a medical doctor.  Do they do differential diagnoses |
| 10:08:35 | 13 | in Europe? |
| 10:08:35 | 14 | A.   They do, but in a different way.  So, in Europe, you |
| 10:08:39 | 15 | usually go to the diagnoses and then exclude.  In the |
| 10:08:45 | 16 | United States, we go one by one.  Now I do go around in the |
| 10:08:51 | 17 | United States, we go one by one. |
| 10:08:52 | 18 | Q.   And which way did you do it in Barbara's case? |
| 10:08:56 | 19 | A.   I did the United States way. |
| 10:08:57 | 20 | Q.   And is that what you're going to share with us here? |
| 10:09:00 | 21 | A.   Yes. |
| 10:09:01 | 22 | Q.   So, based upon the condition that you found on |
| 10:09:07 | 23 | Barbara Earnest's scalp, what did you consider in working |
| 10:09:13 | 24 | through your differential diagnosis? |
| 10:09:15 | 25 | A.   I consider those conditions that cause diffuse hair loss. |

*OFFICIAL TRANSCRIPT*

10:09:21   1   And I consider, first of all, telogen effluvium.

10:09:30   2   Q.   Let me stop you there.  I want to make sure because

10:09:31   3   there's a lot of technical terms there.  Diffuse hair loss.

10:09:33   4   What is diffuse hair loss?

10:09:35   5   A.   Diffuse hair loss.  Maybe I didn't explain why.  Meaning

10:09:40   6   diffuse alopecia, meaning when you have almost no hair left,

10:09:45   7   okay.  And there are conditions that can cause that, and I

10:09:51   8   wanted to exclude those conditions.

10:09:52   9   Q.   So you started out with diffuse and then worked through

10:09:57  10   those potential conditions; is that fair?

10:09:58  11   A.   Yes.  Of course.

10:10:00  12   Q.   What was the first of those conditions that you considered

10:10:07  13   in your differential diagnosis?

10:10:09  14   A.   You know, first of all, you have to see if the patient is

10:10:13  15   shedding or not, okay, because it's very different a patient

10:10:19  16   who lose hair on his food, on his pillow, on his books from a

10:10:24  17   patient who doesn't lose any hair.  That was the most important

10:10:28  18   thing to decide.

10:10:30  19        And so if you see that the patient does not shed and

10:10:36  20   has a negative pull test, then you can exclude telogen

10:10:40  21   effluvium, because telogen effluvium is a condition

10:10:44  22   characterized by shedding, okay.

10:10:46  23   Q.   So you just used another term I want to make sure we

10:10:50  24   understand.  You considered this condition called *telogen*

10:10:53  25   *effluvium*?

**OFFICIAL TRANSCRIPT**

10:10:53  1   A.   Yes.

10:10:54  2   Q.   And what does a patient who has that present with?

10:11:01  3   A.   You know, they come and they say they found hair

10:11:04  4   everywhere.  Okay.  They found it on the floor.  They found

10:11:10  5   hair on the pillow.  They found hair on their books.  So

10:11:17  6   they -- their main complaint is they come with those bags of

10:11:20  7   hair because they shed.

10:11:23  8   Q.   And what are the results of a pull test if a patient --

10:11:28  9   A.   Very positive.  Very positive.  Very -- in these patients,

10:11:32 10   it's very positive.  Very different from Barbara, where it was

10:11:35 11   negative.

10:11:35 12   Q.   And the dermoscopy, if a patient has telogen effluvium,

10:11:41 13   what do you see on the dermoscopy?

10:11:43 14   A.   I explain you that when the follicle -- the hair fall down

10:11:47 15   when the new hair is growing.  So when you see a patient with

10:11:50 16   telogen effluvium, you see all the new hair growing on the

10:11:53 17   scalp.

10:11:53 18   Q.   And if a patient who has these conditions you described,

10:11:59 19   has telogen effluvium, what causes telogen effluvium?

10:12:03 20   A.   Many causes.  Drugs, medications cause telogen effluvium.

10:12:07 21   Almost all medications, if you look inside, they say may cause

10:12:12 22   that.  Inflammatory disorders, severe disease, nutritional

10:12:24 23   deficiencies, all these things.  But there is a long list.

10:12:28 24   Q.   So, Doctor, did you reach a conclusion in this case as to

10:12:34 25   whether or not Barbara Earnest suffers from telogen effluvium?

*OFFICIAL TRANSCRIPT*

10:12:36  1    A.    Yes.  She did not have telogen effluvium, because history

10:12:42  2    is different and everything is different.

10:12:44  3    Q.    And you went through and gave the reasons.  Any more to

10:12:49  4    add?  What you see here summarizes that, fair?

10:12:53  5    A.    Okay, so, you want me to summarize?

10:12:56  6    Q.    No.

10:12:56  7    A.    I already told them.

10:12:57  8    Q.    Yeah, you already told them.  Thank you.  Feel free to do

10:13:02  9    that.

10:13:05  10          So, you continued on with your differential

10:13:09  11   diagnosis, correct?

10:13:10  12   A.    Okay.  Yes.

10:13:11  13   Q.    What was the next condition that you considered for

10:13:14  14   Barbara?

10:13:14  15   A.    You know, she had chemotherapy, so you have to consider

10:13:17  16   anagen effluvium, which is the hair loss caused by

10:13:23  17   chemotherapy.  So when everybody -- most patients in

10:13:28  18   chemotherapy, they lose their hair, and this happens usually

10:13:32  19   two, three weeks after starting the chemotherapy.  And patients

10:13:36  20   usually shave because they don't want to see all of this hair

10:13:40  21   all around.

10:13:41  22   Q.    They usually do what?

10:13:43  23   A.    Shave.

10:13:44  24   Q.    Shave their head?

10:13:45  25   A.    Yes, because they don't want to see hair like that coming

*OFFICIAL TRANSCRIPT*

10:13:49  1    out.  And so that's a condition that should be ruled out, but

10:13:57  2    it's very different because this is an acute condition that

10:14:02  3    happens with chemotherapy and usually resolves, let's say,

10:14:07  4    three months after chemotherapy, the hair grow back.

10:14:10  5    Q.   And in Barbara Earnest's case, do you recall what year,

10:14:15  6    what time period she received her chemotherapy during?

10:14:17  7    A.   Yes, she received her chemotherapy in 2011, and the hair

10:14:24  8    never grow back.  Grow back like that.

10:14:28  9    Q.   Grew back the little bit that we saw?

10:14:28 10    A.   Uh-huh.

10:14:31 11    Q.   So, Doctor, did Barbara suffer from anagen effluvium?

10:14:38 12    A.   No.

10:14:39 13    Q.   So, just so we're clear, this is that condition of when

10:14:42 14    people go through chemotherapy and their hair falls out?

10:14:46 15    A.   Yes, and occurs during the chemotherapy, and the hair

10:14:49 16    regrow.

10:14:49 17    Q.   What is the next condition that -- as your differential

10:15:03 18    diagnosis, what was next on your list of conditions that you

10:15:05 19    considered?

10:15:05 20    A.   I think it was androgenetic alopecia.  Androgenetic

10:15:05 21    alopecia is a common condition, so I wanted to consider in the

10:15:05 22    differential diagnosis, even though the presentation is

10:15:05 23    different.

10:15:18 24         So androgenetic alopecia is also called *female*

10:15:18 25    *pattern hair loss*.  It's the same, that baldness in women.  So

**OFFICIAL TRANSCRIPT**

10:15:30  1    women may become a little bit bald sometimes.  This baldness

10:15:34  2    affect typically the top of the scalp.

10:15:36  3            This is a condition that start slowly.  It's not

10:15:40  4    something that sudden.  It's -- the pull test may be positive.

10:15:48  5    Here, we see, these are the scales that are used by doctors to

10:15:56  6    establish severity of androgenetic alopecia.

10:16:04  7    Q.   Let me stop you there, Doctor.  I think we need to break

10:16:04  8    this down, if we could.

10:16:05  9            So the next condition that you considered was called

10:16:09 10    *androgenic alopecia*; is that correct?

10:16:11 11    A.   You can call *androgenic*.  Androgenetic, I like more.

10:16:15 12    Q.   You like --

10:16:17 13    A.   Androgenetic, or female pattern hair loss.

10:16:24 14    Q.   Androgenetic alopecia or female pattern hair loss.

10:16:28 15            What's the time frame for this condition,

10:16:33 16    androgenetic alopecia?  I mean, does it happen overnight?  Does

10:16:36 17    it happen over a period of time?  Please educate the jury on

10:16:41 18    that.

10:16:41 19    A.   You know, it's usually -- I always tell them, usually it's

10:16:46 20    slowly progressive.  It's something that slowly progress.

10:16:49 21    Q.   When you say *slowly progress*, in your scientific medical

10:16:53 22    experience, what is the progression of that condition, over how

10:16:57 23    long a period of time?

10:16:58 24    A.   Slowly means a few years.  Okay.  Sometimes maybe more.

10:17:02 25    Not months.  Not months.

***OFFICIAL TRANSCRIPT***

| | | |
|---|---|---|
| 10:18:40 | 1 | A.   The one at the top is Ludwig Scale.  It's just for type, |
| 10:18:46 | 2 | normal, type 1, type 2 and type 3. |
| 10:18:50 | 3 | Then some doctors like to use a more detailed scale. |
| 10:18:54 | 4 | Especially if you do a clinical trial for hair regrow, you want |
| 10:18:58 | 5 | to have more options.  That's the Savin Scale.  But they are |
| 10:19:04 | 6 | basically the same, the top of the scalp. |
| 10:19:07 | 7 | Q.   So the top of the scalp.  You distinguish between male |
| 10:19:13 | 8 | pattern and female pattern.  Can you point on your head to |
| 10:19:17 | 9 | where that is, just so we can see? |
| 10:19:19 | 10 | A.   That's the top.  That's the back. |
| 10:19:21 | 11 | Q.   So in your clinical experience, as well as your work as a |
| 10:19:28 | 12 | researcher, do you see women who suffer from female pattern |
| 10:19:33 | 13 | hair loss who have lost hair on the back of her scalp? |
| 10:19:37 | 14 | A.   Back of their scalp down there, no.  I've never seen |
| 10:19:42 | 15 | anything like that. |
| 10:19:42 | 16 | Q.   What about eyebrows and eyelashes, with this androgenetic |
| 10:19:53 | 17 | alopecia do you see loss of eyebrows, eyelashes, underarm hair, |
| 10:19:59 | 18 | other hair on the body? |
| 10:20:00 | 19 | A.   No.  No.  Eyebrow and eyelashes, absolutely not.  Other |
| 10:20:06 | 20 | hair on the body, they may be -- may grow more, so you see the |
| 10:20:10 | 21 | opposite.  Because androgenetic alopecia, the name androgenetic |
| 10:20:18 | 22 | is because androgen hormones genetic predisposition. |
| 10:20:26 | 23 | So androgen hormone cause the hair on the scalp to |
| 10:20:26 | 24 | become thinner, but the hair on the body to become thicker.  So |
| 10:20:30 | 25 | that's what I was saying.  If I see a woman that has hair on |

*OFFICIAL TRANSCRIPT*

10:20:34  1    the body, I'm concerned she may have excessive hormones.

10:20:38  2    Q.    You did a physical exam of Barbara Earnest; is that

10:20:44  3    correct?

10:20:44  4    A.    Yes.  I explained before, she had no hair on her arm and

10:20:51  5    legs, and no axillary, and almost no pubic hair.

10:20:57  6    Q.    So you did not see any excessive body hair?

10:20:59  7    A.    No, the opposite.

10:21:00  8    Q.    Doctor, did Barbara's lack of hair regrowth match the

10:21:18  9    presentation of androgenetic alopecia?

10:21:19  10   A.    No, that's not my opinion, absolutely not.  And, also, her

10:21:24  11   family history from the women side, which is the most

10:21:28  12   important, was negative.

10:21:28  13   Q.    Okay.  Let's talk about Barbara first.  You've seen this

10:21:35  14   photograph before, correct?

10:21:36  15   A.    Yes, this is her photograph, I know, from a trip to

10:21:39  16   Grand Canyon.  That was taken, I think, less than one year

10:21:46  17   before chemotherapy.  I think she has absolutely a normal

10:21:56  18   quantity of hair, hair density.

10:22:02  19   Q.    So do you see any signs, whether it be the photograph or

10:22:11  20   the history that you got from Barbara Earnest, that she

10:22:14  21   suffered from any sort of androgenetic alopecia?

10:22:18  22   A.    No.

10:22:18  23   Q.    You also mentioned female family members, blood relatives.

10:22:30  24   Why is it important when you're making this diagnosis for you

10:22:34  25   to consider female family members?

*OFFICIAL TRANSCRIPT*

10:22:37  1    A.    You know, because it's called *androgenetic* because you may

10:22:42  2    have a genetic disposition.   In women, I look for female

10:22:49  3    members in the family to see if they have any sign of the

10:22:52  4    disease.   In this case, she said no.

10:22:55  5         These are pictures of her sisters.   These are taken

10:23:01  6    at the 80 birthday of her sister, the one on the right is 80.

10:23:07  7    The other one, I don't know the age, but they have completely

10:23:11  8    normal hair.

10:23:12  9    Q.    Now, we talked about the female members of the family.

10:23:19  10   These are blood relatives, you were told, correct?

10:23:22  11   A.    Yes.

10:23:23  12   Q.    Yes.

10:23:26  13   A.    I also ask about her mother.

10:23:29  14   Q.    Yes.   That's what I was going to say.   What did you learn

10:23:32  15   concerning Barbara's mother, who is deceased?

10:23:36  16   A.    Also, no problem -- hair problem.

10:23:38  17   Q.    What about this idea of age and hair counts?

10:23:48  18   A.    You know, of course, when we age, everything gets worse.

10:23:54  19   The hair as well.   Okay.

10:23:56  20        So, there is a little bit of thinning of the hair

10:24:02  21   with aging.   But if you look at the numbers -- and this is a

10:24:06  22   very good paper of David Whiting, who is the most important

10:24:13  23   pathologist on hair -- and you look at the different condition.

10:24:18  24   Here is female pattern hair loss, and here is men.   We don't

10:24:23  25   want to look at me.   This is diffuse hair loss.

*OFFICIAL TRANSCRIPT*

| | |
|---|---|
| 10:24:24 | 1 |

What you see here, from 70 to 79, to 99, you see the numbers.  There is a decrease from 20, but they're still high.  You know, Barbara count is 15.  Here, it's 28.  So it's nothing that may cause severe alopecia.

You know, most old people have normal amount of hair.  Okay.  They are white, of course, but thinning is not part of aging.

Q.   Now, just because it comes to mind, we talked -- when you consider the female members, blood relatives of a patient, do you take into consideration the male relatives?

A.   The male relatives are not as important, but I know that in the male side of the family, her brother and her son had problems; but, you know, the sister, no.

Q.   So you took that into consideration too?

A.   I don't think that's important.  The female part of the family has normal hair, and the patient itself had normal hair.

Q.   So, Doctor, if you could, walk us through Barbara Earnest's presentation with her hair pattern compared to what you see as a scientist and medical professional with women with female pattern hair loss, if you would.

A.   You know, I think that everybody can see that her loss was much more severe than any type of female pattern hair loss that can happen.

Q.   So let's specifically go through some of the things you laid out.  When we see the profile and the back picture of

*OFFICIAL TRANSCRIPT*

10:26:36 1   Barbara Earnest, the back of her scalp --

10:26:39 2   A.   I think this is the most important picture, okay, because

10:26:42 3   here you see that she has hair loss practically everywhere.

10:26:47 4   Even the rim over here is not normal.

10:26:51 5   Q.   I'm sorry, the what was not normal?

10:26:52 6   A.   The rim of hair, the hairline, the back hairline, you see,

10:27:00 7   it's thin.

10:27:01 8   Q.   Could you, with your pen, touch exactly what you're

10:27:06 9   referring to, please.

10:27:07 10   A.   Here.

10:27:08 11   Q.   So why is that important to you?

10:27:13 12   A.   Because in female pattern hair loss, the back of the scalp

10:27:19 13   is typically not involved in women.  Even in men, it's never so

10:27:24 14   involved.

10:27:24 15   Q.   Now, you've used this phrase *diffuse* -- or this word

10:27:29 16   *diffuse*, diffuse hair loss.  Do you typically see diffuse

10:27:33 17   hair loss with female pattern hair loss?

10:27:37 18   A.   Sometimes you can, okay, but it's the degree of severity

10:27:43 19   that is completely different.

10:27:44 20   Q.   Explain that to us, if you would.

10:27:46 21   A.   You know, in some women, you may have a little bit of

10:27:49 22   thinning on the side, a little bit of thinning of the back, but

10:27:53 23   never loss, complete loss like here, with no hair on the back.

10:27:59 24   Q.   Doctor, what I'd like to show you is example of male

10:28:08 25   pattern hair loss.  What is this we're looking at here?

**OFFICIAL TRANSCRIPT**

10:29:54  1    the hair to become thin and thin and invisible.

10:29:58  2            But not all the scalp react to androgens.  There are

10:30:04  3    these area that do not.  They are androgen independent.  That's

10:30:08  4    why you can utilize those area for hair transplantation.

10:30:16  5            But my idea is that even the men with the worst

10:30:18  6    scenarium has this part preserved, has the hair in this area

10:30:31  7    preserved.

10:30:31  8    Q.    So even men who have more dramatic hair loss, when you say

10:30:36  9    they have that hair preserved, what does that mean?

10:30:39  10   A.    They have it as in this picture.  The hair in that area is

10:30:43  11   normal.

10:30:43  12   Q.    Then compare that, if you would, to what you see with

10:30:51  13   Barbara.  Do you see that hair preserved there, as you're

10:30:54  14   referring to?

10:30:54  15   A.    I was saying that even this hair is very thin.  You can

10:30:57  16   see the skin through this hair here.  So it's very, very thin.

10:31:06  17   So the hair loss is more severe than the worst scenarium of

10:31:14  18   male pattern hair loss.

10:31:15  19   Q.    So, Doctor, does Barbara Earnest suffer from androgenetic

10:31:25  20   alopecia?

10:31:25  21   A.    No.

10:31:25  22   Q.    I don't want to make you repeat everything.  For all the

10:31:34  23   reasons you went through?

10:31:34  24   A.    Yes.

10:31:35  25   Q.    In your differential diagnosis, did you consider a

*OFFICIAL TRANSCRIPT*

10:31:46  1    condition called *alopecia areata*?

10:31:58  2    A.    Yes, I did.

10:31:59  3    Q.    What is alopecia areata?

10:31:59  4    A.    Alopecia areata is a very common disorder that usually

10:32:00  5    cause patches of hair loss, but sometimes can cause -- lose of

10:32:04  6    all your hair.  So you can be without any hair on your scalp,

10:32:09  7    on your eyebrows, on your eyelashes.

10:32:14  8          But in alopecia areata, you have no hair, which is

10:32:19  9    different than in Barbara's situation, when you have this fuzzy

10:32:27 10    hair.

10:32:28 11    Q.    So that's true loss of all hair, alopecia areata can be?

10:32:33 12    A.    Yes.  The one in differential, yes, because she has no

10:32:36 13    patches.  It's not a patchy alopecia there.

10:32:42 14    Q.    So you considered alopecia areata; is that correct?

10:32:45 15    A.    I did.

10:32:45 16    Q.    Let's just walk through what we see here, just what we see

10:32:52 17    here, alopecia areata and how that presents, and then how

10:32:58 18    Barbara Earnest presented, so we understand how you reached

10:33:00 19    your conclusion.

10:33:02 20          I should have you state that first.  Do you believe

10:33:04 21    that Barbara suffered from alopecia areata?

10:33:09 22    A.    No.  I think alopecia areata was really not in the

10:33:12 23    differential, but I'm going to go through the slide --

10:33:15 24    Q.    When you say it wasn't even in the differential, what does

10:33:17 25    that mean?

**OFFICIAL TRANSCRIPT**

10:33:18 1    A.    Because the clinical examination is very different.  The

10:33:23 2    skin is like no hair at all, smooth.  They don't have any hair

10:33:30 3    left.

10:33:30 4    Q.    So then why don't we just quickly move through this, just

10:33:34 5    so the jurors understand it.

10:33:36 6    A.    Yes.

10:33:36 7    Q.    Go ahead, if you can take us through --

10:33:39 8    A.    The history in alopecia areata, they have a history of

10:33:45 9    acute hair loss.  They may lose all the hair in a few weeks.

10:33:52 10   From patchy can become complete.  When they still have hair,

10:33:58 11   the pull test is positive.  When they have no hair, of course,

10:34:02 12   is negative.

10:34:12 13   Q.    So in Barbara's case, did you do a pull test that showed

10:34:18 14   negative, correct?

10:34:19 15   A.    Yes.

10:34:19 16   Q.    If it was alopecia areata, it would have been what result?

10:34:25 17   A.    Depend on the phase.  If it's alopecia areata that's still

10:34:30 18   losing hair, it's positive.  But it's already completely

10:34:34 19   without hair, it's negative, has no hair.

10:34:38 20   Q.    So, as you indicated, you considered alopecia areata,

10:34:44 21   although it wasn't in the differential diagnosis.  What was

10:34:46 22   your conclusion?

10:34:47 23   A.    That she has not alopecia areata.

10:34:50 24   Q.    Doctor, moving through your differential diagnosis, did

10:35:13 25   you consider what's referred to as EIA, endocrine-induced

**OFFICIAL TRANSCRIPT**

10:35:21 1  alopecia?

10:35:22 2  A.   Okay.  Yes, I did.  Also, because Barbara was -- is still

10:35:29 3  taking a medication that is an aromatase inhibitor, and that

10:35:37 4  has been reported to cause -- possibly cause this

10:35:43 5  endocrine-induced alopecia.

10:35:45 6  Q.   So let's make sure we walk through this.  So

10:35:54 7  endocrine-induced alopecia.

10:35:59 8  A.   You want me to explain, or you want to me ask?

10:36:02 9  Q.   Yes.  Let's have you explain.

10:36:04 10  A.   Okay.  So this is a type of alopecia due to medications

10:36:10 11  that block the estrogen activity.  Because in women with

10:36:18 12  breast cancer, when the cancer is positive to estrogens, we

10:36:22 13  give medication to prevent estrogens to stimulate the cancer.

10:36:28 14        So these medications are antiestrogens, or

10:36:34 15  aromatase inhibitor.  This medication can cause androgenetic

10:36:34 16  alopecia.  It basically is a type of androgenetic alopecia due

10:36:44 17  to this medication.

10:36:45 18  Q.   Let's kind of just make sure the jury understands the

10:36:48 19  history for Barbara Earnest.  She finished her chemotherapy

10:36:52 20  approximately when?

10:36:53 21  A.   She finished chemotherapy, I think, in June.  Because she

10:37:03 22  started the aromatase inhibitor in November, three months after

10:37:08 23  chemotherapy.  No, November, October, September, August.

10:37:15 24  Q.   So Barbara Earnest finished her chemotherapy --

10:37:19 25  A.   Yes.

*OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 10:37:20 | 1 | Q.    -- and then, at some point, went on what you referred to |
| 10:37:24 | 2 | as the aromatase inhibitor? |
| 10:37:24 | 3 | A.    Yes. |
| 10:37:28 | 4 | Q.    Arimidex, correct? |
| 10:37:30 | 5 | A.    Yes.  She finished chemotherapy.  She had the -- therapy |
| 10:37:34 | 6 | after that.  So after three months, she started the |
| 10:37:38 | 7 | aromatase inhibitor. |
| 10:37:38 | 8 | But this type of alopecia, you have hair, and you |
| 10:37:42 | 9 | lose hair during the medication.  So, in this case, you have |
| 10:37:47 | 10 | normal hair after chemotherapy.  You start the medication. |
| 10:37:50 | 11 | This medication slowly cause androgenetic alopecia. |
| 10:38:00 | 12 | So the chronology is completely different, because |
| 10:38:00 | 13 | she had no hair when she started the medication, and the |
| 10:38:04 | 14 | situation remained the same. |
| 10:38:08 | 15 | Q.    So this drug that she's on is called *Arimidex*? |
| 10:38:12 | 16 | A.    Yes.  It's an aromatase inhibitor. |
| 10:38:17 | 17 | Q.    This inhibits some hormones; is that right? |
| 10:38:22 | 18 | A.    Yes. |
| 10:38:22 | 19 | Q.    You were explaining to the jury, I believe, that it |
| 10:38:28 | 20 | interferes with androgen -- the androgen balance in the female |
| 10:38:31 | 21 | body; is that right? |
| 10:38:31 | 22 | A.    Yes. |
| 10:38:31 | 23 | Q.    What type of presentation or impact does |
| 10:38:39 | 24 | aromatase inhibitor, like Arimidex, have on a woman's hair? |
| 10:38:42 | 25 | A.    You see, here is a picture from the literature.  It's |

**OFFICIAL TRANSCRIPT**

10:38:45  1    hair loss on the top, like androgenetic alopecia -- Gladwell.

10:38:55  2    Q.    Now, Doctor, are you aware that Barbara Earnest is still

10:39:01  3    on this particular type of drug?

10:39:05  4    A.    Yes, of course.

10:39:06  5    Q.    So, how in this case, with the fact that she's still

10:39:11  6    taking -- do you know how this -- this drug is taken with a

10:39:14  7    pill?

10:39:14  8    A.    Uh-huh (affirmative response).  Yes.

10:39:15  9    Q.    How in this case do you rule out Barbara's type of

10:39:26 10    alopecia, the diffuse alopecia, with comparison to the alopecia

10:39:31 11    or hair loss that is caused by the aromatase inhibitor?  Take

10:39:44 12    us through that, if you would.

10:39:44 13    A.    First of all, the severity.  So, clinically, it's much

10:39:45 14    more severe than the alopecia due to endocrine medication, but

10:39:50 15    is more similar to the androgenetic alopecia.

10:39:56 16    Q.    Well, let me stop you there, just to make sure we

10:39:58 17    understand.  So the endocrine drug can cause some type of hair

10:40:04 18    thinning?

10:40:04 19    A.    Yes.

10:40:05 20    Q.    Okay.

10:40:07 21    A.    They do.

10:40:08 22    Q.    Can you describe to the jury the type of hair thinning

10:40:12 23    that is caused by this type of endocrine therapy?

10:40:19 24    A.    It's hair thinning that is very similar to androgenetic

10:40:23 25    alopecia because the mechanism is similar.  So it cause

*OFFICIAL TRANSCRIPT*

10:40:28 1    miniaturization, so thinning of the hair on the top of the

10:40:32 2    scalp.  But they don't cause diffuse hair loss severe like

10:40:37 3    this.

10:40:37 4    Q.    So, I'm assuming -- well, just let me ask.  You indicated

10:40:41 5    that the aromatase inhibitor drug, Arimidex, that Barbara takes

10:40:50 6    mimics or presents like some form of androgenic alopecia?

10:40:53 7    A.    The type of hair loss is very similar.

10:40:56 8    Q.    So, does that mean that the pattern is similar?

10:41:00 9    A.    Yes.

10:41:01 10   Q.    The pattern between the Arimidex drug hair loss and

10:41:10 11   androgenetic hair loss is similar?

10:41:12 12   A.    Yes.

10:41:12 13   Q.    Are those patterns similar to what Barbara Earnest has?

10:41:16 14   A.    No, are milder.

10:41:16 15   Q.    I'm sorry?

10:41:21 16   A.    Are not as severe as her hair loss.

10:41:23 17   Q.    Not as severe?

10:41:24 18   A.    Are less severe.  Much less severe.

10:41:29 19   Q.    Have you ever -- have you ever seen Arimidex inhibitor

10:41:40 20   endocrine-induced alopecia caused by this hormone drug, have

10:41:43 21   you ever seen it present in the severity that Barbara Earnest

10:41:47 22   suffers from with her permanent hair loss?

10:41:53 23   A.    Absolutely not.  The chronology also doesn't match because

10:41:58 24   she never grow back the hair.  So it's a different situation.

10:42:01 25   Q.    I think that's important.  Let's walk through that

*OFFICIAL TRANSCRIPT*

10:58:50  1    session.  You may be seated.

10:58:51  2                    Dr. Tosti, I remind you you're still under oath.

10:58:54  3                    Please proceed, Mr. Schanker.

10:58:54  4    EXAMINATION BY MR. SCHANKER:

10:58:57  5    Q.   Good morning, again.  Dr. Tosti, good morning again.

10:59:00  6           So we were working through your differential

10:59:04  7    diagnosis.  And what conditions have you ruled out, just

10:59:08  8    briefly to cover the names of the conditions we've ruled out up

10:59:12  9    to this point.

10:59:13  10   A.   We rule out telogen effluvium.  We rule out anagen

10:59:21  11   effluvium.  We rule out androgenetic alopecia.  We rule out

10:59:24  12   alopecia areata.  We rule out endocrine-induced alopecia.

10:59:27  13   Q.   So at this point, what is left in your differential

10:59:33  14   diagnosis, Doctor?

10:59:36  15   A.   Permanent alopecia after chemotherapy.

10:59:38  16   Q.   And just so we're clear, there is a difference between

10:59:43  17   permanent alopecia and temporary alopecia?

10:59:46  18   A.   Yes.  This alopecia has been defined as permanent

10:59:52  19   persistent or irreversible, depending on the status, but

10:59:57  20   basically is permanent.

10:59:59  21   Q.   And, Doctor, what is permanent chemotherapy-induced

11:00:03  22   alopecia?

11:00:05  23   A.   It is a type of alopecia that occurs after chemotherapy

11:00:12  24   with certain drug and is characterized by diffuse alopecia

11:00:18  25   involving almost the whole scalp, and the hair are very short

*OFFICIAL TRANSCRIPT*

11:00:27  1    and miniaturized.

11:00:28  2    Q.   And, Doctor, we're looking at a picture.  Is this picture

11:00:33  3    from the medical literature?

11:00:35  4    A.   Yes.  This is a picture from a paper that has been

11:00:38  5    published.  This is the clinical picture showing the

11:00:42  6    presentation of this condition.

11:00:45  7    Q.   And if you could take us through what the indications are

11:00:54  8    that support a diagnosis of permanent chemotherapy-induced

11:00:59  9    alopecia, please.

11:01:02 10    A.   The classical diagnosis depends on history that is

11:01:09 11    incomplete hair regrowth six months after the end of

11:01:14 12    chemotherapy.  And this is Type 2, because there are only two

11:01:19 13    severity grade, unfortunately, because this is what -- the way

11:01:25 14    we grade the severity is just Type 1 and Type 2.

11:01:29 15         So, this is the severe type, which is called *Type 2*,

11:01:34 16    when you have almost -- you know, involvement of almost the

11:01:38 17    whole scalp with thinning.  Severe, severe thinning.  And

11:01:45 18    involvement of eyebrows and eyelashes is also very typical.

11:01:50 19    Q.   Explain that to the jury, if you would, eyebrows and

11:01:54 20    eyelashes.

11:01:54 21    A.   Eyebrows and eyelashes are lost as well.  Become very

11:01:59 22    thin.

11:01:59 23    Q.   And with a presentation of permanent chemotherapy-induced

11:02:03 24    alopecia, what is the result of a pull test?

11:02:07 25    A.   A pull test is usually negative because they have no hair

*OFFICIAL TRANSCRIPT*

11:02:10  1    left.

11:02:11  2    Q.    And then as far as -- let's do this.  You indicated,

11:02:21  3    Doctor, that this particular photograph comes from the

11:02:26  4    literature; is that right?

11:02:27  5    A.    Yes.

11:02:27  6    Q.    And do you remember which study that is?

11:02:33  7    A.    To be honest, I don't know if it was my own study.

11:02:39  8          Yes.  That was my own study.  The study published

11:02:43  9    with Maria Miteva.

11:02:51 10    Q.    What is the name of this study?

11:02:52 11    A.    "Permanent alopecia after systemic chemotherapy:  A

11:02:59 12    clinical pathological study of ten cases."

11:03:00 13    Q.    When was this published?

11:03:02 14    A.    This was published in 2011.

11:03:05 15    Q.    And where was it published?

11:03:07 16    A.    This is *Journal of Dermatopathology*.  I think was the

11:03:13 17    *American Journal of Dermatopathology*.

11:03:30 18          MR. SCHANKER:  Your Honor, may I approach?

11:03:33 19          THE COURT:  Yes, you may.

11:03:33 20    EXAMINATION BY MR. SCHANKER:

11:03:34 21    Q.    Doctor, what was the purpose of this study?

11:03:36 22    A.    This was a study mainly on the pathology, because we

11:03:40 23    wanted to try to put the basis for the pathology of this

11:03:45 24    condition for dermatopathologists to recognize.

11:03:51 25          And this did not only involve permanent alopecia

*OFFICIAL TRANSCRIPT*

| | |
|---|---|
| 11:03:57 | 1 |
| 11:04:00 | 2 |
| 11:04:13 | 3 |
| 11:04:16 | 4 |
| 11:04:16 | 5 |
| 11:04:23 | 6 |
| 11:04:23 | 7 |
| 11:04:25 | 8 |
| 11:04:27 | 9 |
| 11:04:31 | 10 |
| 11:04:32 | 11 |
| 11:04:34 | 12 |
| 11:04:39 | 13 |
| 11:04:42 | 14 |
| 11:04:45 | 15 |
| 11:04:52 | 16 |
| 11:05:00 | 17 |
| 11:05:03 | 18 |
| 11:05:07 | 19 |
| 11:05:09 | 20 |
| 11:05:13 | 21 |
| 11:05:14 | 22 |
| 11:05:14 | 23 |
| 11:05:19 | 24 |
| 11:05:23 | 25 |

after Taxotere.  We also had cases of permanent alopecia from other drugs, including busulfan and I think cisplatin.  So, there were different type of drugs that caused the problem in these patients.

Q.   You mentioned other drugs.  Cisplatin and busulfan; is that right?

A.   Yes.  Not for breast cancer.  For other types of tumors.

Q.   That's what I was going to ask you.  Those other drugs that you mentioned, are those used in breast cancer treatment or for other types of tumors?

A.   They are used for other types of tumor.

Q.   And what is important for the jury to understand concerning this publication?

A.   You know, that the clinical presentation of this patient is absolutely identical to Barbara's clinical presentation.  If you put them together, they look exactly the same.  And, you know, dermatology is very visual.  We look at the skin, we look -- and so, that's why I'm visual and I want to show the visual comparison.

Q.   So this is -- the photograph we were looking at before comes out of this publication?

A.   Yes.

Q.   And you indicated that if we put this photograph of this patient who suffered from --

A.   Permanent alopecia after docetaxel, this particular

*OFFICIAL TRANSCRIPT*

11:05:29  1    patient.

11:05:29  2    Q.    So this is docetaxel or Taxotere?

11:05:31  3    A.    Yes.

11:05:31  4    Q.    And if we put this patient next to Barbara Earnest?

11:05:38  5    A.    You see that the clinical presentation is very, very

11:05:42  6    similar.  They have the same problem.

11:05:45  7    Q.    And so what does this mean to the jury?

11:05:53  8    A.    That they are -- this is the same disease.

11:05:57  9    Q.    Doctor, are there more examples in the literature of this

11:06:10 10    permanent chemotherapy-induced -- bless you -- alopecia --

11:06:16 11          Are there more examples in the literature of this

11:06:19 12    permanent chemotherapy-induced alopecia after Taxotere?

11:06:24 13    A.    Yes, there are many examples.  I think I gave you several.

11:06:39 14    Q.    And when you say gave us, they were materials that you

11:06:42 15    relied upon in preparing your report?

11:06:44 16    A.    Yes.  Those are all the articles in the literature that I

11:06:49 17    utilized for my report.

11:06:51 18    Q.    Doctor, are you familiar with this study?

11:06:59 19    A.    Yes, I am.

11:07:00 20    Q.    Could you please take the jury briefly through this study.

11:07:10 21    And what do you refer to this study as?

11:07:13 22    A.    Martin study.  This is a study done by oncologists.  And

11:07:21 23    they show that 10 percent of patients with -- in treatment with

11:07:29 24    docetaxel and other chemotherapy have severe permanent alopecia

11:07:35 25    after chemotherapy.  But they did not find any case in

*OFFICIAL TRANSCRIPT*

11:11:46  1    EXAMINATION BY MR. SCHANKER:

11:11:53  2    Q.    Doctor, is there more literature and photo evidence that

11:11:58  3    supports your conclusion in this case?

11:12:00  4    A.    Yes.

11:12:00  5    Q.    Can we continue to work through that?

11:12:02  6    A.    Yes.

11:12:02  7    Q.    Doctor, did you present to us this publication?

11:12:14  8    A.    Yes.

11:12:19  9    Q.    Do you recall this?

11:12:21  10   A.    This is a French publication.

11:12:23  11   Q.    And is there photographic support in this treatise or

11:12:32  12   publication?

11:12:32  13   A.    Yes.

11:12:33  14   Q.    Would it assist the jury if I showed them that?

11:12:41  15   A.    Yes.

11:12:43  16   Q.    What are we looking at here?

11:12:50  17   A.    Again, we're looking at the severe alopecia, diffuse

11:12:57  18   severe alopecia.

11:12:58  19   Q.    And this appears to be a slightly different presentation.

11:13:02  20   Explain that.  Is there -- is there anything to draw from that?

11:13:04  21   A.    It's milder.  That's what I was saying before.

11:13:07  22   Q.    It's what?

11:13:08  23   A.    A little less severe, okay, because we have just two

11:13:14  24   grade, and so in Grade 2, you have more severe and less severe.

11:13:22  25   But she needs a wig, so here the distinction is need a wig or

*OFFICIAL TRANSCRIPT*

11:13:27  1    don't need a wig.

11:13:28  2    Q.    And, Doctor, in this case, does Barbara's hair loss meet

11:13:41  3    that of chemotherapy-induced alopecia?

11:13:51  4    A.    Yes, I think so.

11:13:52  5    Q.    Did you continue to go through the literature in your

11:14:00  6    report?

11:14:00  7    A.    Yes.

11:14:01  8    Q.    Doctor, are you familiar with this publication?

11:14:46  9    A.    Yes.

11:14:48 10    Q.    If you could orient the jury to this, tell them about this

11:14:53 11    study which appeared in the *American Academy of Dermatology*.

11:14:58 12    A.    Yes.  This is a study done together from people from

11:15:03 13    United States and people from London.  The main author is

11:15:12 14    Catherine Stefanato, which is -- I know very well.  In this

11:15:15 15    publication, they report patients with the condition.

11:15:19 16    Q.    The main author on this case --

11:15:19 17    A.    Yes, because the main author is always the last author in

11:15:19 18    medical literature.

11:15:19 19    Q.    Have you worked with Dr. Stefanato?

11:15:37 20    A.    I know her very well, yes.  I was invited in London by

11:15:37 21    her.

11:15:38 22    Q.    Did you utilize this report in finding your conclusions in

11:15:43 23    the case that Barbara Earnest's hair loss presentation matched

11:15:47 24    that of permanent chemotherapy-induced alopecia?

11:15:54 25    A.    Yes.

*OFFICIAL TRANSCRIPT*

11:15:54  1    Q.    Was there photographic support in this document?

11:15:54  2    A.    Yes.

11:15:57  3    Q.    Let me show it to you and see.  You recall this?

11:16:01  4    A.    Yes, I do.

11:16:02  5    Q.    What is it that the jury is looking at here?

11:16:06  6    A.    Again, a very diffuse severe alopecia that affects not

11:16:14  7    only the top, but also the back of the scalp, with almost no

11:16:19  8    hair left.

11:16:20  9    Q.    Did you do a comparison to match Barbara's presentation of

11:16:29 10    permanent hair loss with that that we're looking at here?

11:16:33 11    A.    Absolutely, yes.

11:16:33 12    Q.    When you did that side-by-side comparison, what did you

11:16:39 13    conclude, Doctor?

11:16:40 14    A.    You know, they look identical to me.

11:16:42 15    Q.    Describe that, if you could, just the presentation.

11:16:46 16    A.    You know, both have severe involvement of the back of the

11:16:52 17    scalp, with a very, very thin rim, involvement of the top and

11:16:57 18    involvement of the side.

11:16:58 19    Q.    All these -- this particular picture, this is a permanent

11:17:05 20    condition?

11:17:06 21    A.    This is a picture of permanent alopecia from chemotherapy

11:17:12 22    due to docetaxel.

11:17:13 23    Q.    Doctor, just to be clear, in this case, did you, in your

11:17:43 24    differential diagnosis, rule in permanent chemotherapy-induced

11:17:49 25    alopecia as the cause of Barbara Earnest's scalp condition?

*OFFICIAL TRANSCRIPT*

11:17:54  1   A.   Yes, I think she's affected by permanent alopecia from

11:17:59  2   chemotherapy due to Taxotere.

11:18:03  3   Q.   Let's just make sure.  You said, "I think she's

11:18:05  4   affected" --

11:18:06  5   A.   She is.

11:18:08  6   Q.   What was the basis for your conclusion that

11:18:13  7   Barbara Earnest suffered from permanent chemotherapy-induced

11:18:16  8   alopecia?

11:18:19  9   A.   Everything from history to clinical exam, to pull test

11:18:25 10   results, to consistency with pathology results and --

11:18:34 11   Q.   You mentioned pathology results.  Let's talk about those

11:18:40 12   for a moment.

11:18:40 13   A.   Yes.

11:18:49 14   Q.   So you indicated earlier that pathology was done in this

11:18:54 15   case.  Did you do the pathology?

11:19:00 16   A.   No.  She had the biopsy taken before.  So I saw her, and

11:19:05 17   she already had the pathology results.

11:19:09 18          But I saw the biopsy sites, so where the biopsy were

11:19:16 19   taken.  These biopsy were taken, one, from the top of the

11:19:20 20   scalp, the area that was very bald, and one in the area where

11:19:23 21   she has those few hair left.

11:19:28 22          And the both biopsy --

11:19:31 23   Q.   Let me stop you there.  Pathology, you're talking about

11:19:34 24   the biopsy results.

11:19:36 25   A.   Uh-huh (affirmative response).

*OFFICIAL TRANSCRIPT*

11:54:09  1  associated with Taxotere had Type 2 severity permanent

11:54:17  2  alopecia.

11:54:19  3  Q.   So just so I'm clear, so the patients that were involved

11:54:24  4  in this study, 10 percent of them had a particular condition

11:54:32  5  result, and what was that?

11:54:34  6  A.   Permanent alopecia after chemotherapy.

11:54:36  7  Q.   And this patient group --

11:54:39  8  A.   Type 2 severity.

11:54:42  9  Q.   Type 2 severity.  Which is the most severe on the scale?

11:54:46 10  A.   Uh-huh (affirmative response).

11:54:46 11  Q.   And Taxotere was involved in that chemotherapy?

11:54:48 12  A.   Yes.

11:54:49 13       I didn't see the side effects in patients with other

11:54:57 14  chemotherapy agents.

11:54:58 15  Q.   So I understand, was -- in the Martin study, Doctor, did

11:55:11 16  they look at A and C?

11:55:14 17  A.   Yes.  And they had no cases of severe permanent alopecia

11:55:21 18  after chemotherapy.

11:55:22 19  Q.   So what percentage of cases in Martin had severe permanent

11:55:27 20  chemotherapy alopecia of those patients who took the A and C?

11:55:32 21  What percentage?

11:55:34 22  A.   Zero percent.

11:55:35 23  Q.   And just to be clear, Barbara Earnest, you know, received

11:55:43 24  her chemotherapy treatment when?

11:55:46 25  A.   In 2011.

*OFFICIAL TRANSCRIPT*

11:55:47   1    Q.    And this article is from when?

11:55:52   2    A.    2018, I think.  Yes.  Yes.  2018.

11:55:55   3    Q.    Doctor, highlighting another of the articles that was on

11:57:02   4    your reliance list, do you recall the Kang article?

11:57:11   5    A.    Yes, I do.

11:57:18   6    Q.    And the year of that was 2018?

11:57:20   7    A.    Yes.  2018.

11:57:23   8    Q.    And that appeared in what?

11:57:26   9    A.    *The Oncologist*.

11:57:30  10    Q.    *The Oncologist*, that journal?

11:57:32  11    A.    Yes.

11:57:34  12    Q.    Do you have -- obviously you've written publications and

11:57:41  13    written articles that have appeared in publications, but do you

11:57:45  14    have any other involvement with publications at all?

11:57:48  15    A.    I'm editor of a journal.

11:57:50  16    Q.    Which one is that?

11:57:52  17    A.    It's called *Skin Appendage Disorders*.  It's a journal for

11:57:56  18    hair and nail disease.

11:57:57  19    Q.    And so you have great familiarity with the way journals

11:58:04  20    work?

11:58:05  21    A.    Yes, I do.

11:58:05  22    Q.    And with regard to *The Oncologist*, this particular 2018

11:58:12  23    Kang piece of literature, share with the jury why you included

11:58:20  24    in your reliance list.

11:58:21  25    A.    This is a prospective study, so it's more important.  This

*OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 11:58:26 | 1 | is Mario Lacouture here as well.  The people working on this is |
| 11:58:31 | 2 | somehow the same, they are working around the world. |
| 11:58:34 | 3 | Q.   And do you know the individuals, the Lacouture that you |
| 11:58:38 | 4 | mentioned? |
| 11:58:38 | 5 | A.   Yes, I know him, of course.  He's in New York at the |
| 11:58:43 | 6 | Sloan Cancer Center, and he's been involved in studying the |
| 11:58:53 | 7 | side effects of cancer medications. |
| 11:58:57 | 8 | So this is a prospective study.  What means?  For a |
| 11:59:02 | 9 | prospective study, you take a patient before and you follow the |
| 11:59:04 | 10 | patient during the chemotherapy and after the chemotherapy so |
| 11:59:09 | 11 | you have an idea what is happening. |
| 11:59:12 | 12 | They did this study just for looking at the hair, and |
| 11:59:19 | 13 | they measure the density -- again, how many hair -- with the |
| 11:59:23 | 14 | dermoscopy, and the thickness.  So this is an important study |
| 11:59:27 | 15 | because gives us an idea of what happens locally in the scalp; |
| 11:59:36 | 16 | not just looking, but with an instrument that measure. |
| 11:59:39 | 17 | Q.   And what did you find important in the Kang study that you |
| 11:59:49 | 18 | think you should share with the jury? |
| 11:59:50 | 19 | A.   They found in chemotherapy that include Taxotere, it cause |
| 11:59:57 | 20 | permanent alopecia after chemotherapy eight time more |
| 12:00:02 | 21 | frequently than other chemotherapy. |
| 12:00:04 | 22 | Q.   Doctor, with regard to the A and C, did you look at the |
| 12:00:29 | 23 | Kim study? |
| 12:00:32 | 24 | A.   I did.  I think I have it here.  It's again in Korea. |
| 12:00:39 | 25 | They do a lot of study in Korea. |

*OFFICIAL TRANSCRIPT*

12:00:42  1   Q.   And in that Kim study in Korea, do you recall how many AC

12:00:50  2   patients were found to have ongoing or permanent --

12:00:54  3   A.   Many.  I would say that most of the cases of AC from this

12:01:00  4   paper from Korea.

12:01:02  5   Q.   Do you recall approximately how many?

12:01:04  6   A.   I think 29, but I may be wrong.  Something like that.

12:01:07  7   Q.   So 29 of the AC were all from one study?

12:01:11  8   A.   Yes.  I would put 29, question mark.  Maybe 27.  I

12:01:23  9   wouldn't swear on 29.

12:01:25 10   Q.   What type of study was that?  Do you recall?

12:01:33 11   A.   Yes.  They sent patients a questionnaire, and the patients

12:01:37 12   who answered they had the problem, they take the -- they took

12:01:41 13   the patient in and look at the scalp.

12:01:43 14   Q.   So, Doctor, with regard to your clinical evidence that you

12:01:58 15   gathered, based on your experience as well as your review of

12:02:05 16   the scientific literature and personal experience in publishing

12:02:08 17   in that regard, did you reach a conclusion as to the specific

12:02:15 18   cause of Barbara Earnest's permanent hair loss?

12:02:19 19   A.   Yes.  I conclude that her permanent alopecia after

12:02:27 20   chemotherapy is due to the docetaxel, or Taxotere.

12:02:31 21   Q.   And how does the weight of the evidence play into that?

12:02:39 22   A.   The weight of the published literature is definitely

12:02:45 23   important, and the clinical presentation, everything, is really

12:02:51 24   very highly indicating that.

12:02:54 25   Q.   And is that opinion within a reasonable degree of

*OFFICIAL TRANSCRIPT*

12:03:00   1   scientific certainty?

12:03:01   2   A.   Yes.  It is.

12:03:03   3   Q.   Do you believe that that's more likely true than not?

12:03:07   4   A.   I believe that it is much more likely true.

12:03:11   5   Q.   Now, Doctor, in this particular case, there has been some

12:03:21   6   evidence of another chemotherapy drug called paclitaxel, or

12:03:29   7   Taxol.  Are you familiar with that?

12:03:30   8   A.   Yes.

12:03:31   9   Q.   Just to be clear, you understand Barbara Earnest did not

12:03:34 10   take that drug?

12:03:35 11   A.   She did not.

12:03:36 12   Q.   I want to ask you some questions.

12:03:38 13   A.   That's why it was not included in my report.

12:03:40 14   Q.   Okay.  Did you, in the materials that you have put

12:03:46 15   together in this case, review or analyze incidence rates of

12:03:52 16   Taxol?

12:03:52 17   A.   I did, because there are studies on that, yes, I did.

12:03:57 18   Q.   And in your review of the literature and the clinical

12:04:11 19   experience that you have, did you gather the case number -- do

12:04:16 20   you have any idea of case numbers reported in the literature on

12:04:19 21   that?

12:04:20 22   A.   I don't have a clear idea.  Maybe 90, maybe 80, maybe 50.

12:04:25 23   50.  I think 50.

12:04:28 24   Q.   And you were involved -- in one of your recent

12:04:37 25   publications, there were some incident rates of paclitaxel or

*OFFICIAL TRANSCRIPT*

ANTONELLA TOSTI - CROSS

1:18PM   1   **Q.**   And you'd agree with me that Adriamycin causes hair loss;

1:19PM   2   correct?

1:19PM   3   **A.**   Adriamycin can cause anagen effluvium, yes.

1:19PM   4   **Q.**   Okay.  When you say that, though, I'm asking you a very

1:19PM   5   specific question.

1:19PM   6            When a patient takes Adriamycin for chemotherapy,

1:19PM   7   Adriamycin can cause hair loss?

1:19PM   8   **A.**   Yes, hair loss, but not prevent regrowth.

1:19PM   9   **Q.**   I'm sorry.  Say that again.  Not what?

1:19PM   10  **A.**   Can cause hair loss.  But what she has is different.  She

1:19PM   11  has no regrowth.

1:19PM   12  **Q.**   Okay.  Well, my question is just simply it can cause hair

1:19PM   13  loss; right?

1:19PM   14  **A.**   Yes, it can cause hair loss.

1:19PM   15  **Q.**   Very good.  And you'd also agree with me that there are

1:19PM   16  reports in the literature of what you call -- what you talked

1:19PM   17  about this morning, persistent chemotherapy-induced alopecia

1:19PM   18  with Adriamycin; true?

1:19PM   19  **A.**   With Adriamycin alone, just a very, very high dosage, not

1:20PM   20  for breast cancer.

1:20PM   21  **Q.**   All right.  Let me see if I can ask you a different

1:20PM   22  question.

1:20PM   23            Is Adriamycin considered an anthracycline drug?

1:20PM   24  **A.**   Yes.

1:20PM   25  **Q.**   And there's case reports of persistent

OFFICIAL TRANSCRIPT

ANTONELLA TOSTI - CROSS

1:20PM 1    chemotherapy-induced alopecia with anthracycline regimens;
1:20PM 2    true?
1:20PM 3    **A.**    Yes.
1:20PM 4    **Q.**    Okay.  Now, we can agree that Mrs. Earnest was also
1:20PM 5    treated with Cytoxan?
1:20PM 6    **A.**    Yes.
1:20PM 7    **Q.**    And another name for that is cyclophosphamide?
1:20PM 8    **A.**    Yes.
1:20PM 9    **Q.**    And you'd agree that Cytoxan causes hair loss; true?
1:20PM 10   **A.**    Yes.
1:20PM 11   **Q.**    And you'd also agree with me, Doctor, that there are
1:20PM 12   reports in the literature which you have seen personally of
1:20PM 13   persistent chemotherapy-induced alopecia with Cytoxan?
1:20PM 14   **A.**    Very rare.
1:20PM 15   **Q.**    But they exist was my question.
1:20PM 16   **A.**    Yes, but they are very rare.
1:20PM 17   **Q.**    Okay.  Now, there's also a group of chemotherapies used to
1:21PM 18   treat breast cancer known as taxanes; right?
1:21PM 19   **A.**    Yes.
1:21PM 20   **Q.**    And Taxotere is a taxane; true?
1:21PM 21   **A.**    Yes.
1:21PM 22   **Q.**    Taxol is a taxane?
1:21PM 23   **A.**    Yes.
1:21PM 24   **Q.**    And let's talk about Taxol for a moment.  I know you spoke
1:21PM 25   with Mr. Schanker about it on your direct exam.

OFFICIAL TRANSCRIPT

ANTONELLA TOSTI - CROSS

| | | |
|---|---|---|
| 2:02PM | 1 | effects of treatment with aromatase inhibitors; correct? |
| 2:02PM | 2 | **A.**   Yes. |
| 2:02PM | 3 | **Q.**   Okay.  And, in fact, you've seen literature that says |
| 2:02PM | 4 | aromatase inhibitors can cause alopecia in up to 30 percent of |
| 2:02PM | 5 | the people that take them? |
| 2:02PM | 6 | **A.**   Yes. |
| 2:02PM | 7 | **Q.**   And there are reports that aromatase inhibitors, like |
| 2:03PM | 8 | Arimidex, can also result in complete alopecia? |
| 2:03PM | 9 | **A.**   That's wrong.  That's tamoxifen. |
| 2:03PM | 10 | **Q.**   Okay. |
| 2:03PM | 11 | **A.**   And I don't believe that case was really a true case. |
| 2:03PM | 12 | **Q.**   Let me see if I can ask it to you and then maybe we can |
| 2:03PM | 13 | avoid going to your deposition.  Okay? |
| 2:03PM | 14 | Have you seen reports of aromatase inhibitors |
| 2:03PM | 15 | resulting in complete alopecia?  Yes or no, please. |
| 2:03PM | 16 | **A.**   No. |
| 2:03PM | 17 | **Q.**   Okay.  Is tamoxifen an aromatase inhibitor? |
| 2:03PM | 18 | **A.**   No. |
| 2:03PM | 19 | **Q.**   Okay.  What is tamoxifen? |
| 2:03PM | 20 | **A.**   Tamoxifen is a -- block the estrogen receptor.  So it's |
| 2:03PM | 21 | the same type of drugs, but you use tamoxifen before menopause, |
| 2:03PM | 22 | and aromatase inhibitor after menopause. |
| 2:03PM | 23 | **Q.**   Okay.  Well, your study that we were just on a moment ago, |
| 2:04PM | 24 | it included reports of persistent hair loss with aromatase |
| 2:04PM | 25 | inhibitors; correct? |

ANTONELLA TOSTI - CROSS

2:34PM  1    **BY MS. SASTRE:**

2:34PM  2    **Q.**    Okay.  Sure.  I'd be happy to.  So I'm going to go back,

2:34PM  3    and I want to make this clear just before you talk about the

2:34PM  4    photograph.

2:34PM  5              So we can agree the pictures on the left are

2:34PM  6    Mrs. Earnest; true?

2:34PM  7    **A.**    Yes.

2:34PM  8    **Q.**    And then this is not a slide that you showed the jury when

2:34PM  9    you were on direct exam with Mr. Schanker; correct?  This is

2:34PM  10   something new?

2:34PM  11   **A.**    Yes.  This is not.

2:34PM  12   **Q.**    Okay.  Exactly.

2:34PM  13             Okay.  And what it is, it's a picture from the

2:35PM  14   article we just discussed with a photograph on the right of a

2:35PM  15   patient suffering from endocrine-induced hair loss; correct?

2:35PM  16   **A.**    Yes.

2:35PM  17   **Q.**    Okay.  And you would agree with me that there are

2:35PM  18   similarities between the presentation of Mrs. Earnest on the

2:35PM  19   left side and this patient on the right, both having more

2:35PM  20   growth on the sides and the lower back; correct?

2:35PM  21   **A.**    No.  For someone that look at alopecia, they're very

2:35PM  22   different.  Because the one on the right is the top of the

2:35PM  23   scalp.  So it's typical of androgenetic alopecia.

2:35PM  24             You can see the back is normal.  That picture, see

2:35PM  25   they're here from there.  So this is just the top of the scalp,

ANTONELLA TOSTI - CROSS

2:35PM 1    very typical, severe androgenetic alopecia.  But the back is

2:35PM 2    preserved.  That's the big difference.

2:35PM 3    Q.    Okay.  Let me ask you this, just while we're talking about

2:36PM 4    articles, one of the articles that counsel discussed with you

2:36PM 5    is a paper by name of Prevazas.

2:36PM 6          Did I say that correctly?

2:36PM 7    A.    Yes -- no, it's French.  I don't think it's correct, but I

2:36PM 8    know that.

2:36PM 9    Q.    Okay.  And you showed a picture from that article;

2:36PM 10   correct?

2:36PM 11   A.    Uh-huh.

2:36PM 12   Q.    All right.  And I believe you showed this picture to the

2:36PM 13   jury; correct?

2:36PM 14   A.    Yes.

2:36PM 15   Q.    Okay.  But if we turn to the page -- the next page of the

2:36PM 16   article, there's a picture of this patient; right?

2:36PM 17   A.    Yes.

2:36PM 18   Q.    And this is a patient that took Taxol; right?

2:36PM 19   A.    Yes.

2:36PM 20   Q.    Okay.  That's what Taxol can do to your hair; right?

2:36PM 21   A.    You know, that patient is a type of patchy, so I've always

2:37PM 22   been doubtful if it was really -- because they describe two

2:37PM 23   type in this paper, this type that mimics alopecia areata --

2:37PM 24   you can read in the literature.  And so this type, maybe this

2:37PM 25   patient had alopecia areata.  You know, sometimes it's

OFFICIAL TRANSCRIPT

1112

ANTONELLA TOSTI - REDIRECT

|  |  |  |
|---|---|---|
| 3:36PM | 1 | **THE JUROR:** That's all right. I'm good. |
| 3:36PM | 2 | **MR. SCHANKER:** I'm sorry, Dr. Tosti. |
| 3:36PM | 3 | Can we continue, Your Honor? |
| 3:37PM | 4 | **THE COURT:** Please. |
| 3:37PM | 5 | **BY MR. SCHANKER:** |
| 3:37PM | 6 | **Q.** Go ahead. |
| 3:37PM | 7 | **A.** So you start seeing the scalp through the hair. So |
| 3:37PM | 8 | usually that part becomes larger, okay, and sometimes even the |
| 3:37PM | 9 | front of the hairline. And then that can progress. Usually, |
| 3:37PM | 10 | it's a slow progression, okay, and becomes little bit -- little |
| 3:37PM | 11 | bit more evident, as I show in those case. |
| 3:37PM | 12 | **Q.** So how does this condition that you're describing compare |
| 3:37PM | 13 | to what Barbara suffers from as far as presentation? |
| 3:37PM | 14 | **A.** It's never so severe and never affects, as I said several |
| 3:37PM | 15 | times, the back of the scalp. |
| 3:37PM | 16 | **Q.** And so is that part of why you ruled that out in this |
| 3:37PM | 17 | case? |
| 3:37PM | 18 | **MS. SASTRE:** Leading, Your Honor. |
| 3:37PM | 19 | **THE COURT:** You're leading. |
| 3:38PM | 20 | Sustained. |
| 3:38PM | 21 | **BY MR. SCHANKER:** |
| 3:38PM | 22 | **Q.** And did you rule that out in this case, androgenetic |
| 3:38PM | 23 | alopecia? |
| 3:38PM | 24 | **A.** Yes, I did rule it out because of the history, which is |
| 3:38PM | 25 | very different. Because history is an incomplete hair regrow |

OFFICIAL TRANSCRIPT

ANTONELLA TOSTI – REDIRECT

3:38PM   1   after the end of chemotherapy.  It's not gradual thinning of

3:38PM   2   the scalp.  And from the clinical examination, because it was

3:38PM   3   too severe for being that.

3:38PM   4   Q.   Let's move on to a different topic.  We've heard about the

3:38PM   5   slides that were provided from the pathology that was taken

3:38PM   6   here in New Orleans to Dr. Thompson.

3:38PM   7        And were there two kinds of slides that were

3:38PM   8   provided?

3:38PM   9   A.   No.  It's different.  The biopsy means the tissue went

3:38PM   10  from here to Dr. Thompson.  Dr. Thompson cut the tissues and

3:39PM   11  did the stains and look at the slides.

3:39PM   12  Q.   Okay.  So you just described the pathology that was sent

3:39PM   13  from the biopsies; is that right?

3:39PM   14  A.   Yes.

3:39PM   15  Q.   And does that have anything to do with the conversation

3:39PM   16  about this stem cell?

3:39PM   17       MS. SASTRE:  Objection.

3:39PM   18       THE WITNESS:  Yes.

3:39PM   19       MS. SASTRE:  Objection.  It's vague and ambiguous,

3:39PM   20  Your Honor.

3:39PM   21       THE COURT:  Rephrase your question.

3:39PM   22       MR. SCHANKER:  Thank you.

3:39PM   23  BY MR. SCHANKER:

3:39PM   24  Q.   So we have those biopsies.

3:39PM   25       And what were done with those biopsies, just to

OFFICIAL TRANSCRIPT

10:25:22  1          MR. COFFIN:  With regard to this Kopreski testimony, your

10:25:28  2   Honor, we now have had Figure A, which is his reanalysis example,

10:25:33  3   shown to the jury, which your Honor specifically said was not, was

10:25:36  4   prohibited, shouldn't have been shown to the jury.  To be clear,

10:25:40  5   this is the deposition testimony of a witness that Sanofi -- was a

10:25:45  6   Sanofi employee, was not an expert.  We never saw this analysis

10:25:48  7   until it was sprung on us at that deposition and then they don't

10:26:29  8   bring him live.  Then they put the analysis up, which your Honor

10:26:29  9   said should not be shown to the jury.

10:26:29 10          Then they show pictures, comparison pictures that have to

10:26:29 11   do with tamoxifen, not an issue in this case.  They show a case

10:26:29 12   assessment, hormonal therapy assessment, sequence of treatment,

10:26:29 13   dosing, other chemotherapy drugs, this man has just given expert

10:26:29 14   opinion on multiple, multiple areas, extremely prejudicial,

10:26:29 15   extremely.  A lot of which has no probative value like tamoxifen.

10:26:29 16   It's really troubling.

10:27:12 17          THE COURT:  What are you asking me?

10:27:12 18          MR. COFFIN:  I mean, quite frankly I think we might have

10:27:12 19   to move for a mistrial.

10:27:12 20          MR. MOORE:  I think your Honor ruled on the designations,

10:27:12 21   I think that happened and --

10:27:12 22          THE COURT:  Yeah, but --

10:27:12 23          MR. MOORE:  The exhibit, I texted Harley because Dave was

10:27:12 24   not in the negotiations with your Honor yesterday.  Harley said

10:27:12 25   that that table was shown to you --

10:28:06 1    expert, and that the issue of tamoxifen has no bearing on any issue

10:28:10 2    in this lawsuit.

10:28:11 3              MR. STRONGMAN:  Fair enough.

10:28:13 4              MR. MARKOFF:  I think you also need to say that the

10:28:15 5    photos that were shown and the testimony related to tamoxifen was

10:28:20 6    not an issue, was never taken by this client Ms. Earnest, and

10:28:23 7    should not have been shown.

10:28:27 8              MR. STRONGMAN:  Should not have been shown.  I mean, they

10:28:27 9    were all cleared.

10:29:02 10             (WHEREUPON, MR. RATLIFF APPROACHED THE BENCH.)

10:29:02 11             THE COURT:  The photographs of tamoxifen?  I don't

10:29:02 12   remember the alopecia looking like that.

10:29:02 13             MR. RATLIFF:  Their objection, your Honor, was as it

10:29:02 14   related to the demonstrative exhibits, those flow charts and

10:29:02 15   graphs, and that's what we talked about yesterday, which is they

10:29:02 16   said that should not be coming into evidence or published.

10:29:02 17             THE COURT:  The issue was there was pictures of some hair

10:29:02 18   loss.

10:29:02 19             MR. STRONGMAN:  It was an article.

10:29:02 20             MR. RATLIFF:  Yeah, there was no objection to that.

10:29:02 21   There was nothing ever raised about that.  They vetted this video,

10:29:02 22   your Honor, they've had it for two days.  They've watched it.  They

10:29:05 23   never said anything to us about it.  The only issues that were

10:29:07 24   raised with us were the inclusion of wanting to enter that one

10:29:10 25   section that Larry wanted to enter, which you said would not come

10:29:20  1   in, and the demonstratives, that was the only thing we ever talked

10:29:20  2   about.  They've had this video, they've reviewed it, they approved

10:29:20  3   it, they signed off on it.

10:29:20  4           MR. MARKOFF:  That's not correct.  Larry objected to

10:29:23  5   every single demonstrative and every piece of evidence that was in

10:29:27  6   that video.

10:29:27  7           MR. RATLIFF:  It was not raised yesterday.  This was all

10:29:30  8   approved, she already ruled on these designations.

10:29:32  9           THE COURT:  Okay.  I don't remember approving photographs

10:29:36 10   of hair loss.  I do remember that I wouldn't let you go through the

10:29:45 11   actual case reports and show that.

10:29:48 12           MR. RATLIFF:  Right.

10:29:50 13           THE COURT:  That happened.  But that came down.  There

10:29:52 14   were individual case reports that he was going through and I said

10:29:56 15   that's not happening, but I did let you do the spreadsheet.

10:29:59 16           MR. RATLIFF:  Okay.

10:30:00 17           THE COURT:  That bit.

10:30:01 18           MR. RATLIFF:  I guess where we kind of feel kind of

10:30:04 19   caught in a bind here is they had this video, they saw it exactly

10:30:07 20   as we were going to play it; and the objections they raised

10:30:10 21   yesterday were as to the charts that Mr. Kopreski had drawn and

10:30:14 22   created for himself, and you said those won't come into evidence

10:30:17 23   but those will be published to the jury.  If we were going to have

10:30:20 24   this discussion about the articles, which were part of the exhibits

10:30:25 25   that you said came in through the designations, we should have

10:30:28 1    raised this yesterday.  They've had fair notice of this, your

10:30:40 2    Honor.

10:30:40 3              THE COURT:  Okay.  I am just going to tell the jury that

10:30:40 4    tamoxifen has nothing to do with this lawsuit.

10:30:40 5              MR. STRONGMAN:  Fair enough.

10:30:40 6              MR. MARKOFF:  Please mention that the photos when

10:30:42 7    discussing tamoxifen were clearly --

10:30:46 8              MR. RATLIFF:  But they're an aromatase inhibitor.  I

10:30:49 9    mean, they are in the same class as Arimidex.

10:30:51 10             MR. MARKOFF:  Arimidex is not the same drug.  Your Honor,

10:30:51 11   it's incredibly prejudicial to show photographs --

10:30:54 12             MR. STRONGMAN:  The jury has already seen that

10:31:04 13   photograph.

10:31:04 14             MR. RATLIFF:  Why did you raise this yesterday, Dan?

10:31:04 15             MR. MARKOFF:  Larry objected to every single one of these

10:31:04 16   exhibits.

10:31:04 17             THE COURT:  Are these the same photographs that Dr. Tosti

10:31:04 18   showed?

10:31:06 19             MR. COFFIN:  No.

10:31:06 20             MR. STRONGMAN:  May I speak?  They're the same photos

10:31:20 21   that Ms. Sastre crossed Dr. Tosti on that were shown, so.

10:31:20 22             MR. COFFIN:  From the tamoxifen article?

10:31:20 23             MR. STRONGMAN:  The hormonal treatment article that

10:31:23 24   includes tamoxifen and Arimidex.

10:31:26 25             MR. COFFIN:  He didn't say a word about Arimidex.

```
10:31:29  1            THE COURT:  Let me do this.  I am going let them take a
10:31:44  2   break now, but I will tell them that tamoxifen is not an issue in
10:31:44  3   this lawsuit.
10:31:44  4            MR. RATLIFF:  That's fine.
10:31:44  5            THE COURT:  And I will remind them that Dr. Kopreski has
10:31:44  6   not been qualified as an expert.
10:31:44  7            MR. RATLIFF:  That's fine, your Honor.
10:31:57  8        (OPEN COURT.)
10:31:57  9            THE COURT:  Members of the jury, let me remind you that
10:31:59 10   Dr. Kopreski has not been tendered or qualified by this court as an
10:32:04 11   expert.  Additionally, there was some testimony regarding
10:32:10 12   tamoxifen.  I tell you that tamoxifen is not related to any issue
10:32:17 13   in this lawsuit.  With that, the Court will be at recess for
10:32:21 14   15 minutes.
10:32:21 15            THE DEPUTY CLERK:  All rise.
10:33:19 16        (WHEREUPON, THE JURY EXITED THE COURTROOM.)
10:33:19 17            MR. MOORE:  Can we handle the exhibits for Dr. Kopreski
10:33:22 18   now or on a break?
10:33:23 19            THE COURT:  Yes.  Okay.
10:33:32 20            MR. MOORE:  In accordance with Dr. Kopreski's testimony,
10:33:36 21   Defendants would offer, file, and introduce Defense Exhibit 381.A,
10:33:44 22   381 point --
10:33:47 23            MR. MICELI:  No, no, no, no.  Your Honor, he is trying to
10:33:50 24   put in the Kopreski analysis.
10:33:56 25            MR. MOORE:  I just have a stack here.  If that's one
```

JOHN GLASPY - DIRECT

01:51 1 **A.**   I am.

01:51 2 **Q.**   And you are certainly aware of the conversation regarding

01:51 3 ongoing alopecia in the TAC arm and the FAC arm, right?

01:51 4 **A.**   Yes.

01:51 5 **Q.**   And we have talked about how there are 29 cases in the TAC

01:52 6 arm of ongoing, and we have 16 cases in the FAC arm of ongoing;

01:52 7 is that right?  You're familiar with that conversation?

01:52 8 **A.**   Yes.

01:52 9 **Q.**   And I know that you have reviewed Dr. Kopreski's

01:52 10 testimony.  You were in here this morning as well; is that

01:52 11 right?  Go ahead, you can answer.

01:52 12 **A.**   I was in here this morning and I'm aware of his testimony.

01:52 13 **Q.**   And, Doctor, a couple of other questions about the TAC and

01:52 14 FAC comparison, just to make sure we have a couple of other

01:52 15 things clear.

01:52 16         Adriamycin is included in both arms of TAC and FAC;

01:52 17 is that correct?

01:52 18 **A.**   That's correct.

01:52 19 **Q.**   And is Adriamycin made by Sanofi?

01:53 20 **A.**   No.

01:53 21 **Q.**   And then we also have Cytoxan, and Cytoxan is included in

01:53 22 both the TAC arm and the FAC arm; is that correct?

01:53 23         **MR. MICELI:**  Object.  Leading again.

01:53 24         **THE COURT:**  I'm going to let him get to here.  When

01:53 25 we get to questions, I'm not going to let you lead, but I think

**JOHN GLASPY - DIRECT**

01:54  1  than well aware of that.  That's perfectly within the scope of

01:54  2  his experience and expertise.

01:54  3          THE COURT:  I understand that.

01:54  4          MR. STRONGMAN:  Yeah, yeah.

01:54  5          THE COURT:  And then?

01:54  6          MR. STRONGMAN:  I want him just to articulate -- I

01:54  7  feel like the jury has not had a clear articulation of what

01:54  8  statistical significance is.  I'm not going to ask him about

01:55  9  TAC/FAC statistical significance.  I'm not getting into that.

01:55 10  I'm moving on past TAX 316 at this point.  I think the jury has

01:55 11  heard enough of it.

01:55 12          THE COURT:  Then my problem is why did he review

01:55 13  Kopreski's analysis?

01:55 14          MR. MICELI:  Your Honor, that's another problem.

01:55 15          MR. STRONGMAN:  I mean, I'm happy to walk through it.

01:55 16  He did review it.  I'm happy to walk through it.

01:55 17          THE COURT:  I know, but if we let it in and we are

01:55 18  not going to have an expert testify --

01:55 19          MR. STRONGMAN:  I will walk through it.  He knows it.

01:55 20  I just was trying to move it along.  That's all.  I'm happy to

01:55 21  walk through it.

01:55 22          MR. MICELI:  This is the problem.  He did not list

01:55 23  the Kopreski deposition in his review material.  He never

01:55 24  did -- he did all of our experts and he did the plaintiff's.

01:55 25  He didn't do Dr. Kessler; he didn't read Dr. Madigan; he didn't

**JOHN GLASPY - DIRECT**

01:55  1    read Dr. Plunkett; and he didn't read Dr. Kopreski.  So none of

01:55  2    the four.  It's not disclosed on his expert report.

01:56  3              I pulled out one, two --

01:56  4         MR. STRONGMAN:  He did review Kopreski's analysis.

01:56  5         THE COURT:  This is my problem with it.

01:56  6         MR. STRONGMAN:  Sure.  Sure.

01:56  7         THE COURT:  I've let y'all introduce the Kopreski

01:56  8    testimony because he was going to testify and he was going to

01:56  9    then have an opportunity to cross-examine --

01:56 10         MR. STRONGMAN:  I'm happy to go there.  I'm happy to

01:56 11    go there.  I just was trying to move it along.

01:56 12         THE COURT:  We are kind of caught between a rock and

01:56 13    a hard place.  I feel like this has been --

01:56 14         MR. STRONGMAN:  I'm happy to --

01:56 15         MR. MICELI:  Your Honor, if I can tell you, my

01:56 16    concern is that my colleague took his deposition, and at that

01:56 17    point in time he had not -- it had not been disclosed to us --

01:56 18    he had not reviewed the Kopreski depositions.  To this day, I

01:56 19    have never been provided with notice that he had reviewed the

01:56 20    Kopreski deposition, and --

01:56 21         MR. STRONGMAN:  I can --

01:56 22         THE COURT:  What is the question?  There's an

01:56 23    objection to "What is the statistical significance?"  Are you

01:56 24    objecting to that question and then what follows it?

01:56 25         MR. MICELI:  I'm objecting to that question and what

JOHN GLASPY - DIRECT

01:57 1    follows, because now what he is going to try and do is put the
01:57 2    pieces of a puzzle together that he never told me he was going
01:57 3    to put together.  He did not include it in his report, he did
01:57 4    not include it in his materials reviewed, and now here I am in
01:57 5    court on the last day of trial and he is going to start talking
01:57 6    about things that he did that I've never been given notice of.
01:57 7            THE COURT:  Okay.  All right.  Let me back the train
01:57 8    up and let me see if I can get somebody to answer my question.
01:57 9            MR. MICELI:  Sure.
01:57 10           THE COURT:  There is a question on the floor at this
01:57 11   very moment:  "What is statistical significance?"  There was an
01:57 12   objection to that.
01:57 13               Is the objection that he is going to just define
01:57 14   what that means, or are you concerned about what happens next?
01:57 15           MR. MICELI:  I'm concerned that it's outside the
01:57 16   scope of what he has been disclosed for and everything that
01:57 17   follows.  Because once he throws that into --
01:57 18           THE COURT:  Okay.  Let me see if I can get you to
01:57 19   answer.
01:57 20           MR. MICELI:  Okay.
01:57 21           THE COURT:  Are you objecting to that specific
01:57 22   question, "statistical significance," or is there an objection
01:57 23   to him defining what that means within the parameters of a
01:58 24   clinical trial without him giving us an opinion as to whether
01:58 25   or not the GEICAM and TAX study, the results of Dr. Madigan,

JOHN GLASPY - DIRECT

01:58  1   are incorrect?  Because I'm not going to --

01:58  2           MR. STRONGMAN:  He's not going to do that.

01:58  3           MR. MICELI:  Look, my problem is I feel like we are

01:58  4   standing outside of a barn with a pitchfork and we're throwing

01:58  5   hay into this jury box.

01:58  6           THE COURT:  Okay.  So let me see if I can get you to

01:58  7   answer my question.

01:58  8           MR. MICELI:  Okay.

01:58  9           THE COURT:  I'm going to ask it again real slow.

01:58 10           MR. MICELI:  Okay.

01:58 11           THE COURT:  Is the objection to that very question or

01:58 12   is the objection, "I know what's coming"?

01:58 13           MR. MICELI:  All of the above.

01:58 14           THE COURT:  All of the above.  All right.

01:58 15               Well, this is what I will allow him to do,

01:58 16   because he has talked about his participation in these studies:

01:58 17   I'm going to let you ask, "What does statistical significance

01:58 18   mean," even though it has been defined a lot.  But we are not

01:59 19   going into anything beyond that.

01:59 20           MR. MICELI:  It's still --

01:59 21           THE COURT:  I think that's what you said.

01:59 22           MR. STRONGMAN:  In terms of whether or not TAX 316

01:59 23   was statistically significant, I will not ask him that

01:59 24   question.

01:59 25           MR. MICELI:  My concern now --

JOHN GLASPY - DIRECT

01:59  1           MR. STRONGMAN:  I will actually tell him I'm not

01:59  2    asking --

01:59  3           MR. MICELI:  -- with this conversation, what we have

01:59  4    heard up here at the bench is that this witness has educated

01:59  5    himself with things that I have never been told.

01:59  6           THE COURT:  Well, I'm telling you, you say

01:59  7    "Objection," I'm going to sustain it.  The problem is I have

01:59  8    not read his report either.

01:59  9           MR. MICELI:  I can't pull the knowledge out of his

01:59 10    head.  He's --

01:59 11           MR. STRONGMAN:  And what I will do -- there are a

01:59 12    couple things -- I will walk him through the Kopreski analysis

01:59 13    so it's clear that I'm not going to ask him statistical

01:59 14    significance.  We have covered that.

01:59 15           THE COURT:  Well, then why do you need to ask him

01:59 16    that if you are going to then walk him through Kopreski's

01:59 17    analysis --

01:59 18           MR. STRONGMAN:  I can --

01:59 19           THE COURT:  -- if it's not to say --

01:59 20           MR. STRONGMAN:  I will do it later at a different

02:00 21    point in time so that it's not tied to it.

02:00 22           MR. MICELI:  There was never a test for statistical

02:00 23    significance there.

02:00 24           MR. STRONGMAN:  Yeah, that's fine.  That's fine.

02:00 25           MR. MICELI:  This is just --

JOHN GLASPY - DIRECT

02:00 1          THE COURT:  Then I'm concerned --

02:00 2          MR. MICELI:  I am, as well.

02:00 3          THE COURT:  -- that the jury is going to wonder why

02:00 4     you are asking this question if he is not going to give us an

02:00 5     opinion about it.

02:00 6          MR. STRONGMAN:  How about I do this:  How about I ask

02:00 7     about statistical significance.  I can ask about TAX 316 and

02:00 8     efficacy -- he's very well aware of that -- and whether there's

02:00 9     statistical significance there.  And then I will transition

02:00 10    to -- so I will set up so Mr. Miceli can cross him on the

02:00 11    Kopreski analysis.  I will put out there what he did.

02:00 12         MR. MICELI:  I feel like I'm negotiating against

02:00 13    myself, because it's something that wasn't disclosed and I'm --

02:00 14    that's fine.

02:00 15         THE COURT:  But --

02:00 16         MR. MICELI:  I'm not saying this to you; I'm saying

02:00 17    this to my opponent.

02:00 18         THE COURT:  I understand.  I am trying to determine

02:00 19    what was disclosed.  And, again, I'm the only one in this

02:01 20    conversation that has not read his report, and what I

02:01 21    appreciate is that he did review the Kopreski analysis --

02:01 22         MR. STRONGMAN:  Correct.

02:01 23         THE COURT:  -- and he had opinions about that in his

02:01 24    report.

02:01 25         MR. MICELI:  No, he did not have an opinion about it

**JOHN GLASPY - DIRECT**

02:01  1    in his report.

02:01  2               MR. STRONGMAN:  He did.

02:01  3               MR. MICELI:  He has a paragraph on page 26 -- and I

02:01  4    will show you, Your Honor -- that all he has -- I left my

02:01  5    glasses down there.

02:01  6               THE COURT:  I can find 26.

02:01  7               MR. MICELI:  I want to make sure it's 26.  There it

02:01  8    is right here.  This paragraph right there.  At the bottom of

02:01  9    that paragraph, it just says "Figure A."  There's no analysis

02:01 10    of what he did with Figure A, and then Figure A is stapled to

02:01 11    the back of his report.

02:01 12               And that's what's concerning.  In his

02:01 13    deposition, he said, I didn't validate anything.  I didn't

02:01 14    review the data.  If the data is wrong, I'm wrong.

02:01 15               MR. STRONGMAN:  This is what --

02:01 16               MR. MICELI:  That's the problem with this.  So this

02:01 17    is why we fought so hard to try to --

02:02 18               THE COURT:  I understand that.  I think you all filed

02:02 19    the wrong motion, if you want to know the truth.

02:02 20               I don't know why, but I think -- I'm going to

02:02 21    allow you to let him define it, and then you are moving on.

02:02 22    That's it.

02:02 23               MR. STRONGMAN:  Can I ask him a question about the

02:02 24    efficacy stuff, unrelated, just so it's -- I don't want

02:02 25    Mr. Miceli to feel like I've left an impression I'm going to

JOHN GLASPY - DIRECT

02:02  1   then talk about it in relation --

02:02  2            THE COURT:  No, I think you can say -- this is what I

02:02  3   will allow you to say:  "What is statistical significance?"  It

02:02  4   gives you an opportunity to review whether or not the drugs --

02:02  5   they just happened to pick the wrong patients or that these

02:02  6   patients did better on this drug.  And that's it.  We will

02:02  7   leave it there.

02:02  8            MR. STRONGMAN:  Okay.

02:03  9            (End of bench conference.)

02:03 10            THE COURT:  Please proceed, Mr. Strongman.

02:03 11            MR. STRONGMAN:  All right.

02:03 12   BY MR. STRONGMAN:

02:03 13   Q.   Doctor, I had asked a question about statistical

02:03 14   significance, and I want to back up and ask a question before.

02:03 15            We are talking about TAC versus FAC, and that study

02:03 16   was aimed at looking at efficacy; is that right?

02:03 17   A.   That was the primary endpoint, yes.

02:03 18   Q.   And can you discuss what the results of the primary

02:03 19   endpoint were with that study and whether they were

02:03 20   statistically significant?

02:03 21   A.   The results were positive, meaning both progression-free

02:03 22   survival -- time to progression -- and overall survival were

02:03 23   better in the TAC than in the FAC arm.

02:03 24            And the difference was statistically significant,

02:03 25   meaning it's unlikely it arose by chance, that it's more likely

JOHN GLASPY - DIRECT

02:04  1    an effect of the difference in treatment.

02:04  2    Q.    And I think we have already -- I had asked you, you had

02:04  3    reviewed the information that Dr. Kopreski had put together on

02:04  4    the ongoing cases -- do you remember that? -- of alopecia, the

02:04  5    ongoing cases of alopecia, Dr. Kopreski's chart.

02:04  6          Do you remember that?

02:04  7    A.    I do.

02:04  8    Q.    And, Doctor, in review of that chart, the jury has heard

02:04  9    about 29 cases.

02:04  10         And in the review, were there cases, yes or no, that

02:04  11   didn't meet the definition of persistent alopecia going out to

02:04  12   six months?

02:04  13   A.    Yes.

02:04  14   Q.    And did that happen in both the TAC arm and the FAC arm?

02:04  15   A.    Yes.

02:04  16   Q.    And either way, when you look at both, were cases of

02:05  17   ongoing alopecia happening, as the study defined it, in both

02:05  18   arms of the study?

02:05  19   A.    Yes.

02:05  20   Q.    Doctor, based upon your review of the TAX 316 information,

02:05  21   including Dr. Kopreski's analysis, were there actually 29 cases

02:05  22   of permanent alopecia in the TAC arm?

02:05  23   A.    Not documented, right?  I mean, the difference in numbers

02:05  24   is due to the fact that for whatever reason, the patient didn't

02:05  25   have a safety follow-up.  So we don't know what happened to

JOHN GLASPY - CROSS

02:38 1 **Q.**   We will talk through it, then.  What we do know is that
02:39 2 the report you provided in this litigation listed a number of
02:39 3 things that you reviewed.
02:39 4        Before you formed your opinions in this case, you
02:39 5 spoke to nobody at Sanofi, correct?
02:39 6 **A.**   That's correct.
02:39 7 **Q.**   You did not list any information in your report about
02:39 8 co-workers or co-investigators at BCIRG?  You followed a chart
02:39 9 written by a man who was a former employee of Sanofi, who was
02:39 10 taken by lawyers and hand-fed information.  You know that,
02:39 11 don't you, sir?
02:39 12 **A.**   I don't.  I don't know that at all.
02:39 13        But what I do know, that he was a former employee of
02:39 14 Sanofi.  But I viewed that as weighing in -- I admitted and
02:39 15 told you in my deposition I look at -- if the data that's in
02:40 16 that table is incorrect, then none of my opinions are valid.
02:40 17 If the data that's there is correct -- the date of the last
02:40 18 visit, the date of the completion of chemotherapy, if those
02:40 19 things are correct, then my opinions hold because I'm aware as
02:40 20 a clinical trialist how these confusions can arise, how people
02:40 21 can look at that and say, "How can this be 10-year follow-up
02:40 22 and you say it was persistent, but the last date you checked
02:40 23 the alopecia was nine years ago?"
02:40 24 **Q.**   Doctor, you don't know that it was nine years ago, do you?
02:40 25 Do you know that it was nine years ago?

JOHN GLASPY - CROSS

02:40 1  **A.**   No, I -- again --

02:40 2  **Q.**   Let me ask you a question.

02:40 3  **A.**   No, but you just asked me -- I need to be allowed to

02:40 4  answer it.

02:40 5          **MR. STRONGMAN:**  Objection.

02:40 6          **MR. MICELI:**  I didn't have a question.  He was

02:40 7  talking.

02:40 8          **THE COURT:**  Excuse me.

02:40 9          **MR. MICELI:**  Yes, ma'am.

02:40 10         **THE COURT:**  He is entitled -- the question was:

02:41 11 "Doctor, you don't know it was nine years ago, do you?  Do you

02:41 12 know that had it was nine years ago?"

02:41 13         You have to answer that question.

02:41 14         **THE WITNESS:**  Yes.

02:41 15         I know that it's listed there as nine years ago.

02:41 16 I have said and I will say again:  If the data in that chart

02:41 17 are wrong, then my opinions are wrong.  All my opinions come

02:41 18 from the chart.

02:41 19         **THE COURT:**  I don't think you answered the question.

02:41 20         Did you know that it was nine years ago?

02:41 21         **THE WITNESS:**  Well, again I --

02:41 22         **THE COURT:**  That's a yes or no.

02:41 23         **THE WITNESS:**  I know it's listed as nine years ago; I

02:41 24 don't know if it actually happened nine years ago, because I

02:41 25 didn't make the chart.

JOHN GLASPY - CROSS

02:41  1        THE COURT:  Thank you.

02:41  2   BY MR. MICELI:

02:41  3   Q.    You didn't make the chart.  You didn't do anything to

02:41  4   validate it either, did you?

02:41  5   A.    That's correct.

02:41  6   Q.    You just accepted what you were given by the same

02:41  7   attorneys that hired Dr. Kopreski to do the analysis, right?

02:42  8   A.    I don't know if they hired him.  I don't know what the

02:42  9   relationship is.

02:42 10   Q.    Okay.  But, Doctor, you are a master's of public health,

02:42 11   and you do a lot of research.  You have authored 178

02:42 12   peer-reviewed medical journals, correct?

02:42 13   A.    Probably more than that, but yes.

02:42 14   Q.    In the CV I have, it has 178.  I counted them and I looked

02:42 15   at the authors to see if I knew any.  I saw Dr. Bosserman.  You

02:42 16   have coauthored with Dr. Bosserman, correct?

02:42 17   A.    That's correct.

02:42 18   Q.    Every one of the papers you have, when you pick it up, you

02:42 19   can look for a section that's called "methodologies," right?

02:42 20   A.    It depends which journal because some journals don't

02:42 21   organize that way.

02:42 22   Q.    The ones that do, you can look at that methodology

02:42 23   section, you can tell exactly what the people did who were

02:42 24   writing that article, right?

02:42 25   A.    Sometimes.  Not always.

JOHN GLASPY - CROSS

02:42  1   **Q.**   You can't tell what Dr. Kopreski did, can you?

02:42  2   **A.**   In terms of how he got those numbers?

02:42  3   **Q.**   No, not how he got the numbers.  How he came to be in

02:43  4   possession of the records, why he did the analysis.  Do you

02:43  5   know anything about that?

02:43  6   **A.**   Well, I know what he said in his deposition because --

02:43  7   **Q.**   That's interesting, sir.  Can you turn to your expert

02:43  8   report, in Exhibit A, the materials provided?

02:43  9   **A.**   Right.

02:43 10   **Q.**   I want you to read to the jury which depositions you told

02:43 11   me you had reviewed before you gave your opinions.

02:43 12   **A.**   I don't think he had been deposed yet.

02:43 13   **Q.**   Oh, he hadn't been deposed.  But you didn't update that

02:43 14   report, did you?

02:43 15   **A.**   I did not.

02:43 16   **Q.**   Thank you.

02:43 17   **A.**   I have my report here.

02:43 18   **Q.**   Tell the jury if you had reviewed Mr. Kopreski's

02:43 19   deposition before you formed your opinions.

02:43 20   **A.**   Before I wrote this report, no, I had not.

02:43 21   **Q.**   You did not update that report for us either, did you?

02:43 22   **A.**   I did not.  And it didn't change my opinions.

02:43 23   **Q.**   It may not have changed your opinions, but before we came

02:43 24   to court today, I had no idea you had looked at anything other

02:44 25   than what you had told me you had looked at in forming your

JOHN GLASPY - CROSS

02:44  1    opinions.

02:44  2         That's a fair thing for me to understand, isn't it?

02:44  3    What you've looked at, coming in here?

02:44  4    A.   I'm not a lawyer, so I don't --

02:44  5         MR. MICELI:  May I approach, Your Honor?

02:44  6         THE COURT:  Yes, you may.

02:44  7    BY MR. MICELI:

02:44  8    Q.   Now, Dr. Glaspy, you know that Dr. Kopreski didn't do that

02:44  9    analysis until October of last year, right?

02:44 10    A.   I believe that's when he did it, yes.

02:44 11    Q.   About the time that -- right in the middle of when this

02:44 12    case was being litigated, the attorneys decided to find

02:44 13    somebody and have them put together that chart.

02:44 14    A.   Is that a question?

02:44 15    Q.   Yes, sir.

02:44 16    A.   I have no idea.

02:44 17    Q.   But you know he said he did it so that he could figure out

02:44 18    the difference between ongoing and persisting, right?

02:45 19    A.   I thought he did it to clear up confusion about how many

02:45 20    of these alopecia cases have been documented to go beyond seven

02:45 21    months.

02:45 22    Q.   Do you know anybody's name who resides in the Sanofi

02:45 23    department of biostatistics and data mining?

02:45 24    A.   I don't know if I do.

02:45 25    Q.   You know that -- well, you know that in every clinical

JOHN GLASPY - CROSS

02:54  1    seen, yes.

02:54  2    Q.   Well, have you looked at the protocol to see if that's how

02:54  3    they defined it?

02:54  4    A.   That wouldn't be protocol defined.

02:54  5    Q.   Have you looked at the statistical analysis plan?

02:54  6    A.   It wouldn't be there either.

02:54  7    Q.   Where would it be, sir?

02:54  8    A.   It wouldn't be any of those places.  This is the way data

02:54  9    is stored, and then when you punch a button, you can read it

02:54 10    out.  It's up to the person reading it out to interpret what it

02:54 11    means.

02:54 12    Q.   And you haven't looked at the -- you haven't looked at the

02:54 13    SAS programming to determine what it means?

02:54 14    A.   That's correct.

02:54 15    Q.   You haven't looked at the actual datasets, which are

02:54 16    ginormous spreadsheets of data, correct?

02:54 17    A.   That's correct, I did not.

02:54 18    Q.   You haven't looked at those.

02:54 19         And so your understanding of it is just -- comes from

02:54 20    the ether, or is it something that you learned from

02:55 21    Dr. Kopreski?

02:55 22    A.   Yeah, well, I don't think we have discussed ether today.

02:55 23    So --

02:55 24    Q.   Okay.

02:55 25    A.   So where it came from was the blood and guts of doing this

JOHN GLASPY - CROSS

02:55 1    clinical trial, being involved in its planning and its

02:55 2    execution and knowing how it took place, having been involved

02:55 3    in clinical trials over years, and having seen this kind of

02:55 4    interpretation need to be clarified.

02:55 5            But I will say again that if the data that

02:55 6    Dr. Kopreski put in that table isn't accurate, then my analysis

02:55 7    is flawed.  If it is accurate, I will stand by it.

02:55 8    Q.   Okay.  Before we go to that last document I gave you,

02:55 9    let's flip back to page 79 of the Mackey article.

02:55 10   A.   Okay.  I've got it.

02:55 11   Q.   Are you there at the bottom with me?  That paragraph

02:55 12   that's titled "Contributors," you go about four lines down and

02:56 13   there's a "JRM"?

02:56 14   A.   Yes.

02:56 15   Q.   And then you go over about five initials and there's a

02:56 16   "JG."

02:56 17            That's for John Glaspy, right?

02:56 18   A.   There we go.  Yes, it is.

02:56 19   Q.   And if you continue on in that sentence, it says the

02:56 20   individuals whose initials are there participated in data

02:56 21   collection, right?

02:56 22   A.   That's correct.

02:56 23   Q.   And that just means you enrolled patients at your study

02:56 24   center?

02:56 25   A.   No.  It means I filled out those case report forms and

JOHN GLASPY - REDIRECT

04:35  1          Do you remember that?

04:35  2  **A.**   I do.

04:35  3  **Q.**   And I think you said -- and correct me if I'm wrong -- I

04:35  4  think you said:  "If there's anything in the chart that is

04:35  5  inaccurate, then my analysis is inaccurate."

04:35  6          Do you remember that?

04:35  7  **A.**   I do.

04:35  8  **Q.**   Has the plaintiff in this case pointed you to one single

04:35  9  piece of data in Dr. Kopreski's analysis that was inaccurate?

04:35 10  **A.**   No.

04:35 11  **Q.**   Questions were asked about risks of hair loss with

04:35 12  Adriamycin and cyclophosphamide, and Mr. Miceli was writing on

04:35 13  his chart.

04:35 14          Do you remember that?

04:35 15  **A.**   I do.

04:35 16  **Q.**   Doctor, in your experience, has hair loss and alopecia

04:36 17  always been a known effect of Adriamycin?

04:36 18         **MR. MICELI:**  Objection.  Leading.

04:36 19         **THE COURT:**  I think you need to rephrase your

04:36 20  question.

04:36 21  **BY MR. STRONGMAN:**

04:36 22  **Q.**   Doctor, is hair loss a known side effect of Adriamycin?

04:36 23         **MR. MICELI:**  Same, Your Honor.  I'm sorry.

04:36 24         **THE COURT:**  I'm going to allow it.

04:36 25         **THE WITNESS:**  It is.

08:46:10  1   here.

08:46:10  2          And most importantly, yesterday the testimony of Sanofi's

08:46:16  3   employee, a non-expert, Dr. Michael Kopreski, was let in.  And the

08:46:24  4   Court's reasoning in Docket 6160 regarding plaintiff's motion to

08:46:30  5   exclude expert testimony that relies upon defendant's employee,

08:46:33  6   Dr. Michael Kopreski, is very important here.  Because in the

08:46:38  7   Court's order and reasons, your Honor made it clear that

08:46:44  8   defendant's experts are allowed to rely on Dr. Kopreski's

08:46:50  9   reanalysis if, for example -- if they had did independent reviews

08:46:57  10  of the work.  You gave an example regarding Dr. Arrowsmith, who was

08:47:02  11  not called by the defense.  And you said Dr. Arrowsmith, for

08:47:07  12  example, examined patient data for two TAX316 patients and reached

08:47:11  13  the same conclusions as Dr. Kopreski leading her to conclude his

08:47:16  14  analysis was reliable; which makes some sense.

08:47:20  15         The problem that occurred yesterday and the prejudice to

08:47:24  16  the plaintiffs is Dr. Kopreski was allowed to testify about his

08:47:30  17  reanalysis.  The defense put up the actual reanalysis, which was

08:47:36  18  shown to the jury, which your Honor had instructed them not to do.

08:47:39  19  The defense put up pictures related to an article on tamoxifen and

08:47:46  20  hair loss, which, as your Honor knows, the plaintiff did not take

08:47:51  21  in this case.  That was a violation of an MIL.

08:47:54  22         And then Dr. Glaspy gets on the stand and -- as the

08:48:00  23  plaintiff predicted, Dr. Glaspy gets on the stand and he

08:48:03  24  specifically says that he did not independently verify the data

08:48:07  25  that Dr. Kopreski had put together.  In fact, he looked at a chart

08:48:13 1    that Dr. Kopreski had prepared, and he didn't look at any of the

08:48:18 2    underlying data.  As the evidence shows, Dr. Kopreski conducted

08:48:23 3    this analysis in 20 -- either '18 or '19, but certainly well after

08:48:29 4    the TAX316 data had been locked, post hoc analysis.  We find it

08:48:36 5    very prejudicial and that there's no probative value for most of

08:48:40 6    the opinions that were given.

08:48:42 7           To be clear, we do understand that the Court instructed

08:48:46 8    the jury that Dr. Kopreski is not an expert.  Although we

08:48:51 9    appreciate that, that doesn't get us over the fact of the prejudice

08:48:55 10   that Dr. Kopreski was allowed to bring into this courtroom; and

08:49:01 11   quite frankly, Dr. Glaspy couldn't validate at all.

08:49:05 12          Specifically, if I may quickly, your Honor, one example

08:49:09 13   the question that Dr. Glaspy was asked by my colleague Mr. Miceli,

08:49:15 14   "QUESTION:  You didn't make the chart" -- referring to

08:49:18 15   Dr. Kopreski's chart -- "You didn't make the chart.  You didn't do

08:49:22 16   anything to validate it either, did you?

08:49:24 17          "ANSWER:  That's correct."

08:49:25 18          There are at least a few examples in Dr. Glaspy's

08:49:31 19   testimony that are similar to that.  In addition, the multiple

08:49:36 20   expert opinions that Dr. Kopreski gave were improper as he was not

08:49:40 21   an expert as the Court clearly noted.

08:49:44 22          Your Honor, the standard in the Fifth Circuit is under

08:49:49 23   *Hollybrook Cottonseed Processing v. American Guaranty and Liability*

08:49:53 24   *Insurance Company*, 772 F.3d 1031.  It's a Fifth Circuit 2014 case.

08:50:02 25   And the Court stated, "When faced with a motion for a mistrial

08:50:06  1   based on the submission of prejudicial information to the jury, the

08:50:09  2   district court must decide whether the error is harmless or

08:50:13  3   assessing whether the error did not influence the jury or have but

08:50:17  4   a very slight effect."

08:50:19  5          In this situation, your Honor, this is major testimony

08:50:23  6   from Sanofi that offered opinions outside of this gentleman's -- he

08:50:31  7   wasn't even an expert, so he was a lay person; offered multiple

08:50:34  8   expert opinions.  And when Dr. Glaspy testified, he said he could

08:50:38  9   not validate the data.  Wholly improper and highly prejudicial to

08:50:44 10   the plaintiffs.

08:50:45 11          In addition, I have mentioned -- I'll make this short.  I

08:50:49 12   mentioned multiple MIL violations in the past at the bench.  I

08:50:53 13   think the Court -- I know your Honor has recognized some of those

08:50:57 14   MIL violations.  I'll point out just one specifically.

08:51:01 15          With regard to whether or not Dr. Carinder is responsible

08:51:03 16   for a patient's condition, that was MIL No. 7, which the Court

08:51:08 17   granted in part.  The defendants have on multiple times violated

08:51:13 18   this inferring that somehow Dr. Carinder's prescription of the

08:51:19 19   regimen that he gave Ms. Earnest somehow caused her permanent

08:51:25 20   alopecia.  The Court has specifically stated in that MIL ruling

08:51:30 21   that that type of suggestion to the jury was not to happen, and

08:51:35 22   it's happened multiple times, your Honor.

08:51:37 23          So for these multiple reasons, we move for a mistrial,

08:51:40 24   your Honor.

08:51:40 25          THE COURT:  Thank you.  Mr. Strongman.

08:51:43  1          MR. STRONGMAN:  Your Honor, Sanofi would oppose the

08:51:47  2    mistrial.  And, obviously, this is an issue that has been discussed

08:51:51  3    and debated numerous times over the last several days in terms of

08:51:56  4    the Dr. Kopreski analysis.  So we would simply incorporate all of

08:51:59  5    the arguments that have been made before.

08:52:01  6          We think what transpired was entirely appropriate.

08:52:05  7    Dr. Kopreski's testimony was entirely appropriate.  The video that

08:52:09  8    was shown was viewed and cleared by both sides days before it was

08:52:13  9    shown.

08:52:13  10          And with regard to the reliance of Dr. Glaspy relying on

08:52:18  11    data such as that is entirely appropriate.  It's no different than

08:52:22  12    an expert relying on a piece of literature that -- the expert

08:52:25  13    didn't go through that literature and look at all of the underlying

08:52:28  14    data in that literature, but they can rely on the literature.  So

08:52:31  15    this is certainly appropriate evidence, and we just simply

08:52:34  16    incorporate all of our responses that we had previously to this

08:52:38  17    issue.

08:52:39  18          THE COURT:  When faced with a motion for mistrial, the

08:52:45  19    Court has various options to undertake; one, I can grant it, deny

08:52:50  20    it outright, or take other precautionary measures.  I know both

08:52:57  21    prior to and following the testimony of Dr. Kopreski the Court

08:53:03  22    notes specifically told the jury that Dr. Kopreski was not -- had

08:53:09  23    not been tendered nor accepted by this Court as an expert in this

08:53:15  24    field.  The Court gave Mr. Miceli wide latitude in cross-examining

08:53:21  25    Dr. Glaspy related to the testimony of Dr. Kopreski, and he did,

08:53:29  1    indeed, say, "I just relied on it."  What you didn't answer was the

08:53:33  2    following answer, which was when Dr. Glaspy had to admit, "If this

08:53:37  3    is wrong, I am wrong, and I didn't look it and I can't verify this

08:53:42  4    information."  I think that was fully vetted for the jury.

08:53:46  5          Additionally, as to Dr. Carinder, there was some

08:53:55  6    intimation that he did not follow the exact dosage in the label.

08:54:06  7    However, Dr. Glaspy said this was all within the standard of care.

08:54:11  8    There was no one that said that he violated the standard of care,

08:54:14  9    or this was inappropriate, or not a reasonably anticipated use of

08:54:19 10    the product.  I believe that's been clearly established that this

08:54:24 11    dosage was in the standard of care.

08:54:27 12          There was testimony as to the cumulative dosage.  I do

08:54:30 13    not believe that any question regarding what the label says

08:54:34 14    vis-a-vis the dosage in any way prejudiced anybody.  I think it was

08:54:41 15    very clear that this was an appropriate treatment, and I don't find

08:54:48 16    that.

08:54:49 17          For those reasons, the mistrial is denied.

08:54:52 18          MR. COFFIN:  Your Honor, one last thing.  We just want to

08:54:54 19    make a proffer at some point later on; have Ms. Earnest testify

08:55:00 20    about when she got that phone call.

08:55:02 21          THE COURT:  Fine.  But let's go ahead and get --

08:55:09 22          MR. COFFIN:  Thank you, your Honor.

08:55:11 23          MR. MOORE:  Your Honor, real briefly, I just raised this

08:55:13 24    with Sam.  One of the things that we talked about on the jury

08:55:16 25    verdict form --

10:37:01  1          Now, what do I mean when I say that?  If you want to know

10:37:06  2  what was going on with those 29 patients and those 16 patients, you

10:37:11  3  have to look at the underlying information on each one of them to

10:37:16  4  see did they truly report ongoing alopecia or permanent hair loss.

10:37:23  5  The only person in this trial to do that was Dr. Kopreski, and he

10:37:28  6  did it at plaintiff's request.  Dr. Kopreski told you that he

10:37:32  7  looked at the underlying data patient by patient, record by record,

10:37:36  8  and what do you find when you do that?  It's not 29 patients with

10:37:39  9  ongoing alopecia in the Taxotere arm.  It's six.  And it's not 16

10:37:44 10  in the FAC arm.  It's four.  And remember, this is out of over 700

10:37:51 11  patients on each one of these sides.

10:37:54 12          Now, why is that so?  Because what happened, ladies and

10:37:59 13  gentlemen, is that, unfortunately, some of the patients in this

10:38:03 14  study passed away.  They also happened because some of the patients

10:38:08 15  left the study.  But in that case, these patients were still

10:38:12 16  counted as having ongoing or permanent alopecia at the conclusion

10:38:19 17  of the study.  But if you want to know what really happened with

10:38:23 18  TAX316, just like a book, you have to read the book to know how the

10:38:27 19  story ends.  And the only person in this case that did that was

10:38:30 20  Dr. Kopreski.

10:38:31 21          Now, Dr. Madigan, plaintiff's expert on statistics, the

10:38:36 22  biostatistician, even he had to admit with these numbers, 6 and 3,

10:38:39 23  it's just not statistically significant.  And what that means is

10:38:44 24  it's not meaningful.  You heard Dr. Plunkett talk about it, she

10:38:48 25  said it could just be due to chance.

10:38:50  1      And, ladies and gentlemen, if the numbers from TAX316 are

10:38:53  2  not meaningful to Dr. Madigan, how can they support the opinion of

10:38:57  3  the rest of the experts in this case who rely upon it?  The whole

10:39:02  4  case fails once you look at what's under the hood with TAX316.

10:39:10  5      Now, I'm sure someone from the plaintiff's side is going

10:39:14  6  to get up here and say, "Well, even if the numbers were six and

10:39:17  7  three, it was still greater with Taxotere.  Ladies and gentlemen,

10:39:20  8  this was a study involving over 1,400 women.  And when you're

10:39:25  9  talking about the numbers of six and three in that context, it's so

10:39:29 10  small that it's not meaningful.  It would be like if I put one

10:39:33 11  piece of paper here and two pieces on top of each other here.  When

10:39:40 12  you look, you couldn't see the difference.  It's not meaningful,

10:39:44 13  the difference.

10:39:46 14      What else did you hear about TAX316?  You were told that

10:39:50 15  even if the numbers are 29 and 16, that it's not statistically

10:39:54 16  significant.  Dr. Kessler told you that, Dr. Madigan.  That means

10:39:59 17  it's meaningless.  That's what that means.  Their own experts

10:40:03 18  admitted that.

10:40:05 19      Don't forget about the patients on the right-hand side of

10:40:07 20  the page.  They never took Taxotere.  And what happened?  They

10:40:11 21  reported persistent permanent hair loss.  Never took a drop of

10:40:17 22  Taxotere.

10:40:17 23      And let me say one other thing about TAX316.  TAX316 was

10:40:22 24  not a study that was engineered or developed to study hair loss.

10:40:26 25  It was looking at efficacy.  Is Taxotere effective?  And when they

11:30:01  1          MR. MOORE:  It was definitely published to the jury.

11:30:03  2          THE COURT:  I think you questioned her about it.

11:30:05  3          MS. SASTRE:  We put it up.

11:30:06  4          THE COURT:  You showed it to her I don't recall it

11:30:09  5  being --

11:30:10  6          MS. SASTRE:  It was published.  Our recollection is that

11:30:12  7  it was moved in, but of course we checked and we found out that

11:30:17  8  wasn't the case, so.

11:30:19  9          THE COURT:  We might need to look at the record.  My

11:30:23 10  recollection is that it was not.  I thought it was something to

11:30:26 11  confront her with, she showed it, she read it.  I thought it was

11:30:30 12  more impeachment.

11:30:33 13          MR. COFFIN:  I think it was impeachment for sure.

11:30:35 14          THE COURT:  It definitely was impeachment, but I don't

11:30:37 15  recall it being moved in.  And we might have to look through the

11:30:41 16  record.  Trust me, they're going to have time to get this straight.

11:30:45 17  Let me go ahead and charge the jury.  By the time Ms. Mouledous

11:30:50 18  gets all of this in order, it will take a few minutes, and we can

11:30:55 19  dig through the transcript.  I think we have people on both sides

11:30:58 20  that can probably pull up Ms. Earnest's testimony pretty quickly.

11:31:03 21          MR. COFFIN:  Just a couple of other notes for the record,

11:31:05 22  your Honor.

11:31:05 23          Following up on the plaintiff's motion for a mistrial.

11:31:10 24  In closing statement regarding Dr. Kopreski, we heard from defense

11:31:14 25  counsel this quote, "but if you want to know what really happened

11:31:17 1    with TAX316, just like a book, you have to read the book and know

11:31:22 2    how the study ends.  And the only person in this case that did that

11:31:28 3    was Dr. Kopreski."  That's the end of the quote.  Now, Dr. Kopreski

11:31:32 4    is not an expert and it's improper to say that he is the, quote,

11:31:35 5    only person when he is not qualified to provide expert testimony

11:31:39 6    and no one else can validate his numbers.

11:31:44 7            The second thing is, as your Honor is aware, the defense

11:31:46 8    requested that the Court add in the jury instructions an issue

11:31:52 9    about the value of the benefit of Taxotere, that's not the law in

11:31:55 10   the State of Louisiana.  And your Honor struck that.  Unfortunately

11:31:59 11   Ms. Sastre said in front of the jury that they should consider the

11:32:03 12   value of the benefit of Taxotere, which is not something that they

11:32:06 13   should consider.

11:32:07 14           The third thing is, there's a stem cell slide and the

11:32:13 15   inference was that there was a failed study of stem cells, and that

11:32:18 16   clearly isn't the case and that violates another one of your

11:32:22 17   MILs --

11:32:23 18           THE COURT:  Well, the MIL on that, to be clear for more

11:32:31 19   than the second or third time, was that I was allowing testimony as

11:32:38 20   to the stem cell review of Ms. Earnest's slide.  And there was

11:32:49 21   testimony as to the presence of stem cells, it was responded to by

11:32:54 22   Dr. Tosti.  I believe there was another expert that spoke to the

11:33:03 23   slide, but certainly Dr. Tosti spoke to it and it was appropriate.

11:33:07 24           This is argument.  The jury is going to be clearly

11:33:11 25   informed that that is not evidence, it is argument.