08:48:06

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION

Docket No.: 16-MD-2740
Section "H(5)"
September 16, 2019
New Orleans, Louisiana

*Relates To*: *Barbara Earnest,*
*Case No.: 16-CV-17144*

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

DAY 1, MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs: Barrios, Kingsdorf & Casteix, LLP
BY: DAWN BARRIOS, ESQ.
701 Poydras Street
Suite 3650
New Orleans, Louisiana 70139

For the Plaintiffs: Gainsburgh, Benjamin, David, Meunier & Warshauer, LLC
BY: PALMER LAMBERT, ESQ.
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163-2800

APPEARANCES:

For the Plaintiffs: David F. Micelli, LLC.
BY: DAVID F. MICELI, ESQ.
P. O. Box 2519
Carrolllton, GA 30112

For the Plaintiffs: Gibbs Law Group, LLP
BY: KAREN BARTH MENZIES, ESQ.
400 Continental Boulevard
6th Floor
El Segundo, California 90245

For the Plaintiffs: Pendley, Baudin & Coffin, LLP
BY: CHRISTOPHER COFFIN, ESQ.
1100 Poydras Street
Suite 2505
New Orleans, Louisiana 70163

For the Plaintiffs: Bachus & Schanker, LLC
BY: DARIN SCHANKER, ESQ.
BY: J. KYLE BACHUS, ESQ.
1899 Wynkoop Street
Suite 700
Denver, Colorado 80202

For the Plaintiffs: Fleming, Nolen & Jez, LLP
BY: RAND P. NOLEN, ESQ.
2800 Post Oak Boulevard
Suite 4000
Houston, Texas 77056

APPEARANCES:

For Sanofi-Aventis U.S., LLC and Sanofi US Services, Inc.:

Irwin Fritchie Urquhart & Moore, LLC
BY: DOUGLAS J. MOORE, ESQ.
400 Poydras Street, Suite 2700
New Orleans, Louisiana 70130

For Sanofi-Aventis U.S., LLC and Sanofi US Services, Inc.:

Shook Hardy & Bacon, LLP
BY: HARLEY V. RATLIFF, ESQ.
BY: JON A. STRONGMAN, ESQ.
2555 Grand Boulevard
Kansas City, Missouri 64108

For Sanofi-Aventis U.S., LLC and Sanofi US Services, Inc.:

Shook Hardy & Bacon, LLP
BY: HILDY SASTRE, ESQ.
201 Biscayne Boulevard
Suite 3200
Miami, Florida 33131

Official Court Reporter:

Cathy Pepper, CRR, RMR, CCR
Certified Realtime Reporter
Registered Merit Reporter
500 Poydras Street, Room B-275
New Orleans, Louisiana 70130
(504) 589-7779
Cathy_Pepper@laed.uscourts.gov

Proceedings recorded By mechanical stenography. Transcript produced by computer-aided transcription.

**I N D E X**

PAGE

VOIR DIRE.......................................... 5

JURY SELECTED...................................... 151

PRELIMINARY JURY INSTRUCTIONS...................... 152

LUNCHEON RECESS.................................... 159

**P-R-O-C-E-E-D-I-N-G-S**

SEPTEMBER 16, 2019

M O R N I N G   S E S S I O N

(COURT CALLED TO ORDER)

VOIR DIRE

08:38:54 THE DEPUTY CLERK: If I could have all our prospective jurors stand up, please. I'm going to give you your preliminary oath. Everybody could raise their right hand.

08:39:05 Do you solemnly swear that you will make true and perfect answers to all questions that shall be propounded to you touching on your qualifications and competency to sit as jurors in this case, so help you God?

08:39:17 THE PROSPECTIVE JURORS: I do.

08:39:17 THE DEPUTY CLERK: Thank you. Y'all can have a seat.

08:40:06 All rise.

08:40:07 THE COURT: Good morning. Court is in session; you may be seated. This is civil matter 17-144, Barbara Earnest versus Sanofi.

08:40:35 Are the parties ready to proceed?

08:40:39 MR. SCHANKER: Yes.

08:40:40 MS. SASTRE: We are, Your Honor.

08:40:42 THE COURT: Good morning. I do recognize that your being here is an inconvenience for you and for your families.

Please know that your service is appreciated.

The first thing we're going to do this morning is select an eight-person jury to sit for a civil matter that we anticipate will last two weeks.

As I mentioned -- as I just mentioned, this is a civil case. The plaintiff, the person who filed this lawsuit, is Barbara Earnest. The defendant is a company named Sanofi. Barbara Earnest took a chemotherapy drug called Taxotere as part of her treatment for breast cancer. Ms. Earnest contends that Taxotere prevented her hair from growing back and that she now has permanent hair loss on her head and eyebrows that was caused by Taxotere.

Ms. Earnest also asserts that Sanofi, the manufacturer of Taxotere, did not warn her doctor about the risk of permanent hair loss associated with Taxotere. Ms. Earnest seeks damages for her injuries from Sanofi.

Sanofi denies these allegations and contends that it provided adequate warnings to Ms. Earnest's doctor. Sanofi contends that Taxotere did not cause Ms. Earnest alleged injury. Sanofi contends that the approved prescribing information contained accurate scientific -- science-based information that enabled Ms. Earnest's doctor to make an informed decision about the benefits and risks of using Taxotere.

Both the plaintiff and the defendant are entitled

to have this case tried by qualified, fair, and impartial jurors. A qualified and impartial jury is one which is responsible and capable and which will objectively, without fear, favor, bias, prejudice, sympathy or passion hear and decide the issues to be tried, and one which will render its verdict based solely on the evidence presented at this trial and the law applicable to the case as given to the jury by the Court.

The law requires that we inquire into a juror's qualifications and impartiality. This inquiry, which is about to be made, is known as the *voir dire examination*. Its purpose is to develop the whole truth concerning the competency of each prospective juror, his or her frame of mind and ability to do his or her sworn duty in accordance with the juror's oath.

The answers to the questions that I will ask you and the attorneys will ask you will, not only enable the Court to determine whether any of you should be excused for cause, either on the Court's own motion or when challenged for cause by any party, but will also allow counsel for the parties to make intelligent use of peremptory challenges. Those are challenges which the law gives the parties and which will be exercised without assigning any reason therefor.

You should understand, therefore, that each of you is expected to provide complete and truthful answers. Each juror is under compulsion to disclose upon a general question

any matters which might tend to disqualify him or her for any reason from sitting on the case.

False or misleading answers may result in the seating of a juror who might have been discharged by the Court for cause or stricken through the exercise of peremptory challenges, which could, in turn, result in a miscarriage of justice.

Some of the questions will be addressed to you individually. However, most will be addressed to the jury collectively. For those questions addressed to the jury collectively, I ask that each of you consider the question as though directed to you individually, and that each of you answer the question separately.

If you feel during the course of this examination that the response to any of the questions that I ask or the attorneys ask is of a personal nature, you should feel free to request permission to approach the bench and discuss the matter directly with the attorneys and me.

As I said, it is anticipated that this trial -- the trial of this case may require ten days to complete, or two weeks. At the end of each day, the members of the jury will be permitted to return to their homes.

Because this trial may require ten days to complete, if any of you honestly and conscientiously believe that you'll be subjected to serious hardship or would otherwise

be seriously inconvenienced if you are selected to serve as a juror due to the estimated length of the trial, I request that you raise your hands and give me that information.

As I indicated to you earlier, if you feel that any of your answers are of a personal nature, you may approach the bench. Please -- okay. Mr. Stanifer, Juror Number 1. Yes, sir.

PROSPECTIVE JUROR 1: Your Honor, as of last -- this past Friday, my father-in-law was sent home from the hospital after four weeks. And he's home on hospice care. And they've started administering the morphine in order to comfort him. I don't know if he's going to last a day or a week or two weeks, but in the event that he does pass, you know, I have to be there for my family. So...

THE COURT: I understand, and I'm very sorry that your family is going through this. Thank you. Please sit.

Is there anyone else? I think we have Ms. Defils, Juror Number 6.

PROSPECTIVE JUROR 6: I submitted some information previously, but I'm in the middle of proceedings at work that there is no one else there in my role to handle those responsibilities. It's going to be happening within -- we're under consent judgment, and this --

THE COURT: Is the school under evaluation presently?

PROSPECTIVE JUROR 6: Yes. We're in the process of

getting records together. There is a conference call this week, and then on the 27th, which is next Friday, is when we'll have our site visit to present evidence. And so, I'm in the middle of gathering that information to represent the school.

THE COURT: Thank you, ma'am.

PROSPECTIVE JUROR 6: Thank you.

THE COURT: I believe there is Juror Number 12?

PROSPECTIVE JUROR 12: Your Honor, I live so far away, I live 174 miles, and I really don't drive hardly at all. I have to find somebody to bring me and come get me, and it would be a hardship.

THE COURT: How did you -- Ms. Threeton, if we were able to help find accommodations for you to stay here in New Orleans, would that provide assistance? Would that alleviate those concerns?

PROSPECTIVE JUROR 12: Yes, and if you could find me a way to get back and forth.

THE COURT: No, I mean if we could find a place for you to stay here in New Orleans, if we could provide that, would that --

PROSPECTIVE JUROR 12: Yep. Yes.

THE COURT: Thank you, ma'am.

PROSPECTIVE JUROR 12: Thank you.

THE COURT: Okay. Yes, ma'am. This is Ms. Roberts, Juror Number 14.

PROSPECTIVE JUROR 14: The majority of my income is commission. I'm a loan officer, the only loan officer in Slidell in my office, and if I was out for two weeks, it would kill me financially.

THE COURT: Okay. Ma'am, is this -- okay, we may just -- we may ask you further questions about that later. Thank you.

Is there somebody else in the front? That is Mr. Jordan, Juror Number 18.

PROSPECTIVE JUROR 18: Yes, Your Honor, I have the same problem this lady here had with financial problems. I was in a bad accident last year, and I just started back working Friday. So, I really don't have the money to pay for parking.

THE COURT: Mr. Jordan, what do you do? Are you are working now?

PROSPECTIVE JUROR 18: Yes, ma'am.

THE COURT: What do you do?

PROSPECTIVE JUROR 18: I do security.

THE COURT: You do security?

PROSPECTIVE JUROR 18: Yes, ma'am.

THE COURT: And is the problem parking?

PROSPECTIVE JUROR 18: Yeah, paying for parking for right now.

THE COURT: If we were able to work through that, would that -- would you be able to serve if we were able to work with

08:50:19 the Clerk's Office to provide some assistance with parking?

08:50:23 PROSPECTIVE JUROR 18: Yes, ma'am.

08:50:24 THE COURT: Beyond that, that's the problem?

08:50:25 PROSPECTIVE JUROR 18: Yes, ma'am.

08:50:26 THE COURT: Thank you, Mr. Jordan.

08:50:35 Anyone else? Do you know what, we'll ask those 08:50:42 of you in the back -- I'm asking you to listen very carefully 08:50:45 if we, indeed, have to call you up on the next panel, but for 08:50:50 now, I'm just asking you to listen so that if we do this again, 08:50:54 you'll be prepared.

08:50:56 Can all of you read, write, speak, and understand 08:51:00 the English language?

08:51:04 Each of you has filled out a questionnaire before 08:51:08 today. And I'm going to ask you each individually if you 08:51:12 answered the questions honestly and completely. Mr. Stanifer?

08:51:18 PROSPECTIVE JUROR 1: Yes.

08:51:19 THE COURT: Ms. Boutte.

08:51:20 PROSPECTIVE JUROR 2: Yes.

08:51:21 THE COURT: Ms. Duhe.

08:51:22 PROSPECTIVE JUROR 3: Yes.

08:51:23 THE COURT: Mr. Toliver.

08:51:24 PROSPECTIVE JUROR 4: Yes.

08:51:25 THE COURT: Mr. Gillin.

08:51:27 PROSPECTIVE JUROR 5: Yes.

08:51:28 THE COURT: Ms. Defils.

PROSPECTIVE JUROR 6: Yes.
THE COURT: Ms. Becnel.
PROSPECTIVE JUROR 7: Yes.
THE COURT: Mr. Briggs?
PROSPECTIVE JUROR 8: Yes.
THE COURT: Mr. Webre?
PROSPECTIVE JUROR 9: Yes.
THE COURT: Ms. Hudson?
PROSPECTIVE JUROR 10: Yes.
THE COURT: Ms. Nelson.
PROSPECTIVE JUROR 11: Yes.
THE COURT: Ms. Threeton.
PROSPECTIVE JUROR 12: Yes.
THE COURT: Mr. Kilgen?
PROSPECTIVE JUROR 13: Yes.
THE COURT: Ms. Roberts?
PROSPECTIVE JUROR 14: Yes.
THE COURT: Ms. Blackwell?
PROSPECTIVE JUROR 15: Yes.
THE COURT: Ms. Tiemann?
PROSPECTIVE JUROR 16: Yes.
THE COURT: Mr. Guice?
PROSPECTIVE JUROR 17: Yes.
THE COURT: Mr. Jordan?
PROSPECTIVE JUROR 18: Yes.

08:51:52 THE COURT: Ms. Billings?
08:51:53 PROSPECTIVE JUROR 19: Yes.
08:51:54 THE COURT: Mr. Ritter?
08:51:55 PROSPECTIVE JUROR 20: Yes.
08:51:56 THE COURT: And Ms. Martin? You didn't answer the --
08:51:59 PROSPECTIVE JUROR 21: That's not my name.
08:52:01 THE COURT: Oh, I apologize.
08:52:07 Ma'am, could I have your name.
08:52:10 PROSPECTIVE JUROR 21: Trascher, Debra.
08:52:20 THE COURT: I think they have it wrong on the list. Debra Trascher. We have you as -- thank you, ma'am.
08:52:32 All right. Now, did you answer the questionnaire truthfully and completely?
08:52:37 PROSPECTIVE JUROR 21: Yes.
08:52:38 THE COURT: Yes, ma'am.
08:52:41 If any of your answers have changed since the time that you visited and answered the questions, since completing it, please raise your hand. If any of you have any answers that have changed or you feel like there is additional information that was not provided.
08:53:01 Now I'm going to ask you individually if you have discussed your answers with anyone before or after completing the questionnaire. Mr. Stanifer?
08:53:13 PROSPECTIVE JUROR 1: No.
08:53:14 THE COURT: Ms. Boutte.

PROSPECTIVE JUROR 2: No.

THE COURT: Ms. Duhe?

PROSPECTIVE JUROR 3: No.

THE COURT: Mr. Toliver?

PROSPECTIVE JUROR 4: No.

THE COURT: Mr. Gillin?

PROSPECTIVE JUROR 5: No.

THE COURT: Ms. Defils.

PROSPECTIVE JUROR 6: No.

THE COURT: Ms. Becnel?

PROSPECTIVE JUROR 7: No.

THE COURT: Mr. Briggs?

PROSPECTIVE JUROR 8: No.

THE COURT: Mr. Webre?

PROSPECTIVE JUROR 9: No.

THE COURT: Ms. Hudson?

PROSPECTIVE JUROR 10: No.

THE COURT: Ms. Nelson?

PROSPECTIVE JUROR 11: No.

THE COURT: Ms. Threeton?

PROSPECTIVE JUROR 12: No.

THE COURT: Mr. Kilgen?

PROSPECTIVE JUROR 13: No.

THE COURT: Ms. Roberts?

PROSPECTIVE JUROR 14: No.

THE COURT: Ms. Blackwell?

PROSPECTIVE JUROR 15: No.

THE COURT: Ms. Tiemann?

PROSPECTIVE JUROR 16: No.

THE COURT: Mr. Guice?

PROSPECTIVE JUROR 17: Have I mentioned the case to someone after I --

THE COURT: Have you discussed your answers to any of the questions with anyone?

PROSPECTIVE JUROR 17: No. I have mentioned -- I know I'm not supposed to.

THE COURT: I think I'm going to want you to come up here and just talk to me.

Mr. Jordan?

PROSPECTIVE JUROR 18: No.

THE COURT: Ms. Billings?

PROSPECTIVE JUROR 19: No.

THE COURT: Mr. Ritter?

PROSPECTIVE JUROR 20: No.

THE COURT: And Ms. Trascher?

PROSPECTIVE JUROR 21: No.

THE COURT: Mr. Guice, if you don't mind, would you approach the bench.

(WHEREUPON, at this point in the proceedings, there was a conference held at the bench.)

THE COURT: Tell me what you have discussed, Mr. Guice.

PROSPECTIVE JUROR 17: Just the specifics as far as why she's suing and -- just someone that went to chemotherapy and suing the company.

THE COURT: Can you give me all of the conversation. I understand you said you filled out a questionnaire and this is a suit, and what else was that conversation like?

PROSPECTIVE JUROR 17: It wasn't very long. But just my father had cancer. The person I was talking to has breast cancer. She just had one augmentation. She was going to have the other one. Had gone through chemotherapy, and that bothers me, so -- potentially life-saving drug, and then sue the company.

THE COURT: Did those conversations -- in those conversations, did you discuss the merits of the case or your attitude about this sort of case?

PROSPECTIVE JUROR 17: My attitude, yes. The merits, I don't know too many specifics. Just was on the questioning.

THE COURT: You've talked about your attitude toward the case?

PROSPECTIVE JUROR 17: Uh-huh (affirmative response).

THE COURT: What did you say, sir?

PROSPECTIVE JUROR 17: I think it's almost frivolous. The only thing I could see justified in this case would be maybe to cover health expenses.

THE COURT: So it was your belief that -- the attitude that you expressed to these other people is that this is a frivolous lawsuit?

PROSPECTIVE JUROR 17: Yes.

THE COURT: Is that the attitude you bring into court today?

PROSPECTIVE JUROR 17: Yes.

THE COURT: Okay. Can you put that attitude aside and -- or are you pretty fixed in it? Or can you put that attitude aside and render a verdict solely on what you hear in this lawsuit?

PROSPECTIVE JUROR 17: I'll try my best.

THE COURT: Are you confident you can do that?

PROSPECTIVE JUROR 17: I believe so.

THE COURT: Do you want to ask any follow-up questions?

MR. SCHANKER: Yes.

THE COURT: When you indicated that, we felt we needed to come up here before you have this conversation in front of the rest of the jury.

MR. SCHANKER: Thanks for sharing your honest feeling about this. So, Mr. Guice, is it fair to say that you have feelings about people suing a company that might have a potential life-saving drug?

PROSPECTIVE JUROR 17: Yes. You know that potential side effect is hair loss.

MR. SCHANKER: And the judge has explained to us that when you're supposed to be on this jury, you're supposed to base your decision on the evidence.

PROSPECTIVE JUROR 17: Correct.

MR. SCHANKER: And that you're not supposed to let those feelings that you have get in and interfere with the evidence this case.

PROSPECTIVE JUROR 17: And I understand.

MR. SCHANKER: And it's okay that you feel the way you do. It doesn't make you a bad person. Would it be fair to say -- I represent the lady that's bringing the lawsuit. Would it be fair to say, Mr. Guice, that my client might start out behind at the beginning of the case because of those feelings that you expressed?

PROSPECTIVE JUROR 17: I think it would be fair.

MR. SCHANKER: That would be fair to say?

PROSPECTIVE JUROR 17: Yes.

MR. SCHANKER: In spite of your best efforts to set those feelings aside, would it be fair to say, in honesty, it would be difficult to do?

PROSPECTIVE JUROR 17: That's why I'm expressing my feelings now.

MR. SCHANKER: Thank you. I appreciate you doing that.

MS. SASTRE: May I ask a couple questions?

THE COURT: Yes.

08:58:36 MS. SASTRE: Thank you so much. Good morning, sir. Just a couple questions for you. So, of course we're here in the morning just getting a chance to talk with you. You haven't seen or heard any evidence yet. Are you willing to, if you're selected as a juror, to sit here and listen to the evidence with an open mind?

08:58:55 PROSPECTIVE JUROR 17: Absolutely.

08:58:57 MS. SASTRE: And when Her Honor, Judge Milazzo, gives you the law in this case that you have to follow and apply, is that something that you would be willing to do so, sir?

08:59:06 PROSPECTIVE JUROR 17: Yes.

08:59:07 MS. SASTRE: And could you listen to the evidence and follow the law as instructed by the Court, sir?

08:59:16 PROSPECTIVE JUROR 17: Yes.

08:59:16 MS. SASTRE: And do you believe that you could be a fair and impartial juror in this case by listening to the evidence and following the law?

08:59:23 PROSPECTIVE JUROR 17: I'll try my best, yes, but I'm still a human being.

08:59:29 THE COURT: Let me ask you something, Mr. Guice. When you said this is what you told people --

08:59:35 PROSPECTIVE JUROR 17: Just one particular person.

08:59:39 THE COURT: I got it. And it was a conversation, or were you just doing all the talking?

08:59:46 PROSPECTIVE JUROR 17: It wasn't all.

THE COURT: What did they tell you? What did the person you were talking to say to you?

PROSPECTIVE JUROR 17: That basically I don't sound impartial.

THE COURT: Is that what the person you were talking to said to you?

PROSPECTIVE JUROR 17: Yes.

THE COURT: That you don't sound impartial?

PROSPECTIVE JUROR 17: Right. I'm already leaning one way.

THE COURT: Okay. Thank you. I appreciate your candor. That's what this is all about.

MS. SASTRE: Thank you very much.

MR. SCHANKER: Thank you.

(WHEREUPON, at this point in the proceedings, the bench conference concluded.)

THE COURT: Now, ladies and gentlemen of the jury, I know you've completed a questionnaire, but I am going to give you an opportunity to introduce yourself to counsel in this case and myself. So, I'm going to ask each of you to rise, state your name; say the area of the district in which you reside; your occupation; if you're retired, your former occupation; your marital status; how many children you have; the occupation of your spouse; occupation of anybody that lives in your household; and your favorite TV show. But it's really

not that hard. I'll do it for you to give you a heads-up.

My -- so I'll give you an example. My name is Jane Milazzo. I'm a judge. My husband John is a retired banker. Between the two of us, we have six children, all of them out of the house. God is good. I -- I'm originally from Napoleonville. I live in New Orleans now. And my favorite show is *This Is Us*.

So, we're going to start with you, Mr. Stanifer. Wait, we're going to get you a mike. And I will prompt you if you forget something.

PROSPECTIVE JUROR 1: My name is James Stanifer. Pardon me, I had vocal cord cancer years ago.

THE COURT: I'm sorry.

PROSPECTIVE JUROR 1: I'll be 64 years old next month. My wife and I have five children, nine grandchildren. And I retired from Entergy after 44 years of service 17 months ago.

THE COURT: Congratulations. Mr. Stanifer, did your wife work outside the home?

PROSPECTIVE JUROR 1: My wife works for Plaquemines Parish. She's a purchasing agent.

THE COURT: Okay.

PROSPECTIVE JUROR 1: And we -- I guess my favorite pastime is playing golf. And TV shows, mostly it's ESPN stuff.

THE COURT: Thank you, sir. And you live in?

PROSPECTIVE JUROR 1: I live in Belle Chasse.

THE COURT: Thank you, sir. I think that's it.

Ms. Boutte.

PROSPECTIVE JUROR 2: Good morning. My name is Helen Boutte. I'm originally from Lafayette, Louisiana, but reside in Orleans Parish in the Warehouse District. My husband is Carey, the owner and originator of Mulate's, The Original Cajun Restaurant. I am retired, but originally I was a travel agent. I really loved the job. My husband has one daughter; therefore, I have a stepdaughter and two grandchildren.

THE COURT: Favorite TV show?

PROSPECTIVE JUROR 2: So I just finished watching the two series of *Big Little Lies*.

THE COURT: Oh, that's good, too.

Ms. Duhe.

PROSPECTIVE JUROR 3: Good morning, I'm Kathy Duhe. I live in LaPlace, Louisiana. I'm a housewife. I used to work at a local florist and I owned a day care center. Both my husband and I are retired. He was an insurance -- he was a sales representative for the State of Louisiana for an insurance company.

THE COURT: Favorite TV show?

PROSPECTIVE JUROR 3: *Live PD*.

THE COURT: Thank you.

Mr. Toliver.

PROSPECTIVE JUROR 4: Hi. My name is Ronald Toliver.

I'm a refrigeration tech at Tulane University. I've been there 30 years. My wife is a billing clerk at Metropolitan Health Clinic. I have three kids. And my favorite show is ESPN.

THE COURT: Mr. Toliver, you live in?

PROSPECTIVE JUROR 4: Uptown New Orleans.

THE COURT: Thank you, sir.

Mr. Gillin.

PROSPECTIVE JUROR 5: My name is David Gillin. I'm a real estate title abstractor for a local title company. I live in Uptown New Orleans. I'm single, no children, never been married. My favorite TV show is *NCIS*.

THE COURT: Thank you.

Ms. Defils.

PROSPECTIVE JUROR 6: My name is Lori Defils. I'm an educator. I am divorced. I have two children. I live in New Orleans, and I'm currently employed at a high school in New Orleans.

THE COURT: Favorite TV show?

PROSPECTIVE JUROR 6: I don't really watch much TV.

THE COURT: Thank you, ma'am.

Ms. Becnel.

PROSPECTIVE JUROR 7: Good morning. My name is Stephanie Becnel. I'm from St. James Parish. I'm from Vacherie. I am married to Dewayne Becnel. He was a maintenance manager at Dow Chemical. He's retired. I'm a

retired tour guide. I worked for 12 years as a tour guide at Oak Alley Plantation. We have two children, five grandchildren. And my favorite show is *Judge Judy*.

THE COURT: Mr. Briggs.

PROSPECTIVE JUROR 8: My name is Arthur Briggs. I'm retired from Orleans Parish School Board. My wife is the data specialist for the parish. What else?

THE COURT: Children.

PROSPECTIVE JUROR 8: Children, we have five children together. Five grandchildren. And my wife is trying to make me travel. My favorite show is Fox 1.

THE COURT: Thank you, sir.

PROSPECTIVE JUROR 9: My name is Louis Webre. I'm an unemployed field service engineer for laboratory equipment repair. I have a heavy background in chemistry and electronics. My -- I have two sons. My oldest is at LSU dental. And I guess I mainly just watch the news.

THE COURT: Thank you, sir.

Ms. Hudson.

PROSPECTIVE JUROR 10: Good morning, I'm Leslie Hudson. I work as an AR clerk at Cintas Food. My husband works for Jefferson Parish as a deputy chief of the fire department. We have one child. Favorite -- *Chicago PD*, *NCIS*.

THE COURT: Thank you, ma'am.

Ms. Nelson.

PROSPECTIVE JUROR 11: Good morning, my name is Mia Nelson. I'm married. I have two children. I'm unemployed right now. And I just watch TV. I don't have a favorite show.

THE COURT: Ma'am, where does your husband work?

PROSPECTIVE JUROR 11: He's retired, I'm sorry. He's retired from Sewage and Water Board after 30 years.

THE COURT: Thank you, ma'am.

Ms. Threeton.

PROSPECTIVE JUROR 12: Hi, I'm Janie Threeton. I'm usually called Susan. And for Medicare purposes, I have to be called Janie. I'm almost 70. I'm not looking forward to that, but you have to go on, you know. I have one child and two dogs. I live in the country. It's very peaceful. I love it. My favorite show, I watch all of the PBS. Nothing but PBS in all my house, *Downton Abbey*, all of the music. Thank you.

THE COURT: Thank you, ma'am.

Mr. Kilgen.

PROSPECTIVE JUROR 13: My name is Brian Kilgen. I reside in Raceland. I work as an operations manager for a construction company in Thibodaux. I'm recently married. My wife works as a -- in payroll in human resources. As far as television, nothing specific. I do like to watch a lot of the car shows, like *MotorTrend* and stuff like that.

THE COURT: Ms. Roberts.

PROSPECTIVE JUROR 14: My name is Becky Roberts, and

I'm a loan officer, have been for 35 years. And I've got -- I'm divorced. I have three children, six grandchildren. I watch all the Chicago's, all of them. And Fox News. That's it.

THE COURT: Thank you, ma'am.

Ms. Blackwell.

PROSPECTIVE JUROR 15: I'm Lynda Blackwell. I was a unit secretary at Ochsner Hospital in the surgery intensive care unit. I'm widowed ten years, but I'm recently engaged. I'm 73, he's 64. Just call me Mrs. Robinson. Two children. I really don't get to watch my favorite shows anymore since he now lives with me. So we watch *Expedition Unknown* a lot.

THE COURT: Thank you, ma'am.

PROSPECTIVE JUROR 16: I'm Jean Tiemann. I'm a law clerk in the 24th Judicial District Court. My husband is an attorney. He's has a general civil practice. We live in Harvey. I have two grown children. And I watch whatever he's watching.

THE COURT: I understand. Thank you, ma'am.

Mr. Guice.

PROSPECTIVE JUROR 17: Paul Guice. I go by my middle name Garth. I live in Gretna, Louisiana. I'm a locksmith for Rolland Safe & Lock in Metairie. Single, no kids. Show, maybe Netflix. Whatever. Nothing specific.

THE COURT: Thank you, sir.

Mr. Jordan.

PROSPECTIVE JUROR 18: My name is Michael Jordan. I work with Real Security. My wife is a New Orleans policeman. I have five kids. I live in Avondale. And that's it.

THE COURT: Do you watch any TV, sir?

PROSPECTIVE JUROR 18: I like *Rouse* and WCW.

THE COURT: Ms. Billings.

PROSPECTIVE JUROR 19: Hello. My name is Claire Billings. I'm a process safety management clerk at Bayer, which was formally Monsanto. I've been there five years. Prior to that, I was an operations manager in the telecom industry in a five-state area from Texas to Florida. My husband has been at Monsanto, now Bayer, for 22 years. We have one son. He is 26 and a three-year law student at the University of Tennessee. My favorite show is *Friends*. And I live in Luling, Louisiana.

THE COURT: Thank you, ma'am.

Mr. Ritter.

PROSPECTIVE JUROR 20: Good morning, my name is Steve Ritter. I am married. I'm retired. Recently retired about 11 months ago. I was a pharmacist for 41 years. I have two children, three grandchildren, one on the way. Originally from Baton Rouge, now living in Kenner for the last 45 years. I like to watch anything with LSU sports.

THE COURT: Thank you.

09:11:55 Ms. Trascher.

09:11:56 PROSPECTIVE JUROR 21: My name is Debra Trascher. I'm a homemaker now. I used to be an office manager. My husband is a retired St. Tammany Parish teacher. We live in Pearl River, Louisiana. We have one son at home. He's 15. Favorite show, crime dramas and HGTV.

09:12:25 THE COURT: Thank you, ma'am. I'm now going to allow the attorneys to ask questions. If you raise your hand, Ms. Mouledoux will help you get the mike.

09:12:37 Mr. Schanker.

09:12:40 MR. SCHANKER: If it please the Court, Your Honor, thank you. Good morning, folks.

09:12:45 VOICES: Good morning.

09:12:46 MR. SCHANKER: I'll try that again. Good morning, folks. How are y'all doing today? I have noticed being down here -- I'm from Colorado, actually -- you guys do good mornings a little better than I do.

09:13:01 I have a question for you. How many of you, when you woke up this morning, thought to yourself, it's Monday, what do I have to do on Monday? I have to get off to work, get the kids to school -- oh, wait, today is the day, today is the day I get to drive all the way to New Orleans, figure out where to park, go wait in line. Figure out where that federal courthouse is, first of all, if you don't know. Go through the metal detector, be told where to go, figure it out, hurry up

and wait. How many of you when you woke up this morning thought to yourself today, oh, great, today is the day I get to go to jury selection?

Raise your hand high if that's how you felt. We actually have a few folks that were looking forward to being here. I'm impressed with that.

What was that, Mr. Ritter?

PROSPECTIVE JUROR 20: I don't know about that.

MR. SCHANKER: We appreciate you being here. My client appreciates you being here, Barbara Earnest. This is the only opportunity I'm going to get to ask you some questions. And I appreciate if you're brutally honest with us in your responses. You took an oath that that's what this is about.

Mr. Guice has already done that. Thank you, sir, for being honest. We appreciate that.

I'm going to ask you some questions. You all filled out that jury questionnaire, and thank you for coming down here. And I want to ask you some questions based on that jury questionnaire because we already have some information, and I know we have limited time here.

And so, I'm going to -- everyone's favorite thing is to be called on out of the blue, but, I'm sorry, that's the way this is going to work. If I ask you a question you're not comfortable sharing in front of 60 of your closest friends, we can see if the judge will let us do something about that. So

I'm going to pick on some folks here.

Ms. Billings, how are you?

PROSPECTIVE JUROR 19: I'm great.

MR. SCHANKER: Are you comfortable speaking with me this morning?

PROSPECTIVE JUROR 19: Sure.

MR. SCHANKER: And thank you for sharing what you did in your jury questionnaire. Is it fair to say that you're a woman with some strong opinions?

PROSPECTIVE JUROR 19: Yes, absolutely.

MR. SCHANKER: I'm not surprised. So you indicated where you work. Used to be Monsanto. That's Bayer now. Thanks for sharing with us. And it looks like you were brutally honest in your questionnaire. Would you say that?

PROSPECTIVE JUROR 19: I would say that.

MR. SCHANKER: Thank you for that. Do you have feelings about lawsuits? Lawsuits, it could be in general, or lawsuits involving pharmaceutical companies and those sorts of things?

PROSPECTIVE JUROR 19: Sure.

MR. SCHANKER: Are those feelings that you're comfortable sharing with us?

PROSPECTIVE JUROR 19: Sure.

MR. SCHANKER: Would you go ahead and share those with us, please.

PROSPECTIVE JUROR 19: I feel like my -- if we're speaking specifically about pharmaceuticals, that I am in control of my own care. And I use my doctors to help facilitate that, but the final decisions are up to me. And I do all my own research, so I know what questions to ask, what questions not to ask.

I am under care right now, and I did not like the medications I was on, and twice we've changed them because of my feedback to my doctor because I did not like the side effects of the medicine.

MR. SCHANKER: So it sounds like you were actively involved in your care.

PROSPECTIVE JUROR 19: Absolutely.

MR. SCHANKER: Now, with regard to your employment, you indicated that you are kept up to date on lawsuits.

PROSPECTIVE JUROR 19: Right.

MR. SCHANKER: Could you share with us concerning that? Is it something you're allowed to share with us? Obviously nothing that --

PROSPECTIVE JUROR 19: Right, whatever we are allowed to share is already public knowledge.

So we all know that there are commercial after commercial about RoundUp and herbicides, and we are very much aware of what's going on in those cases. We are asked to advocate on behalf of our companies, whatever the name may be.

And, in general, I don't think that our products are unsafe. So, I don't know what else you want to ask me, but --

MR. SCHANKER: No, thank you for sharing. I want to follow up on some of what you said and sort of loop that in with what the judge has instructed us and ask you some questions about that. And I'm going to address this to all of you as well.

We heard the judge talk about if you're on this jury, how you're supposed to judge the case. We're supposed to base it solely on the evidence. Remember, she said that to us a few times. Meaning this is how we're supposed to decide the case, if you're on this jury.

MS. SASTRE: Your Honor, objection.

THE COURT: We're not going to do demonstratives in voir dire.

MR. SCHANKER: So solely on the evidence. But the reality is, I'm sure all of us have feelings on issues and topics. And it may be that those feelings are strong, just like you can't check your common sense at the door -- and, Ms. Billings, I want to ask you about that, and all of you, you may not be able to check those feelings at the door.

So the question is, that circle of deciding the case that's only supposed to be the evidence, as Her Honor instructed us, the question is, are your feelings strong enough about whatever the issue is, feelings about lawsuits, feelings

about these commercials, such that your feelings are going to enter into that decision-making process? I have feelings on cases that I couldn't decide it just on the evidence.

And so, Ms. Billings, you had indicated, and you're comfortable enough, courageous enough to share with us about those feelings, what are your thoughts on that? Can you base the decision on this case, with the little that you know, solely on the evidence, or do you believe your feelings would enter into that decision making?

PROSPECTIVE JUROR 19: I'm not sure I can answer it either way.

MR. SCHANKER: Share with me, if you would.

PROSPECTIVE JUROR 19: My feelings would probably come into play.

THE COURT: I can't hear you, ma'am.

MR. SCHANKER: If you could hold the mike up.

PROSPECTIVE JUROR 19: I said my feelings would probably come into play because I'm a very strong-willed person and I have my own set of moral values that are also very strong. And so if we come -- it would probably be hard for me, or I would be very feisty about my opinions in a jury room.

MR. SCHANKER: And it's okay to be feisty, obviously, but as far as the feelings that you have that you've expressed to us based on the commercials, the lawyer commercials with RoundUp and the feelings that you shared in your

questionnaire --

PROSPECTIVE JUROR 19: Bringing RoundUp, so I know personal things about RoundUp, so that's a personal -- I have a lot more knowledge about that. I don't have that much knowledge about this drug or what it's done. So you're asking me to tell you whether I would have feelings on that or not when I don't have a basis for that right now.

MR. SCHANKER: Okay, that's fair enough. And thanks for that clarification. And so I guess, just kind of backing off that, and what you do know and feelings that you have in general about lawyers and advertising that you were brutally honest with expressing.

PROSPECTIVE JUROR 19: You keep using that word "brutally."

MR. SCHANKER: That's what this process is really about, and I appreciate you being willing to do that. Do you believe that you could -- I'll ask you again, and just because you've kind of clarified for us. Do you believe that as the judge instructs us, that -- honestly that you could set those feelings aside that you have, or do you believe that those feelings will enter into your decision-making process on the evidence such that my client, Barbara Earnest, may start out behind at the beginning of the case, in spite of your best efforts to set that aside?

PROSPECTIVE JUROR 19: I don't think I could set that

09:21:54 aside, if that's what you're asking me.

09:21:56 MR. SCHANKER: So, again, thank you for sharing that 09:22:00 with us.

09:22:00 PROSPECTIVE JUROR 19: I'll try, but I can't promise 09:22:03 you I can.

09:22:04 MR. SCHANKER: There is nothing I can say to change -- 09:22:06 you indicated you're a strong-willed woman. There is nothing I 09:22:10 can do to change your mind on that issue?

09:22:13 PROSPECTIVE JUROR 19: Probably not.

09:22:16 MR. SCHANKER: Is there anything that Her Honor can do 09:22:19 to change your mind on that issue?

09:22:20 PROSPECTIVE JUROR 19: I can try my best, but if you're 09:22:23 asking me today to say that it won't interfere, I can't say 09:22:27 that.

09:22:28 MR. SCHANKER: Thank you. I appreciate you sharing 09:22:30 with us. That probably wasn't fun. You felt you were under 09:22:35 the microscope.

09:22:36 PROSPECTIVE JUROR 19: I don't mind at all.

09:22:40 MR. SCHANKER: Any others that have heard the questions 09:22:43 and this idea of feelings -- I'm sure when you read the 09:22:44 questionnaire, do you feel like you've got an idea what this 09:22:45 case is about or do you think you maybe have an idea what this 09:22:48 case is about? Any others who feel like they have some 09:22:52 feelings that it's important to express to us that might get in 09:22:57 your way of just basing your decision on the evidence?

Mr. Jordan.

PROSPECTIVE JUROR 18: I just feel the same way she feels. You know, my feelings probably --

THE COURT: I'm sorry, Mr. Jordan, I can't hear you.

PROSPECTIVE JUROR 18: I feel the same way that she feels. My feelings might get involved. You may not like the answer I give.

MR. SCHANKER: Mr. Jordan, are there any particular feelings that you're referring to, or just in general?

PROSPECTIVE JUROR 18: Not really.

MR. SCHANKER: Well, if, as we talk about topics and there is a topic, are you comfortable sharing that with us this morning?

PROSPECTIVE JUROR 18: Yes.

MR. SCHANKER: Maybe?

PROSPECTIVE JUROR 18: Maybe.

MR. SCHANKER: Thank you. I'm going to ask if you could pass the microphone to your left to Mr. Ritter.

Good morning, sir.

PROSPECTIVE JUROR 20: Good morning.

MR. SCHANKER: If you could hold the mike up a little.

THE COURT: I'm really struggling, so I need you all to --

PROSPECTIVE JUROR 20: I'm always told I speak low.

MR. SCHANKER: How are you, sir?

PROSPECTIVE JUROR 20: I'm doing fine.

MR. SCHANKER: Thanks for filling out the information you provided us in the questionnaire. My question to you, based on that, it sounds like you were a pharmacist for over four decades, or still are, actually, a practicing pharmacist?

PROSPECTIVE JUROR 20: I'm retired, but one of my sons is trying to get me back to work to open up a store for him.

MR. SCHANKER: Is he having any luck?

PROSPECTIVE JUROR 20: We're in the process. He wants me to take a Mississippi law exam to have license in both states so we could deal in both states.

MR. SCHANKER: So you're seriously still in the game?

PROSPECTIVE JUROR 20: Not seriously, but for him, I would do it.

MR. SCHANKER: That's great. So in this case, obviously from the reading the questionnaire, you could tell that there is issues with regard to pharmaceutical drugs?

PROSPECTIVE JUROR 20: I was looking at that, and I look at pharmaceutical companies listing all the contraindications, all the side effects, the uses, everything, the warnings. Then the doctors are also given the same instructions, and it passes on down to me at the last, the pharmacist. So you do have to counsel with each customer, going over all the side effects, the contraindications; do you have any problems taking this medication?

But as with any drug, you have your major ones that you can list out, but then there might be 50 to 100 that could be listed, but you do give them the brochure. Hopefully it's been passed along down and hopefully that was -- I'm not sure about this particular case, it was talking about Googling in front, if it's in there, contraindications and side effects in their original brochure. So I just would have to listen to all the facts and statements to try to make a decision, an honest decision.

MR. SCHANKER: And it sounds like you clearly have areas of expertise as a pharmacist when it comes to -- and correct me if I'm wrong, certainly when it comes to warnings and adverse events in general and how to handle that with the customer, potentially a patient, is that fair to say?

PROSPECTIVE JUROR 20: That's correct, and each and every customer is an individual, and you do have to counsel with each and every one. Now, if it's a refill or something like that, you don't have to go as much in detail.

MR. SCHANKER: It also sounds like that you may have experience prescribing drugs that women take who are going through breast cancer. You have actually listed some of the -- aromatase inhibitors, do you recall that?

PROSPECTIVE JUROR 20: If you give me the generic or brand the names, I would know it.

MR. SCHANKER: Tamoxifen was one of the drugs that you

09:27:00 listed.

09:27:04 PROSPECTIVE JUROR 20: Yes.

09:27:04 MR. SCHANKER: And a hormone suppressant.

09:27:04 PROSPECTIVE JUROR 20: You read my brochure correctly.

09:27:07 MR. SCHANKER: I did read that.

09:27:10 PROSPECTIVE JUROR 20: For cancer, yes.

09:27:11 MR. SCHANKER: My question is, it does sound like you 09:27:14 do have expertise in that area as well?

09:27:16 PROSPECTIVE JUROR 20: Correct.

09:27:18 MR. SCHANKER: In this case, without getting into the 09:27:21 details, but generally speaking, there is going to be witnesses 09:27:24 and there's going to be evidence that comes in on 09:27:27 prescribing -- proper prescribing, proper warnings. There is 09:27:31 also going to be evidence that comes in on some of these drugs, 09:27:35 drugs that it sounds like you have familiarity and expertise 09:27:38 with.

09:27:39 PROSPECTIVE JUROR 20: Correct.

09:27:40 MR. SCHANKER: So, this process is, is this the right 09:27:44 case for you to be on, right?

09:27:47 PROSPECTIVE JUROR 20: I can look at it honestly and 09:27:49 look at both sides, and yes.

09:27:52 MR. SCHANKER: It sounds like you can, as far as that 09:27:55 goes. You can set aside the feelings that you might have one 09:27:59 way or the other?

09:28:00 PROSPECTIVE JUROR 20: I'm open to everything. I don't

have a feeling leaning one way, but you listen to all the questions and answers, and you honestly give it your best response.

MR. SCHANKER: Here is what I would like to explore with you, if I could. It sounds like that's not going to be an issue for you, setting aside those feelings. But you've got expertise and knowledge that most folks don't have based on your 40-plus years as a pharmacist, is that fair to say?

PROSPECTIVE JUROR 20: Probably so.

MR. SCHANKER: As I'm kind of thinking how this works through, when you hear the evidence in this case and base your decisions solely on the evidence, are you going to be able to do that, or are you going to bring in the outside expertise that you have to this case and apply that? Is there any way you could put a block up in your mind and not bring that outside expertise, in fairness, into the courtroom?

Let's say we don't hear any evidence on a particular issue, but you know that there is additional information. Are you going to be able to not mention or not allow that additional information to enter into your decision-making process, or would that not be fair to you as a person to put you in that situation?

PROSPECTIVE JUROR 20: Having a background for such a long time, it would be hard to hide it. It's in my mind. It cannot get out my mind. I know what's right and what's wrong,

and some of that evidence, I could listen to it, listen to it openly, objectively; but, yes, I cannot get rid of my past. I cannot do that.

MR. SCHANKER: So would it be fair to say, then, that that evidence -- the outside stuff may enter into your decision-making process, things that we might not even hear in this courtroom due to your expertise, is that fair to say?

PROSPECTIVE JUROR 20: I won't let it interfere because I have to listen to the case itself, the exact evidence and details, and I would have to follow the case itself. I know what's going on in the past, but each individual case is individual. I can't lump them all in one lump sum to be the same case. Each one is individual. But, yes, I have knowledge in the past, but you will apply to this and listen to all the evidence and try to do your best.

MR. SCHANKER: You'd do your best with that, obviously. Thank you.

PROSPECTIVE JUROR 20: Correct.

MR. SCHANKER: Thank you, sir. If I could, pass the mike up to Mr. Webre. Good morning, sir.

PROSPECTIVE JUROR 9: Good morning.

MR. SCHANKER: How are you today?

PROSPECTIVE JUROR 9: I'm doing fine.

MR. SCHANKER: Are you comfortable speaking with me? I suppose it depends on what I ask, right?

PROSPECTIVE JUROR 9: Yes.

MR. SCHANKER: Thank you for taking the time, not only to be here, but to fill out that questionnaire. And just a simple question. You indicated, actually, that you have a nephew who either works or worked for the defendant.

PROSPECTIVE JUROR 9: Yes, he did.

MR. SCHANKER: And are there any feelings that you have based on that experience of your nephew -- and that could go either way, right? But are there any feelings that you have based on that experience with your nephew that makes you think that, based on what we've discussed here, that this might not be the right case for you? Could you share with us on that?

PROSPECTIVE JUROR 9: I can listen to both sides of the story and make a decision, and I guess I would have to be presented all of the evidence. And, plus, I do have a heavy background in chemistry. I've worked in chemical plants and worked in laboratory equipment repair for the past 30-plus years, so I do have an in-depth knowledge of chemistry.

MR. SCHANKER: Tell me a little more about that, if you would.

PROSPECTIVE JUROR 9: I guess I could start with my work history. I started off in a chlorine plant. Then I worked in a cryo plant. And also ammonia and hydrogen. And then what all -- then I went to work repairing laboratory equipment, and I've been in refineries, universities,

pharmaceutical -- well, Xavier, for one -- and I do have an idea what's going on with the chemistry.

THE COURT: Mr. Schanker, you've got four minutes left.

MR. SCHANKER: Anything about those experiences that makes you think you couldn't be fair and impartial and set those feelings aside?

PROSPECTIVE JUROR 9: No.

MR. SCHANKER: You think you could do that?

PROSPECTIVE JUROR 9: Yes.

MR. SCHANKER: Thank you, sir.

Since we just have a little bit more time, I want to ask a question here to the group. This is an issue that when you read the questionnaire you may have thought of. Let me set it up this way, if I can.

So we know that a person had cancer in this case. Fortunately, that person is better. Took drugs to get better. Now there is a lawsuit over some side effects that were caused by those drugs that may have made her better.

How many of you, when you heard -- you got that idea from reading the questionnaire, I'm assuming? I see heads nodding. How many of you, when you realized that, thought, you know, I just have a problem with bringing a lawsuit in that situation? Raise your hand high if you do. We've got a lot of hands here and a little bit of time.

So, what I would like to do -- if you could keep

your hands up for just one second for me, please. If I could go ahead and have Ms. Tiemann.

Now, with regard to that situation, do you feel that it's a case that you could sit on, with your -- just the initial feelings that you have concerning this? Obviously, you have knowledge, you know, legal knowledge, as well. Or do you just think that that fact pattern just is one that you would have trouble setting those feelings aside?

It doesn't make you a bad person. We saw a lot of other hands here. Do you think you could set those aside, or do you think they're going to enter into your decisionmaking on just the evidence?

PROSPECTIVE JUROR 16: I think I could listen to the evidence. My initial feeling was I would just be happy I was better.

MR. SCHANKER: But you think you could do it or --

PROSPECTIVE JUROR 16: I think I could do it.

MR. SCHANKER: Who here thinks they may have trouble setting those feelings aside? Raise your hand high. Who here thinks they may have trouble setting those feelings aside?

Ms. Blackwell.

PROSPECTIVE JUROR 15: You said it. She got better. You lost your hair, but you're alive. Okay. That you should be thankful for.

My husband died of cancer. He fought it for four

years. You know, my sister -- his sister died six weeks before he did of cancer.

You know, I just -- I don't like frivolous lawsuits.

MR. SCHANKER: Thank you for sharing that. I want to follow up on that, if I can.

So you get this idea that the judge has given us, right? We've got the circle. Evidence. That's all if you're on this jury, right?

PROSPECTIVE JUROR 15: Right.

MR. SCHANKER: But you can't check some of these feelings at the door, some very close personal-held feelings.

PROSPECTIVE JUROR 15: Exactly.

MR. SCHANKER: Do you feel in this case that what you've expressed, that those are feelings that you would have difficulty setting aside? That my client, Ms. Earnest, may start out behind just because of those feelings that you have, in spite of your best efforts to set them aside?

PROSPECTIVE JUROR 15: Definitely. That's how I feel.

MR. SCHANKER: That's just the way it's going to be?

PROSPECTIVE JUROR 15: That's how it's going to be.

MR. SCHANKER: There is nothing I can say that can change those feelings?

PROSPECTIVE JUROR 15: No. You know, I believe every person should have a right to a jury trial, that they should

have people that are fair and impartial to judge them. That's why I've never, ever tried to get out of jury duty, but, in this case, I think I would be -- I couldn't be fair.

MR. SCHANKER: Nothing the judge can do to change those closely held feelings that you have?

PROSPECTIVE JUROR 15: I don't think so, no, because this is how I feel about it.

MR. SCHANKER: Right. Thank you for sharing.

PROSPECTIVE JUROR 15: You're welcome.

MR. SCHANKER: Now, I had asked the question. We had some other hands up. I believe, Ms. Roberts, on this topic. Then, Ms. Becnel, as well.

Really, what I'm focusing on, I think everyone kind of gets the way we're trying to set this up, figure out is this the right case for you to be on or not.

So just so we have the record clear, Ms. Roberts, you raised your hand when I asked the question about feelings that you had on this idea --

THE COURT: Mr. Schanker, we're out of time. So I think -- I'm going to let you wrap it up, but it's going to have to be very tight, which is, I think we need to raise our hands, see who had, and then we've got time for one question for each. I'm going to let you do that because of this --

MR. SCHANKER: Thank you, Your Honor. I appreciate that.

THE COURT: -- but we're not going to a full conversation.

MR. SCHANKER: So I had y'all raised your hands. Thank you. We'll come back to you.

So I'll just try to do this in one question. If I can, Ms. Roberts -- and if you need more, then you can talk to the judge about it -- so, Ms. Roberts, would it be fair to say that my client may start out behind in this case because of feelings that you have on this topic of having cancer, getting better, and suing the drug company, and that you may not be able to set those feelings aside in spite of your best efforts?

MS. SASTRE: That's leading, Your Honor.

PROSPECTIVE JUROR 14: Do I answer?

THE COURT: Yes.

But I just want you to -- I think we need to get really tight with this. I don't want to lead this.

MR. SCHANKER: Yes, Your Honor.

PROSPECTIVE JUROR 14: Okay. I've been told I'm an overthinker, but --

MR. SCHANKER: I've never been told that.

PROSPECTIVE JUROR 14: All right. I take one prescription med, and one of the side effects is hair loss. Well, I get a hairbrush full of hair every day. If I end up with a bald spot, is this going to allow me to sue just because I lost my hair? I mean, would this start some kind of

09:39:26 precedent? Everybody that has cancer and takes a cancer drug --

09:39:28 THE COURT: I think, Ms. Roberts, the question is, can you put those feelings aside and render a verdict solely upon what you hear in this courtroom?

09:39:38 PROSPECTIVE JUROR 14: Probably not because --

09:39:40 THE COURT: We're going to follow up. I think that's the question to ask these people, and then we have to move on.

09:39:43 MR. SCHANKER: Yes. Thank you, Your Honor.

09:39:47 Let's see, who else had their hand up? If we could go to Ms. Bechtel in the back row.

09:39:57 PROSPECTIVE JUROR 4: Ms. Becnel.

09:40:00 MR. SCHANKER: Becnel, I'm sorry. I didn't write the N down in your name. I apologize.

09:40:00 PROSPECTIVE JUROR 7: Thank you.

09:40:01 MR. SCHANKER: How are you Ms. Becnel?

09:40:05 PROSPECTIVE JUROR 7: I'm fine.

09:40:05 I'm one of eight kids. My daddy owned a business. Under no circumstances when we grew up were you allowed to talk about suing anybody. That was just not --

09:40:14 I also want to add, my mother died of mesothelioma. I took care of my dad the last year of his life with leukemia. We never thought about suing anybody. That's just not the way we were raised.

09:40:29 I think it's just ingrained in me that I just --

I don't think I would be a good person for this jury.

MR. SCHANKER: The question is the judge -- I'll try to do my best on this, Judge -- so the judge is going to give you the law in this case and ask you to follow it. The question is -- and part of that is you're supposed to base your decision solely on the evidence, not on these outside feelings.

THE COURT: You know what, ma'am, can you put those feelings aside and render a verdict solely upon what you hear in this courtroom?

PROSPECTIVE JUROR 7: I really don't think so.

THE COURT: Thank you, ma'am.

Let's to go the next person? Mr. Kilgen, I think you had your hand up? Or did you?

MR. SCHANKER: Mr. Kilgen.

PROSPECTIVE JUROR 13: No, sir. This is if I could not?

MR. SCHANKER: Yes.

PROSPECTIVE JUROR 13: Obviously, with just the initial presentation I read in the questionnaire, that was my first thought is -- but without seeing the evidence and everything, I'm fine.

MR. SCHANKER: So you think you could --

PROSPECTIVE JUROR 13: Yes.

MR. SCHANKER: Okay. All right. Thank you for sharing.

09:41:28 Who else had their hand up?

09:41:28 THE COURT: Mr. Toliver.

09:41:28 MR. SCHANKER: Yes -- no. Actually, Mr. Jordan.

09:41:43 THE COURT: Mr. Jordan. I'm sorry.

09:41:43 PROSPECTIVE JUROR 18: I just feel I couldn't make a decision. I wouldn't feel right, in case I would make the wrong decision on the case.

09:41:55 THE COURT: I'll follow up on that. Thank you, sir.

09:42:06 Oh, Mr. Toliver, you did have your hand up. Okay.

09:42:07 MR. SCHANKER: Mr. Toliver, how are you, sir?

09:42:07 PROSPECTIVE JUROR 4: I'm good.

09:42:07 MR. SCHANKER: Share with us, if you would.

09:42:08 PROSPECTIVE JUROR 4: I feel the same way, too. I don't think I can be fair because I have cancer, too, and lost hair. I'm not suing, so...

09:42:18 THE COURT REPORTER: I can't quite hear you. Could you repeat that?

09:42:19 PROSPECTIVE JUROR 4: Yeah. I say I have cancer, too, skin cancer. I wouldn't be fair because -- loss of hair, I don't -- I couldn't sue.

09:42:28 MR. SCHANKER: So you feel like -- the judge will give you these instructions, and one of them is you've got to base your decision solely on the evidence, and not let these feelings come in. Based on that, you feel like you couldn't be

fair; is that fair to say?

PROSPECTIVE JUROR 4: Right. I couldn't be fair.

MR. SCHANKER: Thank you.

THE COURT: Thank you.

Ms. Sastre.

MS. SASTRE: Thank you, Your Honor.

Good morning, everybody. It's nice to be here with you today. Now, thank you for coming here and spending your time with us, ladies and gentlemen. You should know that there are some folks that come in just like you all did, they fill out the questionnaires, which we know takes some time, and sometimes Your Honor will tell you, we don't see them again. But you all showed up, and we very, very much appreciate that. We appreciate your time today and the time that you've already given us.

Now, ladies and gentlemen, you know that we have limited time with you. So, unfortunately, I'm not going to get a chance to ask each and every one of you questions. I wish that I could. I wish that we could sit down at a kitchen table and talk, instead of being in a courtroom.

But is there anybody who will feel that they are offended if I don't get a chance to ask them questions? I didn't think so. I just wanted to check.

So, Ms. Boutte, good morning, ma'am. How are you?

PROSPECTIVE JUROR 2: Fine.

MS. SASTRE: Good. So I have a few questions for you. I'm going back to your questionnaire. You told us that you have negative views of large corporations.

You know that I represent a large company in the case, right?

PROSPECTIVE JUROR 2: Yes.

MS. SASTRE: You told us that you have negative views of pharmaceutical companies.

You know that the defendant in the case is a pharmaceutical company, right?

PROSPECTIVE JUROR 2: Yes. But I would say that, to me, it originates with the FDA, because that was some of the questions, regarding the Food and Drug Administration --

MS. SASTRE: Sure.

PROSPECTIVE JUROR 2: -- because they are the ones that do ultimately approve what's coming down the pike to everyone. So, I would say that it started with that.

Yes, I think, as far as pharmaceutical corporations go, it is my opinion that the -- that people are bombarded with new drugs, different drugs, symptoms. That's just how I feel. There is just too much out there that we don't know enough about.

I do not believe the Food and Drug Administration is capable of giving -- or judging all of the drugs that come

09:45:53 down the pike.

09:45:55 MS. SASTRE: I think you said, with two exclamation points behind it, that the FDA was corrupt? Is that how you feel?

PROSPECTIVE JUROR 2: I do. I feel that they are a corporation that has too much power and not enough people to back up their findings or to keep those people in line. Yes, I do feel that.

MS. SASTRE: Ma'am, if you learn -- if you're selected as a juror in this case, and you hear evidence about the FDA, about its regulation of drugs, about its involvement with drug labels, and then you hear, of course, about a large pharmaceutical company who's the defendant in the case, do you think that the strong feelings that you have about the FDA being corrupt and that it's filled with bureaucratic leaders -- would those be opinions you have? It sounds like they are strong. Would you agree with that?

PROSPECTIVE JUROR 2: I feel very strongly about it. I'm not saying that I can't make a decision based on the evidence presented in this trial, but it doesn't take away what I believe about that federal arm of the government and, subsequently, pharmaceutical corporations.

MS. SASTRE: Sure. So the negative view that you have, it's not just of FDA, it's -- as you told us, it's also a negative view of pharmaceutical companies, true?

PROSPECTIVE JUROR 2: Of the information that the pharmaceutical companies bring forward in a language that is understood by laypersons, yeah.

MS. SASTRE: You tell me if this is right. You don't like the way that pharmaceutical companies provide warnings; is that true?

PROSPECTIVE JUROR 2: Yes.

MS. SASTRE: It's something you take issue with?

PROSPECTIVE JUROR 2: Yes.

MS. SASTRE: You feel strongly about that, right?

PROSPECTIVE JUROR 2: I do.

MS. SASTRE: Is that something you've believed and felt strongly about for quite some time now?

PROSPECTIVE JUROR 2: Yes. I think, for me, it started many, many years ago with birth control medication. That was a really long time ago. Things have changed. But, yes, that is still my belief, that pharmaceutical companies have far too much control over what is administered to the public -- or offered to the public. Not administered, but offered.

MS. SASTRE: Sure. I very much appreciate your candor. Again, I know this is an unusual setting. There is no wrong answers. The only wrong answer is if you don't tell us exactly how you feel. I promise, you're not going to hurt my feelings at all, okay?

PROSPECTIVE JUROR 2: Yeah, sure.

MS. SASTRE: So let me ask you this, ma'am. So you haven't heard, of course, any evidence in this case yet. But if you were to hear that this case involves a claim of a warning that wasn't adequate, a warning on a drug, a warning that had pharmaceutical company involved in the course, an FDA involvement, based upon the strongly held beliefs you've held for quite some time, would you agree with me that my client, a drug maker, is starting out just a little bit behind in your mind?

PROSPECTIVE JUROR 2: I would like to say no, because I would like to believe that I would strictly go with the evidence that is presented, just like this gentleman was saying. I believe everybody deserves to have their explanation given.

Warnings come in many different factors, whether it's from -- starts with the pharmaceutical, goes to the distributor, the doctor, the pharmacist, the patient. It's like passing a bean. What do you say in the beginning and what does it end five chairs down? I don't think it's always clear. I just -- that's just my belief.

I do believe, though, if everyone got the same exact description in writing, in lay terms, then you'd have a better chance of everyone accepting this point of view and not ending up with this point of view.

MS. SASTRE: Okay. Now, you started answering by

09:50:45 saying: I'd like to say no. It sounded like there was going to be a but there.

09:50:50 PROSPECTIVE JUROR 2: Well, I did say that I'd be willing to listen to the arguments, whatever either side has to say, and hope that I would be listening, that I would be objective to everything that comes forth. That's what I would like to believe of myself.

09:51:11 MS. SASTRE: Let me ask you this, ma'am. The feelings that you have, that you've described to us, about FDA, about drug labels, that you have criticisms of how they are written and the words in them, you don't like large pharmaceutical companies, you have very strong feelings about the FDA, you've felt this way for quite some time, as you told us, you would agree with me that those are feelings that you would have trouble putting aside --

09:51:37 PROSPECTIVE JUROR 2: Yes.

09:51:38 MS. SASTRE: -- if you were selected as a juror in this case?

09:51:41 PROSPECTIVE JUROR 2: Yes.

09:51:41 MS. SASTRE: So it might be -- look, let me say this. None of us came in here a blank slate, right? Everybody has opinions, ladies and gentlemen. It's only natural. If none of you had any opinions about anything, that wouldn't be normal. So we're just trying to find out today how you feel about things. All right?

So, Mrs. Boutte, my question is really based upon the fact that you said you'd have difficulty putting aside those strong beliefs that you've held for a long time. It just may be that this is not the best case for you. There might be a different case that didn't involve these issues, and that might be a better trial for you to serve on?

PROSPECTIVE JUROR 2: Perhaps.

MS. SASTRE: Do you agree with me, ma'am, that it might be difficult for you to be fair and impartial in this case?

PROSPECTIVE JUROR 2: Yes.

MS. SASTRE: Okay. Thank you very, very much for your candor. I very much appreciate that, ma'am.

If you could pass the mike to the lady right next to you, Ms. Duhe. Did I say your name correctly?

PROSPECTIVE JUROR 3: It's Duhe.

MS. SASTRE: Duhe.

PROSPECTIVE JUROR 3: Yes, ma'am.

MS. SASTRE: I have a funny last name, too, and I always have to spell my first name and my last name for folks. They mess them up. So it's nice to see you this morning, Ms. Duhe.

Now, I just have a few questions for you, as well, just going off some things you shared with us from your questionnaire. Okay?

PROSPECTIVE JUROR 3: Okay.

09:53:13 MS. SASTRE: All right, ma'am. So you told us that you thought pharmaceutical companies should do more to warn doctors of potential side effects of their products. My question to you is, tell us why you feel that way.

09:53:29 PROSPECTIVE JUROR 3: I had a son-in-law that just passed away recently from cancer.

09:53:37 MS. SASTRE: I'm very sorry to hear that, ma'am.

09:53:40 PROSPECTIVE JUROR 3: Thank you. He just didn't -- the doctors just did not explain exactly what was going to happen. I mean, he thought he was going to take this medicine, and everything was going to be great. For, like, maybe two months, it was. Then, all of a sudden, he just died.

09:53:56 It was -- I mean, we knew he had cancer, but it was so unexpected because we thought, and like he did, that this -- these drugs that he was taking was going to make him better.

09:54:06 MS. SASTRE: I'm very sorry, again, ma'am, to hear that.

09:54:09 PROSPECTIVE JUROR 3: Thank you.

09:54:10 MS. SASTRE: If I can just ask you a question or two, if you feel comfortable.

09:54:14 PROSPECTIVE JUROR 3: Yeah.

09:54:14 MS. SASTRE: If you don't, please let me know.

09:54:14 PROSPECTIVE JUROR 3: No, I'm okay.

09:54:18 MS. SASTRE: To your knowledge, did your son-in-law

experience a side effect from the medication that he was given? Or is what you're saying is that he was given medications, but, unfortunately, he still passed away?

PROSPECTIVE JUROR 3: He was given -- he just passed away. I mean, he lost his hair. He -- you know, I mean, he was having trouble breathing at the end, but, I mean, that was because of the cancer. But he didn't have any trouble -- I mean, I don't think he had any trouble with the drugs.

MS. SASTRE: Okay. Is there any other reason that you made this statement that you thought pharmaceutical companies should do more to warn doctors of potential side effects?

PROSPECTIVE JUROR 3: I don't remember saying that. I'm sorry.

MS. SASTRE: Listen, it's a long questionnaire, and I totally get it. Not a problem, Ms. Duhe.

Then I think you also said that you were unsure if you had experiences that might influence whether you believed alopecia, meaning hair loss, was permanent. Was that in reference to your son-in-law?

PROSPECTIVE JUROR 3: Yes.

MS. SASTRE: For how long did his hair loss last?

PROSPECTIVE JUROR 3: Well, he was diagnosed in November, and he lost his hair in January, died in May.

MS. SASTRE: Okay, ma'am. I'm not going to ask any more questions about him. Thank you, again, very much. I

appreciate that.

Okay. Well, one other thing, Ms. Duhe. You did say that you have negative views of foreign-based corporations?

PROSPECTIVE JUROR 3: What, ma'am?

MS. SASTRE: Foreign-based corporations. I just wanted to explore that with you a bit. Why did you say that?

PROSPECTIVE JUROR 3: I don't know. I don't know. I'm sorry.

MS. SASTRE: Don't apologize. That's perfectly fine. Thank you very much.

Oh, I'm sorry. Someone is passing me a note.

Okay. Thank you so much, ma'am.

We can go to Mr. Briggs. Good morning, Mr. Briggs, how are you?

PROSPECTIVE JUROR 8: Good morning.

MS. SASTRE: It's nice to see you, sir. I just have a few questions for you.

First, you said in your questionnaire that somebody close to you considered filing a lawsuit, but that it was private. Is that something that you can talk about, or should we discuss it separately with the judge?

PROSPECTIVE JUROR 8: We'll talk to the judge.

THE COURT: Come on, Mr. Briggs. Let's see.

(WHEREUPON, at this point in the proceedings, a conference was held at the bench.)

THE COURT: Can you tell me, sir, about your lawsuit?

PROSPECTIVE JUROR 8: Well, my father died of asbestos and stuff like that.

THE COURT: Mesothelioma?

PROSPECTIVE JUROR 8: Yeah. So that we are still dealing with -- you know, going through the process of --

THE COURT: Have you filed a suit?

PROSPECTIVE JUROR 8: Yeah. It's in -- well, it's in the second thing. It's another lawsuit that they already finalized one, and then they have another coming up. So that's all.

THE COURT: So it's pending?

PROSPECTIVE JUROR 8: Yeah.

THE COURT: The lawsuit's pending with your family?

PROSPECTIVE JUROR 8: Yeah.

THE COURT: Would the fact that your family has filed a lawsuit in any way affect your ability to fairly listen to the in evidence in this case?

PROSPECTIVE JUROR 8: No.

THE COURT: This case is not about asbestos, as you know.

PROSPECTIVE JUROR 8: No, no, I have no problem with serving. The only thing is that I've got to make sure that I will be warm when I come here.

MS. SASTRE: Well, because it's freezing in this

courtroom.

THE COURT: You can bring all the coats and blankets you want.

PROSPECTIVE JUROR 8: All right.

THE COURT: Thank you.

MS. SASTRE: Thank you, sir.

(WHEREUPON, at this point in the proceedings, the bench conference concluded.)

MS. SASTRE: Thank you very much, Mr. Briggs.

What would Your Honor like me to do?

THE COURT: I think we're going to take a quick break now. I think it might be time for a quick break.

I'm going to have Ms. Mouledoux direct you to the jury room, those of you that are part of this initial 21, so that we can take a restroom break. We'll be back in ten minutes, or less if you finish in that time. Thank you.

Those of you that have juror tabs on may proceed and go to the restroom, if you need to, in the hallway. Under no circumstance should you talk to anyone. I don't mean talk about what we're doing here, talk about anything, please. Thank you. We'll be back in about ten minutes.

(WHEREUPON, at 10:00 a.m., the jury panel leaves the courtroom and then a brief recess was taken.)

THE COURT: All potential jurors have returned.

I apologize for breaking up your questioning.

Now, we'll proceed.

Ms. Sastre, please continue.

MS. SASTRE: No apology necessary. I was glad to have the break, Your Honor. Thank you.

Mr. Briggs.

PROSPECTIVE JUROR 8: The mike.

MS. SASTRE: You need the mike. That's right. Thank you for reminding us, sir.

Thank you for your candor at the bench. We appreciate that. I just have one or two more questions for you, Mr. Briggs.

PROSPECTIVE JUROR 8: Okay.

MS. SASTRE: You said on your questionnaire that you agree strongly that pharmaceutical companies should do more to warn doctors of potential side effects of their products. I just would like to ask you, why did you say that, sir?

PROSPECTIVE JUROR 8: Well, I have high blood pressure. Although they put these warning labels on there, it does not mean that I'm going to always read everything. So if I have a conversation with my doctor, and he tells me exactly what the side effects are, it may make me more aware of that there are side effects. Sometimes they don't say there is a side effect. That's --

MS. SASTRE: Do you think that pharmaceutical companies don't do a good job of giving information to doctors to warn

about side effects?

PROSPECTIVE JUROR 8: Okay, this is my -- everything is based on numbers. If you go in these trials, and it's based on how many people are affected by it. They outweigh -- you know, if you got 100 people, and 90 or 75 of them is not affected, and then if you're trying to make money, I could take that gamble and say, well, only five might get affected real serious, and I could get -- you know, it's always the game.

MS. SASTRE: You mentioned money, sir.

PROSPECTIVE JUROR 8: Yeah.

MS. SASTRE: Are you suggesting that pharmaceutical companies put profits or money ahead of safety? Is that something you think, in all candor?

PROSPECTIVE JUROR 8: Not all companies.

MS. SASTRE: But some?

PROSPECTIVE JUROR 8: But some.

MS. SASTRE: Okay. Is that something that you think you'd have difficulty putting aside that belief if you were to be selected as a juror in this case, Mr. Brigs?

PROSPECTIVE JUROR 8: No. The judge is going to warn us or tell us or instruct us on -- based on the evidence that is presented, this is where this case is supposed to be. Not on my feelings, but on the evidence. That's the only thing that I'm supposed to bring a verdict on, what I hear, what I see, and that's it.

MS. SASTRE: That's fair enough, sir. Thank you for that.

Just one more question. I see that you indicated that you had a hardship. You mentioned some medical issues, that you thought they might affect your ability to give your full attention.

PROSPECTIVE JUROR 8: My -- my -- my hardship is that I do have sleep apnea. I'm just bringing it to the Court. As long as you keep my attention, you --

MS. SASTRE: How am I doing so far?

PROSPECTIVE JUROR 8: I have no problem with you. But, now, if you get kind of boring, you might have a hardship with me.

MS. SASTRE: Okay. Let me ask you this: Are you asking to be excused because of that?

PROSPECTIVE JUROR 8: No. The gentleman said, how many of you woke up this morning wanting to come to court? I woke up this morning, not that I wanted to come, but I knew it was my obligation to do this. That's what it's all about.

MS. SASTRE: Well, everyone here very much appreciates that.

THE COURT: Ms. Sastre, I know you put it upside down --

MS. SASTRE: Oh, I'm sorry.

THE COURT: Well, I just didn't want you inadvertently

to put something up there that you didn't want to be showing.

MS. SASTRE: Thank you, Judge.

Thank you so much, Mr. Briggs. If you would be so kind as to pass the microphone down to Ms. Nelson.

Good morning, ma'am. How are you?

PROSPECTIVE JUROR 11: Good morning. I'm fine. Thank you.

MS. SASTRE: Okay, good. Thank you so much.

So, again, just a couple questions from your questionnaire, Ms. Nelson. You said that you agreed strongly that pharmaceutical companies should do more to warn doctors of the potential side effects of their products or medications.

My question to you is, first, that belief that you have, is that something that you feel strongly about?

PROSPECTIVE JUROR 11: Yes. Because I've watched this show called *American Greed*, and I notice a lot of pharmaceuticals, they don't give enough information, or they -- it's just not enough information out there. I think they need to give more to the doctors and more to the public about what's going on with some of the products that they have.

MS. SASTRE: So you don't think -- your belief is that pharmaceutical companies don't do enough to give information to doctors and the public, right?

PROSPECTIVE JUROR 11: Correct.

MS. SASTRE: Is that something -- you said in your

10:22:16 questionnaire that you felt strongly; is that true?

10:22:18 PROSPECTIVE JUROR 11: Yeah, I do.

10:22:20 MS. SASTRE: Now, if in this case, if you were selected 10:22:22 as a juror, would those be issues, feelings that you would 10:22:28 agree with me you would have difficulty just setting them 10:22:32 aside?

10:22:33 PROSPECTIVE JUROR 11: I can set them aside, and I can 10:22:36 be partial. I can hear both sides.

10:22:37 MS. SASTRE: Well, let me ask you this, ma'am. So if 10:22:42 in this case one of the issues that you'll hear about is 10:22:45 whether adequate warning about risks of a medication was given 10:22:49 to the physician, based upon the beliefs, the strongly held 10:22:54 beliefs that you already have that pharmaceutical companies 10:22:56 don't do a good job of getting important information to 10:23:00 doctors, in all candor, in all candor, isn't my client starting 10:23:06 out today just a little bit behind?

10:23:12 PROSPECTIVE JUROR 11: I guess, if you say it like 10:23:15 that. But just if I can hear everything that you have to 10:23:19 present, then I can put those aside and listen. I'm a fair 10:23:25 person. I can listen.

10:23:26 MS. SASTRE: Do you agree with me, because of the 10:23:30 beliefs, the strongly held beliefs you have about what kind of 10:23:35 job pharmaceutical companies do to warn doctors, that it might 10:23:40 be -- even if it's a little bit difficult, that it might be a 10:23:46 little bit difficult for you to be impartial where that is an

10:23:49 issue in this case?

10:23:50 PROSPECTIVE JUROR 11: You know, it's because of what I've seen on television. That's where -- you know, that's what I judged. But if I can hear the case, and I could fairly, you know, make a decision from there.

10:24:01 But it's only because what I've heard of what I saw on television about pharmaceuticals. But if I can listen to what you have to say and what the other party has to say, and I can be fair. But it's only from what I've seen and heard.

10:24:18 MS. SASTRE: You said the show you were watching was *American Greed?*

10:24:23 PROSPECTIVE JUROR 11: Uh-huh (affirmative response).

10:24:26 MS. SASTRE: Do you think that pharmaceutical companies put profits ahead of safety?

10:24:31 PROSPECTIVE JUROR 11: I don't know. I don't know. I can't answer that.

10:24:33 MS. SASTRE: Do you have a negative opinion of pharmaceutical companies, in all candor?

10:24:38 PROSPECTIVE JUROR 11: Only from what I saw on television. That's the only way I can answer it.

10:24:43 MS. SASTRE: Would that be something that would be in your mind if you were selected as a juror in this case?

10:24:48 PROSPECTIVE JUROR 11: No. No.

10:24:49 MS. SASTRE: Okay. Ms. Nelson, thank you very, very

much. I appreciate your time.

If you could pass the mike to the lady right next to you.

PROSPECTIVE JUROR 12: Me?

MS. SASTRE: Yes, ma'am.

PROSPECTIVE JUROR 12: Oh, no.

MS. SASTRE: Good morning.

PROSPECTIVE JUROR 12: Good morning, yes.

MS. SASTRE: It's nice to see, Ms. Threeton. I just have a few questions for you, ma'am, again, going back to your questionnaire.

I'm going to remind you of what you said, okay. You indicated -- you said that you agreed strongly that the warnings companies put on their products aren't strong enough.

PROSPECTIVE JUROR 12: Aren't strong enough?

MS. SASTRE: Yes, ma'am. Does that sound right? Is that how you feel?

PROSPECTIVE JUROR 12: I don't feel that way. Maybe I misunderstood it. I don't know. I look at those warnings and --

MS. SASTRE: Could you speak into the mike.

PROSPECTIVE JUROR 12: I look at the warnings, and I want it all. I don't care how strong it is. I want to hear all those warnings.

MS. SASTRE: That was my question. You think that the

warnings on products are not strong enough?

PROSPECTIVE JUROR 12: No. I think the warnings are fairly strong, yeah.

MS. SASTRE: Okay.

PROSPECTIVE JUROR 12: But you know what, I don't take an awful lot of medicines. You know, I might take -- you know, personally, I've not had cancer or -- I just have the, you know, normal illnesses and -- high blood pressure and all that.

But, no, I think, you know -- but, then again, you know, I haven't had a cancer drug, and I'm trying to read, you know, warnings on it. I don't know what's on those labels, you know.

MS. SASTRE: Sure.

PROSPECTIVE JUROR 12: I have family. I have numerous, you know, breast cancers, deaths in, you know, our family. I'm high risk myself, you know. But --

MS. SASTRE: I'm sorry to hear that.

PROSPECTIVE JUROR 12: -- I want to know what's in the drugs.

MS. SASTRE: Sure.

PROSPECTIVE JUROR 12: Yeah.

MS. SASTRE: Let me ask you another question, ma'am. So you said that you felt strongly that pharmaceutical companies should do more to warn doctors of potential side effects. Could you tell us about those feelings?

10:26:54 PROSPECTIVE JUROR 12: To warn doctors so they can tell -- talk with us about it, you know.

10:26:59 MS. SASTRE: Yes.

10:26:59 PROSPECTIVE JUROR 12: But I don't know. They're usually so overworked, you know, and in a rush or whatever. Maybe I haven't found the right one, but, then again, I haven't, you know, had those life-threatening, you know, illnesses. But I don't know. I think -- I think they are doing a pretty good job, I really do, about the warnings.

10:27:20 MS. SASTRE: Okay. Thank you so much for your time. I appreciate that, ma'am.

10:27:27 PROSPECTIVE JUROR 12: Do I pass this off to someone else?

10:27:30 MS. SASTRE: Yes. Let me see where we're going. How about Ms. Billings. She's right in front of you, so that's going to work out perfect.

10:27:40 Good morning, Ms. Billings. How are you?

10:27:43 PROSPECTIVE JUROR 19: I'm fine. How are you?

10:27:44 MS. SASTRE: Okay, good. It's nice to see you today, ma'am.

10:27:45 So I think you were the first person who was questioned. I know it was a little while ago, so I wanted to ask you a few follow-up questions to make sure that I understand how you feel about things, okay?

10:27:55 PROSPECTIVE JUROR 19: Okay.

MS. SASTRE: All right. Very good.

So you talked about feelings that you had -- that was the word that was used -- and I heard you mostly talking about litigation involving a product called RoundUp, right?

PROSPECTIVE JUROR 19: Yes.

MS. SASTRE: As you sit here today, have you -- well, let me ask you this, ma'am: Are you able to listen to the evidence in this case with an open mind?

PROSPECTIVE JUROR 19: I'm able -- I think I'm able to listen to the evidence. I just don't -- yeah, I don't know.

MS. SASTRE: You're not sure?

PROSPECTIVE JUROR 19: I'm not sure. I think I can listen to the evidence, but I do have strong opinions on lawsuits and frivolousness and how detrimental I think they can be for society as a whole, and not for -- I mean, I was the one who raised my hand, too, and said, you know, you lost your hair, but you have your life.

MS. SASTRE: Sure.

PROSPECTIVE JUROR 19: So it's more along those lines.

MS. SASTRE: Well, let me ask you this, Ms. Billings, because I appreciate that. Like I said, there is no wrong answers today at all. So, look, every one of us has had life experiences, right?

PROSPECTIVE JUROR 19: Right.

MS. SASTRE: We all have opinions.

PROSPECTIVE JUROR 19: Right.

MS. SASTRE: Have done all kinds of things, right?

PROSPECTIVE JUROR 19: Right.

MS. SASTRE: So you have an opinion that sometimes there are frivolous lawsuits, right?

PROSPECTIVE JUROR 19: Right.

MS. SASTRE: But here in this case, before you've heard any of the evidence, you haven't been given the law by Judge Milazzo, can you wait to hear the evidence and get the law, and then make a decision in this case?

PROSPECTIVE JUROR 19: I think so.

MS. SASTRE: If you were selected as a juror in this case, and after you listen to the evidence and get the law from Judge Milazzo, can you be a fair and impartial juror in this case?

PROSPECTIVE JUROR 19: I think so.

MS. SASTRE: Thank you very much, Ms. Billings. I appreciate your time this morning, ma'am.

THE COURT: You have three minutes.

MS. SASTRE: Oh, perfect. I might only need two.

THE COURT: That's even better.

MS. SASTRE: All right. Very good.

I have a question for Ms. Roberts. Good morning, Ms. Roberts. How are you?

PROSPECTIVE JUROR 14: I'm good.

MS. SASTRE: Very nice to see you this morning, ma'am.

I just have a quick question for you. You were asked how you felt about a case, this case, right, how you felt where you have a patient who had cancer, was treated with chemotherapy medication and then lost her hair, and was suing because of her hair. Do you remember that question?

PROSPECTIVE JUROR 14: Not really.

MS. SASTRE: Not too much? Okay.

Well, let me ask you this, ma'am. You would agree with me you haven't heard any of the evidence in the case yet, right?

PROSPECTIVE JUROR 14: No.

MS. SASTRE: If you were selected as a juror, Ms. Roberts, in this case, could you keep an open mind when you listened to the evidence?

PROSPECTIVE JUROR 14: Yes. But I'm probably going to share my opinion, which may or may not be to everyone's liking, but.

MS. SASTRE: Well, when you go back, if you were selected as a juror, and you deliberate, that's exactly what you're supposed to do. You're supposed to talk about the evidence.

My question is just a little bit different, Ms. Roberts. I'm asking you: If you were selected as a juror in this case, could you keep an open mind while you listened to

10:31:56 the evidence coming in during trial?

10:31:58 PROSPECTIVE JUROR 14: I don't know. The reason I say that, I've got a brother-in-law who had cancer treatment -- talking about big pharmaceutical companies -- and he paid $1,250 per shot for chemo, which, to me, is out the box. I mean, how can they have drugs -- that one shot, $1,250.

10:32:35 So, yeah, I've got a problem with big pharmaceutical companies.

10:32:39 MS. SASTRE: Is that something you would have trouble setting aside if you were selected as a juror in the case?

10:32:48 PROSPECTIVE JUROR 14: Probably.

10:32:49 MS. SASTRE: Okay. As you sit here, ma'am, in all candor, do you think that you might have difficulty about your ability to be fair and impartial?

10:33:00 PROSPECTIVE JUROR 14: Probably.

10:33:03 MS. SASTRE: All right, ma'am.

10:33:09 Ms. Blackwell. Good morning, ma'am.

10:33:18 THE COURT: I think we're out of time.

10:33:20 MS. SASTRE: We're out of time?

10:33:23 THE COURT: I gave you the extension.

10:33:25 MS. SASTRE: Okay. All right. Could I have 30 seconds?

10:33:28 THE COURT: You can have 25.

10:33:30 MS. SASTRE: Ms. Blackwell, I'm going to talk fast. Ma'am, could you listen to the evidence in this case and keep

an open mind when you were doing that?

PROSPECTIVE JUROR 15: I could.

MS. SASTRE: Could you follow the law that Judge Milazzo gives you?

PROSPECTIVE JUROR 15: I can.

MS. SASTRE: If selected as a juror in this case, could you do that and be fair and impartial when you were listening to the evidence?

PROSPECTIVE JUROR 15: To the evidence, yes; but as I said, I feel like my feelings are coming into play big time.

MS. SASTRE: But you could be fair and impartial?

PROSPECTIVE JUROR 15: Yes.

MS. SASTRE: Then I just have a question for Mr. Toliver in back. The same question, sir, and I'm sorry that I'm rushing. I apologize. I don't mean to be rude.

THE COURT: Actually, Ms. Sastre, I'm going to ask those same questions.

MS. SASTRE: Then with that, ladies and gentlemen, I'm going to sit down. Thank you very much for your time this morning.

THE COURT: I have some follow-up questions that I need to ask as a result of the questions by counsel for both sides, and I'm going to first start with you, Ms. Boutte. Ma'am, you indicated that you had some issues with pharmaceutical companies and the FDA and how that interacts, and then I

believe you indicated those feelings started -- my gosh -- with birth control with some of the medications associated and the warnings.

PROSPECTIVE JUROR 2: I've had serious surgery, yes.

THE COURT: Do you understand that you will not hear evidence that this was a medication that would be picked up at a pharmacy?

PROSPECTIVE JUROR 2: No.

THE COURT: And that this is -- what the evidence will be is that this is a chemotherapy drug and I believe -- I'm comfortable saying that's administered at an infusion center. So it's a little bit different than picking it up at the pharmacy.

PROSPECTIVE JUROR 2: Sure.

THE COURT: While you have those feelings -- and I understand what they are -- do you understand -- can you agree to render a verdict upon what you hear in this courtroom and not be swayed by what that other personal experience has been?

PROSPECTIVE JUROR 2: I don't think I based all of my opinions on personal experience, first and foremost. I have those opinions, I have those feelings. I would try my best to keep it with the evidence that is given, and not bring any feelings or outside opinions into my decision.

THE COURT: Now, I understand you said: I'm going to try my best. The question I have is, can you do that? Can you

promise to these people that you're going to render a verdict solely upon what you hear the evidence to be and the instructions that I ultimately give you at the conclusion of the case? And if you can't do that, you can't do it. If you can do it, you can do it.

PROSPECTIVE JUROR 2: I don't think so.

THE COURT: Thank you. Now I'm going to ask you to send it down to Mr. Toliver.

Mr. Toliver, you talked a little bit about your experience with skin cancer. And I'm very sorry that you're going through that. And my question is going to be the same to you. And you know very little about this case. Very frankly, it was what you could glean from the questionnaire and the little I told you about. I can assure you both sides will be presenting you with information.

And my question to you is, can you put whatever your personal experience is aside and listen to the evidence based solely upon what you hear in the four corners of this courtroom through testimony of witnesses and exhibits that are entered and render a verdict solely upon what you hear in this courtroom?

PROSPECTIVE JUROR 4: No, I can't, because the minute you think of chemotherapy, you think of hair loss, and it's a matter of what is the side effects that she read or whatever, I mean, normally it's there, you know, so... I don't know if

that's the case.

THE COURT: Well, if that's not the case, if the case is just --

PROSPECTIVE JUROR 4: No. No, I can't.

THE COURT: You think that regardless of what the evidence is presented in the courtroom, you just can't be fair?

PROSPECTIVE JUROR 4: Right, because like I said, I mean, she's well. I mean, hair loss.

THE COURT: Ms. Nelson, let me just ask you -- I think you were pretty clear that your opinions are based upon your watching the series. I haven't seen it, so I don't know if it's a series or if it's a movie, *American Greed*.

PROSPECTIVE JUROR 11: It's a series, Judge.

THE COURT: Can you put that aside and listen -- render a verdict solely upon what you hear in this courtroom?

PROSPECTIVE JUROR 11: Yes, I can.

THE COURT: Okay. Thank you.

And then I believe I want to go to Mr. Kilgen. Mr. Kilgen, we didn't hear much from you. I think you raised your hand at some point initially regarding any attitude you had about this case. Am I correct?

PROSPECTIVE JUROR 13: Yes. Originally when we were asked --

THE COURT: Right. And my question to you is, can you put that opinion aside and render a verdict upon what you hear

in the courtroom instead of some preconceived notion or your thoughts about what this case is about?

PROSPECTIVE JUROR 13: Yes, certainly. It's just I'm not that, I guess, educated on the different stuff, medical issues.

THE COURT: Well, I believe that's what would happen during the course of this trial, is that you would be presented evidence and you would have to weigh that evidence and make a determination.

PROSPECTIVE JUROR 13: I would be able to.

THE COURT: You have an open mind and you would be able to do that?

PROSPECTIVE JUROR 13: Yes.

THE COURT: Thank you.

Ms. Roberts, I'm going to ask you one more time. I think everybody has asked you multiple questions about this. And it seems like you've got various opinions about the issues in this lawsuit. And you haven't heard any evidence, you certainly haven't been instructed by the Court on the law, but -- and there are some times when people say, Judge, it doesn't matter what you tell me, I've already got my mind made up, and it doesn't matter what evidence is presented, my mind is pretty much made up.

So my question for you, ma'am, is, can you listen to the evidence with an open mind and assess the evidence that

you hear in the courtroom and review in the documents that will be admitted during the course of this trial and listen to my instructions and render a verdict solely on that, or will your outside influences -- you would be unable to put aside those outside opinions?

PROSPECTIVE JUROR 14: The outside influences would definitely affect my opinion, without a doubt.

THE COURT: Thank you, ma'am.

Ms. Blackwell?

PROSPECTIVE JUROR 15: Yes.

THE COURT: I'm going to ask you that same question.

PROSPECTIVE JUROR 15: I really feel like I've already made up my mind.

THE COURT: Thank you, ma'am.

Mr. Jordan, I think at some point you said you have strong feelings, and I wasn't quite certain what those feelings were. So my first question is going to be, do you have an opinion about this case?

PROSPECTIVE JUROR 18: No, not really, but I just wouldn't want to make a decision on it.

THE COURT: Well, and so my question is, if you were selected as a juror in this case and you sat during the course of this trial and listened to the evidence, are you telling me that you couldn't listen to the evidence and weigh the evidence and then form an opinion?

PROSPECTIVE JUROR 18: I could listen, but I just -- I would rather not make a decision.

THE COURT: I understand that, sir, but the question is, could you? And why is that?

Is there some -- why is that, sir, that you don't want to render -- sit -- deliberate and be part of rendering a verdict?

PROSPECTIVE JUROR 18: Well, I lost four people that I really love that died from cancer, and it would just get me kind of emotional and I -- you know, just talking about it.

THE COURT: Okay. Thank you, sir.

And, Mr. Ritter, I think you've already indicated that you could render a verdict solely upon what you hear in this courtroom.

PROSPECTIVE JUROR 20: That is correct.

THE COURT: Thank you. I believe that's it. Thank you all very much.

I'm going to give the parties a couple of minutes and then I'm going to ask you to approach.

(WHEREUPON, at this point in the proceedings, there was a conference held at the bench.)

MR. SCHANKER: I'm sorry, I just wanted to make sure I understood the protocol here.

THE COURT: All we're doing is cause strikes right now and then we are going to review hardships.

MR. SCHANKER: So do you want us to --

MR. MOORE: Are we doing hardships first?

MR. SCHANKER: No, cause.

THE COURT: While we're here, can we talk about the hardships?

MS. SASTRE: I would have to get my papers.

THE COURT: Hardships for cause. We have first Mr. Stanifer.

MR. SCHANKER: No objection, Your Honor, regarding Mr. Stanifer, who has his in-law who may die at anytime in the next two weeks. I mean, if ever there was a hardship, putting him in a position where he was missing a funeral or cuts down our jury, I think that's a clear hardship, Your Honor.

MR. MOORE: The only thing I would say, Your Honor, is he didn't say he was caring for the person. He said that if he passed away, he would have to leave. That's true with any juror. That's why we seat eight instead of six. He said he didn't know if it was two days, two weeks, two months. And so, I'm not trying to be unreasonable, but it didn't sound like it was -- it's something that could happen, not something that has happened.

MR. SCHANKER: Starting a case with a high probability that an individual is going to have to be excused --

THE COURT: I'm going to call him back up here.

Mr. Stanifer, could I get you to come, sir,

please.

(Prospective Juror 1 approaches the bench.)

THE COURT: Your father-in-law is in hospice. I know that hospice can sometimes be six months, you know, that's what they say. Is he living with you?

PROSPECTIVE JUROR 1: No. He lives in his own house, and my wife has been staying there with him. My mother-in-law is 80, and he's 81. And he spent four weeks in the hospital, and there is nothing they can do for him. He has heart failure and kidneys, so they sent him home with hospice. It was either stay in the hospital with hospice or go home. So they wanted to send him home.

THE COURT: Now, let me ask you a frank question. Would the fact that your father-in-law is in hospice distract you from being able to listen to the evidence in this case?

PROSPECTIVE JUROR 1: No, ma'am, not at all.

THE COURT: Let me ask you, if for some reason -- you understand that if something happened -- is it your concern that if he passes away, you would have to be excused?

PROSPECTIVE JUROR 1: Yes, ma'am. It's like I want to be part of the system, but if my father-in-law dies, I have to be with my family. I have to be with my wife.

THE COURT: But it's not that you feel like you're going to be distracted while you're here?

PROSPECTIVE JUROR 1: No, not at all.

THE COURT: You're not caring for him?

PROSPECTIVE JUROR 1: I'm not caring for him. I go there and help move him and stuff. He can't walk.

THE COURT: Of course. And if you were seated as a juror, you could still visit him after trial every day?

PROSPECTIVE JUROR 1: Yes.

THE COURT: If something happened, of course --

PROSPECTIVE JUROR 1: That was my question with me, if my father-in-law -- we start the trial and my father-in-law dies tomorrow, what is my obligation?

THE COURT: To go to your father-in-law's funeral. That's what your obligation is.

PROSPECTIVE JUROR 1: I could live with that.

MS. SASTRE: Thank you, sir.

(Prospective Juror 1 was seated.)

THE COURT: We've got two extras.

MR. SCHANKER: That's why we have another 20 jurors sitting in back.

THE COURT: I don't think -- you know, that's why when I asked him, it was like is it going to distract you? No. I'm going to be fine here. I'm going to go see him at night.

But if something happens, we're going to have to excuse him, but we have eight, and we only need six to deliberate. But I'm -- we're going to keep him.

Lori Defils. I'm going to give you a heads-up

before it happens. She filed this request to be excused because of what was going on at work. And then Friday I got a request from Judge Lemelle because apparently they went to high school together, and she has health issues. And I said, Well, I need to know what the health issues are. He said, well, she has depression. I said, Well, is she at work? And he said, She's at work. And she's at work, and now the excuse is back to work.

What she said today and that note you got last week. So -- and, very frankly, what I told Judge Lemelle was she's got to decide what her excuse is. But she's the other person that indicated that there was a hardship. So I will tell you this, she will die in here in the worst way, and when she did indicate on the jury -- they are undergoing something at this school, and if they have -- if they are having that accreditation process -- I did teach -- that is an all-hands-on-deck operation.

MS. SASTRE: We agree, Your Honor. We believe that she stated enough that she should be excused for hardship.

MR. SCHANKER: We think that she should not be excused for hardship. Many folks have issues with work, and she -- understand the prestigious school and that she teaches gifted -- works with gifted and talented -- not teaches, but works with gifted and talented there. I can't believe that there is not -- there isn't a public school system to

reasonably accommodate what's going on and I understand the record appears to be that she doesn't want to be here.

THE COURT: That's my opinion.

MR. SCHANKER: I don't think we -- I don't think she should be excused because I don't think it satisfies a hardship.

MS. SASTRE: Your Honor, what we heard from Ms. Defils was that there was an ongoing process at her school and that this would present a problem with the school being compliant.

I believe, Your Honor, she described it as a situation that she would find distracting for her if she stayed here and that she would have difficulty concentrating if she stayed here. I believe that is enough, under the circumstances, to excuse her for hardship.

THE COURT: Let me get her up here.

Ms. Defils, could I get you to approach, please, ma'am.

(Prospective Juror 6 approaches the bench.)

THE COURT: Yes, ma'am. You indicated that there is -- what's going on at this school again?

PROSPECTIVE JUROR 6: We're under investigation, and so we're having within the next -- this week and next week was the final walk-through and decision. It's a consent judgment based on discrimination and other things. And I am the lead for the school on it because of what I do.

10:54:31 THE COURT: What do you do at the school?

10:54:34 PROSPECTIVE JUROR 6: I coordinate special education, gifted and talented services and Section 504 disabilities. So my -- that's pretty much it. My files, and I'm the lead on it.

10:54:48 THE COURT: Are people on campus as we speak?

10:54:52 PROSPECTIVE JUROR 6: No. They are not on campus as we speak. And --

10:54:55 THE COURT: When do they intend to be?

10:54:58 PROSPECTIVE JUROR 6: They are going to physically be there on Thursday, the 27th.

10:55:03 THE COURT: Ma'am, would that process distract you from being able to listen to the facts in the case?

10:55:12 PROSPECTIVE JUROR 6: It's heavily on my mind.

10:55:17 THE COURT: The question was, would it be distracting?

10:55:22 PROSPECTIVE JUROR 6: It would be distracting. On break, I'm on conference calls.

10:55:30 THE COURT: Would that interfere in your ability to listen to the evidence and make judgments about the evidence?

10:55:38 PROSPECTIVE JUROR 6: No, I would still able to listen to the evidence.

10:55:42 THE COURT: Okay. I guess, ma'am, I'm just curious. You said it would be on your mind, but it wouldn't interfere with your ability to listen to the evidence.

10:55:55 PROSPECTIVE JUROR 6: Sounds like -- yeah.

10:55:58 THE COURT: You need to talk -- you need to explain it

to him.

PROSPECTIVE JUROR 6: Basically, I'm very anxious about things at work right now. I have an eight-day window to make sure that everything is in order. It is not just a local situation. The state is involved, Southern Poverty Law is involved, pretty heavy hitters. So, that's -- yes, it's a serious case, and it's not just a regular monitoring review. So it is impacting me as I sit here.

THE COURT: Okay. Thank you.

(Prospective Juror 6 was seated.)

MS. SASTRE: Are you excusing Ms. Defils?

THE COURT: I think we ought to excuse her. She's excused. I'm going to let you make a record, but the reality is the lady says she would be distracted. She's asked to -- they are going to be on campus on the 27th, so she's the lead in this process.

MR. SCHANKER: Do you want us to make a record or --

THE COURT: No, just go ahead.

MR. SCHANKER: It's plaintiffs' position, so the record is clear, Ms. Defils indicated she could be fair and impartial, set aside the feelings of distraction, listen to the evidence and reach a decision. Thank you, Your Honor.

THE COURT: All right. I think that was -- what other hardship was -- Ms. Roberts was a commission loan officer from Slidell. I did notice -- and she didn't say -- that she is

divorced with three children. So she's divorced. And she's a commissioned loan officer. She doesn't like anybody. Any objection to releasing her for hardship?

MS. SASTRE: I think there are multiple reasons you could.

THE COURT: And I believe Mr. Jordan said that he had -- you know, it was a money issue, but he said -- very frankly, that's harder for me to do for Mr. Jordan than what I could do for Ms. Threeton, because I can put her up.

MS. SASTRE: One issue I would remind the Court with Ms. Threeton --

THE COURT: She said she lives 174 miles one trip, and she doesn't -- she has to get somebody to bring her here, and it's a hardship with money and transportation. And I asked her, ma'am, if I could put you up somewhere, and she said that will do it. And we can do that.

MS. SASTRE: I remember that, Your Honor, and what I was going to remind the Court of -- I'm wondering if Ms. Threeton didn't fully understand, but I believe she's the lady that talked about having dogs, and the idea of her coming and living here for two weeks -- and I know we all have dogs and pets and this and that, but she talked about having to board them, and I just think that may be an issue we need to explore before we just say, well, go stay in a hotel for two weeks.

THE COURT: She didn't say anything --

MS. SASTRE: That's on her questionnaire.

THE COURT: I think she said she just needs a ride here. She would come in on Monday, and we would send her home on Friday. She would come back on Monday, we'd send her home the next Friday.

MS. SASTRE: All right. Fair enough, Judge.

THE COURT: All right. And I believe that was it. Mr. Jordan, he's got problems, too.

MS. SASTRE: Let me look at my notes for a moment on Mr. Jordan.

THE COURT: He had a problem with parking. I said, if we could work that out for you -- he said that would be fine. And very frankly, I can't put him in a hotel. There was a time -- there was a time --

MR. MOORE: Parking, right?

THE COURT: There was a time we used to be able to up front it. I don't think we can do that anymore. Put him in a hotel, but we can't up front it.

MS. SASTRE: Should we talk to him about it, Judge?

THE COURT: He's got other problems. He was pretty clear. All sorts of things. I think we can almost defer on that one because, very frankly, what he indicated was he didn't want to judge, he didn't want to judge. And I pressed him, thinking perhaps it was related to some religious belief. What

he did disclose is: I've had too many people die of cancer. I don't want to -- I don't want to judge in those circumstances.

MR. MOORE: But that's cause.

THE COURT: That's cause. But we'll deal with that. I'm going to let you all -- now are we ready to talk about cause?

MS. SASTRE: No. Well, we would just need a couple minutes to digest what happened.

THE COURT: I'll give you all a couple of minutes.

MS. SASTRE: But Mr. Jordan is still in play at that moment, or did you let him go?

THE COURT: At this very moment, but I wouldn't count on it.

(There was a pause in proceedings.)

THE COURT: Plaintiffs, do you have any challenges for cause?

MS. SASTRE: Yes, Your Honor. Would you like us to list them and then we can talk about them?

MR. SCHANKER: Mr. Toliver, Ms. Becnel, Ms. Roberts, Ms. Blackwell, Mr. Guice, Ms. Billings, Mr. Ritter.

THE COURT: Let's start with Mr. Toliver.

MR. SCHANKER: Your Honor, when asked the question by me, he indicated that he -- I don't think I can be fair. And then you asked can he put aside his personal experiences. He said: No, I can't. He said it again: No, I can't. You asked

him, regardless of the evidence. He said: Yes.

He made a clear record that he cannot be fair and impartial and should be excused for cause.

MS. SASTRE: Your Honor, my impression with Mr. Toliver -- and perhaps I'm not remembering correctly -- I thought when Your Honor asked him questions, he was rehabilitated. So that's not the way I remember Mr. Toliver.

Your Honor, I'm sorry. I think the question was in the context of him having skin cancer, so I guess the question really wasn't meaningful.

THE COURT: Well, I understand that you don't have to be excused just because you have breast cancer. If you have strong feelings about whether or not this lawsuit is frivolous or you've already had preconceived notions that you cannot put aside -- I'm going to look, because I need to --

MR. SCHANKER: The record was clear, Your Honor.

THE COURT: But y'all got to give me a second, because I thought that --

MR. SCHANKER: For the record, Your Honor, when I asked questions as well as when you asked the question, on the fairness, Ms. Becnel --

THE COURT: Let me ask, do y'all have any objection to excusing Ms. Becnel?

MR. MOORE: What was the basis again?

THE COURT: I'm going to try and rehabilitate her.

11:09:35 MS. SASTRE: I'm shaking my head, no, Judge.

11:09:38 THE COURT: Because I was afraid what else was going to come out. Okay. Your next one is Blackwell. She's --

11:09:50 MR. SCHANKER: Ms. Blackwell said: In this case, I couldn't be fair. My feelings would come and give -- the judge asked: Have you already made up your mind? And she said: Already made up my mind.

11:10:14 MS. SASTRE: No objection.

11:10:15 THE COURT: Mr. Guice.

11:10:23 MS. SASTRE: No objection.

11:10:27 THE COURT: And the next one you had was?

11:10:32 MS. SASTRE: Ms. Billings.

11:10:34 THE COURT: Billings.

11:10:34 MS. SASTRE: Absolutely I'm objecting, Your Honor.

11:10:37 MR. MOORE: We rehabbed her.

11:10:39 MS. SASTRE: Ms. Billings was very clear in answering my questions that she could listen to and receive the evidence with an open mind. I asked her that question repeatedly. She also said that she would follow Your Honor's law. And I asked her: Can you be fair and impartial? She said: Yes, I can. That is how she answered that question.

11:10:57 Simply because she works for a pharmaceutical company -- and, by the way, the product that she has feelings on, it's not even a drug, it's RoundUp. It's a spray to kill weeds.

11:11:10 THE COURT: I think that she went into great -- she talked a great deal about the cost of these lawsuits and pharmaceutical companies going on, and that that would have a bearing.

11:11:25 MS. SASTRE: Well, Your Honor, I would -- I'm sorry. Go ahead.

11:11:29 THE COURT: Go ahead.

11:11:30 MS. SASTRE: I would just say, look, you could have somebody sitting here who would say they had complaints about the price of prescription medications, but if they say they could keep an open mind and they say they can listen to evidence and if they say they can be fair and impartial, then there is not proper grounds for a cause challenge on them.

11:11:49 Here, Your Honor, if you recall plaintiffs' counsel's questioning of her, it was sort of like, oh, you have all of these feelings, as if she's not allowed to have an opinion or feeling on any topic. She does. And even despite the fact -- look, there are folks that said they thought this case was frivolous. I understand. She just says: Look, there is litigation and lawyers advertise, but I can listen here and follow the law.

11:12:13 It's not enough.

11:12:15 MR. SCHANKER: Your Honor, this is not a game of "got you with a magic word that I can be fair and impartial." As you know, the law says you look at the entire record that was

established, and the entire record established of questions and answers by both myself and you, Your Honor, is that Ms. Billings cannot set aside these feelings that she has, that they would enter into her decision making. And she said over and over, she said: I don't think I can set it aside. If you ask someone 15 times, they might answer one time differently.

The record is can clear, when asked if she could be fair, she said: Probably not. When asked if she has an open mind, she said she's not sure. And then she said that lawsuits are detrimental to society as a whole and, therefore, she didn't believe she could be fair on this case.

MS. SASTRE: I would just briefly respond. What she said that she has feelings about is that there's lots of lawsuits and there's litigation, and she's involved. She works at a company who is sued a lot. She didn't say she had feelings about this case or that she'd prejudged it or wasn't going to keep an open mind, Your Honor.

Look, this is clearly an intelligent lady. She could have answered that question and said -- it was not a leading question I asked her, Judge. I said: Can you be fair and impartial in this case; do you think you're going to have any difficulty doing that? She said: I can do it.

Of course she's allowed to have feelings about other lawsuits.

THE COURT: I believe she's allowed to have feelings

about other lawsuits. For the record, I'm going to grant the motion for cause. I observed her demeanor. It was apparent to this Court that she had -- I don't believe that she would be able to separate her experiences with the litigation from this. I'm going to grant the challenge for cause.

I believed you asked Ritter?

MR. SCHANKER: Yes. Mr. Ritter's is a different situation. First of all, just for the record, Mr. Ritter did have his hands up on the feelings issue concerning bringing a case after cancer, and he was mumbling under his breath about it, and I would like an opportunity to question him about that because we were never able to ask him those questions about whether he could set those feelings aside.

THE COURT: I did.

MR. SCHANKER: Okay, Your Honor. And specifically Mr. Ritter has indicated, and the record is clear, that he has expertise -- that he has expertise in areas that are conveyed in the purview of the facts in this case and the evidence, and he made it clear -- made it clear -- fact was made, Your Honor, that this is a situation where he's going to bring that expertise on whether it be prescription decisions or whether it be the record -- the medical usage in the case, and that expertise may weigh into his decision-making with regard to the evidence. And, therefore, this is not the right case for him. And, in essence, he can't set aside -- and just follow the

evidence in this courtroom. He's going to bring outside evidence in.

MS. SASTRE: Your Honor, by virtue of being a pharmacist does not mean that Mr. Ritter should be excused from this jury.

PROSPECTIVE JUROR 15: Your Honor, I need to use the bathroom.

THE COURT: Yes, ma'am.

PROSPECTIVE JUROR 15: Can I go out? May I go out that way?

THE COURT: Wait.

(Prospective Juror 15 briefly leaves the courtroom.)

MS. SASTRE: It doesn't mean a doctor should be excused --

THE COURT: You know what, I'm not going to grant the challenges for cause. I specifically asked Mr. Ritter, and he indicated he could not listen to the evidence and render a verdict solely on the evidence.

I think the other one was Mr. Toliver, but I can't get the thing up here. So, I'm going to defer on that one until I can pull it up, because my recollection and my notes say that he was -- but I'm going to go back and look at my realtime. Okay.

Your challenges for cause, defendants.

MS. SASTRE: Yes, ma'am, we would move on Ms. Boutte.

11:16:39 Ms. Boutte said in response to my --

11:16:42 THE COURT: Are y'all going to object to excusing Ms. Boutte?

11:16:46 MR. SCHANKER: Your Honor, we're not going to object.

11:17:22 Are you guys really objecting to Toliver? You heard what he said. Toliver was crystal clear --

11:17:28 MS. SASTRE: Could I have 30 seconds?

11:17:31 THE COURT: I just can't --

11:17:33 MS. SASTRE: No, no, listen. Let me check, and if I could have 30 seconds, I can let you know if we have anything else.

11:17:38 THE COURT: Let me tell you. So it was just Ms. -- and Mr. Jordan has been excused. So we have excused -- I want to make sure my final -- we're looking at Mr. Toliver.

11:18:11 MR. MOORE: We have more cause strikes.

11:18:13 MS. SASTRE: We're not done, Your Honor.

11:18:13 THE COURT: No, I'm talking about what we have. We have excused Ms. Boutte, Ms. Defils, Ms. Becnel, Ms. Roberts, Ms. Blackwell, Mr. Guice, Mr. Jordan, Ms. Billings. That's all we've excused. And I'm going to pull up Mr. Toliver if I can find him.

11:18:40 Okay. I have 13. We need 14. This is the deal. It looks like we have 12 or 13, depending on Mr. Toliver. We need 14. I'm going to put probably seven more people in the box. We don't need to put all 21. I would think. But you're

going to be limited to about 15 minutes to question them. Because --

MS. SASTRE: So you're going to put seven more in?

THE COURT: You only need two more.

MR. SCHANKER: It will just be the first two seated.

THE COURT: No. Y'all get to --

MS. SASTRE: We are going to agree to Mr. Toliver. We checked our notes, thank you.

THE COURT: All right. So, we now have 12. We have 12. You need -- because you need 14, we're going to put seven in the box, and we'll question those. We're not doing peremptories yet.

MS. SASTRE: Could we keep going on cause?

Your Honor, we would move on Ms. Nelson. Ms. Nelson was the lady who said that, you remember, she watches the show *American Greed*, the TV show. And I'm moving on her in particular because, much like Ms. Billings, who talked about some beliefs that she held, although she did say that she could be fair and impartial, Ms. Nelson also talked about very strongly held negative beliefs on pharmaceutical companies, the warnings on medications. Again, just by virtue of the name of the show she was watching where she learned this, *American Greed*.

So, again, if you look at the totality of the circumstances, despite the fact that she said she could be

11:20:50 fair, she should be removed from the jury for cause, Your Honor.

THE COURT: Ms. Nelson.

MR. SCHANKER: Your Honor, you asked if Ms. Nelson could set those feelings aside. At different times she answered: I can. The record is clear. Ms. Nelson should not be excused for cause. She said: If I could hear the case, I could be fair.

THE COURT: While the parties -- I think the defendants worked hard. She did say she had those feelings, it was based on a TV show. And the difference -- because I think the difference is you excused Billings and not Ms. Nelson, Ms. Billings was based on personal experience and her interactions in these large lawsuits.

Ms. Nelson said, it's based on a show I'm watching, but I don't know anything about this. I don't know anything about this company. I thought she was pretty clear: Until I hear evidence, I can't know what I feel.

So, I'm going to deny that challenge for cause.

What's the other one?

MR. MOORE: The last issue we would like to raise is whether we're going to put a lawyer on the jury. Tiemann, the law clerk.

THE COURT: I put on law clerks all the time. We've had judges on the jury.

MR. SCHANKER: We have no -- we're okay. We have no objection to the move -- to having Ms. Tiemann dismissed.

MR. MOORE: Both sides don't want a lawyer on the jury.

MR. SCHANKER: And we have another seven.

THE COURT: Are y'all jointly moving to excuse Ms. Tiemann?

MS. SASTRE: No.

MR. SCHANKER: Motion withdrawn.

THE COURT: Nobody asked --

MR. MOORE: We agree with them, we don't want a lawyer on the jury.

THE COURT: I didn't have a thing with her on it. So we need another three, then. So, I'm going to put about seven in, and hope we don't have a whole bunch. All right. Y'all go.

MS. SASTRE: So you're just going to bring up seven more.

THE COURT: I'm going to fill up that last row.

(WHEREUPON, at this point in the proceedings, the bench conference concluded.)

THE COURT: Potential members of the jury, this always becomes -- gets to be a little bit of a logistical nightmare, but the first thing I'm going to do -- because we're going to have to put up a new panel. So somehow or another, we've got to get you -- the first thing I'm going to do is ask the

members from one to seven, if you will just -- do you know what, why don't you go into the jury room, and then we'll pull up the seven, and then we'll do it that way. Ma'am, if you'll just go into the jury room. Those of you in the second row, you can replace --

MR. SCHANKER: Your Honor, I apologize, just one thing I think that we should just briefly approach on.

(WHEREUPON, at this point in the proceedings, there was a conference held at the bench.)

MR. SCHANKER: I apologize, Your Honor, just would you admonish those jurors not to talk.

THE COURT: They are in the jury room.

MR. SCHANKER: I mean discuss amongst themselves.

THE COURT: Would you go in there and just tell them, they can talk about the TV shows. Nothing related to the questioning.

(WHEREUPON, at this point in the proceedings, the bench conference concluded.)

THE COURT: I'm going to ask you two in the front two rows to just stay put because I have no place to put you.

Juror 22 -- the next seven, we're now going to question you. The good news is this questioning generally goes a great deal faster because you had an opportunity to hear my general instructions. And so, I'm going to first start with, do any of you have any hardship that would affect your ability

to serve on this jury trial that we anticipate to last two weeks?

Yes, ma'am, Ms. Thompkins.

PROSPECTIVE JUROR 27: I don't think I will be able to miss two weeks of work.

THE COURT: What do you do, ma'am?

PROSPECTIVE JUROR 27: Monitor tech at the hospital.

THE COURT: Can you tell me why?

PROSPECTIVE JUROR 27: Well, my insurance and everything comes out of my check every two weeks, and I wouldn't be getting my check.

THE COURT: Would they -- would the hospital -- your check at the hospital is not going to pay you for the time that you're here?

PROSPECTIVE JUROR 27: I think they only do either one or two days.

THE COURT: Ma'am, would that problem with missing work affect your ability to pay attention to this case or would you be distracted during the course of this trial?

PROSPECTIVE JUROR 27: No, but I have bills that I have to pay that I wouldn't be able to.

THE COURT: Thank you, ma'am.

Does anybody else have any issues that would make this a hardship? Okay.

Now I'm going to ask you the same questions that

I asked the first panel; that is, you have all completed a significant questionnaire; were the answers that you gave on that questionnaire true and correct?

Ms. Martin.

PROSPECTIVE JUROR 22: Yes, ma'am.

THE COURT: Ms. Suydam.

PROSPECTIVE JUROR 23: Yes.

THE COURT: Mr. Holbert.

PROSPECTIVE JUROR 24: Yes, ma'am.

THE COURT: Mr. Murphy.

PROSPECTIVE JUROR 25: Yes, ma'am.

THE COURT: Ms. Spears?

PROSPECTIVE JUROR 26: Yes, ma'am.

THE COURT: Ms. Thompkins.

PROSPECTIVE JUROR 27: Yes, ma'am.

THE COURT: Mr. Spicuzza?

PROSPECTIVE JUROR 28: Yes, ma'am.

THE COURT: Did any of you have any additional information or need to make any corrections on the questionnaire?

Ms. Martin.

PROSPECTIVE JUROR 22: No, ma'am.

THE COURT: Ms. Suydam?

PROSPECTIVE JUROR 23: No, ma'am.

THE COURT: Mr. Holbert?

PROSPECTIVE JUROR 24: No, ma'am.

THE COURT: Mr. Murphy?

PROSPECTIVE JUROR 25: No, ma'am.

THE COURT: Ms. Spears?

PROSPECTIVE JUROR 26: No.

THE COURT: Ms. Thompkins?

PROSPECTIVE JUROR 27: No.

THE COURT: Mr. Spicuzza?

PROSPECTIVE JUROR 28: No.

THE COURT: And, finally, did you discuss the questionnaire or any answers you provided with anyone?

Ms. Martin.

PROSPECTIVE JUROR 22: No.

THE COURT: Ms. Suydam?

PROSPECTIVE JUROR 23: No, ma'am.

THE COURT: Mr. Holbert?

PROSPECTIVE JUROR 24: No, ma'am.

THE COURT: Mr. Murphy?

PROSPECTIVE JUROR 25: No, ma'am.

THE COURT: Ms. Spears?

PROSPECTIVE JUROR 26: No, ma'am.

THE COURT: Ms. Thompkins?

PROSPECTIVE JUROR 27: No, ma'am.

THE COURT: Mr. Spicuzza?

PROSPECTIVE JUROR 28: No, ma'am.

THE COURT: Now I'm going to ask you to introduce yourselves again. And as we said, your name; your occupation; the area of the parish you're from; whether you're married or have a significant other and what their occupation is; any children; and your favorite TV show.

We'll start with you, Ms. Martin.

PROSPECTIVE JUROR 22: My name is Penny Martin. I am married. My husband works for a global experience specialist that does conventions in the city. I am a dispatch manager for an air freight company at the New Orleans International Airport. We have six kids together and seven grandchildren altogether. And I live in St. Charles Parish.

THE COURT: Any favorite TV shows?

PROSPECTIVE JUROR 22: Not really. Not much of a TV person.

THE COURT: Ms. Suydam.

PROSPECTIVE JUROR 23: My name is Lynda Suydam. I'm married. My husband is retired from Avondale Shipyards. I have four daughters, 11 grandkids, four great. I work -- I live in Luling, Louisiana. I work for Saint Charles Parish Schools as a food service technician. Yeah, I'm a cook.

THE COURT: Did you tell us what your husband does, ma'am?

PROSPECTIVE JUROR 23: Well, he's retired. Well, disabled.

11:31:36 THE COURT: What did he do before?

11:31:36 PROSPECTIVE JUROR 23: He worked at Avondale Shipyards.

11:31:39 THE COURT: You did tell us that, I apologize. Any favorite TV shows?

11:31:45 PROSPECTIVE JUROR 23: *Mash*.

11:31:45 THE COURT: Mr. Holbert.

11:31:48 PROSPECTIVE JUROR 24: My name is Joshua Holbert. I'm married with two kids. My wife is a recruiter and she does accounting for Nationwide Skilled Trades. I'm a quality manager for a machine shop manufacture in Gray, next to Houma. My favorite TV show is *Big Brother*.

11:32:05 THE COURT: Mr. Murphy.

11:32:05 PROSPECTIVE JUROR 25: I'm Daniel Murphy. I'm a business systems analyst for a local bank. Divorced, three grown children. And honestly, I don't have any favorite television shows. I lead a pretty boring life.

11:32:22 THE COURT: Ms. Spears.

11:32:22 PROSPECTIVE JUROR 26: Good morning. My name is Arlene Spears. I'm an executive secretary at a school. I'm a widower of six years. My favorite TV show is Hallmark, all of the movies. And I live in Jefferson Parish.

11:32:43 THE COURT: Thank you, ma'am.

11:32:44 PROSPECTIVE JUROR 27: My name is Shantell Thompkins. I'm from Raceland. I work at Ochsner as a monitor tech. And favorite TV shows would have to be between *Bones* and *Charmed*.

THE COURT: Mr. Spicuzza.

PROSPECTIVE JUROR 28: My name is Jerry Spicuzza. I'm a chemical plant operator. I'm married, two kids. Favorite shows, anything crime or law.

THE COURT: Let me ask you, sir, does your wife work outside the home?

PROSPECTIVE JUROR 28: Yeah, she's a parts clerk at a cement company.

THE COURT: Thank you, sir.

Mr. Schanker, are you ready to proceed?

MR. SCHANKER: Yes, Your Honor, thank you.

Good morning, top row. So you were all able to hear most of what we were talking about back there? Okay. That's good.

Anybody -- let's do it this way. Any of the things that you heard us talk about with regard to this issue of having feelings about having cancer, taking a drug, and then getting better, and then suing the company that gave you that drug for a side effect? That seemed to be an issue that we had a lot of folks who wanted to speak about, had feelings on.

So, the folks in the back row, raise your hand if that topic sort of makes you feel that there is things that are important for you to share in this case. So we have a few hands here. And, Ms. Suydam, am I pronouncing your name right?

PROSPECTIVE JUROR 23: Yes.

MR. SCHANKER: How are you, ma'am?

PROSPECTIVE JUROR 23: I'm fine.

MR. SCHANKER: Are you willing to share with us?

PROSPECTIVE JUROR 23: Yes.

MR. SCHANKER: Would you, please.

PROSPECTIVE JUROR 23: I feel like some of the others do. I do have family that have had cancer. I've had some that's died. I've had a niece now that's been fighting for two years. She had leukemia. She had to have the bone marrow and all that. So she's lost her hair and all that. But she's -- you know, she's getting better. She's had strong chemo. She knew the side effects. A lot of things, you know the side effects, but it's up to you, it's up to you to decide whether you want -- you know, do I want to get better? I know the side effects, but what's -- you know, what's best for me. Do I want to live? Do I want to lose my hair? What's more important? You could cover your head. You can't get your life back.

And, you know, I mean, I don't take a lot of medicines either. I just -- you know, I'm in good health. But, you know, I read. I check out what medicines I take, you know, I check side effects. I weigh them. You know, it's -- you know, but to me, I think it's the person, you know. You have to decide what -- but I -- I'm not much on suing. It's really got to be really, really, really bad.

MR. SCHANKER: Sure.

PROSPECTIVE JUROR 23: That's all I've got to say about it.

MR. SCHANKER: Thank you for sharing those thoughts. I want to follow up, if I may, with a couple questions. So, as the judge -- as you were listening, you heard this a few times, the judge instructed the jury, instructed you all that you're supposed to base your decision, if you're on this jury, solely on the evidence.

And so the question that I'm posing to you, are the feelings that you have on this idea of suing in this situation where someone had cancer and then took a drug, suing that drug company, do you feel like those feelings that you have, are they going to come into the decision-making or are you going to be able to do it solely on the evidence?

PROSPECTIVE JUROR 23: I'm not sure. Like I say, it's, you know, I just -- I can't see the suing part. I mean, I would rather have my life. You know, that's more important. I would rather have my life. It's hard for me to talk, you know, but I really don't know because I can see both sides. I can see both sides. And I do, I feel pharmaceuticals, you know, they are high priced. You know, they -- you know, and it's like -- it's like money, everywhere, you know, money is the issue. This one wants money. Let's make money this way. And this one wants to go after it, makes things higher. You know, it's -- so I really don't know. I really don't know.

11:38:18 MR. SCHANKER: So as you sit here at this point in time, do you think that you could judge the evidence as it comes in fairly and base your decision on that evidence?

11:38:28 PROSPECTIVE JUROR 23: To be honest, I don't know.

11:38:37 MR. SCHANKER: So it might be a situation where you are sitting on this jury, and you may not be able to set aside those feelings and your feelings and you may take into account those feelings strongly when you are deciding the case and not just base it on the evidence? You don't seem like the kind of person that would let me put words in your mouth. Certainly don't let me do that.

11:39:00 MS. SASTRE: Objection, Your Honor, that's leading.

11:39:02 THE COURT: Sustained. Rephrase your question.

11:39:04 MR. SCHANKER: Do you think you could be fair and impartial in this case or -- and I thank you for your honesty, Your Honor -- ma'am. Do you think that you could be fair and impartial in this case, or you just don't know?

11:39:18 PROSPECTIVE JUROR 23: I honestly don't know.

11:39:20 MR. SCHANKER: Thank you. Mr. Murphy, how are you, sir?

11:39:26 PROSPECTIVE JUROR 25: Just fine, thank you.

11:39:28 MR. SCHANKER: Thank you for taking the time -- it looks like you took real time filling out that questionnaire, and I appreciate it.

11:39:36 PROSPECTIVE JUROR 25: You told me to do it honestly.

So that's just what you got.

MR. SCHANKER: Thanks for doing that. You made some comments about you had strong feelings about some of the issues in this case. Are you comfortable sharing those feelings?

PROSPECTIVE JUROR 25: Sure. Just for full disclosure before we get started, I have opinions about both sides, about big pharma and tort reform as far as plaintiff attorneys.

MR. SCHANKER: That's what it looked like, and that's what I was interested in talking about with you. Thanks for that disclosure. Share with us, if you would.

PROSPECTIVE JUROR 25: Well, my ex-wife is in the pharmaceutical industry. She's a sales rep. She's worked for several companies: Merck; Eli Lilly; Cubist, which is a biotech firm, does infusion drugs similar to cancer drugs. Just from my personal experience seeing the changes from the person that I married as she got into that business where things were done with kind of a wink, you know, hey, we're not able to promote this drug for, say, weight loss because it's a different type of drug, wink, wink, don't get caught, that kind of thing. Live in the gray area. It kind bleeds over to kind of see the -- being torn, things the company wants you to do versus what they tell you to do. I think there is a lot of just money grab for profits in big pharma.

I'm a diabetic. I take three different insulins. If I didn't have insurance, my insulin would cost me over

$3,500 a month. It's a life-saving drug, but it kills me every time I see a commercial for the latest diabetic insulin or insulin substitute or whatever.

In this country we pay the most for our medications. We maybe subsidize other countries. I just think we go beyond the research and development piece of it for the company, and the profits are driven by -- or we're paying for the advertisement that drives the profits, the market segment and everything.

As far as tort reform, I think it affects every facet of our lives, from our car insurance to just the cost of doing business. I think there needs to be some controls there.

MR. SCHANKER: Thank you for sharing that. I mean that. So as you've watched this process here this morning, and understand that this is about trying to find folks that can be fair and impartial --

PROSPECTIVE JUROR 25: Yes.

MR. SCHANKER: -- what are your thoughts? Feelings that you've expressed on both sides, do you think that it would be difficult for you to do that, or do you think that you could set those feelings aside?

PROSPECTIVE JUROR 25: I would like to think that I could be fair. Again, separating the specific issue of the case as far as the warning and the side effects and everything. I have opinions about, you know, we as people, we're -- it's

incumbent upon us to go out and research, not just take the doctor's word for it.

Maybe I'm a little jaded because I've got a little knowledge of how drugs are promoted in a doctor's office and how they get to market and all of that, but certainly when my doctor prescribes new medication for me, before I go get it filled, I'm out there looking at it.

I won't be as bold as to tell you that I read the insert that comes in the package. I don't know how anybody reads it, to be honest with you. But I do try to find out what effects it will have, short term, long term, what it will do for me, what benefits I'll get from it, specifically if I'm changing drugs from one to another.

I would like to trust my doctor, but I don't have full confidence that he's not just promoting what the latest rep came in and told him to do or, you know -- so, you know, I take it upon myself to do a little more research.

MR. SCHANKER: It sounds like you have a fair amount of feelings and opinions on this. I want to really structure the question this way: For either side in this case, do you feel that one or the other, if you were on this jury, would start out behind because of these feelings and your potential inability to set those feelings aside?

PROSPECTIVE JUROR 25: As I said before, just being honest, I would like to think I could be fair and put them

aside. I'm not sure that -- you know, some feelings or another might bleed over into the decision-making process as to whether or not the plaintiff has merit or the defendant has a position. I really couldn't say at this point. I'd like to think I could be fair.

MR. SCHANKER: Let me be clear to ask the question, the judge is -- someone is going to ask it. Could you base your decision -- as you sit here now, do you believe you could base your decision solely on the evidence that you hear in this courtroom?

PROSPECTIVE JUROR 25: Again, being totally honest, I would like to think I could try. I hope I could.

MR. SCHANKER: But you just don't know for sure?

PROSPECTIVE JUROR 25: I just don't know.

MR. SCHANKER: Thank you. I do appreciate your honestly.

Any other folks on that question we asked earlier -- I know I'm bouncing around here -- the question of taking a drug when you have cancer, getting better, and then bringing a lawsuit? Do I have any other folks in the back row that have feelings that --

Mr. Spicuzza, am I pronouncing your name right.

PROSPECTIVE JUROR 28: Yes. I have problems, I guess, with both sides, but I also feel like it's biting the hand of the dog -- biting the hand that feeds you basically. You got

better, you got -- that's a given, your hair falls out when you get chemotherapy. That's a given as far back as I can remember. Numerous members of my family and people that I know that have had cancer, it's always falling out, whenever you get the chemo.

It just seems like, okay, you lived, so you got to buy a wig or wear a hat or something like that. I understand it's a life-changing experience. So is death, you know.

And, also, I do have my own opinions about big pharma and, you know, the reps, the way they promote their different drugs and the drug of the week, and then you'll see it on TV, all over the place with the listed side effects, and then you won't see it any more once somebody dies or they have too many lawsuits or whatever. That's just my opinion.

MR. SCHANKER: Fair enough. So, Mr. Spicuzza, you've heard this line of questioning. Is this the right case for you?

PROSPECTIVE JUROR 28: I don't know. I would like to think I could give an impartial decision on the evidence that's presented to me, but -- I think I could try my best. That's about all I could say.

MR. SCHANKER: As you sit here right now, do you believe that you could base your decision solely on the evidence and the law as Her Honor gives it to you, if you were

on this jury, or are you afraid that those feelings -- those strong feelings that you have on both sides of the fence, that they may creep into your decision-making such that one of these parties would be at a disadvantage?

PROSPECTIVE JUROR 28: Well, I am human, so I mean, I can't totally say that it wouldn't affect my decision, but considering I have feelings on both sides, it probably would balance out. But as far as the evidence goes, I would like to think that I could give my -- you know, base it solely on that. But I am human.

MR. SCHANKER: Thank you, Mr. Spicuzza. Thank you.

So, ladies and gentlemen, another topic in this case that hasn't been discussed, and that is how much evidence it takes. The judge will be giving you the law. And everyone understands this is not a criminal case, right? You've seen the TV shows, beyond a reasonable doubt.

MS. SASTRE: Your Honor, I would object. Excuse me, Your Honor, I would object to counsel telling the jury what the law is during jury selection.

MR. SCHANKER: Your Honor, we're just talking about the standard of proof, the burden of proof.

THE COURT: I'm going to allow him to just ask if they understand it's preponderance of the evidence and not beyond a reasonable doubt.

MR. SCHANKER: Thank you, Your Honor.

And that's just right. As Judge Milazzo says, that's the standard. That's the amount of evidence you need in the case, preponderance of the evidence, which is a lower amount of evidence than beyond a reasonable doubt. And you'll hear that in this case.

And if you're on this jury, every decision that you're making, every question you're answering, that's what you're looking at. Is it more likely true than not. So it's less evidence in this case.

We're not saying we have less evidence, but that's --

THE COURT: Okay, that's enough. I think the question is, can you apply that standard?

MR. SCHANKER: So, folks, are you comfortable applying that standard, or would you want more evidence than more likely true than not? That's my question. Any folks have any issues with that burden of proof that we'll be seeing in this case?

Mr. Holbert, any thoughts on that at all.

PROSPECTIVE JUROR 24: No. If there is enough evidence to make a decision, then that's what it is.

MR. SCHANKER: Okay. Anybody else have any issues with that, that that's the burden of proof that we'll be applying in this particular case?

And, Mr. Holbert, while you have the microphone now --

THE COURT: Mr. Schanker. You're done.

MR. SCHANKER: I'm done, thank you.

Thank you, Your Honor.

THE COURT: Thank you.

Ms. Sastre.

MS. SASTRE: If it may please the Court. Good morning. It's barely still morning. So, ladies and gentlemen, I'm Hildy Sastre, and I just wanted to introduce myself to you. I know it's difficult going through this once, and now you've sort of had to sit through it twice. So thank you on behalf of everybody for hanging in there, staying with us. And we're almost at the end of jury selection, which I know is excellent news for everybody in the room.

I just have a few questions for a couple of you. And if I could start with Ms. Martin, please. How are you doing, ma'am?

PROSPECTIVE JUROR 22: Good. How are you?

MS. SASTRE: I'm doing fine. Thank you so much.

So just a few questions for you, Ms. Martin. I was going to ask you about your husband. You included some information about him on the questionnaire. Are you comfortable talking about that with us, or would you like to do that privately?

PROSPECTIVE JUROR 22: No, that's fine.

MS. SASTRE: So I think you told us that your husband just had knee surgery.

PROSPECTIVE JUROR 22: That's correct.

MS. SASTRE: How is he doing, ma'am?

PROSPECTIVE JUROR 22: He's doing okay.

MS. SASTRE: Are you involved in caring for him?

PROSPECTIVE JUROR 22: I am, yes.

MS. SASTRE: Tell us about that a little bit. Do you care for him during the day?

PROSPECTIVE JUROR 22: No. I have to work during the day. But I care for him in the evenings when I get home.

MS. SASTRE: Let me ask you this, would your being here with us, you wouldn't be distracted because of that?

PROSPECTIVE JUROR 22: I'm sure that would be a distraction, since I'm his main caregiver.

MS. SASTRE: Tell us about that. Why do you feel that if you were here selected as a juror that you feel that you would be distracted because of the situation with your husband's knee surgery.

PROSPECTIVE JUROR 22: Well, because I'm his main caregiver. I set his meals and set him up through the day, check on him on my lunch hour and stuff along those lines. I also have a daughter who is a senior in high school, so we're running through all of the rigmarole of the senior year with her right now. So I feel like, yes, it would be a distraction for me serving on a jury.

MS. SASTRE: Do you feel like you would have difficulty

concentrating while you were listening to the evidence because of the care that you were providing for your husband?

PROSPECTIVE JUROR 22: Yeah, I think that's a good possibility.

MS. SASTRE: Now, let me ask you just another question, ma'am. You stated in your questionnaire, you said you're not a fan of the pharmaceutical industry.

PROSPECTIVE JUROR 22: That would be correct.

MS. SASTRE: So could you tell us, why are you not a fan of the industry? Why do you feel that way?

PROSPECTIVE JUROR 22: Basically I feel like it's a big money gimmick. I do. And I have several people that I know of that have opioid addictions and stuff along those lines.

MS. SASTRE: I'm sorry to hear that.

PROSPECTIVE JUROR 22: I think it all kind of goes hand in hand.

MS. SASTRE: So you have -- you have very negative feelings about the pharmaceutical industry, would that be fair?

PROSPECTIVE JUROR 22: Yeah, I'm not a fan. I mean, I believe in people needing medicine and stuff along those lines, but I don't believe in so much in the way like it's promoted with the commercials and stuff along those lines.

MS. SASTRE: Do you think the pharmaceutical industry puts profits before safety, in all candor?

PROSPECTIVE JUROR 22: Yes, for the most part.

MS. SASTRE: Are these feelings that you have -- you know this is a case about a pharmaceutical company, as you know, who is a defendant. Those feelings that you have, Ms. Martin, those are things that -- would you have difficulty setting them aside or putting them out of your mind if you were selected as a juror?

PROSPECTIVE JUROR 22: Possibility. I really couldn't say. A possibility.

MS. SASTRE: That's really the issue, ma'am, which is: Might it be difficult for you because of your strong negative feelings about the pharmaceutical industry to be fair and impartial in the case where a pharmaceutical company is a defendant, in all candor?

PROSPECTIVE JUROR 22: No, I feel like I'm a fair person. I would be fair either way. I don't believe in lawsuits either. I don't think it's a right way to go about things.

MS. SASTRE: Let me ask you this: You know that there is a pharmaceutical company that's a defendant in this case, right?

PROSPECTIVE JUROR 22: Yes.

MS. SASTRE: I assume, of course, you haven't met Ms. Earnest. You don't know her, right?

PROSPECTIVE JUROR 22: No, ma'am.

MS. SASTRE: Between the two parties right now, based

upon how you feel about pharmaceutical companies, isn't my client starting out just a little bit behind, in your mind?

PROSPECTIVE JUROR 22: I wouldn't necessarily say that, because I do believe that Ms. Earnest is blessed to have her life. You know, I have several people close to me that have also died of cancer. That if hair loss would be the only thing that we suffer, that would be minute.

MS. SASTRE: Thank you very much, Ms. Martin. I appreciate your time this morning.

Ms. Thompkins. Good morning, ma'am. How are you? I have a few questions for you. You first talked about a hardship. You said you thought you would only get paid at work for a day or two. And is that something that's going to be a problem for you financially?

PROSPECTIVE JUROR 27: Yes.

MS. SASTRE: How so, Ms. Thompkins?

PROSPECTIVE JUROR 27: Because I get paid every two weeks, and I have everything lined up as far as my bills based on when I get my checks.

MS. SASTRE: Would you have trouble paying your bills?

PROSPECTIVE JUROR 27: If I don't have my check, yes.

MS. SASTRE: Is that something that would be on your mind?

PROSPECTIVE JUROR 27: Yes.

MS. SASTRE: Something that would cause you stress or

anxiety?

PROSPECTIVE JUROR 27: Not necessarily towards the case, but towards my personal being, yes.

MS. SASTRE: Sure. It would be stressful for you personally?

PROSPECTIVE JUROR 27: Uh-huh (affirmative response).

MS. SASTRE: Do you think if you were selected as a juror, Ms. Thompkins, and if you didn't get paid for two weeks and that was causing you financial distress, would that be something you think that could be a distraction if you were a juror in the case?

PROSPECTIVE JUROR 27: Somewhat.

MS. SASTRE: Do you think it might at times interfere with your ability to concentrate if you were worried about your bills?

PROSPECTIVE JUROR 27: No.

MS. SASTRE: But you do feel like you would be distracted?

PROSPECTIVE JUROR 27: From time to time.

MS. SASTRE: From time to time. All right, Ms. Thompkins, let me ask you just a few other questions, ma'am, while I'm talking with you. You said you had negative views of pharmaceutical companies. And why do you feel that way?

PROSPECTIVE JUROR 27: I feel that sometimes it's --

like others have said, it seems like it's a little more about money than the actual patients themselves.

MS. SASTRE: So do you think that -- do you think that pharmaceutical companies are more interested in profits than they are safety?

PROSPECTIVE JUROR 27: In some ways, yes.

MS. SASTRE: And for how long have you felt that way?

PROSPECTIVE JUROR 27: I really couldn't tell you.

MS. SASTRE: Has it been a long time?

PROSPECTIVE JUROR 27: It wouldn't be completely -- like it's not, like, years and years, but it's been a while.

MS. SASTRE: And is there some personal experience or something that happened that caused you to feel that way?

PROSPECTIVE JUROR 27: Not necessarily, just things I've seen and read.

MS. SASTRE: Is the feeling that you have about pharmaceutical companies, negative feelings -- I think that you also said -- let me actually ask you. You said you also have negative views of large corporations, and you also said that you had negative views of Sanofi, who is the defendant in this case.

PROSPECTIVE JUROR 27: I don't even know what that is.

MS. SASTRE: But you do have negative views of large corporations?

PROSPECTIVE JUROR 27: In some ways, yes.

11:59:10 MS. SASTRE: Tell us about that.

11:59:12 PROSPECTIVE JUROR 27: It's kind of like -- let's see. The situation that I was thinking of is the situation of some people using their power for, like, I guess you could say in bad ways. It wasn't necessarily focused on pharmaceuticals.

11:59:29 MS. SASTRE: I was going to ask you a question about your father. And are you comfortable talking about that? You shared with us that he underwent chemotherapy.

11:59:49 PROSPECTIVE JUROR 27: Uh-huh (affirmative response).

11:59:51 MS. SASTRE: How is he doing today?

11:59:53 PROSPECTIVE JUROR 27: He's fine.

11:59:54 MS. SASTRE: He's in remission?

11:59:56 PROSPECTIVE JUROR 27: Yes, ma'am.

11:59:56 MS. SASTRE: Very good. I'm glad to hear that. When did your father -- when was he fighting cancer? When was that?

12:00:03 PROSPECTIVE JUROR 27: I can't remember the year because I was, like, in middle school. So it's been a long time.

12:00:14 MS. SASTRE: When you look back, was that an emotional time for you?

12:00:19 PROSPECTIVE JUROR 27: Yes.

12:00:19 MS. SASTRE: Now, if you hear in the case -- and you've heard some things already, although it's not evidence, but you've heard that this case is about a lady who developed cancer, took medication for that cancer, right?

PROSPECTIVE JUROR 27: Uh-huh (affirmative response).

MS. SASTRE: Do you think hearing about the plaintiff's struggle and battle with cancer would bring up emotional memories of your dad?

PROSPECTIVE JUROR 27: Not necessarily.

MS. SASTRE: Do you think that you would be able to separate the two?

PROSPECTIVE JUROR 27: Uh-huh (affirmative response).

MS. SASTRE: Okay. Do you think that because of what you saw your father go through, do you feel like you might have sympathy for Ms. Earnest in this case or feel sympathy for her?

PROSPECTIVE JUROR 27: I may.

MS. SASTRE: You may. Even before you've heard any evidence, right?

PROSPECTIVE JUROR 27: Not really. I'm pretty balanced.

MS. SASTRE: I'm not trying to pick on you. I'm trying to make sure I understand how you feel. Knowing what you know about this case, a lady who developed breast cancer, underwent chemotherapy and, as you heard, lost her hair, does that make you feel sympathy for Ms. Earnest, just hearing that?

PROSPECTIVE JUROR 27: I feel sympathy for anyone who has cancer.

MS. SASTRE: Okay. Thank you. And is that something that you think that you might be thinking about, that sympathy,

feelings of your father, when you were listening to the evidence in the case?

PROSPECTIVE JUROR 27: I guess you could say it would be different, but -- I would feel some form of sympathy, but that's all I could say.

MS. SASTRE: Let me ask you this, ma'am: Would it be difficult for you, even if just a little bit, to put --

THE COURT: Ms. Sastre, I need you to come to the mike so I can hear you.

MS. SASTRE: Ms. Thompkins, would it be difficult for you, even just a little bit, for you to put aside the sympathy that you said you already felt for Ms. Earnest?

PROSPECTIVE JUROR 27: It could be possible.

MS. SASTRE: Thank you so much, Ms. Thompkins.

Actually, let me ask you -- I'm sorry, ma'am. You provided so much information in your questionnaire, I just have one more question for you. You said that you thought pharmaceutical companies didn't do enough to provide warnings to doctors. Do you recall that?

PROSPECTIVE JUROR 27: Yes.

MS. SASTRE: Okay. And tell me more about that belief that you hold.

PROSPECTIVE JUROR 27: I guess you can say I've witnessed, a lot of people would say, there is the warning labels that tell you certain things on the bottles, and then

it's like a bunch of other things that you don't see until a long time after. So it's not as forthcoming, I would say.

MS. SASTRE: So in this case, if there is an issue that you're going to hear evidence about that concerns information which is in the warning label and whether it was adequate to convey information about a risk, it sounds like you already have feelings on that, negative feelings about the way drug companies usually put information in their label?

PROSPECTIVE JUROR 27: Only if I see -- like, it's things that I've seen personally, yes.

MS. SASTRE: That's based upon your personal experience, right?

PROSPECTIVE JUROR 27: Uh-huh (affirmative response).

MS. SASTRE: Do you think because of that, ma'am, with that being an issue in this case, that experience you have, that that would be something that'd be difficult for you to put out of your mind, those feelings that you have?

PROSPECTIVE JUROR 27: No.

MS. SASTRE: You think you could do that?

PROSPECTIVE JUROR 27: Uh-huh (affirmative response).

MS. SASTRE: Does my client start out even a little bit behind in a case where we're going to be talking about what information was contained in the warning label?

PROSPECTIVE JUROR 27: No.

MS. SASTRE: Ms. Thompkins, thank you so much. I

appreciate for spending some time with me this morning, ma'am.

Then I do have a question for you, Ms. Suydam. Did I say your name correctly?

PROSPECTIVE JUROR 23: Yes.

MS. SASTRE: Okay. Perfect. Good morning.

PROSPECTIVE JUROR 23: Good morning.

MS. SASTRE: It's nice to see you, Ms. Suydam.

So I have a couple questions for you. You told us that your family had been touched by cancer.

PROSPECTIVE JUROR 23: Yes.

MS. SASTRE: You said there were folks in your family who were treated and had some issues with hair loss?

PROSPECTIVE JUROR 23: Yes.

MS. SASTRE: I'm sorry, I know you mentioned that, unfortunately, you've had folks pass away in your family who suffered from cancer.

PROSPECTIVE JUROR 23: Yes.

MS. SASTRE: I'm sorry to hear that.

You were asked questions about how you feel about a claim for hair loss. Do you remember that?

PROSPECTIVE JUROR 23: Yes.

MS. SASTRE: I just want to ask you this. So right now, in this case, you haven't heard any evidence, right?

PROSPECTIVE JUROR 23: No.

MS. SASTRE: You haven't seen any evidence?

PROSPECTIVE JUROR 23: No.

MS. SASTRE: You haven't seen any witnesses testify?

PROSPECTIVE JUROR 23: No.

MS. SASTRE: Her Honor, Judge Milazzo, as you know, ladies and gentlemen, she's not instructed you on the law.

PROSPECTIVE JUROR 23: No.

MS. SASTRE: So my question to you is, can you listen to the facts and the evidence in this case, and keep an open mind while you're doing that?

PROSPECTIVE JUROR 23: Like I said, I really don't know because when I -- you know, like I said, she has her life. She's doing good. Me personally, if it was me, I would be happy.

MS. SASTRE: Why is that?

PROSPECTIVE JUROR 23: Because I had my life.

MS. SASTRE: It would be more important to you than your hair?

PROSPECTIVE JUROR 23: Yes.

MS. SASTRE: Ma'am, let me ask you this --

PROSPECTIVE JUROR 23: I can't blame something else just for losing my hair. You know, I just can't.

MS. SASTRE: Can you be fair and impartial if you're selected as a juror?

PROSPECTIVE JUROR 23: Like I said, I honestly don't know. Because it's -- you know, it's just my thought.

MS. SASTRE: Again, as I said -- and I know I didn't get a chance to talk with you all, but you probably heard me say it before -- all of us have opinions. No one walked in here without a life experience. No one who came into this courtroom is a blank slate.

So we appreciate your sharing your feelings with us, your opinions on things. It's natural and normal to have them. So thank you very much, ma'am. I appreciate that.

PROSPECTIVE JUROR 23: You're welcome.

MS. SASTRE: Ladies and gentlemen, thank you very much. We appreciate your time.

THE COURT: I just have a couple of follow-up questions. Thank you.

Ms. Martin, you indicated your husband had knee surgery. I believe you said you set him up for the day.

PROSPECTIVE JUROR 22: Yes, ma'am.

THE COURT: Would serving on a jury be any more different than what you're doing at work?

PROSPECTIVE JUROR 22: No, as long as I was able to go home in the evening.

THE COURT: You're going to go home in the evening. We will take a lunch break where you can call and check on him. Is that sufficient to meet your needs?

PROSPECTIVE JUROR 22: Sure.

THE COURT: I think you indicated you've had some

feelings, and some of those -- some opinions, and some of those are rooted in what you deem to be the opioid crisis?

PROSPECTIVE JUROR 22: Correct.

THE COURT: You understand that this is a not a case surrounding opioids?

PROSPECTIVE JUROR 22: Yes, ma'am.

THE COURT: Now, but it does involve a pharmaceutical company and a patient. So my question to you is, ma'am, can you listen to the evidence and render a verdict solely upon the evidence you hear in this courtroom?

PROSPECTIVE JUROR 22: I believe I could, yes.

THE COURT: Well, I need to know if you could, or if your opinions are going to shape the way you listen to the evidence, and you've already -- I need to know if you've already formed an opinion.

PROSPECTIVE JUROR 22: No, I have not formed an opinion.

THE COURT: Can you listen to the evidence and be fair and impartial and render a verdict solely upon the evidence you hear in this courtroom?

PROSPECTIVE JUROR 22: I'm sure I could.

THE COURT: Okay. Thank you.

Now, Ms. Suydam --

PROSPECTIVE JUROR 23: Yes.

THE COURT: -- I'm going to ask you the same question

because it sounded like -- do you have an opinion about this case?

PROSPECTIVE JUROR 23: Yes.

THE COURT: I'm not asking you what that opinion is. I'm asking you if you can put aside that opinion and render a verdict solely upon what you hear in this courtroom, or is that opinion so firmly fixed you could not do that?

PROSPECTIVE JUROR 23: I don't -- I really don't think I could, not with my opinion being the way it is.

THE COURT: Thank you. Mr. Holbert, I don't think I have any questions for you.

Mr. Murphy and Mr. Spicuzza, I'm going to preface both of these questions to both of you gentlemen, if you pass it to them. We're going to talk to Mr. Murphy.

Sounds like you've got an issue with both sides?

PROSPECTIVE JUROR 25: I just have feelings about both sides.

THE COURT: Listen, that's fine. The question I have is, can you put those opinions aside and listen to the evidence in this case, and render a verdict solely upon what you hear in the four corners of this courtroom?

PROSPECTIVE JUROR 25: I believe I can. I know that's not the exact answer you want.

THE COURT: Well, is there one opinion -- because what I heard is -- dislikes both sides is kind of what I said.

PROSPECTIVE JUROR 25: No. Look, honestly --

THE COURT: That's just -- I'm paraphrasing, but it seemed like you had some negative opinions on both sides. My question is, can you treat them and listen to the evidence equally, or are you firmly fixed in a way that you can't listen to be fair --

PROSPECTIVE JUROR 25: Let me answer it this way. I believe my issues with both sides -- I mean, I have the utmost respect for the law profession. Pharmaceutical companies provided income to my family for a long time, so there is some respect there.

I do have problems with the way pharmaceutical companies do some business. I do have problems with just the litigious way that we are as society, as we are.

That aside, I do have an opinion about the case, but I'd be willing to listen to the evidence and see if it changes. I mean, that's being honest.

THE COURT: So you're already starting with an opinion?

PROSPECTIVE JUROR 25: I have an opinion, yes.

THE COURT: Thank you.

All right, Mr. Spicuzza. You already have your mike. It was little bit that -- you indicated that you had some opinions on both sides of this case.

PROSPECTIVE JUROR 28: Yes, ma'am.

THE COURT: My question is: Can you put those opinions

aside and listen to the evidence, and render a verdict solely upon what you hear in this courtroom?

PROSPECTIVE JUROR 28: I probably could. Yes, Your Honor.

THE COURT: You can?

PROSPECTIVE JUROR 28: Yes, Your Honor. I could base it solely on the facts.

THE COURT: That's it.

There are some people that are just not right for certain cases, and that's fine. But we need to determine if you can put those opinions aside and listen, or if you -- sometimes you're so firmly rooted -- you know, you just have really strong opinions, that you feel like, I've pretty much made up my mind. Please tell me.

PROSPECTIVE JUROR 28: No, Your Honor, I have not made up my mind. I think I could base it solely on the facts and the evidence.

THE COURT: Okay, thank you.

If I could hear from the parties, please.

(WHEREUPON, at this point in the proceedings, a conference was held at the bench.)

THE COURT: All right. Any challenges for cause?

MR. SCHANKER: Your Honor, Ms. Suydam.

THE COURT: Is there any objection?

MS. SASTRE: No, Your Honor.

MR. SCHANKER: Mr. Murphy.

MR. MOORE: We have no objection to that one.

THE COURT: I'm going to try to say this softly.

Anybody else?

MR. SCHANKER: No, Your Honor.

MR. MOORE: Your Honor, we had a question about Martin. The question -- Hildy asked her -- she said she was not a fan of the pharmaceutical industry, but the question on the questionnaire said: Is there any reason you cannot serve as a juror in a case? She said: Yes. And then put: I'm not a fan of the pharmaceutical industry.

THE COURT: I think she's explained what her problem is with the pharmaceutical companies.

MR. MOORE: No, I know. It's just inconsistent with her question and answer, and that's what we thought maybe we could get some clarity on. Why did she say she doesn't think she can sit as a juror?

THE COURT: I'll ask her.

Ms. Martin, can I get you to come up, please, ma'am.

(Prospective juror 21 approaches the bench.)

On the questionnaire, it said: Do you believe there is any reason that you should not or cannot serve as a juror in the case?

You said: Yes, I'm not a fan of the

pharmaceutical industry.

Is there anything else that you have to add to that beyond what we have already covered?

PROSPECTIVE JUROR 22: Not really. My sister died of cancer July 7th, and she was just diagnosed in March. She did not have any -- she did not want to do chemo because she did not want to lose her hair.

It was like, when it came down to the very last of the end of it, she had decided that she would, and that I guess it wasn't as important that she wasn't going to lose her hair -- or that she was going to lose her hair as opposed to losing her life. But it was too late, and then she died anyway.

But as far as the pharmaceutical companies, though, you know, my mother died of cancer when I was very young. I watched her go through chemo and radiation and just, you know, a little bit of everything. So as far as being a fan of the pharmaceutical companies, I'm not. I do feel it's a lot of money based, just as much good as it does --

THE COURT: You know that this case is about a Ms. Earnest who was diagnosed with breast cancer.

PROSPECTIVE JUROR 22: Yes, ma'am.

THE COURT: The gravamen of this case is that she lost her hair, and it has not grown back. Of course, that's what this case is about.

I will tell you, the plaintiffs have a great deal more information they will share with you in their cause of action, and the defendants have defenses to all of those causes of action. But if you were saying what was this case about, this case is about a lady that went through chemotherapy and lost all her hair, and it didn't grow back.

Now, you have a sister who made a normal choice about that, and then changed her mind. My guess is, if your relationship with your sister is like mine, you would probably have conversations with her throughout that entire time. So my question for you is, do you kind of have an opinion about this case, knowing that much?

PROSPECTIVE JUROR 22: I don't really have an opinion about this case in reference to my sister. Because when I bring up the opioid use, my sister was a drug abuser. So I don't feel like that contributed to her with the cancer and everything else. That's not why I feel the way towards pharmaceutical companies that I do. I mean, I feel it's money driven, but I also feel like lawsuits are money driven also. So it's really a catch 22 for me in both aspects.

THE COURT: Anybody behind the eight ball when you start listening to the evidence in this case?

PROSPECTIVE JUROR 22: No, I can't say that.

THE COURT: I want you -- what I heard when you talked is that your feelings about the pharmaceutical companies were

driven, a good bit, by the opioid crisis. I will tell you that this company has nothing to do with opioids.

PROSPECTIVE JUROR 22: Right. I understand that.

THE COURT: Just so you know.

So tell me, ma'am, if you have any concerns about your ability to be fair and impartial, and not let some of the many life experiences you've had affect your way to view the evidence, or is it going to be kind of skewed against one party or another?

PROSPECTIVE JUROR 22: I really actually feel like I'm kind of more torn towards Ms. Earnest more than anything, simply because she did come out with her life. You know what I'm saying? If it was me, myself, the hair wouldn't make a difference to me, as long as I had my life.

THE COURT: So you feel like you're basically -- your concern would be a bias against Ms. Earnest? Is that what you're telling me?

PROSPECTIVE JUROR 2: I would hate to even feel that way, because when I do see people with cancer, I mean, I've been up so many by it, I do have -- it does have an effect on me.

THE COURT: Ma'am, can you -- are you the right juror for this case?

PROSPECTIVE JUROR 22: I'm not sure. I'm really not sure.

THE COURT: But can you be fair?

PROSPECTIVE JUROR 22: I'm sure I could be. I'm sure I could be. I mean, I'm a fair person.

THE COURT: Do you want to ask any questions?

MR. SCHANKER: You've been asked so many questions, I'm not going to put you through any more.

Thank you, Your Honor.

THE COURT: Anything?

MS. SASTRE: No, I don't think so. Thank you so much for your time and your candor.

MR. SCHANKER: Thank you.

THE COURT: Ms. Martin, my kids are all out of high school, but God bless you having a senior.

(Prospective Juror 21 was seated.)

MR. MOORE: There was a lot more revealed there, Your Honor, than what was brought up in the questionnaire. I think your question to her about whether this is the right case for her was the right one, and she said she doesn't know.

MR. SCHANKER: I think the record is clear that she indicated she could be fair in the case, and that no challenge for case standard has been satisfied.

MS. SASTRE: Your Honor, these are personal life experiences, if I may. You're talking about she has her own sister who refused to take chemotherapy because she cared more about her hair --

12:22:23 THE COURT: Then it was too late.

12:22:24 MS. SASTRE: -- and then it was too late. This is no different than Ms. Billings.

12:22:27 Your Honor, this is not the right juror for this case. When the Court looks at the totality of the circumstances, combined with her saying in her questionnaire that she was not the right juror because her feelings are strong, she ought to be excused for cause, Your Honor. That's what she's demonstrated.

12:22:43 MR. SCHANKER: Your Honor, she never said she could not be fair and impartial. In fact, we saw her wrestle with these questions -- she wrestled with these tough questions and gave us honest and truthful answers, and indicated that she could be fair when directly asked. That's how she answered the question.

12:23:00 MS. SASTRE: Judge, it's not different than Ms. Billings. I would suggest to the Court, to the extent that there is a difference, it's because her experience is truly personal and something that she is going to have in her mind describing that situation with her sister, combined with very negative strong feelings.

12:23:17 In the questionnaire, she said: I should not be a juror. It's enough, Your Honor.

12:23:20 THE COURT: Let me just process this one. Go to your next one. Have we already talked about --

MR. SCHANKER: Those are the only ones we have. We're done. Suydam and Murphy, and we did not have any more.

MR. MOORE: The only other one we had on our list was whether you were going to entertain a hardship for Ms. Thompkins. She said she can't pay her bills.

THE COURT: How many do we have?

MR. MOORE: You only need three, and you have two, Spears and Holbert.

MS. SASTRE: She did say she would be distracted. She said she would have difficulty concentrating. She said that she would not be able to pay her bills. Very clearly, she said in her response to you at the beginning, and then me.

MR. SCHANKER: So it wasn't whether just distraction is a sufficient standard for hardship. When asked if it would impact her ability to concentrate, she said no.

MS. SASTRE: But she did say that it would be distracting. She said it would be stressful. She said her bills would not get paid, and that she might have difficulty concentrating, Your Honor.

So that is enough. I mean, it's a hardship combined with the impact that it's having on her ability to receive the evidence, Judge. She literally said: I will not be able to pay my bills.

MR. SCHANKER: I do not believe that's what she said, that she cannot pay her bills.

THE COURT: It is what she said.

MR. SCHANKER: I believe she said difficult.

THE COURT: She said, I have my bills spread out so that I could pay them every two weeks when I get paid, and they are deducting for my insurance.

I'm going to give her the hardship.

MR. MOORE: Your Honor, we have three jurors that neither side has objected to. Those are Holbert, Spears and Spicuzza. So if we were to strike Martin for the reasons we discussed, that would give us our 14.

MR. SCHANKER: I don't think that's a rationale --

THE COURT: No, I know that's not the rationale, but I hate to tell you, there is a lot.

Ms. Martin said that she is obviously not a fan of pharmaceutical companies. She indicated that she was not a part of that, but I have to tell you, we've got a woman who -- she was talking to her sister the whole time, and her sister decided not to take chemo because she was going to lose her hair. Then, when she decided to do it, it was too late. Then when we brought her up here to speak in private, I'm biased against Ms. Earnest, because she lost her sister.

MR. MOORE: She's just not the right juror for this case. She's just not.

MR. SCHANKER: Not the right juror is not the legal standard. It's can she be fair and impartial.

MS. SASTRE: The totality of the circumstances absolutely demonstrate that she could not.

THE COURT: I'm going to excuse Ms. Martin. That's just --

MR. MOORE: Thank you, Judge. We've got our 14.

THE COURT: So what we have left is Mr. Holbert, Ms. Spears, and Mr. Spicuzza.

MR. MOORE: Yes, correct, Your Honor.

MS. SASTRE: Yes. Thank you, Your Honor.

THE COURT: This is what I'm going to do. Hey, I am going to excuse the people that have been excused for cause. I am not going to release the rest, because stranger things have happened, but I'm going to give them a ten-minute break because I think everybody needs to go use the restroom.

Then, during that time, you all can figure out where you are. Then we're going to do challenges, peremptory challenge, I'm going to instruct them, and then we're going to take a lunch break.

(WHEREUPON, at this point in the proceedings, the bench conference concluded.)

THE COURT: I think we had some people in there. Those of you that have not been called up, I'm just going to ask you to sit tight for a bit more. I am going to tell some of the people that have been excused. That will include: Ms. Billings, Mr. Guice, Ms. Tiemann, Ms. Blackwell,

Ms. Becnel, Ms. Roberts -- they're in the jury room -- Ms. Martin, Ms. Suydam, and Mr. Murphy, and Ms. Thompkins. You all are excused and may go back to the jury room and get your -- whatever you get -- piece of paper from there, and you're excused for the day.

Everyone else should remain in court. But we're going to take a ten-minute recess.

Those people that have not been excused, please do not discuss anything with anyone else in the courtroom. But I think you all need a ten-minute break, and then we'll come back and complete this process. Thank you very much.

Court is adjourned for ten minutes.

(WHEREUPON, at 12:31 p.m., the Court took a recess.)

THE DEPUTY CLERK: All rise.

(WHEREUPON, at this point in the proceedings, a conference was held at the bench.)

MS. SASTRE: Just a quick question, Your Honor. So plaintiff has exercised their three peremptory challenges. There is one left for the defendant. The question is, if Your Honor is going with eight, then we can see who is on the jury, and we don't need to exercise another strike.

But we wanted to make sure you weren't going to put nine on the jury. So if it's eight, then we would have a jury. Can I say the names? Make sure we're on the same page. You haven't seen this?

THE COURT: No.

MS. SASTRE: Okay. I'm sorry, obviously.

THE COURT: I'm just going to put the first eight.

MS. SASTRE: You're going to put the first eight.

MR. MOORE: The first eight. We just want to make sure.

MS. SASTRE: Okay.

THE COURT: Is there a form for me?

MS. SASTRE: Yes, I'm sorry, I have it.

THE COURT: So that would be Mr. Stanifer, Ms. Duhe, Mr. Gillin, Ms. Hudson, Ms. Threeton, Mr. Kilgen, Joshua Holbert, Debra Trascher and Arlene -- oh, not Arlene Spears --

We're going to have to work with Ms. Threeton. You know what, let me make sure. Because I don't want to -- because I have -- we can do that, but I have had people -- even though she told us briefly it was fine.

THE DEPUTY CLERK: She will have to up front pay --

THE COURT: I don't remember.

But okay. Everybody is good.

MS. SASTRE: My only concern is if she's not going to be part of the group, would have had to have known that before we started making decisions.

THE COURT: No, we're good. I'm just telling Erin, we just need to -- okay.

12:44:34 MR. SCHANKER: The first eight in.

12:44:36 THE COURT: Okay.

12:44:42 MR. MOORE: Your Honor, the jurors that were struck by the plaintiffs were all men. So we assume that they would be able to provide a nongender based reason for striking the jurors?

12:45:08 THE COURT: Are you making a *Batson* challenge?

12:45:11 MR. MOORE: A reverse *Batson* challenge.

12:45:15 THE COURT: Okay.

12:45:47 MR. SCHANKER: Is there a *Batson* on gender? I don't even know if there is, to be honest.

12:45:49 THE COURT: Is there a *Batson* on gender?

12:45:52 MR. SCHANKER: I don't think there is.

12:45:53 THE COURT: Louis Webre.

12:45:58 MR. SCHANKER: Okay.

12:45:59 MR. MOORE: Webre is the one we have a question about. Ritter, the pharmacist, I'm sure they're going to say that --

12:46:12 THE COURT: Speak to me.

12:46:12 MR. MOORE: Ritter, I understand what they're going to say.

12:46:15 THE COURT: Spicuzza, I understand that.

12:46:15 MR. MOORE: Right. But Webre didn't say anything.

12:46:20 THE COURT: We're talking about Webre.

12:46:34 I would particulately note that you've got four men on an eight-person jury.

MR. MOORE: We have four men? Oh.

MR. SCHANKER: Four men and four women.

THE COURT: It's hard for me to take you seriously.

MR. SCHANKER: Right. Do we need to make a record?

MR. MOORE: We'll withdraw the *Batson* challenge.

(WHEREUPON, at this point in the proceedings, the bench conference concluded.)

JURY SELECTED

THE COURT: Ladies and gentlemen, if your name is not called, you should remain seated.

Mr. Briggs -- but don't get up just yet -- Mr. Webre, Ms. Nelson, Mr. Ritter, and Mr. Spicuzza and Ms. Spears, you all may -- just wait a minute. Never mind. We're good.

If your name has been called, you may leave and return to the jury room downstairs. Those whose names have not been called, you're jurors.

Yes, ma'am?

PROSPECTIVE JUROR 12: My name has? So I can leave?

THE COURT: No. No. No. You're here.

Let me give you an idea as to what's going to occur. I'm going to give you some very brief preliminary instructions, and then we will break for lunch. We'll come back after an hour lunch break, and we'll do opening statements.

PROSPECTIVE JUROR 12: Okay. Thank you.

THE COURT: So, Erin, if you'll please swear in the jurors.

THE DEPUTY CLERK: Can I have the eight of you stand up, please, and raise your right hands.

Do you solemnly swear that you will well and truly try the issues joined between the plaintiff and the defendant, and a true verdict render, according to the evidence and the law, as it shall be given you by the Court, so help you God?

THE JURY: I do.

THE COURT: Those potential members of the jury that were not called up, you may now go to the jury room and get your information from there.

PRELIMINARY JURY INSTRUCTIONS

Members of the Jury, now that you have been sworn in, I will give you some preliminary instructions to guide your participation in this trial. It will be your duty to find the facts based on the evidence presented at trial. You, and you alone, will be the judges of the facts. You will then have to apply those facts to the law as the Court will give it to you.

You must follow the law whether you agree with it or not. Nothing the Court may say or do during the course of the trial is intended to indicate or should be taken by you as indicating what your verdict should be.

The evidence from which you will find the facts

will consist of the testimony of witnesses, documents, and other things received into record as exhibits, and any facts that the lawyers stipulate to or that the Court may instruct you to find.

Certain things are not evidence and must not be considered by you. I will list these for you now:

One, statements, arguments, and questions by lawyers are not evidence.

Two, objections to questions are not evidence. Lawyers have an obligation to their clients to make objections when they believe evidence being offered is improper under the Rules of Evidence. You should not be influenced by the objection or by the Court's ruling. If the objection is sustained, ignore the question. If the objection is overruled, treat the answer like any other.

If you are instructed that some item of evidence is received for a limited purpose only, you must follow that instruction.

Testimony that the Court has excluded or told you to disregard is not evidence and should not be considered. Anything that you may have seen or heard outside the courtroom is not evidence and must be disregarded. You are to decide the case solely on the evidence presented here in the courtroom.

There are two kinds of evidence, direct and circumstantial. Direct evidence is direct proof of a fact such

as testimony of an eyewitness. Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist.

I will give you further instructions on the two types of evidence, as well as other matters, at the end of the case, but please keep in mind that you may consider both kinds of evidence.

It will be up to you to decide which evidence -- which witnesses to believe, which witnesses not to believe, and how much of any witness' testimony to accept or reject. I will give you some guidelines for determining the credibility of witnesses at the end of the case.

This is a civil case. The plaintiff has the burden of proving its case by what is called *a preponderance of the evidence*. That means that the plaintiff has to produce evidence which, when considered in light of all the evidence presented at trial, leads you to believe that what the plaintiff claims is more likely true than not.

To put it differently, if you were you to put the plaintiff's and the defendant's evidence on opposite sides of the scale, the plaintiff would have to make the scale tip somewhat on its side. If the plaintiff fails to meet this burden, the verdict must be for the defendant.

Those of you who have sat as jurors on criminal cases have heard of proof beyond a reasonable doubt. That

requirement does not apply to a civil case such as this one. Therefore, you should put it out of your mind.

As I mentioned, the plaintiff is Barbara Earnest, and the defendant is Sanofi. Barbara Earnest took a chemotherapy drug called Taxotere as part of her treatment for breast cancer. Ms. Earnest contends that Taxotere prevented her hair from growing back, and now she has a permanent hair loss on her head and eyebrows that were caused by Taxotere.

Ms. Earnest also asserts that Sanofi, the manufacturer of Taxotere, did not warn her doctor about the risk of permanent hair loss associated with Taxotere. Ms. Earnest seeks damages for her injuries from Sanofi.

Sanofi denies these allegations and contends that it provided adequate warnings to Ms. Earnest's doctor. Sanofi contends that Taxotere did not cause Ms. Earnest's alleged injury. Sanofi contends that the approved prescribing information contained accurate science based information that enabled Ms. Earnest's doctors to make an informed decision about the benefits and risks of using Taxotere.

Now, a few words about your conduct as jurors. First, during the course of the trial you are not to discuss the case with anyone or permit anyone to discuss it with you. Until you retire to the jury room at the end of the case to deliberate on your verdict, you are not to talk about the case.

You are prohibited from using any form of communication over the Internet, such as e-mail, instant messaging, looking at blogs or websites, the use of cell phones for text messaging or video or audio recordings, and the use of any other recording or transmitting devices to talk about this case is prohibited.

Second, do not read or listen to anything relating to this case. If anyone tries to talk to you about the case, please notify the Court immediately.

Third, do not do any research or make any investigation about the case on your own.

Fourth, do not talk to any of the people involved in this case, including the parties, attorneys or witnesses.

While it is customary we exchange pleasantries with people with whom we come into contact, I will ask that you not do so while serving on this jury. It is important that you not only be fair and impartial, but also that you appear to be fair and impartial.

Finally, do not form an opinion about this case until all of the evidence has been presented. Keep an open mind until you start your deliberations at the end of the case.

If you want to take notes during the course of the trial, you may do so; however, it is difficult to take detailed notes and pay attention to what the witnesses are saying at the same time. If you do take notes, be sure that

your note taking does not interfere with your listening to and consideration of all of the evidence. Also, if you do take notes, do not discuss them with anyone before you begin your deliberations.

At the end of the day, you are to leave your notes on the seat of your chair. They will be gathered by my staff, stored overnight, and placed on your chairs before we convene in the morning. Your notes will not be disturbed in any fashion.

If you choose not to take notes, remember that it is your own individual responsibility to listen carefully to the evidence. You cannot give this responsibility to someone who is taking notes. We depend on the judgment of all the members of the jury.

During the course of the trial, there will undoubtedly be occasions in which the attorneys and I will have bench conferences. Those are conversations that take place at the bench and outside of your hearing. On some occasions, we will ask that you return to the jury room. Please understand that matters come up during the course of a trial that do not involve the jury. Please feel free to stand and stretch during those conferences.

The trial will begin after a brief recess at the conclusion of my opening remarks -- after a lunch recess. Here is a brief outline of the course of the trial.

First, either side may make an opening statement. An opening statement is neither evidence nor argument. It is an outline of what the party intends to prove and is offered to help you follow the evidence.

Next, the plaintiff will present its witnesses, and the defendant may cross-examine them. Then the defendant will present its witnesses, and the plaintiff may cross-examine them.

After all of the evidence is in, the parties will present their closing arguments to summarize and interpret the evidence for you. The arguments are intended to present you with the contentions of the respective parties as to what the evidence has shown and what inferences may be drawn from the evidence. As with the opening statements, the closing arguments are not evidence.

After the closing arguments, I will instruct you on the applicable law, and you will retire to deliberate and consider your verdict, which must be unanimous.

We'll now take an hour recess to give you an opportunity to have lunch, and we'll convene at that time. Court will be at recess until two o'clock, and then we'll ask you to convene.

There are a lot of people associated with this case that will be here and around. Let me caution you, again. It is hard, particularly for people from south Louisiana, not

to just make eye contact and say anything, whether it's, can you believe Drew Brees hurt his hand, or how about them Tigers, you know.

So, I'm going to ask you to just not say anything when you run into anyone. You can talk amongst yourselves about anything except this lawsuit. So it may be better if, when we are at recess or after lunch, that when you've finished, that you return to the jury rooms to avoid any contact with anybody else associated with this case.

Court will be at recess until 2:00 p.m.

THE DEPUTY CLERK: All rise.

(WHEREUPON, at 1:00 p.m., the jury panel leaves the courtroom.)

MR. NOLEN: Your Honor, I'm advised that we have an issue on the videos that needs to be resolved, so that they can finish them up, and they'll be ready to present in the afternoon.

THE COURT: Okay.

(WHEREUPON, at 1:06 p.m. the Court was in luncheon recess.)

* * *

REPORTER'S CERTIFICATE

I, Cathy Pepper, Certified Realtime Reporter, Registered Merit Reporter, Certified Court Reporter in and for the State of Louisiana, Official Court Reporter for the United States District Court, Eastern District of Louisiana, do hereby certify that the foregoing is a true and correct transcript to the best of my ability and understanding from the record of the proceedings in the above-entitled and numbered matter.

*s/Cathy Pepper*

Cathy Pepper, CRR, RMR, CCR
Certified Realtime Reporter
Registered Merit Reporter
Official Court Reporter
United States District Court
Cathy_Pepper@laed.uscourts.gov