UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  TAXOTERE (DOCETAXEL)       *
PRODUCTS LIABILITY LITIGATION      *      Docket No.: 16-MD-2740
                                   *      Section "H(5)"
                                   *      New Orleans, Louisiana
*Relates to:  Barbara Earnest*     *      September 16, 2019
*Case No.: 16-CV-17144*            *
* * * * * * * * * * * * * * * * * *


                DAY 1 - AFTERNOON SESSION
           TRANSCRIPT OF JURY TRIAL BEFORE
             THE HONORABLE JANE T. MILAZZO
              UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:


For the Plaintiffs:          Barrios Kingsdorf & Casteix, LLP
                             BY:  DAWN M. BARRIOS, ESQ.
                             701 Poydras Street
                             Suite 3650
                             New Orleans, Louisiana 70139


For the Plaintiffs:          Gainsburgh Benjamin David Meunier
                               & Warshauer, LLC
                             BY:  M. PALMER LAMBERT, ESQ.
                             1100 Poydras Street
                             Suite 2800
                             New Orleans, Louisiana 70163


For the Plaintiffs:          Pendley Baudin & Coffin, LLP
                             BY:  CHRISTOPHER L. COFFIN, ESQ.
                             1100 Poydras Street
                             Suite 2505
                             New Orleans, Louisiana 70163


OFFICIAL TRANSCRIPT

```
 1   APPEARANCES:

 2
     For the Plaintiffs:              Gibbs Law Group, LLP
 3                                    BY:  KAREN BARTH MENZIES, ESQ.
                                      6701 Center Drive West
 4                                    Suite 1400
                                      Los Angeles, California 90045
 5

 6
     For the Plaintiffs:              Bachus & Schanker, LLC
 7                                    BY:   J. KYLE BACHUS, ESQ.
                                      BY:   DARIN L. SCHANKER, ESQ.
 8                                    1899 Wynkoop Street
                                      Suite 700
 9                                    Denver, Colorado 80202

10
     For the Plaintiffs:              Fleming Nolen & Jez, LLP
11                                    BY:  RAND P. NOLEN, ESQ.
                                      2800 Post Oak Boulevard
12                                    Suite 4000
                                      Houston, Texas 77056
13

14
     For the Plaintiffs:              DAVID F. MICELI, LLC
15                                    BY:   DAVID F. MICELI, ESQ.
                                      Post Office Box 2519
16                                    Carrollton, Georgia 30112

17

18
     For the Plaintiffs:              Morgan & Morgan, P.A.
19                                    BY:  EMILY C. JEFFCOTT, ESQ.
                                      700 S. Palafox Street
20                                    Suite 95
                                      Pensacola, Florida 32502
21

22
     For the Sanofi                   Irwin Fritchie Urquhart
23   Defendants:                       & Moore, LLC
                                      BY:  DOUGLAS J. MOORE, ESQ.
24                                    400 Poydras Street
                                      Suite 2700
25                                    New Orleans, Louisiana 70130
```

OFFICIAL TRANSCRIPT

```
1    APPEARANCES:

2

3    For the Sanofi              Shook Hardy & Bacon, LLP
     Defendants:                 BY:  HARLEY V. RATLIFF, ESQ.
                                 BY:  JON A. STRONGMAN, ESQ.
4                                2555 Grand Boulevard
                                 Kansas City, Missouri 64108
5

6

7    For the Sanofi              Shook Hardy & Bacon, LLP
     Defendants:                 BY:  HILDY M. SASTRE, ESQ.
                                 201 Biscayne Boulevard, Suite 3200
8                                Miami, Florida 33131

9

10   Official Court Reporter:    Jodi Simcox, RMR, FCRR
                                 500 Poydras Street
11                               Room HB-275
                                 New Orleans, Louisiana 70130
12                               (504) 589-7780

13

14

15   Proceedings recorded by mechanical stenography, transcript

16   produced by computer.

17

18

19

20

21

22

23

24

25
```

OFFICIAL TRANSCRIPT

1                              **I N D E X**

2                                                    <u>Page</u>

3

   OPENING STATEMENTS
4        Darin Schanker, Esq.                         166
         Hildy Sastre, Esq.                           189
5
   FRANCES POLIZZANO
6        Videotaped deposition                        238

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

OFFICIAL TRANSCRIPT

| | |
|---|---|
| 1:40PM | 1 |

**AFTERNOON SESSION**

**(September 16, 2019)**

**\*\*\*\*\***

1:40PM 1      **AFTERNOON SESSION**

1:40PM 2      **(September 16, 2019)**

1:40PM 3      **\*\*\*\*\***

2:02PM 4   **THE DEPUTY CLERK:**  All rise.

2:02PM 5   **THE COURT:**  Please bring in the jury.

2:02PM 6   (WHEREUPON, the jury entered the courtroom.)

2:02PM 7   **THE DEPUTY CLERK:**  All jurors are present.  Court's

2:02PM 8 back in session.  You may be seated.

2:02PM 9   **THE COURT:**  Mr. Schanker, please proceed with your

2:02PM 10 opening statement.

2:02PM 11   **MR. SCHANKER:**  Yes, Your Honor.  Mr. Wool is going to

2:03PM 12 help set up the easels, if that's okay.

2:03PM 13   **THE COURT:**  Thank you.

2:03PM 14   **MR. SCHANKER:**  We left these chairs over here, and if

2:03PM 15 we need to vacate more space for you all, we certainly will.

2:03PM 16 Whatever you need.  Or right here too, if you'd like.

2:03PM 17   **MS. SASTRE:**  Okay.  Sure.

2:03PM 18   **THE COURT:**  Let me see if I need another chair here.

2:03PM 19   **MR. SCHANKER:**  Would like me to grab one, Your Honor?

2:04PM 20   **THE COURT:**  Please.

2:04PM 21   **MR. SCHANKER:**  Here I'll roll it over there.  Thank

2:04PM 22 you.

2:04PM 23   **MS. SASTRE:**  May I come around, Your Honor?

2:04PM 24   **THE COURT:**  Yes.

2:04PM 25   **MR. SCHANKER:**  Where would you like me to put this,

OFFICIAL TRANSCRIPT

2:04PM 1  Your Honor?

2:04PM 2          **THE COURT:**  Thank you.

2:04PM 3          **MR. SCHANKER:**  Okay.

2:04PM 4          **THE COURT:**  Please proceed.

2:04PM 5          **MR. SCHANKER:**  May it please the Court, Your Honor.

2:04PM 6          Good afternoon, ladies and gentlemen, my name is

2:04PM 7  Darin Schanker, and I have the privilege to represent Barbara

2:04PM 8  Earnest in this case.  You'll get an opportunity to meet her

2:04PM 9  later in the week, her husband, and her family.

2:04PM 10          The evidence is going to show you, ladies and

2:04PM 11  gentlemen, that this is a simple case.  You'll see that a

2:04PM 12  pharmaceutical drug has the risk of a permanent side effect.

2:04PM 13  The result, unfortunately, is that a patient must live with the

2:05PM 14  side effect for the rest of her life.

2:05PM 15          Now, this middle space right here, this is what

2:05PM 16  this case is going to be all about.  Now, our colleagues on the

2:05PM 17  other side are going to tell you something different, but we're

2:05PM 18  going to show you -- we're going to show you with the evidence

2:05PM 19  in this case, that the drug company does not warn doctors.

2:05PM 20          So we have a pharmaceutical drug that has a risk

2:05PM 21  of a permanent side effect, drug company does not warn doctors,

2:05PM 22  and a patient must live with the side effect for the rest of

2:05PM 23  her life.  Side effects from drugs, we're going to hear a lot

2:06PM 24  about them in this case.  What are you going to learn about

2:06PM 25  side effects during this trial?

2:06PM  1           First of all, obviously, all pharmaceutical
2:06PM  2   drugs have side effects.  And most of those side effects we
2:06PM  3   understand are temporary, and they go away when you stop taking
2:06PM  4   the drug.  However, some side effects are permanent, and those
2:06PM  5   never go away.
2:06PM  6           Drug companies, you'll see, are required to
2:06PM  7   study the side effects of their drugs, both before and after
2:06PM  8   their drugs are on the market.  Ladies and gentlemen, you're
2:06PM  9   going to see in this case that it's the drugs companies who are
2:06PM  10  in the best position to know about their drugs and those side
2:06PM  11  effects.  And that's important because doctors rely on drug
2:06PM  12  companies to warn them about each drug's risk.
2:06PM  13          This idea of monitoring side effects.  You're
2:06PM  14  going to hear a lot about that in this trial, monitoring side
2:07PM  15  effects.  Now, understandably, not all side effects are known
2:07PM  16  about a drug when it comes on the market.  And you're going to
2:07PM  17  see that that drug company's responsibility doesn't stop when
2:07PM  18  that drug comes on the market.  They don't just get to wash
2:07PM  19  their hands of the drug.  They have this obligation of
2:07PM  20  monitoring.  Right?
2:07PM  21          Well, how do they do that?  You're going to hear
2:07PM  22  the drug companies monitor and study scientific literature.
2:07PM  23  They have to keep abreast of it, what's going on in the
2:07PM  24  scientific literature with regard to their drug.  Drug
2:07PM  25  companies also run clinical trials.  We heard those referred to

OFFICIAL TRANSCRIPT

1   in the opening -- or in the jury selection, someone mentioned
2   clinical trials.  And then those drug companies analyze the
3   results.
4           In addition, drug companies receive and analyze
5   what are called spontaneous adverse event reports, adverse
6   event reports from patients and doctors.  What are those?
7   You're going to see that those are just simply complaints,
8   complaints about a side effect.  So the drug company monitors
9   those as well.
10          Drug companies also attend major medical
11  conferences.  This entire process is known as safety signal
12  detection.  The drug companies are looking for a signal of a
13  new or emerging side effect that may be happening with their
14  drug.
15          And this is our first big word of the case that
16  some of you may not be familiar with.  This process is called
17  pharmacovigilance.  It really -- you can break it down.  The
18  "pharma" part of the word, obviously, is referring to drugs,
19  right.  And then "vigilant."  What does that mean?  That means
20  to keep careful watch of danger, if we looked it up in the
21  dictionary.  So the drug company is responsible to be vigilant,
22  to keep watch, careful watch of danger or risk over their drug.
23          Why do companies do all this?  Why do the drug
24  companies do this?  You'll see that they are to put safety
25  first.

OFFICIAL TRANSCRIPT

2:09PM  1          You're probably thinking, "Okay.  Drug

2:09PM  2    companies.  How does the FDA fit into all of this?"  Drug

2:09PM  3    companies or the FDA, who knows best about a drug's side

2:09PM  4    effects?

2:09PM  5          You'll see in this case that it's the drug

2:09PM  6    company who's responsible for developing the drug versus the

2:09PM  7    FDA.  The FDA does not develop drugs.  You'll see the drug

2:09PM  8    companies are also responsible for testing drugs to find out

2:09PM  9    the side effects.  The FDA does not test drugs.

2:09PM  10          If we were to take a field trip to the Food and

2:09PM  11    Drug Administration -- and you'll see in this case that if we

2:09PM  12    did that, would we go in and see a bunch of people running

2:09PM  13    around in lab coats, and test tubes, wearing protective

2:09PM  14    eyewear?  No, that's not what the Food and Drug Administration

2:09PM  15    is.  It's a bureaucratic arm of the government, and they don't

2:10PM  16    do testing there.  It's the drug companies that are responsible

2:10PM  17    for not only developing but for testing the drug.  That's how

2:10PM  18    the system is set up.

2:10PM  19          Drug companies are also responsible for

2:10PM  20    providing information to the FDA concerning the side effects.

2:10PM  21    And, in turn, as you can imagine, the FDA relies on those drug

2:10PM  22    companies to provide that information.

2:10PM  23          So the drug company, you'll see, ladies and

2:10PM  24    gentlemen, is responsible for monitoring, studying, and

2:10PM  25    analyzing the side effects after the drug is on the market.

2:10PM 1    And the FDA relies on the drug companies to do that.  That's
2:10PM 2    how the system is set up.
2:10PM 3            We've heard about the system.  I've referred to
2:10PM 4    the system a few times.  Let's talk about one part of that
2:10PM 5    system, warning doctors.  What happens when a drug company
2:11PM 6    warns a doctor?
2:11PM 7            You're going to see in this case, ladies and
2:11PM 8    gentlemen, how the system is supposed to work.  And it's really
2:11PM 9    very simple.  You'll see that a drug company finds out about a
2:11PM 10   side effect, and they're to warn doctors about the side effect
2:11PM 11   of the drug.
2:11PM 12           The doctor then has the information, presents
2:11PM 13   options and recommendations to a patient.  The doctor and the
2:11PM 14   patient can then weigh the risks and benefits of those options,
2:11PM 15   and the patient makes a decision.  And then it's the doctor who
2:11PM 16   writes the prescription with the patient's informed consent.
2:11PM 17   That's how the process is supposed to work.
2:11PM 18           Well, folks, what happened in this case?  What
2:11PM 19   is this case about?  You're going to see that the defendant,
2:11PM 20   Sanofi, is a drug company that makes a chemotherapy drug called
2:12PM 21   Taxotere.  The chemotherapy drug -- all chemotherapy drugs,
2:12PM 22   most all of them, can cause temporary hair loss.
2:12PM 23           And you're going to see, ladies and gentlemen,
2:12PM 24   what is it that everybody knows about chemotherapy drugs?  When
2:12PM 25   you take them, what happens, amongst other things?  Your hair

OFFICIAL TRANSCRIPT

1    falls out.  And then what happens when -- everybody knows that.

2    What happens when you get off that chemotherapy drug?  Your

3    hair grows back.

4              But unlike other chemotherapy drugs, you're

5    going to see that Taxotere has the risk of causing permanent

6    hair loss.

7              Ladies and gentlemen, you'll see the evidence in

8    this case that, for years, Sanofi has known about this risk but

9    did not warn any doctors.  Because Sanofi did not warn

10   Dr. Carinder, Barbara Earnest's oncologist, Barbara could not

11   make an informed choice about whether to use Taxotere.

12             So you'll see that Taxotere has the risk of

13   causing permanent hair loss.  Sanofi did not warn Dr. Carinder.

14   And as a result, Barbara Earnest must live with permanent

15   baldness for the rest of her life.

16             Ladies and gentlemen, it's important that you

17   understand -- and you'll see evidence in this case -- that this

18   is not a case of Taxotere or death.  This is not a case of

19   Taxotere or death.

20             You'll see that Barbara Earnest and that

21   Dr. Carinder will come in and testify that she had other

22   options available besides Taxotere that are equally as

23   effective, several other options that don't cause permanent

24   hair loss.

25             In this case, you'll also learn about the

OFFICIAL TRANSCRIPT

2:14PM  1   chemotherapy, how it works.  And you'll hear that Barbara
2:14PM  2   Earnest received a few chemotherapy drugs, as is often the
2:14PM  3   case.  And you'll get familiar with these -- the technical
2:14PM  4   terms for them.
2:14PM  5            One of them is -- that Barbara Earnest received
2:14PM  6   was called Adriamycin.  And often throughout this case, you'll
2:14PM  7   hear that referred to as A, Adriamycin, A.
2:14PM  8            She also received, C, AC -- C is Cytoxan.  So
2:14PM  9   Barbara received AC, followed by T, Taxotere.  That's going to
2:14PM  10  be important to remember in this case because, ladies and
2:14PM  11  gentlemen, as you'll see it from the evidence, this is not a
2:15PM  12  case about what caused Barbara Earnest's hair to fall out; it's
2:15PM  13  about what drug -- which chemotherapy drug prevented her hair
2:15PM  14  from coming back.
2:15PM  15           Because most all chemotherapy drugs have what
2:15PM  16  risk, you'll see, ladies and gentlemen?  The risk of hair loss.
2:15PM  17  This is a case about what caused the hair not to grow back, and
2:15PM  18  you'll hear a lot of evidence on that.
2:15PM  19           We talked about communication in this case,
2:15PM  20  Sanofi's communication with doctors.  Why did it need to tell
2:15PM  21  doctors about Taxotere's risk of permanent hair loss?  Why was
2:15PM  22  it so important?
2:15PM  23           Because according to multiple studies -- and
2:15PM  24  you'll hear about a lot of studies in this case -- between 3
2:15PM  25  and 6 percent of women who used Taxotere suffered permanent

OFFICIAL TRANSCRIPT

2:15PM   1    hair loss.  But it's important to note that it's not possible
2:15PM   2    to know in advance which women who use Taxotere will suffer
2:15PM   3    permanent hair loss.  You're going to see it's like Russian
2:16PM   4    roulette:  You can't tell ahead of time.
2:16PM   5            Because of that, because it's not possible to
2:16PM   6    know which women who use Taxotere won't ever have their hair
2:16PM   7    grow back, that means that all women who are going to use
2:16PM   8    Taxotere, beforehand, they're all at risk of permanent hair
2:16PM   9    loss.  And, therefore, Sanofi needed to warn 100 percent of the
2:16PM  10    doctors about Taxotere's risk of permanent hair loss.
2:16PM  11            Remember the system and the way it was set up to
2:16PM  12    shield or protect the patient?  Well, what happened in this
2:16PM  13    case?  Sanofi did not warn Dr. Carinder, so Dr. Carinder
2:16PM  14    presented a recommendation to Barbara without knowing about
2:16PM  15    permanent hair loss.  So Dr. Carinder and Barbara Earnest
2:16PM  16    didn't have all the information to weigh the risks and
2:17PM  17    benefits.
2:17PM  18            So Dr. Carinder prescribed Taxotere to Barbara
2:17PM  19    with neither of them knowing about the risk of permanent hair
2:17PM  20    loss.  And as a result, Barbara Earnest must live with
2:17PM  21    permanent baldness for the rest of her life.
2:17PM  22            This idea of communication with doctors, how can
2:17PM  23    Sanofi tell doctors what it knows about permanent hair loss?
2:17PM  24    And you're going to hear in this case about the many, many
2:17PM  25    ways, ladies and gentlemen, that a drug company, Sanofi, could

have communicated with Dr. Carinder.

One of the ways is called a "Dear Doctor" letter.  It's really simple.  They can send them a letter, whether it be snail mail or e-mail.  Dr. Carinder testified he pays attention to those.

Sales reps.  We heard some folks talking about sales reps in the jury selection.  Sales representatives.  They can tell the doctor when they make those visits -- and you'll here from Ruth Avila, who was a Sanofi employee, a sales representative.  She'll explain that she was not made aware by the company of this risk of permanent hair loss.  If she was, she would have conveyed it to Dr. Carinder.  And you're going to see that Dr. Carinder says he would have listened to Ms. Avila.  That's another way that Dr. Carinder could have found out.

What else?  Sanofi distributes educational materials through their sales representatives.  As a matter of fact, you'll see in this case, ladies and gentlemen, that Ruth Avila delivered those sorts of materials.  And as a matter of fact, you'll see examples of those.

The problem with those, when you see them, ladies and gentlemen, you'll see that they did not warn of permanent hair loss.  But that's an avenue that the company could have used.

And lastly, obviously, updating what they call

the label, the package insert.  And you'll hear a lot about
that in this particular case.

Doctors in the 21st century, like Dr. Carinder,
the way that you'll hear how they stay updated on labels, there
are services that keep them updated on the particular drugs
that a doctor uses.

Obviously, you'll see that you don't expect a
doctor to be spending all of his or her time combing through
labels looking for updates.  There's a system set up to update
doctors.  That's another way you'll see that Sanofi could have
warned Dr. Carinder.

So in this case, it's going to be important to
understand what Sanofi did know and when they knew it.  And
you're going to hear a lot of evidence on that topic.

What did Sanofi know and when?  This goes back
to 1996.  That's when this drug first came on the market,
Taxotere.  And by the way, this drug, Taxotere -- you're
probably familiar with the idea of the generic name for the
drug, and then the trade name or the company name for the drug
as well.

Well, in this case, you're going to hear about
Taxotere, and then you're also going to hear it referred to as
Docetaxel.  Taxotere, Docetaxel, those are the same drugs.
That's the drug in question.

And by the way, you'll see evidence -- no one is

OFFICIAL TRANSCRIPT

1    saying that Taxotere is a bad drug.  No one in this case,
2    ladies and gentlemen, will say that.  What the issue is, is
3    about the failure to warn.
4                 1996, Sanofi launched Taxotere.  And the market
5    in the United States that it was approved for was late-stage
6    cancer, metastatic cancer that had already spread outside of
7    the breast.
8                 And those women, unfortunately, that are in that
9    stage typically take a chemotherapy regimen, switch to another
10   regimen when it stops working, switch to another regimen.  They
11   can only do them so many times.  And those women end up,
12   unfortunately, passing away over time.
13                They don't use these drugs to cure women in that
14   status, typically.  And as a result, when this drug comes on
15   the market, Sanofi was unaware of this risk of permanent hair
16   loss because women who survive and grow their hair back,
17   early-stage breast cancer, it wasn't being used in that
18   scenario.  So Sanofi didn't know about this in 1996, but you're
19   going to hear about the evidence that comes in in this case.
20                And the first bit of that is Sanofi starts a
21   clinical trial called the TAX 316 trial in 1997.
22                And in that clinical trial, they have doctors.
23   One of the heads of that, in 1999, a clinical trial actually of
24   early-stage breast cancer women, noticed something.  He noticed
25   that some of his patient population, what was going on?  Their

1   hair fell out.  They stopped taking the drug, they got better,
2   and their hair didn't come back.  And he noticed this.
3              And, ultimately, he published on it.  He
4   published in a journal of clinical oncology, 54 patients,
5   greater than two years after they stopped the chemotherapy.
6   And you're going to hear from the dermatologists in this case
7   that at that two-year point, those dermatologists say they
8   don't believe the hair is coming back; they believe it's
9   permanent.
10              So this happened, and Sanofi was aware of this.
11  So the evidence starts building, you'll see.
12              As a matter of fact, in 2002, in part, because
13  of that, Sanofi decides -- in this same study, TAX 316, they
14  decide that they're going to study the reversibility of
15  alopecia.  That's one of the things they said in 2002, let's
16  take a look at this based on this information.  And study it,
17  they did.
18              By 2004, we have the TAX 316 study.  I want to
19  make sure you know where we are on the time line here.
20              So we're moving our way along.  Evidence is
21  slowly building.
22              2004, a 55-month result.  And this is the actual
23  study.  So these are women who are taking the drug, 55-month
24  median postchemotherapy.  So that median woman in the study,
25  average four and a half years out from chemotherapy.  And

OFFICIAL TRANSCRIPT

2:24PM 1    you'll see.  What's that supposed to mean?  Their hair is

2:24PM 2    supposed to be growing back at that point.  But this study

2:24PM 3    showed 3.2 percent with hair not returning, four and a half

2:24PM 4    years post.  3.2 percent.

2:24PM 5              The number, by the way, in this 2001 Nabholtz

2:24PM 6    study was 7.4 percent.  It was a small patient population.

2:24PM 7              You're going to hear in this case the way that

2:24PM 8    medical doctors categorize -- and the pharmaceutical

2:24PM 9    industry -- side effects.  And they term a common side

2:24PM 10   effect -- you'll hear a lot of evidence of this -- between 1

2:24PM 11   and 10 percent.  And so you're starting to see this number pop

2:24PM 12   up.

2:24PM 13             2002, with this information, study

2:24PM 14   reversibility.  2004, the actual clinical study report.  It

2:25PM 15   says "confidential," just to Sanofi.  It's not made available

2:25PM 16   to the public at all at this point.

2:25PM 17             What do they do with this information?  Do they

2:25PM 18   warn?  You're going to see, they do not.

2:25PM 19             And the beat goes on, ladies and gentlemen.

2:25PM 20             2005, Sanofi receives 20 adverse event reports

2:25PM 21   of permanent hair loss in the same month.  Remember that term

2:25PM 22   "adverse event report"?  Those are complaints from doctors,

2:25PM 23   patients, "My hair fell out, and it's not growing back like I

2:25PM 24   understood that it was going to."

2:25PM 25             Now, that's not the only month or the only

2:25PM
2:25PM
2:25PM
2:25PM
2:25PM
2:26PM
2:26PM
2:26PM
2:26PM
2:26PM
2:26PM
2:26PM
2:26PM
2:26PM
2:26PM
2:26PM
2:26PM
2:26PM
2:26PM
2:26PM
2:26PM
2:26PM
2:27PM
2:27PM
2:27PM

1   number they received.  You're going to hear in this case
2   throughout -- from 1999 forward, of the many, many adverse
3   event report -- the complaints that the company was receiving.
4            But that is noteworthy, and you'll hear the
5   testimony that that's something -- these clusters of reports
6   are important as far as that signal detection that we talked
7   about.
8            So what does Sanofi do with this information?
9   Do they decide to warn?  You'll see they do not.
10           2006, a lot goes on in 2006, as you can see.
11   First of all, Sanofi met -- had a meeting -- a company meeting,
12   interestingly.  And we got information of this when we --
13   through this litigation process, we're entitled to these
14   confidential documents being turned over.
15           And in that meeting in 2006, you'll see what
16   Sanofi discussed.  They discussed two types of hair loss;
17   temporary, which everybody knows about, and then nonreversible.
18   So you'll see that Sanofi is talking about nonreversibility of
19   hair loss in 2006.
20           Also in 2006, there was a doctor who noticed
21   something, just a doctor actually out in Colorado who noticed
22   something in his patient population.  He noticed that some of
23   the women who were taking Taxotere, their hair wasn't growing
24   back like he expected it to.  And this doctor was unaware of
25   this information.  He just discovers it on his own.  He

OFFICIAL TRANSCRIPT

2:27PM 1    presents a paper on this at a cancer symposium.

2:27PM 2               And he says in it, "Unfortunately, the one side
2:27PM 3    effect possibly most dreaded by the patient is alopecia."  And
2:27PM 4    you're going to learn, if you're not familiar with that word,
2:27PM 5    that alopecia simply means hair loss.

2:27PM 6               So the doctor's referring to alopecia.  The
2:27PM 7    doctor says, "Yet, we have always told our female patients,
2:27PM 8    'Don't worry.  It will always come back.'  This last statement
2:27PM 9    may not be true."

2:27PM 10              Then the doctor examined his patient population
2:27PM 11   that he had been using these various chemotherapy drugs with.
2:27PM 12   And the information is that those combination therapies that
2:27PM 13   did not contain Taxotere in his patient population, hundreds of
2:28PM 14   women, zero percent with persistent permanent hair loss, hair
2:28PM 15   loss past two years.  Remember what the dermatologists say
2:28PM 16   about that, after two years, they don't think it's coming back.

2:28PM 17              However, this patient population that had the
2:28PM 18   Taxotere in their regimen, 6.3 percent.  Remember that comment,
2:28PM 19   between 1 and 10 percent?  Sanofi has this information.  We
2:28PM 20   know because, when we got their confidential documents, it's in
2:28PM 21   there.

2:28PM 22              Ladies and gentlemen, what did they do with
2:28PM 23   that?  Did they decide to warn?  You'll see the answer is no.

2:28PM 24              In this case, we had the opportunity to talk to
2:28PM 25   Sanofi employees.  One of those employees we talked to, her

1    name was Dr. Freedman.  And in this litigation process, some of

2    are you familiar, that's called a deposition.  It's when you

3    get to sit down and take a statement under oath.  So that

4    happened in this case, spoke to Dr. Freedman.

5              She's the Sanofi Taxotere global safety officer.

6    She's one of the most knowledgeable Sanofi employees about

7    Taxotere side effects, and she was responsible for monitoring

8    Taxotere's adverse event reports.  You remember those

9    complaints?  That was her job.

10             In her deposition, she's asked questions.  And

11   you'll see that she indicates that Sanofi's clinical trials had

12   cases of irreversible hair loss, these clinical trials.

13             And Dr. Freedman admits that Sanofi knew back in

14   2006 that Taxotere causes irreversible hair loss.  Dr. Freedman

15   admits under oath in 2006 that the company knew that Taxotere

16   causes permanent hair loss.

17             So do they warn?  You'll hear they do not.

18             We also have this clinical trial that's

19   continuing at this point in time, that TAX 316 study that's

20   following women.  And now they're up to the 77-month.  So these

21   are women that were, more or less, 77 months out from their

22   chemotherapy, so years out, 6 1/2 years almost, 6.4 years.  And

23   at this point in time, the data shows 3.1 percent, between that

24   1 and 10 comment.

25             Ladies and gentlemen, you'll see the evidence in

OFFICIAL TRANSCRIPT

2:30PM 1   this case that by 2006, five full years before Barbara Earnest

2:30PM 2   received her chemotherapy from Dr. Carinder -- the prescription

2:30PM 3   from Dr. Carinder, Sanofi had this information and yet was not

2:30PM 4   warning doctors, including Dr. Carinder.

2:30PM 5            As you can see the time line goes on.

2:30PM 6            In 2009, there was a doctor in western France

2:30PM 7   that reported 66 cases of permanent or persistent alopecia.  We

2:30PM 8   know that Sanofi is aware of this because that material was in

2:31PM 9   their confidential files that we got.  2009, we had another

2:31PM 10   clinical trial going on inside Sanofi that shows 6.1 percent of

2:31PM 11   the women with this issue with hair loss.

2:31PM 12            And then, in 2010, we have the end of this

2:31PM 13   clinical trial, the TAX 316, 4.2 percent.  Ten years out, still

2:31PM 14   a full year before Barbara Earnest is prescribed her Taxotere

2:31PM 15   by Dr. Carinder.  No warning.

2:31PM 16            So that's what the company knew.  Well, what did

2:31PM 17   Sanofi tell doctors along the way about this risk of permanent

2:31PM 18   side effects?

2:31PM 19            This is the actual drug label from 1996, which

2:31PM 20   is when the drug first came on the market, remember in that

2:32PM 21   late-stage breast cancer setting.  It says "alopecia" -- this

2:32PM 22   is the actual label -- "hair loss.  Once you've completed all

2:32PM 23   your treatments, hair generally grows back."  It refers to a

2:32PM 24   rash generally will appear between treatments and go away.  Odd

2:32PM 25   sensations, generally these go away within a few weeks.  Nail

changes.  After you finish Taxotere treatments, your nails will generally grow back.

So we ask the Sanofi employee, "What did that label mean?  What did Sanofi know, and what were they warning back in 1996 about this issue of permanent irreversible hair loss?"

So we had the opportunity to speak with Jean-Philippe Aussel, who was the Sanofi medical director, oncology global medical affairs.  He worked on Taxotere for over 20 years.  He worked on all the long-term studies of Taxotere.

So we sat down and had the opportunity to take his deposition under oath with all the lawyers there.  He indicated that -- he said that Sanofi did not and could not know -- in 1996, they did not and could not know in 1996 that alopecia, hair loss, after Taxotere could be permanent.

Remember, you'll see the evidence shows why could they not know?  Because of the setting it was introduced in, the late-stage breast cancer, where they weren't even seeing that this was an issue.  And that's okay.  We're not saying they should have known back then.

Dr. Aussel also explains that the language Sanofi used in that 1996 label, the label right here, to describe hair loss was not a warning about permanent hair loss.  And it makes sense again, because Sanofi didn't know at that

OFFICIAL TRANSCRIPT

2:33PM   1    time.

2:33PM   2            So, ladies and gentlemen, the evidence will show

2:33PM   3    you something odd.  Because you remember the time line that's

2:33PM   4    building.  We saw it here building from 1996 to 2006, 1996 when

2:34PM   5    they don't know anything up to 2006.

2:34PM   6            Well, when we got those confidential documents,

2:34PM   7    one of the documents we got was this.  2006, this is a document

2:34PM   8    that sales representatives are putting into doctors' offices

2:34PM   9    like Dr. Carinder's office.  And Ruth Avila, the sales

2:34PM   10   representative, says she used this very document.

2:34PM   11           Well, in 2006, with all Sanofi knew, what were

2:34PM   12   they telling -- what were they telling doctors, patients?  So

2:34PM   13   this is a document -- Sanofi's alopecia cheat sheet.  This is a

2:34PM   14   document that is given to doctors' offices to be handed to

2:34PM   15   patients.  And it specifically refers to and defines alopecia.

2:34PM   16           It says that "Alopecia is another word for hair

2:34PM   17   loss or thinning of the hair.  It is a common yet temporary

2:35PM   18   side effect of some cancer medicines."

2:35PM   19           The document goes on to explain, if you lose

2:35PM   20   your hair -- talking about when your hair will come back.  If

2:35PM   21   you lose your hair, it will usually grow back after the

2:35PM   22   treatments are over.  It may grow back while you're still

2:35PM   23   having treatments.

2:35PM   24           So this is what Sanofi was telling doctors and

2:35PM   25   then patients about alopecia, that it was a temporary side

OFFICIAL TRANSCRIPT

effect.

And there's more.  That same year, 2006, remember the clinical trials that we talked about that were going on through this whole period of time?  Well, for those clinical trials -- and these are confidential clinical trials -- Sanofi had patients sign off on consent forms, these patients that had volunteered, early-stage breast cancer patients.

And this is an example of one of those consent forms.  And this specific consent form, 2006, refers to Docetaxel, which, remember, is the same as Taxotere.  And it indicates that "The following events have also been reported: Reversible hair loss."  There's no indication of permanent hair loss.

And as a matter of fact, ladies and gentlemen, you will hear that, throughout the life of this label, up until 2011 when Barbara Earnest took the drug, that the word "permanent" and "hair loss" never were in the label.

So, folks, this is Barbara's case.  It's her case.  And you're going get to know Barbara.  You're going to see that she lives in Slidell; that she's been married to her husband, Ralph, for 48 years; that she's a mother to two sons, and a grandmother to four grandsons, so all boys.

And Barbara discovered a lump in her breast. She discovered a lump in 2011.  She was understandably

OFFICIAL TRANSCRIPT

1  terrified.

2              She immediately went to her doctor and, after

3  testing, was diagnosed with early-stage breast cancer.  So

4  fortunately for her, she was lucky they caught it early.

5              Now, you'll hear, ladies and gentlemen, that

6  Ms. Earnest, Barbara, actively questioned her doctors and

7  actively participated in choosing her treatment options.

8              Ms. Earnest received Taxotere as part of her

9  treatment in 2011.  And, unfortunately, Ms. Earnest currently

10 suffers from severe permanent baldness.  And you'll hear that

11 it's because of Taxotere.

12             And it's not about what causes the hair to fall

13 out; it's about what prevents it from coming back.

14             So in this case, we attempted to consult with

15 the finest experts in the world, and you're going to hear from

16 them.

17             You're going to hear from Dr. David Kessler.

18 He's the former head commissioner of the Food and Drug

19 Administration.  He was appointed as the 16th in the history of

20 our country.  He was first appointed by Republican George

21 H.W. Bush, and then reappointed by President -- Democrat

22 President Bill Clinton.

23             Dr. Kessler was one of the longest-serving FDA

24 commissioners in history, and he was in charge of the

25 regulation of thousands of drugs as the FDA commissioner.  As a

OFFICIAL TRANSCRIPT

1    matter of fact, you'll hear that this adverse event reporting

2    that we talked about, these complaints, the system behind all

3    that, he was instrumental in setting that up in our country.

4            So we asked Dr. Kessler to look at all of the

5    evidence in this case.  Dr. Kessler is going to come and talk

6    to you, and Dr. Kessler is going to explain to you that Sanofi

7    should -- that Sanofi, rather, knew -- that Sanofi knew of this

8    risk of permanent hair loss based on the information that we

9    saw.  And that as a result, Sanofi should have warned.

10           You're going to hear from some other folks who

11    are going to come testify.  Dr. Antonella Tosti.  Dr. Tosti is

12    one of the preeminent hair and hair loss experts in the entire

13    world.  She is the president of the American Hair Research

14    Society, professor of clinical dermatology at the University of

15    Miami and also in Italy.  And Dr. Tosti examined Barbara

16    Earnest in this case.  You'll hear that she's the only doctor

17    on either side who actually did a clinical exam of Barbara

18    Earnest.

19           And Dr. Tosti, who has diagnosed this condition

20    previously, years before, she began diagnosing this in women,

21    you'll hear that she looked at Barbara and she determined that

22    Barbara suffers from permanent chemotherapy-induced alopecia

23    caused by Taxotere.  You'll hear that Dr. Tosti ruled out the A

24    and the C and ruled in Taxotere as the cause.

25           And, ladies and gentlemen, you won't hear from

2:40PM 1 another expert in this case that tells you that A or C, within

2:41PM 2 a reasonable degree of medical probability, caused Barbara

2:41PM 3 Earnest's permanent hair loss.

2:41PM 4          You'll also hear from Dr. Carinder.

2:41PM 5 Dr. Carinder was Barbara Earnest's treating oncologist,

2:41PM 6 prescribing oncologist. He's an oncologist who practices on

2:41PM 7 the North Shore. Dr. Carinder is one of those doctors, as I

2:41PM 8 said, who treated Dr. Earnest -- Ms. Earnest and prescribed the

2:41PM 9 Taxotere to her.

2:41PM 10          Dr. Carinder will explain to you that he did not

2:41PM 11 know that Taxotere causes permanent hair loss when he

2:41PM 12 prescribed it to Ms. Earnest. Dr. Carinder will take you

2:41PM 13 through what he does in prescribing the drug. He will explain

2:42PM 14 to you the conversation that he had with Barbara Earnest where

2:42PM 15 he sits down and goes through those risks and benefits of all

2:42PM 16 of the drugs that he's going to prescribe.

2:42PM 17          And you'll hear in this case that Barbara

2:42PM 18 accepted many risks. I mean, it's chemotherapy. It's toxic.

2:42PM 19 It's like a poison to your body, and it has a lot of side

2:42PM 20 effects. Those are the side effects that Barbara Earnest was

2:42PM 21 aware of and that she accepted.

2:42PM 22          However, ladies and gentlemen, you'll hear that

2:42PM 23 there's one side effect that she was not made aware of, and

2:42PM 24 that was the permanent hair loss. And she was not made aware

2:42PM 25 of it because Dr. Carinder did not know.

2:42PM  1          Now, it's important to know in this case, ladies
2:42PM  2     and gentlemen, that nobody on either side of the aisle, no
2:42PM  3     witness, no one is blaming Dr. Carinder for anything in this
2:42PM  4     case.  As a matter of fact, it's the exact opposite.  You'll
2:43PM  5     see that Dr. Carinder followed the highest protocols that are
2:43PM  6     expected and accepted in the United States in his prescription
2:43PM  7     to Barbara Earnest.
2:43PM  8          Ladies and gentlemen, it's a simple case, as I
2:43PM  9     said.  It's about a company that knew, and you'll see, did not
2:43PM  10    warn Dr. Carinder.  As a result, Barbara Earnest's choice was
2:43PM  11    taken away.  Not a case of Taxotere or death.  There were other
2:43PM  12    choices available to her.  Those were taken from her.  And as a
2:43PM  13    result, Barbara must live with permanent, irreversible hair
2:43PM  14    loss for the rest of her life.
2:43PM  15         Thank you.  And I look forward to presenting to
2:43PM  16    you throughout the trial.
2:44PM  17         THE COURT:  Members of the jury, I think it's going
2:44PM  18    to take us a couple of minutes to transfer.  Feel free to stand
2:45PM  19    up and stretch if you need to until we get prepared.
2:45PM  20         Ms. Sastre, are you ready?
2:45PM  21         MS. SASTRE:  Yes, I am, Your Honor.
2:45PM  22         THE COURT:  Please proceed.
2:45PM  23         MS. SASTRE:  May it please the Court, Counsel.
2:45PM  24         Good afternoon, ladies and gentlemen.  As you
2:45PM  25    know, I'm Hildy Sastre.  And I'd like to introduce a couple

OFFICIAL TRANSCRIPT

1    folks that I'm here with today that you didn't have a chance to

2    meet during jury selection.  I'm here with, first, my partner

3    Jon Strongman.  And you'll see that Jon and I will be trying

4    most of this case together.  We're also joined by our colleague

5    Douglas Moore.  And so you'll see the three of us here in

6    trial, in court, every day with you.

7              Now, ladies and gentlemen, let me simply start

8    by saying thank you.  We know that being here with us is a

9    sacrifice, especially for a case that could last as long as two

10   weeks.  So we appreciate the time that you're making for us and

11   to be here with us to help us decide this case.  Because this

12   case, ladies and gentlemen, it's important to both the parties.

13             Now, I can tell you that we're going to do our

14   very, very best to bring you the evidence that you need to

15   decide this case.  We are going to do our best to bring you the

16   evidence that you need to render your verdict in this case.

17   And we're not going to spend time on issues that simply are not

18   important.  And I hope we're going to try to keep things at

19   least a little bit interesting for you.

20             Now, you just heard Mr. Schanker give

21   plaintiff's opening statement.  And one of the things that he

22   told you several times, ladies and gentlemen, he said to you

23   that Sanofi didn't tell doctors about the risk of persistent

24   hair loss.  And he showed you this slide.

25             Can we go to -- I'm sorry.  Oh, there we go.

1   Sorry about that.

2                    And he showed you this slide, ladies and

3   gentlemen.  And he told you it was a study from 2001.  And you

4   heard that there were some patients in this study who took

5   Taxotere and had partial hair loss after two years.

6                    But what you will learn from the evidence,

7   ladies and gentlemen, is that Sanofi sponsored this study,

8   Sanofi supported this study, and Sanofi had the results of this

9   study published, including the persistent hair loss

10  information.  And the results were published in the leading

11  oncology journal.  It's called the Journal of Clinical

12  Oncology, and it goes out literally to thousands of physicians

13  across the United States, including the prescribing doctor in

14  this case, Dr. James Carinder.  Sanofi shared this information.

15                   And this is just one example.  But I wanted to

16  show you at the outset this is an example of Sanofi sharing

17  information, publishing information, giving it to the medical

18  community, information about persistent hair loss and Taxotere.

19  This isn't how you keep information from physicians.

20                   Now, you also heard from Mr. Schanker about

21  interactions that Sanofi had with the FDA.  And he talked with

22  you a lot about a study.  You're going to hear a lot about it

23  during the course of trial, a study called TAX 316, ladies and

24  gentlemen.

25                   And Mr. Schanker showed you this slide.

OFFICIAL TRANSCRIPT

2:49PM  1        **MR. SCHANKER:**  Your Honor, may we approach?

2:49PM  2        **THE COURT:**  Yes.

2:49PM  3        (WHEREUPON, the following proceedings were held at

2:49PM  4   the bench.)

2:49PM  5        **MR. SCHANKER:**  Your Honor, these were not disclosed

2:49PM  6   to us.  These are boards that are ours.  These weren't

2:50PM  7   disclosed to us that they were going to use them.

2:50PM  8        **MS. SASTRE:**  Well, he just put the slide up.  I'm

2:50PM  9   just showing -- I could show them the board.  I could say,

2:50PM 10   "Hand me the board."

2:50PM 11        **MR. SCHANKER:**  So I have could have used their slides

2:50PM 12   in my opening.

2:50PM 13        **MS. SASTRE:**  Sure.  If I had a board here.

2:50PM 14        **THE COURT:**  That's -- I'm not going to do that.

2:50PM 15        **MR. SCHANKER:**  Okay.  Thank you.

2:50PM 16        **MS. SASTRE:**  Thank you, Your Honor.

2:50PM 17        (WHEREUPON, the following proceedings were held in

2:50PM 18   open court.)

2:50PM 19        **THE COURT:**  Please proceed.

2:50PM 20        **MS. SASTRE:**  All right.  Thank you very much, Your

2:50PM 21   Honor.  So let me go back to where I was just -- I'm sorry.  I

2:50PM 22   have to wait for the most important person in the room, and

2:50PM 23   that's our court reporter.

2:50PM 24             So, ladies and gentlemen, let me go back to

2:50PM 25   where I was.  Mr. Schanker showed you this slide, and he told

OFFICIAL TRANSCRIPT

you about a study called TAX 316.  And it's a clinical trial, and you're going to hear a lot about it in this case.

Now, the information that was collected from this study by Sanofi concerning persistent hair loss was shared.  It was shared with the FDA.  And I want to be very clear here at the outset, the data and the results of TAX 316 were given to the FDA, including the persistent hair loss data.

And based upon the results of this study, TAX 316, the FDA approved of the use of Taxotere in this very setting.  They approved of it for the use of operable breast cancer, the exact kind that Mrs. Earnest had.

Now, ladies and gentlemen, in this case, there is not going to be any data or any information from this study, TAX 316, that you're going to see that the FDA didn't see.

Now, what is this case -- what's it really about?  This case is about Barbara Earnest.  It's about one woman who, in 2011, was told she had a life-threatening disease.  Mrs. Earnest, as you've heard, has breast cancer. Mrs. Earnest was diagnosed with Stage 2A, intermediate to high-grade, hormone receptor-positive, lymph node-positive, infiltrating ductal breast carcinoma.

And this case is about Mrs. Earnest's desire to defeat cancer.  It's about Mrs. Earnest's desire to live cancer-free, even if doing so meant that she may have to accept very serious potential side effects and consequences of her

treatment.

This case is about her doctor's decision to
prescribe her chemotherapy medication that would give her the
best chance to survive, and that would give her the best chance
that would -- to prevent her cancer from returning.

Now, you've heard this already, but it merits
repeating again.  In the world that we live in, all medications
have risks.  It's a simple truth, ladies and gentlemen.  And
with chemotherapy, that is especially true.  The evidence in
this case will show to get the benefit of the treatment, the
patient must accept the risk.

Now, I know that you've had a lot of information
presented already, and it may seem like there's a lot of issues
in dispute at the outset.  So I tried to think yesterday,
ladies and gentlemen, of what could I do to streamline all of
this for you right in opening statements, and talk with you
about the key pieces of evidence that I believe will help you
in your job as jurors.

So I'd like to go through, with that in mind,
seven key pieces of evidence that are going to help you render
your verdict in this case.

The first key piece of evidence, ladies and
gentlemen, is that Mrs. Earnest lost her hair before she ever
took Taxotere.

Now, Mrs. Earnest started treatment with two

OFFICIAL TRANSCRIPT

drugs you can see here.  One called Adriamycin and one called Cytoxan.  And she started those two medications on April 18th, 2011.  And within about three weeks of taking Adriamycin and Cytoxan, Ms. Earnest lost her hair.

And, in fact, ladies and gentlemen, you can see from this slide, that it was within about a week of her getting her second dose of Adriamycin and Cytoxan when she lost her hair.  And as you can see, she started Taxotere on June 22nd, several weeks later.

Now, Dr. Carinder, her prescribing physician and oncologist, he will tell you, he's going to take the witness stand, and he's going to tell you, this was his patient, by the time she started Taxotere, her hair was gone.  And you're going to hear the same thing from Mrs. Earnest, and you're going to see the same thing in her medical records.

What's the second key piece of evidence in this case?

Mr. Schanker just said to you, unlike other chemotherapy drugs, Taxotere has the risk of causing permanent hair loss.  But, ladies and gentlemen, take a look at what plaintiff's -- not mine -- plaintiff's expert witnesses have to say about the risk of hair loss, including persistent hair loss, with other chemotherapy drugs, and all of them will tell you the same thing:  There are reports of persistent hair loss with other chemotherapy drugs besides Taxotere.

OFFICIAL TRANSCRIPT

1    The first one, plaintiff's oncologist,
2    plaintiff's dermatologist, and plaintiff's toxicologist, their
3    experts will tell you, the first drug listed, Adriamycin,
4    there's reports of persistent hair loss with it.  And that's
5    the drug Mrs. Earnest was taking when she lost her hair.
6    The next drug, Cytoxan.  Plaintiff's expert
7    witnesses will tell you there are reports of persistent hair
8    loss with Cytoxan.  And that's the other drug Mrs. Earnest was
9    taking when she lost her hair.  And then you see Taxol.  Now,
10   Taxol, you may hear in this case, was an alternative or an
11   option for Mrs. Earnest as opposed to Taxotere.
12   But I want to be very clear, ladies and
13   gentlemen, at the beginning of this case, when it comes to
14   Taxol, there are reports of persistent hair loss with Taxol as
15   well.  And plaintiff's experts are going tell you the exact
16   same thing.
17   When it comes to chemotherapy medications, there
18   are no risk-free options.  That will be the evidence in this
19   case, and that is true for many conditions, including hair
20   loss.
21   Now, here's the Cytoxan label, "Alopecia occurs
22   commonly in patients treated with cyclophosphamide," which is
23   the same drug as Cytoxan.
24   Here's the Adriamycin label, "Patients should be
25   informed they will most certainly develop alopecia.

OFFICIAL TRANSCRIPT

2:58PM 1    Reversible, complete alopecia occurs in most cases."

2:58PM 2              Think about that for a moment.  Adriamycin, the

2:58PM 3    drug Mrs. Earnest was taking when she lost her hair, the label

2:58PM 4    says, "Reversible hair loss occurs in most cases."  Not all,

2:58PM 5    not everyone.  That label said, if you take this drug,

2:58PM 6    sometimes there are patients whose hair isn't going to come

2:58PM 7    back.

2:58PM 8              Now, what's the third key piece of evidence in

2:58PM 9    this case, ladies and gentlemen?  The Taxotere label has always

2:59PM 10   warned of the risk of hair loss.  Taxotere was first approved

2:59PM 11   by the FDA in 1996 to treat certain cancers, and here you can

2:59PM 12   see the label for Taxotere from 2004.  And the reason I'm

2:59PM 13   sharing the 2004 label with you is because this is the label

2:59PM 14   that went into effect when Taxotere was approved by the FDA to

2:59PM 15   treat the type of breast cancer that Mrs. Earnest had.

2:59PM 16             And you can see here, ladies and gentlemen, with

2:59PM 17   your own eyes, what that label said.  "Hair loss.  Loss of hair

2:59PM 18   occurs in most patients taking Taxotere."  And then

2:59PM 19   importantly, "Hair loss will begin after the first few

2:59PM 20   treatments and varies from patient to patient.  Once you have

2:59PM 21   completed all your treatments, hair generally grows back."

2:59PM 22             So here you're reading the FDA-approved label

2:59PM 23   for Taxotere, and it says, "Hair generally grows back."  The

3:00PM 24   Taxotere label never said short-term hair loss.  It never said

3:00PM 25   reversible hair loss.  It says, "Hair generally grows back."

And the evidence will show that that means usually or most of the time, not always.

Now, here's the 2010 label, and I'm showing you this label because this was the label in effect when Dr. Carinder prescribed Taxotere to Mrs. Earnest. This is also FDA approved. It talks about alopecia and hair loss 13 different times in 13 different places throughout the label. And it didn't say short-term or reversible either.

Now, the word "alopecia," you've heard a little bit about it, but I just want to spend a moment on it. It's a medical term, and it's a medical term for hair loss. And it's in the label, ladies and gentlemen, because the label is a document that goes to physicians. So, of course, you would expect that you're going to see words like "alopecia" or medical terminology in the label.

And the reason the label goes to doctors with drugs like chemotherapy is because this isn't an over-the-counter medication. Right? You can't go into the drugstore and go buy a packet of chemotherapy. You've got -- you have to go see a doctor, a cancer specialist. So this label -- these labels are for doctors to read, for doctors to understand, for doctors to have discussions with their patients, and for doctors to make decisions about what medications that they want to prescribe.

Now, the fourth key piece of evidence in this

1    case, Dr. Carinder read the Taxotere label in 1999 and didn't
2    read it again before he prescribed Taxotere to Mrs. Earnest in
3    2011.  The evidence will show that Dr. Carinder read the
4    Taxotere label when he started prescribing it in the late
5    1990s.  In between 1999 and 12 years later when he prescribed
6    Taxotere to Mrs. Earnest in 2011, he hadn't looked at the label
7    once, even though it was updated several times during that
8    period, and even though it had been revised several times
9    during that period.
10           So what did Dr. Carinder see when he looked at
11   the label last in the 1990s?  He looked at the same thing I
12   just showed you a moment ago.  He looked at a label that said,
13   "Once you've completed all your treatments, hair generally
14   grows back."  It never said always or 100 percent of the time.
15   The label that Dr. Carinder read in the late 1990s, it did not
16   give any guarantee of hair regrowth.  It said that most of the
17   time hair comes back, but not all.  That's what the word
18   "generally" means, ladies and gentlemen.
19           Now, what's the fifth key piece of evidence in
20   this case?  You heard counsel tell you Dr. Carinder was not
21   aware of the risk of persistent hair loss with Taxotere or
22   other chemotherapy drugs before he treated Mrs. Earnest.
23           Well, ladies and gentlemen, what you're going to
24   learn from the evidence, we are going to bring you this
25   evidence, Dr. Carinder had a prior patient who had persistent

1   hair loss after taking the exact same chemotherapy treatment he
2   gave Mrs. Earnest.
3          This was six years before his treatment of
4   Mrs. Earnest.  And this prior patient had persistent hair loss,
5   meaning her hair fell out.  And Dr. Carinder continued to see
6   her for years, for many years, and her hair did not grow back.
7   And what you're going to learn, ladies and gentlemen, is that
8   this prior patient of Dr. Carinder's whose hair fell out and
9   didn't come back, he gave her and Mrs. Earnest the exact same
10  three drugs, the exact same dose, and the exact same schedule,
11  Adriamycin, Cytoxan, and Taxotere.
12         The evidence will show, Dr. Carinder knew this
13  could happen.  It was rare, but it could happen.  He'd seen it
14  with his own eyes in his own patient, ladies and gentlemen.
15         And you're also going to learn that the dose
16  that Dr. Carinder gave this patient years earlier whose hair
17  fell out and didn't return, and the dose he gave Mrs. Earnest,
18  I told you they were the same.  Well, that's not all they had
19  in common.  It was also in excess of the Taxotere label.  The
20  label on the left side is a 75-milligram dose.  What
21  Dr. Carinder prescribed to the plaintiff and his prior patient
22  whose hair didn't return was 100 milligrams, and it was in
23  excess of the label.
24         So that's evidence that we're going to bring to
25  you that you'll be able to consider in this case as well.

3:05PM  1          The sixth key piece of evidence, ladies and

3:05PM  2  gentlemen, is that Mrs. Earnest was given a breast cancer

3:05PM  3  handbook that warned, warned of the risk of permanent hair loss

3:05PM  4  months before she started chemotherapy.

3:06PM  5          Now, counsel just told you, Mrs. Earnest didn't

3:06PM  6  know that this could happen.  Dr. Carinder didn't know this

3:06PM  7  could happen.  Right?  This is from Mrs. Earnest's medical

3:06PM  8  records.  February of 2011, months -- you just saw she started

3:06PM  9  chemo in April of 2011.  So we're in February.  And this is a

3:06PM  10  record from her physician saying, "We're leaving an educational

3:06PM  11  book up at the front desk for you."

3:06PM  12          And here's what that book says, *Breast Cancer*

3:06PM  13  *Treatment Handbook*.  It says for Taxotere, "Side effects:

3:06PM  14  Temporary hair loss.  Rare reports, permanent hair loss."

3:06PM  15          This was the information Mrs. Earnest was

3:06PM  16  provided.  Permanent hair loss is rare, but it can happen.

3:07PM  17          Counsel told you she had the right to know of

3:07PM  18  the risks.  Mrs. Earnest had that information, ladies and

3:07PM  19  gentlemen.  It was right in her hands, and whether she chose or

3:07PM  20  decided to read it or not, of course, that was a decision that

3:07PM  21  only she could make.

3:07PM  22          Now, there's one other document, I just want to

3:07PM  23  pause for a moment here.  There's a document that counsel just

3:07PM  24  showed you, and he told you it was something that sales reps

3:07PM  25  used.  And he read to you the information, and then he said it

OFFICIAL TRANSCRIPT

1   was a Sanofi document from 2006.  Of course, many years before

2   Mrs. Earnest's prescription.  And I do want you to pay close

3   attention to the second box, the first bullet point.

4           What's being said here.  "If you lose your hair,

5   it will usually grow back."  The same thing.  There's no

6   guarantee.  There's no guarantee in these documents.

7           Now, what else is important about this document?

8   Unlike the cancer handbook I just showed you, which was given

9   to Mrs. Earnest, you will see that evidence, there's no

10  evidence that Mrs. Earnest ever saw this document.

11          Counsel told you that it was something that

12  sales reps, folks that worked for Sanofi, and you will see one

13  of them testify, that it was something that they would use when

14  they would meet with doctors, but Dr. Carinder will be a

15  witness in this case, and he will tell you he has no memory of

16  ever discussing persistent hair loss with any Sanofi sales rep.

17  And he will tell you, at all times, he exercised his

18  independent medical judgment when he was making decisions about

19  how to treat his patients.

20          Now, ladies and gentlemen, the final key piece

21  of evidence that you'll see in this case is the informed

22  consent.

23          Mrs. Earnest was aware of and accepted the risk

24  of chemotherapy, including hair loss.  Now, plaintiff's counsel

25  showed you two separate forms.  I don't know if you remember

OFFICIAL TRANSCRIPT

1   them.  They were two consent forms he showed you from studies.
2   Documents Mrs. Earnest never saw.
3           Ladies and gentlemen, there's a consent form in
4   this case that Mrs. Earnest saw and signed.  On the left-hand
5   side -- and I apologize.  We'll move the document into evidence
6   and you'll see it.  It's a little hard to read, but it has the
7   drugs that Mrs. Earnest took and she initialed them:
8   Adriamycin, Cytoxan, Taxotere.  And she was told of, made aware
9   of, and accepted the risks of hair loss.  It was the first risk
10  listed.  Life-threatening damage to her heart, lungs, liver,
11  and kidneys, death, brain damage, paralysis of arms and legs,
12  loss of an organ or function, or loss of an arm or leg.
13          Thank you.
14          And if we go back for a moment to the prior
15  slide, do you see where it says hair loss?  Again, it doesn't
16  say reversible or short-term.  There's no limiting language at
17  all.
18          Now, Mrs. Earnest signed this document.  She
19  said that she had read it and she understood.  And you'll see
20  also that her husband Mr. Earnest signed the consent form.  And
21  Mr. Earnest, you will learn, was in the room with Dr. Carinder
22  and Mrs. Earnest when Dr. Carinder was talking about the
23  treatment he was going to give his wife.  Mr. Earnest will tell
24  you that Dr. Carinder didn't give his wife any guarantees when
25  it came to hair loss.

OFFICIAL TRANSCRIPT

1      You saw that one of the drugs listed that

2  Mrs. Earnest took was called Adriamycin, and we've spoken about

3  that a fair amount.  Well, when Dr. Carinder told Mrs. Earnest

4  about Adriamycin, he called it, to her, "the red devil."  And

5  there's a reason that it has that nickname, and here's the

6  label for it.

7      It says, "Myocardial toxicity manifested in its

8  most severe form" -- and "myocardial," that means heart --

9  "manifested in its most severe form by potentially fatal

10  congestive heart failure may occur either during therapy or

11  months to years after therapy."

12      So what the Adriamycin label is saying and what

13  Dr. Carinder discussed with Mrs. Earnest is you could take

14  Adriamycin to treat your breast cancer.  You could beat the

15  cancer, cure the cancer, and you could die of congestive heart

16  failure from Adriamycin years later, after you've stopped

17  taking it.  So that's how serious the risks of this medication

18  are.

19      And here's a medical record for Mrs. Earnest and

20  it says -- again, this is Dr. Carinder's records.  He says,

21  "Potential cardiac toxicity from doxorubicin, which you will

22  learn, ladies and gentlemen, is Adriamycin, were explained to

23  the patient in detail."

24      So, ladies and gentlemen, these are the risks of

25  chemotherapy.  And Mrs. Earnest was made aware of them and she

OFFICIAL TRANSCRIPT

accepted them.  Things like heart failure and paralysis and
loss of a limb.  And, of course, the risk of hair loss.  One of
the issues in this case is whether Mrs. Earnest would have
accepted all these risks but have had some additional
information on Taxotere and hair loss, would she have refused
to have taken Taxotere but accepted all of these risks?  That's
something you're going to have to decide.

Now, let me change gears with you.  I'd like to
talk with you about the disease of breast cancer.  Breast
cancer, as we all know, it's a life-threatening disease and
it's one of the most common cancers.  And here's the statistics
from 2011:  3 million women were living in the United States
with breast cancer at that time, and that year, the year
Mrs. Earnest was diagnosed, nearly 230,000 new cases of breast
cancer would be diagnosed that year.  To put that in
perspective, folks, because it's just a bunch of numbers,
230,000, that's about as many folks that live in Baton Rouge.

Now, nearly 40,000 women were expected to die
from breast cancer that year.  So, again, to put it in
perspective, these numbers, when Mrs. Earnest was diagnosed in
2011, that's 108 women per day, four women every hour that were
expected to die from breast cancer in 2011.

Now, you will learn in trial that breast cancer
starts in the breast, but it can spread to other parts of the
body.  And if it's not treated correctly and quickly, that

OFFICIAL TRANSCRIPT

that's exactly what can happen.  Now, Mrs. Earnest's breast
cancer had already spread to one of her lymph nodes outside of
her breast by the time that she was diagnosed.

        And, ladies and gentlemen, once breast cancer
spreads to a lymph node, it can go to other lymph nodes, and it
can spreed to other parts of the body.

        You'll hear the reason treatment is so important
is because if the cancer returns, a women's chance of beating
that cancer the second time, it goes down dramatically.  And
here are some of the numbers on that.  If -- of those patients
whose breast cancer returns, if it comes back, if you don't get
it the first time, only about 16 percent of them will live
another five years, and only 6 percent of these women will live
another ten years.

        And when breast cancer comes back in patients
who have already been treated, the average life span is about
20 months.  So you better get it right the first time.

        Now, this brings us to the treatment.  What is
chemotherapy and how does it work?

        What you're going to learn about cancer is that
it's a disease of uncontrolled growth of a cell.  And what
chemotherapy does is it prevents cancer cells from
uncontrollably growing and uncontrollably dividing.  Now,
unfortunately, ladies and gentlemen, chemotherapy drugs do not
know the difference between a good cell and a bad cell.  And

that's one of the reasons why breast cancer patients have to accept so many risks in order to get the benefit of the treatment.

Now, all chemotherapy drugs are not the same. They vary in their effectiveness, how good they are in fighting cancer, and they vary in their risks to patients.  And that's important.  Because that's why doctors look for the very best combination to treat each individual patient that they're seeing.  In this case, you will see the evidence, Dr. Carinder did not offer Mrs. Earnest a list of options.  He recommended the medications you've heard about.

And in this case, you will hear Mrs. Earnest, she didn't ask for any options.  She told Dr. Carinder, "I'm in your hands, and I'll do whatever you tell me to do." Dr. Carinder made a reasonable decision by using Taxotere to treat Mrs. Earnest's breast cancer and believed that was in her best interests, ladies and gentlemen.

Now I'd like to spend a few minutes talking with you about Taxotere, but I just want to say one thing, because I heard in this in the opening statement and I just don't want to leave it unaddressed.  So you are going to see some depositions played during the course of trial that are going to be on videotape.  So it won't be a live witness here, but you'll see videos.  And these are going to be videos of some folks that work at Sanofi now, some of them used to work there previously.

3:17PM   1   And you'll see that they're clips essentially from these
3:17PM   2   depositions.
3:17PM   3            Now, you're going to learn that these
3:17PM   4   individuals worked in a wide range of departments.  Obviously
3:17PM   5   this is a large company.  So there's lots of folks doing lots
3:17PM   6   of different things.  Many of them, and this is what I want you
3:17PM   7   to listen for, please, had nothing to do with the Taxotere
3:17PM   8   label, but they're being asked questions about it.  So please
3:17PM   9   listen for that, and then you will get to decide what weight to
3:17PM  10   give that testimony.
3:17PM  11            Now, going back to Taxotere, this is what the
3:18PM  12   evidence where show.  It's FDA approved.  Life-saving
3:18PM  13   chemotherapy medication used to treat seven different types of
3:18PM  14   cancer.  And it's prescribed, ladies and gentlemen, by doctors
3:18PM  15   all over the United States.  It's one of the most commonly used
3:18PM  16   drugs to treat invasive breast cancer, the kind that
3:18PM  17   Mrs. Earnest had.
3:18PM  18            And before drugs like Taxotere were developed in
3:18PM  19   the 1990s, breast cancer survival rates were as low as
3:18PM  20   33 percent, depending upon how far you went back in time.  So
3:18PM  21   you'll learn that scientists and researchers got together to
3:18PM  22   develop a molecule that could be used to fight cancer.
3:18PM  23            And ten years of development, six different
3:18PM  24   clinical studies, meaning studies involving over 1600 real
3:18PM  25   patients, that molecule became what's known as Taxotere.  When

OFFICIAL TRANSCRIPT

3:18PM 1   drugs like Taxotere became available in the 1990s, survival
3:19PM 2   rates for breast cancer increased dramatically.  Adding a drug
3:19PM 3   like Taxotere to a patient's breast cancer treatment was shown
3:19PM 4   to reduce the risk of cancer returning by as much as 20 to
3:19PM 5   30 percent.
3:19PM 6                   And you will hear from Dr. Carinder in this
3:19PM 7   case, he will tell you drugs like Taxotere, he'll use the words
3:19PM 8   "they were in a different class."  And he will tell you they
3:19PM 9   had incredible efficacy, meaning they were very effective.  And
3:19PM 10  he will tell you Taxotere was a good drug, is a good drug.
3:19PM 11  That's what he's going to testify to.
3:19PM 12                  Now, if you go to 2011 and you look at breast
3:19PM 13  cancer survival rates, you will see that they went up
3:19PM 14  significantly.  So 89 percent of the women diagnosed in 2011
3:19PM 15  were expected to live at least five more years, and 82 percent
3:19PM 16  of the women diagnosed with breast cancer in 2011 were expected
3:19PM 17  to live at least another ten years.  This is because of
3:20PM 18  advances in medicine and treatment, ladies and gentlemen.
3:20PM 19                  Now, one of the studies -- and you've heard
3:20PM 20  about it a couple times, TAX 316.  One of the studies that
3:20PM 21  Sanofi did when it was studying Taxotere was TAX 316.  And the
3:20PM 22  purpose of the study -- I want to make this very clear.  The
3:20PM 23  purpose of the study was to see how effective a regimen was.
3:20PM 24  That's basically a combination of chemotherapy drugs.  So how
3:20PM 25  effective is a regimen that includes Taxotere, and how

OFFICIAL TRANSCRIPT

effective is a chemotherapy regimen that does not include Taxotere.

And when that was looked at in TAX 316, here's what they found out:  The group of patients who received Taxotere had a 20-per-7 reduced chance of their breast cancer returning when compared to the group that didn't get Taxotere. Now, we already talked about how important that is, why you don't want breast cancer to come back.  TAX 316 showed how effective Taxotere was and that it dramatically increased a patient's chance of survival.

What else happened in TAX 316?  16 of the patients in the group, the non-Taxotere group, the women who never got Taxotere, they were listed for persistent hair loss. They didn't take Taxotere.  As I said many times, the risk of persistent hair loss exists with nearly all chemotherapy medications.

What else was learned from TAX 316?  Even the patients that took Taxotere, they also took Adriamycin and Cytoxan.  So the patients that took Taxotere and were listed for persistent hair loss, they took the same two drugs that Mrs. Earnest was taking when she lost her hair.

And, finally, ladies and gentlemen, as I mentioned earlier, based upon the data and the results of TAX 316, which were given to the FDA, including the hair loss data, the FDA approved of Taxotere's use for operable breast

OFFICIAL TRANSCRIPT

1    cancer.

2             Now, in this case, the evidence will show that

3    Dr. Carinder chose a treatment plan with Taxotere for

4    Mrs. Earnest because it gave her the best chance to survive.

5    And at the same time, it did something else very important

6    which we haven't talked about, and that's reduce the chance of

7    getting certain side effects.

8             One of the side effects, you haven't heard about

9    it yet, but you will a lot during this trial, is something

10   called neuropathy.  And neuropathy is a painful condition

11   that's caused by damage to the nerves.  Neuropathy can be

12   permanent.  Neuropathy can prevent somebody from walking.

13   Neuropathy can prevent you from doing something as simple as

14   buttoning your shirt.  So it's pain and pins and needles in

15   your hands and your feet.

16            And what you will learn, ladies and gentlemen,

17   is that Dr. Carinder chose Taxotere for Mrs. Earnest because it

18   had less of a chance of neuropathy than an alternative drug

19   you'll hear about called Taxol.  And here is why that was even

20   more important for Mrs. Earnest.

21            Mrs. Earnest, before she had chemotherapy, had

22   several risk factors for developing neuropathy.  She had a

23   family history of diabetes.  Her father died from the disease.

24   Her mother and siblings were diagnosed as well.  She had a

25   history of another disorder called shingles, and that's

OFFICIAL TRANSCRIPT

3:23PM 1    important because it's similar to neuropathy.  It's damage to

3:23PM 2    the nerves, and they can also be painful.

3:23PM 3                And she also, before chemotherapy, had already

3:24PM 4    experienced pain and numbness in her hands and feet.  All of

3:24PM 5    these preexisting conditions placed Mrs. Earnest at an

3:24PM 6    increased risk for neuropathy if she took this alternative

3:24PM 7    drug, Taxol.  And this is one of the reasons Dr. Carinder

3:24PM 8    selected Taxotere.

3:24PM 9                Dr. Carinder also chose Taxotere instead of

3:24PM 10   Taxol because it had less of something called infusion-related

3:24PM 11   complications, and you'll hear more about it at trial.  But it

3:24PM 12   can be a very serious reaction that a patient has when they get

3:24PM 13   Taxol.  And there's a greater risk of that if you get Taxol as

3:24PM 14   compared to Taxotere.

3:24PM 15               Dr. Carinder is also going to tell you that

3:24PM 16   Taxotere has less cardiac or heart risks than Taxol.

3:24PM 17               And, finally, ladies and gentlemen, you will

3:24PM 18   hear from Dr. Carinder that even if Mrs. Earnest had taken this

3:24PM 19   other drug, Taxol, there is no way for anyone to know if

3:25PM 20   Mrs. Earnest would be alive today.  And you will also hear from

3:25PM 21   Dr. Carinder that if Mrs. Earnest had taken this other drug,

3:25PM 22   Taxol, there is no way for anyone to know if her hair would

3:25PM 23   look different than it does today.

3:25PM 24               Now, we're going to bring you, ladies and

3:25PM 25   gentlemen, one of the leading oncologists in the entire

1 country, Dr. John Glaspy.  And he will tell you that with
2 Taxotere, there was less of a chance of developing neuropathy
3 when compared to Taxol.  And he will tell you, ladies and
4 gentlemen, that Taxotere was the right drug for Mrs. Earnest.
5 It was a reasonable choice and the best choice for
6 Mrs. Earnest.
7            **THE DEPUTY CLERK:**  You have six minutes left.
8            **MS. SASTRE:**  Perfect.  Thank you so much.
9            So there's one last drug, and I know you've had
10 a lot of names put out there, but bear with me for a couple
11 more minutes please because it's important.  I'd like to talk
12 with you about a drug by the name of Arimidex.
13            And Arimidex is a medication that Mrs. Earnest
14 started taking right after she completed chemotherapy, and she
15 received Arimidex back, as I said, in November of 2011.  But
16 importantly, ladies and gentlemen, she has taken Arimidex every
17 day since she completed, actually, her chemotherapy, and then
18 she also had radiation.  And you haven't heard much about that
19 yet.
20            For the past eight years, Mrs. Earnest has taken
21 this medication every day, and she takes it as part of her
22 treatment for breast cancer.  Because what Arimidex does is it
23 prevents certain hormones, female hormones, things like
24 estrogen, in Mrs. Earnest's body, it prevents them from leading
25 to the development of another breast tumor.

OFFICIAL TRANSCRIPT

1    So you take Arimidex if you've had breast cancer
2  to suppress your female hormones, and that reduces the risk of
3  cancer returning.
4    But there's something else very important that
5  Arimidex does.  And what Arimidex also does is cause hair loss.
6  And you will see reports.  We will bring you the expert, we
7  will bring you the evidence, you will see reports of patients
8  with persistent hair loss who have taken Arimidex.  And you'll
9  hear the same thing from our oncologist, Dr. Glaspy.  He's seen
10  it in his own patient population.
11    Now, I've told you Mrs. Earnest has taken it for
12  about eight years.  Let me put it in perspective.  Mrs. Earnest
13  had four doses of Taxotere in 2011.  The last time she had
14  Taxotere was September of 2011.  Right?
15    Mrs. Earnest has had Arimidex over 2,800 times
16  if you add up the fact that she's taken it every single day
17  since November of 2011.  You will hear and see the evidence in
18  this case that Arimidex is interfering with Mrs. Earnest's
19  hair's ability to regrow.  That Arimidex, which can cause hair
20  loss, it's just simply not giving her hair a chance to grow.
21    Now, we know that Mrs. Earnest continues to take
22  that medication because it's still a continuing part of her
23  breast cancer treatment.  So that's something you'll hear about
24  Arimidex, ladies and gentlemen, during the course of this
25  trial.

3:28PM  1          Now, I'd like to discuss just one more thing
3:29PM  2   with you, and I'm going to go and sit down.
3:29PM  3          There's a -- well, let me be clear.  Let me back
3:29PM  4   up for a second.
3:29PM  5          Counsel just told you the claim in this case of
3:29PM  6   Mrs. Earnest is that Taxotere is causing her persistent hair
3:29PM  7   loss; right?  That Taxotere is the cause of Mrs. Earnest's
3:29PM  8   persistent hair loss.
3:29PM  9          But you're going to learn something very
3:29PM  10  important.  You are going to see evidence that plaintiff's
3:29PM  11  experts -- again, ladies and gentlemen, not my experts, not the
3:29PM  12  defense experts -- plaintiff's experts' theory is that Taxotere
3:29PM  13  causes persistent hair loss by killing or damaging stem cells.
3:29PM  14  That's their theory.
3:29PM  15         And you are going to learn that their experts
3:29PM  16  took two biopsies or tissue samples from Mrs. Earnest's scalp,
3:30PM  17  and they were looked at underneath a microscope.  And here's
3:30PM  18  what they found.  Stem cells, present.  Not just present,
3:30PM  19  proliferating, which means multiplying.  So that's what you're
3:30PM  20  going to see in this case.
3:30PM  21         And this is from a pathology report, ladies and
3:30PM  22  gentlemen.  This evidence, ladies and gentlemen, along with
3:30PM  23  everything else I discussed with you, will show Mrs. Earnest's
3:30PM  24  persistent hair loss hasn't been caused by Taxotere.  That is
3:30PM  25  what the evidence in this case is going to show.  After all,

OFFICIAL TRANSCRIPT

3:30PM  1    she lost her hair nearly two months before she started

3:30PM  2    Taxotere, and has continued to take a medication for eight

3:30PM  3    years that causes hair loss.

3:30PM  4          THE DEPUTY CLERK:  One minute.

3:30PM  5          MS. SASTRE:  So where does this leave us?

3:31PM  6    Mrs. Earnest is alive today.  She's cancer-free.  It's been

3:31PM  7    eight years since that terrible moment.  It's a terrible moment

3:31PM  8    when you're told you have a disease like breast cancer.  And

3:31PM  9    with the help of chemotherapy, including Taxotere, Mrs. Earnest

3:31PM  10   beat her breast cancer.  She survived.

3:31PM  11          The evidence in this case will show, ladies and

3:31PM  12   gentlemen, when it comes to treating breast cancer, there's no

3:31PM  13   guarantees.  There's no guarantees the treatment will work.

3:31PM  14   There's no guarantees how long the patient will survive.

3:31PM  15   There's no guarantees as to what side effects will impact them.

3:31PM  16   And there's no guarantee as to how severe they will be.

3:31PM  17          No doctor can tell a patient what the outcome

3:31PM  18   can be when they're treating their cancer.  And the evidence

3:31PM  19   will show that Mrs. Earnest had no risk-free chemotherapy

3:32PM  20   options, and she had no risk-free options when it came to hair

3:32PM  21   loss.

3:32PM  22          Now, ladies and gentlemen, as I told you at the

3:32PM  23   beginning, we're going to work very, very hard to use our time

3:32PM  24   with you wisely and effectively and bring you the evidence that

3:32PM  25   you need to decide this case.  At the end of this case, when

OFFICIAL TRANSCRIPT

| | |
|---|---|
| 3:32PM | 1 |
| 3:32PM | 2 |
| 3:32PM | 3 |
| 3:32PM | 4 |
| 3:32PM | 5 |
| 3:32PM | 6 |
| 3:32PM | 7 |
| 3:32PM | 8 |
| 3:32PM | 9 |
| 3:32PM | 10 |
| 3:32PM | 11 |
| 3:33PM | 12 |
| 3:33PM | 13 |
| 3:33PM | 14 |
| 3:33PM | 15 |
| 3:33PM | 16 |
| 3:33PM | 17 |
| 3:33PM | 18 |
| 3:33PM | 19 |
| 3:34PM | 20 |
| 3:34PM | 21 |
| 3:34PM | 22 |
| 3:34PM | 23 |
| 3:34PM | 24 |
| 3:34PM | 25 |

you have heard all of the evidence from both sides, we are
going to ask you to return a verdict --

          THE COURT:  Time up.

          MS. SASTRE:  -- in favor of Sanofi.

              Thank you very, very much for your time.

          THE COURT:  Okay.  Ladies and gentlemen of the jury,
it's 3:30.  It's about time for our afternoon break.  Court
will be at recess for 15 minutes, and then we'll come back and
begin hearing testimony.

          THE DEPUTY CLERK:  All rise.

          (WHEREUPON, the jury exited the courtroom.)

          THE COURT:  Is there something anybody wants to
mention before the first witness?

          MR. NOLEN:  Yes, Your Honor.  There's at least three
MIL violations in Ms. Sastre's opening there.  My co-counsel
was back there collecting that so that we can bring that to the
Court's attention.  I don't know that I have them this second.
But we believe there were at least three in that opening
statement.

          THE COURT:  I'll be back in five minutes and we'll
take those up.

              Ms. Sastre, did you -- I believe that the
plaintiffs believe that there were three motion in limine
violations during your opening statement.  And I'm going to
take five minutes, then I'll be back, and we'll take those up.

| | |
|---|---|
| 3:34PM | 1 |
| 3:34PM | 2 |
| 3:39PM | 3 |
| 3:39PM | 4 |
| 3:39PM | 5 |
| 3:39PM | 6 |
| 3:39PM | 7 |

**MS. SASTRE:**  Sure.  Thank you, Your Honor.

(WHEREUPON, the Court took a recess.)

**THE DEPUTY CLERK:**  All rise.

**THE COURT:**  Please proceed.

**MR. NOLEN:**  Ready, Your Honor?

**THE COURT:**  Yes.

**MR. NOLEN:**  All right.  So plaintiffs object to the violations of the motion in limine No. 13, FDA preemption.

The opening statement that was given by Ms. Sastre says there is not going to be any data or any information from TAX 316 that you're going to see that the FDA didn't see.

That clearly encroaches upon the Court's ruling in motion in limine No. 13, which was consistent with this, the Court will not allow the defendants to argue or suggest that Sanofi provided the FDA with all pertinent information on reports of permanent alopecia, and yet the FDA did not take action.

We think that's a clear violation because that's the implication, clearly, from what was argued.  That's one.

The second one was -- is the Court ruled that -- previously that Dr. Carinder's conduct in this case was not at issue, that in terms of any sort of violation of the -- applicable standard of care for a physician who practices medicine here.  And yet what was argued was is that somehow,

OFFICIAL TRANSCRIPT

one, Carinder wasn't reading the medical literature that he was receiving from Sanofi, which is the first we've heard of that; that he wasn't reading updated -- updated labeling provided by Sanofi.  Again, first we've heard of that.

And that he was not -- and that he, in fact, did prescribe the medication at a higher dose at a higher level than was recommended by the manufacturer; and, therefore, there was something that was inherently wrong with that.

And yet there will be no evidence from any of their experts, certainly not from Dr. Carinder or anyone else, that suggests that he somehow breached the standard of care that is applicable for this -- dispensing this particular cancer drug.  So that's number two.

And number three, there was a direct claim on superiority about Taxotere being really the only option that was available to Ms. Earnest, and that Dr. Carinder picked this as the best option, because it was really the only option; and that somehow Ms. Earnest might not even be with us had he not picked Taxotere, that this was a clearly superior drug to the other drugs.  So that's a violation of yet another MIL.  I'm not sure of the number on that.

**THE COURT:**  You don't need to give me a number.

**MR. NOLEN:**  Well, I understand the Court's ruling. The Court's ruling was that we weren't going to do that kind of superiority analysis because we weren't going to compare the

OFFICIAL TRANSCRIPT

1   toxicities and we weren't going to compare whether or not one

2   was superior to another in terms of the cancer drugs.

3             What the Court had ruled, I believe --

4             THE COURT:  I thought we were not going to talk about

5   toxicity to the extent that it could cause permanent hair loss,

6   but that it would be an issue when Ms. Earnest was having --

7   when Dr. Carinder and Ms. Earnest were having that conversation

8   that, you know, I recommend this because -- you know, the

9   toxicity with Taxol.  I'm not sure, but there were parts of

10  that that did bother me --

11            MR. NOLEN:  Yeah.

12            THE COURT:  -- and I need to talk to Ms. Sastre about

13  it.

14            But I believe that there was -- we did talk

15  about -- I don't -- that Dr. Carinder did prescribe off-label,

16  but I believe that the parties all agreed that that was within

17  the standard of care and was recommended, though it was

18  off-label for Taxotere.  That was my appreciation.

19            MR. NOLEN:  Right.  He used a different protocol that

20  he utilizes that gives the A and the C first, and then brings

21  in the T as really a monotherapy at the end.

22            THE COURT:  Right.  But it was the dosing.

23            MR. NOLEN:  Right.  It's the dosing.  And he uses the

24  higher dose, the dose that's typically used in Europe.

25            And if I can just go back to that issue about

OFFICIAL TRANSCRIPT

3:44PM   1   this superiority claim.

3:44PM   2   What I believe the Court had ruled is is that,

3:44PM   3   as far as superiority is concerned, if Sanofi submits evidence

3:44PM   4   or argues that Taxotere is superior or better than Taxol, which

3:44PM   5   I think was being argued -- the 2009 DDMAC letter states that

3:44PM   6   FDA cannot make that claim.  It states to Sanofi that FDA won't

3:44PM   7   allow them to make that claim.

3:44PM   8   And what I believe the Court had said -- at

3:45PM   9   least our notes reflect -- that if they make that claim, if

3:45PM   10   they assert that there's somehow superiority, then the

3:45PM   11   plaintiffs get to put in the DDMAC letter that says that,

3:45PM   12   actually, you can't make that claim and it is not -- it is not

3:45PM   13   a valid claim.  Because the scientific evidence doesn't even

3:45PM   14   support that.

3:45PM   15   THE COURT:  Okay.

3:45PM   16   MS. SASTRE:  May I respond, Your Honor?

3:45PM   17   THE COURT:  Yes.

3:45PM   18   MS. SASTRE:  Okay.  Thank you.

3:45PM   19   So, Judge, first I'll deal with the preemption

3:45PM   20   issue, which we discussed at our conference when we were last

3:45PM   21   together, I believe, this Saturday, Your Honor.

3:45PM   22   This was -- there was a slide specifically on

3:45PM   23   this.  We crafted the language specifically in the meeting

3:45PM   24   where Your Honor was present with Mr. Schanker.

3:45PM   25   THE COURT:  Let me tell you what bothers me.  It was

OFFICIAL TRANSCRIPT

not the slide that you showed me on Saturday.  It was taking

Mr. Schanker's slide and showing it.

And this is what troubled me because you didn't

say it directly, but I think the inference was very, very

strong.  And you said -- so let me go back to where I was.

Now, the information that was collected from

this study by Sanofi concerning persistent hair loss was

shared.  It was shared with the FDA.  And I want to be very

clear here at the outset, the data and the results of TAX 316

were given to the FDA, including the persistent hair loss.  And

based on the results of this study, TAX 316, the FDA approved

of the use of the Taxotere in this very setting.  They approved

of it for the use...

And you didn't say they said we have to do

anything about persistent hair loss.  But I have to tell you,

the inference, in my view, was very clear that the FDA had this

information of persistent hair loss and, guess what, they

approved it.  And while I am -- that was troubling to me.

**MS. SASTRE:**  May I respond?

**THE COURT:**  Of course.  Because when you said it, I

went, "ah."

**MS. SASTRE:**  So, Your Honor, I will tell you that

what we put on the slide, which was revised and then, of

course, sent around again, as Your Honor knows, was the phrase

which was specifically crafted.

3:47PM 1              And I know you said you were more troubled by
3:47PM 2 what I said.  But what I said is that the FDA received all of
3:47PM 3 the TAX 316 results and data, and that after receiving that, of
3:47PM 4 course, it includes the hair loss data.
3:47PM 5              That's just simply me stating the obvious.  It's
3:47PM 6 trying to orient the jury.  I mean, they're hearing all these
3:47PM 7 things.
3:47PM 8              So I said, well, it includes the hair loss data.
3:47PM 9 And based upon TAX 316, they approved it in 2004 in the
3:47PM 10 adjuvant setting.  When we were meeting together, Judge, I
3:47PM 11 remember you turning to me, and you said --
3:47PM 12      **THE COURT:**  Do not go there.  That's what I said.
3:47PM 13 You cannot say that -- you cannot throw the FDA's obligation to
3:48PM 14 report on hair loss -- you can't throw your state law
3:48PM 15 obligations in the lap of the FDA is what I said.
3:48PM 16      **MS. SASTRE:**  No.  But, Your Honor, when we met and I
3:48PM 17 said, "Look, Judge, what I'm going to say" -- I said what I'm
3:48PM 18 going to put on the slide, and it's what I did put on the slide
3:48PM 19 that they didn't object to was that we gave all of the TAX 316
3:48PM 20 data and results to FDA.  And based upon that information, they
3:48PM 21 approved it in 2004 in the adjuvant setting.
3:48PM 22              And, Your Honor, I can tell you I remember
3:48PM 23 distinctly, you turned to counsel and you said, "Well, that's
3:48PM 24 fine because that's a fact in the case."
3:48PM 25              And I said that here.  The only difference, Your

| | |
|---|---|
| 3:48PM | 1 |

Honor, was I just mentioned that it also included the hair loss
data.  There was no suggestion of preemption or prevention,
anything along those lines, Judge.

So I don't think it comes close to violate any
ruling.  I didn't say that the FDA didn't take any action.  And
so, again, my impression was from our conference that that was
exactly what I was supposed to say.  And I put those same words
on the slide, and there was no objection.

THE COURT:  Okay.  Let's talk about the violation of
the standard of care.  That's going to be an issue.

MS. SASTRE:  Yes, Your Honor.  So on this issue --
well, first of all, I would say that we never said that and we
never suggested it.  The things that we talked about were the
things that had been discussed extensively in the motions in
limine.

Number one, concerning -- well, concerning the
journal, the study from 2001 that was published in the *Journal
of Clinical Oncology*, what I said is that it goes out to
thousands of doctors, right, cancer doctors.  And I said,
including Dr. Carinder, who gets that journal.  That's what he
said in his deposition, "I get that journal."

I said that that is a journal that goes out to
thousands of cancer specialists.

THE COURT:  No.  I think what he's saying is -- well,
there were a couple of things.

3:49PM  1              And I'm not -- I have to tell you, I'm not as

3:49PM  2    excited about this.  I think what you said is Dr. Carinder

3:49PM  3    relied on the 1999 label, and what I heard in plaintiff's

3:50PM  4    opening statement is Dr. Carinder gets -- subscribes to a

3:50PM  5    service that provides him the updates, and that's how he does

3:50PM  6    it.  So he doesn't pull out the labeling instructions every

3:50PM  7    time he prescribes.

3:50PM  8              I think we're just going to have to see what the

3:50PM  9    evidence is on that.

3:50PM  10             MS. SASTRE:  Sure.

3:50PM  11             THE COURT:  Now, the other thing about the off-label,

3:50PM  12   I think we may have to just hear how the evidence bears out on

3:50PM  13   that issue.

3:50PM  14             MS. SASTRE:  Well, Your Honor, if I may, two points,

3:50PM  15   please, in response.  I only mentioned the --

3:50PM  16             THE COURT:  I think I said I'm not really worried

3:50PM  17   about that one.

3:50PM  18             MS. SASTRE:  Okay.

3:50PM  19             THE COURT:  But if you want to make a response, have

3:50PM  20   at it.

3:50PM  21             MS. SASTRE:  No, no.  I just wanted it for the

3:50PM  22   record.  That's fine.  That's fine, Your Honor.

3:50PM  23             Finally, on this superiority claim, it was not

3:50PM  24   done big-picture.  The only thing that I said was, with regard

3:50PM  25   to Mrs. Earnest, because of the risks of certain medications,

OFFICIAL TRANSCRIPT

1  that this was the best option for her.  It wasn't some kind of
2  comparison --
3          THE COURT:  But then it was.  You know, the only
4  thing that bothered me about that is no one can tell you she
5  would be alive today.  Well, of course.
6          MS. SASTRE:  That's what Dr. Carinder is going to --
7  that is a quote from his deposition, Judge.
8          What I said -- I prefaced that statement with
9  "Dr. Carinder will tell you." that is an exact quote.  That is
10  a question to him, and he said nobody could say that.  And he
11  said that about her hair too, if she'd taken Taxol.  That was
12  not argument, Your Honor.
13          THE COURT:  All right.  Okay.  I've just got to think
14  on this.
15          MR. COFFIN:  Your Honor, we'd like to move for an
16  instruction on these MILs that were violated, an instruction to
17  the jury.  Now, we'd like to think about how we craft that
18  instruction.
19          But I can tell you, on the FDA, having read over
20  and over Your Honor's ruling on preemption, the word "suggest"
21  is in there for a reason.  It's because what Your Honor ruled
22  is, under *Albrecht*, which we've discussed many, many times,
23  that the law of this case is that -- Sanofi, the drug company,
24  is not prohibited.  And they can't suggest in some way they
25  gave everything to the FDA.  That's exactly what happened.

OFFICIAL TRANSCRIPT

1    So we're moving for an instruction.

2    MS. SASTRE:  Your Honor, the only time where I said

3    what was given to FDA, Judge, it was in the context of --

4    Judge, it was in the context of TAX 316.  And I said all the

5    data and results of TAX 316 was given to FDA.  And I said to

6    the jury, "You're not going to see any information from TAX 316

7    that the FDA didn't see."  I did not go beyond TAX 316 as far

8    as what the FDA had.

9    THE COURT:  No, I read the quote to you --

10   MS. SASTRE:  Okay.

11   THE COURT:  -- because I marked it at the time when I

12   heard it.  And I'll read it again if you want the exact

13   wording, which was -- and it wasn't in reference to that

14   document.

15   MS. SASTRE:  Okay.

16   THE COURT:  It was in reference to the document that

17   Mr. Schanker used.  And it was shortly after his sidebar where

18   he said, "Well, I didn't see that slide."

19   And I said, "Well, it's your slide."

20   And it was said, "Mr. Schanker showed you this

21   slide.  He told you about a study called TAX 316, and it's a

22   clinical trial, and you're going to hear a lot about that in

23   this case."  All true.

24   "Now, the information that was collected from

25   this study by Sanofi concerning persistent hair loss was

OFFICIAL TRANSCRIPT

228

3:53PM   1    shared.  It was shared with the FDA.  And I want to be very

3:53PM   2    clear at the outset, the data and the results of TAX 316 were

3:53PM   3    given to the FDA, including the persistent hair loss.

3:53PM   4                   "And based on the results of this study,

3:53PM   5    TAX 316, the FDA approved of the use of Taxotere in this very

3:53PM   6    setting.  They approved of it in the use of operable breast

3:53PM   7    cancer, the exact kind that Ms. Earnest had."

3:53PM   8                   MS. SASTRE:  Yes.

3:53PM   9                   THE COURT:  And what was -- I think the inference

3:53PM   10   that bothers me is from this sentence, "It was shared with the

3:54PM   11   FDA.  And I want to be very clear at the outset, the data and

3:54PM   12   the results were given to FDA, including the persistent hair

3:54PM   13   loss.  And based on the results of this study, they approved

3:54PM   14   it."

3:54PM   15                   And in my view, it -- and I have to tell you, if

3:54PM   16   it didn't cross the line, it sure skirted it.  Because I think

3:54PM   17   that there was an inference there that the FDA should have done

3:54PM   18   something with that.

3:54PM   19                   MS. SASTRE:  Your Honor, I will just tell you, you

3:54PM   20   know, when we worked on it -- if I may just go back for a

3:54PM   21   moment on --

3:54PM   22                   THE COURT:  Oh, I remember exactly.  Let me see that.

3:54PM   23   You can show me that slide.  Because we talked about it.  I

3:54PM   24   have a very clear recollection.

3:54PM   25                   MS. SASTRE:  We did, Judge.  And I stuck to that

OFFICIAL TRANSCRIPT

| | |
|---|---|
| 3:54PM | 1 |
| 3:54PM | 2 |
| 3:54PM | 3 |
| 3:54PM | 4 |
| 3:54PM | 5 |
| 3:55PM | 6 |
| 3:55PM | 7 |
| 3:55PM | 8 |
| 3:55PM | 9 |
| 3:55PM | 10 |
| 3:55PM | 11 |
| 3:55PM | 12 |
| 3:55PM | 13 |
| 3:55PM | 14 |
| 3:55PM | 15 |
| 3:55PM | 16 |
| 3:55PM | 17 |
| 3:55PM | 18 |
| 3:55PM | 19 |
| 3:55PM | 20 |
| 3:55PM | 21 |
| 3:55PM | 22 |
| 3:55PM | 23 |
| 3:55PM | 24 |
| 3:55PM | 25 |

1    except simply saying that, of course, the data and the results

2    included hair-loss information, Your Honor.

3            That was something that was crafted with the

4    Court.  And I don't think it, in any way, violates any ruling

5    or even the spirit or intent of any ruling.

6            I stuck to what Your Honor said but simply was

7    making clear at the moment -- you know, we're talking about

8    this study.  It's complicated.  The jury doesn't understand

9    clinical trials and the data and the results.  It doesn't make

10   a lot of sense sometimes.  We move too fast.

11           And I just wanted to make the point that the

12   data -- what data?  It included hair loss data.

13           So, Your Honor, I can only tell you my

14   intention -- and I believe it's what I did -- was to comply

15   with exactly what Your Honor told me.

16           They had that slide.  There was no subsequent

17   objection to it.  And we crafted that sentence when we were

18   together.  And that minor addition of a word in no way, Your

19   Honor, violates your ruling on preemption in this case or any

20   motion in limine, Judge.

21        MR. COFFIN:  Your Honor, as you can guess, I strongly

22   disagree with this.

23        THE COURT:  As opposed to just disagree?

24        MR. COFFIN:  Absolutely.  Absolutely.

25           This is exactly what we were concerned about,

OFFICIAL TRANSCRIPT

| | | |
|---|---|---|
| 3:55PM | 1 | which we've argued since the preemption ruling Your Honor came |
| 3:56PM | 2 | out with.  We've argued it over and over and over because we |
| 3:56PM | 3 | have been so concerned that they're going to suggest that they |
| 3:56PM | 4 | gave everything to the FDA. |
| 3:56PM | 5 | THE COURT:  I know.  I got it.  I really have the |
| 3:56PM | 6 | argument. |
| 3:56PM | 7 | MR. COFFIN:  I understand.  It's so frustrating, Your |
| 3:56PM | 8 | Honor. |
| 3:56PM | 9 | THE COURT:  Can I get you all to approach for a |
| 3:56PM | 10 | second? |
| 3:56PM | 11 | (WHEREUPON, the following proceedings were held at |
| 3:56PM | 12 | the bench.) |
| 3:56PM | 13 | THE COURT:  Who are you calling first? |
| 3:56PM | 14 | MR. COFFIN:  We were going to call Polizzano, which |
| 3:56PM | 15 | is only 15 minutes.  But now -- I mean, we'll probably still do |
| 3:56PM | 16 | that, but we do have a live witness that we're hoping to finish |
| 3:56PM | 17 | today.  We don't have to. |
| 3:56PM | 18 | THE COURT:  Who's your live witness? |
| 3:56PM | 19 | MR. COFFIN:  Ruth Avila, the sales rep. |
| 3:57PM | 20 | Now, we can do her tomorrow, if the Court wants |
| 3:57PM | 21 | to.  But we have two videos ready to go. |
| 3:57PM | 22 | MR. NOLEN:  We don't want to play them back to back. |
| 3:57PM | 23 | THE COURT:  No, that's never a good idea. |
| 3:57PM | 24 | MR. SCHANKER:  Right. |
| 3:57PM | 25 | THE COURT:  I really need to think about this because |

OFFICIAL TRANSCRIPT

<table>
<tbody>
<tr><td>3:57PM</td><td>1</td><td>if I fashion an instruction, it's not going to be -- it would</td></tr>
<tr><td>3:57PM</td><td>2</td><td>only be very innocuous, something to the effect of the</td></tr>
<tr><td>3:57PM</td><td>3</td><td>manufacturer's obligations are -- you know, remain with the</td></tr>
<tr><td>3:57PM</td><td>4</td><td>manufacturer.</td></tr>
<tr><td>3:57PM</td><td>5</td><td>MR. COFFIN:  Something that mirrors your ruling.</td></tr>
<tr><td>3:57PM</td><td>6</td><td>THE COURT:  No, I'm not -- you know, look, I don't</td></tr>
<tr><td>3:57PM</td><td>7</td><td>want to get where the jury thinks I got --</td></tr>
<tr><td>3:57PM</td><td>8</td><td>MS. SASTRE:  Judge, could --</td></tr>
<tr><td>3:57PM</td><td>9</td><td>THE COURT:  I'm listening.</td></tr>
<tr><td>3:57PM</td><td>10</td><td>MS. SASTRE:  Could I leave you -- yes, I'm glad you</td></tr>
<tr><td>3:57PM</td><td>11</td><td>have the slide, because I'll tell you --</td></tr>
<tr><td>3:57PM</td><td>12</td><td>THE COURT:  I tell you what happened -- where the</td></tr>
<tr><td>3:57PM</td><td>13</td><td>kicker happened.  I think it's when you grabbed Mr. Schanker's</td></tr>
<tr><td>3:58PM</td><td>14</td><td>slide, and his slide, and I think it kind of -- I think that's</td></tr>
<tr><td>3:58PM</td><td>15</td><td>what happened.</td></tr>
<tr><td>3:58PM</td><td>16</td><td>MS. SASTRE:  Okay.  Okay.</td></tr>
<tr><td>3:58PM</td><td>17</td><td>THE COURT:  Let me tell you this, and I'm telling it</td></tr>
<tr><td>3:58PM</td><td>18</td><td>directly to you.</td></tr>
<tr><td>3:58PM</td><td>19</td><td>MS. SASTRE:  Yes, ma'am.</td></tr>
<tr><td>3:58PM</td><td>20</td><td>THE COURT:  I do not believe that there was an intent</td></tr>
<tr><td>3:58PM</td><td>21</td><td>in any way --</td></tr>
<tr><td>3:58PM</td><td>22</td><td>MS. SASTRE:  Okay.  I appreciate you saying that.</td></tr>
<tr><td>3:58PM</td><td>23</td><td>THE COURT:  -- to violate my preemption order.  I do</td></tr>
<tr><td>3:58PM</td><td>24</td><td>not believe that.</td></tr>
<tr><td>3:58PM</td><td>25</td><td>MS. SASTRE:  Thank you for saying that.</td></tr>
</tbody>
</table>

OFFICIAL TRANSCRIPT

| | | |
|---|---|---|
| 3:58PM | 1 | **THE COURT:** I think what happened is you did what -- |
| 3:58PM | 2 | what all trial lawyers do, especially at that point. You |
| 3:58PM | 3 | adopted that, and then you kind of get caught in a moment. And |
| 3:58PM | 4 | I believe that. |
| 3:58PM | 5 | I think we had talked about -- I think what |
| 3:58PM | 6 | bothered me is the way that it came in, in that same sentence. |
| 3:58PM | 7 | And I went, "ooh." And I almost stopped you, but nobody else |
| 3:58PM | 8 | stood up -- |
| 3:58PM | 9 | **MR. COFFIN:** I almost did too, but -- |
| 3:58PM | 10 | **THE COURT:** -- so I just said let it go. |
| 3:58PM | 11 | I think -- I'm not inclined to do an instruction |
| 3:58PM | 12 | right now because I think -- if I give an instruction, it's |
| 3:59PM | 13 | going to be very, very innocuous. And I want to have an |
| 3:59PM | 14 | opportunity to think about it. Then I have to determine |
| 3:59PM | 15 | whether or not I want to give something at this point. |
| 3:59PM | 16 | **MR. MICELI:** So, Your Honor, the thing that concerns |
| 3:59PM | 17 | me the most is she's implied that everything about TAX 316 has |
| 3:59PM | 18 | been given to the FDA. They've already said Mr. Strongman |
| 3:59PM | 19 | informed you last week -- or two weeks ago that Mr. -- |
| 3:59PM | 20 | Dr. Kopreski is not coming. They're going to call witnesses |
| 3:59PM | 21 | who are going to rely upon Dr. Kopreski's analysis. |
| 3:59PM | 22 | And what's going to be left with the jury is |
| 3:59PM | 23 | that everything from 316 -- I know I talk fast -- TAX316 has |
| 3:59PM | 24 | been given to the FDA when nobody -- and I said this in |
| 3:59PM | 25 | hearings, and I can say it again -- nobody, other than people |

OFFICIAL TRANSCRIPT

1   in this lawsuit, have heard about Dr. Kopreski's analysis.  And
2   what's going to be left with the jury is, is that everything
3   including that analysis has been --
4            THE COURT:  You weren't on the phone yesterday
5   afternoon.
6            MR. MICELI:  No.  You only wanted one talker, I
7   think.
8            THE COURT:  Well, go talk to them about that.  I made
9   it very clear that that was fodder for cross-examination of the
10  experts that are going to be called live that relied on
11  Kopreski's analysis.  Because I said you can't have people rely
12  on data and then say -- I had this conversation yesterday.
13  We're going to clear it up.
14           MR. COFFIN:  Thank you, Judge.
15           THE COURT:  I'm not sure I want to give an
16  instruction on anything.  If I do, it will be tomorrow, and
17  it's the kind of thing that -- unlike you all, I like to
18  sometimes just --
19           MR. MICELI:  I understand, Your Honor.  With what
20  we've -- with what's been argued to the jury already, we feel
21  that it does open the door for the DDMAC letter.  They've
22  talked about --
23           THE COURT:  I will look at the DDMAC letter.  But let
24  me tell you something, I am very -- you know, I have to think
25  about all of this.

OFFICIAL TRANSCRIPT

| 4:01PM | 1 | MR. MICELI:  Thank you. |
| 4:01PM | 2 | THE COURT:  And what I will tell you is, if I give an |
| 4:01PM | 3 | instruction -- it is never my intent when I instruct a jury |
| 4:01PM | 4 | mid-trial that they say, "Oh, my gosh.  There was this huge |
| 4:01PM | 5 | error, and the judge is already" -- and that is not what I want |
| 4:01PM | 6 | to do. |
| 4:01PM | 7 | If I determine, after thinking about it tonight, |
| 4:01PM | 8 | that I need to give them some instruction to assist them in |
| 4:01PM | 9 | following the evidence, it will be something to the effect of |
| 4:02PM | 10 | state law obligations, and that you -- you know, remain with |
| 4:02PM | 11 | the manufacturer and they're not part of the FDA's obligation. |
| 4:02PM | 12 | MR. MICELI:  The FDA's not on trial here. |
| 4:02PM | 13 | THE COURT:  Well, I'm not going to say that. |
| 4:02PM | 14 | MR. MICELI:  I would like you to say it, Your Honor. |
| 4:02PM | 15 | THE COURT:  Well, I'm sure there's a lot you would |
| 4:02PM | 16 | like me to say.  But let me tell you something, I'm the one |
| 4:02PM | 17 | person they absolutely listen to. |
| 4:02PM | 18 | So when I talk, I want to be sure that it is not |
| 4:02PM | 19 | something that's prejudicial to either party and it is for the |
| 4:02PM | 20 | clear administration of this trial.  So I'm not going to do |
| 4:02PM | 21 | anything lightly, and I'm certainly not going to give |
| 4:02PM | 22 | instructions mid-trial lightly. |
| 4:02PM | 23 | And I've got -- I have to think about it.  But I |
| 4:02PM | 24 | will tell you, as to the others, I'll look at the DDMAC letter, |
| 4:02PM | 25 | that is the only thing -- and the reason why I could go right |

| | | |
|---|---|---|
| 4:02PM | 1 | to it was because it hit me at the time.  I said I'm not sure. |
| 4:02PM | 2 | Ms. Sastre. |
| 4:02PM | 3 | MS. SASTRE:  Yes, ma'am. |
| 4:03PM | 4 | THE COURT:  I mean it when I say I do not believe |
| 4:03PM | 5 | that there was an intent -- |
| 4:03PM | 6 | MS. SASTRE:  Thank you.  I appreciate that, Judge. |
| 4:03PM | 7 | It means a lot to me. |
| 4:03PM | 8 | THE COURT:  -- to overrule -- to bypass my |
| 4:03PM | 9 | instruction, but it better not happen again. |
| 4:03PM | 10 | MS. SASTRE:  Thank you.  Okay. |
| 4:03PM | 11 | THE COURT:  It's their first day.  I'd like to get |
| 4:03PM | 12 | them out of here by 5:00. |
| 4:03PM | 13 | MR. COFFIN:  Okay.  Let me see because -- we're |
| 4:03PM | 14 | talking about logistics. |
| 4:03PM | 15 | You can stay up, Jon. |
| 4:03PM | 16 | MR. STRONGMAN:  Thank you. |
| 4:03PM | 17 | THE COURT:  I like to get them out of here on their |
| 4:03PM | 18 | first day by 5:00 because people have to go home and work out |
| 4:03PM | 19 | other logistics. |
| 4:03PM | 20 | MR. COFFIN:  We have one video that's about 15, |
| 4:03PM | 21 | 20 minutes. |
| 4:03PM | 22 | THE COURT:  How long is your witness? |
| 4:03PM | 23 | MR. COFFIN:  They still want to put an argument on |
| 4:03PM | 24 | the record -- I don't mean to be making your arguments -- about |
| 4:03PM | 25 | the exhibits.  So that's going to take -- |

OFFICIAL TRANSCRIPT

4:03PM  1          **MR. STRONGMAN:**  It shouldn't take.  I don't know

4:03PM  2    anything about it.

4:03PM  3          **THE COURT:**  Can we take that witness live, or is that

4:04PM  4    a problem for you?

4:04PM  5               Go talk to your people because that might be the

4:04PM  6    way, and then we can deal with the exhibits afterward.

4:04PM  7          **MR. COFFIN:**  But if we do the live witness, we want

4:04PM  8    to be sure we're going to finish her today.  So we need to know

4:04PM  9    how long you think your cross will be, approximate.  I know you

4:04PM  10   don't know --

4:04PM  11         **THE COURT:**  Do you think it's going to be an hour

4:04PM  12   cross?

4:04PM  13         **MR. STRONGMAN:**  If they put her on for 10 or

4:04PM  14   15 minutes, no.

4:04PM  15         **MR. COFFIN:**  No, no.  That was Polizzano.  Now we're

4:04PM  16   talking about Avila.  We'll probably have her on for about

4:04PM  17   45 minutes.

4:04PM  18         **THE COURT:**  Does this need to be on the record?

4:04PM  19         **MR. COFFIN:**  No.

4:04PM  20         **THE COURT:**  You can stop.

4:04PM  21                   **(OFF THE RECORD)**

4:04PM  22         (WHEREUPON, the following proceedings were held in

4:04PM  23   open court.)

4:07PM  24         **THE COURT:**  All right.  Let's call the jury back in.

4:07PM  25               Do we have a bailiff?

OFFICIAL TRANSCRIPT

4:07PM    1         **MS. SASTRE:**  Are we doing video or live witness?

4:07PM    2         **THE COURT:**  Video.

4:07PM    3         **MS. SASTRE:**  Okay.  The not knowing was getting

4:07PM    4  exciting there for a minute.

4:08PM    5         **MR. MOORE:**  We have two exhibits that they're going

4:08PM    6  to offer on this witness.

4:08PM    7         **THE COURT:**  We're going to do that, yes, because I

4:08PM    8  want to get the jury -- if we're finished with them, I want to

4:08PM    9  send them home and you can argue this after.

4:08PM   10         **MR. RATLIFF:**  Okay.

4:09PM   11         **THE DEPUTY CLERK:**  All rise.

4:09PM   12       (WHEREUPON, the jury entered the courtroom.)

4:09PM   13         **THE COURT:**  All jurors are present.  Court's back in

4:09PM   14  session.  You may be seated.

4:09PM   15         Mr. Nolen, please call your first witness.

4:09PM   16         **MR. NOLEN:**  Yes, Your Honor.  Rand Nolen.  I'm one of

4:09PM   17  the lawyers for Barbara Earnest.

4:09PM   18         Ms. Earnest calls her first witness, Frances

4:09PM   19  Polizzano, a Sanofi employee.  This is a videotaped deposition,

4:09PM   20  and the excerpt is 14 minutes.

4:09PM   21         **THE COURT:**  Okay.  Members of the jury, you're about

4:09PM   22  to see a video of testimony that was given during a deposition.

4:09PM   23         At a deposition, a witness answers questions

4:10PM   24  under oath in advance of trial.  Under some circumstances, a

4:10PM   25  witness cannot be present to testify from the witness stand,

4:10PM   1    and that witness' testimony will be presented to you in the

4:10PM   2    form of a deposition.

4:10PM   3                  As I said, sometime before this trial, attorneys

4:10PM   4    representing the parties in this case questioned this witness

4:10PM   5    under oath.  A court reporter was present and recorded the

4:10PM   6    testimony, and a videographer was present as well.

4:10PM   7                  The questions and answers will now be presented

4:10PM   8    to you by video.  This deposition testimony is entitled to the

4:10PM   9    same consideration and is to be judged by you as to credibility

4:10PM   10   as if the witness had been present and had testified from the

4:10PM   11   witness stand in court.

4:10PM   12                  Because this testimony is being presented by

4:10PM   13   video, it may sometimes appear choppy.  The parties have edited

4:10PM   14   the videos and deleted portions of it due to time constraints,

4:10PM   15   and, in part, due to some objections that have been sustained

4:11PM   16   by the Court.

4:11PM   17                  So I'm going to ask you now, as I've stated

4:11PM   18   earlier, you should consider this testimony as you would

4:11PM   19   consider any other testimony presented by the parties.

4:11PM   20                  Please proceed.

4:11PM   21                  (WHEREUPON, the videotaped deposition of **Frances**

4:11PM   22   **Polizzano** was played.)

4:11PM   23   **Q.**   Could you state your name for the record, please?

4:11PM   24   **A.**   Fran Polizzano.

4:11PM   25   **Q.**   And are you currently employed?

OFFICIAL TRANSCRIPT

| | | |
|---|---|---|
| 4:11PM | 1 | **A.**   Yes. |
| 4:11PM | 2 | **Q.**   And by whom are you currently employed? |
| 4:11PM | 3 | **A.**   By Sanofi. |
| 4:11PM | 4 | **Q.**   All right.  And in what capacity are you employed there |
| 4:11PM | 5 | currently? |
| 4:11PM | 6 | **A.**   I'm in regulatory affairs.  And, currently, I'm in the |
| 4:11PM | 7 | labeling department, working on consumer health products. |
| 4:11PM | 8 | **Q.**   Do you have a title? |
| 4:11PM | 9 | **A.**   Associate director. |
| 4:11PM | 10 | **Q.**   Do you have a full title of your job? |
| 4:11PM | 11 | **A.**   That's -- it's associate director, labeling manager. |
| 4:12PM | 12 | **Q.**   Okay.  Are you a senior manager on oncology products? |
| 4:12PM | 13 | **A.**   I was.  Not now, but I was. |
| 4:12PM | 14 | **Q.**   Okay.  When were you a senior manager for oncology |
| 4:12PM | 15 | products at Sanofi in the U.S. regulatory affairs department? |
| 4:12PM | 16 | **A.**   From June of 2013 until probably October of 2016. |
| 4:12PM | 17 | **Q.**   And then in October of 2016 your job changed? |
| 4:12PM | 18 | **A.**   Within my department, I moved to support cardiovascular |
| 4:12PM | 19 | products. |
| 4:12PM | 20 | **Q.**   And how long have you been with the company? |
| 4:12PM | 21 | **A.**   Since 2000, May 2000. |
| 4:12PM | 22 | **Q.**   All right.  And you have a doctorate degree? |
| 4:13PM | 23 | **A.**   A PharmD, yes. |
| 4:13PM | 24 | **Q.**   All right.  Do you agree with me that a label must contain |
| 4:13PM | 25 | language that accurately informs the prescribing physician as |

OFFICIAL TRANSCRIPT

4:13PM   1   to common adverse events?

4:13PM   2   A.   Yes, I agree.

4:13PM   3   Q.   A drug manufacturer must warn about common side effects

4:13PM   4   that were known to the manufacturer at the time of

4:13PM   5   distribution?

4:13PM   6   A.   Yes, I would agree.

4:13PM   7   Q.   If a drug manufacturer fails to warn about common side

4:13PM   8   effects that were known at the time of distribution, then the

4:13PM   9   drug manufacturer's warning is inadequate?

4:13PM   10   A.   I mean, I would agree with that.

4:13PM   11   Q.   Do you agree that a drug manufacturer must make sure that

4:13PM   12   its labeling continues to reflect the current knowledge

4:13PM   13   concerning common risks posed by its drug?

4:14PM   14   A.   Yes.  And we -- companies do that by, again, submitting

4:14PM   15   reports where they're continually monitoring the product to the

4:14PM   16   agency.

4:14PM   17   Q.   Sure.  Do you agree that a drug manufacturer must provide

4:14PM   18   informative and accurate information in its label to

4:14PM   19   effectively communicate with doctors?

4:14PM   20   A.   Yes.  So we continue to -- the health -- manufacturers

4:14PM   21   continue to monitor for their products, and then based on those

4:14PM   22   assessments, they'll make a determination on whether a label

4:14PM   23   needs to be updated.  And they could propose to the FDA a

4:14PM   24   labeling update.

4:14PM   25           Having said that, it's up to the agency to make the

OFFICIAL TRANSCRIPT

| | | |
|---|---|---|
| 4:14PM | 1 | final decision.  They have the final say on what is in the |
| 4:14PM | 2 | USPI. |
| 4:15PM | 3 | **Q.**   Do you agree that a drug manufacturer must provide |
| 4:15PM | 4 | informative and accurate information in its label to |
| 4:15PM | 5 | effectively communicate with doctors? |
| 4:15PM | 6 | **A.**   Yes, and they do that by constant monitoring of the |
| 4:15PM | 7 | product.  You know, the label is a living document that is |
| 4:15PM | 8 | constantly changing over its life -- life cycle. |
| 4:15PM | 9 | **Q.**   Under the "Frequency of Adverse Drug Reaction" section, do |
| 4:15PM | 10 | you agree with me that the incidents of adverse event that |
| 4:15PM | 11 | occurs in -- in 1 percent to less than 10 percent of patients |
| 4:15PM | 12 | that utilize the drug would be characterized as a common or |
| 4:15PM | 13 | frequent adverse drug reaction? |
| 4:15PM | 14 | **A.**   Yes, according to this document. |
| 4:15PM | 15 | **Q.**   Good evening, Fran.  How are you? |
| 4:15PM | 16 | **A.**   Good. |
| 4:15PM | 17 | **Q.**   And there were a lot of questions about safety signal |
| 4:16PM | 18 | detection and sources for safety signal detection. |
| 4:16PM | 19 |         Do you remember that? |
| 4:16PM | 20 | **A.**   Yes. |
| 4:16PM | 21 | **Q.**   Okay.  Who would be responsible at Sanofi for safety |
| 4:16PM | 22 | signal detection? |
| 4:16PM | 23 | **A.**   That would be our safety group. |
| 4:16PM | 24 | **Q.**   And who would be responsible at Sanofi for evaluating the |
| 4:16PM | 25 | safety or side effects or potential side effects of a product? |

OFFICIAL TRANSCRIPT

4:16PM  1    **A.**   The global safety officer for the product.

4:16PM  2    **Q.**   Okay.  And who at Sanofi would perform the analysis of

4:16PM  3    safety information related to a product such as Taxotere?

4:16PM  4    **A.**   It would be within the safety group and sort of reviewed

4:16PM  5    and approved by the global safety officer.

4:16PM  6    **Q.**   And who at Sanofi would be responsible or have the

4:16PM  7    function of evaluating safety information and potentially

4:17PM  8    proposing or determining whether such safety information should

4:17PM  9    go in a product label?

4:17PM  10   **A.**   Our global safety officer.

4:17PM  11   **Q.**   Okay.  Fran, in your capacity at Sanofi, would you ever be

4:17PM  12   the person responsible for making determinations of safety

4:17PM  13   analysis, safety signal detection, what information should or

4:17PM  14   should not go in a particular product label?

4:17PM  15   **A.**   No, I would not.

4:17PM  16   **Q.**   And earlier today, you referred to -- correct me if I'm

4:17PM  17   wrong.  I recall you referring to the label, like the Taxotere

4:17PM  18   label, for example, as being a living document.

4:17PM  19        Do you remember saying that?

4:17PM  20   **A.**   Yes.

4:17PM  21   **Q.**   Tell me what you mean by the label being a living

4:17PM  22   document.

4:17PM  23   **A.**   Well, as the drug develops, obviously, we have several

4:17PM  24   indications for it.  So over time, as those studies were being

4:17PM  25   submitted to the agency, we were evolving, not only from an

OFFICIAL TRANSCRIPT

1    efficacy perspective, but we were also continually monitoring

2    the safety profile of the product.

3           So as safety signals came up, we would also address

4    those from, like, a post-marketing perspective as well.

5    Q.   Okay.  So a drug label, like Taxotere's label, is always

6    in the process of being updated and revised; is that correct?

7    A.   That is correct.

8    Q.   What does the term "alopecia" mean to you, as we sit here,

9    as reflected historically in the Taxotere label?

10   A.   "Alopecia" is a term that sort of encompasses a range

11   of -- ranging from -- anything from you have nothing to

12   permanent.

13          So it could be transient.  It could be temporary.  It

14   could be persisting.  It's the full spectrum of hair loss.

15   Q.   Okay.  And is -- in your experience, Fran, in the

16   regulatory department, is it common that, over the life cycle

17   of a drug, that the language -- the safety language may change

18   in a label?

19   A.   Yes, that's very common.  In the beginning, when we first

20   start with the labels, they're based on clinical studies, which

21   is for a finite period of time.  But over time, we start

22   getting information from either other studies or also from

23   post-marketing use.  And so it's an evolving reflection of the

24   safety profile.

25   Q.   You're aware of -- being in the pharmaceutical world,

OFFICIAL TRANSCRIPT

1   you're aware of the many avenues available to Sanofi to promote

2   the use of its products, are you not?

3   A.   In what regard?

4   Q.   TV, radio, magazine, sales representatives, MIS, leaflets,

5   pamphlets --

6   A.   I can't --

7   Q.   I'm sorry.  I'm not done.

8          -- convention booths, appearances, dinners,

9   presentations.

10          You've heard of -- in the pharmaceutical world that

11  you live in and you've been employed in for the last 17 years,

12  you certainly are aware of the various ways that a drug company

13  can promote the use of its product; would you agree?

14  A.   I'm sorry.  You made the list, but -- what is the final

15  question again?

16  Q.   You, based upon your experience working for the

17  pharmaceutical industry for the last 17 years, are aware of the

18  different ways that a pharmaceutical company has available to

19  it to promote the use of its products; correct?  That's it.

20  A.   There are many avenues, I suppose.

21  Q.   If Sanofi felt it was important for people to know about

22  the fact that its product causes permanent, irreversible,

23  forever hair loss in a segment of the user population, if they

24  wanted to get that information out there, they could do it,

25  couldn't they?

OFFICIAL TRANSCRIPT

4:21PM  1   **A.**   They could get all kinds of information out.  There's -- I

4:21PM  2   mean, I know you're focused on this -- the permanent alopecia,

4:21PM  3   but there are many other side effects that are -- also need to

4:22PM  4   be communicated.

4:22PM  5   **Q.**   Let's move on, then, to this exhibit, No. 23.

4:22PM  6           23 is a patient pamphlet that was produced by and

4:22PM  7   delivered by Sanofi-Aventis, and you can see on page 3 of the

4:22PM  8   document Sanofi Bates label No. 01038472.

4:22PM  9           Do you see that?

4:22PM  10  **A.**   Where are you?  Page 3?

4:22PM  11  **Q.**   And one of the side effects that is listed in the third

4:22PM  12  group of side effects, the second down is alopecia.

4:22PM  13          Do you see that?

4:22PM  14  **A.**   Yes, I do.

4:22PM  15  **Q.**   Okay.  If you'll turn to the last page, I've provided you

4:22PM  16  with a copy of that tear-out.

4:22PM  17          You see it says "alopecia hair loss"?

4:23PM  18  **A.**   Yes.

4:23PM  19  **Q.**   All right.  And that's Bates label 01038474.

4:23PM  20          Now, under "What is alopecia?" can you read the --

4:23PM  21  well, I'll read it to you if you'd like.

4:23PM  22          "What is alopecia?  Alopecia is another word for hair

4:23PM  23  loss or thinning of hair."  Next sentence:  "it is a common,

4:23PM  24  yet temporary, side effect of some cancer medicines."

4:23PM  25          Do you see that?

OFFICIAL TRANSCRIPT

4:23PM  1    **A.**    Yes.

4:23PM  2    **Q.**    Do you know the definition of "temporary"?

4:23PM  3    **A.**    Yes.

4:23PM  4    **Q.**    What is it?

4:23PM  5    **A.**    That the hair would return.

4:23PM  6    **Q.**    Right.  We'll talk about that section, if you'd like to.

4:23PM  7              But the first section you see -- by your own

4:24PM  8    definition, "temporary" means it's coming back; right?  That's

4:24PM  9    what you testified to a minute ago; right?

4:24PM  10   **A.**    I don't have the context -- I mean, it says "What is

4:24PM  11   alopecia?"  And it says -- I would have to see these references

4:24PM  12   that they're referring to to understand if -- these statements.

4:24PM  13   I can't validate these statements.

4:24PM  14   **Q.**    On the left side, the column says, "What is alopecia?"

4:24PM  15              It says that it's temporary; correct?

4:24PM  16              And on the right side, it tells you when it's going

4:24PM  17   to grow back.  And what it says is, "If you lose your hair, it

4:24PM  18   will usually grow back after the treatment is over, but it may

4:24PM  19   grow back while you are still having treatment."

4:24PM  20   **A.**    But it's not definitive.  It doesn't say -- it's not

4:24PM  21   guaranteeing.  It's not saying that, for sure, you're going to

4:24PM  22   have hair grow back.

4:24PM  23   **Q.**    And then the next part says, "When my hair grows back."

4:24PM  24              Do you see that?

4:25PM  25   **A.**    It's very difficult for me to comment on this document.

OFFICIAL TRANSCRIPT

4:25PM   1    I've never seen this admit.

4:25PM   2              MR. COFFIN:  Your Honor, may we approach?

4:25PM   3              THE COURT:  Yes.

4:25PM   4              (WHEREUPON, the following proceedings were held at

4:25PM   5    the bench.)

4:25PM   6              MR. COFFIN:  As we discussed, we believe that she

4:25PM   7    opened the door to that 2015 e-mail.

4:25PM   8              THE COURT:  We're going to talk about that.  I

4:25PM   9    thought -- you mean Dr. Polizzano?

4:25PM  10              MR. COFFIN:  Correct.

4:25PM  11              MR. MOORE:  It's somebody else's testimony; right?

4:26PM  12    It's Freedman's testimony you wanted it in.

4:26PM  13              MR. COFFIN:  No, no.  This involves -- you asked to

4:26PM  14    see the e-mails this morning.

4:26PM  15              THE COURT:  I don't think that's --

4:26PM  16              MR. COFFIN:  Okay.

4:26PM  17              THE COURT:  We're not there yet.

4:26PM  18              MR. COFFIN:  Okay.

4:26PM  19              THE COURT:  Have a seat.

4:26PM  20              MR. COFFIN:  Do you want us to stop for the day?

4:26PM  21              THE COURT:  Yes.  Go sit down.

4:26PM  22              MR. COFFIN:  Thank you.

4:26PM  23              (WHEREUPON, the following proceedings were held in

4:26PM  24    open court.)

4:26PM  25              THE COURT:  Members of the jury, we're going to

OFFICIAL TRANSCRIPT

recess a little bit early today so that you'll have an opportunity to go home and advise who you need to advise that you're serving on a jury.

We are going to resume tomorrow morning at 8:30. So I'm going to ask you to be here at 8:30, and we will try to close about 5:00-ish each day.  But I will tell you, sometimes we're very close and we're taking a witness, and we might go a little bit over.  But we will plan 8:30 to 5:00 each day.

Now, before you leave, I'm going to admonish you that you should not discuss this case amongst yourselves or with anyone else.

Let me tell you what I do know.  When you get home this evening, whether it's a spouse, a significant other, or your friend that stops by for coffee, they are going to say, "You can just tell me."

Well, you can tell them, "The judge clearly and unequivocally ordered that I cannot discuss this case with you."

Okay.  So we'll see that.  But the court's going to be at recess until 8:30 tomorrow morning.

Please leave your tablets on your seat.  They will be collected by my staff.  No one will look at whatever notes you have taken.

I want to remind you that when you arrive tomorrow morning, it's probably better if you go directly into

OFFICIAL TRANSCRIPT

4:28PM  1   the jury room because you don't want to run into -- make any

4:28PM  2   contact with anybody associated with this case.

4:28PM  3             Court's at recess until 8:30 tomorrow morning.

4:28PM  4             **THE DEPUTY CLERK:**  All rise.

4:28PM  5             (WHEREUPON, the jury exited the courtroom.)

4:28PM  6             **THE COURT:**  Okay.  I'm listening, Mr. Nolen.

4:28PM  7             **MR. NOLEN:**  Your Honor, in conjunction with the video

4:28PM  8   that just played, the Polizzano video, plaintiffs move to admit

4:29PM  9   the two exhibit s that were displayed in the video, Plaintiff's

4:29PM  10  Exhibit 192 and Plaintiff's Exhibit 556.

4:29PM  11            **THE COURT:**  Okay.  Is there an objection,

4:29PM  12  Mr. Ratliff?

4:29PM  13            **MR. RATLIFF:**  Yes, Your Honor.  May I approach for

4:29PM  14  the objection?

4:29PM  15            **THE COURT:**  Sure.

4:29PM  16            **MR. RATLIFF:**  Your Honor, Sanofi objects to

4:29PM  17  Plaintiff's Trial Exhibit No. 192 on 401 and 402 grounds as

4:29PM  18  irrelevant; on 403 as misleading and unfairly prejudicial in

4:29PM  19  that there was no testimony from this witness, nor will there

4:29PM  20  be any testimony from any witness that Dr. Carinder was ever

4:29PM  21  provided that by Sanofi or ever relied on it with respect to

4:29PM  22  his treatment of Ms. Earnest.

4:29PM  23            The last one would be 602, foundation.  There is

4:29PM  24  no testimony -- or there was no testimony now that

4:29PM  25  Ms. Polizzano had ever seen that particular document or had the

OFFICIAL TRANSCRIPT

1 kind of personal knowledge to testify and opine on what that
2 document meant.
3           As it relates to our objection to Plaintiff's
4 Trial Exhibit 556, again, irrelevant under 401, 402, that was a
5 World Health Organization grading scale, et cetera, and lack of
6 foundation.  Again, this was a document that she was not
7 familiar with, had no personal knowledge to testify to.
8           And then also, Your Honor, in particular for
9 this one, this is just one where we have an objection as it
10 relates to completeness.  That's a 2-page document of a 96-page
11 document.  So if that document -- that exhibit is going to go
12 to the jury for their review, we would request that the entire
13 document be received by the jury.
14           **THE COURT:**  Mr. Nolen?
15           **MR. NOLEN:**  Your Honor, my understanding and belief
16 is the Court previously considered these exhibits in ruling on
17 the objections to the video depositions.
18           **THE COURT:**  I've already ruled on the objections, but
19 I believe I have previously said that the entire document would
20 come in even though you only referenced those two pages.
21           **MR. NOLEN:**  Okay.  The only thing that happens then
22 is the entire document is rather voluminous.  So it obscures
23 the information that was only referred to as part of the video
24 deposition.
25           So most of the document wasn't even referenced

OFFICIAL TRANSCRIPT

| | | |
|---|---|---|
| 4:31PM | 1 | by the witness; therefore, it is somewhat confusing to the jury |
| 4:31PM | 2 | to put in the entire document. |
| 4:31PM | 3 | THE COURT:  I appreciate that.  It's coming in. |
| 4:31PM | 4 | MR. RATLIFF:  Do I need to respond? |
| 4:31PM | 5 | THE COURT:  No.  I think I already said it. |
| 4:31PM | 6 | MR. RATLIFF:  Thank you, Your Honor. |
| 4:31PM | 7 | THE COURT:  The entire document's coming in. |
| 4:31PM | 8 | Objections raised by defendant are overruled. |
| 4:31PM | 9 | I think we need to lay some ground rules. |
| 4:31PM | 10 | Mr. Moore, it looks like you have something to |
| 4:31PM | 11 | say. |
| 4:31PM | 12 | MR. MOORE:  I did.  I can wait until after the ground |
| 4:31PM | 13 | rules or before.  It was a housekeeping matter as it relates to |
| 4:31PM | 14 | the video deposition. |
| 4:31PM | 15 | The only evidence of what testimony you |
| 4:31PM | 16 | permitted in and what testimony you excluded are the Excel |
| 4:32PM | 17 | spreadsheets you gave back to us that have your handwritten |
| 4:32PM | 18 | rulings on it.  So our thought was to just put that into the |
| 4:32PM | 19 | record to memorialize what's in and what's out. |
| 4:32PM | 20 | THE COURT:  I think that's an appropriate way to do |
| 4:32PM | 21 | that.  I'm just hoping against all hope that if another court |
| 4:32PM | 22 | looks at this, they can understand my handwriting.  But you |
| 4:32PM | 23 | managed to do it, so I guess that's fine. |
| 4:32PM | 24 | MR. MOORE:  Thank you, Your Honor. |
| 4:32PM | 25 | THE COURT:  Okay.  Ground rules.  I had |

OFFICIAL TRANSCRIPT

1    conversations, and I have to tell you -- I guess this needs to
2    be on the record.
3               Over the course of the weekend, we had multiple
4    telephone conferences.  And I believe they may have started
5    toward the end of last week.  I don't know.  I'm losing track
6    of time.
7               But at some point, I said I only want to talk to
8    one person.  And that was because we were having these
9    conferences primarily on the phone.  And there were just too
10   many people, and everyone felt the need to voice their opinion
11   or their personal argument.  And so at some point, I limited it
12   to one person per side.
13              And I will tell you, if I've already had the
14   conversation, I really don't feel like I should have to have
15   the same conversation with every member of the team.  It was my
16   belief that if I instructed one person as to how we were going
17   handle various things, it was that person's responsibility to
18   advise you.
19              So if I -- if you bring something to me, I'll
20   tell you, "Go talk to somebody else.  I've already had this
21   conversation."  And if it becomes an ongoing problem, you will
22   be assessed the time for me having to relay the same thing I've
23   already said on multiple occasions.
24              With that, I would like to see -- has plaintiff
25   shared witness lists for tomorrow?

OFFICIAL TRANSCRIPT

4:34PM 1      **MR. COFFIN:**  Yes, Your Honor.  We've shared that.
4:34PM 2  But it will likely be altered a bit because we had witnesses
4:34PM 3  today that will just carry over or be shifted.  But, yes, they
4:34PM 4  have that.
4:34PM 5      **THE COURT:**  Okay.  All right.  And what I would like
4:34PM 6  to do is I have received somewhere the objections to the
4:34PM 7  exhibits that intend to be used.
4:34PM 8          I'd like to have a brief conference with the
4:34PM 9  parties, perhaps at 8:00 tomorrow morning, to see if we can
4:34PM 10  resolve some of those objections.
4:34PM 11          Now, I know, with live witnesses, everything is
4:34PM 12  contextual.  And it may be that -- you know, my first thought
4:34PM 13  is that it should not come in; but then after I hear the
4:34PM 14  testimony, I will agree that it certainly has bearing, and it
4:35PM 15  may come in.  But perhaps we can talk through many of those.
4:35PM 16      **MR. STRONGMAN:**  Your Honor, may I just say something
4:35PM 17  briefly?  Jon Strongman.
4:35PM 18          The good news is I think the objections that
4:35PM 19  you've received for a live witness was just Ruth Avila.  And
4:35PM 20  the one document at issue -- there was a couple of
4:35PM 21  demonstratives, but we can deal with that later.
4:35PM 22          The one document at issue, we've already
4:35PM 23  addressed.  It was the same document that was used in
4:35PM 24  Dr. Polizzano's deposition.  So I don't think there's going to
4:35PM 25  be any need for your time on that document.

4:35PM  1      **THE COURT:**  Right.

4:35PM  2      **MR. STRONGMAN:**  We will have Dr. Kessler tomorrow, I

4:35PM  3  believe.  We'll certainly get their list of documents.  Fingers

4:35PM  4  crossed we don't have any objections, but that would be

4:35PM  5  pie-in-the sky, I think.  But we will get those to you as soon

4:35PM  6  as we can.

4:35PM  7      **THE COURT:**  Okay.  So what we intend tomorrow is

4:35PM  8  Ms. Avila and Dr. Kessler?

4:35PM  9      **MR. NOLEN:**  Yes.  He would be our second witness of

4:35PM  10  the day after Ms. Avila.

4:36PM  11      I will represent to the Court we have -- I

4:36PM  12  believe there's less than seven documents that we're going to

4:36PM  13  utilize with Dr. Kessler.

4:36PM  14      **THE COURT:**  Well, I received, very frankly, with

4:36PM  15  Dr. Kessler, there was a separate pretty large binder with

4:36PM  16  exhibits, and there were some things that I allowed you to talk

4:36PM  17  about but the document didn't come in, specifically, those

4:36PM  18  individualized adverse event reports.

4:36PM  19      I was allowing you to say, this is the date, but

4:36PM  20  I didn't allow the documents to come in unless you all agreed

4:36PM  21  to that.  And I think what you got in the front was a sticky

4:36PM  22  note that said "15 in.  16 out.  Number 2 in.  2 out."  I've

4:36PM  23  already done that.

4:36PM  24      **MR. NOLEN:**  You're actually talking about -- I

4:36PM  25  believe, Your Honor, you're talking about Dr. Kopreski, which

OFFICIAL TRANSCRIPT

4:36PM 1    is a different --

4:36PM 2              THE COURT:  Kopreski.

4:36PM 3              MR. NOLEN:  Yeah, that's a different --

4:36PM 4              THE COURT:  I was --

4:36PM 5              MR. NOLEN:  -- a different individual.

4:36PM 6              THE COURT:  See what you're all doing to me?

4:36PM 7              MR. NOLEN:  It's been a long weekend for all of us,

4:37PM 8    Your Honor.  I promise you.

4:37PM 9              THE COURT:  I'm sure it has.  Okay.

4:37PM 10             MR. STRONGMAN:  Thank you.

4:37PM 11             THE COURT:  All right.  So Dr. Kessler, yes, I knew

4:37PM 12   that.

4:37PM 13             MR. STRONGMAN:  Thank you, Your Honor.

4:37PM 14             THE COURT:  All right.  Thank you.  But 8:00 to

4:37PM 15   discuss those exhibits.  Thank you.

4:37PM 16             THE DEPUTY CLERK:  All rise.

4:37PM 17             THE COURT:  Court's at recess until 8:30.

4:37PM 18             It is -- perhaps what we can do for the exhibits

4:37PM 19   tomorrow is just meet in chambers at 8:00 around my conference

4:37PM 20   room table.  That might be an easier way to do that.

4:37PM 21             Okay.  Is there anything else you need from me?

4:37PM 22             MR. NOLEN:  I don't have anything, Your Honor.

4:37PM 23             MR. SCHANKER:  Nothing from the plaintiff, Your

4:37PM 24   Honor.

4:37PM 25             MR. MOORE:  Run.  Run.

OFFICIAL TRANSCRIPT

1    **THE DEPUTY CLERK:**  All rise.

2    (WHEREUPON, the proceedings were concluded.)

3    *****

4    <u>CERTIFICATE</u>

5    I, Jodi Simcox, RMR, FCRR, Official Court Reporter

6    for the United States District Court, Eastern District of

7    Louisiana, do hereby certify that the foregoing is a true and

8    correct transcript, to the best of my ability and

9    understanding, from the record of the proceedings in the

10   above-entitled and numbered matter.

11

12

13                    <u>s/Jodi Simcox, RMR, FCRR</u>
                     Jodi Simcox, RMR, FCRR
14                    Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

OFFICIAL TRANSCRIPT