08:48:06

1                         UNITED STATES DISTRICT COURT

2                        EASTERN DISTRICT OF LOUISIANA

3

4

5    IN RE:   TAXOTERE (DOCETAXEL)
              PRODUCTS LIABILITY            Docket No.: 16-MD-2740
6             LITIGATION                    Section "H(5)"
                                            September 17, 2019
7                                           New Orleans, Louisiana

8    *Relates To*:  *Barbara Earnest*,
     *Case No.: 16-CV-17144*

9

10   * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

11

12                        DAY 2, MORNING SESSION
                   TRANSCRIPT OF JURY TRIAL PROCEEDINGS
13          HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
                     UNITED STATES DISTRICT JUDGE

14

15   APPEARANCES:

16   For the Plaintiffs:          Barrios, Kingsdorf & Casteix, LLP
                                   BY:  DAWN BARRIOS, ESQ.
17                                 701 Poydras Street
                                   Suite 3650
18                                 New Orleans, Louisiana 70139

19

20   For the Plaintiffs:          Gainsburgh, Benjamin, David,
                                     Meunier & Warshauer, LLC
21                                 BY:  PALMER LAMBERT, ESQ.
                                   2800 Energy Centre
22                                 1100 Poydras Street
                                   New Orleans, Louisiana 70163-2800
23

24

25

                          ***OFFICIAL TRANSCRIPT***

1    APPEARANCES:

2    For the Plaintiffs:          David F. Micelli, LLC.
                                  BY: DAVID F. MICELI, ESQ.
3                                 P. O. Box 2519
                                  Carrolllton, GA 30112
4

5    For the Plaintiffs:          Gibbs Law Group, LLP
                                  BY:  KAREN BARTH MENZIES, ESQ.
6                                 400 Continental Boulevard
                                  6th Floor
7                                 El Segundo, California 90245

8

9    For the Plaintiffs:          Pendley, Baudin & Coffin, LLP
                                  BY:  CHRISTOPHER COFFIN, ESQ.
10                                1100 Poydras Street
                                  Suite 2505
11                                New Orleans, Louisiana 70163

12

13   For the Plaintiffs:          Bachus & Schanker, LLC
                                  BY:  DARIN SCHANKER, ESQ.
14                                BY:  J. KYLE BACHUS, ESQ.
                                  1899 Wynkoop Street
15                                Suite 700
                                  Denver, Colorado 80202
16

17
     For the Plaintiffs:          Fleming, Nolen & Jez, LLP
18                                BY:  RAND P. NOLEN, ESQ.
                                  2800 Post Oak Boulevard
19                                Suite 4000
                                  Houston, Texas 77056.
20

21
     For the Plaintiffs:          Morgan and Morgan
22                                BY:  EMILY C. JEFFCOTT, ESQ.
                                  7010 S. Palafox Street, Suite 95
23                                Pensacola, Florida 32502

24

25

                          *OFFICIAL TRANSCRIPT*

APPEARANCES:

For Sanofi-Aventis U.S.,
LLC and Sanofi US
Services, Inc.:              Irwin Fritchie Urquhart
                              & Moore, LLC
                            BY:  DOUGLAS J. MOORE, ESQ.
                            400 Poydras Street, Suite 2700
                            New Orleans, Louisiana 70130


For Sanofi-Aventis U.S.,
LLC and Sanofi US
Services, Inc.:              Shook Hardy & Bacon, LLP
                            BY:  HARLEY V. RATLIFF, ESQ.
                            BY:  JON A. STRONGMAN, ESQ.
                            2555 Grand Boulevard
                            Kansas City, Missouri 64108


For Sanofi-Aventis U.S.,
LLC and Sanofi US
Services, Inc.:              Shook Hardy & Bacon, LLP
                            BY:  HILDY SASTRE, ESQ.
                            201 Biscayne Boulevard
                            Suite 3200
                            Miami, Florida 33131


Official Court Reporter:    Cathy Pepper, CRR, RMR, CCR
                            Certified Realtime Reporter
                            Registered Merit Reporter
                            500 Poydras Street, Room B-275
                            New Orleans, Louisiana 70130
                            (504) 589-7779
                            Cathy_Pepper@laed.uscourts.gov

Proceedings recorded By mechanical stenography.  Transcript
produced by computer-aided transcription.

*OFFICIAL TRANSCRIPT*

1                           **I N D E X**

2

3                                                                PAGE

4

5    **AMY FREEDMAN** VIDEOTAPED DEPOSITION................... 265

6    **DAVID KESSLER, MD**.................................. 285

7    VOIR DIRE EXAMINATION BY MR. NOLEN................... 286

8    DIRECT EXAMINATION BY MR. NOLEN..................... 302

9    LUNCHEON RECESS...................................... 375

10

07:59:30  11

07:59:30  12

13

14

15

16

17

18

19

20

21

22

23

24

25

*OFFICIAL TRANSCRIPT*

**P-R-O-C-E-E-D-I-N-G-S**

TUESDAY, SEPTEMBER 17, 2019

M O R N I N G   S E S S I O N

(COURT CALLED TO ORDER)


THE DEPUTY CLERK:  All rise.

THE COURT:  Before we bring in the jury, I understand there are objections to the first deposition that you want to put on the record.

MR. MOORE:  Your Honor, good morning.  Douglas Moore on behalf of Sanofi.

Consistent with the objections outlined in the plaintiff's final exhibit list, Sanofi objects to Plaintiff Exhibit No. 175, 177, and 192, using the deposition of Ms. Freedman, and the basis for those are stated in the document previously submitted to the Court.

THE COURT:  Thank you.

I intend to give the instruction to the jury as I've outlined with the additional statement, reminding them that opening statement is not evidence.

Is there is something you want to put on the record?

MR. COFFIN:  Yes, Your Honor.  Chris Coffin on behalf of the plaintiffs.

*OFFICIAL TRANSCRIPT*

08:36:43 1          Your Honor, as we've discussed in your chambers,

08:36:46 2     plaintiffs are seriously concerned about the message that was

08:36:50 3     sent to jury yesterday during Ms. Sastre's opening remarks.

08:36:55 4          Number 1, the way that her opening was portrayed

08:37:01 5     to the -- provided to the jury was clearly argument on multiple

08:37:07 6     levels.

08:37:07 7          Number 2, the way that it was structured, at the

08:37:11 8     beginning of her argument, she informed the jury that they are

08:37:16 9     going to see evidence that the doctors were fully informed and

08:37:20 10    that the FDA was fully informed.

08:37:23 11         She specifically used a sentence, "Now, ladies

08:37:27 12    and gentlemen, in this case, there is not going to be any data

08:37:30 13    or any information from this study, TAX316, that you're going

08:37:37 14    to see that the FDA didn't see."

08:37:39 15         She also said the data and the results of TAX316

08:37:43 16    were given to the FDA, including the permanent hair loss data

08:37:48 17    and, based upon the results of this study, TAX316, the FDA

08:37:52 18    approved the use of Taxotere in this very setting.

08:37:56 19         This is clearly contradictory to what the Court

08:38:01 20    has instructed through Your Honor's ruling on the MIL regarding

08:38:06 21    preemption.  The language in your order specifically says there

08:38:11 22    aren't to be suggestions that the company provided the FDA with

08:38:15 23    all of the relevant information.

08:38:17 24         We are -- we feel strongly that the jury now has

08:38:22 25    this idea that information has been provided to the FDA that,

*OFFICIAL TRANSCRIPT*

08:38:28  1    in fact, wasn't provided to the FDA.

08:38:30  2              We think under the *Albrecht* decision, that your

08:38:33  3    MIL ruling on preemption and -- your ruling on preemption was

08:38:39  4    correct and your MIL ruling was correct as well.  We think

08:38:42  5    that's been violated.

08:38:43  6              We understand the Court is going to give an

08:38:46  7    instruction.  I would like to tender the instruction that we

08:38:53  8    suggest, Your Honor, and we will reserve our thoughts about

08:38:57  9    further moving for any other relief in the future.

08:39:00 10        THE COURT:  Okay.  We've got to get this show on the

08:39:02 11    road.  Thank you.

08:39:07 12              Are we ready?  Let's bring in the jury.

08:39:11 13              That's a proffer.

08:39:21 14              Let's bring in the jury.

08:39:23 15        MS. SASTRE:  Your Honor, is it okay if we have water?

08:39:59 16        MR. NOLEN:  We're going to move to admit an exhibit, so

08:40:03 17    I think he wants to make objections.

08:40:05 18        THE COURT:  He did that.  Those objections have been

08:40:08 19    admitted.

08:40:11 20              (WHEREUPON, at 8:40 a.m., the jury panel enters the

08:40:21 21    courtroom.)

08:40:21 22        THE COURT:  All jurors are present.  Court is back in

08:40:24 23    session.  You may be seated.

08:40:26 24              Members of the Jury, good morning.

08:40:30 25        THE JURY:  Good morning.

*OFFICIAL TRANSCRIPT*

08:40:30  1          THE COURT:  Before we begin today, yesterday I gave you

08:40:35  2  preliminary instructions, and I would like to remind you that

08:40:38  3  the opening statements are not evidence.

08:40:42  4              But in order to assist you in following the

08:40:46  5  evidence, I want to instruct you as follows:  The FDA is a

08:40:52  6  regulatory body of the United States, and Sanofi is a

08:40:57  7  pharmaceutical company.  Pharmaceutical companies are heavily

08:41:00  8  regulated by the FDA.  The FDA, however, does not bear the

08:41:05  9  primary responsibility for creating or updating a drug's label.

08:41:11 10  It is the drug manufacturer who bears the responsibility for

08:41:15 11  the content of its label.  In creating or updating a label, the

08:41:21 12  pharmaceutical companies must comply with regulations of the

08:41:26 13  FDA.

08:41:27 14              Please present your first witness, plaintiffs.

08:41:29 15          MR. NOLEN:  Thank you, Your Honor.  Barbara Earnest

08:41:34 16  calls Amy Freedman, Sanofi global safety officer, and this is a

08:41:40 17  videotaped deposition, Your Honor, and it's 28 minutes.

08:41:43 18          THE COURT:  Okay.  Ladies and gentlemen of the Jury,

08:41:46 19  yesterday I gave you instructions regarding deposition

08:41:50 20  testimony, and as I related to you, at a time earlier than this

08:41:56 21  trial, the witness was placed under oath and questioned by

08:42:00 22  attorneys from both sides, and you will be shown that testimony

08:42:04 23  in court today.  You should consider this testimony and weigh

08:42:09 24  this testimony as you would any other witness.

08:42:11 25              Please proceed.

*OFFICIAL TRANSCRIPT*

08:42:11  1              (WHEREUPON, at this point in the proceedings, the

08:42:11  2      videotaped deposition of AMY FREEDMAN was played.)

08:42:11  3      Q.    Could you state your full name for the record, please.

08:42:22  4      A.    Amy Freedman.

08:42:23  5      Q.    And when did you start working for Sanofi?

08:42:25  6      A.    November 2002.

08:42:26  7      Q.    And when did you stop working for Sanofi?

08:42:30  8      A.    March 25th -- when am I talking -- 2013.

08:42:37  9      Q.    When you first went to work at Sanofi, what was the job

08:42:40 10      title that you held?

08:42:43 11      A.    Global safety officer.

08:42:44 12      Q.    What is a global safety officer?

08:42:49 13      A.    It's a physician who is responsible for the oversight of

08:42:54 14      the safety profile of their assigned products within the global

08:42:58 15      organization.

08:42:58 16      Q.    When you went to work for Sanofi as a global safety

08:43:03 17      officer in 2002, over what drugs were you to be the global

08:43:11 18      safety officer over?

08:43:14 19      A.    I had a number of drugs that I was responsible for, some

08:43:20 20      in more marketed areas -- marketed in more countries than

08:43:26 21      others.

08:43:26 22              So Taxotere is obviously one of the oncology

08:43:29 23      products.  I also worked on developmental products.  I worked

08:43:32 24      on marketed products in -- some in neuroscience, some in

08:43:36 25      infectious disease.

**OFFICIAL TRANSCRIPT**

08:43:38  1    Q.   Well, in 2002, when you went to work as a global safety

08:43:42  2    officer, were you assigned to be the global safety officer

08:43:46  3    responsible for the safety profile for Taxotere?

08:43:49  4    A.   I was transitioning into that role.  There were two other

08:43:56  5    people working on Taxotere at the time.

08:43:56  6    Q.   So by sometime in the --

08:44:00  7    A.   First quarter.

08:44:00  8    Q.   -- the first quarter of 2003, you would have --

08:44:03  9    A.   Yeah.

08:44:03 10    Q.   -- assumed the responsibilities associated with being the

08:44:07 11    global safety officer responsible for the safety profile for

08:44:10 12    Taxotere?

08:44:13 13    A.   Right.

08:44:13 14    Q.   When did you stop working as the global safety officer

08:44:21 15    responsible for the safety profile of Taxotere?

08:44:26 16    A.   March 2010.

08:44:28 17    Q.   Can you -- so Taxotere had more than one global safety

08:44:34 18    officer?

08:44:38 19    A.   It transitioned from a unified organization to the Sanofi

08:44:43 20    model, which was a split by postmarketing and clinical trials.

08:44:49 21    Q.   Can you explain that to me?

08:44:58 22    A.   There are marketed products and there are products that

08:45:09 23    are in development, and there are products that span both

08:45:12 24    active clinical trials and marketed use.  The Sanofi model was

08:45:17 25    to have two global safety officers per product.

*OFFICIAL TRANSCRIPT*

08:45:25  1    Q.    One global safety officer on the postmarketing side, one
08:45:32  2    on the clinical trial side?
08:45:33  3    A.    That's what I said, yes.
08:45:35  4    Q.    I'm just trying to learn as I go.
08:45:39  5    A.    That's okay.
08:45:40  6    Q.    When we talked about the first quarter of 2003, when you
08:45:53  7    became the global safety officer -- or assumed the
08:45:56  8    responsibilities of the global safety officer role for the
08:46:01  9    safety profile of Taxotere, at that point were there two GSOs
08:46:05 10    or just one?
08:46:07 11    A.    There was -- I was in name the global safety officer for
08:46:15 12    Taxotere; however, there were two other physicians working
08:46:18 13    actively on the submissions that were going on.
08:46:19 14    Q.    Okay.  Then, in 2006, when Dr. Palatinsky became a GSO for
08:46:34 15    Taxotere, you also held the title?
08:46:38 16    A.    I was the -- yes, the GSO for postmarketing.
08:46:45 17    Q.    Dr. Palatinsky was the GSO for?
08:46:51 18    A.    Clinical development.
08:46:53 19    Q.    I understand the distinction by title, but tell me what
08:46:58 20    the distinction is or was by substantive job duty.
08:47:04 21    A.    Taxotere is an active clinical development program, and
08:47:10 22    Emanuel was working on the safety of the -- monitoring of the
08:47:14 23    safety of the clinical trials, as well as preparing the
08:47:16 24    regulatory submissions for new indications.
08:47:23 25          The division continued up to the higher levels, so

*OFFICIAL TRANSCRIPT*

08:47:27  1    our managers were also different.

08:47:29  2    Q.    What was your role -- what was the substantive job duties

08:47:33  3    that you undertook in your role as GSO over Taxotere?

08:47:40  4    A.    I dealt with any kind of safety concerns or regulatory

08:47:47  5    concerns regarding the marketed use of the product.

08:47:50  6    Q.    Meaning what?

08:47:56  7    A.    I would prepare the routine regulatory aggregate reports,

08:48:03  8    the global reports, global responses, global position for the

08:48:06  9    PSURs, which are required for the European agency.

08:48:11 10    Q.    During the time frame of 2003, first quarter of 2003, up

08:48:21 11    through, let's say, May of 2006, were you responsible for the

08:48:29 12    individual case safety report reviews?

08:48:36 13    A.    I was responsible for reviewing a portion of them.

08:48:39 14    Q.    Those -- the portion of -- those are called ICSRs; is that

08:48:39 15    right?

08:48:47 16    A.    That's the acronym.

08:48:48 17    Q.    Yes.  So the ICSRs that would come in from a postmarketing

08:48:54 18    unsolicited perspective were your responsibility; is that

08:48:54 19    right?

08:49:00 20    A.    Ultimately.

08:49:01 21    Q.    The clinical side of safety -- once there was a split, the

08:49:08 22    clinical side of safety would have been responsible for

08:49:10 23    reviewing solicited ICSRs; is that right?

08:49:17 24    A.    You got that, yes.

08:49:18 25    Q.    During this time period from first quarter of 2003 up

*OFFICIAL TRANSCRIPT*

08:49:30 1    through 2006, were you responsible for performing aggregate
08:49:40 2    case reviews of unsolicited ICSRs?
08:49:52 3    A.    I'm not -- there is a team of people.  There is a handoff
08:49:57 4    and a workflow for that kind of aggregate analysis.  You
08:50:01 5    prepare aggregate documents for regulatory authorities.
08:50:04 6    Q.    In terms of an aggregate case review, what is your
08:50:08 7    understanding of what an aggregate case review is?
08:50:17 8    A.    It's to look at all the cases at one time that have a
08:50:22 9    similarly reported adverse event in the case.
08:50:27 10   Q.    An aggregate case review could be from the beginning of
08:50:34 11   the drug's postmarketing experience, if you were looking at it
08:50:39 12   from a postmarketing perspective, or it could be in interval
08:50:44 13   time frames, correct?
08:50:45 14   A.    Correct.
08:50:45 15   Q.    Well, you've mentioned a couple of times now that there
08:50:50 16   are different safety issue or safety signal detection sources,
08:50:50 17   correct?
08:50:57 18   A.    Uh-huh (affirmative response).
08:50:57 19   Q.    Yes?
08:50:57 20   A.    (Witness nods head affirmatively.)
08:50:59 21   Q.    For the record --
08:51:00 22   A.    Oh, yes.  Sorry.
08:51:01 23   Q.    One of those is ICSR review, correct?
08:51:08 24   A.    Correct.
08:51:08 25   Q.    Another one of those would be aggregate case review,

*OFFICIAL TRANSCRIPT*

08:51:08 1   correct?

08:51:13 2   A.   Correct.

08:51:13 3   Q.   Literature surveillance --

08:51:13 4   A.   Yes.

08:51:17 5   Q.   -- would be another example, right?

08:51:19 6   A.   Yes.

08:51:19 7   Q.   What other examples can you provide of safety issue or

08:51:27 8   safety signal detection sources?

08:51:29 9   A.   We considered a health authority request as a safety

08:51:33 10   signal as well.

08:51:33 11   Q.   So at least between -- I'm just trying to understand.  So

08:51:38 12   your testimony that from between 2003 and 2006, that during

08:51:43 13   that time frame the global safety officer was not involved in

08:51:51 14   the determination as to whether a serious adverse event was

08:51:58 15   considered to be listed or unlisted?

08:52:00 16   A.   I reviewed the serious unlisted cases.  If there was a

08:52:05 17   question, I could be approached for input.

08:52:10 18          But the physician knows the labeling and knows how to

08:52:14 19   determine listedness, the case evaluating physician.  That's

08:52:21 20   their expertise.  I'm not sure what you're talking about.

08:52:23 21   Q.   Well, I think we're talking about the same thing, right,

08:52:26 22   that there is going to be a determination, when an adverse

08:52:29 23   event comes in somebody has to characterize that as either

08:52:32 24   nonserious or serious, correct?

08:52:35 25   A.   By information provided in the case, they will determine

*OFFICIAL TRANSCRIPT*

08:52:38  1   whether it meets -- that's correct, if it meets regulatory

08:52:43  2   definitions.

08:52:43  3   Q.    The determination as to whether a reported adverse event

08:52:51  4   between 2003 and 2006 was considered to be listed or unlisted,

08:52:55  5   who would have been making that decision, if not the global

08:52:59  6   safety officer?

08:53:00  7   A.    We have a case -- medical case evaluation team of

08:53:03  8   physicians whose sole responsibility is to manage these

08:53:08  9   individual cases through the claim trace database.

08:53:12  10  Q.    When you were making your PSUR for submission, if somebody

08:53:23  11  at the company had characterized an adverse event report as

08:53:28  12  serious but listed, the PSUR submission would include the line

08:53:36  13  data entry, but would not include the actual substantive

08:53:44  14  adverse event report in the form of a CIOMS report, correct?

08:53:47  15  A.    That is correct.

08:53:51  16  Q.    If the person who characterizes the adverse event report

08:53:54  17  when it comes as serious but listed, the only thing that the

08:54:00  18  regulatory agency is going to see about that adverse event

08:54:04  19  report is a line listing in a PSUR when the periodic interval

08:54:12  20  reporting occurs, correct?

08:54:13  21  A.    They'll see in it the periodic report.

08:54:16  22  Q.    So we're trying to detect safety issues, so that we might

08:54:20  23  further investigate identified safety issues, so that we can

08:54:23  24  make sure that the labeling has kept up with the science,

08:54:23  25  correct?

*OFFICIAL TRANSCRIPT*

08:54:32  1    A.    Yes, we should always have up-to-date safety information
08:54:36  2    available.
08:54:36  3    Q.    From an importance perspective, it's important to -- from
08:54:41  4    a global safety officer, a safety profile examiner perspective,
08:54:47  5    you're looking for, are there new safety issues that we have
08:54:50  6    not previously identified, or are there new characteristics and
08:54:55  7    adverse events that we know exist, true?
08:54:57  8    A.    Well, I would say I would be more concerned with a new
08:55:02  9    event that was reasonably suspected to be related caused by the
08:55:06 10    drug.  I would be more concerned -- if I had to prioritize my
08:55:11 11    resources, I would look at issues that impact public health.
08:55:16 12    Those are the regulatory requirements.
08:55:22 13          We have -- today, there is responsibility to
08:55:26 14    monitor -- but I guess what you were alluding to is the change
08:55:32 15    in the nature of a listed event and we do that.
08:55:37 16    Q.    Right.
08:55:38 17    A.    But we do have to prioritize to be able to communicate the
08:55:42 18    impactful safety information to physicians and patients, so we
08:55:48 19    can keep them safe and to have save use of the drug.
08:55:52 20    Q.    The company Sanofi is responsible for identifying both new
08:56:08 21    safety signals and identifying the new characteristics of
08:56:25 22    existing adverse events that are known to the company, correct?
08:56:31 23    A.    That's the responsibility of pharmacovigilance, yes.
08:56:39 24    Q.    I'm going to hand you what I have marked Exhibit 2 to the
08:56:45 25    deposition.  It's my understanding from the document list

**OFFICIAL TRANSCRIPT**

08:56:46 1    that's been provided to us this morning that you have reviewed

08:56:49 2    this document in preparation for today's deposition.

08:56:53 3    A.    I saw the document.

08:56:54 4    Q.    Exhibit Number 2 is a brief e-mail chain.  It is a --

08:57:06 5    well, there's a two-page document, and then there is some

08:57:10 6    information on the last page about from where this document was

08:57:15 7    pulled, okay?

08:57:16 8            But the document that I want to ask you about is

08:57:19 9    really pages 1 and 2.  I think, if you look -- from a time

08:57:24 10    chronology perspective, if we turn to page 2 and look at --

08:57:29 11    there's an e-mail from Heidi Filtenborg.  Do you see that?

08:57:34 12    A.    Yes.

08:57:35 13    Q.    It looks like it's dated March -- Friday, March 3, 2006.

08:57:39 14    Do you see that?

08:57:40 15    A.    Yes.

08:57:40 16    Q.    The subject matter is:  "Reversibility of Alopecia after

08:57:47 17    Taxotere Treatment."  Do you see that?

08:57:48 18    A.    I see it.

08:57:49 19    Q.    All right.  Heidi writes that she has received a question

08:57:58 20    from a Danish physician.  Do you see that?

08:58:00 21    A.    Yes.

08:58:00 22    Q.    The question:  "Is there any documentation/knowledge about

08:58:05 23    the reversibility of alopecia after Taxotere treatment?"  Then

08:58:10 24    there is, in parens, "expected time frame."  Do you see that?

08:58:13 25    A.    Uh-huh (affirmative response).

*OFFICIAL TRANSCRIPT*

08:58:13  1   Q.   Yes?

08:58:18  2        The -- Heidi Filtenborg's e-mail says that the

08:58:24  3   patient has had alopecia since 2004.  Do you see that?

08:58:27  4   A.   I see it.

08:58:27  5   Q.   All right.  Then the e-mail above that is an e-mail that

08:58:34  6   appears to be from you.  Do you see that?

08:58:35  7   A.   Well, the e-mail above is from Steve.

08:58:41  8   Q.   Oh, I'm sorry.  The e-mail above that is from Steve and is

08:58:47  9   cc'ing you, correct?

08:58:49 10   A.   Correct.

08:58:50 11   Q.   That e-mail is March -- Friday, March the 3rd, at

08:58:53 12   4:44 p.m.?

08:58:54 13   A.   Uh-huh (affirmative response).

08:58:54 14   Q.   Yes?

08:58:55 15   A.   Yes.

08:58:55 16   Q.   Steve asks of Emanuel:  "Please address this matter on

08:59:05 17   your return.  Apparently this is an inquiry, not an SAE."

08:59:09 18   Do you see that?

08:59:09 19   A.   I see that.

08:59:09 20   Q.   Then below that, it says:  "In addition to providing the

08:59:13 21   information requested, we may need to enter an AE and, of

08:59:17 22   course, inquire about the event, illness, concomitant

08:59:21 23   medications and other therapies."  Right?

08:59:23 24   A.   Right.

08:59:24 25   Q.   Then the last thing, it says:  "Perhaps, Amy might know if

08:59:28  1   we have a file on this topic."  Do you see that?

08:59:31  2   A.   I see that.

08:59:31  3   Q.   Again, this is March the 3rd of 2006, right?

08:59:40  4   A.   That's what it says.

08:59:41  5   Q.   Did you maintain files regarding safety issues related to

08:59:47  6   docetaxel treatment outside of a PSUR?

08:59:50  7   A.   I'm not sure what he means by "file."  I'm putting air

08:59:54  8   quotes.  Because I didn't keep files.  I think he just meant if

09:00:00  9   there were some additional information I was aware of.

09:00:01 10   Q.   Well, what he actually, though, says is that you may have

09:00:06 11   a file on this topic, right?

09:00:08 12   A.   He does say file, but I don't know if he meant

09:00:11 13   literally -- you know, I didn't have a file on the topic.

09:00:16 14   That's why I answered as I did.

09:00:18 15   Q.   So, you responded to Steven Neibart's March 3rd, 2006,

09:00:28 16   e-mail, in an e-mail that you wrote on March the 5th, 2006,

09:00:32 17   correct?

09:00:32 18   A.   That's the date.

09:00:35 19   Q.   It was an e-mail that you would have written as an

09:00:38 20   employee of Sanofi, in the course and scope of your employment

09:00:41 21   with Sanofi, correct?

09:00:42 22   A.   Yes.

09:00:42 23   Q.   So on Sunday, March the 5th, 2006, at 2:17 p.m., you wrote

09:00:50 24   back to Steven Neibart and to Emanuel Palatinsky, and you

09:01:00 25   indicate only peripheral knowledge, correct?

*OFFICIAL TRANSCRIPT*

09:01:03 1   A.   That's the wording.

09:01:04 2   Q.   When you looked at the investigator's brochure and the CDS

09:01:10 3   wording, was that the sole source of your peripheral knowledge?

09:01:20 4   A.   I can't recall what I did in 2006 at the time.  I don't

09:01:27 5   know.  All I can say is, just looking -- reading this, I

09:01:35 6   must -- I looked at the IB and the CDS and wrote this response.

09:01:40 7   Q.   You do not indicate that there is any indication of

09:01:52 8   irreversible cases of alopecia described in the U.S. product

09:01:54 9   label, correct?

09:01:58 10  A.   Say that again, please.

09:02:02 11  Q.   Sure.  In your e-mail of March the 5th, 2006, when you're

09:02:04 12  describing your peripheral knowledge and indicating to see the

09:02:06 13  investigator's brochure and the CDS wording, you do not

09:02:11 14  indicate that you found any information about irreversible

09:02:17 15  alopecia in the U.S. product label?

09:02:20 16  A.   I didn't mention UPSI.  I looked at the core information,

09:02:24 17  the IB for clinical and the CCDS for the marketed.

09:02:28 18  Q.   You do not indicate --

09:02:28 19  A.   I didn't --

09:02:30 20  Q.   -- that you found any indication of irreversible cases of

09:02:36 21  alopecia in the U.S. product, correct?

09:02:38 22  A.   I did not mention the UPSI in this e-mail.

09:02:41 23  Q.   You then go on to say:  "I'm sorry that I do not have more

09:02:44 24  to offer."  Do you see that?

09:02:46 25  A.   I see it.

**_OFFICIAL TRANSCRIPT_**

09:02:46  1    Q.    Then you say:  "This is the kind of thing that a
09:02:49  2    non-company physician would review in their practice and
09:02:53  3    possibly report in the literature."  Do you see that?
09:02:55  4    A.    I'm reading.
09:02:56  5    Q.    Am I reporting accurately to the jury what you've stated
09:03:02  6    in your e-mail?
09:03:03  7    A.    I am reading with you this e-mail, yes.
09:03:05  8    Q.    All right.  Then it says:  "However, I am not" -- in all
09:03:08  9    caps -- "advising a lit search for this topic, exclamation
09:03:12 10    point."  Do you see that?
09:03:13 11    A.    I see that.
09:03:13 12    Q.    All right.  With regard to your March 5th, 2006, e-mail,
09:03:20 13    do you recall receiving any further word from Steven Neibart
09:03:26 14    asking you to do anything further?
09:03:28 15    A.    No.
09:03:29 16    Q.    I believe this is also a document that you reviewed in
09:03:35 17    preparation for today's deposition.  Are you familiar with what
09:03:40 18    I've provided to you as Exhibit 3?
09:03:42 19    A.    I have not seen this.
09:03:44 20    Q.    If you go to page 1 of the e-mail chain on Exhibit 3,
09:03:51 21    there is an e-mail from Dr. Palatinsky dated Wednesday,
09:03:56 22    March the 8th, 2006.  Do you see that?
09:03:57 23    A.    I see it.
09:03:59 24    Q.    This is an e-mail from Dr. Palatinsky back to
09:04:08 25    Heidi Filtenborg, and you are also an addressee, as well as

*OFFICIAL TRANSCRIPT*

| | |
|---|---|
| 09:04:13 1 | Michael Kopreski.  Do you see that? |
| 09:04:18 2 | A.   No, it's not me. |
| 09:04:19 3 | Q.   Amy Friedman? |
| 09:04:22 4 | A.   Not me, not my spelling.  Didn't come to me.  I never got |
| 09:04:24 5 | this. |
| 09:04:24 6 | Q.   You don't believe you ever got this? |
| 09:04:28 7 | A.   No, I don't believe I ever got it. |
| 09:04:29 8 | Q.   Because the person who has addressed it has misspelled |
| 09:04:32 9 | your name in the name? |
| 09:04:33 10 | A.   Uh-huh (affirmative response). |
| 09:04:33 11 | Q.   You don't think that the e-mail address that's associated |
| 09:04:37 12 | with it ever came to you? |
| 09:04:37 13 | A.   No, my name is two E's. |
| 09:04:39 14 | Q.   Well, I understand that, but the person puts the title of |
| 09:04:43 15 | the contact, and then the e-mail is attached to the contact. |
| 09:04:46 16 | Do you see what I'm saying? |
| 09:04:50 17 | Is it your testimony you don't recall ever receiving |
| 09:04:53 18 | this e-mail? |
| 09:04:53 19 | A.   I don't recall receiving it, and that's not my name. |
| 09:04:56 20 | Q.   All right.  It is your name, it's -- |
| 09:05:01 21 | A.   No. |
| 09:05:02 22 | Q.   It's spelled Friedman instead of Freedman; is that what |
| 09:05:07 23 | you're saying? |
| 09:05:07 24 | A.   It's not my name.  There was another Amy Friedman in the |
| 09:05:11 25 | company. |

*OFFICIAL TRANSCRIPT*

09:05:11  1    Q.   Oh, there was another Amy Friedman in the company?

09:05:15  2    A.   That would not be delivered to me.  If it says

09:05:18  3    F-R-I-E-D-M-A-N, this e-mail would not have come to me.

09:05:20  4    Q.   Outside of isolated review of individual reports that

09:05:28  5    might come in, who at the company, if not the global safety

09:05:36  6    officers, would be looking in -- proactively looking in

09:05:40  7    aggregate at what these reports are all -- the picture being

09:05:45  8    painted by these reports as an aggregate?

09:05:51  9    A.   So I have two parts to the answer for you.  One is, we're

09:05:55 10    always looking to see whether the label is reflecting the

09:05:57 11    information, as we're receiving additional information over the

09:06:02 12    marketed use of the product and as patient use grows for this

09:06:06 13    product.  So this wasn't necessarily new information, even if

09:06:12 14    individual cases were read.

09:06:14 15         The other piece I wanted to say was, back to the

09:06:18 16    clinical trial information, is that this information is looked

09:06:22 17    in aggregate in those clinical trials, looking at how

09:06:25 18    frequently alopecia occurs and what the outcome is.

09:06:28 19    Q.   So --

09:06:29 20    A.   So just let me be clear about what the word "aggregate"

09:06:32 21    means.  The aggregate doesn't mean that I'm going to go take,

09:06:36 22    you know, these 44 cases, or if I'm looking a neutropenia I'm

09:06:41 23    going to look at 2,000 cases or 10,000 cases, and look at every

09:06:46 24    single one of those cases.  The whole point of aggregate review

09:06:49 25    is that you have to kind of harmonize and codify the entry of

**OFFICIAL TRANSCRIPT**

09:06:53 1   those cases.  That's what line listing is for.  That's what

09:06:55 2   case counts are for.

09:06:55 3           So we have MedDRA dictionary coding.  MedDRA

09:07:00 4   dictionary coding is alopecia for every single one of these

09:07:02 5   cases.  That was the term.  When you aggregate, you can do

09:07:06 6   counts on alopecia.  You're not drilling into every single

09:07:09 7   case.

09:07:10 8           So if you see a listed event, and you say, we have

09:07:13 9   the -- pretty much the same number of cases from interval to

09:07:17 10  interval, PSUR to PSUR, you know, reporting frequency, there is

09:07:22 11  nothing suggesting that something has changed about the nature

09:07:26 12  of that listed event.

09:07:29 13          The company is doing their job.  It's not that they

09:07:31 14  are not doing their job.  It is absolutely they are following

09:07:35 15  the process.  That's what we're supposed to do, and we're doing

09:07:37 16  it.

09:07:38 17  Q.   Clearly, Sanofi knew that Taxotere could cause

09:07:46 18  irreversible alopecia in 2006, right?

09:07:48 19  A.   It's in the label.

09:07:49 20  Q.   When you refer to the label, which label are you referring

09:07:56 21  to?

09:07:57 22  A.   Pick one.

09:07:57 23  Q.   USPI.

09:07:59 24  A.   SmPC.  The patient leaflet of the USPI, if I remember

09:08:04 25  correctly, has it in it.  The IB.  The core safety data sheet.

*OFFICIAL TRANSCRIPT*

09:08:12  1   Q.   Just going back to -- my question was, to make sure I have

09:08:15  2   got the question actually answered on the record, from -- based

09:08:20  3   upon your knowledge at Sanofi in 2006, Sanofi knew Taxotere

09:08:28  4   could cause irreversible alopecia in 2006, correct?

09:08:33  5   A.   Yes.  Well, they were listed events.  They were certainly

09:08:37  6   considered listed events.

09:08:39  7   Q.   Do you agree with me that, by definition, something that

09:08:46  8   is temporary is not the same as something that is permanent?

09:08:53  9   A.   By definition, yes.  I'm sorry, I think I misunderstood

09:08:56 10   you.  I thought you were saying temporary and reversible.

09:09:00 11   Q.   From an outcome perspective, if you have something that is

09:09:11 12   permanent in outcome, that's different, by definition, than

09:09:16 13   something that is temporary in outcome, right?

09:09:19 14   A.   The outcome, yes.  We collect outcomes on reports when we

09:09:24 15   can get it, and permanent would be not recovered.

09:09:28 16   Q.   Temporary would be?

09:09:31 17   A.   Recovered.

09:09:32 18   Q.   Those aren't the same thing, are they?

09:09:35 19   A.   Not recovered is -- does not -- is not the same as

09:09:36 20   recovered.

09:09:37 21   Q.   Say it again.

09:09:39 22   A.   Not recovered is not the same as recovered, right, because

09:09:42 23   there is a not in front of one of the words.

09:09:42 24        (WHEREUPON, at this point in the proceedings, the video

09:09:55 25   deposition testimony of Amy Freedman concluded.)

***OFFICIAL TRANSCRIPT***

09:09:55  1         THE COURT:  Mr. Nolen, please call your next witness.

09:10:00  2         MR. NOLEN:  Your Honor, may we approach?

09:10:02  3         THE COURT:  Yes.

09:10:02  4         (WHEREUPON, at this point in proceedings, a conference

09:10:17  5  was held at the bench.)

09:10:17  6         MR. NOLEN:  I don't know one way or another if it was

09:10:22  7  never ruled upon that involved expert compensation.  That's

09:10:24  8  going to become relevant in his testimony.

09:10:29  9             Dr. Kessler has been working MDL-wide, and not

09:10:33  10  just simply on the Earnest case.  His total compensation was

09:10:38  11  what we were objecting to being put forward because he's

09:10:42  12  actually working on behalf of 12,000 plaintiffs.

09:10:45  13        THE COURT:  Is it something that he's not going to

09:10:47  14  testify to that's related to the others but not Ms. Earnest?

09:10:51  15        MR. NOLEN:  He can segregate it, if necessary.  That's

09:10:54  16  the point.

09:10:55  17        THE COURT:  If he can segregate and say, this is -- I

09:11:04  18  will tell you this -- we're running out of time -- if he can

09:11:11  19  say, I did not -- none of this other work pertains to my

09:11:15  20  testimony here, then that's different; but, if he uses -- if he

09:11:20  21  encapsulates all of that testimony, what he is presenting to

09:11:24  22  this Court, then it comes in.

09:11:27  23        MR. NOLEN:  So then do we say that he's worked on

09:11:30  24  12,000 cases?

09:11:31  25        THE COURT:  No.  What I'm saying is, if there is some

*OFFICIAL TRANSCRIPT*

09:11:37  1   of his testimony that's related to people, for example, between

09:11:40  2   11,000 and 15,000 or something like that, and he is able to

09:11:45  3   carve that out and say, none of that work was related to the

09:11:48  4   testimony I'm giving at this trial, that's a different matter.

09:11:52  5            But if he is using all of that in the testimony

09:11:56  6   today, I don't think -- I mean, I think you would have to show

09:11:59  7   that the work that he did in this case, Ms. Earnest, would have

09:12:07  8   been different had he worked -- do you see what I'm saying?

09:12:18  9            MS. JEFFCOTT:  I think so.  So it's basically, if there

09:12:19 10   is a piece that's just --

09:12:21 11            THE COURT:  I would say if there's a piece of 2015

09:12:21 12   post, which is not at issue in this case, then, yeah.  It's got

09:12:24 13   nothing to do with this case.  He's not going to testify about

09:12:27 14   it.

09:12:27 15            But if he's going to talk about safety systems,

09:12:30 16   he can't say, well, I'm going to give you just only 1/1000th of

09:12:34 17   the safety system work that I did.

09:12:38 18            MR. STRONGMAN:  Your Honor, obviously, his report is

09:12:45 19   general.  It's not case specific, so his report is his report.

09:12:46 20            THE COURT:  I understand that.  But I will tell you,

09:12:49 21   Mr. Strongman, nobody wants to hear about what happened in

09:12:52 22   2015, for a lot of reasons.  So the work that he did post 2015

09:12:58 23   is not related to this particular trial.

09:13:00 24            Now, if he is going to effectively segregate it,

09:13:06 25   that's fine.

*OFFICIAL TRANSCRIPT*

09:13:06  1        MR. STRONGMAN:  I would also note for the record that

09:13:09  2   this was included in a plaintiff's Motion in *Limine*.  It was an

09:13:13  3   omnibus-type Motion in *Limine*, and Your Honor actually did rule

09:13:15  4   on it and said that cross-examination on bias is --

09:13:18  5        THE COURT:  Of course.  But I'm not going to let you

09:13:21  6   cross-examine him on something unrelated to this trial.  And so

09:13:28  7   his field, his hourly rate, the amount of work he's put into

09:13:32  8   it, that's fine; but, if it's something unrelated to this

09:13:35  9   trial -- so I guess the question is -- yes, you're entitled to

09:13:40 10   cross him on his fees and his billing and how much time he's

09:13:45 11   spent on this, that's all fine.  You don't need me to tell you

09:13:50 12   that.

09:13:50 13        The question is, if there is part of the work

09:13:56 14   that he's performed that is unrelated to this trial -- now,

09:14:01 15   he's talking about general.  I would imagine it's this much

09:14:06 16   that's not, because the only thing I would think that's

09:14:09 17   probably important is post 2015.

09:15:28 18        MS. JEFFCOTT:  Post 2011.

09:15:29 19        THE COURT:  Post 2011.

09:14:19 20        The things that I'm not going to let him testify

09:14:22 21   about, that will work.  I don't know how he segregates it.

09:14:26 22   That's for you.

09:14:27 23        MR. STRONGMAN:  Obviously, Your Honor, it's fair game,

09:14:30 24   the fact that Dr. Kessler has made a lot of money in general

09:14:33 25   testifying across the board.

                          ***OFFICIAL TRANSCRIPT***

09:14:36 1    THE COURT:  I hear that all the time.  You only work

09:14:39 2  for plaintiffs.  You only work for defendants.  You hear that

09:14:42 3  all the time.

09:14:43 4    MS. JEFFCOTT:  If you're going to tell the jury here --

09:14:49 5  question Dr. Kessler about other litigation that he's made --

09:14:51 6  would it not be fair for us on redirect to explain what those

09:14:56 7  litigations are about?

09:14:57 8    THE COURT:  Yeah.  This is 101.

09:15:05 9    THE COURT REPORTER:  The objection time goes to --

09:15:08 10    THE COURT:  I'm going to let it skip this time.

09:15:08 11    (WHEREUPON, at this point in the proceedings, the bench

09:15:19 12  conference concluded.)

09:15:19 13    MR. NOLEN:  Your Honor, from the previous deposition,

09:15:21 14  the plaintiffs move to admit Exhibit 175.

09:15:24 15    THE COURT:  That will be admitted.  That's fine.

09:15:27 16    Let's proceed.

09:15:28 17    (WHEREUPON, Plaintiff's Exhibit 175 was admitted.)

09:15:28 18    MR. NOLEN:  Thank you.  At this time, Your Honor,

09:15:34 19  Barbara Earnest calls Dr. David Kessler.

20    THE DEPUTY CLERK:  Would you please raise your right

21  hand.  Do you solemnly swear that the testimony which you are

22  about to give will be the truth, the whole truth, and nothing

23  but the truth, so help you God?

24    THE WITNESS:  I do.

25                    **DAVID KESSLER, MD**

                       *OFFICIAL TRANSCRIPT*

1   was called as a witness and, after being first duly sworn by

2   the Clerk, was examined and testified on his oath as follows:

3          THE DEPUTY CLERK:  Please state and spell your name for

4   the record.

09:16:08   5          THE WITNESS:  David Kessler, K-E-S-S-L-E-R.

09:16:11   6                      VOIR DIRE EXAMINATION

09:16:14   7   BY MR. NOLEN:

09:16:14   8   Q.   Good morning, Doctor.  Would you please state your full

09:16:19   9   name for the jury.

09:16:20  10   A.   David Aaron Kessler.

09:16:22  11   Q.   And, Dr. Kessler, before we get into more detail, can you

09:16:28  12   tell the jury a little bit about who you are and what you have

09:16:30  13   spent your career doing.

09:16:31  14   A.   I'm a physician.  I'm a grandfather.  I've spent the last

09:16:40  15   40 years studying, writing about, being responsible for the

09:16:47  16   safety of foods and drugs.

09:16:51  17   Q.   Have you spent time studying public health and the safety

09:16:56  18   of our food and drugs?

09:16:58  19   A.   I have.

09:16:59  20   Q.   Tell us about that.

09:17:00  21   A.   So I had the privilege to teach about it at law school.  I

09:17:09  22   wrote about it, wrote articles about it.  And I had the

09:17:16  23   distinct privilege of being responsible for the safety of

09:17:21  24   virtually all food, drugs, cosmetics, medical devices, blood,

09:17:29  25   animal veterinary drugs.  So I was -- I had that

                            *OFFICIAL TRANSCRIPT*

09:17:35 1    responsibility.  And I've also -- subsequently, I've been on

09:17:41 2    the boards of certain companies that sell drugs and devices.

09:17:46 3    Q.    Well, you held the position of public service back in the

09:17:51 4    1990s.  Can you tell us what that was?

09:17:52 5    A.    I had the privilege of being commissioner of the

09:17:55 6    United States Food and Drug Administration, FDA.

09:17:59 7    Q.    Is the --

09:18:01 8    A.    And just one footnote, Counselor, I just want to make one

09:18:05 9    thing absolutely clear, I do not speak today for FDA.  I am

09:18:13 10   here just on -- myself.  I just want to make that clear, if I

09:18:13 11   may.

09:18:21 12   Q.    Is the FDA commissioner the head person in charge of that

09:18:26 13   administrative agency?

09:18:28 14   A.    You know the expression "the buck stops here"?  If

09:18:32 15   something went wrong somewhere in this country with food or

09:18:35 16   drugs, I was the one who was held responsible, yes, while I was

09:18:39 17   FDA commissioner.

09:18:40 18   Q.    Can you tell us how you obtained that position?

09:18:45 19   A.    One day I was in my office in the Bronx, I was running a

09:18:52 20   hospital, and I got a phone call and they said, "This is

09:18:56 21   White House personnel.  The President would like to nominate

09:19:01 22   you to be commissioner of the FDA."  That's the way it

09:19:04 23   happened.

09:19:05 24   Q.    So, Doctor, are you familiar with the development of

09:19:09 25   prescription drugs and drug issues relating to drug safety?

*OFFICIAL TRANSCRIPT*

09:19:13  1   A.    I spent my life, really, working on those kinds of issues,
09:19:18  2   prescription drugs and other medical products.
09:19:22  3   Q.    Now, Doctor, I'm going to ask you about your curriculum
09:19:29  4   vitae.  What is a curriculum vitae?
09:19:33  5   A.    Oh, it's a résumé.  It's just a list of my professional
09:19:38  6   experiences put down on paper.
09:19:41  7   Q.    And so does the curriculum vitae contain your experience,
09:19:48  8   work experience, professional experience, education, and
09:19:51  9   training?
09:19:51 10   A.    It lists the positions and the education that I have.
09:19:56 11   Q.    All right.  And does it also identify things like honors
09:20:00 12   and lectures and publications?
09:20:03 13   A.    Yeah.  The usual kind of stuff like that.
09:20:05 14   Q.    Okay.  I'm going to publish for the jury a copy of your
09:20:13 15   curriculum vitae, what we call curriculum vitae.
09:20:20 16         MR. NOLEN:  Is that acceptable, Your Honor?
09:20:22 17         THE COURT:  Yes.
09:20:23 18   EXAMINATION BY MR. NOLEN:
09:20:41 19   Q.    Dr. Kessler, I see that this has your name at the top,
09:20:45 20   David A. Kessler, right?
09:20:48 21   A.    Exactly.
09:20:48 22   Q.    Now, where did you attend medical school?
09:20:51 23   A.    I went to Harvard.
09:20:53 24   Q.    And if we flip back, if we're starting on the first page,
09:20:58 25   it looks like you have employment and education on the first

*OFFICIAL TRANSCRIPT*

09:21:02 1   page, and so right here we see Harvard Medical School, correct?

09:21:07 2   A.   Correct.

09:21:07 3   Q.   And what years were those?

09:21:11 4   A.   I entered 1973.  I graduated in 1979.

09:21:17 5   Q.   And it looks like you also attended -- looks like you

09:21:24 6   attended law school also, correct?

09:21:26 7   A.   Yeah, in the middle of med school, I went off to get my

09:21:29 8   law degree.  So I did -- I did that while I was in med school.

09:21:36 9   Q.   So why did you do that?

09:21:41 10  A.   Issues like the ones we're, you know, dealing with,

09:21:46 11  healthcare, pretty conflicted.  And I just wanted to be broadly

09:21:51 12  trained to be able to deal with these very complicated,

09:21:58 13  important -- enormous privilege to deal with important matters

09:22:02 14  of public health, and I wanted to be able to look at questions

09:22:05 15  from a number of different angles.  But, I mean, down deep, I'm

09:22:09 16  a doc, that's how I view myself.

09:22:12 17  Q.   But you didn't stop there.  You got some business

09:22:15 18  training; is that right?

09:22:16 19  A.   Yeah.  I was running a hospital, and I needed to know

09:22:21 20  something about finance and management, so I went back and got

09:22:25 21  a little more training to do that.

09:22:29 22  Q.   After attending medical school, did you go into a

09:22:34 23  residency program?

09:22:35 24  A.   I did.

09:22:35 25  Q.   And what is that?

**OFFICIAL TRANSCRIPT**

09:22:39  1    A.    That's where -- medical school teaches you a lot of words

09:22:42  2    and definitions and science, but you really learn to be a doc

09:22:49  3    in your residency, and I went to the Johns Hopkins hospital for

09:22:52  4    three years and trained as a pediatrician.

09:22:54  5    Q.    Okay.  And so did you also do an internship?

09:23:01  6    A.    That's part of my residency, yes.

09:23:03  7    Q.    And how long does that take, Doctor?

09:23:09  8    A.    It was three years.

09:23:10  9    Q.    And so, while you were at Johns Hopkins, you specialized;

09:23:20  10   is that correct?

09:23:20  11   A.    Just in pediatrics.

09:23:23  12   Q.    And were you licensed to practice medicine?

09:23:26  13   A.    I still am.  Licensed in the state of California.  I pay

09:23:33  14   my dues -- I'm inactive, which just means I don't have to pay

09:23:38  15   dues.  I think it's Maryland, Connecticut and New York where

09:23:43  16   I'm inactive but I'm licensed today.

09:23:45  17   Q.    I would like to go back to your work experience.  Where

09:23:50  18   did you begin working after you completed your medical

09:23:54  19   training?

09:23:55  20   A.    I was probably the lowest paid, somewhere between a

09:24:00  21   volunteer -- I think I made $100 a month when I was -- I was

09:24:07  22   sort of a low -- very low staffer on the United States Senate

09:24:12  23   Health Committee, and I dealt with FDA issues for the -- for

09:24:18  24   that Senate Health Committee.  Then I went off to the Bronx to

09:24:26  25   learn how to run and -- to actually run the hospital.

*OFFICIAL TRANSCRIPT*

09:24:29  1    Q.   And was that at Montefiore Medical Center?

09:24:35  2    A.   That's where I started and then went to Einstein, which is

09:24:39  3    a part of the Montefiore.  So, spent a wonderful decade taking

09:24:49  4    care of people in a borough of the Bronx that needed quality

09:24:56  5    healthcare.

09:24:56  6    Q.   In your work experience, where did you go next?

09:24:59  7    A.   So I taught -- while I was at the hospital, I was also

09:25:05  8    teaching -- just on a part-time basis, I was teaching at

09:25:11  9    Columbia Law School.  I was teaching food and drug law, and it

09:25:17  10   was when I was at the hospital in New York that I got the phone

09:25:21  11   call asking me to be commissioner of FDA.

09:25:23  12   Q.   Okay.  So, you were actually at Columbia University

09:25:28  13   teaching law?

09:25:29  14   A.   I was.  I mean, you know, I was spending most of my time

09:25:36  15   at the hospital, running the hospital, but I would come in

09:25:39  16   several times a week to teach this one class in food and drug

09:25:43  17   law.

09:25:43  18   Q.   And then according to your CV, it looks like you're at

09:25:50  19   Albert Einstein College of Medicine.  I think you mentioned

09:25:53  20   that a moment ago.  What was your position there?

09:25:57  21   A.   I was medical director.  I was -- it's sort of like I'm

09:25:59  22   going to date myself.  I was a little young -- Marcus Welby

09:26:05  23   kind of -- you know, the head of the -- I was sort of chief of

09:26:06  24   staff at the hospital.  I was a chief medical person in the

09:26:09  25   hospital.

*OFFICIAL TRANSCRIPT*

09:26:09  1    Q.   And this was all before you became FDA commissioner; is

09:26:12  2    that right?

09:26:13  3    A.   That's correct.

09:26:13  4    Q.   You mentioned a moment ago being appointed commissioner by

09:26:20  5    the President, correct?

09:26:23  6    A.   Correct.

09:26:23  7    Q.   And who was the President that appointed you?

09:26:27  8    A.   George Bush, the father.  George Bush, the father.

09:26:32  9    Q.   George H.W. Bush, the father of George W. Bush?

09:26:38 10    A.   Correct.

09:26:38 11    Q.   How long did you serve under George H.W. Bush?

09:26:42 12    A.   Throughout his term after I got appointed, so through the

09:26:46 13    end of his term, and then beyond.

09:26:49 14    Q.   And that's an interesting question.  You stayed after

09:26:55 15    George H.W. Bush left office?

09:26:59 16    A.   I was asked to, yes.

09:27:01 17    Q.   Who asked you?

09:27:01 18    A.   President Clinton.

09:27:04 19    Q.   And how long did you serve for President Clinton?

09:27:07 20    A.   Through 1997.

09:27:08 21    Q.   In your experience and understanding, is it unusual for an

09:27:14 22    FDA commissioner to bridge different administrations, different

09:27:19 23    parties?

09:27:19 24    A.   I think that would be fair.  Certainly over the last 30,

09:27:23 25    40 years, that would be -- I don't think that's happened in any

*OFFICIAL TRANSCRIPT*

09:27:26  1    other case.  It used to happen back 1920s, 1930s, people used

09:27:33  2    to be in these jobs for decades.  More recently, certainly

09:27:38  3    since the 1970s, it tends to change with the president and

09:27:42  4    change with the party.  So, again, it was a distinct privilege

09:27:45  5    to be able to serve two wonderful presidents.

09:27:49  6    Q.   And if you could, explain for us a little bit what you did

09:27:52  7    as the FDA commissioner.

09:27:57  8    A.   So FDA regulates $0.25 of every consumer dollar, so

09:28:06  9    virtually all food except that which was regulated by the

09:28:10 10    Department of Agriculture:  All food, all drugs, prescription

09:28:15 11    drugs, over-the-counter drugs, generic drugs, medical devices.

09:28:23 12    But we worked on certain things that were sort of, I think,

09:28:29 13    timely and that were important public health issues.

09:28:33 14         So we worked on, for example, you know, that

09:28:36 15    nutrition facts panel on all foods where it tells you the

09:28:43 16    calories and the saturated fats.  So we did that label.  We did

09:28:49 17    the investigation into the tobacco industry.

09:28:55 18         At the time when I came, there was only one drug for

09:29:00 19    AIDS, and it didn't work very well.  And through the hard work

09:29:03 20    and -- including the pharmaceutical industry, by the time I

09:29:07 21    left, there were 17 drugs for HIV, and it wasn't a cure, but

09:29:14 22    really changed something that was previously a death sentence

09:29:19 23    into something that people could at least have hope.

09:29:24 24         Did something called the MedWatch program, the

09:29:26 25    medical product/drug reporting.  So we had the privilege -- we

***OFFICIAL TRANSCRIPT***

09:29:31 1  had the privilege of doing a lot of things that were important

09:29:34 2  public health issues.

09:29:35 3  Q.   And, Doctor, you said "we" a couple of the times, and I'm

09:29:39 4  trying to be sure everybody understands.  You were not a

09:29:41 5  department of one, correct?

09:29:44 6  A.   I was absolutely not.  I had wonderful biostatisticians

09:29:50 7  and physicians and engineers and nurses and administrators.  We

09:29:56 8  had 10,000 people.  When you think about it, a lot of food and

09:30:02 9  a lot of drugs in this country, and very, very well-qualified

09:30:11 10 and hard-working people who believed in the mission of the

09:30:16 11 agency.  Lovely agency.

09:30:18 12 Q.   I'm sorry, I didn't mean to cut you off.  When did you

09:30:21 13 leave your post as the commissioner of the FDA?

09:30:25 14 A.   1997.

09:30:26 15 Q.   And where did you go after leaving FDA?

09:30:29 16 A.   I went to Yale to be a professor and to run the medical

09:30:37 17 school.

09:30:37 18 Q.   Did you ultimately become the dean of Yale University

09:30:43 19 School of Medicine?

09:30:44 20 A.   I did, as well as be a professor of public health and

09:30:50 21 pediatrics and epidemiology.

09:30:54 22 Q.   And after leaving Yale, where did you go?

09:30:57 23 A.   I went to the University of California, San Francisco,

09:31:06 24 where I still am.  I am a professor of pediatrics, epidemiology

09:31:14 25 and biostatistics.  It's a mouthful.

**OFFICIAL TRANSCRIPT**

09:31:15  1    Q.    Well, that's a good question.  So, explain, if you can.

09:31:20  2    You said *epidemiology and biostatistics*.  What are the

09:31:25  3    differences between those two things?

09:31:28  4    A.    So, you know, as a doc, as a pediatrician, I would take

09:31:33  5    care of one patient or, more importantly, take care of a

09:31:39  6    family, and I take care of individual people.  Epidemiologists

09:31:46  7    tend to study the effects on groups of people.

09:31:49  8          So if you're interested in studying the effect of a

09:31:53  9    drug, it's not just the effect of a drug on one person, but the

09:31:56  10   effect of a drug on all the people who take it.  So it's

09:32:03  11   populations.  So that's really what epidemiology does is

09:32:08  12   studies the effects on populations, not just one patient.

09:32:11  13         What biostatistics does is it just gives us some of

09:32:16  14   the tools, some of the mathematical tools that epidemiologists

09:32:22  15   and others use to understand certain -- those tools to

09:32:27  16   understand how to answer or approach certain questions.  Does

09:32:32  17   this cause that?  What's the chances of that happening by

09:32:36  18   chance?  Is it going to be a reliable finding?  So they are all

09:32:43  19   sort of lumped together.

09:32:44  20   Q.    Thank you.

09:32:46  21         You may notice that I have highlighted virtually

09:32:49  22   every single line of your -- the first page of your CV, and I

09:32:55  23   noticed that your résumé is some 24 pages long, and I'm not

09:33:09  24   going to do that, I'm not going to highlight every line.  I do

09:33:11  25   want to hit some high points, though.  So I'd like to move to

*OFFICIAL TRANSCRIPT*

09:33:15   1   your publications, is that okay?

09:33:17   2   A.   Sure.

09:33:17   3   Q.   All right.  So I think that's on page 19 of this CV.  And

09:33:38   4   it looks like you've written some books; is that right?

09:33:42   5   A.   Yep.  Yes.

09:33:43   6   Q.   How many books have you written, Doctor?

09:33:46   7   A.   Oh, three, four.  I just turned in another one last week

09:33:51   8   to the publisher, but not yet done.

09:33:55   9   Q.   Have you also written some scholarly articles?

09:34:00  10   A.   I have.

09:34:00  11   Q.   With regard to your books themselves, have any of those

09:34:06  12   been best sellers?

09:34:07  13   A.   Now you're embarrassing me, I mean, sort of.  Yeah.  I've

09:34:14  14   been fortunate.

09:34:14  15   Q.   Have any of them been translated into other languages?

09:34:20  16   A.   Please don't ask me to give you the names and titles of

09:34:24  17   them in these foreign languages.  They are listed there.  It's

09:34:27  18   always fun to get your book and not be able to understand a

09:34:30  19   word of it because it's been translated.

09:34:33  20   Q.   So, for example, this part right here, you can't read that

09:34:38  21   actually, even though it appears on your CV?

09:34:41  22   A.   I would have to go back and get another degree, which I'm

09:34:43  23   not aiming to do.  Nope.  It's Japanese or Korean.

09:34:48  24   Q.   And a moment ago I asked you about your scholarly

09:34:55  25   publications, right?

*OFFICIAL TRANSCRIPT*

09:34:56 1    A.    Sure.

09:34:56 2    Q.    And with regard to your scholarly publications, have those

09:35:01 3    been peer reviewed?

09:35:03 4    A.    Yes.

09:35:03 5    Q.    So explain that just a little bit for us.  If you have an

09:35:10 6    article that you write and put into the medical or scientific

09:35:15 7    literature, how is that done and what does it mean to be peer

09:35:20 8    reviewed?

09:35:20 9    A.    So if it's a peer-reviewed journal, which are the journals

09:35:24 10   that I publish in, you submit the article to the editor, but

09:35:30 11   then the editor sends it out to people, other scientists, other

09:35:34 12   doctors who will also review -- will review the article and

09:35:37 13   make comments, whether they think the material is accurate,

09:35:43 14   whether they think it should be published, and you get back

09:35:47 15   comments.

09:35:47 16        I've served -- both my articles have been subjected

09:35:52 17   to peer review, but I've also peer reviewed -- been asked to

09:35:56 18   peer review other people's articles.  So it's a process where

09:36:00 19   journals sort of check on what's in the material.

09:36:04 20   Q.    And, Doctor, just to give the jury a flavor, the first one

09:36:12 21   here is a publication in the *Proceedings of the National*

09:36:15 22   *Academy of Sciences of the United States of America*.  I see

09:36:22 23   *New England Journal of Medicine*.

09:36:25 24   A.    For example, on the FDA regulation of stem cells.  So I've

09:36:31 25   written a lot about FDA regulation of drugs, medical devices,

*OFFICIAL TRANSCRIPT*

09:36:36 1    different kinds of products.  That's what you see there.

09:36:39 2    Q.    One of these that was in the *New England Journal* is

09:36:42 3    towards a more comprehensive food labeling, right?

09:36:45 4    A.    Yeah.  Everything -- most of those are about FDA, one way

09:36:50 5    or the other.

09:36:51 6    Q.    And, Doctor, you've actually written articles on cancer

09:36:59 7    drugs; is that right?

09:36:59 8    A.    Speeding up the cancer drug approval, accelerating the

09:37:03 9    cancer drug approval process, yes, that was something that was

09:37:07 10   important to us.

09:37:07 11   Q.    And you told us earlier about the MedWatch program while

09:37:12 12   you were at FDA.  I think you actually published on that, too.

09:37:16 13   Is that correct?

09:37:17 14   A.    Correct.

09:37:17 15   Q.    And explain to us what the MedWatch program is.

09:37:21 16   A.    So, you know, people think when FDA approves a drug, the

09:37:30 17   day it approves it that it's safe and is safe forevermore.  The

09:37:35 18   fact is, when a drug gets approved, it gets approved on the

09:37:38 19   basis of some clinical trials, and people try hard to do the

09:37:43 20   right clinical trials and look at the safety and the adverse

09:37:48 21   events that happen in those clinical trials, but after that

09:37:52 22   drug gets on the market and gets approved, we may learn -- in

09:37:56 23   almost all cases, you'll learn more about a drug.  And that's

09:38:01 24   what is called the postmarketing period.

09:38:06 25         And it's very important because if you test a drug on

*OFFICIAL TRANSCRIPT*

09:38:10  1   a thousand people, but then you give the drug to a million

09:38:14  2   people, you're going to see things that you never saw in those

09:38:17  3   thousand people.  It's not that you did anything wrong; it's

09:38:21  4   just the limitations of those clinical trials, you can't detect

09:38:24  5   everything.

09:38:25  6         So, when a drug gets on the market, it's very

09:38:28  7   important to monitor that drug.

09:38:29  8         And what we did was we created a program by which the

09:38:35  9   manufacturers, but also hospitals and doctors and consumers

09:38:43 10   anywhere in the world could submit to the FDA on one unified

09:38:48 11   form, and the form was called the MedWatch form.

09:38:52 12   Q.   And, Doctor, on FDA-related issues and medical issues,

09:38:59 13   have you been published more than 40 times in the peer-reviewed

09:39:04 14   medical journals?

09:39:06 15   A.   I haven't counted it up, but I think that's probably

09:39:09 16   right.

09:39:09 17   Q.   I'm just kind of reeling through the pages here that keep

09:39:14 18   going, including editorials and then published speeches that

09:39:18 19   you've made, correct?

09:39:19 20   A.   It's been -- again, very, very privileged to have a nice

09:39:24 21   career in that regard.

09:39:25 22   Q.   And have you received honors and awards over this period

09:39:31 23   of time that you've been doing public service?

09:39:33 24   A.   Sure.

09:39:33 25   Q.   And if you could -- and I don't want to embarrass you.

*OFFICIAL TRANSCRIPT*

09:39:36  1   I've turned to page 3 of your CV where you actually identify

09:39:43  2   these.  Can you just give us an idea of some of those honors

09:39:47  3   that you've received?

09:39:48  4   A.    Sure.  I would much rather talk about drug safety than

09:39:52  5   talk about me, but sure.  So, there is -- National Academy of

09:39:58  6   Sciences gave me the public health medal.  You see awards on

09:40:04  7   that page.  American Society of Clinical Oncology.  If you turn

09:40:10  8   to the next page, I think some are -- American Cancer Society,

09:40:17  9   I think, is on there, March of Dimes, the Franklin Delano

09:40:25 10   Roosevelt leadership award.  So, again, very nice awards, but

09:40:30 11   some of these were not just for me, but really recognizing the

09:40:34 12   work of the FDA and all of the people at the FDA.

09:40:36 13   Q.    I'm counting four pages of awards.

09:40:39 14   A.    Yeah, it's --

09:40:40 15   Q.    Have you received any honorary degrees?

09:40:44 16   A.    Yep.  Those are the things when you get to wear those

09:40:48 17   gowns and funny hats --

09:40:49 18   Q.    And --

09:40:53 19   A.    -- and give commencement speeches.

09:40:56 20   Q.    I didn't mean to cut you off again.  And, Doctor, you

09:41:01 21   mentioned, I think, earlier that you have actually served on

09:41:05 22   some boards of pharmaceutical companies; is that right?

09:41:08 23   A.    I have.

09:41:08 24   Q.    Can you tell us what boards you have served on?

09:41:18 25   A.    I waited about a decade after I was FDA commissioner to do

*OFFICIAL TRANSCRIPT*

09:41:23 1   that, but I've gone on the boards of some -- a specialty

09:41:26 2   pharmaceutical company wanted me -- GI drugs, one that made a

09:41:33 3   drug for prostate cancer, on a company that does safety testing

09:41:40 4   for blood and blood banking.

09:41:43 5           So, again, I don't work for those companies, but I'm

09:41:46 6   on the board of directors, so I have sort of fiduciary

09:41:52 7   responsibility for the company, as any board member.

09:41:54 8   Q.   And, Doctor, have you been an invited lecturer throughout

09:41:58 9   the country and, indeed, the world?

09:42:00 10  A.   Yes.  I've been asked to give lectures.  It's part of my

09:42:05 11  academic sort of essence.  It's very nice, you come into -- you

09:42:11 12  get invited by universities around the world to come and give a

09:42:18 13  talk.  It's very nice how you get to meet people.

09:42:21 14  Q.   I noted that you've been to Louisiana before and given a

09:42:24 15  talk at Tulane and LSU; is that right?

09:42:27 16  A.   And had a good time.

09:42:28 17  Q.   Do you have any idea how many lectures you've given around

09:42:35 18  the world on FDA issues and FDA matters?

09:42:39 19  A.   Probably a couple dozen.

09:42:40 20       MR. NOLEN:  With that, Your Honor, I would tender

09:42:47 21  Dr. Kessler to testify in this case as an expert on FDA

09:42:51 22  regulation, drug standards and labeling of drugs and medical

09:42:58 23  devices, as well as a medical expert in the fields of

09:43:01 24  epidemiology and biostatistics.

09:43:09 25       MR. STRONGMAN:  No objections.  I'll reserve my

*OFFICIAL TRANSCRIPT*

09:43:10 1    questions.

09:43:10 2          THE COURT:  The Court is going to accept Dr. Kessler as

09:43:13 3    an expert in the field of FDA regulation, drug standards and

09:43:17 4    labeling of drugs and medical devices, as well as a medical

09:43:20 5    expert in the fields of epidemiology and biostatistics,

09:43:24 6    qualified to render opinions in those areas.

09:43:29 7          Please proceed.

09:43:30 8          THE WITNESS:  Thank you.

09:43:31 9                  DIRECT EXAMINATION

09:43:33 10   BY MR. NOLEN:

09:43:33 11   Q.    Now, Doctor, before we get started with your substantive

09:43:36 12   opinions, I'm going to hand you an expert report that you wrote

09:43:41 13   in this matter and a binder of information that we put together

09:43:47 14   to try to help us move along through your examination.  Is that

09:43:50 15   okay?

09:43:51 16   A.    Thank you, Counselor.

09:43:56 17         MR. NOLEN:  May I approach, Your Honor?

09:43:56 18         THE COURT:  Yes, you may.

09:43:56 19         MR. NOLEN:  Thank you.

09:43:57 20         THE WITNESS:  Thank you.

09:43:59 21   EXAMINATION BY MR. NOLEN:

09:44:15 22   Q.    Are you ready, Doctor?

09:44:16 23   A.    I am.

09:44:16 24   Q.    If you could, tell us why you're here.

09:44:20 25   A.    So I was asked by plaintiff's counsel to look at evidence,

*OFFICIAL TRANSCRIPT*

look at information, and to address the question of whether

Sanofi should have warned about the risks of permanent

hair loss associated with their drug Taxotere, so should they

have warned about permanent hair loss.

Q.   Doctor, do you have an overarching opinion in this case?

A.   I think that would be fair.  Yes, I do.

Q.   Can you tell us what that is?

A.   I think Sanofi should have clearly and prominently warned

about the risks of permanent hair loss associated with

Taxotere.

Q.   Would that warning have been in the product labeling for

Taxotere?

A.   Yes.  Absolutely.  I'm happy to explain what that is.

Q.   Yes.  Please do.

A.   So everyone is familiar with the bottle or, you know, the

form of the drug itself; but accompanying that drug is

something called -- goes by a number of different names.  I

mean, in FDA, we call it the drug label.  It's sometimes called

the physician insert, PI, the package insert.  There are books

that used to collect all the package inserts, even those meant

for physicians.  My mother, when she was alive, would read it

every time she -- a doctor prescribed a medicine, would call me

up and say, what should I do?

        So it's really the central information about a drug,

so that -- you want to be sure that a doctor and a patient --

*OFFICIAL TRANSCRIPT*

09:46:38  1    that a doctor and patient needs in order to have a discussion
09:46:44  2    about taking that drug safely.
09:46:47  3           That's the goal of that information, to make sure
09:46:50  4    that doctor and that patient can have a discussion about what
09:46:57  5    the drug works for, what its risks for, should I take this
09:47:02  6    drug, should I take another drug.  It's really meant to educate
09:47:06  7    the doctor, so the doctor and the patient can have a
09:47:09  8    discussion.
09:47:09  9    Q.   Doctor, is there -- with respect to Taxotere, is there a
09:47:16  10   particular place in the labeling where the warning regarding
09:47:21  11   permanent hair loss should appear, in your view?
09:47:24  12   A.   My opinion is that it should have been clearly and -- the
09:47:30  13   company should have clearly and prominently warned.  I think,
09:47:34  14   in the end, there are different sections of the label.  I'm
09:47:39  15   happy to discuss that.  There is a warning section.  It's
09:47:43  16   called Section 5.  There is an adverse event section called
09:47:49  17   Section 6.
09:47:49  18          I think, in either section, as long as it was clearly
09:47:53  19   and prominently warned of permanent hair loss, that's what I
09:48:00  20   care about.  There are technicalities about which section it
09:48:05  21   should go in, but the goal is to make sure the doctors and
09:48:09  22   patients have that information so that they can discuss whether
09:48:14  23   to take a drug and what to look for, so that there are choices.
09:48:19  24   Q.   So you've given us your overarching opinion just a moment
09:48:24  25   ago.  I need to make sure that I understand.  Did the Taxotere

*OFFICIAL TRANSCRIPT*

09:48:31  1   label provide no warning on permanent alopecia?

09:48:36  2   A.    There was nothing -- if you go through the label and you

09:48:41  3   look at all the sections, there was no warning about permanent

09:48:47  4   alopecia, correct.

09:48:48  5   Q.    All right.  Are there rules that relate to whether Sanofi

09:48:56  6   must warn regarding an adverse reaction?

09:49:02  7   A.    Yes.  There are rules that everyone follows, and they are

09:49:06  8   pretty well known.  They govern when and what do you warn

09:49:12  9   about.

09:49:12 10   Q.    So I need to get into a few specifics.  Was there a rule

09:49:19 11   that would have required Sanofi to describe whether an adverse

09:49:24 12   event is permanent or not?

09:49:25 13   A.    Yes.

09:49:25 14   Q.    What rule would that be?

09:49:29 15   A.    So, on any adverse event, you need to describe, if it's

09:49:38 16   available, information about the nature, severity and duration

09:49:45 17   of that adverse event.

09:49:52 18         You need to give the doctors and patients any

09:49:55 19   information necessary to interpret, I think is what the

09:49:57 20   guidance says, any information in the label.  So you would want

09:50:04 21   to make sure -- because there is a big difference between

09:50:11 22   irreversible and reversible hair loss -- you'd want to make

09:50:18 23   sure doctors and patients have the information.  It's pretty

09:50:21 24   common sense.

09:50:21 25   Q.    So, you know, it occurs to me that we're talking about the

*OFFICIAL TRANSCRIPT*

09:50:25  1    label for Taxotere, and I haven't directed you to tab 1, which

09:50:31  2    is Exhibit 396, Plaintiff's Exhibit 396.

09:50:37  3    A.    Thanks.

09:50:38  4    Q.    Do you recognize that document, Doctor?

09:50:44  5    A.    I do.

09:50:44  6    Q.    Is that the drug labeling for Taxotere?

09:50:48  7    A.    It is.

09:50:53  8          MR. NOLEN:  Plaintiffs are actually going to move that

09:50:55  9    Plaintiff's Exhibit 396 be admitted into evidence, Your Honor.

09:50:59 10          MR. STRONGMAN:  No objection.

09:51:00 11          THE COURT:  Let it be admitted.

09:51:03 12          MR. NOLEN:  May I publish?

09:51:05 13          THE COURT:  Yes, you may.

09:51:07 14          MR. NOLEN:  Thank you.

09:51:08 15          (WHEREUPON, Plaintiff's Exhibit 396 was admitted.)

09:51:10 16    EXAMINATION BY MR. NOLEN:

09:51:10 17    Q.    So, Doctor, is this what you're looking at in your

09:51:13 18    notebook there?

09:51:13 19    A.    It is.

09:51:14 20    Q.    Is this the labeling for Taxotere?

09:51:17 21    A.    It is.

09:51:17 22    Q.    It says it right up here at the top, correct?

09:51:22 23    A.    That's correct.

09:51:22 24    Q.    This is the May 2010 label.  Do you see that, Doctor?

09:51:30 25    A.    Correct.  It says that on the first page.  There is also a

*OFFICIAL TRANSCRIPT*

09:51:34 1    date on the last page, I believe.

09:51:35 2    Q.   All right.  I want to make sure I understand.  Who is

09:51:40 3    responsible for the safety of a pharmaceutical drug?

09:51:44 4    A.   So the drug company has primary responsibility for the

09:51:53 5    safety of a drug, for the drugs it sells.

09:51:59 6    Q.   Is part of the safety of a drug the drug's labeling?

09:52:07 7    A.   Of course.  Safety information needs to be in the drug

09:52:12 8    label.  Again, it's the sort of central document from which a

09:52:19 9    lot of other documents emanate, but it's the sort of central

09:52:24 10   repository of key information, of safety information about a

09:52:31 11   drug.

09:52:31 12   Q.   Doctor, whose drug label is this label for Taxotere?

09:52:41 13   A.   I mean, this is Sanofi's label.  If you look at the last

09:52:45 14   page, as my colleagues at FDA used to say, it's the drug

09:52:53 15   company who owns the label.  They, in fact, have -- there is a

09:52:58 16   little c, I think there's a copyright mark on the last page.

09:53:03 17   So it's the drug company that owns the label.

09:53:05 18   Q.   I've just highlighted that.  That's copyright 2010

09:53:13 19   Sanofi-Aventis U.S. LLC.  Do you see that?

09:53:15 20   A.   I do.

09:53:15 21   Q.   So this is published by the drug company; is that correct?

09:53:19 22   A.   Correct.  It's reviewed by the agency at the time of

09:53:25 23   approval, but it's sort -- this is sort of a living document

09:53:30 24   that can have changes throughout the life of a drug.

09:53:37 25   Q.   So as far as drug safety is concerned, how important is

*OFFICIAL TRANSCRIPT*

09:53:42  1    the label?

09:53:45  2    A.    It's key.  May I explain?

09:53:51  3    Q.    Oh, yes.

09:53:53  4    A.    So it's key because it's the agreed-upon language for

09:54:02  5    which we want doctors and patients to have information.  So

09:54:10  6    anything doctors and patients need to make a decision should be

09:54:13  7    in the label.

09:54:13  8            Now, that doesn't mean -- I mean, I wish it were the

09:54:17  9    case that every doctor read every section of the label.  I

09:54:20 10    don't believe that.  But I do believe the label is key because

09:54:24 11    the label -- sometimes it's copied into -- and it's fine, we

09:54:29 12    encourage that -- it's copied into textbooks or handbooks or

09:54:34 13    books that -- you know, little pocket books that I would carry

09:54:38 14    in my white coat, or I'd have it in my phone these days, or it

09:54:44 15    would be on lecture slides, or it would be discussed in

09:54:47 16    lectures.

09:54:47 17            So, the label, just think about it, is at the center,

09:54:51 18    but all of this -- other ways of communicating with doctors --

09:54:55 19    sales representatives, when they go in, for example, to talk to

09:55:01 20    a doctor, they are supposed to stay and give the information

09:55:05 21    that is consistent with the drug label.

09:55:08 22            So, while, you know, in the physical form, you know,

09:55:14 23    not everybody may read it, it has enormous effect because it's

09:55:20 24    supposed to influence, generally, what doctors and patients

09:55:22 25    know about a drug.

                          *OFFICIAL TRANSCRIPT*

09:55:24  1   Q.    So, Doctor, just briefly -- I don't want to go through

09:55:29  2   every section of this drug label -- can you tell us what the

09:55:34  3   sections are of a drug label.

09:55:36  4   A.    Sure.  If you turn, I think, to the second page of the

09:55:40  5   drug label, you'll see there is a table of contents, and there

09:55:45  6   is 17 different sections.

09:55:48  7         So you have what the drug is used for, what its

09:55:52  8   dosage should be.  Then you have a series of, in essence,

09:55:57  9   warning sections that include contraindications, Section 5 that

09:56:02 10   I've discussed, the warning section, and the adverse reaction

09:56:10 11   section.

09:56:11 12         Then you have other sections lower down, including a

09:56:14 13   section about the clinical trials, as well as information about

09:56:18 14   patient counseling.  That would be information that's sometimes

09:56:24 15   shared directly and actually copied and given to patients.

09:56:28 16         Sometimes when you go into a drug store, and they

09:56:30 17   staple a piece of paper, we worked on that.  That's the sort of

09:56:35 18   abbreviated -- that's the patient package insert.  Not every

09:56:41 19   drug has it, but we encourage that information, so that

09:56:45 20   patients know everything -- have a choice.

09:56:48 21   Q.    I noticed that, unlike what many of us may be familiar

09:56:53 22   with, this is a pretty extensive drug label that is 62 pages in

09:57:01 23   length; is that right?

09:57:02 24   A.    Correct.

09:57:03 25   Q.    Did you review every part of this label?

*OFFICIAL TRANSCRIPT*

09:57:07 1   A.    I study drug labels, but that's what I like to do.

09:57:13 2   Q.    That's what you do in your spare time?

09:57:16 3   A.    Absolutely.

09:57:16 4   Q.    So, Doctor, you told us that the drug company is

09:57:21 5   responsible for the label.  Who is required and responsible and

09:57:28 6   in the best position to provide warnings about the dangers of a

09:57:32 7   drug?

09:57:33 8   A.    So, the primary responsibility rests with the drug

09:57:38 9   company.  They are the ones who do the clinical studies.

09:57:43 10          Many people don't realize that.  They think the FDA

09:57:47 11  does the studies.  We have a private system of drug development

09:57:50 12  in this country.  So a company will study it.  They will get

09:57:54 13  the results.  They will write the reports.  They know the

09:57:58 14  drugs.  They get the adverse reactions.

09:58:01 15          Once the drug is on the market, most of the time they

09:58:04 16  get first the adverse reaction reports.  Sometimes the FDA can

09:58:10 17  get them, but then they are shared with the drug company.

09:58:13 18          Just think about it, a company will have a handful of

09:58:19 19  drugs, I mean, at any one time that it's focused on.  They are

09:58:24 20  really sitting on that information on a day-by-day basis.  FDA

09:58:29 21  has -- when I was there, I had tens of thousands of drugs.  So

09:58:34 22  that's why we say that the company has primary responsibility

09:58:39 23  for assuring the safety of a drug, not only up until the time

09:58:43 24  it gets approved, but throughout the life of the drug while

09:58:48 25  it's on the market.

*OFFICIAL TRANSCRIPT*

09:58:49  1        That's why -- what's very important is to update this

09:58:54  2   label and change it as soon as you have evidence that -- or

09:58:58  3   information that you think may be relevant to a doctor and a

09:59:03  4   patient having a discussion.

09:59:04  5   Q.   So, Doctor, that begs the question, I guess, is what role

09:59:09  6   does FDA, the agency you headed, have?

09:59:15  7   A.   That's a great question.  FDA is responsible for the

09:59:21  8   approval of the drug.  So you can't get it on the market unless

09:59:26  9   FDA approves it.

09:59:27 10        So the day that a drug is approved -- and this, I

09:59:33 11   think, if you go back to the first page, you see it was

09:59:40 12   approved in 1996 -- that day of approval, FDA has gone through

09:59:43 13   that label pretty thoroughly.

09:59:46 14        Here, you have -- it's a little complicated because

09:59:48 15   the drug has gotten approved for different indications

09:59:52 16   subsequently.  So FDA does look at it periodically.

09:59:55 17        So, no doubt, FDA takes a lot of care at the time of

10:00:01 18   approval; but, then this -- it's this period of postmarketing

10:00:05 19   when things happen.  So, FDA does have some information and

10:00:11 20   does have back and forth, but that's -- in general, I mean, and

10:00:16 21   the rules have it, it's the company's responsibility to update

10:00:19 22   the label as soon as they have information that a doctor and a

10:00:26 23   patient should need to discuss.

10:00:28 24   Q.   All right.  Now, Doctor, you mentioned a couple of things,

10:00:32 25   and I just need to kind of unpack that answer you just gave.

*OFFICIAL TRANSCRIPT*

10:00:35 1                You talked about FDA approval in 1996 for Taxotere,

10:00:35 2    right?

10:00:41 3    A.    Correct.

10:00:41 4    Q.    All right.  It says right here on the front, approval,

10:00:46 5    1996, correct?

10:00:47 6    A.    Correct.

10:00:47 7    Q.    Were you the commissioner who approved Taxotere?

10:00:52 8    A.    I was -- I was commissioner.  My good Center for Drugs did

10:00:58 9    the approval, but I was commissioner on my watch.  I mean, I

10:01:03 10   stand by their actions, am responsible for them.

10:01:07 11   Q.    Just to be clear at this juncture, your opinion in this

10:01:14 12   case is not that Taxotere should not have been approved?

10:01:18 13   A.    No.  I have no -- no question in my mind about that.

10:01:26 14   Taxotere should have been approved.  The risk/benefit is such,

10:01:34 15   the benefits outweigh the risks.

10:01:36 16               The question is just what information needed to be

10:01:40 17   conveyed, not at the time of approval, right, but subsequently

10:01:46 18   on the label, and when should the label have been updated.

10:01:49 19   That's the question.

10:01:49 20   Q.    You mentioned something called *postmarketing*.  I want to

10:01:54 21   be sure I understand what postmarketing means.  What is

10:02:00 22   postmarketing?

10:02:00 23   A.    So that approval date is 1996.  Anything before 1996 is

10:02:06 24   premarketing.  Anything post-1996 is postmarketing.

10:02:15 25               So there is premarketing, before it goes on the

*OFFICIAL TRANSCRIPT*

market.  There was no Taxotere on the market, so you --
sometimes you have a drug approved in another country, and you
may have adverse events, but that's the premarketing period.

From 1996 on, that's postmarketing.

Now, you have to be a little careful because there
were a whole host, a whole handful of subsequent supplemental
approvals, so it gets a little complicated, for other types of
cancers in other forms, where there are subsequent approvals
thereafter.

Q.   In this postmarketing period of time, after this drug is
now on the market, it's being sold, and in this particular
case, 1996, it's on the market, it's being sold, who is
responsible for monitoring the safety of the drug?

A.   The drug company.  That's the way it works.  I mean,
certainly, postmarketing -- you don't just put a drug on the
market and say, done.

As, you know, you saw in that video deposition -- I
was in the courtroom -- the companies monitor postmarketing
for, are there -- is there any new adverse events?  Are there
any different adverse events?  Is there any change in nature or
severity?  Again, is there anything that comes up that we've
got to let doctors and patients know about?  That's the
question, and do it in the label.

Q.   I think we're going to talk a little bit more about what
is involved in that postmarketing a little later.  But, first,

*OFFICIAL TRANSCRIPT*

10:04:02  1   I need to ask you, while the drug is on the market and being

10:04:07  2   sold to consumers, doctors are prescribing it, who is

10:04:10  3   charged -- who is obligated to update the label as new

10:04:13  4   information comes available?

10:04:15  5   A.   The drug company.

10:04:16  6   Q.   Does the FDA ultimately review any updates by the

10:04:23  7   manufacturer?

10:04:24  8   A.   That would be correct.

10:04:25  9   Q.   Tell us how that process works.

10:04:28  10  A.   Well, there is a number of different processes.  I think

10:04:34  11  it's fair to say, when you're talking about safety issues --

10:04:40  12  we're not talking about whether there is a new claim that it

10:04:44  13  works for different types of cancer, I'm talking about when

10:04:47  14  there are safety issues -- it's the responsibility of the drug

10:04:51  15  company to update the label.  There are several different

10:04:55  16  processes that the company can go through.

10:04:59  17          Dating back to 1979, FDA has made clear that there

10:05:05  18  should be no impediment, there is no regulation that stands in

10:05:09  19  the way of a drug company from warning.  It makes sense.  If

10:05:14  20  you think that there is an issue about drug safety, you can

10:05:18  21  warn.  You should make -- you can make a change in the label.

10:05:21  22  There is a technical name for that process.  It's called CBE,

10:05:25  23  or changes being effected.  But even then, you're supposed to

10:05:30  24  come in and discuss it with the agency.

10:05:34  25          Certainly, thereafter, but you can go make that

**OFFICIAL TRANSCRIPT**

10:05:37  1   change, if it's safety information.  Again, that's the goal,

10:05:43  2   make sure doctors and patients have the information they need.

10:05:47  3   That's what's key.

10:05:50  4   Q.   Now, you just said something, and I want to be clear

10:05:54  5   because I'm not sure I entirely understood it.  Is there

10:05:57  6   anything in the regulations or the rules that prohibit a drug

10:06:02  7   company from updating a label as soon as it learns about a new

10:06:05  8   hazard with the drug?

10:06:07  9   A.   When it comes to safety information, always warn.  Nothing

10:06:10 10   stands in the way of warning.

10:06:11 11   Q.   What about the doctors' role in the safety of prescribing

10:06:17 12   drugs to their patients?  Do doctors -- are they required and

10:06:24 13   obligated to constantly monitor every drug that they prescribe?

10:06:37 14   A.   You know, I'd love to say yes, but, you know, the reality

10:06:42 15   is that doctors, especially those in clinical practice, are

10:06:48 16   very busy.  That's why -- I mean, can you go read -- no doctor

10:06:58 17   is going to read all the medical literature, read clinical

10:07:02 18   studies.  That's why we have a drug label.

10:07:05 19        That's why there is a drug label, to make it --

10:07:09 20   again, they may not even read the drug label.  They may read a

10:07:13 21   handbook or a textbook or go to a lecture or hear from a

10:07:16 22   sales rep.  We want to make it easy for doctors, right, because

10:07:20 23   they don't have time to go searching through, you know, endless

10:07:27 24   articles or -- I mean, I -- you know, clinical reports that are

10:07:32 25   30, 40,000 pages, they are not even available fully to doctors.

*OFFICIAL TRANSCRIPT*

10:07:37 1          So, what you try to do is make the information

10:07:42 2    available in the label, and make sure that important things --

10:07:51 3    make sure important information is available to that doctor and

10:07:55 4    patient in the label.  That's the bottom line.

10:07:57 5    Q.   Doctor, I think probably everybody here is familiar with

10:08:01 6    drug marketing because we've seen ads on TV.  Is there also

10:08:07 7    other type of drug marketing that includes sales reps who

10:08:12 8    actually physically visit doctors?

10:08:15 9          MR. STRONGMAN:  Objection.  Leading.  It's outside the

10:08:18 10   scope.

10:08:18 11         THE COURT:  Sustain.  Rephrase your question.

10:08:20 12   EXAMINATION BY MR. NOLEN:

10:08:21 13   Q.   Do drug companies have sales representatives?

10:08:24 14   A.   Yes.

10:08:24 15   Q.   Do they visit doctors?

10:08:26 16   A.   Yes, and nothing wrong with that.  I mean, that's the way

10:08:29 17   the system works.  They are supposed to be consistent what they

10:08:34 18   say with the drug label.  So they are trained on the drug

10:08:38 19   label.  So if there is new safety information, that's one way

10:08:42 20   doctors could get that information.  If it's in the label, it

10:08:49 21   could be shared with doctors.

10:08:49 22   Q.   All right.  Doctor, that's important, I guess, is when the

10:08:57 23   sales representative visits a doctor, what is the purpose of

10:09:02 24   the visit?

10:09:06 25         MR. STRONGMAN:  Objection, speculative.

**OFFICIAL TRANSCRIPT**

| | |
|---|---|
| 10:09:08 1 | THE COURT:  Lay a foundation. |
| 10:09:10 2 | EXAMINATION BY MR. NOLEN: |
| 10:09:12 3 | Q.   Sure.  Doctor, you're aware that sales representatives |
| 10:09:15 4 | visit doctors to promote drugs, correct? |
| 10:09:17 5 | A.   Correct. |
| 10:09:17 6 | Q.   All right.  Do you have an understanding about what kind |
| 10:09:21 7 | of information sales representatives provide to doctors when |
| 10:09:25 8 | they visit to promote drugs? |
| 10:09:27 9 | A.   Yes.  I have that. |
| 10:09:31 10 | MR. STRONGMAN:  Still speculation. |
| 10:09:34 11 | THE COURT:  I think it is speculation.  Let's move on. |
| 10:09:38 12 | Or lay a clearer foundation. |
| 10:09:41 13 | EXAMINATION BY MR. NOLEN: |
| 10:09:42 14 | Q.   Doctor, you're a practicing physician, correct? |
| 10:09:44 15 | A.   I am. |
| 10:09:45 16 | Q.   Have you ever been visited by sales representatives? |
| 10:09:48 17 | A.   I won't let a sales -- I'm sorry, I don't -- I don't mean |
| 10:09:50 18 | anything by this, and nothing should be taken from this, but my |
| 10:09:54 19 | policy is not to see sales reps.  But that's my own personal |
| 10:09:59 20 | policy, and nothing should be inferred from that.  I don't |
| 10:10:02 21 | think there is anything wrong with sales reps going in, but |
| 10:10:05 22 | it's been my practice not to be seen by a sales reps. |
| 10:10:10 23 | Q.   When you were at FDA and currently, are there regulations |
| 10:10:15 24 | as to what sales representatives can share with physicians? |
| 10:10:20 25 | A.   Yes.  I mean, it -- the most important thing is the |

*OFFICIAL TRANSCRIPT*

10:10:24  1   information has to be consistent with the label.  I mean, the

10:10:29  2   label is key.  You want to have the essential information,

10:10:34  3   what's the evidence of where the drug works, what's the

10:10:37  4   important safety information, how can the doctor and the

10:10:43  5   patient make an informed decision so the patient had choices.

10:10:51  6          I mean, can I just add to that?

10:10:53  7   Q.   Sure.

10:10:54  8   A.    I mean, there was a day -- you go back, 1930s, 1940s, and

10:11:02  9   I read the history where the information in the drug label,

10:11:08 10   doctors actually wrote, it should be written in a language that

10:11:11 11   patients could not understand.

10:11:15 12          MR. STRONGMAN:  Objection.  This is a narrative.  Not

10:11:17 13   responsive to the question.

10:11:18 14          THE COURT:  I think, sustained.  Let's move on.

10:11:20 15   EXAMINATION BY MR. NOLEN:

10:11:21 16   Q.   So, Doctor, the labeling, you've told us, is very

10:11:24 17   important, correct?

10:11:25 18   A.    Correct.

10:11:25 19   Q.   It's very important to warn about potential side effects?

10:11:31 20   A.    Correct.  That patients -- in language that patients could

10:11:35 21   understand, yes.  Absolutely.

10:11:36 22   Q.   Now, is the label aimed towards the patient or to the

10:11:40 23   doctor?

10:11:41 24   A.    It's aimed primarily -- the physician part of the label is

10:11:44 25   aimed at the physician.  But we all know that it's really about

**OFFICIAL TRANSCRIPT**

10:11:52  1    the physician communicating with the patients.

10:11:56  2              Not to be -- I mean, that -- those days of where it

10:12:02  3    was supposed to only be the doctor are no longer.  We want

10:12:05  4    patients to have information.  That's what's key.  There is no

10:12:10  5    longer a paternalistic system that only doctors get

10:12:13  6    information.  We want patients to have information.  That was

10:12:16  7    my point.

10:12:16  8              THE COURT:  Mr. Nolen, why don't you let me know when

10:12:22  9    it's a good time for a break.

10:12:24 10              MR. NOLEN:  I'll take about five more minutes, if

10:12:27 11    that's okay, Your Honor.

10:12:28 12              THE COURT:  Perfect.  Then we'll take our morning

10:12:30 13    break.  Thank you.

10:12:31 14    EXAMINATION BY MR. NOLEN:

10:12:32 15    Q.   Doctor, I want to turn briefly to a different topic, which

10:12:35 16    is this label we have in front of us, the 2010 Taxotere label.

10:12:39 17    I'll represent to you that the reason we have the 2010

10:12:43 18    Taxotere label is because Ms. Earnest took Taxotere, was

10:12:48 19    prescribed Taxotere in early 2011, so that's why this drug

10:12:56 20    label is at issue.

10:12:57 21              Now, in this drug label, is there a warning about

10:13:04 22    permanent hair loss?

10:13:06 23    A.   No.

10:13:07 24    Q.   Is there a warning about something called permanent

10:13:15 25    alopecia?

**OFFICIAL TRANSCRIPT**

10:13:15  1    A.    No.

10:13:15  2    Q.    Is alopecia the same as hair loss?

10:13:19  3    A.    Alopecia is hair loss, yes.

10:13:23  4    Q.    Is alopecia warned of in this label?

10:13:27  5    A.    It is.

10:13:27  6    Q.    I think I can see it here.  Under Adverse Reactions, which

10:13:42  7    is this section right here on the first page, I see alopecia.

10:13:51  8    Do you see that, sir?

10:13:51  9    A.    I do, sir.

10:14:03 10    Q.    I'm going to try to get a little closer.  Doctor, since

10:14:08 11    1996, when this drug first came on the market, from the very

10:14:13 12    beginning, has alopecia been on the label?

10:14:16 13    A.    It has.

10:14:16 14    Q.    Through this label in 2010, was permanent alopecia in the

10:14:22 15    label?

10:14:22 16    A.    No.

10:14:23 17    Q.    Is that significant?

10:14:28 18    A.    Yes.

10:14:29 19    Q.    Why?

10:14:32 20    A.    Because they are different.

10:14:33 21    Q.    And explain that, please.

10:14:40 22    A.    Certainly through the year 1999 or so, the general

10:14:49 23    understanding was that hair loss associated with chemotherapy

10:14:56 24    was reversible, that it would come back.  So anytime there is a

10:15:01 25    change, there is a big difference between something that comes

*OFFICIAL TRANSCRIPT*

10:15:08  1    back and something that can be disfiguring for a lifetime.

10:15:16  2          Just think if there is a -- my grandkids, you know,

10:15:22  3    the tattoos -- if my grandkids had, you know, one of those --

10:15:29  4          MR. STRONGMAN:  Objection, outside of the scope of the

10:15:31  5    question.

10:15:34  6          THE COURT:  Sustained.  Let's proceed.  I think the

10:15:37  7    question was, if they're different, please explain that.

10:15:42  8          THE WITNESS:  They are very different.  Just think if

10:15:46  9    you're a patient and I'm going to give you a drug and it's an

10:15:53 10    important drug, there are other drugs that also can be given,

10:15:58 11    and that's going to -- I'm going to say, you know, you're going

10:16:02 12    to have hair loss and it's going to grow back in, you know,

10:16:07 13    three months or six months.  You'll say, hey, I'm not going to

10:16:11 14    like that, but I'll probably endure that.

10:16:14 15          If I know that it's -- or there is a chance that

10:16:18 16    it's going to be permanent, it's never going to grow back, that

10:16:22 17    would be information that you would want.

10:16:24 18    EXAMINATION BY MR. NOLEN:

10:16:24 19    Q.   And, Doctor, just to crystalize that --

10:16:28 20          THE COURT:  Was there an objection?

10:16:30 21          MR. STRONGMAN:  Go ahead.  He finished.

10:16:33 22          THE COURT:  Okay.

10:16:33 23    EXAMINATION BY MR. NOLEN:

10:16:33 24    Q.   Just to crystalize that, Doctor, alopecia is the issue,

10:16:38 25    right?  That's the issue we're here about, permanent alopecia

*OFFICIAL TRANSCRIPT*

10:16:42 1    versus alopecia, right?

10:16:43 2              MR. STRONGMAN:  Objection.  Leading.

10:16:43 3    EXAMINATION BY MR. NOLEN:

10:16:46 4    Q.    That's your understanding?

10:16:46 5              THE COURT:  Overruled.  I'm going to allow him.

10:16:49 6              THE WITNESS:  It's my understanding of whether the

10:16:52 7    company should have warned that there was permanent hair loss.

10:16:57 8    And it's my opinion that nature, severity and duration of an

10:17:03 9    adverse event is important and required.

10:17:07 10   EXAMINATION BY MR. NOLEN:

10:17:10 11   Q.    Nature, severity and duration.

10:17:11 12             In this same section, Adverse Reactions, it has

10:17:17 13   diarrhea.  Do you see that?

10:17:19 14   A.    Correct.

10:17:19 15   Q.    It as vomiting, right?

10:17:21 16   A.    Correct.

10:17:21 17   Q.    And if there was a permanent diarrhea attached to

10:17:27 18   Taxotere, would that be important to advise patients about?

10:17:31 19   A.    Certainly that goes to nature and severity and duration.

10:17:35 20   If you have that information, once that information becomes

10:17:41 21   available, my opinion is that that should be in that label,

10:17:47 22   because it's important information for a doctor and patient to

10:17:50 23   have.

10:17:51 24   Q.    And so the word "permanent" becomes extremely important if

10:17:56 25   we're talking about, for example, diarrhea?

*OFFICIAL TRANSCRIPT*

10:17:57  1          MR. STRONGMAN:  Objection.  Leading.

10:17:59  2          THE COURT:  Sustained.

10:18:00  3          Rephrase your question.

10:18:04  4          MR. NOLEN:  Thank you.  We can break.

10:18:06  5          THE COURT:  This is a good time for our morning break.

10:18:09  6   Court will be at recess for ten minutes.

10:18:12  7          THE DEPUTY CLERK:  All rise.

10:18:13  8          (WHEREUPON, at 10:18 a.m. the jury panel leaves the

10:29:33  9   courtroom.)

10:29:33 10          THE DEPUTY CLERK:  All rise.

10:31:08 11          (WHEREUPON, at 10:31 a.m. the jury panel enters the

10:31:32 12   courtroom.)

10:31:32 13          THE COURT:  All jurors are present.  Court is back in

10:31:35 14   session.  You may be seated.

10:31:37 15              Dr. Kessler, I remind you you're under oath.

10:31:40 16          THE WITNESS:  Thank you, Your Honor.

10:31:41 17          THE COURT:  Thank you.  Please proceed.

10:31:43 18          MR. NOLEN:  Thank you, Your Honor.

10:31:43 19   EXAMINATION BY MR. NOLEN:

10:31:44 20   Q.   Dr. Kessler, you've told us several times about the rules

10:31:48 21   that drug companies must comply with.  Do you remember that

10:31:50 22   testimony?

10:31:51 23   A.   I do.

10:31:54 24   Q.   And I would like to direct your attention, I think, to

10:31:57 25   tab 2 -- right, tab 2 in your notebook there.  And under tab 2,

**OFFICIAL TRANSCRIPT**

10:32:09 1     I think you'll see a portion of Section 201.57 of the Code of

10:32:15 2     Federal Regulations.  Do you recognize that?

10:32:17 3     A.    I do.

10:32:17 4     Q.    And is this something you're familiar with in your work at

10:32:26 5     FDA and as a lawyer?

10:32:28 6     A.    I went to law school.  I never took a Bar, so I don't

10:32:32 7     represent myself as a lawyer, but, yes, I know these

10:32:36 8     regulations very well.  I've studied these extensively.

10:32:39 9     Q.    And you've lectured on them, right?

10:32:42 10    A.    I have.  I taught them and enforced them.

10:32:46 11         MR. NOLEN:  Your Honor, I would like to publish just

10:32:48 12    this small portion of the CFR for the jury so they have a sense

10:32:54 13    of what it is that we're talking about.

10:32:55 14         MR. STRONGMAN:  No objection.

10:33:00 15         THE COURT:  Please do so.

10:33:00 16    EXAMINATION BY MR. NOLEN:

10:33:01 17    Q.    So I've put on the ELMO, the presenter as it's called now,

10:33:06 18    I've put on a copy of the Food and Drug Administration HHS --

10:33:14 19    what is HHS, Doctor?

10:33:16 20    A.    It's the Department of Health and Human Services, of which

10:33:20 21    FDA is an agency.

10:33:21 22    Q.    And it looks like Section 201.57 of the regulations; is

10:33:21 23    that right?

10:33:34 24    A.    Correct.  That relate to the content and format, basically

10:33:37 25    what has to be in the drug label.

*OFFICIAL TRANSCRIPT*

10:33:39  1    Q.   And so I've highlighted it, I've highlighted the part
10:33:42  2    that says, "Specific requirements on content and format of
10:33:45  3    labeling for human prescription drug and biological products
10:33:50  4    described in Section 201.56(b)(1)."  Do you see that?
10:33:56  5    A.   I do.
10:33:56  6    Q.   All right.  And is this the section that relates to the
10:34:00  7    labeling for pharmaceutical drugs?
10:34:02  8    A.   Correct.
10:34:03  9    Q.   And I'm going to direct your attention, because you can
10:34:06 10    see these are -- actually, it looks better on the presenter
10:34:13 11    than it does on the paper because it's bigger, but if we turn
10:34:18 12    back to page 38 of the document, it talks about labeling, and I
10:34:31 13    want to ask you specifically about that.
10:34:36 14         I'm trying to get the whole thing in and not make
10:34:42 15    everybody dizzy.
10:34:43 16         Doctor, the questions I have is, do these rules --
10:34:51 17    and I'll just call them rules -- provide for when a
10:34:59 18    manufacturer is supposed to revise and update its labeling?
10:35:04 19    A.   Yes.
10:35:05 20    Q.   And these are the rules that pharmaceutical companies are
10:35:09 21    obligated to comply with; is that true?
10:35:12 22    A.   Correct.
10:35:12 23    Q.   In your experience, Doctor, are the pharmaceutical
10:35:18 24    companies well aware of these regulations?
10:35:22 25    A.   This is their bread and butter.

*OFFICIAL TRANSCRIPT*

10:35:24  1    Q.    So in order to maintain -- get a drug to market, maintain

10:35:28  2    it on market, they have to comply with this?

10:35:31  3    A.    Exactly.

10:35:31  4    Q.    So, I'm going to direct your attention to this part

10:35:38  5    where it says -- that I've already highlighted, and I did

10:35:44  6    that for myself because it's small and it's hard to read

10:35:47  7    when I'm standing here.  It says, "The labeling must be

10:35:49  8    revised to include a warning about a clinically significant

10:35:54  9    hazard as soon as there is reasonable evidence of a causal

10:35:59  10   association -- a causal association with a drug.  A causal

10:36:04  11   relationship need not have been definitely established."

10:36:07  12           Do you see that?

10:36:08  13   A.    I do.

10:36:09  14   Q.    Can you try to tell us what that means in English?

10:36:15  15   A.    Sure.  So it starts with -- that's for -- that's the

10:36:20  16   standard for the warning section of the label.  That's

10:36:25  17   Section 5.  And that warning section says if there is a

10:36:34  18   clinically significant hazard, and that's whether it's serious,

10:36:40  19   clinically significant, whether it could makes a difference in

10:36:44  20   patients' lives, you have to warn about the adverse event

10:36:50  21   when -- and this is the standard, when there is reasonable

10:36:54  22   evidence -- reasonable evidence of a causal association, and

10:37:02  23   there is a comma, and it basically says but it doesn't have to

10:37:07  24   be definite evidence of causal.  So it doesn't have to be

10:37:10  25   perfect, it doesn't have to be a hundred percent.  It's

**OFFICIAL TRANSCRIPT**

10:37:13  1    reasonable evidence of a causal association.

10:37:15  2         A causal association goes to whether the drug causes

10:37:26  3    that adverse event, whether it impacts, whether it drives it,

10:37:33  4    whether it has an effect.  So the question has to be reasonable

10:37:35  5    evidence -- once you have reasonable evidence of a causal

10:37:38  6    association.  It doesn't have to be a hundred percent evidence.

10:37:45  7    Because it says specifically "a causal relationship need not

10:37:50  8    have been definitely established."  But once there is that,

10:37:56  9    then you have to put the adverse event and warn about it in the

10:38:01  10   warning section of the label.

10:38:03  11   Q.   I want to direct you to another section because we just --

10:38:08  12   just for context, we just looked at the Taxotere label and we

10:38:12  13   looked at the adverse reactions section where it says the word

10:38:18  14   "alopecia."  Do you remember that?

10:38:19  15   A.   I do.

10:38:19  16   Q.   And so, if we go down the bottom of 38 -- and I'm going to

10:38:27  17   try to get in there so we can see it -- it says, "For purposes

10:38:34  18   of prescription drug labeling, an adverse reaction is an

10:38:41  19   undesirable effect reasonably associated with use of a drug" --

10:38:47  20   and there is "drug" -- "that may occur as part of the

10:38:53  21   pharmacological action of the drug or may be unpredictable in

10:38:59  22   its occurrence."  Do you see that, Doctor?

10:39:01  23   A.   Correct.

10:39:02  24   Q.   All right.  What does that mean?

10:39:07  25   A.   So the warning section is Section 5 of the label, and

10:39:13  1    Section 6 is the adverse event section, both in the label.  And

10:39:18  2    the standard here is just slightly different.  It doesn't say

10:39:22  3    it has to be a clinically significant hazard.  It says -- I

10:39:27  4    think it says *untoward effect*, an undesired effect.  So it's

10:39:31  5    probably not quite as serious.

10:39:34  6            Probably the best language to underline, if I may,

10:39:39  7    Counsel, is just if you can -- the rest of that paragraph, just

10:39:44  8    go -- just go back up.  It says "some reason to believe."  So

10:39:48  9    it's some reason to believe --

10:39:51 10            MR. STRONGMAN:  Objection.  He's not answering the

10:39:52 11    question.  We're beyond the question.

10:39:54 12            THE COURT:  Overruled.  I'm going to allow him to

10:39:57 13    explain it.

10:39:57 14            THE WITNESS:  So if you just go up, Counsel, you see

10:40:00 15    that in that same paragraph, because it's in English, it says,

10:40:03 16    "some basis to believe there is a causal relationship between

10:40:07 17    the drug and the adverse event."  So there is some reason to

10:40:11 18    believe.

10:40:11 19            So the warning section is reasonable evidence of

10:40:14 20    a causal association.  It doesn't have to be definitive.  This

10:40:17 21    is reasonably associated with the drug.  Some basis to believe

10:40:24 22    there is a causal relationship.  That's for the adverse

10:40:28 23    reaction section of the label.  Two different sections of the

10:40:31 24    label, both where warnings can occur.

10:40:33 25    EXAMINATION BY MR. NOLEN:

                            *OFFICIAL TRANSCRIPT*

10:40:35  1    Q.   And I notice, too, there is additional language that I've

10:40:40  2    highlighted.  When is it that those adverse reactions -- when

10:40:47  3    is it that any type of warning is supposed to be updated?

10:40:52  4    A.   The bottom line is when it's important for doctors and

10:40:55  5    patients to have that information.  Specifically in the

10:41:01  6    regulations, in the adverse event section when it talks about

10:41:04  7    nature, severity, duration, any information -- the guidance

10:41:09  8    says when it's necessary -- any information necessary to

10:41:12  9    interpret that adverse event.

10:41:14  10   Q.   And you've just said some words there that I think we find

10:41:17  11   right here.

10:41:18  12        "For adverse reaction with clinical significant

10:41:24  13   implications, the listings must be supplemented with additional

10:41:28  14   detail about the nature, frequency and severity of the adverse

10:41:33  15   reaction."

10:41:34  16        Do you see that, Doctor?

10:41:36  17   A.   Correct.

10:41:36  18   Q.   Is that consistent what you just told us?

10:41:39  19   A.   It is.

10:41:39  20   Q.   So, Doctor, this the rule that a drug company must follow;

10:41:48  21   is that correct?

10:41:48  22   A.   I think you probably put an "s" on that, and I would

10:41:51  23   agree.  There are a number of different rules for the warning

10:41:53  24   section, and there is rules for the adverse event section.

10:41:56  25   Q.   And in your view, Doctor, did Sanofi comply with this with

**OFFICIAL TRANSCRIPT**

10:42:02 1   regard to permanent hair loss?

10:42:04 2   A.    No.

10:42:04 3   Q.    And you reviewed the Taxotere label, I think you told us

10:42:12 4   that already, correct?

10:42:13 5   A.    Correct.

10:42:13 6   Q.    And did you ever find a warning about permanent hair loss

10:42:20 7   in any section?

10:42:23 8   A.    In the label that you've shown me.

10:42:26 9   Q.    From a regulatory standpoint, is it your belief that that

10:42:31 10  should have been warned about?

10:42:33 11        MR. STRONGMAN:  Objection.  Leading.

10:42:35 12        THE COURT:  Rephrase -- no, overruled.

10:42:39 13        THE WITNESS:  Yes, it should have been warned -- Sanofi

10:42:41 14  should have warned clearly and prominently about the risks of

10:42:47 15  irreversible hair loss.

10:42:47 16  EXAMINATION BY MR. NOLEN:

10:42:51 17  Q.    What have you reviewed in this case to come here and

10:42:54 18  provide opinions today?

10:42:57 19  A.    I've reviewed, you know, thousands and thousands of pages

10:43:00 20  of documents.  I have looked at Sanofi's pharmacovigilance

10:43:12 21  database.  I have looked at their clinical trials.  I've looked

10:43:16 22  at the medical literature.  I've read testimony, deposition

10:43:19 23  testimony.  I've read company internal correspondence.

10:43:22 24  Q.    So I want to be clear about this.  Is it your opinion that

10:43:28 25  by 2011, the time that Ms. Earnest took Taxotere, there should

*OFFICIAL TRANSCRIPT*

10:43:35  1    have been a warning about permanent hair loss?

10:43:36  2    A.   Yes.

10:43:39  3    Q.   With regard to the information that you have reviewed,

10:43:44  4    have you made a determination about approximately when the

10:43:51  5    information was sufficient to put Sanofi on notice that it

10:43:57  6    needed to provide a permanent hair loss warning?

10:44:01  7    A.   Yes, I have made that determination.

10:44:06  8    Q.   When, approximately, was that?

10:44:09  9    A.   I think not later than about 2009, and probably as early

10:44:13 10    as around 2006.

10:44:17 11    Q.   We talked about this earlier, but I need to be clear.  Did

10:44:21 12    Sanofi need FDA to tell it to make a labeling change to add

10:44:29 13    *permanent* to the alopecia warning?

10:44:31 14    A.   No, it does not.

10:44:32 15    Q.   I think you told us about changes being effected.  How

10:44:38 16    does that process work?

10:44:42 17    A.   Changes being effected is if you have evidence of a safety

10:44:46 18    hazard, if you have any new information that you think doctors

10:44:49 19    and patients should have, it's one of the ways you can get that

10:44:53 20    information on the label.  You can go ahead and make that

10:44:57 21    changes -- that change to the label, even without FDA approval.

10:45:01 22    But then you have to come in to FDA, and FDA ultimately gets to

10:45:06 23    review that label.

10:45:07 24    Q.   Okay.  But the labeling change itself is not FDA

10:45:14 25    generated; is that correct?

*OFFICIAL TRANSCRIPT*

10:45:16 1    A.   Under a changes being effected, that would be correct.

10:45:19 2    Q.   All right.  I want to direct your attention back just for

10:45:23 3    a moment, if I could, to the label itself.  We talked about how

10:45:27 4    thick this thing is.  It's big.  It's thick.  There is a lot of

10:45:31 5    information here that's aimed at doctors.

10:45:34 6            Is there any information that is aimed towards

10:45:37 7    patients?

10:45:38 8    A.   Yes.

10:45:38 9    Q.   Where is that information found?

10:45:43 10   A.   First -- I do want to underscore this -- I think the

10:45:47 11   entire label, ultimately, is about patients.  It's doctors

10:45:52 12   conveying the information to patients.

10:45:54 13           But there is a special section of the label, at the

10:45:57 14   very end of the label, excuse me, that I believe is titled

10:46:04 15   Patient Counseling Information.

10:46:06 16   Q.   If I can -- see if I can locate exactly where that starts.

10:46:19 17   Yes.  Yes.  Right here.  It's page 58.  58.

10:46:28 18           It says, Patient Information.  Do you see that?  Is

10:46:32 19   this what you're referring to?

10:46:34 20   A.   Correct.  One thing we did when we were at FDA is we

10:46:37 21   encouraged drug companies to do exactly this.  We call this the

10:46:41 22   patient package insert, the patient information section of the

10:46:45 23   label.

10:46:45 24   Q.   What's the purpose of it?

10:46:50 25   A.   Not to supplant the physician/patient discussion, that's

**_OFFICIAL TRANSCRIPT_**

10:47:01 1    not the purpose, but to make sure that the patient has the

10:47:05 2    information that he or she would need to make a decision, do I

10:47:11 3    want to take this drug?  Do I want to take another drug?  Do I

10:47:14 4    want to -- what should I be looking for?  What's the correct

10:47:19 5    dose?

10:47:20 6              So it gives basic information that's important --

10:47:24 7    that would be important to consider or to be looking out for or

10:47:28 8    to know about in using a drug.

10:47:31 9    Q.   Does it include this section called What are Possible Side

10:47:37 10   Effects?

10:47:37 11   A.   It does.

10:47:38 12   Q.   That's page 60 of this label.  It identifies potential

10:47:49 13   side effects with the drug; is that correct?

10:47:51 14   A.   Correct.

10:47:52 15   Q.   If we turn to page 61, which is the next page, do you see

10:48:02 16   a warning about hair loss?

10:48:04 17   A.   Yes.

10:48:05 18   Q.   Under the most common side effects of Taxotere include --

10:48:13 19   and we've got that list, again -- it looks like diarrhea, rash,

10:48:21 20   nausea and vomiting, and hair loss.  Right?

10:48:27 21   A.   Correct.

10:48:27 22   Q.   Is there anywhere in this patient information that

10:48:34 23   permanent hair loss was labeled?

10:48:36 24   A.   No.

10:48:36 25   Q.   So we're clear, I want to be sure that we're entirely

*OFFICIAL TRANSCRIPT*

10:48:54  1   clear, so if we look at the package, the labeling for Taxotere,

10:49:03  2   in the part that is aimed towards physician, there is no

10:49:08  3   permanent hair loss warning; is that right?

10:49:11  4   A.   Correct.

10:49:11  5   Q.   The same is true for the patient information; is that

10:49:15  6   correct?

10:49:16  7   A.   Correct.

10:49:16  8        THE COURT:  You're leading.

10:49:32  9             He answered before he objected, but he was

10:49:32 10   leading the witness.  I'm cautioning Mr. Nolen.

10:49:43 11   EXAMINATION BY MR. NOLEN:

10:49:44 12   Q.   Now, did you reach any sort of conclusion in the

10:49:46 13   investigation that you conducted in this matter about whether

10:49:48 14   or not hair loss is associated, from a regulatory standpoint,

10:49:52 15   to Taxotere?

10:49:53 16   A.   Yes.

10:49:56 17   Q.   What was your conclusion in that regard?

10:50:00 18   A.   That based on the totality of the evidence, not just any

10:50:06 19   one fact, but based on the totality of evidence, that there is

10:50:12 20   reasonable evidence of a causal association between Taxotere

10:50:19 21   and permanent hair loss.

10:50:22 22   Q.   In that regard, what kind of analysis did you undertake?

10:50:28 23   What is your directive?  How do you do that?

10:50:32 24   A.   So that's -- that comes from my training in epidemiology

10:50:37 25   and in drug safety.  There are certain established factors.

*OFFICIAL TRANSCRIPT*

10:50:47 1    Originally, they were raised in the 1960's by Sir Bradford

10:50:58 2    Hill, and they have been modified by FDA since then.

10:51:06 3         They're not all always applicable, but there are

10:51:12 4    certain factors that you go through.  If there is available

10:51:16 5    evidence -- because in chemotherapy drugs, there is not

10:51:19 6    always -- each factor -- it's possible to have evidence under

10:51:22 7    each factor, but you look at a range of factors.

10:51:28 8         No one factor, in my opinion, gives you the answer,

10:51:35 9    but the goal was to look at all the factors for which evidence

10:51:38 10   is available.

10:51:39 11   Q.    So, is this consistent with your training as an

10:51:43 12   epidemiologist?

10:51:45 13   A.    And with FDA, yes.  That's what I -- that's drug safety --

10:51:49 14   that's the core of how you evaluate safety risks.  That's what

10:51:53 15   I've been trained to do and did.

10:51:54 16   Q.    Could you tell us what some of those factors that you're

10:51:57 17   referring to are?

10:51:58 18   A.    Sure.  Probably -- I mean, one of the most important ones

10:52:07 19   is biological plausibility.  It's a fancy term, but is there --

10:52:14 20   you don't have to have a definitive understanding.  You don't

10:52:18 21   have to have proof exactly how the drug causes permanent hair

10:52:23 22   loss, but it has to make sense to you from a biological

10:52:27 23   perspective.

10:52:28 24        So is there a biological mechanism that could explain

10:52:33 25   it?  Because you want to make sure you're grounded in biology.

*OFFICIAL TRANSCRIPT*

10:52:38 1   So does it make sense that a chemotherapeutic drug that is

10:52:44 2   toxic, by its very nature, and supposed to be, could it cause

10:52:48 3   permanent hair loss?  So biological plausibility is a key

10:52:52 4   factor.

10:52:53 5           Then you want to look at the frequency.  Are you

10:52:58 6   seeing these?  Were you seeing these before?  Is something

10:53:01 7   different?  So you want to look at frequency.

10:53:04 8           You want to look at the comparative groups,

10:53:11 9   controlled trials, to compare, are there more people in one

10:53:14 10  group that get the drug than people who don't get the drug?  So

10:53:18 11  there is a range of factors that one can -- and look for.

10:53:25 12          There are also factors that you can't easily look for

10:53:30 13  when it comes to chemotherapeutic drugs, and happy to explain

10:53:38 14  those if you would like.

10:53:38 15  Q.   Yes, please go ahead.

10:53:39 16  A.   So, you know, one factor is what's called challenge,

10:53:45 17  dechallenge, rechallenge.  So if I have a skin cream, and I

10:53:49 18  want to know whether the skin cream causes this rash, I take

10:53:54 19  the skin cream, and I apply it to the skin and see if it causes

10:53:58 20  the rash.  I take it away, that's called a dechallenge, and see

10:54:03 21  if it goes away.  Then I apply it again, and that's called a

10:54:08 22  rechallenge.

10:54:09 23          But you can't do that with a chemotherapeutic drug

10:54:15 24  ethically.  I can't just use it willy-nilly because, I mean,

10:54:19 25  it's toxic.  And it's serious.  And I can only use it under

*OFFICIAL TRANSCRIPT*

10:54:23  1   certain circumstances.

10:54:24  2          Also, dose response.  It's nicer in higher doses.  I

10:54:28  3   can up the dose, see if a higher dose is associated, a total

10:54:31  4   dose is associated.  But, again, I'm limited when it comes to

10:54:35  5   chemotherapy on just elevating the dose willy-nilly.  So

10:54:40  6   certain factors I can't really look at with regard to

10:54:46  7   chemotherapeutic drugs because of the nature and the

10:54:49  8   seriousness and toxicity associated with them.

10:54:51  9   Q.   Now, is this a type of analysis that is done at FDA on a

10:54:55 10   routine basis?

10:54:58 11   A.   Yes, and in drug companies.

10:54:59 12   Q.   I'm just trying to understand.  So, there is a regulatory

10:55:07 13   purpose to this and then there is a science purpose, and they

10:55:12 14   are basically the same; is that correct or not?

10:55:14 15          MR. STRONGMAN:  Objection.  Leading.  Foundation.

10:55:16 16          THE COURT:  Just rephrase your question.

10:55:19 17          MR. NOLEN:  Yes.

10:55:19 18   EXAMINATION BY MR. NOLEN:

10:55:20 19   Q.   So this factor analysis that you're talking about, is that

10:55:25 20   something that is found in regulations, at least with respect

10:55:32 21   to FDA; is that correct?

10:55:35 22   A.   It's in guidance.  It's not in the regulations.  It's in

10:55:39 23   FDA guidance.  But it's a way that guidance explains how one

10:55:44 24   makes a determination, for example, of whether there is

10:55:47 25   reasonable evidence of a causal association or whether there

*OFFICIAL TRANSCRIPT*

10:55:52 1   is -- the adverse event is reasonably associated.

10:55:56 2           So those are the factors one goes through to see

10:55:59 3   whether the standard in Section 5 and Section 6 is met.

10:56:03 4   Q.   Are those factors utilized in the guidance derived from

10:56:14 5   science?

10:56:14 6   A.   Yes.  It's a scientific based regulatory framework.

10:56:19 7   Q.   In this particular case, did you have to look at a number

10:56:24 8   of items in order to evaluate each of these factors?

10:56:29 9   A.   Yes.  Especially you want to look at it from a number of

10:56:36 10  different perspectives.  You don't want to just rely on any one

10:56:40 11  fact, unless that fact is so overwhelming.  But, even then, my

10:56:44 12  goal was to look at it from a range of evidence and a range of

10:56:48 13  factors.

10:56:48 14  Q.   So that's what I'm getting at is what data did you look at

10:56:53 15  to make these evaluations regarding the factors?

10:56:59 16  A.   So I looked at Sanofi's pharmacovigilance.  Basically,

10:57:06 17  Sanofi's drug safety database, their information within the

10:57:12 18  company.  I looked at the medical literature.  I looked at

10:57:15 19  clinical trials that the company performed.  I looked at

10:57:23 20  studies that were comparative that were reported in the medical

10:57:28 21  literature.

10:57:29 22  Q.   For your opinions in this case, do you point to just one

10:57:34 23  or any one to reach your conclusions?

10:57:37 24  A.   No.  I think it's important to look at the totality or the

10:57:42 25  weight of the evidence as a whole.

10:57:44  1    Q.    How do you know, Doctor -- when you started this process,

10:57:48  2    how did you know what to look at to form your opinions?

10:57:55  3    A.    I've been doing it for 40 years.  Firemen know how to

10:58:00  4    fight fires.  I know how to look at drug safety data.  It's

10:58:04  5    what I've been trained to do.  I took courses in it.  I did it.

10:58:08  6    It's the way we have been trained.

10:58:11  7    Q.    In this particular case, can you tell us approximately how

10:58:17  8    many documents you think you've looked at?

10:58:20  9    A.    Oh, hundreds of thousands.  Of pages, certainly.

10:58:24 10    Q.    So, don't worry, we're just going to go through all of

10:58:28 11    them.  Is that all right?

10:58:30 12    A.    Happy to comply and answer your questions, sir.

10:58:33 13    Q.    We're not going to go through all of them.

10:58:37 14          Now, Doctor, are you being compensated for your time

10:58:40 15    in this case?

10:58:40 16    A.    I am.

10:58:41 17    Q.    How much do you charge per hour?

10:58:42 18    A.    My standard rate is a thousand dollars an hour.

10:58:45 19    Q.    How many hours did you spend in Ms. Earnest's case?

10:58:53 20    A.    Oh, I don't have it exactly.  Figure a hundred-plus hours.

10:58:56 21    Q.    All right.  Doctor, have you testified in other cases for

10:59:04 22    other parties?

10:59:04 23    A.    I have.

10:59:05 24    Q.    Have you testified for plaintiffs and defendants?

10:59:10 25    A.    Mostly plaintiffs.  The overwhelming number is plaintiffs,

*OFFICIAL TRANSCRIPT*

10:59:16   1   but sometimes defendants.

10:59:17   2   Q.   Can you tell us, just as an example, one of the defense

10:59:22   3   cases you testified in?

10:59:24   4   A.   I testified in a case where plaintiffs wanted to put a

10:59:29   5   warning on -- a cancer warning on coffee.  I didn't think the

10:59:34   6   science justified that.  I testified for the coffee

10:59:40   7   manufacturers in that case.

10:59:43   8   Q.   Have you testified in other proceedings other than court

10:59:46   9   proceedings?

10:59:47  10   A.   Sure.

10:59:47  11   Q.   Have you testified for attorneys general?

10:59:55  12   A.   Yes, I have.

10:59:57  13   Q.   Have you testified before Congress?

11:00:01  14   A.   Too many times.

11:00:01  15   Q.   When you say *too many times*, in your role as FDA

11:00:07  16   commissioner, were you called upon to testify before Congress

11:00:12  17   on a routine basis?

11:00:13  18   A.   Yeah.  Sorry, I was a little flip.  You know, I was called

11:00:16  19   up there routinely when I was FDA commissioner.  It was an

11:00:21  20   honor to do that.  Let me say it that way.

11:00:23  21   Q.   As between your testimony in litigation and your testimony

11:00:30  22   before Congress, which is greater, in number of times?

11:00:34  23   A.   Oh, I think I've testified in Congress, you know, many

11:00:37  24   more times, if you added them up.  I never did that

11:00:41  25   specifically.

*OFFICIAL TRANSCRIPT*

11:00:41  1   Q.    We talked a minute ago -- and I just want to go back to

11:00:48  2   this -- we talked a minute ago about the factors for casual

11:00:53  3   association in a regulatory sense.  Can you be more specific

11:00:56  4   about the evidence that you have reviewed that you believe

11:01:01  5   support your opinions of a causal association between Taxotere

11:01:06  6   and permanent hair loss?

11:01:08  7   A.    I would be happy to do that.

11:01:09  8   Q.    All right.  So tell us what it is that you believe

11:01:12  9   supports your opinion.

11:01:13 10   A.    Well, you can start very simply with the first factor,

11:01:20 11   just with the frequency, the number of cases that are in

11:01:29 12   Sanofi's pharmaco -- what's called technically their pharmaco

11:01:33 13   drug vigilance surveying, their drug survey information.  So

11:01:40 14   just look at -- you search that database to see whether this

11:01:47 15   adverse event has, in fact -- is it being seen, and when is it

11:01:52 16   being seen?

11:01:53 17   Q.    So I've written here *adverse database*.  That's adverse

11:02:01 18   event database, adverse event reporting.  Is that what you're

11:02:03 19   looking at?

11:02:03 20   A.    Exactly.  Pharmacovigilance, sometimes database, PVV.  It

11:02:13 21   goes by a number of different names.

11:02:13 22   Q.    I think we need some explanation on that, because what is

11:02:16 23   in the -- in this case, what is in the adverse database that

11:02:25 24   you're actually looking at?

11:02:25 25   A.    So companies get information from a lot of different

*OFFICIAL TRANSCRIPT*

1    sources.  They may get information from their clinical trials

2    about adverse events.  They may get information directly from

3    hospitals, doctors, directly from patients.  They may get

4    information through their sales representative.

5            They are obligated -- every time they get a complaint

6    of an adverse reaction, they have an obligation to investigate

7    that complaint.  They put it in their pharmacovigilance, their

8    adverse event database.

9    Q.   So as these reports are received, they are put into a

10   central database; is that your testimony?

11   A.   Within the company, yes.  Sometimes they change the

12   actual -- you know, the software, but there is a central

13   repository of all complaints and adverse reactions, yes.

14   Q.   Were you able to isolate reports of alopecia?

15   A.   Yes.  So, I asked, through counsel, an eminent

16   biostatistician, who does this much more often than I do -- I'm

17   a professor of biostatistics, but he does it every day, and his

18   specialty is being able to get the information out of these

19   databases, he's much more adept -- to look at the number of

20   cases of permanent alopecia that were occurring.

21   Q.   Did you use or utilize anything else in coming to your

22   opinions, other than looking at Sanofi's internal database?

23   A.   Certainly, there are other factors, but for this factor --

24   let me just understand your question.

25   Q.   So in forming your opinions in this matter about the

*OFFICIAL TRANSCRIPT*

11:04:24 1   association between Taxotere and permanent hair loss, did you

11:04:29 2   look at anything other than Sanofi's internal database?

11:04:33 3   A.   Yes.   Sorry, I didn't understand.   So I looked at the

11:04:36 4   medical literature for the period of time that was at issue in

11:04:44 5   this case, so what was actually put in the medical literature.

11:04:48 6   Q.   I've written medical literature.

11:04:57 7        So, Doctor, is that it?

11:04:58 8   A.   No.   I looked at Sanofi's clinical trials.

11:05:04 9   Q.   What is a clinical trial?

11:05:07 10  A.   So a clinical trial is when the company is testing their

11:05:10 11  drugs to see what diseases it works.   Clinical trial is when

11:05:16 12  you create -- it's a study that breaks patients into two

11:05:24 13  different groups, and will give one group one drug, and, in the

11:05:28 14  case of chemotherapy, another group another drug or a

11:05:33 15  combination of drugs.   Then you compare the results, and you

11:05:38 16  compare the safety reactions.

11:05:40 17       There is a way that those -- you can control for

11:05:43 18  things, to make sure that it's only a drug that's causing the

11:05:51 19  adverse event, if it's adequate and well controlled.

11:05:55 20  Q.   Did Sanofi have clinical trials that you could look at --

11:05:58 21  A.   It did.

11:05:59 22  Q.   -- related to Taxotere?

11:06:02 23  A.   And, more importantly, clinical trials that followed

11:06:07 24  patients long enough so that you could determine whether, in

11:06:14 25  fact, there was permanent hair loss.

*OFFICIAL TRANSCRIPT*

11:06:16 1          There are many clinical trials that the company
11:06:19 2   undertakes -- that companies undertake generally, but you need
11:06:22 3   to be specifically following the patients for a long enough
11:06:25 4   period.  There were two clinical trials that followed patients
11:06:29 5   for up to ten years.
11:06:30 6   Q.   So I just want to break down this a little bit, so we have
11:06:34 7   a better understanding.  I don't want to spend a lot of time on
11:06:39 8   it.  But when you said you went through and you started with
11:06:41 9   Sanofi's internal database, what was it you were looking for?
11:06:47 10  A.   I was looking for specifically the number of cases of
11:06:57 11  permanent alopecia, how many times were there cases of
11:07:01 12  permanent alopecia.  There was a reason why I was looking for
11:07:07 13  cases of permanent alopecia.
11:07:09 14  Q.   So these are individual reports that are received by the
11:07:14 15  company; is that correct?  Am I understanding that right?
11:07:17 16  A.   That's correct.
11:07:17 17  Q.   What is the company supposed to do, if anything, when they
11:07:22 18  receive one of these reports?
11:07:24 19  A.   So, what's key is they're supposed to investigate it.  But
11:07:30 20  the special importance, what the company is supposed to do, is
11:07:36 21  you recognize that through 1999, with chemotherapeutic drugs,
11:07:43 22  there were not -- it was very, very rare to have any reports of
11:07:48 23  irreversible alopecia or hair loss.  Just they weren't in the
11:07:54 24  database on the major chemotherapeutic drugs.
11:07:56 25          So, sure, there was hair loss.  So you're looking

*OFFICIAL TRANSCRIPT*

11:07:59  1    for, is there something different here?  That's what's key.

11:08:04  2    Q.    Just so we understand -- because I'm not sure I do -- who

11:08:10  3    is supposed to submit these reports?  How do these reports come

11:08:14  4    to the company?

11:08:15  5    A.    Many different ways.  All different ways.  It can come

11:08:20  6    from a physician writing in:  I have a patient whose hair

11:08:26  7    hasn't grown back in two years.  What do you know?  That can

11:08:30  8    trigger an adverse event.

11:08:31  9             It could be a patient calling in.

11:08:34 10             It could be a sales rep who said:  I just visited

11:08:38 11    three doctors -- a doctor, and they told me about a patient

11:08:42 12    that had irreversible, permanent hair loss.

11:08:48 13             So there are a lot of different mechanisms that can

11:08:50 14    feed -- a lot of different routes into that database.

11:08:53 15    Q.    So other than collecting this data, is there anything else

11:08:56 16    that the drug company, in this case Sanofi, is supposed to do

11:08:59 17    with them?

11:09:00 18    A.    It's supposed to analyze them.  It's really supposed to

11:09:08 19    determine, are they seeing something different here than they

11:09:11 20    saw in the past.  I mean, is there a change here?  That's

11:09:18 21    what's key.

11:09:22 22    Q.    What did you find in looking at Sanofi's database?

11:09:26 23    A.    So, what you see is that, beginning in around 1999 and

11:09:37 24    going through --

11:09:38 25             What, 2011?  What year should I use?

**OFFICIAL TRANSCRIPT**

11:09:43  1    Q.    2011.

11:09:43  2    A.    -- 2011, if you look at Sanofi's database, I think -- and

11:09:51  3    I asked Dr. Madigan, who I know -- I think will testify -- but

11:09:56  4    I asked Dr. Madigan specifically, I think there were 168 cases

11:10:03  5    of irreversible or permanent hair loss.  I think the company

11:10:11  6    identified 142 through that period of time, if my memory serves

11:10:18  7    me right.  I don't think there is much of a difference.  I'm

11:10:21  8    not making any difference.  142, you can use that number, or

11:10:24  9    the 168, number of cases by 2011.

11:10:29 10    Q.    Doctor, did you rely upon a chart that Dr. Madigan

11:10:36 11    prepared regarding the year-by-year breakdown on the receipt of

11:10:41 12    these permanent hair loss reports?

11:10:44 13    A.    I did.

11:10:45 14         MR. NOLEN:  I'm going to publish for the jury this

11:10:49 15    permanent hair loss report chart.

11:10:54 16         THE COURT:  I think there is no objection.

11:10:55 17    Mr. Strongman?

11:10:55 18         MR. STRONGMAN:  Correct, Your Honor.

11:10:57 19    EXAMINATION BY MR. NOLEN:

11:10:59 20    Q.    Doctor, I want to be clear.  My understanding of this

11:11:02 21    chart is the 2011 time period runs through the end of the year.

11:11:07 22    So it runs through the end of the year that Ms. Earnest took

11:11:12 23    Taxotere.  Is that your understanding?

11:11:15 24    A.    I believe that's correct.

11:11:15 25    Q.    Okay.  So explain to us why this is significant, if it is.

*OFFICIAL TRANSCRIPT*

11:11:21 1   A.   So, normal case reports, if this were just a list of heart

11:11:29 2   attacks -- heart attacks is certainly serious too -- if this

11:11:36 3   were just a list of heart attacks, list of the number of heart

11:11:40 4   attacks of people taking Taxotere, heart attacks were a pretty

11:11:45 5   common event that occur independent of Taxotere.  I'm not

11:11:50 6   saying Taxotere causes heart attacks, I want to be clear.

11:11:53 7        But what's important here -- so case reports, in and

11:11:55 8   of themselves, unless you do specific methodological testing --

11:12:02 9   and Dr. Madigan did that -- but case reports normally aren't

11:12:09 10  accorded great weight.  But this is different.  This is

11:12:11 11  different because, as you go back to other databases, you don't

11:12:16 12  see irreversible hair loss being reported, certainly in these

11:12:22 13  kind of numbers.  There may be a case here or a case there,

11:12:25 14  but, certainly, with the major chemotherapeutic drugs up to

11:12:29 15  1999, except for bone marrow transplants and some of the

11:12:34 16  radiation cases, I mean, this is different.  Something is

11:12:38 17  different here in irreversible hair loss that was not seen

11:12:45 18  before, not generally seen before.

11:12:46 19  Q.   And, Doctor, we've actually prepared a different depiction

11:12:50 20  of this so we can illustrate what's happening on a year-by-year

11:12:55 21  basis.  Have you seen that before?

11:12:57 22  A.   I have.

11:12:57 23  Q.   All right.  I'm going to place that in front of the jury.

11:13:03 24  And, in your view, Doctor, what, if anything, does this graphic

11:13:09 25  depiction indicate?

**OFFICIAL TRANSCRIPT**

11:13:12  1    A.    You see this basically very uncommon event becoming more

11:13:20  2    common once Taxotere is being more broadly used.  You probably

11:13:26  3    should be -- to be fair, you can use Number 142 or 168, that's

11:13:31  4    not what makes a difference, but you see that this emerged,

11:13:36  5    this phenomena emerged with Taxotere.  That doesn't mean that

11:13:41  6    Taxotere could be the only thing.  I'm not saying that, but

11:13:45  7    certainly in these databases, you see Taxotere, it's emerging.

11:13:57  8    That was the important thing to me about these cases.  I wasn't

11:13:57  9    seeing this before.

11:13:57 10    Q.    All right.  So having covered that, let's move on to the

11:14:04 11    medical literature, so I know there is a lot more you can tell

11:14:07 12    us about this.  But moving to the medical literature, first,

11:14:10 13    who is supposed to monitor the medical literature that is

11:14:15 14    published?

11:14:16 15    A.    The companies are certainly responsible for reviewing the

11:14:20 16    medical literature when it comes to looking for whether there

11:14:24 17    are safety adverse events with their drug.

11:14:28 18    Q.    And for purposes of your opinions in this case, did you

11:14:31 19    attempt to find all of the relevant medical literature relating

11:14:37 20    to Taxotere and permanent hair loss?

11:14:44 21    A.    Yes, with a few footnotes.

11:14:46 22    Q.    Okay.  Tell us what those are.

11:14:48 23    A.    So, what I tried to find is the relevant articles in the

11:14:53 24    literature for the period up to Ms. Earnest taking the drug.

11:15:01 25    So there may be literature after that, but the relevant period

11:15:05  1    was up through 2011.

11:15:11  2             I looked for those articles on permanent hair loss

11:15:13  3    when -- where the numbers were quantifiable, so there was a

11:15:22  4    specific drug and a specific number of patients.  And there

11:15:24  5    were other treatment modalities such as bone marrow transplant

11:15:28  6    that I didn't put on the list.

11:15:29  7    Q.   All right, Doctor, to assist us in this, we actually have

11:15:34  8    prepared a chart with some of the studies, I think most of the

11:15:38  9    studies that you've looked at and relied upon.  And I'm going

11:15:41 10    to publish that to the jury.

11:15:43 11             THE COURT:  I believe that's already been listed.

11:15:47 12             MR. STRONGMAN:  No objection.

11:15:49 13             THE COURT:  Thank you.

11:15:49 14    EXAMINATION BY MR. NOLEN:

11:15:52 15    Q.   So we're looking at our chart here, and it says:

11:15:56 16    Chemotherapy-Induced Permanent Hair Loss.  Do you see that?

11:15:59 17    A.   I do.

11:15:59 18    Q.   And it says:  Published reports as of April 2011.  Do you

11:16:04 19    see that?

11:16:05 20    A.   I do.

11:16:07 21    Q.   Okay.  And I'll just represent to you, April 2011 is when

11:16:12 22    Ms. Earnest received her Taxotere treatment.

11:16:15 23    A.   Thank you.

11:16:15 24    Q.   And so, did you review the Nabholtz 2001 study?

11:16:23 25    A.   I did.

*OFFICIAL TRANSCRIPT*

11:16:23  1    Q.   What, if anything, did that add to your understanding in

11:16:26  2    this matter?

11:16:31  3    A.   So there were four cases reported of permanent hair loss

11:16:34  4    in that study with Taxotere-based therapies.  And I just want

11:16:40  5    to make sure you understand, Taxotere is sometimes given with

11:16:44  6    other -- with -- in combination.  So there were four cases in

11:16:50  7    Nabholtz where it's a Taxotere-based therapy of permanent hair

11:16:55  8    loss.  And so there were four there, and there was no mention

11:17:02  9    of any cases with other base therapies.

11:17:08 10    Q.   Let me make sure I understand.  So Nabholtz has a

11:17:14 11    Tax-based arm?

11:17:14 12    A.   Regimen.

11:17:15 13    Q.   It has a Tax-based regimen on one side, and I guess there

11:17:21 14    were four cases of permanent alopecia over there, and it had a

11:17:25 15    nonTax-based regimen?

11:17:27 16    A.   No, you just put a dash or whatever.  It's only a Tax --

11:17:32 17    if my memory serves me right on Nabholtz, it was only a

11:17:36 18    Taxotere-based arm.  That would be correct.

11:17:41 19    Q.   And then what about this next one in 2006, Sedlacek, how

11:17:49 20    does that inform your understanding?

11:17:50 21    A.   Dr. Sedlacek actually had three arms to a study, but I'll

11:17:56 22    simplify it down to really two.  He had seven cases of

11:18:02 23    permanent hair loss in Taxotere-based therapies and zero cases

11:18:09 24    of permanent hair loss in the other therapies, including Taxol

11:18:17 25    and Adriamycin and Cytoxan.  He had two other arms, and it was

*OFFICIAL TRANSCRIPT*

11:18:22   1   zero there.

11:18:23   2   Q.    The next one we have is Masidonski in 2009.  How did that

11:18:28   3   inform your opinions?

11:18:29   4   A.    So I believe Masidonski was 11 cases with Taxotere-based

11:18:36   5   therapies and two cases in the literature in that article on

11:18:43   6   nonTaxotere-based therapies.

11:18:46   7   Q.    And then Prevezas 2009?

11:19:01   8   A.    I saw in Prevezas a report of one case of permanent hair

11:19:04   9   loss with one Taxotere-based therapy and one case of permanent

11:19:08  10   hair loss with Taxol-based therapies.

11:19:11  11   Q.    Palamaras 2009?

11:19:17  12   A.    Five and -- five with Taxotere-based therapies and two

11:19:25  13   nonTaxotere-based therapies.

11:19:30  14   Q.    And these are cases of permanent hair loss you're

11:19:32  15   describing?

11:19:33  16   A.    Permanent poor hair loss as reported in those papers.

11:19:37  17   Q.    And is it Bourgeois?

11:19:42  18   A.    Well said.

11:19:43  19   Q.    2009, 2010?

11:19:46  20   A.    This was the French survey that was done over 2009, 2010,

11:19:56  21   and there were 104 cases with Taxotere-based therapies, and I

11:20:06  22   believe it was four cases of nonTaxotere-based therapies.

11:20:13  23   Q.    Then Tallon, 2010.

11:20:20  24   A.    There was a Taxotere-based therapy arm of -- there was

11:20:24  25   just one case reported, but there was only one real arm, so you

*OFFICIAL TRANSCRIPT*

11:20:29  1    really would have to put a dash there.

11:20:30  2    Q.   All right.  So there is no information about

11:20:33  3    nonTaxotere --

11:20:34  4    A.   I think -- or it was a case report.

11:20:36  5    Q.   And Tosti, 2010?

11:20:40  6    A.   There would be seven cases in the Taxotere-based arm and,

11:20:45  7    again, I would put a dash because I don't think there was

11:20:48  8    specifically anything reported in nonTaxotere-based arm or

11:20:48  9    looked for.

11:20:57  10   Q.   So if I add these up, I've got nine on the nonTax.  And on

11:21:04  11   the Tax, do you know what the total is, Doctor?

11:21:12  12   A.   You've got, what, about 140 something.  I don't think --

11:21:19  13   scientifically, I think the studies should speak for

11:21:23  14   themselves.  I'm not sure they should be pooled in just some

11:21:26  15   addition.  I mean, I would let each study speak for itself.

11:21:30  16   Q.   Well, I think I got it.  It's 140.  But you're telling me

11:21:33  17   that you don't think that's really appropriate?

11:21:35  18   A.   Yeah, I would let -- this is what was in the literature.

11:21:39  19   I mean, you certainly can add it up, but I don't think

11:21:42  20   that's -- that was not the way I sort of looked at these.  I

11:21:47  21   was looking to see whether something was more common with --

11:21:53  22   when Taxotere was given in Taxotere-based therapies versus

11:21:58  23   other drugs.  That's what I was looking for because, again,

11:22:01  24   this was not -- permanent hair loss wasn't being seen generally

11:22:05  25   before 2000 with these drugs, so what is going on.  We're

*OFFICIAL TRANSCRIPT*

| 11:22:11 | 1 | seeing -- I saw it in the Sanofi database, and that's why I |

11:22:11  1   seeing -- I saw it in the Sanofi database, and that's why I
11:22:15  2   wanted to check the medical literature to see what was here.
11:22:20  3   Q.   Doctor, did you see the internal documents that Sanofi
11:22:25  4   produced in this case?
11:22:25  5   A.   I certainly reviewed many.  I don't want to represent that
11:22:29  6   I reviewed all of them.  I would have been working for months,
11:22:35  7   but I reviewed many of them.
11:22:38  8   Q.   And are you aware of any internal documents that discusses
11:22:41  9   Sanofi's position towards performing a medical lit -- or
11:22:46 10   literature search for reports of permanent hair loss?
11:22:52 11   A.   I have seen that.
11:22:53 12   Q.   You were here for Ms. Freedman's deposition testimony that
11:22:59 13   was played for the jury here today; is that correct?
11:23:00 14   A.   Correct.
11:23:00 15   Q.   You saw Plaintiff's Exhibit 175 that's been admitted into
11:23:06 16   evidence already in that presentation?
11:23:08 17   A.   Correct.
11:23:08 18   Q.   Had you seen this document previously?
11:23:13 19   A.   Yes.
11:23:14 20   Q.   Was that part of your review in this case?
11:23:18 21   A.   Yes.
11:23:19 22   Q.   And I'm just going to direct you to the part that was
11:23:23 23   discussed in the video this morning.  It appears that there is
11:23:29 24   this question from Heidi Filtenborg, "Dear colleagues, I have
11:23:38 25   received this question from a Danish physician.  Is there any

*OFFICIAL TRANSCRIPT*

11:23:42 1   documentation/knowledge about the reversibility of alopecia

11:23:47 2   after Taxotere treatment, e.g., expected time frame?  The

11:23:54 3   patient has had alopecia since 2004.  The ICSR has already been

11:24:00 4   reported."

11:24:01 5          Do you see that, Doctor?

11:24:02 6   A.   I do see that.

11:24:03 7   Q.   And then we review it all the way up until we get to

11:24:08 8   Ms. Freedman, who you saw testify this morning.  And so we're

11:24:12 9   in March -- Sunday, March 5, 2006, and the subject:

11:24:19 10  "Reversibility of alopecia after Taxotere treatment."

11:24:23 11         Do you see that?

11:24:24 12  A.   I see that, sir.

11:24:25 13  Q.   And then she states, "Only peripheral knowledge.  I know

11:24:30 14  that there were some irreversible cases of alopecia, as

11:24:34 15  documented in clinical trials, see IB and CDS wording."

11:24:41 16         Do you see that?

11:24:42 17  A.   I see that, sir.

11:24:43 18  Q.   What is IB and CDS?

11:24:46 19  A.   IB is an investigative brochure.  It's basically the

11:24:53 20  documents that govern clinical trials, and that's what IB

11:24:59 21  stands for.

11:24:59 22  Q.   And is clinical trials what you talked about earlier, you

11:25:07 23  told us about that Sanofi has some of?

11:25:08 24  A.   Yes.  So an investigative brochure would be the documents

11:25:15 25  that would go to Sanofi's investigators.  It doesn't go to all

*OFFICIAL TRANSCRIPT*

11:25:21 1   doctors out there, but those who are doing the clinical trials

11:25:24 2   for the companies would get the investigative brochure that

11:25:29 3   would have information, such as an informed consent, etcetera.

11:25:33 4   Q.   And then this e-mail goes on to say, "This is the kind of

11:25:37 5   thing a non-company physician would review in their practice

11:25:42 6   and possibly report in the literature."

11:25:45 7          Is that consistent with your work as a physician over

11:25:50 8   40 years and as a regulator?

11:25:52 9   A.   Yes.  That's why I went to the medical literature to see

11:25:56 10  what was, in fact, reported.

11:25:57 11  Q.   Okay.  So we understand that, in the clearest sense.  If a

11:26:03 12  doctor or scientist finds something in their practice, in

11:26:07 13  their -- at their center, whatever medical center they may be

11:26:12 14  in, if they find something that is interesting, is that the

11:26:17 15  kind of thing that they publish?

11:26:19 16         MR. STRONGMAN:  Objection.  Leading.

11:26:20 17         THE COURT:  Sustained.  Rephrase your question.

11:26:22 18         MR. NOLEN:  Yes.

11:26:23 19  EXAMINATION BY MR. NOLEN:

11:26:24 20  Q.   How do physicians communicate with the broader medical

11:26:30 21  community about things they find in their practice?

11:26:36 22  A.   A number of different ways.  They can go publish it in the

11:26:43 23  medical literature.  They could pick up the phone and call the

11:26:46 24  drug company.  They can go give a lecture about it.  They can

11:26:50 25  talk to their colleagues.

*OFFICIAL TRANSCRIPT*

| | |
|---|---|
| 11:26:52 | 1 |

Q.    And in this particular e-mail, it says, "However, I am
not advising a lit search for this topic."

        Do you see that?

A.    I do.

Q.    Did that inform any of your opinions in this case?

A.    It did.

Q.    How so?

A.    If you go back to the first e-mail on the bottom of the
page, you have to see that in context.  Here -- here
Ms. Freedman is getting information from a Danish doctor
saying, there is a case that I have of a patient who hasn't
had -- whose hair hasn't grown back in two years.  What do you
know about it?

        So that's coming in to the drug company.  I have no
problems when she says -- if you go back to Ms. Freedman's
words, she may not know anything about it.  She says:  I only
have peripheral knowledge.

        It's not ringing any -- it's only ringing maybe some
bells.  There's not a problem with that.

        MR. STRONGMAN:  Your Honor, objection as to what
Dr. Freedman knows or doesn't know.

        THE COURT:  Sustained.  Sustained.  I think we need to
move on.

EXAMINATION BY MR. NOLEN:

Q.    Okay.  So, Doctor, what is your understanding about what

*OFFICIAL TRANSCRIPT*

11:28:35  1   is being requested here?

11:28:37  2          MR. STRONGMAN:  Same objection, Your Honor.

11:28:40  3          THE COURT:  I'm going to --

11:28:41  4          MR. STRONGMAN:  Foundation, speculation.

11:28:47  5          THE COURT:  I'm going to take these one at a time.  You

11:28:50  6   may answer that question.

11:28:53  7          THE WITNESS:  Could you re-state the question, please.

11:28:56  8   EXAMINATION BY MR. NOLEN:

11:28:57  9   Q.   The question was, what is your understanding about the

11:29:00 10   request?

11:29:01 11   A.   I view it as, look into it, study it.  It's an opportunity

11:29:15 12   to find out about it.  Is there evidence of it?

11:29:19 13          MR. STRONGMAN:  Objection.

11:29:21 14          THE COURT:  Sustained.  I think --

11:29:23 15   EXAMINATION BY MR. NOLEN:

11:29:24 16   Q.   Doctor, ultimately the response to the question that is

11:29:29 17   posed, how does the response, if at all, inform your opinions

11:29:36 18   in this case?

11:29:38 19          MR. STRONGMAN:  Same objection.

11:29:39 20          THE COURT:  Sustained.

11:29:42 21   EXAMINATION BY MR. NOLEN:

11:29:42 22   Q.   Well, did this e-mail chain inform your opinions in this

11:29:46 23   case?

11:29:46 24          THE COURT:  That's not the problem.  Sustained.

11:29:49 25          MR. STRONGMAN:  Thank you.

*OFFICIAL TRANSCRIPT*

| | |
|---|---|
| 11:29:51 | 1 |

EXAMINATION BY MR. NOLEN:

Q.   This is a document that you reviewed as part of your --

THE COURT:  Why don't y'all approach the bench real quickly.

(WHEREUPON, at this point in the proceedings, there was a conference held at the bench.)

THE COURT:  I don't want to just keep belaboring the point.  I think what I said is, I don't want him to go into what the intent of Sanofi is by doing this.  I think what we're interested in is the fact of the e-mail itself, the fact of the report itself.

I think there was a Motion in *Limine* to talk about Sanofi's intent and knowledge and that sort of thing. And I'm afraid you're skirting on what is the intent to do or -- where is he going with this?

MR. NOLEN:  Actually, we advised Dr. Kessler about that Motion in *Limine*, so he was not going to go into the intent.

THE COURT:  Where is he going?

MR. NOLEN:  About what should happen when a request comes in, and so he started to give that answer and then, for whatever reason, didn't finish the answer.  So that was --

THE COURT:  That's because I stopped him.

MR. NOLEN:  Right.  What the normal process is when you get a request, the normal process is that if information is requested of a company and you don't know the answer, the

*OFFICIAL TRANSCRIPT*

11:31:18  1   normal process is they find it so they can appropriately

11:31:23  2   respond.

11:31:23  3          THE COURT:  The problem, I think, is you're looking at

11:31:31  4   more than one -- multiple questions.  Perhaps the question is

11:31:32  5   when a company gets a request, what is their normal process?

11:31:36  6   And take it down from what they intended to do with that

11:31:42  7   response.  My problem is -- and I think that's my problem.  And

11:31:44  8   the jury can make whatever inferences they want.

11:31:48  9          MR. STRONGMAN:  Thank you.

11:32:02  10         THE COURT:  Thank you.

11:32:02  11         (WHEREUPON, at this point in the proceedings, the bench

11:32:02  12  conference concluded.)

11:32:02  13  EXAMINATION BY MR. NOLEN:

11:32:03  14  Q.   Dr. Kessler, when a pharmaceutical company receives a

11:32:07  15  request --

11:32:07  16         THE COURT:  Let's take that down.

11:32:10  17         MR. NOLEN:  Pardon me?

11:32:10  18         THE COURT:  Let's take that down.

11:32:10  19         MR NOLEN:  Okay.

11:32:10  20  EXAMINATION BY MR. NOLEN:

11:32:12  21  Q.   When a pharmaceutical company receives a request about a

11:32:18  22  condition associated with their drug or allegedly associated

11:32:22  23  with their drug, what is the normal process?  What is the

11:32:26  24  response?

11:32:28  25  A.   They should investigate it.  They have a duty -- that have

*OFFICIAL TRANSCRIPT*

11:32:31  1   a responsibility to investigate it.

11:32:32  2   Q.   Is that so that the question can be answered conclusively

11:32:41  3   one way or the other?

11:32:42  4   A.   It's not only to answer the question, but if there is a

11:32:45  5   safety issue here that's being raised, it may have implications

11:32:51  6   to inform other doctors and patients about that.  That's the

11:32:54  7   real goal.  Certainly you want to answer the question, but you

11:32:57  8   have to be on the lookout for issues that may be arising with

11:33:02  9   the drug that you want to inform other doctors about.

11:33:06 10   Q.   Doctor, you mentioned a minute ago investigator brochure.

11:33:12 11   Do you remember that?

11:33:14 12   A.   I do.

         13        THE COURT REPORTER:   (Addressing the judge)  Who gets

         14   that objection?

         15        THE COURT:   That was me.  That's on me.  I'm sorry, I'm

         16   talking to the court reporter, and everybody was -- I'm sorry.

         17             Please proceed, Mr. Nolen.  I didn't mean to

         18   interrupt you.

11:33:14 19   EXAMINATION BY MR. NOLEN:

11:33:14 20   Q.   A minute ago, I had asked you what IB meant, and I think

11:33:33 21   you said investigator brochure.

11:33:35 22   A.   Correct.

11:33:35 23   Q.   And a little bit of time has passed.  What was that --

11:33:41 24   what is that?

11:33:41 25   A.   So investigative brochure is the information,

*OFFICIAL TRANSCRIPT*

11:33:45  1    investigator, physician or a scientist who conducts

11:33:50  2    clinical trials for the companies.  So these are the sort of

11:33:53  3    information, not for doctors, not the label, but this is just

11:33:57  4    for your own company investigators who are doing the

11:34:02  5    clinical trials.

11:34:07  6    Q.   And in a clinical trial, is there typically an informed

11:34:11  7    consent for patients?

11:34:12  8    A.   Yes, there has to be.

11:34:13  9    Q.   And when you say there has to be, is that because they are

11:34:17  10   testing a medication?

11:34:19  11   A.   Exactly.

11:34:20  12   Q.   And in your notebook there, tab 4, I believe you'll find

11:34:31  13   Exhibit 200.  Do you have that in front of you?

11:34:33  14   A.   Correct.

11:34:34  15   Q.   Have you reviewed Exhibit 200?

11:34:36  16   A.   I have.

11:34:37  17        THE COURT:  I'm not talking to you.  I'm trying to --

11:34:56  18   I'm sorry, I didn't mean to interrupt you.  I've got -- please

11:34:57  19   proceed.

11:34:58  20   EXAMINATION BY MR. NOLEN:

11:34:58  21   Q.   Did Exhibit 200 form -- did it go into your understanding

11:35:02  22   and help you form the basis for some of your opinions in this

11:35:06  23   matter?

11:35:07  24   A.   It does.

11:35:08  25   Q.   And is Exhibit 4 -- I mean, excuse me, is Exhibit 200 a

*OFFICIAL TRANSCRIPT*

11:35:20  1    portion of an informed consent?

11:35:22  2    A.    It is.

11:35:24  3         MR NOLEN:  I'm going to ask to admit Plaintiff's

11:35:27  4    Exhibit 200 as one of the documents relied upon by Dr. Kessler

11:35:33  5    in forming his opinions in this matter.

11:35:35  6         MR. STRONGMAN:  Objection, there is no foundation for

11:35:37  7    this document with this witness.  Relevance, 401, 403,

11:35:41  8    foundation.

11:35:42  9         THE COURT:  Overruled.  The Court is going to allow the

11:35:45 10    document.

11:35:45 11         (WHEREUPON, Plaintiff's Exhibit 200 was admitted.)

11:35:46 12         MR NOLEN:  I'm going to publish it, then, to the jury.

11:35:50 13         THE COURT:  I was trying to -- I think we need to pull

11:35:52 14    that one down.  That document.  That has been the problem.

11:35:55 15    Thank you.

11:35:55 16    EXAMINATION BY MR. NOLEN:

11:36:04 17    Q.    All right.  I'm putting on the ELMO Plaintiff's

11:36:11 18    Exhibit 200, and I'm going to direct your attention, Doctor, to

11:36:20 19    several pages back in the document, which indicates this is the

11:36:33 20    Cross Cancer Institute.  Do you see that, sir?

11:36:36 21    A.    Let me just get there.  I have a number of pages in front

11:36:40 22    of me.  I apologize.

11:36:42 23    Q.    It's two pages in.

11:36:44 24    A.    Thank you, sir.  Yes, I do.

11:36:46 25    Q.    And it says, "A Phase II, open-label, multicenter pilot

*OFFICIAL TRANSCRIPT*

11:36:55  1    study of the safety and efficacy of two docetaxel-based

11:37:01  2    regimens plus," and then it goes on.  Do you see that, sir?

11:37:03  3    A.    I do.

11:37:04  4    Q.    And then it says "Consent Form."  Doctor, is this the

11:37:10  5    informed consent for this particular study?

11:37:12  6    A.    It is.

11:37:13  7    Q.    And I'm going to direct your attention back into the

11:37:24  8    consent form itself where it talks about side effects.  Do you

11:37:41  9    see that?

11:37:41  10   A.    I do.

11:37:42  11   Q.    Was this a consent form for a Sanofi study?

11:37:48  12   A.    It was.

11:37:48  13   Q.    And it says "What are the side effects?"  Do you see that?

11:37:52  14   A.    I do.

11:38:02  15   Q.    And the study drug, it looks like, is doxorubicin or

11:38:07  16   Adriamycin.  Do you see that?

11:38:08  17   A.    It's one of the drugs, yes.

11:38:10  18   Q.    It's the study drug that's being dealt with on this

11:38:13  19   particular page; is that correct?

11:38:15  20   A.    Correct.

11:38:16  21   Q.    And it says, "Route, IV," what does that mean?

11:38:20  22   A.    Intravenous, by vein.

11:38:25  23   Q.    And it says "reported side effects."  Do you see that?

11:38:30  24   A.    I do.

11:38:31  25   Q.    What, if anything, was significant about this listing of

*OFFICIAL TRANSCRIPT*

11:38:36  1    side effects in association with doxorubicin or Adriamycin?

11:38:42  2    A.   It says "hair loss."

11:38:44  3    Q.   Right here?

11:38:50  4    A.   Correct.

11:38:51  5    Q.   Why is that important?

11:38:58  6    A.   Because it's an informed consent, and you want to make

11:39:02  7    sure that the patients that are enrolled in that clinical trial

11:39:06  8    know that there is hair loss associated with the drug.

11:39:11  9    Doxorubicin is also called Adriamycin.

11:39:14 10    Q.   Is that a cancer drug?

11:39:16 11    A.   It is.  Approved in 1974.

11:39:18 12    Q.   And I see that the date of this is January 2007.

11:39:26 13    A.   Correct.

11:39:26 14    Q.   And so this is a trial or clinical trial that is taking

11:39:34 15    place in 2007?

11:39:36 16    A.   Yes.  This is the informed consent that's being done.

11:39:40 17    Q.   And if we turn to the next page, there is another drug

11:39:50 18    name, again, 2007, and it says, cyclophosphamide.  Do you see

11:40:04 19    that?

11:40:04 20    A.   I do.

11:40:05 21    Q.   And is the route of administration for that drug IV?

11:40:10 22    A.   Yes, sir.  Intravenous.

11:40:14 23    Q.   Is that drug also known as Cytoxan?

11:40:17 24    A.   Yes.

11:40:17 25    Q.   And do you know approximately how long that drug has been

*OFFICIAL TRANSCRIPT*

11:40:21  1    on the market?

11:40:22  2    A.    I used it when I was in my residency and gave it to kids.

11:40:27  3    Q.    And so, what is significant, if anything, about this

11:40:38  4    particular drug and this listing of side effects?

11:40:43  5    A.    It also says "hair loss."

11:40:44  6    Q.    And why is that important?

11:40:57  7    A.    Because, again, you would want to make sure that patients

11:41:01  8    have that information when -- before they take the drug, you

11:41:09  9    want to -- I mean, it's the basics of just ethics in how we

11:41:15 10    conduct clinical trials.

11:41:16 11    Q.    So if we turn to the next page, this one says docetaxel.

11:41:26 12    Is that -- and it says Taxotere right under it.  Do you see

11:41:29 13    that?

11:41:30 14    A.    Correct.

11:41:30 15    Q.    And it is also administered by IV?

11:41:37 16    A.    Correct.

11:41:37 17    Q.    And what, if anything, is important about this

11:41:48 18    identification of Taxotere IV route of administration and then

11:41:56 19    this listing of adverse events?

11:42:04 20    A.    You see "hair loss" crossed with a strike-through in one

11:42:09 21    column, and the term "permanent hair loss" in the other column.

11:42:15 22    Q.    So this is January of 2007?

11:42:24 23    A.    Correct.

11:42:24 24    Q.    What, if anything, does this indicate to you?

11:42:31 25          MR. STRONGMAN:  Objection, foundation.

*OFFICIAL TRANSCRIPT*

| 11:42:33 | 1 | THE COURT:  Sustained. |
| 11:42:34 | 2 | EXAMINATION BY MR. NOLEN: |
| 11:42:34 | 3 | Q.   How does this inform your opinions in this case? |
| 11:42:40 | 4 | MR. STRONGMAN:  Same objection, Your Honor. |
| 11:42:54 | 5 | THE COURT:  I am going to allow the witness to say it, |
| 11:42:57 | 6 | knowing that it will not -- the witness should not cross into |
| 11:43:00 | 7 | areas that I have excluded, which is intent, knowledge. |
| 11:43:09 | 8 | THE WITNESS:  That there is evidence -- that there is |
| 11:43:16 | 9 | evidence of an association between Taxotere and permanent hair |
| 11:43:22 | 10 | loss. |
| 11:43:22 | 11 | EXAMINATION BY MR. NOLEN: |
| 11:43:25 | 12 | Q.   That is as of 2007? |
| 11:43:27 | 13 | A.   Correct. |
| 11:43:27 | 14 | Q.   Now, I will represent to you that Ms. Earnest's |
| 11:43:47 | 15 | prescribing physician was not part of this clinical trial.  Do |
| 11:43:51 | 16 | you know if this information -- |
| 11:43:52 | 17 | MR. STRONGMAN:  Objection.  Relevance, foundation, |
| 11:43:57 | 18 | counsel is testifying. |
| 11:43:57 | 19 | THE COURT:  Sustained. |
| 11:43:57 | 20 | EXAMINATION BY MR. NOLEN: |
| 11:43:59 | 21 | Q.   Do you know if this information was being communicated in |
| 11:44:05 | 22 | the Taxotere label in 2007 to physicians who were not part of |
| 11:44:08 | 23 | the clinical trial? |
| 11:44:10 | 24 | THE COURT:  You may answer. |
| 11:44:11 | 25 | THE WITNESS:  It was not. |

*OFFICIAL TRANSCRIPT*

11:44:12  1    EXAMINATION BY MR. NOLEN:

11:44:13  2    Q.    Was it being communicated in 2011 as part of the label to

11:44:19  3    physicians who were not involved in this clinical trial?

11:44:23  4    A.    It was not.

11:44:24  5    Q.    So let's move to clinical trials and the clinical trial

11:44:32  6    data.

11:44:32  7              With regard to Sanofi's clinical trials, what exactly

11:44:35  8    did you look at?

11:44:38  9    A.    I looked at -- I looked at many clinical trials, but, as I

11:44:44 10    testified earlier, there were two clinical trials that were

11:44:51 11    long enough and for which alopecia was followed specifically,

11:44:59 12    hair loss was followed specifically.

11:45:00 13              So I focused my attention on those clinical trials

11:45:05 14    that were long enough and for which alopecia was a follow-up

11:45:11 15    parameter.

11:45:11 16    Q.    So I've got here TAX316 and TAX301.  Are those the

11:45:19 17    clinical trials you looked at?

11:45:20 18    A.    Correct.  Two different clinical trials.  Very similar in

11:45:25 19    their conduct, with one -- with one difference, one big

11:45:31 20    difference.

11:45:31 21    Q.    You told us about comparator arms earlier.  Were there

11:45:38 22    comparator arms in these clinical trials?

11:45:42 23    A.    Yes.

11:45:43 24    Q.    How were they different?

11:45:44 25    A.    So, one arm, which is one group of patients, got what I

*OFFICIAL TRANSCRIPT*

11:45:51  1   would call Taxotere-based therapies.  So they got Taxotere, as

11:45:58  2   well as Adriamycin, doxorubicin, and Cytoxan.  So they got

11:46:08  3   three drugs.  That is called TAC:  T, Taxotere; A, Adriamycin;

11:46:12  4   C, for Cytoxan or cyclophosphamide.  That's one group got that,

11:46:14  5   T-A-C.

11:46:16  6        The other group got FAC, F-A-C.  The F stands for

11:46:24  7   5-fluorouracil -- that was the different drug -- as well as A

11:46:32  8   and C, Adriamycin and Cytoxan.

11:46:35  9        So you have a group getting TAC, a group getting FAC.

11:46:42 10   The only real difference between that group is the T and the F,

11:46:48 11   and both groups are getting A and C.  So, in essence, to the

11:46:52 12   extent that you can, you control for A and C, both arms are

11:46:58 13   getting A and C, so that shouldn't make a difference.  So

11:47:01 14   you're really isolating the effects of T.  That's why this

11:47:06 15   study was done that way.

11:47:07 16   Q.   So, Doctor, when were these studies conducted?

11:47:10 17   A.   If my memory serves me right, they started 1997, ended

11:47:17 18   around -- followup 2009, if my memory is right.

11:47:23 19   Q.   So a little over ten years; is that right?

11:47:29 20   A.   That's why I specifically focused on them, right, because

11:47:36 21   you could see the drug and a followup for an extended period of

11:47:42 22   time.

11:47:42 23   Q.   Were both these studies completed prior to 2011?

11:47:46 24   A.   Correct.

11:47:46 25   Q.   Was Sanofi tracking the hair loss associated with Taxotere

*OFFICIAL TRANSCRIPT*

11:47:56  1   in these studies?

11:47:57  2   A.   Yes.  A little better job -- again, nothing -- I don't

11:48:03  3   mean any comment, but there was more data in 316 than in 301,

11:48:12  4   with regard to followup.  316 had more data.  301 had some data

11:48:19  5   on followup.

11:48:19  6   Q.   Were you able to review Sanofi's internal final

11:48:25  7   clinical trial reports for these studies?

11:48:27  8   A.   Yes.  I did.

11:48:28  9   Q.   I'm going to direct you to tab 5 in your notebook there.

11:48:41 10   Are you there?

11:48:42 11   A.   I am.

11:48:43 12   Q.   Tab 5 is the clinical study report.  Is that correct?

11:48:54 13   A.   Correct.

11:48:55 14   Q.   Is this one of the documents that you reviewed in forming

11:48:58 15   your opinions in this case?

11:48:59 16   A.   Correct.  Recognizing that I think the document itself is

11:49:02 17   some 37,000 pages, but I certainly reviewed the relevant pages

11:49:06 18   and searched the document as a whole.

11:49:07 19   Q.   All right.  So we've got the clinical study report, and

11:49:12 20   not the entire study up there with you right now, correct?

11:49:15 21   A.   You have excerpts of the clinical study reports and the

11:49:20 22   relevant tables.

11:49:21 23        MR. NOLEN:  I'm going to ask to move into evidence

11:49:24 24   Plaintiff's Exhibit 320, which is the clinical study report

11:49:27 25   from Sanofi.

*OFFICIAL TRANSCRIPT*

11:49:28  1          MR. STRONGMAN:  No objection.

11:49:29  2          THE COURT:  Let it be admitted.

11:49:29  3          (WHEREUPON, Plaintiff's Exhibit 320 was admitted.)

11:49:29  4    EXAMINATION BY MR. NOLEN:

11:49:32  5    Q.   All right, Doctor.  Is this what you have in front of you

11:49:34  6    up there?

11:49:35  7    A.   It is, sir.

11:49:38  8    Q.   All right.  You can see it's Plaintiff's 320.

11:49:45  9          This, in and of itself, although it is an excerpt, is

11:49:49 10    quite thick, but we're only going to really look at one page, I

11:49:53 11    think.

11:49:54 12          So, I'm going to direct you to page 37, which is a

11:50:02 13    chart.  It's Table 7.  Do you see that, sir?

11:50:05 14    A.   I see it, sir.

11:50:05 15    Q.   All right.  What, if anything, is the importance of this

11:50:13 16    chart?

11:50:16 17    A.   So, it is -- if you just look at the Table 7.  Let's look

11:50:23 18    at the heading.  It's the number of patients with T`AEs.  It's

11:50:31 19    treatment associated adverse events, right, during the

11:50:36 20    treatment period, that persisted into followup, regardless of

11:50:44 21    causal relationship.  It's a safety population.

11:50:48 22          So this is all -- you see a whole list.  If you go

11:50:55 23    on -- it's actually two pages, right, of different adverse

11:50:59 24    events by different terms.  So these are all the adverse

11:51:04 25    events, right, that they are required to list.

                              *OFFICIAL TRANSCRIPT*

11:51:07  1    What you see is there is two arms to this study.  If

11:51:13  2  you can highlight the TAC arm -- that's Taxotere, Adriamycin,

11:51:21  3  Cytoxan, they got three drugs -- you see there were

11:51:24  4  744 patients -- that's what the "N" is -- who got that -- those

11:51:29  5  three drugs.

11:51:30  6    You see that in the FAC arm -- again, the difference

11:51:35  7  being the F and the T, the A and C is the same -- there were

11:51:41  8  736 patients.

11:51:44  9    Now, if you go to the top line, if you look --

11:51:52 10  highlight the word *alopecia*, that's just hair loss.  That, in

11:51:59 11  and of itself, doesn't tell you whether it's permanent or

11:52:02 12  irreversible.

11:52:04 13    But if you go to -- and this is the -- this is what's

11:52:08 14  called the lock data.  This is the data that's in the final

11:52:14 15  study report.  If you look at that column that's called

11:52:22 16  Ongoing, that is the number of patients that had ongoing

11:52:28 17  hair loss at the end of the followup period.

11:52:35 18    Now, we know followup was ten years, but I don't want

11:52:38 19  to say that every patient was followed for ten years, right.

11:52:42 20  But this was at the end of this ten-year study.

11:52:45 21    You see that under "N," under Ongoing, that there

11:52:54 22  were 29 patients that received TAC that had ongoing hair loss

11:53:04 23  at the end of this ten-year followup study.

11:53:09 24    Now, there were 16 patients that had ongoing

11:53:15 25  hair loss in the FAC arm.

*OFFICIAL TRANSCRIPT*

11:53:23  1              Now, to the extent -- so I took those numbers, and I

11:53:30  2       asked -- just for completeness sake, I asked the

11:53:35  3       biostatistician, Dr. David Madigan, whether those numbers, the

11:53:41  4       29 in TAC, whether that was different than the 16 in FAC, was

11:53:47  5       that statistically significant, was there a difference, was

11:53:50  6       there more -- there is obviously more in the TAC arm that

11:53:54  7       everyone sees, 29 versus 16.  But the question specifically,

11:53:58  8       was it statistically significant?  Was it more likely to

11:54:03  9       happen -- was it -- could be a result of chance, or was it a

11:54:08 10       real effect that these were more?

11:54:10 11              So I asked him to apply the statistics to that.  He

11:54:16 12       informed me -- and I looked at that data -- that it's

11:54:21 13       statistically significant, meaning that that the TAC arm

11:54:26 14       compared to the FAC arm had more cases in this study.

11:54:32 15              One caveat -- I mean, what he did specifically at my

11:54:39 16       request is he pooled 316 and 301.  In the 301 arm, there were

11:54:50 17       three cases in TAC, one case.  So he added those together.  He

11:54:56 18       pooled it in something that's called a metaanalysis, and that's

11:55:00 19       what was statistically significant.

11:55:01 20       Q.   Okay.  Explain that again.  What is -- I'm sorry.  What is

11:55:06 21       a metaanalysis?

11:55:07 22       A.   So, a metaanalysis is when you do drug safety, I'm looking

11:55:12 23       to see whether some -- there is a reasonable evidence of a

11:55:16 24       causal association.  I'm looking for whether the drug is

11:55:22 25       associated with -- causes this adverse event.

                                  *OFFICIAL TRANSCRIPT*

11:55:29  1            So clinical studies are not always big enough to

11:55:33  2    detect adverse events, so sometimes you have to pool a number

11:55:37  3    of clinical trials in order to see an effect.  When you pool --

11:55:43  4    and you're allowed to do that if the trials are similar, and

11:55:48  5    316 and 301 were similar -- you can pool those studies so you

11:55:54  6    have an increased denominator, you have an increased population

11:55:58  7    exposed, so you can have better methodologies.

11:56:02  8            So when you pool studies, that's called a

11:56:06  9    metaanalysis.  He put those two studies together.  I said,

11:56:10 10    specifically, the question is:  Are there more cases in the TAC

11:56:15 11    arm and FAC arm?  We know that, but was it statistically

11:56:20 12    significant?  The answer:  It when was you pool those data.

11:56:22 13    Q.   So, I've written here *statistically significant*.

11:56:28 14            So, what is the -- what is the bottom line on FAC and

11:56:34 15    TAC regarding statistically significant based on this

11:56:38 16    metaanalysis?

11:56:41 17    A.   The TAC arm was statistically significant, more cases of

11:56:45 18    ongoing at the ten-year point of irreversible hair loss than in

11:56:55 19    the non-Taxotere arm.

11:57:03 20    Q.   So TAC, yes.  FAC, no.  Is that right?

11:57:09 21    A.   Correct.

11:57:09 22    Q.   That's utilizing the data -- is that utilizing the data

11:57:14 23    from 301 and 316 in a metaanalysis conducted by Dr. Madigan?

11:57:24 24    A.   Perfectly said.

11:57:25 25    Q.   Thank you.  It was tough.

                              *OFFICIAL TRANSCRIPT*

11:57:33  1        All right.  Doctor, is this the basis for your

11:57:38  2   opinion regarding Taxotere and permanent alopecia?

11:57:45  3   A.   Not in and of itself.  It's one piece of evidence.  But,

11:57:51  4   again, I was interested in the pharmacovigilance database.  I

11:57:58  5   was looking in the medical literature.  Certainly interested in

11:58:00  6   this for a very special reason, right, that was key.

11:58:04  7        So this did inform with regard to one special reason

11:58:07  8   that I'm happy to explain, but, again, it's the totality of

11:58:11  9   evidence that's important to me.

11:58:12 10   Q.   When you say for one special reason, what is that?

11:58:19 11   A.   When you just see, for example, the 168 cases of -- that

11:58:26 12   happened in Sanofi's 142 cases, that were in Sanofi's database,

11:58:32 13   those were patients who got Taxotere plus some other therapies.

11:58:37 14   So it was Taxotere-based therapies.  They got TAC, in all

11:58:41 15   likelihood, Adriamycin and Cytoxan only.

11:58:46 16        I can't sit here and tell you, based on that

11:58:48 17   pharmacovigilance database, that was it was the T.  What about

11:58:51 18   the A and C?

11:58:53 19        Here, it adds information because both arms got A and

11:58:58 20   C, and the T arm was still greater than the -- than the F arm.

11:59:06 21   You control, in essence.  So you can say with some degree of

11:59:11 22   reliability that it's not the A and C that's driving this

11:59:16 23   permanent hair loss, because you isolate the Taxotere.  It's

11:59:19 24   the Taxotere.

11:59:19 25   Q.   So aside from what we've just looked at, I guess, which is

*OFFICIAL TRANSCRIPT*

11:59:27 1   the -- we've looked at the medical -- the database, the medical

11:59:32 2   database and the adverse events, and the internal memoranda,

11:59:38 3   the internal documents of Sanofi, and the clinical trials, was

11:59:45 4   there anything else that you looked to to inform your opinion

11:59:51 5   about the association between permanent hair loss and Taxotere?

11:59:55 6   A.    Yes.

11:59:56 7   Q.    What was that?

11:59:58 8   A.    Well, there are several things.

12:00:00 9        THE COURT:  Wait.  Is this a good time to take a break?

12:00:04 10   I'm just wondering --

12:00:06 11        MR. NOLEN:  Yes.

12:00:06 12        THE COURT:  I thought we might be going into a new

12:00:11 13   area.  It's noon.  We're going to break for lunch.  So Court is

12:00:14 14   going to be recessed until 1:00 p.m.

12:00:17 15        Let me remind you, don't discuss this case

12:00:20 16   amongst yourself or with anyone else, and please don't

12:00:25 17   communicate in any way, however benign, with anyone associated

12:00:32 18   with this case.

12:00:33 19        So it's probably better, when you finish lunch,

12:00:36 20   if you're leaving, that you just hang out in the jury room.

12:00:39 21   You may leave your tablets on the chairs.  No one will disturb

12:00:45 22   them.

12:00:46 23        Court is at recess until 1 o'clock.

12:00:49 24        (WHEREUPON, at 12:00 p.m., the jury panel leaves the

25   courtroom, and the Court was in luncheon recess.)

*OFFICIAL TRANSCRIPT*

1                       REPORTER'S CERTIFICATE

2

3          I, Cathy Pepper, Certified Realtime Reporter, Registered

4     Merit Reporter, Certified Court Reporter in and for the State

5     of Louisiana, Official Court Reporter for the United States

6     District Court, Eastern District of Louisiana, do hereby

7     certify that the foregoing is a true and correct transcript to

8     the best of my ability and understanding from the record of the

9     proceedings in the above-entitled and numbered matter.

10

11                              *s/Cathy Pepper*

12                              Cathy Pepper, CRR, RMR, CCR
                                Certified Realtime Reporter
13                              Registered Merit Reporter
                                Official Court Reporter
14                              United States District Court
                                Cathy_Pepper@laed.uscourts.gov
15

16

17

18

19

20

21

22

23

24

25

                          ***OFFICIAL TRANSCRIPT***