UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  TAXOTERE (DOCETAXEL)       *
PRODUCTS LIABILITY LITIGATION      *       Docket No.: 16-MD-2740
                                   *       Section "H(5)"
                                   *       New Orleans, Louisiana
Relates to:  Barbara Earnest       *       September 17, 2019
Case No.: 16-CV-17144              *
* * * * * * * * * * * * * * * * * *


DAY 2 – AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL BEFORE
THE HONORABLE JANE T. MILAZZO
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:


For the Plaintiffs:          Barrios Kingsdorf & Casteix, LLP
                             BY:  DAWN M. BARRIOS, ESQ.
                             701 Poydras Street
                             Suite 3650
                             New Orleans, Louisiana 70139



For the Plaintiffs:          Gainsburgh Benjamin David Meunier
                               & Warshauer, LLC
                             BY:  M. PALMER LAMBERT, ESQ.
                             1100 Poydras Street
                             Suite 2800
                             New Orleans, Louisiana 70163



For the Plaintiffs:          Pendley Baudin & Coffin, LLP
                             BY:  CHRISTOPHER L. COFFIN, ESQ.
                             1100 Poydras Street
                             Suite 2505
                             New Orleans, Louisiana 70163


OFFICIAL TRANSCRIPT

APPEARANCES:

For the Plaintiffs:                 Gibbs Law Group, LLP
                                    BY:  KAREN BARTH MENZIES, ESQ.
                                    6701 Center Drive West
                                    Suite 1400
                                    Los Angeles, California 90045


For the Plaintiffs:                 Bachus & Schanker, LLC
                                    BY:  J. KYLE BACHUS, ESQ.
                                    BY:  DARIN L. SCHANKER, ESQ.
                                    1899 Wynkoop Street
                                    Suite 700
                                    Denver, Colorado 80202


For the Plaintiffs:                 Fleming Nolen & Jez, LLP
                                    BY:  RAND P. NOLEN, ESQ.
                                    2800 Post Oak Boulevard
                                    Suite 4000
                                    Houston, Texas 77056


For the Plaintiffs:                 DAVID F. MICELI, LLC
                                    BY:  DAVID F. MICELI, ESQ.
                                    Post Office Box 2519
                                    Carrollton, Georgia 30112


For the Plaintiffs:                 Morgan & Morgan, P.A.
                                    BY:  EMILY C. JEFFCOTT, ESQ.
                                    700 S. Palafox Street
                                    Suite 95
                                    Pensacola, Florida 32502


For the Sanofi                      Irwin Fritchie Urquhart
Defendants:                          & Moore, LLC
                                    BY:  DOUGLAS J. MOORE, ESQ.
                                    400 Poydras Street
                                    Suite 2700
                                    New Orleans, Louisiana 70130

OFFICIAL TRANSCRIPT

APPEARANCES:

For the Sanofi                  Shook Hardy & Bacon, LLP
Defendants:                     BY:  HARLEY V. RATLIFF, ESQ.
                                BY:  JON A. STRONGMAN, ESQ.
                                2555 Grand Boulevard
                                Kansas City, Missouri 64108


For the Sanofi                  Shook Hardy & Bacon, LLP
Defendants:                     BY:  HILDY M. SASTRE, ESQ.
                                201 Biscayne Boulevard, Suite 3200
                                Miami, Florida 33131


Official Court Reporter:        Jodi Simcox, RMR, FCRR
                                500 Poydras Street
                                Room HB-275
                                New Orleans, Louisiana 70130
                                (504) 589-7780



Proceedings recorded by mechanical stenography, transcript

produced by computer.

OFFICIAL TRANSCRIPT

<u>I N D E X</u>

<u>Page</u>

DAVID KESSLER
    Direct Examination By Mr. Nolen:       381
    Cross-Examination By Mr. Strongman:   388
    Redirect Examination By Mr. Nolen:    506

PROFFER
    Examination By Mr. Strongman:       528

PROFFER
    Examination By Mr. Miceli          534

OFFICIAL TRANSCRIPT

DAVID KESSLER - DIRECT

| | | |
|---|---|---|
| 12:37PM | 1 | **AFTERNOON SESSION** |
| 12:37PM | 2 | **(September 17, 2019)** |
| 12:37PM | 3 | ****** |
| 12:53PM | 4 | |
| 1:00PM | 5 | **THE DEPUTY CLERK:**  All rise. |
| 1:00PM | 6 | (WHEREUPON, the jury entered the courtroom.) |
| 1:01PM | 7 | **THE COURT:**  All jurors are present.  Court's back in |
| 1:01PM | 8 | session.  You may be seated. |
| 1:01PM | 9 | Dr. Kessler, I remind you again that you're |
| 1:01PM | 10 | still under oath. |
| 1:01PM | 11 | **THE WITNESS:**  Thank you, Your Honor. |
| 1:01PM | 12 | **THE COURT:**  Please proceed, Mr. Nolen. |
| 1:01PM | 13 | (WHEREUPON, **DAVID KESSLER**, having been previously |
| 1:01PM | 14 | duly sworn, testified as follows.) |
| 1:01PM | 15 | **DIRECT EXAMINATION** |
| 1:01PM | 16 | **BY MR. NOLEN:** |
| 1:01PM | 17 | **Q.**   Hi, Dr. Kessler. |
| 1:01PM | 18 | **A.**   Good afternoon. |
| 1:01PM | 19 | **Q.**   All right.  So I -- right before we took a break there, we |
| 1:01PM | 20 | had just talked about the statistical significance in the TAC |
| 1:01PM | 21 | arm of 316 versus the FAC arm; is that right? |
| 1:02PM | 22 | **A.**   Right. |
| 1:02PM | 23 | **Q.**   Now, you were looking, I believe, for causal association, |
| 1:02PM | 24 | from a regulatory standpoint, in your analysis and search. |
| 1:02PM | 25 | And so was -- did your analysis -- did your |

OFFICIAL TRANSCRIPT

DAVID KESSLER - DIRECT

| | | |
|---|---|---|
| 1:02PM | 1 | investigation stop at the clinical trial? |
| 1:02PM | 2 | **A.** No, it did not. |
| 1:02PM | 3 | **Q.** What else, if anything, did you review? |
| 1:02PM | 4 | **A.** So a number of things, including -- there was another |
| 1:02PM | 5 | comparative study done by Dr. Sedlacek in 2006. |
| 1:02PM | 6 | **Q.** Okay. You mentioned that earlier in today's proceedings; |
| 1:02PM | 7 | right? |
| 1:02PM | 8 | **A.** Correct. |
| 1:02PM | 9 | **Q.** So is Sedlacek -- let's see, S-E-D-L-A-C-E-K. |
| 1:02PM | 10 | So he did a comparison between what drugs? |
| 1:03PM | 11 | **A.** So he looked at patients in his clinical practice over an |
| 1:03PM | 12 | 11-year period, and he divided them up into three groups. The |
| 1:03PM | 13 | first group was Adriamycin without taxane, without Taxotere or |
| 1:03PM | 14 | Taxol. So it was just the Adriamycin and other drug combos. |
| 1:03PM | 15 | So there was no taxane in that first group. |
| 1:03PM | 16 | He had a second group that had Adriamycin and Taxol |
| 1:03PM | 17 | or also called the Taxol, and that was his second group. So |
| 1:03PM | 18 | that did have a taxane, but it was Taxol, not Taxotere. |
| 1:03PM | 19 | And he had a third group that included Adriamycin |
| 1:03PM | 20 | plus Taxotere. |
| 1:04PM | 21 | **Q.** Okay. So -- |
| 1:04PM | 22 | **THE COURT:** I'm sorry. Dr. Kessler, was -- the first |
| 1:04PM | 23 | group was what? |
| 1:04PM | 24 | **THE WITNESS:** The first group, Your Honor, was |
| 1:04PM | 25 | Adriamycin without either of the Ts. |

DAVID KESSLER - DIRECT

1:04PM  1          THE COURT:  Okay.  Thank you.

1:04PM  2          THE WITNESS:  So no taxane, just Adriamycin, but a

1:04PM  3   number of different Adriamycin combinations, Your Honor.

1:04PM  4          THE COURT:  Thank you.

1:04PM  5   BY MR. NOLEN:

1:04PM  6   Q.   And so we have A, which is Adriamycin -- A and Taxol,

1:04PM  7   which is a different drug than Taxotere; right?

1:04PM  8   A.   Correct.  Also called paclitaxel.

1:04PM  9   Q.   And then we had A, which is Adriamycin, plus Taxotere?

1:04PM  10  A.   Correct.

1:04PM  11  Q.   And so what was important about Dr. Sedlacek's findings?

1:04PM  12  A.   So he studied his patients, it should be pointed out,

1:05PM  13  retrospectively.  He went back and looked at the data in his

1:05PM  14  charts, and he studied them.  And he reported something that he

1:05PM  15  called persistent significant alopecia.  And it was alopecia

1:05PM  16  that persisted and that was greater than 50 percent.

1:05PM  17          And what he reported, both in his abstract and at the

1:05PM  18  San Antonio breast conference in -- mid -- I think it was 2006,

1:05PM  19  if I'm right, if my memory serves right.  He reported that

1:05PM  20  there were zero cases of significant persistent alopecia in

1:05PM  21  that first group with Adriamycin alone.

1:05PM  22          There was zero in the Adriamycin plus Taxol group.

1:06PM  23  And there were seven cases of persistent significant alopecia

1:06PM  24  in the Adriamycin plus Taxotere.  And I think, if my memory

1:06PM  25  serves me, it was about 6 percent.

OFFICIAL TRANSCRIPT

DAVID KESSLER - DIRECT

1:06PM  1  **Q.**   So does that reach this level or this threshold of what

1:06PM  2  you described earlier as statistically significant?

1:06PM  3  **A.**   Yes.  So if you do statistics on this, again, it just --

1:06PM  4  when you compare seven with a number of patients in that arm

1:06PM  5  versus the zeros in the other arms, it comes out to be

1:06PM  6  statistically significant.

1:06PM  7  **Q.**   So these two things, Sedlacek and the clinical trial,

1:06PM  8  those are statistically significant; is that right?

1:06PM  9  **A.**   Correct.

1:06PM  10  **Q.**   All right.  So is that -- is that the total sum of what

1:07PM  11  you've looked at in order to formulate your opinion regarding

1:07PM  12  the causal association?

1:07PM  13  **A.**   No.  Well, again, cumulatively.

1:07PM  14  **Q.**   Okay.

1:07PM  15  **A.**   So it includes everything that we've talked about this

1:07PM  16  morning.  It's not just any one of these.

1:07PM  17           Plus I think we need to underscore again what I

1:07PM  18  talked about with the jury a little earlier about biological

1:07PM  19  plausibility.  Just because you have a statistically

1:07PM  20  significant result, I'm not willing to say there's reasonable

1:07PM  21  evidence of a causal association, unless there's a possible

1:07PM  22  mechanism definitively how the drug causes persistent hair

1:07PM  23  loss.  But I have to have a -- by a plausible biological

1:07PM  24  rational.

1:07PM  25           And I think that everyone would agree, when it comes

OFFICIAL TRANSCRIPT

DAVID KESSLER - DIRECT

1:07PM   1   to chemotherapy, there is at least a plausible mechanism.  So

1:08PM   2   you need that just to -- it's a check on making sure that, you

1:08PM   3   know, you just don't believe the statistics alone.  It's --

1:08PM   4   again, it's the totality.  So biological plausibility was also

1:08PM   5   an important factor.

1:08PM   6   Q.   Okay.  So applying the regulatory -- let me try to phrase

1:08PM   7   this appropriately.

1:08PM   8         Applying the regulatory criteria, did you determine

1:08PM   9   whether or not there is a causal association between Taxotere

1:08PM   10  and permanent hair loss?

1:08PM   11  A.   Yes.

1:08PM   12  Q.   And --

1:08PM   13  A.   So I think under -- under both standards, the standard for

1:08PM   14  the warning and the standard for adverse events that we saw

1:09PM   15  this morning, I think it's fair to say there's reasonable

1:09PM   16  evidence, not perfect evidence -- rarely is there perfect

1:09PM   17  evidence.  There's reasonable evidence of a causal association.

1:09PM   18  Q.   And you told us you were in the courtroom this morning for

1:09PM   19  Dr. Freedman's testimony.

1:09PM   20         Remember that?

1:09PM   21  A.   Correct.

1:09PM   22  Q.   The deposition testimony?

1:09PM   23  A.   I heard that, yes.

1:09PM   24  Q.   Did you hear in that testimony that there was an

1:09PM   25  association as early as 2006?

OFFICIAL TRANSCRIPT

DAVID KESSLER - DIRECT

1:09PM   1          **MR. STRONGMAN:**  Objection.  Misstates the evidence.

1:09PM   2   Foundation.

1:09PM   3          **THE COURT:**  I think -- just rephrase your question.

1:09PM   4   **BY MR. NOLEN:**

1:09PM   5   **Q.**   Did anything Dr. Freedman testified to that you heard in

1:09PM   6   court today differ from any opinions that you've offered?

1:09PM   7          **MR. STRONGMAN:**  Objection.  Foundation.  Misstates

1:09PM   8   the evidence.

1:10PM   9          **THE COURT:**  I'm going to allow him to answer the

1:10PM  10   question.  I think I'll allow him to answer the question.

1:10PM  11          **THE WITNESS:**  Dr. Freedman's statement that Taxotere

1:10PM  12   caused permanent hair loss in 2006, her statement I would

1:10PM  13   corroborate.

1:10PM  14   **BY MR. NOLEN:**

1:10PM  15   **Q.**   Okay.  And so is it fair to say that -- that Sanofi should

1:10PM  16   have warned about permanent hair loss as early as '06?

1:10PM  17   **A.**   Yes.  Because in addition to the reasonable evidence of a

1:10PM  18   causal association, I think permanent hair loss is serious,

1:10PM  19   certainly a clinically significant hazard, that can be

1:10PM  20   life-changing.

1:10PM  21          So the two together, I think, meet the definition of

1:11PM  22   reasonable evidence of a causal association, as well as the

1:11PM  23   standard for an adverse event, which is reasonably associated

1:11PM  24   or some basis to believe.  Both standards, I believe, would be

1:11PM  25   met.

OFFICIAL TRANSCRIPT

DAVID KESSLER - DIRECT

1:11PM   1   **Q.**   And where were they supposed to warn?

1:11PM   2   **A.**   Clearly and prominently in the label.

1:11PM   3   **Q.**   And so -- and I want to go back, because I'm concerned

1:11PM   4   that there may be some confusion.

1:11PM   5        In 2007, we looked at, a moment ago, a warning

1:11PM   6   that -- about permanent hair loss that was in a clinical trial;

1:11PM   7   correct?

1:11PM   8   **A.**   It was a warning in a informed consent that was for just

1:11PM   9   the clinical trial, correct.

1:11PM   10  **Q.**   All right.  But that warning about permanent hair loss was

1:12PM   11  not appearing in labeling --

1:12PM   12  **A.**   Correct.

1:12PM   13  **Q.**   -- all the way through 2011?

1:12PM   14  **A.**   Correct.

1:12PM   15  **Q.**   Thank you.

1:12PM   16        **MR. NOLEN:**  I pass the witness.

1:12PM   17        **THE COURT:**  Mr. Strongman.

1:12PM   18        **MR. STRONGMAN:**  If I could take a moment just to set

1:12PM   19  up, Your Honor.

1:12PM   20        **THE COURT:**  Of course.

1:13PM   21        Can you all see the easel?

1:13PM   22        **A JUROR:**  Yes.

1:13PM   23        **THE COURT:**  Okay.  Thank you.

1:13PM   24        **MR. STRONGMAN:**  Dr. Kessler, can you see?

1:13PM   25        **THE WITNESS:**  Yes.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 1:13PM | 1 | **THE COURT:**  Please proceed. |
| 1:13PM | 2 | **MR. STRONGMAN:**  Good afternoon, ladies and gentlemen. |
| 1:13PM | 3 | **CROSS-EXAMINATION** |
| 1:13PM | 4 | BY MR. STRONGMAN: |
| 1:13PM | 5 | **Q.**  Good afternoon, Dr. Kessler.  How are you? |
| 1:13PM | 6 | **A.**  Good afternoon. |
| 1:13PM | 7 | **Q.**  So you and I have not had a chance to meet before, but you |
| 1:13PM | 8 | are no stranger to the courtroom; correct? |
| 1:13PM | 9 | **A.**  That's fair. |
| 1:13PM | 10 | **Q.**  I think you've testified more than 40 times; correct? |
| 1:14PM | 11 | **A.**  Approximately. |
| 1:14PM | 12 | **Q.**  And I thought I heard during your testimony that you said |
| 1:14PM | 13 | you like to review labels in your spare time. |
| 1:14PM | 14 | Do you remember that? |
| 1:14PM | 15 | **A.**  I think I said something to that effect. |
| 1:14PM | 16 | **Q.**  Right.  And the truth is you actually spend quite a bit of |
| 1:14PM | 17 | your spare time reviewing drug labels for plaintiffs' lawyers |
| 1:14PM | 18 | at $1,000 an hour; isn't that correct? |
| 1:14PM | 19 | **A.**  Absolutely. |
| 1:14PM | 20 | **Q.**  In fact, that's the role that you find yourself in here |
| 1:14PM | 21 | today; isn't that right? |
| 1:14PM | 22 | **A.**  I find myself testifying, absolutely. |
| 1:14PM | 23 | **Q.**  All right.  And you know how this process works. |
| 1:14PM | 24 | You create an expert report; isn't that correct? |
| 1:14PM | 25 | **A.**  Right here, sir, correct. |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:14PM  1  **Q.**   Very good.  And when you create an expert report, you have
1:14PM  2  to review data; isn't that right?
1:14PM  3  **A.**   Correct.
1:14PM  4  **Q.**   And you have to consider all the relevant information;
1:14PM  5  isn't that right?
1:14PM  6  **A.**   Correct.
1:14PM  7  **Q.**   You can't cherry-pick information; fair?
1:14PM  8  **A.**   Fair.
1:14PM  9  **Q.**   All right.
1:14PM  10  **A.**   There should be a footnote there.
1:14PM  11  **Q.**   You can footnote that?
1:14PM  12  **A.**   I can footnote that.
1:15PM  13  **Q.**   All right.  Well, certainly, when you're asked to get
1:15PM  14  involved in a case, you need to approach it neutrally; isn't
1:15PM  15  that right?
1:15PM  16  **A.**   Exactly.
1:15PM  17  **Q.**   Right.
1:15PM  18  **A.**   That's the way I do it.
1:15PM  19  **Q.**   And the reality is, in nearly every single case where you
1:15PM  20  have come into the courtroom to testify about whether or not a
1:15PM  21  drug label was adequate, in nearly every single one of those
1:15PM  22  cases, you have said the drug label is inadequate; correct?
1:15PM  23  **A.**   In those settings where that's an issue, yes.  I've also
1:15PM  24  testified that, in some instances, that a label would be
1:15PM  25  adequate.  But many times, when that's the question and I'm

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:15PM  1   testifying for plaintiffs, that's the ultimate.  You're

1:15PM  2   correct.

1:15PM  3   Q.    And, Doctor, wouldn't you agree that, when you consider

1:15PM  4   information and when you tell the jury information, you should

1:16PM  5   share the things that are both helpful to the plaintiff side

1:16PM  6   and the things that are helpful to the defense side; correct?

1:16PM  7   A.    Absolutely.  I love to do that.  But as you know, I'm sort

1:16PM  8   of restricted on answering questions.  When I stray to do that,

1:16PM  9   I get -- so I have to answer the questions, and happy to do

1:16PM  10  that.  I can't lecture here.

1:16PM  11  Q.    And the point being that you have to answer the questions

1:16PM  12  that plaintiff's lawyers asked you; right?

1:16PM  13  A.    Correct.

1:16PM  14  Q.    You're limited in what they asked you; true?

1:16PM  15  A.    Correct.

1:16PM  16  Q.    They didn't ask you, "Hey, what information is actually

1:16PM  17  helpful to Sanofi," did they?  They didn't ask that question,

1:16PM  18  did they?

1:16PM  19  A.    That was not one of the questions that came from

1:16PM  20  plaintiff's counsel.  You are correct.

1:16PM  21  Q.    And you've held up your report in this case, and it's big,

1:16PM  22  isn't it?  When you include all the appendixes and the

1:16PM  23  different attachments like the -- you have schedules, is what

1:16PM  24  you call them?

1:16PM  25  A.    That's fair.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 1:16PM | 1 | **Q.** Okay. |
| 1:16PM | 2 | **A.** Exactly. |
| 1:17PM | 3 | **Q.** And it's long, isn't it? |
| 1:17PM | 4 | **A.** Mine is double-sided, so yours is probably single-sided. |
| 1:17PM | 5 | **Q.** Several hundred pages; right? |
| 1:17PM | 6 | **A.** I haven't counted, but I wouldn't dispute that. |
| 1:17PM | 7 | **Q.** Okay. How long did it take you to write this report? |
| 1:17PM | 8 | Actual pen to paper, how long did it take you to write? |
| 1:17PM | 9 | **A.** Oh, probably close to 100 hours. |
| 1:17PM | 10 | **Q.** I want you to set aside the time reviewing documents. |
| 1:17PM | 11 | How long did it actually take you to write? |
| 1:17PM | 12 | **A.** I tend not to write. I tend to dictate my reports. You |
| 1:17PM | 13 | know, I'm not a great typist. |
| 1:17PM | 14 | **Q.** How long did it take to you dictate your report, Doctor? |
| 1:17PM | 15 | **A.** Oh, it took, certainly, several days -- |
| 1:17PM | 16 | **Q.** Okay. |
| 1:17PM | 17 | **A.** -- at least. |
| 1:17PM | 18 | **Q.** Okay. And you understand that, when you do a report like |
| 1:17PM | 19 | you did in this case, that you have it include all your |
| 1:17PM | 20 | opinions in it; correct? |
| 1:17PM | 21 | **A.** Of course. |
| 1:17PM | 22 | **Q.** And you have to include all of the things that you relied |
| 1:17PM | 23 | upon; correct? |
| 1:17PM | 24 | **A.** Correct. I tried to do that, absolutely. Again, there's |
| 1:17PM | 25 | always a caveat to that in a footnote. But essentially, yes. |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:18PM 1   **Q.**   Okay.  Now I want to talk about a few things that you're

1:18PM 2   not offering opinions on.  Okay.

1:18PM 3   **A.**   Sure.  Happy do that.

1:18PM 4   **Q.**   All right.  Dr. Kessler, just so the record is clear, in

1:18PM 5   this case, you are not offering any opinions specifically about

1:18PM 6   Ms. Earnest; is that correct?

1:18PM 7   **A.**   I think that would be fair.

1:18PM 8   **Q.**   Okay.  You haven't reviewed her medical records; is that

1:18PM 9   correct?

1:18PM 10  **A.**   I think I looked -- for the purposes -- essentially,

1:18PM 11  you're correct.

1:18PM 12  **Q.**   Okay.

1:18PM 13  **A.**   I mean, I think I've reviewed, but I'm not testifying.

1:18PM 14  Others will testify.

1:18PM 15  **Q.**   You're not here to actually offer any testimony about what

1:18PM 16  happened to Ms. Earnest; correct?

1:18PM 17  **A.**   Well said.  That was not my job.  Others will testify.

1:19PM 18  **Q.**   And you were shown -- for example, you were shown an

1:19PM 19  informed consent earlier by Mr. Nolen.

1:19PM 20          Do you remember that?

1:19PM 21  **A.**   I certainly do.

1:19PM 22  **Q.**   Right.  Did Mr. Nolen show you Ms. Earnest's informed

1:19PM 23  consent?

1:19PM 24  **A.**   Not during this trial, no.

1:19PM 25  **Q.**   All right.  But you understand, certainly, what it means

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:19PM   1   to offer a case-specific opinion?  You understand what that
1:19PM   2   means in the context of litigation; correct?
1:19PM   3   A.   I did go to law school.  Yes, I think I understand that.
1:19PM   4   Q.   And so you're not here talking about Ms. Earnest today;
1:19PM   5   correct?
1:19PM   6   A.   Please, you're exactly correct, Counselor.  Others will
1:19PM   7   testify.  I'm here to talk about the framework for drug safety.
1:19PM   8   Q.   But you do know, Doctor, that Ms. Earnest is cancer-free
1:19PM   9   today?  You do know that; correct?
1:19PM  10   A.   Again, I'm under oath.
1:19PM  11   Q.   You don't know?
1:19PM  12   A.   I will leave it to her doctors to talk.
1:20PM  13   Q.   Nobody told you that?
1:20PM  14   A.   Again, I don't want to make any statements.  People have
1:20PM  15   told me.  I've looked at certain things.  But please have her
1:20PM  16   doctors please testify.  I just want to be very respectful and
1:20PM  17   stay within the areas that I have studied.
1:20PM  18   Q.   Right.  I understand that, Doctor.
1:20PM  19        But you don't you think it would have been important
1:20PM  20   to know that Ms. Earnest is cancer-free today?
1:20PM  21        Isn't that the kind of information you'd want to know
1:20PM  22   before you come into this courtroom and offer an opinion in
1:20PM  23   Ms. Earnest's case?
1:20PM  24   A.   So I did ask for all the medical records.  But I think, to
1:20PM  25   answer the question whether Sanofi should have warned, I think

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:20PM  1   that question is independent.

1:20PM  2   Q.   So it's not important to know whether Ms. Earnest is

1:20PM  3   cancer-free?  Just yes or no.

1:20PM  4           MR. NOLEN:  Objection.  Mischaracterizes the

1:20PM  5   testimony.

1:20PM  6           THE COURT:  Overruled.  I think he can answer the

1:20PM  7   question under cross-examination.

1:20PM  8           THE WITNESS:  There are a lot of things that are

1:20PM  9   important in this case, but they're beyond my testimony.

1:21PM  10  BY MR. STRONGMAN:

1:21PM  11  Q.   Okay.  Do you know who Dr. James Carinder is?

1:21PM  12  A.   I believe he is the oncologist, yes.

1:21PM  13  Q.   All right.  And so in this case, sitting here today,

1:21PM  14  you're also not offering any opinions about Dr. Carinder;

1:21PM  15  correct?

1:21PM  16  A.   That would be correct.  That's beyond the scope of my

1:21PM  17  expertise or my assignment.

1:21PM  18  Q.   But what we can say for sure is that you're not coming in

1:21PM  19  here offering any criticisms of Dr. Carinder for using

1:21PM  20  Taxotere; correct?

1:21PM  21  A.   I would not do that, no.

1:21PM  22  Q.   And do you know anything about the dose that Dr. Carinder

1:21PM  23  used when he treated Ms. Earnest?

1:21PM  24  A.   I have some information on that.  I've inquired, but

1:21PM  25  again --

DAVID KESSLER - CROSS

1:21PM  1   **Q.**   Not within the scope of your opinions?

1:21PM  2   **A.**   It depends on Your Honor -- everything is up to Your

1:22PM  3   Honor.

1:22PM  4   **Q.**   Okay.

1:22PM  5   **A.**   I mean, I would -- I'd respectfully stay away from that

1:22PM  6   and let others testify about, but I have some familiarity with

1:22PM  7   that.

1:22PM  8   **Q.**   Now, setting aside Dr. Carinder for a minute.

1:22PM  9        When a prescription drug like Taxotere is approved,

1:22PM  10  in the label -- and we saw the label -- there are dosages and

1:22PM  11  regimens specifically called out; is that correct?

1:22PM  12  **A.**   Correct.

1:22PM  13  **Q.**   And so when you're prescribing something on-label, so

1:22PM  14  that's within the four corners of that drug label, that's using

1:22PM  15  the dose that's set out in the label; correct?

1:22PM  16  **A.**   A little more complicated than that.

1:22PM  17  **Q.**   So let me just ask it this way:  In the adjuvant breast

1:22PM  18  cancer setting -- are you with me so far?

1:22PM  19  **A.**   I am.

1:22PM  20  **Q.**   Okay.  So adjuvant breast cancer, what we're dealing with

1:22PM  21  is chemotherapy treatment after there has been some sort of

1:22PM  22  intervention surgically, normally; is that correct?

1:23PM  23  **A.**   Correct.  That's the definition of "adjuvant."

1:23PM  24  **Q.**   And so we've we have a patient who's had surgery, and now

1:23PM  25  they're undergoing chemotherapy; is that correct?

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:23PM 1  **A.**   Correct.

1:23PM 2  **Q.**   Okay.  And you understand that Taxotere has indication in

1:23PM 3  that setting; is that correct?

1:23PM 4  **A.**   Yes.  And that's generally where off-label attaches to.  I

1:23PM 5  mean, it's for a certain type of breast cancer.  That's usually

1:23PM 6  how I would use off-label.  You're using "off-label" with

1:23PM 7  regard to dose.

1:23PM 8  **Q.**   Very good.  But you know that, in the approval for

1:23PM 9  Taxotere, correct, that the regimen that was approved was T

1:23PM 10  with A with C all together; correct?

1:23PM 11  **A.**   Correct.

1:23PM 12  **Q.**   Okay.  And the dose of the T -- so that's the dose of the

1:23PM 13  Taxotere -- in that regimen was approved at 75 milligrams per

1:23PM 14  meter squared in the adjuvant setting; correct?

1:23PM 15  **A.**   That's not entirely correct.  Times how many doses?  So

1:24PM 16  that's what's key.

1:24PM 17  **Q.**   Yeah.

1:24PM 18  **A.**   Because you have to look at cumulative dose, right.  So it

1:24PM 19  gets a little more complicated than --

1:24PM 20  **Q.**   Understood.  Understood.

1:24PM 21  **A.**   It's the dose times the number of treatments that really

1:24PM 22  is key.  Oncology has its own complexities, I think it's fair

1:24PM 23  to say.

1:24PM 24  **Q.**   Very good.  But the dosage that was included in the

1:24PM 25  label -- and we're talking about a dose that's given how many

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:24PM  1    times in the label, Doctor?

1:24PM  2    A.    If you could pull up the label, just because I want to be

1:24PM  3    exactly sure.  Let's just be exact because -- it's the dose

1:24PM  4    times the number of treatments --

1:24PM  5    Q.    Okay.

1:24PM  6    A.    -- that I think is in the label.

1:24PM  7    Q.    And let me just ask it this way:  In your report, you're

1:24PM  8    not offering any opinions about whether a doctor should or

1:24PM  9    should not prescribe a chemotherapy regimen in a particular

1:24PM  10   way; correct?  That's not within the scope of your opinions?

1:25PM  11   A.    I've had many -- I've testified many times that an

1:25PM  12   individual physician may prescribe, in his or her judgment,

1:25PM  13   off-label.  I've testified about that repeatedly.

1:25PM  14   Q.    So in addition to no opinions on Dr. Carinder, you also,

1:25PM  15   in your report, offer no criticisms of doctors that use

1:25PM  16   Taxotere in the treatment of cancer; correct?

1:25PM  17   A.    No, absolutely not.

1:25PM  18   Q.    And I noticed right at the end of your questioning,

1:25PM  19   Mr. Nolen asked you several carefully worded questions

1:26PM  20   regarding -- in the regulatory framework causation.

1:26PM  21         Do you remember those?

1:26PM  22   A.    Sure.

1:26PM  23   Q.    Okay.  And you understand what general medical causation

1:26PM  24   is from your experience in litigation; is that correct?

1:26PM  25   A.    From -- from my torts class, I think.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 1:26PM | 1 | **Q.**   Very good. |
| 1:26PM | 2 | **A.**   You're bringing back memories. |
| 1:26PM | 3 | **Q.**   And just so the jury is clear, your focus in this case is |
| 1:26PM | 4 | not one of general medical causation; correct? |
| 1:26PM | 5 | **A.**   I will leave it to the Court to determine.  I'm here as a |
| 1:26PM | 6 | regulatory expert and, under a specific standard, how that |
| 1:26PM | 7 | interplays with general causation language.  It can be similar. |
| 1:26PM | 8 | I leave it to Your Honor. |
| 1:26PM | 9 | **Q.**   Well, Doctor, this question has been asked of you before. |
| 1:26PM | 10 | I'll ask it again and see if you can answer it. |
| 1:27PM | 11 |         Your focus -- and it's not identified in your |
| 1:27PM | 12 | report -- is not one of a general medical causation expert? |
| 1:27PM | 13 | **A.**   You're correct.  I'm here as a regulatory expert on what |
| 1:27PM | 14 | should be in the label. |
| 1:27PM | 15 | **Q.**   So the rest of my exam with you, today, Doctor, is going |
| 1:27PM | 16 | to cover three broad areas.  The first is going to be some |
| 1:27PM | 17 | things I think we can agree about, or hopefully agree about. |
| 1:27PM | 18 |         The next is I'm going to ask you some more questions |
| 1:27PM | 19 | about you, what you do with your time and your experience. |
| 1:27PM | 20 | Okay? |
| 1:27PM | 21 |         And then we're going to end with your opinions that |
| 1:27PM | 22 | you have on Taxotere. |
| 1:27PM | 23 |         Does that sound fair? |
| 1:28PM | 24 | **A.**   Sure. |
| 1:28PM | 25 | **Q.**   Okay.  I'm going to move this just a little bit so you can |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1   see it better.
2          So I want to start with some agreements on the FDA.
3   Okay?
4   A.   Okay.
5   Q.   You like talking about the FDA?
6   A.   I love talking about the FDA.
7   Q.   And I think you made it clear at the very beginning of
8   your examination that you were not here speaking on behalf of
9   the FDA; is that correct?
10  A.   Please underline that.
11  Q.   These are purely your opinions, not the opinions of FDA;
12  correct?
13  A.   Correct.
14  Q.   And, Doctor, you would agree -- and I'm just -- just so
15  it's clear, I'm asking these questions about the FDA generally,
16  okay, not even within the context of Taxotere.
17          You with me?
18  A.   Sure.
19  Q.   Okay.  You would agree, Doctor, that the FDA is the most
20  important consumer protection agency in the world; correct?
21  A.   I think you're quoting me.
22  Q.   I am.
23  A.   Thank you.
24  Q.   Correct?  Am I correct?
25  A.   Yes.  That's an exact quote.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:29PM   1   **Q.**   You would -- you would agree that the FDA is full of many

1:29PM   2   dedicated professionals; correct?

1:29PM   3   **A.**   Absolutely.

1:29PM   4   **Q.**   And the FDA employees share a commitment to protect and

1:29PM   5   enhance public health; correct?

1:29PM   6   **A.**   Correct.  There's always footnotes to any of these, and I

1:29PM   7   think I've said that.  But, again, as a general thrust, well

1:29PM   8   said.  You're quoting me.

1:29PM   9   **Q.**   And you mentioned applications for new drugs; right?  We

1:29PM  10   call those an NDA; is that correct?

1:29PM  11   **A.**   Correct.

1:29PM  12   **Q.**   New drug application; fair?

1:29PM  13   **A.**   Correct.

1:29PM  14   **Q.**   Okay.  And the professionals at the FDA work on reviewing

1:29PM  15   each NDA; correct?

1:29PM  16   **A.**   Correct.

1:29PM  17   **Q.**   These dedicated professionals look at data for each trial;

1:29PM  18   correct?

1:29PM  19   **A.**   Yes and no.  All trials that are submitted to the agency,

1:29PM  20   I think, would be the correct way to say it.

1:29PM  21   **Q.**   Well, I'll make it clear.  The dedicated professionals at

1:30PM  22   the FDA look at all data for each trial submitted to the FDA;

1:30PM  23   correct?

1:30PM  24   **A.**   Well -- well said.

1:30PM  25   **Q.**   All right.  Very good.  And we can agree that there are

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:30PM 1   requirements that manufacturers submit certain documents from

1:30PM 2   time to time; correct?

1:30PM 3   A.   Correct.

1:30PM 4   Q.   And those would include regular -- we might call them

1:30PM 5   annual reports -- or PSURs are sometimes used in place of those

1:30PM 6   reports; is that correct?

1:30PM 7   A.   The annual reports in the American system is the PADER

1:30PM 8   system, but some companies ask to submit the international

1:30PM 9   document called the PSUR.

1:30PM 10  Q.   And, certainly, the FDA looks at or considers what the

1:30PM 11  manufacturer is submitting to them; correct?

1:30PM 12  A.   I would like to say yes, but I think you have to put a

1:30PM 13  caveat on that.  I don't believe that FDA can look at every

1:31PM 14  single page when millions of pages are submitted.  So I think

1:31PM 15  just within -- FDA tries to look at the salient features.

1:31PM 16  Q.   Well, Doctor, you've been asked this question before, too.

1:31PM 17        Certainly, the FDA looks at or considers what the

1:31PM 18  manufacturer is submitting to them; correct?

1:31PM 19  A.   If you're -- you mean in general, I would agree.  If

1:31PM 20  you're asking whether the FDA looks at every single page out of

1:31PM 21  millions of pages, that would not be realistic.  So just with

1:31PM 22  that caveat.

1:31PM 23  Q.   But you would also agree that these dedicated, highly

1:31PM 24  qualified professionals at the FDA don't just rely on what the

1:31PM 25  pharmaceutical companies tell them; correct?

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:31PM 1    A.    I think that's fair, in part.  They're only as good as

1:31PM 2    what the pharmaceutical manufacturers tell them, usually.

1:31PM 3    Q.    But they don't just rely on the conclusions of the

1:31PM 4    company; correct?

1:31PM 5    A.    They don't rely on just the conclusions of company, no.

1:31PM 6    That would be correct.

1:32PM 7    Q.    And at the end of the day, the FDA must determine, in

1:32PM 8    order for the medication to go out into the public, that it is

1:32PM 9    safe and effective under the FDA rules and regulations;

1:32PM 10   correct?

1:32PM 11   A.    Not to quibble, but it would be safe and effective for the

1:32PM 12   intended conditions of use.

1:32PM 13   Q.    Very good.  And you would certainly agree that FDA

1:32PM 14   approval is not a rubber stamp; correct?

1:32PM 15   A.    I think that's -- I think that's fair.  There are times

1:32PM 16   when FDA makes a mistake and does rubber stamp.  But I think

1:32PM 17   that, in general, you are correct.

1:32PM 18   Q.    And you would agree that the FDA has served the American

1:32PM 19   public well in ensuring the remarkable standard of product

1:32PM 20   safety; correct?

1:32PM 21   A.    I'm sure I've said something like that.  But you also have

1:32PM 22   to recognize sometimes FDA messes up, and that's just a

1:32PM 23   reality.

1:32PM 24   Q.    And, Doctor, maybe you said something exactly like that.

1:32PM 25          Maybe those are your words; fair?

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:32PM   1   A.   I've said FDA is the most important consumer protection

1:33PM   2   agency, and I've also said FDA messes up.  So I've said both of

1:33PM   3   those and believe that that's the case.

1:33PM   4   Q.   And it is the gold standard across the world, the FDA's

1:33PM   5   review, when they decide that a product is safe and effective;

1:33PM   6   correct?

1:33PM   7   A.   Tends to be.  Again, with certain -- those are

1:33PM   8   generalities.  When FDA make a mistake, it's not the gold

1:33PM   9   standard, but it's looked to.  And, overall, I think the last

1:33PM   10  50 years have shown that FDA standards are very important for

1:33PM   11  the world.

1:33PM   12  Q.   And I also want to talk now a little bit about the

1:33PM   13  labeling component of it.

1:33PM   14        It when a manufacturer submits its new drug

1:33PM   15  application, it also involves proposed labeling; is that

1:33PM   16  correct?

1:33PM   17  A.   Correct.

1:33PM   18  Q.   And when the FDA approves the NDA and it finds the drug to

1:33PM   19  be safe and effective for its indicated use, it also approves

1:34PM   20  the labeling; correct?

1:34PM   21  A.   At that moment in time.

1:34PM   22  Q.   Very good.  Absolutely.  And what we know is that, once

1:34PM   23  the drug is on the market -- I think you talked about the CBE

1:34PM   24  process as one example; correct?

1:34PM   25  A.   Sure.  One process.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:34PM   1   **Q.**   So once the drug is on the market, the drug manufacturer

1:34PM   2   can propose changes to the FDA; is that correct?

1:34PM   3   **A.**   Certainly.

1:34PM   4   **Q.**   And the FDA, however, still has to approve the change in

1:34PM   5   the end; correct?

1:34PM   6   **A.**   Even under the --

1:34PM   7       **MR. NOLEN:**  Objection, Your Honor.  403.  Relevance.

1:34PM   8       **THE COURT:**  I think you need to rephrase your

1:34PM   9   question.

1:34PM   10  **BY MR. STRONGMAN:**

1:34PM   11  **Q.**   When you propose labeling to the FDA -- let's talk about

1:34PM   12  that.

1:34PM   13      The manufacturer proposes labeling to the FDA;

1:34PM   14  correct?

1:34PM   15  **A.**   "When you propose" -- I just want to -- when the

1:34PM   16  manufacturer does it?

1:34PM   17  **Q.**   Fair question.  Yes.

1:34PM   18  **A.**   Yeah, thanks.

1:34PM   19  **Q.**   When the manufacturer proposes labeling to the FDA in

1:34PM   20  order to get the drug approved, is there a negotiation with the

1:35PM   21  FDA about the label?

1:35PM   22  **A.**   Yes.

1:35PM   23  **Q.**   And there are times when the manufacturer will ask that

1:35PM   24  certain information be put in the label or taken out of the

1:35PM   25  label; is that fair?

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:35PM 1   **A.**   There's a negotiation, fair.

1:35PM 2   **Q.**   And, at times, the FDA, as part of this negotiation, will

1:35PM 3   sometimes suggest additions or subtractions from the label;

1:35PM 4   correct?

1:35PM 5   **A.**   Yes.  FDA is -- it's a back-and-forth process.

1:35PM 6   **Q.**   And as a reasonable drug manufacturer, it's at least

1:35PM 7   reasonable to consider the negotiation?  It's reasonable to

1:35PM 8   consider what proposals the FDA makes; true?

1:35PM 9         **MR. NOLEN:**  Objection, Your Honor.  402, 403.

1:35PM 10        **THE COURT:**  I think you all need to approach.

1:35PM 11        (WHEREUPON, the following proceedings were held at

1:35PM 12   the bench.)

1:36PM 13        **THE COURT:**  How far are you going with this?  Because

1:36PM 14   I've got to tell you, I'm getting nervous.

1:36PM 15        **MR. STRONGMAN:**  Well, Your Honor, where we're going

1:36PM 16   is, if he answers those questions that it is reasonable to

1:36PM 17   consider, that's it.

1:36PM 18        I'm not in any way implying that it's not the

1:36PM 19   drug manufacturer's responsibility.  I'm not going to imply

1:36PM 20   that it's not our responsibility what's in the label, just that

1:36PM 21   it's part of the conversation.  That's where it ends.

1:36PM 22        **MR. NOLEN:**  To a large degree, Your Honor, just the

1:36PM 23   questions that he's already elicited that I did not object to

1:36PM 24   go pretty far along in implying that what Your Honor gave as an

1:36PM 25   instruction this morning is not correct, that it somehow is the

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:36PM   1    FDA.

1:36PM   2              Because I didn't know where he was going.  I

1:36PM   3    wanted to hear the question before I stood up and objected.  I

1:36PM   4    gave him a lot of wiggle room on that before I stood up and

1:37PM   5    made an objection.  And I think we clearly are headed down this

1:37PM   6    road.

1:37PM   7              MR. STRONGMAN:  Your Honor, it's certainly relevant

1:37PM   8    what we proposed.  I will preface any question with, "It's

1:37PM   9    still our responsibility -- even if the FDA says something

1:37PM  10    different, it's still our responsibility."  And I'm not going

1:37PM  11    to get into it.

1:37PM  12              THE COURT:  The problem I have is -- the problem I

1:37PM  13    have is that I have seen no evidence that they did not -- that

1:37PM  14    you were precluded from changing the label.  I know that there

1:37PM  15    was some conversation, but nobody ever said you cannot do that,

1:37PM  16    you cannot do that.  And I think that's relevant.

1:37PM  17              MR. STRONGMAN:  And, Your Honor, just for the record,

1:37PM  18    what the FDA said was in 2004 -- in 2004, the FDA proposed to

1:38PM  19    delete certain information, and that doesn't mean --

1:38PM  20              THE COURT:  Yeah, the clinical adverse reports.  Not

1:38PM  21    a warning, but signs of adverse events.

1:38PM  22              MR. STRONGMAN:  -- in the section that Dr. Kessler

1:38PM  23    just said we could have put information in.  Now, I'm not

1:38PM  24    saying we're precluded from telling FDA you were wrong in

1:38PM  25    deleting it or proposing a change.  It's just the fact that it

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:38PM   1   was a negotiation.  That's all.

1:38PM   2          MR. COFFIN:  Your Honor, this is exactly what we

1:38PM   3   talked about so much in this case, because it's the heart of

1:38PM   4   the case.  And *Albrecht* changes what the defense is entitled to

1:38PM   5   do, and they keep --

1:38PM   6          THE COURT:  Look, we're not tag-teaming.  We've

1:38PM   7   already had --

1:38PM   8          MR. COFFIN:  I understand.  The only reason I'm here

1:38PM   9   is because I've made these arguments multiples times, and I

1:38PM   10  apologize.

1:38PM   11         MR. STRONGMAN:  I can -- I mean, in terms of these

1:38PM   12  are general questions, I haven't gotten any specifics.  I can

1:38PM   13  move on for now as well.  I can move on.

1:38PM   14         So -- but that's the issue is that as we move

1:39PM   15  down the road, the facts show that we made a proposal, the FDA

1:39PM   16  made proposed changes.  That's just a fact.  And it's just a

1:39PM   17  matter of whether it's reasonable or not for us --

1:39PM   18         THE COURT:  I'm going to allow you to ask him if

1:39PM   19  there are conversations that occur.  Because I did instruct the

1:39PM   20  jury this morning that in making those changes, they have to

1:39PM   21  comply with FDA regulations.  But you're skating on thin ice.

1:39PM   22         MR. STRONGMAN:  Understood.

1:39PM   23         THE COURT:  And I will stop you without an objection

1:39PM   24  if I feel like you've crossed the line.

1:39PM   25         MR. COFFIN:  Can I be clear on something?  If they're

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:39PM 1  talking about the 2004 strike-through, that's been ruled on.

1:39PM 2          **THE COURT:**  Will you stop.  This is his witness.  And

1:39PM 3  maybe that's something for us to do at a recess, but I'm not

1:39PM 4  going to have this tag-team every time we get up to the bench.

1:39PM 5          **MR. COFFIN:**  I apologize.

1:39PM 6          **THE COURT:**  Mr. Nolen is doing a fine job handling

1:39PM 7  himself.

1:39PM 8          **MR. COFFIN:**  I apologize.

1:39PM 9          **MR. STRONGMAN:**  It is our understanding that the 2004

1:40PM 10  situation has not been affirmatively ruled on.  It was an

1:40PM 11  objected-to document, so it wasn't in opening.  So that's where

1:40PM 12  we're at posture-wise.

1:40PM 13          **THE COURT:**  And that's something we need to talk at a

1:40PM 14  recess.

1:40PM 15          **MR. STRONGMAN:**  We can do that.  We'll deal with that

1:40PM 16  at a recess.

1:40PM 17          **THE COURT:**  Okay.

1:40PM 18          (WHEREUPON, the following proceedings were held in

1:40PM 19  open court.)

1:40PM 20  **BY MR. STRONGMAN:**

1:40PM 21  **Q.**   So, Doctor, we were talking about the FDA.

1:40PM 22  **A.**   Right.

1:40PM 23  **Q.**   And we were discussing that there is a negotiation,

1:40PM 24  there's a conversation; right?

1:40PM 25  **A.**   Generally, yes.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:40PM  1    **Q.**   Fair enough.  And you're proud of the work that you did at
1:40PM  2    the FDA; isn't that true?
1:41PM  3    **A.**   I think that would be fair.
1:41PM  4    **Q.**   And that also included the work of overseeing the
1:41PM  5    commission when Taxotere was approved in 1996; correct?
1:41PM  6    **A.**   It's not a commission, but that's okay.
1:41PM  7    **Q.**   The administration?
1:41PM  8    **A.**   Fair.  It's an agency, yes.
1:41PM  9    **Q.**   Very good.
1:41PM  10   **A.**   Yes.  And I stand behind what the agency did in 1996.
1:41PM  11   **Q.**   Very good.  Let's talk about another area I think we might
1:41PM  12   be able to agree on some things on.
1:41PM  13   **A.**   Sure.
1:41PM  14   **Q.**   And that's breast cancer.
1:41PM  15           All right.  So you understand, certainly, to
1:41PM  16   understand the risk profile of a drug, when you're talking
1:41PM  17   about the labeling, you have to also understand something about
1:41PM  18   the disease condition that you're treating; correct?
1:41PM  19   **A.**   For the risk -- for the overall risk-benefit equation of
1:41PM  20   whether you should approve a drug, you want to weigh the risks
1:41PM  21   versus the benefits.  For that ultimate question of whether a
1:42PM  22   drug is safe, it's really a risk-benefit question, correct.
1:42PM  23   **Q.**   And, Doctor, you understand that breast cancer is common
1:42PM  24   in the United States; correct?
1:42PM  25   **A.**   Regrettably so, yes.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:42PM 1    Q.    Yes.  And you understand that a woman living in the United
1:42PM 2    States has a 1-in-8 chance of being diagnosed with breast
1:42PM 3    cancer; correct?
1:42PM 4    A.    Yes.  And I also understand that oncologists will come --
1:42PM 5    and while I've done a good deal of oncology in taking care of a
1:42PM 6    lot of oncology patients, I think it's probably best to allow
1:42PM 7    the oncologists to testify on breast cancer specifically.  But
1:42PM 8    happy to answer your questions, sir.
1:42PM 9    Q.    Appreciate that.  And you also understand, obviously, that
1:42PM 10   breast cancer is a life-threatening disease; correct?
1:42PM 11   A.    It can be.  Not all -- again, let the oncologists talk
1:42PM 12   about that.  I wouldn't want to make any generalities.  I
1:42PM 13   wouldn't want to scare people.  There are also many treatable
1:42PM 14   forms of -- with very good outcomes.
1:43PM 15   Q.    And one thing I think -- as you were going through your
1:43PM 16   background, one of things that was mentioned is you had gotten
1:43PM 17   several awards.
1:43PM 18         Do you remember that?
1:43PM 19   A.    Yes.
1:43PM 20   Q.    And one of the things -- or awards that was mentioned was
1:43PM 21   that you got an award from the American Cancer Society, I think
1:43PM 22   you said; is that right?
1:43PM 23   A.    Correct.
1:43PM 24   Q.    And the American Cancer Society is a reliable
1:43PM 25   organization, isn't it?

DAVID KESSLER - CROSS

1:43PM  1    **A.**    Sure.  Just, again, let's get everything right.  Yes,

1:43PM  2    generally, that's a fair statement.

1:43PM  3    **Q.**    Sure.  And the American Cancer Society puts out

1:43PM  4    information for people on cancer statistics; correct?

1:43PM  5    **A.**    Fair.

1:43PM  6    **Q.**    And they put out some information that can be used for

1:43PM  7    doctors and patients also, just on basic risks and cancer

1:43PM  8    information; correct?

1:43PM  9    **A.**    Correct.  I just don't want to say that everything is

1:43PM  10   perfectly right.  But, yes, of course, it's good -- it's a very

1:43PM  11   good-intended organization that serves a very valuable

1:43PM  12   function.

1:43PM  13   **Q.**    And at the time of 2011, you understand that there were

1:44PM  14   nearly 3 million women living in the United States with breast

1:44PM  15   cancer; correct?

1:44PM  16   **A.**    I'll take your representation on exact numbers.

1:44PM  17   **Q.**    Very good.  And at that same time, you understood that

1:44PM  18   nearly 40,000 women would die from breast cancer annually as of

1:44PM  19   2011?

1:44PM  20   **A.**    Regrettably, there are forms that we've not made

1:44PM  21   advancements; there are forms we have made advancements.

1:44PM  22   **Q.**    And you also know that, when it comes to the treatment of

1:44PM  23   breast cancer, that every chemotherapy has risks; correct?

1:44PM  24   **A.**    Sure, as does every drug.  I would agree with that

1:44PM  25   statement.

DAVID KESSLER - CROSS

1:44PM  1    **Q.**   And, in fact, most chemotherapies have some very serious

1:44PM  2    side effects; correct?

1:44PM  3    **A.**   Yes.  That's -- when you use the term "chemotherapy."  But

1:44PM  4    there are other therapies, anticancer, that are not

1:44PM  5    chemotherapy that we're lucky to have today that don't have the

1:44PM  6    effects of chemo.  So, again, it's across the board.

1:44PM  7    **Q.**   And --

1:45PM  8           **MR. NOLEN:**  Objection.  Counsel's outside --

1:45PM  9    objection.  611.  Outside the scope.

1:45PM  10          **THE COURT:**  I'm going to allow him to go there.  This

1:45PM  11   is an expert.

1:45PM  12   **BY MR. STRONGMAN:**

1:45PM  13   **Q.**   And, Doctor, when it comes to treating breast cancer, it's

1:45PM  14   good to have multiple options for doctors and patients;

1:45PM  15   correct?

1:45PM  16   **A.**   I'll support that statement.

1:45PM  17   **Q.**   Okay.  Now, I want to talk a little bit about Taxotere.

1:45PM  18   Okay.

1:45PM  19          And as we mentioned, Taxotere was approved in 1996;

1:45PM  20   correct?

1:45PM  21   **A.**   Correct.

1:45PM  22   **Q.**   And that was for metastatic breast cancer?

1:45PM  23   **A.**   Correct.

1:45PM  24   **Q.**   Okay.  Now, when Taxotere came on the market in 1996,

1:45PM  25   there was another taxane that was also on the market as well,

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:45PM  1    and it was called Taxol; correct?

1:45PM  2    A.    Correct.

1:45PM  3    Q.    Okay.

1:45PM  4    A.    Approved in 1992.

1:45PM  5    Q.    Very good.  And wouldn't you agree that both of those

1:45PM  6    drugs -- let me put it this way.

1:45PM  7          Both of those drugs are called taxanes; correct?

1:45PM  8    A.    Fair.

1:46PM  9    Q.    So that's a broad class; correct?

1:46PM  10   A.    Correct.

1:46PM  11   Q.    And wouldn't you agree that taxanes have revolutionized

1:46PM  12   the treatment of breast cancer?

1:46PM  13   A.    If I can be respectful, I'd leave that to the oncologist

1:46PM  14   in this case.

1:46PM  15   Q.    Very good.  And you just said that taxanes extend

1:46PM  16   survival?  Is that what you said?

1:46PM  17   A.    That was the basis for approval, yes.  So I certainly

1:46PM  18   support that statement.  But revolutionized, I think -- let the

1:46PM  19   oncologists testify.  They do this every day.

1:46PM  20   Q.    Very good.  But you would certainly agree with me that

1:46PM  21   Taxotere has extended survival; correct?

1:46PM  22   A.    It can.  In clinical trials, it can extend survival by

1:46PM  23   several months, yes.

1:46PM  24   Q.    And a couple of other things that I think we can agree on.

1:47PM  25   I think you said this during your examination as well.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:47PM  1          The risk of alopecia has always been included in the

1:47PM  2   Taxotere label; correct?

1:47PM  3   A.   Correct.

1:47PM  4   Q.   And after Taxotere was approved in 1996 for metastatic

1:47PM  5   breast cancer, it was then approved for several other types of

1:47PM  6   cancer as well; correct?

1:47PM  7   A.   Exactly.

1:47PM  8   Q.   Okay.  It was approved for adjuvant breast cancer;

1:47PM  9   correct?

1:47PM  10  A.   Correct, in the node-positive situation.

1:47PM  11  Q.   Very good.  And "node-positive" means that the cancer has

1:47PM  12  shown up in one of the nodes; correct?

1:47PM  13  A.   Correct, or a high-risk, I think.  I'd have to look at the

1:47PM  14  indication, yes.

1:47PM  15  Q.   And Taxotere has also been approved as an indication for

1:47PM  16  lung cancer; correct?

1:47PM  17  A.   Non-small cell lung cancer, yes, a specific type of lung

1:47PM  18  cancer.

1:47PM  19  Q.   Very good.  And Taxotere has also been approved for

1:48PM  20  prostate cancer; correct?

1:48PM  21  A.   In combination for hormone refractary.  Unfortunately, the

1:48PM  22  results aren't great there.  And that's an end-stage prostate

1:48PM  23  cancer.

1:48PM  24  Q.   And Taxotere has also be approved for gastric cancer?

1:48PM  25  A.   Or head and neck, correct.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:48PM  1    **Q.**   Very good.  I want to talk a little bit about you.  Okay.
1:48PM  2    Next chapter.
1:48PM  3    **A.**   Sure.  I always prefer to talk about drug safety, but
1:48PM  4    happy to talk about me.
1:48PM  5    **Q.**   I think we established earlier that you've testified a
1:48PM  6    number of times; correct?
1:48PM  7    **A.**   I have.
1:48PM  8    **Q.**   Okay.  And if I were to count them up, I think you said,
1:48PM  9    you know, there's been a time when you testified for a coffee
1:48PM  10   manufacturer.
1:48PM  11           Do you remember that?
1:48PM  12   **A.**   Starbucks.
1:48PM  13   **Q.**   Very good.  But if I went and added them up and I created
1:48PM  14   a percentage, it would be more than 90 percent of the time that
1:48PM  15   you've testified for plaintiffs; correct?
1:48PM  16   **A.**   I haven't done it exactly that way, but I think you're
1:49PM  17   probably right.
1:49PM  18   **Q.**   And what we know is that, setting aside Taxotere, you're
1:49PM  19   also currently involved in a number of other litigations;
1:49PM  20   correct?
1:49PM  21   **A.**   I am.
1:49PM  22   **Q.**   Okay.  And just last year, you were asked how many.
1:49PM  23           And you didn't have even a number that you could
1:49PM  24   offer; correct?
1:49PM  25   **A.**   Currently involved?  You have a list of all my prior

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:49PM  1    testimonies.

1:49PM  2    **Q.**   Yeah.  How many litigations are you currently involved in,

1:49PM  3    Doctor?

1:49PM  4    **A.**   I'm involved in a handful of litigations.

1:49PM  5    **Q.**   Okay.  And for each one of those litigations, you get paid

1:49PM  6    $1,000 an hour; correct?

1:49PM  7    **A.**   That's correct.

1:50PM  8    **Q.**   And, Doctor, the fact of the matter is, isn't it true

1:50PM  9    that, right now, while you're in this courtroom testifying

1:50PM  10   today, you're also testifying in another case today in

1:50PM  11   Philadelphia by video?

1:50PM  12   **A.**   Oh.  You know, sometimes you can't control lawyers -- what

1:50PM  13   lawyers do.

1:50PM  14   **Q.**   That's true, though; correct?

1:50PM  15   **A.**   I have no idea.  That's the first time you've told me

1:50PM  16   that.

1:50PM  17   **Q.**   Two places at the same time?

1:50PM  18   **A.**   Hold on a second.  I had no idea.  I testified about five

1:50PM  19   years ago in a case about a drug that caused breasts in teenage

1:50PM  20   boys, and they taped it.  Now -- now, I'll take your

1:50PM  21   representation --

1:50PM  22   **Q.**   I'm just saying, do you know one way or another?

1:50PM  23   **A.**   I have no idea what lawyers are doing with that testimony,

1:50PM  24   but I can tell you --

1:50PM  25   **Q.**   Fair enough.

OFFICIAL TRANSCRIPT

417

DAVID KESSLER - CROSS

1:50PM  1    **A.**    -- 100 percent, one thing I'm confident of, I'm here.  I
1:51PM  2    promise you.  I'm not in Philadelphia.
1:51PM  3    **Q.**    But when you did that deposition that they're playing, you
1:51PM  4    got paid $1,000 an hour for it; correct?
1:51PM  5    **A.**    No, I think that was a de bene esse to be specific.  And I
1:51PM  6    can tell you -- maybe you're right.  Maybe I should ask them to
1:51PM  7    get royalties on that tape.  I'm not getting anything from them
1:51PM  8    playing that tape.
1:51PM  9    **Q.**    Very good.  But over the course of your career at the FDA,
1:51PM  10   your salary was about $115,000; correct?
1:51PM  11   **A.**    Maybe a little less.
1:51PM  12   **Q.**    And after you left the FDA, you started doing consulting
1:51PM  13   work, at some point, for plaintiffs lawyers; correct?
1:51PM  14   **A.**    And writing books and doing other things, yes.
1:51PM  15   **Q.**    And, Doctor, isn't it true that doing the consulting work
1:51PM  16   that you've done for plaintiffs lawyers, you have made millions
1:52PM  17   and millions and millions of dollars?
1:52PM  18   **A.**    I'll take it on the millions once, correct.  Absolutely.
1:52PM  19   I will -- I agree with you 100 percent.  Over the last ten-year
1:52PM  20   period, you are correct.
1:52PM  21   **Q.**    How many millions?
1:52PM  22   **A.**    I don't know.
1:52PM  23   **Q.**    So, Doctor, can you estimate, a reasonable estimate?
1:52PM  24   **A.**    I have no idea.  My wife keeps all the books in the
1:52PM  25   family, and I have no idea.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 1:52PM | 1 | **Q.**   No idea? |
| 1:53PM | 2 | **A.**   No idea. |
| 1:53PM | 3 | **Q.**   A lot of money. |
| 1:53PM | 4 | **A.**   Oh, I will agree with you 100 percent.  That's a lot of |
| 1:53PM | 5 | money.  But exact number under oath, I have no idea. |
| 1:53PM | 6 | **Q.**   So sitting here today, you've made millions of dollars |
| 1:53PM | 7 | testifying for plaintiff's lawyers, and you cannot even |
| 1:53PM | 8 | estimate how many millions? |
| 1:53PM | 9 | **A.**   I have no idea.  I've never added it up.  It's over a |
| 1:53PM | 10 | ten-year period, and I don't know the answer to that question. |
| 1:53PM | 11 | **Q.**   With regard to Taxotere, I think you answered a few |
| 1:53PM | 12 | questions. |
| 1:53PM | 13 | And you said that you had spent about 100 hours -- I |
| 1:53PM | 14 | think was what you said? |
| 1:53PM | 15 | **A.**   On Mrs. Earnest's case. |
| 1:53PM | 16 | **Q.**   Correct, on Mrs. Earnest's case. |
| 1:53PM | 17 | **A.**   100-plus, that's right. |
| 1:53PM | 18 | **Q.**   And the report that you prepared that you brought in here |
| 1:53PM | 19 | today is for Ms. Earnest's case; correct? |
| 1:53PM | 20 | **A.**   I need to look at Your Honor to know how to answer that |
| 1:53PM | 21 | question. |
| 1:53PM | 22 | **Q.**   Let me ask it this way. |
| 1:53PM | 23 | **THE COURT:**  Be careful about opening doors. |
| 1:54PM | 24 | **BY MR. STRONGMAN:** |
| 1:54PM | 25 | **Q.**   Let me ask the question this way. |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:54PM   1        You spent hundreds -- how many hours have you spent
1:54PM   2   on Ms. Earnest's case?
1:54PM   3   A.   I think I testified this morning 100-plus, but I want to
1:54PM   4   be specific.
1:54PM   5   Q.   Do you know how many plus 100, or is it just right in that
1:54PM   6   ballpark?
1:54PM   7   A.   It could be a little more, but it's in generally that
1:54PM   8   ballpark.  It's under 200, I mean, on Ms. Earnest's case.
1:54PM   9   Q.   Fair enough.  And I think you testified that you'd looked
1:54PM   10  at, I think, hundreds of thousands of pages of documents?
1:54PM   11  A.   Yes, I did.
1:54PM   12  Q.   Have you figured out what that superhuman rate of review
1:54PM   13  is?
1:54PM   14  A.   Yeah.  I'm happy to -- I'm looking at Your Honor because
1:54PM   15  there are complexities to litigation that involve a number of
1:54PM   16  different parts.
1:54PM   17        MR. STRONGMAN:  I'll withdraw the question and move
1:54PM   18  on, Your Honor.
1:54PM   19        THE WITNESS:  Again, I want to be exact.
1:55PM   20  BY MR. STRONGMAN:
1:55PM   21  Q.   Now, Doctor, you are currently a professor at the
1:55PM   22  University of San -- California, San Francisco; correct?
1:55PM   23  A.   University of California, San Francisco.
1:55PM   24  Q.   Yeah, that was a mouthful for me.  Thank you.
1:55PM   25        And you have been at the University of California,

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:55PM  1   San Francisco, since 2003; correct?

1:55PM  2   **A.**   Correct.

1:55PM  3   **Q.**   Okay.  And at one point, you were the dean of the medical

1:55PM  4   school; correct?

1:55PM  5   **A.**   Correct.

1:55PM  6   **Q.**   And you were terminated as the dean of the medical school;

1:55PM  7   correct?

1:55PM  8   **A.**   Correct.  I was a whistleblower at the medical school.

1:55PM  9   **Q.**   Well, Doctor, you understood that the chancellor concluded

1:55PM 10   that you could no longer effectively lead the School of

1:55PM 11   Medicine; correct?

1:55PM 12   **A.**   That was his view.  I'm a full professor there.  But the

1:55PM 13   record should show I reported certain financial irregularities.

1:55PM 14   **Q.**   We'll get there.

1:55PM 15   **A.**   Thank you very much.

1:55PM 16   **Q.**   Very good.  But you would certainly agree that the

1:55PM 17   chancellor determined that your leadership was ineffective.

1:55PM 18            That was the chancellor's determination?

1:56PM 19   **A.**   I think that's probably -- again, I don't want to testify

1:56PM 20   for him.  You would have to ask him.

1:56PM 21   **Q.**   And you also know that senior campus administrators

1:56PM 22   communicated to the chancellor that they had lost trust in you;

1:56PM 23   correct?

1:56PM 24   **A.**   After I reported certain financial irregularities, yeah.

1:56PM 25   **Q.**   And you also know that the clinical chairs at the medical

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:56PM  1    school reported that they believed there was serious problems
1:56PM  2    with the dean; correct?
1:56PM  3    A.   I'm not sure that that's exactly right.  I also know the
1:56PM  4    university apologized for its action.
1:56PM  5    Q.   And, Doctor, what you know is there was an administrative
1:56PM  6    proceeding; fair?
1:56PM  7    A.   And the university apologized.
1:56PM  8    Q.   I'm just asking, there was an administrative hearing?
1:56PM  9    A.   You're correct.  I was terminated.  But there's a letter
1:56PM  10   of apology from that chancellor.
1:56PM  11   Q.   Very good.  And you ultimately filed a lawsuit; correct?
1:56PM  12   A.   The Government Accountability Project filed the lawsuit on
1:56PM  13   my behalf because of these financial irregularities.
1:57PM  14   Q.   Well, Doctor, you filed a lawsuit against the chancellor;
1:57PM  15   correct?
1:57PM  16   A.   The actual filing was by the organization, the Government
1:57PM  17   Accountability Project, because I had reported certain
1:57PM  18   financial irregularities.  And they were interested in good
1:57PM  19   government, so they filed the lawsuit on my behalf.
1:57PM  20   Q.   And that lawsuit wasn't successful, was it?
1:57PM  21   A.   That was not for administrative reasons, not for the
1:57PM  22   merits.
1:57PM  23   Q.   Now, what we also know is that, at the University of
1:57PM  24   California, San Francisco, there's something called a
1:57PM  25   compensation plan; correct?

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:57PM  1  **A.**   Correct, for which I have an exemption.

1:57PM  2  **Q.**   We'll get there, too.  Okay.

1:57PM  3       But you will agree with me that, at the University of

1:57PM  4  the California, San Francisco, there is a plan that is set up

1:57PM  5  that is supposed to apply to faculty members, correct, unless

1:57PM  6  you have an exemption?

1:57PM  7  **A.**   And I have an exemption, yes.

1:57PM  8  **Q.**   And in that compensation plan, it talks about how much

1:57PM  9  money you should be able to earn doing outside professional

1:58PM  10  activities; correct?

1:58PM  11  **A.**   And that plan exists.  But there is a letter from the

1:58PM  12  president of the University of California for which there is an

1:58PM  13  exemption.

1:58PM  14  **Q.**   I understand, Doctor.

1:58PM  15       My question is there is a plan that exists that

1:58PM  16  limits how much money a faculty member can make doing outside

1:58PM  17  activities unless they had an exemption; correct?

1:58PM  18  **A.**   I think that's probably a fair statement.

1:58PM  19  **Q.**   And what the compensation plan actually says is that a

1:58PM  20  faculty member is limited to $40,000 or 40 percent of your

1:58PM  21  academic year base salary unless you have an exemption;

1:58PM  22  correct?

1:58PM  23       **MR. NOLEN:**  Objection, Your Honor.  402 and 403.

1:58PM  24       **THE COURT:**  Sustained.

25

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:58PM  1    BY MR. STRONGMAN:

1:58PM  2    Q.   Doctor, you got an exemption from the compensation plan;

1:58PM  3    correct?

1:58PM  4    A.   I was given an exemption the day I walked into the

1:59PM  5    University of California.  I didn't get anything.  That was

1:59PM  6    what the president decided.  That was their statement.  I was

1:59PM  7    exempt from it.

1:59PM  8    Q.   Very good.  But your exemption allows you to make millions

1:59PM  9    of dollars testifying as outside income when other faculty

1:59PM  10   members at the University of California, San Francisco, cannot;

1:59PM  11   correct?

1:59PM  12   A.   Others could get the exemption, and others can do other

1:59PM  13   things that are in the public service realm.

1:59PM  14   Q.   Doctor, I want to talk a little bit about your medical

1:59PM  15   background.  Okay?

1:59PM  16   A.   Sure.

1:59PM  17   Q.   Now, had you training in pediatrics; correct?

1:59PM  18   A.   Correct.

1:59PM  19   Q.   And I think you were board-certified in pediatrics?

1:59PM  20   A.   I was board-certified until I let it lapse a few years

1:59PM  21   ago, but I was board-certified for some 30 years.  I just have

1:59PM  22   not taken my maintenance certification.  One day, I'll do that.

2:00PM  23   But I'm still licensed.

2:00PM  24   Q.   Very good.  And I know, from time to time, you still -- I

2:00PM  25   know I've seen you, you'll treat a patient from time to time

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:00PM 1    when appropriate, but you don't have an active practice
2:00PM 2    currently; correct?
2:00PM 3    A.    If you collapse right now and Your Honor lets me, I'll
2:00PM 4    come take care of you.
2:00PM 5    Q.    Very good.  And I appreciate that.
2:00PM 6    A.    You're welcome.
2:00PM 7    Q.    Hopefully, I won't need it.  We'll see how to goes.
2:00PM 8          But you're not currently an attending physician at a
2:00PM 9    hospital; correct?
2:00PM 10   A.    I gave that up.  I spend my time writing my books and
2:00PM 11   doing my academic work.
2:00PM 12   Q.    And we went through -- Mr. Nolen showed that you have
2:00PM 13   written a couple of best sellers; right?
2:00PM 14   A.    He was very nice in that regard, yes.
2:00PM 15   Q.    And those books don't have anything to do with
2:00PM 16   chemotherapy, correct, the best sellers?
2:00PM 17   A.    Not chemotherapy.  But, obviously, there's an effect --
2:00PM 18   the most current one that I just turned in has an effect.  It
2:00PM 19   discusses metabolic syndrome in certain cancers and breast
2:01PM 20   cancers.  So there is a section on that in the current book,
2:01PM 21   but not on chemotherapy, per se.  I think that's fair.
2:01PM 22   Q.    Very good.  And what your books are about are obesity and
2:01PM 23   overeating; correct?
2:01PM 24   A.    Mental health, tobacco.  They're a range of public health
2:01PM 25   subjects that I have spent my career working with.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:01PM   1   **Q.**   Very good.  And the point being, none of your books that

2:01PM   2   Mr. Nolen asked you about are about Taxotere; correct?

2:01PM   3   **A.**   Oh, exactly correct.  I've not written a book about

2:01PM   4   Taxotere.

2:01PM   5   **Q.**   Now, Mr. Nolen also asked you some questions about your

2:01PM   6   experience on boards of directors.

2:01PM   7          Do you remember that?

2:01PM   8   **A.**   I do.

2:01PM   9   **Q.**   And I think you mentioned that you had been a board of

2:01PM  10   director at a handful of corporations; correct?

2:01PM  11   **A.**   Correct.

2:01PM  12   **Q.**   And I think you mentioned that one of the companies that

2:01PM  13   you were a board of director for developed a prostate cancer

2:02PM  14   drug; correct?

2:02PM  15   **A.**   It tried to.

2:02PM  16   **Q.**   Correct.  And you mentioned the prostate cancer drug

2:02PM  17   during your questioning with Mr. Nolen.

2:02PM  18          Do you remember that?

2:02PM  19   **A.**   Galeterone.

2:02PM  20   **Q.**   Very good.  So the name of company is Tokai; correct?

2:02PM  21   **A.**   Correct.

2:02PM  22   **Q.**   And Tokai was a company that was trying to develop -- can

2:02PM  23   you pronounce it for me?

2:02PM  24   **A.**   Galeterone.

2:02PM  25   **Q.**   And Galeterone was a medication that was going, hopefully,

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

<div style="margin-left:2em">

2:02PM 1    to be approved to treat prostate cancer; correct?

2:02PM 2    **A.** Well, a certain form of prostate cancer. And I think

2:02PM 3    you -- it's fair to say it was to be an alternative to

2:02PM 4    chemotherapy, but it was not in the space of terminal cancer.

2:02PM 5    **Q.** Well -- and, Doctor, you know that, ultimately, what

2:02PM 6    happened was Tokai tried to finish their Phase 3, I think,

2:03PM 7    clinical trials and could not get enough patients to enroll.

2:03PM 8        Do you remember that?

2:03PM 9    **A.** I certainly remember that. That's a subject of, you know,

2:03PM 10    other issues, and I just -- I want to be careful about talking

2:03PM 11    about a company without the company being here, but happy to be

2:03PM 12    helpful.

2:03PM 13    **Q.** All right. Thank you. And, Doctor, what happened was the

2:03PM 14    prostate drug that Tokai was trying to develop, in the end,

2:03PM 15    would have competed with Taxotere; correct?

2:03PM 16    **A.** I checked on that last week. I called the CEO of the

2:03PM 17    company because your colleague raised that in a deposition, and

2:03PM 18    I didn't have memory at that time. So I called the CEO and I

2:03PM 19    said -- I anticipated you were going to ask that question.

2:03PM 20        I said, "Did we compete against Taxotere?"

2:03PM 21        And the answer was no, because Taxotere doesn't work

2:04PM 22    very well in prostate cancer, unfortunately, and that we really

2:04PM 23    competed against Zytiga and another drug from Janssen and

2:04PM 24    Medivation.

2:04PM 25        So maybe very early on in 2013, it was in some

</div>

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:04PM  1   document.  But this was because Taxotere is not very effective

2:04PM  2   in prostate, we were competing against drugs that were

2:04PM  3   effective both, Zytiga and Xtandi.

2:04PM  4   Q.   Well, let me ask the question this way:  You understand

2:04PM  5   that after Tokai had the clinical trials not work out, that

2:04PM  6   there was a lawsuit filed against the company and the board of

2:04PM  7   directors, including you personally; correct?

2:04PM  8   A.   As a shareholder derivative, whenever stock prices go

2:04PM  9   down, as you're familiar.

2:04PM  10  Q.   There was a lawsuit filed against you personally?

2:04PM  11  A.   It was a shareholder derivative case that is pending

2:05PM  12  because, after the drug failed, the stock price went down, and

2:05PM  13  investors sued.

2:05PM  14  Q.   And sued you personally; correct?

2:05PM  15  A.   As I was on the board, that's correct.

2:05PM  16  Q.   And you understand that the allegations in the lawsuit

2:05PM  17  specifically include that Tokai knew taxanes were a

2:05PM  18  significantly preferrable option to the drug that was being

2:05PM  19  developed; correct?

2:05PM  20       MR. NOLEN:  Objection, Your Honor.  403, not

2:05PM  21  relevant, and wasting time.

2:05PM  22       MR. STRONGMAN:  It goes to his bias.

2:05PM  23       THE COURT:  I'm going to allow it.

2:05PM  24       THE WITNESS:  It's completely frivolous.  Anyone who

2:05PM  25  knows anything about prostate cancer knows that Galeterone was

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 2:05PM | 1 | competing against Xtandi and Zytiga.  Any allegations that |
| 2:06PM | 2 | Taxotere played any role is incorrect. |
| 2:06PM | 3 | And, furthermore, any issue of bias -- this is |
| 2:06PM | 4 | years ago.  It has nothing to do with any testimony today. |
| 2:06PM | 5 | **BY MR. STRONGMAN:** |
| 2:06PM | 6 | **Q.**   So you would agree, Doctor, that there was a lawsuit |
| 2:06PM | 7 | filed, but you don't think it has merit; correct? |
| 2:06PM | 8 | **A.**   I'll let judges and juries and the process work, because I |
| 2:06PM | 9 | believe in that process. |
| 2:06PM | 10 | But I was proud to be involved in trying to find a |
| 2:06PM | 11 | drug for prostate cancer, and there's nothing I will tell |
| 2:06PM | 12 | you -- I mean, drugs fail, right?  I try to find something for |
| 2:06PM | 13 | prostate cancer.  It doesn't work, but then you go back and you |
| 2:06PM | 14 | try again. |
| 2:06PM | 15 | **Q.**   Doctor, I think my question was just simple. |
| 2:06PM | 16 | There was a lawsuit filed, but you don't think it has |
| 2:06PM | 17 | merit; fair?  And we can move on. |
| 2:07PM | 18 | **A.**   Happy to move on. |
| 2:07PM | 19 | **MR. NOLEN:**   Is that a question, Your Honor? |
| 2:07PM | 20 | Objection. |
| 2:07PM | 21 | **THE COURT:**   Sustained.  I think it's been asked and |
| 2:07PM | 22 | answered, and we need to move on. |
| 2:07PM | 23 | **BY MR. STRONGMAN:** |
| 2:07PM | 24 | **Q.**   Dr. Kessler, I want to talk about our next topic, and |
| 2:07PM | 25 | that's some of the opinions that you offered regarding the |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:07PM   1    Taxotere labeling.  Okay?

2:07PM   2    A.    Happy to talk about this case.

2:07PM   3    Q.    And one of the distinctions that was going on earlier was

2:07PM   4    you were talking about alopecia and whether or not that covered

2:07PM   5    temporary and permanent.

2:07PM   6          Do you remember that?

2:07PM   7    A.    I remember that very well, sir.

2:07PM   8    Q.    Okay.  And I think, in your report, you actually talked

2:07PM   9    about the phrase "irreversible alopecia."

2:07PM   10   A.    Several times, yes.

2:07PM   11   Q.    Yeah.  And you have a footnote that says these terms are

2:07PM   12   kind of interchangeable, "irreversible," "permanent."

2:07PM   13   A.    Yes.  I think that's fair.

2:07PM   14   Q.    Very good.  And I want to make sure we're kind of talking

2:07PM   15   on the same page here.

2:08PM   16         All right.  So in your report, you actually offered

2:08PM   17   up -- you have a section in your report called, I think, "Key

2:08PM   18   Definitions."

2:08PM   19   A.    I believe so.

2:08PM   20   Q.    And in your --

2:08PM   21   A.    Would you like me to look -- turn to it?

2:08PM   22   Q.    You certainly may.

2:08PM   23   A.    Tell me what page.

2:08PM   24   Q.    Paragraph 81.

2:08PM   25   A.    Thank you, sir.  Very kind.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:09PM  1  **Q.**   Are you with me?

2:09PM  2  **A.**   I am, sir.  Thank you.

2:09PM  3  **Q.**   All right.  In your report, in paragraph 81, what you say

2:09PM  4  is "With respect to irreversible alopecia, the medical

2:09PM  5  literature has generally defined this condition as the complete

2:09PM  6  loss of growth or partial regrowth at least six months after

2:09PM  7  chemotherapy."  Correct?

2:09PM  8  **A.**   Correct.  And then I go on.

2:09PM  9         **MR. NOLEN:**  Your Honor, may we approach?

2:09PM  10        **THE COURT:**  Yes.

2:09PM  11        (WHEREUPON, the following proceedings were held at

2:09PM  12  the bench.)

2:10PM  13        **MR. NOLEN:**  Your Honor, Mr. Strongman is asking the

2:10PM  14  witness questions about what is in the witness's expert report,

2:10PM  15  and the report is not admitted into evidence.  It will never be

2:10PM  16  admitted into evidence.

2:10PM  17            The only thing the jury hears is what the jury

2:10PM  18  heard today in his direct testimony.  If he has questions that

2:10PM  19  he wants to ask to try to impeach Dr. Kessler's opinions about

2:10PM  20  the opinions he offered in this courtroom today, I think that's

2:10PM  21  appropriate.

2:10PM  22            I don't think -- they got to depose him after he

2:10PM  23  rendered his opinions.  I don't think going into an expert's

2:10PM  24  underlying report and what he did not offer in this courtroom

2:10PM  25  is appropriate.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 2:10PM | 1 | **MR. STRONGMAN:** I don't see how me simply asking how |
| 2:10PM | 2 | he defined the condition that it is he's saying we should have |
| 2:10PM | 3 | put in our label and in his report is in any way improper. |
| 2:10PM | 4 | **MR. NOLEN:** I simply don't know how far it's going to |
| 2:10PM | 5 | go. |
| 2:10PM | 6 | **THE COURT:** Well, I will tell you this, and I |
| 2:10PM | 7 | think -- this is an expert -- |
| 2:11PM | 8 | **MR. NOLEN:** I agree. |
| 2:11PM | 9 | **THE COURT:** -- and I give a lot of latitude in |
| 2:11PM | 10 | cross-examination of experts. I don't know where this is |
| 2:11PM | 11 | going. |
| 2:11PM | 12 | I think if he begins -- I think he can certainly |
| 2:11PM | 13 | ask him a question of how do you define the condition on which |
| 2:11PM | 14 | he's rendering his opinions. I don't know if we need to |
| 2:11PM | 15 | reference the report. It could be that you could just easily |
| 2:11PM | 16 | ask him, "Tell me what you think permanent alopecia is." |
| 2:11PM | 17 | **MR. STRONGMAN:** I can do that, and I guess if he |
| 2:11PM | 18 | disagrees with me, that was part of why I didn't start with the |
| 2:11PM | 19 | report, to make it easier. |
| 2:11PM | 20 | **THE COURT:** Of course. Of course. |
| 2:11PM | 21 | **MR. STRONGMAN:** Easy enough. |
| 2:11PM | 22 | **THE COURT:** I think it's fair, and it's certainly an |
| 2:11PM | 23 | appropriate question. |
| 2:12PM | 24 | (WHEREUPON, the following proceedings were held in |
| 2:12PM | 25 | open court.) |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:12PM   1   **BY MR. STRONGMAN:**

2:12PM   2   **Q.**   Ready to proceed?

2:12PM   3   **A.**   I am.

2:12PM   4   **Q.**   Very good.  So, Doctor, you can agree with me that your

2:12PM   5   definition of "irreversible alopecia" is -- in the medical

2:12PM   6   literature, it was generally defined as six months with

2:12PM   7   complete loss of growth or partial regrowth; correct?

2:12PM   8   **A.**   I said the medical literature has generally defined it,

2:12PM   9   right, but do note some exceptions to that.

2:12PM   10  **Q.**   Very good.  So there are -- there are several other

2:12PM   11  definitions in the literature as well; correct?

2:12PM   12  **A.**   Fair.  Certainly within Sanofi, et cetera.  And different

2:13PM   13  doctors, different publications have different definitions.

2:13PM   14  **Q.**   And, for example, we've seen definitions that go out to

2:13PM   15  12 months or 24 months, things like that; correct?

2:13PM   16  **A.**   Correct.

2:13PM   17  **Q.**   Okay.  But you would agree with me that, most of the time

2:13PM   18  in the literature, it's six months.  That's the most common?

2:13PM   19  **A.**   I think that's a reasonable period of time.  There's no --

2:13PM   20  there's no magic to these numbers.

2:13PM   21  **Q.**   Okay.  And what we saw also in the literature is -- I

2:13PM   22  doubt you saw any definition for what you're calling

2:13PM   23  irreversible alopecia as being less than six months?

2:13PM   24  **A.**   I think that would be correct because, in general, you

2:13PM   25  know, before 2000, it was always expected, you know, that hair

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:13PM   1    would grow back.  But sometimes it would take three to six

2:13PM   2    months for that to happen.

2:14PM   3    Q.   Okay.  And with that kind of framework, we've kind of got

2:14PM   4    some working definition here.  I want to talk a little bit

2:14PM   5    about what is in the labeling.  Okay?

2:14PM   6    A.   Sure.

2:14PM   7    Q.   Okay.  And --

2:14PM   8         MR. STRONGMAN:  May I approach, Your Honor?

2:14PM   9         THE COURT:  Yes, you may.

2:14PM   10        THE WITNESS:  Thank you, Counsel.

2:14PM   11   BY MR. STRONGMAN:

2:14PM   12   Q.   Of course.  Doctor, what I've handed you has been marked

2:14PM   13   as Defendants' Exhibit 215.

2:14PM   14        And this is the 1996 approval letter from the FDA;

2:15PM   15   correct?

2:15PM   16   A.   Correct, signed by Dr. Temple.

2:15PM   17        MR. STRONGMAN:  And Sanofi would move into evidence

2:15PM   18   Defendants' Exhibit 215.

2:15PM   19        THE COURT:  Any objection?

2:15PM   20        MR. NOLEN:  No objection, Your Honor.

2:15PM   21        THE COURT:  Let it be admitted.

2:15PM   22   BY MR. STRONGMAN:

2:15PM   23   Q.   Okay.  And, Doctor, with the approval letter that we've

2:15PM   24   got here, Defendants' Exhibit 215, there's also the labeling

2:15PM   25   attached; correct?

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:15PM  1   **A.**    Correct.

2:15PM  2   **Q.**    Okay.  And as we know, earlier when you were testifying

2:15PM  3   about time frames, I think you may have said something about

2:15PM  4   2009, maybe 2006, in terms of when a label should have been

2:15PM  5   changed.

2:15PM  6          Do you remember that?

2:15PM  7   **A.**    When there was evidence of a -- association or causal

2:16PM  8   association, yes.

2:16PM  9   **Q.**    But we can certainly agree that you're not offering any

2:16PM  10  opinions that there was an inadequacy with regard to any kind

2:16PM  11  of hair-loss warning in the 1996 label; correct?

2:16PM  12  **A.**    That would be correct, yes.

2:16PM  13         **MR. STRONGMAN:**  May I approach, Your Honor?

2:16PM  14         **THE COURT:**  Sure.

2:16PM  15  **BY MR. STRONGMAN:**

2:16PM  16  **Q.**    Doctor, I'm going to hand you what I've marked as Defense

2:16PM  17  Exhibit 317.  If you could take a look at that.

2:16PM  18  **A.**    Yes.

2:16PM  19  **Q.**    And this is the approval letter from the FDA for the 2004

2:17PM  20  Taxotere application; correct?

2:17PM  21  **A.**    Correct.

2:17PM  22  **Q.**    And included with the approval letter also is the

2:17PM  23  labeling; is that correct?

2:17PM  24  **A.**    Correct.

2:17PM  25         **MR. STRONGMAN:**  Defendants would move into evidence

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:17PM 1    Defense Exhibit 317.

2:17PM 2              THE COURT:  Any objection?

2:17PM 3              MR. NOLEN:  No objection, Your Honor.

2:17PM 4              THE COURT:  Let it be admitted.

2:17PM 5    BY MR. STRONGMAN:

2:17PM 6    Q.   And, Doctor, we can also agree, based on what you said

2:17PM 7    this morning, that you've not offered any opinions that the

2:17PM 8    labeling for Taxotere, as it relates to hair loss, was

2:17PM 9    inadequate in the 2004 labeling; correct?

2:17PM 10   A.   That would be fair.

2:17PM 11   Q.   And I asked you this already, but we can agree that the

2:18PM 12   definition of "alopecia" -- you've been asked this -- it's hair

2:18PM 13   loss; correct?

2:18PM 14   A.   "Alopecia" means hair loss, correct.

2:18PM 15   Q.   And we can agree that "alopecia" was always in the

2:18PM 16   Taxotere label; correct?

2:18PM 17   A.   "Alopecia" was in the Taxotere label.

2:18PM 18   Q.   And if I take out Webster's dictionary and look up

2:18PM 19   "alopecia," the definition will just be loss of hair; correct?

2:18PM 20   A.   I'm sure that would be correct.

2:18PM 21   Q.   And we talked about the American Cancer Society a little

2:18PM 22   bit earlier.

2:18PM 23             Do you remember that?

2:18PM 24   A.   Correct.

2:18PM 25   Q.   And the American Cancer Society, we established, is a

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 2:18PM | 1 | reliable organization that puts out information into the |
| 2:18PM | 2 | public; correct? |
| 2:18PM | 3 | A.   Correct. |
| 2:18PM | 4 | Q.   And they put out information about how terms are defined; |
| 2:18PM | 5 | correct? |
| 2:18PM | 6 | A.   They put -- a lot of organizations may have glossaries or |
| 2:18PM | 7 | other things, yes. |
| 2:19PM | 8 | MR. STRONGMAN:  May I approach? |
| 2:19PM | 9 | THE COURT:  Yes, you may. |
| 2:19PM | 10 | BY MR. STRONGMAN: |
| 2:19PM | 11 | Q.   Doctor, what I've handed you is entitled "The American |
| 2:19PM | 12 | Cancer Society Breast Cancer Dictionary." |
| 2:19PM | 13 | Do you see that? |
| 2:19PM | 14 | A.   Thank you very much. |
| 2:19PM | 15 | Q.   Okay.  It has a date of 2006 on it; correct? |
| 2:19PM | 16 | A.   I'll take you're representation.  I'm sure it's here |
| 2:19PM | 17 | somewhere.  I'm just not seeing it, but I'll take your |
| 2:19PM | 18 | representation. |
| 2:19PM | 19 | MR. STRONGMAN:  Permission to publish, Your Honor? |
| 2:19PM | 20 | THE COURT:  Is this in evidence? |
| 2:19PM | 21 | MR. STRONGMAN:  This is a learned treatise.  It's a |
| 2:19PM | 22 | reliable publication by a reliable organization. |
| 2:20PM | 23 | THE COURT:  I think you're going to need to lay a |
| 2:20PM | 24 | foundation that's it's a learned treatise. |
| | 25 | |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 2:20PM | 1 | BY MR. STRONGMAN: |
| 2:20PM | 2 | Q.   Dr. Kessler, we've established that the American Cancer |
| 2:20PM | 3 | Society is a reliable organization; correct? |
| 2:20PM | 4 | A.   A very well-respected organization. |
| 2:20PM | 5 | Q.   And they put out -- |
| 2:20PM | 6 | A.   They asked me if I wanted to be president. |
| 2:20PM | 7 | Q.   Very good.  And the American Cancer Society puts out |
| 2:20PM | 8 | pamphlets and various materials that are relied on by people in |
| 2:20PM | 9 | the field; correct? |
| 2:20PM | 10 | A.   They -- I have no reason to dispute their good intention. |
| 2:20PM | 11 | I don't know exactly -- this looks like it's meant for -- it |
| 2:20PM | 12 | looks like a very useful document for the layperson.  I'm not |
| 2:20PM | 13 | sure any breast oncologist would rely on this. |
| 2:20PM | 14 | Q.   But you would agree it's a reliable pamphlet, correct, put |
| 2:21PM | 15 | out by a society that asked you to be the president; correct? |
| 2:21PM | 16 | A.   I'm -- I don't mean to quibble.  I don't mean to quibble, |
| 2:21PM | 17 | but I haven't studied every definition.  But, you know, I'll -- |
| 2:21PM | 18 | sure, I mean, of course. |
| 2:21PM | 19 | MR. NOLEN:  We object, Your Honor.  I don't know that |
| 2:21PM | 20 | this is a learned treatise, and I'm not sure where it comes |
| 2:21PM | 21 | from other than -- I'm not sure where it comes from or when -- |
| 2:21PM | 22 | MR. STRONGMAN:  The American Cancer Society? |
| 2:21PM | 23 | MR. NOLEN:  Well, I know. |
| 2:21PM | 24 | THE COURT:  You know what?  I'm the one person who |
| 2:21PM | 25 | doesn't have it. |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:21PM  1          **MR. STRONGMAN:**  Your Honor, can I hand it up to you?

2:21PM  2          **THE COURT:**  Can I have a copy?

2:22PM  3                Members of the jury, this might be a good time

2:22PM  4  for you to take your afternoon break.  Court will be at recess

2:22PM  5  for 15 minutes.

2:22PM  6          **THE DEPUTY CLERK:**  All rise.

2:22PM  7          (WHEREUPON, the jury exited the courtroom.)

2:23PM  8          **THE COURT:**  I was just looking at rule, and I will

2:23PM  9  tell you I looked at the rule last week, and I just -- because

2:23PM  10  I have to tell you, I -- I just -- I'm listening.

2:24PM  11          **MR. STRONGMAN:**  Would you like me to go ahead and

2:24PM  12  make my --

2:24PM  13          **THE COURT:**  Please.

2:24PM  14          **MR. STRONGMAN:**  Okay.  So what we've got here is

2:24PM  15  Breast Cancer Dictionary by the American Cancer Society.  This,

2:24PM  16  under 803(18), is a learned treatise, periodical, or pamphlet.

2:24PM  17  It's clearly a statement called the attention -- I know

2:24PM  18  Dr. Kessler is in here.  Is that fine?

2:24PM  19          **THE WITNESS:**  Do you want me to leave?

2:24PM  20          **THE COURT:**  Yes.  Would you stand in that little

2:24PM  21  hallway, please, Dr. Kessler.

2:24PM  22          **THE WITNESS:**  Of course, Your Honor.

2:24PM  23          **MR. STRONGMAN:**  Thank you, Your Honor.  So what we've

2:24PM  24  got is a document put out by the American Cancer Society called

2:24PM  25  Breast Cancer Dictionary.  It is clearly a pamphlet under

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:24PM  1  803(18) called to the attention of an expert witness on

2:24PM  2  cross-examination.  We certainly would have an expert as well

2:24PM  3  that would say it's a reliable authority.

2:25PM  4          And I believe that it's not just some

2:25PM  5  peer-reviewed publication.  It's a pamphlet put out by a

2:25PM  6  reliable authority, which this is, under 803(18).

2:25PM  7          MR. NOLEN:  Your Honor, a couple of things.  One,

2:25PM  8  this is -- I don't know that this is a learned treatise.  I

2:25PM  9  don't think if qualifies.  It's not peer-reviewed.  It doesn't

2:25PM  10  appear in a peer-reviewed journal or publication.  So we have

2:25PM  11  that.

2:25PM  12          Two, Dr. Kessler doesn't say that he relies upon

2:25PM  13  this for any reason.  He didn't say that he relies upon it.  He

2:25PM  14  personally didn't say that he recognizes it, "it" being this

2:25PM  15  particular document, this list of definitions from the American

2:25PM  16  Cancer Society, as being authoritative on anything.

2:25PM  17          What he did is vouch for the American Cancer

2:25PM  18  Society by saying that he thinks it's a fine organization that

2:26PM  19  actually once asked him to be their president.

2:26PM  20          But aside from that, what this is, is something

2:26PM  21  that's printed off the Internet that, apparently, goes to the

2:26PM  22  lay public.  I think it's intended for the lay public.  I don't

2:26PM  23  think that there's any foundation whatsoever for this being an

2:26PM  24  actual learned treatise.

2:26PM  25          MR. STRONGMAN:  The fact that Dr. Kessler didn't cite

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:26PM   1    to it is part of the reason that I want to bring it to his

2:26PM   2    attention.  And if I have an expert that will say --

2:26PM   3          **THE COURT:**  I'm sorry.  Can you speak up.  You know

2:26PM   4    what?  Just pull down the mic.  I think that's part of the

2:26PM   5    problem.  Thank you.

2:26PM   6          **MR. STRONGMAN:**  Very good.  So what I was saying is,

2:26PM   7    obviously, we have an expert who would say it's a reliable

2:26PM   8    authority, thanks to the American Cancer Society as well.

2:26PM   9          So the fact that Dr. Kessler hasn't cited it is

2:26PM  10    part of the reason I want to bring it to his attention.  I

2:26PM  11    think it's appropriate.  It's not going into evidence.  It's

2:26PM  12    going to be --

2:26PM  13          **THE COURT:**  No, I understand.

2:27PM  14          Well, it doesn't have to be relied upon by the

2:27PM  15    witness in his direct testimony.  It's something he can call to

2:27PM  16    his attention during cross-examination.

2:27PM  17          The question is whether or not it's established

2:27PM  18    as a reliable authority by the expert's admission or testimony,

2:27PM  19    by another expert's testimony, or by judicial notice.

2:27PM  20          I think -- I will tell you, I think Dr. Kessler

2:27PM  21    equivocated on that.  He was less than -- let me see --

2:27PM  22    unfortunately, I was over there.

2:27PM  23          And let me just say -- let me go back to his

2:27PM  24    exact testimony, what he said.  "I have no reason to dispute

2:27PM  25    their good intention.  I don't know exactly.  This looks like

DAVID KESSLER - CROSS

2:27PM  1    it's meant for -- it looks like a very useful document for the

2:28PM  2    lay person.  I'm not sure any breast oncologist would rely on

2:28PM  3    this."

2:28PM  4                My guess is you're not asking him if a breast

2:28PM  5    oncologist would use this.

2:28PM  6                MR. STRONGMAN:  No, that's not my particular

2:28PM  7    question.

2:28PM  8                THE COURT:  I know what your particular is.  You know

2:28PM  9    what?  I've got that.

2:28PM  10               And then the question is what does this mean.

2:28PM  11   And then it goes right to what does the plaintiff mean when

2:28PM  12   they see it in the label.

2:28PM  13               And so I'm listening.  Because I think -- I am

2:28PM  14   quite certain that's where we're going as to what is the

2:28PM  15   definition of "alopecia."

2:28PM  16               MR. NOLEN:  So if we look at the comments to

2:28PM  17   Rule 803(18), it tells us, "The relevance of the use of

2:28PM  18   treatises on cross-examination is evident.  The use of

2:28PM  19   treatises has been the subject of varying views.  The most

2:29PM  20   restrictive position is that the witness must have stated

2:29PM  21   expressly on direct his reliance on upon the treatise.  A

2:29PM  22   slightly more liberal approach still insists upon reliance but

2:29PM  23   allows it to be developed on cross-examination."

2:29PM  24               We don't have that here, Your Honor.

2:29PM  25               THE COURT:  But I'm looking at the language of the

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:29PM   1   rule.  "The statement is called to the attention of an expert
2:29PM   2   on cross-examination or relied on by the expert on direct.  And
2:29PM   3   the publication is established as a reliable authority by the
2:29PM   4   expert's admission or testimony or by another expert's
2:29PM   5   admission."
2:29PM   6           MR. STRONGMAN:  Obviously, Dr. Kessler has been
2:29PM   7   through this a few times.  He can't control his cross.
2:29PM   8           THE COURT:  I'm sorry?
2:29PM   9           MR. STRONGMAN:  I said the witness shouldn't be able
2:29PM  10   to control their cross.
2:29PM  11           THE COURT:  Well, I think the rule says -- the rule
2:29PM  12   says he doesn't have to rely on it in his direct, but he's got
2:30PM  13   to acknowledge if as a learned -- as some authority.
2:30PM  14           And it's not -- you can't just put something in
2:30PM  15   front of him unless he says, "Yes, this is" because it says
2:30PM  16   "and" -- I'm a civilian, so we look at all of these books --
2:30PM  17   "the publication is established as a reliable authority by the
2:30PM  18   expert's admission or testimony or by another expert's
       19   testimony or judicial notice."
2:30PM  20           MR. STRONGMAN:  Correct.
2:30PM  21           THE COURT:  So I think he's got to say this is --
2:30PM  22   this is reliable authority.
2:30PM  23           I'm trying to look at his language, because I
2:30PM  24   think that -- I think that, certainly, he doesn't have to rely
2:30PM  25   on it in direct, absolutely.  But he has -- and you can call it

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:30PM   1    to his attention on cross, but he's got to establish that this
2:30PM   2    is reliable authority.
2:30PM   3             MR. STRONGMAN:  I think under the rule, it says, "or
2:31PM   4    by another expert's testimony."  So that means another expert,
2:31PM   5    if they come in here, can testify that it is a reliable
2:31PM   6    authority.
2:31PM   7             THE COURT:  Oh, absolutely.
2:31PM   8             MR. STRONGMAN:  And so the point being that
2:31PM   9    Dr. Kessler shouldn't be able to control his cross-examination
2:31PM  10    just by saying, "I don't think that's reliable" when another
2:31PM  11    expert in the case could come in and say it is.  I think that's
2:31PM  12    the intent of this rule.
2:31PM  13             THE COURT:  I agree with you except that do I
2:31PM  14    anticipate -- am I supposed to anticipate whether another
2:31PM  15    expert's going to say that?
2:31PM  16             MR. STRONGMAN:  I think that's a fair thing to do.  I
2:31PM  17    think the Court could also take judicial notice of it.
2:31PM  18    Obviously, that's included as well.
2:31PM  19             We're talking about definitions from the
2:31PM  20    American Cancer Society, and it's totally -- it's totally fair
2:31PM  21    to just ask did he look for this, did he review it, does he
2:31PM  22    know what it says.
2:31PM  23             And if he says it's worthless, that's fine too,
2:31PM  24    in terms of "I've read it.  Here's what it says.  And I have an
2:32PM  25    opinion that it's not worth something."  But I think it's fair

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 2:32PM | 1 | to cross-examine him on it. |
| 2:32PM | 2 | THE COURT:  Okay.  I'm listening. |
| 2:32PM | 3 | MR. NOLEN:  Just -- again, I don't think there's any |
| 2:32PM | 4 | evidence here that this is a peer-reviewed document. |
| 2:32PM | 5 | THE COURT:  Oh, I don't think anybody's going to say |
| 2:32PM | 6 | it's a peer-reviewed document. |
| 2:32PM | 7 | MR. NOLEN:  And, therefore, it's not a learned |
| 2:32PM | 8 | treatise, because it's not learned if it's not peer-reviewed. |
| 2:32PM | 9 | THE COURT:  But it says "periodicals" or "pamphlets." |
| 2:32PM | 10 | MR. NOLEN:  I think that they would have to come |
| 2:32PM | 11 | under some scrutiny; otherwise, we could put The New York Times |
| 2:32PM | 12 | in front of him. |
| 2:32PM | 13 | THE COURT:  Well, we're not going to do that. |
| 2:32PM | 14 | I'm going to take my ten-minute break, and then |
| 2:32PM | 15 | I'll be back. |
| 2:32PM | 16 | THE DEPUTY CLERK:  All rise. |
| 2:32PM | 17 | (WHEREUPON, the Court took a recess.) |
| 2:39PM | 18 | THE COURT:  Please be seated. |
| 2:39PM | 19 | MR. STRONGMAN:  Your Honor, if I could point one |
| 2:39PM | 20 | other thing out. |
| 2:39PM | 21 | THE WITNESS:  Do you want me out of here? |
| 2:39PM | 22 | THE COURT:  Not the jury yet. |
| 2:39PM | 23 | MR. STRONGMAN:  You're fine. |
| 2:39PM | 24 | I asked Dr. Kessler pretty directly: |
| 2:39PM | 25 | "Q.  And the American Cancer Society, we established, |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:39PM   1          is a reliable organization that puts out information in

2:39PM   2          the public; correct?

2:39PM   3              "A.   Correct."

2:39PM   4                  And I think that alone is sufficient.  It

2:39PM   5     doesn't have to be each and every individual piece of paper.

2:39PM   6     The organization itself -- just like a peer-reviewed journal,

2:39PM   7     it's the journal, it's not every single article in the journal.

2:39PM   8                  So I think that foundation even was laid.

2:39PM   9              MR. NOLEN:  Your Honor, I do have a response to that.

2:39PM  10              THE COURT:  Can you --

2:39PM  11              MR. NOLEN:  I do have a response to that, Your Honor.

2:39PM  12                  We spent some time over the break trying to

2:39PM  13     figure out exactly which one of their experts had indicated

2:39PM  14     they relied on the American Cancer Association's definitions.

2:39PM  15     We didn't see that.  We were looking at the reliance materials

2:40PM  16     from the experts that have been disclosed in this case.

2:40PM  17                  Dr. Kessler didn't indicate that he relies upon

2:40PM  18     this definition for any purpose.  So I don't know how in the

2:40PM  19     world this comes in as a learned treatise or as reliable given

2:40PM  20     that I don't think, as best we could tell, none of their

2:40PM  21     experts rely on it.

2:40PM  22              THE COURT:  That's not the test.  I think it can be

2:40PM  23     called to the attention of an expert on cross-examination if

2:40PM  24     the publication is established as a reliable authority by the

2:40PM  25     expert's admission or testimony by another expert -- by another

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:40PM   1   expert's testimony or by judicial notice.  That's the test.

2:40PM   2              So it could be called to his attention without

2:40PM   3   another expert relying on it if he establishes it as reliable

2:40PM   4   authority -- the publication as reliable authority.

2:40PM   5          **MR. NOLEN:**  Yes.  And Dr. Kessler didn't do that, and

2:41PM   6   we don't see where any of their experts, at least in their

2:41PM   7   reports -- we're going to hold them to the four corners -- ever

2:41PM   8   did.

2:41PM   9          **MR. STRONGMAN:**  Certainly, Your Honor, I feel like I

2:41PM  10   should be able to just read the definition to him, and he can

2:41PM  11   say whether he agrees with it or he doesn't.

2:42PM  12          **THE COURT:**  What Dr. Kessler said is that the

2:42PM  13   American Cancer Society is a very reliable organization.

2:42PM  14              And then the question was:

2:42PM  15          "Q.  And puts out pamphlets and various materials

2:42PM  16       that are relied on by people in the field; correct?"

2:42PM  17              And he said:

2:42PM  18          "A.  I have no reason to dispute their good

2:42PM  19       intention.  I don't know exactly -- this document looks

2:42PM  20       like it's meant for -- it looks like it's a very useful

2:42PM  21       document for the layperson.  I'm not sure a breast

2:42PM  22       oncologist would rely on this."

2:42PM  23              And then the follow-up was:

2:42PM  24          "Q.  But it's a reliable pamphlet?"

2:42PM  25              And he said:

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 2:42PM | 1 | "A.  I don't mean to quibble.  I don't mean to |
| 2:42PM | 2 | quibble, but I haven't studied every definition.  But, you |
| 2:42PM | 3 | know, I'll -- I mean, of course." |
| 2:43PM | 4 | Gosh.  This is -- |
| 2:43PM | 5 | MR. STRONGMAN:  I think I should be able to read it |
| 2:43PM | 6 | to him, and he can agree with it or disagree with it.  He has |
| 2:43PM | 7 | agreed the American Cancer Society -- this is not |
| 2:43PM | 8 | controversial. |
| 2:43PM | 9 | THE COURT:  Oh, I understand it's not controversial. |
| 2:43PM | 10 | I've seen learned treatises, and I've used learned treatises on |
| 2:43PM | 11 | cross-examination. |
| 2:43PM | 12 | I've never had a pamphlet that looks like this. |
| 2:43PM | 13 | It's usually a peer-reviewed article from Journal of American |
| 2:43PM | 14 | Medical Society or it's a textbook that everybody says, "Yes, |
| 2:43PM | 15 | this is the information." |
| 2:43PM | 16 | This is just very, very different.  I have to |
| 2:43PM | 17 | tell you, I'm not inclined to allow it simply because it's -- I |
| 2:44PM | 18 | believe -- it certainly wasn't relied on in his direct |
| 2:44PM | 19 | examination.  It's appropriate to bring a learned treatise to |
| 2:44PM | 20 | an expert witness on cross-examination, whether he's ever, you |
| 2:44PM | 21 | know -- whether he's relied on it or not. |
| 2:44PM | 22 | But it is -- don't you hate when you have people |
| 2:44PM | 23 | in your ear? |
| 2:44PM | 24 | MS. SASTRE:  I'm sorry.  I don't want to violate your |
| 2:44PM | 25 | rule, but... |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:44PM  1        **THE COURT:**  I know.

2:44PM  2        **MR. STRONGMAN:**  Your Honor, I think I should at least

2:44PM  3  be able to just ask, "Would you agree that alopecia is defined

2:44PM  4  by the American Cancer Society as -- yes or no?  Do you agree

2:44PM  5  or disagree?"  I don't have to put it up on the screen.  I can

2:45PM  6  just ask that question.

2:45PM  7        **MR. NOLEN:**  Your Honor, the American Cancer Society

2:45PM  8  isn't here, and this is not an appropriate document to be

2:45PM  9  impeaching the witness with because it's not a scientific

2:45PM 10  document.

2:45PM 11        **THE COURT:**  Well, this is what I'm going to allow you

2:45PM 12  to do:  I think, at some point later in this trial, my guess is

2:45PM 13  somebody's going to say, "Look, this is what it is."

2:45PM 14              I think you can ask him if he would accept this

2:45PM 15  definition without referring to the American Cancer Society.

2:45PM 16  Let's see what he does.  And then at some point later, somebody

2:45PM 17  will probably come in and say what they have to say.

2:45PM 18              But I'm -- you know, it's very difficult for me

2:45PM 19  to say this is a learned treatise.

2:45PM 20              The objection's noted for the record.

2:45PM 21        **MR. STRONGMAN:**  Thank you.

2:45PM 22        **MR. NOLEN:**  Your Honor, can we ask the Court for an

2:45PM 23  instruction asking him to disregard -- asking the jury to

2:45PM 24  disregard the questioning related to the American Cancer

2:46PM 25  Society?

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:46PM   1          THE COURT:  What are you asking me to say to
2:46PM   2   disregard?
2:46PM   3          MR. NOLEN:  Yeah, the jury should disregard the
2:46PM   4   question regarding the American Cancer Society.
2:46PM   5          THE COURT:  I'm not going to do that.  We're going to
2:46PM   6   call them.  The jury's going to -- I told them if I sustain an
2:46PM   7   objection, I sustain an objection, it's taken down.
2:46PM   8          I think if we go into that -- no, no.  I am
2:46PM   9   sustaining the objection.
2:46PM  10          MR. NOLEN:  Thank you, Your Honor.
2:46PM  11          While we're at this break, I do need to raise
2:46PM  12   one other issue, and that is the issue that came up that we
2:46PM  13   approached earlier on at the bench about the money issue with
2:47PM  14   Dr. Kessler.
2:47PM  15          There was this line of questioning that we got
2:47PM  16   here talking about Ms. Earnest and the report that he prepared.
2:47PM  17          THE COURT:  Wait.
2:47PM  18          I'm not talking to you.
2:47PM  19          Okay.  Go ahead.  I'm talking to the court
2:47PM  20   security officer, who I think was getting ready to bring in the
2:47PM  21   jury.
2:47PM  22          MR. NOLEN:  I see, Your Honor.
2:47PM  23          He says:
2:47PM  24          "Q.  And on the report you prepared for Ms. Earnest's
2:47PM  25   case; correct?

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:47PM  1          "A.  I need to look at Your Honor to know how to

2:47PM  2      answer that."

2:47PM  3              He was looking to you, the witness.

2:47PM  4              And then you talked about opening doors, and

2:47PM  5  then Mr. Strongman said:

2:47PM  6          "Q.  Let me ask the question this way.  You spend

2:47PM  7      hundreds of -- how many hours have you spent on

2:47PM  8      Ms. Earnest's case?

2:47PM  9          "A.  I think I testified this morning 100-plus.  I

2:47PM  10      want to be specific.

2:47PM  11          "Q.  Do you know how many" --

2:47PM  12          **THE COURT:**  What's the question?

2:47PM  13          **MR. NOLEN:**  I think --

2:47PM  14          "Q.  -- pages?  100 or is just right in that

2:47PM  15      ballpark?

2:47PM  16          "A.  It could be a little more than 2."

2:48PM  17              I think he meant hours.  I think it's a rough.

2:48PM  18          "A.  But it's in, generally, that ballpark.  It's

2:48PM  19      under 200 on Ms. Earnest's and many cases."

2:48PM  20              And then he called it:

2:48PM  21          "Q.  Have you figured out what that superhuman rate

2:48PM  22      of review is?"

2:48PM  23              What that does, Your Honor, is undermine

2:48PM  24  Dr. Kessler's credibility because Dr. Kessler testified that he

2:48PM  25  spent many, many hours reviewing hundreds of thousands of pages

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:48PM  1    of documents.

2:48PM  2                    Then he testified that he spent 100 hours on

2:48PM  3    Ms. Earnest's case, approximately 100.  That goes right into

2:48PM  4    that area that we were having some difficulty with this

2:48PM  5    morning.

2:48PM  6            THE COURT:  Well, you might have read -- you know

2:48PM  7    what I heard?  This is -- this is how I took that line of

2:48PM  8    questioning.

2:48PM  9                    What I heard was Dr. Kessler say, "I was

2:48PM  10   provided a gazillion pieces of paper."

2:48PM  11                   And then how did you get through that?  And

2:48PM  12   Dr. Kessler, I think -- what I recall his testimony was, "I

2:49PM  13   didn't look at every piece of paper.  I could not look at every

2:49PM  14   piece of paper.  I looked at abstracts.  I looked at the

2:49PM  15   pertinent provisions.  I was provided all of these papers."

2:49PM  16                   And then I think Mr. Strongman was trying to

2:49PM  17   make the point, "Oh, that superhuman rate of review."

2:49PM  18                   But what I heard is "I didn't look at every

2:49PM  19   piece of paper.  I couldn't."

2:49PM  20                   But what do you want me to do?

2:49PM  21           MR. NOLEN:  Well, Your Honor, what we believe is that

2:49PM  22   was knocking at and opening the door of allowing in that there

2:49PM  23   are many cases involved in this litigation and that his review

2:49PM  24   and work in this litigation includes more than just Barbara

2:49PM  25   Earnest.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:49PM  1      **THE COURT:**  I tell you, Mr. Nolen, I think he was

2:49PM  2  getting ready to open the door.  And that's when I looked at

2:49PM  3  him and said, "Do you really want to do that?"

2:49PM  4      **MR. STRONGMAN:**  And I stopped.

2:49PM  5      **THE COURT:**  And he stopped in his tracks because we

2:49PM  6  were going to talk about the 11,000 other plaintiffs.  But I

2:50PM  7  don't think he was able to do that.

2:50PM  8           Now, I think the superhuman rate of review --

2:50PM  9  all I can tell you is what I heard.  I guess, if I dissected

2:50PM 10  every sentence or every word, I would come up with a different

2:50PM 11  thing.  But I thought it was related to the wealth of

2:50PM 12  information that was provided to this man and that he clearly

2:50PM 13  said, "I didn't look at it all because I could not."

2:50PM 14           I don't think the door is open.  Look, he was

2:50PM 15  trying.

2:50PM 16           All right.  I think we can bring in the jury

2:50PM 17  now.

2:50PM 18      **THE DEPUTY CLERK:**  All rise.

2:50PM 19      (WHEREUPON, the jury entered the courtroom.)

2:51PM 20      **THE COURT:**  All jurors are present.  Court's back in

2:51PM 21  session.  You may be seated.

2:51PM 22           Mr. Strongman, please continue your questioning.

2:51PM 23      **MR. STRONGMAN:**  Thank you, Your Honor.

2:51PM 24  BY MR. STRONGMAN:

2:51PM 25  **Q.**  Are you ready to proceed, Doctor?

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:51PM  1    **A.**   I am.

2:51PM  2    **Q.**   Okay.  We were talking about alopecia definitions, and I

2:51PM  3    put some information up here.  And we were generally talking

2:51PM  4    about alopecia.

2:51PM  5            Do you remember that?

2:51PM  6    **A.**   Correct.

2:51PM  7    **Q.**   Okay.  Doctor, do you accept or reject this definition of

2:51PM  8    alopecia, "Hair loss, which may include eyebrows, eyelashes,

2:51PM  9    and even pubic hair.  This often happens as a result of

2:51PM  10   chemotherapy or from radiation therapy to the head.  In most

2:51PM  11   people, the hair grows back after treatment ends"?

2:52PM  12   **A.**   I would agree with the first part up, until the "most

2:52PM  13   people."  And then I think the rest of the sentence is vague

2:52PM  14   and not helpful.  I don't think it gives us a full story.

2:52PM  15   **Q.**   Did you do research?

2:52PM  16           So one of things that we've been talking about in

2:52PM  17   your labeling opinions is the fact that the label is

2:52PM  18   intended -- it has a patient counseling sheet in it.

2:52PM  19           Do you remember that?

2:52PM  20   **A.**   Correct.

2:52PM  21   **Q.**   And I think that you testified about how there were some

2:52PM  22   terms in there that were done in a way so that they were

2:52PM  23   understandable by patients; correct?

2:52PM  24   **A.**   The patient, and how we move the whole label to be that as

2:52PM  25   opposed to decades ago, yes.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | |
|---|---|
| 2:52PM 1 | **Q.**   And in your -- let me put it this way:  Have you done |
| 2:53PM 2 | research on all the various lay definitions that are given to |
| 2:53PM 3 | patients as it relates to the definition of "alopecia"? |
| 2:53PM 4 | **A.**   I've looked at other labels in other drugs and statements |
| 2:53PM 5 | in other drugs and what's said in the patient counseling form. |
| 2:53PM 6 | I wouldn't want to represent that I've looked at every drug. |
| 2:53PM 7 | **Q.**   No.  And what I was asking was have you done any research |
| 2:53PM 8 | on what is in the public sphere for patients in terms of how |
| 2:53PM 9 | "alopecia" is defined for patients? |
| 2:53PM 10 | **A.**   Yes, I have done that research. |
| 2:53PM 11 | **Q.**   And the definition that I read to you, you reject part of |
| 2:53PM 12 | it or do you accept it? |
| 2:53PM 13 | **A.**   I reject a part of it because -- I rejected a part of it. |
| 2:54PM 14 | **Q.**   What part? |
| 2:54PM 15 | **A.**   I think the part that most times hair grows back, the end, |
| 2:54PM 16 | I think, is somewhat vague.  And it's sort of contradictory to |
| 2:54PM 17 | what, in fact, transpired. |
| 2:54PM 18 | **Q.**   Well, let's look -- let's look at the Taxotere label. |
| 2:54PM 19 | Okay?  Why don't we go there. |
| 2:54PM 20 | **A.**   Sure. |
| 2:54PM 21 | **Q.**   So we've talked about the 2004 label; correct? |
| 2:54PM 22 | **A.**   Yes, sir. |
| 2:54PM 23 | **Q.**   And I handed you the approval letter, and it's in |
| 2:54PM 24 | evidence. |
| 2:54PM 25 | **MR. STRONGMAN:**  If we could bring up the 2004 label. |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 2:54PM | 1 | And if you could bring up the patient information paragraph. |
| 2:55PM | 2 | **BY MR. STRONGMAN:** |
| 2:55PM | 3 | **Q.**   All right.  Doctor, can you see your screen in front of |
| 2:55PM | 4 | you? |
| 2:55PM | 5 | **A.**   I can see it well. |
| 2:55PM | 6 | **Q.**   And what we've got is Exhibit -- Defendants' Exhibit 317; |
| 2:55PM | 7 | correct? |
| 2:55PM | 8 | **A.**   Correct. |
| 2:55PM | 9 | **Q.**   And this is the 2004 patient information in the Taxotere |
| 2:55PM | 10 | label; correct? |
| 2:55PM | 11 | **A.**   2004, in the -- you said the patient section? |
| 2:56PM | 12 | **Q.**   Correct. |
| 2:56PM | 13 | **A.**   Correct, sir. |
| 2:56PM | 14 | **Q.**   And what it says is "Loss of hair occurs in most patients |
| 2:56PM | 15 | taking Taxotere, including the hair on your head, underarm, |
| 2:56PM | 16 | pubic hair, eyebrows, and eyelashes."  Correct? |
| 2:56PM | 17 | **A.**   Correct. |
| 2:56PM | 18 | **Q.**   "Hair loss will begin after the first few treatments and |
| 2:56PM | 19 | varies from patient to patient." |
| 2:56PM | 20 |         Did I read that correctly? |
| 2:56PM | 21 | **A.**   Exactly, sir. |
| 2:56PM | 22 | **Q.**   And then it says, "Once you have completed all your |
| 2:56PM | 23 | treatments, hair generally grows back."  Correct? |
| 2:56PM | 24 | **A.**   That's what it says. |
| 2:56PM | 25 | **Q.**   And this exact same language was in the 1996 label that |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 2:56PM | 1 | was approved while you were the commissioner of the FDA; |
| 2:56PM | 2 | correct? |
| 2:56PM | 3 | A.   I believe so.  I have no reason to dispute that. |
| 2:56PM | 4 | Q.   And we know that the word "generally" means most of the |
| 2:56PM | 5 | time; correct? |
| 2:57PM | 6 | A.   Yes.  It has to, obviously, be in context.  It's -- it |
| 2:57PM | 7 | gets -- it's usually not helpful in labels.  And FDA, you know, |
| 2:57PM | 8 | has moved to take the word "generally" out from those kind of |
| 2:57PM | 9 | statements because it's not helpful. |
| 2:57PM | 10 | Q.   Well, Doctor, we talked about "generally" just a minute |
| 2:57PM | 11 | ago, didn't we?  "Generally," "most of the time," several |
| 2:57PM | 12 | others. |
| 2:57PM | 13 | Do you remember that conversation? |
| 2:57PM | 14 | A.   Right.  But that's in a definition.  That's not in the |
| 2:57PM | 15 | context of a warning.  Don't -- a warning shouldn't be |
| 2:57PM | 16 | "generally."  We don't do back -- you know, you be clear and |
| 2:57PM | 17 | direct with a warning. |
| 2:57PM | 18 | Q.   Doctor, if you could listen to my question. |
| 2:57PM | 19 | We talked about the definition of "generally"; |
| 2:57PM | 20 | correct?  Setting aside whether you think the word "generally" |
| 2:57PM | 21 | should or shouldn't be in a label, okay, the definition of |
| 2:57PM | 22 | "generally" means most of the time; correct? |
| 2:58PM | 23 | A.   I think that would be a fair general statement. |
| 2:58PM | 24 | Q.   Yes.  And it's a word that you used yourself; correct? |
| 2:58PM | 25 | A.   Whatever my testimony, if I said it -- I certainly used |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:58PM  1    the word "generally" to -- I use that word, of course.

2:58PM  2    **Q.**   And what that means is most of the time but not all the

2:58PM  3    time; correct?

2:58PM  4    **A.**   Well, yes.

2:58PM  5    **Q.**   "Yes"?

2:58PM  6    **A.**   Yes.  But that's not what this means necessarily.

2:58PM  7    **Q.**   Doctor, if you could just focus on my question.

2:58PM  8    **A.**   I am.

2:58PM  9    **Q.**   The definition of "generally" means most of the time but

2:58PM  10   not all the time; correct?

2:58PM  11   **A.**   Correct.  If you don't lose your hair, it doesn't have to

2:58PM  12   grow back.

2:58PM  13           **MR. STRONGMAN:**  I move to strike after "correct."

2:58PM  14           **THE COURT:**  Sustained.

2:59PM  15   BY MR. STRONGMAN:

2:59PM  16   **Q.**   And, Doctor, you don't have any knowledge -- let me

2:59PM  17   withdraw that and ask it a different way.

2:59PM  18           Doctor, you're not offering any opinion about what

2:59PM  19   label version Dr. Carinder did or did not see?

2:59PM  20   **A.**   Absolutely not.  I don't know.  I've not investigated.

2:59PM  21   It's beyond the scope.

2:59PM  22   **Q.**   And I think you testified earlier that it was very

2:59PM  23   important to review labels as a doctor; correct?

2:59PM  24   **A.**   I think I said it as an aspirational goal, recognizing, I

2:59PM  25   think, that not all doctors read the entire label.  They may

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 2:59PM | 1 | hear it in different formats or hear about that information in |
| 3:00PM | 2 | different forms. |
| 3:00PM | 3 | **Q.**   But you would agree it's vitally important to understand |
| 3:00PM | 4 | what's in the label for drugs that are prescribed by yourself, |
| 3:00PM | 5 | as a doctor; correct? |
| 3:00PM | 6 | **A.**   That's why we spend so much time working on the label.  I |
| 3:00PM | 7 | don't disagree with that statement. |
| 3:00PM | 8 | **Q.**   And I think you even said that your mother reads the label |
| 3:00PM | 9 | for every medication that she receives? |
| 3:00PM | 10 | **A.**   Until she recently died, yes, she would call me up about |
| 3:00PM | 11 | those labels. |
| 3:00PM | 12 | **Q.**   Do you know whether or not Ms. Earnest ever read the label |
| 3:00PM | 13 | for Taxotere? |
| 3:00PM | 14 | **A.**   I would -- the answer is no, and I would certainly not |
| 3:00PM | 15 | expect or put the burden on a patient to know what's on the |
| 3:00PM | 16 | label.  I think that would be unfair. |
| 3:01PM | 17 | **Q.**   I want to talk about the different prongs of analysis that |
| 3:01PM | 18 | you did. |
| 3:01PM | 19 | You mentioned that you looked at the internal |
| 3:01PM | 20 | database, I think, and looked at clinical trial data, and you |
| 3:01PM | 21 | looked at literature. |
| 3:01PM | 22 | Do you remember that? |
| 3:01PM | 23 | **A.**   Correct. |
| 3:01PM | 24 | **Q.**   And the first section that I want to address is the |
| 3:01PM | 25 | analysis that you did on the internal database.  Okay? |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:01PM  1   **A.**   Correct.

3:01PM  2   **Q.**   And what you did is you asked Dr. Madigan to perform an

3:01PM  3   analysis; correct?

3:01PM  4   **A.**   I asked him to pull data and perform an analysis, correct.

3:01PM  5   **Q.**   Now, with regard to the internal database work that was

3:01PM  6   done, the methodology consisted of Dr. Madigan looking for the

3:01PM  7   high-level term "alopecia"; correct?

3:01PM  8   **A.**   Correct.

3:01PM  9   **Q.**   And then searching for whether or not the report contained

3:01PM  10  one of various words; correct?

3:01PM  11  **A.**   Are you talking about in the FAERS database or in the

3:02PM  12  internal pharmacovigilance --

3:02PM  13  **Q.**   I'm talking --

3:02PM  14  **A.**   -- database?

3:02PM  15  **Q.**   Sorry.  I'm talking about the internal database that you

3:02PM  16  talked with Mr. Nolen about today.

3:02PM  17  **A.**   Sure.  Not the FAERS database?

3:02PM  18  **Q.**   Correct.

3:02PM  19  **A.**   Correct.

3:02PM  20  **Q.**   So what Dr. Madigan did was he searched for the high-level

3:02PM  21  term "alopecia," and then whether or not the report contained

3:02PM  22  one of any number of words; correct?

3:02PM  23  **A.**   After -- yes.

3:02PM  24  **Q.**   And so one of the words that Dr. Madigan searched for was

3:02PM  25  "chronic"; correct?

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:02PM  1    A.   I'd have to pull that, but I take your representation,

3:02PM  2    yes.

3:02PM  3    Q.   And what you know by looking at Dr. Madigan's information

3:02PM  4    and report is that the word "chronic" just had to be somewhere

3:02PM  5    in the report; correct?

3:02PM  6    A.   No, because Dr. Madigan wasn't given the reports.  I was

3:02PM  7    asked -- he was given the data.  But I asked for the CIOMS, but

3:03PM  8    they don't think they were produced.

3:03PM  9         So I looked for the reports themselves.  And I don't

3:03PM  10   think they were made available by the company, if I'm correct.

3:03PM  11   Q.   Doctor, listen to my question carefully for a minute.

3:03PM  12   A.   Sure.

3:03PM  13   Q.   So this is a report, and it has information in it;

3:03PM  14   correct?  Can we agree on that?

3:03PM  15   A.   There's data in the database format.

3:03PM  16        This is for Dr. Madigan?

3:03PM  17   Q.   Correct.

3:03PM  18   A.   Yeah.  I think it's probably best -- I think the jury will

3:03PM  19   hear from Dr. Madigan, and it's probably most reliable to

3:03PM  20   note -- to ask him exactly what he did as far as accessing from

3:03PM  21   the database so we don't confuse reports and database terms.

3:03PM  22   But I'm happy to --

3:03PM  23   Q.   Let me ask you this.  You asked Dr. Madigan to do this

3:03PM  24   analysis.

3:03PM  25        Did you go back and analyze his methodology?

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:03PM  1   **A.**   Yes.  Not only did I look at his methodology, I took that

3:03PM  2   methodology against the company.  And the company found 142.

3:04PM  3   Dr. Madigan found 168.  And I think, as I testified, I'll take

3:04PM  4   the 142.  I think that's enough evidence.  And the company --

3:04PM  5   **Q.**   Doctor, if you could listen to my question.

3:04PM  6        Did you review Dr. Madigan's methodology?  Yes or no?

3:04PM  7   **A.**   I did.

3:04PM  8   **Q.**   And you know, therefore, that the way that Dr. Madigan

3:04PM  9   performed this analysis, you could have a report of alopecia

3:04PM  10  during chemotherapy along with a report of chronic back pain,

3:04PM  11  and it would generate a positive result in Dr. Madigan's

3:04PM  12  report; correct?

3:04PM  13  **A.**   In the FAERS analysis, I think you're correct.  I'm not

3:04PM  14  sure in the pharmacovigilance, you're correct.  I'd have to go

3:04PM  15  back and review it, but I did double-check.

3:04PM  16  **Q.**   So, Doctor, answer my question.

3:04PM  17       Do you know, sitting here today, whether or not that

3:04PM  18  kind of complaint would be in one of your 168?

3:05PM  19       **MR. NOLEN:**  Objection, Your Honor.  The witness

3:05PM  20  wasn't allowed to even finish his response.

3:05PM  21       **THE COURT:**  Okay.  Overruled.

3:05PM  22       I'm going let him answer the question, but I

3:05PM  23  think this --

3:05PM  24       **THE WITNESS:**  I know there were definitely 142 cases

3:05PM  25  where Sanofi had the CIOMS forms.  I don't believe those CIOMS

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1    forms were made available to Dr. Madigan.

2              So I can assure you that there were 142 cases

3    where it was not chronic back pain but it was permanent

4    alopecia that had not been seen previously.

5    BY MR. STRONGMAN:

6    Q.   Well, Doctor, you talked about these forms; the forms are

7    where the actual data is?  Like there's a narrative in it;

8    correct?

9    A.   There can be, yes.

10   Q.   Okay.  And you -- we can let Dr. Madigan talk for himself.

11             But you don't know whether or not Dr. Madigan even

12   asked for those forms; correct?

13   A.   I asked for those forms.

14   Q.   Did you get them?

15   A.   No.  Because I was told they were not produced.

16   Q.   Do you know whether that's accurate?

17   A.   Sir, I could only ask questions.  You know -- I mean, I

18   asked for the CIOMS forms.  I asked for all the CIOMS forms so

19   I could look specifically at your questions.  And I was only

20   provided with certain CIOMS forms, not the entire database.

21   Q.   Okay.

22   A.   I'm not challenging -- I'm not challenging.  That's a

23   dispute between lawyers, and I leave it to all of you to figure

24   out.

25   Q.   And let me just ask the question this way:  The

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:06PM  1   information that you were provided to do this analysis came

3:06PM  2   from the plaintiff's lawyers; correct?

3:06PM  3   A.   No.   The information I had was Sanofi.   These 142 cases

3:06PM  4   are in your database.   Your company had that.

3:06PM  5   Q.   Well, my question, Doctor, is a little different.   You're

3:07PM  6   talking about these forms; right?   You call them the CIOMS

3:07PM  7   forms?

3:07PM  8   A.   There are CIOMS forms and a number of different forms.

3:07PM  9   Q.   My question is you asked for those forms?   Yes or no?

3:07PM  10  A.   I did ask for those forms.

3:07PM  11  Q.   And you did not get those forms?   Yes or no?

3:07PM  12  A.   I did not get the entire -- entire database of those forms

3:07PM  13  and, therefore, relied on the company's numbers of 142.

3:07PM  14  Q.   Well -- and, Doctor, let me ask you the question this way:

3:07PM  15  For every one of those 168 or 142, there's actually information

3:07PM  16  underneath that number; correct?

3:07PM  17          There's a narrative.   There's information about how

3:07PM  18  long the patient took the medication.   There's information

3:07PM  19  about what other medications the patient took.   There's

3:07PM  20  information about what other medical conditions they had,

3:07PM  21  whether they were taking a hormone therapy.

3:07PM  22          There's information like that included in that

3:08PM  23  underlying data; correct?

3:08PM  24  A.   Yes.

3:08PM  25  Q.   And sitting here today, you don't have the benefit of that

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:08PM  1    information; correct?

3:08PM  2    A.   I have the benefit of the information on the 142 cases,

3:08PM  3    because that was provided by Sanofi.  And I know there were

3:08PM  4    142 cases of permanent alopecia certainly by the time

3:08PM  5    Mrs. Earnest took her medicine.

3:08PM  6    Q.   So, Doctor, if you could listen to my question.

3:08PM  7         Did you look at the 142 -- let's use that number --

3:08PM  8    CIOMS reports?

3:08PM  9         MR. NOLEN:  Object to the form of that question in

3:08PM  10   that -- all of those questions that say "listen to my

3:08PM  11   question," because he answered the question that was asked.

3:08PM  12        THE COURT:  I don't think -- overruled.

3:08PM  13        Answer the question.

3:08PM  14        THE WITNESS:  I looked at the narratives of those

3:08PM  15   142, as provided in Sanofi documents.

3:09PM  16   BY MR. STRONGMAN:

3:09PM  17   Q.   Did you look at the narratives for the 168 that you told

3:09PM  18   the jury about today?

3:09PM  19   A.   There are not -- to my knowledge, those don't exist, as I

3:09PM  20   understand it.  I could not.  I tried.  I asked.

3:09PM  21   Q.   So the answer is no, you did not; correct?

3:09PM  22   A.   That's correct, for the 168.

3:09PM  23        MR. STRONGMAN:  May I approach the witness, Your

3:09PM  24   Honor?

3:09PM  25        THE COURT:  Yes, you may.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 3:09PM | 1 | **BY MR. STRONGMAN:** |
| 3:09PM | 2 | Q.   And, Doctor, I've handed you what's been marked as |
| 3:09PM | 3 | Defendants' Exhibit D-31. |
| 3:09PM | 4 | Do you see it? |
| 3:09PM | 5 | A.   Yes. |
| 3:09PM | 6 | Q.   And this is entitled "Periodic Safety Update Report," and |
| 3:10PM | 7 | it has a date of report of 21 January 2011. |
| 3:10PM | 8 | Do you see that? |
| 3:10PM | 9 | A.   Correct. |
| 3:10PM | 10 | MR. STRONGMAN:  And, Your Honor, defendants would |
| 3:10PM | 11 | move into evidence Defendants' Exhibit 31. |
| 3:10PM | 12 | THE COURT:  Any objection? |
| 3:10PM | 13 | MR. NOLEN:  No objection. |
| 3:10PM | 14 | THE COURT:  Let it be admitted. |
| 3:10PM | 15 | Please proceed. |
| 3:10PM | 16 | **BY MR. STRONGMAN:** |
| 3:10PM | 17 | Q.   And, Dr. Kessler, if -- could we bring it up? |
| 3:10PM | 18 | If we go to page 2 -- let me first do one thing. |
| 3:10PM | 19 | Let's talk about a little bit of context. |
| 3:10PM | 20 | So we had mentioned periodic safety update reports |
| 3:10PM | 21 | earlier. |
| 3:10PM | 22 | Do you remember that? |
| 3:10PM | 23 | A.   Correct. |
| 3:10PM | 24 | Q.   And this is a report that is prepared by the manufacturer; |
| 3:10PM | 25 | correct? |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:10PM  1    **A.**   Correct.

3:10PM  2    **Q.**   And then it's -- it's shared with various people; correct?

3:11PM  3    **A.**   Correct.

3:11PM  4    **Q.**   Okay.  And if we look at the executive summary, there's

3:11PM  5    information in this executive summary about an estimated number

3:11PM  6    of patients treated during a current period.  And if you could

3:11PM  7    look -- it might be on your screen as well.

3:11PM  8             Do you see that?

3:11PM  9    **A.**   I see that.

3:11PM  10   **Q.**   Okay.  And so this report covers about six months;

3:11PM  11   correct?

3:11PM  12   **A.**   Generally, that's correct.

3:11PM  13   **Q.**   And we can see there, based on Defendants' Exhibit No. 31,

3:11PM  14   that during this six-month period, 296,816 patients were

3:11PM  15   treated with docetaxel; correct?

3:11PM  16   **A.**   I've seen that number, yes.

3:11PM  17   **Q.**   And that's the -- docetaxel is the molecular name for

3:12PM  18   Taxotere; correct?

3:12PM  19   **A.**   Correct.

3:12PM  20   **Q.**   And we also can see up above that there were 95,083

3:12PM  21   patients worldwide enrolled in clinical studies at this time;

3:12PM  22   correct?

3:12PM  23   **A.**   That's of company-sponsored and unsponsored studies.

3:12PM  24   **Q.**   Okay.  And so looking at this six-month period alone, we

3:12PM  25   can tell that there was over 300,000 individuals treated with

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 3:12PM | 1 | Taxotere; correct -- |
| 3:12PM | 2 | A.   Correct. |
| 3:12PM | 3 | Q.   -- in this period in 2011; correct? |
| 3:12PM | 4 | A.   Correct. |
| 3:12PM | 5 | Q.   And so Taxotere had been on the market since 1996; |
| 3:12PM | 6 | correct? |
| 3:12PM | 7 | A.   Correct. |
| 3:12PM | 8 | Q.   And so we're talking about up -- until this report, we're |
| 3:12PM | 9 | talking about from 1996 to the beginning of 2011; correct? |
| 3:12PM | 10 | A.   Correct. |
| 3:12PM | 11 | Q.   And certainly we can agree, if there's more than 300,000 |
| 3:12PM | 12 | patients in that one six-month period, that there was at least |
| 3:13PM | 13 | 2 million patients treated with Taxotere during the life of the |
| 3:13PM | 14 | medication from 1996 to 2011; fair? |
| 3:13PM | 15 | A.   Again, I asked for the sales data.  If you have sales |
| 3:13PM | 16 | data -- because I've seen this number in this PSUR.  I think |
| 3:13PM | 17 | it's probably best to put up real numbers, if you have it, |
| 3:13PM | 18 | because I have not seen the total sales numbers. |
| 3:13PM | 19 | Q.   Well, Doctor, can you assume with me that it's at least |
| 3:13PM | 20 | 2 million?  Just assume with me. |
| 3:13PM | 21 | A.   I'm happy to assume any hypothetical you'd like. |
| 3:13PM | 22 | Q.   Okay.  And I know we've been debating 168, 142 or -3, I |
| 3:14PM | 23 | think you said.  And I'll give you the benefit with the 168. |
| 3:14PM | 24 | Okay. |
| 3:14PM | 25 | And if we assume -- again, I'm asking you to assume. |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 3:14PM | 1 | And that's a fair assumption, being there was 300,000 in a |
| 3:14PM | 2 | six-month period alone, but I'm asking you to assume.  Okay? |
| 3:14PM | 3 | A.   It depends what the curve is. |
| 3:14PM | 4 | Q.   Okay.  And if you do the math and you take 168 out of |
| 3:14PM | 5 | 2 million, you get -- do you trust my math that you would get |
| 3:15PM | 6 | .0084 percent? |
| 3:15PM | 7 | A.   I trust your math, but I don't know why you're doing that |
| 3:15PM | 8 | number.  I don't know what your methodology is because that |
| 3:15PM | 9 | methodology doesn't make sense to me. |
| 3:15PM | 10 | Q.   Doctor, can we just agree that 168 out of over 2 million |
| 3:15PM | 11 | is .0084 percent? |
| 3:15PM | 12 | A.   Your math is perfect. |
| 3:15PM | 13 | Q.   Thank you.  Just so it's clear, under my hypothetical, |
| 3:16PM | 14 | based on your definition of your search and your search with |
| 3:16PM | 15 | Dr. Madigan, you came up with 168 cases of what you considered |
| 3:16PM | 16 | to be irreversible alopecia in the internal database; correct? |
| 3:16PM | 17 | A.   In the internal database, correct. |
| 3:16PM | 18 | Q.   And what we're talking about with the 2 million would be |
| 3:16PM | 19 | the number of people who had used Taxotere; correct?  That's |
| 3:16PM | 20 | what my hypothetical is; correct? |
| 3:16PM | 21 | A.   How do you -- how do you relate the two? |
| 3:16PM | 22 | Q.   Doctor, we talked about it.  I asked you to assume it. |
| 3:16PM | 23 | We had $300,000 in a six-month period alone; correct? |
| 3:16PM | 24 | A.   But that's not the way you look at a percentage.  You have |
| 3:16PM | 25 | to have a defined population. |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 3:16PM | 1 | So you follow X number of patients.  Sedlacek had |
| 3:17PM | 2 | 100 patients, and had a 7 percent.  In 316, you had a |
| 3:17PM | 3 | 4 percent. |
| 3:17PM | 4 | **Q.**   Doctor, if you could... |
| 3:17PM | 5 | **A.**   Sure.  But that's -- you're creating a false impression |
| 3:17PM | 6 | there. |
| 3:17PM | 7 | **Q.**   And, Doctor, this question, then:  You know that there is |
| 3:17PM | 8 | a scale that sets out what's rare, very rare, et cetera. |
| 3:17PM | 9 | Are you with me? |
| 3:17PM | 10 | **A.**   I know it well. |
| 3:17PM | 11 | **Q.**   Okay.  And the number for very rare is what? |
| 3:17PM | 12 | **A.**   I'd have to look at it.  Why don't you pull it up.  I |
| 3:17PM | 13 | don't want to do it.  I'm under oath.  I don't know if it's 1 |
| 3:17PM | 14 | in 10,000, 1 in 1,000.  I forget exactly.  It's a WHO |
| 3:17PM | 15 | classification. |
| 3:18PM | 16 | **Q.**   Doctor, would you agree with me that the WHO |
| 3:18PM | 17 | classification for "very rare" is less than .01 percent? |
| 3:18PM | 18 | **A.**   Whatever you have there, that's correct. |
| 3:18PM | 19 | **Q.**   I next want to talk about some of the TAX 316 data that |
| 3:18PM | 20 | you talked about.  Okay? |
| 3:18PM | 21 | **A.**   Sure. |
| 3:18PM | 22 | **Q.**   Okay.  Now, you talked about TAX 316, and you marked the |
| 3:18PM | 23 | clinical study report; correct -- or counsel marked the |
| 3:19PM | 24 | clinical study report and showed it to you; correct? |
| 3:19PM | 25 | **A.**   That's correct. |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:19PM  1   **Q.**   And let's start off with the efficacy question.  Okay?

3:19PM  2              So in the clinical study that they marked that we're

3:19PM  3   calling TAX 316, it showed that Taxotere was more effective

3:19PM  4   than the FAC arm in terms of overall survival and disease-free

3:19PM  5   survival; correct?

3:19PM  6   **A.**   I remember the disease-free survival.  You'd have to show

3:19PM  7   me the clinical study report.  I'll take your representation.

3:19PM  8   **Q.**   And those numbers were statistically significant; correct?

3:19PM  9   **A.**   On the efficacy side, yes.  And they supported the

3:19PM  10  indication.

3:19PM  11  **Q.**   Correct.  And when you say "they supported the

3:19PM  12  indication," they were the basis of the FDA approval in 2004.

3:20PM  13              That's what you mean by that; correct?

3:20PM  14  **A.**   In part.

3:20PM  15  **Q.**   In part, correct.

3:20PM  16              The five-year component of that was submitted in

3:20PM  17  2004; correct?

3:20PM  18  **A.**   Counsel marked the ten-year, the final report.  I based my

3:20PM  19  analysis off the final report, not the interterm report.

3:20PM  20  **Q.**   Very good.  But what we know is, at the end of final

3:20PM  21  report and in the interim report, Taxotere was working to treat

3:20PM  22  patients and help survival; correct?

3:20PM  23  **A.**   That's the reason why the agency approved the drug.

3:20PM  24  **Q.**   And you also talked about a study called -- I think

3:20PM  25  Mr. Nolen called it TAX 301.

DAVID KESSLER - CROSS

3:20PM  1         Do you remember that?

3:20PM  2  A.   I do.

3:20PM  3  Q.   And you talked about statistical significance, and you

3:20PM  4  said that Dr. Madigan had to pool the two studies together;

3:21PM  5  correct?

3:21PM  6  A.   Exactly.

3:21PM  7  Q.   Okay.  And you know that Dr. Madigan also did an analysis

3:21PM  8  on each of those studies individually; correct?

3:21PM  9  A.   Correct.

3:21PM 10  Q.   And the study, TAX 316, the analysis that Dr. Madigan did

3:21PM 11  actually showed that there was not a statistically significant

3:21PM 12  different result between the TAC arm -- the Taxotere,

3:21PM 13  Adriamycin, Cytoxan arm -- and the FAC arm in terms of ongoing

3:21PM 14  hair loss; correct?

3:21PM 15  A.   At certain points in time.

3:21PM 16  Q.   At the --

3:21PM 17  A.   I think it was .058, something like that.  I'd have to

3:21PM 18  refresh my memory.  It just missed it, if my memory serves me

3:21PM 19  right.  But Dr. Madigan, I'm sure, will testify as to that.

3:21PM 20  Q.   So my question is Dr. Madigan did an analysis of TAX 316,

3:21PM 21  ongoing hair loss data; correct?

3:21PM 22  A.   Correct.

3:21PM 23  Q.   Okay.  And Dr. Madigan concluded that, at the end of the

3:22PM 24  ten years, there was not, not a statistically significant

3:22PM 25  difference between the TAC arm and the FAC arm; correct?

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 3:22PM | 1 | **A.**    I think we should let Dr. Madigan testify on how he |
| 3:22PM | 2 | interprets the data on 316.  I'm looking for it.  I think -- I |
| 3:22PM | 3 | think you're right that, at certain points in time, it was not. |
| 3:22PM | 4 | But, again, Dr. Madigan should testify.  But when pooled, it |
| 3:22PM | 5 | was statistically significant. |
| 3:22PM | 6 | **Q.**    And my question was, individually, neither TAX 316 or |
| 3:22PM | 7 | TAX 301 had statistically significant results?  Yes or no? |
| 3:22PM | 8 | **A.**    Again, I'd have to -- you'd have to pull up Dr. Madigan's |
| 3:22PM | 9 | report to be absolutely sure. |
| 3:22PM | 10 | If you want to take a minute, I have it.  And I'm |
| 3:23PM | 11 | happy to have you, if you want to put it up -- |
| 3:23PM | 12 | **Q.**    So, Doctor, my question is -- |
| 3:23PM | 13 | **A.**    I have the specific results. |
| 3:23PM | 14 | **Q.**    Listen to my question. |
| 3:23PM | 15 | **A.**    Okay. |
| 3:23PM | 16 | **Q.**    So there's a table in Dr. Madigan's report.  You're |
| 3:23PM | 17 | looking at. |
| 3:23PM | 18 | **A.**    I'm looking at it right now. |
| 3:23PM | 19 | **Q.**    Okay.  And there's a table for TAX 316, and there's a |
| 3:23PM | 20 | table for TAX 301 -- or we sometimes call it GEICAM. |
| 3:23PM | 21 | **A.**    Correct. |
| 3:23PM | 22 | **Q.**    Okay.  And at the table, at the end of study, there's a |
| 3:23PM | 23 | ten-year cell, if you will, on Dr. Madigan's table. |
| 3:23PM | 24 | Do you see that? |
| 3:23PM | 25 | **A.**    I'm looking at that exactly. |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:23PM  1   **Q.**   Okay.  And what we know is that, on the side of the table,
3:23PM  2   there is what's called, I think, a P value; correct?
3:23PM  3   **A.**   I love P values.
3:23PM  4   **Q.**   All right.  And we know that a P value is how you're
3:23PM  5   determining whether something is statistically significant.
3:23PM  6          That's what you set out at the front of your study as
3:23PM  7   the measure; correct?
3:23PM  8   **A.**   P value is to determine whether there is statistical
3:24PM  9   significance, correct.
3:24PM  10  **Q.**   And in the scientific and medical community, what we know
3:24PM  11  is that a normal P value is .05; correct?  Yes or no?
3:24PM  12  **A.**   Yes.  And this is .053.
3:24PM  13  **Q.**   So, Doctor, my question is, looking -- you got it right in
3:24PM  14  front of you now.
3:24PM  15  **A.**   I'm looking at all the cells, and you may want to show the
3:24PM  16  jury all the cells.
3:24PM  17  **Q.**   Doctor, listen to my question.
3:24PM  18          **THE COURT:**  Wait, Doctor.  Answer the question.
3:24PM  19  BY MR. STRONGMAN:
3:24PM  20  **Q.**   At the end of the study, neither TAX 316 or TAX 301 were
3:24PM  21  statistically significant with regard to ongoing hair loss;
3:24PM  22  correct?
3:24PM  23  **A.**   You're correct that it was not --
3:24PM  24  **Q.**   Thank you.
3:24PM  25  **A.**   -- statistically significant --

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 3:24PM | 1 | **Q.**   If you could -- |
| 3:24PM | 2 | **A.**   -- at 120 months. |
| 3:24PM | 3 | **MR. STRONGMAN:**  Your Honor? |
| 3:24PM | 4 | **THE COURT:**  Dr. Kessler, you have to answer the |
| 3:24PM | 5 | question, and I think you've done that. |
| 3:24PM | 6 | **THE WITNESS:**  I'm sorry. |
| 3:24PM | 7 | BY MR. STRONGMAN: |
| 3:24PM | 8 | **Q.**   Now, I also remember you were talking about -- you showed |
| 3:25PM | 9 | the table. |
| 3:25PM | 10 | Do you remember the table, and it had 29? |
| 3:25PM | 11 | **A.**   And 16. |
| 3:25PM | 12 | **Q.**   And 16. |
| 3:25PM | 13 | Let's talk about the 16 for a minute.  Okay? |
| 3:25PM | 14 | **A.**   Yeah. |
| 3:25PM | 15 | **Q.**   So the 16 that -- by your definition, I think you said |
| 3:25PM | 16 | these individuals had -- well, what did you call it?  Permanent |
| 3:25PM | 17 | hair loss? |
| 3:25PM | 18 | **A.**   It was on -- the report said "ongoing alopecia" at the end |
| 3:25PM | 19 | of the study, is what I specifically said, after the ten-year |
| 3:25PM | 20 | period. |
| 3:25PM | 21 | **Q.**   Do you know what "ongoing" meant, as it was defined by the |
| 3:25PM | 22 | study? |
| 3:25PM | 23 | **A.**   Yes. |
| 3:25PM | 24 | **Q.**   What? |
| 3:25PM | 25 | **A.**   So "ongoing" meant, at the end of study, whether the |

DAVID KESSLER - CROSS

3:25PM  1  adverse event persisted and still was there.
3:25PM  2  **Q.**   Now, what happened if a patient dropped out of the study
3:25PM  3  after two months but, at their last visit, they reported the
3:25PM  4  side effect such as hair loss, would that --
3:25PM  5  **A.**   I --
3:25PM  6  **Q.**   Let me finish my question.
3:26PM  7           Under that circumstance, would that be ongoing or not
3:26PM  8  under the protocol?
3:26PM  9  **A.**   It would be ongoing for this specific data for how long
3:26PM 10  the patients were in there in 316.
3:26PM 11  **Q.**   Okay.  And so with regard to the 16 -- so this is patients
3:26PM 12  that received no FAC, no Taxotere; correct?
3:26PM 13  **A.**   Correct.
3:26PM 14  **Q.**   Under your definition, they had ongoing alopecia?
3:26PM 15  **A.**   No.  According to the company's definition.  It's not my
3:26PM 16  definition.
3:26PM 17  **Q.**   So, Doctor, do you know how -- let's talk about the fact
3:26PM 18  that -- in both arms, every patient received Adriamycin;
3:26PM 19  correct?
3:26PM 20  **A.**   Correct.
3:26PM 21  **Q.**   And you know that that drug is sometimes called "the red
3:26PM 22  devil"; correct?
3:26PM 23  **A.**   I would be careful, Counselor.  I've taken care of -- I've
3:26PM 24  given Adriamycin to children.  I pushed that drug.
3:26PM 25  **Q.**   Doctor, I understand your --

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:26PM 1    A.    And I think one has to be --

3:27PM 2            MR. STRONGMAN:  Your Honor, I --

3:27PM 3            THE COURT:  Doctor, has it been called "the red

3:27PM 4    devil"?

3:27PM 5            THE WITNESS:  I would not call it "the red devil."

3:27PM 6    It has saved -- it has saved people's lives.  There are

3:27PM 7    children today that I've taken care of who are oral surgeons

3:27PM 8    and mothers because of Adriamycin.

3:27PM 9    BY MR. STRONGMAN:

3:27PM 10   Q.    And, Doctor, there are people today that Taxotere has also

3:27PM 11   saved their lives; correct?

3:27PM 12   A.    And I'm not disputing that.

3:27PM 13   Q.    Okay.  And so when we take a step back and we talk about

3:27PM 14   this clinical trial data that you were talking about, every

3:27PM 15   patient received Adriamycin; correct?

3:27PM 16   A.    In both arms.

3:27PM 17   Q.    Correct.  And every patient in both arms received Cytoxan;

3:27PM 18   correct?

3:27PM 19   A.    In both arms.

3:27PM 20   Q.    And you know that there are reports of ongoing alopecia

3:28PM 21   for both Adriamycin and Cytoxan; correct?

3:28PM 22   A.    No, not in that study.

3:28PM 23   Q.    I'm not asking about the study.

3:28PM 24          In your research, did you see in the medical

3:28PM 25   literature -- you talked about how you researched the medical

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:28PM 1  literature?

3:28PM 2  **A.**   I have.

3:28PM 3  **Q.**   Do you believe that there are reports in the medical

3:28PM 4  literature of ongoing or persistent hair loss with Adriamycin?

3:28PM 5  **A.**   There was zero cases with Adriamycin and Cytoxan -- with

3:28PM 6  Adriamycin, there were zero cases up to 2000 in the

3:28PM 7  pharmacovigilance database.  I think I see one or two patients

3:28PM 8  alone with Adriamycin, but it's exceptionally rare.

3:28PM 9  **Q.**   Doctor, I want you to focus on my question.

3:28PM 10  **A.**   Sure.

3:28PM 11  **Q.**   You searched the literature?

3:28PM 12  **A.**   I did.

3:28PM 13  **Q.**   Okay.  Did you see in your literature -- looking for

3:28PM 14  information from 2011 and before, did you see any reports of

3:29PM 15  persist or permanent or irreversible hair loss with Adriamycin?

3:29PM 16  Yes or no?

3:29PM 17  **A.**   I think I saw one case with Adriamycin alone, but I'd want

3:29PM 18  to check that.  It's -- I mean, I searched specifically for

3:29PM 19  that, and that was the best I could do.

3:29PM 20  **Q.**   Now, what about Cytoxan?  In your research, did you do

3:29PM 21  research to try to determine whether or not there were cases in

3:29PM 22  2011 and before of Cytoxan causing permanent hair loss?

3:29PM 23  **A.**   There are zero cases of Cytoxan.  If you look at the FDA

3:29PM 24  database of Cytoxan causing permanent alopecia, certainly,

3:29PM 25  through --

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:29PM 1   **Q.**   Doctor, I didn't ask about the FDA database.  I asked
3:29PM 2   about the literature.  If you could answer my question.
3:29PM 3         And if the answer is you didn't find any, that's
3:30PM 4   fine.  I'm asking you, did you find any?
3:30PM 5   **A.**   I saw no case of monotherapy Cytoxan where Cytoxan caused
3:30PM 6   irreversible or permanent hair loss.  I did not see it any in
3:30PM 7   the medical literature, and I searched.
3:30PM 8   **Q.**   How about this?  Did you see any reports -- you slipped in
3:30PM 9   the word "monotherapy" there.
3:30PM 10        Did you see any reports in the medical literature
3:30PM 11  where the regimen included Cytoxan and there was a report of
3:30PM 12  permanent hair loss?
3:30PM 13  **A.**   Sure, of course.  Because in the FAC arm, that includes
3:30PM 14  Cytoxan.  So, of course, it included Cytoxan --
3:30PM 15  **Q.**   Okay.
3:30PM 16  **A.**   -- in that arm.
3:30PM 17  **Q.**   And the same thing for Adriamycin; correct?
3:30PM 18  **A.**   Correct.  But they were controlled.
3:30PM 19  **Q.**   So you can't say that there is no risk of any kind of
3:30PM 20  persistent hair loss with the FAC arm; correct?
3:30PM 21  **A.**   I certainly can, in a controlled trial.  You're missing
3:30PM 22  the point.  When you compare TAC versus FAC, the only
3:31PM 23  difference is the T; it's not the A and C.
3:31PM 24        You're explaining away the risk.  It's the biggest
3:31PM 25  mistake in drug safety.  You're explaining away the risk and

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:31PM 1    pointing to something else.

3:31PM 2    Q.   Let's go back to this real quick.  We talked about this

3:31PM 3    definition, "six months" was -- most of the time, was your most

3:31PM 4    common definition; correct?

3:31PM 5    A.   That was certainly one of the definitions.

3:31PM 6    Q.   Okay.  And you would have to agree with me that, in order

3:31PM 7    to know whether or not somebody actually had hair loss more

3:31PM 8    than six months after treatment, that patient would have to be

3:31PM 9    evaluated more than six months after treatment; correct?

3:31PM 10   A.   Exactly.

3:31PM 11   Q.   That's just logic; right?

3:31PM 12   A.   That's what 316 did.

3:32PM 13   Q.   Doctor, do you know -- in the work that you did reviewing

3:32PM 14   materials, looking at information in this case, do you know how

3:32PM 15   many of the 29 patients were actually evaluated more than six

3:32PM 16   months?

3:32PM 17   A.   That data is available.  It's not front of mind.  But it

3:32PM 18   is in the clinical study report, and I think you can -- at one

3:32PM 19   point, I did know the average follow-up period for that.

3:32PM 20   Q.   And I'm not talking about the average follow-up.

3:32PM 21        I'm talking about -- can you tell me how many people

3:32PM 22   of the 29 were actually followed up more than six months?

3:32PM 23   A.   It was a ten-year study.  We could pull that table.  It's

3:33PM 24   in your clinical study report.  You have it.

3:33PM 25        And I'm almost certain that -- certainly, in 316 --

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:33PM  1    it was a ten-year study.  It went well beyond six months, the
3:33PM  2    follow-up.
3:33PM  3    Q.    So, Doctor, if you've looked at the data, you would know
3:33PM  4    that only 21 -- no.  Let me ask that again.
3:33PM  5          You would know if you looked at the data that 21 of
3:33PM  6    these patients were followed for six months or less; correct?
3:33PM  7    A.    After the initial period?
3:33PM  8    Q.    After the treatment.
3:33PM  9    A.    So the treatment was X number of weeks, and the six
3:33PM  10   months -- the clinical study report, if you pull the table, it
3:33PM  11   will tell you it was a ten-year study.
3:33PM  12   Q.    Let me just ask it this way:  Are you aware that 21 of
3:34PM  13   these 29 patients were never seen to determine whether or not
3:34PM  14   they have hair loss after six months after they finished their
3:34PM  15   treatment?  Do you know that?
3:34PM  16   A.    I don't know that.  I looked at the table.  If that's the
3:34PM  17   case, then there's a big problem with the study because it was
3:34PM  18   represented as a ten-year study.
3:34PM  19   Q.    Well, Doctor, if that's the case, setting aside whether
3:34PM  20   you think there's a big problem with the study, it would be a
3:34PM  21   big problem for you concluding that there were 29 cases of
3:34PM  22   permanent alopecia; correct?
3:34PM  23   A.    Not at all.  Because you have Sedlacek that found seven
3:34PM  24   cases in that arm and zero in the other arm.  So it's
3:34PM  25   replicable.  You don't even have to rely on 316.  There is

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:34PM  1    other data that supports the fact that Taxotere causes

3:34PM  2    permanent alopecia.

3:35PM  3    **Q.**   Doctor, do you remember looking, in all of the documents

3:35PM  4    that you looked at, at a table that included data on follow-up

3:35PM  5    duration?

3:35PM  6    **A.**   In 316.

3:35PM  7    **Q.**   Correct.  Sorry.  Thank you for the clarification.

3:35PM  8    **A.**   Great.

3:35PM  9    **Q.**   Do you remember looking at that patient by patient?

3:35PM  10   **A.**   I did -- I looked at many patients -- pulling out some of

3:35PM  11   the patient -- individual patient stuff here, I looked at some

3:35PM  12   of the patients.  But, again, the clinical study report is some

3:35PM  13   37,000 pages.  And I will represent that I did not look at

3:35PM  14   every single patient.

3:35PM  15   **Q.**   And I'm just saying, did you look at any data anywhere

3:35PM  16   that stratifies the follow-up duration for each one of these

3:35PM  17   29 patients and each one of these 16 patients?

3:35PM  18   **A.**   I did look.  And at one point in time, I had that in my

3:36PM  19   memory, and I'm -- I'm sure, if you have it, you can show it.

3:36PM  20           **MR. STRONGMAN:**  May I approach, Your Honor?

3:36PM  21           **THE COURT:**  Yes, you may.

3:36PM  22   **BY MR. STRONGMAN:**

3:36PM  23   **Q.**   Doctor, I just want you to look, I'm just going to ask you

3:36PM  24   a question.  Take your time and look at that table.

3:36PM  25   **A.**   I am looking at that table.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:36PM  1    Q.   And does this refresh your recollection as to how many of

3:36PM  2    these 29 patients that you said had permanent alopecia were

3:36PM  3    actually not even evaluated longer than six months?

3:36PM  4    A.   No, it does not.  Because the study's represented as a

3:37PM  5    ten-year follow-up.

3:37PM  6    Q.   So that does not refresh your recollection that, in fact,

3:37PM  7    what you told the jury this morning about these people, the 29,

3:37PM  8    being followed up at ten-year mark for hair loss is actually

3:37PM  9    not the case?  That doesn't refresh your recollection as to

3:37PM 10    that?

3:37PM 11    A.   It refreshes my recollection.  I'm very aware of this

3:37PM 12    data, but that 29 off Table 7 is your lock data -- it's the

3:37PM 13    company data that I took that 29 off of, ongoing after the

3:37PM 14    ten-year study.

3:37PM 15         So it's your data, not mine, where I got that 29.  If

3:37PM 16    that's not reliable, then you have a problem.  But it's the

3:37PM 17    company data that I used.  I didn't make up that 29.

3:37PM 18    Q.   Doctor, look at the table in front of you.

3:37PM 19    A.   I am looking at it.

3:37PM 20    Q.   Can you agree with this:  .5 years is six months?  Do you

3:38PM 21    agree with that?

3:38PM 22    A.   Correct.

3:38PM 23    Q.   Do you see on the right, the very right of the chart --

3:38PM 24    A.   I see that.

3:38PM 25    Q.   -- "Follow-up Duration"; correct?

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 3:38PM | 1 | **A.** I'm not sure where I see .5. |
| 3:38PM | 2 | **Q.** I'm just saying do you see "Follow-up Duration"? |
| 3:38PM | 3 | **A.** Correct? |
| 3:38PM | 4 | **Q.** And it's listed as a decimal point. |
| 3:38PM | 5 | Do you see that? |
| 3:38PM | 6 | **A.** I see some are saying 10.04.  Some are saying 2.96.  Some |
| 3:38PM | 7 | are saying 0.14. |
| 3:38PM | 8 | **Q.** So, Doctor, what I'd like you to do is count up, of those |
| 3:38PM | 9 | 29, how many were followed up for a duration of .5 or more in |
| 3:38PM | 10 | the TAC arm and the FAC arm. |
| 3:38PM | 11 | **A.** (Witness complies.) |
| 3:38PM | 12 | I get five -- actually, that's not correct.  Let me |
| 3:39PM | 13 | do it again.  Bear with me. |
| 3:39PM | 14 | One, two, three, four, five, six -- I have about six. |
| 3:39PM | 15 | **Q.** What about -- what about the FAC arm? |
| 3:39PM | 16 | **A.** I haven't looked at that.  I'm happy do that. |
| 3:39PM | 17 | **Q.** How many in the FAC arm? |
| 3:39PM | 18 | **A.** That were greater than .05?  One, two, three -- I see |
| 3:39PM | 19 | three in the FAC arm -- actually, hold on a second.  One, two, |
| 3:40PM | 20 | three, four -- I see four. |
| 3:40PM | 21 | **Q.** Four? |
| 3:40PM | 22 | **A.** Yes. |
| 3:40PM | 23 | **Q.** A couple of very simply math questions, Doctor. |
| 3:40PM | 24 | 29 is different than 6; correct? |
| 3:40PM | 25 | **MR. NOLEN:** Objection, Your Honor.  I think the FAC |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:40PM   1    side is incorrect.  It's actually wrong.

3:40PM   2              THE COURT:  The witness said four.

3:40PM   3              MR. NOLEN:  No, the top number, 19.

3:40PM   4              MR. STRONGMAN:  16.  Sorry.  Thanks.  Getting messy.

3:40PM   5    Thank you.  I had the 9 wrong.

3:41PM   6    BY MR. STRONGMAN:

3:41PM   7    Q.   29 and 16, right.

3:41PM   8              So, Doctor, would you agree with me, simple question,

3:41PM   9    29 is not 6; correct?

3:41PM   10   A.   That, I'll agree with you.

3:41PM   11   Q.   16 is not 4?

3:41PM   12   A.   Correct.

3:41PM   13   Q.   And here's my next question:  Have you done any

3:41PM   14   statistical analysis or have you asked Dr. Madigan to do any

3:41PM   15   statistical analysis using the number six for the TAC arm and

3:41PM   16   the number four for the FAC arm?  Yes or no?

3:41PM   17   A.   No.

3:41PM   18              MR. STRONGMAN:  Your Honor, could I have that -- may

3:41PM   19   I approach, Your Honor?

3:41PM   20              THE COURT:  Yes, you may.

3:41PM   21   BY MR. STRONGMAN:

3:42PM   22   Q.   So the medical literature, I think that was the next

3:42PM   23   category of stuff that you talked about; fair?

3:42PM   24   A.   Yeah.

3:42PM   25   Q.   And, Doctor, you also talked about the Sedlacek study.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:42PM 1          Do you remember that?

3:42PM 2   A.   I remember it well.

3:42PM 3   Q.   Okay.  And when you looked at the Sedlacek study, you

3:42PM 4   said, I think, that there were three groups, A, B, and C; is

3:42PM 5   that correct?

3:42PM 6   A.   I believe so.

3:42PM 7   Q.   Now, in the C group, that's the group that had various

3:43PM 8   patients that received Taxotere; correct?

3:43PM 9   A.   It was doxorubicin plus Taxotere.

3:43PM 10  Q.   Very good.  And you actually noted, in that C group, there

3:43PM 11  was a wide range of regimens that were actually used with

3:43PM 12  Taxotere; correct?

3:43PM 13  A.   That's correct.

3:43PM 14  Q.   Okay.  Are you looking for?

3:43PM 15  A.   I have certain notes that have the exactly --

3:43PM 16  Q.   If you have the notes, you can look at them.

3:43PM 17  A.   Can I look at them?

3:43PM 18  Q.   Yeah, please.  That's fine.

3:43PM 19  A.   Let me see if I can find my -- I have my notes on

3:43PM 20  Dr. Sedlacek.

3:43PM 21  Q.   Now, Dr. Sedlacek -- those are quite a set of notes.

3:43PM 22  A.   Yeah.

3:43PM 23  Q.   My gosh.

3:44PM 24  A.   Thank you for letting me look at them.

3:44PM 25  Q.   So Dr. Sedlacek reported, I think you said, seven

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | |
|---|---|
| 3:44PM | 1 | patients; is that correct? |
| 3:44PM | 2 | A.   7 out of 112 in that group C. |
| 3:44PM | 3 | Q.   Okay.  And when you look at group C, how many different |
| 3:44PM | 4 | regimens involving Taxotere were actually included in that |
| 3:44PM | 5 | group? |
| 3:44PM | 6 | A.   So he had -- let me count them up, one, two, three, four, |
| 3:44PM | 7 | five, six, seven -- I see eight. |
| 3:44PM | 8 | Q.   So you're talking about eight different mixes of |
| 3:44PM | 9 | chemotherapy drugs among those how many patients in that group, |
| 3:44PM | 10 | 100 and some? |
| 3:44PM | 11 | A.   112. |
| 3:44PM | 12 | Q.   Okay.  And so of that 112 patients, there was eight |
| 3:44PM | 13 | different mixes and matches of medications in those patients, |
| 3:44PM | 14 | but each one of those included a Taxotere piece; correct? |
| 3:45PM | 15 | A.   Exactly.  Most of them are Adriamycin and Cytoxan. |
| 3:45PM | 16 | There's some minor difference, but the majority is Adriamycin |
| 3:45PM | 17 | and Cytoxan. |
| 3:45PM | 18 | Q.   So what's interesting about Sedlacek, in fact, is that all |
| 3:45PM | 19 | seven patients in that study actually -- or the seven patients |
| 3:45PM | 20 | you're talking about -- right, you used seven as the number? |
| 3:45PM | 21 | A.   Dr. Sedlacek used seven. |
| 3:45PM | 22 | Q.   Fair enough.  All seven of the patients in that study that |
| 3:45PM | 23 | you are talking about received the exact same regimen; correct? |
| 3:45PM | 24 | A.   They received AC times four every three weeks followed by |
| 3:45PM | 25 | docetaxel every three weeks. |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 3:45PM | 1 | **Q.**   What was the dosage of the T? |
| 3:45PM | 2 | **A.**   It was 100 milligrams per meter squared q3 weeks. |
| 3:45PM | 3 | **Q.**   And what was the dosage of the Adriamycin? |
| 3:46PM | 4 | **A.**   6600. |
| 3:46PM | 5 | **Q.**   So that's 60 for the A? |
| 3:46PM | 6 | **A.**   60 for the A, I'm sorry, milligrams per meter squared. |
| 3:46PM | 7 | **Q.**   And 600 for the C? |
| 3:46PM | 8 | **A.**   That's correct. |
| 3:46PM | 9 | **Q.**   And what we know is that, in the Taxotere label, the |
| 3:46PM | 10 | regimen is TAC; is that correct? |
| 3:46PM | 11 | **A.**   Correct. |
| 3:46PM | 12 | **Q.**   And the dosage is 75 for Taxotere, 50 for Adriamycin, and |
| 3:47PM | 13 | 500 for Cytoxan; correct? |
| 3:47PM | 14 | **A.**   You're not complete. |
| 3:47PM | 15 | **Q.**   And I'll get there. |
| 3:47PM | 16 | Because it depends on how many times you take it; |
| 3:47PM | 17 | right?  I'm going to get there. |
| 3:47PM | 18 | **A.**   Right.  So you've got a cumulative dose. |
| 3:47PM | 19 | **Q.**   Very good.  But you'll agree with me that, in the label, |
| 3:47PM | 20 | it's TAC at these doses every three weeks; correct? |
| 3:47PM | 21 | **A.**   Correct. |
| 3:47PM | 22 | **Q.**   And you do that six times; correct? |
| 3:47PM | 23 | **A.**   Correct. |
| 3:47PM | 24 | **Q.**   And what we know is that, in Dr. Sedlacek's study, every |
| 3:47PM | 25 | single Taxotere patient that took the medication on-label did |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:47PM 1   not get permanent hair loss as defined by Dr. Sedlacek;

3:47PM 2   correct?

3:47PM 3   A.   Only 6.3 percent got -- if I understand your question,

3:47PM 4   6.3 percent of group C got, as he defined, I think, greater

3:48PM 5   than a year of poor hair growth.

3:48PM 6   Q.   I want you to listen to my question carefully.  Okay.

3:48PM 7        So we discussed all seven received this regimen,

3:48PM 8   right, right here?

3:48PM 9   A.   Correct.

3:48PM 10  Q.   That is not the regimen set out in the Taxotere-approved

3:48PM 11  label; correct?

3:48PM 12  A.   It's the regimen.  It's just it's a different dose.

3:48PM 13  Q.   And it's a different sequence; correct?

3:48PM 14  A.   Yes.  I think, as oncologists do.

3:48PM 15  Q.   And I'm not being critical.  It's a specific point.

3:48PM 16        In the label, you get these three medications

3:48PM 17  together at the same time; correct?  Yes or no?

3:48PM 18  A.   Correct.  It can be, yes.

3:48PM 19  Q.   And you get them every three weeks; correct?

3:48PM 20  A.   Correct, per protocol.

3:48PM 21  Q.   Correct.  That's how it's set out in the study that was

3:49PM 22  the basis of the 2004 approval; correct?

3:49PM 23  A.   Sure.

3:49PM 24  Q.   Okay.  And what we know is that there wasn't one single

3:49PM 25  patient in the Sedlacek study that took the T, the A, and the C

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:49PM   1   together every three weeks six times and had what Dr. Sedlacek
3:49PM   2   described as irreversible hair loss; correct?
3:49PM   3   A.   There is a difference there, you're correct.  But it's not
3:49PM   4   a meaningful one for the adverse event.
3:49PM   5   Q.   Every single one was this regimen; correct?
3:49PM   6   A.   No, that's not correct.  There are three groups.  You're
3:49PM   7   missing the point of Sedlacek.  It's not all ACT.  He has other
3:49PM   8   groups that, in essence, control for the AC, and you're not
3:49PM   9   putting that up.
3:50PM  10   Q.   I'm just -- I don't want to get too far in the weeds on
3:50PM  11   this.  I think we actually agree and --
3:50PM  12        THE COURT:  He needs to answer the question.
3:50PM  13   BY MR. STRONGMAN:
3:50PM  14   Q.   Yeah, just answer the question.
3:50PM  15        MR. STRONGMAN:  Can I approach, Your Honor?
3:50PM  16        THE COURT:  Yes, you may.
3:50PM  17   BY MR. STRONGMAN:
3:50PM  18   Q.   What I've handed you is actually the abstract that is what
3:50PM  19   we're calling Sedlacek paper; correct?
3:50PM  20   A.   Correct.
3:50PM  21   Q.   Okay.  And just a couple of things.
3:50PM  22        It's an abstract; right?  That's means it's not a
3:50PM  23   full publication?
3:50PM  24   A.   Correct.
3:50PM  25   Q.   And this was actually a poster presentation that was given

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 3:50PM | 1 | at a conference; correct? |
| 3:50PM | 2 | A.    A San Antonio press conference. |
| 3:50PM | 3 | Q.    And that's a well-attended, well-known conference; |
| 3:51PM | 4 | correct? |
| 3:51PM | 5 | A.    Correct. |
| 3:51PM | 6 | Q.    Okay.  And this was 2006; correct? |
| 3:51PM | 7 | A.    Correct. |
| 3:51PM | 8 | Q.    And what Dr. Sedlacek says is all seven of these women |
| 3:51PM | 9 | with PSA had received AC times 4, 6600 milligrams per meter |
| 3:51PM | 10 | squared every three weeks followed by docetaxel, 100 milligrams |
| 3:51PM | 11 | per meter squared every three weeks; correct? |
| 3:51PM | 12 | A.    Right.  He says a number of things in this.  You're |
| 3:51PM | 13 | reading one sentence. |
| 3:51PM | 14 | Q.    I'm just asking did I read that correct? |
| 3:51PM | 15 | A.    You read that sentence, but there are other sentences. |
| 3:51PM | 16 | Q.    Did I read that sentence correct? |
| 3:51PM | 17 | A.    Yes, sir. |
| 3:51PM | 18 | Q.    And we know that the paper reported on seven patients, |
| 3:51PM | 19 | correct, that actually had what he called permanent hair loss; |
| 3:51PM | 20 | correct? |
| 3:51PM | 21 | A.    The paper reported on over 500 patients. |
| 3:51PM | 22 | Q.    Doctor, I understand what you're saying. |
| 3:51PM | 23 |         He said there are seven patients that had what he |
| 3:52PM | 24 | defines as permanent hair loss; correct? |
| 3:52PM | 25 | A.    In that group, correct. |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:52PM    1    Q.    Correct.  And there were zero in any other group; correct?

3:52PM    2    A.    Zero out of 250, zero out of 126, seven out of 112.

3:52PM    3    Q.    We're talking on the same page now.  We got it.

3:52PM    4          So seven.  And they all were in this very specific

3:52PM    5    regimen?  Yes or no?

3:52PM    6    A.    Correct.

3:52PM    7    Q.    Okay.  And Dr. Sedlacek's presentation was given at, you

3:52PM    8    said, San Antonio breast conference -- is that what it's

3:52PM    9    called?

3:52PM   10    A.    Symposium.

3:52PM   11    Q.    Symposium.

3:52PM   12          And that's a very well-attended symposium; is that

3:52PM   13    correct?

3:52PM   14    A.    For breast oncologists.

3:52PM   15    Q.    Very good.  It's maybe the most well-regarded symposium

3:52PM   16    for that specialty; correct?

3:52PM   17    A.    The oncologists can testify to that.

3:52PM   18    Q.    Fair enough.  But it certainly was public; correct?

3:53PM   19    A.    Dr. Sedlacek presented it.  I wasn't there.  I have no

3:53PM   20    reason to dispute that.

3:53PM   21    Q.    Now, one other thing we know about abstracts is that

3:53PM   22    they're often turned into manuscripts and put -- and published

3:53PM   23    into the medical literature; correct?

3:53PM   24    A.    Correct.

3:53PM   25    Q.    And we know -- well, Dr. Sedlacek never published a paper

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:53PM  1    on this data; correct?

3:53PM  2    A.   I couldn't find one.

3:53PM  3    Q.   And you know that there are times -- when there's a

3:53PM  4    peer-review process for a paper, it's different than a

3:53PM  5    peer-review process for a poster presentation; correct?

3:53PM  6    A.   Fair.

3:53PM  7    Q.   And you would agree with me that there at least times --

3:53PM  8    we don't know what happened with Dr. Sedlacek.  Fair enough?

3:53PM  9    We don't know what happened with that report or whether he ever

3:53PM  10   wrote up a paper?  We don't know; correct?

3:53PM  11   A.   I haven't seen a paper.

3:53PM  12   Q.   Right.  We certainly know that, in peer-reviewed published

3:54PM  13   literature, Dr. Sedlacek was actually never successful in

3:54PM  14   getting a paper out; correct?

3:54PM  15   A.   I don't know if he tried or not.  I just don't have that

3:54PM  16   information.

3:54PM  17   Q.   But either way you slice it, Dr. Sedlacek's information

3:54PM  18   was presented to the public and open for anybody there or

3:54PM  19   anybody that wanted to know about it; true?

3:54PM  20   A.   If you were there, you heard about it.

3:54PM  21   Q.   I'm almost done, Doctor.

3:54PM  22        You put up with counsel a slide that had the various

3:55PM  23   studies listed.

3:55PM  24        Do you remember this?

3:55PM  25   A.   I do.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:55PM  1  **Q.**   You did not cite Nabholtz in your report, though, did you?

3:55PM  2  **A.**   I believe it's in some footnote or some material

3:55PM  3  somewhere.

3:55PM  4  **Q.**   If I did a control-F, find, and entered "Nabholtz," it

3:55PM  5  wouldn't come up with anybody in your report; correct?

3:55PM  6  **A.**   Just check the exhibit list too.  Maybe it's one the

3:55PM  7  exhibits.  I'd have to go back and check.

3:55PM  8  **Q.**   And you know that the Nabholtz paper was published in the

3:55PM  9  peer-reviewed literature; correct?

3:55PM  10  **A.**   Correct.

3:55PM  11  **Q.**   And you know that was a study that Sanofi actually

3:55PM  12  sponsored and -- having putting out there in the public sphere;

3:55PM  13  correct?

3:55PM  14  **A.**   When you publish a paper, that's correct.

3:55PM  15  **Q.**   And we know that all of the papers that you referenced are

3:55PM  16  public; correct?

3:55PM  17  **A.**   You can find them.  If you have access to them and you can

3:55PM  18  afford them, yes.

3:56PM  19  **Q.**   And we also know that doctors have many sources of

3:56PM  20  information when they practice medicine; correct?

3:56PM  21  **A.**   Correct.

3:56PM  22  **Q.**   And that includes what's in the literature; correct?

3:56PM  23  **A.**   Can be, if they're looking at the literature, yes.

3:56PM  24  **Q.**   And it can also include their own personal clinical

3:56PM  25  experience; correct?

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 3:56PM | 1 | **A.**   On adverse events?  Is that what you're saying? |
| 3:56PM | 2 | **Q.**   I'm saying every single time that a doctor treats a |
| 3:56PM | 3 | patient, that doctor brings with them the experience of what |
| 3:56PM | 4 | has happened in their practice before; correct? |
| 3:56PM | 5 | **A.**   Sure.  That's a truism.  But we don't rely on that for |
| 3:56PM | 6 | safety information.  I'm just not sure I understand. |
| 3:56PM | 7 | **Q.**   I'm just saying that when a doctor -- you're a doctor; |
| 3:56PM | 8 | correct? |
| 3:56PM | 9 | **A.**   Correct. |
| 3:56PM | 10 | **Q.**   Right.  You've treated patients? |
| 3:56PM | 11 | **A.**   Sure. |
| 3:56PM | 12 | **Q.**   And when you are standing face to face with a patient, one |
| 3:56PM | 13 | of the things that goes through your mind is all the experience |
| 3:56PM | 14 | that you've had before in your medical career; correct? |
| 3:57PM | 15 | **A.**   Sure. |
| 3:57PM | 16 | **Q.**   Okay.  Now, one of the other articles that you cited was |
| 3:57PM | 17 | the Tallon article that's on this chart; correct? |
| 3:57PM | 18 | **A.**   Sure.  I wanted it for completeness sake, yes. |
| 3:57PM | 19 | **Q.**   And in Tallon -- this is an article that you put up with |
| 3:57PM | 20 | counsel -- it states, "Permanent CIA" -- and that's how this |
| 3:57PM | 21 | article defines chemotherapy-induced alopecia; is that correct? |
| 3:57PM | 22 | **A.**   Yes. |
| 3:57PM | 23 | **Q.**   And feel free.  Why don't you get your -- |
| 3:57PM | 24 | **A.**   I brought a copy. |
| 3:57PM | 25 | **Q.**   Let me know when you're there. |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:57PM  1   **A.**   I have it.  Permanent chemotherapy-induced alopecia.  It's

3:57PM  2   a case report, correct.

3:57PM  3   **Q.**   And so what we know from the Tallon article that you put

3:57PM  4   up there, it states, "Permanent CIA has been described

3:58PM  5   following the use of busulfan, cyclophosphamide, thiotepa,

3:58PM  6   melphalan, etoposide -- did I pronounce that correctly?

3:58PM  7   **A.**   Yes.

3:58PM  8   **Q.**   -- carboplatin, docetaxel -- that's Taxotere; correct? --

3:58PM  9   and paclitaxel; correct?

3:58PM  10  **A.**   Correct.

3:58PM  11  **Q.**   And paclitaxel is Taxol; correct?

3:58PM  12  **A.**   Correct.

3:58PM  13  **Q.**   Now, counsel didn't read that paragraph out of Tallon to

3:58PM  14  you, did he?

3:58PM  15          **MR. NOLEN:**  Objection, Your Honor.  May we approach?

3:58PM  16          (WHEREUPON, the following proceedings were held at

3:58PM  17  the bench.)

3:58PM  18          **MR. NOLEN:**  Mr. Strongman has introduced a pile of

3:59PM  19  different drugs that aren't at issue, that she never took, that

3:59PM  20  are included in the studies.  And there are other drugs

3:59PM  21  included in the studies, but he's didn't ask to do that.

3:59PM  22          And what the next thing that's going to come is

3:59PM  23  is that all of those had some report of permanent hair loss,

3:59PM  24  I'm sure.

3:59PM  25          But the point of it is that Your Honor ruled

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:59PM   1   that drugs that Ms. Earnest did not take, was not exposed to

3:59PM   2   was not relevant.  Whether or not they caused permanent hair

3:59PM   3   loss or not makes no difference because we can't delve into

3:59PM   4   every one of those and unravel that, in terms of labeling,

3:59PM   5   whether they had the same data -- the same level of data that

3:59PM   6   Sanofi has that would warrant a label change.  We can't get

3:59PM   7   into all of that.  And so that's a violation of the Court's

4:00PM   8   ruling on that issue.

4:00PM   9        MR. STRONGMAN:  I was just reading the sentence that

4:00PM  10   says there's -- and several of those are ones she took

4:00PM  11   and/or -- or proposed to take.  I'm not going any further than

4:00PM  12   I read the sentence and I'm done.

4:00PM  13             And I would just say, in opening, counsel for

4:00PM  14   the plaintiff said, "Unlike other chemotherapies, Taxotere has

4:00PM  15   a risk of permanent hair loss."  I'm done.  I'm moving on.

4:00PM  16   I've read the line, and that's it.

4:00PM  17        MR. MICELI:  You ruled what happened, why in the

4:00PM  18   office with Dr. --

4:00PM  19        THE COURT:  Okay.  There's a question that I ruled on

4:00PM  20   a motion in limine, and all of these other chemotherapy drugs

4:00PM  21   would not be -- but because -- because Ms. Earnest was not

4:00PM  22   exposed to those drugs.  On the other hand, the problem you got

4:00PM  23   is you introduced -- you were the one that relied -- he was the

4:01PM  24   one that relied on this -- on this article.

4:01PM  25             Now, what I heard, and have heard, and

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

4:01PM  1  anticipate I will hear is that Ms. Earnest should have taken

4:01PM  2  Taxol.

4:01PM  3          MR. MICELI:  That's not what you'll only hear.

4:01PM  4          THE COURT:  I understand.  But I think it's

4:01PM  5  absolutely pertinent that there is this other study that your

4:01PM  6  expert relied on that said we have reports of

4:01PM  7  chemotherapy-induced alopecia associated with Taxol.

4:01PM  8          And I don't think Adriamycin was on the list,

4:01PM  9  but the other --

4:01PM  10          MR. STRONGMAN:  Cytoxan.

4:01PM  11          THE COURT:  -- Cytoxan was listed.

4:01PM  12          MR. MICELI:  I think what we're concerned about is

4:01PM  13  the thiotepa, busulfan, carboplatin, which were never part of

4:01PM  14  the discussion with -- between Dr. Carinder and Ms. Earnest,

4:01PM  15  and that's what Your Honor ruled on on plaintiff's motion in

4:02PM  16  limine No. 9, that that was not going to be coming in.

4:02PM  17          And the problem is that we've been having a lot

4:02PM  18  of conferences up here with you.  And I apologize for that.

4:02PM  19  But they bit off a lot in the opening.  Then they bit off some

4:02PM  20  more.  And the cookie is going to be gone because they nibble

4:02PM  21  around and they keep violating these MILs.  And by the end,

4:02PM  22  they have a full belly of what they want.  And what we then

4:02PM  23  have is there's nothing left in these MILs.

4:02PM  24          MR. STRONGMAN:  Your Honor, I'm happy to rephrase the

4:02PM  25  question and only focus on those two.  But in the opening

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

4:02PM  1  statement, the plaintiff's slide said, "Unlike other
4:02PM  2  chemotherapies."  And I'm not going to go into those other
4:02PM  3  drugs.  I just simply read --
4:02PM  4          THE COURT:  This is what I'm going to do.
4:02PM  5          MR. STRONGMAN:  Fair enough.
4:02PM  6          THE COURT:  I'm going to tell the jury that they
4:02PM  7  should disregard that last question.  Why don't you rephrase
4:02PM  8  the question to those drugs that are pertinent to this issue.
4:02PM  9          But let me tell you something, you know, what I
4:02PM 10  understand is Dr. Carinder's deposition was the only option he
4:03PM 11  had was Taxol.  I don't know if any of that's in his -- because
4:03PM 12  as I appreciate it now, there's a different story about what
4:03PM 13  Dr. Carinder is going to say was in his toolbox.
4:03PM 14          MR. MICELI:  Well, I think that when Dr. Carinder's
4:03PM 15  deposition was taken, what he said was in his toolbox is Taxol
4:03PM 16  and FEC, and FUC, and that's what we discussed with the Court
4:03PM 17  during the motions in limine.
4:03PM 18          THE COURT:  I understand that, Mr. Miceli.  But let
4:03PM 19  me back this train up because I was in the conferences with
4:03PM 20  counsel regarding slides associated with opening statements.
4:03PM 21  And it's like, well, now, there's six things he could
4:03PM 22  recommend.  Before it was just two or three.
4:03PM 23          So, you know, I don't want them to be limited.
4:03PM 24  If there -- if there is -- and you're going to tell me right
4:03PM 25  now if there's something else on that laundry list that

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1   Mr. Strongman just went through that is going to be in

2   Dr. Carinder's toolbox.

3           MR. MICELI:  It's not going to be.  Particularly,

4   Your Honor, what Mr. Strongman has brought up were medicines

5   for bone marrow transplant preconditioning.

6           THE COURT:  Listen, we're going to fix it because

7   it -- I don't know if those are chemotherapy drugs.  I don't

8   know that.

9           But if this is related to bone marrow

10  transplants, it's not related and it would be totally

11  confusing.  I'm going to tell the jury they should disregard

12  that last question, and you rephrase it.  Just say --

13          MR. STRONGMAN:  Just the two.

14          THE COURT:   -- to include -- and use the drugs

15  associated as well as any drug that was in Dr. Carinder's

16  toolbox.

17          MR. MICELI:  For early-stage breast cancer.  And

18  that's all that was highlighted in the agreement in our slides.

19          THE COURT:  Fair enough.  Fair enough.

20          MR. STRONGMAN:  While we're up here, Rand --

21          THE COURT:  Yes.

22          MR. STRONGMAN:  One thing that we had talked about

23  was the 2004, and I wanted to -- I'm not interested in causing

24  a huge thing about that, a brouhaha about that.  But I guess I

25  feel like I have to ask the Court's guidance on whether I can

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

4:05PM  1   ask about the FDA's strikeout of that language in the 2004

4:05PM  2   proposal or not.

4:05PM  3           THE COURT:  I think this is something that we're

4:05PM  4   going to have to have a more robust discussion that's going to

4:05PM  5   take more time than we have here.  So we're going to do this

4:05PM  6   after court today.

4:05PM  7               Unfortunately, I know Dr. Kessler is going to be

4:05PM  8   gone.

4:05PM  9           MR. STRONGMAN:  Right.

4:05PM  10          THE COURT:  But --

4:05PM  11          MR. MICELI:  There are other issues we'll need to

4:05PM  12  take up at that time, and I don't think we can waste the time

4:05PM  13  with the jury sitting here.

4:05PM  14          MR. STRONGMAN:  I'm just saying that I think -- you

4:05PM  15  understand that I think it's relevant.  I think Dr. Kessler is

4:05PM  16  the witness for me to cross-examine on it.  And if Your Honor

4:05PM  17  tells me I cannot, I won't.

4:05PM  18          THE COURT:  Then let's not.  But we will talk about.

4:05PM  19          MR. STRONGMAN:  Thank you.  Thank you.

4:06PM  20          (WHEREUPON, the following proceedings were held in

4:06PM  21  open court.)

4:06PM  22          THE COURT:  Members of the jury, you should disregard

4:06PM  23  that last question.

4:06PM  24              I'm now going to ask Mr. Strongman to rephrase

4:06PM  25  the question.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 4:06PM | 1 | **BY MR. STRONGMAN:** |
| 4:06PM | 2 | **Q.**   Doctor, do you have Tallon in front of you? |
| 4:06PM | 3 | **A.**   I do, sir. |
| 4:06PM | 4 | **Q.**   All right.  Let's ask the question this way. |
| 4:06PM | 5 | Permanent CIA has been described following |
| 4:06PM | 6 | cyclophosphamide; correct? |
| 4:06PM | 7 | **A.**   If just give me the exact page that we're on and the |
| 4:06PM | 8 | column. |
| 4:06PM | 9 | **Q.**   334 on the right. |
| 4:07PM | 10 | **A.**   No, I have -- mine is numbered 234.  I'll find it, sir.  I |
| 4:07PM | 11 | have must have a different version. |
| 4:07PM | 12 | **Q.**   And I'm under the discussion. |
| 4:07PM | 13 | **A.**   Yes, I'm there.  Which paragraph, sir? |
| 4:07PM | 14 | **Q.**   Okay.  If we keep going on the discussion, there's a |
| 4:07PM | 15 | paragraph that starts, "Permanent CIA has been described." |
| 4:07PM | 16 | Are you with me? |
| 4:07PM | 17 | **A.**   I'm right there with you. |
| 4:07PM | 18 | **Q.**   Okay.  And in Tallon -- this is an article that you |
| 4:07PM | 19 | discussed with Mr. Nolen; correct? |
| 4:07PM | 20 | **A.**   Correct.  It was on the list. |
| 4:07PM | 21 | **Q.**   Okay.  And in this article, Tallon, it states that |
| 4:07PM | 22 | permanent CIA has been described following cyclophosphamide; |
| 4:07PM | 23 | correct? |
| 4:07PM | 24 | **A.**   Correct. |
| 4:07PM | 25 | **Q.**   And it also states that permanent CIA -- |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 4:07PM | 1 | **A.**   Sorry.  Just say that question again. |
| 4:07PM | 2 | **Q.**   Sure.  Permanent CIA has been described following the use |
| 4:07PM | 3 | of cyclophosphamide; correct? |
| 4:07PM | 4 | **A.**   I'm reading the paragraph, "Permanent CIA defined is an |
| 4:07PM | 5 | absence." |
| 4:07PM | 6 | Am I in the wrong paragraph? |
| 4:07PM | 7 | **MR. STRONGMAN:**  May I approach with him really quick? |
| 4:08PM | 8 | **THE WITNESS:**  I'm two paragraphs up from you, sir.  I |
| 4:08PM | 9 | apologize. |
| 4:08PM | 10 | **BY MR. STRONGMAN:** |
| 4:08PM | 11 | **Q.**   Do you see it? |
| 4:08PM | 12 | **A.**   Now I do. |
| 4:08PM | 13 | **Q.**   Very good.  So with me? |
| 4:08PM | 14 | **A.**   Yes, sir. |
| 4:08PM | 15 | **Q.**   So in Tallon, it states, "Permanent CIA has been described |
| 4:08PM | 16 | following the use of cyclophosphamide."  Correct? |
| 4:08PM | 17 | **A.**   That's what that says. |
| 4:08PM | 18 | **Q.**   And cyclophosphamide is also known as Cytoxan; correct? |
| 4:08PM | 19 | **A.**   Correct. |
| 4:08PM | 20 | **Q.**   Okay.  And Tallon also states that permanent CIA has been |
| 4:08PM | 21 | described following the use of paclitaxel; correct? |
| 4:08PM | 22 | **A.**   That's what that sentence says. |
| 4:08PM | 23 | **Q.**   Very good.  And paclitaxel is the chemical name for Taxol; |
| 4:08PM | 24 | correct? |
| 4:08PM | 25 | **A.**   Correct.  That's what that one sentence says. |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 4:08PM | 1 | **Q.**   Fair enough.  Fair enough. |
| 4:08PM | 2 | And I have one last set of questions for you, and I'm |
| 4:08PM | 3 | done, Doctor. |
| 4:09PM | 4 | Doctor, had you mentioned earlier that you had |
| 4:09PM | 5 | actually used Adriamycin in your practice; correct? |
| 4:09PM | 6 | **A.**   I did. |
| 4:09PM | 7 | **Q.**   And when you prescribe Adriamycin, you knew it could cause |
| 4:09PM | 8 | hair loss; correct? |
| 4:09PM | 9 | **A.**   Reversible hair loss. |
| 4:09PM | 10 | **Q.**   Well, Doctor, you knew your Adriamycin that you prescribed |
| 4:09PM | 11 | could cause alopecia; correct? |
| 4:09PM | 12 | **A.**   Reversible hair loss. |
| 4:09PM | 13 | **THE COURT:**  I think you need to answer the question. |
| 4:09PM | 14 | **BY MR. STRONGMAN:** |
| 4:09PM | 15 | **Q.**   Answer my question, please. |
| 4:09PM | 16 | Yes or no?  You knew Adriamycin could cause alopecia |
| 4:09PM | 17 | when you prescribed it to your patients; correct? |
| 4:09PM | 18 | **THE COURT:**  You knew it could cause alopecia? |
| 4:09PM | 19 | **THE WITNESS:**  It could make hair fall out.  That's |
| 4:09PM | 20 | part of what I knew. |
| 4:09PM | 21 | **BY MR. STRONGMAN** |
| 4:09PM | 22 | **Q.**   And when you counseled your patients, you did not promise |
| 4:09PM | 23 | your patients that their hair would come back, did you? |
| 4:10PM | 24 | **A.**   I didn't promise one way or the other, because I don't |
| 4:10PM | 25 | make promises.  When I'm confronted with a child with Wildens |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

4:10PM 1  tumor, all right, I wasn't making promises.

4:10PM 2  **Q.**   And we can agree that, when you deal with chemotherapy,

4:10PM 3  there are no guarantees; correct?

4:10PM 4  **A.**   Well, I don't think -- I don't think it's that -- I can't

4:10PM 5  promise you the efficacy and whether you'll respond, but I

4:10PM 6  don't think it's quite as -- as maybe making it where -- there

4:10PM 7  are very good therapies.

4:10PM 8  **Q.**   No.  What I'm just saying is that, when you're dealing

4:10PM 9  with a condition like cancer and you're dealing with

4:11PM 10  chemotherapies, there are no guarantees you could make any

4:11PM 11  patient about an outcome; correct?

4:11PM 12  **A.**   I think that's correct, but we all were under the

4:11PM 13  assumption that it grew back -- that hair grew back.  That was

4:11PM 14  the way we practiced medicine.

4:11PM 15  **Q.**   Doctor, there are no guarantees for survival; correct?

4:11PM 16  Yes or no?

4:11PM 17  **A.**   No guarantees for survival in life.  That's why I'm a

4:11PM 18  doctor.  You do your best.  That's why you try to make sure the

4:11PM 19  patients have information.

4:11PM 20  **Q.**   But there are no guarantees; correct?  Yes or no?

4:11PM 21  **A.**   No guarantees.

4:11PM 22  **Q.**   This isn't hard.

4:11PM 23  **A.**   But there are choices, and there is information the

4:11PM 24  patient should have.

4:11PM 25  **Q.**   Dr. Kessler, this is not a difficult question.

OFFICIAL TRANSCRIPT

505

DAVID KESSLER - CROSS

4:11PM 1          Yes or no?  When you're treating cancer, which you've
4:12PM 2 done, there are no guarantees for how a patient will respond or
4:12PM 3 what their outcome will be?  Yes or no?
4:12PM 4 A.   On efficacy, I think --
4:12PM 5 Q.   On anything.
4:12PM 6 A.   Well, that's not true.  We've advanced our science and our
4:12PM 7 medicine.  There are tumors today that I can sit and tell
4:12PM 8 people what to expect.
4:12PM 9          Maybe "guarantee" is not a word that I would use in
4:12PM 10 my vocabulary when it comes to medicine.  But there are real
4:12PM 11 advances and good outcomes that can be assured in certain types
4:12PM 12 of cancers.  I just don't like the word "guarantees."
4:12PM 13 Q.   How about this?  Because these are your words.  You don't
4:12PM 14 make promises; correct?  Those are your words.
4:12PM 15 A.   I know these are my words.  But I'll tell you, there's one
4:13PM 16 nine-year-old that I'm thinking about --
4:13PM 17 Q.   Doctor, if you could maker answer my question.
4:13PM 18 A.   -- who I made a promise to.  So sometimes I do make a
4:13PM 19 promise.
4:13PM 20 Q.   Doctor, this is not that hard of a question.  I just want
4:13PM 21 a yes-or-no answer.
4:13PM 22          When you deal with cancer and you deal with
4:13PM 23 chemotherapy, you can't make promises; correct?  Yes or no?
4:13PM 24 A.   You can make informed judgments and statements.
4:13PM 25          MR. STRONGMAN:  I don't have any other questions.

OFFICIAL TRANSCRIPT

DAVID KESSLER - REDIRECT

| | | |
|---|---|---|
| 4:14PM | 1 | **THE COURT:** Mr. Nolen? |
| 4:14PM | 2 | Mr. Strongman, I know you're getting all your |
| 4:14PM | 3 | things. If we can get somebody to come get that. Thank you. |
| 4:14PM | 4 | **REDIRECT EXAMINATION** |
| 4:14PM | 5 | BY MR. NOLEN: |
| 4:14PM | 6 | **Q.** Hi again, Dr. Kessler. How are you? |
| 4:14PM | 7 | **A.** Just chipper. |
| 4:14PM | 8 | **Q.** Okay. Doctor, on July 5th, 2007, did J. Michael Bishop, |
| 4:14PM | 9 | Chancellor of the University of the California, San Francisco, |
| 4:14PM | 10 | send a letter of apology to you? |
| 4:14PM | 11 | **A.** He did. |
| 4:14PM | 12 | **Q.** And was that in regard to these financial issues that had |
| 4:15PM | 13 | come up that you reported? |
| 4:15PM | 14 | **A.** That's correct. |
| 4:15PM | 15 | **Q.** And did you then return as a full professor to the |
| 4:15PM | 16 | University of California San Francisco? |
| 4:15PM | 17 | **A.** Yes, that's correct. |
| 4:15PM | 18 | **Q.** Now, a moment ago, we saw Defendants' 317, and it was |
| 4:15PM | 19 | admitted into evidence. |
| 4:15PM | 20 | I'll show the Court and the jury Defendants' |
| 4:15PM | 21 | Exhibit 317. |
| 4:15PM | 22 | Do you see that? |
| 4:15PM | 23 | **A.** I do. |
| 4:15PM | 24 | **Q.** And for your orientation, this is a document -- I think |
| 4:15PM | 25 | you may still have it up there -- that has do with a 2004 |

OFFICIAL TRANSCRIPT

DAVID KESSLER - REDIRECT

4:15PM | 1   approval for an indication for Taxotere; is that right?

4:16PM | 2   **A.**   Correct.  By Dr. Pazdur through the company.

4:16PM | 3   **Q.**   And included was a warning, as of 2004, regarding hair

4:16PM | 4   loss.

4:16PM | 5        Do you see that?  It's on page 2.

4:16PM | 6   **A.**   Correct.

4:16PM | 7   **Q.**   And it says, "Loss of hair occurs in most patients taking

4:16PM | 8   Taxotere, including the hair on your head, underarm hair, pubic

4:16PM | 9   hair, eyebrows, and eyelashes.  Hair loss will begin after the

4:16PM | 10  first few treatments and varies from patient to patient.  Once

4:16PM | 11  you have completed all your treatments, hair generally grows

4:16PM | 12  back."

4:16PM | 13       Do you see that?

4:16PM | 14  **A.**   I do.

4:16PM | 15  **Q.**   Now, Doctor, does that warn of permanent hair loss?

4:16PM | 16  **A.**   No.

4:16PM | 17  **Q.**   In the 2004 label, was there a warning regarding permanent

4:17PM | 18  hair loss?

4:17PM | 19  **A.**   No.

4:17PM | 20       **THE COURT:**  I think Mr. Nolen, you better -- we might

4:17PM | 21  need to approach.

4:17PM | 22       **MR. NOLEN:**  You want to see me, Your Honor?

4:17PM | 23       (WHEREUPON, the following proceedings were held at

4:17PM | 24  the bench.)

4:17PM | 25       **THE COURT:**  Was this the approval that resulted -- is

OFFICIAL TRANSCRIPT

DAVID KESSLER - REDIRECT

4:17PM   1   this the same approval with FDA scratched redlines?

4:17PM   2         MR. NOLEN:  It doesn't have a redline.

4:17PM   3         THE COURT:  No, no.  Maybe -- maybe I'm --

4:17PM   4         MR. NOLEN:  Your Honor, this is --

4:17PM   5         THE COURT:  I understand this is a 2004 approval.  I

4:17PM   6   thought that was the one that you -- no, that was a different

4:17PM   7   one.  I'm sorry.  I'm sorry.

4:17PM   8         MR. NOLEN:  Okay.  Thank you.

4:17PM   9         THE COURT:  This is my time.

4:17PM   10        (WHEREUPON, the following proceedings were held in

4:17PM   11   open court.)

4:18PM   12        THE COURT:  Please proceed.  I apologize.

4:18PM   13   BY MR. NOLEN:

4:18PM   14   Q.   All right.  So we're clear, Doctor, from 1996, when

4:18PM   15   Taxotere came on the market, through the time Ms. Earnest was

4:18PM   16   administered the drug, was there any warning regarding

4:18PM   17   permanent hair loss?

4:18PM   18   A.   There was not.

4:18PM   19   Q.   Now, earlier we talked about Plaintiff's Exhibit 396,

4:18PM   20   which was the label.  You can see it right here.  It's already

4:18PM   21   been admitted into evidence, and this is the Taxotere label.

4:19PM   22   And we've highlighted May of 2010.

4:19PM   23        Do you see that?

4:19PM   24   A.   Yes.

4:19PM   25   Q.   And you were asked about this by Mr. Strongman.  And,

OFFICIAL TRANSCRIPT

DAVID KESSLER - REDIRECT

| | | |
|---|---|---|
| 4:19PM | 1 | specifically, you all talked about indications that it was |
| 4:19PM | 2 | approved for -- that Taxotere was approved for.  And he went |
| 4:19PM | 3 | through a number of them.  I don't think he put up the label, |
| 4:19PM | 4 | but he said breast cancer, non-small cell lung cancer, prostate |
| 4:19PM | 5 | cancer, gastric -- I can't even pronounce it. |
| 4:19PM | 6 | **A.**   Adenocarcinoma. |
| 4:19PM | 7 | **Q.**   Right.  That's another form of cancer. |
| 4:19PM | 8 | Head and neck cancer; right? |
| 4:19PM | 9 | **A.**   Right. |
| 4:19PM | 10 | **Q.**   So with regard to all of those indications for Taxotere, |
| 4:19PM | 11 | was there any warning about permanent hair loss? |
| 4:19PM | 12 | **A.**   No. |
| 4:19PM | 13 | **Q.**   So throughout this label, this 2010 label, if we look |
| 4:20PM | 14 | through it -- if we look through every section, including the |
| 4:20PM | 15 | sections that relate to other types of cancer, do we see a |
| 4:20PM | 16 | warning about permanent hair loss? |
| 4:20PM | 17 | **A.**   No. |
| 4:20PM | 18 | **Q.**   And you were asked about dosing with this and -- about |
| 4:20PM | 19 | dosage and administration and breast cancer. |
| 4:20PM | 20 | Do you remember that testimony? |
| 4:20PM | 21 | **A.**   I do. |
| 4:20PM | 22 | **Q.**   And if we look at this -- and we didn't highlight this |
| 4:20PM | 23 | earlier, but we'll go ahead and do it now. |
| 4:20PM | 24 | If we look at No. 2 in the label, it talks about |
| 4:20PM | 25 | dosage and administration. |

OFFICIAL TRANSCRIPT

DAVID KESSLER - REDIRECT

4:20PM 1              Do you see that?

4:20PM 2    A.    I do.

4:20PM 3    Q.    And if we look at breast cancer, being No. 1, that's the

4:20PM 4    first thing that comes up here; correct?

4:20PM 5    A.    Correct.

4:20PM 6    Q.    And we look at dosage and administration, and it tells you

4:20PM 7    to go to 2.7.

4:20PM 8    A.    Correct.

4:20PM 9    Q.    And if we flip back there, we see dosage adjustments

4:21PM 10   during treatment.

4:21PM 11            That's 2.7 right there; correct?

4:21PM 12   A.    Correct.

4:21PM 13   Q.    And the very first one is breast cancer.

4:21PM 14            Do you see that, sir?

4:21PM 15   A.    I do.

4:21PM 16   Q.    All right.  And can you read that first line for me.

4:21PM 17   A.    "Patients who are dosed initially at 100 milligrams per

4:21PM 18   meter squared and who experience either febrile neutropenia,

4:21PM 19   neutrophils less than 500 cells per cubic millimeter for more

4:21PM 20   than one week, or severe or cumulative cutaneous reactions

4:21PM 21   during Taxotere therapy should have their dosage adjusted from

4:21PM 22   100 milligrams per meter squared to 75 milligrams per meter

4:21PM 23   squared."

4:21PM 24   Q.    Does this indicate at all what the proper dosing for

4:21PM 25   Taxotere breast cancer is?

OFFICIAL TRANSCRIPT

DAVID KESSLER - REDIRECT

4:22PM 1          **MR. STRONGMAN:**  Objection.  Different indication.

4:22PM 2          **THE COURT:**  Is this the label?

4:22PM 3          **MR. NOLEN:**  Yes.

4:22PM 4          **THE COURT:**  Okay.  We might need to approach.

4:22PM 5          (WHEREUPON, the following proceedings were held at

4:22PM 6     the bench.)

4:22PM 7          **THE COURT:**  You might have to explain that.

4:22PM 8          **MR. STRONGMAN:**  Sure.  Thank you, Your Honor.

4:22PM 9          So when you look at dosage and administration,

4:22PM 10    there's a recommended dosage and administration for adjuvant

4:22PM 11    breast cancer, and that's what we've talked about which is 75,

4:22PM 12    500, 50.  Then there is a dosage for metastatic breast cancer,

4:22PM 13    a different indication, and it's 100.

4:22PM 14         So what Mr. Nolen is reading from is patients

4:22PM 15    who are dosed initially at 100, et cetera.  The implication is

4:23PM 16    that those are patients in the metastatic setting.  So that's

4:23PM 17    the objection.

4:23PM 18         **MR. NOLEN:**  Not what it says.  That's incorrect, Your

4:23PM 19    Honor.  So let me just say that is not what the labeling says.

4:23PM 20         **THE COURT:**  You know what -- what I would be curious

4:23PM 21    to see is what the dosage -- recommended dosage is for

4:23PM 22    metastatic breast cancer and adjuvant breast cancer and if this

4:23PM 23    is --

4:23PM 24         **MR. SCHANKER:**  That's a 2010.  That's not the one

4:23PM 25    he's talking about.

OFFICIAL TRANSCRIPT

DAVID KESSLER - REDIRECT

4:23PM   1          MR. NOLEN:  No, that was the one.

4:23PM   2          MR. STRONGMAN:  May I reach over and point?  Thank

4:23PM   3   you, Your Honor.  So when you look at dosages, the BC adjuvant,

4:24PM   4   it's right there.  And the one right above it, BC locally and

4:24PM   5   advanced metastatic.  So those are the two bullets to look at.

4:24PM   6   And one is 100.

4:24PM   7          THE COURT:  So the recommended dosage for locally,

4:24PM   8   advanced or metastatic is 60 to 100.

4:24PM   9          MR. NOLEN:  Right.

4:24PM  10          THE COURT:  For adjuvant care, it's 75 milligrams.

4:24PM  11   It doesn't say -- no, you know, where are you?

4:24PM  12          MR. NOLEN:  We're back in the actual section, which

4:24PM  13   is 2.7.

4:24PM  14          THE COURT:  Dosage adjustments during treatment.

4:24PM  15          MR. NOLEN:  Yes.

4:24PM  16          THE COURT:  But this is the recommended treatment.

4:24PM  17   And this is treatment for metastatic breast cancer, right here.

4:25PM  18   That's not the recommended dosage for adjuvant treatment.  And

4:25PM  19   so this is talking about if you're giving this at

4:25PM  20   100 milligrams.

4:25PM  21          MR. NOLEN:  Right.

4:25PM  22          THE COURT:  Which would certainly would be related to

4:25PM  23   the metastatic breast cancer.

4:25PM  24          MR. NOLEN:  Yes.  And you'll hear from Dr. Carinder

4:25PM  25   that the physician has an option about how they structure the

OFFICIAL TRANSCRIPT

DAVID KESSLER - REDIRECT

| | | |
|---|---|---|
| 4:25PM | 1 | dosing on cancer treatments, including this one, that |
| 4:25PM | 2 | 100 milligrams -- |
| 4:25PM | 3 | THE COURT:  I think my problem is this:  Then maybe |
| 4:25PM | 4 | Dr. Carinder needs to explain this, but not this witness. |
| 4:25PM | 5 | Because I think it is -- I think what you've |
| 4:25PM | 6 | done is taken apples and oranges, and we mentioned apples and |
| 4:25PM | 7 | oranges and we're just -- and now we've -- and I think this |
| 4:25PM | 8 | needs to be explained in the context what is the dosage that |
| 4:25PM | 9 | was approved for metastatic breast cancer, which is not the |
| 4:25PM | 10 | same dosage as approved in the adjuvant setting. |
| 4:26PM | 11 | MR. NOLEN:  Well, if you'd like, I can ask |
| 4:26PM | 12 | Dr. Kessler that. |
| 4:26PM | 13 | THE COURT:  No, I think you're going to have to. |
| 4:26PM | 14 | Because I think what you've done is he's given an apple and |
| 4:26PM | 15 | you're saying, "Now, look at this orange."  And I'm not going |
| 4:26PM | 16 | to allow that. |
| 4:26PM | 17 | Now, he can say that -- well, I have to see what |
| 4:26PM | 18 | he says.  But what I'm not going to do is allow him to do is to |
| 4:26PM | 19 | say the label says that this is appropriate, because that's not |
| 4:26PM | 20 | the setting that Ms. Earnest -- when he was prescribing for |
| 4:26PM | 21 | Ms. Earnest, she did not have metastatic breast cancer or it |
| 4:26PM | 22 | wasn't advanced.  We're all on the same page. |
| 4:26PM | 23 | MR. STRONGMAN:  Okay. |
| 4:26PM | 24 | MR. NOLEN:  Okay.  I'll ask. |
| 4:26PM | 25 | THE COURT:  So I think you have to back up.  The |

OFFICIAL TRANSCRIPT

DAVID KESSLER - REDIRECT

| | | |
|---|---|---|
| 4:26PM | 1 | objection is sustained.  That's plaintiff. |
| 4:27PM | 2 | (WHEREUPON, the following proceedings were held in |
| 4:27PM | 3 | open court.) |
| 4:27PM | 4 | **THE COURT:**  Please proceed, Mr. Nolen. |
| 4:27PM | 5 | **BY MR. NOLEN:** |
| 4:27PM | 6 | **Q.**   All right.  Dr. Kessler, we were looking at the -- we were |
| 4:27PM | 7 | looking at the labeling.  So I wanted to ask you about dosage |
| 4:27PM | 8 | and administration. |
| 4:27PM | 9 | If we look at the first page, which has the summary |
| 4:27PM | 10 | information, which is where I am.  Do you see that? |
| 4:27PM | 11 | **A.**   I do see it. |
| 4:27PM | 12 | **Q.**   And we go down here, it talks about the administrator in a |
| 4:27PM | 13 | facility equipped to manage possible complications, and then it |
| 4:27PM | 14 | goes down and says, "Administer intravenously over one hour |
| 4:27PM | 15 | every three weeks.  PVC equipment is not recommended." |
| 4:28PM | 16 | And then it says "BC."  Is that breast cancer? |
| 4:28PM | 17 | **A.**   Correct. |
| 4:28PM | 18 | **Q.**   "Locally advanced or metastatic, 60 milligrams/m squared |
| 4:28PM | 19 | to 100 milligrams/m squared.  Single agent." |
| 4:28PM | 20 | Do you see that? |
| 4:28PM | 21 | **A.**   I do see that. |
| 4:28PM | 22 | **Q.**   And directly under that it says "BC adjuvant, |
| 4:28PM | 23 | 75 milligrams/m squared administered one hour after |
| 4:28PM | 24 | doxorubicin," and then it goes on. |
| 4:28PM | 25 | Do you see that? |

OFFICIAL TRANSCRIPT

DAVID KESSLER - REDIRECT

4:28PM  1    **A.**   I do.

4:28PM  2    **Q.**   And it says every three weeks for six cycles; correct?

4:28PM  3    **A.**   Correct.

4:28PM  4    **Q.**   Now, you were telling us, I believe, during

4:28PM  5    cross-examination about the total dose.  Do you recall that?

4:28PM  6    **A.**   Correct.

4:28PM  7    **Q.**   And I don't -- did not understand your testimony in that

4:28PM  8    regard.  Can you tell us what was meant by the total dose?

4:29PM  9    **A.**   When you're looking at chemotherapy and you're concerned

4:29PM  10   about toxicity and the build up of toxicity in the body, one of

4:29PM  11   the things you want to keep track of is not just the dose

4:29PM  12   you're giving at any one point in time, you want to have a

4:29PM  13   running total of how much you're giving.

4:29PM  14          So if you're giving -- sometimes you give a dose over

4:29PM  15   six weeks -- six cycles, let's say, and sometimes you give it

4:29PM  16   over three cycles.  And it looks like that's twice as much, but

4:29PM  17   that would be misleading.  You have to add up the total dose.

4:29PM  18          That's what I was referring to.  To see whether there

4:29PM  19   really is a difference in dose, make sure you look at the

4:29PM  20   cumulative dose of the total number of cycles times the dose as

4:30PM  21   well as the individual dose.  That was the only point I was

4:30PM  22   making.

4:30PM  23   **Q.**   Now, do doctors have to follow these dosing

4:30PM  24   recommendations exactly, or do you have a choice?

4:30PM  25   **A.**   A doctor, in his or her judgment, can make a decision on

OFFICIAL TRANSCRIPT

DAVID KESSLER - REDIRECT

4:30PM  1    the dose certainly taking into -- taking into consideration,

4:30PM  2    you know, what the -- decide what the guidance, what the best

4:30PM  3    practice is at the time.

4:30PM  4            Doctors are allowed to deviate from the label,

4:30PM  5    certainly, when it comes to dose.

4:30PM  6    Q.    All right.  And, Doctor, you were shown in

4:30PM  7    cross-examination a moment ago Defendants' Exhibit D-31, which

4:31PM  8    was the periodic safety update for docetaxel, which is

4:31PM  9    Taxotere; right?

4:31PM  10   A.    Correct.

4:31PM  11   Q.    And this was the document you saw; correct?

4:31PM  12   A.    Correct.

4:31PM  13   Q.    And you were shown this portion.  I actually highlighted

4:31PM  14   it while it was being shown to you.

4:31PM  15           It says "During the reporting period, the active

4:31PM  16   docetaxel clinical trials company-sponsored and unsponsored

4:31PM  17   studies including investigator-sponsored studies, had a

4:31PM  18   cumulative enrollment of approximately 95,083."

4:31PM  19           Do you see that?

4:31PM  20   A.    I see that.

4:31PM  21   Q.    And earlier when I talked with you, I showed you the Cross

4:31PM  22   Cancer Institute document, which was a consent form, informed

4:32PM  23   consent.  Do you recall that?

4:32PM  24   A.    Correct.

4:32PM  25   Q.    And in the informed consent, we saw permanent hair loss.

DAVID KESSLER - REDIRECT

1    Remember?

2              THE COURT:  I think this is outside the scope.

3              MR. STRONGMAN:  I agree.

4              THE COURT:  Outside the scope of cross-examination.

5    BY MR. NOLEN:

6    Q.   Doctor, do you know whether or not these people, that were

7    95,083 patients worldwide, were being given a permanent hair

8    loss warning in these --

9              MR. STRONGMAN:  Same objection.  Outside the scope.

10             THE COURT:  Sustained.  This is outside the scope.

11             MR. NOLEN:  All right.

12   BY MR. NOLEN:

13   Q.   Doctor, do you know what warnings the folks in the

14   clinical trials in this were being given?

15             MR. STRONGMAN:  Objection.

16             MR. NOLEN:  It's his document, Your Honor.

17             THE COURT:  I understand that, but it's outside the

18   scope of cross-examination.  We -- this is outside the scope of

19   cross-examination.

20             You may proceed.

21   BY MR. NOLEN:

22   Q.   Doctor, do we know -- do we know whether or not any of

23   these folks were being given warnings?

24             MR. STRONGMAN:  It's the same question, Your Honor.

25   Same objection.

DAVID KESSLER - REDIRECT

4:33PM  1          THE COURT:  I think that issue was raised in his
4:33PM  2  direct examination.  It was not touched upon in his
4:33PM  3  cross-examination, and we're going to proceed.
4:33PM  4          MR. NOLEN:  All right.
4:33PM  5          THE COURT:  So that's sustained.
4:33PM  6  BY MR. NOLEN:
4:33PM  7  Q.    By 2010, June of 2010 through November of 2010, which is
4:33PM  8  the period for this document, was there a warning of permanent
4:33PM  9  hair loss in the Taxotere label?
4:33PM  10  A.    No.
4:33PM  11  Q.    Now, Doctor, you were shown that number of 296,816, which
4:34PM  12  comes from the Defense Exhibit 31.  And on the flip chart, the
4:34PM  13  numbers --
4:34PM  14          MR. STRONGMAN:  Your Honor, I'd object to this.  This
4:34PM  15  isn't an accurate representation of what he was shown at all.
4:34PM  16          MR. NOLEN:  It comes straight from the document.
4:34PM  17          MR. STRONGMAN:  I'm happy to approach and explain.
4:34PM  18  But, yeah, that's not what I showed.
4:34PM  19          (WHEREUPON, the following proceedings were held at
4:34PM  20  the bench.)
4:34PM  21          MR. STRONGMAN:  What I showed Dr. Kessler was 168
4:34PM  22  reports out of 2 million.  What Mr. Nolen has up there is 160
4:34PM  23  out of what is six-month data.  So he's implying that 160
4:34PM  24  reports as opposed to being over, whatever, 15 years well over
4:34PM  25  six months.  So that's my objection.

OFFICIAL TRANSCRIPT

DAVID KESSLER - REDIRECT

4:35PM  1          THE COURT:  That is what he had.

4:35PM  2          MR. NOLEN:  He said million on his chart.  But he

4:35PM  3  also referenced this number straight out of this document,

4:35PM  4  296,816.

4:35PM  5          THE COURT:  Right, saying that was six months.

4:35PM  6          MR. STRONGMAN:  Six months.

4:35PM  7          THE COURT:  So he did his own extrapolation.

4:35PM  8          MR. NOLEN:  Yes.

4:35PM  9          THE COURT:  Tell me this, Mr. Nolen, but he said

4:35PM  10  that's not an accurate way to do this.  You can ask him, "Why

4:35PM  11  it is not accurate," but you can't re-create the -- do you

4:35PM  12  understand what I'm saying?

4:35PM  13          MR. NOLEN:  I was going to show the smaller number

4:35PM  14  still doesn't get you accurate.  And then extrapolate out to

4:35PM  15  what Jon wrote on the board.

4:35PM  16          MR. STRONGMAN:  I just don't understand what the

4:35PM  17  six-month data versus a number from 15 years.

4:35PM  18          THE COURT:  I think what you need to do is stay

4:35PM  19  within the confines of cross-examination.  This is what he

4:36PM  20  said.  You said that was not inaccurate.  You need to explain

4:36PM  21  how that calculation should have been done.

4:36PM  22              So that -- because I've got to tell you, FYI,

4:36PM  23  I'm going to hold you all tight because I don't think redirect

4:36PM  24  is an opportunity to go back in and redo your direct

4:36PM  25  examination.  You got one shot at that, and then you get to

OFFICIAL TRANSCRIPT

DAVID KESSLER - REDIRECT

4:36PM   1   poke holes in what he did.  And that's all.
4:36PM   2          MR. NOLEN:  Your Honor, while I'm here, I've got a
4:36PM   3   whole team of people who believe that there were multiple doors
4:36PM   4   opened during cross-examination.
4:36PM   5          THE COURT:  That's good.  They can take that up with
4:36PM   6   me later.  But we're not doing this -- I know.  I see them, and
4:36PM   7   they're all looking at me with just incredulous expressions.
4:36PM   8   I'm telling you what you can do with that question.
4:36PM   9          MR. NOLEN:  Your Honor, I've given you no
4:36PM  10   incredulity.
4:37PM  11          THE COURT:  Well, it hasn't been you.
4:37PM  12          MR. NOLEN:  I know.
4:37PM  13          THE COURT:  I see them.
4:37PM  14          (WHEREUPON, the following proceedings were held in
4:37PM  15   open court.)
4:37PM  16          THE COURT:  Please proceed.
4:37PM  17   BY MR. NOLEN:
4:37PM  18   Q.   Dr. Kessler, earlier when you were working through the
4:37PM  19   flip chart with Mr. Strongman, you were being asked about --
4:37PM  20   you were being asked about the nominator and the numerator for
4:37PM  21   the total number of prescriptions for Taxotere.
4:37PM  22          Do you recall that?
4:37PM  23   A.   I do.
4:37PM  24   Q.   And the number of reports that had been received in a
4:37PM  25   division.  Do you recall that?

OFFICIAL TRANSCRIPT

DAVID KESSLER - REDIRECT

4:37PM  1   **A.**   Correct.

4:37PM  2   **Q.**   Did you disagree with that?

4:37PM  3   **A.**   His math was correct, but I disagreed with any methodology

4:37PM  4   or any implications one could derive from that for

4:37PM  5   methodological reasons.

4:37PM  6   **Q.**   So if you would, Doctor, explain where the -- where the

4:37PM  7   discrepancy is on the methodology?

4:38PM  8   **A.**   So if you want a reliable rate, what's the percentage of

4:38PM  9   people who get Taxotere and that have permanent hair loss, you

4:38PM  10  really need to follow in some kind of study that group.

4:38PM  11  Because it's notorious underreporting in voluntary adverse

4:38PM  12  reaction -- when it ends up in the company's adverse reaction

4:38PM  13  database, that's going to be markedly underreported.  It's not

4:38PM  14  capturing it.  It's not mandatory for doctors and physicians or

4:38PM  15  patients to report.

4:38PM  16        So the way you do that is you do something like

4:38PM  17  Dr. Sedlacek did, even with the limitations, you follow 100

4:38PM  18  patients who got Taxotere-based therapies, and then you measure

4:39PM  19  over a defined period, you followed each one.  Then you can get

4:39PM  20  an incidence that you can have some confidence in.

4:39PM  21        You just can't take sales data that's extrapolated.

4:39PM  22  It's just not going to give you the degree of confidence that

4:39PM  23  you would see in a Dr. Sedlacek study or in a clinical trial

4:39PM  24  that's properly conducted.

4:39PM  25  **Q.**   Now, Doctor, we talked about the TAX 316 study on direct,

OFFICIAL TRANSCRIPT

DAVID KESSLER - REDIRECT

| | | |
|---|---|---|
| 4:39PM | 1 | and you were asked about it on cross.  Do you recall that? |
| 4:39PM | 2 | **A.**   I do. |
| 4:39PM | 3 | **Q.**   Before today, had you heard that the TAX 316 study, at |
| 4:39PM | 4 | least as to alopecia, was not a ten-year study? |
| 4:39PM | 5 | **MR. STRONGMAN:**  Objection.  Misstates the question. |
| 4:39PM | 6 | **THE COURT:**  I'm going to allow the question. |
| 4:39PM | 7 | Overruled. |
| 4:39PM | 8 | **THE WITNESS:**  I thought that -- I believe that there |
| 4:39PM | 9 | was a total follow-up for ten years, not of any individual |
| 4:40PM | 10 | patient but it was a ten-year follow-up study. |
| 4:40PM | 11 | BY MR. NOLEN: |
| 4:40PM | 12 | **Q.**   In any of the documentation or data that you have reviewed |
| 4:40PM | 13 | in this case, have you ever seen that TAX 316, the final |
| 4:40PM | 14 | results was withdrawn by Sanofi? |
| 4:40PM | 15 | **A.**   No, the final results were submitted by Sanofi. |
| 4:40PM | 16 | **Q.**   And have been resubmitted; is that correct? |
| 4:40PM | 17 | **A.**   Yes.  In multiple -- I believe that is correct.  There was |
| 4:40PM | 18 | more than one source relied on. |
| 4:40PM | 19 | **Q.**   Different indications, 316 -- |
| 4:40PM | 20 | **A.**   I would have to double-check that.  I don't want to -- I |
| 4:40PM | 21 | want to be sure.  It was certainly -- the final study report |
| 4:40PM | 22 | was certainly submitted as -- in that form that had the 29 and |
| 4:40PM | 23 | the 16. |
| 4:40PM | 24 | **MR. NOLEN:**  Thank you, Doctor. |
| 4:41PM | 25 | **THE COURT:**  Please call your next witness. |

OFFICIAL TRANSCRIPT

4:41PM  1   **THE WITNESS:**  Could I have a minute to --

4:41PM  2   **MR. STRONGMAN:**  Your Honor, may we approach?

4:41PM  3   (WHEREUPON, the following proceedings were held at

4:41PM  4   the bench.)

4:41PM  5   **MS. SASTRE:**  Before we get to the next witness, could

4:41PM  6   we raise an issue with regard to Dr. Kessler before he's

4:41PM  7   excused.  And it could be Mr. Strongman, if the Court would

4:41PM  8   prefer.

4:41PM  9   **THE COURT:**  Uh-huh.  That's fine.  That's fine.

4:41PM  10  **MR. COFFIN:**  I missed the question.

4:41PM  11  **MR. STRONGMAN:**  The issue is we've tiptoed the line

4:41PM  12  on the 2004 label change, and I understand -- or the

4:41PM  13  strike-through.  The strike-through.

4:41PM  14  So we did not get into that after talking with

4:41PM  15  Your Honor.  We believe it would at least be appropriate for

4:41PM  16  Dr. Kessler, outside the presence of jury, at some point to

4:42PM  17  proffer just on what his testimony would be on that.

4:42PM  18  **THE COURT:**  That's fine.

4:42PM  19  **MR. STRONGMAN:**  That's all.

4:42PM  20  **MS. SASTRE:**  Thank you, Your Honor.

4:42PM  21  **MR. COFFIN:**  What do you want to do about --

4:42PM  22  **THE COURT:**  How long -- do you have a video?

4:42PM  23  **MS. MENZIES:**  We have a live witness.  She's 30 to 40

4:42PM  24  minutes with me.

4:42PM  25  **THE COURT:**  Let me tell you, you all are going to run

OFFICIAL TRANSCRIPT

4:42PM   1   out of time.  You all will be out of time limits.

4:42PM   2              MS. MENZIES:  The witness is Ms. Avila, the sales

4:42PM   3   rep.

4:42PM   4              THE COURT:  I understand, but they're going to have

4:42PM   5   time.  Do you want to take her and have her back for cross

4:42PM   6   tomorrow morning?

4:42PM   7              MS. SASTRE:  I think --

4:42PM   8              MR. COFFIN:  It's a quarter to 5:00.  So if we start

4:42PM   9   now, she's going to have to come back tomorrow anyway.

4:42PM   10              THE COURT:  I understand that.  I do.  I'm going to

4:42PM   11   be here for the next month, so it doesn't matter to me.  But

4:43PM   12   you guys wanted time.  You had me tell this jury it was two

4:43PM   13   weeks.

4:43PM   14              MR. COFFIN:  We're going to fit it within our time

4:43PM   15   period.  We're going to do it because you told us to.

4:43PM   16              THE COURT:  All right.

4:43PM   17              MS. SASTRE:  Your Honor, can we make sure Dr. Kessler

4:43PM   18   doesn't leave?

4:43PM   19              (WHEREUPON, the following proceedings were held in

4:43PM   20   open court.)

4:43PM   21              THE COURT:  Dr. Kessler, could I get you to just sit

4:43PM   22   tight, please.  Okay.

4:43PM   23              (WHEREUPON, the following proceedings were held at

4:43PM   24   the bench.)

4:43PM   25              Okay.  I'm going to let him go early.  Okay.

OFFICIAL TRANSCRIPT

1    I'm going to excuse the jury for the day.

2            MS. MENZIES:  The question is, I don't know how long

3    they're going to be with her.  If we could get her done by

4    5:30, I don't know if that's -- I can tell you she would rather

5    go, I just don't know how long.

6            THE COURT:  I understand.  But I was told yesterday

7    that if you're going to take half an hour, they're going to

8    take at least as much time.

9            MS. MENZIES:  Is that for her too?

10           THE COURT:  I wouldn't mind keeping the jury here

11   until 5:20, but if you're pushing 6:00, some of these people

12   are traveling.

13           MS. MENZIES:  I understand.

14           THE COURT:  Including one from Napoleonville.

15           MS. MENZIES:  So we'll have to put her up very first

16   thing.

17           THE COURT:  Okay.

18           MS. MENZIES:  Thank you, Your Honor.

19           (WHEREUPON, the following proceedings were held in

20   open court.)

21           THE COURT:  All right.  Members of the jury, we're

22   going to have to recess just a little bit early again today.

23           So court will be at recess until 8:30 a.m.

24   tomorrow morning.  Let me remind you, you should not discuss

25   this case amongst yourselves or with anyone else.  When you

OFFICIAL TRANSCRIPT

1  arrive tomorrow morning, please go directly to the jury room.

2  I think Aaron's probably going to have coffee for you.

3                  In any event, please leave your tablets on your

4  chairs.  They will not be disturbed and they will be maintained

5  by my staff.

6                  With that, court's at recess until 8:30 tomorrow

7  morning.

8                  MR. MOORE:  Your Honor, before you excuse the jury.

9                  THE COURT:  Wait just a minute.

10                 (WHEREUPON, the following proceedings were held at

11  the bench.)

12                 MR. MOORE:  It was mentioned that the instruction is

13  to instruct the jurors not to do any research about --

14                 THE COURT:  Oh, I told them that.

15                 (WHEREUPON, the following proceedings were held in

16  open court.)

17                 THE COURT:  As you know -- I'm going to admonish you

18  again that there should be no research at all on any topics

19  covered during the course of this trial.  I know I gave that

20  instruction to you when we started.  Please understand that

21  that should be a part of your instruction from the Court and

22  order from the Court during the pendency of this trial.

23                 Thank you.  Court's at recess until 8:30

24  tomorrow morning.

25                 THE DEPUTY CLERK:  All rise.

OFFICIAL TRANSCRIPT

4:45PM 1    (WHEREUPON, the jury exited the courtroom.)

4:46PM 2    THE COURT:  Dr. Kessler, I believe that there is --

4:46PM 3  the Sanofi attorneys wish to make a proffer, and I'm going to

4:46PM 4  allow that at this time.  And I probably need to meet with

4:46PM 5  counsel in my chambers.

4:46PM 6    How long is it going to be?

4:46PM 7    MR. STRONGMAN:  I just really need to walk through

4:46PM 8  three documents with him.

4:46PM 9    THE COURT:  Okay.  That's fine.

4:46PM 10   MR. COFFIN:  Your Honor, before Mr. Strongman starts.

4:46PM 11 Do you want us to put on the record our objection to the strike

4:46PM 12 through again, or do you want to just go forward with it?

4:46PM 13   THE COURT:  I think I already sustained your

4:46PM 14 objection.  I don't know how many times we need to do that.

4:46PM 15   MR. COFFIN:  Thank you, Your Honor.

4:46PM 16   THE COURT:  But, Mr. Strongman -- but I do want to

4:46PM 17 have a conversation about some other things, but I know

4:46PM 18 Mr. Strongman will want to be there.  So I'll go in my office

4:46PM 19 when you all finish.

4:47PM 20   MR. COFFIN:  Your Honor, one more thing we just were

4:47PM 21 talking about.  They're going to proffer this.  Can we proffer

4:47PM 22 some testimony on the submissions that have been made in 2019

4:47PM 23 and the labeling that's -- that currently exists?

4:47PM 24   MR. MICELI:  Since 2011.  They've never changed the

4:47PM 25 29, and then they -- now put before the jury, Mr. Strongman

DAVID KESSLER - EXAMINATION

| | | |
|---|---|---|
| 4:47PM | 1 | handwrote Dr. Kopreski's analysis for the jury.  And that's |
| 4:47PM | 2 | never been put before, never been submitted to the FDA.  And |
| 4:47PM | 3 | they've opened the door throughout Mr. Strongman's |
| 4:47PM | 4 | cross-examination.  We want to make a proffer of our own. |
| 4:47PM | 5 | THE COURT:  You can proffer whatever you want. |
| 4:47PM | 6 | MR. MICELI:  Thank you, Your Honor. |
| 4:47PM | 7 | THE COURT:  I'm not sitting in the courtroom.  I'm |
| 4:47PM | 8 | just -- do what you want, but I'm a little bit at a loss as to |
| 4:48PM | 9 | what your objection is.  But we can talk about that later. |
| 4:48PM | 10 | Make your proffer. |
| 4:48PM | 11 | MR. MICELI:  Thank you. |
| 10:32AM | 12 | PROFFER NO. 1 |
| 4:48PM | 13 | EXAMINATION |
| 4:48PM | 14 | BY MR. STRONGMAN: |
| 4:48PM | 15 | Q.   All right.  Dr. Kessler, we'll be quick.  I'm going to |
| 4:48PM | 16 | hand you Defendants' Exhibit 76.  And Defendants' Exhibit 76 is |
| 4:48PM | 17 | an e-mail from a Michael Rozycki to Ann Staten at the FDA; is |
| 4:48PM | 18 | that correct? |
| 4:48PM | 19 | A.   Correct. |
| 4:48PM | 20 | Q.   And included in the data -- this is June 23rd, 2004; is |
| 4:48PM | 21 | that correct? |
| 4:48PM | 22 | A.   Correct. |
| 4:48PM | 23 | Q.   And included with this e-mail is proposed labeling going |
| 4:49PM | 24 | from Sanofi to the FDA; correct? |
| 4:49PM | 25 | A.   Let me just -- let me just read this.  Proposed change |

OFFICIAL TRANSCRIPT

529

DAVID KESSLER - EXAMINATION

4:49PM  1    in -- proposed change in text.
4:49PM  2    Q.   Yes.  So it's an e-mail from Mr. Rozycki to
4:49PM  3    Commander Staten at the FDA with a proposed label attached;
4:49PM  4    fair?
4:49PM  5    A.   Correct.
4:49PM  6    Q.   Okay.  And if you just could turn with me quick to page 29
4:49PM  7    of the label.  It has a number at the bottom, Sanofi 000355231.
4:49PM  8         Do you see that?
4:49PM  9    A.   Yes, I do.
4:49PM 10    Q.   Okay.  And on this page, there's a section entitled "Other
4:49PM 11    Persistent Reactions."  Do you see that?
4:49PM 12    A.   I see that.
4:49PM 13    Q.   And it states that "The following events were observed to
4:50PM 14    be ongoing in TAC-treated patients at the median follow-up time
4:50PM 15    of 55 months."  And it includes "alopecia (22 out of 687)."
4:50PM 16         Do you see that?
4:50PM 17    A.   I see that.
4:50PM 18    Q.   And then it includes various other adverse persistent
4:50PM 19    reactions as well; is that correct?
4:50PM 20    A.   Correct.
4:50PM 21    Q.   And that's Defense Exhibit 76.
4:50PM 22    A.   I see that.
4:50PM 23    Q.   And I'm going to also hand you Defense 102.  And this is
4:50PM 24    an e-mail back from Ann Staten, if I pronounced that right, on
4:50PM 25    August 11th, 2004.  Is that correct?

OFFICIAL TRANSCRIPT

DAVID KESSLER - EXAMINATION

4:50PM  1    A.    I see that.

4:50PM  2    Q.    And so this is coming from the FDA, Commander Staten at

4:50PM  3    the FDA; correct?

4:50PM  4    A.    Correct.

4:50PM  5    Q.    And in it, there are -- it says, "Here's the FDA draft of

4:51PM  6    the package insert and labeling review comments."

4:51PM  7          Do you see that?

4:51PM  8    A.    Correct.

4:51PM  9    Q.    And then if you'll turn to page 33 of the attached label,

4:51PM  10   Sanofi Number 00548512.  Are you with me?

4:51PM  11   A.    I see that.

4:51PM  12   Q.    Okay.  And the "Other Persistent Reactions" section, do

4:51PM  13   you see it there?

4:51PM  14   A.    I see that.

4:51PM  15   Q.    And you see that it is struck through?

4:51PM  16   A.    I see that.

4:51PM  17   Q.    And you understand how track changes work, that a strike

4:51PM  18   through means it has been proposed to be deleted; is that

4:51PM  19   correct?

4:51PM  20   A.    There are caveats.  For example, you got to understand the

4:51PM  21   context of this.  If you go to the last page, for example, it

4:51PM  22   gives you also information.  So I become very nervous on track

4:52PM  23   changes in black and white.  When I see it initialed, I'm

4:52PM  24   very -- I'm much happier.

4:52PM  25          So the answer is yes, I know how track changes work,

OFFICIAL TRANSCRIPT

531

DAVID KESSLER - EXAMINATION

4:52PM  1    to your question.

4:52PM  2    **Q.**   Very good.

4:52PM  3          And so you can just see a simple question in

4:52PM  4    Exhibit 102, the language was struck in that -- in that

4:52PM  5    document; correct?

4:52PM  6    **A.**   I see -- I see cross-outs in that document.

4:52PM  7    **Q.**   Fair enough.  I'm going to hand you Defendants'

4:52PM  8    Exhibit 272.

4:52PM  9    **A.**   Does yours have the answer in it?

4:53PM  10   **Q.**   So I hand you Defense Exhibit 272, which is a color

4:53PM  11   version of the track changes.  Do you see that it has color in

4:53PM  12   the document?

4:53PM  13   **A.**   I do.

4:53PM  14   **Q.**   Okay.  And if you will flip to page 30.

4:53PM  15   **A.**   Wait a second.  So this is -- just to orient me.  This is

4:53PM  16   the same document you're saying as the prior?

4:53PM  17   **Q.**   Correct.  But it has -- do you know what native format is?

4:53PM  18   **A.**   I do.

4:53PM  19   **Q.**   Yeah.  So that was in native, so you can see the color.

4:53PM  20   And you can see the actual changes and who made them.

4:53PM  21   **A.**   You can see initials next to it.

4:53PM  22   **Q.**   Correct.

4:53PM  23   **A.**   Okay.

4:53PM  24   **Q.**   And if you could turn to page 30 with me.

4:53PM  25   **A.**   Yes.

OFFICIAL TRANSCRIPT

DAVID KESSLER - EXAMINATION

4:53PM  1  **Q.**   And you can see on the right-hand side, there's a bunch

4:53PM  2  of -- you know, there's a red and then the blues.  There's a

4:53PM  3  bunch of different changes there.

4:53PM  4          Do you see those?

4:53PM  5  **A.**   Under "Acute Myeloid Leukemia," is that what we're

4:53PM  6  reading?

4:53PM  7  **Q.**   I am just saying you can see that there's changes.  You

4:53PM  8  see on the right-hand side column.  You know how they kind of

4:53PM  9  show who did what over there?

4:53PM  10  **A.**   Good old Microsoft Word, right.

4:54PM  11  **Q.**   Yes.  So if you could just look with me at the bottom of

4:54PM  12  that right-hand column, there is a "Staten, A., deleted other

4:54PM  13  persistent reactions."  And then it shows the text of what was

4:54PM  14  deleted over there in that right-hand column.  I know it's

4:54PM  15  small, but can you see that?

4:54PM  16  **A.**   I can see that, sir.

4:54PM  17  **Q.**   Okay.  And so what you can tell from Exhibit No. 272 is

4:54PM  18  that who, in fact, deleted the other persistent reactions was

4:54PM  19  Staten, S-T-A-T-E-N-A; correct?

4:54PM  20  **A.**   The document says exactly what the document says.

4:54PM  21  **Q.**   Very good.

4:54PM  22          Doctor, you would agree that if the FDA offered

4:54PM  23  suggestions, it was at least reasonable for Sanofi to entertain

4:54PM  24  them in general?

4:54PM  25  **A.**   Your favorite words, "general."

OFFICIAL TRANSCRIPT

DAVID KESSLER - EXAMINATION

4:54PM  1           No, I don't think that would be a fair representation

4:55PM  2   to -- if FDA did something for formatting, I think, and took

4:55PM  3   out an important -- important information, you would --

4:55PM  4   especially with the last footnote -- the footnote in the last

4:55PM  5   page, that it was done to be consistent with the lung cancer

4:55PM  6   indications, it would not be reasonable to leave that

4:55PM  7   information out and not raise it with the agency.

4:55PM  8   **Q.**   Okay.  And, Doctor, the last couple of questions.

4:55PM  9           So we can agree that Sanofi proposed to the FDA

4:55PM  10  language that included 55-month data on persistent reactions;

4:55PM  11  correct?

4:55PM  12  **A.**   Documents speak for themselves.

4:55PM  13  **Q.**   Very good.  And that based on the documents, there were

4:55PM  14  strikeouts that have Ann Staten's initials next to them;

4:55PM  15  correct?

4:55PM  16  **A.**   The document say what the documents say.

4:55PM  17  **Q.**   Thank you.  I appreciate your time, Doctor.

4:56PM  18           **MR. STRONGMAN:**  Doctor, may I approach and just get

4:56PM  19  those.  Thank you.

4:56PM  20           **MR. NOLEN:**  At this time, the plaintiffs are going to

4:56PM  21  make their own proffer regarding the Kopreski reanalysis.

4:56PM  22           **MR. MICELI:**  It will be a little more limited than

4:56PM  23  that.

4:56PM  24

4:56PM  25

OFFICIAL TRANSCRIPT

DAVID KESSLER - EXAMINATION

<u>**PROFFER NO. 2**</u>

**EXAMINATION**

BY MR. MICELI

**Q.**   Dr. Kessler, David Miceli.  We met before.  And I just have a couple of questions.

You were questioned earlier today, this morning or this afternoon, I think, or perhaps both, about the 2010 label?

**A.**   I was.

**Q.**   And you were asked whether or not that label contained any warning language concerning permanent alopecia, were you?

**A.**   I was.

**Q.**   Okay.  I'm going to show you -- I'm going to have to mark this separately now because this is not an exhibit on the exhibit list, but we can mark it.

Page 24 is where we're going to go.

Dr. Kessler, I've handed you the 2019 -- or can you identify this for me?

**A.**   This is a revised label of June 2019 for Taxotere.

**Q.**   Okay.  Can you turn with me to pages 21 -- or excuse me, 23.  And you see there's a -- actually if you will flip back to page 21 just to identify the section we're in.  We're in the section concerning TAX 316.

And then on 23 --

**A.**   Hold on.  Let me -- I apologize, Counselor.  Just give me one second.

DAVID KESSLER - EXAMINATION

4:57PM  1          Where is the heading?  Just show me the heading.
4:58PM  2   Take me back.
4:58PM  3   Q.   Sure.  There's a table 6 on page 21.
4:58PM  4   A.   I see that.  I assume we are in Section 6; is that
4:58PM  5   correct?
4:58PM  6   Q.   Yes.
4:58PM  7   A.   We're in Section 6 of the label "In the Clinical Trial and
4:58PM  8   the Post-Marketing Surveillance."
4:58PM  9   Q.   Yes.
4:58PM  10          "Clinically Important Treatment-Emergent Adverse
4:58PM  11  Reactions Regardless of Causal Relationship in Patients
4:58PM  12  Receiving Taxotere in Combination with Doxorubicin and
4:58PM  13  Cyclophosphamide (TAX 316)."
4:58PM  14  A.   I see table 6.
4:58PM  15  Q.   Okay.  If you flip through to page 24, the first full
4:58PM  16  paragraph, do you see that just above the "Acute Myeloid
4:58PM  17  Leukemia"?
4:58PM  18  A.   Yes, sir.
4:58PM  19  Q.   Okay.  And the last sentence it says, "Referring to
4:58PM  20  TAX 316, at the end of the follow-up period, actual mean
4:58PM  21  follow-up time of eight years, asthenia was observed to be
4:58PM  22  ongoing in 29 patients" -- excuse me, that's the wrong section.
4:59PM  23  I'm looking at the -- I was right, on 23.
4:59PM  24          The -- at the -- under the "Skin and Subcutaneous
4:59PM  25  Reaction" section, sentence starts "At the end of the follow-up

OFFICIAL TRANSCRIPT

DAVID KESSLER - EXAMINATION

4:59PM   1    period, actual median follow-up time of eight years, alopecia

4:59PM   2    was observed to be ongoing in 29 TAC patients, 3.9 percent, and

4:59PM   3    16 FAC patients, 2.2 percent."

4:59PM   4            Do you see that?

4:59PM   5    A.   Yes.

4:59PM   6    Q.   Now, is there any reason -- if that information was in the

4:59PM   7    possession -- well, let me strike that.

4:59PM   8            Does that address warning language concerning

4:59PM   9    alopecia that persists beyond either -- we can use any time,

4:59PM   10   six months to two years?

4:59PM   11   A.   Could you restate the question.  I apologize.

4:59PM   12   Q.   Sure.  Let me ask it differently.

4:59PM   13           Does the -- does the language on page 23 that we just

4:59PM   14   read together decrease the duration of alopecia, persisting

5:00PM   15   alopecia?

5:00PM   16   A.   It simply says, "At the end of follow-up period."  And the

5:00PM   17   follow-up median was eight years, median follow-up.

5:00PM   18   Q.   Okay.

5:00PM   19   A.   That's the information contained in that sentence.

5:00PM   20   Q.   And you looked at the clinical study report earlier today

5:00PM   21   where the follow-up period was a ten-year follow-up?

5:00PM   22   A.   Overall.

5:00PM   23   Q.   And this says a median follow-up period of eight years;

5:00PM   24   correct?

5:00PM   25   A.   That was a median for -- yes.

OFFICIAL TRANSCRIPT

DAVID KESSLER - EXAMINATION

5:00PM   1   **Q.**   And the clinical study report that you reviewed, do you

5:00PM   2   recall what year it was completed?

5:00PM   3   **A.**   2009.  Don't hold me to it exactly, but I think so.

5:00PM   4   **Q.**   Okay.  Prior to 2011?

5:00PM   5   **A.**   Correct.

5:00PM   6   **Q.**   Do you have an opinion as to whether or not this

5:00PM   7   information should have been included in a label as least -- at

5:00PM   8   least as early as 2010?

5:01PM   9   **A.**   It would make sense to do that.

5:01PM   10          **MR. MICELI:**  Thank you.  Excuse me, Doctor.

5:01PM   11   **BY MR. MICELI:**

5:01PM   12   **Q.**   And, Dr. Kessler, you were just asked momentarily -- a

5:01PM   13   moment ago about some strike-throughs in e-mail in 2004.

5:01PM   14          Do you recall that?

5:01PM   15   **A.**   I do.

5:01PM   16   **Q.**   And is a strike-through of an e-mail the type of action

5:01PM   17   that represents official final action of the FDA?

5:01PM   18   **A.**   It calls for a legal conclusion.

5:01PM   19          I don't mean to be -- official agency action, is that

5:01PM   20   what you're asking me?

5:01PM   21   **Q.**   Well, final determination, is that how you -- the FDA --

5:01PM   22   excuse me.

5:01PM   23          Is that how the FDA communicates its final regulatory

5:01PM   24   decision on a label change?

5:02PM   25   **A.**   Let me see if I can --

OFFICIAL TRANSCRIPT

DAVID KESSLER - EXAMINATION

| | |
|---|---|
| 5:02PM | 1 |
| 5:02PM | 2 |
| 5:02PM | 3 |
| 5:02PM | 4 |
| 5:02PM | 5 |
| 5:02PM | 6 |
| 5:02PM | 7 |
| 5:02PM | 8 |
| 5:02PM | 9 |
| 5:02PM | 10 |
| 5:02PM | 11 |
| 5:02PM | 12 |
| 5:02PM | 13 |
| 5:03PM | 14 |
| 5:03PM | 15 |
| 5:03PM | 16 |
| 5:03PM | 17 |
| 5:03PM | 18 |
| 5:03PM | 19 |
| 5:03PM | 20 |
| 5:04PM | 21 |
| 5:04PM | 22 |
| 5:04PM | 23 |
| 5:04PM | 24 |
| 5:04PM | 25 |

**Q.**   Excuse me.  I withdraw the question.

        Is any -- is the approval of any label, initial approval of a label, approval for all purposes for all times including safety?

**A.**   Of course not.

**Q.**   And are supplemental labels that are approved, does that mean that they are for all purposes, including safety, and for all time going forward?

**A.**   No, of course not.

**Q.**   Okay.

        **MR. MICELI:**  That's all I have.  Thank you.

        **THE WITNESS:**  Am I excused?

        **MR. NOLEN:**  Yes, Dr. Kessler, you are.

        **THE COURT:**  Thank you.

        **THE WITNESS:**  Thank you, Your Honor.

        **THE COURT:**  All right.  Thank you.

        I figured while you were in here, I would clean up my spot, my work space, but I need to talk to counsel.  We can go -- I don't know how many of you that need -- necessarily there needs to be.

        I do want lead counsel, and I'm going to have a conversation with lead counsel.  But part of the problem is we got trial by committee on the plaintiff's side, and that's creating, in my humble opinion, an issue.  Because it's just too much and it's become problematic because I never know --

OFFICIAL TRANSCRIPT

5:04PM 1   I'm not dealing with the person that's taking the witness.

5:04PM 2   It's other people that are coming up.  And it's creating -- I

5:04PM 3   mean, you can do what you want to do, but it's creating a

5:04PM 4   problem.

5:04PM 5           And I feel like I'm saying things and I am

5:05PM 6   issuing -- I have a bench conference and I say something, and

5:05PM 7   everybody else is involving themselves in a ruling that they

5:05PM 8   weren't privy to.  And it's just -- so if there's a way to fix

5:05PM 9   it, I think you all need to do that.

5:05PM 10       **MR. COFFIN:**  We can do that.

5:05PM 11       **THE COURT:**  Okay.  I think that's a really good idea.

5:05PM 12           All right.  I'd like to speak to lead counsel.

5:05PM 13   Let me see where we are.  And we can just do that in my office.

5:06PM 14       (WHEREUPON, the proceedings were concluded.)

5:06PM 15                 \*\*\*\*\*

5:06PM 16              <u>CERTIFICATE</u>

5:06PM 17      I, Jodi Simcox, RMR, FCRR, Official Court Reporter

5:06PM 18   for the United States District Court, Eastern District of

5:06PM 19   Louisiana, do hereby certify that the foregoing is a true and

5:06PM 20   correct transcript, to the best of my ability and

5:06PM 21   understanding, from the record of the proceedings in the

5:06PM 22   above-entitled and numbered matter.

5:06PM 23

5:06PM
5:06PM 24               *s/Jodi Simcox, RMR, FCRR*
5:06PM               Jodi Simcox, RMR, FCRR

25               Official Court Reporter

OFFICIAL TRANSCRIPT