08:48:06  1                    UNITED STATES DISTRICT COURT

       2                    EASTERN DISTRICT OF LOUISIANA

       3

       4

       5    IN RE:   TAXOTERE (DOCETAXEL)
                     PRODUCTS LIABILITY          Docket No.: 16-MD-2740
       6             LITIGATION                  Section "H(5)"
                                                 September 18, 2019
       7                                         New Orleans, Louisiana

       8    *Relates To*:  *Barbara Earnest*,
            *Case No.: 16-CV-17144*
       9

      10    * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

      11

      12                     DAY 3, MORNING SESSION
                     TRANSCRIPT OF JURY TRIAL PROCEEDINGS
      13        HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
                        UNITED STATES DISTRICT JUDGE

      14

      15    APPEARANCES:

      16    For the Plaintiffs:        Barrios, Kingsdorf & Casteix, LLP
                                       BY:  DAWN BARRIOS, ESQ.
      17                               701 Poydras Street
                                       Suite 3650
      18                               New Orleans, Louisiana 70139

      19

      20    For the Plaintiffs:        Gainsburgh, Benjamin, David,
                                         Meunier & Warshauer, LLC
      21                               BY:  PALMER LAMBERT, ESQ.
                                       2800 Energy Centre
      22                               1100 Poydras Street
                                       New Orleans, Louisiana 70163
      23

      24

      25

                            ***OFFICIAL TRANSCRIPT***

1    APPEARANCES:

2    For the Plaintiffs:        David F. Miceli, LLC
                                BY:  DAVID F. MICELI, ESQ.
3                               P. O. Box 2519
                                Carrollton, GA 30112
4

5
     For the Plaintiffs:        Gibbs Law Group, LLP
6                               BY:  KAREN BARTH MENZIES, ESQ.
                                6701 Center Drive West, Suite 1400
7                               Los Angeles, California 90045

8

9    For the Plaintiffs:        Pendley, Baudin & Coffin, LLP
                                BY:  CHRISTOPHER COFFIN, ESQ.
10                              1100 Poydras Street
                                Suite 2505
11                              New Orleans, Louisiana 70163

12

13   For the Plaintiffs:        Bachus & Schanker, LLC
                                BY:  DARIN SCHANKER, ESQ.
14                              BY:  J. KYLE BACHUS, ESQ.
                                1899 Wynkoop Street
15                              Suite 700
                                Denver, Colorado 80202
16

17
     For the Plaintiffs:        Fleming, Nolen & Jez, LLP
18                              BY:  RAND P. NOLEN, ESQ.
                                2800 Post Oak Boulevard
19                              Suite 4000
                                Houston, Texas 77056
20

21
     For the Plaintiffs:        Morgan and Morgan
22                              BY:  EMILY C. JEFFCOTT, ESQ.
                                7010 S. Palafox Street, Suite 95
23                              Pensacola, Florida 32502

24

25

                        *OFFICIAL TRANSCRIPT*

```
 1    APPEARANCES:

 2

 3    For Sanofi-Aventis U.S.,
      LLC and Sanofi US
 4    Services, Inc.:            Irwin Fritchie Urquhart
                                   & Moore, LLC
 5                              BY:  DOUGLAS J. MOORE, ESQ.
                               400 Poydras Street, Suite 2700
 6                              New Orleans, Louisiana 70130

 7

 8    For Sanofi-Aventis U.S.,
      LLC and Sanofi US
 9    Services, Inc.:            Shook Hardy & Bacon, LLP
                                BY:  HARLEY V. RATLIFF, ESQ.
10                              BY:  JON A. STRONGMAN, ESQ.
                               2555 Grand Boulevard
11                              Kansas City, Missouri 64108

12

13    For Sanofi-Aventis U.S.,
      LLC and Sanofi US
14    Services, Inc.:            Shook Hardy & Bacon, LLP
                                BY:  HILDY M. SASTRE, ESQ.
15                              201 Biscayne Boulevard
                               Suite 3200
16                              Miami, Florida 33131

17

18    Official Court Reporter:   Cathy Pepper, CRR, RMR, CCR
                                Certified Realtime Reporter
19                              Registered Merit Reporter
                               500 Poydras Street, Room B-275
20                              New Orleans, Louisiana 70130
                               (504) 589-7779
21                              Cathy_Pepper@laed.uscourts.gov

22    Proceedings recorded By mechanical stenography.  Transcript
      produced by computer-aided transcription.
23

24

25

                        OFFICIAL TRANSCRIPT
```

1
2
3
4
5
6
7
8
9
10
11
12
07:59:30 13
09:12:31 14
15
16
17
18
19
20
21
22
23
24
25

# I N D E X

PAGE

**RUTH AVILA**.......................................... 544

DIRECT EXAMINATION BY MS. MENZIES.................... 545

CROSS-EXAMINATION BY MR. STRONGMAN.................. 585

**DAVID MADIGAN, PH.D**.................................. 618

VOIR DIRE EXAMINATION BY MR. MICELI.................. 618

DIRECT EXAMINATION BY MR. MICELI.................... 630

LUNCHEON RECESS..................................... 665

*OFFICIAL TRANSCRIPT*

08:44:42  1                    **P-R-O-C-E-E-D-I-N-G-S**

09:44:42  2              WEDNESDAY, SEPTEMBER 18, 2019

09:44:42  3              M O R N I N G   S E S S I O N

09:44:42  4                  (COURT CALLED TO ORDER)

09:44:42  5

08:15:54  6

08:37:58  7         THE DEPUTY CLERK:  All rise.

08:37:59  8         THE COURT:  Bring in the jury.

08:38:14  9         (WHEREUPON, at 8:38 a.m. the jury panel enters the

08:38:33 10    courtroom.)

08:38:33 11         THE COURT:  All the jurors are present.  Court is back

08:38:35 12    in session.  You may be seated.

08:38:40 13              Good morning.  Please call -- who is taking

08:38:47 14    Dr. Madigan.

08:38:47 15         MS. MENZIES:  No, our first witness, Your Honor, will

08:38:53 16    be Ruth Avila.

08:38:57 17         THE COURT:  Please bring in Ms. Avila.

08:39:18 18              Right here, ma'am.

08:39:30 19         THE DEPUTY CLERK:  Raise your right hand.

        20         Do you solemnly swear that the testimony which you are

        21    about to give will be the truth, the whole truth and nothing

        22    but the truth, so help you God?

        23         THE WITNESS:  I do.

        24                     **RUTH AVILA**

        25     was called as a witness and, after being first duly sworn by

                          ***OFFICIAL TRANSCRIPT***

1    the Clerk, was examined and testified on her oath as follows:

2         THE DEPUTY CLERK:  Please state and spell your name for

3    the record.

08:39:45  4         THE WITNESS:  Ruth Mora Avila.  R-U-T-H, M-O-R-A,

08:39:50  5    A-V-I-L-A.

08:39:51  6                        DIRECT EXAMINATION

08:39:51  7    BY MS. MENZIES:

08:39:55  8    Q.    Good morning.  Just briefly I'll introduce myself.  My

08:39:59  9    name is Karen Barth Menzies.  I'm one of the attorneys

08:40:03 10    representing Ms. Barbara Earnest.  Good morning, Ms. Avila.

08:40:03 11    A.    Good morning.

08:40:08 12    Q.    Could you please state your full name for the record.

08:40:11 13    A.    Ruth Mora Avila.

08:40:13 14    Q.    Did you formerly work for Sanofi?

08:40:15 15    A.    Yes.

08:40:15 16    Q.    And what were the years you worked for Sanofi?

08:40:18 17    A.    I worked for Sanofi from September 2004 until October

08:40:26 18    2009, five years.

08:40:26 19    Q.    And what was your job?

08:40:30 20    A.    My title was senior sales specialist when I left.

08:40:35 21    Q.    And can you please explain to the jury what a

08:40:39 22    pharmaceutical sales representative is.

08:40:42 23    A.    So, my job was to maximize the sales of my product, which

08:40:50 24    was Taxotere.  And I was to do that in my FDA-approved

08:40:55 25    indications.  We were approved for multiple things, but my main

**OFFICIAL TRANSCRIPT**

08:40:58  1    indication was adjuvant and metastatic breast.

08:41:04  2               And I was to do that through educating, not only the

08:41:07  3    physicians, but the staff that work with them in the clinic.  I

08:41:11  4    was to use my company resources wisely and appropriately.  And

08:41:17  5    I was to use my skills of building and strengthening and

08:41:23  6    maintaining relationships in the clinic to help maximize those

08:41:27  7    sales.

08:41:27  8    Q.    And what were your roles, duties and responsibilities with

08:41:32  9    regard to Sanofi and Taxotere?

08:41:36  10   A.    Well, I guess -- didn't I just say what the job was?

08:41:41  11   Q.    That's fine.  So that job that you described, that was

08:41:44  12   part of your role with Sanofi and particularly --

08:41:48  13   A.    Yes.  I mean, there is a lot of different ways that you do

08:41:50  14   the job.  I'm not sure if that's what you're asking me right

08:41:53  15   now.  That was my job, to sell the drug in my approved

08:41:57  16   indications.

08:41:57  17   Q.    Okay.  Was there an educational aspect to your role?

08:42:01  18   A.    Yeah.  Absolutely.  That's what I said, you know, you have

08:42:03  19   to educate the physicians on the product in order to sell it.

08:42:08  20   And also how do they manage the side effects of the drugs.  My

08:42:12  21   job was to educate them on all of that within the profile of

08:42:16  22   the product and the indications.

08:42:18  23   Q.    At any time before you left Sanofi, did Sanofi ever tell

08:42:23  24   you that Taxotere could cause permanent hair loss?

08:42:26  25   A.    They did not tell me.  I heard it at a meeting we had for

*OFFICIAL TRANSCRIPT*

08:42:32  1    the very first time.  And then it was addressed at the meeting,

08:42:39  2    and it was an off-label thing, so we were not allowed to talk

08:42:45  3    about it, and then I never heard about it again until my

08:42:49  4    deposition.  Well, no, then I heard about it again years later.

08:42:52  5    It was like a year after I left there --

08:42:54  6              MR. STRONGMAN:  Your Honor, objection.

08:42:58  7              THE COURT:  Sustained.  Rephrase your question.

08:43:00  8    EXAMINATION BY MS. MENZIES:

08:43:02  9    Q.   Let me ask it this way.  What was your understanding,

08:43:05  10   while you worked for Sanofi between 2004 and 2009 about

08:43:10  11   Taxotere and the side effect of hair loss?

08:43:14  12   A.   That it was a temporary side effect and that the women's

08:43:19  13   hair would return once they finished their chemotherapy

08:43:22  14   treatment.

08:43:22  15   Q.   Did you receive a subpoena to come and testify for us

08:43:25  16   today?

08:43:25  17   A.   Yes.  I did not volunteer for this.  I'm nervous as heck,

08:43:30  18   if you can't tell.  I work for pharma and I'm a single mom.

08:43:35  19   This is a very precarious position I don't like being in.

08:43:42  20             THE COURT:  Ms. Avila, you can pour a glass of water.

08:43:46  21             THE WITNESS:  Thank you.

08:43:46  22   EXAMINATION BY MS. MENZIES:

08:43:47  23   Q.   We'll take our time through this and we'll kind of get

08:43:51  24   into a roll.  We understand why you're nervous.  All of us are,

08:43:54  25   in some ways.

                              *OFFICIAL TRANSCRIPT*

08:43:55  1            What is your understanding why it's necessary for us

08:43:58  2    to have you come here and talk to the jury today?

08:44:02  3            MR. STRONGMAN:  Objection.  Calls for a narrative.

08:44:05  4            THE COURT:  Sustained.  I think you need to rephrase

08:44:07  5    the question.

08:44:07  6    EXAMINATION BY MS. MENZIES:

08:44:08  7    Q.   Okay.  What role do you play as a witness in this case?

08:44:15  8            MR. STRONGMAN:  Same objection.

08:44:19  9            THE COURT:  Ask a question.

08:44:20 10    EXAMINATION BY MS. MENZIES:

08:44:21 11    Q.   Are you here today to testify about what recall during the

08:44:24 12    time you were working at Sanofi?

08:44:25 13    A.   Yes.

08:44:26 14    Q.   You're not here today to give us any kind of medical

08:44:28 15    opinion or anything like that?

08:44:30 16    A.   No.

08:44:30 17    Q.   Okay.  So you're basically a fact witness for us today,

08:44:33 18    correct?

08:44:34 19    A.   Correct.

08:44:34 20    Q.   Did you agree to meet with me last week?

08:44:39 21    A.   I met with you, and I also met with the defense.  I agreed

08:44:42 22    to meet with both sides.

08:44:43 23    Q.   Why did you agree to meet with us?

08:44:59 24    A.   Because I was subpoenaed here, and I don't want it to

08:44:59 25    appear in any way, shape, or form that I'm being swayed in one

*OFFICIAL TRANSCRIPT*

08:44:59 1    way or another.  I wanted to be able to say that when I came up

08:44:59 2    here, that I met with both sides.

08:44:59 3    Q.    Okay.  Let's begin with some background of you.  Where

08:45:04 4    were you born?

08:45:05 5    A.    I was born in New Orleans at Baptist Hospital.  I was

08:45:07 6    raised in Metairie.  Lifelong resident of this town.

08:45:11 7    Q.    So you live here now, in Metairie?

08:45:13 8    A.    I live in Metairie.

08:45:15 9    Q.    Please give us an overview of your educational background

08:45:19 10   starting with college.

08:45:19 11   A.    I went to college in Mississippi.  I got a Bachelor of

08:45:23 12   Science in Nursing degree.  I subsequently worked as a nurse.

08:45:28 13          Then I went back to nurse practitioner school and got

08:45:31 14   a family nurse practitioner degree, with an extra certificate

08:45:34 15   in oncology nursing, because at the time it was the only type

08:45:41 16   of nursing that I had ever done.

08:45:42 17   Q.    Let me ask a little bit more specifically about some of

08:45:44 18   that information you've just provided.

08:45:45 19          When you went to college, how many years did that

08:45:47 20   take to get your degree in nursing?

08:45:49 21   A.    Four.

08:45:49 22   Q.    Then after you graduated, did you receive any -- earn any

08:45:55 23   certificates?

08:45:56 24   A.    After I graduated, I went to work as an oncology nurse

08:46:03 25   straight out of school.  Then, when I went back to nurse

*OFFICIAL TRANSCRIPT*

08:46:06  1    practitioner school, I also earned an oncology clinical nurse
08:46:13  2    specialist certificate as part of that program.
08:46:14  3    Q.    Why did you decide to go back to school for your master's
08:46:17  4    in nursing and your nurse practitioner's license?
08:46:20  5    A.    Because I was working in radiation oncology at Ochsner,
08:46:26  6    and I felt like I was almost doing the work that the physician
08:46:33  7    was doing.  I wanted to further my education.  I had a patient
08:46:40  8    encourage me.  He said:  You're a wonderful nurse.  You should
08:46:44  9    go back to school and do some more.  And so I did.
08:46:46 10    Q.    Explain to jury, please, what a nurse practitioner is.
08:46:50 11    A.    A nurse practitioner is a mid-level provider.  They see
08:46:54 12    patients in the clinic for the physicians.
08:46:58 13          In oncology, they function more like -- there is a
08:47:03 14    lot of sick patients that call in the day of oncology, because
08:47:06 15    you never know with chemotherapy what's going to happen.  So a
08:47:10 16    doctor may have a full schedule, but a nurse practitioner would
08:47:13 17    function as where they'd leave a lot of openings in her
08:47:17 18    schedule to see these sick patients.
08:47:19 19          She would also be someone that would see follow-up
08:47:20 20    care, because follow-up care was pretty well defined, you know,
08:47:24 21    check counts, make sure somebody is ready for chemo.  So in
08:47:29 22    oncology, that would be a role.  Sometimes they would see new
08:47:31 23    patients with a physician; sometimes not.
08:47:34 24    Q.    During your education for the nurse practitioner license
08:47:40 25    and Master's in Nursing degree, did you study pharmacology?

*OFFICIAL TRANSCRIPT*

08:47:45 1   A.   Yes, I did.

08:47:48 2   Q.   What is pharmacology, just briefly?

08:47:48 3   A.   The mechanics of how a drug works.

08:47:49 4   Q.   Did you also learn about the various chemotherapy

08:47:53 5   treatments?

08:47:53 6   A.   Yes, I did.

08:47:53 7   Q.   Then what did you do after you earned the degrees?  Can

08:47:56 8   you remind us?

08:47:58 9   A.   Well, I was working as a nurse in a clinic while I was

08:48:03 10   getting that degree and that same clinic was going to hire me.

08:48:07 11   So I just transitioned out of my role, which was education, so

08:48:12 12   that I could get my degree, into a nurse practitioner role.

08:48:16 13        I worked there as a nurse practitioner until I moved

08:48:19 14   back here.  Because I went to school in Washington state and

08:48:21 15   was working in Washington state.

08:48:23 16   Q.   Why did you decide to move back to Metairie?

08:48:26 17   A.   I was with child, and I wanted to have my child

08:48:30 18   here around my family.  I moved back here when I was

08:48:33 19   seven-and-a-half months pregnant.

08:48:35 20   Q.   At some point when you moved back to Metairie, you got a

08:48:40 21   job with Sanofi, correct?

08:48:40 22   A.   No.  My first job when I moved back here was as a nurse

08:48:49 23   practitioner.  Then, three weeks before I had my child, Amgen

08:48:55 24   called, and they were looking for an oncology nurse specialist,

08:49:00 25   not a salesperson.

*OFFICIAL TRANSCRIPT*

08:49:02  1          The drug rep from that company that called on me when

08:49:05  2   I was a nurse practitioner recommended me for the job.  I

08:49:10  3   wasn't enjoying the role that I had as a nurse practitioner

08:49:15  4   here.  I was working for an anesthesia place, and it was

08:49:18  5   boring.  So I took that role.  That was my first job in

08:49:21  6   industry.  It wasn't a salesperson.  It was a clinical

08:49:24  7   specialist role.

08:49:25  8          Then, I wanted to be a salesperson, because in a

08:49:28  9   clinical specialist role you have a large geography.  I had an

08:49:32 10   infant baby.  I watched all the sales reps go home at the end

08:49:39 11   of every day.  I thought, I could do that job.  It's just

08:49:42 12   talking to doctors and nurses, and I'm not afraid of that, so I

08:49:45 13   want to do sales.

08:49:47 14          Sanofi gave me the opportunity, that job, gave me the

08:49:50 15   opportunity to do sales.

08:49:51 16   Q.   When did you first begin working at Sanofi?

08:49:53 17   A.   In September 2004.

08:49:54 18   Q.   Your first role at Sanofi?

08:49:57 19   A.   Was a sales specialist selling Taxotere.

08:50:02 20   Q.   Were you promoted while you were at Sanofi?

08:50:04 21   A.   I was promoted, yes, to a senior sales specialist, about a

08:50:08 22   year after I was there.

08:50:08 23   Q.   Then when did you leave Sanofi?

08:50:12 24   A.   October 2009.

08:50:13 25   Q.   Did you like working for Sanofi?

                              *OFFICIAL TRANSCRIPT*

08:50:16  1    A.    I really enjoyed the job.  I enjoyed learning about sales.
08:50:20  2    I enjoyed realizing that I had skills that I didn't know I had,
08:50:24  3    because I was a clinician and used to talk to patients.  So it
08:50:28  4    was a very good learning experience.
08:50:30  5    Q.    Are you still in communication with some of your former
08:50:33  6    coworkers from Sanofi?
08:50:35  7    A.    Yeah, I'm friends with a lot of my coworkers from Sanofi.
08:50:35  8    It's a small world, the pharmaceutical world, when you're in
08:50:41  9    sales in oncology.
08:50:41  10   Q.    How about Taxotere?  Did you believe Taxotere is a good
08:50:44  11   drug when you were promoting it for Sanofi?
08:50:46  12   A.    Yes, I did.
08:50:46  13   Q.    Then why did you leave Sanofi in October 2009?
08:50:50  14   A.    I was fired from Sanofi in October 2009 because I --
08:50:58  15   you're not allowed to have -- send food to a clinic or provide
08:51:03  16   food for a clinic if you're not present.  I had a lunch go to a
08:51:08  17   clinic on a day that we were traveling for a company meeting.
08:51:11  18   I forgot to cancel the lunch.  That is a violation of the
08:51:15  19   company policy, and I got fired for that.
08:51:17  20   Q.    Sometime after you left Sanofi, did you bring any legal
08:51:21  21   action against Sanofi?
08:51:22  22   A.    I did.  I got fired in 2009.  I earned a bonus in 2008
08:51:28  23   that was a large bonus that they were paying out over payments.
08:51:32  24   I went to go see a lawyer to talk to him about it because I
08:51:36  25   kind of felt like, if I already earned it, shouldn't they pay

**OFFICIAL TRANSCRIPT**

08:51:39  1   it to me, even though I got let go.

08:51:41  2         He counseled me.  He said, you know -- I told him my

08:51:45  3   whole story.  There is a lot more to it that doesn't need to be

08:51:49  4   got into.  He said:  This is a wage claim.  The Louisiana law

08:51:53  5   says, if you earn it, you should get it.  So, you know, I'll do

08:51:56  6   this wage claim for you.

08:51:58  7         I did file a wage claim against the company.  I

08:52:02  8   didn't win.

08:52:02  9   Q.   Do you know why you didn't win?

08:52:05 10   A.   There are some theories out there.  I don't know that it

08:52:07 11   matters.  But, I mean, at that point, when I finally found that

08:52:11 12   I didn't win -- because my lawyer was so convicted about it, he

08:52:17 13   was so cute -- that they took it and ran with it.  Like, he

08:52:20 14   asked me permission, like:  Can I keep pursuing this?  Because

08:52:23 15   we lost twice.  I was like:  If you want.  Like, I didn't even

08:52:27 16   remember when he called me in 2012 to say:  Oh, sorry, we lost

08:52:31 17   that other one.  I was like:  Oh, God, really?  All right.

08:52:33 18   Whatever.

08:52:35 19         So, there were some theories about it, but I don't

08:52:40 20   know it all.

08:52:40 21   Q.   That's fine.

08:52:41 22         Do you hold a grudge against Sanofi today?

08:52:44 23   A.   No.  I don't.  They gave me my first opportunity in sales.

08:52:48 24   I learned a lot about it.  Like, one of the things, when I was

08:52:51 25   talking to my friends and other nurse practitioners and people

*OFFICIAL TRANSCRIPT*

08:52:54 1    that have gotten into industry in sales, that I was, you know,

08:52:58 2    warned about was, you know, the bad part about sales on the

08:53:04 3    pharma side is you can get let go at any minute.  There is

08:53:08 4    layoffs, there is this, there is that.

08:53:10 5           So, you know, I kind of considered myself fortunate,

08:53:12 6    and I was very grateful that I made it through my vesting

08:53:17 7    period, which meant that I got to keep the money that the

08:53:21 8    company matched on my retirement.

08:53:23 9           I might have been a little bit more upset if that

08:53:26 10   hadn't happened.  But I got a job three days later.  I was

08:53:29 11   pregnant.  I was in a different phase of my life.  I don't hold

08:53:32 12   a grudge.

08:53:33 13   Q.   Is your testimony here today affected in any way by what

08:53:38 14   happened when you left Sanofi?

08:53:39 15   A.   No.  Nobody could have predicted this.  This fell out of

08:53:43 16   the sky.  Like, if you would tell me I would be up here doing

08:53:47 17   this, I would say, no way.

08:53:48 18   Q.   Where do you work now?

08:53:51 19   A.   I work for a company called Astellas.

08:53:54 20   Q.   Is Astellas a pharmaceutical company?

08:53:59 21   A.   Yes, it is.

08:53:59 22   Q.   Do you remember Dr. Carinder?

08:54:02 23   A.   Yes, I do.

08:54:02 24   Q.   While you were employed at Sanofi, did you call on

08:54:09 25   Dr. Carinder?

**OFFICIAL TRANSCRIPT**

08:54:09  1    A.    Yes, I did.

08:54:13  2    Q.    We're going to use some terminology today that's sort of

08:54:13  3    familiar in the sales world that we may ask you to explain to

08:54:13  4    us a little bit.

08:54:17  5          Calling on a doctor or detailing a doctor, just

08:54:20  6    generally, can you explain to the jury what that means?

08:54:26  7    A.    When you have a drug and an indication, there are

08:54:32  8    marketing materials that the company provides for you in terms

08:54:38  9    of what are the messaging -- what is the messaging surrounding

08:54:42 10    what you should be telling the doctor.

08:54:43 11          So, I would book a lunch or an appointment.  A

08:54:48 12    typical lunch would be I'd go into the clinic to see

08:54:53 13    Dr. Carinder, provide food, and sit at the table.  As the

08:54:57 14    nurses come in, I would have the conversation, using my

08:55:02 15    marketing pieces with them, outlining, you know, what are the

08:55:06 16    points that they need to know about my drug.

08:55:08 17          I would always tailor mine to who I was speaking to.

08:55:12 18    So if I'm speaking to a nurse, they needed to know more how to

08:55:16 19    manage the drug, what the side effects were, what to tell the

08:55:19 20    patient the side effects were, how to dose reduce, if it needs

08:55:24 21    to be dose reduced, and when to dose reduce.

08:55:27 22          Even though the doctor is the one doing the dose

08:55:31 23    reductions, the nurses are the front line in terms of hearing

08:55:33 24    what's wrong with the patients.  They are the ones that they,

08:55:35 25    you know, say, I'm getting this fingernail stuff, you know,

**OFFICIAL TRANSCRIPT**

08:55:38 1    whatever.

08:55:39 2            Then, at whatever point the physician came in, then I

08:55:44 3    would transition to the physician, to more of the treatment

08:55:47 4    information in our sales aids meeting, like what is the

08:55:53 5    regimen, how is it dosed, how often do you give it, as well as

08:55:54 6    the side effect, manage it, because the physician kind of needs

08:55:57 7    to know it all.

08:55:58 8            If I didn't have a lunch, Dr. Carinder would -- he

08:56:05 9    would -- I could leave my card at his desk and sit in the

08:56:08 10   waiting room.  Then, when he had an opportunity, he'd call me

08:56:11 11   back and let me sit in his office and talk to him.

08:56:15 12   Q.    So you had discussions with Dr. Carinder about Taxotere?

08:56:19 13   A.    Yes, I did.

08:56:19 14   Q.    We'll talk more about those a little bit in a moment.

08:56:23 15           Do you remember who Nurse Lisa Reso is?

08:56:26 16   A.    Yes.

08:56:26 17   Q.    Who is she?

08:56:28 18   A.    She is a nurse that worked for what was formerly called

08:56:35 19   Hematology/Oncology Specialists, which was a large group of

08:56:37 20   oncologists that were all interconnected here in the city and

08:56:39 21   on the North Shore and in Slidell.  I wanted to say at one

08:56:42 22   point they had probably like nine locations.

08:56:45 23           She was on the North Shore, at their big location.

08:56:50 24   She has subsequently stayed with Dr. Carinder.  The group has

08:56:56 25   broken up now, but she's -- I think, at least up until -- I

*OFFICIAL TRANSCRIPT*

08:56:59 1   don't know when exactly she left, but it wasn't too long ago

08:57:03 2   that I saw her at an office with him.  But she was one of their

08:57:07 3   main nurses.

08:57:08 4          If there is busy day in a clinic, and lot of nurses

08:57:13 5   can't get back to the lunch because they are in infusion and

08:57:17 6   stuff, she was in a role -- I can't remember what her specific

08:57:20 7   title was -- that if I couldn't, you know, see all of them,

08:57:23 8   whatever, she would be the one that would come back and say:

08:57:25 9   All right, what you got?  You know, like, hand it to me.  Give

08:57:29 10  it to me, tell me what's your spiel -- you know, like where are

08:57:32 11  the books?  We had a lot of patient education books that I

08:57:36 12  handed out all the time.  That was her role.

08:57:40 13  Q.   So it's accurate to say that you had occasion to speak

08:57:45 14  with Nurse Reso --

08:57:47 15  A.   Oh, I spoke with her a lot, so I know her very well.

08:57:52 16  Q.   Including about Taxotere, correct?

08:57:53 17  A.   Yes, definitely.

08:57:54 18  Q.   How long have you been working in the pharmaceutical

08:57:58 19  industry?

08:57:58 20  A.   Just made 17 years.

08:58:00 21  Q.   During that entire time have you been involved with

08:58:03 22  oncology?

08:58:04 23  A.   Yeah.  I am a member of the New Orleans Oncology Nurses.

08:58:09 24  I attend their meetings every month.  I -- yes.  I mean, I'm

08:58:17 25  involved in the community.  I'm heavily involved in the

*OFFICIAL TRANSCRIPT*

08:58:20  1    community.

08:58:20  2    Q.   Do you believe that your education and prior experience as

08:58:24  3    a nurse practitioner and a nurse oncologist assisted you in

08:58:31  4    your job at Sanofi?

08:58:32  5    A.   It definitely did.  My clinical background gave me, like,

08:58:39  6    a distinct edge from other reps that may not understand why a

08:58:45  7    physician is making clinical decisions.

08:58:47  8         So, often, I could have conversations with them --

08:58:50  9    like, they would say:  Oh, I have this 42-year-old woman.

08:58:56 10    She's hormone positive.  You know, and they would explain what

08:59:00 11    the patient's characteristic was.  Then I would know

08:59:05 12    automatically, oh, well, the study you need to see is -- the

08:59:07 13    patient you're talking about is this.  So I could go to that

08:59:10 14    page in my detail aid and say -- you know, it was just a quick,

08:59:14 15    direct -- I think they felt like they were talking more to a

08:59:17 16    peer than a sales rep, and it helped me.

08:59:20 17    Q.   So let's talk about when you started working at Sanofi.

08:59:24 18    Did you undergo training?

08:59:26 19    A.   Yes, I did.

08:59:26 20    Q.   Can you tell us a little bit about that?

08:59:28 21    A.   We were flown out to Bridgewater, New Jersey.  We went to

08:59:36 22    class all day long for -- I want to say it was two weeks.

08:59:43 23         Before we get there, you're shipped a bunch of

08:59:47 24    binders and information.  You have to do a home study.  It's

08:59:50 25    like about six to eight weeks long.  There is online tests with

*OFFICIAL TRANSCRIPT*

08:59:55 1   the home study, that they make sure you pass each one of those,

08:59:59 2   so that you could get to the point where you can go to the

09:00:01 3   class at home office, which kind of brings it all together.

09:00:05 4        Then, they have a big test at the end of that.  When

09:00:09 5   you pass training, you're certified to sell the drug and your

09:00:12 6   indications.  I was just saying that's initial training.

09:00:19 7   Q.   Then, did you continue to get training throughout the time

09:00:22 8   you worked at Sanofi?

09:00:23 9   A.   All the time.  I mean, every -- like, if you divide the

09:00:29 10  year in half, semesters, and then quarters.  So that every once

09:00:35 11  in a while -- well, every quarter or whatever -- they keep us

09:00:39 12  motivated.  By doing that, they train us.

09:00:43 13       So there was plan of action meetings that we got

09:00:46 14  trained at several times a year, conference calls.  We had

09:00:51 15  ongoing training the entire time we're there.

09:00:53 16  Q.   Did Sanofi train you and the other sales professionals

09:01:02 17  about the various ways that you could communicate information

09:01:04 18  to the doctors and nurses?

09:01:06 19  A.   Yes.  They did.  They gave us the tools to do it.  So they

09:01:11 20  trained us on the tools, which would be the patient education

09:01:14 21  books, tear sheets, whatever tool they came out with that we

09:01:19 22  were to use that -- for that period of time.

09:01:22 23       We also had speaker programs that we could utilize.

09:01:28 24  You know, they trained us on how to use all of their resources

09:01:32 25  that we had at our disposable -- at our disposal to educate the

**OFFICIAL TRANSCRIPT**

09:01:39  1    physicians and the nurses.

09:01:40  2    Q.    Were you trained about the information in the Taxotere

09:01:44  3    label?

09:01:44  4    A.    Yes.

09:01:45  5    Q.    What did you learn -- what did you learn about the label

09:01:52  6    for Taxotere during your training?

09:01:55  7    A.    That's a big question.  What do you mean?

09:01:58  8    Q.    Let me ask you this:  Were you trained to stay within the

09:02:02  9    label on terms of information you could talk to doctors and

09:02:05 10    nurses about?

09:02:06 11    A.    Oh, yeah, like that's a guiding principle as a sales rep.

09:02:11 12    You're not allowed to go rogue, meaning like if I read some

09:02:15 13    article on the Internet about, I don't know, Taxotere and

09:02:19 14    breast cancer, if you want to say that, if it was not within my

09:02:23 15    package insert, I was not allowed to talk about it.

09:02:26 16            We were trained to speak only to what our indications

09:02:31 17    were and what was in the package insert.  You could use only

09:02:38 18    the tools that the company gave you to disseminate that

09:02:42 19    information to the physicians and the nurses.

09:02:46 20            So I couldn't make up my own spreadsheet and show it

09:02:50 21    to them.  Even though I might be able to explain what they were

09:02:53 22    explaining in a different manner that might be more

09:02:56 23    understandable, you're not able to do that.

09:02:56 24    Q.    Just two follow-up questions on that.  When you say the

09:03:00 25    *prescribing information*, that's the same as the label?

***OFFICIAL TRANSCRIPT***

09:03:02  1    A.    The label is the prescribing information.

09:03:03  2    Q.    Okay.  You -- any information that you provided to nurses

09:03:08  3    and doctors needed to be consistent with what was in the label;

09:03:12  4    is that correct?

09:03:12  5    A.    Yes.

09:03:13  6    Q.    Okay.  So you couldn't talk to doctors about something

09:03:18  7    that was inconsistent with the label?

09:03:19  8    A.    No, I could not.

09:03:20  9    Q.    Then if outside resources or outside sources were used as

09:03:25 10    some of the information that was put in those materials, that

09:03:28 11    needed to be consistent with the label as well, correct?

09:03:30 12         MR. STRONGMAN:  Objection, leading.

09:03:32 13         THE COURT:  Sustained.  Rephrase your question.

09:03:33 14    EXAMINATION BY MS. MENZIES:

09:03:35 15    Q.    Was the information from the materials, if it came from

09:03:38 16    outside sources, was that consistent with the label?

09:03:40 17    A.    I don't understand your question.

09:03:44 18    Q.    That's fine.  Let me ask it again.

09:03:47 19         Was the information -- if the -- the materials that

09:03:50 20    you had, if it had information from sources outside of Sanofi,

09:03:57 21    made references or otherwise, was that information also

09:04:01 22    consistent with the label as you were trained to understand it?

09:04:04 23    A.    Yes.

09:04:04 24         MR. STRONGMAN:  Same objection.

09:04:05 25         THE COURT:  I'm having trouble following it.  I think

*OFFICIAL TRANSCRIPT*

09:04:07 1    maybe you need to cut that --

09:04:09 2              MS. MENZIES:  Let's just move then.  It was a long one.

09:04:12 3              THE COURT:  -- into two questions.

09:04:13 4    EXAMINATION BY MS. MENZIES:

09:04:15 5    Q.   Let's see.  So the training that you talked about that you

09:04:21 6    said was quite often, the initial and then throughout, the

09:04:24 7    continuous training, were those all opportunities for Sanofi to

09:04:27 8    inform you about information that they learned about Taxotere,

09:04:33 9    both side effects and benefits?

09:04:37 10             MR. STRONGMAN:  This is leading --

09:04:38 11             THE WITNESS:  Absolutely.

09:04:38 12             MR. STRONGMAN:  -- leading, Your Honor.

09:04:39 13             THE COURT:  Okay.

09:04:40 14             THE WITNESS:  Yes, they were.

09:04:41 15             THE COURT:  You're going to have to stop leading your

09:04:45 16   witness.

09:04:45 17             MS. MENZIES:  Okay.

09:04:47 18             THE COURT:  Thank you.

09:04:47 19   EXAMINATION BY MS. MENZIES:

09:05:00 20   Q.   Did Sanofi ever train you, initially or throughout the

09:05:05 21   time you worked there for those five-plus years, that a side

09:05:14 22   effect of Taxotere is permanent hair loss?

09:05:16 23   A.   No.

09:05:16 24   Q.   At any dose, were you trained by Sanofi that

09:05:22 25   60 milligrams, 75 milligrams, 100 milligrams, were you ever

*OFFICIAL TRANSCRIPT*

09:05:26  1   trained that that dose could cause permanent hair loss?

09:05:28  2   A.    No.

09:05:29  3   Q.    Those were all approved doses for Taxotere?

09:05:35  4   A.    Yes.

09:05:35  5   Q.    The information about the side effects in the Taxotere

09:05:40  6   label relate to those doses, correct?

09:05:42  7           MR. STRONGMAN:  Objection, leading.

09:05:43  8           THE WITNESS:  They relate --

09:05:45  9           THE COURT:  Wait.  Don't --

09:05:45 10           MS. MENZIES:  Let me restate it.  I apologize.

09:05:45 11           THE COURT:  Rephrase your question.

09:05:48 12           MS. MENZIES:   Thank you, Your Honor.

09:05:50 13   EXAMINATION BY MS. MENZIES:

09:05:50 14   Q.    Does the information in the label about side effects cover

09:05:54 15   those doses?

09:05:55 16   A.    Yes.

09:05:56 17   Q.    I think you've testified to this earlier, that your

09:06:12 18   understanding of the hair loss that's associated with Taxotere

09:06:14 19   is that that hair loss was temporary?

09:06:18 20           MR. STRONGMAN:  Objection, leading.

09:06:19 21           THE COURT:  Rephrase your question.

09:06:21 22   EXAMINATION BY MS. MENZIES:

09:06:22 23   Q.    What is your understanding of the nature of the hair loss

09:06:23 24   that's associated with taking Taxotere?

09:06:26 25           MR. STRONGMAN:  Objection, asked and answered also.

*OFFICIAL TRANSCRIPT*

09:06:28 1        THE COURT:  Overruled.

09:06:30 2        THE WITNESS:  My understanding was that the hair loss

09:06:35 3   was temporary.  That is what I conveyed to the nurses and the

09:06:41 4   physicians.  That's what I felt like my pieces conveyed, which

09:06:44 5   were my marketing pieces, to them as well.  Like, I did not

09:06:53 6   think it caused permanent hair loss.

09:06:55 7   EXAMINATION BY MS. MENZIES:

09:06:56 8   Q.   Your understanding that it did not cause permanent hair

09:06:58 9   loss, that was consistent with the label as you were trained,

09:07:02 10  correct?

09:07:02 11       MR. STRONGMAN:  Objection, leading.

09:07:03 12       THE COURT:  Sustained.

09:07:04 13       MS. MENZIES:  Sorry.

09:07:05 14  EXAMINATION BY MS. MENZIES:

09:07:06 15  Q.   Is your understanding that Taxotere is associated with

09:07:09 16  temporary hair loss consistent with the label?

09:07:14 17       MR. STRONGMAN:  Same objection.

09:07:16 18       THE COURT:  You need to ask a question.  Quit leading.

09:07:22 19  Sustained.

09:07:24 20  EXAMINATION BY MS. MENZIES:

09:07:24 21  Q.   Let me ask you this:  From your training and -- over the

09:07:28 22  time period you were there and your understanding, does the

09:07:31 23  Taxotere label warn about permanent hair loss?

09:07:35 24       MR. STRONGMAN:  Objection, foundation as well.  Calls

09:07:38 25  for opinion testimony.

*OFFICIAL TRANSCRIPT*

09:07:43 1          THE COURT:  Overruled.

09:07:44 2          THE WITNESS:  Does that mean I answer?

09:07:47 3          THE COURT:  That means you answer.

09:07:49 4          THE WITNESS:  There is the label, and there are my

09:07:58 5     tools.  I didn't think any of it meant that there was permanent

09:08:05 6     hair loss.

09:08:05 7     EXAMINATION BY MS. MENZIES:

09:08:07 8     Q.    Okay.  We talked about the number of ways that you

09:08:10 9     communicated with doctors, and I wanted to talk a little bit

09:08:14 10    more specifically about that.

09:08:20 11         MR. STRONGMAN:  Objection, Your Honor.  Could we

09:08:21 12    approach just briefly?

09:08:23 13         THE COURT:  Yes.  Take it down.

09:08:23 14         (WHEREUPON, at this point in the proceedings, a

09:08:36 15    conference was held at the bench.)

09:08:36 16         MR. STRONGMAN:  My objection is, for one, you can read

09:08:43 17    right through the little sticky notes on there.  Two, she's

09:08:47 18    leading the witness.  This is just another mechanism to lead

09:08:50 19    the witness, this demonstrative.

09:08:53 20              So I think she should ask appropriate questions

09:08:55 21    for a fact witness, and she can answer them if she can, without

09:08:59 22    being led and without being able to see through the sticky

09:09:02 23    notes.

09:09:02 24         THE COURT:  I think you just need to ask her, how do

09:09:05 25    you communicate?  I'm not sure we need all of this

*OFFICIAL TRANSCRIPT*

09:09:08  1    demonstratives.  I mean, she can say that, and that's something

09:09:14  2    that you can convey --

09:09:14  3         MS. MENZIES:  I wasn't going to ask about the specific

09:09:20  4    stuff.

09:09:21  5         THE COURT:  I think you need to ask her instead of

09:09:23  6    giving her the answer.  You need to ask her, how it is that you

09:09:27  7    communicated the doctors.

09:09:28  8              That's it?  Okay.  Thank you.

09:09:28  9         (WHEREUPON, at this point in the proceedings, the bench

09:09:56 10    conference concluded.)

09:09:56 11    EXAMINATION BY MS. MENZIES:

09:09:57 12    Q.   Was one of the ways -- what is a reprint?

09:10:01 13    A.   A reprint is an article.  It's a journal article.  It

09:10:08 14    could be like the *New England Journal of Cancer* or *Journal of*

09:10:13 15    *Clinical Oncology*.  It would be a piece that we would give to

09:10:16 16    the physicians, like the entire study.  We would be able to

09:10:20 17    give them that.  It would be a reprint.

09:10:22 18              Often, it would be in a reprint carrier.  So it would

09:10:26 19    be slid in there.  It would have a package insert behind it.

09:10:29 20    The opening or the front page would have kind of like our

09:10:32 21    marketing points bulleted on it, so that the physician would

09:10:35 22    say -- would be able to look at it and know kind of like what

09:10:39 23    we wanted them to see in the article.  We were allowed to give

09:10:42 24    those to physicians.

09:10:43 25    Q.   Can you explain to us what a sales aid is?

**OFFICIAL TRANSCRIPT**

09:10:48  1    A.    A sales aid is basically your piece that gives you the

09:10:55  2    direction in your dialogue.  So it's your recipe about how to

09:11:00  3    have the conversation with the physician.

09:11:02  4            Because we have multiple indications in that drug,

09:11:05  5    and because I had multiple responsibilities for those

09:11:09  6    indications, sometimes you could get a number mixed up or, you

09:11:13  7    know, you can't remember all of that stuff.  So it would be,

09:11:17  8    you know, like your metastatic breast information on two page

09:11:22  9    with your bullet points and your study highlights on it, your

09:11:26 10    adjuvant breast cancer on one page.

09:11:30 11            So it was what I would use to have, like, the

09:11:32 12    discussion with the physician.  It was my main tool in my,

09:11:36 13    quote/unquote, sales bag that I used on a daily basis.

09:11:39 14    Q.    Do you recall using sales aids with Dr. Carinder when you

09:11:42 15    would discuss Taxotere?

09:11:43 16    A.    Yes.

09:11:43 17    Q.    Do you recall using information, sales aids or otherwise,

09:11:47 18    when you would talk to Nurse Reso?

09:11:49 19    A.    Yes.

09:11:49 20    Q.    What is a lunch and learn?

09:11:52 21    A.    A lunch and learn is like I described before.  It's where

09:11:57 22    you would book a lunch with a clinic.  It was your better --

09:12:00 23    one of your better opportunities to have time with the

09:12:05 24    physicians and the nurses, because you would bring them the

09:12:07 25    food and be able to sit there and have the lunch with them, so

09:12:10  1   you could have multiple details with multiple people in the

09:12:13  2   clinic, nurses, as well as the physicians.  So that's where you

09:12:17  3   actually had great -- good time to speak to them.

09:12:20  4   Q.   Do you recall having lunch and learns with Dr. Carinder

09:12:24  5   and Nurse Reso?

09:12:26  6   A.   Yes, I did.

09:12:27  7   Q.   How frequently would you estimate, while you were a sales

09:12:32  8   representative at Sanofi, that you would have lunch and learns

09:12:36  9   at Dr. Carinder's office?

09:12:37 10   A.   The actual lunches and learns, I don't exactly know how

09:12:42 11   many, but I touched the clinic probably twice a month.  Because

09:12:46 12   if you don't do a lunch and learn, you are dropping off

09:12:50 13   materials, the materials meaning patient booklets, education

09:12:54 14   materials.

09:12:55 15        They don't have a lot of room on the shelves in these

09:13:00 16   clinics to house all of the materials that all of the companies

09:13:04 17   would want them to give to their patients.  It was also a way

09:13:07 18   to get in to the clinic, because, if you're going to drop off

09:13:10 19   something, you might be able to talk to a physician when you

09:13:13 20   see them, when you're dropping off some materials.  So -- and

09:13:16 21   those weren't necessarily, like -- you know, you just kind of

09:13:19 22   roll by and drop off some books, have a little conversation.

09:13:23 23        So, that's how it worked.

09:13:26 24   Q.   How about dinner programs?  Did you have dinner programs

09:13:30 25   when you were promoting Taxotere for Sanofi?

**OFFICIAL TRANSCRIPT**

09:13:33  1   A.    Yes, I did.  I did a lot of dinner programs.

09:13:35  2   Q.    Those were similar to the lunch and learns just later in

09:13:35  3   the evening?

09:13:39  4   A.    No.  Because you had a Physicians Speakers Bureau, and

09:13:47  5   they were the ones doing the talking at a dinner program.

09:13:49  6   Like, I wouldn't get up and do a presentation on my drug at a

09:13:53  7   dinner program.  I would organize for a physician speaker to

09:13:56  8   come to a restaurant and I would organize for the physicians

09:14:00  9   and the nurses to come there, and that is why I liked doing

09:14:04  10  them and why I did many of them, because I felt like it was

09:14:09  11  peer-to-peer learning.  They had a physician in front of them

09:14:11  12  telling them everything about the drug, and then they could

09:14:14  13  have their conversation at the table and, you know, kind of

09:14:18  14  made my job easy, as long as I could get them there.  So I

09:14:23  15  wasn't really doing the detailing at a physician program.

09:14:26  16  Q.    And you said *detailing*.  Can you explain?  Is that the

09:14:30  17  same as --

09:14:31  18  A.    Again, it's the education of the physician and the nurses

09:14:33  19  about all of the aspects of my drug.

09:14:35  20  Q.    And do you recall that Sanofi would sometimes setup booths

09:14:40  21  at conventions and provide material information to --

09:14:43  22       MR. STRONGMAN:  Objection, leading.

09:14:44  23       THE COURT:  Rephrase your question.

09:14:58  24  EXAMINATION MS. MENZIES:

09:14:58  25  Q.    Tell us about any Sanofi booths at conventions.  Did you

*OFFICIAL TRANSCRIPT*

09:14:58 1    have those?

09:14:58 2    A.   Yes.  I actually worked a few.  These are big meetings.

09:14:58 3    So, like, the oncology nurses group, local group that I'm a

09:15:02 4    part of has a national group called the Oncology Nursing

09:15:06 5    Society, they would have a meeting, and they would have an

09:15:09 6    exhibit hall and they would allow pharmacology companies to

09:15:14 7    purchase exhibit space and put on a booth.  So would the

09:15:18 8    American Society of Clinical Oncology, ASCO, which is the major

09:15:22 9    physician group for oncologists in the country.

09:15:29 10         So Sanofi and other pharmaceutical companies would

09:15:30 11   pay to have these booths at these conventions because they

09:15:33 12   would be able to interact with the physicians that come through

09:15:37 13   the exhibit hall and possibly give a detail.  Plus, they have

09:15:42 14   these big, ginormous panels that show all of our information

09:15:48 15   there.

09:15:48 16         So reps were selected to go and work these

09:15:50 17   meetings -- these booths, these conventions, and detail

09:15:55 18   physicians at the booth.

09:15:57 19   Q.   And the material that was provided at the booths, at the

09:16:03 20   dinner, the lunch and learn, that was all Sanofi-approved

09:16:06 21   material for you to use with physicians, correct?

09:16:08 22   A.   Yes, they provided it.  We didn't bring any of it to

09:16:11 23   conventions.  They provided what we would use at conventions.

09:16:15 24   You would have a training when you first got there.  It would

09:16:16 25   be like a two-hour meeting, and they would tell us everything

*OFFICIAL TRANSCRIPT*

09:16:19  1    that -- all the materials that were in the booth, what was

09:16:23  2    going to be highlighted in the booth, what you could talk

09:16:26  3    about, what you couldn't talk about, and, you know, just give

09:16:30  4    us our direction.

09:16:31  5    Q.    From your experience working at Sanofi, does Sanofi know

09:16:36  6    how to clearly and effectively communicate information to

09:16:39  7    doctors and nurses?

09:16:40  8            MR. STRONGMAN:  Objection.

09:16:44  9            THE WITNESS:  I don't know if --

09:16:45  10           THE COURT:  I'm going to allow it, even though it is

09:16:48  11   leading.

09:16:49  12           THE WITNESS:  I don't know if they knew how, but I felt

09:16:52  13   like I knew what I was supposed to be saying from the materials

09:16:56  14   that I had.

09:16:57  15   EXAMINATION BY MS. MENZIES:

09:17:00  16   Q.    So let's talk more about Dr. Carinder specifically.  You

09:17:04  17   called on him while you were at Sanofi for a little more than

09:17:08  18   five years; is that correct?

09:17:09  19   A.    Correct.

09:17:09  20   Q.    And tell us more about how you would interact with

09:17:12  21   Dr. Carinder when you were a sales rep for Sanofi.

09:17:17  22   A.    At that point, I knew him very well because I worked at

09:17:22  23   Amgen for three years and had called on -- not specifically on

09:17:25  24   him, but I had interacted -- well, I did call on him, but we

09:17:28  25   knew each other by then.  And so -- I forgot the question

*OFFICIAL TRANSCRIPT*

09:17:34  1    already.

09:17:36  2    Q.   That's all right.  What were your impressions -- you

09:17:39  3    worked with Dr. Carinder.  What were your impressions of him?

09:17:42  4    A.   I loved Dr. Carinder.  He's a great guy.  He's a good

09:17:46  5    physician.  I found him very up to date, very clinical.  He

09:17:50  6    went to all of the latest meetings.  We had high-level clinical

09:17:56  7    discussions.  I sought out his advice when I got breast cancer.

09:17:58  8    He was one of the physicians that I went to.  I said:  You

09:18:02  9    know, tell me, is this the right thing that they want to do?  I

09:18:06 10    really respect him a lot.

09:18:06 11    Q.   I want to show you Plaintiff's Exhibit 192.

09:18:10 12         MS. MENZIES:  Am I allowed to give her -- may I

09:18:13 13    approach and give her a physical copy?

09:18:15 14         THE COURT:  Yes, you may.  Is it already in evidence?

09:18:19 15         MS. MENZIES:  Yes, Your Honor.  Monday, I believe.

09:18:27 16    EXAMINATION BY MS. MENZIES:

09:18:41 17    Q.   I've put up on the board here -- I know you have it in

09:18:43 18    front of you -- Plaintiff's Exhibit 192, and you can flip

09:18:48 19    through those pages a little, if you haven't already.  Have you

09:18:51 20    seen this document before?

09:18:52 21    A.   Yes, I have.

09:18:52 22    Q.   And was this one of the materials that you used when you

09:18:56 23    were promoting Taxotere for Sanofi?

09:18:57 24    A.   Yes.

09:18:58 25    Q.   What are we looking at in 192?

                              *OFFICIAL TRANSCRIPT*

09:19:03   1    A.    We had a packet that we could give -- I gave it out a lot

09:19:09   2    to the nurses.  It was a CD-ROM and a USB port, and it housed

09:19:24   3    individual tear sheets on all of the side effects -- the common

09:19:29   4    side effects of the drug.

09:19:31   5            And so, it was nifty because the clinics could

09:19:36   6    customize it.  So they could put on the top of it

09:19:43   7    "Hematology/Oncology Specialist" and they could put their

09:19:46   8    number on it in case of an emergency or what have you.

09:19:48   9            Also, it did not take up a ton of space because it

09:19:51  10    was either a USB port or a CD-ROM, so they could put on it

09:19:56  11    their computer.  If they had somebody coming in and they were

09:19:58  12    having trouble with nail fungus and neutropenia, they could

09:20:05  13    just go on their desktop and click neutropenia, nail fungus,

09:20:08  14    and print out the associated sheet that is with that side

09:20:10  15    effect and hand it to the patient and say:  Here, take this

09:20:13  16    home.  This will help you.  They'd go over what's on the sheet

09:20:13  17    with the patient.

09:20:13  18            And so we used this a lot to help with side effect

09:20:19  19    management.

09:20:19  20    Q.    Let's just look at it briefly.  The first page we have

09:20:22  21    here, and then there's just a dark page, and then go to the

09:20:27  22    next page.  Can you tell us what this first page is here?

09:20:30  23    A.    This is the side effect sheet for hair loss, or *alopecia*

09:20:36  24    is the term for it.

09:20:39  25    Q.    Go one before that.  It's Bates ending 472, if you see

*OFFICIAL TRANSCRIPT*

09:20:46   1   that in the lower right.  And --

09:20:48   2   A.    Sorry.

09:20:48   3   Q.    And this -- who is this letter to?

09:20:53   4   A.    This is to the nurses.

09:20:55   5   Q.    And it's from Sanofi; is that correct?

09:20:59   6   A.    Correct.

09:20:59   7   Q.    You mentioned the CD-ROM, USB port.  Looks like we have a

09:21:04   8   picture of that here?

09:21:05   9   A.    Correct.

09:21:05  10   Q.    What was the purpose of providing it as a USB port or

09:21:09  11   CD-ROM as well?

09:21:11  12   A.    As I said, the clinics don't have a lot of space for

09:21:15  13   materials, and so this was an easy way for them to save space

09:21:20  14   but yet have all of the information necessary to help the

09:21:24  15   patients with all of the different side effects.

09:21:26  16   Q.    And we have a -- we just have four pages in this exhibit.

09:21:32  17   Is this brochure actually a bigger document?

09:21:35  18   A.    Yes.

09:21:36  19   Q.    So we just have an excerpt of a few pages.  If you turn

09:21:40  20   the next page, what are we looking at there?

09:21:43  21   A.    This is the hair loss page.

09:21:46  22   Q.    And let's take a little bit closer look at that.  It says:

09:21:54  23   "Alopecia hair loss.  What is alopecia?"

09:21:56  24           Can you read that first sentence to the jury, please.

09:21:59  25   A.    "Alopecia is another word for hair loss or thinning of the

*OFFICIAL TRANSCRIPT*

09:22:04 1    hair.  It is a common, yet temporary, side effect of some

09:22:07 2    cancer medicines."

09:22:08 3    Q.    And when -- we have at the top:  "Coping with side effects

09:22:13 4    of chemotherapy."  In that sentence, it says:  "Common

09:22:19 5    temporary side effect of some cancer medicines."

09:22:21 6              Did you understand that *some cancer medicines*

09:22:23 7    include --

09:22:23 8              MR. STRONGMAN:  Objection, leading.

09:22:26 9              THE COURT:  Rephrase.

09:22:28 10   EXAMINATION BY MS. MENZIES:

09:22:28 11   Q.    Did *some cancer medicines* include Taxotere?

09:22:32 12             MR. STRONGMAN:  Same objection.

09:22:35 13             THE COURT:  Can you rephrase it?

09:22:38 14   EXAMINATION BY MS. MENZIES:

09:22:38 15   Q.    When it says *some cancer medicines*, what cancer medicines

09:22:42 16   is it referring to, to your understanding?

09:22:44 17   A.    This is my drug.  It's what I sold.  And this is what the

09:22:50 18   company gave me to sell my drug.  I felt, and still do feel,

09:22:54 19   that they were saying it's temporary.

09:22:56 20   Q.    Okay.  And then if we look to the right side, it says --

09:23:01 21   can you read that to the jury?

09:23:04 22   A.    "If you do lose your hair, it will usually grow back after

09:23:08 23   the treatments are over.  It may grow back while you are still

09:23:11 24   having treatments.  And it may grow back a different color or

09:23:15 25   texture."

                        *OFFICIAL TRANSCRIPT*

09:23:16  1   Q.    Is this part of the brochure telling you when --

09:23:19  2           MR. STRONGMAN:  Objection.  Leading.

09:23:21  3   EXAMINATION BY MS. MENZIES:

09:23:22  4   Q.    What is this part of the brochure telling you?

09:23:24  5   A.    It's telling me that the patient's hair is going to grow

09:23:29  6   back when their treatment is over, and it might grow back

09:23:31  7   different.

09:23:32  8   Q.    Is that because it varies between patients?

09:23:34  9           MR. STRONGMAN:  Same objection.

09:23:35 10           THE COURT:  Overruled.

09:23:36 11           THE WITNESS:  It does vary between patients.  I've seen

09:23:40 12   it myself.  And it does.  Sometimes it grows back curly,

09:23:45 13   sometimes it grows back straight.  A different color.

09:23:47 14   EXAMINATION BY MS. MENZIES:

09:23:48 15   Q.    And then it says:  "When my hair grows back."

09:23:51 16           What is the purpose of that explanation?

09:23:53 17   A.    This is telling -- this whole entire sheet is telling the

09:23:56 18   patient how to manage hair loss.  Hair loss is -- was -- it is

09:24:00 19   a devastating side effect to these patients.  It's one of the

09:24:04 20   number one things that they talk about.  And this sheet is to

09:24:10 21   help them cope with that side effect and how difficult it is.

09:24:14 22           So it's reassuring them that you can deal with it,

09:24:17 23   it's going to grow back.  It might grow back a little

09:24:20 24   different, but it's going to grow back.  And if you wash your

09:24:22 25   hair, you can maybe help it.  Maybe you shave it.  This is what

*OFFICIAL TRANSCRIPT*

09:24:25  1    they used to help with the hair loss.

09:24:26  2    Q.   Does this language in this brochure tell patients that

09:24:30  3    their hair loss could be permanent?

09:24:33  4         MR. STRONGMAN:  Objection.  Leading and foundation.

09:24:36  5         MS. MENZIES:  Your Honor --

09:24:40  6         THE COURT:  Why don't you -- I'm going to overrule it.

09:24:55  7    You can answer it.

09:25:01  8         THE WITNESS:  I thought this meant, and I still do

09:25:03  9    think this meant that the hair loss was temporary.

09:25:06 10    EXAMINATION BY MS. MENZIES:

09:25:07 11    Q.   Did you trust that Sanofi would tell you about the side

09:25:10 12    effects it knew about?

09:25:12 13    A.   Yes, I did.  I'm a professional, and I thought that they

09:25:21 14    would.

09:25:21 15    Q.   From your experience, what side effects were patients

09:25:25 16    concerned about when they take therapy?

09:25:27 17    A.   They are concerned about hair loss.  They are concerned

09:25:29 18    about all of them.  I mean, it's chemotherapy; it's terrifying.

09:25:33 19    But women are especially concerned about hair loss.  That's why

09:25:37 20    there is programs like Look Good, Feel Better through the

09:25:40 21    American Cancer Society that helps them cope with it, because

09:25:43 22    they are shocked.

09:25:44 23         They don't just lose their hair.  They lose their

09:25:47 24    eyebrows, they lose their eyelashes, and they don't feel

09:25:56 25    normal.  There is sexual concerns.  There is infection

*OFFICIAL TRANSCRIPT*

09:25:59  1   concerns, especially young women who have children that are

09:26:03  2   running around with snotty noses that have no immune system.  I

09:26:09  3   mean, all of it is very concerning and alarming.

09:26:11  4   Q.    While you were a sales representative at Sanofi, did

09:26:15  5   anyone at Sanofi, your managers, others, did they ever give you

09:26:18  6   any information that Sanofi had about patients taking Taxotere

09:26:22  7   and their hair not regrowing?

09:26:24  8   A.    No.  The one thing that I heard was about the abstract --

09:26:35  9   an abstract that was presented at a meeting at a San Antonio

09:26:42 10   breast conference.  A girl got up at our company meeting --

09:26:47 11          MR. STRONGMAN:  Objection, hearsay.

09:26:50 12          THE COURT:  Y'all are going to have to approach on this

09:26:52 13   one.

09:26:52 14          (WHEREUPON, at this point in the proceedings, there was

09:27:13 15   a conference held at the bench.)

09:27:13 16          MS. MENZIES:  This is the Sedlacek abstract.  I wasn't

09:27:18 17   planning on getting into it too much.  She obviously has

09:27:20 18   attention on it.

09:27:20 19          THE COURT:  This is my concern.  Two things.  One, I'm

09:27:24 20   not sure if you're offering it for the truth of what was said,

09:27:30 21   which is, is it indeed hearsay?  And if it's the fact that it

09:27:40 22   was said, I'm not sure this lady is going to speak to whether

09:27:44 23   or not that information is true, and she's offering it for that

09:27:48 24   purpose.  So you're going to have to tell me where we're going

09:27:51 25   with this and what it is, indeed, you intend to have this

*OFFICIAL TRANSCRIPT*

09:27:59  1    witness testify about it.

09:28:00  2            MS. MENZIES:  I was not planning on it.  She obviously

09:28:05  3    has it in the forefront of her mind, so I can tell her -- I can

09:28:09  4    move on, and my question had more to do with whether she was

09:28:14  5    told by other patients or whether somebody outside --

09:28:16  6            THE COURT:  Whether she was --

09:28:18  7            MS. MENZIES:  Whether she was told anything by Sanofi.

09:28:20  8    And so my understanding is there was some discussion internally

09:28:28  9    at the company about the abstract and how they had to follow

09:28:29 10    the instructions so I can establish that, because she -- in her

09:28:31 11    mind, they did discuss it.  So she's trying to be truthful.

09:28:34 12            MR. STRONGMAN:  I would just say, so there is some

09:28:38 13    context, is -- we're dealing with the objections here, so that

09:28:43 14    Ms. Avila cannot, under the rules -- and she has testified to

09:28:47 15    this -- cannot share information like this.  It's not permitted

09:28:50 16    by the rules.

09:28:51 17            So, did Sanofi hear about a patient?  Did Sanofi

09:28:55 18    hear about -- these are things that Ms. Avila cannot herself

09:28:58 19    relay.  So, the fact -- it has to come through -- it's not part

09:29:03 20    of the label, and she will admit that.

09:29:06 21            So, the idea that she is -- like, the notice is

09:29:10 22    coming to her is not the relevant question because it goes to

09:29:15 23    Sanofi and goes to a different process.  So, what she's even

09:29:19 24    allowed to talk to the doctor about is what's relevant, not

09:29:22 25    just what she hears in the atmosphere.

                            *OFFICIAL TRANSCRIPT*

09:29:25  1          THE COURT:  I understand, but I don't know the context

09:29:27  2   in which she heard it.  If it was a communication, not

09:29:34  3   officially from Sanofi but spoken about generally in Sanofi

09:29:39  4   until -- we're going on and on.  I don't think it's

09:29:46  5   necessarily -- that's what very difficult about hearsay.  I'm

09:29:50  6   not -- I'm not sure it's being offered for the truth that

09:29:54  7   that's what was presented, but there was discussion and nothing

09:29:57  8   came of it.

09:29:57  9          MR. STRONGMAN:  How about we do this?  Was Ms. Avila at

09:30:00  10  the San Antonio breast conference where this was discussed?

09:30:04  11  No, she wasn't.

09:30:05  12         THE COURT:  I got that.  But who told her?

09:30:07  13         MR. STRONGMAN:  Good question.

09:30:08  14         MS. MENZIES:  It was her Sanofi company sales manager.

09:30:13  15  They talked about it internally.  I can establish that you

09:30:17  16  discussed it internally, but you never talked to doctors about

09:30:20  17  it.  That isn't for the truth of the matter asserted; it's the

09:30:21  18  fact that she heard about it and then she couldn't talk to

09:30:24  19  doctors about it.

09:30:25  20         THE COURT:  Did someone instruct her not to talk to

09:30:27  21  doctors about it?

09:30:29  22         MS. MENZIES:  She was told not to.

09:30:30  23         MR. STRONGMAN:  It was off label.

09:30:33  24         MS. MENZIES:  But the point is, she heard about it

09:30:33  25  from the company, but she wasn't allowed to talk about it.

*OFFICIAL TRANSCRIPT*

09:30:35 1   Your Honor, they've come in and said that all of this stuff

09:30:38 2   that Dr. Carinder had.  She could have given it to him if

09:30:41 3   Sanofi had put in it the label.  That's our point.

09:30:43 4         It's not that it causes anything.  It's that she

09:30:46 5   is an employee who heard about it, they discussed it at a sales

09:30:50 6   meeting, and nothing came of it after that.  It wasn't in the

09:30:53 7   label, so she couldn't talk to doctors about it.

09:30:56 8       THE COURT:  I don't think that's being offered for the

09:30:58 9   truth of the matter asserted.  I think it's a -- I think that

09:31:02 10  the statement was made.  If she's being called to say this

09:31:06 11  was -- you know, the study showed this and that, but, you know,

09:31:11 12  if you somebody tells you something, it's just the matter that

09:31:15 13  the statement was made, not that necessarily any of it is true.

09:31:19 14      MR. STRONGMAN:  But it's not tied to anything relevant

09:31:22 15  to the claims of the case.  So, that would be my objection.

09:31:24 16      THE COURT:  Okay.  Overruled.

09:31:31 17        But you're going to have to -- Mr. Strongman.

09:31:36 18        You're going to have to carefully lay this

09:31:39 19  foundation, because if I find that she starts speaking to the

09:31:45 20  veracity of the study, I'm going to shut you down because then

09:31:47 21  you're going to cross into offering it to show that this is

09:31:51 22  indeed the requirements.

09:32:19 23  EXAMINATION BY MS. MENZIES:

09:32:20 24  Q.   You mentioned that you internally at the company heard

09:32:24 25  about an abstract; is that correct?

**OFFICIAL TRANSCRIPT**

09:32:25  1   A.    Yes.

09:32:28  2   Q.    And what is your recollection of that?

09:32:32  3   A.    We were at a national meeting.  It was the one right after

09:32:37  4   this abstract came out, so it was our beginning-of-the-year

09:32:41  5   plan of action or whatever, meeting.  And they have sometimes

09:32:47  6   forums where people can get up and ask marketing and all the

09:32:52  7   leaders questions.

09:32:52  8         And a girl got up in the audience and asked directly

09:32:56  9   about the abstract that was presented at San Antonio breast

09:33:01 10   conference.  And that was the first I had heard of it.

09:33:04 11         And she was given direction that the company knew,

09:33:06 12   they were investigating it.  Until they, you know, looked at it

09:33:10 13   all, that, you know, we were to proceed as usual with our

09:33:14 14   on-label discussions and, you know, like everything was going

09:33:19 15   to be okay.

09:33:20 16         And when you are in this position --

09:33:23 17         THE COURT:  Okay.  I think that's the answer to the

09:33:26 18   question.

09:33:26 19         MS. MENZIES:  Thank you, Your Honor.

09:33:28 20   EXAMINATION BY MS. MENZIES:

09:33:28 21   Q.    Were you ever permitted to talk to doctors or nurses about

09:33:32 22   that abstract?

09:33:32 23   A.    No.

09:33:33 24   Q.    Do you recall the name of the abstract?

09:33:47 25   A.    Seledak, S-E-L-E-D-A-K [verbatim].  I can't pronounce his

*OFFICIAL TRANSCRIPT*

09:33:57  1    name.  And it was seven patients that had permanent hair loss.

09:34:00  2    Q.    Okay.  Let's talk a little bit more about the risk of

09:34:21  3    permanent hair loss.  You were not -- were you allowed to talk

09:34:24  4    about permanent hair loss or risks related to Taxotere with

09:34:29  5    doctors at all?

09:34:31  6                MR. STRONGMAN:  Objection.  Leading again.

09:34:40  7                THE COURT:  Just rephrase your question.

09:34:41  8    EXAMINATION BY MS. MENZIES:

09:34:42  9    Q.    Okay.  Are you able to talk to doctors and nurses about

09:34:53 10    the side effects on the Taxotere label?

09:34:54 11    A.    If it's within the label, I'm allowed to speak to what's

09:34:57 12    in the label.

09:34:59 13    Q.    And did the label include permanent hair loss?

09:35:02 14    A.    It -- to my understanding, it did not include permanent

09:35:07 15    hair loss.

09:35:07 16    Q.    So you couldn't talk to doctors and nurses about that?

09:35:10 17                MR. STRONGMAN:  Same objection.

09:35:12 18    EXAMINATION BY MS. MENZIES:

09:35:12 19    Q.    And were you able to talk to doctors and nurses about

09:35:15 20    permanent hair loss?

09:35:15 21    A.    We were not able to talk to doctors and nurses about

09:35:18 22    anything that was not in the label, and I was not understanding

09:35:23 23    or told that my label meant that there was permanent hair loss.

09:35:27 24    Q.    If Sanofi had put the risk of permanent hair loss in the

09:35:40 25    label, could you have talked to doctors and nurses about that?

*OFFICIAL TRANSCRIPT*

09:35:43 1          MR. STRONGMAN:  Objection.

09:35:44 2          THE COURT:  Sustained.

09:35:45 3     EXAMINATION BY MS. MENZIES:

09:35:46 4     Q.    Did you ever have any conversations with Dr. Carinder or

09:35:50 5     Nurse Reso about Taxotere and the potential side effect of

09:35:59 6     permanent hair loss?

09:36:00 7     A.    I talked to Nurse Reso about loss.  I mean, it was a side

09:36:05 8     effect of the drug.  Its being permanent, no, and it being --

09:36:09 9     no.  No.  Because I didn't think it was permanent.  I wasn't

09:36:13 10    told it was permanent, so, I didn't say it was permanent or

09:36:16 11    have a conversation that it might be permanent.

09:36:19 12          We spoke to this.  We used things like

09:36:22 13    this (indicating).  And these -- to this day, understand this

09:36:27 14    as temporary, so I can't be conveying something that I didn't

09:36:32 15    think.

09:36:37 16          MS. MENZIES:  Thank you, Your Honor, no more questions

09:36:39 17    at this time.

09:36:41 18          THE COURT:  Thank you.

09:36:41 19             Mr. Strongman.

09:37:08 20          MR. STRONGMAN:  May I proceed, Your Honor?

09:37:09 21          THE COURT:  Yes, you may.

09:37:09 22                          CROSS-EXAMINATION

09:37:09 23    BY MR. STRONGMAN:

09:37:12 24    Q.    Good morning.  Now, Ms. Avila, you worked at Sanofi from

09:37:18 25    September 2004 until October 2009, correct?

*OFFICIAL TRANSCRIPT*

09:37:21  1    A.    Correct.

09:37:21  2    Q.    Now, if Ms. Earnest's treatment was in June of 2011, you

09:37:30  3    would have left Sanofi two years before that, correct?

09:37:32  4    A.    Yes.

09:37:33  5    Q.    So as it relates to this case with Ms. Earnest, you don't

09:37:36  6    have any personal knowledge in terms of what materials

09:37:40  7    Dr. Carinder would or would not have relied upon as it relates

09:37:44  8    to Taxotere during that June 2011 period, correct?

09:37:48  9    A.    Correct.

09:37:48  10   Q.    And as it relates to Dr. Carinder's nurses who worked with

09:37:53  11   him, in terms of what they would have reviewed, what they would

09:37:56  12   have thought was important regarding Taxotere in that June 2011

09:37:59  13   period, that would not be something that you would have

09:38:02  14   knowledge of, correct?

09:38:04  15   A.    Correct.

09:38:04  16   Q.    And obviously you were never in the room when Dr. Carinder

09:38:10  17   was discussing risks with his patients, correct?

09:38:12  18   A.    Correct.

09:38:13  19   Q.    And obviously you were not in the room when Dr. Carinder

09:38:15  20   was discussing risks with Ms. Earnest, correct?

09:38:17  21   A.    Correct.

09:38:18  22   Q.    And when you first started calling on Dr. Carinder, he was

09:38:30  23   already using Taxotere, correct?

09:38:32  24   A.    Correct.

09:38:32  25   Q.    And he was specifically already using Taxotere in the

*OFFICIAL TRANSCRIPT*

09:38:37  1   adjuvant setting, correct?

09:38:43  2   A.    The adjuvant indication was in 2005.  I mean, he started

09:38:49  3   using it when it was indicated.

09:38:51  4   Q.    Okay.  And if you previously said that when you started

09:38:54  5   calling on Dr. Carinder, he was already using it in the

09:38:57  6   adjuvant setting, you wouldn't disagree with that, correct?

09:39:00  7   A.    Probably not.  I mean, it was right around the same time.

09:39:03  8   Q.    And you also know that based on your interactions with

09:39:07  9   Dr. Carinder, he had good success with his patients with

09:39:09 10   Taxotere, correct?

09:39:10 11   A.    He liked the drug, yes.

09:39:11 12   Q.    And we know also that Dr. Carinder made his own decisions

09:39:16 13   about what regimens and what treatments to give patients,

09:39:19 14   correct?

09:39:19 15   A.    Correct.

09:39:20 16   Q.    And that's how it works; doctors make informed decisions

09:39:24 17   about what to give their patients, correct?

09:39:26 18   A.    Correct.

09:39:27 19   Q.    Doctors exercise their own independent medical judgment,

09:39:32 20   correct?

09:39:32 21   A.    Correct.

09:39:32 22   Q.    And I think we've established you were last at Sanofi

09:39:38 23   nearly ten years ago, correct?

09:39:40 24   A.    Correct.

09:39:40 25   Q.    But one of the things you talked about during your

*OFFICIAL TRANSCRIPT*

09:39:46  1   questions with Ms. Menzies was that you had a lot of training

09:39:49  2   when you were there; is that correct?

09:39:50  3   A.    Yes.  We had training all the time.

09:39:52  4   Q.    And when you were trained by Sanofi, they took that

09:39:57  5   training seriously, didn't they?

09:39:59  6   A.    I think that they did.

09:40:00  7   Q.    And when you were trained at Sanofi, they certainly told

09:40:05  8   you about the rules and how to interact with physicians,

09:40:05  9   correct?

09:40:09 10   A.    Correct.

09:40:09 11   Q.    And we can certainly agree as well, you were familiar with

09:40:22 12   the package insert while you were working on Taxotere, correct?

09:40:28 13   A.    I was definitely familiar with the package insert, but we

09:40:32 14   really didn't use it to detail the physicians.  It's tiny

09:40:37 15   writing; nobody can see it.  But, yes, I was familiar with it.

09:40:38 16   Q.    Well, Ms. Avila, your entire job in terms of what you can

09:40:44 17   tell a doctor --

09:40:46 18   A.    Is based on the package insert.

09:40:48 19   Q.    -- is controlled by what is in the package insert,

09:40:52 20   correct?

09:40:52 21   A.    Correct.

09:40:54 22   Q.    So certainly you must have read and paid attention to that

09:40:57 23   package insert?

09:40:58 24   A.    Oh, yeah.  I said that.  We know the package insert.  All

09:41:01 25   I said was we just -- I didn't pull a package insert out, these

*OFFICIAL TRANSCRIPT*

09:41:05 1    tiny things, and show it -- like, we used the sales things.

09:41:09 2    But, yes, it was all based on the package insert.  You can only

09:41:12 3    talk about the package insert.

09:41:14 4    Q.    Ms. Avila, you know that alopecia was always included as

09:41:18 5    an adverse event in the package insert, correct?

09:41:22 6    A.    Alopecia is -- there is language in the -- about it, yes.

09:41:26 7    Q.    Specifically, alopecia is included as an adverse event in

09:41:28 8    the package insert for Taxotere, correct?

09:41:32 9    A.    Yes, there is language about alopecia in the package

09:41:35 10   insert.

09:41:35 11   Q.    Now, the plaintiffs handed you what was marked as

09:41:51 12   Plaintiff's Exhibit 192.  Do you have that in front of you?

09:41:54 13   A.    Yes.

09:41:54 14   Q.    How many pages is it, the plaintiff's exhibit?

09:42:02 15   A.    Five.

09:42:02 16   Q.    Five pages, is that what you said?

09:42:02 17   A.    Yes.

09:42:08 18        MR. STRONGMAN:  May I approach, Your Honor?

09:42:10 19        THE COURT:  Yes, you may.

09:42:11 20   EXAMINATION BY MR. STRONGMAN:

09:42:14 21   Q.    Now, Ms. Avila, I've handed you what has been marked as

09:42:30 22   Defendant's Exhibit 570.  It is a whole lot more than five

09:42:35 23   pages, correct?

09:42:36 24   A.    Correct.

09:42:37 25        MR. STRONGMAN:  And defendants would offer for

*OFFICIAL TRANSCRIPT*

09:42:39  1    completeness Defendant's Exhibit 570.

09:42:43  2            THE COURT:  Any objection?

09:42:44  3            MS. MENZIES:  No objection.

09:42:45  4            THE COURT:  Let it be admitted.

09:42:45  5            (WHEREUPON, Defendant's Exhibit 570 was admitted.)

09:42:45  6    EXAMINATION BY MR. STRONGMAN:

09:42:46  7    Q.    And when you look at the document that I've handed you,

09:42:54  8    Defendant's Exhibit 570, what you see is there is a whole bunch

09:42:58  9    of information about all kinds of different side effects,

09:43:03 10    correct?

09:43:04 11    A.    Correct.

09:43:04 12    Q.    It's not just a single sheet on alopecia; is that correct?

09:43:08 13    A.    Correct.

09:43:08 14    Q.    And this document includes information about some serious

09:43:13 15    and life-threatening side effects, correct?

09:43:16 16    A.    Correct.

09:43:16 17    Q.    And if you could, I want to look at the same page that you

09:43:26 18    were shown in terms of the cover letter.  All right.  Are you

09:43:42 19    with me on that cover letter?

09:43:43 20    A.    Yes.

09:43:44 21    Q.    And the date of this is October 2006, correct?

09:43:48 22    A.    Correct.

09:43:48 23    Q.    And so this would obviously be five years before

09:43:54 24    Ms. Earnest ever received any treatment, best to your

09:43:56 25    knowledge, correct?

                          *OFFICIAL TRANSCRIPT*

09:43:56 1    A.    Correct.

09:43:57 2    Q.    And you were pointed out that it was to the nursing

09:44:02 3    professional.  Do you see that?

09:44:03 4    A.    Yes.

09:44:04 5    Q.    And I think what you said was how this would work with

09:44:07 6    regard to the specific -- there is more in here than just

09:44:11 7    tear sheets, correct?

09:44:12 8    A.    Oh, yeah.

09:44:13 9    Q.    There is a lot more in here than just tear sheets, right?

09:44:17 10   A.    Absolutely, there is a lot more in here.

09:44:18 11   Q.    But what you indicated in terms of the tear sheets is, the

09:44:21 12   way it would work is if a patient was experiencing a side

09:44:24 13   effect during treatment, the nurse could hand them one of those

09:44:27 14   tear sheets, correct?

09:44:28 15   A.    That was one way it could be utilized, yes.

09:44:33 16   Q.    In fact, there is a paragraph there that sets out all of

09:44:37 17   the tear sheets that were available.  It states that you can

09:44:41 18   hand these out to your patients depending on the side effects

09:44:45 19   they experience during treatment, correct?

09:44:58 20   A.    Correct.

09:44:58 21   Q.    Nothing in Document 570 is directed towards the

09:44:58 22   oncologist, him or herself, correct?  It's to the nursing

09:44:58 23   professional?

09:44:59 24   A.    It's says:  "Dear Oncology Nursing Professional."  It

09:45:03 25   doesn't mean a physician couldn't see this, but it is geared

*OFFICIAL TRANSCRIPT*

09:45:06  1    towards nurses.

09:45:06  2    Q.    It is not specifically geared towards a doctor like

09:45:09  3    Dr. Carinder, correct?  It's geared toward his nurse.  Fair?

09:45:11  4    A.    Exactly.

09:45:12  5    Q.    When you look at the letter, you can also see that it

09:45:24  6    actually attaches to it what?  What is this last bullet point

09:45:29  7    in the list?

09:45:30  8    A.    Yeah, we gave the PIA with everything.

09:45:35  9    Q.    So with every single thing that you handed out, you

09:45:39 10    actually provided the label, correct?

09:45:43 11    A.    Correct.

09:45:43 12    Q.    Do you know the last time Dr. Carinder -- let me ask it

09:45:46 13    this way:  Do you have any knowledge one way or another while

09:45:50 14    you were detailing Dr. Carinder, do you have any knowledge one

09:45:53 15    way or the other when the last time he looked at a Taxotere

09:45:57 16    label was?

09:45:59 17            MS. MENZIES:  Judge, that calls for speculation.

09:46:02 18            THE COURT:  She can answer it if she knows it.

09:46:06 19            MS. MENZIES:  Thank you, Judge.

09:46:06 20            THE WITNESS:  I don't know.

09:46:07 21    EXAMINATION BY MR. STRONGMAN:

09:46:16 22    Q.    One of the other things that's included in the brochure is

09:46:21 23    some dosing information, correct?  Yes?

09:46:25 24    A.    Yes.

09:46:25 25    Q.    It also includes some information on risks that happen

*OFFICIAL TRANSCRIPT*

09:46:32 1  because there are steroids that are administered with

09:46:40 2  chemotherapy treatment -- or before chemotherapy treatment; is

09:46:42 3  that right?  Do you see that?

09:46:43 4  A.    It says:  "Patient instruction sheet."  I mean, I've got

09:46:46 5  to get to that sheet.

09:46:46 6  Q.    Yeah.  Go ahead and look at it.

09:46:50 7  A.    Do you know what number it is?

09:46:53 8  Q.    Do you see how the exhibit has some numbers at the very

09:47:04 9  bottom in the right-hand corner, Ms. Avila?

09:47:04 10  A.    Uh-huh (affirmative response).

09:47:07 11  Q.    If you could go -- the last three are 490.

09:47:16 12  A.    Oh.  Yeah.  I'm here.

09:47:17 13  Q.    What you see on this is that this is information about --

09:47:27 14  that'd be given to a patient regarding steroid administration,

09:47:32 15  correct?

09:47:32 16  A.    Yeah.  They had to take steroids prior to getting this

09:47:36 17  medication to reduce potential for allergic reactions to the

09:47:44 18  drug.

09:47:45 19  Q.    That -- when you have to take steroids, that introduces a

09:47:51 20  different set of risks as well for a patient, correct?

09:47:54 21       MS. MENZIES:  Objection, Your Honor, calls for a

09:47:56 22  medical opinion.

09:47:57 23       THE COURT:  Sustained.  You have to lay a foundation.

09:47:57 24  EXAMINATION BY MR. STRONGMAN:

09:48:00 25  Q.    In the brochure that we have in front us that you said you

*OFFICIAL TRANSCRIPT*

09:48:04 1   provided to various oncology practices, does it include a sheet

09:48:10 2   about the steroid administration schedules?

09:48:14 3   A.   It did, because the patients had to take the steroids

09:48:17 4   starting the day before therapy.  It's hard to keep it

09:48:23 5   straight, how many pills to take when.  You start the day

09:48:28 6   before, and then you take the day of, and then you take the day

09:48:29 7   after, to try to reduce the chances of getting allergies, as

09:48:34 8   well as fluid retention, which was a side effect of our drug.

09:48:36 9   Q.   When you look at this sheet, over on the right-hand side

09:48:38 10  there is a bunch of information about risks, correct?

09:48:40 11  A.   Yes.

09:48:42 12  Q.   It says:  "Important safety information for Taxotere."

09:48:45 13  Correct?

09:48:45 14  A.   Yes.

09:48:46 15  Q.   Then there is a warning.  Do you see that?

09:48:48 16  A.   Yes.

09:48:51 17  Q.   What does the warning say, that first bullet point?

09:48:54 18  A.   "Taxotere treatment can cause serious physically limiting

09:49:00 19  and potentially life-threatening side effects, such as

09:49:04 20  infection, low blood counts, allergic reaction and retention of

09:49:12 21  excessive fluid," which is "edema," is in parenthesis.

09:49:14 22  Q.   These are life-threatening, serious side effects that you

09:49:17 23  would discuss with physicians regarding Taxotere, correct?

09:49:21 24  A.   Correct.

09:49:22 25  Q.   If you go down, there is a bullet point that says:

*OFFICIAL TRANSCRIPT*

09:49:25  1    "Treatment-related."  Do you see that?

09:49:26  2    A.    Yes.

09:49:30  3    Q.    What does it say?

09:49:32  4    A.    "Treatment-related acute myeloid leukemia, AML, has

09:49:40  5    occurred in patients given anthracyclines and/or

09:49:44  6    cyclophosphamide, including use with Taxotere in adjuvant

09:49:48  7    therapy for breast cancer."

09:49:48  8    Q.    Is that a secondary cancer?

09:49:50  9    A.    Yes.

09:49:50 10    Q.    Would you discuss the risks of secondary cancer with

09:49:55 11    chemotherapy with oncologists?

09:50:03 12    A.    I can't say that I didn't, but I can't recall having that

09:50:08 13    conversation.  Like, certainly, we knew of it because years

09:50:11 14    later women appeared with AML, but I don't remember

09:50:14 15    specifically speaking -- I can't say that I specifically spoke

09:50:19 16    about this.

09:50:19 17    Q.    We know that, based on the package insert and based on the

09:50:22 18    information that you have here, that even risks like secondary

09:50:27 19    cancers come with the information regarding chemotherapies,

09:50:31 20    correct?

09:50:31 21         MS. MENZIES:  Objection, Your Honor, calls for a

09:50:37 22    medical opinion.

09:50:38 23         THE COURT:  Overruled.

09:50:40 24         THE WITNESS:  Can you repeat the question?

09:50:41 25    EXAMINATION BY MR. STRONGMAN:

                          *OFFICIAL TRANSCRIPT*

09:50:42  1   Q.   Absolutely.  So you know in the package insert that it

09:50:45  2   includes risks for things including secondary cancers, correct?

09:50:52  3   A.   I mean, it says here that it does.

09:50:56  4   Q.   Right.  That's a serious risk, correct?

09:50:59  5   A.   All the risks are serious.

09:51:02  6   Q.   Those are the kinds of things you would talk to doctors

09:51:05  7   about, correct?

09:51:05  8   A.   Yes.

09:51:05  9   Q.   Okay.  If you go down, there is another paragraph

09:51:11 10   regarding *Other Common Side Effects*.  Do you see that?

09:51:14 11   A.   Yes.

09:51:15 12   Q.   It lists hair loss, correct?

09:51:20 13   A.   Hair loss is listed.

09:51:21 14   Q.   Now, I want to take a look at the specific sheet on

09:51:38 15   alopecia.  Do you remember this?

09:51:48 16   A.   Yes.

09:51:50 17   Q.   In this sheet there is a question posed:  "Will my hair

09:51:56 18   grow back?"  Do you see that?

09:51:57 19   A.   Uh-huh (affirmative response).

09:51:57 20   Q.   The answer is:  "If you do lose your hair, it will usually

09:52:03 21   grow back after treatments are over."  Did I read that

09:52:06 22   correctly?

09:52:06 23   A.   Yes.

09:52:07 24   Q.   If I were to get the Webster's dictionary and pull out the

09:52:12 25   definition for *usually*, it's not going to say always, correct?

**OFFICIAL TRANSCRIPT**

09:52:20  1    A.    I don't think it would say always.

09:52:22  2    Q.    Usually does not mean always, correct?

09:52:25  3    A.    Correct.

09:52:25  4    Q.    There is a footnote at the end of that bullet point.  Do

09:52:32  5    you see that?

09:52:32  6    A.    Yes.

09:52:32  7    Q.    If we could go down and look at the bottom, that's

09:52:39  8    Footnote Reference 2, correct?

09:52:43  9    A.    Yes.

09:52:43 10    Q.    Is the footnote actually to the package insert?

09:52:49 11    A.    No.

09:52:52 12    Q.    It's actually referencing the American Cancer Society,

09:52:52 13    correct?

09:52:56 14    A.    Correct.

09:52:56 15    Q.    Now, do you know if the American Cancer Society puts out

09:52:59 16    information for patients regarding definitions of terms?

09:53:05 17    A.    They do.

09:53:06 18    Q.    Are you familiar with the American Cancer Society's

09:53:10 19    breast cancer dictionary?

09:53:12 20    A.    I'm not familiar with that specific document, but I ran

09:53:20 21    Look Good Feel Better.

09:53:20 22    Q.    Do you know whether or not the American Cancer Society has

09:53:23 23    a definition of alopecia in a breast cancer dictionary?

09:53:27 24         MS. MENZIES:  Objection, speculation.  Lack of

09:53:29 25    foundation.

**OFFICIAL TRANSCRIPT**

09:53:29  1    THE WITNESS:  No.  I mean, I know they have -- you're

09:53:32  2  saying they have it, but I don't know.

09:53:33  3    THE COURT:  I'm going to let her --

09:53:36  4  EXAMINATION BY MR. STRONGMAN:

09:53:36  5  Q.    So you just don't know one way or another?

09:53:38  6  A.    No.

09:54:02  7    MR. STRONGMAN:  May I approach, Your Honor?

09:54:05  8    THE COURT:  Yes, you may.

09:54:06  9  EXAMINATION BY MR. STRONGMAN:

09:54:23 10  Q.    Ms. Avila, I've handed you what I've marked as Defendant's

09:54:26 11  Exhibit Number 5.  Do you see that?

09:54:28 12  A.    Yep.

09:54:28 13  Q.    This is the package insert dated September 28, 2007; is

09:54:34 14  that correct?

09:54:34 15  A.    Yes.

09:54:37 16  Q.    This would have been one of the package inserts that would

09:54:42 17  have been in effect during the time that you worked at Sanofi

09:54:45 18  and the time that you worked on Taxotere; is that correct?

09:54:49 19  A.    Correct.

09:54:53 20    MR. STRONGMAN:  Your Honor, I would move into evidence

09:54:55 21  Defendant's Exhibit D-5.

09:54:57 22    THE COURT:  Any objection?

09:54:58 23    MS. MENZIES:  No objection, Your Honor.

09:55:02 24    THE COURT:  Let it be admitted.

09:55:02 25    (WHEREUPON, Defendant's Exhibit D-5 was admitted.)

*OFFICIAL TRANSCRIPT*

09:55:02 1          MR. STRONGMAN:  If you could bring it up.

09:55:06 2   EXAMINATION BY MR. STRONGMAN:

09:55:06 3   Q.   So, Ms. Avila, if you look at the front page, I want to

09:55:10 4   start with:  *Dosing and Administration*.  Do you see that?

09:55:12 5   A.   Correct.  I see it.

09:55:14 6   Q.   Can you read what it says -- it's on the screen in front

09:55:18 7   of you, too, if it's easier -- can you read what it says in

09:55:21 8   terms of the dosing and administration for adjuvant treatment?

09:55:26 9   A.   "Breast cancer adjuvant:  75 milligrams per meter squared

09:55:44 10  administered one hour after doxorubicin 50 milligrams per meter

09:55:48 11  squared and cyclophosphamide 500 milligrams per meter squared

09:55:51 12  every three weeks for six cycles."

09:55:53 13  Q.   With regard to the adjuvant treatment regimen, that's what

09:55:58 14  we would call *on label*, correct?  The on-label regimen and

09:56:05 15  dose, correct?

09:56:06 16  A.   Oh, yeah, this is -- yes, this is the label.

09:56:09 17  Q.   When you would talk with doctors about Taxotere and

09:56:14 18  regimens and dose, you were not allowed to talk about off-label

09:56:17 19  doses and regimens, correct?

09:56:17 20  A.   Correct.

09:56:20 21  Q.   In fact, staying on label was very important for you,

09:56:20 22  correct?

09:56:26 23  A.   For me, yes.

09:56:27 24  Q.   It was very important because that's just what the rules

09:56:32 25  were, correct?

*OFFICIAL TRANSCRIPT*

09:56:33   1   A.   For me, the rules are that I have to speak to on label.

09:56:40   2   Oncologists use drugs off label all the time.

09:56:40   3   Q.   Correct.  But you can't recommend --

09:56:46   4   A.   I can't talk about it.

09:56:47   5   Q.   You can't talk about it.  You can't recommend it.

09:56:50   6            In fact, if a doctor were to bring up an off-label

09:56:52   7   use, an off-label regimen, an off-label dose, you would have to

09:56:58   8   shut that conversation down, correct?

09:57:00   9   A.   Correct.

09:57:00  10   Q.   Sanofi has an entire separate operation called the medical

09:57:05  11   science liaison that you could refer a doctor to, correct?

09:57:09  12   A.   Correct.  If they want to have an off-label discussion

09:57:14  13   about the drug, you're supposed to call in your medical science

09:57:18  14   liaison to have that conversation with them.

09:57:20  15   Q.   So the company actually provides for a doctor an avenue

09:57:24  16   for them to have a conversation with people specifically on the

09:57:28  17   medicine and science, correct?

09:57:29  18   A.   Correct.

09:57:29  19   Q.   That person is not you, correct?

09:57:33  20   A.   No, not in this role.

09:57:34  21   Q.   So they split the medical and science conversation from

09:57:39  22   sales, correct?

09:57:40  23   A.   Correct.

09:57:40  24   Q.   That's a good thing, isn't it?

09:57:41  25   A.   I understand the purpose, yes.

***OFFICIAL TRANSCRIPT***

09:57:43  1    Q.    If you look at this label, I want to show you -- we've

09:57:59  2    seen this before, but you understand that in the label -- this

09:58:04  3    is in Defendant's Exhibit Number 5 -- that it states

09:58:09  4    specifically that once you've completed all your treatments,

09:58:11  5    hair generally grows back, correct?

09:58:14  6    A.    Correct.

09:58:15  7    Q.    If hair generally grows back is what is in the label, that

09:58:21  8    would have been your message to doctors, correct?

09:58:25  9    A.    Yeah, we thought it grew back.  I mean, yeah.

09:58:29 10    Q.    Because if hair generally grows back is what is in the

09:58:33 11    label, that is what you are bound to in terms of your

09:58:37 12    conversation with a doctor, correct?

09:58:40 13    A.    Correct.  And also to my tools.

09:58:43 14    Q.    If I took out the Webster's dictionary and looked up

09:58:49 15    *generally*, it's not going to say always, correct?

09:58:52 16    A.    It's not going to say always.  But, generally -- and

09:58:59 17    this -- we were not instructed that it did not grow back.

09:59:04 18    Like, we -- this, to me, meant it grew back.

09:59:06 19    Q.    Ms. Avila, you had to stick to the label, fair enough,

09:59:10 20    right?

09:59:10 21    A.    Correct.

09:59:10 22    Q.    You were asked some questions about something that you may

09:59:14 23    or may not have heard about Dr. Sedlacek.  Do you remember

09:59:19 24    that?

09:59:19 25    A.    Yes.

*OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 09:59:21 | 1 | Q.   Dr. Sedlacek presented a poster in 2006, correct? |
| 09:59:32 | 2 | A.   Correct. |
| 09:59:32 | 3 | Q.   That was to a whole convention of oncologists, correct? |
| 09:59:37 | 4 | A.   Correct. |
| 09:59:37 | 5 | Q.   It was public, correct? |
| 09:59:39 | 6 | A.   Correct. |
| 09:59:39 | 7 | Q.   It wasn't hidden, correct? |
| 09:59:40 | 8 | A.   Correct. |
| 09:59:41 | 9 | Q.   What we know is that the dose in the Sedlacek paper was |
| 09:59:50 | 10 | off label, correct? |
| 09:59:52 | 11 | A.   I don't recall the details of that. |
| 09:59:53 | 12 | Q.   But you couldn't talk about the Sedlacek paper because it |
| 09:59:58 | 13 | was off label, correct? |
| 10:00:00 | 14 | A.   No, I couldn't talk about it because my company didn't |
| 10:00:05 | 15 | allow me to speak about it.  It was not an approved marketing |
| 10:00:11 | 16 | piece. |
| 10:00:11 | 17 |         I don't know if it was -- if the doses that they used |
| 10:00:14 | 18 | in Sedlacek were off label or not, but I couldn't talk about it |
| 10:00:19 | 19 | because it wasn't something in my toolkit that the company |
| 10:00:22 | 20 | provided me. |
| 10:00:22 | 21 |         They knew about it, but I wasn't given that to talk |
| 10:00:24 | 22 | to the physicians with or given any talking about points on it. |
| 10:00:28 | 23 | Q.   What we also know is that when you -- well, let me put it |
| 10:00:42 | 24 | this way.  You understand that case reports are anecdotal |
| 10:00:48 | 25 | information, correct? |

**OFFICIAL TRANSCRIPT**

10:00:49  1    A.    Yes, I do.

10:00:50  2    Q.    You can't talk about anecdotal information with your

10:00:54  3    doctors, correct?

10:00:55  4    A.    Correct.

10:00:55  5    Q.    There is good reason for that, right?

10:00:57  6    A.    Yes.

10:00:58  7    Q.    So if you heard one doctor tell you that you had a

10:01:02  8    patient -- or that that doctor, he or she, had a patient that

10:01:05  9    had a really good outcome with the medication, Taxotere, but

10:01:12 10    used in an off-label setting, you would be prohibited from

10:01:16 11    going to another doctor and saying:  Hey, this oncologist had a

10:01:24 12    great outcome using it in a different way than is in the label.

10:01:25 13    You should try that too.

10:01:28 14          You couldn't do that, correct?

10:01:29 15    A.    No, I could not do that.

10:01:31 16    Q.    So anecdotal information, you can't share it, good or bad,

10:01:35 17    right?

10:01:35 18    A.    Correct.

10:01:36 19    Q.    It has to be through the controlled channels that the

10:01:40 20    company has in place for determining what goes into the package

10:01:45 21    insert, correct?

10:01:45 22    A.    Correct, which is why I depended on my company to give me

10:01:50 23    that information that was appropriate and correct.

10:01:51 24    Q.    What you also know is that doctors, just like the doctors

10:01:53 25    at a conference, they have multiple sources of information,

604

10:01:57 1    correct?

10:01:57 2    A.    Correct.

10:01:57 3    Q.    They don't just get information from you, correct?

10:02:00 4    A.    Correct.

10:02:00 5    Q.    With regard to -- let me just back up to this.  With

10:02:06 6    regard to this nurse pamphlet, when you were working with this

10:02:15 7    document, you would have certainly dropped off the entire

10:02:20 8    document to the office, correct?

10:02:21 9    A.    Yeah, we would dissect it.

10:02:23 10   Q.    You wouldn't just drop off one or two pages or five pages;

10:02:27 11   you would drop off the whole document, correct?

10:02:28 12   A.    Yeah, and it was not the only thing that we used as well.

10:02:31 13   Q.    Right.  You also know that this is dated in 2006, correct?

10:02:34 14   A.    Correct.

10:02:35 15   Q.    You certainly have no information about whether or not

10:02:39 16   Ms. Earnest ever saw one single page of this document, correct?

10:02:42 17   A.    I do not know what Ms. Earnest saw.

10:02:44 18   Q.    Do you know whether or not Nurse Reso even handed out any

10:02:49 19   information to patients that she received from Sanofi

10:02:55 20   salespeople; do you know one way or another?

10:02:57 21   A.    I know that they needed a lot.  They called me for them.

10:03:00 22   They ran out of them.  I handed them out like candy.

10:03:04 23   Q.    But you know you were never in any of those meetings with

10:03:07 24   Nurse Reso and any of her patients, correct?

10:03:10 25   A.    I was not in the meetings.

*OFFICIAL TRANSCRIPT*

10:03:12 1    Q.   We've talked about it, you saw in the package insert, you

10:03:24 2    saw in the nurse packet that we've talked about, you know that

10:03:30 3    chemotherapy treatment drugs have serious side effects,

10:03:30 4    correct?

10:03:30 5    A.   Correct.

10:03:33 6    Q.   You also know that when you were talking to doctors about

10:03:36 7    the side effects of Taxotere, the side effect profile, the

10:03:39 8    primary discussion points were those side effects that had the

10:03:42 9    potential to be serious, if not life threatening, correct?

10:03:46 10   A.   Correct.

10:03:46 11   Q.   While you weren't calling on Dr. Carinder any time in the

10:03:59 12   two years before Ms. Earnest was treated, you said you did have

10:04:04 13   conversations with Dr. Carinder a couple of times a month while

10:04:09 14   you were at the company, correct?

10:04:12 15   A.   I was at the clinic a couple times a month.  I can't say I

10:04:16 16   spoke to him every single time I was in there.  Those would

10:04:20 17   have been more documented calls.  But I frequented the clinic

10:04:24 18   probably more than I put it in the computer.

10:04:26 19   Q.   Well, certainly, when it comes to conversations with

10:04:30 20   Dr. Carinder in a professional capacity, what you're saying is

10:04:34 21   that you actually physically talked to him less than once a

10:04:37 22   month?

10:04:38 23   A.   I don't really recall what I had documented.  He's very

10:04:42 24   accessible.  He's very easy to see.  I saw him a lot, and I

10:04:48 25   still do.

*OFFICIAL TRANSCRIPT*

10:04:48  1    Q.    But when you dealt with Dr. Carinder in the brief

10:04:53  2    encounters that you did have with him, were you fair and

10:04:58  3    balanced?

10:04:58  4    A.    Yes.

10:04:58  5    Q.    That means you have to talk about benefits and risks,

10:05:02  6    both, right?

10:05:02  7    A.    Correct.

10:05:03  8    Q.    When you talked to Dr. Carinder, you certainly never

10:05:08  9    strayed off the label, correct?

10:05:10 10    A.    Correct.

10:05:10 11    Q.    You certainly never made any promises to Dr. Carinder

10:05:14 12    about any side effects, correct?

10:05:17 13    A.    No.

10:05:17 14    Q.    So you were detailing Dr. Carinder in 2005, correct?

10:05:26 15    A.    Correct.

10:05:26 16    Q.    At any time did Dr. Carinder ever tell you that he had a

10:05:36 17    patient in 2005 that had persistent hair loss after taking AC

10:05:45 18    followed by Taxotere at 100 milligrams?

10:05:51 19    A.    Not that I recall.

10:05:52 20    Q.    So you don't ever have any recollection of Dr. Carinder

10:05:56 21    telling you that he had a patient with persistent or permanent

10:06:03 22    hair loss in 2005, correct?

10:06:04 23          MS. MENZIES:  Objection, asked and answered.

10:06:06 24          THE COURT:  Asked and answered.  Sustained.

10:06:08 25    EXAMINATION BY MR. STRONGMAN:

*OFFICIAL TRANSCRIPT*

10:06:09   1    Q.    If you did get such a report from Dr. Carinder, you would

10:06:13   2    have had to call it in within 24 hours, correct?

10:06:16   3    A.    Yeah, because it's not a usual side effect of the drug.

10:06:19   4    We weren't telling the doctors that it could cause permanent

10:06:22   5    hair loss.  So if he told me that, I would have put in a

10:06:25   6    medical information request for the medical side to contact him

10:06:28   7    about that.

10:06:28   8    Q.    Exactly.  Because if you got that kind of report from

10:06:33   9    Dr. Carinder, it goes into the system to be reported and

10:06:36  10    followed up on, correct?

10:06:38  11    A.    Correct.

10:06:38  12    Q.    Dr. Carinder never told you about his 2005 patient that

10:06:42  13    you remember, correct?

10:06:45  14          MS. MENZIES:  Objection, asked and answered.

10:06:47  15          THE COURT:  It's been asked and answered.  Sustained.

10:06:48  16    EXAMINATION BY MR. STRONGMAN:

10:06:49  17    Q.    Now, with regard to Taxotere, you didn't just work in this

10:06:53  18    New Orleans area, correct?

10:06:55  19    A.    Correct.

10:06:55  20    Q.    In fact, you had a territory that had 19 cities, correct?

10:07:04  21    A.    Over the five-year span, my territory changed a lot.  I

10:07:11  22    don't know if it was up to 19 cities, but it might be.  I mean,

10:07:15  23    I had New Orleans, Jackson, Gulf Coast.

10:07:17  24    Q.    So you had -- you had many hospitals in many cities in two

10:07:21  25    different states, correct, that you called on?

*OFFICIAL TRANSCRIPT*

10:07:23  1    A.    Yes.

10:07:24  2    Q.    During all of those visits to the various oncology

10:07:33  3    practices, you would have conversations with those doctors

10:07:36  4    about Taxotere, correct?

10:07:38  5    A.    Correct.

10:07:38  6    Q.    In your experience, doctors would be open with you if they

10:07:44  7    were seeing something with Taxotere that they did not expect,

10:07:44  8    correct?

10:07:49  9    A.    Correct.

10:07:49 10    Q.    During all the time that you worked on Taxotere, from 2004

10:07:55 11    until 2009, you do not recall one single doctor relaying to you

10:08:03 12    any concern about a side effect of permanent hair loss,

10:08:11 13    correct?

10:08:11 14    A.    To me directly, no.

10:08:12 15    Q.    No doctor in 19 cities or two states over five years ever

10:08:18 16    said to you:  My patient's hair did not grow back.  Correct?

10:08:24 17         MS. MENZIES:  Objection, asked and answered.

10:08:26 18         THE COURT:  Sustained.

10:08:27 19    EXAMINATION BY MR. STRONGMAN:

10:08:28 20    Q.    Now, Ms. Avila, you were terminated for misconduct,

10:08:32 21    correct?

10:08:34 22    A.    I violated the policy of the lunch, correct.

10:08:36 23    Q.    Now, you testified that you sent a lunch to an office, but

10:08:43 24    that you didn't attend the meeting, correct?

10:08:45 25    A.    I forgot to cancel it.  We were traveling for a company

*OFFICIAL TRANSCRIPT*

10:08:49 1   meeting that day, so I wasn't in attendance at the lunch.

10:08:53 2   That's the company policy, and I was fired for that.

10:08:55 3   Q.   Now, Ms. Avila, the truth of the matter is you were fired

10:09:02 4   for more than just sending a pizza and not attending a lunch,

10:09:08 5   correct?

10:09:08 6   A.   No, it's not correct.  I was accused of a lot of other

10:09:10 7   things, but ultimately that is what I was fired for.

10:09:15 8   Q.   Now, Sanofi had a code of how you had to interact with

10:09:21 9   physicians, correct?

10:09:22 10  A.   Correct.

10:09:22 11  Q.   You knew that code, correct?

10:09:24 12  A.   Correct.

10:09:24 13  Q.   You had a dinner program in 2009 where you received a gift

10:09:35 14  card back from a restaurant instead of having the refund put on

10:09:40 15  the company credit card, correct?

10:09:42 16  A.   No.  That's not correct.  That's not how that happened.  I

10:09:48 17  was not fired for that.

10:09:49 18        I was not the only person present at that dinner

10:09:52 19  program.  Michael Gillespie was there, and he was senior to me.

10:09:56 20  He was party to everything that happened there, which is why I

10:09:58 21  was not fired for that, because he would have been fired as

10:10:03 22  well.

10:10:03 23        I was fired for the pizza.  Yes, that incident was

10:10:06 24  brought up in my HR conversation, as well as a lot of other

10:10:09 25  things that they were not able to prove.

**OFFICIAL TRANSCRIPT**

10:10:12  1          Our company was about to have company layoffs, and we

10:10:15  2     had three people that worked in my geography.  Somebody had to

10:10:19  3     go.

10:10:21  4          I worked for a manager who, the moment I got married

10:10:26  5     in 2009, was like:  Are you going to get pregnant?  I got fired

10:10:32  6     right after I got pregnant.

10:10:33  7          So, there is a lot more to that story.  I got fired

10:10:37  8     for the pizza, and I resent you bringing it up.

10:10:41  9     Q.   Ms. Avila, you sued Sanofi, correct?

10:10:49 10     A.   I entered a wage claim against Sanofi because I wanted to

10:10:53 11     get the money back that I earned in 2008, when I won regional

10:10:57 12     award of the year and completed all of that.  I was due that

10:11:03 13     money, to my understanding.

10:11:04 14          So I sought counsel for that.  He recommended -- very

10:11:09 15     vehemently, he recommended that I should get the money back,

10:11:14 16     because he felt like Louisiana statute said, if you earn it,

10:11:18 17     you should get it.  I had earned it in 2008.

10:11:21 18     Q.   My question was:  You filed a lawsuit against Sanofi,

10:11:24 19     correct?

10:11:24 20     A.   Yes.

10:11:25 21     Q.   The lawsuit wasn't successful, correct?

10:11:28 22     A.   No, it was not.

10:11:28 23     Q.   Now, you know --

10:11:30 24          MR. STRONGMAN:  May I approach the witness, Your Honor?

10:11:32 25          THE COURT:  Yes, you may.

                              *OFFICIAL TRANSCRIPT*

10:11:52  1        MS. MENZIES:  Your Honor, objection.  Objection on

10:11:56  2   relevance.

10:12:03  3   EXAMINATION BY MR. STRONGMAN:

10:12:04  4   Q.   Ms. Avila, as part of your lawsuit --

10:12:07  5        THE COURT:  Wait.

10:12:08  6        MS. MENZIES:  We have some objections to this.

10:12:08  7        MR. STRONGMAN:  Do you want me to approach?

10:12:08  8        THE COURT:  Yes.

10:12:08  9        (WHEREUPON, at this point in the proceedings, a

10:12:08 10   conference was held at the bench.)

10:12:30 11        MR. STRONGMAN:  So Ms. Avila said it was the pizza.  In

10:12:33 12   her lawsuit, it explains that the gift card was part of her

10:12:37 13   firing, and that she took doctors to dinner with the gift card.

10:12:42 14   She just denied that.

10:12:44 15        THE COURT:  She took doctors to dinner with the gift

10:12:47 16   card?

10:12:47 17        MR. STRONGMAN:  Correct.

10:12:48 18        THE COURT:  So she didn't use it on herself?

10:12:50 19        MR. STRONGMAN:  Correct.  She then took doctors out to

10:12:53 20   dinner on it, which violated the code.  That's documented in

10:12:56 21   her lawsuit.

10:13:06 22        THE COURT:  What's the objection?

10:13:07 23        MS. MENZIES:  The objection is relevance.  He asked her

10:13:15 24   about the gift card.  She admitted that she -- that that was an

10:13:19 25   issue.  She talked about how other people were involved.

**OFFICIAL TRANSCRIPT**

10:13:21  1              So she's already answered this question.  She

10:13:23  2     didn't say --

10:13:23  3              MR. STRONGMAN:  This is a case, Judge.  This isn't some

10:13:23  4     kind of sworn testimony or something.

10:13:23  5              MR. COFFIN:  (Inaudible).

10:13:30  6              THE COURT REPORTER:  I really can't hear you.

10:13:31  7              THE COURT:  Well, that's because she's supposed to be

10:13:33  8     arguing.

10:13:46  9              You need to show me what word I'm looking for.

10:13:50  10             MR. STRONGMAN:  If you look here and here, it's these

10:13:55  11    two paragraphs.  She admitted to doing what she just denied

10:13:59  12    doing.  It's clear impeachment.  This is the reported decision

10:14:04  13    on her case.

10:14:14  14             THE COURT:  I'm going to let you ask the question, but

10:14:17  15    you understand on redirect, she's going to be able to say she

10:14:23  16    didn't use the gift card to buy anything except --

10:14:26  17             MR. STRONGMAN:  The problem was that she did use it for

10:14:30  18    doctors.  That was the problem.  Because that's not allowed.

10:14:31  19             MS. MENZIES:  She didn't -- but she didn't deny she

10:14:36  20    used it with doctors.  But she isn't recalling that.  That is

10:14:40  21    in the opinion.  And also, it's going to be -- the problem,

10:14:44  22    Judge, is the jurors, they're going to start trying the case

10:14:58  23    on --

10:14:58  24             THE COURT REPORTER:  I can't hear you.

10:14:58  25             THE COURT:  Y'all have got to start talking where I can

                                    *OFFICIAL TRANSCRIPT*

10:14:58  1   hear you.

10:14:58  2       MS. MENZIES:  The problem is we're going to end up

10:14:58  3   retrying the case against Sanofi here on the stand, and it's

10:15:01  4   just simply not relevant.  She didn't deny that she was accused

10:15:03  5   of using this gift card incorrectly.  She explained the

10:15:09  6   circumstances of what happened to it.

10:15:11  7           He wants to point out that it was in judgment.

10:15:13  8   My concern is if we continue down this past path, we are going

10:15:17  9   to start retrying the case, and it has nothing to do with this

10:15:20 10   case here.

10:15:21 11       MR. STRONGMAN:  It all goes to her credibility.

10:15:24 12   They've brought her in here with an ax to grind, and it goes to

10:15:27 13   her credibility.

10:15:28 14       MS. MENZIES:  She testified she doesn't have an ax to

10:15:30 15   grind.

10:15:30 16       MR. STRONGMAN:  Of course she did.  I know.

10:15:33 17       THE COURT:  I'm going to allow you to ask her -- this

10:15:45 18   is, I have to tell you, difficult for someone that's not a

10:15:52 19   lawyer to follow.

10:15:53 20           I will allow you to ask her if her getting the

10:15:57 21   gift cards and subsequently using it for these purposes was a

10:16:01 22   violation of a policy, and was that part of the reason she was

10:16:04 23   fired.

10:16:04 24           Her testimony -- very frankly, it was a little

10:16:12 25   less, I think, clear for me what her testimony was about that

**OFFICIAL TRANSCRIPT**

10:16:20  1    because --

10:16:21  2            MR. STRONGMAN:  About the gift card, you mean?

10:16:23  3            THE COURT:  Yeah.  She said, yeah, that was part it,

10:16:25  4    but my boss was there, he did it too.  I was the one that got

10:16:29  5    blamed.  But I think you can -- where are we going with this?

10:16:36  6            MR. STRONGMAN:  It goes to her bias.

10:16:38  7            THE COURT:  I understand why you say she's got an ax to

10:16:41  8    grind.

10:16:41  9            MR. STRONGMAN:  I think it's a fair interpretation,

10:16:43 10    that's all.  That's a fair interpretation of the situation

10:16:45 11    we're in.  And her bias and credibility is relevant.

10:16:50 12            THE COURT:  Do you think this brings more than what

10:16:52 13    she's already admitted?

10:16:54 14            MR. STRONGMAN:  She denied --

10:16:57 15            THE COURT:  She didn't deny the gift card.

10:17:01 16            MR. STRONGMAN:  She denied she was fired for that.  And

10:17:03 17    it was clearly part of the reason she was fired.

10:17:06 18            MS. MENZIES:  She does deny that she understood that HR

10:17:09 19    told her that she was fired because --

10:17:09 20            THE COURT:  I think this is what I'm going to do.  I

10:17:12 21    think you need to ask the questions again, and if she ventures

10:17:16 22    far from it, I think you can direct her to it.  I think that's

10:17:16 23    fair.

10:17:24 24            THE COURT REPORTER:  The objection time goes to --

10:17:27 25            THE COURT:  The objection time goes to nobody.

*OFFICIAL  TRANSCRIPT*

10:17:57 1    EXAMINATION BY MR. STRONGMAN:

10:18:03 2    Q.    Ms. Avila, you got a gift card after a dinner program,

10:18:09 3    correct?  In 2009, correct?

10:18:14 4    A.    Yes.

10:18:14 5    Q.    And you used that gift card, and you took a doctor and a

10:18:19 6    nurse out to dinner, correct?

10:18:21 7    A.    Correct.  Am I allowed to give context around these

10:18:25 8    questions?

10:18:26 9           THE COURT:  Excuse me, ma'am.  What?

10:18:28 10          THE WITNESS:  Am I allowed to give context around these

10:18:30 11   questions?

10:18:30 12          THE COURT:  I think you just need to answer the

10:18:32 13   questions for now.

10:18:37 14   EXAMINATION BY MR. STRONGMAN:

10:18:38 15   Q.    And Sanofi believed that you doing that was a violation of

10:18:42 16   the company's prohibition of using funds for anything like

10:18:49 17   that, correct?

10:18:50 18   A.    They did.  And had I not sent the pizza, I would have been

10:18:54 19   disciplined with that, along with Michael Gillespie, who was my

10:18:59 20   superior, who was with me at the time that we received the gift

10:19:02 21   card, instead of wine or steak, which is what a lot of reps did

10:19:08 22   at the time, taking that home, because you invite ten people to

10:19:11 23   a dinner program and four show up, and you've guaranteed ten

10:19:15 24   people to the restaurant and there is all of this money left

10:19:18 25   over.  So what do you do with it?

*OFFICIAL TRANSCRIPT*

10:19:20 1          I didn't want to take steak or wine.  I conferred

10:19:25 2   with Michael.  We decided to do the gift card and use it for

10:19:29 3   the company.  That's not why I got fired.  I was fired for the

10:19:36 4   pizza.

10:19:37 5   Q.   Ms. Avila, is it fair to say you're upset with the

10:19:41 6   company?

10:19:41 7   A.   No.  I'm upset with you right now because this is uncalled

10:19:48 8   for.

10:19:49 9          MR. STRONGMAN:  I don't have any other questions.

10:19:51 10          THE COURT:  Okay.  Ladies and gentlemen of the Jury,

10:19:55 11   it's time for our morning break.  Court will be at recess until

10:20:00 12   10:30.  I remind you don't discuss the case amongst yourselves

10:20:04 13   or with anyone else.  Court will be in recess until 10:30.

10:20:11 14          (WHEREUPON, at 10:20 a.m. the jury panel leaves the

10:20:31 15   courtroom.)

10:20:31 16          THE COURT:  You cannot discuss your testimony with

10:20:33 17   anyone.

10:20:42 18          MS. SASTRE:  Your Honor, I do have something I'd like

10:20:54 19   to raise very quickly.  I think that people are expected to act

10:20:56 20   a certain way in a courtroom when the jury is present.  The

10:21:01 21   witness' statement was not a joke.  I noticed none of the

10:21:04 22   jurors laughed.  There wasn't any laughing on our side of the

10:21:08 23   room.

10:21:08 24          This was the about the third or fourth time that,

10:21:10 25   for some reason, the left side of the room erupts in laughter.

*OFFICIAL TRANSCRIPT*

10:21:15 1    I think it's inappropriate.  They liked that she sort of said

10:21:17 2    something back to him that was a punch back at Mr. Strongman.

10:21:23 3    "I'm upset with you."  And I just think it's not appropriate,

10:21:25 4    Judge.

10:21:25 5         MR. COFFIN:  Your Honor, we're human beings.  If

10:21:29 6    there's something funny that's said, we all laugh, and that's

10:21:31 7    the reality.

10:21:33 8         THE COURT:  I think everyone should comport themselves

10:21:38 9    with appropriate decorum for being in the courtroom.  I have to

10:21:41 10   tell you, I'm not sure that it was limited to one side.  But

10:21:50 11   everybody should control themselves.  Thank you.  We'll be at

10:21:54 12   recess.

10:21:55 13        (WHEREUPON, at 10:21 a.m. the Court took a recess.)

10:32:12 14        THE DEPUTY CLERK:  All rise.

10:32:13 15        THE COURT:  Please bring in the jury.

10:32:48 16        (WHEREUPON, at 10:32 a.m. the jury panel enters the

10:32:50 17   courtroom.)

10:32:50 18        THE COURT:  All jurors are present.  Court is back in

10:32:53 19   session.  You may be seated.

10:32:56 20         Ms. Avila, I remind you you're under oath.

10:32:59 21        THE WITNESS:  Yes.

10:32:59 22        THE COURT:  Please proceed, Ms. Menzies.

10:33:04 23        MS. MENZIES:  Your Honor, we have no more questions.

10:33:10 24        THE COURT:  Ms. Avila, you're excused.

10:33:13 25         Mr. Miceli, please call your next witness.

                        *OFFICIAL TRANSCRIPT*

10:33:34  1          MR. MICELI:  The plaintiffs call Dr. David Madigan.

10:33:41  2          THE DEPUTY CLERK:  Would you please raise your right

3    hand.  Do you solemnly swear that the testimony which you are

4    about to give will be the truth, the whole truth and nothing

5    but the truth, so help you God?

6          THE WITNESS:  I do.

7                      **DAVID MADIGAN, PH.D.**

8    was called as a witness and, after being first duly sworn by

9    the Clerk, was examined and testified on his oath as follows:

10          MR. MICELI:  Good morning, Your Honor, may it please

11    the Court.  This is my first time to have the opportunity to be

10:33:52 12    in front of the jury.  I'm David Miceli.  Good morning.

10:33:52 13                    VOIR DIRE EXAMINATION

10:33:59 14    BY MR. MICELI:

10:33:59 15    Q.    Good morning, Dr. Madigan.

10:34:01 16    A.    Good morning, Mr. Miceli.

10:34:03 17    Q.    If it's okay, I'm going to try to direct to you and ask

10:34:05 18    you to talk to the jury.  I felt like I was standing off to

10:34:10 19    side.

10:34:11 20          Could you please introduce yourself to the Court and

10:34:13 21    to the jury.

10:34:13 22    A.    I'm David Madigan.

10:34:15 23    Q.    Can you tell us a little bit about your educational

10:34:18 24    background and work experience.

10:34:20 25    A.    So, I grew up in Ireland.  I have two degrees from Trinity

                      ***OFFICIAL TRANSCRIPT***

10:34:24   1   College Dublin, a bachelor's degree in mathematics and a Ph.D.

10:34:31   2   in statistics.  I moved to this country in my late twenties,

10:34:33   3   and I've held faculty positions at three different

10:34:38   4   universities.  And I've also worked outside the university

10:34:41   5   setting over the years.

10:34:42   6   Q.   Thank you, Doctor.

10:34:44   7        I'm going to -- you're very modest in your

10:34:47   8   explanation, but before we jump into what you reviewed and what

10:34:50   9   your opinions are, I would like to follow up with you just a

10:34:53  10   little bit about your experience and your background.  You said

10:34:58  11   you've been a professor.  Since when have you been a professor?

10:35:01  12   A.   I was -- my first appointment -- faculty appointment was

10:35:04  13   in 1990 at the University of Washington in Seattle.

10:35:06  14   Q.   And do you -- do you have a CV?  We're going to walk

10:35:24  15   through this, Doctor, without --

10:35:26  16        MR. MICELI:  May I have just one moment to get

10:35:28  17   something off of my desk?  Thank you.

10:35:28  18   EXAMINATION BY MR. MICELI:

10:35:58  19   Q.   I'm embarrassed to say I may have misplaced it.

10:36:02  20        Dr. Madigan, I'm going to ask you a few things that

10:36:04  21   are on your CV.  You said you've been at the University of

10:36:06  22   Washington?

10:36:06  23   A.   That was my first faculty appointment.

10:36:09  24   Q.   Where did you go from there?

10:36:11  25   A.   I left the University of Washington in 1999, then I worked

*OFFICIAL TRANSCRIPT*

10:36:16   1    for a period for AT&T.  I worked for a small software company.

10:36:21   2    And then I took a faculty position as a professor at Rutgers

10:36:27   3    University in New Jersey.  So I was there for seven years.

10:36:28   4         I served a period as a dean at Rutgers.  And then

10:36:35   5    about 12 or 13 years ago, I moved to Columbia University in

10:36:38   6    New York, where I chaired the Department of Statistics for five

10:36:38   7    years.

10:36:42   8         And then I was the executive vice president for arts

10:36:45   9    and sciences and dean of the faculty of arts and sciences for

10:36:49  10    five years until last summer.  I stepped down in summer 2018.

10:36:57  11    I continued to be a professor at Columbia.

10:36:57  12    Q.   When you were the dean and the --

10:36:59  13         Did you say executive vice president?

10:37:00  14    A.   Yes.

10:37:01  15    Q.   -- of the school of arts and sciences, can you explain

10:37:05  16    what that means?

10:37:06  17    A.   Sure.  So if you're a student at Columbia University,

10:37:10  18    you're in one of -- I think it's 14 different schools; business

10:37:13  19    school, etcetera.  So five of those schools are gathered

10:37:18  20    together under an umbrella, which is the arts and sciences.  So

10:37:23  21    it comprises five schools, 27 academic departments, and about

10:37:27  22    50 centers and institutes.  For a five-year period, I had

10:37:31  23    budgetary and academic oversight of that part of the

10:37:34  24    university.

10:37:34  25    Q.   I have found a clean copy of your CV.  You've provided me

*OFFICIAL TRANSCRIPT*

10:37:38  1    with a CV?

10:37:39  2    A.    Yes, I did.

10:37:39  3    Q.    And does it accurately reflect your work experience and

10:37:44  4    your background?

10:37:45  5    A.    Yes.

10:37:46  6          MR. MICELI:  Do you mind if I put it on the overhead?

10:37:50  7          THE COURT:  No.  Please proceed.

10:37:51  8    EXAMINATION BY MR. MICELI:

10:37:51  9    Q.    There you go.  There we are.  It's going to be in front of

10:38:01 10    you, as well, Dr. Madigan.  I want to follow up on a few

10:38:05 11    things.  On this first page, if you follow down about halfway

10:38:08 12    down, it says 1992, and there is a reference to an assistant

10:38:13 13    and associate member of the Fred Hutchinson Cancer Research

10:38:18 14    Center.  What is that?

10:38:18 15    A.    This was while I was a faculty member at the University of

10:38:22 16    Washington, at the same time, I held an appointment -- for much

10:38:25 17    of the time, I held an academic appointment at the Fred

10:38:32 18    Hutchinson Cancer Research Center.  It's one of the premier

10:38:33 19    cancer research enterprises in the country.

10:38:36 20          While I was there, I was involved mostly in

10:38:40 21    studies -- statistical matters -- I'm a statistician -- related

10:38:43 22    to cancer pain.

10:38:43 23    Q.    And then if we follow down your first page there, it says:

10:38:50 24    *Honors*.  I'm not going to go through all of them.  It says

10:38:53 25    *elected member* on several of them.  Can you explain what that

*OFFICIAL TRANSCRIPT*

10:38:57  1   means?

10:38:57  2   A.   Sure.  So, I'm a member of a number of scholarly or

10:39:03  3   academic organizations, and it's sort of typical of these

10:39:08  4   organizations that they anoint, if you will, some -- a small

10:39:15  5   subset of the members as fellows of the organization.  There is

10:39:17  6   a process whereby you're nominated, they solicit references and

10:39:23  7   letters, and there is a committee that adjudicates it, and then

10:39:26  8   you may or may not be given this designation of fellow.

10:39:29  9           So, I'm fortunate to be a fellow of a number of

10:39:33 10   organizations, including the American Association for the

10:39:35 11   Advancement of Science, and several others.

10:39:37 12   Q.   If we move through your qualifications -- I want to move

10:39:42 13   from the first page to the second.  And under your research

10:39:47 14   grants, one of the -- in fact, the first one mentions that

10:39:52 15   you're a principal investigator on the subcontract from NSF,

10:39:58 16   and it's through the University of California, Los Angeles,

10:40:02 17   UCLA.

10:40:03 18           What is that?  And can you explain to us how a dean

10:40:07 19   of arts and sciences and a professor of statistics and

10:40:10 20   biostatistics ends up being a primary investigator on a grant

10:40:15 21   at UCLA?

10:40:15 22   A.   So, maybe I should step back a little bit.  Within

10:40:21 23   academia, within the research sort of enterprise, actually both

10:40:25 24   in academia and in corporate settings, it's quite common to

10:40:29 25   seek funding for one's research.  The funding is used to pay

*OFFICIAL TRANSCRIPT*

10:40:34  1    graduate students and post-docs and travel and stuff like that.

10:40:38  2         So over the years, I've had financial support from

10:40:41  3    many government agencies, National Science Foundation, National

10:40:46  4    Institutes for Health, Food and Drug Administration, Department

10:40:49  5    of Homeland Security, and so on.

10:40:50  6         The first one that Mr. Miceli is referring to is --

10:40:57  7    concerns a project -- a collaboration that I've been involved

10:40:58  8    with for the last ten years or so related to drug safety and

10:41:02  9    methodology -- statistical methodology for drug safety analysis

10:41:07 10    in large databases.  It's a large collaboration, but my key

10:41:13 11    collaborator is a professor at UCLA, University of California,

10:41:19 12    Los Angeles, and so we have a grant together that, for

10:41:22 13    administrative reasons, was routed through UCLA and then to

10:41:26 14    Columbia.

10:41:26 15    Q.   There are several others, and I think you've hit on a

10:41:28 16    couple, NIH and FDA.  Are there other public health

10:41:33 17    organizations that you have also done research and worked

10:41:36 18    with -- research for and worked with?

10:41:38 19    A.   Sure.  I guess we mentioned the FDA already.  I've worked

10:41:42 20    extensively with the CDC, Centers for Disease Control, in

10:41:46 21    Atlanta.

10:41:47 22         So, in particular, there was about a ten-year period

10:41:52 23    after 9/11 when there was a lot of focus on anthrax, and I did

10:41:58 24    a lot of work with the CDC on their anthrax vaccine research

10:42:04 25    program over -- you know, statistical work and guidance for the

*OFFICIAL TRANSCRIPT*

10:42:08 1    CDC over about a ten-year period.

10:42:10 2    Q.   And I don't want to go through all of your publications,

10:42:16 3    but as I flip through your CV, you go from research grants to

10:42:24 4    refereed publications.

10:42:26 5         What are refereed publications?

10:42:28 6    A.   I guess you're familiar with the idea -- I know it's been

10:42:31 7    discussed here in court -- of a scholarly journal.  Journals

10:42:39 8    publish scholarly papers in scientific journals and other kinds

10:42:42 9    of journals.  They have a process that's more or less in common

10:42:45 10   across all the major journals of what's called *peer review*.

10:42:50 11        So the idea is you do some research, you write it up

10:42:53 12   in a paper, you send the paper to the journal.  The editor of

10:42:56 13   the journal looks at it and decides who would be the

10:42:59 14   appropriate people to review it.  These are your peers,

10:43:02 15   typically three or four or something like that.  And you don't

10:43:05 16   know who they are.  It's anonymous.

10:43:06 17        So the editor sends it to these peers.  The peers

10:43:09 18   write up a review saying this is great or this is bad, or

10:43:12 19   suggestions for improvement.  And then the editor looks at

10:43:16 20   these and decides whether or not to publish the paper or to

10:43:18 21   seek revisions before publishing the paper.

10:43:21 22   Q.   And without going through each one, it appears that you

10:43:25 23   have done this on a number of occasions.  I'm just flipping

10:43:29 24   through your CV, and I hope I get to the end shortly.  I'm

10:43:33 25   going to jump ahead.

*OFFICIAL TRANSCRIPT*

10:43:37  1          It appears that you have in the neighborhood of 166

10:43:41  2   that have been published and then others that have been

10:43:43  3   submitted?

10:43:43  4   A.    That's correct.

10:43:44  5   Q.    And then other publications just continue to roll on

10:43:47  6   through your CV?

10:43:48  7   A.    Sure.

10:43:48  8   Q.    Okay.  We may talk a little bit more about some of those

10:43:53  9   in a moment.  Pardon me.

10:44:02 10          I'm going to flip to page 27 of your CV.  In addition

10:44:08 11   to writing in journals, I'm going to draw your attention to

10:44:12 12   your Scholarly Activities section of your CV.

10:44:17 13          You serve as a peer reviewer, as well?

10:44:20 14   A.    Absolutely.  Yes.

10:44:21 15   Q.    Now, that top one says:  "Editorial board."

10:44:25 16          What is that?

10:44:26 17   A.    So most journals -- the way I phrased it a minute ago was

10:44:29 18   the editor gets the paper and decides -- you know, seeks

10:44:33 19   reviews.

10:44:33 20          The reality is there is -- typically, the work is

10:44:36 21   divided amongst members of an editorial board.  So for larger

10:44:41 22   journals, it would not be possible for one human being to do

10:44:43 23   this.

10:44:43 24          So there are associates editors or members of the

10:44:46 25   editorial board who work with the editor to carry out the

*OFFICIAL TRANSCRIPT*

10:44:58  1    process I just described.

10:44:58  2    Q.    You mentioned already that you'd worked with a number of

10:44:58  3    governmental agencies.  Was that in the field of statistics and

10:44:58  4    biostatistics?

10:44:59  5    A.    Yes.

10:44:59  6    Q.    Have you worked with FDA?

10:45:01  7    A.    Yes.

10:45:01  8    Q.    What type of work have you done with FDA, in collaboration

10:45:05  9    with FDA?

10:45:09  10   A.    So I've had extensive interaction with the FDA over the

10:45:12  11   years.  I've been involved -- I was very heavily involved with

10:45:17  12   a drug safety research project called OMOP, the Observational

10:45:22  13   Medical Outcomes Partnership.  It was a public-private

10:45:27  14   partnership between the FDA and the pharmaceutical industry

10:45:32  15   that was led by the FDA.  I was one of the principal

10:45:33  16   investigators of that project.  That went on for about five

10:45:36  17   years and ended about six years ago or something like that.

10:45:40  18            I continue to be engaged with a project called OHDSI,

10:45:45  19   which is a sort of successor to the OMOP project that has

10:45:49  20   extensive FDA involvement.

10:45:51  21            I've also served on a number of -- I served on an FDA

10:45:56  22   Advisory Committee.  So the FDA maintains a set of external

10:46:01  23   advisory committees.  There are about 20 of them.  They turn to

10:46:04  24   these committees for advice when they are making decisions

10:46:07  25   about drug approvals or what have you.

**OFFICIAL TRANSCRIPT**

10:46:10  1          So I served on the drug safety and risk management

10:46:13  2     advisory committee for a term.  I continued as a consultant to

10:46:18  3     the FDA when my term expired, which is a normal thing to have

10:46:24  4     happen.

10:46:24  5          I've also worked with the FDA science board on,

10:46:28  6     essentially, an ad hoc review of pharmacovigilance at the FDA

10:46:32  7     some years ago.

10:46:34  8          MR. MICELI:  Your Honor, I'm going to continue to talk

10:46:36  9     to Dr. Madigan shortly about his qualifications, but I would

10:46:41 10     like to publish the summary of his qualifications to the jury.

10:46:41 11          THE COURT:  Any objection?

10:46:49 12          MR. PATERSON:  No objection.  You can go ahead.

10:46:49 13     EXAMINATION BY MR. MICELI:

10:46:52 14     Q.   Nice picture of you there, Dr. Madigan.

10:46:53 15          Does this summary accurately highlight your

10:46:58 16     experiences in the field of biostatistics and statistics?

10:47:00 17     A.   Sure.  I don't know if it's comprehensive, but, certainly,

10:47:04 18     these are all things I did.

10:47:08 19     Q.   Certainly, your CV is much thicker.  I wanted to make it

10:47:11 20     one page, so I wasn't fumbling through.

10:47:15 21     A.   Okay.

10:47:15 22     Q.   Thank you.

10:47:15 23          You were in the courtroom yesterday, weren't you?

10:47:16 24     A.   Yes, I was here yesterday.

10:47:18 25     Q.   You heard about being an invited lecturer.  Have you ever

*OFFICIAL TRANSCRIPT*

10:47:21  1    done that before?

10:47:22  2    A.    Yes.  As Dr. Kessler described yesterday, it's sort of

10:47:26  3    routine within academic settings to go give talks at other

10:47:32  4    institutions.  It's one of the key ways in which ideas get

10:47:37  5    exchanged and so on.  So I've given -- I've never counted it

10:47:38  6    up, but it may be hundreds of talks over my career at various

10:47:42  7    universities all over the place.  I mean, we're in the South,

10:47:48  8    so maybe I -- you know, I've given talks at University of

10:47:52  9    Florida, Florida State, Vanderbilt, Emory, CDC, and so on.  But

10:48:02 10    this is sort of normal academic interchange that I've engaged

10:48:08 11    in quite a lot.

10:48:09 12    Q.    Well, we're in Tiger country, so we might want to get you

10:48:13 13    to LSU soon.

10:48:14 14    A.    I'd like that.

10:48:14 15    Q.    Do you still teach statistics and biostatistics at

10:48:21 16    Columbia?

10:48:21 17    A.    Yes, I do.

10:48:21 18    Q.    On what level do you teach?  Do you teach undergraduates,

10:48:24 19    graduates, doctoral students?

10:48:26 20    A.    All of the above.  Not in any one year, but, you know,

10:48:27 21    over a period of time.  I teach undergraduates courses,

10:48:31 22    master's courses and Ph.D. courses.

10:48:34 23    Q.    Well, the methods that we're going to talk a little bit

10:48:36 24    about today in this courtroom, do you teach those methods to

10:48:40 25    your students at Columbia?

*OFFICIAL TRANSCRIPT*

10:48:41 1   A.   Sure.  I do.

10:48:42 2   Q.   Have you ever taught those methods to persons or groups

10:48:45 3   outside of the university setting?

10:48:46 4   A.   Yes.  So, over the years, I've taught quite a few --

10:48:51 5   they're typically called *short courses*, sort of like a half-day

10:48:55 6   course or a one-day course, on drug safety -- on statistical

10:49:00 7   methods for drug safety.  So I've taught those at a number of

10:49:04 8   conferences over the years.  It's typical to have a tutorial

10:49:08 9   program or a short course program at a conference.

10:49:10 10          I've also taught such courses for pharmaceutical

10:49:14 11  companies, quite a number of them over the years, including

10:49:16 12  Sanofi, in the company setting.

10:49:19 13  Q.   Again, the statistical methods and biostatistical analyses

10:49:26 14  that we're going to hear about today, did you teach those same

10:49:30 15  principles and methods that we're going to hear in this

10:49:32 16  courtroom to Sanofi when you did that short course for them?

10:49:35 17  A.   Sure, I did.

10:49:37 18          MR. MICELI:  Your Honor, I would like to tender

10:49:40 19  Dr. Madigan as an expert in biostatistics, statistics,

10:49:45 20  pharmacovigilance and safety.

10:49:47 21          THE COURT:  Any objection?

10:49:47 22          MR. PATERSON:  No objection, Your Honor.

10:49:49 23          MR. MICELI:  Thank you.

10:49:50 24          THE COURT:  The Court is going to accept Dr. Madigan as

10:49:52 25  an expert in the field in the biostatistics, statistics,

*OFFICIAL TRANSCRIPT*

10:49:56 1    pharmacovigilance and safety, qualified to render an opinion in

10:50:00 2    those areas.

10:50:01 3                    Please proceed.

10:50:01 4              MR. MICELI:  Thank you.

10:50:01 5                    DIRECT EXAMINATION

10:50:04 6    BY MR. MICELI:

10:50:04 7    Q.   Dr. Madigan, at my request, did you investigate the

10:50:08 8    chemotherapy drug Taxotere?

10:50:08 9    A.   Yes, I did.

10:50:09 10   Q.   You might want to speak a little closer to that

10:50:09 11   microphone.

10:50:13 12                  Will you please tell the jury what your investigation

10:50:15 13   included.

10:50:15 14   A.   So I considered three strands of evidence pertaining to

10:50:21 15   the question of Taxotere and irreversible hair loss.

10:50:27 16                  So, first and foremost, I considered the

10:50:28 17   clinical trials that we heard Dr. Kessler talk about.  I also

10:50:33 18   considered a government run, if you will, drug safety database

10:50:39 19   called FAERS.  I conducted an analysis in that database.  Then

10:50:44 20   I also looked at the company's internal pharmacovigilance

10:50:49 21   database, their own drug safety database.

10:50:50 22              MR. MICELI:  Your Honor, I would like to put on the

10:50:52 23   screen so the jury knows where we're going.

10:50:55 24              THE COURT:  That's fine.  Is there any objection?

10:50:56 25              MR. PATERSON:  It's fine.

                              *OFFICIAL TRANSCRIPT*

10:50:59  1          THE COURT:  Thank you.

10:50:59  2   EXAMINATION BY MR. MICELI:

10:51:00  3   Q.   Dr. Madigan, I'm going to put up a little road map, just

10:51:02  4   to keep us oriented as to where we're going traveling down this

10:51:06  5   road of your testimony.

10:51:07  6          We've talked about your education and your

10:51:10  7   qualifications.  The first thing that you said you looked at

10:51:13  8   were the clinical studies.  I believe you said you did a

10:51:19  9   meta-analysis; is that true?

10:51:20 10   A.   I don't think I said that, but it is true that I did it,

10:51:23 11   yes.

10:51:23 12   Q.   I'm sorry.  Well, I built the road sign incorrectly.  I

10:51:27 13   apologize.

10:51:28 14          You mentioned that you looked at Sanofi's

10:51:31 15   clinical trial data.  Can you tell the jury and the Court which

10:51:34 16   clinical trials you reviewed?

10:51:35 17   A.   So I reviewed two randomized control trials that

10:51:40 18   Dr. Kessler actually discussed yesterday, TAX316 and TAX301.

10:51:45 19   Q.   Can you tell the jury just a little bit about the studies

10:51:47 20   that you reviewed?

10:51:49 21   A.   So these two randomized controlled trials were very, very

10:51:55 22   similar.  So they were -- the design of these studies was very

10:52:01 23   similar, except for one particular difference.  But in both

10:52:05 24   cases, the subjects in the studies were randomly assigned to

10:52:11 25   either TAC or FAC.  So TAC being Taxotere plus two other drugs,

*OFFICIAL TRANSCRIPT*

10:52:15  1    and FAC being 5-FU plus two other drugs.  So, basically, the

10:52:24  2    difference between the two arms of study is Taxotere.  So, you

10:52:27  3    know, one group received Taxotere, and the other did not.

10:52:30  4         So both studies were of that type.  Both studies had

10:52:34  5    fairly lengthy followup.  So ten years in the case of TAX316,

10:52:40  6    eight years in the case of TAX301.  That's the basics of these

10:52:46  7    two studies.

10:52:47  8    Q.   As a statistician, are clinical trials -- is

10:52:51  9    clinical trial data important to you?

10:52:54 10    A.   Absolutely.  So randomized controlled trials are sort of

10:52:58 11    at the pinnacle in terms of the quality of evidence that they

10:53:02 12    provide.  So there are many reasons for this.

10:53:07 13         So randomized controlled trials, first of all, they

10:53:11 14    are regulated in this country and in most countries.  If you

10:53:14 15    want to conduct a clinical trial in human beings, you have to

10:53:18 16    get permission, and the FDA has to approve it.

10:53:21 17         So they are very important for many reasons.  There

10:53:27 18    are sort of five things that I talk about when I teach this.

10:53:30 19    So one of them is prespecification.

10:53:32 20         So when you conduct a randomized controlled trial --

10:53:36 21    an RCT is the acronym -- when you conduct an RCT you have to

10:53:39 22    state in advance exactly what you're going to do, right, the

10:53:43 23    design of the study, how you're going to recruit the patients,

10:53:46 24    how you're going to randomize them, how you're going to follow

10:53:50 25    up, how you're going to measure everything.  You have to have a

*OFFICIAL TRANSCRIPT*

10:53:51  1  statistical analysis plan in advance that says how you're going

10:53:54  2  to analyze the data, so you can't after the fact change

10:53:57  3  direction and decide to analyze it some other way.

10:54:01  4          So there's prespecification.

10:54:03  5          There's typically extensive inclusion and exclusion

10:54:06  6  criteria.  So you select very particular patients to include in

10:54:11  7  the study, so that you can isolate the effect of the drug that

10:54:13  8  you're studying.

10:54:14  9          Randomization is of central importance.  So, a flip

10:54:19 10  of a coin decides whether you get, in our case, TAC or FAC.

10:54:25 11  The beauty of that, as against, say, a physician saying, I

10:54:30 12  think you would do well on TAC, or you would do well on FAC,

10:54:33 13  which is -- that's clinical practice down the road, but when

10:54:36 14  you're trying to study the effect of a drug, you don't want any

10:54:40 15  bias creeping in.  So randomization ensures that there isn't

10:54:45 16  any sort of slanting of things one way or the other in deciding

10:54:49 17  who gets which drugs.

10:54:49 18          So randomization -- the first randomized trials in

10:54:53 19  humans was in the 1940s.  It's arguably kind of one of the most

10:54:56 20  important developments in all of science in the last century.

10:55:00 21  It's hugely important in terms of advancing our ability to

10:55:03 22  study the effects of interventions, drugs, devices and so on,

10:55:07 23  in an unbiased way.

10:55:09 24          The fourth thing is followup.  So good randomized

10:55:15 25  trials follow patients after the treatment, essentially, to see

**OFFICIAL TRANSCRIPT**

10:55:17  1   what happened to them.  In our particular case here, there is

10:55:21  2   lengthy followup of the patients.

10:55:23  3        The final piece of it is the quality of the data.  So

10:55:31  4   in the conduct of these trials -- and I've been involved in

10:55:33  5   many trials -- the data are gathered typically using what are

10:55:37  6   called *case report forms* during the conduct of the study, but

10:55:40  7   then they are checked and double-checked and triple-checked

10:55:44  8   against source medical records and various other avenues.  So

10:55:48  9   they are very heavily curated data.

10:55:50 10        So, at the end of the day, when you lock the data --

10:55:56 11   maybe we can talk about locked, what that means, in a few

10:55:59 12   minutes -- but when you lock the data at the end of the study,

10:56:02 13   you're highly confident that the data are accurate.  They are

10:56:05 14   verified.  They are reliable.  You can -- you can be sure that

10:56:08 15   what's in there is what actually happened.

10:56:11 16        That's a lengthy process, that curation process.  You

10:56:18 17   know, pharmaceutical companies devote, you know, hundreds of

10:56:19 18   people, thousands of people to that process to ensure that you

10:56:24 19   have very high quality data at the end of the day.

10:56:26 20        So these five things together are why randomized

10:56:32 21   controlled trials, particularly multiple randomized control

10:56:36 22   trials, are at the top of the heap in terms of, you know, the

10:56:38 23   best possible science in pharmaceutical science.

10:56:42 24   Q.   Thank you.

10:56:44 25        Just one thing, Doctor.  I tend to talk fast.  You

*OFFICIAL TRANSCRIPT*

10:56:48  1   tend to talk fast.  I don't want the jury to feel like they are

10:56:51  2   hearing two auctioneers talking here.  If we could try to slow

10:56:56  3   down just a little bit.

10:56:56  4   A.   Okay.

10:56:58  5   Q.   Thank you.

10:56:58  6   A.   I'll do my best.

10:57:00  7   Q.   With what you just explained about clinical trials, can

10:57:04  8   clinical trials help determine if a drug is causing an adverse

10:57:09  9   event like permanent hair loss?

10:57:10  10  A.   Absolutely.

10:57:10  11  Q.   How is that?

10:57:11  12  A.   It's to do with the random- -- it's everything I just

10:57:15  13  said, but, in particular, the randomization.  So if there is a

10:57:18  14  difference between the two arms of the study, you know, at the

10:57:22  15  end of the day, then you can be sure that that difference is

10:57:28  16  due to one of two things:  It's either due to the drug in

10:57:32  17  question, that it's causing the outcome, or it could be the

10:57:35  18  play of chance.

10:57:37  19       That's where you need a statistician.  So it's the

10:57:39  20  body of knowledge that is statistics, which has been around for

10:57:42  21  a couple hundred years, can quantify the role of chance.

10:57:46  22       So if you see a difference between the two arms,

10:57:49  23  statistical calculations can tell you, what's the chance that

10:57:52  24  that is just, you know, random variation, as against a real

10:57:57  25  effect?

**OFFICIAL TRANSCRIPT**

10:57:57  1          So statistical significance is kind of a widely used

10:58:03  2  arbiter.  So if you have a statistically significant difference

10:58:08  3  between the two arms, then basically that rules out, for all

10:58:13  4  intents and purposes, that it could be due to chance.  It's

10:58:15  5  real.  It's a causal effect.

10:58:17  6  Q.    Thank you.

10:58:18  7          Doctor, did Sanofi study permanent hair loss in

10:58:22  8  clinical trials?

10:58:22  9  A.    Absolutely.  So, irreversible hair loss was a prespecified

10:58:29 10  endpoint in both studies.

10:58:30 11  Q.    Did you review -- in forming your opinions, did you review

10:58:35 12  the statistical analysis plan for TAX316?

10:58:39 13  A.    Yes, I did.

10:58:40 14  Q.    Did it inform your decisions and your opinions?

10:58:43 15  A.    Yes.  I mean, it shows the irreversible hair loss is one

10:58:46 16  of -- is prespecified in that plan before they gathered the

10:58:50 17  data -- before they looked at the data.

10:58:56 18          MR. MICELI:  Your Honor, may I approach the witness?

10:58:56 19          THE COURT:  Yes, you may.

10:58:56 20  EXAMINATION BY MR. MICELI:

10:59:03 21  Q.    I'm just going to give you that.  I put a finger there

10:59:05 22  just to help you identify the location.

10:59:05 23          Is this the statistical analysis plan that you

10:59:16 24  reviewed?

10:59:16 25          THE COURT:  I'm sorry.  Is there --

*OFFICIAL TRANSCRIPT*

10:59:32  1          MR. STRONGMAN:  Your Honor, may we approach?

10:59:32  2          THE COURT:  Sure.

10:59:32  3          (WHEREUPON, at this point in the proceedings, a

10:59:34  4  conference was held at the bench.)

10:59:34  5          MR. STRONGMAN:  This is a document that's not on his

10:59:38  6  reliance list or referenced in his report anywhere, and I

10:59:38  7  haven't seen any verification of that.

10:59:38  8          MR. MICELI:  He reviewed Pierre Mancini's deposition.

10:59:38  9  This is an exhibit to Pierre Mancini's deposition.  I can ask

10:59:49 10  him if he reviewed the deposition with the exhibit.  He's going

10:59:52 11  to say yes.

10:59:55 12          THE COURT:  What is this?

10:59:57 13          MR. MICELI:  Your Honor, if you look, this is a 2002

10:59:59 14  document.

11:00:03 15          THE COURT:  Was this reviewed in his deposition?

11:00:05 16          MR. MICELI:  It is not reviewed in his deposition, but

11:00:08 17  he reviewed it in preparation for giving his report.  The fact

11:00:09 18  that they didn't ask the questions in the deposition is not

11:00:11 19  really the key.  It's whether or not he relied upon it.

11:00:15 20          He did review -- Pierre Mancini is the head of

11:00:21 21  biostatistics for Sanofi.  He is the Dr. Madigan of Sanofi.  He

11:00:25 22  helped me prepare and he helped review what Mr. Mancini --

11:00:30 23          THE COURT:  Does his material say that he reviewed

11:00:33 24  Dr. Mancini --

11:00:38 25          MR. MICELI:  Mancini's is on his reliance list.

**_OFFICIAL TRANSCRIPT_**

11:00:40  1          MR. STRONGMAN:  I trust your judgment with that.  But

11:00:40  2   it's like an exhibit to a deposition.  He specifically lists

11:00:52  3   the documents he relies on.  My position is just, when getting

11:00:52  4   down to having to pull it from an exhibit to a deposition, this

11:00:56  5   really isn't something that he relied on.  This is something

11:01:01  6   they've decided is important today.  That's my objection.

11:01:05  7          MR. MICELI:  No, it's not important today.  It's been

11:01:06  8   used in multiple depositions.

11:01:09  9          THE COURT:  Overruled.

11:01:09 10          MR. MICELI:  Thank you.

11:01:09 11          THE COURT REPORTER:  The objection time goes to?

11:01:12 12          THE COURT:  Objection goes to nobody.

11:01:12 13          (WHEREUPON, at this point in the proceedings, the bench

11:01:12 14   conference concluded.)

11:01:33 15   EXAMINATION BY MR. MICELI:

11:01:33 16   Q.   Dr. Madigan, is this the statistical analysis plan that

11:01:37 17   you reviewed?

11:01:37 18   A.   Yes.

11:01:37 19   Q.   I want to direct your attention to Section 11.7.

11:01:42 20          You know what?  Before we do that, let's stay with

11:01:44 21   the front page just for one moment.  I'm going to --

11:01:47 22          MR. MICELI:  May I publish to the jury, Your Honor?

11:01:54 23          THE COURT:  It's admitted into evidence.  Yes.

11:01:54 24   EXAMINATION BY MR. MICELI:

11:01:57 25   Q.   This is the statistical analysis plan that you reviewed?

*OFFICIAL TRANSCRIPT*

11:02:00  1    A.    Yes.

11:02:00  2    Q.    It's dated at the bottom, correct?

11:02:06  3    A.    Yes.

11:02:07  4    Q.    28 February, 2002?

11:02:10  5    A.    Yes.

11:02:10  6    Q.    Have you reviewed statistical analysis plans before?

11:02:13  7    A.    Yes, hundreds of them.

11:02:14  8    Q.    When you see a date like that, what do you take that to

11:02:16  9    mean?

11:02:17 10    A.    That's the date on which it was finalized.

11:02:20 11    Q.    Thank you.

11:02:21 12          Now, I'm going to direct your attention to page 30 of

11:02:25 13    47, Section 11.7.

11:02:43 14          Do you see right here, Dr. Madigan?

11:02:46 15    A.    Yes.

11:02:48 16    Q.    "Reversibility of the following events will be analyzed."

11:02:54 17    Alopecia is the first adverse event listed in Sanofi-Aventis'

11:03:04 18    statistical analysis plan, correct?

11:03:06 19    A.    Yes.

11:03:07 20    Q.    Did you take that into consideration while reviewing their

11:03:12 21    clinical trial data?

11:03:12 22    A.    Yes.

11:03:12 23    Q.    This formed a portion of the basis of your opinions?

11:03:16 24    A.    Yes.

11:03:16 25    Q.    Thank you.

*OFFICIAL TRANSCRIPT*

11:03:27 1          I may have said this.  I just want to make sure whose

11:03:29 2   statistical analysis plan we're talking about.

11:03:33 3          Down at the bottom, right underneath the plaintiff's

11:03:38 4   exhibit sticker, is the name Sanofi, correct?

11:03:41 5   A.   At the top, as well.

11:03:41 6   Q.   I don't think there is any argument about that.  I just

11:03:44 7   wanted to make it clear.

11:04:02 8          Can you describe the data that you reviewed in

11:04:07 9   preparation for forming your opinions and reaching your

11:04:10 10  conclusions in this case?

11:04:12 11  A.   Sure.  So I asked for and received the locked data for the

11:04:18 12  two studies.  So I mentioned that term earlier.  Maybe I should

11:04:24 13  just explain it a little bit.

11:04:27 14         So as a trial takes place, over many years in some

11:04:32 15  cases, like here, the data are flowing into the company,

11:04:36 16  typically on these case report forms, and they are keyed in.

11:04:40 17  Then there is a process of validation and verification and

11:04:43 18  checking that goes on extensively.

11:04:46 19         But there comes a moment in time after -- they call

11:04:49 20  it *last patient out*, right, after the last patient is finished

11:04:52 21  in the study, and sometime after that, there comes a moment in

11:04:55 22  time where you sort of have to say:  Okay, we're done.  This is

11:04:58 23  it.  Right?  The study is done.  These are the data.  Okay.

11:05:02 24         It's sacrosanct.  This is not just -- I'm not just

11:05:07 25  talking about Sanofi.  This the industrywide.  This is

**OFFICIAL TRANSCRIPT**

11:05:08  1    worldwide.  It's common sense.  Right?  You have to say:  Okay,

11:05:10  2    we're done, at a certain moment in time.  And then we can reach

11:05:13  3    certain conclusions and move forward.  You can't go back at

11:05:16  4    that point and open it up again and change your mind.

11:05:19  5          So I asked for and received the locked data for both

11:05:28  6    TAX316 and TAX301.

11:05:30  7    Q.   When you say you reviewed the data, is that like pages and

11:05:37  8    pages of documents, or is it electronic?

11:05:39  9    A.   It's all electronic.

11:05:41 10    Q.   Okay.  So because of the terminology that the jury may

11:05:48 11    hear throughout this trial, that locked data that you referred

11:05:50 12    to, was that the final clinical trial data?

11:05:53 13    A.   Yes.

11:05:53 14    Q.   Okay.  Just so when we hear those terms -- I may say it

11:05:59 15    differently when I speak to you, but the locked data you're

11:06:02 16    referring to is the final clinical study trial data?

11:06:06 17    A.   Yes.

11:06:08 18    Q.   Thank you.

11:06:10 19          What importance do you place on having that locked

11:06:14 20    data, that final clinical trial study data?

11:06:19 21    A.   It is the definitive representation of what happened.  So

11:06:22 22    if you want to know, you know, what do these two studies tell

11:06:25 23    you about an issue, like irreversible hair loss, this is -- you

11:06:33 24    know, the locked data, frozen file some people call it, is the

11:06:36 25    definitive representation of what happened in that trial.

*OFFICIAL TRANSCRIPT*

11:06:39  1  Q.    In addition to the final clinical trial study data, did

11:06:43  2  you also review the clinical study reports?

11:06:48  3  A.    Sure.  So I reviewed -- actually, you know, it might be

11:06:53  4  worth kind of going over this.  So, typically, there are many

11:06:56  5  documents associated with a clinical trial, but there are three

11:06:59  6  key documents, from my perspective, a statistician's

11:07:05  7  perspective.

11:07:06  8        So there's the protocol, which describes what's going

11:07:08  9  to happen in the study in great detail.  There is the

11:07:11 10  statistical analysis plan, which we just looked at, which

11:07:15 11  describes, you know, what statistical analysis is going to be

11:07:17 12  conducted.  Then, after the study is done, and after the data

11:07:21 13  have been locked down, there is a document published, produced

11:07:24 14  called the clinical study report, the CSR, that contains the

11:07:29 15  record of -- it contains the analysis that were set out in the

11:07:33 16  statistical analysis plan, and it's a document that summarizes,

11:07:38 17  here is what happened in this study.  These are voluminous

11:07:42 18  reports.

11:07:42 19  Q.    I want to back up just a little bit because you said, this

11:07:45 20  is the definitive representation of what the data is, but we

11:07:48 21  didn't say who is representing that this is the definitive

11:07:50 22  data.  Who is representing that?

11:07:53 23  A.    The company.

11:07:53 24  Q.    Sanofi here?

11:07:54 25  A.    Sanofi in this case.

*OFFICIAL TRANSCRIPT*

11:07:55  1    Q.    Thank you.

11:08:02  2          Do you know how much time Sanofi spent validating the

11:08:06  3    final clinical study trial data, that locked data?

11:08:10  4    A.    I don't know exactly, but, I mean, they would have been

11:08:13  5    doing it throughout the conduct of the trials, but many months.

11:08:17  6    I don't know exactly how many, but several months elapsed

11:08:19  7    between the last patient out and the time they locked the

11:08:24  8    database.  This is not an overnight process.

11:08:26  9    Q.    Okay.  You were in the courtroom yesterday when

11:08:29 10    Dr. Kessler was being questioned?

11:08:31 11    A.    Yes, I was.

11:08:31 12    Q.    You heard him being questioned by defense counsel going

11:08:35 13    through what they represented to be some of Sanofi's

11:08:41 14    clinical study trial data?

11:08:43 15    A.    Yes.

11:08:44 16    Q.    I want to be verify clear.  The final clinical study trial

11:08:47 17    data that you looked at, was it consistent with what was being

11:08:51 18    asked of Dr. Kessler yesterday?

11:08:53 19    A.    No.

11:08:53 20    Q.    Have you seen any report from Sanofi or submission by the

11:09:04 21    company or a statement in any other source outside of this

11:09:09 22    litigation where Sanofi has represented the numbers that were

11:09:13 23    being questioned to Dr. Kessler yesterday?

11:09:15 24    A.    No.

11:09:15 25    Q.    Before we get to the analysis of the data, are you

*OFFICIAL TRANSCRIPT*

11:09:26 1  familiar with how Sanofi recorded data?

11:09:31 2  A.    Sure.

11:09:32 3  Q.    Is that represented in their final clinical study trial

11:09:36 4  data, that locked set that you were talking about?

11:09:39 5  A.    Yes.

11:09:40 6  Q.    How many patients did Sanofi record in the final

11:09:48 7  clinical study data, the locked data, with ongoing persistent

11:09:51 8  or permanent alopecia as of the end of the ten-year followup in

11:09:55 9  TAX316?

11:09:56 10 A.    So in 316, on the T arm, the Taxotere arm, there are

11:10:03 11 29 patients in there who had -- they refer to it in their

11:10:08 12 documents as *ongoing alopecia*.  So that was -- yeah, at the end

11:10:11 13 of the study.

11:10:11 14 Q.    Were you able to reproduce those numbers when you ran

11:10:16 15 analyses based upon how Sanofi did them as well?

11:10:19 16 A.    Yes, I can absolutely reproduce the numbers in their

11:10:23 17 clinical study report.

11:10:23 18 Q.    Were you able to verify the length of followup for these

11:10:28 19 patients with ongoing persist permanent hair loss?

11:10:30 20 A.    Yes.

11:10:31 21 Q.    How many of those patients were represented in the final

11:10:39 22 clinical study data as having followup less than six months?

11:10:42 23 A.    So of the 29 patients with ongoing hair loss at the end of

11:10:49 24 the study, of the 29 one of those patients had a followup of

11:10:53 25 less than six months.  It was 117 days for one patient.

*OFFICIAL TRANSCRIPT*

11:10:57  1    Q.    Now, is that the 29 that are represented in that -- I want

11:10:58  2    to make sure I get the term right -- the definitive

11:11:01  3    representations of Sanofi?

11:11:02  4    A.    Yes.

11:11:02  5    Q.    Thank you.

11:11:11  6          Dr. Madigan, now that we have Sanofi's final verified

11:11:15  7    clinical study trial data, and you understand how they were

11:11:20  8    recording it, are there statistical tools that provide you an

11:11:25  9    opportunity to get some level of certainty in what you're

11:11:27 10    looking at is actually a real effect?

11:11:29 11    A.    Yes.  So there's -- in this particular context, because

11:11:31 12    there is more than one trial -- which is typical -- the

11:11:34 13    particular type of statistical analysis that is appropriate is

11:11:37 14    something called a *meta-analysis*.

11:11:39 15          So I conducted a meta-analysis of the trials to

11:11:44 16    estimate the treatment effect, the effect of Taxotere.

11:11:48 17    Q.    Once you do that, is there a way that you can look to

11:11:56 18    see -- you talked about play of chance and such earlier.  Is

11:12:00 19    there a way you can rule out play of chance?

11:12:02 20    A.    Yes.  So --

11:12:02 21    Q.    How -- I'm sorry.  Please explain that.

11:12:04 22    A.    So the meta-analysis that I conducted the analysis of, the

11:12:10 23    clinical trials, shows an effect size -- something called a

11:12:16 24    relative risk of 1.85.  So it's close to a doubling of the risk

11:12:19 25    of irreversible hair loss on Taxotere, as compared with the

*OFFICIAL TRANSCRIPT*

11:12:24  1   other arm of the study.

11:12:27  2           This finding was statistically significant.  So it

11:12:31  3   is -- by conventional standards, you cannot attribute this to

11:12:35  4   the play of chance.  The difference between the two arms is

11:12:38  5   large enough that that can't be chance alone.  There is a real

11:12:43  6   causal effect here.

11:12:44  7   Q.   That's in the TAX316 data?

11:12:47  8   A.   No, that's the meta-analysis.

11:12:49  9   Q.   Oh, that's the meta-analysis.  I'm sorry.  You're going to

11:12:53 10   learn just how bad my handwriting is.

11:13:00 11           Now, the meta-analysis was of TAX316 and TAX301?

11:13:05 12   A.   Yes, the totality of the evidence -- of the studies.

11:13:08 13   Q.   So TAX316, you said they had -- in the TAC arm, they had

11:13:17 14   29?

11:13:18 15   A.   Correct.

11:13:18 16   Q.   Am I able to get all that on there?

11:13:21 17           And in the FAC arm, you had 16?

11:13:26 18   A.   That's correct.

11:13:26 19   Q.   This is based on what you referred to as the definitive --

11:13:38 20   make sure I get this right -- definitive representation of

11:13:43 21   Sanofi, correct?

11:13:47 22   A.   Yes.

11:13:48 23   Q.   Now, the TAX301, did you determine what the definitive

11:13:58 24   representation of Sanofi was there in the final clinical study

11:14:03 25   data that was locked?

*OFFICIAL TRANSCRIPT*

11:14:05 1   A.   So the numbers -- the equivalent numbers for TAX301 -- the

11:14:11 2   followup was more limited in 301, so the equivalent numbers are

11:14:15 3   3 on TAC and 1 on FAC.

11:14:18 4   Q.   You said they were a little bit more limited.  And I'm

11:14:21 5   just going to put "DR," definitive rep of Sanofi.

11:14:29 6        Now, you said something about more limited followup.

11:14:34 7   Let me ask you:  Did you determine how many clinical study

11:14:38 8   centers there were that conducted TAX301?

11:14:43 9   A.   Sure.  So both of these are, I suppose, called multicenter

11:14:59 10  studies.  When you're trying to recruit a thousand-plus

11:14:59 11  patients, you generally have to recruit patients from all over

11:14:59 12  the world, from different centers.  So there were actually 55

11:15:00 13  different -- for 301, there were 55 different sites or centers

11:15:04 14  from around the world where they recruited and randomized

11:15:08 15  patients.

11:15:08 16  Q.   Did you investigate how many of those centers followed

11:15:12 17  patients and reported adverse events, including permanent

11:15:18 18  alopecia?

11:15:18 19  A.   Of the 55 centers, only 12 of them report anything about

11:15:22 20  hair loss in followup.

11:15:25 21  Q.   So only 12 of 55 are reported, right?

11:15:34 22  A.   That's correct.

11:15:39 23       MR. MICELI:  Sorry, Judge.

11:15:39 24  EXAMINATION BY MR. MICELI:

11:15:55 25  Q.   Is it with these numbers, these definitive represented

*OFFICIAL TRANSCRIPT*

11:15:58  1   numbers, that you conducted your meta-analysis?

11:16:01  2   A.   Yes.  There are other numbers involved as well, but these

11:16:04  3   are the primary inputs to the meta-analysis.

11:16:07  4   Q.   Of the individuals that reported persisting permanent

11:16:11  5   ongoing hair loss, these were the numbers of those patients?

11:16:14  6   A.   Yes.

11:16:14  7   Q.   Now, before we sort of move on to talk more about these,

11:16:23  8   is meta-analysis a recognized statistical tool in your

11:16:27  9   industry?

11:16:28 10   A.   Absolutely.

11:16:28 11   Q.   Is it something you teach at the college level?

11:16:31 12   A.   It's something I teach.  It's something I published about.

11:16:36 13   It's something I do in my consulting for pharmacology

11:16:40 14   companies.  Meta-analysis of sets of randomized trials, that's

11:16:45 15   as good as it gets in terms of the quality of evidence.

11:16:51 16   Q.   Now, we're looking at two studies put together in a

11:16:57 17   meta-analysis.  Is it appropriate in this particular

11:17:00 18   circumstance to combine these two studies into a meta-analysis?

11:17:03 19   A.   Absolutely.  They are about as similar a pair of studies

11:17:07 20   as you're likely to encounter.

11:17:08 21   Q.   Please tell the jury the results of your meta-analysis.

11:17:17 22   A.   As I said already, there was a statistically significant

11:17:21 23   elevated risk of irreversible hair loss on Taxotere; and from

11:17:29 24   this, I infer that Taxotere causes irreversible hair loss.

11:17:33 25   Q.   Okay.  Dr. Madigan, when you say you infer that Taxotere

*OFFICIAL TRANSCRIPT*

11:17:44  1   causes permanent hair loss, because what we're going to hear in

11:17:50  2   this courtroom, have you reached an opinion to a reasonable

11:17:56  3   degree of scientific certainty that Taxotere causes permanent

11:17:58  4   hair loss?

11:17:59  5   A.   Absolutely, yes.

11:17:59  6   Q.   I'm going to move up the road a little bit from the

11:18:07  7   meta-analysis.  I want to go to your next item, which is the

11:18:19  8   FAERS analysis.  You mentioned earlier you conducted an

11:18:23  9   analysis of the FAERS database.  Can you tell the jury what

11:18:26 10   that is?

11:18:26 11   A.   Maybe as a kind of preamble, the analysis of the

11:18:32 12   randomized controlled trials is the centerpiece of what I did,

11:18:37 13   but it's good statistical practice to look at other sources of

11:18:41 14   evidence.  What we're about to talk about, FAERS, is one of

11:18:45 15   those.  But it's supportive.  It's not in and of itself

11:18:51 16   definitive, unlike the clinical trials.  It's qualitatively

11:18:55 17   different from the clinical trials.  It's limited in various

11:18:56 18   ways, which I'm happy to talk about, but that side you asked --

11:19:00 19   what is it, I suppose, is what you asked.

11:19:01 20   Q.   Let's try to slow down.  I want to make sure, because I'm

11:19:05 21   with you, I talk fast, Dr. Madigan.  But can you explain to us

11:19:10 22   what the -- first just explain to us what the FAERS database

11:19:15 23   is.

11:19:15 24   A.   Sure.  It's a voluntary adverse event reporting system.

11:19:20 25   So if you take a medication and you believe it has caused a

side effect, you can submit that information on a form to this database.  It's maintained by the government, by the FDA.  But it's publicly available.

If you go to your doctor or nurse or whatever, then that person might submit a report and, in particular, if you call or your doctor calls the pharmaceutical companies, they have a duty to report to this database.

So reports flow into FAERS, the FDA Adverse Event Reporting System.  Reports flow in over time.  As of the end of June, there is about 13 million reports in this database, so it's a very important data source for public health and for understanding drug safety.

And statistical techniques for analyzing these data have been developed by people like me and others over a number of years that are now widely used, you know, by -- every pharmacology company, essentially, is analyzing -- uses these statistical methods to analyze these data.

There's kind of two major use cases that you might distinguish.  One is pharmaceutical companies use these databases prospectively to identify potential signals, meaning they will look at a broad range of drugs and adverse events to see:  Is anything popping up?  Is there anything we should be worrying about?  That's one use of these data.  That's perfectly legitimate.

A different use that is more akin to what I'm doing

*OFFICIAL TRANSCRIPT*

1  here is retrospectively.  If an issue arises from one source or

2  another that you're concerned about, it's routine practice to

3  look -- to analyze the FAERS database to see:  What does that

4  database have to say about this issue?

5       That's more akin to -- that's the nature of what I'm

6  doing here.  That's a specific concern.

7  Q.   Is the use of the FAERS database for the purposes you just

8  mentioned, is that limited to the United States?

9  A.   No.

10 Q.   People from all over the world can use it?

11 A.   Absolutely.  The data are on the FDA website.  You can

12 download them.

13 Q.   How do you perform your safety investigation in the FAERS

14 database?  How do you actually go about doing it?

15 A.   So, to conduct a kind of analysis I'm doing here, which is

16 very routine, you need to define an outcome.  What is the issue

17 that you're concerned about.  You need to define -- it's called

18 a *target outcome*.  You need to define a target drug, the drug

19 that you're studying.

20      And then typically, and certainly in my practice and

21 the one that I published about, you typically also look at some

22 comparator drugs.  You also look at the relationship between

23 related drugs and the outcome, for various reasons.

24 Q.   And what -- do you just select any term you want to look

25 at through the FAERS database?

**OFFICIAL TRANSCRIPT**

11:22:25 1    A.    For the outcome?

11:22:27 2    Q.    Yes.

11:22:27 3    A.    So, maybe I should explain a bit.  So the reports -- when

11:22:34 4    they flow into the database, the reports, you know, have

11:22:40 5    descriptions in natural language of what happens -- what

11:22:43 6    happened to the patient.  So the FDA and pharmaceutical

11:22:47 7    companies actually more typically, they code the narrative.

11:22:51 8          There is a dictionary called MedDRA, which is a list

11:22:54 9    of tens of thousands of terms.  There is a term for fever.

11:22:57 10   There is a term for alopecia.  There is a term for heart

11:23:01 11   attack.

11:23:01 12         What the pharmaceutical companies do is they assign

11:23:05 13   to the description in text, they will assign codes.  So if

11:23:10 14   somebody said, you know, I had a temperature of 104, the code

11:23:15 15   *fever* might get attached -- would -- presumably would get

11:23:19 16   attached to that report.

11:23:19 17         So the version of the data that are publicly

11:23:25 18   available and have these codes, so they don't actually have the

11:23:28 19   narratives.  The FDA does not release the narratives for

11:23:32 20   privacy reasons, at least not en masse.

11:23:35 21         The kind of analysis I did and the kind of analysis

11:23:38 22   that is done every day of the week across essentially every

11:23:42 23   pharmaceutical company is a statistical analysis of these codes

11:23:45 24   and how they relate to the drugs.  Maybe I went off.

11:23:48 25   Q.    I think that's what I wanted to learn.

**OFFICIAL TRANSCRIPT**

11:23:53  1        Is every term that you want to search for in that
11:23:57  2   dictionary that you were discussing?
11:23:59  3   A.    No.  So, there are many reasons why it's not as simple as
11:24:04  4   find the term in the dictionary and just analyze that.
11:24:08  5   Sometimes -- actually, I published a study recently where I had
11:24:13  6   to use a whole collection of terms to capture the clinical
11:24:18  7   concept that I was studying.  I didn't choose them; a physician
11:24:20  8   chose them.

11:24:22  9        And other times, you have to combine terms -- like,
11:24:26 10   for example, supposing you're concerned about cardiovascular
11:24:30 11   mortality.  Well, there is no MedDRA term for that, but there
11:24:34 12   is a box on the form -- MedWatch is the name of the form.
11:24:40 13   There is a box on the MedWatch form for *death.*  So an analysis
11:24:44 14   I've done, this kind of analysis you might do, is to look for
11:24:44 15   cardiovascular events and the box checked for *death.*

11:24:49 16        So in this particular case, which I think to head off
11:24:52 17   your next question, there is no code, there no MedDRA-preferred
11:24:58 18   term for irreversible alopecia or hair loss.  There is a term
11:25:04 19   for alopecia, that is a preferred -- it's a preferred term, and
11:25:08 20   there is actually -- let me use that.  We can get into that.

11:25:12 21        There is a term for *alopecia*, so I used that.  And
11:25:14 22   then there is a term -- there is a box on the form for
11:25:17 23   *permanent or disabled*.  It's for the outcome.  If the outcome
11:25:19 24   is permanent or disabled, then that's what I looked for.

11:25:24 25        I looked for a code for *alopecia* and the box

**OFFICIAL TRANSCRIPT**

11:25:27  1   *permanent or disabled* checked on the form.  And this is -- you

11:25:31  2   know, this is not perfect, but this is -- this is, you know, a

11:25:36  3   reasonable way to capture the concept of irreversible alopecia.

11:25:41  4   Q.   I just want to make sure we're clear for the jury.  We're

11:25:44  5   talking about one box that says *disability [sic] or permanent*,

11:25:47  6   not two boxes, choice between the two words?

11:25:48  7   A.   That's right.  There is five choices for -- I think it's

11:25:51  8   for the outcome, one of which is -- it's slightly different

11:25:55  9   names on different forms, but *permanent or disabled*.

11:25:58 10   Q.   Thank you.

11:25:59 11        So, you run this analysis.  Then what do you do with

11:26:03 12   the information?

11:26:05 13   A.   So I -- the statistical analysis computes -- it's

11:26:12 14   essentially a measure of association, how strong is the

11:26:16 15   association between your target drug and your target outcome.

11:26:19 16        There are a number of statistics in use.  I think I

11:26:25 17   ran basically all of the metrics that are in common use.  And

11:26:30 18   they all basically say the same thing, they all point in the

11:26:33 19   same direction, which is to say that there is a striking

11:26:36 20   association between Taxotere and irreversible alopecia.  And

11:26:41 21   that isn't present for the comparator drugs.  It's certainly

11:26:45 22   very spotty for the other drugs.

11:26:47 23   Q.   Because you mentioned the other the drugs, you didn't just

11:26:50 24   do it on Taxotere only?

11:26:51 25   A.   No.  So I also did it -- I used as the comparator drugs --

*OFFICIAL TRANSCRIPT*

11:26:55  1    in consultation with some of the physicians, I used A and C,

11:27:02  2    the two other ones that are in the clinical trial, Adriamycin

11:27:06  3    and cyclophosphamide, and then I also did Taxol, and I did

11:27:13  4    5-FU.

11:27:17  5    Q.   I think you've already made this point, but I want to make

11:27:19  6    sure I'm clear.  Are these types of investigations or tools and

11:27:24  7    investigating this database, is this widely accepted in the

11:27:28  8    pharmacovigilance industry?

11:27:29  9    A.   This is completely routine.

11:27:30 10    Q.   I'm sorry, you've answered some of my questions as parts

11:27:38 11    of others.  So, I'm going to try to shorten this.

11:27:45 12             Did you chart your findings for your FAERS analysis

11:27:54 13    graphically for me?

11:27:58 14    A.   Sure.  It's routine to plot these things -- or I guess

11:28:00 15    you're going to show one in a second.  It's routine to plot

11:28:04 16    these things over time because it's of interest.  And I've done

11:28:06 17    this over and over.  And it's routine.

11:28:08 18             It's of interest just to see how this developed, how

11:28:12 19    it evolved over time, and also to look at what it would have

11:28:15 20    shown had you looked at a particular moment in time.  It's

11:28:18 21    routine to plot these things with time on the horizontal axis

11:28:22 22    and the vertical axis is the statistic, the measure.

11:28:25 23             THE COURT:  Have you reviewed that with Mr. Strongman?

11:28:31 24             MR. STRONGMAN:  No objection.

11:28:36 25             MR. MICELI:  May I approach the witness?

*OFFICIAL TRANSCRIPT*

11:28:38  1          THE COURT:  Yes.

11:28:38  2  EXAMINATION BY MR. MICELI:

11:28:40  3  Q.    You'll see it on the screen, but I wanted you to have that

11:28:43  4  as well, Doctor.  Doctor, is this one of the graphically

11:28:51  5  depicted -- graphic depictions of one of the analyses you did?

11:28:59  6  A.    Yes.

11:29:00  7  Q.    Can you explain what we're looking at here?

11:29:02  8  A.    This is what I was talking about.  I don't need a pointer.

11:29:08  9  Q.    Excuse me, is there a way we can activate his pointer?

11:29:13 10          THE COURT:  You can.

11:29:14 11          THE WITNESS:  With this?

11:29:15 12          THE COURT:  Yes?  You should be able to -- try it now,

11:29:17 13  Doctor.

11:29:24 14          THE WITNESS:  So time is on the horizontal axis, so

11:29:27 15  here it begins in 2000, and this particular one is limited to

11:29:30 16  the end of 2011.  In fact, we have data beyond that, but for

11:29:34 17  the purposes of this litigation, I think it's restricted to

11:29:38 18  2011.

11:29:38 19          So the vertical axis is a particular statistic;

11:29:42 20  the SEBGM, which I'm happy to explain.  And you can think of

11:29:46 21  this -- when I teach this -- actually, this is exactly what I

11:29:49 22  was teaching, the short course, at Sanofi.  When I teach this,

11:29:53 23  I often tell people think of this like a Richter scale that

11:29:56 24  measures the strength of earthquakes.  So the bigger the

11:30:00 25  number, the more the concern.

                              *OFFICIAL TRANSCRIPT*

11:30:03  1          In this particular case -- well, 2 -- you see up

11:30:06  2     on a horizontal line here at the value 2.  So 2 is -- this is

11:30:11  3     not God-given, but 2 is widely considered to be a threshold

11:30:15  4     that -- above 2 is a concern.  So, you're worried about it.

11:30:19  5          So what I'm showing here is that for docetaxel,

11:30:24  6     for Taxotere, which is the red one, the colors aren't so clear,

11:30:28  7     but it's the one on the top, so it was above 2 in the first

11:30:33  8     quarter of 2000.  And then it dropped below 2, then it peaked

11:30:38  9     above 2, then it went below 2.  And then sometime actually in

11:30:42 10     Q2, the second quarter of 2008, it went above 2, and it's been

11:30:47 11     above 2 consistently since that time.

11:30:52 12          So it's a signal.  This is evidence of a concern.

11:30:55 13     And for the comparator drugs, they don't -- they don't rise to

11:31:00 14     that level of -- they never get to that level of concern.

11:31:03 15     Q.   You may have pointed to this, but you're referring to the

11:31:08 16     dotted lines.  We have the legend there for paclitaxel,

11:31:17 17     fluorouracil, doxorubicin and cyclophosphamide.

11:31:19 18          All those are well below the 2 line?

11:31:19 19     A.   Right.  So, this one up here is Taxotere.  And then these

11:31:22 20     ones down here are the other drugs, and they are coded.  So

11:31:27 21     this one is Taxol, it's paclitaxel.  The other ones are bunched

11:31:36 22     together down below.

11:31:36 23     Q.   Looking at the data that you did in the FAERS database,

11:31:43 24     what conclusions do you draw from this from a statistical point

11:31:49 25     of view?

*OFFICIAL TRANSCRIPT*

11:31:50 1   A.   In and of itself, this does not establish causation, but

11:31:53 2   it's supportive.  It's pointing in the same direction.  It's

11:31:57 3   suggesting that there is an issue here and a potential causal

11:32:01 4   association between Taxotere and irreversible alopecia.  So it

11:32:05 5   is supportive evidence for the randomized trial analysis.

11:32:10 6   Q.   If you're looking -- well, why do you chart it over time

11:32:14 7   like this?

11:32:17 8   A.   It's a conventional thing to do.  It's just to see how the

11:32:21 9   signal -- people use the term *signal* in this context -- how it

11:32:25 10  has evolved over time.  And as I said before, it enables you to

11:32:29 11  look -- see -- everything is cumulative here.  So, you know, if

11:32:32 12  you -- my arrow is pointed here is about -- is about 2010, so

11:32:38 13  that's what it look have looked like had you done the analysis

11:32:42 14  in 2010.  So it's a historical perspective.

11:32:45 15  Q.   And what conclusions do you draw with regard to Taxotere

11:32:50 16  versus the other drugs that are listed on this graphic

11:32:56 17  depiction concerning a safety signal?

11:32:59 18  A.   So there is a safety signal for Taxotere that is not

11:33:02 19  present for the other drugs.  The picture for other metrics --

11:33:06 20  this isn't the only metric that people use, the thing on the

11:33:10 21  vertical axis.  Some of the others periodically and

11:33:14 22  sporadically signal, but the only one that is consistently

11:33:18 23  signalling over time is Taxotere.

11:33:19 24  Q.   We're using a term *signal*, and we all take signal --

11:33:24 25  traffic signal, everything else, but what does a signal mean to

*OFFICIAL TRANSCRIPT*

11:33:27  1    a statistician who is doing a safety investigation in a

11:33:31  2    database like the FAERS database?

11:33:33  3    A.   So a safety signal -- if you were doing this

11:33:39  4    prospectively, a safety signal would be -- you know, raise a

11:33:41  5    red flag, this is something you should look at and be concerned

11:33:46  6    about.

11:33:46  7             In the context here, there is a particular issue that

11:33:49  8    we're studying, which is irreversible alopecia.  So here the

11:33:52  9    fact that it's above the signalling level is saying, this is

11:33:56 10    supportive of the idea that there is a causal effect here.

11:33:59 11    Q.   Now, you explained at the very beginning, and I should

11:34:01 12    have asked this then, but since I didn't, I'll ask it now, you

11:34:05 13    talked about sort of the imperfection in the terms and

11:34:08 14    dictionary that you get to use.  Did you use the same exact

11:34:12 15    terms in searching for safety signals with paclitaxel,

11:34:21 16    fluorouracil, doxorubicin and cyclophosphamide that you used in

11:34:26 17    doing it with Taxotere?

11:34:26 18    A.   Yes.  So, there are real limitations to this kind of

11:34:29 19    analysis.  These are voluntary reports, but the playing field

11:34:32 20    is entirely level.  It's actually the same computer program

11:34:35 21    that does the analysis for Taxotere as for the other four

11:34:40 22    drugs.  It's the exact same analysis using the same definition

11:34:44 23    of the target outcome.

11:34:44 24    Q.   Do you teach this process and these methods to your

11:34:48 25    students?

*OFFICIAL TRANSCRIPT*

11:34:48  1    A.    Yes, you betcha.

11:34:50  2    Q.    Do you teach them and speak of them in publishing in your

11:34:52  3    professional career on this?

11:34:54  4    A.    Absolutely.

11:34:55  5    Q.    If contacted by a drug company to say this is what's being

11:34:59  6    shown for our product, what would you tell them?

11:35:01  7    A.    I would tell them this -- well, in light of the

11:35:05  8    clinical trials, I would say to them, we've established there

11:35:08  9    is a causal effect here, and it is supported by this analysis.

11:35:11 10    Q.    And can you tell that to this jury, again, to a reasonable

11:35:17 11    degree of scientific certainty in your profession?

11:35:19 12    A.    Yes.

11:35:20 13    Q.    All right.  Now, we've talked -- we're going down the

11:35:23 14    road.  We're done with your qualifications.  We're done with

11:35:28 15    the randomized controlled trials.  We've talked about the FAERS

11:35:36 16    database.

11:35:36 17          And we're now at the fourth sign on this road.  And

11:35:39 18    that is the Sanofi database.  Did you look at the Sanofi

11:35:44 19    pharmacovigilance database?

11:35:45 20    A.    Yes, I did.  So this is kind of the counterpart to FAERS.

11:35:50 21    So FAERS is national, somewhat international.  Reports are

11:35:50 22    flowing in constantly --

11:35:56 23    Q.    Doctor, if I could interrupt you, and I apologize for

11:35:59 24    this, because when I removed my document, your highlighting

11:36:05 25    remained.

                        *OFFICIAL TRANSCRIPT*

11:36:06  1                Can we delete that?  Thank you.

11:36:09  2                I'm sorry.  Could you continue.  You were explaining

11:36:12  3    the Sanofi pharmacovigilance database.

11:36:15  4    A.    The Sanofi database is essentially the internal

11:36:18  5    counterpart.  So every pharmaceutical company maintains an

11:36:24  6    internal database of reports that come in to them about their

11:36:26  7    products.  So that's what this is.

11:36:29  8    Q.    How did you go about looking at Sanofi's internal

11:36:35  9    pharmacovigilance database?

11:36:37 10    A.    So here, I simply looked at a tally over time of how many

11:36:41 11    reports they had received cumulatively over time of

11:36:47 12    irreversible hair loss.

11:36:48 13    Q.    And did you chart those out for us, Doctor?

11:36:53 14    A.    Yes, I did.

11:36:54 15    Q.    I'm going to --

11:37:07 16                MR. MICELI:  Your Honor, may I approach so that the

11:37:09 17    witness has copies as well?

11:37:11 18                THE COURT:  Mr. Strongman.

11:37:13 19                MR. STRONGMAN:  No objection.

11:37:14 20                THE COURT:  Okay.

11:37:14 21    EXAMINATION BY MR. MICELI:

11:37:23 22    Q.    Dr. Madigan, because you were here yesterday, you saw that

11:37:26 23    these were shown during Dr. Kessler's testimony, before I put

11:37:30 24    them on the screen, can you tell me how you went about

11:37:32 25    searching that database?

*OFFICIAL TRANSCRIPT*

A.    Sure.  So there is a bit of a difference here between this database and FAERS that I just described.  So the FAERS database that is available, as I mentioned, has these MedDRA codes that you look for or you analyze along with other information.

In the internal database, at least what I was provided with, there were no codes.  So there was just a textual description of, you know, a narrative, if you will, of what happened to the patient.

Perhaps I should even preface this further.  The database that I'm looking from Sanofi is their alopecia database.  So it was restricted to -- I think it's 2,174 reports of alopecia.

What I wanted to identify in there was the occurrences of irreversible alopecia.  So I couldn't do what I did with the FDA's database because there no codes and there isn't a box for the outcome.

Instead, what I did was I consulted with Dr. Tosti, who is an alopecia specialist, and I asked her to provide me the terms, words and phrases that would be, in her estimation, indicative of irreversible hair loss.  And there was some to-ing and fro-ing with her, which I'd be happy to describe. That's what I did.

I basically ran her search on these -- in this database.  And then what you see -- what's about to be on the

11:39:03  1    screen -- is on the screen --

11:39:04  2    Q.   We'll first do the numbers.  Are these the results of your

11:39:12  3    search, Dr. Madigan?

11:39:13  4    A.   Yes, this is the cumulative number of events that sat --

11:39:20  5    in the past -- Dr. Tosti's search terms -- that were returned

11:39:26  6    by Dr. Tosti's search over a period of time.

11:39:28  7         As you can see, by the end of 2011, there were 168 of

11:39:32  8    these alopecia reports that were irreversible.  And this is the

11:39:38  9    number we saw yesterday.

11:39:39  10   Q.   Are these without duplication because you used different

11:39:43  11   terms?

11:39:44  12   A.   They are without duplication because there are individual

11:39:47  13   case report identifiers within the database.

11:39:54  14   Q.   I am going to put up this graph that the jury has seen

11:39:58  15   already through Dr. Kessler.  Is this the graphic depiction of

11:40:02  16   what is shown in your numeric chart?

11:40:05  17   A.   Yes.

11:40:05  18   Q.   What did your review of Sanofi's internal database show

11:40:16  19   about Taxotere causing permanent hair loss?

11:40:20  20   A.   So, not unlike the FAERS analysis, in and of itself, it

11:40:25  21   doesn't establish that the drug is causing irreversible hair

11:40:30  22   loss.  But it's supportive.  So you would expect there to be

11:40:34  23   reports piling up, so to speak, in the internal database,

11:40:38  24   indeed, when there is a causal association.  And that is

11:40:41  25   exactly what we see.

*OFFICIAL TRANSCRIPT*

11:40:41  1    Q.    Is this consistent with what you saw in the other two
11:40:44  2    strands of evidence that you looked at?
11:40:46  3    A.    Yes.
11:40:46  4    Q.    Does that give you any level of confidence that what
11:40:49  5    you're seeing, more likely than not, this is supportive of your
11:40:52  6    opinion on causation?
11:40:52  7    A.    It is definitely supportive of my opinion.
11:40:55  8    Q.    Okay.  We've looked at all three sources that you've
11:40:59  9    reviewed -- excuse me, have we looked at all three sources of
11:41:02 10    what you've reviewed?
11:41:03 11    A.    Yes.
11:41:04 12    Q.    I want to finish up with just one slide.  Does this slide
11:41:16 13    here accurately summarize your opinions as we've discussed them
11:41:23 14    today?
11:41:23 15    A.    Yes, it does.
11:41:24 16    Q.    Do you hold all of the conclusions that you've reached in
11:41:30 17    this case through your investigation to a reasonable degree of
11:41:37 18    scientific certainty within your field of biostatistics?
11:41:41 19    A.    Yes, I do.
11:41:49 20         MR. MICELI:  Nothing further, Your Honor.
11:41:53 21         THE COURT:  Members of the Jury, it's quarter to 12:00.
11:42:00 22    I believe we're going to have some testimony for some time, so
11:42:03 23    it would be a good idea for us to take our lunch break now.
11:42:06 24         So court will be at recess until quarter to 1:00,
11:42:09 25    for an hour.  So we'll be at recess for an hour.

*OFFICIAL TRANSCRIPT*

11:42:13 1          Let me remind you, you should not discuss this

11:42:16 2    case amongst yourselves or with anyone else.  Certainly, no

11:42:20 3    contact with anyone associated with this case, which is why I

11:42:22 4    ask that you basically hang out in the jury room.  No research

11:42:28 5    during the course of this break.

11:42:29 6          Please leave your tablets on your chairs.  I can

11:42:32 7    assure you they will not be interrupted.

11:42:34 8          Court will be at recess for one hour.

11:43:42 9          (WHEREUPON, at 11:42 a.m., the jury panel leaves the

10    courtroom, and the Court was in luncheon recess.)

11                           *   *   *

12

13

14                      REPORTER'S CERTIFICATE

15          I, Cathy Pepper, Certified Realtime Reporter, Registered
      Merit Reporter, Certified Court Reporter in and for the State
16    of Louisiana, Official Court Reporter for the United States
      District Court, Eastern District of Louisiana, do hereby
17    certify that the foregoing is a true and correct transcript to
      the best of my ability and understanding from the record of the
18    proceedings in the above-entitled and numbered matter.

19

20                           *s/Cathy Pepper*_____
                             Cathy Pepper, CRR, RMR, CCR
21                           Certified Realtime Reporter
                             Registered Merit Reporter
22                           Official Court Reporter
                             United States District Court
23                           Cathy_Pepper@laed.uscourts.gov

24

25

                       **OFFICIAL  TRANSCRIPT**