UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  TAXOTERE (DOCETAXEL)        *
PRODUCTS LIABILITY LITIGATION       *        Docket No.: 16-MD-2740
                                    *        Section "H(5)"
                                    *        New Orleans, Louisiana
*Relates to:  Barbara Earnest*      *        September 18, 2019
*Case No.: 16-CV-17144*             *
* * * * * * * * * * * * * * * * *


                   DAY 3 – AFTERNOON SESSION
               TRANSCRIPT OF JURY TRIAL BEFORE
                THE HONORABLE JANE T. MILAZZO
                UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:


For the Plaintiffs:        Barrios Kingsdorf & Casteix, LLP
                           BY:  DAWN M. BARRIOS, ESQ.
                           701 Poydras Street
                           Suite 3650
                           New Orleans, Louisiana 70139



For the Plaintiffs:        Gainsburgh Benjamin David Meunier
                             & Warshauer, LLC
                           BY:  M. PALMER LAMBERT, ESQ.
                           1100 Poydras Street
                           Suite 2800
                           New Orleans, Louisiana 70163



For the Plaintiffs:        Pendley Baudin & Coffin, LLP
                           BY:  CHRISTOPHER L. COFFIN, ESQ.
                           1100 Poydras Street
                           Suite 2505
                           New Orleans, Louisiana 70163


OFFICIAL TRANSCRIPT

APPEARANCES:

For the Plaintiffs:          Gibbs Law Group, LLP
                             BY:  KAREN BARTH MENZIES, ESQ.
                             6701 Center Drive West
                             Suite 1400
                             Los Angeles, California 90045


For the Plaintiffs:          Bachus & Schanker, LLC
                             BY:  J. KYLE BACHUS, ESQ.
                             BY:  DARIN L. SCHANKER, ESQ.
                             1899 Wynkoop Street
                             Suite 700
                             Denver, Colorado 80202


For the Plaintiffs:          Fleming Nolen & Jez, LLP
                             BY:  RAND P. NOLEN, ESQ.
                             2800 Post Oak Boulevard
                             Suite 4000
                             Houston, Texas 77056


For the Plaintiffs:          DAVID F. MICELI, LLC
                             BY:  DAVID F. MICELI, ESQ.
                             Post Office Box 2519
                             Carrollton, Georgia 30112


For the Plaintiffs:          Morgan & Morgan, P.A.
                             BY:  EMILY C. JEFFCOTT, ESQ.
                             700 S. Palafox Street
                             Suite 95
                             Pensacola, Florida 32502


For the Sanofi               Irwin Fritchie Urquhart
Defendants:                   & Moore, LLC
                             BY:  DOUGLAS J. MOORE, ESQ.
                             400 Poydras Street
                             Suite 2700
                             New Orleans, Louisiana 70130

OFFICIAL TRANSCRIPT

APPEARANCES:

For the Sanofi                    Shook Hardy & Bacon, LLP
Defendants:                       BY:  HARLEY V. RATLIFF, ESQ.
                                  BY:  JON A. STRONGMAN, ESQ.
                                  2555 Grand Boulevard
                                  Kansas City, Missouri 64108


For the Sanofi                    Shook Hardy & Bacon, LLP
Defendants:                       BY:  HILDY M. SASTRE, ESQ.
                                  201 Biscayne Boulevard, Suite 3200
                                  Miami, Florida 33131


Official Court Reporter:          Jodi Simcox, RMR, FCRR
                                  500 Poydras Street
                                  Room HB-275
                                  New Orleans, Louisiana 70130
                                  (504) 589-7780


Proceedings recorded by mechanical stenography, transcript

produced by computer.

OFFICIAL TRANSCRIPT

<u>I N D E X</u>

<u>Page</u>

DAVID MADIGAN
    Cross-Examination By Mr. Strongman:    670
    Redirect Examination By Mr. Miceli:    723

JEAN-PHILIPPE AUSSEL
    Videotaped deposition    739

LAURA MASSEY PLUNKETT
    Direct Examination By Mr. Nolen:    789
    Cross-Examination By Ms. Sastre:    826
    Redirect Examination By Mr. Nolen:    916

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

| | | |
|---|---|---|
| 12:27PM | 1 | **AFTERNOON SESSION** |
| 12:27PM | 2 | **(September 18, 2019)** |
| 12:29PM | 3 | ***** |
| 12:29PM | 4 | |
| 12:45PM | 5 | **THE DEPUTY CLERK:** All rise. |
| 12:46PM | 6 | **THE COURT:** Please bring the jury in. |
| 12:46PM | 7 | **THE DEPUTY CLERK:** All rise. |
| 12:46PM | 8 | (WHEREUPON, the jury entered the courtroom.) |
| 12:47PM | 9 | **THE COURT:** All jurors are present. Court's back in |
| 12:47PM | 10 | session. You may be seated. |
| 12:47PM | 11 | Dr. Madigan, I'll remind you, you're under oath. |
| 12:47PM | 12 | Mr. Strongman, please proceed. |
| 12:47PM | 13 | (WHEREUPON, **DAVID MADIGAN**, having been previously |
| 12:47PM | 14 | duly sworn, testified as follows**:)** |
| 12:47PM | 15 | **MR. STRONGMAN:** May it please the Court. |
| 12:47PM | 16 | **CROSS-EXAMINATION** |
| 12:47PM | 17 | **BY MR. STRONGMAN:** |
| 12:47PM | 18 | **Q.** Good afternoon, Dr. Madigan. |
| 12:47PM | 19 | **A.** Good afternoon. |
| 12:47PM | 20 | **Q.** We may use the flip chart this afternoon at times today. |
| 12:47PM | 21 | Anytime you have trouble seeing it, please let me know and I'm |
| 12:47PM | 22 | happy to work with you. Okay? |
| 12:47PM | 23 | **A.** I can see the top half of it but not the bottom. |
| 12:47PM | 24 | **Q.** Good. So, Dr. Madigan, you were -- |
| 12:47PM | 25 | **THE COURT:** Can you all see? |

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

12:47PM  1                    **THE JUROR:**  Yes.

12:47PM  2                    **THE COURT:**  Okay.  Thank you.  Please proceed.

12:47PM  3                    **MR. STRONGMAN:**  Yes, certainly give me my indication

12:47PM  4       if you're having trouble.

12:47PM  5       **BY MR. STRONGMAN:**

12:47PM  6       **Q.**    So, Dr. Madigan, you were here yesterday when Dr. Kessler

12:47PM  7       testified; correct?

12:47PM  8       **A.**    Yes.

12:47PM  9       **Q.**    And you understand that Dr. Kessler generally defined

12:47PM  10      "irreversible alopecia" as a lack of hair growth or incomplete

12:47PM  11      regrowth after six months.

12:47PM  12                   Do you remember that testimony?

12:47PM  13      **A.**    I don't think the testimony was as precise as that.  But

12:48PM  14      that was one of the definitions, I think, that he was talking

12:48PM  15      about.

12:48PM  16      **Q.**    But you remember a conversation about six months?

12:48PM  17      **A.**    I do.

12:48PM  18      **Q.**    Okay.  And, Doctor, one thing I want to just make sure is

12:48PM  19      clear, you're not a medical doctor; is that correct?

12:48PM  20      **A.**    That's correct, I'm not.

12:48PM  21      **Q.**    And so you're not qualified to actually diagnose alopecia;

12:48PM  22      is that correct?

12:48PM  23      **A.**    That's correct.

12:48PM  24      **Q.**    And you're not an expert in alopecia; correct?

12:48PM  25      **A.**    I am not.

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

| | |
|---|---|
| 12:48PM | 1 |
| 12:48PM | 2 |
| 12:48PM | 3 |
| 12:48PM | 4 |

1    **Q.**   And if I were to hand you a medical report, it's not your

2    expertise to look at that report and say, "This individual is

3    diagnosed with permanent or irreversible alopecia."  Correct?

4    **A.**   Correct.

5    **Q.**   Okay.  And I think what I'm going to do is Mr. Miceli's

6    roadmap.  I think I'll just work the same direction, but

7    backwards.  I'll start where you left off.

8    **A.**   Okay.

9          **MR. MICELI:**  Your Honor, if I could ask, he wrote six

10   months up there.  Are we just going to leave "six months" up

11   there?

12         **THE COURT:**  Well, I'm trying to see what the question

13   was.

14         **MR. STRONGMAN:**  I'm happy to flip it over if that

15   bothers Mr. Miceli.

16         **THE COURT:**  Thank you.  Please proceed.

17         **MR. STRONGMAN:**  Thank you.

18   **BY MR. STRONGMAN:**

19   **Q.**   Now, Doctor, the last analysis that you discussed with

20   Mr. Miceli was the internal database analysis that you did;

21   correct?

22   **A.**   Yes.

23   **Q.**   Okay.  And I think you put up the charts of the 168

24   reports; is that correct?

25   **A.**   Sure.  Yes.

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

12:49PM 1    **Q.**   And I want to talk about your methodology.

12:49PM 2    **A.**   Okay.

12:49PM 3    **Q.**   Does that make sense?

12:49PM 4    **A.**   Sure.

12:49PM 5    **Q.**   So if I understand, what you did is you had access to the

12:49PM 6    Sanofi database, and I think you said you had access to all of

12:49PM 7    the alopecia reports.

12:49PM 8          Do you remember that?

12:49PM 9    **A.**   Yes.

12:49PM 10   **Q.**   Okay.  And then what you did was you came up with some

12:50PM 11   search terms; right?

12:50PM 12   **A.**   No, I didn't.  They were provided to me.

12:50PM 13   **Q.**   Were those search terms provided by Dr. Plunkett?

12:50PM 14   Dr. Tosti?

12:50PM 15   **A.**   Dr. Tosti.

12:50PM 16   **Q.**   Okay.  And those search terms, did you actually talk to

12:50PM 17   Dr. Tosti?

12:50PM 18   **A.**   No.

12:50PM 19   **Q.**   Okay.  How did you get that information?

12:50PM 20   **A.**   From -- through counsel.

12:50PM 21   **Q.**   So the communication between yourself and Dr. Tosti was

12:50PM 22   through counsel?

12:50PM 23   **A.**   Sure.

12:50PM 24   **Q.**   Okay.  And so there was a list of search terms that were

12:50PM 25   developed, is that right, by Dr. Tosti, being proposed through

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

12:50PM 1    counsel to you?  Correct?

12:50PM 2    A.    Yes.

12:50PM 3    Q.    And you don't have an opinion as to whether or not those

12:50PM 4    search terms were actually the appropriate search terms to find

12:50PM 5    or define "permanent alopecia"; correct?

12:50PM 6    A.    Not from a medical point of view, but I think there

12:50PM 7    were -- I added what I refer to as linguistic variations of

12:50PM 8    some of these search terms, just -- not any medical expertise,

12:50PM 9    just English to those search terms.

12:51PM 10   Q.    Okay.  And a high-level term -- I think we may have even

12:51PM 11   heard a little bit about that.

12:51PM 12         But a high-level term in the database you were

12:51PM 13   searching had "alopecia" as a high-level term; correct?

12:51PM 14   A.    I'm not following you.

12:51PM 15   Q.    Is that in the FAERS database?

12:51PM 16         Well, let me do if this way.

12:51PM 17         So you had all of Sanofi's alopecia reports to search

12:51PM 18   through; correct?

12:51PM 19   A.    Yes.

12:51PM 20   Q.    Okay.  And then you took this collection of search terms

12:51PM 21   that you got from Dr. Tosti, and you searched through this -- I

12:51PM 22   think you said there was like 2,000 of them, something like

12:51PM 23   that; correct?

12:51PM 24         And then you filtered them through these search

12:51PM 25   terms, and you ended up with the number that Mr. Miceli showed

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

12:51PM  1  you today up to 2011; correct?

12:51PM  2  A.    Yes.

12:51PM  3  Q.    Okay.  And you know, in the internal database, that there

12:51PM  4  can be more than one event that's listed in an internal report;

12:51PM  5  correct?

12:51PM  6  A.    More than one event listed?  You mean there's a narrative?

12:52PM  7  Q.    Yes, there's a narrative.

12:52PM  8         For example, if somebody put into the internal

12:52PM  9  database that they had a complaint of alopecia, they could also

12:52PM 10  put into the internal database that they had a complaint about

12:52PM 11  a headache or a complaint about joint pain; correct?

12:52PM 12  A.    Yes.

12:52PM 13  Q.    Okay.  And so the search terms that you used included the

12:52PM 14  terms "permanent," "irreversible," "chronic," "persistent," and

12:52PM 15  then several others; correct?

12:52PM 16  A.    Right.  Can I modify that a little bit, though?

12:52PM 17         So what I did was the -- in looking for the

12:52PM 18  linguistic variants on some of the search terms that Dr. Tosti

12:52PM 19  provided, I modified some of these.  It's in my report.

12:52PM 20         So, for example, I had "chronic" -- I didn't look for

12:52PM 21  just the word "chronic."  I looked for "chronic" followed by

12:52PM 22  "hair loss," or "chronic" followed by "alopecia," for example.

12:52PM 23  Q.    But what we know is that there's nothing preventing you

12:53PM 24  from turning up a report of somebody that actually had

12:53PM 25  temporary alopecia but chronic back pain; correct?  That could

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1   happen?

2   **A.**   That can't happen because it's -- "chronic hair loss" or

3   "chronic alopecia" is what I searched for.

4   **Q.**   Well, Doctor, did you go look at any one of those

5   168 reports?

6   **A.**   I looked at all 2,174.

7   **Q.**   Well, Doctor, you said there's a narrative; correct?

8   **A.**   Yes.

9   **Q.**   Did you actually pull the narrative and go through it?

10   **A.**   Yes.

11   **Q.**   And did you determine that every single one of those 164

12   actually were cases -- 168 were actually cases of persistent

13   hair loss?

14   **A.**   No.   That's not my expertise, but I don't think there any

15   false positives in there.   If there are one or two of them,

16   were that wouldn't surprise me.   But I think, in general, there

17   aren't.

18   **Q.**   Okay.   Doctor, do you have your report in front of you?

19   **A.**   No.

20           **MR. STRONGMAN:**   May I approach the witness, Your

21   Honor?

22           **THE COURT:**   Yes, you may.

23           **THE WITNESS:**   Thank you.

24           **MR. MICELI:**   Your Honor, I hate to be intrusive, but

25   I'm just going to get my binder so I can follow along with him.

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

12:54PM 1          THE COURT:  Sure.

12:54PM 2  BY MR. STRONGMAN:

12:55PM 3  Q.    All right.  Doctor, give me a second.

12:55PM 4          All right.  I want you to look in your report with me

12:55PM 5  at Table 4.

12:55PM 6  A.    Yep, I'm there.

12:55PM 7  Q.    So Table 4 in your report actually is the table that you

12:55PM 8  generated from the internal database; correct?

12:55PM 9  A.    Yes.

12:55PM 10 Q.    Okay.  Now, Doctor, if there is a report with a

12:55PM 11 higher-level term of permanent "alopecia" and, in that

12:55PM 12 narrative, there's a comment that this individual's headache is

12:55PM 13 permanent, that report would be counted in Table 4; correct?

12:56PM 14 A.    That could happen.

12:56PM 15 Q.    And, in fact, what we know is that you never went through

12:56PM 16 and verified that any one of those reports that Mr. Miceli

12:56PM 17 listed actually meet the definition of irreversible hair loss,

12:56PM 18 which means six months or more?  You didn't do that analysis;

12:56PM 19 correct?

12:56PM 20 A.    Correct.  I applied Dr. Tosti's search terms.  That's it.

12:56PM 21 Q.    And, Doctor, out of the 168 reports in the internal

12:56PM 22 database, you can't sit here today and say how much actually

12:56PM 23 had their alopecia resolved; correct?

12:56PM 24 A.    Had their alopecia resolved ultimately?

12:56PM 25 Q.    Correct.

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

12:56PM 1   **A.**   No.

12:56PM 2   **Q.**   And you can't tell me, out of the 168, how many actually

12:56PM 3   meet Dr. Kessler's definition of irreversible alopecia;

12:57PM 4   correct?

12:57PM 5   **A.**   Well, it's what your representing as his definition.  I

12:57PM 6   don't know that I necessarily accept that.

12:57PM 7        But I don't know what Dr. Kessler's definition would

12:57PM 8   be.  And I'm applying, if you will, Dr. Tosti's definition.

12:57PM 9   **Q.**   And you don't know how many of the individuals in that 168

12:57PM 10  actually were reporting alopecia during treatment; correct?

12:57PM 11  **A.**   I don't know.

12:57PM 12  **Q.**   And I asked you the question about -- how about this one,

12:57PM 13  Doctor?  Do you remember I asked you a question about back

12:57PM 14  pain?  Do you remember that just a second ago?

12:57PM 15       Let me ask it this way:  If the report has a

12:58PM 16  higher-level term of "alopecia" and the narrative describes the

12:58PM 17  individual having chronic back pain, that report would count

12:58PM 18  and include in your Table 4; correct?

12:58PM 19  **A.**   Wrong.  It wouldn't.

12:58PM 20  **Q.**   So, Doctor, I handed you your deposition.

12:58PM 21       Do you see it?

12:58PM 22  **A.**   I do.

12:58PM 23  **Q.**   And I want you to turn to page 228 with me.  Okay?

12:58PM 24  **A.**   Okay.

12:59PM 25  **Q.**   Now, the jury's heard a little bit about this, but when

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

12:59PM 1    you give a deposition, Doctor, you give sworn testimony under
12:59PM 2    oath; correct?
12:59PM 3    A.    Yes.
12:59PM 4    Q.    And when you give a deposition, it's just -- with the same
12:59PM 5    level of seriousness as the testimony that you're giving today;
12:59PM 6    correct?
12:59PM 7    A.    Certainly.
12:59PM 8    Q.    And you were deposed in this case; correct?
12:59PM 9    A.    Yes.
12:59PM 10   Q.    And when you answered questions in your deposition in this
12:59PM 11   case, you tried to be as forthcoming and honest as you could;
12:59PM 12   correct?
12:59PM 13   A.    Yes.
12:59PM 14   Q.    Now, I want you to look at page 228, line 18.
12:59PM 15         Are you with me?
12:59PM 16   A.    Yes.
12:59PM 17   Q.    And it says:
12:59PM 18         "Q.   If the report has a higher-level term of
12:59PM 19         'alopecia,' and the narrative describes the individual
1:00PM 20         having chronic back pain, that report would be counted and
1:00PM 21         included in your Table 4?
1:00PM 22         "A.   You know, I don't know if that ever happened.
1:00PM 23         That could happen.
1:00PM 24         "Q.   The methodology you use to search wouldn't
1:00PM 25         prevent that from happening?

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1:00PM 1          "A.   That's true."

1:00PM 2          Did I read that correctly?

1:00PM 3 **A.**   You read it correctly.  I misspoke.

1:00PM 4 **Q.**   Did I read that correctly?

1:00PM 5 **A.**   I answered the question, I did -- yes, you did.

1:00PM 6 **Q.**   Now, Dr. Tosti gave you these search terms.

1:00PM 7          Did you ever give the results of your research to

1:01PM 8 her?

1:01PM 9 **A.**   I don't know.  I didn't personally.

1:01PM 10 **Q.**   Would it have been a good idea to give her the results?

1:01PM 11 **A.**   I don't know.  I mean, maybe she has a copy of my report.

1:01PM 12 I don't know.

1:01PM 13 **Q.**   And, Doctor, with regard to the 168, you don't know a

1:01PM 14 denominator for the number of individuals exposed to Taxotere

1:01PM 15 during that time period from 1996 up to 2011; correct?

1:01PM 16 **A.**   That's correct, I don't.

1:01PM 17 **Q.**   And I talked with Dr. Kessler about that yesterday, and

1:01PM 18 you were here for that; correct?

1:01PM 19 **A.**   I was.  I was very unhappy with it, but yes.

1:01PM 20 **Q.**   Now, let's talk with -- next step, the FAERS analysis.

1:01PM 21 Okay?

1:01PM 22 **A.**   Okay.

1:02PM 23 **Q.**   And what you did with regard to the FAERS analysis -- now,

1:02PM 24 that is the FDA database; correct?

1:02PM 25 **A.**   Sure.

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1:02PM 1  Q.   And what you did with regard to this analysis is that you
1:02PM 2  had a form, and it included "alopecia" as a high-level term;
1:02PM 3  correct?
1:02PM 4  A.   Yes.
1:02PM 5  Q.   And then it also included Taxotere somewhere over in the
1:02PM 6  medications list; correct?
1:02PM 7  A.   Correct.
1:02PM 8  Q.   And then it has a box on the form, and there's a --
1:02PM 9  several boxes, but one of them is listed as "disability,
1:02PM 10  permanent"; correct?
1:02PM 11  A.   Let's just be clear.  There's sections on the form.
1:02PM 12  There's a section for -- called "Outcome," and there are five
1:02PM 13  little check boxes in there can, one of which is "permanent" or
1:02PM 14  "disability."
1:02PM 15  Q.   So, Doctor, what I've got here is a blowup of a MedWatch
1:03PM 16  form; correct?
1:03PM 17  A.   Okay.  Yes.
1:03PM 18  Q.   And so this is what we were talking about?
1:03PM 19  A.   Okay.
1:03PM 20        THE WITNESS:  Can I stand up, Your Honor?
1:03PM 21        THE COURT:  Yes, you may.
1:03PM 22  BY MR. STRONGMAN:
1:03PM 23  Q.   You can even come down here if you need to.
1:03PM 24  A.   That's okay.
1:03PM 25  Q.   So what we were talking about is there's this box right

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1:03PM  1  here that says, "Describe event or problem."

1:03PM  2  **A.**   That's not the box we're talking about.  Sorry.  Beg your

1:03PM  3  pardon.

1:03PM  4  **Q.**   So Step 1, we're going to talk about alopecia as a

1:03PM  5  high-level term first.  Okay?

1:03PM  6  **A.**   Is it okay if I come down?

1:03PM  7  **Q.**   Absolutely.  Come on down.

1:03PM  8         **THE COURT:**  Do we have this in a mechanism that puts

1:03PM  9  it on a computer instead or no?

1:03PM  10        **MR. STRONGMAN:**  Well, I'm going to write on it.

1:04PM  11        **THE COURT:**  Okay.  Thank you.

1:04PM  12        **MR. STRONGMAN:**  But I could give you a paper copy.

1:04PM  13  BY MR. STRONGMAN:

1:04PM  14  **Q.**   All right.  So, Doctor, let's move down the form.  How

1:04PM  15  about that.

1:04PM  16  **A.**   Sure.

1:04PM  17  **Q.**   Let's do that first.

1:04PM  18        So what we've got here is the "Outcome" box right up

1:04PM  19  here; right?

1:04PM  20  **A.**   Yes, so this, yeah, collection of boxes.

1:04PM  21  **Q.**   And there's a whole collection of options; isn't that

1:04PM  22  right?

1:04PM  23  **A.**   Sure.

1:04PM  24  **Q.**   Right.  And there's "death," "life-threatening."

1:04PM  25        And then over here and a box, "Disability or

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1:04PM 1  permanent damage."  Correct?

1:04PM 2  A.   Yes.

1:04PM 3  Q.   And when the person fills out this form -- and, by the

1:04PM 4  way, this form could be filled out by any number of different

1:04PM 5  types of people; correct?

1:04PM 6  A.   Correct.

1:04PM 7  Q.   It could be filled out by a doctor; it could be filled out

1:04PM 8  by a patient --

1:04PM 9  A.   Sure.

1:04PM 10  Q.   Right.  And there's no limitation on the number of boxes

1:04PM 11  that could be checked?

1:04PM 12  A.   That's correct.

1:04PM 13  Q.   Okay.  And then over here, we have a box for "Product."

1:04PM 14  A.   Yes.

1:04PM 15  Q.   Okay.  And there's -- the top two box -- the two top lines

1:04PM 16  are for the name of a product.

1:05PM 17        And then down here, there's a place where you could

1:05PM 18  put concomitant medications as well; is that correct?

1:05PM 19  A.   Yes.

1:05PM 20  Q.   So this one is sort of the primary product identified; is

1:05PM 21  that fair?

1:05PM 22  A.   Sure.

1:05PM 23  Q.   And when you did your search of this database, what you

1:05PM 24  looked for as Taxotere showing up either in the concomitant box

1:05PM 25  or up here in this section; is that correct?

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1:05PM   1   **A.**   Right.  I've done it both ways.  The results are very

1:05PM   2   similar, whether you just restrict it to here or you include

1:05PM   3   both drugs here and here.

1:05PM   4   **Q.**   Very good.  And then you were also looking for reports

1:05PM   5   that obviously had the term "alopecia" in them; correct?

1:05PM   6   **A.**   They were coded to the higher-level term "alopecias."

1:05PM   7   **Q.**   And the higher-level term for permanent "alopecias" is --

1:05PM   8   comes from what's called like a medical -- it's called MedDRA?

1:05PM   9   **A.**   Yes.

1:05PM  10   **Q.**   What does MedDRA stand for?

1:06PM  11          **MR. RATLIFF:**  Medical Dictionary for Regulatory

1:06PM  12   Affairs, I think.

1:06PM  13   **BY MR. STRONGMAN:**

1:06PM  14   **Q.**   Okay.  And MedDRA is a dictionary, and it has all of these

1:06PM  15   terms in it; correct?

1:06PM  16   **A.**   Sure.

1:06PM  17   **Q.**   And then you have a high-level term, and then under it are

1:06PM  18   a bunch of -- are they called preferred terms?  Is it the next

1:06PM  19   level down?

1:06PM  20   **A.**   Yes.

1:06PM  21   **Q.**   So "alopecia" is the broadest term --

1:06PM  22   **A.**   No.

1:06PM  23   **Q.**   -- in that category of alopecia; correct?

1:06PM  24   **A.**   I'm probably agreeing with you.  It's organized

1:06PM  25   hierarchically.  So there are preferred terms, which there are

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1:06PM  1    tens of thousands of them.  And they're grouped into

1:06PM  2    higher-level terms.  And, in turn, those higher-level terms are

1:06PM  3    grouped into higher-level group terms.  And they're grouped

1:06PM  4    into a system.  So it's organized in a tree.

1:06PM  5           So I'm basically agreeing with you.  So I'm at one

1:06PM  6    level up -- I was following Sanofi.  That's why I did it this

1:06PM  7    way.  I'm one level up in the tree.  So there's a higher-level

1:06PM  8    term called "alopecias," and under there are about a dozen or

1:06PM  9    so preferred terms for different kinds of alopecia.

1:07PM  10   Q.   And when a report like this is made, there can be several

1:07PM  11   higher-level terms identified in one report; correct?

1:07PM  12   A.   There can be, yes.  Sometimes yes; sometimes no.

1:07PM  13   Q.   Right.  So I could report on this form that the patient

1:07PM  14   had alopecia that the patient had liver problems, that the

1:07PM  15   patient had neuropathy.

1:07PM  16          I could report all of those on the same form;

1:07PM  17   correct?

1:07PM  18   A.   That can happen.

1:07PM  19   Q.   I can report that the patient passed away; correct?

1:07PM  20   A.   Yeah, you could.

1:07PM  21   Q.   Okay.  And this outcome box up here, the disability or

1:07PM  22   permanent damage, is not inherently tied to any one specific

1:07PM  23   high-level term; correct?

1:07PM  24   A.   Correct.

1:07PM  25   Q.   And so let's walk through just a couple of examples.  Is

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1:07PM  1   that okay?

1:07PM  2   **A.**   Sure.

1:07PM  3   **Q.**   Don't want to use the permanent marker on a dry-erase

1:08PM  4   board.

1:08PM  5          Okay.  So we've got Taxotere up there as the product;

1:08PM  6   fair enough?

1:08PM  7   **A.**   Yes.

1:08PM  8   **Q.**   Okay.  We've got "alopecia" here as a high-level term;

1:08PM  9   fair enough?

1:08PM  10  **A.**   Yes.

1:08PM  11  **Q.**   Okay.  And we've got a "disability or permanent damage"

1:08PM  12  box checked; correct?

1:08PM  13  **A.**   Sure.

1:08PM  14  **Q.**   Now, we could also have an event in there, something like

1:08PM  15  organ failure?

1:08PM  16  **A.**   That could happen.

1:08PM  17  **Q.**   Okay.  And if you read the narrative, you could actually

1:08PM  18  see that it could say -- it could say, "Alopecia on treatment,

1:09PM  19  organ failure ongoing."  Correct?

1:09PM  20  **A.**   That could happen.

1:09PM  21  **Q.**   And so what we know is that, if you actually look, if

1:09PM  22  you're having alopecia while you're on the treatment and you're

1:09PM  23  having ongoing organ failure that could result in permanent

1:09PM  24  damage, that's still going to generate a positive number in

1:09PM  25  your search; correct?

DAVID MADIGAN - CROSS

1:09PM 1  **A.** That could happen. It'll happen in the foreground and the

1:09PM 2  background, as I'm looking at a ratio. So it could happen on

1:09PM 3  the drug; it could happen on the comparator.

1:09PM 4  **Q.** Right. And so your analysis, your methodology, didn't do

1:09PM 5  anything to eliminate this circumstance from happening;

1:09PM 6  correct?

1:09PM 7  **A.** So there's no -- with the kind of analysis I'm doing, I

1:09PM 8  said there were limitations. There is one of the limitations.

1:09PM 9  So, you know, I mentioned earlier today that it's routine, for

1:09PM 10  example, to look at things like cardiovascular death. Same

1:09PM 11  issue arises. So you can't be certain that the death is due to

1:10PM 12  a cardiovascular event.

1:10PM 13      Now, I will say that, in more than half of the

1:10PM 14  reports that enter into my set --

1:10PM 15  **Q.** Doctor, could you focus on my question.

1:10PM 16  **A.** Sorry.

1:10PM 17  **Q.** I know. We're getting along, but it's still a little bit

1:10PM 18  of a cross. So just focus on my question.

1:10PM 19      So another example, so we have the "disability or

1:10PM 20  permanent damage" box checked. Okay?

1:10PM 21  **A.** Sure.

1:10PM 22  **Q.** Over here -- over here, we have the suspect drug primary

1:10PM 23  as Arimidex. Okay.

1:10PM 24      Are you with me so far?

1:10PM 25  **A.** Uh-huh.

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1:10PM  1    **Q.**   And then down here, we have concomitant medications,

1:10PM  2    Taxotere.

1:10PM  3    **A.**   I see that.

1:10PM  4    **Q.**   And your search would pick up this because Taxotere is in

1:10PM  5    this box; true?

1:10PM  6    **A.**   Like I said, I've done it both ways.

1:10PM  7    **Q.**   Yeah.  And what we know is that -- so if we had a report

1:11PM  8    that reported alopecia on hormone therapy, disability box

1:11PM  9    checked, this would generate a positive result in your

1:11PM  10   analysis; correct?

1:11PM  11   **A.**   You're right.  That could happen.

1:11PM  12   **Q.**   And your methodology didn't do -- and just so we know

1:11PM  13   Arimidex is a hormone therapy?

1:11PM  14   **A.**   I don't know.

1:11PM  15   **Q.**   You don't know?

1:11PM  16          Taxotere is not a hormone therapy; correct?

1:11PM  17   **A.**   That's what I understand.

1:11PM  18   **Q.**   And, in fact, if we went and actually pulled it -- and

1:11PM  19   what if it said alopecia on hormone therapy -- "alopecia

1:11PM  20   resolved after treatment of Taxotere" -- let's just say it said

1:11PM  21   that.

1:11PM  22   **A.**   You're right.  That could happen.

1:11PM  23   **Q.**   And your search terms would still -- your methodology

1:12PM  24   would still generate a positive result; correct?

1:12PM  25   **A.**   Sure.  For about half of them, alopecia is the only event.

OFFICIAL TRANSCRIPT

1:12PM   1    We can be certain it is the other.  In others, you're right,

1:12PM   2    there's uncertainty.

1:12PM   3    Q.    And these are the inherent weaknesses in this type of

1:12PM   4    analysis; correct?

1:12PM   5    A.    It's a limitation.

1:12PM   6    Q.    Yeah.  And the fact of the matter is you didn't pull any

1:12PM   7    of these individual reports and look at them; correct?

1:12PM   8    A.    So my analysis involves every report in the database.  So

1:12PM   9    there's four numbers that go into the analysis.

1:12PM   10           So you'd have to pull 13 million reports and look at

1:12PM   11   narrative on every one of them.  It's conceivable.  That's not

1:12PM   12   what a statistician does.  So I'm doing a statistical analysis

1:12PM   13   of these data with the limitations that it has.

1:12PM   14   Q.    I understand, Doctor, that you are a man of statistics.

1:12PM   15   Fair enough?

1:12PM   16   A.    I'm a statistician.

1:12PM   17   Q.    You're a well-qualified statistician, but you're not a man

1:12PM   18   of medicine; correct?

1:13PM   19   A.    Yes, I'm not a medical doctor.

1:13PM   20   Q.    Okay.  And what we know, though, is that, when you did

1:13PM   21   your analysis -- so you showed the jury, with Mr. Miceli, a

1:13PM   22   chart; right?  And it had a line on it -- it had a bunch of

1:13PM   23   lines on it.

1:13PM   24   A.    FAERS.

1:13PM   25   Q.    It was the FAERS database chart.

DAVID MADIGAN - CROSS

| | | |
|---|---|---|
| 1:13PM | 1 | **A.**   Sure. |
| 1:13PM | 2 | **Q.**   There's numbers behinds that chart; correct? |
| 1:13PM | 3 | **A.**   Yes. |
| 1:13PM | 4 | **Q.**   Okay.  And your chart had from, you know, a certain date |
| 1:13PM | 5 | up to 2011 and then had the lines.  And then there's numbers of |
| 1:13PM | 6 | reports that you hit on that are underlying that chart; |
| 1:13PM | 7 | correct? |
| 1:13PM | 8 | **A.**   You know, every report in the database enters into that |
| 1:13PM | 9 | calculation. |
| 1:13PM | 10 | **Q.**   So, Dr. Madigan, with regard to this FAERS analysis, from |
| 1:13PM | 11 | 1996 up through 2011, was your search time-limited going |
| 1:13PM | 12 | backwards? |
| 1:13PM | 13 | **A.**   No.  It begins at the beginning of the database.  There's |
| 1:13PM | 14 | not essentially anything happening more or less prior to -- I |
| 1:14PM | 15 | start the graph in 2000. |
| 1:14PM | 16 | **Q.**   Right.  But you searched the data all the way back to -- |
| 1:14PM | 17 | when did the database begin? |
| 1:14PM | 18 | **A.**   1969. |
| 1:14PM | 19 | **THE WITNESS:**  Should I go back to my chair? |
| 1:14PM | 20 | **THE COURT:**  Are we finished? |
| 1:14PM | 21 | **MR. STRONGMAN:**  You may.  We can stay down here if |
| 1:14PM | 22 | you want, but you may. |
| 1:14PM | 23 | **BY MR. STRONGMAN:** |
| 1:14PM | 24 | **Q.**   So you understand Taxotere came onto the market in 1996? |
| 1:14PM | 25 | **A.**   Yes, I think so. |

DAVID MADIGAN - CROSS

1:14PM 1    **Q.**   Okay.  And your analysis that you showed -- this is the

1:14PM 2    FAERS analysis the internal database analysis that you showed,

1:14PM 3    and it had those lines.  That analysis went all the way up to

1:14PM 4    2011.

1:14PM 5            So we can assume that's -- what? -- 11 plus 4 --

1:14PM 6    15 years?

1:14PM 7    **A.**   Sure.

1:15PM 8    **Q.**   Okay.  And, Doctor, when you look at your FAERS analysis,

1:15PM 9    how many reports did you get a hit on in that 15 years between

1:15PM 10   1996 and 2011 -- and, let's say, up until the second quarter of

1:15PM 11   2011?

1:15PM 12   **A.**   I actually can't answer that with what's in front of me.

1:15PM 13   **Q.**   I'm happy to provide that for you.

1:15PM 14           You had a table attached as part of your report;

1:15PM 15   correct?

1:15PM 16   **A.**   It's not here.

1:16PM 17           **MR. STRONGMAN:**  May I approach, Your Honor?

1:16PM 18           **THE COURT:**  Yes, you may.

1:16PM 19           **THE WITNESS:**  Thank you.

1:16PM 20   BY MR. STRONGMAN:

1:16PM 21   **Q.**   So this was a table that you generated as part of your

1:16PM 22   report; correct, Doctor?

1:16PM 23   **A.**   Yes.

1:16PM 24   **Q.**   And so do you have the information in front of you now?

1:16PM 25   **A.**   Yes.

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1:16PM   1   **Q.**   So in the 15 years in the FAERS analysis, where you did
1:16PM   2   this search that we went through, how many reports?
1:16PM   3   **A.**   Eleven.
1:17PM   4   **Q.**   That's 11 reports in more than 15 years; correct?
1:17PM   5   **A.**   That's correct.
1:17PM   6   **Q.**   It goes without saying that that's less than one report
1:17PM   7   per year; correct?
1:17PM   8   **A.**   Indeed.
1:17PM   9   **Q.**   Now, Doctor, out of those 11 reports, how many actually
1:17PM  10   had alopecia that resolved?
1:17PM  11   **A.**   I don't believe any of them did, but I don't know that for
1:17PM  12   certain.  It is what it is.  The alopecia was recorded in the
1:17PM  13   one place, and "permanent disability" was checked in the other
1:17PM  14   place.
1:17PM  15   **Q.**   And as we established, the term down here in the -- like
1:17PM  16   if there's -- so liver failure.  Okay.  So we've got Arimidex.
1:17PM  17   Yeah, yeah.
1:17PM  18          So we've got Arimidex, we've got alopecia, and we've
1:17PM  19   got liver failure.
1:17PM  20          Are you with me?
1:18PM  21   **A.**   Yep.
1:18PM  22   **Q.**   This box up here, it's not tied to one of these two events
1:18PM  23   in the data that you looked at; correct?
1:18PM  24   **A.**   Not necessarily.  The same is true for the comparators.
1:18PM  25   This is one of the reason that you run comparator drugs.

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1:18PM   1   **Q.**   And I understand, Doctor, that you've got -- the

1:18PM   2   response -- my question is very simple.

1:18PM   3        On this very report that we've got here right in

1:18PM   4   front of us, if the patient had liver failure that was

1:18PM   5   disabling or permanent, alopecia that occurred on the hormone

1:18PM   6   drug but they had taken Taxotere months before for

1:18PM   7   chemotherapy, that would have hit on your report; correct.

1:18PM   8   **A.**   Yes.  Yes, it could have -- it would have.

1:18PM   9   **Q.**   So how many of these 11 -- I think we established how many

1:18PM   10  of the 11 had hair loss that resolved.

1:19PM   11       You can't say for sure; correct?

1:19PM   12  **A.**   Like I said, the goal is to capture that they're all

1:19PM   13  irreversible alopecia, but I can't be certain.

1:19PM   14  **Q.**   Okay.  How many of those 11 actually had hair loss that

1:19PM   15  was evaluated six months post-chemotherapy?

1:19PM   16  **A.**   I don't know.

1:19PM   17  **Q.**   How many of those 11 included reports of people with hair

1:19PM   18  loss while they were actually on the drug?

1:19PM   19  **A.**   I don't know.

1:19PM   20  **Q.**   How many of those 11 involved several other drugs in the

1:20PM   21  list?

1:20PM   22  **A.**   I don't know -- for the 11, I don't know.

1:20PM   23       I did conduct an analysis, as you know, to address

1:20PM   24  the question of other drugs.

1:20PM   25  **Q.**   And, Doctor, the bottom line is you didn't actually pull

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1:20PM   1   the report with all the narrative information and go through

1:20PM   2   each and every one of the 11; correct?

1:20PM   3   A.   I'm a statistician.  You'd have to -- to do that

1:20PM   4   appropriately -- to bolster what I'm doing, you'd need to look

1:20PM   5   at 13 million reports.  You have to look at every report.

1:20PM   6          There's a foreground and a background, and there's

1:20PM   7   reports with permanent alopecia and without.  You have to look

1:20PM   8   at every single one of them.

1:20PM   9          I'm not arguing against it, but it's just not the

1:20PM  10   nature of what I'm doing here.  It's a statistical analysis.

1:21PM  11   Q.   And I understand what you're saying is you'd have to

1:21PM  12   actually pull the report for all the adverse events and go

1:21PM  13   through them one by one.  I understand that's what your saying.

1:21PM  14          But my question is for -- my purpose is just you

1:21PM  15   didn't pull the 11 reports and actually read the narrative

1:21PM  16   about what actually happened with each individual patient;

1:21PM  17   correct?

1:21PM  18          MR. MICELI:  Object.  It's been asked and answered

1:21PM  19   twice now.

1:21PM  20          THE COURT:  Sustained.  Let's move on.

1:21PM  21   BY MR. STRONGMAN:

1:21PM  22   Q.   Doctor, here is a question for you.  I'm going to try to

1:21PM  23   use sort of a different way of explaining this.  Okay?

1:21PM  24          Would you agree with me that an apple is a red fruit?

1:21PM  25   A.   No.  It could be green.

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1:21PM  1  **Q.**   It could be green.  It could be red.  Fair enough.  Right.

1:21PM  2        It could be red; fair?

1:21PM  3  **A.**   Sure.

1:21PM  4  **Q.**   Would you agree with me that a raspberry is a red fruit?

1:21PM  5  **A.**   I agree with you on that one.

1:21PM  6  **Q.**   Would you agree with me that a cherry can be a red fruit?

1:22PM  7  **A.**   Yes.

1:22PM  8  **Q.**   And if I am holding a bag in my hands right now and I told

1:22PM  9  you that I've got a piece of fruit in the bag and that it's

1:22PM  10 red, you can't tell me that it's an apple; correct?

1:22PM  11 **A.**   Correct.

1:22PM  12 **Q.**   The only way to tell me it's an apple is to open the bag

1:22PM  13 and look; fair enough?

1:22PM  14 **A.**   Yeah.  I think the analogy is kind of out there, but okay.

1:22PM  15 **Q.**   And, Doctor, when you performed your work in this case,

1:23PM  16 you didn't do any kind of thorough medical literature review;

1:23PM  17 correct?

1:23PM  18 **A.**   Sorry.  You're now talking like just in general?  You're

1:23PM  19 not talking about FAERS anymore?

1:23PM  20 **Q.**   Sorry.  Yes.  I'm just talking about when you worked on

1:23PM  21 generating your report in this case, you didn't do any kind of

1:23PM  22 thorough medical literature review, did you?

1:23PM  23 **A.**   No.  I'm -- it's a statistical exercise that I conducted.

1:23PM  24 **Q.**   Okay.  And, in fact, I think you indicated that what you

1:23PM  25 thought was in the literature were case reports generally and

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1:23PM 1   that you didn't find them all that helpful; correct?

1:23PM 2   A.   Something along -- I'm aware of the fact that there are

1:23PM 3   case reports in the literature.  And in terms of, you know,

1:23PM 4   looking at a causal association, that's a piece of the puzzle.

1:23PM 5   But it's arguably not as important as what I'm looking at here.

1:23PM 6   Q.   Fair enough.  And I think you said they're not terribly

1:23PM 7   useful.

1:23PM 8   A.   I might have something like that, yeah, for purposes of

1:24PM 9   establishing a causal association.  They're used for other

1:24PM 10  purposes.  But for establishing if they're a causal

1:24PM 11  association, case reports are of some value but a limited

1:24PM 12  value.

1:24PM 13  Q.   I think you testified about this, but I want to make sure

1:24PM 14  I'm clear.  This search that you did, ending up with 11 reports

1:24PM 15  in 15 years, you would agree that that does not, in and of

1:24PM 16  itself, prove causation; correct?

1:24PM 17  A.   It doesn't.  You're calling it a search.  I call it an

1:24PM 18  analysis.  It's an important distinction.

1:24PM 19        But no, in and of itself, my FAERS analysis does not

1:24PM 20  establish causation.

1:24PM 21  Q.   And you actually did -- Mr. Miceli showed you one chart,

1:24PM 22  correct, of the FAERS analysis -- sorry, that wasn't clear.

1:24PM 23        So you did put up one chart that showed the various

1:24PM 24  medications over time; correct?

1:24PM 25  A.   It showed one particular metric for the five medications

DAVID MADIGAN - CROSS

1:24PM 1   over time.

1:25PM 2   **Q.**   And you also did a metric that is called -- and what was

1:25PM 3   the title of that metric that Mr. Miceli showed you?

1:25PM 4   **A.**   SEBGM.

1:25PM 5   **Q.**   SEBGM.

1:25PM 6          You also did a metric called EB05.

1:25PM 7   **A.**   Yes.

1:25PM 8   **Q.**   And it's another way of running an analysis for what you

1:25PM 9   are calling signals; correct?

1:25PM 10  **A.**   It's another metric.  It's one of the ones that uses --

1:25PM 11  it's very conservative, "conservative" meaning it tends to be

1:25PM 12  lower than all the others.

1:26PM 13  **Q.**   And what we know is that EB05 metric is the one that's

1:26PM 14  primarily used by the FDA; correct?

1:26PM 15  **A.**   No.  I know you're going to produce a document where I

1:26PM 16  probably said that, and I thought it was true.  I no longer

1:26PM 17  believe that's true.  I now know it's not true.

1:26PM 18  **Q.**   Doctor, you have your report in front of you; correct?

1:26PM 19  **A.**   Yes.

1:26PM 20  **Q.**   Let me ask you this question:  Doctor, you prepared this

1:26PM 21  report yourself; correct?

1:26PM 22  **A.**   Yes.

1:26PM 23  **Q.**   And when you prepared this report, did you take your time

1:26PM 24  and make sure you got the information correct?

1:26PM 25  **A.**   Certainly.

DAVID MADIGAN - CROSS

1:26PM  1   **Q.**   Details matter; correct?

1:26PM  2   **A.**   Certainly.

1:26PM  3   **Q.**   I mean, you're a person of numbers.

1:26PM  4        Numbers, details really matter, don't they --

1:26PM  5   **A.**   Sure.

1:26PM  6   **Q.**   -- right?

1:26PM  7   **A.**   Yep.

1:26PM  8   **Q.**   And in your report, these words are your own words;

1:27PM  9   correct?

1:27PM  10  **A.**   I'm sorry.  Could you direct me to where you're --

1:27PM  11  **Q.**   I'm just saying, in your report, the words that you wrote

1:27PM  12  were your own words?

1:27PM  13  **A.**   You're not going to tell me where it is in the report?

1:27PM  14  **Q.**   I will.  I'm getting there.

1:27PM  15        I'm just saying, when you wrote your report, these

1:27PM  16  weren't lawyer's words or anyone else's words.  These were your

1:27PM  17  words; correct?

1:27PM  18  **A.**   I don't know what you're about to tell me.

1:27PM  19  **Q.**   Your whole report.

1:27PM  20  **A.**   Okay.  Sure.  Sure.  Sure.  Sure.

1:27PM  21  **Q.**   I'm just asking about your whole report.

1:27PM  22  **A.**   Yes.

1:27PM  23  **Q.**   And if you look at paragraph 24 of your report -- are you

1:27PM  24  with me?

1:27PM  25  **A.**   Yep.

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1:27PM  1   **Q.**   These are your words, "Both the FDA and the Medicines and

1:27PM  2   Healthcare Products Regulatory Agency in the UK use the MPGS

1:27PM  3   algorithm and focus primarily on the EB05 measure."  Correct?

1:27PM  4   **A.**   Okay.  Keep reading.

1:27PM  5   **Q.**   I know it has more.

1:27PM  6   **A.**   No, no.

1:27PM  7   **Q.**   But you say it focuses primarily on the EB05 measure.

1:28PM  8           **THE WITNESS:**  Can I clarify?  He's cherry-picking.

1:28PM  9           **THE COURT:**  You're going to have to answer the

1:28PM  10  question first, and then you can finish your answer.

1:28PM  11  **BY MR. STRONGMAN:**

1:28PM  12  **Q.**   And what it goes on to say -- that's the end of sentence,

1:28PM  13  though; correct?

1:28PM  14  **A.**   Sure.

1:28PM  15  **Q.**   And then it goes on to say, "In the FDA's case, EB05 has

1:28PM  16  been in use at least since 1998, although the agency often

1:28PM  17  presents both EBGM and EB05 and a non-Bayesian metric."

1:28PM  18  Correct?

1:28PM  19  **A.**   Such as the PRR or the RR, yes.

1:28PM  20  **Q.**   But your words in your report says FDA focused primarily

1:28PM  21  on EB05 measure.

1:28PM  22          Those are your words; correct?

1:28PM  23  **A.**   Yeah.  But they use -- they're fond the EB05, but they

1:28PM  24  routinely present other metrics as well.  And different safety

1:28PM  25  officers do different things.

DAVID MADIGAN - CROSS

1:29PM 1   **Q.**   And I'm certainly not going to represent that it's the
1:29PM 2   only metric anyone looks at, but your words were focused
1:29PM 3   primarily on EB05; right?
1:29PM 4   **A.**   I don't really accept that.  But anyway...
1:29PM 5   **Q.**   And, Doctor, what we know is that, when you did this EB05
1:29PM 6   metric, as of 2011 -- are you with me --
1:29PM 7   **A.**   I'm listening, yes.
1:29PM 8   **Q.**   -- there was absolutely no signal at all with Taxotere;
1:29PM 9   correct?
1:29PM 10   **A.**   I don't know what the EB05 was.
1:29PM 11   **Q.**   You don't know?
1:29PM 12   **A.**   Off the top of my head, a random moment in time?  I'm not
1:29PM 13   that smart.
1:29PM 14           It was 1.65 at the end of 2011.  That's not no
1:30PM 15   signal.  You said "absolutely no signal."  Absolutely no signal
1:30PM 16   is one.  This is not absolutely no signal.
1:30PM 17   **Q.**   Well, Doctor, you -- Doctor, this is the chart that you
1:30PM 18   showed; right?  This is the one that Mr. Miceli put up; right?
1:30PM 19   Do you remember that?
1:30PM 20           And it has this line at 2; right?
1:30PM 21   **A.**   Yep.
1:30PM 22   **Q.**   And that had some meaning for you; correct?
1:30PM 23   **A.**   Yep.
1:30PM 24   **Q.**   Can you explain that.
1:30PM 25   **A.**   Sure.  So two is a threshold, as I said this morning, is a

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1:30PM  1    threshold -- think like Richter scale.  So above a 2, people

1:30PM  2    consider that to be a very serious problem.  That doesn't mean

1:30PM  3    it's not a serious problem below 2.  But above 2, for sure, is

1:30PM  4    considered a signal.

1:30PM  5    **Q.**   And, Doctor, on the EB05 metric, the one that you say is

1:30PM  6    primarily focused on by the FDA, as of 2011, there was no

1:31PM  7    signal above your line of 2 for Taxotere; correct?

1:31PM  8    **A.**   There was not.

1:31PM  9            **MR. MICELI:**  Your Honor, object.  It's asked and

1:31PM  10   answered again.

1:31PM  11           **THE COURT:**  Sustained.

1:31PM  12   **BY MR. STRONGMAN:**

1:31PM  13   **Q.**   Did Mr. Miceli ask you any questions about EB05?

1:31PM  14   **A.**   Don't think so.

1:31PM  15   **Q.**   All right.  Doctor, I think the last -- the last leg of

1:31PM  16   your roadmap there, the last sign going backwards is your

1:32PM  17   TAX 316 and TAX 301 analysis; right?

1:32PM  18   **A.**   Okay.

1:32PM  19   **Q.**   And we know what you did, as Mr. Miceli asked you, is you

1:32PM  20   analyzed this data in both these clinical studies, and you came

1:32PM  21   up with the numbers that you presented on what you -- you

1:32PM  22   called them "permanent alopecia."

1:32PM  23           Do you remember that?

1:32PM  24   **A.**   Yes.  I think I used the word "irreversible."

1:32PM  25   **Q.**   I think you used the word "permanent."

DAVID MADIGAN - CROSS

1:32PM   1   **A.**   Okay.  If you say so.

1:32PM   2   **Q.**   Or "irreversible."

1:32PM   3          But here's my question, Doctor:  If you actually look

1:32PM   4   in TAX 316 or TAX 301, is the word "irreversible alopecia"

1:32PM   5   reported there?

1:32PM   6   **A.**   No.  They call it "ongoing."

1:32PM   7   **Q.**   They call it "ongoing."

1:32PM   8   **A.**   Yeah.

1:32PM   9   **Q.**   Do you know the definition of "ongoing" as it related to

1:32PM   10  TAX 316?

1:33PM   11  **A.**   Meaning the --

1:33PM   12  **Q.**   Do you know?

1:33PM   13  **A.**   Yeah.  The adverse event is persistent.

1:33PM   14  **Q.**   Do you know how that term is actually defined and followed

1:33PM   15  up on as the study moves on in TAX 316?

1:33PM   16  **A.**   Their protocol says that, at every follow-up, you check

1:33PM   17  for if side effects have reversed or are continuing, clinical

1:33PM   18  adverse events that started on treatment.

1:33PM   19  **Q.**   And I have a similar question as it relates to TAX 316 and

1:33PM   20  TAX 301, those -- the 29 and the 16 in TAX 316.

1:33PM   21          Are you with me?

1:33PM   22  **A.**   Yes.

1:33PM   23  **Q.**   Did you actually pull any of the clinical information on

1:33PM   24  any of those patients and look at them?

1:33PM   25  **A.**   I did not.  I'm doing a statistical analysis, as any

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1:33PM 1 biostatistician would do, of the frozen, locked clinical trial

1:33PM 2 data.  That's not the nature of my analysis or of any analysis

1:33PM 3 that one would do like this.

1:34PM 4 Q.   And so you didn't open the bag on any of those 29 or those

1:34PM 5 16 to look underneath and see do any of these individuals

1:34PM 6 actually have alopecia that lasted longer than six months?

1:34PM 7 A.   The database says -- states that they do.  It's the frozen

1:34PM 8 file.  It is what happened in the clinical trial.  That's what

1:34PM 9 I look at.

1:34PM 10 Q.   That wasn't my question.

1:34PM 11 A.   I thought I answered your question.

1:34PM 12 Q.   My question was did you actually pull the clinical

1:34PM 13 information on each one of those patients and evaluate it to

1:34PM 14 determine whether or not any of them --

1:34PM 15       MR. MICELI:  Your Honor, this has been asked and

1:34PM 16 answered.  Object.

1:34PM 17       THE COURT:  I'm going to let him finish the question

1:34PM 18 because I think -- finish your question.

1:34PM 19 BY MR. STRONGMAN:

1:34PM 20 Q.   Doctor, did you actually pull --

1:34PM 21       THE COURT:  Overruled.

1:34PM 22 BY MR. STRONGMAN:

1:34PM 23 Q.   -- any of the clinical medical information that gives the

1:34PM 24 narrative about each one of those individual patients in the 29

1:34PM 25 or the 16?

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1:34PM   1   A.   That's not what I do.  It's not what a statistician does.
1:35PM   2   It's not the nature of my analysis.  It's -- I'm conducting a
1:35PM   3   statistical analysis of the locked clinical trial data.
1:35PM   4   Q.   And then what you did was you did these analyses, and
1:35PM   5   Mr. Miceli talked to you about a meta-analysis; correct?
1:35PM   6   A.   Sure.
1:35PM   7   Q.   And you did an analysis, actually, of each of the two
1:35PM   8   studies individually; correct?
1:35PM   9   A.   Sure.  As part -- on the way to -- to doing a
1:35PM  10   meta-analysis, which is the totality of the evidence.
1:35PM  11   Q.   And when you did your analysis on each individual study,
1:35PM  12   you set a parameter for statistical significance, a P value;
1:35PM  13   correct?
1:35PM  14   A.   I computed a P value.  Is that what you mean?  Are we
1:35PM  15   agreeing?
1:35PM  16   Q.   Well, you know what P value .05 means; right?
1:35PM  17   A.   So if the P value is less than .05, typically, it's not
1:36PM  18   right or wrong but, typically, call that statistically
1:36PM  19   significant.
1:36PM  20   Q.   So, Doctor, at the end of the TAX 316 study, you ran an
1:36PM  21   analysis between the 29 and the 16 to see if there was a
1:36PM  22   statistically significant difference between the two at that
1:36PM  23   point in time; correct?
1:36PM  24   A.   No.  That wasn't the purpose of why I did the analysis.  I
1:36PM  25   did the analysis to estimate the effect size.  I computed a key

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1:36PM  1    value along the way.

1:36PM  2          The way you phrased it there is -- I'm uncomfortable

1:36PM  3    with it.  You're saying I did it to see whether it was

1:36PM  4    statistically significant.  No, that's not why I did it.

1:36PM  5    Q.   Maybe not the why but the result.  Let's talk about the

1:36PM  6    result.

1:36PM  7    A.   Sure.

1:36PM  8    Q.   At the end of the ten-year study, when you compared the 29

1:36PM  9    and the 16 in TAX 316 -- are you with me so far?

1:36PM  10   A.   Absolutely.

1:36PM  11   Q.   -- your analysis showed that it was a not statistically

1:37PM  12   significant result; correct?

1:37PM  13   A.   It just missed statistical significance, .054, I think

1:37PM  14   or -- but you're right, it wasn't statistically significant.

1:37PM  15   Q.   And with regard to TAX 301, you did the same type of

1:37PM  16   analysis; correct?

1:37PM  17   A.   Sure.

1:37PM  18   Q.   And what we know is, at the end of ten years, you looked

1:37PM  19   to see whether or not there's a statistically significant

1:37PM  20   difference, and you didn't find one there either; correct?

1:37PM  21   A.   Same problem with your question.  I did not do either of

1:37PM  22   those to see if they were statistically significant.  I

1:37PM  23   couldn't care less whether they're statistically significant or

1:37PM  24   not because I'm going to do a meta-analysis that looks at the

1:37PM  25   totality of the evidence, and that's what I care about.

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1:37PM 1  Q.   Well, Doctor, you did an analysis of TAX 316 alone; right?

1:37PM 2  A.   Sure.  But not -- the way you're characterizing it is I

1:37PM 3  did it to see if there was statistical significance.  That's

1:37PM 4  simply wrong.  I didn't do that.

1:37PM 5  Q.   Doctor, at the end of the ten-year analysis in TAX 301

1:37PM 6  alone, the Taxotere arm and the 5-FU arm were not statistically

1:38PM 7  significant in terms of the difference; correct?

1:38PM 8  A.   The P value is bigger than .05 in 301.

1:38PM 9  Q.   So the answer to my question is it is not statistically

1:38PM 10  significant; correct?

1:38PM 11  A.   Yeah.  I said that a couple minutes ago.

1:38PM 12  Q.   Mr. Miceli also asked you some questions about my

1:38PM 13  examination of Dr. Kessler yesterday on whether the 29 or the

1:38PM 14  16 were actually followed for six months.

1:39PM 15       Do you remember that?

1:39PM 16  A.   I do.

1:39PM 17  Q.   And I think you said something along the lines of you had

1:39PM 18  never seen any document where Sanofi represented data to anyone

1:39PM 19  consistent with the way that I asked Dr. Kessler those

1:39PM 20  questions.

1:39PM 21  A.   Something like that.  Yeah, I haven't seen a document like

1:39PM 22  that.

1:39PM 23       MR. STRONGMAN:  May I approach, Your Honor?

1:39PM 24       THE COURT:  Yes, you may.

1:39PM 25       MR. MICELI:  I think we need to approach the bench.

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1:39PM   1          **THE COURT:**  Okay.

1:39PM   2          (WHEREUPON, the following proceedings were held at

1:39PM   3   the bench.)

1:40PM   4          **MR. MICELI:**  Your Honor, if I can address this -- I

1:40PM   5   need to go to page 10 of this document.  This is -- Your Honor,

1:40PM   6   this is a document that was used yesterday with Dr. Kessler.

1:40PM   7   It was not admitted.  There's no foundation for this -- to use

1:40PM   8   this with this witness.  It is also a document that if you --

1:40PM   9   that there's no foundation.

1:40PM   10         **THE COURT:**  What is it?

1:40PM   11         **MR. MICELI:**  I'll show you exactly what it is, Your

1:40PM   12   Honor.  This is a listing of the TAX 316 adverse events for

1:40PM   13   alopecia.  It's all adverse events.

1:40PM   14              But if you look at the bottom here, you see this

1:40PM   15   SAS string.  It ends in 2012.  Their statistician is testifying

1:41PM   16   that if you see a SAS string that like that, it ends in 2012,

1:41PM   17   that is an analysis he's done after 2011.

1:41PM   18              If we're not allowed to put in stuff that's

1:41PM   19   analyzed after 2011, the defendant should not be allowed to do

1:41PM   20   so.  This is a 2012 reanalysis of --

1:41PM   21         **THE COURT:**  Is this Dr. Kopreski?

1:41PM   22         **MR. MICELI:**  This is not Dr. Kopreski.  But I suspect

1:41PM   23   we'll learn, if he ever shows up in this courtroom, that this

1:41PM   24   is where they came up with the Dr. Kopreski analysis.

1:41PM   25         **MR. STRONGMAN:**  May I explain, Your Honor?

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1:41PM  1          So what Dr. Madigan has said at the questioning

1:41PM  2   of Mr. Miceli is that nowhere did we ever represent that the

1:41PM  3   data meant what I asked Dr. Kessler about.

1:41PM  4          What this is, is this was a question, it was

1:41PM  5   asked, "What does 'ongoing' mean?"  The company provided the

1:41PM  6   data, and it said, "Here is the follow-up duration for the

1:41PM  7   adverse events."  And it just gives a time period.

1:41PM  8          If Mr. Miceli wants to talk -- this is the

1:41PM  9   TAX 316 data that we've been talking about all trial.  This

1:42PM  10  isn't a --

1:42PM  11         MR. MICELI:  This is not the TAX 316 data we've been

1:42PM  12  talking about all trial.

1:42PM  13         MR. STRONGMAN:  Just let me finish.

1:42PM  14         MR. MICELI:  I will.

1:42PM  15         MR. STRONGMAN:  So all this does is it shows how long

1:42PM  16  each individual patient for each adverse event was actually

1:42PM  17  followed up on that adverse event.  And he has said

1:42PM  18  unequivocally this didn't exist anywhere.  I feel like I -- I

1:42PM  19  don't have to move it into evidence even.  I feel like I should

1:42PM  20  be able to show it to him.

1:42PM  21         MR. MICELI:  Your Honor, if you flip through those

1:42PM  22  pages, what you're going to see is this is something that was

1:42PM  23  produced in Canada.  What you told us we wouldn't be able to

1:42PM  24  produce in here things from foreign countries.

1:42PM  25         This is a reanalysis in 2012 of their data.

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1:42PM  1    This is data that has never been shared with the FDA.  There's

1:42PM  2    no been no proof through any deposition that this has been

1:42PM  3    provided to a regulatory agency.  This is not a statement from

1:42PM  4    Sanofi to anybody.

1:42PM  5                There's no -- there's certainly no proof of it.

1:42PM  6    There's no foundation that's been laid, and there's none that

1:43PM  7    can be laid to use this with this witness.

1:43PM  8                If this comes in, then we need to be able to

1:43PM  9    show the jury the 2015 clinical overview that analyzes

1:43PM  10   partially data from before 2011.  In 2015, Sanofi is still

1:43PM  11   representing 29 and 16.

1:43PM  12         MR. STRONGMAN:  For ongoing.  It's just a matter of

1:43PM  13   how "ongoing" is defined in this courtroom versus the actual

1:43PM  14   study.

1:43PM  15         MR. MICELI:  Well, Jon, it's important how they

1:43PM  16   represented to the world, to the people who used the drug, and

1:43PM  17   to the doctors.  This 29 and 16 is how they represented it.

1:43PM  18                They're trying to create a false narrative

1:43PM  19   before this jury.  And if they're going to do it, we have to

1:43PM  20   have the opportunity -- if they go beyond 2011, we have to have

1:43PM  21   the opportunity to do the same, Your Honor.

1:43PM  22         THE COURT:  All right.

1:43PM  23         MR. STRONGMAN:  Can I make just a couple of points?

1:43PM  24                So, one, with regard to foreign regulatory, your

1:43PM  25   order was clear that anything we say to a foreign regulatory

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1:44PM    1    about alopecia is fair game.

1:44PM    2            The second is that this document was already

1:44PM    3    ruled on by Your Honor in Dr. Kopreski's deposition and allowed

1:44PM    4    when you went through Dr. Kopreski's deposition.

1:44PM    5            THE COURT:  I want to make sure I'm understanding

1:44PM    6    what I'm looking at.

1:44PM    7            This is -- this is what occurred in Canada, and

1:44PM    8    it goes through 2012.  And there was this information that

1:44PM    9    provides how this -- how the patients are followed.

1:44PM   10            MR. STRONGMAN:  So what happened was is the same 2011

1:44PM   11    TAX 316 data that we've been talking about, and Canada just

1:44PM   12    asked the question, "What does 'ongoing' mean?"  And we

1:44PM   13    responded and said, "Let me explain to you what 'ongoing'

1:44PM   14    means," and we set it out.

1:45PM   15            MR. MICELI:  If we open this door --

1:45PM   16            THE COURT:  Would you let me ask some questions

1:45PM   17    before you keep talking?

1:45PM   18            MR. MICELI:  I apologize, Your Honor.

1:45PM   19            THE COURT:  Now, this is what was presented to the

1:45PM   20    FDA as the final.

1:45PM   21            MR. MICELI:  I don't want to put the document in.  I

1:45PM   22    want to show what the data on this document is, and I want to

1:45PM   23    show what is stated in the document.  Because this is a 2015

1:45PM   24    representation of what they said to the FDA, and that's -- this

1:45PM   25    is still in the label today, Your Honor.

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

| | | |
|---|---|---|
| 1:45PM | 1 | They put that in in '15, and it hasn't come out. |
| 1:45PM | 2 | They haven't given this less-than-six-month stuff to anybody in |
| 1:45PM | 3 | the United States.  And it's not in my label. |
| 1:45PM | 4 | More importantly for us, we had Dr. Madigan, |
| 1:45PM | 5 | who's assisting us in understanding what statistics mean in |
| 1:45PM | 6 | this sort of a case, and that SAS program that I showed you at |
| 1:45PM | 7 | the bottom. |
| 1:45PM | 8 | THE COURT:  Okay.  I'm trying to tell you something. |
| 1:45PM | 9 | Do you want to keep talking? |
| 1:45PM | 10 | MR. MICELI:  No, ma'am. |
| 1:45PM | 11 | THE COURT:  I think it's fair game to question, but I |
| 1:46PM | 12 | think that opens to the door to 2015 to explain what was |
| 1:46PM | 13 | happening. |
| 1:46PM | 14 | MR. STRONGMAN:  If I could just get -- if I could get |
| 1:46PM | 15 | clarification on what is the -- so not putting in the 2015 |
| 1:46PM | 16 | whole document, but just saying in 2015 -- |
| 1:46PM | 17 | THE COURT:  The question is what was reported to the |
| 1:46PM | 18 | FDA.  Sure.  What were the numbers they presented to the FDA. |
| 1:46PM | 19 | Because apparently we have -- |
| 1:46PM | 20 | MR. STRONGMAN:  It's the apples-and-oranges thing, |
| 1:46PM | 21 | the fruit and the apples. |
| 1:46PM | 22 | MR. MICELI:  He's opened the bag.  I'm just taking |
| 1:46PM | 23 | the apples out, Your Honor. |
| 1:46PM | 24 | MR. COFFIN:  The green ones.  Only the green ones. |
| 1:46PM | 25 | THE COURT:  I didn't mean to laugh, but I thought it |

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1:46PM  1    was funny.

1:46PM  2              MR. STRONGMAN:  It's fair.

1:46PM  3              THE COURT:  You laughed.

1:46PM  4              MR. STRONGMAN:  I did.  I understand.

1:46PM  5              THE COURT:  I think -- but that's part of what was

1:46PM  6    said with Kopreski.  I know you say it's not going to be

1:46PM  7    anything like that.  I think all of this is fair.  I certainly

1:46PM  8    think that's appropriate for you to explore that, but I think

1:46PM  9    they get -- they certainly -- the plaintiffs have the right to

1:46PM  10   then say, "Well, let's look what else they've represented."

1:47PM  11             MR. STRONGMAN:  Can we reach an agreement that if I

1:47PM  12   show this to him, I'm not going to move it into evidence?  I'll

1:47PM  13   show it him, and I'll say, "Look at the chart," and then he

1:47PM  14   could --

1:47PM  15             THE COURT:  Nothing's coming into evidence.

1:47PM  16             MR. STRONGMAN:  Say that again.

1:47PM  17             THE COURT:  Nothing's coming into evidence.

1:47PM  18             MR. STRONGMAN:  Yeah.  So he could then show him

1:47PM  19   something and saying, well, here, it says something different.

1:47PM  20             THE COURT:  Yeah.

1:47PM  21             MR. STRONGMAN:  Okay.

1:47PM  22             THE COURT:  I think that's good.  Fair enough.

1:47PM  23   What's good for the goose.

1:47PM  24             (WHEREUPON, the following proceedings were held in

1:47PM  25   open court.)

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1:47PM  1         **THE COURT:**  Mr. Strongman, please proceed.

1:47PM  2         **MR. STRONGMAN:**  Thank you.

1:47PM  3  BY MR. STRONGMAN:

1:47PM  4  **Q.**   Doctor, may I approach to hand you one?

1:47PM  5  **A.**   Sure.

1:48PM  6  **Q.**   Doctor, what I want to do is I want to turn to -- there's

1:48PM  7  a chart in the document that I've handed you.

1:48PM  8         Do you see that?

1:48PM  9  **A.**   Well, let's be precise.  So you're on page?

1:48PM  10 **Q.**   Yes, let me -- flip a few pages in, and then there's a

1:48PM  11 chart.  And at the very bottom, it has, like, a 1 of 133 page

1:48PM  12 number.

1:48PM  13        Do you see that?

1:48PM  14 **A.**   I do.

1:48PM  15 **Q.**   And, actually, if you could actually back up with me.  I

1:48PM  16 asked you a question about what "ongoing" means.

1:48PM  17 **A.**   Yep.

1:48PM  18 **Q.**   And take your time.  Tell me when you're good.

1:48PM  19 **A.**   Yep.

1:48PM  20 **Q.**   You're good?

1:48PM  21 **A.**   I'm good.  But if you're going to ask me questions about

1:49PM  22 this, I need more time.

1:49PM  23 **Q.**   Actually, if you could flip back to just page 3 right

1:49PM  24 there.

1:49PM  25        You all right?

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1:49PM  1   **A.**   Page 3.  Okay.  Yes, I think I...

1:49PM  2   **Q.**   Okay.  And it actually talks about what "ongoing" means,

1:49PM  3   and what "ongoing and persisting into the follow-up period"

1:49PM  4   means.

1:49PM  5           Do you see that, down at the last paragraph on that

1:49PM  6   page?

1:49PM  7   **A.**   Yeah.

1:49PM  8   **Q.**   And it says that "ongoing" means --

1:49PM  9   **A.**   Could I have a minute to read this?  Could I --

1:49PM  10  **Q.**   You certainly may.

1:49PM  11  **A.**   Okay.  Thank you.  (Witness reviews document.)

1:49PM  12  **Q.**   Okay.  So the question is asked, "What is ongoing?"

1:49PM  13          And it says that "'Ongoing' means that the adverse

1:50PM  14  event was present at the last follow-up visit, whenever this

1:50PM  15  visit occurred," correct, "starting 30 days after the treatment

1:50PM  16  and ongoing."

1:50PM  17          Correct?  Do you see that?

1:50PM  18  **A.**   "Persisting or starting through the follow-up period and

1:50PM  19  that were present in the lasted follow-up visit."

1:50PM  20          I see that.

1:50PM  21  **Q.**   Okay.  Now, if you'll look with me where I had you

1:50PM  22  earlier, which is the chart that starts on page 1 of 33.

1:50PM  23  **A.**   Okay.

1:50PM  24  **Q.**   Okay.  And you see there's "alopecia" there; right?

1:50PM  25  **A.**   I do.

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

| | | |
|---|---|---|
| 1:50PM | 1 | **Q.** And if you could take a second -- or you can trust me or |
| 1:50PM | 2 | I'm more than welcome to have you do it. |
| 1:51PM | 3 | But if you see, next to "alopecia," there's a |
| 1:51PM | 4 | treatment arm for TAC. And then as you go down the chart, it |
| 1:51PM | 5 | has the treatment arm for FAC. |
| 1:51PM | 6 | Do you see that? |
| 1:51PM | 7 | **A.** Yep. |
| 1:51PM | 8 | **Q.** Okay. And this is -- as you can tell, this is TAX 316 |
| 1:51PM | 9 | data; correct? |
| 1:51PM | 10 | **A.** Yes. |
| 1:51PM | 11 | **Q.** And if you could, I want you to count the total number of |
| 1:51PM | 12 | the alopecia events, the total number under the TAC arm on this |
| 1:51PM | 13 | chart. |
| 1:51PM | 14 | **A.** You're going to tell me 26, I guess. |
| 1:51PM | 15 | **Q.** I think it's 29. |
| 1:51PM | 16 | **A.** Beg your pardon, 29. I misspoke. |
| 1:51PM | 17 | **Q.** No, you're fine. You're fine. |
| 1:51PM | 18 | **THE COURT:** Dr. Madigan, do you need a piece of |
| 1:51PM | 19 | paper? |
| 1:51PM | 20 | **THE WITNESS:** No. I'm okay. Thank you. I think for |
| 1:51PM | 21 | now. 29. |
| 1:52PM | 22 | **BY MR. STRONGMAN:** |
| 1:52PM | 23 | **Q.** And if you could do the same, how many are in the FAC arm? |
| 1:52PM | 24 | **A.** 16. |
| 1:52PM | 25 | **Q.** Okay. And you see on the chart, there is a date of last |

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1:52PM   1    follow-up of AE?  Do you see that?

1:52PM   2    A.    I see that.

1:52PM   3    Q.    And you understand that AE means adverse event; correct?

1:52PM   4    A.    I do.  But I know for a fact these dates are wrong.

1:52PM   5    Q.    I'm just saying looking at the chart --

1:52PM   6    A.    They're not what they purport to be.  They're not the date

1:52PM   7    of the last follow-up?

1:52PM   8    Q.    The last follow-up --  let me ask two questions first just

1:52PM   9    as a precursor.

1:52PM  10          You understand that you can follow up a patient in a

1:52PM  11    clinical trial for adverse events -- like let's say a patient

1:53PM  12    had a reaction -- an allergic reaction, and so they transition

1:53PM  13    to a different medication.

1:53PM  14          Are you with me so far?

1:53PM  15    A.    Okay.

1:53PM  16    Q.    So they could stop being evaluated for the adverse event

1:53PM  17    but that they could still be evaluated for overall survival.

1:53PM  18          Do you understand the difference?

1:53PM  19    A.    I do.  But that's not what the protocol calls for.  The

1:53PM  20    protocol call says everyone is followed up for clinical adverse

1:53PM  21    events at every follow-up visit.

1:53PM  22    Q.    Do you understand what I asked?

1:53PM  23    A.    I do.  You don't have it repeat it.  I do.

1:53PM  24    Q.    So on the very far right column on this chart, there is a

1:53PM  25    number that says "follow-up duration years."

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1:53PM 1          Do you see that?

1:53PM 2    **A.**   I do.

1:53PM 3    **Q.**   And we can agree that .5 years is six months; correct?

1:53PM 4    **A.**   We can agree on that.

1:53PM 5    **Q.**   Now, can you go through and add up how many of the 29 were

1:54PM 6    followed up for more than six months?

1:54PM 7    **A.**   I can do that.  You made Dr. Kessler do it yesterday.

1:54PM 8          These numbers are nonsense.  So these are not

1:54PM 9    follow-up times.  I know how to compute a follow-up time.  And

1:54PM 10   I have seen a document just like this one, exact same layout,

1:54PM 11   with numbers that agree with mine.

1:54PM 12   **Q.**   Doctor --

1:54PM 13   **A.**   Let me tell you what these numbers are.

1:54PM 14   **Q.**   Doctor, I just --

1:54PM 15         **THE COURT:**  You need to just answer the question, and

1:54PM 16   you'll have an opportunity to explain your answer.

1:54PM 17         **MR. MICELI:**  Your Honor, could he have an

1:54PM 18   opportunity?

1:54PM 19         **THE COURT:**  He's got to answer the question.  Then he

1:54PM 20   may explain it, is what I told him.

1:54PM 21         **MR. MICELI:**  My concern, Your Honor, is the

1:54PM 22   interruption from counsel.

1:54PM 23         **THE COURT:**  Well, he's got to answer the question

1:54PM 24   first.

1:54PM 25         **MR. MICELI:**  Thank you.

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1:54PM  1      **THE COURT:**  And then he may explain it.

1:54PM  2           So I believe the question --

1:54PM  3  **BY MR. STRONGMAN:**

1:54PM  4  **Q.**  And I'm sure Mr. Miceli will give you opportunities to

1:54PM  5  explain anything that you feel like you need to explain.

1:54PM  6      **THE COURT:**  I think the question was, now can you go

1:54PM  7  through and add up how many of the 29 were followed up for more

1:54PM  8  than six months?

1:54PM  9      **THE WITNESS:**  The answer is I can.  And he made

1:54PM  10  Dr. Kessler do it yesterday, and I'm sure Dr. Kessler did it

1:55PM  11  correctly.  I wanted to take a few minutes to do it.  I can do

1:55PM  12  it.  But they're not follow-up times.

1:55PM  13  **BY MR. STRONGMAN:**

1:55PM  14  **Q.**  I'm just saying --

1:55PM  15      **THE COURT:**  Just answer the question.

1:55PM  16  **BY MR. STRONGMAN:**

1:55PM  17  **Q.**  Can you just go through --

1:55PM  18  **A.**  I answered the question.  The question was can I do it?

1:55PM  19  The answer is yes, I can.

1:55PM  20  **Q.**  Will you do it for me, please.

1:55PM  21  **A.**  Pretty please.  Sure.

1:55PM  22           So they're not follow-up times, but okay.  The

1:55PM  23  question is, how many are less -- or more than .5?

1:55PM  24  **Q.**  More than six months.

1:55PM  25  **A.**  I count five.  Five of the these numbers that are not

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1:55PM 1    follow-up times are greater than .5.

1:56PM 2    **Q.**    Now, I got six.

1:56PM 3    **A.**    Oh, I'm sorry.

1:56PM 4    **Q.**    Can we go with six?

1:56PM 5            I think Dr. Kessler got six too.  I'll give you an

1:56PM 6    extra one.

1:56PM 7    **A.**    You're right, six.  I misspoke.

1:56PM 8    **Q.**    And if you --

1:56PM 9    **A.**    I totally contest what you just put up on the flip chart.

1:56PM 10   **Q.**    I understand.  I understand that you have responses and

1:56PM 11   whatnot.

1:56PM 12           THE COURT:  I think we're just going to have to

1:56PM 13   answer his questions, and then --

1:56PM 14           THE WITNESS:  Right.  But he's putting something on

1:56PM 15   there as if that's what I said.  That's not what I said.

1:56PM 16           THE COURT:  I appreciate that, but you just need to

1:56PM 17   answer the question, Dr. Madigan.

1:56PM 18           THE WITNESS:  Okay.

1:56PM 19   BY MR. STRONGMAN:

1:56PM 20   **Q.**    Doctor, can you go through and add up the numbers in the

1:56PM 21   FAC arm, and will you do that for me, please?

1:56PM 22   **A.**    Yes, to both.

1:56PM 23           I count four.  I think that's what Dr. Kessler got,

1:57PM 24   too.

1:57PM 25   **Q.**    Doctor, here's my question.  I want you to make some

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1:57PM  1   assumptions with me.  Okay?

1:57PM  2   **A.**    Okay.

1:57PM  3   **Q.**    I want you to assume, for purposes of an analysis, that

1:57PM  4   TAX 316 showed six in the TAC arm and four in the FAC arm.

1:57PM  5          Okay?  Are you with me so far?

1:57PM  6   **A.**    I am.  It's counterfactual, but okay.

1:57PM  7   **Q.**    And that TAX 301 was the same, three and one?

1:57PM  8   **A.**    The same.  Okay.

1:57PM  9   **Q.**    Are you with me?

1:57PM  10  **A.**    I'm with you.

1:58PM  11  **Q.**    And, Doctor, under that hypothetical, sitting here today,

1:58PM  12  you cannot say that your meta-analysis would show a

1:58PM  13  statistically significant difference between the Taxotere side

1:58PM  14  and the non-Taxotere side; correct?

1:58PM  15         **MR. MICELI:**  Your Honor, objection to the

1:58PM  16  inappropriate -- inappropriate hypothetical.

1:58PM  17         **THE COURT:**  I think he can ask this expert witness a

1:58PM  18  hypothetical, and he can answer it.  You will have an

1:58PM  19  opportunity to clear that up.  This is an expert witness that

1:58PM  20  can answer hypothetical questions.

1:58PM  21         **MR. MICELI:**  Thank you, Your Honor.

1:58PM  22         **THE WITNESS:**  You asked me would it be statistically

1:58PM  23  significant under that hypothetical.  Probably not.

1:58PM  24  **BY MR. STRONGMAN:**

1:58PM  25  **Q.**    And I'll write up here "hypo."  This is my hypothetical.

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

1:58PM 1  Okay?

1:59PM 2          Doctor, the last thing I want to ask you about just

1:59PM 3  briefly -- and this should be short -- is that you've testified

1:59PM 4  a number of times yourself; correct?

1:59PM 5  A.   Yes.

1:59PM 6  Q.   And the testimony that you've given is almost always for

1:59PM 7  the plaintiffs; correct?

1:59PM 8  A.   Almost always.  I've essentially never been asked to work

1:59PM 9  for -- on the defense side.  I would have been happy to do so.

1:59PM 10 Q.   And I think, during your deposition, you said you could

1:59PM 11 come up with maybe one time that you worked on a defense side;

1:59PM 12 correct?  And it was for a patent case; it wasn't for a case

2:00PM 13 like this.  Correct?

2:00PM 14 A.   I certainly testified on behalf of a defendant in a patent

2:00PM 15 case.  I'd have to check.  Was there one other?  I can't

2:00PM 16 remember.

2:00PM 17         I haven't been asked.  It's not like I sit here and

2:00PM 18 choose not do it.  I just haven't been asked.

2:00PM 19 Q.   The bottom line is, you've been hired by plaintiffs'

2:00PM 20 lawyers on a number of occasions in litigation; correct?

2:00PM 21 A.   That is certainly true.

2:00PM 22 Q.   And you've made over a million dollars with that work for

2:00PM 23 plaintiffs' lawyers in litigation; correct?

2:00PM 24 A.   Something like that, over a 15-year period or close to

2:00PM 25 15 years.

OFFICIAL TRANSCRIPT

DAVID MADIGAN - CROSS

2:00PM  1              MR. STRONGMAN:  I don't have any other questions.

2:00PM  2              THE COURT:  Thank you.

2:00PM  3                   Mr. Miceli, redirect.

2:00PM  4              MR. MICELI:  Yes, Your Honor.  It may take me a

2:00PM  5      little bit of time to organize.

2:00PM  6                   Can I have just a minute, please?

2:00PM  7              MR. STRONGMAN:  Do you want me to leave my flip

2:00PM  8      chart?

2:00PM  9              MR. MICELI:  Actually, if you can leave it there, I

2:00PM  10     may want to use it with the witness.

2:01PM  11                  I'll try not to stand behind that when I'm

2:01PM  12     talking to you all.  I don't want to break their demonstrative

2:01PM  13     either.

2:01PM  14             THE COURT:  Mr. Strongman, are you going to sit over

2:01PM  15     here?

2:01PM  16             MR. MICELI:  I'm sorry.  I can move it to wherever

2:01PM  17     you can see it.

2:01PM  18             THE COURT:  That's okay.  I'll just go sit down here.

2:01PM  19             MR. MICELI:  Okay.  Thank you.

2:02PM  20                  Now, I can't see.  I apologize.  I'm all

2:02PM  21     flustered.

2:02PM  22             THE COURT:  Just move the mic, please.

2:02PM  23             MR. MICELI:  I will.  Thank you, Your Honor.

        24

        25

OFFICIAL TRANSCRIPT

DAVID MADIGAN - REDIRECT

**REDIRECT EXAMINATION**

2:02PM 1

2:02PM 2 BY MR. MICELI:

2:02PM 3 Q.   Dr. Madigan, towards the end there, you were shown

2:02PM 4 Exhibit D-233, and you were talking -- you were asking -- you

2:02PM 5 were asked some questions about the number of individuals

2:02PM 6 who -- to count the number of individuals who, in this

2:02PM 7 document, are represented as having alopecia for less than six

2:03PM 8 months; correct?

2:03PM 9 A.   Yeah, for who it was represented that the follow-up was

2:03PM 10 six months or less.

2:03PM 11 Q.   Six months or less?

2:03PM 12 A.   Yes.  Yes.

2:03PM 13 Q.   Now, have you seen another document very similar to that

2:03PM 14 one?

2:03PM 15 A.   Yes.  That's what I alluded to, yes.

2:03PM 16         MR. MICELI:  I only have one copy with me.

2:03PM 17             If I may approach?

2:03PM 18         THE COURT:  Yes, you may.

2:03PM 19 BY MR. MICELI:

2:03PM 20 Q.   Let me hand you that document.

2:03PM 21 A.   Thanks.

2:03PM 22 Q.   That's Plaintiff's 417.

2:03PM 23             Is this the document you were referring to?

2:03PM 24 A.   Yes.

2:03PM 25 Q.   I want to walk through with you, if you could -- if you

OFFICIAL TRANSCRIPT

DAVID MADIGAN - REDIRECT

1   could go to page 1 of 32.

2   A.   Okay.  33.

3         MR. MICELI:  And I'm going to actually put a copy up

4   on the ELMO, if that's okay with Your Honor.

5         THE COURT:  Not yet.

6         MR. MICELI:  Not yet?

7         THE COURT:  Not yet.  You can yes him about it,

8   but --

9   BY MR. MICELI:

10  Q.   Dr. Madigan, did you review this in preparation for your

11  testimony today?

12  A.   I've seen this document, yes.

13  Q.   Okay.  Does it inform your opinion on whether or not

14  follow-up was less than six months or more than six months for

15  the individuals in the TAX 316 study?

16  A.   Well, yes, although I won't phrase it that way.  I

17  calculated -- I know how to calculate a follow-up time.  I

18  calculated the follow-up times for the patients, for the 29 and

19  the 16.  And my numbers -- when I saw these, these numbers

20  agree with my numbers.

21  Q.   Okay.  And the numbers that -- you say these numbers in

22  Plaintiff's 417 agree with your numbers.

23        Do your numbers agree with that locked final clinical

24  trial data?

25  A.   Yes.  One patient with less than six months' follow-up,

OFFICIAL TRANSCRIPT

DAVID MADIGAN - REDIRECT

| | | |
|---|---|---|
| 2:04PM | 1 | 28 patients more than six months. |
| 2:04PM | 2 | MR. MICELI:  Now may I show it to the jury, Your |
| 2:04PM | 3 | Honor? |
| 2:05PM | 4 | THE COURT:  I think we might need another conference. |
| 2:05PM | 5 | (WHEREUPON, the following proceedings were held at |
| 2:05PM | 6 | the bench.) |
| 2:05PM | 7 | MR. MICELI:  I thought he used the opposing document |
| 2:05PM | 8 | with Dr. Kessler yesterday. |
| 2:05PM | 9 | MR. STRONGMAN:  I never put it into evidence or |
| 2:05PM | 10 | published it.  I did not. |
| 2:05PM | 11 | MR. MICELI:  He didn't publish it to the jury? |
| 2:05PM | 12 | MR. STRONGMAN:  I didn't. |
| 2:05PM | 13 | THE COURT:  This is my question, because I didn't |
| 2:05PM | 14 | hear you identify what that document was with him this morning. |
| 2:05PM | 15 | Did you? |
| 2:05PM | 16 | MR. STRONGMAN:  I don't remember.  I wasn't going to |
| 2:05PM | 17 | put it into evidence because you said we're not putting that |
| 2:05PM | 18 | document in, so I didn't go through those steps. |
| 2:05PM | 19 | MR. MICELI:  I won't -- |
| 2:05PM | 20 | THE COURT:  This is what I think.  I think you can |
| 2:05PM | 21 | ask him if this is the final whatever that was submitted to |
| 2:06PM | 22 | whom, and are those numbers consistent.  And that's enough. |
| 2:06PM | 23 | MR. MICELI:  Okay.  Thank you. |
| 2:06PM | 24 | THE COURT:  I don't want to get us caught. |
| 2:06PM | 25 | MR. MICELI:  I understand, Your Honor.  Thank you. |

OFFICIAL TRANSCRIPT

DAVID MADIGAN - REDIRECT

| | | |
|---|---|---|
| 2:06PM | 1 | **THE COURT:**  Thank you. |
| 2:06PM | 2 | (WHEREUPON, the following proceedings were held in |
| 2:06PM | 3 | open court.) |
| 2:06PM | 4 | **THE COURT:**  Please proceed. |
| 2:06PM | 5 | **MR. MICELI:**  Thank you, Your Honor. |
| 2:06PM | 6 | BY MR. MICELI: |
| 2:06PM | 7 | **Q.**  Going back, Dr. Madigan, to Plaintiff's Exhibit 417. |
| 2:06PM | 8 | **A.**  Sorry.  Which one was -- yes. |
| 2:06PM | 9 | **Q.**  I want to get us back on track. |
| 2:06PM | 10 | This -- the data reflected in this exhibit is |
| 2:06PM | 11 | consistent with -- is it consistent with the final clinical |
| 2:06PM | 12 | study data, as you have reviewed it? |
| 2:07PM | 13 | **A.**  Yes, these follow-up times are essentially the same.  I |
| 2:07PM | 14 | think they're the same as the follow-up times I computed. |
| 2:07PM | 15 | **Q.**  Okay.  And just for the jury's benefit, if you could, for |
| 2:07PM | 16 | the 29 -- excuse me, yeah -- 29 individuals on TAC, on pages 1 |
| 2:07PM | 17 | and 2, can you please read to them what the follow-up times |
| 2:07PM | 18 | were -- follow-up duration in years were for the 29 individuals |
| 2:07PM | 19 | in the TAC arm? |
| 2:07PM | 20 | **A.**  Read the 29 numbers? |
| 2:07PM | 21 | **Q.**  Yes. |
| 2:07PM | 22 | **A.**  Okay.  Sure.  So there are 29 patients.  It lists for each |
| 2:07PM | 23 | patient the date of the last IV, the last treatment, and then |
| 2:07PM | 24 | the date of the last follow-up, actual calendar days. |
| 2:07PM | 25 | And then it subtracts one from the other to get the |

OFFICIAL TRANSCRIPT

2:07PM   1   elapsed time between the last treatment and last follow-up.

2:08PM   2          So for Patient No. 1 is 10.04.  This is -- everything

2:08PM   3   is in years.  I won't keep saying "years," but everything is in

2:08PM   4   years -- 10.04, 6.57, .32.  That's the one that was less than

2:08PM   5   six months that I mentioned earlier.

2:08PM   6          10.57, 9.95, 10.23, 10.07, 10.02, 10.82, 10.31,

2:08PM   7   10.48, 5.52, 9.79, 10.10, 2.83, 5.98, 6.18, 4.65, 2.56, 10.03,

2:08PM   8   1.19, 10.07, 10.26, 10.01, 6.28, 1.82, 9.74, 10.24, and 9.97.

2:09PM   9   Q.   Thank you.  All but one greater than six months?

2:09PM   10  A.   Correct.

2:09PM   11  Q.   Dr. Madigan, have I asked you in the past to look at this

2:09PM   12  document?

2:09PM   13  A.   I believe so, yes.  I've seen it before.  I don't remember

2:09PM   14  the...

2:09PM   15  Q.   We won't read all of the 16 for FAC, but how many in the

2:09PM   16  FAC arm had less than six months' follow-up?

2:09PM   17  A.   My memory is that it's two.

2:09PM   18  Q.   And if you remove one individual -- Mr. Strongman went

2:09PM   19  through this flip chart with you.  I'm just going to flip this

2:09PM   20  over, but I want you to remember this.  Okay?

2:09PM   21          If we do TAX 316 -- I don't have as good a

2:10PM   22  handwriting as Mr. Strongman -- that's Taxotere and A and C we

2:10PM   23  were talking about before, right, and FAC, on this side.

2:10PM   24          If we take out the 1 of the 29 and it goes to 28, and

2:10PM   25  we take out 2 --

DAVID MADIGAN - REDIRECT

2:10PM   1    **A.**   So that's 28 people with ongoing alopecia where the

2:10PM   2    follow-up was at least six months?

2:10PM   3    **Q.**   Yes.

2:10PM   4    **A.**   Right.

2:10PM   5    **Q.**   We're going from the document Plaintiff's 417.

2:10PM   6    **A.**   Okay.

2:10PM   7    **Q.**   In the FAC, we take the 16 and we subtract 2.  So that's

2:10PM   8    14.

2:10PM   9            Have you attempted to run a meta-analysis calculation

2:10PM   10   of whether or not that would be statistically significant?

2:11PM   11   **A.**   I've run a calculation for that study and for that

2:11PM   12   comparison; in other words, just restricting it to at least six

2:11PM   13   months of follow-up.  And that contrast is statistically

2:11PM   14   significant for 316 alone.

2:11PM   15   **Q.**   So if we do what Mr. Strongman suggests, we take out the

2:11PM   16   six months -- people less than six months, TAX 316 becomes

2:11PM   17   statistically significant standing alone?

2:11PM   18   **A.**   As it happens, yes.

2:11PM   19   **Q.**   Statistically significant.  Thank you.

2:11PM   20           Now, I want to -- we can put that aside for one

2:11PM   21   second.

2:12PM   22           **MR. MICELI:**  Excuse me.  May I approach?

2:12PM   23           **THE COURT:**  Yes, you may.

2:12PM   24           **MR. MICELI:**  Thank you.

2:12PM   25

OFFICIAL TRANSCRIPT

DAVID MADIGAN - REDIRECT

| | | |
|---|---|---|
| 2:12PM | 1 | BY MR. MICELI: |
| 2:12PM | 2 | Q.   This is Plaintiff's 517. |
| 2:12PM | 3 | Dr. Madigan, have you seen this document before? |
| 2:12PM | 4 | THE COURT:  Mr. Miceli, are you going to continue |
| 2:12PM | 5 | writing on this? |
| 2:12PM | 6 | MR. MICELI:  No.  Would you like me to move it? |
| 2:12PM | 7 | THE COURT:  Then I'm going to sit back up here. |
| 2:12PM | 8 | MR. MICELI:  Okay. |
| 2:12PM | 9 | THE COURT:  Thank you. |
| 2:12PM | 10 | MR. MICELI:  I'm getting my workout today. |
| 2:12PM | 11 | BY MR. MICELI: |
| 2:12PM | 12 | Q.   Doctor, I've handed you Plaintiff's Exhibit 517. |
| 2:12PM | 13 | Do you see that? |
| 2:12PM | 14 | A.   I do. |
| 2:12PM | 15 | Q.   Is this a document you've seen before? |
| 2:13PM | 16 | A.   Yes.  I'm very familiar with it. |
| 2:13PM | 17 | Q.   Okay.  Did you review it in forming your opinions in this |
| 2:13PM | 18 | case? |
| 2:13PM | 19 | A.   Yes, I did. |
| 2:13PM | 20 | Q.   Okay.  I want to direct your attention to page 8 of 37, |
| 2:13PM | 21 | the Bates stamp at the bottom -- you know, let's look at the |
| 2:13PM | 22 | first page. |
| 2:13PM | 23 | MR. MICELI:  Your Honor, do you mind if I show this? |
| 2:13PM | 24 | MR. STRONGMAN:  Objection. |
| 2:13PM | 25 | THE COURT:  Is this in evidence? |

OFFICIAL TRANSCRIPT

DAVID MADIGAN - REDIRECT

2:13PM  1          **MR. STRONGMAN:**  May we approach briefly?

2:13PM  2          (WHEREUPON, the following proceedings were held at

2:13PM  3  the bench.)

2:13PM  4          **THE COURT:**  I don't know what this is.

2:13PM  5          **MR. MICELI:**  This is that -- is this what showed you

2:13PM  6  earlier.  This is their 2015 statement that you just --

2:13PM  7          **THE COURT:**  That he's already talked about.

2:13PM  8          **MR. STRONGMAN:**  You said that he could say, "Is that

2:13PM  9  data different than what Mr. Strongman showed you?"  I don't

2:13PM  10  want --

2:13PM  11          **MR. MICELI:**  He opened the door.

2:14PM  12          **MR. STRONGMAN:**  I don't want the document on the

2:14PM  13  screen.

2:14PM  14          **THE COURT:**  But this is -- wait.  This is what you've

2:14PM  15  already had him look at.

2:14PM  16          **MR. MICELI:**  He's looked at it.  It hasn't been shown

2:14PM  17  to the jury.

2:14PM  18          **THE COURT:**  So this is not in evidence?

2:14PM  19          **MR. STRONGMAN:**  This is not in evidence.

2:14PM  20          **THE COURT:**  Then we're not showing it to the jury.

2:14PM  21          **MR. MICELI:**  Okay.  Thank you.

2:14PM  22          (WHEREUPON, the following proceedings were held in

2:14PM  23  open court.)

2:14PM  24  **BY MR. MICELI:**

2:14PM  25  **Q.**   Dr. Madigan, what is Plaintiff's Exhibit 517?

OFFICIAL TRANSCRIPT

DAVID MADIGAN - REDIRECT

| | | |
|---|---|---|
| 2:14PM | 1 | **A.**   So this is an analysis of the internal database, right, |
| 2:14PM | 2 | the pharmacovigilance database within the company.  So there |
| 2:14PM | 3 | was a 2011 analysis that the company did -- |
| 2:15PM | 4 | **MR. STRONGMAN:**  Your Honor -- |
| 2:15PM | 5 | BY MR. MICELI: |
| 2:15PM | 6 | **Q.**   Let's stop right there.  Let me just ask you -- I'll ask |
| 2:15PM | 7 | another question. |
| 2:15PM | 8 | **THE COURT:**  Rephrase. |
| 2:15PM | 9 | BY MR. MICELI: |
| 2:15PM | 10 | **Q.**   What is the date on this document? |
| 2:15PM | 11 | **A.**   11th of November 2015. |
| 2:15PM | 12 | **Q.**   Okay.  This comes three years after the document that |
| 2:15PM | 13 | Mr. Strongman showed you; correct? |
| 2:15PM | 14 | **A.**   Four. |
| 2:15PM | 15 | **Q.**   Four years after.  Okay.  I thought it was -- it's |
| 2:15PM | 16 | March 2012. |
| 2:15PM | 17 | Between three and four years? |
| 2:15PM | 18 | **A.**   I'm sorry.  I'm confused.  Which document? |
| 2:15PM | 19 | **Q.**   I apologize.  Defendants' Exhibit -- I'm sorry.  I keep |
| 2:15PM | 20 | hitting in screen in front of me when I reach down.  I hope I'm |
| 2:15PM | 21 | not -- |
| 2:15PM | 22 | **A.**   I know where you're going. |
| 2:15PM | 23 | **Q.**   Defendants' Exhibit 233.  And the pages that he went over |
| 2:15PM | 24 | with you have a date at the bottom of March 5th, 2012. |
| 2:15PM | 25 | Do you see that? |

OFFICIAL TRANSCRIPT

DAVID MADIGAN - REDIRECT

2:15PM   1          I think I'm confusing the witness.

2:15PM   2          **THE COURT:**  Does he still have the document?

2:16PM   3          **THE WITNESS:**  I do.

2:16PM   4          I got it.  Yes.  Yes.  Yes.  Now I'm with you.

2:16PM   5   **BY MR. MICELI:**

2:16PM   6   **Q.**   That's March 15th of 2012.

2:16PM   7          And what I handed you just now is a Sanofi document

2:16PM   8   dated 11th of November 2015; correct?

2:16PM   9   **A.**   Yes.

2:16PM  10   **Q.**   So that we're clear, do you understand that this is a

2:16PM  11   Sanofi document?

2:16PM  12   **A.**   Yes.

2:16PM  13   **Q.**   Okay.  If you can flip with me to the page that ends --

2:16PM  14   the Bates number at the bottom right corner of Plaintiff's 517,

2:16PM  15   the number ending in 8150.

2:16PM  16   **A.**   Okay.  I'm there.

2:16PM  17   **Q.**   And in this section of the document, they're referring to

2:16PM  18   skin and subcutaneous tissue disorders.

2:16PM  19          Do you see that?

2:16PM  20   **A.**   Yes.

2:16PM  21   **Q.**   And underneath that, there's a paragraph that reads, "In

2:17PM  22   study TAX 316, alopecia persisting into the follow-up period

2:17PM  23   after the end of chemotherapy was reported in 687 out of 744

2:17PM  24   TAC patients and 645 of 736 FAC patients.

2:17PM  25          "At the end of follow-up period, actual median

OFFICIAL TRANSCRIPT

DAVID MADIGAN - REDIRECT

2:17PM   1    follow-up time of 96 months, alopecia was observed to be

2:17PM   2    ongoing in 29 patients, 3.9 percent, and 16 FAC patients,

2:17PM   3    2.2 percent."

2:17PM   4            Do you see that, sir?

2:17PM   5    A.   29 TAC patients and 16 FAC patients.

2:17PM   6    Q.   FAC patients.  If I misspoke, I apologize.

2:17PM   7            Does -- that information that Sanofi was

2:17PM   8    communicating in November of 2015, is that consistent or

2:17PM   9    inconsistent with the final locked clinical trial data that you

2:18PM   10   reviewed?

2:18PM   11   A.   Consistent.

2:18PM   12   Q.   Okay.  Now, have you ever -- have you reviewed anything

2:18PM   13   from Sanofi wherein the company itself agrees with your

2:18PM   14   conclusion that there's reasonable evidence of a causal

2:18PM   15   association between Taxotere and permanent irreversible hair

2:18PM   16   loss?

2:18PM   17           MR. STRONGMAN:  Your Honor, this is outside the

2:18PM   18   scope.

2:18PM   19           THE COURT:  Sustained.

2:18PM   20           MR. MICELI:  Okay.

2:18PM   21   BY MR. MICELI:

2:18PM   22   Q.   Sorry.  Now, I have to sift through a few things to talk

2:18PM   23   to you.

2:18PM   24           Dr. Madigan, do you still have up this, the document

2:18PM   25   that Mr. Strongman gave you concerning the FAERS database

OFFICIAL TRANSCRIPT

DAVID MADIGAN - REDIRECT

2:18PM  1   analysis?

2:18PM  2   A.   Yes.

2:18PM  3   Q.   Okay.  If you can look at that with me.

2:18PM  4        And he made a point of having you confirm that there

2:18PM  5   were only 11 reports in the FAERS database for a 15-year period

2:19PM  6   that you investigated; correct?

2:19PM  7   A.   Yes.

2:19PM  8   Q.   Now, using the same investigative terms and for the same

2:19PM  9   period of time, could you flip two pages in and tell the jury

2:19PM  10  how many events in that 15-year period were reported for

2:19PM  11  paclitaxel or Taxol?

2:19PM  12  A.   Five.

2:19PM  13  Q.   Okay.  Flip two more pages in for me, sir.

2:19PM  14       Can you please tell the jury, in that same 15-year

2:19PM  15  period, using the same exact terms, how many events were

2:19PM  16  reported for fluorouracil?

2:19PM  17  A.   One.

2:19PM  18  Q.   And if you flip two more pages in, during that same

2:19PM  19  15-year period, same search terms used, how many were reported

2:19PM  20  for doxorubicin, the D -- excuse me, the A and the --

2:20PM  21  doxorubicin and anthracycline are the same -- so the A in the

2:20PM  22  TAC regimen?

2:20PM  23  A.   Zero.

2:20PM  24  Q.   Zero.

2:20PM  25       And if you flip two more pages in, finally, in the

DAVID MADIGAN - REDIRECT

2:20PM 1  same 15-year period, using the same search terms, for the C in

2:20PM 2  the TAC regimen, cyclophosphamide, how many events were

2:20PM 3  reported in the FAERS database?

2:20PM 4  A.   One.

2:20PM 5  Q.   Thank you.  Now, hypothetically speaking, if you had --

2:20PM 6  and we're going back to the example of the hypothetical that

2:20PM 7  Mr. Strongman did with you for the numbers that we come up

2:20PM 8  with.

2:20PM 9       If you had 100 individuals in the TAC arm and

2:21PM 10 20 individuals in the FAC arm, would that be statistically

2:21PM 11 significant, all other things being equal as you know them?

2:21PM 12 A.   In the clinical trials?

2:21PM 13 Q.   Yes?

2:21PM 14 A.   Sure.

2:21PM 15 Q.   Okay.  We could pick numbers and just come up with would

2:21PM 16 it be statistically significant, and ask you tell us; right?

2:21PM 17 A.   Sure.

2:21PM 18 Q.   Okay.  Now, you've looked at, in addition to the metric

2:21PM 19 that you used and we put up on the board, EG --

2:21PM 20 A.   EBGM.

2:21PM 21 Q.   -- EBGM.

2:21PM 22      Now, you mentioned that there were several others;

2:21PM 23 correct?

2:21PM 24 A.   Yes.

2:21PM 25 Q.   Okay.  Were all of the others, regardless of where they

OFFICIAL TRANSCRIPT

DAVID MADIGAN - REDIRECT

2:21PM  1   cross the line of two, were they all trending in the same

2:21PM  2   direction?

2:21PM  3   A.   Yeah.  They're all very similar.

2:21PM  4   Q.   You mentioned one of them that you did that you -- you did

2:21PM  5   it in a way that controlled for all of the others while you

2:21PM  6   were testing for Taxotere; correct?

2:21PM  7   A.   That's right.  If you will, the fanciest of the analyses

2:21PM  8   that I did, controls for all drugs.  So it's a very refined

2:22PM  9   kind of analysis.

2:22PM  10  Q.   What did that one show?

2:22PM  11  A.   So it's qualitatively similar to the others.  It shows

2:22PM  12  a -- a striking effect for Taxotere and essentially nothing at

2:22PM  13  all for the other four drugs.

2:22PM  14          MR. STRONGMAN:   Your Honor, I think this is outside

2:22PM  15  the scope.

2:22PM  16          THE COURT:   Sustained.

2:22PM  17  BY MR. MICELI:

2:22PM  18  Q.   Let's me look over my notes.  I think we may be done but,

2:22PM  19  because there were so many notes, I need check.

2:22PM  20          Doctor, some time was spent with you talking about

2:22PM  21  you not going back and looking at reports and doing a medical

2:22PM  22  review of information.

2:23PM  23          Why do you, as a statistician, not do medical

2:23PM  24  reviews?

2:23PM  25  A.   It's not my training.  It's not what statisticians do.

OFFICIAL TRANSCRIPT

DAVID MADIGAN - REDIRECT

2:23PM 1    **Q.** Okay. Following Mr. Strongman's storyline of apples in

2:23PM 2    bags, if Sanofi finds a bag that belongs to them that says

2:23PM 3    "apples" in it, "apples inside," should they open that bag and

2:23PM 4    look and see if there are apples in there?

5           Let me ask it a different way. Now I'm the one

2:23PM 6    getting the laughs. I like this.

2:23PM 7           But if Sanofi sees a signal, should they investigate

2:23PM 8    it?

2:23PM 9    **A.** Absolutely.

2:23PM 10          **MR. STRONGMAN:** Objection. Outside the scope.

2:23PM 11          **THE COURT:** Sustained.

2:23PM 12          **MR. MICELI:** Thank you, Your Honor. I have nothing

2:23PM 13   further.

2:23PM 14          **THE COURT:** Thank you. You may step down,

2:23PM 15   Dr. Madigan.

2:23PM 16          **THE WITNESS:** Thank you.

2:23PM 17          **THE COURT:** Do you all need a break?

2:24PM 18          All right. It's time -- the Court's going to

2:24PM 19   take a ten-minute recess.

2:24PM 20          **THE DEPUTY CLERK:** All rise.

2:24PM 21          (WHEREUPON, the jury exited the courtroom.)

2:24PM 22          **THE COURT:** Who's next up?

2:24PM 23          **MR. MICELI:** Dr. Plunkett.

2:24PM 24          **THE COURT:** You all can come up. I'll be back in two

2:24PM 25   minutes.

OFFICIAL TRANSCRIPT

DAVID MADIGAN - REDIRECT

2:24PM  1          **MR. MICELI:**  Your Honor, I'm assuming whenever a
2:24PM  2    witness is done, they're released and they can leave?
2:24PM  3          **THE COURT:**  I would think, unless -- is there any
2:24PM  4    reason that defendants would want Dr. Madigan to hang around?
2:25PM  5          **MS. SASTRE:**  No.
2:25PM  6          **THE COURT:**  Okay.  Yes, he's released.
2:25PM  7          **MS. SASTRE:**  That's fine.  Thank you.
2:25PM  8          (WHEREUPON, the Court took a recess.)
2:36PM  9          **THE COURT:**  All right.  I think are we ready?
2:36PM  10         **MR. COFFIN:**  One more minute, Your Honor.
2:37PM  11         **THE COURT:**  Please bring in the jury.
2:38PM  12         **THE DEPUTY CLERK:**  All rise.
2:38PM  13         (WHEREUPON, the jury entered the courtroom.)
2:38PM  14         **THE COURT:**  All jurors are present.  Court's back in
2:38PM  15    session.  You may be seated.
2:38PM  16              Plaintiff, call your next witness.
2:38PM  17         **MR. COFFIN:**  Good afternoon, Your Honor.  Chris
2:38PM  18    Coffin on behalf of plaintiff, Ms. Barbara Earnest.
2:38PM  19              The plaintiff calls next Jean-Philippe Aussel,
2:39PM  20    Sanofi, by video.
2:39PM  21         **THE COURT:**  Members of the jury, you're now going to
2:39PM  22    be played another video deposition.  As I've told you before,
2:39PM  23    you should treat this testimony as you would any other.
2:39PM  24              Thank you.
2:39PM  25              (WHEREUPON, the videotaped deposition of

OFFICIAL TRANSCRIPT

**Jean-Philippe Aussel** was played.)

**Q.**   My name is Zachary Wool, and I represent the plaintiff in this matter.  And we're here today for your deposition.

Do your colleagues call you Dr. Aussel or Mr. Aussel?

**A.**   I prefer Mr. Aussel.  I'm not a medical doctor.  In France, we don't use to call people "doctor" if they are not a medical doctor.

**Q.**   To your understanding, can Taxotere cause permanent hair loss?

**A.**   As part of my responsibilities within Sanofi, my responsibility was to make sure the data collected from the clinical trials were accurate, reliable, clean, and complete. And then my job was to make sure they are reported as such in the statistical analysis, in the clinical study reports.

And then we have some teams within Sanofi that were in charge of interpreting the data, reporting to authorities, discussing with authorities and discuss what is meaningful with the authorities.

And, more importantly, for the oncologists, they are -- it's their job and their duty to assess what is meaningful as a side effect, to inform the patients, to discuss individually with the patients.  So that's my understanding.

**Q.**   I'd like go a little bit through your background.

You've been with Sanofi a long time, haven't you?

**A.**   Yes.  That's correct, yes.

OFFICIAL TRANSCRIPT

**Q.**   When did you start with Sanofi or one of its predecessor companies?

**A.**   So I first joined Sanofi in '96.  Actually, I was working for Sanofi as a contractor for one year before.  And I was hired by Sanofi in January of '96 in the oncology R&D department.

**Q.**   And what did you do in the oncology R&D department in 1996?

**A.**   I was a so-called CRA, so clinical research associate.  I was mostly monitoring the studies.  "Monitoring" means going on-site; visiting the investigative site; looking at the source documents, meaning the patient charts; and comparing whether the information contained this those documents is consistent to the information the investigators report in the case report forms, in the questionnaires that they are supposed to fill in; and to correlate the investigator.  And then bring back this information, the case reports forms, in Sanofi.  Make sure it is properly entered in the database and then relegating the data things to various teams.

There are different tools, checks that we do with the data.  And that's mostly it at that time.

**Q.**   And when you started working in the oncology R&D department, did your responsibilities include studies that involved Taxotere?

**A.**   Yeah.

OFFICIAL TRANSCRIPT

**Q.**   And at any point since you've been working at Sanofi until recently, has there been a time that you were not working on Taxotere?

**A.**   Well, there were some times where I wasn't working on Taxotere because I was in a department or in a team which -- for which the main responsibility was not to work on specific Taxotere studies.

As you may see in my résumé, I mean, I moved from R&D to medical affairs.  So depending whether the studies belong to this area within Sanofi, I did or did not work on Taxotere.

**Q.**   And about how long were you a clinical research associate when you started?

**A.**   For this specific job, meaning monitoring the study, within the sites, I would say for two, three years.  Then I became what we call an international coordinator.  So meaning approximately the same job conceptually but more making sure the job is done in the countries, because it was international studies.

So the site -- the investigative sites were all over the world, and so my role was to coordinate the Sanofi affiliates, our local offices, to make sure the job is properly done by the local country-based monitors.

**Q.**   Now, when you were the international coordinator, were you working on Taxotere studies?

**A.**   Yes, correct.

OFFICIAL TRANSCRIPT

| | | |
|---|---|---|
| 2:43PM | 1 | **Q.**   And how long were you an international coordinator? |
| 2:44PM | 2 | **A.**   Until approximately -- well, different roles.  But I would |
| 2:44PM | 3 | say, within this umbrella term, until 2004 when -- I moved at |
| 2:44PM | 4 | the end of 2004 to medical affairs to do something different. |
| 2:44PM | 5 |        So between the early 2000s and 2004, I was |
| 2:44PM | 6 | international coordinator.  We dealt directly, managing studies |
| 2:44PM | 7 | and country-based monitors or other high -- more |
| 2:44PM | 8 | senior-level -- more senior position, managing and watching the |
| 2:44PM | 9 | team of the corporate staff with people and/or myself who are |
| 2:44PM | 10 | managing themselves in the countries.  So I got a higher |
| 2:44PM | 11 | position called program coordinator, so in charge of the |
| 2:44PM | 12 | overall project. |
| 2:44PM | 13 | **Q.**   And that was before you moved to medical affairs; correct? |
| 2:44PM | 14 | **A.**   Before I moved to medical affair. |
| 2:44PM | 15 | **Q.**   And what was your role when you moved to medical affairs? |
| 2:45PM | 16 | **A.**   When I moved to medical affairs -- actually, after ten |
| 2:45PM | 17 | years of R&D, I chose to remain in the oncology area but to see |
| 2:45PM | 18 | oncology from a different window, we'll say.  And I had the |
| 2:45PM | 19 | opportunity to integrate the clinical operation team to medical |
| 2:45PM | 20 | affairs studies, meaning late-phase studies, and to be the |
| 2:45PM | 21 | oncology scientific director in this team. |
| 2:45PM | 22 | **Q.**   And as the -- when you were the oncology scientific |
| 2:45PM | 23 | director, was that -- was Taxotere one of your |
| 2:45PM | 24 | responsibilities? |
| 2:45PM | 25 | **A.**   It was one of my responsibilities, indeed, although we had |

OFFICIAL TRANSCRIPT

also other products.  And, yeah, it was one of my
responsibilities.

**Q.**    And how long were you a scientific director in medical
affairs?

**A.**    If I recall right, for four years, until 2008 or so, maybe
slightly later.  I can't recall very well.  But there was a
huge transformation within Sanofi, and they created several new
departments in the organization internally, and especially they
created a huge clinical operation platform gathering everyone
doing clinical operation, regardless, R&D, medical affairs.

And then I departed during this huge platform to
become the so-called project leader for oncology, medical
affairs studies.  So it was a slightly different role.  It was
more project direction than anything really scientific.

**Q.**    And was that dealing with clinical trials still?

**A.**    It was still dealing with clinical studies, correct.

**Q.**    And that still involved Taxotere?

**A.**    Still, although less and less, because there were less and
less studies in Taxotere due to the maturity of the product.
And it was not one of the main focus of oncology at that time.

**Q.**    And then when did you stop being a project leader in
global medical affairs?

**A.**    Four months ago.

**Q.**    What role did you take over then?

**A.**    So I changed completely.  I'm not a person working in

OFFICIAL TRANSCRIPT

clinical operations or R&D anymore.  I went to a department

which is called global health to be a project director in

malaria, actually.

So the department objective is to provide access to

medicines to people in need, especially in the low- or

middle-income countries; Africa, for example.  So I am in

charge of the malaria programs.

Q.   Can you just explain, in basic terms, what a clinical

trial is?

A.   We do clinical trials to assess the effect of either

efficacy or safety of new products that are not yet on the

market, meaning that are not yet prescribed and authorized.

So we do clinical trials with different phases.  So

the first phase, what you call Phase I, is we try to find the

right dose and define the toxicities of the brand-new drugs

that we have with us that were never tested in humans.

And then when this is clarified, we go to Step 2,

which is the Phase II studies.  We try to investigate what best

indication, in oncology, for example, the product may work

best.  Is it in lung cancer?  In breast cancer?  So we do some

studies with dose-defining the Phase I but with more patients.

And we want to better access the activity of the drug in this

case and to continue to define the safety profile.

And then when we have promising results and good

results in terms of efficacy, safety for the drug in the

specific indication, in the specific population, we move to what we call Phase III.  And Phase III is the big trials where we compare our drug to the existing standard of care, usually. In some cases -- not in oncology, but in some cases, it also actually is placebo.  But in oncology, there is almost never a placebo.

And we conduct large international -- large first-rate trials with many patients.  And those trials usually are meant to support our registration dossier with the health authorities to assure the benefit/risk of the product.

Q.   And can you explain briefly what a clinical trial protocol is?

A.   A protocol define what the objective of the study, what it is all about, what is the rationale, why the study is conducted to explain to oncologists why the -- I mean, to inform oncologists what is the context and whether you agree to conduct the study, yes or no.

And it tells also the objectives and the way we are going to collect data, how it's to be collected, what are the duties of the investigator in terms of reporting both what he supposed to report, when he's supposed to report it, how frequently, some -- also administrative considerations.  So that's basically what it is.

Q.   We talked a little bit about the clinical study protocol.

That delivers the objectives of a study; correct?

OFFICIAL TRANSCRIPT

**A.**   Yes, correct.

**Q.**   And it includes how the data will be collected; correct?

**A.**   Yes, correct.

**Q.**   And how the data will be documented; right?

**A.**   Yes, correct.

**Q.**   And part of your role early on was to oversee the documentation of data; correct?

**A.**   Yes.  That was what I explained.

**Q.**   And then the clinical trial protocol also says how data is going to be reported; is that right?

**A.**   Yes.  It says that there will be a study report.  It does not insist on the content of the study report because we cannot predict what will be in the report at that time.  But it says that the study will be reported.  It's our duty to report the results of trial anyway.

**Q.**   Now, when patients enroll in a clinical trial, they sign a document called an informed consent; is that correct?

**A.**   Yes, it is.

**Q.**   And what is your understanding of what informed consent is?

**A.**   This is a document that is provided to the patients.  It has to be provided in a language that the patient can understand.  And it is to explain to the patient what are the objectives of the study they will be participating in, what will be the procedures that he will have to follow -- blood

OFFICIAL TRANSCRIPT

2:51PM 1   samples, CT scans, whatever -- and what are the expectations

2:51PM 2   from this trial, why are we doing this trial, and what -- also

2:51PM 3   the risks the patients may face when taking the drug based on

2:52PM 4   the knowledge we have about the drug at that time.

2:52PM 5   Q.   And because a clinical trial is effectively an

2:52PM 6   experiment -- you're agreeing with that statement?

2:52PM 7   A.   Yes.  It is clearly an experiment, yes.

2:52PM 8   Q.   Because these patients are participating in an experiment,

2:52PM 9   the informed consents generally warn of side effects that the

2:52PM 10  company knows about; correct?

2:52PM 11  A.   Correct.

2:52PM 12  Q.   And it also lets them know that there may be unknown side

2:52PM 13  effects that the company does not yet know about because the

2:52PM 14  drug is still in an experimental stage; correct?

2:52PM 15  A.   Yes, correct.  And those are the adverse events that are

2:52PM 16  known and may be discovered with the clinical trial as well,

2:52PM 17  sure.

2:52PM 18  Q.   Are you familiar with what a clinical study report is?

2:52PM 19  A.   Yes, I am.

2:52PM 20  Q.   Can you briefly explain what a clinical study report is.

2:52PM 21  A.   A clinical study report's objective is to report the

2:52PM 22  results of the study.  There is typically a long

2:52PM 23  introduction -- a long section reminding what the protocol was,

2:53PM 24  especially if there were any amendments to the protocol during

2:53PM 25  the course of the study, for whatever reasons.

OFFICIAL TRANSCRIPT

1            And then there's a section, of course, on the
2    results -- the more graphic results, meaning the type of
3    patients that were included, efficacy results, safety results,
4    what are the other end points, quality of life, socioeconomic,
5    whatever is collected in the study.
6    Q.    So to distill it down, the report basically reports the
7    findings of the study with regards to efficacy; correct?
8    A.    Efficacy, safety.  Everything that was collected is
9    recorded in the report.
10   Q.    And you've co-authored clinical study reports before,
11   haven't you?
12   A.    Yes.  It was part of my role, especially at that time,
13   quite a long time ago.  Within Sanofi, the trial managers
14   contribute -- because we contributed to the collection of the
15   data, to the cleaning of the data, to make sure the data are
16   correct, reliable, and so on.  We are part of the co-author of
17   the report, yes.  There's a long list of co-authors.
18   Q.    And earlier you talked about -- when I asked you about
19   clinical trials, you mentioned that these trials are often
20   conducted to get an indication for use for a product in a
21   country before a product is on the market; correct?
22   A.    Yes.  Correct.  This is what we call internally the R&D
23   trials.  Or in R&D, we conduct trials mostly for this goal,
24   trying to find an indication and to get a registration dossier,
25   a market of authorization, correct.

OFFICIAL TRANSCRIPT

2:54PM  1    Q.    And so then a health authority, like the FDA, will look at

2:54PM  2    one of those studies and then approve a drug for use, like

2:54PM  3    Taxotere; correct?

2:54PM  4    A.    Yes.

2:54PM  5    Q.    And when they do that approval, the drug contains a

2:54PM  6    labeling; correct?

2:54PM  7    A.    It does, yes.

2:54PM  8    Q.    And in that label, if a drug has not been on the market

2:54PM  9    before, the label reflects what the company found out during

2:54PM  10   the clinical trials that had been conducted before the drug

2:55PM  11   came on the market; is that correct?

2:55PM  12   A.    Yes.  This is my understanding.  And it is also my

2:55PM  13   understanding that the label is discussed and included together

2:55PM  14   with the health authorities.  So you said when is the first

2:55PM  15   time for market authorization, the only data they have is the

2:55PM  16   data of clinical trials that are part of the dossier.  So I

2:55PM  17   understand that the clinical data are put together and

2:55PM  18   mentioned in the label in discussion with the health

2:55PM  19   authorities, yes.

2:55PM  20   Q.    In your years working at Sanofi, have you ever worked in a

2:55PM  21   regulatory role and negotiated a label?

2:55PM  22   A.    No, never.

2:55PM  23   Q.    Do you remember when Taxotere was first approved for use

2:55PM  24   in the United States?

2:55PM  25   A.    It was shortly before -- shortly after I joined

OFFICIAL TRANSCRIPT

2:55PM 1    Rhone-Polenc Rorer, so in the '96 also.

2:55PM 2    **Q.**   Now, this original indication, it's for metastatic breast

2:56PM 3    cancer; correct?

2:56PM 4    **A.**   Yes, this is for what we call second line metastatic

2:56PM 5    breast cancer, meaning the patient had to have in this case an

2:56PM 6    anthracycline-containing regimen first for metastatic disease.

2:56PM 7    And then after relapse, they had to receive Taxotere.

2:56PM 8    **Q.**   Now, can you please complain for me the difference between

2:56PM 9    metastatic breast cancer and early-stage breast cancer?

2:56PM 10   **A.**   Yes.  When the patient typically developed cancer, so

2:56PM 11   let's take the example of breast cancer, there's usually tiny

2:56PM 12   tumor cancer cells in the breast, this is what you call early

2:56PM 13   stages, the tumor is located in the breast only.

2:56PM 14           And then later on when the tumor tends to, what we

2:56PM 15   call metastasize, meaning spread beyond breast and touch other

2:56PM 16   organs, that is called metastatic stage.

2:56PM 17   **Q.**   So for metastatic breast cancer, then, to use -- to get

2:57PM 18   away from that terminology, then, it's cancer that spread from

2:57PM 19   the breast; correct?

2:57PM 20   **A.**   Yes.  Correct.

2:57PM 21   **Q.**   And women who have metastatic breast cancer, what is

2:57PM 22   generally the prognosis for them?

2:57PM 23   **A.**   Well, each woman is different, so it difficult to

2:57PM 24   generalize.  But if you ask me to generalize, metastatic breast

2:57PM 25   cancer at that time was known as an uncurable -- as a

2:57PM 1  non-curable disease.  So the treatment given was more for

2:57PM 2  prolonging life, and not, technically speaking, saving life.

2:57PM 3  Q.    So when Sanofi was seeking this indication for women whose

2:57PM 4  lives really couldn't be saved --

2:57PM 5  A.    Some of them were, but it's in the --

2:57PM 6  Q.    A small number of them?

2:57PM 7  A.    A small number.

2:57PM 8  Q.    -- Sanofi had not done any long-term studies on the safety

2:57PM 9  of Taxotere; is that correct?

2:57PM 10 A.    Yeah, this is correct, because the disease itself did not

2:58PM 11 allow, unfortunately, to long-term studies because of the short

2:58PM 12 life of the patients.

2:58PM 13 Q.    But there have been some studies since Taxotere came on

2:58PM 14 the market that were long-term studies that had a long-term

2:58PM 15 follow-up; correct?

2:58PM 16 A.    There were long-term studies in our research setting, yes,

2:58PM 17 because in that setting, patients have a better prognosis so

2:58PM 18 can live longer, I guess.

2:58PM 19 Q.    One of those studies was TAX 316; correct?

2:58PM 20 A.    One of them is 316.

2:58PM 21 Q.    And you had involvement with 316; right?

2:58PM 22 A.    Yes, I had some involvement, yes.

2:58PM 23 Q.    Another one is called GEICAM 9805 or TAX 301?

2:58PM 24 A.    Yes.  Correct.

2:58PM 25 Q.    And you had involvement with that study; right?

OFFICIAL TRANSCRIPT

2:58PM   1   A.   I had also, from time to time, a role in that, yes.

2:58PM   2   Q.   So why don't we look at that first label which was for

2:58PM   3   metastatic breast cancer; correct?

2:58PM   4   A.   Yes.

2:59PM   5   Q.   Now, at the time that Sanofi -- or that Taxotere came on

2:59PM   6   the market in the United States in 1996, no long-term studies

2:59PM   7   had been done about the safety of Taxotere; is that correct?

2:59PM   8   A.   To my knowledge, yes.

2:59PM   9   Q.   And that's because one with metastatic breast cancers just

2:59PM   10  generally don't live very long, unfortunately; is that correct?

2:59PM   11  A.   Yes.

2:59PM   12  Q.   So in 1996, then, it would be fair to say that Sanofi had

2:59PM   13  no idea that Taxotere could cause permanent hair loss, could

2:59PM   14  it?

2:59PM   15  A.   Based on the follow-up of the studies, I would agree, yes,

2:59PM   16  that it's difficult to predict the full duration of alopecia,

2:59PM   17  yes.

2:59PM   18  Q.   But Sanofi at that time would have no idea to know then

2:59PM   19  that there was a permanent alopecia problem, would there?

2:59PM   20  A.   No, I don't think so.

2:59PM   21  Q.   You're generally familiar with drug labels; correct?

2:59PM   22  A.   No, I'm not.

2:59PM   23  Q.   And according to our labeling chronology, this is the

2:59PM   24  first label for Taxotere; correct?

2:59PM   25  A.   Yes.  Correct.

OFFICIAL TRANSCRIPT

1  Q.   All right.  And if you see the top, it's a little hard to

2  read because it's an old document.  It says "Patient

3  Information Leaflet."  Do you see that?

4  A.   Okay.  All right.  Yes, I can see that.

5  Q.   Are you familiar that a patient leaflet information is?

6  A.   I have a good idea what it could be, yes.

7  Q.   Okay.

8  A.   It's information to the patient in a lay language the

9  patient can understand.

10  Q.   Okay.  So this is written, just so I'm clear, in lay

11  language that a patient can understand?

12  A.   Yes.

13  Q.   So let's turn to page 3 then.  Do you see at the top,

14  there's a section that says "Hair Loss"?

15  A.   Yes, I can see that.

16  Q.   Okay.  And it says "Hair loss – Loss of hair occurs in

17  most patients taking Taxotere, including the hair on your head,

18  underarm hair, pubic hair, eyebrows and eyelashes."  Is that

19  correct?

20  A.   Yes.  Correct.

21  Q.   It then says, "Hair loss will begin after the first few

22  treatments and varies from patient to patient."  Correct?

23  A.   Yes.

24  Q.   And did then says, "Once you have completed all of your

25  treatments, hair generally grows back."  Correct?

OFFICIAL TRANSCRIPT

**A.**    Yes.

**Q.**    And then it says, "Your doctor or nurse can refer you to a store that carries wig, hair pieces and turbans for patients with cancer."  Correct?

**A.**    Yes.

**Q.**    So this language describing hair loss, this is language that Sanofi is using in 1996 when there have been no studies of long-term side effects represented to Taxotere; correct?

**A.**    Yes.  I see that.

**Q.**    And it would be -- it would be fair, then -- sorry, I stepped on your answer.

It would be fair to say, then, that Sanofi used this language when it had no idea that Taxotere could cause permanent hair loss; correct?

**A.**    Well, this language is the lay language translation for the data that were generated in the clinical trials.  And it was quite clear in the clinical trials conducted so far, in breast cancer, that there were hair loss in the studies.  And that after completion of the treatments, alopecia generally recovers.  That's what is the translation of the data that they are --

**Q.**    So Sanofi, then, had no way to know if the hair loss was permanent; correct?

**A.**    This is my understanding.

**Q.**    And not knowing if the hair loss was permanent, because

1    there was no study of it, Sanofi chose to use the language

2    "hair generally grows back."  Is that correct?

3    A.    Yes.  I didn't know whether that was a question, yes.

4    Q.    Then when using the term hair "generally grows back," is

5    Sanofi warning about permanent hair loss in 1996?

6    A.    I don't think so, not with this language.  Although you

7    can understand that if it generally grows back, it means that,

8    in some cases, it does not, then -- that's all.

9    Q.    But there's no data to that effect in 1996?

10    A.    Again, there are some data showing that some patients

11    terminated the study or unfortunately died with their alopecia

12    still ongoing.  That's what the data shows.

13    Q.    Did the data show permanent hair loss?

14    A.    No, again, the data showed that, again, of the study the

15    patient still has hair loss.  Considering the duration of the

16    study, it's difficult to qualify that as permanent or

17    long-lasting.  I mean, it's the duration of the follow-up of

18    the study.  If it's two years, you can say after two years, X

19    many patients or potential patients had alopecia when they

20    died.

21    Q.    So let's do it this way.

22          So is it fair to say, then, that this statement is

23    saying hair generally grows back before you die and you may die

24    with alopecia?

25    A.    I'm not sure that that's the kind of language that can be

OFFICIAL TRANSCRIPT

3:03PM  1   put in a document like this, but that's the data generated by

3:03PM  2   the studies.  Again, some patients don't die, they are

3:04PM  3   sometimes put in other treatments.  So, again, third-line,

3:04PM  4   fourth-line treatments for treatment of cancer, and they may

3:04PM  5   carry on alopecia, because chemotherapy drugs cause alopecia,

3:04PM  6   most of them.  So they continue to have alopecia -- alopecia

3:04PM  7   because of other chemotherapies.

3:04PM  8   Q.   Let's keep looking at this page 3.  Do you see that

3:04PM  9   there's a section called "Rash"?

3:04PM  10  A.   Okay.  Yes.

3:04PM  11  Q.   And then it says, "This side effect occurs commonly but is

3:04PM  12  severe in about 2 percent."  Is that right?

3:04PM  13  A.   Yes.

3:04PM  14  Q.   You may develop a rash that looks like a blotchy,

3:04PM  15  hive-like reaction."  Correct?

3:04PM  16  A.   Yes.

3:04PM  17  Q.   And then it says, "This usually occurs on the hands and

3:04PM  18  feet but may also appear on the arms, face and body."  Correct?

3:04PM  19  A.   Yes.

3:04PM  20  Q.   And then can you read with me what the next sentence is.

3:04PM  21  A.   "Generally, it will appear between treatments and will go

3:04PM  22  away before the next treatment.  Inform your doctor or nurse if

3:05PM  23  you experience a rash.  They can help you avoid discomfort."

3:05PM  24  Q.   Does that statement that begins with "generally," does

3:05PM  25  that tell people that they may permanently have a rash?

OFFICIAL TRANSCRIPT

**A.**    Here this sentence is all about the onset of the rash,
saying that it will appear generally after a chemotherapy
course and then disappear before you receive the next course.
So it's all about the onset of the rash.  This is your
understanding of the sentence.

**Q.**    And let's look at the next section called "Odd
Sensations."  Do you see that?

**A.**    "Odd Sensations," yes.

**Q.**    And it says, "About half of patients getting Taxotere will
feel numbness, tingling or burning sensations in their hands
and feet."  Is that correct?

**A.**    Yes.

**Q.**    And it then says, "If you do experience this, tell your
doctor or nurse."  Correct?

**A.**    Uh-huh, yes.

**Q.**    And then it says, "Generally, these go away within a few
weeks or months after your treatments are completed."

        Does that tell patients that they may permanently
have odd sensations?

**A.**    No, it doesn't say so.  It says that "generally."  So I
translate into most of the cases, these symptoms disappear
after a few weeks or months after completion of treatments.
That's what it says.

        Again, I think it is substantiated by the data
gathered in the clinical studies.  That's what I can say.

Q.   And the next section says "Nail changes."

        Do you see that?

A.   Yes.

Q.   And it says, "Color changes to your fingernails or toenails may occur while taking Taxotere."  Is that correct?

A.   Yes.

Q.   And then it says, "In extreme, but rare, cases nails may fall off."  Correct?

A.   Yes.

Q.   And it says, "After you have finished Taxotere treatments, your nails will generally grow back."

        Did I read that right?

A.   Yes, you're correct.

Q.   When this says "your nails will generally grow back," does that tell patients that they may permanently lose their nails?

A.   I think it is a similar answer to all of these adverse events or side effects.  It says that the data generated in the clinical trials show that in many cases -- and here it is not specified how much or which is the percentage -- the side effect recover.

        And this is what is said in the patient leaflet here. They aren't talking about permanent or anything.

Q.   Are they talking about permanent or not?

A.   They are not talking about permanent.

Q.   Okay.  So they're not talking about permanent nail

OFFICIAL TRANSCRIPT

1  changes, were they?

2  **A.**   No, they are not.  They just say that generally this

3  condition recovers.

4  **Q.**   They're not talking about permanent odd sensations, are

5  they?

6  **A.**   No, they are not.  As it's written here, they are not

7  talking about permanent.

8  **Q.**   They're not talking about permanent rash, are they?

9  **A.**   No, they are not.

10  **Q.**   And they're not talking about permanent hair loss, are

11  they?

12  **A.**   They're not either.

13  **Q.**   And if you look at the -- at page 10, there's an "Adverse

14  Reactions" section, if you see about halfway down on the left

15  side.  Do you see that?

16  **A.**   Okay.  Yes.  Before the table?

17  **Q.**   Yes, before the table.

18        And then the table represents, at the top, it says

19  "Summary of Adverse Events in Patients Receiving Taxotere at

20  100 milligrams."  Correct?

21  **A.**   Yes.  Correct.

22  **Q.**   And then it says "Alopecia."  Correct?  It's about

23  three-fourths of the way down.

24  **A.**   Yeah, I got it.  Alopecia.  Okay.

25  **Q.**   It just says the word "Alopecia."  Correct?

OFFICIAL TRANSCRIPT

A.   Yes.  Correct.

Q.   And at this time, as we discussed before, Sanofi is not referring to permanent hair loss here, because no long-term studies have been done to assess the safety of Taxotere; is that correct?

A.   This is correct.

Q.   Mr. Aussel, I'm going to hand you what I've marked as Exhibit 9.  If you look at this, this appears to be an informed consent; correct?

A.   Yes, this is correct.

Q.   For a study that appears to be 3501?

A.   Yes.  Correct.

Q.   And this is a study of the use of Taxotere for prostate cancer; correct?

A.   Correct.

Q.   All right.  And are you familiar with this study?

A.   Yes.  I know this study, yes.

Q.   All right.  And the date of issue at the bottom says May 24th, 2005; correct?

A.   Correct.

Q.   All right.  If you flip to the second page at the top, it says, "Document status:  Final."

         Do you see that?

A.   Second page.  Oh, "Status:  Final," yes.  Got it.

Q.   Where it says page 3 at the bottom, there's a section that

OFFICIAL TRANSCRIPT

3:09PM 1  says "What the Risks of the Study?"

3:09PM 2          Do you see that?

3:09PM 3  A.   Yes, I see that.

3:09PM 4  Q.   All right.  And then if you flip to the next page -- let

3:10PM 5  me take a step back.  This is a study that had -- it was a

3:10PM 6  combination drug study; correct?

3:10PM 7  A.   Yes.  That is correct.  This is kind of a sophisticated

3:10PM 8  design because there are several arms, what you call two-by-two

3:10PM 9  design, meaning that the study wants to answer two questions in

3:10PM 10 one clinical trial.

3:10PM 11 Q.   All right.  And so an informed consent like this, you

3:10PM 12 would list the side effects of all the drugs that would be

3:10PM 13 given possibly to the patient; correct?

3:10PM 14 A.   That is correct.

3:10PM 15 Q.   Okay.  And so in here, then, it's not surprising that

3:10PM 16 there's a section that lists the side effects of Taxotere; is

3:10PM 17 that correct?

3:10PM 18 A.   That's correct.

3:10PM 19 Q.   Okay.  And do you see that section on the top of page 4?

3:10PM 20 A.   Yes.

3:10PM 21 Q.   Where it says "With Taxotere"?

3:10PM 22 A.   Yes.

3:10PM 23 Q.   And then there's a second paragraph under that, that says,

3:10PM 24 "The following events have also been reported."

3:10PM 25          Do you see that?

OFFICIAL TRANSCRIPT

3:10PM   1   **A.**   Yes, I can see that there.

3:10PM   2   **Q.**   And it starts off with "elevation of liver enzymes."

3:10PM   3   Correct?

3:10PM   4   **A.**   Yes.

3:10PM   5   **Q.**   And then it has "fatigue."  Right?

3:10PM   6   **A.**   Yes.

3:11PM   7   **Q.**   And it lists "reversible pins and needles sensation in

3:11PM   8   hands or feet."  Correct?

3:11PM   9   **A.**   Yes.

3:11PM   10   **Q.**   And then it says, "pain in the joints or the muscles."

3:11PM   11   Correct?

3:11PM   12   **A.**   Yes.

3:11PM   13   **Q.**   And it says "reversible hair loss."  Correct?

3:11PM   14   **A.**   Yes.

3:11PM   15   **Q.**   So this informed consent is telling patients that

3:11PM   16   reversible hair loss has been reported following use of

3:11PM   17   Taxotere; correct?

3:11PM   18   **A.**   Yes.

3:11PM   19   **Q.**   And in document is dated May 24th, 2005; correct?

3:11PM   20   **A.**   Yes.

3:11PM   21   **Q.**   And you testified earlier that the informed consents,

3:11PM   22   because they're signed by patients, are written in a language

3:11PM   23   that patients can understand; correct?

3:11PM   24   **A.**   This is correct, yes.

3:11PM   25   **Q.**   And so there's not the use of the word "alopecia."

OFFICIAL TRANSCRIPT

1   Instead, the informed consent used the nonmedical term

2   "reversible hair loss."  Correct?

3   A.   That's my understanding, yes.

4   Q.   I'm going to hand you what I'll mark as Exhibit No. 10.

5   And if we look at the bottom of this label, we see that it's

6   marked Sanofi_000213; correct?

7   A.   Yes.

8   Q.   And if we look over at Exhibit No. 7, which is the

9   labeling chronology.

10  A.   Yes.

11  Q.   If you look at where it as supplement No. 31.  Do you see

12  that?

13  A.   Yes.

14  Q.   And it has a label that's effective from January 6th,

15  2005, to August 10th of 2005; correct?

16  A.   Yes.

17  Q.   And that's a time period from this informed consent;

18  correct?

19  A.   Informed consent, May.  Yes.  Correct.

20  Q.   And that's the document we have in front of us.  So this

21  appears to be the label that was in effect in the United States

22  at the time that this informed consent was written; correct?

23  A.   Yes.

24  Q.   And if we turn to page 2, at the bottom, there's a "Hair

25  Loss" section.  Do you see that?

OFFICIAL TRANSCRIPT

**A.**   I can see that, yes.

**Q.**   And it says, "Loss of hair occurs in most patients taking Taxotere (including the hair on your head, underarm hair, pubic hair, eyebrows and eyelashes)."  Correct?

**A.**   Yes.

**Q.**   And it says, "Hair [sic] will begin after the first few treatments and varies from patient to patient."  Correct?

**A.**   Yes.

**Q.**   And then it says, "Once you have completed all of your treatments, hair generally grows back."  Correct?

**A.**   Yes.

**Q.**   That's the same language that we saw in the original 1996 label, isn't it?

**A.**   Yes.

**Q.**   And you had testified that this section is not talking about permanent hair loss; correct?

**A.**   Yes.  I mean, I can hardly interpret what the people in charge of labeling meant here, but that's my interpretation.

**Q.**   And then if we look at the informed consent, that confirms our understanding, because it warns of reversible hair loss as a reported side effect of Taxotere; correct?

**A.**   Yes.

**Q.**   And both this patient leaflet and the informed consent are written in language that -- for patients to understand; correct?

OFFICIAL TRANSCRIPT

3:14PM  1  A.    I think so, yes.

3:14PM  2  Q.    Do you see anything inconsistent between the warning for

3:14PM  3  reversible hair loss in the informed consent and the statement

3:14PM  4  "hair generally grows back"?

3:14PM  5  A.    No, I don't see any inconsistency, but -- no inconsistency

3:14PM  6  that I can appreciate.

3:14PM  7  Q.    So this "Hair Loss" section --

3:14PM  8  A.    In the --

3:14PM  9  Q.    -- in the patient leaflet --

3:14PM  10  A.    In the patient leaflet, yes.

3:14PM  11  Q.    -- is giving information on reversible hair loss like the

3:14PM  12  informed consent says; correct?

3:14PM  13  A.    To my understanding, it gives information on hair loss.

3:14PM  14  It doesn't mention specifically what -- it does mention some

3:14PM  15  words about reversibility, even though the term "reversible" is

3:15PM  16  not used in the label.

3:15PM  17          Again, I'm not a label specialist.  I don't know why

3:15PM  18  it was used or not, but that's my interpretation.

3:15PM  19  Q.    The same terminology that would be used in a label;

3:15PM  20  correct?

3:15PM  21  A.    Well, I -- I'm not sure it was the exact same terminology,

3:15PM  22  because, again, I'm not a person specialized in labeling, and I

3:15PM  23  have never been involved in labeling, but I assume my

3:15PM  24  colleagues in charge of labeling takes the language of the

3:15PM  25  study report and translate it into the labeling.

OFFICIAL TRANSCRIPT

3:15PM 1    Q.    I guess my question is, but you can understand the medical

3:15PM 2    terminology used in the label?

3:15PM 3    A.    I can understand it, yes.

3:15PM 4    Q.    And if you turn to the next page, page 22, at the top of

3:15PM 5    the page, it says, "The safety profile is generally similar in

3:15PM 6    patients receiving Taxotere for the treatment of breast cancer

3:15PM 7    and in patients with other tumor types."  Is that correct?

3:15PM 8    A.    Yes.  This is what's written, yes.

3:15PM 9    Q.    What does that statement mean?

3:15PM 10   A.    Difficult for me to interpret or to guess what is meant by

3:16PM 11   the people in charge of labeling, by the regulatory.  I mean,

3:16PM 12   it's -- I can read that the safety profile generally is similar

3:16PM 13   in patients receiving Taxotere for a year conditions.

3:16PM 14   Q.    So let's at this first chart.  It has a "Summary of

3:16PM 15   Adverse Events in Patients Receiving Taxotere at

3:16PM 16   100 milligrams."  Correct?

3:16PM 17   A.    Correct.

3:16PM 18   Q.    And then this you flip to the send -- the next page,

3:16PM 19   there's a listing five up from the bottom that says "Alopecia."

3:16PM 20   Correct?

3:16PM 21   A.    Yes.

3:16PM 22   Q.    And that's in a medical term; correct?

3:16PM 23   A.    Correct.

3:16PM 24   Q.    And we -- if we look back at the informed consent, it's

3:16PM 25   written in language that patients can understand, Sanofi chose

OFFICIAL TRANSCRIPT

3:16PM 1    to use the term in patient language "reversible hair loss."

3:16PM 2    Correct?

3:16PM 3    **A.**   Hair loss.  Yes.  Correct.

3:16PM 4    **Q.**   Reversible hair loss; correct?

3:16PM 5    **A.**   Yes.

3:17PM 6    **Q.**   Okay.  So is it fair, then, to say that when we translate

3:17PM 7    from language that patients can understand, "reversible hair

3:17PM 8    loss" to "alopecia," what we're seeing here in this chart is

3:17PM 9    the percentage of people who had reversible hair loss?

3:17PM 10   **A.**   In the chart here?

3:17PM 11   **Q.**   Yes.

3:17PM 12   **A.**   No, that's what is not shown -- I mean, here in the chart.

3:17PM 13   In the table, the numbers are the percentage of patients who

3:17PM 14   experienced, once, alopecia during the course of the study.

3:17PM 15         It doesn't have any qualifier whether this

3:17PM 16   short-lasting or long-lasting, partial, total.

3:17PM 17   **Q.**   Okay.  But in the document that's given to patients --

3:17PM 18   **A.**   Yeah.

3:17PM 19   **Q.**   -- that patients read and sign before they participate in

3:17PM 20   Sanofi's experiment, which is what a clinical trial is, Sanofi

3:17PM 21   has translate the "alopecia" into "reversible hair loss."

3:17PM 22   Correct?

3:17PM 23   **A.**   That's what is written in the document, yes.

3:17PM 24   **Q.**   And if we go through the label, if you go to page 28,

3:18PM 25   there's another chart, and this is study TAX 316; correct?

OFFICIAL TRANSCRIPT

**A.**   Yes.

**Q.**   And here it lists alopecia about halfway down, just the term "alopecia."  Correct?

**A.**   Okay.  Got it.

**Q.**   And so for doctors, Sanofi is telling the doctors about alopecia, and they're telling the patients that alopecia is reversible hair loss; correct?

**A.**   Correct.

**Q.**   And this informed consent we've been looking at from this time period is an informed consent for a prostate cancer study; right?

**A.**   Yes.  Correct.  TAX 327 is a study in metastatic prostate cancer.  3501 is a study in earlier stages of prostate cancer, correct.

**Q.**   Is it your belief, Mr. Aussel, that when Sanofi tells doctors alopecia, that they are telling doctors about both permanent and reversible alopecia?

**A.**   I don't know.  I mean, the label says "alopecia."  I don't know what was agreed with the health authorities about the details to be provided regarding alopecia.  I don't know what was the -- what the specialists in labeling meant when listing this specific adverse event.

          As it is, I can't really comment.  But the form of alopecia, I mean the incidence of alopecia, there's no specific qualifier.

**Q.**   In anywhere in this Taxotere section, is Sanofi telling patients that permanent hair loss has been reported?

**A.**   This is a question?  Yes.  Correct.

**Q.**   So you're agreeing with me that there's no warning in this section of Sanofi telling patients that permanent hair loss has been reported following the use of Taxotere?

**A.**   I agree.

**Q.**   Do you believe that this informed consent from 2005 that is written in language for patients to understand is consistent with the label from 2005?

**A.**   I believe so, yes.

**Q.**   And I understand -- I asked you earlier, and you said you've never participated in any discussions with the health authority about a label; correct?

**A.**   Correct.  Difficult for me to interpret and to make the direct relationship between the detailed tables that we provide to the investigators, to the professional oncologists, and the lay language we use to inform the patients.  I can only say that, compared to the patient leaflet, there's no inconsistency with the informed consent.

**Q.**   Mr. Aussel, I'm going to hand you what I've marked as Exhibit 14.

          And this appears to be a letter from Sanofi to the FDA dated June 12th, 2006; correct?

**A.**   Yes.

OFFICIAL TRANSCRIPT

3:20PM  1    **Q.**    I'm going to guess you haven't seen this letter before;

3:20PM  2    correct?

3:20PM  3    **A.**    No, I have not seen it before.

3:20PM  4    **Q.**    If you look at the last paragraph of that first page, it

3:20PM  5    says, "Enclosed please find a new protocol."  Correct?

3:21PM  6    **A.**    Yes.

3:21PM  7    **Q.**    Can you read the protocol title for me.

3:21PM  8    **A.**    "Phase IIb, randomized, multicenter, non-comparative pilot

3:21PM  9    study of the safety and efficacy of three docetaxel-based

3:21PM  10   chemotherapy regimens plus bevacizumab and trastuzumab for the

3:21PM  11   adjuvant treatment of patients with node-positive and high-risk

3:21PM  12   node-negative breast cancer."

3:21PM  13   **Q.**    Are you familiar with Study 714?

3:21PM  14   **A.**    Not at all.

3:21PM  15   **Q.**    But from reading the title, in your 20 years of

3:21PM  16   experience, you understand what the study is looking into?

3:21PM  17   **A.**    Yes.  Yes.

3:21PM  18   **Q.**    So this letter appears to be Sanofi transmitting a new

3:21PM  19   study protocol to the FDA; correct?

3:21PM  20   **A.**    Yes.  Yes.  Yes.  Could be a protocol amendment.  I don't

3:21PM  21   know what it means, the title here.  But it's a protocol

3:21PM  22   anyway, yes.

3:22PM  23   **Q.**    At the top of that page, it says "Amendment:  New

3:22PM  24   Protocol."  Correct?

3:22PM  25   **A.**    Okay.  New protocol, yes.

OFFICIAL TRANSCRIPT

**Q.** Let's turn to the page -- just to take a step back, you mentioned that you've worked a lot with protocols in executing clinical trials; correct?

**A.** Yes.

**Q.** So you have an understanding of how to read and understand clinical trial protocols from your years of experience?

**A.** Oh, when reading, yeah.

**Q.** You know a lot more about clinical trials than I do. Let me just make sure I understand.

So if we look back -- and to be fair, actually, if we look back at a prior page, I didn't read the parentheticals where they have n=100 and n=150.

**A.** I am not familiar at all with the general study, which is complex, I think, because there are many study drugs. There is bevacizumab. There is trastuzumab. There is a plus/minus. So I need to understand better, if needed, what are the actual treatment arms.

But this is basically -- and the -- Herceptin is a drug that can be used only in HER2-positive patients. So that's why you also try to then pay attention to make sure that the HER2-negative patients don't receive Herceptin.

So it's a complex design that I will need a few minutes to understand. But go ahead with your questions.

**Q.** Let's turn to Appendix D.

**A.** Yes.

OFFICIAL TRANSCRIPT

3:23PM  1    **Q.**    And do you see that Appendix D contains the sample

3:23PM  2    informed consent?

3:23PM  3    **A.**    Correct.

3:23PM  4    **Q.**    And this appears to have been submitted to the FDA as part

3:23PM  5    of the protocol; correct?

3:23PM  6    **A.**    Correct.

3:23PM  7    **Q.**    All right.  If you turn to page 91, you'll see there's a

3:23PM  8    section that begins with a question:  "What are the possible

3:23PM  9    risks and inconveniences of being in the study?"  Correct?

3:23PM  10   **A.**    Correct.

3:23PM  11   **Q.**    And then if you turn to the next page, it begins with a

3:24PM  12   section entitled "Non-cardiovascular Risks of Doxorubicin,

3:24PM  13   Cyclophosphamide, Docetaxel, and/or Carboplatin."  Correct?

3:24PM  14   **A.**    Correct.

3:24PM  15   **Q.**    And the doxorubicin, cyclophosphamide, and docetaxel are

3:24PM  16   commonly referred to as TAC; correct?

3:24PM  17   **A.**    Correct.

3:24PM  18   **Q.**    And, here, Sanofi is reporting the side effects that it

3:24PM  19   knows about for the combination of drugs doxorubicin,

3:24PM  20   cyclophosphamide, and docetaxel; correct?

3:24PM  21   **A.**    And carboplatin, yeah, correct.

3:24PM  22   **Q.**    And/or carboplatin.

3:24PM  23           And then we see language like we've seen before.

3:24PM  24           Do you see where it says, "The following events have

3:24PM  25   also been reported"?

OFFICIAL TRANSCRIPT

3:24PM 1    **A.**    Yes.

3:24PM 2    **Q.**    Okay.  And then two lines under that, it lists reversible

3:24PM 3    hair loss as a reported side effect; correct?

3:24PM 4    **A.**    Correct.

3:24PM 5    **Q.**    And do you see anything in that paragraph about

3:24PM 6    long-standing hair loss?

3:24PM 7    **A.**    No.  It's not written this way.

3:24PM 8    **Q.**    Do you see anything in that paragraph about permanent hair

3:25PM 9    loss being reported?

3:25PM 10    **A.**    No.

3:25PM 11    **Q.**    And then if you look down one paragraph, it says, "These

3:25PM 12    side effects were reported from previous studies."  Correct?

3:25PM 13    **A.**    Correct.

3:25PM 14    **Q.**    And like the other informed consents we looked at, this

3:25PM 15    informed consent is written in language that a non-doctor can

3:25PM 16    understand; correct?

3:25PM 17    **A.**    Yes.  This is the objective.

3:25PM 18    **Q.**    So here in this informed consent, we have Sanofi telling

3:25PM 19    patients that are participating in a clinical trial for Sanofi

3:25PM 20    that a reported side effect of the TAC regimen is reversible

3:25PM 21    hair loss; correct?

3:25PM 22    **A.**    Yes.

3:25PM 23    **Q.**    All right.  And if we look at the label that was in effect

3:25PM 24    at this time, we have the hair loss section, which is the

3:25PM 25    language we've seen before, "hair generally grows back."

OFFICIAL TRANSCRIPT

1  Correct?

2  **A.**   Yes.

3  **Q.**   And you had testified that, you know, since the informed

4  consent and the patient leaflet -- or patient information

5  section are written in language that patients can understand,

6  "hair generally grows back," is a warning for reversible hair

7  loss; correct?

8  **A.**   Yes.

9  **Q.**   There's nothing in the label that says anything about

10  personal alopecia, is there?

11  **A.**   Correct.

12  **Q.**   Would you agree that, if Sanofi had knowledge that

13  Taxotere could be associated with long-standing or permanent

14  hair loss, it had an obligation to clearly warn parents

15  patients about that risk?

16  **A.**   I can hardly comment on this kind of consideration because

17  it was not my responsibilities at that time within Sanofi.

18        The people responsible for making such decisions were

19  people sitting in regulatory departments, labeling departments,

20  possibly pharmacovigilance departments.  They have regular

21  discussions with health authorities.  And in conjunction with

22  health authorities, they define what is in the label, what

23  should be brought to the patients in terms of information.

24        I can't really comment.

25  **Q.**   Have you ever worked in pharmacovigilance?

OFFICIAL TRANSCRIPT

| | | |
|---|---|---|
| 3:27PM | 1 | **A.**    I'm sorry? |
| 3:27PM | 2 | **Q.**    Have you ever worked in pharmacovigilance? |
| 3:27PM | 3 | **A.**    Never. |
| 3:27PM | 4 | **Q.**    Did you ever take part in any discussions, when you were |
| 3:27PM | 5 | working on clinical trials, about discussing or warning doctors |
| 3:27PM | 6 | about two different kinds of alopecia? |
| 3:27PM | 7 | **A.**    No.  In my role -- again, we were conducting studies, |
| 3:27PM | 8 | making sure that we collect information about alopecia, that |
| 3:27PM | 9 | the studies are run in an appropriate way.  And we collect |
| 3:27PM | 10 | data.  And we contribute to feed the evidence that are then |
| 3:27PM | 11 | interpreted, discussed by the different labeling regulatory |
| 3:27PM | 12 | teams within Sanofi. |
| 3:27PM | 13 | It was not specifically -- I didn't have the specific |
| 3:27PM | 14 | mission to inform the health authorities about the different |
| 3:28PM | 15 | types of alopecia.  I relied on what was in the informed |
| 3:28PM | 16 | consent based on, as we discussed before, based on what is in |
| 3:28PM | 17 | the patient leaflet.  And this is what is officially approved |
| 3:28PM | 18 | both by health authorities and Sanofi persons of labeling. |
| 3:28PM | 19 | I mean, my responsibility was to -- to provide the |
| 3:28PM | 20 | data for each clinical trial so that those persons within |
| 3:28PM | 21 | Sanofi and these bodies, health authorities, can make an |
| 3:28PM | 22 | appropriate judgment on what is the safety profile of Taxotere. |
| 3:28PM | 23 | And that's it. |
| 3:28PM | 24 | **Q.**    Were you part of that regulatory team ever? |
| 3:28PM | 25 | **A.**    Never. |

OFFICIAL TRANSCRIPT

3:28PM  1    **Q.**   All right.  So you didn't participate in any discussions
3:28PM  2    with the FDA yourself, did you?
3:28PM  3    **A.**   No, no, never.
3:28PM  4    **Q.**   Do you recall any -- being told anything about the
3:28PM  5    labeling discussions by the American team?
3:29PM  6    **A.**   No, never.
3:29PM  7    **Q.**   Were you ever on the safety management team for Taxotere?
3:29PM  8    **A.**   No.  In my role at that time, I was not supposed to be
3:29PM  9    part of this kind of team.
3:29PM  10   **Q.**   At any point, have you been?
3:29PM  11   **A.**   At any point, I did not -- never had any roles that
3:29PM  12   justify my presence in such team.
3:29PM  13   **Q.**   Good afternoon, Jean-Philippe.  How are you?
3:29PM  14   **A.**   I'm fine.  Thank you.
3:29PM  15   **Q.**   Have you ever worked in Sanofi's pharmacovigilance
3:29PM  16   department?
3:29PM  17   **A.**   Never.
3:29PM  18   **Q.**   Have you ever been involved in making safety signal
3:29PM  19   analyses?
3:29PM  20   **A.**   No.
3:29PM  21   **Q.**   Have you ever been involved in or engaged in any sort of
3:29PM  22   determinations about the causal association or causal
3:29PM  23   relationship between Taxotere and any particular side effect?
3:29PM  24   **A.**   No.  It was up to the investigator to do it, not up to me.
3:29PM  25   **Q.**   That would never -- making determinations as to a safety

OFFICIAL TRANSCRIPT

3:29PM 1   analysis or a safety signal analysis or a causal relationship,
3:29PM 2   has that ever, at any point in your time at Sanofi, been part
3:30PM 3   of one of your roles or responsibilities?
3:30PM 4   A.   No, never.
3:30PM 5   Q.   And it would never be one of your roles or
3:30PM 6   responsibilities to prepare leaflets or pamphlets that would go
3:30PM 7   to oncologists or any type of medical professional?
3:30PM 8   A.   No.  It was not my job.
3:30PM 9   Q.   Okay.  And that's for your entire time at Taxotere; is
3:30PM 10  that correct?
3:30PM 11  A.   Yeah, correct.
3:30PM 12  Q.   Jean-Philippe, you were asked if you remember, say, an
3:30PM 13  hour and a half or several hours of questions about a variety
3:30PM 14  of Taxotere labels.
3:30PM 15       Do you recall that?  It was kind of at the beginning
3:30PM 16  of day.
3:30PM 17  A.   Okay.  Yeah.
3:30PM 18  Q.   Okay.  And all the questions that you had were related to
3:30PM 19  what's known as the U.S. package insert or the Taxotere label
3:30PM 20  that's used in the United States.
3:30PM 21       Does that sound about right?
3:30PM 22  A.   Yes.
3:30PM 23  Q.   At any time at Sanofi, have you been involved or part of
3:30PM 24  any type of labeling group or labeling working committee or
3:31PM 25  labeling review committee?

OFFICIAL TRANSCRIPT

1  A.   No.  I've never been part of these kind of committees.

2  Q.   Have you ever drafted or provided input as to what should

3  go in a particular label?

4  A.   No, did not.

5  Q.   Have you ever been given a label to -- a proposed label to

6  review or provide comment on as it relates to Taxotere?

7  A.   No, I have not.

8  Q.   Okay.  Do you know who is responsible within Sanofi,

9  generally, for reviewing and preparing and updating drug

10  labels?

11  A.   Yes.  There is a labeling department whose responsibility

12  is to do this kind of activity.  I think they do it with the

13  support of regulatory affairs, medical doctors,

14  pharmacovigilance.

15  Q.   So, as we sit here today, would you have any information

16  about what safety information Sanofi proposed to regulatory

17  authorities related to Taxotere?

18  A.   I am not aware of such information.  I'm not part of the

19  people to be aware of these kind of discussions or information.

20  Today, I was shown some document about that.  So I could read

21  what was inside, but I wasn't part of the decisions.

22  Q.   And would you have any personal knowledge as to what was

23  meant or intended by particular language in a label, whether

24  that be the label in the U.S. or whether that be the label in

25  Europe?

OFFICIAL TRANSCRIPT

3:32PM  1  **A.**   No.   I'm not knowledgeable about these technical labeling

3:32PM  2  details.   I don't know the meaning of the wording and what is

3:32PM  3  supporting the decisions.

3:32PM  4  **Q.**   Okay.   If you will grab Exhibit No. 8.

3:33PM  5           Exhibit No. 8 was the Taxotere label from, I believe,

3:33PM  6  1996 when the drug was first approved in the United States.

3:33PM  7           Does that sound about right?   Once you've had a

3:33PM  8  chance to look over that document.

3:33PM  9  **A.**   It doesn't seem there's any date here, but could be.

3:33PM  10  **Q.**   Okay.   I'll represent to you that this was during the

3:33PM  11  examination earlier today, the Taxotere label from 1996.

3:33PM  12           If you'll turn to Sanofi 000003 of this document.

3:33PM  13  **A.**   Okay.

3:33PM  14  **Q.**   I apologize, Jean-Philippe.   I believe this was the

3:33PM  15  relevant section.   It was both the label -- the FDA-approved

3:33PM  16  label as well as the FDA-approved patient leaflet, and the

3:34PM  17  discussion was about the patient leaflet.

3:34PM  18  **A.**   Okay.

3:34PM  19  **Q.**   Will you look at the section that's called "Hair Loss."

3:34PM  20           Do you see that section?

3:34PM  21  **A.**   I see, yes.

3:34PM  22  **Q.**   Okay.   And do you recall that you were asked a number of

3:34PM  23  questions about that particular section?

3:34PM  24  **A.**   Yes, I do.

3:34PM  25  **Q.**   So just to be clear for the record and for the ladies and

OFFICIAL TRANSCRIPT

3:34PM  1  gentlemen of the jury, you would not have prepared or been
3:34PM  2  involved in the drafting of this label, the submission to FDA,
3:34PM  3  or what FDA's feedback may have been related to this particular
3:34PM  4  section; is that correct?
3:34PM  5  A.   That's correct.  I was not aware.
3:34PM  6  Q.   Okay.  And you'll see a section on hair loss.  The last
3:34PM  7  sentence in the first paragraph, it says, "Once you have
3:34PM  8  completed all your treatments, hair generally grows back."
3:34PM  9       Do you see that?
3:34PM  10 A.   I see, yeah.
3:34PM  11 Q.   And I know you're not in pharmacovigilance.
3:34PM  12      But at least in your experience in helping to run a
3:34PM  13 number of breast cancer trials involving Taxotere, would you
3:34PM  14 say that statement is accurate?
3:35PM  15 A.   I think it is a correct statement, indeed, yes, that hair
3:35PM  16 generally grows back.
3:35PM  17 Q.   That once you take Taxotere, you may lose your hair and
3:35PM  18 that it generally grows back?
3:35PM  19 A.   Correct.
3:35PM  20 Q.   In your experience, you would say that's an accurate
3:35PM  21 statement?
3:35PM  22 A.   Yes, it is.
3:35PM  23 Q.   Okay.  And does that statement say that, once you've taken
3:35PM  24 Taxotere, that your hair will always grow back?
3:35PM  25 A.   No, that it generally grows back.

OFFICIAL TRANSCRIPT

3:35PM 1    **Q.**    Okay.  Jean-Philippe, will you turn to Exhibit No. 9.

3:35PM 2    This was one of, I believe, a number of informed consents that

3:35PM 3    you were provided.

3:35PM 4    **A.**    Yes.  Correct.

3:35PM 5    **Q.**    Okay.  And this is a -- this particular exhibit is an

3:35PM 6    informed consent from a -- I think a prostate cancer clinical

3:35PM 7    trial; is that correct?

3:36PM 8    **A.**    Yes, correct.

3:36PM 9    **Q.**    So not a breast cancer trial; correct?

3:36PM 10   **A.**    No.  It's a trial, early-stage prostate cancer.

3:36PM 11   **Q.**    A non-adjuvant breast cancer trial?

3:36PM 12   **A.**    Not an adjuvant cancer.

3:36PM 13   **Q.**    Jean-Philippe, are you the person at Sanofi who is

3:36PM 14   responsible for drafting and preparing and approving what goes

3:36PM 15   in the informed consent?

3:36PM 16   **A.**    No, I'm not.

3:36PM 17   **Q.**    Who, in your experience, would be the individuals that are

3:36PM 18   responsible for drafting and preparing and approving what goes

3:36PM 19   in a particular informed consent for a clinical trial?

3:36PM 20   **A.**    At the time it was prepared -- drafted by the trial

3:36PM 21   manager itself, him or herself, and -- especially for the

3:36PM 22   so-called administrative sections.

3:36PM 23          But for the sections, for example, the risks, it was

3:36PM 24   prepared together by the medical director and

3:36PM 25   pharmacovigilance.

OFFICIAL TRANSCRIPT

**Q.** So you said "the medical director."

Would that be a medical doctor?

**A.** Yes, medical doctor, oncologist.

**Q.** Okay. So at least in your recollection, the informed consent and the safety information that goes in an informed consent, that's something that would be drafted, prepared, and finalized by an oncologist or a medical doctor?

**A.** Yeah, correct.

**Q.** And if you'll go to page 3 of this particular informed consent from May 24th, 2005, and you look down at what are the risks of the study.

Do you see that section?

**A.** I see it.

**Q.** Just to be clear, this, again, is not something that Jean-Philippe Aussel would have prepared, reviewed, signed off on; is that correct?

**A.** This is correct, yes.

**Q.** Okay. And it goes on to state, "Every treatment can have side effects."

Do you agree with that?

**A.** Yeah. Sure.

**Q.** And if you look further down, it says, "There also may be other side effects that cannot be predicted. Other drugs will be given to make the side effects less serious and make them less uncomfortable.

OFFICIAL TRANSCRIPT

3:38PM  1        "Many side effects go away shortly after Taxotere or
3:38PM  2   Eligard are stopped.  But in some cases, side effects can be
3:38PM  3   serious, long-lasting, or permanent."
3:38PM  4        Just to be clear, "In some cases, side effects can be
3:38PM  5   serious, long-lasting, or permanent."
3:38PM  6        Do you see that?
3:38PM  7   A.   I see, yes.
3:38PM  8   Q.   What does that mean to you?
3:38PM  9   A.   It means that, at the time the protocol and the informed
3:38PM 10   consent are written, we are providing the list of the potential
3:38PM 11   side effects for all the drugs of the protocol.  But we are
3:38PM 12   informing the patients that there may be other side effects
3:38PM 13   that may be discovered in this particular trial and that some
3:38PM 14   of them can have different characteristics than the
3:38PM 15   characteristics that we know today.
3:39PM 16   Q.   Okay.  And some of those characteristics may be that the
3:39PM 17   side effect could be permanent?
3:39PM 18   A.   That's what is written here.
3:39PM 19   Q.   Okay.  If you'll turn to the next page, page 4, this is a
3:39PM 20   section that plaintiff's counsel asked you a number of
3:39PM 21   questions about.  It's the paragraph that starts with "The
3:39PM 22   following events have also been reported."
3:39PM 23   A.   Okay.
3:39PM 24   Q.   Do you see that?
3:39PM 25   A.   Yeah.  Yeah.

OFFICIAL TRANSCRIPT

**Q.**    It says, "The following events have also been reported."
And then there's a big, long list of events that have been
reported.  And the one that plaintiff's counsel was focused on
was reversible hair loss.

Do you see that?

**A.**    Yeah, I see that.

**Q.**    Is it fair to say or is it accurate that one of the events
that had been reported with Taxotere was reversible hair loss?

**A.**    Yes.  This is correct, yes.

**Q.**    And is it also fair to say that, in your experience,
that -- it's true then, is it true now, that most, if not all,
patients who take a Taxotere regimen will have reversible hair
loss?

**A.**    That's what you're observing in clinical trials, yes.

**Q.**    And despite the fact that reversible hair loss had been
reported, this informed consent also advises patients that
there may be side effects that could be permanent; is that
correct?

**A.**    This is what it's saying, yes.

**Q.**    And we could go through -- well, is it your recollection
that most of the informed consents we looked at, more or less,
had similar or the same language?

**A.**    Yes.  That's what we are.  I mean, they are supposed to be
consistent with the template of informed consent.  And whatever
the drug for some of them in a particular area, not oncology

OFFICIAL TRANSCRIPT

1  but others, they are some standard paragraphs that we must put

2  in the informed consent.

3  Q.   But at the end of the day, Jean-Philippe, you, in your

4  role -- in your job responsibilities at Sanofi, you rely on

5  medical professionals and oncologists to prepare informed

6  consents; is that correct?

7  A.   Yes.

8  Q.   Who prepares, say, the safety information that might go in

9  an investigational brochure?

10  A.   Typically, the pharmacovigilance team, because they are in

11  charge of safety for the company for all products.  And they

12  are the most knowledgeable of what should be in these

13  documents.

14  Q.   And within Sanofi's pharmacovigilance team, are there

15  medical professionals?

16  A.   Yes, there are, especially the group of safety officers

17  they are medical doctors.

18  Q.   Including oncologists?

19  A.   Including oncologists, pharmacology, yeah.

20  Q.   And so you rely on those medical professionals, those

21  oncologists, those trained physicians to prepare, update,

22  include the information that they believe should go in an

23  investigational brochure or that should go in an informed

24  consent.

25        Would you agree with that?

OFFICIAL TRANSCRIPT

3:41PM 1   **A.**   Yes, I do.

3:41PM 2   **Q.**   Jean-Philippe, we talked about a number of adjuvant breast

3:42PM 3   cancer clinical trials.

3:42PM 4           Do you recall that?

3:42PM 5   **A.**   Yes, I do.

3:42PM 6   **Q.**   For TAX 316 -- that was one of the trials we talked about;

3:42PM 7   right?

3:42PM 8   **A.**   Yes.

3:42PM 9   **Q.**   And I know you had involvement with TAX 316.

3:42PM 10  **A.**   That's correct.

3:42PM 11  **Q.**   Can you just give me or give us sort of a time frame when

3:42PM 12  you had responsibilities for TAX 316 and when you no longer had

3:42PM 13  responsibilities for TAX 316.

3:42PM 14  **A.**   Yes.  I had responsibilities for TAX 316 from about 2001

3:42PM 15  maybe -- very beginning of 2001 until 2004 when I changed

3:42PM 16  departments.

3:42PM 17  **Q.**   Okay.  So you weren't involved with TAX 316 when the study

3:42PM 18  started, and you weren't involved with TAX 316 when the study

3:42PM 19  ended; is that correct?

3:42PM 20  **A.**   This is correct, yes.  I came into TAX 316 actually

3:43PM 21  between the first and the second interim analysis.

3:43PM 22  **Q.**   And can you give us a little bit of background in terms of

3:43PM 23  when you were involved with BCIRG 005, which is the one of the

3:43PM 24  studies we've talked about?

3:43PM 25  **A.**   Okay.  When I joined the medical affair group after the

OFFICIAL TRANSCRIPT

3:43PM  1   ten years in R&D.  So it was at the end of 2004.  So let's say

3:43PM  2   January 2005.  Then I had to take care of BCIRG 005.  That was

3:43PM  3   a medical affair trial.

3:43PM  4   Q.   When you say -- I apologize.  When did you say you stopped

3:43PM  5   having responsibility for 005?

3:43PM  6   A.   The beginning was in January 2005.  And then I stopped my

3:43PM  7   responsibility in approximately 2010, when the clinical

3:43PM  8   position platform was cleared with Sanofi and when I became the

3:43PM  9   project leader all oncology medical affairs studies.  But I was

3:44PM  10  not at that time directly managing the 005 study.

3:44PM  11  Q.   So you weren't involved with 005 at the beginning of

3:44PM  12  study --

3:44PM  13  A.   No.

3:44PM  14  Q.   -- the setup of the protocol, the setup of the informed

3:44PM  15  consent?

3:44PM  16  A.   Not at all.

3:44PM  17  Q.   Nor were you involved or responsible for the end of 005;

3:44PM  18  is that correct?

3:44PM  19  A.   Yes, correct.

3:44PM  20  Q.   Okay.  Then can you just tell us the same thing for 006.

3:44PM  21  A.   These are -- I can call parallel studies.  So they are the

3:44PM  22  same timing.  So I took over 006 in January 2005, and I also

3:44PM  23  was not involved anymore on 006 approximately in 2010.

3:44PM  24  Q.   So, again, you weren't involved at the beginning of 006 in

3:44PM  25  terms of the setup of the protocol, the setup of the informed

OFFICIAL TRANSCRIPT

1 consent, nor were you involved or responsible for that study at
2 the very end of the study; is that correct?
3 **A.**   Yes, this is correct.
4 **Q.**   Okay.  Just to be clear, you would not have had
5 responsibility for GEICAM 9805 at the beginning in the setup of
6 the trial?
7 **A.**   Sure.  Absolutely.
8 **Q.**   And you would not have responsibility at the end of trial;
9 is that correct?
10 **A.**   Correct.
11 **Q.**   And then what about with TAX 315 -- just the same set of
12 questions -- when did you have a direct role and responsibility
13 for that particular adjuvant trial?
14 **A.**   So, again, I was responsible from time to time when my own
15 scope, meaning in the R&D or medical affairs, fit the
16 positioning of the study within the company, either in medical
17 affairs or in R&D.
18         So when he was in R&D -- so in the early 2000 years,
19 I was overseeing a team of trial managers taking care of the
20 study and -- but then the study moved to medical affairs while
21 I was still in R&D.  It was at the time of the TAX 316
22 submission.
23         But then when I moved to medical affairs in
24 January 2005, then I -- again, my scope to oversee TAX 315,
25 again, I was not directly in charge of the study itself.  I was

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

3:46PM  1   a trial manager in charge of specifically, but it was part of

3:46PM  2   my portfolio, I would say, of the studies.

3:46PM  3   Q.   Okay.  And just to be clear, you have a doctorate, but you

3:46PM  4   are not a medical doctor; is that correct?

3:46PM  5   A.   I am not a medical doctor, correct, yes.

3:46PM  6   Q.   And is it fair to say that you rely on the medical

3:46PM  7   professionals and medical doctors and the oncologists, whether

3:46PM  8   within Sanofi or in these resource organizations, to make

3:46PM  9   analysis and determinations about safety data?

3:46PM  10  A.   We have to, yes.

3:46PM  11          THE COURT:  Mr. Nolen, call your next witness.

3:46PM  12          MR. NOLEN:  Thank you, Your Honor.

3:47PM  13              Barbara Earnest calls Dr. Laura Plunkett.

3:47PM  14          THE COURT:  Come forward, Dr. Plunkett.

3:47PM  15          (WHEREUPON, **LAURA MASSEY PLUNKETT**, having been duly

3:47PM  16  sworn, testified as follows**:)**

3:47PM  17          THE DEPUTY CLERK:  Please state your full name and

3:47PM  18  correct spelling for the record.

3:47PM  19          THE WITNESS:  Laura Massey Plunkett.  L-A-U-R-A,

3:47PM  20  M-A-S-S-E-Y, P-L-U-N-K-E-T-T.

3:47PM  21                    DIRECT EXAMINATION

3:47PM  22  BY MR. NOLEN:

3:47PM  23  Q.   Good afternoon, Dr. Plunkett.

3:47PM  24  A.   Good afternoon.

3:47PM  25  Q.   How are you today?

LAURA MASSEY PLUNKETT - DIRECT

3:47PM  1    **A.**    Good.

3:47PM  2    **Q.**    Great.  Dr. Plunkett, at my request, did you conduct an

3:48PM  3    investigation into the Taxotere product?

3:48PM  4    **A.**    Yes, I did.

3:48PM  5    **Q.**    As part of your investigation, did you review the

3:48PM  6    scientific literature pertaining to chemotherapy drugs?

3:48PM  7    **A.**    Yes.

3:48PM  8    **Q.**    Did you review the available scientific literature related

3:48PM  9    to chemistry -- the chemistry of chemotherapy products?

3:48PM  10   **A.**    Yes, I did.

3:48PM  11   **Q.**    Did you receive and review internal documents from Sanofi

3:48PM  12   related to Taxotere?

3:48PM  13   **A.**    I did, yes.

3:48PM  14   **Q.**    And did you obtain and review some of the depositions that

3:48PM  15   had been taken in the Taxotere litigation?

3:48PM  16   **A.**    Yes, I did.

3:48PM  17   **Q.**    Based upon your review and investigation, have you formed

3:48PM  18   a number of conclusions related to the Taxotere product?

3:48PM  19   **A.**    I have.

3:48PM  20   **Q.**    All right.  Doctor, before we discuss your investigation

3:48PM  21   and conclusions into this these matters, I want to provide the

3:48PM  22   jury with some insights regarding your training, education, and

3:48PM  23   experience, your professional background, so they can get an

3:49PM  24   understanding of exactly who you are.

3:49PM  25   **A.**    Okay.

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

3:49PM   1   **Q.**   Is that all right?

3:49PM   2               **MR. NOLEN:**   Your Honor, I want to publish

3:49PM   3   Dr. Plunkett's CV.

3:49PM   4               **MS. SASTRE:**   No objection, Your Honor.

3:49PM   5               **THE COURT:**   Thank you.

3:49PM   6   BY MR. NOLEN:

3:49PM   7   **Q.**   All right.  Dr. Plunkett, I've got your CV up on the ELMO.

3:49PM   8               And first of all, where are you from?

3:49PM   9   **A.**   Originally from Baltimore, Maryland, but I live in

3:49PM  10   Houston, Texas.  I've lived there since 1993.

3:49PM  11   **Q.**   And what is your educational background?

3:49PM  12   **A.**   So I have a bachelor's degree in zoology and a

3:49PM  13   doctorate -- a doctoral degree in pharmacology.

3:50PM  14   **Q.**   All right.  So your Ph.D. is in pharmacology?

3:50PM  15   **A.**   Yes, that's correct.

3:50PM  16   **Q.**   And what is your professional experience?

3:50PM  17   **A.**   So I've done a number of things.  In addition to receiving

3:50PM  18   my degree in 1984, I did some additional training for two years

3:50PM  19   at the National Institutes of Health as a pharmacology research

3:50PM  20   associate training fellow.

3:50PM  21               Then, in 1986, I took what I call my first real job.

3:50PM  22   I went into academics.  I was an assistant professor of

3:50PM  23   pharmacology.  I had a separate appointment to the department

3:50PM  24   of toxicology as well at the medical school in Little Rock at

3:50PM  25   the University of Arkansas for Medical Sciences.  And I was

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

3:50PM 1  there for about three and a half years teaching medical

3:50PM 2  students basic pharmacology and toxicology, also working in the

3:50PM 3  lab doing basic research and teaching graduate students as

3:51PM 4  well.

3:51PM 5          And then since -- when I left that job in '89 due to

3:51PM 6  relocation from Little Rock to the Washington, D.C. area, I

3:51PM 7  changed career paths and became a consultant, which is what I

3:51PM 8  do today, which is someone, essentially, who works outside of

3:51PM 9  the academic environment or outside the research lab but

3:51PM 10 assists clients that have issues related to pharmacology and

3:51PM 11 toxicology for products that are regulated by different bodies

3:51PM 12 within the federal government or by state government.

3:51PM 13         So since I've left academics, that's what I've been

3:51PM 14 doing for the last, I guess, 30 years now.

3:51PM 15 Q.  Dr. Plunkett, if you could -- you mentioned toxicology and

3:51PM 16 pharmacology a couple times.

3:51PM 17         What are the differences between those areas?

3:51PM 18 A.  So pharmacology is the study of the actions that drugs,

3:51PM 19 and chemicals as well, have on the body.  I study mainly drugs

3:51PM 20 because I was in pharmacy school where I did my training.

3:51PM 21         The only real difference between pharmacology and

3:52PM 22 toxicology, in my world that I operate in, is that toxicology

3:52PM 23 is looking at the undesired or unwanted or toxicity or the bad

3:52PM 24 things that drugs can do to your body versus looking at the

3:52PM 25 benefits or the things you want the drug to do.  So it's two

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

3:52PM  1    sides of the coin.

3:52PM  2                And when I studied in pharmacology, my actual project

3:52PM  3    was a toxicology project.  I was interested in understanding

3:52PM  4    how a specific drug called digitalis could produce a lethal

3:52PM  5    arrhythmia, heart arrhythmia where the heart doesn't beat

3:52PM  6    properly -- you could actually die from it -- how the drug

3:52PM  7    actually produced that.

3:52PM  8                So I was doing a toxicology project even though I was

3:52PM  9    basically in a pharmacology department studying how the actions

3:52PM 10    of digitalis could produce also the beneficial effects that you

3:52PM 11    get.

3:52PM 12    Q.    And I'm looking at your professional certification.

3:52PM 13                You're a registered patent agent?

3:52PM 14    A.    Yes, that's correct.

3:53PM 15    Q.    Why is that?

3:53PM 16    A.    So when I went out into the consulting world after 1989, I

3:53PM 17    worked for a large company first.  And then that company closed

3:53PM 18    their office in Houston where I was at that time, and I went

3:53PM 19    out on my own.  I was working at the time with a law firm --

3:53PM 20    actually, it happens to be my sister's law firm, and she's a

3:53PM 21    patent attorney.

3:53PM 22                And she started using me to help her with some of her

3:53PM 23    projects to help a university-based inventor take their

3:53PM 24    invention from the laboratory and get a patent on it so that

3:53PM 25    they could, hopefully, move it out into the real world and sell

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

3:53PM   1   it to another company or start a company from it.

3:53PM   2           So I started doing that work and became very

3:53PM   3   interested in it.  And so I decided that I wanted to actually

3:53PM   4   have my own certification so I could actually sign documents

3:53PM   5   and represent my clients in phone calls with patent -- the

3:54PM   6   USPTO, the United States Patent and Trademark Office.

3:54PM   7           In order to do that, you either have to be a patent

3:54PM   8   attorney or a patent agent.  So I'm not a lawyer, but I had to

3:54PM   9   sit for the patent bar.  I passed it, and I obtained my

3:54PM  10   registration in 1999.  And it's really just fun work.

3:54PM  11           It feeds right out of the things that I do in my

3:54PM  12   basic job as a pharmacologist.  All the projects I work on with

3:54PM  13   inventors tend to be medical applications.  I do projects on

3:54PM  14   drugs, devices, new uses for a drug, anything that has to do

3:54PM  15   with the kind of science that I've worked on for 30 years.

3:54PM  16   Q.   Are you presently affiliated with any university?

3:54PM  17   A.   Yes.  I have an adjunct appointment to Baylor University,

3:54PM  18   the department of environmental sciences.  I really miss

3:54PM  19   working with students, and so I've tried over the years to find

3:54PM  20   ways to stay involved by doing some visiting lectures at

3:55PM  21   different places.  And I was offered this opportunity three

3:55PM  22   years ago now.

3:55PM  23           So it gives me an opportunity to stay involved more

3:55PM  24   directly in the academic world, to participate in some of the

3:55PM  25   programs they have and interact with the science there and the

LAURA MASSEY PLUNKETT - DIRECT

3:55PM  1    students.  So it's just something I like to do, which is why I

3:55PM  2    sought that.

3:55PM  3    Q.   Are you a diplomat with the American Board of Toxicology?

3:55PM  4    A.   Yes, I am.

3:55PM  5    Q.   And I see you have several professional memberships.  If

3:55PM  6    you could, just kind of run through these in kind of summary

3:55PM  7    fashion and tell us a little bit about them.

3:55PM  8    A.   Sure.  So all of these professional memberships deal with

3:55PM  9    something that I do in my daily job or my daily life.  My

3:55PM  10   oldest memberships were in the Society for Neuroscience, for

3:55PM  11   example.  One of my older ones is also the Society of

3:55PM  12   Toxicology because, again, that's a lot of what I do.  I look

3:55PM  13   at the toxic effect of things in our everyday environment.  So

3:56PM  14   I stay involved with other scientists by attending those

3:56PM  15   meetings.

3:56PM  16        I'm also a part of the American College of

3:56PM  17   Toxicology, another toxicology organization.  But because I

3:56PM  18   have a basic interest in medical therapeutics, I'm also a

3:56PM  19   member of American Associations for Pharmaceutical Scientists.

3:56PM  20   It's a meeting where drug industry heavily attends.  So I stay

3:56PM  21   involved with that, as I can.

3:56PM  22        So most of these organizations I'm involved with have

3:56PM  23   something to do with either pharmacology, toxicology, or

3:56PM  24   products that are regulated by either the Food and Drug

3:56PM  25   Administration and/or the Environmental Protection Agency.

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

3:56PM  1    Because some of the things I do are consumer products, not just
3:56PM  2    drugs.
3:56PM  3    Q.   All right.  Doctor, and you have a number of publications;
3:56PM  4    is that true?
3:56PM  5    A.   Yes.
3:56PM  6    Q.   All right.  And so the jury has heard about publications
3:56PM  7    and the peer-review journals.
3:57PM  8         Are all of these publications publications in the
3:57PM  9    peer-reviewed journals or medical journals?
3:57PM  10   A.   Yes.  The first section here in my CV is things I have
3:57PM  11   published in peer-reviewed literature.
3:57PM  12   Q.   I know it goes on for several pages.
3:57PM  13        And you've published abstracts also; is that right?
3:57PM  14   A.   Yes, that's correct.  That's a little different kind of
3:57PM  15   publication, but it can undergo peer review as well.  But it's
3:57PM  16   where you give a presentation, either orally or in a smaller
3:57PM  17   group, at a scientific meeting.  Whereas, the papers are ones
3:57PM  18   that are actually put out more broadly across either the
3:57PM  19   journal or even on the Internet nowadays.  Most of these
3:57PM  20   journals are available online.
3:57PM  21        So the other presentations or the abstracts are more
3:57PM  22   focused on a smaller topic.  Sometimes they turn into a paper
3:57PM  23   that I've put into peer-reviewed literature; sometimes they
3:57PM  24   don't.  It just depends on the project.
3:58PM  25   Q.   And it looks like you have over 50 of these; is that

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

1   right?

2   A.   Yes.   That -- again, I try -- every year, I attend at

3   least one scientific meeting.   And if I'm going, I try very

4   hard to present because it gives me an opportunity to interact

5   more directly with my colleagues.   And I just enjoy it, so I

6   try to do that.

7   Q.   And you've identified presentations separately, actually,

8   on your CV; correct?

9   A.   Yes.   Because those aren't at scientific meetings.   Those

10  tend to be things I've done, either as an invited lecturer or

11  an invited speaker.   Or I've given talks where I may be

12  explaining a topic of a short course kind of thing.

13          Some of those also are -- I've given lectures at law

14  schools on issues related to regulation of products by the FDA.

15  I've also done that -- some law school presentations on my

16  patent work as well.   So I've done both of those things.

17  Q.   And have you published book chapters?

18  A.   Yes, I have several.

19  Q.   All right.   Just kind of running through these, I see

20  let's see, five of those; is that right?

21  A.   Yes.   There's actually six now.   I have a new one that

22  just came out, but, yes.

23  Q.   And you've given testimony before the United States

24  Senate?

25  A.   Yes, I did.

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

**Q.**   And you've given other types of presentations to lay people; is that right?

**A.**   Yes, I do that as well.

**Q.**   All right.  Doctor, I want to ask you a few specific questions about your experience.  Have you prepared submissions to the FDA representing to pharmaceutical drugs?

**A.**   Yes.  A good -- about -- over the last -- since 1989, a good deal of my work has dealt with putting together packages or information to support an issue related to a therapeutic product of some type.  A lot of that was drug work over the years as well.

**Q.**   Have you assisted pharmaceutical companies with monitoring compliance?

**A.**   Yes, I have.  I'm recently working on a project like that for a company that spun out of one of the laboratories at a university.

**Q.**   And how about --

        **MS. SASTRE:**  Excuse me, Your Honor.  Compliance question, Judge.  I object.

        **THE COURT:**  I think -- can we just get on -- maybe we need to -- I don't know if she's asking that.  I think this is just going through qualifications, but that's -- we're not going to go there.

        **MR. NOLEN:**  I'm just asking about her training and qualifications, what she does.

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

4:00PM 1          **THE COURT:**  I'm going to allow it to get to just -- I

4:00PM 2  understand.

4:00PM 3          **MS. SASTRE:**  Thank you.

4:00PM 4  BY MR. NOLEN:

4:00PM 5  **Q.**   Does your pharmacology, toxicology and other work include

4:00PM 6  review and analysis of medical literature, scientific

4:01PM 7  literature and epidemiological literature?

4:01PM 8  **A.**   Yes.  Almost every project I do, either as -- in my

4:01PM 9  regulatory practice as a pharmacologist and toxicologist.  But

4:01PM 10  definitely in my -- also in my practice working with inventors,

4:01PM 11  I am constantly looking at the literature, understanding

4:01PM 12  things.  And with the patent work I do, it's great because I

4:01PM 13  stay really up-to-date with things that are new, which is

4:01PM 14  really helpful to the kind of work I do.

4:01PM 15  **Q.**   All right.  And so you've worked with pharmaceutical

4:01PM 16  companies; is that correct?

4:01PM 17  **A.**   Yes.

4:01PM 18  **Q.**   And you have consulted in litigation; is that right?

4:01PM 19  **A.**   Yes, that's about -- that's one of the things I do in my

4:01PM 20  practice.  I have three areas of any practice, and that's one

4:01PM 21  of them.

4:01PM 22  **Q.**   And what's the third area?

4:01PM 23  **A.**   Patent work -- the three are patent work, regulatory

4:01PM 24  consulting, and then litigation support.

4:01PM 25  **Q.**   Are you compensated for your work as a consultant?

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

4:01PM   1   **A.**   Yes, I am.

4:01PM   2   **Q.**   And at what rate?

4:01PM   3   **A.**   As a litigation consultant, I charge $300 an hour.  In my

4:02PM   4   regulatory practice, it depends whether it's a government

4:02PM   5   project or not, but the rate ranges from 250 to 300.  In my

4:02PM   6   patent work, I take a salary from a law firm, so it's not paid

4:02PM   7   on an hourly rate.

4:02PM   8   **Q.**   And have you worked for both plaintiffs and defendants?

4:02PM   9   **A.**   I have.

4:02PM  10   **Q.**   All right.  And, Doctor, as part of your work, do you

4:02PM  11   utilize human risk assessment?

4:02PM  12   **A.**   Yes, that's a tool I use every day in something that I'm

4:02PM  13   doing with my job.

4:02PM  14   **Q.**   All right.  If you could just explain that to the jury.

4:02PM  15   **A.**   So no matter what the question, I'm asking whether -- a

4:02PM  16   case like this whether I'm looking at toxicity of a drug or a

4:02PM  17   case where I'm working to try to help a company with a problem

4:02PM  18   that's been raised during development of a drug product or

4:02PM  19   exposure, somebody's being supposed to something in their

4:03PM  20   water, all of those kinds of projects deal with what I call

4:03PM  21   safety assessment.  And that safety assessment is also part of

4:03PM  22   something overall called risk assessment.

4:03PM  23        So it's looking at -- and I focus on the issues

4:03PM  24   related to human health.  It's looking on -- looking at the

4:03PM  25   issues across everything that you have and determining whether

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

4:03PM 1    or not there's a certain type of way people can be exposed to

4:03PM 2    something that would be a harm to them in some way.

4:03PM 3         So risk assessment is looking at what are the overall

4:03PM 4    effects something can have that could be harmful to a person,

4:03PM 5    looking at how people could be exposed.  And determining

4:03PM 6    whether, based on that exposure and those risks, that something

4:03PM 7    needs to be done, either by telling people about it, by telling

4:03PM 8    the government they need to maybe consider how they look at

4:03PM 9    this product, maybe saying the government is looking at it the

4:03PM 10   wrong way.  I do that a lot too.

4:03PM 11        But essentially trying to understand how exposure to

4:04PM 12   something like a drug in our body and the way it could produce

4:04PM 13   toxic effects in our body, whether those things raise to a

4:04PM 14   level that we need to be concerned about it.  So -- because

4:04PM 15   everything has risks that we're exposed to in our world, but --

4:04PM 16        **MS. SASTRE:**  Your Honor, objection to narrative.

4:04PM 17        **THE COURT:**  I think we need to move this along.

4:04PM 18        **THE WITNESS:**  I'm sorry.

4:04PM 19   BY MR. NOLEN:

4:04PM 20   **Q.**   Do you utilize weight-of-the-evidence assessments?

4:04PM 21   **A.**   Yes.  That's a tool I use when I go through a body of

4:04PM 22   information or literature, yes.

4:04PM 23   **Q.**   All right.  And is that part of the methodology that

4:04PM 24   you've utilized throughout your career?

4:04PM 25   **A.**   Yes.  That's something I was trained on in my training in

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

4:04PM 1  my doctoral work up through today.  I still use it.

4:04PM 2  Q.   And is that a generally accepted methodology in your

4:04PM 3  field?

4:04PM 4  A.   Yes, all of the projects I work on, regulatory bodies use

4:04PM 5  that as well.

4:04PM 6           MR. NOLEN:   Your Honor, I would tender Dr. Plunkett

4:05PM 7  as an expert in pharmacology, toxicology and risk assessment.

4:05PM 8           MS. SASTRE:   No objection, Your Honor.

4:05PM 9           THE COURT:   The Court's going to accept Dr. Plunkett

4:05PM 10 as an expert in the field of pharmacology, toxicology and risk

4:05PM 11 assessment, qualified to render opinions in those areas.

4:05PM 12          Please proceed.

4:05PM 13 BY MR. NOLEN:

4:05PM 14 Q.   Now, Doctor, will all of the conclusions that you provide

4:05PM 15 today for the jury be based upon a reasonable degree of

4:05PM 16 scientific certainty?

4:05PM 17 A.   Yes, they will.

4:05PM 18 Q.   And what are your overarching conclusions in this case

4:05PM 19 based upon what you've been asked to do?

4:05PM 20 A.   So first it's my opinion, to a reasonable degree of

4:05PM 21 scientific certainty, based on my training, experience and all

4:05PM 22 the evidence I looked at, that irreversible alopecia, or

4:05PM 23 permanent hair loss, is not the same injury as drug-induced

4:05PM 24 alopecia that you see with many chemotherapeutic drugs.

4:05PM 25 Q.   And -- oh, go ahead.  I'm sorry.

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

4:06PM    1    **A.**    That's the first opinion.  That leads to the second.

4:06PM    2        The second major area -- major opinion that I formed

4:06PM    3    in this case, again also based on my review of the evidence

4:06PM    4    I've looked at, my training and experience, is that

4:06PM    5    irreversible alopecia, Taxotere itself is associated with an

4:06PM    6    increased risk of irreversible alopecia, permanent hair loss,

4:06PM    7    as compared to other chemotherapeutic drugs including Taxol.

4:06PM    8    **Q.**    And as part of your work, did you review the science

4:06PM    9    related to taxanes?

4:06PM    10   **A.**    Yes.

4:06PM    11   **Q.**    All right.  And what is a taxane, Doctor?

4:06PM    12   **A.**    Taxanes is a name for a group of drugs.  There's two main

4:06PM    13   ones that we're interested here; Taxotere is a taxane, and

4:06PM    14   Taxol is a taxane.  So they're two drugs.

4:06PM    15       They're both natural products derived from a plant

4:06PM    16   called the yew tree.  And now they're made in the laboratory

4:06PM    17   and synthesized in the laboratory.  And they've been developed

4:07PM    18   into FDA-approved drugs.  One has the name Taxotere, and one

4:07PM    19   has the name Taxol.

4:07PM    20   **Q.**    All right.  Doctor, I'm going to put up a compound and ask

4:07PM    21   you about it.

4:07PM    22       Doctor, what are we looking at here?

4:07PM    23   **A.**    So this is the chemical structure --

4:07PM    24       **THE COURT:**  Ms. Sastre, there's no objection?

4:07PM    25       **MS. SASTRE:**  I'm sorry, no objection.

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

4:07PM   1        **THE COURT:**  Thank you.

4:07PM   2              Please proceed.

4:07PM   3        **THE WITNESS:**  This is the chemical structure of the

4:07PM   4   drug we're here to talk about, Taxotere.  The other name,

4:07PM   5   docetaxel, is called the chemical name of the drug, and

4:07PM   6   Taxotere is what's called the trade name.  It's the name that

4:07PM   7   the company Sanofi gave to the drug when it sent it in for

4:07PM   8   approval.

4:07PM   9              But this is the chemical structure.  You can see

4:07PM  10   it's got a lot of -- it's pretty complex.  This is an organic

4:08PM  11   chemical.  It means it has lots of carbon in it, and all the

4:08PM  12   little lines that come together, right here is a carbon atom.

4:08PM  13   So these -- its carbon atoms are the building block, and it has

4:08PM  14   other types of chemical groups on it as well.  So it's a pretty

4:08PM  15   complex structure.

4:08PM  16   BY MR. NOLEN

4:08PM  17   **Q.**   All right.  And is there another drug that's chemically

4:08PM  18   similar to this particular compound?

4:08PM  19   **A.**   Yes.  And actually it's the drug that was first -- first

4:08PM  20   came on the market, and that's Taxol.  And it's also known as

4:08PM  21   paclitaxel.  And I think we have a --

4:08PM  22   **Q.**   Yes.

4:08PM  23   **A.**   If you want to show them, you'll see how similar they are.

4:08PM  24   **Q.**   All right.

4:08PM  25        **MS. SASTRE:**  No objection.

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

4:08PM  1          THE COURT:  Okay.

4:08PM  2     BY MR. NOLEN:

4:08PM  3     Q.   So that is paclitaxel?

4:08PM  4     A.   Yes.

4:08PM  5     Q.   All right.  I'm not sure I can get them both here.  There

4:09PM  6     we go.

4:09PM  7          So we have docetaxel on top and paclitaxel below.  Do

4:09PM  8     you see that?

4:09PM  9     A.   Yes.

4:09PM  10    Q.   All right.  And what are the chemical differences between

4:09PM  11    these two compounds?

4:09PM  12         THE WITNESS:  Can I circle with this?

4:09PM  13         THE COURT:  Yes.

4:09PM  14    BY MR. NOLEN:

4:09PM  15    Q.   You can.

4:09PM  16    A.   So I put two circles.  Those two areas of the molecule are

4:09PM  17    where the differences are.  So you'll see here, you have this

4:09PM  18    larger bulky ring structure.  And then over here, instead of

4:09PM  19    the OH -- oxygen and hydrogen -- you have this other group

4:09PM  20    that's a little different.  So chemically they're very similar.

4:09PM  21    Most of the structure is the same.  But these two groups are

4:09PM  22    different.

4:09PM  23         And as a result of having those two groups different,

4:09PM  24    they act very similarly in the body, but there are some

4:10PM  25    differences in the way they interact with cells.  But

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

1    generally, they're the same drug -- basic drug, as far as how

2    they go about producing the benefits that they were approved to

3    be used for.

4    **Q.**   Are these -- they're both cancer drugs; right?

5    **A.**   Yes, I'm sorry.  I should have that said that.  These are

6    both drugs used to treat cancer; breast cancer, even.

7    **Q.**   Do you know whether or not they're listed among the

8    essential medicines for the treatment of breast cancer?

9    **A.**   I do.  And they are, yes.

10   **Q.**   And who does that?

11   **A.**   There's a group called the WHO, the World Health

12   Organization.  And they put together a list of essential

13   medicines for use, for a why, and these two drugs are both

14   lists, and they're listed as being drugs that could be used

15   interchangeably, one or the other.

16   **Q.**   All right.  If you would please explain to us what the

17   term "toxic effects" means as it relates to a chemical or to a

18   compound?

19   **A.**   So the toxic effects of a chemical are the things that

20   could harm you.  So things you really don't want.

21           When you give somebody a drug, you hope that they'll

22   get all the things you want, like to treat the cancer, but that

23   you won't see any side effects or toxic effects.  The idea is

24   to maximize what they call the benefits, and minimize the

25   toxicity.

LAURA MASSEY PLUNKETT - DIRECT

4:11PM 1          And you try to find -- when you're developing a drug,

4:11PM 2    you try to find that balance, because you always want the

4:11PM 3    benefits to be greater than the risks for the patient.  So

4:11PM 4    that's what you do.  And the toxic effects are those risks that

4:11PM 5    you identify.

4:11PM 6    **Q.**   And are some toxic effects temporary?

4:11PM 7    **A.**   Yes.  Depending on what you talk about.

4:11PM 8          **MS. SASTRE:**  Your Honor, I object.  This is beyond

4:11PM 9    the scope, what we discussed earlier today.  I'd be happy to

4:11PM 10   approach.

4:11PM 11         **THE COURT:**  I think you need to approach.

4:11PM 12         (WHEREUPON, the following proceedings were held at

4:11PM 13   the bench.)

4:12PM 14         **MS. SASTRE:**  So, Your Honor, I object.

4:12PM 15          I did let counsel ask the first question on are

4:12PM 16   there toxic effects, and then he got into sort of what was more

4:12PM 17   the comparison, are some toxic effects worse than others, and

4:12PM 18   something like that.  I was very concerned about what she might

4:12PM 19   say.  And, to me, it felt like getting very, very close to

4:12PM 20   encroaching upon Your Honor's *Daubert* ruling.

4:12PM 21         **MR. NOLEN:**  Drugs have toxic effects.  Some are

4:12PM 22   permanent; some are temporary.

4:12PM 23         **MS. SASTRE:**  The last question was more like some are

4:12PM 24   worse than others.

4:12PM 25         **MR. NOLEN:**  No.

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

4:12PM   1          **MS. SASTRE:**  I thought so.

4:12PM   2          **THE COURT:**  The question was:  "And are some toxic

4:12PM   3   effects temporary?"

4:12PM   4              She said:  "Yes, depending upon what you're

4:12PM   5   talking about."

4:12PM   6          **MS. SASTRE:**  Okay.

4:13PM   7          **MR. NOLEN:**  Your Honor, there's nothing -- I don't

4:13PM   8   think there's anything wrong with the question.

4:13PM   9          **THE COURT:**  That question is fine.  We're just -- she

4:13PM  10   can't talk as to the comparison of which one is more toxic than

4:13PM  11   the other.  But my guess -- okay.

4:13PM  12          **MR. NOLEN:**  I'm trying to avoid it, Your Honor.  I've

4:13PM  13   admonished the witness.  I've conformed myself to the rules.

4:13PM  14          **THE COURT:**  Thank you.

4:13PM  15          (WHEREUPON, the following proceedings were held in

4:13PM  16   open court.)

4:13PM  17   **BY MR. NOLEN:**

4:13PM  18   **Q.**   Are some toxic effects permanent?

4:13PM  19   **A.**   Yes, they can be permanent, or they can be temporary.

4:13PM  20   **Q.**   And have you determined through your work whether

4:13PM  21   temporary alopecia or hair loss is a common toxic effect of

4:13PM  22   chemotherapy?

4:13PM  23   **A.**   I have determined that, yes.

4:14PM  24   **Q.**   What is temporary -- what is the temporary toxic effect of

4:14PM  25   alopecia known as?

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

A.   Anagen effluvium.  And it essentially is a type of injury where you essentially stop the cells within the fair follicles, you stop them from growing.  So, essentially, you kill those cells and so the hair falls out.

But once the drug is gone, if that is the condition, then the hair can regrow.  So it's something that typically is temporary, and once the drug is no longer there, then the process is such that the hair can regrow.

So that's, what in the medical literature that I reviewed, is called drug-induced alopecia.  It's something that happens with almost all cancer drugs.  Many of the cancer drugs, that ACT, kill cells.  They kill cells.  They kill the cells within the hair follicles as well, stop them from dividing.  The hair can't grow, and the hair actually falls out.

Q.   And so for the two drugs we've talked about already, taxol and Taxotere, is -- is temporary hair loss a known toxic effect?

A.   Yes, it is.

Q.   All right.  And in order to come to that conclusion, did you review the scientific literature?

A.   Yes, I did.

Q.   All right.  And when we talk about scientific literature, is that the report of studies or information about scientific happenings or medical happenings?

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

4:15PM 1 **A.**   Yes.   The review I did was focusing on looking for doing a

4:15PM 2 search of the published literature, also in textbooks as well.

4:15PM 3 And looking at what I could find about alopecia and hair loss

4:15PM 4 related to -- I started with Taxotere, for example.   But I also

4:16PM 5 looked generally across chemotherapy drugs as well.

4:16PM 6 **Q.**   All right.   And I want to ask you about what you looked

4:16PM 7 for in the medical literature.   And so I want to talk to you a

4:16PM 8 little bit about studies that appear in this published

4:16PM 9 literature.   And so I've prepared this, and let me get -- clear

4:16PM 10 the annotations.

4:16PM 11          See, I can do that from here.

4:16PM 12          And so I wanted to talk to you about studies and what

4:16PM 13 you're looking for when you go through scientific literature,

4:16PM 14 and what you're pulling out, and how you're utilizing the

4:16PM 15 literature that you find.

4:16PM 16 **A.**   Okay.

4:16PM 17 **Q.**   So if you would, what are the basic types of scientific

4:16PM 18 studies?

4:16PM 19 **A.**   So on this chart, we're focusing on the basic types of

4:16PM 20 human studies.   The scientific literature also can have studies

4:16PM 21 outside of humans.   But for this project, I focused on the

4:16PM 22 human -- things I could find about humans themselves.   And

4:17PM 23 there were three basics types of things that I can find in the

4:17PM 24 scientific literature, and that's what this -- it shows.

4:17PM 25          It shows that you can get something called a case

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

4:17PM  1    report, which is something written about maybe one or two

4:17PM  2    people that a doctor or a nurse may have observed about those

4:17PM  3    one or two people.

4:17PM  4          Then there's something that's a little more

4:17PM  5    structured called an observational study.  And that's where you

4:17PM  6    actually have a -- have a -- more of a design about how you

4:17PM  7    collect the information and how you compare it.  It's not as

4:17PM  8    good as the third category, which is the clinical trial.  And

4:17PM  9    Dr. Madigan was talking a lot about clinical trials this

4:17PM  10   morning, so I don't want to repeat that.

4:17PM  11         But essentially the clinical trial is the most

4:17PM  12   controlled type of human study you can do where you actually

4:17PM  13   set out with what you want to study, and you choose very

4:17PM  14   carefully how you design it and you collect that information.

4:17PM  15   And unfortunately, case reports, you're not allowed to do that.

4:17PM  16   You can't do that based on how they are.  And even for

4:18PM  17   observational studies, you can't control them as well as you

4:18PM  18   can.

4:18PM  19         So clinical trials is the most reliable kind of

4:18PM  20   information.  If you want to really understand something about

4:18PM  21   the toxicity of a compound, how often it may occur, for

4:18PM  22   example, and whether or not the thing you're observing is

4:18PM  23   really due to the drug or due to chance as he was describing.

4:18PM  24   Q.   All right.  So with respect to these, and this is what I'm

4:18PM  25   trying to get at because I don't know how many people have read

LAURA MASSEY PLUNKETT - DIRECT

4:18PM  1    scientific journals, with regard to a case report, if we open

4:18PM  2    up a scientific journal and find an article about a single

4:18PM  3    event, one person having a reaction, is that a case report?

4:18PM  4    A.   Yes, that's correct.

4:18PM  5    Q.   All right.  And we have over here the word "anecdotal."

4:18PM  6    Is that because that is not something that is set forth in a

4:19PM  7    series?  What -- what does this mean?

4:19PM  8              MS. SASTRE:  I was going to say leading.

4:19PM  9              THE COURT:  Sustained.

4:19PM  10             Rephrase your question.

4:19PM  11   BY MR. NOLEN:

4:19PM  12   Q.   All right.  When we -- when we talk about case reports,

4:19PM  13   are they anecdotal?

4:19PM  14   A.   Yes, they are.  Because they are just something that's

4:19PM  15   been observed.  It's not something that you went out to

4:19PM  16   actually study in a prescribed manner.  It's something you see,

4:19PM  17   and it's interesting and maybe it's the first time you've seen

4:19PM  18   it in your practice.

4:19PM  19             So you report it, and you tell other people about it.

4:19PM  20   But it's anecdotal because it's your experience, the doctor's

4:19PM  21   experience.

4:19PM  22   Q.   And so if we go to a journal and we find a study that

4:19PM  23   calls itself "observational," what does that mean?

4:19PM  24   A.   So an observational study is a study that is actually

4:19PM  25   designed to try to look at whether or not two things are

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

4:19PM 1    related.  In an observational study, you can say, "I want to
4:20PM 2    figure out if exposure to Taxotere is associated with permanent
4:20PM 3    alopecia."
4:20PM 4         And so you could -- you could design that in a way in
4:20PM 5    a population of people, but you don't actually enroll people in
4:20PM 6    a clinical trial where you have a control group and a group,
4:20PM 7    and you go forward and you randomize them in an observational
4:20PM 8    study; randomization isn't going to stay place.
4:20PM 9         You just essentially say "I have a population of
4:20PM 10   people here that were exposed to Taxotere, and I have a
4:20PM 11   population here pf people that were exposed to another drug.
4:20PM 12   And I want to compare them and see if I can find out whether or
4:20PM 13   not there's a difference in what we see, the experience."
4:20PM 14        For example, is there a difference in the way
4:20PM 15   these -- these people respond to -- with alopecia.  Is it
4:20PM 16   permanent with one -- with this group and not permanent with
4:20PM 17   that group, for example.  You can answer those questions.
4:20PM 18        And then you can also tease out from that
4:20PM 19   association.  You can actually determine from those studies
4:21PM 20   whether or not you believe that the drug was associated with
4:21PM 21   the -- with the event, but you can't prove it.  You have to go
4:21PM 22   further than just one individual study.
4:21PM 23   Q.   And then we've heard about clinical trials.  I'll tell you
4:21PM 24   that Dr. Kessler testified.  You were here for Dr. Madigan.
4:21PM 25   We've heard about the design of clinical trials.  So I'm not

LAURA MASSEY PLUNKETT - DIRECT

4:21PM  1  going to ask you to explain that.

4:21PM  2          But I am going to ask you that when you are reviewing

4:21PM  3  literature, do you prioritize one over the other as far as the

4:21PM  4  study designs?

4:21PM  5  A.    Yes.  If the question I'm asking is trying to determine

4:21PM  6  whether two things are related to each other, yes, I would

4:21PM  7  prioritize.

4:21PM  8  Q.    And how do you do that?

4:21PM  9  A.    In the idea of trying to figure out whether or not there's

4:21PM  10  a toxicity associated with a drug, that I would prioritize the

4:21PM  11  results from a clinical trial first as being the best evidence

4:21PM  12  I could get.  Because those studies are controlled and tell me

4:22PM  13  something about exposure in people that -- and, again, the

4:22PM  14  randomization.  There's less bias.

4:22PM  15          And the observational study would be my next level of

4:22PM  16  evidence, because sometimes you don't have clinical data.

4:22PM  17  Sometimes in my toxicity evaluations, I have only have human

4:22PM  18  experience out there in the real world, which is what

4:22PM  19  observational data and case reports are, is real-world

4:22PM  20  experience in people.

4:22PM  21          And so I put the observational studies as the next

4:22PM  22  level.  Because it's not just one patient or two patients, but

4:22PM  23  it's actually a study that somebody put together to try to

4:22PM  24  answer questions by controlling certain things in the

4:22PM  25  comparison.  But obviously not as controlled as a clinical

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

4:22PM  1   trial.  So the observational studies are good, and it's often
4:22PM  2   all we have in many things I work on with toxicity.  So I
4:22PM  3   prioritize it second.
4:22PM  4          And then the last level of evidence would be the case
4:22PM  5   report.  All of them, though, form a weight of the evidence.
4:22PM  6          So when I do my assessment, I look at everything I
4:23PM  7   have.  But I would hope that if I have it, clinical trial data
4:23PM  8   would probably give me the best piece of evidence to base my
4:23PM  9   final conclusions upon.
4:23PM 10   Q.   Do you also consider a meta-analysis?
4:23PM 11   A.   Yes, a meta-analysis, which can be done on either clinical
4:23PM 12   trial data.  You could also do a meta-analysis on observational
4:23PM 13   data.  And that's -- essentially that's just taking two or
4:23PM 14   three studies that are very similar and looking across them to
4:23PM 15   see if, when you look at them as a whole, they give you more
4:23PM 16   information that when they're looked at individually.
4:23PM 17          And there's reasons and science why that's important
4:23PM 18   to be able to do that.
4:23PM 19   Q.   All right.  Doctor, I heard your opinion earlier about
4:23PM 20   Taxotere and permanent hair loss.  And in reviewing the
4:23PM 21   literature, you -- was that the basis for your conclusions?
4:23PM 22   A.   Yes.  In reviewing literature, I also did and reviewed
4:23PM 23   other documents as well.  There's some information available
4:24PM 24   within internal company documents that informed about clinical
4:24PM 25   trials, for example.  So I had that plus the publicly available

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

4:24PM 1  medical literature as well.

4:24PM 2  **Q.**   All right.  In forming your opinions, can you run through

4:24PM 3  some of the -- some of the medical literature and scientific

4:24PM 4  literature that you reviewed and how they informed your

4:24PM 5  opinion?

4:24PM 6  **A.**   Sure.  I can do that.

4:24PM 7  **Q.**   Go ahead.

4:24PM 8  **A.**   Okay.  So starting with some of the clinical data, there

4:24PM 9  is clinical data in the published literature that isn't some of

4:24PM 10  the studies that have been talked about this morning.  There is

4:24PM 11  something called a Phase II clinical trial, which comes before

4:24PM 12  the Phase III trials, which were the TAX 316 and the TAX 301

4:24PM 13  that we -- that Dr. Madigan talked about.

4:24PM 14      So these Phase II clinical studies, there's some

4:25PM 15  publications in the literature that talked about them.  One of

4:25PM 16  them -- one publication came out in 2001 by an investigator

4:25PM 17  named Dr. Nabholz.  And Dr. Nabholz was actually a clinical

4:25PM 18  investigator for Sanofi as part of the development of Taxotere.

4:25PM 19      And then there's another abstract that was talked

4:25PM 20  about, I believe this morning as well.  Dr. Sedlacek.  He

4:25PM 21  published that in 2006.  And that is also a publication

4:25PM 22  describing clinical experience from Phase II work with

4:25PM 23  Taxotere.

4:25PM 24      So they're clinical data, but they're not published

4:25PM 25  and I don't have -- they're not large.  They're smaller groups

LAURA MASSEY PLUNKETT - DIRECT

4:25PM 1   of patients.  Even though they're clinical studies, they're not

4:25PM 2   as large as the Phase III studies which are much more

4:25PM 3   controlled and much more robust in the way the data is

4:25PM 4   collected.  But those two were very informative to start out,

4:25PM 5   and they were early publications, some of the earliest

4:25PM 6   information in the scientific literature.

4:26PM 7   Q.   Did you determine whether or not permanent hair loss

4:26PM 8   associated with Taxotere is a common side effect?

4:26PM 9   A.   Yes, I did.

4:26PM 10  Q.   And what is your opinion in that regard?

4:26PM 11  A.   Based upon the information that's available in the medical

4:26PM 12  literature as well as in the clinical trial information that's

4:26PM 13  been collected, that permanent alopecia, irreversible alopecia,

4:26PM 14  permanent hair loss, whatever name you want to use, is not

4:26PM 15  rare; it's common.  That's because it's occurring in more than

4:26PM 16  1 percent of the people in many of the reports that are out

4:26PM 17  there.

4:26PM 18       So you rank things as being rare or common or

4:26PM 19  frequent in the medical literature based upon whether it's less

4:26PM 20  than 1 percent, more than 1 percent, more than 10 percent of

4:26PM 21  the people that are being studied at that time.  Rare is less

4:26PM 22  than 1 percent.

4:27PM 23  Q.   And, Doctor, let me stop you just for a second.

4:27PM 24       Is the ranking that you just provided WHO also?

4:27PM 25  A.   Yes.  That's another -- that's where you can find it.  The

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

4:27PM 1   World Health Organization also has published sort of this

4:27PM 2   standard for how you rank -- use names.  All the scientists in

4:27PM 3   the clinical literature, if they see the word "rare," they

4:27PM 4   should understand that that should be something that occurs

4:27PM 5   less than 1 percent of time.

4:27PM 6   Q.   All right.  Doctor, I'm going to put in front of the

4:27PM 7   jury -- publish to the jury something that's already been shown

4:27PM 8   as part of the opening about frequency of reactions.

4:27PM 9        Is this the WHO ranking scale?

4:27PM 10  A.   Yes, that's correct.

4:27PM 11  Q.   All right.  And so you were explaining a moment ago about

4:27PM 12  common.

4:27PM 13       Can you tell us, looking at this scale, what it is

4:27PM 14  you're talking about there?

4:27PM 15  A.   So the second bar at the top here, this here, so if it's

4:27PM 16  greater than 1 in 100, it's greater than 1 percent; less than

4:28PM 17  1 in 10, so it's between 1 and 10 percent of the people in the

4:28PM 18  study or the people in the population that you're talking

4:28PM 19  about.

4:28PM 20       So each -- each piece of literature I looked at, I

4:28PM 21  could look and see whether or not it was showing percentages

4:28PM 22  that would fit common or rare, for example.  If you look at

4:28PM 23  rare, it's going to be less than 1 percent.  Where it says less

4:28PM 24  than 1 in 100, that means less than 1 percent.

4:28PM 25  Q.   Okay.  So aside from Nabholz and Sedlacek, which I think

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

4:28PM  1   you just told us about, did you review the 2009 study by

4:28PM  2   Prevazas?

4:28PM  3   A.   Yes, I did.

4:28PM  4   Q.   Did it inform your opinions in this case?

4:28PM  5   A.   Yes.

4:28PM  6   Q.   And how?

4:28PM  7   A.   So Prevazas is a case report.  So it fits back in one of

4:28PM  8   buckets of information that I was able to collect.  And the

4:28PM  9   Prevazas study reports on cases of permanent alopecia in

4:29PM  10  patients that -- in a patient that had been treated with

4:29PM  11  Taxotere.

4:29PM  12       So this is where the investigator felt it was

4:29PM  13  important to put it into the literature.  They wrote the case

4:29PM  14  report up and got it published.  So it fits in that case report

4:29PM  15  bucket.

4:29PM  16  Q.   All right.  And, Doctor, did you review the Bertrand study

4:29PM  17  from 2013?

4:29PM  18  A.   Yes, I did.

4:29PM  19  Q.   And did it inform your opinions in this case?

4:29PM  20  A.   It did.

4:29PM  21  Q.   And how so?

4:29PM  22  A.   So it fit into that middle bucket, observational

4:29PM  23  information, so observational studies.

4:29PM  24       It's something that is called a prospective study.

4:29PM  25  It's where the investigator decided to follow in his practice a

LAURA MASSEY PLUNKETT - DIRECT

4:29PM  1  group of patients going forward over time, and they reported a
4:29PM  2  five-year follow-up for patients that were treated for breast
4:29PM  3  cancer with Taxotere.  And they found that there was -- that
4:29PM  4  persistent -- I think they called it persistent alopecia was
4:30PM  5  occurring that population they looked at about a third of the
4:30PM  6  time in five years.
4:30PM  7  Q.   And did you review the Kang 2018 study?
4:30PM  8  A.   Yes, I did.
4:30PM  9  Q.   And did it inform your opinions in this matter?
4:30PM  10  A.   It did.
4:30PM  11  Q.   And how so?
4:30PM  12  A.   So it's another one of those studies in the middle bucket
4:30PM  13  of observational.  It also is prospective, meaning someone is
4:30PM  14  following patients going forward in time, looking at the
4:30PM  15  experience of the patients.  And that investigator also finds
4:30PM  16  that persistent alopecia with Taxotere is a common event, so
4:30PM  17  more than 1 percent of the patients.
4:30PM  18  Q.   And the 2016 Namini study, did you review that?
4:30PM  19  A.   Yes.
4:30PM  20  Q.   And what type of study is that?
4:30PM  21  A.   So it's a review paper, but it cites to clinical data.
4:30PM  22  And when I say "clinical data," clinical trial data for
4:30PM  23  Taxotere.  And it actually reports on 316 data.
4:31PM  24  Q.   Okay.  316?
4:31PM  25  A.   Oh, it talks about the TAX 316 clinical trial for

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

4:31PM 1  Taxotere.

4:31PM 2  **Q.**   Okay.  And so we're going to get to the TAX 316.  I think

4:31PM 3  the jury's heard a lot about it already.

4:31PM 4       How did Namini inform your opinions in this matter?

4:31PM 5  **A.**   It was important because it was another piece of

4:31PM 6  information from the medical literature confirming the fact

4:31PM 7  that there was clinical trial information reporting that

4:31PM 8  Taxotere was being associated with an increased risk of

4:31PM 9  permanent alopecia in patients in the study and to a greater

4:31PM 10  rate than the comparator group.

4:31PM 11       And this is TAX 316.  So it's comparing the TAC and

4:31PM 12  the FAC groups, and it talks about the actual percentages.

4:31PM 13  And, again, the percentages reported would not fit with rare;

4:31PM 14  they would fit with common.

4:31PM 15  **Q.**   And, Doctor, you mentioned 316 just a minute ago in

4:32PM 16  connection with Namini.

4:32PM 17       Did you review Sanofi's TAX 316 study?

4:32PM 18  **A.**   I did.  I looked at the -- I didn't do what Dr. Madigan

4:32PM 19  did.  But I did look at the study report and the study results,

4:32PM 20  as reported to FDA.

4:32PM 21  **Q.**   And what, if anything, is important about TAX 316 to your

4:32PM 22  opinions in this case?

4:32PM 23  **A.**   It's the fact that, in a study where they had two -- it's

4:32PM 24  a well-controlled, well-designed, randomized study.  In order

4:32PM 25  to control all those things that make it reliable, they -- were

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

4:32PM 1 able to show, when they adjusted Taxotere in a population of

4:32PM 2 people as compared to 5-fluorouracil with the other regimens --

4:32PM 3 regimens being the same, that the Taxotere group, when you

4:32PM 4 added that drug into that group, that there was a difference in

4:32PM 5 the rate of permanent alopecia being reported.

4:33PM 6 So in other words, the pattern was more permanent

4:33PM 7 alopecia in the drug group that got the Taxotere as compared to

4:33PM 8 the drug group that didn't get it, even though both groups were

4:33PM 9 also getting other drugs.  And that's true, they were.  But the

4:33PM 10 variable that looked different was Taxotere or not.

4:33PM 11 **Q.**   Did you look at the Sanofi GEICAM study?

4:33PM 12 **A.**   Yes.

4:33PM 13 **Q.**   Did it inform your opinions in this case?

4:33PM 14 **A.**   Yes.  It's the same as the TAX 301 study, I believe, that

4:33PM 15 was talked about this morning.

4:33PM 16 **Q.**   All right.  And how did it inform your opinions?

4:33PM 17 **A.**   Because it was another clinical trial done by Sanofi on

4:33PM 18 Taxotere, also on a breast cancer population, that is, again,

4:33PM 19 seeing a difference in the rate that's being reported for

4:33PM 20 patients that were on Taxotere with the TAC versus patients on

4:33PM 21 the FAC.

4:33PM 22 And I think that was talked about a lot this morning.

4:33PM 23 But essentially the same pattern in those clinical trials is

4:34PM 24 seen for persistent alopecia.  And, again, the rate that's

4:34PM 25 reported was not rare, but it was common in those patients.

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

4:34PM 1   **Q.**   Now, Doctor, did you review any of the other cancer agents
4:34PM 2   on the market to determine whether or not there was a permanent
4:34PM 3   toxic effect of hair loss?
4:34PM 4   **A.**   Yes.  I did a general survey, as part of my work, to look
4:34PM 5   first for literature on persistent alopecia and didn't limit it
4:34PM 6   just to one drug, looked across the literature to see what I
4:34PM 7   could find.
4:34PM 8   **Q.**   Did you find, through the literature that you did look at,
4:34PM 9   whether any other drug has, as a common toxic effect, permanent
4:34PM 10  hair loss?
4:34PM 11  **A.**   I did look for that, yes.
4:34PM 12  **Q.**   And what did you find?
4:34PM 13  **A.**   I found that the database of information that's available
4:34PM 14  for Taxotere looks very different than the kind of information
4:34PM 15  for any other drug that may have a report.
4:34PM 16        And the difference is, for Taxotere, you have all
4:34PM 17  three buckets of evidence we -- I showed on that.  You have
4:35PM 18  clinical trial data, you have observational data, and you have
4:35PM 19  case reports that are consistently showing that Taxotere has
4:35PM 20  been linked to or associated with permanent alopecia or
4:35PM 21  irreversible hair loss.
4:35PM 22        For some of the other drugs that are out there, I see
4:35PM 23  a few case reports for some of them, but I don't see all three
4:35PM 24  types of evidence that's available for me to look at publicly.
4:35PM 25  It just isn't there.

LAURA MASSEY PLUNKETT - DIRECT

4:35PM   1          Even drugs -- and I focused, actually, on some of the
4:35PM   2   drugs that were being used in combination with Taxotere,
4:35PM   3   because I wanted to know about doxorubicin and I wanted to know
4:35PM   4   about cyclophosphamide and 5-fluorouracil.  So I really paid
4:35PM   5   attention to those.  And the database of information that's
4:35PM   6   available looks very different than it does for Taxotere.
4:35PM   7   Q.   And based -- did you utilize your weight-of-the-evidence
4:35PM   8   analysis to come to your conclusions regarding permanent hair
4:35PM   9   loss and Taxotere?
4:36PM   10  A.   Yes.
4:36PM   11  Q.   And so if you were looking at it and weighing the
4:36PM   12  evidence, how do you come down ultimately on that issue?
4:36PM   13  A.   I come down that there's a difference.  Taxotere looks
4:36PM   14  different.  My opinion is that Taxotere has a -- carries a
4:36PM   15  greater -- an increased risk of being associated with permanent
4:36PM   16  alopecia in patients as compared to the other drugs that I was
4:36PM   17  able to review and that I saw reviewed or discussed within the
4:36PM   18  scientific literature.  And that included Taxol as well.
4:36PM   19  Q.   Is it close?
4:36PM   20  A.   No, it wasn't close.  And that was, I think -- what was --
4:36PM   21  it jumps out when you look across the published literature.
4:36PM   22          MR. NOLEN:  Thank you.  I'll pass the witness.
4:36PM   23          MS. SASTRE:  Your Honor, may we approach?
4:36PM   24          (WHEREUPON, the following proceedings were held at
4:36PM   25  the bench.)

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

4:37PM  1      **MS. SASTRE:**  Your Honor, I definitely have over an
4:37PM  2  hour.  I know I told you that before.  So unless you're willing
4:37PM  3  to keep the jury until -- it could easily be 6:00.  And I do
4:37PM  4  not want them to hold it against me.  I don't want to rush.

4:37PM  5      **THE COURT:**  How can you be more than an hour?

4:37PM  6      **MS. SASTRE:**  I have a lot of things to go over with
4:37PM  7  her, Your Honor.  You know, he just puts up all these papers
4:37PM  8  and studies, and this one said this and this one said this.  It
4:37PM  9  takes longer to dissect it than it does to come up with
4:37PM  10  sweeping statements like that.

4:37PM  11      **THE COURT:**  Well, let's get going.

4:37PM  12      **MS. SASTRE:**  Do you want to get started?  But I don't
4:37PM  13  want to break not middle of the cross, Your Honor.

4:37PM  14      **MR. COFFIN:**  We would not have put her on.  We made a
4:37PM  15  decision.  One of our debates was do we put her on or not.  We
4:37PM  16  don't have another video.  That's why we did this, so we need
4:37PM  17  to --

4:37PM  18      **THE COURT:**  Well, you know, you could have put her
4:37PM  19  before the video.

4:37PM  20      **MS. SASTRE:**  Yeah, that's what I'm saying, Judge.  I
4:37PM  21  just didn't want to break in the middle of the cross.

4:37PM  22      **THE COURT:**  Let's go.

4:37PM  23      **MS. SASTRE:**  What time do you want to go until
4:37PM  24  because then I can make some strategic decisions?

4:37PM  25      **THE COURT:**  5:30.

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

4:37PM  1          **MS. SASTRE:**  Oh, 5:30.  Okay.  All right.  All right,

4:38PM  2  Your Honor.

4:38PM  3          (WHEREUPON, the following proceedings were held in

4:38PM  4  open court.)

4:38PM  5          **THE COURT:**  Let me ask the jury, do you all need a

4:38PM  6  quick break?  Okay.  Please proceed.

4:38PM  7          **MS. SASTRE:**  You guys are troopers.

4:38PM  8                      **CROSS-EXAMINATION**

4:38PM  9  BY MS. SASTRE:

4:38PM  10  **Q.**   Good afternoon.

4:38PM  11  **A.**   Good afternoon.

4:38PM  12  **Q.**   Dr. Plunkett, how are you?

4:38PM  13  **A.**   I'm good.  Thank you.

4:38PM  14  **Q.**   Good.  I don't know if you remember -- I'll see whether I

4:38PM  15  made an impression on you or not, Doctor -- but you and I met

4:38PM  16  last year.

4:39PM  17          Do you recall that?

4:39PM  18  **A.**   Yes.  You took my deposition.

4:39PM  19  **Q.**   Exactly.  I took your deposition in this case; right?

4:39PM  20  **A.**   That's correct.

4:39PM  21  **Q.**   And that was in December, I believe, of 2018?

4:39PM  22  **A.**   That -- I don't remember the month, but it was late last

4:39PM  23  year, yes.

4:39PM  24  **Q.**   Okay.  And I came to Houston, and we spent about a day

4:39PM  25  together; right?

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

4:39PM  1   **A.**   Yes, we did.

4:39PM  2   **Q.**   Okay.  Very good.  What I'd like to do is I'll go ahead

4:39PM  3   and hand you a copy of your deposition just in case we need it

4:39PM  4   today.  Okay?

4:39PM  5   **A.**   Sure.

4:39PM  6   **Q.**   All right.

4:39PM  7           **MS. SASTRE:**  Your Honor, may I approach the witness?

4:39PM  8           **THE COURT:**  Yes, you may.

4:39PM  9           **MS. SASTRE:**  Counsel, would you like a copy.

4:39PM  10          **MR. NOLEN:**  Sure.

4:39PM  11  **BY MS. SASTRE:**

4:39PM  12  **Q.**   Now, before I tock your deposition in December of 2018,

4:39PM  13  you'd agree with me that you had been deposed hundreds of times

4:40PM  14  before that; true?

4:40PM  15  **A.**   Over 20-some years, yes, I have.

4:40PM  16  **Q.**   Okay.  And, in fact, in 2018 alone, last year -- by the

4:40PM  17  time I took your deposition in 2018, you had given

4:40PM  18  approximately 25 other depositions just last year?

4:40PM  19  **A.**   Yes, that's true.  Not all separate cases, but yes.

4:40PM  20  **Q.**   And you'd agree with me that you gave us a list of your

4:40PM  21  prior testimony of all the cases in which you had testified as

4:40PM  22  an expert witness, just like you're doing today; right?

4:40PM  23  **A.**   Yes, that's correct.

4:40PM  24  **Q.**   Okay.  And I'd like to take a look at that with you.

4:40PM  25          **MS. MENZIES:**  May I approach the witness, Your Honor?

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

| | | |
|---|---|---|
| 4:40PM | 1 | **THE COURT:**  Yes, you may. |
| 4:40PM | 2 | **MS. SASTRE:**  Okay. |
| 4:40PM | 3 | BY MS. SASTRE: |
| 4:40PM | 4 | **Q.**   So, Dr. Plunkett, I'm going to hand you a list of your |
| 4:40PM | 5 | prior testimony.  And if you could take a look at that. |
| 4:41PM | 6 | Are you familiar with that, ma'am? |
| 4:41PM | 7 | **A.**   Yes.  This is -- of course, this is the one from, I |
| 4:41PM | 8 | believe, our deposition.  That's correct. |
| 4:41PM | 9 | **Q.**   Okay.  Very good.  And we have created a slide that we'd |
| 4:41PM | 10 | like to take a look at. |
| 4:41PM | 11 | **A.**   Sure. |
| 4:41PM | 12 | **MR. NOLEN:**  I've not seen it. |
| 4:41PM | 13 | **MS. SASTRE:**  This is cross-examination, Your Honor. |
| 4:41PM | 14 | **THE COURT:**  I understand.  Could he see a copy? |
| 4:41PM | 15 | **MS. SASTRE:**  Oh, sure.  It's a list. |
| 4:41PM | 16 | **MR. NOLEN:**  That's fine. |
| 4:41PM | 17 | **MS. SASTRE:**  So can we bring up the slide, please.  I |
| 4:41PM | 18 | didn't see that.  Oh, I'm sorry.  It's not on my screen. |
| 4:41PM | 19 | Is it on your screen, ladies and gentlemen? |
| 4:41PM | 20 | Okay.  All right.  Very good. |
| 4:41PM | 21 | BY MS. SASTRE |
| 4:41PM | 22 | **Q.**   So it's very difficult to read, but Dr. Plunkett -- |
| 4:41PM | 23 | **MR. NOLEN:**  Your Honor, I object.  This goes back |
| 4:42PM | 24 | more than four years. |
| 4:42PM | 25 | **THE COURT:**  Let me get you all up here. |

LAURA MASSEY PLUNKETT - CROSS

4:42PM   1          (WHEREUPON, the following proceedings were held at

4:42PM   2   the bench.)

4:42PM   3          THE COURT:  She's under cross-examination.

4:42PM   4          MR. NOLEN:  I agree.

4:42PM   5          THE COURT:  So can I see the document?

4:42PM   6          MS. SASTRE:  It's just this list, Your Honor, that

4:42PM   7   she provided to us.  I'm just putting it on a single slide.

4:42PM   8   It's just to talk about the cases that she's testified in and

4:42PM   9   been paid by plaintiff lawyers.  It goes to bias, Your Honor.

4:42PM  10          THE COURT:  That's fine.  That's fine.

4:42PM  11          MS. SASTRE:  But, see, that's my --

4:42PM  12          THE COURT:  No.  Let's go.  Let's go.  Overruled.

4:42PM  13          MS. SASTRE:  Thank you, Your Honor.

4:43PM  14          (WHEREUPON, the following proceedings were held in

4:43PM  15   open court.)

4:43PM  16   BY MS. SASTRE:

4:43PM  17   Q.   Okay.  So, Dr. Plunkett, the list that I just handed

4:43PM  18   you -- I know it's a little difficult to see.

4:43PM  19          But this is the list of matters where you've provided

4:43PM  20   testimony, sworn under-oath testimony, like you're doing today,

4:43PM  21   since 2013; right?

4:43PM  22   A.   Yes.  It's both depositions and trials.  That's correct.

4:43PM  23   Q.   All right.  And you'd agree with me, for every one of

4:43PM  24   these matters since 2013, you have testified on behalf of a

4:43PM  25   plaintiff just like you're doing today; true?

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

4:43PM 1    A.   I don't recall whether all of these are, but I would say

4:43PM 2    99 percent of them are.  There might be one case in here or two

4:44PM 3    that have to do with my work in impairment that are often for

4:44PM 4    insurance defense?

4:44PM 5         But I don't recall.  I'd have to look.  I would

4:44PM 6    agree.  The overall majority would be product liability for

4:44PM 7    plaintiffs, that is -- I've done a lot of that, yes.

4:44PM 8    Q.   Okay.  And for these recent matters, you were retained and

4:44PM 9    paid by plaintiffs lawyers to serve as an expert witness; true?

4:44PM 10   A.   Yes.  I am paid for my work as an expert witness in the

4:44PM 11   litigation work I do.

4:44PM 12   Q.   And you served as an expert witness in litigation

4:44PM 13   involving Tylenol; correct?

4:44PM 14   A.   I don't know about the time frame, but I have in the past,

4:44PM 15   yes.

4:44PM 16   Q.   And you were paid by plaintiffs attorneys in that

4:44PM 17   litigation; true?

4:44PM 18   A.   Yes, I would have.  I worked for plaintiffs, so yes.

4:44PM 19   Q.   And you were paid by plaintiffs attorneys to testify in a

4:44PM 20   litigation involving a product called Vitacost; right?

4:44PM 21   A.   The product wasn't Vitacost; the company was Vitacost.

4:45PM 22   And the product was a dietary supplement that caused liver

4:45PM 23   failure in an individual.  I worked on behalf of the injured

4:45PM 24   party.

4:45PM 25   Q.   You were paid by plaintiffs lawyers in the insulin pump

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

4:45PM  1    litigation?

4:45PM  2    A.    Oh, the Medtronics case?  Yes, that's correct.  It's a

4:45PM  3    medical device.  I was working on the behalf of the injured

4:45PM  4    party.

4:45PM  5    Q.    You were paid by plaintiffs lawyers to testify in

4:45PM  6    litigation involving an antibiotic called fluoroquinolone?

4:45PM  7    A.    I'm sorry?

4:45PM  8    Q.    An antibiotic called fluoroquinolone?

4:45PM  9    A.    Yes, that's correct.

4:45PM  10   Q.    You were paid by plaintiffs lawyers to testify in

4:45PM  11   litigation involving a medication by the name of Abilify;

4:45PM  12   correct?

4:45PM  13   A.    Yes, I did work on one case involving Abilify, yes.

4:45PM  14   Q.    You were also paid by plaintiffs lawyers to testify in

4:45PM  15   litigation involving a medication by the name of Risperdal?

4:45PM  16   A.    Yes, I've worked on multiple cases involving that drug,

4:45PM  17   yes.

4:45PM  18   Q.    Okay.  And I'll just sort of run through the list.  It's

4:45PM  19   the same question.

4:45PM  20          You were retained and paid by plaintiffs lawyers in

4:46PM  21   litigation involving Androgel?

4:46PM  22   A.    Yes, I was.

4:46PM  23   Q.    Accutane, another medication; true?

4:46PM  24   A.    Yes, that's correct.

4:46PM  25   Q.    Another medication by the name of Paxil?

LAURA MASSEY PLUNKETT - CROSS

4:46PM  1   **A.**   Yes, that's correct.

4:46PM  2   **Q.**   Clozaril?

4:46PM  3   **A.**   Clozaril, yes, I've done one of those.

4:46PM  4   **Q.**   Avandia?

4:46PM  5   **A.**   Yes.

4:46PM  6   **Q.**   Children's Motrin?

4:46PM  7   **A.**   Yes, I have.

4:46PM  8   **Q.**   Seroquel?

4:46PM  9   **A.**   Yes, that's correct.

4:46PM  10  **Q.**   Xarelto?

4:46PM  11  **A.**   Yes.

4:46PM  12  **Q.**   You've even testified and been paid by plaintiffs lawyers

4:46PM  13  in litigation involving aspirin; true?

4:46PM  14  **A.**   Yes.  One individual case involving a liver injury, again,

4:46PM  15  due to aspirin.

4:46PM  16  **Q.**   Okay.  And there are others in the list.  But in the

4:46PM  17  interest of time, let me ask you this, Doctor.

4:46PM  18          Over the last 15 years, you have never testified for

4:46PM  19  a manufacturer in a product liability case?

4:46PM  20  **A.**   That's true.  I've not been asked to testify.  I haven't

4:47PM  21  been called by any.  I used to do that all the time but not

4:47PM  22  anymore.

4:47PM  23  **Q.**   Now, you are the owner of a company called Integrative

4:47PM  24  Biostrategies; right?

4:47PM  25  **A.**   Yes.

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

4:47PM 1   **Q.**   Okay.  And the last time we saw each other, when we were

4:47PM 2   in Houston together, I believe you told me that the company had

4:47PM 3   two employees.

4:47PM 4        It was you and your husband?

4:47PM 5   **A.**   Yes, that's correct.

4:47PM 6   **Q.**   Is that still the case, Doctor?

4:47PM 7   **A.**   Yes.  I hire subcontractors.  But as far as full-time

4:47PM 8   employees, it's just the two of us.

4:47PM 9   **Q.**   All right.  And you'd agree with me that, since you've

4:47PM 10  been providing consulting services -- strike that.

4:47PM 11       You'd agree with me that since you've been serving as

4:47PM 12  an expert witness in litigation, like you're doing today, that

4:47PM 13  you have been paid a very large sum of money to serve as an

4:47PM 14  expert; true?

4:47PM 15  **A.**   Well, I charge the same rate -- but I certainly -- yes.  I

4:47PM 16  have -- over the years, about half of my income per year in the

4:48PM 17  last 18 years has been due to litigation, yes.

4:48PM 18  **Q.**   And the kind of money that we're talking about -- and I

4:48PM 19  said it's a large sum money that you've been paid -- we're

4:48PM 20  talking about millions of dollars; correct?

4:48PM 21  **A.**   I believe, as I've testified recently, over 18 years, it's

4:48PM 22  been about $2 million, yes.

4:48PM 23  **Q.**   And in this case, just to be clear, you've been retained

4:48PM 24  by plaintiff's counsel; correct?

4:48PM 25  **A.**   Yes.

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

4:48PM 1 **Q.**   You're being paid for your time; true?

4:48PM 2 **A.**   Yes, I am.

4:48PM 3 **Q.**   And that will be added on to the 2 million or so that

4:48PM 4 you've already made; true?

4:48PM 5 **A.**   It will be new income.  Yes, it will be.

4:48PM 6 **Q.**   Okay.  And that's income that you share, you and your

4:48PM 7 husband; correct?

4:48PM 8 **A.**   Well, it goes to the company.  We pay a salary, and I have

4:48PM 9 expenses.  But, yes, he and I are the owners of the company.

4:48PM 10 So that's correct.

4:48PM 11 **Q.**   Let's change gears for a moment, Doctor.  Okay?

4:48PM 12 **A.**   Sure.

4:48PM 13 **Q.**   Okay.  So let's talk about the plaintiff in this case for

4:49PM 14 a moment.  All right?

4:49PM 15 **A.**   Okay.

4:49PM 16 **Q.**   Okay.  So you said -- several times on direct exam, you

4:49PM 17 said, you know, "I was sitting in the courtroom."  I did see

4:49PM 18 you sitting here today.  And, of course, I recognize you, since

4:49PM 19 we've met.

4:49PM 20       For how long have you been sitting in trial?

4:49PM 21 **A.**   Just this morning.  I haven't been -- I arrived last

4:49PM 22 night.  And this morning, at -- just for -- no, actually, I did

4:49PM 23 hear Ms. Avila.  I got here about a quarter to 9:00.

4:49PM 24 **Q.**   So you spent generally today in the courtroom?

4:49PM 25 **A.**   Yes, that's correct.  But I did not listen to the video.

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

1    I was downstairs --

2    Q.    Okay.

3    A.    -- for most of that.

4    Q.    Well, here's what I'm interested in, ma'am.

5          Have you ever met Mrs. Earnest?

6    A.    I did meet her at lunch today.

7    Q.    Okay.  And did you get a chance to talk with her?

8    A.    I just said hello and introduced myself, but we didn't

9    have any further conversation, no.

10   Q.    Do you know -- as you sit here today, do you know what

11   chemotherapy medication she took?

12   A.    I'm not case-specific.  So I have not seen her medical

13   records.  I do happen -- I've had general conversations with

14   the attorneys about the fact that she was exposed to Taxotere

15   for breast cancer, but I haven't looked across her records, no.

16   I'm not case-specific.

17   Q.    Okay.  So I didn't ask you whether you were case specific

18   or not.

19   A.    Well, that is -- I apologize that -- typically, I would

20   ask those questions if I was case-specific.

21   Q.    Okay.  But I'm going to ask you a super, super

22   straightforward question.

23         Do you know, as you sit here today, what chemotherapy

24   medications Mrs. Earnest took?  Yes or no, please.

25   A.    No, I can't give you a complete list.

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

4:50PM  1  **Q.**   You cannot even give us a partial list; right?

4:50PM  2  **A.**   I confirmed that she had taken Taxotere.  But other than

4:50PM  3  that, I can't give you a further list than that.

4:50PM  4  **Q.**   Do you know whether Mrs. Earnest is cancer-free today,

4:51PM  5  ma'am?

4:51PM  6  **A.**   Same answer.  I can't answer that.  I don't know.  I

4:51PM  7  haven't had a conversation with her.

4:51PM  8  **Q.**   You cannot ask her at all when you met her?  You didn't

4:51PM  9  say, you know, "I'm serving as an expert witness on your case.

4:51PM  10  I've been working on it for over a year now or longer, and it's

4:51PM  11  so nice to meet you.  How are you doing?"

4:51PM  12        You didn't find out the status of whether she's in

4:51PM  13  remission or not?

4:51PM  14            **MR. NOLEN:**   Objection.  402 and 403.  Relevance.

4:51PM  15            **THE COURT:**   She's under cross-examination, but I

4:51PM  16  think she's already answered the question.

4:51PM  17  BY MS. SASTRE:

4:51PM  18  **Q.**   So to be clear, you are not going to provide a single

4:51PM  19  opinion that's specific to Mrs. Earnest; right?

4:51PM  20  **A.**   Not in terms of her treatment or her diagnosis, no.  But

4:51PM  21  if she took Taxotere, what I'm talking about would be relevant

4:51PM  22  to her.  But, again, I'm not here to speak about her specific

4:51PM  23  injury as far as when it occurred or how to occurred.  No,

4:52PM  24  that's not my role.

4:52PM  25  **Q.**   Ma'am, let me ask you again.  I did not ask you if you

OFFICIAL TRANSCRIPT

4:52PM   1   were going to provide an opinion that you believe is relevant

4:52PM   2   to Mrs. Earnest.  My question is super specific.

4:52PM   3          Sitting here today, you just said you are "not

4:52PM   4   case-specific," and you just said you don't know anything about

4:52PM   5   Mrs. Earnest.

4:52PM   6          So my question, Dr. Plunkett, is straightforward:

4:52PM   7   You are not going to provide the ladies and gentlemen of this

4:52PM   8   jury a single opinion that's specific to Mrs. Earnest; true?

4:52PM   9          MR. NOLEN:  Objection.  Asked and answered.

4:52PM   10         THE COURT:  Sustained.  She answered the question --

4:52PM   11   well, you can ask her again, but --

4:52PM   12         MS. SASTRE:  I don't think I got an answer, Your

4:52PM   13   Honor.

4:52PM   14         THE COURT:  Answer the question.  Are you going to

4:52PM   15   provide a case-specific opinion about Ms. Earnest?

4:52PM   16         THE WITNESS:  I am not a case-specific expert.  So,

4:52PM   17   no, I would not be doing that.

4:52PM   18   BY MS. SASTRE:

4:52PM   19   Q.  Thank you.

4:52PM   20         Now, let's talk about your background a little bit.

4:52PM   21   All right?

4:52PM   22   A.  Okay.

4:52PM   23   Q.  Okay.  So I know we're calling you "Doctor," but I do want

4:53PM   24   to be very clear.

4:53PM   25         You're not a medical doctor; correct?

LAURA MASSEY PLUNKETT - CROSS

4:53PM  1    **A.**    That's correct.  You saw my CV.  I have a Ph.D., not an

4:53PM  2    MD.

4:53PM  3    **Q.**    And you have never been to medical school; true?

4:53PM  4    **A.**    No.  I've taught medical students, but I've never been to

4:53PM  5    medical school.

4:53PM  6    **Q.**    You don't have a medical degree; fair?

4:53PM  7    **A.**    I do not.

4:53PM  8    **Q.**    You don't treat patients?

4:53PM  9    **A.**    No, I do not.

4:53PM  10   **Q.**    And, in fact, you had never treated a patient who's had

4:53PM  11   breast cancer; right?

4:53PM  12   **A.**    That's correct.  I haven't treated any kind of patients.

4:53PM  13   **Q.**    You've never diagnosed a patient with breast cancer; true?

4:53PM  14   **A.**    That's correct, I have not.

4:53PM  15   **Q.**    And so you agree it would follow, then, that you have

4:53PM  16   never been in the position of an oncologist and had to make the

4:53PM  17   decision to determine what is the most appropriate treatment

4:53PM  18   for a patient who has breast cancer; true?

4:53PM  19   **A.**    That's true, I have not.

4:54PM  20   **Q.**    You've never made the decision to give a patient Taxotere,

4:54PM  21   obviously; right?

4:54PM  22   **A.**    That is correct, I have not.

4:54PM  23   **Q.**    Never made a decision to give a patient Taxol; right?

4:54PM  24   **A.**    That is correct, I have not.

4:54PM  25   **Q.**    Yet, you've told the ladies and gentlemen of the jury that

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

4:54PM 1  you believe that those medications, despite the fact that

4:54PM 2  you've never ever had to make a prescribable decision on either

4:54PM 3  one of them, you said they're quote, interchangeable; right?

4:54PM 4  A.   Yes.  Based on my -- the information and my review of that

4:54PM 5  information with my expertise in pharmacology and toxicology.

4:54PM 6  Q.   Dr. Plunkett, you have no idea what goes into the

4:54PM 7  decisions an oncologist makes when they are making the decision

4:54PM 8  between Taxol and Taxotere.  That is not the experience you

4:54PM 9  have, that is the training that you have; correct?

4:54PM 10  A.   That is correct.  I'm not a medical doctor.  I don't make

4:54PM 11  those decisions.

4:54PM 12  Q.   And you are not going to come here today and tell the

4:55PM 13  ladies and gentlemen of this jury that you're going to speak

4:55PM 14  for medical doctors and oncologists when you say that these

4:55PM 15  mings are interchangeable?

4:55PM 16  A.   That is correct, I'm not.  I'm here to speak about

4:55PM 17  information that would be reviewed by those physicians if they

4:55PM 18  were making their decisions, but I'm not here to make those

4:55PM 19  decisions or tell you that I'm a doctor who makes those

4:55PM 20  decisions.

4:55PM 21  Q.   You believe that you know what physicians review before

4:55PM 22  they make decisions on what medications to prescribe?

4:55PM 23  A.   I do, based on my experience.  They review the label and

4:55PM 24  they review the medical literature.

4:55PM 25  Q.   How do you know that physicians review the label?

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

4:55PM 1   A.   Because I have seen it discussed within -- within the

4:55PM 2   literature.  I also, with my FDA regulatory practice, I work

4:55PM 3   with companies that are looking at putting together information

4:55PM 4   for the prescriber.  That's what the labels are for.  I

4:55PM 5   don't -- I mean, pharmacologists and toxicologists write

4:56PM 6   labels.  That's just the way it is.

4:56PM 7   Q.   So are you telling the jury that a physician should review

4:56PM 8   the label before he prescribes a medication?

4:56PM 9   A.   No.  What I'm saying to you is that a company produces a

4:56PM 10  label in order for physicians to have information they need in

4:56PM 11  order to prescribe a drug.  And a physician will make that

4:56PM 12  decision based upon his experience, his training, what's in the

4:56PM 13  label, and probably also some of them review the literature.

4:56PM 14  Q.   But, Doctor, you would agree with me, you do not know

4:56PM 15  under what circumstances it would be appropriate for a

4:56PM 16  physician to give a patient Taxotere versus Taxol; correct?

4:56PM 17  A.   I don't make those decisions, so, no.  You would have to

4:56PM 18  ask an oncologist how they would approach it.  I'm saying I'm

4:56PM 19  here to talk about the information that they -- that is

4:56PM 20  provided to them that would form a basis for some of those

4:56PM 21  decisions they make.

4:56PM 22  Q.   Well, actually you said something a little bit different.

4:56PM 23  You said that these drugs are interchangeable.  And my question

4:56PM 24  to you, Doctor, is you have no idea of what goes in to the

4:57PM 25  decision-making process when an oncologist is deciding to give

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

4:57PM   1   Taxotere versus Taxol to a patient for breast cancer?

4:57PM   2   **A.**   I disagree with your premise, from where you started the

4:57PM   3   question.   I think the question that I answered was am I aware

4:57PM   4   of the fact that there are bodies that have made statements.

4:57PM   5   And the WHO, indeed, has said that they are interchangeable,

4:57PM   6   and I believe that's what I stated.

4:57PM   7   **Q.**   And to the extent that they are, you do not know, based

4:57PM   8   your experience as a pharmacologist and toxicologist, under

4:57PM   9   what circumstances one could be used versus the other; true?

4:57PM   10   **A.**   I don't make patient decisions.   But as a pharmacologist,

4:57PM   11   I am aware of what is in the scientific literature.   If you

4:57PM   12   wanted to go there, we can discuss some of that.

4:57PM   13   **Q.**   My question is different, Doctor.   It's based on

4:57PM   14   interchangeability.

4:57PM   15       You do not know under what circumstances Taxol or

4:57PM   16   Taxotere could be considered interchangeable because you've

4:57PM   17   never had to make that decision; true?

4:58PM   18       **MR. NOLEN:**   Objection.   Asked and answered.

4:58PM   19       **THE COURT:**   Sustained.

4:58PM   20   BY MS. SASTRE:

4:58PM   21   **Q.**   Well, let me ask you this, Dr. Plunkett.   So before your

4:58PM   22   work in this case, you've never done any work within the

4:58PM   23   litigation context related to breast cancer.

4:58PM   24       Can we agree upon that?

4:58PM   25   **A.**   That is true, yes.

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

4:58PM 1   **Q.**   Okay.  And before this case, you'd never done any work
4:58PM 2   related to alopecia or hair loss; true?
4:58PM 3   **A.**   In the litigation context, that is true.  I had not.
4:58PM 4   **Q.**   Okay.  And you'd never given any presentations or talks
4:58PM 5   when it comes to persistent hair loss; right?
4:58PM 6   **A.**   No, I have not done that.
4:58PM 7   **Q.**   And you've never given any presentations or talks on
4:58PM 8   breast cancer?
4:58PM 9   **A.**   No, I have not done that.
4:58PM 10  **Q.**   And, in fact, you have never published -- well, let me go
4:58PM 11  back.
4:58PM 12          Counsel shared -- let me do this.  I'll move it
4:59PM 13  around.  Sorry about that.
4:59PM 14          So plaintiff's counsel went through your résumé or CV
4:59PM 15  with you.  Do you recall that?
4:59PM 16  **A.**   Yes.
4:59PM 17  **Q.**   And he pointed out and shared with the jury a number of
4:59PM 18  publications that you have; right?
4:59PM 19  **A.**   Yes.
4:59PM 20  **Q.**   And you've been published fairly often; true?
4:59PM 21  **A.**   Yes.
4:59PM 22  **Q.**   All right.  But you would agree with me that you've never
4:59PM 23  published a single article on alopecia; true?
4:59PM 24  **A.**   I have not done that, no.
4:59PM 25  **Q.**   And you've never published a single study on alopecia;

LAURA MASSEY PLUNKETT - CROSS

4:59PM  1   true?

4:59PM  2   **A.**   That's true, I have not.

4:59PM  3   **Q.**   And you've never, certainly, published a paper that had

4:59PM  4   anything to do with persistent hair loss, the subject you're

4:59PM  5   talking about here today; correct?

4:59PM  6   **A.**   No, I have not published on that specifically.

4:59PM  7   **Q.**   And when it comes to breast cancer, your answers would be

4:59PM  8   the same:  You've never published a paper on breast cancer?

4:59PM  9   **A.**   That's correct.  I did not work on that in my research

4:59PM  10  career at all.

4:59PM  11  **Q.**   And before this case, whether it was in the litigation

4:59PM  12  context or in the other work that you do, Doctor, you have

5:00PM  13  never endeavored to make a comparison between Taxotere and

5:00PM  14  Taxol; true?

5:00PM  15  **A.**   Not in the way I've done it here, no.  I think I -- we

5:00PM  16  discussed in my deposition I have worked on Taxol before in my

5:00PM  17  patent work.  And Taxotere was also discussed in this

5:00PM  18  application I can think about.  But, no, I was not doing this

5:00PM  19  kind of risk assessment, that is correct.

5:00PM  20  **Q.**   Fair enough.  Thank you, Dr. Plunkett.

5:00PM  21          Now, let's change gears again for a moment.  Okay.

5:00PM  22  I'm trying to -- trying to move sort of quickly based upon the

5:00PM  23  hour of the day.  Okay, Doctor.  Get as much done as I can.

5:00PM  24  See if we can finish, perhaps.

5:00PM  25          So let's talk about Taxotere for a moment.  All

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

1   right?

2   A.   Okay.

3   Q.   Okay.  So you'd agree with me that Taxotere is a

4   life-saving chemotherapy drug; true?

5   A.   Yes.

6   Q.   And you'd agree it's been prescribed to patients for a

7   variety of cancers?

8   A.   Yes.  It has a number of different approved indications.

9   Q.   Including breast cancer?

10   A.   Yes.

11   Q.   And you'd agree also that Taxotere has shown efficacy,

12   meaning it is an effective drug, in the context of breast

13   cancer treatment; true?

14   A.   Yes.  For the indications that it has been studied for,

15   that's correct.

16   Q.   And one of those indications is the adjuvant treatment of

17   breast cancer; correct?

18   A.   Yes.

19   Q.   And you know that from the label?

20   A.   Yes.

21   Q.   And adjuvant treatment of breast cancer is treatment after

22   a patient has had an operation to remove a tumor; correct?

23   A.   Yes.  Sorry, I didn't mean to interrupt you.

24        Yes, that's correct.

25   Q.   You're fine.

LAURA MASSEY PLUNKETT - CROSS

5:01PM 1          Okay.  And in that setting, it's specifically shown

5:02PM 2    efficacy or effectiveness; right?

5:02PM 3    A.   Yes, that's correct.  Otherwise, it would not have been

5:02PM 4    approved by FDA.

5:02PM 5    Q.   Now, you'd also agree with me when it comes to breast

5:02PM 6    cancer and when it comes to chemotherapy, there is no treatment

5:02PM 7    that is 100 percent risk-free?

5:02PM 8    A.   That is true.

5:02PM 9    Q.   And the potential for side effects depends upon the type

5:02PM 10   of drug given to a patient; right?

5:02PM 11   A.   Well, I'm -- if you're meaning chemotherapy drugs, I said

5:02PM 12   all of them -- all have side effects.  But if you mean a very

5:02PM 13   specific side effect potential, are you asking me?

5:02PM 14   Q.   Well, I'm asking you that the potential for side effects

5:02PM 15   depends upon the type of drug given just generally, first.

5:02PM 16   A.   Yes, I would say they could have different profiles, if

5:02PM 17   that's what you mean.  Yes.

5:02PM 18   Q.   Okay.  And then if you -- if we got sort of more focused,

5:03PM 19   even within the chemotherapy drugs, the potential for side

5:03PM 20   effects also can depend upon the drug given; correct?

5:03PM 21   A.   Yes, I would say they all have side effects,

5:03PM 22   unfortunately, because you're killing cells so you're going to

5:03PM 23   have side effects.

5:03PM 24   Q.   Sure.  But the side effects amongst them are not uniform;

5:03PM 25   true?

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

5:03PM   1   **A.**   No, that's true.

5:03PM   2   **Q.**   They vary as far as the type of side effects; right?

5:03PM   3   **A.**   They can.

5:03PM   4   **Q.**   They vary as far as the severity; correct?

5:03PM   5   **A.**   Yes.

5:03PM   6   **Q.**   They vary as far as the longevity of the side effect;

5:03PM   7   true?

5:03PM   8   **A.**   For some things, yes.

5:03PM   9   **Q.**   Sure.  And then it can even vary further from patient to

5:03PM  10   patient.  Can we agree upon that?

5:03PM  11   **A.**   Yes.  And that's an issue for this drug, yes.

5:03PM  12   **Q.**   Now, you said that you did a literature search; right?

5:03PM  13   **A.**   Yes.

5:03PM  14   **Q.**   And you were looking at published literature concerning

5:03PM  15   Taxotere; correct?

5:03PM  16   **A.**   Yes.

5:03PM  17   **Q.**   And your search was focused, of course, primarily on hair

5:04PM  18   loss issues; is that fair?

5:04PM  19   **A.**   The search I did related to that.  I mean, I did some

5:04PM  20   general searches on Taxotere, pharmacology and toxicology too.

5:04PM  21   **Q.**   Okay.  And in the searching that you did, you were unable

5:04PM  22   today to identify a single peer-reviewed publication which

5:04PM  23   concluded that the risks of Taxotere outweigh the benefits;

5:04PM  24   correct?

5:04PM  25   **A.**   No, I don't -- I would agree -- I don't mean, no, that

OFFICIAL TRANSCRIPT

5:04PM  1  you're wrong.  No, I did not.

5:04PM  2          You're correct, there's not a paper I can point you

5:04PM  3  to that draws that specific conclusion.  That's true.

5:04PM  4  Q.  Okay.  And let me make sure -- I just want to make sure we

5:04PM  5  get it clear.

5:04PM  6          In all of your searching and reading of the

5:04PM  7  literature, you did not see anything that was published and

5:04PM  8  peer-reviewed that says, when it comes to Taxotere, the risks

5:04PM  9  are greater than the benefits; true?

5:04PM  10  A.  Yes.  That's true.  It's an FDA-approved medication.  So

5:04PM  11  if it -- that happened, that would be a big problem.

5:05PM  12  Q.  Let's change gears again.  Okay?

5:05PM  13  A.  Uh-huh.

5:05PM  14  Q.  Let's talk about alopecia for a moment.

5:05PM  15  A.  Okay.

5:05PM  16  Q.  All right.  So alopecia, or hair loss, is a well-known

5:05PM  17  side effect of cancer medicines; true?

5:05PM  18  A.  Yes.  As in the reversible kind, that's exactly right.

5:05PM  19  Q.  Well, you would agree with me that "alopecia" is a medical

5:05PM  20  term for hair loss?

5:05PM  21  A.  Yes.  That's correct.  If you're talking about the actual

5:05PM  22  loss part, that is true.  I would agree.

5:05PM  23  Q.  And the term "alopecia" does not indicate if someone's

5:05PM  24  hair will grow back or not; true?

5:05PM  25  A.  No, that's -- well, I would agree that the term doesn't

5:05PM 1 use that as part of the definition.  It is essentially hair

5:05PM 2 loss.  That is true.

5:05PM 3 **Q.**   Correct.

5:06PM 4         And you would agree with me as well that the term

5:06PM 5 "alopecia" was in the Taxotere label from 1996 all the way

5:06PM 6 through 2011; correct?

5:06PM 7 **A.**   Yes.  The word "alopecia" is there.

5:06PM 8 **Q.**   Okay.  And I'm focusing on 2011 because, you may not know

5:06PM 9 it, but that's when Mrs. Earnest has her treatment.  Okay?

5:06PM 10 **A.**   I actually did know that, yes.  That's correct.

5:06PM 11 **Q.**   Okay.  And that word "alopecia" has always been contained

5:06PM 12 in the Taxotere labels during that period; correct?

5:06PM 13 **A.**   Yes.  As an adverse event or adverse reaction, yes.

5:06PM 14 **Q.**   Okay.  I think I'd like to use the chart, if I can pull

5:06PM 15 over the flip board for a moment.

5:06PM 16         **THE COURT:**  Sure.

5:07PM 17 BY MS. SASTRE:

5:07PM 18 **Q.**   All right.  Dr. Plunkett, thanks for bearing with me for a

5:07PM 19 moment.

5:07PM 20         So let's just get a couple things down on here.

5:07PM 21 Okay?

5:07PM 22 **A.**   I'm sorry.

5:07PM 23 **Q.**   You said "alopecia" means hair loss; right?

5:07PM 24 **A.**   That's the definition, yes.

5:07PM 25 **Q.**   Okay.  And then you agreed that that term does not

LAURA MASSEY PLUNKETT - CROSS

5:08PM  1   indicate whether someone's hair will grow back; correct?

5:08PM  2           You just said that a moment ago.

5:08PM  3   A.   By strict definition, that is true.

5:08PM  4   Q.   Okay.  Okay.  And then, of course, we already talked about

5:08PM  5   it, but you said it was in the label all the way through '96 to

5:08PM  6   2011; correct?

5:08PM  7   A.   Yes.

5:08PM  8   Q.   Okay.

5:08PM  9   A.   The word "alopecia" is in the label.  That is true.

5:08PM  10  Q.   Now, hair loss after Taxotere is usually reversible; true?

5:08PM  11  A.   It depends how you define "usually," but I would agree

5:09PM  12  that it -- in the majority of the patients, yes, that is true.

5:09PM  13  When you look at the fact that percentage is less than

5:09PM  14  10 percent majority, yes.

5:09PM  15  Q.   Okay.  And when you said that you agreed with me that hair

5:09PM  16  loss after Taxotere is usually reversible, that's based upon

5:09PM  17  the work and the research and the studying you did and the

5:09PM  18  literature you reviewed; correct?

5:09PM  19  A.   Yes.  But there's a different condition that is also

5:09PM  20  pertinent here, but I would agree that on that issue, yes, that

5:09PM  21  is true.  Most of the patients that happens, but not all.

5:09PM  22  Q.   Okay.  And, in fact, ma'am, it's your opinion, in this

5:09PM  23  very case, that hair loss after Taxotere is generally

5:09PM  24  reversible as well; true?

5:09PM  25  A.   That's true.  But, again, there is a population of people

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

1  where it does not do that.

2  Q.   Sure.  Okay.

3        Okay.  So I'm putting a Dr. P over there.  I ran out

4  of space.

5        So these are the words you just used.  "Hair loss

6  after Taxotere is usually reversible and generally reversible."

7        Now, you'd agree that when it comes to hair loss and

8  Taxotere that hair after Taxotere use generally grows back;

9  true?

10  A.   I would agree that alopecia is generally reversible, but

11  Taxotere has the ability to do two things, to cause hair loss

12  but also to prevent regrowth.

13  Q.   I'm going to ask you once more, and I'm going to be very

14  specific.  Okay?

15        You'd agree with me that -- that hair loss after

16  Taxotere use, that it generally grows back; true?

17  A.   It you're talking about the effect as in the initial --

18  initial injury called drug-induced alopecia, yes, that

19  typically is reversible.

20  Q.   Doctor, do you recall we talked about your deposition was

21  taken in case; right?

22  A.   Yes.

23  Q.   And you were under oath?

24  A.   Yes.

25  Q.   Just like you are today; correct?

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

| | | |
|---|---|---|
| 5:11PM | 1 | **A.** Yes. |
| 5:11PM | 2 | **Q.** Okay. Can you take a look with me, if you go to page 287, |
| 5:11PM | 3 | please, of your deposition. |
| 5:12PM | 4 | **MR. NOLEN:** Objection, Your Honor. It's improper |
| 5:12PM | 5 | impeachment. |
| 5:12PM | 6 | **THE COURT:** Well, I don't know what she said in her |
| 5:12PM | 7 | deposition. |
| 5:12PM | 8 | **MR. NOLEN:** I do. It's inconsistent. |
| 5:12PM | 9 | **THE COURT:** Well, I have to see it. |
| 5:12PM | 10 | **BY MS. SASTRE:** |
| 5:12PM | 11 | **Q.** You're on 287, Doctor? |
| 5:12PM | 12 | **THE COURT:** I think there's an objection. |
| 5:12PM | 13 | **MS. SASTRE:** Do you want to take a look at it, Judge? |
| 5:12PM | 14 | **THE COURT:** Let me look at it. |
| 5:12PM | 15 | **MS. SASTRE:** Okay. |
| 5:12PM | 16 | **THE WITNESS:** I see my answer -- |
| 5:12PM | 17 | **THE COURT:** Wait. |
| 5:12PM | 18 | **THE WITNESS:** I'm sorry. I apologize. |
| 5:13PM | 19 | **THE COURT:** I'm going to allow you to ask the |
| 5:13PM | 20 | question. |
| 5:13PM | 21 | **BY MS. SASTRE:** |
| 5:13PM | 22 | **Q.** Okay. Dr. Plunkett, so let's just go back to where we |
| 5:13PM | 23 | were. If you take a look at your deposition. And I'm looking |
| 5:13PM | 24 | at page 287, line 23. |
| 5:13PM | 25 | Are you with me, ma'am? |

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

5:13PM   1   **A.**   Yes, I thought it was the one above you were looking at.

5:13PM   2   But, yes, I can see you there too.  You asked the question a

5:13PM   3   different way.  But, yes, a similar question.

5:13PM   4   **Q.**   Well, let me see -- let me see if we're literally and

5:14PM   5   figuratively on the same page.  Okay?

5:14PM   6   **A.**   Okay.

5:14PM   7   **Q.**   All right.  So I asked you:

5:14PM   8            "Q.  Would you agree with me that hair loss -- the

5:14PM   9        hair loss after Taxotere, that it generally grows back;

5:14PM   10       true?"

5:14PM   11           And your answer:

5:14PM   12           "A.  Based on the clinical data that they have and

5:14PM   13       you -- if you -- if you talk about the word 'generally' as

5:14PM   14       defined by a rate 90 percent, yeah, it's true because

5:14PM   15       that's what the study showed."

5:14PM   16           Did I read it correctly, ma'am?

5:14PM   17   **A.**   You did.

5:14PM   18   **Q.**   Okay.  So --

5:14PM   19           **THE COURT:**  Okay.  Now, let's take it off.

5:14PM   20           **MS. SASTRE:**  Got it.  I'll take it down, Your Honor.

5:14PM   21           **THE COURT:**  Thank you.

5:14PM   22   BY MS. SASTRE:

5:14PM   23   **Q.**   Okay.  Okay.  So I just put those words down, "generally

5:15PM   24   grows back."  And as you've said, that's what you saw in the

5:15PM   25   studies and what the some of the data showed; right?

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

5:15PM  1   **A.**   By using the 90 percent level that I referred to, yes,

5:15PM  2   that's true.

5:15PM  3   **Q.**   Okay.  And you would agree with me that in 2004, Taxotere

5:15PM  4   was approved for operable breast cancer in the adjuvant

5:15PM  5   setting; correct?

5:15PM  6   **A.**   Yes, I believe it was node-positive, but, yes, that's

5:15PM  7   true.

5:15PM  8   **Q.**   And you reviewed that label; correct?

5:15PM  9   **A.**   Yes.

5:15PM  10  **Q.**   Okay.  And you would agree with me that the 2004 Taxotere

5:15PM  11  label, which was the approval for the treatment in the adjuvant

5:15PM  12  setting for operable breast cancer, stated "hair generally

5:15PM  13  grows back"; true?

5:15PM  14          **MR. NOLEN:**  Objection.  Your Honor.  Exceeds the

5:15PM  15  scope of direct.

5:15PM  16          **THE COURT:**  I think we need to look at the rules.

5:15PM  17          **MR. NOLEN:**  Your Honor, may I approach?

5:15PM  18          (WHEREUPON, the following proceedings were held at

5:15PM  19  the bench.)

5:16PM  20          **THE COURT:**  Do you really want to open that door?

5:16PM  21          **MS. SASTRE:**  I'm not following, Judge.

5:16PM  22          **THE COURT:**  Well, you asked all about labeling that

5:16PM  23  you didn't want -- there's the *Daubert* motion that she was not

5:16PM  24  to give any opinions about what was in the label, what the

5:16PM  25  label should have said, what the label meant.  And you're

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

5:16PM 1    questioning her about labels and what they mean.

5:16PM 2            MR. NOLEN:  And, Your Honor, if I could just

5:16PM 3    respectfully point out, I didn't ask her one word about the

5:16PM 4    label.

5:16PM 5            THE COURT:  I know that.

5:16PM 6            MS. SASTRE:  Your Honor, the issue that we were

5:16PM 7    talking about before was the idea of counsel using obviously

5:16PM 8    these other documents that had nothing to do with her opinions.

5:16PM 9    So on cross-exam, it's simply to say she has written in her

5:16PM 10   report these words, and it does go to the rate.  And so she did

5:17PM 11   review the label.  It's part of her reliance list, and in terms

5:17PM 12   of the rate and whether she says it's common.  It's just a

5:17PM 13   single question on that, those are the words there.

5:17PM 14           THE COURT:  I know, but you asked more questions

5:17PM 15   about the label.  And I'm wondering, do you want to open the

5:17PM 16   door so that they're entitled on redirect to ask her about

5:17PM 17   whether or not this labeling says "permanent alopecia."

5:17PM 18           MS. SASTRE:  Well, the only question I was going to

5:17PM 19   ask her is the one that I just did, and that was going to be

5:17PM 20   it.  Because I haven't asked anything about the label yet,

5:17PM 21   Judge.  I just asked her based on her opinions those other

5:17PM 22   questions.  Those are straight from her depo.  She said when

5:17PM 23   you take Taxotere, your hair generally grows back.  It usually

5:17PM 24   grows back.  It's generally reversible.

5:17PM 25           THE COURT:  I understand what she said in the

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

5:17PM 1    deposition, but we got to concern ourselves with what was part

5:17PM 2    of the testimony.

5:17PM 3                **MS. SASTRE:**  Right.

5:17PM 4                **THE COURT:**  Because this -- this *Daubert* motion

5:17PM 5    related to how we were going to limit her trial testimony, not

5:17PM 6    her deposition testimony.  That's -- that's water under the

5:17PM 7    bridge in my view.

5:18PM 8                **MS. SASTRE:**  Okay.  I can move on.

5:18PM 9                **THE COURT:**  You better.

5:18PM 10               **MS. SASTRE:**  I will, Judge.

5:18PM 11               **THE COURT:**  Because I got to tell you, I don't know

5:18PM 12   if you haven't already opened the door.

5:18PM 13               **MS. SASTRE:**  Well, I haven't asked her about the --

5:18PM 14   there's an objection on -- it was one question, Your Honor.

5:18PM 15   She reviewed the label.  But I'll move on, Judge.

5:18PM 16               **THE COURT:**  But --

5:18PM 17               **MR. NOLEN:**  If I could just speak to this.  She

5:18PM 18   actually asked -- Ms. Sastre actually asked her had she

5:18PM 19   reviewed the label, which I did not.  She asked her was

5:18PM 20   alopecia in the label, which I did not ask the witness.  She

5:18PM 21   asked, has it always been the label, which I did not ask the

5:18PM 22   witness.

5:18PM 23               I think the door is swinging wide open, and I

5:18PM 24   fully intend to ask whether "permanent alopecia" has ever been

5:18PM 25   in the label because she asked those questions.

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

<div style="margin-left:2em">

5:18PM  1         **MS. SASTRE:**  Well, if that's what's going to happen,

5:18PM  2    then I would like an answer to my last question.

5:18PM  3         **THE COURT:**  You're entitled to that answer, but

5:18PM  4    that's what's going to happen.  Because I think -- very

5:19PM  5    frankly, I was a little bit surprised.

5:19PM  6         **MS. SASTRE:**  Okay.

5:19PM  7         **MR. NOLEN:**  We were too, Judge.

5:19PM  8         **THE COURT:**  You opened the door.

5:19PM  9         (WHEREUPON, the following proceedings were held in

5:19PM  10    open court.)

5:19PM  11         **THE COURT:**  Please answer the question, ma'am.

5:19PM  12    **BY MS. SASTRE:**

5:19PM  13    **Q.**   Would you like me to repeat it?

5:19PM  14    **A.**   Please.

5:19PM  15    **Q.**   Okay.  I'd be happy to.

5:19PM  16         Dr. Plunkett, my question to you was:  You would

5:19PM  17    agree with me that the 2004 Taxotere label, which was the label

5:19PM  18    that approved for Taxotere in the adjuvant setting, said "hair

5:19PM  19    generally grows back"?

5:19PM  20    **A.**   Yes, that's true.

5:19PM  21    **Q.**   Okay.  Okay.

5:20PM  22         We'll move on to a new topic, Doctor.

5:20PM  23         Now, if I understand what you did, you did a risk

5:20PM  24    analysis; true?

5:20PM  25    **A.**   Yes.

</div>

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

5:20PM  1  **Q.**   And you were focused on the risk of hair loss; correct?

5:20PM  2  **A.**   That's what -- what I've been talking about, yes, that's

5:20PM  3  true.

5:20PM  4  **Q.**   Okay.  And it's your opinion after conducting that

5:20PM  5  analysis that Taxotere as a greater risk of hair loss compared

5:20PM  6  to other chemotherapy medications; correct?

5:20PM  7  **A.**   Permanent or irreversible hair loss, yes.  That's why I

5:21PM  8  had the first opinion about there's a distinction between

5:21PM  9  general hair loss due to drugs and permanent or irreversible.

5:21PM  10  **Q.**   Okay.  But you would agree with me that there are many

5:21PM  11  chemotherapy drugs associated with hair loss or alopecia; true?

5:21PM  12  **A.**   If you're talking about reversible or the drug-induced

5:21PM  13  reversible type, yes, that is correct.  Almost anything that's

5:21PM  14  going to kill cells will do that.

5:21PM  15  **Q.**   Can you take a look at your deposition again, please.

5:21PM  16  Page 15, line 6, Doctor.  Let me know when you're there.

5:21PM  17  **A.**   Yes, I'm there.

5:21PM  18  **Q.**   Okay.  Very good.

5:21PM  19        You were asked:

5:21PM  20        "Q.  Let me ask you this:  You agree with me that

5:21PM  21     there are many chemotherapy drugs that are associated with

5:21PM  22     hair loss or alopecia; true?"

5:22PM  23        And your answer:

5:22PM  24        "A.  Yes, that's true."

5:22PM  25        Did I read that correctly?

OFFICIAL TRANSCRIPT

858

LAURA MASSEY PLUNKETT - CROSS

5:22PM 1  **A.**   You did.

5:22PM 2  **Q.**   All right.  Now --

5:22PM 3          **THE COURT:**  The jury can make a determination whether

5:22PM 4  that was --

5:22PM 5          **MS. SASTRE:**  I'm sorry, Your Honor?

5:22PM 6          **THE COURT:**  Mr. Nolen was standing up to object, and

5:22PM 7  I overruled him before he got to say it.

5:22PM 8          **MS. SASTRE:**  I thought you were telling me something.

5:22PM 9  Okay.  All right.  No problem.  Thank you, Judge.

5:22PM 10 **BY MS. SASTRE:**

5:22PM 11 **Q.**   Okay.  Let's do this, Dr. Plunkett.  So let's talk about

5:22PM 12 that a little further.  Okay.

5:22PM 13          When you say that there's a group of chemotherapy

5:22PM 14 drugs and they're associated with hair loss, I'd like to make a

5:22PM 15 list with you.  Can we do that?

5:22PM 16 **A.**   Sure.

5:22PM 17 **Q.**   Okay.  Great.  So first let's start with Taxol.  Okay.  Is

5:22PM 18 Taxol associated with hair loss as a chemotherapy drug?

5:22PM 19 **A.**   Yes.  It is if you're -- and I assume -- but I want to

5:22PM 20 make sure we understand when I'm talking here, I'm talking

5:23PM 21 about drug-induced hair loss, which is the -- not the same as

5:23PM 22 permanent alopecia.  It's two different things.

5:23PM 23 **Q.**   We're going make a list.  The next thing we'll talk about

5:23PM 24 is whether those drugs with associated with persistent or

5:23PM 25 permanent alopecia.  Okay?

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

5:23PM  1    A.    Okay.  So we're not doing just drug-induced alopecia, or

5:23PM  2    you are -- are you going to do both?

5:23PM  3    Q.    We're going to do both.  We're going to take it one step

5:23PM  4    at a time.  Okay?

5:23PM  5    A.    Okay.  That's fine.

5:23PM  6    Q.    Okay.  Very good.  So, Doctor, first, with regard to

5:23PM  7    Taxol, you would agree with me that Taxol has been associated

5:23PM  8    with alopecia; correct?

5:23PM  9    A.    Drug-induced reversible alopecia, yes, it has.

5:23PM  10   Q.    Okay.  So I'm going to write "Taxol" here.

5:23PM  11         You would agree with me that Adriamycin has also been

5:24PM  12   associated with alopecia or hair loss; correct?

5:24PM  13   A.    Yes.  It's the same drug as doxorubicin, but that's right.

5:24PM  14   Q.    Okay.  Did you know that Ms. Earnest took Adriamycin?  You

5:24PM  15   didn't; right?

5:24PM  16   A.    I didn't know her therapy.  But I assumed, if she was

5:24PM  17   taking Taxol, she was on the combination regimen, which would

5:24PM  18   include that.

5:24PM  19   Q.    Okay.  So Adriamycin is on our list.  All right.

5:24PM  20         You would agree with me that Cytoxan has been

5:24PM  21   associated with alopecia; correct?

5:24PM  22   A.    Yes, it has.  This drug-induced alopecia, yes.

5:24PM  23   Q.    And you'd also agree with me that a drug by the name of

5:24PM  24   5-FU or 5-fluorouracil has also been associated with alopecia;

5:24PM  25   correct?

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

5:24PM 1  A.    Yes, with the reversible drug-induced, it has.

5:24PM 2  Q.    Okay.  And that's a drug that's frequently used in

5:25PM 3  combination with place and Cytoxan; correct?

5:25PM 4  A.    Yes.  It was part of the clinical trials.  The FAC was

5:25PM 5  5-FU, Adriamycin, Cytoxan.  And then the other, TAC, was,

5:25PM 6  instead of 5-FU, Taxol.

5:25PM 7  Q.    Okay.  So I'll write "5-FU" here.  Okay.

5:25PM 8        And that was the as you said the first drug if one of

5:25PM 9  the arms of the TAX 316 clinical trial; correct?

5:25PM 10  A.    It was an interchangeable drug.  You took Taxol or you

5:25PM 11  took 5-FU, and the other drugs were the same.

5:25PM 12  Q.    And because it's almost 5:30 and I'm sure everyone's

5:25PM 13  tired, you would agree with me there's other drugs we could put

5:25PM 14  on that list; right?

5:25PM 15  A.    Yes.  Many drugs used to kill cancer cells will cause

5:25PM 16  drug-induced alopecia, hair loss.  It's common as a reversible

5:25PM 17  side effect.

5:26PM 18  Q.    Okay.  Now, let's move on to the next step in the chart

5:26PM 19  that we're making.  Okay?

5:26PM 20  A.    Okay.

5:26PM 21  Q.    So you would agree with me that you identified permanent

5:26PM 22  hair loss as a hazard, a hazard of the Taxol; correct?

5:26PM 23  A.    There are some case reports, yes.  That's true.

5:26PM 24  Q.    Okay.  So I wrote "persistent" here.  I'm going to change

5:26PM 25  it.  I'm going to write "permanent."  Okay?

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

5:26PM  1   A.   I think the reports would fit either definition.

5:26PM  2   Sometimes it's called one and sometimes it's called the other.

5:26PM  3   Q.   Okay.  But let me just be clear.  When it came to Taxol

5:26PM  4   and the research and the work you did, you specifically

5:26PM  5   identified permanent hair loss as a hazard of Taxol; true?

5:26PM  6   A.   Within case reports, yes.  There were some case reports.

5:27PM  7   Q.   Let's talk about Adriamycin.  You identified permanent

5:27PM  8   hair loss as a hazard of Adriamycin; correct?

5:27PM  9   A.   Same answer.  There are some case reports for that as

5:27PM  10  well.  Not as many, but there are some.

5:27PM  11  Q.   But it's something you saw in the literature; correct?

5:27PM  12  A.   Yes, there are some case reports.

5:27PM  13  Q.   Okay.  And if we move to Cytoxan -- well, let me actually

5:27PM  14  stop for a moment.

5:27PM  15       Did you review the Adriamycin label?

5:27PM  16  A.   I believe that was on my reliance materials, yes.

5:27PM  17  Q.   Okay.

5:27PM  18  A.   I think I tell you that in my report, that I looked at the

5:27PM  19  labeling for the drugs that were used in combination with

5:27PM  20  Taxotere.

5:27PM  21  Q.   Okay.  And did you see that it says "reverse complete

5:27PM  22  alopecia occurs in most cases"?

5:27PM  23  A.   I don't recall the words.  I would have to pull it back

5:27PM  24  out.  But let me look at my report.  I might have it in here,

5:27PM  25  if you want me to -- I just don't recall the specific wording

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

5:27PM   1   in the label.

5:28PM   2   **Q.**   Okay.   Do you have any -- does that sound familiar to you?

5:28PM   3   Do you know one way or the other?   Does that sound right?

5:28PM   4   **A.**   I don't recall the specific wording, no.   I'm sorry, I

5:28PM   5   don't.

5:28PM   6   **Q.**   Okay.

5:28PM   7           **MS. SASTRE:**   Your Honor, may I approach?

5:28PM   8           **THE COURT:**   Sure.

5:28PM   9           **MS. SASTRE:**   Counsel?   There you are.

5:28PM   10           There you go, Rand.

5:28PM   11           **MR. NOLEN:**   Your Honor, objection.   We're now talking

5:28PM   12   about the labeling of another product, doxorubicin.

5:28PM   13           **MS. SASTRE:**   Of course.

5:28PM   14           **THE COURT:**   I'm going to let her ask the question.

5:28PM   15           **MS. SASTRE:**   Can we come up for a moment, Judge?

5:29PM   16           **THE COURT:**   Sure.

5:29PM   17           (WHEREUPON, the following proceedings were held at

5:29PM   18   the bench.)

5:29PM   19           **MS. SASTRE:**   Your Honor, her primary opinion is that

5:29PM   20   there's a higher rate of permanent or persistent hair loss with

5:29PM   21   Taxotere compared to other drugs.

5:29PM   22           **THE COURT:**   Right.

5:29PM   23           **MS. SASTRE:**   So this is just simply going to the fact

5:29PM   24   that there is a real rate and even a warning in the label for

5:29PM   25   Adriamycin that it is associated with irreversible hair loss.

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

5:29PM 1   It goes to her comparison opinion and nothing to do with what

5:29PM 2   we were talking about earlier.

5:29PM 3           MR. NOLEN:  Your Honor, she -- Ms. Sastre objected to

5:29PM 4   all the labeling.

5:29PM 5           MS. SASTRE:  No, I didn't say that.

5:29PM 6           THE COURT:  But at the end of the day, the testimony

5:29PM 7   that came in that you offered was that she was a general

5:30PM 8   causation expert that was -- there's a greater risk of

5:30PM 9   permanent alopecia with Taxotere than other drugs.  If she's

5:30PM 10  got a warning in this label, I think she's entitled to cross

5:30PM 11  her on it.

5:30PM 12          MS. SASTRE:  Yeah.  If I could mention just while

5:30PM 13  we're here on timing, I have, like, a few more things I'd like

5:30PM 14  to finish that's right on this slide, but then I'm just kind of

5:30PM 15  getting going, Judge.  So I have more to do.  And really, I

5:30PM 16  could keep them here another hour.

5:30PM 17          MR. NOLEN:  Which part of the labeling?

5:30PM 18          MS. SASTRE:  I'm going to finish her cross unless

5:30PM 19  you're going to keep them late.

5:30PM 20          MR. NOLEN:  Which part of the label are you referring

5:30PM 21  to?

5:30PM 22          THE COURT:  She said --

5:30PM 23          MS. SASTRE:  Page 21, adverse reactions.

5:30PM 24          So would you like me to go for a few more

5:30PM 25  minutes and break, Judge?

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

| | | |
|---|---|---|
| 5:30PM | 1 | **MR. NOLEN:**  No, I would appreciate it if she could |
| 5:30PM | 2 | finish with the witness. |
| 5:30PM | 3 | **THE COURT:**  Let's see how far we can go. |
| 5:31PM | 4 | **MS. SASTRE:**  Judge, I'm -- |
| 5:31PM | 5 | **THE COURT:**  Let's just see how far we can go. |
| 5:31PM | 6 | **MS. SASTRE:**  Okay.  Okay.  You let me know, Your |
| 5:31PM | 7 | Honor.  That's fine. |
| 5:31PM | 8 | (WHEREUPON, the following proceedings were held in |
| 5:31PM | 9 | open court.) |
| 5:31PM | 10 | **THE COURT:**  We're just going to have to go a little |
| 5:31PM | 11 | bit late tonight.  Is there anybody with a significant problem? |
| 5:31PM | 12 | **THE JUROR:**  I only paid parking until 5:00. |
| 5:31PM | 13 | **THE COURT:**  Okay.  We're going to take, then, a |
| 5:31PM | 14 | recess to get everybody to go pay their parking. |
| 5:31PM | 15 | All right.  Court will be at recess for 15 |
| 5:31PM | 16 | minutes. |
| 5:31PM | 17 | **THE DEPUTY CLERK:**  All rise. |
| 5:31PM | 18 | (WHEREUPON, the Court took a recess.) |
| 5:43PM | 19 | **THE DEPUTY CLERK:**  All rise. |
| 5:43PM | 20 | (WHEREUPON, the jury entered the courtroom.) |
| 5:43PM | 21 | **THE COURT:**  All jurors are present.  Court's back in |
| 5:43PM | 22 | session.  You may be seated. |
| 5:43PM | 23 | Dr. Plunkett, I'll remind you you're under oath. |
| 5:44PM | 24 | Ms. Sastre, please continue. |
| 5:44PM | 25 | **MS. SASTRE:**  Yes, ma'am.  Thank you very much, Your |

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

5:44PM 1    Honor.

5:44PM 2    **BY MS. SASTRE:**

5:44PM 3    **Q.**   Dr. Plunkett, just before we broke, I had handed you the

5:44PM 4    label for Adriamycin, and I was going to direct you to a

5:44PM 5    specific page, page 21, please.

5:44PM 6    **A.**   I'm there, yes.

5:44PM 7    **Q.**   You're there.  Okay.  Very good.

5:44PM 8           This is something you reviewed as part of your work

5:44PM 9    in this case; correct?

5:44PM 10   **A.**   Not this specific year, but I did cite to three other

5:44PM 11   years of labels, yes.

5:44PM 12   **Q.**   And you see that it states here in the Adriamycin label

5:44PM 13   "complete reversible alopecia occurs in most cases."  Correct?

5:44PM 14   **A.**   Yes.  Which is consistent with my report.

5:44PM 15   **Q.**   Okay.  And you'd agree when it says "reversible in most

5:44PM 16   cases," that Adriamycin labeling does not say that hair loss is

5:44PM 17   reversible in all cases; true?

5:44PM 18   **A.**   No, I --

5:44PM 19          **MR. NOLEN:**  Objection.  Mischaracterizes the

5:44PM 20   document.

5:44PM 21          **THE COURT:**  I'm going to let her -- I think

5:44PM 22   Dr. Plunkett was getting ready to answer that question.

5:45PM 23   Overruled.

5:45PM 24          **THE WITNESS:**  I disagree with that.  That's not what

5:45PM 25   this sentence means.  Do you want me to explain?

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

BY MS. SASTRE:

Q.   Well, let me -- let me go back and see if we can figure it out together.  The sentence "Reversible alopecia" -- excuse me, the sentence "Reversible alopecia occurs in most cases," it does not follow that alopecia is reversible in all cases.

Do you agree with that, Doctor?

A.   No.

MR. NOLEN:  Objection.  It mischaracterizes.  She has not read the document appropriately.

THE COURT:  Well, that's -- I think the witness needs to answer that question.

Overruled.

THE WITNESS:  That's not what the sentence says.  It says "Reversible complete alopecia occurs in most cases," which is consistent with my statement, which is that these -- these -- this is a drug that is almost always associated with alopecia due to drug-induced temporary hair loss.  That's what this statement is about.  It is not addressing permanent.  I disagree with you.

BY MS. SASTRE:

Q.   Okay.  So you have, according to the -- well, let's go back for a moment.

You found in the literature reports of permanent hair loss associated with Adriamycin; right?

A.   I found, I think, one or two case reports, yes.

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

5:46PM  1   **Q.**   So you've got a set of hair loss cases, right?  If you
5:46PM  2   were to make a circle, associated with Adriamycin use.  Okay.
5:46PM  3   Are you with me so far?
5:46PM  4   **A.**   I think -- but are you talking all types of alopecia or
5:46PM  5   are you doing now temporary, reversible or permanent?  So that
5:46PM  6   makes a difference on the universe of things that we talk
5:46PM  7   about.
5:46PM  8   **Q.**   I'm talking about all.
5:46PM  9   **A.**   Okay.
5:46PM  10  **Q.**   Adriamycin.  All Adriamycin hair loss.  Okay.
5:46PM  11  **A.**   Both reversible and permanent.
5:46PM  12  **Q.**   Okay.  Are you with me?
5:46PM  13  **A.**   I am.
5:46PM  14  **Q.**   Now, within that circle, for most of the folks in that
5:47PM  15  circle, their hair loss is reversible.  Are you with me so far?
5:47PM  16  **A.**   I don't think I would put it quite that way.  Do you want
5:47PM  17  me to explain?
5:47PM  18  **Q.**   I just want you to follow with me, please.
5:47PM  19          For most of the people within the Adriamycin alopecia
5:47PM  20  circle, their hair loss is reversible.  Okay?
5:47PM  21          **THE COURT:**  Are you asking her -- are you giving her
5:47PM  22  a hypothetical?
5:47PM  23          **THE WITNESS:**  Is this a hypothetical?
5:47PM  24  **BY MS. SASTRE:**
5:47PM  25  **Q.**   Yes, do you follow what I'm saying?

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

5:47PM    1   **A.**    If you want to make a hypothetical, I can -- I can follow

5:47PM    2   you.  Hypothetically, we can consider that, yes.

5:47PM    3   **Q.**    Okay.  And then there would be a group of people within

5:47PM    4   the Adriamycin circle of hair loss whose hair loss was not

5:47PM    5   reversible.  So for most of them, it's reversible; and for some

5:47PM    6   of them, it's not reversible.

5:47PM    7        Do you follow me so far?  Are you with me?

5:47PM    8   **A.**    In your hypothetical, I am following you.

5:47PM    9   **Q.**    Yes, ma'am.

5:47PM   10        And isn't that exactly the situation described by the

5:48PM   11   Adriamycin label when it says "reverse complete alopecia occurs

5:48PM   12   reversible hair loss in most cases."  True?

5:48PM   13   **A.**    I disagree with that.  I don't think that is -- that is

5:48PM   14   not what this says compared to your hypothetical.

5:48PM   15   **Q.**    Okay.  Not a problem.

5:48PM   16        You read it a different way; right?

5:48PM   17   **A.**    No, I don't read it a different way.  I'm reading it based

5:48PM   18   also on the literature that I know exists as well, and

5:48PM   19   consistent with my statement in my report.

5:48PM   20        **MS. SASTRE:**  Your Honor, we would like to move this

5:48PM   21   into evidence.

5:48PM   22        Counsel, do you have a copy or any objection?

5:48PM   23        **THE COURT:**  The Adriamycin.

5:48PM   24        **MS. SASTRE:**  The Adriamycin label, yes, Your Honor.

5:48PM   25   It's D-388-D.

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

5:48PM  1           **MR. NOLEN:**  Your Honor, we object to the moving of

5:48PM  2  this label into evidence because it's not relevant to anything

5:48PM  3  in this case.

5:48PM  4           **MS. SASTRE:**  Of course, we can -- I can come up and

5:48PM  5  address that.

5:48PM  6           **THE COURT:**  Come up here.

5:48PM  7           (WHEREUPON, the following proceedings were held at

5:48PM  8  the bench.)

5:49PM  9           **MS. SASTRE:**  She took Adriamycin.  I can't even

5:49PM  10  believe what I just heard.  It's relevant to four or five or

5:49PM  11  six or seven different things.  Of course the Adriamycin label

5:49PM  12  is relevant.  It's relevant in the context of cross-examining

5:49PM  13  this witness when it comes to there are reports of irreversible

5:49PM  14  or permanent hair loss with all these medications, including

5:49PM  15  Adriamycin.

5:49PM  16           **THE COURT:**  Does it have that in there?

5:49PM  17           **MS. SASTRE:**  It says -- right there, that's the

5:49PM  18  sentence, Your Honor.

5:49PM  19           **THE COURT:**  Reversible, complete...

5:49PM  20           **MS. SASTRE:**  I don't know of any other way to read it

5:49PM  21  than I'm reading it, but that's just me.

5:49PM  22           **THE COURT:**  Oh, I do.

5:49PM  23           **MS. SASTRE:**  Well, I don't see it that way.

5:49PM  24           **THE COURT:**  And your objection?

5:49PM  25           **MR. NOLEN:**  My objection is it's just -- it's

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

5:49PM  1   intended to confuse the jury.  It's intended to confuse the

5:50PM  2   jury.  It's the May 8th, 2003.  I don't know that this is the

5:50PM  3   label that would have been in existence at the time this drug

5:50PM  4   was prescribed.

5:50PM  5          THE COURT:  I don't think that's the issue.  I think

5:50PM  6   the issue is -- is that -- I believe the argument is Adriamycin

5:50PM  7   causes permanent alopecia.  So that is -- I think it's for that

5:50PM  8   limited purpose.

5:50PM  9          MR. NOLEN:  Your Honor, I would just add for the

5:50PM  10  record that this is another one of those deals where you throw

5:50PM  11  everything up against the wall and see what sticks.  Because

5:50PM  12  the reality is -- the reality is is that there is no

5:50PM  13  statistically significant -- you can't prove statistically

5:50PM  14  significant association between Adriamycin and permanent hair

5:50PM  15  loss.  We have done that research, Your Honor.

5:50PM  16         THE COURT:  Okay.  I'm not telling you --

5:50PM  17         MS. SASTRE:  I don't know about it.  I don't even

5:50PM  18  know what that is.

5:50PM  19         THE COURT:  That's way past what I'm talking about

5:51PM  20  here.

5:51PM  21         MR. NOLEN:  So you put it in, it's misleading.

5:51PM  22         THE COURT:  The question is whether or not this

5:51PM  23  should come in.  I think you questioned her about it, the

5:51PM  24  document -- did she review this document?

5:51PM  25         MS. SASTRE:  She has three Adriamycin labels on her

OFFICIAL TRANSCRIPT

5:51PM  1   reliance list, yes, Your Honor.  She just said she reviewed

5:51PM  2   them.  She reviewed them also in particular --

5:51PM  3          **THE COURT:**  He can't help it.

5:51PM  4          **MS. SASTRE:**  She reviewed them in particular, Your

5:51PM  5   Honor, because she also read them carefully because there's

5:51PM  6   clinical information contained within them.  And a lot of her

5:51PM  7   opinions are based upon clinical information within the labels.

5:51PM  8   I mean, Judge, this case is -- Adriamycin is an issue that's

5:51PM  9   alive and well in this case in numerous respects.

5:51PM  10         **MR. NOLEN:**  Your Honor, that clinical information

5:51PM  11  that all of her opinions are based on --

5:51PM  12         **THE COURT:**  Listen, I'm not going to do an assessment

5:51PM  13  of whether or not -- and I think that gives you just whether or

5:51PM  14  not it's relevant.

5:51PM  15         **MR. NOLEN:**  I did not elicit that testimony.  And,

5:51PM  16  therefore, again, it's 611.  It exceeds the scope.  So that's

5:52PM  17  another objection.

5:52PM  18         **MS. SASTRE:**  It's a label for a drug she took, Judge.

5:52PM  19  I'm just a little bit beside myself.  It's a label for a drug

5:52PM  20  she took.

5:52PM  21         **THE COURT:**  I don't think you need to be beside

5:52PM  22  yourself.

5:52PM  23         **MS. SASTRE:**  Okay.  I'm sorry.  I'm tired, Judge.  I

5:52PM  24  apologize.

5:52PM  25         **THE COURT:**  We all are.

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

5:52PM 1        **MS. SASTRE:**  Okay.

5:52PM 2        **THE COURT:**  I'm going to allow it.  The jury can make

5:52PM 3    a determination as to what it means.

5:52PM 4        (WHEREUPON, the following proceedings were held in

5:52PM 5    open court.)

5:53PM 6        **MS. SASTRE:**  Your Honor, the defendant would move in

5:53PM 7    Exhibit D-388-D, then, Adriamycin labeling into evidence.

5:53PM 8        **THE COURT:**  Over plaintiff's objection, let it be

5:53PM 9    admitted.

5:53PM 10   **BY MS. SASTRE:**

5:53PM 11   **Q.**   Okay.  Very good.

5:53PM 12       I'll just go ahead and put it up on the ELMO just

5:53PM 13   because we have it right here.  And so what we were talking

5:53PM 14   about Dr. Plunkett is underneath the adverse reaction section,

5:53PM 15   Adriamycin states "reversible complete alopecia occurs in most

5:53PM 16   cases."  Correct?

5:53PM 17   **A.**   That's what is stated, which means most women will lose

5:53PM 18   their hair as a result of drug, which I believe is true, that

5:53PM 19   drug-induced alopecia.

5:53PM 20   **Q.**   Okay.  All right.  Thank you.

5:53PM 21       Now, if we go back to the chart that we're making,

5:53PM 22   let's talk about Cytoxan for a moment.  Okay?

5:54PM 23   **A.**   Okay.

5:54PM 24   **Q.**   You said that you knew or you found out recently that

5:54PM 25   Mrs. Earnest took Adriamycin; correct?

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

5:54PM   1   A.   I assume.  I said I assume she did based on the fact that

5:54PM   2   she was -- she was taking it for breast cancer -- well, I say

5:54PM   3   taking it, Taxotere, as an adjuvant treatment.  So I assume

5:54PM   4   that she was taking Adriamycin and cyclophosphamide, but I

5:54PM   5   don't know for sure.  I'm not a case-specific expert.

5:54PM   6   Q.   Okay.  Well, your assumptions were right.  So Cytoxan, you

5:54PM   7   just used the word "cyclophosphamide"?

5:54PM   8   A.   Yes.

5:54PM   9   Q.   And just to be clear, Cytoxan is cyclophosphamide;

5:54PM   10  correct?

5:54PM   11  A.   Yes.  And I'm using that word because that's what's in the

5:54PM   12  literature most of the time.

5:54PM   13  Q.   Okay.  Is it okay if we use the term "Cytoxan"?

5:54PM   14  A.   That's fine.

5:54PM   15  Q.   Okay.  Very good.

5:54PM   16       So you now know that Mrs. Earnest was also taking

5:54PM   17  Cytoxan; correct?

5:54PM   18  A.   If you're going to tell me that's true, I will believe

5:54PM   19  that's true.

5:54PM   20  Q.   Okay.  All right.  So with regard to, again, your work in

5:55PM   21  this case, your search, your review, your analysis of the

5:55PM   22  literature, you would agree with me that you identified

5:55PM   23  permanent hair loss as a hazard of Cytoxan; correct?

5:55PM   24  A.   In terms of case reports, yes, there are some case

5:55PM   25  reports.

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

5:55PM 1    Q.    Okay.  So I'm going to put a check mark there.  All right,

5:55PM 2    Doctor?

5:55PM 3          And then going on to 5-FU or what's called

5:55PM 4    5-fluorouracil.  Did I say that correctly?

5:55PM 5    A.    Yes.

5:55PM 6    Q.    Okay.  It's a miracle.

5:55PM 7          And you said that that was, again, in the TAX 316

5:55PM 8    study, there was the arm that got Taxotere, Adriamycin, and

5:55PM 9    Cytoxan; correct?

5:55PM 10   A.    Yes.

5:55PM 11   Q.    And then there was an arm that got 5-FU, right, or

5:55PM 12   5-fluorouracil, Adriamycin, and Cytoxan; correct?

5:55PM 13   A.    Yes.

5:55PM 14   Q.    Hence the name TAC versus FAC; correct?

5:56PM 15   A.    Yes.

5:56PM 16   Q.    And when we talk about FAC in the TAX 316 study, we're

5:56PM 17   talking about 5-FU; right?

5:56PM 18   A.    Yes.

5:56PM 19   Q.    Okay.  And you would agree with me, Doctor, that you also

5:56PM 20   identified permanent hair loss as a hazard of 5-FU; correct?

5:56PM 21   A.    One case report that I can find.

5:56PM 22   Q.    Okay.  But you would agree with me that in a combination

5:56PM 23   setting, where it was given with Adriamycin and Cytoxan, you

5:56PM 24   don't have to go any further than TAX 316 to agree that it is

5:56PM 25   identified as a hazard, at least in the combination setting,

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

5:56PM  1   when it comes to hair loss; true?

5:56PM  2   A.   I would agree that they did -- results of that study, yes.

5:56PM  3   It's different than Taxotere, but you're correct.  It had some

5:56PM  4   of those.

5:56PM  5   Q.   Okay.  So I'm going to put a check mark next to 5-FU for

5:56PM  6   permanent alopecia.  Okay?  Fair enough?

5:56PM  7   A.   With the idea that the evidence is different for the

5:56PM  8   drugs, but, yes.

5:57PM  9   Q.   I'm sorry, I didn't hear you.  The idea that what?

5:57PM  10   A.   With the understanding that there is different evidence

5:57PM  11   for different drugs, but, yes.

5:57PM  12   Q.   I didn't ask you about any of the evidence.  Just that you

5:57PM  13   identified permanent hair loss as a hazard for all of these

5:57PM  14   medications.  Okay?

5:57PM  15   A.   Well, that's what I'm having a problem with.  I don't

5:57PM  16   think I've said it's a hazard.  I think what I'm saying to you

5:57PM  17   is that there are some reports, and there's a different hazard

5:57PM  18   posed by different drugs.

5:57PM  19        If, under hazard assessment, I find a report, yes, I

5:57PM  20   agree with that.  That is there.

5:57PM  21   Q.   Well, there are reports for sure.  We can agree upon that;

5:57PM  22   correct?

5:57PM  23   A.   There is at least one case report for each of those.

5:57PM  24   That's true.

5:57PM  25   Q.   Okay.  Take a look at your deposition, please,

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

5:57PM   1   Dr. Plunkett.  If you go to page 185, line 14.

5:58PM   2           Let me know when you're there, please.

5:58PM   3   **A.**   I am.

5:58PM   4   **Q.**   Okay.

5:58PM   5   **A.**   Line 14?

5:58PM   6   **Q.**   Yes, ma'am.  Page 185.

5:58PM   7           "Q.  Did you identify permanent hair loss as a hazard

5:58PM   8   of Taxol, 5-FU, doxorubicin, cyclophosphamide, cisplatin

5:58PM   9   and prednisone?

5:58PM   10          "A.  Identified alopecia initially, and then I looked

5:58PM   11  within that for permanent alopecia as well.  Within the --

5:58PM   12  I already told you, with some of these drugs, I did not

5:58PM   13  see information that indicated the hazard would be

5:58PM   14  permanent hair loss for all of these drugs."

5:58PM   15          Question on line 25:

5:58PM   16          "Q.  But you did see it for Taxol?

5:58PM   17          "A.  Yes, I did.

5:58PM   18          "Q.  And you did see it for doxorubicin; correct?

5:58PM   19          "A.  Yes.

5:58PM   20          "Q.  And for cyclophosphamide?

5:58PM   21          "A.  And I think I told you another one that I looked

5:58PM   22  at that isn't discussed because I pulled literature and

5:58PM   23  there's literature on busulfan which, is not used for

5:58PM   24  breast cancer.

5:59PM   25          "Q.  You also saw it for 5-FU?"

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

5:59PM 1        **MR. NOLEN:**  Objection, Your Honor.

5:59PM 2        **MS. SASTRE:**  It's each one of the drugs she's

5:59PM 3  identifying as a hazard, Your Honor.  That was the --

5:59PM 4        **THE COURT:**  Okay.  I think we need to.

5:59PM 5        (WHEREUPON, the following proceedings were held at

5:59PM 6  the bench.)

5:59PM 7        **MS. SASTRE:**  Here's the question, Judge.

5:59PM 8        **THE COURT:**  I'm wondering if we have that she took

5:59PM 9  prednisone?

5:59PM 10       **MS. SASTRE:**  No, that just -- it was in there.  I was

5:59PM 11 just getting to the part because you have to continue -- she

5:59PM 12 said with those that she didn't identify them.  I'm not asking

5:59PM 13 about those.

5:59PM 14       **THE COURT:**  I understand that, but where are we

5:59PM 15 going?

5:59PM 16       **MS. SASTRE:**  Because, Your Honor, she just said

5:59PM 17 that -- she just said that -- she just said that -- when I said

5:59PM 18 you identified all these drugs as a hazard in the summary

5:59PM 19 question, she sort of begged off of it.  And I have claimed

6:00PM 20 concessions in her deposition on each one of them, that she

6:00PM 21 said she identified them as a hazard for permanent hair loss.

6:00PM 22 I have no choice but to impeach her, Judge.  It's right here.

6:00PM 23       **THE COURT:**  Okay.  I'm just wondering where are we

6:00PM 24 going?  How far -- how many doors are we opening here?  Because

6:00PM 25 her testimony on direct was limited to Taxotere's associated

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

6:00PM 1    with greater risk of permanent alopecia compared to some other

6:00PM 2    chemotherapy drugs, including Taxol.  That's what her testimony

6:00PM 3    was on direct.

6:00PM 4                MS. SASTRE:  Right.  But she says that there's -- she

6:00PM 5    does a comparative analysis of Taxotere having a greater risk

6:00PM 6    of hair loss compared to other chemotherapy drugs.  She said in

6:00PM 7    her search that she did, it was the top one.  It was the

6:00PM 8    biggest hit.  So she says basically compared to everything she

6:00PM 9    saw.

6:00PM 10               And if I could continue, I'm about to get to the

6:00PM 11   issue of rate with her, to put even a finer point on it on each

6:00PM 12   of them.  So I'm just basically engaging in her comparative

6:01PM 13   analysis, and I'm just working through it slowly, Judge.

6:01PM 14               THE COURT:  Okay.

6:01PM 15               MR. NOLEN:  Your Honor, the plaintiffs object because

6:01PM 16   the Court heard a motion in limine in this case that said we

6:01PM 17   weren't going to talk about drugs that Ms. Earnest didn't take

6:01PM 18   and that she wasn't offered.  And so -- you're talking about

6:01PM 19   Prednisone and a whole bunch of other things, and, of course,

6:01PM 20   when we're doing expert reports, we don't know what the scope

6:01PM 21   of the universe is going to be.

6:01PM 22               But, nevertheless, in this case, the Court did

6:01PM 23   enter a motion in limine, which Ms. Sastre has just violated.

6:01PM 24   And it's a clear violation.  And I didn't ask about any of

6:01PM 25   those other drugs.  And I'll give her doxorubicin.  I'll give

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

6:01PM  1    her Adriamycin, because she took those drugs.  But the others,

6:01PM  2    you know, I didn't ask about.

6:01PM  3            MS. SASTRE:  Your Honor, I was just trying to impeach

6:01PM  4    her.  I don't care about the other drugs, Judge.  I just -- I

6:01PM  5    couldn't alter her answer.

6:01PM  6            THE COURT:  Well, then get to the point that has to

6:01PM  7    do with the drugs that the woman was exposed to.

6:01PM  8            MS. SASTRE:  Well, but her opinions are broader than

6:02PM  9    that.  She says Taxotere is the most high-risk drug when it

6:02PM 10    comes to permanent hair loss.  And I'm allowed to explore that

6:02PM 11    with her entirely, Your Honor.

6:02PM 12            THE COURT:  All right.

6:02PM 13            MS. SASTRE:  That is what she said, though.

6:02PM 14            THE COURT:  You have no idea -- you are opening more

6:02PM 15    doors, but that's fine.

6:02PM 16            MS. SASTRE:  Okay.  So that is not what -- I'm not

6:02PM 17    going into the other drugs that were mentioned in the answer.

6:02PM 18    When I asked her about the group, I had written down Taxol,

6:02PM 19    Adriamycin, Cytoxan, and the F in FAC, which, of course, we

6:02PM 20    know is in TAX 316.

6:02PM 21            I said, "And you identified all of these as

6:02PM 22    hazards for permanent hair loss?"

6:02PM 23            And she said, "Not exactly."

6:02PM 24            This was my answer to impeach her, Judge.  That

6:02PM 25    is the only reason I read it back.

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

6:02PM  1        **THE COURT:**  Let me see.

6:02PM  2        **MS. SASTRE:**  Yes, please, Your Honor.  It starts

6:02PM  3  here, and then I think if you'll just read it continuing here.

6:03PM  4        **THE COURT:**  Is this different than her testimony?

6:03PM  5        **MS. SASTRE:**  Well, she just said, when I asked her a

6:03PM  6  summary question, she said, "Well, I didn't exactly identify

6:03PM  7  them as hazards for permanent hair loss."  And that's the

6:03PM  8  concession.

6:03PM  9            I said, "You did for Taxol.  You did for

6:03PM  10  Adriamycin.  You did for cyclophosphamide.  You did for 5-FU."

6:03PM  11            Unfortunately, there are a couple other words

6:03PM  12  there.  I would have been happy to have left them out, but I

6:03PM  13  didn't want to be accused of not reading the whole thing.

6:03PM  14        **THE COURT:**  I just don't see it as inconsistent with

6:03PM  15  her testimony because she said that.

6:04PM  16        **MS. SASTRE:**  She did.  But on the last question, she

6:04PM  17  didn't, Judge.  I asked her a summary question, and she said,

6:04PM  18  "That's not exactly what I said."  She changed the prior

6:04PM  19  answer.

6:04PM  20            She said, "I didn't exactly identify them as a

6:04PM  21  hazard -- permanent hair loss as a hazard."  So there's her

6:04PM  22  saying in her deposition that she did.

6:04PM  23        **THE COURT:**  So where did you start reading?

6:04PM  24        **MS. SASTRE:**  I started reading right here, Judge.  I

6:04PM  25  started reading exactly what I have in blue, Your Honor.  And

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

| | | |
|---|---|---|
| 6:04PM | 1 | then the other -- on the next page in the blue, and I was |
| 6:04PM | 2 | almost at the very end, Judge.  That's all I was reading. |
| 6:05PM | 3 | THE COURT:  I'm going to let you read it, but I don't |
| 6:05PM | 4 | think it's inconsistent with her testimony, but have at it. |
| 6:05PM | 5 | MS. SASTRE:  I mean, believe me, I will -- |
| 6:05PM | 6 | THE COURT:  I mean -- no, that's fine.  The jury can |
| 6:05PM | 7 | make a determination whether it's inconsistent.  That's not my |
| 6:05PM | 8 | appreciation. |
| 6:05PM | 9 | MS. SASTRE:  Okay.  I was almost finished.  I have |
| 6:05PM | 10 | like a couple more sentences in here. |
| 6:05PM | 11 | THE COURT:  But I have told you all repeatedly we |
| 6:05PM | 12 | don't just peek in doors; they open.  But, okay. |
| 6:05PM | 13 | (WHEREUPON, the following proceedings were held in |
| 6:05PM | 14 | open court.) |
| 6:05PM | 15 | THE COURT:  Please proceed. |
| 6:05PM | 16 | MS. SASTRE:  Thank you, Your Honor. |
| 6:05PM | 17 | BY MS. SASTRE: |
| 6:05PM | 18 | Q.   All right.  Dr. Plunkett, I know I was reading back your |
| 6:05PM | 19 | answer, so I'm going to try and pick up where I left off. |
| 6:05PM | 20 | Okay? |
| 6:05PM | 21 | A.   Okay.  I don't remember where you were, but -- |
| 6:05PM | 22 | Q.   Me neither, exactly.  But I think it was around page 186, |
| 6:06PM | 23 | line 4.  Okay? |
| 6:06PM | 24 | A.   That's fine. |
| 6:06PM | 25 | Q.   Okay.  And you said -- your answer: |

LAURA MASSEY PLUNKETT - CROSS

6:06PM   1            "A.   Yes.   And for cyclophosphamide -- and I think I

6:06PM   2     told you another one that I looked at and I didn't discuss

6:06PM   3     in that paragraph.   I did because I pulled literature.

6:06PM   4         "Q.   You also saw it for 5-FU; correct?

6:06PM   5         "A.   Yes.   Well, you see it in 5-FU in 316, and you

6:06PM   6     do see a few cases in combination with Adriamycin and

6:06PM   7     cyclophosphamide."

6:06PM   8         Did I read that correctly?

6:06PM   9  **A.**   Yes, you did.

6:06PM  10  **Q.**   Okay.   Thank you so much, Doctor.

6:06PM  11         Now, Taxotere is also on your list, right?   The list

6:06PM  12  that we're making together, of course.

6:06PM  13  **A.**   Absolutely.   I think that's what I said when I first

6:06PM  14  started talking.

6:06PM  15  **Q.**   Okay.   I'm going to put it on the list.   All right?

6:07PM  16         And I'm going to put a check mark next to it by

6:07PM  17  "permanent" because that's your opinion; right?   It's

6:07PM  18  associated with permanent alopecia?

6:07PM  19  **A.**   Yes, based on the three buckets of evidence we talked

6:07PM  20  about.

6:07PM  21  **Q.**   Okay.

6:07PM  22  **A.**   Actually, I don't think -- I don't think that is quite my

6:07PM  23  opinion.   And if that is my opinion, then I think what I told

6:07PM  24  you is that I believe that there's an increased risk of

6:07PM  25  permanent alopecia with the use of Taxotere, as compared to

LAURA MASSEY PLUNKETT - CROSS

1    other drugs.

2         And you said "may be associated."  I think that's

3    different.

4    Q.   Okay.  Thank you.

5    A.   But if you want to talk about another opinion, we can talk

6    about it.

7    Q.   That's all right.  Thank you, Doctor.  I appreciate the

8    clarification.

9         So I've put another column up on our chart, if you

10   will.

11   A.   Uh-huh.

12   Q.   And can you see it there?  It says "rate."

13   A.   Yes, I see that.

14   Q.   Okay.  So I want to spend just a couple moments with you

15   on the rate.

16        You'd agree with me, when it comes to Taxol, you do

17   not know what the incidence rate is for persistent alopecia

18   associated with the it; correct?

19   A.   No.  The data does not develop that, and I don't see any

20   evidence that would support you to be able to quantify a rate.

21   Q.   All right.  So I put a question mark there next to "rate."

22   Okay?

23   A.   Quantifying the rate, yes.

24   Q.   Okay.  Let me ask you, you don't know what the incidence

25   rate is for persistent alopecia associated is Taxol; correct?

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

1   A.   I know it's less than Taxotere, but I don't know the
2   number.  And that's why I was using the word "quantify."  I
3   don't have the data to quantify it.
4   Q.   Okay.  But I really just need an answer to my question.  I
5   am looking for a number.  When I say "rate," I mean number.
6       So just tell me -- if you have a rate, you can tell
7   me what it is.  And if you don't have a rate, can you let me
8   know as well?
9   A.   Yes.
10  Q.   Okay.
11  A.   I will try to do that.
12  Q.   Okay.  Very good.  Now, when it comes to Adriamycin, you
13  don't note the rate for persistent alopecia either; correct?
14  A.   That's correct.  The data that I relied upon does not
15  quantify it other than qualitatively.
16  Q.   And when it comes to Cytoxan, you don't have an incidence
17  rate for persistent alopecia; true?
18  A.   That is true, other than I have a few reports.  But I
19  can't quantify a rate based on that.
20  Q.   And when it comes to 5-fluorouracil or 5-FU, one of drugs
21  that was given in combination in TAX 316, you don't have a
22  rate -- an incidence rate for persistent alopecia for 5-FU,
23  either; true?
24  A.   By itself, that is true.
25  Q.   And when it comes to Taxotere, you would agree with me

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

6:10PM 1 that you don't have a rate for it either, correct, as a single

6:10PM 2 agent?

6:10PM 3 A.   Not as a single agent, but we can get rates from the

6:10PM 4 study -- the clinical data that is available.

6:10PM 5 Q.   Okay.  But as you sit here today, when Taxotere is

6:10PM 6 given -- just like I asked on the other medications -- as a

6:10PM 7 single agent, you don't have a rate that you can share with the

6:10PM 8 ladies and gentlemen of the jury with regard to persistent

6:10PM 9 alopecia; true?

6:10PM 10 A.   Yes.  Because in the studies that have been single-agent,

6:10PM 11 they haven't attempted to monitor that.  So I can't get it from

6:10PM 12 the studies that are available.

6:10PM 13 Q.   Okay.  But I want to make sure I understand, then.

6:11PM 14         You don't have a rate for persistent or permanent

6:11PM 15 alopecia for any of these medications, but it is your opinion

6:11PM 16 to this jury, to a reasonable degree of scientific certainty,

6:11PM 17 that the incidence rate or the risk for development of

6:11PM 18 permanent alopecia with Taxotere is greater than every drug on

6:11PM 19 this list.

6:11PM 20         Is that your testimony?

6:11PM 21 A.   My testimony has to do an increased risk, yes, which is a

6:11PM 22 different assessment than quantifying rate.

6:11PM 23         Would you like me to explain?

6:11PM 24 Q.   No.  I just want to make sure I understand your opinions,

6:11PM 25 Doctor.

OFFICIAL TRANSCRIPT

6:11PM  1   A.   Well, to understand my opinion, I'd have to explain it.

6:11PM  2   But if you don't want to hear, that's fine.

6:11PM  3   Q.   Okay.  But I just want to be clear.

6:12PM  4          Even though you don't know what is the incidence rate

6:12PM  5   for any of these drugs, it's your opinion that persistent

6:12PM  6   alopecia with Taxotere occurs more frequently than with other

6:12PM  7   medications?

6:12PM  8   A.   It's my opinion, based on the evidence that we have, that

6:12PM  9   there's an increased risk.  And that has been my opinion.  And

6:12PM  10  I have a good reason for saying that, if you would like me to

6:12PM  11  explain.

6:12PM  12  Q.   And your opinion, because you don't have an incidence

6:12PM  13  rate, is based on something you call the weight of the

6:12PM  14  evidence; right?

6:12PM  15  A.   Yes.  It's what scientists do when they look at risk.

6:12PM  16  Risk is not always quantified with a specific number.  Risk

6:12PM  17  is -- can be looked at in terms of comparison qualitatively.

6:12PM  18          And that's what I'm talking about.  What type of

6:12PM  19  evidence do I have?  Are you more likely to see it with one

6:12PM  20  particular drug than another?

6:12PM  21          And that's what I'm talking about by increased risk.

6:12PM  22  Q.   Okay.  Well, let me ask you this.  So there were some

6:12PM  23  examples today.  I think my partner, Mr. Strongman, came up

6:13PM  24  here, and he had an example using a bag of fruit.

6:13PM  25          Did you hear that?

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

6:13PM    1    A.    I think I did.  I didn't hear the second time he --

6:13PM    2    someone did it.  Maybe that was --

6:13PM    3    Q.    Someone tried.  All right.  I'm going to try too.  Okay?

6:13PM    4    A.    Sure.

6:13PM    5    Q.    So a hypothetical.  Okay?  So instead of bags, let's say

6:13PM    6    we have five baskets up here.  Okay?  And we're going to put

6:13PM    7    apples into each one of baskets.  Okay?  And it's going to be a

6:13PM    8    different number of apples in each one of the five baskets.

6:13PM    9          Are you with me so far?

6:13PM   10    A.    I can't think I am, but go ahead and finish your

6:13PM   11    hypothetical before I tell you whether I think you can do that.

6:13PM   12    But okay.

6:13PM   13    Q.    Well, I can put a different number of apples in each

6:13PM   14    basket; right?

6:13PM   15    A.    You certainly can do that, physically, yes.

6:13PM   16    Q.    Okay.  And if I asked you, "Dr. Plunkett, please tell me

6:13PM   17    how many apples are in each basket," the way that you would

6:13PM   18    need do that would be to come out here and count the apples in

6:13PM   19    each basket; true?

6:13PM   20    A.    If I'm only counting apples, yes, that is true.

6:14PM   21    Q.    Right.  And here you're not counting anything because you

6:14PM   22    don't have any numbers to count; true?

6:14PM   23    A.    I disagree.  What I'm counting instead is you have -- in

6:14PM   24    each basket, you have apples, oranges, and grapefruit.  The

6:14PM   25    apples are the clinical trial evidence.  The oranges are the

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

6:14PM   1   observational evidence.  The grapefruit are the case reports.

6:14PM   2          And when I look across the risk issue, the only

6:14PM   3   basket I have all three of those in is the Taxotere basket.  So

6:14PM   4   as a result, that tells me there's something different than the

6:14PM   5   others.  And that's what risk assessors do.

6:14PM   6          They can't always quantify it with an actual rate.

6:14PM   7   In fact, drug companies don't even do that when they do their

6:14PM   8   studies.  They list things in their label that aren't

6:14PM   9   necessarily backed up by rates.

6:14PM   10          That just is the way science is develop -- in drug

6:14PM   11   development and often in these kinds of things.

6:14PM   12          So a risk assessor can come in and look at a body of

6:15PM   13   evidence and make a statement whether or not there's a

6:15PM   14   difference in the risk profile of agents.  And that's what I've

6:15PM   15   done.  And that's grapefruit, oranges, and apples; just not

6:15PM   16   apples.

6:15PM   17   Q.   Okay.  So, again, going back to my example.

6:15PM   18          If you wanted to know how many apples were in each

6:15PM   19   basket, you would agree with me the best way to know that would

6:15PM   20   be to count them; right?

6:15PM   21   A.   That's the only way to know how many.  You have to count

6:15PM   22   them unless you wanted to the guess.

6:15PM   23   Q.   Right.  And what you're doing instead, Doctor, is you're

6:15PM   24   coming up and you're lifting each one of them and you're seeing

6:15PM   25   which one feels heavier.  And then you're trying to make a

LAURA MASSEY PLUNKETT - CROSS

6:15PM   1   determination as to which one has more apples; true?  That's

6:15PM   2   your weight-of-evidence analysis here?  You're doing a

6:15PM   3   weighing; true?

6:15PM   4   A.   Not necessarily.  Some of those pieces of fruit have

6:15PM   5   greater weight than others.  So if you're telling me I'm going

6:15PM   6   to then -- it is true.  If I would say -- I should reverse it,

6:15PM   7   then.  The grapefruit weigh more than the oranges and the

6:15PM   8   apples.

6:15PM   9         So, yes, the basket that has the most grapefruit in

6:15PM   10  it, obviously, is going to weigh the most.  That's the clinical

6:16PM   11  trial data.

6:16PM   12        So if we reverse it, I would agree that's what you

6:16PM   13  would be doing.  But you have to segregate the quality of the

6:16PM   14  information.  It's not just counting things up.

6:16PM   15  Q.   Okay.  Let's move on from the fruit.  Okay?

6:16PM   16  A.   Sure.

6:16PM   17  Q.   Okay.  So in this case, there is a definition for

6:16PM   18  persistent alopecia that your using; correct?

6:16PM   19  A.   Well, based upon studies I'm reviewing, that's correct.

6:16PM   20  Q.   Okay.  And in this case, the way that you define

6:16PM   21  persistent alopecia is where a patient has hair loss longer

6:16PM   22  than six months after chemotherapy treatment?

6:16PM   23  A.   Yes.  Because the scientific studies I rely upon use that

6:16PM   24  definition, typically.

6:16PM   25  Q.   Okay.  And so whether we use the term "permanent" or

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

6:16PM  1    "irreversible" or "persistent," according to the definition
6:16PM  2    that you use, that always means in excess of six months; true?
6:16PM  3    A.   As far as identifying the studies, yes, I agree.  But
6:17PM  4    there are people that discuss in the literature the difference
6:17PM  5    between what permanent alopecia looks like.
6:17PM  6         So I would refer you to a dermatologist to discuss
6:17PM  7    that.  That's not my area.  But, certainly, the studies have
6:17PM  8    definitions, and I relied upon those.
6:17PM  9    Q.   Okay.  And that's what I'm saying, Doctor.
6:17PM  10        So your definition is six months; right?  That's the
6:17PM  11   one you're using?
6:17PM  12   A.   I'm using the definition of investigators.  And almost all
6:17PM  13   of them use six months, although some of them use another
6:17PM  14   definition.
6:17PM  15   Q.   And you're using six months too; correct?
6:17PM  16   A.   In the studies that I'm relying upon, that's typically
6:17PM  17   what is used, yes.
6:17PM  18   Q.   Okay.  I'm just asking for the definition you're using
6:17PM  19   here.  Okay?  And I think -- I'll move on.  I think I have an
6:17PM  20   answer, but I wasn't asking you about the studies.
6:17PM  21        So you would agree with me, though, that it can take
6:17PM  22   some patients longer than six months to regrow their hair after
6:17PM  23   chemotherapy?
6:17PM  24   A.   Yes.  That's why the best studies are ones that have
6:17PM  25   longer-term follow-up.

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

6:18PM 1  **Q.**   And you would agree with me that, in the literature in the

6:18PM 2  studies that you reviewed, you, in fact, saw instances where it

6:18PM 3  took patients longer than six months to regrow their hair after

6:18PM 4  chemotherapy; true?

6:18PM 5  **A.**   For drug-induced alopecia, yes, that is true.  And for

6:18PM 6  some of these drugs, they discuss that.

6:18PM 7  **Q.**   All right.  But according to the definition that you're

6:18PM 8  using, of hair loss being loss that's greater than six months,

6:18PM 9  if a patient's hair was to regrow at the nine-month mark, that

6:18PM 10 would still meet your definition of permanent alopecia; true?

6:18PM 11 **A.**   I disagree that that's my definition.  That's what I'm

6:18PM 12 trying to explain to you.

6:18PM 13 **Q.**   Can you take a look at your deposition, please.

6:18PM 14 **A.**   Yes.  What page?

6:18PM 15 **Q.**   104.  And it's line 8.

6:19PM 16 **A.**   Well, actually, it starts at line 4.

6:19PM 17 **Q.**   Okay.

6:19PM 18 **A.**   You're asking me a hypothetical.

6:19PM 19 **Q.**   Okay.  I'll read the whole thing.  Okay?

6:19PM 20 **A.**   Yes, please.

6:19PM 21 **Q.**   Okay.

6:19PM 22       "Q.  So -- well, it's a hypothetical question.  So I

6:19PM 23       understand you haven't done an analysis of any individual,

6:19PM 24       including the plaintiffs in this litigation.

6:19PM 25             "So my question is, pursuant to your definition

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

6:19PM  1      of permanent hair loss being loss greater than six months,
6:19PM  2      if a patient's hair was to regrow at the nine-month mark,
6:19PM  3      that would still fit your definition of permanent hair
6:19PM  4      loss; true?"
6:19PM  5          And your answer:
6:19PM  6          "A.   So I think it could depend upon what was
6:19PM  7      described because there is a discussion in the literature
6:19PM  8      I relied upon about the fact that some people can get
6:19PM  9      regrowth, same as before.  So I -- yes, it could fit that.
6:20PM  10     It's possible."
6:20PM  11         Did I read that correctly?
6:20PM  12  A.   No.   It's "but it's not the same as before."  I think you
6:20PM  13  said "the same as."
6:20PM  14  Q.   Okay.  I apologize.
6:20PM  15  A.   But agree that the rest was read correctly, yes.
6:20PM  16  Q.   Okay.  Now, you say that the risk is greater for Taxotere
6:20PM  17  for permanent hair loss; right?
6:20PM  18  A.   That's my opinion, yes.
6:20PM  19  Q.   Okay.  But you would agree with me you don't know how much
6:20PM  20  greater; correct?
6:20PM  21  A.   Are you asking me can I quantify that it's always two
6:21PM  22  times greater than this drug or that drug?  No.  That would go
6:21PM  23  with having the actual rates for all of these, and I don't.
6:21PM  24         But I think you asked me this question in deposition.
6:21PM  25  I believe you gave you an answer, but...

OFFICIAL TRANSCRIPT

6:21PM 1    **Q.**   Now, your opinion here as well, I think we could describe

6:21PM 2    it as comparative.

6:21PM 3          Can we use those words?  You're comparing Taxotere to

6:21PM 4    other medications and looking at risk; right?

6:21PM 5    **A.**   I'm comparing the risk of toxicity profile of the drugs,

6:21PM 6    yes.

6:21PM 7    **Q.**   Okay.  And in order to do that, you need information on

6:21PM 8    all the medications, not just Taxotere; right?

6:21PM 9    **A.**   Well, I need -- I need to do research to see if there is

6:21PM 10   information.  The fact that there are no reports is informative

6:21PM 11   as well.

6:21PM 12   **Q.**   Okay.  But my question was just simply, in order to do a

6:21PM 13   comparison, you want to get as much information as you can on

6:21PM 14   all of them; right?

6:22PM 15   **A.**   I looked for all publicly available information I could

6:22PM 16   find.  Yes, that's correct.

6:22PM 17   **Q.**   And you'd agree with me, when it came to these other

6:22PM 18   medications on the list, you had less information for Taxol

6:22PM 19   when compared to Taxotere; true?

6:22PM 20   **A.**   What do you mean by less?  There were less reports in the

6:22PM 21   literature, or are you asking me for sources of information?  I

6:22PM 22   think that's what you probably are meaning, but that isn't how

6:22PM 23   I'm taking it.

6:22PM 24   **Q.**   Doctor, please, just yes or no.

6:22PM 25   **A.**   I can't answer that yes or no, the way you asked the

LAURA MASSEY PLUNKETT - CROSS

6:22PM 1    question, then.

6:22PM 2    **Q.**   I'll try once more.  You had less information which you

6:22PM 3    reviewed for Taxotere -- for Taxol than you did for Taxotere;

6:22PM 4    true?

6:22PM 5    **A.**   If what you're asking me is did I have less because I

6:22PM 6    didn't have access to the NDA, that is true.  But as far as the

6:22PM 7    comparison of what's publicly available, it is what it is.

6:22PM 8    There is either less reports or more reports.

6:23PM 9            And so I relied upon looking at my search and

6:23PM 10   determining how much I could find publicly.  So that's not an

6:23PM 11   issue of less or more as far as -- as far as my process or my

6:23PM 12   method.

6:23PM 13   **Q.**   Okay.  Well, let me just give you an example.

6:23PM 14           So with regard to Taxotere -- and the jury's heard a

6:23PM 15   lot about this -- you relied upon clinical trial information;

6:23PM 16   correct?

6:23PM 17   **A.**   Yes, I did.

6:23PM 18   **Q.**   Okay.  And, in fact, you had access to clinical studies

6:23PM 19   that -- a number of clinical studies that analyzed Taxotere,

6:23PM 20   including TAX 316; right?

6:23PM 21   **A.**   Yes, I did.

6:23PM 22   **Q.**   And these were studies that helped to inform you about

6:23PM 23   certain things with regard to Taxotere and hair loss; right?

6:23PM 24   **A.**   Yes, that's correct.

6:23PM 25   **Q.**   Okay.  And they're studies that you relied upon before you

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

6:23PM   1   came into court today and shared your opinions with our jury;
6:23PM   2   true?
6:23PM   3   A.   Yes, that's correct.
6:23PM   4   Q.   Okay.  And your opinions are based, in part, on those
6:24PM   5   studies; true?
6:24PM   6   A.   Yes, they are.  I think that's what we talked about under
6:24PM   7   direct.
6:24PM   8   Q.   And you would agree with me that there are certainly
6:24PM   9   clinical study reports that exist for Taxol; correct?
6:24PM  10   A.   Well, there's -- yes, that's correct.  I don't have those,
6:24PM  11   but I have what's off the FDA website instead.
6:24PM  12   Q.   And that's right, Doctor, that was my point.
6:24PM  13        There are clinical study reports that exist for
6:24PM  14   Taxol; you haven't reviewed them before you came in here to
6:24PM  15   court today.  True?
6:24PM  16   A.   I don't have access to them, that's true.
6:24PM  17   Q.   That's not my question, ma'am.
6:24PM  18        You did not review them; true?
6:24PM  19   A.   Yes, because I could not.  I didn't have access.
6:24PM  20   Q.   And the same could be true for Adriamycin; correct?
6:24PM  21   A.   That's correct.  I could only get publicly available
6:24PM  22   information.
6:24PM  23   Q.   The same is true for Cytoxan and 5-FU; correct.
6:24PM  24   A.   Yes, that's correct.
6:24PM  25   Q.   And I think you described it in your report as it was

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

6:24PM  1    unfortunate that you didn't have access to that information, as

6:24PM  2    you claimed; right?

6:24PM  3    A.    I may have used that word, yes.

6:24PM  4    Q.    Okay.  And it's unfortunate because you'd agree with me

6:25PM  5    that you don't know what you don't know; right?  I mean, it's

6:25PM  6    just a simple truism.  You don't know what don't know; right?

6:25PM  7    A.    I can only form my opinions based on what I can get access

6:25PM  8    to.  That is true.

6:25PM  9    Q.    And whatever is in those clinical study reports for Taxol,

6:25PM  10   Adriamycin, Cytoxan, and 5-FU, you don't know what it says

6:25PM  11   because you haven't read it; right?

6:25PM  12   A.    No.  But I did -- instead, relied upon what was relayed

6:25PM  13   from the labeling and the FDA website for those drugs.

6:25PM  14   Q.    Now, you did review TAX 316?

6:25PM  15   A.    The clinical study report, yes, I did.

6:25PM  16   Q.    Okay.  And let's talk about that for a few moments.  Okay?

6:25PM  17   A.    Okay.

6:25PM  18   Q.    All right.  That was something important to your opinions;

6:26PM  19   true?

6:26PM  20   A.    Yes.  Because it had -- it has a -- fills a bucket.

6:26PM  21   Q.    Okay.  And that was a clinical study conducted by Sanofi.

6:26PM  22   The jury's already heard a fair amount about it already.

6:26PM  23          But you agree with that; correct?

6:26PM  24   A.    Yes, that's correct.

6:26PM  25   Q.    And you agree that this study contained about

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

6:26PM 1    1,500 patients; true?

6:26PM 2    **A.**   I don't remember the number, but I believe that's close to

6:26PM 3    what Dr. Madigan said this morning.  So I'll take that as true.

6:26PM 4    **Q.**   Okay.  And they were divided up into two arms; right?

6:26PM 5    **A.**   Yes, that's correct.

6:26PM 6    **Q.**   Okay.  And they were given two different treatment

6:26PM 7    regimens; correct?

6:26PM 8    **A.**   Yes.

6:26PM 9    **Q.**   Okay.  And we've talked about this as well.

6:26PM 10           So there was a TAC group which was Taxotere,

6:26PM 11   Adriamycin, and Cytoxan, hence the name TAC; correct?

6:26PM 12   **A.**   Yes, that's correct.

6:26PM 13   **Q.**   Okay.  And then there was another group that we call the

6:26PM 14   FAC group; right?

6:26PM 15   **A.**   Yes.

6:26PM 16   **Q.**   FAC?

6:26PM 17   **A.**   Yes, that's correct.

6:26PM 18   **Q.**   Okay.  Dr. Plunkett, and that was 5-FU, Adriamycin, and

6:27PM 19   Cytoxan; true?

6:27PM 20   **A.**   Yes, that's true.

6:27PM 21   **Q.**   Okay.  And the study looked at patients for up to ten

6:27PM 22   years; right?

6:27PM 23   **A.**   Yes, that's correct.

6:27PM 24   **Q.**   And what you did -- when you looked at TAX 316, what you

6:27PM 25   were interested in was you wanted to look at the ongoing

OFFICIAL TRANSCRIPT

6:27PM 1   alopecia data; true?

6:27PM 2   A.   Well, I looked at any of the alopecia data, but I was

6:27PM 3   focusing on the issue of the long-term follow-up, yes.

6:27PM 4   Q.   Okay.  Well, let me see if I can ask if this way:  One of

6:27PM 5   the things that you analyzed was the event of ongoing alopecia;

6:27PM 6   is that fair?

6:27PM 7   A.   Oh, I didn't analyze it.  The study report reported it,

6:27PM 8   and I used that information in forming my opinions.

6:27PM 9   Q.   Okay.  There is a part of the study -- a list of adverse

6:27PM 10  events; correct?

6:27PM 11  A.   Yes.  And the only reason I'm answering this way is I

6:28PM 12  didn't do what Dr. Madigan did.  I just want to make it clear.

6:28PM 13  I didn't reanalyze the data.  That's why I'm being specific.

6:28PM 14  Q.   Gotcha.  Okay.  Not a problem.  But there is a section, a

6:28PM 15  list of effects; correct?

6:28PM 16  A.   Yes, there is.

6:28PM 17  Q.   And within that list is included alopecia; correct?

6:28PM 18  A.   Yes, that's correct.

6:28PM 19  Q.   Okay.  And what the TAX 316 study did was it looked at --

6:28PM 20  it tracked ongoing alopecia.

6:28PM 21        That's actually what it's called in that table;

6:28PM 22  correct?

6:28PM 23  A.   If you're going to ask those kind of questions, I would

6:28PM 24  have it get it back out because I don't recall the details

6:28PM 25  of -- the labels in the table.  But I agree that they were

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

| | | |
|---|---|---|
| 6:28PM | 1 | looking at alopecia, whether it persisted over time. |
| 6:28PM | 2 | So you could call that ongoing, and maybe the table |
| 6:28PM | 3 | does.  But I don't recall it. |
| 6:28PM | 4 | Q.   Let me see if I can do it this way so we don't have to get |
| 6:28PM | 5 | the document out. |
| 6:28PM | 6 | Would you agree with me that the TAX 316 study never |
| 6:28PM | 7 | used the word that you came into court and used, which is |
| 6:28PM | 8 | "permanent."  True? |
| 6:29PM | 9 | A.   I don't know for sure, but I wouldn't be surprised.  I |
| 6:29PM | 10 | imagine it probably did not, because they were -- they were |
| 6:29PM | 11 | looking over time.  But that's probably true. |
| 6:29PM | 12 | Q.   It sounds like I should give a copy of the TAX 316. |
| 6:29PM | 13 | A.   Well, if you're going to ask me specific questions, |
| 6:29PM | 14 | whether I agree or disagree with you, with a yes or no, I would |
| 6:29PM | 15 | need it see that to answer that way. |
| 6:29PM | 16 | Q.   Okay.  That's why I thought I'd give it to you. |
| 6:29PM | 17 | MS. SASTRE:  Your Honor, may I approach? |
| 6:29PM | 18 | THE COURT:  Yes, you may. |
| 6:29PM | 19 | MS. SASTRE:  Judge, I'm going to go until you tell me |
| 6:29PM | 20 | to stop or I finish.  So I'm -- |
| 6:29PM | 21 | THE COURT:  Okay. |
| 6:29PM | 22 | MS. SASTRE:  I'm continuing at the Court's pleasure. |
| 6:29PM | 23 | THE COURT:  Okay. |
| 6:29PM | 24 | MS. SASTRE:  All right, Your Honor. |
| | 25 | |

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

| | | |
|---|---|---|
| 6:29PM | 1 | **BY MS. SASTRE:** |
| 6:29PM | 2 | **Q.**   All right.  So, Dr. Plunkett, I just provided you with a |
| 6:30PM | 3 | copy of TAX 316; correct? |
| 6:30PM | 4 | **A.**   Yes.  The clinical study report, yes. |
| 6:30PM | 5 | **Q.**   Yes, exactly.  So if we turn to -- just a couple quick |
| 6:30PM | 6 | questions here.  I think it's page 37 and then 38. |
| 6:30PM | 7 | **A.**   The ones you have tabbed here? |
| 6:30PM | 8 | **Q.**   Probably. |
| 6:30PM | 9 | **A.**   I'm at 37.  There a table. |
| 6:30PM | 10 | **Q.**   Okay.  So -- very good.  So this is the list of adverse |
| 6:30PM | 11 | event; correct? |
| 6:30PM | 12 | **A.**   Yes, that's correct, during the treatment period, yes. |
| 6:30PM | 13 | **Q.**   Okay.  And one of them was described as alopecia; true? |
| 6:30PM | 14 | **A.**   Yes, that's correct. |
| 6:30PM | 15 | **Q.**   Okay.  And you see it's described -- on the right-hand |
| 6:30PM | 16 | side, the word is "ongoing"? |
| 6:30PM | 17 | **A.**   Yes, it is there.  That's correct. |
| 6:30PM | 18 | **Q.**   Okay. |
| 6:30PM | 19 | **A.**   There's also "persisting" over here, but I -- "persisting" |
| 6:30PM | 20 | into "follow-up" and then "resolved" and "ongoing." |
| 6:30PM | 21 | **Q.**   Okay.  So we can agree that this study was looking at |
| 6:30PM | 22 | ongoing alopecia; fair? |
| 6:30PM | 23 | **A.**   Yes.  That's correct. |
| 6:31PM | 24 | **Q.**   Okay.  Thank you, Doctor. |
| 6:31PM | 25 |         Now, the question I'd asked you a moment ago but I |

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

6:31PM  1   want to be sure you had the benefit of the study, which is that

6:31PM  2   TAX 316 never used the word that you've used to describe

6:31PM  3   alopecia which is "permanent."  True?

6:31PM  4   **A.**   So to answer that, I'd have to read the text, because I'd

6:31PM  5   have to look at what they describe on the results.

6:31PM  6          Do you want me to look for that or --

6:31PM  7   **Q.**   How long would it take you?

6:31PM  8   **A.**   Maybe a few minutes, a couple of minutes.  Do you want me

6:31PM  9   to look and see?  I would be looking in the section where it

6:31PM  10  discusses the results of the adverse events.

6:31PM  11         **THE COURT:**  Can you direct her to where that is.

6:31PM  12         **MS. SASTRE:**  Well, it's asking to for a negative.

6:31PM  13  It's saying that it don't include that word anywhere in the

6:31PM  14  study, so...

6:31PM  15         **THE WITNESS:**  Do you want me to go ahead and look for

6:31PM  16  it?

6:31PM  17         **THE COURT:**  Direct her to the adverse event area.

6:31PM  18  Give her a page so we're not doing this.

6:32PM  19         **MS. SASTRE:**  Let me see if I can -- I'm just trying

6:32PM  20  to move thing along, based upon the hour.

6:32PM  21  **BY MS. SASTRE:**

6:32PM  22  **Q.**   I mean, as you sit here today, do you have any

6:32PM  23  recollection of TAX 316 talking about permanent alopecia?

6:32PM  24  **A.**   I don't recall that word, but I wasn't trying to look for

6:32PM  25  that word either, so...

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

**Q.**   Okay.  All right.  Fair enough.  Let me ask you just a similar but related question.

As you sit here, do you have any recollection of TAX 316 using the term "irreversible alopecia"?

**A.**   It's possible the word "irreversible" is there.  But if you're asking me did they give it a name, I don't know.  I'd have to look.  Same answer as before.

**Q.**   Okay.  Because what happened in TAX 316 is that ongoing alopecia data simply means that, at a patient's last follow-up appointment, they reported having alopecia; true?

**A.**   Yes.  At the end of study, at ten years, there were a number of patients who still were reporting alopecia, yes.

**Q.**   Well, let me see if I can walk through it with you sort of in steps, then.  Okay, Doctor.

So as you sit here today, you don't know how many patients withdrew from the study; true?

**A.**   That's in here.  Do you want me to look for that?  I mean, all of that information would be in here.  Withdrawals are in here.

But I'd have to look for it, because I don't recall it without looking.

**Q.**   Okay.  Well, Doctor, my question is, as you sit here right now, you don't know what number of those patients may have withdrawn from the study at a certain point; true?

**A.**   Without looking, no.  I'd have to look to answer that

LAURA MASSEY PLUNKETT - CROSS

6:33PM 1    question.

6:33PM 2    Q.   And that's sort of any point.  I mean, you haven't done

6:33PM 3    that analysis before you came into court to determine how many

6:33PM 4    patients might have withdrawn from the study before the ten

6:33PM 5    years; correct?

6:33PM 6    A.   No, I don't think that's quite true.  I certainly read

6:33PM 7    this report and looked at those issues.  I did not form an

6:33PM 8    opinion, however, that there was an issue with withdrawals to

6:34PM 9    affect the interpretation of data.

6:34PM 10           In fact, this is the study report that was submitted

6:34PM 11   as part of the approval package.  So, to me, this is data that

6:34PM 12   this company relied upon to support their approval.

6:34PM 13   Q.   Well, just a few more questions on TAX 316.  Okay?

6:34PM 14   A.   Okay.

6:34PM 15   Q.   And I just want to know whether you analyzed these things

6:34PM 16   or not.  Okay?

6:34PM 17           So you didn't analyze how many patients may have,

6:34PM 18   unfortunately, passed away during the follow-up period; true?

6:34PM 19           If you analyzed it, please just let me know yes or

6:34PM 20   no.

6:34PM 21   A.   I need you to define what you -- so, to me, when I hear

6:34PM 22   the word "analyze," I'm thinking what Dr. Madigan did.  I did

6:34PM 23   not do that.  I relied on the results, as reported in the

6:34PM 24   clinical study report.

6:34PM 25           So I analyzed this is as a piece of information in my

LAURA MASSEY PLUNKETT - CROSS

6:34PM  1   weight of evidence, but I didn't try to discern whether there
6:34PM  2   were problems that would change any of the numbers in the
6:35PM  3   study.  That, I did not do.  That would be analysis, and I
6:35PM  4   didn't do that.
6:35PM  5   **Q.**   Okay.  Good.  Maybe we're making progress.
6:35PM  6            So you did not do an analysis to determine if there
6:35PM  7   are any issues with the numbers in the study; correct?
6:35PM  8   **A.**   No.  I understood other experts were addressing issues
6:35PM  9   with that in the study.
6:35PM 10   **Q.**   But yet your opinions that you've come in here and
6:35PM 11   expressed to the jury, to a reasonable degree of scientific
6:35PM 12   certainty, are, in fact, based upon those numbers; true?
6:35PM 13   **A.**   Yes.  Like FDA, I'm relying upon the numbers as being an
6:35PM 14   accurate reflection of results of study, absolutely.
6:35PM 15   **Q.**   Okay.  Well, let me ask you a specific question.
6:35PM 16            There may be patients included within group of 29,
6:35PM 17   right, who were part of the TAC arm and are listed as having
6:35PM 18   ongoing alopecia at the end of the study at the ten years, and
6:36PM 19   that those are patients who contact may have been lost with
6:36PM 20   them after a period of months; true?
6:36PM 21   **A.**   I haven't done that analysis.  I can't answer that.  But,
6:36PM 22   again, I would say that I relied upon the results as you
6:36PM 23   reported -- not you -- as the company reported them to FDA as
6:36PM 24   being an assessment of how many people had ongoing alopecia in
6:36PM 25   each arm.

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

6:36PM 1    Q.    So I think, if I understand you, what I hear you saying is

6:36PM 2    that it is possible that there are patients that were not

6:36PM 3    followed the entire ten years; correct?

6:36PM 4    A.    There are -- it's also possible patients were followed --

6:36PM 5    were all were.  I can't answer that.  You're asking to do

6:36PM 6    analysis -- that's what I'm saying to you.  I didn't tear apart

6:36PM 7    the numbers.  I relied upon the numbers as reported in the

6:36PM 8    study that, indeed, was the same study and the numbers that

6:36PM 9    were given to FDA and used in their assessment.

6:36PM 10            So that's what I did.  I used it as a valid piece of

6:36PM 11   scientific evidence for me to rely upon.

6:36PM 12   Q.    But, Doctor, I really just need an answer to my question

6:37PM 13   first.

6:37PM 14   A.    I tried to always answer your question first if I can.  I

6:37PM 15   apologize if I'm not.  I really try to do that.

6:37PM 16   Q.    Okay.  So my question, Doctor, was that there may be

6:37PM 17   patients included within the group of 29 who reported

6:37PM 18   persistent alopecia in the Taxotere arm and contact may have

6:37PM 19   been lost with them after six months; true?

6:37PM 20   A.    I think I answered it is possible, but it is also possible

6:37PM 21   that is not true.

6:37PM 22   Q.    And if somebody was lost to follow-up in the first six

6:37PM 23   months, you certainly are not telling this jury that you know

6:37PM 24   what their hair would look like after two years; right?

6:37PM 25   A.    Well, I don't think I formed that opinion, no.  I haven't

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

6:37PM  1  tried to tell you what any individual patient's hair would look
6:38PM  2  like in this study, no.
6:38PM  3          But the data that Dr. Madigan read that I heard is
6:38PM  4  the majority of these patients in this 29 were followed for at
6:38PM  5  least five years, if not ten.
6:38PM  6  Q.   My question was simply:  You are not telling us that you
6:38PM  7  know what a patient's hair would look like at two years if they
6:38PM  8  were lost to follow-up in the first six months; correct?
6:38PM  9  A.   I said I agree.  I haven't done that.
6:38PM  10 Q.   Okay.
6:38PM  11 A.   But then I explained my answer.  I apologize.  I think
6:38PM  12 context is important.
6:38PM  13 Q.   You would agree with me that you also don't know how many
6:38PM  14 of the patients within the 29 who were listed as having ongoing
6:38PM  15 alopecia in the TAC arm, you don't know how many of them were
6:38PM  16 taking hormone therapy; true?
6:38PM  17 A.   That, I may be able to find within this study.  Do you
6:38PM  18 want me to look and see?  Because they typically give you
6:38PM  19 inclusion/exclusion criteria and also characteristics of the
6:38PM  20 patients.  Do you want me to look and see if I can find that?
6:39PM  21         I did not look for that, though, in formulating any
6:39PM  22 opinions.
6:39PM  23 Q.   Right.  My question -- let me try to ask it a little bit
6:39PM  24 better.
6:39PM  25         My question is that you did not determine how many of

OFFICIAL TRANSCRIPT

6:39PM  1  the patients were on hormone therapy before you came into court

6:39PM  2  today; correct?

6:39PM  3  A.   No, I did not reanalyze this data.

6:39PM  4  Q.   So let's talk about what the data showed far a moment.

6:39PM  5  All right?

6:39PM  6  A.   Okay.

6:39PM  7  Q.   All right.  So first if we talk about the Taxotere,

6:39PM  8  Adriamycin, Cytoxan group, okay.  Where the TAC arm, as it's

6:39PM  9  called.

6:39PM  10  A.   Sure.

6:39PM  11  Q.   So in your report, you list the final results for ongoing

6:39PM  12  alopecia for the TAC arm as being 3.9 percent; correct?

6:39PM  13  A.   I'm going look and see.

6:39PM  14  Q.   Sure.

6:39PM  15  A.   I don't remember the numbers that I have in my report,

6:40PM  16  but...

6:40PM  17       Yes, that's correct.  It's in the sentence in my

6:40PM  18  paragraph 45.

6:40PM  19  Q.   Okay.  So for the TAC group, then, just to get it out

6:40PM  20  there, it's 3.9 percent; correct?  For ongoing alopecia?

6:40PM  21  A.   That's what I reported here, yes.

6:40PM  22  Q.   Okay.  And then for the FAC group, the reports or the

6:40PM  23  folks that were listed for ongoing alopecia was 2.2 percent;

6:41PM  24  correct?

6:41PM  25  A.   I don't have that in the paragraph, but I believe that's

6:41PM 1  true.

6:41PM 2  Q.   Do you want to take a look?

6:41PM 3  A.   No, I believe that's true.  I'm fine with saying I believe

6:41PM 4  that's true.

6:41PM 5  Q.   Okay.  All right.

6:41PM 6        Now, Doctor, you would agree with me that the FAC

6:41PM 7  group that had 2.2 percent ongoing alopecia, as you state, at

6:41PM 8  the ten-year mark at the end of study, none of those patients

6:41PM 9  got a drop of Taxotere; right?

6:41PM 10 A.   That is correct.  They were not exposed to Taxotere --

6:41PM 11 well, I can't tell you that they never were, but I've assumed

6:41PM 12 an exclusion criteria would indicate that that was true.

6:41PM 13       So, yes, I don't believe that they did.

6:41PM 14 Q.   Okay.  Now, you're familiar with the phrase "statistical

6:42PM 15 significance"; correct?

6:42PM 16 A.   Yes.

6:42PM 17 Q.   And, in fact, as you've told us, you were sitting in court

6:42PM 18 today and you saw Dr. Madigan testify?

6:42PM 19 A.   Yes, I did.

6:42PM 20 Q.   Okay.  And I know you are a toxicologist and a

6:42PM 21 pharmacologist; correct?

6:42PM 22 A.   Yes.

6:42PM 23 Q.   Okay.  But Dr. Madigan is something different.  He is a

6:42PM 24 statistician; correct?

6:42PM 25 A.   Yes.  That's what he does every day.

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

6:42PM 1  **Q.**   Okay.

6:42PM 2  **A.**   Statistics.

6:42PM 3  **Q.**   And I think you referred a moment ago, and you said "Well,

6:42PM 4  wait a minute.  I didn't do that analysis."  You were referring

6:42PM 5  to the analysis that Dr. Madigan did; true?

6:42PM 6  **A.**   Yes, that's correct.

6:42PM 7  **Q.**   Okay.  And when we get to for, lack of a better

6:42PM 8  expression, the numbers, when we get down to brass tacks here

6:42PM 9  and we're talking about these numbers of 2.2 and 3.9, the guy

6:42PM 10  that did the analysis on those numbers was, in fact,

6:42PM 11  Dr. Madigan the statistician; correct?

6:42PM 12  **A.**   I don't know that he said it quite that way, but I think

6:43PM 13  his testimony would speak for himself.  I think he argued back

6:43PM 14  to you that that isn't quite what he set out to do, the way

6:43PM 15  you're describing it.  He was doing a meta-analysis, looking

6:43PM 16  across not just this data but combining it, which would combine

6:43PM 17  the rates within the studies.

6:43PM 18       But I think he did admit to you that there was not a

6:43PM 19  statistically significant difference at P05 of 3.9 and 2.2.

6:43PM 20  **Q.**   Okay.  I think we can agree that he did a deeper dive into

6:43PM 21  the numbers than you did because he's a numbers guy.

6:43PM 22       Can we agree upon that?

6:43PM 23  **A.**   Right.  I never set out to reanalyze the data like he did.

6:43PM 24  **Q.**   Okay.  And, again, you heard him talk about that for hours

6:43PM 25  today; true?

LAURA MASSEY PLUNKETT - CROSS

6:43PM 1    **A.**   Yes.

6:43PM 2    **Q.**   You had the benefit of hearing his testimony; right?

6:43PM 3    **A.**   Right.

6:43PM 4    **Q.**   All right.  And you would agree with me, you heard

6:43PM 5    Dr. Madigan testify under oath, and he said that if you were

6:43PM 6    looking at those two groups, the Taxotere, Adriamycin, Cytoxan

6:44PM 7    group, and you were comparing it to the FAC, or the

6:44PM 8    fluorouracil, Adriamycin, Cytoxan group, and the numbers are

6:44PM 9    2.2 percent and 3.9 percent for ongoing alopecia, he said they

6:44PM 10   are not statistically significant; correct?

6:44PM 11   **A.**   Yes, that's what I just said a minute ago.  He did -- he

6:44PM 12   did testify to that.

6:44PM 13   **Q.**   And what that means, when a statistician like Dr. Madigan

6:44PM 14   says that those two numbers, that that data from those two

6:44PM 15   groups is not statistically significant, what he's saying is

6:44PM 16   that's something that you cannot rule out being caused because

6:44PM 17   of chance; true?

6:44PM 18   **A.**   That one comparison, yes, I would agree.  But that's not

6:44PM 19   what you do in risk assessment.

6:44PM 20   **Q.**   Well, the comparison we're talking about is the

6:44PM 21   2.2 percent and the 3.9 percent, which he says does -- has no

6:44PM 22   statistically significance; true?

6:44PM 23   **A.**   I don't disagree with that.  I'm saying that --

6:45PM 24   **Q.**   Very good.

6:45PM 25   **A.**   -- there's a different way, as a risk assessor, you look

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

6:45PM 1    at data.

6:45PM 2    Q.   And statistical significance, just so we can have a clear

6:45PM 3    agreement on the record, Doctor, is the likelihood that a

6:45PM 4    relationship between two or more variables is caused by

6:45PM 5    something other than chance; correct?

6:45PM 6    A.   I agree with that definition.  Yes.  That is true.

6:45PM 7    Q.   And when you say something is not statistically

6:45PM 8    significant, what you are saying in your world and in

6:45PM 9    Dr. Madigan's world, is you are saying you cannot rule out

6:45PM 10   chance to a reasonable degree of scientific certainty; true?

6:45PM 11   A.   Based upon that specific comparison, yes, you can say

6:45PM 12   that.

6:45PM 13   Q.   Let's change topics.

6:45PM 14        MS. SASTRE:  I'm very close, if you would like me --

6:45PM 15   I'm happy to do whatever the Court wants, as Your Honor knows.

6:46PM 16        THE COURT:  I think we have utilities for a little

6:46PM 17   while long, and that's what we're going to do.

6:46PM 18        MS. SASTRE:  As long as we have lights and running

6:46PM 19   water.

6:46PM 20        THE COURT:  I think we have time to -- I think we

6:46PM 21   have time to finish.

6:46PM 22        MS. SASTRE:  I'll keep going, Judge.

6:46PM 23   BY MS. SASTRE:

6:46PM 24   Q.   Doctor, you talked a little bit about a study sometimes

6:46PM 25   called TAX 301.  Sometimes it's called GEICAM.

LAURA MASSEY PLUNKETT - CROSS

6:46PM   1          Do you recall that?

6:46PM   2   A.   Yes, it's my understanding it's the same study, so...

6:46PM   3   Q.   We have a meeting of the minds on this issue, then.  Okay?

6:46PM   4          So just a couple questions there.  But that's

6:46PM   5   something that you reviewed and you relied upon; correct?

6:46PM   6   A.   Yes.

6:46PM   7   Q.   All right.  And you would agree with me that in that

6:46PM   8   study, which had a TAC group; correct?  Taxotere, Adriamycin,

6:46PM   9   Cytoxan group.

6:46PM   10  A.   Yes.

6:46PM   11  Q.   And they also looked at ongoing alopecia; correct?

6:46PM   12  A.   They did.

6:46PM   13  Q.   And there were only three cases of ongoing alopecia at the

6:46PM   14  end of that study for the Taxotere, Adriamycin, Cytoxan group;

6:46PM   15  right?

6:46PM   16  A.   Yes.  Much smaller study, but that's correct.

6:47PM   17  Q.   Now, I think you've -- I think it's your opinion, you tell

6:47PM   18  me if I have this right, that you think there were issues with

6:47PM   19  the follow-up on the GEICAM study; right?

6:47PM   20  A.   Well, I have -- the data I've seen indicates there were

6:47PM   21  issues with the number of reporting sites.  It had to do with

6:47PM   22  the number of sites that were actually reporting in data.

6:47PM   23  Q.   Okay.

6:47PM   24  A.   And I think this is paragraph 46 in my report.

6:47PM   25  Q.   And my question is just really that you don't agree with

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

| | |
|---|---|
| 6:47PM | 1 |
| 6:47PM | 2 |
| 6:47PM | 3 |
| 6:47PM | 4 |

1  combining the data from TAX 301 or GEICAM and combining it with

2  TAX 316?

3       You don't agree with combining the data from those

4  two studies; true?

5  **A.**   Are you asking me as a toxicologist and a risk assessor,

6  or are you asking me as a statistician?

7  **Q.**   I am asking you as a witness sitting here at trial.  You

8  don't agree with combining the data from GEICAM and TAX 316;

9  true?

10  **A.**   I wouldn't necessarily combine them in an meta-analysis

11  because that's not what I do.  And I think that's what you're

12  talking about.  So, no, that's not my job.  I don't do that.

13       But I relied on both of those studies as providing

14  independent information that was part of my weight of the

15  evidence.

16  **Q.**   It's not just that it's not your job, Dr. Plunkett, it's

17  that you disagree with pooling those two studies together

18  because you think there were significant problems with

19  follow-up in GEICAM; true?

20  **A.**   I certainly thought follow-up was an issue, but I'm not a

21  statistician.  So, again, I have -- that's not what I do.  I

22  don't do a meta-analysis.  So I would defer to the statistician

23  to tell you whether it's appropriate to combine them in the way

24  he did.  That's not me.

25  **Q.**   But you do have an opinion.  I'm just going to ask a very

LAURA MASSEY PLUNKETT - CROSS

6:48PM  1   straightforward question, Dr. Plunkett.  It is your opinion

6:49PM  2   that you disagree with pooling those two studies together;

6:49PM  3   correct?

6:49PM  4   A.   So you must be --

6:49PM  5   Q.   Yes or no, please.

6:49PM  6   A.   I can't answer -- I don't think I can answer the way

6:49PM  7   you're asking.  I -- I don't -- I disagree if the issue is I

6:49PM  8   can't use both of those studies as independent piece of

6:49PM  9   information.  If you're asking me would I do an analysis to

6:49PM  10  combine the data, I haven't done that.  And I would have to

6:49PM  11  investigate further the -- the characteristics to do it.  So I

6:49PM  12  would disagree I would do it.  Yeah, I probably would have said

6:49PM  13  to you in a deposition, I wouldn't do that because that isn't

6:49PM  14  what I do.

6:49PM  15  Q.   Well, it's what Dr. Madigan did; right?

6:49PM  16  A.   And he, I think, explained it.  Yes, he did.  And I think

6:49PM  17  he explained that to you.

6:49PM  18  Q.   And --

6:49PM  19  A.   Or not to you, but to the Court.

6:49PM  20  Q.   And it's something you wouldn't do; right?

6:49PM  21  A.   Because I'm not a statistician, that's correct.

6:49PM  22  Q.   And because you're not comfortable doing it; true?

6:50PM  23  A.   Because I'm not a statistician, that's true.

6:50PM  24  Q.   Let's take a look at your deposition.

6:50PM  25  A.   All right.

LAURA MASSEY PLUNKETT - CROSS

| | | |
|---|---|---|
| 6:50PM | 1 | **Q.** Very good. |
| 6:50PM | 2 | Page 276, please. |
| 6:50PM | 3 | 276, Dr. Plunkett, and I'll start at line 11. |
| 6:50PM | 4 | **A.** Yes. |
| 6:50PM | 5 | **Q.** Okay. |
| 6:50PM | 6 | **A.** Well, the question -- oh, you're going to go to the |
| 6:50PM | 7 | question or the -- |
| 6:50PM | 8 | **Q.** Line 11 on 276 is a question. |
| 6:50PM | 9 | **A.** Oh, I see it now.  I apologize. |
| 6:50PM | 10 | **Q.** No worries.  It's getting late. |
| 6:50PM | 11 | Okay. |
| 6:50PM | 12 | "Q.  And then if we combine that with the number of |
| 6:50PM | 13 | patients in the GEICAM study, 532, I've done the math, |
| 6:51PM | 14 | it's 1,276 patients. |
| 6:51PM | 15 | "A.  I believe that's true.  Yes, I think I've seen |
| 6:51PM | 16 | that number. |
| 6:51PM | 17 | "Q.  And if we added the number that reported |
| 6:51PM | 18 | alopecia beyond this 31-day period, it's a total of 32 |
| 6:51PM | 19 | individuals out of 1,276?" |
| 6:51PM | 20 | And your answer was: |
| 6:51PM | 21 | "A.  So I disagree with you pooling these two |
| 6:51PM | 22 | together based on the significant problems with the GEICAM |
| 6:51PM | 23 | study on follow-up, but I absolutely agree your math is |
| 6:51PM | 24 | correct.  And if you're asking me do those numbers added |
| 6:51PM | 25 | come to the number, they do." |

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - REDIRECT

6:51PM  1                 Did I read that correctly?

6:51PM  2    A.    You did, but that is not what Dr. Madigan did.

6:51PM  3    Q.    Okay.  Just give me a second.

6:52PM  4                 Doctor, you are not providing an opinion that

6:52PM  5    Taxotere causes persistent alopecia; true?

6:52PM  6    A.    That is correct.  I'm not here to speak with causation.

6:52PM  7    Q.    Okay.  And, likewise, we can agree you're not providing an

6:52PM  8    opinion that Taxotere caused persistent alopecia in

6:52PM  9    Mrs. Earnest; correct?

6:52PM  10   A.    That's correct.  I'm not case specific causation.

6:52PM  11                 MS. SASTRE:  Thank you very much for your time.

6:52PM  12   Thank you, Your Honor, ladies and gentlemen.

6:52PM  13                      Pass the witness.

6:52PM  14                 THE COURT:  Dr. Plunkett, we're going to come back

6:52PM  15   tomorrow.

6:52PM  16                 THE WITNESS:  I was -- I missed all my planes, so --

6:52PM  17                 THE COURT:  Well, the problem I have is we've got

6:52PM  18   utilities until 7:00.

6:52PM  19                 MR. NOLEN:  Five minutes.  Five minutes.  I'll take

6:53PM  20   five minutes.

6:53PM  21                 THE COURT:  Five minutes.  Okay.

6:53PM  22                      REDIRECT EXAMINATION

6:53PM  23   BY MR. NOLEN:

6:53PM  24   Q.    Dr. Plunkett, did you review the Taxotere label, the 2011

6:53PM  25   Taxotere label?

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - REDIRECT

6:53PM  1  **A.**   Yes.

6:53PM  2  **Q.**   And did you see any warning at all for permanent hair

6:53PM  3  loss?

6:53PM  4  **A.**   Absolutely not.  It's not in the label.

6:53PM  5  **Q.**   And would you base an opinion about increased risk on --

6:53PM  6  an increased risk of permanent hair loss on case reports?

6:53PM  7  **A.**   No.

6:53PM  8  **Q.**   And --

6:53PM  9  **A.**   Not alone, no.

6:53PM  10 **Q.**   For the other drugs you were asked about -- Taxol, 5-FU,

6:53PM  11 Prednisone, busulfan, cisplatin -- did you find anything other

6:53PM  12 than case reports?

6:53PM  13 **A.**   That's all I found.  That's the difference between those

6:53PM  14 drugs and Taxotere.

6:54PM  15 **Q.**   And would you agree that it would be improper to base an

6:54PM  16 opinion about increased risk of permanent hair loss on just

6:54PM  17 those case reports?

6:54PM  18       **MS. SASTRE:**  Leading, objection.

6:54PM  19       **THE COURT:**  Overruled.

6:54PM  20       **THE WITNESS:**  Yes, that's correct.

6:54PM  21 BY MR. NOLEN:

6:54PM  22 **Q.**   When you were reviewing Sanofi's data related to 316,

6:54PM  23 TAX 316, did you believe that you could rely on their published

6:54PM  24 study results?

6:54PM  25 **A.**   Yes, I did.

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - REDIRECT

6:54PM   1   **Q.**   Did some of the literature that you reviewed rely on
6:54PM   2   Sanofi's published study results for TAX 316?
6:54PM   3   **A.**   Yes, we went over one.  Namini does that.
6:54PM   4   **Q.**   Now, Doctor, do you agree -- strike that.
6:55PM   5          Doctor, we talked about apples and grapefruit a lot.
6:55PM   6   **A.**   And oranges.
6:55PM   7   **Q.**   And oranges.
6:55PM   8          Do you remember that?
6:55PM   9   **A.**   Yes.
6:55PM  10   **Q.**   All right.  So if case reports are apples, if you took a
6:55PM  11   bunch of case reports or a bunch of apples, and if a clinical
6:55PM  12   trial is a grapefruit, would a bunch of apples ever equal a
6:55PM  13   grapefruit?
6:55PM  14   **A.**   No, because it's not just weight.  The actual grams they
6:55PM  15   weigh or the ounces they weigh, that's right, there's quality
6:55PM  16   to the consideration.  So the grapefruit becomes much bigger
6:55PM  17   even than the ones you might see in a store.  So maybe that's
6:55PM  18   not even the best analogy.  I should have used watermelons to
6:55PM  19   apples.
6:55PM  20   **Q.**   So if we did weight of the evidence, which is what you
6:55PM  21   said you utilized, and we put 100 apples over here and one
6:56PM  22   grapefruit on the left side, which way does it go?
6:56PM  23   **A.**   It would go to the grapefruit probably.
6:56PM  24   **Q.**   Okay.
6:56PM  25   **A.**   Because of the -- because of the quality considerations as

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - REDIRECT

6:56PM 1    well.  It's not as simple as just how many.

6:56PM 2    Q.    One grapefruit bigger than 100 apples?

6:56PM 3    A.    It can be, yes.

6:56PM 4            MR. NOLEN:  Thank you.  Pass the witness.

6:56PM 5            THE COURT:  All right.  We are at recess until

6:56PM 6    tomorrow morning.

6:56PM 7            Let me remind you, ladies and gentlemen, don't

6:56PM 8    discuss the case amongst yourself or with anyone else.  Don't

6:56PM 9    do any research.  You should have no contact with anyone out

6:56PM 10   here.  And I think we're going to start at 9:00 tomorrow

6:56PM 11   because you had to stay late today, so we'll -- Court will

6:56PM 12   begin at 9:00 tomorrow.  Court's at recess until 9:00 a.m.

6:56PM 13           THE DEPUTY CLERK:  All rise.

6:56PM 14           (WHEREUPON, the jury exited the courtroom.)

6:56PM 15                          *****

6:56PM 16                        **CERTIFICATE**

6:56PM 17       I, Jodi Simcox, RMR, FCRR, Official Court Reporter
6:56PM      for the United States District Court, Eastern District of
6:56PM 18   Louisiana, do hereby certify that the foregoing is a true and
6:56PM      correct transcript, to the best of my ability and
6:56PM 19   understanding, from the record of the proceedings in the
6:56PM      above-entitled and numbered matter.
6:56PM 20
6:56PM
6:56PM 21
6:56PM
6:56PM 22                     *s/Jodi Simcox, RMR, FCRR*
6:56PM                        Jodi Simcox, RMR, FCRR
6:56PM 23                     Official Court Reporter
6:56PM

24

25

OFFICIAL TRANSCRIPT