08:48:06

1                     UNITED STATES DISTRICT COURT

2                     EASTERN DISTRICT OF LOUISIANA

3

4

5    IN RE:   TAXOTERE (DOCETAXEL)
              PRODUCTS LIABILITY          Docket No.: 16-MD-2740
6             LITIGATION                  Section "H(5)"
                                          September 19, 2019
7                                         New Orleans, Louisiana

8    *Relates To*:  *Barbara Earnest*,
     *Case No.: 16-CV-17144*

9

10   * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

11
                          DAY 4, MORNING SESSION
12             TRANSCRIPT OF JURY TRIAL PROCEEDINGS
          HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
13                 UNITED STATES DISTRICT JUDGE

14

15   <u>APPEARANCES</u>:

16   For the Plaintiffs:        Barrios, Kingsdorf & Casteix, LLP
                                BY:  DAWN BARRIOS, ESQ.
17                              701 Poydras Street
                                Suite 3650
18                              New Orleans, Louisiana 70139

19

20   For the Plaintiffs:        Gainsburgh, Benjamin, David,
                                  Meunier & Warshauer, LLC
21                              BY:  PALMER LAMBERT, ESQ.
                                2800 Energy Centre
22                              1100 Poydras Street
                                New Orleans, Louisiana 70163-2800
23

24

25

                          ***OFFICIAL TRANSCRIPT***

1    APPEARANCES:

2    For the Plaintiffs:          David F. Miceli, LLC.
                                  BY:  DAVID F. MICELI, ESQ.
3                                 P. O. Box 2519
                                  Carrollton, GA 30112
4

5
     For the Plaintiffs:          Gibbs Law Group, LLP
6                                 BY:  KAREN BARTH MENZIES, ESQ.
                                  6701 Center Drive West, Suite 1400
7                                 Los Angeles, California 90045

8

9    For the Plaintiffs:          Pendley, Baudin & Coffin, LLP
                                  BY:  CHRISTOPHER COFFIN, ESQ.
10                                1100 Poydras Street
                                  Suite 2505
11                                New Orleans, Louisiana 70163

12

13   For the Plaintiffs:          Bachus & Schanker, LLC
                                  BY:  DARIN SCHANKER, ESQ.
14                                BY:  J. KYLE BACHUS, ESQ.
                                  1899 Wynkoop Street
15                                Suite 700
                                  Denver, Colorado 80202
16

17
     For the Plaintiffs:          Fleming, Nolen & Jez, LLP
18                                BY:  RAND P. NOLEN, ESQ.
                                  2800 Post Oak Boulevard
19                                Suite 4000
                                  Houston, Texas 77056
20

21
     For the Plaintiffs:          Morgan and Morgan
22                                BY:  EMILY C. JEFFCOTT, ESQ.
                                  7010 S. Palafox Street, Suite 95
23                                Pensacola, Florida 32502

24

25

                          *OFFICIAL TRANSCRIPT*

<u>APPEARANCES</u>:

For Sanofi-Aventis U.S.,
LLC and Sanofi US
Services, Inc.:              Irwin Fritchie Urquhart
                              & Moore, LLC
                             BY:  DOUGLAS J. MOORE, ESQ.
                             400 Poydras Street, Suite 2700
                             New Orleans, Louisiana 70130


For Sanofi-Aventis U.S.,
LLC and Sanofi US
Services, Inc.:              Shook Hardy & Bacon, LLP
                             BY:  HARLEY V. RATLIFF, ESQ.
                             BY:  JON A. STRONGMAN, ESQ.
                             2555 Grand Boulevard
                             Kansas City, Missouri 64108


For Sanofi-Aventis U.S.,
LLC and Sanofi US
Services, Inc.:              Shook Hardy & Bacon, LLP
                             BY:  HILDY M. SASTRE, ESQ.
                             201 Biscayne Boulevard
                             Suite 3200
                             Miami, Florida 33131


Official Court Reporter:    Cathy Pepper, CRR, RMR, CCR
                             Certified Realtime Reporter
                             Registered Merit Reporter
                             500 Poydras Street, Room B-275
                             New Orleans, Louisiana 70130
                             (504) 589-7779
                             Cathy_Pepper@laed.uscourts.gov


Proceedings recorded By mechanical stenography.  Transcript
produced by computer-aided transcription.

*OFFICIAL TRANSCRIPT*

1                              **I N D E X**

2

3                                                          <u>PAGE</u>

4

5    **ANTONELLA TOSTI, M.D.**................................. 929

6    VOIR DIRE EXAMINATION BY MR. SCHANKER................ 929

7    DIRECT EXAMINATION BY MR. SCHANKER................... 942

8    LUNCHEON RECESS.....................................1023

9

07:59:30 10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*OFFICIAL TRANSCRIPT*

**P-R-O-C-E-E-D-I-N-G-S**

THURSDAY, SEPTEMBER 19, 2019

M O R N I N G   S E S S I O N

(COURT CALLED TO ORDER)

08:46:35

09:02:16       THE DEPUTY CLERK:  All rise.  Court is in session.  You

09:02:31   may be seated.

09:02:32       THE COURT:  Have a seat.

09:02:33           I understand that we need to put in exhibits

09:02:36   related to the Aussel deposition.  So while Mr. Schanker and

09:02:42   Mr. Ratliff are working through exhibits, let's get that done.

09:02:49       MR. COFFIN:  Yes, Your Honor, Chris Coffin on behalf of

09:02:51   the plaintiff, Barbara Earnest.  For Mr. Aussel's testimony,

09:02:56   there were five exhibits:  11 -- Plaintiff's 11, 131, 141, 185,

09:03:07   526.  I understand that in 141 there was a page that had to

09:03:14   be -- or pages that had to be replaced.  I believe that was

09:03:17   done already, and your clerk is indicating that that was done.

09:03:22   So I think all of the exhibits have been corrected, and we

09:03:24   offer those in evidence, Your Honor.

09:03:26       MR. MOORE:  We would simply restate our objections as

09:03:33   outlined in the plaintiff's exhibit list.  There were missing

09:03:36   pages from Exhibit 141, and that has been supplemented to the

09:03:39   Court by the plaintiffs.

09:03:41       THE COURT:  Thank you.

*OFFICIAL TRANSCRIPT*

09:03:42  1              Are there any other preliminary issues that we

09:03:47  2      want to put on the record now?

09:03:51  3              MR. STRONGMAN:  Good morning, Your Honor, Jon Strongman

09:03:54  4      on behalf of Sanofi.  Just a couple of issues.  I understand

09:03:55  5      that Dr. Feigal is going to testify today, and we would just

09:04:03  6      re-urge the points set out in our *Daubert* motion as it relates

09:04:05  7      to Dr. Feigal's general causation opinion.

09:04:11  8              And, specially, it's my understanding that

09:04:11  9      Dr. Feigal is going to come in today and talk about causation

09:04:14 10      factors, Bradford Hill factors.  And our arguments, as we

09:04:17 11      raised in those motions, would be that she did not adequately

09:04:21 12      set out that opinion in a report or methodically walk through

09:04:26 13      those factors and, for those reasons, hasn't established a

09:04:29 14      reliable methodology for that opinion.  So we would just

09:04:32 15      reassert those objections.

09:04:37 16              MR. MICELI:  We're doing this as a formality.  We went

09:04:40 17      over this in chambers.

09:04:41 18              THE COURT:  And the Court has previously ruled in the

09:04:45 19      *Daubert* motion and finds no reason to change anything I've

09:04:50 20      already ruled upon.

09:04:54 21              MR. STRONGMAN:  Then with regard to the documents that

09:04:55 22      I understand they are going to use with Dr. Feigal, just in

09:04:58 23      terms of trying to avoid the interruption of being up at the

09:04:59 24      bench today, as we discussed this morning, one of the documents

09:05:02 25      that they had identified was what we called the *2015 Clinical*

**OFFICIAL TRANSCRIPT**

09:05:07  1    *Overview.*  I think it's Plaintiff's Exhibit 517.

09:05:12  2         It's my understanding that Mr. Miceli intends to

09:05:16  3    not put the document in evidence or up on the screen but will

09:05:20  4    ask the witness whether or not a Sanofi employee has reached

09:05:24  5    the same conclusion that she has drawn, and the witness will be

09:05:27  6    able to answer that question yes or no.

09:05:32  7         THE COURT:  I'm not sure, Mr. Miceli --

09:05:33  8         MR. MICELI:  Yes, Your Honor.  I wanted to know what

09:05:37  9    your question was when I said "yes."  I'm sorry.

09:05:40 10         THE COURT:  I thought you indicated that you were going

09:05:42 11    to show the chart of the adverse --

09:05:45 12         MR. MICELI:  What I would like to show would be just

09:05:48 13    the front page of it, if anything at all, and then ask her the

09:05:51 14    question we discussed in chambers.

09:05:55 15         THE COURT:  And the questions you discussed in chambers

09:05:58 16    are certainly coming up.  I couldn't recall, very frankly, if

09:06:01 17    there was an agreement.

09:06:02 18         Is there an objection to him showing just the

09:06:05 19    front page?

09:06:06 20         MR. STRONGMAN:  I think the date of it is irrelevant

09:06:08 21    for her opinion.  So that would be it.  You can show -- it's

09:06:11 22    the date of it that I feel is irrelevant, because she's not

09:06:14 23    talking about when or -- what the company knew when or when

09:06:20 24    they should have known it.  That would be my objection.  She's

09:06:23 25    just giving a causation opinion.

                              ***OFFICIAL TRANSCRIPT***

09:06:24  1          THE COURT:  That it is a 2015 document?

09:06:25  2          MR. MICELI:  It's a 2015 document, but because she's

09:06:29  3     general causation, everything is open to her.  We're asking,

09:06:33  4     does it cause it as of today?

09:06:35  5          THE COURT:  I understand.  She's not limited to the

09:06:38  6     2011 because she's not speaking to the labelling that should

09:06:43  7     have been -- she's not what they knew when.

09:06:45  8          MR. MICELI:  She's only speaking to general causation.

09:06:48  9     So, therefore, the date is not irrelevant.  It's what she

09:06:52 10     reviewed.  We agreed in chambers as an accommodation to not put

09:06:56 11     the document --

09:06:57 12          THE COURT:  I'm going to allow you to show the front

09:07:00 13     page, but I'm not -- I think I'm not going to allow you to

09:07:03 14     enter the document into evidence --

09:07:04 15          MR. MICELI:  Okay.

09:07:05 16          THE COURT:  -- subject to any objections.

09:07:07 17          MR. STRONGMAN:  And I have just made my objections, and

09:07:09 18     that way I won't have to approach in the middle of examination.

09:07:12 19          THE COURT:  Okay.  Thank you.

09:07:13 20          MR. MICELI:  Thank you, Your Honor.

09:07:14 21          THE COURT:  Anything else?

09:07:15 22          MR. COFFIN:  On the Aussel documents you just talked

09:07:18 23     about, I just did not hear the Court say that those were

09:07:21 24     admitted.  Are those admitted?

09:07:23 25          THE COURT:  I thought I already did that.  But okay.

*OFFICIAL TRANSCRIPT*

09:07:26  1        MR. MOORE:  I thought you did.

09:07:28  2        THE COURT:  Those documents are admitted.

09:07:28  3        (WHEREUPON, Plaintiff's Exhibit 11, 131, 141, 185 and

09:07:28  4  529 were admitted.)

09:07:43  5        THE COURT:  Is there anything we can do ahead of time

09:07:45  6  while we're finishing up these last few things?

09:07:49  7        MS. SASTRE:  If I could have 30 seconds to find out

09:09:05  8  where we left off in the slide.

09:09:05  9        THE COURT:  Just let me know when we're ready for the

09:09:08 10  jury.

09:09:08 11        MR. SCHANKER:  Your Honor, we've worked through all of

09:09:42 12  these.

09:09:42 13        THE COURT:  Are we ready?

09:09:44 14        MS. SASTRE:  Ten seconds.

09:09:45 15        MR. SCHANKER:  They are just taking a final look.  And

09:09:48 16  you got your copy back, I believe.

09:09:52 17        THE COURT:  Oh, no, I have my copy.

09:09:54 18        MR. SCHANKER:  There are some redactions that are not

09:10:05 19  on your copy that you'll see, part of our agreement.

09:12:48 20        THE COURT:  Are we ready?

09:12:50 21        MS. SASTRE:  Yes, ma'am.

09:12:52 22        THE COURT:  Let's bring in the jury.

09:12:55 23        (WHEREUPON, at 9:12 a.m. the jury panel enters the

09:13:05 24  courtroom.)

09:13:05 25        THE COURT:  All jurors are present.  Court is back in

*OFFICIAL TRANSCRIPT*

09:13:08 1   session.  You may be seated.  Good morning.

09:13:11 2            VOICES:  Good morning.

09:13:12 3            THE COURT:  Mr. Schanker, please proceed.

09:13:16 4            MR. SCHANKER:  Good morning, Your Honor.  Good morning,

09:13:18 5   everyone.  We would like to call, Your Honor,

09:13:27 6   Dr. Antonella Tosti to the stand.

09:13:47 7            THE DEPUTY CLERK:  Would you please raise your right

8   hand.  Do you solemnly swear that the testimony which you are

9   about to give will be the truth, the whole truth and nothing

10  but the truth, so help you God?

11            THE WITNESS:  I understand.

12                    **ANTONELLA TOSTI, M.D.,**

13   was called as a witness and, after being first duly sworn by

14   the Clerk, was examined and testified on her oath as follows:

15            THE DEPUTY CLERK:  Please state and spell your name for

16  the record.

09:13:56 17           THE WITNESS:  Antonella Tosti.

09:13:56 18           THE DEPUTY CLERK:  Can you spell it, please.

09:14:00 19           THE WITNESS:  A-N-T-O-N-E-L-L-A, T-O-S-T-I.

09:14:09 20                   VOIR DIRE EXAMINATION

09:14:11 21  BY MR. SCHANKER:

09:14:11 22  Q.   Good morning.  Could you go ahead and introduce yourself

09:14:13 23  to the jury, Dr. Tosti, and tell them where you're from.

09:14:17 24  A.   So I am Italian.  I believe you can hear from my accent.

09:14:22 25  And I am a medical doctor and I am a dermatologist, and I

*OFFICIAL TRANSCRIPT*

09:14:29 1    specialize in disorders.

09:14:31 2         I've been working with disorders all my life.  And I

09:14:36 3    am very well known in the world.  I wrote books.  I wrote

09:14:41 4    publications.  I'm invited all over the world to teach hair

09:14:47 5    disorders to people.  And I also, of course, see patients with

09:14:51 6    hair disorder in my daily life.

09:14:54 7         THE COURT:  Dr. Tosti, I think he's going to need to

09:14:57 8    ask you some questions.

09:14:59 9         THE WITNESS:  Okay, sorry.

09:14:59 10   EXAMINATION BY MR. SCHANKER:

09:15:01 11   Q.   Dr. Tosti, we'll just kind of back up.  Thanks for sharing

09:15:05 12   a little bit about yourself.

09:15:06 13        You're here to testify in this case concerning some

09:15:11 14   scientific issues; is that right?

09:15:13 15   A.   Yes.  It is.

09:15:14 16   Q.   Okay.  We'll work through that.  But, first, let's work

09:15:18 17   through your professional background for the jury.  You already

09:15:22 18   covered a little bit there, but if you could share with the

09:15:25 19   jury, just so we're clear, exactly what you do for a living.

09:15:30 20   A.   I do for a living, I'm a medical doctor, so I see

09:15:35 21   patients.  That's what I do for a living.  I teach at

09:15:38 22   university.  So I will have been at university -- I was in

09:15:42 23   Italy before, at University of Bologna, which is the oldest

09:15:49 24   university in the world.  Then I moved to United States.  I'm

09:15:54 25   now a professor in Miami, at University of Miami.

*OFFICIAL TRANSCRIPT*

09:15:56   1    Q.   Obviously, English is your second language.

09:16:00   2    A.   Yes.  Please don't tell me that.

09:16:02   3    Q.   Doctor, the jury has a right to hear and understand what

09:16:08   4    you say.  So if I ask you to repeat some things, so that

09:16:13   5    everyone is clear in the courtroom, is that okay?

09:16:15   6    A.   Absolutely fine.

09:16:16   7    Q.   Thank you.

09:16:18   8         So you've indicated what you do for a living.  Do you

09:16:25   9    practice medicine?

09:16:25  10    A.   Yes, I do practice medicine every day.

09:16:28  11    Q.   Share with the jury what that means and what you do.

09:16:32  12    A.   So I see patients with hair disorders, mostly, but I'm

09:16:39  13    also an expert in nail, because nails and hair are very

09:16:44  14    similar.  I see patients in Miami.  I also still keep my

09:16:49  15    practice in Italy, where I go every three months for two weeks

09:16:54  16    to see patients.

09:16:55  17    Q.   You gave us your résumé in this case; is that right?

09:17:01  18    A.   Yes.

09:17:01  19    Q.   I would like to just -- we won't go through the whole

09:17:06  20    thing.  It's 60-some pages.  But just highlight in order for

09:17:11  21    the jury to understand a little bit about what you do

09:17:13  22    professionally.  Is that fair?

09:17:14  23    A.   Yes.  Sure.

09:17:41  24    Q.   Dr. Tosti, we talked about the fact that you practice

09:17:44  25    medicine.  How long have you practiced medicine, specifically

*OFFICIAL TRANSCRIPT*

09:17:45  1    as a dermatologist?

09:17:45  2    A.    More than 30 years.

09:17:48  3    Q.    Just so we're all clear, do you have a specialty within

09:17:50  4    dermatology?

09:17:51  5    A.    I have a specialty in hair and nail disorders.

09:17:54  6    Q.    How long have you had that specialty?

09:17:56  7    A.    You know, I started becoming interested in hair very soon,

09:18:01  8    as soon as I finished my residency --

09:18:05  9    Q.    Okay.

09:18:06 10    A.    -- so more than 30 years.

09:18:07 11    Q.    You indicated that you practice -- you see patients in

09:18:12 12    Miami, as well as in Italy?

09:18:15 13    A.    Yes.  I do.

09:18:17 14    Q.    Could you estimate how many patients you've seen in your

09:18:21 15    lifetime?

09:18:22 16    A.    Thousands.

09:18:25 17    Q.    As far as why, just so the jury understands, why you have

09:18:28 18    a practice both in Italy and in Miami?

09:18:32 19    A.    Because I was working in Italy.  When I moved to the

09:18:35 20    United States, my practice was very successful, and I thought I

09:18:40 21    will keep it.  You know, I don't know what's going to happen

09:18:45 22    with the university.  That's the main reason.  I love my

09:18:48 23    patients in Italy, so I keep both.

09:18:50 24    Q.    In addition to practicing and seeing patients, do you do

09:18:55 25    research?

*OFFICIAL TRANSCRIPT*

09:19:00  1  A.    Yes, I do clinical research, and I teach.  That's what I
09:19:04  2  really love to do.
09:19:05  3  Q.    Since you brought up your teaching, let's talk about that.
09:19:08  4        Before we do that, just briefly, let's make sure the
09:19:12  5  jury understands when you got your degree, and take us through
09:19:16  6  where you went to school and that process, your higher
09:19:18  7  education, if you would.
09:19:20  8  A.    Yes, I had my degree at University of Bologna, and I did
09:19:24  9  my residency at University of Bologna.  I was full professor of
09:19:29 10  dermatology at the University of Bologna.  I also was director
09:19:33 11  of the residency school.
09:19:36 12        Then, at one point, I decide to move.  I needed
09:19:40 13  something maybe new in my life.  I moved to Miami, to the
09:19:45 14  United States.
09:19:45 15  Q.    That's what brought you to Miami?
09:19:47 16  A.    That's when I moved to Miami.  Then, you know, I start
09:19:57 17  working at University of Miami.
09:19:57 18  Q.    We were talking about your work as researcher.  You
09:20:01 19  indicated -- you specified for me clinical researcher.  Could
09:20:05 20  you explain to the jury what you mean by that?
09:20:07 21  A.    That means that, you know, I may publish papers about
09:20:14 22  treatment and diagnosis of hair disorders.
09:20:19 23        For instance, I first recognized a new hair disorder
09:20:23 24  in my life.  You know, that's something -- that's clinical
09:20:29 25  research, to describe new things, so the other doctors reading

*OFFICIAL TRANSCRIPT*

09:20:37 1    the paper learn either how to diagnose or how to treat.

09:20:41 2         I developed this technique, which is called

09:20:46 3    *dermoscopy* or *trichoscopy*, to look at the scalp very close, and

09:20:51 4    that is very helpful for diagnosis.

09:20:52 5    Q.   Doctor, with regard to your research -- and we'll come

09:20:57 6    back to the dermoscopy or trichoscopy that you developed, but

09:21:00 7    with regard to your research, in your résumé it lists many,

09:21:13 8    many pages.  Do you know how many peer-reviewed articles you

09:21:14 9    have published?

09:21:17 10   A.   You know, I've published a lot.  More than 600.

09:21:21 11   Q.   Of those, how many are on the topic of hair,

09:21:22 12   approximately?

09:21:22 13   A.   I would say one-third.

09:21:23 14   Q.   With regard to being a clinical researcher, why do you do

09:21:29 15   it?

09:21:30 16   A.   That's what I love to do.  You know, it's complicated.  I

09:21:35 17   cannot even explain why I like to write papers and I like to

09:21:39 18   research.  It's something that you probably are born with.  As

09:21:45 19   you like to draw, I like to research.

09:21:47 20   Q.   In addition to being a clinician seeing patients, being a

09:21:54 21   researcher, do you also teach?

09:21:57 22   A.   Yes.  That's also something I like.  That's why I've been

09:22:02 23   always at university all my life.

09:22:04 24        I teach all over the world.  I have fellows coming --

09:22:12 25   for instance, now in Miami, they come to spend one year with me

*OFFICIAL TRANSCRIPT*

09:22:14  1   to learn hair and nail disorders and go back.  We have a

09:22:19  2   special fellowship at university for that.

09:22:23  3         I have people from Brazil, from South Arabia, from

09:22:29  4   Mexico, from Italy, of course, from many, many countries.

09:22:31  5   Q.   So you teach at the University of Miami?

09:22:34  6   A.   Yes, I teach at the University of Miami.  I teach

09:22:38  7   students, residents, and fellows.

09:22:40  8   Q.   The fellows you're taking about, are these doctors who

09:22:44  9   come?

09:22:44 10   A.   They are already dermatologists that want to specialize in

09:22:52 11   hair disorders.  There are not many people that are really

09:22:53 12   trained in the world.  There are some countries, they don't

09:22:55 13   have anybody, so they decide to come and be trained.

09:22:58 14   Q.   In addition to the formal, that style of teaching, whether

09:23:06 15   students or other doctors, do you do lectures?

09:23:08 16   A.   I do a lot of lectures, yes, all over the world.

09:23:11 17   Q.   Just briefly, make sure the jury understands what type of

09:23:17 18   lectures you do, where you do them, those sorts of things.

09:23:19 19   A.   You know, most of these lectures are either on hair

09:23:23 20   disorders, on diagnosis or treatment, or on nail disorders.

09:23:30 21         A lecture means that I have a title, and I explain

09:23:35 22   the audience, the topic that -- may be various topics.

09:23:46 23   Q.   Of those, being a practicing doctor, being a researcher

09:23:50 24   and a teacher, what -- do you have a favorite of those?

09:23:54 25   A.   You know, I like all of them.  I like my patients.  I

*OFFICIAL TRANSCRIPT*

09:23:57  1   really love seeing my patients.  I really love to teach.  I
09:24:02  2   believe clinical research is part of all of that.  Because you
09:24:07  3   improve the way you can treat your patients.  If I see
09:24:09  4   something, I always go and see if there is something new you
09:24:12  5   can do.  You know, it's a way --
09:24:17  6   Q.    Just to be clear, you're licensed in Italy, as well as in
09:24:20  7   the United States?
09:24:21  8   A.    Yes, I'm licensed both in Italy and in the United States.
09:24:25  9   Q.    In Florida?
09:24:26 10   A.    Yes.  Because when I start practicing at university, you
09:24:31 11   know, if you are not trained in U.S., you normally have to do
09:24:35 12   the exam and everything.  But the Florida board gave me the
09:24:40 13   license because of my extraordinary abilities.
09:24:49 14   Q.    Doctor, in your clinic, how long does it take to get an
09:24:55 15   appointment to see you?
09:24:57 16   A.    Right now, maybe nine months, but that's not something I
09:25:00 17   like.  I hate it.  I have to improve.
09:25:03 18   Q.    As far as speaking around in conferences and those sorts
09:25:13 19   of things, are you invited to do that?
09:25:15 20   A.    Yes.  I'm invited to do that.
09:25:17 21   Q.    Share with the jury just a little bit about that, if you
09:25:19 22   would.
09:25:19 23   A.    The people who organize the meeting, they want me to go to
09:25:25 24   teach at the meeting -- they usually decide what they want me
09:25:29 25   to teach.

**OFFICIAL TRANSCRIPT**

09:25:31 1      They usually pay for my travel and for my hotel to

09:25:36 2 go.  But, in any case, it's tough, because flights may be

09:25:41 3 longer, and it's -- my family is not always so happy that I go,

09:25:46 4 but I like to go.

09:25:47 5 Q.   Concerning societies, organizations, those sorts of

09:25:53 6 things, do you belong to any of those -- you could highlight

09:25:58 7 those for the jury, if you do -- that are in your area of

09:26:01 8 specialty?

09:26:02 9 A.   I'm now the president of the American Hair Research

09:26:06 10 Society, which is the society that is in United States and is

09:26:14 11 South America -- so it's called *America*, but it's not America

09:26:18 12 and Canada, it's also Central and South America -- of all the

09:26:21 13 doctors who study and do research on hair.  So I'm president of

09:26:26 14 that society.

09:26:28 15      I'm president of the International Society of

09:26:35 16 Trichoscopy, which is this technique to look at the scalp

09:26:39 17 closely.  I founded this society five years ago.

09:26:43 18 Q.   Let's talk about that device, since you mentioned it

09:26:47 19 again.  You've referred to it a couple of times, and I believe

09:26:50 20 you used two different terms for it, the trichoscopy or the

09:26:54 21 dermoscopy.  Just so the jury understands, as it goes to your

09:26:57 22 qualifications --

09:26:57 23 A.   Yes.

09:26:58 24 Q.   -- could you share with us the background on that device

09:27:01 25 and your involvement in its innovation?

*OFFICIAL TRANSCRIPT*

09:27:04 1    A.    So that device, you probably know, because the doctors

09:27:08 2    often use to check moles.  So it's a special device that you

09:27:12 3    can see clearly and magnified the skin.

09:27:16 4          I start using that device to look at the scalp to see

09:27:21 5    the single hair coming out from the scalp.  So it's very useful

09:27:25 6    to screen the patient because it's not invasive, so it doesn't

09:27:30 7    cause any pain.  It's kind of fast thing to see clearly,

09:27:34 8    because, otherwise, it's difficult.

09:27:35 9    Q.    Just to understand, as far as your qualifications go, your

09:27:41 10   experience with the trichoscopy, you talked about pain.  What

09:27:48 11   are you referring to, it doesn't cause pain?  Is there

09:27:49 12   something else that does cause pain that the trichoscopy

09:27:51 13   replaced or helped to minimize?

09:27:54 14   A.    Sometimes, to make a diagnosis of a scalp disorder, a hair

09:27:58 15   disorder, the doctor need to take a biopsy, a piece of skin.

09:28:02 16   That, of course, required anesthesia, and it required stitches.

09:28:07 17         With this technique, you can avoid that in many

09:28:12 18   cases.  So it's very, very useful.

09:28:13 19   Q.    Doctor, with regard to publications, we talked about the

09:28:19 20   literature that you published.  Have you been involved in

09:28:23 21   writing books?

09:28:24 22   A.    Yes.  I wrote several books on hair disorders.

09:28:29 23   Q.    Specifically on hair disorders?

09:28:31 24   A.    Yes.  I think I wrote maybe seven books in my life, not

09:28:36 25   all now.

**OFFICIAL TRANSCRIPT**

09:28:37   1    Q.    Doctor, I understand, in addition to your specialty with

09:28:43   2    hair disorders, you also have a subspecialty with regard to

09:28:49   3    permanent chemotherapy-induced alopecia; is that correct?

09:28:54   4    A.    You know, I've been studying permanent alopecia, induced

09:28:59   5    alopecia for many years.  So I think this is one of my field of

09:29:03   6    interest and expertise.

09:29:04   7    Q.    I'm sorry, one of your what interests?

09:29:06   8    A.    Field of interest.

09:29:09   9    Q.    Thank you.

09:29:11  10          So, if you could explain to the jury your background

09:29:15  11    and experience specifically in regards to permanent

09:29:20  12    chemotherapy-induced alopecia?

09:29:23  13    A.    You know, that started many years ago when I was in

09:29:29  14    Bologna with permanent chemotherapy-induced alopecia due to a

09:29:34  15    drug which is call *busulfan*, which is a drug that is utilized

09:29:39  16    for transplantation.

09:29:42  17          You know, since in Bologna was a very, very good

09:29:45  18    center for leukemia, I saw children and adults with leukemia

09:29:50  19    with this condition.  I published my first paper on the topic,

09:29:55  20    on this permanent alopecia after chemotherapy.

09:29:59  21          After a while, let's say I start seeing the first

09:30:05  22    patient with permanent alopecia that occur after treatment of

09:30:13  23    breast cancer with Taxotere.  I saw that first patient in 2006.

09:30:20  24          Then, the first time, I didn't really -- you know, I

09:30:24  25    thought, that's very strange, because it's a very typical,

*OFFICIAL TRANSCRIPT*

09:30:28  1   clean-cut presentation.  Then I saw another patient.

09:30:31  2   THE COURT:  Okay.  We might be getting into opinion

09:30:34  3   testimony.  So I think, if you're going to make a tender, we

09:30:38  4   probably need to do that now.

09:30:40  5   MR. SCHANKER:  Yes, Your Honor.  What we would like to

09:30:42  6   do, to simply make sure the jury understands her background and

09:30:48  7   qualifications, because she has published, if we can narrow it

09:30:48  8   to just her publications on this, as far as laying a

09:30:51  9   foundation?

09:30:51  10  THE COURT:  I think then you need to probably ask very

09:30:52  11  specific questions --

09:30:52  12  MR. SCHANKER:  Yes, Your Honor.

09:30:54  13  THE COURT:  -- avoid a narration that winds ourselves

09:30:58  14  in opinion testimony.

09:30:59  15  MR. SCHANKER:  Yes.  I'll work hard, if I can, for

09:31:01  16  that.  Obviously, you'll let us know.  Thank you, Your Honor.

09:31:06  17  EXAMINATION BY MR. SCHANKER:

09:31:07  18  Q.   So, Doctor, with regard to just what you've laid out for

09:31:10  19  us, permanent chemotherapy-induced alopecia in regards to

09:31:16  20  Taxotere, have you published on this prior to your involvement

09:31:19  21  in this litigation?

09:31:23  22  A.   Yes.

09:31:23  23  Q.   If you could share with the jury your publications on this

09:31:26  24  condition, permanent chemotherapy-induced alopecia caused by

09:31:30  25  Taxotere.

*OFFICIAL TRANSCRIPT*

09:31:32  1    A.    I published, in total, four papers on that.  You know,

09:31:37  2    three a long time ago, because it was 2011, 2012.  That's when

09:31:45  3    I published the first three papers on this topic.

09:31:49  4    Q.    Why did you find this particular area of the science

09:32:03  5    something that you followed up in?

09:32:05  6    A.    Because I think it's a problem area, a problem that

09:32:09  7    destroy life of women.  So we have to find what exactly

09:32:13  8    happens, to prevent it.

09:32:15  9          THE COURT:  Mr. Schanker, we just need to get to

09:32:17  10   qualifications.

09:32:19  11         MR. SCHANKER:  Thank you, Dr. Tosti.  Let's go ahead

09:32:25  12   and offer you, Dr. Tosti, to the Court.

09:32:25  13               We offer Dr. Tosti as an expert in the field of

09:32:30  14   dermatology, hair, hair disorders, lack of hair regrowth,

09:32:35  15   diagnosis of permanent chemotherapy-induced alopecia, including

09:32:38  16   the diagnosis of permanent chemotherapy-induced alopecia caused

09:32:41  17   by Taxotere.

09:32:43  18         THE COURT:  Okay.  I want to just -- the field of

09:32:45  19   dermatology, hair, lack of hair regrowth, diagnosis -- wait,

09:32:53  20   I'm really having trouble seeing this.

09:32:55  21         MR. SCHANKER:  Shall I go through it again?

09:32:56  22         THE COURT:  Can you go through it again?

09:32:58  23         MR. SCHANKER:  Yes, Your Honor.  Dermatology, hair,

09:33:01  24   hair disorders, lack of hair regrowth, diagnosis of permanent

09:33:07  25   chemotherapy-induced alopecia, including the diagnosis --

*OFFICIAL TRANSCRIPT*

09:33:12 1        THE COURT:  Wait.  Excuse me.  Hair regrowth, diagnosis

09:33:19 2   of chemotherapy-induced alopecia --

09:33:20 3        MR. SCHANKER:  Permanent chemotherapy-induced alopecia,

09:33:27 4   including the diagnosis of permanent chemotherapy-induced

09:33:39 5   alopecia caused by Taxotere.

09:33:42 6        MS. SASTRE:  Your Honor, I believe the expert is just

09:33:45 7   supposed to be tendered in the field in which they are going to

09:33:48 8   offer testimony.  So we do not object that Dr. --

09:33:49 9        THE COURT:  I mean, I think it's the final area that's

09:33:54 10  problematic.

09:34:04 11       MS. SASTRE:  I'm looking at it, Your Honor.

09:34:06 12       THE COURT:  I think that's her opinion, is the last

09:34:09 13  one.

09:34:09 14            Okay.  The Court is going to accept Dr. Tosti as

09:34:11 15  an expert in the field of dermatology, hair, hair disorders,

09:34:16 16  lack of hair regrowth, and a diagnosis of permanent

09:34:19 17  chemotherapy-induced alopecia, qualified to render opinions.

09:34:23 18       MR. SCHANKER:  Thank you, Your Honor.

09:34:24 19       THE COURT:  Thank you.  Please proceed.

09:34:26 20                    DIRECT EXAMINATION

09:34:28 21  BY MR. SCHANKER:

09:34:28 22  Q.   Dr. Tosti, we'll get into detail on how you reached your

09:34:32 23  conclusions, but I ask, did you reach a conclusion in this

09:34:35 24  case, first of all, yes or no?

09:34:37 25  A.   Yes, I did.

*OFFICIAL TRANSCRIPT*

09:34:37 1   Q.   Would you share with the jury what conclusion you reached
09:34:42 2   in regards to our client, Barbara Earnest.
09:34:45 3   A.   My conclusion about Barbara is that she is affected by
09:34:51 4   permanent alopecia due to chemotherapy from Taxotere.
09:34:55 5   Q.   Doctor, are you prepared to give the jury some basics on
09:35:06 6   hair facts?
09:35:07 7   A.   Sure.
09:35:07 8   Q.   Doctor, what is it that we're looking at here on this
09:35:19 9   diagram?  If you could just familiarize and orient the jury.
09:35:23 10       THE COURT:  Dr. Tosti, if it helps, you have a pen.
09:35:28 11       THE WITNESS:  I saw that yesterday.  I will use when I
09:35:31 12  need, because I am afraid to make mistakes.
09:35:34 13       So what you see here is the hair follicle.  The
09:35:39 14  hair follicle that you see is something that is into the skin
09:35:42 15  and produce the hair.
09:35:44 16       So the hair is, in reality, a dead structure.  So
09:35:49 17  the hair is dead.  The cell into the hair shaft don't reply.
09:35:58 18  It's the hair follicle that has cells that reply and produce
09:36:00 19  the hair.
09:36:01 20  EXAMINATION BY MR. SCHANKER:
09:36:01 21  Q.   Ask you what might seem like a basic question, but where
09:36:05 22  is the hair on the human body?
09:36:07 23  A.   It's everywhere except for our palms and soles.
09:36:10 24  Q.   Explain what you mean, it's everywhere.
09:36:15 25  A.   All our skin except for palms and soles.

*OFFICIAL TRANSCRIPT*

09:36:20 1    Q.    With regard to the hair -- and you've used this term

09:36:27 2    *hair follicles* -- what is the difference between the hair and

09:36:31 3    the hair follicle?

09:36:32 4    A.    The hair follicle is the organ that produce the hair.

09:36:34 5    It's a very complicate organ.  You know, this is the

09:36:38 6    hair follicle here.  This is all the hair follicle.  This is

09:36:43 7    the hair that comes out from the skin.

09:36:45 8    Q.    Doctor, before we get into more depth on that, obviously,

09:36:52 9    humans have different colors of hair, right?

09:36:54 10   A.    Yes.  Depending on the genetics and race.

09:36:59 11   Q.    Are the number of hair follicles different depending

09:37:04 12   typically on the color of hair?

09:37:05 13   A.    The number of bodies, with race, for instance,

09:37:12 14   African American have less and with color.  Blonde people have,

09:37:14 15   you know, more hair, but it's thinner.

09:37:19 16   Q.    You indicated -- you indicated, Doctor, that there is

09:37:28 17   hair follicles that are found basically everywhere on the human

09:37:32 18   body except for our palms and the soles of our feet; is that

09:37:32 19   correct?

09:37:36 20   A.    Correct.

09:37:36 21   Q.    Now, explain that to us, because we may not see hair all

09:37:42 22   over our body.

09:37:43 23   A.    Because there are two types of follicles.  You see these

09:37:48 24   slides.  There are those follicles that are all called *vellus*

09:37:55 25   *follicles*.  These are very small, and they produce hair that is

**OFFICIAL TRANSCRIPT**

09:37:57 1    not really seen.  The hair we have our cheeks, on your

09:38:04 2    forehead.  Think of it, you have more hair on your face than on

09:38:07 3    our scalp, because there are many, many of those vellus

09:38:12 4    follicles.

09:38:14 5           Then we have the terminal follicles that produce hair

09:38:15 6    that are long and thick, like the hair of the scalp, the

09:38:20 7    eyebrows, the eyelashes.

09:38:21 8    Q.   So these vellus follicles that are all over our body, do

09:38:27 9    they have a color?

09:38:28 10   A.   The vellus hair, you mean?

09:38:28 11   Q.   Yes.

09:38:30 12   A.   Because the vellus follicles produce the vellus hair --

09:38:30 13   Q.   Thank you for the clarification.

09:38:34 14   A.   -- which is usually transparent.  It's very, very blonde.

09:38:38 15   You don't see.

09:38:38 16   Q.   So, those are the vellus follicles.  Could you please

09:38:45 17   explain to the jury -- we probably have an idea, but just so

09:38:48 18   we're clear -- what from the terminal follicles?

09:38:50 19   A.   The terminal follicles is the one on the right.  They

09:38:55 20   produce -- they are bigger and produce hair that are pigmented

09:38:59 21   and thick and long.

09:39:00 22   Q.   Where are the terminal follicles found on our body?

09:39:06 23   A.   On your scalp, on your eyebrows and eyelashes.  On men, in

09:39:12 24   other area, like the beard, those are terminal follicles.

09:39:16 25   Q.   As human beings go through puberty, is there a transition

*OFFICIAL TRANSCRIPT*

09:39:21  1    from one follicle to the other?

09:39:23  2    A.    Yes, those follicles make change.  So vellus follicle can

09:39:30  3    become terminal follicles.  For instance, at puberty, when men

09:39:33  4    develop the beard, it's vellus follicle that became terminal

09:39:38  5    follicle.  And the opposite can happen, as well.

09:39:41  6    Q.    Tell us about that.

09:39:42  7    A.    The opposite is what happens in baldness, for instance.

09:39:49  8    Okay.  So men that look bald, in reality, they have some

09:39:54  9    follicle, but they are just not visible, because they become

09:39:59 10    thin like the vellus follicle that you have on the face.

09:40:06 11    Q.    Doctor, we may have heard of a concept called the *hair*

09:40:09 12    *cycle*.  Are you prepared to explain to the jury what the hair

09:40:11 13    cycle is?

09:40:12 14    A.    Yes, absolutely.  You know, it looks complicate, but I try

09:40:19 15    to make it simple.

09:40:20 16          So we say the follicle produce the hair.  But this is

09:40:25 17    not continuous.  The follicle has period when it produces the

09:40:29 18    hair and periods of rest.  So it's not working all the time.

09:40:35 19    Take some rest.

09:40:36 20          So that when the follicle produce the hair, this is

09:40:42 21    called *anagen*, *anagen phase*.  The name from Latin.  So the

09:40:48 22    anagen phase, the follicle produce the hair.  So it's a very,

09:40:52 23    very active organ.  The anagen phase is the longest phase of

09:40:57 24    the hair cycle.

09:40:58 25          So, for instance, in women, the anagen phase usually

*OFFICIAL TRANSCRIPT*

09:41:03 1  lasts from three to seven years.  That's why the hair become

09:41:06 2  long.  In men, usually last less.  Men cannot usually grow hair

09:41:12 3  as long as women.

09:41:13 4  Q.   So what happens after the anagen phase, or how does it

09:41:16 5  transition?

09:41:17 6  A.   After the anagen phase, the follicle go to rest.  So there

09:41:25 7  is this catagen phase, which is very, very short, lasts like

09:41:29 8  days.

09:41:30 9       Then there is the telogen phase.  You see in that

09:41:34 10 picture.  The follicle rests, and rests usually for three

09:41:37 11 months.  After three months, the follicle start producing a new

09:41:45 12 hair that push out the old one.  So, usually, when you would

09:41:48 13 shed the hair, the new one is already growing.

09:41:51 14      The follicles don't work -- are not all together in

09:41:58 15 the same phase.  You know, for instance, cats or dogs, all the

09:42:03 16 follicles are in the same phase, so they lose all the hair

09:42:07 17 altogether.  In humans, they are not.  So we lose some hair

09:42:11 18 every day.  Normally, the normal shedding is about 80 hair

09:42:18 19 every day.  You mostly lose when you shampoo, when you brush,

09:42:23 20 of course, because friction make it easy for the hair to fall

09:42:27 21 out.

09:42:27 22 Q.   So is that why cats and dogs and some other animals go

09:42:32 23 through what we call *shedding*, but, as human beings, we do not.

09:42:35 24 A.   Exactly, because they have -- the cycle is synchronized,

09:42:39 25 and our hair cycle, they are not synchronized.

**OFFICIAL TRANSCRIPT**

09:42:42 1    Q.    So hair loss, can you begin to educate the jury about

09:42:51 2    hair loss.

09:42:52 3    A.    You know, there are many conditions that cause hair loss.

09:42:58 4    Hair loss is like fever.  So we have a hair loss.  We have to

09:43:02 5    find out what's causing.  Then you have to distinguish between

09:43:05 6    hair loss and failure of hair to grow, meaning alopecia.

09:43:12 7    Q.    So let me stop you there.  I believe you said you have to

09:43:18 8    distinguish between hair loss and failure of hair to regrow.

09:43:23 9    Are those two different things?

09:43:27 10   A.    Maybe together sometimes.  Sometimes are two different

09:43:32 11   things.  So you have -- this is a very important part of the

09:43:35 12   examination and the history of the patient.

09:43:38 13   Q.    So, examination and history of a patient, is that -- that

09:43:44 14   is an important part, an aspect in determining the cause of

09:43:50 15   hair loss, is it?

09:43:50 16   A.    Absolutely.  This is important in any field of medicine.

09:43:54 17   You cannot make a diagnosis without seeing the patient and

09:43:59 18   talking to the patient, you know.  Because this is very, very

09:44:02 19   important, in my personal experience, to talk with the patient

09:44:07 20   and to learn from the patient, because sometimes the patient

09:44:11 21   knows much more than everybody else.

09:44:14 22   Q.    You mentioned a clinical evaluation.  I want to talk to

09:44:20 23   you about that.  Are there steps to a clinical evaluation?

09:44:26 24   A.    You know, everybody has his own steps.  So for patients

09:44:31 25   with hair disorder, for instance, the first thing I want to do

*OFFICIAL TRANSCRIPT*

09:44:35  1   is to look at the patient, briefly, but to understand what he

09:44:38  2   may have.

09:44:39  3           So I ask the questions that are important depending

09:44:43  4   on what I see.  Because, you know, any hair disorder may

09:44:48  5   require different studies, different questions.  Then --

09:44:52  6   Q.   So just so we're clear, you said you ask the patient, you

09:44:59  7   talk to the patient?

09:45:00  8   A.   I start by saying, can you please have a seat.  Can I

09:45:03  9   please look at you one moment.  I want to understand how --

09:45:06 10   what she has.  Then I go and start my clinical history, which

09:45:13 11   is, as I said, very, very important.  But the question I ask

09:45:17 12   depends on what I see, because if I see a patient with partial

09:45:22 13   alopecia, I ask questions that are different if I see a patient

09:45:26 14   who is bald, you know.

09:45:27 15   Q.   So I want to take you through each of these steps, but is

09:45:33 16   it fair to say, do you first do the history, you talk to the

09:45:35 17   patient?

09:45:36 18   A.   Uh-huh (affirmative response).  Yes.

09:45:37 19   Q.   Then you mentioned a clinical exam; is that right?

09:45:41 20   A.   Yes.

09:45:42 21   Q.   Let's go ahead and talk about the clinical exam, because

09:45:45 22   you just began to touch on that.  What is it that you're

09:45:50 23   looking for and what exactly do you do in a clinical exam?

09:45:54 24   A.   I first look at the scalp of the patient.  I do something

09:46:00 25   that is called a *pull test*.  This is to see if the patient is

**OFFICIAL TRANSCRIPT**

09:46:05  1   losing more hair than normal.

09:46:06  2   So I take, like, a tuft, usually it should be 50

09:46:12  3   hair, and I pull gently.  If I find hair in my hands, that

09:46:16  4   means that is shedding more than normal.  And this is important

09:46:21  5   because gives me some information.

09:46:25  6   Q.   I want to take you back to the clinical exam.  You started

09:46:29  7   to touch on something, and I may have interrupted you.  So just

09:46:32  8   so we're all clear, the clinical exam, you're sitting with the

09:46:35  9   patient; is that right?

09:46:36  10  A.   I stand up and the patient is sitting.

09:46:39  11  Q.   Thank you.

09:46:40  12  And when you're doing that, this is a patient that's

09:46:44  13  presented to you with some issue or condition typically, I'm

09:46:47  14  assuming?

09:46:48  15  MS. SASTRE:  Objection, Your Honor.

09:46:50  16  THE COURT:  Let me just -- approach a little bit --

09:46:50  17  approach.

09:46:50  18  (WHEREUPON, at this point in the proceedings, there was

09:47:05  19  a conference held at the bench.)

09:47:05  20  THE COURT:  I'm going to let her -- I think because of

09:47:14  21  her pretty thick accent, I might let a little bit of follow-up

09:47:19  22  because sometimes I'm having to look at realtime, and I know

09:47:23  23  the jury can't --

09:47:24  24  MR. SCHANKER:  I'll do my best not to --

09:47:27  25  THE COURT:  Sometimes it's just "you said that."  I'm

*OFFICIAL TRANSCRIPT*

09:47:30 1   going to allow some of that simply because -- just a pretty

09:47:35 2   thick accent.  I'm not going to let him testify.

09:47:38 3          MR. SCHANKER:  They don't want to hear from me.

09:47:41 4          THE COURT:  All right.  Thank you.

09:47:41 5          (WHEREUPON, at this point in the proceedings, the bench

09:47:41 6   conference concluded.)

09:47:59 7          THE COURT:  Please proceed.

09:48:01 8   EXAMINATION BY MR. SCHANKER:

09:48:01 9   Q.   Yes.  Clinical evaluation, what are you looking for?  Are

09:48:08 10  there conditions -- hair conditions that you're looking for in

09:48:12 11  that clinical -- that initial clinical evaluation?

09:48:16 12  A.   I look at the pattern of the hair loss.  If it's patchy,

09:48:21 13  if it's diffuse, if it affects certain area of the scalp.  I

09:48:26 14  look, you know, like the pull test, as I said.  You see some

09:48:32 15  example of patchy, you see a patch.

09:48:36 16  Q.   If you could, because these are probably new terms or

09:48:40 17  scientific terms here, let's just make sure we drill down on

09:48:45 18  these, Dr. Tosti.  You mentioned patchy alopecia --

09:48:46 19  A.   You see here is a patch; that you don't have a complete

09:48:50 20  loss all over the scalp.  You have patches.  And here you have

09:48:55 21  a kind of diffuse, you know.  And here, in this one, the

09:49:01 22  hair loss is on the top of the scalp.  We call *pattern*

09:49:04 23  *alopecia*.

09:49:04 24  Q.   Doctor, you indicated -- you explained to us what the pull

09:49:13 25  test was.  And then we have a dermoscopy.  You shared with us

*OFFICIAL TRANSCRIPT*

09:49:22 1  about the dermoscopy.  Just explain in detail what you're doing

09:49:26 2  with the dermoscopy or trichoscopy -- are those words

09:49:32 3  interchangeable?

09:49:33 4  A.   Yes.

09:49:34 5  Q.   What you're doing with the dermoscopy, what you're looking

09:49:36 6  for, what you can accomplish with that tool.

09:49:39 7  A.   The first thing I want to see, if it's a scarring

09:49:45 8  alopecia, meaning that the hair follicle is being destroyed by

09:49:52 9  a scar and so there are now openings of the follicles or if

09:49:59 10 it's a nonscarring alopecia, meaning that the follicle are

09:50:02 11 small, but are there, because that makes a big change in term

09:50:05 12 of treatment.

09:50:05 13 Q.   Just to make sure that I haven't skipped over a step, is

09:50:10 14 the dermoscopy, is it basically a magnifier, like a microscope?

09:50:16 15 What is it?

09:50:17 16 A.   It's a very big magnifier.  With my instrument, I can go

09:50:22 17 from 20 times to, you know, even 100 time the size of the area

09:50:32 18 that I want to see.

09:50:33 19 Q.   Just so the jury understands, is this a big, giant machine

09:50:41 20 or a small device, the dermatoscope?

09:50:44 21 A.   I have a small device.  You can have a small device that

09:50:47 22 most doctors have, because they look at the moles with that

09:50:53 23 device.  If you have a skin check, your doctor look with that

09:50:56 24 device at your skin.  But I also have very big instruments, I

09:51:01 25 can take pictures.

*OFFICIAL TRANSCRIPT*

09:51:01  1    Q.    So after you use that -- do the dermoscopy, what's next as
09:51:07  2    far as your clinical evaluation?
09:51:08  3    A.    You know, you may need to take a biopsy.  You may need to
09:51:15  4    take a piece of skin and look under the microscope.  And you
09:51:20  5    may need the laboratory tests, depending on the diagnosis.  So,
09:51:24  6    when you have an idea what you think the patient may have, you
09:51:29  7    go ahead.
09:51:30  8    Q.    And let's go back through those.  You indicated that you
09:51:33  9    might need to take a biopsy.  Is that always the case?
09:51:40  10   A.    You know, very often the patient has seen somebody else
09:51:47  11   before you, because patients often go to many doctors, and they
09:51:51  12   may already have a biopsy.  And you don't always need to have a
09:51:55  13   biopsy.  It depends on the situation.
09:51:57  14   Q.    And then you talked about the laboratory results.  The lab
09:52:01  15   results.  Is that just a blood test?
09:52:03  16   A.    Yes, blood test.  If somebody is shedding hair, I will do
09:52:08  17   a blood test and check if he has any disease that can cause
09:52:12  18   that.  If I see a woman with hair on her face, I will check
09:52:19  19   labs to be sure she doesn't have some problem with hormones.
09:52:24  20   Q.    Doctor, in this case, did you perform a clinical
09:52:32  21   evaluation of Barbara Earnest?
09:52:34  22   A.    Yes.  Absolutely, yes.  She came to Miami, and I saw her.
09:52:39  23   Q.    So we understand that the first step on the clinical
09:52:50  24   evaluation is history.  You indicated that you saw
09:52:55  25   Barbara Earnest.  Specifically with regard to Barbara Earnest,

*OFFICIAL TRANSCRIPT*

09:53:04  1    you took a history; is that correct?

09:53:06  2    A.    Yes.  I had her medical records in advance because this

09:53:11  3    was a kind of a very long history, but I -- then I spoke with

09:53:17  4    her, and we -- she explained me what happened, and I did a

09:53:25  5    clinical exam.  I did the pull test.  I did the dermoscopy.

09:53:29  6    She already had the pathology results with her.

09:53:34  7    Q.    So what I would like to do is go ahead and go through each

09:53:37  8    of those steps specifically that you did with Barbara.  Is that

09:53:43  9    fair?

09:53:43 10    A.    Yes.

09:53:43 11    Q.    Could you take us through your history, what you gathered

09:53:48 12    in regard to Barbara's case?

09:53:50 13    A.    The most important aspect of her history is that she

09:53:53 14    didn't regrow hair after chemotherapy.  So she had

09:54:00 15    breast cancer.  She had chemotherapy.  At the end of

09:54:05 16    chemotherapy, the hair didn't grow back.  Okay.  Usually when

09:54:09 17    you have chemotherapy, we know you lose hair, but then the hair

09:54:14 18    grow back.  In this situation, didn't.

09:54:16 19    Q.    Now, Doctor, during this history, were you made aware of

09:54:20 20    the drugs that Barbara Earnest took, the chemotherapy drugs, as

09:54:26 21    well as the order that she took those drugs in?

09:54:28 22    A.    Yes, of course I did.  So she first had the two

09:54:33 23    chemotherapy therapy together, that is called *AC*, and she had

09:54:37 24    that chemotherapy.  During that chemotherapy, had she had

09:54:42 25    hair loss and lost all her hair.

*OFFICIAL TRANSCRIPT*

09:54:44  1          After that, she had docetaxel, Taxotere.  When she

09:54:52  2     had Taxotere, she had no hair at that moment.  After Taxotere,

09:54:56  3     the hair didn't grow back.

09:55:01  4     Q.    You indicated that you performed a physical exam of

09:55:06  5     Barbara; is that correct?

09:55:06  6     A.    Yes.

09:55:07  7     Q.    Did you take photographs of Barbara's scalp?

09:55:10  8     A.    Yes, I did, because with this instrument, you need to take

09:55:12  9     also photographs to take the dermoscopy.  So I did.

09:55:17 10     Q.    So you took the dermoscopy photos, correct?

09:55:21 11     A.    I took both.

09:55:22 12     Q.    Both.  And by *both*, you mean you took just regular

09:55:27 13     photographs as well?

09:55:28 14     A.    This instrument that does the dermoscopy, you need first

09:55:33 15     to take a regular photo and then to do the dermoscopy.

09:55:36 16     Q.    And with Barbara's permission, as part of you explaining

09:55:44 17     her condition, I'm going to show us all photographs of

09:55:49 18     Barbara's scalp.  Would that assist you in explaining to the

09:55:53 19     jury what you did?

09:55:54 20     A.    Yes.  If she's okay with that.

09:56:06 21          So, what you can see here is that she has a very

09:56:12 22     severe and diffuse alopecia that involves all the top and the

09:56:17 23     back of her scalp and the side.  She has just a very minimal

09:56:24 24     hair that's on the occipital and the parietal scalp.

09:56:31 25     Q.    Can you slow down right there.  You just used a couple of

*OFFICIAL TRANSCRIPT*

09:56:36 1  scientific words that we may not understand.  So if you could

09:56:39 2  go over those again, please.

09:56:40 3  A.    So, she has some remaining hair in the back here and on

09:56:44 4  the lateral side here.  But the top is almost -- very thin,

09:56:53 5  fuzzy hair.  And her longest hair was 10 centimeter, you know,

09:57:00 6  which is very, very typical, we'll discuss later, of her

09:57:06 7  problem.

09:57:06 8         And she also lost -- had very, very thin eyebrows and

09:57:15 9  eyelashes.  And I also examined other body areas.  So she had

09:57:19 10 no hair in the arms and legs and no hair in the armpits, almost

09:57:27 11 no pubic hair.  So all the hair is basically gone.

09:57:34 12 Q.    Doctor, you indicated that you performed a pull test.  You

09:57:43 13 demonstrated for the jury what that was.  As part of your

09:57:47 14 clinical exam -- or as part of your clinical evaluation,

09:57:50 15 rather, did you do that in Barbara's case?

09:57:53 16 A.    Yes, but you couldn't get even one hair.  She doesn't have

09:57:58 17 almost hair, so it's very difficult to get hair in this

09:58:01 18 situation.  But negative, it was negative.

09:58:04 19 Q.    So the pull test --

09:58:05 20 A.    Was negative.

09:58:06 21 Q.    -- just so I'm clear, was negative?

09:58:07 22 A.    Was negative.

09:58:08 23 Q.    Okay.  And then did you use the dermatoscope on Barbara's

09:58:17 24 scalp?

09:58:17 25 A.    Yes.

*OFFICIAL TRANSCRIPT*

09:58:18  1    Q.   And if you could, you know, one thing I haven't asked is,

09:58:28  2    do you recall when this -- if you don't recall the exact date,

09:58:32  3    we can work through that.

09:58:33  4    A.   No.

09:58:33  5    Q.   Do you recall when the examination was that you did?

09:58:35  6    A.   June 2018.  Exact date, I don't remember.

09:58:39  7    Q.   Let me ask you this concerning that examination because I

09:58:46  8    think it's important, I didn't ask you this before, is how you

09:58:50  9    came to be involved in this case.

09:58:52 10    A.   You know, I was contacted by -- by the lawyers.

09:58:56 11    Q.   And had you ever done any of this kind of legal work or

09:59:02 12    expert testimony work before?

09:59:04 13    A.   No, never.

09:59:04 14    Q.   Okay.  And you obviously agreed to do it in this case?

09:59:09 15    A.   Yes.

09:59:10 16    Q.   And could you tell the jury why you agreed to do it in

09:59:14 17    this case.

09:59:15 18    A.   Because I thought it was important for these women to --

09:59:22 19    to understand what's going on.

09:59:23 20    Q.   So we were talking about the dermoscopy.  Just to clarify,

09:59:34 21    is this the first time you've testified?

09:59:36 22    A.   Yes.

09:59:37 23    Q.   Are you nervous?

09:59:39 24    A.   Yes.

09:59:39 25    Q.   It doesn't seem like it.

*OFFICIAL TRANSCRIPT*

09:59:44  1          THE COURT:  Mr. Schanker, I just want to --

09:59:44  2          (WHEREUPON, at this point in the proceedings, there was

09:59:58  3   a conference held at the bench.)

09:59:58  4          THE COURT:  I don't know if you -- she said *these*

10:00:01  5   *women*, and I'm inclined to just admonish the witness that she

10:00:05  6   should not -- because I think if I say something, it makes it

10:00:10  7   worse.  But she needs to not say that.  So if you all are okay,

10:00:16  8   I will just tell her, Dr. Tosti.

10:00:18  9          MS. SASTRE:  My antenna was up when I heard the

10:00:22  10  question, the why did you get involved, and I kind of thought

10:00:25  11  it worried me, but I didn't want to object.  I was just

10:00:29  12  listening carefully, I'll put it that way.

10:00:30  13         MR. SCHANKER:  She's clearly -- because she examined

10:00:35  14  two other women, and she's been told not to talk about it.

10:00:38  15         THE COURT:  If you all don't mind, I'm going to quietly

10:00:43  16  say, Dr. Tosti, only reference Ms. Earnest.

10:00:46  17         MS. SASTRE:  Maybe if you want to let her know now,

10:00:51  18  too, -- when I ask her in the deposition, did I read that

10:00:52  19  correctly, I don't want her to say you left out the names.

10:00:54  20         THE COURT:  You all are okay with that?

10:00:57  21         MS. SASTRE:  Sure.

10:01:24  22         THE COURT:  Dr. Tosti, the jury is unaware that there

10:01:26  23  were other women involved in this litigation.  So, I'm going to

10:01:31  24  ask you if any question like that comes about --

10:01:31  25         THE WITNESS:  (Speaking simultaneously) I'll just ask.

                            ***OFFICIAL TRANSCRIPT***

10:01:37  1          THE COURT:  And if during the course of your testimony

10:01:42  2     you're called to look upon your prior deposition, if they skip

10:01:47  3     over the mention of those other two women, I'm going to ask you

10:01:50  4     to ignore that.

10:01:52  5          THE WITNESS:  Okay.  Thank you very --

10:01:54  6          THE COURT:  Thank you.

10:01:54  7          (WHEREUPON, at this point in the proceedings, the bench

10:01:54  8     conference concluded.)

10:01:54  9     EXAMINATION BY MR. SCHANKER:

10:02:15 10     Q.   So you indicated that you performed the dermoscopy, and at

10:02:23 11     Step Number 4, what's the jury looking at, Doctor?

10:02:25 12     A.   They are looking at a small area of the scalp that is

10:02:32 13     magnified.  So you can see very well the hair, and you can see

10:02:35 14     what's very evident is that the density of the hair is reduced.

10:02:39 15     So normally you have much more hair and less space between the

10:02:43 16     hair.

10:02:46 17          They are all very thin.  And you see these yellow

10:02:49 18     dots.  You see those yellow dots.  Those correspond to the

10:02:53 19     upper part of the follicle that is full of sebum because in --

10:03:01 20     the follicle has these glands that produce the oil that may

10:03:06 21     have on the scalp, and usually sebum is pushed out by the hair,

10:03:11 22     but here there are no hair, and so you have those yellow dots.

10:03:15 23     Q.   So I want to ask you about a couple of those things that

10:03:20 24     you just mentioned.  You said low hair density.  Could you

10:03:26 25     please explain to the jury what you mean by *low hair density*?

**OFFICIAL TRANSCRIPT**

10:03:30  1    A.   You see here that you have a space between the hair.

10:03:34  2    Normally you should have one hair close to the other one.

10:03:41  3    Q.   You also mentioned hair thinning.  Is there a distinction

10:03:45  4    between hair density and hair thinning?

10:03:48  5    A.   You know, they may go together, but here you see that you

10:03:53  6    have less hair -- let's see if I can make it -- this area that

10:03:56  7    have no hair.  Okay?  And then you see that this hair, for

10:04:00  8    instance, is much thinner than this one.  So, you have some

10:04:04  9    hair that became very loose, that became thinner, miniaturized.

10:04:04  10        THE REPORTER:  What did you say?

10:04:04  11        THE WITNESS:  Miniaturized.

10:04:13  12   EXAMINATION BY MR. SCHANKER:

10:04:13  13   Q.   So we see some -- just so I'm clear, too, along with

10:04:19  14   Cathy, we see some hairs that are miniaturized; is that right?

10:04:24  15   A.   Yes.  Then we see all these yellow dots are openings

10:04:27  16   without the hair.  The hair is so small that you don't see it.

10:04:31  17   Q.   Doctor, working through the steps --

10:04:39  18        MS. SASTRE:  Objection.

10:04:39  19        THE COURT:  Yes.  I think we need to approach.  Was

10:04:39  20   there an objection?

10:04:39  21        MS. SASTRE:  Yes.

10:04:39  22        (WHEREUPON, at this point in the proceedings, there was

10:04:50  23   a conference held at the bench.)

10:04:50  24        MS. SASTRE:  The yellow dots was taken out of the

10:04:50  25   slide.  It was my understanding she was told not to talk about

**OFFICIAL TRANSCRIPT**

10:04:50  1    it.

10:04:50  2                  THE COURT REPORTER:  I can't hear you.

10:04:56  3                  MS. SASTRE:  The yellow dots issue, we argued that this

10:04:58  4    morning.  I know you said you took it out of the slides.  I

10:05:02  5    would assume she was told not to talk about it as well.  Same

10:05:06  6    objection.  It's not in her report.  That's why they took it

10:05:08  7    out of the slides.

10:05:08  8                  THE COURT:  I'm going to overrule.  I think she

10:05:10  9    was just --

10:05:10  10                 MS. SASTRE:  Well, I'm just afraid, Your Honor, that --

10:05:14  11   they agreed to take it out of the slides because it's not in

10:05:17  12   her report, so she just can't keep talking about something

10:05:19  13   that's not in her report, Judge.  Now, I'm not suggesting there

10:05:22  14   is anything that counsel did incorrectly.

10:05:24  15                 MR. SCHANKER:  I'm not going to ask her questions about

10:05:27  16   it.  I'm not going to elicit any testimony --

10:05:30  17                 THE COURT:  You've changed the slide?

10:05:33  18                 MR. SCHANKER:  Yeah, I went through and redacted it.

10:05:34  19                 MS. SASTRE:  Because you don't have it electronically?

10:05:38  20   You had to cross it out?

10:05:40  21                 MR. SCHANKER:  I just crossed it out.  I've been told

10:05:43  22   that Harley agreed to that.

10:05:46  23                 MS. SASTRE:  Okay.  There's nothing we can do.  Okay.

10:05:47  24   Thanks.

10:05:47  25                 (WHEREUPON, at this point in the proceedings, the bench

*OFFICIAL TRANSCRIPT*

10:06:02  1    conference concluded.)

10:06:02  2            THE COURT:  Please proceed.

10:06:05  3            MR. SCHANKER:  Thank you, Your Honor.

10:06:05  4    EXAMINATION BY MR. SCHANKER:

10:06:07  5    Q.    So working our way through the clinical evaluation,

10:06:10  6    Dr. Tosti, after the dermoscopy and analyzing your findings,

10:06:17  7    what -- what did you do next as far as your analysis?  What are

10:06:23  8    the steps?  What came next?

10:06:25  9    A.    After that, I -- she already had biopsy results because

10:06:29 10    she had the biopsy before, so I looked at her biopsy results.

10:06:34 11    And I didn't order any lab because she was not shedding hair or

10:06:38 12    she had no features that suggested any hormonal problem.

10:06:46 13    Q.    We'll talk about those biopsy results later.  But what I

10:06:50 14    would like to move on to now -- and just to clarify, you didn't

10:06:55 15    order the lab tests?

10:06:56 16    A.    No, I did not because she didn't need.

10:06:59 17    Q.    Doctor, are you familiar with a phrase *differential*

10:07:16 18    *diagnosis*?

10:07:16 19    A.    Yes, I do.

10:07:17 20    Q.    And could you please explain to the jury what -- for a

10:07:23 21    medical doctor, what a differential diagnosis is.

10:07:25 22    A.    You know, when you see a patient, you see a condition in

10:07:29 23    your head came, all the conditions that may look similar, and

10:07:34 24    you have -- one by one, compare and decide.  This is all in

10:07:40 25    medicine for any type of problem.

*OFFICIAL TRANSCRIPT*

10:07:42  1    Q.    And just so I'm clear, is that -- how does a doctor use a

10:07:49  2    differential diagnosis in her practice?

10:07:53  3    A.    To -- use a differential diagnosis to rule out the other

10:07:57  4    possible diseases.  Because you have, for instance, somebody

10:08:01  5    who complains that he has pain in the chest, and you have to

10:08:06  6    rule out all possible causes of chest pain.  The same is for

10:08:11  7    hair.  I see a diffuse alopecia, I have to exclude the other

10:08:16  8    possible causes of diffuse alopecia.

10:08:18  9    Q.    And did you perform a differential diagnosis on Barbara?

10:08:24 10    A.    Yes, I did.

10:08:24 11    Q.    And just so we're clear, I understand you were educated in

10:08:29 12    Europe as a medical doctor.  Do they do differential diagnoses

10:08:35 13    in Europe?

10:08:35 14    A.    They do, but in a different way.  So, in Europe, you

10:08:39 15    usually go to the diagnoses and then exclude.  In the

10:08:45 16    United States, we go one by one.  Now I do go around in the

10:08:51 17    United States, we go one by one.

10:08:52 18    Q.    And which way did you do it in Barbara's case?

10:08:56 19    A.    I did the United States way.

10:08:57 20    Q.    And is that what you're going to share with us here?

10:09:00 21    A.    Yes.

10:09:01 22    Q.    So, based upon the condition that you found on

10:09:07 23    Barbara Earnest's scalp, what did you consider in working

10:09:13 24    through your differential diagnosis?

10:09:15 25    A.    I consider those conditions that cause diffuse hair loss.

**OFFICIAL TRANSCRIPT**

10:09:21 1   And I consider, first of all, telogen effluvium.

10:09:30 2   Q.   Let me stop you there.  I want to make sure because

10:09:31 3   there's a lot of technical terms there.  Diffuse hair loss.

10:09:33 4   What is diffuse hair loss?

10:09:35 5   A.   Diffuse hair loss.  Maybe I didn't explain why.  Meaning

10:09:40 6   diffuse alopecia, meaning when you have almost no hair left,

10:09:45 7   okay.  And there are conditions that can cause that, and I

10:09:51 8   wanted to exclude those conditions.

10:09:52 9   Q.   So you started out with diffuse and then worked through

10:09:57 10  those potential conditions; is that fair?

10:09:58 11  A.   Yes.  Of course.

10:10:00 12  Q.   What was the first of those conditions that you considered

10:10:07 13  in your differential diagnosis?

10:10:09 14  A.   You know, first of all, you have to see if the patient is

10:10:13 15  shedding or not, okay, because it's very different a patient

10:10:19 16  who lose hair on his food, on his pillow, on his books from a

10:10:24 17  patient who doesn't lose any hair.  That was the most important

10:10:28 18  thing to decide.

10:10:30 19       And so if you see that the patient does not shed and

10:10:36 20  has a negative pull test, then you can exclude telogen

10:10:40 21  effluvium, because telogen effluvium is a condition

10:10:44 22  characterized by shedding, okay.

10:10:46 23  Q.   So you just used another term I want to make sure we

10:10:50 24  understand.  You considered this condition called *telogen*

10:10:53 25  *effluvium*?

**OFFICIAL TRANSCRIPT**

10:10:53  1    A.   Yes.

10:10:54  2    Q.   And what does a patient who has that present with?

10:11:01  3    A.   You know, they come and they say they found hair

10:11:04  4    everywhere.  Okay.  They found it on the floor.  They found

10:11:10  5    hair on the pillow.  They found hair on their books.  So

10:11:17  6    they -- their main complaint is they come with those bags of

10:11:20  7    hair because they shed.

10:11:23  8    Q.   And what are the results of a pull test if a patient --

10:11:28  9    A.   Very positive.  Very positive.  Very -- in these patients,

10:11:32 10    it's very positive.  Very different from Barbara, where it was

10:11:35 11    negative.

10:11:35 12    Q.   And the dermoscopy, if a patient has telogen effluvium,

10:11:41 13    what do you see on the dermoscopy?

10:11:43 14    A.   I explain you that when the follicle -- the hair fall down

10:11:47 15    when the new hair is growing.  So when you see a patient with

10:11:50 16    telogen effluvium, you see all the new hair growing on the

10:11:53 17    scalp.

10:11:53 18    Q.   And if a patient who has these conditions you described,

10:11:59 19    has telogen effluvium, what causes telogen effluvium?

10:12:03 20    A.   Many causes.  Drugs, medications cause telogen effluvium.

10:12:07 21    Almost all medications, if you look inside, they say may cause

10:12:12 22    that.  Inflammatory disorders, severe disease, nutritional

10:12:24 23    deficiencies, all these things.  But there is a long list.

10:12:28 24    Q.   So, Doctor, did you reach a conclusion in this case as to

10:12:34 25    whether or not Barbara Earnest suffers from telogen effluvium?

*OFFICIAL TRANSCRIPT*

10:12:36  1    A.    Yes.  She did not have telogen effluvium, because history

10:12:42  2    is different and everything is different.

10:12:44  3    Q.    And you went through and gave the reasons.  Any more to

10:12:49  4    add?  What you see here summarizes that, fair?

10:12:53  5    A.    Okay, so, you want me to summarize?

10:12:56  6    Q.    No.

10:12:56  7    A.    I already told them.

10:12:57  8    Q.    Yeah, you already told them.  Thank you.  Feel free to do

10:13:02  9    that.

10:13:05  10          So, you continued on with your differential

10:13:09  11   diagnosis, correct?

10:13:10  12   A.    Okay.  Yes.

10:13:11  13   Q.    What was the next condition that you considered for

10:13:14  14   Barbara?

10:13:14  15   A.    You know, she had chemotherapy, so you have to consider

10:13:17  16   anagen effluvium, which is the hair loss caused by

10:13:23  17   chemotherapy.  So when everybody -- most patients in

10:13:28  18   chemotherapy, they lose their hair, and this happens usually

10:13:32  19   two, three weeks after starting the chemotherapy.  And patients

10:13:36  20   usually shave because they don't want to see all of this hair

10:13:40  21   all around.

10:13:41  22   Q.    They usually do what?

10:13:43  23   A.    Shave.

10:13:44  24   Q.    Shave their head?

10:13:45  25   A.    Yes, because they don't want to see hair like that coming

*OFFICIAL TRANSCRIPT*

10:13:49  1    out.  And so that's a condition that should be ruled out, but

10:13:57  2    it's very different because this is an acute condition that

10:14:02  3    happens with chemotherapy and usually resolves, let's say,

10:14:07  4    three months after chemotherapy, the hair grow back.

10:14:10  5    Q.   And in Barbara Earnest's case, do you recall what year,

10:14:15  6    what time period she received her chemotherapy during?

10:14:17  7    A.   Yes, she received her chemotherapy in 2011, and the hair

10:14:24  8    never grow back.  Grow back like that.

10:14:28  9    Q.   Grew back the little bit that we saw?

10:14:28 10    A.   Uh-huh.

10:14:31 11    Q.   So, Doctor, did Barbara suffer from anagen effluvium?

10:14:38 12    A.   No.

10:14:39 13    Q.   So, just so we're clear, this is that condition of when

10:14:42 14    people go through chemotherapy and their hair falls out?

10:14:46 15    A.   Yes, and occurs during the chemotherapy, and the hair

10:14:49 16    regrow.

10:14:49 17    Q.   What is the next condition that -- as your differential

10:15:03 18    diagnosis, what was next on your list of conditions that you

10:15:05 19    considered?

10:15:05 20    A.   I think it was androgenetic alopecia.  Androgenetic

10:15:05 21    alopecia is a common condition, so I wanted to consider in the

10:15:05 22    differential diagnosis, even though the presentation is

10:15:05 23    different.

10:15:18 24         So androgenetic alopecia is also called *female*

10:15:18 25    *pattern hair loss*.  It's the same, that baldness in women.  So

**OFFICIAL TRANSCRIPT**

10:15:30  1   women may become a little bit bald sometimes.  This baldness

10:15:34  2   affect typically the top of the scalp.

10:15:36  3          This is a condition that start slowly.  It's not

10:15:40  4   something that sudden.  It's -- the pull test may be positive.

10:15:48  5   Here, we see, these are the scales that are used by doctors to

10:15:56  6   establish severity of androgenetic alopecia.

10:16:04  7   Q.   Let me stop you there, Doctor.  I think we need to break

10:16:04  8   this down, if we could.

10:16:05  9          So the next condition that you considered was called

10:16:09 10   *androgenic alopecia*; is that correct?

10:16:11 11   A.   You can call *androgenic*.  Androgenetic, I like more.

10:16:15 12   Q.   You like --

10:16:17 13   A.   Androgenetic, or female pattern hair loss.

10:16:24 14   Q.   Androgenetic alopecia or female pattern hair loss.

10:16:28 15          What's the time frame for this condition,

10:16:33 16   androgenetic alopecia?  I mean, does it happen overnight?  Does

10:16:36 17   it happen over a period of time?  Please educate the jury on

10:16:41 18   that.

10:16:41 19   A.   You know, it's usually -- I always tell them, usually it's

10:16:46 20   slowly progressive.  It's something that slowly progress.

10:16:49 21   Q.   When you say *slowly progress*, in your scientific medical

10:16:53 22   experience, what is the progression of that condition, over how

10:16:57 23   long a period of time?

10:16:58 24   A.   Slowly means a few years.  Okay.  Sometimes maybe more.

10:17:02 25   Not months.  Not months.

**OFFICIAL TRANSCRIPT**

10:17:06  1    Q.    What does this condition cause?

10:17:09  2    A.    Hair loss on the top of the scalp.  Thinning.  Again, the

10:17:17  3    hair becomes vellus, like in men.  So there are hair, but are

10:17:23  4    thin.

10:17:24  5    Q.    What -- we have some scales here in front of us.  We have

10:17:33  6    the Ludwig and the Savin Scale for female hair loss.  Is this

10:17:42  7    for female pattern hair loss or androgenetic alopecia; is that

10:17:44  8    what we're looking at?

10:17:44  9    A.    It's for androgenetic alopecia in women, which is also

10:17:47 10    called female pattern hair loss.

10:17:51 11    Q.    So is this a female version of when we think of male

10:17:56 12    pattern hair loss?

10:17:57 13    A.    Yes, that is.

10:17:57 14    Q.    I think important for us to understand, is the pattern

10:18:00 15    different for women and men?

10:18:02 16    A.    Yes, it is.  Because in women, the condition affects only

10:18:08 17    the top of the scalp.  In men, it may affect the back of the

10:18:12 18    scalp.

10:18:14 19          Some men, just like a little rim of hair left; but,

10:18:21 20    in women, as you see the scales don't even show the back of the

10:18:24 21    scalp because the doctors who made the scale knew that the

10:18:28 22    condition doesn't affect the back of the scalp.

10:18:30 23    Q.    Just so we're clear, as we work across the top, what is

10:18:35 24    the top row?  The diagrams we're looking at, what is that

10:18:35 25    showing?

**OFFICIAL TRANSCRIPT**

A.   The one at the top is Ludwig Scale.  It's just for type, normal, type 1, type 2 and type 3.

Then some doctors like to use a more detailed scale. Especially if you do a clinical trial for hair regrow, you want to have more options.  That's the Savin Scale.  But they are basically the same, the top of the scalp.

Q.   So the top of the scalp.  You distinguish between male pattern and female pattern.  Can you point on your head to where that is, just so we can see?

A.   That's the top.  That's the back.

Q.   So in your clinical experience, as well as your work as a researcher, do you see women who suffer from female pattern hair loss who have lost hair on the back of her scalp?

A.   Back of their scalp down there, no.  I've never seen anything like that.

Q.   What about eyebrows and eyelashes, with this androgenetic alopecia do you see loss of eyebrows, eyelashes, underarm hair, other hair on the body?

A.   No.  No.  Eyebrow and eyelashes, absolutely not.  Other hair on the body, they may be -- may grow more, so you see the opposite.  Because androgenetic alopecia, the name androgenetic is because androgen hormones genetic predisposition.

So androgen hormone cause the hair on the scalp to become thinner, but the hair on the body to become thicker.  So that's what I was saying.  If I see a woman that has hair on

*OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 10:20:34 | 1 | the body, I'm concerned she may have excessive hormones. |
| 10:20:38 | 2 | Q.    You did a physical exam of Barbara Earnest; is that |
| 10:20:44 | 3 | correct? |
| 10:20:44 | 4 | A.    Yes.  I explained before, she had no hair on her arm and |
| 10:20:51 | 5 | legs, and no axillary, and almost no pubic hair. |
| 10:20:57 | 6 | Q.    So you did not see any excessive body hair? |
| 10:20:59 | 7 | A.    No, the opposite. |
| 10:21:00 | 8 | Q.    Doctor, did Barbara's lack of hair regrowth match the |
| 10:21:18 | 9 | presentation of androgenetic alopecia? |
| 10:21:19 | 10 | A.    No, that's not my opinion, absolutely not.  And, also, her |
| 10:21:24 | 11 | family history from the women side, which is the most |
| 10:21:28 | 12 | important, was negative. |
| 10:21:28 | 13 | Q.    Okay.  Let's talk about Barbara first.  You've seen this |
| 10:21:35 | 14 | photograph before, correct? |
| 10:21:36 | 15 | A.    Yes, this is her photograph, I know, from a trip to |
| 10:21:39 | 16 | Grand Canyon.  That was taken, I think, less than one year |
| 10:21:46 | 17 | before chemotherapy.  I think she has absolutely a normal |
| 10:21:56 | 18 | quantity of hair, hair density. |
| 10:22:02 | 19 | Q.    So do you see any signs, whether it be the photograph or |
| 10:22:11 | 20 | the history that you got from Barbara Earnest, that she |
| 10:22:14 | 21 | suffered from any sort of androgenetic alopecia? |
| 10:22:18 | 22 | A.    No. |
| 10:22:18 | 23 | Q.    You also mentioned female family members, blood relatives. |
| 10:22:30 | 24 | Why is it important when you're making this diagnosis for you |
| 10:22:34 | 25 | to consider female family members? |

*OFFICIAL TRANSCRIPT*

10:22:37  1    A.   You know, because it's called *androgenetic* because you may

10:22:42  2    have a genetic disposition.  In women, I look for female

10:22:49  3    members in the family to see if they have any sign of the

10:22:52  4    disease.  In this case, she said no.

10:22:55  5         These are pictures of her sisters.  These are taken

10:23:01  6    at the 80 birthday of her sister, the one on the right is 80.

10:23:07  7    The other one, I don't know the age, but they have completely

10:23:11  8    normal hair.

10:23:12  9    Q.   Now, we talked about the female members of the family.

10:23:19 10    These are blood relatives, you were told, correct?

10:23:22 11    A.   Yes.

10:23:23 12    Q.   Yes.

10:23:26 13    A.   I also ask about her mother.

10:23:29 14    Q.   Yes.  That's what I was going to say.  What did you learn

10:23:32 15    concerning Barbara's mother, who is deceased?

10:23:36 16    A.   Also, no problem -- hair problem.

10:23:38 17    Q.   What about this idea of age and hair counts?

10:23:48 18    A.   You know, of course, when we age, everything gets worse.

10:23:54 19    The hair as well.  Okay.

10:23:56 20         So, there is a little bit of thinning of the hair

10:24:02 21    with aging.  But if you look at the numbers -- and this is a

10:24:06 22    very good paper of David Whiting, who is the most important

10:24:13 23    pathologist on hair -- and you look at the different condition.

10:24:18 24    Here is female pattern hair loss, and here is men.  We don't

10:24:23 25    want to look at me.  This is diffuse hair loss.

                              ***OFFICIAL TRANSCRIPT***

10:24:24 1          What you see here, from 70 to 79, to 99, you see the

10:24:32 2   numbers.  There is a decrease from 20, but they're still high.

10:24:42 3   You know, Barbara count is 15.  Here, it's 28.  So it's nothing

10:24:48 4   that may cause severe alopecia.

10:24:51 5          You know, most old people have normal amount of hair.

10:24:55 6   Okay.  They are white, of course, but thinning is not part of

10:25:00 7   aging.

10:25:01 8   Q.   Now, just because it comes to mind, we talked -- when you

10:25:09 9   consider the female members, blood relatives of a patient, do

10:25:16 10  you take into consideration the male relatives?

10:25:18 11  A.   The male relatives are not as important, but I know that

10:25:22 12  in the male side of the family, her brother and her son had

10:25:29 13  problems; but, you know, the sister, no.

10:25:31 14  Q.   So you took that into consideration too?

10:25:37 15  A.   I don't think that's important.  The female part of the

10:25:41 16  family has normal hair, and the patient itself had normal hair.

10:25:45 17  Q.   So, Doctor, if you could, walk us through

10:26:00 18  Barbara Earnest's presentation with her hair pattern compared

10:26:04 19  to what you see as a scientist and medical professional with

10:26:10 20  women with female pattern hair loss, if you would.

10:26:16 21  A.   You know, I think that everybody can see that her loss was

10:26:20 22  much more severe than any type of female pattern hair loss that

10:26:24 23  can happen.

10:26:24 24  Q.   So let's specifically go through some of the things you

10:26:31 25  laid out.  When we see the profile and the back picture of

**OFFICIAL TRANSCRIPT**

10:26:36  1   Barbara Earnest, the back of her scalp --

10:26:39  2   A.   I think this is the most important picture, okay, because

10:26:42  3   here you see that she has hair loss practically everywhere.

10:26:47  4   Even the rim over here is not normal.

10:26:51  5   Q.   I'm sorry, the what was not normal?

10:26:52  6   A.   The rim of hair, the hairline, the back hairline, you see,

10:27:00  7   it's thin.

10:27:01  8   Q.   Could you, with your pen, touch exactly what you're

10:27:06  9   referring to, please.

10:27:07  10  A.   Here.

10:27:08  11  Q.   So why is that important to you?

10:27:13  12  A.   Because in female pattern hair loss, the back of the scalp

10:27:19  13  is typically not involved in women.  Even in men, it's never so

10:27:24  14  involved.

10:27:24  15  Q.   Now, you've used this phrase *diffuse* -- or this word

10:27:29  16  *diffuse*, diffuse hair loss.  Do you typically see diffuse

10:27:33  17  hair loss with female pattern hair loss?

10:27:37  18  A.   Sometimes you can, okay, but it's the degree of severity

10:27:43  19  that is completely different.

10:27:44  20  Q.   Explain that to us, if you would.

10:27:46  21  A.   You know, in some women, you may have a little bit of

10:27:49  22  thinning on the side, a little bit of thinning of the back, but

10:27:53  23  never loss, complete loss like here, with no hair on the back.

10:27:59  24  Q.   Doctor, what I'd like to show you is example of male

10:28:08  25  pattern hair loss.  What is this we're looking at here?

**OFFICIAL TRANSCRIPT**

10:28:14  1    A.    What I want to explain you is this, even the worst

10:28:19  2    scenario, the worst severity of male pattern hair loss, they

10:28:25  3    have hair here.

10:28:26  4          I don't know why it doesn't work anymore.

10:28:28  5          Okay.  Here.  This hair is the base of hair

10:28:34  6    transplantation, you know.  You know that in men you can do

10:28:36  7    hair transplantation.  Why?  Because the hair in this area do

10:28:41  8    not react to androgens, so they never thin.  So you can take

10:28:48  9    the hair from there and put them here.

10:28:50 10    Q.    Let me stop you there.  I want to make sure I understand.

10:28:53 11    You're talking about -- we've probably all heard of hair

10:28:58 12    transplant.  You're referring to that.  You indicated something

10:29:03 13    about that with males, they can get -- who have male pattern

10:29:07 14    hair loss, they can utilize that part of their hair for hair

10:29:12 15    transplant; is that correct?

10:29:13 16    A.    Yes, that's the donor area.  It's called the *donor area*.

10:29:17 17    The reason of that is that those hair do not react to

10:29:21 18    androgens.

10:29:21 19    Q.    You've talked about this a couple times.  I think it's

10:29:24 20    important we understand.  When you say *don't react to*

10:29:30 21    *androgens*, what are androgens, just briefly?  And then how are

10:29:33 22    they involved in this hair loss process?

10:29:36 23    A.    Androgens are the main hormones.  Testosterone is the most

10:29:42 24    important androgens.  Androgens, in certain situation, make the

10:29:49 25    hair to get thinner.  In androgenetic alopecia, androgens make

*OFFICIAL TRANSCRIPT*

10:29:54  1    the hair to become thin and thin and invisible.

10:29:58  2            But not all the scalp react to androgens.  There are

10:30:04  3    these area that do not.  They are androgen independent.  That's

10:30:08  4    why you can utilize those area for hair transplantation.

10:30:16  5            But my idea is that even the men with the worst

10:30:18  6    scenarium has this part preserved, has the hair in this area

10:30:31  7    preserved.

10:30:31  8    Q.    So even men who have more dramatic hair loss, when you say

10:30:36  9    they have that hair preserved, what does that mean?

10:30:39 10    A.    They have it as in this picture.  The hair in that area is

10:30:43 11    normal.

10:30:43 12    Q.    Then compare that, if you would, to what you see with

10:30:51 13    Barbara.  Do you see that hair preserved there, as you're

10:30:54 14    referring to?

10:30:54 15    A.    I was saying that even this hair is very thin.  You can

10:30:57 16    see the skin through this hair here.  So it's very, very thin.

10:31:06 17    So the hair loss is more severe than the worst scenarium of

10:31:14 18    male pattern hair loss.

10:31:15 19    Q.    So, Doctor, does Barbara Earnest suffer from androgenetic

10:31:25 20    alopecia?

10:31:25 21    A.    No.

10:31:25 22    Q.    I don't want to make you repeat everything.  For all the

10:31:34 23    reasons you went through?

10:31:34 24    A.    Yes.

10:31:35 25    Q.    In your differential diagnosis, did you consider a

*OFFICIAL TRANSCRIPT*

10:31:46 1   condition called *alopecia areata*?

10:31:58 2   A.   Yes, I did.

10:31:59 3   Q.   What is alopecia areata?

10:31:59 4   A.   Alopecia areata is a very common disorder that usually

10:32:00 5   cause patches of hair loss, but sometimes can cause -- lose of

10:32:04 6   all your hair.  So you can be without any hair on your scalp,

10:32:09 7   on your eyebrows, on your eyelashes.

10:32:14 8        But in alopecia areata, you have no hair, which is

10:32:19 9   different than in Barbara's situation, when you have this fuzzy

10:32:27 10  hair.

10:32:28 11  Q.   So that's true loss of all hair, alopecia areata can be?

10:32:33 12  A.   Yes.  The one in differential, yes, because she has no

10:32:36 13  patches.  It's not a patchy alopecia there.

10:32:42 14  Q.   So you considered alopecia areata; is that correct?

10:32:45 15  A.   I did.

10:32:45 16  Q.   Let's just walk through what we see here, just what we see

10:32:52 17  here, alopecia areata and how that presents, and then how

10:32:58 18  Barbara Earnest presented, so we understand how you reached

10:33:00 19  your conclusion.

10:33:02 20       I should have you state that first.  Do you believe

10:33:04 21  that Barbara suffered from alopecia areata?

10:33:09 22  A.   No.  I think alopecia areata was really not in the

10:33:12 23  differential, but I'm going to go through the slide --

10:33:15 24  Q.   When you say it wasn't even in the differential, what does

10:33:17 25  that mean?

**OFFICIAL TRANSCRIPT**

10:33:18  1    A.    Because the clinical examination is very different.  The

10:33:23  2    skin is like no hair at all, smooth.  They don't have any hair

10:33:30  3    left.

10:33:30  4    Q.    So then why don't we just quickly move through this, just

10:33:34  5    so the jurors understand it.

10:33:36  6    A.    Yes.

10:33:36  7    Q.    Go ahead, if you can take us through --

10:33:39  8    A.    The history in alopecia areata, they have a history of

10:33:45  9    acute hair loss.  They may lose all the hair in a few weeks.

10:33:52 10    From patchy can become complete.  When they still have hair,

10:33:58 11    the pull test is positive.  When they have no hair, of course,

10:34:02 12    is negative.

10:34:12 13    Q.    So in Barbara's case, did you do a pull test that showed

10:34:18 14    negative, correct?

10:34:19 15    A.    Yes.

10:34:19 16    Q.    If it was alopecia areata, it would have been what result?

10:34:25 17    A.    Depend on the phase.  If it's alopecia areata that's still

10:34:30 18    losing hair, it's positive.  But it's already completely

10:34:34 19    without hair, it's negative, has no hair.

10:34:38 20    Q.    So, as you indicated, you considered alopecia areata,

10:34:44 21    although it wasn't in the differential diagnosis.  What was

10:34:46 22    your conclusion?

10:34:47 23    A.    That she has not alopecia areata.

10:34:50 24    Q.    Doctor, moving through your differential diagnosis, did

10:35:13 25    you consider what's referred to as EIA, endocrine-induced

**OFFICIAL TRANSCRIPT**

10:35:21 1    alopecia?

10:35:22 2    A.    Okay.  Yes, I did.  Also, because Barbara was -- is still

10:35:29 3    taking a medication that is an aromatase inhibitor, and that

10:35:37 4    has been reported to cause -- possibly cause this

10:35:43 5    endocrine-induced alopecia.

10:35:45 6    Q.    So let's make sure we walk through this.  So

10:35:54 7    endocrine-induced alopecia.

10:35:59 8    A.    You want me to explain, or you want to me ask?

10:36:02 9    Q.    Yes.  Let's have you explain.

10:36:04 10   A.    Okay.  So this is a type of alopecia due to medications

10:36:10 11   that block the estrogen activity.  Because in women with

10:36:18 12   breast cancer, when the cancer is positive to estrogens, we

10:36:22 13   give medication to prevent estrogens to stimulate the cancer.

10:36:28 14          So these medications are antiestrogens, or

10:36:34 15   aromatase inhibitor.  This medication can cause androgenetic

10:36:34 16   alopecia.  It basically is a type of androgenetic alopecia due

10:36:44 17   to this medication.

10:36:45 18   Q.    Let's kind of just make sure the jury understands the

10:36:48 19   history for Barbara Earnest.  She finished her chemotherapy

10:36:52 20   approximately when?

10:36:53 21   A.    She finished chemotherapy, I think, in June.  Because she

10:37:03 22   started the aromatase inhibitor in November, three months after

10:37:08 23   chemotherapy.  No, November, October, September, August.

10:37:15 24   Q.    So Barbara Earnest finished her chemotherapy --

10:37:19 25   A.    Yes.

*OFFICIAL TRANSCRIPT*

10:37:20  1    Q.    -- and then, at some point, went on what you referred to

10:37:24  2    as the aromatase inhibitor?

10:37:24  3    A.    Yes.

10:37:28  4    Q.    Arimidex, correct?

10:37:30  5    A.    Yes.  She finished chemotherapy.  She had the -- therapy

10:37:34  6    after that.  So after three months, she started the

10:37:38  7    aromatase inhibitor.

10:37:38  8          But this type of alopecia, you have hair, and you

10:37:42  9    lose hair during the medication.  So, in this case, you have

10:37:47  10   normal hair after chemotherapy.  You start the medication.

10:37:50  11   This medication slowly cause androgenetic alopecia.

10:38:00  12         So the chronology is completely different, because

10:38:00  13   she had no hair when she started the medication, and the

10:38:04  14   situation remained the same.

10:38:08  15   Q.    So this drug that she's on is called *Arimidex*?

10:38:12  16   A.    Yes.  It's an aromatase inhibitor.

10:38:17  17   Q.    This inhibits some hormones; is that right?

10:38:22  18   A.    Yes.

10:38:22  19   Q.    You were explaining to the jury, I believe, that it

10:38:28  20   interferes with androgen -- the androgen balance in the female

10:38:31  21   body; is that right?

10:38:31  22   A.    Yes.

10:38:31  23   Q.    What type of presentation or impact does

10:38:39  24   aromatase inhibitor, like Arimidex, have on a woman's hair?

10:38:42  25   A.    You see, here is a picture from the literature.  It's

**OFFICIAL TRANSCRIPT**

| | | |
|---|---|---|
| 10:38:45 | 1 | hair loss on the top, like androgenetic alopecia -- Gladwell. |
| 10:38:55 | 2 | Q.   Now, Doctor, are you aware that Barbara Earnest is still |
| 10:39:01 | 3 | on this particular type of drug? |
| 10:39:05 | 4 | A.   Yes, of course. |
| 10:39:06 | 5 | Q.   So, how in this case, with the fact that she's still |
| 10:39:11 | 6 | taking -- do you know how this -- this drug is taken with a |
| 10:39:14 | 7 | pill? |
| 10:39:14 | 8 | A.   Uh-huh (affirmative response).  Yes. |
| 10:39:15 | 9 | Q.   How in this case do you rule out Barbara's type of |
| 10:39:26 | 10 | alopecia, the diffuse alopecia, with comparison to the alopecia |
| 10:39:31 | 11 | or hair loss that is caused by the aromatase inhibitor?  Take |
| 10:39:44 | 12 | us through that, if you would. |
| 10:39:44 | 13 | A.   First of all, the severity.  So, clinically, it's much |
| 10:39:45 | 14 | more severe than the alopecia due to endocrine medication, but |
| 10:39:50 | 15 | is more similar to the androgenetic alopecia. |
| 10:39:56 | 16 | Q.   Well, let me stop you there, just to make sure we |
| 10:39:58 | 17 | understand.  So the endocrine drug can cause some type of hair |
| 10:40:04 | 18 | thinning? |
| 10:40:04 | 19 | A.   Yes. |
| 10:40:05 | 20 | Q.   Okay. |
| 10:40:07 | 21 | A.   They do. |
| 10:40:08 | 22 | Q.   Can you describe to the jury the type of hair thinning |
| 10:40:12 | 23 | that is caused by this type of endocrine therapy? |
| 10:40:19 | 24 | A.   It's hair thinning that is very similar to androgenetic |
| 10:40:23 | 25 | alopecia because the mechanism is similar.  So it cause |

*OFFICIAL TRANSCRIPT*

10:40:28 1   miniaturization, so thinning of the hair on the top of the

10:40:32 2   scalp.  But they don't cause diffuse hair loss severe like

10:40:37 3   this.

10:40:37 4   Q.   So, I'm assuming -- well, just let me ask.  You indicated

10:40:41 5   that the aromatase inhibitor drug, Arimidex, that Barbara takes

10:40:50 6   mimics or presents like some form of androgenic alopecia?

10:40:53 7   A.   The type of hair loss is very similar.

10:40:56 8   Q.   So, does that mean that the pattern is similar?

10:41:00 9   A.   Yes.

10:41:01 10   Q.   The pattern between the Arimidex drug hair loss and

10:41:10 11   androgenetic hair loss is similar?

10:41:12 12   A.   Yes.

10:41:12 13   Q.   Are those patterns similar to what Barbara Earnest has?

10:41:16 14   A.   No, are milder.

10:41:16 15   Q.   I'm sorry?

10:41:21 16   A.   Are not as severe as her hair loss.

10:41:23 17   Q.   Not as severe?

10:41:24 18   A.   Are less severe.  Much less severe.

10:41:29 19   Q.   Have you ever -- have you ever seen Arimidex inhibitor

10:41:40 20   endocrine-induced alopecia caused by this hormone drug, have

10:41:43 21   you ever seen it present in the severity that Barbara Earnest

10:41:47 22   suffers from with her permanent hair loss?

10:41:53 23   A.   Absolutely not.  The chronology also doesn't match because

10:41:58 24   she never grow back the hair.  So it's a different situation.

10:42:01 25   Q.   I think that's important.  Let's walk through that

**OFFICIAL TRANSCRIPT**

10:42:04  1    chronology.

10:42:05  2         So take the jury through the chronology that you see

10:42:10  3    with women who you diagnose with endocrine-induced alopecia.

10:42:17  4    Take us through that chronology, please.

10:42:20  5    A.   It's not just me, all the literature.  So these women

10:42:24  6    regrow hair after chemotherapy, and then start these

10:42:31  7    medications.  After usually one year, they start seeing some

10:42:36  8    thinning that in some case may be severe, but never as severe.

10:42:42  9    Q.   So in your history that you took for Barbara, did you find

10:42:47 10    any evidence that her hair fell out with the anagen effluvium,

10:42:56 11    like it does with chemotherapy, and then returned, and then

10:42:58 12    fell out to some degree again?  Did you see anything like that

10:43:02 13    at all?

10:43:02 14    A.   Absolutely not.

10:43:03 15         THE COURT:  Mr. Schanker, is this a good time for a

10:43:10 16    break?  I'm going to rely on you to give me a time where it's a

10:43:14 17    good time for a break.

10:43:15 18         MR. SCHANKER:  How about just two more minutes?  Is

10:43:17 19    that okay?

10:43:17 20         THE COURT:  That would be perfect.  Thank you.

10:43:23 21    EXAMINATION BY MR. SCHANKER:

10:43:24 22    Q.   So, Doctor, does Barbara suffer from endocrine-induced

10:43:30 23    alopecia?

10:43:30 24    A.   No.

10:43:30 25    Q.   Without going through the details of how you reached this

*OFFICIAL TRANSCRIPT*

10:43:37 1    determination --

10:43:38 2            I think you've covered those, correct?

10:43:39 3    A.    Yes.

10:43:40 4    Q.    -- the answer is she does not, no; is that correct?

10:43:44 5    A.    Yes.

10:43:51 6            MR. SCHANKER:  Your Honor, that was a fast two minutes.

10:43:55 7            THE COURT:  Okay.  Members of the Jury, we'll be at

10:43:58 8    recess for ten minutes.  Again, don't talk amongst yourselves

10:44:04 9    or with anyone else about this case.  Just leave your tablets

10:44:08 10   in your chairs.  Court is in recess for ten minutes.

10:44:12 11           THE DEPUTY CLERK:  All rise.

10:44:13 12           (WHEREUPON, at 10:44 a.m. the jury panel leaves the

10:44:38 13   courtroom.)

10:44:38 14           MR. SCHANKER:  Since she hasn't done this before, you

10:44:41 15   might want to instruct her as far as not speaking with --

10:44:44 16           THE COURT:  Dr. Tosti, while you're in the middle of

10:44:48 17   your examination, you can't speak to the lawyers and review

10:44:53 18   again what you said or what you're going to say.

10:44:55 19           THE WITNESS:  Okay.

10:44:56 20           THE COURT:  But you may certainly run to the restroom

10:45:01 21   if you need to.

10:45:02 22           THE WITNESS:  Okay.

10:45:03 23           (WHEREUPON, at 10:45 a.m. the Court took a recess.)

10:56:37 24           THE DEPUTY CLERK:  All rise.

10:56:38 25           THE COURT:  All jurors are present.  Court is back in

*OFFICIAL TRANSCRIPT*

10:58:50 1    session.  You may be seated.

10:58:51 2              Dr. Tosti, I remind you you're still under oath.

10:58:54 3              Please proceed, Mr. Schanker.

10:58:54 4    EXAMINATION BY MR. SCHANKER:

10:58:57 5    Q.   Good morning, again.  Dr. Tosti, good morning again.

10:59:00 6              So we were working through your differential

10:59:04 7    diagnosis.  And what conditions have you ruled out, just

10:59:08 8    briefly to cover the names of the conditions we've ruled out up

10:59:12 9    to this point.

10:59:13 10   A.   We rule out telogen effluvium.  We rule out anagen

10:59:21 11   effluvium.  We rule out androgenetic alopecia.  We rule out

10:59:24 12   alopecia areata.  We rule out endocrine-induced alopecia.

10:59:27 13   Q.   So at this point, what is left in your differential

10:59:33 14   diagnosis, Doctor?

10:59:36 15   A.   Permanent alopecia after chemotherapy.

10:59:38 16   Q.   And just so we're clear, there is a difference between

10:59:43 17   permanent alopecia and temporary alopecia?

10:59:46 18   A.   Yes.  This alopecia has been defined as permanent

10:59:52 19   persistent or irreversible, depending on the status, but

10:59:57 20   basically is permanent.

10:59:59 21   Q.   And, Doctor, what is permanent chemotherapy-induced

11:00:03 22   alopecia?

11:00:05 23   A.   It is a type of alopecia that occurs after chemotherapy

11:00:12 24   with certain drug and is characterized by diffuse alopecia

11:00:18 25   involving almost the whole scalp, and the hair are very short

*OFFICIAL TRANSCRIPT*

11:00:27  1    and miniaturized.

11:00:28  2    Q.    And, Doctor, we're looking at a picture.  Is this picture

11:00:33  3    from the medical literature?

11:00:35  4    A.    Yes.  This is a picture from a paper that has been

11:00:38  5    published.  This is the clinical picture showing the

11:00:42  6    presentation of this condition.

11:00:45  7    Q.    And if you could take us through what the indications are

11:00:54  8    that support a diagnosis of permanent chemotherapy-induced

11:00:59  9    alopecia, please.

11:01:02 10    A.    The classical diagnosis depends on history that is

11:01:09 11    incomplete hair regrowth six months after the end of

11:01:14 12    chemotherapy.  And this is Type 2, because there are only two

11:01:19 13    severity grade, unfortunately, because this is what -- the way

11:01:25 14    we grade the severity is just Type 1 and Type 2.

11:01:29 15          So, this is the severe type, which is called *Type 2*,

11:01:34 16    when you have almost -- you know, involvement of almost the

11:01:38 17    whole scalp with thinning.  Severe, severe thinning.  And

11:01:45 18    involvement of eyebrows and eyelashes is also very typical.

11:01:50 19    Q.    Explain that to the jury, if you would, eyebrows and

11:01:54 20    eyelashes.

11:01:54 21    A.    Eyebrows and eyelashes are lost as well.  Become very

11:01:59 22    thin.

11:01:59 23    Q.    And with a presentation of permanent chemotherapy-induced

11:02:03 24    alopecia, what is the result of a pull test?

11:02:07 25    A.    A pull test is usually negative because they have no hair

*OFFICIAL TRANSCRIPT*

11:02:10 1    left.

11:02:11 2    Q.    And then as far as -- let's do this.  You indicated,

11:02:21 3    Doctor, that this particular photograph comes from the

11:02:26 4    literature; is that right?

11:02:27 5    A.    Yes.

11:02:27 6    Q.    And do you remember which study that is?

11:02:33 7    A.    To be honest, I don't know if it was my own study.

11:02:39 8              Yes.  That was my own study.  The study published

11:02:43 9    with Maria Miteva.

11:02:51 10   Q.    What is the name of this study?

11:02:52 11   A.    "Permanent alopecia after systemic chemotherapy:  A

11:02:59 12   clinical pathological study of ten cases."

11:03:00 13   Q.    When was this published?

11:03:02 14   A.    This was published in 2011.

11:03:05 15   Q.    And where was it published?

11:03:07 16   A.    This is *Journal of Dermatopathology*.  I think was the

11:03:13 17   *American Journal of Dermatopathology*.

11:03:30 18        MR. SCHANKER:  Your Honor, may I approach?

11:03:33 19        THE COURT:  Yes, you may.

11:03:33 20   EXAMINATION BY MR. SCHANKER:

11:03:34 21   Q.    Doctor, what was the purpose of this study?

11:03:36 22   A.    This was a study mainly on the pathology, because we

11:03:40 23   wanted to try to put the basis for the pathology of this

11:03:45 24   condition for dermatopathologists to recognize.

11:03:51 25              And this did not only involve permanent alopecia

*OFFICIAL TRANSCRIPT*

11:03:57  1    after Taxotere.  We also had cases of permanent alopecia from

11:04:00  2    other drugs, including busulfan and I think cisplatin.  So,

11:04:13  3    there were different type of drugs that caused the problem in

11:04:16  4    these patients.

11:04:16  5    Q.   You mentioned other drugs.  Cisplatin and busulfan; is

11:04:23  6    that right?

11:04:23  7    A.   Yes.  Not for breast cancer.  For other types of tumors.

11:04:25  8    Q.   That's what I was going to ask you.  Those other drugs

11:04:27  9    that you mentioned, are those used in breast cancer treatment

11:04:31 10    or for other types of tumors?

11:04:32 11    A.   They are used for other types of tumor.

11:04:34 12    Q.   And what is important for the jury to understand

11:04:39 13    concerning this publication?

11:04:42 14    A.   You know, that the clinical presentation of this patient

11:04:45 15    is absolutely identical to Barbara's clinical presentation.  If

11:04:52 16    you put them together, they look exactly the same.  And, you

11:05:00 17    know, dermatology is very visual.  We look at the skin, we

11:05:03 18    look -- and so, that's why I'm visual and I want to show the

11:05:07 19    visual comparison.

11:05:09 20    Q.   So this is -- the photograph we were looking at before

11:05:13 21    comes out of this publication?

11:05:14 22    A.   Yes.

11:05:14 23    Q.   And you indicated that if we put this photograph of this

11:05:19 24    patient who suffered from --

11:05:23 25    A.   Permanent alopecia after docetaxel, this particular

*OFFICIAL TRANSCRIPT*

11:05:29  1    patient.

11:05:29  2    Q.    So this is docetaxel or Taxotere?

11:05:31  3    A.    Yes.

11:05:31  4    Q.    And if we put this patient next to Barbara Earnest?

11:05:38  5    A.    You see that the clinical presentation is very, very

11:05:42  6    similar.  They have the same problem.

11:05:45  7    Q.    And so what does this mean to the jury?

11:05:53  8    A.    That they are -- this is the same disease.

11:05:57  9    Q.    Doctor, are there more examples in the literature of this

11:06:10 10    permanent chemotherapy-induced -- bless you -- alopecia --

11:06:16 11          Are there more examples in the literature of this

11:06:19 12    permanent chemotherapy-induced alopecia after Taxotere?

11:06:24 13    A.    Yes, there are many examples.  I think I gave you several.

11:06:39 14    Q.    And when you say gave us, they were materials that you

11:06:42 15    relied upon in preparing your report?

11:06:44 16    A.    Yes.  Those are all the articles in the literature that I

11:06:49 17    utilized for my report.

11:06:51 18    Q.    Doctor, are you familiar with this study?

11:06:59 19    A.    Yes, I am.

11:07:00 20    Q.    Could you please take the jury briefly through this study.

11:07:10 21    And what do you refer to this study as?

11:07:13 22    A.    Martin study.  This is a study done by oncologists.  And

11:07:21 23    they show that 10 percent of patients with -- in treatment with

11:07:29 24    docetaxel and other chemotherapy have severe permanent alopecia

11:07:35 25    after chemotherapy.  But they did not find any case in

*OFFICIAL TRANSCRIPT*

11:07:41  1    chemotherapy without Taxotere, so the only cases they saw were

11:07:49  2    with Taxotere.

11:07:50  3    Q.    So let's come back to that important point a little bit

11:07:55  4    later, if we could.   Right now I want to focus on the

11:07:58  5    presentation concerning -- visual presentation.   Is that fair?

11:08:02  6    A.    Yes.   Here, if you go on the following page, it may be two

11:08:08  7    following page, you'll find the clinical pictures, and you can

11:08:12  8    put the clinical pictures close to Barbara's picture to show

11:08:19  9    that it's the same condition.

11:08:27 10          Here it show not only the severe type, but in the --

11:08:33 11    here, below, you'll see the Type 1.   So the difference between

11:08:38 12    Type 1 and Type 2 severity is that Type 2, they cannot -- they

11:08:45 13    need to wear a wig.   They cannot go out without it because they

11:08:51 14    cannot camouflage the problem.   Type 1, yes, there they can

11:08:59 15    camouflage.   It's less severe.

11:09:01 16    Q.    So this bottom row --

11:09:05 17    A.    Is Type 1.

11:09:06 18    Q.    And so, just so we're clear, we have two types that you've

11:09:11 19    seen or that are found in the literature of permanent

11:09:14 20    chemotherapy-induced alopecia; is that correct?

11:09:15 21    A.    Yes.   This is a limit of this classification because, of

11:09:19 22    course, I would like to have a classification with more type to

11:09:25 23    put that very severe, like Type 4 and -- we have intermittent

11:09:33 24    grade by sure.

11:09:34 25          But this is the Type 2.   And so on the top is a very

*OFFICIAL TRANSCRIPT*

11:09:38  1   severe Type 2, and these patients look very much like Barbara,

11:09:46  2   this, this, this.

11:09:47  3   Q.   So, Doctor, this top left, which is marked with the big A,

11:09:56  4   what is the classification for that type of permanent hair loss

11:10:00  5   caused by chemotherapy?

11:10:01  6   A.   Type 2.

11:10:02  7   Q.   That's Type 2.  And, Doctor, can we look at matching

11:10:11  8   Barbara's condition with the condition of the big A?

11:10:15  9   A.   Yes.

11:10:15 10   Q.   And --

11:10:19 11   A.   You see it's very, very, very similar, okay.  Maybe a

11:10:24 12   little bit less severe than Barbara.

11:10:27 13   Q.   And what do you see here that enables you to make that

11:10:31 14   kind of determination?

11:10:34 15   A.   The diffuse hair loss and very important finding in this

11:10:40 16   condition, the shortness of the hair.

11:10:42 17   Q.   You mentioned that earlier.  Take us through that, if you

11:10:46 18   would.

11:10:47 19   A.   You know, all the reported cases, this is a specific

11:10:51 20   feature, the hair do not get long.  They are very, very short.

11:10:54 21   Q.   And so, does this evidence information go to support your

11:11:02 22   conclusion in this case?

11:11:03 23   A.   Yes.

11:11:44 24        MR. SCHANKER:  May I approach?

11:11:45 25        THE COURT:  Yes, you may.

*OFFICIAL TRANSCRIPT*

11:11:46  1   EXAMINATION BY MR. SCHANKER:

11:11:53  2   Q.   Doctor, is there more literature and photo evidence that

11:11:58  3   supports your conclusion in this case?

11:12:00  4   A.   Yes.

11:12:00  5   Q.   Can we continue to work through that?

11:12:02  6   A.   Yes.

11:12:02  7   Q.   Doctor, did you present to us this publication?

11:12:14  8   A.   Yes.

11:12:19  9   Q.   Do you recall this?

11:12:21 10   A.   This is a French publication.

11:12:23 11   Q.   And is there photographic support in this treatise or

11:12:32 12   publication?

11:12:32 13   A.   Yes.

11:12:33 14   Q.   Would it assist the jury if I showed them that?

11:12:41 15   A.   Yes.

11:12:43 16   Q.   What are we looking at here?

11:12:50 17   A.   Again, we're looking at the severe alopecia, diffuse

11:12:57 18   severe alopecia.

11:12:58 19   Q.   And this appears to be a slightly different presentation.

11:13:02 20   Explain that.  Is there -- is there anything to draw from that?

11:13:04 21   A.   It's milder.  That's what I was saying before.

11:13:07 22   Q.   It's what?

11:13:08 23   A.   A little less severe, okay, because we have just two

11:13:14 24   grade, and so in Grade 2, you have more severe and less severe.

11:13:22 25   But she needs a wig, so here the distinction is need a wig or

*OFFICIAL TRANSCRIPT*

11:13:27  1   don't need a wig.

11:13:28  2   Q.   And, Doctor, in this case, does Barbara's hair loss meet

11:13:41  3   that of chemotherapy-induced alopecia?

11:13:51  4   A.   Yes, I think so.

11:13:52  5   Q.   Did you continue to go through the literature in your

11:14:00  6   report?

11:14:00  7   A.   Yes.

11:14:01  8   Q.   Doctor, are you familiar with this publication?

11:14:46  9   A.   Yes.

11:14:48 10   Q.   If you could orient the jury to this, tell them about this

11:14:53 11   study which appeared in the *American Academy of Dermatology*.

11:14:58 12   A.   Yes.  This is a study done together from people from

11:15:03 13   United States and people from London.  The main author is

11:15:12 14   Catherine Stefanato, which is -- I know very well.  In this

11:15:15 15   publication, they report patients with the condition.

11:15:19 16   Q.   The main author on this case --

11:15:19 17   A.   Yes, because the main author is always the last author in

11:15:19 18   medical literature.

11:15:19 19   Q.   Have you worked with Dr. Stefanato?

11:15:37 20   A.   I know her very well, yes.  I was invited in London by

11:15:37 21   her.

11:15:38 22   Q.   Did you utilize this report in finding your conclusions in

11:15:43 23   the case that Barbara Earnest's hair loss presentation matched

11:15:47 24   that of permanent chemotherapy-induced alopecia?

11:15:54 25   A.   Yes.

                          *OFFICIAL TRANSCRIPT*

11:15:54  1    Q.   Was there photographic support in this document?

11:15:54  2    A.   Yes.

11:15:57  3    Q.   Let me show it to you and see.  You recall this?

11:16:01  4    A.   Yes, I do.

11:16:02  5    Q.   What is it that the jury is looking at here?

11:16:06  6    A.   Again, a very diffuse severe alopecia that affects not

11:16:14  7    only the top, but also the back of the scalp, with almost no

11:16:19  8    hair left.

11:16:20  9    Q.   Did you do a comparison to match Barbara's presentation of

11:16:29 10    permanent hair loss with that that we're looking at here?

11:16:33 11    A.   Absolutely, yes.

11:16:33 12    Q.   When you did that side-by-side comparison, what did you

11:16:39 13    conclude, Doctor?

11:16:40 14    A.   You know, they look identical to me.

11:16:42 15    Q.   Describe that, if you could, just the presentation.

11:16:46 16    A.   You know, both have severe involvement of the back of the

11:16:52 17    scalp, with a very, very thin rim, involvement of the top and

11:16:57 18    involvement of the side.

11:16:58 19    Q.   All these -- this particular picture, this is a permanent

11:17:05 20    condition?

11:17:06 21    A.   This is a picture of permanent alopecia from chemotherapy

11:17:12 22    due to docetaxel.

11:17:13 23    Q.   Doctor, just to be clear, in this case, did you, in your

11:17:43 24    differential diagnosis, rule in permanent chemotherapy-induced

11:17:49 25    alopecia as the cause of Barbara Earnest's scalp condition?

*OFFICIAL TRANSCRIPT*

11:17:54  1    A.    Yes, I think she's affected by permanent alopecia from

11:17:59  2    chemotherapy due to Taxotere.

11:18:03  3    Q.    Let's just make sure.  You said, "I think she's

11:18:05  4    affected" --

11:18:06  5    A.    She is.

11:18:08  6    Q.    What was the basis for your conclusion that

11:18:13  7    Barbara Earnest suffered from permanent chemotherapy-induced

11:18:16  8    alopecia?

11:18:19  9    A.    Everything from history to clinical exam, to pull test

11:18:25 10    results, to consistency with pathology results and --

11:18:34 11    Q.    You mentioned pathology results.  Let's talk about those

11:18:40 12    for a moment.

11:18:40 13    A.    Yes.

11:18:49 14    Q.    So you indicated earlier that pathology was done in this

11:18:54 15    case.  Did you do the pathology?

11:19:00 16    A.    No.  She had the biopsy taken before.  So I saw her, and

11:19:05 17    she already had the pathology results.

11:19:09 18          But I saw the biopsy sites, so where the biopsy were

11:19:16 19    taken.  These biopsy were taken, one, from the top of the

11:19:20 20    scalp, the area that was very bald, and one in the area where

11:19:23 21    she has those few hair left.

11:19:28 22          And the both biopsy --

11:19:31 23    Q.    Let me stop you there.  Pathology, you're talking about

11:19:34 24    the biopsy results.

11:19:36 25    A.    Uh-huh (affirmative response).

*OFFICIAL TRANSCRIPT*

11:19:36 1    Q.   So did you need those biopsy results to reach your

11:19:40 2    conclusion that Barbara Earnest suffered from -- suffers from

11:19:45 3    permanent chemotherapy-induced alopecia, or how did those fit

11:19:49 4    into your analysis and conclusion in this case?

11:19:51 5    A.   To be honest, I didn't need.  Even in the literature, not

11:19:57 6    every patient had the biopsy, because the history had a

11:20:01 7    presentation as so strong that you usually don't take a biopsy

11:20:05 8    to a patient who already has this problem.

11:20:10 9         If it is my patient, I probably wouldn't because I

11:20:13 10   know what it is.  But in this case, the biopsy were already

11:20:17 11   taken because it was a different type of case.

11:20:20 12   Q.   Let's talk about that.  You indicated if this was your

11:20:25 13   patient.  You mean like a traditional patient that comes to see

11:20:29 14   you?

11:20:29 15   A.   Yes.  If it is one of my patients at University of Miami,

11:20:33 16   I wouldn't take a biopsy.  Why should I take a biopsy, put

11:20:38 17   stitches, if I already know what it is?

11:20:40 18   Q.   But this case, obviously, is not a traditional situation

11:20:44 19   where an individual is going to see you about this condition,

11:20:44 20   correct?

11:20:50 21   A.   Yes.

11:20:50 22   Q.   In fact, it involves this lawsuit and this litigation?

11:20:54 23   A.   Yes.  In fact, in this case, I was prepared to take a

11:20:58 24   biopsy if I -- if I need it, but I didn't need, and I didn't

11:21:05 25   take.

*OFFICIAL TRANSCRIPT*

11:21:05 1    Q.    Now, in this case, you understand that a biopsy was done?

11:21:08 2    A.    Yes.

11:21:09 3    Q.    Then how does this work?  If you could explain to the

11:21:16 4    jurors, who is it that looks at or interprets a biopsy?

11:21:20 5    A.    So the biopsy is looked at by a specialized doctor who is

11:21:27 6    called *dermatopathologist*.

11:21:31 7    Q.    Let me stop you there.  Dermatopathologist?

11:21:37 8    A.    Dermatopathologist.  Or can be only a pathologist, but the

11:21:41 9    best is a dermatopathologist, who is trained in the looking at

11:21:45 10   biopsies.

11:21:47 11          They cut the biopsies, like transverse, like this.

11:21:52 12   They count the number of follicles in the 4-millimeter punch.

11:22:01 13   So they can count how many follicles are there.  They can

11:22:05 14   measure how big these follicles are and give you this count

11:22:10 15   that important for diagnosis.

11:22:11 16   Q.    In this case, was that done?

11:22:16 17   A.    Yes.  It was done.

11:22:17 18   Q.    Who did it?

11:22:20 19   A.    Dr. Thompson, who is a dermatopathologist from Oregon.

11:22:25 20   Q.    Is that Dr. Curtis Thompson?

11:22:29 21   A.    Yes, it is.

11:22:29 22   Q.    Dr. Thompson, are you aware that he is to be a witness in

11:22:34 23   this case as well?

11:22:35 24   A.    Yes, of course I do.

11:22:37 25   Q.    So, prior to this litigation, did you know Dr. Thompson?

*OFFICIAL TRANSCRIPT*

11:22:43  1    A.    Yes, of course.  I've been publishing with him, and I know

11:22:49  2    him very well.

11:22:49  3    Q.    So just briefly, so the jury understands the context and

11:22:56  4    relationship, describe the work that you've done with

11:22:59  5    Dr. Thompson prior to this.

11:23:01  6    A.    Dr. Thompson is one of the few dermatopathologists who are

11:23:07  7    expert in nails.  So I've been working with him in tumors of

11:23:13  8    the nails.

11:23:13  9    Q.    Have you ever worked with him in any other capacity?

11:23:18 10    A.    Yes.  We published some studies on a disease which is

11:23:24 11    called *frontal fibrosing alopecia.*

11:23:27 12    Q.    Is that a separate type of hair?

11:23:30 13    A.    Yes.  Nothing to do with this problem.

11:23:32 14    Q.    So did you -- do you know how Dr. Thompson became

11:23:38 15    involved?  Did you recommend him or --

11:23:40 16    A.    I did recommend Dr. Thompson.

11:23:42 17    Q.    Why did you recommend Dr. Thompson?

11:23:44 18    A.    Because I trust him and think he's a very good

11:23:47 19    pathologist.  Also, because there are very few

11:23:51 20    dermatopathologists in the United States who are specialized on

11:23:55 21    hair.

11:23:55 22    Q.    Did you then receive those biopsy results that --

11:24:04 23    Dr. Thompson's conclusions in this case?

11:24:06 24    A.    I did receive the biopsy results with her medical records

11:24:13 25    before seeing her.

**OFFICIAL TRANSCRIPT**

11:24:13  1   Q.   Do you have an understanding of what Dr. Thompson's

11:24:16  2   conclusions were in this case?

11:24:16  3   A.   Yes.  I saw his counts, which are also important, the

11:24:22  4   numbers.

11:24:24  5        THE COURT:  No, I'm sorry.  I interrupted.

11:24:26  6        MR. SCHANKER:  No, that's okay.

11:24:27  7   EXAMINATION BY MR. SCHANKER:

11:24:28  8   Q.   You saw his counts?

11:24:30  9   A.   Counts.  They count.  They count how many follicles, how

11:24:37 10   many small follicles, how about big follicles.  You have

11:24:40 11   numbers.

11:24:41 12   Q.   So did Dr. Thompson's conclusions -- explain to the jury

11:24:49 13   how that fit into your conclusion in this case, if at all, just

11:24:54 14   how that works.

11:24:55 15   A.   Yes, because the biopsy show a very important reduction in

11:25:01 16   the number of the hair follicles.  Very similar of what I show

11:25:05 17   you at the dermoscopy.  So there are very, very few follicles,

11:25:11 18   okay, less than half the normal -- almost half the normal, and

11:25:15 19   all the follicles were small.

11:25:16 20   Q.   So with regard to your conclusion, explain how, if at all,

11:25:25 21   you used Dr. Thompson's conclusion in rendering your opinion in

11:25:29 22   the case.

11:25:29 23   A.   You know, Dr. Thompson's conclusion were consistent with

11:25:34 24   my diagnosis, okay.  That's what I like to say.  I don't think

11:25:38 25   his conclusion changed anything.  Was just consistent with my

**OFFICIAL TRANSCRIPT**

11:25:44 1    diagnosis.

11:25:44 2    Q.    Just so we're clear, Dr. Thompson doesn't go in and offer

11:25:50 3    conclusions, to your knowledge, about what types of

11:25:52 4    chemotherapy drugs might cause anything?

11:25:55 5    A.    No, he cannot.  He looks at the specimens.

11:25:58 6            MS. SASTRE:  I know we talked about that, Judge.

11:25:58 7            MR. SCHANKER:  Yes.

11:26:01 8            MS. SASTRE:  Leading.

11:26:01 9            THE COURT:  Leading.  Okay.  Sustained.

11:26:02 10           MR. SCHANKER:  Thank you, Your Honor.

11:26:03 11   EXAMINATION BY MR. SCHANKER:

11:26:05 12   Q.    So any other use that you did with Dr. Thompson's

11:26:09 13   conclusions in this case, other than what you've described to

11:26:12 14   the jury?

11:26:12 15   A.    No.

11:26:13 16   Q.    You just indicated that -- let me ask you this:  To your

11:26:26 17   knowledge, did Dr. Thompson -- is what he does as a

11:26:31 18   pathologist, is he able, to your knowledge and experience and

11:26:38 19   expertise, able to render any kind of opinion on the different

11:26:42 20   chemotherapy drugs that were taken and cause in that regard?

11:26:45 21           MS. SASTRE:  Objection.

11:26:47 22           THE WITNESS:  I don't think --

11:26:47 23           THE COURT:  Overruled.  I'm going to allow her to

11:26:50 24   answer the question.

11:26:51 25           THE WITNESS:  I don't think so.

*OFFICIAL TRANSCRIPT*

| | |
|---|---|
| 11:26:52 1 | EXAMINATION BY MR. SCHANKER: |
| 11:26:53 2 | Q.    So that's not what he was doing in this case? |
| 11:26:56 3 | A.    That's not his expertise at all. |
| 11:26:59 4 | Q.    That's yours? |
| 11:27:00 5 | A.    That's mine, yes. |
| 11:27:02 6 | THE COURT:  Sustained.  You can't keep repeating it. |
| 11:27:04 7 | EXAMINATION BY MR. SCHANKER: |
| 11:27:07 8 | Q.    So you reached your conclusion concerning permanent |
| 11:27:14 9 | chemotherapy-induced alopecia, correct? |
| 11:27:15 10 | A.    Yes. |
| 11:27:16 11 | Q.    I understand that there were -- are you aware that |
| 11:27:24 12 | Dr. Thompson did some stem cell testing in this case? |
| 11:27:30 13 | A.    Yes. |
| 11:27:30 14 | Q.    First of all, from a broad standpoint, what are |
| 11:27:34 15 | scientists -- why do scientists do stem cell testing?  Why |
| 11:27:41 16 | would they be done in general? |
| 11:27:43 17 | A.    You know, stem cells are cells that have a big potential |
| 11:27:49 18 | to reconstitute -- reconstitute organs.  So stem cells are the |
| 11:27:56 19 | cells that can regenerate our -- most part of the body. |
| 11:28:04 20 | The follicles has stem cells and are very important. |
| 11:28:10 21 | There is a researcher in England who was able to make blood |
| 11:28:16 22 | cells from the follicle stem cells, just to give you an idea |
| 11:28:20 23 | how complicate is this situation. |
| 11:28:26 24 | Q.    What are scientists like you still trying to learn about |
| 11:28:30 25 | permanent chemotherapy-induced alopecia? |

*OFFICIAL TRANSCRIPT*

11:28:33  1   A.    You know, what I would like to learn is that why -- the

11:28:37  2   molecular mechanism of why this happened, the general mechanism

11:28:42  3   of why this happened.

11:28:43  4   Q.    So I want to make sure I'm clear.  You reached your

11:28:47  5   conclusion on causation in this case, correct?

11:28:50  6   A.    Yes, but the causation is different from why this

11:28:58  7   medication cause the problem.  We don't know why, you know.  So

11:29:02  8   we know -- just know that this is a possible side effect of the

11:29:08  9   medication.  What I would like to know is why this happen,

11:29:11 10   because this is the way to find the treatment, which is the

11:29:14 11   reason I'm interested in this problem.

11:29:16 12   Q.    So you understand causation; is that clear?

11:29:23 13   A.    I understand causation.  I know that your problem is -- if

11:29:29 14   I believe the medication caused the problem.  I believe the

11:29:33 15   medication caused the problem, but what I would like to know is

11:29:36 16   how, because this how may make me able to prevent or to treat

11:29:44 17   this situation in the future.

11:29:45 18   Q.    I understand.  So, in this case, to your knowledge, did

11:29:50 19   Dr. Thompson do some stem cell testing?

11:29:54 20   A.    Yes, he did.

11:29:55 21   Q.    What's your understanding --

11:30:02 22   A.    I --

11:30:03 23   Q.    Let me ask you this:  With regard to the anatomy, we

11:30:11 24   talked about earlier generally the anatomy of the

11:30:17 25   hair follicle.  Tell us your understanding with regard to

*OFFICIAL TRANSCRIPT*

11:30:21 1   stem cells.

11:30:22 2   A.    So there are different stem cells in the hair follicle.

11:30:26 3   The most common, the one that everybody knows, are the

11:30:30 4   stem cells here in the bulge.

11:30:35 5         I don't know what I'm making.  Okay, found it.

11:30:37 6         Okay.  Here, where I put this arrow, is the bulge.

11:30:41 7   These are the epithelial stem cells of the hair follicle.

11:30:46 8   Epithelial.  It's a type of cell.

11:30:49 9         Then you have stem cells here in the epidermis, okay.

11:30:54 10   Then you have stem cells in the sebaceous gland.

11:31:02 11         Then, what we have are stem cells here in this factor

11:31:05 12   which is called the *dermal papilla*.  So the dermal papilla is

11:31:11 13   very, very important because many studies now show that you can

11:31:15 14   grow hair from the cells of the dermal papilla.

11:31:20 15         This is a big -- of course, very big business because

11:31:24 16   there are companies that take these cells, multiply the cells

11:31:32 17   in vitro, and grow new hair.  That's their purpose.

11:31:35 18         But these stem cells are very important because they

11:31:38 19   send signals to the cell, the epithelial cell -- of the bulge

11:31:44 20   to start cycling.  So it's quite complicated.

11:31:47 21         What Dr. Thompson did, he use a stain that is

11:31:53 22   utilized for this.  It's called *K15*.  It's utilized to look at

11:31:59 23   these stem cells.  But it didn't study at all the papilla.  The

11:32:10 24   *dermal papilla*, it's called.

11:32:11 25   Q.    What's your understanding of why Dr. Thompson stained the

**OFFICIAL TRANSCRIPT**

11:32:19  1    cells with K15?  What was he interested in, if you know?

11:32:23  2    A.    K15 is a chemical stain that stain the stem cells of the

11:32:33  3    epidermal stem cells.  But it's not very specific.  It also

11:32:37  4    stains other cells.  But I'm not discussing that.

11:32:40  5          What I think he found, it was positive, meaning the

11:32:44  6    stem cells were there, but this stain doesn't show you if the

11:32:52  7    stem cells work.  It's like you do -- you, for instance, have

11:32:56  8    cirrhosis.  So your liver is there, but may not work.  So, this

11:33:02  9    stain just show that stem cells are there, doesn't show they

11:33:06  10   are working properly.

11:33:07  11   Q.    So I want to ask you a question, but understand if I'm

11:33:11  12   clear.  Did you say that results of the staining for stem cells

11:33:16  13   were positive in this situation for Barbara Earnest?

11:33:21  14   A.    Yes, the stain was positive.  The significance, I don't

11:33:26  15   think there is any significance.

11:33:27  16   Q.    Whether it was positive or negative, would it have any

11:33:31  17   significance to you?

11:33:32  18   A.    You know, I don't believe one case can ever make

11:33:39  19   significance, not diagnostic significance, and not even

11:33:43  20   significant to understand exactly what's happening.

11:33:48  21   Q.    As a scientist and a researcher, you said one case doesn't

11:33:55  22   have significance.  What kind of volume of cases would you need

11:33:59  23   on stem cells in order -- can you even answer that question?

11:34:05  24   A.    I don't know, maybe 100.  I don't know exactly the number.

11:34:13  25   A statistician should decide the number.

**OFFICIAL TRANSCRIPT**

11:34:15  1    Q.    Doctor, getting back to your conclusion concerning

11:34:24  2    permanent chemotherapy-induced alopecia, is permanent

11:34:29  3    chemotherapy-induced alopecia, is that different than just a

11:34:33  4    diagnosis of alopecia or hair loss?

11:34:36  5    A.    Yes.  Alopecia is like -- well, hair loss is like fever.

11:34:42  6    You have to give the specific name to each type of alopecia.

11:34:45  7    Alopecia is not a diagnosis.

11:34:46  8    Q.    So we've worked through your differential diagnosis,

11:34:57  9    correct?  Is that right?

11:34:59 10    A.    Yes.

11:35:00 11    Q.    Did you, Doctor, then make a determination as to which

11:35:05 12    chemotherapy drug caused Barbara Earnest's permanent

11:35:11 13    chemotherapy-induced alopecia?

11:35:12 14    A.    Yes.  I believe it was docetaxel, Taxotere.

11:35:18 15    Q.    What formed the basis for that conclusion?

11:35:26 16    A.    The basis from that conclusion is my personal experience

11:35:31 17    with this medication, my -- with this condition, sorry, my

11:35:36 18    personal experience with the -- with my literature review.

11:35:44 19    Q.    Let's first talk about your personal experience with this

11:35:53 20    condition and these medications.  You touched a little bit on

11:35:58 21    this earlier, but I want to come back to it.

11:36:02 22          Have you, as a clinician and practitioner, seen

11:36:10 23    permanent --

11:36:10 24          MS. SASTRE:  Your Honor's Motion in *Limine* ruling.  I

11:36:13 25    would be happy to come up, Your Honor.

**_OFFICIAL TRANSCRIPT_**

11:36:13  1          THE COURT:  Come up.

11:36:13  2          (WHEREUPON, at this point in the proceedings, a

11:36:25  3    conference was held at the bench.)

11:36:25  4          MS. SASTRE:  So, Your Honor, your ruling was that for

11:36:28  5    all experts they couldn't talk about numbers of patients that

11:36:34  6    they've seen.  They can talk about what they've seen in their

11:36:38  7    clinical experience.  But, like, for example, Dr. Glaspy you

11:36:41  8    said couldn't come in and say, I've seen X number of patients.

11:36:46  9    You know, it's kind of getting into the numbers, numbers of

11:36:48 10    patients.  That was the issue.

11:36:51 11          They could talk about that they'd seen things

11:36:51 12    like this, which, of course, she's done all morning.

11:36:51 13          I have it here.  I just have to find it,

11:36:55 14    Your Honor.

11:36:55 15          THE COURT:  I know what you're talking about.

11:36:58 16          MR. SCHANKER:  Your Honor, that's a big distinction

11:37:01 17    because she's a causation witness.  Dr. Glaspy and

11:37:06 18    Dr. Miletello, as well as the plaintiff's, Dr. Bosserman and

11:37:11 19    Dr. Feigal, are not causation experts.  So --

11:37:14 20          THE COURT:  Dr. Feigal is not a causation expert?

11:37:17 21          MR. SCHANKER:  I'm sorry.  She does offer a general

11:37:20 22    causation opinion.

11:37:21 23          But this is a specific causation expert.  As part

11:37:24 24    of her opinion concerning specific causation, and as we

11:37:31 25    explained in specific causation argument, she has formed her

*OFFICIAL TRANSCRIPT*

11:37:35  1    opinion based on seeing these patients in her practice.

11:37:38  2         THE COURT:  I think what I said is she could -- I think

11:37:47  3    she can talk about the literature viewed and that she has seen

11:37:52  4    it.  I think she's even written on it.  That was my

11:37:58  5    appreciation, that she did the case studies on it.  She can

11:38:05  6    talk about that.  As I said last week, I saw -- I don't want to

11:38:06  7    get into where it's anecdotal evidence --

11:38:10  8         MR. SCHANKER:  So, basically, her history, Your Honor,

11:38:13  9    is that she saw a presentation in clinic, and then she

11:38:20 10    researched that.

11:38:21 11         THE COURT:  She could give us that history which

11:38:24 12    presented, why she did the research.

11:38:25 13         MR. SCHANKER:  Then she saw another patient, as she

11:38:29 14    started to touch on earlier, and researched based on that, and

11:38:33 15    that it continued to drive her research, Your Honor, in this

11:38:35 16    and publish this, as she saw more and more of these patients

11:38:42 17    present.  This then continued to form and educate her on her --

11:38:47 18         THE COURT:  I understand that.  She can say, I saw it

11:38:50 19    in the clinic and research.  She ultimately did a case study,

11:38:52 20    didn't she?

11:38:53 21         MS. SASTRE:  Yes.

11:38:53 22         MR. SCHANKER:  She did multiple case studies.

11:38:55 23         THE COURT:  Right.  That she can talk about.  Those are

11:38:59 24    case studies.  They are different from, oh, my gosh, I've been

11:39:01 25    practicing for 30 years, I've never seen this before.  That

                              *OFFICIAL TRANSCRIPT*

11:39:04  1    doesn't tell me what it was before.  That's a little different.

11:39:08  2                    She's a clinician and an academic that does

11:39:13  3    research.  I think she could say, my curiosity was peaked when

11:39:18  4    I saw this patient.  I began to do research.  As a result of

11:39:22  5    this research, this is what I determined.  But there is some

11:39:25  6    basis for it.  It's not just, oh, in my practice, I saw this.

11:39:31  7                    You can ask --

11:39:32  8         MR. SCHANKER:  I want to make sure that I'm staying --

11:39:32  9    I'm not going (speaking simultaneously) --

11:39:36 10         THE COURT:  -- what prompted this research.

11:39:36 11         MR. SCHANKER:  So I will not elicit testimony from her,

11:39:39 12    as I'm hearing Your Honor, on the number of patients that she's

11:39:42 13    seen.  Is that --

11:39:43 14         THE COURT:  That's what I'm saying.  There is something

11:39:45 15    that prompted the research, and she did research it, and she

         16    published --

         17         MR. SCHANKER:  (Speaking simultaneously) So we can

         18    elicit what prompted --

         19         THE COURT REPORTER:  Please speak one at a time.

         20         MR. SCHANKER:  I'm sorry.

11:39:57 21         THE COURT:  I think we're on the same page.  I'm

11:39:58 22    telling you what she can do.  But I don't want anecdotal

11:40:03 23    evidence that, oh, last week I saw a lady, and I think she had

11:40:07 24    that.  That I'm not going to allow.  But I think she can say, I

11:40:10 25    saw a patient ten years ago, prompted my curiosity, I began

                              *OFFICIAL TRANSCRIPT*

11:40:16  1    doing research.  Then I did these studies, and this is what --

11:40:20  2        MR. COFFIN:  Maybe just ask the question saying,

11:40:21  3    without telling the numbers, have you seen this?

11:40:24  4        THE COURT:  You know what, you have got to kind of stay

11:40:26  5    back.  I think Mr. Schanker can speak for himself.  This is

11:40:34  6    becoming problematic.

11:40:34  7        MR. COFFIN:  I understand.

11:40:35  8        THE COURT:  Pretty soon, it's going to be an order that

11:40:37  9    says you've got to stay back there unless I call you up.

11:40:40 10        What I'm saying is, you can say anecdotal

11:40:47 11    experience, something prompted her to do this study.

11:40:50 12        MR. SCHANKER:  She can explain what that was?

11:40:53 13        THE COURT:  Yes.  I saw a patient.  I was curious.  I

11:40:55 14    did this research.  This is what my research did.  Then I've

11:40:58 15    written these papers as a result of it.

11:41:02 16        MR. SCHANKER:  I'm sorry.

11:41:02 17        MS. SASTRE:  No.  Go ahead.

11:41:02 18        MR. SCHANKER:  I'm trying to lay out the testimony is

11:41:05 19    that she saw another presentation, and then she did further

11:41:07 20    research.

11:41:09 21        THE COURT:  She did further research, and then she's

11:41:09 22    had this stuff.  There's something that prompts you to do the

11:41:12 23    research.  You don't just wake up one morning and think about

11:41:16 24    it.

11:41:16 25        MS. SASTRE:  So the only comment I have, Your Honor, is

                            *OFFICIAL TRANSCRIPT*

11:41:24 1    that, depending upon the depth that Mr. Schanker goes into,

11:41:27 2    because I can't cross-examine on other patients, but if it's

11:41:31 3    sort of as Your Honor described, I have no issue with that.

11:41:34 4         THE COURT:  She's already published on it.  So there is

11:41:36 5    something that you've published.  What prompted that?

11:41:39 6         MS. SASTRE:  Yes.  It's just the in-depth level that

11:41:42 7    I --

11:41:42 8         THE COURT:  No, no, no, no, no, no.

11:41:43 9         MR. SCHANKER:  I'm not planning on going through the

11:41:47 10   multitude of patients --

11:41:47 11        THE COURT:  Thank you.

11:41:49 12        MS. SASTRE:  Thank you, Your Honor.

11:41:49 13        THE COURT:  Wait, Ms. Sastre.

11:41:54 14             How much longer do you think you have?

11:41:55 15        MR. SCHANKER:  I guess, maybe 15 minutes.  Probably

11:41:59 16   something that's going to be good for the lunch break.

11:42:03 17        MS. SASTRE:  You're not going to make me stay until

11:42:06 18   7 o'clock, are you?

11:42:07 19        THE COURT:  Unless you talk for five hours.

11:42:07 20        (WHEREUPON, at this point in the proceedings, the bench

11:42:07 21   conference concluded.)

11:42:21 22        THE COURT:  Please proceed, Mr. Schanker.

11:42:22 23        MR. SCHANKER:  Thank you, Your Honor.

11:42:23 24   EXAMINATION BY MR. SCHANKER:

11:42:33 25   Q.   So, Doctor, we were talking about what prompted your --

*OFFICIAL TRANSCRIPT*

11:42:40 1  let's walk through your experience, your initial experience in

11:42:44 2  your clinical practice with permanent chemotherapy-induced

11:42:55 3  alopecia and Taxotere.

11:42:55 4  A.   So my clinical experience started in Italy.  Then, when I

11:43:00 5  moved to Miami, I start seeing cases in Miami as well.  So I've

11:43:03 6  seen -- I would say many, but maybe between 30 and 50 cases of

11:43:10 7  permanent alopecia --

11:43:11 8       THE COURT:  Rephrase -- you might want to just ask the

11:43:14 9  next question.

11:43:14 10  EXAMINATION BY MR. SCHANKER:

11:43:14 11  Q.   So specifically, Doctor, let's -- you indicated clinical

11:43:23 12  experience.  Did that clinical experience then cause you to

11:43:27 13  perform research in this area?

11:43:29 14  A.   Yes, clinical research.

11:43:33 15  Q.   Let's walk the jury through the clinical research that you

11:43:39 16  did in order to gain the knowledge that you have with regard to

11:43:46 17  this topic that enables you to come here and share your opinion

11:43:49 18  with the jury.

11:43:50 19  A.   No.  My clinical research involved looking at the history

11:43:54 20  of these patients, the chronology of the problem.  We did

11:43:59 21  literature review.

11:44:01 22  Q.   I'm sorry, the what?

11:44:02 23  A.   A review of what has been published before.  It's called

11:44:06 24  *literature review*.  In 2012, I think, we did the pathological

11:44:14 25  study, which was to try to define the pathological features of

*OFFICIAL TRANSCRIPT*

11:44:21  1   this condition.

11:44:22  2          I was recently involved in another study that

11:44:28  3   involved many doctors around the world that also tried to

11:44:35  4   clarify the epidemiology of the features of this condition.

11:44:41  5   Q.   So, as far as that research, the clinical research that

11:44:48  6   you've done, you've indicated that you've published on this

11:44:51  7   topic.  Could you let the jury know how many times you've

11:44:56  8   actually published on this topic of permanent

11:44:59  9   chemotherapy-induced alopecia as it relates to Taxotere?

11:45:03 10   A.   I published four papers.  Three maybe in 2010, 2012 at

11:45:11 11   that time, and one recent paper.

11:45:13 12   Q.   So in addition to your personal experience and then your

11:45:29 13   own clinical research that you performed, you've also talked

11:45:34 14   about your literature review, what you did as far as a

11:45:37 15   literature review in order to reach your conclusion in this

11:45:42 16   case that Barbara's permanent chemotherapy alopecia was caused

11:45:48 17   by Taxotere.  Could you please explain to the jury what you

11:45:54 18   mean by this literature review.

11:45:54 19   A.   You look at what has been published before.  That's all.

11:45:59 20   What we do often when we see something new or something we

11:46:05 21   don't know exactly, we go on *PubMed*, it's called, like a

11:46:11 22   database where you can find if something similar has been

11:46:14 23   published to understand.

11:46:15 24   Q.   And you did that in this case?

11:46:19 25   A.   I always -- I'm always in PubMed most of my day.

***OFFICIAL TRANSCRIPT***

11:46:23  1   Q.   And as far as the literature that you found and relied

11:46:30  2   upon in this case, describe for the jury, is there very little

11:46:36  3   literature out there on this topic, is there an abundance of

11:46:39  4   it?  Explain this so the jury understands.

11:46:40  5   A.   I believe there is a moderate amount of literature, you

11:46:45  6   know, not a -- not much.  But recently, a CME article was

11:46:53  7   published.  I want to explain to you briefly what a CME is.

11:46:58  8        Medical doctors, to maintain their license, they have

11:47:02  9   to have CME.  It's continuing medical education.  So they have

11:47:06 10   to keep -- be up with new thing that happens.  So they have to

11:47:12 11   either go to meeting to get that or to read these CME articles.

11:47:18 12   And there was a recent CME article describing this condition.

11:47:23 13   Q.   And, Doctor, referring to the Martin article?

11:47:31 14   A.   No, no.  The CME, it's an article that was published on

11:47:35 15   the JOD, which is a very important journal for dermatology.

11:47:42 16   Freites Martinez.  The main author is Mario Lacouture.

11:48:01 17   Q.   Doctor, let's go through some of that literature that went

11:48:11 18   to form your opinion in this case.  But before we do that, did

11:48:23 19   you get an idea from your review of the literature as to the

11:48:31 20   number of cases that you see cited concerning what you believe

11:48:36 21   to be Taxotere-caused permanent alopecia versus other

11:48:42 22   chemotherapy drugs that were used in this case?

11:48:44 23   A.   Yes.  From the literature, there are probably published

11:48:51 24   300-and-something cases of Taxotere-induced permanent alopecia,

11:48:58 25   and the numbers for -- just for instance, AC, around 35.  So

11:49:05 1    there is a very big difference in what has been reported in the

11:49:11 2    literature.

11:49:12 3    Q.   So, I want to go through some of that literature with you

11:49:16 4    here.  But you indicated that in your literature search that

11:49:22 5    you saw -- what did you say as far as --

11:49:27 6    A.   Three-hundred-and-something.  I'm not very good with

11:49:32 7    numbers.

11:49:33 8    Q.   And then it sounds like you also searched the literature

11:49:47 9    concerning A and C; is that correct?

11:49:49 10   A.   Yes.  That's because what she had.  And I think there are

11:49:57 11   35.

11:49:57 12   Q.   Approximately.

11:50:03 13   A.   Approximately.  Also because some literature is not on

11:50:06 14   PubMed, and that literature I cannot assess.  Because sometimes

11:50:15 15   doctors present to meetings and there is an abstract, and that

11:50:18 16   abstract, either you are at a meeting or you don't see.

11:50:23 17   Q.   And, Doctor, this is the literature that you referenced

11:50:26 18   and cited in your report; is that correct?

11:50:29 19   A.   I think there is something new, but it may not be in my

11:50:33 20   report.

11:50:33 21   Q.   There may be newer things.  This is constantly -- just

11:50:37 22   like any science, there is constantly more coming in.  But at

11:50:41 23   the time of your report, do you recall how many -- if you know,

11:50:44 24   how many pieces of literature you ended up citing,

11:50:49 25   approximately?

*OFFICIAL TRANSCRIPT*

11:50:49  1    A.    No.  I don't remember.

11:50:50  2    Q.    Do you have any idea at all?

11:50:57  3    A.    Probably 20, something like that.  It's not a big, big

11:51:02  4    literature.

11:51:02  5    Q.    Did you use the term *moderate* amount of literature?

11:51:05  6    A.    Uh-huh (affirmative response).

11:51:06  7    Q.    Is that right?

11:51:06  8    A.    Yes.

11:51:07  9    Q.    Well, let's go through just a couple of these and work

11:51:11  10   through some issues here that -- questions that the jury may

11:51:14  11   have.

11:51:19  12          From your report, it looks like you reviewed the

11:51:22  13   Martin study and relied upon that; is that correct?

11:51:22  14   A.    Yes.

11:51:27  15   Q.    And we've shown this to the jury earlier, but this -- the

11:51:37  16   Martin study -- and where was that published?

11:51:43  17   A.    In an oncology journal, Breast Cancer, something like

11:51:48  18   that.

11:51:48  19   Q.    The *Breast Cancer Research and Treatment*, is that what

11:51:52  20   you're referring to?

11:51:52  21   A.    Yes.

11:51:53  22   Q.    And then if you could just take us through this Martin

11:52:03  23   study.

11:52:03  24   A.    What's very important of this study, you look, it was sent

11:52:11  25   to the journal on June 11th and accepted after a few days.

*OFFICIAL TRANSCRIPT*

11:52:16 1    That's very important for a paper.  If you have a good paper

11:52:21 2    and you send a good paper to the journal, if you are lucky,

11:52:26 3    they send you back with revisions.

11:52:28 4    Q.    With what?

11:52:30 5    A.    Asking for changes.  If you are unlucky, they reject.  And

11:52:36 6    that happen very often.  But if the paper is very, very good,

11:52:41 7    the editor may decide to accept the paper immediately, which

11:52:45 8    is -- which is rare.

11:52:48 9            Why this paper is very important for me, because this

11:52:53 10   is the first time they show you can prevent this condition by

11:52:59 11   cooling the scalp during chemotherapy.  So this is something

11:53:03 12   that is not involved with this litigation, but I think is very,

11:53:07 13   very important from a medical point of view.

11:53:10 14   Q.    Now, Doctor, with the issues that are involved in this

11:53:15 15   litigation, tell us what the jury should know concerning

11:53:23 16   Martin's study.

11:53:25 17   A.    So they found Grade 2 alopecia in 2 percent [verbatim] of

11:53:31 18   patients with a docetaxel regimen.

11:53:36 19   Q.    What percent was that?

11:53:39 20   A.    10 percent of Grade 2.

11:53:42 21   Q.    So just so I'm clear, I want to make sure from a language

11:53:48 22   standpoint.  So what did Martin -- what did Martin find?

11:53:53 23   Because there is a lot loaded in that sentence.

11:53:57 24   A.    He found a prevalence of 10 percent -- that 10 percent of

11:54:04 25   patients undergoing chemotherapy with a different drug

11:54:09  1  associated with Taxotere had Type 2 severity permanent

11:54:17  2  alopecia.

11:54:19  3  Q.   So just so I'm clear, so the patients that were involved

11:54:24  4  in this study, 10 percent of them had a particular condition

11:54:32  5  result, and what was that?

11:54:34  6  A.   Permanent alopecia after chemotherapy.

11:54:36  7  Q.   And this patient group --

11:54:39  8  A.   Type 2 severity.

11:54:42  9  Q.   Type 2 severity.  Which is the most severe on the scale?

11:54:46 10  A.   Uh-huh (affirmative response).

11:54:46 11  Q.   And Taxotere was involved in that chemotherapy?

11:54:48 12  A.   Yes.

11:54:49 13       I didn't see the side effects in patients with other

11:54:57 14  chemotherapy agents.

11:54:58 15  Q.   So I understand, was -- in the Martin study, Doctor, did

11:55:11 16  they look at A and C?

11:55:14 17  A.   Yes.  And they had no cases of severe permanent alopecia

11:55:21 18  after chemotherapy.

11:55:22 19  Q.   So what percentage of cases in Martin had severe permanent

11:55:27 20  chemotherapy alopecia of those patients who took the A and C?

11:55:32 21  What percentage?

11:55:34 22  A.   Zero percent.

11:55:35 23  Q.   And just to be clear, Barbara Earnest, you know, received

11:55:43 24  her chemotherapy treatment when?

11:55:46 25  A.   In 2011.

*OFFICIAL TRANSCRIPT*

11:55:47  1    Q.    And this article is from when?

11:55:52  2    A.    2018, I think.  Yes.  Yes.  2018.

11:55:55  3    Q.    Doctor, highlighting another of the articles that was on

11:57:02  4    your reliance list, do you recall the Kang article?

11:57:11  5    A.    Yes, I do.

11:57:18  6    Q.    And the year of that was 2018?

11:57:20  7    A.    Yes.  2018.

11:57:23  8    Q.    And that appeared in what?

11:57:26  9    A.    *The Oncologist*.

11:57:30 10    Q.    *The Oncologist*, that journal?

11:57:32 11    A.    Yes.

11:57:34 12    Q.    Do you have -- obviously you've written publications and

11:57:41 13    written articles that have appeared in publications, but do you

11:57:45 14    have any other involvement with publications at all?

11:57:48 15    A.    I'm editor of a journal.

11:57:50 16    Q.    Which one is that?

11:57:52 17    A.    It's called *Skin Appendage Disorders*.  It's a journal for

11:57:56 18    hair and nail disease.

11:57:57 19    Q.    And so you have great familiarity with the way journals

11:58:04 20    work?

11:58:05 21    A.    Yes, I do.

11:58:05 22    Q.    And with regard to *The Oncologist*, this particular 2018

11:58:12 23    Kang piece of literature, share with the jury why you included

11:58:20 24    in your reliance list.

11:58:21 25    A.    This is a prospective study, so it's more important.  This

*OFFICIAL TRANSCRIPT*

11:58:26 1  is Mario Lacouture here as well.  The people working on this is
11:58:31 2  somehow the same, they are working around the world.
11:58:34 3  Q.   And do you know the individuals, the Lacouture that you
11:58:38 4  mentioned?
11:58:38 5  A.   Yes, I know him, of course.  He's in New York at the
11:58:43 6  Sloan Cancer Center, and he's been involved in studying the
11:58:53 7  side effects of cancer medications.
11:58:57 8        So this is a prospective study.  What means?  For a
11:59:02 9  prospective study, you take a patient before and you follow the
11:59:04 10 patient during the chemotherapy and after the chemotherapy so
11:59:09 11 you have an idea what is happening.
11:59:12 12       They did this study just for looking at the hair, and
11:59:19 13 they measure the density -- again, how many hair -- with the
11:59:23 14 dermoscopy, and the thickness.  So this is an important study
11:59:27 15 because gives us an idea of what happens locally in the scalp;
11:59:36 16 not just looking, but with an instrument that measure.
11:59:39 17 Q.   And what did you find important in the Kang study that you
11:59:49 18 think you should share with the jury?
11:59:50 19 A.   They found in chemotherapy that include Taxotere, it cause
11:59:57 20 permanent alopecia after chemotherapy eight time more
12:00:02 21 frequently than other chemotherapy.
12:00:04 22 Q.   Doctor, with regard to the A and C, did you look at the
12:00:29 23 Kim study?
12:00:32 24 A.   I did.  I think I have it here.  It's again in Korea.
12:00:39 25 They do a lot of study in Korea.

*OFFICIAL TRANSCRIPT*

12:00:42  1    Q.    And in that Kim study in Korea, do you recall how many AC

12:00:50  2    patients were found to have ongoing or permanent --

12:00:54  3    A.    Many.  I would say that most of the cases of AC from this

12:01:00  4    paper from Korea.

12:01:02  5    Q.    Do you recall approximately how many?

12:01:04  6    A.    I think 29, but I may be wrong.  Something like that.

12:01:07  7    Q.    So 29 of the AC were all from one study?

12:01:11  8    A.    Yes.  I would put 29, question mark.  Maybe 27.  I

12:01:23  9    wouldn't swear on 29.

12:01:25  10   Q.    What type of study was that?  Do you recall?

12:01:33  11   A.    Yes.  They sent patients a questionnaire, and the patients

12:01:37  12   who answered they had the problem, they take the -- they took

12:01:41  13   the patient in and look at the scalp.

12:01:43  14   Q.    So, Doctor, with regard to your clinical evidence that you

12:01:58  15   gathered, based on your experience as well as your review of

12:02:05  16   the scientific literature and personal experience in publishing

12:02:08  17   in that regard, did you reach a conclusion as to the specific

12:02:15  18   cause of Barbara Earnest's permanent hair loss?

12:02:19  19   A.    Yes.  I conclude that her permanent alopecia after

12:02:27  20   chemotherapy is due to the docetaxel, or Taxotere.

12:02:31  21   Q.    And how does the weight of the evidence play into that?

12:02:39  22   A.    The weight of the published literature is definitely

12:02:45  23   important, and the clinical presentation, everything, is really

12:02:51  24   very highly indicating that.

12:02:54  25   Q.    And is that opinion within a reasonable degree of

*OFFICIAL TRANSCRIPT*

12:03:00  1    scientific certainty?

12:03:01  2    A.    Yes.  It is.

12:03:03  3    Q.    Do you believe that that's more likely true than not?

12:03:07  4    A.    I believe that it is much more likely true.

12:03:11  5    Q.    Now, Doctor, in this particular case, there has been some

12:03:21  6    evidence of another chemotherapy drug called paclitaxel, or

12:03:29  7    Taxol.  Are you familiar with that?

12:03:30  8    A.    Yes.

12:03:31  9    Q.    Just to be clear, you understand Barbara Earnest did not

12:03:34 10    take that drug?

12:03:35 11    A.    She did not.

12:03:36 12    Q.    I want to ask you some questions.

12:03:38 13    A.    That's why it was not included in my report.

12:03:40 14    Q.    Okay.  Did you, in the materials that you have put

12:03:46 15    together in this case, review or analyze incidence rates of

12:03:52 16    Taxol?

12:03:52 17    A.    I did, because there are studies on that, yes, I did.

12:03:57 18    Q.    And in your review of the literature and the clinical

12:04:11 19    experience that you have, did you gather the case number -- do

12:04:16 20    you have any idea of case numbers reported in the literature on

12:04:19 21    that?

12:04:20 22    A.    I don't have a clear idea.  Maybe 90, maybe 80, maybe 50.

12:04:25 23    50.  I think 50.

12:04:28 24    Q.    And you were involved -- in one of your recent

12:04:37 25    publications, there were some incident rates of paclitaxel or

*OFFICIAL TRANSCRIPT*

12:04:45  1    Taxol?

12:04:46  2    A.    Yes, it's a publication on quality of life of patients who

12:04:56  3    have permanent alopecia after chemotherapy.  And that show that

12:05:04  4    the quality of life is really affected, but this is not

12:05:08  5    difficult to imagine, and that there were a number of cases

12:05:14  6    from Taxol.

12:05:20  7    Q.    But in your review, those numbers were, as reflected on

12:05:29  8    the demonstrative, significantly less than Taxotere?

12:05:33  9    A.    Yes.

12:05:41 10    Q.    And in that review, is there any indication of severity or

12:05:45 11    anything like that in those publications?  Severity?

12:05:49 12    A.    Yes.  You know, all the publications distinguish a severe

12:05:56 13    from -- the grade, but doesn't indicate if Taxotere or Taxol

12:06:03 14    give a different severity, if this is the question.

12:06:05 15    Q.    So, Doctor, with regard to your conclusions in this case

12:06:11 16    concerning Taxotere and it causing Barbara Earnest's permanent

12:06:19 17    irreversible chemotherapy-caused alopecia, are those opinions

12:06:24 18    within a reasonable degree of scientific probability?

12:06:28 19    A.    Yes, I already answered your question.  Yes, they are.

12:06:32 20         MR. SCHANKER:  I don't have any more questions right

12:06:34 21    now, Your Honor.

12:06:34 22         THE COURT:  Okay.  Thank you.

12:06:36 23         Members of the Jury, it's an ideal time to break

12:06:40 24    for lunch.  Court will be at recess until 12:15 [verbatim].  I

12:06:45 25    remind you, don't discuss the case amongst yourselves or anyone

**OFFICIAL TRANSCRIPT**

12:06:48  1   else.  You may certainly leave your tablets on your chairs.

12:06:51  2   And it's better if you not talk to anyone associated with this

12:06:59  3   case.  You should not talk to anyone associated with this case.

12:07:01  4   Return at 1:15.  Court is at recess.

12:07:38  5            (WHEREUPON, at 12:07 p.m., the jury panel leaves the

6   courtroom, and the Court was in luncheon recess.)

7                        *    *    *

8

9

10                    REPORTER'S CERTIFICATE

11

12        I, Cathy Pepper, Certified Realtime Reporter, Registered

13   Merit Reporter, Certified Court Reporter in and for the State

14   of Louisiana, Official Court Reporter for the United States

15   District Court, Eastern District of Louisiana, do hereby

16   certify that the foregoing is a true and correct transcript to

17   the best of my ability and understanding from the record of the

18   proceedings in the above-entitled and numbered matter.

19

20                        *s/Cathy Pepper*
                        _____

21                        Cathy Pepper, CRR, RMR, CCR
                         Certified Realtime Reporter

22                        Registered Merit Reporter
                         Official Court Reporter

23                        United States District Court
                         Cathy_Pepper@laed.uscourts.gov

24

25

                        ***OFFICIAL  TRANSCRIPT***