08:48:06

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4

5    IN RE:   TAXOTERE (DOCETAXEL)
              PRODUCTS LIABILITY          Docket No.: 16-MD-2740
6             LITIGATION                  Section "H(5)"
                                          September 20, 2019
7                                         New Orleans, Louisiana

8    *Relates To*:  *Barbara Earnest*,
     *Case No.: 16-CV-17144*
9

10   * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

11
                        DAY 5, MORNING SESSION
12             TRANSCRIPT OF JURY TRIAL PROCEEDINGS
           HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
13                  UNITED STATES DISTRICT JUDGE

14

15   APPEARANCES:

16   For the Plaintiffs:        Barrios, Kingsdorf & Casteix, LLP
                                BY:   DAWN BARRIOS, ESQ.
17                              701 Poydras Street
                                Suite 3650
18                              New Orleans, Louisiana 70139

19

20   For the Plaintiffs:        Gainsburgh, Benjamin, David,
                                  Meunier & Warshauer, LLC
21                              BY:   PALMER LAMBERT, ESQ.
                                2800 Energy Centre
22                              1100 Poydras Street
                                New Orleans, Louisiana 70163-2800
23

24

25

                      ***OFFICIAL TRANSCRIPT***

1    APPEARANCES:

2    For the Plaintiffs:          David F. Miceli, LLC.
                                  BY:  DAVID F. MICELI, ESQ.
3                                 P. O. Box 2519
                                  Carrollton, GA 30112
4

5
     For the Plaintiffs:          Gibbs Law Group, LLP
6                                 BY:  KAREN BARTH MENZIES, ESQ.
                                  6701 Center Drive West, Suite 1400
7                                 Los Angeles, California 90045

8

9    For the Plaintiffs:          Pendley, Baudin & Coffin, LLP
                                  BY:  CHRISTOPHER COFFIN, ESQ.
10                                1100 Poydras Street
                                  Suite 2505
11                                New Orleans, Louisiana 70163

12

13   For the Plaintiffs:          Bachus & Schanker, LLC
                                  BY:  DARIN SCHANKER, ESQ.
14                                BY:  J. KYLE BACHUS, ESQ.
                                  1899 Wynkoop Street
15                                Suite 700
                                  Denver, Colorado 80202
16

17
     For the Plaintiffs:          Fleming, Nolen & Jez, LLP
18                                BY:  RAND P. NOLEN, ESQ.
                                  2800 Post Oak Boulevard
19                                Suite 4000
                                  Houston, Texas 77056
20

21
     For the Plaintiffs:          Morgan and Morgan
22                                BY:  EMILY C. JEFFCOTT, ESQ.
                                  7010 S. Palafox Street, Suite 95
23                                Pensacola, Florida 32502

24

25

                         *OFFICIAL TRANSCRIPT*

1    APPEARANCES:

2

3    For Sanofi-Aventis U.S.,
     LLC and Sanofi US
     Services, Inc.:              Irwin Fritchie Urquhart
4                                    & Moore, LLC
                                  BY:  DOUGLAS J. MOORE, ESQ.
5                                 400 Poydras Street, Suite 2700
                                  New Orleans, Louisiana 70130
6

7

     For Sanofi-Aventis U.S.,
8    LLC and Sanofi US
     Services, Inc.:              Shook Hardy & Bacon, LLP
9                                 BY:  HARLEY V. RATLIFF, ESQ.
                                  BY:  JON A. STRONGMAN, ESQ.
10                                2555 Grand Boulevard
                                  Kansas City, Missouri 64108
11

12

     For Sanofi-Aventis U.S.,
13   LLC and Sanofi US
     Services, Inc.:              Shook Hardy & Bacon, LLP
14                                BY:  HILDY M. SASTRE, ESQ.
                                  201 Biscayne Boulevard
15                                Suite 3200
                                  Miami, Florida 33131
16

17

     Official Court Reporter:     Cathy Pepper, CRR, RMR, CCR
18                                Certified Realtime Reporter
                                  Registered Merit Reporter
19                                500 Poydras Street, Room B-275
                                  New Orleans, Louisiana 70130
20                                (504) 589-7779
                                  Cathy_Pepper@laed.uscourts.gov
21

22   Proceedings recorded By mechanical stenography.  Transcript
     produced by computer-aided transcription.
23

24

25

                         *OFFICIAL TRANSCRIPT*

**I N D E X**

PAGE

**ELLEN G. FEIGAL, MD, (CONTINUED)**.....................1170

DIRECT EXAMINATION (CONTINUED) BY MR. MICELI.........1170

CROSS-EXAMINATION BY MR. STRONGMAN...................1214

REDIRECT EXAMINATION BY MR. MICELI...................1243

LINDA BOSSERMAN, MD, FACP, FASCO.....................1248

VOIR DIRE EXAMINATION BY MS. MENZIES.................1248

DIRECT EXAMINATION BY MS. MENZIES....................1259

CROSS-EXAMINATION BY MR. STRONGMAN...................1275

REDIRECT EXAMINATION BY MS. MENZIES..................1284

LUNCHEON RECESS......................................1285

07:59:30

09:12:31

*OFFICIAL TRANSCRIPT*

09:44:42  1                    **P-R-O-C-E-E-D-I-N-G-S**

09:44:42  2               FRIDAY, SEPTEMBER 20, 2019

09:44:42  3            M O R N I N G   S E S S I O N

09:44:42  4               (COURT CALLED TO ORDER)

09:44:42  5

08:12:53  6

08:31:39  7          THE DEPUTY CLERK:  All rise.

08:31:53  8          (WHEREUPON, at 8:31 a.m. the jury panel enters the

08:32:12  9   courtroom.)

08:32:12 10          THE COURT:  All jurors are present.  Court is back in

08:32:15 11   session.  You may be seated.

08:32:21 12          MR. MICELI:  May I proceed?

08:32:22 13          THE COURT:  Of course.  I'm talking to -- but you may

08:32:28 14   proceed, Mr. Miceli.

08:32:28 15              **ELLEN G. FEIGAL, MD, (CONTINUED)**

08:32:28 16   was called as a witness and, after being previously duly sworn

08:32:28 17   by the Clerk, was examined and testified on his oath as

08:32:37 18   follows:

08:32:37 19                  DIRECT EXAMINATION (CONTINUED)

08:32:38 20   BY MR. MICELI:

08:32:38 21   Q.   Before we get started, we have more than 15 minutes, so we

08:32:42 22   don't have to go quite as fast as we did yesterday, and I want

08:32:45 23   to back up.  And I know we've already qualified you as an

08:32:48 24   expert in the fields -- the areas that the judge has

08:32:52 25   recognized.

                               *OFFICIAL TRANSCRIPT*

08:32:52 1          There are two items on your CV that we didn't go over
08:32:56 2  with the jury, and that is, what do you currently do today
08:33:01 3  professionally?
08:33:02 4  A.    Currently today I'm a partner in NDA Partners.  It's a
08:33:07 5  global strategy firm that helps in medical product development.
08:33:12 6  Q.    In the -- does that -- NDA Partners, do they also do
08:33:17 7  litigation support?
08:33:18 8  A.    They can do litigation support.
08:33:19 9  Q.    Will you please tell the jury about your experience in
08:33:23 10  testifying in court.
08:33:24 11  A.    I have never testified before in a trial.  And I've never
08:33:28 12  given any depositions before this case.
08:33:30 13  Q.    And we talked about some of your teaching experience at
08:33:36 14  UC San Francisco, UC San Diego yesterday.  Do you teach
08:33:36 15  anywhere currently other than the course that you mentioned
08:33:44 16  that you were teaching Wednesday?
08:33:44 17  A.    I'm also adjunct professor at the Sandra Day O'Connor
08:33:53 18  College of Law in Phoenix, Arizona, and I teach two classes
08:33:54 19  there.
08:33:54 20  Q.    Let's just jump right into it.  Please tell the jury what
08:34:01 21  you were asked to do in relationship to this case.
08:34:04 22  A.    I was asked to look into the potential causal relationship
08:34:07 23  of Taxotere in causing permanent persistent alopecia.
08:34:16 24  Q.    And what did your investigation include?  And I would ask
08:34:20 25  you, just direct your answers to the jury, please.

**OFFICIAL TRANSCRIPT**

08:34:23   1     A.    Okay.  Well, my investigation included using reliable

08:34:28   2     scientific methods to evaluate the evidence in different

08:34:31   3     categories of information.  This included the clinical trials

08:34:35   4     that were sponsored by Sanofi.  It included what was available

08:34:39   5     in the worldwide published literature on Taxotere and

08:34:44   6     permanent, persistent or irreversible alopecia, and included

08:34:49   7     looking at the internal pharmacovigilant database from Sanofi

08:34:54   8     on safety reporting of permanent irreversible alopecia.

08:34:58   9     Q.    What exactly is your opinion?

08:35:01   10    A.    My opinion, based on my review of these different

08:35:05   11    categories of information, is that there is reasonable

08:35:09   12    scientific evidence that Taxotere causes permanent irreversible

08:35:12   13    alopecia.

08:35:12   14    Q.    When you say *permanent irreversible alopecia*, we've heard

08:35:18   15    testimony in this case so far about hair falling out.  Are we

08:35:21   16    talking about hair falling out or hair not regrowing?

08:35:25   17    A.    We're talking about hair that the patients lose and not

08:35:32   18    sufficiently coming back within a period after the end of

08:35:35   19    chemotherapy.

08:35:35   20    Q.    Okay.  Now, because of your answer, I have to ask this.

08:35:39   21    Does this mean that every woman that takes Taxotere is going to

08:35:43   22    end up with hair loss?

08:35:44   23    A.    No.

08:35:44   24    Q.    What does it mean?

08:35:47   25    A.    It means that some individuals who take Taxotere can end

*OFFICIAL TRANSCRIPT*

08:35:52  1   up with permanent or irreversible alopecia.

08:35:54  2   Q.    Okay.  Now, if you said this already, I apologize.  It's

08:35:59  3   the first thing in the morning, and I shouldn't be forgetting

08:36:01  4   things yet, but what exactly -- what sources of data or

08:36:05  5   evidence did you review in order to educate yourself to give an

08:36:08  6   opinion?

08:36:09  7   A.    Well, the sources of information I looked at, I briefly

08:36:13  8   mentioned earlier, but basically I looked at the randomized

08:36:18  9   clinical trials that were sponsored by Sanofi, the TAX316, the

08:36:22 10   TAX301, the protocol, and the clinical study reports that went

08:36:26 11   out to ten years.

08:36:28 12        I also looked at the published literature.  I did a

08:36:33 13   search using PubMed and EndNote using computer algorithms to

08:36:38 14   look for relevant articles related to permanent irreversible or

08:36:40 15   persistent alopecia, and then used the term specific for the

08:36:43 16   types of chemotherapy the patients with breast cancer use.

08:36:46 17        I also looked and then I reviewed those -- all of

08:36:50 18   those articles that came up on those -- that were relevant to

08:36:53 19   my search.  And then I also looked at -- Sanofi has a

08:36:57 20   pharmacovigilance database where safety reporting comes into

08:37:02 21   the company, and there are a certain number of reports that

08:37:06 22   were relevant to permanent irreversible or alopecia that lasts

08:37:09 23   a certain duration or period, and that is what I reviewed.

08:37:13 24   Q.    Did you apply the same sort of standards or methods that

08:37:19 25   you would use to investigate issues outside of the context of

**OFFICIAL TRANSCRIPT**

08:37:22 1    the courthouse?

08:37:23 2    A.   Yes.  I mean, there are certain criteria that I used to

08:37:27 3    try to establish causation.  So I did look at a variety of

08:37:30 4    those different factors to evaluate the evidence.

08:37:33 5    Q.   Can you tell us what those factors are?

08:37:36 6    A.   Sure.  Those factors include issues such as consistency of

08:37:41 7    the data, particularly because I was looking at different

08:37:43 8    bodies of evidence, so I was looking at the cumulative body of

08:37:46 9    evidence and whether or not there was a consistent trend across

08:37:50 10   all of those different areas.

08:37:51 11            I also looked at biologic plausibility.  Let me ask

08:37:56 12   you if you want me to go into detail with each of these

08:38:00 13   criteria or just explain the criteria right now.

08:38:02 14   Q.   Why don't you just list the criteria, and then we can go

08:38:05 15   through one at a time.

08:38:06 16   A.   I looked at whether or not there was reasonable biological

08:38:06 17   plausibility for Taxotere causing --

08:38:06 18            THE REPORTER:  Can you just slow down a little bit?

08:38:06 19            THE WITNESS:  I'm sorry.

08:38:12 20   EXAMINATION BY MR. MICELI:

08:38:12 21   Q.   Remember, we have more than 15 minutes we had yesterday,

08:38:18 22   Dr. Feigal.

08:38:18 23   A.   So I'll start over.  I looked at consistency.  I looked at

08:38:23 24   biologic plausibility.  I looked at specificity, whether or not

08:38:29 25   the outcome of interest, permanent irreversible alopecia or

*OFFICIAL TRANSCRIPT*

08:38:34  1    persistent alopecia, was related to Taxotere.  I looked at dose

08:38:38  2    response, whether or not -- if you get more of Taxotere,

08:38:43  3    whether that can lead to a higher degree of permanent

08:38:47  4    irreversible or persistent alopecia or a more severe grade of

08:38:53  5    alopecia.

08:38:53  6            I looked at coherence and whether or not it was --

08:39:00  7    whether or not there was any conflicting evidence with what was

08:39:03  8    in the literature about these issues.

08:39:06  9            I looked at temporality, whether or not the exposure

08:39:12 10    preceded the event of permanent irreversible or persistent

08:39:16 11    alopecia.  I didn't just look at whether it preceded reversible

08:39:21 12    alopecia.  I looked at whether it preceded the event of

08:39:26 13    permanent irreversible persistent alopecia.

08:39:27 14            There was some other criteria I may have forgotten

08:39:30 15    without a little bit of a trigger here, but the other criteria

08:39:34 16    that you can look at is challenge, dechallenge and rechallenge,

08:39:38 17    where you actually have the patient receive the exposure, then

08:39:43 18    you take them away from exposure, and then you rechallenge them

08:39:46 19    with the exposure.  That's really not possible with a toxic

08:39:53 20    chemotherapy agent.  We don't just rechallenge them, so I

08:39:57 21    didn't use that criteria.

08:39:59 22            The other criteria is whether or not there is an

08:40:01 23    analogy with other conventional chemotherapy causing permanent

08:40:04 24    persistent or irreversible alopecia, and there is not another

08:40:07 25    analogy in terms of that.

                                *OFFICIAL TRANSCRIPT*

08:40:08  1   Q.   Okay.  I'm going to do the court reporter a favor, I hope,

08:40:12  2   and ask you to keep slowing down, because I don't want to pick

08:40:14  3   up the pace as we run through the answers.

08:40:18  4   A.   Sure.

08:40:18  5   Q.   Did you look at strength of association?

08:40:20  6   A.   I did look at strength of association.  And so strength of

08:40:23  7   association is really thinking about the magnitude of effect,

08:40:27  8   and so looking at whether or not there is a -- how strong is

08:40:30  9   the association with permanent persistent or irreversible

08:40:34 10   alopecia.

08:40:34 11   Q.   Okay.  I'm going to -- okay.

08:40:39 12   A.   There is basically nine different -- may I just make one

08:40:42 13   more comment?  There is basically nine different criteria that

08:40:47 14   I looked at.  You don't have to check the box for every

08:40:50 15   criteria, but basically you have to look at the criteria, apply

08:40:54 16   those that are relevant, and base the interpretation of all of

08:40:59 17   that evidence as to whether or not there is a causal

08:41:03 18   relationship to permanent alopecia.

08:41:09 19          MR. MICELI:  Mr. Strongman agreed that I could --

08:41:14 20          THE COURT:  Thank you.

08:41:14 21   EXAMINATION BY MR. MICELI:

08:41:20 22   Q.   There we have it.  Does this circle here go over the

08:41:28 23   factors you considered?

08:41:29 24   A.   Yes, it does.

08:41:30 25   Q.   Let's talk about those individually.

*OFFICIAL TRANSCRIPT*

08:41:39  1        But before we talk about them individually, because

08:41:42  2   there are nine factors -- there are eight pieces of this

08:41:47  3   puzzle, but I have analogy and experiment up in the upper

08:41:49  4   left-hand corner -- do those apply to your analysis of whether

08:41:53  5   Taxotere causes permanent irreversible hair loss, hair that

08:41:59  6   doesn't come back?

08:42:00  7   A.   Those particular criteria don't really apply.  As I

08:42:04  8   briefly mentioned, the challenge, dechallenge, rechallenge,

08:42:08  9   very difficult to do an experimental setting with this kind

08:42:11 10   of -- with any kind of toxic chemotherapy.  It's not just

08:42:16 11   Taxotere, but any kind of toxic chemotherapy, that would be a

08:42:20 12   very difficult criteria to meet.

08:42:22 13        The other criteria that he mentioned is analogy.

08:42:27 14   Once again, I said there is really not an analogous situation

08:42:29 15   of conventional chemotherapy in the setting of breast cancer

08:42:33 16   where this occurs.

08:42:34 17   Q.   Let's walk through these and just define them, if we

08:42:43 18   could.  What is plausibility?

08:42:44 19   A.   Plausibility is the possibility, the potential.  It's a

08:42:52 20   reasonable setting that this could occur.

08:42:55 21   Q.   Explain that to the jury.  When you direct your answers,

08:42:58 22   if you could, Dr. Feigal, explain this to the jury.  What is

08:43:03 23   temporality?

08:43:04 24   A.   So temporality is really based on the presence -- on the

08:43:09 25   premise that the exposure has to precede the event.

*OFFICIAL TRANSCRIPT*

08:43:13  1          The event in this case is permanent irreversible or
08:43:17  2    persistent alopecia.  It's not about reversible alopecia.
08:43:21  3    Everybody knows and accepts that cytotoxic chemotherapy does
08:43:28  4    cause reversible alopecia.
08:43:30  5          This is about the event downstream of permanent
08:43:34  6    irreversible or persistent, and that the exposure to the event,
08:43:37  7    Taxotere, has to precede that event.
08:43:41  8    Q.    Then can you have temporality where the injury that
08:43:48  9    manifests itself does not come along until sometime after the
08:43:52 10    exposure, like six months, a year or two years, as we may hear
08:43:57 11    in this case?
08:43:57 12    A.    Oh, absolutely.
08:43:58 13    Q.    Let's walk through -- I've fallen down on my job.  We
08:44:05 14    already talked about plausibility.
08:44:07 15          We've talked about temporality.
08:44:09 16          Now let's talk about consistency.  What is
08:44:13 17    consistency?
08:44:15 18    A.    Consistency is that it's -- it really aligns with
08:44:20 19    different lines of evidence.  Some of the strongest evidence
08:44:23 20    for causation is that you're looking at different categories of
08:44:28 21    interest, so -- different categories of evidence.
08:44:31 22          So I was looking at randomized clinical trials.  I
08:44:36 23    was looking at published literature.  I was looking at the
08:44:37 24    pharmacovigilance database.
08:44:39 25          Some of the most -- best ways to look for consistency

**OFFICIAL TRANSCRIPT**

08:44:42  1    is whether the compass is pointing in the same direction when

08:44:46  2    you're looking at these different areas of evidence.  So

08:44:51  3    consistency is everybody -- everything is going in the same

08:44:54  4    direction.

08:44:54  5    Q.    Thank you.

08:44:57  6          If we could, explain what coherence is.

08:45:00  7    A.    Well, coherence is really does it -- are there evidence

08:45:06  8    you're finding that contradicts what's out there, so if there

08:45:11  9    is -- does it really seriously conflict with other -- other

08:45:16 10    evidence that's out there about the causation of permanent

08:45:19 11    irreversible -- maybe I -- if I could, just say *permanent*

08:45:23 12    *alopecia* for the other three terms that we're using today.

08:45:26 13    Q.    Certainly.  I want to keep walking through the factors of

08:45:30 14    the criteria.  Can you explain what specificity is?

08:45:36 15    A.    Well, specificity -- and the whole topic of what we're

08:45:39 16    talking about today is Taxotere.  We're not talking about, you

08:45:42 17    know, all the laundry list of other things that could cause

08:45:46 18    permanent alopecia.  The topic is Taxotere.  And can Taxotere

08:45:51 19    cause permanent alopecia?

08:45:53 20          So I specifically looked for that alignment in the

08:45:57 21    evidence of whether all the needles on the compass pointed --

08:46:03 22    reasonably pointed to Taxotere as being the causative agent.

08:46:07 23    Q.    Can you explain what dose response is?

08:46:13 24    A.    Well, the concept of dose response -- and it's true even

08:46:17 25    when you're looking at product development, and you're trying

*OFFICIAL TRANSCRIPT*

08:46:20  1    to see whether a higher dose or a longer period of dosing

08:46:25  2    actually leads to heightened, say, response rate.

08:46:29  3            You know, you have a patient with cancer.  You have a

08:46:32  4    low dose, and then you have a higher dose.  You have different

08:46:36  5    cycles of chemotherapy you give.  One of the concepts is, if

08:46:41  6    it's due to the drug, the activity, maybe a higher dose leads

08:46:45  7    to a higher level of activity.

08:46:47  8            In the same vein, no pun intended, but you can look

08:46:51  9    at that in terms of safety.  Sometimes if you give -- and

08:46:54 10    that's often how we do early phase clinical trials, is you get

08:46:58 11    to a higher dose, does it lead to more toxicity?

08:47:04 12            So, basically, dose response, if you see that, gives

08:47:07 13    stronger evidence that the effect is due to that exposure.  In

08:47:10 14    this instance, the exposure is Taxotere.

08:47:12 15            Does that make sense?

08:47:14 16    Q.   All right.  I think it does.

08:47:16 17            Dr. Feigal, before we move on to the next criteria,

08:47:21 18    you talked about dose response.  We talked about lower doses

08:47:24 19    and higher doses.  In every situation, do you look just at the

08:47:29 20    dose that is given at any one time, or is it also cumulative

08:47:35 21    dosing that you have to be concerned of?

08:47:37 22    A.   So when you look -- I'm not a pharmacologist, but when you

08:47:42 23    at the -- but I certainly have reviewed a lot of pharmacology

08:47:46 24    in my day.  But, basically, what you look -- you know, there is

08:47:48 25    different ways that the pharmacology of the product can impact

*OFFICIAL TRANSCRIPT*

08:47:53 1    on safety or efficacy.

08:47:56 2           So sometimes you look at the dose.  Maybe the peak

08:48:00 3    dose is perhaps what causes the toxicity.  Other times you look

08:48:03 4    at what's called the *area under the curve*.  You look at the

08:48:07 5    cumulative dose over time, and is it that cumulative dose

08:48:12 6    that's at -- you know, you give, you know, anywhere from three

08:48:15 7    to six cycles of chemotherapy.  Is it that you're giving that

08:48:21 8    cumulative dose, and that's what's leading to the toxicity?

08:48:25 9           So in the specific instance of Taxotere, the data

08:48:28 10   shows that it's that cumulative dose over time, not the

08:48:32 11   individual dose, but the cumulative, that leads to the

08:48:35 12   increased toxicity.

08:48:36 13   Q.   The next piece of the puzzle -- or criteria as we move

08:48:44 14   around the circle is the strength of association.  Can you

08:48:48 15   explain to the jury what strength of association is?

08:48:50 16   A.   So what I looked at is, really, the cumulative evidence.

08:48:53 17   As I said, you know, is it just one article?  Is it 19

08:48:57 18   articles?  In this particular instance, I found 19 articles

08:49:01 19   that were relevant to the topic under discussion.  Was there,

08:49:04 20   you know, no randomized clinical trials, or did we have

08:49:09 21   randomized clinical trials that showed this effect?

08:49:12 22          Then I looked at the pharmacovigilance database.

08:49:14 23   Were there no safety reporting coming in?  Was there some

08:49:18 24   safety reporting coming in?

08:49:19 25          So I looked at the magnitude of the effect across the

*OFFICIAL TRANSCRIPT*

08:49:23 1    different categories of evidence.  That leads to -- it's

08:49:25 2    qualitative -- from my -- I'm not the biostatistician, so I

08:49:29 3    looked at the qualitative evidence over all these different

08:49:32 4    categories of evidence.

08:49:33 5         There is another, you know, biostatistician who can

08:49:37 6    talk to you about the strength of association and whether it's

08:49:40 7    statistically significant.  I looked at the medical qualitative

08:49:46 8    judgment of these issues.

08:49:47 9    Q.   Thank you.

08:49:48 10        Then the last one that completes this circle is

08:49:52 11   analogy and experiment.  I believe you said earlier already

08:49:55 12   that these two don't apply?

08:49:57 13   A.   These two criteria really aren't relevant to the case

08:50:00 14   under study.  As I also said at the beginning, this is not a

08:50:03 15   check box.  You know, you have to check the box for all these

08:50:06 16   different criteria.  You don't need all of them.  You just need

08:50:09 17   to have some of them and show that there is relevance -- there

08:50:14 18   is enough evidence.

08:50:15 19        It's qualitative decision of whether or not this is

08:50:18 20   causative evidence for Taxotere and permanent alopecia.

08:50:22 21   Q.   Okay.  Now, you said you don't have to check every box.

08:50:28 22   Is there any magic number that we have to look to?

08:50:30 23   A.   There's not a magic number.

08:50:31 24   Q.   Okay.  Before we go further into applying these, I want to

08:50:36 25   talk -- let's talk about the data you reviewed.

                        *OFFICIAL  TRANSCRIPT*

08:50:42  1        The jury has heard a lot about Sanofi's

08:50:45  2  clinical trials, TAX301, TAX316.  They've heard about some

08:50:49  3  medical literature.  They've heard about Sanofi's internal

08:50:54  4  database.  So I don't want to have to re-plow the same ground

08:50:57  5  with you to summarize those things, but I do want the jury to

08:51:01  6  understand how you reviewed and analyzed this evidence.

08:51:04  7        So can you walk us through each of the data sources

08:51:07  8  that you relied upon first with the clinical trial data.  What

08:51:12  9  exactly did you look at in the clinical trials?

08:51:16 10  A.   So I looked at the clinical trial protocol.  I looked at

08:51:19 11  the objectives.  I look at the dosing.  I looked at the sample

08:51:23 12  size.  I looked at how the -- how the patients were supposed to

08:51:28 13  have been followed, the time intervals they followed, the

08:51:32 14  length of time of follow-up.

08:51:34 15        Then I also looked at the clinical study report.  In

08:51:37 16  particular, I looked at the ten-year clinical study report.

08:51:41 17  There was ten-year follow-up on those patients.

08:51:44 18  Q.   So you said you looked at the clinical study report.  Did

08:51:50 19  you look at the actual, you know, the hard data, or is it the

08:51:54 20  data in the clinical study report that you relied upon?

08:51:54 21  A.   I looked at the -- you know, I didn't look at thousands

08:51:58 22  and thousands of pages of raw data.  I did not do that.  I

08:52:01 23  looked at the summary of the data and I did look at the tables,

08:52:04 24  and I reviewed the clinical study report as it pertains to the

08:52:08 25  pertinent findings from that clinical study report.

*OFFICIAL TRANSCRIPT*

| | |
|---|---|
| 08:52:10 1 | Q.   Okay.  Are there any other sources of evidence that you |
| 08:52:15 2 | reviewed to inform your opinions about Taxotere and causing |
| 08:52:19 3 | permanent hair loss, that being hair that doesn't regrow? |
| 08:52:23 4 | A.   So are we moving on beyond the randomized clinical trials |
| 08:52:27 5 | now? |
| 08:52:27 6 | Q.   We're going to talk in greater detail about some of these, |
| 08:52:31 7 | but I just want the jury to understand what you looked at. |
| 08:52:33 8 | A.   So then I did a medical search of the literature in terms |
| 08:52:36 9 | of chemotherapy-induced alopecia, and included the terms |
| 08:52:42 10 | *permanent*, *persistent* or *irreversible*. |
| 08:52:45 11 |         Then, I also looked at the specific types of |
| 08:52:49 12 | chemotherapy that are involved in administering to patients |
| 08:52:53 13 | with breast cancer. |
| 08:52:53 14 | Q.   Anything else? |
| 08:52:56 15 | A.   Then I looked at the pharmacovigilance database.  I read |
| 08:53:00 16 | their report, the clinical overview.  I looked at the -- how |
| 08:53:04 17 | they did their analysis of the clinical studies, the |
| 08:53:10 18 | pharmacovigilance database, the worldwide literature, the |
| 08:53:12 19 | things that were included in the clinical overview. |
| 08:53:15 20 |         Then I also looked at the tabulation of the reports |
| 08:53:18 21 | that are coming in of those cases that they said were |
| 08:53:21 22 | consistent with permanent irreversible or alopecia lasting at |
| 08:53:26 23 | least two years. |
| 08:53:26 24 | Q.   Okay.  We're going to come back to that in just a little |
| 08:53:31 25 | bit, but let's talk about how -- well, we'll talk about the |

*OFFICIAL TRANSCRIPT*

08:53:36  1   pharmacovigilance database.  How many cases of permanent

08:53:41  2   irreversible alopecia lasting more than two years did you see?

08:53:48  3   A.    117.

08:53:48  4   Q.    Now, we've heard about investigations into this database

08:53:57  5   already in this trial.  Now, does the number -- the number

08:54:02  6   117 was generated, as you understand, by what?

08:54:05  7   A.    Well, by whether or not it fit with the terms, *permanent*,

08:54:10  8   *irreversible* and *two years*.

08:54:12  9          Then there was actually a larger denominator of

08:54:17 10   alopecia that was reported.  There was a certain number --

08:54:20 11   you're asking me to recall by memory -- there's about, I think,

08:54:23 12   2,172 that came in.  They excluded about 1,300 because there

08:54:27 13   were -- they couldn't figure out the outcome.  Then there were

08:54:32 14   other categories that were weeded out, and it came down to 117.

08:54:38 15   Q.    Did your investigation reveal whether or not Sanofi used

08:54:41 16   verbatim terms or whether they used an algorithm to look for

08:54:47 17   pseudonyms?

08:54:48 18   A.    It's my impression from reading the report that was

08:54:52 19   available to me that they used verbatim terms, that it had to

08:54:56 20   be permanent.  It had to be verbatim.  By that, I mean it had

08:55:00 21   to be explicit, permanent, irreversible, or lasting more than

08:55:05 22   two years in duration.

08:55:06 23   Q.    Now, you mentioned medical literature.  Can you tell us

08:55:15 24   how you identified the medical literature that you reviewed?

08:55:17 25   A.    Yeah.  So there's -- the National Library of Medicine

*OFFICIAL TRANSCRIPT*

08:55:20 1    codes published literature.  You can use computer -- you can

08:55:25 2    use computer search engines to find literature that you're

08:55:30 3    particularly interested in.

08:55:32 4         There are medical terms -- there is a way to search

08:55:34 5    the literature that I reliably use, scientifically valid

08:55:41 6    methods that I've used to do a comprehensive analysis of the

08:55:43 7    literature.

08:55:44 8         So I think, as I mentioned earlier, I used the terms

08:55:47 9    *chemically-induced* -- or *chemotherapy-induced alopecia*

08:55:52 10   conjointly with the terms *permanent*, *irreversible*, or

08:55:56 11   *persistent*.  Then I looked at the specific types of

08:55:59 12   chemotherapy that are provided to patients with early stage

08:56:02 13   breast cancer.  That turned up literature.

08:56:06 14        I looked at the different literature for -- may I go

08:56:10 15   on?

08:56:10 16   Q.   Sure.

08:56:11 17   A.   I looked at the literature to see whether or not it

08:56:15 18   actually did have the terms that I was interested in looking

08:56:20 19   at.

08:56:20 20        Sometimes search terms, you get extraneous things.

08:56:24 21   Maybe they are improperly coded.  You know, stuff happens.

08:56:30 22   But, basically, I made sure that the topic of interest was in

08:56:33 23   the article.

08:56:33 24        Then I also looked at whether or not they named that

08:56:37 25   chemotherapy, whether or not there were numbers to the type of

*OFFICIAL TRANSCRIPT*

08:56:41 1    regimen that were provided to patients.

08:56:43 2          So, for example, if they didn't name the regimen for

08:56:47 3    the breast cancer, they just have a laundry list of different

08:56:51 4    chemotherapy agents, any one of which might have been pertinent

08:56:54 5    for a breast cancer patient, I couldn't use that because the

08:56:58 6    topic under discussion is Taxotere.  So I was trying to find

08:57:02 7    out what the data was concerning that.

08:57:05 8          The other is whether or not they just used

08:57:08 9    percentages, but there were no numbers.  Well, I can't do much

08:57:12 10   with that.  I need to have numbers when I'm looking at data.  I

08:57:15 11   need to see, are we talking about 300 patients, or are we

08:57:19 12   talking about ten patients.

08:57:19 13         The other thing is whether or not -- the quality of

08:57:22 14   the paper.  You know, I rank them according to the hierarchy of

08:57:27 15   evidence, but, basically, was it a paper?  Was it an abstract?

08:57:30 16   Was it a poster?  But everything I looked at was peer-reviewed

08:57:34 17   and was published.

08:57:35 18   Q.   Okay.  Now, you talk about -- what's under investigation

08:57:40 19   is Taxotere.  When you did this literature search, did you do

08:57:45 20   it just for Taxotere, or did you do it for other breast cancer

08:57:49 21   chemotherapy drugs as well?

08:57:51 22   A.   I did it for the -- I did it for the cancer chemotherapy

08:57:55 23   drugs that are relevant for breast cancer.

08:57:57 24   Q.   Okay.  I just want to ask you a little list here.  Did

08:58:01 25   your search -- scientific medical literature search, search for

*OFFICIAL TRANSCRIPT*

1188

08:58:07 1   are articles and literature on anthracycline, the A in the TAC

08:58:13 2   that we've heard about?

08:58:13 3   A.   Yes.

08:58:14 4   Q.   Did it search for Cytoxan, the C that the jury has heard

08:58:22 5   about in the TAC regimen?

08:58:24 6   A.   Yes.  The terms were either *Cytoxan* or the longer term,

08:58:29 7   *cyclophosphamide*.

08:58:29 8   Q.   Did your scientific literature search, search for

08:58:38 9   5-fluorouracil, the F in the FAC arm of TAX316?

08:58:44 10  A.   Yes, I did.

08:58:44 11  Q.   Did you look for any other breast cancer -- did you

08:58:47 12  investigate any other breast cancer chemotherapy drugs in this

08:58:51 13  scientific literature search?

08:58:52 14  A.   Yes.  Of course, I looked for Taxotere or what's also

08:58:56 15  called *docetaxel*.  Then I also had a broad term, *chemical or*

08:59:03 16  *chemotherapy-induced alopecia*.

08:59:03 17  Q.   Did you search for Taxol, or paclitaxel?

08:59:07 18  A.   Yes, those were part of the articles that came up in the

08:59:10 19  broader search for chemotherapy-induced alopecia.

08:59:16 20  Q.   The A, anthracycline, is that also called *epirubicin*

08:59:23 21  sometimes?

08:59:24 22  A.   Well, there is several different types of -- anthracycline

08:59:27 23  is the class.  It's also called *doxorubicin*, Adriamycin,

08:59:34 24  epirubicin.  Those are other names for anthracyclines.

08:59:38 25  Q.   Thank you.

*OFFICIAL TRANSCRIPT*

08:59:41   1            Dr. Feigal, did you create a chart that details the

08:59:44   2    results of your search?

08:59:45   3    A.    I did.

08:59:45   4    Q.    Would putting that in front of the jury help you explain

08:59:49   5    what you did?

08:59:50   6    A.    It would.

08:59:51   7            MR. MICELI:  Your Honor, may I provide the witness with

08:59:53   8    a copy?

09:00:00   9            THE COURT:  Yes, you may.

09:00:04 10            THE WITNESS:  Thank you.

09:00:18 11            Is this supposed to come up on my monitor as

09:00:21 12    well, or no?

09:00:22 13            THE COURT:  It should be.

09:00:23 14            THE WITNESS:  It's not.

09:00:25 15            THE COURT:  Do you all have it on your monitor?

09:00:29 16            MR. MICELI:  I have it on mine.

09:00:29 17            THE WITNESS:  Do I just have to hit it?

09:00:42 18            Well, I have it in front of me.  But if there's

09:00:44 19    other things that need to be shown.

09:00:48 20            Anyway, I can hear you, and I have got the table

09:00:50 21    in front of me.

09:00:51 22            MR. MICELI:  Thank you.

09:00:53 23    EXAMINATION BY MR. MICELI:

09:00:55 24    Q.    Can you just generally explain what this chart seeks to

09:00:59 25    represent to the jury?

*OFFICIAL TRANSCRIPT*

09:01:00  1   A.    Yeah.   What I was trying to do is, in an efficient way,

09:01:07  2   try to put down the summary of the data that I looked at in a

09:01:13  3   way that hopefully is digestible.

09:01:16  4          So what I did, in the -- so these are the data

09:01:20  5   sources that reported permanent alopecia in the treatment of

09:01:24  6   breast cancer.

09:01:24  7          So on the left-hand side, I -- if you look at the --

09:01:29  8   you know, there is columns that go down, there is rows that go

09:01:32  9   across.   So in the columns I have where the data came from.

09:01:37 10          So, for the clinical trials, it lists the two

09:01:40 11   randomized clinical trials that were sponsored by Sanofi.   Then

09:01:45 12   in the publication, which was -- involved my search, I list all

09:01:49 13   the relevant articles by the author's last name and by the year

09:01:55 14   in which it was published.

09:01:55 15          You'll notice it's not in a yearly sequence -- you

09:02:01 16   know, it sort of jumps from 2001 to 2013 -- because what I was

09:02:05 17   trying to do is put it in terms of the hierarchy of the level

09:02:09 18   of evidence, whether it was a prospective clinical trial.   That

09:02:13 19   is to say, you look forward.   Patients get something, or they

09:02:17 20   have an exposure to a chemotherapy agent, and you follow them

09:02:22 21   over time.   You're going forward.

09:02:25 22          Other types of trials are what we call retrospective.

09:02:29 23   They'll look back.   So you could have lookbacks, where the

09:02:31 24   patient got exposure to the agent, but it was sometime in the

09:02:35 25   past.

**OFFICIAL TRANSCRIPT**

09:02:36  1    You also have lookback trials where it's the outcome
09:02:40  2  that you're looking at.  The patients are coming forward with
09:02:44  3  permanent or irreversible or persistent alopecia, and then you
09:02:48  4  look back to see what chemotherapy regimens they received.
09:02:54  5    Then there is papers or there is abstracts.  I put
09:02:57  6  more emphasis on published papers than I do on published
09:03:02  7  abstracts or published posters, just because there's a
09:03:04  8  higher -- it's not that you don't get valuable information from
09:03:06  9  all of these things, but just there is a higher level of rigor.
09:03:11 10  There is a higher amount of material you can look at.  There is
09:03:14 11  more details.
09:03:16 12    Maybe I'll stop there.  I tend to go on.  But that's
09:03:20 13  the first column.
09:03:21 14    So then the second column is actually listing the
09:03:26 15  exposure -- you know, Taxotere.  Those are the cases that are
09:03:29 16  reported that are relevant to the Taxotere exposure.
09:03:34 17    The next column that you'll see in the published
09:03:37 18  literature -- because, obviously, in the randomized
09:03:41 19  clinical trial, there is no Taxol in the randomized
09:03:44 20  clinical trial -- you'll see the column of Taxol.
09:03:47 21    Then the next column, I have Taxotere and Taxol.
09:03:52 22  There are some rare instances where some patients got both of
09:03:57 23  the taxanes.
09:03:58 24    Then in the next column, I have a category called
09:04:01 25  *Taxane*.  That's where the author of the publication failed to

**OFFICIAL TRANSCRIPT**

09:04:06  1    specify whether it was Taxol or Taxotere.  What I did in that

09:04:11  2    one instance was contact the author, who affirmed that they

09:04:16  3    actually gave both -- there was both Taxotere and Taxol in the

09:04:20  4    study, but he didn't look to see whether or not it was due to

09:04:25  5    the Taxol or to the Taxotere.

09:04:29  6              I asked further, could he look?  No.  It just didn't

09:04:35  7    happen.  So I didn't throw out the data.  I included it.

09:04:39  8              Then the next column are the non-taxanes, where there

09:04:45  9    is not a Taxol or a Taxotere in the regimen.

09:04:47 10    Q.   I want to talk more about the chart, but right now I want

09:04:51 11    to ask a couple of questions about what's not in the chart.

09:04:54 12              Well, I'm going to ask about the clinical trials

09:04:58 13    first.  TAX316 and TAX301, the jury has already heard, that's

09:05:05 14    Sanofi's studies, right?  Correct?

09:05:06 15    A.   I believe that's true.

09:05:07 16    Q.   Okay.  So I'm going to just put RCT's, randomized

09:05:16 17    controlled trials, only Sanofi, on your chart.

09:05:25 18              Now, the literature search that you did, if there

09:05:33 19    would have been published peer-reviewed medical scientific

09:05:36 20    articles that documented an increased risk of permanent

09:05:42 21    hair loss with any of the other breast cancer chemotherapy

09:05:50 22    drugs, would your search have caught them?

09:05:53 23    A.   It should have caught them.  But I do want to say a

09:05:57 24    caveat, it was not an exhaustive search.  It was a

09:05:59 25    comprehensive search.  So I will -- you know, caveat, it's

*OFFICIAL TRANSCRIPT*

09:06:05 1    possible that I didn't catch everything.  I'd be shocked if a
09:06:08 2    randomized clinical trial didn't show up, but it's possible
09:06:12 3    that a case report or something may not have.  So I do want to
09:06:16 4    say, it's not 100 percent, but it's comprehensive.
09:06:19 5    Q.    More likely than not that you would have caught those
09:06:27 6    studies?
09:06:27 7    A.    Absolutely.
09:06:28 8    Q.    I'm going to put a circle over here in these absence
09:06:33 9    categories.  I'm going to put no RCT's for any other -- I'm
09:06:42 10   going to put BC -- breast cancer chemo drugs.  Is that a fair
09:06:50 11   statement?
09:06:51 12   A.    And permanent alopecia, right.
09:06:51 13   Q.    That's what this all about.
09:06:51 14   A.    That's right.
09:06:51 15   Q.    Okay.  So no RCT's --
09:06:59 16   A.    There are a lot of RCT's out there.
09:07:01 17   Q.    Certainly, but there's no -- your search captured no
09:07:05 18   randomized controlled trials or articles that document or
09:07:09 19   report upon randomized controlled trials that show an increased
09:07:15 20   risk of permanent alopecia with any other breast cancer chemo
09:07:21 21   drug other than Taxotere?
09:07:22 22   A.    That's correct.
09:07:22 23   Q.    Now, let's look down at these publications just for a
09:07:34 24   second.  I've counted them before.  I think there is 19.
09:07:37 25   A.    There are.

*OFFICIAL TRANSCRIPT*

1194

09:07:38  1    Q.    Do any of these articles document that Sanofi reported the

09:07:46  2    results from their clinical trials and the incidents of

09:07:52  3    permanent chemotherapy-induced alopecia with Taxotere?

09:07:59  4    A.    Nothing in the published literature.

09:08:01  5    Q.    In your experience, Dr. Feigal, who makes the decision

09:08:10  6    whether a company publishes the results of their

09:08:14  7    clinical trials?

09:08:14  8    A.    Well, the company does.

09:08:27  9          I do want to add, if I may, a caveat.  There are

09:08:31 10    investigator-sponsored clinical trials.  In this instance, that

09:08:35 11    isn't the case.  This is a Sanofi-sponsored clinical trial.

09:08:38 12          So issues have evolved over time, but, if it's only

09:08:42 13    an investigator-sponsored clinical trial -- let's say the

09:08:47 14    sponsor is providing the drug, but they are independent of the

09:08:51 15    statistical analysis and the design, they are just providing

09:08:55 16    the drug -- the investigator can write up the results.

09:08:57 17          In general, they provide it to the sponsor and give

09:09:01 18    them X period time, maybe it's 30 days, to review it, so that

09:09:05 19    the sponsor can, you know, have a say in what the paper says.

09:09:11 20    But usually that's worked out ahead of time.

09:09:14 21          THE COURT:  Dr. Feigal --

09:09:16 22          MR. MICELI:  Dr. Feigal, I don't think there's -- there

09:09:16 23    wasn't a question about that, so let's --

09:09:19 24          THE WITNESS:  Oh, I'm sorry.

09:09:20 25          THE COURT:  Just listen to the question.

*OFFICIAL TRANSCRIPT*

09:09:22  1          THE WITNESS:  Thank you.

09:09:23  2          THE COURT:  Thank you.

09:09:23  3   EXAMINATION BY MR. MICELI:

09:09:25  4   Q.    You did review TAX316 and TAX301's clinical study reports?

09:09:30  5   A.    I did.

09:09:30  6   Q.    Who conducted those studies?

09:09:34  7   A.    Sanofi.

09:09:34  8   Q.    Thank you.

09:09:35  9          The second column in your chart, the numbers -- or

09:09:38 10   the second through -- second from the left and all the way to

09:09:41 11   the right, those depict, I think you said, the numbers of

09:09:44 12   events that have actually been reported in the published

09:09:47 13   peer-reviewed medical literature?

09:09:50 14   A.    With the caveat that the permanent alopecia on the

09:09:55 15   randomized clinical trials were not reported in the literature.

09:09:58 16   Q.    I was just referring to the publications.

09:10:01 17   A.    That's correct, for the published literature.

09:10:03 18   Q.    I think what you're saying is -- what you were trying to

09:10:05 19   communicate is, this 347 down here, that doesn't include these

09:10:10 20   32; is that right?

09:10:11 21   A.    That's correct.

09:10:11 22   Q.    Just so we're clear.

09:10:19 23          Because a case report is reported in a published

09:10:26 24   journal, does that mean that that particular event rises to the

09:10:30 25   same level as something you see in a randomized controlled

*OFFICIAL TRANSCRIPT*

09:10:36  1    trial?

09:10:37  2    A.    It's supportive, but it doesn't rise to the same level.

09:10:41  3          If you have evidence from a randomized controlled

09:10:44  4    trial, and the variable under study is the variable you want to

09:10:49  5    examine, then the randomized clinical trial has a higher level

09:10:53  6    of evidence.

09:10:53  7    Q.    Thank you.

09:10:58  8          Did you review each of these articles carefully?

09:11:01  9    A.    I did.

09:11:01  10   Q.    Okay.  Now, with the exception of the Freites-Martinez

09:11:11  11   article, which is on your chart, which was published, I

09:11:14  12   believe, after your report was given --

09:11:15  13   A.    That's true.  The report was provided, I believe, in late

09:11:20  14   2018.  The -- I want to pronounce his name correctly --

09:11:26  15   Freites-Martinez report, I believe, was published in March of

09:11:32  16   2019.

09:11:33  17   Q.    We're going to talk probably just a little bit more about

09:11:35  18   that article in a moment, but I want the jury to understand,

09:11:38  19   does the Freites-Martinez article change your opinions in any

09:11:42  20   way?

09:11:43  21   A.    Not at all.

09:11:43  22   Q.    Why does it not change your opinions?

09:11:47  23   A.    Well, I think there is a lot of methodologic issues I have

09:11:52  24   with the Freites-Martinez article in terms of -- I'm sure it's

09:11:56  25   nothing intentional by the author, but it's just the methods

*OFFICIAL TRANSCRIPT*

09:12:01  1   are a little bit opaque to figure out exactly what they did.

09:12:07  2        Be that it as it may, I still think it is valuable,

09:12:10  3   so I did look at it, and do I think there is important

09:12:13  4   information that can be derived.  But, no, it did not change my

09:12:16  5   opinion in this case.

09:12:17  6   Q.   Okay.  Does -- do the authors of the Freites-Martinez

09:12:28  7   article set out the number of patient -- let me back up.  Let

09:12:35  8   me just lay a little foundation.

09:12:36  9        What type of a study is the Freites-Martinez article?

09:12:40 10   A.   You know, I think they sort of mischaracterize their

09:12:42 11   study as a -- and these terms probably won't mean a lot to you,

09:12:46 12   but they characterize it as a retrospective cohort study.

09:12:51 13   Actually, it's more of a retrospective case study.

09:12:51 14        I tried to explain it at the beginning, but the

09:12:58 15   outcome is already there, alopecia.  And then they looked back,

09:13:02 16   you know, to look at the regimens that were provided.  And, you

09:13:06 17   know, it's just a -- I just look at everything, but basically

09:13:10 18   it's more of a case than a cohort study.

09:13:13 19   Q.   I'm going to hand you a copy of a Freites-Martinez

09:13:23 20   article.

09:13:24 21        MR. MICELI:  May I approach, Your Honor?

09:13:26 22        THE COURT:  Yes, you may.

09:13:28 23        THE WITNESS:  May I ask for a pen?

09:13:30 24   EXAMINATION BY MR. MICELI:

09:13:30 25   Q.   Here you are.

*OFFICIAL TRANSCRIPT*

09:13:37  1    A.    Okay, thanks.

09:13:38  2    Q.    Now, Dr. Feigal, you're familiar with -- and I'm going to

09:13:46  3    start on the first page.  You're familiar with how articles are

09:13:51  4    published, are you not?

09:13:51  5    A.    Yes.

09:13:52  6    Q.    You've published them yourself before?

09:13:55  7    A.    And currently.

09:13:56  8    Q.    When an article is published -- the first name in the list

09:14:00  9    of authors there is Freites-Martinez, correct?

09:14:04 10    A.    Correct.

09:14:04 11    Q.    And the last name mentioned is Mario Lacouture, correct?

09:14:10 12    A.    Correct.

09:14:11 13    Q.    And then there is a number of individuals in between,

09:14:13 14    including a gentleman by the name of Dr. Jerry Shapiro?

09:14:17 15    A.    Correct.

09:14:17 16    Q.    And Dr. Tosti, who the jury heard from yesterday?

09:14:24 17    A.    Correct.

09:14:24 18    Q.    Now, when you look at that list of authors there, how do

09:14:28 19    you identify the primary author?

09:14:30 20    A.    It should be the first author.

09:14:32 21    Q.    And then on the front page there, it says,

09:14:36 22    "Correspondence," I believe, "to Mario Lacouture."

09:14:39 23    A.    Yes.

09:14:39 24    Q.    What does that mean?

09:14:40 25    A.    Well, corresponding author, since I've been that before,

*OFFICIAL TRANSCRIPT*

09:14:43   1   is you handle all the correspondence with the journal editor

09:14:47   2   and any letters to the editor or comments that come in.  You

09:14:51   3   are the contact with the journal.

09:14:53   4   Q.   So the lead author whose study this was or whose article

09:15:05   5   this was, was Dr. Martinez?

09:15:07   6   A.   Yes.  I just want to make the caveat.  You don't have

09:15:10   7   to -- oh, you didn't ask a question.

09:15:10   8        THE COURT:  Just see if you can answer the question.

09:15:12   9   EXAMINATION BY MR. MICELI:

09:15:12  10   Q.   If you don't mind, I just want to -- stick to the

09:15:16  11   questions with me, Doctor, please.

09:15:18  12          Dr. Lacouture is who individuals would write to if

09:15:22  13   they had questions or concerns about the study and how it was

09:15:25  14   conducted; is that correct?

09:15:25  15   A.   Yes.  The corresponding author is who, if people have

09:15:31  16   questions, they can either send a letter to the journal editor,

09:15:34  17   who will then funnel it to the corresponding author, or I have

09:15:38  18   gotten emails directly from people who want to ask questions

09:15:41  19   about the article.

09:15:42  20   Q.   Okay.  To characterize, one of the individuals between

09:15:47  21   Freites-Martinez and the corresponding author, Dr. Lacouture,

09:15:53  22   it's their study, as if they are the primary author, would that

09:15:58  23   be correct or incorrect?

09:15:58  24   A.   If somebody is the primary author -- and I had this

09:16:04  25   example just recently, is we had -- because academics --

*OFFICIAL TRANSCRIPT*

09:16:07  1   Q.   The question was:  Is somebody in between

09:16:10  2   Freites-Martinez -- to characterize somebody between

09:16:14  3   Freites-Martinez and Dr. Lacouture as the primary author, would

09:16:19  4   that be correct or incorrect?  You can explain.

09:16:21  5   A.   I was going to try to -- there's a caveat.  Sometimes the

09:16:25  6   first two authors on a paper are primary authors, but it's

09:16:32  7   denoted that they are sharing coprimary authorship.  But if

09:16:36  8   it's not denoted, then the primary author is the first author.

09:16:39  9   Q.   Thank you.

09:16:49 10        Now, in this retrospective case review or case report

09:16:56 11   review publication, do they -- do the authors tell you how many

09:17:03 12   charts were reviewed to come up with 47 in Taxol, 31 in

09:17:03 13   Taxotere, and 18 others?

09:17:16 14   A.   It's challenging to figure out their methods.  Some of

09:17:18 15   that may be a consequence of journal limitations, but that

09:17:23 16   wasn't the question you asked.  So I could just say it was

09:17:26 17   challenging to figure out their methods from what was

09:17:30 18   published.

09:17:38 19   Q.   Now, are you familiar with the term in clinical study

09:17:43 20   research or scientific research called *bias*?

09:17:46 21   A.   I am familiar with the term *bias*.

09:17:48 22   Q.   Can you explain to the jury what bias is?

09:17:50 23   A.   Well, let me start with non-bias.  You flip a coin.  It

09:17:56 24   comes up heads or tail.  You do something to that coin to sort

09:18:00 25   of weight it so it always comes up tails.  That's a simplified

*OFFICIAL  TRANSCRIPT*

09:18:06  1    version.

09:18:07  2         But it's introducing prejudice.  It's introducing

09:18:11  3    some bias.  Sometimes it can be intentional and sometimes it's

09:18:14  4    just unintentional that it happens, but it's sort of weighting

09:18:20  5    it in one way rather than have it be perfectly randomized.

09:18:25  6    Q.   When you're comparing randomized controlled trials versus

09:18:28  7    a retrospective cohort study, which one has the likelihood --

09:18:34  8    all other things being equal, which one has more likelihood of

09:18:37  9    being affected by bias?

09:18:39 10    A.   Well, the ones that aren't randomized and the ones --

09:18:42 11    there are ways -- to be clear, there is caveats to everything,

09:18:46 12    unfortunately, you'll find out as we're talking to each other.

09:18:49 13    There are ways to minimize bias in even these types of studies,

09:18:53 14    but generally there is the introduction of more bias when

09:18:57 15    you're not working with randomized clinical trials.

09:18:59 16    Q.   Okay.  Now, the chart that you've created -- the chart

09:19:21 17    that you've created in your 19 articles lists one from 2001,

09:19:28 18    that's Nabholtz, and one from 2006 that is Sedlacek, correct?

09:19:36 19    A.   That's correct.

09:19:36 20    Q.   And the rest begin in 2009, correct?

09:19:42 21    A.   Yes, that's correct.

09:19:42 22    Q.   Now, between 2010 and the -- let me back up.  I may have

09:19:50 23    asked this.  I'm going to shortcut it.

09:19:52 24         You've looked at TAX316 and TAX301.  Have you seen

09:19:57 25    where those articles have been published in the peer-reviewed

*OFFICIAL TRANSCRIPT*

09:20:02  1    medical literature?

09:20:02  2    A.   Those articles without the persistent permanent

09:20:05  3    irreversible alopecia results are published in the literature.

09:20:09  4    Q.   They were published?

09:20:10  5    A.   Yes.  That's right.

09:20:11  6    Q.   They just don't have the alopecia information, as these

09:20:14  7    other articles do?

09:20:15  8    A.   They don't have the permanent alopecia information.

09:20:17  9    Q.   Thank you.

09:20:21 10         I'm going to walk through the factors with you a

09:20:24 11    little bit more and we're going to apply them, I hope, to this

09:20:28 12    chart.  I may take them in a little bit different order than we

09:20:35 13    discussed them or named them for the jury, but I want to talk

09:20:38 14    to you first about plausibility.

09:20:41 15         You explained what biologic plausibility was

09:20:43 16    earlier -- or plausibility, and I have a question for you.  In

09:20:47 17    forming your opinions in this matter, do the clinical trials

09:20:50 18    and the literature reviewed and the randomized controlled data

09:20:53 19    that you reviewed demonstrate that there is a plausible

09:20:57 20    mechanism of how Taxotere can cause permanent hair loss?

09:21:01 21    A.   Yes.  There is a plausible mechanism for how Taxotere can

09:21:04 22    cause permanent hair loss.

09:21:07 23    Q.   I'm going to ask you for each one of these factors, is the

09:21:10 24    evidence more favorable to demonstrating biologic plausibility?

09:21:17 25    A.   You'll have to rephrase that question.

                              *OFFICIAL TRANSCRIPT*

09:21:18  1    Q.    Does it show biologic plausibility?

09:21:21  2    A.    The biologic plausibility is actually evidenced by what we

09:21:27  3    know about the mechanism of action of Taxotere, not all of

09:21:29  4    which is in each of these clinical trials, but it's well known

09:21:33  5    about the effect of Taxotere on hair loss.

09:21:37  6    Q.    Right.  And part of the mechanism of action is the effect

09:21:43  7    it has on the cells that create the growth of the hair?

09:21:47  8    A.    Yeah.  I mean, obviously Taxotere is an

09:21:51  9    anti-chemotherapy -- is a chemotherapy drug that's antitumor.

09:21:54 10    So it gets the rapidly dividing cells and -- I know I'm going

09:22:00 11    farther than you want, but basically the rapidly dividing cells

09:22:05 12    also occur on the hair on your head, and so it also -- because

09:22:09 13    blood circulates to the scalp of the head, and the hair gets

09:22:13 14    nutrition and its nutrients from the blood that circulates, it,

09:22:18 15    too, is affected because it gets exposed to the drug.  So that

09:22:22 16    causes your hair to fall out at different phases of the hair

09:22:28 17    cycle.

09:22:28 18          And there is also a biologically plausible mechanism

09:22:32 19    that's been articulated in the literature in multiple places,

09:22:36 20    including in these clinical studies that it's been thought that

09:22:39 21    it may attack the hair follicle and/or the stem cells and the

09:22:47 22    signalling.

09:22:47 23          So the stem cells themselves may not be affected, but

09:22:50 24    the signalling -- there probably are seven or eight different

09:22:53 25    factors, growth signals that can be researched and evaluated as

*OFFICIAL TRANSCRIPT*

09:22:58 1   to whether or not that communication between cells is

09:23:01 2   interrupted.  So those are some of the biologically plausible

09:23:06 3   mechanisms that have been proposed.

09:23:07 4   Q.    I'm going to ask you about that, because I think we're

09:23:10 5   probably going to hear some more about it this morning when

09:23:12 6   others are questioning you.

09:23:15 7            Is the effect on stem cells by Taxotere or any

09:23:21 8   chemotherapy agent a proven scientific fact in the medical

09:23:24 9   literature?

09:23:24 10  A.    No.

09:23:25 11  Q.    Is it just a theory?

09:23:27 12  A.    It's biologically plausible, since hair has stem cells,

09:23:36 13  that that would be one avenue where it might permanently affect

09:23:39 14  it or the signalling.  But, no, it's not proven.

09:23:42 15  Q.    Based upon your knowledge of stem cells, are follicles the

09:23:47 16  only place that stem cells are present on the scalp?

09:23:49 17  A.    No.  I realized when you were doing my CV, you didn't

09:23:52 18  mention that I headed up research and development of the

09:23:56 19  California Institute for Regenerative Medicine.  So I do a lot

09:23:57 20  of work with stem cells.

09:23:58 21           But, basically, the stem cells are throughout the

09:24:01 22  body and in various parts of the body, and they are sort of the

09:24:05 23  mother cell that can replicate, they can form in certain

09:24:10 24  instances every tissue in the body or, for the hair, they form

09:24:14 25  hair.  So if there is some damage or there is a loss of

*OFFICIAL TRANSCRIPT*

09:24:17  1   communication between the hair cell, that cue to regrow isn't
09:24:21  2   there.
09:24:22  3   Q.   Thank you.
09:24:24  4        Now, we talked about temporality earlier.  I stopped
09:24:28  5   when we were just running through them, but you already
09:24:32  6   testified about temporality, correct?
09:24:34  7   A.   Correct.
09:24:34  8   Q.   So we're going to move past that one.  Let's move to
09:24:41  9   consistency.
09:24:42 10        Your review of the medical literature that you have
09:24:45 11   here today and that you've documented for jury, does it
09:24:48 12   demonstrate to a reasonable degree of scientific certainty that
09:24:52 13   consistency as a criteria for establishing causation has been
09:24:56 14   met in the scientific literature and clinical studies?
09:25:00 15   A.   Yes.
09:25:00 16   Q.   In fact, when you look at this chart, the Taxotere column
09:25:12 17   is filled with the exception of the Kim article, correct?
09:25:18 18   A.   I'm sorry, say this again.
09:25:20 19   Q.   Sure.  When we look at the number of articles that's your
09:25:23 20   literature search -- and I want to make clear, the literature
09:25:27 21   search you did didn't just look for Taxotere, it looked for all
09:25:30 22   of these breast cancer chemotherapy drugs?
09:25:32 23   A.   Yes.  I had a broad term for chemotherapy-induced
09:25:35 24   permanent irreversible or persistent alopecia.
09:25:38 25   Q.   And then these articles that you have listed here in the

*OFFICIAL TRANSCRIPT*

09:25:43 1    Taxotere column, there is only one column with an empty cell,

09:25:47 2    and that's the Kim study, right?

09:25:49 3    A.    Oh, yes.  I'm sorry.  Yes.

09:25:51 4    Q.    And you look at the Taxol column.  How many of the cells

09:25:57 5    are filled with numbers?

09:25:58 6    A.    There are three.

09:25:59 7    Q.    Now, let's talk about just for a second the

09:26:03 8    Freites-Martinez article.

09:26:05 9    A.    Just a little caveat.  There is that second column that's

09:26:08 10   called *Taxotere and Taxol*, so there is, I guess, some

09:26:13 11   additional cases.

09:26:14 12   Q.    I understand what you're saying, but we can't unscramble

09:26:17 13   that egg, can we, to figure out which one it is?

09:26:20 14   A.    I know.

09:26:20 15   Q.    So let's just talk about the ones where we have one listed

09:26:24 16   for a second.  But with the Taxol column, you have the Crown

09:26:30 17   study that only documents three events, correct?

09:26:34 18   A.    That's correct.

09:26:34 19   Q.    And then you have the Prevezas, the 2009 article that has

09:26:39 20   just one report?

09:26:40 21   A.    That's correct.

09:26:41 22   Q.    So we have 51 reports with Taxol, but all but four of them

09:26:47 23   come from the Freites-Martinez article?

09:26:51 24   A.    That's correct.

09:26:51 25   Q.    Are you familiar with the term called *outlier*?

**OFFICIAL TRANSCRIPT**

09:26:53  1    A.    Yes.

09:26:54  2    Q.    Would the Freites-Martinez article represent consistency

09:26:59  3    or outlier?

09:26:59  4    A.    It represents an outlier in terms of what's happening with

09:27:05  5    Taxol.  It represents consistency in terms of Taxotere still

09:27:11  6    being associated with permanent alopecia.  There are some other

09:27:16  7    valuable things I could say.  I know I'm going further than you

09:27:21  8    asked.

09:27:21  9    Q.    We're just talking about the consistency criteria.  Now, I

09:27:25 10    appreciate that you could impart much more knowledge on each of

09:27:27 11    these to us, but I just want to try to keep it organized.

09:27:32 12          So let's talk about specificity.  You've already

09:27:35 13    explained to us what specificity is, correct?

09:27:38 14    A.    I hope so.

09:27:38 15    Q.    Well, why don't you just go ahead and repeat it for us,

09:27:42 16    just to make sure we're clear.

09:27:42 17    A.    Well, the topic under discussion is Taxotere, so I was

09:27:46 18    looking for articles specifically where there was exposure to

09:27:50 19    Taxotere, and, you know, there is other chemotherapy agents,

09:27:54 20    other things that were provided to that patient, but whether

09:27:56 21    all the evidence did or did not point to Taxotere.

09:28:00 22    Q.    Okay.  Now, did the clinical trials, literature,

09:28:05 23    pharmacovigilance database information that you reviewed

09:28:09 24    demonstrate that the criteria of specificity was met in your

09:28:15 25    causation analysis?

*OFFICIAL TRANSCRIPT*

09:28:17  1    A.    Yes.

09:28:17  2    Q.    How about dose response?

09:28:20  3    A.    Yes, some of the articles did look at dose response,

09:28:24  4    specifically the cumulative dose, not the individual dose, but

09:28:27  5    the cumulative dose over time, and I believe -- I have to jog

09:28:32  6    my memory, but I believe it was 400 milligrams per meters

09:28:37  7    squared, some of them may have looked at 450 milligrams per

09:28:41  8    meters squared.

09:28:41  9         Anyway, the higher cumulative dose showed either

09:28:43 10    more alopecia or more severe permanent alopecia compared to

09:28:47 11    the lower dose, and I believe the lower dose was around

09:28:51 12    300 milligrams per meters squared.  And when I say -- do I need

09:28:56 13    to define milligram or meters squared?

09:28:59 14    Q.    I think they've heard a lot about that all this week.

09:29:02 15    A.    So, good.

09:29:02 16    Q.    I want to talk to you about dose response just for a

09:29:05 17    second.  And you list the Martin study from 2018.  I think it's

09:29:12 18    fourth the top of the publication list.

09:29:14 19    A.    Okay.

09:29:16 20         MR. MICELI:  And, Your Honor, may I provide the witness

09:29:18 21    with a copy?

09:29:19 22         THE COURT:  Yes, you may.

09:29:22 23    EXAMINATION BY MR. MICELI:

09:29:33 24    Q.    Does this article provide support for dose response with

09:29:39 25    Taxotere?

*OFFICIAL TRANSCRIPT*

09:29:39 1    A.    Yes.  I believe from my -- jogging my memory here, taking

09:29:48 2    all the three institutions together, that there was more

09:29:54 3    higher-grade permanent chemotherapy-induced alopecia at the

09:29:59 4    higher cumulative dose of 400 milligrams per meters squared,

09:30:05 5    but not in the patients who received a lower cumulative dose.

09:30:09 6    Q.    If you could flip with me to page -- the third page in.

09:30:21 7    A.    Where the graph is?

09:30:24 8    Q.    Yes.

09:30:25 9    A.    Oh, you're on the table?

09:30:26 10   Q.    Yes.

09:30:27 11   A.    Okay.  Okay.  Just so you know, that table was corrected

09:30:32 12   in an errata, so there is an update.

09:30:35 13   Q.    What does the errata show?

09:30:38 14   A.    What investigators do is they -- if there is a correction

09:30:42 15   that's needed, they send it in to the -- they send it in to the

09:30:47 16   journal and ask for a correction.

09:30:48 17   Q.    Okay.  And that was done with this case?

09:30:51 18   A.    Yes, it was.  I think it was --

09:30:52 19   Q.    It was done with that chart?

09:30:54 20   A.    It was done with that table.

09:30:56 21   Q.    With this table?

09:30:57 22   A.    Because I looked for it.  Actually, when you find the

09:31:00 23   paper, it automatically lets you know if there is an errata.

09:31:05 24   If there is a -- there is a correction that was -- and I

09:31:10 25   usually look for those, because it may impact what I say about

**OFFICIAL TRANSCRIPT**

09:31:14  1   the article.

09:31:14  2   Q.    Okay.  So, what I just put on the screen did not have the

09:31:22  3   accurate depiction of what that table should be?

09:31:25  4   A.    Well, all it did, just to be clear, is it took out all of

09:31:29  5   the zeros.

09:31:29  6   Q.    And what I want to talk about, though, is -- I put an X on

09:31:37  7   mine because this one was corrected and removed.  Down at the

09:31:42  8   bottom, where it talks about the dosing at Hospital Clínico

09:31:48  9   San Carlos, Madrid -- and just so we're clear, this was a study

09:31:50 10   that was done at only three hospitals in Spain, right?

09:31:54 11   A.    That's correct.

09:31:54 12   Q.    And with regard to dosing of Taxotere, when you're looking

09:32:07 13   at cumulative dosing, what contains -- cumulatively more

09:32:15 14   Taxotere, a 75 milligram per meters squared over six cycles --

09:32:22 15   may have to do some math there, Doc -- or four cycles with

09:32:28 16   100 milligrams?

09:32:29 17   A.    Oh, well, the six cycles of 75 have a higher cumulative

09:32:33 18   dose.

09:32:33 19   Q.    So if we're concerned about cumulative dose, giving it at

09:32:37 20   75 times 6 is greater than giving it 4 times 100?

09:32:42 21   A.    That's correct.

09:32:42 22   Q.    When you give drugs together versus sequentially, does

09:32:46 23   that have an impact on toxicity?

09:32:50 24   A.    That may have an impact on toxicity.  There may be

09:32:55 25   overlapping toxicity when you give them together.

*OFFICIAL TRANSCRIPT*

09:32:57  1     Q.    Thank you.

09:32:59  2              If I didn't ask this already, does the literature

09:33:02  3     that you've reviewed support a dose response relationship with

09:33:06  4     Taxotere?

09:33:06  5     A.    Yeah, from the literature I reviewed, there is evidence

09:33:09  6     for a dose response.

09:33:17  7              MR. MICELI:  May I have a moment to speak to my --

09:33:20  8              THE COURT:  Sure.

09:33:21  9              MR. STRONGMAN:  Your Honor, may I just grab my

09:33:35 10     exhibits?

09:33:36 11              THE COURT:  Sure.

09:33:37 12     EXAMINATION BY MR. MICELI:

09:34:11 13     Q.    Now, Dr. Feigal, because this jury has been told that

09:34:15 14     A and C may have caused Ms. Earnest's lack of hair regrowth, I

09:34:21 15     have to ask you, have you reviewed -- in your review of all of

09:34:26 16     the scientific evidence and medical literature that's out

09:34:28 17     there, have you seen evidence that A or C has been related --

09:34:34 18     causally related to permanent irreversible hair loss, hair that

09:34:38 19     doesn't grow back when it's supposed to?

09:34:41 20     A.    I haven't seen evidence for causal relationship.  You'll

09:34:44 21     see those anecdotal cases that have been reported in the

09:34:48 22     published literature.

09:34:48 23     Q.    I just want to do a little bit of simple math with you,

09:34:53 24     based upon your chart.  Okay?  I guess I can look at it right

09:34:59 25     here.

*OFFICIAL TRANSCRIPT*

09:34:59  1   A.   Just so you know, the monitor still doesn't work.  I can

09:35:06  2   see it.  I just wanted to let them know that.

09:35:10  3        THE DEPUTY CLERK:  I can take a one-minute recess and

09:35:12  4   just reset it in the background.

09:35:12  5        THE COURT:  Why don't we take just a one-minute break.

09:35:12  6        (WHEREUPON, there was a brief pause in the

09:35:14  7   proceedings.)

09:35:14  8   EXAMINATION BY MR. MICELI:

09:36:57  9   Q.   Can you see this if I write on it?

09:37:00 10   A.   Yes.  I have good eyesight.

09:37:00 11   Q.   We have your report where your literature search revealed

09:37:08 12   347 events documented in the scientific medical literature for

09:37:17 13   Taxotere, right?

09:37:18 14   A.   Correct.

09:37:18 15   Q.   Okay.  And there were 51 with Taxol, correct?

09:37:29 16   A.   Correct.

09:37:29 17   Q.   That ends up -- when we divide the number of Taxol into

09:37:34 18   the number of Taxotere, that is 6.8 times more reports with

09:37:45 19   Taxotere than there are with Taxol?

09:37:47 20   A.   That's correct.

09:37:47 21   Q.   Okay.  And if we were to rewrite this as a percentage,

09:37:52 22   would it be accurate, Doctor, to call this 680 percent?

09:38:03 23   A.   It is correct with one caveat.

09:38:07 24   Q.   What is that caveat, Doctor?

09:38:10 25   A.   It's just a little math.  347 is indeed 680-some percent

*OFFICIAL TRANSCRIPT*

1213

09:38:17  1    of 54, but because you're not starting from zero, you're

09:38:21  2    starting from 54, you subtract 100.  So it's a 580 percent

09:38:27  3    increase from 51.  Just a minor -- it's still big, but it's

09:38:31  4    just 580 percent instead of 680.

09:38:33  5    Q.   So it's 580 percent more likely that you're going to see

09:38:42  6    Taxotere reported in the medical literature related to

09:38:46  7    permanent hair loss than Taxol?

09:38:49  8              MR. STRONGMAN:  Objection.  Leading.

09:38:51  9              THE COURT:  Sustained.  Rephrase your question.

09:38:53 10    EXAMINATION BY MR. MICELI:

09:38:53 11    Q.   Could you restate what this number, 6.8-fold, relates to

09:38:58 12    on a percentage basis, doing the caveat?

09:39:01 13    A.   With all the caveats, it's what you observed -- what I've

09:39:06 14    observed in the literature with my review of the published

09:39:09 15    literature of 347 cases in Taxotere and 51 cases in Taxol,

09:39:17 16    that's about a 6.8 times' increase, and that does translate to

09:39:22 17    about a 580 percent increase from 51.

09:39:26 18    Q.   Okay.  Did your investigation into the evidence that you

09:39:36 19    saw in your -- in the medical literature reflect -- ever

09:39:42 20    reflect a physician or scientist reporting that Taxol was

09:39:48 21    reasonably related -- or excuse me, causally related to

09:39:55 22    permanent hair loss?

09:39:55 23    A.   There is nothing I read in the published literature that

09:40:01 24    was suggesting Taxol was causally related.  There was the one

09:40:07 25    article that we've talked about, Freites-Martinez, where it was

*OFFICIAL TRANSCRIPT*

09:40:13  1    obviously suggested that they saw it.

09:40:16  2    Q.   Suggested they saw it.  My question simply was -- I'm

09:40:18  3    going to ask you this sort of collectively -- with regard to

09:40:20  4    the A in the TAC, anthracycline, Cytoxan, 5-FU or Taxol, did

09:40:32  5    you find anything in the medical literature that causally

09:40:35  6    relates those drugs to permanent irreversible hair loss, hair

09:40:39  7    that doesn't come back?

09:40:40  8    A.   Not the non-Taxotere arms, no.

09:40:47  9            Perhaps I should have said drugs, not arms.

09:40:53 10            MR. MICELI:  That's all I have at this time.

09:40:56 11    Thank you.

09:40:56 12            THE COURT:  Thank you.

09:40:57 13            THE WITNESS:  Thank you.

09:40:57 14            THE COURT:  Mr. Strongman.

09:41:00 15                Please proceed.

09:41:00 16                    CROSS-EXAMINATION

09:41:00 17    BY MR. STRONGMAN:

09:42:07 18    Q.   Good morning, Dr. Feigal.  How are you?

09:42:09 19    A.   I'm good.

09:42:10 20    Q.   My name is Jon Strongman.  We haven't met yet; is that

09:42:14 21    correct?

09:42:14 22    A.   That's correct.

09:42:15 23    Q.   All right.  Very good.

09:42:16 24            Now, I want to make just a couple of things clear at

09:42:18 25    the beginning about what you're not offering some opinions on,

*OFFICIAL TRANSCRIPT*

09:42:21  1    okay?

09:42:21  2    A.   Okay.

09:42:29  3    Q.   All right.  Dr. Feigal, we know you're not offering any

09:42:38  4    opinions about Barbara Earnest in this case, correct?

09:42:41  5    A.   That is correct.

09:42:41  6    Q.   So it's -- just so we're clear, there is no confusion, you

09:43:01  7    are not coming into this courtroom and saying that Taxotere

09:43:04  8    caused Ms. Earnest to have any kind of permanent hair loss,

09:43:07  9    correct?

09:43:07 10    A.   That is correct.

09:43:08 11    Q.   Now, Doctor, you are an oncologist by training, correct?

09:43:20 12    A.   That is correct.

09:43:20 13    Q.   But you have not treated a breast cancer patient since

09:43:24 14    1991; is that correct?

09:43:25 15    A.   I do not have an active clinical practice, but I still am

09:43:30 16    actively involved in clinical trials for breast cancer

09:43:33 17    patients.

09:43:33 18         But you're correct, I haven't actively treated a

09:43:36 19    breast cancer patient probably -- I think that's probably

09:43:42 20    correct -- since my UC San Diego days.

09:43:45 21    Q.   Doctor, I'll ask this specific question:  The last time

09:43:49 22    you treated a breast cancer patient would have been as recently

09:43:52 23    as 1991, fair?

09:43:56 24    A.   I think it's probably 1992 when I left San Diego, but you

09:44:01 25    may be correct.

*OFFICIAL TRANSCRIPT*

1216

09:44:01  1    Q.   Is that all right, if I just put since 1991 or 1992?  Fair

09:44:01  2    enough?

09:44:38  3    A.   It's fair enough.

09:44:38  4    Q.   What we know is when you actually were a treating

09:44:44  5    oncologist out in the field, taxanes weren't yet on the market

09:44:48  6    for the treatment of breast cancer, correct?

09:44:50  7    A.   Well, you do know I was at the institute that developed

09:44:54  8    the taxanes.  So I'm extremely familiar with the

09:44:58  9    clinical trials and the clinical results, but I didn't, myself,

09:45:02  10   treat the patient.  That is correct.

09:45:04  11   Q.   Exactly.  So in your clinical experience, you never

09:45:09  12   prescribed Taxotere to a patient, correct?

09:45:14  13   A.   I may have done it in an investigational setting.  I can't

09:45:17  14   say 100 percent I've never treated a patient with Taxotere.

09:45:21  15   Q.   Doctor, you were asked these questions in your deposition.

09:45:25  16   Do you remember that?

09:45:27  17   A.   I don't.  I have a good memory, but I don't recall every

09:45:30  18   single sentence.  Did I say I did not?

09:45:33  19   Q.   That is correct.  You said you had never prescribed

09:45:35  20   Taxotere for a breast cancer patient, correct?

09:45:39  21   A.   I thought there was a caveat in that deposition that I may

09:45:42  22   have done it in an investigational setting, but that isn't the

09:45:45  23   same as prescribing it, I guess.

09:45:47  24   Q.   Just basic math.  You haven't treated a breast cancer

09:45:52  25   patient since 1991 or 1992, correct?

*OFFICIAL TRANSCRIPT*

09:45:55  1   A.    That is correct.

09:45:55  2   Q.    We know that Taxotere was not approved until 1996,

09:46:00  3   correct?

09:46:01  4   A.    That's correct.

09:46:01  5   Q.    You certainly are not coming in here offering any

09:46:07  6   criticisms of physicians that prescribed Taxotere to

09:46:10  7   breast cancer patients, correct?

09:46:12  8   A.    That's correct.

09:46:13  9        MR. MICELI:  Your Honor, I object to this line.  It's

09:46:15 10   outside the scope.  She's not a specific causation expert.

09:46:21 11   Dr. Tosti is that.

09:46:21 12        MR. STRONGMAN:  It goes to her background and

09:46:23 13   experience with the drug she's talking about.  It's only going

09:46:28 14   to be brief.

09:46:28 15        THE COURT:  I'm going to allow brief examination in

09:46:30 16   this regard.

09:46:30 17   EXAMINATION BY MR. STRONGMAN:

09:46:32 18   Q.    Doctor, you came in today, and you're talking about

09:46:36 19   causation, correct?

09:46:37 20   A.    That's correct.

09:46:37 21   Q.    But you would agree with me that -- despite your opinions

09:46:40 22   that you've offered in court today, you would agree with me

09:46:44 23   that Taxotere is not only a reasonable choice to use in a

09:46:49 24   chemotherapy regimen to treat breast cancer, but that it's a

09:46:53 25   very reasonable regimen, correct?

**OFFICIAL TRANSCRIPT**

09:46:55 1          MR. MICELI:  Same objection, Your Honor.

09:46:56 2          THE COURT:  I think we're now really going far afield

09:46:59 3 of what her direct testimony was and her qualifications.

09:47:03 4 EXAMINATION BY MR. STRONGMAN:

09:47:04 5 Q.   Now, Doctor, with regard to the opinions that you offered

09:47:07 6 today regarding causation, you would agree with me, Doctor,

09:47:14 7 that there have been cases of permanent hair loss reported with

09:47:19 8 Taxol, correct?

09:47:19 9 A.   Correct.

09:47:20 10 Q.   You would agree with me that there have been cases of

09:47:23 11 permanent hair loss reported with cyclophosphamide, correct?

09:47:31 12 A.   I actually don't have isolated cyclophosphamide in here,

09:47:35 13 unless it's pooled with Freites-Martinez's article.  But it's

09:47:49 14 captured in my table.

09:47:50 15 Q.   Well, Doctor, let me just ask the question again.  You

09:47:53 16 would agree that there have been cases of permanent hair loss

09:47:56 17 reported with cyclophosphamide, correct?

09:47:59 18 A.   I can't tell from the Freites-Martinez paper, to tell you

09:48:03 19 the truth, but if it was, it was in that paper.

09:48:07 20          MR. STRONGMAN:  May I approach the witness, Your Honor?

09:48:08 21          THE COURT:  Yes, you may.

09:48:28 22          THE WITNESS:  Oh, I'm sorry.  It is in the AC regimen,

09:48:31 23 so yes.

09:48:31 24 EXAMINATION BY MR. STRONGMAN:

09:48:31 25 Q.   So let me just ask the question again, so we have a clear

*OFFICIAL TRANSCRIPT*

09:48:35  1    reference.

09:48:35  2    A.    I'm sorry, I thought you were talking about monotherapy.

09:48:38  3    So my apologies.

09:48:39  4    Q.    Would you agree with me that there have been cases of

09:48:42  5    permanent hair loss reported with cyclophosphamide?

09:48:44  6    A.    Yes.  Yes.

09:48:44  7    Q.    Would you agree with me that there have been cases of

09:48:48  8    permanent hair loss reported with Adriamycin?

09:48:52  9    A.    Correct.

09:48:53  10   Q.    Would you agree with me that there have been cases of

09:48:57  11   permanent hair loss reported with the AC regimen?

09:49:03  12   A.    Well, now I am a little confused.  I was including the

09:49:07  13   cyclophosphamide in the anthracycline answer, with combo.

09:49:12  14   Q.    But you would agree with me that in the AC regimen combo,

09:49:15  15   there have been cases of permanent hair loss?

09:49:16  16   A.    Yes, I do agree.

09:49:17  17   Q.    You would agree with me that there have been cases

09:49:19  18   reported of permanent hair loss with the AC Taxol regimen,

09:49:24  19   correct?

09:49:25  20   A.    I believe that's captured in some of the cases I have on

09:49:32  21   the --

09:49:34  22   Q.    So the answer is yes?

09:49:35  23   A.    Yes.  I'd have to look at the specifics of the article,

09:49:42  24   but I believe those were in combo.

09:49:48  25   Q.    Now, you talked through a chart of literature that you

*OFFICIAL TRANSCRIPT*

09:49:59 1   reviewed; is that correct?

09:49:59 2   A.    That's correct.

09:50:00 3   Q.    Okay.  One of the things that you did was you searched the

09:50:06 4   literature, and you came up with these articles, and then you

09:50:09 5   counted the reports; is that correct?

09:50:10 6   A.    Well, I reviewed the articles.

09:50:13 7   Q.    Fair enough.

09:50:14 8         But then you counted the reports, correct?

09:50:16 9   A.    Yes.  I looked at the number of events that were reported

09:50:19 10  in those papers, so I accurately described what was in the

09:50:22 11  papers.

09:50:22 12  Q.    I think you explained that your search was -- I think you

09:50:26 13  called it *comprehensive*, but not exhaustive; is that correct?

09:50:29 14  A.    That's a correct description.

09:50:30 15  Q.    You certainly remember during your deposition you were

09:50:33 16  shown some articles that had reports with other drugs that you

09:50:37 17  had not found during your original search, correct?

09:50:40 18  A.    They handed me articles that I had not found on my

09:50:43 19  original search, but I read them in realtime and, after reading

09:50:48 20  them, decided one would have gone in, the others would have

09:50:55 21  not.  Two were actually incorrect and were corrected in the

09:50:58 22  literature.

09:50:59 23  Q.    I think you testified several times that the topic under

09:51:04 24  consideration was Taxotere, right?  That's what you've said

09:51:07 25  today multiple times, correct?

*OFFICIAL TRANSCRIPT*

1221

09:51:08  1    A.    Yes, that's my impression of why we're all here today.

09:51:10  2    Q.    You were laser focused on Taxotere, correct?

09:51:13  3    A.    Well, I was focused on issues relevant to Taxotere in the

09:51:17  4    setting of the treatments that breast cancer patients received.

09:51:21  5    So I looked at the regimens, if that's what you're asking.

09:51:25  6          MR. STRONGMAN:  May I approach, Your Honor?

09:51:26  7          THE COURT:  Yes, you may.

09:51:28  8    EXAMINATION BY MR. STRONGMAN:

09:51:41  9    Q.    Now, Dr. Feigal, one more question.  During your direct

09:51:48 10    examination with Mr. Miceli, you did not offer any opinions

09:51:53 11    about the overall exposure in the entire patient population for

09:51:59 12    each individual drug, correct?

09:52:00 13    A.    Well, I did talk about -- I thought I talked about the

09:52:05 14    cumulative dose for those papers.

09:52:07 15    Q.    Let me just ask it a different way.  You didn't offer any

09:52:11 16    opinions about how many patients worldwide were exposed to one

09:52:15 17    drug or another drug or another drug, correct?

09:52:17 18    A.    Worldwide?

09:52:19 19    Q.    Yes.

09:52:19 20    A.    No.

09:52:20 21    Q.    You didn't offer any opinions about that, correct?

09:52:22 22    A.    I didn't offer opinion on worldwide exposure.

09:52:25 23    Q.    Now, what I've handed you is the Crown poster, correct?

09:52:30 24    A.    Correct.

09:52:31 25    Q.    Crown is included in your list; is it not?

                              *OFFICIAL TRANSCRIPT*

09:52:35  1   A.   It is.

09:52:35  2   Q.   What we know about Crown is -- all you provided on your

09:52:43  3   chart was a number?

09:52:45  4   A.   That's true -- yes, that's true.

09:52:49  5   Q.   All right.  By the way, this was presented at the -- this

09:52:57  6   is a poster presentation, so this is the kind of document that

09:53:00  7   is presented at a conference, correct?

09:53:02  8   A.   Yeah.  It is true, actually, that -- I think this is the

09:53:07  9   poster where we couldn't figure out where it was presented.

09:53:10 10   Q.   But Crown is included in your chart, correct?

09:53:15 11   A.   Right.  I had both an abstract, where I know it was

09:53:18 12   presented, and a poster, where I tried to find out where it was

09:53:22 13   presented.  They are slightly different.  About five patients

09:53:25 14   different.

09:53:25 15   Q.   What we know is that when you prepared your original chart

09:53:28 16   before your deposition, Crown was not on it, correct?

09:53:31 17   A.   That's true.  My search did not find this particular

09:53:35 18   article.  That's true.

09:53:36 19   Q.   So when we showed up at your deposition, we handed you

09:53:39 20   this and said:  Look what you didn't find.  And you've now

09:53:43 21   included it, correct?

09:53:44 22   A.   That's correct.  I carefully reviewed it and agreed it

09:53:48 23   should be on my table.

09:53:48 24   Q.   So what we see when you really look at the data for Crown

09:53:53 25   is that -- it states that the overall incidence of permanent

*OFFICIAL TRANSCRIPT*

09:54:00  1   alopecia for patients receiving docetaxel was 15 percent.  You

09:54:03  2   see that?

09:54:03  3   A.   I see that.

09:54:05  4   Q.   It says Grade 2.  That's talking about the grade of

09:54:10  5   alopecia, correct?

09:54:11  6   A.   That's correct.

09:54:11  7   Q.   It says Grade 2, 3 percent, correct?

09:54:16  8   A.   That's correct.

09:54:16  9   Q.   Then it says the overall incidence of permanent alopecia

09:54:20 10   for patients receiving anthracyclines was 19 percent, correct?

09:54:25 11   A.   That's correct.

09:54:26 12   Q.   It says Grade 2, so the most severe permanent alopecia,

09:54:34 13   was 6 percent; is that right?

09:54:36 14   A.   That's correct.  You're reading that correctly.

09:54:38 15   Q.   Then next line says the overall incidence of permanent

09:54:42 16   alopecia for patients receiving paclitaxel -- and we know

09:54:46 17   that's Taxol, correct?

09:54:47 18   A.   That's correct.

09:54:47 19   Q.   That number is 13 percent, correct?

09:54:49 20   A.   That's correct.

09:54:50 21   Q.   For Grade 2 alopecia in that category, it lists 9 percent,

09:54:50 22   correct?

09:54:57 23   A.   That's correct.

09:54:57 24   Q.   So what you did was you just counted the cases, and you

09:55:01 25   said, because there were more patients on Taxotere in this

*OFFICIAL TRANSCRIPT*

09:55:07 1    study, it just shows up on your chart as a higher tabulation

09:55:11 2    for Taxotere, correct?

09:55:13 3    A.    That is true.  The arms are not equal.  This was not a

09:55:16 4    randomized study.

09:55:17 5    Q.    When you look, though, at how it's presented, what we see

09:55:21 6    is that the highest incidence of permanent alopecia for

09:55:30 7    patients receiving anthracycline -- or, pardon me, for patients

09:55:31 8    receiving one of these drugs was for anthracyclines, correct,

09:55:34 9    at 19 percent?

09:55:35 10   A.    Yes.  There were, I believe, 12 patients we're talking

09:55:41 11   about --

09:55:41 12   Q.    Correct.

09:55:42 13   A.    -- compared to 265 on the Taxotere arm.

09:55:46 14   Q.    You certainly would agree with me 19 percent is higher

09:55:49 15   than 15 percent, and it's higher than 13 percent, correct?

09:55:53 16   A.    But the reason why --

09:55:55 17   Q.    Doctor, can you focus on my question.

09:55:55 18        THE COURT:  I think you need to answer the question.

09:55:57 19        THE WITNESS:  It's not a yes-or-no question.  You have

09:55:59 20   to look at numbers as well as percentage.

09:56:02 21            But, yes, I do agree you're reading that

09:56:04 22   correctly.

09:56:04 23   EXAMINATION BY MR. STRONGMAN:

09:56:04 24   Q.    Doctor, you would also agree with me that the highest

09:56:15 25   percentage as reported here for Grade 2 permanent alopecia was

*OFFICIAL TRANSCRIPT*

09:56:20  1    9 percent with Taxol, correct?

09:56:24  2    A.    You're reading that correctly.   Yes.

09:56:26  3    Q.    We can also agree that the second highest Grade 2 alopecia

09:56:32  4    number is for anthracyclines, correct?

09:56:36  5    A.    You're reading that correctly.

09:56:38  6    Q.    Just, again, we have been over this a few times, but when

09:56:41  7    you read anthracyclines, that would include -- Mr. Miceli said

09:56:45  8    this -- would include drugs such as Adriamycin, correct?

09:56:48  9    A.    That's correct.   That's correct.

09:56:52 10    Q.    So with regard to the chart that you were shown -- well,

09:57:07 11    let me back up just a second.

09:57:09 12          We can certainly agree that Mr. Miceli showed you the

09:57:16 13    Freites-Martinez article, as well, correct?

09:57:19 14    A.    Yes, I have that up here now.

09:57:20 15    Q.    As we know, and as the jury saw yesterday, that paper

09:57:23 16    reported more cases with Taxol than with Taxotere, correct?

09:57:29 17    A.    That's correct.

09:57:29 18    Q.    When you look at that paper, Dr. Tosti is listed as an

09:57:37 19    author, correct?

09:57:37 20    A.    Yes.

09:57:37 21    Q.    So when you're listed on a paper, it means something,

09:57:42 22    correct?

09:57:44 23    A.    Sometimes.

09:57:44 24    Q.    Yes or no?

09:57:48 25    A.    Yes.   It should mean something, yes.

*OFFICIAL TRANSCRIPT*

09:57:50  1    Q.    Now, your chart.  So when Mr. Miceli showed you the chart,

09:57:54  2    it had a category for Taxotere, it had a category for Taxol,

09:58:03  3    and then it had, I think, a category for maybe taxanes that you

09:58:05  4    couldn't differentiate, and then it had a non-taxane, correct?

09:58:11  5    A.    That's correct.

09:58:11  6    Q.    Now, what you know, though, is that when you really dig

09:58:14  7    into the data, when you focus on the details of those papers,

09:58:17  8    almost all of those patients were on combination therapies,

09:58:17  9    correct?

09:58:24 10    A.    That's correct.

09:58:32 11          MR. STRONGMAN:  May I approach the witness, Your Honor?

09:58:45 12          THE COURT:  Yes, you may.

09:58:46 13    EXAMINATION BY MR. STRONGMAN:

09:58:50 14    Q.    Now, Doctor --

09:58:54 15    A.    I don't know what you handed me.  You'll have to explain

09:58:57 16    it.

09:58:57 17    Q.    Now, Doctor, what I have handed you --

09:59:03 18          MR. MICELI:  Your Honor, may we approach?

09:59:05 19          THE COURT:  Yes.

09:59:07 20          THE WITNESS:  I've never seen this before.

09:59:08 21          THE COURT:  Let's take it down.  Thank you.

09:59:08 22          (WHEREUPON, at this point in the proceedings, a

09:59:08 23    conference was held at the bench.)

09:59:09 24          THE COURT:  What is this?

09:59:09 25          MR. STRONGMAN:  What this is, is this is her listing of

*OFFICIAL TRANSCRIPT*

09:59:28 1    all the papers.  It shows how many patients in each one were

09:59:32 2    exposed to Cytoxan or Adriamycin, in addition to the Taxotere

09:59:38 3    or the Taxol.  That's all it is.

09:59:38 4            MR. MICELI:  Well, actually, Your Honor, I think --

09:59:40 5    one, I think that's incorrect.  I think this number would be

09:59:44 6    744, 744, 735.  The TAX316 study had about 1480 people.

09:59:44 7            MR. STRONGMAN:  The point is this --

09:59:53 8            MR. MICELI:  These numbers -- excuse me -- these

09:59:55 9    numbers are nowhere in any of their literature or any of their

10:00:00 10   documents that we've seen from the TAX316 study report.

10:00:02 11           If he came up with these from something internal

10:00:05 12   that we have never been able to look at, I don't know where

10:00:08 13   they came from.

10:00:09 14           MR. STRONGMAN:  So, Judge, what I did is, in TAX316,

10:00:13 15   this is just showing, in all their studies, that the fact that

10:00:16 16   these were combination regimens, and that she only counted the

10:00:21 17   Taxol one or the Taxotere one.  I'm just showing what the

10:00:25 18   numbers would be if she actually tabulated for each of the

10:00:28 19   drugs in the regimen.

10:00:30 20           Mr. Miceli is happy to cross-examine her on

10:00:32 21   anything he thinks is inaccurate.  It's just creating a chart

10:00:37 22   just like the chart they created.

10:00:42 23           MR. MICELI:  It's not just like the one we created

10:00:44 24   because the one we pulled is straight out of the clinical study

10:00:49 25   report.  These numbers --

*OFFICIAL TRANSCRIPT*

10:00:49  1          MR. STRONGMAN:  These are your studies.  You can go and

10:00:52  2     say I'm wrong.  You can show it and say, you're wrong.

10:00:55  3          MR. MICELI:  I'm not worried about what you have down

10:00:57  4     here.  I'm worried about what you have up top here and what

10:01:00  5     it's attributed to.

10:01:02  6               Where does that 45 come from?  Because every

10:01:03  7     patient in the TAX316 study received 60 milligrams of Cytoxan

10:01:07  8     and 600 milligrams of Adriamycin.  It's not 45.  It's the

10:01:11  9     entire population of that study that received it.  I can show

10:01:14 10     you the protocol, Your Honor, and the treatment on it.

10:01:17 11          MR. STRONGMAN:  This is fair cross-examination.

10:01:19 12          THE COURT:  She's your causation expert.  I'm going to

10:01:22 13     let him cross her on this.  I have no doubt that you're going

10:01:28 14     to revisit this and review this, as you should.

10:01:32 15               But, I mean, this is fair game.  This is an

10:01:35 16     expert.

10:01:35 17          MR. MICELI:  Thank you, Your Honor.  As long as I get

10:01:39 18     to revisit it on redirect.

10:01:41 19          THE COURT:  Of course, you do.

10:01:41 20          MR. MICELI:  Thank you.

10:01:41 21          (WHEREUPON, at this point in the proceedings, the bench

10:01:41 22     conference concluded.)

10:01:41 23          THE COURT:  Please proceed.

10:02:09 24     EXAMINATION BY MR. STRONGMAN:

10:02:09 25     Q.   Are you ready to proceed, Doctor?

                            *OFFICIAL TRANSCRIPT*

10:02:12  1     A.     Sure.

10:02:12  2     Q.     So what we've done here, just as an example, we know that,

10:02:16  3     like you said, in most of these studies, most of these patients

10:02:19  4     received more than one drug at the same time, correct?

10:02:22  5     A.     Right.

10:02:22  6     Q.     So if a patient received the TAC regimen, for example,

10:02:31  7     does that make sense, so Taxotere, Adriamycin, Cytoxan, you

10:02:35  8     only tabulated a count for the Taxotere when you did your

10:02:41  9     chart, correct?

10:02:44 10     A.     Since the question is, is there some differential between

10:02:50 11     Taxotere in combination versus non-Taxotere combinations,

10:02:57 12     that's exactly a scientific method you would use to try and

10:03:01 13     determine --

10:03:01 14     Q.     Doctor, just listen to my question.

10:03:03 15            THE COURT:  Carefully listen to the question,

10:03:05 16     Dr. Feigal.

10:03:06 17            THE WITNESS:  Okay.

10:03:07 18     EXAMINATION BY MR. STRONGMAN:

10:03:07 19     Q.     In your chart, when a patient received Taxotere,

10:03:12 20     Adriamycin, and cyclophosphamide, you only counted a tabulation

10:03:21 21     for the Taxotere, correct?

10:03:21 22     A.     Right, and --

10:03:21 23     Q.     Yes or no, Doctor?

10:03:22 24     A.     Yes.  It's a Taxotere regimen.  It was counted in the

10:03:25 25     Taxotere regimen arm.

*OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 10:03:26 | 1 | I just want to say -- |
| 10:03:27 | 2 | Q.   Doctor, if you could focus on the question. |
| 10:03:27 | 3 | A.   No, I do have to -- |
| 10:03:33 | 4 | THE COURT:  When I talk, everybody has to stop. |
| 10:03:36 | 5 | You have to answer the question.  You may explain |
| 10:03:38 | 6 | it, but you have to answer the question first. |
| 10:03:41 | 7 | THE WITNESS:  So the answer is yes.  May I explain it? |
| 10:03:45 | 8 | MR. STRONGMAN:  Mr. Miceli can have you answer any |
| 10:03:47 | 9 | questions that he has about your opinions. |
| 10:03:49 | 10 | MR. MICELI:  Your Honor, object -- |
| 10:03:49 | 11 | THE COURT:  I think she gets to explain her answer. |
| 10:03:53 | 12 | You may explain your answer. |
| 10:03:54 | 13 | MR. STRONGMAN:  Go ahead. |
| 10:03:54 | 14 | THE WITNESS:  Yeah.  The only reason I didn't put |
| 10:03:56 | 15 | Taxotere-containing regimen with the anthracycline and |
| 10:04:07 | 16 | cyclophosphamide is it doesn't fit on a column header. |
| 10:04:08 | 17 | So the implication is those are |
| 10:04:10 | 18 | Taxotere-containing regimens.  I wasn't trying to be |
| 10:04:13 | 19 | nontransparent.  I just can't fit all of those words on a |
| 10:04:17 | 20 | column. |
| 10:04:17 | 21 | THE COURT:  Okay.  Now, answer his questions. |
| 10:04:19 | 22 | EXAMINATION BY MR. STRONGMAN: |
| 10:04:20 | 23 | Q.   Doctor, I was certainly not trying to imply you weren't |
| 10:04:23 | 24 | being transparent. |
| 10:04:23 | 25 | A.   Okay. |

*OFFICIAL TRANSCRIPT*

1231

10:04:25  1   Q.    What I'm trying to say is that when you see a report that

10:04:28  2   has Taxotere, Adriamycin and cyclophosphamide -- are you with

10:04:34  3   me so far?

10:04:35  4   A.    Yes.

10:04:35  5   Q.    -- you put a one check mark for Taxotere, correct?

10:04:39  6   A.    In the Taxotere-containing regimen --

10:04:42  7   Q.    Correct.

10:04:42  8   A.    -- which I can't fit all the words on a column header.

10:04:45  9   Q.    But what you didn't do is say Taxotere one, Adriamycin

10:04:50 10   one, cyclophosphamide --

10:04:53 11   A.    That part is correct.

10:04:54 12   Q.    So if you look at these studies, and you look at all of

10:04:58 13   the medications that the patients were exposed to, and you add

10:05:02 14   them up, you can get numbers bigger than your 350-some number

10:05:12 15   that you got for Taxotere, correct, looking at the chart?

10:05:16 16   A.    You know what?  Since this is the first time I'm seeing

10:05:20 17   it, I'm not able to check your math.  So I can't -- I can't

10:05:24 18   just accept this out of hand.  I haven't been able to review it

10:05:28 19   and see if it's accurate.

10:05:30 20   Q.    Can you agree with me on some basic principles?

10:05:34 21   A.    I'll try.

10:05:35 22   Q.    400 is bigger than the number that you had in your chart

10:05:42 23   for Taxotere, correct?

10:05:43 24   A.    Is 405 bigger than 347?  I think everybody would agree,

10:05:48 25   yes.

*OFFICIAL TRANSCRIPT*

10:05:48   1   Q.   Very good.

10:05:51   2        We can agree that when you did your tabulation, you

10:05:56   3   didn't break it out that way, correct?

10:05:58   4   A.   I put it under the column header for the TAX combination

10:06:05   5   regimen.  That is correct.  That's how it was described.

10:06:08   6   That's how I listed it.

10:06:10   7   Q.   We can also agree that when you look at the right-hand

10:06:12   8   column, anthracyclines, that would include Adriamycin and some

10:06:17   9   other medications, like epirubicin, correct?  The category of

10:06:25  10   anthracyclines generally?

10:06:25  11   A.   I'm a little bit confused because, obviously, Adriamycin

10:06:29  12   is an anthracycline.  So you've listed this twice.

10:06:34  13   Q.   Yeah.  And what we've done is there are some studies where

10:06:36  14   you know exactly what the anthracycline is, and there are some

10:06:41  15   studies when it's general, you don't know which one of the

10:06:42  16   anthracyclines it is.

10:06:44  17   A.   Well, that would be impossible for TAX316 and GEICAM 9805.

10:06:50  18   You know exactly what they used.

10:06:51  19   Q.   Exactly.  It was Adriamycin, correct?

10:06:53  20   A.   But you listed it twice.

10:06:54  21   Q.   I'm not -- Doctor --

10:06:58  22        THE COURT:  You're really going to just have to answer

10:06:59  23   the questions that Mr. Strongman asks.  You can't ask him

10:07:04  24   questions.  He's going to ask the question.

10:07:07  25        MR. STRONGMAN:  Very good.

*OFFICIAL TRANSCRIPT*

10:07:07 1              THE WITNESS:  Fine.  Yes, you've listed it under, I

10:07:10 2      guess, Adriamycin, and you've also listed it under

10:07:12 3      anthracycline.

10:07:15 4      EXAMINATION BY MR. STRONGMAN:

10:07:15 5      Q.    Exactly.  So what we have is we have a category here that

10:07:21 6      has Adriamycin.  We know that Adriamycin is an anthracycline,

10:07:21 7      correct?

10:07:28 8      A.    Correct.

10:07:28 9      Q.    So, anthracycline is a broader category.  Adriamycin is a

10:07:39 10     more narrow category.  Are you with me so far?

10:07:42 11     A.    Yeah.

10:07:43 12     Q.    So in TAX316, as example, you found -- or you saw 29 in

10:07:49 13     the TAC arm?

10:07:49 14     A.    Correct.

10:07:50 15     Q.    You saw 16 in the FAC arm?  Are you with me?

10:07:55 16     A.    Yeah.

10:07:56 17     Q.    What's 29 plus 16?  It's 45, correct?  Yes?

10:08:05 18     A.    Yes.

10:08:09 19     Q.    All 45 of those patients would have been exposed to

10:08:14 20     Cytoxan, correct?

10:08:16 21     A.    Okay.

10:08:16 22     Q.    All 45 of those patients would have been exposed to

10:08:20 23     Adriamycin, correct?

10:08:21 24     A.    Correct.

10:08:21 25     Q.    We know in the FAC arm there were 16 exposed to the

*OFFICIAL TRANSCRIPT*

10:08:28  1    5-fluorouracil, correct?

10:08:35  2    A.    Correct.

10:08:35  3    Q.    We know that 45 were exposed to some type of

10:08:41  4    anthracycline, which was the Adriamycin, correct?

10:08:46  5    A.    Right.  I'm just confused why you listed it twice, but

10:08:49  6    that's okay.

10:08:50  7          THE COURT:  That's -- that's -- Mr. Strongman.

10:08:57  8          THE WITNESS:  I also don't see the 29 anywhere on this

10:08:59  9    chart.

10:09:00  10         THE COURT:  Doctor, you really just need to answer

10:09:04  11   Mr. Strongman's questions.

10:09:05  12   EXAMINATION BY MR. STRONGMAN:

10:09:15  13   Q.    Now I want to talk about TAX316 very briefly, Doctor.

10:09:51  14         Let me just ask one question.  I want to make sure I

10:09:54  15   understood your answer.  So this is the chart that you had

10:09:58  16   showed the jury with Mr. Miceli, correct?

10:10:03  17   A.    You know, I'm really sorry, I can't see that from here.

10:10:06  18   Q.    Do you have that one in front of you still?

10:10:06  19   A.    Well, I don't know what you're holding.

10:10:08  20         THE COURT:  The chart that Mr. Miceli gave you.

10:10:11  21   EXAMINATION BY MR. STRONGMAN:

10:10:13  22   Q.    Do you have that one in front you still?

10:10:15  23   A.    Yeah, yeah, yeah.

10:10:16  24   Q.    Did you prepare this chart yourself?

10:10:18  25   A.    Yes.

*OFFICIAL TRANSCRIPT*

10:10:18 1   Q.   You typed it up?

10:10:20 2   A.   Yes.  Well, they provided the visual for the trial, but I

10:10:23 3   provided the table.

10:10:24 4   Q.   The actual -- you actually typed up this table?

10:10:27 5   A.   Yes, this is the data I put together.

10:10:30 6       MR. MICELI:  Your Honor, I object to the form of the

10:10:30 7   question, asked and answered.

10:10:32 8       THE COURT:  Sustained.

10:10:32 9       MR. MICELI:  Thank you.

10:10:32 10  EXAMINATION BY MR. MICELI:

10:10:36 11  Q.   Doctor, if I understand what you said earlier, is that

10:10:38 12  when you put -- you wrote *Taxotere* here, correct?

10:10:40 13  A.   That's correct.

10:10:40 14  Q.   The reason that you didn't include the A and the C was

10:10:44 15  because it didn't fit in that cell; is that correct?

10:10:46 16  A.   Correct.

10:10:47 17  Q.   You didn't think about maybe making it a landscape

10:10:52 18  version, so you could include that information?

10:10:54 19  A.   I'm just saying in headers -- no, I didn't have a big

10:11:01 20  header.  It was a Taxotere, and it was implied these are

10:11:04 21  Taxotere regimens.  None of these are monotherapy.

10:11:22 22  Q.   So, Doctor, we can also agree that when you looked at the

10:11:28 23  TAX316 data, just like with the Taxotere arm, there were cases

10:11:34 24  of what you're calling irreversible alopecia in the

10:11:44 25  non-Taxotere arm, correct?

**OFFICIAL TRANSCRIPT**

10:11:44 1    A.    That's correct.

10:11:45 2    Q.    So, Doctor, my question to you is, for these -- there were

10:11:46 3    16 of them, correct?

10:11:47 4    A.    That's correct.

10:11:47 5    Q.    For those 16, was it the F that caused the permanent

10:11:59 6    alopecia, was it the A that caused the permanent alopecia, or

10:12:02 7    was it the C that caused the permanent alopecia?

10:12:06 8    A.    I just call it a non-taxane arm.

10:12:13 9    Q.    Well, Doctor, that wasn't my question.

10:12:15 10   A.    I didn't isolate the 16 according to which part of the

10:12:34 11   combo, that is correct.

10:12:35 12   Q.    Doctor, sitting here today, can you tell me that it was

10:12:38 13   the F that caused the permanent alopecia in 16, yes or no?

10:12:44 14   A.    Highly unlikely, because there is nothing in the

10:12:46 15   literature about the 5- FU.

10:12:48 16   Q.    Doctor, sitting here today, can you tell me, yes or no,

10:12:51 17   whether it was the A that caused the permanent alopecia in

10:12:53 18   those 16 patients?

10:12:54 19   A.    It could be either A or C or both.

10:12:57 20   Q.    And so you would agree with me that it could have been the

10:13:01 21   A, the C, or both, correct?

10:13:03 22   A.    It could have been both, right.

10:13:14 23   Q.    Now, Doctor, you also asked -- were asked some questions

10:13:26 24   about, I think, biologic plausibility, correct?

10:13:32 25   A.    That's correct.

*OFFICIAL TRANSCRIPT*

10:13:32   1    Q.    And mechanism of action, do you remember that?

10:13:34   2    A.    Yes.

10:13:34   3    Q.    And stem cells, do you remember that?

10:13:36   4    A.    Yes.

10:13:36   5    Q.    And I think you said you had quite a bit of -- quite a bit

10:13:42   6    of experience with stem cells, I think, was -- something along

10:13:45   7    those lines, right?

10:13:46   8    A.    Not specifically on hair stem cells, but on stem cell

10:13:51   9    research.

10:13:51  10    Q.    And when you were discussing your opinions with us, you

10:13:57  11    believed that the theory -- and I know it's a theory -- would

10:14:02  12    be that Taxotere damages stem cells in some fashion, correct?

10:14:06  13    A.    I think what I said in my depos and here is that the

10:14:12  14    hypothesis is that it damages stem cells and/or the signalling

10:14:18  15    between -- the communication.  So it may not affect the stem

10:14:23  16    cells directly.  It may affect the communication signals

10:14:26  17    between stem cells.  That is --

10:14:28  18    Q.    And I think?  I'm sorry.  Are you finished?  Go ahead.

10:14:30  19    A.    May I explain?

10:14:32  20    Q.    You may.  Certainly.

10:14:32  21    A.    That is in addition to the known mechanism of action in

10:14:36  22    terms of damaging hair cells and rapidly dividing cells.  So we

10:14:42  23    already know that Taxotere, as a cytotoxic chemotherapy, does

10:14:50  24    cause hair loss.  There is no question about that.  So it's on

10:14:53  25    top of what we already know about the product.

*OFFICIAL TRANSCRIPT*

10:14:55  1    Q.   Yeah.  And I want to break that down just a little bit.

10:14:59  2    So we know that Taxotere has an effect on rapidly dividing

10:15:02  3    cells, correct?

10:15:03  4    A.   It has an effect on -- correct.

10:15:05  5    Q.   And you would agree with me that all of the chemotherapies

10:15:12  6    we have been talking about today have an effect on rapidly

10:15:14  7    dividing cells, right?

10:15:15  8    A.   To some extent.

10:15:17  9    Q.   Now, with regard to the stem cell questions that you were

10:15:21 10    asked, I think you said that it has not been proven, correct?

10:15:25 11    A.   That is correct.

10:15:25 12    Q.   And I think you -- you would agree with me that there is

10:15:29 13    no proven mechanism of action with regard to chemotherapy and

10:15:38 14    permanent hair loss, correct?

10:15:38 15    A.   That's correct.  The criteria is just it has to be

10:15:41 16    plausible.  Not that it has to be proven.

10:15:43 17    Q.   And when you're testing out whether or not something is

10:15:47 18    plausible or not -- let me back up.  Let me ask that question a

10:15:51 19    different way.

10:15:51 20         If you want to know whether or not your plausibility

10:15:55 21    hypothesis is right, one thing you might want to do is get

10:15:59 22    data, correct?

10:16:00 23    A.   If it exists in the published literature.

10:16:04 24    Q.   Now, you are the expert that's been brought in here to

10:16:13 25    talk about biologic plausibility, and the plaintiffs in this

*OFFICIAL TRANSCRIPT*

10:16:17  1    case --
10:16:18  2         MR. MICELI:  I object, Your Honor, that's a
10:16:21  3    mischaracterization.  That's not what she was qualified for.
10:16:26  4    Biologic plausibility is part of what we talked about, but it
10:16:31  5    is not what she was qualified for as an expert specifically.
10:16:31  6         THE COURT:  Overruled.
10:16:34  7    EXAMINATION BY MR. STRONGMAN:
10:16:34  8    Q.    Dr. Feigal, you were brought in here to talk about
10:16:37  9    biologic plausibility, correct?
10:16:39 10    A.    As one of the criteria for causation.
10:16:41 11    Q.    And you talked about stem cells, correct?
10:16:44 12    A.    We mentioned stem cells as a possible biologic
10:16:47 13    plausibility mechanism.
10:16:49 14    Q.    And what we know is that the plaintiffs never gave you any
10:16:57 15    of the testing that was done on stem cells, correct?
10:16:59 16         MR. MICELI:  I object, Your Honor, outside the scope.
10:17:01 17    She's not a case-specific expert.  Can we approach?
10:17:06 18         THE COURT:  You can approach.
10:17:06 19         (WHEREUPON, at this point in the proceedings, there was
10:17:38 20    a conference held at the bench.)
10:17:38 21         MR. MICELI:  My concern here is that she is not
10:17:40 22    offering any case-specific opinions.  He's asking why didn't
10:17:43 23    you look at the stem cells reports?  She hasn't testified that
10:17:46 24    she's looked at them.  She talked about general causation,
10:17:50 25    biologic plausibility, and he wants to get into case specifics,

*OFFICIAL TRANSCRIPT*

10:17:54  1   and they are trying to drag this, you know --

10:17:58  2        THE COURT:  This is the problem.  I have limited the

10:18:02  3   stem cells as to this purpose.  And I don't want to open the

10:18:06  4   door that they were -- and I don't know how we get there with a

10:18:13  5   general causation expert and say there was only one stem cell

10:18:18  6   and --

10:18:18  7        MR. STRONGMAN:  Can I just say, have you seen any

10:18:21  8   testing on stem cells, and stop there?

10:18:22  9        MR. MICELI:  No.

10:18:22 10        THE COURT:  I think what you can ask is, did you see

10:18:27 11   any -- Ms. Earnest that the --

10:18:33 12        MR. MICELI:  (Speaking simultaneously) Your Honor, that

10:18:34 13   is case-specific causation.  This is not what she was brought

10:18:36 14   here for.  We purposefully did not give her those slides

10:18:40 15   because she is not a case-specific expert.

10:18:42 16             And what they do is they want to set up a general

10:18:45 17   and ask her case-specific questions and put the impression in

10:18:48 18   this jury's mind that she did something wrong or we did

10:18:52 19   something wrong with her.  That is absolutely prejudicial to

10:18:56 20   us.

10:18:56 21        MR. STRONGMAN:  But at the same time, if she's offering

10:18:58 22   a general opinion, testing that was done is relevant.

10:19:00 23        MR. MICELI:  No, it is not.  It is absolutely not.

10:19:02 24        THE COURT:  Wait.  Wait, wait.  I'm just trying to see

10:19:14 25   how -- if there is a mechanism to thread that needle, because

*OFFICIAL TRANSCRIPT*

10:19:19  1   then on redirect, he's going to be able to say would it mean

10:19:23  2   anything -- it doesn't mean anything.  But the problem is, if

10:19:26  3   that's --

10:19:28  4        MR. MICELI:  He's going to get to cross-examine

10:19:34  5   Curtis Thompson.  He did those slides on Monday.  That's the

10:19:36  6   appropriate witness --

10:19:37  7        MR. STRONGMAN:  When she comes in and mentions

10:19:40  8   stem cells, I feel like I should at least be able to just ask

10:19:43  9   whether she's seen any testing on it, yes or no.

10:19:45 10        THE COURT:  I think what you can ask her is -- yeah, I

10:19:48 11   think you can ask her, have you seen, not in -- any studies

10:19:52 12   that reveal this?

10:19:55 13        MR. MICELI:  He can ask generally about stem cells, but

10:19:56 14   he can't ask about Ms. Earnest --

10:19:58 15        MR. STRONGMAN:  (Speaking simultaneously) I'm going to

10:19:58 16   say, have you seen any testing that was done on stem cells, yes

10:20:00 17   or no?

10:20:00 18        MR. MICELI:  That's the objectionable part.

10:20:01 19        THE COURT:  I think it's appropriate for him to ask,

10:20:04 20   without saying, do you know that it was done, have you seen any

10:20:07 21   studies revealing any testing on stem cells?

10:20:10 22        MR. MICELI:  Any studies.  Any studies but not

10:20:12 23   Ms. Earnest's slides.

10:20:12 24        THE COURT:  That's what I just said.  Did you listen to

10:20:15 25   me?

**OFFICIAL TRANSCRIPT**

1242

| | |
|---|---|
| 10:20:15 | 1 |

        MR. MICELI:  I am.  I listen to you, Your Honor, but

the problem is when I hear Mr. Strongman --

        THE COURT:  Listen, would you stop talking.

        MR. MICELI:  Yes, ma'am.

        THE COURT:  You may ask if you've seen any studies that

have -- that verify that stem cell research that you did, any

studies on stem cells.

        MR. STRONGMAN:  Any studies regarding testing on stem

cells.  That's fair language?

        MR. MICELI:  You see, that's the splitting of the hair,

Your Honor.  Any testing on stem cells.  He wants to --

        THE COURT:  Any studies.

        MR. MICELI:  Published studies?

        THE COURT:  That's what I said.

        MR. MICELI:  But that's not what he repeated to you.

        THE COURT:  I think he gets it.

        MR. MICELI:  I'll be shooting up like a bottle rocket

if he goes over that line.

        THE COURT:  As will I.

            Ask the question, Mr. Strongman.

EXAMINATION BY MR. STRONGMAN:

Q.   Dr. Feigal, as it relates to your opinions in the case,

have you seen any studies related to the testing of stem cells?

A.   Be a little more specific.  Related to hair?

Q.   Correct.

                    *OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 10:21:41 | 1 | A.    No. |
| 10:21:43 | 2 | MR. STRONGMAN:  No further questions. |
| 10:21:45 | 3 | THE COURT:  Thank you. |
| 10:21:45 | 4 | MR. STRONGMAN:  This might be a good time to take a |
| 10:21:48 | 5 | recess, our morning recess.  Court will be at recess |
| 10:21:53 | 6 | 15 minutes. |
| 10:21:54 | 7 | THE DEPUTY CLERK:  All rise. |
| 10:22:00 | 8 | (WHEREUPON, at 10:22 a.m. the jury panel leaves the |
| 10:22:22 | 9 | courtroom.) |
| 10:22:22 | 10 | MR. MICELI:  15 minutes, Your Honor? |
| 10:22:24 | 11 | THE COURT:  15 minutes. |
| 10:25:07 | 12 | (WHEREUPON, at 10:22 a.m., the Court took a recess.) |
| 10:38:28 | 13 | THE DEPUTY CLERK:  All rise. |
| 10:39:27 | 14 | (WHEREUPON, at 10:39 a.m. the jury panel enters the |
| 10:39:38 | 15 | courtroom.) |
| 10:39:38 | 16 | THE COURT:  All jurors are present.  Court is back in |
| 10:39:42 | 17 | session.  You may be seated. |
| 10:39:44 | 18 | Dr. Feigal, I remind you that you're under oath. |
| 10:39:47 | 19 | Thank you.  Please proceed. |
| 10:39:50 | 20 | REDIRECT EXAMINATION |
| 10:39:50 | 21 | BY MR. MICELI: |
| 10:39:52 | 22 | Q.    Ready to proceed, Dr. Feigal? |
| 10:39:54 | 23 | A.    I am. |
| 10:39:54 | 24 | Q.    Are you here today to offer specific causation opinions |
| 10:39:57 | 25 | about Barbara Earnest and what caused her hair loss? |

***OFFICIAL TRANSCRIPT***

10:40:01 1    A.    No, I am not.

10:40:02 2    Q.    Now, you explained, when I asked you questions earlier,

10:40:09 3    about a scientific method you went through to come up with your

10:40:13 4    causation opinion?

10:40:14 5    A.    Correct.

10:40:14 6    Q.    Is that a recognized scientific method for doing so?

10:40:18 7    A.    Yes.

10:40:19 8    Q.    Now, Mr. Strongman showed you a chart.  Do you recall that

10:40:26 9    one?

10:40:27 10   A.    His chart?  Yes.

10:40:28 11   Q.    Yes.  Now, prior to coming into this court today, I think

10:40:33 12   you mentioned to the jury that you had been deposed?

10:40:36 13   A.    Correct.

10:40:36 14   Q.    On how many occasions have you been deposed?

10:40:40 15         MR. STRONGMAN:  Objection, outside the scope.

10:40:42 16         THE COURT:  Sustained.

10:40:42 17   EXAMINATION BY MR. MICELI:

10:40:44 18   Q.    In review of Mr. Strongman's chart, are you able to

10:40:47 19   discern whether this is the product of any scientific

10:40:50 20   methodology?

10:40:51 21         MR. STRONGMAN:  Objection, speculation.

10:40:54 22         THE COURT:  Overruled.  I'm going to allow it.

10:40:57 23         THE WITNESS:  I can answer?

10:40:58 24         THE COURT:  You may answer.

10:41:00 25         THE WITNESS:  Honestly, I can't tell what was done.

*OFFICIAL TRANSCRIPT*

10:41:05 1   It's the first time I'm seeing it, so I can't speculate what

10:41:08 2   the intent was, but I had trouble interpreting it.

10:41:12 3   EXAMINATION BY MR. MICELI:

10:41:14 4   Q.   Let me just do something over here.

10:41:26 5         In talking to you about his chart, Mr. Strongman went

10:41:32 6   over the TAX316 numbers on his chart with you, didn't he?

10:41:38 7   A.   He went over the TAX316 numbers I believe just for FAC.

10:41:45 8   Q.   But there was a TAC arm and a FAC arm, correct?

10:41:50 9   A.   Correct.

10:41:50 10  Q.   Both arms received A and C, correct?

10:41:54 11  A.   Correct.

10:41:55 12  Q.   Okay.  Now, what do you call that when you control for

10:41:59 13  those things?

10:42:01 14  A.   It's randomized and controlled.

10:42:03 15  Q.   What is the purpose of that?

10:42:06 16  A.   To isolate the effect of the chemotherapy you're trying to

10:42:11 17  evaluate.

10:42:11 18  Q.   Okay.  So when you do that, then -- I'm going to try to

10:42:16 19  speak loud enough for this microphone to hear me -- if you

10:42:21 20  control for them, you can take them out of both arms; is that

10:42:27 21  correct?

10:42:27 22         MR. STRONGMAN:  Objection, leading.

10:42:29 23         THE COURT:  Sustained.

10:42:31 24  EXAMINATION BY MR. MICELI:

10:42:35 25  Q.   Can controlling account for A and C?

*OFFICIAL TRANSCRIPT*

10:42:37 1  A.   Yes, you can control by having the identical A and C on

10:42:42 2  both arms.

10:42:42 3  Q.   Did they do that in TAX316?

10:42:45 4  A.   Yes.

10:42:45 5  Q.   They were doing that to investigate what drug?

10:42:49 6  A.   Taxotere, the drug that they are developing.

10:42:51 7  Q.   They were doing it to investigate Taxotere, right?

10:43:00 8  A.   That's correct.

10:43:00 9  Q.   What data was that applied to?  Well, what data did TAX316

10:43:13 10  investigate?

10:43:13 11  A.   TAX316 was investigating patients with breast cancer who

10:43:22 12  were node positive.  Is that your question?

10:43:23 13  Q.   Well, no.  Who sponsored that study?

10:43:29 14  A.   I'm sorry.  The sponsor of the study was Sanofi.

10:43:33 15  Q.   Sanofi's data?

10:43:34 16  A.   Correct.

10:43:35 17       MR. MICELI:  That's all I have, Your Honor.

10:43:39 18            Your Honor, may I have just a couple more

10:43:41 19  minutes?  Thank you.

10:43:42 20       THE COURT:  Yes.

10:43:43 21  EXAMINATION BY MR. MICELI:

10:43:46 22  Q.   I want to follow up on something else Mr. Strongman said.

10:43:50 23  He put up the number 16 here for you, did he not?

10:43:53 24  A.   He did.

10:43:53 25  Q.   That was a number in FAC.  29 in TAC.

**OFFICIAL TRANSCRIPT**

10:44:02  1    A.    Correct.

10:44:03  2    Q.    So there is a 13 -- there is a difference of 13?

10:44:10  3    A.    Correct.

10:44:11  4    Q.    If you divide 13 by 29 --

10:44:18  5          MR. STRONGMAN:  Objection, beyond the scope.

10:44:22  6          MR. MICELI:  -- you get 44 --

10:44:24  7          THE COURT:  Sustained.

10:44:27  8    EXAMINATION BY MR. MICELI:

10:44:28  9    Q.    Did Mr. Strongman ask you any questions --

10:44:30 10          MR. STRONGMAN:  Objection, Your Honor.

10:44:31 11          THE COURT:  Sustained.

10:44:32 12          MR. MICELI:  Thank you, Your Honor.

10:44:33 13          THE COURT:  You may step down, Dr. Feigal.

10:44:35 14                Please call your next witness.

10:44:38 15          MR. MICELI:  Your Honor, may I step out for a moment.

10:44:42 16    I want to speak with Dr. Feigal.

10:44:42 17          THE COURT:  Sure.

10:44:44 18          MR. MICELI:  Thank you.

10:44:44 19          MR. COFFIN:  Just one minute, Your Honor, just while I

10:45:18 20    get organized.  Dr. Bosserman, Dr. Linda Bosserman, is going to

10:45:21 21    be the plaintiff's next witness.

10:47:33 22          (WHEREUPON, there was a pause in the proceedings.)

10:47:33 23          THE COURT:  Dr. Bosserman, right here, please.

         24          THE DEPUTY CLERK:  Would you please raise your right

         25    hand.  Do you solemnly swear that the testimony which you are

                              *OFFICIAL TRANSCRIPT*

1    about to give will be the truth, the whole truth and nothing

2    but the truth, so help you God?

3         THE WITNESS:  I do.

4              **LINDA BOSSERMAN, MD, FACP, FASCO**

5     was called as a witness and, after being first duly sworn by

10:48:05  6     the Clerk, was examined and testified on her oath as follows:

10:48:05  7                    VOIR DIRE EXAMINATION

10:48:06  8    BY MS. MENZIES:

10:48:06  9    Q.    Good morning, Dr. Bosserman.

10:48:10 10    A.    Good morning.

10:48:10 11    Q.    Can you please state your name for the record?

10:48:13 12    A.    Linda Diana Bosserman, MD.

10:48:16 13    Q.    Introduce yourself to the jury.  What do you?

10:48:18 14    A.    Good morning.  My name is Linda Bosserman.  I'm a medical

10:48:22 15    oncologist specializing in breast cancer and value-based care.

10:48:25 16    Q.    Tell us a little bit more about what it means to be a

10:48:29 17    medical oncologist specializing in breast cancer.

10:48:31 18    A.    So, to be a medical oncologist, you train for 14 years,

10:48:36 19    through college and medical school and internship and

10:48:39 20    residency, become an adult doctor specialist.

10:48:43 21         Then you spend three years or more becoming very

10:48:46 22    knowledgeable about cancer specialty.

10:48:49 23         Then after I went into practice, over the years, as

10:48:53 24    breast cancer practice was very substantial, I focused

10:48:57 25    95 percent of my practice on breast cancer.  I continue to do

                          ***OFFICIAL TRANSCRIPT***

10:49:01 1    that today.

10:49:01 2    Q.   Can you please tell the jury a little bit more about what

10:49:06 3    you're referring to when you say value-based care?

10:49:08 4    A.   So I practice in California.  As you all know, healthcare

10:49:12 5    costs are escalating.  We are looking at how do we provide the

10:49:16 6    very best scientific care for every patient, the latest

10:49:21 7    effective therapy for every patient, and do it in a way that's

10:49:25 8    comprehensive and cost effective.

10:49:28 9         That's how we've had such great improvement in

10:49:31 10   outcomes over the years.  So I focus on having our entire

10:49:36 11   organization be able to provide the best treatment to every

10:49:39 12   patient where we are and now throughout the country.

10:49:41 13   Q.   Are you also a professor?

10:49:43 14   A.   I am an assistant clinical professor at City of Hope and

10:49:47 15   being reviewed for full professor.

10:49:50 16   Q.   Let's go ahead and take a look at your CV.

10:49:53 17        MS. MENZIES:  May it show it?

10:49:54 18        THE COURT:  Yes, you may.

10:49:55 19   EXAMINATION BY MS. MENZIES:

10:50:06 20   Q.   Dr. Bosserman, we have here your CV.  It says "Linda D.

10:50:11 21   Bosserman, MD," and then it's followed by a few letters after

10:50:14 22   that.  Can you please explain to the jury what those refer to?

10:50:17 23   A.   Yes.  Fellow of the American College of Physicians is an

10:50:21 24   honor that is applied for and chosen by your peers, that you

10:50:26 25   have achieved a level of recognition and high quality practice

*OFFICIAL TRANSCRIPT*

10:50:31  1   in internal medicine.  I got that in about 1992, as I remember.

10:50:35  2           Fellow of the American College -- fellow in the

10:50:38  3   American Society of Clinical Oncologist, ASCO, American Society

10:50:42  4   of Clinical Oncology, is the most prestigious oncology

10:50:48  5   organization, professional organization, for the United States

10:50:49  6   and actually the world.  To be a fellow there takes years of

10:50:54  7   work, volunteer work, recognition for leadership, for working

10:51:00  8   on committees, for your expertise.  I achieved that two years

10:51:05  9   ago.

10:51:05 10   Q.   Thank you.

10:51:08 11           Can you tell us about your educational background.

10:51:11 12   A.   So I spent four years at UC Berkeley, where I majored in

10:51:18 13   biochemistry, and graduated with highest honors, which is the

10:51:22 14   top 5 percent of the class.  I did that knowing since I was

10:51:25 15   seven I wanted to be a doctor.

10:51:27 16           When I finished medical school, I then went to

10:51:29 17   Stanford on, again, another full scholarship, for medical

10:51:34 18   school.  I went there because I was really interested in the

10:51:36 19   evolving science and the incredible hands-on care they had

10:51:40 20   there for their patients.

10:51:42 21           During my four years of medical school, I really

10:51:45 22   decided to become an oncologist because the doctors were so

10:51:48 23   caring and so good.

10:51:50 24           When I finished medical school, I stayed at Stanford,

10:51:54 25   and I did my internship and then two years of residency.  Then

**OFFICIAL TRANSCRIPT**

10:51:59  1    you're eligible to become board certified in internal medicine

10:52:03  2    as an adult medicine expert.  To become a subspecialist like a

10:52:10  3    medical oncologist, you have to first be an adult medical

10:52:12  4    specialist.

10:52:13  5         So I did that for three years.  Then I had a baby.

10:52:16  6         So I joined the faculty, and I worked on the faculty

10:52:20  7    at Stanford.  Then I went back to Harvard, and I spent three

10:52:25  8    years as a fellow, which is the advanced training to become

10:52:29  9    certified as an adult medical oncologist.

10:52:34 10    Q.   Thank you.

10:52:34 11         Tell us a little bit about your academic

10:52:37 12    appointments, please.

10:52:40 13    A.   So, again, when I finished my internal medicine residency,

10:52:43 14    I was appointed to the clinical faculty at Stanford.  I did

10:52:46 15    that until I moved to Boston to do my fellowship.  I had

10:52:51 16    planned a year off, but I went back to work as a clinical

10:52:54 17    faculty member.

10:52:55 18         After I finished my three years of fellowship, I went

10:52:58 19    into practice, and I was asked to be -- remain on the Harvard

10:53:02 20    faculty as a clinical instructor in medical oncology in Boston,

10:53:08 21    where I worked one day a week teaching and seeing patients and

10:53:12 22    overseeing care.

10:53:13 23         Then I came back to California, where I'm a native,

10:53:16 24    where my family is, moved near my family, and I was in private

10:53:20 25    practice for 26 years.

*OFFICIAL TRANSCRIPT*

10:53:23  1          Then in 2014, our entire practice became one of the
10:53:28  2  network sites for City of Hope, which is a NCI National Cancer
10:53:33  3  Institute designated comprehensive cancer center, very
10:53:37  4  prestigious.  I joined them in 2014, and at that time I became
10:53:45  5  an assistant clinical professor.
10:53:46  6          Two years ago, I was asked to move to the campus and
10:53:50  7  join the academic faculty and help the campus with their
10:53:52  8  breast cancer program, as well as the 31 network sites now that
10:53:56  9  we're coordinating.  I am being put up for full professor.
10:53:59 10  Q.   Okay.  You are, we said, a medically licensed doctor?
10:54:05 11  A.   Yes.  I have licenses both in California and
10:54:09 12  Massachusetts.  I held my Massachusetts license through those
10:54:13 13  years of training, and then I reactivated it a couple of years
10:54:16 14  ago because we're doing more national care of patients through
10:54:20 15  City of Hope.
10:54:20 16  Q.   Have you been involved in research?
10:54:22 17  A.   Yes.  So, I was involved in research first at Stanford,
10:54:26 18  where we really developed so many new treatments for cancer.
10:54:29 19  Then at Harvard, when I was there for the five years.
10:54:33 20          When I came back to practice, the private practice I
10:54:37 21  chose did community research.  So patients who were treated
10:54:40 22  close to home could participate in clinical trials and have
10:54:44 23  access to new drugs, so that they might be able to get the
10:54:47 24  standard therapy or perhaps a standard therapy with a new drug
10:54:51 25  and many other trials.

*OFFICIAL TRANSCRIPT*

10:54:53  1          So over my many years in practice since 1990, I was
10:54:57  2    participating in many trials, including through the UCLA
10:55:00  3    network, where we helped -- were founding members of that
10:55:04  4    network.  Also through US Oncology network.  In fact, at one
10:55:11  5    time we had 40 open clinical trials, and I was the head of our
10:55:14  6    clinical trial program for a number of years.
10:55:15  7    Q.   Have you been a consultant for pharmaceutical companies?
10:55:20  8    A.   I have.  So, over the years, I have been asked to sit on
10:55:22  9    advisory boards for development or education of people on
10:55:28 10    drugs.  I've written education decks for a couple companies.
10:55:31 11    I've been a key opinion leader.  I've participated in advisory
10:55:36 12    boards.  And I've given lectures for various drugs.
10:55:38 13    Q.   Let's talk a little bit more about your specific -- excuse
10:55:38 14    me.
10:55:43 15          MS. MENZIES:  Your Honor, may I publish this to the
10:55:47 16    jury?
10:55:48 17          THE COURT:  Yes, I don't think there was any objection.
10:55:52 18          MR. STRONGMAN:  No objection.
10:55:52 19          THE COURT:  Thank you.
10:55:52 20          MS. MENZIES:  Thank you.
10:55:55 21    EXAMINATION BY MS. MENZIES:
10:55:57 22    Q.   I would like to have us talk a little bit more about your
10:56:00 23    experience as a medical oncologist and your treatment in
10:56:02 24    breast cancer.  We've talked about a couple of these things
10:56:05 25    already, but let's look here.

                        *OFFICIAL TRANSCRIPT*

10:56:05  1          We have Dr. Bosserman's experience includes private
10:56:08  2   practice for 26 years; is that correct?
10:56:09  3   A.    Yes.  I continued for two more after that, yes.
10:56:13  4   Q.    The focus was on patients with breast cancer starting in
10:56:18  5   2003; is that correct?
10:56:19  6   A.    Yes.
10:56:19  7   Q.    You were selected by your peers as editor in chief of the
10:56:25  8   *Journal of Oncology Practice*.  Can you tell us a little bit
10:56:30  9   about that?
10:56:31 10   A.    Yes.  So I both was interested in writing and educating
10:56:34 11   and sharing knowledge, both with patients and with clinicians.
10:56:37 12   So I actually was an editor at the *Journal of Community*
10:56:42 13   *Oncology* for 14 years.
10:56:43 14          Then I've been a reviewer on various journals.  I've
10:56:46 15   been a reviewer for another major journal.  A year and a half
10:56:51 16   ago, the editor for *Journal of Oncology Practice*, which is the
10:56:56 17   clinical practice journal for ASCO, which I've said is our
10:56:59 18   major professional organization.  That journal focuses on
10:57:04 19   quality clinical practice and care delivery, so that we can
10:57:08 20   share knowledge with physicians on best practices in
10:57:12 21   standardizing and improving care for every patient.  Because
10:57:17 22   85 percent of patients are treated in the community; but,
10:57:19 23   whether you're academic or community, we're sharing best
10:57:22 24   practices.
10:57:22 25          And after a competitive interview process and -- I

*OFFICIAL TRANSCRIPT*

10:57:27 1    was selected to be the editor in chief.  This January, I

10:57:30 2    started a five-year and potentially ten-year commitment as the

10:57:35 3    editor in chief at the journal.

10:57:38 4    Q.    Thank you.

10:57:38 5          You participated -- you mentioned the research.  You

10:57:40 6    have participated in over 40 clinical trials with breast cancer

10:57:44 7    therapies?

10:57:44 8    A.    Yes.

10:57:46 9    Q.    You have spoken on breast cancer treatment to the

10:57:50 10   community and professional audiences for over 30 years?

10:57:52 11   A.    Yes, I have.

10:57:53 12   Q.    Do you have any idea how many times?

10:57:56 13   A.    Hundreds of times.  I think on my CV I listed over a

10:58:00 14   hundred invited speeches.  I mean, I've given talks at Duke.

10:58:04 15   I've given university talks.  I've given lay talks.  I've given

10:58:07 16   a lot of medical society talks in various states and various

10:58:11 17   professional organizations.

10:58:11 18   Q.    You're an active member at ASCO, correct?

10:58:16 19   A.    Yes.

10:58:17 20   Q.    Can you tell us a little bit about your involvement with

10:58:20 21   ASCO?

10:58:20 22   A.    So, again, the American Society of Clinical Oncology is

10:58:23 23   the most prestigious oncology organization for professionals.

10:58:27 24   We provide policy information.  We work with payors to

10:58:33 25   understand complicated treatments.  We have oversight,

*OFFICIAL TRANSCRIPT*

10:58:37  1    education.  We have the largest annual meeting attended by

10:58:41  2    45,000 people every year.  We have other sub-meetings attended

10:58:45  3    for between two and -- 2,000 patients -- 2,000 professionals

10:58:50  4    every year around the country and now internationally.

10:58:53  5         ASCO has committees on research, on practice

10:58:59  6    delivery, on patient support, on advocacy, on financial

10:59:03  7    support.  Every aspect of cancer treatment, there is committees

10:59:07  8    and oversight run by a board of directors.

10:59:09  9         I have volunteered on many of the committees over the

10:59:13 10    years, including the clinical research committee for eight

10:59:16 11    years.  I've overseen the guideline -- if there are guidelines

10:59:20 12    written, then there is a group of clinicians in the committee

10:59:24 13    that help review and make sure the wording is correct and the

10:59:26 14    information is clear and correct before they are finalized.

10:59:29 15    I've also served on the guideline committee for certain drugs

10:59:35 16    in breast cancer.

10:59:36 17    Q.   You've spoken at an ASCO conference in the last couple

10:59:41 18    weeks; is that right?

10:59:41 19    A.   I have.  So I was elected to the board of directors by the

10:59:45 20    United States election.  I served for four years.

10:59:48 21         Then I've also been involved, again, in this clinical

10:59:52 22    practice conference that we have annually.  I've been on the

10:59:56 23    steering committee.  Last year, I co-chaired it.  A week and a

11:00:00 24    half ago, I was the chair of the meeting where we bring all the

11:00:02 25    practical aspects of how do we do -- how do we provide the best

*OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 11:00:09 | 1 | quality care to patients in the community. |
| 11:00:10 | 2 | We have several topics:  Value, pharmaceuticals, |
| 11:00:15 | 3 | treatment.  All of those things get covered at the conference. |
| 11:00:18 | 4 | Q.   All right.  Is it correct that you have over a hundred |
| 11:00:22 | 5 | peer-reviewed publications, in addition to reviews, abstracts, |
| 11:00:26 | 6 | poster presentations? |
| 11:00:26 | 7 | A.   That is true. |
| 11:00:30 | 8 | MS. MENZIES:  Your Honor, at this time the plaintiffs |
| 11:00:31 | 9 | would like to tender as an expert in the -- Dr. Bosserman as an |
| 11:00:34 | 10 | expert in the fields of breast cancer diagnosis, breast cancer |
| 11:00:41 | 11 | treatment and the management of breast cancer treatment, |
| 11:00:46 | 12 | treatment options and guidelines for breast cancer, and the |
| 11:00:50 | 13 | standard of care for physicians for informing patients through |
| 11:00:55 | 14 | the decisionmaking process. |
| 11:00:56 | 15 | MR. STRONGMAN:  Should we approach? |
| 11:00:56 | 16 | THE COURT:  I believe so. |
| 11:00:56 | 17 | (WHEREUPON, at this point in the proceedings, a |
| 11:01:20 | 18 | conference was held at the bench.) |
| 11:01:20 | 19 | MS. MENZIES:  I've taken that right from the MIL, |
| 11:01:29 | 20 | Your Honor. |
| 11:01:30 | 21 | THE COURT:  That's right, the guidelines.  Yeah, she |
| 11:01:33 | 22 | can't talk about the informed consent process. |
| 11:01:35 | 23 | MS. MENZIES:  She can talk about it -- it's right |
| 11:01:38 | 24 | there.  She can talk about it generally, just not how it went |
| 11:01:43 | 25 | through with Dr. Carinder -- |

**OFFICIAL TRANSCRIPT**

11:01:43 1       THE COURT:  The guidelines, what they are, what they

11:01:47 2  require.  She can testify to the standard of care for

11:01:48 3  physicians for informing patients through the decisionmaking

11:01:53 4  process.  She cannot, however, testify about the

11:02:07 5  complications --

11:02:07 6       MR. STRONGMAN:  There's obviously been a lot of

11:02:10 7  conversation about standard of care, too, so I'm just not quite

11:02:12 8  sure where that's going, but --

11:02:12 9       THE COURT:  We're going to deal with standard of care.

11:02:16 10      MS. MENZIES:  We're going to talk on standard of care

11:02:20 11 within the treatment regimens, that those are all based on

11:02:23 12 standards of care generally.

11:02:24 13      THE COURT:  I think she can do that.  She can say yes,

11:02:27 14 it's the standard of care, how this process works in the

11:02:32 15 diagnosis of breast cancer.

11:02:33 16          I'm not going to let her say the doctor needs to

11:02:37 17 do -- informed consent process.

11:02:40 18      MS. MENZIES:  She was going to describe the informed

11:02:44 19 consent process generally.

11:02:45 20      MR. STRONGMAN:  But we have a specific informed consent

11:02:48 21 process in the case already.

11:02:54 22      THE COURT:  You can talk in general.  I'm just going to

11:02:56 23 watch it very, very, very carefully.

11:02:58 24      MS. MENZIES:  I just wanted to make sure we were --

11:03:01 25      THE COURT:  No, no, I understand.  I just thought you

                              *OFFICIAL TRANSCRIPT*

11:03:03 1    were going to talk about -- I'm going to be watching you.

11:03:05 2    Thank you.

11:03:05 3              MS. MENZIES:  Thank you.

11:03:05 4              (WHEREUPON, at this point in the proceedings, the bench

11:03:07 5    conference concluded.)

11:03:07 6              THE COURT:  The Court is going to accept Dr. Bosserman

11:03:26 7    as an expert in the fields of breast cancer diagnosis, breast

11:03:30 8    cancer treatment, management of breast cancer treatment,

11:03:34 9    treatment options and guidelines for breast cancer, and

11:03:38 10   generally the care physicians provide for informing patients

11:03:47 11   through the decisionmaking process.

11:03:47 12             MS. MENZIES:  Thank you, Your Honor.

11:03:49 13             THE COURT:  Qualified to render opinions in those

11:03:51 14   areas.  Please proceed.

11:03:51 15             MS. MENZIES:  Thank you.

11:03:51 16                        DIRECT EXAMINATION

11:03:51 17   BY MS. MENZIES:

11:03:56 18   Q.   Dr. Bosserman, can you please explain the various stages

11:03:58 19   of breast cancer?

11:03:59 20   A.   Okay.  When we think about treating breast cancer, we ask:

11:04:03 21   Where is it now?  We divide it generally into four categories.

11:04:08 22   Of course, there is a lot of subcategories.

11:04:10 23             In general, there are four stages.  Stage I is a

11:04:15 24   tumor just in the breast that's small, under an inch.

11:04:21 25             Stage II can be a breast cancer in the breast up to

**OFFICIAL TRANSCRIPT**

11:04:24  1   five inches and/or in the lymph nodes, depending on which

11:04:31  2   version we look at.  There are national staging guidelines.

11:04:35  3           Stage III is a much larger local cancer, large in the

11:04:38  4   breast and/or could have a lot of local lymph nodes.

11:04:43  5           Stage I, II and III are considered early

11:04:45  6   breast cancer and are treated with curative intent.

11:04:51  7           Stage IV breast cancer is when there is metastasis

11:04:54  8   anywhere.  It's kind of like a little bit pregnant.  If your

11:04:57  9   bone metastasis, one, or liver or lung or the other places it

11:05:02 10   could go, so any spread outside of the region is considered

11:05:06 11   stage IV.

11:05:07 12           That we treat to improve the quality and length of

11:05:10 13   life.

11:05:10 14   Q.   Are there treatment guidelines for the treatment of early

11:05:21 15   stage breast cancer?

11:05:21 16   A.   Yes.  Partly why I specialized in breast cancer starting

11:05:25 17   in 2003 is our treatment options have expanded.  They're very

11:05:29 18   specific for, not only the stage of breast cancer, but the

11:05:33 19   biology types within that.  With that -- by that, we mean

11:05:37 20   receptors and something about the gene mutations, which we'll

11:05:42 21   talk about.

11:05:42 22           So guidelines were developed to talk about what is

11:05:49 23   the best treatment of the many things, surgery, radiation,

11:05:54 24   chemotherapy, endocrine therapy, targeted therapy, what

11:05:57 25   combination is right for patients with certain types of

*OFFICIAL TRANSCRIPT*

11:05:59  1    stage I.  What about stage IIA, IIB, IIIA, IIIB, IIIC, IV?
11:06:08  2    Because we now personalize the treatment recommendations for
11:06:11  3    each patient based on their stage and the biology of their
11:06:15  4    disease.
11:06:15  5    Q.    Can you explain to us what the NCCN Guidelines are?
11:06:23  6    A.    So NCCN, the National Comprehensive Cancer Center Network,
11:06:27  7    came together over 25 years ago.  As we were privileged to have
11:06:31  8    all of these new treatments that could help patients live
11:06:34  9    longer and hopefully better, 19 academic centers got together,
11:06:41 10    including City of Hope, where I work, was one of the founding
11:06:44 11    members of that organization.
11:06:45 12          It is still to this day the most prestigious
11:06:52 13    organization setting guidelines for the treatment of cancers
11:06:54 14    and all their subgroups and the different aspects, whether it's
11:06:59 15    surgery, radiation, chemotherapy, hormonal therapy, targeted
11:07:07 16    therapy, supportive therapy.  All of those are in the
11:07:10 17    guidelines.  They are available at no cost to physicians, and
11:07:13 18    there are patient handouts that can go with it that are written
11:07:16 19    specifically for patients that follow along the professional
11:07:20 20    guidelines.
11:07:21 21          So that organization oversees disease committees.
11:07:27 22    So, for instance, there is a breast committee.  A City of Hope
11:07:29 23    faculty member has been on that committee since inception, has
11:07:36 24    been on it or led it.
11:07:36 25          That committee meets regularly.  That committee

*OFFICIAL TRANSCRIPT*

| | |
|---|---|
| 11:07:41 1 | reviews any new information.  It reviews the guidelines for |
| 11:07:43 2 | treatment.  It then recommends guidelines.  As we learn more |
| 11:07:47 3 | and more about staging and biology subtypes, it starts |
| 11:07:54 4 | differentiating page after page after page of what the |
| 11:07:57 5 | different treatment options are to be considered and discussed. |
| 11:08:00 6 | When it comes to therapies like chemotherapy, it will |
| 11:08:04 7 | specifically discuss what we call regimens, or combinations of |
| 11:08:08 8 | single agents, when to use them, and even what doses and |
| 11:08:12 9 | schedule to use. |
| 11:08:13 10 | Q.   Are you aware of what stage of breast cancer |
| 11:08:19 11 | Barbara Earnest had? |
| 11:08:20 12 | A.   I am.  I reviewed her records.  She had stage IIA |
| 11:08:24 13 | breast cancer that was hormone-sensitive, HER2, which is a gene |
| 11:08:35 14 | mutation.  She did not have abnormalities in that area.  She |
| 11:08:35 15 | had one small lymph node, about a half an inch.  She had a |
| 11:08:39 16 | tumor that was just under one inch inside -- in the breast. |
| 11:08:49 17 | MS. MENZIES:  Plaintiffs would like to offer into |
| 11:08:50 18 | evidence Plaintiff's Exhibit 1878.  These are the NCCN |
| 11:08:54 19 | Guidelines for Adjuvant Chemotherapy in Early Stage |
| 11:08:58 20 | Breast Cancer. |
| 11:08:58 21 | MR. STRONGMAN:  No objection, Your Honor. |
| 11:09:04 22 | THE COURT:  Let it be admitted. |
| 11:09:04 23 | (WHEREUPON, Plaintiff's Exhibit 1878 was admitted.) |
| 11:09:04 24 | MS. MENZIES:  May I approach, Your Honor? |
| 11:09:07 25 | THE COURT:  Yes, you may. |

*OFFICIAL TRANSCRIPT*

11:09:25  1           MS. MENZIES:  May I publish it to the jury?

11:09:26  2           THE COURT:  Yes, you may.

11:09:26  3   EXAMINATION BY MS. MENZIES:

11:09:26  4   Q.   Dr. Bosserman, we're looking at Plaintiff's Exhibit 1878.

11:09:30  5   Can you identify this for us?

11:09:32  6   A.   Yes.  This is one of the standard pages of the NCCN

11:09:36  7   Guidelines for breast cancer.  You'll see it has a Version 2

11:09:38  8   that came out in 2011.  This is one of the pages that describes

11:09:48  9   using chemotherapy, either before surgery, which we call

11:09:51 10   neoadjuvant, or after surgery, which we call adjuvant, or in

11:09:55 11   addition to.  That's what adjuvant means.

11:09:57 12           There are two columns.  You might remember I

11:10:02 13   mentioned her early two, a very strange name, but it describes

11:10:06 14   the gene that every one of us has on our 17th chromosome.  For

11:10:12 15   about 20 percent of breast cancer patients, there are

11:10:15 16   abnormalities in it, multiplications that make it more

11:10:18 17   sensitive to other treatment.  That's the category on the

11:10:21 18   right.

11:10:22 19           Trastuzumab is a specific drug for women that have

11:10:27 20   abnormalities in that gene.  We're not talking about that whole

11:10:31 21   category of patients today.  We're talking about, on the left,

11:10:35 22   for patients that have hormone sensitive --

11:10:40 23           THE COURT:  Dr. Bosserman, would you please -- because

11:10:42 24   I want to -- you know, you're saying to the left, to the right,

11:10:46 25   and I have to -- you can pick up a pencil and just show us

                          *OFFICIAL TRANSCRIPT*

11:10:51  1    which one you're talking about.

11:10:54  2          THE WITNESS:  Can I write here?

11:10:55  3          THE COURT:  You may.  That might help, because you were

11:10:56  4    just saying to the right and to the left.  I thought, are we

11:11:00  5    looking at right or left?

11:11:01  6          THE WITNESS:  If I write on here, I think that will

11:11:01  7    help.

11:11:01  8          THE COURT:  Okay.

11:11:02  9    EXAMINATION BY MS. MENZIES:

11:11:02 10    Q.    You could write on the top HER2 positive above

11:11:19 11    Trastuzumab.  That's HER2 positive.

11:11:20 12    A.    That's not what we're talking about.  On the left are for

11:11:26 13    regimens that are HER2 negative.

11:11:29 14    Q.    Just cross through the second side, the right side?

11:11:34 15    A.    Yes.  These are the ones for patients that are HER2

11:11:39 16    negative.  There is not an abnormality in that gene.

11:11:44 17          These are the list of what's called *Category 1*

11:11:49 18    *treatments*.  Each of these have scientific evidence in

11:11:53 19    appropriate high-quality trials reviewed by the national

11:11:58 20    leaders in breast cancer across our country.  They are from

11:12:03 21    Memorial Sloan Kettering, from Dana Farber, from M.D. Anderson,

11:12:06 22    from City of Hope, and other national cancer center experts.

11:12:11 23    These are considered the best options for patients who want to

11:12:15 24    decrease the risk of recurrence and get chemotherapy.  And as

11:12:20 25    you noticed, there are 13 options.

                                *OFFICIAL TRANSCRIPT*

11:12:23  1   Q.   Okay.  Let's talk about, if you would, Doctor, first the
11:12:27  2   options that include -- am I doing that?  The options that
11:12:27  3   include docetaxel or Taxotere.
11:12:39  4   A.   So if we start from the top.  The first regimen, TAC --
11:12:45  5   and we have these pneumonics we use -- includes docetaxel,
11:12:51  6   Adriamycin or doxorubicin, and cyclophosphamide.
11:12:55  7            And you might notice that we use brand name, and for
11:13:00  8   every brand name there is a generic name.  So docetaxel is the
11:13:04  9   generic name for Taxotere.  They are one in the same.
11:13:11 10            When we say *Adriamycin*, doxorubicin is the generic.
11:13:15 11            And cyclophosphamide, the main brand name was
11:13:19 12   Cytoxan.  So sometimes we mix those up.  We need to make a
11:13:21 13   chart.  They are the same thing.
11:13:22 14   Q.   Okay.  And then what's the next dose there that includes
11:13:27 15   docetaxel or Taxotere?
11:13:28 16   A.   The next one would be TC, which is docetaxel and
11:13:34 17   cyclophosphamide.  It's TC because it's Taxotere and
11:13:39 18   cyclophosphamide.
11:13:39 19            The next regimen will be the FEC followed by T.  So
11:13:51 20   that is 5-FU, or fluorouracil, epirubicin, which is another
11:14:02 21   anthracycline, and cyclophosphamide followed by the docetaxel.
11:14:13 22   Right above that, the AC followed by docetaxel, that one
11:14:14 23   doesn't have it.  The two above it.
11:14:16 24            THE COURT:  You can use the pen now if you need to.
11:14:20 25   EXAMINATION BY MS. MENZIES:

                         *OFFICIAL TRANSCRIPT*

11:14:20  1    Q.    Let me catch us up here real quick.

11:14:27  2    A.    That one, and the TC.  And then the fourth one down, AC

11:14:35  3    followed by docetaxel.  So that would be Adriamycin,

11:14:45  4    cyclophosphamide, followed by docetaxel every three weeks.

11:14:49  5    Those are the four regimens with docetaxel.

11:14:49  6    Q.    I'm going to put Taxotere here.  Four; is that right?

11:14:58  7    A.    Four regimens that are recommended under Category 1.

11:15:02  8    Q.    Can you go through the regimens that do not include

11:15:05  9    docetaxel or Taxotere?

11:15:06 10    A.    Yes.  So the first would be the dose-dense AC followed by

11:15:12 11    paclitaxel, which the brand name is Taxol.

11:15:16 12          The second would be AC followed by weekly paclitaxel,

11:15:21 13    which is also weekly Taxol.

11:15:25 14          The next one down, right there, AC followed by weekly

11:15:29 15    Taxol.

11:15:30 16          Then it would be FAC or CAF, that's fluorouracil, an

11:15:30 17    anthracycline, and cyclophosphamide, the top regimen.

11:15:41 18          The next one would be the same using epirubicin

11:15:46 19    instead of doxorubicin.

11:15:49 20          The next is CMF, cyclophosphamide methotrexate

11:15:56 21    fluorouracil.

11:15:56 22          The next one is EC, just epirubicin and

11:15:56 23    cyclophosphamide.

11:16:01 24          And the next is a sequence using anthracycline alone,

11:16:08 25    followed by Taxol alone, followed by cyclophosphamide alone,

*OFFICIAL TRANSCRIPT*

11:16:10  1    each given every two weeks, the ATC.

11:16:14  2            And the last one is FEC, again, fluorouracil,

11:16:25  3    epirubicin, cyclophosphamide followed by weekly Taxol.

11:16:30  4    Q.   And did I miss AC above?

11:16:33  5    A.   Yes, thank you.  Yes, AC alone, just anthracycline and

11:16:43  6    Cytoxan alone.

11:16:44  7    Q.   Can you count those for us and tell us how many regimens

11:16:45  8    did not include Taxotere or docetaxel?

11:16:48  9    A.   Nine regimens under the Category 1 recommended options for

11:16:53 10    consideration, they're all shown to be effective.  No Taxotere

11:16:59 11    are nine regimens.

11:17:00 12    Q.   Let's take a look at the second page of the NCCN

11:17:13 13    Guidelines, please.  It looks like -- what are we looking at

11:17:23 14    here?

11:17:23 15    A.   So as I mentioned, we have those pneumonics, TAC and FAC

11:17:27 16    and FEC, and actually they each translate, not just to drugs,

11:17:33 17    but to specific doses of drugs, their schedule, and the number

11:17:38 18    of times they are given, based on the clinical trials that have

11:17:41 19    shown their efficacy.  So this is them specifying exactly how

11:17:46 20    each of those drugs are given, in which dose, and how many

11:17:51 21    times.

11:17:51 22    Q.   Can you please explain to the jury what combination

11:17:56 23    treatment and sequential treatment mean?

11:17:59 24    A.   Okay.  So for a number of years going back to my earliest

11:18:05 25    days in oncology, we knew that giving drugs together could be

*OFFICIAL TRANSCRIPT*

11:18:10  1    more effective, but as you give more drugs at the same time, it
11:18:14  2    obviously has a lot more side effect.
11:18:16  3            As we began to get great results -- and the death
11:18:20  4    rates from breast cancer have come down almost 40 percent in
11:18:23  5    the last 20 years from early detection as well as better
11:18:28  6    therapies -- we began to realize that instead of giving all of
11:18:33  7    them on one day, there were ways to sequence either a drug
11:18:36  8    alone or some combination in sequence could give you equal
11:18:42  9    efficacy, sometimes better, but less toxicity.
11:18:45 10            So, it became an option when you have multiple
11:18:49 11    different ways of giving the drugs that have been proven in
11:18:53 12    clinical trials, those become options for the patients, whether
11:18:58 13    given altogether or whether given in sequence.  And this is
11:19:03 14    specifying the different ways why these regimens are there.
11:19:06 15    Q.    Again, are all these regimens acceptable options for the
11:19:11 16    treatment of early-stage breast cancer in the adjuvant setting?
11:19:12 17    A.    They are not just acceptable; they are Category 1 under
11:19:15 18    the NCCN, which means they have the highest clinical evidence
11:19:18 19    of efficacy.
11:19:19 20    Q.    Those little numbers after each of the treatments, can you
11:19:24 21    tell us what those are?
11:19:25 22    A.    So the first number after the name of the regimen is the
11:19:28 23    major reference in the literature that supported the science of
11:19:34 24    the efficacy that also would have the safety with it.  It was
11:19:38 25    based on putting this on the regimen.  You can go look at that

*OFFICIAL TRANSCRIPT*

11:19:42  1    reference and read it.

11:19:43  2    Q.   All right.  And each of these have references that are

11:19:47  3    science based, correct?

11:19:48  4    A.   They are all science -- evidence based, yes.

11:19:51  5    Q.   Can you tell the jury what cumulative dosing means?

11:19:55  6    A.   Cumulative dose means -- when we order a regimen, it means

11:20:01  7    we have these alphabet soups of TAC or FAC and they are given a

11:20:07  8    number of times.

11:20:08  9         When we look at the overall, whether you got four

11:20:11 10    treatments or eight treatments or 16 treatments, what was the

11:20:14 11    total dose that the patient got for that cancer, and that's

11:20:19 12    called the *cumulative dose*.

11:20:20 13         And the expressed doses of chemotherapy in different

11:20:24 14    ways for different drugs, but most of these are expressed in

11:20:33 15    milligrams, the actual milligrams of the drug, per meters

11:20:34 16    squared.  And meters squared is about the patient, but it's

11:20:36 17    standardized for every patient.

11:20:37 18    Q.   Can you explain for us using this chart what the

11:20:40 19    cumulative dose was for each of the regimens that included

11:20:44 20    Taxotere or docetaxel, please?

11:20:46 21    A.   Yes.  Should we highlight those first?

11:20:50 22         That would be the TAC regimen, the TC regimen, right

11:20:56 23    down below.  Find them all.  The second column bottom, AC

11:21:04 24    followed by docetaxel.  And then to the right, the last column,

11:21:10 25    the third one down, FEC followed by docetaxel.

*OFFICIAL TRANSCRIPT*

11:21:15  1            So let's look at each of these.  So TAC chemotherapy
11:21:20  2    involves giving all three drugs once -- on one day every
11:21:24  3    three weeks for six treatments.  The docetaxel is given at
11:21:28  4    75 milligrams per meters squared.  When you give it over six
11:21:34  5    treatments, the total cumulative dose is 450 milligrams per
11:21:41  6    meters squared of docetaxel, so that's 450 milligrams per
11:21:46  7    meters squared.
11:21:47  8    Q.    These are the cumulative doses?
11:21:50  9    A.    Milligrams per meters squared cumulative.
11:21:53 10    Q.    Okay.  Next.
11:22:01 11    A.    In the TC regimen, that's given for four cycles.  Taxotere
11:22:09 12    and Cytoxan or cyclophosphamide is given on one day every
11:22:13 13    three weeks for four treatments.  So the Cytoxan at
11:22:16 14    75 milligrams per meters squared for four treatments gives you
11:22:20 15    a cumulative dose of 300 milligrams per meters squared.
11:22:26 16    Q.    Okay.  Next, please.
11:22:30 17    A.    The AC followed by docetaxel, because we give them in
11:22:35 18    sequence, we're allowed to give -- we have been shown the
11:22:39 19    efficacy and safety is best with the doxorubicin at
11:22:44 20    100 milligrams per meters squared.  That's given four cycles of
11:22:47 21    AC followed by four cycles of docetaxel at 100 per meters
11:22:54 22    squared.  So 100 per meters squared times the four cycles would
11:22:55 23    be a cumulative dose of 400 milligrams per meters squared, in
11:22:59 24    sequence is 400 milligrams per meters squared.
11:23:03 25            And the last one, FEC followed by docetaxel, the FEC

*OFFICIAL TRANSCRIPT*

11:23:09  1   is given for three cycles, and the docetaxel, again, because

11:23:13  2   it's given alone in -- but in sequence after the FEC, the

11:23:19  3   effect -- the appropriate dose is 100 milligrams per meters

11:23:24  4   squared times three cycles.  That cumulative dose is

11:23:28  5   300 milligrams per meters squared.

11:23:30  6   Q.   And can you tell us what regimen Ms. Barbara Earnest

11:23:36  7   received?

11:23:36  8   A.   She received the AC followed by docetaxel regimen.

11:24:05  9   Q.   I missed a highlight.

11:24:16 10   A.   Oh, the TC for four cycles or the --

11:24:20 11   Q.   So you mentioned that the sequential dosing for docetaxel

11:24:25 12   in the AC followed by T regimen includes a dose of

11:24:30 13   100 milligrams, correct?

11:24:31 14   A.   That is the correct single-agent dose.  When it's given in

11:24:35 15   combination like in TAC, you have to reduce the dose to

11:24:38 16   75 milligrams per meters squared.

11:24:39 17   Q.   Among women who have a diagnosis similar to

11:24:45 18   Barbara Earnest, is chemotherapy essential to survival?

11:24:52 19   A.   Chemotherapy is an option.  Most people with early-stage

11:24:55 20   IIA disease are cured by surgery and/or radiation.  So,

11:25:01 21   chemotherapy is recommended because it can improve the outcome

11:25:06 22   for some patients, and so it's considered a standard, but some

11:25:12 23   patients accept it and some people don't.

11:25:14 24   Q.   I'm going to switch gears on you a little bit.  Let's just

11:25:20 25   talk very generally about the doctor-patient discussions

*OFFICIAL TRANSCRIPT*

11:25:23 1    regarding informed consent, okay?

11:25:25 2    A.    Uh-huh (affirmative response).

11:25:25 3    Q.    How are treatment decisions made?

11:25:29 4    A.    So as you can see, there are multiple options that all

11:25:32 5    have strong evidence of efficacy, and each of those regimens

11:25:36 6    have some different toxicities.  So a major principle

11:25:42 7    established in the community and across the country, and

11:25:46 8    especially by ASCO and quality metrics, is to have an informed

11:25:51 9    consent process.

11:25:51 10          Informed consent is not a document.  It's a

11:25:54 11   discussion and a process where in this very unfair

11:25:59 12   relationship -- I have almost 40 years of experience treating

11:26:04 13   patients.  A patient comes in with breast cancer.  I tell them

11:26:07 14   they can learn everything I know, but probably not in one week

11:26:11 15   or two weeks when they need to make decisions.  So it's our job

11:26:15 16   to go over what is known about the major risks and the

11:26:20 17   benefits, not just to talk about potential benefits, but what

11:26:24 18   price do you pay.  It's their body.  It's their treatment plan.

11:26:28 19          And we have to find the right treatment plan for

11:26:32 20   them, including surgery, potential radiation, and then the

11:26:36 21   systemic therapy, which for patients with endocrine-positive

11:26:42 22   IIA disease includes chemotherapy and endocrine therapy, which

11:26:47 23   we're not going to talk about.  But the chemotherapy has all

11:26:50 24   these options.

11:26:51 25          So the process means going through and talking

*OFFICIAL TRANSCRIPT*

11:26:54  1   about -- we might recommend one or another for a patient.  We

11:26:57  2   would explain why, and we would go over in detail what are the

11:27:01  3   likely side effects?  How long might they last?  Are anything

11:27:06  4   permanent or disfiguring?  Or is it permanent and you wouldn't

11:27:10  5   see it, but the patient would live with it?  Are things

11:27:14  6   temporary?  What time frame might we expect these symptoms to

11:27:18  7   wear off?  What would their life be like on the chemotherapy

11:27:21  8   and afterwards?

11:27:22  9        And then we go over the things we could do to lower

11:27:25 10   it or prevent it, like nausea.  We automatically give very

11:27:29 11   specific regimens to prevent nausea or vomiting.  So each of

11:27:33 12   these are discussed with the patient, sometimes in more than

11:27:36 13   one visit.

11:27:37 14        And then we give materials for them to read, and then

11:27:40 15   we have them come back and discuss it.  And when they are in

11:27:44 16   agreement, we have patients sign an informed consent, which is

11:27:48 17   a quality measure across the country.

11:27:50 18   Q.   And how does the informed consent process work with the

11:27:55 19   doctor and the patient?  I think you're describing the doctor

11:27:57 20   and patient in a clinical setting; is that correct?

11:27:59 21   A.   Yes.  And in the clinic, we have a whole education

11:28:03 22   discussion.  We give the patient a chance to ask questions, to

11:28:07 23   involve their family members.  Many times I get the children or

11:28:10 24   the parents or doctor friends or their advisor friends coming

11:28:15 25   to those visits or calling me with questions or emailing or

*OFFICIAL TRANSCRIPT*

11:28:18  1    texting.

11:28:19  2              And we want to make sure we answer all those

11:28:21  3    questions so the patient goes into it choosing the treatment

11:28:26  4    and knowing what to expect from it, when to call us, and how to

11:28:30  5    manage it well.  So that's the process we go through in the

11:28:33  6    clinic.

11:28:33  7    Q.   And you talked a little bit earlier about your experience

11:28:38  8    in clinical trials.  Is the informed consent process when

11:28:41  9    patients are enrolled in clinical trials different?

11:28:44 10    A.   It's very different.

11:28:46 11    Q.   How so?

11:28:46 12    A.   So, in the clinic setting, we do the whole informed.

11:28:51 13              Consent process and use education materials depending

11:28:54 14    on what patients want, but we give them a packet of information

11:28:57 15    generally done by the drug company.  They have tear-offs and

11:29:01 16    handouts that we can give, or there is other places we can

11:29:04 17    download information sheets, or some places make their own.

11:29:09 18    And we give that to the patient, and then we have them sign an

11:29:12 19    informed consent that highlights these that we develop.

11:29:15 20              In a clinical trial, the sponsor of the

11:29:18 21    clinical trial develops the consent form, and all that

11:29:22 22    information is proprietary and confidential.  So, they are very

11:29:27 23    different.  If an investigator does a clinical trial, then the

11:29:32 24    organization sponsoring it oversees the informed consent

11:29:35 25    through the investigation review board.

                              *OFFICIAL TRANSCRIPT*

| | |
|---|---|
| 11:29:37 | 1 |

Q.    Doctor, can you tell the jury, please, what your opinion

is on the treatment options for stage II, ER/PR positive, HER2

negative, early-stage breast cancer in the 2011 time frame?

A.    So, in 2011, there were 13 proven effective regimens, and

a patient might choose any of those and expect an excellent,

high survival rate in the 95 to 98 percent range.  So, there

are some, as you noticed on the top, that were preferred.

Those might be more chosen, but there is reason to choose

other.

          So all are Category 1.  All are approved by the

United States experts who are the breast cancer leaders for the

country for use in patients with this disease.

Q.    Thank you, Dr. Bosserman.

          MS. MENZIES:  Nothing further at this time, Your Honor.

          THE COURT:  Mr. Strongman.

                    CROSS-EXAMINATION

BY MR. STRONGMAN:

Q.    Good morning, Dr. Bosserman.  How are you?

A.    Good morning.

Q.    Nice to see you again.

A.    You, too.

Q.    You and I had an opportunity to spend a good bit of time

together when I took your deposition, do you remember that?

A.    I do.

Q.    Now, I want to talk just a little bit about these

*OFFICIAL TRANSCRIPT*

11:31:11  1   guidelines as well.  And I just want to walk through them.

11:31:19  2   I know Ms. Menzies asked you some questions about there is

11:31:24  3   both a *Preferred Regimen* and an *Other Adjuvant Regimen*

11:31:29  4   category.  Do you see that?

11:31:30  5   A.    I do.

11:31:31  6   Q.    What's the difference?

11:31:31  7   A.    Well, it could be there might be a small difference in the

11:31:39  8   efficacy.  It might be more toxicity.  It might be convenience.

11:31:45  9   Q.    So, what we can decipher from this chart, though, is that

11:31:51  10  the preferred regimens are in a different category than the

11:31:56  11  other adjuvant regimens; is that correct?

11:31:58  12  A.    That is correct.  But they are all Category 1, which is

11:32:02  13  the most important overlay as being appropriate for the

11:32:05  14  patients.

11:32:05  15  Q.    And we can certainly agree that there are

11:32:10  16  Taxotere-containing regimens in the *Preferred Regimen* category;

11:32:15  17  is that right?

11:32:15  18  A.    Yes.

11:32:15  19  Q.    Just so -- I keep using the word *regimen*, right.  So when

11:32:19  20  we look at this -- everything on this side of it -- which is

11:32:25  21  the relevant side, right?

11:32:26  22  A.    Yes.

11:32:26  23  Q.    Everything on that side is a regimen of chemotherapy

11:32:31  24  drugs, right?

11:32:32  25  A.    Yes.  I think I explained regimen is the letters, but also

*OFFICIAL TRANSCRIPT*

11:32:35 1    the dose and the cycles and the timing.  It's a whole package.

11:32:39 2    Q.    Great.  And so you -- a couple of questions on that.  So,

11:32:44 3    if I look up the guidelines for maybe something like metastatic

11:32:50 4    breast cancer, sometimes I'll see monotherapy listed; is that

11:32:50 5    correct?

11:32:55 6    A.    That's correct.

11:32:55 7    Q.    These are not monotherapy, correct?

11:32:57 8    A.    That's correct.

11:32:57 9    Q.    When it comes to a regimen, I think what I'm understanding

11:33:00 10   is there is a couple of variables.  There is the drugs; is that

11:33:04 11   right?

11:33:05 12   A.    Yes.

11:33:05 13   Q.    There is the dose; is that correct?

11:33:06 14   A.    Correct.

11:33:07 15   Q.    And then there is the timing; is that correct?

11:33:09 16   A.    Correct.

11:33:09 17   Q.    And all three of those variables are very important,

11:33:13 18   correct?

11:33:14 19   A.    And the number of cycles.  Fourth part.

11:33:17 20   Q.    Correct.  So all four of those variables are very

11:33:21 21   important to consider, correct?

11:33:22 22   A.    Correct.

11:33:22 23   Q.    Okay.  Good.

11:33:24 24          And what we see is, I think we have two of the

11:33:29 25   preferred regimens include Taxotere, correct?

*OFFICIAL TRANSCRIPT*

11:33:33  1    A.    Correct.

11:33:33  2    Q.    And then I just want to work down.  So we have the TAC,

11:33:38  3    and then the next one down is dose-dense AC followed by

11:33:44  4    paclitaxel every two weeks.  Do you see that?

11:33:48  5    A.    I do.

11:33:48  6    Q.    And then we have the next one down, which is AC followed

11:33:57  7    by weekly paclitaxel.  Do you see that?

11:33:58  8    A.    Correct.

11:33:58  9    Q.    So, I'm just curious, what's the difference between

11:34:02 10    dose-dense AC and just AC?

11:34:04 11    A.    About 20- to $40,000.

11:34:07 12    Q.    But what's the difference?

11:34:09 13    A.    So, when you give the AC every two weeks, followed by

11:34:15 14    Taxol every two weeks, you have to give a growth factor.  So I

11:34:19 15    think we've talked about when you give chemotherapy, you slow

11:34:23 16    the growth of cells that rapidly divide, and the blood cells

11:34:28 17    are one of those, so we lower the white count, which is what

11:34:32 18    leads to the risk of infection.  And we have to wait until the

11:34:35 19    white count comes back before we can give the next dose.

11:34:40 20           One of the ways we investigated can we make treatment

11:34:43 21    more effective years ago is by giving it closer together.  And

11:34:48 22    with the development of the '90s of white cell growth factor,

11:34:53 23    we could give the chemotherapy one day, give a shot the next

11:34:55 24    day which would help the white cells grow back faster.  So

11:35:00 25    instead of waiting three weeks between treatments, we could

*OFFICIAL TRANSCRIPT*

11:35:03  1    wait two weeks.

11:35:04  2           So when you give the AC dose dense, you have to use

11:35:08  3    growth factors.  And the growth factors in those days were a

11:35:13  4    long-acting one, it's very expensive, or ten days of shots,

11:35:16  5    which most people would take one shot over ten shots.  But it's

11:35:20  6    very expensive.

11:35:21  7    Q.    When you're using dose dense, you're saying that you're

11:35:24  8    adding a whole other element of complexity and cost into the

11:35:28  9    equation, correct?

11:35:28 10    A.    Yes.

11:35:29 11    Q.    That's because when you do dose-dense AC, you have to have

11:35:32 12    these growth factors, correct?

11:35:33 13    A.    Yes.

11:35:34 14    Q.    So it's fair to say that dose-dense AC followed by Taxol

11:35:39 15    and AC followed by Taxol, those are different regimens,

11:35:45 16    correct?  They are different?

11:35:46 17    A.    Yes, they are different, yes.

11:35:48 18    Q.    In moving down the list, we see down there under the other

11:35:56 19    adjuvant regimens that there is AC followed by Taxotere every

11:36:04 20    three weeks, right?

11:36:05 21    A.    Yes.

11:36:05 22    Q.    So up here, we had dose-dense AC followed by Taxol,

11:36:13 23    correct?

11:36:13 24    A.    Yes.

11:36:13 25    Q.    And then AC followed by Taxol?

*OFFICIAL TRANSCRIPT*

```
11:36:16   1   A.    Yes, and that does not need growth factor.

11:36:19   2   Q.    And down here we have AC followed by Taxotere, correct?

11:36:23   3   A.    Yes.

11:36:23   4   Q.    I don't see a dose-dense AC followed by Taxotere.  That's

11:36:28   5   not on the preferred guidelines or on the -- let me ask that

11:36:31   6   question again.

11:36:32   7              Is there a dose-dense AC followed by Taxotere in the

11:36:40   8   NCCN Guidelines that we're looking at?

11:36:41   9   A.    No.

11:36:41  10   Q.    And if you were to give a patient dose-dense AC followed

11:36:47  11   by Taxotere, you would have to do the growth factor type of

11:36:52  12   treatment as well, correct?

11:36:53  13   A.    I'm sorry.  What are you asking?

11:36:58  14   Q.    Yeah, I'm saying, like if you did -- if a doctor did do a

11:37:02  15   dose-dense AC regimen --

11:37:04  16   A.    Yes.

11:37:04  17   Q.    -- followed by Taxotere -- are you with me so far?

11:37:07  18   A.    Yes.

11:37:07  19   Q.    -- a doctor would have to do those growth factor

11:37:12  20   treatments that you were talking about earlier?

11:37:14  21   A.    Yes, dose dense requires growth factors.

11:37:18  22   Q.    But the bottom line is, what we know is that dose-dense AC

11:37:22  23   followed by Taxotere is not in the guidelines, correct?

11:37:26  24   A.    Correct.

11:37:35  25   Q.    When you look at the differential between dose-dense AC
```

*OFFICIAL TRANSCRIPT*

11:37:38  1    and regular AC, it's a timing issue, correct?

11:37:42  2    A.    Yes.

11:37:42  3    Q.    So it's every two weeks, correct, for dose dense?

11:37:46  4    Correct?

11:37:46  5    A.    Correct.   It means that the whole regimen is done really

11:37:54  6    in about -- it's eight total cycles, 16 weeks, as opposed to

11:38:01  7    about 24 weeks.

11:38:01  8    Q.    Doctor, when you were being asked questions by

11:38:07  9    Ms. Menzies, what regimen did you say Barbara Earnest received?

11:38:10 10    A.    She received the AC followed by docetaxel regimen.

11:38:14 11    Q.    Now, the truth is, Doctor -- did you look at Ms. Earnest's

11:38:18 12    medical records?

11:38:19 13    A.    I did.

11:38:19 14    Q.    The truth is, Ms. Earnest actually got dose-dense AC

11:38:26 15    followed by Taxotere, correct?

11:38:28 16    A.    Yes.   I haven't really looked at that, to be honest,

11:38:33 17    today.

11:38:33 18    Q.    The answer is yes, correct?

11:38:35 19    A.    I actually didn't look at that dose yesterday when I was

11:38:39 20    reviewing that case, so I would have to look at that.

11:38:40 21    Q.    Certainly when you were asked questions by Ms. Menzies

11:38:43 22    about the dose and the regimen that Ms. Earnest got, you didn't

11:38:46 23    mention dose dense, correct?

11:38:49 24    A.    I didn't mention it, no.

11:38:50 25    Q.    And you pointed to one of the specific regimens on the

*OFFICIAL TRANSCRIPT*

NCCN Guidelines for Ms. Earnest, correct?

A.    Yes.  It's considered completely acceptable to use dose-dense AC with docetaxel.  It just didn't get called out in the regimen sheet.

Q.    Doctor, do you even know, sitting here today, whether or not Ms. Earnest got dose-dense AC --

A.    I would have to look at my notes.

Q.    -- followed by Taxotere?

A.    I would have to look at my notes.  You have those.  Could you show them to me.  I'll tell you right away.

Q.    Can you answer that question one way or the other, sitting here?

A.    I would have to look at my notes to tell you that.

Q.    So you don't have that information in front of you?

        MS. MENZIES:  Objection, Your Honor, asked and answered.

        THE COURT:  Sustained.  It's been asked and answered.

EXAMINATION BY MR. STRONGMAN:

Q.    Now, Dr. Bosserman, you talked about your experience, correct?

A.    Yes.

Q.    And you have experience with Taxotere, correct?

A.    Yes.

Q.    And you have experience treating patients with Taxotere; is that right?

*OFFICIAL TRANSCRIPT*

1283

| | |
|---|---|
| 11:39:59 1 | A.    I do. |
| 11:40:00 2 | Q.    And you prescribed Taxotere to patients with early-stage |
| 11:40:04 3 | stage II breast cancer, correct? |
| 11:40:05 4 | A.    I have. |
| 11:40:06 5 | Q.    And in your patients, Taxotere has been an effective |
| 11:40:11 6 | regimen for them, correct? |
| 11:40:12 7 | A.    Taxotere is a proven effective drug in breast cancer. |
| 11:40:15 8 | Q.    Certainly, Doctor, you're not coming in here today to make |
| 11:40:23 9 | any kind of implication that Ms. Earnest shouldn't have had |
| 11:40:27 10 | chemotherapy, correct? |
| 11:40:29 11 | A.    Correct. |
| 11:40:29 12 | Q.    And what we know is that if a patient came in to see you |
| 11:40:34 13 | with stage II cancer, the type that Ms. Earnest had, you would |
| 11:40:39 14 | recommend both chemotherapy and endocrine therapy, correct? |
| 11:40:46 15 | A.    Today?  2011? |
| 11:40:48 16 | Q.    I'm saying if Ms. Earnest walked into your office in |
| 11:40:51 17 | 2011 -- |
| 11:40:52 18 | A.    We would definitely be discussing chemotherapy and |
| 11:40:56 19 | endocrine therapy. |
| 11:40:57 20 | Q.    And what we know is that when it comes to breast cancer, |
| 11:41:02 21 | the first shot is the best shot, correct? |
| 11:41:05 22 | A.    That is true. |
| 11:41:06 23 | Q.    And getting the right treatment for the right disease is |
| 11:41:09 24 | really important from the beginning, correct? |
| 11:41:11 25 | A.    That is true. |

*OFFICIAL TRANSCRIPT*

11:41:13  1    Q.   Because if you don't, you would certainly agree with me

11:41:16  2    that recurrent breast cancer puts a patient in an entirely

11:41:22  3    different category in terms of survival than someone who has

11:41:28  4    not had a recurrence, correct?

11:41:30  5    A.   Correct.

11:41:34  6         MR. STRONGMAN:  I have no other questions.

11:41:39  7         THE COURT:  Thank you.

11:41:39  8            Ms. Menzies.

11:41:43  9         MS. MENZIES:  Thank you, Your Honor.  Just a couple.

11:41:42  10                   REDIRECT EXAMINATION

11:41:43  11   BY MS. MENZIES:

11:41:43  12   Q.   Dr. Bosserman, we talked about all the different

11:41:51  13   treatments.  Are these all available treatment options

11:41:59  14   acceptable under the NCCN Guidelines?

11:42:01  15   A.   They are all acceptable under NCCN.

11:42:04  16   Q.   Why are there so many different options endorsed by the

11:42:07  17   NCCN?

11:42:10  18   A.   They are there because they are effective, and different

11:42:13  19   patients may have different priorities and want to make

11:42:17  20   different choices.

11:42:18  21         So the important thing is to be able to talk about

11:42:20  22   each regimen, what the pros and cons, what the risks,

11:42:27  23   short-term and long-term, are, and find out from the patient

11:42:29  24   what their priorities are because all of them can improve the

11:42:33  25   survival of breast cancer patients.

                            *OFFICIAL TRANSCRIPT*

11:42:36 1          MS. MENZIES:  Thank you.  That's all we have.

11:42:39 2          THE COURT:  Thank you.  You may step down.

11:42:41 3          MS. MENZIES:  Thank you, Dr. Bosserman.

11:42:43 4          THE COURT:  Members of the Jury, this might be a good

11:42:45 5  time for us to take our lunch break.  The Court will be at

11:42:51 6  recess until -- let's say quarter till 1:00.  This time I'm

11:42:59 7  right.  Quarter to 1:00.

11:43:02 8               Again, leave your tablets on the chairs.  Don't

11:43:04 9  discuss your case amongst yourselves or with anyone else.

11:43:06 10              Court will be at recess until quarter to 1:00.

11:43:14 11         (WHEREUPON, at 11:43 a.m., the jury panel leaves the

11:46:45 12 courtroom, and the Court was in luncheon recess.)

13                          *    *    *

14

15

16                    REPORTER'S CERTIFICATE

17

18       I, Cathy Pepper, Certified Realtime Reporter, Registered
    Merit Reporter, Certified Court Reporter in and for the State
19  of Louisiana, Official Court Reporter for the United States
    District Court, Eastern District of Louisiana, do hereby
20  certify that the foregoing is a true and correct transcript to
    the best of my ability and understanding from the record of the
    proceedings in the above-entitled and numbered matter.
21

22                         s/Cathy Pepper
                           _____
23                         Cathy Pepper, CRR, RMR, CCR
                           Certified Realtime Reporter
24                         Registered Merit Reporter
                           Official Court Reporter
25                         United States District Court
                           Cathy_Pepper@laed.uscourts.gov

                    **OFFICIAL TRANSCRIPT**