UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  TAXOTERE (DOCETAXEL)      *
PRODUCTS LIABILITY LITIGATION    *      Docket No.: 16-MD-2740
                                 *      Section "H(5)"
                                 *      New Orleans, Louisiana
*Relates to:  Barbara Earnest*     *      September 20, 2019
*Case No.: 16-CV-17144*            *
* * * * * * * * * * * * * * * * *


DAY 5 – AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL BEFORE
THE HONORABLE JANE T. MILAZZO
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:


For the Plaintiffs:          Barrios Kingsdorf & Casteix, LLP
                             BY:  DAWN M. BARRIOS, ESQ.
                             701 Poydras Street
                             Suite 3650
                             New Orleans, Louisiana 70139



For the Plaintiffs:          Gainsburgh Benjamin David Meunier
                               & Warshauer, LLC
                             BY:  M. PALMER LAMBERT, ESQ.
                             1100 Poydras Street
                             Suite 2800
                             New Orleans, Louisiana 70163



For the Plaintiffs:          Pendley Baudin & Coffin, LLP
                             BY:  CHRISTOPHER L. COFFIN, ESQ.
                             1100 Poydras Street
                             Suite 2505
                             New Orleans, Louisiana 70163


OFFICIAL TRANSCRIPT

<u>APPEARANCES:</u>

For the Plaintiffs:          Gibbs Law Group, LLP
                             BY:  KAREN BARTH MENZIES, ESQ.
                             6701 Center Drive West
                             Suite 1400
                             Los Angeles, California 90045


For the Plaintiffs:          Bachus & Schanker, LLC
                             BY:  J. KYLE BACHUS, ESQ.
                             BY:  DARIN L. SCHANKER, ESQ.
                             1899 Wynkoop Street
                             Suite 700
                             Denver, Colorado 80202


For the Plaintiffs:          Fleming Nolen & Jez, LLP
                             BY:  RAND P. NOLEN, ESQ.
                             2800 Post Oak Boulevard
                             Suite 4000
                             Houston, Texas 77056


For the Plaintiffs:          DAVID F. MICELI, LLC
                             BY:  DAVID F. MICELI, ESQ.
                             Post Office Box 2519
                             Carrollton, Georgia 30112


For the Plaintiffs:          Morgan & Morgan, P.A.
                             BY:  EMILY C. JEFFCOTT, ESQ.
                             700 S. Palafox Street
                             Suite 95
                             Pensacola, Florida 32502


For the Sanofi               Irwin Fritchie Urquhart
Defendants:                   & Moore, LLC
                             BY:  DOUGLAS J. MOORE, ESQ.
                             400 Poydras Street
                             Suite 2700
                             New Orleans, Louisiana 70130

OFFICIAL TRANSCRIPT

APPEARANCES:

For the Sanofi              Shook Hardy & Bacon, LLP
Defendants:                 BY:  HARLEY V. RATLIFF, ESQ.
                            BY:  JON A. STRONGMAN, ESQ.
                            2555 Grand Boulevard
                            Kansas City, Missouri 64108


For the Sanofi              Shook Hardy & Bacon, LLP
Defendants:                 BY:  HILDY M. SASTRE, ESQ.
                            201 Biscayne Boulevard, Suite 3200
                            Miami, Florida 33131


Official Court Reporter:    Jodi Simcox, RMR, FCRR
                            500 Poydras Street
                            Room HB-275
                            New Orleans, Louisiana 70130
                            (504) 589-7780


Proceedings recorded by mechanical stenography, transcript

produced by computer.

OFFICIAL TRANSCRIPT

# I N D E X

Page

MICHAEL STEVEN KOPRESKI
     Videotaped deposition                    1290

MARIE CELESTE LAGARDE
     Direct Examination By Mr. Schanker:      1346
     Cross-Examination By Mr. Moore:          1372
     Redirect Examination By Mr. Schanker:    1386

OFFICIAL TRANSCRIPT

|        |    |                                                                        |
|--------|----|------------------------------------------------------------------------|
| 12:16PM | 1  | <div align="center">**AFTERNOON SESSION**</div> |

**AFTERNOON SESSION**

**(September 20, 2019)**

**\*\*\*\*\***

THE DEPUTY CLERK:  All rise.

**(OFF THE RECORD)**

THE DEPUTY CLERK:  All rise.

(WHEREUPON, the jury entered the courtroom.)

THE COURT:  All jurors are present.  Court's back in session.  You may be seated.

Plaintiffs, call your next witness.

MR. COFFIN:  Good afternoon, Your Honor.  The plaintiffs call the Sanofi corporate witness, the company witness, Mr. Michael Kopreski, by video.

THE COURT:  Members of the jury, you'll be shown another video deposition.  I've previously given you instructions.  You should consider this testimony as you would any other.  I also tell you that this deposition is the company representative deposition.

So please proceed.

(WHEREUPON, the videotaped deposition of **Michael Steven Kopreski** was played.)

Q.   Good morning.  Could you state your name for the record, please.

A.   Good morning.  My name is Michael Steven Kopreski.

Q.   And is it your understanding that Sanofi has elected to

OFFICIAL TRANSCRIPT

1  designate you to appear today on behalf of Sanofi, to provide

2  binding testimony on behalf of the company during the course of

3  today's deposition?

4  **A.**   That's my understanding.

5  **Q.**   What I want to go over with you is briefly discuss safety

6  signals and how you determine if something is a safety signal

7  and why.  And we'll then apply that to the adverse event

8  reports.

9          So kind of the first stop on this roadway is going to

10  be discuss safety signals, and then we'll move from there to

11  discuss what Sanofi as learned through the adverse event

12  reports that were submitted during this time frame, from

13  January of 2005 to 2011.

14          Do you agree with me that, when we talk about the

15  detection of safety signals, that not all side effects or

16  adverse events are known to the company at the time that a drug

17  is first licensed to be sold?

18  **A.**   That's correct.

19  **Q.**   Some side effects are detected only after a drug is on the

20  market; correct?

21  **A.**   That's correct.

22  **Q.**   Not just with the Taxotere drug, but this is true -- it's

23  a problem that exists -- and when I say "problem," I don't

24  necessarily mean that it's a negative problem, but it's a

25  problem that exists with the marketing of all drugs; correct?

OFFICIAL TRANSCRIPT

1  **A.**   I don't think I would refer to it as a problem as to more

2  of a reality that pertains to all drugs, that the number of --

3  the detection of side effects depends upon the rarity of the

4  side effect and -- and the number of people that have been

5  exposed to the drug.

6       So for very rare side effects, you would not expect

7  to necessarily see it until large numbers of people have been

8  exposed to the drug.

9  **Q.**   All right.  So that reality is addressed by a solution

10  called pharmacovigilance; correct?

11  **A.**   One of the roles of pharmacovigilance is to detect such --

12  such rare side effects, that's correct.

13  **Q.**   And safety signal detection is part of that process;

14  correct?

15  **A.**   That would be correct.

16  **Q.**   I'm going to show you, then, this definition and ask

17  whether you agree with the definition or not.

18       Can you see that?

19       Pharmacovigilance -- and this is the definition that

20  I read a moment ago, and then I was asking whether you agree

21  with this.

22       Pharmacovigilance is the monitoring of effects of

23  medical drugs after they've been licensed for use to identify

24  and evaluate previously unreported side effects or new aspects

25  of previously known side effects.

OFFICIAL TRANSCRIPT

12:52PM 1          Do you agree or disagree with that definition?

12:52PM 2  **A.**   As I mentioned, I think that is one of the roles of

12:52PM 3  pharmacovigilance.  Excuse me.

12:52PM 4  **Q.**   And do you see --

12:52PM 5  **A.**   The -- the definition that you're providing here, the

12:52PM 6  monitoring of the drugs to identify and evaluate previously

12:53PM 7  unreported side effects or new aspects of side effects, is

12:53PM 8  basically a -- pertains to a definition of signal detection?

12:53PM 9          Signal detection is detecting either a new side

12:53PM 10 effect or a new aspect of a previously known side effect.  But

12:53PM 11 pharmacovigilance is more than -- the role of pharmacovigilance

12:53PM 12 is more than simply signal detection.

12:53PM 13 **Q.**   But yet this definition of "pharmacovigilance" came from

12:53PM 14 a -- if this definition of pharmacovigilance came from a

12:53PM 15 medical dictionary, would you disagree with the medical

12:53PM 16 dictionary?

12:53PM 17 **A.**   I --

12:53PM 18 **Q.**   Or do you agree with the definition; you just think that

12:53PM 19 it's not -- that there's more to it than this definition?

12:53PM 20 **A.**   For example, one of the roles of pharmacovigilance is

12:53PM 21 reporting to regulatory authorities.  That's not part of that

12:54PM 22 definition.

12:54PM 23         So what I'm saying is I agree with that definition of

12:54PM 24 pharmacovigilance as -- one of the roles of pharmacovigilance

12:54PM 25 is signal detection, and that definition is referring to signal

OFFICIAL TRANSCRIPT

1    detection.

2              But I'm saying that pharmacovigilance, as a section

3    of the company, has a much larger number of roles.

4    Q.   What I'm hearing from you is that you don't disagree with

5    this definition; you think that it's this definition plus more?

6    A.   What I'm -- what I'm saying is I think this definition

7    pertains to signal detection, which is one of the roles of

8    pharmacovigilance.

9              So I agree with that aspect, but I think there's --

10   Q.   At the bottom here, you see where it says "pharmaco" --

11   just in terms of -- the source of this word "pharmaco" is Greek

12   for "drug"?  Do you see that?

13   A.   Okay.

14   Q.   And "vigilance" is Latin and means to keep awake or alert,

15   to keep watch, the process of paying close and continuous

16   attention.

17             Do you agree that "pharmacovigilance" is -- relating

18   to drugs, the obligation to keep awake or alert, to keep watch,

19   the process of paying close and continuous attention to the

20   drug?

21   A.   I would agree with -- that's part of the response of

22   pharmacovigilance.  To put it very simply, pharmacovigilance is

23   responsible for the safety of the drug.

24   Q.   Right.  And "safety signal detection," it says, "Detecting

25   information about a new or known side effect or adverse event

OFFICIAL TRANSCRIPT

12:55PM 1    that may be caused by medicine and requires further

12:55PM 2    investigation."

12:55PM 3            Do you agree that that's what safety signal detection

12:55PM 4    is?

12:55PM 5    A.   Well, first, you have to understand what a safety signal

12:55PM 6    is.

12:55PM 7    Q.   Okay.

12:55PM 8    A.   So it's detection of a safety signal.

12:55PM 9            A safety signal is detection of a safety topic or an

12:56PM 10   adverse event which is new to the drug.  So the first

12:56PM 11   characteristic, it has to be new.

12:56PM 12           Or there's an -- there's an "or" to it.  Or it is

12:56PM 13   a -- it's a new aspect that would not be known to a known

12:56PM 14   effect of a drug.

12:56PM 15   Q.   Okay.  But is safety signal detection detecting

12:56PM 16   information about a new or known side effect that may be caused

12:56PM 17   by medicine and that requires further investigation?

12:56PM 18   A.   A safety signal is not a known aspect.

12:56PM 19   Q.   A new characteristic to a known side effect would be

12:56PM 20   included, based upon that second part that you described?

12:56PM 21   A.   If you have -- if you have a new aspect to a known

12:56PM 22   toxicity, that could be a safety signal.

12:57PM 23   Q.   All right.  Thank you.

12:57PM 24           And, again, just in terms of, you know, where we are

12:57PM 25   on this discussion, we'll kind of start with this first exit,

OFFICIAL TRANSCRIPT

12:57PM 1    this promise -- we're going to talk about the promise or

12:57PM 2    requirement to detect safety signals.  Okay?

12:57PM 3           And when we look at safety signals, do you agree with

12:57PM 4    me that safety signals can be detected from a wide range of

12:57PM 5    sources?

12:57PM 6    A.   Yes.

12:57PM 7    Q.   And if you look at what I have here, would you agree with

12:57PM 8    me that some examples of locations or sources of safety signals

12:57PM 9    would include review of scientific literature and abstracts?

12:57PM 10   A.   Yes, that would be correct.

12:57PM 11   Q.   And clinical trials and studies?

12:57PM 12   A.   That's correct.

12:57PM 13   Q.   All right.  And spontaneous adverse event reports?

12:57PM 14   A.   Yes.

12:57PM 15   Q.   What is a spontaneous adverse event report?

12:58PM 16   A.   So adverse -- safety reports can be submitted to the

12:58PM 17   company either because they're solicited -- so you're asking

12:58PM 18   for the physician to send a report, and the example would be a

12:58PM 19   clinical trial.

12:58PM 20   Q.   Okay.

12:58PM 21   A.   So a clinical trial where it's an obligation of the

12:58PM 22   investigator to report adverse events.  And as part of -- part

12:58PM 23   of the protocol, that would be a solicited report.

12:58PM 24          A spontaneous report would be a report where it's not

12:58PM 25   solicited but it is spontaneously sent in.  An example would be

OFFICIAL TRANSCRIPT

1  a physician in a practice that has a patient with a toxicity

2  that he wants to report to the -- to the company.  He doesn't

3  have an obligation -- he doesn't have a legal obligation

4  necessarily -- it depends on the countries -- but he doesn't

5  have a legal obligation to send it in in the same manner that

6  the investigator has to report.  But he is sending it in as

7  more of a spontaneous matter.  So that would be a spontaneous

8  adverse report.

9  Q.   And a moment ago, you were talking about something called

10  a solicited adverse event report.

11          That's different than the spontaneous adverse event

12  report; correct?

13  A.   We generally break down adverse event reports into those

14  two groups, solicited and spontaneous.

15  Q.   Solicited, then, if we look at the sources that --

16  solicited would fall under clinical trials and studies; is that

17  right?

18  A.   Generally.  Certainly, if it's a company trial, those

19  would be solicited reports.

20  Q.   Okay.  And the spontaneous adverse event reports, these

21  are reports that might come in from a consumer; true?

22  A.   Yes.

23  Q.   Might come in from a medical provider; true?

24  A.   Yes.

25  Q.   Could come in from -- with chemotherapy drugs, could come

OFFICIAL TRANSCRIPT

1:00PM 1   in from a pharmacist; right?

1:00PM 2   A.   Correct.

1:00PM 3   Q.   And then the scientific literature, you -- the company

1:00PM 4   might be reviewing scientific literature, and there might be

1:00PM 5   some comment about an adverse event related to one of your

1:00PM 6   products that would be contained in literature; is that right?

1:00PM 7   A.   Yeah it could be a case report within a literature, that's

1:00PM 8   correct.

1:00PM 9   Q.   Right.  And so the -- part of safety signal detection to

1:00PM 10  address the reality of the fact that not all side effects are

1:00PM 11  fully understood or known at the time a drug is licensed, part

1:00PM 12  of the detection process is to look at these various sources of

1:00PM 13  information as they might come into the company; is that right?

1:00PM 14  A.   Yes, that's correct.

1:00PM 15  Q.   We talked about the fact that the evaluation of safety

1:00PM 16  signals is a required part of this pharmacovigilance process.

1:00PM 17          And the companies, not just your company, but

1:00PM 18  pharmaceutical companies want to put safety first; correct?

1:01PM 19  A.   Correct.

1:01PM 20  Q.   But the safety signal evaluation, the reason it's so

1:01PM 21  important is so that doctors and patients have up-to-date

1:01PM 22  information on a drug's benefits and risks during the life

1:01PM 23  cycle of the drug?

1:01PM 24  A.   Well, I think it's -- I think it's important for the

1:01PM 25  safety of a drug to be understood.  And safety -- safety

OFFICIAL TRANSCRIPT

1:01PM 1    evaluation not only by the company, but by the regulatory

1:01PM 2    authorities, is part of that process to understand the safety

1:01PM 3    of a product.

1:01PM 4    Q.    Sure.  I'm just trying to confirm with you that one of the

1:01PM 5    reasons that we're going through this process of trying to

1:01PM 6    conduct pharmacovigilance and to look at these potential

1:01PM 7    sources of safety signals that we've discussed, one of the

1:01PM 8    reasons we're doing that is because safety signal evaluation is

1:01PM 9    essential so that doctors and patients have the most up-to-date

1:01PM 10   information on the benefits and the risks of drugs?

1:02PM 11   A.    I think that's a fair statement.

1:02PM 12   Q.    Okay.  And when a drug is licensed, part of that -- part

1:02PM 13   of the requirement is that a company like Sanofi, with

1:02PM 14   Taxotere, is going to engage in responsible pharmacovigilance;

1:02PM 15   right?  That's a regulatory requirement?

1:02PM 16   A.    When -- when -- there are obligations that are -- that are

1:02PM 17   regulatory obligations that require the monitoring and the

1:02PM 18   submission of safety signals to regulatory authorities.

1:02PM 19   Q.    On this chart that I've put up where it says that, "As

1:02PM 20   part of the licensing of Taxotere, Sanofi is required to engage

1:02PM 21   in responsible pharmacovigilance."

1:02PM 22         You don't disagree with that, do you?

1:02PM 23   A.    Well, I think it's independent of the licensing of

1:03PM 24   Taxotere.  I think -- I think companies are required to engage

1:03PM 25   in responsible pharmacovigilance of all their products.  And --

1:03PM 1  and I do agree that there are regulatory responsibilities in

1:03PM 2  that regard.

1:03PM 3          In fact, I would say that pharmacovigilance is an

1:03PM 4  extremely regulated branch of the company.  There are very

1:03PM 5  specific regulations for each country that a product is

1:03PM 6  licensed into, and that dictates the process that the company

1:03PM 7  adheres to to follow those regulations.

1:03PM 8  Q.   And one of the things that Sanofi is required to do as it

1:03PM 9  relates to Taxotere is to engage in responsible safety signal

1:03PM 10 detection and evaluation and to take action with respect to

1:04PM 11 safety signals if they were to be identified?

1:04PM 12 A.   That -- that is the way that Sanofi operates, that's

1:04PM 13 correct.

1:04PM 14 Q.   So just to make sure that we're all still on the same

1:04PM 15 page, we're still talking about this promise -- or maybe it's

1:04PM 16 better to say "requirement" -- to detect safety signals, if you

1:04PM 17 like the word "requirement" better, that that's still -- we're

1:04PM 18 still talking about that.

1:04PM 19         And then we're going to move on in a few minutes, and

1:04PM 20 we're going to look at some of the reports that came in.  Okay?

1:04PM 21 A.   Sure.

1:04PM 22 Q.   But as we talk about the safety signal process, there is a

1:04PM 23 process for safety signal detection that is adhered to at

1:04PM 24 Sanofi; isn't that true?

1:04PM 25 A.   There is a process.

OFFICIAL TRANSCRIPT

1:04PM 1   **Q.**   Why don't I start with a more simple question.

1:04PM 2          What is an individual case safety report?

1:05PM 3   **A.**   It is a single identifiable report, safety report.

1:05PM 4   **Q.**   And would you agree with me that some of the documents

1:05PM 5   identified in Table 2 of the 30(b)(6) designation, that some of

1:05PM 6   those documents are individual case safety reports?

1:05PM 7   **A.**   Yes.

1:05PM 8   **Q.**   All right.  And there's this ICSR.

1:05PM 9          Is that the acronym for individual case safety

1:05PM 10  reports that's used by Sanofi?

1:05PM 11  **A.**   I believe so.

1:05PM 12  **Q.**   Another thing that is monitored by the company for doing

1:05PM 13  safety signal detection would be to look at -- do an aggregate

1:05PM 14  case review; is that true?

1:05PM 15  **A.**   Yes.

1:05PM 16  **Q.**   And an aggregate case review, is that when we, instead of

1:05PM 17  maybe looking at one individual case study report in isolation,

1:06PM 18  that you would look at a group of individual case safety

1:06PM 19  reports?  Is that what is meant by aggregated case review?

1:06PM 20  **A.**   Yes.

1:06PM 21  **Q.**   Another category of information to be monitored for -- as

1:06PM 22  part of the safety signal detection process is literature

1:06PM 23  surveillance?

1:06PM 24  **A.**   Yes.

1:06PM 25  **Q.**   And in a broad sense, what does "literature surveillance"

OFFICIAL TRANSCRIPT

1:06PM   1    mean from a safety signal detection perspective?

1:06PM   2    A.   Well, one would -- one would look at the literature and

1:06PM   3    see if there are any case reports pertaining to safety that is

1:06PM   4    in that literature report.  And you have -- as we'll see, you

1:06PM   5    have several of those reports in Table 2 that are reports that

1:06PM   6    are coming from literature cases.

1:06PM   7    Q.   All right.  And the -- would you agree that we're looking

1:07PM   8    at these materials for a reason?

1:07PM   9         And as part of the safety signal detection process,

1:07PM  10    the goal is to try to identify -- and I think you already kind

1:07PM  11    of beat me to this part of our discussion.  But you're looking

1:07PM  12    to identify newly identified side effects or adverse events or

1:07PM  13    new characteristics of previously known side effects or adverse

1:07PM  14    events.  That's why we're engaging in this review of individual

1:07PM  15    case study reports and aggregate case reviews and clinical data

1:07PM  16    review and literature surveillance.

1:07PM  17         Would you agree with that?

1:07PM  18    A.   I would agree.

1:07PM  19    Q.   Yet, when you identify either a newly identified side

1:07PM  20    effect or a new characteristic of a previously known side

1:07PM  21    effect, then there's an evaluative process that has to be

1:08PM  22    undertaken as part of safety signal detection.

1:08PM  23         Would you agree with me on that?

1:08PM  24    A.   Yes.

1:08PM  25    Q.   But my understanding of the previous testimony in the case

OFFICIAL TRANSCRIPT

1   is that, if you have a newly identified side effect, that's

2   it's very important to define it; and in defining the side

3   effect or adverse event, that you are going to go beyond just a

4   MedDRA term to make sure that you have clearly characterized

5   the side effect?

6   A.   I don't know what "define" means.  You want to analyze.

7   Okay.  We could use the word -- we could use the word

8   "analyze."

9        If you see a side effect, you want to know what are

10  the potential confounds that might also be affecting that side

11  effect.  You want to know about the temporal relationship.  You

12  want to know if the patient's been on any other medications,

13  what is the past medical history.

14       All these have -- play a role in helping you decide

15  about -- about that even that you found.

16  Q.   So --

17  A.   So when you go at an individual level and you have a side

18  effect, you go through a process of analyzing.  And that, of

19  course, depends upon the amount of data that you have.  That

20  plays a role into saying is it credible or not.

21       One of the -- one of the very important aspects when

22  analyzing is, if you give the drug -- you take it away and the

23  side effect disappears; you give the drug again, and the side

24  effect comes back again.  That would help you understand the

25  relationship to the side effect of the drug.

OFFICIAL TRANSCRIPT

1:09PM   1          So there's an analytical process that goes with every

1:09PM   2   case and every potential side effect to try to evaluate that

1:09PM   3   side effect.

1:09PM   4   Q.   When we look at some of the adverse event reports Table 2,

1:09PM   5   when we go through some of them individually, we'll see that

1:10PM   6   there are times when there's characterizations of "serious" or

1:10PM   7   "nonserious."  And we'll see "listed" or "unlisted."

1:10PM   8          You'll agree were me that we'll see of that what we

1:10PM   9   start going through these reports?

1:10PM  10   A.   Yes.  Yes.

1:10PM  11   Q.   "Listed" or "unlisted," you know, could we add unlisted --

1:10PM  12   "unexpected," we see that.  You know, you may see a terminology

1:10PM  13   of "expected" or "unexpected."  Right?

1:10PM  14   A.   Yes.

1:10PM  15   Q.   What does -- first of all, when we talk about "listed"

1:10PM  16   versus -- versus "unlisted," that has to do with whether

1:10PM  17   something is contained within either -- or "expected" or

1:10PM  18   "unexpected," that has to do with whether a particular adverse

1:10PM  19   event is already contained within some of the company's core

1:10PM  20   data or contained within the prescribing label?

1:11PM  21   A.   If it's in the label, it refers to "listed" or "unlisted."

1:11PM  22   If you're referring to clinical trials, and you're using an

1:11PM  23   investigative brochure, you can refer to that as "expected" or

1:11PM  24   "unexpected."

1:11PM  25          I think it's also important for the jury's standpoint

OFFICIAL TRANSCRIPT

1    to clarify "serious" and "nonserious."

2            "Serious" does not refer to how severe something is.

3    Okay.  It's -- it's a regulatory definition.  And one might --

4    we -- in layperson's terms, we say something is serious and we

5    think that must be very severe; it must be very important.  But

6    that is not what "serious" means from the regulatory

7    standpoint.

8            You can have something that's clinical very mild.

9    But let's say someone is in a hospital for observation because

10   of it, that makes the event, from a regulatory perspective,

11   serious.

12   Q.   So we will see, as we review some individual case study

13   reports that are contained Table 2, where sometimes the adverse

14   event is characterized as "nonserious"; other times, it's

15   characterized as "serious"?

16   A.   Correct.

17   Q.   Depending on maybe a case-specific outcome?

18   A.   Correct.  The seriousness criteria are determined by

19   regulatory aspects.

20           I know you know this, Mr. Bachus.  But for the jury's

21   benefit, a hospitalization, death, life-threatening, congenital

22   defect, a significant disability that's permanent, or a

23   medically important event will be -- from a regulatory

24   standpoint, will fit that "serious" criteria.

25   Q.   And some of the adverse event reports that we'll look at

OFFICIAL TRANSCRIPT

1:13PM 1   that are in Table 2, they're on a form that's called a CIOMS

1:13PM 2   form; is that right?

1:13PM 3   A.   Correct.

1:13PM 4   Q.   But there's also something that the company called a

1:13PM 5   safety management committee.

1:13PM 6        Are you aware of that?

1:13PM 7   A.   Yes.

1:13PM 8   Q.   And the safety management committee would internally

1:13PM 9   consider whether there is a need to update a label or to take

1:13PM 10  any further action or to adjudicate whether there's agreement

1:13PM 11  that a serious unexpected or unlisted and related adverse event

1:13PM 12  has been identified associated with a particular drug, whether

1:13PM 13  that's Taxotere or any other drug.

1:14PM 14       Is that accurate?

1:14PM 15  A.   If there is a signal.  Okay?  We're not talking about a

1:14PM 16  single case.  But we're talking about, if there's a signal,

1:14PM 17  then that signal can be referred to the SMC for further

1:14PM 18  adjudication.

1:14PM 19  Q.   And the end goal and the reason for the safety -- the

1:14PM 20  safety signal detection process that we've been discussing is

1:14PM 21  to, at the end of the day, make sure that the doctors and

1:14PM 22  patients know about the benefits and know about the risks

1:14PM 23  associated with the use of the drug; correct?  That's why we do

1:14PM 24  this?

1:14PM 25  A.   Well, I think I responded to that in your initial

OFFICIAL TRANSCRIPT

1:14PM   1   questions, that we want to maximize awareness of the safety

1:15PM   2   profile of the product.

1:15PM   3   Q.   The start date, for purposes of this deposition, is

1:15PM   4   January 1, 2005.

1:15PM   5         Do you agree with me that Exhibit 2, Tabs 3 --

1:15PM   6   Tabs 2, 3, 4, 5, 6, 7, and 8 represent the report of a cluster

1:15PM   7   of patients reported to the company on July the 25th, 2005?

1:15PM   8   A.   I'm sorry.  Could you give me those numbers a little more

1:15PM   9   slowly.  You said 2 --

1:15PM  10   Q.   2 through 8.

1:15PM  11   A.   2 through 8.

1:15PM  12         I would agree that -- I would agree that these cases

1:15PM  13   are part of a group of cases that were reported to the company

1:16PM  14   on -- from the same source.

1:16PM  15   Q.   The report originally was received from a sales

1:16PM  16   representative on behalf of the company, received from a nurse;

1:16PM  17   is that right?

1:16PM  18   A.   Yes, that is -- that is correct.

1:16PM  19   Q.   And then follow-up information was obtained on October the

1:16PM  20   10th, 2005?

1:16PM  21   A.   On which case?

1:16PM  22   Q.   On all of the cases.  If you look at --

1:16PM  23   A.   October 10th of 2005?

1:16PM  24   Q.   If you would look at, again, Exhibit 2, Tab 2, there's an

1:16PM  25   addendum on page 2 of 3 of the suspect adverse reaction report

1:16PM 1   that details that an addendum of information occurred on

1:17PM 2   October the 10th, 2005.

1:17PM 3   **A.**   Follow-up was obtained in Case 2 on October the 10th of

1:17PM 4   2005, as was on Case 3, as was on Case 4, as was on Case 5, as

1:17PM 5   was on Case 6, as was on Case 7, and as was on Case 8.

1:17PM 6         Yes, I agree with that statement.

1:17PM 7   **Q.**   And in the follow-up, the nurse who -- well, the sales

1:17PM 8   representative initially reported in July of 2005 that the

1:17PM 9   nurse indicated that there were five patients who had been

1:18PM 10   treated with Taxotere in an adjuvant therapy setting who had

1:18PM 11   ongoing hair loss.

1:18PM 12         That was the initial report to the sales -- by the

1:18PM 13   sales representative from the nurse; correct?

1:18PM 14   **A.**   That is correct.

1:18PM 15   **Q.**   Then in October of 2005, additional information was

1:18PM 16   obtained from the nurse reporter, and the nurse then reported

1:18PM 17   that there were eight, not five, patients that she was aware

1:18PM 18   of; correct?

1:18PM 19   **A.**   Well, I -- I'm not sure that's entirely the -- correct and

1:18PM 20   that the eight cases were reported in July as -- as you

1:18PM 21   highlighted previously.

1:18PM 22   **Q.**   Do you agree with me that the words written in the page 2

1:18PM 23   of the CIOMS report in Tab 2, Exhibit 2, states that "The nurse

1:19PM 24   reports eight (not five) patients who experienced alopecia

1:19PM 25   following Taxotere, docetaxel therapy"?

OFFICIAL TRANSCRIPT

1:19PM  1  **A.**   That's correct.

1:19PM  2  **Q.**   The description of reactions being reported on the cluster

1:19PM  3  patient in Tab 2 of Exhibit 2 was, as it relates to alopecia,

1:19PM  4  was permanent alopecia.  Do you see that?

1:19PM  5  **A.**   Yes, I do.

1:19PM  6  **Q.**   So in the assessment done on receipt of this adverse event

1:19PM  7  report back in 2005, a determination was made that permanent

1:19PM  8  alopecia was considered to be listed as opposed to unlisted;

1:19PM  9  correct?

1:19PM  10  **A.**   The assessment was that permanent alopecia along with a

1:19PM  11  number of adverse events are considered listed in the core data

1:19PM  12  sheet for docetaxel.

1:20PM  13  **Q.**   Now, if you'd look at tab 10.  On the bottom of the first

1:20PM  14  page contained in tab 10 of Exhibit 2, there's an entry

1:20PM  15  indicated 7/29/05.  Do you see that?

1:20PM  16  **A.**   7/29/05, I -- I do.

1:20PM  17  **Q.**   This report is from a nurse indicating that she had

1:20PM  18  patients that were treated in an adjuvant setting and five out

1:20PM  19  of 90 still have hair loss and have not regrown hair.

1:20PM  20         Do you see that?

1:20PM  21  **A.**   Yes.  I see this is a case with very limited information

1:20PM  22  that reported state -- a request of information on hair loss.

1:20PM  23  She said she had treated in an adjuvant setting, 5 out of 90

1:21PM  24  still have hair loss and have not regrown, they all had

1:21PM  25  Taxotere.

OFFICIAL TRANSCRIPT

1:21PM  1   **Q.**   And 5 out of 90 is about 5 and a half percent of that
1:21PM  2   patient group she's reporting sustained hair loss and has not
1:21PM  3   regrown?  That's the report; right?
1:21PM  4   **A.**   She reports 5 out of 90 have not regrown.  Whether it's
1:21PM  5   sustained, I see no documentation of even that the hair loss
1:21PM  6   exceeded six months of duration.
1:21PM  7   **Q.**   The -- all right.
1:21PM  8           The nurse who called apparently or contacted Sanofi
1:21PM  9   at 12:58 on July 29th, 2005, reported that she had patients
1:22PM  10  that were treated in an adjuvant setting and 5 out of 90 still
1:22PM  11  have hair loss and have not regrown hair.  They all have
1:22PM  12  Taxotere, information on long-term hair loss; right?
1:22PM  13  **A.**   That's correct.
1:22PM  14  **Q.**   All right.  And in response to this report, it
1:22PM  15  indicates -- meaning this document indicates -- "A medical
1:22PM  16  literature search was performed in response to your request for
1:22PM  17  information on Taxotere and long-term or prolonged hair loss."
1:22PM  18          Do you see that?
1:22PM  19  **A.**   I do.
1:22PM  20  **Q.**   And it says, "No references relevant to your inquiry were
1:22PM  21  identified."
1:22PM  22          Do you see that?
1:22PM  23  **A.**   Yes.
1:22PM  24  **Q.**   And the only thing that the company provided in response
1:22PM  25  to this request for information on long-term hair loss was a

1:22PM   1   copy of the Taxotere label; correct?

1:23PM   2   A.   The Taxotere package insert was provided.

1:23PM   3   Q.   If you would look to tab 11 in Exhibit 2.  There's an

1:23PM   4   entry for a contact made on 8/19/2005.  It's an entry --

1:23PM   5   there's a reference number that ends in 1266, but the entry is

1:23PM   6   8/19/2005, 1653.

1:23PM   7            21 -- we'll go with you, 21 days.

1:23PM   8            All right.  This was a report received from another

1:23PM   9   nurse, a nurse practitioner; correct?

1:24PM  10   A.   A nurse phoned it in.

1:24PM  11   Q.   And it says -- well, it actually was a nurse who reported

1:24PM  12   this through your sales representative, Sean Miller.

1:24PM  13            Do you see that?

1:24PM  14   A.   Yes.

1:24PM  15   Q.   And it says, "We" -- in quotes -- "We have had six

1:24PM  16   patients who received Taxotere for breast cancer and

1:24PM  17   experienced permanent alopecia.  About a year or so out from

1:24PM  18   therapy, they have had no hair regrowth or very thin hair."

1:24PM  19            Is that what it states?

1:24PM  20   A.   Correct.

1:24PM  21   Q.   And it says, "Please call me for follow-up regarding

1:24PM  22   this."

1:24PM  23            Do you see that?

1:25PM  24   A.   Yes, I do.

1:25PM  25   Q.   Did that occur?  Do you see any documentation that there

OFFICIAL TRANSCRIPT

1312

1:25PM 1    was follow-up?

1:25PM 2    A.   I do not see documentation on this report, but I would not

1:25PM 3    interpret that as saying that the follow-up did not occur.

1:25PM 4    Q.   And do you agree with me that in the span of a month or

1:25PM 5    less, between July the 25th, 2005, and August 19th of 2005, you

1:25PM 6    had a report from -- of 8 patients in a cluster, followed by 5

1:25PM 7    out of 90, followed by this report that we're looking at now of

1:25PM 8    6 patients, all of whom were reported to have received

1:25PM 9    Taxotere, all of whom were reporting long-term alopecia after

1:25PM 10   Taxotere use.

1:26PM 11           Do you agree with that?

1:26PM 12   A.   I agree that we received the reports over the period of

1:26PM 13   time that you just specified.

1:26PM 14   Q.   All right.  Okay.  If you could turn to Exhibit 28.

1:26PM 15           Have you had an opportunity to find tab 28 in

1:26PM 16   Exhibit 2?

1:26PM 17   A.   It is 28?  Yes.

1:26PM 18   Q.   Do you agree that the company received a report from a

1:26PM 19   physician through a company sales representative on

1:26PM 20   October 17th, 2006, regarding patients who received docetaxel

1:26PM 21   having ongoing alopecia?

1:27PM 22   A.   This is a report received on the 17th of October 2006 from

1:27PM 23   a physician via a sales representative reporting about half a

1:27PM 24   dozen patients who received Taxotere with Adriamycin and

1:27PM 25   cyclophosphamide.  And it goes on to say exact dates were

OFFICIAL TRANSCRIPT

1:27PM  1  not -- but dosing were not provided and the patients

1:27PM  2  experienced alopecia.

1:27PM  3  **Q.**   Do you see an entry dated 10/17/2006 at 14:14?

1:27PM  4  **A.**   I do.

1:27PM  5  **Q.**   And this is a phone call from a Taxotere rep calling in

1:27PM  6  questions she received from a physician.

1:27PM  7          Do you see that?

1:27PM  8  **A.**   Yes.

1:27PM  9  **Q.**   And it reports, "About a half dozen of his patients

1:27PM  10 treated with TAC for adjuvant breast cancer experienced

1:27PM  11 alopecia.  However, their hair has not grown back in its

1:28PM  12 entirety.  The hair is still quite thin."

1:28PM  13         Do you see that?

1:28PM  14 **A.**   I see that.

1:28PM  15 **Q.**   And then the representative of your company passes on this

1:28PM  16 question from the physician, "Any info on this?  Could this be

1:28PM  17 researched?"

1:28PM  18         Do you see that?

1:28PM  19 **A.**   Yes, I do.

1:28PM  20 **Q.**   So they were given the label and then sent a copy of an

1:28PM  21 article by Calhoun?

1:28PM  22 **A.**   Yes, apparently so.

1:28PM  23 **Q.**   And what did the article on Calhoun have to say about

1:28PM  24 whether the company has any info regarding patients treated

1:28PM  25 with Taxotere in the TAC setting who were experiencing ongoing

OFFICIAL TRANSCRIPT

1:28PM   1   hair loss?

1:28PM   2   A.   The article by Calhoun is an article of taxane-induced

1:28PM   3   alopecia:  A review of patients with ovarian or breast cancer

1:29PM   4   treated with paclitaxel, docetaxel, or paclitaxel poliglumex.

1:29PM   5   Q.   In 2006, would you agree with me that Exhibit 2 contains

1:29PM   6   32 reports related to docetaxel and alopecia?

1:29PM   7   A.   That appears to be the case.

1:29PM   8   Q.   And some of those reports that we -- as we've discussed

1:29PM   9   include multiple patients; correct?

1:29PM   10   A.   Correct.

1:29PM   11   Q.   If you could turn to tab 38 in Exhibit 2.  Let me know

1:29PM   12   when you're there.

1:29PM   13   A.   Okay.

1:29PM   14   Q.   With respect to a few minutes ago when we talked about the

1:29PM   15   Sedlacek abstract that was provided to one of the reporters, do

1:29PM   16   you remember that?

1:29PM   17   A.   Yes.

1:29PM   18   Q.   When was the contact with Dr. Sedlacek made after the

1:30PM   19   publication of his abstract in -- in December 15th, 2006?

1:30PM   20   A.   The contact and the follow-up with Dr. Sedlacek's site --

1:30PM   21   and I cannot say whether it was in-person or not -- but with

1:30PM   22   his site occurred on these patients before the publication.

1:30PM   23   There's extensive discussion and follow-up.

1:30PM   24       My understanding is that these patients are the

1:30PM   25   patients that you previously went through in -- in the group of

OFFICIAL TRANSCRIPT

1:30PM 1   eight patients starting with -- with your Case 2 of the

1:30PM 2   exhibit.  If you look at those -- those eight cases, you'll see

1:30PM 3   that there is extensive follow-up and -- and discussions with

1:30PM 4   that site.

1:30PM 5   Q.   Can you turn to tab 43, please.  Do you see a time -- or,

1:31PM 6   I mean, an entry dated 12/19/2006 time-stamped at 14:07?

1:31PM 7          "Consumer calling to see if there's any clinical

1:31PM 8   research available for Taxotere.  On Taxotere three and a half

1:31PM 9   years ago.  Lost hair.  Never grew back.  Info was discussed at

1:31PM 10  the 2006 meeting in San Antonio."

1:31PM 11         Do you see that?

1:31PM 12  A.   Yes, I do.

1:31PM 13  Q.   It appears that the company's response was telling the

1:31PM 14  patient that they have to have their doctor call?

1:31PM 15  A.   Well, I think it says here, "Joyce told patient to have

1:31PM 16  doctor call" -- well, it doesn't say they had to have.  I think

1:31PM 17  you inserted that word there.

1:31PM 18         "Joyce told patient to have doctor call MIS for

1:31PM 19  information available."

1:31PM 20  Q.   Would you agree with me that Exhibit 2 contains 45 reports

1:32PM 21  related to Taxotere and alopecia being received by the company

1:32PM 22  between January 1st, 2005, and December 31st, 2008?

1:32PM 23  A.   Well, I would agree that from that time period, that in

1:32PM 24  your table 1, there are 45 reports.

1:32PM 25  Q.   Okay.

OFFICIAL TRANSCRIPT

1:32PM  1  A.   You know, some -- some of these reports are double

1:33PM  2  reports, et cetera, so.

1:33PM  3  Q.   You mean some of them contain more than one patient?

1:33PM  4  A.   Or some contain more than patient.  Some retain -- such as

1:33PM  5  28 and 37, have more than one report, but I would have -- I

1:33PM  6  would agree that there are 45 cases that you've identified

1:33PM  7  with -- on Table -- on Table 2 of Exhibit 1 within that time

1:33PM  8  period.

1:33PM  9  Q.   Can you turn to tab 58?

1:33PM  10      You agree this is a report received by the company in

1:33PM  11  July of 2008, July 3rd, 2008, it was from a health care

1:33PM  12  provider who was participating in an observational study?

1:33PM  13  A.   Yes.  This was received on the 3rd of July, 2008, a health

1:33PM  14  care provider, and he was in a German observational study

1:34PM  15  reporting 15 patients, and I believe this is the first.

1:34PM  16  Q.   Some of the 15 --

1:34PM  17  A.   Well, 16 patients.

1:34PM  18  Q.   Some of the 15 patients were treated with docetaxel

1:34PM  19  monotherapy and some were treated with other combinations of

1:34PM  20  drugs; correct?

1:34PM  21  A.   That's correct.

1:34PM  22  Q.   This indicates the patient had ongoing alopecia 11 months

1:34PM  23  after last Taxotere treatment; correct?

1:34PM  24  A.   I don't believe there's a documentation of the last

1:34PM  25  alopecia in this -- in this study.

**Q.** This goes back to the conversation we had earlier about documented as ongoing at the time of this report in July of 2008 and whether that is reliable?

**A.** Well, the last documentation that I see for this patient is hypoglycemia in October of 2007. And that would have been less than six months from the last dose of Taxotere. I don't see any documentation for any event beyond that. So it's not clear to me that the patient had alopecia exceeding six months.

I see an event of alopecia. I don't see an event or -- I'm trying to look while I'm talking, but I don't see an event of persistent or permanent or irreversible alopecia. So, for this, unless I'm missing it, and please point it out to me, Mr. Bachus, for this case, I don't see any documentation that the alopecia extended beyond six -- six months.

**Q.** The outcome of alopecia is indicated as ongoing with a report date of July the 3rd, 2008, the last Taxotere attempt date of 8/20 at 1:07, which would place the alopecia as ongoing as an outcome on July the 3rd, 2008?

**A.** To use those dates would suggest that the patient was seen the very day that the investigator sent this report off to the company. I see no documentation that this patient was actually seen on July 3rd of 2008. I only see that the investigator sent this report to the company on July 2008.

**Q.** So your -- your position is that on this particular event, you cannot say that there was ongoing alopecia, despite the

1:37PM   1   fact that that's what's reported by the investigator; correct?
1:37PM   2   A.    No.   The question is not whether there was ongoing
1:37PM   3   alopecia when the patient was last seen.   The question that I'm
1:37PM   4   saying I cannot document is whether that alopecia persisted for
1:37PM   5   more than six months from the last chemotherapy without
1:37PM   6   resolution.
1:37PM   7   Q.    All right.   Could you turn to tab 68.
1:37PM   8         Let me know when you're there.
1:37PM   9   A.    Okay.
1:37PM  10   Q.    Do you see an entry dated October 8th, 2008?
1:38PM  11   A.    Yes.   October 8th, 2008.
1:38PM  12   Q.    She indicates that she underwent four rounds of Taxotere
1:38PM  13   and four rounds of AC as part of the study, and her question is
1:38PM  14   "Have there been reports of permanent hair loss with this
1:38PM  15   treatment?"
1:38PM  16         And she goes on to say, "It's been 15 months since my
1:38PM  17   last treatment and the only hair growth that I have been able
1:38PM  18   to achieve is very patchy at best.   Any information you could
1:38PM  19   provide would be greatly appreciated."
1:38PM  20         Do you see that?
1:38PM  21   A.    Yes, I see that.
1:38PM  22   Q.    In October of 2008, when this medical professional and
1:38PM  23   breast cancer survivor made this inquiry, what did your company
1:38PM  24   tell her about whether there had been reports of permanent hair
1:38PM  25   loss with your product?

OFFICIAL TRANSCRIPT

1:38PM 1  **A.**   It says in the response information that the -- that

1:39PM 2  there's an e-mail sent to the patient and there was no call or

1:39PM 3  contact.

1:39PM 4  **Q.**   Turn to No. 87.  Do you agree this is a consumer report to

1:39PM 5  your company by a patient on July the 2nd, 2009?

1:39PM 6  **A.**   Yes, July 2nd, 2009.

1:39PM 7  **Q.**   And the description of the concern being presented is

1:39PM 8  permanently bald; correct?

1:39PM 9  **A.**   Correct.

1:39PM 10 **Q.**   This female patient received four treatments with

1:39PM 11 docetaxel for breast cancer in 2004.  That's what it indicates;

1:39PM 12 right?

1:39PM 13 **A.**   Correct.

1:39PM 14 **Q.**   If you turn to the -- well, this consumer, again, reports

1:39PM 15 that the event was ongoing as of September 18th, 2009?

1:40PM 16 **A.**   Correct.  So in this -- in the case, as opposed to the

1:40PM 17 last case, dates are provided.  In the previous case, the --

1:40PM 18 the dates are unknown.  In this case, you have a -- a -- you

1:40PM 19 have the -- the date that it was ongoing, and you have a

1:40PM 20 statement approximating when she received docetaxel.

1:40PM 21          So this is a very different case.  Even though

1:40PM 22 there's limited information in this case, we don't know the

1:40PM 23 dose.  We don't have the regimen.  We don't know if there were

1:40PM 24 other anticancer drugs given.  We don't know if there are any

1:40PM 25 medications, or the past medical history.  In this case, we

OFFICIAL TRANSCRIPT

1320

| | |
|---|---|
| 1:40PM | 1 |
| 1:41PM | 2 |
| 1:41PM | 3 |
| 1:41PM | 4 |
| 1:41PM | 5 |
| 1:41PM | 6 |
| 1:41PM | 7 |
| 1:41PM | 8 |
| 1:41PM | 9 |
| 1:41PM | 10 |
| 1:41PM | 11 |
| 1:41PM | 12 |
| 1:41PM | 13 |
| 1:41PM | 14 |
| 1:42PM | 15 |
| 1:42PM | 16 |
| 1:42PM | 17 |
| 1:42PM | 18 |
| 1:42PM | 19 |
| 1:42PM | 20 |
| 1:42PM | 21 |
| 1:42PM | 22 |
| 1:42PM | 23 |
| 1:42PM | 24 |
| 1:42PM | 25 |

1  do -- we do have dates in contrast to the last case.

2  Q.   It says, "Additional information received, permanent hair

3  loss from docetaxel, permanently bald since January 2005, and

4  it was very emotional for her because she saw it every morning

5  before she puts on her wig."

6       Do you see that?

7  A.   Yes.  Correct.

8  Q.   So -- and did the company characterize this report of

9  being bald from Taxotere permanently as being listed or

10 unlisted?

11 A.   Okay.  So the PSUR, that was line listing that was sent to

12 the FDA, specifies "permanently bald" and considers it -- this

13 event sent to the FDA and the line listing says "permanently

14 bald," and it characterized it as unlisted.

15 Q.   Unlisted?

16 A.   Unlisted.

17 Q.   The company is aware of circumstances with its own drugs

18 where fewer than ten reports of a particular serious unlisted

19 adverse event led to a change of a label with Sanofi products;

20 correct?

21 A.   I think that's probably correct.

22 Q.   Even though hundreds of thousands of users may have

23 utilized the drug without reporting that adverse event;

24 correct?

25 A.   First off, the adverse event would have to not be already

OFFICIAL TRANSCRIPT

1:42PM  1    in the label.  I'll remind you alopecia was in the label.

1:42PM  2    Q.   My point is, even if -- in making a decision regarding

1:42PM  3    whether to provide an update to a label, the fact that -- it's

1:43PM  4    not how many people reported the adverse event over a

1:43PM  5    denominator of how many took a drug in a period of time that is

1:43PM  6    the focus; right?  That's not the focus.

1:43PM  7    A.   The decision has to consider whether the event is in the

1:43PM  8    label or not in the label.

1:43PM  9    Q.   My question, which is, would you agree with me it's not a

1:43PM  10   mathematical equation of how many people took the drug versus

1:43PM  11   how many people reported a serious unlisted adverse event?

1:43PM  12   That's not -- that's not the math, is it?

1:43PM  13   A.   The real question that has to be assessed is the

1:43PM  14   scientific strength for an association of something that was

1:43PM  15   not previously known by looking at the quality of the

1:44PM  16   information, the past medical history, the medications that

1:44PM  17   somebody may have received, medications that are being given

1:44PM  18   along with the drug that you're evaluating, whether or not

1:44PM  19   there was --

1:44PM  20   Q.   I'm just --

1:44PM  21   A.   -- say that not only the temporal relationship but also

1:44PM  22   whether there's a repeat of the adverse event on -- on a

1:44PM  23   subsequent rechallenge.

1:44PM  24   Q.   Let's move on.  We've spent obviously a significant amount

1:44PM  25   of time on the individual case reports.  Let's move on and

OFFICIAL TRANSCRIPT

| | | |
|---|---|---|
| 1:44PM | 1 | discuss briefly the process by which a responsible |
| 1:45PM | 2 | pharmaceutical company would be evaluating the individual case |
| 1:45PM | 3 | safety reports individually and then in aggregate over this |
| 1:45PM | 4 | time frame.  Okay? |
| 1:45PM | 5 | And so let's make kind of the next stop this -- what |
| 1:45PM | 6 | we would expect from -- from a pharmaceutical company with the |
| 1:45PM | 7 | information that we have gone over. |
| 1:45PM | 8 | So, first of all, do you agree that Sanofi in -- in |
| 1:45PM | 9 | looking at the safety signal issue -- safety signal detection |
| 1:45PM | 10 | issue was responsible for engaging in proactive, not reactive, |
| 1:45PM | 11 | pharmacovigilance in terms of safety signal detection and the |
| 1:46PM | 12 | adverse event reports contained in Exhibit 2 and 3? |
| 1:46PM | 13 | A.   Sanofi, you know, certainly believes that one should be |
| 1:46PM | 14 | proactive. |
| 1:46PM | 15 | Q.   So the company, when in possession of these aggregated |
| 1:46PM | 16 | individual case safety reports that we have gone over, has to |
| 1:46PM | 17 | make an analysis as to whether there are unlisted adverse |
| 1:46PM | 18 | events, if so, how serious they are, if so, how do we define |
| 1:46PM | 19 | that adverse event, and can we validate it; correct?  That's |
| 1:46PM | 20 | what would be -- that's what should have been done certainly |
| 1:46PM | 21 | with these individual case safety reports? |
| 1:47PM | 22 | A.   When -- when you have a question of a safety signal and -- |
| 1:47PM | 23 | and, you know, the first question, is it a safety signal. |
| 1:47PM | 24 | That's -- that's the first question.  All of the cases that |
| 1:47PM | 25 | we've gone through are cases of alopecia.  Is alopecia a safety |

1:47PM 1   signal?  Alopecia is in the label.

1:47PM 2   **Q.**   The word "alopecia"?

1:47PM 3   **A.**   Alopecia.  Okay.  The diagnosis here is alopecia.  If you

1:47PM 4   talked about -- if you talk about a patient being bald, okay,

1:47PM 5   that's a description of the severity of the alopecia.  Okay.

1:47PM 6   That would be Grade 2 alopecia in the typical NCI-CTC criteria.

1:47PM 7         Does the label have Grade 2 alopecia in the label?

1:47PM 8   That would be a question to ask.  Okay?  So you have to

1:48PM 9   distinguish when someone says, you know, "I have persistence"

1:48PM 10  or "I'm bald," those could be descriptions of duration or

1:48PM 11  descriptions of severity.  But the event is the alopecia.

1:48PM 12        So the first question is -- may I finish?  The first

1:48PM 13  question is alopecia in the label.

1:48PM 14        The second question, then, is even if it's in the

1:48PM 15  label, is there a change -- is there a new aspect of what's in

1:48PM 16  the label.

1:48PM 17        Now, a new aspect would be if there's an increase in

1:48PM 18  the frequency, that will be a new aspect.  A new aspect would

1:48PM 19  be if you've identified a new subpopulation.  Okay.  So if all

1:48PM 20  of a sudden I know that --

1:48PM 21  **Q.**   Can I ask another question?

1:49PM 22  **A.**   Okay.

1:49PM 23  **Q.**   All right.  So let's talk about during the time frame that

1:49PM 24  these individual case safety reports are coming in and you're

1:49PM 25  making a determination as to whether there's a safety signal

OFFICIAL TRANSCRIPT

1:49PM 1  and then whether it's a validatable safety signal.  What the

1:49PM 2  company knew at that time, and this is just a statement of your

1:49PM 3  previous testimony in the earlier part of this 30(b)(6), that,

1:49PM 4  you know, permanent hair loss is a great concern to many women.

1:49PM 5  That was known by the company; correct?

1:49PM 6  A.    Permanent hair loss would be a certain.

1:49PM 7  Q.    At any time between January 2005 and the end of 2011, did

1:49PM 8  the company ever ask of itself, do these individual case safety

1:49PM 9  reports with all these people coming to the company about

1:49PM 10  permanent irreversible alopecia, does that represent a

1:49PM 11  validated safety signal?  Was that question asked?

1:50PM 12  A.    Let me answer not with respect to validated safety signal.

1:50PM 13  Q.    Well, that's the question.

1:50PM 14  A.    That's -- that's the question.  I would -- I would say

1:50PM 15  that the company did -- did ask.  As you've already shown in

1:50PM 16  today's testimony, that the company analyzed data with respect

1:50PM 17  to the issue of persistent alopecia.  And you have already

1:50PM 18  provided exhibits to that effect.

1:50PM 19  Q.    Do you agree that the company understood if the side

1:50PM 20  effect is already listed and there's not, I guess -- then

1:50PM 21  there's no new safety signal?

1:50PM 22  A.    No.

1:50PM 23  Q.    Is that --

1:50PM 24  A.    The company absolutely does not limit a safety signal to

1:50PM 25  merely as a side effect listed.  I explained that previously.

OFFICIAL TRANSCRIPT

1:51PM 1  You could have a new aspect of a listed event that could be a

1:51PM 2  safety signal.

1:51PM 3  Q.   All right.  All right.

1:51PM 4        Do you agree that the regulatory requirement for

1:51PM 5  determining if the side effect is listed or unlisted is

1:51PM 6  accurately stated here and that is that a side effect is

1:51PM 7  considered to be listed in the label only when its nature,

1:51PM 8  severity, specificity and outcome are consistent with the

1:51PM 9  information already in the label?

1:51PM 10  A.   I'd certainly agree with the nature, severity and

1:51PM 11  specificity.  In terms of outcome, I believe that depended upon

1:51PM 12  time period, and I'm not prepared to discuss, you know, the

1:51PM 13  various time periods.

1:51PM 14  Q.   Well, I'm handing you what's been marked as Exhibit 8 to

1:52PM 15  your deposition.  I'll represent to you that this was produced

1:52PM 16  as the standard operating procedures regarding the handling of

1:52PM 17  unsolicited individual case safety reports for registered

1:52PM 18  products that went into effect in November of 2007.  Okay?

1:52PM 19        And if you would turn to page 7 of 14, the document

1:52PM 20  is Sanofi 06246562.  It's page 7 of 14.

1:52PM 21  A.   Yes.  Okay.

1:52PM 22  Q.   Do you want to read that paragraph?  I'm going to ask you

1:52PM 23  a question about the "Unexpected ADR" paragraph.

1:52PM 24  A.   Yes, I will.  Thank you.

1:52PM 25        Okay.

OFFICIAL TRANSCRIPT

**Q.**   Have you had a chance to look at that?

And do you see right under "Unexpected ADR," there's also "Unlisted ADR"?  Essentially uses the same language.

**A.**   Yes, I do.

**Q.**   All right.  Having had a chance to look at Exhibit 8, do you agree an adverse event is considered to be listed in the label only when its nature, severity, specificity and outcome are consistent with the information that's already in the label?

**A.**   I do with regards to the time period covered by this -- this SOP.

**Q.**   Well, to be clear, we asked for the SOPs that were in effect during this window of time that we're here to talk about.  And we were provided with two SOPs that covered that time period related to the handling of unsolicited individual case safety reports, and both of them contain the same language.

**A.**   Okay.  That, I don't think changes my statement.

**Q.**   All right.  So at least from the effective date of the 2007 time frame, you would agree that a side effect is considered listed -- to be listed in the label only when the nature, severity, specificity and outcome are consistent with information already in the label; correct?

**A.**   Well, I would agree with what's specified in the SOP for unlisted ADRs, and an ADR whose nature, severity, specificity,

1327

1:54PM  1   or outcome is not consistent with the information included in

1:54PM  2   the company core safety information.

1:54PM  3   Q.   Let's look at unexpected.  Okay.  That's the one right

1:54PM  4   above it.

1:54PM  5   A.   Yes, and --

1:54PM  6   Q.   Unexpected.

1:54PM  7   A.   As you said, similar language ADR whose nature, severity

1:54PM  8   and specificity --

1:54PM  9   Q.   Specificity.

1:54PM  10  A.   Sorry, throat is getting a little dry.

1:54PM  11          -- or outcome is not consistent with the term or

1:54PM  12  description used in the labeling.

1:54PM  13  Q.   In the label; right?

1:54PM  14  A.   Or package insert.

1:54PM  15  Q.   Which is the label.

1:54PM  16  A.   Yes.

1:55PM  17  Q.   Right.

1:55PM  18          Do you agree with me that the word "alopecia" or the

1:55PM  19  word "hair loss" in the Taxotere label does not address the

1:55PM  20  nature, severity, specificity and outcome of determine

1:55PM  21  alopecia?

1:55PM  22  A.   That is not my opinion.  I wouldn't agree with you because

1:55PM  23  it -- because the very nature of alopecia is one that includes

1:55PM  24  alopecia that -- that does not recover for a long period of

1:55PM  25  time or may not recover.  I think that -- when one looks at the

OFFICIAL TRANSCRIPT

1328

1  word in terms of labeling assessment, one has to consider the

2  medical context of that word.

3  **Q.**   What does the word "alopecia" or "hair loss" tell you

4  about the outcome of the alopecia or hair loss in terms of

5  duration of permanency?

6  **A.**   Okay.  So first we need to understand what outcome refers

7  to, what the word "outcome" refers to, and that refers to

8  whether it is fatal, whether it resolves.

9  **Q.**   Whether it's permanent?

10  **A.**   It is whether it's fatal, whether it's ongoing, resolves.

11  Those are words that pertain to outcome.

12       So when you talk about a new aspect of an event as

13  applied to outcome, you would look, for example -- the typical

14  outcome would be fatality.  So if alopecia was fatal, if you

15  had a case of fatal alopecia, the assessment of a fatal

16  alopecia should be, even though alopecia is listed, should be

17  unlisted.

18       In other words, it would not -- it would not apply.

19  **Q.**   Do you believe that the term "alopecia" talks about

20  whether the outcome of reversibility -- you agree that the

21  outcome would be whether it's reversible or irreversible;

22  correct?

23  **A.**   If you look at the way outcome is used -- and I would

24  point you to the CRFs in clinical trials, talking about

25  fatality, resolution, or ongoing.

OFFICIAL TRANSCRIPT

**Q.**    "Resolution" means reversible?

**A.**    Correct.

**Q.**    So that would be part of the outcome.

You agree that the word "alopecia" doesn't tell you whether it's irreversible, does it?

**A.**    Okay.  So --

**Q.**    Do you agree with that statement?

**A.**    You're asking -- you're asking a question of the word "alopecia."  "Alopecia" means hair loss.  Okay.  So if you would just look at the word "alopecia," it means hair loss. Okay?

But in terms of assessment of whether it's listed or unlisted, or labeled or unlabeled, you're looking at the medical concept and the comparable concepts of the term.  Okay?

So -- so one has to -- one has to ask, "If you have alopecia, what does that mean?"

Okay.  It means hair loss, but what does it mean clinically?  You're making a clinical assessment.

And I previously described in my previous testimony that the term of "alopecia," in terms -- in terms of duration, is a variable recovery.  There's a known -- medically, it's known that alopecia has variable recovery.

Resolution -- I would agree if -- if alopecia reversed and the hair grew back, that would be resolution.

**Q.**    And resolution is an outcome, isn't it?

OFFICIAL TRANSCRIPT

1:59PM  1   **A.**   I --

1:59PM  2   **Q.**   Didn't you say that already?

1:59PM  3   **A.**   I did.  The resolution, I would consider an outcome.

1:59PM  4   **Q.**   Okay.  And --

1:59PM  5   **A.**   Ongoing, I would also consider an outcome.

1:59PM  6   **Q.**   The word "alopecia" or "hair loss" cannot warn of both

1:59PM  7   temporary and irreversible alopecia because "temporary" and

1:59PM  8   "persistent" -- or "temporary" and "permanent" are not

1:59PM  9   consistent terms; correct?

1:59PM  10  **A.**   That's not correct.

1:59PM  11  **Q.**   Is "temporary" the same -- is "temporary" --

1:59PM  12  **A.**   I'm sorry.  What is the question you're asking, whether

1:59PM  13  the word "alopecia" --

1:59PM  14  **Q.**   Whether the word "temporary" -- I'm sorry.  Let me restate

1:59PM  15  the question.

2:00PM  16          Do you agree with me that temporary and permanent are

2:00PM  17  not consistent outcomes?

2:00PM  18  **A.**   They're not consistent words.  I agree with that.

2:00PM  19  **Q.**   Do you agree with me -- can you answer my question.

2:00PM  20          Do you agree that temporary and permanent are not

2:00PM  21  consistent outcomes?

2:00PM  22  **A.**   Well, neither of them are outcomes, right.

2:00PM  23  **Q.**   Well, we talked about -- just a moment ago, you just

2:00PM  24  agreed that irreversible is an outcome.

2:00PM  25          Isn't irreversible -- doesn't irreversible equal

OFFICIAL TRANSCRIPT

2:00PM  1    permanent?

2:00PM  2    **A.**    And I said the other outcome was ongoing.

2:00PM  3    **Q.**    Okay.

2:00PM  4    **A.**    You're --

2:00PM  5    **Q.**    I want you to answer my questions.

2:00PM  6            A moment ago, you testified under oath that

2:00PM  7    irreversible is an outcome; true?

2:01PM  8    **A.**    I don't recall testifying that.  Maybe -- I mean,

2:01PM  9    irreversible would be ongoing.

2:01PM  10   **Q.**    Which is an outcome; right?

2:01PM  11   **A.**    Ongoing is an outcome, correct.

2:01PM  12   **Q.**    Is -- irreversible is the same as permanent, isn't it?

2:01PM  13   **A.**    That's -- yes.

2:01PM  14   **Q.**    Irreversible or permanent versus temporary, those are not

2:01PM  15   consistent outcomes, are they?

2:01PM  16   **A.**    If you're referring to the outcomes, are they consistent

2:02PM  17   outcomes?  One is not ongoing; one is ongoing.  So...

2:02PM  18   **Q.**    They're inconsistent outcomes?

2:02PM  19   **A.**    So that would not be consistent.

2:02PM  20   **Q.**    All right.

2:02PM  21   **A.**    But in terms of your -- in terms of your question about

2:02PM  22   assessment of alopecia based on -- on the word and based on the

2:02PM  23   outcome, there's a range of outcomes that you can have in

2:02PM  24   assessment.

2:02PM  25            If you have a heart attack, you can -- you can die of

OFFICIAL TRANSCRIPT

2:02PM 1   a heart attack; you can recover.  Both of those contradictory

2:02PM 2   outcomes are recognized as part of the outcome of a heart

2:02PM 3   attack, even though they're inconsistent.

2:02PM 4   Q.   Do you agree with me that Sanofi repeatedly characterized

2:02PM 5   permanent irreversible alopecia, as listed?

2:03PM 6   A.   Sanofi characterized alopecia, as listed.  Within the

2:03PM 7   concept of -- within some of the cases of alopecia, some were

2:03PM 8   described as permanent or irreversible.

2:03PM 9            As alopecia is listed, I agree that -- that those

2:03PM 10  cases were characterized as listed or expected.

2:03PM 11  Q.   State your name, please.

2:03PM 12  A.   My name is Michael Kopreski.

2:03PM 13  Q.   And you are board-certified in internal medicine and

2:03PM 14  oncology?

2:03PM 15  A.   Yes, I was board-certified in both internal medicine and

2:03PM 16  in oncology.

2:03PM 17  Q.   Okay.  All right.  I want to spend a little bit of time

2:03PM 18  talking about a particular case that I think may illustrate the

2:03PM 19  importance of getting additional information.  And I want to

2:03PM 20  direct your attention to, I believe, it's Tab No. 77.  I

2:04PM 21  believe, in Mr. Bachus' notebook, it's Tab 76.

2:04PM 22            And if you could take a moment to pull that out,

2:04PM 23  Dr. Kopreski, I would ask if this is an example of -- well, let

2:04PM 24  me --

2:04PM 25  A.   Well, let me -- let me pull it up.

OFFICIAL TRANSCRIPT

1    2:04PM    Yes, Tab 76, I have it.

2    2:04PM  **Q.**   All right.  What is it -- without spending too much time

3    2:04PM  on this, what is it about this in particular that you think

4    2:04PM  illustrates the value of getting as much additional information

5    2:04PM  as possible to properly evaluate a case assessment?

6    2:04PM  **A.**   Well, this is a case where the alopecia was being

7    2:04PM  described as permanent.  And the case was received by --

8    2:04PM  initially received by the company on the 4th of March of 2009.

9    2:05PM  And at that time, it says that there's an unspecified date --

10   2:05PM  I'm sorry.

11   2:05PM    It says this patient -- it involves a female patient

12   2:05PM  of unknown age who receives docetaxel therapy.  Dates and

13   2:05PM  dosing were not reported.  And the medical history and

14   2:05PM  concomitant medications were not provided.

15   2:05PM    And then it goes on to say, "On an unspecified date,

16   2:05PM  the patient continued to experience almost total alopecia one

17   2:05PM  year after docetaxel treatment finalized."

18   2:05PM    And then it says that her treatment included

19   2:05PM  epirubicin and cyclophosphamide and then Taxotere with

20   2:05PM  Herceptin.  So this -- this is a -- in a way, it's, I think,

21   2:05PM  somewhat typical of some of the cases that we've seen among

22   2:06PM  these 230 cases in that there's a lot of unprovided

23   2:06PM  information.  There's not information provided on the medical

24   2:06PM  history or medications, for example.

25   2:06PM    At that time, the report is -- casual assessment is

2:06PM  1    not reported.  And then we get a follow-up on the 7th of April,
2:06PM  2    '09.  And the following -- the additional information is
2:06PM  3    reported, that the patient's hair has not returned, she has no
2:06PM  4    eyebrows.  And then it gives -- it gives a dose for the
2:06PM  5    docetaxel, and it says the patient will be seen by a
2:06PM  6    dermatologist.
2:06PM  7         It goes on -- it goes on to make the statement of
2:06PM  8    some relevant medical history.
2:06PM  9         So now, with follow-up, we're starting to get
2:06PM  10   additional medical history.  And it says that the history
2:07PM  11   includes a hair follicle infection ten years earlier.  At that
2:07PM  12   time, there was no involvement of the eyelashes or eyebrows.
2:07PM  13   And since then, she had very thin hair but had not been bald.
2:07PM  14        So now we get information that the patient
2:07PM  15   information was not previously available, that the patient had
2:07PM  16   a problem with thin hair and a problem with a scalp in the
2:07PM  17   past.
2:07PM  18        The last follow-up, just to show the importance of
2:07PM  19   additional information -- as we learn more, the last follow-up
2:07PM  20   involves -- reports a biopsy of the scalp that shows a biopsy
2:07PM  21   consistent with folliculitis decalvans.
2:07PM  22   Q.   What is folliculitis decalvans?
2:07PM  23   A.   So folliculitis decalvans is a inflammatory reaction to
2:08PM  24   the scalp, often -- some postulate it might be due to a
2:08PM  25   response to a bacteria, which can persist for many years.  It

OFFICIAL TRANSCRIPT

1   may affect other areas of hair growth in the body, and it's

2   characterized by a -- by a scarring type of alopecia, while

3   chemotherapy is generally considered -- characterized by

4   nonscarring, to the best of my knowledge.

5   Q.   Okay.

6   A.   So what -- the additional information takes a case that

7   initially sounds like it's due to the chemotherapy.  And as we

8   get more information, learn more about the patient, ending up

9   with a biopsy, find out that this probably is not

10  chemotherapy-induced but is probably folliculitis decalvans

11  with a very different history and characterization on the

12  biopsy and pathology.

13  Q.   Okay.  Are there, just briefly, several other examples

14  like this one that show the difficulty in making assessments

15  when you have limited information from the -- either from the

16  reporter or from the hospital or the doctor or the consumer?

17          I think perhaps Case No. 33 or 48 might be

18  instructive, and then we can move on to another topic.

19  A.   Yes.  I'm looking at Case No. 38.

20  Q.   Okay.  What does that -- why is that instructive to you?

21  A.   Well, I think, in this case, it's instructive in terms of

22  the limited amount of information that's provided.  It does not

23  provide the medical history.

24          It says, "Patient with unspecified medical

25  history" -- other than having breast cancer -- "was treated

OFFICIAL TRANSCRIPT

with Taxotere and experienced alopecia."

So it does not provide any information as to any other medication that may have been provided or any other medical history, and it's -- it's very limited in scope.

Well, again, looking at 48, which is number -- last four is 8760E.

This is -- this is a case, again, where we do not know what cancer was being treated.  The indication is unknown. Because of that, we don't know whether the dose or the regimen is one that is recommended.  We don't have any information on the medications other than this patient having received docetaxel in October of 2007.

On top of that, the dates are not provided, other than there was treatment on 2007.  And that means that -- since the data the manufacturer received was 28th of March 2008, by my count, that means that this case falls into less than six-month time frame.

**Q.**   Okay.

**A.**   But, again, what I want to point out is -- is how little information is provided on this case.

**Q.**   Okay.

**A.**   In fact, the date of October 2007 was provided only on follow-up.

**Q.**   Okay.  All right.  I want to hit on a couple other things, and then we'll be winding down here.

OFFICIAL TRANSCRIPT

| | | |
|---|---|---|
| 2:12PM | 1 | Doctor, there was a Tab 80, Case 80 -- I believe "80" |
| 2:12PM | 2 | corresponds to Mr. Bachus' notebook. |
| 2:12PM | 3 | And for the record, it's -- the control number ends |
| 2:12PM | 4 | in 634FR. |
| 2:12PM | 5 | If you could pull that up. |
| 2:12PM | 6 | And "FR" means to comes from France, Doctor? |
| 2:12PM | 7 | A.   That's correct. |
| 2:12PM | 8 | Q.   Dr. Kopreski, I'm going to put this on the -- what is |
| 2:13PM | 9 | significant to you about this report from France? |
| 2:13PM | 10 | A.   Well, this is -- this is a literature report. |
| 2:13PM | 11 | Q.   Okay.  Do you have the literature report? |
| 2:13PM | 12 | A.   I do. |
| 2:13PM | 13 | Q.   Before I -- before I -- I have the literature.  Let me |
| 2:13PM | 14 | mark that as Exhibit No. 35. |
| 2:13PM | 15 | I'll hand that to you, Exhibit 35. |
| 2:13PM | 16 | A.   So this is a literature report from author Prevezas, |
| 2:13PM | 17 | P-R-E-V-E-Z-A-S. |
| 2:13PM | 18 | I'm sorry.  I should have been spelling some of the |
| 2:13PM | 19 | others for you. |
| 2:13PM | 20 | Q.   Explain what happened here, Doctor. |
| 2:13PM | 21 | A.   Okay.  What I would like to point out in this case is it |
| 2:14PM | 22 | describes two -- it provides two case -- two patients. |
| 2:14PM | 23 | The first is -- Patient 1 is a woman that receives |
| 2:14PM | 24 | docetaxel in combination with -- or docetaxel and additionally |
| 2:14PM | 25 | receives the endocrine therapy letrozole.  And that is |

OFFICIAL TRANSCRIPT

1  described as Patient No. 1.

2            If you look at the literature report on page 884,

3  you'll see that the wording is the same.

4            Patient 2 is described in this case as --

5  Q.   Let me just interrupt you, Doctor.

6            So Patient 1 had docetaxel, and that's Taxotere?

7  A.   That's Taxotere.

8  Q.   Okay.  And Patient 2?

9  A.   And letrozole.

10  Q.   Okay.

11  A.   Okay.

12  Q.   And Patient 2?

13  A.   And Patient 2, in the cases described, is a

14  paclitaxel-associated case created under a different number,

15  which is not provided here.

16            So this is -- this is a literature report of two

17  cases of what they describe as irreversible and severe alopecia

18  of -- one case is this combination of docetaxel and also the

19  patient receiving letrozole, which is a antihormonal or

20  endocrine.

21            And the second case is Patient 2, which is a

22  55-year-old woman with no previous problems who received four

23  cycles of paclitaxel every three weeks.

24  Q.   Let me interrupt you.

25            That is Taxol; right?

OFFICIAL TRANSCRIPT

A.   That is Taxol.

Q.   That's not Taxotere?

A.   That is not Taxotere.  That is Taxol.

Q.   Okay.

A.   Okay.

Q.   And this clinical report, then, was included in the adverse event report that we started with?

A.   Patient 1 was included.  Patient 2 was not included in this Case 79.  But the details of Patient 2 -- see, there's no information for Patient 2.  It's referred to another.  So the details of Patient 2 are included in the literature.

Q.   Okay.

A.   Specifically, you know, the details that say that a severe and diffuse hair shedding followed a few weeks after receiving the paclitaxel involved not only the scalp but also the eyebrows, the eyelashes, the axillary and pubic region.  And there has been no regrowth since.

Q.   Okay.  And that was for the Taxol drug?

A.   That was for the Taxol.

Q.   All right.

A.   So the -- so the report concludes that we believe this case, paclitaxel, gave rise to irreversible alopecia presenting in a more generalized pattern.

Q.   All right.  Okay.  I want to conclude by spending just a brief amount of time on the Sedlacek reports, and I believe

2:17PM  1    those were very early on in day one.  I think the Sedlaceks are

2:17PM  2    Tab 2 and Tab 5.

2:18PM  3         I wanted to briefly ask you a couple quick questions

2:18PM  4    about Sedlacek.

2:18PM  5         Okay.  I'm directing your attention to Tab 2 and, in

2:18PM  6    particular, the -- briefly talk to the jury a little bit about

2:18PM  7    the therapy, the particular regimen that was part of

2:18PM  8    Dr. Sedlacek's clinic there in Colorado.

2:18PM  9    A.   Okay.  Well, in Tab 2, this -- this patient received

2:18PM  10   Adriamycin and Cytoxan followed by the Taxotere.  So you --

2:18PM  11   or -- she -- I'm sorry.

2:18PM  12        She received the AC regimen.  This particular patient

2:18PM  13   also received the antihormonal agent tamoxifen.

2:18PM  14   Q.   Okay.  And with respect to the -- the addendum, the

2:19PM  15   company obtained follow-up information from Dr. Sedlacek's

2:19PM  16   nurse.

2:19PM  17        And with respect to the additional information in the

2:19PM  18   follow-up on October 10th of 2005, what is significant, in your

2:19PM  19   mind, in terms of the additional information about the therapy?

2:19PM  20   A.   Well, again, I think says what I had just mentioned, that

2:19PM  21   the patient had received the Adriamycin, or the doxorubicin,

2:19PM  22   plus the cyclophosphamide regimen followed by the Taxotere

2:19PM  23   100-milligram regimen.

2:20PM  24   Q.   What -- what -- was -- 100 milligrams, was that the dosage

2:20PM  25   in the package insert for breast cancer?

OFFICIAL TRANSCRIPT

A.    The 100 -- you're referring to the Taxotere package insert?

Q.    Yes.

A.    Okay.  In the Taxotere package insert, I believe this is a treatment for -- for adjuvant therapy.  So the recommended regimen is -- is the TAC regimen for adjuvant therapy at a Taxotere dose of 75 milligrams.

        The 100-milligram dose of Taxotere in the package insert is -- is a single-agent dose that is recommended for metastatic breast cancer.  Although the 100-milligram dose is often used in this AC followed by T regimen, that's not -- that AC followed by T regimen is not one of the recommended ways of dosing Taxotere in the United States for breast cancer.

Q.    Okay.  Direct your attention to Tab 5 of the Sedlacek case reports.

        And I think we have this one and one more, and I think then we'll be -- we'll be concluded.

        This -- what, in your mind, Doctor, is significant with respect to this Sedlacek case report?  And if you need to, you can refer to the --

A.    Well, with -- I noted, with the Sedlacek case reports as a whole, that six of the patients were receiving Coumadin mentioned as one of the -- Coumadin, which is an anticoagulant. And mentioned is a drug that can cause hair loss.

        In this particular patient, in addition to the

1  Coumadin, the patient was also receiving Synthroid, which is
2  using given to patients with a thyroid problem.  And Synthroid
3  also has been associated with the hair loss.
4       So in this patient, in addition to receiving the AC
5  regimen followed by the Taxotere combination, the patient was
6  also on -- and they talk about Case 5, so I think this patient
7  received Taxotere in combination with Xeloda, if I'm not
8  mistaken.
9       But the -- but the point is that there were multiple
10 other agents being given besides the Taxotere that had been
11 associated with hair loss.
12 Q.   All right.  So let's go back to the case assessment here.
13      This case is an example of a woman who received other
14 chemotherapy drugs that cause alopecia; right, Doctor?
15 A.   Correct.
16 Q.   For the A and the C, Adriamycin?
17 A.   Correct.
18 Q.   There's no evidence she had hormonal therapy; right?
19 A.   I don't see any evidence of having hormonal therapy.
20 Q.   But she was taking Coumadin and Synthroid; correct?
21 A.   On page 2 of 3, you'll see that her concomitant
22 medications are quite lengthy.  And it includes Coumadin or
23 warfarin.  It includes Synthroid, which is levothyroxine.  And
24 it also includes Xeloda, or capecitabine, among -- along with
25 Adriamycin, Cytoxan, and several other agents.

OFFICIAL TRANSCRIPT

**Q.**   So other drugs that cause chemotherapy -- other -- other medications -- I'm sorry -- that cause alopecia -- other medicines that cause alopecia --

**A.**   Correct.

**Q.**   -- in a dose that was higher than the approved label at that time?

**A.**   Not so much that the dose is higher than the approved label, but the combination of the AC followed by T at that dose is not in the United States package insert.

**Q.**   Okay. All right. Final exhibit, then. We're going to go to the last one of Dr. Sedlacek, and that is Tab No. -- what tab is it -- Tab No. 9.

**A.**   If I can just clarify, it's not only -- it's not only that -- the dose.

**Q.**   So, Doctor, if you could go to Tab No. 9. And I believe that's 8 for you. I think this is going to be my final exhibit.

       And this -- with respect to this patient, what do you find significant in terms of this CIOMS adverse reaction report?

**A.**   This is Patient 8. This is very similar to the previous patient. The patient was receiving the AC followed by the T and was receiving Coumadin.

       In this -- in this case, the -- I don't see Synthroid identified, but I do believe the patient -- I'll stop there. I

OFFICIAL TRANSCRIPT

2:26PM  1    believe the patient was also receiving Ativan, but I'm not

2:26PM  2    easily finding it.

2:26PM  3    Q.    The first page of this document does identify Coumadin as

2:26PM  4    well as Adriamycin as concomitant drugs that she was taking?

2:26PM  5    A.    Correct.

2:26PM  6    Q.    Okay.

2:26PM  7    A.    And if you turn to the next page, on page 2 of 3, you also

2:27PM  8    see identification of the Adriamycin and the Cytoxan and -- and

2:27PM  9    many other drugs.

2:27PM  10   Q.    In the Sedlacek abstract that you were asked some

2:27PM  11   questions about, there were three different groups of patients

2:27PM  12   treated by Dr. Sedlacek that he was reporting upon.

2:27PM  13          Do you agree with that, Group A, Group B, Group C?

2:27PM  14   A.    Yes, I do.

2:27PM  15   Q.    And you agree with me that Group A and Group B -- that

2:27PM  16   Group A received Adriamycin and -- received the A and the C --

2:27PM  17   let's put it that way, Group A; right?  Group A?

2:27PM  18   A.    Yes.

2:27PM  19   Q.    All right.  And Group A that didn't receive Taxotere had

2:28PM  20   exactly zero percent -- even though they had the AC, had zero

2:28PM  21   percent who were reporting persistent hair loss; correct?

2:28PM  22   A.    That is what it says.

2:28PM  23   Q.    Okay.  And then Group B had doxorubicin, which is

2:28PM  24   Adriamycin, which is the A, correct, in the AC?

2:28PM  25   A.    Correct.

OFFICIAL TRANSCRIPT

| | | |
|---|---|---|
| 2:28PM | 1 | **Q.**   Okay.  Plus paclitaxel; correct? |
| 2:28PM | 2 | **A.**   Correct. |
| 2:28PM | 3 | **Q.**   And that's Taxol, right, not Taxotere? |
| 2:28PM | 4 | **A.**   Right. |
| 2:28PM | 5 | **Q.**   So Group B, the women who had that regimen ended up with |
| 2:28PM | 6 | zero percent reporting persistent alopecia; correct? |
| 2:28PM | 7 | **A.**   That's what it says, yes. |
| 2:28PM | 8 | **Q.**   And Group C, which is the only group that received -- in |
| 2:28PM | 9 | addition to the other combinations of therapies, the only group |
| 2:28PM | 10 | that received Taxotere reported -- 6.3 percent reported |
| 2:29PM | 11 | persistent alopecia; is that right? |
| 2:29PM | 12 | **A.**   That's what Dr. Sedlacek is reporting in this abstract. |
| 2:29PM | 13 | **MR. SCHANKER:**  Your Honor, plaintiffs move to admit |
| 2:29PM | 14 | P205, Exhibit P205 of that deposition. |
| 2:29PM | 15 | **THE COURT:**  Subject to the objection? |
| 2:29PM | 16 | **MR. MOORE:**  Subject to the objection stated on this |
| 2:29PM | 17 | yesterday.  Thank you, Your Honor. |
| 2:29PM | 18 | **THE COURT:**  Do you all need a little break? |
| 2:29PM | 19 | Court will be at recess for ten minutes. |
| 2:29PM | 20 | **THE DEPUTY CLERK:**  All rise. |
| 2:29PM | 21 | (WHEREUPON, the jury exited the courtroom.) |
| 2:30PM | 22 | (WHEREUPON, the Court took a recess.) |
| 2:49PM | 23 | **THE DEPUTY CLERK:**  All rise. |
| 2:50PM | 24 | (WHEREUPON, the jury entered the courtroom.) |
| 2:50PM | 25 | **THE COURT:**  Yes, sir. |

MARIE CELESTE LAGARDE - DIRECT

| | | |
|---|---|---|
| 2:50PM | 1 | Mr. Schanker, please call your next witness. |
| 2:50PM | 2 | MR. SCHANKER:  Thank you, Your Honor.  We would like |
| 2:50PM | 3 | to call Dr. Celeste Lagarde. |
| 2:50PM | 4 | THE COURT:  Doctor Lagarde, right here. |
| 2:50PM | 5 | (WHEREUPON, **MARIE CELESTE LAGARDE**, having been duly |
| 2:50PM | 6 | sworn, testified as follows**:)** |
| 2:50PM | 7 | THE DEPUTY CLERK:  Please state and spell your name |
| 2:50PM | 8 | for the record. |
| 2:51PM | 9 | THE WITNESS:  Marie Celeste Lagarde, L-A-G-A-R-D-E. |
| 2:51PM | 10 | THE COURT:  Please proceed. |
| 2:51PM | 11 | MR. SCHANKER:  Thank you, Your Honor. |
| 2:51PM | 12 | DIRECT EXAMINATION |
| 2:51PM | 13 | BY MR. SCHANKER: |
| 2:51PM | 14 | Q.   Good afternoon, ma'am.  Could you please introduce |
| 2:51PM | 15 | yourself to the jury. |
| 2:51PM | 16 | A.   My name is Dr. Celeste Lagarde.  I'm a breast surgeon on |
| 2:51PM | 17 | the North Shore in Covington. |
| 2:51PM | 18 | Q.   And how long have you practiced in Covington? |
| 2:51PM | 19 | A.   Almost 30 years. |
| 2:51PM | 20 | Q.   So you shared with us that you're a breast surgeon. |
| 2:51PM | 21 | Could you explain to the jury what you mean by that, |
| 2:51PM | 22 | what that is exactly. |
| 2:51PM | 23 | A.   I'm a general surgeon by training and board-certified by |
| 2:51PM | 24 | the American Society of Surgeons.  I did special training in |
| 2:51PM | 25 | breast ultrasounds, stereotactic pathology, mammography, and |

OFFICIAL TRANSCRIPT

MARIE CELESTE LAGARDE - DIRECT

2:52PM 1    surgery.

2:52PM 2            I specialize now in diagnosing diseases of the

2:52PM 3    breast, breast cancers.  I do the surgery, lumpectomies,

2:52PM 4    mastectomies.

2:52PM 5            I also have interoperative ultrasound, which I am

2:52PM 6    certified by the American Society of Breast Surgeons, which is

2:52PM 7    recognized by the American College of Radiology.

2:52PM 8            So I do my own ultrasound, diagnostic, plus I can do

2:52PM 9    ultrasound-guided biopsies in the office.

2:52PM 10   Q.    And could you explain -- you know what an oncologist is;

2:52PM 11   correct?

2:52PM 12   A.    Correct.

2:52PM 13   Q.    Are you an oncologist?

2:52PM 14   A.    Surgical oncologist.

2:52PM 15   Q.    What's the difference between -- when we think of an

2:52PM 16   oncologist and a surgical oncologist?

2:52PM 17   A.    There's different types of oncologists.  You have

2:52PM 18   radiation oncologists.  They do, obviously, the x-ray therapy

2:52PM 19   for the patient.  You have a medical oncologist, who does the

2:53PM 20   IV and PO chemotherapy for the patient.  Surgical oncologists

2:53PM 21   do the operations for different types of cancers.

2:53PM 22           I specifically now just do breasts.

2:53PM 23   Q.    And you understand why you're here today?

2:53PM 24   A.    Yes.

2:53PM 25   Q.    You happened to treat Barbara Earnest; is that correct?

OFFICIAL TRANSCRIPT

MARIE CELESTE LAGARDE - DIRECT

| | | |
|---|---|---|
| 2:53PM | 1 | **A.**   Yes. |
| 2:53PM | 2 | **Q.**   One time? |
| 2:53PM | 3 | **A.**   Yes. |
| 2:53PM | 4 | **Q.**   Were you subpoenaed here today? |
| 2:53PM | 5 | **A.**   Yes. |
| 2:53PM | 6 | **Q.**   Are you happy to be here? |
| 2:53PM | 7 | **A.**   No. |
| 2:53PM | 8 | **Q.**   Okay.  Well, we'll move through this. |
| 2:53PM | 9 | I want to specifically ask you about Barbara Earnest, |
| 2:53PM | 10 | and I'd like to refer you to the medical records that you |
| 2:53PM | 11 | provided in the litigation in this case, specifically -- that's |
| 2:54PM | 12 | Exhibit D-2365. |
| 2:54PM | 13 | **MR. SCHANKER:**  Your Honor, may I approach? |
| 2:54PM | 14 | **THE COURT:**  Yes.  Do you want to enter this into |
| 2:54PM | 15 | evidence? |
| 2:54PM | 16 | **MR. SCHANKER:**  Not yet. |
| 2:54PM | 17 | **THE COURT:**  Okay. |
| 2:54PM | 18 | **BY MR. SCHANKER:** |
| 2:54PM | 19 | **Q.**   Doctor, do you recall when you -- the first and only time |
| 2:54PM | 20 | that you saw Barbara Earnest? |
| 2:54PM | 21 | **A.**   Yes. |
| 2:54PM | 22 | **Q.**   And tell the jury when that was. |
| 2:54PM | 23 | **A.**   I saw the patient on February 7th, 2011.  She presented |
| 2:54PM | 24 | with an abnormal mammogram that she had done at Lakeview |
| 2:54PM | 25 | Regional Medical Center on February 4th, 2011.  We had no |

OFFICIAL TRANSCRIPT

MARIE CELESTE LAGARDE - DIRECT

2:55PM  1    previous mammograms for comparing.  And when the patient

2:55PM  2    presented, she had a palpable mass on the outer aspect of her

2:55PM  3    left breast.

2:55PM  4              As I told you, I do my own ultrasound examinations.

2:55PM  5    And when I did, this was obvious on ultrasound exam to be

2:55PM  6    highly suspicious for a breast carcinoma.

2:55PM  7              So at that same visit, I did an ultrasound-guided

2:55PM  8    core biopsy, marked the specimen with a clip, and then sent

2:55PM  9    that specimen to pathology.

2:55PM  10   Q.   And, Doctor, it looks like you must have reviewed your

2:55PM  11   records.  You have a good recollection of this.

2:55PM  12              MR. SCHANKER:  Your Honor, let's go ahead and enter

2:55PM  13   the exhibit, since I'm going to ask her to refer to that.

2:55PM  14              So that's Exhibit D-2365.

2:55PM  15              MR. MOORE:  No objection, Your Honor.

2:55PM  16              THE COURT:  Let it be admitted.

2:55PM  17   BY MR. SCHANKER:

2:55PM  18   Q.   So you did all of what you just described on that first

2:56PM  19   visit, February 7th in 2011?

2:56PM  20   A.   Yes.

2:56PM  21   Q.   And let's go ahead and break that down for the jury.

2:56PM  22              How did -- how did Barbara Earnest come to see you?

2:56PM  23   Do you know?

2:56PM  24   A.   She was referred by her gynecologist.

2:56PM  25   Q.   And what's your understanding of why she was referred?

OFFICIAL TRANSCRIPT

MARIE CELESTE LAGARDE - DIRECT

2:56PM  1   **A.**   She had a palpable mass and an abnormal mammogram.

2:56PM  2   **Q.**   Okay.  And could you describe for the jury what you mean

2:56PM  3   by an abnormal mammogram specifically?

2:56PM  4   **A.**   The radiologist read it as a 2-centimeter --

2:56PM  5   2.5-centimeters is an inch, so this is slightly smaller than an

2:56PM  6   inch -- highly suspicious mass in the left breast.

2:56PM  7   **Q.**   So Barbara was referred to you by a doctor?

2:56PM  8   **A.**   Correct.

2:56PM  9   **Q.**   And you visited with her, you saw her.  And could you just

2:56PM  10  explain to us what happens.

2:56PM  11         In that situation, did you sit down with Barbara

2:56PM  12  first and take a patient history?  I know you did some more

2:57PM  13  things too, but walk us through that visit, if you would,

2:57PM  14  please.

2:57PM  15  **A.**   We get -- we obviously have the patient write down their

2:57PM  16  prior history and their medications.  We then talk to the

2:57PM  17  patient about when they felt the mass, obviously, their

2:57PM  18  gynecologic history.  She still had her ovaries.  Her mother

2:57PM  19  had uterine cancer.  Two children, two pregnancies.  And then I

2:57PM  20  do a physical exam.

2:57PM  21  **Q.**   And take us through the physical exam of anything

2:57PM  22  relevant, if you would, please.

2:57PM  23  **A.**   No masses were palpable in the right breast, but she did

2:57PM  24  have a dominant fixed mass at the 3:00 position on the left.

2:57PM  25  **Q.**   So what did you do next?

OFFICIAL TRANSCRIPT

MARIE CELESTE LAGARDE - DIRECT

2:57PM 1   **A.**   Ultrasound examination showed a -- I have it measured at

2:57PM 2   1.57 centimeters.  I also put Doppler flow -- what Doppler flow

2:58PM 3   is it tells us the blood flow of the mass.  Increased blood

2:58PM 4   flow shows us that the tumor is being fed, and so that means

2:58PM 5   that it's growing.  So that is also one indication that this is

2:58PM 6   a more suspicious mass.

2:58PM 7          Masses with no blood flow in them, we're not as

2:58PM 8   suspicious.  But this one had a lot of blood flow.

2:58PM 9   **Q.**   So that's all part of the physical exam?

2:58PM 10  **A.**   The ultrasound exam.

2:58PM 11  **Q.**   The ultrasound.

2:58PM 12         Any other findings on the ultrasound?

2:58PM 13  **A.**   It was spiculated and irregular.

2:58PM 14  **Q.**   Tell the jury what that means.

2:58PM 15  **A.**   Benign masses are smooth, well-defined.  Carcinomas have

2:58PM 16  very irregular borders.  That's why they're called crabs

2:58PM 17  because they have irregular, spiculated mass -- spiculated

2:58PM 18  borders.

2:58PM 19         So when you are looking at an ultrasound and trying

2:58PM 20  to determine if this mass needs to be biopsied or not, you look

2:59PM 21  at the shadowing, you look at the borders, and you look at the

2:59PM 22  blood flow.

2:59PM 23  **Q.**   You used that word "spiculated."  Could you explain to us

2:59PM 24  what that means.

2:59PM 25  **A.**   Irregular, spiked.

OFFICIAL TRANSCRIPT

MARIE CELESTE LAGARDE - DIRECT

2:59PM  1    **Q.**   And why is that of note to you?

2:59PM  2    **A.**   That's indicative of a worrisome mass, which would require

2:59PM  3    a biopsy.  Solid also versus cystic is another way we look at

2:59PM  4    the morphology of the tumor.

2:59PM  5    **Q.**   So, Doctor, you went through the results of ultrasound.

2:59PM  6          What then did you do next?

2:59PM  7    **A.**   So we had the patient sign a consent.  I then numb her up

2:59PM  8    with a lidocaine-Marcaine mix and then use an ultrasound-guided

2:59PM  9    core biopsy where you take an actual specimen of the tumor.

3:00PM  10         It almost looks like a small piece of spaghetti.  So

3:00PM  11   it's not a random biopsy; it's ultrasound-guided.  So I'm

3:00PM  12   100 percent sure I'm in the mass and obtain tissue.

3:00PM  13         Then the specimen is marked with a clip to document

3:00PM  14   that it's been biopsied, and then the specimen is sent to the

3:00PM  15   pathologist who tells us what the results are.

3:00PM  16   **Q.**   And so when you take that biopsy, it sounds like you don't

3:00PM  17   get the results immediately?

3:00PM  18   **A.**   That's correct.

3:00PM  19   **Q.**   Where do you -- and that has to be sent out to a

3:00PM  20   specialist in order for you to obtain the results; is that

3:00PM  21   right?

3:00PM  22   **A.**   That's correct.

3:00PM  23   **Q.**   And in this particular case, that was done; is that right?

3:00PM  24   **A.**   Yes.

3:00PM  25   **Q.**   And when did you get the results back?

OFFICIAL TRANSCRIPT

MARIE CELESTE LAGARDE - DIRECT

3:01PM 1   **A.**   The -- this was sent to the St. Tammany Parish Hospital

3:01PM 2   pathology department.  It was received on the 8th.

3:01PM 3   **Q.**   You received the results back?

3:01PM 4   **A.**   Yes.

3:01PM 5   **Q.**   Okay.  They went to St. Tammany, the results?

3:01PM 6   **A.**   Yes.

3:01PM 7   **Q.**   And St. Tammany received them on the 8th; is that correct,

3:01PM 8   Doctor?

3:01PM 9   **A.**   Yes.  It looks like that we received the permanent report

3:01PM 10   on the 10th.

3:01PM 11   **Q.**   And can you take us through the permanent report, meaning

3:01PM 12   the results of that biopsy.

3:01PM 13   **A.**   The report shows an infiltrating ductal carcinoma, which

3:01PM 14   is our most common cell type.  Well over half of our cell types

3:01PM 15   are ductal carcinomas.  This is an intermediate to high-grade.

3:02PM 16          So what that means is, when the pathologist looks

3:02PM 17   under the microscope and looks at the slide, the cells are

3:02PM 18   dividing fairly fast.

3:02PM 19          So this was a -- I believe this was a Grade 3.  So

3:02PM 20   Grades 1, 2, 3; 1 being the lowest grade, 2 intermediate, and 3

3:02PM 21   high.

3:02PM 22          It also had a micropapillary pattern.  All that means

3:02PM 23   is it may have originated out of a papilloma.  It's just a

3:02PM 24   variation of a ductal cancer.

3:02PM 25   **Q.**   So you got those results.

OFFICIAL TRANSCRIPT

MARIE CELESTE LAGARDE - DIRECT

3:02PM  1   A.    Uh-huh.

3:02PM  2   Q.    And then what's the next step once you receive those

3:02PM  3   results?

3:02PM  4   A.    In my practice, we usually call the patient.  We give them

3:02PM  5   the option of coming back, but it is -- in my opinion, I think

3:02PM  6   that's cruel to make them come back and wait.  So we usually

3:02PM  7   call the patient and tell them the results.

3:03PM  8         The next step is to order hormone receptors,

3:03PM  9   estrogen, progesterone, and HER2 receptors on the tumor.

3:03PM  10  Q.    So in this particular case, Doctor, did you call Barbara

3:03PM  11  Earnest?

3:03PM  12  A.    I believe my nurse practitioner did.

3:03PM  13  Q.    Okay.  And that's what -- is that what often happens in

3:03PM  14  your practice group?

3:03PM  15  A.    Yes.

3:03PM  16  Q.    And in your records, there is what's referred to as a

3:03PM  17  pathology report phone consult.

3:03PM  18        What is the pathology report phone consult?

3:03PM  19  A.    This is to document that we've called the patient with the

3:03PM  20  report and document that -- what the next steps are, as is laid

3:04PM  21  out to the patient.

3:04PM  22  Q.    So according to this record, it looks like this was done

3:04PM  23  or -- in this case, on what particular date?

3:04PM  24  A.    The 10th.

3:04PM  25  Q.    So we're --

OFFICIAL TRANSCRIPT

MARIE CELESTE LAGARDE - DIRECT

3:04PM  1    **A.**    February 10th.

3:04PM  2    **Q.**    Of what year?

3:04PM  3    **A.**    2011.

3:04PM  4    **Q.**    Okay.  Could you go ahead and take us through this

3:04PM  5    pathology report phone consult.

3:04PM  6    **A.**    So we call the patient with the diagnosis.  We tell them

3:04PM  7    the cell type, as I've told you, ductal carcinoma; the size of

3:04PM  8    tumor, which was between 1.5 and 2 centimeters.

3:04PM  9            The estrogen progesterone receptors were not

3:04PM  10   available at this time, as was the HER2.

3:04PM  11   **Q.**    What does that mean?

3:04PM  12   **A.**    When you treat breast cancers in 2019, the first thing you

3:04PM  13   want to know is the hormone receptors; estrogen positive or

3:04PM  14   estrogen negative, progesterone positive or progesterone

3:05PM  15   negative, Herceptin positive or Herceptin negative.

3:05PM  16           That determines how you're going to treat the breast

3:05PM  17   cancer, whether you're going to do surgery first on the patient

3:05PM  18   or you're going to treat them with what we call neoadjuvant or

3:05PM  19   chemotherapy before you operate on them.

3:05PM  20           HER2 means Herceptin, which is a separate drug that

3:05PM  21   we use to treat these cancers.  So the hormone receptors are

3:05PM  22   essential in the treatment of any breast cancer in order to

3:05PM  23   determine the best way to treat them.

3:05PM  24   **Q.**    Could you continue taking us through that report phone

3:05PM  25   consult, please.

OFFICIAL TRANSCRIPT

MARIE CELESTE LAGARDE - DIRECT

**A.**   In 2011, what we liked to do was do bilateral MRIs.  MRIs are the next level of imaging.  The patient is injected with a dye, and the MRI calculates the amount of breast -- amount of blood flow in particular masses in the breast.

So premenopausal patients will have rapid uptake and outflow of the dye.  Tumors will have very rapid uptake of the dye and outflow.  And that's how we determine if something's more suspicious or not.

The other thing we like to get is a PET/CT scan.  A PET/CT scan is the patient drinks the dye, as you would in a CAT scan, plus they're injected with radioactive sulfur colloid -- I'm sorry -- radioactive glucose.  Radioactive glucose takes up in cancer cells much faster than in regular cells.

So a PET scan will tell us, from neck to knees, if the patient has any metastases to the liver, to the bone, to the abdomen.  The patient did have her ovaries, so we were particularly interested to see if there was any tumor anywhere else in the patient's body.

**Q.**   So then, Doctor, what's next as far as working your way down the pathology report phone consult?

**A.**   So then we took -- we tell the patient that -- when we expect the estrogen progesterone receptors, and we get precerts on the PET/MRI and the PET/CT scan.

And the final thing we do is, as a member of American

OFFICIAL TRANSCRIPT

MARIE CELESTE LAGARDE - DIRECT

3:07PM  1   Society of Breast Surgeons, we have a book that we purchase and
3:07PM  2   give out to all our cancer patients.  In particular -- there's
3:07PM  3   a lot of books that are available.
3:07PM  4         I particularly like this one because it explains to
3:07PM  5   the patient, in laymen's terms, this very complicated picture
3:07PM  6   that we've been talking about and how to treat the patient.
3:07PM  7   Q.   So, Doctor, you talked about the educational breast cancer
3:07PM  8   book; is that right?
3:07PM  9   A.   Yes.
3:08PM 10   Q.   And the note says, am I right, that a -- can you read what
3:08PM 11   the notes say there.
3:08PM 12   A.   "Copy of pathology left for patient at front desk with
3:08PM 13   educational book."
3:08PM 14   Q.   So to your understanding, both those things, the copy of
3:08PM 15   the pathology that you described to us and this educational
3:08PM 16   book, were left for Barbara at your front desk?
3:08PM 17   A.   Yes.
3:08PM 18   Q.   Okay.  Doctor, I want to ask you about that breast cancer
3:08PM 19   book.
3:08PM 20         MR. SCHANKER:  Your Honor, this is Plaintiff's
3:08PM 21   Exhibit 0633.  I believe you have a copy of it, as do counsel.
3:08PM 22         MR. MOORE:  Your Honor, I do.  And we have an exhibit
3:08PM 23   on our list as well, but I thought we could perhaps just have a
3:08PM 24   sidebar quickly on how to proceed.
3:08PM 25         THE COURT:  Sure.

OFFICIAL TRANSCRIPT

MARIE CELESTE LAGARDE - DIRECT

3:08PM   1          (WHEREUPON, the following proceedings were held at

3:08PM   2   the bench.)

3:09PM   3          MR. MOORE:  Your Honor, we have no objection to the

3:09PM   4   introduction of this book into evidence.  Obviously, it was in

3:09PM   5   our opening.  It's on our list as well.

3:09PM   6          But we heard this morning from Mr. Schanker that

3:09PM   7   Dr. Lagarde did not go over the book with the plaintiff, did

3:09PM   8   not refer her to any sections of it.

3:09PM   9          And when Mr. Schanker pulled out the book, the

3:09PM  10   version he has has all sorts of tabs in it.  And it's not my

3:09PM  11   intention to read from within the book.  Because she didn't

3:09PM  12   discuss the book with the plaintiff, we don't think that would

3:09PM  13   be relevant.

3:09PM  14          And we don't think -- because there's whole

3:09PM  15   passages in here about the emotional impact of cancer and the

3:09PM  16   impact of hair loss.  And then there's other things that both

3:09PM  17   of us can sit here and read all day.

3:09PM  18          So we don't think that this is the witness who

3:09PM  19   should be used to express those kinds of data and opinions and

3:09PM  20   information that's in the book because she didn't discuss it

3:09PM  21   with the plaintiff.

3:09PM  22          MR. SCHANKER:  Well, she indicates that she directs

3:10PM  23   the patient to certain passages in the book, certain parts of

3:10PM  24   the book.

3:10PM  25          THE COURT:  She wasn't even there.  She just picked

OFFICIAL TRANSCRIPT

MARIE CELESTE LAGARDE - DIRECT

3:10PM  1    it up at the front desk.

3:10PM  2            MR. SCHANKER:  She dog-ears the passages, the

3:10PM  3    sections, and tells her -- tell the patients what to refer to

3:10PM  4    in the book.

3:10PM  5            MR. MOORE:  But she didn't testify that she did that.

3:10PM  6            MR. SCHANKER:  Excuse me?

3:10PM  7            THE COURT:  That's -- okay.  Well, if she testifies

3:10PM  8    to that, you can ask her if these are the areas -- if her

3:10PM  9    testimony is that "I dog-ear certain sections and tell them to

3:10PM 10    pay attention to it," we'll see that, unless I'm really wrong

3:10PM 11    about it.

3:10PM 12            If she -- if she doesn't, if it's just the book

3:10PM 13    was at the counter, that's it.  The book is at the counter.

3:10PM 14            MR. MOORE:  So she'll -- you'll be able to identify

3:10PM 15    the sections that she would have dog-eared, but not read the

3:10PM 16    sections.

3:10PM 17            THE COURT:  Yeah.

3:10PM 18            MR. SCHANKER:  Well --

3:10PM 19            THE COURT:  Maybe -- this is what I would think --

3:11PM 20    this is what I think.  If she says "I dog-eared sections," I

3:11PM 21    think it's perfectly appropriate to say, "Which ones, and why."

3:11PM 22            MR. SCHANKER:  Right.

3:11PM 23            THE COURT:  If there's certain things she wants the

3:11PM 24    patient to know and why, I think that's perfectly appropriate.

3:11PM 25            MR. MOORE:  That's fine.

OFFICIAL TRANSCRIPT

3:11PM    1          **THE COURT:**  But I don't think she needs to read the
3:11PM    2   pamphlet.  If she says, "I dog-eared those sections," I think
3:11PM    3   you can ask her what's covered in the sections.  I mean, you
3:11PM    4   know, I am, again, operating in a vacuum.  So it just depends
3:11PM    5   on what she says.
3:11PM    6               We're not going to read 20 pages from this book.
3:11PM    7   But if she says "I marked off these pages because I think it's
3:11PM    8   important what's contained in that chapter," I think that's
3:11PM    9   sufficient.
3:11PM   10          **MR. SCHANKER:**  We're certainly planning -- just so
3:11PM   11   we're clear, so we don't march back, is to ask her about that
3:11PM   12   she doesn't have -- instruct the patient to read the entire
3:11PM   13   book or any other sections.  We're going to explore that.
3:11PM   14          **THE COURT:**  She's first going to have to tell me she
3:12PM   15   had a conversation with the lady.
3:12PM   16          **MR. SCHANKER:**  Right, or that the information was
3:12PM   17   passed on to the lady, is what she's going to explain.
3:12PM   18          **MR. MOORE:**  Well, that's calling for hearsay.
3:12PM   19          **MR. SCHANKER:**  Well, why don't we just take it up as
3:12PM   20   I ask the questions.
3:12PM   21          **THE COURT:**  I'm going to have to take it up a
3:12PM   22   question at a time.
3:12PM   23               But I'm going to tell you, if she says -- and
3:12PM   24   this is all she can say -- I don't -- I instruct my patients
3:12PM   25   not to pay attention to the rest of the book.  If she says

MARIE CELESTE LAGARDE - DIRECT

3:12PM   1   that, then it is what it is.  But we don't still don't know

3:12PM   2   that she told -- we still don't know that they followed

3:12PM   3   instructions on that day.

3:12PM   4           But if she dog-ears certain sections, and they

3:12PM   5   can pick it up, then you can say, "Why were those was

3:12PM   6   dog-eared?" "Do you give instructions to your staff?"  And if

3:12PM   7   she says, "Yes, tell them don't worry about anything else,"

3:12PM   8   then I think that's as far as you can go.  Because we don't --

3:12PM   9           MR. SCHANKER:  We're not planning on going any

3:12PM   10  farther than that.  This is what we just said.  That's all

3:12PM   11  we're planning on discussing.  I'm not going to get up and

3:13PM   12  filibuster.

3:13PM   13          THE COURT:  No.  We're also not going to -- I'm not

3:13PM   14  going to allow you to ask her if Ms. Earnest was told by her

3:13PM   15  nurse not to pay attention to certain sections.

3:13PM   16          MR. SCHANKER:  I wasn't planning on asking her.

3:13PM   17          THE COURT:  Okay.  Because all she can say is what we

3:13PM   18  said.

3:13PM   19          We're good.

3:13PM   20          (WHEREUPON, the following proceedings were held in

3:13PM   21  open court.)

3:14PM   22  BY MR. SCHANKER:

3:14PM   23  Q.   Doctor, is this the book that you were referring to that

3:14PM   24  you -- go ahead and tell us in a couple minutes, what do you do

3:14PM   25  with this book?

OFFICIAL TRANSCRIPT

MARIE CELESTE LAGARDE - DIRECT

1    Just so we're all on the same page, what do you have
2    your staff do with it or you do with it?
3  **A.**   When I see the patient initially, we give them this book,
4    and I highlight three areas.  The first is the pathology report
5    section so that the patient can better understand what type of
6    tumor they have.
7         In the pathology report section, they talk about
8    Herceptin and hormone receptors, the cell types, the size, and
9    the stages.
10        The other thing they have is diagrams and pictures
11   about the different surgeries that the patient can have,
12   lumpectomy, mastectomy with no reconstruction, and mastectomies
13   with different types of reconstruction.
14        Usually at the time that I see the patient, I
15   sometimes don't have hormone receptors.  So I want to show them
16   that when they go home and they can think better, that they can
17   look at these particular areas of the book and better
18   understand the treatment options that are available to them.
19  **Q.**   So let me stop you there.  You indicated that you
20   highlight the pathology report section.
21        Could you -- and before we get there, I want to
22   understand just the context -- make sure the jury understands
23   the context of this book.
24        If you could, flip to just the inside front cover.  I
25   want to look -- actually, let's look at the front cover.

MARIE CELESTE LAGARDE - DIRECT

3:16PM 1      Who is this book published by?

3:16PM 2      We mentioned this generally earlier, but who is this

3:16PM 3  published by?

3:16PM 4  A.   This author of the book is a nurse who had breast cancer.

3:16PM 5  Q.   And whats her name?

3:16PM 6  A.   Judy Kneece, K-N-E-E-C-E.

3:16PM 7  Q.   So, Doctor, to your knowledge, does this book have any

3:16PM 8  affiliation or is it published by Sanofi, the defendant in this

3:16PM 9  case?

3:16PM 10 A.   Not to my knowledge.

3:16PM 11 Q.   Okay.  And then let's look at -- if you can look at the

3:16PM 12 second page on the back where the copyright is, I want to make

3:16PM 13 sure the jury understands when -- what the copyright was on

3:16PM 14 this particular book.

3:16PM 15      Do you have that there?  If you don't, you can look

3:16PM 16 here on the screen.

3:17PM 17      Blow it up for us.

3:17PM 18      Do you see the copyright there?

3:17PM 19 A.   You mean the 7th edition, 2009?

3:17PM 20 Q.   Yes.  Okay.

3:17PM 21      Do you know Nurse Kneece personally?

3:17PM 22 A.   No.

3:17PM 23 Q.   Have you just found this to be a helpful book?

3:17PM 24 A.   When we go to the American Society of Breast Surgeons,

3:17PM 25 there's different booths you can go to.  And she is at that

OFFICIAL TRANSCRIPT

MARIE CELESTE LAGARDE - DIRECT

3:17PM  1    booth, and we order the books from her and pay for them
3:17PM  2    ourselves.
3:17PM  3    Q.    Okay.  So you indicated -- thank you, by the way.
3:17PM  4          You indicated that one of the sections that you
3:17PM  5    direct your patients to deals with the pathology, is that
3:17PM  6    right, the pathology report section?
3:17PM  7    A.    Correct.
3:17PM  8    Q.    Would that be -- if you look at Roman numeral II under the
3:18PM  9    table of contents.
3:18PM  10   A.    That's Chapter 9.
3:18PM  11   Q.    Yes.  So that's Chapter 9.
3:18PM  12         What is the title of that chapter?
3:18PM  13   A.    "Understanding your Pathology Report."
3:18PM  14   Q.    Okay.  So Chapter 9, "Understanding your Pathology
3:18PM  15   Report."  So that's one of the sections you direct your
3:18PM  16   patients to.
3:18PM  17         Can you explain -- and then we'll move on the other
3:18PM  18   sections you said that you direct your patients to.
3:18PM  19         Why do you direct them to the "Understanding your
3:18PM  20   Pathology Report" section?
3:18PM  21   A.    Because as I stated, breast cancer has become more
3:18PM  22   specific in treatment as to the genetics of the particular
3:18PM  23   tumor.  Because your neighbor has a 2-centimeter cancer and
3:18PM  24   it's what we call a triple-negative carcinoma, she's going to
3:18PM  25   be treated different than a patient who as an estrogen

OFFICIAL TRANSCRIPT

MARIE CELESTE LAGARDE - DIRECT

3:18PM   1   progesterone-positive HER2-negative carcinoma, even though

3:19PM   2   they're both the same size and the same stage.  The markers

3:19PM   3   determine the treatment, not the size and not the stage.

3:19PM   4   Q.   Now, Doctor, what is the next -- you said there were, I

3:19PM   5   believe, three sections that you direct your patients to.

3:19PM   6        What was the next section?

3:19PM   7   A.   The surgical treatment decisions.

3:19PM   8   Q.   Would that be Chapter 8?

3:19PM   9   A.   And 6.

3:19PM  10   Q.   6 and 8.  Okay.  I'm sorry.  Let's start with Chapter 6,

3:19PM  11   "Surgical Treatment Decisions."

3:19PM  12        And why do you direct your patients to Chapter 6,

3:19PM  13   "Surgical Treatment Decisions"?

3:19PM  14   A.   If the patient has a tumor that can either be treated by

3:19PM  15   lumpectomy or mastectomy, it's important that the patient

3:19PM  16   understands their options and understands what happens with

3:20PM  17   each procedure.

3:20PM  18        With a lumpectomy, that is pretty much always

3:20PM  19   followed by radiation of some sort.  Mastectomy can be done

3:20PM  20   without reconstruction, or you can have an immediate

3:20PM  21   reconstruction, which is done at the time of the mastectomy.

3:20PM  22        So that pretty much is explained in here.  We go

3:20PM  23   through that in an office visit, but this helps reinforce that.

3:20PM  24   Q.   Okay.  And then you indicated that you direct your

3:20PM  25   patients specifically to a third and final section of this

OFFICIAL TRANSCRIPT

1   book.

2   **A.**   Well, in here, they do have a checklist -- I can't find it

3   right now -- that goes through lumpectomy and mastectomy, and

4   it goes through a checklist that the patient can do.  So if

5   she's on the fence and she's not sure what she wants to do, it

6   can help clarify that for her.

7   **Q.**   Okay.  You also indicated that you direct the patients to

8   the "Surgical Experience" chapter.  Is that Chapter 8?

9   **A.**   Yes.

10  **Q.**   And why do you direct your patients to the "Surgical

11  Experience" chapter?

12  **A.**   Because that's what I do.  So it explains from being

13  scheduled for the procedure, going through the operation, and

14  then the postoperative care.

15  **Q.**   Okay.  So, Doctor, on page Roman numeral IX on the table

16  of contents, we have five chapters, Chapters 1 through 5.  I

17  just want to be clear and work through these.

18      You don't direct your patients to any of those

19  chapters specifically, do you, just the ones you highlighted

20  for us?

21  **A.**   Yes.

22  **Q.**   Okay.  Working our way through Chapter 6 through 8, we

23  talked about 6 and 8.

24      You don't direct your patients to Chapter 7 on

25  reconstructive surgery specifically, do you?

MARIE CELESTE LAGARDE - DIRECT

3:22PM  1   A.   I touch on that.

3:22PM  2   Q.   Tell us about that.

3:22PM  3   A.   Well, reconstructive surgery is usually done with the

3:22PM  4   breast surgeon and the plastic surgeon at the same time.  Most

3:22PM  5   of the mastectomies with reconstruction we do now are done at

3:22PM  6   the same surgery.  So I do go through that because I'm a part

3:22PM  7   of that.

3:22PM  8        If the patient decides on reconstruction, they then

3:22PM  9   have to have a plastic surgery consultation, and the plastic

3:22PM  10   surgeon would discuss with them whether or not they would do an

3:22PM  11   implant reconstruction with our new generation of silicone

3:22PM  12   implants or what we call autologous reconstructions where you

3:22PM  13   can take the patient's own tissue from her abdomen, hips and do

3:23PM  14   a microvascular free flap to the internal mammaries.  And,

3:23PM  15   again, that's also done at the same time.

3:23PM  16        And believe it or not, LSU was the first place to do

3:23PM  17   autologous breast reconstructions, and they are still the

3:23PM  18   preeminent microsurgical autologous flap in the country.

3:23PM  19   Q.   So, Doctor, it looks like this book continues on and has

3:23PM  20   24 chapters as well as an appendix.

3:23PM  21   A.   Correct.

3:23PM  22   Q.   And some tear-out sheets and some other things.

3:23PM  23        This -- is it your expectation that your client read

3:23PM  24   this 230-plus-page book in its entirety, that your patient read

3:23PM  25   it, the whole thing?

OFFICIAL TRANSCRIPT

MARIE CELESTE LAGARDE - DIRECT

3:23PM   1   **A.**   One of the things -- when a patient is told they have

3:23PM   2   cancer, they're very limited in the amount of information that

3:24PM   3   they can absorb.  So what we try to do is tell the patient on a

3:24PM   4   need-to-know basis, to direct them to learn more about

3:24PM   5   chemotherapy or radiation or other parts.  The patient may not

3:24PM   6   need chemotherapy at all.  The patient may not need radiation

3:24PM   7   at all.

3:24PM   8   So my job, since I'm the first oncologist that they

3:24PM   9   see, is to talk to them about the immediate options, which are

3:24PM  10  either surgery or to direct the patient to a medical oncologist

3:24PM  11  who does the chemotherapy part.

3:24PM  12  **Q.**   And at this point when you saw Barbara Earnest, you

3:24PM  13  weren't talking about any specific chemotherapy options with

3:24PM  14  her, or were you?

3:24PM  15  **A.**   I didn't know her markers, so there wasn't any point.  I

3:24PM  16  could not intelligently or accurately tell her what she was

3:25PM  17  going to receive.

3:25PM  18  **Q.**   So none of that type of conversation took place then?

3:25PM  19  **A.**   No.

3:25PM  20  **Q.**   Doctor, this breast cancer book, have you ever read it in

3:25PM  21  its entirety?

3:25PM  22  **A.**   No.

3:25PM  23  **Q.**   And why is that?

3:25PM  24  **A.**   As I stated, I did read the parts that were important to

3:25PM  25  me.

OFFICIAL TRANSCRIPT

MARIE CELESTE LAGARDE - DIRECT

| | | |
|---|---|---|
| 3:25PM | 1 | **Q.**   Makes sense.  Parts that deal with your -- |
| 3:25PM | 2 | **A.**   Correct. |
| 3:25PM | 3 | **Q.**   -- specialty? |
| 3:25PM | 4 | Is that why you give it out to patients, for those |
| 3:25PM | 5 | parts that deal with your specialty -- |
| 3:25PM | 6 | **A.**   Yes. |
| 3:25PM | 7 | **Q.**   -- that you highlighted for us? |
| 3:25PM | 8 | **A.**   Yes. |
| 3:25PM | 9 | **Q.**   Thank you. |
| 3:25PM | 10 | So, Doctor, how do you indicate -- you said you |
| 3:25PM | 11 | indicate to the patients just these three chapters that you |
| 3:25PM | 12 | wish for them to read. |
| 3:25PM | 13 | How do you do that?  How do you let them know? |
| 3:25PM | 14 | **A.**   I either highlight them or I usually dog-ear those |
| 3:26PM | 15 | sections, just fold them down and say, "This, this, this is |
| 3:26PM | 16 | what I want you to pay attention to." |
| 3:26PM | 17 | **Q.**   So those three sections, those three chapters that you |
| 3:26PM | 18 | just mentioned for us, you will physically take the book and do |
| 3:26PM | 19 | something to it, either highlight it or fold the page down? |
| 3:26PM | 20 | **A.**   Yes. |
| 3:26PM | 21 | **Q.**   And why do you do that? |
| 3:26PM | 22 | **A.**   Because that's what I want them to read. |
| 3:26PM | 23 | **Q.**   Okay.  So, Doctor, on what particular date, just to orient |
| 3:26PM | 24 | the jury, was this book and the important pathology information |
| 3:26PM | 25 | left for Barbara Earnest at your front desk? |

OFFICIAL TRANSCRIPT

MARIE CELESTE LAGARDE - DIRECT

3:26PM  1   **A.**   February 10th, 2011.

3:26PM  2   **Q.**   Okay.  Year 2011; correct?  And what day in February was

3:27PM  3   it?

3:27PM  4   **A.**   That she was first seen or --

3:27PM  5   **Q.**   That you left the book there.

3:27PM  6   **A.**   The 10th.

3:27PM  7   **Q.**   Okay.  That was just three days after you had first seen

3:27PM  8   her?

3:27PM  9   **A.**   Correct.

3:27PM  10  **Q.**   And then if I told you that Barbara Earnest first saw

3:27PM  11  Dr. Carinder on March 31st of 2011 -- this is an easy question.

3:27PM  12        You'd agree that she saw Dr. Carinder several weeks

3:27PM  13  after she had seen you; correct?

3:27PM  14  **A.**   Yes.

3:27PM  15  **Q.**   Do you know Dr. Carinder?

3:27PM  16  **A.**   Very well.

3:27PM  17  **Q.**   And how do you know Dr. Carinder?

3:27PM  18  **A.**   He's one of my main consultants for chemotherapy.

3:27PM  19  **Q.**   Tell us about that.

3:27PM  20  **A.**   So when I see someone who requires IV chemotherapy or I

3:28PM  21  decide the patient should have chemotherapy beforehand, then I

3:28PM  22  send them to a medical oncologist for consultation.

3:28PM  23        Dr. Carinder and Dr. Saux are the group that is right

3:28PM  24  across the street from St. Tammany Parish Hospital and the ones

3:28PM  25  that I'm most familiar with.  There's several others that we

OFFICIAL TRANSCRIPT

MARIE CELESTE LAGARDE - DIRECT

3:28PM  1    refer to, but they've been there the longest, so they're one of

3:28PM  2    our main referrals.

3:28PM  3    Q.    Okay.  And why do you refer to Dr. Carinder?

3:28PM  4          MR. MOORE:  Objection.  Foundation.  Relevance.

3:28PM  5          THE COURT:  Sustained.

3:28PM  6    BY MR. SCHANKER:

3:28PM  7    Q.    So, Dr. Lagarde, just to be clear, when you saw Barbara in

3:28PM  8    that February time period, February 7th of 2011, did you have

3:29PM  9    any sort of conversation with her whatsoever about chemotherapy

3:29PM  10   drug options, side effects from chemotherapy, anything like

3:29PM  11   that at all?

3:29PM  12   A.    No.

3:30PM  13   Q.    Okay.  Doctor, just so the jury's clear, why is it that

3:30PM  14   you didn't have any sort of chemotherapy conversation with

3:30PM  15   Barbara Earnest?

3:30PM  16   A.    It was my understanding that I was not on her insurance

3:30PM  17   plan, so I only had the one visit with her.  So once we made

3:30PM  18   the diagnosis, we were just -- we didn't have any other

3:30PM  19   conversations with her.

3:30PM  20   Q.    Thank you, Doctor.

3:30PM  21          MR. SCHANKER:  And, Your Honor, plaintiffs move to

3:30PM  22   introduce Exhibit 0633.

3:30PM  23          MR. MOORE:  No objection.

3:30PM  24          THE COURT:  Let it be admitted.

3:30PM  25          MR. SCHANKER:  No further questions.  Thank you.

OFFICIAL TRANSCRIPT

MARIE CELESTE LAGARDE - CROSS

3:30PM 1      **THE COURT:**  Mr. Moore.

3:30PM 2                      **CROSS-EXAMINATION**

3:30PM 3   BY MR. MOORE:

3:30PM 4   **Q.**   Good afternoon, Doctor.  Any name is Douglas Moore.  I'm

3:31PM 5   going ask you some questions today, and I'm going to try and

3:31PM 6   get back to the base of Causeway Bridge before the cars stack

3:31PM 7   up.

3:31PM 8            So when I want to ask you a couple of questions about

3:31PM 9   your care and treatment of Barbara Earnest.  I'm going to try

3:31PM 10  and not duplicate some of the things that Mr. Schanker covered.

3:31PM 11           But we've been here all week, and you're actually the

3:31PM 12  first health care provider that treated Barbara Earnest that

3:31PM 13  we're hearing from.  So there's a couple of details that I

3:31PM 14  wanted to cover regarding your care and treatment of her.

3:31PM 15           **MR. MOORE:**  And, Erin, if we could throw it back to

3:31PM 16  Jen there, please.

3:31PM 17           So what I'd like to call up is page 8 of

3:31PM 18  Defendant 2365, please.

3:31PM 19  BY MR. MOORE:

3:31PM 20  **Q.**   And what I'd like to ask you, Doctor, is do you recognize

3:32PM 21  this document?

3:32PM 22  **A.**   Yes.

3:32PM 23  **Q.**   And can you tell us what this document is.

3:32PM 24  **A.**   It's notes from my clinic visit.

3:32PM 25  **Q.**   Okay.  So this is the documentation of your clinic visit

OFFICIAL TRANSCRIPT

MARIE CELESTE LAGARDE - CROSS

1  with Barbara Earnest?

2  A.   Yes.

3        MR. MOORE:  Okay.  And if we could pull up the top

4  section there, Jen, please.

5  BY MR. MOORE:

6  Q.   Okay.  So it says there at the top, "Referring MD."

7        Could you tell us who that is, Doctor?

8  A.   Dr. Stefanie Schultis.  She's a gynecologist.

9  Q.   Okay.  And is that who referred Barbara Earnest to your

10 office -- to your care?

11 A.   That's my understanding.

12 Q.   Okay.  Because it says "referring MD" right there next

13 to --

14 A.   That's right.

15 Q.   Okay.  And then the date is February 7th, 2011; yes?

16 A.   Yes.

17 Q.   And that's the single time that you saw Barbara Earnest;

18 right?

19 A.   Yes.

20 Q.   Okay.  And then it has her name and it has her age,

21 60 years old; right?

22 A.   Yes.

23 Q.   Okay.  All right.

24        MR. MOORE:  And if we could go to the next section,

25 Jen, please.  Right there -- yep, there you go.

OFFICIAL TRANSCRIPT

MARIE CELESTE LAGARDE - CROSS

3:32PM   1    BY MR. MOORE:

3:32PM   2    Q.    So it looks like, in this section of the document, Doctor,

3:32PM   3    you're documenting some important information that the patient

3:33PM   4    would be relating to you; is that right?

3:33PM   5    A.    Yes.

3:33PM   6    Q.    Okay.  And the first thing is family history.

3:33PM   7          Do you see that?

3:33PM   8    A.    Yes.

3:33PM   9    Q.    That's what the "HX" stands for, history?

3:33PM  10    A.    Yes.

3:33PM  11    Q.    Okay.  And it says "mother, uterine, 60s."

3:33PM  12          What does that mean?

3:33PM  13    A.    Her mother had uterine cancer in her 60s.

3:33PM  14    Q.    Okay.  And does it indicate whether the uterine cancer

3:33PM  15    that her mother had in her 60s, was that fatal or -- do you

3:33PM  16    know the outcome there?

3:33PM  17    A.    No.

3:33PM  18    Q.    Okay.  It's not reported one way or the other?

3:33PM  19    A.    Correct.

3:33PM  20    Q.    And then on the next line, it says, "Reason for visit."

3:33PM  21          Do you see that?

3:33PM  22    A.    Yes.

3:33PM  23    Q.    And it says, "Abnormal mammogram, left, solid mass,

3:33PM  24    suspicious."

3:33PM  25          Do you see that?

MARIE CELESTE LAGARDE - CROSS

3:33PM  1   **A.**   Yes.

3:33PM  2   **Q.**   And when you would have written down that information,

3:33PM  3   would you have been reviewing the mammogram report?

3:33PM  4   **A.**   I have the actual mammograms in the room on x-ray view

3:33PM  5   boxes at that time.

3:34PM  6   **Q.**   At that time.  Okay.

3:34PM  7         So you're actually looking at the actual mammogram,

3:34PM  8   yes?

3:34PM  9   **A.**   Correct.

3:34PM  10  **Q.**   Okay.  And it was your assessment that it was suspicious?

3:34PM  11  **A.**   Plus I had the radiologist report.

3:34PM  12  **Q.**   Okay.  Let's take a look at the radiologist report.

3:34PM  13         **MR. MOORE:**  Jen, if you could pull up page 13,

3:34PM  14  please.

3:34PM  15         This is page 13 of 2365, D2365.

3:34PM  16         If you could highlight that first paragraph,

3:34PM  17  please.

3:34PM  18  **BY MR. MOORE:**

3:34PM  19  **Q.**   Okay.  In the first highlighted section of the first

3:34PM  20  paragraph there that's on the screen, it says, "The patient

3:34PM  21  complains of a papable abnormality of the left breast, times

3:34PM  22  one week."

3:34PM  23         Do you see that?

3:34PM  24  **A.**   Yes.

3:34PM  25  **Q.**   Okay.  And the palpable mass, that means you can feel it,

OFFICIAL TRANSCRIPT

MARIE CELESTE LAGARDE - CROSS

3:34PM  1   like physically, you can feel the mass?

3:34PM  2   **A.**   Yes.

3:34PM  3   **Q.**   Okay.  And then the last sentence of that section says,

3:34PM  4   "No prior mammograms available for comparison."

3:34PM  5               Do you see that?

3:34PM  6   **A.**   Yes.

3:34PM  7   **Q.**   Okay.  And is it normal, when you receive a mammography

3:35PM  8   report, to not see any comparison to a prior mammogram?

3:35PM  9   **A.**   It is unusual.

3:35PM  10  **Q.**   Okay.  Because usually you'll look at things that look

3:35PM  11  suspicious and look and see -- at the previous one to see if

3:35PM  12  they've changed?

3:35PM  13  **A.**   Correct.

3:35PM  14           **MR. MOORE:**  Okay.  Let's go back to page 8, Jen, if

3:35PM  15  we can, please.

3:35PM  16  **BY MR. MOORE:**

3:35PM  17  **Q.**   All right.  So after you looked at the mammogram, it looks

3:35PM  18  like -- I think you told us that you did your own ultrasound

3:35PM  19  there in the office?

3:35PM  20  **A.**   Correct.

3:35PM  21  **Q.**   Okay.  And according to this document, what did the

3:35PM  22  ultrasound show?

3:35PM  23  **A.**   Mine or Lakeview's?

3:35PM  24  **Q.**   Okay.  So let's do yours, because Lakeview's, I'm less

3:35PM  25  interested in.

MARIE CELESTE LAGARDE - CROSS

3:35PM  1          **MR. MOORE:**  Not that section, Jen, the one that says

3:35PM  2  "clinical ultrasound results."  Right here.

3:36PM  3          **THE WITNESS:**  "Left 3:00, hypoechoic area, 1.57

3:36PM  4  centimeters wide, 1.26 centimeters with diffuse blood flow per

3:36PM  5  Doppler."

3:36PM  6  **BY MR. MOORE:**

3:36PM  7  **Q.**  Okay.  What was the significance of the diffuse blood

3:36PM  8  flow?

3:36PM  9  **A.**  We place a Doppler, which determines the amount of blood

3:36PM  10  flow.  Cancers will have increased blood flow in them which

3:36PM  11  indicates increased vascularity to the tumor.

3:36PM  12  **Q.**  Okay.  And if I'm looking at this document -- I have the

3:36PM  13  section called up here and highlighted -- it says, "Very

3:36PM  14  worrisome."

3:36PM  15          Do you see that that I highlighted?

3:36PM  16  **A.**  Yes.

3:36PM  17  **Q.**  Okay.  And did you write that there, "very worrisome"?

3:36PM  18  **A.**  No.  I dictated it.

3:36PM  19  **Q.**  Oh, you dictated it, and then somebody else wrote it?

3:36PM  20  **A.**  Yes.

3:36PM  21  **Q.**  Okay.  And tell us why it was very worrisome.

3:36PM  22  **A.**  It was solid, not cystic, irregular border, increased

3:37PM  23  flood flow with calcifications.

3:37PM  24  **Q.**  And in your impression, that was very likely to be a

3:37PM  25  cancer; correct?

OFFICIAL TRANSCRIPT

MARIE CELESTE LAGARDE - CROSS

3:37PM  1   **A.**   If I was teaching someone how to do breast ultrasounds and

3:37PM  2   look at a cancer, I would have shown them that picture.

3:37PM  3   **Q.**   Okay.  So in your judgment -- and I think you told us once

3:37PM  4   before that, if the pathology came back negative for cancer,

3:37PM  5   you would have challenged it?

3:37PM  6   **A.**   Yes.

3:37PM  7   **Q.**   Okay.  Because you knew from the Doppler that was going to

3:37PM  8   be cancer?

3:37PM  9   **A.**   I knew from ultrasound examination that it was a cancer.

3:37PM  10  **Q.**   Okay.  So at this point, the next step is to get a tissue

3:37PM  11  sample of that mass and get it off to the lab; right?

3:37PM  12  **A.**   Yes.

3:37PM  13  **Q.**   And you did that?

3:37PM  14  **A.**   Yes.

3:37PM  15  **Q.**   That was the spaghetti that you told us about?

3:37PM  16  **A.**   Yes.

3:37PM  17  **Q.**   And then you got laboratory report back about three or

3:37PM  18  four days later, yes?

3:37PM  19  **A.**   Yes.

3:37PM  20         **MR. MOORE:**  If we could go to page 9, please.

3:38PM  21  **BY MR. MOORE:**

3:38PM  22  **Q.**   Okay.  What I'm showing you, Doctor, is the pathology

3:38PM  23  report from St. Tammany Parish Hospital, and what I'd like to

3:38PM  24  pull up is the first highlighted the section under "Diagnosis."

3:38PM  25         Okay.  And do you see the diagnosis there, Doctor?

OFFICIAL TRANSCRIPT

MARIE CELESTE LAGARDE - CROSS

3:38PM  1    **A.**    Yes.

3:38PM  2    **Q.**    And it reads "Infiltrating duct carcinoma, intermediate to

3:38PM  3    high histologic grade."

3:38PM  4            Do you see that?

3:38PM  5    **A.**    Yes.

3:38PM  6    **Q.**    And a histologic grade is an assessment by pathologist of

3:38PM  7    how abnormal the cells are; right?

3:38PM  8    **A.**    Yes.

3:38PM  9    **Q.**    And the more abnormal the cells, the faster they will

3:38PM  10   replicate; right?

3:38PM  11   **A.**    And the higher the grade.

3:38PM  12   **Q.**    Right.  And so, in cancer, a high grade is not a good

3:38PM  13   finding?

3:38PM  14   **A.**    Yes.

3:38PM  15   **Q.**    Okay.  And at this time, you did not have -- I'm sorry,

3:38PM  16   when you first met -- strike that.

3:38PM  17           You testified that you had your office call Barbara

3:38PM  18   Earnest to give her the results of the pathology?

3:39PM  19   **A.**    Yes.

3:39PM  20   **Q.**    And the purpose of that call was to confirm that she had

3:39PM  21   cancer, yes?

3:39PM  22   **A.**    Yes.

3:39PM  23   **Q.**    And at that time, you did not have the information on

3:39PM  24   whether it was -- the tumor was ER positive or PR positive?

3:39PM  25   **A.**    Correct.

OFFICIAL TRANSCRIPT

MARIE CELESTE LAGARDE - CROSS

3:39PM 1    **Q.**    Okay.  But in this report, it looks like there was an

3:39PM 2    addendum.

3:39PM 3              **MR. MOORE:**  Jen, if you can highlight the second

3:39PM 4    section.

3:39PM 5    **BY MR. MOORE:**

3:39PM 6    **Q.**    Okay.  Right above where it says "addendum," there's some

3:39PM 7    numbers there.  It might be -- it looks like it may have come

3:39PM 8    in on the 11th, but anyway --

3:39PM 9    **A.**    That comes later.

3:39PM 10   **Q.**    It comes later, right.

3:39PM 11   **A.**    What happens is the pathologist gives us the preliminary,

3:39PM 12   and then we get the secondary with the hormone receptors.

3:39PM 13   **Q.**    Right.  And --

3:39PM 14   **A.**    That takes longer to do.

3:39PM 15   **Q.**    Right.  And so this information wasn't available to your

3:39PM 16   office when she came back, but we knew it was cancer; right?

3:39PM 17   **A.**    That's correct.

3:39PM 18   **Q.**    Okay.  And -- but, ultimately, it was determined that the

3:39PM 19   cancer type was both ER positive and PR positive; right?

3:39PM 20   **A.**    Yes.

3:39PM 21   **Q.**    And that's estrogen receptor and progesterone receptor

3:40PM 22   positive, yes?

3:40PM 23   **A.**    Yes.

3:40PM 24   **Q.**    And so what that means is that the tumor -- the growth of

3:40PM 25   the tumor is fueled by those hormones?

OFFICIAL TRANSCRIPT

MARIE CELESTE LAGARDE - CROSS

3:40PM   1   **A.**   Yes.

3:40PM   2   **Q.**   And that's particularly important in a patient who still

3:40PM   3   has their ovaries; right?

3:40PM   4   **A.**   Well, if the patient is postmenopausal, then their ovaries

3:40PM   5   aren't functioning.

3:40PM   6   **Q.**   Right.

3:40PM   7   **A.**   So then there would be no estrogen that the patient is

3:40PM   8   producing in her own body except maybe in the adrenals.   But

3:40PM   9   it's very important, if the patient is taking exogenous

3:40PM   10   hormones -- which this patient was not, I don't think.

3:40PM   11   **Q.**   Okay.   So -- but still part of the picture, part of the

3:40PM   12   factors, that goes into what you're going to go next; right?

3:40PM   13   **A.**   Yes.

3:40PM   14   **Q.**   Okay.   And so the next step in your exchange with this

3:40PM   15   plaintiff -- with this patient would be then to make the phone

3:40PM   16   call; right?

3:40PM   17   **A.**   Yes.

3:40PM   18   **Q.**   Yeah.   And that phone call happened on the 10th of

3:40PM   19   February, yes?

3:40PM   20   **A.**   Yes.

3:40PM   21         **MR. MOORE:**   Okay.   If we could pull that report up.

3:40PM   22   I think Mr. Schanker put it on the overhead.

3:41PM   23             That would be page 6, Jen.   There you go.

3:41PM   24   **BY MR. MOORE:**

3:41PM   25   **Q.**   And you see her name at the top, Barbara Earnest; right?

OFFICIAL TRANSCRIPT

MARIE CELESTE LAGARDE - CROSS

3:41PM 1    **A.**    Yes.

3:41PM 2    **Q.**    And the date there, February 10th, 2011?

3:41PM 3    **A.**    Yes.

3:41PM 4    **Q.**    Okay.  And it looks like, under the "Note" section, is

3:41PM 5    says, "Copy of pathology left for patient at front desk with

3:41PM 6    educational book."  Right?

3:41PM 7    **A.**    Yes.

3:41PM 8    **Q.**    Okay.  And the educational book was the book that we

3:41PM 9    talked about; correct?

3:41PM 10   **A.**    Yes.

3:41PM 11          **MR. MOORE:**  And then if you could, Jen, drop that

3:41PM 12   cull out.

3:41PM 13   **BY MR. MOORE:**

3:41PM 14   **Q.**    I wanted to ask about the highlighted section where it

3:41PM 15   says instructional -- "instructed patient" -- that one.

3:41PM 16          **MR. MOORE:**  There you go, Jen.

3:41PM 17   **BY MR. MOORE:**

3:41PM 18   **Q.**    "Instructed patient with ER/PR, HER2/neu, breast MRI, and

3:41PM 19   PET/CT."  And next to that, it says, "for invasive carcinomas

3:41PM 20   only."

3:41PM 21   **A.**    Yes.

3:41PM 22   **Q.**    What does that mean?  What is an invasive carcinoma?

3:41PM 23   **A.**    Ductal carcinoma in situ -- there's different ladders with

3:41PM 24   breast cancer.  You have a regular breast.  Then you have

3:42PM 25   atypical hyperplasia, which means the cells are starting to

OFFICIAL TRANSCRIPT

MARIE CELESTE LAGARDE - CROSS

3:42PM  1   look abnormal.

3:42PM  2              Then you have ductal carcinoma in situ, and that

3:42PM  3   means there's cancer cells in the duct but no break through the

3:42PM  4   duct or no invasion beyond the duct.

3:42PM  5              Invasive carcinomas mean that now the cells have

3:42PM  6   broken through the duct and are invading beyond the duct.

3:42PM  7              PET/CT scans, which, as we talked about previously,

3:42PM  8   indicate metastases.  Ductal carcinoma in situs rarely

3:42PM  9   metastasize.  Breast cancers don't kill because they're in the

3:42PM  10  breast; they kill because they go somewhere else.

3:42PM  11             So an in situ lesion, which means it's just in the

3:42PM  12  duct, we usually don't do metastatic workups.  So invasion, by

3:42PM  13  definition, we would do the PET/CT scan, which tells us if the

3:42PM  14  tumor is somewhere else in the body.

3:42PM  15  Q.   Okay.  And that was your recommendation for Ms. Earnest?

3:43PM  16  A.   Yes.

3:43PM  17  Q.   And do you know if she sent forward with the PET/CT scan?

3:43PM  18  A.   Yes.

3:43PM  19  Q.   And do you know whether or not cancer was found anywhere

3:43PM  20  else in her body besides the breast?

3:43PM  21  A.   The CT scan I had said that she had a questionable lymph

3:43PM  22  node in her axilla.

3:43PM  23  Q.   Okay.  So if the lymph node that we're referring to --

3:43PM  24  that you're referring to from your record contained the cancer,

3:43PM  25  that's an indication that the cancer is escaping the breast;

OFFICIAL TRANSCRIPT

MARIE CELESTE LAGARDE - CROSS

3:43PM 1   right?

3:43PM 2   A.   Correct.

3:43PM 3   Q.   And that's a very ominous finding, isn't it?

3:43PM 4   A.   It would change the way we treat her.

3:43PM 5   Q.   Okay.  All right.  And as I understand the testimony today

3:43PM 6   and from looking at your records, the only time you saw her was

3:43PM 7   on February 7th, yes?

3:43PM 8   A.   Yes.

3:43PM 9            MR. MOORE:  Okay.  And, Jen, you can take that down.

3:43PM 10            Erin, if you can throw me back over here.

3:44PM 11   BY MR. MOORE:

3:44PM 12   Q.   Okay.  And you had testified during your direct

3:44PM 13   examination, that it would be your practice for the breast

3:44PM 14   cancer book -- the breast cancer treatment handbook, to

3:44PM 15   highlight certain sections and discuss with the patient what

3:44PM 16   sections you wanted them to review; right?

3:44PM 17   A.   Yes.

3:44PM 18   Q.   But your medical records for Barbara Earnest indicate that

3:44PM 19   the book was left for her when she came in to get a copy of her

3:44PM 20   pathology report; right?

3:44PM 21   A.   Yes.

3:44PM 22   Q.   And I'm assuming, sitting here today, you don't have any

3:44PM 23   independent recollection of discussing this book at all with

3:44PM 24   Barbara Earnest; right?

3:44PM 25   A.   I'm sure I didn't.

OFFICIAL TRANSCRIPT

MARIE CELESTE LAGARDE - CROSS

3:44PM 1   **Q.**   Okay.  You're sure you did not discuss it with her?

3:44PM 2   **A.**   Right.  Because, remember, I didn't have her path report

3:44PM 3   in my hand.  I only had the ultrasound examination.  I'm not

3:44PM 4   going to give her the book without a documentation of carcinoma

3:44PM 5   with the pathology report.

3:44PM 6   **Q.**   Okay.  And so do you have any way of knowing or telling

3:44PM 7   this jury that, for certain, any particular pages or passages

3:44PM 8   would have dog-eared or highlighted for Ms. Earnest when she

3:44PM 9   picked it up?

3:45PM 10  **A.**   No.

3:45PM 11  **Q.**   Okay.  And the information that's contained in this book,

3:45PM 12  you would agree, it's quite comprehensive?

3:45PM 13  **A.**   Yes.

3:45PM 14  **Q.**   And it looks like it covers information -- Mr. Schanker

3:45PM 15  showed you some of these pages.  I'll show you page little

3:45PM 16  Roman IX where it starts off with "the functional impact of

3:45PM 17  breast cancer" in Chapter 1.

3:45PM 18          Do you see that?

3:45PM 19  **A.**   Yes.

3:45PM 20  **Q.**   And then it goes through -- you were shown other sections

3:45PM 21  on treatment, surgery, emotional impact, finances.  It covers

3:45PM 22  the whole waterfront, the book, doesn't it?

3:45PM 23  **A.**   Yes.

3:45PM 24  **Q.**   And it even has an appendix on chemotherapy medicines;

3:45PM 25  right?

MARIE CELESTE LAGARDE - REDIRECT

3:45PM  1    **A.**   Yes.

3:45PM  2    **Q.**   And if any of your patients were interested in learning

3:45PM  3    about any of the subject matters in this book at any time

3:45PM  4    during their treatment and during their journey, they'd be able

3:45PM  5    to go read it; right?

3:45PM  6    **A.**   Yes.

3:45PM  7    **Q.**   Okay.  And you were asked about sort of the timing of when

3:45PM  8    this book was provided to Ms. Earnest in conjunction with when

3:46PM  9    she was seen by Dr. Carinder.

3:46PM  10   Do you remember that?  He wrote down, like, the dates

3:46PM  11   on the thing?

3:46PM  12   **A.**   Uh-huh.  Uh-huh.

3:46PM  13   **Q.**   And I just want to confirm that it's your testimony that,

3:46PM  14   when Ms. Earnest met with Dr. Carinder and was prescribed

3:46PM  15   chemotherapy, had you already given her this book, yes?

3:46PM  16   **A.**   Yes.

3:46PM  17   **MR. MOORE:**  Okay.  Thank you, Your Honor.  No further

3:46PM  18   questions.

3:46PM  19   **THE COURT:**  Thank you.

3:46PM  20   Mr. Schanker, any redirect?

3:46PM  21   **MR. SCHANKER:**  Yes.  Just one question brief

3:46PM  22   question.

3:46PM  23   **REDIRECT EXAMINATION**

3:46PM  24   BY MR. SCHANKER:

3:46PM  25   **Q.**   Doctor, was this a highly treatable cancer that Barbara

OFFICIAL TRANSCRIPT

MARIE CELESTE LAGARDE - REDIRECT

3:46PM 1    Earnest had?

3:46PM 2    **A.**   Yes.

3:46PM 3            **MR. SCHANKER:**   Thank you, Doctor.

3:46PM 4            **THE COURT:**   That's it.   Thank you, Dr. Lagarde.

3:46PM 5                 Members of the jury, it's been a long week and

3:46PM 6    you've worked hard.   We're going to break a little early today.

3:47PM 7    So we'll be at recess until Monday morning at 8:30.

3:47PM 8                 Let me remind you, because it becomes even more

3:47PM 9    compelling during the course of the weekend, don't discuss the

3:47PM 10   case amongst yourselves or with anyone else or anybody in your

3:47PM 11   family that happens to come over to watch LSU beat Vanderbilt.

3:47PM 12                Please do no independent research or -- and

3:47PM 13   leave your tablets on your desk.

3:47PM 14                And then, of course, when you arrive Monday,

3:47PM 15   please go into the jury room and not hang out, look at anybody

3:47PM 16   associated with this case.

3:47PM 17                Court's in recess until Monday at 8:30.

3:47PM 18                Would you all stay in the back for one minute.

3:47PM 19   I believe Erin has some things to give you all.

3:47PM 20            **THE DEPUTY CLERK:**   All rise.

3:47PM 21            (WHEREUPON, the jury exited the courtroom.)

22

23

24

25

OFFICIAL TRANSCRIPT

MARIE CELESTE LAGARDE - REDIRECT

1                              *****

2                           **CERTIFICATE**

3            I, Jodi Simcox, RMR, FCRR, Official Court Reporter

4    for the United States District Court, Eastern District of

5    Louisiana, do hereby certify that the foregoing is a true and

6    correct transcript, to the best of my ability and

7    understanding, from the record of the proceedings in the

8    above-entitled and numbered matter.

9

10

11                         *s/Jodi Simcox, RMR, FCRR*
                            Jodi Simcox, RMR, FCRR
12                          Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

OFFICIAL TRANSCRIPT