UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  TAXOTERE (DOCETAXEL)      *        16-MD-2740
PRODUCTS LIABILITY LITIGATION     *
                                  *        Section H
                                  *
Relates to:  Barbara Earnest      *        September 23, 2019
             16-CV-17144          *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *


DAY 6 - AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL BEFORE
THE HONORABLE JANE T. MILAZZO
UNITED STATES DISTRICT JUDGE


<u>Appearances</u>:


For the Plaintiffs:          Barrios Kingsdorf & Casteix, LLP
                             BY:  DAWN M. BARRIOS, ESQ.
                             701 Poydras Street, Suite 3650
                             New Orleans, Louisiana 70139


For the Plaintiffs:          Gainsburgh Benjamin David Meunier
                               & Warshauer, LLC
                             BY:  M. PALMER LAMBERT, ESQ.
                             1100 Poydras Street, Suite 2800
                             New Orleans, Louisiana 70163


For the Plaintiffs:          Pendley Baudin & Coffin, LLP
                             BY:  CHRISTOPHER L. COFFIN, ESQ.
                             1100 Poydras Street, Suite 2505
                             New Orleans, Louisiana 70163


For the Plaintiffs:          Gibbs Law Group, LLP
                             BY:  KAREN BARTH MENZIES, ESQ.
                             6701 Center Drive West, Suite 1400
                             Los Angeles, California 90045

Appearances:

For the Plaintiffs:            Bachus & Schanker, LLC
                               BY:  J. KYLE BACHUS, ESQ.
                                    DARIN L. SCHANKER, ESQ.
                               1899 Wynkoop Street, Suite 700
                               Denver, Colorado 80202


For the Plaintiffs:            Fleming Nolen & Jez, LLP
                               BY:  RAND P. NOLEN, ESQ.
                               2800 Post Oak Blvd., Suite 4000
                               Houston, Texas 77056


For the Plaintiffs:            DAVID F. MICELI, LLC
                               BY:  DAVID F. MICELI, ESQ.
                               Post Office Box 2519
                               Carrollton, Georgia 30112


For the Plaintiffs:            Morgan & Morgan, P.A.
                               BY:  EMILY C. JEFFCOTT, ESQ.
                               700 S. Palafox Street, Suite 95
                               Pensacola, Florida 32502


For the Sanofi                 Irwin Fritchie Urquhart
Defendants:                         & Moore, LLC
                               BY:  DOUGLAS J. MOORE, ESQ.
                               400 Poydras Street, Suite 2700
                               New Orleans, Louisiana 70130


For the Sanofi                 Shook Hardy & Bacon, LLP
Defendants:                    BY:  HARLEY V. RATLIFF, ESQ.
                                    JON A. STRONGMAN, ESQ.
                               2555 Grand Boulevard
                               Kansas City, Missouri 64108


For the Sanofi                 Shook Hardy & Bacon, LLP
Defendants:                    BY:  HILDY M. SASTRE, ESQ.
                               201 Biscayne Boulevard, Suite 3200
                               Miami, Florida 33131

```
Official Court Reporter:        Toni Doyle Tusa, CCR, FCRR
                                500 Poydras Street, Room B-275
                                New Orleans, Louisiana 70130
                                (504) 589-7778




Proceedings recorded by mechanical stenography using
computer-aided transcription software.
```

1509

## INDEX

Page

JAMES CARINDER

    Cross-Examination By Ms. Sastre     1510
    Redirect Examination By Mr. Schanker    1612

LESLEY FIERRO (Deposition)     1632

<div align="center"><strong><u>AFTERNOON SESSION</u></strong></div>

<div align="center"><strong>(September 23, 2019)</strong></div>

1  THE COURT:  Please bring in the jury.

2  THE DEPUTY CLERK:  All rise.

3  (The jury entered the courtroom.)

4  THE COURT:  All jurors are present.  Court is back in session.  You may be seated.

5  MS. SASTRE:  Thank you, Your Honor.  May it please the Court, Counsel.

6  THE COURT:  Wait.

7  Dr. Carinder, I'll remind you you are under oath.

8  THE WITNESS:  Okay.

9  THE COURT:  Thank you.  Please proceed.

10  MS. SASTRE:  Ladies and gentlemen, good afternoon.

<div align="center"><strong>JAMES CARINDER,</strong></div>

having been duly sworn, testified as follows:

<div align="center"><strong>CROSS-EXAMINATION</strong></div>

BY MS. SASTRE:

Q.   Dr. Carinder, good afternoon.

A.   Hi.

Q.   Doctor, my name is Hildy Sastre, and I have some questions for you today.

A.   Okay.

Q.   I don't think you and I have ever met, have we?

JAMES CARINDER - CROSS

1  A.   No.

2  Q.   Okay.  So, Doctor, let me start off by asking you some

3  questions just about breast cancer generally, okay?

4  A.   Okay.

5  Q.   All right, sir.  Now, you would agree with me that breast

6  cancer is a serious disease, true?

7  A.   Yes.

8  Q.   And it's a disease that, in fact, when we say it's

9  serious, to be clear, it can be deadly or fatal, correct?

10  A.   Yes.

11  Q.   And if breast cancer spreads to the lymph node, it can

12  spread throughout the lymphatic system and metastasize to other

13  parts of the body, true?

14  A.   Yes.

15  Q.   And here I believe you said, sir, that Mrs. Earnest's

16  breast cancer had spread to one of her lymph nodes, true?

17  A.   Yes.

18  Q.   Now, chemotherapy, you would agree with me, is an

19  important tool for treating breast cancer.

20  A.   Yes.

21  Q.   And taxanes -- T-A-X-A-N-E-S -- taxanes are a class of

22  chemotherapy medicines used to treat breast cancer, right?

23  A.   Yes.

24  Q.   And when we say "taxanes," I want to be clear, Taxotere is

25  a taxane.

JAMES CARINDER - CROSS

01:15  1    **A.**   That's correct.

01:16  2    **Q.**   Now, with the advent of taxanes, including Taxotere, you

01:16  3    agree that they have helped increase breast cancer survival

01:16  4    rates.

01:16  5    **A.**   Yes.

01:16  6    **Q.**   And taxanes have incredible efficacy in breast cancer

01:16  7    treatment, true?

01:16  8    **A.**   Yes.

01:16  9    **Q.**   And when we say that, Dr. Carinder, when we say they have

01:16  10   incredible efficacy, what we are saying is that they improve

01:16  11   survival, true?

01:16  12   **A.**   Yes.

01:16  13   **Q.**   They increase a patient's risk [sic] of surviving breast

01:16  14   cancer, as opposed to dying from breast cancer.

01:16  15   **A.**   Yes.

01:16  16   **Q.**   Taxotere is a good drug, in your experience?

01:16  17   **A.**   Yes.

01:16  18   **Q.**   Effective?

01:16  19   **A.**   Yes.

01:16  20   **Q.**   And you would agree with me, sir, that that's one of the

01:17  21   reasons why you prescribed it to Mrs. Earnest back in 2011.

01:17  22   **A.**   Yes.

01:17  23   **Q.**   Now, when you're treating a patient with chemotherapy for

01:17  24   breast cancer, one of your goals is to select a regimen,

01:17  25   meaning a combination of medications or chemotherapy drugs,

JAMES CARINDER - CROSS

01:17   1   that gives the patient the best chance to survive?

01:17   2   A.   Yes.

01:17   3   Q.   To give the patient the best chance of having a

01:17   4   reoccurrence of their breast cancer, true?

01:17   5   A.   Avoidance of reoccurrence.

01:17   6   Q.   Yes, sir.

01:17   7        That's something that's in your mind, correct?

01:17   8   A.   Yes.

01:17   9   Q.   It's in your mind when you are selecting medications for

01:17  10   your patients, true?

01:17  11   A.   True.

01:17  12   Q.   You would agree with me, Dr. Carinder, that it was, of

01:17  13   course, in fact, in your mind back in 2011 when you were

01:17  14   prescribing chemotherapy to Mrs. Earnest?

01:18  15   A.   You mean to keep her breast cancer from recurring?  Yes.

01:18  16   Q.   Yes.  Okay.

01:18  17        That was one of your goals?

01:18  18   A.   Yes.

01:18  19   Q.   And as the jury has heard -- and we will spend a little

01:18  20   time on it, Doctor -- but what you decided was going to be the

01:18  21   most effective option to treat Mrs. Earnest's breast cancer and

01:18  22   to prevent a reoccurrence was a regimen involving Adriamycin,

01:18  23   Cytoxan, and Taxotere, true?

01:18  24   A.   True.

01:18  25   Q.   And we can agree, of course, Mrs. Earnest is here in the

JAMES CARINDER - CROSS

01:18  1   courtroom.
01:18  2              I assume you saw her today, sir?
01:18  3   **A.**   Yes.
01:18  4   **Q.**   When was the last time you saw Mrs. Earnest?
01:18  5   **A.**   2013.
01:18  6   **Q.**   The last time she was your patient?
01:18  7   **A.**   That's correct.
01:18  8   **Q.**   So it's been about six years?
01:18  9   **A.**   Yes.
01:18  10  **Q.**   Are you aware of the fact that she is cancer free today?
01:19  11  **A.**   Yes.
01:19  12  **Q.**   Okay.  So we can agree that after the surgery that was
01:19  13  done to remove her cancerous tumor and the chemotherapy that
01:19  14  you prescribed, which included Taxotere, that as a result of
01:19  15  that, Mrs. Earnest is alive today and cancer free.
01:19  16  **A.**   Yes.
01:19  17  **Q.**   And I think you might have said this on direct, but I just
01:19  18  want to be clear:  Mrs. Earnest was at risk for her cancer
01:19  19  coming back if she did not get chemotherapy.
01:19  20  **A.**   Absolutely.
01:19  21  **Q.**   Let's talk about risks, generally, for just a moment,
01:19  22  okay?
01:19  23             So you would agree with me that all chemotherapy
01:19  24  drugs have risks.
01:19  25  **A.**   Yes.

JAMES CARINDER - CROSS

| | | |
|---|---|---|
| 01:19 | 1 | **Q.**   And Adriamycin has certain risks, correct? |
| 01:19 | 2 | **A.**   Yes. |
| 01:19 | 3 | **Q.**   Cytoxan has certain risks? |
| 01:19 | 4 | **A.**   Yes. |
| 01:19 | 5 | **Q.**   Taxol has certain risks? |
| 01:19 | 6 | **A.**   Yes. |
| 01:19 | 7 | **Q.**   And the risks vary from drug to drug? |
| 01:20 | 8 | **A.**   Yes. |
| 01:20 | 9 | **Q.**   And you'd agree with me, sir, that the risks can also vary |
| 01:20 | 10 | from patient to patient, depending upon that patient's medical |
| 01:20 | 11 | history or other patient-specific factors? |
| 01:20 | 12 | **A.**   Yes. |
| 01:20 | 13 | **Q.**   Now, we already talked about your primary goal is to pick |
| 01:20 | 14 | what you think is going to be the most effective combination of |
| 01:20 | 15 | medications to prevent the patient's breast cancer from |
| 01:20 | 16 | returning. |
| 01:20 | 17 |          And what I would like to ask you about now is that |
| 01:20 | 18 | one of your considerations is also to pick a combination of |
| 01:20 | 19 | medications that will minimize potential risks; is that fair? |
| 01:20 | 20 | **A.**   Well, the goal with treating anyone, whether it's in a |
| 01:20 | 21 | metastatic setting or adjuvant setting, okay, is to afford that |
| 01:20 | 22 | patient the most effective treatment with as little adverse |
| 01:21 | 23 | side effect as we can get away with. |
| 01:21 | 24 | **Q.**   So those are the two big goals; is that fair? |
| 01:21 | 25 | **A.**   Yes.  And you have to take into account, when you are |

JAMES CARINDER - CROSS

01:21  1    treating someone, whatever co-existing comorbidities that they

01:21  2    have got at the time.

01:21  3    Q.   Referring to the patient's medical history?

01:21  4    A.   Yes.

01:21  5    Q.   So to be clear, when you're treating a patient -- and

01:21  6    let's go back to 2011 for the purposes of this case, okay, sir,

01:21  7    when you saw Mrs. Earnest.

01:21  8    A.   Uh-huh.

01:21  9    Q.   There are two primary considerations in your mind:  One is

01:21 10    what's going to be the most effective combination of

01:21 11    chemotherapy medications to prevent that patient's breast

01:21 12    cancer from returning, true?

01:21 13    A.   Yes.

01:21 14    Q.   And then the other primary goal that you have, Doctor, is

01:21 15    going to be what is the combination of medications that's going

01:21 16    to reduce the risks, as well, correct?

01:21 17    A.   Yes.  That can be given safely.

01:21 18    Q.   Sure.

01:21 19         And you would agree with me that all risks are not

01:21 20    the same, true?

01:21 21    A.   That's true.

01:21 22    Q.   And when it came to prescribing chemotherapy for

01:22 23    Mrs. Earnest, there certainly weren't any risk-free

01:22 24    chemotherapy options for her.

01:22 25    A.   All chemotherapy drugs carry a risk.

JAMES CARINDER - CROSS

01:22  1    **Q.**   Okay.  Let me ask you a question, going back to the
01:22  2    guidelines that Mr. Schanker asked you about.  It was the NCCN
01:22  3    guidelines.
01:22  4            Do you recall that?
01:22  5    **A.**   Yes.
01:22  6    **Q.**   And if we take a look at the guidelines -- it's
01:22  7    Defendants' 2279.
01:22  8            **MS. SASTRE:**  If we could bring that up, please.
01:22  9    **BY MS. SASTRE:**
01:23 10    **Q.**   There's a footnote I would like to look at with you,
01:23 11    Footnote 5 on the bottom of the page.
01:23 12            And let me actually stop before we go to that.
01:23 13            So these were the guidelines that you went through
01:23 14    with Mr. Schanker, true?
01:23 15    **A.**   Yes.
01:23 16    **Q.**   Let's take a look at the footnote at the bottom of the
01:23 17    page.  And you see that it's a footnote for the very top line,
01:23 18    where it says "Neoadjuvant or Adjuvant Chemotherapy," and it
01:23 19    has five footnotes.
01:23 20            Do you see that?  We will pull it up so you --
01:23 21    **A.**   Yes, I see it.
01:23 22    **Q.**   And then this is Footnote 5, and it states:  "Randomized
01:23 23    clinical trials demonstrate that the addition of a taxane to
01:23 24    anthracycline-based chemotherapy provides an improved outcome,"
01:23 25    right?

JAMES CARINDER - CROSS

01:23  1              Do you see that, sir?

01:23  2   A.    Yes.

01:23  3   Q.    Had you read that before today or --

01:24  4   A.    Yes.

01:24  5   Q.    -- did you read that statement in the guidelines?  You're

01:24  6   familiar with it?

01:24  7   A.    Yes, I'm very familiar with it.

01:24  8   Q.    Okay.  Very good.

01:24  9              And so do you agree with that statement?

01:24  10  A.    Yes.

01:24  11  Q.    Okay.  So let's talk about what it means for a moment,

01:24  12  okay?

01:24  13             So what this is saying is that clinical trials --

01:24  14  meaning studies involving real humans that are focused on the

01:24  15  efficacy of drugs -- have shown that using a taxane with -- and

01:24  16  then it says anthracycline-based chemotherapies -- provides an

01:24  17  improved outcome, right?

01:24  18  A.    Yes.

01:24  19  Q.    And when it says "anthracycline-based," I think the jury

01:24  20  has heard this a few times now, but that includes drugs like

01:24  21  Adriamycin?

01:24  22  A.    Yes.

01:24  23  Q.    And when it says "improved outcome," that means more

01:24  24  efficacy, better survival for patients, right?

01:24  25  A.    Yes.

JAMES CARINDER - CROSS

01:24  1  Q.    And so what we are talking about here is that when you add

01:24  2  a taxane, including Taxotere, to a regimen that includes

01:25  3  Adriamycin, that patient has a better chance of living.

01:25  4  A.    Yes.

01:25  5  Q.    Now, in the context of adjuvant breast cancer treatment,

01:25  6  there's really two taxanes that we're talking about, Taxotere

01:25  7  and Taxol?

01:25  8  A.    Yes.

01:25  9  Q.    And I know we touched on them a moment ago, but you would

01:25 10  agree with me that taxanes, including Taxotere, have caused

01:25 11  survival rates to go up, true?

01:25 12  A.    Yes.

01:25 13  Q.    And I believe, sir, that you were prescribing Taxotere for

01:25 14  many years before you prescribed it to Mrs. Earnest in 2011.

01:25 15  A.    Yes.

01:25 16  Q.    And would it be fair to say that you had been prescribing

01:25 17  Taxotere going all the way back to, I believe, the late 1990s?

01:26 18  A.    Yes.

01:26 19  Q.    And is that after you essentially finished all of your

01:26 20  medical training and you became a fully fledged --

01:26 21  A.    Yes.

01:26 22  Q.    -- licensed oncologist?

01:26 23  A.    Yes.

01:26 24  Q.    Right away you started using Taxotere?

01:26 25  A.    Yes.

JAMES CARINDER - CROSS

01:26  1   **Q.**   And you would agree with me, sir, that you started using
01:26  2   it then because it was a drug that you found worked, it was a
01:26  3   good drug, right?
01:26  4   **A.**   Yes.  If you'll recall, though, its initial indication was
01:26  5   for metastatic disease, not adjuvant treatment.
01:26  6   **Q.**   And we are going to talk about that, but I appreciate you
01:26  7   pointing that out.
01:26  8          And you would agree with me, Doctor -- I know you
01:26  9   were asked a lot of hypothetical questions today, a lot of
01:26 10   questions that were like, "Well, if you saw X, what would you
01:26 11   have done," right?  Do you remember those questions?
01:26 12   **A.**   Yes.
01:26 13   **Q.**   Okay.  So I want to ask you instead a little bit of a
01:26 14   different question about what you actually did, going back to
01:26 15   the day that you prescribed this medication to Mrs. Earnest,
01:27 16   which was March 31, 2011, right?
01:27 17   **A.**   Yes.
01:27 18   **Q.**   And on that date, we can agree that you came into that
01:27 19   room where you were meeting with your patient, with
01:27 20   Mrs. Earnest, and you had a single recommendation for her,
01:27 21   true?
01:27 22   **A.**   Yes.
01:27 23   **Q.**   And that recommendation was, to be specific, dose-dense
01:27 24   Adriamycin plus Cytoxan, then to be followed by Taxotere, true?
01:27 25   **A.**   Yes.

JAMES CARINDER - CROSS

01:27  1   Q.   And on that day, sir, when we go back to March 31, 2011 --
01:27  2   I know you talked a lot with counsel about all these options
01:27  3   and I'm going to ask you about that later -- but for now, when
01:27  4   we go back to what actually happened, you didn't discuss any
01:27  5   other options with Mrs. Earnest, right?
01:27  6   A.   No.
01:27  7   Q.   And you would agree with me, sir, she didn't ask you for
01:27  8   any other options, true?
01:27  9   A.   No.
01:28 10   Q.   Now, when talking about the guidelines with plaintiff's
01:28 11   counsel, Mr. Schanker, you talked about -- I believe it was
01:28 12   three other options that you said under a series of certain
01:28 13   circumstances that you could have potentially discussed with
01:28 14   Mrs. Earnest, fair?
01:28 15   A.   Yes.
01:28 16        MR. SCHANKER:   Objection, Your Honor.  Misstates the
01:28 17   testimony.  Multiple options, Your Honor.
01:28 18        THE COURT:   I'm going to allow the question and I'm
01:28 19   just going to let the witness answer it.  Overruled.
01:28 20        MS. SASTRE:   Thank you, Your Honor.
01:28 21   BY MS. SASTRE:
01:28 22   Q.   Now, why don't we go ahead and bring up the guidelines,
01:29 23   please, page 1 of the guidelines.  Oh, we have them up.  I'm
01:29 24   sorry.
01:29 25        So if we look at other adjuvant regimens, I believe

JAMES CARINDER - CROSS

01:29  1    that one of the options you talked about was F-E-C, or FEC,
01:29  2    correct?
01:29  3    **A.**   Yes.
01:29  4    **Q.**   Okay.  And that's fluorouracil, epirubicin, and then
01:29  5    Cytoxan, correct?
01:29  6    **A.**   Yes.
01:29  7    **Q.**   And then it would be followed by weekly Taxol?
01:29  8    **A.**   Yes.
01:29  9    **Q.**   Now, I just want to ask you a few questions about the FEC
01:29 10    regimen.
01:29 11            **MS. SASTRE:**  Jen, if you can highlight it, it's just
01:29 12    the bottom of that.
01:29 13    **BY MS. SASTRE:**
01:29 14    **Q.**   First of all, you would agree with me it's not listed in
01:29 15    the preferred regimens, true?
01:29 16    **A.**   True.
01:29 17    **Q.**   It's listed in the other regimens.
01:29 18            You would agree with me, in fact, when you look at
01:29 19    the preferred adjuvant regimens for 2011, the very first
01:29 20    regimen listed is Taxotere, Adriamycin, Cytoxan; correct?
01:30 21    **A.**   Yes.
01:30 22    **Q.**   Okay.  So when it comes to FEC, if it's given without a
01:30 23    taxane, you would agree with me that survival will be reduced,
01:30 24    correct?
01:30 25    **A.**   I agree.

JAMES CARINDER - CROSS

01:30 1   **Q.**   And so if you were going to have a conversation with
01:30 2   Mrs. Earnest or, candidly, any patient in 2011 about the FEC
01:30 3   regimen on the one hand and a regimen including a taxane like
01:30 4   Taxotere on the other hand, you would agree with me that you
01:30 5   would say, "Listen, with FEC without a taxane, there's less
01:30 6   survival."  You would tell them that.
01:30 7   **A.**   I would say there's a slightly higher risk that she could
01:30 8   get a recurrence.
01:30 9   **Q.**   Which is another way of saying "slightly higher risk your
01:30 10  breast cancer could come back," right?
01:30 11  **A.**   Yes.
01:30 12  **Q.**   "Slightly higher risk you may not survive"?
01:31 13  **A.**   True.
01:31 14  **Q.**   All right.  Okay.  Now, I believe if we go to the top
01:31 15  line, under "Other Adjuvant Regimens," you also talked about
01:31 16  the F-A-C or C-A-F regimen?
01:31 17  **A.**   Yes.
01:31 18  **Q.**   And FAC is fluorouracil, Adriamycin, and then Cytoxan,
01:31 19  right?
01:31 20  **A.**   Yes.
01:31 21  **Q.**   And, again, this is a regimen which does not include a
01:31 22  taxane, true?
01:31 23  **A.**   True.
01:31 24  **Q.**   And so would it follow, Dr. Carinder, that you would be
01:31 25  having essentially the same conversation with any patient you

JAMES CARINDER - CROSS

1  would have seen in 2011, including Mrs. Earnest, and you would

2  have said, "On the one hand, I have a regimen which includes

3  Taxotere; it's a taxane, it's effective.  And over here I have

4  a nontaxane regimen, a non-Taxotere regimen.  With the FAC

5  regimen, there is going to be a slightly higher chance of your

6  breast cancer reoccurring."

7  A.   True.

8  Q.   Okay.  You would share that --

9  A.   Yes.

10  Q.   -- with Mrs. Earnest if you were going to talk with her

11  about FAC, true?

12  A.   Yes.  The only time, though, that I would offer the FAC is

13  if she had not wanted to run the risk of developing neuropathy.

14  If she had said, "I absolutely don't want anything that's going

15  to give me numb feet or numb fingers," then we would avoid a

16  TAC.  I would avoid a taxane, period, at that point, because

17  both taxanes have the potential to cause neuropathy.

18       Before the taxanes came along, FAC was a very widely

19  used regimen in the adjuvant setting.

20  Q.   And then FAC became less widely used, right?

21  A.   Exactly.

22  Q.   And that's because taxanes --

23  A.   Because the taxanes came along and proved themselves.

24  Q.   And I think you just made a comment on neuropathy.  You

25  said, "Well, you can have neuropathy with Taxol or Taxotere,"

JAMES CARINDER - CROSS

01:33  1    something like that.
01:33  2    A.    Yes.  Or if you had a diabetic patient that already had
01:33  3    preexisting neuropathy, you don't want to give them something
01:33  4    that's going to aggravate it.
01:33  5    Q.    Right.
01:33  6          But, sir, you would agree with me -- and I believe
01:33  7    you testified to this clearly on direct exam -- that with
01:33  8    Taxol, there is a greater risk for the patient to develop
01:33  9    neuropathy, true?
01:33 10    A.    Yes.
01:33 11    Q.    And with Taxol, Dr. Carinder.  It's not only that the risk
01:33 12    is greater that you get neuropathy, you said that there is a
01:33 13    higher risk of getting worse neuropathy with it, right?
01:33 14    A.    Yes.
01:33 15    Q.    Okay.  And I believe in your deposition you used the words
01:33 16    several times of "daunting neuropathy."
01:33 17          Do you recall that?
01:33 18    A.    Yes.
01:33 19    Q.    And when you say "daunting neuropathy," you are talking
01:33 20    about a serious condition, true?
01:33 21    A.    Yes.
01:33 22    Q.    Something that's painful.
01:33 23    A.    Yes.
01:33 24    Q.    Pins and needles in your hands and feet, right?
01:33 25    A.    In some people, yeah.

JAMES CARINDER - CROSS

01:33  1   **Q.**   Some people can't button their shirts, right?

01:33  2   **A.**   True.

01:33  3   **Q.**   Some people have trouble walking.

01:34  4   **A.**   True.

01:34  5   **Q.**   We are talking about a condition that with Taxol, you have

01:34  6   a better chance of getting it and you have a chance of it being

01:34  7   worse, and this is the kind of condition that is debilitating

01:34  8   to people, true?

01:34  9   **A.**   Yes.

01:34  10  **Q.**   And if you were there talking with Mrs. Earnest in 2011

01:34  11  about Taxol, you would have told her all of that, right?

01:34  12  **A.**   Yes.

01:34  13  **Q.**   Okay.  And you would have told her with any regimen,

01:34  14  whether it's FAC or FEC, if it didn't include a taxane, you

01:34  15  would have said, "There's a better chance your cancer is going

01:34  16  to return with this one," right?

01:34  17  **A.**   Yes.

01:34  18  **Q.**   Now, let me just ask you while we are here, sir:  Your

01:34  19  testimony on direct exam, if I understand it, was that if the

01:34  20  Taxotere label had said "Cases of permanent alopecia have been

01:35  21  reported," you would have shared that information with

01:35  22  Mrs. Earnest in 2011.

01:35  23              Is that fair?

01:35  24              **MR. SCHANKER:**  Objection, Your Honor.  Misstates

01:35  25  testimony.

JAMES CARINDER - CROSS

1       **THE COURT:**  You need to rephrase the question.

2       **MS. SASTRE:**  Okay.

3   BY MS. SASTRE:

4   **Q.**   I'll ask you this way:  Doctor, do you agree with me that

5   if the Taxotere label said "Cases of permanent alopecia have

6   been reported," that you would have shared this information

7   with Mrs. Earnest, along with all of the other risks of

8   chemotherapy you discussed with her?

9   **A.**   Yes.

10  **Q.**   And if Mrs. Earnest said in response to that, "Thank you,

11  Dr. Carinder, but I don't need to hear anything else about any

12  other options," and if she had said to you -- if she didn't ask

13  for another option, we can agree you wouldn't have given her

14  one, right?

15  **A.**   I'm sorry, can you repeat that?

16  **Q.**   Yeah, let me redo that, okay?

17  **A.**   Uh-huh.

18  **Q.**   If after you said to Mrs. Earnest --

19  **A.**   "You could potentially have permanent hair loss."

20  **Q.**   Well, let me reask that question.

21  **A.**   Okay.

22  **Q.**   So you would agree with me that if the Taxotere label had

23  stated:  "There have been cases of permanent alopecia

24  reported," that you would have shared that information with

25  Mrs. Earnest, along with all the other risks of chemotherapy,

JAMES CARINDER - CROSS

01:36 1   true?

01:36 2   A.   Yes.

01:36 3   Q.   All right.  And my next question, Doctor, is that if

01:36 4   Mrs. Earnest didn't ask for another option, you would have

01:36 5   given her what was the only recommendation you walked in the

01:36 6   door with, which was dose-dense Adriamycin and Cytoxan,

01:36 7   followed by Taxotere, true?

01:36 8   A.   True.

01:36 9   Q.   And if Mrs. Earnest did say, "You know what, Dr. Carinder,

01:36 10  I would like to hear more about other options," you would have

01:36 11  discussed a Taxol regimen with her, correct?

01:36 12  A.   True.

01:36 13  Q.   And just to go back for a moment, but in discussing that

01:37 14  Taxol regimen with Mrs. Earnest, you would agree with me you

01:37 15  would have talked to her about the increased neuropathy and the

01:37 16  worse neuropathy with Taxol, true?

01:37 17  A.   Yes.

01:37 18  Q.   And you would have also told her about the increased risk

01:37 19  for developing an infusion reaction with Taxol, correct?

01:37 20  A.   Yes.

01:37 21  Q.   And so to be clear, there is a greater chance of

01:37 22  developing a severe infusion-related reaction if a patient

01:37 23  takes Taxol instead of Taxotere, true?

01:37 24  A.   True.

01:37 25  Q.   And you would have shared that with Mrs. Earnest, right?

JAMES CARINDER - CROSS

01:37 1   **A.**    True.

01:37 2   **Q.**    Because all of this is important information for her to

01:37 3   have, right, Dr. Carinder?

01:37 4   **A.**    Yes.

01:37 5   **Q.**    If Mrs. Earnest had then said -- let's continue down the

01:37 6   road, okay?  If she had then said, "Well, what else do you

01:37 7   have" -- right? -- then you would have said, "Well, I have an

01:37 8   FAC regimen" --

01:38 9   **A.**    FAC.

01:38 10   **Q.**    -- "or FEC regimen," right?

01:38 11   **A.**    Yes.

01:38 12   **Q.**    But on those regimens, you would have made sure to have

01:38 13   told her, "You have a better chance of your breast cancer

01:38 14   coming back if I give you this," right?

01:38 15   **A.**    A higher risk.

01:38 16   **Q.**    A higher risk, right?  A greater chance.

01:38 17   **A.**    Yes.

01:38 18   **Q.**    And was Mrs. Earnest supposed to then somehow pick what

01:38 19   she was going to take without your recommendation, sir?

01:38 20   **A.**    I'm sorry, what do you mean by that?

01:38 21   **Q.**    Is it your expectation, Dr. Carinder, that after you

01:38 22   discussed Taxotere and after you discussed Taxol and after you

01:38 23   discussed FAC and after you discussed FEC, are you telling the

01:38 24   jury that after you had that conversation with Mrs. Earnest,

01:38 25   that your expectation was, without any further input or

JAMES CARINDER - CROSS

1  recommendation from you, that she was just going to have to
2  pick on her own?
3  **A.**   No.
4  **Q.**   You wouldn't have let that happened.
5  **A.**   No.
6  **Q.**   You were going to make a recommendation to her, right?
7  **A.**   Right.
8  **Q.**   Because lots of patients come in and they go, "I mean, I'm
9  not a doctor.  I'm certainly not an oncologist.  I'm here to
10  get treatment for a deadly disease.  Doctor, this is what you
11  do.  Tell me what I'm supposed to take," right?
12  **A.**   Yes.
13  **Q.**   And that's what you would have done here, right, sir?
14  **A.**   Yes.
15  **Q.**   And what you were doing at the time, Doctor, in 2011 was
16  prescribing, under these circumstances, a lot more Taxotere
17  than Taxol, true?
18  **A.**   True.
19  **Q.**   And you were doing it because the way that you needed to
20  give Taxol was every two weeks at the time, true, with this
21  regimen?
22  **A.**   True.
23  **Q.**   And because of the higher dose that you would have to
24  give, at a bimonthly rate, right, the dosing would change,
25  correct?

JAMES CARINDER - CROSS

01:39  1    A.   Yes.
01:39  2    Q.   And because of that, sir, that is what was exposing
01:40  3    patients to this increased risk and worsened risk of neuropathy
01:40  4    with Taxol, true?
01:40  5    A.   True.
01:40  6    Q.   And that's why back in 2011, Taxotere was your go-to
01:40  7    taxane, right?
01:40  8    A.   True.
01:40  9    Q.   And you would agree with me, sir, that in your clinical
01:40 10    experience, even if it's stated in the label -- well, let me
01:40 11    ask you this.
01:40 12         The Taxol label warns of neuropathy, right?
01:40 13    A.   Yes.
01:40 14    Q.   And you had seen that in your clinical experience prior to
01:40 15    2011.
01:40 16    A.   True.
01:40 17    Q.   And you had seen it more than once.
01:40 18    A.   Yes.
01:40 19    Q.   It wasn't unusual; can we agree upon that?
01:40 20    A.   It's not unusual, but it's not to the severity or the
01:40 21    degree that paclitaxel has.
01:40 22         And then with paclitaxel given every two weeks, those
01:40 23    patients have to be premedicated heavily because they have the
01:40 24    risk of having infusion-related complications.
01:40 25    Q.   Let me go back for a moment.  I'm going to try to use the

JAMES CARINDER - CROSS

1    words "Taxotere" and "Taxol," if that's okay with you.  We have

2    been using them for most of the trial.

3             My question to you, Doctor, is prior to 2011 you had

4    seen patients develop daunting neuropathy after using Taxol?

5    A.    Yes.

6    Q.    That was not something which was unusual when it came to

7    your patients who took Taxol, true?

8    A.    True.

9    Q.    But if we go back prior to 2011, sir, and think about, on

10   the other hand, how many patients you had seen develop

11   persistent or long-term hair loss after taking Taxotere, you

12   had only seen it once, right?

13   A.    Yes.

14   Q.    One time, and it was six years before you saw

15   Mrs. Earnest, true?

16   A.    True.

17   Q.    In all of the other patients you treated with Taxotere

18   between 1999 and the date that you saw Mrs. Earnest in 2011,

19   you had one lady whose hair didn't grow back?

20   A.    Yes.

21   Q.    You said her hair was not exactly perfect in the first

22   place, right?

23   A.    That's true.

24   Q.    So if we are going to complete your conversation with

25   Mrs. Earnest, you are going to share this information with her

JAMES CARINDER - CROSS

| | | |
|---|---|---|
| 01:42 | 1 | too, right? |
| 01:42 | 2 | **A.**   Yes. |
| 01:42 | 3 | **Q.**   What you are going to tell her you are going to do, sir, |
| 01:42 | 4 | is exactly what you did do.  You were going to recommend the |
| 01:42 | 5 | Taxotere regimen, true? |
| 01:42 | 6 | **A.**   True. |
| 01:42 | 7 | **Q.**   Just bear with me one second, Doctor, please. |
| 01:43 | 8 |       Now, let's talk about your prior patient for a |
| 01:43 | 9 | moment, while we are here.  So 2011 you're seeing Mrs. Earnest, |
| 01:43 | 10 | and you meet her, you assess her, you make your recommendation; |
| 01:43 | 11 | and it's dose-dense A plus C -- Adriamycin and Cytoxan, three |
| 01:43 | 12 | weeks later to be followed by Taxotere, right? |
| 01:43 | 13 | **A.**   Yes. |
| 01:43 | 14 | **Q.**   By that time, as we just discussed a moment ago, you had a |
| 01:43 | 15 | prior patient who had the exact same regimen, same drugs, same |
| 01:43 | 16 | dose, same schedule as Mrs. Earnest, true? |
| 01:44 | 17 | **A.**   True. |
| 01:44 | 18 | **Q.**   That patient, you said her hair fell out and it didn't |
| 01:44 | 19 | grow back. |
| 01:44 | 20 | **A.**   A little bit. |
| 01:44 | 21 | **Q.**   But for the most part -- |
| 01:44 | 22 | **A.**   For the most part. |
| 01:44 | 23 | **Q.**   -- it didn't return, correct? |
| 01:44 | 24 | **A.**   Right. |
| 01:44 | 25 | **Q.**   What you believe, Dr. Carinder, is that this prior patient |

JAMES CARINDER - CROSS

01:44 1  from 2005 that you gave the dose-dense A plus C and the

01:44 2  Taxotere too, it was your opinion and belief that chemotherapy

01:44 3  is what prevented her hair from regrowing, right?

01:44 4  A.   Yes.

01:44 5  Q.   So, sir, you knew, we can agree, from your own clinical

01:44 6  experience with this patient, that hair does not always return

01:45 7  after chemotherapy?

01:45 8  A.   In her case it didn't.

01:45 9  Q.   Because Mrs. Earnest was getting the same exact three

01:45 10  medications, the same exact schedule, the same exact dose, you

01:45 11  would agree with me this was important information to share

01:45 12  with her, sir, wasn't it?

01:45 13  A.   Well, it was an anecdotal case.  I had treated countless

01:45 14  other patients with the same regimen and had not seen that

01:45 15  occur.

01:45 16  Q.   I understand.  It happened one time, that it's incredibly

01:45 17  rare to not have your hair grow back after chemotherapy, from

01:45 18  your experience.  But my question is simply different.

01:45 19        You're using this word "anecdotal."  I'm not asking

01:45 20  about that.  You would agree with me this was important

01:45 21  information to have shared with Mrs. Earnest, correct?

01:45 22        MR. SCHANKER:   Objection, Your Honor.  Asked and

01:45 23  answered.

01:46 24        THE COURT:   Sustained.  It's been asked and answered.

25

JAMES CARINDER - CROSS

01:46 1   BY MS. SASTRE:

01:46 2   Q.   Doctor, isn't it true that you always told patients who

01:46 3   were on dose-dense Adriamycin and Cytoxan, followed by

01:46 4   Taxotere, that you did have a patient who didn't recover her

01:46 5   hair?

01:46 6   A.   No.

01:46 7          MS. SASTRE:   Your Honor, may I approach the witness?

01:46 8          THE COURT:   Yes, you may.

01:46 9          MS. SASTRE:   Okay.   Thank you.

01:46 10              Your Honor, would you like a copy?

01:46 11         THE COURT:   Please.

01:46 12         MS. SASTRE:   Counsel, do you need a copy?

01:46 13  BY MS. SASTRE:

01:46 14  Q.   Dr. Carinder, I have just handed you your deposition which

01:46 15  was taken in this case.   You see, sir -- I'm sure you will

01:46 16  recall.   It's dated January 11, 2018, right?

01:47 17  A.   Yes.

01:47 18  Q.   In your deposition you took an oath, just like you did

01:47 19  here today, coming into court.   Right, sir?

01:47 20  A.   Yes.

01:47 21  Q.   Both sides asked you some questions that day, as we heard,

01:47 22  for, I think, about three hours or four hours, correct?

01:47 23  A.   Yes.

01:47 24  Q.   Okay, sir.   If I get you to turn, please, to page 125 of

01:47 25  your deposition, line 4, sir.

JAMES CARINDER - CROSS

01:47 1        **MR. SCHANKER:**  Your Honor, improper use of showing
01:47 2    the depo.  She can certainly read it, but showing the entire
01:47 3    page of the deposition -- I ask that it be read.
01:47 4        **THE COURT:**  It's appropriate to read it to him.
01:47 5        **MS. SASTRE:**  Okay, Your Honor.
01:47 6        **MR. SCHANKER:**  What's the page number?  I'm sorry.
01:47 7        **MS. SASTRE:**  Sure.  125.  I thought both sides had
01:47 8    done that, Judge, but I'm happy to just read it, Your Honor.
01:47 9    **BY MS. SASTRE:**
01:48 10   **Q.**   So page 125, line 4.
01:48 11           "QUESTION:  Did you ever warn patients who were on
01:48 12        the dose-dense AC, and then followed by Taxotere cycle, of
01:48 13        the possibility of permanent hair loss?
01:48 14           "ANSWER:  Patients have asked about that, and at the
01:48 15        time I always told them -- I said, I have one lady, I
01:48 16        said, who still hasn't recovered her hair yet.  But prior
01:48 17        to her, I had never seen anyone have long-lasting
01:48 18        alopecia."
01:48 19           Did I had read that correctly, sir?
01:48 20   **A.**   Yes.
01:48 21        **MR. SCHANKER:**  Your Honor, the time frame is not in
01:48 22   response to the question.  Improper use of the deposition.
01:48 23        **THE COURT:**  Mr. Schanker, overruled.  The jury will
01:48 24   make that determination.
01:48 25        **MR. SCHANKER:**  Thank you.

JAMES CARINDER - CROSS

01:48  1          THE COURT:  Let's proceed.
01:48  2          MS. SASTRE:  Okay.  Thank you.
01:48  3  BY MS. SASTRE:
01:48  4  Q.   So, Dr. Carinder, you see you said here you always told
01:48  5  your patients, right?  I just read that to you?
01:48  6  A.   Yes.
01:48  7  Q.   So does that refresh your recollection in any way that, in
01:48  8  fact --
01:49  9  A.   Yes.
01:49 10  Q.   Okay, sir.  So let me just make sure I get the whole
01:49 11  question out for the record, Dr. Carinder.
01:49 12  A.   Yes.
01:49 13  Q.   It's true, you would agree with me, you always told your
01:49 14  patients, if they were on dose-dense AC followed by Taxotere,
01:49 15  you would tell them about the prior patient, true?
01:49 16  A.   Yes.
01:49 17  Q.   As you sit here today, sir, you don't have any reason that
01:49 18  you deviated from that practice when it came to Mrs. Earnest,
01:49 19  right?
01:49 20  A.   No.
01:49 21  Q.   So you would have told her about that patient, correct?
01:49 22  A.   Yes.
01:49 23  Q.   After having heard about that patient and after learning
01:49 24  about the possibility that her hair might not grow back, you
01:49 25  would agree with me that Mrs. Earnest accepted your treatment

JAMES CARINDER - CROSS

01:49  1   plan and agreed to proceed with the same regimen of dose-dense
01:49  2   AC followed by Taxotere, true?
01:49  3   A.   Yes.
01:49  4           MR. SCHANKER:  Your Honor, it misstates the
01:49  5   testimony.
01:49  6           THE COURT:  You're going to have a time in redirect
01:49  7   to cover this.
01:50  8           MR. SCHANKER:  Thank you.
01:50  9   BY MS. SASTRE:
01:50  10  Q.   One of the things that you said, Dr. Carinder, on direct
01:50  11  exam, you said something like permanent hair loss can be a big
01:50  12  deal to women, right?
01:50  13  A.   Yes.
01:50  14  Q.   Okay, sir.  So, again, because of that, that would be why
01:50  15  you were sharing information like this, true?
01:50  16  A.   Yes.
01:50  17  Q.   Okay, sir.  Okay.
01:50  18          So let's switch gears a little bit.  I want to talk
01:50  19  with you, I think, first, about the 2004 Taxotere label.  I
01:50  20  know you call it the "package insert."  Right?  And I will tell
01:50  21  you, only in this courtroom we have been calling it the
01:50  22  "label," but I mean all of the information that comes with the
01:50  23  drug.  Is that okay?
01:50  24  A.   You mean like a warning label?
01:51  25  Q.   Yes.

JAMES CARINDER - CROSS

01:51  1    **A.**   Adverse side effects.

01:51  2    **Q.**   Yes.  Let me just show you.  Essentially the same thing

01:51  3    as -- you went through a 2010 label today with counsel, and

01:51  4    then you also --

01:51  5    **A.**   2011.

01:51  6    **Q.**   I believe it was 2010, sir.  But in any event, you looked

01:51  7    at a number of labels this morning with counsel, so I would

01:51  8    just like to give you the 2004 label.

01:51  9         **MS. SASTRE:**  Your Honor, may I approach?

01:51 10         **THE COURT:**  Yes.

01:51 11    BY MS. SASTRE:

01:51 12    **Q.**   So, Doctor, what you are looking at -- this is in

01:51 13    evidence.  It's Defense Exhibit 401.  You see that this is the

01:52 14    May 2004 label for Taxotere?

01:52 15    **A.**   Yes.

01:52 16    **Q.**   You would agree with me -- I want to be clear.  I don't

01:52 17    think you looked at this label on your direct exam.  Right?

01:52 18    **A.**   No.

01:52 19    **Q.**   Now, what's important about this label is that 2004 is

01:52 20    when Taxotere became approved to treat adjuvant breast cancer

01:52 21    like Mrs. Earnest had, right?

01:52 22    **A.**   Yes.

01:52 23    **Q.**   I know you spent some time talking with plaintiff's

01:52 24    counsel about a prior label, but that would have been for the

01:52 25    treatment of only metastatic breast cancer, which Mrs. Earnest

JAMES CARINDER - CROSS

1   was never diagnosed with, true?

2   A.   That's true.

3   Q.   This would be the first label issued for Taxotere that

4   would directly apply to the treatment you rendered in this

5   case.

6   A.   True.

7   Q.   Okay.  Very good, sir.

8        Now, sir, you would agree with me that the 2004 label

9   contains the same language that hair generally grows back,

10  right?  You're familiar with that?

11  A.   Yes.

12  Q.   That's something you looked at in the prior version of the

13  label, which was like in the late 1990s, true?

14  A.   True.

15  Q.   Let's go ahead and take a look at the label from 1999,

16  which is in evidence.

17       P-28, please.

18       Would you like a copy?

19  A.   Please.

20  Q.   We will add it to your collection up here.  Thank you.

21  So, Doctor, you agree we are looking at the 1999 label for

22  Taxotere, true?

23  A.   Yes.

24  Q.   This was a label which you have personally read, correct?

25  A.   Yes.

JAMES CARINDER - CROSS

**Q.**   I believe what you told us, sir, is that -- when we took
your deposition in 2018, I believe you said the same thing for
the Taxotere label, the Adriamycin label, and the Cytoxan
label.  You said -- in 2018 you said, "I read them about
20 years ago, in the late '90s, when I started practicing."

**A.**   Yes.

**Q.**   Fair?  Okay, sir.  So let's take a look at what you would
have seen when you read this label in approximately 1999.
Okay.

         Let me ask you this first.  So it is 32 pages long,
right?

**A.**   Yes.

**Q.**   You agree that the purpose of the label is to provide
information to the prescribing physician like yourself, true?

**A.**   True.

**Q.**   Did you read the whole thing, every page?

**A.**   Most of it.

**Q.**   Well --

**A.**   Yes.

**Q.**   -- all of it? some of it? most of it?  What do you think?

**A.**   All of it.

**Q.**   You read all of it.  You read it word for word.  Is that
fair?

**A.**   Yes.

**Q.**   Okay.  Very good.  So what you would have seen or what you

JAMES CARINDER - CROSS

01:55 1   would have read --

01:55 2                If we go to page 31, please.

01:56 3                THE DEPUTY CLERK:  It wasn't actually moved into

01:56 4   evidence, so if you just want to do that on the record.

01:56 5                MR. SCHANKER:  Go ahead.

01:56 6                MS. SASTRE:  Yes, we would like to move it in.

01:56 7                THE COURT:  I thought it was already in evidence.

01:56 8                MS. SASTRE:  I did too.

01:56 9                THE COURT:  Let it be admitted.

01:56 10  BY MS. SASTRE:

01:56 11  Q.   Dr. Carinder, let's take a look at what you would have

01:56 12  read when you read the whole label.

01:56 13               If we can take a look at the hair loss section,

01:56 14  please.

01:56 15               So this is what you read, sir, in about 1999, right?

01:56 16  A.   Yes.

01:56 17  Q.   It states first:  "Hair loss.  Loss of hair occurs in most

01:56 18  patients taking Taxotere, including the hair on your head,

01:56 19  underarm, pubic hair, eyebrows and eyelashes.  Hair loss will

01:56 20  begin after the first few treatments and varies from patient to

01:56 21  patient.  Once you have completed all of your treatments, hair

01:56 22  generally grows back."

01:56 23               Did I read that correctly, sir?

01:56 24  A.   Yes.

01:57 25  Q.   When it states here that "hair generally grows back," you

JAMES CARINDER - CROSS

01:57  1    would agree with me that what that means is usually or most of
01:57  2    the time, right?
01:57  3    A.    Yes.
01:57  4    Q.    It doesn't mean always, right?
01:57  5    A.    No.
01:57  6    Q.    I know counsel asked you, again, a lot of hypothetical
01:57  7    question about, "Well, what if it had said cases of persistent
01:57  8    alopecia or permanent alopecia?  Would you have talked about
01:57  9    this?"
01:57 10          I want to ask you a question that's not hypothetical,
01:57 11    but based off of what you really did read before you saw
01:57 12    Mrs. Earnest in 2011.  Sir, did you tell her what you had
01:57 13    learned from the Taxotere label that you last read?  Did you
01:58 14    tell her, "Listen.  It says right in the label hair grows back
01:58 15    most of the time but not always"?
01:58 16    A.    No, I did not tell her that.
01:58 17    Q.    But you would agree with me you didn't give her any
01:58 18    guarantees when it came to her treatment, right?
01:58 19    A.    There are no guarantees in medicine.
01:58 20    Q.    That's right, and it's especially true with cancer and
01:58 21    chemotherapy.
01:58 22    A.    True.
01:58 23    Q.    You didn't give Mrs. Earnest any guarantees when it came
01:58 24    to the issue of whether her cancer would return, right?
01:58 25    A.    No.

JAMES CARINDER - CROSS

01:58 1   **Q.**   You didn't give her any guarantees with regard to what
01:58 2   side effects she might experience?
01:58 3   **A.**   No.
01:58 4   **Q.**   You would agree with me you didn't give her any guarantees
01:58 5   when it came to her hair either, right?
01:58 6   **A.**   No.
01:58 7   **Q.**   Had you forgotten, because it was 12 years later, that you
01:58 8   had read those exact words in this 33-page label?
01:58 9   **A.**   I hadn't forgotten anything.
01:59 10  **Q.**   Okay.
01:59 11  **A.**   You have to remember, the population of patients of that
01:59 12  first label when the drug was developed were with people with
01:59 13  metastatic disease.  As I commented earlier today, most of
01:59 14  those patients had seen chemotherapy before, and they're not
01:59 15  going to have as risk or normal or customary recovery of blood
01:59 16  counts and hair that people that are chemotherapy naive would
01:59 17  have.
01:59 18  **Q.**   Sir, you would agree with me -- you said this earlier --
01:59 19  the 2004 label, which speaks to the treatment of metastatic
01:59 20  cancer and adjuvant treatment that Mrs. Earnest had, it had the
01:59 21  same language?
01:59 22  **A.**   It had the same language.
01:59 23  **Q.**   You hadn't read that label, though, cover to cover, like
01:59 24  you did this one, right?
01:59 25  **A.**   No.  The initial 1999, when the drug was new, I read

JAMES CARINDER - CROSS

1  everything.

2  Q.   That's what I'm saying, Dr. Carinder.  The labels that

3  came out afterward, including 2004 and 2010, you didn't read

4  them word for word, page by page, line by line, like you did in

5  1999, true?

6  A.   True.

7  Q.   If you had read the 2004 label word for word and saw that

8  it said in the context of adjuvant treatment like Mrs. Earnest,

9  that hair grows back most of the time or all of the time --

10  excuse me -- most or the time, or usually would you have shared

11  that information with Mrs. Earnest?

12         MR. SCHANKER:  Your Honor, mischaracterizes the

13  testimony and the label as read.

14         THE COURT:  I think you need to rephrase your

15  question.

16         MS. SASTRE:  Sure.

17  BY MS. SASTRE:

18  Q.   If you had read word for word the 2004 label and read that

19  it said hair generally grows back, would you have shared that

20  information with Mrs. Earnest in 2011?

21  A.   Yes.

22  Q.   That would have been telling her hair usually grows back

23  but not every time.

24  A.   Yes.

25  Q.   Now, I know counsel walked through the 2010 label with

JAMES CARINDER - CROSS

02:01  1   you, asked you some questions about it.  Do you recall that?

02:01  2   A.   Yes.

02:01  3   Q.   Okay, sir.  I know he went through a number of times where

02:01  4   it said alopecia and hair loss.  Would it surprise you to learn

02:01  5   that's listed in that label 13 times?

02:01  6   A.   No.

02:01  7   Q.   Is that a label that you read word for word, line by line?

02:01  8   A.   Which year?

02:02  9   Q.   2010, Doctor?

02:02 10   A.   No.

02:02 11   Q.   I know you talked about something called ASCO, or A-S-C-O,

02:02 12   and you said, "I kind of use it to stay up to date."  Do you

02:02 13   recall that?

02:02 14   A.   Yes.

02:02 15   Q.   Let me ask you a very specific question:  You're not

02:02 16   telling us that you have a specific recollection of reading

02:02 17   about some update in ASCO, if there even was one, with regard

02:02 18   to the 2004 Taxotere label, right?

02:02 19   A.   No.

02:02 20   Q.   You're also, likewise, Dr. Carinder, not telling us today

02:02 21   that you have a specific recollection of reading about some

02:02 22   ASCO update, if there even was one, for the 2010 Taxotere

02:02 23   label.  Fair?

02:02 24   A.   True.

02:03 25   Q.   You would agree with me, when you discuss the risks -- are

JAMES CARINDER - CROSS

02:03  1    you okay on water?

02:03  2    A.   Yes.

02:03  3    Q.   Okay.

02:03  4         -- when you discuss the risks of chemotherapy with

02:03  5    your patients -- again, I want to go back to 2011 -- you did

02:03  6    not discuss every single risk of treatment with them, true?

02:03  7    A.   You mean everything that's on the list?

02:03  8    Q.   Yeah.

02:03  9    A.   They get the most common, and then when they get their

02:03  10   patient education, the nurse goes over a few more, plus they

02:03  11   get printed material.

02:03  12   Q.   Because I think you have said that going over every single

02:03  13   thing that could happen, it's just like overwhelming for the

02:03  14   patient.  Right?

02:03  15   A.   That's true.

02:03  16   Q.   The truth is, Doctor, they are already overwhelmed because

02:04  17   they have just learned they have cancer?

02:04  18   A.   That's true.

02:04  19   Q.   I think we saw in the medical records you put up, your

02:04  20   very first encounter, where you decided what to prescribe for

02:04  21   Mrs. Earnest, it said she was anxious to start treatment,

02:04  22   right?

02:04  23   A.   Yes.

02:04  24   Q.   She wanted to get going.

02:04  25   A.   Yes.

JAMES CARINDER - CROSS

02:04 1   **Q.**   She wanted to treat her cancer.

02:04 2   **A.**   Yes.

02:04 3   **Q.**   Get rid of it.

02:04 4   **A.**   Yes.

02:04 5   **Q.**   With your help she was able to do that, right?

02:04 6   **A.**   Yes.

02:04 7   **Q.**   Now, Doctor, the jury has -- there's been evidence in the

02:04 8   case that there's also a risk of persistent hair loss with

02:05 9   Taxol.  My question to you is if that was something you were

02:05 10  aware of --

02:05 11          **MR. SCHANKER:**  Objection.  It misstates the evidence.

02:05 12          **THE COURT:**  I think you need to rephrase your

02:05 13  question.

02:05 14          **MS. SASTRE:**  I would be happy to.

02:05 15  BY MS. SASTRE:

02:05 16  **Q.**   Let me just ask you this way, Dr. Carinder.  Let's go back

02:05 17  in 2011.  You're in your room in your office with Mrs. Earnest.

02:05 18  It's March 31.  As you were sitting there that day, if for some

02:05 19  reason you got into having a conversation about another option

02:05 20  for her -- which I know you didn't -- but if you did and you

02:05 21  were talking about Taxol and if you were aware at the time that

02:05 22  there had also been reports of persistent or permanent hair

02:05 23  loss with Taxol, you would have shared that with her, right?

02:05 24  **A.**   Yes.

02:05 25  **Q.**    If you were aware of reports of persistent or permanent

JAMES CARINDER - CROSS

02:05  1   hair loss for Adriamycin, you would have shared that with

02:05  2   Mrs. Earnest?

02:05  3   A.   Yes.

02:05  4   Q.   And Cytoxan, true?

02:06  5   A.   Yes.

02:06  6   Q.   In a way you kind of did share reports of persistent

02:06  7   alopecia or hair loss with Adriamycin and Cytoxan because of

02:06  8   the conversation you had about your other patient, right?

02:06  9          MR. SCHANKER:   Objection, Your Honor.  Misstates the

02:06 10   testimony.

02:06 11          THE COURT:   Sustained.  Redo it.

02:06 12   BY MS. SASTRE:

02:06 13   Q.   I guess my question is -- I will be a little bit broader,

02:06 14   Doctor.  Regardless of whether you were talking about FAC --

02:06 15   F-A-C -- or FEC -- F-E-C -- or any of the drugs that you went

02:06 16   through on the guidelines with Mrs. Earnest, if you were aware

02:06 17   that they had been associated with reports of persistent

02:06 18   alopecia, it's something you would have discussed with her at

02:06 19   the time in 2011, true?

02:06 20   A.   Yes.

02:06 21   Q.   Now, you would agree with me that if we go back to the

02:07 22   time before 2011, sir, that there were reports in the medical

02:07 23   literature that patients had experienced persistent hair loss

02:07 24   after a number of medications, true?

02:07 25          MR. SCHANKER:   Objection, Your Honor.

JAMES CARINDER - CROSS

02:07 1      THE WITNESS:  None that I have ever seen.

02:07 2      THE COURT:  Overruled.  I'm going to allow him to

02:07 3  answer the question.

02:07 4      MR. SCHANKER:  M-I-L concerning general --

02:07 5      THE COURT:  Well, let's come up here.

02:07 6      (The following proceedings were held at the bench.)

02:07 7      MR. SCHANKER:  Your Honor, the way I heard the

02:07 8  question, she was referring generally to drugs.  I didn't hear

02:07 9  a specific chemotherapy drug.

02:07 10     MS. SASTRE:  I probably just was not wanting to list

02:08 11 every single one of them out, but I'm about to get to a

02:08 12 specific article.  I just didn't say Taxol, Adriamycin,

02:08 13 Cytoxan, just because I was getting tired of saying them and I

02:08 14 thought they were getting tired of hearing them, but I'm going

02:08 15 to go -- the next question is an article.

02:08 16     THE COURT:  Has he acknowledged --

02:08 17     MS. SASTRE:  I don't know.  I haven't shown it to him

02:08 18 yet.  He might say he's seen it.

02:08 19          You don't even know what article I'm going to

02:08 20 show him.

02:08 21     MR. SCHANKER:  Well, I'm assuming it's the Nabholtz

02:08 22 article that you're going to show him, and he --

02:08 23     THE COURT:  Well, listen, this is the --

02:08 24     MR. SCHANKER:  And he has not acknowledged that he

02:08 25 has seen it.  I just want to make sure this is done the right

JAMES CARINDER - CROSS

02:08  1   way.  She can ask him if he has seen this article without

02:08  2   talking about the contents of the article, loading the question

02:08  3   to get the jury to hear the information.  That's my concern

02:08  4   here.

02:08  5          MS. SASTRE:  I'm not tracking at all.  Here is what I

02:08  6   heard.  He said that he stays abreast of the literature, and I

02:08  7   just want to ask him about sort of what was out there in the

02:08  8   public sphere.  These are all published in journals that he

02:08  9   gets.  Had he seen those?  Is he aware of it?

02:08 10          MR. SCHANKER:  So she can ask him about the Nabholtz

02:09 11   article.  He can look at it.  She can't ask him about and

02:09 12   testify to the jury about the contents of the article when he

02:09 13   hasn't -- no foundation has been laid.

02:09 14          THE COURT:  Well, it's a little bit like a learned

02:09 15   treatise, but that's with experts.  This is not --

02:09 16          MR. SCHANKER:  Right.

02:09 17          THE COURT:  This is a really strange --

02:09 18          MR. SCHANKER:  He is not an expert, Your Honor.  She

02:09 19   can say, "Did this go to form your opinion?"  If he says he's

02:09 20   never seen it --

02:09 21          THE COURT:  Well, except that he shouldn't be --

02:09 22          MS. SASTRE:  He was shown a bunch of stuff -- go

02:09 23   ahead, Your Honor.  I don't want to interrupt you.

02:09 24          THE COURT:  I think it's appropriate for the

02:09 25   defendants to show him an article and ask him if this is the

JAMES CARINDER - CROSS

02:09   1   literature that he received and did he review this article.  If

02:09   2   he says, "This is the kind of literature that I receive and

02:09   3   regularly review," then we will just see where it takes us.

02:09   4            I think I'm not going to say no, but I think

02:09   5   it's appropriate because he talked about that.  We will see

02:10   6   where it takes us.

02:10   7       MR. SCHANKER:  And to be clear, Your Honor, he didn't

02:10   8   say, "I keep up with all these articles."  He acknowledged that

02:10   9   he doesn't read every single article.

02:10  10       THE COURT:  He said, "I don't read cover to cover,

02:10  11   but I pick up what's pertinent."

02:10  12       MR. SCHANKER:  Right.  If he's shown the Nabholtz

02:10  13   article and he says, "No, I don't recognize that," then she

02:10  14   can't cross-examine him on something he has never seen because

02:10  15   it clearly didn't go into his decision-making in the room,

02:10  16   which is the way that this has been defined --

02:10  17       MS. SASTRE:  Your Honor, they had him testify that he

02:10  18   had no idea that this could happen.  They went through a list.

02:10  19   He wrote "no" on a piece of paper 15 times and he left it up

02:10  20   there during the course of his entire exam, that this man had

02:10  21   no earthly idea, as if he was like in a cave in Afghanistan or

02:10  22   something.  I'm just showing that he wasn't.

02:10  23       MR. SCHANKER:  Sure, and I'm not disagreeing --

02:10  24       THE COURT:  I think it's fair examination and then we

02:10  25   will see.  If it's a periodical here, you know, he's --

JAMES CARINDER - CROSS

02:10  1          **MR. SCHANKER:**  If he says he hasn't seen it, then --

02:11  2          **THE COURT:**  Not necessarily.  If it's some renegade

02:11  3  outfit, that would be one thing.  If it's from a journal of

02:11  4  oncology or one of these that everybody reads --

02:11  5          **MS. SASTRE:**  It is that category, Your Honor.

02:11  6          **MR. SCHANKER:**  But, Your Honor, then what we are

02:11  7  getting into is a violation of the MIL that somehow he violated

02:11  8  the standard of care by not staying up to date and it's --

02:11  9          **MS. SASTRE:**  No.

02:11 10          **THE COURT:**  No, that's not what I'm hearing.

02:11 11          **MR. SCHANKER:**  That somehow he is at fault for not

02:11 12  staying abreast of the literature, that's --

02:11 13          **MS. SASTRE:**  I'm not saying that.

02:11 14          **MR. SCHANKER:**  That's the only inference that a jury

02:11 15  could draw from allowing --

02:11 16          **THE COURT:**  That's not how I'm seeing it.

02:11 17  Mr. Schanker, you had him go through everything and say, "I

02:11 18  have never seen this.  I never heard it.  I never saw it."

02:11 19          His informed consent issue as to Mrs. Earnest,

02:12 20  he had to tell her, "I'm going to give you these three drugs.

02:12 21  Let's talk about these three drugs."  If this literature says

02:12 22  that these drugs are associated with permanent hair loss,

02:12 23  that's something that would have been part of his conversation.

02:12 24          **MR. SCHANKER:**  If he had seen it.  If he hasn't seen

02:12 25  it --

JAMES CARINDER - CROSS

02:12  1          THE COURT:  Mr. Schanker, I'm going to let her go
02:12  2  over it.  We could stay up here for another 20 minutes, but
02:12  3  that decision is already made.
02:12  4          MS. SASTRE:  Thank you, Your Honor.
02:12  5          THE COURT:  Charged to plaintiff.
02:12  6          (End of bench conference.)
02:12  7          THE COURT:  Please proceed.
02:12  8          MS. SASTRE:  Thank you, Your Honor.  May I approach?
02:12  9          THE COURT:  Yes, you may.
02:13 10  BY MS. SASTRE:
02:13 11  Q.   Doctor, I've just handed you an article.  As you can see,
02:13 12  it's titled "Phase II study of docetaxel, doxorubicin, and
02:13 13  cyclophosphamide as first-line chemotherapy for metastatic
02:13 14  breast cancer."
02:13 15          Do you see that, sir?
02:13 16  A.   Yes.
02:13 17  Q.   And my question is that this is --
02:13 18          THE COURT:  Can I get a copy of the article?
02:13 19          MS. SASTRE:  Oh, I'm so sorry.  Here you are.  Sorry
02:13 20  about that, Your Honor.
02:13 21          THE COURT:  Thank you.
02:13 22  BY MS. SASTRE:
02:13 23  Q.   You see that this is published in the *Journal of Clinical*
02:13 24  *Oncology*?
02:13 25  A.   Yes.

JAMES CARINDER - CROSS

02:13  1    **Q.**   And, sir, that's a journal that you get, right?

02:13  2    **A.**   Yes.

02:13  3    **Q.**   I think you told us you get it every month?

02:13  4    **A.**   Yes.

02:13  5    **Q.**   Is that something that is a peer-reviewed journal, sir?

02:13  6    **A.**   Oh, absolutely.

02:13  7    **Q.**   I mean, it's a good one, right?

02:14  8    **A.**   Yes.

02:14  9    **Q.**   It's reliable, the information contained in it?

02:14  10   **A.**   Yes.

02:14  11   **Q.**   It's considered authoritative?

02:14  12   **A.**   That's ASCO's journal.

02:14  13   **Q.**   Okay.  So let me ask you this, sir:  Did you see this

02:14  14   paper?

02:14  15   **A.**   Yes.

02:14  16   **Q.**   You have seen it previously?

02:14  17   **A.**   Yes --

02:14  18   **Q.**   Okay.

02:14  19   **A.**   -- years ago.

02:14  20        **MS. SASTRE:**  Your Honor, I would like to go ahead and

02:14  21   put it up, please.  Okay.

02:14  22        **THE COURT:**  Are you offering it into evidence?

02:14  23        **MS. SASTRE:**  Well, it's medical literature.  I don't

02:14  24   think we have been moving it in --

02:14  25        **THE COURT:**  All right.

JAMES CARINDER - CROSS

02:14  1          MS. SASTRE:  -- but we have been publishing it.

02:14  2          THE COURT:  That's fine.  You can publish it.

02:14  3          MS. SASTRE:  Okay.  Thank you, Your Honor.

02:14  4    BY MS. SASTRE:

02:14  5    Q.   So, Doctor, just a couple quick questions on it, okay?

02:14  6          You see it's from 2001, right, sir?

02:14  7    A.   Yes.

02:14  8    Q.   Which we can agree, of course, was years before you

02:14  9    treated Mrs. Earnest, true?

02:14 10    A.   True.

02:14 11    Q.   And you see that there are four patients in the study who

02:14 12    were identified as having long-lasting partial alopecia, and

02:14 13    they were treated with Taxotere, Adriamycin, and Cytoxan,

02:14 14    correct?

02:14 15    A.   Yes.

02:14 16    Q.   Okay.  And so that's something, when you reviewed this

02:14 17    article, you would have learned of Taxotere, Adriamycin, and

02:15 18    Cytoxan being associated with four reports of persistent hair

02:15 19    loss, correct?

02:15 20    A.   Yes.

02:15 21    Q.   And, again, this is something that's published and

02:15 22    available in the literature, true?  Publicly available even,

02:15 23    true?

02:15 24    A.   Yes.

02:15 25    Q.   Did you share this information with Mrs. Earnest?

JAMES CARINDER - CROSS

02:15  1   **A.**   No.

02:15  2   **Q.**   Okay.

02:15  3   **A.**   I guess I didn't focus on that when I read this.  This

02:15  4   would never be a regimen I would use with somebody with

02:15  5   metastatic disease.

02:15  6   **Q.**   Fair enough.

02:15  7   **A.**   It's too harsh.

02:15  8   **Q.**   Okay, sir.  Let's take a look at another article.

02:16  9        So, Dr. Carinder, I just handed you an article, do

02:16  10  you see, from 2009, sir.

02:16  11  **A.**   Yes.

02:16  12  **Q.**   And it's called the Prevezas article, correct?  That's the

02:16  13  author?  Do you see that, sir?

02:16  14  **A.**   No.

02:16  15       **MR. SCHANKER:**  Your Honor, I would like this to be

02:16  16  established as a learned treatise.  This is a dermatology --

02:16  17       **THE COURT:**  Wait.  I think the first question is -- I

02:16  18  think she needs to lay a foundation.

02:16  19       **MR. SCHANKER:**  Yes.

02:16  20       **MS. SASTRE:**  Okay.  Sure.

02:16  21  BY MS. SASTRE:

02:16  22  **Q.**   So my question is simply:  Do you see that this was

02:16  23  published in 2009?

02:16  24  **A.**   Yes.

02:16  25  **Q.**   Okay.  And it's published in -- it's the *British Journal*

JAMES CARINDER - CROSS

1    *of Dermatology.*

2              Do you see that?

3    **A.**   Yes.

4    **Q.**   Is this something that you saw before you treated

5    Mrs. Earnest in 2011, this article?

6    **A.**   No.

7    **Q.**   Do you see, if you look at the article --

8              **MR. SCHANKER:**  Your Honor, we would object.

9              **THE COURT:**  Wait.

10             **MR. SCHANKER:**  This is a derma --

11             **THE COURT:**  I think --

12             **MR. SCHANKER:**  There's no foundation laid within his

13   area of expertise.

14             **THE COURT:**  I think we need to lay a foundation that

15   this is something he would have relied on.

16             **MS. SASTRE:**  Okay.

17   **BY MS. SASTRE:**

18   **Q.**   Well, let me ask you this, sir:  I mean, have you heard of

19   the *Journal of Dermatology* before?

20   **A.**   Yes.

21             **MR. SCHANKER:**  Misstates the title.  That's not the

22   title.

23             **THE COURT:**  Mr. Schanker, let's see if we can get

24   past this line of questioning first, if a foundation is going

25   to be laid.  But I'm going to allow some questions.

JAMES CARINDER - CROSS

02:17  1          MR. SCHANKER:  That's not the title of the article.
02:17  2          THE COURT:  I understand.
02:17  3          MR. SCHANKER:  Okay.  Well --
02:17  4          THE COURT:  Please ask your question.
02:17  5          MS. SASTRE:  Okay, Your Honor.  Thank you.
02:17  6  BY MS. SASTRE:
02:17  7  Q.   It's the *British Journal of Dermatology*.
02:17  8          So my question is:  Have you heard of that before?
02:18  9  A.   Yes.
02:18 10  Q.   Is it something that you consider reliable, sir?  If you
02:18 11  know.
02:18 12  A.   I don't read it, so I don't -- I would assume it is, but I
02:18 13  don't -- that's not a journal that I'm going to be reading all
02:18 14  the time at all.
02:18 15  Q.   Do you know whether it would be considered authoritative?
02:18 16  A.   I would assume so, but I don't know.
02:18 17  Q.   This is something you said you hadn't seen; is that fair?
02:18 18  A.   No, I haven't seen it.
02:18 19  Q.   Okay.  Very good.  We will move on.
02:18 20          MS. SASTRE:  May I approach?
02:18 21          THE COURT:  Yes, you may.
02:18 22          MS. SASTRE:  Thank you.
02:18 23  BY MS. SASTRE:
02:18 24  Q.   All right.  Sir, I've just handed you -- it's a --
02:19 25  something that was published, you see, in the *Journal of*

JAMES CARINDER - CROSS

02:19   1   *Clinical Oncology Nursing*?

02:19   2   **A.**   Yes.

02:19   3   **Q.**   Is this something that you would consider to be a reliable

02:19   4   journal?

02:19   5   **A.**   Yes.

02:19   6   **Q.**   Something --

02:19   7           **MR. SCHANKER:**   Your Honor, just for the record,

02:19   8   that's not the title of the journal.  I just want to make sure

02:19   9   the doctor knows the proper title of the journal.

02:19  10           **THE COURT:**   I believe he recognized the journal, but

02:19  11   just rephrase your question, please.

02:19  12           **MS. SASTRE:**   Okay.

02:19  13   BY MS. SASTRE:

02:19  14   **Q.**   The title of the journal, we can read it together on the

02:19  15   bottom of the page, right, sir?

02:19  16   **A.**   *Clinical Journal of Oncology Nursing*.

02:19  17   **Q.**   Yes.

02:19  18   **A.**   I read it.

02:19  19   **Q.**   Okay.  And this is something you would consider to be

02:19  20   reliable and authoritative, right?

02:19  21   **A.**   Well, I don't read it, but I would assume for nurses it

02:19  22   would be.  But that's not a journal that I read.

02:20  23   **Q.**   Well, let me ask you this, sir:  This letter to the editor

02:20  24   that was submitted in the *Clinical Journal of Oncology Nursing*,

02:20  25   is this something you have seen previously?

JAMES CARINDER - CROSS

02:20  1   **A.**    No.

02:20  2   **Q.**    Okay.

02:20  3            **MS. SASTRE:**  I'll move on.

02:20  4            **THE COURT:**  Thank you.

02:20  5   **BY MS. SASTRE:**

02:20  6   **Q.**    Counsel asked you some questions about the *Breast Cancer*

02:20  7   *Handbook* that the jury has seen a few times now.

02:20  8            Do you recall that?

02:20  9   **A.**    Yes.

02:20  10  **Q.**    And I think you said that this was not something that your

02:20  11  office gave to patients, right?

02:20  12  **A.**    That's right.

02:21  13  **Q.**    But had you had an opportunity to look through this

02:21  14  handbook at any time?

02:21  15  **A.**    No.

02:21  16  **Q.**    Would it surprise you to learn, sir, that --

02:21  17            **MR. SCHANKER:**  Objection.  Foundation.

02:21  18            Can we approach, Your Honor?

02:21  19            **THE COURT:**  You can approach.

02:21  20            (The following proceedings were held at the bench.)

02:21  21            **MR. SCHANKER:**  Your Honor, you already clearly

02:21  22  indicated that I could not use this with the doctor, and now

02:21  23  defense counsel is trying to use that very document that you

02:21  24  indicated I couldn't go through with the doctor, the *Breast*

02:21  25  *Cancer Handbook*.  She wants to use it with the doctor.

JAMES CARINDER - CROSS

02:21  1          MS. SASTRE:  That wasn't my understanding of the
02:21  2     ruling, Judge.
02:22  3          THE COURT:  Okay.  I thought that you were going to
02:22  4     go through it -- I didn't know what you were going to do with
02:22  5     it, to be perfectly honest with you.  I said, "Wait a minute.
02:22  6     You can't bring in this to talk about what he did with his
02:22  7     patient."
02:22  8          MR. SCHANKER:  Right, and to talk about --
02:22  9          THE COURT:  I believe --
02:22 10          MR. SCHANKER:  I'm sorry.
02:22 11          THE COURT:  I believe, though I'm not certain, that
02:22 12     the defense wants to show that this information was out in the
02:22 13     public sphere.
02:22 14          MR. SCHANKER:  Your Honor, this is highly
02:22 15     prejudicial.  I was not permitted to go through it and to ask
02:22 16     him if he had seen it or not.  I was strictly prohibited from
02:22 17     doing that pursuant to your ruling, and I respected that.  Now
02:22 18     defense counsel wants to do that.  That is highly prejudicial
02:22 19     on a document that you prevented me from asking him about.
02:23 20     There's no foundation he has ever seen it, so asking him about
02:23 21     an article that I --
02:23 22          THE COURT:  It is prejudicial.  It is prejudicial,
02:23 23     but that doesn't mean that it's not relevant and that the
02:23 24     probative value doesn't outweigh it.
02:23 25          I think it's probative for her to say, "This was

JAMES CARINDER - CROSS

out there."  Now, whether he saw it and whether he relied on it
or anything, I just think it's probative whether it was out
there.  She has said that in cross-examination and to go --
very frankly, what I expected you to do in your direct
examination and then when you told me what you wanted it for, I
said, "That's fine.  You can do it for that purpose."  We told
her she didn't have to read this portion.

          MR. SCHANKER:  He has never seen the book, so --

          THE COURT:  And I'm expecting we're going to hear
that, but if this is --

          MR. SCHANKER:  He has already testified to that.

          THE COURT:  I understand that, but I think that
what's pertinent is that this is information that's
disseminated to people that says just the opposite.  It's a
little bit different to hold him accountable to what's in a
dermatology journal.

          MR. SCHANKER:  She's going right to it.  She has not
established that it's a learned treatise or it's in the realm
of something that he should see.  She skipped that step.  All
she said is, "You have seen this book," the cover of the book.
She hasn't established --

          THE COURT:  I think you can lay a foundation.

          MR. SCHANKER:  -- in any way that he --

          THE COURT:  He doesn't have to have read it if it's
out there.

JAMES CARINDER - CROSS

02:24   1              **MS. SASTRE:**  This is in the ether is how I've been

02:24   2      thinking about it, right?

02:24   3              **THE COURT:**  I got it.

02:24   4              **MR. SCHANKER:**  The ether versus within the realm of

02:24   5      what -- she can't bring out any shred of --

02:24   6              **THE COURT:**  I don't think any of this is being

02:24   7      offered to show that he was not doing his job.  I don't think

02:25   8      any of this is being offered there.  I think this is in

02:25   9      response to the inference that it was being kept a secret.

02:25  10              **MR. SCHANKER:**  It's a warn case, Your Honor, and if

02:25  11      that's established as a treatise --

02:25  12              **THE COURT:**  All he has to say is, "I didn't see it.

02:25  13      This is not the kind of thing I read.  I expected to get

02:25  14      information from the company."

02:25  15              **MR. SCHANKER:**  She does have to establish that he

02:25  16      acknowledges that as a learned treatise.

02:25  17              **MS. SASTRE:**  It doesn't have to be a treatise.  The

02:25  18      question is it's out there in the domain, did he see it or not.

02:25  19              **THE COURT:**  It's in evidence.

02:25  20              **MS. SASTRE:**  Right.

02:25  21              **MR. SCHANKER:**  Yes, I know that, but she shouldn't be

02:25  22      allowed to cross him on that.

02:25  23              **THE COURT:**  I think I have already told you what I'm

02:25  24      going to allow her to do and what you can do in response.

02:25  25              **MS. SASTRE:**  Okay.  Thank you.

JAMES CARINDER - CROSS

02:26  1          THE COURT:  Charged to plaintiff.

02:26  2          (End of bench conference.)

02:26  3          THE COURT:  Please proceed.

02:26  4          MS. SASTRE:  May I approach?

02:26  5          THE COURT:  Yes, you may.

02:26  6  BY MS. SASTRE:

02:26  7  Q.   Do you already have a copy, Doctor?

02:26  8  A.   I have one up here.

02:26  9  Q.   Very good.  Okay.

02:26 10          So, Doctor, this is the *Breast Cancer Treatment*

02:26 11  *Handbook*, which plaintiff's counsel, Mr. Schanker, asked you a

02:26 12  few questions about.

02:26 13          You recall that, right?

02:26 14  A.   Yes.

02:26 15  Q.   All right.  And, sir, is this something that -- you see

02:26 16  it's the 7th edition, and if you go a little further in the

02:26 17  book, you will see that it was published in 2009, if we turn to

02:27 18  the third page.

02:27 19          Just to establish that, Dr. Carinder, if you see

02:27 20  that, please.

02:27 21  A.   I see it.

02:27 22  Q.   Okay.  Very good.

02:27 23          So this would have been about two years before you

02:27 24  treated Mrs. Earnest, fair?

02:27 25  A.   Yes.

JAMES CARINDER - CROSS

02:27  1    **Q.**   Okay.  And then I would like to ask you a question.  If

02:27  2    you turn to page 195, please.  Yes.

02:27  3          And you see that there's a section on docetaxel,

02:27  4    which, of course, is Taxotere, right?

02:27  5    **A.**   Yes.

02:27  6    **Q.**   And you see that it states:  "Side effects:  Temporary

02:27  7    hair loss, rare reports of permanent hair loss," right?

02:27  8    **A.**   Yes.

02:27  9    **Q.**   And you would agree with me that what is stated there in

02:27  10   this handbook in 2009, two years before Mrs. Earnest ever

02:27  11   walked into your office, was consistent with your clinical

02:27  12   experience, that hair loss was normally temporary, but that

02:27  13   rarely it was permanent.

02:28  14   **A.**   I had had one incident.

02:28  15   **Q.**   Yes.  This is generally consistent with your experience;

02:28  16   fair, sir?

02:28  17   **A.**   Yes.

02:28  18   **Q.**   Okay.  Thank you.

02:28  19         And if you had reviewed this entry, if it was

02:28  20   something you had come across for whatever reason, you agree

02:28  21   with me that you would have shared that with Mrs. Earnest,

02:28  22   true?

02:28  23   **A.**   Yes.

02:28  24   **Q.**   Now, I believe your office was, in 2011, giving out

02:28  25   something to patients called *Chemocare*?

JAMES CARINDER - CROSS

02:28  1   **A.**   We use that now.

02:28  2   **Q.**   And I believe you were using it back then too, but it

02:29  3   changes over time, right?

02:29  4   **A.**   Yes.

02:29  5   **Q.**   So I would like to talk with you about that, please.

02:29  6           And I think what you have told us, Doctor, is that

02:29  7   you were not personally involved in giving things out to

02:29  8   patients, but that was something, if it was done, it was done

02:29  9   by your nurses?

02:29  10  **A.**   Yes.

02:29  11  **Q.**   I think you called them nurse navigators.

02:29  12          Is that fair?

02:29  13  **A.**   Yes, yes.

02:29  14  **Q.**   They help patients sort of navigate their way through this

02:29  15  treatment?

02:29  16  **A.**   Right.

02:29  17  **Q.**   Okay, Doctor.  So if you look at what I have just handed

02:29  18  you, you will see it's dated February 2011 on the top right

02:29  19  corner, which would be about a month before you prescribed

02:30  20  chemotherapy to Mrs. Earnest, true?

02:30  21  **A.**   True.

02:30  22  **Q.**   Okay.  Let me ask you first:  Does this generally look

02:30  23  like the *Chemocare* information that was available at the time,

02:30  24  going back to 2011, sir?

02:30  25  **A.**   Yes.

JAMES CARINDER - CROSS

02:30  1   Q.   Okay.  Let's go ahead and take a look at it, please.  And

02:30  2   this is *Chemocare* for Taxotere, okay?

02:30  3   A.   Okay.

02:30  4   Q.   And I just want to look at a few sections with you.

02:30  5        So, first of all, on the bottom of the page, under

02:30  6   "Side Effects," it states:  "Taxotere side effects are almost

02:30  7   always reversible and will go away after treatment is

02:30  8   complete," right?

02:30  9   A.   Yes.

02:30 10   Q.   It doesn't say "always," it says "almost always," right?

02:30 11   A.   Yes.

02:30 12   Q.   Which means not a hundred percent of the time, right?

02:30 13   A.   Right.

02:30 14   Q.   It means that there are some things that can happen that

02:30 15   may not go away, true?

02:30 16   A.   True.

02:30 17   Q.   If we turn to the next page, you see that it lists hair

02:31 18   loss as a side effect, true?

02:31 19   A.   Yes.

02:31 20   Q.   With no limiting information whatsoever, correct?

02:31 21   A.   Right.

02:31 22   Q.   It doesn't say "temporary," "short-term," "short-lived,"

02:31 23   or anything else, right?

02:31 24   A.   Right.

02:31 25   Q.   And then if you go to -- it's actually the last page, sir,

JAMES CARINDER - CROSS

1  and it's called "Hair Loss in Chemotherapy."  It's under "Side

2  Effects."

3         And you see, sir, that it states -- in the middle of

4  the *Chemocare* pamphlet or printout that your office was giving

5  to patients in 2011, it states:  "In almost all cases of

6  chemotherapy-induced hair loss, your hair will resume growth

7  after treatment," right?

8         **MR. SCHANKER:**  Your Honor, objection.  Misstates the

9  evidence concerning his office giving this out to all patients.

10         **THE COURT:**  Overruled.  I'm going to --

11  BY MS. SASTRE:

12  Q.   Did I read that correctly?

13  A.   Can you rephrase your -- or not rephrase it, but repeat

14  your question, please?

15  Q.   Yes, I would be happy to, Doctor.  And I have it up on the

16  screen for your convenience, sir.

17         But do you see that the February of 2011 *Chemocare*

18  pamphlet, which your office was using with its patients,

19  states:  "In almost all cases of chemotherapy-induced hair

20  loss, your hair will resume growth after treatment," right?

21  A.   Yes.

22  Q.   And, again, it states "not in all cases," but "in almost

23  all cases," true?

24  A.   That's true.  But there again, there's very few guarantees

25  and there's very few "always" in medicine.

JAMES CARINDER - CROSS

02:32  1    **Q.**   For sure, and especially true with chemotherapy.

02:32  2    **A.**   That's true.

02:32  3    **Q.**   And it doesn't matter whether we're talking about your

02:32  4    cancer coming back or neuropathy or your hair, there aren't any

02:32  5    guarantees, right?

02:32  6    **A.**   There's no guarantees in medicine.

02:33  7    **Q.**   This was something -- and I understand that you weren't

02:33  8    personally involved in handing materials to patients, but as

02:33  9    you sit here today, it's your understanding that this *Chemocare*

02:33 10    pamphlet or document from 2011 was being handed out by your

02:33 11    office routinely to patients, true?

02:33 12    **A.**   True.

02:33 13    **Q.**   You don't have any reason to think that Mrs. Earnest

02:33 14    didn't get a copy, fair?

02:33 15    **A.**   No, I don't.

02:33 16    **Q.**   Thank you, Doctor.

02:33 17          Doctor, you talked about going to medical

02:33 18    conferences.

02:33 19    **A.**   Yes.

02:33 20    **Q.**   And I know you said you go to a conference in Miami

02:34 21    frequently, right?

02:34 22    **A.**   They have the breast conference every year, and generally

02:34 23    it's February.

02:34 24    **Q.**   Miami is a good place to be in February, right?

02:34 25    **A.**   Yes.

JAMES CARINDER - CROSS

02:34 1    Q.    Okay.  So let me ask you this, though:  There is also a
02:34 2    Breast Cancer Symposium in San Antonio, right?
02:34 3    A.    Yes.
02:34 4    Q.    And that's a big, well-known one too?
02:34 5    A.    Yes.  I have presented there before.
02:34 6    Q.    When did you present there, sir?
02:34 7    A.    When I was a fellow.
02:34 8    Q.    So back in the --
02:34 9    A.    1996 or '97, somewhere in there.
02:34 10   Q.    And do you go to that conference yearly, Dr. Carinder?
02:34 11   A.    I did when I was a fellow.  It's grown quite huge since
02:34 12   that time.  When I went, there were probably 2,000 attendees.
02:34 13   Now they get 15,000 or 20,000, 30,000 attendees.  It's really
02:34 14   grown big.
02:34 15   Q.    Do you know if you went in 2006?
02:34 16   A.    No.  I was not going to San Antonio anymore after about
02:35 17   1998, '97.
02:35 18   Q.    Let me hand you something.
02:35 19         MS. SASTRE:  If I may, Your Honor?
02:35 20         THE COURT:  Okay.
02:35 21         MS. SASTRE:  It's very small, I know.  I can share my
02:35 22   reading glasses with you, but only one of us will be able to
02:35 23   see at a time.  But if you need them, really.
02:35 24         Are you able to see that?
02:35 25         THE WITNESS:  Yeah -- well, I can -- I can't.

JAMES CARINDER - CROSS

02:35  1   BY MS. SASTRE:

02:35  2   Q.   Well, Doctor, let me ask you this:  You can see this is an

02:35  3   abstract, right?

02:35  4   A.   Yes.

02:35  5   Q.   And are you aware that this was something that was

02:35  6   presented at the 2006 San Antonio Breast Cancer Symposium?

02:35  7   A.   No, I wasn't.

02:35  8   Q.   You said thousands and thousands of doctors go to these

02:35  9   symposiums, right?

02:35 10   A.   Yes.

02:36 11   Q.   So anyone who is at this symposium, that's thousands of

02:36 12   doctors seeing what's being presented, right?

02:36 13   A.   Was this a poster?

02:36 14   Q.   My understanding is that it's --

02:36 15        THE COURT:  Doctor, you can't ask the questions.

02:36 16        THE WITNESS:  Well, I mean, was it from the poster

02:36 17   session?  Or do you know?  Because poster sessions are just

02:36 18   posted up, and they are not necessarily orally presented to

02:36 19   people.  And so that was why unless you stopped and looked at

02:36 20   the poster, you wouldn't be aware of it.

02:36 21   BY MS. SASTRE:

02:36 22   Q.   Let me ask you a couple questions and see if we can sort

02:36 23   it out; if not, I'll move on.  Okay, Dr. Carinder?

02:36 24   A.   Okay.

02:36 25   Q.   Let me ask you first:  Have you seen this before, sir?

02:36  1   **A.**   No.

02:36  2   **Q.**   Would you think, based upon your knowledge and experience

02:36  3   in going to the San Antonio Breast Cancer Symposium, that a

02:36  4   presentation like this, whether it be an abstract or a poster,

02:36  5   would be something you could consider reasonably reliable?

02:37  6   **A.**   Yes.

02:37  7          **MS. SASTRE:**  Can we take a look at it, Your Honor?

02:37  8          **MR. SCHANKER:**  Your Honor, it's an abstract, and the

02:37  9   doctor hasn't indicated -- as a matter of fact, he said he

02:37 10   wasn't even at that symposium, and there's been no evidence

02:37 11   that this has ever been presented to him by Sanofi or any other

02:37 12   source.  We object.

02:37 13          **THE COURT:**  Come back up.

02:37 14          (The following proceedings were held at the bench.)

02:37 15          **THE COURT:**  Let me get back to the learned treatise.

02:37 16   The problem is he has not been qualified as an expert.

02:37 17          **MR. SCHANKER:**  Right.

02:37 18          **MS. SASTRE:**  I understand that, and I haven't been

02:37 19   talking much at the sidebars, Your Honor, because I know you

02:37 20   have been mostly engaged with Mr. Schanker.  That's been fine,

02:37 21   Judge, but I do just want to say the idea is exactly what

02:37 22   you're describing.

02:37 23          I've been thinking of -- and you are saying

02:37 24   what's been out in the world -- it's sort of like this is all

02:38 25   out there in the ether.  This is a doctor that's living in the

JAMES CARINDER - CROSS

02:38  1    real word, interacting with colleagues.  You think about the
02:38  2    sort of things that they wanted to put up in front of him --
02:38  3    they are actually asking a question whether he knows about the
02:38  4    testimony of a company witness which they know he wouldn't know
02:38  5    about, "Do you know about this internal document?"
02:38  6              THE COURT:  I sustained those objections.
02:38  7              MS. SASTRE:  Right.  Some.
02:38  8              THE COURT:  I sustained those objections.
02:38  9              MS. SASTRE:  Right.  This is my problem.  If he
02:38 10    hasn't seen it, I just want to ask him a question or two
02:38 11    without even showing it to the jury, "You agree with me on what
02:38 12    it says," and then I don't need to show it to him.  If he
02:38 13    hadn't seen it, he hadn't seen it.
02:38 14              THE COURT:  I think we have already had the testimony
02:38 15    about this --
02:38 16              MR. SCHANKER:  We have, Your Honor.
02:38 17              THE COURT:  -- presentation.
02:38 18              MR. SCHANKER:  He has indicated he wasn't there.  He
02:38 19    hasn't seen it.  Beyond that, I don't understand how he can be
02:38 20    asked any other questions about it.  If we are going to let
02:38 21    every single shred of anything that exists in the world on
02:39 22    this, things he has never seen, that's creating a misperception
02:39 23    for the jury that this should have been all information he
02:39 24    should have had.
02:39 25              THE COURT:  I think the problem is even if there was

JAMES CARINDER - CROSS

02:39  1    a ton of information out there, it doesn't relieve Sanofi of
02:39  2    its obligation to warn.
02:39  3             MS. SASTRE:   That's true, Your Honor, but this is a
02:39  4    different issue.  This is warnings causation.  The idea is,
02:39  5    Your Honor, this is a tremendous amount of information.  He
02:39  6    just admitted what his clinical experience -- this is
02:39  7    information out in the bright -- I'm sorry.  I just want to get
02:39  8    this on the record.
02:39  9             It's information out in the bright light of day,
02:39  10   Your Honor, that is either known or knowable.  If at the end of
02:39  11   day this is something that he either knew from his own
02:39  12   independent knowledge or should have known from the world
02:39  13   around him, then the label can't be the proximate cause of
02:39  14   this, Your Honor.
02:39  15            They made it sound like he had no idea of
02:39  16   anything that was happening, and we are bringing paper after
02:39  17   paper, study after study.  This is all publically available,
02:40  18   published.  Now, I understand the issue if he says he hadn't
02:40  19   read it, but it's not like this information is not out there
02:40  20   from a variety of sources.
02:40  21            Then it would be incumbent upon him to decide --
02:40  22   and I am not in any way being critical of him.  I think what he
02:40  23   did was perfectly appropriate.  But it is incumbent upon him to
02:40  24   make a decision, as the intermediary, as to what he is going to
02:40  25   discuss or not.  It basically makes this idea of -- this

JAMES CARINDER - CROSS

02:40  1   testimony of "Oh, if I had known this, I would have said it,"
02:40  2   it makes it seem artificial, Your Honor, and I'm entitled to
02:40  3   show that.  That's all I'm trying to do.
02:40  4           MR. SCHANKER:  Your Honor, he has no knowledge of
02:40  5   this.  The fact is there's no reason to introduce something
02:40  6   that he has no knowledge of, that he can't even establish is a
02:40  7   learned treatise.  He wasn't at this particular conference.
02:40  8   The only reason they are doing this -- by the way, they haven't
02:40  9   injected article after article.  There's been two.  They have
02:41 10   tried many more, and you properly haven't allowed them in,
02:41 11   Your Honor.
02:41 12           This particular reference to this abstract, he
02:41 13   doesn't even know about it.  He hasn't seen it.  The only
02:41 14   reason they are trying to inject it is to blame the doctor, to
02:41 15   say that the doctor should have been aware of these things, he
02:41 16   was not aware of it, and that's why he did not warn.  There's
02:41 17   no other reason why they are injecting this other than to blame
02:41 18   the doctor.
02:41 19           MS. SASTRE:  That's not true.  I'm not doing that at
02:41 20   all.  If it looks like that, then I'm not doing a very good
02:41 21   job.  That is not my intention.  That is not in any way what I
02:41 22   am asking him.
02:41 23           THE COURT:  I think the test is to show it was in the
02:41 24   public sphere.  The dermatology article I didn't think was
02:41 25   pertinent.  While it's in the public sphere, he is not going to

JAMES CARINDER - CROSS

02:42  1    ever look at that dermatology article.

02:42  2            MS. SASTRE:  Right.

02:42  3            THE COURT:  This was presented in a place where what

02:42  4    we understand is there were 15,000 other oncologists present.

02:42  5    He was not there.  I'm going to let you explore that with him

02:42  6    when he comes back on redirect.  You can explore all of this.

02:42  7            MR. SCHANKER:  Just to clarify, there was no

02:42  8    testimony this was presented.  He asked if it was a poster.

02:42  9            THE COURT:  I thought the testimony was it was a

02:42 10    poster.

02:42 11            MR. SCHANKER:  If it's a poster, he explained that's

02:42 12    not even presented.  That's something they tack up on the wall,

02:42 13    and he is expected to know everything that is tacked up on a

02:42 14    wall around the country at every oncology conference that goes

02:42 15    on?

02:42 16            THE COURT:  I think you are going to be able to

02:42 17    explore all of that on redirect.  Thank you.

02:42 18            Charged to plaintiff.

02:43 19            (End of bench conference.)

02:43 20    BY MS. SASTRE:

02:43 21    Q.   Dr. Carinder, we were just looking at this presentation

02:43 22    from the San Antonio Breast Cancer Symposium.  I just have a

02:43 23    couple questions for you, sir.  Then we can quickly move on,

02:43 24    which I think will make everyone in the courtroom happy.

02:43 25            So let me ask you first:  Just looking at this -- and

JAMES CARINDER - CROSS

02:43 1    I know you're having a bit of a hard time seeing it -- but you
02:43 2    can see it involves seven women that were on Adriamycin,
02:43 3    Cytoxan, and then and followed by Taxotere, right?
02:43 4    A.    Yes.
02:43 5    Q.    And it was reported that of those seven women that were on
02:43 6    Adriamycin, Cytoxan, and followed by Taxotere, that they
02:43 7    experienced persister alopecia, meaning less than 50 percent
02:43 8    regrowth, true?
02:43 9    A.    Yes.
02:43 10   Q.    If you look again at the time period when this
02:43 11   presentation or poster was made, it's 2006, correct?
02:44 12   A.    Yes.
02:44 13   Q.    You see that on top.
02:44 14          And my question is just simply:  The idea of there
02:44 15   being persistent hair loss associated with Adriamycin, Cytoxan,
02:44 16   and even Taxotere was certainly something being presented upon
02:44 17   or discussed at one of the largest breast cancer symposiums in
02:44 18   the United States, true?
02:44 19   A.    Yes.
02:44 20   Q.    That would have been five years before you first met
02:44 21   Mrs. Earnest, right?
02:44 22   A.    Yes.
02:44 23   Q.    Okay, Doctor.  Thank you.
02:44 24          Let's talk about Adriamycin for a moment, okay, and
02:44 25   let's change topics.  I want to go back to Mrs. Earnest

JAMES CARINDER - CROSS

02:44 1   specifically.

02:45 2   **A.**   Okay.

02:45 3   **Q.**   One of the things that you specifically discussed with

02:45 4   Mrs. Earnest about Adriamycin was the cardiac -- or heart --

02:45 5   risk -- its cardiac toxicity, true?

02:45 6   **A.**   Potential for cardiac toxicity.

02:45 7   **Q.**   Yes, sir.  It's a potential, meaning that Adriamycin can

02:45 8   cause heart failure.

02:45 9   **A.**   Yes.

02:45 10   **Q.**   That's warned of in its label, true?

02:45 11   **A.**   Yes.

02:45 12   **Q.**   And that's something that in addition to all of the risks

02:45 13   you discussed with Mrs. Earnest that were associated with her

02:45 14   treatment, you made certain to discuss this risk with her of

02:45 15   heart failure with Adriamycin.  You discussed it separately

02:45 16   true?

02:45 17   **A.**   Yes.

02:45 18   **Q.**   And that's because the kind of heart failure -- well, let

02:45 19   me say it first.  Heart failure, of course, we can all agree by

02:45 20   its name is oftentimes fatal, right?

02:45 21   **A.**   Yes.

02:45 22   **Q.**   People die from that.  Your heart stops working, right?

02:46 23   **A.**   Right.

02:46 24   **Q.**   And the reason you were sure to discuss it with

02:46 25   Mrs. Earnest specifically, the risk of Adriamycin and heart

JAMES CARINDER - CROSS

02:46 1   failure, was because with patients who take Adriamycin, they
02:46 2   can take it, the treatment can work, they go on and they live
02:46 3   cancer-free; and then some period of time, even years later,
02:46 4   after they have stopped chemotherapy, they can die from heart
02:46 5   failure.
02:46 6   A.   Yes.
02:46 7   Q.   That's why -- I think you told us, sir, that you had
02:46 8   special testing done, even on Mrs. Earnest's heart.  Correct?
02:46 9   A.   Before we give any anthracyclines to anyone, we test their
02:46 10  heart.
02:46 11  Q.   And Mrs. Earnest accepted this risk of heart failure,
02:46 12  heart failure which she could develop years --
02:46 13  A.   Yes.
02:46 14  Q.   -- after overcoming her cancer, true?
02:46 15  A.   Yes.
02:46 16  Q.   You would agree with me she did that to get the benefit of
02:46 17  the treatment.  Right?
02:47 18  A.   Yes.
02:47 19  Q.   Did Mrs. Earnest say to you, "Dr. Carinder, I am not
02:47 20  willing to accept the risk of having heart failure years after
02:47 21  I complete my chemotherapy.  I don't want Adriamycin.  Give me
02:47 22  something else"?
02:47 23  A.   She did not say that.
02:47 24        MS. SASTRE:  Let's take a look at the consent form,
02:47 25  please, for a moment.

JAMES CARINDER - CROSS

02:47  1          It's D-2058.  I believe it's already in
02:47  2    evidence.
02:47  3          THE DEPUTY CLERK:  I don't have this number,
02:47  4    unless --
02:47  5          MS. SASTRE:  Well, it was also just moved in in his
02:47  6    medical records.
02:47  7          THE COURT:  It's already in.
02:48  8          MS. SASTRE:  If we can bring it up, please.
02:48  9    BY MS. SASTRE:
02:48  10   Q.   Just a few things I want to go over with you, sir.  I know
02:48  11   counsel asked you some questions about this as well.
02:48  12         If we look at the first highlighted line here, when
02:48  13   you talk about -- this is the form that Mrs. Earnest signed,
02:48  14   correct?
02:48  15   A.   Yes.
02:48  16   Q.   And this is something that you don't just give -- this
02:48  17   isn't, like, a form that they put under your nose the morning
02:48  18   of surgery at the hospital.  This is something that
02:48  19   Mrs. Earnest's treatment started weeks later, right?
02:48  20   A.   Yes.
02:48  21   Q.   I mean, she didn't start chemotherapy until like
02:48  22   mid-April?
02:48  23   A.   Around there.
02:48  24   Q.   About April 12.  Does that sound right, sir?
02:48  25   A.   I think that's right.

JAMES CARINDER - CROSS

02:48  1    **Q.**    And so if at any time after she signed this document --
02:48  2    the last day of March -- and she said, "You know what?  I've
02:48  3    got some more questions for Dr. Carinder," you were always
02:48  4    available to her, right?
02:48  5    **A.**    Yes.
02:48  6    **Q.**    Technically, if she had a change of heart and said, "Hey,
02:49  7    you know what?  I went home, I did some research, I looked up
02:49  8    some things on these drugs.  I don't like it," she had about 12
02:49  9    or 13 days to think about all this and decide whether she
02:49 10    wanted to go forward, true?
02:49 11    **A.**    That's correct.
02:49 12    **Q.**    Okay, Doctor.  This form is specific for the treatment she
02:49 13    was going to have.  You have the drugs listed on the bottom of
02:49 14    the page, correct?
02:49 15    **A.**    Yes.
02:49 16    **Q.**    And she, in fact, initialed next to each one of those
02:49 17    medications, right?
02:49 18    **A.**    Yes.
02:49 19    **Q.**    It says "BE," presumably Barbara Earnest, right?
02:49 20    **A.**    Yes.
02:49 21    **Q.**    You listed the three chemotherapy drugs and then the other
02:49 22    drug the jury heard about today, the growth factor.  Neulasta?
02:49 23    **A.**    Yes.
02:49 24    **Q.**    Okay, very good.
02:49 25             So the first thing that's listed, if we look at side

JAMES CARINDER - CROSS

02:49  1    effects:  "Side effects from chemotherapeutic agents may
02:49  2    include hair loss," right?
02:49  3    A.   Yes.
02:49  4    Q.   And then if we go down a little bit further, it says --
02:50  5    and these are the risks that Mrs. Earnest was made aware of and
02:50  6    accepted, true?
02:50  7    A.   Yes.
02:50  8    Q.   Let's just go through a few of them.
02:50  9         "Potentially life-threatening damage to such vital
02:50 10    organs as the heart, the lungs, the liver, and the kidneys,"
02:50 11    right?
02:50 12    A.   Yes.
02:50 13    Q.   "It is possible that these medications may result in
02:50 14    death"?
02:50 15    A.   Yes.
02:50 16    Q.   That's something that I think you mentioned earlier.  You
02:50 17    said, "Look, even when it came to the risk of death from the
02:50 18    treatment," you didn't give any guarantees.
02:50 19    A.   There are no guarantees.
02:50 20    Q.   Right.  Because you as a physician don't have a crystal
02:50 21    ball to see into the future, right?
02:50 22    A.   That's correct.
02:50 23    Q.   It would be nice, but that's not how things work in the
02:50 24    real world, right?
02:50 25    A.   Right.

JAMES CARINDER - CROSS

02:50  1  **Q.**   Okay.  Mrs. Earnest was made aware of the deaths -- excuse
02:50  2  me, the risks of brain damage and accepted it, correct?
02:51  3  **A.**   Yes.
02:51  4  **Q.**   She was made aware of the risk of quadriplegia, meaning
02:51  5  paralysis of arms and legs, and she accepted that risk, true?
02:51  6  **A.**   Yes.
02:51  7  **Q.**   She was made aware of the risk of paraplegia, or paralysis
02:51  8  of her legs, correct?
02:51  9  **A.**   Yes.
02:51  10  **Q.**   Loss of an organ or function of an organ, correct?
02:51  11  **A.**   Yes.
02:51  12  **Q.**   And loss of an arm or leg or function of an arm or a leg,
02:51  13  correct?
02:51  14  **A.**   Yes.
02:51  15  **Q.**   And in addition to this form, you obviously also had
02:51  16  conversations with Mrs. Earnest, talking about risks, true?
02:51  17  **A.**   Yes.
02:51  18  **Q.**   At the conclusion of your conversation, Mrs. Earnest
02:51  19  accepted those risks and agreed to proceed with the treatment,
02:51  20  right?
02:51  21  **A.**   Yes.
02:51  22  **Q.**   Mrs. Earnest didn't say to you, "Dr. Carinder, I am
02:51  23  unwilling to accept the risk of potential brain damage.  Do you
02:51  24  have something else for me?"  Right?
02:51  25  **A.**   No, she did not say that.

JAMES CARINDER - CROSS

02:51 1  **Q.**   And she didn't say that about any of these potential

02:52 2  risks, true?

02:52 3  **A.**   No.

02:52 4  **Q.**   Even after being advised --

02:52 5  **A.**   That's correct.

02:52 6  **Q.**   -- of all of these risks, sir, Mrs. Earnest didn't ask for

02:52 7  a single other option, right?

02:52 8         **MR. SCHANKER:**  Objection.  Asked and answered

02:52 9  multiple times.

02:52 10        **THE COURT:**  Sustained.

02:52 11 BY MS. SASTRE:

02:52 12 **Q.**   If we look at the second page of the consent form, it's

02:52 13 signed by Mrs. Earnest, and then it appears to be Ralph

02:52 14 Earnest, her husband?

02:52 15 **A.**   Yes.

02:52 16 **Q.**   Do you recall he was there when you spoke with

02:52 17 Mrs. Earnest that day?

02:52 18 **A.**   I don't recall meeting him.  She always came to her

02:53 19 appointments by herself.

02:53 20 **Q.**   If there was testimony that he was there that day, do you

02:53 21 have any reason to dispute that?

02:53 22 **A.**   You mean meeting with me or meeting with the nurse?

02:53 23 **Q.**   Being present when Mrs. Earnest met with you on March 31.

02:53 24 **A.**   I don't remember if he was there or not.

02:53 25 **Q.**   Fair enough.

JAMES CARINDER - CROSS

02:53 1    **A.**    Most appointments she came alone.

02:53 2    **Q.**    Thank you.

02:53 3            So Mrs. Earnest stated that she read and fully

02:53 4    understood the consent, true?

02:53 5    **A.**    Yes.

02:53 6    **Q.**    I believe one of the things that is also set forth here is

02:53 7    she released you and your group from any liability associated

02:53 8    with the treatment, true?

02:53 9            **MR. SCHANKER:**   Your Honor, I object to the form.

02:53 10   Outside the scope.

02:53 11           **THE COURT:**   It's outside the scope.

02:53 12                   Where are we going with this?

02:53 13           **MS. SASTRE:**   Just going through the informed consent

02:54 14   form, Your Honor.

02:54 15           **THE WITNESS:**   That's what it says here.

02:54 16   **BY MS. SASTRE:**

02:54 17   **Q.**    All right, sir.

02:54 18           So counsel asked you some questions about a period of

02:54 19   time where it appeared that Mrs. Earnest's hair loss was

02:54 20   beginning to resolve.  Do you recall that?

02:54 21   **A.**    Yes.

02:54 22   **Q.**    So just a few preliminary questions before we get into

02:54 23   that.

02:54 24           But based upon your experience -- and again, always

02:54 25   going back to before your care and treatment of Mrs. Earnest --

JAMES CARINDER - CROSS

1  your experience at that time, Dr. Carinder, was that it took

2  about 8 to 10 weeks after chemotherapy, and then typically, but

3  not always, a patient's hair would return, true?

4  **A.**  On average, about 8 to 10 weeks.  As I mentioned earlier,

5  some patients' hair will start growing back even before the

6  treatment is done.

7  **Q.**  Again, just sticking with what you said was on average,

8  the 8 to 10 weeks, obviously that's about two to three months,

9  true?

10  **A.**  Roughly, yes.

11  **Q.**  And if a patient didn't get their hair back six months

12  after chemotherapy, that would be an amount of time where you

13  would start to be concerned?

14  **A.**  That would be unusual.

15  **Q.**  Did you discuss with Mrs. Earnest -- after she had gone

16  about six months after chemotherapy without her hair returning,

17  was there a discussion between you and her that this is

18  unusual?

19  **A.**  Yes.

20  **Q.**  And did you tell her you were concerned that her hair

21  hadn't grown back after chemotherapy?

22  **A.**  I said, "It's not common.  It's uncommon to see the hair

23  take this long to come back."

24  **Q.**  Approximately when would you start to have that

25  conversation with the patient, at what period of time after

JAMES CARINDER - CROSS

02:56 1  treatment?

02:56 2  **A.**   I would say six to eight months.

02:56 3  **Q.**   You believe you had that conversation here with

02:56 4  Mrs. Earnest?

02:56 5  **A.**   Yes.

02:56 6  **Q.**   I believe, based upon your experience with your prior

02:56 7  patient, the fact Mrs. Earnest's hair, of course, fell out when

02:56 8  she was taking chemotherapy, it would have been your belief

02:56 9  that her hair loss was caused by chemotherapy, true?

02:56 10  **A.**   Yes.

02:56 11  **Q.**   That would have been something you discussed with her,

02:56 12  right?

02:56 13  **A.**   Yes.

02:56 14  **Q.**   Now, I don't want to go back through all of the records.

02:56 15  I'll just touch on some dates with you.  I know you have a

02:56 16  whole notebook in front of you.

02:56 17        But you would agree with me that starting in April of

02:56 18  2012 -- which is about seven months after Mrs. Earnest's

02:56 19  completed her treatment, right?

02:57 20  **A.**   Yes.

02:57 21  **Q.**   -- starting in that time period, sir, you have a number of

02:57 22  records, one after the other, that indicate her hair loss was

02:57 23  resolving.  Is that fair?

02:57 24        **MR. SCHANKER:**  Objection.  Misstates the record.

02:57 25        **THE COURT:**  Overruled.  I'm going to let Dr. Carinder

JAMES CARINDER - CROSS

1    answer.

2            THE WITNESS:  She was starting to get some hair

3    growth back.

4    BY MS. SASTRE:

5    Q.   You noted that on a number of occasions.  Fair?

6    A.   Yes.  I mean, very sparse hair, but there was some hair

7    growth.

8    Q.   Understood.  I think you described -- if I understood you

9    correctly, that at some point -- and you noted this for a

10   number of months -- that it looked like hair was starting to

11   come back, but then it just kind of came to a standstill,

12   right?

13   A.   Yes.

14   Q.   You would agree with me that at the time when you noticed

15   this standstill, right, that this was at the same time

16   Mrs. Earnest was taking Arimidex?

17           MR. SCHANKER:  Objection.  Foundation.

18           THE COURT:  Overruled.  Overruled.

19           THE WITNESS:  She was taking anastrozole.

20   BY MS. SASTRE:

21   Q.   You were prescribing it to her?

22   A.   Yes.

23   Q.   Okay.  And so again, during this period of 2012 --

24   mid-2012 and 2013, when you were noting resolving alopecia in

25   your records and you were seeing with your own eyes there was

JAMES CARINDER - CROSS

02:58  1   some activity, some regrowth -- my question is just simply this
02:58  2   was during the time period when, of course, she was taking
02:58  3   Arimidex that you had prescribed?
02:58  4   A.    Yes.
02:58  5   Q.    You would agree with me that Arimidex is something that
02:58  6   works by blocking estrogen, right?
02:58  7   A.    Yes.
02:58  8   Q.    And the reason you were giving it to Mrs. Earnest was
02:58  9   because it's part of her breast cancer treatment, true?
02:59 10   A.    Yes.
02:59 11   Q.    It's another medication, in addition to the chemotherapy
02:59 12   drugs, and the idea is that it's going to help Mrs. Earnest in
02:59 13   not having a reoccurrence of breast cancer?
02:59 14   A.    Yes.
02:59 15   Q.    That's why she agreed to take it, right?
02:59 16   A.    Yes.
02:59 17   Q.    You told her there were risks associated with it, true?
02:59 18   A.    Side effects associated with it.
02:59 19   Q.    Because I know we are focused on chemotherapy, but we can
02:59 20   agree that it is a truism to say there are no risk-free
02:59 21   medications at all.
02:59 22   A.    The only thing in this world that's without side effects
02:59 23   is air -- fresh air and water.  Every medication has side
02:59 24   effects.  Anastrozole, the most common side effect is
02:59 25   fatigue -- fatigue and bone and joint pain.  That's what you

JAMES CARINDER - CROSS

02:59  1    hear the most complaints.

02:59  2    Q.   Well, you would agree, though, that there can also be hair

03:00  3    loss with Arimidex and medications like it.

03:00  4    A.   It's a listed side effect, yes.

03:00  5    Q.   It's something you have seen with your own eyes, with your

03:00  6    own patients?

03:00  7    A.   I have not seen the hair loss to the degree that I notice

03:00  8    it.  I mentioned earlier that patients will come in and say,

03:00  9    "My hair feels like it's thinning."  And women know that.  They

03:00 10    know their own hair.  They comb their hair, they brush their

03:00 11    hair every day.  But it wasn't so much that I looked at them

03:00 12    and thought, Wow their hair is falling out.

03:00 13    Q.   You have -- let me see if I can get this right.  You tell

03:00 14    me if I'm correct.

03:00 15    A.   Okay.

03:00 16    Q.   In the overwhelming majority of your adjuvant treatment

03:00 17    breast cancer patients like Mrs. Earnest, they get their

03:00 18    chemotherapy, and nearly all of them, their hair comes out,

03:00 19    right?

03:00 20    A.   Yes.

03:00 21    Q.   In nearly all of them, except for the one or two examples

03:00 22    we have talked about, it comes back for the most part?

03:00 23    A.   Yes.

03:00 24    Q.   With many, many of these women, these breast cancer

03:01 25    patients of yours, many of them also go on medications like

JAMES CARINDER - CROSS

03:01  1   Arimidex, right?

03:01  2   A.   Yes.

03:01  3   Q.   So here, though, in Mrs. Earnest's case, by the time she

03:01  4   started Arimidex, her hair was gone from the chemotherapy and

03:01  5   really hadn't returned, right?

03:01  6   A.   Right.

03:01  7   Q.   So once she starts getting the Arimidex, which can cause

03:01  8   hair issues, we are talking about a patient, Doctor, that

03:01  9   really didn't have any hair in the first place, right?

03:01  10  A.   She didn't have any hair when the Arimidex was started.

03:01  11  Q.   That's my point.  That's based upon your independent

03:01  12  recollection, true?

03:01  13  A.   Right, right.  She didn't start getting regrowth of hair

03:01  14  until months later.  She would have already been on the

03:01  15  anastrozole by then.

03:01  16  Q.   And you would have told Mrs. Earnest that there can be

03:02  17  hair issues associated with Arimidex, right?

03:02  18  A.   Yes.

03:02  19  Q.   And that was a risk she would have accepted in order to

03:02  20  get the benefit of the treatment, the benefit of not having a

03:02  21  breast cancer reoccurrence, true?

03:02  22  A.   Yes.

03:02  23  Q.   She didn't say to you, "Dr. Carinder, I don't want to take

03:02  24  a drug if it might negatively impact my hair," right?

03:02  25  A.   She did not.

JAMES CARINDER - CROSS

**Q.**   She continued to take Arimidex the whole time she was under your care, true?

**A.**   Yes.

**Q.**   And do you know whether she is on it today?

**A.**   No, I don't.

**Q.**   Okay.

**A.**   The recommended treatment duration is five years, so it should be over with by now.

**Q.**   But as you sit here, you don't know.

**A.**   No, I don't know.

**Q.**   Fair enough, Doctor.

         **MS. SASTRE:**  Do you want me to keep going or -- I don't know what you are thinking on afternoon break.  It would be a good time if you did want to break.  If not, I'm happy to keep going, Judge.

         **THE COURT:**  How much longer do you have?

         **MS. SASTRE:**  If we broke, I probably could make it shorter.

         **THE COURT:**  Okay.

         **MS. SASTRE:**  It might keep us a little longer than our break.  It would be helpful if you want me to stop.

         **THE COURT:**  All right.  We are going to take our afternoon break now.  As I have told you repeatedly, don't talk amongst yourselves or with anyone else.  Leave your tablets there.  Court will be at recess until 3:15.

JAMES CARINDER - CROSS

03:03  1              THE DEPUTY CLERK:  All rise.

03:03  2              (The jury exited the courtroom.)

03:04  3              MS. SASTRE:  I'm going to take a look.  I'm going to

03:04  4    talk to my colleagues and I'm going to try to make it as short

03:04  5    as I can, Judge.  So that's why I thought it might be a good

03:04  6    idea.

03:04  7              THE COURT:  Okay.

03:04  8              MS. SASTRE:  Okay.  Thank you.

03:04  9              (Recess.)

03:16  10             THE DEPUTY CLERK:  All rise.

03:16  11             MS. SASTRE:  Thank you for the break, Judge.

03:17  12             THE COURT:  Let's bring in the jury, please.

01:13  13             (The jury entered the courtroom.)

03:17  14             THE COURT:  All jurors are present.  Court is back in

03:17  15    session.  You may be seated.

03:17  16                  Ms. Sastre.

03:18  17             MS. SASTRE:  Yes.  Thank you.  May it please the

03:18  18    Court.

03:18  19    BY MS. SASTRE:

03:18  20    Q.   Good afternoon.  Welcome back from break, Dr. Carinder.

03:18  21             Okay, sir, just a couple more topics and I'm going to

03:18  22    be done soon, okay?

03:18  23    A.   Okay.

03:18  24    Q.   So you spent some time talking with counsel about what

03:18  25    information is contained in the Taxotere label as far as the

JAMES CARINDER - CROSS

1  prescribing information, and then you spent some time talking
2  about how you prescribed it here.  And I just want to spend
3  just a couple minutes on that with you, okay?
4  A.   Okay.
5  Q.   So let's talk about the label that would have been in
6  effect for Taxotere at this time when you were treating
7  Mrs. Earnest.  And I want to focus specifically on, of course,
8  treatment for her breast cancer, which would be adjuvant, okay?
9  A.   Yes.
10 Q.   Because the label speaks to different dosing and a
11 different regimen, depending upon whether the patient is
12 metastatic or adjuvant, true?
13 A.   True.
14 Q.   So let's talk about what would apply to Mrs. Earnest,
15 which, of course, would be adjuvant.
16         And you would agree with me, sir, that the label that
17 was in place at the time, the Taxotere label, had an
18 FDA-approved treatment set out, which was Adriamycin given at
19 the same time as Cytoxan, and then followed an hour later by
20 Taxotere, right?
21 A.   Are you talking about the TAC regimen?
22 Q.   Yes, sir --
23 A.   Okay.
24 Q.   -- which is in the Taxotere label.
25 A.   Right.

JAMES CARINDER - CROSS

03:19   1    Q.    Is that correct so far?

03:19   2    A.    Yes.

03:19   3    Q.    And Adriamycin, according to the label, would be

03:19   4    prescribed at 50 -- I'm just going to say milligrams, okay?

03:19   5    A.    Uh-huh.

03:19   6    Q.    We know it's meters squared.

03:19   7          But Adriamycin would be prescribed at 50, right --

03:19   8    A.    Yes.

03:19   9    Q.    -- according to the Taxotere label?

03:19  10          Cytoxan at 500, true?

03:20  11    A.    Yes.

03:20  12    Q.    And then Taxotere at 75, right?

03:20  13    A.    Yes.

03:20  14    Q.    And that is a regimen, Adriamycin and Cytoxan, followed by

03:20  15    Taxotere an hour later, according to the Taxotere label is

03:20  16    something that would be given six times every three weeks,

03:20  17    right?

03:20  18    A.    Yes.

03:20  19    Q.    And we can agree that your prescription in this case

03:20  20    differed from the Taxotere label.

03:20  21          Is that fair?

03:20  22    A.    Differed from that regimen, yes.

03:20  23    Q.    Yes, sir, which is set forth in the label, true?

03:20  24    A.    Yes.

03:20  25    Q.    Okay.  And, again, just to move along, what you gave, sir,

JAMES CARINDER - CROSS

03:20  1    was dose-dense Adriamycin and Cytoxan, true?

03:20  2    A.    Yes.

03:20  3    Q.    And "dose-dense" means that you give it to the patient on

03:20  4    a different schedule versus nondose-dense, right?

03:20  5    A.    Yes.

03:20  6    Q.    So dose-dense, by definition, means you get the Adriamycin

03:20  7    and the Cytoxan every two weeks instead of every three, right?

03:20  8    A.    Yes.

03:20  9    Q.    All right.  And that's what you did here, true?

03:21 10    A.    Yes.

03:21 11    Q.    Okay.  And the reason you gave dose-dense --

03:21 12    A.    Because it was the standard of care by then.

03:21 13    Q.    And I was going to ask you something a little different.

03:21 14            But the reason you were giving dose-dense in 2011 and

03:21 15    the reason you gave it to Mrs. Earnest is that there was a

03:21 16    little more efficacy if you gave the Adriamycin and the Cytoxan

03:21 17    dose-dense --

03:21 18    A.    Yes.

03:21 19    Q.    -- as opposed to nondose-dense.

03:21 20            Is that fair?

03:21 21    A.    Yes.

03:21 22    Q.    And that's why you made that decision to give that to

03:21 23    Mrs. Earnest that way, true?

03:21 24    A.    We have been doing it a long time.  But by then it was

03:21 25    firmly standard of care.

JAMES CARINDER - CROSS

03:21  1    Q.    Okay.  And you had found it worked well in your patients?
03:21  2    A.    Yes.
03:21  3    Q.    It was effective?
03:21  4    A.    Yes.
03:21  5    Q.    And you believe dose-dense was important.
03:21  6    A.    Yes.
03:21  7    Q.    And that's why you gave it to Mrs. Earnest.
03:21  8    A.    Yes.
03:21  9    Q.    Now, the doses that you gave, you gave Adriamycin at
03:21 10    60 milligrams, right?
03:22 11    A.    Yes.
03:22 12    Q.    And Cytoxan at 600?
03:22 13    A.    Yes.
03:22 14    Q.    Which you would agree with me -- I'm only just asking --
03:22 15    it is different than what's in the Taxotere label.
03:22 16            Is that fair?
03:22 17    A.    It's different than the TAC regimen, yes.
03:22 18    Q.    Which is discussed in the Taxotere label.
03:22 19    A.    Yes.
03:22 20    Q.    And then when you got to the Taxotere, instead of giving
03:22 21    it an hour later, according to the label, my understanding is
03:22 22    it was administered at three weeks after Adriamycin and Cytoxan
03:22 23    were completed, true?
03:22 24    A.    Yes.  It was a single agent.
03:22 25    Q.    Okay.  Very good.

JAMES CARINDER - CROSS

03:22  1          And the dose of Taxotere that you gave to

03:22  2  Mrs. Earnest was a hundred milligrams per meter squared.

03:22  3  A.   Yes.  Because it was a single agent.  It wasn't in

03:22  4  combination with another drug.

03:22  5  Q.   You would agree with me, though, that when the Taxotere

03:22  6  label speaks to the administration of Taxotere in the adjuvant

03:22  7  setting, the dose that it references is 75 milligrams.

03:22  8  A.   Now, yes.

03:22  9  Q.   Well, then too, sir.

03:23 10  A.   There were -- we gave 75 milligrams per meter squared as a

03:23 11  single agent with metastatic disease.  At that time, we were

03:23 12  giving a hundred per meter squared in an adjuvant setting.

03:23 13  Q.   Okay.  Let me ask you this, because the label says what it

03:23 14  says and I don't want to take up a bunch of everyone's time:

03:23 15  The Taxotere label sets forth the TAC regimen that we just

03:23 16  discussed, true?

03:23 17  A.   Yes.

03:23 18  Q.   And the regimen that you gave Mrs. Earnest, the dose-dense

03:23 19  Adriamycin and Cytoxan, as you said, followed by the

03:23 20  Taxotere --

03:23 21  A.   Yes.

03:23 22  Q.   -- at a hundred milligrams, you believed that that was a

03:23 23  regimen -- my point is just that putting aside whatever the

03:23 24  label said, you believed that that was in her best interest,

03:23 25  true?

JAMES CARINDER - CROSS

03:24  1   A.    Yes.

03:24  2   Q.    You thought that was going to be the most effective

03:24  3   regimen for her, true?

03:24  4   A.    Yes.

03:24  5   Q.    And one that would minimize unnecessary complications,

03:24  6   true?

03:24  7   A.    Yes.

03:24  8   Q.    And then just a question briefly on the guidelines.

03:24  9          MS. SASTRE:  If we can bring up the first page,

03:24 10   please.

03:24 11   BY MS. SASTRE:

03:24 12   Q.    Do you still have your set in front of you if you need

03:24 13   them?

03:24 14   A.    Somewhere in the pile I do.

03:24 15   Q.    I can give you another copy.

03:24 16   A.    Could you, please?

03:24 17   Q.    Yes.

03:24 18          MS. SASTRE:  Can we bring up the first page, please.

03:25 19               I can put it up on the ELMO if that's easier.

03:25 20   It may be faster.  Thank you.

03:25 21   BY MS. SASTRE:

03:25 22   Q.    So, Doctor, we are looking now all together at the 2011

03:25 23   NCCN guidelines, right?

03:25 24   A.    Yes.

03:25 25   Q.    And I don't know whether it's been explained, but this is

JAMES CARINDER - CROSS

03:25  1  the National Comprehensive Cancer Network, right?

03:25  2  A.    Yes.

03:25  3  Q.    That's what NCCN is?

03:25  4  A.    Yes.

03:25  5  Q.    And these are guidelines that are just intended to assist

03:25  6  physicians in providing the best outcome to patients, right?

03:25  7  A.    Yes.

03:25  8  Q.    Okay.  You see that the very first preferred adjuvant

03:26  9  regimen is TAC, right?

03:26  10  A.    Yes.

03:26  11  Q.    And then the next one is dose-dense AC followed by Taxol,

03:26  12  correct?

03:26  13  A.    Yes.

03:26  14  Q.    And if you look at the whole list of regimens, whether it

03:26  15  be preferred or other adjuvant regimens, you would agree with

03:26  16  me that there is no dose-dense AC regimen followed by Taxotere,

03:26  17  true?

03:26  18  A.    They don't have it written that way.

03:26  19  Q.    And so my question is just simply:  Because you gave

03:26  20  dose-dense for the reasons you explained, you would agree with

03:26  21  me that your regimen of dose-dense Adriamycin and Cytoxan

03:26  22  followed by Taxotere every three weeks is not on the 2011

03:27  23  guidelines.

03:27  24  A.    They don't phrase it with "dose-dense," but no one has

03:27  25  given AC every three weeks for years.

JAMES CARINDER - CROSS

03:27  1    **Q.**   And my question is just simply:  That regimen is not here.

03:27  2    Is that fair?

03:27  3    **A.**   No.  They don't phrase it that way on there, no.

03:27  4    **Q.**   And even if -- sir, if we turn to -- the closest thing to

03:27  5    what you did would be the regimen under "Other," which is AC

03:27  6    followed by docetaxel every three weeks, right?

03:27  7    **A.**   Yes.

03:27  8    **Q.**   But what's missing from the beginning of that is the

03:27  9    dose-dense part, right?

03:27 10    **A.**   Right.

03:27 11    **Q.**   And if we turn to the next page, sir, it has a specific

03:27 12    section on that regimen.  You see it's right there, right?

03:27 13    That's the AC followed by Taxotere regimen from page 1, right?

03:28 14    **A.**   Yes.

03:28 15    **Q.**   And what it says here under the guidelines, it says under

03:28 16    this regimen you give AC every 21 days, right?

03:28 17    **A.**   It's what it says there.  We pretty much gave all the AC

03:28 18    as a dose-dense.

03:28 19    **Q.**   I totally get it and I'm not being critical in any way.

03:28 20    **A.**   No, I see what's written here.

03:28 21    **Q.**   Yeah.  What you did was different than what's written in

03:28 22    the guidelines.

03:28 23    **A.**   Yes.

03:28 24    **Q.**   Okay.  But what you did is what you thought was in

03:28 25    Mrs. Earnest's best interest, right?

JAMES CARINDER - CROSS

03:28  1   **A.**   Yes.

03:28  2   **Q.**   And she's living proof that it worked.

03:28  3   **A.**   She is here.

03:28  4   **Q.**   Yeah.  Okay.  All right.  You can put the guidelines down.

03:28  5   Just a couple more minutes and I'll be done, Doctor.

03:29  6          Now, Mr. Schanker, who did your direct exam, is an

03:29  7   attorney that you met with a number of times before your

03:29  8   deposition in this case and also before your trial testimony

03:29  9   today, right?

03:29  10  **A.**   Once before the deposition.

03:29  11  **Q.**   Let's talk about that just for a moment, okay?

03:29  12         I believe that you also know the gentleman sitting at

03:29  13  counsel's table on the far left, Mr. Coffin?

03:29  14  **A.**   Yes.

03:29  15  **Q.**   And I believe -- and I want to start at the very

03:29  16  beginning, but I believe how this all started is that you got a

03:29  17  phone call from Mr. Coffin in about November of 2017, right?

03:29  18  **A.**   I don't remember if I got a phone call from him.

03:30  19  **Q.**   Okay.  You agree that was about two months before your

03:30  20  deposition was taken?

03:30  21  **A.**   The deposition was in January of 2018, so yes.

03:30  22  **Q.**   And let me just show you your deposition just to refresh

03:30  23  your recollection, Doctor.  I know it's been a long time.  But

03:30  24  if you'd turn to page 18, please, line 6.

03:30  25         From line 6:  "Do you recall meeting" --

JAMES CARINDER - CROSS

03:30  1          THE COURT:  I thought you were refreshing his memory.

03:30  2          MS. SASTRE:  Okay.

03:30  3  BY MS. SASTRE:

03:30  4  Q.   If you'd read from line 6 to line 17.

03:30  5          MS. SASTRE:  That's fine, Your Honor.

03:31  6          THE WITNESS:  I don't even remember that.  I mean, I

03:31  7  didn't remember that --

03:31  8  BY MS. SASTRE:

03:31  9  Q.   That's okay.

03:31 10  A.   -- honestly.

03:31 11  Q.   No problem.  I understand.  This is not a memory test on

03:31 12  every single thing, so, again, it was just to refresh your

03:31 13  memory.

03:31 14          But you see now that you testified you had a phone

03:31 15  call with Mr. Coffin.

03:31 16  A.   It must have been a brief one.

03:31 17  Q.   And Mr. Coffin was somebody that represented you

03:31 18  previously -- I know you talked about that on direct exam -- in

03:31 19  a lawsuit, true?

03:31 20  A.   True.

03:31 21  Q.   So you had familiarity with him.  You knew who he was and

03:31 22  he knew who you were, right?

03:31 23  A.   Yes.

03:31 24  Q.   And after that, you had a meeting -- I believe several

03:31 25  weeks before your deposition -- where Mr. Schanker was present,

JAMES CARINDER - CROSS

03:31  1   true?

03:32  2   A.   Yes.

03:32  3   Q.   And I believe another attorney was there, too, who

03:32  4   represents the plaintiff, a lawyer named John Thornton?

03:32  5   A.   I don't remember the name.

03:32  6   Q.   And do you recall Mr. Coffin also joined you by phone?

03:32  7   A.   No.

03:32  8   Q.   And do you recall that on that date, that you met with

03:32  9   plaintiff's counsel for about an hour?  Does that sound about

03:32 10   right?

03:32 11   A.   An hour seems a stretch, but it could have been.

03:32 12   Q.   And you talked with them about, of course, this lawsuit,

03:32 13   right?

03:32 14   A.   Yes.

03:32 15   Q.   And you would agree with me no lawyer or representative

03:32 16   from Sanofi was there, true?

03:32 17   A.   No.  I didn't meet anyone representing Sanofi until they

03:32 18   deposed me.

03:32 19   Q.   Right.  And your deposition, of course, both sides were

03:32 20   present and we asked you questions under oath like today,

03:32 21   right?

03:32 22   A.   Yes.

03:32 23   Q.   But before your deposition and before trial and, candidly,

03:32 24   at any time -- I know we haven't met before today, right?

03:32 25   A.   Right.

JAMES CARINDER - CROSS

03:33  1   **Q.**   And you would agree with me you haven't had any private

03:33  2   meetings with any of the lawyers sitting at my table before

03:33  3   today, right?

03:33  4   **A.**   No.

03:33  5   **Q.**   The only private meetings you have had have been with a

03:33  6   number of the plaintiff's attorneys, right?

03:33  7   **A.**   Yes.

03:33  8   **Q.**   Now, you then had another meeting with Mr. Schanker, and

03:33  9   that was two days before your deposition, true?

03:33 10   **A.**   Yes.

03:33 11   **Q.**   And, in fact, one of the things he showed you at that

03:33 12   meeting is the *Breast Cancer Handbook* that we have been talking

03:33 13   about.

03:33 14   **A.**   Yes, yes.

03:33 15   **Q.**   And you would agree with me that these meetings that you

03:33 16   had with Mr. Schanker and the other plaintiff's attorneys were,

03:33 17   in fact, to prepare you for your deposition.  They were prep

03:33 18   sessions, right?

03:33 19   **A.**   Yes.

03:33 20   **Q.**   And you charged them for your time; is that fair?

03:33 21   **A.**   Yes.

03:33 22   **Q.**   I believe it was a thousand dollars an hour?

03:33 23   **A.**   Yes.

03:33 24   **Q.**   And you're charging them for your time today, right?

03:34 25   **A.**   Yes.

JAMES CARINDER - CROSS

03:34 1    **Q.**    And your rate for today is $1,250 an hour, right?

03:34 2    **A.**    Yes.

03:34 3    **Q.**    That's about $20 a minute?

03:34 4    **A.**    I guess.

03:34 5    **Q.**    Take my word for it?

03:34 6    **A.**    Yes.

03:34 7    **Q.**    And then, sir, about six days before the start of this

03:34 8    trial, you had another meeting with Mrs. Earnest's lawyers on

03:34 9    September 10th, right?

03:34 10   **A.**    Yes, around there.

03:34 11   **Q.**    And you met with them for about 1 1/2 hours, true?

03:34 12   **A.**    Yes.

03:34 13   **Q.**    And there was another lawyer present at that meeting.  It

03:34 14   was Mr. Schanker again, and there was also a gentleman named

03:34 15   Mr. Wool, right, Zachary Wool?

03:34 16   **A.**    Yes.

03:34 17   **Q.**    And you were paid for that meeting, correct, about $1,500?

03:34 18   **A.**    Yes.

03:34 19   **Q.**    They showed you some documents during that meeting,

03:34 20   correct?

03:34 21   **A.**    Yes.

03:35 22   **Q.**    They told you about some of the questions they might ask

03:35 23   you at trial, right?

03:35 24   **A.**    Briefly.  Not really.

03:35 25   **Q.**    They told you about some of the things that the Sanofi

**JAMES CARINDER - CROSS**

03:35 1  lawyer might ask you, right?

03:35 2  **A.**   They alluded to a few.

03:35 3  **Q.**   Did they work on answers with you, how you should respond?

03:35 4  **A.**   No.

03:35 5  **Q.**   Okay.  And then on September 17th, while we were actually

03:35 6  already in trial, you had another meeting with the lawyers that

03:35 7  represent the plaintiff -- Mr. Schanker and Mr. Wool -- again,

03:35 8  true?

03:35 9  **A.**   By phone.  I think it was by phone.

03:35 10 **Q.**   But you talked with them.  You're right, that was over the

03:35 11 phone.

03:35 12 **A.**   Yes.

03:35 13 **Q.**   And you spoke with them for about 45 minutes at that time,

03:35 14 true?

03:35 15 **A.**   Roughly.

03:35 16 **Q.**   And you were compensated at your usual rate of about a

03:35 17 thousand dollars an hour?

03:35 18 **A.**   Yes.

03:35 19 **Q.**   And then just again yesterday, the day before you were set

03:35 20 to come in here and testify, you again spoke with Mr. Schanker

03:35 21 and Mr. Wool, true?

03:36 22 **A.**   Yes.

03:36 23 **Q.**   And, again, did they talk with you about the questions

03:36 24 they were going to ask you, sir?

03:36 25 **A.**   No.

JAMES CARINDER - CROSS

03:36  1   **Q.**   Any more conversations about questions that the lawyers on
03:36  2   the defense side might ask you with them?
03:36  3   **A.**   They alluded to the angle that might be taken.
03:36  4   **Q.**   In any of your meetings with Mr. Coffin, Mr. Schanker,
03:36  5   Mr. Wool, Mr. Thornton, was Mrs. Earnest ever present?
03:36  6   **A.**   No.
03:36  7   **Q.**   Okay.  Just a couple more questions.
03:36  8            You talked about the four cycles of the Adriamycin
03:36  9   and Cytoxan chemotherapy that you gave Mrs. Earnest, right?
03:37 10   **A.**   Yes.
03:37 11   **Q.**   She received it four times, right?
03:37 12   **A.**   Yes.
03:37 13   **Q.**   Two weeks apart each time.
03:37 14   **A.**   Yes.
03:37 15   **Q.**   And you would agree with me, sir, that sometime shortly
03:37 16   after Mrs. Earnest received her second dose of Adriamycin and
03:37 17   Cytoxan, she lost her hair.
03:37 18   **A.**   Yes.
03:37 19   **Q.**   And, to use your words, at that time her hair was gone,
03:37 20   true?
03:37 21   **A.**   Yes.
03:37 22   **Q.**   And that was weeks and weeks before she ever took her
03:37 23   first drop of Taxotere.
03:37 24   **A.**   That's correct.
03:37 25   **Q.**   Sir, you agree with me nobody can say with certainty that

JAMES CARINDER - CROSS

03:37  1    Mrs. Earnest would be alive today if she had taken Taxol

03:37  2    instead of Taxotere.

03:37  3            MR. SCHANKER:  Objection, Your Honor.  MIL.

03:37  4            MS. SASTRE:  May we approach?

03:37  5            THE COURT:  Yes.

03:37  6            (The following proceedings were held at the bench.)

03:38  7            MS. SASTRE:  Your Honor, this comes directly -- it's

03:38  8    Q&A.  I would be happy to have you read it right out of his

03:38  9    deposition word for word.

03:38 10            THE COURT:  That doesn't matter.  It does not matter.

03:38 11            MR. SCHANKER:  We had a motion in limine on this.

03:38 12            THE COURT:  What's covered in his deposition doesn't

03:38 13    mean it's admissible.

03:38 14            MS. SASTRE:  I'm not tracking the motion in limine

03:38 15    issue, then.

03:38 16            THE COURT:  I think what's important is at that time

03:38 17    he thought that was the best regimen to keep her alive.

03:38 18            MS. SASTRE:  Right.

03:38 19            MR. SCHANKER:  Right.

03:38 20            THE COURT:  That was the choice he made.

03:38 21            MS. SASTRE:  Sure.  Okay.

03:38 22            THE COURT:  I think for us to say -- that's a bit

03:38 23    like saying, "Well, she would have had worse neuropathy if she

03:38 24    had taken Taxol."  We don't know.

03:38 25            MS. SASTRE:  I agree, and so that's the point of the

**JAMES CARINDER - CROSS**

03:38 1    question, Judge.  He is saying that nobody could say that.  So

03:39 2    if I was to say to him, "It's not your opinion in this case

03:39 3    that Mrs. Earnest -- you don't know whether she would be alive

03:39 4    today if she had taken Taxol or Taxotere," he is saying that

03:39 5    nobody can know that.  He is saying, "If she had taken a

03:39 6    different medication, I don't know" --

03:39 7             THE COURT:  I think what is relevant for this case is

03:39 8    at the time he prescribed it, he thought that was the best way

03:39 9    to keep her alive.

03:39 10            MS. SASTRE:  Okay.

03:39 11            MR. SCHANKER:  That's been asked and answered

03:39 12   multiple times.

03:39 13            MS. SASTRE:  What if I said something like "So if you

03:39 14   gave her Taxol at the time, do you know one way or another

03:39 15   whether she would be alive today?"

03:39 16            THE COURT:  How is that any different from asking

03:39 17   about the neuropathy?  He made a prescribing decision based

03:39 18   upon information he had at the time.  He made a prescribing

03:39 19   recommendation.

03:39 20            MS. SASTRE:  Okay.  I'll ask a couple different

03:39 21   questions and then I will sit down.  Thank you.  I think yours

03:40 22   are better than mine.

03:40 23            THE COURT:  Charged to defendant.

03:40 24            (End of bench conference.)

      25

JAMES CARINDER - REDIRECT

BY MS. SASTRE:

Q.   Dr. Carinder, the treatment of dose-dense Adriamycin and
Cytoxan followed by Taxotere that you prescribed to
Mrs. Earnest, that is something that you believed at the time,
on March 31, 2011, to be in Mrs. Earnest's best interest?

        MR. SCHANKER:  Asked and answered, Your Honor.

        THE COURT:  I'm going to let him answer this one, and
then --

        THE WITNESS:  Yes.

        THE COURT:  -- that's it.

BY MS. SASTRE:

Q.   And you stand by that decision today, sir?

        THE COURT:  Okay.  That's asked and answered.

        MS. SASTRE:  Whether he stands by the decision today?

        MR. SCHANKER:  Yes, Your Honor.

        THE COURT:  You can answer that.

        THE WITNESS:  Yes.

        MS. SASTRE:  Okay.  Thank you, sir.  I have no
further questions.  I appreciate your time.

        THE COURT:  Okay.  Mr. Schanker.

        MR. SCHANKER:  Thank you, Your Honor.

                    REDIRECT EXAMINATION

BY MR. SCHANKER:

Q.   Good afternoon again, Dr. Carinder.

        Were you aware -- you were asked questions about

JAMES CARINDER - REDIRECT

1    attorneys meeting with you.  Were you aware that the Court
2    entered an order in this case allowing plaintiff's lawyers to
3    meet with you?
4              MS. SASTRE:  Objection, Your Honor.
5              THE COURT:  Sustained.  Sustained.
6              (The following proceedings were held at the bench.)
7              THE COURT:  The fact there were orders in place,
8    there was nothing improper with him meeting with this witness.
9    I'm inclined to tell the jury there's nothing improper.
10             MS. SASTRE:  I didn't suggest there was anything
11   improper, Your Honor, but to go through --
12             MR. SCHANKER:  We believe that inference was created.
13             MS. SASTRE:  Your Honor, they decided how many times
14   they were going to meet him, how much time to spend with him,
15   what they were going to discuss with him, showing documents
16   from their opening, showing him materials that he wouldn't have
17   an opportunity to see in his care and treatment, and the truth
18   is we could have had an opportunity --
19             MR. SCHANKER:  Could you keep your voice down,
20   please.
21             MS. SASTRE:  Sure.  We could have had an opportunity
22   to have met with them as well, but we didn't because they
23   opposed that.
24             MR. SCHANKER:  The judge entered an order.
25             MS. SASTRE:  You opposed our having an opportunity to

JAMES CARINDER - REDIRECT

1 meet with the prescribing doctors.  I could have asked that

2 question too.  In fact, they have an obligation to tell him

3 that when they meet with him.  I did not ask that question.

4           So they have met with him -- Your Honor, if you

5 want to go and spend this much time with a fact witness, we are

6 going to bring it out.  The inference is the inference.  I

7 didn't suggest there's something wrong with it.  But if they

8 are going to talk with him about the questions I'm going to ask

9 him and the things that they are going to ask him on direct

10 exam --

11           MR. SCHANKER:  Your Honor, we are allowed to do that,

12 and the inference was created by counsel that it's

13 impermissible.

14           THE COURT:  I wasn't involved in any order that was

15 entered.  It is what it is.  I think there was an inference

16 that there was something improper with the meeting, and there

17 is nothing improper with meeting with a witness that you intend

18 to call at trial.

19           MS. SASTRE:  Well, Your Honor, candidly, we do think

20 that there were things that were done that we talked to you

21 about that we believe were improper.  So I'm just saying --

22           MR. SCHANKER:  Nothing improper was done.

23           MS. SASTRE:  Hold on.  If you want to spend six hours

24 with a fact witness and show him a bunch of things and have

25 five different lawyers meet with him for, quote, prep talks

JAMES CARINDER - REDIRECT

03:43  1  before his deposition and prior to trial, then there is a
03:43  2  price.  You have to make a decision when you do things like
03:43  3  that.  The jury is entitled to hear about it.  They are
03:43  4  entitled, and I'm entitled to ask what they talked about.
03:44  5          THE COURT:  And you did.
03:44  6          MS. SASTRE:  I understand, Judge, but to say now that
03:44  7  there's nothing improper --
03:44  8          THE COURT:  I think what I will tell the jury -- I'm
03:44  9  not getting into any orders that were entered.  Maybe the best
03:44 10  thing for you to do is to ask this series of questions "Did we
03:44 11  try to influence your testimony?  Did we ask you to say
03:44 12  anything?" that sort of thing, but I'm not going to get into
03:44 13  orders.
03:44 14          MS. SASTRE:  Okay.
03:44 15          THE COURT:  You can question him about whether or not
03:44 16  we instructed you how to answer certain questions --
03:44 17          MR. SCHANKER:  Sure.
03:44 18          THE COURT:  -- that sort of thing.  Let's do it that
03:44 19  way.
03:44 20          Charged to nobody.
03:44 21          (End of bench conference.)
03:45 22  BY MR. SCHANKER:
03:45 23  Q.   Dr. Carinder, you were asked a whole litany of questions
03:45 24  about meetings I had with you.  My question to you is:  Did I,
03:45 25  in any way, try to influence you in any way, shape, or form in

**JAMES CARINDER - REDIRECT**

1    your testimony here?

2    **A.**    No.

3    **Q.**    Did any other lawyer who met with you from the plaintiff's

4    side try to influence you in any way, shape, or form in your

5    testimony here?

6    **A.**    No.

7    **Q.**    In this case the defense attorney had the chance to take

8    your deposition for -- you indicated, I believe -- almost four

9    hours?

10   **A.**    Yes.

11   **Q.**    Did you answer all of those questions honestly and

12   truthfully?

13   **A.**    Yes.

14   **Q.**    When I met with you, did you answer all of the questions I

15   asked you honestly and truthfully?

16   **A.**    Yes.

17   **Q.**    Thank you.

18          I want to ask you about the NCCN guidelines, which we

19   have gone over quite a bit here today, and specifically talk

20   about the regimen that you prescribed.

21          We understand it's the AC, followed by the Taxotere,

22   correct?

23   **A.**    Yes.

24   **Q.**    Before we do that, I want to remind you in this context --

25   let's go to page 3 of the document.  First of all, page --

JAMES CARINDER - REDIRECT

03:46  1   Doctor, as you look through the document -- let's do it this

03:46  2   way.  Let's make sure we familiarize the jury with the entirety

03:46  3   of the document.

03:46  4          Page 1 of what is Exhibit 1878, how would you -- is

03:47  5   that a cover page basically?  Is that how you describe that?

03:47  6   Or is there a better way of these options that are available?

03:47  7   A.   What do you mean by a "cover page"?

03:47  8   Q.   When I look at it, we just have a list of regimens without

03:47  9   any great detail.  Is that fair to say?

03:47 10   A.   Yes.

03:47 11   Q.   And then that's page 1, correct?

03:47 12   A.   Yes.

03:47 13   Q.   Then when we get to page 2 of the document -- page 2 of

03:47 14   the document, do we see more detail provided?

03:47 15   A.   Yes.

03:47 16   Q.   That's what I meant.

03:47 17   A.   Yes.

03:47 18   Q.   I apologize for the poor question.

03:47 19          You used the AC, followed by Taxotere, correct?

03:47 20   A.   Yes.

03:47 21   Q.   You used the AC in dose-dense, right?

03:47 22   A.   Yes.

03:48 23   Q.   On page 2, I've just put a box around.  Is that AC

03:48 24   followed by docetaxel or Taxotere chemotherapy?

03:48 25   A.   Yes.

JAMES CARINDER – REDIRECT

03:48  1   **Q.**   And then, Doctor, do you remember when I asked you earlier

03:48  2   about this, the language at the bottom of several of these

03:48  3   pages concerning selection dosing and administration of these

03:48  4   anticancer agents -- do you remember when I asked you questions

03:48  5   about that?

03:48  6   **A.**   Yes.

03:48  7   **Q.**   And then you were asked questions on cross-examination

03:48  8   about the NCCN guidelines.  You remember that?

03:48  9   **A.**   Yes.

03:48  10  **Q.**   I just want to make sure that it's clear to the jury here.

03:48  11  Could you go ahead and read what's boxed at the bottom of

03:48  12  page 3?

03:48  13          **MS. SASTRE:**  Objection.

03:48  14          **MR. SCHANKER:**  I want to ask you a question about it.

03:49  15          **THE COURT:**  Wait.

03:49  16          **MS. SASTRE:**  Repetitive of direct.  It's outside the

03:49  17  scope of cross.

03:49  18          **MR. SCHANKER:**  Your Honor, this document --

03:49  19          **THE COURT:**  I'm going to allow it.  Overruled.

03:49  20          **MR. SCHANKER:**  Thank you.

03:49  21  BY MR. SCHANKER:

03:49  22  **Q.**   If you could go ahead and read the first sentence there.

03:49  23  **A.**   The box with the black line around it, not your yellow

03:49  24  highlighter?

03:49  25  **Q.**   The yellow highlighter is what I'm interested in.  A

JAMES CARINDER - REDIRECT

1  question on clarification.

2  **A.**    "The selection dosing and administration of anticancer

3  agents and management of associated toxicities are complex.

4  Modifications of drug dose and schedule and initiation and

5  supportive care interventions are often necessary because of

6  expected toxicities; and because of individual patient

7  variability, prior treatment, and comorbidity, the optimal

8  delivery of anticancer agents therefore requires a health care

9  delivery team experienced in the use of anticancer agents in

10  the management of associated toxicities in patients with

11  cancer."

12  **Q.**    So doctor, is what you did with the dose-dense AC,

13  followed by the Taxotere, is it fair to say that's a

14  modification of schedule?

15          **MS. SASTRE:**  Leading, Your Honor.

16          **THE COURT:**  It is leading.

17  BY MR. SCHANKER:

18  **Q.**    Doctor, did you modify the schedule of AC followed by T?

19  **A.**    Yes.  Because we were -- everyone was using AC in a

20  dose-dense fashion by then.

21  **Q.**    Was that a modification of schedule?

22  **A.**    Yes.

23  **Q.**    Okay.  And so then, Doctor, did you follow the NCCN

24  guidelines with that understanding of the ability to modify

25  your schedule?

**A.** Yes.
**Q.** Doctor, was that within the standard of care?
**A.** Yes.
**Q.** You were asked some questions by defense counsel concerning your advisory to patients such as Barbara Earnest back before and including 2011 -- the conversation in the room.
Do you remember those questions you were asked?
**A.** Yes.
**Q.** I want to clarify some things because I was confused. Remember when they pulled out your deposition, defense counsel did, and asked you a question concerning your deposition?
**A.** Yes.
**Q.** Was I at your deposition?
**A.** Yes.
**Q.** So, Doctor, just for the jury's understanding: When you -- back in 2011 and prior to that, with Barbara Earnest, when you were having the conversation in the room, you were -- were you advising as to a risk of permanent hair loss with Taxotere?
**A.** No.
**Q.** Back then were you advising -- with every one of these patients, would you talk about temporary hair loss?
**A.** Yes.
**Q.** And would you only bring up the prior 2005 patient if asked about a risk of permanent hair loss by a patient?

JAMES CARINDER - REDIRECT

03:52  1        MS. SASTRE:  It's leading, Your Honor.

03:52  2        THE COURT:  You are leading.  Ask the question.

03:52  3  BY MR. SCHANKER:

03:52  4  Q.   Let me rephrase that.

03:52  5        Would you say anything about your prior patient that

03:53  6  you referenced here for us -- the 2005 patient, would you say

03:53  7  anything about that just out of the box when talking about

03:53  8  temporary hair loss?

03:53  9        MS. SASTRE:  Objection.  It's ambiguous.  It's a

03:53 10  vague and ambiguous question, Your Honor.

03:53 11        THE COURT:  Under what circumstances would you talk

03:53 12  about your prior patient?

03:53 13        THE WITNESS:  If asked about it, yes.

03:53 14  BY MR. SCHANKER:

03:53 15  Q.   I want to make sure the jury understands.  If asked about

03:53 16  what?

03:53 17  A.   Permanent hair loss.

04:58 18  Q.   Just so I'm clear:  So you would advise as to the risk of

03:53 19  temporary hair loss?

03:53 20  A.   Temporary hair loss always.

03:53 21        THE COURT:  That's been asked and answered, yes.

03:53 22        THE WITNESS:  Always.

03:53 23        THE COURT:  Sustained.

03:53 24  BY MR. SCHANKER:

03:53 25  Q.   Under what circumstances would you bring up the prior --

**JAMES CARINDER - REDIRECT**

03:53  1   this one prior patient that you had?

03:53  2          THE COURT:   Sustained.

03:54  3   BY MR. SCHANKER:

03:54  4   **Q.**   So if Barbara Earnest did not ask you about a risk of

03:54  5   permanent hair loss, would you bring up the prior 2005 patient?

03:54  6          THE COURT:   Sustained.   Sustained.   Ask your next

03:54  7   question.

03:54  8   BY MR. SCHANKER:

03:54  9   **Q.**   As you sit here, do you have any memory of Barbara Earnest

03:54  10  on her own bringing up a risk of permanent hair loss in that

03:54  11  conversation?

03:54  12  **A.**   No.

03:54  13  **Q.**   As you sit here today, do you have any memory of Barbara

03:54  14  Earnest -- of you explaining to Barbara Earnest about this one

03:54  15  prior patient that you had?   Do you have any memory of that at

03:54  16  all?

03:54  17         MS. SASTRE:   Objection, Your Honor.

03:54  18         THE WITNESS:   No.

03:54  19         THE COURT:   Sustained.   That's been asked and

03:54  20  answered.

03:54  21         MR. SCHANKER:   Your Honor, not with regard to Barbara

03:54  22  Earnest.   It has not.

03:55  23         THE COURT:   I think it has.

03:55  24  BY MR. SCHANKER:

03:55  25  **Q.**   Doctor, you were asked a lot of questions on

JAMES CARINDER - REDIRECT

03:55  1   cross-examination about neuropathy.  Can neuropathy be treated?

03:55  2   A.   Yes.

03:55  3   Q.   Is the neuropathy that you are talking about that can come

03:55  4   with the use of Taxotere or Taxol, is that temporary?

03:55  5              MS. SASTRE:  Objection.  This was discussed on direct

03:55  6   exam, Your Honor.

03:55  7              MR. SCHANKER:  Your Honor, there were a lot of

03:55  8   detailed questions about neuropathy.  We certainly are not

03:55  9   trying to plow old ground.

03:55 10              THE COURT:  This was covered on direct.  I will allow

03:55 11   one question because there was more information adduced during

03:56 12   cross-examination, but we are not going to plow over what was

03:56 13   part of your direct examination.

03:56 14              MR. SCHANKER:  Absolutely.

03:56 15              THE COURT:  So pick your one carefully.

03:56 16              MR. SCHANKER:  I'll try.

03:56 17   BY MR. SCHANKER:

03:56 18   Q.   Doctor, was the neuropathy that you would discuss with

03:56 19   patients concerning -- that could come from the use of Taxotere

03:56 20   or Taxol, was that temporary in nature?

03:56 21   A.   Yes.

03:56 22   Q.   Doctor, at the time you prescribed Taxotere to Barbara

03:56 23   Earnest, were you aware that Taxotere has a common risk of

03:56 24   permanent hair loss?

03:56 25              MS. SASTRE:  Objection.  This has been asked and

**JAMES CARINDER – REDIRECT**

03:56 1    answered on direct exam.

03:56 2            THE COURT:  I think it has been.

03:56 3            MR. SCHANKER:  Your Honor, would you like me to

03:56 4    approach?

03:56 5            THE COURT:  Yes, please.

03:56 6            (The following proceedings were held at the bench.)

03:57 7            MS. SASTRE:  So this was the most repetitive

03:57 8    question, asked about 25 different ways, candidly, to counsel's

03:57 9    credit.  He walked through it on direct over and over.  This

03:57 10   was the drum he beat about 30 times.  To go back to it now,

03:57 11   it's inappropriate, Your Honor.

03:57 12           MR. SCHANKER:  Your Honor, can I explain?

03:57 13           THE COURT:  You can explain, but let me tell you

03:57 14   something.  This jury has heard that ad nauseam.

03:57 15           MR. SCHANKER:  This is a key difference, Your Honor.

03:57 16   She asked questions as to whether he would have warned of cases

03:57 17   of permanent hair loss being reported.  That's what she asked.

03:57 18   That's much different than the question I asked, which is about

03:58 19   you said he would report that.  It falls naturally to respond

03:58 20   to that whether he would have advised of a common -- and I

03:58 21   never asked him if he would have advised of a common side

03:58 22   effect.  What she has just done is given more anecdotal --

03:58 23           THE COURT:  You said --

03:58 24           MR. SCHANKER:  Common side effect.  Permanent hair

03:58 25   loss a common side effect, that's the question I just asked.

JAMES CARINDER - REDIRECT

03:58  1    That is not one that I asked over and over before.

03:58  2            MS. SASTRE:  He said, whether it was common or not,

03:58  3    it doesn't matter.  He said that if he knew about it, he would

03:58  4    have told her about it.  They asked him that 20 different ways,

03:58  5    Your Honor.

03:58  6            MR. SCHANKER:  I never used the word "common."

03:58  7            MS. SASTRE:  It doesn't matter.

03:58  8            MR. SCHANKER:  You asked about cases of permanent

03:58  9    hair loss.

03:58  10           She redefined it, and I'm allowed to explore

03:58  11   that because it flows naturally from it.  It's different

03:58  12   between cases and a common side effect, and that is a key,

03:58  13   important --

03:58  14           THE COURT:  I will allow it one time.  Mr. Schanker,

03:58  15   y'all are killing this jury with the same thing over and over

03:59  16   and over and over again.  I'm going to allow you to ask whether

03:59  17   it's common because you said if he had read cases of permanent

03:59  18   hair loss have been reported it would have been different.  I

03:59  19   will allow you to ask this one because that's it.

03:59  20           MS. SASTRE:  That's fine.  Hold on, please.  I would

03:59  21   just like to say -- and I understand the Court's ruling.  I

03:59  22   don't want to keep coming up here.  I hope I can sit through

03:59  23   the rest of the exam and not object once.  There is an attempt

03:59  24   here to do another direct.

03:59  25           MR. SCHANKER:  Not at all.

JAMES CARINDER - REDIRECT

03:59  1          **MS. SASTRE:**  Let me finish, please.  On the

03:59  2     guidelines, he read the exact same thing he had him read.  He

03:59  3     reread it and then he asked him the same thing.

03:59  4               It's not a response to the cross.  You are going

03:59  5     literally back to your direct, and I don't want to be up here

03:59  6     every time.

03:59  7          **MR. SCHANKER:**  Your Honor, that's not what happened

03:59  8     on the guidelines.  We hadn't specified that particular box we

03:59  9     have shown on page 3.  We hadn't referred to that.

04:00 10          **THE COURT:**  Page 3 was covered in cross-examination,

04:00 11     but I'm going to allow you to ask the common and then that's

04:00 12     it.  That's it.

04:00 13               Charged to plaintiff.

04:00 14          (End of bench conference.)

04:00 15     BY MR. SCHANKER:

04:00 16     **Q.**   Doctor, if you had been told by Sanofi that a risk of

04:00 17     permanent hair loss was a common side effect of Taxotere, would

04:00 18     you have told Barbara Earnest that?

04:00 19     **A.**   Yes.

04:00 20     **Q.**   Doctor, there was on cross-examination a discussion of the

04:00 21     conversation that goes on in the room.  Is that a two-way

04:00 22     conversation between you and the patient?  Or do you make the

04:01 23     decision on your own?

04:01 24     **A.**   No.  It's a two-way conversation.  Patients and doctors

04:01 25     work as a team during this.  Their input is just as critical as

JAMES CARINDER - REDIRECT

1    mine.

2    **Q.**   Tell us about that.  Explain what you mean by that, if you

3    would.

4    **A.**   This is a big journey for these patients, and they -- it's

5    a team effort.  I'm giving them poisons to try to keep their

6    cancer away.  They have to be informed and compliant.  If

7    there's not effort on both sides, it's not going to work.  You

8    are not going to have a good outcome.

9    **Q.**   Doctor, on cross-examination you were asked about the 1999

10   label and the language "hair generally grows back."  Do you

11   recall that?

12   **A.**   Yes.

13   **Q.**   With regard to that "hair generally grows back" language,

14   did that warn you in 1999 of the risk of permanent hair loss

15   for patients in the adjuvant setting such as Barbara Earnest?

16           **THE COURT:**  Sustained.  That's been covered.

17   **BY MR. SCHANKER:**

18   **Q.**   Doctor, in cross-examination the phrase "all risks are not

19   the same" was used.  Do you recall that?

20   **A.**   Yes.  Vaguely.

21   **Q.**   Is the risk of temporary hair loss different than the risk

22   of permanent hair loss?

23   **A.**   Temporary hair loss is more common.

24   **Q.**   Are those the same thing in your mind:  temporary and

25   permanent hair loss?

JAMES CARINDER - REDIRECT

04:03  1    **A.**   No, they are different.

04:03  2    **Q.**   Doctor, on cross-examination did you use the phrase "there

04:03  3    are no guarantees in medicine"?

04:03  4    **A.**   There are no guarantees in medicine.

04:03  5    **Q.**   And does that in any way influence your decision on what

04:03  6    you warn a patient of because there are no guarantees?

04:03  7    **A.**   I give the patients as much information as they need.

04:03  8    **Q.**   So do you want as much information as you can get from the

04:04  9    pharmaceutical company?

04:04 10    **A.**   Yes.

04:04 11    **Q.**   Do you regularly read dermatology journals?

04:04 12    **A.**   No.

04:04 13    **Q.**   Do you regularly read nursing journals?

04:04 14    **A.**   No.  I read *ASH*, *JCO*, *Blood*, and *New England Journal of*

04:04 15    *Medicine*.  That's pretty much where I glean all my information

04:04 16    from.

04:04 17    **Q.**   Doctor, you were shown Defense Exhibit 47, the Nabholtz

04:04 18    study.  Do you recall that?

04:04 19    **A.**   Yes.

04:04 20    **Q.**   You were asked about it?

04:04 21    **A.**   Yes.

04:04 22    **Q.**   Do you have any recollection at all with regard to this

04:05 23    Nabholtz study that Sanofi ever --

04:05 24             **THE COURT:**  There's some writing on that that needs

04:05 25    to be covered.

JAMES CARINDER - REDIRECT

1    04:05          MR. SCHANKER:  That's why I picked it up, Your Honor,
2    04:05    there.
3    04:05          THE COURT:  Okay.
4    04:05    BY MR. SCHANKER:
5    04:05    Q.   With regard to the Nabholtz study.  You have it in your
6    04:05    hand.
7    04:05    A.   Yes.
8    04:05    Q.   Do you have any information at all that that was ever
9    04:05    provided to you by Sanofi?
10   04:05    A.   I don't think so.
11   04:05    Q.   You were also shown the Sedlacek abstract?  Do you
12   04:05    remember the little, teeny writing?
13   04:05    A.   From San Antonio.
14   04:05    Q.   From San Antonio?
15   04:05    A.   Yes.
16   04:05    Q.   Do you have any information at all that that was ever
17   04:05    provided to you by Sanofi?
18   04:05    A.   No.
19   04:05    Q.   Doctor, you were taken through on cross-examination many
20   04:06    of the serious risks that are associated with the chemotherapy
21   04:06    drugs.  Do you remember that?
22   04:06    A.   Yes.
23   04:06    Q.   Are those risks that you warn of in your practice?
24   04:06    A.   Yes.
25   04:06    Q.   Are those unavoidable risks?

JAMES CARINDER - REDIRECT

1 **A.**   Most of them.

2 **Q.**   With many of the chemotherapy drugs, those are just risks

3 that can then happen?

4          **MS. SASTRE:**  Leading.

5          **THE COURT:**  Sustained.  You are leading.

6 **BY MR. SCHANKER:**

7 **Q.**   Doctor, if Sanofi knew of this risk of permanent hair loss

8 and chose -- and did not warn you, was that an avoidable risk?

9          **MS. SASTRE:**  Objection, Your Honor.

10          **THE COURT:**  Rephrase your question.

11 **BY MR. SCHANKER:**

12 **Q.**   Doctor, did you know -- you did not know about the risk of

13 permanent hair loss, as you have testified, correct?

14          **MS. SASTRE:**  Objection.

15          **THE COURT:**  I think you need to get to the question.

16 **BY MR. SCHANKER:**

17 **Q.**   Doctor, were you aware of a risk of permanent hair loss

18 with the other chemotherapy regimens that you explained to the

19 jury were available to Barbara Earnest if she chose not to take

20 Taxotere?  Were you aware of any permanent risk associated with

21 those?

22 **A.**   No.

23 **Q.**   Doctor, was there anything that you heard in the

24 cross-examination, the questions, the documents that were shown

25 to you that in any way changes the testimony that you offered

JAMES CARINDER - REDIRECT

04:08  1   that Sanofi did not warn you of a risk of permanent hair loss?
04:08  2          MS. SASTRE:  Objection.
04:08  3          THE COURT:  Sustained.
04:08  4   BY MR. SCHANKER:
04:08  5   Q.   Have you changed your opinions on what you were warned of
04:08  6   at all based on the information you have heard?
04:08  7          MS. SASTRE:  Objection.
04:08  8          THE COURT:  Sustained.  Sustained.
04:08  9          MR. SCHANKER:  No further questions, Your Honor.
04:08 10          THE COURT:  Thank you.  You may step down
04:08 11   Dr. Carinder.
04:08 12                Please call your next witness.
04:08 13          MR. COFFIN:  Your Honor, the plaintiffs call by video
04:08 14   Lesley Fierro, a Sanofi employee.
04:08 15          THE COURT:  Members of the jury, as I instructed you
04:08 16   last week, this testimony was taken at an earlier date, and you
04:08 17   should view this testimony as you would any other witness.
04:09 18          MR. COFFIN:  It's approximately 39 minutes,
04:09 19   Your Honor.
04:09 20          THE COURT:  Please proceed.
04:09 21          (Technical difficulties.)
04:09 22          THE COURT:  We are going to have to stop this.
04:10 23          MR. COFFIN:  If I could just consult with our
04:10 24   technical person.
04:10 25                We may have to put another witness on, a

LESLEY FIERRO - EXAMINATION

1    different witness on.  We just need a minute to consult with

2    him because I'm not technologically savvy.

3              MR. COFFIN:  Your Honor, our technical person just

4    needs a couple minutes.  If we could take a quick break.

5              THE COURT:  The Court will be at recess for 5 or

6    10 minutes or until this is worked out.

7              THE DEPUTY CLERK:  All rise.

8              (The jury exited the courtroom.)

9              THE COURT:  Does this one have the testimony

10   underneath?

11             MR. WOOL:  No.

12             (Recess.)

13             THE DEPUTY CLERK:  All rise.

14             THE COURT:  All jurors are present.  Court is back in

15   session.  You may be seated.

16             MR. COFFIN:  Thank you, Your Honor, for that quick

17   break.  We worked out the technical issues.

18                  We will now call Ms. Lesley Fierro, a Sanofi

19   employee.  Approximately 39 minutes.

20             THE COURT:  Thank you.  Please proceed.

21                       LESLEY FIERRO,

22   having been duly sworn, testified by deposition as follows:

23                        EXAMINATION

24   Q.   Good morning, Ms. Fierro.

25   A.   Good morning.

LESLEY FIERRO - EXAMINATION

1   **Q.**   Do you have an understanding what this litigation is
2   about?
3   **A.**   I do, as discussed in the last few days, as being prepared
4   for this.
5   **Q.**   What's your understanding of the case?
6   **A.**   It's a case about Taxotere and alopecia.
7   **Q.**   Is it just about alopecia, or is it about permanent
8   alopecia, to your understanding?
9   **A.**   To me it's about all aspects of alopecia, including
10  permanent alopecia.
11  **Q.**   The CV that was provided to us right before the deposition
12  started, is this a CV that you prepared?
13  **A.**   Yes.
14  **Q.**   It indicates on here that you have a Pharm.D. that you
15  obtained from the University of Illinois in 1992, correct?
16  **A.**   Correct.
17  **Q.**   And that's a doctoral degree in pharmacy?
18  **A.**   Yes.
19  **Q.**   So in layman's terms, people call you a pharmacist.
20  **A.**   Yes.
21  **Q.**   But just to be clear, you are not a medical doctor; is
22  that right?
23  **A.**   That is correct.
24  **Q.**   If we looked at work experience, it appears that you
25  worked for about 14 years at Sanofi or one of its predecessor

LESLEY FIERRO - EXAMINATION

04:20  1   companies; is that correct?

04:20  2   A.   Correct.

04:20  3   Q.   And the title you had during that time is associate

04:20  4   vice president, medical information services, drug safety; is

04:20  5   that right?

04:20  6   A.   That was the title I had when I completed my service at

04:20  7   Sanofi.

04:20  8   Q.   Did your job change over time or did just your title

04:20  9   change over time?

04:20 10   A.   My title changed over time.

04:20 11   Q.   But during this 14 years, you had the same basic job

04:20 12   duties; does that help?  Is that a correct understanding?

04:20 13   A.   Correct.

04:20 14   Q.   And it says here that your responsibilities included

04:20 15   strategy and direction for the department and associates that

04:20 16   make up medical information services.

04:21 17   A.   Correct.

04:21 18   Q.   And were you the head of medical information services?

04:21 19   A.   Yes.

04:21 20   Q.   All right.  And just for the jury's sake, what is "medical

04:21 21   information services" as a department at Sanofi?

04:21 22   A.   It's the department within the company that's responsible

04:21 23   to handle unsolicited questions from health care professionals

04:21 24   and consumers about the products.

04:21 25   Q.   And what are unsolicited questions?

**LESLEY FIERRO - EXAMINATION**

04:21 1  **A.**   It means that we did not go out and ask people to ask us

04:21 2  questions, but they had to contact us on their own.

04:21 3  **Q.**   And does medical information services have, as a part of

04:21 4  it, a call center?

04:21 5  **A.**   Yes.

04:21 6  **Q.**   And so you were head of a call center, then?

04:21 7  **A.**   Correct.

04:21 8  **Q.**   And when people would call where there would be

04:21 9  unsolicited inquiries, sometimes there would be adverse events

04:21 10 that would be reported to the call center; is that correct?

04:21 11 **A.**   Correct.

04:21 12 **Q.**   I will hand you what I will mark as Exhibit 3, which is an

04:22 13 article I found that you were quoted in from *Pharmaceutical*

04:22 14 *Executive* in 2005.

04:22 15        Do you remember this?

04:22 16 **A.**   Not specifically.

04:22 17 **Q.**   Are you familiar with *Pharmaceutical Executive*?

04:22 18 **A.**   Yes.

04:22 19 **Q.**   Is it a magazine or just a website?

04:22 20 **A.**   No, it was a periodical journal that was circulated.

04:22 21 **Q.**   Okay.  And I'm not going to go through the whole article;

04:22 22 I just wanted to use this because of the sidebar on the front

04:22 23 page, where it says "Understanding Call Center Functions."

04:22 24        Do you see that?

04:22 25 **A.**   The sidebar on the front page?

LESLEY FIERRO - EXAMINATION

1    Q.    On the top left, there's a title that says "Understanding
2    Call Center Functions."
3    A.    Yes.
4    Q.    And your 14 years at Sanofi, the call center reported to
5    you, correct?
6    A.    Correct.
7    Q.    Okay.  And here it says:  "Call centers perform the
8    following functions:  Disseminate information."
9          Do you see that?
10   A.    Yes.
11   Q.    Do you agree that one of the functions of a call center is
12   to disseminate information?
13   A.    Yeah.  Under the direction of the medical information
14   department.
15   Q.    And then under "Disseminate Information," the article
16   says:  "To ensure public safety, the information that can be
17   distributed by pharmaceutical call centers is regulated by the
18   FDA"; is that correct?
19   A.    This is their statement.  I certainly didn't make that
20   statement, but, I mean, in general, yes, call centers adhere to
21   any guidelines that are through the FDA, yes.
22   Q.    And then it says:  "Specifically, FDA mandates that only
23   information that has been approved for product labeling can be
24   freely shared by call center employees with the general public
25   and the health care community."

04:23   1          Do you agree with that statement?

04:23   2   A.   I agree with it to a certain extent.

04:24   3   Q.   And how do you disagree with it?

04:24   4   A.   In general, the best information to be shared with

04:24   5   consumers is the labeling.  However, there are times when

04:24   6   consumers ask for information beyond the labeling, and if it

04:24   7   can be shared, you know, we would make every effort to try to

04:24   8   share information with them.

04:24   9   Q.   And the information you are talking about, you are talking

04:24  10   about information that's consistent with the labeling, correct?

04:24  11   A.   Correct.

04:24  12   Q.   And then the last sentence of that section says:  "Call

04:24  13   centers must also adhere to FDA guidelines for disseminating

04:24  14   other types of information, such as supporting studies."

04:24  15          Do you agree with that statement?

04:25  16   A.   Yes.

04:25  17   Q.   And so this section really talks about -- and it has a

04:25  18   perfect heading -- disseminating information, so giving

04:25  19   information to health care providers and patients, correct?

04:25  20   A.   Correct.

04:25  21   Q.   If we turn to the second page, to the section I pointed to

04:25  22   you where you were quoted, it appears, from what you said to

04:25  23   this journal publication, that you were in charge of setting up

04:25  24   the systems in the Sanofi call center for collecting

04:25  25   information.

LESLEY FIERRO - EXAMINATION

04:25 1          Do you recall that as part of your job duties?

04:25 2  **A.**   I was responsible to build and maintain a system within

04:25 3  medical information for handling inquiries, as well as putting

04:25 4  together the documents that were necessary to answer the

04:25 5  questions.  It was not just the call center; it's the entire

04:25 6  medical information --

04:26 7  **Q.**   Okay.

04:26 8  **A.**   -- function.

04:26 9  **Q.**   Did medical information services ever proactively send out

04:26 10 information to consumers or doctors about any drug that Sanofi

04:26 11 sold?

04:26 12 **A.**   Not that I'm aware of.

04:26 13 **Q.**   So the communications that you are sending out, then, are

04:26 14 going to be reactive communications to somebody originally

04:26 15 asking medical information services a question, correct?

04:26 16 **A.**   That's correct.

04:26 17 **Q.**   How would a call center employee know what to send a

04:26 18 doctor if a doctor called and asked about Taxotere and hair

04:26 19 loss?

04:26 20 **A.**   If there was a standard document on that topic, the call

04:26 21 center would use that letter to respond -- health care

04:26 22 professional or consumer.

04:26 23          If there was no standard letter or there was nothing

04:26 24 contained in any of the standard letters, then they would

04:26 25 escalate the inquiry to the therapeutic area that handled the

LESLEY FIERRO - EXAMINATION

04:27 1    product.  They would then initiate -- they would talk to the
04:27 2    physician to see what they want.  And then they would initiate,
04:27 3    if appropriate, a literature search, which is then sent to the
04:27 4    physician, and it's attached to a templated standard cover
04:27 5    letter.
04:27 6    Q.    Let me ask you this:  As a pharmacist, do you understand
04:27 7    today that Taxotere can cause permanent hair loss?
04:27 8    A.    Correct, yes.
04:27 9    Q.    When did you learn that?
04:27 10   A.    I can't tell you specifically when I learned it.  I mean,
04:27 11   I certainly learned in pharmacy school that chemotherapeutic
04:27 12   agents can cause hair loss.
04:27 13   Q.    I didn't ask about hair loss; I asked about permanent hair
04:27 14   loss.
04:27 15   A.    I don't know that I ever learned about permanent hair loss
04:27 16   specifically.  And, really, until a caller came in and asked us
04:28 17   details around hair loss is really the first time that I
04:28 18   thought about, you know, what is -- you know, what are they
04:28 19   really asking about, what does it mean for the hair loss.
04:28 20   Q.    When you were working at Sanofi, you then, I assume, had
04:28 21   read the Taxotere label.
04:28 22   A.    So I was responsible for every product, every therapeutic
04:28 23   area.  Did I read all of the package inserts regularly?  No.
04:28 24         You know, the way the department was organized, there
04:28 25   was an oncology therapeutic area that was responsible to

**LESLEY FIERRO - EXAMINATION**

04:28  1    understand and know everything about those drugs.

04:28  2    **Q.**   Do you have an understanding as to whether Sanofi knew in

04:28  3    1996 that Taxotere could cause permanent hair loss?

04:28  4    **A.**   I didn't come to Sanofi until 2000.

04:28  5    **Q.**   Okay.  When you joined Sanofi in 2000 --

04:28  6    **A.**   Uh-huh.

04:28  7    **Q.**   -- was it your understanding then that Taxotere could

04:28  8    cause permanent hair loss?

04:28  9    **A.**   No.

04:28 10    **Q.**   And did you read the label when you joined Sanofi and

04:29 11    started working in medical information services, overseeing

04:29 12    information being given out about Taxotere?

04:29 13    **A.**   I did.

04:29 14    **Q.**   After reading that label, you didn't have an understanding

04:29 15    that Taxotere could cause permanent hair loss in 2002, correct?

04:29 16    **A.**   No.

04:29 17    **Q.**   Let me hand you what I've marked as Exhibit 8.  And I

04:29 18    don't have printed with me the label that was being used when

04:29 19    you joined Sanofi in 2002, but I do have the original label.

04:29 20    **A.**   From 1996?

04:29 21    **Q.**   From 1996.

04:29 22          And if you see down at the bottom, it says

04:29 23    Sanofi_000001.  This was the first page of the first document

04:29 24    that Sanofi produced to us in this litigation.

04:29 25    **A.**   Okay.

LESLEY FIERRO - EXAMINATION

Q.   And if you look at this, at the top -- it's a little hard
to read.  This is a black box, but it says "Patient Information
Leaflet."

          Do you see that?

A.   Yes.

Q.   All right.  And is the patient information leaflet part of
the label?

A.   I -- no, at least in 1996 -- I'm going to go back.  I
don't know for sure --

Q.   All right.

A.   -- if it was part of the label.

Q.   Would this have been part of what was used to update the
patient information form response -- standard response letter,
the patient information leaflet?

A.   Certainly if it was part of the package insert, it would
have.

Q.   Well, let's look at page 2.  So the front of this is the
patient information leaflet, and that's what I'm going to ask
you about.

          So if you look at page 2, there's a gray bar in the
middle of the page, and written over that it says:  "What are
the possible side effects of Taxotere?"

          Do you see that?

A.   Yes.

Q.   All right.  And if you turn to the next page, there is a

**LESLEY FIERRO - EXAMINATION**

1    section on hair loss.

2    **A.**    Uh-huh.

3    **Q.**    And it says:  "Loss of hair occurs in most patients taking

4    Taxotere."

5            Do you see that?

6    **A.**    Yes.

7    **Q.**    All right.  "Hair loss will begin after the first few

8    treatments and varies from patient to patient."

9            Do you see that?

10   **A.**    Yes.

11   **Q.**    And it says:  "Once you have completed all your

12   treatments, hair generally grows back."

13   **A.**    Correct.

14   **Q.**    And that's in the original label, correct?

15   **A.**    Yes.

16   **Q.**    And when you read the then-current version of this label

17   in 2000 -- when you joined Sanofi -- you did not read the label

18   to have information on permanent hair loss or a warning that

19   Taxotere could cause permanent hair loss.

20   **A.**    There's nothing in here about permanent hair loss.  I

21   would not have been reading something about permanent hair

22   loss.

23            This is information for patients.  If I was reading

24   the package insert to familiarize myself with Taxotere, I would

25   have read the professional package insert.

LESLEY FIERRO - EXAMINATION

04:32 1    **Q.**   Okay.  Well, let's look at the -- this might be a little
04:32 2    more difficult on this copy, but to your understanding, was
04:32 3    there anything about permanent alopecia in the label in 2000 --
04:32 4    when you joined Sanofi -- this copy of the original label
04:32 5    that's difficult to read?
04:32 6    **A.**   No.
04:32 7    **Q.**   Now I'm going to hand you what I will mark as Exhibit 12.
04:32 8    So Sanofi's lawyers have told us that this is an export from
04:32 9    Siebel as it relates to Taxotere and alopecia.
04:32 10           And Siebel is the call center database in which the
04:33 11   customer service or call center representatives would enter
04:33 12   information about calls they received, correct?
04:33 13   **A.**   Correct.
04:33 14   **Q.**   I believe it's your testimony that at this time there was
04:33 15   nothing in the U.S. label about permanent alopecia, correct?
04:33 16   **A.**   The labeling spoke to alopecia.  It didn't qualify --
04:33 17   well, alopecia can be -- it's a general term for hair loss.  It
04:33 18   doesn't discount it being permanent or temporary.  So they
04:33 19   would have told her that -- exactly what it says here, that
04:33 20   alopecia can occur.
04:33 21   **Q.**   Just to make clear, you're agreeing with me that there's
04:33 22   no specific information in the label about permanent hair loss,
04:33 23   because if there were, it would have been in this form letter.
04:33 24   **A.**   Correct.  When someone is asking about hair loss and says,
04:33 25   "Is this" -- "could this be permanent," alopecia means hair

LESLEY FIERRO - EXAMINATION

1    loss.  It doesn't qualify whether it can be permanent,

2    temporary, or -- and there's no guarantee specified that it's

3    going to come back.

4            I think that's the kind of information that would

5    have been discussed.  We don't have specific information to

6    relate to you from trials that's in the labeling that we know

7    of about the time frame specifically and if the hair will come

8    back and when it will come back.

9    Q.    Have you ever heard of the reference book *U.S.*

10   *Pharmacopeia*?

11   A.    Yes, USP.

12   Q.    And what is that?

13   A.    It's a compendium -- it's a resource that lists drugs and,

14   typically, testing that needs to be done to assure that the

15   drug is compliant with government standards.

16   Q.    And is it generally a well-respected publication?

17   A.    Yes.

18   Q.    I'm going to hand you what I will mark -- and is this

19   something that you would refer to as a pharmacist if you needed

20   to?

21   A.    As a pharmacist in general?  Sometimes.

22   Q.    So you have referred to USP, as you called it, before?

23   A.    Correct.

24   Q.    All right.  I'll mark that as Exhibit 24.

25            And this is how it was produced to us.

LESLEY FIERRO - EXAMINATION

04:35  1   **A.**   It says 23.

04:35  2   **Q.**   Oh, 23.  I'm sorry.  Thank you.

04:35  3            This is how it was produced to us.  There's a page on

04:35  4   the front that says "Product Information."

04:35  5            Do you see that?

04:35  6   **A.**   Yes.

04:35  7   **Q.**   And it says:  "Taxotere Package Insert, Aventis

04:35  8   Pharmaceuticals, 2000."

04:35  9            Do you see that?

04:35 10   **A.**   Yes.

04:35 11   **Q.**   And then under it, it says "*U.S. Pharmacopeia*, Docetaxel,"

04:36 12   and then it lists August 16, 2000.

04:36 13            Do you see that?

04:36 14   **A.**   Correct.

04:36 15   **Q.**   And if you look behind that page, it has the label --

04:36 16   that's when you started at Sanofi, 2000, correct?

04:36 17   **A.**   Correct.

04:36 18   **Q.**   It ends in 2176 on the bottom right.  It's the first page

04:36 19   of the USP.

04:36 20   **A.**   Okay.  I'm going to correct one -- something that you

04:36 21   said.

04:36 22            This is not what I would call USP.  This is USP-DI,

04:36 23   which are two different things.

04:36 24   **Q.**   And what is "USP-DI"?

04:36 25   **A.**   It's put out by the people that do the USP, but it's meant

LESLEY FIERRO - EXAMINATION

04:36   1  to be -- it's meant to take a package insert and put it into
04:36   2  lay language for consumers.
04:36   3  **Q.**   Okay.  So maybe that's why we have -- we don't know who
04:36   4  created this or why, but maybe that's why we have a cover sheet
04:36   5  that has the package insert and then the USP-DI.
04:36   6  **A.**   They are two separate --
04:36   7  **Q.**   So they're taking -- just to make sure, because I had
04:37   8  never heard of USP-DI before, but -- so your understanding as a
04:37   9  pharmacist is that USP-DI translates the label into lay
04:37  10  language.
04:37  11  **A.**   Correct.
04:37  12  **Q.**   Okay.  So let's look at what USP-DI says about docetaxel.
04:37  13          Do you see that in the page that ends 2167?
04:37  14  **A.**   Uh-huh.
04:37  15  **Q.**   Now, if you turn to the page that ends 2170 -- actually,
04:37  16  2169.  Do you see 2169?
04:37  17  **A.**   Yes.
04:37  18  **Q.**   In the top right column, there's a heading that says
04:37  19  "Side/Adverse Events."
04:37  20          Do you see that?
04:37  21  **A.**   Yes.
04:37  22  **Q.**   And if you turn to the next page, in the left-hand column
04:37  23  there's one entry right before with the heading "Overdose."
04:37  24          Do you see that?
04:37  25  **A.**   Yes.

LESLEY FIERRO - EXAMINATION

04:37  1   **Q.**   And there's a heading that says:  "Those not indicating
04:37  2   need for medical attention."
04:38  3   **A.**   Uh-huh.
04:38  4   **Q.**   And from your reading of this reference, those would be
04:38  5   referencing side effects or adverse events, correct?
04:38  6   **A.**   Correct.
04:38  7   **Q.**   Okay.  And it says:  "Incidence more frequent," correct?
04:38  8   **A.**   Correct.
04:38  9   **Q.**   And it says:  "Alopecia (loss of hair)."
04:38 10           Do you see that?
04:38 11   **A.**   Yes.
04:38 12   **Q.**   And then there's a dash, and what does it say after that
04:38 13   dash?
04:38 14   **A.**   "Occurs in 80 percent of patients, but is fully reversible
04:38 15   after therapy has ended."
04:38 16   **Q.**   So in 2000 -- the year you started at Sanofi -- USP-DI has
04:38 17   taken the Taxotere label, which is what you say they do, and
04:38 18   translated it for lay people, correct?
04:38 19   **A.**   Okay.  I'm going to -- so I'm going to come back and --
04:38 20   I'm going to step back one more time.
04:38 21           USP-DI had several publications, one of which was to
04:38 22   put information into lay language.  Another one was for health
04:39 23   care -- for pharmacists mainly --
04:39 24   **Q.**   Okay.
04:39 25   **A.**   -- which is what this is.

LESLEY FIERRO - EXAMINATION

04:39  1    **Q.**    Oh, so this one is for pharmacists?

04:39  2    **A.**    Right.

04:39  3    **Q.**    And this one says that hair loss occurs in 80 percent of

04:39  4    patients but is fully reversible after therapy has ended,

04:39  5    correct?

04:39  6    **A.**    That's what it says.

04:39  7    **Q.**    And that's their interpretation, USP-DI, of the U.S.

04:39  8    label, correct, in effect at the time.

04:39  9    **A.**    I can't speak for what it is.  I mean, it's not my

04:39 10    publication -- our publication.  It's not fed by Sanofi.

04:39 11    **Q.**    No, but you're -- but you're a pharmacist, correct?

04:39 12    **A.**    Yes.

04:39 13    **Q.**    And you know that -- you testified that USP, U.S.

04:39 14    Pharmacopeia, puts out a publication both for consumers and for

04:39 15    pharmacists, correct?

04:39 16    **A.**    Correct.

04:39 17    **Q.**    And this publication that they put out from August 16,

04:39 18    2000 -- do you see that on the front page?

04:39 19    **A.**    Uh-huh.

04:39 20    **Q.**    -- says that alopecia or loss of hair is fully reversible

04:39 21    after therapy has ended, correct?

04:39 22    **A.**    Yes, I see that's what it says.

04:40 23    **Q.**    And you had testified earlier that they are a

04:40 24    well-respected company and a reference that you have looked at

04:40 25    before in your career as a pharmacist, correct?

LESLEY FIERRO - EXAMINATION

04:40  1    **A.**    One of the go-to references.

04:40  2    **Q.**    Do you view the Sedlacek information as being inconsistent

04:40  3    with the labeling?

04:40  4    **A.**    Not necessarily.  I don't.  I mean, I -- it certainly adds

04:40  5    to the information that's known.  But I don't think the

04:40  6    labeling is inconsistent.  The labeling doesn't say it's

04:40  7    permanent or it's not permanent.  It just says there's hair

04:40  8    loss that can occur.

04:40  9    **Q.**    And you said alopecia, in your mind, makes no guarantee,

04:40  10   when you warn of that as an adverse event, it could be

04:40  11   temporary, it could be permanent, correct?

04:40  12   **A.**    Correct.

04:40  13   **Q.**    And we've been talking a lot about literature searches.

04:40  14           Are literature searches an important part of medical

04:40  15   information services' communicating information to medical

04:40  16   providers?

04:41  17   **A.**    Generally, yes.

04:41  18   **Q.**    And if there were an issue that arose in medical

04:41  19   information services and a doctor were asking for information,

04:41  20   would you ever see a need to not perform a literature search?

04:41  21   **A.**    We only would -- we would not perform a literature search

04:41  22   if we already had a standard document that was referenced.

04:41  23   **Q.**    Okay.  So if a doctor called in and reported an adverse

04:41  24   event and said, "I want more information on this," it would be

04:41  25   proper to do a literature search to provide that medical

**LESLEY FIERRO - EXAMINATION**

1   professional additional information that's out there, correct?

2   **A.**   Correct.

3   **Q.**   Here's a physician calling in, in January of 2007.   So

4   "Refer to inquiry number," and has a number.   It says:   "What

5   M.D. wants is poster discussing seven cases of hair loss

6   associated with the administration of Taxotere that did not

7   grow back post treatment.   Poster was presented at San Antonio

8   Breast Cancer Symposium 2006."

9            Do you see that?

10   **A.**   Yes.

11   **Q.**   So that appears that he's asking for a copy of Sedlacek.

12   **A.**   Yes.

13   **Q.**   In the month after Sedlacek was presented, right?

14   **A.**   Correct.

15   **Q.**   And you all had it by that point because it appears you

16   sent it to him, correct?

17   **A.**   That's what it looks like.

18   **Q.**   Okay.   Good afternoon, Ms. Fierro.   I appreciate you

19   hanging in.   I know it's been a long day.   I do have a few

20   questions for you, but I will try to move as efficiently as

21   possible.

22            Is that -- do you understand?

23   **A.**   Yes.

24   **Q.**   Okay.   Before we start, why don't you tell the jury a

25   little bit about yourself.   And specifically, can you talk

**LESLEY FIERRO - EXAMINATION**

1    about your education.  Can you please discuss your education.
2    **A.**   Yes.  So I'm a pharmacist by education.  I got my
3    undergraduate degree at Rutgers College of Pharmacy.  I have a
4    master's degree from Arnold and Marie Schwartz College of
5    Pharmacy in New York, and I have a doctor of pharmacy degree
6    from the University of Illinois in Chicago.
7    **Q.**   Why did you go to pharmacy school?
8    **A.**   My father was a pharmacist, so I grew up in a pharmacy
9    family, and I basically went into pharmacy to help patients.
10   **Q.**   And after graduation from pharmacy school, what was your
11   first job?
12   **A.**   So initially after pharmacy school I was a hospital
13   pharmacist.  I worked in three different hospitals.  At the
14   time there was an overabundance of pharmacists, so it was hard
15   to get a full-time job, so I worked in three hospital
16   pharmacies.
17   **Q.**   Did you like working in hospital pharmacies?
18   **A.**   Yes, very much so.
19   **Q.**   Why?
20   **A.**   I got to work with other pharmacists and other health care
21   professionals, work closely with physicians and nurses; and I
22   had patient contact and patient interaction.
23   **Q.**   Did you enjoy patient interaction?
24   **A.**   I did.
25   **Q.**   After you left the hospitals, what was your next job?

LESLEY FIERRO - EXAMINATION

04:44  1   **A.**   So after working part-time jobs, I did obtain a full-time

04:44  2   job in a hospital.  And after working there for a few years, I

04:44  3   decided I wanted a broader experience and exposure, and I went

04:44  4   to work at a pharmaceutical company in the regulatory area.

04:44  5   **Q.**   What pharmaceutical company would that be?

04:44  6   **A.**   Parke-Davis, which was a division of Warner-Lambert.

04:44  7   **Q.**   Okay.  And at Parke-Davis what were your responsibilities?

04:44  8   **A.**   Initially, I was in the regulatory department, so I was

04:44  9   responsible to work on all aspects of the products that I was

04:45 10   assigned to.  So I did labeling submission and other

04:45 11   submissions.  I worked on advertising pieces.  You know, all

04:45 12   regulatory functions.

04:45 13   **Q.**   And was that the only responsibility -- or only job

04:45 14   position you had at Parke-Davis?

04:45 15   **A.**   No.  So after being in the regulatory area for about six

04:45 16   years, that department moved out of New Jersey, where we were

04:45 17   located.  And rather than relocate, I moved over into the

04:45 18   medical area, which was called the drug information department.

04:45 19   **Q.**   And what were your responsibilities in the medical

04:45 20   information department?

04:45 21   **A.**   Initially, I was a medical information specialist.  So I

04:45 22   handled inquiries on specific products and sort of growing the

04:46 23   department of medical information, which was a new function at

04:46 24   the time.

04:46 25   **Q.**   Did you enjoy that position?

LESLEY FIERRO - EXAMINATION

**A.**   I did.  I stayed and worked my way up in the area of drug

information.  I was there for -- I was there at Parke-Davis for

a total of 18 years.

**Q.**   Okay.  How many years were you working in medical

information while you were at Parke-Davis?

**A.**   12.

**Q.**   And why is medical information services important to you?

**A.**   Well, it's the area within the company where, you know, I

feel you can use your pharmaceutical -- your pharmacist

training as much as possible, because you work on questions and

inquiries about products from basically anyone.  And any

question can be asked, so you really get to use the breadth of

your educational knowledge.

**Q.**   And what was your mission at Parke-Davis while you were in

medical information services?

**A.**   So the mission of medical information -- back then in the

'80s, '90s, and today, the mission of medical information is to

provide unbiased, accurate, up-to-date information in response

to an unsolicited question.

**Q.**   Do you believe you achieved that mission at Parke-Davis?

**A.**   I do.

**Q.**   After Parke-Davis, what company did you work for?

**A.**   So in 2000, I went to work for Aventis, which was a newly

formed company made up from a merger of, basically, six

companies.

1654

LESLEY FIERRO - EXAMINATION

04:48  1   **Q.**   And what was your responsibilities at Aventis?

04:48  2   **A.**   So I was the head of medical information, which, because

04:48  3   it was a newly formed company, meant that I was responsible for

04:48  4   all aspects of medical information for all therapeutic areas.

04:48  5   I hired everyone that worked on the team, developed the systems

04:48  6   that we used, and put everything in place to make sure that the

04:48  7   department ran smoothly.

04:48  8   **Q.**   Just for the jury's education, what is Aventis called

04:48  9   today?

04:48  10  **A.**   So in 2000 it was Aventis.  In 2005 they merged with

04:48  11  Sanofi, and for a time it was Sanofi Aventis; and now I believe

04:48  12  the company is just Sanofi.

04:49  13  **Q.**   Earlier, when you told me the mission of medical

04:49  14  information services at Parke-Davis, was it the same mission at

04:49  15  Sanofi?

04:49  16  **A.**   Yes.

04:49  17  **Q.**   What was that?

04:49  18  **A.**   To provide accurate and up-to-date information in

04:49  19  request -- for an unsolicited request for information.

04:49  20  **Q.**   Do you believe you achieved that goal while working at

04:49  21  Sanofi?

04:49  22  **A.**   Yes.

04:49  23  **Q.**   I would like to discuss some of your responsibilities at

04:49  24  Sanofi.  Initially at Sanofi, were you in charge of product

04:49  25  labeling?

LESLEY FIERRO - EXAMINATION

04:49  1   **A.**   No, I was not.

04:49  2   **Q.**   Were you in charge of overseeing product labeling for

04:49  3   Taxotere?

04:49  4   **A.**   No, I was not.

04:49  5   **Q.**   Were you in charge of regulatory interactions with FDA?

04:49  6   **A.**   No.

04:49  7   **Q.**   Were you responsible for any regulatory interactions at

04:50  8   Sanofi?

04:50  9   **A.**   No.

04:50 10   **Q.**   Did you oversee the conduct of clinical trials?

04:50 11   **A.**   No.

04:50 12   **Q.**   Were you -- did you ever develop clinical trials at

04:50 13   Sanofi?

04:50 14   **A.**   No.

04:50 15   **Q.**   What is the extent of your knowledge regarding the

04:50 16   clinical trials that were performed to support the Taxotere

04:50 17   application?

04:50 18   **A.**   You know, if there was publications that were put together

04:50 19   and published as part of the pivotal trials, we would use that

04:50 20   information in our standard response letters.

04:50 21   **Q.**   Sitting here today, do you know whether Sanofi collected

04:50 22   data from its clinical trials on long-term alopecia?

04:51 23   **A.**   I do not know.

04:51 24   **Q.**   I believe he asked you specifically about the sentence

04:51 25   that says:  "Once you stop Taxotere treatment, hair generally

LESLEY FIERRO - EXAMINATION

04:51  1    grows back."  Does that sound right?

04:51  2    **A.**   Yes.

04:51  3    **Q.**   What does that mean to you?

04:51  4    **A.**   It means to me that if there's loss of hair, it usually

04:51  5    will come back.  It will usually grow back.

04:51  6    **Q.**   Do you understand that to mean that it may not always grow

04:51  7    back?

04:51  8    **A.**   Yes.

04:51  9    **Q.**   Is that statement -- is the statement "hair generally

04:51 10    grows back" consistent with your understanding of alopecia?

04:51 11    **A.**   The term "alopecia" to me means that there is hair loss.

04:51 12    It's not -- it does not in any way guarantee that it will not

04:52 13    grow back.  It doesn't really tell you whether it will grow

04:52 14    back or it won't grow back.

04:52 15    **Q.**   Does alopecia to you exclude temporary alopecia?

04:52 16    **A.**   No.

04:52 17    **Q.**   Does it exclude permanent alopecia?

04:52 18    **A.**   No.

04:52 19    **Q.**   Let me ask you one more question regarding "hair generally

04:52 20    grows back."  Is that a guarantee that hair will grow back?

04:52 21    **A.**   No.

04:52 22    **Q.**   I would like to move to Exhibit 8.

04:52 23    **A.**   Okay.

04:52 24    **Q.**   Do you recall seeing this document?

04:52 25    **A.**   Yes.

LESLEY FIERRO - EXAMINATION

04:52  1    Q.   Do you know what this document is in?

04:53  2    A.   It's patient labeling for using Taxotere, and then it has

04:53  3    the professional package insert at the end.

04:53  4    Q.   If you go to page Sanofi 0003 --

04:53  5    A.   Yes.

04:53  6    Q.   -- do you see the statement there with respect to hair

04:53  7    loss?

04:53  8    A.   Yes.

04:53  9    Q.   Is this statement consistent with the statement in

04:53  10   Exhibit 7?

04:53  11   A.   Yes, it's consistent.

04:53  12   Q.   To you, does it accurately reflect what is known about

04:53  13   alopecia?

04:53  14   A.   Yes.

04:53  15   Q.   I believe you said you reviewed the product labeling in

04:53  16   2000 when you joined the company.  Is that correct?

04:54  17   A.   I would have reviewed labeling for all the products, yes.

04:54  18   Q.   At various times today plaintiff's counsel discussed the

04:54  19   product labeling.  Aside from reviewing the labeling when you

04:54  20   first joined Sanofi, do you have any specific recollection of

04:54  21   reviewing the product labeling?

04:54  22   A.   I do not.

04:54  23   Q.   Who in your department would be responsible for reviewing

04:54  24   the product labeling and using that information for medical

04:54  25   information inquiries?

LESLEY FIERRO - EXAMINATION

04:54  1   **A.**   The therapeutic area would be responsible to have read and
04:54  2   understood the professional labeling and to use it in authoring
04:54  3   the standard documents.  The call center that handled the
04:55  4   questions would also need to know the labeling very well.
04:55  5   **Q.**   If you go to Document 10.
04:55  6   **A.**   Yes.
04:55  7   **Q.**   You were asked questions about Exhibit 10, correct?
04:55  8   **A.**   Correct.
04:55  9   **Q.**   Is this a document that you have seen prior to today?
04:55  10  **A.**   No.
04:55  11  **Q.**   Do you have any specific recollection of receiving this
04:55  12  document?
04:55  13  **A.**   I do not.
04:55  14  **Q.**   Based on the face of this document, was this document ever
04:55  15  sent to you?
04:55  16  **A.**   I do not know if this document -- from what I see here, it
04:55  17  does not appear that it was sent to me.
04:55  18  **Q.**   Turn to Document 23.
04:55  19  **A.**   Okay.
04:55  20  **Q.**   I believe this document -- can you even tell me what this
04:56  21  document is?
04:56  22  **A.**   This is a copy of the professional labeling from 2000,
04:56  23  along with the consumer labeling also.
04:56  24  **Q.**   One section of this document is entitled "USP-DI."  What
04:56  25  is that?

**LESLEY FIERRO - EXAMINATION**

04:56  1   **A.**    That's information for patients that's prepared in more
04:56  2   consumer-friendly language.
04:56  3   **Q.**    Is that a document that Sanofi would draft?
04:56  4   **A.**    No.
04:56  5   **Q.**    Do you know whether Taxotere alone can cause permanent
04:56  6   alopecia?
04:56  7   **A.**    I do not.
04:56  8   **Q.**    At Sanofi, who would you rely on to make that
04:57  9   determination?
04:57 10   **A.**    We would rely on what is in the labeling to respond to
04:57 11   questions.  If that was a question that was not in the labeling
04:57 12   and was asked, we would talk to folks in the medical area or
04:57 13   the clinical area or potentially the pharmacovigilance area.
04:57 14   **Q.**    It was not a part of MIS's responsibility to make that
04:57 15   determination.  Have you ever assessed the medical literature
04:57 16   to determine whether a causal association exists between
04:57 17   Taxotere and permanent alopecia?
04:57 18   **A.**    No.
04:57 19              **MR. COFFIN:**  That completes that witness, Your Honor.
04:58 20              **THE COURT:**  Members of the jury, it's 5:00.  I think
04:58 21   it's time for us to go home.
04:58 22              Let me remind you again, please, don't discuss
04:58 23   this case amongst yourselves or with anyone else.  Leave your
04:58 24   tablets on the chairs.  You should conduct no independent
04:58 25   research about this case.

1    With that, Court is at recess until 8:30

2    tomorrow morning.  Thank you.

3         (The jury exited the courtroom.)

4         (Off the record.)

5         **MR. WOOL:**  The plaintiffs would offer, file, and

6    introduce into Plaintiff's Exhibit 30, Plaintiff's Exhibit 492,

7    and Plaintiff's Exhibit 546 from the deposition of Lesley

8    Fierro.

9         **MR. MOORE:**  Subject to our objection as articulated

10   originally.

11        **THE COURT:**  Thank you.

12        (Proceedings adjourned.)

13                         * * *

14                      <u>CERTIFICATE</u>

15        I, Toni Doyle Tusa, CCR, FCRR, Official Court
     Reporter for the United States District Court, Eastern District
16   of Louisiana, certify that the foregoing is a true and correct
     transcript, to the best of my ability and understanding, from
17   the record of proceedings in the above-entitled matter.

18

19

20                    <u>*/s/ Toni Doyle Tusa*</u>
                      Toni Doyle Tusa, CCR, FCRR
21                    Official Court Reporter

22

23

24

25