```
 1                      UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF LOUISIANA
 2

 3   ************************************************************

 4   IN RE:  TAXOTERE (DOCETAXEL)        Docket No. 16-MD-2740
     PRODUCTS LIABILITY LITIGATION       Section H
 5                                        New Orleans, LA
     Relates to:  Barbara Earnest        Tuesday, September 24, 2019
 6                16-CV-17144

 7   ************************************************************

 8                  TRANSCRIPT OF TRIAL PROCEEDINGS
            HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
 9                 UNITED STATES DISTRICT JUDGE
                       DAY 7, MORNING SESSION
10

11   APPEARANCES:

12   FOR THE PLAINTIFF:            BACHUS & SCHANKER, LLC
                                   BY:  DARIN L. SCHANKER, ESQ.
13                                      J. KYLE BACHUS, ESQ.
                                   1899 Wynkoop St., Suite 700
14                                 Denver, CO 80202

15                                 FLEMING NOLEN & JEZ
                                   BY:  RAND P. NOLEN, ESQ.
16                                 2800 Post Oak Blvd., Suite 4000
                                   Houston, TX 77056
17
                                   GIBBS LAW GROUP, LLP
18                                 BY:  KAREN B. MENZIES, ESQ.
                                   6701 Center Drive West, 14th Floor
19                                 Los Angeles, CA 90045

20                                 DAVID F. MICELI, LLC
                                   BY:  DAVID F. MICELI, ESQ.
21                                 P.O. Box 2519
                                   Carrollton, GA 30112-0046
22
                                   PENDLEY BAUDIN & COFFIN
23                                 BY:  CHRISTOPHER L. COFFIN, ESQ.
                                   2505 Energy Centre
24                                 1100 Poydras St.
                                   New Orleans, LA 70163
25
```

```
 1
                                    BARRIOS KINGSDORF & CASTEIX
 2                                  BY:  DAWN M. BARRIOS, ESQ.
                                    701Poydras St., Suite 3650
 3                                  New Orleans, LA 70139

 4                                  GAINSBURGH BENJAMIN DAVID
                                    MEUNIER & WARSHAUER
 5                                  BY:  M. PALMER LAMBERT, ESQ.
                                    2800 Energy Centre
 6                                  1100 Poydras St.
                                    New Orleans, LA 70163
 7
                                    MORGAN & MORGAN
 8                                  BY:  EMILY C. JEFFCOTT, ESQ.
                                    700 S. Palafox St., Suite 95
 9                                  Pensacola, FL 32502

10
      FOR THE DEFENDANT:            SHOOK HARDY & BACON
11                                  BY:  HILDY M. SASTRE, ESQ.
                                    201 Biscayne Blvd., Suite 3200
12                                  Miami, FL 33131

13                                  SHOOK HARDY & BACON
                                    BY:  JON A. STRONGMAN, ESQ.
14                                       HARLEY V. RATLIFF, ESQ.
                                    2555 Grand Blvd.
15                                  Kansas City, MO 64108

16                                  IRWIN FRITCHIE URQUHART & MOORE
                                    BY:  DOUGLAS J. MOORE, ESQ.
17                                  400 Poydras St., Suite 2700
                                    New Orleans, LA 70130
18
19    Official Court Reporter:      Karen A. Ibos, CCR, RPR, CRR, RMR
                                    500 Poydras Street, B-275
20                                  New Orleans, Louisiana 70130
                                    (504) 589-7776
21
22      Proceedings recorded by mechanical stenography, transcript
      produced by computer.
23

24

25
```

```
 1                        I N D E X

 2

 3   WITNESSES FOR THE PLAINTIFF:              PAGE/LINE:

 4   RALPH EARNEST

 5      Direct Examination by Mr. Schanker        1664/23

 6      Cross-Examination by Mr. Moore            1672/18

 7

 8   MICHAEL S. KOPRESKI - BY VIDEO              1695/21

 9

10   BARBARA EARNEST

11      Direct Examination by Mr. Schanker        1718/14

12      Cross-Examination by Ms. Sastre           1756/25

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<pre>
 1                    P R O C E E D I N G S

 2             (TUESDAY, SEPTEMBER 24, 2019)

 3                    (MORNING SESSION)

 4

 5       (OPEN COURT.)

 6             THE COURT:  Please bring in the jury.

 7       (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

 8             THE COURT:  All jurors are present.  Court's back in

 9   session.  You may be seated.

10             Good morning, everyone.  Mr. Schanker, please call your

11   next witness.

12             MR. SCHANKER:  Yes, good morning, your Honor.  Good

13   morning, folks.  Your Honor, we would like to call Mr. Ralph, Ralph

14   Earnest.

15             THE COURT:  Come forward, Mr. Earnest.

16             THE DEPUTY CLERK:  Mr. Earnest, are you raise your right

17   hand, please.

18       (WHEREUPON, RALPH EARNEST, WAS SWORN IN AND TESTIFIED AS

19       FOLLOWS:)

20             THE DEPUTY CLERK:  Thank you.  You can have a seat.  And

21   you can move that microphone if you need to.

22                    DIRECT EXAMINATION

23   BY MR. SCHANKER:

24   Q.  Good morning, sir.

25   A.  Good morning.
</pre>

08:48:08  1    Q.  Would you please introduce yourself to the jury.

08:48:11  2    A.  My name is Ralph Lynn Earnest, Sr.  Good morning to y'all.

08:48:17  3    Q.  And, Ralph, who is Barbara Earnest to you?

08:48:21  4    A.  Barbara is my wife.

08:48:23  5    Q.  How long have y'all been married?

08:48:24  6    A.  Sixty-eight years.

08:48:28  7    Q.  How long have y'all been married?

08:48:36  8    A.  Forty-eight years, I'm sorry.

08:48:42  9    Q.  Could you tell us about how you first met, Barbara?

08:48:46 10    A.  I met Barbara on a blind date.  It was Halloween.  That's

08:48:57 11    pretty much what it was all about.

08:48:59 12    Q.  And how long ago was that?  I don't want to test you too hard

08:49:03 13    on your memory.

08:49:04 14    A.  (NO RESPONSE.)

08:49:12 15    Q.  That's okay.  You're currently employed?

08:49:14 16    A.  No, sir.  I am retired.

08:49:16 17    Q.  And what did you do for work before you retired?

08:49:19 18    A.  I worked for a company called Southern Natural Gas.  I worked

08:49:24 19    at PBX 556A switchboard, and then I worked for a compressor

08:49:31 20    department offshore.

08:49:33 21    Q.  And how long did you do that?

08:49:34 22    A.  I worked for that company for about 27 years.

08:49:37 23    Q.  And you have a family?

08:49:40 24    A.  Yes, sir, I do.

08:49:41 25    Q.  Tell the jury just briefly about your family, your children,

08:49:46  1   grandchildren.

08:49:47  2   A.  I have two fine young men; one is 43, the other one is 39.  I

08:49:55  3   have four very, very fine grandsons; one starts at 18, the other

08:50:04  4   just made one year old yesterday.  I love them to death.

08:50:07  5   Q.  Ralph, could you describe for the jury your relationship with

08:50:13  6   Barbara, what she means to you?

08:50:15  7   A.  Barbara is the love of my life, and I wouldn't exist without

08:50:27  8   her.

08:50:29  9   Q.  All relationships work differently.  Is there one who wears the

08:50:33  10  pants or who is the boss?

08:50:35  11  A.  Barbara is the boss in my household.  I have problems with my

08:50:39  12  memory.

08:50:40  13  Q.  But -- just tell us about how that relationship works out in

08:50:45  14  the house.

08:50:46  15  A.  Final decision is made -- when we have a problem, basically her

08:50:52  16  final decision is what provokes.

08:50:58  17  Q.  Ralph, I would like to spend a little bit of time here having

08:51:01  18  you share with the jury about what Barbara's hair looked like

08:51:07  19  before chemotherapy.  Could you describe it?

08:51:09  20  A.  Barbara's hair was beautiful.  It was -- she always kept it

08:51:15  21  real neat.  It was frosty, it was mousy brown.  I used to love to

08:51:21  22  wake up in the morning and see her face.  Always did.  And still

08:51:26  23  do.  I still do.  She's very beautiful to me.  I don't know how to

08:51:38  24  describe it.  I mean, you would have to be the person visualizing

08:51:43  25  this.  I love her to death.  The hair's -- it was just her.  It was

08:51:48  1    her.  That was Barbara.

08:51:50  2    Q.  How did she have it cut?

08:51:52  3    A.  She always had it cut short length hair and she always had it

08:51:56  4    frosted.

08:52:00  5            MR. SCHANKER:  Your Honor, I would like to admit

08:52:03  6    Plaintiff's Exhibit 0624.  It's a photograph.

08:52:08  7            THE COURT:  Any objection?

08:52:10  8            MR. MOORE:  No objection, your Honor.

08:52:13  9            THE COURT:  Let it be admitted.

08:52:25  10   BY MR. SCHANKER:

08:52:26  11   Q.  Ralph, we've seen this photograph before.  Does that picture

08:52:32  12   adequately depict Barbara's hair before the chemotherapy?

08:52:35  13   A.  Yes, sir.  Yes, sir, it does.

08:52:37  14   Q.  I want to talk about what y'all liked to do.  Talking about

08:52:45  15   before the chemotherapy.  What would you do together?  What did you

08:52:49  16   enjoy doing together?

08:52:51  17   A.  Barbara and myself loved going to different places.  We were

08:52:54  18   not always financially capable of doing what we wanted, but we did

08:52:59  19   stuff we enjoyed.  We used to go out and eat at Rocky and Carlo's

08:53:06  20   in Chalmette.  We used to go shopping.  We would have relationship

08:53:10  21   with our sons and our grandsons.  We always made sure that our boys

08:53:14  22   were taken care of first, so they were always included in what we

08:53:17  23   did.

08:53:20  24   Q.  How did you feel about Barbara's appearance before

08:53:23  25   chemotherapy?

08:53:23  1    A.  Barbara's appearance before chemotherapy was great.  I tell you

08:53:29  2    what, she always kept herself clean, always immaculate.  She was a

08:53:33  3    very meticulous individual.

08:53:40  4    Q.  We talked to you about the experience that you and Barbara went

08:53:44  5    through when you watched her undergo the cancer treatment.  How did

08:53:48  6    you feel when you learned she had been diagnosed with cancer?

08:53:51  7    A.  I was -- it's beyond thought.  I tell you what, I really

08:53:58  8    thought that I was going to -- my world was at a loss.  I thought I

08:54:04  9    was going to lose a person I had been living with for years, and I

08:54:08  10   don't know how I was going to be able to handle it.

08:54:10  11   Q.  Did you attend doctors appointments with Barbara for the breast

08:54:16  12   cancer?

08:54:16  13   A.  No, sir, not too many.

08:54:19  14   Q.  And why is that?

08:54:20  15   A.  Because I had to work.  I had to support my family.

08:54:26  16   Q.  Do you remember Barbara's oncologist?  Do you remember who that

08:54:35  17   was?

08:54:35  18   A.  Dr. Carinder, something like that.

08:54:42  19   Q.  Dr. Carinder.  Dr. Carinder.  Did you go to the Dr. Carinder

08:54:51  20   visits?

08:54:51  21   A.  I went -- not too many times, no.  I tell you what, I think to

08:54:54  22   his visit I went one time.

08:54:57  23   Q.  Ralph, did you go to -- do you recall, did you go to the

08:55:01  24   Dr. Carinder visit when the chemotherapy was initially discussed?

08:55:09  25   A.  Yes, I did.

08:55:11 1   Q.  And do you recall was the issue of the hair loss discussed in

08:55:19 2   that meeting?

08:55:19 3   A.  Yes, it was discussed.  We were told at that point that she --

08:55:24 4   Barbara would lose her hair upon starting chemo, but that her hair

08:55:30 5   would grow back.

08:55:33 6   Q.  Were you told anymore about how it would grow back or anything

08:55:38 7   like that at all?

08:55:39 8   A.  We were told that her hair could grow back differently, it

08:55:43 9   could be curly, could be the same, could be a different color.

08:55:47 10  Myself, I was looking for hair to turn back red.  I wanted

08:55:51 11  something different in my life.

08:55:57 12  Q.  So, Ralph, I just want to be clear.  Before Barbara took the

08:56:01 13  chemotherapy, to your knowledge was she warned at all that if she

08:56:07 14  took Taxotere she might be forever bald?

08:56:09 15  A.  No, sir.

08:56:10 16  Q.  I want to move on now to Barbara now, Barbara after the

08:56:21 17  permanent hair loss.  Could we see -- Barbara's wearing a turban

08:56:29 18  today.  When did she start wearing that turban?

08:56:32 19  A.  She started wearing the turban after she began to lose her

08:56:35 20  hair.

08:56:35 21  Q.  Did she wear that turban at all before the chemotherapy?

08:56:39 22  A.  No, sir, she did not.

08:56:40 23  Q.  After the chemotherapy, sir, has there ever been a time where

08:56:50 24  your wife felt comfortable enough to go outside of the house

08:56:53 25  without something on her head?

08:56:54  1    A.  No, sir.

08:56:56  2    Q.  And do you know why that is?

08:56:57  3    A.  She was very self-conscious about the fact that her hair was

08:57:02  4    gone.

08:57:02  5    Q.  Tell us about that.

08:57:03  6    A.  She always -- Barbara always really took care of herself, and

08:57:09  7    she was very, I guess, courteous to the people and surrounding

08:57:16  8    around her.  She felt like if her hair was looking good, she was

08:57:20  9    presentable and she could present herself going outside.

08:57:25  10   Q.  Does she ever leave the house without a head covering?

08:57:30  11   A.  No, sir, she does not.

08:57:32  12   Q.  Ralph, you know Barbara better than anybody; is that fair?

08:57:35  13   A.  Yes, sir.

08:57:35  14   Q.  How has this not having hair impacted her?  What have you seen?

08:57:40  15   A.  I tell you what, I see a great deal of -- we do have to have

08:57:45  16   occasion where she needs to go outside and go shopping with me.

08:57:50  17   And then on different occasions I've seen people staring at her

08:57:54  18   from a distance, and I tried to shield her from the fact that --

08:57:59  19   this is not something she needs to see, so I try to keep her mind

08:58:03  20   away from it.  But I still -- I don't want her to see stuff like

08:58:09  21   this.  I don't want her to be singled out.  She's a very cautious

08:58:16  22   individual and she'd rather be in the background instead of the

08:58:24  23   spotlight.

08:58:26  24   Q.  And have you seen -- describe -- have you seen other folks look

08:58:33  25   at her, those sorts of things?

08:58:35  1   A.  I have seen other people look, and I just -- I don't know what

08:58:39  2   to make of it when these people are doing what they're doing.  I

08:58:44  3   know they're singling her out because they say, "Well, geez, she

08:58:48  4   must be have something wrong with her."  I don't want to bring it

08:58:50  5   to her attention.  I try not to do that.

08:58:53  6   Q.  Ralph, have you seen any changes in your wife's personality

08:58:57  7   since she has the permanent baldness?

08:58:59  8   A.  Yes, I have.  I tell you what, she is now more of an introvert.

08:59:03  9   She does not go out as often as she used to.  She goes out mainly

08:59:08  10  because she has to.

08:59:09  11  Q.  Tell us about that.

08:59:10  12  A.  Occasions like she needs to go out and go to travel to visit

08:59:17  13  our grandchildren.  She takes care of her grandchildren.  She has

08:59:22  14  to go out to do that.  She cannot stay at home.  There is occasions

08:59:25  15  where we've been invited to weddings and so forth, and she's

08:59:29  16  cautious as to whether or not she wants to go to the wedding

08:59:33  17  because she knows that there's going to be people mentioning to

08:59:36  18  her, "Well, why are you wearing this?"  And she doesn't really make

08:59:41  19  it publicly known that she has had this problem with her hair loss.

08:59:46  20  Q.  Now, I understand you all have gone on vacations and things

08:59:50  21  like that, correct?

08:59:51  22  A.  Yes, we have.

08:59:52  23  Q.  So those are things she's willing to do?

08:59:58  24  A.  I think she does the vacation thing for me, and she has a close

09:00:05  25  tie with her brother.  And being involved with me and her brother

09:00:12 1   both, we try to convince her to go out and have a good time to keep

09:00:17 2   her from keeping this on her mind all the time.

09:00:23 3   Q.  So, Ralph, when you look at your wife when she doesn't have her

09:00:33 4   turban on, what do you see?

09:00:35 5   A.  I see Barbara.  That's what I look for.  I tell you what, I

09:00:40 6   don't see anything else.  I see what's inside her.  I do not see

09:00:44 7   what's up here (INDICATING).  And I miss the fact that she doesn't

09:00:49 8   have the hair, because I tell you what, she is -- this is --

09:00:54 9   Barbara is Barbara now, Barbara was Barbara back then.  But what's

09:00:59 10  inside makes a difference to me.

09:01:01 11  Q.  Has your relationship changed at all?

09:01:04 12  A.  Me and her relationship hasn't changed, let me tell you.  It's

09:01:09 13  not going to change.

09:01:12 14          MR. SCHANKER:  Thank you, sir.

09:01:13 15          THE WITNESS:  Okay.  Thank you.

09:01:15 16          THE COURT:  Mr. Moore.

09:01:20 17                  CROSS-EXAMINATION

09:01:22 18  BY MR. MOORE:

09:01:40 19  Q.  Good morning, Mr. Earnest.

09:01:41 20  A.  Good morning.

09:01:48 21  Q.  My name is Douglas Moore.  I met your son last week, and I am

09:01:54 22  going to tell you the same thing I told him.  I am not up here to

09:01:57 23  play lawyer tricks on you.  I am just going to ask you questions.

09:02:00 24  If I ask you a question that you don't like, just tell me that.

09:02:03 25  Okay?

09:02:03 1   A.  I would expect that.

09:02:05 2   Q.  So I want to talk to you this morning about two time periods.

09:02:09 3   And I think you touched on both of those time periods during your

09:02:12 4   direct examination.

09:02:12 5          The first thing I want to talk to you about is the time

09:02:16 6   period between your wife achieving remission of her cancer and

09:02:23 7   today, kind of activities, the things that she is involved in, what

09:02:28 8   her quality of life is like today.

09:02:30 9          And the next subject matter is we're going to go back in

09:02:34 10  time and talk about some of the things that happened back in 2011

09:02:36 11  when Barbara was diagnosed with cancer.  Okay?

09:02:38 12  A.  Okay.

09:02:39 13  Q.  Okay.  You would agree with me that Barbara is a happy,

09:02:44 14  positive person?

09:02:45 15  A.  Yes.

09:02:46 16  Q.  She was before cancer and she is today, yes?

09:02:50 17  A.  Not the same.  There is not the same, no.

09:02:53 18  Q.  Okay.  But she is, in your general assessment, a positive

09:02:58 19  person?

09:02:58 20  A.  Yes.

09:02:58 21  Q.  Even today?

09:02:59 22  A.  Yes.

09:02:59 23  Q.  You did notice during her cancer treatment that she was anxious

09:03:13 24  about it and concerned about the fact that she had cancer?

09:03:16 25  A.  Yes.  I was too.

09:03:18  1    Q.  But once she learned that she was in remission, did her

09:03:25  2    demeanor change?  Did it improve?

09:03:27  3    A.  The factor was always there.  It was always in the back of her

09:03:32  4    mind that it was still there.

09:03:34  5    Q.  What about your -- how did you learn that your wife had beaten

09:03:38  6    cancer?

09:03:38  7    A.  Through her.  Through the meetings with the doctors.

09:03:40  8    Q.  And how did you react to that?

09:03:42  9    A.  I was very, very angry, because I tell you what, I did not

09:03:47 10    want -- I didn't even want to think about the fact that I would

09:03:50 11    lose her due to cancer.

09:03:52 12    Q.  Right.  But I am talking about how you felt when you learned

09:03:55 13    that she had beaten cancer, when she was in remission.

09:03:58 14    A.  Well, anybody would be happy.  I was happy.

09:04:00 15    Q.  Right.  I think you said you were elated, right?

09:04:02 16    A.  Yes, yes, I could say that.

09:04:04 17    Q.  Mr. Schanker showed you this photograph.  For identification,

09:04:13 18    Plaintiff's Exhibit 624, and he put it on the ELMO.  And this was

09:04:19 19    you guys at the Grand Canyon, yes?

09:04:21 20    A.  That is correct.

09:04:22 21    Q.  And you talked about what Barbara's hair looked like back at

09:04:28 22    this time with relationship to this photograph, right?

09:04:30 23    A.  Yes.

09:04:31 24    Q.  Can you tell me when this photograph was taken?

09:04:34 25    A.  I want to say either 2009 or 2010.

09:04:44  1    Q.  Okay.  But somewhere before she had cancer?

09:04:46  2    A.  It was before chemo.

09:04:49  3    Q.  And my colleague, Ms. Sastre, is going to ask Barbara about her

09:04:53  4    hair before she had chemotherapy.  I just wanted to try and find

09:04:58  5    out if you could give us an assessment of when this photo was

09:05:02  6    taken.  And you say 2009 is your best guess?

09:05:06  7    A.  2009, 2010, somewhere in that area, yes, sir.

09:05:09  8    Q.  Okay.  All right.  We heard from your son, the jury did, that

09:05:14  9    your -- one of your wife's activities is to go to garage sales?

09:05:18 10    A.  Yes.

09:05:19 11    Q.  Is that something you would occasionally do with her?

09:05:22 12    A.  I don't generally go to garage sales.  I just don't care for

09:05:26 13    them all that much.  I do go, but I don't always care to go.

09:05:30 14    Q.  You mentioned during your direct examination that Barbara is

09:05:35 15    now sort of an introvert, right?

09:05:38 16    A.  That is correct.

09:05:38 17    Q.  But you did mention that she goes on vacations and engages in

09:05:42 18    activities when occasionally she does that?

09:05:46 19    A.  Occasionally, yes.

09:05:47 20    Q.  If we could switch it over to Jen, Erin.  And what I would like

09:05:57 21    to do is ask you some questions about some photographs that are

09:06:01 22    already in evidence.  They're Exhibit 2034.

09:06:05 23            And, Jen, if we could go to the second page of that

09:06:10 24    exhibit.  Do you recognize this photograph?

09:06:20 25    A.  I do.  That's my wife and my brother-in-law.

09:06:23 1   Q.  And do you know where this photograph was taken?  It says

09:06:30 2   Silver Dollar City on the gigantic chair.  Do you see that?

09:06:33 3   A.  Either last year or the year before last.  I am not really

09:06:37 4   certain of the exact date.

09:06:38 5   Q.  All right.  Was this a picture from a vacation in Silver Dollar

09:06:42 6   City in Missouri?

09:06:43 7   A.  Yes.  Yes, sir.

09:06:44 8   Q.  That was something that happened either last year or the year

09:06:47 9   before you think?

09:06:47 10  A.  Yes, sir.  I didn't attend to that -- didn't go to that

09:06:50 11  vacation.

09:06:51 12  Q.  Okay.  Did you go to Disney World with your wife?

09:06:57 13  A.  Oh, yes, I did.

09:06:59 14         MR. MOORE:  Jen, if you could pull up Bates page 2312,

09:07:02 15  please.  Make it larger if you can, Jen.

09:07:02 16  BY MR. MOORE:

09:07:17 17  Q.  Okay.  So do you recall being at Disney World on vacation with

09:07:20 18  Barbara?

09:07:21 19  A.  Yes, sir.

09:07:21 20  Q.  And this looks like this is a picture.  You were there and some

09:07:24 21  sort of PeopleMover or roller coaster or something?

09:07:28 22  A.  I think we might have been at a restaurant.  I am not really

09:07:32 23  sure.

09:07:32 24  Q.  And is that your son Ralph, Jr., there in the Saints jersey?

09:07:35 25  A.  Yes, sir, it is.

09:07:36 1    Q.  And one of your grandsons?

09:07:38 2    A.  Yes, sir.

09:07:39 3    Q.  And that was something that Barbara participated in, family

09:07:45 4    vacation?

09:07:45 5    A.  She did family vacation because of the family.  She wanted her

09:07:49 6    family to have a good time, too.

09:07:53 7            MR. MOORE:  Jen, if you could flip to page 2315.

09:07:59 8    BY MR. MOORE:

09:07:59 9    Q.  Looks like here at Disney World your wife's enjoying a parade.

09:08:05 10   Do you see that?

09:08:05 11   A.  Yes, sir.

09:08:06 12   Q.  And did she have a good time as well?

09:08:08 13   A.  Well, certainly.

09:08:09 14   Q.  Sure.

09:08:10 15   A.  Think about it.  Her grandchildren were with her.  She was

09:08:14 16   having a good time.

09:08:14 17   Q.  And did you have a good time?

09:08:16 18   A.  Yes, I did.  I had my grandchildren with me.

09:08:19 19           MR. MOORE:  Let's show 2316, if we could, Jen.

09:08:19 20   BY MR. MOORE:

09:08:23 21   Q.  This looks you guys are getting ready to get on the Thunder

09:08:27 22   Mountain Railroad?

09:08:28 23   A.  I couldn't even tell you.  I just know I was going on

09:08:31 24   something.

09:08:31 25   Q.  Looks like you're pretty excited about it there.

09:08:33  1    A.  Yeah, sure.  We were having a good time, yeah.

09:08:36  2    Q.  And then --

09:08:37  3    A.  That's what Disney World is all about, right?

09:08:39  4    Q.  Yep.

09:08:40  5    A.  Okay.

09:08:41  6    Q.  The places where dreams come true, right?

09:08:46  7            How about 2317?  Can you tell us what's happening here?

09:08:51  8    There's a date at the top that says, "February 2018."  Do you see

09:08:55  9    that?  This looks like a grandparents day or something?

09:09:00  10   A.  That one I don't recall.  I don't know.  I can't remember that

09:09:04  11   one.

09:09:08  12           MR. MOORE:  And how about 2319, Jen.

09:09:10  13   BY MR. MOORE:

09:09:13  14   Q.  Okay.  This looks like a -- says, "Happy birthday" somebody

09:09:17  15   there on the cookie cake.  Do you recall this event?

09:09:21  16   A.  No, I don't.

09:09:22  17   Q.  Okay.  It says "July 2018" at the top.  Does that at all ring a

09:09:28  18   bell?

09:09:29  19   A.  My birthday is in July.  I don't know.  I can't remember the

09:09:33  20   rest.  I am not good at remembering anymore that particular dates

09:09:37  21   and so forth.

09:09:37  22   Q.  Okay.

09:09:38  23   A.  That's what I have Barbara for.

09:09:40  24   Q.  Let's take a look at 2320, if we could, please.  This looks

09:09:47  25   like some kind of sporting event.  Says, "July 2018."  Do you

09:09:51  1   recall enjoying a sporting event with Barbara and the family?

09:09:54  2   A.  No, I do not.  July again.  Once again, like I said, that's my

09:10:07  3   birth date.  I don't know if they were celebrating my birthday or

09:10:11  4   not.  I couldn't tell you.

09:10:14  5   Q.  Other than vacations and birthday parties and sporting events,

09:10:21  6   have you gotten out with Barbara yourself to go to any sort of

09:10:24  7   events around town since her cancer --

09:10:25  8   A.  No, sir.  We generally stay at home.  We do basically what we

09:10:29  9   need to do.

09:10:30  10  Q.  Okay.  What I would like to show you now is a couple of pages

09:10:34  11  from 2369.  This has already been admitted into evidence.

09:10:42  12          MR. MOORE:  Jen, I can't see the page number.  Can I show

09:10:45  13  it to you?  Maybe four or five down.  Okay.

09:10:45  14  BY MR. MOORE:

09:10:55  15  Q.  Do you see that there's a handwritten notation there on the

09:10:57  16  bottom of this photograph.  This is one of the pages of Defense

09:11:02  17  2369.  It says, "December 2014" there on the bottom.  Can you make

09:11:06  18  that out?

09:11:07  19  A.  Yes, sir.

09:11:07  20  Q.  And this is you and Barbara?

09:11:10  21  A.  Yes, it is.

09:11:10  22  Q.  Is this like at Celebration in the Oaks or something?

09:11:14  23  A.  I think that's what it depicts, yes.

09:11:20  24          MR. MOORE:  And then, Jen, if you could pull up this

09:11:23  25  photograph (INDICATING).  I think it's 11.

09:11:23  1   BY MR. MOORE:

09:11:30  2   Q.  And what I am showing you is page 11 of the Defense 2369.  Is

09:11:35  3   this you and Barbara at the zoo?

09:11:37  4   A.  That was us at the zoo.  We brought our grandchildren to see

09:11:40  5   the animals at the zoo.

09:11:42  6   Q.  And the things that I've showed you, the going to the zoo,

09:11:49  7   going to Celebration in the Oaks, going to Disney World, going to

09:11:53  8   Silver Dollar City and birthday parties, grandparents day, those

09:11:58  9   are all things that Barbara has been able to do today?

09:12:01  10  A.  They are selective, though.  She does it for the grandkids, not

09:12:04  11  for herself.  She is willing to sacrifice, taking time out to go

09:12:10  12  for the grandkids.

09:12:11  13  Q.  She is able to make those sacrifices --

09:12:14  14  A.  Yeah, that's grandparents.  That's what grandparents do.

09:12:17  15  Q.  Let me get the whole question out --

09:12:17  16  A.  Sure.

09:12:19  17  Q.  She can't do us both at the same time, so let me get the whole

09:12:21  18  question out --

09:12:21  19  A.  Sure.  I'm sorry.

09:12:22  20  Q.  You have to pretend like we're on walkie-talkies.  It makes it

09:12:26  21  easier for her.

09:12:26  22  A.  I'm sorry.

09:12:27  23  Q.  So she is able to do all of those things because she beat

09:12:31  24  cancer, right?

09:12:31  25  A.  Yes, yes.

09:12:32  1    Q.  And that was your primary objective when back in 2011 when she

09:12:38  2    was diagnosed and you were meeting with Dr. Carinder and his staff?

09:12:41  3    A.  Let me ask you something.  Wouldn't you do the same thing --

09:12:46  4              THE COURT:  Mr. --

09:12:47  5              THE WITNESS:  Excuse me?

09:12:48  6              THE COURT:  Mr. Earnest, you have to answer the question.

09:12:50  7    You can't ask him questions.

09:12:51  8              THE WITNESS:  All right.  I'm sorry.  Yes, it would be.

09:12:54  9              MR. MOORE:  I would love to sit around and talk to you,

09:12:57 10    but we have to do the back and forth.

09:12:59 11              THE WITNESS:  That's all right.

09:13:00 12    BY MR. MOORE:

09:13:01 13    Q.  Let's transition a little bit to that time period.  When you

09:13:04 14    learned that your wife was diagnosed with cancer, you understood

09:13:10 15    that that was very serious?

09:13:11 16    A.  Yes, sir.

09:13:12 17    Q.  And your primary focus at that time was to see her be cured,

09:13:19 18    right?

09:13:19 19    A.  Yes, sir.

09:13:19 20    Q.  And you understood that chemotherapy that she was going to have

09:13:24 21    to undertake was going to have potential for side effects?

09:13:28 22    A.  Yes, sir.

09:13:29 23    Q.  And notwithstanding those side effects, it was your goal to see

09:13:34 24    her survive, right?

09:13:35 25    A.  Yes, sir.

09:13:35  1    Q.  And you testified a little bit, I think, on direct examination

09:13:41  2    that you had met with Dr. Carinder at least once.  Do you recall

09:13:44  3    that testimony?

09:13:45  4    A.  Yes, sir.

09:13:46  5    Q.  And when you met with Dr. Carinder, he talked to you and

09:13:52  6    Barbara about some of the potential complications and risks that

09:13:56  7    were associated with chemotherapy.  Do you remember that?

09:13:57  8    A.  Yes, sir.

09:13:57  9    Q.  And I think Mr. Schanker asked you about whether or not he

09:14:05  10   talked to you about hair loss?

09:14:07  11   A.  That is correct.

09:14:08  12   Q.  And your testimony was that he told you that the hair would

09:14:15  13   grow back?

09:14:15  14   A.  He told us during the chemo that the hair -- she would lose her

09:14:20  15   hair and that her hair would grow back.

09:14:23  16   Q.  Okay.  All right.  And do you remember giving a deposition in

09:14:27  17   this case?

09:14:27  18   A.  Yes, I do.

09:14:27  19   Q.  And that happened in April of 2016.  About a year-and-a-half

09:14:34  20   ago?

09:14:34  21   A.  That sounds about right.

09:14:36  22        MR. MOORE:  Your Honor, may I approach the witness?

09:14:38  23        THE COURT:  Yes, you may.

09:14:58  24   BY MR. MOORE:

09:14:59  25   Q.  Do you recall at the end of your deposition that, after the

09:15:02 1    lawyer from Sanofi had talked to you and asked you all of the

09:15:06 2    questions, that Mr. Darin asked you some questions after that?  Do

09:15:10 3    you recall that?

09:15:11 4    A.  Yes, sir.

09:15:11 5    Q.  And if you could, please, turn to page 146 of the deposition.

09:15:22 6    A.  (WITNESS COMPLIES.)  I have it.

09:15:39 7              MR. MOORE:  Erin, can we flip back over to the doc cam.

09:15:43 8              MR. SCHANKER:  Your Honor, improper use of a depo to show

09:15:45 9    it in this manner.

09:15:47 10             MR. MOORE:  I am not refreshing his recollection.

09:15:48 11             MR. SCHANKER:  You can read it to impeach, but not show

09:15:50 12   it.

09:15:59 13             THE COURT:  Come see.

09:16:02 14        (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

09:16:02 15             THE COURT:  I really think you ought to read it and not

09:16:05 16   show it.

09:16:06 17             MR. MOORE:  That's fine.

09:16:08 18             THE COURT:  Yesterday, there's way too much information

09:16:10 19   that comes in.

09:16:11 20             MR. MOORE:  I was trying to use the big one so there

09:16:13 21   wouldn't be extra stuff, but that's okay.

09:16:20 22             THE COURT:  Let's just go there.  Thank you.

09:16:24 23        (OPEN COURT.)

09:16:24 24   BY MR. MOORE:

09:16:25 25   Q.  Okay.  You with me on page 146?  We're just going to read it,

09:16:25  1   okay?

09:16:25  2   A.  Yes, sir.

09:16:28  3   Q.  So at 146, you see how they have all of the lines numbered on

09:16:31  4   the side?

09:16:32  5   A.  Yes, sir.

09:16:32  6   Q.  If you go to line -- I'm sorry, Line 13, do you see that?

09:16:38  7   A.  Yes, sir.

09:16:39  8   Q.  And it says, "Examination by Mr. Schanker," right?

09:16:44  9   A.  Yes, sir.

09:16:45  10  Q.  And that's Mr. Darin, yes?

09:16:48  11  A.  What's that?

09:16:49  12  Q.  That's Mr. --

09:16:50  13  A.  Oh, yeah.  Yes.

09:16:52  14  Q.  So line 13.  "Question:  Now, Mr. Earnest, you talked about

09:16:58  15  Dr. Carinder when you were asked questions earlier.  Is that

09:17:00  16  correct?"  And then what did you say?

09:17:02  17  A.  "Yes, that's correct."

09:17:03  18  Q.  And then the question from Mr. Schanker was:  "You understand

09:17:07  19  that Dr. Carinder was the doctor who prescribed the Taxotere

09:17:10  20  chemotherapy regimen to your wife.  Correct?"  And what did you

09:17:12  21  say?

09:17:13  22  A.  I said, "Correct."

09:17:14  23  Q.  And then on line 21, the question is:  "If I understood your

09:17:19  24  testimony, you actually went to a meeting with Dr. Carinder when he

09:17:22  25  spoke with you and your wife about prescribing Taxotere.  Is that

09:17:26  1    right?"

09:17:27  2    A.  Yes.

09:17:28  3    Q.  And so flip to the next page, on page 147.

09:17:34  4    A.  Okay.

09:17:34  5    Q.  And if you go down to line 24.  Mr. Darin asks you, quote, Did

09:17:40  6    he explain to you that her hair would grow back after using

09:17:44  7    chemotherapy?  Do you see that?

09:17:45  8    A.  Yes.

09:17:46  9    Q.  Okay.  And then, at the top of page 148, read to the jury what

09:17:50  10   you said in response to that question.

09:17:52  11   A.  You want the answer is what you're looking for?

09:17:56  12   Q.  Yeah, where it says, "answer."

09:17:57  13   A.  "He said that it was possible -- it was possible it would never

09:18:01  14   grow back."  That's not correct.  That's not what I meant.  That's

09:18:06  15   not what I meant.

09:18:07  16           MR. MOORE:  Your Honor.

09:18:08  17           THE COURT:  Wait, wait, wait, Mr. Earnest.

09:18:08  18           MR. SCHANKER:  Your Honor, pursuant to Rule 611 and the

09:18:10  19   rule of completeness, I request now to read page 148, which is

09:18:15  20   immediately after that line --

09:18:17  21           MR. MOORE:  I'm not done.  I'm going to read all of that.

09:18:19  22           MR. SCHANKER:  -- read that into the record.

09:18:21  23           THE COURT:  Mr. Schanker, let's get there first.

09:18:23  24           MR. MOORE:  I am going to get there.

09:18:25  25   BY MR. MOORE:

09:18:26  1    Q.  So the first time Mr. Schanker asked you, quote, Did he explain

09:18:29  2    to you that her hair would grow back after using chemotherapy?

09:18:33  3    Your answer was, "He said it was possible it would never grow

09:18:35  4    back."

09:18:36  5    A.  That's not what I meant.  I said it but that's not what I

09:18:40  6    meant.

09:18:40  7    Q.  I'm just asking if that's what it says here, that's all.

09:18:42  8    A.  Yes, yes.

09:18:42  9    Q.  And so then Mr. Schanker decides to ask you a question.  Again,

09:18:45 10    if you look at line 3.  Are you with me?

09:18:47 11    A.  Yes, sir.

09:18:48 12    Q.  And the question was, "Did Dr. Carinder say to you, 'Your hair

09:18:53 13    will grow back, Barbara, after you are done with the

09:18:56 14    chemotherapy?'"  Do you see that?

09:18:57 15    A.  Yes, sir.

09:18:57 16    Q.  And then your answer was, where it says, THE WITNESS, it says,

09:19:00 17    "No, he didn't say it like that."  Do you see that?

09:19:03 18    A.  Yes.

09:19:03 19    Q.  And then the next question is:  "What did he say to you?"  Do

09:19:07 20    you see that?

09:19:07 21    A.  Yes.

09:19:07 22           MR. SCHANKER:  Your Honor, we just went over this.  He is

09:19:09 23    just reading it in the record again.

09:19:11 24           THE COURT:  Mr. Schanker, I think this is the testimony

09:19:14 25    you wanted.

1687

09:19:14  1          MR. MOORE:  I am going step by step.

09:19:17  2          MR. SCHANKER:  Your Honor, I believe the rule permits me

09:19:18  3   to read that into the record.

09:19:21  4          THE COURT:  He has to first -- stop.  If he reads it in,

09:19:27  5   I don't -- please proceed.

09:19:28  6   BY MR. MOORE:

09:19:28  7   Q.  And so just so that we can keep track here.  Picking up where

09:19:45  8   we were.  The question to you was:  "What did he say to you?"  Do

09:19:49  9   you see that on line 11, page 148?

09:19:51 10   A.  Yes, sir.

09:19:51 11   Q.  And your answer was:  "He just said that your hair possibly

09:19:55 12   could grow back.  It may be a different texture."  Do you see that?

09:19:59 13   A.  Correct.

09:19:59 14   Q.  So the first time he asked you the question --

09:20:02 15          MR. SCHANKER:  Your Honor, that wasn't read in its

09:20:04 16   entirety --

09:20:04 17          THE COURT:  Okay.

09:20:05 18          MR. SCHANKER:  Pursuant to the rule --

09:20:06 19          MR. MOORE:  I am not done.

09:20:06 20          THE COURT:  Mr. Schanker, I am going to allow that line

09:20:09 21   of questioning to be completed.  Mr. Moore, I believe that he is

09:20:13 22   entitled to have it read now.

09:20:16 23          MR. SCHANKER:  Thank you, your Honor.

09:20:18 24          MR. MOORE:  Okay.

09:20:19 25          MR. SCHANKER:  May I go ahead and read it?

09:20:21  1          MR. MOORE:  I am not done yet.

09:20:23  2          MR. SCHANKER:  She just --

09:20:24  3          THE COURT:  We're not going --

09:20:25  4          MR. MOORE:  You don't want --

09:20:26  5          THE COURT:  We are not doing this until this line of

09:20:30  6  questioning is completed.  And under the rule of completeness, he

09:20:33  7  is entitled to have this entire line of questioning --

09:20:35  8          MR. MOORE:  Okay.  I will read it.

09:20:36  9  BY MR. MOORE:

09:20:37 10  Q.  So that was your answer --

09:20:38 11          THE COURT:  He may read it as long as --

09:20:40 12          MR. SCHANKER:  Your Honor, there's been questions asked

09:20:43 13  and questions of the witness.  It has not been read in its entirety

09:20:46 14  I believe, your Honor.  And I just want to make sure that it is.

09:20:49 15          THE COURT:  I believe that's what I am requiring him to

09:20:52 16  do this very minute, which is why I stopped him from writing and

09:20:57 17  analyzing these questions.  Now, you're going to read the --

09:21:02 18          MR. MOORE:  Yes.

09:21:03 19          THE COURT:  -- in its entirety under the rule of

09:21:05 20  completeness.

09:21:05 21          MR. MOORE:  I am.

09:21:05 22          MR. SCHANKER:  From line 3 to line 16 is what my request

09:21:08 23  is, your Honor, so that the jury gets the full context.

09:21:11 24          THE COURT:  Okay.

09:21:13 25          MR. MOORE:  I will do exactly that.

| | | |
|---|---|---|
| 09:21:15 | 1 | THE COURT:  Thank you. |
| 09:21:16 | 2 | MR. MOORE:  So Line 3:  "QUESTION:  Did Dr. Carinder say |
| 09:21:19 | 3 | to you, 'Your hair will grow back, Barbara after you are done with |
| 09:21:23 | 4 | the chemotherapy?' |
| 09:21:24 | 5 | "ANSWER:  No, he didn't say it like that. |
| 09:21:26 | 6 | "QUESTION:  What did he say to you?" |
| 09:21:28 | 7 | "He just said that your hair possibly could grow back. |
| 09:21:31 | 8 | It may grow back different." |
| 09:21:33 | 9 | "QUESTION:  So he said it was going to grow back, but it |
| 09:21:36 | 10 | could grow back differently? |
| 09:21:37 | 11 | "ANSWER:  Yes." |
| 09:21:39 | 12 | Is that it? |
| 09:21:40 | 13 | MR. SCHANKER:  Thank you. |
| 09:21:41 | 14 | MR. MOORE:  Can I do this now? |
| 09:21:57 | 15 | (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:) |
| 09:21:59 | 16 | THE COURT:  If this was used for impeachment, I don't |
| 09:22:02 | 17 | think you get to go in and analyze the impeaching evidence.  You |
| 09:22:06 | 18 | have read it.  Those words are correct.  They are what they are. |
| 09:22:09 | 19 | You're stuck with his testimony today in court.  The jury can |
| 09:22:13 | 20 | consider this impeachment evidence -- |
| 09:22:16 | 21 | MR. MOORE:  Right. |
| 09:22:17 | 22 | THE COURT:  -- to determine his veracity today.  But we |
| 09:22:21 | 23 | don't go in and weigh in on this. |
| 09:22:24 | 24 | MR. SCHANKER:  Yes, your Honor. |
| 09:22:25 | 25 | MR. MOORE:  But I can ask him about his testimony today |

09:22:28  1    and why it's different than it was here?

09:22:29  2        MR. SCHANKER:  That was just done, your Honor.  He just

09:22:33  3    attempted to show an inconsistent statement and that is done.

09:22:37  4        THE COURT:  You showed there is an inconsistent

09:22:41  5    statement, and I don't think you get to go back and reanalyze this.

09:22:46  6    You can ask him his testimony about here today in court.

09:22:50  7        MR. MOORE:  Right.  But the point I wanted to make is

09:22:53  8    this his testimony or is it Darin's testimony because he told him

09:22:57  9    possibly never --

09:22:58 10        THE COURT:  Then you can ask him that.  "Was your

09:23:02 11    testimony at that time truthful?  Is your testimony today

09:23:07 12    truthful?"

09:23:10 13        MR. MOORE:  What I am making is, he says Dr. Carinder

09:23:14 14    said possibly would never, second time he answers the question he

09:23:20 15    said possibly could, and then Darin says, "So he said it was -- so

09:23:25 16    he said it was going to grow back."  That's not what the witness

09:23:28 17    said.

09:23:29 18        MR. SCHANKER:  Your Honor, he used it for impeachment.

09:23:31 19    He got what impeachment is supposed to be.

09:23:33 20        THE COURT:  I think you can ask him those questions.

09:23:36 21    What we're analyzing is his truthfulness today, not then.  The fact

09:23:40 22    that he made an inconsistent statement is what's pertinent.

09:23:44 23        MR. MOORE:  All right.  I understand.

09:23:54 24      (OPEN COURT.)

09:23:54 25        THE COURT:  Thank you.

09:23:56  1   BY MR. MOORE:

09:24:08  2   Q.  Okay.  So having read your testimony, would you agree with me

09:24:11  3   that your sworn testimony in April of 2018 is different than it is

09:24:16  4   today, yes?

09:24:17  5   A.  Yes.

09:24:18  6   Q.  And when you took your -- gave your deposition in April 2018,

09:24:24  7   you were under oath?

09:24:25  8   A.  That's correct.

09:24:25  9   Q.  And you swore to give truthful testimony?

09:24:30 10   A.  That's correct.

09:24:30 11   Q.  And we asked you at the beginning of the deposition if there

09:24:33 12   was any reason you wouldn't be able to provide full and complete

09:24:36 13   testimony on that day.  Do you remember that?

09:24:38 14   A.  Yes.

09:24:38 15   Q.  And you said that you could, right?

09:24:40 16   A.  Yes.

09:24:41 17   Q.  And that's what you did, correct?

09:24:42 18   A.  Yes.

09:24:43 19   Q.  All right.  Let's talk a little bit more about that meeting.

09:25:06 20        MR. MOORE:  Your Honor, what we have next for the witness

09:25:08 21   is Defense Exhibit 2058.  There is no objection to the exhibit.

09:25:13 22   It's the consent form, it's part of the broader medical record.  We

09:25:17 23   just have it as a separate exhibit.  So we would offer to file and

09:25:21 24   introduce Exhibit 2058.

09:25:22 25        THE COURT:  Isn't it already in?

09:25:24 1          MR. MOORE:  It's not in as -- it's in as part of a

09:25:25 2    plaintiff exhibit, like part of the whole record.  We just wanted

09:25:28 3    to introduce our own copy of just the consent form.

09:25:30 4          THE COURT:  Okay.  That's fine.  Let it be admitted.

09:25:50 5          MR. MOORE:  Erin, if you could flip it back.

09:26:02 6    BY MR. MOORE:

09:26:03 7    Q.  If we could pull up Defense Exhibit 2058.  And, Mr. Earnest,

09:26:09 8    what I am showing you is a chemotherapy consent form.

09:26:12 9          MR. MOORE:  And if you flip to the second page, Jen.

09:26:12 10   BY MR. MOORE:

09:26:15 11   Q.  And do you see your signature on this document?

09:26:19 12   A.  Yes, sir.

09:26:20 13   Q.  And do you see the date March 31st, 2011?

09:26:24 14   A.  Yes, sir.

09:26:24 15   Q.  Go back to the first page.  Do you see there's a paragraph

09:26:36 16   there at the top.

09:26:37 17         MR. MOORE:  Yeah, go ahead and pull it up, Jen.

09:26:37 18   BY MR. MOORE:

09:26:41 19   Q.  Do you see that one of the things that I've highlighted there

09:26:44 20   in the paragraph where it talks about the potential side effects is

09:26:48 21   hair loss?  Do you see that?

09:26:49 22   A.  Yes, sir.

09:26:49 23   Q.  And we talked to Dr. Carinder yesterday and his testimony is

09:26:54 24   what it is.  But what I want to find out from you is if you have

09:26:58 25   any recollection of Dr. Carinder talking to you and Barbara about a

09:27:05  1    prior patient who had taken the same chemotherapy regimen as he was

09:27:10  2    recommending for Ms. Barbara who did not have her hair come back

09:27:13  3    the same way?

09:27:14  4    A.  No, I do not recall.

09:27:15  5    Q.  You don't recall that?

09:27:17  6    A.  (WITNESS SHAKES HEAD IN THE NEGATIVE.)

09:27:19  7    Q.  And the other things that are listed here besides hair loss,

09:27:27  8    one of them is alteration of the skin.  Do you see that?

09:27:30  9    A.  Yes, sir.

09:27:30  10   Q.  Potentially life threatening damage to such vital organs as the

09:27:36  11   heart.  Do you see that?

09:27:37  12   A.  Yes, sir.

09:27:37  13   Q.  The lungs.  Do you see that?

09:27:40  14   A.  Yes, sir.

09:27:40  15   Q.  The liver and kidneys.  Do you see that?

09:27:42  16   A.  Yes, sir.

09:27:43  17   Q.  And when you were shown this information, did you or Barbara

09:27:48  18   ask the doctor for any additional information about any of these

09:27:52  19   side effects?

09:27:55  20   A.  I don't recall at the time, no.

09:27:57  21   Q.  Do you recall saying -- having a discussion with a particular

09:28:03  22   medicine called Adriamycin that might damage the heart?  Do you

09:28:06  23   recall any of that?

09:28:06  24   A.  No, sir.

09:28:08  25   Q.  Do you recall saying to Dr. Carinder for any side effect that

09:28:15  1  it didn't sound like -- or did you ask for any other options or any

09:28:19  2  other different chemotherapy regimens that might have different

09:28:22  3  side effects?

09:28:22  4  A.  No, sir.

09:28:22  5  Q.  No discussion like that at all?

09:28:24  6  A.  No, sir.

09:28:25  7  Q.  And if you go to the second page -- I'm sorry.  Go down to the

09:28:36  8  two highlighted sentences there at bottom.  And you see that before

09:28:42  9  you signed this document, it has a statement in it that says, "I

09:28:45 10  understand that there is a risk of very uncommon, rare, or

09:28:48 11  previously unknown side effects developing because of the use of

09:28:51 12  these drugs."  Do you see that?

09:28:53 13  A.  Yes, sir.

09:28:53 14  Q.  And you understood that at the time you signed this document?

09:28:56 15  A.  Yes, sir.

09:28:57 16  Q.  Did you ask any questions about any of that?

09:28:59 17  A.  At the time, no, sir.

09:29:02 18  Q.  At the time were you even thinking about side effects?

09:29:11 19  A.  No, sir.

09:29:11 20  Q.  You just wanted Barbara to survive, right?

09:29:13 21  A.  That is correct.

09:29:14 22  Q.  And did Dr. Carinder give you any guarantees about anything?

09:29:20 23  A.  No, he did not.

09:29:22 24  Q.  You understood that there was no guarantee that the medicine

09:29:25 25  would save Barbara's life?

```
09:29:26   1   A.  All I was concerned about at the time was her survival.
09:29:30   2   Q.  And the reason for that is because you wanted her to survive,
09:29:37   3   yes?
09:29:37   4   A.  That is correct.
09:29:38   5   Q.  And she did survive, correct?
09:29:43   6   A.  That is correct, yes, sir.
09:29:44   7   Q.  And your feelings for her have not changed at all?
09:29:48   8   A.  No, not a bit.
09:29:50   9   Q.  And the amount of hair that she has has not changed anything in
09:29:56  10   your mind about Barbara?
09:29:57  11   A.  That is correct, yes, sir.
09:30:01  12   Q.  And you do not regret the decision that Barbara made to go
09:30:08  13   forward with treatment to save her life?
09:30:09  14   A.  No, I do not because she is still with me.
09:30:12  15            MR. MOORE:  Thank you.  No further questions, your Honor.
09:30:14  16            THE COURT:  Thank you.  Redirect, Mr. Schanker?
09:30:17  17            MR. SCHANKER:  No questions, your Honor.
09:30:18  18            THE COURT:  Thank you.  You may step down, Mr. Earnest.
09:30:21  19            THE WITNESS:  Thank you.  Have a good day.
09:30:25  20            THE COURT:  Please call your next witness.
09:30:34  21            MR. COFFIN:  Your Honor, the plaintiffs call as their
09:30:37  22   next witness Michael Kopreski, who is a Sanofi employee, called by
09:30:42  23   video.  And it's approximately 40 minutes, your Honor.
09:30:45  24            THE COURT:  Ladies and gentlemen, we're going to have
09:30:50  25   deposition testimony.  And as I instructed you before, at a time
```

09:30:53 1   before this trial, the witness was placed under oath and

09:30:59 2   questioned, and you should consider this testimony as you do any

09:31:02 3   other.

09:31:04 4          (WHEREUPON, THE VIDEO DEPOSITION OF MICHAEL KOPRESKI WAS

09:31:09 5   PLAYED AS FOLLOWS:)

09:31:12 6   Q.  Good morning, Doctor.  Could you please state your full name

09:31:14 7   for the record?

09:31:15 8   A.  Yes.  My name is Michael Steven Kopreski.

09:31:19 9   Q.  Prior to your retirement, according to this business card, you

09:31:25 10  were the associate vice president, global pharmacovigilance and

09:31:31 11  epidemiology?

09:31:31 12  A.  That is correct.

09:31:32 13  Q.  And so you were head of the oncology area for Sanofi

09:31:40 14  responsible for safety surveillance and risk management?

09:31:43 15  A.  That's correct.  So if I can maybe assist you, Mr. Bachus, to

09:31:51 16  speed up, you'll see in 2002 to 2005 I was director -- I was a

09:31:55 17  global safety officer.  And then, in 2005, I became the head of the

09:32:00 18  unit and the titles and even the unit name changed, but I was

09:32:06 19  essentially the same position until my retirement.

09:32:09 20  Q.  All right.  In 2005 Taxotere was a marketed product for breast

09:32:17 21  cancer.  Would you agree?

09:32:19 22  A.  Yes.

09:32:19 23  Q.  Doctor, do you know now have Exhibit 6 in front of you?

09:32:25 24  A.  I do.

09:32:25 25  Q.  So this publication by Dr. Nabholtz was published in the

09:32:29 1   *Journal of Clinic Oncology.*  Do you see that?

09:32:32 2   A.  That's correct.

09:32:32 3   Q.  And it was published in January the 15th of 2001.  Do you see

09:32:38 4   that?

09:32:38 5   A.  Yes, I do.

09:32:39 6   Q.  So at the conclusion of the study and by time of publication,

09:32:53 7   Dr. Nabholtz is reporting that four out of 54 patients had alopecia

09:32:59 8   lasting longer than two years; is that accurate?

09:33:02 9   A.  That's -- I think that's -- I think that's accurate, yes.

09:33:11 10  Q.  And do you agree with me that 4 out of 54 represents 7.4

09:33:19 11  percent of the study -- patients in the study are reported to have

09:33:27 12  had alopecia lasting longer than two years, as published in the

09:33:37 13  *Journal of Clinical Oncology*?

09:33:45 14  A.  Well, in this -- I would have to do the math, but I am willing

09:33:57 15  to concede, I remember the number was around that in this study

09:34:04 16  involving the TAC regimen, the Taxotere, doxorubicin, and

09:34:11 17  cyclophosphamide regimen.

09:34:12 18  Q.  And this publication that is Exhibit 6 that was published on

09:34:24 19  January the 15th, 2001, this publication was known certainly to

09:34:31 20  Sanofi at the time of publication in January of 2001, correct?

09:34:37 21  A.  The information in here was Sanofi-confidential information

09:34:44 22  that Sanofi would have had -- had to basically agree with -- not

09:34:50 23  only agree with the publication, but likely provide the data and

09:34:54 24  support, as well as review the publication, so that would be a

09:34:59 25  correct statement.

09:35:01  1    Q.  I am going to hand you what is being marked as Exhibit No. 11.
09:35:10  2    Now, this is a meeting invite and the meeting invite is on
09:35:22  3    4/25/2006, so we're about maybe a month after the Amy Freedman
09:35:34  4    e-mail that we just discussed, and the subject is going to be
09:35:38  5    proposed changes to section 4 of a product label.  Do you see that,
09:35:45  6    at the top, under "Subject"?
09:35:47  7    A.  Discussion of proposed changes to section 4PL, yes.
09:35:51  8    Q.  And then there's a list of required attendees for the meeting.
09:36:00  9    It looks like the first listed required attendee would be yourself.
09:36:05 10    Do you see that?
09:36:06 11    A.  I see myself on the list.
09:36:06 12    Q.  All right.
09:36:09 13    A.  But I do want to highlight that -- that required attendees is
09:36:15 14    an indication that this is something they would like you to be at,
09:36:20 15    but that doesn't necessarily that this is a meeting that was
09:36:23 16    attended.  In fact, there were times where I had two or even three
09:36:29 17    required meetings occurring at the same time.
09:36:35 18    Q.  You agree that this document, Exhibit 11, lists yourself as a
09:36:42 19    required attendee?
09:36:43 20    A.  I am -- I am listed.  I am just trying to clarify that doesn't
09:36:46 21    mean --
09:36:47 22    Q.  No, I appreciate it.
09:36:48 23    A.  -- that I would have attended it.
09:36:49 24    Q.  And the PL at the top, is that patient leaflet?
09:36:54 25    A.  I don't know.  I think that's a very good assumption.

09:36:58  1    Q.  Okay.  And what is a patient leaflet?

09:37:01  2    A.  A patient leaflet would be a part of the labelling that is

09:37:10  3    designed for the patient, with the patient's -- the patient reading

09:37:21  4    it as opposed to, let's say, the package insert, which is designed

09:37:28  5    more for physicians in terms of the language and the tone.

09:37:33  6    Q.  And so I think my question to you was simply whether you see

09:37:40  7    the attachment that says, "current patient leaflet," and if four

09:37:46  8    bullet points from the bottom you see the portion that says, "Very

09:37:49  9    common temporary loss of hair.  After your treatment, normal hair

09:37:54 10    growth should return."  Do you see that?

09:37:57 11    A.  I do.

09:37:57 12    Q.  Do you know who wrote that language?

09:38:02 13    A.  No, I do not.

09:38:04 14    Q.  And based upon the meeting invite, this is the current patient

09:38:10 15    leaflet at the time that they wanted to be updated, correct?

09:38:17 16    A.  Well, the top of the page says, "current PL."  That's the only

09:38:24 17    information I have here.

09:38:25 18    Q.  Well, you've been in this industry for decades.  You, I'm sure,

09:38:30 19    have dealt with these types of required meetings previously.

09:38:34 20    A.  True.  But you asked me if this is the current package leaflet.

09:38:39 21    I don't have an official patient leaflet corresponding to this date

09:38:47 22    to know whether this, indeed, is the current one.  So I -- I am

09:38:52 23    willing to proceed in the line of questioning as if it is and

09:38:56 24    assume that it is because it says, "current PL."  But I can't under

09:39:00 25    oath say that it is.

09:39:01  1    Q.  Sure.  The meeting was set to discuss updating the current PL,

09:39:04  2    correct?

09:39:05  3    A.  Apparently so, yes.

09:39:07  4    Q.  An attachment to the e-mail to the meeting contains this page,

09:39:10  5    which at the top identifies itself as "Current PL", correct?

09:39:15  6    A.  That's what it says, "Current PL."

09:39:18  7    Q.  If you turn past the current PL, you'll see a document that has

09:39:28  8    a title at the top that says, "Draft Proposal 1."

09:39:35  9    A.  Okay.

09:39:36 10    Q.  Do you see that?

09:39:36 11    A.  I do.

09:39:37 12    Q.  This was also attached to the e-mail.  And a draft proposal,

09:39:42 13    what does a proposal draft mean to you in pharmacovigilance?

09:39:53 14    A.  Well, I don't think there's any -- anything unique to

09:39:59 15    pharmacovigilance in the word draft proposal.  It is a draft

09:40:03 16    meaning it's not finalized.  It's a -- and proposal 1 would suggest

09:40:12 17    that this is a non-finalized, non -- probably non-reviewed proposal

09:40:17 18    that's being made.

09:40:18 19    Q.  Okay.  And if you --

09:40:20 20    A.  I would imagine it's being attached for discussion.

09:40:22 21    Q.  I'm sorry.  Were you able to finish?

09:40:25 22    A.  Yes.  Sorry.

09:40:25 23    Q.  All right.  If you go down to the proposal on page 1 of the

09:40:28 24    draft proposal No. 1, under "Very Common," do you see it says,

09:40:33 25    "Very Common" and then it says, "(experienced in more than 1 in 10

09:40:38 1   patients)."  Do you see that?

09:40:40 2   A.  All right.

09:40:45 3   Q.  And then -- one, two, three -- four bullet points down it says,

09:40:52 4   under "Very Common," "short-term hair loss, after normal -- after

09:40:57 5   treatment, normal hair growth should return."  Do you see that?

09:41:00 6   A.  I do see that.

09:41:01 7   Q.  And then if you turn the page to the second page of proposal

09:41:05 8   No. 1, at the bottom, under what's termed as "Rare," it says,

09:41:18 9   "Alopecia (hair loss) that did not reverse at the end of the

09:41:23 10  study."  Do you see that?

09:41:24 11  A.  I do.

09:41:24 12  Q.  Clearly, whoever -- well, first of all, do you know who drafted

09:41:28 13  proposal No. 1?

09:41:29 14  A.  Excuse me.  No.

09:41:31 15  Q.  Would you agree with me that clearly whoever it was that

09:41:34 16  drafted proposal No. 1 was able to identify and describe two

09:41:43 17  distinct types of hair loss related to the use of Taxotere; one

09:41:49 18  that was identified as occurring in -- as a very common side effect

09:41:56 19  in more than one in ten patients, as short-term hair loss; and the

09:42:01 20  second, that's rare alopecia that did not reverse at the end of the

09:42:04 21  study.  Do you see that?

09:42:06 22  A.  I do.  But I don't think I agree with the way that you posed

09:42:09 23  your question.  I don't think they're describing two distinct

09:42:11 24  types.  I think they're describing two different patterns of

09:42:17 25  recovery in terms of duration and frequency.

09:42:21  1    Q.  What were you going to do at the meeting if you didn't discuss

09:42:24  2    the proposals?

09:42:25  3    A.  No, I'm sure -- I'm sure at the meeting they were discussing

09:42:29  4    the proposal.  Whether people looked at it before the meeting or

09:42:33  5    looked at it during the meeting, I can't answer that.  I can't

09:42:36  6    answer it for myself because I don't have recollection of this, but

09:42:40  7    I can't certainly answer for other people also.

09:42:42  8    Q.  So when the people who bothered to attend this mandatory,

09:42:49  9    important meeting got as far as draft proposal No. 1 --

09:42:53  10   A.  Yes.

09:42:53  11   Q.  -- at that point in time in the year 2006, somebody in a

09:43:00  12   management position at Sanofi related -- with their work related to

09:43:07  13   Taxotere --

09:43:08  14   A.  Uh-huh.

09:43:09  15   Q.  -- would have had the opportunity to see, whether they wrote it

09:43:13  16   or not, which you can't testify about, that there -- that you can

09:43:18  17   characterize short-term hair loss as an outcome and you can

09:43:22  18   characterize alopecia that did not reverse at the end of the study

09:43:28  19   as an outcome, right?

09:43:30  20   A.  I would think that would be a reasonable assumption.

09:43:32  21   Q.  All right.  You see the draft proposal No. 2?

09:43:36  22   A.  Yes, I do.

09:43:37  23   Q.  If you will turn to page 2 of draft proposal 2 of the patient

09:43:44  24   leaflet.  Turn to page 2.

09:43:45  25   A.  Okay.

09:43:45  1   Q.  There is an area of proposal No. 2, it's about -- one, two,

09:43:50  2   three, four -- five paragraphs from the bottom and it starts with,

09:43:54  3   "Skin and subcutaneous tissue disorders."  Do you see that?

09:43:59  4   A.  Yes, I do.

09:44:00  5   Q.  And it lists hair loss (alopecia) -- do you see that?

09:44:04  6   A.  I do.

09:44:04  7   Q.  -- as very common, and then there's a semicolon.  Do you see

09:44:13  8   that?

09:44:13  9   A.  Yes.

09:44:13 10   Q.  And then listed as uncommon, alopecia (hair loss) that did

09:44:21 11   not -- it says did not reversible, but -- did not reversible at the

09:44:24 12   end of the study.  Do you see that?

09:44:26 13   A.  I do.

09:44:27 14   Q.  So here, again, in April of 2006 in Proposal 2 to a patient

09:44:36 15   leaflet, being discussed are two different outcomes of alopecia

09:44:43 16   described as such in this draft proposal, correct?

09:44:49 17   A.  Two different outcomes of resolution, yes, I think that's a

09:44:54 18   reasonable statement.

09:44:56 19   Q.  Have you found draft proposal No. 3?

09:44:58 20   A.  I have.

09:44:59 21   Q.  If you turn to page 2 of proposal No. 3, and, again, look under

09:45:07 22   "Skin and subcutaneous skin disorders."  It's the third set of

09:45:13 23   boxes down.

09:45:14 24   A.  Yes, I do see it.

09:45:15 25   Q.  That under "very common" it describes hair loss.  Do you see

09:45:19  1    that?  Alopecia, meaning, occurs in greater than ten percent.

09:45:23  2    Correct?

09:45:24  3    A.  Yes, I do see that.

09:45:25  4    Q.  And then do you see over in the uncommon it says, "Alopecia

09:45:31  5    non-reversible at the end of the study."  Do you see that?

09:45:35  6    A.  I do see that.

09:45:36  7    Q.  Do you agree with me that in April of 2006, in Taxotere patient

09:45:50  8    leaflet Proposals 1, 2, and 3, there are three different ways to

09:45:58  9    present two different outcomes for alopecia so that the patient can

09:46:06  10   understand the distinction?

09:46:13  11   A.  I agree -- I agree that in Leaflets 1, 2, and 3 there are --

09:46:23  12   there are the different presentations related to recovery.

09:46:30  13   Q.  Do you have any independent recollection as to your

09:46:35  14   participation in the meeting regarding updating the patient leaflet

09:46:41  15   for Taxotere?

09:46:42  16   A.  No, I'm afraid I don't recall that.

09:46:44  17   Q.  Looking at Exhibit No. 13, if you'll see at the top of Exhibit

09:46:50  18   No. 13, there is a date --

09:46:53  19   A.  Yes.

09:46:53  20   Q.  -- January of 2007?

09:46:55  21   A.  Yes.

09:46:56  22   Q.  And in this consent form, this is from a clinical trial in

09:47:06  23   Canada.  Do you see the Alberta Cancer Board?

09:47:10  24   A.  Okay.

09:47:10  25   Q.  Do you see that?

09:47:11  1    A.  I do see it.

09:47:12  2    Q.  All right.  If you would turn to page 6.  And these highlights

09:47:28  3    were on the document when they were produced to us.  They are not

09:47:31  4    highlights that we placed on the document.

09:47:34  5    A.  So you don't like green?

09:47:36  6    Q.  I am just wanting to let you know that --

09:47:39  7    A.  Okay.

09:47:39  8    Q.  -- I haven't made any highlights on this document, that this is

09:47:43  9    the way that -- that the document was produced to us.

09:47:47  10        Do you see -- well, first of all, this consent form, this

09:47:53  11   is the type of form that a participant in a clinical trial would be

09:48:01  12   given and then sign after reading; is that true?  That's what a

09:48:06  13   consent form is?

09:48:07  14   A.  Yes.  Yes, that's -- that would be true.

09:48:11  15   Q.  On the second line of the first paragraph under "What are the

09:48:16  16   side effects," on page 6, it says, "It is important that you know

09:48:20  17   and understand the possible side effects of the treatment given in

09:48:23  18   this study."  Do you see that?

09:48:24  19   A.  Yes, I do.

09:48:25  20   Q.  And then below there's a table listing a drug, a route, and

09:48:32  21   then reported side effects.  Do you see that on page 6?

09:48:37  22   A.  I do.

09:48:37  23   Q.  And do you see the first drug listed is doxorubicin?

09:48:42  24   A.  Yes.

09:48:43  25   Q.  So anyway, that's the drug we're talking about?

09:48:45  1   A.  Okay.

09:48:45  2   Q.  And do you notice here under "reported side effects" that one

09:48:50  3   of the side effects is hair loss?  It's right here --

09:48:53  4   A.  Yes, I do see it.

09:48:54  5   Q.  Now, if you turn to the next page and this is cyclophosphamide.

09:49:04  6   Do you see that?  This is page 7.

09:49:08  7   A.  Yes, I do see that.

09:49:09  8   Q.  All right.  And on page 7, it's in the first column of side

09:49:13  9   effects.  Do you see where it says, "hair loss"?

09:49:16  10  A.  Yes, I see that.

09:49:18  11  Q.  And then if we turn to the next page, under "docetaxel," do you

09:49:28  12  see in the first column -- docetaxel, that's Taxotere, right?

09:49:31  13  A.  That's correct.

09:49:32  14  Q.  -- in the first column it says, "hair loss."  Do you see that?

09:49:36  15  A.  Correct.

09:49:36  16  Q.  And then if you go over to the second column on the right, do

09:49:40  17  you see it says, "permanent hair loss."  Do you see that?

09:49:44  18  A.  Yes, I do see that.

09:49:45  19  Q.  And if you just flip back just for a second, only because the

09:49:55  20  top of page 8 actually starts on the bottom of page 7, where it

09:49:59  21  says, "Reported Side Effects."  Do you see that?

09:50:02  22  A.  Yes.

09:50:04  23  Q.  So the reported side effects -- then you carry that over onto

09:50:09  24  the Taxotere page -- the reported side effects listed in this

09:50:14  25  informed consent form are hair loss and permanent hair loss.  Do

09:50:18  1   you see that?

09:50:18  2   A.  I do see that.

09:50:20  3   Q.  Do you agree with me that there are two different outcomes of

09:50:27  4   alopecia being described in the Taxotere portion of this informed

09:50:36  5   consent form for this Canadian clinical trial?

09:50:39  6   A.  No, I don't see that as two different outcomes.  I see that as

09:50:43  7   further clarification of -- that the range of outcomes for hair

09:50:48  8   loss could be -- include permanent hair loss.

09:50:54  9   Q.  Clearly, when the Canadian Taxotere clinical trial informed

09:51:07 10   consent form was created in this version, January 8, 2007, Sanofi

09:51:19 11   was aware of permanent hair loss being a reported side effect

09:51:24 12   related to its product, correct?

09:51:26 13   A.  Again, it was in the company core safety data sheet.

09:51:36 14   Q.  Meaning -- first of all, you agree with me, this is a

09:51:42 15   Sanofi-Aventis document, right?  Look at the top, "Treatment

09:51:46 16   Consent Sanofi-Aventis"?  Look at the top of page 8.

09:51:52 17   A.  I don't -- I don't necessarily think I would agree with you.

09:51:57 18   I'm not in the clinical development group that would interact with

09:52:05 19   the site in terms of this document, but -- this appears to be a

09:52:11 20   Sanofi-Aventis protocol, but as I understand it, the informed

09:52:15 21   consents are produced by the individual institutions very often.

09:52:25 22   This appears to be an informed consent that is -- that is from the

09:52:33 23   Alberta Cancer Board.

09:52:34 24   Q.  And this is a Sanofi clinical trial, correct?

09:52:37 25   A.  It's a Sanofi clinical trial.

09:52:39 1  Q.  And according to the consent form signed -- to be used, under

09:52:45 2  "reported side effects," again, the top of page 7, carrying over,

09:52:53 3  reported side effects of Taxotere, permanent hair loss.

09:52:58 4  A.  Permanent hair loss is in the consent form, that is correct.

09:53:02 5  Q.  And of the drugs listed in this consent form that we just

09:53:13 6  discussed, the doxorubicin and the cyclophosphamide, the only one

09:53:18 7  of the three that lists permanent hair loss as a side effect is

09:53:23 8  docetaxel or Taxotere, correct?

09:53:25 9  A.  The only -- I don't recall seeing permanent hair loss for the

09:53:38 10 Adriamycin or cyclophosphamide in this particular consent form, but

09:53:42 11 the informed consent form does specify that events -- and I'll read

09:53:52 12 to you -- "these side effects may or may not be more severe when

09:53:55 13 the drugs are taken together."

09:53:57 14 Q.  But the tables describe reported side effects, right?

09:54:08 15 A.  Correct.

09:54:09 16 Q.  And the only one of the three drugs that we discussed, the

09:54:18 17 cyclophosphamide, the doxorubicin, and the Taxotere, the only one

09:54:24 18 that includes permanent hair loss as a reported side effect is

09:54:28 19 Taxotere, correct?

09:54:28 20 A.  That is correct.

09:54:29 21 Q.  And that was January of 2007, correct?

09:54:36 22 A.  Yes, correct, in this document.

09:54:39 23 Q.  I am going to hand you what's been marked as Exhibit 15.  Now,

09:54:44 24 the last document that we looked at, that clinical study report

09:54:49 25 with the 6.1 percent, was dated November the 9th, 2009.  And now, I

1709

09:54:57 1   do want to show you this Exhibit No. 15.  And the date at the

09:55:03 2   bottom of this is December 13th, 2009.  Do you see that, the bottom

09:55:13 3   of page 1 of Exhibit 15?

09:55:19 4   A.  Yes.

09:55:21 5   Q.  You can look on the screen.

09:55:24 6   A.  Yes -- well, yes, it's a period of time, I think, of the

09:55:31 7   conference itself from December 9 to December 13th.

09:55:35 8   Q.  And the first doctor listed on this document is Dr. Bourgeois.

09:55:41 9   Do you see that?

09:55:42 10  A.  I do.

09:55:42 11  Q.  And this is an abstract about long-term persistent alopecia and

09:55:49 12  suboptimal hair regrowth after chemotherapy for breast cancer.  Do

09:55:53 13  you see that?

09:55:53 14  A.  I do see that.

09:55:54 15  Q.  And you've had the opportunity to review this abstract before

09:56:03 16  today, haven't you?

09:56:04 17  A.  Within the course of my 30(b)(6) depositions, I did see this

09:56:13 18  abstract, as well as many of the cases associated with this

09:56:17 19  abstract.

09:56:18 20  Q.  There's a network that's identified in this abstract called

09:56:22 21  OMIT.  Do you see that in the document?

09:56:24 22  A.  I do see that.

09:56:25 23  Q.  And it's the Drugs and Emerging Therapeutics Observatory that

09:56:32 24  was cleated by this group?

09:56:33 25  A.  I do see that.

09:56:34  1   Q.  And this group indicates that they quickly drew up a case

09:56:38  2   report form and mailed it to the oncologists in Western France to

09:56:43  3   collect data.  Do you see that?

09:56:45  4   A.  I do.

09:56:45  5   Q.  And at any time, either before or after this Bourgeois

09:56:58  6   abstract, to your knowledge, did Sanofi ever quickly draw up a case

09:57:03  7   report form and mail it to oncologists to collect data on

09:57:08  8   persisting or irreversible or permanent alopecia?

09:57:16  9   A.  It is my belief that Sanofi collected surveillance information

09:57:27 10   on Taxotere toxicity.  I don't think it was -- to my knowledge, I

09:57:33 11   am not aware of surveillance being restricted to alopecia itself.

09:57:43 12   Q.  The drawn-up case report forms that were mailed out resulted in

09:57:48 13   information coming in about 66 cases of persistent alopecia.  Do

09:57:53 14   you see that?

09:57:53 15   A.  Yes.

09:57:54 16   Q.  And amongst the chemotherapy regimens, would you agree with me

09:58:05 17   that there were cases where the only identified chemotherapy or

09:58:16 18   anti-cancer agent given was Taxotere?  You can look on the screen --

09:58:24 19   A.  I can't draw that conclusion from what's in the abstract

09:58:27 20   because while it does cite that there were three cases where

09:58:36 21   patients received docetaxel, it also cites a number of patients

09:58:43 22   that received anti-cancer and antihormonal agents.  And it

09:58:53 23   doesn't -- it's written in such a way that the -- the two groups

09:58:59 24   could overlap.

09:59:00 25   Q.  In the conclusion, do you agree that this group of doctors

09:59:05  1   concluded, in part, by stating, "It's an important side effect that

09:59:09  2   must be considered by oncologists as optimal information to give to

09:59:14  3   curable patients."  Do you see that on the conclusion, the second

09:59:19  4   sentence?

09:59:22  5   A.  Yes, I do see that.

09:59:23  6   Q.  State your name, please.

09:59:24  7   A.  My name is Michael Steven Kopreski.

09:59:28  8   Q.  You are a medical doctor with board certifications.  Describe

09:59:33  9   those?

09:59:33 10   A.  That is correct.  I am an M.D. I was board certified in

09:59:40 11   internal medicine and oncology, medical oncology.

09:59:47 12   Q.  Okay.  And --

09:59:49 13   A.  I would add, both trainings were here in the United States.

09:59:51 14   Q.  Okay.  There was a time you were a practicing oncologist?

09:59:56 15   A.  That's correct.  Of course, I practiced during my fellowship in

10:00:03 16   medical oncology.  And after finishing my fellowship, I was at the

10:00:09 17   National Cancer Institute as a senior investigator where I saw

10:00:14 18   patients, as well as doing clinical research, so I was practicing

10:00:19 19   then.  And I also had some privileges at the hospital across the

10:00:30 20   street where we would put some of our National Cancer Institute

10:00:38 21   patients in if warranted.

10:00:43 22   Q.  I want to talk just briefly about chemotherapy and why do some

10:00:51 23   chemotherapy therapies cause alopecia.

10:00:53 24   A.  Okay.  Well -- okay.  "Chemotherapy" is a fairly broad term.

10:01:06 25   But within that, there are cytostatic and cytotoxic agents.  And

10:01:11 1   basically, you know, what -- what cancer is is a disease where the

10:01:19 2   signals are out of balance so that cancer cells grow unchecked.  So

10:01:28 3   normally when cancer is -- when you have normal cells -- let's

10:01:37 4   take, for example, if you have a wound and you get a laceration and

10:01:42 5   you have to heal that, those cells will receive signals to grow,

10:01:47 6   but at the appropriate time, that growth stops.  Once the wound has

10:01:52 7   healed, the growth stops.

10:01:54 8          But in cancer, those signals are disregulated, so you

10:02:02 9   have continued growth.  What the chemotherapy agents basically do

10:02:08 10  as a very broad or general class is, they interfere with the growth

10:02:12 11  of the cancer cell either by killing the cancer cell or interfering

10:02:16 12  with the growth mechanism of the cancer cell, such as Taxotere

10:02:24 13  interfering with a mechanism that allows for a division of the

10:02:28 14  cancer cell.

10:02:29 15  Q.  Okay.  There's been a lot of discussion about alopecia and

10:02:34 16  modifiers of alopecia, whether it's persistent or irreversible or

10:02:39 17  ongoing.  Let's talk a little bit about alopecia.  Is there a

10:02:42 18  commonly accepted definition of persistent alopecia?

10:02:47 19  A.  I don't believe there is.  Alopecia -- alopecia is a diagnostic

10:02:54 20  term, and as we've talked about in not only this deposition but

10:03:02 21  other depositions, 30(b)(6) depositions that I've been in, the

10:03:13 22  concept of -- of a term that applies to persistence or permanence

10:03:25 23  is -- is something that's not a defined medically accepted

10:03:32 24  diagnostic term or even a term where there's full agreement on what

10:03:39 25  that term should mean.  Some people will use as persistence a

10:03:47  1    definition of alopecia that doesn't resolve after six months.

10:03:50  2    Other people have mentioned that while most alopecia resolve after

10:03:57  3    six months, quite a considerable amount of alopecias resolve

10:04:01  4    between six months and a year.

10:04:03  5    Q.   Okay.  And staying briefly on this topic of alopecia, what is

10:04:10  6    it about breast cancer patients and the therapies that they may

10:04:15  7    take after the chemotherapy have stopped that they may impact hair

10:04:19  8    regrowth?

10:04:19  9    A.   Well -- so the way that I've looked at this question is -- is

10:04:30 10    that we have initial insult that could lead to hair loss.  I

10:04:38 11    described chemotherapies, including Adriamycin and cyclophosphamide

10:04:46 12    and Taxotere and Taxol.  They all have -- they all have a high

10:04:51 13    instance of alopecia because one of the faster-growing cells in the

10:04:59 14    body are hair follicles.  They tend to be active and you're giving

10:05:04 15    agents that interfere with growth.

10:05:06 16          So the aspect of having alopecia after these therapies is

10:05:14 17    not unusual.  There's a high instance of alopecia after these

10:05:18 18    therapies.  But the question becomes, why do some patients not

10:05:24 19    recover?  Why is it that most patients recover but some patients

10:05:30 20    don't recover?

10:05:30 21    Q.   And when you talk recovery, you're talking about alopecia?

10:05:34 22    A.   Recover from their alopecia.  So -- and, clinically, we see

10:05:42 23    that non-recovery in ways that's been discussed in this deposition,

10:05:48 24    you know, people referring to terms as "persistent" or "permanent"

10:05:51 25    or "chronic" or "irreversible," okay.  But the way that I look at

10:06:00  1    it is, it's an issue of what determines some patients to recover

10:06:04  2    and some patients receive the same insult and don't recover.

10:06:08  3            So one has to consider what are the factors that might

10:06:13  4    interfere with recovery.  Now, there's a lot of hypotheses, but in

10:06:20  5    realty, I think for the most part today, people still don't know.

10:06:25  6    They don't truly understand the cause.  They have hypotheses.  Some

10:06:30  7    hypotheses will suggest it's one factor or another factor.

10:06:36  8            When one looks at factors that are involved in recovery,

10:06:42  9    there are many factors; and drugs that might be given after

10:06:45 10    chemotherapy are one such factor.  The common drugs, for example,

10:06:51 11    in breast cancer that are given after a chemotherapy are drugs that

10:06:58 12    interfere with the estrogen response that some breast cancers

10:07:06 13    thrive upon.  So these are antihormonal or anti-antiandrogen

10:07:11 14    agents.  They include agents such as tamoxifen and Arimidex, the

10:07:17 15    aromatase inhibitors, letrozole.  There's a whole class of these

10:07:23 16    agents.  And they've been shown to, in their own right, interfere

10:07:29 17    with the hair growth, and even in their own right, as single agents

10:07:34 18    cause alopecia.

10:07:34 19    Q.  Okay.  Very good.  I want to shift gears and talk a little bit

10:07:40 20    about pharmacovigilance.  I want you to describe for the jury the

10:07:45 21    pharmacovigilance organization at Sanofi when you were there.  So

10:07:49 22    give us an overview, if you would.

10:07:51 23    A.  Well, pharmacovigilance is -- which basically is responsible

10:07:54 24    for drug safety and monitoring for drug safety.  It is a very big

10:08:02 25    organization at Sanofi that has high importance and independence

10:08:12  1   from -- at Sanofi from other departments such as clinical

10:08:19  2   developing -- development and marketing and regulatory.  It's

10:08:23  3   really its own separate department.

10:08:26  4   Q.  I want to focus on Nabholtz.  It's Exhibit No. 6.  I know

10:08:31  5   you -- you can just --

10:08:32  6   A.  All right.

10:08:33  7   Q.  You can follow me.

10:08:34  8   A.  I'll follow you.

10:08:35  9   Q.  Doctor, I want to -- this has already been the subject of some

10:08:40 10   discussion, so I want to move through this relatively quickly.

10:08:46 11   This is Exhibit 6, and you recall the questions about this study,

10:08:49 12   right?

10:08:49 13   A.  Yes, I do.

10:08:50 14   Q.  And I think counsel previously established that this would have

10:08:53 15   been in 2001?

10:08:56 16   A.  It was -- that's correct.

10:08:56 17   Q.  Okay.

10:08:57 18   A.  In the *Journal of Clinical Oncology,* which is a very prominent

10:09:02 19   journal.  The association -- the American Society of Clinical

10:09:08 20   Oncology has an international membership of thousands of members

10:09:13 21   and this journal of the society is one of the more prominent

10:09:22 22   journals in the oncology field.

10:09:24 23   Q.  Okay.  And I want to also direct your attention to a statement

10:09:28 24   that counsel spent some time with you on with respect to the

10:09:32 25   reports of alopecia.  And in this -- so let's be clear.  This paper

10:09:43 1    is being published in one of the most prominent oncology journals?

10:09:47 2    A.  That's correct.  That's my opinion.

10:09:49 3    Q.  And this was a study that was funded and underwritten by Sanofi

10:09:53 4    or its predecessor company?

10:09:55 5    A.  Yes.  The importance of that is that for this Sanofi study, it

10:10:02 6    has confidentiality rights and also would need to review this

10:10:07 7    study.  So Sanofi basically agreed to have and probably provided

10:10:12 8    the data since that -- this is more than one site.  So the data

10:10:19 9    would have had to be provided by Sanofi to the authors in order to

10:10:24 10   publish this.  So Sanofi actually advocated and supported the

10:10:29 11   publication of this.

10:10:30 12   Q.  Okay.  Dr. Kopreski, Mr. Bachus showed you Exhibit 15 and

10:10:37 13   you're familiar with Exhibit 15, are you not?

10:10:39 14   A.  Yes, I am.  I would say also this study is a very interesting

10:10:43 15   example of what I was talking about in terms of understanding the

10:10:48 16   criteria behind the study, because what this study basically says,

10:10:56 17   if you go back to that page, is that after a study that -- in

10:11:06 18   France with publication of the PACS 01 publication, that the FEC

10:11:15 19   100 followed by docetaxel -- and I am reading the first paragraph,

10:11:19 20   followed by docetaxel really became a standard regimen.

10:11:24 21                    So if -- so what you have is a number of

10:11:28 22   cases of persistent alopecia coming out of France involving

10:11:34 23   docetaxel.  But you need to understand that docetaxel was the

10:11:40 24   standard.  Most of the patients were receiving docetaxel, so the

10:11:44 25   implication that we're seeing many cases of docetaxel and not too

10:11:49  1   many case of another drug doesn't necessarily mean that docetaxel

10:11:53  2   is more likely than the other drug to be causing persistent

10:11:58  3   alopecia.  It could be an indication of the fact that most of the

10:12:01  4   use was with docetaxel.         (WHEREUPON, THE VIDEO DEPOSITION

10:12:09  5   WAS CONCLUDED.)

10:12:09  6          THE COURT:  Thank you.  Members of the jury, it's a

10:12:11  7   little after ten.  This is a good time for us to take our morning

10:12:16  8   recess.  The court will be at recess until 10:25.  Thank you.

10:12:23  9          THE DEPUTY CLERK:  All rise.

10:12:23 10      (WHEREUPON, THE JURY EXITED THE COURTROOM AND A RECESS WAS

10:12:23 11        TAKEN.)

10:12:23 12      (OPEN COURT.)

10:32:40 13          MR. COFFIN:  Your Honor, before the jury comes in, we

10:32:42 14   just want to offer this evidence, the exhibits --

10:32:45 15          THE COURT:  I'm listening.

10:32:46 16          MR. COFFIN:  -- from Dr. Kopreski's video deposition that

10:32:50 17   was just played.  We offer Plaintiff's Exhibit 32, Plaintiff's 180,

10:32:54 18   Plaintiff's 199, Plaintiff's 250 in evidence, your Honor.

10:32:59 19          THE COURT:  Okay.

10:33:00 20          MR. MOORE:  Subject to the objections articulated

10:33:03 21   previously, your Honor.

10:33:04 22          THE COURT:  Thank you.

10:33:06 23          MR. COFFIN:  Thank you.

10:33:08 24          THE COURT:  Let them be admitted.  We are ready to bring

10:33:11 25   in the jury.

| | | |
|---|---|---|
| 10:33:42 | 1 | (WHEREUPON, THE JURY ENTERED THE COURTROOM.) |
| 10:33:42 | 2 | THE COURT:  All jurors are present.  Court's back in |
| 10:33:42 | 3 | session.  You may be seated. |
| 10:33:45 | 4 | Mr. Schanker, please call your next witness. |
| 10:33:47 | 5 | MR. SCHANKER:  Thank you, your Honor.  We would like to |
| 10:33:49 | 6 | call Ms. Barbara, Barbara Earnest. |
| 10:33:53 | 7 | THE COURT:  Come forward, Ms. Earnest. |
| 10:34:15 | 8 | (WHEREUPON, BARBARA EARNEST, WAS SWORN IN AND TESTIFIED AS |
| 10:34:16 | 9 | FOLLOWS:) |
| 10:34:16 | 10 | THE DEPUTY CLERK:  Thank you.  You can have a seat. |
| 10:34:31 | 11 | MR. SCHANKER:  Are you situated there? |
| 10:34:33 | 12 | THE WITNESS:  Yes. |
| 10:34:34 | 13 | DIRECT EXAMINATION |
| 10:34:35 | 14 | BY MR. SCHANKER: |
| 10:34:35 | 15 | Q.  Good morning. |
| 10:34:36 | 16 | A.  Good morning. |
| 10:34:37 | 17 | Q.  Could you please introduce yourself to the jury. |
| 10:34:39 | 18 | A.  My name is Barbara LeBlanc Earnest. |
| 10:34:43 | 19 | Q.  And tell these folks where you were born. |
| 10:34:46 | 20 | A.  New Orleans.  I'm from here. |
| 10:34:50 | 21 | Q.  All right.  Have you lived in Louisiana your whole life? |
| 10:34:52 | 22 | A.  Yes, I have. |
| 10:34:53 | 23 | Q.  And how old are you? |
| 10:34:56 | 24 | A.  I am 68. |
| 10:34:58 | 25 | Q.  And when did you meet Ralph Earnest? |

10:35:02  1    A.  I met Ralph in 1968 -- I had to think about that -- on a blind
10:35:10  2    date.  It was Halloween night and the date ended and I went home.
10:35:20  3    Didn't know he was going to follow me, though.
10:35:23  4    Q.  And just briefly, obviously, he -- something happened with him
10:35:29  5    following you.  Can you share that with the jury?
10:35:31  6    A.  One weekend I went -- the next weekend I went to my
10:35:36  7    grandmother's house and who come knocking on the door.  He found
10:35:38  8    out where I was and met me over there.  And we been together ever
10:35:43  9    since.
10:35:43  10   Q.  How long ago was that?
10:35:45  11   A.  That was in 1968.  We got married in 1970.  And like I say,
10:35:54  12   we -- no, I graduated in 1970.  We got married in '72 and we been
10:35:59  13   together ever since.
10:36:00  14   Q.  You mentioned graduating.  Tell the jury a little bit just
10:36:05  15   about your education that you have.
10:36:06  16   A.  I went to Andrew Jackson High in Chalmette, Louisiana.  Four
10:36:14  17   years of high school there.  And he went to an all boy school.  I
10:36:19  18   went to an all girl school.
10:36:21  19   Q.  And so how long have y'all been married?
10:36:26  20   A.  Forty-seven years, not 46.  I think he said 46.  So he was
10:36:33  21   wrong on the date.  It's 47 years.
10:36:35  22   Q.  Now, just briefly, as far as background goes, have you worked
10:36:40  23   outside of the home in your lifetime?
10:36:43  24   A.  Yes, I have.  I worked in a cleaners.  In fact, I was working
10:36:49  25   in the cleaners when my oldest son was born.  And when I was able

10:36:57  1   to -- when he was able to -- someone watched him for a little

10:37:02  2   while, but then after that, I brought him with me to the cleaners.

10:37:05  3   So I had him with me all the time.

10:37:09  4        Then I quit work, I am not sure when that was.  I think

10:37:12  5   that was before Michael was born I quit.  But then I went back in

10:37:19  6   about '99.  Right before Ralph retired, I went back to work.  And I

10:37:25  7   was supposed to be -- going to be a manager of a cleaners again and

10:37:30  8   Katrina took it away.  The storm came because I was supposed to be

10:37:35  9   manager in 2005 and that didn't happen.

10:37:39 10   Q.  I want to talk a little bit about your family, Barbara.  I

10:37:44 11   understand that we've heard that you have two boys; is that right?

10:37:47 12   A.  Yes, I have two sons.

10:37:49 13   Q.  Tell the jury their names, ages, a little bit about them.

10:37:53 14   A.  Ralph is a junior, he's 44, and he's very good in computer.

10:38:04 15   That's what he does for a living.  He works on computers.

10:38:09 16        Michael is 39.  When he was little he turned around, he

10:38:15 17   asked me, "Mom, why didn't you name me Ralph, too?"

10:38:19 18        I said, "Well, we already have two Ralphs.  I couldn't

10:38:22 19   name you that."  But he wanted to be named after his big brother.

10:38:26 20        And I love my kids very dearly.  And Michael still lives

10:38:31 21   at home with me -- with us.

10:38:35 22        And I have four grandsons.  And I would do anything for

10:38:41 23   them.  In fact, my little -- the littlest one just had a birthday

10:38:47 24   yesterday, one years old, and I missed his birthday.  But I'll

10:38:51 25   celebrate it when I go back.  I have an 18-year-old that's going to

10:38:57  1    graduate this coming year in 2020, I have a 13-year-old, and I have

10:39:04  2    a four-year-old, and then the baby is the one that just made one.

10:39:10  3    Q.  Now, I understand that you do regular childcare for some of the

10:39:15  4    grandsons; is that right?

10:39:16  5    A.  Yes.

10:39:16  6    Q.  Could you share that with the jury, please.

10:39:19  7    A.  I baby-sit -- well, I watch the three kids, which I don't have

10:39:24  8    to watch the 18-year-old, but the four-year-old and the

10:39:28  9    one-year-old, I watch them on Sundays and Mondays.  And then the

10:39:33 10    other grandma comes in and she watches them Tuesday, Wednesdays,

10:39:36 11    and part of Thursday.  Then I go back on a Thursday and a Friday.

10:39:40 12    So I look forward to those days, you know.  I been here for two

10:39:47 13    weeks and I miss them.

10:39:50 14    Q.  Barbara, I want to talk to you a little bit about what your

10:39:55 15    hair looked like before the chemotherapy, okay?

10:39:58 16    A.  Okay.

10:39:58 17    Q.  And just so we are clear, what year did you receive the

10:40:02 18    chemotherapy?

10:40:03 19    A.  2011.

10:40:06 20    Q.  So prior to that, can you describe to the jury what your hair

10:40:09 21    looked like?

10:40:09 22    A.  It was short up to my ears.  It was -- I'd either frost it or,

10:40:19 23    I don't know, highlight, however y'all want to call it.  But I had

10:40:25 24    a full head of hair.  Do you want --

10:40:29 25    Q.  No, I think -- what I would like to do --

10:40:32  1    A.  No, I mean, do you want me to show the wig because that's my

10:40:35  2    hair?

10:40:35  3    Q.  Oh, yeah, we'll show that wig that you brought here in a little

10:40:39  4    bit.

10:40:39  5    A.  Okay.

10:40:39  6    Q.  What I would like to do, as far as making sure that jurors

10:40:43  7    understand, can I show you some of the photographs that you

10:40:46  8    provided of what you looked like prior?  Is that okay?

10:40:50  9    A.  Sure.

10:41:06  10         MR. SCHANKER:  Your Honor, I would like to admit

10:41:08  11   Plaintiff's Exhibit 0649.

10:41:10  12         THE COURT:  Any objection?

10:41:12  13         MS. SASTRE:  No, your Honor.

10:41:13  14         THE COURT:  Let it be admitted.

10:41:14  15         MR. SCHANKER:  And I have hard copies if you need them,

10:41:16  16   your Honor.

10:41:18  17   BY MR. SCHANKER:

10:41:19  18   Q.  Barbara, I want to take you through some photographs.  And you

10:41:22  19   can just let us know as best you can when these were taken and

10:41:25  20   we'll ask you just a few questions about them, okay?

10:41:29  21   A.  Okay.

10:41:29  22   Q.  Who is this?

10:41:35  23   A.  That's me.  Graduation, 1970.

10:41:40  24   Q.  And what color was your hair then?

10:41:43  25   A.  Back then it was more -- I called it, like, a dirty blonde or

10:41:50  1   mousy blonde, brown.  It was, like, a brown.  It wasn't blonde at

10:41:54  2   all there.  At that time I hadn't did any highlights or frosting in

10:42:01  3   1970.  I didn't do it until after I was married that I started

10:42:05  4   frosting my hair.

10:42:06  5   Q.  Did you always have what -- did you always consider your hair

10:42:14  6   normal or did you have any problems with it?

10:42:16  7   A.  Oh, no, it was normal.  I never had any problems with my hair.

10:42:23  8   Q.  Several photographs here.  I'll zero in on these as best I can.

10:42:30  9   This top right here, what are we looking at?

10:42:34 10   A.  That's my wedding picture.  It was at my mother's house.

10:42:39 11   Q.  And what year is this?

10:42:40 12   A.  1972.  And I had a full head of hair there.

10:42:44 13   Q.  That's your natural hair?

10:42:47 14   A.  Yes.

10:42:47 15   Q.  And then, let the jury know, do you know when this was taken?

10:42:54 16   A.  Yes.  That's -- I am holding little Ralph.  Ralph, Jr.  That's

10:43:02 17   his christening, and that was in 1975.

10:43:09 18   Q.  And then identify the folks in that photograph for us.

10:43:13 19   A.  That's my husband, myself, Michael, holding the little ball,

10:43:21 20   and Ralph, Jr.  And that's about 1983.

10:43:32 21   Q.  Go through some more photographs.

10:43:40 22        MR. SCHANKER:  Your Honor, I believe these are in

10:43:42 23   evidence, but just to confirm, Plaintiff's Exhibit 0645.  We'll go

10:43:48 24   ahead and make sure those are admitted.

10:43:52 25        THE COURT:  That wasn't --

10:43:53  1          THE DEPUTY CLERK:  I don't have that one in.

10:43:55  2          THE COURT:  Any objection, Ms. Sastre?

10:43:58  3          MS. SASTRE:  No, your Honor.

10:44:00  4          THE COURT:  Let them be admitted.

10:44:01  5          MR. SCHANKER:  Thank you, your Honor.

10:44:05  6     BY MR. SCHANKER:

10:44:05  7     Q.  And moving through these just to give the jury an idea here.

10:44:09  8     We have a couple of them back to back -- next to each other,

10:44:15  9     rather, and we have years identifying these.  Tell us --

10:44:20 10     A.  That's Ralph, my husband, myself, and Ralph, Jr.  That was

10:44:27 11     1977.

10:44:30 12     Q.  Okay.

10:44:32 13     A.  My hair is full at the top.

10:44:34 14     Q.  Yes.

10:44:35 15     A.  The next picture, that's 1991.  Just me and my husband in that

10:44:41 16     picture.

10:44:42 17     Q.  And just to be clear, up until the time you took chemotherapy,

10:44:46 18     did you always consider your hair to be normal?

10:44:49 19     A.  Yes.

10:44:49 20     Q.  Tell us about this photograph, if you would.

10:45:04 21     A.  That's one of my grandsons, that's 2006, and I was at the

10:45:10 22     hospital.

10:45:12 23     Q.  Who is that little baby?

10:45:14 24     A.  Caleb, Michael's son.

10:45:41 25          MR. SCHANKER:  Your Honor, we move to admit Plaintiff's

10:45:43  1    Exhibit 0651.

10:45:45  2              THE COURT:  Any objection?

10:45:46  3              MS. SASTRE:  No, your Honor.

10:45:47  4              THE COURT:  Let it be admitted.

10:45:48  5              MR. SCHANKER:  Thank you, your Honor.

10:45:49  6    BY MR. SCHANKER:

10:45:51  7    Q.  And tell us about this photograph.

10:45:55  8    A.  I know that photograph very well.

10:45:58  9    Q.  I'm sorry.  I need you --

10:46:00 10    A.  I know that photograph very well because I was going to a

10:46:03 11    funeral that day.  My daughter-in-law passed away and that was in

10:46:07 12    2008.  Ralph's first wife.

10:46:11 13    Q.  So this is about three years before the chemotherapy?

10:46:15 14    A.  Yes.

10:46:37 15              MR. SCHANKER:  Your Honor, Plaintiff's Exhibit 0624 has

10:46:40 16    already been admitted.

10:46:42 17              THE COURT:  Okay.  Please proceed.

10:46:44 18    BY MR. SCHANKER:

10:46:46 19    Q.  We've seen this photograph several times throughout this case.

10:46:51 20    Just tell us what this is and when it was taken, if you could,

10:46:56 21    these two photographs.

10:46:58 22    A.  That's me and my husband.  We were -- went to the Grand Canyon

10:47:02 23    and that was in 2010.

10:47:05 24    Q.  And so, obviously, this was some kind of vacation?

10:47:08 25    A.  Yes.

10:47:08  1   Q.  Tell us about that.

10:47:10  2   A.  We just decided to go to the Grand Canyon for vacation that

10:47:16  3   year.

10:47:17  4   Q.  Barbara --

10:47:21  5   A.  And --

10:47:22  6   Q.  -- prior to chemotherapy, how did you feel about having your

10:47:25  7   picture taken?

10:47:26  8   A.  I am not really a picture person, but I did take pictures.  The

10:47:31  9   reason why I try to take pictures is my son, Michael, his

10:47:38 10   grandmother died when he was three.  And he comes to me, "Momma, I

10:47:43 11   don't even know what grandma looked like or remember her."  And

10:47:47 12   since Katrina we lost all of our pictures, so I can't tell them

10:47:50 13   what she looked like or remember.

10:47:53 14          And that's what I want for my kids.  I don't want my

10:47:56 15   grandkids to say, "Momma, I don't remember what Mawmaw looks like."

10:48:00 16   Because I don't -- even though I don't like to take pictures I try

10:48:04 17   to.

10:48:04 18   Q.  Barbara, tell the jury how you felt about your hair and your

10:48:10 19   appearance prior to chemotherapy.

10:48:12 20   A.  I was comfortable with my hair.  I went places.  I did things.

10:48:21 21   But since I don't have my hair, I am not -- I don't feel like I am

10:48:26 22   the same person.

10:48:27 23   Q.  Barbara, can we talk about your discovery of the lump?

10:48:36 24   A.  Sure.

10:48:36 25   Q.  Are you comfortable sharing that?

10:48:38  1  A.  Yes.

10:48:38  2  Q.  Please tell the jury about that.

10:48:40  3  A.  Well, one evening I went to go take a bath, and I happened to

10:48:47  4  be undressed.  And in the mirror, in the reflection, I seen a

10:48:52  5  dimple like you have on your cheek that was on my breast.  And when

10:48:56  6  I touched it, I could feel a lump.  And we were planning to go

10:49:01  7  visit his people in Alabama.  And I went outside and I said, "Bae,"

10:49:08  8  I said, "I think I have a lump in my breast."  And that immediately

10:49:11  9  cancelled that trip and wind up going to go find a doctor.

10:49:15 10  Q.  I want to back up for a second.  Did you do any sort of checks

10:49:20 11  for lumps in your -- check your breasts prior to --

10:49:25 12  A.  All the time.  That's why I've always -- I can't say I did it

10:49:30 13  every night, no, I didn't.  But I might have done it maybe two

10:49:34 14  times a week, checked.  Because I never ever -- until that time, I

10:49:40 15  never did a mammogram.  I've always heard it hurt, so it scared me.

10:49:48 16  So I just never did do it.  So I always checked myself.

10:49:54 17  Q.  So you found the lump?

10:49:55 18  A.  Myself, yes.

10:49:57 19  Q.  You said something about my -- "his people in Alabama."  You're

10:50:02 20  referring to your husband?

10:50:03 21  A.  Yes, my husband's people.  We were going up there to go visit

10:50:08 22  them and that got cancelled.

10:50:10 23  Q.  Okay.  Did you call a doctor?  Do something about the lump?

10:50:16 24  What did you do?  Explain to the jury.

10:50:18 25  A.  I didn't know who to go to, so I just got my book out with who

10:50:25  1    was a female doctor, a gynecologist, because I figured that's who I

10:50:30  2    had to go to.  And I just picked one out and I went to her.  And

10:50:37  3    they sent me to do a mammogram then.  And that was Dr. -- the

10:50:42  4    office of Dr. Schultis was her name, but I didn't see her.  I seen

10:50:47  5    her practitioner.

10:50:49  6             She did an examination.  And when she concluded that, she

10:50:56  7    could feel the lump herself, then she sent me to go do a mammogram.

10:51:01  8    And that was my first mammogram in 2011.

10:51:05  9    Q.  So I want to understand.  The time between when you found the

10:51:07  10   lump and you called to make an appointment, how long a period of

10:51:12  11   time was that?

10:51:13  12   A.  Honestly, I don't remember that.  It might have been two days

10:51:16  13   because I told them over the phone that I found a lump in my

10:51:19  14   breast.  And they said, "Oh, we'll get you in immediately."  But I

10:51:23  15   don't remember the exact, whether it was two, three, four.  I can't

10:51:27  16   say I remember that.  But it was right away, I do know that.  It

10:51:34  17   was right away.

10:51:34  18   Q.  So you saw a -- did you say a Dr. Schultis?

10:51:37  19   A.  Well, I didn't see her, I seen her practitioner.  And I don't

10:51:40  20   remember her name.

10:51:40  21   Q.  Okay.  And then -- you were in here.  We heard testimony from a

10:51:46  22   Dr. Lagarde?

10:51:47  23   A.  Yes.  They sent me to Lagarde, which is a surgeon, and I seen

10:51:52  24   her.

10:51:53  25   Q.  So Dr. Schultis's office sent you to Lagarde?

10:51:59  1    A.  Yes.  Well, they were in the same building.

10:52:01  2    Q.  And tell us about -- did you see Dr. Lagarde?

10:52:05  3    A.  Yes, I did.

10:52:05  4    Q.  Share with the jury about your time seeing Dr. Lagarde.

10:52:10  5    A.  Well, I went to go see Lagarde, and she got the results from

10:52:15  6    the mammogram.  And right away she put it on the screen and she was

10:52:20  7    showing it to me.  And she started talking about reconstructive

10:52:25  8    surgery, which meant she was going to remove my breasts.  But not

10:52:30  9    just one, she wanted to remove both of them.

10:52:33  10          Well, that sort of scared me.  So I just let her finish

10:52:37  11   her -- you know, she was saying that she was going to take fat from

10:52:44  12   my stomach, my butt, my thighs and reconstruct my breasts.  And it

10:52:50  13   really scared me.

10:52:52  14          So on the way home, I just told my husband, I said, "I've

10:52:55  15   got to go get a second opinion.  I am not -- I am not just going to

10:53:00  16   jump into something I don't know anything about."  So I went and

10:53:04  17   got a second opinion.  I went to another doctor.

10:53:06  18   Q.  So tell the jury about that part of the story, about you

10:53:10  19   getting a second opinion.

10:53:11  20   A.  Well, then I went to my primary care physician, and he sent me

10:53:19  21   to have tests done, which I think it was a PET scan and a CAT scan.

10:53:25  22   And then they -- he sent me to a surgeon.  And that surgeon looked

10:53:31  23   at all of my tests.  And I asked him, I said, "Do you believe that

10:53:36  24   I need to have both of my breasts removed?"

10:53:38  25          And he looked at me and said, "No."  He told me, "No,"

1730

10:53:43 1    that he thinks that I could just have the lump removed.  And so

10:53:48 2    that's what I wanted to have done.  But I wanted it to come from

10:53:54 3    someone else to tell me that.

10:53:56 4    Q.  So then, what surgery did you have?

10:53:58 5    A.  Lump -- how you say it lump --

10:54:02 6    Q.  Lumpectomy?

10:54:04 7    A.  Yes, that's what I had -- I had done.  So they only removed the

10:54:08 8    lump and one lymph node.

10:54:12 9    Q.  So I want to go back briefly to Dr. Lagarde.  And you were in

10:54:18 10   the courtroom when Dr. Lagarde testified.  And do you remember the

10:54:22 11   discussion about the pink cancer book?

10:54:25 12   A.  Yes.

10:54:25 13   Q.  Did Dr. Lagarde leave that pink cancer book for you?

10:54:30 14   A.  Yes.

10:54:31 15   Q.  Share with the jury whether you looked at that cancer book.

10:54:38 16   A.  I may have looked at a few of the pages.  I couldn't tell you

10:54:42 17   what they were.  But I didn't read that whole book.  There's no way

10:54:47 18   I read that book.  I know I didn't.  In fact, I put it away after

10:54:54 19   since I wasn't going to her.  I just decided to -- that I didn't

10:54:59 20   need it.

10:55:02 21   Q.  So, Barbara, Dr. Lagarde had testified that she dog-ears pages.

10:55:07 22   Do you have any recollection of that?

10:55:09 23   A.  Not really.  I may have read those pages, but I don't remember

10:55:14 24   what they were.

10:55:17 25   Q.  And did you -- we saw something on page 195.  Were you in

10:55:23  1   here -- page 195 of that book of the appendix.  Do you remember

10:55:29  2   that testimony?

10:55:29  3   A.  Uh-huh, yes.

10:55:30  4   Q.  Did you look at anything in that book concerning chemotherapy

10:55:34  5   drugs or side effects?

10:55:35  6   A.  No.

10:55:36  7   Q.  Were you instructed by anyone in this case to read that book in

10:55:40  8   its entirety?

10:55:42  9   A.  No.

10:55:42 10   Q.  Did Dr. Carinder's office give you that book?

10:55:47 11   A.  No.

10:55:48 12   Q.  Where did you end up -- when and where did you end up realizing

10:55:56 13   you had that book?

10:55:57 14   A.  I was -- honestly, I was putting some tax papers away in the

10:56:02 15   closet, and that's when I found the book.  I forgot that it was

10:56:06 16   even in there.

10:56:07 17   Q.  And when was this?

10:56:10 18   A.  I think that was in 2017.  I think that's when I found it.

10:56:15 19   Q.  Why didn't you read that book cover to cover?

10:56:18 20   A.  I can't -- I just didn't read it being that I wasn't going to

10:56:26 21   that doctor.

10:56:26 22   Q.  Did you receive that pink cancer book before you saw

10:56:32 23   Dr. Carinder or after you saw Dr. Carinder?

10:56:34 24   A.  Before.

10:56:35 25   Q.  Speaking of Dr. Carinder, can you share with the jury how you

10:56:43  1   came to be seeing him?

10:56:45  2   A.  Well, I had my surgery in Bogalusa.  And after the surgery, on

10:56:55  3   the ride home I got sick.  My husband had to pull over.  So I am

10:57:01  4   thinking ahead of time because the doctor told me I would have to

10:57:04  5   do chemotherapy and radiation.  I'm thinking I don't know if I can

10:57:08  6   make this long trip every day, because I know chemo, you go -- or

10:57:13  7   radiation is done every day, chemo's done so often.

10:57:19  8          I decided to talk to him and ask him, that's Dr. Karlin,

10:57:24  9   if I could go find me a doctor in Slidell to do my chemo and

10:57:30 10   radiation.  And he told me I could, just to let him know who he

10:57:34 11   was.

10:57:34 12          And I went to the cancer center, and I found

10:57:40 13   Dr. Carinder, which I gave the name to Dr. Karlin, and he said that

10:57:44 14   I could go over there.

10:57:45 15   Q.  So you saw Dr. Carinder?

10:57:48 16   A.  Yes.

10:57:49 17   Q.  What was he like as a doctor?

10:57:52 18   A.  Very nice, very gentle.  I liked him.  I thought he was giving

10:58:00 19   me the information correctly at that time, you know.  He was very

10:58:09 20   nice.

10:58:10 21   Q.  Do you remember the chemotherapy drugs that Dr. Carinder ended

10:58:14 22   up prescribing you?

10:58:15 23   A.  Adriamycin, the C one was -- I call it ACT.  I can't remember

10:58:28 24   the name.  And the last was Taxotere, but I can't remember the name

10:58:31 25   of the second one.

10:58:31  1    Q.  Okay.  After your meeting with Dr. Carinder, did you have an

10:58:39  2    understanding of what side effects you might have from the

10:58:44  3    chemotherapy drugs?

10:58:45  4    A.  Yes, he gave me a list of side effects.  I would get weak.  I

10:58:57  5    wouldn't want to eat.  I'd have sores in my mouth.  Probably

10:59:02  6    wouldn't want to go anywhere if you don't want to eat.  Loss of

10:59:09  7    limb.  Death.  There was a lot of major side effects, too, he

10:59:17  8    mentioned it.

10:59:18  9    Q.  What was your understanding after meeting with Dr. Carinder

10:59:22  10   about what would happen to your hair when you underwent the

10:59:26  11   chemotherapy?

10:59:26  12   A.  That I would lose my hair.  In fact, he told me I would lose my

10:59:30  13   hair, but that it would grow -- and he said it would grow back in a

10:59:34  14   different way or it could come back the same.  He said it could

10:59:37  15   come back curly.  And my husband joked and said, "Oh, well, maybe

10:59:41  16   I'll get a redhead," when I told him all of that.  I said, "Nay,

10:59:45  17   not a redhead."

10:59:48  18   Q.  Do you recall signing an informed consent before you took the

10:59:54  19   chemotherapy?

10:59:54  20   A.  Yes, I did.

11:00:04  21           MR. SCHANKER:  Your Honor, Exhibit 621, which has been

11:00:08  22   admitted --

11:00:08  23           THE COURT:  It's already in evidence.

11:00:10  24           MR. SCHANKER:  Thank you.

11:00:10  25           THE COURT:  Thank you.  Please proceed.

11:00:12  1  BY MR. SCHANKER:

11:00:16  2  Q.  Take a look at this, if you would, Barbara.  Does this look

11:00:20  3  like that informed consent that you signed?

11:00:23  4  A.  Yes, it is.

11:00:24  5  Q.  And is that your signature?

11:00:32  6  A.  Yes, it is.

11:00:32  7  Q.  Barbara, when you were in that room meeting with Dr. Carinder,

11:00:49  8  did you ask him anything about permanent hair loss?

11:00:53  9  A.  I can honestly say, "No," because he didn't mention permanent

11:00:58 10  hair loss to me.

11:01:01 11  Q.  If Dr. Carinder had told you about the risk of your hair not

11:01:07 12  coming back with Taxotere, what would you have done?

11:01:10 13  A.  I'd -- I would have asked him if there was another drug out

11:01:15 14  there that I could have used.

11:01:17 15  Q.  And if Dr. Carinder would have given you another option that

11:01:23 16  did not cause permanent hair loss, what would you have done?

11:01:28 17  A.  I would have taken it.

11:01:32 18  Q.  Barbara, you've heard testimony in this case about a side

11:01:37 19  effect of neuropathy.

11:01:40 20  A.  Yes.

11:01:41 21  Q.  And what's your understanding of neuropathy?

11:01:44 22  A.  That it's the tingling in the hands and the feet.  But if you

11:01:49 23  have neuropathy -- I feel like if I had neuropathy, no one would

11:01:56 24  know that.  But since I have this (INDICATING), everybody knows I

11:02:02 25  have cancer because they see my bald -- they see my head.  They

11:02:06   1   don't see my bald head because I do not go out without wearing my

11:02:11   2   turban.

11:02:11   3   Q.  Barbara, did Dr. Carinder tell you anything about a prior

11:02:18   4   patient that he had whose hair did not grow back?

11:02:21   5   A.  No.  If he did, I probably would have asked him, "Well, am I

11:02:27   6   going to be like that, too?"  But he didn't say anything to me.

11:02:34   7   Q.  In that room, Barbara, with what you explained that

11:02:39   8   Dr. Carinder said to you, why didn't you ask for a second choice?

11:02:47   9   A.  Because I did not hear the word "permanent hair loss."  I did

11:02:54  10   hear about all of the side effects, but every drug has side

11:02:58  11   effects.  I took my risk on that.  But I wouldn't have wanted to

11:03:01  12   take a risk on permanent hair loss.

11:03:08  13   Q.  Barbara, I want to take you to the time after your chemotherapy

11:03:13  14   treatments.  And you continued to see Dr. Carinder; is that

11:03:17  15   correct?

11:03:17  16   A.  Yes.

11:03:18  17   Q.  Now, at any time during the time that you saw Dr. Carinder when

11:03:25  18   your hair wasn't growing back, did you ever ask him about that?

11:03:29  19   A.  Oh, yes.  I've asked him.

11:03:31  20   Q.  And when did you ask him?

11:03:34  21   A.  I'd say it was in early April I asked him about my hair.  And

11:03:40  22   all he said, "Honey, it's going to grow.  It takes time."  So

11:03:44  23   that's what I kept doing.  I kept waiting.

11:03:47  24   Q.  That's April of 2012?

11:03:49  25   A.  Yes.

11:03:49   1   Q.  And how long did you hold out hope that your hair was going to

11:03:55   2   grow back?

11:03:55   3   A.  Until I found out about this lawsuit, which was when my brother

11:04:02   4   called.

11:04:04   5   Q.  Barbara, let's talk about your hair now.

11:04:13   6   A.  I don't feel like I have hair now.

11:04:15   7   Q.  How long has your hair looked the way it does right now?

11:04:19   8   A.  Ever since -- I can't say I lost it.  It was coming out, I

11:04:25   9   chose to shave it early.  So ever since I shaved it, this is how

11:04:30  10   it's been.  And that was in 2011.

11:04:34  11   Q.  And it's grown back a little bit --

11:04:36  12   A.  A little bit.

11:04:37  13   Q.  -- we've seen from pictures?

11:04:38  14   A.  Yes.

11:04:39  15   Q.  Has it ever grown all the way back and then fallen out again?

11:04:44  16   A.  No.  Never.

11:04:48  17   Q.  Do you style your hair now in any way?

11:04:51  18   A.  No.

11:04:55  19   Q.  You talked about what you wear on your head, and we'll get into

11:04:58  20   that a little bit more.  But if you leave the house now, do you

11:05:03  21   ever leave it without something on your head?

11:05:05  22   A.  Never.

11:05:07  23   Q.  And why not?

11:05:07  24   A.  I'll leave my teeth, which I have a partial, I'll leave that

11:05:12  25   home before I go out the house without my wig.  I am just -- and I

11:05:18 1   don't let them -- my husband or my son answer the door until I have

11:05:22 2   my turban on.  If I go by my daughter-in-law, I can take it off

11:05:28 3   there because I only have a handful of people that I go around,

11:05:33 4   which is my husband, my two kids, my daughter-in-law, and my

11:05:37 5   grandkids.  That's it.  If she gets company, the turban goes back

11:05:42 6   on.  I do not sit there and entertain anybody without my turban.

11:05:48 7   Q.  And share with the jury why that is.

11:05:51 8   A.  I just -- I admire people that can go around bald, but I can't.

11:05:59 9   I just can't do that.  I mean, I feel like that's part of me that's

11:06:03 10   missing, you know.

11:06:07 11       Just like I tried to explain to my husband, a man shaves

11:06:12 12   their head purposely.  My son shaved his head purposely years ago

11:06:16 13   when he worked offshore.  He looks distinguished, men looked

11:06:21 14   distinguished.  But yet a woman, if they shave their head and they

11:06:24 15   go out, the first thing someone's thinking, something's wrong with

11:06:29 16   her.  And that's what I get, something's wrong with me.

11:06:34 17       And yet nothing is wrong with me.  My cancer is cured.

11:06:38 18   What's wrong with me is I am bald.  I lost my hair.

11:06:45 19   Q.  Barbara, are you comfortable showing the jury your head, your

11:06:50 20   scalp without your turban?

11:06:52 21   A.  I do -- I'll do that, but it's going to be hard.

11:06:59 22       MR. SCHANKER:  Your Honor, with your permission, could I

11:07:02 23   just put a chair here and have Barbara sit in it so that the jury

11:07:06 24   can see her scalp?

11:07:08 25       THE COURT:  Any objection?

11:07:13  1            MS. SASTRE:  (ATTORNEY SHAKES HEAD IN THE NEGATIVE.)

11:07:23  2         (WHEREUPON, THE WITNESS LEAVES THE WITNESS STAND.)

11:07:37  3            MR. SCHANKER:  Barbara, could you go ahead and take off

11:07:39  4   your glasses so that they can observe your eyebrow area.

11:07:48  5            THE WITNESS:  (WITNESS COMPLIES.)

11:07:51  6            THE SCHANKER:  Is this close enough for you folks?  No,

11:07:53  7   that's good right there.

11:07:59  8            THE COURT:  We can't hear.

11:07:59  9            MR. SCHANKER:  Okay.  Barbara --

11:08:01 10            THE WITNESS:  I'm blind without my glasses.

11:08:03 11            MR. SCHANKER:  That's okay.  They can't hear you without

11:08:05 12   the microphone, so I'll just give you some instruction if that's

11:08:07 13   okay.

11:08:08 14            THE WITNESS:  (WITNESS NODS HEAD IN THE AFFIRMATIVE.)

11:08:09 15            THE COURT:  Let's just have instructions.

11:08:10 16            MR. SCHANKER:  Yes, just instruction at this point.  I'll

11:08:14 17   hold your glasses for you.

11:08:17 18            THE WITNESS:  Can I put them back on?

11:08:18 19            MR. SCHANKER:  You can put them back on.  Yes, you can.

11:08:22 20            And when you're ready, if you can go ahead and take off

11:08:25 21   your turban.

11:08:28 22            THE WITNESS:  (WITNESS COMPLIES.)

11:08:33 23            MR. SCHANKER:  And if you could just turn your head to

11:08:36 24   the right, please.

11:08:37 25            THE WITNESS:  (WITNESS COMPLIES.)

11:08:44  1          MR. SCHANKER:  And then if you could go ahead and rotate
11:08:47  2  around and turn your head to the left.
11:08:49  3          THE WITNESS:  (WITNESS COMPLIES.)
11:08:51  4          MR. SCHANKER:  And then if you could rotate all the way
11:08:58  5  around the back so they can see.
11:09:00  6          THE WITNESS:  (WITNESS COMPLIES.)
11:09:06  7          MR. SCHANKER:  All right.  Thank you.  You can go ahead
11:09:09  8  and put your turban back on.
11:09:12  9          THE WITNESS:  (WITNESS COMPLIES.)
11:09:17 10          MR. SCHANKER:  And, your Honor, can --
11:09:18 11          THE COURT:  Please return to the seat here.
11:09:22 12          MR. SCHANKER:  Thank you, your Honor.
11:09:38 13        (WHEREUPON, THE WITNESS RETURNS TO THE WITNESS STAND.)
11:09:45 14          MR. SCHANKER:  Your Honor, may I approach the witness?
11:09:52 15          THE COURT:  Yes.  You can get a glass of water.
11:10:17 16          THE WITNESS:  Thank you.
11:10:17 17          THE COURT:  Please proceed.
11:10:18 18          MR. SCHANKER:  Thank you, your Honor.
11:10:19 19  BY MR. SCHANKER:
11:10:21 20  Q.  May I ask you some questions, Barbara?
11:10:23 21  A.  Yes.
11:10:24 22  Q.  Just to be clear, you showed the jury what your scalp looks
11:10:30 23  like today.  And how long has it looked like that?
11:10:32 24  A.  Since 2012.
11:10:37 25  Q.  As far as how much it grew back?

11:10:39 1   A.  Yes.

11:10:39 2   Q.  For the first few years after chemotherapy, did you allow

11:10:47 3   yourself to be photographed?

11:10:48 4   A.  Not really.  I try not to.  But I was uncomfortable, especially

11:11:01 5   in 2012 and 2013, I don't even think there's any pictures of me

11:11:07 6   around then.  I just didn't -- I wasn't comfortable with taking

11:11:13 7   pictures.

11:11:15 8   Q.  Now, you do have some -- we've seen some photographs of you

11:11:20 9   following, correct?

11:11:21 10  A.  Yes.

11:11:21 11  Q.  Tell us your view on photographs and being photographed today

11:11:25 12  with the condition that you have.

11:11:26 13  A.  It all depends on where I am going to where if I wear my wig.

11:11:35 14  If I wear my wig, I don't mind being photographed.  But if I am --

11:11:39 15  but if I am in my turban and it depends on if I am going to a

11:11:44 16  wedding, I don't want to mess up their pictures; that's how I feel,

11:11:47 17  personally feel, I don't want to mess up somebody's pictures being

11:11:51 18  at a wedding, being at a birthday party.

11:11:56 19         That's what I'm saying, this is hard to decide what

11:12:01 20  you're going to wear.  The weather even plays a part in whether I

11:12:05 21  wear my wig.  If it's raining, I can't wear my wig in the rain.

11:12:09 22  I'll mess it up.  If it's hot I don't want to wear the wig because

11:12:13 23  it's uncomfortable.

11:12:14 24         This plays a major part in your life.  And nobody

11:12:18 25  understands, nobody can understand what a -- only another person

11:12:24  1    that's lost their hair can understand what I am going through.  I
11:12:27  2    mean, that's just like if someone loses a child and you walk up
11:12:31  3    there, "oh, I know what you're going through," but yet my two kids
11:12:35  4    are alive.  I don't know what that person is going through.
11:12:37  5            And I can't get my husband to understand that, because he
11:12:40  6    will make a comment, "We're going to get through this."  No, you
11:12:44  7    can't get through this.  I don't think he understands what I am
11:12:49  8    going through at times.
11:12:51  9    Q.  Tell the jury what you're going through.
11:12:55 10    A.  It's emotional at times.  It's just hard to have to decide day
11:13:06 11    by day -- if you have your hair you don't have to decide what
11:13:09 12    you're going to wear, you just put on clothes.  But when you don't
11:13:14 13    have your hair and you're going somewhere special, I have to
11:13:17 14    decide, well, what's the weather?  Am I going to wear this wig?
11:13:21 15            I went -- well, it was my son was invited to a graduation
11:13:26 16    in Texas, and my sister moved there since 2005 and I hardly -- I
11:13:34 17    don't get to see her that often.  So I decided to -- instead of
11:13:38 18    letting him go on the trip by himself, I'd take the ride.  And I
11:13:42 19    brought my wig because I wanted to show it to her for the first
11:13:45 20    time.  And when I got there, she liked it.  She says, "oh, it looks
11:13:52 21    just like your hair."  And I said, "Yeah, we match tried to match
11:13:57 22    it.  I bought it before I lost my hair."
11:14:02 23            And, well, she talked me into going to the graduation.  I
11:14:07 24    didn't want to, and I said, "Okay, I'll go."  But the weather was
11:14:10 25    getting bad that day.  Well, I had to wind up -- it was an outdoor

11:14:15 1    graduation, I had to wind up going under cover, taking it off and

11:14:20 2    putting my turban on because it started to sprinkle a little bit.

11:14:24 3    And I didn't want to get it ruined.

11:14:26 4          So that's the aggravation part, that's always being on

11:14:32 5    guard as to what to do.

11:14:37 6          I went to a birthday party for a neighbor that she was

11:14:44 7    there -- we moved with my family when I was 18 months old to

11:14:50 8    Chalmette and they were already there, so I knew that lady all my

11:14:54 9    life until I got married.  So they invited me and my brother to go

11:15:01 10   celebrate her birthday.  And so being that my parents are deceased,

11:15:05 11   I went in their behalf.

11:15:07 12   Q.  Yes.

11:15:08 13   A.  I wanted to go.  I wore my turban.  She was 90 years old.

11:15:13 14   Ms. Irene comes in, and the first words out of her mouth when she

11:15:17 15   seen me is, "What's wrong with you?"  And I said, "Ms. Irene, I had

11:15:22 16   cancer.  My hair hasn't grown back.  But I am not here to talk

11:15:26 17   about that.  This is your party.  We'll talk about that another

11:15:30 18   day," which I figured I would never see her again to talk about it.

11:15:34 19   But she was ready to talk about me and I didn't want that.

11:15:40 20   Q.  Barbara, I want to take you through some photographs since

11:15:48 21   2011, okay?

11:15:49 22   A.  Okay.

11:15:56 23          MR. SCHANKER:  This is part of Plaintiff's Exhibit 0645.

11:16:02 24          THE COURT:  Any objection?

11:16:03 25          MS. SASTRE:  No objection to any of these, your Honor.

11:16:06  1          MR. SCHANKER:  I'm sorry, I believe this was already an

11:16:09  2   exhibit -- admitted.

11:16:09  3          THE COURT:  All right.  Thank you.

11:16:11  4          MR. SCHANKER:  Sorry for not clarifying that.

11:16:13  5   BY MR. SCHANKER:

11:16:17  6   Q.  So, is this December of 2011 when this was taken?

11:16:20  7   A.  Yes.

11:16:21  8   Q.  And identify for us who is in this photograph?

11:16:25  9   A.  The lady in blue is my -- is a girlfriend of mine, her name is

11:16:31 10   Debbie.  Do you need the last name?

11:16:33 11   Q.  No, that's okay.

11:16:35 12   A.  And she's, in fact, my son's Godmother.  And we graduated

11:16:41 13   together.

11:16:42 14   Q.  And who is this in the middle?

11:16:44 15   A.  The next girl is Debbie.

11:16:46 16   Q.  Okay.

11:16:48 17   A.  And we graduated together and just a friend.  And we try to get

11:16:55 18   together every Christmas.  This may have been our first Christmas.

11:17:00 19   We try to get together every Christmas and celebrate.

11:17:04 20   Q.  And so that picture was taken in the year after your surgery

11:17:08 21   and chemotherapy; is that right?

11:17:10 22   A.  Yes.

11:17:11 23   Q.  And then here we have a picture, we've seen this earlier.  When

11:17:19 24   was this taken?

11:17:20 25   A.  2014.

11:17:22  1    Q.  And you're wearing your wig in this picture?

11:17:24  2    A.  Yes.  We were celebrating my sister's birthday, the one in the

11:17:29  3    middle, that's Beverly that I was telling you that lives in Texas

11:17:32  4    that I don't get to see.  But they brought her down here to

11:17:37  5    celebrate her 80th birthday.  And the other one is my sister, and

11:17:45  6    she is no longer here, she passed away in 2016.

11:17:49  7    Q.  Okay.  Now, in this you have your wig on.

11:17:53  8    A.  Yes.

11:17:54  9    Q.  Do you have your wig here with you today?

11:17:56 10    A.  Yes.

11:17:58 11         MR. SCHANKER:  And with the court's permission, can we

11:18:01 12    show that, just let the jury see it?

11:18:04 13         THE COURT:  Sure.  Any objection?

11:18:07 14         MS. SASTRE:  (WITNESS SHAKES HEAD IN THE NEGATIVE.)

11:18:08 15         THE COURT:  Please proceed.

11:18:09 16         MR. SCHANKER:  I want to ask you some questions about

11:18:11 17    that.

11:18:23 18         THE WITNESS:  (WITNESS COMPLIES - TAKES WIG OUT AND

11:18:31 19    PLACES IT ON THE WITNESS STAND.)

11:18:31 20    BY MR. SCHANKER:

11:18:32 21    Q.  Now, is this the same wig that you have on in the pictures?

11:18:37 22    A.  Yes.

11:18:37 23    Q.  Is that the only wig that you've had since the chemotherapy?

11:18:40 24    A.  No.

11:18:41 25    Q.  Tell us about the other wig or wigs that you've had.

11:18:43 1    A.  I got this wig before chemotherapy.  I was told by Dr. Carinder

11:18:46 2    to go get a wig, to have them match it to my hair as much as

11:18:51 3    possible.  And so I went.  Then one of the treatments when I was

11:18:57 4    going to the Cancer Center, they said, "Ms. Earnest, do you have a

11:19:00 5    wig?"  And I said, "yes, I do."  She says, "Well, we're allowed to

11:19:03 6    give you a wig."

11:19:05 7          And my husband picked out a red wig, and I wasn't too

11:19:12 8    happy with that.  So I wound up, I wound up, my daughter-in-law was

11:19:18 9    having a garage sale and I told her put it in it, give it to the

11:19:22 10   first person that asks about it; because it was given to me, I

11:19:26 11   wasn't about to charge anybody, I gave it away to someone that

11:19:29 12   needed it.  I was not going to be a red head.

11:19:34 13   Q.  Now, this particular wig, how often do you wear it?

11:19:38 14   A.  There's no telling.  I could go a month without wearing it, I

11:19:45 15   could wear it three or four times a month.  It all depends on what

11:19:48 16   I have to do and the weather.

11:19:52 17         Really, I only wear it if it's a really a special

11:19:56 18   occasion.  In fact, when my sister passed away in 2016, her

11:20:01 19   daughter came to me, and she says, "Aunt Barbara," she says, "don't

11:20:05 20   you think you have to dress up for momma and don't wear your wig.

11:20:08 21   Momma knew you wore a turban.  She wouldn't care if you wore it."

11:20:14 22   So I wore the turban to my own sister's funeral.

11:20:17 23   Q.  Why don't you wear the wig all the time?

11:20:20 24   A.  Because it's uncomfortable.  It shifts.  It moves I find.  I

11:20:26 25   just don't like it, it's hot.

11:20:32  1           MR. SCHANKER:  Can you go ahead and set that down.  Thank

11:20:34  2  you for showing us the wig.

11:20:39  3           THE WITNESS:  (WHEREUPON, THE WITNESS REMOVED THE WIG

11:20:44  4  FROM THE WITNESS STAND.)

11:20:49  5  BY MR. SCHANKER:

11:20:49  6  Q.  I would like to continue going through some of the photographs,

11:20:51  7  is that okay?

11:20:52  8  A.  Okay.

11:20:53  9  Q.  So we have this photograph, which we saw earlier.  When was

11:21:00 10  this taken?

11:21:01 11  A.  In I think 2014.

11:21:06 12  Q.  So we heard about -- and what event is this, by the way?

11:21:12 13  A.  It was Christmas in the Oaks.  My son and daughter-in-law were

11:21:17 14  going with the -- with Gabriel and we had taken I think Caleb, too,

11:21:26 15  and they wanted me to go.  Mawmaw -- well, not so much Gabriel but

11:21:31 16  Caleb, "Mawmaw, please come with us."  So I went.

11:21:36 17  Q.  So I want the jury to understand if there's been any change in

11:21:41 18  the sorts of things that you do, vacations or activities such as

11:21:45 19  this since the fact that you don't have your hair.  Explain that to

11:21:51 20  the jury.

11:21:52 21  A.  We used to take vacations every week -- I mean every year.  I

11:21:57 22  don't go every year.  I may go -- I went to Silver Dollar City, but

11:22:03 23  that wasn't a vacation, it may have turned out that way.  It was

11:22:06 24  supposed to be a visit, we were visiting a niece and nephew that's

11:22:11 25  moved up there since Katrina.  I hadn't seen them, my brother was

11:22:16  1   going, his wife didn't want to go with him, so he asked me to go.

11:22:24  2        And I turned around and I told him, yeah, I'll go.  It

11:22:27  3   was only supposed to be a visit.  And I lost my sister, so back in

11:22:33  4   my mind if I tell my brother "no" and then something happens, then

11:22:38  5   I would feel bad the rest of my life.  So that's why I went there

11:22:42  6   with him.

11:22:44  7        But when we got there, they turned around and asked if we

11:22:50  8   wanted to go to Silver Dollar City because their daughter worked

11:22:53  9   there.  I didn't even know she worked there.  My brother didn't

11:22:57 10   know she worked there.  So it turned out to be that's why we went

11:23:00 11   to Silver Dollar City.

11:23:04 12   Q.  You still go to these kind of things; is that correct?

11:23:08 13   A.  To --

11:23:09 14   Q.  Vacations or trips or --

11:23:11 15   A.  Well, I may go on trips every now and then, but I don't go --

11:23:17 16   it's not something that me and Ralph are really planning.  We

11:23:21 17   haven't planned a vacation in -- since 2010.

11:23:25 18   Q.  And why is that?

11:23:27 19   A.  Because of the cancer.  And 2011 I was dealing with the cancer

11:23:32 20   so we didn't go anywhere.  2012 then I was dealing with my hair,

11:23:37 21   waiting for my hair to grow back.  Then that didn't happen.  So

11:23:43 22   then I had to put it where, "okay.  Now I am going to try and get

11:23:46 23   out."  I started getting out and doing a little bit.  Because you

11:23:49 24   feel bad, even because I feel bad I don't want to make them feel

11:23:54 25   bad, my husband, my sons, you know.  And I don't want to disappoint

11:24:00  1   my grandkids.

11:24:02  2         Like I said, my son doesn't remember his grandparents and

11:24:06  3   I only remember one set of grandparents.  My daddy's parents were

11:24:12  4   dead before I was born, so you don't get to know them.  And I don't

11:24:17  5   want my grandkids to say, "Well, I don't remember my grandma

11:24:21  6   because she never did anything with us."

11:24:25  7   Q.  I want to work through some more of these photographs, and some

11:24:28  8   of these we've seen already and some of them we haven't.  Tell us

11:24:34  9   about this photo.

11:24:35 10   A.  This was his birthday.

11:24:36 11   Q.  And who is that?

11:24:37 12   A.  That's Caleb, he was a year old there, 2014 -- I mean '16.

11:24:44 13   Q.  You look happy there.

11:24:46 14   A.  Yeah.  Holding him I am.

11:25:01 15   Q.  And tell us about that photo.

11:25:03 16   A.  That was a photo that I was baby-sitting and they wanted to go

11:25:09 17   out and eat, his momma and daddy; so I could have stayed home by

11:25:13 18   the house by myself, but I decided to go with them.  And at the

11:25:17 19   restaurant, his momma took a picture of us together.  But I feel

11:25:28 20   like I ruin the pictures, that's how I feel wearing my turban all

11:25:32 21   the time.

11:25:33 22   Q.  Tell us about that.

11:25:34 23   A.  Who wants to see pictures of just, you look turban, turban.  It

11:25:41 24   doesn't look good.  And I don't carry my wig in my back pocket to

11:25:46 25   say I am going to have it all the time, so it doesn't get put on.

11:25:52  1   Something special may happen or the baby may do something and I

11:25:56  2   want to be in the picture but I am not.

11:25:59  3   Q.  And you do have some pictures with your wig on, right?

11:26:02  4   A.  Yes.

11:26:06  5          MR. SCHANKER:  And, your Honor, I want to move to admit

11:26:11  6   Plaintiff's Exhibit 0654.

11:26:15  7          THE COURT:  Any objection?

11:26:16  8          MS. SASTRE:  No, your Honor.

11:26:17  9          THE COURT:  Let it be admitted.

11:26:23 10   BY MR. SCHANKER:

11:26:24 11   Q.  And when was this photograph taken?

11:26:26 12   A.  I can't remember really, we planned to do that.  That wasn't

11:26:31 13   something that just happened.  We made a date and planned to go do

11:26:37 14   a family portrait because I hadn't had one in years.  And I

11:26:42 15   actually thought my family was finished, as to my grandkids, and

11:26:47 16   then, boomp, I get another one.  So now I got to take another

11:26:53 17   family picture because I would like to have a family picture with

11:26:55 18   all of us.  I think I had Caleb and Gabriel and Matthew are the

11:27:02 19   only three in these pictures that I had.

11:27:10 20   Q.  And who all is in this photo, is that everybody?

11:27:13 21   A.  Yes, that's everybody.  That's Matthew in the tan pants in the

11:27:18 22   front, next to him is Caleb, then myself, my husband; in the back

11:27:24 23   in the blue shirt is Michael, and that's Ralph, Jr. holding

11:27:31 24   Gabriel, his son.  Now they have another son Jase and I'll have to

11:27:37 25   redo another family picture, plan it.

11:27:42  1   Q.  Barbara, I asked you earlier about the conversation you had in

11:27:49  2   the room with Dr. Carinder.  Do you remember that?

11:27:51  3   A.  Yes.

11:27:51  4   Q.  And I want to ask you another question about that.  If you were

11:27:57  5   provided a chemotherapy option by Dr. Carinder with less of a risk

11:28:04  6   of permanent hair loss than Taxotere, would you have taken that

11:28:09  7   chemotherapy option, as opposed to Taxotere?

11:28:11  8   A.  Okay.  Resay it again.  It was just so big of a --

11:28:18  9   Q.  I will.  If you were provided with a chemotherapy option with

11:28:24  10  less of a risk of permanent hair loss than Taxotere had, would you

11:28:29  11  have taken that option?

11:28:30  12  A.  Yes.

11:28:31  13  Q.  Just a few more photos I want to go through with you.

11:28:59  14          MR. SCHANKER:  Your Honor, these are already admitted,

11:29:01  15  this is Plaintiff's Exhibit 0655.

11:29:03  16          THE COURT:  Okay.  Please proceed.

11:29:18  17  BY MR. SCHANKER:

11:29:18  18  Q.  And when was this photograph taken?

11:29:20  19  A.  2018.

11:29:24  20  Q.  And where was this?

11:29:26  21  A.  That was in Silver Dollar City, that was the trip that we went

11:29:31  22  to go visit my niece and nephew and it turned out that we wind up

11:29:37  23  in Silver Dollar City.  That's my brother.

11:29:51  24  Q.  And who is this in this photograph with you?

11:29:53  25  A.  That's Caleb, Gabriel, and myself.  That was Gabriel's

11:30:01  1    birthday, three-year old -- his third birthday party.

11:30:13  2    Q.  And who is in this photograph?

11:30:16  3    A.  Myself, Gabriel, and his cousin Levi.  We went to -- Maxi was

11:30:26  4    taking them -- Maxi is my daughter-in-law -- to a Sea World in

11:30:33  5    Mississippi, some sea place, and she wanted help with the kids.

11:30:37  6    She didn't want to go with the two kids by herself because she is

11:30:41  7    always afraid one of them is going to go off on her.  So I went to

11:30:44  8    help her watch the two kids.

11:30:48  9    Q.  Barbara, do you let your appearance prevent you from doing

11:30:51  10   things with your family and grandkids?

11:30:54  11   A.  I try not to.  But sometimes -- I try to be there for my

11:31:02  12   grandkids because I want them to remember me.  I don't want them to

11:31:06  13   say, "Well, Mawmaw never did anything."  But like I say, a lot of

11:31:12  14   the times if I have to go somewhere and if it's weather bad, that

11:31:17  15   keeps me in if I have to wear a hat -- I mean my wig.  If I have to

11:31:23  16   really wear the wig to go somewhere and it's going to be bad

11:31:26  17   weather, I will stay home before I go.  I won't go.

11:31:32  18   Q.  Will you share with the jury the situation you had with getting

11:31:36  19   your driver's license?

11:31:38  20   A.  I went to go get my license -- well, let me put it this way.

11:31:44  21   My brother called me to go with him to take a ride.  He was going

11:31:49  22   to a doctor's office to get paperwork.  And I said, well, I'll take

11:31:52  23   a ride and chitchat with him in the car.  And so he went, I stayed

11:31:56  24   in the vehicle while he went upstairs to get his stuff.

11:32:00  25           We come down and we're going back home and we pass this

11:32:03  1  building that you can go get your license when it's due.  And I

11:32:08  2  said, oh, I'm gonna go get my license, they're due.  And not

11:32:12  3  realizing we were in November, and he says, "Well, you know your

11:32:16  4  birthday -- is it this year?"  And I said, "Wait, I think it is."

11:32:19  5  Well, when I looked on my license, they were about to expire in

11:32:23  6  about three days.  So he turns the truck around and we go in.

11:32:27  7       And I told them I want my license.  They do all of the

11:32:30  8  paperwork, they take my insurance card.  And I pay for it.  And she

11:32:35  9  says, "Well, you have to go over there to go get your picture

11:32:39 10  taken."  I said, "Okay.  No problem."  So I walk over there.  And

11:32:42 11  when I get over there, she goes, "Well, you got to remove your

11:32:45 12  turban."  And I go, "What?"  She says, "You have to remove your

11:32:48 13  turban."  I said, "No, ma'am."  I said, "I am not taking a picture

11:32:51 14  with my bald head on my license."  I said, "If I get stopped by a

11:32:56 15  policeman, he is going to see a turban.  He is not going to see my

11:32:59 16  bald head."

11:32:59 17       And I even made a remark, I said, "I'll go in another

11:33:02 18  room and let you look what's underneath it, it's a bald head."  And

11:33:06 19  she says, "I'm sorry.  I can't take it."

11:33:08 20       So now for the inconvenience, that's another

11:33:11 21  inconvenience to me, my brother -- which he did, he took me -- in

11:33:16 22  fact, I told him, no, I'll do it another day.  He says, no, come

11:33:21 23  on.  I went home, got my wig, went back and then had to go back

11:33:25 24  again.

11:33:26 25       To me that was an inconvenience.  I don't feel like I

11:33:28  1   should have been inconvenienced.  I don't see why they couldn't

11:33:30  2   have taken it with the turban.  This is me.  This is me now.  The

11:33:36  3   wig ain't me.  That's -- it may be part of me, you see that on my

11:33:43  4   head, but that's not me.  I don't have my hair back.

11:33:46  5   Q.  You said earlier that you feel like part of you is missing.

11:33:50  6   Can you explain to the jury?

11:33:51  7   A.  Yeah.  My hair is missing.  When it fell out and it didn't come

11:33:57  8   back, I feel like it died.

11:34:01  9   Q.  How many lawsuits have you filed in your lifetime?

11:34:04 10   A.  None.

11:34:06 11   Q.  Why are you doing this?

11:34:08 12   A.  I am doing this to make it aware to pharmaceutical companies

11:34:16 13   that they have to put all of the warnings on labels and tell the

11:34:21 14   doctors what's at risk for us.  That we should get all of the

11:34:26 15   information, not just part of the information.  Because had I known

11:34:30 16   that I was going to lose my hair, just like that first doctor

11:34:34 17   wanted to remove both breasts, then I would have -- it would have

11:34:38 18   put up a red flag to me, and I wasn't told that.  I was told my

11:34:42 19   hair was going to grow back.

11:34:46 20   Q.  How would you describe to the jury the way it feels to be a

11:34:50 21   woman with no hair?

11:34:52 22   A.  I just -- I just don't feel like a woman.  Like I said, a man

11:34:58 23   is distinguished when they lose their hair.  A woman is not

11:35:02 24   distinguished by no means.

11:35:06 25   Q.  When you look in the mirror without your turban on, what do you

11:35:09  1  see?

11:35:10  2  A.   That's a reminder of me having cancer.  It reminds me that even

11:35:14  3  though I don't have cancer anymore, this is a daily remindance.

11:35:18  4  And you get that when you go somewhere when someone sees you.  And

11:35:23  5  I don't have cancer anymore but right away they say, "oh, you have

11:35:27  6  cancer."  Well, I don't want to go through the rigmarole, "no, I

11:35:31  7  don't," "yes, I do," "I don't have hair."  I'll say, "Yes, ma'am, I

11:35:34  8  do."  And it sort of shuts them up, "oh, I'm sorry."

11:35:39  9        You know, I had a lady, actually, I was went to go eat

11:35:44 10  with my brother --

11:35:46 11        THE COURT:  Ma'am, I think -- I think you can tell us

11:35:53 12  what you felt, feel like.  But outside of what other people are

11:35:57 13  telling you.

11:35:58 14        THE WITNESS:  Okay.

11:35:59 15  BY MR. SCHANKER:

11:36:00 16  Q.   Barbara, is Ralph supportive?

11:36:04 17  A.   Yes, he is.  Very supportive.

11:36:06 18  Q.   And can he do what he needs to to support you in this process?

11:36:12 19  A.   Yes.  But like I say, I don't think he understands.  Like I

11:36:20 20  said, unless you have your hair gone, you can't understand what

11:36:25 21  someone goes through.

11:36:35 22        MR. SCHANKER:  No further questions at this time, your

11:36:37 23  Honor.

11:36:38 24        THE COURT:  Thank you.  Ms. Sastre.

11:36:42 25        MS. SASTRE:  Yes, your Honor, could I come up for a

11:36:44  1    moment, please.

11:36:45  2              THE COURT:  Sure.

11:37:10  3         (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

11:37:13  4          MS. SASTRE:  Your Honor, so I am very concerned about the

11:37:20  5    comment a moment ago from Mrs. Earnest that she has filed a suit

11:37:27  6    because the idea is she is trying to make companies warn, that has

11:37:32  7    nothing to do with what she is asking for in this case.  In fact,

11:37:36  8    that legally cannot be the outcome.  This is not about making

11:37:41  9    sanofi doing anything, the suit is about seeking money damages.

11:37:43 10    And, of course, I can ask a question or two, and I was thinking

11:37:47 11    about objecting when he asked the question, but it wasn't

11:37:50 12    objectionable per se until she responded.

11:37:54 13          And I just feel very uncomfortable because the idea of

11:37:57 14    what's so troubling about it, Judge, there are women sitting out in

11:38:01 15    the galley, I know your Honor is observing them, and combined with

11:38:05 16    that kind of comment, it just brings up motions of some out of

11:38:10 17    court victim that's not here that needs this jury's protection and

11:38:14 18    it's very, very troubling to me.  I think just some sort of

11:38:18 19    instruction from the Court would be appropriate because this is a

11:38:21 20    case about money damages.  So I am very concerned, your Honor.

11:38:27 21          MR. SCHANKER:  And, your Honor, I don't remember exactly

11:38:30 22    what her response was to my question --

11:38:34 23          THE COURT:  I thought the question was she never filed a

11:38:37 24    lawsuit and then why did you file this lawsuit.

11:38:41 25          MR. SCHANKER:  Right.

11:38:42  1          THE WITNESS:  What she said is I think companies should

11:38:46  2     warn, basically warn consumers so that they can be -- make informed

11:38:53  3     decisions.

11:38:54  4          MR. SCHANKER:  Right.

11:38:55  5          THE COURT:  You're right, this lawsuit, all she can ask

11:39:04  6     for is money.  Broadly speaking we all are aware that policy

11:39:11  7     determinations, it is, you know, that lawsuits are filed and people

11:39:18  8     sometimes respond through lawsuits.  What I can say is the jury

11:39:30  9     should be aware that this Court -- that they will not have --

11:39:44 10          MS. SASTRE:  And, Judge, we can do it, we can do it at

11:39:47 11     lunch, it doesn't have to be this moment, but I did want to raise

11:39:50 12     it contemporaneously, if that's okay.

11:39:52 13          THE COURT:  That's fine.

11:39:54 14          MS. SASTRE:  And I don't mind getting started.

11:39:54 15          THE COURT:  Okay.

11:39:55 16          MS. SASTRE:  I know.  Okay.  Thank you.

11:39:55 17          MR. SCHANKER:  Your Honor, we can make a record later.

11:39:57 18          MS. SASTRE:  Sure.

11:39:57 19          THE COURT:  That's fine.

11:39:57 20          MS. SASTRE:  Thank you, your Honor.

11:40:04 21        (OPEN COURT.)

11:40:05 22          THE COURT:  Thank you.  Please proceed.

11:40:17 23          MS. SASTRE:  Yes, your Honor.

11:40:30 24                         CROSS-EXAMINATION

11:40:30 25     BY MS. SASTRE:

11:40:31 1    Q.  Good morning.

11:40:31 2    A.  Good morning.

11:40:32 3    Q.  It's nice to see you, Mrs. Earnest.  I am Hildy Sastre and I

11:40:41 4    know that we met on I believe it was the first day of trial,

11:40:44 5    correct?

11:40:44 6    A.  Yes.

11:40:45 7    Q.  And I know we've run into each other in the lady's room just

11:40:49 8    about every day.

11:40:50 9    A.  Yes.

11:40:50 10   Q.  But I wanted to introduce myself to you again.  I've got some

11:40:54 11   questions for you this morning, okay, ma'am?

11:40:56 12   A.  Yes.

11:40:57 13   Q.  Okay.  If at any point you need something, I know you have some

11:41:02 14   water there.  I know from being on this side, this can be tiring.

11:41:08 15   If you need a break or you need anything will you let me know?

11:41:11 16   A.  Yes, ma'am.

11:41:12 17   Q.  And of course her honor is in charge, but please let us know.

11:41:16 18   A.  Okay.

11:41:16 19   Q.  Okay.  Very good, Mrs. Earnest.

11:41:21 20          Now, I would like to start by talking with you about

11:41:28 21   2011.  And I want to go back to the day when you first felt the

11:41:36 22   lump in your breast, okay?

11:41:38 23   A.  Okay.

11:41:39 24   Q.  All right.  And you told us that you were doing a self breast

11:41:47 25   exam?

11:41:47  1    A.  Correct.

11:41:48  2    Q.  And you saw at first a dimple --

11:41:50  3    A.  Correct.

11:41:51  4    Q.  -- in your left breast?

11:41:59  5    A.  Yes.

11:42:00  6    Q.  And what you felt with your own hands was a lump, right?

11:42:03  7    A.  Yes, yes.

11:42:03  8    Q.  And do you remember that moment still today?

11:42:08  9    A.  Yes.

11:42:10 10    Q.  Why?

11:42:11 11    A.  Because that was -- it's just -- that was something that I

11:42:20 12    found on my body that wasn't there a few days before, you know.

11:42:27 13    And I could feel that lump so I knew something was wrong.

11:42:31 14    Q.  It scared you?

11:42:32 15    A.  Yes.

11:42:33 16    Q.  And the reason you were checking your breasts, I think you said

11:42:39 17    about twice a week, right, ma'am?

11:42:42 18    A.  Yes.  Because I didn't do the mammograms.

11:42:47 19    Q.  And I see you nodding when you answer.

11:42:49 20    A.  I'm sorry.

11:42:50 21    Q.  No, don't apologize, please.  But if I ask you to respond out

11:42:55 22    loud, I just need to make sure that your answers make it for the

11:42:59 23    record verbally, okay?

11:43:00 24    A.  Yes, ma'am.

11:43:01 25    Q.  But I know you're answering me, I know what you're saying.

11:43:04  1          Okay, Mrs. Earnest, so you told us that at this time you

11:43:12  2   were 60 years old?

11:43:13  3   A.  Yes.

11:43:14  4   Q.  And you hadn't had a mammogram?

11:43:18  5   A.  No.

11:43:18  6   Q.  And so your way instead of having a mammogram was to give

11:43:27  7   yourself self breast exams; is that fair?

11:43:30  8   A.  Yes.

11:43:32  9   Q.  Now, that moment, that was the first time you had ever felt a

11:43:42 10   lump in your breast?

11:43:43 11   A.  Yes.

11:43:44 12   Q.  And did you say to yourself, "Gosh, I hope this isn't cancer"?

11:43:55 13   A.  Not really.  I didn't say that.  To be honest with you, what I

11:44:00 14   said was, "Oh, we can't go on vacation."  That's what I said.  I

11:44:04 15   really didn't even think about cancer at that time.  I was hoping

11:44:09 16   that it wasn't cancer, that it might have been just fibroids or

11:44:14 17   just build up fat tissue.  I really -- cancer didn't really come in

11:44:21 18   my mind until I went to the doctor.

11:44:24 19   Q.  And I think what you just said is that you knew there were some

11:44:29 20   things that it could have been, right?

11:44:31 21   A.  Yes.

11:44:34 22   Q.  But you were hoping, you were hoping that it wasn't cancer?

11:44:38 23   A.  Correct.

11:44:38 24   Q.  And you told your husband, Ralph, Mr. Earnest, you told him

11:44:47 25   about the lump that day?

11:44:48  1    A.  Yes.

11:44:49  2    Q.  And he said to you, "You better go make an appointment with the

11:44:57  3    doctor"?

11:44:57  4    A.  Yes.

11:44:57  5    Q.  And you did that right away?

11:45:00  6    A.  Yes.

11:45:01  7    Q.  And then that appointment, your first appointment,

11:45:14  8    Mrs. Earnest, do you recall that that was February 4th of 2011?

11:45:18  9    A.  Yes.

11:45:19  10   Q.  And you still remember that date?

11:45:21  11   A.  Yes.

11:45:21  12   Q.  And on that day, that February 4th in 2011, when you went to

11:45:33  13   see -- I believe you said you went to see a gynecologist?

11:45:36  14   A.  Yes, I did.

11:45:37  15   Q.  And at that time you didn't really have a gynecologist that you

11:45:41  16   were seeing regularly?

11:45:42  17   A.  No.

11:45:43  18   Q.  So you found somebody and you went to the appointment.  And

11:45:48  19   they did a mammogram that very same day?

11:45:52  20   A.  Yes.

11:45:52  21   Q.  And they also did an ultrasound that day?

11:45:55  22   A.  Yes.

11:45:56  23   Q.  Now, February 4th of 2011, the day you had that mammogram and

11:46:17  24   ultrasound, that was a Friday.  Do you recall that?

11:46:22  25   A.  I couldn't tell you what weekday it was, no.

11:46:24 1   Q.  Okay.  Well, let me ask you this:  Do you remember that when
11:46:30 2   you had those tests done on February 4th of 2011, that you had to
11:46:36 3   wait over the weekend to get the results back?
11:46:40 4   A.  Yes.
11:46:44 5   Q.  Was that hard for you?
11:46:45 6   A.  Oh, yeah.
11:46:49 7   Q.  What were some of the things that were running through your
11:46:52 8   mind that weekend?
11:46:53 9   A.  What it was, not knowing, you know.  I would have rather the
11:47:02 10  results right then and there, but they couldn't give them to me.
11:47:05 11  And that's the hardest part is waiting.
11:47:08 12  Q.  Sure.  And you were hoping --
11:47:14 13  A.  That it wasn't cancer.
11:47:16 14  Q.  And that's the conversation you're having with yourself that
11:47:20 15  weekend, weren't you?
11:47:21 16  A.  Yes.
11:47:21 17  Q.  And you're probably having some conversations sort of saying,
11:47:31 18  "Please, dear God, don't let it be cancer"?
11:47:34 19  A.  Yes.
11:47:34 20  Q.  Sometimes people talk about -- maybe you've seen this with your
11:47:37 21  friends or other loved ones, like, you know, making deals with God.
11:47:43 22  "Just please don't let it be cancer," right?
11:47:45 23  A.  Yes.
11:47:46 24  Q.  Did you have those kind of conversations that weekend?
11:47:49 25  A.  Sure.

11:47:50  1    Q.   Now, that Monday you went to see Dr. Lagarde to get the

11:47:58  2    results?

11:47:59  3    A.   Yes.

11:47:59  4    Q.   And you had your husband, Ralph, he was with you?

11:48:06  5    A.   Yes.

11:48:07  6    Q.   And I believe also your sister was with you?

11:48:10  7    A.   Yes.

11:48:10  8    Q.   Had you ever brought your husband and your sister to a doctor's

11:48:15  9    appointment before this one?

11:48:17 10    A.   No.

11:48:18 11    Q.   Because this day was different, right?

11:48:26 12    A.   Yes.

11:48:26 13    Q.   This was the day you were going to go into your doctor and you

11:48:34 14    were going to be told whether you had breast cancer or not?

11:48:38 15    A.   Correct.

11:48:39 16    Q.   Now, you talked a moment ago about -- you said people don't

11:48:48 17    understand what it's like to go through certain experiences unless

11:48:54 18    they've had that experience.

11:48:56 19    A.   Correct.

11:48:57 20    Q.   Okay.  And this experience of what you must have felt going

11:49:06 21    into that visit to get the news of do I have cancer or not, is that

11:49:15 22    that same kind of experience that you just don't know what it's

11:49:18 23    like until you've stood in those shoes?

11:49:20 24    A.   Yes, that's correct.

11:49:22 25    Q.   There's nothing like it, right?

11:49:24 1   A.  Right.

11:49:25 2   Q.  And unfortunately, you found out that day some terrible news.

11:49:40 3   That was the day you were told you had breast cancer --

11:49:44 4   A.  Yes.

11:49:44 5   Q.  -- right?

11:49:45 6          Do you still remember that moment today?

11:49:48 7   A.  Yes.

11:49:49 8   Q.  What was that like?

11:49:50 9   A.  Like a big kick in the chest, you know.  I still can't believe

11:49:57 10  that I have cancer because, you know, none of my sisters had breast

11:50:04 11  cancer, so I couldn't go to them about information.  I didn't know

11:50:08 12  anybody that had breast cancer.  So this was all new to me.  And

11:50:16 13  then -- it was just hard to believe that I had cancer.  I almost

11:50:23 14  blame myself for not having mammograms, but that's why I always

11:50:28 15  checked myself, and I was glad I found it.

11:50:32 16  Q.  Did you ever hear the saying, did your heart feel like it sank?

11:50:37 17  A.  Yes.

11:50:42 18  Q.  And even though you were hoping and praying all weekend?

11:50:48 19  A.  Yes.

11:50:49 20  Q.  The news you got was bad news, right?

11:50:53 21  A.  Yes.

11:50:53 22  Q.  You still remember when Dr. Lagarde told you those words?

11:51:02 23  A.  Yes.

11:51:03 24  Q.  What was the first thing that went through your mind?

11:51:08 25          MR. SCHANKER:  Objection, your Honor, asked and answered.

11:51:11  1          THE COURT:  Overruled.

11:51:13  2          THE WITNESS:  I honestly don't remember the exact first

11:51:18  3  thing.

11:51:21  4  BY MS. SASTRE:

11:51:21  5  Q.  Did you think about your family?

11:51:23  6  A.  Well, sure.  I don't know if that was the first thing I thought

11:51:27  7  of, but I did think about them.  How was I going to tell them, all

11:51:36  8  my family, that I had cancer.

11:51:40  9  Q.  Were you worried about telling your boys?

11:51:42 10  A.  Yes.

11:51:43 11  Q.  Michael and Ralph, Jr.?

11:51:44 12  A.  Yes.

11:51:45 13  Q.  And were you thinking is this something that I might die from?

11:51:57 14  A.  Not exactly the very -- not that moment until -- I guess until

11:52:05 15  I would have heard those words from a doctor, "Well, you know,

11:52:08 16  you're going to die from this."  I didn't think about it that way.

11:52:15 17  Q.  But you knew that breast cancer, of course, was something that

11:52:21 18  can lead to death?

11:52:22 19  A.  Right.  But I was hoping that I caught it early.

11:52:25 20  Q.  Sure.

11:52:26 21  A.  That was always in the back of my mind that, don't wait, that

11:52:31 22  did I catch it early.

11:52:34 23  Q.  And you were hoping with your surgery and your treatment that

11:52:41 24  you were going to beat it, right?

11:52:42 25  A.  Yes.

11:52:43  1    Q.  You heard that expression beat cancer?

11:52:45  2    A.  Yes.

11:52:46  3    Q.  And when we talk about, you know, beating cancer, we're talking

11:52:56  4    about fighting it, right?

11:52:59  5    A.  Yes.

11:53:00  6    Q.  Is that what you decided to do?  You were going to fight?

11:53:04  7    A.  Oh, yes, definitely.  Fight to live.

11:53:07  8    Q.  You were going to fight to stay alive, right?

11:53:10  9    A.  Yes.

11:53:10  10   Q.  How did your husband, Mr. Earnest --

11:53:24  11         THE COURT:  Ms. Sastre, I am really having trouble

11:53:27  12   hearing you.

11:53:28  13         MS. SASTRE:  You're having trouble hearing me?

11:53:31  14         THE COURT:  Yes.

11:53:32  15         MS. SASTRE:  Okay.  Thank you for letting me know.

11:53:34  16   BY MS. SASTRE:

11:53:37  17   Q.  When your husband, Ralph, was there with you and he now learned

11:53:46  18   of this devastating news, do you remember how it affected him?

11:53:51  19   A.  I think he hugged me and started crying.

11:53:56  20   Q.  Were you crying, too?

11:53:57  21   A.  Oh, sure.  I cried just about all the way home.

11:54:02  22   Q.  Why?

11:54:03  23   A.  Because I knew I had cancer then, you know.  And I was afraid.

11:54:12  24   I was afraid of going down this venture that I've never been down.

11:54:20  25   What do I have to do now.

1766

11:54:26 1    Q.  You told your sons when you got home?

11:54:28 2    A.  Yes.  Or my husband did.

11:54:33 3    Q.  Was that something that was difficult?

11:54:35 4    A.  Yes, very difficult.  And I know I even went and told my best

11:54:42 5    friend.

11:54:45 6    Q.  And your boys --

11:54:46 7    A.  Not over the phone.  I told her face to face.

11:54:50 8    Q.  Your boys, Ralph, Jr., and Michael, they were upset?

11:54:59 9    A.  Michael was really upset.  I know he spoke to his daddy and

11:55:04 10   told his daddy that he would take the last dollar out of his pocket

11:55:08 11   if we needed money, that he would -- he would help.  Ralph was

11:55:13 12   upset.  "Daddy, anything y'all need, let me know."

11:55:23 13   Q.  Is it hard to tell your children that you have a disease?

11:55:28 14   A.  Yes.

11:55:29 15   Q.  Breast cancer?

11:55:29 16   A.  Yes.

11:55:30 17   Q.  And we know you're close with your sons, right?

11:55:37 18   A.  Yes.

11:55:38 19   Q.  You're close with your family, right?

11:55:39 20   A.  Yes.

11:55:40 21   Q.  Okay.  Is family the most important thing in your life?

11:55:44 22   A.  Oh, definitely.

11:55:45 23   Q.  By far.

11:55:47 24   A.  By far.

11:55:48 25   Q.  Okay.  And it was then too, right?  It was your whole life?

11:55:54  1   A.   Yeah.   Till Katrina separated us all, you know.

11:56:01  2   Q.   I know.   Your boys, Michael and Ralph, Jr., they were worried

11:56:18  3   about losing you to cancer, right?

11:56:20  4   A.   Sure they were.

11:56:24  5   Q.   Is it difficult as a mother to think about your children and

11:56:31  6   how they feel about losing you?   Is that a hard thing?

11:56:39  7   A.   Yes.   Very hard because I almost had an experience with my

11:56:46  8   son -- losing my son and I didn't cope with that very good.

11:56:55  9   Q.   And I know your boys at this time, they were grown, they were

11:56:58 10   adults?

11:56:59 11   A.   Yes.

11:56:59 12   Q.   But we're never ready to leave our kids, right?

11:57:04 13   A.   No.

11:57:04 14   Q.   It doesn't matter how old you get?

11:57:07 15   A.   Right.

11:57:08 16   Q.   Now, your mother, I just want to talk about her for a moment.

11:57:24 17   I believe you've told us that she was diagnosed with cancer also

11:57:37 18   when she was in her 60s?

11:57:37 19   A.   Yes.   She died at 65.

11:57:37 20   Q.   I believe you told us she passed away the same year that she

11:57:40 21   was diagnosed?

11:57:40 22   A.   Yes.

11:57:41 23   Q.   And it was either ovarian or uterine cancer?

11:57:46 24   A.   Right, I don't remember.   And when I talked to one sister

11:57:50 25   before she passed away, she said uterine cancer.   I thought it was

11:57:56  1    ovarian cancer.  And then, my other sister has Alzheimer's, so we

11:58:05  2    can't ask -- we couldn't ask her.  She doesn't know.

11:58:09  3    Q.  Was this something entering your mind at the time as well?

11:58:13  4    Were you thinking of your mother?

11:58:14  5    A.  Oh, yes.

11:58:38  6              MS. SASTRE:  Keep going?

11:58:40  7              THE COURT:  (WITNESS NODS HEAD IN THE AFFIRMATIVE.)

11:58:41  8              MS. SASTRE:  You're okay, Mrs. Earnest, to keep going?

11:58:45  9              THE WITNESS:  Yes.

11:58:46 10              MS. SASTRE:  The judge will let us know when to break, so

11:58:49 11    I'll keep asking questions till she tells me to stop.

11:58:54 12    BY MS. SASTRE:

11:58:55 13    Q.  We didn't hear a lot this morning about your surgery, but I

11:58:57 14    just want to spend a moment or two on that.

11:59:02 15              After you learned of your diagnosis in February, it was

11:59:07 16    on, I believe, March 10th of 2011, that you had surgery?

11:59:11 17    A.  Correct.

11:59:11 18    Q.  And you had the cancerous lump in your left breast removed?

11:59:18 19    A.  Yes.

11:59:18 20    Q.  And then you told us you also had a lymph node removed.

11:59:22 21    A.  Yes.

11:59:23 22    Q.  So you were told by your doctors that the cancer in your breast

11:59:31 23    that it had spread to one of your lymph nodes?

11:59:33 24    A.  Yes.

11:59:34 25    Q.  And it was important for them to take that lymph node out,

11:59:37  1   right?

11:59:37  2   A.  Yes.

11:59:37  3   Q.  And that was to prevent the cancer from going somewhere else in

11:59:43  4   your body from that lymph node?

11:59:45  5   A.  Right.

11:59:45  6   Q.  And then you understood around this same time that, in addition

11:59:56  7   to the surgery, that wasn't going to be enough for you, you were

12:00:01  8   also going to need chemotherapy and radiation?

12:00:04  9   A.  Yes.

12:00:05 10   Q.  And you told us a little bit about how you ultimately made your

12:00:13 11   way into Dr. Carinder's office, right?

12:00:15 12   A.  Yes.

12:00:15 13   Q.  And he was closer to you in Slidell, as you said, so it was

12:00:18 14   convenient?

12:00:19 15   A.  Right.

12:00:19 16   Q.  Because you knew you would have to go a number of times to get

12:00:23 17   chemo?

12:00:23 18   A.  Yes.

12:00:24 19   Q.  Do you remember your first visit with him?

12:00:29 20   A.  Yes.

12:00:29 21   Q.  That was March 31st, 2011?

12:00:34 22   A.  Correct.

12:00:35 23   Q.  Were you nervous that day?

12:00:39 24   A.  Yes.

12:00:43 25   Q.  You were about to go in and meet with an oncologist and he was

12:00:51  1  going to talk to you about chemotherapy?

12:00:53  2  A.  Yes.

12:00:54  3  Q.  And you knew chemotherapy is not easy.  It's not fun, right?

12:01:03  4  A.  No, it's not.

12:01:05  5  Q.  People get sick from it, right?

12:01:07  6  A.  Yes.

12:01:08  7  Q.  It's tough, right?

12:01:11  8  A.  Yes.

12:01:12  9  Q.  Now, during the first appointment on March 31st, 2011,

12:01:32 10  Dr. Carinder recommended a drug to you by the name of Adriamycin,

12:01:37 11  right?

12:01:37 12  A.  Yes.  I'm sorry.

12:01:39 13  Q.  And he also recommended a chemotherapy drug to you by the same

12:01:45 14  of Cytoxan?

12:01:45 15  A.  Yes, yes.

12:01:46 16  Q.  That was the one with the "C"?

12:01:48 17  A.  Yes, ma'am.

12:01:48 18  Q.  Yes.  And he also recommended that they be followed by

12:01:54 19  Taxotere?

12:01:55 20  A.  Yes.

12:01:57 21  Q.  And you asked Dr. Carinder when he told you that, "How long am

12:02:06 22  I going to get chemo for," meaning, how long will this last, right?

12:02:11 23  A.  Yes.

12:02:12 24  Q.  And you asked him, "How long do I have to go for each time I

12:02:18 25  get chemo"?

12:02:19  1    A.   Yes.

12:02:20  2    Q.   But other than that, you didn't ask Dr. Carinder any other

12:02:27  3    questions about the treatment he recommended?

12:02:30  4    A.   No.

12:02:36  5    Q.   What you said to Dr. Carinder after he told you about his

12:02:42  6    recommendation on March 31st, 2011, you said, "I am in your hands.

12:02:51  7    Whatever you tell me I have to do, I'll do it"?

12:02:55  8    A.   Correct.

12:02:56  9    Q.   And when Dr. Carinder came in to talk with you about his

12:03:09 10    recommendation on March 31st, that was the only recommendation he

12:03:15 11    gave you, Adriamycin, Cytoxan, Taxotere?

12:03:19 12    A.   Yes.

12:03:19 13    Q.   There was no discussion of any options that day, correct?

12:03:23 14    A.   No, he did not give me any options.

12:03:26 15    Q.   And you didn't ask for any, true?

12:03:29 16    A.   What he gave me -- the option that I heard was that I was --

12:03:35 17    that I was going to get better, that I was going to get well, that

12:03:38 18    I was going to regrow my hair.  So I didn't ask for any options.

12:03:42 19    Those were all good options.  Why would I?

12:03:45 20    Q.   I --

12:03:46 21    A.   That's what I wanted to hear, I was going to get better.  I was

12:03:50 22    going to regrow my hair.  The lump -- my cancer wouldn't come back.

12:03:55 23    That's what I was hoping.

12:03:58 24    Q.   I understand.  I am just asking you, ma'am, when Dr. Carinder

12:04:06 25    told you, "These are the three drugs I am recommending," he talked

12:04:10 1   with you about them.  You didn't say, "Hey, do you have anything

12:04:14 2   else"?

12:04:15 3   A.  No, because I didn't know anything about drugs.  Why would I --

12:04:20 4   that's all right.

12:04:26 5   Q.  Well, before you left Dr. Carinder's office on March 31st, he

12:04:34 6   did talk with you about possible side effects and the potential

12:04:40 7   risks --

12:04:41 8   A.  Yes.

12:04:41 9   Q.  -- of these three medications?

12:04:44 10  A.  Yes.

12:04:44 11  Q.  Now, let's talk about the drug Adriamycin for a moment.  Okay?

12:05:00 12  A.  Okay.

12:05:01 13  Q.  Okay.  And Dr. Carinder -- in Dr. Carinder's records it states:

12:05:16 14  "Potential cardiac toxicity from the doxorubicin," which is

12:05:21 15  Adriamycin, "were explained to the patient in detail."

12:05:26 16       I just want to ask you:  Do you recall the detailed

12:05:31 17  conversation that Dr. Carinder had with you about Adriamycin on

12:05:35 18  March 31st?

12:05:37 19  A.  Not all of it, some of it.

12:05:39 20  Q.  What do you remember?

12:05:40 21  A.  I remember him telling me about what you just said, and I

12:05:47 22  figured I had a good heart.  I don't have heart trouble, that I

12:05:51 23  probably -- I'm sure if something would happen that they would

12:05:56 24  correct it.  You have to listen to your doctor.  That's all I'm

12:06:01 25  saying and that's what I was doing.  He recommended those drugs.

12:06:04 1   That's what -- I thought he was doing the right thing.  Which I

12:06:09 2   still do.  He did the right thing.

12:06:19 3   Q.  And you're living proof of that today, right?

12:06:21 4   A.  Yes.

12:06:22 5   Q.  When you said that Dr. Carinder talked with you about -- my

12:06:33 6   question I used the words "cardiac toxicity."  But when he talked

12:06:39 7   with you about Adriamycin, what he was telling you was that you

12:06:44 8   could have heart failure from this drug, right?

12:06:46 9   A.  Yes.

12:06:47 10  Q.  And he told you, "Mrs. Earnest, it's not just that you can have

12:06:53 11  heart failure from Adriamycin, you could have heart failure years

12:06:58 12  after you stopped taking it."  Right?

12:07:01 13  A.  Yes.

12:07:04 14  Q.  That's a big risk to accept, right?

12:07:08 15  A.  Yes, it is.

12:07:31 16  Q.  But you agreed to accept that risk?

12:07:33 17  A.  Yes.

12:07:33 18  Q.  Because you had made up your mind you were going to fight this

12:07:40 19  cancer?

12:07:40 20  A.  Yes.

12:07:41 21  Q.  And you had made up your mind that you were going to follow

12:07:46 22  Dr. Carinder's recommendations?

12:07:47 23  A.  Yes.

12:07:48 24  Q.  And that was because preventing a recurrence of your breast

12:07:57 25  cancer was more important than even the potential side effect or

12:08:04  1    risk of heart failure years later, right?

12:08:07  2    A.  Yes.

12:08:07  3    Q.  Now, when Dr. Carinder talked with you, Mrs. Earnest, about

12:08:28  4    Adriamycin, he used the words to describe it, he called it the red

12:08:38  5    devil.  Do you remember that?

12:08:39  6    A.  Yes, I remember that.

12:08:41  7              MR. SCHANKER:  Objection.  States facts not in evidence.

12:08:45  8              THE COURT:  Overruled.  I am going to allow it.

12:08:52  9    BY MS. SASTRE:

12:08:53  10   Q.  And when he called this drug that he just recommended you take

12:08:57  11   the red devil, that probably didn't sound too good to you, right?

12:09:04  12   A.  No, it didn't.

12:09:05  13   Q.  And you thought this is a drug that must be pretty bad, I think

12:09:13  14   those were your words?

12:09:14  15   A.  I didn't really say, "bad" in my mind.  I used the word must be

12:09:18  16   a strong drug, that's the word I thought of.  Not bad, strong to

12:09:26  17   knock this cancer out.  That's what I thought he was saying to me.

12:09:32  18   That's what I interpreted.

12:09:35  19   Q.  Did you ask Dr. Carinder and say, "Why is Adriamycin called the

12:09:45  20   red devil?  What are you giving me"?

12:09:47  21   A.  No, I didn't ask him that.  I really didn't.

12:09:52  22   Q.  Did you say, "Doctor, I don't know if I feel comfortable taking

12:10:00  23   something you just called the red devil"?

12:10:01  24   A.  No, I didn't tell him that.

12:10:20  25   Q.  Do you still remember how you felt on March 31st when you were

12:10:24  1    talking to Dr. Carinder?

12:10:25  2    A.  Yes.

12:10:25  3    Q.  Why is that something you remember, Mrs. Earnest?

12:10:30  4    A.  Because I was getting information about drugs that was -- that

12:10:34  5    I was going to have to take, scared.

12:10:41  6    Q.  Did you understand that chemotherapy was being recommended to

12:10:44  7    you by your doctors with the idea of being your cancer wouldn't

12:10:51  8    come back?

12:10:53  9    A.  What was --

12:10:54  10   Q.  I'm sorry -- let me ask you a different question, ma'am.  I

12:10:58  11   apologize.

12:10:59  12   A.  That's okay.

12:10:59  13   Q.  You understood that chemotherapy was being recommended because

12:11:05  14   the goal of the treatment was to stop your cancer from coming back?

12:11:09  15   A.  Yes.

12:11:10  16   Q.  And that's what you wanted, right?

12:11:12  17   A.  Yes.

12:11:13  18   Q.  Sitting here right now, you know that your treatment worked,

12:11:37  19   right?

12:11:37  20   A.  Yes, yes.  Because I'm here.

12:11:40  21   Q.  That's right.  If we try to go back together to that day when

12:11:46  22   you -- when you were in Dr. Carinder's office on March 31st, you

12:11:53  23   didn't know how this story was going to turn out, right?

12:11:56  24   A.  No.

12:11:56  25   Q.  Sitting there that day, you didn't know if you were going to be

12:12:02  1  alive another year, five years, ten years?

12:12:07  2  A.  No, nobody knew.  I don't know if I am going to die tomorrow.

12:12:10  3  Q.  Sure.  That's true for all of us.

12:12:15  4  A.  Yes.

12:12:15  5  Q.  But your situation was a little different there because you

12:12:18  6  were being treated for breast cancer, right?

12:12:20  7  A.  Right.

12:12:21  8  Q.  When you're thinking about whether cancer is going to return,

12:12:27  9  one of the things you're thinking about is:  Am I going to make it

12:12:32 10  to next Christmas, right?

12:12:33 11  A.  Yes.

12:12:34 12  Q.  Am I going to get to see these beautiful grandbabies you have,

12:12:39 13  are you going to get to see them grow up?

12:12:42 14  A.  Yes.

12:12:42 15  Q.  Right?  You're thinking about your family?

12:12:44 16  A.  Yes.

12:12:45 17  Q.  And the number one thing that you were praying and wishing and

12:12:55 18  hoping for when you were meeting with Dr. Carinder on that day was

12:13:01 19  that your cancer didn't ever come back, right?

12:13:04 20  A.  Yes.

12:13:06 21  Q.  That was your number one goal, survival was No. 1?

12:13:09 22  A.  Yes, ma'am.

12:13:10 23  Q.  Because not having your breast cancer come back was more

12:13:31 24  important than any of the potential risks of these medications,

12:13:36 25  right?

12:13:36 1    A.  Yes.

12:13:41 2            MS. SASTRE:  It might be a good time, Judge.  I am about

12:13:44 3    to change.

12:13:44 4            THE COURT:  Why don't you all approach.

12:13:46 5            MS. SASTRE:  Sure, your Honor.

12:13:56 6        (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

12:13:56 7            THE COURT:  How much longer do you have?

12:14:09 8            MS. SASTRE:  I have awhile.  I haven't -- I have things I

12:14:09 9    need to do with her, Judge.

12:14:09 10           THE COURT:  My question is --

12:14:09 11           MS. SASTRE:  Sure.

12:14:09 12           THE COURT:  -- how long?

12:14:09 13           MS. SASTRE:  Oh, that's fair.  I am going to guess and

12:14:17 14   say 45-minutes, I hope, but it could go a little longer, Judge, it

12:14:20 15   could go an hour.  And here is part of the reason.  I can't rush

12:14:27 16   and lead, you know.  I want to have a conversation --

12:14:30 17           THE COURT:  I understand.

12:14:42 18           MS. SASTRE:  Okay.  This is different than an expert.

12:14:42 19           THE COURT:  I was hoping if it was going to be a shorter

12:14:42 20   time, take an extra long break when you all rest, that's what's in

12:14:42 21   the back of my mind.

12:14:48 22           MS. SASTRE:  I think I have about an hour, Judge, I hope

12:14:48 23   it's less, but I am not sure, your Honor.

12:14:48 24           THE COURT:  Okay.  All right.

12:14:49 25           MR. SCHANKER:  Okay.

12:14:50  1           THE COURT:  All right.

12:14:51  2           MS. SASTRE:  Is it okay to break?

12:14:56  3           THE COURT:  Yeah.

12:14:56  4           MS. SASTRE:  Okay.  Very good.  Okay.  Thank you, your

12:14:56  5  Honor.

12:14:56  6           THE COURT:  Ms. Sastre, do me a favor?

12:14:59  7           MS. SASTRE:  Yeah, what am I doing?

12:15:02  8           THE COURT:  They are looking at me, "we're going to go as

12:15:06  9  long as the Judge."

12:15:06 10           MS. SASTRE:  Oh, I'm sorry.  I don't mean it that way.  I

12:15:09 11  didn't mean it that way.

12:15:09 12           THE COURT:  It's really okay.  I have large shoulders,

12:15:12 13  but sometimes it's like the jurors --

12:15:14 14           MS. SASTRE:  I apologize.  It won't happen again.

12:15:14 15      (OPEN COURT.)

12:15:24 16           THE COURT:  Members of the jury, this is a good time for

12:15:25 17  us to take our lunch break, it's 12:15.  Court will be at recess

12:15:31 18  until 1:15.

12:15:31 19           Please let me remind you, don't discuss the case with

12:15:41 20  amongst yourselves or with anyone else.  Leave your tablets on your

12:15:41 21  chairs.

12:15:41 22           Recess until 1:15.

12:16:01 23      (WHEREUPON, THE JURY EXITED THE COURTROOM.)

12:16:01 24           THE COURT:  Ms. Earnest, just give me a minute.

12:16:01 25           Ms. Earnest, we are breaking in the middle of your

12:16:05  1    testimony, so you cannot discuss your testimony with anyone,

12:16:10  2    including your lawyers.  But I wanted to let you know because --

12:16:16  3    just to make sure that you understood that.

12:16:18  4            THE WITNESS:  Yes, ma'am.

12:16:18  5            THE COURT:  Thank you.

12:16:20  6            MS. SASTRE:  Thank you, Judge.

12:16:20  7        (WHEREUPON, THE FOLLOWING PROFFER WAS MADE BY PLAINTIFF'S

12:18:22  8        COUNSEL:)

12:18:22  9            MR. LAMBERT:  My name is Palmer Lambert, I am counsel for

12:18:41  10   plaintiff, and I am making a proffer for the record.

12:18:43  11           Plaintiff makes the proffer of affirmatively designated

12:18:50  12   deposition testimony related to deposition exhibits and testimony

12:18:53  13   that have been excluded by the Court.

12:19:03  14           No. 1:  The Court's rulings regarding Francis Polizzano's

12:19:03  15   deposition testimony have been provided to the Court in a binder

12:19:05  16   along with its exhibits.  Particularly, the Court excluded

12:19:09  17   testimony of Ms. Polizzano regarding her personal knowledge that

12:19:18  18   the U.S. product insert did not contain a warning of permanent hair

12:19:21  19   loss as described in Exhibit P-496 attached to her deposition.

12:19:29  20           Plaintiff also specifically proffers Plaintiff 516, which

12:19:34  21   is Exhibit 19 to her deposition, which is an e-mail dated

12:19:45  22   November 9, 2015, from Ms. Polizzano to Gina Vestea, both Sanofi

12:19:45  23   employees at the time.  The subject line of the e-mail is "re:

12:19:51  24   Taxotere FDA request regarding permanent/irreversible alopecia-CO

12:20:04  25   with my comments."  The e-mail states, "Well, this is going to be

12:20:05 1    fun submitting greater than four-year old labelling changes to the

12:20:09 2    FDA now."

12:20:11 3          This e-mail is evidence of Sanofi's notice and state of

12:20:15 4    mind that a label change regarding permanent alopecia was made

12:20:28 5    necessary in 2011.  This e-mail also is evidence of a statement

12:20:28 6    against interests that the company agreed a labeling change request

12:20:31 7    should have been made in 2011.

12:20:33 8          Plaintiff, therefore, offers the entirety of the

12:20:37 9    deposition testimony excluded by adverse rulings, as well as the

12:20:43 10   exhibits to her deposition.

12:20:45 11         No. 2:  Plaintiff proffers the designations and portions

12:20:50 12   of testimony of Amy Freedman that have been excluded by adverse

12:20:56 13   rulings, as well as the exhibits to her deposition.

12:21:00 14         No. 3:  Plaintiff proffers her affirmative designations

12:21:04 15   and deposition testimony of Intouch Solutions through its

12:21:09 16   representative Matthew Goyer, and of Sanofi's employees, Lesley

12:21:15 17   Fierro and Madeline Malia; which testimony and related exhibits

12:21:19 18   have been excluded by this Court's in limine rulings disallowing

12:21:28 19   testimony regarding social media.  Record Document 8198.

12:21:30 20         These depositions elicit company efforts to silence

12:21:47 21   complaints regarding permanent alopecia and remove them from the

12:21:47 22   public's ability to see them.  More specifically, Sanofi had a

12:21:47 23   Facebook page that was entitled VOICES.  The testimony of Mr. Goyer

12:21:51 24   provides evidence that Sanofi hired Intouch Solutions to implement

12:21:57 25   a rapid response plan developed by Sanofi to scrub this Facebook

12:22:02  1  page of complaints of side effects of Taxotere, including

12:22:08  2  persistent hair loss.

12:22:09  3        The testimony of Intouch shows this rapid response plan

12:22:14  4  involved identifying complaints, including the complaints of side

12:22:19  5  effects of hair loss, removing those complaints, and taking the

12:22:25  6  additional step of reporting the Facebook user to Facebook for

12:22:28  7  abusing Facebook policies.

12:22:31  8        The deposition testimony and exhibits prove that some of

12:22:36  9  the removed Facebook posts include women trying to advise the

12:22:41 10  company and the public of the adverse reaction of permanent hair

12:22:45 11  loss.

12:22:47 12        In this proffer plaintiff would specifically highlight

12:22:49 13  Exhibits P-239, 546, 288, 289, 294, 273 to the Fierro deposition,

12:23:02 14  which document these Facebook posts and the removal efforts by

12:23:05 15  Sanofi.

12:23:07 16        Plaintiff also highlights Exhibit P-37 and 283 to the

12:23:13 17  Malia deposition documenting, "Taxotere and persistent alopecia

12:23:22 18  communication plan."

12:23:25 19        The testimony of Ms. Fierro, Mr. Goyer, and Ms. Malia is

12:23:31 20  directly related to Louisiana Supreme Court's factors for

12:23:35 21  evaluation of liberative prescription and contra non valentem

12:23:41 22  because the factor includes the conduct of the defendant.

12:23:45 23        No. 4:  Plaintiff next proffers her affirmatively

12:23:50 24  designated deposition testimony of Paul Chew regarding the FDA's

12:23:54 25  January 2011 warning letter to Sanofi and corresponding 483

12:24:00  1    inspection and exhibits attached to his deposition.

12:24:03  2            This testimony was excluded by the Court's order

12:24:07  3    Document 8216 granting defendant's motion in limine.  Plaintiff's

12:24:12  4    proffered evidence goes directly to the company's propensity to be

12:24:17  5    truthful in submissions to the FDA.  It also provides evidence that

12:24:21  6    directly calls into question Sanofi counsel's opening statement

12:24:26  7    that the jury will not see anything that the FDA did not see

12:24:30  8    regarding TAX316.

12:24:33  9            No. 5:  Plaintiff next proffers her affirmative

12:24:36 10    designations of the deposition testimony of Nanae Hangai excluded

12:24:41 11    by the Court's ruling regarding post remedial measures.

12:24:46 12    Specifically, the testimony of Ms. Hangai provides testimony

12:24:51 13    regarding Sanofi's clinical overview in 2015 through an exhibit

12:24:57 14    authored by Ms. Hangai, P-517, entitled, "2.5 Clinical Overview

12:25:07 15    Docetaxel and Permanent Alopecia."  And this is dated November 11,

12:25:13 16    2015.  Ms. Hangai's statement on page 15, is, "based on my review

12:25:21 17    of the Sanofi global pharmacovigilance database, worldwide

12:25:27 18    scientific literature, clinical studies and biological

12:25:34 19    plausibility.  The cumulative weighted evidence is sufficient to

12:25:38 20    support a causal association between docetaxel and

12:25:44 21    permanent/irreversible alopecia in patients who received

12:25:48 22    docetaxel."

12:25:49 23            It was prejudicial to plaintiff's presentation of this

12:25:52 24    case for the jury not to hear this admission of the party defendant

12:25:57 25    on general causation.

 1    No. 6:  Plaintiff next proffers her affirmatively

 2    designated testimony and related exhibits to the Michael Kopreski

 3    depositions.  Those are the December 12 and 13, 2018, 30(b)(6); the

 4    June 4, 2019, 30(b)(6), and the individual deposition taken on

 5    April 3rd, 2019.  Portions of which were excluded from the video

 6    presentation and also excluded by rulings on Sanofi's objections.

 7    Plaintiff specifically was precluded from showing the

 8    adverse events reports as demonstrative exhibits alongside the

 9    witness's video deposition that was played to the jury.  The

10    adverse event reports directly relate to Sanofi's notice of

11    complaints of permanent, persistent, ongoing, or irreversible hair

12    loss and their responses thereto.

13    No. 7:  Plaintiff next proffers her affirmatively

14    designated testimony and related exhibits of Jean-Phillipe Aussel

15    and Linda Gustavson, which were excluded by sustaining certain of

16    defendant's objections.  All of these deposition testimony binders

17    and exhibits have been provided to the Court.

18    And that concludes the plaintiff's proffer.

19    (WHEREUPON, A LUNCH RECESS WAS TAKEN.)

20

21                           *  *  *  *  *  *

22

23

24

25

1

2                    REPORTER'S CERTIFICATE

3

4          I, Karen A. Ibos, CCR, Official Court Reporter, United

5     States District Court, Eastern District of Louisiana, do hereby

6     certify that the foregoing is a true and correct transcript, to the

7     best of my ability and understanding, from the record of the

8     proceedings in the above-entitled and numbered matter.

9

10

11                        ___/s/ Karen A. Ibos_____

12                        Karen A. Ibos, CCR, RPR, CRR, RMR

13                        Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25