UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  TAXOTERE (DOCETAXEL)      *       16-MD-2740
PRODUCTS LIABILITY LITIGATION     *
                                  *       Section H
                                  *
Relates to:  Barbara Earnest      *       September 24, 2019
             16-CV-17144          *
* * * * * * * * * * * * * * * * * *


DAY 7 - AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL BEFORE
THE HONORABLE JANE T. MILAZZO
UNITED STATES DISTRICT JUDGE


<u>Appearances</u>:


For the Plaintiffs:        Barrios Kingsdorf & Casteix, LLP
                           BY:  DAWN M. BARRIOS, ESQ.
                           701 Poydras Street, Suite 3650
                           New Orleans, Louisiana 70139


For the Plaintiffs:        Gainsburgh Benjamin David Meunier
                             & Warshauer, LLC
                           BY:  M. PALMER LAMBERT, ESQ.
                           1100 Poydras Street, Suite 2800
                           New Orleans, Louisiana 70163


For the Plaintiffs:        Pendley Baudin & Coffin, LLP
                           BY:  CHRISTOPHER L. COFFIN, ESQ.
                           1100 Poydras Street, Suite 2505
                           New Orleans, Louisiana 70163


For the Plaintiffs:        Gibbs Law Group, LLP
                           BY:  KAREN BARTH MENZIES, ESQ.
                           6701 Center Drive West, Suite 1400
                           Los Angeles, California 90045

Appearances:

For the Plaintiffs:            Bachus & Schanker, LLC
                               BY:  J. KYLE BACHUS, ESQ.
                                    DARIN L. SCHANKER, ESQ.
                               1899 Wynkoop Street, Suite 700
                               Denver, Colorado 80202


For the Plaintiffs:            Fleming Nolen & Jez, LLP
                               BY:  RAND P. NOLEN, ESQ.
                               2800 Post Oak Blvd., Suite 4000
                               Houston, Texas 77056


For the Plaintiffs:            David F. Miceli, LLC
                               BY:  DAVID F. MICELI, ESQ.
                               Post Office Box 2519
                               Carrollton, Georgia 30112


For the Plaintiffs:            Morgan & Morgan, P.A.
                               BY:  EMILY C. JEFFCOTT, ESQ.
                               700 S. Palafox Street, Suite 95
                               Pensacola, Florida 32502


For the Sanofi                 Irwin Fritchie Urquhart
Defendants:                         & Moore, LLC
                               BY:  DOUGLAS J. MOORE, ESQ.
                               400 Poydras Street, Suite 2700
                               New Orleans, Louisiana 70130


For the Sanofi                 Shook Hardy & Bacon, LLP
Defendants:                    BY:  HARLEY V. RATLIFF, ESQ.
                                    JON A. STRONGMAN, ESQ.
                               2555 Grand Boulevard
                               Kansas City, Missouri 64108


For the Sanofi                 Shook Hardy & Bacon, LLP
Defendants:                    BY:  HILDY M. SASTRE, ESQ.
                               201 Biscayne Boulevard, Suite 3200
                               Miami, Florida 33131

```
Official Court Reporter:        Toni Doyle Tusa, CCR, FCRR
                                500 Poydras Street, Room B-275
                                New Orleans, Louisiana 70130
                                (504) 589-7778




Proceedings recorded by mechanical stenography using
computer-aided transcription software.
```

## INDEX

                                                        Page

Barbara Earnest

    Cross-Examination By Ms. Sastre              1789
    Redirect Examination By Mr. Schanker         1876

Motions                                          1887

**AFTERNOON SESSION**

**(September 24, 2019)**

01:17 1

01:17 2

01:18 3       **THE COURT:**  It looks like everybody is here.  Please

01:18 4   proceed.

01:19 5              All jurors are present.  Court is back in

01:19 6   session.  You may be seated.

01:19 7              Ms. Earnest, I remind you you are under oath.

01:19 8   **BARBARA EARNEST,**

01:19 9   having been duly sworn, testified as follows:

01:19 10  **CROSS-EXAMINATION**

01:19 11  **BY MS. SASTRE:**

01:19 12  **Q.**   Good afternoon, Ms. Earnest.  Welcome back from lunch.

01:19 13  **A.**   Thank you.

01:19 14  **Q.**   Now, Mrs. Earnest, I would like to ask you some questions

01:19 15  about the informed consent that you signed in this case.

01:19 16  **A.**   Okay.

01:19 17  **Q.**   I want to take a look at that together.  We will put it up

01:19 18  on the screen so we can all look at the same time.

01:19 19  **A.**   Okay.

01:19 20  **Q.**   Okay.  Very good.  I would like to start with the second

01:20 21  page first, please.  Thank you.

01:20 22              If we look at the paragraph, Mrs. Earnest -- are you

01:20 23  able to see all right up there?

01:20 24  **A.**   Yes.

01:20 25  **Q.**   All right.  Very good.  If we look at the paragraph right

BARBARA EARNEST - CROSS

01:20  1  above your signature -- I would like to just go through that

01:20  2  with you.  Okay?

01:20  3         It says:  "I certify with my signature that I have

01:20  4  read and fully understand the above consent and that I have had

01:20  5  an opportunity to ask questions of my physician regarding the

01:20  6  consent, the specific chemotherapy and known hazards.  I

01:20  7  further acknowledge that I am signing this on my own free

01:20  8  will."

01:20  9         Did I read that correctly?

01:20 10  A.   Yes.

01:20 11  Q.   You did read the form before you signed it?

01:20 12  A.   Yes.

01:20 13  Q.   You knew this wasn't -- this was important?

01:21 14  A.   Yes.

01:21 15  Q.   This is your signature, correct?

01:21 16  A.   Correct.

01:21 17  Q.   And your husband's -- Mr. Earnest's signature?

01:21 18  A.   Yes.

01:21 19  Q.   If we turn to the first page, please -- well, let me ask

01:21 20  you this for a moment:  You signed the form on March 31, 2011,

01:21 21  correct?

01:21 22  A.   Is that a question?

01:21 23  Q.   Yes.  I'm sorry.  You signed on March 31, right?

01:21 24  A.   Yes.

01:21 25  Q.   And then you started your actual treatment, the

**BARBARA EARNEST - CROSS**

01:21 1  chemotherapy, in about mid-April?

01:21 2  **A.**  Yes.

01:21 3  **Q.**  So you had a couple of weeks after your appointment with

01:21 4  Dr. Carinder, him talking with you about the risks of these

01:21 5  medications, after reading and signing this form, to think

01:21 6  about your treatment, right?

01:22 7  **A.**  Yes.

01:22 8  **Q.**  Was Dr. Carinder the kind of doctor who made himself

01:22 9  available to you?  If you had questions, you could reach him?

01:22 10  **A.**  I'm sure he was, but I didn't call him to ask him any

01:22 11  questions after I signed it.

01:22 12  **Q.**  Okay.  So between that day of March 31, when you signed

01:22 13  the form and you met with Dr. Carinder, you didn't call him

01:22 14  back with any questions?

01:22 15  **A.**  No.

01:22 16  **Q.**  You didn't do any reading up or any kind of research on

01:22 17  your own --

01:22 18  **A.**  No.

01:22 19  **Q.**  -- with regard to the three chemotherapy medications you

01:22 20  were going to take?

01:22 21  **A.**  No.  No, I didn't.

01:22 22  **Q.**  Let's go ahead and take a look at the first page, starting

01:22 23  on the bottom, ma'am.  I believe these are your initials next

01:22 24  to -- I want to focus on the first three medications:

01:22 25  Adriamycin, Cytoxan, and Taxotere.

BARBARA EARNEST - CROSS

01:23  1    A.    Yes.

01:23  2    Q.    So you knew specifically from your conversation with

01:23  3    Dr. Carinder and, of course, also this form, exactly the

01:23  4    medication he was going to give you?

01:23  5    A.    Yes, I did.

01:23  6    Q.    Now, if we look at the first sentence in the third

01:23  7    paragraph, it says:  "I hereby acknowledge that Dr. Carinder

01:23  8    has provided a detailed explanation of the chemotherapy

01:23  9    treatment."  Do you see that?

01:23 10    A.    Yes.

01:23 11    Q.    Was that true?

01:23 12    A.    Yes.

01:23 13    Q.    And the possible side effects as well?

01:23 14    A.    Yes.

01:23 15    Q.    If we look at the last sentence of that paragraph that

01:23 16    begins with "I understand," it states:  "I understand that

01:24 17    drugs used in my treatment are being used to try to produce a

01:24 18    beneficial effect."  Was that your understanding?

01:24 19    A.    Yes.

01:24 20    Q.    In your case that would be it talks about remission?

01:24 21    A.    Yes.

01:24 22    Q.    To keep your cancer from coming back, right?

01:24 23    A.    Yes.

01:24 24    Q.    Which means in remission, correct?

01:24 25    A.    Yes.

**BARBARA EARNEST - CROSS**

01:24 1    **Q.**   And then it says:  "Though such a result cannot be
01:24 2    guaranteed."  Was that your understanding?
01:24 3    **A.**   Yes.
01:24 4    **Q.**   Dr. Carinder didn't give you a guarantee when it came to
01:24 5    your chemotherapy treatment?
01:24 6    **A.**   No.
01:24 7    **Q.**   And the form states:  "I understand there is a risk of
01:24 8    very uncommon, rare, or previously unknown side effects
01:24 9    developing because of the use of these drugs."
01:25 10           Do you see that, ma'am?
01:25 11   **A.**   Where were you?
01:25 12   **Q.**   It states in the last sentence of that paragraph.  Do you
01:25 13   see that?
01:25 14   **A.**   Oh, yes, yes.
01:25 15   **Q.**   So you would agree with me, you accepted a risk of
01:25 16   previously unknown side effects in addition to uncommon or rare
01:25 17   side effects, true?
01:25 18   **A.**   Yes.
01:25 19   **Q.**   So you understood that there might be things that could
01:25 20   happen which were potentially unknown, true?
01:25 21   **A.**   True.
01:25 22   **Q.**   Because that's the risk of taking chemotherapy, right?
01:25 23   **A.**   Yes.
01:25 24   **Q.**   Let's go to the second paragraph.  I would like to start
01:25 25   four lines from the bottom, beginning with the word

## BARBARA EARNEST - CROSS

01:25 1   "potentially."  I just want to go through a few of these risks

01:26 2   with you.  Okay?

01:26 3   **A.**   Okay.

01:26 4   **Q.**   Okay, Mrs. Earnest.  So starting with the word

01:26 5   "potentially," four lines from the bottom -- well, let me go up

01:26 6   a little bit in that paragraph.

01:26 7          It says:  "Side effects from chemotherapeutic agents

01:26 8   may include" -- and then there's a long list.  "Side effects

01:26 9   may include."  Okay?

01:26 10  **A.**   Yes.

01:26 11  **Q.**   And then I want to go back down to where we were:

01:26 12  "Potentially life-threatening damage to vital organs such as

01:26 13  the heart, lungs, liver, and kidneys."

01:26 14          You were advised of that risk?

01:26 15  **A.**   Yes.

01:26 16  **Q.**   You accepted that risk?

01:26 17  **A.**   Yes.

01:26 18  **Q.**   And you accepted that risk to get the benefit of being

01:26 19  alive?

01:26 20  **A.**   Yes.

01:26 21  **Q.**   When you were told about the risk of life -- potentially

01:27 22  life-threatening damage to your heart, your lungs, your liver,

01:27 23  or your kidneys, you didn't ask Dr. Carinder for any other

01:27 24  options?

01:27 25  **A.**   No, I didn't.

BARBARA EARNEST - CROSS

01:27 1    Q.   You didn't say to him, "Is there something else I can take
01:27 2    with less of a risk of that"?
01:27 3    A.   No.
01:27 4    Q.   You didn't ask him any questions about that risk?
01:27 5    A.   No.
01:27 6    Q.   The informed consent also states side effects may
01:27 7    include -- excuse me.  It says:  "In addition, it is possible
01:27 8    that these medications may result in death," and then it says
01:27 9    "brain damage."  Do you see that?
01:27 10   A.   Yes.
01:27 11   Q.   You accepted that risk --
01:27 12   A.   Yes.
01:27 13   Q.   -- the risk of possibly dying from this treatment, true?
01:28 14   A.   True.
01:28 15   Q.   You accepted the risk of possible brain damage from the
01:28 16   treatments.
01:28 17   A.   Is that a question?
01:28 18   Q.   Yes, ma'am.
01:28 19   A.   What was the question?
01:28 20   Q.   You accepted the risk of potential brain damage from the
01:28 21   chemotherapy treatment.
01:28 22   A.   Yes.
01:28 23   Q.   You did that to get the benefit of the treatment?
01:28 24   A.   Yes.
01:28 25   Q.   And when you were told about the risk of brain damage, you

**BARBARA EARNEST - CROSS**

01:28 1    didn't ask Dr. Carinder for different options?

01:28 2    **A.**    No.

01:28 3    **Q.**    You didn't ask him any questions about that risk, true?

01:28 4    **A.**    True.

01:28 5    **Q.**    For example, you didn't ask him, "Well, how often does

01:28 6    that happen?"

01:28 7    **A.**    No, I didn't ask him that.

01:28 8    **Q.**    We can do the next two together.  You were made aware of

01:28 9    the risk of quadriplegia, meaning paralysis of the arms and

01:28 10   legs; and then separately it talks about paralysis of the legs.

01:29 11            Those were risks you accepted --

01:29 12   **A.**    Yes.

01:29 13   **Q.**    -- to get the benefit of the treatment?

01:29 14   **A.**    Yes.

01:29 15   **Q.**    No questions of Dr. Carinder about those risks of

01:29 16   paralysis?

01:29 17   **A.**    No.

01:29 18   **Q.**    And you didn't ask for any other options when you learned

01:29 19   of those risks?

01:29 20   **A.**    No.

01:29 21   **Q.**    On the next one, Mrs. Earnest, you were advised of the

01:29 22   risk of loss of an organ or function of an organ, correct?

01:29 23   **A.**    Correct.

01:29 24   **Q.**    That was a risk you accepted to get the benefit of this

01:29 25   treatment?

## BARBARA EARNEST - CROSS

| | | |
|---|---|---|
| 01:29 | 1 | **A.** Yes. |
| 01:29 | 2 | **Q.** You didn't ask Dr. Carinder how often something like that |
| 01:29 | 3 | might have happened? |
| 01:29 | 4 | **A.** No. |
| 01:29 | 5 | **Q.** You didn't ask him if there was anything else you could |
| 01:29 | 6 | take that would avoid that risk or lessen that risk? |
| 01:29 | 7 | **A.** No. |
| 01:29 | 8 | **Q.** And then the last one is loss of an arm or leg -- the |
| 01:30 | 9 | function of an arm or a leg.  Do you see that? |
| 01:30 | 10 | **A.** Yes. |
| 01:30 | 11 | **Q.** That was a risk you were made aware of and accepted -- |
| 01:30 | 12 | **A.** Yes. |
| 01:30 | 13 | **Q.** -- to get the benefit of being alive? |
| 01:30 | 14 | **A.** Yes. |
| 01:30 | 15 | **Q.** You didn't ask Dr. Carinder for any other options when you |
| 01:30 | 16 | learned of that risk? |
| 01:30 | 17 | **A.** No. |
| 01:30 | 18 | **Q.** You didn't ask him how often that happened, based upon his |
| 01:30 | 19 | experience? |
| 01:30 | 20 | **A.** No. |
| 01:30 | 21 | **Q.** Now, still looking at your informed consent, if we look at |
| 01:31 | 22 | the second paragraph, ma'am, the third line down, it says: |
| 01:31 | 23 | "Side effects from chemotherapeutic agents may include hair |
| 01:31 | 24 | loss."  Do you see that? |
| 01:31 | 25 | **A.** Yes. |

BARBARA EARNEST - CROSS

01:31 1    **Q.**    I'm going to put in there the word "permanent."  Okay?

01:31 2    **A.**    But it doesn't say permanent.

01:31 3    **Q.**    My question to you, Mrs. Earnest, is:  Even if the word

01:31 4    "permanent" had appeared before "hair loss" on this consent

01:31 5    form, you still would have signed it?

01:31 6    **A.**    No, I wouldn't have.  No.  I would have asked him about

01:31 7    explain that to me, more about that.  I know I would have.

01:31 8    **Q.**    So the only risk you were unwilling to accept was the risk

01:32 9    of permanent hair loss?

01:32 10   **A.**    Yes.

01:32 11   **Q.**    Even compared to brain damage?

01:32 12            **MR. SCHANKER:**  Objection.  Asked and answered.

01:32 13            **THE COURT:**  Sustained.

01:32 14   BY MS. SASTRE:

01:32 15   **Q.**    So you said if the word "permanent" had been there, you

01:32 16   would have asked Dr. Carinder about that?

01:32 17   **A.**    Yes, I would have.  I would have asked him if there would

01:32 18   be another drug.

01:32 19   **Q.**    Even though you didn't ask him questions about anything

01:32 20   else in the entire consent form?

01:32 21   **A.**    No, I didn't.  I think if he -- in my own opinion, I think

01:32 22   that if he had previously had anything happen like that, I

01:32 23   think he would have automatically told me, "Mrs. Earnest, I had

01:33 24   a patient that did this" or "Mrs. Earnest, I had a patient that

01:33 25   did that."  He didn't tell me that.

BARBARA EARNEST - CROSS

01:33  1          He told me that my hair would grow back, and that's
01:33  2  what I was hoping for all these years because that's what I
01:33  3  heard from him.  And it didn't.
01:33  4  Q.   So I believe you testified that if Dr. Carinder gave you
01:33  5  another option that had less of a risk of hair loss, you would
01:33  6  have taken it.  Right?
01:33  7  A.   Yes.
01:33  8  Q.   So the only thing that would have caused you to have asked
01:33  9  about another option or taken another medication -- the only
01:33 10  thing you're telling us is hair loss?
01:33 11          MR. SCHANKER:  Objection.  Asked and answered.
01:33 12          THE COURT:  Sustained.
01:34 13  BY MS. SASTRE:
01:34 14  Q.   Let's assume that you did ask Dr. Carinder for a different
01:34 15  option.  Okay?
01:34 16  A.   Okay.
01:34 17  Q.   You would have wanted to have known something about that
01:34 18  option too, right?
01:34 19  A.   What option?  What do you mean?
01:34 20  Q.   This drug we are talking about.
01:34 21  A.   Oh.
01:34 22  Q.   Let me go back.  It's kind of a hypothetical question,
01:34 23  following up on your lawyer's questions.
01:34 24          So, again, I think what you said is that
01:34 25  hypothetically, if Dr. Carinder -- well, let me back up.

BARBARA EARNEST - CROSS

01:35 1          I think what you are telling us is that if

01:35 2 Dr. Carinder had advised you of permanent hair loss risk, that

01:35 3 you would have asked him questions about that?

01:35 4 A.   Yes, I would have.

01:35 5 Q.   Would it have been important to you -- when asking

01:35 6 Dr. Carinder questions about this hair loss risk, wouldn't you

01:35 7 want to know how often he had seen that?

01:35 8 A.   If he would have told me about the permanent hair loss,

01:35 9 yes.

01:35 10 Q.   I understand what you are saying, that that was the thing

01:35 11 that was going to determine what you took, but my question is:

01:35 12 You might think that that's a risk that you don't like the

01:35 13 sound of, but what you would also want to know about that risk

01:36 14 is, well, how often does it happen, right?

01:36 15          MR. SCHANKER:  Objection.  Misstates the testimony.

01:36 16          THE COURT:  Overruled.

01:36 17          THE WITNESS:  So repeat.

01:36 18 BY MS. SASTRE:

01:36 19 Q.   I would be happy to.  I will try to, ma'am.

01:36 20          If Dr. Carinder had told you about the permanent hair

01:36 21 loss issue, you would want to know what were the chances of

01:36 22 something like that happening, right?

01:36 23 A.   Yes.

01:36 24 Q.   I know you were here yesterday when Dr. Carinder

01:36 25 testified.  Right?

01:36 1  A.   Yes.

01:36 2  Q.   And you heard him tell us, tell the ladies and gentlemen

01:36 3  of the jury that before you, he had only had one patient in his

01:36 4  whole medical career who lost her hair and it didn't come back,

01:36 5  right?

01:36 6  A.   Yes.

01:36 7  Q.   If that's what Dr. Carinder told you, he said, "Well,

01:37 8  Mrs. Earnest, I have only seen this one time, one time before

01:37 9  my visit with you in 2011," are you telling us that would have

01:37 10 been enough for you to say, "I'm not going to take Taxotere"?

01:37 11 A.   I can't say I can answer that, because it never happened.

01:37 12 I can't answer something that I can't -- that I never heard.

01:37 13 That's hard to answer, a hypothetical question.

01:37 14 Q.   Well, the problem is that you answered a hypothetical

01:37 15 question that your lawyer asked you when he said, "If

01:37 16 Dr. Carinder told you about permanent hair loss, what would you

01:37 17 have done" --

01:37 18 A.   Well, that's not a hypothetical question to me, because it

01:37 19 doesn't say "permanent" on there, on the paper that I signed.

01:37 20 But if it had said "permanent," I would have asked him

01:38 21 something.  I know I would have.

01:38 22 Q.   Let me go back to my question a moment ago and see if we

01:38 23 can get on the same page, Mrs. Earnest.  Okay?

01:38 24       My question is just simply:  If Dr. Carinder had told

01:38 25 you about a risk of permanent hair loss, wouldn't you have

BARBARA EARNEST - CROSS

01:38 1    asked him, "Well, how often have you seen that?" and he told

01:38 2    you one time, are you telling us today that that would have

01:38 3    been enough for you to say, "I'm not taking Taxotere"?

01:38 4             MR. SCHANKER:  Objection.  Asked and answered.

01:38 5             THE WITNESS:  I can't answer that question.

01:38 6             THE COURT:  You can't answer that, ma'am?

01:38 7             THE WITNESS:  I can't answer a hypothetical question.

01:38 8    That's the way I feel.  I don't want to say, "Yeah, I'm going

01:38 9    to go just because of that one," or "No, I'm not.  I would need

01:38 10   more evidence."

01:38 11            I don't know how I would do.  I would to have

01:38 12   that actually, really happen.  I can't answer a hypothetical

01:38 13   question like that.  I don't know what I would have done.  All

01:38 14   I know is had I known it would have caused -- if he would have

01:39 15   told me, "Barbara, you're going to have permanent hair loss," I

01:39 16   know I would have went in that direction.  And I wasn't told

01:39 17   that.  That's what I'm saying.

01:39 18            MS. SASTRE:  Okay.

01:39 19            THE COURT:  I think you can explore --

01:39 20            MS. SASTRE:  I'm sorry, ma'am.

01:39 21            THE COURT:  You're looking at me --

01:39 22            MS. SASTRE:  Oh, I'm sorry.  Okay.  I'll just

01:39 23   continue, Judge.

01:39 24            THE COURT:  -- explore.

01:39 25            MS. SASTRE:  That's what I thought you said.

BARBARA EARNEST - CROSS

BY MS. SASTRE:

**Q.**   So I understand you have said twice that you can't tell us.  You don't have an answer to the question as to whether hearing that Dr. Carinder had one patient who had lost their hair, whether that would have been enough for you to make a decision to not take Taxotere.  Right?

**A.**   Right.

**Q.**   Okay.  I want to follow up on something you just said a moment ago.  You tell me if I heard you correctly, if I understood you correctly.  You said what you think you should have been told or what you would have liked to have been told was that Dr. Carinder or somebody should have told you that this was going to happen to you, right?

**A.**   Correct.

**Q.**   But you would agree with me, Mrs. Earnest, that no person, including Dr. Carinder, can see into the future and tell you what your outcome will be, right?

**A.**   No.  But if he had the record that that drug caused permanent hair loss, I think he would have told me that.

**Q.**   My question is a little different.  I'm just going to ask you again.

**A.**   But it's not different to me.  I don't understand how you can give me a hypothetical question, but then I can't say -- if I see the word "permanent," I'm going to reflect on that word. If I don't see it, then that means my hair is going to grow

BARBARA EARNEST - CROSS

01:41 1  back.  To me, to -- why would he tell me my hair is going to
01:41 2  grow back?  That's what I don't understand.
01:41 3  **Q.**   Let me just go back for a moment with you, Mrs. Earnest.
01:41 4  My question was that you stated that you believed you should
01:41 5  have been told that this was going to happen to you.  And all
01:41 6  I'm asking you is that you would agree these are potential
01:41 7  risks, and no person, including Dr. Carinder, can look into the
01:41 8  future and tell you, "Mrs. Earnest, I'm going to tell you
01:41 9  exactly what's going to happen with your hair or any other part
01:41 10 of this."
01:41 11                **MR. SCHANKER:**  Objection.  Asked and answered.
01:41 12                **THE COURT:**  Overruled.
01:41 13                **THE WITNESS:**  But they are telling me -- by giving
01:41 14 you that list, they are telling me what could happen; and on
01:41 15 that list that I'm going by, saying hair loss, and in the same
01:42 16 sentence he said would grow back.
01:42 17                So that's what I'm telling you.  That's what I
01:42 18 see, that's on there.
01:42 19 **BY MS. SASTRE:**
01:42 20 **Q.**   Let's continue a little bit with the hypotheticals.  Okay?
01:42 21 Let's assume you did say to Dr. Carinder, "Well, I want to take
01:42 22 something else."  Okay?
01:42 23 **A.**   Okay.
01:42 24 **Q.**   You would agree with me that it would be important to know
01:42 25 if that drug was effective in treating breast cancer, right?

BARBARA EARNEST - CROSS

01:42  1    A.    Yes.

01:42  2    Q.    You would want to make sure that that other drug was at

01:42  3    least as effective in treating breast cancer as Taxotere,

01:42  4    right?

01:42  5    A.    Yes.

01:42  6    Q.    Because at the end of the day, like we talked about before

01:42  7    the lunch break, the number one goal was to survive this?

01:42  8    A.    Right.

01:42  9    Q.    And potential risks were secondary?

01:43 10    A.    It all depends on what's the potential risk.

01:43 11    Q.    Okay.  Well, if Dr. Carinder gave you an option for

01:43 12    another drug, but he said to you, "It's not as effective as

01:43 13    Taxotere, you're not telling us today that you would have

01:43 14    agreed to that, right?

01:43 15    A.    It's hard to answer those questions.  It's a hypothetical.

01:43 16    Unless you have it in front of you, black and white, you're not

01:43 17    going to know how you are going to deal with something.

01:43 18           I mean, you want to say a hypothetical.  I could get

01:43 19    in my car and have a wreck.  So do I not ever drive?  That's

01:43 20    hypothetical.  You don't know.  I don't know if I'm going to

01:43 21    get into a wreck.  I don't know what another drug is going to

01:43 22    do.  Like you say, nobody knows.  But I'm only going by what he

01:44 23    told me at the time that I went and seen him and what I signed.

01:44 24    Q.    I understand.  Thank you.

01:44 25           If you had been told that another option or an option

BARBARA EARNEST - CROSS

01:44 1  for you was a drug that had an increased risk of neuropathy,
01:44 2  that would be something you would want to explore with
01:44 3  Dr. Carinder, right?
01:44 4  A.    Yes.
01:44 5  Q.    You understand what neuropathy is?
01:44 6  A.    Yes.
01:44 7  Q.    It can be painful.
01:44 8  A.    Yes.
01:44 9  Q.    And if this other -- if this option, this hypothetical
01:44 10 option, if there was a greater risk of neuropathy with this
01:44 11 drug compared to Taxotere and worsened neuropathy with this
01:44 12 other drug compared to Taxotere, that would have been something
01:45 13 that would have been important to you, right?
01:45 14 A.    Okay.  Am I going to have my hair, then, with this greater
01:45 15 risk of neuropathy with that drug?  You're giving me a
01:45 16 hypothetical.  Am I going to, hypothetical, have hair?
01:45 17           THE COURT:  Ma'am, you have to just answer the
01:45 18 question.
01:45 19           THE WITNESS:  I can't answer that question.  To me,
01:45 20 she left things out.
01:45 21           THE COURT:  Well, you can answer it --
01:45 22           THE WITNESS:  Ask your question again.
01:45 23           THE COURT:  -- with the information that you feel
01:45 24 that you need.
01:45 25           THE WITNESS:  But I need more information.

BARBARA EARNEST - CROSS

01:45  1    **BY MS. SASTRE:**

01:45  2    **Q.**   Mrs. Earnest, in talking about this other drug, some

01:45  3    option for you, with Dr. Carinder and if he told you about a

01:45  4    risk of neuropathy and said, "With this other drug, there's a

01:45  5    greater chance or a higher risk of developing neuropathy

01:45  6    compared to Taxotere, and there's a greater risk of having

01:46  7    worsened neuropathy when compared to Taxotere," that would have

01:46  8    been something that would have been important for you to know,

01:46  9    right?

01:46 10           **MR. SCHANKER:**   Your Honor, misstates the testimony of

01:46 11    Dr. Carinder.

01:46 12           **THE COURT:**   I'm going to allow this line of

01:46 13    questioning.   Overruled.

01:46 14           **THE WITNESS:**   I can't answer that.   That question, I

01:46 15    feel like that's not -- that some components of it is missing.

01:46 16    If all the -- what is all the side effects?   Is hair loss in

01:46 17    this drug that you're saying or permanent hair loss is in this

01:46 18    drug?   I would want to know that too.

01:46 19           If I'm going to change a drug that he already

01:46 20    told me about the first time, and if I want him to give me

01:46 21    another drug, that would be the first thing I would ask him,

01:46 22    "Well, what about this drug with hair loss?"   Do you understand

01:46 23    what I'm saying?   I would ask him that.   That would be my first

01:47 24    question.   And if he told me that I would have my hair but I

01:47 25    might get neuropathy, I would take the neuropathy over hair

BARBARA EARNEST - CROSS

01:47 1   loss.

01:47 2   **BY MS. SASTRE:**

01:47 3   **Q.**   And what if he said, "I don't know if you're going to have

01:47 4   your hair with this other drug"?

01:47 5   **A.**   Well, then I'd tell him to find another drug.  There's got

01:47 6   to be a drug out there that I wouldn't lose it.  Otherwise

01:47 7   everybody that has cancer would be bald, and there's people out

01:47 8   there that have their hair back that have cancer.  So that's

01:47 9   not going to happen.

01:47 10   **Q.**   In talking about this other drug with Dr. Carinder and in

01:47 11   talking about neuropathy, would it have been important for you

01:47 12   to know how often he had seen neuropathy occur in his patients?

01:47 13   **A.**   Sure.

01:47 14   **Q.**   And you would want to compare how often the neuropathy

01:47 15   occurred with this other drug to the one patient who he had

01:48 16   seen with permanent hair loss since he started practicing,

01:48 17   right?

01:48 18   **A.**   Sure.

01:48 19   **Q.**   Because it's not just the risk that's important; it's how

01:48 20   often it occurs, right?

01:48 21   **A.**   Right.

01:48 22   **Q.**   And that would have been important to you, fair?

01:48 23   **A.**   Yes.

01:48 24   **Q.**   And if Dr. Carinder had told you that he had seen in his

01:48 25   patients that neuropathy with this other drug was not unusual,

BARBARA EARNEST - CROSS

01:48 1   but with Taxotere he had seen one patient who had taken

01:48 2   Adriamycin, Cytoxan, and Taxotere and her hair didn't grow

01:48 3   back, you're not telling us that because of that, you would

01:48 4   have picked neuropathy instead of Taxotere, are you?

01:48 5   A.   I am telling you that.

01:48 6        MR. SCHANKER:  Objection, Your Honor.

01:48 7        THE WITNESS:  I would pick a drug that I wouldn't

01:49 8   have lost my hair.

01:49 9        MR. SCHANKER:  Improper hypothetical.  Misstates

01:49 10  anything Dr. Carinder offered in his testimony.

01:49 11       THE COURT:  She answered it, but --

01:49 12       MR. SCHANKER:  Okay.  Withdrawn.

01:49 13  BY MS. SASTRE:

01:49 14  Q.   Let's talk about Dr. Carinder's prior patient for a

01:49 15  moment, okay, Mrs. Earnest, the patient who lost her hair.

01:49 16  A.   Okay.

01:49 17  Q.   All right.  So you understand now that Dr. Carinder had a

01:49 18  patient a few years before you and that he gave her the exact

01:49 19  same three medications at the same rate, the same dose, the

01:49 20  exact same regimen as he gave you, right?

01:49 21  A.   Correct.

01:49 22  Q.   You heard that testimony --

01:49 23  A.   Yes.

01:49 24  Q.   -- when you were here yesterday?

01:49 25       Okay.  And he said that that patient's hair didn't

**BARBARA EARNEST - CROSS**

01:49 1 come back, right?

01:50 2 A.   Right.

01:50 3         MR. SCHANKER:  Objection.  Misstates the testimony,

01:50 4 Your Honor, of Dr. Carinder.

01:50 5         THE COURT:  Just approach.

01:50 6         MR. SCHANKER:  Yes.

01:50 7         (The following proceedings were held at the bench.)

01:50 8         THE COURT:  That's exactly what Dr. Carinder said.

01:50 9 What did he not say?

01:50 10         MR. SCHANKER:  He didn't say what she said, hair

01:50 11 didn't come back, right?  That's not what Dr. Carinder said.

01:50 12 Dr. Carinder said that she already had thin hair and that it

01:50 13 didn't come all the way back.  That implied that she had

01:50 14 complete hair loss.  That's not what Dr. Carinder said in his

01:50 15 testimony.  He was very clear about that.  It misstates his

01:50 16 testimony.

01:50 17         MS. SASTRE:  I just wrote that.  He said she lost her

01:50 18 hair.

01:50 19         THE COURT:  I understand what you are saying, but he

01:50 20 did testify numerous times that if patients asked about

01:51 21 permanent hair loss, he always told them about that one

01:51 22 patient.

01:51 23         MR. SCHANKER:  And just to correct the record, yeah,

01:51 24 he did say he referenced that patient, Your Honor, but he

01:51 25 didn't say that he had one woman who had hair loss; he said he

BARBARA EARNEST - CROSS

01:51  1  had one woman whose hair didn't come all the way back, who
01:51  2  already had thin hair to start with.  That's what he said.
01:51  3          THE COURT:  I think you're parsing what Dr. Carinder
01:51  4  said.  I believe he clearly testified that this woman, the
01:51  5  result of the chemotherapy was permanent hair loss.
01:51  6          MR. SCHANKER:  Okay.  Thank you, Judge.
01:51  7          THE COURT:  Overruled.
01:51  8             Plaintiff.
01:51  9          (End of bench conference.)
01:51 10          THE COURT:  Please proceed.
01:51 11  BY MS. SASTRE:
01:51 12  Q.   I can't remember if you answered the question, so just to
01:51 13  reorient myself, you recall the testimony from Dr. Carinder
01:52 14  yesterday about his prior patient.
01:52 15  A.   Yes.
01:52 16  Q.   And you told us that you did have a conversation with
01:52 17  Dr. Carinder about hair loss when you went to see him.
01:52 18  A.   Yes.
01:52 19  Q.   And you heard Dr. Carinder yesterday testify that he
01:52 20  always told his patients about this prior patient, especially
01:52 21  if he gave them the exact same drugs?
01:52 22          MR. SCHANKER:  Objection, Your Honor.  Misstates the
01:52 23  testimony.
01:52 24          THE COURT:  That's sustained.
       25

BARBARA EARNEST - CROSS

01:52  1   **BY MS. SASTRE:**

01:52  2   **Q.**   Okay.  Let me ask it this way:  Did you hear Dr. Carinder

01:52  3   talk about explaining his situation with this other patient to

01:52  4   his patients like yourself?

01:53  5           **MR. SCHANKER:**  Objection, Your Honor.  Vague.

01:53  6           **THE COURT:**  Rephrase your question.

01:53  7           **MS. SASTRE:**  Okay.

01:53  8   **BY MS. SASTRE:**

01:53  9   **Q.**   So did you ask any questions of Dr. Carinder about your

01:53  10  hair during that visit on March 31?

01:53  11          **MR. SCHANKER:**  Objection, Your Honor.  Asked and

01:53  12  answered.

01:53  13          **THE COURT:**  Overruled.

01:53  14          **THE WITNESS:**  Yes.

01:53  15  **BY MS. SASTRE:**

01:53  16  **Q.**   What did you ask?

01:53  17  **A.**   When will it come back, how will it come back.  And he

01:53  18  automatically said --

01:53  19          **THE WITNESS:**  Can I say what he said to me?

01:53  20          **THE COURT:**  Yes, ma'am.

01:53  21          **THE WITNESS:**  -- that -- he said that my hair

01:53  22  would -- that it may not come back like it is.  It may come

01:53  23  back curly, may come back a different color.  But he did tell

01:54  24  me it was going to come back.  And that's what I've been hoping

01:54  25  for all these years.

BARBARA EARNEST - CROSS

01:54 1    BY MS. SASTRE:

01:54 2    Q.   You heard when Dr. Carinder said that if a patient asked

01:54 3    questions about their hair, that he would tell them about his

01:54 4    prior patient who lost her hair, true?

01:54 5              MR. SCHANKER:   Objection, Your Honor.  Misstates the

01:54 6    testimony of Dr. Carinder.

01:54 7              THE COURT:   Overruled.

01:54 8              THE WITNESS:   Yes, I heard him say that.

01:54 9    BY MS. SASTRE:

01:54 10   Q.   You heard him say that, right?

01:54 11   A.   Yes.

01:54 12   Q.   But it's your testimony in this case that even though you

01:54 13   spoke to him about your hair and had a couple questions, he

01:54 14   never told you about his prior patient?

01:54 15   A.   No.

01:54 16   Q.   Does that upset you?

01:54 17   A.   No.

01:54 18   Q.   Why not?

01:54 19   A.   It just -- I can't be upset.  It's over.  It's done with.

01:54 20   Now I'm trying to get past this part.

01:55 21        If he did tell me, I don't remember it.  Let me put

01:55 22   it that way.  If he did.  He could have.  I really don't know

01:55 23   if he told me.  But I can't even be mad at the fact that I have

01:55 24   lost my hair, because there's -- why be -- I'm mad, but I can't

01:55 25   get it back.

BARBARA EARNEST - CROSS

01:55 1  **Q.**   As you sit here today, the best of your recollection is
01:55 2  you are not sure if he told you about that patient?
01:55 3  **A.**   Right, not sure.
01:55 4  **Q.**   If he did tell you --
01:55 5  **A.**   Here we go with the hypothetical thing.
01:55 6  **Q.**   Well, just two questions on it.
01:55 7          If he did tell you, you would have been made aware
01:55 8  that this is a possible potential outcome but still agreed to
01:55 9  the treatment.
01:55 10 **A.**   No.  I would have asked for another drug.  I know I would
01:55 11 have.
01:55 12 **Q.**   But we know you didn't.
01:55 13 **A.**   No, we didn't.  That's why I'm like I am.
01:56 14 **Q.**   My question is just simply:  If he did tell you about this
01:56 15 patient, what we know you did is you still agreed to take
01:56 16 Adriamycin, Cytoxan, and Taxotere.
01:56 17         **MR. SCHANKER:**  Objection, Your Honor.  Asked and
01:56 18 answered.
01:56 19         **THE COURT:**  Sustained.
01:56 20 BY MS. SASTRE:
01:56 21 **Q.**   And if he didn't tell you, do you wish he had?
01:56 22 **A.**   I can say that, but wishing isn't going to make it happen
01:56 23 now.
01:56 24 **Q.**   Wouldn't that have been important information for you to
01:56 25 have, based upon your being very, very concerned -- amongst all

**BARBARA EARNEST - CROSS**

01:56  1    these risks, Mrs. Earnest, you're telling us the decision point

01:56  2    for you is hair.  And so don't you wish he had told you that?

01:56  3             MR. SCHANKER:  Objection, Your Honor.  Compound

01:56  4    question; argumentative.

01:56  5             MS. SASTRE:  I'll rephrase, Your Honor.

01:56  6             THE COURT:  You need to rephrase it.

01:56  7             MS. SASTRE:  Yeah.

01:56  8    BY MS. SASTRE:

01:56  9    Q.   Don't you wish Dr. Carinder had told you?

01:57  10            MR. SCHANKER:  Objection, Your Honor.  Asked and

01:57  11   answered.

01:57  12            THE WITNESS:  But I don't know if he did or didn't,

01:57  13   so I can't --

01:57  14            THE COURT:  Wait.

01:57  15            MS. SASTRE:  If I did, I'm sorry, Your Honor.  I'll

01:57  16   ask a different question.

01:57  17            THE COURT:  It has been asked and answered.

01:57  18            MS. SASTRE:  Yeah.

01:57  19   BY MS. SASTRE:

01:57  20   Q.   The last question, I think, was:  Wouldn't that have been

01:57  21   important information that you would like to have known?

01:57  22            MR. SCHANKER:  Objection, Your Honor.  Asked and

01:57  23   answered and asked and answered.

01:57  24            THE COURT:  Sustained.

       25

BARBARA EARNEST - CROSS

01:57 1   BY MS. SASTRE:

01:57 2   Q.   Let me ask you this:  As you're working through these

01:57 3   other options that you're discussing with Dr. Carinder, right,

01:57 4   and if he had said to you at the end, "Mrs. Earnest, I

01:58 5   understand your concerns about your hair.  These are all the

01:58 6   options.  These are the risks of these other drugs."  If he

01:58 7   said to you at the end of that, "My recommendation is that you

01:58 8   take Adriamycin and Cytoxan, followed by Taxotere," wouldn't

01:58 9   you have followed his advice?

01:58 10  A.   It's hard to say.  I may have went to another doctor.  I

01:58 11  don't know.  I would have went and found some -- there has to

01:58 12  be another drug that I could have took that wouldn't have gave

01:58 13  me my hair loss, is what I'm saying.  There's women out there

01:58 14  that have cancer that had their hair grow back.  Why couldn't

01:58 15  mine grow back?

01:58 16  Q.   Ma'am, let's talk about the handbook that you got from

01:58 17  Dr. Lagarde's office for a moment.

01:58 18  A.   Sure.

01:58 19  Q.   All right.  Very good.  Let me get a copy of that.

01:59 20       MS. SASTRE:  May I approach?

01:59 21       THE COURT:  Yes, you may.

01:59 22       MS. SASTRE:  Would Your Honor like a copy?

01:59 23       THE COURT:  I have one, but I'll take one so I don't

01:59 24  have to dig mine out.

01:59 25       MS. SASTRE:  Okay.

01:59 1              Mrs. Earnest.

01:59 2              **THE WITNESS:**  Thank you.

01:59 3              **MS. SASTRE:**  You're very welcome.

01:59 4   BY MS. SASTRE:

01:59 5   **Q.**   So I know you were asked a few questions on direct exam

01:59 6   about when and how you got this book.

01:59 7   **A.**   Yes.

01:59 8   **Q.**   So I just want to follow up for a moment.

01:59 9              This was a book that was left for you at the front

01:59 10  desk at Dr. Lagarde's office?

01:59 11  **A.**   Yes.

01:59 12  **Q.**   Okay.  And she's been a witness here at trial.  The jury

02:00 13  has heard from Dr. Lagarde.

02:00 14             And the book was left for you, it appears, in early

02:00 15  February of 2011, right?

02:00 16  **A.**   Correct.

02:00 17  **Q.**   And so you would have had the *Breast Cancer Handbook* for

02:00 18  about a month before you saw Dr. Carinder in March, right?

02:00 19  **A.**   Yes.

02:00 20  **Q.**   Let's talk about that period first, those first 30 days,

02:00 21  about.

02:00 22             So at this time, you have been diagnosed with breast

02:00 23  cancer, right?

02:00 24  **A.**   Yes.

02:00 25  **Q.**   And you know what the future holds:  You're going to have

**BARBARA EARNEST - CROSS**

02:00  1  to have treatment and surgery, correct?

02:00  2  **A.**   Yes.

02:00  3  **Q.**   And I think you said that you might have looked through

02:00  4  some portions of the book, but you didn't read it from

02:00  5  beginning to end.

02:00  6  **A.**   No, I didn't.

02:00  7  **Q.**   What portions did you read through?

02:00  8  **A.**   Honestly, right now sitting here, I don't remember.

02:00  9  **Q.**   Okay.  That's fair.

02:01 10         And when did you do that?  When did you read through

02:01 11  these portions?

02:01 12  **A.**   I can't give a date, but I know it probably may have been

02:01 13  the first week or second week that I got -- that I took the

02:01 14  book home.

02:01 15  **Q.**   Okay.  And then you go in to see Dr. Carinder in March?

02:01 16  **A.**   Yes.

02:01 17  **Q.**   Okay.  And, of course, as the jury has seen many times,

02:01 18  you're given the exact name of the drugs that you're going to

02:01 19  take, right?

02:01 20  **A.**   Yes.

02:01 21  **Q.**   And I believe you kept a little journal once you heard --

02:01 22  once you were diagnosed with cancer.

02:01 23  **A.**   Yes.

02:01 24  **Q.**   It was like one of those little spiral notebooks you kept

02:01 25  in your purse?

1819

BARBARA EARNEST - CROSS

02:01 1  **A.**   Yes.

02:01 2  **Q.**   And you wrote down in there -- when you saw Dr. Carinder

02:01 3  in March, you wrote down exactly what he was going to give you,

02:01 4  the names of the drugs, right?

02:01 5  **A.**   Yes.

02:01 6  **Q.**   Okay.  And so my question is:  Did you go back to the book

02:01 7  after your visit with Dr. Carinder on March 31 to -- now that

02:02 8  you know chemo is a real thing, I'm on the verge of having it,

02:02 9  and I know the drugs that I'm going to take, did you go back

02:02 10 and read about chemotherapy in this book?

02:02 11 **A.**   No, I didn't.

02:02 12 **Q.**   Did you go back and read about the drugs that you were

02:02 13 about to take from this book?

02:02 14 **A.**   Using the individual names?

02:02 15 **Q.**   Yes, ma'am.

02:02 16 **A.**   No, I didn't.

02:02 17 **Q.**   Well, let's just take a look for a moment at what you had

02:02 18 in your possession.  And I would like to look at page 195 with

02:02 19 you.

02:02 20         **MR. SCHANKER:**  Your Honor, objection.  Foundation.

02:02 21 She has testified she didn't look at this.

02:02 22         **THE COURT:**  I agree.  Overruled, but I believe the

02:02 23 question -- the book was in her possession.

02:03 24         **MR. SCHANKER:**  May I please have a copy?

02:03 25         **MS. SASTRE:**  Yes.  I'm sorry.  I just want to put up

BARBARA EARNEST - CROSS

02:03  1    a clean copy without any highlighting.

02:03  2                THE WITNESS:  Okay.

02:03  3    BY MS. SASTRE:

02:03  4    Q.    Okay.  So we are on page 195, Mrs. Earnest.

02:03  5    A.    I'm there.

02:03  6    Q.    Okay.  You're ahead of me.

02:03  7          And if we zoom out for a second, you see that there's

02:03  8    a section in the book starting on page 194, and it states

02:03  9    "Chemotherapy Drugs," right?  On page 194, ma'am.

02:03 10    A.    Oh.

02:03 11    Q.    You see that?  I have it up on the screen for you.

02:03 12    A.    Okay.

02:03 13    Q.    So there's a section on the drugs, right?

02:03 14    A.    Yes.

02:03 15    Q.    And it lists them out by name, but when you get to the

02:04 16    next page, page 195, you see it says "docetaxel" and then

02:04 17    "Brand Name:  Taxotere"?

02:04 18    A.    Yes.

02:04 19                MR. SCHANKER:  Your Honor, I'm again going to object

02:04 20    here.  No foundation and also hearsay.  She has indicated she

02:04 21    never looked at this, and she's not an expert in this field.

02:04 22    I'm not sure what this is about.

02:04 23                MS. SASTRE:  This is information in her possession

02:04 24    concerning the very risk at issue in this case, Your Honor.

02:04 25    What was known by her or knowable is at issue, Judge.  I would

BARBARA EARNEST - CROSS

02:04  1    be happy to come up, Your Honor.

02:04  2              THE COURT:  Yeah, I think we need to come up.

02:04  3              MS. SASTRE:  Okay.

02:04  4              MR. SCHANKER:  Could we go ahead and take that off

02:04  5    the screen while we come up?

02:04  6              THE COURT:  Let's take it off the screen.

02:04  7              MS. SASTRE:  Sure.

02:04  8              (The following proceedings were held at the bench.)

02:04  9              THE COURT:  I guess my concern is -- I thought the

02:04  10   learned intermediary doctrine applied.

02:04  11             MS. SASTRE:  Uh-huh.

02:04  12             THE COURT:  So are you saying that --

02:04  13             MS. SASTRE:  It does.

02:05  14             THE COURT:  -- a patient has an obligation to then do

02:05  15   their own independent research?

02:05  16             MS. SASTRE:  No.  One of --

02:05  17             THE COURT:  Is there a defense that it was knowable,

02:05  18   she knew or should have known because she had this in her

02:05  19   possession?  I'm curious about that --

02:05  20             MS. SASTRE:  Okay.  Let me tell you --

02:05  21             THE COURT:  -- so explain.

02:05  22             MS. SASTRE:  Let me explain.  Let me tell you where

02:05  23   I'm at on this.

02:05  24                  My understanding of where we are in this case

02:05  25   legally -- as I believe Your Honor has said many times, it's

BARBARA EARNEST - CROSS

02:05 1    burned in my brain -- is chemotherapy is different or special

02:05 2    to -- I'm not quoting Your Honor, but something like that.

02:05 3              THE COURT:  Yeah, I did.

02:05 4              MS. SASTRE:  And what we have put at the heart of

02:05 5    this case, at the center of this case, is this whole

02:05 6    conversation:  What did the patient know?  What did the patient

02:05 7    ask?  What did the doctor say?

02:05 8              And so to answer your question directly, for

02:05 9    example, if I was to ask her a series of questions on, you

02:05 10   know, "You didn't go back and do any research and you didn't

02:05 11   look at this" -- so the idea of what she had to inform herself

02:05 12   to go into this visit on March 31 and ask questions,

02:06 13   particularly about hair loss, with this being in her hands -- I

02:06 14   understand she says she didn't read it, but she is the

02:06 15   plaintiff in this case.  And her telling me on cross-exam she

02:06 16   didn't read something when it was in her very hands, I get to

02:06 17   show the jury what she didn't read.

02:06 18             Because if that answer alone did the trick, any

02:06 19   document that wasn't helpful to their case, the plaintiff could

02:06 20   just say, "Oh, well, I had it, but I didn't read it."  So I

02:06 21   don't think I need to lay a foundation with her, and what she

02:06 22   knows based not just upon her interactions with Dr. Carinder,

02:06 23   but, again, because she had this before she ever went in there,

02:06 24   I think it's fair --

02:06 25             THE COURT:  Before, she didn't know what drugs he was

BARBARA EARNEST - CROSS

02:06  1    going to recommend.

02:06  2              MS. SASTRE:  Yeah, but then he tells her and then she

02:06  3    has the book for two more weeks.  And so it's just a question

02:06  4    on, "You had this information."  It would be the same thing if

02:06  5    she is saying, "Well, I had a consent form, but I didn't read

02:06  6    it," and I couldn't ask a question about it?

02:06  7              So it's just one question, Judge.  The jury has

02:07  8    seen it.

02:07  9              MR. SCHANKER:  Your Honor, it's clearly

02:07 10    uncontroverted evidence that she hasn't seen it.  She is not

02:07 11    supposed to be an expert, and we have seen no evidence that she

02:07 12    has any knowledge concerning what's in the book.

02:07 13              And expecting her to have read the book when we

02:07 14    are talking about the doctor's expertise and what went on in

02:07 15    the room would be like allowing cross-examination on all the

02:07 16    research she did on this drug and if she had knowledge about

02:07 17    the risk of permanent hair loss.

02:07 18              It's already been demonstrated that she hasn't

02:07 19    read this, and so putting something up in front of her that she

02:07 20    clearly hasn't read and that is the doctor's obligation and no

02:07 21    one instructed her to read this -- there's no testimony that

02:07 22    anyone told her to read this -- and so it's not like she is not

02:08 23    following doctor's orders.

02:08 24              So I see no relevance to this as far as

02:08 25    cross-examining her on the contents of something that no one

**BARBARA EARNEST - CROSS**

02:08  1   told her to read and there's no evidence that she did read it.

02:08  2   It creates some inference that she had some obligation to read

02:08  3   everything that was given to her.

02:08  4          MS. SASTRE:  I would just say two things in response.

02:08  5   At the end of the day, she has come in here and she has said,

02:08  6   "I wish I had known, I wish I had known, I wish I had known."

02:08  7   She has a piece of paper sitting on her shelf for a long time

02:08  8   before she had chemo, even after she found out the drugs.  If

02:08  9   she didn't read it, that's perfectly fine, but I think I'm

02:08 10   entitled to ask.

02:08 11          The other thing, very importantly, that I think

02:08 12   it relates to is there's a statute of limitations issue in this

02:08 13   case, and this is sitting on her bookshelf for years and years

02:08 14   and years and years and years.  And this goes to what did -- it

02:08 15   goes to her -- potentially, her actual knowledge -- I don't

02:08 16   know if she ever looked at it -- but certainly also her

02:08 17   constructive knowledge.

02:08 18          I mean, she is sitting around for years

02:08 19   supposedly having some incredibly unexpected side effect, "I

02:09 20   never knew this could happen."  And for years and years and

02:09 21   years she's waiting, waiting, waiting, not discussing it with

02:09 22   her doctors, and now there's -- which I will get to -- and then

02:09 23   there is this book sitting right there.  So I do think it goes

02:09 24   to that, as well, Your Honor.

02:09 25          THE COURT:  I'm going to allow her to ask the

BARBARA EARNEST - CROSS

02:09  1   question.  You are going to be able to cover all of this in

02:09  2   your redirect.

02:09  3           MR. SCHANKER:  Okay.  Thank you, Your Honor.

02:09  4               Just so I'm clear, what question is she

02:09  5   permitted to ask?

02:09  6           THE COURT:  I think the question was:  "Did you look

02:09  7   at this page," and --

02:09  8           MS. SASTRE:  Yeah, did you -- exactly.

02:09  9           MR. SCHANKER:  And that's it?

02:09 10           THE COURT:  Uh-huh.

02:09 11           MR. SCHANKER:  Okay.  Thank you.

02:09 12           MS. SASTRE:  Well --

02:09 13           THE COURT:  Wait, Mr. Schanker.

02:09 14           MS. SASTRE:  I just don't want to leave the

02:09 15   impression -- I mean, I might ask one or two questions on it,

02:09 16   but I'm not going to spend a lot of time.

02:09 17           THE COURT:  Where are we going?

      18           MS. SASTRE:  Well --

      19           THE COURT:  If she says, "It was in my closet, I

      20   picked it up and" --

02:09 21           MS. SASTRE:  Okay.  Okay.  I'll just ask -- that's

02:09 22   it.  I will just ask her whether she saw that, whether she read

02:09 23   it, that's it.

02:09 24           THE COURT:  I mean, I don't know what else to do if

02:10 25   she says, "I didn't."

BARBARA EARNEST - CROSS

02:10 1        MS. SASTRE:  I can ask her whether that's important
02:10 2   information she would have liked to have known; does she wish
02:10 3   that she had read it?  But if you want me to limit it, I will,
02:10 4   Judge.  You tell me while I'm here so I don't have to come
02:10 5   back.
02:10 6        THE COURT:  Okay.
02:10 7        MR. SCHANKER:  We are creating some legal burden
02:10 8   that --
02:10 9        THE COURT:  That's my concern.
02:10 10       MR. SCHANKER:  -- a 250-page book that was given to
02:10 11  her.
02:10 12       THE COURT:  I understand, but I'm not --
02:10 13       MS. SASTRE:  I'll move fast.
02:10 14       THE COURT:  Okay.  I think it's fine to ask it.
02:10 15       MS. SASTRE:  Thank you.
02:10 16            Charged to nobody.
02:10 17       (End of bench conference.)
02:10 18       THE COURT:  Please proceed.
02:10 19       MS. SASTRE:  Okay.  Thank you, Your Honor.
02:10 20  BY MS. SASTRE:
02:10 21  Q.   All right.  So, Mrs. Earnest, we are on page 195 of the
02:10 22  *Breast Cancer Handbook*, and I just have a question for you
02:10 23  here.
02:10 24            You see where it says "Brand Name:  Taxotere"?
02:11 25  A.   Yes.

BARBARA EARNEST - CROSS

02:11 1   **Q.**   Okay.  And it states:  "Side effects:  Temporary hair

02:11 2   loss, rare reports of permanent hair loss."

02:11 3         And my question to you is just simply:  Did you read

02:11 4   this information about permanent hair loss from this book at

02:11 5   any time?

02:11 6   **A.**   No.  No, I didn't read the book.  I read the inserts

02:11 7   that -- the pages that Lagarde told me about, and that was it.

02:11 8   And I put it in my closet and I forgot about it even being in

02:11 9   there.

02:11 10  **Q.**   Okay.  Thank you.

02:12 11        You told us, I believe, in your deposition that you

02:12 12  thought you might have been given some pamphlets by

02:12 13  Dr. Carinder's office.

02:12 14  **A.**   Yes.

02:12 15  **Q.**   Do you remember whether you were or weren't?

02:12 16  **A.**   I really don't remember.  I don't remember if I just took

02:12 17  them home and threw them away.  I really don't know.

02:12 18  **Q.**   Dr. Carinder said yesterday although he didn't hand things

02:12 19  out, he said that his nurses did.

02:12 20  **A.**   Right.

02:12 21  **Q.**   And he described something called *Chemocare* as being a

02:12 22  pamphlet they were giving out, and we looked at the 2011

02:12 23  *Chemocare*.

02:12 24        Do you remember getting that?

02:12 25  **A.**   I don't remember.

1828

BARBARA EARNEST - CROSS

02:12  1   **Q.**   If you did, you don't remember reading that?

02:12  2   **A.**   No.

02:13  3   **Q.**   Let's change topics.  I just want to talk with you about

02:13  4   the timing of your hair loss.  Okay?  You recall getting four

02:13  5   cycles before treatment with Adriamycin and Cytoxan, right?

02:13  6   **A.**   Yes, uh-huh.

02:13  7   **Q.**   You would agree with me sometime between the second and

02:13  8   the third treatment or cycle of Adriamycin and Cytoxan when

02:13  9   your hair fell out, right?

02:13 10   **A.**   I wouldn't say it fell out completely.  I went to go wash

02:13 11   my hair, and when I did, I had a few strands if my hair, so I

02:13 12   knew it was beginning.

02:13 13   **Q.**   Okay.

02:13 14   **A.**   Do you want me to continue?

02:14 15   **Q.**   Yes, please.  Thank you.

02:14 16   **A.**   So that's when I got dressed, went outside, and talked to

02:14 17   my son Michael and asked him to cut my hair, and he started

02:14 18   crying.  And I said, "Hold up.  Never mind.  I'll go to

02:14 19   somebody else."

02:14 20            I went to my girlfriend, and had her cut my hair.

02:14 21   She shaved it all off because I didn't want to wake up and see

02:14 22   hair in my bed.  I didn't want to do that.

02:14 23   **Q.**   But you had lost more than a few strands of hair by that

02:14 24   time?

02:14 25   **A.**   No.  Like I said, that was the first time that I lost

BARBARA EARNEST - CROSS

02:14 1   hair, and it wasn't a lot.

02:14 2   Q.   Okay.

02:14 3   A.   I mean, I don't mean 10 little strands.  I don't know how

02:14 4   many strands.  I didn't count them.  It was more than 10; I

02:14 5   know that.  It was a lot -- a few in my hand, but it wasn't --

02:15 6   like I say, I wasn't bald at the top yet.  Let me put it that

02:15 7   way.

02:15 8   Q.   Let's take a look at one of your medical records, then.

02:15 9   P-621.  It's in evidence.  621, it's the May 10 visit -- I'm

02:15 10  sorry.  Oncology Associates, 260.

02:15 11        Ma'am, while we are looking, let me ask you this:

02:15 12  You heard Dr. Carinder testify yesterday that you lost your

02:15 13  hair after your second treatment of Adriamycin and Cytoxan?

02:16 14  A.   Yes.

02:16 15  Q.   He agreed that your hair was gone before you took

02:16 16  Taxotere?

02:16 17  A.   Yes.

02:16 18  Q.   You agree with that?

02:16 19  A.   Yes.

02:16 20  Q.   Okay.  Your medical records in this case, from May 10,

02:16 21  which was several weeks before you took Taxotere, says there's

02:16 22  "alopecia secondary to cytotoxic chemotherapy."

02:16 23        Do you have any reason to disagree with this record?

02:16 24  A.   I only know -- I'm not sure when my hair -- that I shaved

02:16 25  it.  I don't know if it was after the first chemo or after the

## BARBARA EARNEST - CROSS

02:16  1   second chemo, but when my hair started to fall out, I

02:16  2   immediately shaved it.  I didn't wait for any more to fall out

02:16  3   a second time.

02:16  4   Q.   From when you shaved it --

02:16  5   A.   That was it.

02:16  6   Q.   Hold on.

02:16  7   A.   I thought you were saying that was it.

02:16  8   Q.   Well, sort of.  From when you shaved it while you were --

02:16  9   right after your second treatment of Adriamycin and Cytoxan,

02:17 10   your hair was coming out, right?  Started to come out?

02:17 11   A.   When it came out at home, I shaved it immediately that

02:17 12   day.

02:17 13   Q.   Okay.  And then you had --

02:17 14   A.   That was the only time my hair ever came out.

02:17 15   Q.   You didn't need to shave your hair after that, right?

02:17 16   A.   No.

02:17 17   Q.   So you then had your third treatment of Adriamycin and

02:17 18   Cytoxan, right?

02:17 19   A.   Yes.

02:17 20   Q.   Then you had your fourth treatment, correct?

02:17 21   A.   Yes.

02:17 22   Q.   And then you had about three weeks before you took

02:17 23   Taxotere?

02:17 24   A.   Yes.

02:17 25   Q.   And your hair didn't need any further shaving, during that

BARBARA EARNEST - CROSS

02:17 1  period, by the time you started Taxotere?

02:17 2  A.    No.

02:17 3  Q.    Because there wasn't any hair to shave, right?

02:17 4  A.    Wasn't any hair to shave.

02:17 5  Q.    I would like to talk with you about Arimidex for a moment.

02:18 6  A.    Sure.

02:18 7  Q.    Arimidex is a medication you still take today,

02:18 8  Mrs. Earnest?

02:18 9  A.    Yes.

02:18 10  Q.    And Arimidex is something you take to prevent a

02:18 11  reoccurrence of your breast cancer, right?

02:18 12  A.    Correct.

02:18 13  Q.    It reduces the risk of your breast cancer coming back,

02:18 14  right?

02:18 15  A.    Correct.

02:18 16  Q.    You have taken Arimidex since -- shortly after your

02:18 17  chemotherapy ended, you started taking Arimidex.  Actually, I'm

02:18 18  sorry, that's wrong.  You started Arimidex shortly after your

02:18 19  radiation treatment ended?

02:18 20  A.    Yes.

02:18 21  Q.    That would have been back in 2011?

02:18 22  A.    Yes.

02:18 23  Q.    And you remain on it today --

02:18 24  A.    Yes.

02:18 25  Q.    -- in September of 2019, right?

BARBARA EARNEST - CROSS

02:18  1   A.    Yes.

02:18  2   Q.    You have taken it about eight years?

02:18  3   A.    Yes.

02:18  4   Q.    You understand that there's certain risks associated with

02:18  5   the Arimidex, true?

02:18  6   A.    Yes.

02:19  7   Q.    In fact, you went to see a doctor, Dr. Collins-Burow.  Do

02:19  8   you know who that is?

02:19  9   A.    Yes, that's my oncologist now.

02:19 10   Q.    Since you left Dr. Carinder, right?

02:19 11   A.    Yes.

02:19 12   Q.    So the jury hasn't heard much about Dr. Collins-Burow.

02:19 13   But you were with Dr. Collins-Burow in December of 2016, and at

02:19 14   that time you had been on Arimidex for about five years, right?

02:19 15   A.    Yes.

02:19 16   Q.    You had a conversation on that date with Dr. Collins-Burow

02:19 17   about whether you should continue to take it anymore, true?

02:19 18   A.    True.

02:19 19   Q.    Your doctor talked with you, on that date in particular,

02:19 20   about the risks of continuing to take Arimidex, right?

02:19 21   A.    Well, she didn't give me any risks.  She just told me to

02:19 22   continue taking it so I don't get breast cancer come back.

02:19 23           MS. SASTRE:  Let's take a look at the medical record,

02:19 24   please.

02:19 25           THE WITNESS:  I don't remember her telling me any

BARBARA EARNEST - CROSS

02:19  1   risks.

02:19  2   BY MS. SASTRE:

02:19  3   Q.   Not a problem.  I will hand you the record, and maybe that

02:20  4   will refresh your memory.  Okay.

02:20  5            MS. SASTRE:  Your Honor, may I?

02:20  6            THE COURT:  Yes.

02:20  7            MS. SASTRE:  Would you like a copy, Judge?

02:20  8            THE COURT:  Yes, please.

02:20  9   BY MS. SASTRE:

02:20 10   Q.   Mrs. Earnest, you see this record has your name on the top

02:20 11   of it and Tulane Medical Center?

02:20 12   A.   Yes.

02:20 13   Q.   It's dated November 13, 2016, on the top left?

02:20 14   A.   November?  What did you say the date was?

02:20 15   Q.   Oh, I'm sorry.  December 13.

02:20 16   A.   Yes, I see that.

02:20 17   Q.   You see that this is your medical record with

02:20 18   Dr. Collins-Burow, correct?

02:21 19   A.   Yes.

02:21 20            MS. SASTRE:  Your Honor, we would like to move this

02:21 21   into evidence, please.

02:21 22            MR. SCHANKER:  Objection, Your Honor.  Foundation.

02:21 23   The doctor has not testified here.

02:21 24            THE COURT:  Is this a certified medical record?

02:21 25            MS. SASTRE:  Yes, Your Honor.

BARBARA EARNEST - CROSS

02:21 1              (The following proceedings were held at the bench.)

02:21 2         THE COURT:  Is this a certified medical record?

02:21 3         MS. SASTRE:  Yes.  Mr. Moore is going to handle this.

02:21 4         MR. MOORE:  Yes, it's a certified medical record.

02:21 5         THE COURT:  Okay.

02:21 6         MR. MOORE:  It's self-authenticating.  Judge, there

02:21 7    are no objections on authentication.

02:21 8         THE COURT:  I've got this.  I didn't know if it was a

02:21 9    certified medical record, which is why I'm asking.

02:21 10        MS. SASTRE:  Yes.

02:21 11        MR. SCHANKER:  And, Your Honor, this document is full

02:21 12   of hearsay that can't be substantiated.

02:21 13        THE COURT:  I know.  But if it's a certified medical

02:22 14   record, it's authenticated.

02:22 15        MR. SCHANKER:  And, Your Honor, as far as the

02:22 16   relevance of this document, as well, we have no idea what the

02:22 17   relevance is.  It's a failure to warn case.  I'm not sure what

02:22 18   it's being offered for at all.  If it's that she is still

02:22 19   taking Arimidex, that's something that the client has already

02:22 20   testified to.

02:22 21        THE COURT:  There is a question about relevance, even

02:22 22   if it is hearsay.

02:22 23        MS. SASTRE:  Well, I can address that, Your Honor.  I

02:22 24   asked her the question just a moment ago about an informed

02:22 25   consent conversation about Arimidex.  And Arimidex, Your Honor,

BARBARA EARNEST - CROSS

02:22  1   Dr. Carinder has testified to that he has seen patients with
02:22  2   hair loss; we are going to have a witness that's going to talk
02:22  3   about it; Dr. Tosti talked about Arimidex.  I told the jury in
02:22  4   opening she had been taking Arimidex for eight years, it's
02:22  5   associated with hair loss.
02:22  6              What's important about this visit is there's a
02:22  7   paragraph that I'm going to go to, Judge -- and I'll show you
02:22  8   what's highlighted; it might help you, Your Honor -- and she
02:22  9   has a big conversation with the doctor on that date.  So I just
02:23 10   want to ask her a question or two about it.
02:23 11              MR. SCHANKER:  Your Honor, this is incredibly
02:23 12   confusing because this is in 2016, a conversation that she has.
02:23 13   That doesn't go to her knowledge in 2011.  So she wants to
02:23 14   elicit testimony about a conversation that was had in 2016 that
02:23 15   is in no way relevant for the reason it's being offered.
02:23 16              MS. SASTRE:  When you are done reading, I'm happy to
02:23 17   respond.
02:23 18              THE COURT:  I read it.
02:23 19              MS. SASTRE:  Okay.  So, Your Honor, it goes to an
02:23 20   informed consent conversation about a medication that she
02:23 21   continues to take to treat and to prevent a reoccurrence of her
02:23 22   breast cancer and a medication that's associated with hair
02:23 23   loss, which is already in evidence in this case.
02:23 24              THE COURT:  That's not --
02:23 25              MS. SASTRE:  That's what I was going to ask her

BARBARA EARNEST - CROSS

02:23  1    about.

02:23  2            THE COURT:  Informed consent, unless we get into what

02:23  3    the doctor told her about Arimidex and get into all that --

02:23  4            MS. SASTRE:  Well, what's interesting about the

02:23  5    record is that at the five-year mark, you heard even

02:24  6    Dr. Carinder say a lot of people stop.  But she wanted to

02:24  7    continue taking it.  She said, "Look, I have friends that take

02:24  8    it."  And so the idea was preventing the reoccurrence of breast

02:24  9    cancer was very important to her.

02:24 10            And then I'm going to ask her about whether the

02:24 11    doctor discussed the hair loss issue with her, which is a

02:24 12    fair -- of course it's a fair question.  If she was consented

02:24 13    on hair loss --

02:24 14            MR. SCHANKER:  If she says she is knowingly taking

02:24 15    Arimidex and her advisory in 2016 concerning Arimidex -- which

02:24 16    is not -- has no -- is not subject to any claim or defense, is

02:24 17    not a party -- the manufacturer of Arimidex is not a party in

02:24 18    this case, then whether an advisory was given --

02:24 19            THE COURT:  There are a couple things.

02:24 20            The first objection was hearsay.  That's

02:24 21    overruled.

02:24 22            As to relevance, you don't need me to tell you

02:24 23    why this line of questioning is relevant.  It's twofold:  What

02:24 24    I believe you are going to hear is that Arimidex can cause hair

02:25 25    loss.  I know that's not what Dr. Tosti said, but they are

BARBARA EARNEST - CROSS

02:25  1    entitled to present a defense.

02:25  2              MR. SCHANKER:  Absolutely.

02:25  3              THE COURT:  The other thing is if, during this

02:25  4    conversation about consent, the plaintiff was informed that

02:25  5    this could be a cause of her hair loss, I think it's very

02:25  6    relevant if she chooses to accept it.

02:25  7                    Now, look, the Lord giveth and the Lord taketh

02:25  8    away.  It also means that she is making very informed decisions

02:25  9    about her treatment.

02:25 10                    Does that make sense?

02:25 11              MS. SASTRE:  We'll see.  I don't know.  I'm flying

02:25 12    without wings here, so -- okay.  Thank you, Your Honor.

02:25 13              THE COURT:  Plaintiff.

02:25 14              (End of bench conference.)

02:25 15              MS. SASTRE:  Your Honor, we would like to move this

02:25 16    into evidence.

02:26 17              THE COURT:  Let it be admitted.

02:26 18    BY MS. SASTRE:

02:26 19    Q.   Mrs. Earnest, I just want you to take a look at a section

02:26 20    on the top of page 3 -- I will put it up here.  We can look at

02:26 21    it together -- just to see if it refreshes your recollection of

02:26 22    your conversation with Dr. Collins-Burow about Arimidex.  Okay?

02:26 23    A.   You are counting the top sheet as a page?

02:26 24    Q.   I have it up on your screen, if that's just as easy for

02:26 25    you to follow.

BARBARA EARNEST - CROSS

02:26 1   A.   Nothing else is up here.

02:26 2        THE COURT:   Nothing is up here.

02:27 3   BY MS. SASTRE:

02:27 4   Q.   You have it?

02:27 5   A.   Yes.

02:27 6   Q.   Very good.  Thank you.

02:27 7        Just quickly, just to go through this and see if this

02:27 8   sort of rings a bell now.  It states in your record:

02:27 9   "Mrs. Earnest currently is on Arimidex for continued treatment

02:27 10  and tolerating this well.  No clinical evidence of

02:27 11  reoccurrence."

02:27 12       You would agree that's referring to your breast

02:27 13  cancer, as far as you know, right?

02:27 14  A.   Uh-huh.

02:27 15  Q.   Yes?

02:27 16  A.   Yes.

02:27 17  Q.   "As of November 2016, she has completed five years of

02:27 18  Arimidex therapy.  Mrs. Earnest is aware of the data supporting

02:27 19  the use of" -- it says -- "Tamoxifen beyond five years to a

02:27 20  total of 10 years in postmenopausal patients.  She also states

02:27 21  that many of her friends are continuing their aromatase

02:28 22  inhibitor beyond five years."

02:28 23  A.   I don't know where she got that.

02:28 24  Q.   I was just going to ask you about that.

02:28 25  A.   I have no idea about that.  That's the first time I'm

**BARBARA EARNEST - CROSS**

02:28  1    seeing that stuff.  I have no idea.  I didn't know anybody that

02:28  2    had cancer.  What would they be using that for other than

02:28  3    cancer?  I don't know where she got that at.

02:28  4    **Q.**    Fair enough.  It states:  "Today we discussed the

02:28  5    possibility of continuing Arimidex, surgical pathology showing

02:28  6    one of two sentinel nodes positive for malignancy.  We

02:28  7    specifically discussed risks and benefits of Arimidex

02:28  8    continuation.  After her questions were answered to her

02:28  9    satisfaction, Mrs. Earnest confirmed her desire to continue

02:28 10    to" -- "Arimidex."

02:28 11         So my question is:  Now just having had the

02:28 12    opportunity to look at this together, do you recall when

02:28 13    Dr. Collins-Burow says that you-all specifically discussed the

02:28 14    risks and benefits of Arimidex continuation?

02:29 15         Does that refresh your memory at all?

02:29 16    **A.**    Yes.

02:29 17    **Q.**    Tell me what you remember talking about.  Very good.

02:29 18    **A.**    I just remember her telling me that she was using it as an

02:29 19    aid so I wouldn't get cancer again.  I don't remember anything

02:29 20    other than that, that it was going to help stop the cancer from

02:29 21    coming back for the next five years.

02:29 22         That's why she wanted -- Dr. Carinder only wanted me

02:29 23    to be on it for five years.  He wanted to take me off of it.

02:29 24    Because I had changed doctors, I went and found her, she wanted

02:29 25    to keep me on it for another five years.

BARBARA EARNEST - CROSS

02:29 1    **Q.**   What did she tell you about the risks of Arimidex?

02:29 2    **A.**   I honestly don't remember the risks.  I was already on it

02:29 3    for five years, so I considered, what's five more years?

02:29 4    **Q.**   Let me ask you this, though.  Do you dispute what's stated

02:29 5    here by Dr. Collins-Burow that the risks were specifically

02:30 6    discussed?

02:30 7    **A.**   No, I don't dispute that.  I just don't remember.

02:30 8    **Q.**   You don't remember.  Okay.  Very good.

02:30 9          Well, ma'am, let me ask you this:  Have you ever

02:30 10   thought it possible that Arimidex is contributing to the

02:30 11   current condition of your hair?

02:30 12   **A.**   No.

02:30 13   **Q.**   Well, ma'am, isn't it true that you met with the physician

02:30 14   and told them that you thought your hair was coming back and it

02:30 15   was the other medicine causing your hair loss?

02:31 16   **A.**   I don't ever remember saying that.

02:31 17          **MS. SASTRE:**  May I approach?

02:31 18          **THE COURT:**  Yes, you may.

02:31 19   BY MS. SASTRE:

02:31 20   **Q.**   So, Mrs. Earnest, I'm going to direct your attention to

02:31 21   the second line.

02:31 22          **MR. SCHANKER:**  Could we approach, Your Honor?

02:31 23          **THE WITNESS:**  I can't read it.

02:31 24          **MR. SCHANKER:**  Could we approach, Your Honor?

02:31 25          **THE COURT:**  Okay.

BARBARA EARNEST - CROSS

02:31 1                (The following proceedings were held at the bench.)

02:32 2           MS. SASTRE:  So, Your Honor, this is something we

02:32 3      talked about extensively at pretrial, and you said although you

02:32 4      had excluded the two psychs that Mrs. Earnest went to see, you

02:32 5      said if she testifies to something different and directly

02:32 6      contrary to what's in her medical records, that without going

02:32 7      into detail as to who they were, that we could use those

02:32 8      records to impeach her.

02:32 9                And if Your Honor looks at that entry -- and he

02:32 10     testified to --

02:32 11          THE COURT:  From whom?

02:32 12          MS. SASTRE:  This is a record from the psychs that

02:32 13     Your Honor excluded.

02:32 14                And what we talked about, Your Honor -- I hope

02:32 15     that you recall -- we talked about -- I said, well, Judge, the

02:32 16     issue is that if she testifies to something that's directly

02:32 17     contrary to what she told them and is recorded in their

02:32 18     records, what you told us was that we could use those records,

02:32 19     without going into detail about who these people are, any of

02:32 20     that.  But you see here in Dr. Bianchini's record it states,

02:32 21     "Thought hair was coming back and other medicine causing hair

02:32 22     loss."  And that's exactly what he testified to.  It's right

02:33 23     there, Judge.

02:33 24          THE COURT:  Oh, this is Bianchini.

02:33 25          MS. SASTRE:  Yes.

BARBARA EARNEST - CROSS

02:33  1          THE COURT:  Okay.

02:33  2          MS. SASTRE:  Yes.  Because what she just said,

02:33  3  Your Honor -- and I will read you the question.  Oh, you have

02:33  4  it up.  I said to her --

02:33  5          MR. SCHANKER:  We're going to have to call

02:33  6  Dr. Bianchini.

02:33  7          MS. SASTRE:  No.

02:33  8          THE COURT:  Wait.

02:33  9          MS. SASTRE:  No.  Go ahead.

02:33 10          THE COURT:  Wait.

02:33 11          MS. SASTRE:  So the ruling -- hold on.

02:33 12          MR. SCHANKER:  This is wholly improper.  We don't

02:33 13  know what he means by this.  It's a scribble.  We have no idea

02:33 14  what "thought hair coming back" -- I can't even read what it

02:33 15  says.  "Other medicine," are we talking about the Taxotere?  We

02:33 16  don't know --

02:33 17          MS. SASTRE:  Well, we do know what it means because

02:33 18  he was deposed.  I have that right here.

02:33 19          MR. SCHANKER:  We have no --

02:34 20          THE COURT:  This is my situation.  What she says is

02:34 21  she doesn't remember.  So before we use it, perhaps the first

02:34 22  thing you do is ask her if this helps refresh her memory.

02:34 23  Let's just try that.

02:34 24          MS. SASTRE:  Yes, of course.  That's why I was --

02:34 25          THE COURT:  It's not, at this point, impeachment if

BARBARA EARNEST - CROSS

02:34 1    she says, "I don't recall saying that."  Maybe we give her an
02:34 2    opportunity to see if she remembers --
02:34 3              MS. SASTRE:  Okay.  Sure.
02:34 4              THE COURT:  -- first.
02:34 5              MS. SASTRE:  I mean, Dr. Bianchini says, "It was my
02:34 6    understanding she was attributing it to that medicine and the
02:34 7    fact was that she thought that it would still come back."
02:34 8              And he says, "What was the other medicine?"
02:34 9              And he says, "It's the Arimidex."
02:34 10             We asked, "What did you mean when you said
02:34 11       'other medicine causing hair loss?'"
02:34 12             And he said, "She told me the Arimidex."
02:34 13             MR. SCHANKER:  I can't tell if that's what he is
02:34 14   referring to.  Now we are talking about something he said in
02:34 15   the deposition, not something --
02:34 16             MS. SASTRE:  I'm not going to use the depo with her,
02:35 17   but I'm trying to --
02:35 18             THE COURT:  Stop.
02:35 19             May I see his other notes?
02:35 20             MS. SASTRE:  You want to see the other notes?
02:35 21             THE COURT:  Is this it?  Are there more notes?
02:35 22             MS. SASTRE:  I would have to go check.  I can show
02:35 23   you from his deposition exactly what he said about this.  And,
02:35 24   again, Your Honor said that if she denies something, if it's
02:35 25   inconsistent with what's in these records, that we could use it

BARBARA EARNEST - CROSS

02:35  1   to impeach her.  And that's exactly what I'm doing, Judge.

02:35  2            MR. SCHANKER:  We don't even know exactly what he

02:35  3   means by this.  It's cryptic.  We can't even read it.

02:35  4            MS. SASTRE:  We do because he was deposed, and you

02:35  5   know that, and it's right there from my outline.

02:35  6            THE COURT:  I think what I see is a question that

02:35  7   says, "Because she thought it was coming back and other

02:35  8   medicine was causing hair loss."

02:35  9            MR. SCHANKER:  We don't know what that means.  He is

02:35 10   not here to explain it.  We are going to have --

02:35 11            MS. SASTRE:  Would you just --

02:35 12            MR. SCHANKER:  We will have to call him to explain

02:36 13   the record, and we have no idea what this means.

02:36 14            THE COURT:  I'm going to, first, allow you to refresh

02:36 15   her memory.  And if she says something like, "I didn't say

02:36 16   that," you are entitled to that.

02:36 17            If you remember, there was a big discussion -- I

02:36 18   didn't know where this came from --

02:36 19            MS. SASTRE:  I'm sorry, Judge.

02:36 20            THE COURT:  -- and you jumped three paragraphs ahead

02:36 21   and I thought:  who? what? when? where?  There was extensive

02:36 22   discussion about possibly perjuring herself, and I said,

02:36 23   "That's not going to happen."  So I said they would have an

02:36 24   opportunity, if she said something different -- one might have

02:36 25   to come.  But I'm going to allow you to ask the question.

BARBARA EARNEST - CROSS

02:36  1          MS. SASTRE:  Well, we didn't talk about them coming,

02:36  2     Judge.  I mean, obviously it was the idea that they were

02:36  3     excluded, they are out --

02:37  4          (End of bench conference.)

02:37  5          THE COURT:  Members of the jury, this might be a good

02:37  6     time for your afternoon break.  Court is going to be at recess

02:37  7     for 15 minutes.

02:37  8          (The jury exited the courtroom.)

02:37  9          THE COURT:  Mrs. Earnest, ma'am, I hate to -- now

02:37 10     would be a good time for you to go to the ladies room, because

02:37 11     we need to have a conversation that I can't let you hear.

02:37 12     Either that or you can go into -- usually I send people in that

02:37 13     hallway, like they are punished or something.  Okay?

02:38 14          (The plaintiff exited the courtroom.)

02:38 15          THE COURT:  All right.  Thank you.

02:38 16               Just so the record is clear, defendants have

02:38 17     moved to enter a certain portion of the record related to

02:38 18     Dr. Bianchini.

02:38 19          MS. SASTRE:  Yes, Your Honor.

02:38 20          THE COURT:  Okay, thank you.

02:38 21               And very frankly, the question that's posed in

02:39 22     this note says:  "Why no treatment for alopecia?"

02:39 23               The response, as I can see it, is:  "Thought

02:39 24     hair was coming back and other meds caused hair loss."

02:39 25               I believe defendants wish to use this

**BARBARA EARNEST - CROSS**

02:39  1  information, this record, to impeach her prior testimony that

02:39  2  she never thought the Arimidex was related to her alopecia --

02:39  3  or I believe she said, "I don't recall ever having that

02:39  4  conversation with a doctor."

02:39  5          Correct?  Any corrections so far?

02:39  6          And so plaintiffs have objected to this and that

02:39  7  this is hearsay and everything else.

02:40  8          What this Court remembers is having a pretty

02:40  9  extensive discussion about this very thing at the pretrial

02:40 10  conference because I believe defendants indicated at that time

02:40 11  that they intended to bring forth statements made to

02:40 12  Drs. Thompson and Bianchini.  And I was very concerned --

02:40 13          You all can sit down.  It's kinda making me

02:40 14  nervous.

02:40 15          I was concerned about statements being made and

02:40 16  being excluded from the jury simply because the witness was not

02:40 17  being called if those statements had indeed been made.

02:41 18          I very clearly remember saying that's not going

02:41 19  to happen.  I'm not going to let the witness deny a statement

02:41 20  she clearly made.  If that occurred, we were going to confront

02:41 21  her with it, or we would bring Dr. Bianchini in.

02:41 22          Now, I have to tell you, this is my only concern

02:41 23  with the way that the question was posed.  I think we perhaps

02:41 24  need to give his name.  Because I have to tell you, when I got

02:41 25  this, I said, I thought, I don't even know what this is.

BARBARA EARNEST - CROSS

02:41 1          If the witness made a statement before and it --

02:41 2 it's coming in or we are going to get Dr. Bianchini here to ask

02:41 3 him this question.

02:41 4          MR. SCHANKER:  Your Honor, we don't have

02:41 5 Dr. Bianchini here, and if Dr. Bianchini was on the stand, we

02:41 6 could impeach him with a purported prior inconsistent statement

02:41 7 or confirm this.  We don't even have Dr. Bianchini here, so we

02:41 8 have no idea.  First of all --

02:41 9          THE COURT:  It's her statement.

02:41 10          MR. SCHANKER:  We don't know if it is.  There's no

02:42 11 quotes around it.  I can't read what it says.  We don't have

02:42 12 Dr. Bianchini here to say, "Did you hear her say this?"  If we

02:42 13 did, you could impeach Dr. Bianchini with this.

02:42 14          THE COURT:  I have to tell you, if you want to go

02:42 15 down that road, he is coming, and then only this question is

02:42 16 going to be asked.

02:42 17          MR. SCHANKER:  We just may need to do that because

02:42 18 otherwise the jury is going to be left with some version that

02:42 19 defendants --

02:42 20          THE COURT:  Dr. Bianchini, was he asked this question

02:42 21 in his deposition while he was under oath?

02:42 22          MR. SCHANKER:  That's what I have my folks -- this is

02:42 23 the first time we have seen this.

02:42 24          MS. SASTRE:  Yes.

02:42 25          MR. SCHANKER:  We are having folks look at it.

BARBARA EARNEST - CROSS

02:42  1          THE COURT:  Let's look at that.  Because I am not --
02:42  2   and I think I made myself very clear.  This was not going to be
02:42  3   a question that I was going to just everybody skirt it because
02:43  4   I excluded his expert testimony.
02:43  5          Let's pull up the deposition.  But if he said
02:43  6   that under oath, one of two things -- well, two things are
02:43  7   going to happen.  She is going to be asked this question
02:43  8   directly; and if she denies it, Dr. Bianchini's testimony under
02:43  9   oath is going to be admitted as to that question.
02:43 10          MR. SCHANKER:  Okay.
02:43 11          MS. SASTRE:  And then --
02:43 12          MR. SCHANKER:  If counsel could assist with a page
02:43 13   number.
02:43 14          THE COURT:  Sure, sure.
02:43 15          MS. SASTRE:  Just a second.  I'm looking.
02:43 16          Your Honor -- the Court may recall it's in
02:43 17   Dr. Bianchini's notes and deposition and Dr. Thompson's.  I was
02:43 18   just going to ask about Bianchini.  They both testified with
02:43 19   regard to it.  And Dr. Bianchini says, on page 129:
02:43 20          "QUESTION:  From your notes, you asked her why no
02:43 21      treatment for alopecia?
02:44 22          "ANSWER:  Yes.
02:44 23          "QUESTION:  And then you wrote down as her
02:44 24      response --
02:44 25          "ANSWER:  Thought hair was coming back.

BARBARA EARNEST - CROSS

02:44 1          "QUESTION:  Coming back?

02:44 2          "ANSWER:  Right.

02:44 3          "QUESTION:  And other medicine causing hair loss?

02:44 4          "ANSWER:  Correct.

02:44 5          "QUESTION:  That's what she told you?

02:44 6          "ANSWER:  Yes.

02:44 7          "QUESTION:  What was the other medicine?

02:44 8          "ANSWER:  I think it was the Arimidex.  I knew

02:44 9     that -- I read about that in some of Thompson's materials.

02:44 10    That was my understanding."

02:44 11         Then he was later asked:

02:44 12         "QUESTION:  Did you ask why, even if she thought it

02:44 13    was the Arimidex, why she wasn't complaining or seeking

02:44 14    treatment for her hair loss?

02:44 15         "ANSWER:  My understanding was that she was just

02:44 16    attributing it to that medicine" -- referring to Arimidex

02:44 17    and her hair loss -- "and the fact that she was -- you

02:44 18    know, maybe -- that maybe it would still come back."

02:44 19         And it kind of goes on from there.

02:44 20         Dr. Thompson, it's the same thing, Your Honor.

02:44 21    It's very clear.  He talks about the Arimidex, as well.

02:44 22    There's the same entry there, Your Honor.

02:45 23         THE COURT:  But this is a Bianchini note; it's not a

02:45 24    Thompson note?

02:45 25         MS. SASTRE:  Yes, yes.  And it's just -- it's in

02:45  1    both, Your Honor, but that's right, it's Dr. Bianchini.  That

02:45  2    was Bianchini's testimony.

02:45  3         MR. SCHANKER:  Your Honor, even just hearing that

02:45  4    testimony read, I was in no way clear what he was talking

02:45  5    about, the drug.  Is he referring to Taxotere?

02:45  6         Because we have heard the testimony that the

02:45  7    reason that she didn't seek -- you know, with regard -- we have

02:45  8    heard a statute of limitations argument, and Mrs. Earnest has

02:45  9    explained that the reason she didn't think it was caused by --

02:45 10    she always thought her hair would come back.  It sounds

02:45 11    remarkably similar to what the doctor says in this note.

02:45 12         I can't tell if he is referring to the

02:45 13    Arimidex -- from what was read -- or if he's referring to the

02:45 14    Taxotere -- from what was read.

02:45 15         And, remember, Dr. Bianchini did reports on

02:45 16    three different women at this point in time.  We have to look

02:45 17    through to see if this note is even in reference to Barbara

02:45 18    Earnest or one of the others.  We have to just confirm all of

02:45 19    this.

02:45 20         MS. SASTRE:  Well, I can tell Your Honor that it is.

02:45 21    We were focused on this issue in pretrial, as Your Honor knows.

02:46 22    I just read to you from his deposition.

02:46 23         I will tell Your Honor, as well, only because he

02:46 24    referenced Dr. Thompson, Dr. Thompson was asked the same thing:

02:46 25         "QUESTION:  She told you up until the time she saw a

BARBARA EARNEST - CROSS

02:46 1    television commercial, she knew she was taking Arimidex

02:46 2    and thought her hair loss could be from the Arimidex?

02:46 3         "ANSWER:  Right, yeah, that it might be due to one of

02:46 4    the drugs she was taking and she had hopes it might come

02:46 5    back.

02:46 6         "QUESTION:  And when you say 'one of the drugs she

02:46 7    was taking,' she was talking about Arimidex?

02:46 8         "ANSWER:  She was talking about an estrogen receptor

02:46 9    blocker and I believe the one she's taking, Arimidex."

02:46 10        All roads lead to the same place here,

02:46 11   Your Honor.  We are talking about a question or two, and I will

02:46 12   move on.

02:46 13        MR. SCHANKER:  And, Your Honor, I believe -- we are

02:46 14   trying to sort through this -- that that's actually

02:46 15   Dr. Bianchini talking about a Dr. Thompson note.  So this is in

02:46 16   no way sorted out, first of all.  It's not clear.

02:47 17        And I think there's multiple levels of hearsay

02:47 18   that it appears we are talking about here, with two different

02:47 19   doctors and Barbara Earnest and some language in a note that

02:47 20   isn't even clearly attributable to Mrs. Earnest and certainly

02:47 21   isn't put in quotations.

02:47 22        And I think we would have to ask Dr. Bianchini

02:47 23   about this himself before we should ever be allowing Barbara

02:47 24   Earnest to be cross-examined on a scribble on a piece of paper.

02:47 25        THE COURT:  I'm going to give you all a minute to go

BARBARA EARNEST - CROSS

02:47 1    dig through this, but it's a statement from the plaintiff, and

02:47 2    if there is a question as to any of this, we are going to read

02:47 3    the deposition of Dr. Bianchini as to that into evidence, those

02:47 4    portions.

02:47 5            Because I was pretty clear at the pretrial

02:47 6    conference that I wasn't going to let a statement she made to a

02:48 7    physician just -- her answer contrary to what she had

02:48 8    previously told a doctor.  I think I made myself clear.

02:48 9        MR. SCHANKER:  Sure.  And I guess that -- yes,

02:48 10   Your Honor, that's the question.  I don't think in any way is

02:48 11   it clear that this is a statement made to a physician that's

02:48 12   contrary.

02:48 13       THE COURT:  Well, let me tell you what's going to

02:48 14   happen, just so you know.  I'm going to allow the question to

02:48 15   Mrs. Earnest.  If she says, "I didn't tell him that," then I'm

02:48 16   going to allow the testimony from Dr. Bianchini that that's

02:48 17   what she said, if that's what his testimony is.

02:48 18       MR. SCHANKER:  Then I'm assuming, Your Honor, if need

02:48 19   be, we would be allowed to call Dr. Bianchini in to explain the

02:48 20   context of what we believe would be clearly taken out of

02:48 21   context and misleading to this jury.

02:48 22       THE COURT:  I think I kind of said that at the

02:49 23   pretrial conference --

02:49 24       MR. SCHANKER:  Okay.

02:49 25       THE COURT:  -- that one way or another, this is going

BARBARA EARNEST - CROSS

02:49 1    to be -- I am not going to allow inconsistent statements from

02:49 2    the witness.  And if there was an inconsistent statement or she

02:49 3    is being less than -- I'm not going to allow it.

02:49 4             MR. SCHANKER:  All right.  We will take a look.

02:49 5             THE COURT:  Okay.  I believe, Palmer, you and John

02:49 6    have something to take up with me.

02:49 7             But take a look.  Just kind of look quickly.

02:49 8             (Recess.)

03:03 9             THE DEPUTY CLERK:  All rise.

03:03 10            THE COURT:  Is there anything else I need to see?

03:03 11            I'm not going to say anything in front of --

03:03 12            MR. SCHANKER:  Oh, I'm sorry.

03:03 13            THE COURT:  -- Mrs. Earnest.

03:03 14            MR. SCHANKER:  So we had --

03:03 15            THE COURT:  Mrs. Earnest, would you mind if I put you

03:04 16   in the punish corner?  It's just a little hallway.

03:04 17            MS. SASTRE:  There are doors everywhere around here.

03:04 18            THE WITNESS:  I see that.

03:04 19            THE COURT:  I'm sorry, ma'am.

03:04 20            (The plaintiff exited the courtroom.)

03:04 21            MR. SCHANKER:  So, Your Honor, not waiving the

03:04 22   objections that we made and finding the section of the

03:04 23   deposition, I think it's important that you review it.

03:04 24            And the context of this is it appears that the

03:04 25   questioning asked --

BARBARA EARNEST - CROSS

03:04 1            THE COURT:  Why don't you let me see it.

03:04 2            MR. SCHANKER:  Okay.

03:04 3            MS. SASTRE:  What page is that, please?

03:04 4            MR. SCHANKER:  Page 127, 128, and 129 that, pursuant

03:04 5    to the rule of completeness, would clearly need to be read to

03:04 6    give the context to the jury.

03:04 7            MS. SASTRE:  Okay.

03:04 8            MR. SCHANKER:  After you read, I will explain,

03:04 9    Your Honor.

03:06 10           So you can see, Your Honor, what Dr. Bianchini

03:06 11   testifies to is that Barbara Earnest wasn't sure, hoped that

03:06 12   her hair would come back, thought maybe it was the Arimidex

03:06 13   through this period of time, and it wasn't until she saw the

03:06 14   commercials and then learned about other women and this case

03:06 15   that she then realized that it was the Taxotere.

03:06 16           And that's clearly needed.  We need to read all

03:06 17   of that to the jury or else they are going to be misled with

03:06 18   the context of what has been offered by the defense.  And so

03:06 19   pursuant to the rule of completeness, we believe that that

03:06 20   needs to be read to the jury so that they understand the

03:06 21   context, or otherwise it's going to be left with the jury that

03:06 22   they simply think that she brought this lawsuit thinking that

03:07 23   it was Arimidex that was the cause and not Taxotere, when the

03:07 24   fact is she didn't know.  She thought maybe that's the drug,

03:07 25   and the full explanation of what Dr. Bianchini explains --

BARBARA EARNEST - CROSS

03:07 1       **THE COURT:**  But I think the question was:  "Ma'am,

03:07 2    did you ever tell that to a doctor?"  And then she said, "I

03:07 3    don't remember doing that."  I think she is entitled to bring

03:07 4    this statement to her.

03:07 5           I will tell you this, though, because this does

03:07 6    give context and this witness was not listed.  I am going to

03:07 7    allow the plaintiffs, at the conclusion of Mrs. Earnest's

03:07 8    testimony, to read from the deposition of the doctor to explain

03:07 9    it.  Because if this is what he jotted down and then there was

03:07 10   a further conversation that he is reporting here, I don't think

03:07 11   it's fair for it to be this one line.

03:08 12      **MS. SASTRE:**  So, Your Honor, I'd just redirect the

03:08 13   Court back to the record and the first line, "Why no treatment

03:08 14   for alopecia," and then put that in context of what Your Honor

03:08 15   just read.  So, "Why didn't Mrs. Earnest get treatment for her

     16    hair loss," written right beneath that, "Thought hair was

     17    coming back and other medicine causing hair loss."

03:08 18          And in the context of Dr. Bianchini's comments

03:08 19   that he believed she was referring to Arimidex, it's just a

03:08 20   question to say:  "Does this refresh your recollection that

03:08 21   this is what you told Dr. Bianchini?  You didn't get treatment

03:08 22   because you thought it was the other medicine, and that other

03:08 23   medicine, you agree with me, was Arimidex?"

03:08 24          And then she can answer however she is going to,

03:08 25   Your Honor, and I will move on.

BARBARA EARNEST - CROSS

03:08  1          THE COURT:  Right.  He says, "First of all, I guess

03:09  2  she was still hanging on to hope that she was just slower than

03:09  3  most people and maybe the Arimidex was contributing to that

03:09  4  process.  That's my understanding."

03:09  5          MS. SASTRE:  Uh-huh.

03:09  6          THE COURT:  So what she said, that's a little bit

03:09  7  different from Arimidex was causing the hair loss.

03:09  8          MS. SASTRE:  Yes, Arimidex is contributing, right --

03:09  9          THE COURT:  Right.

03:09 10          MS. SASTRE:  -- and that's why she didn't get

03:09 11  treatment.

03:09 12          THE COURT:  Contributing to the process, that it was

03:09 13  slow coming back --

03:09 14          MS. SASTRE:  Yeah.

03:09 15          THE COURT:  -- and Arimidex was contributing to that

03:09 16  process.

03:09 17          MR. SCHANKER:  Your Honor, if --

03:09 18          MS. SASTRE:  Yeah, one issue there, when he's talking

03:09 19  about the lawsuits, plural.  So that's a problem, and this

03:09 20  obviously doesn't open the door to that.

03:09 21              And, anyway, I can tell Your Honor --

03:09 22          THE COURT:  No.  I think this is -- there are two

03:09 23  paragraphs that I think are pertinent to that comment.

03:09 24          MR. MOORE:  We don't have those paragraphs in front

03:09 25  of us, so we're --

BARBARA EARNEST - CROSS

03:09 1          THE COURT:  Okay.  On page 128 --

03:10 2          MR. MOORE:  Yes.

03:10 3          THE COURT:  -- line 10 through 20.  I think those are

03:10 4  the only ones that are pertinent to this."

03:10 5              She was under the understanding that her hair

03:10 6  would come -- likely come back, but it would be different,

03:10 7  grayer, curlier, thinner, something, but it would come back."

03:10 8          MR. MOORE:  Okay.

03:10 9          THE COURT:  "And that somewhere along -- and then she

03:10 10 began worrying because it wasn't coming back, but she had these

03:10 11 other things that she was -- first of all, I guess she was

03:10 12 hanging on to hope that she was slower than most people and

03:10 13 maybe the Arimidex was contributing to that process.  That's my

03:10 14 understanding."

03:10 15         MS. SASTRE:  Your Honor read -- I'm sorry, you were

03:10 16 envisioning reading page 128, lines 10 through 20, and what

03:10 17 else, Judge, just so I can follow you?  That was it?  Okay.

03:10 18         THE COURT:  I think that's an explanation of that

03:10 19 sentence.

03:10 20         MR. SCHANKER:  And, Your Honor, I think the true

03:10 21 context of this -- and I hear what you are saying, but the true

03:10 22 context of Dr. Bianchini's testimony is that wasn't all of it.

03:10 23 If we are going to see why she realized that it wasn't the

03:11 24 Arimidex and something else, we would have to read about the

03:11 25 next step, which is lines 24 on page 128 to line 5 on page 129.

BARBARA EARNEST - CROSS

03:11  1    And that is --

03:11  2              THE COURT:  That's why she filed the lawsuit.

03:11  3              MR. SCHANKER:  Yeah, but she wouldn't have filed the

03:11  4    lawsuit -- she wouldn't have changed her mind concerning

03:11  5    Arimidex if she hadn't gained additional information.

03:11  6              MS. SASTRE:  I'm going to ask questions about the ad.

03:11  7              THE COURT:  That comes too far.

03:11  8              MS. SASTRE:  We're going to get to that.

03:11  9              THE COURT:  That goes too far.  You're asking -- what

03:11 10    she said is, "What did you tell the doctor?"  And then I think

03:11 11    it's appropriate, because we've got these two cryptic lines.

03:11 12              MR. SCHANKER:  Very cryptic.

03:11 13              THE COURT:  Very cryptic.  And these two paragraphs

03:11 14    explains what this means.  It doesn't mean -- she didn't ask

03:11 15    him, "When did you realize it wasn't coming back?"  That's not

03:11 16    here.

03:11 17              MR. SCHANKER:  Right.

03:11 18              THE COURT:  That's not here.  He says two things:

03:11 19    She thought it was coming back, and then she thought that

03:12 20    Arimidex might be contributing to the process.

03:12 21              MR. SCHANKER:  Right.  And as I made the record --

03:12 22    you know, for the record's sake, Your Honor, we believe that

03:12 23    you got it.  I hear you.

03:12 24              THE COURT:  No, I mean, you can make your record.

03:12 25    That's what I'm doing.

BARBARA EARNEST - CROSS

03:12  1            And I think if you want to -- the problem is, is

03:12  2    from this record is that what -- I'm trying to work through how

03:12  3    we handle this.  Do I just let this proceed and then allow you,

03:12  4    at the conclusion of this, to, by deposition, read the

03:12  5    provider's explanation of what those two lines meant?

03:12  6            MR. SCHANKER:  Your Honor, can I make a proposal?

03:12  7            THE COURT:  I'm all ears.

03:12  8            MR. SCHANKER:  Okay.  Thank you.

03:12  9            It seems like pursuant to completeness, that

03:12 10    contemporaneously reading what you just read to flesh out what

03:13 11    these cryptic lines mean -- and they truly are cryptic, way too

03:13 12    much speculation from just this note -- if we are going to give

03:13 13    this to the jury, we should give it in the context of the

03:13 14    person who wrote the note, who under oath explained, as you

03:13 15    just read, what he meant by the note.  To allow defense counsel

03:13 16    to --

03:13 17            THE COURT:  I got it.

03:13 18            Ms. Sastre.

03:13 19            MS. SASTRE:  Your Honor, I think it's clear.  I read

03:13 20    it to you earlier.  He explained what he wrote, what exactly it

03:13 21    said.  It's not cryptic, and he described the other medicine as

03:13 22    he believed as being Arimidex.

03:13 23            He was also asked, Your Honor, on page 130:

03:13 24    "Did you ask her why, even if she thought it was the Arimidex,

03:13 25    why she wasn't complaining or seeking treatment?"

BARBARA EARNEST - CROSS

03:13 1          And he said:  "It's my understanding she was

03:14 2   attributing it to that medicine and the fact that she was, you

03:14 3   know -- you know, maybe -- that maybe it would still come back

03:14 4   and, you know, that she, you know, thought that's what the

03:14 5   explanation was, so I guess didn't think that it warranted

03:14 6   treatment for hair loss."

03:14 7          Meaning she is continuing to take Arimidex, she

03:14 8   thinks it's causing her hair loss, and she doesn't seek any

03:14 9   treatment while she is taking it.  That's what he said.  It's

03:14 10  clear, Your Honor.  It's throughout his deposition.  There's

03:14 11  lots of pages we can both point to.

03:14 12          MR. SCHANKER:  I think we should do that, then, is

03:14 13  read -- give context to this, or else it's clearly going to be

03:14 14  misleading to the jury, the way that defense counsel is trying

03:14 15  to interpret this, which, on its face, I can't see how you can.

03:14 16          MS. SASTRE:  Your Honor, all I would say -- I guess

03:14 17  the last thing I would say to the Court is that we came in here

03:14 18  specifically prepared to comply with Your Honor's pretrial

03:14 19  ruling.  We discussed this extensively.  This is not surprise

03:15 20  to anybody in this courtroom who has been involved with this

03:15 21  case.

03:15 22          I remember Your Honor saying quite clearly and

03:15 23  somewhat passionately said, "If she testifies to something

03:15 24  that's contrary there, she can be confronted with it."  She has

03:15 25  testified to something contrary.  And, candidly, this could

BARBARA EARNEST - CROSS

03:15  1    have been over quite a while ago with just simply two questions

03:15  2    on this.

03:15  3              So that's all I can tell you, Judge.  We are

03:15  4    simply complying with Your Honor's ruling.

03:15  5              THE COURT:  This is what we are going to do, because

03:15  6    I did remember saying, "If she says something contrary, we are

03:15  7    going to get Dr. Bianchini in here."  But I'm not going to let

03:15  8    her testify to something contrary.  She hasn't actually done

03:15  9    that yet, because what she said is, "I don't remember."

03:15 10              I think, in all fairness, she wasn't directed to

03:15 11    which doctor; it was just this piece of paper.  And that was my

03:15 12    first thing:  What on earth is this?  I think maybe what needs

03:15 13    to be asked --

03:16 14              MS. SASTRE:  Yep.

03:16 15              THE COURT:  -- is if she told this to Dr. Bianchini.

03:16 16    And if she says "yes," it's over.  If she says "no," then you

03:16 17    can confront her with it.

03:16 18              But I also think -- and I'm not going to go

03:16 19    into, at this point, reading this portion of Dr. Bianchini's

03:16 20    testimony, but I will allow -- after this witness, if she ever

03:16 21    gets off the stand -- you to call -- just to read a certain

03:16 22    portion of his deposition that explains that note.

03:16 23              MS. SASTRE:  Okay.

03:16 24              MR. SCHANKER:  So we will be able to read that to the

03:16 25    jury, Your Honor?

03:16  1          THE COURT:  Just --

03:16  2          MR. SCHANKER:  That portion of the deposition that

03:16  3   explains the note.

03:16  4          THE COURT:  Just this.

03:16  5              And I will tell you, if there's contrary that

03:16  6   they wish to bring from his deposition, we will do that too.

03:16  7              But I am not going to allow you to read about

03:16  8   television ads and other lawsuits and that sort of thing,

03:17  9   because I think if there's any explanation for this note, it's

03:17 10   these two very limited paragraphs.

03:17 11          MR. SCHANKER:  May I approach?

03:17 12          THE COURT:  Because I don't want to go any further

03:17 13   into Dr. Bianchini, because I don't want to get into why she

03:17 14   was there and what she was doing there.

03:17 15              All right.  I think we got it.

03:17 16          MS. SASTRE:  Okay.

03:17 17          THE COURT:  Thank you.

03:17 18              Please.

03:17 19          (The plaintiff entered the courtroom.)

03:17 20          THE COURT:  Please bring in the jury.

03:17 21              Mrs. Earnest, you're not the first person who

03:17 22   has been in that hallway.

03:18 23          THE WITNESS:  Not the last.

03:18 24          THE COURT:  You will not be the last.

03:18 25          (The jury entered the courtroom.)

BARBARA EARNEST - CROSS

03:18  1        THE COURT:  All jurors are present.  Court is back in

03:18  2  session.  You may be seated.

03:18  3            Ms. Sastre.

03:18  4        MS. SASTRE:  Yes.  Thank you, Your Honor.

03:18  5  BY MS. SASTRE:

03:18  6  Q.  Mrs. Earnest, welcome back from our break, ma'am.

03:18  7  A.  Thank you.

03:18  8        THE COURT:  I'll remind you, you are under oath.

03:18  9        THE WITNESS:  Yes.

03:18 10        THE COURT:  Thank you.

03:18 11  BY MS. SASTRE:

03:18 12  Q.  Mrs. Earnest, you have in front of you the document that I

03:18 13  handed you before our break, ma'am.

03:18 14  A.  Yes.

03:18 15  Q.  And I just want you to take a look at the top three lines

03:18 16  of that document.  And if you could just look at them for a

03:19 17  moment, okay?  Tell me when you have done that.

03:19 18  A.  Okay.

03:19 19  Q.  Okay.  Very good.

03:19 20        And my question to you, Mrs. Earnest, is:  Did you

03:19 21  tell Dr. Bianchini on May 14 of 2019 that you thought your hair

03:19 22  was growing back and that another medicine was causing your

03:19 23  hair loss?

03:19 24  A.  No.  I don't know where he got that.  In fact, this is the

03:19 25  first time I'm seeing it.

BARBARA EARNEST - CROSS

03:19  1          **MS. SASTRE:**  Your Honor, may I publish the document?

03:19  2          **THE COURT:**  Yes, you may.

03:19  3          **MS. SASTRE:**  Okay.

03:19  4          **THE WITNESS:**  Had I known he had wrote that down, I

03:19  5  would have questioned him about that.

03:19  6  **BY MS. SASTRE:**

03:19  7  **Q.**   Okay.  So just taking a look for a moment, you see that it

03:20  8  states here:  "Why no treatment for alopecia?"

03:20  9  **A.**   Yes.

03:20 10  **Q.**   Then it states:  "Thought hair was coming back and other

03:20 11  medicine causing hair loss," right?

03:20 12  **A.**   That's what it says.  I don't think I said that.

03:20 13  **Q.**   Okay.  Thank you, ma'am.

03:20 14          Mrs. Earnest, I want to ask you about just a couple

03:20 15  other things quickly.  And my goal is to be done with my

03:20 16  questions as soon as I can, okay?

03:20 17  **A.**   Sure.

03:20 18  **Q.**   So I'm going to try to move a little bit quickly.  I just

03:20 19  wanted to let you know that, ma'am.  All right?

03:20 20  **A.**   Okay.

03:20 21  **Q.**   So, ma'am, has any doctor at any point ever told you that

03:20 22  they believe -- or that they know what the cause of the

03:20 23  condition of your hair is?

03:20 24  **A.**   No.

03:20 25  **Q.**   Has any doctor ever said to you, Mrs. Earnest, that they

BARBARA EARNEST - CROSS

03:21  1   think you have permanent alopecia?

03:21  2   A.    No.  Because I have never, ever really asked them.

03:21  3   Q.    So in about the eight years, approximately, since you lost

03:21  4   your hair, you haven't asked any of your doctors what was the

03:21  5   cause of your hair loss?

03:21  6   A.    Well, the only doctors I went to was my two cancer

03:21  7   doctors, is what I would ask.  And I asked them.  And they

03:21  8   didn't say that it was not going to come back; they just told

03:21  9   me to wait.

03:21 10   Q.    Let me ask you again.  And I know you're pointing to

03:21 11   certain doctors.  My question is a little bit broader, and it's

03:21 12   just simply that:  In the eight years since 2011, since you

03:21 13   have lost your hair, you haven't asked any of your doctors as

03:21 14   to what was the cause of your hair loss, right?

03:22 15   A.    No.

03:22 16   Q.    You haven't asked any of them whether it was permanent,

03:22 17   right?

03:22 18   A.    No.

03:22 19   Q.    Now, I believe you have described for us a conversation

03:22 20   that you had with Dr. Carinder in about February or March of

03:22 21   2012 where you and he had a conversation about whether your

03:22 22   hair was going to come back.

03:22 23   A.    Yes.

03:22 24   Q.    It was a few months after you lost your hair?

03:22 25   A.    Yes.

**BARBARA EARNEST - CROSS**

03:22  1   **Q.**   All right.  And at that time, you believed that the
03:22  2   condition of your hair or the lack of regrowth was due to
03:22  3   chemotherapy, true?
03:22  4   **A.**   Yes.
03:22  5   **Q.**   And after that date, February or March of 2012, you didn't
03:23  6   have any other conversations with Dr. Carinder about why your
03:23  7   hair wasn't coming back, true?
03:23  8   **A.**   True.
03:23  9   **Q.**   I just have a few questions about Dr. Tosti, okay?
03:23 10   **A.**   Uh-huh.
03:23 11   **Q.**   All right, ma'am.
03:23 12         Now, Dr. Tosti is coming here to trial, and she is a
03:23 13   physician in Miami, right?
03:23 14   **A.**   Yes.
03:23 15   **Q.**   And your lawyers arranged for you to have a visit with
03:23 16   her?
03:23 17   **A.**   Yes.
03:23 18   **Q.**   And you met with her just one time?
03:23 19   **A.**   Yes, correct.
03:23 20   **Q.**   In about June of 2018; does that sound about right?
03:23 21   **A.**   Yeah, I guess it does.  I don't really remember the date.
03:23 22   **Q.**   Okay.  You would agree with me you didn't have much of a
03:23 23   conversation with Dr. Tosti at that visit?
03:23 24   **A.**   No.  She was very busy.
03:23 25   **Q.**   Very busy.

**BARBARA EARNEST - CROSS**

03:23  1        And was she in and out of the room, seeing other

03:24  2  patients, while she was with you?

03:24  3  A.    Yes.

03:24  4  Q.    And did you feel like, ma'am, in all candor, that it was a

03:24  5  long way for you to travel, all the way down to Miami, and then

03:24  6  to have Dr. Tosti be in a rush?

03:24  7  A.    Not really, no.  I mean, she's very -- from what I

03:24  8  understand, she's very well-known and very busy.

03:24  9        And what happened, it was a mixup.  They put me in

03:24 10  the wrong room, so that's what put our time short.  It wasn't

03:24 11  because she was in a rush; it was because somebody put me in

03:24 12  the wrong room.

03:24 13  Q.    She was busy; is that fair?

03:24 14  A.    Yes.

03:24 15  Q.    Okay.  Very good.

03:24 16        Dr. Tosti didn't provide you with a diagnosis?

03:24 17  A.    No.

03:24 18  Q.    She didn't tell you what she thought caused the condition

03:24 19  of your hair?

03:24 20  A.    No.

03:24 21  Q.    She certainly didn't tell you that she thought the

03:24 22  condition of your hair was caused by Taxotere?

03:24 23  A.    No, she didn't say that to me.

03:25 24  Q.    And she didn't provide any recommendations for treatment

03:25 25  for you?

BARBARA EARNEST - CROSS

03:25  1    **A.**   No.

03:25  2    **Q.**   Now, in the eight years since you have lost your hair, you

03:25  3    haven't tried any medications or treatments to see if you could

03:25  4    get it to come back?

03:25  5    **A.**   You mean like --

03:25  6    **Q.**   Like anything.

03:25  7    **A.**   No.  Any shampoos or medicine that you take by mouth?  No.

03:25  8    I haven't done anything.

03:25  9    **Q.**   And you would agree with me you haven't even considered

03:25  10   undertaking any treatment to see if it would help your hair,

03:25  11   right?

03:25  12   **A.**   No, I haven't, because I always thought in my mind it

03:25  13   would come back.

03:25  14   **Q.**   I want to ask you a few questions about some photos, and

03:25  15   we are almost done, okay?

03:25  16   **A.**   Okay.

03:26  17   **Q.**   Just bear with me for a minute.

03:26  18          **MS. SASTRE:**  Your Honor, may I approach?

03:26  19          **THE COURT:**  Yes, you may.

03:26  20   BY MS. SASTRE:

03:26  21   **Q.**   Mrs. Earnest, if you could just flip through this.

03:26  22          **MS. SASTRE:**  I would like to move it into evidence,

03:26  23   the photos.

03:26  24          **THE COURT:**  Any objection?

03:26  25          **MR. SCHANKER:**  No objection.

BARBARA EARNEST - CROSS

03:26 1          THE COURT:  Let them be admitted.

03:26 2  BY MS. SASTRE:

03:26 3  Q.   Okay.  Very good.

03:26 4          So I just want to ask you a few questions about

03:26 5  photos, and I'm going to try and not go through any of the same

03:26 6  ones that were shown before.

03:26 7          But before I do that, let me ask you this first:  The

03:26 8  first photograph is from December of 2011, and then I wrote the

03:27 9  word "Christmas" on there when you were talking.  That's my

03:27 10 writing.

03:27 11         This is a Christmas picture you told us about?

03:27 12 A.   Yes.

03:27 13 Q.   And do you tend to take pictures with your family just

03:27 14 about every Christmas?

03:27 15 A.   That's not my family.

03:27 16 Q.   Okay.  But do you do that?  I know that we have some

03:27 17 pictures in here every year around Christmastime.

03:27 18 A.   Right, but the question is my family.  That's not my

03:27 19 family; that's my friends.

03:27 20         But we do this every year.  We get together, the

03:27 21 three of us.  We went to school together.  And we have been

03:27 22 doing that since 2011.  That's when we started.  And we just

03:27 23 get together at each other's house, we cook, and we take

03:27 24 pictures.

03:27 25 Q.   Okay.  It sounds nice.

BARBARA EARNEST - CROSS

03:27  1          So let me ask you this:  The next photograph -- and
03:28  2    these are in chronological order that we have from you -- is
03:28  3    November of 2014.  And I wrote here, when you were testifying
03:28  4    on direct exam, "Sister's Birthday."
      5          Did I get that right?
03:28  6    A.   Yes.
03:28  7    Q.   I guess my question to you is:  Between the dates of
03:28  8    December 2011 and November of 2014 -- and I know you said you
03:28  9    don't like to be in a lot of pictures.  But is it your
03:28 10    testimony that you weren't in a single photo during that entire
03:28 11    period of time?
03:28 12    A.   No.  I was in other photos.
03:28 13    Q.   You were in photos between December of 2011 and November
03:28 14    of 2014?
03:28 15    A.   Yes.  Because I gave -- I thought I gave-- sent in
03:28 16    pictures between that.  I don't know what happened if y'all
03:28 17    don't have them.
03:28 18    Q.   Who did you give those photos to, ma'am?  Did you give
03:28 19    them to your lawyers?
03:28 20    A.   Yes.  I thought I did.
03:29 21    Q.   Now, you would agree with me it's during this period of
03:29 22    time, in 2012 and 2013, that Dr. Carinder's records indicate
03:29 23    that your alopecia was resolving?
03:29 24    A.   That what?
03:29 25    Q.   That during this period of time in 2012 and 2013 is when

BARBARA EARNEST - CROSS

03:29 1    Dr. Carinder has records stating that your alopecia was

03:29 2    resolving?

03:29 3    A.    I don't know what he means by that.  Does it mean my hair

03:29 4    was totally growing back?  I don't understand the statement.  I

03:29 5    would have to --

03:29 6    Q.    Was your hair growing back during that time period?

03:29 7    A.    It grew back in 2012 and stayed like this.  It hasn't --

03:29 8    to me, this isn't grown back.

03:29 9    Q.    Do you have any idea why we don't have photos during that

03:29 10   time period?

03:29 11   A.    No, I don't.

03:29 12            MR. SCHANKER:  Objection.  Asked and answered,

03:30 13   Your Honor.

03:30 14            THE COURT:  Sustained.

03:30 15   BY MS. SASTRE:

03:30 16   Q.    I think this is the picture of you with your grandson.

03:30 17   Right?

03:30 18   A.    Yes.

03:30 19   Q.    This is Caleb.  Do I have that right?

03:30 20   A.    Yes.

03:30 21   Q.    How old is Caleb now?

03:30 22   A.    Four.

03:30 23   Q.    So he was born after your chemotherapy treatment, right?

03:30 24   A.    Yes.

03:30 25   Q.    He is a very cute little boy.

BARBARA EARNEST - CROSS

03:30 1    A.    Thank you.

03:30 2    Q.    This is a picture of you and your husband, Ralph, right?

03:30 3    A.    Yes.

03:30 4    Q.    Is this at Christmastime?  Looks like y'all had some

03:30 5    decorations up and you are in a Christmas sweater.

03:30 6    A.    Yes.

03:30 7    Q.    Do you know what year this was?

03:30 8    A.    It's saying 2016, but I don't really know for sure.

03:30 9    Q.    But it was after your treatment, correct?

03:31 10   A.    Yes.  That has to be 2016.

03:31 11   Q.    Thank you.  I think we are looking at -- it says here

      12   "Christmas party 2017," right?

03:31 13   A.    Yes.

03:31 14   Q.    It's a nice picture of you and Mr. Earnest, right?

03:31 15   A.    Yes.

03:31 16   Q.    Who else are you with in this photo?

03:31 17   A.    The girl in the red sweater next to me is Debbie, with her

03:31 18   husband, Phillip.  The next one is Debbie, with her husband,

03:31 19   Tony.

03:31 20   Q.    Thank you.  I know the jury has seen the pictures of, of

03:31 21   course, your trip to Disneyland in 2018.  Right?

03:31 22   A.    Yes.

03:31 23   Q.    You had a good time on that trip?

03:31 24   A.    Yes, I enjoyed it.

03:32 25   Q.    How many grandkids were with you?

**BARBARA EARNEST - CROSS**

03:32  1    **A.**    One -- two at the time.

03:32  2    **Q.**    Is Gabriel the baby?

03:32  3    **A.**    At that time he was.

03:32  4    **Q.**    Who is the youngest now?

03:32  5    **A.**    Jase.

03:32  6    **Q.**    Jase.  Okay.  So you have had two grandbabies born since

03:32  7    your treatment, right?

03:32  8    **A.**    Yes.  So they have never seen Maw-Maw with hair.

03:32  9    **Q.**    I think this is from the same day that we saw another

03:32 10    picture that had your grandchildren.  This is a family photo of

03:32 11    your husband, and you are with your boys, right?

03:32 12    **A.**    Yes.

03:32 13    **Q.**    This is marked March of 2018.  Does that sound correct to

03:32 14    you?

03:32 15    **A.**    Yes, yes.

03:32 16    **Q.**    All right, ma'am.  Take a look at this photo from July of

03:33 17    2018.  Who are you with in this picture?

03:33 18    **A.**    My grandson and his cousin.

03:33 19    **Q.**    That's Caleb?

03:33 20    **A.**    No, that's Gabriel.

03:33 21    **Q.**    Oh, okay.

03:33 22    **A.**    And his cousin Levi on his mother's side.

03:33 23    **Q.**    Where were you at in that picture?

03:33 24    **A.**    Where were we?

03:33 25    **Q.**    Yes, ma'am.

## BARBARA EARNEST - CROSS

03:33 1 **A.**   At a SeaWorld.  It was for dolphins and fish, and she

03:33 2 wanted to bring him there, and she asked me to help her with

03:33 3 the kids.

03:33 4 **Q.**   Okay.  Mrs. Earnest, thank you.  Just a couple more

03:33 5 questions.

03:33 6       You told us that you have been married -- I believe

03:33 7 you said 48 years.  47?

03:33 8 **A.**   No.  47.  He said 46.  47.

03:34 9 **Q.**   47 years.  Congratulations.

03:34 10 **A.**   Thank you.

03:34 11 **Q.**   I know that's not easy.  But you have a beautiful, happy

03:34 12 marriage?

03:34 13 **A.**   I do.  I do.

03:34 14 **Q.**   You are married to a loving man?

03:34 15 **A.**   Yes.

03:34 16 **Q.**   He still loves you very much today?

03:34 17 **A.**   Yes.

03:34 18 **Q.**   You have four beautiful, healthy grandchildren?

03:34 19 **A.**   Yes.

03:34 20 **Q.**   That you get the pleasure of spending time with, right?

03:34 21 **A.**   Yes, I do.

03:34 22 **Q.**   I know that you babysit -- I think you said every week.

03:34 23 Right?

03:34 24 **A.**   Not these two weeks.

03:34 25 **Q.**   For sure.  You would rather be there with them than with

BARBARA EARNEST - CROSS

03:34 1   us, I'm sure.  Right?

03:34 2   A.   Yes, I would.

03:34 3   Q.   Being with them is not a sacrifice; it's something you

03:34 4   enjoy.  Right?

03:34 5   A.   Yes, I do.

03:35 6   Q.   I know you still do some fun things with your family.  And

03:35 7   I think your brother -- you told us sometimes you and he would

03:35 8   go to the casino every now and then?

03:35 9   A.   Yes.

03:35 10  Q.   You go to eat and maybe you spend $20 gambling or

03:35 11  something like that?

03:35 12  A.   Sometimes, not all the time.

03:35 13  Q.   Okay.

03:35 14  A.   One time we went, and we were all laughing because we were

03:35 15  leaving and the sun was still out.

03:35 16  Q.   Ma'am, you have been cancer free for eight years, right?

03:35 17  A.   Yes.

03:35 18  Q.   Every day of that eight years has been a gift, right?

03:35 19  A.   Yes.

03:35 20  Q.   Thank you very, very much for your time, Mrs. Earnest.

03:35 21  A.   Thank you.

03:35 22       MS. SASTRE:  I pass the witness, Your Honor.

03:35 23       THE COURT:  Mr. Schanker.

03:35 24       MR. SCHANKER:  Thank you, Your Honor.

25

1876

BARBARA EARNEST - REDIRECT

REDIRECT EXAMINATION

BY MR. SCHANKER:

03:35 1
03:35 2

**Q.**   Good afternoon, again, Barbara.  Let's address this photograph issue.  Can we, first?

03:36 3
03:36 4

**A.**   Yes.

03:36 5

**Q.**   Do you keep all your photos in a certain place?

03:36 6

**A.**   I used to but not anymore.  When I lost them all in Katrina, I just use a shoebox now.

03:36 7
03:36 8

**Q.**   Did you give all those photos to us in this case?

03:36 9

**A.**   Yes, I did.

03:36 10

**Q.**   Barbara, are there mystery photos out there of you with a full head of hair that this jury should see?

03:36 11
03:36 12

**A.**   Not that I know of.

03:36 13

**Q.**   Did your hair ever grow back and fall out again, Barbara?

03:36 14

**A.**   No.

03:36 15

**Q.**   I want to talk to you a little bit about the pink cancer book.  Remember, you were asked about this?

03:36 16
03:37 17

**A.**   Yes.

03:37 18

**Q.**   You were shown some parts of this book.  I want to show, make sure that you and the jury see some other parts of this book.  Is that okay?

03:37 19
03:37 20
03:37 21

**A.**   Yes.

03:37 22

**Q.**   First of all, can you see how many pages there are in this book, just so we get an idea?  It looks like 242 pages plus worksheets.  Do you see that?

03:37 23
03:37 24
03:37 25

**BARBARA EARNEST - REDIRECT**

03:37  1   **A.**    Yes.

03:37  2   **Q.**    The part you were shown was on page 195.  Can you turn to

03:38  3   page 195?  Tell me when you have it there.

03:38  4   **A.**    I have it.

03:38  5   **Q.**    Can you see at the top of page 194 -- I'll put that up

03:38  6   here.  Page 195 is the part you were shown.  Did you ever look

03:38  7   at page 195 of this book?

03:38  8   **A.**    No.

03:38  9   **Q.**    Page 194, what does it say at the top of that, at the very

03:38 10   top there?

03:38 11   **A.**    "Appendix B."

03:38 12   **Q.**    Say that again.

03:38 13   **A.**    "Appendix B."

03:38 14   **Q.**    Okay.  Did you look at the appendix to this book?

03:38 15   **A.**    No.

03:38 16   **Q.**    Can you see -- what is the title there under the

03:38 17   Appendix B?  What's that section?  Can you see this --

03:38 18   **A.**    "Chemotherapy Drugs."

03:38 19   **Q.**    You never looked at that part of the appendix?

03:38 20   **A.**    No.

03:39 21   **Q.**    Did you ever look at Chapter 10 of this book?

03:39 22   **A.**    No.

03:39 23   **Q.**    So you didn't look at the section on hair loss and the

03:39 24   temporary hair loss, in this book?

03:39 25            If you look on page -- take a look at page 84, and I

**BARBARA EARNEST - REDIRECT**

03:39  1    will show it to you and see if it's something you looked at or

03:39  2    not.

03:39  3              THE COURT:  Mr. Schanker, I want to caution you about

03:39  4    leading.

03:39  5              MR. SCHANKER:  Yes.

03:39  6              I'm sorry, Your Honor.  I'm just trying to move

03:39  7    this along.

03:39  8              THE COURT:  I understand.

03:39  9    BY MR. SCHANKER:

03:39 10    Q.   Do you see this section on hair loss?

03:39 11    A.   Yes.

03:39 12    Q.   Let me find it here.

03:40 13              I'm going to do this.  I'm going to ask Ms. Perez if

03:40 14    you could find it so --

03:40 15              While she is doing that, I will shift gears, and

03:40 16    we'll come back to the cancer book.

03:40 17              Ms. Sastre asked you whether your number one goal was

03:40 18    to live cancer-free.  Do you remember that line of questioning?

03:40 19    A.   Yes.

03:40 20    Q.   I would like to give you a chance to explain, if you like.

03:40 21    Are you free from the side effects of your cancer treatment at

03:40 22    this time?

03:40 23    A.   Am I free from the side effects?

03:40 24    Q.   Yes?

03:40 25    A.   No, because one of my side effects is losing my hair, and

BARBARA EARNEST - REDIRECT

03:40  1    I still have that.

03:41  2    Q.   Do you believe that you look cancer-free?

03:41  3    A.   No, I don't look cancer-free.  I am cancer-free.

03:41  4    Q.   I want to go back to our pink cancer book.

03:41  5             Thank you.

03:41  6             Did you read this section of this pink cancer book on

03:41  7    page 84 under Hair Loss?  "Chemotherapy for breast cancer

03:41  8    produces temporary alopecia"?

03:41  9    A.   I honestly don't remember.

03:41 10    Q.   Did you read this section on hair loss?  "Hair loss is

03:41 11    sometimes more difficult to face than the loss of all or part

03:41 12    of a breast"?

03:41 13    A.   I don't remember the pages that I was told to read.

03:41 14    Q.   Did you read this part, that "Some people may try to offer

03:41 15    consolation and support by pointing out how insignificant hair

03:42 16    loss is compared to battling a life-threatening disease, but

03:42 17    most can say this because they have never lost their hair"?

03:42 18             Did you read that section, do you recall?

03:42 19    A.   No.

03:42 20    Q.   Is that the way you feel?

03:42 21    A.   That's the way I feel, but I can't say I read that.

03:42 22    Q.   Do you know where this -- who produced this cancer book?

03:42 23    Who put this together?

03:42 24    A.   Who wrote the book?

03:42 25    Q.   Yeah.

## BARBARA EARNEST - REDIRECT

03:42  1   **A.**   I heard it in court who wrote it.

03:42  2   **Q.**   What's it say on the title there?

03:42  3   **A.**   Judy Kneece, R.N.

03:42  4   **Q.**   Do you see anywhere on that title that Sanofi had anything

03:42  5   to do with that book?

03:42  6   **A.**   No.

03:43  7   **Q.**   Do you remember the questions you were asked about

03:43  8   Dr. Carinder and the one prior patient?

03:43  9   **A.**   Yes.

03:43 10   **Q.**   Ms. Sastre asked you some questions concerning that?

03:43 11   **A.**   Yes.

03:43 12   **Q.**   Did you expect Sanofi to give Dr. Carinder all the

03:43 13   information they had so that he could pass it on to you?

03:43 14   **A.**   Yes.

03:43 15   **Q.**   Do you wish that had happened in this case?

03:43 16   **A.**   Yes.

03:43 17            **MS. SASTRE:**   It's beyond the scope.

03:43 18            **THE COURT:**   Overruled.

03:43 19   BY MR. SCHANKER:

03:43 20   **Q.**   Ms. Sastre asked you questions about cancer drugs with

03:43 21   some real serious side effects and risks.  Do you remember

03:43 22   those questions?

03:43 23   **A.**   Yes.

03:44 24   **Q.**   Paralysis and death, those sorts of things?

03:44 25   **A.**   Yes.

**BARBARA EARNEST - REDIRECT**

03:44 1    **Q.**   If Dr. Carinder had two different drugs available to him,
03:44 2    two cancer drugs, and one of them had the risk of death and the
03:44 3    other one did not, is that information that you wished that he
03:44 4    would pass on to you?
03:44 5    **A.**   Yes.
03:44 6    **Q.**   And if Dr. Carinder had two different cancer drugs and one
03:44 7    had the risk of permanent hair loss as a common risk and the
03:44 8    other did not, is that information that you would want
03:44 9    Dr. Carinder to pass on to you?
03:44 10   **A.**   Yes.
03:44 11   **Q.**   Ms. Sastre spent a lot of time asking you questions about
03:44 12   that conversation you had in the room with Dr. Carinder and
03:44 13   your treatment.
03:44 14          What discussion do you wish that Dr. Carinder had
03:45 15   with you in that room that you didn't have?
03:45 16   **A.**   That he would have told me that my hair was not going to
03:45 17   come back.  That's something I really would want to know.
03:45 18   **Q.**   Ms. Sastre talked a lot about treatment goals.  Do you
03:45 19   remember, it was earlier, before lunch, treatment goals.  Do
03:45 20   you recall that?
03:45 21   **A.**   Refresh me.
03:45 22   **Q.**   I'll do that.  Your goals with treatment, your primary
03:45 23   goal is --
03:45 24   **A.**   Is to live.
03:45 25   **Q.**   To live, to beat cancer.

BARBARA EARNEST - REDIRECT

03:45  1    **A.**   Yes, yes.

03:45  2    **Q.**   If one drug allows you to meet that treatment goal to live

03:45  3    to beat cancer and have your hair, and another one allows you

03:45  4    to live and beat cancer, but you lose your hair forever, which

03:45  5    of those two drugs would you choose?

03:45  6    **A.**   The first one.

03:46  7    **Q.**   Have you heard evidence in this courtroom about what the

03:46  8    defendant knew about permanent hair loss?

03:46  9            **MS. SASTRE:**  Objection.

03:46 10            **THE COURT:**  Sustained.

03:46 11   **BY MR. SCHANKER:**

03:46 12   **Q.**   What do you wish Dr. Carinder would have been told in this

03:46 13   case?

03:46 14            **MS. SASTRE:**  Objection.

03:46 15            **THE COURT:**  Sustained.

03:46 16            **MR. SCHANKER:**  No further questions, Your Honor.

03:46 17   Thank you.  Thank you for testifying here today.

03:46 18            **THE COURT:**  Thank you.  You can step down,

03:46 19   Mrs. Earnest.

03:46 20            Please call your next witness.

03:46 21            **MR. SCHANKER:**  Yes, Your Honor.  Concerning what we

03:46 22   talked about, should we just approach briefly?

03:46 23            **THE COURT:**  Yes.  Wait.  I need somebody from the

03:47 24   defense.  Ms. Sastre.

03:47 25            **MS. SASTRE:**  Yes.  I'm just getting the right papers,

03:47  1    Your Honor.
03:47  2            THE COURT:  Thank you.
03:47  3            (The following proceedings were held at the bench.)
03:47  4            MS. SASTRE:  Sorry about that.
03:47  5            MR. SCHANKER:  So, Your Honor, as the Court
03:47  6    indicated, we would just like to read into the record a portion
03:47  7    of Dr. Bianchini's deposition to give context to the document
03:47  8    that Barbara Earnest was impeached with.
03:47  9            MS. SASTRE:  Yes, ma'am.  My colleague is bringing me
03:47 10    the full deposition.  I have excerpts up here.
03:48 11            THE COURT:  Okay.  Thank you.
03:48 12            MS. SASTRE:  Okay.  Thank you.
03:48 13            Okay, Your Honor.  All set.
03:48 14            You want to know what I want to read?
03:48 15            THE COURT:  Uh-huh.
03:48 16            MS. SASTRE:  Okay.
03:48 17            THE COURT:  That's all I want to know.
03:48 18            MS. SASTRE:  Can you tell me what you want to read?
03:48 19            THE COURT:  What I said he could.  I'm not allowing
03:48 20    him to read anything more than that.
03:48 21            MS. SASTRE:  Okay.  So I believe Your Honor said
03:48 22    page 128, lines 10 through 20; is that correct?
03:48 23            THE COURT:  Uh-huh.
03:48 24            MS. SASTRE:  The only other thing I might say,
03:48 25    Your Honor, is 130, but --

03:48  1           **MR. SCHANKER:**  Let me look at that.

03:49  2           **MS. SASTRE:**  Yeah, it would be the first Q&A.  I

03:49  3  think all that puts it in context, Your Honor.

03:49  4           **THE COURT:**  Okay.  This is what I propose we do, is

03:49  5  that the plaintiffs say, "In light of some of the testimony, we

03:49  6  wish to present limited excerpts from Dr. Bianchini's

03:49  7  deposition."

03:49  8           **MS. SASTRE:**  Okay.

03:49  9           **THE COURT:**  And what I think we should do is get

03:49 10  somebody up here to be Dr. Bianchini, and you get to ask your

03:49 11  question and you get to ask your question.

03:49 12           **MS. SASTRE:**  Now, there's no question here; we are

03:49 13  just reading.

03:49 14           **THE COURT:**  Oh, okay.

03:49 15           **MS. SASTRE:**  That's going to be the issue.

03:49 16           **THE COURT:**  So then you get to read your portion and

03:49 17  then you read your portion.

03:49 18           **MS. SASTRE:**  Sure.

03:49 19           **THE COURT:**  And I think that's how we present it.

03:49 20           **MS. SASTRE:**  That's fine, Your Honor.

03:49 21           So which part are you going to -- you're going

03:49 22  to read which part?  That's what I'm confused by.  Oh, you're

03:49 23  just reading 10 through 20.

03:49 24           **THE COURT:**  That's what I told them they could read.

03:50 25           **MS. SASTRE:**  All right.  Thank you, Your Honor.

03:50  1          **THE COURT:**  Okay.  And so we will do it that way and
03:50  2  I will let you read it, then you can do whatever else you want
03:50  3  to do.
03:50  4          **MR. SCHANKER:**  Thank you.
03:50  5          **THE COURT:**  Charged to nobody.
03:50  6          (End of bench conference.)
03:50  7          **THE COURT:**  Please proceed.
03:50  8          **MR. SCHANKER:**  Your Honor, in light of the testimony,
03:50  9  we would just like to read a portion of Dr. Bianchini's sworn
03:50 10  deposition to the jury, please.
03:50 11          **THE COURT:**  Okay.
03:50 12          **MR. SCHANKER:**  "She was under the understanding that
03:50 13  her hair would likely come back, but it would be different,
03:50 14  grayer, curlier, thinner, something, but that it would come
03:50 15  back.  And that somewhere along -- and then she began worrying
03:50 16  because it wasn't coming back, but she had these other things
03:50 17  that she was -- first of all, I guess she was still hanging on
03:51 18  to hope that she was just slower than most people and maybe the
03:51 19  Arimidex was contributing to that process.  And that -- that's
03:51 20  my understanding."
03:51 21          **THE COURT:**  Thank you.
03:51 22              Ms. Sastre.
03:51 23          **MS. SASTRE:**  Thank you, Your Honor.  May I read from
03:51 24  here?  Is that okay?
03:51 25          **THE COURT:**  That's fine.

03:51 1     **MS. SASTRE:**  Thank you, Judge.

03:51 2              "Did you ask her why -- even if she thought it

03:51 3     was the Arimidex, why she wasn't complaining or seeking

03:51 4     treatment for hair loss?

03:51 5              "So my understanding was that she just -- she

03:51 6     was attributing it to that medicine and the fact that she was,

03:51 7     you know -- you know, maybe -- that maybe it would still come

03:51 8     back and that she -- you know -- and that she, you know,

03:51 9     thought that that's -- was the explanation, and so I -- I guess

03:51 10    didn't think that -- that it -- that treatment for hair loss

03:51 11    was warranted."

03:52 12             **THE COURT:**  Mr. Coffin.

03:52 13             **MR. COFFIN:**  Your Honor, the plaintiffs will rest

03:52 14    their case.  One caveat, we just want to make sure that the

03:52 15    exhibits are all straight.  We will do that with your clerk.

03:52 16             Plaintiffs rest at this time, Your Honor.

03:52 17             **THE COURT:**  Members of the jury, you have just heard

03:52 18    and seen all of the evidence that the plaintiffs have offered

03:52 19    in their case in chief.  After recess the defendant may put on

03:52 20    any evidence that they wish to present.

03:52 21             I again clearly admonish you not to discuss the

03:52 22    case amongst yourselves or with anyone else.  You must wait

03:52 23    until you have heard all of the evidence, listened to argument

03:52 24    of counsel, and the instructions by the Court before you begin

03:52 25    your deliberations.

03:52  1            Because there are issues, I have business that I

03:52  2  must deal with with counsel.  We are going to recess early

03:52  3  today until 8:30 tomorrow.

03:52  4            Court is at recess until 8:30 tomorrow.  Please

03:53  5  leave your tablets on the chairs.  Thank you.

03:53  6            (The jury exited the courtroom.)

03:53  7       THE COURT:  Please have a seat.

03:53  8            Any motions the defendants wish to raise?

03:54  9       MR. MOORE:  Your Honor, the defendant, pursuant to

03:54 10  Rule 50 of the Federal Rules of Civil Procedure, moves for a

03:54 11  directed verdict on the grounds that no reasonable jury would

03:54 12  have a legally sufficient evidentiary basis to find for the

03:54 13  plaintiff in this case.

03:54 14            My colleagues are filing a written Rule 50

03:54 15  motion so that the complete grounds with record citations are

03:54 16  memorialized in the record.

03:54 17            We are filing a Rule 50(a) motion that addresses

03:54 18  the evidence that was presented to the jury.  Then we are

03:54 19  filing our separate motion that I mentioned yesterday for

03:54 20  judgment as a matter of law on the issue of preemption.  I can

03:54 21  speak briefly to both of those today with the understanding

03:54 22  that the full motions are being filed, perhaps as I speak.

03:54 23       THE COURT:  Okay.

03:55 24       MR. MOORE:  We have moved for summary judgment under

03:55 25  Rule 50(a) on four separate grounds:  First, we believe that

03:55 1    the plaintiff has failed to elicit sufficient information to
03:55 2    establish a case of liability under the LPLA for unreasonably
03:55 3    dangerous by virtue of an inadequate warning.
03:55 4              We have also believed that the testimony that
03:55 5    was heard today does not carry the plaintiff's burden of
03:55 6    proving that she lacked constructive or actual knowledge of her
03:55 7    claim.
03:55 8              We also believe that the evidence adduced at
03:55 9    trial is insufficient to raise a jury issue on the issues of
03:55 10   general causation and specific causation.
03:55 11             As it relates to the issue of failure to warn,
03:55 12   under the LPLA there is no duty for a manufacturer to warn of
03:56 13   an adverse event that the user of the product either knows
03:56 14   about or reasonably should know about.  We believe that the
03:56 15   testimony in this case establishes that Dr. Carinder knew from
03:56 16   his own experience and knew from the literature that he read,
03:56 17   that he testified from that witness stand about, that there was
03:56 18   rare cases of permanent alopecia reported as to be associated
03:56 19   with the use of Taxotere.
03:56 20             So we think as a principal matter that they have
03:56 21   to establish, before we have an obligation to even warn about
03:56 22   it, that it's an adverse event that the user of the product is
03:56 23   unaware of.  We believe that that evidence is lacking in this
03:56 24   case.
03:56 25             We also believe that Your Honor -- and step back

03:56  1    for a second.  We disagree, as we have said, with the way
03:56  2    Your Honor has interpreted "learned intermediary" and set out
03:56  3    the framework for learned intermediary in this case.  However,
03:56  4    Your Honor was not unclear about what had to be proved in order
03:57  5    to make out a failure-to-warn claim in the context of this
03:57  6    case, with what happened in that room with this doctor and with
03:57  7    that patient.
03:57  8             This is not a case of risk versus no risk.  The
03:57  9    evidence that the jury heard in this case was about the
03:57 10    potential for an increased risk.  The question that was asked
03:57 11    of the plaintiff this morning -- I'm reading from the rough
03:57 12    transcript on page 70, line 11:
03:57 13        "QUESTION:  And if Dr. Carinder had given you another
03:57 14        option that did not cause permanent hair loss, what would
03:57 15        you have done?
03:57 16        "ANSWER:  I would have taken it.
03:57 17        "QUESTION:  Barbara, you have heard testimony in this
03:57 18        case" --
03:57 19             Well, strike that.  That's the next thing I will
03:57 20    talk about.
03:57 21             So just as to the question that they posed on
03:57 22    warnings causation in the context of the way Your Honor framed
03:58 23    it -- and you said -- I thought pretty clearly in your summary
03:58 24    judgment ruling:  The jury will have to hear testimony at trial
03:58 25    and decide whether Earnest would have chosen paclitaxel despite

03:58 1    the neuropathy, or whether she would have still chosen

03:58 2    paclitaxel [sic], knowing of its risk of permanent alopecia."

03:58 3              So that hypothetical, balancing the risk between

03:58 4    these two medicines, which Your Honor articulated in the motion

03:58 5    for summary judgment denial, was not a question that they

03:58 6    elicited from Mrs. Earnest.

03:58 7              And when we asked the questions -- and I wrote

03:58 8    down her answers -- her question [sic] was:  "I can't answer

03:58 9    that.  I don't know what I would have done."

03:58 10             Under the framework that this Court has laid

03:58 11   out, they had to ask the right questions, and she had to say

03:58 12   that she would have accepted the risk with these other

03:58 13   treatments to avoid the risk of hair loss.  And she did not say

03:58 14   that.

03:58 15             And, Your Honor, a step further from that is

03:59 16   that the decision tree process as described by Dr. Carinder,

03:59 17   they have to live within the confines of what Dr. Carinder

03:59 18   would have done, how he would have consulted this patient, and

03:59 19   how this patient's decision-making would have been altered.

03:59 20             And what we heard Dr. Carinder say is that his

03:59 21   choice, coming in the room, his recommendation, would have

03:59 22   still been AC followed by Taxotere.  Had he known of -- cases

03:59 23   of alopecia had been reported or known of some increased risk

03:59 24   of permanent alopecia, he would have told her.

03:59 25             Then the question was:

03:59  1              "And if she would have said, 'What else do you

03:59  2     have,' what would you say?"

03:59  3              "I would have told her Taxol, but I would have

03:59  4     said there's an increased risk of neuropathy, and just not

03:59  5     neuropathy, but daunting neuropathy."

03:59  6              "Well, what if she wants to avoid the

03:59  7     neuropathy?  What would you have said then?"

03:59  8              "Well, then I would have told her FAC or FEC,

03:59  9     but I would have told her that there's a less chance of

03:59 10     survival with those."

03:59 11              So the question that needed to be presented to

04:00 12     Barbara Earnest is:  Of the three choices that Dr. Carinder

04:00 13     talked about -- potential increased risk of hair loss,

04:00 14     increased risk of daunting neuropathy, or increased risk of

04:00 15     recurrence -- you would have taken Taxotere?

04:00 16              Those questions have not been asked and this

04:00 17     record is devoid of that evidence.  And so for that reason,

04:00 18     Judge, we think that warning's causation is deficient.

04:00 19              We also believe that there has not been an

04:00 20     establishment of an increased risk in this case that has been

04:00 21     quantified to a point where Dr. Carinder has testified it would

04:00 22     have changed his prescribing decision.  So for those reasons,

04:00 23     we think that there is an immaterial -- that the evidence is

04:00 24     insufficient -- legally insufficient for the jury to find in

04:01 25     the plaintiff's favor.

04:01 1          We also believe that the evidence adduced today

04:01 2    and yesterday concerning Mrs. Earnest's knowledge of the

04:01 3    association between her use of chemotherapy and this product is

04:01 4    insufficient for the plaintiffs to carry their burden of

04:01 5    proving that she did not know of the connection between the

04:01 6    two.

04:01 7          There was no testimony today other than the fact

04:01 8    that she had a conversation with her doctor and that she just

04:01 9    always thought it would grow back.  We don't think that there's

04:01 10   a legally sufficient evidentiary basis for a jury to conclude

04:01 11   that she nonetheless lacked knowledge.  She knew -- she said

04:01 12   multiple times, "Nobody ever told me this was going to happen.

04:01 13   Nobody ever told me my hair might not grow back."

04:01 14          And she further testified that it didn't grow

04:01 15   back, and she further testified that she knew it was because of

04:01 16   chemotherapy.  And we think under those reasons, her claim is

04:01 17   time barred.

04:02 18          On general causation, Your Honor, we believe

04:02 19   that the evidence is legally insufficient to establish a

04:02 20   statistically significant increased risk associated with the

04:02 21   use of Taxotere and other chemotherapy agents.

04:02 22          And we heard evidence in this case:  We heard it

04:02 23   from Dr. Madigan; we heard case counting from Dr. Feigal; we

04:02 24   heard the piling on of individual case reports.  But the entire

04:02 25   statistical analysis in this case hinged on whether or not 29

cases of ongoing alopecia is actually 29 cases of ongoing alopecia.  And even in that study, the TAX 316 study, it's not statistically significant in that study.  It's not until you combine them together.

But what Dr. Madigan said is if those 29 cases are 6, which is what Dr. Kessler admitted they were and what Dr. Madigan was forced to admit that they were, the whole house of cards comes tumbling down.

We also have no evidence of the biological mechanism in this case and, therefore, we think the general causation evidence is insufficient.

And then lastly, Your Honor, on specific causation, as I said before, this is not a case of no risk versus risk.  This is -- the way the case has been presented to the jury through the plaintiff's expert is that this rare side effect can and does happen with other chemotherapy agents. It's reported with Adriamycin; it's reported with cyclophosphamide; it's reported with multiple other chemotherapy regimens.

And we have no expert in this case who testified that if she would have taken Taxol, she would have a full head of hair.  We have no evidence in this case to conclude that the risk, the increased risk, whatever that is, because it's never been quantified before this jury, is what led to Barbara Earnest having permanent, chemotherapy-induced alopecia.

04:04  1          There is no -- where is the witness? where is
04:04  2  the doctor? where is the expert, that said had she taken Taxol,
04:04  3  she would have a full head of hair and that she wouldn't look
04:04  4  exactly like she looks today.  There's no evidence saying that
04:04  5  for FAC either, because Adriamycin and cyclophosphamide are the
04:04  6  two agents that caused her hair to fall out.
04:04  7          So for that reason, Judge, and for the reasons
04:04  8  stated in our papers, we do not believe that there's been a
04:04  9  sufficient evidence of specific causation in this case.
04:04 10          Another point to make, going back to learned
04:04 11  intermediary, is that Dr. Carinder did not read the label since
04:04 12  1999.  And in order for us to be liable for failing to make a
04:04 13  label change to include this information, the doctor has to
04:04 14  read it.  That is hornbook under the Louisiana products
04:05 15  liability law.
04:05 16          This whole case has been about what happened in
04:05 17  2006, and they put the chart with the big arrow, 2006.  That's
04:05 18  when the world changed.  Dr. Carinder did not read the label.
04:05 19  The label in 2010 could have said, "Hey, Dr. Carinder, don't
04:05 20  give this medicine to Barbara Earnest."  He would not know
04:05 21  because he never read it.  And for that reason, there's also a
04:05 22  break in the chain of warnings causation.
04:05 23          I will turn briefly, Your Honor, to the issue of
04:05 24  preemption.  We are in some ways, we think, in uncharted waters
04:05 25  as it relates to the issue of preemption as mandated by the

Supreme Court, one that has to be decided by Your Honor.  And

we have had lots of debates through motions in limine and in

chambers conferences about what the impact that is on the

evidence that should come before this jury, and we don't agree

with the plaintiffs and they don't agree with us --

**THE COURT:**  That's a shocker.

**MR. MOORE:**  Right.  Big surprise.

-- as to what -- how the evidence should change

and what should the jury see as it relates to the FDA for what

the jury has to decide.

But what we do know is that Your Honor has to

decide the issue of preemption.  We filed a motion for summary

judgment on this issue before the *Albrecht* decision, and the

way we presented the issue to Your Honor was whether or not

there was a material fact in dispute that could go to the jury.

And then *Albrecht* comes out and sort of changes the landscape,

makes it your issue.

And so the way we presented Your Honor the

motion, the way I think Your Honor considered it, is as one of

summary judgment and viewing the facts in the light most

favorable for the nonmoving party, which is what Rule 56 says

you're supposed to do.

We think now that the plaintiff's evidence is

in, we believe that we are entitled to judgment as a matter of

law on the issue of preemption, because what we now know as it

04:06  1   relates to the opinion of Dr. Kessler is that he believes we
04:07  2   should have clearly and prominently displayed on the Taxotere
04:07  3   label in 2006 and no later than 2009 a warning about permanent
04:07  4   alopecia.  Doesn't say whether it's a "Capital W" warning,
04:07  5   which we argued about before; sort of suggests it could be the
04:07  6   "Adverse Events" section.
04:07  7           But what he doesn't say is that adding a single
04:07  8   sentence to page 33 of the label that says "Cases of permanent
04:07  9   alopecia have been reported" is adequate.  And we think that
04:07 10   the clearly and prominently displayed warning is inconsistent
04:07 11   with the final agency action in 2015, where the FDA decided to
04:07 12   add a single sentence to page 33.
04:07 13           So as we state in our papers that are being
04:07 14   filed today, Your Honor, FDA labeling decisions, they are not a
04:07 15   nullity; they are decisions -- they are formal agency actions
04:07 16   that carry the force and effect of federal law; and when FDA
04:08 17   approves a label, it analyzes the evidence and data and that
04:08 18   process is part of its Congressionally delegated authority.
04:08 19           One of the issues Your Honor raised in denying
04:08 20   our motion for summary judgment on preemption was that -- I
04:08 21   believe Your Honor faulted Sanofi for not using the CBE process
04:08 22   in making a labeling change.
04:08 23           We know now today, from what Dr. Kessler says to
04:08 24   what he believes that labeling change should be, and we don't
04:08 25   think that there is a dispute in the evidence now.  We don't

04:08  1    think that there is a need for a separate evidentiary -- like a

04:08  2    Markman-type hearing.  We don't think that that's the case.

04:08  3            What we do think is that Your Honor needs to see

04:08  4    the full record of communications and exchange of information

04:08  5    with the agency, and that's something that we are putting

04:09  6    together with the papers.  Because the issue surrounds whether

04:09  7    or not there is new evidence that has not been shared with the

04:09  8    agency that would have supported some action by the defendant,

04:09  9    and we believe that the evidence that is submitted to

04:09  10   Your Honor will demonstrate that that is not the case and that

04:09  11   the agency decision that was made in 2015 is inconsistent with

04:09  12   what these jurors are being asked to do.

04:09  13           And so for that reason, Your Honor, and for the

04:09  14   reasons more fully stated in our papers, we would ask for

04:09  15   judgment as a matter of law on the issue of preemption.

04:09  16           **THE COURT:**  Thank you.

04:09  17           **MR. NOLEN:**  Rand Nolen, N-O-L-E-N, for the plaintiff.

04:09  18           And we would respectfully ask the Court to deny

04:09  19   the motion for judgment as a matter of law under Rule 50(a).

04:10  20   As the Fifth Circuit explained in *Ellis v. Weasler Engineering*,

04:10  21   258 F.3d 326, in 2001, the way that the Fifth Circuit treats a

04:10  22   motion for judgment as a matter of law is procedural and

04:10  23   applies federal law to that analysis.

04:10  24           And the burden on the party moving for a

04:10  25   directed verdict has a difficult burden of persuasion, because

04:10  1    the Court must view the evidence in the light most favorable to

04:10  2    the nonmovant and indulge all reasonable inferences in favor of

04:10  3    the nonmovant.  And that was specified in *Russell v. McKinney*

04:10  4    *Hospital Venture*, 235 F.3d 219 at page 222, and that's a

04:11  5    Fifth Circuit case from 2000.

04:11  6              In this particular case -- and we will file a

04:11  7    written response once we actually see the brief -- in this

04:11  8    particular case, there's conflicting evidence, which is

04:11  9    inappropriate for judgment as a matter of law.

04:11 10              And we know that to be true.  The Supreme Court,

04:11 11    in *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133 at 150,

04:11 12    in 2000, and in *Russell v. McKinney*, which I have just

04:11 13    previously cited to the Court, says that it is improper to

04:11 14    grant a motion for judgment as a matter of law when there is

04:11 15    conflicting evidence, and there is sufficient and conflicting

04:11 16    evidence in this case to clearly negate any argument that the

04:12 17    defendants are entitled to a directed verdict.

04:12 18              So I'm going to go through some of that

04:12 19    evidence, if the Court doesn't mind; and, again, we will file a

04:12 20    written response.

04:12 21              Failure to adequately warn.  The jury heard

04:12 22    testimony from Dr. Kessler, Dr. Freedman, and Dr. Kopreski

04:12 23    explaining that drug companies, including Sanofi, must monitor

04:12 24    for signals of adverse events and update product labeling when

04:12 25    a risk of an adverse event appears or changes.

04:12  1        Kessler was particularly strong on that issue.
04:12  2   He went through the regulatory requirements at some length and
04:12  3   explained that once it becomes apparent through whatever
04:12  4   means -- but he was specifically talking about two means; one
04:12  5   is the clinical trial data and the other through adverse
04:13  6   events -- once it becomes evident that there is an increased
04:13  7   risk or a difference in the severity, duration, or the type of
04:13  8   harm that is committed, the drug company has to immediately
04:13  9   move to change their label and there's nothing that precludes
04:13 10   them from doing that, according to the FDA.
04:13 11        In fact, although they may have to obtain FDA
04:13 12   preapproval in order to change their labeling related to such
04:13 13   things as indication or indications for use, for safety, when
04:13 14   it comes to safety, as soon as they become aware of a -- new
04:13 15   information or information obtained or gleaned through their
04:13 16   clinical trial data, they have to go in and make that labeling
04:13 17   change so that doctors can be warned.
04:13 18        For a warning to be adequate, Dr. Kessler
04:13 19   testified that Sanofi is required to disclose information
04:14 20   regarding severity and duration of adverse events.
04:14 21   Dr. Kessler, sales representative Ruth Avila, and Dr. Plunkett
04:14 22   testified that the label for Taxotere did not include a warning
04:14 23   for permanent hair loss prior to Ms. Earnest's chemotherapy
04:14 24   treatment with Taxotere.
04:14 25        Dr. Aussel, one of the video depositions,

testified that references to alopecia in the Taxotere label did not refer to permanent hair loss, and Dr. Kessler testified that a warning for alopecia is not an adequate warning for permanent hair loss.

Dr. Aussel testified that reference to "hair generally grows back" in the Taxotere label does not refer to permanent hair loss, and Dr. Kessler testified that a warning that hair generally grows back is not an adequate warning for permanent hair loss, because it is not direct and clear about the risk of permanent hair loss.

In fact, again, Kessler was particularly strong on that, that it wasn't a clear and direct warning about permanent hair loss, and we know from the testimony that has been elicited in this case and through the documents that Sanofi never moved for a changes being effected, they never submitted a CBE, in order to add a permanent hair loss warning.

Dr. Kessler testified that Sanofi was required to warn about the risk of permanent alopecia clearly and prominently in the label.  He testified that it was his opinion that Sanofi should have included a warning for permanent hair loss in the Taxotere label as 2006, and he based his opinion and findings that permanent hair loss is a clinically significant hazard and there was a reasonable evidence of a causal association between Taxotere and permanent hair loss from a regulatory standpoint.

04:15  1          And so as to the label for sure, we have
04:16  2   certainly met our burden of proof in this case.  Dr. Kessler
04:16  3   testified that a warning of permanent alopecia was necessary to
04:16  4   make sure that doctors and patients have that information so
04:16  5   that they can discuss whether to take the drug or not.
04:16  6          On general causation, Dr. Madigan testified that
04:16  7   to a reasonable degree of scientific probability, it is his
04:16  8   opinion that Taxotere causes permanent hair loss.  Madigan
04:16  9   based his opinion on his statistical analyses of Sanofi's
04:16 10   clinical trial data, Sanofi's pharmacovigilence database, and
04:16 11   FDA's FAERS analysis.
04:16 12          Specifically, Madigan found a statistically
04:16 13   significant increased risk of permanent alopecia between
04:16 14   Taxotere and 5-FU in a meta-analysis of TAX 316 and TAX 301.
04:16 15   Madigan also analyzed Sanofi's pharmacovigilence database, and
04:17 16   it revealed a significant increase of reports of permanent
04:17 17   alopecia starting in 2006.  In fact, we repeatedly showed the
04:17 18   chart showing how much of an increase there was.
04:17 19          Also, based on his analysis of FDA's FAERS
04:17 20   database, Madigan could detect no signal using an SEBGM
04:17 21   analysis for permanent hair loss for Adriamycin, Cytoxan, and
04:17 22   5-FU and Taxol.  So we have addressed every one of those.
04:17 23          Dr. Feigal came in and testified that in her
04:17 24   opinion, to a reasonable degree of scientific evidence,
04:17 25   Taxotere causes permanent hair loss.  Dr. Feigal reached this

04:17 1    opinion based on her evaluation of seven causation factors,

04:17 2    namely:  biological plausibility, consistency, temporality,

04:17 3    coherence, similarity, specificity, and dose-response.

04:17 4              Dr. Feigal evaluated these causation factors by

04:18 5    looking at Sanofi's clinical trials, the medical literature,

04:18 6    and Sanofi's pharmacovigilance database.

04:18 7              Dr. Tosti likewise testified that based on her

04:18 8    review of the medical literature and her experience as a

04:18 9    leading dermatologist in the science of alopecia, it was her

04:18 10   opinion to a reasonable degree of medical certainty that

04:18 11   Taxotere causes permanent hair loss.  In fact, Dr. Tosti has

04:18 12   published on that issue, and so her opinions are not simply for

04:18 13   litigation; they are actually published in the peer-review

04:18 14   medical literature.

04:18 15             On specific causation, Dr. Tosti testified that

04:18 16   to a reasonable degree of scientific certainty, it is her

04:18 17   opinion that Mrs. Earnest suffers from very severe and diffuse

04:18 18   alopecia caused by Taxotere.  Tosti reached this opinion by

04:18 19   performing a differential diagnosis, ruling out other hair loss

04:18 20   disorders, such as telogen effluvium, androgen effluvium, and

04:18 21   androgenetic alopecia, alopecia areata, and endocrine-induced

04:19 22   alopecia.

04:19 23             And Tosti further testified that Mrs. Earnest is

04:19 24   suffering from chemotherapy-induced permanent alopecia.  So

04:19 25   direct causation, we have sufficient evidence.

1    Dr. Carinder came in and testified as the
2 learned intermediary.  And he testified that he was not aware
3 that Taxotere caused permanent hair loss.  Ruth Avila had
4 testified that she never communicated that information to
5 Carinder.  Carinder testified he never recalled Avila
6 communicating that information; that no other Sanofi sales rep
7 ever communicated that information; that he did read the label
8 back when he began prescribing the drug, which I would submit
9 to the Court is very normal for clinicians, that they read the
10 label and any updates they receive from the company.  He also
11 reviewed the medical literature on a regular basis and tried to
12 remain up to date on every drug that he prescribed.
13    The question and answer was:  "At the time in
14 2011, did you warn Barbara that she could experience permanent
15 hair loss from using Taxotere before you prescribed it to her?"
16    His answer was clear and unequivocal:  "No."
17    "And why not?"
18    He said:  "Because we weren't aware of that."
19    Sanofi never warned Dr. Carinder that Taxotere
20 causes permanent hair loss, and, again, there's a question and
21 answer on that:
22    "And at the time you treated Barbara in 2011,
23 did the Taxotere label warn you about Taxotere risk of
24 permanent hair loss?"
25    "No."

04:20  1        Then:  "Doctor, I asked you about whether or not

04:20  2  you were warned of the risk of permanent hair loss with

04:20  3  Taxotere.  Following up on that at the time you treated Barbara

04:20  4  in 2011, at that time had Sanofi provided you with a warning by

04:20  5  any other avenue that Taxotere caused permanent hair loss?"

04:21  6        The answer was "No."

04:21  7        He went through a series of questions where he

04:21  8  was asked specifically:

04:21  9        Did he receive emails?

04:21 10        No.

04:21 11        Did he receive calls?

04:21 12        No.

04:21 13        Did he receive a sales rep?

04:21 14        No.

04:21 15        Did he receive any kind of letter, a "Dear

04:21 16  Doctor" letter?  Any kind of correspondence from Sanofi warning

04:21 17  of permanent hair loss?

04:21 18        The answer was no, no, no, no; and, in fact,

04:21 19  there was a demonstrative put up on the screen that chronicled

04:21 20  every time Dr. Carinder said "no" in that regard.

04:21 21        Barbara had other treatment options.  We heard

04:21 22  from Dr. Carinder that he had other treatment options

04:21 23  available.  And the thing that Sanofi wants to point to is that

04:21 24  this was his preferred regimen.  That's true.  That's what he

04:21 25  testified to.  But he had other treatment options, and had he

04:21  1   told Mrs. Earnest about the potential for permanent hair loss,
04:21  2   her testimony is that she would have asked about other
04:22  3   treatment options; he would have offered other treatment
04:22  4   options.
04:22  5           There's also his testimony.  Had he warned her
04:22  6   and she had expressed concern about the issue of permanent hair
04:22  7   loss?  So that information was available.
04:22  8           With regard to the issue that I think was just
04:22  9   raised on the statute of limitations, we heard from
04:22 10   Mrs. Earnest today that she was unaware that Taxotere had
04:22 11   caused her permanent hair loss and only became aware of that --
04:22 12   it was directly elicited on direct examination -- through
04:22 13   advertisements.  And she found out about this lawsuit,
04:22 14   referring to this litigation, and then realized that she had
04:22 15   hair loss that was probably -- or potentially, at least, caused
04:22 16   as a result of taking Taxotere because Taxotere was the only
04:22 17   one of the drugs that she has taken that actually results in
04:23 18   permanent hair loss, at least according to the evidence that's
04:23 19   been elicited to this point in the trial.
04:23 20           So we think, for all of those reasons,
04:23 21   Your Honor, that the motion for judgment as a matter of law --
04:23 22   or a directed verdict, using the old nomenclature -- is not
04:23 23   well-founded, is actually contrary to the evidence in this
04:23 24   case, and that the evidence in this case strongly supports the
04:23 25   plaintiff's case and that a reasonable jury can and will rule

04:23  1  in the favor of the plaintiff in this case.

04:23  2                    Thank you, Your Honor.

04:23  3          THE COURT:  Thank you.

04:23  4          MR. MURA:  Good afternoon, Your Honor.  Andre Mura

04:23  5  for the plaintiffs.

04:24  6          THE COURT:  As I appreciate it, everybody is filing

04:24  7  written briefs.  I'll let you say something, but let's kind of

04:24  8  keep it brief simply because I'm not going to do anything

04:24  9  today.

04:24 10          MR. MURA:  I'll make a suggestion, I can make it

04:24 11  briefer, which was that we don't believe that preemption is the

04:24 12  proper issue for directed verdict.  A directed verdict is -- it

04:24 13  concerns state law issues and which either party believes

04:24 14  should not go to the jury because the Court should decide it,

04:24 15  the evidence is so clear.

04:24 16                    Preemption is an issue of federal law, that the

04:24 17  Court has already decided that never goes to the jury and has

04:24 18  not been tried to the jury.  So we don't think this is the

04:24 19  appropriate procedural time to be making such a motion.

04:24 20                    The Court has already ruled that many of the

04:24 21  arguments that you heard right now were the arguments that

04:24 22  Sanofi wants to make about a post-2015 case.  This is a

04:24 23  pre-2015 case.  There was nothing in the label, there was no

04:24 24  warning about permanent hair loss.  I think that's

04:24 25  uncontroverted.  And *Albrecht* says that a defendant, to

04:25 1  establish preemption, must show that federal law or appropriate

04:25 2  federal actions prohibited any and all warnings.  And that's

04:25 3  not something that Sanofi can show in a pre-2015 case where the

04:25 4  label said nothing.  It cannot show that the FDA would have

04:25 5  prohibited any and all warnings.  It was quite obvious in 2015

04:25 6  the FDA approved a warning in the adverse reactions section.

04:25 7          When Dr. Kessler was asked, he said it would

04:25 8  have been appropriate in either section.  So that was his

04:25 9  testimony.  We don't believe his testimony has been fairly

04:25 10 characterized.  It's an attempt to, again, relitigate an issue

04:25 11 that's not properly before the Court at this time.

04:25 12         Thank you.

04:25 13     MR. MOORE:  I was not going to add another point.

04:25 14     THE COURT:  I will tell you, as I appreciate it, the

04:25 15 defendants have indicated that they have filed motions as a

04:25 16 matter of law.  And I have heard from the plaintiffs that they

04:26 17 would like the same opportunity to do so.

04:26 18         I will tell you that I'm going to defer on all

04:26 19 of those pending the trial of this matter.  Depending upon what

04:26 20 the jury does, if the Court feels like, after a careful review

04:26 21 of the motions, oral argument is warranted, I will invite you

04:26 22 back to do that.  But it's very difficult for me -- I was

04:26 23 listening, knowing that somewhere there is a document with

04:26 24 clear cites to the evidence that my guess is just more

04:26 25 detailed.  I think we just need to -- I'm going to defer on all

04:26  1    of that and deal with it at the conclusion of this trial, after

04:26  2    the jury's verdict.

04:26  3                 Now, you may talk.

04:26  4          MR. MOORE:  I was trying to hop on the housekeeping

04:27  5    issues as quickly as I could.

04:27  6          THE COURT:  Okay.

04:27  7          MR. MOORE:  Yes, our Rule 50 motions are being filed.

04:27  8    I think what they were waiting on were transcripts getting --

04:27  9          THE COURT:  I will tell you, Mr. Moore, I'm not

04:27 10    reading your Rule 50 motion tonight.

04:27 11          MR. MOORE:  I just want to make sure.

04:27 12          THE COURT:  In case you are wondering.

04:27 13          MR. MOORE:  Our side as caucused during the day and

04:27 14    considered the plaintiff's case in chief and has made the

04:27 15    decision.  We wanted to inform the Court and the other side

04:27 16    that we will be resting the defense case upon the completion of

04:27 17    Dr. Glaspy's testimony tomorrow.  Therefore, we do not think we

04:27 18    will need a full day tomorrow.  We can probably use the extra

04:27 19    time for the charge conference in the afternoon and then close

04:27 20    Thursday morning.

04:27 21          THE COURT:  Depending upon whether or not -- we will

04:28 22    cross that bridge when we get to it.

04:28 23                 Sam and I have been working to the extent that

04:28 24    we can through this jury charge, which has been a significant

04:28 25    undertaking because you agreed on virtually nothing.  And so

04:28  1    I'm trying diligently to have it prepared tomorrow.  I really

04:28  2    thought it was going to the jury on Friday.

04:28  3               Under any circumstance, you will have a rough

04:28  4    draft tomorrow as early as possible.

04:28  5               My belief is that if we finish tomorrow with the

04:28  6    testimony, that we would come back Thursday, give everybody an

04:28  7    opportunity to argue, instruct the jurors, and then send them

04:28  8    back for deliberation.

04:28  9               So, of course, it's really hard for me to

04:29 10    believe that we will be finished early tomorrow because that

04:29 11    has been an everyday occurrence, "We will be done by noon," and

04:29 12    we are fighting at 5:30.  But we will see how Dr. Glaspy goes

04:29 13    tomorrow.

04:29 14          MR. COFFIN:  Your Honor, just to be clear, the

04:29 15    current plan -- I understand the defendants intend to put

04:29 16    Dr. Glaspy on tomorrow.  Then would you like us to meet in the

04:29 17    afternoon to talk about the charges?  Is what I understood you

04:29 18    to say, the plan would be to do closings on Thursday morning?

04:29 19          THE COURT:  That's my intent, to do closings on

04:29 20    Thursday.

04:29 21          MR. COFFIN:  Are we going to have a discussion about

04:29 22    how long for closings?

04:29 23               We will have a discussion when we finish.  We

04:29 24    will do that at the charge conference.  Maybe we can do that

04:29 25    now.

04:29  1            We can go off the record, Toni.  I think we are
04:30  2    good.
04:30  3            (Proceedings adjourned.)
04:30  4                         * * *
       5                      <u>CERTIFICATE</u>
       6            I, Toni Doyle Tusa, CCR, FCRR, Official Court
       7    Reporter for the United States District Court, Eastern District
       8    of Louisiana, certify that the foregoing is a true and correct
       9    transcript, to the best of my ability and understanding, from
      10    the record of proceedings in the above-entitled matter.
      11
      12
      13                    <u>/s/ Toni Doyle Tusa</u>
                            Toni Doyle Tusa, CCR, FCRR
      14                    Official Court Reporter
      15
      16
      17
      18
      19
      20
      21
      22
      23
      24
      25