1                       UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

2

    ******************************************************************

3

IN RE:  TAXOTERE (DOCETAXEL)      Docket No. 16-MD-2740

4   PRODUCTS LIABILITY LITIGATION     Section H
                                New Orleans, LA

5   Relates to:  Barbara Earnest      Wednesday, September 25, 2019
             16-CV-17144

6

    ******************************************************************

7

                 TRANSCRIPT OF TRIAL PROCEEDINGS

8         HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
               UNITED STATES DISTRICT JUDGE

9                   DAY 8, MORNING SESSION

10

APPEARANCES:

11

FOR THE PLAINTIFF:           BACHUS & SCHANKER, LLC

12                      BY:  DARIN L. SCHANKER, ESQ.
                           J. KYLE BACHUS, ESQ.

13                      1899 Wynkoop St., Suite 700
                      Denver, CO 80202

14

                      FLEMING NOLEN & JEZ

15                      BY:  RAND P. NOLEN, ESQ.
                      2800 Post Oak Blvd., Suite 4000

16                      Houston, TX 77056

17                      GIBBS LAW GROUP, LLP
                      BY:  KAREN B. MENZIES, ESQ.

18                      6701 Center Drive West, 14th Floor
                      Los Angeles, CA 90045

19

                      DAVID F. MICELI, LLC

20                      BY:  DAVID F. MICELI, ESQ.
                      P.O. Box 2519

21                      Carrollton, GA 30112-0046

22                      PENDLEY BAUDIN & COFFIN
                      BY:  CHRISTOPHER L. COFFIN, ESQ.

23                      2505 Energy Centre
                      1100 Poydras St.

24                      New Orleans, LA 70163

25

```
 1                              BARRIOS KINGSDORF & CASTEIX
                                BY:  DAWN M. BARRIOS, ESQ.
 2                              701Poydras St., Suite 3650
                                New Orleans, LA 70139
 3
                                GAINSBURGH BENJAMIN DAVID
 4                              MEUNIER & WARSHAUER
                                BY:  M. PALMER LAMBERT, ESQ.
 5                              2800 Energy Centre
                                1100 Poydras St.
 6                              New Orleans, LA 70163

 7                              MORGAN & MORGAN
                                BY:  EMILY C. JEFFCOTT, ESQ.
 8                              700 S. Palafox St., Suite 95
                                Pensacola, FL 32502
 9

10   FOR THE DEFENDANT:         SHOOK HARDY & BACON
                                BY:  HILDY M. SASTRE, ESQ.
11                              201 Biscayne Blvd., Suite 3200
                                Miami, FL 33131
12
                                SHOOK HARDY & BACON
13                              BY:  JON A. STRONGMAN, ESQ.
                                     HARLEY V. RATLIFF, ESQ.
14                              2555 Grand Blvd.
                                Kansas City, MO 64108
15
                                IRWIN FRITCHIE URQUHART & MOORE
16                              BY:  DOUGLAS J. MOORE, ESQ.
                                400 Poydras St., Suite 2700
17                              New Orleans, LA 70130

18
     Official Court Reporter:   Karen A. Ibos, CCR, RPR, CRR, RMR
19                              500 Poydras Street, B-275
                                New Orleans, Louisiana 70130
20                              (504) 589-7776

21
        Proceedings recorded by mechanical stenography, transcript
22   produced by computer.

23

24

25
```

1                       I N D E X

2

3    WITNESSES FOR THE DEFENDANT:                PAGE/LINE:

4

5    VIDEO DEPOSITION OF MICHAEL S. KOPRESKI       1917/10

6

7    DR. JOHN GLASPY

8       Voir Dire Examination by Mr. Strongman    1966/5

9       Traverse Examination by Mr. Miceli        1977/22

10      Direct Examination by Mr. Strongman        1981/2

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

(WEDNESDAY, SEPTEMBER 25, 2019)

(MORNING SESSION)

09:00:18    4

09:00:18    5    (OPEN COURT.)

09:00:20    6        THE COURT:  I believe there are some things that the

09:00:22    7    parties want to put on the record now.

09:00:29    8        MR. COFFIN:  Yes, your Honor.  Good morning.  Chris

09:00:32    9    Coffin on behalf of the plaintiff.

09:00:35   10        This particular argument relates to the Court's order and

09:00:40   11    reasons in Document 6160, which was the plaintiff's motion to

09:00:46   12    exclude expert testimony that relies upon defendant's employee

09:00:51   13    Dr. Michael Kopreski.

09:00:54   14        In the Court's order and reasons allowing experts, the

09:01:00   15    defense experts to rely on Dr. Kopreski's testimony and analysis,

09:01:06   16    your Honor specifically stated that on page 5, "Here, defendants

09:01:13   17    explain that their experts conducted independent reviews of

09:01:17   18    Dr. Kopreski's work.  Dr. Arrowsmith, for example, examined patient

09:01:23   19    data for two TAX316 patients and reached the same conclusions as

09:01:29   20    Dr. Kopreski leading her to conclude his analysis was reliable."

09:01:33   21        In other words, your Honor, the Court has ruled that

09:01:37   22    Dr. Kopreski's analysis can be used to support experts' opinions if

09:01:43   23    those experts conducted independent reviews of Dr. Kopreski's work.

09:01:48   24        The only expert that the defense is bringing to this

09:01:54   25    trial, and that the jury will hear from, specifically testified

09:02:01  1  with regard to Dr. Kopreski's analysis in his deposition on page

09:02:07  2  122 of Dr. Glaspy's deposition, the question is: "Okay.  Did you

09:02:13  3  have a direct role in the review that was taken that's shown in

09:02:18  4  Figure A?"

09:02:20  5           Objection to the form.

09:02:21  6           And then the answer, "I did not have a role in forming

09:02:25  7  the table or writing the table, planning the table, or suggesting

09:02:31  8  that the table be made."  That's talking about Figure A in

09:02:37  9  Dr. Kopreski's reanalysis, which is at the heart of this issue.

09:02:41  10          In Dr. Glaspy's deposition on page 123, the question was

09:02:50  11  stated:  "QUESTION:  You cannot verify, then, that the material

09:02:54  12  contained in Figure A is accurate or complete?"

09:03:00  13          There was an objection.  And then:  "ANSWER:  I -- not

09:03:05  14  independently.  I -- I can only comment assuming these are the

09:03:10  15  data, this is my conclusion.  That's all I can do."

09:03:16  16          It's very clear that Dr. Glaspy, the defendant's expert,

09:03:21  17  who intends to rely on the Kopreski reanalysis and testimony, did

09:03:26  18  not independently review that analysis and had nothing to do with

09:03:31  19  putting together any of the tables as he testified.

09:03:34  20          In addition, your Honor, to be clear, the defendant's

09:03:39  21  witness, Dr. Kopreski, is an employee of Sanofi.  He is not an

09:03:43  22  expert.  He has not been qualified as an expert.  He did a post hoc

09:03:48  23  analysis of data that Sanofi's lawyers pulled and put in front of

09:03:53  24  him.  It is not an expert report.  It's not an expert opinion, and

09:03:57  25  certainly not an expert analysis.  Yet, this morning the defendants

09:04:02  1    will be playing the videotaped deposition of Dr. Kopreski

09:04:06  2    explaining his analysis, and that is highly prejudicial to the

09:04:13  3    defendant -- to the plaintiffs, excuse me.  It's highly prejudicial

09:04:17  4    to the plaintiffs because the defendants are allowed to present

09:04:19  5    testimony from a non-expert about a post hoc analysis, and they

09:04:25  6    will not have an expert who has independently reviewed and relied

09:04:29  7    on that information.

09:04:30  8           So we would ask that Dr. Kopreski's testimony be stricken

09:04:35  9    and not be allowed to be played for this jury, and that Dr. Glaspy

09:04:40  10   not be permitted in any way to rely on that analysis in his

09:04:44  11   opinions.  Thank you.

09:04:46  12          THE COURT:  Thank you.  Okay.  Are we ready to bring in

09:04:51  13   the jury?  Okay.  Please bring the jury in.

09:05:15  14          Did y'all want to respond?

09:05:17  15          MS. SASTRE:  I'm sorry?

09:05:18  16          THE COURT:  I thought -- the fevered conversation.

09:05:23  17          MR. STRONGMAN:  No, I think your Honor has already ruled

09:05:26  18   on this.  Just based on all of the reasons and arguments previously

09:05:30  19   made.  Sorry about that.

09:05:30  20          MS. SASTRE:  Sorry, your Honor.

09:05:53  21       (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

09:05:53  22          THE COURT:  All jurors are present.  Court's back in

09:05:53  23   session.  You may be seated.

09:05:55  24          Good morning.  I apologize that we're a little late

09:05:58  25   getting started today.  We're just -- the lawyers and I have been

09:06:02  1  working through various things that we must deal with.

09:06:06  2          And now I ask the defendants, are you prepared to call

09:06:09  3  your first witness?

09:06:10  4          MS. SASTRE:  Yes, your Honor.  We would call Dr. Kopreski

09:06:13  5  to play our portion of his examination.

09:06:16  6          THE COURT:  Okay.  Before we get started, members of the

09:06:19  7  jury, I advise you that Dr. Kopreski has neither been offered nor

09:06:25  8  accepted by the Court as an expert.

09:06:27  9          With that, please begin the deposition.

09:06:30 10      (WHEREUPON, THE VIDEO DEPOSITION OF DR. MICHAEL S. KOPRESKI

09:06:33 11      WAS PLAYED AS FOLLOWS:)

09:06:33 12  EXAMINATION:

09:06:44 13  Q.  State your name, please.

09:06:46 14  A.  My name is Michael Kopreski.

09:06:47 15  Q.  And you are board certified in internal medicine and oncology?

09:06:51 16  A.  Yes.  I -- I -- I was board certified in both internal medicine

09:06:55 17  and in oncology.

09:06:58 18  Q.  I've marked as deposition Exhibit No. 16 a copy of your

09:07:01 19  curriculum vitae.  You were employed in pharmacovigilance at Sanofi

09:07:08 20  for approximately 15 years?

09:07:10 21  A.  That's correct.  I -- I retired about a year ago.

09:07:16 22  Q.  All right.  Very good.

09:07:17 23  A.  In the -- in the end of 2017.

09:07:20 24  Q.  Okay.  And you are here today to play a particular role in

09:07:22 25  terms of reviewing reports and clinical data with an eye to reports

09:07:27 1  of alopecia in a time period of 2005 to 2011?

09:07:31 2  A.  That's correct.

09:07:32 3  Q.  Okay.  As an oncologist, let's talk briefly about alopecia and

09:07:40 4  how frequently it's seen with chemotherapy drugs, generally.

09:07:48 5  A.  Well, first off, chemotherapy during this time period employed

09:08:00 6  agents that were often not specific only to the -- to the cancer,

09:08:09 7  but to other normal tissue, and had a range of very common side

09:08:18 8  effects.  Alopecia was one of those frequently observed side

09:08:21 9  effects with chemotherapy.

09:08:23 10        THE COURT:  I'm sorry.  Can we stop this?

09:08:23 11     (WHEREUPON, VIDEO WAS PAUSED.)

09:08:30 12        MR. COFFIN:  Can we approach, your Honor?

09:08:31 13        THE COURT:  Yes.

10:06:07 14     (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

09:09:20 15        MR. MARKOFF:  The only agreement for close captioning is

09:09:20 16  for foreign witnesses; Dr. Aussel and the other foreign witness, I

09:09:20 17  forgot who it was now.  This is not a foreign witness.

09:09:20 18        MR. STRONGMAN:  I wasn't part of that conversation.

09:09:20 19        THE COURT:  Who was part of the conversation?

09:09:20 20        MR. MARKOFF:  It was Harley and myself.

09:09:20 21        MR. STRONGMAN:  We agreed not to put up closed

09:09:20 22  captioning?

09:09:20 23        MR. COFFIN:  That's correct.

09:09:20 24        MR. MARKOFF:  They didn't want it in our case either.

09:09:20 25        MR. STRONGMAN:  I'll see if he can take it down.

09:09:20 1          THE COURT:  Take it down.

09:09:20 2          MR. MARKOFF:  It's a switch.

09:09:20 3          THE COURT:  Okay.  Just take it down.

09:09:35 4      (OPEN COURT.)

09:09:35 5          THE COURT:  Okay.  Please proceed.

09:09:35 6      (WHEREUPON, THE VIDEO RESUMED PLAYING AS FOLLOWS:)

09:10:21 7   Q.  All right, Dr. Kopreski.  I want to shift gears and focus a

09:10:21 8   little bit on the time period of 2005 to 2011, and I want to spend

09:10:21 9   a little time talking about Taxotere and what kind of cancers

09:10:21 10  Taxotere was approved by the regulatory authorities to treat.  So

09:10:25 11  in this time period, what were the range of types of cancers that

09:12:33 12  Taxotere was authorized to treat?

09:12:33 13  A.  Well, before this time period in the United States, Taxotere

09:12:33 14  was approved for breast cancer and lung cancer.  But during this

09:12:33 15  time period, there was an increased use of Taxotere in other

09:12:33 16  indications.  And during this time period, indications such as

09:12:33 17  gastric cancer, prostate cancer, and head and neck cancer were, to

09:12:37 18  the best of my recollection, all received approval during this

09:12:37 19  period of time in the United States.

09:12:37 20  Q.  Okay.  And are you able to review Sanofi's documentation to

09:12:37 21  determine an estimate of the number of patients who would have been

09:12:37 22  treated for these various cancers by Taxotere in this time period

09:12:37 23  of 2005 to 2011?

09:12:37 24  A.  I did review estimates of marketing data from -- of

09:12:37 25  accumular -- from reports of PSURs.  I do have to caution that

09:12:37 1   these are estimates and rather indirect estimates in part because

09:12:37 2   of the -- they were not recording actual patient numbers, but they

09:12:37 3   were estimating the number of patients that would have been used

09:12:37 4   based on the amount of drug that was sold.  But they do provide

09:12:37 5   estimates that are provided to the regulatory authorities.

09:12:37 6   Q.  You may have said that number.  What is the estimate?

09:12:37 7   A.  The estimate during the time period of 2005 through 2011 that I

09:12:37 8   came up was over three million patients; approximately, 3.4 million

09:12:37 9   patients.

09:12:37 10  Q.  Okay.

09:12:37 11  A.  Okay.  So with that as an understanding, yes, I did review the

09:12:54 12  data of patients that were described as having alopecia that went

09:29:13 13  into the follow-up period, and was described as ongoing.

09:29:13 14  Q.  We're going to spend some more time on TAX316, but the first

09:29:13 15  thing I want to do, Doctor, is I want to have you described for the

09:29:13 16  jury what TAX316 meant in terms of clinical data of the efficacy of

09:29:13 17  Taxotere in treating women with node positive breast cancer.

09:29:13 18          And I am going to hand you what is Exhibit No. 21, which

09:29:13 19  is a study that was published in 2005, and that would be within

09:29:13 20  this time period, right?  2005?

09:29:13 21  A.  Correct.

09:29:13 22  Q.  Okay.  And I'm going to hand you Exhibit No. 21, and I will put

09:29:13 23  this on the ELMO, and I am going to ask a couple of quick questions

09:29:13 24  here, and then we can -- the *New England Journal of Medicine*, that

09:29:13 25  is a foremost peer-reviewed medical journal?

09:29:13 1   A.  Yes, I would consider it so.

09:29:13 2   Q.  And this is -- just tell the jury what this published study

09:29:13 3   represents as it relates to TAX316, and then we'll spend a little

09:29:13 4   time identifying some of the results of the study.

09:29:13 5   A.  Well, it appears this is a publication of the TAX316 55-month

09:29:13 6   data.  Now, that's important because -- one of the reasons why

09:29:13 7   TAX316 is important is that it was the basis of the approval of

09:29:13 8   Taxotere in combination with Adriamycin and cyclophosphamide for

09:29:13 9   the treatment of node positive women with breast cancer as adjuvant

09:29:13 10  treatment.  So this was basically a study that FDA used, and this

09:29:13 11  reflects of the data that the FDA would have used to approve

09:29:13 12  Taxotere for the treatment of adjuvant breast cancer.

09:29:13 13  Q.  And when this study speaks in terms -- and we'll talk of this

09:29:14 14  in more detail, but FAC and TAC, the TAC is a regimen that includes

09:29:14 15  Taxotere and the FAC is a regimen that does not?

09:29:14 16  A.  That is -- that is correct.  The study -- the study is

09:29:14 17  characterized by, first, being a very large study.  It's secondly

09:29:14 18  characterized by being a randomized study.  So that provides some

09:29:14 19  scientific power to evaluate the effect of Taxotere.

09:29:14 20          And by the randomization, it compared the TAC regimen to

09:29:14 21  commonly-used alternative regimen, which is the FAC.

09:29:14 22  Q.  Okay.  So, in particular, this statement here, which you can

09:29:14 23  look on the ELMO, "Treatment with TAC resulted in a 30 percent

09:29:14 24  reduction in the risk of death."  I think that's pretty obvious

09:29:14 25  what that means, but if you could just elaborate on that as a board

09:29:14  1    certified oncologist?

09:29:14  2    A.  Well, as a company representative, you know, I think it

09:29:14  3    indicates that there is substantial efficacy -- for this regimen,

09:29:14  4    when it is compared against the FAC regimen.  Now, note that both

09:29:14  5    of the arms have the Adriamycin and cyclophosphamide in there, so

09:29:14  6    the comparison, whether there is a difference between the Taxotere

09:29:14  7    and the fluorouracil, the comparison suggests that it's the

09:29:14  8    Taxotere which is predominantly making that difference, that

09:29:14  9    reduction in the risk of death that's being seen with this regimen,

09:29:14 10    the TAC regimen.

09:29:14 11    Q.  All right.  Is it also significant to you, Dr. Kopreski, the

09:29:14 12    statement here about quality of life scores decreased during

09:29:14 13    chemotherapy but returned to baseline levels after treatment?

09:29:14 14    A.  I take it as it reads; that they did a quality of life

09:29:14 15    assessment, and this was the finding that they found in the TAC

09:29:14 16    arm.

09:29:14 17    Q.  Okay.  And then the last sentence I want to ask you about is

09:29:14 18    the conclusion:  "Adjuvant chemotherapy with TAC, as opposed to

09:29:14 19    FAC, significantly improves the rates of disease-free and overall

09:29:14 20    survival among women with operable node positive breast cancer."

09:29:14 21          This study led to the approval of Taxotere for node

09:29:15 22    positive women with breast cancer?

09:29:15 23    A.  Yes.  If you could just give me a moment.  I agree with that

09:29:15 24    statement, but I also, particularly within that statement, I would

09:29:15 25    like you -- to draw your attention to page 2309 of the --

09:29:15 1   Q.  Okay.

09:29:15 2   A.  -- and I would like to draw your attention to the table on page

09:29:15 3   2309, which is a risk reduction of disease-free survival in

09:29:15 4   subgroups.  And you will see, if you look at the hormonal status,

09:29:15 5   whether the patient was hormone receptor-negative or hormone

09:29:15 6   receptor-positive.  They both had fairly similar risk reduction in

09:29:15 7   favor of the TAC.

09:29:15 8           So this is important because for women who have hormonal

09:29:15 9   receptor-positive status, which is roughly two-thirds of the women

09:29:15 10  with breast cancer, this Taxotere regimen provides them an option

09:29:15 11  that has a survival benefit.

09:29:15 12  Q.  Okay.  All right.  Very good.  All right.  I want to spend just

09:29:15 13  a little bit more time on the study design of TAX316, and then

09:29:15 14  we'll get in the particulars of some of the patients there.  But I

09:29:15 15  created this -- this rather crude graphic here, and the first thing

09:29:15 16  I want -- describe for the jury the information you requested with

09:29:15 17  respect to these TAX316 patients and why it was important to you.

09:29:15 18  A.  Well, in particular, since the focus of this -- of my testimony

09:29:15 19  has been regarding persistent alopecia, I thought it was important

09:29:15 20  to look at the -- the data of patients with ongoing alopecia in the

09:29:15 21  manner that my understanding was that persistent or permanent

09:29:15 22  alopecia was being defined, and that was patients who had alopecia

09:29:15 23  greater than six months duration after chemotherapy that did not

09:29:15 24  resolve.

09:29:15 25          Now, I -- I mentioned before, you know, this definition,

09:29:15 1   there is -- there was not a, you know, clear-set clinical

09:29:16 2   definition that we would say when we said persistent.  So in the

09:29:16 3   early reports, there might be some confusion as to when you say,

09:29:16 4   "persistent" or "ongoing" compared with the -- the definition I

09:29:16 5   just described of at least six months.

09:29:16 6   Q.  Okay.

09:29:16 7   A.  Okay?  So in view of that, and also in view that the analysis

09:29:16 8   described ongoing, which I previously talked about in the

09:29:16 9   definition of -- the meaning of "ongoing" to mean, you know,

09:29:16 10   alopecia was present, you know, when they died a month later, you

09:29:16 11   know.

09:29:16 12       So I review this data from a stricter standpoint in terms

09:29:16 13   of whether the criteria laid out of -- of at least six months

09:29:16 14   without resolution, six months after chemotherapy without

09:29:16 15   resolution was being fulfilled in these patients that were being

09:29:16 16   called "ongoing."

09:29:16 17   Q.  All right.  I've identified -- I know you've talked about some

09:29:16 18   of these already.  I want to just quickly go through some of the

09:29:16 19   features of TAX316, and I just want to just briefly have you

09:29:16 20   discuss some of the characteristics of this study being an

09:29:16 21   important part of its design.  So, the randomized aspect, just

09:29:16 22   briefly, what does that mean and why is that significant to the

09:29:16 23   study?

09:29:16 24   A.  Well, randomization is a way of trying to avoid and introduce

09:29:16 25   bias in -- in a study.  So if you're going to compare two treatment

09:29:16 1  groups, you could consciously or unconsciously skew the patients

09:29:16 2  that receive one treatment versus -- versus another.

09:29:16 3          Well, let's say, for example, you're doing a study at a

09:29:16 4  single institution, and you know who the patients are and what

09:29:16 5  treatment they're going to get.  You could, perhaps, put your

09:29:16 6  select patient so that the patient who has the worst prognosis will

09:29:16 7  get one treatment and the patient that has the best prognosis gets

09:29:16 8  another treatment.  That -- that introduces a bias in -- in terms

09:29:16 9  of interpreting not only the efficacy data, but also the safety

09:29:16 10 data.

09:29:16 11         You might -- a single institution might give one

09:29:16 12 treatment at one period of time, let's say, for five years, then

09:29:16 13 switch to another treatment, and then report all of the data

09:29:16 14 together.  That's -- that's a biased way --

09:29:16 15 Q.  Okay.

09:29:16 16 A.  -- of looking at the data.

09:29:16 17 Q.  Okay.

09:29:16 18 A.  So randomization, in a prospective manner -- in other words,

09:29:16 19 you're going back looking at what was given, but you're

09:29:16 20 prospectively proceeding with the trial and you're randomizing

09:29:17 21 patients so the characteristics of the patients are balanced in

09:29:17 22 both arms.

09:29:17 23 Q.  Okay.  Another feature was long-term follow-up.  Why was that

09:29:17 24 important to TAX316?

09:29:17 25 A.  This is particularly important in TAX316 because it -- it does

1926

09:29:17 1   have not only long-term efficacy follow-up, but long-term safety

09:29:17 2   follow-up.  In a lot of trials, even randomize trials -- randomized

09:29:17 3   trials, you might see follow-up reported for survival and some

09:29:17 4   efficacy follow-up, but might not provide information on long-term

09:29:17 5   safety.

09:29:17 6           The absence of a report of a toxicity in the long-term

09:29:17 7   follow-up depends on how the study was conducted, and if you are

09:29:17 8   going to analyze a specific issue, it has to be planned for in --

09:29:17 9   preferably in a -- in a manner where the follow-up, such as

09:29:17 10  alopecia, is done on a regular basis to make assessments.

09:29:17 11  Q.  Okay.

09:29:17 12  A.  So -- so this study was very well designed and specifically

09:29:17 13  designed within a standpoint of looking not only at long-term

09:29:17 14  efficacy, but certain long-term safety issues.

09:29:17 15  Q.  Okay.  Quickly, there's two other -- there's three things that

09:29:17 16  I want to just identify of TAX316.  I think we've already talked

09:29:17 17  about it led to a new clinical indication that we just described in

09:29:17 18  the *New England Journal of Medicine*?

09:29:17 19  A.  Correct.

09:29:17 20  Q.  And then briefly talk about the multiple endpoints.  Why is

09:29:17 21  that important in TAX316?

09:29:17 22  A.  Can you clarify further what you mean by "multiple endpoints"?

09:29:17 23  Q.  Did they -- they were evaluating a whole host of side effects,

09:29:17 24  in addition to just alopecia, for example.  And just describe for

09:29:17 25  the jury, a study like this, the extensive consideration of how

09:29:17 1   they were doing and their, you know, their health as a whole.

09:29:17 2   A.   Okay.  So it's important to realize that there's an obligation

09:29:17 3   when the company's doing these trials that it doesn't only look at

09:29:18 4   one specific toxicity; it -- it needs to -- it needs to look at all

09:29:18 5   the toxicities that might occur and that might be made aware of.

09:29:18 6           So, during the course of the study, there are -- there

09:29:18 7   are a number of toxicities that were -- that were being evaluated,

09:29:18 8   and they were evaluated on a -- on a basis of intimate --

09:29:18 9   intermittent and follow-up.  The further out from the study the

09:29:19 10  patients got, the less frequent the follow-up was, but there was

09:29:19 11  well-prescribed intermittent follow-up.

09:29:19 12  Q.   Okay.  I want to direct your attention specifically to the

09:29:19 13  follow-up in TAX316 that tracked patients for alopecia.  Are you

09:29:19 14  with me?

09:29:19 15  A.   (Witness nodded.)

09:29:19 16  Q.   With me?

09:29:19 17  A.   Okay.

09:29:19 18  Q.   I've put up a graphic here that has some statistics on it, and

09:29:19 19  if you could just walk us through this flow chart and explain what

09:29:19 20  these numbers represent?

09:29:19 21  A.   The -- the 316 had two groups of patients, as I had mentioned.

09:29:19 22  The patients receiving TAC, and also the patients receiving FAC.

09:29:19 23  One is the Taxotere arm and -- the TAC, and the other was without

09:29:19 24  the Taxotere.  There were 744 patients in the safety population

09:29:25 25  being evaluated in the TAC arm.  It's 736 in the -- in the FAC arm.

09:29:33  1          Now, this is ten-year follow-up data, but I think it's

09:29:48  2  important to understand what that -- what that means.  That doesn't

09:29:48  3  mean that every single patient is -- is seen for ten years.  It

09:29:49  4  means -- because some patients will have died within that ten-year

09:29:52  5  period; some patients will have been lost to follow-up or refused

09:29:57  6  to be followed, basically, refuse -- you know, refused to give it

09:30:05  7  further informed consent.  Some patient may have, due to recurrence

09:30:12  8  of the -- of their breast cancer, got onto other treatments, and --

09:30:18  9  and thus, might not be followed for certain conditions.  So the

09:30:26 10  follow-up is to -- goes ten years to evaluate, but it's important

09:30:31 11  not to be confused to think that every single patient has lived for

09:30:37 12  ten years and had a ten-year evaluation.

09:30:40 13          Okay.  So that's the first point I would like to make.

09:30:47 14  With -- with -- within that, patients were evaluated to see if they

09:30:52 15  had alopecia, did that alopecia persist into the follow-up period.

09:30:58 16          Now, what's the follow-up period?  The follow-up period

09:31:01 17  is 30 days after the last treatment with the Taxotere or the FAC

09:31:09 18  on -- on the protocol.  And that kicks in the follow-up period.  So

09:31:13 19  the question is:  Do patients have continuation into the follow-up

09:31:21 20  period?

09:31:23 21          Well, indeed, most patients, since hair grows rather

09:31:30 22  slowly, you know, most -- most patients take more than 30 days from

09:31:38 23  the last treatment to have resolution of their alopecia.  So, what

09:31:47 24  you have is a large number of the patients have alopecia going into

09:31:54 25  the follow-up period, and the question then is, of those who have

09:31:57 1   alopecia, is -- is there resolution or is it ongoing?  And the vast

09:32:04 2   majority of patients will have document -- will resolve.

09:32:10 3          But this particular table classified 29 patients in the

09:32:14 4   TAC arm and 16 patients in the FAC arm as having alopecia that was

09:32:21 5   ongoing.

09:32:22 6          Now, I previously testified and we discussed, and I think

09:32:28 7   in some detail, that ongoing doesn't mean that it's -- that it has

09:32:35 8   persisted for more than six months.  "Ongoing" means that the last

09:32:39 9   time that there was a documentation, there was still alopecia.

09:32:44 10  That means that if the patient had alopecia at the time that they

09:32:53 11  died, it would be considered ongoing.  If they had alopecia at the

09:32:55 12  time that they removed their informed consent, it would be

09:32:59 13  considered ongoing.  If they had alopecia at the time they switched

09:33:02 14  therapy to another chemotherapy and were no longer seen, that would

09:33:08 15  be considered ongoing.

09:33:09 16  Q.  So what -- what did you do?  Explain to the jury what you did

09:33:15 17  to evaluate the patients and -- to have, according to the study of

09:33:23 18  29 ongoing to six persistent, briefly, how did you -- what work did

09:33:29 19  you do to evaluate these patients and determine what, in fact, was

09:33:32 20  the nature of their alopecia over the ten-year period?

09:33:36 21  A.  Okay.  So again, the criteria that I utilized for persistent

09:33:43 22  was if they had alopecia that lasted at least six months, was

09:33:51 23  documented to have lasted at least six months after chemotherapy,

09:33:55 24  and did not have any subsequent resolution.  That was -- that was

09:34:00 25  the criteria.

1930

09:34:02  1          In order to -- in order to evaluate that, I looked at the
09:34:06  2    patients that were -- had -- were classified as ongoing.  The other
09:34:11  3    patients had already -- you know, the -- there -- there were
09:34:16  4    patients that were previously defined in the analysis of ongoing of
09:34:21  5    having been resolved.  So we didn't -- I didn't look at -- at all
09:34:27  6    of those patients that had already been classified as having been
09:34:31  7    resolved.

09:34:32  8          I looked at the patients from the 29 that were considered
09:34:35  9    to be ongoing, and I asked of those if there was documentation that
09:34:43 10    answered two questions, two simple questions:  Number 1, did we
09:34:50 11    have documentation, either from what was provided in the CRFs or
09:34:56 12    what was provided in terms of SAS or clinical trial datasets, that
09:35:04 13    were produced from the CRFs that showed documentation that the
09:35:12 14    alopecia was still present six months after the last chemotherapy.
09:35:18 15    So that was -- that was the first criteria:  Was the alopecia still
09:35:24 16    present six months after the last chemotherapy that was received.

09:35:28 17          The second criteria:  Was there any evidence of
09:35:34 18    resolution of that alopecia?  If there was any resolution, then it
09:35:39 19    would not be considered persistent.  So that -- that, very simply,
09:35:45 20    is -- is the process.  It was a very straightforward process.  It
09:35:51 21    was looking to see if -- if there was documentation for any of
09:35:54 22    those two characteristics.
09:35:56 23    Q.  Okay.  I just want to briefly ask you about the -- the fact
09:36:00 24    that the FAC -- that these patients did not have Taxotere; is that
09:36:04 25    right?

09:36:04  1   A.   Correct.

09:36:05  2   Q.   The fact that the FAC patients had evidence of both ongoing

09:36:10  3   alopecia and persistent alopecia?

09:36:12  4   A.   That is correct.

09:36:13  5   Q.   And how -- what is one explanation for why the FAC patients

09:36:20  6   were having ongoing and persistent alopecia and the TAC patients

09:36:24  7   were also having ongoing and persistent alopecia?  What's in common

09:36:29  8   with those two arms?

09:36:30  9   A.   Well, let me first go back to when I started testifying with

09:36:41 10   you, Mr. Keenan, that alopecia is -- is fairly common to a wide

09:36:47 11   range of chemotherapeutic agents.  So alopecia is not simply a

09:36:56 12   condition that occurs with Taxotere.

09:36:58 13        We -- we also -- I also testified that the AC causes --

09:37:06 14   which is the Adriamycin plus the cyclophosphamide, has a very high

09:37:11 15   incidence of alopecia.  I -- I believe it was roughly 90 percent,

09:37:20 16   and also a very high incidence of even severe alopecia, Grade 3-4

09:37:28 17   alopecia, which, by the grading, would include very -- very severe

09:37:31 18   alopecia.

09:37:32 19        So -- so this is -- this is common with chemotherapy,

09:37:39 20   such as Adriamycin and cyclophosphamide in combination.

09:37:42 21        Now, what you have is demonstration that in some of those

09:37:49 22   patients that receive Adriamycin and cyclophosphamide, the alopecia

09:37:52 23   persists for more than six months.  There were three patients where

09:37:56 24   it fit the criteria for persistent.  We also see that there were

09:38:02 25   six patients in the TAC arm that fit the persistence.

09:38:10  1        So I -- I think the presence of persistent alopecia being

09:38:15  2  in the -- in the FAC arm demonstrates that the AC is an important

09:38:22  3  component in the extent and the severity and duration, or is

09:38:31  4  likely, at least, to be a very important component of the extent,

09:38:36  5  severity, and duration of the -- of the alopecia in these patients.

09:38:39  6  Q.  One more question about this, and then I want to identify a

09:38:40  7  couple specific patients in this group.

09:38:42  8        Based on your review of the medical records and the study

09:38:48  9  of TAX316, were you able to identify what the percentage -- what

09:38:52 10  the frequency was of persistent or permanent alopecia with respect

09:38:59 11  to these two patient populations and are those numbers reflected

09:39:03 12  here in this?

09:39:04 13  A.  Yes, I believe those are correct reflection of six -- divided

09:39:10 14  by 200 and -- six out of 244 patients, 24 and three out of the 736

09:39:16 15  patients.  That's, I believe, rounded off --

09:39:16 16  Q.  Okay.

09:39:18 17  A.  -- to -- to the nearest tenth.

09:39:20 18  Q.  I previously marked as Exhibit No. 13 this document.  And

09:39:27 19  briefly, what -- what is Exhibit 13, if you could just describe

09:39:30 20  this?  I don't want to spend any time on it.  I just want to have

09:39:34 21  you identify this in your own --

09:39:36 22        MR. MICELI:  Your Honor, may we approach?

09:39:37 23        THE COURT:  Yes.

09:39:48 24        MR. MICELI:  Take that down, please.

10:06:07 25   (WHEREUPON, THE VIDEO WAS PAUSED AND THE FOLLOWING BENCH

10:06:07  1        CONFERENCE WAS HELD:)

09:39:54  2            MR. MICELI:  They said they weren't going to show it.

09:40:09  3    This IT fella back there puts it right up there.

09:40:09  4            THE COURT:  That is not supposed to come up.

09:40:09  5            MR. STRONGMAN:  Okay.  This video has been previewed.  I

09:40:09  6    am not putting up with Dr. Glaspy, he'll take it down.  I thought

09:40:09  7    that video had all been previewed on both sides.

09:40:15  8            THE COURT:  And we talked about --

09:40:15  9            MR. MICELI:  And we objected to --

09:40:15 10            THE COURT:  They objected and I said it's not going to up

09:40:20 11    because I didn't let the other stuff go up, so it's exactly -- I

09:40:34 12    don't know how that happened.  Okay.  How long is it going to take

09:40:34 13    to fix it?

09:40:34 14            MR. STRONGMAN:  I think he can click a button and it

09:40:34 15    takes off the screen.

09:40:34 16            THE COURT:  Click that button.

09:40:34 17        (OPEN COURT.)

09:40:52 18        (WHEREUPON, THE VIDEO WAS RESUMED.)

09:41:08 19    A.  -- to the nearest tenth.

09:41:11 20    Q.  I previously marked as Exhibit No. 13 this document.  And,

09:41:28 21    briefly, what -- what is Exhibit 13, if you could just describe

09:41:28 22    this?  I don't want to spend any time on it.  I just want to have

09:41:28 23    you identify this in your own -- in your own words.

09:41:28 24    A.  This appears to be a document that shows patients in the --

09:46:41 25    patients who were among the 29 TAC and the 16 FAC patients

09:46:41 1    identified as ongoing, who, upon further analysis, by my analysis,

09:46:41 2    failed to meet the criteria that I outlined of either being greater

09:46:41 3    than six months or not having resolution.

09:46:41 4         So -- so, essentially, these are patients in the TAC and

09:48:34 5    the FAC arm that do not meet -- my -- the criteria that I -- that I

09:48:34 6    defined as being persistent alopecia.

09:48:34 7    Q.  Okay.

09:48:34 8    A.  And I would just mention that the first group are the TAC arm

09:48:34 9    patients, and then, at the end of the document are the FAC arm

09:48:34 10   patients.  And, further, this is structured to be very simple with

09:48:45 11   the subject number, the treatment arm, the last date of

09:48:45 12   chemotherapy, and the last documented -- documentation of alopecia,

09:48:45 13   so you can see whether or not it was more than six months or not.

09:48:45 14   And then, also, there's a column for resolution.  And then, on the

09:48:45 15   far right is the -- is a clinical description with the Bates

09:48:45 16   numbers and documentations.

09:48:45 17   Q.  For the record, I've marked as Exhibit 22 the flow chart that

09:48:55 18   we were just discussing.

09:48:55 19        Doctor, I want to spend time talking about three patients

09:48:55 20   in particular that were part of the initial set of patients in the

09:48:55 21   29 that, upon your review, were determined not to be in the final

09:48:55 22   six.  Are you with me?

09:48:55 23   A.  Yes.

09:48:55 24   Q.  Okay.  Doctor, one of the patients that was in the initial

09:49:05 25   group of ongoing is Patient 12403.  Are you familiar with Patient

09:49:05  1  12403?

09:49:05  2  A.  I am, if you give me a second to find them on the --

09:49:05  3  Q.  Describe in a summary fashion what your review of the records

09:49:05  4  of Patient 12403 revealed.

09:49:05  5  A.  Well, this patient received six cycles of the TAC regimen, and

09:49:14  6  the last cycle was administered in December -- December 11th of

09:49:14  7  1998.  And, at this time, the patient had ongoing alopecia.

09:49:14  8          On the first follow-up visit of -- of April 7th, 1999,

09:49:14  9  the alopecia was recorded as resolved.  So that would have been --

09:49:15  10  that follow-up visit appears to have been less than six months, but

09:49:15  11  the resolution date was -- at that follow-up visit was listed as

09:49:15  12  January of 1999.

09:49:15  13  Q.  All right.

09:49:15  14  A.  So it was less than six months with a -- with a resolution date

09:49:15  15  specified, and a review of the additional -- next ten follow-ups

09:49:15  16  did not have alopecia record as an adverse event.

09:49:15  17  Q.  Okay.  Doctor, I've put this document on the screen, and I've

09:49:15  18  marked it Exhibit 24.  And this shows -- this is Patient 12403; is

09:49:15  19  that right?

09:49:15  20  A.  That's correct.

09:49:15  21  Q.  And does this show a tracking of alopecia on a date certain

09:49:15  22  that it would have resolved?

09:49:15  23  A.  That appears to be correct, and it says, "ceased January 1999."

09:49:15  24  Q.  All right.  So this would be a patient that would not be

09:49:15  25  considered a patient with permanent or irreversible alopecia?

A.  No, for -- for -- for two reasons.  The first is:  Does it meet the six-month criteria?  And the answer to that is no.  And the second is:  Does it meet the resolution criteria?  And in this case, the patient also resolved.  So in -- in neither of those criteria is there a basis of saying tis patient had permanent alopecia.

Q.  Exhibit 25 identified as another patient, and this is Patient 17603.  If you could pull the notes up for 17603, and describe for me what your notes reflect about the review of the records for this patient who was in TAX -- in TAX316.

A.  Okay.  So patient 17603 received six cycles of the TAC regimen, the Taxotere/Adriamycin/cyclophosphamide regimen.  The last cycle was administered on 5/8/98.  May 8th of 1998.

On this date, the patient was recorded as having ongoing alopecia.  The alopecia was recorded as ongoing -- during her first three follow-up visits.  So it was recorded as being ongoing, with the third follow-up visit being on the -- February 19th, 1999. However, on the fourth follow-up visit of -- of May 7th, 1999, the alopecia was listed as being resolved.

So in -- in -- in this patient, although it appears that the alopecia continued for more than six months, the alopecia did subsequently resolve and we have a resolution date.

Q.  Okay.

A.  Accordingly, this patient was not considered to have persistent alopecia.

09:49:15  1  Q.  Okay.  And just for the record, I am marking this Exhibit 26.

09:49:15  2  Exhibit 26 reflects Patient 17603.

09:49:15  3  A.  Correct.

09:49:15  4  Q.  And then, in this record, does it reflect the alopecia and

09:49:15  5  its -- its status as resolved?

09:49:15  6  A.  It does.

09:49:15  7  Q.  Okay.  And would this be a patient that, upon your review, you

09:49:15  8  concluded would not meet the criteria of irreversible or permanent

09:49:16  9  alopecia as part of TAX316?

09:49:16 10  A.  That is correct.

09:49:16 11  Q.  Okay.  The final patient that I want to speak to, and then we

09:49:16 12  will take a break, is Patient No. 15002.  And I'll mark this as

09:49:16 13  Exhibit 27.

09:49:16 14        15002 is a little bit more complicated than the others.

09:49:16 15  If you could just take a moment and look at your notes and describe

09:49:16 16  why this patient is significant to you, Dr. Kopreski, and why it

09:49:16 17  was not counted in the final ten-year data as persistent alopecia.

09:49:16 18  A.  This patient received only one cycle of Taxotere arm, TAC, and

09:49:18 19  that cycle was administered on the 8th of -- I'm sorry, on August

09:49:24 20  the 26th, 1998.  The patient developed alopecia and was withdrawn

09:49:32 21  from the study after developing gastrointestinal mucositis

09:49:39 22  following the -- the administration of the TAC regimen.

09:49:43 23        On the September of 1998, the patient started alternative

09:49:54 24  chemotherapy with Adriamycin and cyclophosphamide, or the AC.

09:50:02 25  The -- the numbers of the cycle are not known.

09:50:05  1          She was seen in follow-up on November 3rd of 1998, at

09:50:14  2    which time alopecia was ongoing, but because the patient was on

09:50:24  3    another therapy and was no longer in this therapy, there was no

09:50:31  4    longer any follow-up due to the new chemotherapy.  It's recorded

09:50:38  5    that there's no longer follow-up due to the new chemotherapy

09:50:42  6    regimen started, and no further alopecia assessments were -- were

09:50:45  7    made for -- for the patient.

09:50:49  8    Q.  Okay.

09:50:49  9    A.  So the -- the documentation of -- of alopecia that we have was

09:50:55  10   less than six months, and then the patient received another therapy

09:50:59  11   instead of Taxotere, which was continuing.  She -- she later had a

09:51:04  12   breast cancer relapse and -- and was started on Taxol, but,

09:51:10  13   unfortunately, this patient later died from -- from her breast

09:51:17  14   cancer in August of 2001.

09:51:20  15   Q.  Okay.  So some of the records that you just described are here,

09:51:24  16   and I've marked these records as Exhibit 28.  This describes her

09:51:29  17   regimen of Taxol weekly, and obviously, that's -- Taxol is a -- is

09:51:40  18   not a drug made by Sanofi.

09:51:43  19   A.  That's correct.

09:51:44  20   Q.  And the next document reflects that, unfortunately, this woman

09:51:56  21   passed away?

09:52:01  22   A.  Unfortunately, that's the case for this patient.

09:52:04  23   Q.  Okay.  And so, obviously, Dr. Kopreski, TAX316 was an important

09:52:10  24   part of our submission to the FDA?

09:52:12  25   A.  Yes, it was.

09:52:13  1   Q.  Okay.  I've marked as Exhibit 32 from the journal called *The*
09:52:21  2   *Oncologist,* and it is a paper by Vishal Saggar, S-A-G-G-A-R, and I
09:52:26  3   ask you to take a moment and describe that study for me.  What are
09:52:36  4   we looking at here, Doctor?
09:52:38  5   A.  Well, this -- this paper by Saggar is entitled "Alopecia With
09:52:42  6   Endocrine Therapies in Patients With Cancer."  And it's a review of
09:52:51  7   various studies looking at various endocrine therapies, which I
09:53:00  8   referred to previously as hormonal therapy or antihormonal therapy.
09:53:06  9   But it -- so it's -- it's a review of -- of the literature, and
09:53:12  10  what it emphasizes is that patients very often will have alopecia
09:53:19  11  who are receiving these -- these endocrine therapies.
09:53:25  12          For example, just reading from the abstract in the
09:53:29  13  results section, Saggar state -- states that the incidence of
09:53:37  14  all-grade alopecia range from 0 to 25 percent with an overall
09:53:43  15  instance of 4.4 percent, the highest incidence.  And I'm -- I am
09:53:48  16  paraphrasing here, the highest incidence of all-grade alopecia was
09:53:52  17  observed in patients treated with tamoxifen in a Phase II study at
09:54:00  18  25.4 percent.
09:54:01  19  Q.  Now, what does that mean in plain English, Doctor?
09:54:04  20  A.  Well, when it says in this -- in this trial, looking at
09:54:06  21  patients treated with tamoxifen, in this particular trial, roughly
09:54:12  22  a quarter of the patients had alopecia.
09:54:14  23  Q.  Okay.
09:54:17  24  A.  So it -- it goes on also to say that the overall incidence of
09:54:21  25  Grade 2 alopecia, which we previously described as essentially

09:54:26  1   being a more severe alopecia, by meta-analysis was highest in

09:54:37  2   tamoxifen, and they have it at 6.4 percent.

09:54:43  3   Q.  And -- and this -- this study was a review of -- describes here

09:54:48  4   19,000 patients in 35 clinical trials.  Is that called a

09:54:55  5   meta-analysis, Doctor?

09:54:55  6   A.  Well, meta-analysis is more of a statistical term where they --

09:55:02  7   it's -- as -- to my understanding, it's a methodology of --

09:55:06  8   where -- that allows them to combine and analyze different studies

09:55:11  9   together.

09:55:13  10  Q.  Okay.  There were a couple other findings in this.  I want to

09:55:23  11  direct your attention to page 1130 where it has Incidence of

09:55:28  12  High-Grade Alopecia.  Do you see that, on page 1130?

09:55:44  13  A.  Yes.  Yes, I do.

09:55:45  14  Q.  Is that significant to you?

09:55:47  15  A.  Well, high-grade alopecia -- high-grade -- yes -- yes, it would

09:55:51  16  be significant to me in terms of representing a more severe

09:55:58  17  alopecia.  They -- high-grade would be, you know, above -- would be

09:56:11  18  patients that have more of a frank alopecia.

09:56:15  19  Q.  And this --

09:56:15  20  A.  It's more -- it would of greater severity.

09:56:15  21  Q.  And this is identifying the high-grade with tamoxifen.

09:56:18  22  A.  Well, the study says that the incidence of high-grade alopecia

09:56:22  23  range between 0.2 percent and 16.9 percent.  And it says that the

09:56:28  24  highest incidence of 16.9 percent was observed in a Phase II trial

09:56:33  25  studying the use of tamoxifen in treatment of, in this case, renal

09:56:40  1   cell carcinoma.

09:56:43  2   Q.  Okay.  All right.  And then there's one other finding here, and

09:56:46  3   that's on page 1132, the conclusion.  And I'll just read that.

09:56:46  4   A.  I -- I --

09:56:58  5   Q.  Do you have it there?

09:56:58  6   A.  Yes, I do have it.

09:57:00  7   Q.  Okay.

09:57:01  8   A.  Would you like me to read --

09:57:02  9   Q.  Sure.

09:57:03 10   A.  -- the conclusion?

09:57:04 11         "The results of this meta-analysis indicate that alopecia

09:57:07 12   is a common but underreported adverse event associated with

09:57:12 13   endocrine agents used to treat cancer, particularly of the breast.

09:57:16 14   This study aims to provide information that is critical for

09:57:20 15   counselling and intervention against alopecia.  These findings are

09:57:24 16   critical for pretherapy counselling, the identification of risk

09:57:29 17   factors, and the development of interventions that could mitigate

09:57:33 18   this psychosocially untoward event."

09:57:36 19   Q.  And this article also has a photograph of Grade 1 alopecia and

09:57:42 20   Grade 2 alopecia.  Do you see that, Doctor?

09:57:45 21   A.  I do.  So the -- the -- the -- I -- I would consider that the

09:57:52 22   terms the used in this article, the Grade 2 alopecia, would -- I --

09:57:56 23   I -- I would consider is what they consider high grade.

09:57:59 24   Q.  What is the value of more information as opposed to less

09:58:04 25   information when evaluating a spontaneous case report?  And I will

09:58:08  1    put up on the ELMO a document that I will mark as Exhibit No. 34.

09:58:21  2    A.   Okay.   So -- so -- so let's consider what -- when one is doing

09:58:28  3    an analysis, one would like to have the best understanding you can

09:58:34  4    of the clinical situation.   One of the -- one of the questions that

09:58:43  5    from a corporate side would like to understand is -- is what role

09:58:49  6    is Taxotere potentially playing in -- in the event, and is there

09:58:57  7    anything to suggest that there are certain conditions in the -- in

09:59:04  8    the patient population or certain -- that would be important to

09:59:13  9    note, or is -- is -- is there -- are there other factors that might

09:59:21 10    be accounting for alopecia?

09:59:23 11           So in general -- in general one likes to have as much

09:59:29 12    information as possible.

09:59:30 13           Now, sometimes I think that results in doctors, perhaps,

09:59:36 14    ordering more tests than -- than -- that they would like to order.

09:59:42 15    But -- but, in general, when it comes to clinical assessment, one

09:59:47 16    wants to know as much information about the case as possible.

09:59:49 17    Q.   All right.   Without -- without -- we're going to come back to

09:59:53 18    this, but is this -- is this demonstrative, does this give a little

09:59:58 19    bit of context in terms of information that ideally you would like

10:00:01 20    to have in evaluating a case report of a man or woman who is having

10:00:09 21    a side effect of Taxotere?

10:00:12 22    A.   Well, this -- this case or -- or the document that you were

10:00:19 23    displaying indicates many considerations that we would want to

10:00:27 24    understand when evaluating a case of alopecia in -- and I think

10:00:36 25    we've already talked about one of those cases.

10:00:39  1          I see at the bottom you have hormonal therapy.

10:00:41  2  Q.  Right.

10:00:42  3  A.  And I've already talked about hormonal therapy being a very

10:00:46  4  common therapy in women with -- with breast cancer.  Keep in mind

10:00:51  5  the vast majority of the cases of the ones that we discussed today

10:00:55  6  are women with breast cancer.

10:00:57  7  Q.  We talked about chemotherapy drugs that cause alopecia, right?

10:01:01  8          In terms of the top of the chart it says, "treatment

10:01:05  9  dates."  Well, when did the alopecia occur with respect to when was

10:01:12  10 Taxotere received?  We noted that many of the combination regimens

10:01:19  11 involved giving a sequential combination instead of a concurrent

10:01:24  12 combination, such as receiving the FEC followed by the Taxotere.

10:01:32  13 That's the epirubicin combination plus Taxotere.  Or other times

10:01:36  14 it's the Adriamycin, such as AC, followed by Taxotere.

10:01:42  15          Well, if -- if you recall the -- the labelling

10:01:48  16 information --

10:02:29  17      (WHEREUPON, THE VIDEO WAS PAUSED AND A DISCUSSION WAS HELD OFF

10:02:29  18       THE RECORD.)

10:02:29  19      (WHEREUPON, THE VIDEO WAS RESUMED.)

10:02:33  20 A.  In terms of the top of the chart it says, "treatment dates."

10:02:33  21 Well, when did the alopecia occur with respect to when was Taxotere

10:02:46  22 received?  We noted that in many of the combination regimens

10:02:46  23 involved giving a sequential combination instead of a concurrent

10:02:49  24 combination, such as receiving the FEC followed by the Taxotere.

10:02:56  25 That's the epirubicin combination plus Taxotere.  Or other times

10:03:04  1   it's the Adriamycin, such is, AC followed by Taxotere.

10:03:08  2          Well, if -- if you recall the -- the labelling

10:03:13  3   information, there's a very high percent of patients who received

10:03:18  4   those drugs in their own right who developed alopecia.  So, if you

10:03:24  5   have a 90 percent expectation that the -- that the drug is going to

10:03:34  6   cause alopecia and you notice alopecia with -- with the regimen,

10:03:44  7   the one question is:  Did the alopecia occur even before the

10:03:44  8   Taxotere was given?

10:03:44  9   Q.  Right.  What about dose?

10:03:44  10  A.  The -- one wants to know that one is giving a proper dose

10:03:51  11  and -- and not an overdose.  So -- so knowing the dose and knowing

10:03:54  12  the time is making -- knowing -- one of the assessments you want to

10:04:00  13  know is whether the -- the patient received medication along the

10:04:03  14  lines of what's prescribed in our labelling.

10:04:10  15  Q.  Now, we're going to get --

10:04:10  16  A.  In other words, the company would want to know if you're

10:04:22  17  following the -- the way that the medicine is supposed to be given

10:04:22  18  in terms of dose.  You would want -- you would want to have that

10:04:23  19  information.

10:04:23  20          Obviously, there are other medications that may cause

10:04:27  21  alopecia that are not normally used in a chemotherapy regimen.

10:05:17  22  Q.  And generally speaking, when you talk about going over the

10:05:17  23  cases, what did your review include?

10:05:41  24  A.  Well, my review included looking at the -- the case.  Usually,

10:05:41  25  the CIOMS.  Trying to transcribe that case into my notes so that I

10:05:41 1 would be able to quickly respond to the case without having to

10:05:41 2 reread the entire case in -- in detail.

10:05:41 3          I -- I reviewed or tried to review, when there was

10:05:51 4 co-medications mentioned, which of those medications might have

10:05:51 5 caused alopecia or have alopecia in the -- in the label or

10:05:51 6 publications.

10:05:51 7          I -- I tried to review the case in terms of whether or

10:05:51 8 not there was sufficient support to show that the case was going

10:05:51 9 beyond six -- six months duration.  In many of these cases, there's

10:05:54 10 no clear documentation or it is unknown that these cases were going

10:05:54 11 beyond six months duration.  There was some cases where I -- I felt

10:06:22 12 that the documentation showed that it was less than six months in

10:06:22 13 duration.  I tried to understand their regimens that -- that the

10:06:22 14 case was receiving.  In some cases, that meant going back to an

10:06:22 15 abstract such as the ones that were provided in exhibit, or

10:06:28 16 referring to a regimen discussed in that abstract, such as the

10:06:46 17 exhibit that we had on -- on the PACS 01 trial.

10:06:46 18          The analysis also included paying particular attention to

10:07:32 19 the antihormonal agents and trying to categorize and note with the

10:07:32 20 cases if they were serious or not.  I paid attention to were these

10:07:32 21 adjuvant breast cancer or metastatic breast cancer when indicated,

10:07:32 22 what was the indication.  Was the indication being provided?

10:07:32 23 Q.  Doctor, if you look at Exhibit No. 38, it's the clinical study

10:07:33 24 report.

10:07:33 25 A.  This is the ten-year follow-up --

1946

| | |
|---|---|
| 10:07:33 | 1 | Q. Yep. |
| 10:07:33 | 2 | A. -- study report, correct? |
| 10:07:33 | 3 | Q. Do you agree with me -- and you can look at the monitor if you |
| 10:07:33 | 4 | want, that the study completion date was January 25th, 2010, |
| 10:07:46 | 5 | correct? |
| 10:07:46 | 6 | A. For the ten-year study report, correct. |
| 10:07:46 | 7 | Q. Right.  Oh, now -- well, since you mentioned it, let's just |
| 10:07:46 | 8 | confirm that.  And the previous version was interim at 55 months, |
| 10:07:52 | 9 | and that was in January 2004, correct? |
| 10:07:54 | 10 | A. That's correct.  The study was planned to have interim analysis |
| 10:08:00 | 11 | and a ten-year analysis, and that's what that reflects. |
| 10:08:04 | 12 | Q. During your -- the testimony that you are giving on -- from |
| 10:08:11 | 13 | your lawyers, you referenced a patient with a patient number of |
| 10:08:17 | 14 | 12403.  Do you remember that?  12403? |
| 10:08:22 | 15 | A. This is on the TAX316 study? |
| 10:08:25 | 16 | Q. Yes. |
| 10:08:25 | 17 | A. Okay. |
| 10:08:27 | 18 | Q. Do you remember that? |
| 10:08:27 | 19 | A. Yes. |
| 10:08:29 | 20 | Q. Can you see the patient number 12403? |
| 10:08:32 | 21 | A. I do. |
| 10:08:33 | 22 | Q. Okay. |
| 10:08:33 | 23 | A. I do. |
| 10:08:33 | 24 | Q. Do you see that your company made representation to regulatory |
| 10:08:38 | 25 | authorities that the last follow-up date with this particular |

10:08:51 1  patient was in 2009?  Do you see that?  And at the time -- do you

10:08:55 2  see that, sir?

10:08:56 3  A.  I -- I do.

10:09:08 4  Q.  Now, the material that you were given by the lawyers for your

10:09:08 5  company, is this document right here.  You guys entered it as an

10:09:09 6  exhibit when you were testifying.  Do you see the date on this

10:09:19 7  document, December the 9th, 2003?

10:09:25 8  A.  I do.

10:09:25 9  Q.  All right.  So the last follow-up that you were given related

10:09:30 10 to this patient was from December of 2003, but the last follow-up

10:09:47 11 according to regulatory submissions regarding this patient from

10:09:47 12 your company was some six years later.  Do you see that?

10:09:56 13 A.  I -- I -- okay.

10:10:33 14 Q.  That was one of the three examples that you gave of people who

10:10:33 15 should not be part of the persistent alopecia group at the end of

10:10:33 16 the follow-up study --

10:10:33 17 A.  But --

10:10:33 18 Q.  Let me -- let me ask you this:  Do you believe that you were

10:10:33 19 provided with a single follow-up line item data sheet that went

10:10:33 20 beyond the year 2003 as part of your preparation for today's

10:10:33 21 deposition?

10:10:33 22 A.  Was I provided with a single line item data sheet beyond 2003?

10:10:42 23 Q.  For the 29.

10:10:42 24 A.  In -- in my preparation in terms of if a patient showed

10:10:57 25 resolution, including data sheets that may have been derived from

10:10:57 1   the interim study report, if it showed a resolution, I would

10:10:57 2   consider that patient resolved.

10:10:57 3   Q.  Can you answer my question?  Do you believe that you were

10:10:57 4   provided with a single, by the lawyers who gave you the information

10:11:01 5   that you were relying upon, that you previously testified you don't

10:11:29 6   know whether it's complete or not, do you believe that the lawyers

10:11:29 7   gave you any follow-up data, data lines, after 2003, when you were

10:11:29 8   commenting about a study that ended in 2010?

10:11:29 9   A.  The ten-year follow-up ended in 2010.  If you look at the --

10:11:29 10  Q.  Can you answer my question, please?

10:11:29 11  A.  I don't -- I don't -- I don't know.  It's not -- it's not a

10:11:29 12  question that I had considered.

10:11:29 13  Q.  If you would look at Exhibit 39, just under the last patient

10:11:37 14  that we discussed under 12403, you'll see patient reference 12612.

10:11:46 15  Do you see that patient?

10:11:51 16  A.  Yes.  Yes, I do.

10:11:51 17  Q.  Do you see the representation made by Sanofi to regulatory

10:11:51 18  authorities regarding that patient in March of 2012 that the last

10:11:57 19  follow-up date with this patient was on June the 16th of 2009?

10:12:07 20  A.  I see the date of follow-up was June the 16th, 2009.

10:12:11 21  Q.  And according to the representations made by Sanofi to

10:12:15 22  regulatory authorities in 2012, that at the time of last follow-up

10:12:20 23  in June of 2009, 10.02 years in duration, that alopecia was ongoing

10:12:27 24  at the end of the follow-up period.  Do you see that representation

10:12:30 25  that's been made?  Third from the bottom, Patient 12612.

10:12:55  1   A.  Okay.  Yes.

10:12:55  2   Q.  All right.

10:12:55  3   A.  I see that.

10:12:55  4   Q.  But the material you were provided by the lawyers regarding

10:12:55  5   this patient is dated 2003.  Do you see that?

10:12:55  6   A.  I want to remind you that all of the patients of the 29 and the

10:12:57  7   6 -- and the 16 that were reviewed were analyzed as ongoing at the

10:13:03  8   end of the follow-up period.

10:13:04  9          The question is not whether it was ongoing at the end of

10:13:09 10   the follow-up period; the question was whether it meets the -- the

10:13:16 11   definition of -- of the persistence.  And that is why you have the

10:13:16 12   29 and the 16 because there -- so -- so you can -- you can go

10:13:19 13   through these, and it -- and it says, "ongoing" at the end of the

10:13:35 14   follow-up period, which is exactly what the table and study report

10:13:35 15   says with the patients.  But then next step that we went through,

10:13:35 16   as was detailed, was whether it meets the criteria.

10:13:35 17   Q.  Sir, did you -- can you answer my question?  Did you realize

10:13:46 18   that you -- that the information that was given -- that was given

10:13:46 19   to you in terms -- in terms of the patient data stopped in 2003,

10:13:48 20   six years before the end of the study?  Did you realize that when

10:14:00 21   you were reviewing it?

10:14:00 22   A.  I realize that much of the data that we were utilizing was data

10:14:00 23   that was available in the 55-month analysis.

10:14:01 24   Q.  Then why didn't you tell the jury that when you were

10:14:05 25   pontificating about the fact that you reviewed the full ten years

10:14:08  1   of follow-up data?

10:14:13  2   A.  I believe what I said to the jury, I think I went through and

10:14:13  3   detailed exactly how the analysis was -- was conducted.  And if

10:14:17  4   there was evidence of resolution or evidence of persistence, you

10:14:36  5   know, if there was evidence of persistence, then we certainly would

10:14:36  6   want to know was there any resolution beyond the 55 months.  But if

10:14:36  7   there was evidence of resolution, then the question was addressed.

10:14:41  8   If it resolved, it resolved.  If it resolved within the 55 months,

10:14:56  9   it resolved.

10:14:56  10  Q.  Let me ask you this:  When did Sanofi research and study

10:14:56  11  Taxotere and permanent alopecia in a clinical trial setting so that

10:14:56  12  you could make sure that you had all of this case assessment

10:15:01  13  information that you wanted to study, permanent alopecia and your

10:15:08  14  drug, whether in a monotherapy setting or in combination with

10:15:08  15  others?  When did you do that?

10:15:09  16  A.  Well, I previously testified that in the conduct of a clinical

10:15:14  17  trial, we don't restrict the gathering of safety information.  Only

10:15:19  18  to an event, or one event, such as alopecia, but we gather all

10:15:23  19  safety information.

10:15:26  20       Within the -- within the study of -- of recovery of

10:15:33  21  alopecia I previously cited that I think the best study trying to

10:15:38  22  control for these factors was the TAX316, which was initiated, I

10:15:44  23  believe, in 1997.

10:15:47  24  Q.  Didn't you previously testify in this very deposition that the

10:15:51  25  company had only limited information with respect to many of the

10:15:57  1  adverse event reports?

10:15:59  2  A.  I did.

10:16:01  3  Q.  Okay.  And all that I asked you previously was:  Wouldn't you

10:16:06  4  agree with me that the company didn't have the outcome information

10:16:09  5  or all of the information that the company would have liked to have

10:16:12  6  had in many of the adverse event reports that we discussed?  The

10:16:24  7  answer to that is yes, right?

10:16:24  8  A.  Well, you --

10:16:24  9  Q.  It didn't have all of the information that you wanted?

10:16:24  10 A.  I'm sorry.  You asked about processing.  So there's information

10:16:24  11 that we would like to have, but there's information that we need to

10:16:28  12 have for processing; and what I am drawing the distinction of is

10:16:31  13 there can be two groups of information.

10:16:34  14         All of those cases with limited information, obviously,

10:16:38  15 were processed and had sufficient information to process, but there

10:16:41  16 were limited information in terms of determining aspects such as,

10:16:46  17 you know, likelihood of cause.

10:16:49  18 Q.  Okay.  Let me mark and show to you Exhibit 45, which is a

10:17:12  19 document that may be more instructive on the issue of whether or

10:17:12  20 not there was an effort by the company to track alopecia as a side

10:17:27  21 effect for patients in TAX316, and I've got this on the ELMO.

10:17:27  22         What do these headings reflect, and how do these headings

10:17:28  23 differ from Exhibit 39 that was marked and shown to you by

10:17:32  24 Mr. Bachus?

10:17:33  25 A.  Well, I think this is a document based on the date of 15th of

10:17:43 1    March 2012, so it would be based upon the ten-year data.  And in

10:17:49 2    contrast to the document shown by Mr. Bachus, you can see the

10:17:53 3    header of this document shows date of last follow-up of the adverse

10:17:58 4    event.

10:17:58 5    Q.  What does that mean?

10:18:00 6    A.  Well, that means if you want to see when was the last date that

10:18:05 7    the alopecia was actually recorded or had a follow-up, whether that

10:18:13 8    follow-up was resolved or ongoing but had a follow-up evaluation,

10:18:16 9    that would be shown in this document in the second-to-right column,

10:18:24 10   as opposed to the one that Mr. Bachus had shown us, which is only

10:18:28 11   the date of the last follow-up for the patient.

10:18:31 12         And on the right-hand column, you will have the duration

10:18:35 13   of the follow-up for that adverse event.  So if you really want to

10:18:41 14   determine the dates of the follow-up for alopecia, you would use

10:18:46 15   this document looking at the -- particularly looking at the last

10:18:50 16   two columns.

10:18:51 17   Q.  And was this document and this evaluation done independent of

10:18:54 18   your analysis?

10:18:55 19   A.  Yes, it was.

10:19:07 20   Q.  And --

10:19:07 21   A.  It was done in 2012.

10:19:07 22   Q.  Okay.  And are there a couple individual patients that are

10:19:07 23   listed here that are of interest to you that you want to talk about

10:19:09 24   briefly in greater detail?

10:19:11 25   A.  Well, I think all of the patients are of interest.  If you --

10:19:17  1    if you look down the entire list, you can see that, particularly

10:19:20  2    when you go to the -- it's even clearer on the next page, that the

10:19:26  3    vast majority of patients in the TAC arm have alopecia.  And,

10:19:32  4    again, this refers to, you know, patients that we had previously

10:19:41  5    looked at, including those with Mr. Bachus.  You can see the

10:19:45  6    numbers on the right are all, for the most part, very short

10:19:50  7    duration in years.  Most of them indicate less than six months of

10:19:59  8    duration.

10:20:00  9    Q.  And that's duration of alopecia?

10:20:01 10    A.  That's duration of alopecia.

10:20:03 11    Q.  Let's focus on Patient 40401.

10:20:03 12    A.  Okay.

10:20:10 13    Q.  What does the Exhibit 45 reflect in terms of duration of

10:20:14 14    alopecia?

10:20:14 15    A.  Well, if you look at -- this demonstrates the difference

10:20:24 16    between the document and Mr. Bachus, the way he interpreted, and

10:20:31 17    the actual duration of the alopecia.  So if you look in the

10:20:35 18    previous Exhibit 39 of Mr. Bachus, underneath 40401, which is

10:20:41 19    page -- numbered page 2 out of 32 --

10:20:41 20    Q.  Yes.

10:20:47 21    A.  -- you see that the last date reflected here is October 2008

10:20:50 22    and that the duration is 10.24 years.  Now, that's not the last

10:20:56 23    date of the alopecia.  That is when the last follow-up of the

10:21:01 24    patient was.

10:21:02 25              But if you want to know when the date of the ongoing

10:21:07  1    alopecia being followed is for that patient, if you look at this

10:21:11  2    Exhibit 45, underneath 40401, you see that, in actuality, the date

10:21:15  3    of the last follow-up is in September of 1998 and that the total

10:21:23  4    duration of the alopecia in years is 0.14 years, plus 30 days,

10:21:29  5    since the counting started 30 days after the last IV, so less than

10:21:33  6    six months.

10:21:33  7    Q.   Okay.

10:21:34  8    A.   So this is a clarification of ongoing with respect to alopecia.

10:21:40  9    Q.   Okay.  I want to spend my last few minutes talking about

10:21:44  10   Patient 12403, and that's also a patient that was part of the

10:21:51  11   TAX316 study; is that right?

10:21:53  12   A.   That is correct.

10:21:54  13   Q.   In Mr. Bachus's cross-examine of you in December, he asked you

10:22:00  14   questions about Patients 120 -- 12403 and represented to you that

10:22:09  15   was a patient who had alopecia that was ongoing into 2009.  Do you

10:22:13  16   recall that -- those questions?

10:22:15  17   A.   I do.

10:22:16  18   Q.   Okay.  I am going to mark as Exhibit No. 46 a document that I

10:22:22  19   think speaks to that question, and I'll hand you that Exhibit 46.

10:22:37  20   Exhibit -- exhibit -- I have just a few minutes left here.

10:22:37  21        Dr. Kopreski, I want to start here with the date here,

10:22:49  22   July 6, 2010, at the bottom of Exhibit 46.  And what does that tell

10:22:49  23   us, the origin of this document?

10:22:49  24   A.   This would indicate this is -- this is ten-year data.

10:22:55  25   Q.   And does this document also speak to this particular patient

10:23:00  1    12403 that was the subject of questions by you by Mr. Bachus?

10:23:05  2    A.  Yes, I believe it does.

10:23:07  3    Q.  Okay.  And just briefly, tell the jury what is this document

10:23:12  4    and what value does it add in terms of evaluating a particular

10:23:18  5    patient's progress in this particular TAX316 study?

10:23:24  6    A.  Well, this is -- this is the data by a cycle and follow-up

10:23:30  7    period that allows you to assess given events.  And you will see

10:23:39  8    for this patient, the alopecia, contrary to the way that was

10:23:44  9    previously described and the interpretation from Mr. Bachus's

10:23:49 10    document of it being ongoing for the period of time he mentioned,

10:23:57 11    you can see on page 38267 on the bottom where it says, "Follow-up

10:24:07 12    period 601 alopecia" provides an end date of January 1999.

10:24:17 13    Q.  And what does that mean?

10:24:19 14    A.  That means the patient -- alopecia resolved on January of 1999

10:24:27 15    in contrast to the suggestion that Mr. Bachus made that it was

10:24:35 16    ongoing.  This is Patient 02403.

10:24:47 17    Q.  12403?

10:24:49 18    A.  Yeah, 12403.  Mr. Bachus's document it has date of last

10:24:53 19    follow-up is February 2009.  So the last follow-up was in 2009, but

10:25:00 20    the resolution of the alopecia, consistent with my analysis, was in

10:25:05 21    January of 1999.

10:25:10 22         (WHEREUPON, THE VIDEO WAS CONCLUDED.)

10:25:10 23            MR. COFFIN:  Your Honor, may we approach?

10:25:12 24            THE COURT:  Yes.

10:25:22 25         (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

10:25:22  1          MR. COFFIN:  With regard to this Kopreski testimony, your

10:25:28  2     Honor, we now have had Figure A, which is his reanalysis example,

10:25:33  3     shown to the jury, which your Honor specifically said was not, was

10:25:36  4     prohibited, shouldn't have been shown to the jury.  To be clear,

10:25:40  5     this is the deposition testimony of a witness that Sanofi -- was a

10:25:45  6     Sanofi employee, was not an expert.  We never saw this analysis

10:25:48  7     until it was sprung on us at that deposition and then they don't

10:26:29  8     bring him live.  Then they put the analysis up, which your Honor

10:26:29  9     said should not be shown to the jury.

10:26:29 10          Then they show pictures, comparison pictures that have to

10:26:29 11     do with tamoxifen, not an issue in this case.  They show a case

10:26:29 12     assessment, hormonal therapy assessment, sequence of treatment,

10:26:29 13     dosing, other chemotherapy drugs, this man has just given expert

10:26:29 14     opinion on multiple, multiple areas, extremely prejudicial,

10:26:29 15     extremely.  A lot of which has no probative value like tamoxifen.

10:26:29 16     It's really troubling.

10:27:12 17          THE COURT:  What are you asking me?

10:27:12 18          MR. COFFIN:  I mean, quite frankly I think we might have

10:27:12 19     to move for a mistrial.

10:27:12 20          MR. MOORE:  I think your Honor ruled on the designations,

10:27:12 21     I think that happened and --

10:27:12 22          THE COURT:  Yeah, but --

10:27:12 23          MR. MOORE:  The exhibit, I texted Harley because Dave was

10:27:12 24     not in the negotiations with your Honor yesterday.  Harley said

10:27:12 25     that that table was shown to you --

10:27:12  1           THE COURT:  That table but not -- there was something

10:27:12  2    that went up that wasn't supposed to be -- the individual case

10:27:12  3    reports with the table.

10:27:12  4           MR. MOORE:  Which we don't know what that was.  Dan,

10:27:12  5    maybe Dan can shed some light on it.

10:27:16  6           MR. MARKOFF:  We objected to all of it --

10:27:16  7           MR. COFFIN:  In but in chambers --

10:27:19  8           THE COURT:  I did not allow them to go through the

10:27:21  9    individual reports and that went up and then that came down.  And I

10:27:25 10    think there was something else that went up that wasn't supposed

10:27:25 11    to.

10:27:25 12           MR. MARKOFF:  The hair.

10:27:30 13           THE COURT:  The hair was not supposed to go up.

10:27:31 14           MR. MARKOFF:  I think we should at least -- it's up to

10:27:33 15    Chris, but I think we should at least get an instruction that

10:28:04 16    tamoxifen is not an issue in this case, in relation to the photos

10:28:04 17    that were shown, especially to tamoxifen, they were inappropriate

10:28:04 18    and should not have been shown to the jury.

10:28:04 19           MR. COFFIN:  I understand that, but there have been

10:28:04 20    multiple MIL violations, now we have this.  The prejudice is

10:28:04 21    overwhelming, and I am going to talk to my team about a mistrial,

10:28:04 22    Judge.

10:28:04 23           THE COURT:  Okay.  Well, until you do that, I am going to

10:28:05 24    tell them -- I am going to remind them that Dr. Kopreski is not an

10:28:05 25    expert, he has not been tendered or accepted by this court as an

10:28:06  1    expert, and that the issue of tamoxifen has no bearing on any issue

10:28:10  2    in this lawsuit.

10:28:11  3              MR. STRONGMAN:  Fair enough.

10:28:13  4              MR. MARKOFF:  I think you also need to say that the

10:28:15  5    photos that were shown and the testimony related to tamoxifen was

10:28:20  6    not an issue, was never taken by this client Ms. Earnest, and

10:28:23  7    should not have been shown.

10:28:27  8              MR. STRONGMAN:  Should not have been shown.  I mean, they

10:28:27  9    were all cleared.

10:29:02  10             (WHEREUPON, MR. RATLIFF APPROACHED THE BENCH.)

10:29:02  11             THE COURT:  The photographs of tamoxifen?  I don't

10:29:02  12   remember the alopecia looking like that.

10:29:02  13             MR. RATLIFF:  Their objection, your Honor, was as it

10:29:02  14   related to the demonstrative exhibits, those flow charts and

10:29:02  15   graphs, and that's what we talked about yesterday, which is they

10:29:02  16   said that should not be coming into evidence or published.

10:29:02  17             THE COURT:  The issue was there was pictures of some hair

10:29:02  18   loss.

10:29:02  19             MR. STRONGMAN:  It was an article.

10:29:02  20             MR. RATLIFF:  Yeah, there was no objection to that.

10:29:02  21   There was nothing ever raised about that.  They vetted this video,

10:29:02  22   your Honor, they've had it for two days.  They've watched it.  They

10:29:05  23   never said anything to us about it.  The only issues that were

10:29:07  24   raised with us were the inclusion of wanting to enter that one

10:29:10  25   section that Larry wanted to enter, which you said would not come

10:29:20  1    in, and the demonstratives, that was the only thing we ever talked

10:29:20  2    about.  They've had this video, they've reviewed it, they approved

10:29:20  3    it, they signed off on it.

10:29:20  4         MR. MARKOFF:  That's not correct.  Larry objected to

10:29:23  5    every single demonstrative and every piece of evidence that was in

10:29:27  6    that video.

10:29:27  7         MR. RATLIFF:  It was not raised yesterday.  This was all

10:29:30  8    approved, she already ruled on these designations.

10:29:32  9         THE COURT:  Okay.  I don't remember approving photographs

10:29:36 10    of hair loss.  I do remember that I wouldn't let you go through the

10:29:45 11    actual case reports and show that.

10:29:48 12         MR. RATLIFF:  Right.

10:29:50 13         THE COURT:  That happened.  But that came down.  There

10:29:52 14    were individual case reports that he was going through and I said

10:29:56 15    that's not happening, but I did let you do the spreadsheet.

10:29:59 16         MR. RATLIFF:  Okay.

10:30:00 17         THE COURT:  That bit.

10:30:01 18         MR. RATLIFF:  I guess where we kind of feel kind of

10:30:04 19    caught in a bind here is they had this video, they saw it exactly

10:30:07 20    as we were going to play it; and the objections they raised

10:30:10 21    yesterday were as to the charts that Mr. Kopreski had drawn and

10:30:14 22    created for himself, and you said those won't come into evidence

10:30:17 23    but those will be published to the jury.  If we were going to have

10:30:20 24    this discussion about the articles, which were part of the exhibits

10:30:25 25    that you said came in through the designations, we should have

10:30:28   1   raised this yesterday.  They've had fair notice of this, your

10:30:40   2   Honor.

10:30:40   3        THE COURT:  Okay.  I am just going to tell the jury that

10:30:40   4   tamoxifen has nothing to do with this lawsuit.

10:30:40   5        MR. STRONGMAN:  Fair enough.

10:30:40   6        MR. MARKOFF:  Please mention that the photos when

10:30:42   7   discussing tamoxifen were clearly --

10:30:46   8        MR. RATLIFF:  But they're an aromatase inhibitor.  I

10:30:49   9   mean, they are in the same class as Arimidex.

10:30:51  10        MR. MARKOFF:  Arimidex is not the same drug.  Your Honor,

10:30:51  11   it's incredibly prejudicial to show photographs --

10:30:54  12        MR. STRONGMAN:  The jury has already seen that

10:31:04  13   photograph.

10:31:04  14        MR. RATLIFF:  Why did you raise this yesterday, Dan?

10:31:04  15        MR. MARKOFF:  Larry objected to every single one of these

10:31:04  16   exhibits.

10:31:04  17        THE COURT:  Are these the same photographs that Dr. Tosti

10:31:04  18   showed?

10:31:06  19        MR. COFFIN:  No.

10:31:06  20        MR. STRONGMAN:  May I speak?  They're the same photos

10:31:20  21   that Ms. Sastre crossed Dr. Tosti on that were shown, so.

10:31:20  22        MR. COFFIN:  From the tamoxifen article?

10:31:20  23        MR. STRONGMAN:  The hormonal treatment article that

10:31:23  24   includes tamoxifen and Arimidex.

10:31:26  25        MR. COFFIN:  He didn't say a word about Arimidex.

10:31:29  1            THE COURT:  Let me do this.  I am going let them take a

10:31:44  2   break now, but I will tell them that tamoxifen is not an issue in

10:31:44  3   this lawsuit.

10:31:44  4            MR. RATLIFF:  That's fine.

10:31:44  5            THE COURT:  And I will remind them that Dr. Kopreski has

10:31:44  6   not been qualified as an expert.

10:31:44  7            MR. RATLIFF:  That's fine, your Honor.

10:31:57  8        (OPEN COURT.)

10:31:57  9            THE COURT:  Members of the jury, let me remind you that

10:31:59 10   Dr. Kopreski has not been tendered or qualified by this court as an

10:32:04 11   expert.  Additionally, there was some testimony regarding

10:32:10 12   tamoxifen.  I tell you that tamoxifen is not related to any issue

10:32:17 13   in this lawsuit.  With that, the Court will be at recess for

10:32:21 14   15 minutes.

10:32:21 15            THE DEPUTY CLERK:  All rise.

10:33:19 16        (WHEREUPON, THE JURY EXITED THE COURTROOM.)

10:33:19 17            MR. MOORE:  Can we handle the exhibits for Dr. Kopreski

10:33:22 18   now or on a break?

10:33:23 19            THE COURT:  Yes.  Okay.

10:33:32 20            MR. MOORE:  In accordance with Dr. Kopreski's testimony,

10:33:36 21   Defendants would offer, file, and introduce Defense Exhibit 381.A,

10:33:44 22   381 point --

10:33:47 23            MR. MICELI:  No, no, no, no.  Your Honor, he is trying to

10:33:50 24   put in the Kopreski analysis.

10:33:56 25            MR. MOORE:  I just have a stack here.  If that's one

10:33:56  1    that's not supposed to go in --

10:33:56  2              MR. MICELI:  We talked about this in the chambers.

10:33:57  3              THE COURT:  All right.  You know what --

10:33:58  4              MR. MICELI:  I'm sorry, your Honor.

10:33:59  5              THE COURT:  I hear your indignation and I see it.  But

10:34:04  6    right now, why don't you just look at this stack with Mr. Moore and

10:34:10  7    let's do it that way.

10:34:10  8              MR. MOORE:  What is it that's supposed to go in?  You

10:34:10  9    tell me.  So that's a "no," right?

10:34:28 10              MR. MICELI:  That's a no.

         11              MR. MOORE:  That one is a yes.

         12              MR. MICELI:  I thought we weren't sending medical

         13    literature back.

         14              MR. RATLIFF:  This one was withdrawn.

         15              MR. MOORE:  These are the flow charts, those are just

         16    demonstratives, right?

10:34:28 17              MR. MICELI:  They're demonstratives so they don't go

10:34:32 18    back.

10:34:32 19              MR. MOORE:  Right.

10:34:32 20              THE COURT:  Right.  We all agreed to that.  We've had

10:34:32 21    lots of demonstratives.  I don't think any of them go back.

10:35:31 22              MR. MICELI:  I don't think any foundation was laid to put

10:35:31 23    that in.  We would object to those going in.

10:35:31 24              MR. COFFIN:  Identify what you're talking about,

10:35:31 25    Mr. Moore.

10:35:31  1          MR. MOORE:  This is the same exercise we've been doing
10:35:31  2  with every video deposition --
10:35:31  3          MR. MICELI:  Well, I apologize.  Your Honor, I'll step
10:35:31  4  aside.  If this has been done through the depo cuts, let me get my
10:35:31  5  colleague.
10:35:31  6          MR. MOORE:  It has.
10:35:31  7          THE COURT:  And I will be honest with you, I had already
10:35:31  8  ruled on those as the testimony was coming in.  What I indicated
10:35:31  9  was that the individual adverse event reports were not coming in,
10:35:31 10  which has been a consistent ruling all along; but then I did say
10:35:31 11  that flow chart -- I don't know if you call it a flow chart.
10:35:31 12          MR MARKOFF:  Seibel chart.  That was from Fierro's
10:35:32 13  deposition that you allowed in.
10:35:32 14          THE COURT:  That.  That came in.
10:35:32 15          MR. MARKOFF:  That's correct.
10:35:32 16          MR. MOORE:  Just getting organized here.
10:35:32 17          MR. MICELI:  I apologize for sticking my nose in.  I'm
10:35:32 18  going back over here, Judge.
10:36:00 19          MR. NOLEN:  Your Honor --
10:36:00 20          THE COURT:  You may make your record.  Please come
10:36:00 21  forward and make your record.
10:36:00 22          MR. MOORE:  SO in accordance with the testimony of
10:36:06 23  Dr. Kopreski, Defendants would offer and file and introduce into
10:36:06 24  evidence Defense Exhibit 381.E, 381.G, 381.I, 381.L, 381.N, 381.K,
10:36:25 25  and 381.M.

10:36:33  1          MR. COFFIN:  We would just like to look through these,

10:36:33  2    your Honor, in light of the discussions we just had.

10:37:00  3          THE COURT:  Yes, go through them.

10:39:36  4          MR. COFFIN:  Your Honor, we will reserve our objections

10:39:36  5    as we have already stated.

10:39:36  6          And in addition, the issue of learned treatises going

10:39:36  7    back to the jury, it's our understanding from the Federal Rules of

10:39:36  8    Evidence that that doesn't happen.  So any of those that are in

10:39:36  9    here, we need to pull out.  We object to, let me say it that way.

10:39:36 10          MR. MOORE:  We will have to meet and confer on what

10:39:36 11    exhibits have been admitted through depositions, which of those are

10:39:36 12    scientific literature.

10:39:36 13          THE COURT:  You need to, but I think you're right, they

10:39:36 14    don't go back.  But they can use it.  You can show them.

10:39:36 15          MR. NOLEN:  Right.

10:39:36 16          THE COURT:  They can refer to them.  But like

10:39:37 17    depositions, they don't go back.

10:39:37 18          MR. MOORE:  Because there's other things admitted through

10:39:37 19    their deposition designations that may be articles we would want to

10:39:37 20    have the same rule apply to, we just have to sort that out.

10:39:37 21          MR. COFFIN:  In addition, your Honor, I just noticed that

10:39:37 22    I think Mr. Moore mentioned a demonstrative that is not supposed to

10:39:37 23    go back to the jury.

10:39:37 24          THE COURT:  That is not going back.

10:39:37 25          MR. MOORE:  Oh, yeah, sorry.  That would be 381.I.

10:39:37  1          MR. MARKOFF:  Your Honor, question about 381.L.  This is
10:39:37  2  the follow-up adverse experiences of one individual --
10:39:37  3          THE DEPUTY CLERK:  State your name.
10:39:37  4          MR. MARKOFF:  I'm sorry, Dan Markoff.  One individual
10:39:37  5  that was part of the 29 from TAX316.
10:39:37  6          THE COURT:  No.  We discussed -- and I know this becomes
10:39:37  7  a little problematic because we have met outside of open court to
10:39:37  8  work through the many and varied depositions that I have gone
10:39:37  9  through, and what I indicated is that these individual reports were
10:39:37 10  not coming in.  But it was that --
10:39:37 11          MR. MARKOFF:  So the rest are two learned treatises, your
10:39:37 12  Honor.
10:39:37 13          THE COURT:  But there was also that -- Harley, you and
10:39:37 14  Dan come up here.
10:39:58 15      (WHEREUPON, A DISCUSSION WAS HELD OFF THE RECORD.)
10:48:22 16      (WHEREUPON, A RECESS WAS TAKEN.)
10:52:48 17      (OPEN COURT.)
10:52:49 18          THE COURT:  All jurors are present.  Court's back in
10:52:49 19  session.  You may be seated.
10:52:50 20          Mr. Strongman, please call your next witness.
10:52:54 21          MR. STRONGMAN:  Sanofi calls Dr. John Glaspy.
10:53:09 22          THE DEPUTY CLERK:  Doctor, can I have you raise your
10:53:11 23  right hand.
10:53:11 24      (WHEREUPON, DR. JOHN GLASPY, WAS SWORN IN AND TESTIFIED AS
10:53:15 25      FOLLOWS:)

10:53:15 1          THE DEPUTY CLERK:  Thank you.  And you can have a seat.

10:53:19 2   And please state and spell your name for the record.

10:53:21 3          THE WITNESS:  John Glaspy, G-L-A-S-P-Y.

10:53:27 4                    VOIR DIRE EXAMINATION

10:53:27 5   BY MR. STRONGMAN:

10:53:31 6   Q.  Good morning, Dr. Glaspy.

10:53:34 7   A.  Good morning.

10:53:34 8   Q.  Can you please just introduce yourself to the jury, and tell

10:53:37 9   the jury what you do.

10:53:39 10  A.  So my name is John Glaspy, I am a medical oncologist.  I work

10:53:43 11  at UCLA Hospital, I see patients primarily with breast cancer, and

10:53:52 12  I have, play a lot of roles in the regulation internally of our

10:53:56 13  research and our doctors.

10:53:58 14  Q.  And, Dr. Glaspy, do you treat patients regularly?

10:54:04 15  A.  I do.

10:54:04 16  Q.  Explain a little bit about your daily practice with regard to

10:54:09 17  oncology.

10:54:10 18  A.  So I restrict my patient care, I try to, to three to three and

10:54:16 19  a half days a week.  On those days I'll see somewhere between 20

10:54:22 20  and 30 patients with cancer, most of them will have breast cancer.

10:54:29 21  The other days I am doing my research, doing administration, doing

10:54:34 22  paperwork.

10:54:35 23  Q.  And, Doctor, I want to put up your CV and walk through a couple

10:54:43 24  of things here.  And can you go through your educational background

10:54:48 25  for the jury?

10:54:49  1    A.   Starting with college?

10:54:50  2    Q.   Sure.

10:54:51  3    A.   So I have a bachelors of science degree from the University of

10:54:55  4    Santa Clara in California, I received that degree in 1975.   I then

10:55:02  5    went to UCLA and went to medical school, and at night I went to

10:55:07  6    public health school.   So over the four years, I earned an M.D. and

10:55:13  7    an MPH degree, a public health degree.   I then went to internship

10:55:21  8    and residency in internal medicine for three years.   And then I did

10:55:25  9    three years of fellowship, specialized training in blood and cancer

10:55:30 10    disease.

10:55:32 11    Q.   And are you board certified?

10:55:35 12    A.   I am.

10:55:35 13    Q.   And what board certifications do you hold?

10:55:37 14    A.   I am board certified in internal medicine, medical oncology and

10:55:41 15    hematology.

10:55:42 16    Q.   And those are three board certifications, is that correct,

10:55:50 17    Doctor?

10:55:51 18    A.   That's correct.

10:55:52 19    Q.   With regard to your professional experience, can you explain

10:55:57 20    your present position as it's stated on your CV?

10:56:02 21    A.   So I am a professor of medicine at UCLA.   I also hold an

10:56:09 22    endowed share in cancer research at UCLA.   So a donor gave the

10:56:15 23    university a corpus of money that was supposed to support a faculty

10:56:22 24    member who did research; the university did a search and I was

10:56:28 25    awarded the chair, and I've held that for quite awhile now.   I

10:56:32   1   think 2003 was when I sat in that chair.

10:56:36   2   Q.  And I see on your resumé it mentions the Jonsson Comprehensive

10:56:43   3   Cancer Center.  Do you see that?

10:56:44   4   A.  Yes.

10:56:44   5   Q.  Can you explain what that is?

10:56:47   6   A.  That's what I was doing all day yesterday.  So the major

10:56:50   7   universities in the country organize their cancer research and

10:56:56   8   treatment around a central grant that they submit to the federal

10:57:02   9   government, they're called a cancer center grant.  Our cancer

10:57:08   10  center grant is -- supports a center called the Jonsson

10:57:15   11  Comprehensive Cancer Center, which is really a reorganization of

10:57:16   12  faculty, researchers, and patient care and clinical research

10:57:20   13  activities, so it's a virtual center.  It doesn't exist physically,

10:57:25   14  it's a center that applies to the government.

10:57:31   15          And if you win, you get designated as a designated

10:57:37   16  compressive cancer center, and that brings benefits in terms of

10:57:42   17  prestige but also some other things you can access with the federal

10:57:47   18  government.  And we were up for our five-year review yesterday and

10:57:50   19  hopefully it went well.

10:57:52   20  Q.  And when you say you were up for your review, who specifically

10:57:56   21  were you talking with yesterday?

10:57:58   22  A.  So the National Cancer Institute makes us apply every year, but

10:58:06   23  they automatically grant renewal of the grant; except every fifth

10:58:11   24  year, they say, okay.  Now this is a competitive renewal, you could

10:58:15   25  lose the grant; and we have to write, rewrite the grant in total.

10:58:21  1   And then they sent, yesterday there were 25 cancer scientists and

10:58:26  2   doctors from around the country sitting at UCLA, and we had to

10:58:30  3   present to them what we were doing and how things were organized

10:58:34  4   and how many patients we placed on trials and all of those things.

10:58:37  5   Q.  And, Doctor, is being a national compressive cancer center a

10:58:44  6   prestigious thing?

10:58:45  7   A.  It is.  It also helps with participation in some critical

10:58:50  8   programs around the country that you can't participate in without

10:58:54  9   it.

10:58:54  10  Q.  And when you talk about programs, are you talking about

10:58:56  11  research?

10:58:57  12  A.  Everything; research, referrals of patients from national

10:59:06  13  websites, those kinds of things.

10:59:09  14  Q.  Doctor, moving through your CV a little bit more.  Are you

10:59:17  15  involved in the review process for peer-reviewed journals?

10:59:22  16  A.  I am.

10:59:23  17  Q.  And can you explain that for the jury what your involvement is?

10:59:26  18  A.  So there are two kinds of publications:  One are publications

10:59:31  19  that are not peer reviewed, and that means that you write your

10:59:37  20  paper and then the journal will publish it; and those that are peer

10:59:42  21  reviewed, meaning, it has to be sent out to referees who review the

10:59:48  22  publication and make comments.  Frequently they'll say you're not

10:59:52  23  ready to publish, go back and do this experiment, or add this

10:59:57  24  number of patients, or look at this aspect, or don't graph it that

11:00:01  25  way.  It's a way of making sure that the publications carry impact

11:00:11  1    and we can rely better on those publications.

11:00:14  2              In order to do that, you have to -- somebody has to do

11:00:18  3    that refereeing, and so we share the duty reviewing each other's

11:00:23  4    papers.

11:00:24  5    Q.  And, Doctor, are you a reviewer for some of the most

11:00:28  6    prestigious medical journals in the country?

11:00:30  7    A.  I guess, yes.  Yeah.  Yes.

11:00:32  8    Q.  And that would include the *New England Journal of Medicine;* is

11:00:36  9    that correct?

11:00:37  10   A.  Yes.

11:00:37  11   Q.  And we've also heard about the *Journal of Clinic Oncology*

11:00:45  12   during this trial.  Can you explain what the *Journal of Clinical*

11:00:48  13   *Oncology* is?

11:00:48  14   A.  So the *Journal of Clinical Oncology* has become sort of the

11:00:52  15   central journal for cancer medicine.  So if something has enough

11:00:58  16   national impact that it extends beyond oncology, it might go in the

11:01:04  17   *New England Journal of Medicine*.  But the best articles that are

11:01:08  18   primarily of interest to oncologists more and more are in the

11:01:14  19   *Journal of Clinical Oncology*.  It's become the dominant journal in

11:01:19  20   cancer.

11:01:20  21   Q.  Doctor, in your CV you've also given a list here of numerous

11:01:31  22   lectures and presentations; is that correct?

11:01:34  23   A.  Yes.

11:01:35  24   Q.  And I think if I counted it up, there are several hundred of

11:01:39  25   them listed; is that right?

11:01:40   1   A.   Yes.

11:01:41   2   Q.   And, Doctor, throughout the course of your career, have you

11:01:44   3   given numerous lectures on breast cancer?

11:01:46   4   A.   I have.

11:01:46   5   Q.   And have you given numerous lectures on chemotherapy to treat

11:01:50   6   breast cancer?

11:01:51   7   A.   Yes.

11:01:51   8   Q.   And flipping forward in your CV, you also have a section for

11:02:03   9   research papers that have been peer reviewed; is that correct?

11:02:07  10   A.   Yes.

11:02:07  11   Q.   And you've been published in peer-reviewed journals any number

11:02:12  12   of times; is that correct?

11:02:13  13   A.   That's correct.

11:02:13  14   Q.   And, Doctor, are you involved any societies, professional

11:02:25  15   societies?

11:02:25  16   A.   I am when I remember to pay my dues, and occasionally I am not

11:02:30  17   a member for awhile.   But, yes.

11:02:32  18   Q.   Okay.   And one of the things that I wanted to talk about

11:02:37  19   briefly, tell me about your role with Stand Up to Cancer, what it

11:02:42  20   is and what your role has been historically and what it is

11:02:46  21   currently.

11:02:46  22   A.   So Stand Up to Cancer was the brain child of Laura Ziskin, who

11:02:55  23   was a famous producer, who developed breast cancer and was my

11:02:58  24   patient.   And she became very frustrated with the pace of research

11:03:04  25   in breast cancer and wanted to find out if there was something she

11:03:10 1    could do that was different.

11:03:13 2            So we had a meeting, we convened a meeting of some of the

11:03:17 3    thought leaders in the field and identified areas where we're not

11:03:21 4    very good at -- with the current funding of research, we're not

11:03:27 5    good at cooperating, we're more focused on competing; we're not as

11:03:33 6    focused on breaking through to help the patients as quickly as

11:03:37 7    possible, we're focused on understanding things as well as

11:03:41 8    possible.

11:03:45 9            So she said she wanted to throw her weight as an

11:03:49 10   entertainment person behind a plan to do this.  And our initial

11:03:56 11   thought was -- she got the Oxygen Channel and Oprah to agree to

11:04:01 12   give them an hour to do a fundraiser.  Six other power women in

11:04:10 13   Southern California move circles got wind of this and said, why are

11:04:16 14   you doing that?  If we all put all of our power together, we can do

11:04:20 15   a national road block where when you watch TV -- I don't know if

11:04:24 16   you've noticed, but those nights those hit -- it's every other

11:04:27 17   night now, you can change the channel if you want, but the same

11:04:31 18   thing is on every channel.  The country every two years has a road

11:04:36 19   block, and if you want to watch television, you have to watch the

11:04:40 20   Stand Up to Cancer show.

11:04:42 21           That has developed a fund raising infrastructure, it

11:04:47 22   developed a close relationship with Major League Baseball, you've

11:04:51 23   probably seen people saying "I stand up" and that stuff on

11:04:54 24   television.

11:04:56 25           And it has raised approximately $150 million a year, and

11:05:02  1    we administer that money along the line -- Laura is not with us

11:05:06  2    anymore, but we administer that money along the lines of what Laura

11:05:11  3    wanted.

11:05:12  4              And so that's what Stand Up to Cancer is.  I am just a

11:05:17  5    dumb stand-by person.  It happened because of a magical meeting

11:05:24  6    that just happened in my office because I had a couple of patients

11:05:27  7    that had power.

11:05:28  8    Q.  And is that an organization and a movement that's important to

11:05:32  9    you?

11:05:32 10    A.  It is for both reasons:  One, it's -- I was very close to

11:05:40 11    Laura, and as long as this lives, she lives.  So that's number one.

11:05:44 12    And number two is, I think it's doing good work.

11:05:46 13    Q.  Now, Doctor, in your clinical practice, how long have you been

11:05:50 14    in clinical practice treating cancer?

11:05:52 15    A.  Since -- well, if we don't count fellowship because I was

11:05:56 16    practicing side-by-side with a faculty member, it would be 1985 or

11:06:01 17    '86.

11:06:01 18    Q.  And throughout that time, have you been using chemotherapies of

11:06:07 19    various kinds in your practice?

11:06:09 20    A.  Yes.

11:06:10 21    Q.  And have you been involved in clinical trials at all?

11:06:13 22    A.  Yes.

11:06:13 23    Q.  And explain your involvement in clinical trials.

11:06:16 24    A.  Well, do you mean the process of an individual trial or --

11:06:22 25    Q.  Just what your experience has been.  We'll get into, actually,

11:06:25  1    how a clinical trial works a little bit, but what's your

11:06:28  2    experience?

11:06:29  3    A.  We're very focused on -- because one of the responsibilities of

11:06:33  4    a university is to generate new knowledge, so we're very focused,

11:06:37  5    not just on trying to take care of patients but also trying to make

11:06:44  6    treatments better.  So to do that, you have to do clinical trials.

11:06:49  7           And I've been involved in that since the beginning.  I

11:06:55  8    have personally been the principal investigator on hundreds of

11:06:58  9    clinical trials over the years.  And I've trained fellows for the

11:07:04  10   last 20 years that are also now involved in clinical research at

11:07:09  11   UCLA and around the country.

11:07:12  12   Q.  As part of your involvement, both in clinical trial and in

11:07:15  13   terms of just treating patients on a day-to-day basis, tell the

11:07:18  14   jury what your familiarity is and what your expertise is with

11:07:21  15   regard to the -- we've been calling it label -- but the risk and

11:07:27  16   warning information for chemotherapy drugs.

11:07:32  17   A.  Well, I've been involved in one way with -- in drug

11:07:39  18   development.  I've been fortunate enough to have been involved as a

11:07:42  19   central investigator of several drugs that have gone all the way

11:07:47  20   through to --

11:07:48  21           MR. MICELI:  Your Honor, I have to object, it's outside

11:07:50  22   the scope of his expertise.

11:07:54  23           THE COURT:  I think we're just going through his CV,

11:07:57  24   right?

11:07:57  25           MR. STRONGMAN:  We're talking about his experience, yeah.

11:08:00  1          MR. MICELI:  We are.  And I will not be challenging him

11:08:02  2   as an oncologist.  I will give that up right now.  But I do object

11:08:08  3   to out of the scope of regulatory.

11:08:14  4          THE COURT:  Mr. Strongman -- I am going to allow him to

11:08:18  5   talk about his qualifications and his opinions will be limited to

11:08:24  6   those areas that he is --

11:08:29  7          MR. STRONGMAN:  Thank you, your Honor.

11:08:29  8   BY MR. STRONGMAN:

11:08:30  9   Q.  Go ahead.

11:08:32  10  A.  So I am trying to remember where I was.

11:08:35  11  Q.  Let me ask it this way.  As a doctor treating patients, do you

11:08:39  12  have to understand and be familiar with the label for the

11:08:44  13  chemotherapies that you're prescribing?

11:08:45  14  A.  Yes.

11:08:47  15  Q.  And as part of your practice throughout the 30 plus years that

11:08:51  16  you've been treating patients, do you review those labels?

11:08:55  17  A.  Yes.

11:08:56  18  Q.  And as part of your practice, do you make it your goal to

11:09:02  19  understand what the labels say so that you can know the risks and

11:09:08  20  you can then relay those as appropriate to your patients?

11:09:11  21  A.  Yes.  That's one -- that's not the only reason we look at

11:09:15  22  labels, but, yes.

11:09:16  23  Q.  What other reasons do you look at labels?

11:09:18  24  A.  Well, increasingly over time the FDA labels have come to be the

11:09:26  25  first place you look when you're trying to find out if an insurance

11:09:31  1    company is going to cover a medicine for a person that you want to

11:09:35  2    treat with that medicine.  It's unfortunately just part of the way

11:09:40  3    it is now that the only way to be sure there's going to be

11:09:44  4    reimbursement, say, from Medicare, is that label.  So that becomes

11:09:49  5    a very important thing for oncologists to stay in contact with as

11:09:54  6    well.

11:09:54  7    Q.  And throughout your practice --

11:09:56  8    A.  And excuse me.  There's also, when a drug first comes out, if

11:10:01  9    it wasn't something you were involved in developing, you look to

11:10:05  10   the label for precautions for dosing, for -- it's not just how many

11:10:14  11   milligrams, it's also what do you mix it in and how fast do you

11:10:18  12   give it, and how big a volume do you put it in, and all of those

11:10:22  13   things; it's an instruction book for how the FDA thinks that drug

11:10:25  14   should be administered.

11:10:27  15   Q.  And I think you actually have had some experience in working on

11:10:32  16   what's called a new drug application; is that correct?  With

11:10:38  17   Neupogen?

11:10:38  18   A.  I have with several drugs, stem cell factor, Neulasta,

11:10:46  19   Neupogen, Aranesp, Herceptin.

11:10:49  20   Q.  Very good.

11:10:51  21         MR. STRONGMAN:  And, your Honor, I would offer Dr. Glaspy

11:10:54  22   as an expert in oncology, breast cancer care and treatment,

11:10:57  23   labelling risk information for chemotherapy, clinical trials,

11:11:01  24   informed consent, and side effects of chemotherapy.

11:11:06  25         MR. MICELI:  Your Honor, we do not object to Dr. Glaspy's

11:11:09 1   qualifications as an oncologist and as a clinical researcher.  For

11:11:14 2   all others, we would contest his qualifications.  Particularly as

11:11:19 3   it goes to regulatory.

11:11:20 4           THE COURT:  I don't think I heard that.

11:11:23 5           MR. MICELI:  Labelling, your Honor.  I put labelling

11:11:25 6   under the umbrella of regulatory.

11:11:27 7           MR. STRONGMAN:  And in his expertise as it relates to his

11:11:31 8   use of labelling as a treating physician, your Honor.

11:11:35 9           MR. MICELI:  Your Honor, as a physician it has to look at

11:11:37 10  labels, I don't challenge that, he is an oncologist.  But --

11:11:43 11          THE COURT:  Okay.  I will tell you, as the conversation

11:11:51 12  that we had this morning, within those parameters is there an

11:11:58 13  objection outside of the parameters we addressed this morning?

11:12:02 14          MR. MICELI:  Yes.  We haven't put it officially on the

11:12:06 15  record, but we can do that when we break later.

11:12:09 16          THE COURT:  Okay.  Then do you want to voir dire this

11:12:12 17  witness?

11:12:13 18          MR. MICELI:  I would briefly like to voir dire this

11:12:15 19  witness, your Honor, yes.

11:12:16 20          THE COURT:  Please proceed.

11:12:38 21                     TRAVERSE EXAMINATION

11:12:39 22  BY MR. MICELI:

11:12:43 23  Q.  Good morning.

11:12:43 24  A.  Good morning.

11:12:43 25  Q.  Just briefly, I will have my opportunity later.

11:12:47  1             You do not have any specific training in FDA regulatory

11:12:52  2    law, do you?

11:12:53  3    A.  I do not.

11:12:54  4    Q.  And you don't have any specific training in FDA regulation

11:12:58  5    compliance?

11:13:00  6    A.  That's correct.

11:13:00  7    Q.  You've never worked for the FDA?

11:13:03  8    A.  I have not.

11:13:03  9    Q.  And you've not undertaken a review of the regulatory history of

11:13:11 10    Taxotere?

11:13:12 11    A.  I have to some extent, but --

11:13:17 12    Q.  Have you done that since your deposition, sir?

11:13:20 13    A.  No.  There was -- I think -- I want to avoid stepping on some

11:13:27 14    areas you've agreed not to step on.

11:13:30 15    Q.  Understood.

11:13:30 16    A.  But I think if you look at the totality of my deposition,

11:13:33 17    you'll see an area in there where I can't honestly answer that

11:13:37 18    question no.

11:13:38 19    Q.  Okay.

11:13:39 20    A.  Okay.

11:13:40 21             MR. MICELI:  I think perhaps Mr. Strongman and I may need

11:13:42 22    to talk to the judge.  But may I just show him some of this

11:13:47 23    testimony, your Honor, to refresh his recollection?

11:13:48 24             THE COURT:  Why don't you come up here.

11:13:57 25             MR. MICELI:  Sure.

11:13:57   1      (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

11:14:11   2         THE COURT:  What is your objection of this man?  He is

11:14:11   3 not going to testify about FDA regulations, he is going to say as a

11:14:11   4 treating oncologist I read --

11:14:11   5         MR. MICELI:  I am entirely fine with that, that's where

11:14:11   6 we're going.  But when I read his report that's not what I get out

11:14:24   7 of it, your Honor, and I have to be hesitate to say --

11:14:24   8         MR. STRONGMAN:  I haven't implied I am going to do

11:14:24   9 anything other than --

11:14:24 10         THE COURT:  I saw one paragraph of his report -- because

11:14:25 11 there was no *Daubert* motion filed on behalf of Dr. Glaspy.

11:14:28 12         MR. MICELI:  Right.

11:14:29 13         THE COURT:  So what I saw was that one area he is not

11:14:33 14 being tendered as an expert in the field of FDA regulations.

11:14:42 15         MR. MICELI:  As long as that's what we hear, I am fine

11:14:42 16 with that.  But I read it differently.

11:14:42 17      What had happened was, your Honor, in the deposition we

11:14:45 18 have a question that says he hasn't undertaken it, he would defer

11:14:59 19 to regulatory experts.  Then he said that he looked at an e-mail

11:14:59 20 that was not disclosed in his review material, and that is the

11:14:59 21 strike through e-mail that seems like every witness in this case

11:14:59 22 has looked at, and I was concerned that there may be some testimony

11:15:04 23 because of that testimony in the deposition.

11:15:08 24         MR. STRONGMAN:  That's not my intent.

11:15:08 25         MR. MICELI:  It's not the intent, that's fine.

11:15:11  1          MR. STRONGMAN:  Just what we talked about this morning.

11:15:13  2          MR. MICELI:  I don't challenge him as an oncologist.

11:15:16  3          THE COURT:  I was trying to figure out where you were

11:22:23  4  going with this.

11:22:23  5          MR. MICELI:  I understand.  Thank you.

11:22:23  6          THE COURT:  So do you want to say there is no objections,

11:22:23  7  but that's fine if you want to continue your voir dire.

11:22:23  8          MR. MICELI:  I won't continue with my voir dire so long

11:22:23  9  as we have the agreement on what we discussed; and if there's

11:22:23 10  anything outside of that, I'll make my objections.

11:22:23 11          THE COURT:  Make your objection at the time.  Okay.

11:22:23 12  Thank you.

11:22:23 13      (OPEN COURT.)

11:22:23 14          THE COURT:  Mr. Miceli.

11:22:23 15          MR. MICELI:  Oh, I'm sorry.  I have nothing further and

11:22:23 16  we don't object to the areas of expertise with the understanding

11:22:23 17  that he will be testifying to what an oncologist --

11:22:23 18          THE COURT:  To those areas.

11:22:23 19          MR. MICELI:  Yes, thank you.

11:22:23 20          THE COURT:  The Court is going to accept Dr. Glaspy as an

11:22:23 21  expert in the field of oncology, breast cancer care and treatment,

11:22:23 22  labelling, risk information for chemotherapy, clinical trials,

11:22:24 23  informed consent with side effects of chemotherapy qualified to

11:22:24 24  render opinions in those areas.  Please proceed.

11:22:24 25          MR. STRONGMAN:  Thank you.

11:22:24  1                    DIRECT EXAMINATION

11:22:24  2   BY MR. STRONGMAN:

11:22:24  3   Q.  Now, Doctor, have you formed some opinions in this case?

11:22:24  4   A.  I have.

11:22:24  5   Q.  And can you discuss briefly what you reviewed in forming your

11:22:24  6   opinions?

11:22:24  7   A.  So I reviewed the medical records of Mrs. Earnest.  I've

11:23:15  8   reviewed the depositions of many of the experts, if not all of the

11:23:15  9   experts, that have been deposed in this case, together with all of

11:23:15 10   their attachments.  I reviewed literature and based also my

11:23:15 11   opinions on my own experience and my own literature, that I didn't

11:23:15 12   re-review as part of the preparation.

11:23:15 13   Q.  And, Doctor, do you have an opinion as to whether Ms. Earnest

11:23:15 14   needed chemotherapy?

11:23:15 15   A.  I do.  And I believe she did.

11:23:15 16   Q.  And, Doctor, do you have an opinion as to whether a

11:23:15 17   chemotherapy regimen with Taxotere was the best choice for her

11:23:15 18   treatment?

11:23:15 19   A.  I think to be really balanced, I would say it was one of the

11:24:15 20   best choices.  There were more than one best choice available at

11:24:15 21   the time.

11:24:15 22   Q.  And, Doctor --

11:24:15 23   A.  In terms of treatment for her cancer, there were two dominant

11:24:15 24   ones.  I would have favored the one she receive -- well, not the

11:24:15 25   one she received, but one similar to the one she received for

11:24:15  1    special reasons for her.

11:24:15  2    Q.  Explain.

11:24:15  3    A.  So the two -- by 2011 we knew -- we've skipped all of the

11:24:15  4    history of this -- but by 2011, we knew that in terms of preventing

11:24:15  5    breast cancer death in a woman who had a significant risk of --

11:24:15  6    that he was harboring micrometastatic disease, that's what we're

11:24:15  7    doing when we treat early breast cancer.  We're taking a woman

11:24:15  8    where her scans are clear but we know there's a pretty good chance

11:24:15  9    that there's cancer hiding somewhere beneath our ability to see it

11:24:15 10    on a scan, because we can't see things until there's many millions

11:24:51 11    of cells in one spot.

11:24:51 12         So those women, if they're treated before it becomes big

11:24:51 13    enough to see, are still potentially curable.  That's why survival

11:24:51 14    goes up when they receive some chemotherapy, because you're curing

11:24:51 15    that disease that otherwise would have caused a relapse and that

11:24:51 16    relapse would not have been curable.

11:27:19 17         So we've been working since -- this all unfolded while I

11:27:19 18    was growing up as an oncologist, it all unfolded over the period

11:27:19 19    between the mid 1980s and now, where it was shown that chemotherapy

11:27:19 20    improved survival.  And then the question was, "How can we make it

11:28:32 21    better?"  And so we went through several generations.

11:28:32 22         When the taxanes became available, two major regimens in

11:28:32 23    the United States rose to the top; one was Adriamycin/Cytoxan,

11:28:32 24    you've heard these a lot now, AC, followed by Taxol.  With the

11:28:32 25    Taxol given weekly.  That was one dominant regimen in the United

11:28:33  1    States in 2011.

11:28:33  2            The other was substituting Taxotere for the Taxol.

11:28:33  3    Usually, that was given all three drugs at once, so it was TAC or

11:28:33  4    DAC, if you want to call it docetaxel so it doesn't get confusing,

11:28:33  5    DAC, given every three weeks to patients.  That was the most common

11:28:33  6    one.

11:28:33  7            But some people were mixing them and doing AC followed by

11:28:33  8    Taxotere.  That ultimately was what she received.  So there's that.

11:28:33  9    That's the background.

11:28:33 10            Now, why I would favor the use of docetaxel in her case

11:28:33 11    was twofold:  One was --

11:28:33 12    Q.  So the jury has heard this, too, but docetaxel is Taxotere?

11:28:33 13    A.  Taxotere, right.  We'll go back to the T, but it's gets

11:28:33 14    confusing because when you talk about regimens, yes.

11:28:33 15            So the reason I would have favored that is that -- you

11:28:33 16    need to hear a little bit of detail.  The taxanes major issues when

11:28:33 17    they first were administered to human beings were that they had a

11:28:33 18    very high chance of causing a serious allergic reaction.  That was

11:28:33 19    limiting during those early times when it was being developed

11:28:33 20    initially in ovarian cancer.  And it became known that if you gave

11:28:33 21    steroids, corticosteroids -- not the ones that make you make muscle

11:28:33 22    but the ones that prevent allergic reactions -- the day before, the

11:28:33 23    day of, and the day after the taxane chemotherapy, that now we

11:28:33 24    could give them to humans with better safety.

11:28:33 25            So now when an oncologist is contemplating giving either

1  Taxol or Taxotere to a patient, you have to factor in that you're

2  going to be giving them high doses of steroids the day before, the

3  day of, and the day after chemotherapy.

4       If somebody has high blood sugars or is prediabetic, the

5  steroids will often cause very high blood sugars during those

6  periods of time; and you can end up getting sick from that, you

7  know, your doctor gets a phone call that your blood sugar is 400 in

8  the ER.

9       So we get concerned about steroids.  And if you're giving

10  Taxol in 2011, my opinion, the optimal way to give it is weekly,

11  which means 12 treatments to get it all in, which means 12 weeks

12  when you're getting three of the days high-dose steroids.  Whereas

13  Taxotere was given every three weeks, so there were only six times

14  when you needed to get the steroids spread over a period of

15  18 weeks.  So it minimized the steroid exposure.

16       The second reason was that by 2011, my opinion, we were

17  convinced that both drugs could cause neuropathy but that Taxol had

18  more neuropathy complications than Taxotere.  And if you are

19  diabetic or prediabetic, the risk of neuropathy goes up.  So that

20  would have been another thing drawing me towards Taxotere.

21  Q.  And, doctor, even backing up we talked about taxanes; is that

22  right?

23  A.  I did.

24  Q.  And do you believe that Ms. Earnest needed a taxane in her

25  chemotherapy regimen?

11:28:34 1   A.  If her goal was to optimize her cure rate, yes.

11:28:34 2   Q.  And, Doctor, we've heard a lot about persistent hair loss in

11:28:34 3   this case.  If Ms. Earnest was going to get chemotherapy with a

11:28:34 4   taxane, do you have an opinion as to whether there were any

11:28:34 5   regimens for the treatment of adjuvant breast cancer that did not

11:28:34 6   carry a risk of persistent hair loss?

11:28:34 7   A.  I believe there wasn't.

11:28:34 8   Q.  And finally, Doctor, you have reviewed Ms. Earnest's medical

11:28:34 9   records; is that correct?

11:28:34 10  A.  I have.

11:28:34 11  Q.  And, Doctor, do you have an opinion as to whether there is any

11:28:34 12  medically reliable way to trace Ms. Earnest's current alopecia to

11:28:34 13  Taxotere specifically?

11:28:34 14  A.  I believe it is impossible.

11:28:34 15  Q.  And are the opinions that you're going to offer today, do you

11:28:34 16  hold those to a reasonable degree of medical certainty?

11:28:34 17  A.  I do.

11:28:34 18  Q.  And I want to back up now and talk about just your experience

11:28:34 19  with Taxotere.  Okay.

11:28:34 20       When did you first get introduced to Taxotere and what

11:28:34 21  has your experience in your clinical practice?

11:28:34 22  A.  So we were fortunate to become involved early in the

11:28:34 23  development of Taxotere, so we participated in some of those early

11:28:34 24  Phase II trials.  Drugs go through a Phase I where you're just

11:28:34 25  trying to figure out the dose, a Phase II where you're trying to

11:28:34  1    look for signals of its ability to work in different diseases, and

11:28:34  2    then Phase III where you're trying to see if it's better than

11:28:34  3    what's already out there.  So that's when randomization kicks in

11:28:34  4    and it becomes important to randomize at the Phase III level.

11:28:34  5    Q.  And with regard to Taxotere, were you involved in clinical

11:28:35  6    trials?

11:28:35  7    A.  We were.  We were involved in 316 pretty heavily.

11:28:35  8    Q.  And explain what your involvement was, specifically your site's

11:28:35  9    involvement in TAX316.

11:28:35 10    A.  So that's a little complicated.  So the first and most

11:28:35 11    important one is we were a study center, we were putting patients

11:28:35 12    on the trial.  And so that's No. 1.  No. 2, the cooperative group,

11:28:35 13    which at the time was called BCIRG that was doing the trial, the

11:28:35 14    group doing the trial was led by UCLA faculty.  That cooperative

11:28:35 15    group is still to this day, it's not called BCIRG anymore, but it

11:28:37 16    was led by UCLA faculty members.  Dr. Nabholtz and Dr. Slamon were

11:28:37 17    key people at that cooperative group level.

11:28:37 18    Q.  And have you also had experience with Taxotere just in terms of

11:28:37 19    your clinical practice outside of a clinical trial setting?

11:28:37 20    A.  I have.

11:28:37 21    Q.  A couple of questions, Doctor.  Obviously you're getting

11:29:29 22    compensated for your time today; is that correct?

11:29:29 23    A.  Yes.

11:29:29 24    Q.  And your rate is $400 an hour; is that right?

11:29:29 25    A.  That's correct.

11:29:29  1   Q.  And, Doctor, does the University of California system have a

11:29:29  2   compensation plan?

11:29:29  3   A.  Yes.

11:29:29  4   Q.  And do you participate in that plan?

11:29:29  5   A.  I do.

11:29:29  6   Q.  Do you get any exemptions from that plan?

11:29:29  7   A.  No.

11:29:29  8   Q.  Just explain to the jury, do you stand to be able to make just

11:29:29  9   as much money as you want doing outside litigation consulting work?

11:29:29 10   A.  I do not.

11:29:29 11   Q.  Explain that to the jury.

11:29:29 12   A.  So, the university went through several iterations of this and

11:29:29 13   they're thinking of another one in the future.  But they, many

11:29:29 14   years ago before this whole litigation started, decided that we --

11:29:29 15   that faculty members can get some outside income, okay.  So rather

11:29:29 16   than say you can't have any, they said you can have some, and you

11:29:29 17   can't spend more than a day a week of your time doing this.

11:29:29 18              The amount -- do you want me to -- the total amount?

11:29:29 19   Q.  Sure.

11:29:29 20   A.  Okay.  So the total amount in a year is $40,000.

11:29:29 21   Q.  And you participate in that plan?

11:29:29 22   A.  I do.

11:29:29 23   Q.  And, Doctor, you have also, obviously you said you worked in

11:29:29 24   consulting with clinical trials with various drug manufacturers

11:29:29 25   over the years; is that correct?

11:29:29  1    A.  That's correct.

11:29:29  2    Q.  And as part of your work in that, is there compensation

11:29:29  3    involved?

11:29:29  4    A.  There's compensation to the university, not to me.  So it comes

11:29:29  5    in under my name, but the check is written to the Regents of the

11:29:29  6    University of California.

11:29:29  7    Q.  Very good.  All right.  Let's take one step back even from

11:29:30  8    Taxotere.  Can you explain what cancer is and how it works?

11:29:30  9    A.  So cancer is a -- you can think of it as a loss of an

11:29:30 10    instruction book on the part of cells.  While I've been talking to

11:29:30 11    you today, just in this little bit of time, I have made maybe 80

11:29:36 12    billion blood cells.  In order to do that, my bone marrow has been

11:29:41 13    divided like crazy.  And because there are millions of genes that

11:29:45 14    have to be copied, mistakes are happening.  I've made mistakes

11:29:51 15    while we've been sitting here.

11:29:53 16            Our body is set up to correct those mistakes.  You have

11:29:57 17    incredible apparatus in the cells to find those mistakes and fix

11:30:03 18    them.  And then if they can't be fixed, because some cells are just

11:30:08 19    really screwed up, if they can't be fixed, then they either

11:30:13 20    self-destruct or they raise their hand and say, "I am an invader"

11:30:18 21    so the immune system will kill them.  It's an amazing system that

11:30:23 22    we have.

11:30:28 23            So I probably am going to escape today without getting

11:30:28 24    leukemia, probably.  But if that system works, one, it works

11:30:37 25    999,999 out of a million, it eventually is going to fail.  And when

11:30:44  1   that fails, a cell with a mutation survives.  Okay.  It wasn't

11:30:51  2   destroyed.  And then that cell is now unstable because part --

11:30:56  3   somebody ripped one of the pages of the instruction book out and

11:30:59  4   threw it away.  And so now it's more likely to make a mistake next

11:31:05  5   time and not correct it.

11:31:08  6        And then as time goes on, you pile up these things,

11:31:11  7   they're called mutations, where our DNA is changing, and the

11:31:16  8   simplest cancers like -- breast cancer is a relatively simple

11:31:21  9   cancer -- there will be 50 or 60 million mutations, minimum, in a

11:31:28 10   breast cancer once it's clinically evident as breast cancer.

11:31:34 11        So this process unfolds over time.  This failure of

11:31:37 12   patrolling and gradual instability.

11:31:49 13        So when a cancer is fully developed, it's lost its

11:31:49 14   inhibitions on invading surrounding tissue, it has reopened its

11:31:51 15   ability to float around in the blood stream and eat out of a blood

11:31:55 16   vessel at a distant site and take up and establish a blood supply

11:31:59 17   and take up residence, it's got everything it needs to do to do

11:32:03 18   what cancers do to kill us.

11:32:16 19        That's what cancer is, it's an accumulated failure of

11:32:16 20   these safeguards that we have, that work pretty well.  Most of us

11:32:16 21   make it to reproductive age without getting cancer, which is, you

11:32:18 22   know, how nature designs us.

11:32:32 23   Q.  And, Doctor, with regard to breast cancer specifically, are you

11:32:32 24   familiar with the statistics regarding breast cancer in the

11:32:32 25   population?

11:32:32 1    A.  Yes.

11:32:32 2    Q.  And what percentage of women will develop breast cancer in

11:32:32 3    their lives?

11:32:33 4    A.  So in the United States it's approximately one in eight.

11:32:37 5    Q.  And with regard to that statistic, that includes all types of

11:32:42 6    breast cancer, correct?

11:32:43 7    A.  It does.

11:32:43 8    Q.  And so that includes both metastatic breast cancer as well as

11:32:53 9    what we're calling in this case invasive breast cancer that hasn't

11:32:57 10   fully metastasized yet?

11:33:00 11   A.  And it also includes noninvasive breast cancer.  Sometimes

11:33:05 12   cancers get found before they invade.

11:33:08 13   Q.  Okay.  Very good.  And with regard to the breast cancer

11:33:10 14   statistics, how many women are living in the United States with

11:33:16 15   breast cancer?

11:33:17 16   A.  I think it's somewhere in the range of 3 million.  They've had

11:33:22 17   breast cancer and are alive and living.  Some of them aren't living

11:33:26 18   with it because it's gone, it's cured.

11:33:28 19   Q.  And I want to back up to 2011 when Ms. Earnest was diagnosed

11:33:32 20   with breast cancer, okay?

11:33:34 21   A.  Okay.

11:33:42 22           MR. STRONGMAN:  May I approach, your Honor?

11:33:44 23           THE COURT:  Yes, you may.

11:34:05 24   BY MR. STRONGMAN:

11:34:05 25   Q.  Doctor, what I've handed you is a document entitled breast

11:34:08  1   cancer facts and figures.  Do you see that?

11:34:11  2   A.  I do.

11:34:11  3   Q.  And it's from that 2011 time period.  Do you see that?

11:34:15  4   A.  I do.

11:34:15  5   Q.  And this is put out by the American Cancer Society; is that

11:34:20  6   correct?

11:34:20  7   A.  Yes.

11:34:26  8   Q.  And, Doctor, in your field, is the American Cancer Society a

11:34:26  9   reliable authority for statistics regarding breast cancer?

11:34:41 10   A.  In general, yes.

11:34:41 11   Q.  And, Doctor, looking at this publication, in 2011, what is the

11:34:41 12   estimated number of new cases of invasive breast cancer, according

11:34:54 13   to the American Cancer Society?

11:34:54 14   A.  Which page is that?

11:34:54 15   Q.  If you go to page 2.

11:34:54 16   A.  I want to quote it correctly.

11:34:56 17   Q.  And if you look --

11:35:04 18   A.  Oh, I see.  Okay.

11:35:04 19   Q.  Got it?

11:35:05 20   A.  All right.  So in 2011 it was 230,480.

11:35:18 21   Q.  And in 2011, how many women were expected to die from breast

11:35:18 22   cancer?

11:35:18 23   A.  Almost 40,000; 39,520.

11:35:22 24   Q.  And, Doctor, based on your clinical experience, in 2011 was

11:35:30 25   breast cancer a significant problem?

11:35:35   1   A.  Yes.

11:35:35   2   Q.  And is it still a significant problem?

11:35:38   3   A.  It is.

11:35:38   4   Q.  And what are the risk factors for developing breast cancer,

11:35:46   5   Doctor?

11:35:46   6   A.  So the main one is being female, right, that's the dominant

11:35:53   7   risk factor.  The other risk factors are having a positive family

11:36:01   8   history, especially if there's a gene that can be detected that

11:36:04   9   runs through the family that causes breast cancer.  Exposure to

11:36:10  10   estrogen that isn't opposed, so that would be for a woman early

11:36:18  11   menarche/late menopause or not ovulating, polycystic ovary patients

11:36:29  12   get more breast cancer because they don't ovulate, those kinds of

11:36:31  13   things.

11:36:31  14        There's a little bit of effect of environmental things

11:36:35  15   like radiation, that's why flight attendants get more breast cancer

11:36:39  16   because they spend more time unshielded from the radiation from

11:36:43  17   outer space.

11:36:43  18   Q.  And, Doctor, I want to talk about how has the treatment of

11:36:47  19   breast cancer evolved during your practice?

11:36:49  20   A.  Yeah, I was lucky like Forrest Gump.  I've been lucky to just

11:36:56  21   be sitting in the right place.

11:36:57  22        When I started my fellowship, we were just ending the era

11:37:06  23   where -- the problem with breast cancer is you have the breast

11:37:09  24   cancer removed and everybody says you're fine and then five years

11:37:13  25   later you have terminal breast cancer.  Everyone knows someone

11:37:18  1  where that kind of thing happened to them.  That's the central

11:37:24  2  problem.

11:37:24  3       For a century, medicine was convinced that that was

11:37:28  4  because we weren't doing a big enough surgery.  So the surgeries

11:37:32  5  got bigger and bigger and bigger and bigger, and the cure rates

11:37:36  6  didn't change at all.  And a lot of ver mutilating things were done

11:37:43  7  without benefit.

11:37:48  8       Then by accident -- this is a neat thing.  So there was a

11:37:55  9  scientist who said maybe the problem is that when we're doing the

11:38:01 10  surgery, we're shaking cancer cells loose.  And so they gave a dose

11:38:05 11  of chemo the day before surgery, the day of, and the day after

11:38:09 12  surgery and that was it.  And mortality went down.  They quickly

11:38:13 13  realized it wasn't because that they were shaking cells loose, it

11:38:17 14  was because they were treating breast cancer that had already

11:38:20 15  spread around the body effectively with that chemo.

11:38:24 16       And that started a process in the early and mid 80s of

11:38:29 17  using chemotherapy to improve survival and decrease relapse risk in

11:38:39 18  women with breast cancer.  That's where this all came from.

11:38:39 19       And it started during my infancy as an oncologist with

11:38:43 20  two years of chemotherapy that women would take after their

11:38:49 21  surgery, and then we went through the CMF chemotherapy regimen, the

11:38:56 22  Adriamycin/Cytoxan and epirubicin/Cytoxan regimens, and then ended

11:39:02 23  in the taxanes came on board and we already talked about that.

11:39:12 24  Q.  And how have survival rates changed for breast cancer during

11:39:12 25  your practice?

11:39:12  1    A.  They've improved a lot.  They've improved by about 40 percent.

11:39:15  2    So that time frame has been a fun time to be an oncologist because

11:39:21  3    you can see progress happening.

11:39:23  4    Q.  And, Doctor, as you said, you've actually been involved in

11:39:28  5    clinical trials that have led to those developments, that have led

11:39:31  6    to the improvement in survival, fair?

11:39:34  7    A.  I have, yeah.

11:39:34  8    Q.  And, Doctor, can you explain how chemotherapy, in general --

11:39:39  9    we're going to talk about chemotherapy in general and then taxane

11:39:43 10    specifically.  But can you explain how a chemotherapy in general

11:39:46 11    goes after and attacks cells?

11:39:48 12    A.  So chemotherapy in general works by making cell division hard,

11:40:01 13    okay.  The problem is it makes it hard for normal cells and for

11:40:06 14    malignant cells.  You're living on the difference that you're

11:40:08 15    hoping the cancer needs that ability to grow more than the normal

11:40:11 16    body does.  So you're always sailing between those two rocks.

11:40:17 17            They can do this in different ways.  Adriamycin binds to

11:40:23 18    the DNA and makes it so the coils that happen when it's copied

11:40:28 19    can't be clipped and fixed.  Cytoxan works by cross-linking the DNA

11:40:37 20    so it can't pull apart.  And the taxanes work on the spindles, the

11:40:49 21    spindle apparatus.

11:40:49 22            So when a cell divides, 46 chromosomes have to go each

11:40:52 23    way, right.  So in order to make sure that happens, the cell builds

11:41:02 24    strings that attach to the chromosomes and attach to the two new

11:41:03 25    cells that are going to form.  And then one, two, three everybody

11:41:18  1    pulls and it pulls -- and when it goes well, then everybody is

11:41:18  2    happy.  There's two complete copies and two new cells.

11:41:18  3          The taxanes make those ropes not work.  So when you say

11:41:20  4    one, two, three pull, you pull and all of the ropes break because

11:41:25  5    there's taxanes inserted in the ropes because the body thought they

11:41:29  6    were rope building blocks when they weren't.

11:41:39  7    Q.  And, Doctor, I think this actually kind of explains what you're

11:41:39  8    talking about.  So explain for the jury what you're talking about

11:41:40  9    in terms of the mechanism of action of a taxane.

11:41:54 10    A.  This is better than looking at my hands.

11:41:54 11          THE COURT:  Dr. Glaspy, there is a pen that you can use

11:41:56 12    and on that screen, if you want to.

11:42:38 13          THE WITNESS:  Okay.  So instead of me making -- thank

11:42:38 14    you -- two cells, two cells with my hands, these are the two

11:42:38 15    cells -- one cell becoming two cells.  And all of the chromosomes

11:42:38 16    are lined up in the middle, that's what the blue is.  And each

11:42:38 17    little pink dot is the center of a chromosome.  So if you count

11:42:38 18    those pink dots, there should be 46 times two of them, whatever

11:42:38 19    that is.  And this, the green here, these things are the ropes

11:42:38 20    (INDICATING).

11:42:38 21          And they're going to pull the chromosomes, this rope will

11:42:38 22    pull one copy of chromosome 22, say, and this one will pull the

11:42:51 23    other copy of chromosome 22.  It's amazing that it works as well as

11:42:51 24    it does.

11:42:51 25    Q.  And so what a taxane does is it goes in and it jams up that

11:42:51 1  process?

11:42:51 2  A.  Well, actually, it sort of is a false building block for the

11:42:56 3  ropes.  So the ropes are made out of strings, boxcar strings of

11:43:02 4  proteins, and taxanes substitute for those.  And when you pull, the

11:43:31 5  rope just breaks.  You don't pull the chromosome.

11:43:31 6  Q.  And, Doctor, with regard to taxanes, did the advent of taxanes

11:43:31 7  dramatically improve the treatment of breast cancer in your

11:43:31 8  practice?

11:43:31 9  A.  I think it did, yes.  Yeah.  Especially the limits of your

11:43:31 10  question, in metastatic disease, the taxanes turned out to be the

11:43:33 11  best drug we ever had.  And then later in early breast cancer, the

11:43:38 12  taxanes made an impact.

11:43:42 13  Q.  And we've talked about metastatic treatment and adjuvant

11:43:46 14  treatment.  And if you could, just explain, again, what adjuvant

11:43:51 15  treatment is.

11:43:52 16  A.  So metastatic treatment -- I'll do it backwards, metastatic

11:44:18 17  treatment means the woman has visible tumors in other parts of her

11:44:18 18  body.  So she can't be cured.  And the goal of her treatment is to

11:44:18 19  do as little as necessary to control the cancer to prolong life and

11:44:18 20  have that life be high quality.

11:44:21 21       But we don't want to play that game unless we have to,

11:44:35 22  because that doesn't end well and it's rough on her because she's

11:44:35 23  never finished with treatment.

11:44:35 24       That's where this early breast cancer thing comes from,

11:44:35 25  it comes from that notion that that Swedish guy had that giving a

11:44:40  1    little chemo after surgery would help people and it did.  We're

11:44:44  2    treating micrometastatic disease.  We're treating metastatic breast

11:44:49  3    cancer before it can be seen.  The only way we actually know it's

11:44:52  4    there is statistically, right.  We know that if we don't give

11:45:01  5    chemotherapy, this many women relapsed and die; and if we do give

11:45:11  6    chemotherapy, a smaller number of women relapse and die.

11:45:11  7    Therefore, some women with metastatic cancer must have been cured.

11:45:11  8            And that's why these trials are so big because you need

11:45:14  9    lots of patients, because some of them, in both groups, are going

11:45:19 10    to do fine even though without chemo, we guessed wrong, they didn't

11:45:24 11    have tumor spots in their body.  Some are going to do badly no

11:45:37 12    matter what we do.  But in-between, there's room for improvement,

11:45:37 13    and that's what the clinical trials in early breast cancer do.

11:45:41 14    Early breast cancer and adjuvant are interchangeable words.  I

11:45:45 15    don't know to lose you.

11:45:46 16    Q.  And why is it important to prevent a recurrence?

11:45:55 17    A.  Because metastatic disease is a place -- that's not something

11:45:55 18    we want to have to deal with.  We don't want her to have to deal

11:46:02 19    with.  Because it has a very high mortality and a woman ends up

11:46:12 20    staying on treatment for the rest of her life.

11:46:12 21            MR. STRONGMAN:  May I approach, your Honor?

11:46:12 22            THE COURT:  Yes, you may.

11:46:29 23    BY MR. STRONGMAN:

11:46:29 24    Q.  And, Doctor, I've handed you an article -- I've handed you an

11:46:47 25    article entitled "Survival in Patients with Metastatic Recurrent

11:46:47  1    Breast Cancer After Adjuvant Treatment," and this was in what

11:46:47  2    journal?

11:46:47  3    A.  This was in the *Journal of Cancer*.

11:46:59  4    Q.  And, Doctor, is this a reliable authority?

11:46:59  5    A.  Yes.

11:46:59  6    Q.  And if you turn to the third page in there, does this article

11:47:13  7    give statistics on what the estimated five year and ten year

11:47:13  8    survival rates would be if you have a recurrent cancer?

11:47:18  9    A.  If you have metastatic cancer.

11:47:18 10    Q.  Yes.

11:47:18 11    A.  Yes, it does, it gives those rates.

11:47:20 12    Q.  And what are they?

11:47:21 13    A.  So the five-year rate was 16.3 percent, and the ten-year rate

11:47:26 14    is 6.4 percent.

11:47:27 15    Q.  And how do those compare to the rates if you are successful in

11:47:33 16    treating adjuvant breast cancer before you get metastatic disease?

11:47:37 17    A.  Well, by definition, if you're successful, you don't relapse.

11:47:41 18    So there's zero risk of dying of breast cancer if you're successful

11:47:45 19    with the adjuvant therapy.  If you're saying you're successful in

11:47:51 20    administering it, there will still be women who relapse and die,

11:47:55 21    just fewer of them.

11:48:05 22    Q.  And, Doctor, is it important to treat breast cancer early?

11:48:05 23    A.  Yes.

11:48:05 24    Q.  And does getting it right the first time make all of the

11:48:09 25    difference in a patient's course?

11:48:09 1          MR. MICELI:  Object to the form -- object, leading.

11:48:12 2          MR. STRONGMAN:  I'll rephrase.

11:48:13 3          THE COURT:  Rephrase your question.

11:48:14 4  BY MR. STRONGMAN:

11:48:14 5  Q.  Doctor, why is it important to get it right the first time when

11:48:19 6  you're treating breast cancer?

11:48:19 7  A.  Because the only feedback you get that you've been unsuccessful

11:48:34 8  is too late, right.  If you do something in the early breast cancer

11:48:34 9  setting and you've guessed -- you've -- you haven't done the best

11:48:37 10 you could and she relapses, it's too late to go back and do the

11:48:41 11 best you can.  She is incurable.

11:48:43 12 Q.  Now, Doctor, I want to shift gears a little bit and talk about

11:48:47 13 your treatment of patients and patient counselling, okay?

11:48:54 14 A.  Yes.

11:48:54 15 Q.  So --

11:48:54 16         THE COURT:  Mr. Strongman, are we shifting gears?

11:48:57 17         MR. STRONGMAN:  Is it -- are we good to --

11:49:00 18         THE COURT:  It might be a good time.

11:49:01 19         MR. STRONGMAN:  Fine with me.

11:49:02 20         THE COURT:  It's ten to 12.  The Court's going to be at

11:49:08 21 recess until ten after one.  I just have a meeting that I have to

11:49:12 22 go to, so we're going to take a little bit longer time.

11:49:30 23         But again, leave your tablets on the chairs and don't

11:49:30 24 discuss the case amongst yourselves or with anyone else.

11:49:30 25         Court's at recess until ten after one.

```
11:49:30   1              THE DEPUTY CLERK:  All rise.
11:49:57   2         (WHEREUPON, THE JURY EXITED THE COURTROOM.)
11:49:57   3              THE WITNESS:  Can I take off?
11:49:58   4              THE COURT:  You can take off.  Dr. Glaspy, I remind you
11:50:02   5    that you're in the middle of your testimony, so you should not
11:50:04   6    discuss your testimony with counsel or with anyone else.
11:50:07   7              THE WITNESS:  Okay.
           8              THE COURT:  Thank you.
           9         (WHEREUPON, A LUNCH RECESS WAS TAKEN.)
          10
          11                         *  *  *  *  *  *
          12
          13                     REPORTER'S CERTIFICATE
          14
          15         I, Karen A. Ibos, CCR, Official Court Reporter, United
          16    States District Court, Eastern District of Louisiana, do hereby
          17    certify that the foregoing is a true and correct transcript, to the
          18    best of my ability and understanding, from the record of the
          19    proceedings in the above-entitled and numbered matter.
          20
          21
          22              ____/s/ Karen A. Ibos_____
          23              Karen A. Ibos, CCR, RPR, CRR, RMR
          24              Official Court Reporter
          25
```