UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  TAXOTERE (DOCETAXEL)     *     16-MD-2740
PRODUCTS LIABILITY LITIGATION    *
                                 *
                                 *     Section H
Relates to:  Barbara Earnest     *
          16-CV-17144            *
                                 *     September 25, 2019
* * * * * * * * * * * * * * * * * *


DAY 8 - AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL BEFORE
THE HONORABLE JANE T. MILAZZO
UNITED STATES DISTRICT JUDGE


Appearances:


For the Plaintiffs:        Barrios Kingsdorf & Casteix, LLP
                           BY:  DAWN M. BARRIOS, ESQ.
                           701 Poydras Street, Suite 3650
                           New Orleans, Louisiana 70139


For the Plaintiffs:        Gainsburgh Benjamin David Meunier
                             & Warshauer, LLC
                           BY:  M. PALMER LAMBERT, ESQ.
                           1100 Poydras Street, Suite 2800
                           New Orleans, Louisiana 70163


For the Plaintiffs:        Pendley Baudin & Coffin, LLP
                           BY:  CHRISTOPHER L. COFFIN, ESQ.
                           1100 Poydras Street, Suite 2505
                           New Orleans, Louisiana 70163


For the Plaintiffs:        Gibbs Law Group, LLP
                           BY:  KAREN BARTH MENZIES, ESQ.
                           6701 Center Drive West, Suite 1400
                           Los Angeles, California 90045

Appearances:

For the Plaintiffs:            Bachus & Schanker, LLC
                              BY:   J. KYLE BACHUS, ESQ.
                                    DARIN L. SCHANKER, ESQ.
                              1899 Wynkoop Street, Suite 700
                              Denver, Colorado 80202


For the Plaintiffs:            Fleming Nolen & Jez, LLP
                              BY:   RAND P. NOLEN, ESQ.
                              2800 Post Oak Blvd., Suite 4000
                              Houston, Texas 77056


For the Plaintiffs:            David F. Micelli, LLC
                              BY:   DAVID F. MICELI, ESQ.
                              Post Office Box 2519
                              Carrollton, Georgia 30112


For the Plaintiffs:            Morgan & Morgan, P.A.
                              BY:   EMILY C. JEFFCOTT, ESQ.
                              700 S. Palafox Street , Suite 95
                              Pensacola, Florida 32502


For the Sanofi                 Irwin Fritchie Urquhart
Defendants:                       & Moore, LLC
                              BY:   DOUGLAS J. MOORE, ESQ.
                              400 Poydras Street, Suite 2700
                              New Orleans, Louisiana 70130


For the Sanofi                 Shook Hardy & Bacon, LLP
Defendants:                   BY:   HARLEY V. RATLIFF, ESQ.
                                    JON A. STRONGMAN, ESQ.
                                    ADRIENNE L. BYARD, ESQ.
                              2555 Grand Boulevard
                              Kansas City, Missouri 64108


For the Sanofi                 Shook Hardy & Bacon, LLP
Defendants:                   BY:   HILDY M. SASTRE, ESQ.
                              201 Biscayne Boulevard, Suite 3200
                              Miami, Florida 33131

Official Court Reporter:        Toni Doyle Tusa, CCR, FCRR
                                500 Poydras Street, Room B-275
                                New Orleans, Louisiana 70130
                                (504) 589-7778


Proceedings recorded by mechanical stenography, transcript
produced by computer.

## INDEX

                                                    Page

John Glaspy

    Direct Examination By Mr. Strongman        2005

    Cross-Examination By Mr. Miceli            2046

    Redirect Examination By Mr. Strongman      2128

JOHN GLASPY - DIRECT

| | |
|---|---|
| 01:02 1 | <div align="center">**AFTERNOON SESSION**</div> |
| 01:11 2 | <div align="center">**(September 25, 2019)**</div> |
| 01:11 3 | **THE DEPUTY CLERK:**  All rise. |
| 01:12 4 | (The jury entered the courtroom.) |
| 01:12 5 | **THE COURT:**  All jurors are present.  Court is back in |
| 01:12 6 | session.  You may be seated. |
| 01:13 7 | Dr. Glaspy, I remind you you are under oath. |
| 01:13 8 | Mr. Strongman, please proceed. |
| 01:13 9 | <div align="center">**JOHN GLASPY,**</div> |
| 01:13 10 | having been duly sworn, testified as follows: |
| 01:13 11 | <div align="center">**DIRECT EXAMINATION**</div> |
| 01:13 12 | BY MR. STRONGMAN: |
| 01:13 13 | **Q.**   Are you ready to proceed, Doctor? |
| 01:13 14 | **A.**   I am. |
| 01:13 15 | **Q.**   When we left off, we were talking about the topic of |
| 01:13 16 | patient interaction, patient counseling, and how you come up |
| 01:13 17 | with a treatment plan, right? |
| 01:13 18 | **A.**   Yes. |
| 01:13 19 | **Q.**   Is this something in your practice you have done thousands |
| 01:13 20 | of times? |
| 01:13 21 | **A.**   Yes. |
| 01:13 22 | **Q.**   Can you walk the jury through when you see a patient -- |
| 01:13 23 | let's focus on breast cancer -- what kind of considerations you |
| 01:13 24 | are going through and how that conversation goes with a |
| 01:13 25 | patient? |

**JOHN GLASPY - DIRECT**

01:13 1   **A.**   So let's make a hypothetical be a situation where we have

01:13 2   all the data we need.

01:13 3   **Q.**   Great.

01:13 4   **A.**   So there's not going to be a follow-up visit; it's all

01:13 5   going to be one.

01:13 6        We start with an explanation similar to what I gave

01:13 7   you earlier of the role of treatment after a woman has surgery

01:14 8   for breast cancer, to clean up micrometastatic cancer to

01:14 9   improve her cure rate.  So I explain it to them similarly to

01:14 10   how I explained it to you.

01:14 11        Then I would tell them that what I really needed to

01:14 12   give them was an estimate of what their chances were of

01:14 13   developing fatal breast cancer in the future without additional

01:14 14   treatment.

01:14 15        And then I would endeavor to provide her with an

01:14 16   estimate of what that risk would be if she received hormonal

01:14 17   therapies -- the treatments you have been hearing about that

01:14 18   won't let estrogen feed cancers, and then the addition of

01:14 19   chemotherapy.  We would only do the hormone part if she was

01:15 20   estrogen positive, as Mrs. Earnest's cancer was.  So we would

01:15 21   provide those numbers.

22        If, in my opinion, chemotherapy was something she

01:15 23   should consider, I would tell her that and make the

01:15 24   recommendation and then go through with her what the side

01:15 25   effects are.

JOHN GLASPY - DIRECT

01:15 1   BY MR. STRONGMAN:

01:15 2   Q.   Let's take a couple of these things a step at a time.

01:15 3   A.   Uh-huh.

01:15 4   Q.   So with regard to a breast cancer diagnosis, what are the

01:15 5   factors that are in play in terms of the size, the lymph node

01:15 6   involvement, etc.?  Explain that.

01:15 7   A.   So the most important factor is the lymph node

01:15 8   involvement, because if you think about it, a lymph node is a

01:15 9   good marker for that micrometastatic disease in the liver or

01:15 10  lung.  A breast cancer that has migrated from the breast to the

01:15 11  lymph node and been able to get out of the blood vessel and

01:16 12  start a big colony, that has all the same qualities that a cell

01:16 13  would need to go grow in the liver.

01:16 14          So the best predictor is lymph nodes and number of

01:16 15  lymph nodes.

01:16 16          Another very important predictor is HER2/neu.  It's

01:16 17  irrelevant to this case, but it's critical to breast cancer.

01:16 18  If that's positive, that makes the prognosis worse and

01:16 19  indicates how it's harder for treatment.  The hormone receptors

01:16 20  are very important, both to guide therapy, and they lower risk,

01:16 21  if they are positive, by a little bit.

01:16 22          The size of the primary tumor, the rate at which the

01:16 23  tumor is growing.  We call it a Ki-67.  It's a test that's done

01:16 24  on the tumor that tells us what percent of the cells were

01:16 25  dividing when the cancer was removed, and that helps us --

JOHN GLASPY - DIRECT

01:16  1  that's a prognostic factor.

01:17  2          We look at the grade of the tumor, how abnormal it

01:17  3  looks.

01:17  4          And sometimes we have some additional genetic data

01:17  5  from Oncotype or one of the other genomic testings that can be

01:17  6  done.

01:17  7  Q.   With regard to the lymph node involvement, could you

01:17  8  elaborate a little bit more about why having metastasis or

01:17  9  having cancer present in one of the lymph nodes is so important

01:17 10  specifically?

01:17 11  A.   It's a biological test for what we want to know about this

01:17 12  cancer.  We want to know if this cancer is a spreader; if it's

01:17 13  capable of traveling, getting back out of the bloodstream, and

01:17 14  establishing a colony.  Those are -- not all breast cancers

01:17 15  have those abilities.

01:17 16          The best way to look at future behavior is past

01:17 17  behavior.  And if this cancer has been able to grow in the

01:17 18  lymph node, that is a marker for a cancer that has the ability

01:18 19  to grow in distant tissues and that probably has been in the

01:18 20  bloodstream.  That's why lymph nodes have been such a good

01:18 21  marker.  We have known about them for so many years that we

01:18 22  have accumulated big databases of tens of thousands of women

01:18 23  followed for a long time to sort of validate the lymph nodes.

01:18 24  Q.   In your review of the medical records, did Ms. Earnest

01:18 25  have positive findings in the lymph node?

JOHN GLASPY - DIRECT

01:18 1   A.   She had one positive lymph node.

01:18 2   Q.   What's the significance of that to you in terms of your

01:18 3   evaluation of how to proceed with treatment options?

01:18 4   A.   I think that is the major factor that made chemotherapy

01:18 5   something that was recommended to her, because of that positive

01:18 6   lymph node.

01:18 7   Q.   With regard to the chemotherapy regimens that are

01:18 8   available, the jury has heard about NCCN guidelines.  Are you

01:18 9   familiar with those, Doctor?

01:18 10  A.   I am.

01:19 11  Q.   This is already in evidence, but, Doctor, could you, just

01:19 12  to orient ourselves again to these guidelines -- the jury has

01:19 13  seen them -- on the left -- what is the differentiation between

01:19 14  the category on the left side of this piece of paper and the

01:19 15  category on the right?

01:19 16  A.   So the right side is for HER2-positive cancers, which

01:19 17  aren't under discussion today, but we treat those differently

01:19 18  now.

01:19 19       The left side is for non-HER2-positive patients.

01:19 20  Q.   Did Mrs. Earnest have HER2-positive or HER2-negative?

01:19 21  A.   She was negative.

01:19 22  Q.   This is from 2011.  Is that fair?

01:19 23  A.   Yes.

01:19 24  Q.   When you look at the options in 2011, what are the top

01:19 25  preferred regimens?

JOHN GLASPY - DIRECT

01:19  1   A.   The first one listed is TAC, which is the Taxotere
01:20  2   regimen.   The second one is dose-dense AC --
01:20  3   Adriamycin/Cytoxan -- followed by Taxol every two weeks.
01:20  4          The next one is AC followed by weekly Taxol, for the
01:20  5   reasons we talked about this morning.   Then TC is another
01:20  6   Taxotere regimen that was studied relatively early on and that
01:20  7   had the advantage of not having Adriamycin in it.   Adriamycin
01:20  8   damages hearts and causes leukemia, so a lot of us are anxious
01:20  9   to see if we can minimize Adriamycin exposure.
01:20 10          Then AC, which was the previous regimen.   My
01:20 11   understanding has always been that this was here because we
01:20 12   were using still some AC in node-negative patients.
01:20 13   Q.   Doctor, what's the difference between the top section,
01:21 14   which is preferred adjuvant regimens, and then the other
01:21 15   adjuvant regimens?
01:21 16   A.   I think there are a couple things in play here.   First of
01:21 17   all, this is developed by a group of experts who get together
01:21 18   and write these things.   One of the functions is to help
01:21 19   doctors who maybe aren't familiar with all the literature find
01:21 20   the right treatment in the town they are in.
01:21 21          Another reason, though, is for insurance coverage.
01:21 22   Many insurances will cover something if it's on NCCN guidelines
01:21 23   and not if it isn't.   So as those doctors sit there, one of the
01:21 24   things they are cognizant of is that they don't want to leave
01:21 25   things out that somebody might want to use in a special patient

**JOHN GLASPY - DIRECT**

01:21 1   that's a reasonable treatment.

01:21 2   **Q.**   Doctor, the preferred adjuvant regimens that are listed

01:22 3   here in the 2011 NCCN guidelines, are those all supported by

01:22 4   clinical data?

01:22 5   **A.**   Yes.

01:22 6   **Q.**   Is that one of the ways that regimens actually end up on

01:22 7   these guidelines?  There's actual studies with clinical data

01:22 8   that are done specific to that regimen?

01:22 9   **A.**   It's not just one of the ways; it's the only way.  Without

01:22 10  clinical data it's not going to end up on them.

01:22 11  **Q.**   There's been some conversation -- I see on the top there

01:22 12  there's a difference between dose-dense AC and then paclitaxel

01:22 13  or Taxol, and then AC followed by paclitaxel.

01:22 14             Could you just explain to the jury what "dose-dense"

01:22 15  is and how it's different?

01:22 16  **A.**   So when -- at the same time that Taxol was going into

01:22 17  clinical trials for early breast cancer, to see if it should be

01:22 18  part of the adjuvant treatment, a theory was put forward at

01:23 19  Memorial Sloan-Kettering that said:  "I think what's happening,

01:23 20  the reason why we don't have even better cure rates, is we are

01:23 21  doing this wrong."

01:23 22             If we -- let's pick CMF just because then we won't be

01:23 23  talking about any of the things -- CMF is three drugs given

01:23 24  each time you see the patient, right.  This doctor's theory

01:23 25  was:  If we triple the dose of Cytoxan and just do Cytoxan; and

**JOHN GLASPY - DIRECT**

01:23 1    then after we have done that a few times, triple the dose of
01:23 2    the M and just give the M; and after that, triple the dose of
01:23 3    the F and just give the F -- that was called "sequential"
01:23 4    rather than "simultaneous" treatment.  He thought that would
01:23 5    cause higher cure rates.
01:23 6         So a trial was done primarily to test that
01:23 7    hypothesis, whether doing one and then the other was better
01:23 8    than doing it all together.  But they threw in a second
01:24 9    question.  The second question was if you use growth factors,
01:24 10   things that make it so that these treatments don't lower blood
01:24 11   counts, there are ways to protect the bone marrow from the
01:24 12   effects of chemotherapy.  If you give those, you can get the
01:24 13   chemotherapy in every two weeks instead of every three weeks.
01:24 14        So let's see what happens if you get the chemotherapy
01:24 15   in every two weeks versus every three weeks.  That trial did a
01:24 16   couple things.  First, the sequential versus simultaneous
01:24 17   hypothesis didn't pan out.  So the main reason that the people
01:24 18   who were interested in doing this didn't pan out.
01:24 19        But the dose-dense was better than the every three
01:24 20   week.  So every two week was better than every three week, and
01:25 21   that became one of the standard treatments that was available.
01:25 22   It's still being used today, and it was being used in 2011.
01:25 23        Later we learned -- just to finish the story -- that
01:25 24   this probably was better because it was taking Taxol that was
01:25 25   being given every three weeks and moved it more frequent.  So

2013

**JOHN GLASPY - DIRECT**

01:25  1     the most important part of the dose-dense was that part, that

01:25  2     it made the Taxol given more often.

01:25  3                Later a trial was done that documented that Taxol

01:25  4     works best if it's given weekly.  And so that's kind of how the

01:25  5     story played out.

01:25  6     Q.   Simple question:  Is dose-dense AC followed by Taxotere on

01:26  7     the guidelines specifically?

01:26  8     A.   It is not.

01:26  9     Q.   Doctor, with regard to the conversation that you're having

01:26 10     with a patient, we have gone through you are looking at the

01:26 11     size of the tumor, the node involvement, are we hormone-

01:26 12     receptor-positive, are we HER2-positive or negative.  We've

01:26 13     gone through that.  Then we are talking about chemotherapy

01:26 14     regimens, and we have the guidelines.

01:26 15                Tell me a little bit -- you said you mention risks

01:26 16     with patients -- risks and benefits.

01:26 17     A.   Right.

01:26 18     Q.   Talk to the jury about what kind of risk conversation you

01:26 19     have with patients when we're talking about chemotherapy.

01:26 20     A.   So the benefits part we have already done.  We were in the

01:26 21     middle of that discussion with the woman, talking about what's

01:26 22     your risk of having cancer come back incurable if you do this,

01:26 23     and what's your chance if you don't.  So we have a measure of

01:26 24     the impact and what the chances are that chemotherapy will

01:26 25     essentially save her life.

2014

**JOHN GLASPY - DIRECT**

01:26 1              Then we have to talk about the side effects of

01:27 2     chemotherapy, and they include increased risk of infection that

01:27 3     can be fatal, heart damage, leukemia at some point in the

01:27 4     future, nerve damage, rashes, allergic reactions, nausea,

01:27 5     vomiting.  And hair loss is a side effect of all these

01:27 6     regimens; that would be part of the discussion as well.

01:27 7     Q.   When you're having these conversations with a patient, do

01:27 8     you ever make guarantees about whether someone will or will not

01:27 9     have a side effect?

01:27 10    A.   No.  I can't think of a time.

01:27 11    Q.   With regard to hair loss, do you ever make guarantees to a

01:27 12    patient that their hair will for sure come back?

01:27 13    A.   No.  I actually do the opposite.  I tell women, with these

01:28 14    regimens that they can expect they are going to get hair loss

01:28 15    and that there is a -- not a small chance that they will be

01:28 16    unhappy with the recovery, that that happens, and that

01:28 17    unhappiness can be because of color or texture, but often

01:28 18    because of thinness, because it's thin.  We also, if she has

01:28 19    hormone receptors, we talk about the interplay of hormone

01:28 20    therapy with that problem.

01:28 21    Q.   Describe that.  When you talk about "hormone therapy,"

01:28 22    what is that?  And describe how it has an impact on the hair.

01:28 23    A.   So for a woman that has hormone-positive breast cancer,

01:28 24    there are actually two things that can be done to clean up

01:28 25    these metastatic deposits around the body.  One of them is

JOHN GLASPY - DIRECT

01:28 1   chemotherapy, and the other one is medicines that block
01:29 2   estrogen's effect on her cancer cells by either lowering her
01:29 3   estrogen even more than a postmenopausal woman's usually is
01:29 4   lowered or by taking a medicine to change how estrogen works in
01:29 5   the body.
01:29 6          In postmenopausal women we usually use the one that
01:29 7   just lowers the estrogen level.  That's what Mrs. Earnest got
01:29 8   because she had a hormone-positive cancer.
01:29 9          Those are the two options.  It turns out you can kill
01:29 10  breast cancer cells that are hormone-dependent by taking
01:29 11  hormone levels down.  It's also true that those things can
01:29 12  cause hair thinning and hair changes.  And so that can make the
01:29 13  situation with the chemotherapy hair loss worse.
01:29 14  Q.   I want to talk about another risk for a minute.  You have
01:30 15  mentioned it earlier.  You talked about neuropathy and nerve
01:30 16  damage, but could you elaborate on what that is and how that
01:30 17  risk plays into the conversation, particularly when you are
01:30 18  talking about Taxotere and Taxol?
01:30 19  A.   So one of the side effects that happens with the taxanes
01:30 20  in general is damage to peripheral nerves, meaning nerves after
01:30 21  they have left your spine, primarily sensory nerves.  So the
01:30 22  symptoms can be numbness and tingling and pain -- more than
01:30 23  weakness -- in an extremity, etc., although weakness can
01:30 24  happen.  These medicines, because they are interfering with
01:30 25  those tubules that pull the chromosomes apart, seem to have an

JOHN GLASPY - DIRECT

01:30  1    effect on nerve cells through a similar mechanism because all
01:30  2    of the taxanes have a risk of neuropathy.
01:31  3            As it happens, Taxol's neuropathy risk is higher than
01:31  4    Taxotere's neuropathy risk.  If you get neuropathy, it could be
01:31  5    mild -- a little bit of tingling that goes away before the next
01:31  6    dose of chemotherapy -- or it can be severe.  I have seen
01:31  7    people in wheelchairs because of taxane neuropathy.  So it can
01:31  8    be a big deal as well.  What we talked about this morning was
01:31  9    incidence in diabetics.  It can be worse.
01:31 10    Q.   When you say -- is there a difference between the severity
01:31 11    of neuropathy dealing with Taxotere and taxane?
01:31 12    A.   Both the incidence and the grade, the neuropathy -- the
01:31 13    severity.
01:31 14    Q.   When you are talking about severity, elaborate a little
01:31 15    bit more on how bad can neuropathy be and what are the ultimate
01:31 16    consequences of severe neuropathy.
01:31 17    A.   I have only seen it once, but the wheelchair example is
01:32 18    the worst, I think, can happen.
01:32 19            It can be debilitating.  People can't button their
01:32 20    shirt without looking, because they can't feel where the button
01:32 21    is.  People who like to knit can't knit anymore.  Fine motor
01:32 22    functions -- tying ties, fixing watches -- those kinds of
01:32 23    things are affected.
01:32 24            It's bothersome.  If you have ever had numbness in
01:32 25    something, it really can bug you.  To have your hand be numb

**JOHN GLASPY - DIRECT**

01:32  1    can really bother you even when you are not trying to button

01:32  2    your shirt.  Finally, it can be painful.

01:32  3    Q.   Is neuropathy a consideration that a lot of patients take

01:32  4    into play when making a decision on what chemotherapy to use?

01:32  5              MR. MICELI:  Objection.  Calls for speculation.

01:32  6              THE COURT:  Sustained.

01:32  7    BY MR. STRONGMAN:

01:32  8    Q.   Is neuropathy one of the risks that you discuss with your

01:32  9    patients?

01:32 10    A.   It is.

01:32 11    Q.   I want to turn and talk a little bit more about hair loss.

01:33 12    And, Doctor, based on your experience and your review of the

01:33 13    information -- Doctor, are there any chemotherapy drugs used in

01:33 14    the adjuvant treatment of breast cancer that don't result in

01:33 15    alopecia?

01:33 16    A.   So asked that way, I would have to say 5-FU might be the

01:33 17    answer to your question.  Yes, that 5-FU -- you asked drugs

01:33 18    that are used.  I don't think 5-FU causes much alopecia at all.

01:33 19    But if you say regimens that are used, then no, they all cause

01:33 20    alopecia.

01:33 21    Q.   Do you ever use 5-FU alone in the treatment of adjuvant

01:33 22    breast cancer?

01:33 23    A.   Never.  It was a phrasing issue.  I'm trying to answer

01:33 24    precisely.

01:33 25    Q.   Doctor, in your review of the medical literature, are

**JOHN GLASPY - DIRECT**

01:34 1    there reports of persistent hair loss with regimens containing

01:34 2    Adriamycin?

01:34 3    **A.**   Yes.

01:34 4    **Q.**   Are there reports of persistent hair loss with regimens

01:34 5    containing Cytoxan?

01:34 6    **A.**   Yes.

01:34 7    **Q.**   Are there reports of persistent hair loss with regimens

01:34 8    containing Taxol?

01:34 9    **A.**   Yes.

01:34 10   **Q.**   Of course, there are reports of persistent hair loss with

01:34 11   regimens containing Taxotere too.  Is that correct?

01:34 12   **A.**   That's correct.

01:34 13   **Q.**   Is it possible, Doctor, to prescribe one of these regimens

01:34 14   to a patient in the adjuvant setting without some risk of

01:34 15   persistent hair loss for that patient?

01:34 16            **MR. MICELI:**  Object to the form.  Speculation.

01:34 17            **THE COURT:**  Overruled.

01:34 18            **THE WITNESS:**  I believe it's not possible.

01:34 19            **MR. STRONGMAN:**  May I approach, Your Honor?

01:35 20            **THE COURT:**  Yes, you may.

01:35 21   BY MR. STRONGMAN:

01:35 22   **Q.**   Dr. Glaspy, what I have handed you is a chart that

01:35 23   Dr. Feigal presented to this jury.  Do you see it?

01:35 24   **A.**   I do.

01:35 25   **Q.**   Do you have it in front of you?

JOHN GLASPY - DIRECT

01:35 1   **A.**   I do.

01:35 2   **Q.**   So Dr. Feigal went through -- and the jury has seen

01:35 3   Dr. Feigal's chart.  This is Dr. Feigal's chart.  She went

01:35 4   through and she tabulated cases, and you can see that there,

01:35 5   Doctor, in front of you?

01:35 6   **A.**   I see it in front of me.  I just don't see it on the

01:35 7   screen here.

01:35 8   **Q.**   Doctor, is going through the literature and tabulating

01:35 9   cases solely on Taxotere or Taxol or nontaxane like this a

01:35 10  reliable way to determine risk?

01:35 11  **A.**   Not in my opinion.

01:35 12  **Q.**   Why not?

01:35 13  **A.**   Because risk means you need to have an idea of

01:36 14  percentages.  You need the denominator.  You need to know how

01:36 15  many patients were at risk before you can tell a patient what

01:36 16  the risk is.  You can't say it's happened 20 times and not know

01:36 17  what to divide that by in order to advise somebody of their

01:36 18  risk.

01:36 19  **Q.**   In addition to that, is it also important to know the

01:36 20  exposure? how many people are using Taxotere relative to other

01:36 21  medications?  Is that an important factor?

01:36 22  **A.**   Yes, that's the denominator.  You need to know the

01:36 23  denominator.

01:36 24  **Q.**   When you do your analysis of the reports and the

01:36 25  literature, should you also calculate whether the report

JOHN GLASPY - DIRECT

01:36 1    contains Adriamycin with it or whether it contains Cytoxan with

01:36 2    it as well?

01:36 3            MR. MICELI:  Object.  Leading.

01:36 4            THE COURT:  Sustained.

01:36 5            MR. STRONGMAN:  I'll rephrase my question.

01:36 6            THE COURT:  Rephrase your question.

01:36 7    BY MR. STRONGMAN:

01:36 8    Q.    If you were to go through the literature, should you

01:37 9    include or exclude Adriamycin and Cytoxan when you are looking

01:37 10   at regimens and hair loss?

01:37 11   A.    When we are talking about early breast cancer, the answer

01:37 12   is you should include.

01:37 13   Q.    Doctor, in your opinion, were there any available

01:37 14   chemotherapy regimens for the type of cancer Mrs. Earnest had

01:37 15   that did not carry a risk of persistent hair loss?

01:37 16           MR. MICELI:  Object.  Asked and answered, I believe.

01:37 17           THE COURT:  That has been asked and answered.

01:37 18   Sustained.

01:37 19   BY MR. STRONGMAN:

01:37 20   Q.    I think you have reviewed the medical records.  I think

01:37 21   you indicated Mrs. Earnest is on a hormone treatment as well.

01:37 22   Is that correct?

01:37 23   A.    That's correct.

01:37 24   Q.    What's the name of that treatment?

01:37 25   A.    It's an aromatase inhibitor.  She is receiving Arimidex.

**JOHN GLASPY – DIRECT**

01:37 1   **Q.**   We have talked about that.  Have you indicated that

01:37 2   Arimidex can result in hair problems as well?

01:37 3   **A.**   Yes.

01:38 4   **Q.**   When it comes to this conversation that you are having

01:38 5   with your patient, where does a doctor get his or her

01:38 6   information in terms of the risks?  What are the sources of

01:38 7   information?

01:38 8   **A.**   We get it initially from the package insert when a drug is

01:38 9   new, from literature, from medical meetings, from sometimes

01:38 10  other online sources of information, like UpToDate, that stays

01:38 11  up to date and provides doctors with some helpful information.

01:38 12  Those kinds of things.

01:38 13          And then as time goes on, you base it more and more

01:38 14  on your experience.  It's like anything else in life:  You

01:38 15  don't read the instructions when you have done something a lot

01:38 16  of times.

01:38 17  **Q.**   So, Doctor, what we need is that the drug label isn't the

01:38 18  only source of information for a doctor.  Is that fair?

01:39 19  **A.**   That's fair.

01:39 20  **Q.**   That being said, Doctor, throughout your career have you

01:39 21  reviewed the Taxotere drug label?

01:39 22  **A.**   I have.

01:39 23          **MR. STRONGMAN:**  May I approach, Your Honor?

01:39 24          **THE COURT:**  Yes, you may.

25

JOHN GLASPY - DIRECT

01:39  1  **BY MR. STRONGMAN:**
01:39  2  **Q.**   Doctor, what I have handed you is --
01:39  3          **MR. STRONGMAN:**  Actually, for the Court's record,
01:39  4  this will get -- I could go ahead and admit it because I have
01:39  5  entered the document with the same number before.
01:39  6          What I have handed the Doctor is Defense 401.4,
01:40  7  I believe, which is the 2004 package insert for Taxotere.  I
01:40  8  believe this was already admitted under D-317 as well.
01:40  9          **THE COURT:**  Okay.
01:40 10  **BY MR. STRONGMAN:**
01:40 11  **Q.**   Doctor, when you look at the 2004 package insert -- I want
01:40 12  to point your attention to the second page.  Do you see that
01:40 13  this is information on hair loss?  Do you see that down there?
01:40 14  You can also look at your screen.
01:40 15  **A.**   Yes, I do.  I see it.
01:40 16  **Q.**   What we know and what the jury has heard is that the
01:40 17  Taxotere labeling has said:  "Once you have completed all of
01:40 18  your treatments, hair generally grows back."  Do you see that?
01:40 19  **A.**   Yes.
01:40 20  **Q.**   Doctor, as an oncologist with decades of experience, what
01:40 21  does that language mean to you?
01:41 22  **A.**   To me it means that -- hair usually grows back would be a
01:41 23  synonym.
01:41 24  **Q.**   Doctor, does it mean that hair always grows back?
01:41 25  **A.**   It does not.

JOHN GLASPY - DIRECT

01:41 1    **Q.**   Based on your knowledge of the Taxotere labeling, is

01:41 2    alopecia also always listed as a potential side effect?

01:41 3    **A.**   Yes.

01:41 4    **Q.**   Doctor, as an oncologist who has these conversations who

01:41 5    knows the contents of drug labeling, what does "alopecia" mean

01:41 6    to you?

01:41 7    **A.**   To me it means hair loss, and I think it means that to

01:41 8    everybody.

01:41 9          But to me it would -- what it calls to mind is that

01:41 10   initial loss of pretty much all the hair on the head following

01:41 11   some of these chemotherapy drugs.

01:41 12   **Q.**   Doctor, does alopecia include both the possibility that

01:41 13   your hair may return and the possibility that it may not?

01:42 14          **MR. MICELI:**  Object.  Leading.

01:42 15          **THE COURT:**  Rephrase your question.

01:42 16   **BY MR. STRONGMAN:**

01:42 17   **Q.**   Doctor, does "alopecia" by definition include any kind of

01:42 18   temporal aspect?

01:42 19          **MR. MICELI:**  Still leading, Your Honor.

01:42 20          **THE COURT:**  I'm going to let him answer the question.

01:42 21          **THE WITNESS:**  So if the medicine that's causing it is

01:42 22   being stopped, generally the hair starts to regrow; but I have

01:42 23   already testified that in my experience, it's not infrequent

01:42 24   that women are not happy with what grows back.  And that is

01:42 25   often because of thinness, and that could be something that I

JOHN GLASPY - DIRECT

01:42 1    can't see.  Doesn't matter if she is unhappy.  It can be

01:42 2    something that looks really severe.  It can be anywhere along

01:42 3    that spectrum.

01:42 4    BY MR. STRONGMAN:

01:42 5    Q.   Doctor, in your practice is the language "hair generally

01:43 6    grows back" consistent with what you see in your patient

01:43 7    population?

01:43 8    A.   Yes.

01:43 9    Q.   Doctor, in your opinion, was the label that we have looked

01:43 10   at here for Taxotere -- does that label adequately warn of the

01:43 11   risk of alopecia, including the possibility of hair not

01:43 12   returning following treatment?

01:43 13           MR. MICELI:  Object.  Leading again.

01:43 14           THE COURT:  I'm going to allow him to answer the

01:43 15   question.

01:43 16           MR. MICELI:  Excuse me, Your Honor.  May we approach?

01:43 17           THE COURT:  Yes.

01:43 18           (The following proceedings were held at the bench.)

01:43 19           MR. MICELI:  Your Honor, this was the labeling issue

01:43 20   I talked about before.  If he is going to talk about what a

01:43 21   normal doctor, normal oncologist wants to look at, and now he

01:43 22   wants to talk about what a label should include, I think that's

01:44 23   a little different.

01:44 24           THE COURT:  I think his report says that as he read

01:44 25   the label, that's what it meant to him as an oncologist.  The

2025

**JOHN GLASPY - DIRECT**

01:44 1    question I'm seeing here is:  Does that label adequately warn

01:44 2    of the risk of alopecia?

01:44 3                So are you saying that that requires some sort

01:44 4    of --

01:44 5                MR. MICELI:  Well, for him -- if it warns him, that's

01:44 6    fine.  But he can't speak for -- he said he doesn't do

01:44 7    regulatory.  What is an adequate warning --

01:44 8                MR. STRONGMAN:  I can say, "I'm not asking you for an

01:44 9    FDA opinion."  I'm going to ask his opinion as a clinical

01:44 10   oncologist.

01:44 11               THE COURT:  "Your opinion in the treatment of

01:44 12   cancer."

01:44 13               MR. STRONGMAN:  Yeah.

01:44 14               THE COURT:  Okay.  Thank you.

01:44 15               (End of bench conference.)

01:44 16               THE COURT:  Rephrase your question, please.

01:45 17   BY MR. STRONGMAN:

01:45 18   Q.   And I'm talking about in your role as a clinical

01:45 19   oncologist, okay?  Are you following?

01:45 20   A.   I'm following.

01:45 21   Q.   And in that role as an oncologist treating patients, does

01:45 22   the Taxotere label that we are looking at here from 2004 with

01:45 23   the language that hair generally grows back, does that label

01:45 24   adequately warn of the risk of alopecia, including the

01:45 25   possibility that hair may not return?

JOHN GLASPY - DIRECT

01:45 1  **A.**   As an oncologist, that informs me of that, yes.

01:45 2  **Q.**   I want to back up and talk a little bit more about

01:45 3  clinical trials for a second, Doctor.

01:45 4       I think you've talked a little bit about how clinical

01:45 5  trials get started because they are looking for new therapies.

01:45 6  Can you talk a little bit more about how a clinical trial is

01:46 7  actually run in terms of patient follow-up and in terms of the

01:46 8  way that safety and efficacy is monitored in a clinical trial.

01:46 9  **A.**   To make this efficient, can we focus on Phase III trials?

01:46 10 **Q.**   Sure.

01:46 11 **A.**   Okay.

01:46 12 **Q.**   Go ahead.

01:46 13 **A.**   Then we don't have to go through all the other . . .

01:46 14       So when you do a Phase III trial, patients will be

01:46 15 randomly assigned to get the old standard and the new

01:46 16 treatment.  And in chemotherapy trials, they will be treated

01:46 17 for a period of time, say 18 weeks, and then they will be

01:46 18 followed for a period of time.

01:46 19       The patients, when they sign into the trial, are

01:46 20 given a subject's bill of rights.  And that subject's bill of

01:46 21 rights informs them that they can withdraw their consent any

01:47 22 time they want, for the reasons of their own, with no argument.

01:47 23 So the patients have the control over their follow-up,

01:47 24 especially once they are done with treatment and they are just

01:47 25 being followed.

JOHN GLASPY - DIRECT

01:47 1          They will generally be followed for two things:  One
01:47 2   is efficacy, meaning did the treatment work; in this case, in
01:47 3   early breast cancer, are they having a relapse?  And so they
01:47 4   will be scanned periodically.  Once they are done with the
01:47 5   chemo, they will be brought in to be scanned to see if there is
01:47 6   a relapse so that people can see if there's a difference
01:47 7   between the two groups in how long it takes the cancer to come
01:47 8   back.
01:47 9          They will also be followed to see if they are alive.
01:47 10  Now, that is recorded -- every time the doctor sees the
01:48 11  patient, they fill out what's called a case report form that is
01:48 12  aimed at efficacy.  So it asks you about has the patient
01:48 13  relapsed, is there evidence of relapse, etc., and is the
01:48 14  patient alive.
01:48 15         Then there's a second thing that's checked, and
01:48 16  that's safety.  And those are a second case report form that
01:48 17  you fill out, and the side effects of interest, whatever they
01:48 18  are, are recorded there.
01:48 19         Sometimes patients go through the chemotherapy part
01:48 20  of this, say, and then they decide that they don't want to keep
01:48 21  coming in every month and they don't want to do the scans or
01:48 22  they don't want to have the blood tests, and they withdraw
01:48 23  their consent.  They call up and say, I'm not going to stay on
01:49 24  the study, so I'm not going to come in for these visits.
01:49 25         If that happens, sometimes they will say, It's okay

JOHN GLASPY - DIRECT

01:49  1    if you call me to make sure I'm alive, but I'm just not coming

01:49  2    in.  So on those patients, we would call them when their visit

01:49  3    was due and at least get that information, the survival

01:49  4    information; but we wouldn't have scan follow-up and we

01:49  5    wouldn't have safety follow-up.  We would have some follow-up,

01:49  6    but not all of it.

01:49  7           When you do clinical trials, you anticipate that this

01:49  8    is going to happen.  It's called the dropout rate, and you

01:49  9    build this into your clinical trials so that you are treating

01:49 10    more patients than you're actually going to need in order to

01:49 11    find out your real endpoint survival, because you are

01:49 12    anticipating that there are going to be dropouts.

01:50 13           Another thing that can happen is that --

01:50 14           MR. MICELI:  Your Honor, I believe this is just a

01:50 15    narrative.  There's been no breaking question.

01:50 16           MR. STRONGMAN:  I think he is just explaining how

01:50 17    patients are followed up in Phase III clinical trials.  And

01:50 18    I'll ask some questions.

01:50 19           THE COURT:  I think we are starting to get to a

01:50 20    narrative, so --

01:50 21    BY MR. STRONGMAN:

01:50 22    Q.   And so, Doctor, one of the questions that I want to follow

01:50 23    up on, one of the points I want to follow up on, is I think you

01:50 24    indicated that there can be an occasion when a patient in a

01:50 25    clinical trial is followed for an adverse event for a certain

**JOHN GLASPY - DIRECT**

01:50 1  period of time.

01:50 2          Is that correct?

01:50 3  A.   Yes.

01:50 4  Q.   And then, let's just say hypothetically, that patient has

01:50 5  a recurrence and goes onto different medication, and so they

01:50 6  drop out of the study as it relates to the adverse event

01:50 7  follow-up.

01:50 8          Is that an example of what you are talking about?

01:50 9          MR. MICELI:  Your Honor, that's a leading narrative.

01:50 10         THE COURT:  I think you need to rephrase your

01:51 11  question.

01:51 12  BY MR. STRONGMAN:

01:51 13  Q.   Can you give the jury an example of how someone could be

01:51 14  followed up for a certain period of time for an adverse event,

01:51 15  but followed up for a longer period of time for overall

01:51 16  survival?

01:51 17  A.   I have given one example, which is the patient just drops

01:51 18  out.

01:51 19         Another example in the -- in, say, the TAC/FAC trial,

01:51 20  another example would be that the patient's cancer came back

01:51 21  and they started another chemotherapy drug.  And at that point,

01:51 22  you're not going to be collecting safety data on the previous

01:51 23  chemotherapy drug used, so you stop collecting safety data.

01:51 24  Q.   So, Doctor, you certainly are familiar with -- have

01:51 25  established you're familiar with TAX 316, correct?

JOHN GLASPY - DIRECT

01:51 1   **A.**   I am.

01:51 2   **Q.**   And you are certainly aware of the conversation regarding

01:51 3   ongoing alopecia in the TAC arm and the FAC arm, right?

01:51 4   **A.**   Yes.

01:51 5   **Q.**   And we have talked about how there are 29 cases in the TAC

01:52 6   arm of ongoing, and we have 16 cases in the FAC arm of ongoing;

01:52 7   is that right?  You're familiar with that conversation?

01:52 8   **A.**   Yes.

01:52 9   **Q.**   And I know that you have reviewed Dr. Kopreski's

01:52 10  testimony.  You were in here this morning as well; is that

01:52 11  right?  Go ahead, you can answer.

01:52 12  **A.**   I was in here this morning and I'm aware of his testimony.

01:52 13  **Q.**   And, Doctor, a couple of other questions about the TAC and

01:52 14  FAC comparison, just to make sure we have a couple of other

01:52 15  things clear.

01:52 16          Adriamycin is included in both arms of TAC and FAC;

01:52 17  is that correct?

01:52 18  **A.**   That's correct.

01:52 19  **Q.**   And is Adriamycin made by Sanofi?

01:53 20  **A.**   No.

01:53 21  **Q.**   And then we also have Cytoxan, and Cytoxan is included in

01:53 22  both the TAC arm and the FAC arm; is that correct?

01:53 23          **MR. MICELI:**  Object.  Leading again.

01:53 24          **THE COURT:**  I'm going to let him get to here.  When

01:53 25  we get to questions, I'm not going to let you lead, but I think

JOHN GLASPY - DIRECT

01:53 1   that this, to establish a background --

01:53 2            THE WITNESS:  That's correct.

01:53 3   BY MR. STRONGMAN:

01:53 4   Q.   And Cytoxan, is it a product made by Sanofi?

01:53 5   A.   It is not.

01:53 6   Q.   Doctor, what is "statistical significance"?  Can you

01:53 7   explain that to the jury?

01:53 8   A.   So statistical --

01:53 9            MR. MICELI:  Your Honor, I hate to be popping up and

01:53 10  having to object to outside the scope.  We have identified him

01:53 11  as an oncologist in clinical study operation, but not

01:53 12  biostatistics.

01:53 13           MR. STRONGMAN:  Certainly I think that Dr. Glaspy is

01:53 14  more than -- I mean, do you want me to respond from here?

01:54 15           THE COURT:  I think you maybe all need to come up

01:54 16  with his report.

01:54 17           (The following proceedings were held at the bench.)

01:54 18           THE COURT:  Is it outside of the scope of his report?

01:54 19           MR. MICELI:  He didn't talk about statistical

01:54 20  significance in his report.  He didn't go over the clinical

01:54 21  trial data.  He read the reports.  The words "statistical

01:54 22  significance" is not in his report.

01:54 23           MR. STRONGMAN:  We're just saying this is a doctor

01:54 24  who does clinical trials.  He is allowed to articulate what the

01:54 25  word "statistical significance" means, the concept.  He's more

JOHN GLASPY - DIRECT

01:54 1  than well aware of that.  That's perfectly within the scope of
01:54 2  his experience and expertise.
01:54 3          THE COURT:  I understand that.
01:54 4          MR. STRONGMAN:  Yeah, yeah.
01:54 5          THE COURT:  And then?
01:54 6          MR. STRONGMAN:  I want him just to articulate -- I
01:54 7  feel like the jury has not had a clear articulation of what
01:54 8  statistical significance is.  I'm not going to ask him about
01:55 9  TAC/FAC statistical significance.  I'm not getting into that.
01:55 10 I'm moving on past TAX 316 at this point.  I think the jury has
01:55 11 heard enough of it.
01:55 12         THE COURT:  Then my problem is why did he review
01:55 13 Kopreski's analysis?
01:55 14         MR. MICELI:  Your Honor, that's another problem.
01:55 15         MR. STRONGMAN:  I mean, I'm happy to walk through it.
01:55 16 He did review it.  I'm happy to walk through it.
01:55 17         THE COURT:  I know, but if we let it in and we are
01:55 18 not going to have an expert testify --
01:55 19         MR. STRONGMAN:  I will walk through it.  He knows it.
01:55 20 I just was trying to move it along.  That's all.  I'm happy to
01:55 21 walk through it.
01:55 22         MR. MICELI:  This is the problem.  He did not list
01:55 23 the Kopreski deposition in his review material.  He never
01:55 24 did -- he did all of our experts and he did the plaintiff's.
01:55 25 He didn't do Dr. Kessler; he didn't read Dr. Madigan; he didn't

**JOHN GLASPY - DIRECT**

01:55 1  read Dr. Plunkett; and he didn't read Dr. Kopreski.  So none of

01:55 2  the four.  It's not disclosed on his expert report.

01:56 3            I pulled out one, two --

01:56 4            MR. STRONGMAN:  He did review Kopreski's analysis.

01:56 5            THE COURT:  This is my problem with it.

01:56 6            MR. STRONGMAN:  Sure.  Sure.

01:56 7            THE COURT:  I've let y'all introduce the Kopreski

01:56 8  testimony because he was going to testify and he was going to

01:56 9  then have an opportunity to cross-examine --

01:56 10           MR. STRONGMAN:  I'm happy to go there.  I'm happy to

01:56 11 go there.  I just was trying to move it along.

01:56 12           THE COURT:  We are kind of caught between a rock and

01:56 13 a hard place.  I feel like this has been --

01:56 14           MR. STRONGMAN:  I'm happy to --

01:56 15           MR. MICELI:  Your Honor, if I can tell you, my

01:56 16 concern is that my colleague took his deposition, and at that

01:56 17 point in time he had not -- it had not been disclosed to us --

01:56 18 he had not reviewed the Kopreski depositions.  To this day, I

01:56 19 have never been provided with notice that he had reviewed the

01:56 20 Kopreski deposition, and --

01:56 21           MR. STRONGMAN:  I can --

01:56 22           THE COURT:  What is the question?  There's an

01:56 23 objection to "What is the statistical significance?"  Are you

01:56 24 objecting to that question and then what follows it?

01:56 25           MR. MICELI:  I'm objecting to that question and what

JOHN GLASPY - DIRECT

01:57 1   follows, because now what he is going to try and do is put the

01:57 2   pieces of a puzzle together that he never told me he was going

01:57 3   to put together.  He did not include it in his report, he did

01:57 4   not include it in his materials reviewed, and now here I am in

01:57 5   court on the last day of trial and he is going to start talking

01:57 6   about things that he did that I've never been given notice of.

01:57 7        THE COURT:  Okay.  All right.  Let me back the train

01:57 8   up and let me see if I can get somebody to answer my question.

01:57 9        MR. MICELI:  Sure.

01:57 10       THE COURT:  There is a question on the floor at this

01:57 11  very moment:  "What is statistical significance?"  There was an

01:57 12  objection to that.

01:57 13            Is the objection that he is going to just define

01:57 14  what that means, or are you concerned about what happens next?

01:57 15       MR. MICELI:  I'm concerned that it's outside the

01:57 16  scope of what he has been disclosed for and everything that

01:57 17  follows.  Because once he throws that into --

01:57 18       THE COURT:  Okay.  Let me see if I can get you to

01:57 19  answer.

01:57 20       MR. MICELI:  Okay.

01:57 21       THE COURT:  Are you objecting to that specific

01:57 22  question, "statistical significance," or is there an objection

01:57 23  to him defining what that means within the parameters of a

01:58 24  clinical trial without him giving us an opinion as to whether

01:58 25  or not the GEICAM and TAX study, the results of Dr. Madigan,

JOHN GLASPY - DIRECT

01:58 1      are incorrect?  Because I'm not going to --

01:58 2                  MR. STRONGMAN:  He's not going to do that.

01:58 3                  MR. MICELI:  Look, my problem is I feel like we are

01:58 4      standing outside of a barn with a pitchfork and we're throwing

01:58 5      hay into this jury box.

01:58 6                  THE COURT:  Okay.  So let me see if I can get you to

01:58 7      answer my question.

01:58 8                  MR. MICELI:  Okay.

01:58 9                  THE COURT:  I'm going to ask it again real slow.

01:58 10                 MR. MICELI:  Okay.

01:58 11                 THE COURT:  Is the objection to that very question or

01:58 12     is the objection, "I know what's coming"?

01:58 13                 MR. MICELI:  All of the above.

01:58 14                 THE COURT:  All of the above.  All right.

01:58 15                     Well, this is what I will allow him to do,

01:58 16     because he has talked about his participation in these studies:

01:58 17     I'm going to let you ask, "What does statistical significance

01:58 18     mean," even though it has been defined a lot.  But we are not

01:59 19     going into anything beyond that.

01:59 20                 MR. MICELI:  It's still --

01:59 21                 THE COURT:  I think that's what you said.

01:59 22                 MR. STRONGMAN:  In terms of whether or not TAX 316

01:59 23     was statistically significant, I will not ask him that

01:59 24     question.

01:59 25                 MR. MICELI:  My concern now --

JOHN GLASPY - DIRECT

01:59  1          MR. STRONGMAN:  I will actually tell him I'm not

01:59  2    asking --

01:59  3          MR. MICELI:  -- with this conversation, what we have

01:59  4    heard up here at the bench is that this witness has educated

01:59  5    himself with things that I have never been told.

01:59  6          THE COURT:  Well, I'm telling you, you say

01:59  7    "Objection," I'm going to sustain it.  The problem is I have

01:59  8    not read his report either.

01:59  9          MR. MICELI:  I can't pull the knowledge out of his

01:59 10    head.  He's --

01:59 11          MR. STRONGMAN:  And what I will do -- there are a

01:59 12    couple things -- I will walk him through the Kopreski analysis

01:59 13    so it's clear that I'm not going to ask him statistical

01:59 14    significance.  We have covered that.

01:59 15          THE COURT:  Well, then why do you need to ask him

01:59 16    that if you are going to then walk him through Kopreski's

01:59 17    analysis --

01:59 18          MR. STRONGMAN:  I can --

01:59 19          THE COURT:  -- if it's not to say --

01:59 20          MR. STRONGMAN:  I will do it later at a different

02:00 21    point in time so that it's not tied to it.

02:00 22          MR. MICELI:  There was never a test for statistical

02:00 23    significance there.

02:00 24          MR. STRONGMAN:  Yeah, that's fine.  That's fine.

02:00 25          MR. MICELI:  This is just --

JOHN GLASPY - DIRECT

02:00  1          THE COURT:  Then I'm concerned --

02:00  2          MR. MICELI:  I am, as well.

02:00  3          THE COURT:  -- that the jury is going to wonder why

02:00  4     you are asking this question if he is not going to give us an

02:00  5     opinion about it.

02:00  6          MR. STRONGMAN:  How about I do this:  How about I ask

02:00  7     about statistical significance.  I can ask about TAX 316 and

02:00  8     efficacy -- he's very well aware of that -- and whether there's

02:00  9     statistical significance there.  And then I will transition

02:00 10     to -- so I will set up so Mr. Miceli can cross him on the

02:00 11     Kopreski analysis.  I will put out there what he did.

02:00 12          MR. MICELI:  I feel like I'm negotiating against

02:00 13     myself, because it's something that wasn't disclosed and I'm --

02:00 14     that's fine.

02:00 15          THE COURT:  But --

02:00 16          MR. MICELI:  I'm not saying this to you; I'm saying

02:00 17     this to my opponent.

02:00 18          THE COURT:  I understand.  I am trying to determine

02:00 19     what was disclosed.  And, again, I'm the only one in this

02:01 20     conversation that has not read his report, and what I

02:01 21     appreciate is that he did review the Kopreski analysis --

02:01 22          MR. STRONGMAN:  Correct.

02:01 23          THE COURT:  -- and he had opinions about that in his

02:01 24     report.

02:01 25          MR. MICELI:  No, he did not have an opinion about it

JOHN GLASPY - DIRECT

02:01  1    in his report.

02:01  2              MR. STRONGMAN:  He did.

02:01  3              MR. MICELI:  He has a paragraph on page 26 -- and I

02:01  4    will show you, Your Honor -- that all he has -- I left my

02:01  5    glasses down there.

02:01  6              THE COURT:  I can find 26.

02:01  7              MR. MICELI:  I want to make sure it's 26.  There it

02:01  8    is right here.  This paragraph right there.  At the bottom of

02:01  9    that paragraph, it just says "Figure A."  There's no analysis

02:01 10    of what he did with Figure A, and then Figure A is stapled to

02:01 11    the back of his report.

02:01 12              And that's what's concerning.  In his

02:01 13    deposition, he said, I didn't validate anything.  I didn't

02:01 14    review the data.  If the data is wrong, I'm wrong.

02:01 15              MR. STRONGMAN:  This is what --

02:01 16              MR. MICELI:  That's the problem with this.  So this

02:01 17    is why we fought so hard to try to --

02:02 18              THE COURT:  I understand that.  I think you all filed

02:02 19    the wrong motion, if you want to know the truth.

02:02 20              I don't know why, but I think -- I'm going to

02:02 21    allow you to let him define it, and then you are moving on.

02:02 22    That's it.

02:02 23              MR. STRONGMAN:  Can I ask him a question about the

02:02 24    efficacy stuff, unrelated, just so it's -- I don't want

02:02 25    Mr. Miceli to feel like I've left an impression I'm going to

JOHN GLASPY - DIRECT

02:02 1    then talk about it in relation --

02:02 2            THE COURT:  No, I think you can say -- this is what I

02:02 3    will allow you to say:  "What is statistical significance?"  It

02:02 4    gives you an opportunity to review whether or not the drugs --

02:02 5    they just happened to pick the wrong patients or that these

02:02 6    patients did better on this drug.  And that's it.  We will

02:02 7    leave it there.

02:02 8            MR. STRONGMAN:  Okay.

02:03 9            (End of bench conference.)

02:03 10           THE COURT:  Please proceed, Mr. Strongman.

02:03 11           MR. STRONGMAN:  All right.

02:03 12   BY MR. STRONGMAN:

02:03 13   Q.   Doctor, I had asked a question about statistical

02:03 14   significance, and I want to back up and ask a question before.

02:03 15           We are talking about TAC versus FAC, and that study

02:03 16   was aimed at looking at efficacy; is that right?

02:03 17   A.   That was the primary endpoint, yes.

02:03 18   Q.   And can you discuss what the results of the primary

02:03 19   endpoint were with that study and whether they were

02:03 20   statistically significant?

02:03 21   A.   The results were positive, meaning both progression-free

02:03 22   survival -- time to progression -- and overall survival were

02:03 23   better in the TAC than in the FAC arm.

02:03 24           And the difference was statistically significant,

02:03 25   meaning it's unlikely it arose by chance, that it's more likely

**JOHN GLASPY - DIRECT**

02:04  1    an effect of the difference in treatment.

02:04  2    **Q.**   And I think we have already -- I had asked you, you had

02:04  3    reviewed the information that Dr. Kopreski had put together on

02:04  4    the ongoing cases -- do you remember that? -- of alopecia, the

02:04  5    ongoing cases of alopecia, Dr. Kopreski's chart.

02:04  6                 Do you remember that?

02:04  7    **A.**   I do.

02:04  8    **Q.**   And, Doctor, in review of that chart, the jury has heard

02:04  9    about 29 cases.

02:04 10                 And in the review, were there cases, yes or no, that

02:04 11    didn't meet the definition of persistent alopecia going out to

02:04 12    six months?

02:04 13    **A.**   Yes.

02:04 14    **Q.**   And did that happen in both the TAC arm and the FAC arm?

02:04 15    **A.**   Yes.

02:04 16    **Q.**   And either way, when you look at both, were cases of

02:05 17    ongoing alopecia happening, as the study defined it, in both

02:05 18    arms of the study?

02:05 19    **A.**   Yes.

02:05 20    **Q.**   Doctor, based upon your review of the TAX 316 information,

02:05 21    including Dr. Kopreski's analysis, were there actually 29 cases

02:05 22    of permanent alopecia in the TAC arm?

02:05 23    **A.**   Not documented, right?  I mean, the difference in numbers

02:05 24    is due to the fact that for whatever reason, the patient didn't

02:05 25    have a safety follow-up.  So we don't know what happened to

JOHN GLASPY - DIRECT

02:05 1   that patient.

02:05 2   **Q.**   And can you explain that.

02:05 3   **A.**   So -- I will.  I just --

02:06 4   **Q.**   Can you --

02:06 5   **A.**   So when you look at those 29 cases, some of them did not

02:06 6   have a follow-up at six months.  They had not been followed up.

02:06 7   Even though this may have been seven years ago, the last time

02:06 8   that their hair was assessed on the case report form was less

02:06 9   than six months -- less than seven months after finishing

02:06 10  chemo.  So we don't know whether that patient's hair recovered

02:06 11  or not.

02:06 12         There were patients who weren't in the 29 because

02:06 13  there was a documented recovery date.  Those, we knew they

02:06 14  recovered.

02:06 15         So there were two ways that patients could be on that

02:06 16  list of 29 and not have permanent hair loss:  One was by being

02:07 17  lost to follow-up and actually having their hair recover and it

02:07 18  just was never seen; or the hair recovered.

02:07 19  **Q.**   And the same goes for the FAC arm too, right?

02:07 20  **A.**   Yes.

02:07 21         **MR. MICELI:**  Objection, Your Honor.  It's leading.

02:07 22  I'm sorry.

02:07 23         **THE COURT:**  Rephrase your question.

02:07 24  BY MR. STRONGMAN:

02:07 25  **Q.**   Doctor, would that analysis apply to the FAC arm?

**JOHN GLASPY - DIRECT**

02:07  1   **A.**    It did, yes.

02:07  2   **Q.**    I want to turn and talk about Mrs. Earnest, okay?

02:07  3        Doctor, what chemotherapy regimen did Mrs. Earnest

02:07  4   ultimately receive?

02:07  5   **A.**    She received dose-dense AC, followed by Taxotere.

02:07  6   **Q.**    And what was the --

02:07  7   **A.**    And the Taxotere dose was 100 per meter squared.

02:07  8   **Q.**    And when you look at the conversation we were having

02:07  9   earlier about tumor type, stage, etc., could you explain to the

02:07 10   jury what Mrs. Earnest's cancer type was and what her factors

02:08 11   were.

02:08 12   **A.**    Yeah.  She had an infiltrating ductile cancer, the most

02:08 13   common kind of invasive breast cancer.  It had hormone

02:08 14   receptors on it.  It did not have HER2/neu on it.  It was in a

02:08 15   lymph node, and so that made it a Stage 2B.

02:08 16   **Q.**    And, again, do you believe that chemotherapy was

02:08 17   appropriate for Mrs. Earnest?

02:08 18   **A.**    I do.

02:08 19   **Q.**    And do you believe that Mrs. Earnest, in order to optimize

02:08 20   overall survival, that she needed a taxane?

02:08 21   **A.**    Well, yes, with the proviso that that was the only way to

02:08 22   get the highest cure rate.

02:08 23   **Q.**    And we have talked about Taxol and the risk of neuropathy;

02:08 24   is that right, Doctor?

02:08 25   **A.**    We did.

**JOHN GLASPY - DIRECT**

02:08 1  **Q.**   Did Mrs. Earnest have any -- and we are talking about the

02:08 2  time period in 2011 and before.

02:08 3         Are you with me?

02:08 4  **A.**   I am.

02:08 5  **Q.**   In that time period, did Ms. Earnest have any risk factors

02:08 6  for neuropathy?

02:08 7  **A.**   She had prediabetes and high blood sugars.

02:09 8  **Q.**   Doctor, did Mrs. Earnest then go on hormone therapy as

02:09 9  well?  Is that right?

02:09 10  **A.**   She did.

02:09 11  **Q.**   And do you know whether, based on your review of the

02:09 12  records, she is continuing that therapy to this day?

02:09 13  **A.**   She is continuing it, so far as I can tell from the

02:09 14  records.

02:09 15  **Q.**   And, Doctor, with regard to Mrs. Earnest's hair loss, is

02:09 16  there any way to rule out the role that Cytoxan would play?

02:10 17  **A.**   No.

02:10 18  **Q.**   And same question:  With regard to Mrs. Earnest's hair

02:10 19  loss, is there any way to rule out the role that Adriamycin

02:10 20  could play?

02:10 21  **A.**   No.

02:10 22  **Q.**   Is there any way to rule out the role that Arimidex could

02:10 23  play in Mrs. Earnest's hair loss?

02:10 24  **A.**   No.

02:11 25  **Q.**   Just a couple of other questions and I will be done.

JOHN GLASPY - DIRECT

02:11 1        When Mrs. Earnest took her regimen, do you know, yes

02:11 2   or no, one way or the other, whether or not she received the

02:11 3   Adriamycin and the Cytoxan weeks before she received Taxotere?

02:11 4   A.   She did.

02:11 5   Q.   And based on your review, did Mrs. Earnest lose her hair

02:11 6   before she started taking Taxotere?

02:11 7   A.   Yes.

02:11 8   Q.   And when you talk about the neuropathy again, what is the

02:11 9   significance of risk factors for neuropathy when you are

02:11 10  evaluating chemotherapy options?

02:11 11       MR. MICELI:  Your Honor, I object to the form.  I

02:11 12  think we spoke about this in chambers, did we not?

02:11 13       THE COURT:  I think you all need to approach.

02:11 14       (The following proceedings were held at the bench.)

02:12 15       THE COURT:  I don't want to have this conversation in

02:12 16  front of the jury, but what I thought I said in chambers is you

02:12 17  couldn't put the chart up because it is what Dr. Carinder said.

02:12 18  So I think you have already asked him what risk factors she

02:12 19  had, and I think that's enough.

02:12 20       MR. STRONGMAN:  Okay.  Thank you.

02:12 21       (End of bench conference.)

02:12 22  BY MR. STRONGMAN:

02:12 23  Q.   Doctor, with regard to chemotherapy and the options

02:12 24  available to Mrs. Earnest, were there any risk-free options?

02:12 25  A.   No, but that's a relatively vague question.  "Risk-free"

JOHN GLASPY - DIRECT

02:12  1   meaning "hair loss risk-free"?

02:12  2   **Q.**   How about were there any options that Mrs. Earnest had

02:12  3   that didn't have a risk of hair loss?

02:13  4   **A.**   No.

02:13  5   **Q.**   And, Doctor, in your opinion, is giving Taxotere to

02:13  6   Mrs. Earnest by Dr. Carinder, was that a reasonable decision?

02:13  7   **A.**   I believe his treatment was reasonable.

02:13  8   **Q.**   Doctor, have you offered all the opinions that you have

02:13  9   stated today to a reasonable degree of medical certainty?

02:13 10   **A.**   Yes.

02:13 11            **MR. MICELI:**  Your Honor, as we said before lunch, I'm

02:13 12   going to have a little setup time.  Could we take five?

02:13 13            **THE COURT:**  Sure.  Court will be at recess for five

02:13 14   minutes.

02:13 15            **THE DEPUTY CLERK:**  All rise.

02:13 16            (Recess.)

02:19 17            **THE COURT:**  Are we ready?

02:19 18            **THE DEPUTY CLERK:**  All rise.

02:20 19            **THE COURT:**  All jurors are present.  Court is back in

02:20 20   session.  You may be seated.

02:20 21            Dr. Glaspy, I remind you you are under oath.

02:20 22            **THE WITNESS:**  Okay.

02:20 23            **THE COURT:**  Okay.  Mr. Miceli.

02:20 24            **MR. MICELI:**  Yes.

      25

JOHN GLASPY - CROSS

|  |  |
|---|---|
| 02:20 | 1 |

CROSS-EXAMINATION

BY MR. MICELI:

Q.   Hello, Dr. Glaspy.

A.   Hi.

Q.   I'm going to have some follow-up questions for you, but I want to try to make sure I heard some things right at the beginning of your testimony this morning.

When you were asked a question about metastatic and adjuvant treatment, you had said that there was a -- when you are giving adjuvant treatment, you are attempting to treat metastatic cancer before it ever materializes because it's circulating in your body in unseen form, correct?

A.   No, I didn't say before it materializes; I said before it becomes big enough to be seen on a scan.

Q.   Before it can be seen, right, what the --

A.   It's not floating around.  There's meta -- these women have metastatic disease; it just isn't big enough to see yet.

Q.   I understand.  The only way to actually know it's there is statistically, by looking at it, correct, by looking at the incidence rate statistically?

A.   By looking at what happens if you don't treat and if you do treat, you can get an idea of the magnitude of benefit, right.

Q.   That's the way studies go, isn't it?  You look at things and then you see whether they happen in one group and not in

JOHN GLASPY - CROSS

02:21 1   the other?

02:21 2   A.   Yes.

02:21 3   Q.   You randomize them so that they're -- you try to get them

02:22 4   evenly split, and then you control for certain factors.   Then

02:22 5   one group shows an effect, and the other one doesn't, right?

02:22 6   A.   Correct.

02:22 7   Q.   You said, "That's why the trials are so big.  And you need

02:22 8   a lot of patients because both groups are going to be fine --

02:22 9   some people in both groups are going to be fine even without

02:22 10  chemo.  We guessed wrong.  They didn't have tumor spots in

02:22 11  their body."  Right?

02:22 12  A.   Correct.

02:22 13  Q.   That's because -- I think your words before had been:  The

02:22 14  hallmark of treating early-stage breast cancer is surgery.

02:22 15  Right?

02:22 16  A.   I don't know if I said a hallmark.  I think that the

02:22 17  mainstay of treatment for the local tumor is surgery.

02:22 18  Q.   Dr. Glaspy, do you from time to time for

02:22 19  Stand Up to Cancer do interviews on television or have them

02:22 20  filmed?

02:22 21  A.   I may --

02:22 22  Q.   Have you ever had one done in your office before?

02:22 23  A.   Probably.

02:22 24       MR. MICELI:  Can you cue up No. 2.  Before we play

02:23 25  it, just pull up the picture.

JOHN GLASPY - CROSS

02:23 1   BY MR. MICELI:

02:23 2   Q.   And see if that's you on the screen there, Dr. Glaspy.

02:23 3         THE COURT:  Just Dr. Glaspy.

02:23 4         MR. MICELI:  Just Dr. Glaspy.

02:23 5         THE COURT:  Okay.

02:23 6         THE WITNESS:  I'm seeing me, but it's my reflection.

02:23 7   The screen has got --

02:23 8         MR. MICELI:  There he is.

02:23 9         THE WITNESS:  Yes, that's me.

02:23 10        MR. MICELI:  Okay.  Can you play that, please.

02:23 11        THE DEPUTY CLERK:  To everyone?

02:23 12        MR. MICELI:  Is it okay if we play it?  I just want

02:23 13  to make sure you understood it was him that was being

02:23 14  interviewed.

02:23 15        MR. STRONGMAN:  For what purpose?

02:23 16        MR. MICELI:  I wanted to see if he says the hallmark

02:23 17  of treating breast cancer is surgery.

02:23 18        THE COURT:  I don't know -- this is a little bit

02:23 19  different from having a statement I can read.  Have you all

02:23 20  seen this?

02:23 21        MR. MICELI:  Your Honor, it's cross-examination.

02:23 22        THE COURT:  I understand that.  Play it.

02:24 23        MR. MICELI:  We need the sound.

02:24 24        THE DEPUTY CLERK:  Just give it a second.

02:24 25        (Multimedia exhibit played.)

JOHN GLASPY - CROSS

02:24 1  BY MR. MICELI:

02:24 2  Q.   You're talking about breast cancer there?

02:24 3  A.   It is, yes.

02:24 4  Q.   Okay.

02:24 5  A.   Again, earlier I thought you were asking me about my

02:24 6  testimony today.

02:24 7  Q.   Oh, I'm sorry.

02:24 8  A.   So I don't have any doubt that surgery is an important

02:24 9  part of the treatment of breast cancer, especially local breast

02:24 10  cancer.

02:24 11  Q.   With regard to local breast cancer, there are more --

02:24 12  there's more than one best choice, right?

02:24 13  A.   For localized treatment?

02:24 14  Q.   Yes.

02:24 15  A.   That's correct.

02:24 16  Q.   You know, in your report you say at the bottom of

02:24 17  page 10 --

02:24 18      MR. MICELI:   John, did you give him the binder with

02:24 19  his report in it?

02:24 20      THE WITNESS:   It's here.

02:24 21  BY MR. MICELI:

02:24 22  Q.   If you want to look at the bottom of page 10, you

02:24 23  criticize or you seem to say you wouldn't use anything, but a

02:24 24  taxane.  But then I think you went back on that in your

02:24 25  deposition.  Didn't you?

JOHN GLASPY - CROSS

02:24 1                There are a lot of good choices for treating

02:25 2   early-stage breast cancer.

02:25 3   A.    I don't think the two statements are contradictory.

02:25 4   Something can be best and other options be reasonable options.

02:25 5   Q.    Okay.  So there are many reasonable options for

02:25 6   early-stage breast cancer?

02:25 7   A.    That's correct.

02:25 8   Q.    The way a woman should be able to make a choice about what

02:25 9   is her best option is that she should have a fully informed

02:25 10  discussion with her doctor, right?

02:25 11  A.    I agree.

02:25 12  Q.    The only way a doctor can be fully informed is if the

02:25 13  company tells them everything they know about their drug,

02:25 14  right?

02:25 15  A.    Yes.

02:25 16  Q.    From a safety standpoint?

02:25 17  A.    And an efficacy standpoint.

02:25 18  Q.    Certainly.  You want to make sure that you get the full

02:25 19  story on both ends, right?

02:25 20  A.    As full as they can know, right.

02:25 21          MR. MICELI:  Your Honor, may I approach the witness?

02:25 22          THE COURT:  Yes, you may.

02:26 23  BY MR. MICELI:

02:26 24  Q.    Do you recognize this article, Dr. Glaspy?

02:26 25  A.    I do.

JOHN GLASPY - CROSS

02:26 1   **Q.**   This is an article that you are a coauthor on, right?

02:26 2   **A.**   That's correct.

02:26 3   **Q.**   This is the publication of the TAX 316 BCIRG 001 study,

02:26 4   right?

02:26 5   **A.**   That's correct.

02:26 6   **Q.**   You were a study investigator on that one?

02:26 7   **A.**   Yes.

02:26 8   **Q.**   You weren't a study investigator for the whole time, were

02:26 9   you?

02:26 10   **A.**   Yes.

02:26 11   **Q.**   You were?

02:26 12   **A.**   I was.

02:26 13   **Q.**   I guess your partner -- is it Linnea Chap?

02:26 14   **A.**   Well, there were two UCLA faculty slots.  One went to

02:26 15   Dr. Nabholtz and one I gave to Linnea Chap.  She was my fellow.

02:26 16   **Q.**   She subsequently left the practice at UCLA, and you

02:26 17   stepped in, right?

02:26 18   **A.**   I didn't give her the -- I didn't give her the authorship

02:26 19   position anymore, that's correct.

02:26 20   **Q.**   You talked to Mr. Strongman a little bit about the TAX 316

02:27 21   study and how people may fall out of the study, and there may

02:27 22   be people that are removed from the study for other reasons

02:27 23   other than just removing their consent, right?

02:27 24   **A.**   Where you would stop collecting safety data, yes.

02:27 25   **Q.**   Let's look at page 79, if we can.

JOHN GLASPY - CROSS

02:27 1        **MR. MICELI:**  Your Honor, am I allowed to use the --
02:27 2        **THE COURT:**  Sure.
02:27 3        **THE DEPUTY CLERK:**  Is this for everyone to see?
02:27 4        **MR. MICELI:**  Yes.
02:27 5              You know what?  I'm not going to put that one
02:27 6   with my notes on it.  I apologize there.  Everyone in the room,
02:27 7   including myself, would not be able to read it.
02:27 8   **BY MR. MICELI:**
02:27 9   **Q.**   I want to direct your attention to the left side of the
02:27 10  page and the first highlighted section.  Do you see that, where
02:28 11  it starts "The intention to treat efficacy and safety analysis
02:28 12  were done as originally and prospectively defined in the study
02:28 13  protocol"?
02:28 14  **A.**   That's correct.
02:28 15  **Q.**   Now, a study protocol is something that puts all of the
02:28 16  rules on how that study is going to be conducted and sets it
02:28 17  out, how we are going to administer doses of medicine, how you
02:28 18  are going to collect data, and in part how you're going to
02:28 19  analyze the data, right?
02:28 20  **A.**   Yes.
02:28 21  **Q.**   And other aspects as well?
02:28 22  **A.**   Yes.
02:28 23  **Q.**   The next highlighted portion on the left side of the page
02:28 24  says:  "Few patients have been lost to follow-up."
02:28 25              I'm going to stop there for a second.  The

JOHN GLASPY - CROSS

02:28 1   follow-up -- lost to follow-up is what you were explaining to

02:28 2   Mr. Strongman just a moment ago, right?

02:28 3   A.   Those are dropouts.  Essentially statistically they are

02:28 4   called dropouts.

02:28 5   Q.   But in this particular study that you, sir, were a member

02:28 6   of the authorship of the paper:  "Few patients have been lost

02:29 7   to follow-up, roughly .5 percent per year in each treatment

02:29 8   group."

02:29 9           That's what's published in the *Lancet Oncology*,

02:29 10  right?

02:29 11  A.   Yes.  And that's consistent with what I said earlier.

02:29 12  Q.   Which allows for unbiased comparisons for both efficacy

02:29 13  and safety, right?

02:29 14  A.   That's correct.

02:29 15  Q.   What that means is that the data was collected; there was

02:29 16  low dropout; and it's good data in order to conduct the

02:29 17  analyses necessary.  Right?

02:29 18  A.   That's not how I would phrase it.  I don't think that's

02:29 19  exactly accurate.  What it says is half a percent of patients

02:29 20  per year over a 10-year period is not a tiny number of

02:29 21  patients.  What we are saying is that our dropout rate was

02:29 22  lower than what we built into our plan, so the analyses are

02:29 23  statistically valid.

02:29 24  Q.   You agree with the statement in the article, right?

02:30 25  A.   Yes.  As long as it's interpreted the way I just said.

JOHN GLASPY - CROSS

02:30 1   This is how we researchers talk to each other.

02:30 2   Q.   I'm going to go to one other portion, and then I'm going

02:30 3   to get away from this.  We will be coming back to this

02:30 4   throughout the afternoon, though.

02:30 5         On the right-hand column it says:  "Because of the

02:30 6   absence of direct comparisons of widely used adjuvant

02:30 7   therapies, including various other sequential anthracycline and

02:30 8   taxane regimens, identification of which anthracycline- and

02:30 9   taxane-based regimen provides the best risk-to-benefit ratio is

02:30 10  not currently possible."

02:30 11        That's what you said as an author in this article.

02:30 12  A.   It's what I believe.

02:30 13  Q.   It's what you believe, but you were saying earlier today,

02:30 14  when you were talking to Mr. Strongman, how much better

02:30 15  Taxotere regimens are than all other regimens.  And what we

02:30 16  write here is that without head-to-head studies, you can't

02:30 17  claim that one is better than the other, can you?

02:30 18  A.   Actually, I never said that this morning to Mr. Strongman.

02:30 19  What I said was that I thought these regimens were equal; but

02:31 20  for Mrs. Earnest the issue of the prediabetes made Taxotere

02:31 21  have some advantages for her, not that TAC works better than

02:31 22  AC-T.  So far as I know, they are identical in their efficacy.

02:31 23  The issue is safety.

02:31 24  Q.   Let's be clear, though.  You conducted one study,

02:31 25  BCIRG 001 TAX 316, same study.  It compared FAC to TAC,

JOHN GLASPY - CROSS

02:31 1    correct?

02:31 2    A.    That's correct, yes.

02:31 3    Q.    And that's the only head-to-head study that you have

02:31 4    been -- you have participated in where a superiority could

02:31 5    actually be supported.  Would that be a fair statement?

02:31 6    A.    It's the only one I participated in.  It's not as though

02:31 7    others were participating where the superiority wasn't

02:31 8    demonstrated.

02:31 9    Q.    We will come back to this in just a moment.

02:32 10           Earlier you talked or you spoke with Mr. Strongman

02:32 11   about the chart of cases where he asked if it was

02:32 12   scientifically valid to just list the number of cases that were

02:32 13   involved -- were under one of the drugs.  Do you remember that?

02:32 14   A.    I don't remember using the word "scientifically valid,"

02:32 15   but I do remember him producing that and asking me if I thought

02:32 16   that was a fair comparison.

02:32 17   Q.    One of the things you said is you need a denominator,

02:32 18   right?

02:32 19   A.    That's correct.

02:32 20   Q.    I'm going to go down that list with you for a second.  In

02:32 21   TAX 316, what has been continuously report by Sanofi is 29 out

02:32 22   of -- over 744, and that is 3.9 percent.

02:32 23           Do you accept that number?

02:32 24   A.    I accept that 3.9 percent is what you get if you are

02:32 25   looking for 29 out of 746.  I think it's an area of contention,

JOHN GLASPY - CROSS

02:33  1    whether it's 29 or 6 that should be the number.

02:33  2    Q.    Well, Doctor, you haven't written the *Lancet Oncology* to

02:33  3    tell them anything about your study data is invalid, have you?

02:33  4    A.    No.  And there's nothing in here that is invalid.

02:33  5    Q.    You haven't written anybody in your study -- your

02:33  6    coauthors or your co-study participants saying that there's

02:33  7    something wrong with the way that the adverse events were

02:33  8    collected, have you?

02:33  9    A.    No.  I think they were collected very well.  I think the

02:33 10    issue is how are they being interpreted in this setting.

02:33 11    Q.    And how they are being interpreted in this setting, what

02:33 12    you have looked at is a table by a gentleman by the name of

02:33 13    Michael Kopreski, right?

02:33 14    A.    Yes.

02:33 15    Q.    We are going to talk about Dr. Kopreski in a little bit.

02:33 16          I want to keep going down some numerator-denominator

02:33 17    mathematics.  7 over 112 is 6.3 percent, correct?

02:34 18    A.    I'll trust your math.  I think that's correct.

02:34 19    Q.    Did you read the Sedlacek abstract?

02:34 20    A.    Yes.

02:34 21    Q.    He had 7 individuals on a Taxotere regimen, over 112,

02:34 22    which was the population that used that regimen.  That's

02:34 23    6.3 percent, correct?

02:34 24    A.    That's correct.

02:34 25    Q.    In the Crown article -- in the Crown abstract we have

JOHN GLASPY - CROSS

02:34 1    39 individuals who suffered permanent alopecia on TAC and over

02:34 2    a denominator of 260.   That's 15 percent.

02:34 3        Do you trust that math?

02:34 4    A.    I need to see the abstract.

02:34 5    Q.    Okay.   In the -- Miguel Martin is one of your co-directors

02:34 6    at TRI Oncology, isn't he?

02:34 7    A.    TRIO Oncology, yes.

02:34 8    Q.    TRIO Oncology.

02:34 9    A.    Right.   Yes.

02:34 10   Q.    Now, he published an article where he had 98 individuals

02:34 11   who he documented on Taxotere regimens over a population of

02:34 12   417.   That's 23.5 percent.

02:34 13   A.    I believe the math is correct.   But, again, I would like

02:34 14   to see the article and go through it with you.

02:35 15   Q.    Sir, you listed the 2015 clinical overview as one of the

02:35 16   items you reviewed in preparing your report and to give

02:35 17   opinions in this case, correct?

02:35 18   A.    Yes.

02:35 19   Q.    They had 117 events over a population of people who

02:35 20   suffered alopecia of 2174, and that is 5.3 percent.   Would you

02:35 21   agree with that?

02:35 22   A.    I accept the math.

02:35 23   Q.    I'm going to --

02:35 24        MR. MICELI:   May I approach, Your Honor?

02:35 25        THE COURT:   Yes, you may.

JOHN GLASPY - CROSS

02:35 1    BY MR. MICELI:

02:35 2    Q.   Doctor, do you recognize the Study Protocol 6 for your

02:35 3    study TAX 316?

02:36 4    A.   Yes.

02:36 5    Q.   I just want to flip through this to the second page.  It

02:36 6    lists the study co-chairs as Charles Vogel, Miguel Martin, and

02:36 7    John Mackey, the coauthor -- the lead author on the study we

02:36 8    just looked at, correct?

02:36 9    A.   Yes.

02:36 10   Q.   Those three gentlemen are co-directors of TRIO Oncology?

02:36 11   A.   Mackey is no longer, and Vogel never was.

02:36 12   Q.   But they are in related study centers in Florida and

02:36 13   Canada, correct?

02:36 14   A.   One of them works in Florida, one works in Canada.

02:36 15   Q.   Okay.  So you have -- on this first page here, you have

02:36 16   the participants in this study -- one, two, three -- four

02:36 17   individuals from BCIRG who was -- is that a contract research

02:36 18   organization that you're a director of?

02:36 19   A.   It's a cooperative group that does clinical trials.

02:37 20   Q.   Then if you flip over to the third page, you still have

02:37 21   BCIRG listing another -- one, two, three, four, five -- six

02:37 22   individuals.  That's up to nine individuals at BCIRG that are

02:37 23   listed on this protocol, correct?

02:37 24   A.   Yes, because it was done by that -- BCIRG was the

02:37 25   cooperative group that carried it out.

JOHN GLASPY - CROSS

02:37 1   **Q.**   I understand.

02:37 2   **A.**   That's why all the staff came from there.

02:37 3   **Q.**   That's why the name of the study is BCIRG 1?

02:37 4   **A.**   001.

02:37 5   **Q.**   001.

02:37 6   **A.**   Right.

02:37 7   **Q.**   If you keep flipping through, Doctor, page 3 of 104, it

02:37 8   starts to list -- 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13,

02:37 9   14, 15, 18, 19, 20, 22, 23, 25, 26, 27, 28, 29, 30, 33, 34, 35,

02:38 10  36, 37 -- 38 individuals affiliated with Sanofi in this

02:38 11  protocol for the study that you were involved, yet when you --

02:38 12  **A.**   Can you --

02:38 13  **Q.**   Excuse me.  Not a question yet, Doctor.

02:38 14  **A.**   Okay.

02:38 15       **MR. MICELI:**  I'll settle down, Your Honor.

02:38 16  BY MR. MICELI:

02:38 17  **Q.**   You have -- what did we count up? -- 38 individuals?  And

02:38 18  a number from BCIRG.  But when you needed to form opinions in

02:38 19  this case, you looked at a chart that was put together by a

02:38 20  person that was selected by the attorneys who are defending

02:38 21  Sanofi in this case, who handpicked information, fed it to him,

02:38 22  and then he came up with his chart, and you, sir, relied upon

02:38 23  that in rendering opinions, correct?

02:38 24  **A.**   I don't believe that's a correct statement at all.  So I

02:38 25  wouldn't characterize it like that.

JOHN GLASPY - CROSS

02:38 1  Q.   We will talk through it, then.  What we do know is that

02:39 2  the report you provided in this litigation listed a number of

02:39 3  things that you reviewed.

02:39 4          Before you formed your opinions in this case, you

02:39 5  spoke to nobody at Sanofi, correct?

02:39 6  A.   That's correct.

02:39 7  Q.   You did not list any information in your report about

02:39 8  co-workers or co-investigators at BCIRG?  You followed a chart

02:39 9  written by a man who was a former employee of Sanofi, who was

02:39 10 taken by lawyers and hand-fed information.  You know that,

02:39 11 don't you, sir?

02:39 12 A.   I don't.  I don't know that at all.

02:39 13         But what I do know, that he was a former employee of

02:39 14 Sanofi.  But I viewed that as weighing in -- I admitted and

02:39 15 told you in my deposition I look at -- if the data that's in

02:40 16 that table is incorrect, then none of my opinions are valid.

02:40 17 If the data that's there is correct -- the date of the last

02:40 18 visit, the date of the completion of chemotherapy, if those

02:40 19 things are correct, then my opinions hold because I'm aware as

02:40 20 a clinical trialist how these confusions can arise, how people

02:40 21 can look at that and say, "How can this be 10-year follow-up

02:40 22 and you say it was persistent, but the last date you checked

02:40 23 the alopecia was nine years ago?"

02:40 24 Q.   Doctor, you don't know that it was nine years ago, do you?

02:40 25 Do you know that it was nine years ago?

JOHN GLASPY - CROSS

02:40  1   **A.**   No, I -- again --

02:40  2   **Q.**   Let me ask you a question.

02:40  3   **A.**   No, but you just asked me -- I need to be allowed to

02:40  4   answer it.

02:40  5                **MR. STRONGMAN:**  Objection.

02:40  6                **MR. MICELI:**  I didn't have a question.  He was

02:40  7   talking.

02:40  8                **THE COURT:**  Excuse me.

02:40  9                **MR. MICELI:**  Yes, ma'am.

02:40 10                **THE COURT:**  He is entitled -- the question was:

02:41 11   "Doctor, you don't know it was nine years ago, do you?  Do you

02:41 12   know that had it was nine years ago?"

02:41 13                You have to answer that question.

02:41 14                **THE WITNESS:**  Yes.

02:41 15                I know that it's listed there as nine years ago.

02:41 16   I have said and I will say again:  If the data in that chart

02:41 17   are wrong, then my opinions are wrong.  All my opinions come

02:41 18   from the chart.

02:41 19                **THE COURT:**  I don't think you answered the question.

02:41 20                Did you know that it was nine years ago?

02:41 21                **THE WITNESS:**  Well, again I --

02:41 22                **THE COURT:**  That's a yes or no.

02:41 23                **THE WITNESS:**  I know it's listed as nine years ago; I

02:41 24   don't know if it actually happened nine years ago, because I

02:41 25   didn't make the chart.

JOHN GLASPY - CROSS

02:41  1          THE COURT:  Thank you.

02:41  2  BY MR. MICELI:

02:41  3  Q.    You didn't make the chart.  You didn't do anything to

02:41  4  validate it either, did you?

02:41  5  A.    That's correct.

02:41  6  Q.    You just accepted what you were given by the same

02:41  7  attorneys that hired Dr. Kopreski to do the analysis, right?

02:42  8  A.    I don't know if they hired him.  I don't know what the

02:42  9  relationship is.

02:42 10  Q.    Okay.  But, Doctor, you are a master's of public health,

02:42 11  and you do a lot of research.  You have authored 178

02:42 12  peer-reviewed medical journals, correct?

02:42 13  A.    Probably more than that, but yes.

02:42 14  Q.    In the CV I have, it has 178.  I counted them and I looked

02:42 15  at the authors to see if I knew any.  I saw Dr. Bosserman.  You

02:42 16  have coauthored with Dr. Bosserman, correct?

02:42 17  A.    That's correct.

02:42 18  Q.    Every one of the papers you have, when you pick it up, you

02:42 19  can look for a section that's called "methodologies," right?

02:42 20  A.    It depends which journal because some journals don't

02:42 21  organize that way.

02:42 22  Q.    The ones that do, you can look at that methodology

02:42 23  section, you can tell exactly what the people did who were

02:42 24  writing that article, right?

02:42 25  A.    Sometimes.  Not always.

JOHN GLASPY - CROSS

02:42 1    **Q.**    You can't tell what Dr. Kopreski did, can you?

02:42 2    **A.**    In terms of how he got those numbers?

02:42 3    **Q.**    No, not how he got the numbers.  How he came to be in

02:43 4    possession of the records, why he did the analysis.  Do you

02:43 5    know anything about that?

02:43 6    **A.**    Well, I know what he said in his deposition because --

02:43 7    **Q.**    That's interesting, sir.  Can you turn to your expert

02:43 8    report, in Exhibit A, the materials provided?

02:43 9    **A.**    Right.

02:43 10   **Q.**    I want you to read to the jury which depositions you told

02:43 11   me you had reviewed before you gave your opinions.

02:43 12   **A.**    I don't think he had been deposed yet.

02:43 13   **Q.**    Oh, he hadn't been deposed.  But you didn't update that

02:43 14   report, did you?

02:43 15   **A.**    I did not.

02:43 16   **Q.**    Thank you.

02:43 17   **A.**    I have my report here.

02:43 18   **Q.**    Tell the jury if you had reviewed Mr. Kopreski's

02:43 19   deposition before you formed your opinions.

02:43 20   **A.**    Before I wrote this report, no, I had not.

02:43 21   **Q.**    You did not update that report for us either, did you?

02:43 22   **A.**    I did not.  And it didn't change my opinions.

02:43 23   **Q.**    It may not have changed your opinions, but before we came

02:43 24   to court today, I had no idea you had looked at anything other

02:44 25   than what you had told me you had looked at in forming your

JOHN GLASPY - CROSS

02:44  1    opinions.

02:44  2          That's a fair thing for me to understand, isn't it?

02:44  3    What you've looked at, coming in here?

02:44  4    A.   I'm not a lawyer, so I don't --

02:44  5          MR. MICELI:  May I approach, Your Honor?

02:44  6          THE COURT:  Yes, you may.

02:44  7    BY MR. MICELI:

02:44  8    Q.   Now, Dr. Glaspy, you know that Dr. Kopreski didn't do that

02:44  9    analysis until October of last year, right?

02:44 10    A.   I believe that's when he did it, yes.

02:44 11    Q.   About the time that -- right in the middle of when this

02:44 12    case was being litigated, the attorneys decided to find

02:44 13    somebody and have them put together that chart.

02:44 14    A.   Is that a question?

02:44 15    Q.   Yes, sir.

02:44 16    A.   I have no idea.

02:44 17    Q.   But you know he said he did it so that he could figure out

02:44 18    the difference between ongoing and persisting, right?

02:45 19    A.   I thought he did it to clear up confusion about how many

02:45 20    of these alopecia cases have been documented to go beyond seven

02:45 21    months.

02:45 22    Q.   Do you know anybody's name who resides in the Sanofi

02:45 23    department of biostatistics and data mining?

02:45 24    A.   I don't know if I do.

02:45 25    Q.   You know that -- well, you know that in every clinical

JOHN GLASPY - CROSS

02:45 1    study you work on has a statistician that crunches the numbers,

02:45 2    right?

02:45 3    A.   Usually.

02:45 4    Q.   We can go back and look at the Mackey article later, but

02:45 5    you know that Sanofi's statisticians are the ones that crunch

02:45 6    those numbers, right?

02:45 7    A.   On 316?

02:45 8    Q.   Yes.

02:45 9    A.   Yes.

02:45 10   Q.   The same group that crunched those numbers crunched the

02:45 11   ones that are sitting in front of you.  At least that's what

02:45 12   they told us.  I want you to look at page 3 of the document we

02:45 13   have here.

02:45 14         MR. STRONGMAN:  Objection.  Counsel is testifying.

02:45 15         THE COURT:  He can ask leading questions.  He is

02:45 16   under cross-examination.

02:46 17              But I think you need to ask questions.

02:46 18         MR. MICELI:  Thank you, Your Honor.

02:46 19         THE WITNESS:  Page 3?

02:46 20   BY MR. MICELI:

02:46 21   Q.   Yes, the one that has about four paragraphs on it, Doctor.

02:46 22   A.   Got it.

02:46 23   Q.   Right there it says "TAX 316."  This is dated, if you look

02:46 24   up in the right-hand corner, 22 January 2013.  So this is

02:46 25   almost two years after Mrs. Earnest had her treatment, but it's

JOHN GLASPY - CROSS

02:46  1    a good 5 1/2 years before Michael Kopreski was hired by these

02:46  2    attorneys in the courtroom with us to do this chart for you.

02:46  3             So let's look at what Sanofi said --

02:46  4             MR. STRONGMAN:  Objection.  Misstates the evidence;

02:46  5    argumentative; and he is testifying still.

02:46  6             THE COURT:  I think you all need to approach.

02:46  7             (The following proceedings were held at the bench.)

02:46  8             THE COURT:  You may lead him until the cows come

02:47  9    home.  This is cross-examination.  I think for you to say the

02:47 10    attorneys picked him, the attorneys gave him that information,

02:47 11    once he said, "I don't know that" --

02:47 12             MR. MICELI:  Can I educate him on that?  Because he

02:47 13    read the deposition and Dr. Kopreski says where he got it.  I

02:47 14    can show him the deposition testimony.

02:47 15             MR. MOORE:  You can't put testimony in that way.

02:47 16             MR. MICELI:  Well, he said he read the deposition.

02:47 17             MR. MOORE:  If they wanted those facts in the record,

02:47 18    they could have put it in through Kopreski's testimony, which

02:47 19    they didn't.  They can't sit here through cross-examination and

02:47 20    introduce facts that are not in evidence.

02:47 21             THE COURT:  Except that part of the problem is he is

02:47 22    the expert that's testifying as to this, and that forms some of

02:47 23    the basis of his opinion, is Kopreski --

02:47 24             MR. MOORE:  The data.

02:47 25             THE COURT:  I think it's appropriate for him to

JOHN GLASPY - CROSS

02:47 1    challenge the data.

02:47 2                    The problem is I think you continue to testify.

02:47 3    You may ask leading questions and I'm going to give you a great

02:47 4    deal of latitude.  The man is under cross-examination, but I

02:47 5    think enough --

02:47 6            MR. MICELI:  Okay.  I've been chomping at the bit

02:47 7    after watching what's been going on last week, so I will tone

02:48 8    it down, Your Honor.

02:48 9            THE COURT:  I'm going to give you a great deal of

02:48 10   latitude --

02:48 11           MR. MICELI:  Thank you.

02:48 12           THE COURT:  -- but we have heard "what the lawyers

02:48 13   did, the lawyers did, the lawyers did."

02:48 14           MR. MICELI:  So I shouldn't refer to this as the

02:48 15   "Kopreski analysis"?

02:48 16           THE COURT:  No.

02:48 17           MR. MICELI:  Okay.  I won't do that.

02:48 18           THE COURT:  I think that might cross the line.

02:48 19           MR. MICELI:  Okay.

02:48 20           MR. STRONGMAN:  While we are up here, I would just

02:48 21   make a request that the witness be able to answer the question

02:48 22   without being cut off.  I'm trying to stay out of the way

02:48 23   because I know it's cross.

02:48 24           THE COURT:  He has to answer it first.

02:48 25           MR. STRONGMAN:  Fair point.

JOHN GLASPY - CROSS

02:48 1          THE COURT:  He has to answer it first, then he may

02:48 2    explain it.  But he doesn't get to avoid it by just an

02:48 3    explanation.

02:48 4          (End of bench conference.)

02:49 5          THE COURT:  Please proceed.

02:49 6          MR. MICELI:  Thank you.

02:49 7    BY MR. MICELI:

02:49 8    Q.   Dr. Glaspy, you have had an opportunity to read this

02:49 9    document?

02:49 10   A.   Yes.

02:49 11   Q.   In the TAX 316 paragraph in 2013 -- and this is Sanofi's

02:49 12   document:  "By the end of the follow-up period, 29 TAC patients

02:49 13   (4.2 percent) still had persistent alopecia."

02:49 14          That's what it says, correct?

02:49 15   A.   It is.

02:49 16   Q.   Now, in addition to -- let me back up, because you said

02:49 17   that you have now reviewed Dr. Kopreski's deposition.

02:49 18          Have you reviewed anything else, any other

02:49 19   depositions?

02:49 20   A.   No.

02:49 21   Q.   And you have only heard the testimony from this morning

02:49 22   when you were in court, or have you heard other testimony this

02:49 23   week?

02:50 24   A.   That's it.

02:50 25   Q.   Okay.  So --

JOHN GLASPY - CROSS

02:50 1          **MR. MICELI:**  May I approach, Your Honor?

02:50 2          **THE COURT:**  Yes, you may.

02:50 3  BY MR. MICELI:

02:50 4  **Q.**   Dr. Glaspy, I've just handed you a compilation of a number

02:50 5  of pages.

02:50 6          Have you ever seen this before?

02:50 7  **A.**   I don't recall having seen it.

02:50 8  **Q.**   So I want to just -- before I ask you questions about

02:50 9  it -- walk through it a little bit.

02:51 10         You have received Dr. Kopreski's chart and you have

02:51 11  read just one of his depositions?

02:51 12  **A.**   I believe so.  It was a little ways back now, so --

02:51 13  **Q.**   Okay.

02:51 14  **A.**   -- and it was very long.

02:51 15  **Q.**   And I know from looking at your expert report disclosures

02:51 16  that you have reviewed several labels, several package inserts,

02:51 17  a couple of clinical overviews, and some clinical study

02:51 18  reports.

02:51 19         Is there anything else that you can recall reviewing

02:51 20  from Sanofi's possession, any of their other documents?

02:51 21  **A.**   Yeah, we are getting near a minefield again.

02:51 22  **Q.**   Okay.  Well, subject to the minefield.

02:51 23  **A.**   There are other things I have reviewed, but -- to be

02:51 24  honest, the answer is yes.  But --

02:51 25  **Q.**   Okay.

JOHN GLASPY - CROSS

02:51 1    A.    Okay.  So there's that.

02:51 2          And there was interaction with the Canadian

02:52 3    authority.  I saw that.

02:52 4    Q.    Okay.

02:52 5    A.    Okay?  So I'm trying to stay out of --

02:52 6          THE COURT:  Okay.  Maybe you need to get to --

02:52 7          MR. MICELI:  That's fine.

02:52 8    BY MR. MICELI:

02:52 9    Q.    Let me just ask it this way:  Are those two items that you

02:52 10   alluded to information that is not disclosed on your expert

02:52 11   report disclosures?

02:52 12   A.    I think everything is there.  I think it's all there.

02:52 13   Q.    Okay.

02:52 14   A.    I think.

02:52 15   Q.    I'm not going to say agree to disagree, because I don't

02:52 16   want to -- but I --

02:52 17   A.    It's possible.

02:52 18   Q.    You didn't review any -- you didn't review the final

02:52 19   clinical study data, the actual datasets themselves, have you?

02:52 20   A.    No.  Only the ones I had in my physical hand, because I

02:52 21   filled out some of these case report forms, right.

02:52 22   Q.    But as far as what we heard from the statistician last

02:52 23   week who obtained the actual -- and you know what I mean when I

02:52 24   say a "locked clinical trial dataset," don't you?

02:52 25   A.    I do.

JOHN GLASPY - CROSS

02:52 1   Q.   When a clinical trial is run -- after 10 years in the case
02:53 2   of -- actually, more than 10 years; you have treatment and then
02:53 3   you had a ten-year follow-up, right, in TAX 316?
02:53 4   A.   Yes.
02:53 5   Q.   And then you had a period of time of about eight months
02:53 6   where a team of people at BCIRG and Sanofi confirmed and
02:53 7   validated everything, correct?
02:53 8   A.   That's correct.
02:53 9   Q.   And then after that happens, there comes a date where they
02:53 10  call data lock, right?
02:53 11  A.   That's correct.
02:53 12  Q.   And that data is locked and you don't get to change it and
02:53 13  you don't get to violate it, right?
02:53 14  A.   Yeah.  I don't know what the rules are about that, but
02:53 15  there does come a data lock date that's supposed to be final
02:53 16  and it's the analysis set.
02:53 17  Q.   And the statistical analyses are run on that dataset.
02:53 18  A.   That's correct.
02:53 19  Q.   And you know that the statistical analyses that were run
02:53 20  on that dataset, in the clinical study report that you were --
02:53 21  the final ten-year follow-up clinical study report reports
02:53 22  alopecia ongoing as 29 out of 744.
02:54 23  A.   Yeah, and I'm not disagreeing with that.
02:54 24  Q.   Okay.  And --
02:54 25  A.   I'm saying that that's ongoing when the patient was last

JOHN GLASPY - CROSS

02:54 1    seen, yes.

02:54 2    Q.   Well, have you looked at the protocol to see if that's how

02:54 3    they defined it?

02:54 4    A.   That wouldn't be protocol defined.

02:54 5    Q.   Have you looked at the statistical analysis plan?

02:54 6    A.   It wouldn't be there either.

02:54 7    Q.   Where would it be, sir?

02:54 8    A.   It wouldn't be any of those places.  This is the way data

02:54 9    is stored, and then when you punch a button, you can read it

02:54 10   out.  It's up to the person reading it out to interpret what it

02:54 11   means.

02:54 12   Q.   And you haven't looked at the -- you haven't looked at the

02:54 13   SAS programming to determine what it means?

02:54 14   A.   That's correct.

02:54 15   Q.   You haven't looked at the actual datasets, which are

02:54 16   ginormous spreadsheets of data, correct?

02:54 17   A.   That's correct, I did not.

02:54 18   Q.   You haven't looked at those.

02:54 19        And so your understanding of it is just -- comes from

02:54 20   the ether, or is it something that you learned from

02:55 21   Dr. Kopreski?

02:55 22   A.   Yeah, well, I don't think we have discussed ether today.

02:55 23   So --

02:55 24   Q.   Okay.

02:55 25   A.   So where it came from was the blood and guts of doing this

JOHN GLASPY - CROSS

02:55  1    clinical trial, being involved in its planning and its

02:55  2    execution and knowing how it took place, having been involved

02:55  3    in clinical trials over years, and having seen this kind of

02:55  4    interpretation need to be clarified.

02:55  5             But I will say again that if the data that

02:55  6    Dr. Kopreski put in that table isn't accurate, then my analysis

02:55  7    is flawed.  If it is accurate, I will stand by it.

02:55  8    Q.   Okay.  Before we go to that last document I gave you,

02:55  9    let's flip back to page 79 of the Mackey article.

02:55 10   A.   Okay.  I've got it.

02:55 11   Q.   Are you there at the bottom with me?  That paragraph

02:55 12   that's titled "Contributors," you go about four lines down and

02:55 13   there's a "JRM"?

02:56 14   A.   Yes.

02:56 15   Q.   And then you go over about five initials and there's a

02:56 16   "JG."

02:56 17            That's for John Glaspy, right?

02:56 18   A.   There we go.  Yes, it is.

02:56 19   Q.   And if you continue on in that sentence, it says the

02:56 20   individuals whose initials are there participated in data

02:56 21   collection, right?

02:56 22   A.   That's correct.

02:56 23   Q.   And that just means you enrolled patients at your study

02:56 24   center?

02:56 25   A.   No.  It means I filled out those case report forms and

JOHN GLASPY - CROSS

02:56  1    made determinations about whether a patient had a toxicity or

02:56  2    relapse or was dead, and made sure that that information got to

02:56  3    BCIRG.

02:56  4    Q.   But the way you operate UCLA's research centers, not every

02:56  5    person that's on a UCLA study has to come to Westwood, correct?

02:56  6    A.   In those days, that wasn't true.

02:57  7    Q.   That wasn't true?  The way it is now is not the way it was

02:57  8    then?

02:57  9    A.   That's correct.

02:57 10    Q.   You don't have to --

02:57 11    A.   We built all these satellites long after this study was

02:57 12    done.

02:57 13    Q.   But then the only people that had access to the full study

02:57 14    data were Miguel Martin, John Mackey, and Charles Vogel, right?

02:57 15    A.   They were more involved in the analysis of the data than I

02:57 16    was, yes.

02:57 17    Q.   Well, what it says here in this article, this

02:57 18    peer-reviewed journal article with your name on it, is their

02:57 19    initials, "as principal investigator and co-chairs of this

02:57 20    study, respectively, had full access to all of the data in the

02:57 21    study and take responsibility for the integrity of the data and

02:57 22    the accuracy of the data analysis."  That's what it says.

02:57 23    A.   Yeah, and that doesn't disagree with what I just said.  I

02:57 24    think we are saying the same thing.

02:57 25    Q.   All right.  Let's look at this last document.  I --

JOHN GLASPY - CROSS

02:57 1  A.   Which one is that?

02:57 2  Q.   Excuse me.  The one that has "Kopreski 11" on it.

02:57 3  A.   Okay.  Got it.

02:58 4        MR. MICELI:  These are not exhibits.  We are not

02:58 5  going to be trying to put them in, so I don't have the exhibit

02:58 6  numbers, Your Honor.

02:58 7        THE WITNESS:  Which page?

02:58 8  BY MR. MICELI:

02:58 9  Q.   Let's just walk through this, okay?

02:58 10       This is a -- looks like an invitation, "Telephone

02:58 11 conference, 4/25/2006.  Required attendees," the first person

02:58 12 is Michael Kopreski, right?

02:58 13 A.   Yes.

02:58 14 Q.   And then down at the bottom, it says:  "Dear all," just

02:58 15 under "Message by Email," "The meeting has been scheduled to

02:58 16 discuss the requested changes from the EMEA for patient leaflet

02:58 17 for Taxotere," right?

02:58 18 A.   Yeah.  That's why I'm --

02:58 19 Q.   Let's turn about six pages in.  The one at the bottom

02:58 20 right corner has a number -- excuse me.  The preceding page has

02:59 21 a number ending in 4128.

02:59 22       Are you there with me?

02:59 23 A.   I have a 4126 and a 4129 --

02:59 24 Q.   Here, I will give you mine, sir.

02:59 25 A.   -- and a 4125 and then a bunch with no numbers.

JOHN GLASPY - CROSS

02:59 1     **MR. MICELI:**  Oh, I'm sorry, can I approach?  I just
02:59 2     came walking right --
02:59 3             **THE COURT:**  Yes.
02:59 4             **MR. MICELI:**  -- around.
02:59 5             **THE WITNESS:**  If you can just show me where in this
02:59 6     thing it would be.
02:59 7             **MR. MICELI:**  Sure.  Here we go.
02:59 8             **THE WITNESS:**  Okay.
03:00 9     BY MR. MICELI:
03:00 10    **Q.**  About halfway down, more than a little -- a little more
03:00 11    than halfway down the page, it says:  "Very common, experienced
03:00 12    in more than 1 in 10 people:  Short-term hair loss.  After
03:00 13    treatment, normal hair growth should return."
03:00 14            Do you see that?
03:00 15    **A.**  Yes.
03:00 16    **Q.**  Okay.  Let's flip the page.
03:00 17            **MR. STRONGMAN:**  I object.  Is this in evidence?
03:00 18            **THE COURT:**  No.  I don't know what it is.
03:00 19            **MR. MICELI:**  I'm sorry, Your Honor.
03:00 20            Do I have another copy of this?
03:00 21            Excuse me, Your Honor.  This was actually put in
03:00 22    during Dr. Kopreski's 30(b)(6), I've been told by my colleague.
03:00 23            **THE COURT:**  Thank you.
03:00 24    BY MR. MICELI:
03:00 25    **Q.**  Under "Rare," it says:  "Alopecia, hair loss that did not

JOHN GLASPY - CROSS

03:01 1    reverse at the end of study."

03:01 2              Do you see that?

03:01 3    A.   I do.

03:01 4    Q.   Okay.  Let's flip in just a few more pages.  There's going

03:01 5    to be one that has the top left-hand corner that says "Draft

03:01 6    Proposal 2."

03:01 7    A.   I've got it.

03:01 8    Q.   Flip to the next page with me.

03:01 9    A.   I've got it.

03:01 10   Q.   "Skin and cutaneous tissue disorders, hair loss, alopecia,

03:01 11   very common."

03:01 12             Do you see that?

03:01 13   A.   Yes.

03:01 14   Q.   And then:  "Alopecia" -- below that several lines --

03:01 15   "Alopecia, hair loss that did not reversible at the end of the

03:01 16   study."

03:01 17             Do you see that?

03:01 18   A.   Yes.

03:01 19   Q.   So in 2006, Sanofi is internally discussing the difference

03:01 20   between short-term hair loss that returns and hair loss that

03:01 21   does not return, correct?

03:01 22   A.   That broadly would describe what this paragraph is about.

03:02 23   I don't know if they are discussing it, but it's what the

03:02 24   paragraph is about.

03:02 25   Q.   Now, Doctor, when you -- and I'm going to get to my

JOHN GLASPY - CROSS

03:02  1    outline sooner or later.  I'm not even there yet.

03:02  2           When you started practicing medicine,

03:02  3    cyclophosphamide and Adriamycin had already been on the market

03:02  4    for years, correct?

03:02  5    A.    Cyclophosphamide, yes; Adriamycin, I'm not sure.  It

03:02  6    showed up in the pharmacy while I was a fellow.

03:02  7    Q.    Okay.  Excuse me.

03:03  8           Does 1959 sound right for about the time that

03:03  9    cyclophosphamide came on the market?

03:03 10    A.    Yeah, I was too young at that point, so I can't say.

03:03 11    Q.    I was too, thankfully.

03:03 12           So 1959, that's 60 years ago, right?

03:03 13    A.    Right.

03:03 14    Q.    60 years.

03:03 15           And when was the first time you documented in your

03:03 16    report anything about a report of hair loss beyond temporary

03:03 17    hair loss for cyclophosphamide?

03:03 18    A.    You mean what was the date of publication?

03:03 19    Q.    Yes.

03:03 20    A.    I can't remember.  It was in the 2000s.

03:04 21    Q.    Yeah, it was 2009, and that was the de Jonge article.

03:04 22           Do you recall the de Jonge article?

03:04 23    A.    I do.  But if we are going to talk about it, I would like

03:04 24    a copy.

03:04 25    Q.    And the de Jonge article, do you recall -- I don't know if

JOHN GLASPY - CROSS

03:04 1    ruled out is the right word, but they said that the

03:04 2    cyclophosphamide wasn't the cause of the permanent alopecia in

03:04 3    that article.

03:04 4            Do you recall that?

03:04 5    A.   So if we are going to talk about it, I would like a copy.

03:04 6    Q.   Okay.  Let me make sure you don't get the one with my

03:04 7    notes on it, Doctor.

03:04 8            MR. MICELI:  May I approach?

03:04 9            THE COURT:  Yes, you may.

03:05 10   BY MR. MICELI:

03:05 11   Q.   The de Jonge article studied participants -- and I know

03:05 12   you are going to have to look at it, Doctor, but the de Jonge

03:05 13   study participants were not taking an adjuvant breast cancer --

03:05 14   an adjuvant care for early-stage breast cancer treatment, were

03:05 15   they?

03:05 16   A.   That's correct.

03:05 17   Q.   And they were taking -- the individuals in this study were

03:05 18   receiving about 250 percent of the dosage of cyclophosphamide

03:05 19   that Mrs. Earnest received, correct?

03:05 20   A.   Close to that, yes.

03:05 21   Q.   1500 milligrams per meter squared sound about right?

03:05 22   A.   Yeah.

03:05 23   Q.   And on the --

03:05 24   A.   And some of these patients did have breast cancer.  At

03:05 25   least one of the patients did have breast cancer.

JOHN GLASPY - CROSS

03:05 1  **Q.**   They had late-stage metastatic breast cancer.

03:05 2  **A.**   Correct.

03:05 3  **Q.**   They needed bone marrow transplantation to precondition

03:05 4  them for further treatment, right?

03:05 5  **A.**   Right.

03:06 6  **Q.**   Okay.  It's not adjuvant breast care like Mrs. Earnest had

03:06 7  to have, right?

03:06 8  **A.**   That's correct.

03:06 9  **Q.**   And while we're talking about that, Mrs. Earnest's tumor

03:06 10 in her breast, just so we have a little point of reference, it

03:06 11 was about the size of a peanut M&M, wasn't it?

03:06 12 **A.**   Yeah.

03:06 13 **Q.**   And the one in her lymph node was about the size of two

03:06 14 pieces of rice, 8 millimeters.

03:06 15 **A.**   Yeah.

03:06 16 **Q.**   She caught it very early and she was very treatable,

03:06 17 wasn't she?

03:06 18 **A.**   It wasn't very early; it was a Stage 2B.

03:06 19 **Q.**   2B.

03:06 20 **A.**   But it was very treatable, and she was treated.

03:06 21 **Q.**   Doctor, when you have patients come in -- I know you

03:06 22 talked to us and we saw the slide talking about survival and

03:06 23 you talked about the things that you talk about, but you have

03:06 24 also told women that when they come in with early-stage breast

03:06 25 cancer, the good news is strong likelihood they are going to be

JOHN GLASPY - CROSS

03:06 1   cured, don't you?

03:06 2   A.   I sometimes can say that, yes.

03:06 3   Q.   Okay.  In fact, you've said it on one of those interviews

03:07 4   that's online, haven't you?

03:07 5   A.   I don't know.  But I have said it -- yeah, I've said it

03:07 6   when it's true.

03:07 7   Q.   And somebody that comes in with a 2B early-stage breast

03:07 8   cancer has a very strong likelihood of survival.

03:07 9   A.   Especially if she takes treatment.

03:07 10   Q.   Right.

03:07 11   A.   Yes.

03:07 12   Q.   Let's go back to the de Jonge article.  And if you look on

03:07 13   page 596, towards the middle of the page, there's a sentence

03:07 14   that begins:  "Cyclophosphamide is often used in CIA mouse

03:07 15   models to induce alopecia."

03:07 16         Do you see that?

03:07 17   A.   Which -- did you say second paragraph?

03:07 18   Q.   Second paragraph, beginning third sentence.

03:07 19   A.   Third sentence.  Got it.

03:07 20   Q.   Okay.

03:07 21   A.   No, wait a minute.  I --

03:07 22   Q.   Actually, drop down to -- you see where Footnotes 20 and

03:07 23   22 are, the sentence that starts "In spite of"?

03:08 24   A.   Are we still on page 596?

03:08 25   Q.   Yes, sir.

JOHN GLASPY - CROSS

03:08  1   A.   Second paragraph?

03:08  2   Q.   Second full paragraph.

03:08  3   A.   Okay.  Second full paragraph.  Okay.  So "In spite of its

03:08  4   high"?

03:08  5   Q.   Right.  "In spite of its high potential for inducing

03:08  6   reversible alopecia, no relationship between cyclophosphamide

03:08  7   or 4-hydroxycyclophosphamide exposure in permanent alopecia was

03:08  8   observed in our study."

03:08  9            That's what it says?

03:08 10   A.   Yes.

03:08 11   Q.   The study author said that no permanent alopecia was

03:08 12   related to cyclophosphamide, but you included it in your -- as

03:08 13   support in your paper for relationship between cyclophosphamide

03:08 14   and permanent alopecia, right?

03:09 15   A.   That's correct.

03:09 16   Q.   That's because you're only talking about cases that have

03:09 17   been reported, right?

03:09 18   A.   It's because I'm pointing out cases that have been

03:09 19   reported.  A lot of these things obviously have never been

03:09 20   reported over the years.

03:09 21   Q.   And for 60 years -- 60 years -- this drug has been on the

03:09 22   market, you cited four articles:  One article that specifically

03:09 23   says it's not cyclophosphamide, one is a mail-in survey from a

03:09 24   hospital in Boston, and two studies from 2016 and 2017.

03:09 25            That's what you --

JOHN GLASPY - CROSS

03:09  1    A.    Is that a question?

03:09  2    Q.    -- support a 60-year history?  Yes.

03:09  3    A.    Yes.  Yes, that's accurate.

03:09  4    Q.    All right.  So I'm just going to put a line across this

03:09  5    page here.  I'm going to put "2011" on this side; we are going

03:10  6    to put "1959."  We will do a little history lesson just to give

03:10  7    context to what we are doing.

03:10  8          Do you recall that 1959 is when Hawaii and Alaska

03:10  9    became our 49th and 50th states?

03:10 10    A.    I'll take your word for it.

03:10 11    Q.    Eisenhower was president, right?

03:10 12    A.    1959, that's correct.

03:10 13    Q.    Okay.  That's when this drug came on the market, and the

03:10 14    support that you bring to this courtroom to say that

03:10 15    cyclophosphamide is related to permanent hair loss, four

03:10 16    articles, 60 years, 1 every 15 years, except they are all four

03:10 17    jumbled up at the end where Taxotere is being used, right?

03:10 18    A.    Taxotere was in use by that point, yes.

03:10 19    Q.    All right.  I'm going to put the four, which is -- I'm

03:10 20    just going to put "Cytoxan."

03:10 21          MR. MICELI:  Is it A-N or I-N?

03:10 22          Okay.  Thank you.

03:10 23    BY MR. MICELI:

03:11 24    Q.    Four studies.  So we had about 52 years without a hitch,

03:11 25    and four come in at the end, right?

JOHN GLASPY - CROSS

03:11 1   A.   Four that I found, correct.

03:11 2   Q.   And then you have Adriamycin.  What's that, about 1974,

03:11 3   '79?

03:11 4   A.   It was in that range.  It was the early '80s.

03:11 5   Q.   I couldn't find the old label.  I thought it said '74, but

03:11 6   let's just give it 1980.  1980, 39 years on the market.

03:11 7        And before Taxotere came on the market and it was

03:11 8   used in combination with Taxotere [sic], how many studies did

03:11 9   you find that related Adriamycin to permanent hair loss?

03:12 10  A.   I don't remember.

03:12 11  Q.   I think it was zero, sir.

03:12 12  A.   Okay.  Well, it --

03:12 13  Q.   Okay.

03:12 14       THE COURT:  I think -- I just want to correct -- your

03:12 15  question was:  "Before Taxotere came on the market and it was

03:12 16  used in combination with Taxotere, how many studies did you

03:12 17  find?"

03:12 18       Did you mean to say -- maybe I misunderstood the

03:12 19  question.

03:12 20       MR. MICELI:  My colleague has shown me the error of

03:12 21  my way.

03:12 22  BY MR. MICELI:

03:12 23  Q.   For 39 years -- actually, it's going to be '96, so

03:12 24  16 years before Taxotere comes on the market, 22 years if

03:12 25  you -- 24 years if you include when it's approved for adjuvant

JOHN GLASPY - CROSS

03:13 1    care -- no reports of permanent alopecia with Adriamycin that

03:13 2    you cited us to in your report, right?

03:13 3    A.   That's correct.

03:13 4    Q.   And then Arimidex.  When did Arimidex come on the market?

03:13 5    A.   I would have to look it up.  It was 20 years, 25 years

03:13 6    ago --

03:13 7    Q.   Okay.

03:13 8    A.   -- that range.

03:13 9    Q.   This says 1995, but I only have one copy, so --

03:13 10   A.   Oh, pretty good.

03:13 11   Q.   It was very good.

03:13 12         You cite in your report that Arimidex causes hair

03:13 13   thinning, correct?

03:13 14   A.   It does, yes.  It frequently causes that.

03:13 15   Q.   But you didn't cite us to any studies that say that

03:13 16   Arimidex causes permanent hair loss, where hair just doesn't

03:14 17   regrow again?

03:14 18   A.   Well, see, there we are getting into the semantic issues.

03:14 19   So it's very common with all these drugs that women are never

03:14 20   happy with their hair again, because it's thinner than it was.

03:14 21         Is that permanent hair loss?  It is; it's just not

03:14 22   total permanent hair loss with scarring.  But it's permanent

03:14 23   hair loss.

03:14 24         And with Arimidex, in general, it recovers when you

03:14 25   stop.  In general.

JOHN GLASPY - CROSS

03:14  1   **Q.**   Dr. Glaspy, when we took your deposition, you said that
03:14  2   you would defer to dermatological opinions -- to
03:14  3   dermatologists.
03:14  4           Do you still hold that position?
03:14  5   **A.**   Yeah, as long as I'm allowed to amplify what I mean by a
03:14  6   "dermatologic opinion."
03:14  7   **Q.**   Okay.  Well, you never saw Mrs. Earnest until you came to
03:14  8   court today, right?
03:14  9   **A.**   That's correct.
03:14  10  **Q.**   You never asked to see her.
03:15  11  **A.**   That's correct.
03:15  12  **Q.**   You have never examined her?
03:15  13  **A.**   That's correct.
03:15  14  **Q.**   In your practice as an oncologist, you don't use a
03:15  15  dermatoscope, do you?
03:15  16  **A.**   No.
03:15  17  **Q.**   You don't normally take punch biopsies from patients'
03:15  18  heads?
03:15  19  **A.**   No.
03:15  20  **Q.**   You don't do what's necessary to do a differential
03:15  21  diagnosis to try and figure out if somebody has or does not
03:15  22  have permanent, chemotherapy-induced alopecia, right?
03:15  23  **A.**   If you mean me personally, no, I don't.  I refer people
03:15  24  for that.
03:15  25  **Q.**   But as far as in this courtroom, you're not coming in here

JOHN GLASPY - CROSS

03:15  1    and telling this jury you're going to make a dermatological

03:15  2    diagnosis of Mrs. Earnest's permanent hair loss, are you?

03:15  3    A.   If you mean am I going to do biopsies, no; read biopsies,

03:15  4    no; decide who gets a biopsy, no.

03:15  5         If you mean am I going to opine on whether I think

03:15  6    this is coming from chemotherapy or Arimidex or what, yes, I

03:16  7    will.  That's not a dermatologic opinion.  I see more of these

03:16  8    patients than dermatologists do by far.

03:16  9    Q.   Well, do you see more than all dermatologists do?

03:16 10    A.   Than all the -- you mean --

03:16 11    Q.   Yes.

03:16 12    A.   You mean --

03:16 13    Q.   Let me ask it a different way, Doctor.

03:16 14    A.   Yeah.

03:16 15    Q.   Do you know what dermatologist has come into this

03:16 16    courtroom?

03:16 17    A.   You mean Dr. Tosti?

03:16 18    Q.   Yes.

03:16 19    A.   Yes.

03:16 20    Q.   Do you know anything about Dr. Tosti?

03:16 21    A.   I've read her papers and --

03:16 22    Q.   Her report?

03:16 23    A.   Yeah.

03:16 24    Q.   Okay.  That one wasn't on your list of things that were

03:16 25    disclosed either, I don't believe.

2088

JOHN GLASPY - CROSS

03:16 1  **A.**   Well, I'm not sure I read her report, but I did definitely

03:16 2  read her papers.

03:16 3  **Q.**   Okay.  And so are you going to challenge Dr. Tosti's --

03:16 4  the work that Dr. Tosti did to diagnose permanent

03:16 5  chemotherapy-induced alopecia?

03:16 6  **A.**   Tell me what work she did.

03:16 7  **Q.**   Well --

03:16 8  **A.**   So tell me what she did that I might challenge.

03:17 9        THE COURT:  Dr. Glaspy, you don't get to ask the

03:17 10  questions.  I'm sorry.  You have to answer his questions and --

03:17 11        THE WITNESS:  And if I find it vague, just say it's

03:17 12  vague?

03:17 13        THE COURT:  "I can't answer it" is an answer.

03:17 14        THE WITNESS:  Okay.  It's vague.

03:17 15        THE COURT:  Thank you.

03:17 16  BY MR. MICELI:

03:17 17  **Q.**   Are you aware that Dr. Tosti, an expert in this case,

03:17 18  testified that Mrs. Earnest suffers from permanent hair

03:17 19  regrowth -- permanent hair loss, and she did that based upon a

03:17 20  differential diagnosis, biopsy, and dermatoscope?  Are you

03:17 21  aware of that?

03:17 22  **A.**   I'm aware of that, yes.

03:17 23  **Q.**   And you haven't done any of those things, have you?

03:17 24  **A.**   That's correct.

03:17 25  **Q.**   And you haven't physically -- we already established you

JOHN GLASPY - CROSS

03:17 1   haven't physically examined her.

03:17 2           Are you aware that Dr. Tosti has?

03:17 3   A.   I am.

03:17 4   Q.   You would certainly agree with me -- and I think you

03:17 5   agreed in your deposition -- that you would defer to a doctor

03:17 6   who actually diagnoses -- or, excuse me, actually examines a

03:17 7   patient over somebody who doesn't examine the patient, right?

03:18 8   A.   All other things being equal, yes.

03:18 9   Q.   Okay.  Well, on a dermatology footing, you're not equal to

03:18 10  Dr. Tosti, are you?

03:18 11  A.   With the limits we have talked about, I'm not, yes.

03:18 12  Q.   Now, in addition to -- and I'm going to switch gears and

03:18 13  I'm going to come back.

03:18 14          MR. MICELI:  When do you want to take the afternoon

03:18 15  break, Your Honor?  Because I can go as long or as short as you

03:18 16  want me to.

03:18 17          THE COURT:  Well, we took a little quick break.

03:18 18          Do you all need a break about now?

03:18 19          MR. MICELI:  Okay.

03:18 20          THE COURT:  Let's proceed.

03:18 21          MR. MICELI:  Thank you.

03:18 22  BY MR. MICELI:

03:18 23  Q.   In addition to being a study author and study investigator

03:18 24  on TAX 316, you have also spoken for Sanofi over the years,

03:19 25  haven't you?

JOHN GLASPY - CROSS

03:19 1  A.   I don't know.  We went over this in my deposition, and I

03:19 2  don't have any recollection of doing a Sanofi-sponsored talk,

03:19 3  but I may well have.

03:19 4  Q.   Okay.

03:19 5  A.   We just couldn't find the -- any evidence of it in the

03:19 6  *ProPublica* stuff.

03:19 7  Q.   Well, I'll tell you what.  I'm on the page of your CV

03:19 8  that -- they are not numbered, but the top of the page is 185,

03:19 9  and it's in the middle of your talks.

03:19 10  A.   Okay.  Did you give me that?

03:19 11  Q.   Yes.  It's in the white binder.  I think I have your

03:19 12  report and your --

03:19 13  A.   It's in the white binder?

03:19 14  Q.   Yes.  I believe it is.  If not, I will get you one.

03:19 15  A.   So which page?

03:19 16  Q.   It's the one that has 185 at the top.

03:19 17  A.   Okay.

03:20 18       Well, that's an abstract, so --

03:20 19  Q.   Okay.

03:20 20  A.   -- I don't think you gave me --

03:20 21  Q.   "Lectures and Presentations."

03:20 22  A.   Yeah, you didn't give me that part of the CV.

03:20 23       Well, here it is.  It's mixed up.  It's in the front.

03:20 24  Q.   Okay.

03:20 25  A.   Okay.  So you said 185?

## JOHN GLASPY - CROSS

03:20 1   **Q.**   It's 185, but I'm going to go down the page.  Because I

03:20 2   think the first one that I notice where you are speaking for a

03:20 3   pharmaceutical company starts at 196.

03:20 4   **A.**   So skip 185?

03:20 5   **Q.**   Well, just go down to 185, starting at 196.  I flipped

03:20 6   through several pages --

03:20 7   **A.**   Got it.

03:20 8   **Q.**   -- all the way over to 320.

03:20 9   **A.**   That's correct.

03:20 10   **Q.**   Or, actually, 309 is where you had spoken for a multitude

03:20 11   of pharmaceutical companies, including Sanofi-Aventis, correct?

03:20 12   **A.**   Where is the Sanofi?

03:20 13   **Q.**   Sanofi starts on page --

03:20 14   **A.**   Oh, so it's No. 206?

03:20 15   **Q.**   -- 206, 208, 210, 213 --

03:21 16   **A.**   Yes.  Got it.

03:21 17   **Q.**   -- 215.

03:21 18   **A.**   Yes, yes.  Those are all listed, so now I know that I did

03:21 19   do Sanofi-sponsored talks.

03:21 20           The question is:  Were these paid talks or things

03:21 21   that Sanofi arranged, and I don't have any record of them

03:21 22   paying.

03:21 23           **MR. MICELI:**  May I approach, Your Honor?

03:21 24           **THE COURT:**  Yes, you may.

03:21 25           **MR. MICELI:**  Perhaps I can help you with that.

JOHN GLASPY - CROSS

03:21  1              THE WITNESS:  Good.

03:21  2    BY MR. MICELI:

03:21  3    Q.    This is an email.  It's internal to Sanofi, and it's

03:21  4    talking about speakers utilization report.

03:21  5              It says:  "Please not" -- I think it meant to be

03:21  6    "note" -- "that several of our speakers have reached their

03:21  7    $100,000 cap for 2008."

03:21  8              You're the second person listed, at $116,850, right?

03:21  9    A.    Yes.

03:21 10    Q.    And that's only July 9th.

03:21 11              Did you have a second half of the year just as well?

03:22 12    A.    I have no idea.

03:22 13    Q.    Okay.

03:22 14    A.    Looking at the CV might be helpful.

03:22 15    Q.    And if we look at the CV -- what I tried to find --

03:22 16    because I saw the number, I wanted to see what you did in 2008

03:22 17    for Sanofi, but I couldn't find one.  I see a lot for 2009, so

03:22 18    I'm assuming you were a speaker for Sanofi in 2009 as well.

03:22 19    A.    It's possible, yes.

03:22 20    Q.    Then you are a speaker for Bristol-Myers Squibb.  It

03:22 21    appears you were speaking mostly for Amgen, correct?

03:22 22    A.    I wouldn't know which one was most, but I have spoken for

03:22 23    several companies.

03:22 24    Q.    The ones for Amgen are when you were doing the G-CSF drug?

03:22 25    A.    There were lots of things.  We did stem cell factor; we

JOHN GLASPY - CROSS

03:22 1   did Aeromist; we did lots of things.

03:22 2   **Q.**   Growth factor?

03:22 3   **A.**   Which you -- well, G-CSF is a growth factor.

03:22 4   **Q.**   Right, and that's used -- just so we are clear, that's

03:22 5   used when somebody gives dose-dense chemotherapy, right?

03:23 6   **A.**   It's one of the places it's used, right.

03:23 7   **Q.**   Taxol came on the market when, sir?

03:23 8   **A.**   19 -- was it '99?

03:23 9   **Q.**   It couldn't have been that, because Taxol came on first

03:23 10   and --

03:23 11   **A.**   Right.  I don't remember the year.

03:23 12   **Q.**   I'm going to say 1990 or less.

03:23 13   **A.**   Okay.  That's for Taxol.  It would be before 1990.  That

03:24 14   makes sense.

03:24 15   **Q.**   Again, you cite that cases have been reported with Taxol

03:24 16   and permanent alopecia, right?

03:24 17   **A.**   Right.

03:24 18   **Q.**   But you don't cite -- I'm going lump all of these in here

03:24 19   now, the Taxol, Arimidex, Adriamycin, Cytoxan.  Because you're

03:24 20   a master's of public health and you teach young physicians who

03:24 21   want to be master's in public health the importance of sound

03:24 22   scientific study, correct?

03:24 23   **A.**   Yeah.  I don't think it has much to do with a master's of

03:24 24   public health, but the answer is yes.

03:24 25   **Q.**   When you are trying to determine causation, randomized

JOHN GLASPY - CROSS

03:24 1    controlled trials and meta-analyses of randomized controlled

03:24 2    trials are the highest level of evidence, right?

03:24 3    A.    No.  The highest level of evidence is a single randomized

03:24 4    trial.  It's an endpoint.  Meta-analyses are always confounded.

03:24 5    Q.    Okay.  Okay.  So randomized controlled trials, let's go to

03:25 6    randomized controlled trials, then.  You don't cite us to any

03:25 7    randomized controlled trials demonstrating that Cytoxan -- the

03:25 8    "C" -- is related to permanent hair loss, do you?

03:25 9    A.    That's correct.  It's never been studied.

03:25 10   Q.    Adriamycin, you don't cite -- Cytoxan, 60 years and

03:25 11   there's never been a study to demonstrate that, right?

03:25 12   A.    That's correct.

03:25 13   Q.    Adriamycin, nearly 40 years now.  Have you cited us to any

03:25 14   randomized controlled trial or journal articles based upon data

03:25 15   from randomized controlled trials that demonstrates an

03:25 16   increased risk of permanent hair loss?

03:25 17   A.    There's never been one.

03:25 18   Q.    Arimidex, same thing.  1995.  Have you cited us to any

03:25 19   randomized controlled trials linking permanent hair loss, hair

03:25 20   that won't grow back, to Arimidex?

03:25 21   A.    But are we talking about thin hair that won't grow back or

03:26 22   total baldness that won't grow back?

03:26 23   Q.    I'm talking about permanent hair loss, hair that will not

03:26 24   grow back.

03:26 25   A.    If a woman thins to 50 percent of her baseline hair and it

JOHN GLASPY - CROSS

03:26 1    never recovers, that's permanent hair loss.

03:26 2    Q.   Have you cited us to a randomized controlled trial that

03:26 3    demonstrates that, sir, was my question.

03:26 4    A.   I haven't.  But there are trials of Arimidex versus

03:26 5    nothing that showed more hair thinning in the Arimidex group.

03:26 6    What they haven't done is followed out to see what percent

03:26 7    recover.

03:26 8    Q.   So your testimony is that there are trials.  You just

03:26 9    didn't cite them for us.  Wasn't worthy of bringing into this

03:26 10   case.

03:26 11   A.   They don't prove the point.

03:26 12   Q.   Okay.  And then Taxol.  You haven't cited us to any

03:26 13   randomized controlled trials that demonstrate an increased risk

03:26 14   of permanent hair loss, hair that won't grow back, related to

03:26 15   Taxol?

03:26 16   A.   That's correct.

03:27 17   Q.   I'm going to put on each one of these RCT zero for each

03:27 18   one of these, right?

03:27 19   A.   Correct.

03:27 20   Q.   Now, the only -- subject to the work Dr. Kopreski was

03:27 21   enlisted to do -- well, what Dr. Kopreski was enlisted to do

03:27 22   was not a randomized controlled trial, was it?

03:27 23   A.   It was.  He was analyzing a randomized controlled trial.

03:27 24   Q.   He was not meeting a primary endpoint of a randomized

03:27 25   controlled trial.  His was not -- let me strike that.

JOHN GLASPY - CROSS

03:28  1   **A.**   Right.

03:28  2   **Q.**   What he did was not prospectively designed?

03:28  3   **A.**   It was not a primary endpoint.

03:28  4   **Q.**   It wasn't a primary endpoint at all.  The study was over

03:28  5   in 2010, and he did what he did in October of 2018.  We have

03:28  6   already established that, right?

03:28  7   **A.**   Yes.  It wasn't the primary endpoint, right.

03:28  8   **Q.**   Sir, it's not that it wasn't a primary endpoint.  I

03:28  9   understand what a primary endpoint is:  When you do a study,

03:28 10   you have a protocol, you write a protocol, and you have a

03:28 11   primary endpoint that says this study is going to study this

03:28 12   issue, and we are going to have an answer one way or another on

03:28 13   this date.  Right?

03:28 14   **A.**   It usually doesn't give you a date; it gives you an event

03:28 15   time.

03:28 16   **Q.**   Event time.  Either tell me the number of events --

03:28 17   **A.**   That's correct.

03:28 18   **Q.**   -- or to a time?

03:28 19   **A.**   That's correct.

03:28 20   **Q.**   So what happened is TAX 316 was started in 1999, ran until

03:28 21   September of 2009, when the last patient came out; and they

03:28 22   took eight months or so to verify all that data; and then they

03:29 23   did a study report in September of 2010.  Right?

03:29 24   **A.**   Yes.

03:29 25   **Q.**   That's when the primary endpoints were assessed and the

JOHN GLASPY - CROSS

03:29 1   secondary endpoints were assessed, right?

03:29 2   A.   Correct.

03:29 3   Q.   And then eight years later, when we are sitting in a case

03:29 4   in this courthouse, Dr. Kopreski is asked to do a reanalysis of

03:29 5   some data.

03:29 6        But you don't know that he used the final data, do

03:29 7   you?

03:29 8   A.   You mean he used data from after the data lock?

03:29 9   Q.   No.  No, no.  That's not what I'm saying, sir.

03:29 10       You sat here in the courtroom and you listened to him

03:29 11  today.

03:29 12  A.   I did.

03:29 13  Q.   Every document that he looked at, Mr. Bachus, my

03:29 14  colleague, read back to Dr. Kopreski and said, "This is from

03:29 15  2003."

03:29 16       Well, 2003 was not the end of TAX 316, was it?

03:29 17  A.   You mean was the end of all the follow-up?

03:30 18  Q.   Right.

03:30 19  A.   No, it was not.

03:30 20  Q.   You were a study investigator, and you know that case

03:30 21  report forms get reported back into BCIRG and Sanofi; and

03:30 22  before the final data lock, everything gets validated.  Right?

03:30 23  A.   That's correct.

03:30 24  Q.   Everything gets double- and triple-checked so we know that

03:30 25  what's in the final data set is the exact truth?

JOHN GLASPY - CROSS

03:30  1   A.   As close as it can be, correct.

03:30  2   Q.   Right.  But Dr. Kopreski looked at documents, just case

03:30  3   report forms that were selected by an attorney and handed to

03:30  4   him that were dated 2003, right?

03:30  5   A.   I don't know that an attorney selected and handed it to

03:30  6   him, but I do know that the case report forms he was looking at

03:30  7   were the ones from the time that that visit had happened, yes.

03:31  8   Q.   Now, Taxotere came on the market in 1996, but it didn't

03:31  9   get adjuvant indication until 2004?

03:32 10   A.   2004, right.

03:32 11   Q.   Between 2004 and 2011, two randomized controlled trials

03:32 12   were conducted, correct?

03:32 13   A.   I'm trying to think if there was a third.  But there were

03:32 14   at least two.

03:32 15   Q.   In your report you said something about TAX311.  We have

03:32 16   heard about that this week.  That's a metastatic case, and it

03:32 17   was earlier.

03:32 18   A.   Okay.  Got it.

03:32 19   Q.   I think you even mentioned in your report, unfortunately,

03:32 20   individuals in metastatic breast cancer studies with Taxotere,

03:32 21   and other drugs as well -- unfortunately, you can't follow them

03:32 22   very long because the disease is so advanced, they don't make

03:32 23   it.

03:32 24   A.   And you can't stop treatment, so you can't look for

03:32 25   resolution of things.

JOHN GLASPY - CROSS

03:32 1    **Q.**   Right.  So what we have is two randomized controlled

03:32 2    trials in a 15-year window, right?

03:32 3    **A.**   In early breast cancer.

03:32 4    **Q.**   In early-stage breast cancer?

03:33 5    **A.**   Right.

03:33 6    **Q.**   Okay.  And so those two randomized controlled trials were

03:33 7    done by Sanofi and one of them by BCIRG, correct?

03:33 8    **A.**   Well, Sanofi was involved in both of them.  Sanofi hired

03:33 9    BCIRG to do the trial for them.

03:33 10   **Q.**   They hired a company, an organization called GEICAM, for

03:33 11   the other one?

03:33 12   **A.**   With the Spanish group, correct.

03:33 13   **Q.**   And GEICAM is a collaborator.  You can go to TRIO Oncology

03:33 14   and look at collaborators, and GEICAM is the first one listed,

03:33 15   right?

03:33 16   **A.**   That's correct.

03:33 17   **Q.**   You're not one and the same, but you've worked closely

03:33 18   together?

03:33 19   **A.**   Yes.

03:33 20   **Q.**   Okay.  I just want to make sure I'm summarizing this

03:34 21   right.  You were a study investigator from the very beginning

03:34 22   of 316, which is in the late 1990s, correct?

03:34 23   **A.**   That's correct.

03:34 24   **Q.**   You were study investigator through its conclusion in

03:34 25   2010?

JOHN GLASPY - CROSS

03:34 1   **A.**   That's correct.

03:34 2   **Q.**   During that time period you were traveling around the

03:34 3   country, giving talks on Taxotere, right?

03:34 4   **A.**   And other things, yes.

03:34 5   **Q.**   And other things.

03:34 6         And you were publishing articles on Taxotere?

03:34 7   **A.**   During that time?  I don't remember if I published any

03:34 8   Taxotere papers.

03:34 9   **Q.**   That's right.  2013 is when the Mackey article got

03:34 10  published.

03:34 11  **A.**   Right.

03:34 12  **Q.**   So when Sanofi had to go find an independent expert to

03:34 13  come in here and testify and support their case, they went and

03:34 14  they got a guy that's been on their team since 1999, right?

03:34 15  **A.**   It depends on what you mean by "on the team."  If you mean

03:34 16  that I worked for Sanofi, I haven't.  If you mean that we have

03:35 17  collaborated with them to do some research together, yes.

03:35 18  **Q.**   Now, your work with BCIRG, now TRIO Oncology, does that go

03:35 19  into your compensation package at UCLA as well?

03:35 20  **A.**   There is no compensation for TRIO.

03:35 21  **Q.**   It's just clinical studies that are funded, and you guys

03:35 22  do them?

03:35 23  **A.**   Right.  And I serve on the board for free, without pay.

03:35 24  **Q.**   Okay.  Are you currently doing any other consulting work

03:35 25  for Sanofi?

JOHN GLASPY - CROSS

03:35 1  A.   No.

03:35 2         MR. MICELI:   Your Honor, can we take our break now?

03:35 3  I think I may be able to shorten some things up.

03:35 4         THE COURT:   Court will be at recess for 10 minutes.

03:35 5         MR. MICELI:   That's not a promise.

03:35 6         THE DEPUTY CLERK:   All rise.

03:36 7         (Recess.)

03:47 8         THE COURT:   We can bring in the jury now.   Thank you.

03:48 9         (The jury entered the courtroom.)

03:48 10        THE COURT:   All jurors are present.   Court is back in

03:48 11 session.   You may be seated.

03:48 12        Dr. Glaspy, I remind you you are under oath.

03:48 13        Mr. Miceli, please proceed.

03:48 14        MR. MICELI:   Thank you.

03:48 15 BY MR. MICELI:

03:48 16 Q.   Dr. Glaspy, I want to sort of close the loop on these time

03:48 17 lines -- accrued time lines that I have built on this ELMO.

03:48 18 I'm going to -- if you still have the charts that Mr. Strongman

03:49 19 went over with you, the publications on permanent alopecia and

03:49 20 the treatment of breast cancer?

03:49 21 A.   Not this one, is it?

03:49 22 Q.   Either one, I think, as long as they have the dates on

03:49 23 there.

03:49 24 A.   Okay.   There's two.   There's one with just taxanes and one

03:49 25 with the other drugs.   Which one are we talking about?

JOHN GLASPY - CROSS

03:49  1   Q.   The one that's titled "Publications on Permanent Alopecia
03:49  2   in the Treatment of Breast Cancer."
03:49  3   A.   I think they are both in there.  Aren't they?
03:49  4   Q.   The one that has 29 in the Taxotere column for TAX 316.
03:49  5   A.   So the one that's restricted to taxanes.
03:49  6   Q.   Yes.
03:49  7   A.   Okay.  Got it.
03:49  8   Q.   I'm going to operate -- and I know these time lines.  One
03:49  9   spans 60 years and one spans -- what's that? -- 25 years.
03:49 10          What I'm going to try to do is -- I'm just going to
03:49 11   use the bottom one for Taxotere, and I'm going to try to just
03:50 12   eyeball it.  This is 2011 here.  I'm going to put 2004 right
03:50 13   about here.  And I know that's not going to work for every one
03:50 14   of these lines, because of the differing lengths of time they
03:50 15   have been on the market.  But I'm going to write 2004 right
03:50 16   here.
03:50 17          Now, with regard to Cytoxan, the four articles -- we
03:50 18   can do this this way if you like.  I believe it's page 20 or
03:50 19   21.  I will find this, sir.
03:51 20          If we look at the bottom of page 19 and the top of
03:51 21   page 20, Adriamycin --
03:51 22   A.   Of what document?
03:51 23   Q.   I'm sorry.  I'm sorry.  Your report.
03:51 24   A.   Okay.
03:51 25   Q.   I apologize.

JOHN GLASPY - CROSS

03:51 1  **A.**   Got it.

03:51 2  **Q.**   Adriamycin is Footnote 21.  We have one, Masidonski,

03:51 3  Crown, 2017.  So I have to put an arrow here and put one out

03:51 4  there.  Yeager, 2011, right there at the end.  And Jung -- 2011

03:52 5  is Yeager and 2013 is Jung.  So we are out here as well.

03:52 6          So all of the Adriamycin cases that you have cited

03:52 7  this jury to, after 39 years on the market, happened after

03:52 8  2004, and all but one happened after 2011, right?

03:52 9  **A.**   Yes.

03:52 10 **Q.**   Then for cyclophosphamide, Footnote 29, we have already

03:53 11 talked about the de Jonge article.  That one was 2002, so it's

03:53 12 actually on this side of the line.  You have Masidonski again

03:53 13 here.

03:53 14         You have Berglund -- which Berglund is a mail-in

03:53 15 survey.  That's that mail-in survey study.  Do you base

03:53 16 causation on mail-in surveys?

03:53 17 **A.**   It contributes information.  It's not the optimal way to

03:53 18 get it.  There were other mail-in surveys here as well,

03:53 19 including ones that are already on that chart.

03:53 20 **Q.**   Well, let's go ahead and put this -- that's 1991.  I will

03:53 21 put this an X because it's a mail-in survey.  And then the

03:53 22 Jung, again, is 2013, so we're out here.

03:53 23         So you have four events or four articles, one mail-in

03:54 24 survey, over a 20-year period, right?

03:54 25 **A.**   You asked me is that the only mail-in survey?

JOHN GLASPY - CROSS

03:54 1    Q.   No, no.  It's not the only mail-in survey; it's just the
03:54 2    only -- you only had four items listed for that footnote.
03:54 3    A.   For that footnote, correct.
03:54 4    Q.   For a drug that's been on the market for 60 years.  And to
03:54 5    be fair, you don't list the Arimidex in your list of drugs that
03:54 6    cause or have cases reported of permanent hair loss on this
03:54 7    one.  And the Taxol --
03:54 8    A.   Are you saying there's no footnote for aromatase
03:54 9    inhibitors?
03:54 10   Q.   Not here.  Page 19 starts out with Adriamycin.  Then
03:55 11   there's several that are not related to the issues in this
03:55 12   case, so we are not speaking of them.  Then Footnote 24 is
03:55 13   Taxol, and Taxol, you have a larger number.  But you have
03:55 14   Prevezas, which is 2009; Miteva, which is 2011 -- oh, excuse
03:55 15   me.  Wrong one.  I'm sorry.  Miteva, 2011.  Crown, 2017, right
03:55 16   there.
03:55 17   A.   Are you still on page 20?
03:55 18   Q.   Page 20.  Number 24 -- Footnote 24.
03:55 19   A.   Okay.
03:55 20   Q.   Yeager, which is another 2011.
03:56 21        Are these all correct thus far?
03:56 22   A.   Approximately -- yes, I believe so.
03:56 23   Q.   Yang, which is 2015, I'll put that out here.  That's
03:56 24   correct, right?  We are beyond 2011?
03:56 25   A.   Yes.

JOHN GLASPY - CROSS

03:56  1    **Q.**    And then Jung, again, at 2013, another one that came out

03:56  2    after Mrs. Earnest received her treatment, correct?

03:56  3    **A.**    That's correct.

03:56  4    **Q.**    Then with the Taxotere, which is going to be my chart

03:56  5    again, you have a randomized controlled trial that was reported

03:56  6    in 2010, a randomized controlled trial that was reported in

03:56  7    2010.  You have Nabholtz, which is 2001.  So I have to put him

03:57  8    on this side of the line, right?

03:57  9    **A.**    For randomized trials with Taxol?

03:57  10   **Q.**    Yes -- Taxotere.

03:57  11   **A.**    Taxotere, yes.

03:57  12   **Q.**    Then Bertrand, which is 2013, would go beyond 2011,

03:57  13   correct?

03:57  14   **A.**    Yes.  It would go on your time line there, correct.

03:57  15   **Q.**    Then Kang, Martin, and Kim are 2018, 2018, and 2017,

03:57  16   correct?

03:57  17   **A.**    That's correct.

03:57  18   **Q.**    We have three more way out by the edge of the page, right?

03:57  19   **A.**    Yes.

03:57  20   **Q.**    Then Bourgeois, 2010, we need to put that over here.

03:57  21   **A.**    That one was a mail-in survey, Bourgeois, I think.

03:57  22   **Q.**    Sedlacek was 2006.  That's the abstract we talked about,

03:57  23   right?

03:57  24   **A.**    Yes, it's an abstract.

03:57  25   **Q.**    Then you have both the Crown abstracts or posters,

JOHN GLASPY - CROSS

03:58 1   correct?

03:58 2   **A.**   One is a poster, one's an abstract, I think.  I'd have to

03:58 3   pull them out.

03:58 4   **Q.**   Both of those are well outside the 2011 time when

03:58 5   Mrs. Earnest had her chemotherapy, right?

03:58 6   **A.**   That's correct.

03:58 7   **Q.**   Thorp is 2015, more outside the 2011 line.

03:58 8   Freites-Martinez is more outside the 2011 line, correct?

03:58 9   **A.**   2019, yes.

03:58 10   **Q.**   Fonia, 2017, correct?

03:58 11   **A.**   Yes.

03:58 12   **Q.**   Miteva is 2011?

03:58 13   **A.**   That's correct.

03:58 14   **Q.**   Tallon 2010?

03:58 15   **A.**   That's correct.

03:58 16   **Q.**   Werbel, 2018?

03:58 17   **A.**   Correct.

03:58 18   **Q.**   Masidonski and Mahon, 2009?

03:59 19   **A.**   Yes.

03:59 20   **Q.**   Palamaras, 2011?

03:59 21   **A.**   Correct.

03:59 22   **Q.**   Tosti, 2013?

03:59 23   **A.**   That's correct.

03:59 24   **Q.**   And Prevezas is 2009?

03:59 25   **A.**   Right.

JOHN GLASPY - CROSS

03:59 1   Q.   Doctor, does one of these things not look like the other?
03:59 2   A.   There's more lines on the Taxotere.  We are not putting
03:59 3   lines on Adriamycin when it's a Taxotere combination, when it
03:59 4   appears in, right?  We're not putting lines on Cytoxan when
03:59 5   it's a Taxotere-Cytoxan combination it appears in.  But the
03:59 6   lines are correct for the year.
03:59 7   Q.   Well, for TAX 316 and GEICAM 9805, we wouldn't put them
04:00 8   there, because they were controlled before they were in both
04:00 9   arms, right?
04:00 10  A.   Well, no, because when you give somebody a combination,
04:00 11  you don't know which drug is causing it or whether it's the
04:00 12  combination.
04:00 13  Q.   Randomized controlled trials, when you control and you
04:00 14  give the same exact thing to one arm as you do to the other and
04:00 15  you see a difference, unless it's by chance, it's attributable
04:00 16  to the difference in the drugs given, correct?
04:00 17  A.   In the combinations, correct.
04:00 18  Q.   Those are the only randomized controlled trials, the
04:00 19  highest level of evidence that we have, right, in these five
04:00 20  drugs?
04:00 21  A.   Yes, those are the only randomized trials.
04:00 22  Q.   Isn't it true, with the exception of the mail-in survey
04:01 23  for Cytoxan and one other report -- case report, all other
04:01 24  events for all five drugs appear after Taxotere comes on the
04:01 25  market?

JOHN GLASPY - CROSS

04:01 1    A.    Comes on the market for adjuvant?

04:01 2    Q.    Yes.

04:01 3    A.    Yes.

04:01 4    Q.    Actually, if we backed it up to the date of market entry,

04:01 5    1996, we capture one more.  Only one falls outside, and that's

04:01 6    the mail-in survey, right?

04:01 7    A.    No.  You might capture Cytoxan as well.

04:01 8    Q.    Okay.  Thank you.  That's right.  Because we have Nabholtz

04:01 9    and then we have one up top there, right?

04:01 10   A.    Yep.

04:01 11   Q.    Thank you.  But you know that before Taxotere was on the

04:01 12   market in 1996, there were no events reported with Cytoxan and

04:02 13   Adriamycin?

04:02 14   A.    There were no events?

04:02 15   Q.    For permanent alopecia.

04:02 16   A.    For permanent alopecia defined as complete hair loss that

04:02 17   doesn't recover, that's correct.

04:02 18   Q.    Well, were there reports for any other definition of

04:02 19   permanent hair loss?

04:02 20   A.    The thing I keep saying is that the problem with

04:02 21   chemotherapy in general is incomplete hair recovery, not

04:02 22   failure of hair recovery.  That's the common problem.

04:02 23         And those things we were observing all those years.

04:02 24   People didn't write papers, because it was just part of the

04:02 25   background noise of practicing oncology.

JOHN GLASPY - CROSS

04:02 1    Q.   But you said in your deposition that sometimes losing just

04:02 2    part of your hair can be just as bad as losing all of it

04:02 3    because you look mangy, right?

04:02 4    A.   Yes, I agree with that.

04:02 5    Q.   If you cause somebody to -- if you don't warn of an event,

04:02 6    warn of a risk, and somebody ends up with a mangy head, don't

04:03 7    you think they should have been warned about that?

04:03 8    A.   That's why I always warn everybody, regardless of what

04:03 9    chemotherapy they are getting, that they may not be happy with

04:03 10   their hair.

04:03 11   Q.   That's what you warn, right?

04:03 12   A.   Yes.

04:03 13   Q.   Wouldn't you agree with me that if a company has evidence

04:03 14   that the use of their product, whether alone or in combination

04:03 15   with other products, can leave an individual at an increased

04:03 16   risk for having permanent hair loss, hair that does not return,

04:03 17   whether it's 51 percent or 100 percent, they should be told --

04:03 18   the doctor should be told so that the doctor and the patient

04:03 19   can have a fully informed discussion about risks and benefits?

04:03 20   A.   If they have evidence that it is increased compared to the

04:03 21   alternatives and that evidence is good evidence, yes.

04:03 22   Q.   The only evidence that Sanofi had until Dr. Kopreski did

04:04 23   what he did last year was that 29 out of 744 women on the TAC

04:04 24   arm, or 3.9 percent, had ongoing what they represented later in

04:04 25   2013 as persisting alopecia at the end of follow-up, right?

JOHN GLASPY - CROSS

04:04 1  **A.**   Yes.

04:04 2  **Q.**   Now, I want to talk to you about some of the deferring

04:04 3  that we discussed and earlier my colleague discussed in your

04:04 4  deposition.

04:04 5          You defer dermatology opinions to dermatologists.

04:04 6  **A.**   As we discussed.

04:05 7  **Q.**   Right.  And the only dermatologist that's come into this

04:05 8  courtroom to testify about the facts in this case is

04:05 9  Dr. Antonella Tosti.  And it's your testimony that you defer to

04:05 10 her in this case, right?

04:05 11         **MR. STRONGMAN:**  Objection.  Argument.

04:05 12         **THE WITNESS:**  That's not what I said.  I said that I

04:05 13 deferred --

04:05 14         **THE COURT:**  Wait.

04:05 15         **THE WITNESS:**  Oops.  Sorry.

04:05 16         **THE COURT:**  There was an objection.

04:05 17         **MR. STRONGMAN:**  Objection.  It's just an argument and

04:05 18 testimony by counsel.

04:05 19         **THE COURT:**  I'm going to overrule.

04:05 20         **THE WITNESS:**  I defer to her on dermatologic issues

04:05 21 regarding that case, not on the case.

04:05 22 **BY MR. MICELI:**

04:05 23 **Q.**   You're not deferring to her for anything other than

04:05 24 dermatologic diagnoses?

04:05 25 **A.**   Right.  Biopsies, looking through a dermatoscope, those

JOHN GLASPY - CROSS

04:05 1   kinds of things.

04:05 2   **Q.**   Differential diagnosis as a dermatologist?

04:05 3   **A.**   For hair loss in somebody getting chemotherapy?

04:05 4   **Q.**   Yes, sir.

04:05 5   **A.**   I wouldn't defer to her on that.

04:06 6   **Q.**   Have you ever submitted an adverse event report for

04:06 7   permanent hair loss to the FDA?

04:06 8   **A.**   I don't believe so.

04:06 9   **Q.**   Okay.  You did agree in your deposition, though, that you

04:06 10   would -- "If there's a dermatologist on both sides, I would on

04:06 11   dermatologic questions defer to them and suggest the trier of

04:06 12   fact weigh their two opinions side by side and come to a

04:06 13   conclusion."

04:06 14          That was your testimony, right?

04:06 15   **A.**   On the dermatologic issues, yes.  And it's still my

04:07 16   position.

04:07 17   **Q.**   So there has to be two:  One that testifies for the

04:07 18   plaintiff and one that testifies for the defense, before you

04:07 19   will defer to one or the other?

04:07 20   **A.**   No.  It's that I won't defer to either one of them or to

04:07 21   their trier of fact weighting for anything but dermatologic

04:07 22   issues.

04:07 23   **Q.**   Would you feel like you're in a better position to make a

04:07 24   dermatology diagnosis of permanent hair loss having never seen

04:07 25   a patient, having never examined the patient, having never

JOHN GLASPY - CROSS

04:07 1  ordered labs or other diagnostic measures before making a

04:07 2  diagnosis, as opposed to somebody who has done all of that?

04:07 3  A.    I think I'm in an equally good position if it's somebody

04:07 4  who has had chemotherapy that is known to cause alopecia and

04:07 5  that that hasn't recovered and they have received several

04:07 6  cancer therapies.  On that -- that's not something that I think

04:07 7  looking through the dermatoscope is helpful.

04:08 8  Q.    Looking through the dermatoscope is helpful.  Do you look

04:08 9  through the dermatoscope regularly?

04:08 10 A.    I don't.  We don't send people for it.

04:08 11 Q.    I want to switch gears a little bit.  Can we go back to

04:08 12 the protocol for one moment?

04:08 13 A.    Got it.

04:08 14 Q.    If you can turn to page 70 of 104.

04:08 15 A.    Is there --

04:08 16 Q.    Upper right-hand corner.

04:08 17 A.    Yeah, 70.  Got it.

04:09 18 Q.    Now, we could go fishing around in this document, but

04:09 19 hopefully you will just agree with me on this one.  As a study

04:09 20 investigator, you had to sign off to abide by the protocols of

04:09 21 this study protocol, right?

04:09 22 A.    Yes.

04:09 23 Q.    All study investigators do?

04:09 24 A.    That's correct.

04:09 25 Q.    Section 11.11 --

JOHN GLASPY - CROSS

04:09  1   **A.**   Uh-huh.

04:09  2   **Q.**   -- use of "Information and Publication"?

04:09  3   **A.**   Right.

04:09  4   **Q.**   It says:  "All information concerning the study drug

04:09  5   supplied by Rhone-Poulenc Rorer" -- and that's the predecessor

04:09  6   to Sanofi.  You understand that, don't you?

04:09  7   **A.**   Yes.

04:09  8   **Q.**   "In connection with the study and not previously published

04:09  9   is considered confidential and proprietary information."

04:09 10         Then it tells what the information includes.

04:09 11         The closing sentence of that paragraph says:  "This

04:09 12   confidential information shall remain the sole property of

04:09 13   Rhone-Poulenc Rorer and shall not be disclosed to others

04:10 14   without the prior written consent of Rhone-Poulenc Rorer/Sanofi

04:10 15   and shall not be used except in the performance of this study."

04:10 16         Do you see that?

04:10 17   **A.**   I do.

04:10 18   **Q.**   That means that Sanofi gets to keep private, keep

04:10 19   confidential, its information for as long as it wants to.  They

04:10 20   are the ones who get to decide whether information gets out.

04:10 21   **A.**   Well, there's just one qualifier here.  We signed those

04:10 22   things and then a contract is negotiated between the university

04:10 23   and, in this case, TRIO.  The university's contract says that

04:10 24   the university investigators, if they believe there's a patient

04:10 25   safety issue, don't have to abide by this and are required to

JOHN GLASPY - CROSS

04:10  1    report it immediately to the authorities.

04:10  2    Q.   I don't mean to imply that Sanofi is trying to hide

04:10  3    injuries to people or bad things are happening and they can't

04:10  4    cover them up.

04:10  5              You have to report things, right?

04:10  6    A.   You do.

04:10  7    Q.   Okay.

04:10  8    A.   And it supersedes this.

04:11  9    Q.   But, now, let's go down two paragraphs, one that starts

04:11 10    "No publication."

04:11 11    A.   Correct.

04:11 12    Q.   "No publication of the study will be made without approval

04:11 13    of the advisory board of the BCIRG" -- that's your group,

04:11 14    right?

04:11 15    A.   That's correct.

04:11 16    Q.   -- "and Rhone-Poulenc Rorer, which is Sanofi" -- I'm just

04:11 17    going to say Sanofi -- "Sanofi will review the manuscript to

04:11 18    prevent forfeiture of patent rights to data not in the public

04:11 19    domain."

04:11 20              So Sanofi gets to determine what information stays

04:11 21    confidential and you and your group and Sanofi get to determine

04:11 22    what gets published, right?

04:11 23              MR. STRONGMAN:  Objection.  Misstates the evidence.

04:11 24    BY MR. MICELI:

04:11 25    Q.   Is that what that means, sir?

JOHN GLASPY - CROSS

04:11  1              MR. MICELI:  I'm sorry.

04:11  2              THE COURT:  I think y'all are going to have to come

04:11  3    up here on that.

04:11  4              (The following proceedings were held at the bench.)

04:12  5              THE COURT:  You said misstates the evidence.

04:12  6              MR. STRONGMAN:  Dr. Glaspy just testified that if

04:12  7    there's a safety issue, it's not confidential, it can be

04:12  8    reported at any time.  And so Mr. Miceli then is following up

04:12  9    that you can -- it's confidential, you don't have to report it.

04:12  10   It's inconsistent --

04:12  11             MR. MICELI:  I will preface my question.

04:12  12             THE COURT:  I think you need to, please, because I

04:12  13   was just like what --

04:12  14             MR. MICELI:  I understand.

04:12  15             THE COURT:  Okay.  Thank you.

04:12  16             (End of bench conference.)

04:12  17   BY MR. MICELI:

04:12  18   Q.   Dr. Glaspy, subject to the safety issues you explained a

04:13  19   moment ago, the confidentiality agreement and the no

04:13  20   publication agreement without the consent of Sanofi in the

04:13  21   first and Sanofi and BCIRG in the latter is a contract of

04:13  22   confidentiality that you all get to keep things private until

04:13  23   you and Sanofi decide to disclose them.

04:13  24   A.   That's not the way I view it, but I suppose technically

04:13  25   that's true.

**JOHN GLASPY - CROSS**

04:13 1          What it really means is that people can't publish
04:13 2 piecemeal the trial, so each individual investigator can't
04:13 3 publish their piece.  The goal here is to wait until all the
04:13 4 patent issues have been settled that Sanofi needed settled,
04:13 5 perhaps.  I can't think of one, but that's why they put these
04:13 6 things in these.
04:13 7 Q.   Sure.
04:13 8 A.   And then that it come out where all of the data is
04:13 9 published, not piecemeal.
04:13 10 Q.   Okay.  Well, the study was completed in 2010, right?
04:14 11 A.   I think the last patient, yeah.
04:14 12 Q.   Okay.  Last patient, that was '09 sometime?
04:14 13 A.   Right.
04:14 14 Q.   And study report, September of 2010, right?  And then the
04:14 15 Mackey paper and the *Lancet Oncology* doesn't come out until
04:14 16 2013.
04:14 17 A.   Correct.
04:14 18 Q.   So the drug has been on the market and it's been approved
04:14 19 for adjuvant care for a number of years, then, right?
04:14 20 A.   Correct.
04:14 21 Q.   Wasn't any patent issues going on?
04:14 22 A.   Yeah, I'm not a patent attorney.  I don't know what the
04:14 23 issues are.
04:14 24          But one of the things companies are very sensitive
04:14 25 about when you do clinical trials is that it's possible that

**JOHN GLASPY - CROSS**

04:14  1  there's an intellectual property issue for them, with things

04:14  2  going into publication as prior art before they are ready.  So

04:14  3  these are sort of boilerplate things that end up in clinical

04:14  4  trials.

04:14  5  **Q.**   But we do know that when 2013 rolled around and you got

04:15  6  that *Lancet* article published on the TAX 316 study, I think you

04:15  7  already told the jury you guys didn't include the safety data

04:15  8  on alopecia.

04:15  9  **A.**   You mean in the Mackey paper?

04:15 10  **Q.**   Yes, sir.

04:15 11  **A.**   Yes, that's correct.

04:15 12  **Q.**   Okay.  All right.  The --

04:15 13         **MR. MICELI:**  May I approach, Your Honor?

04:15 14         **THE COURT:**  Yes, you may.

04:15 15  BY MR. MICELI:

04:15 16  **Q.**   Dr. Glaspy, do you recognize this document?

04:15 17  **A.**   I don't, but --

04:15 18  **Q.**   If you look on the by line, this is the 10-year follow-up

04:16 19  for TAX 316 and you're listed as one of the participants in the

04:16 20  study.

04:16 21  **A.**   Right.  But this was a presentation done at a meeting that

04:16 22  I didn't attend, so I don't recognize the slides.

04:16 23  **Q.**   You didn't have any input into these?

04:16 24  **A.**   I don't remember.

04:16 25  **Q.**   Okay.

JOHN GLASPY - CROSS

04:16 1   **A.**   I may have.

04:16 2   **Q.**   Well, since you don't remember -- I don't know if you want

04:16 3   to flip through them -- but if I represent to you they don't

04:16 4   have the safety data in them, you wouldn't have participated in

04:16 5   putting these together anyhow, would you?

04:16 6   **A.**   In putting the slide together?

04:16 7   **Q.**   Putting the slides together.

04:16 8   **A.**   If John had asked me for my input, I would have given it

04:16 9   to him.

04:16 10  **Q.**   Well, at what point --

04:16 11  **A.**   But I just don't remember.

04:17 12  **Q.**   Dr. Glaspy, I would like to ask you -- we have already

04:17 13  talked about this timeline with these five drugs.

04:17 14  **A.**   Excuse me.  Are we done with Mackey's paper?

04:17 15  **Q.**   Yes, sir.

04:17 16  **A.**   I just want to -- there's a dangling -- because I wasn't

04:17 17  familiar with it.  You said there was no safety data.  There is

04:17 18  safety data in here.  There's the congestive heart failure data

04:17 19  and all the other safety data; there just isn't alopecia data.

04:17 20  **Q.**   There's no safety data for alopecia.

04:17 21  **A.**   That's correct.

04:17 22  **Q.**   I thought that's what I said.  If I didn't, I didn't mean

04:18 23  to misrepresent.  Thank you.

04:18 24  **A.**   I think we are both tired.

04:18 25  **Q.**   Yes, sir.

JOHN GLASPY - CROSS

04:18  1          We talked about my timeline of these case reports on
04:18  2  the ELMO already a lot, correct?
04:18  3  A.   Yes.
04:18  4  Q.   And I would like to ask you about the numbers of case
04:18  5  reports in the year that Mrs. Earnest says she found out about
04:18  6  Taxotere causing permanent hair loss, okay?
04:18  7  A.   Okay.
04:18  8  Q.   Now, you read Mrs. Earnest's deposition, correct?
04:18  9  A.   I did.
04:18 10  Q.   And they are listed on your materials, I know.
04:18 11          And having read the deposition, you know that
04:18 12  Mrs. Earnest testified that she found her permanent hair
04:18 13  loss --
04:18 14          MR. STRONGMAN:  Objection.  May we approach, please?
04:18 15          THE COURT:  I think so.
04:18 16          (The following proceedings were held at the bench.)
04:18 17          THE COURT:  We are not going to restate
04:18 18  Mrs. Earnest's testimony.  I think you can ask him -- I think I
04:19 19  know where you are going with it.  I don't think you get to
04:19 20  read her testimony into the record with this witness.
04:19 21          MR. MICELI:  Okay.
04:19 22          THE COURT:  But I think it's appropriate if you want
04:19 23  to ask him when did these signals come in or whatever, because
04:19 24  I think that's --
04:19 25          MR. STRONGMAN:  Yeah, it's just the reading of her

JOHN GLASPY - CROSS

04:19 1    testimony or whatever is the problem.

04:19 2              **THE COURT:**  Okay.  Thank you.

04:19 3              (End of bench conference.)

04:19 4    BY MR. MICELI:

04:19 5    Q.   Dr. Glaspy, in your report, you didn't include any mention

04:20 6    of a signal of permanent hair loss related to Taxotere's safety

04:20 7    signal.

04:20 8              You don't have an opinion one way or the other on

04:20 9    that?

04:20 10   A.   On whether I mentioned a safety signal?

04:20 11   Q.   Yes.

04:20 12   A.   I don't think I mentioned a safety signal.  That's my

04:20 13   opinion.

04:20 14   Q.   You testified earlier you don't take issue with the care

04:20 15   and treatment that Dr. Carinder provided to Mrs. Earnest,

04:20 16   correct?

04:20 17   A.   With the chemotherapy choice we were talking about at the

04:20 18   time, that is correct.

04:20 19   Q.   And the choice, that would include the dosing, correct?

04:20 20   A.   Even that.  It's not what I would have done, but I'm not

04:20 21   critical.  It was within the standard of care.

04:20 22   Q.   Okay.  Thank you.

04:20 23             I want to make sure I'm understanding a couple of

04:21 24   things.

04:21 25             You testified earlier that Taxotere and Taxol have

JOHN GLASPY - CROSS

04:21 1    equal efficacy; is that correct?

04:21 2    A.   In early breast cancer, as long as the Taxol is used

04:21 3    weekly, compared to Taxotere used every three weeks, then yes,

04:21 4    I think that they yield, so far as we know, identical efficacy

04:21 5    results.

04:21 6    Q.   And when presenting drug options of equal efficacy, would

04:21 7    you agree that the side effects associated with these drugs

04:21 8    become all the more important information for the doctor and

04:21 9    the patient to consider together?

04:21 10   A.   Yes.

04:21 11   Q.   The drug company is obligated to provide information about

04:21 12   side effects that it knows of, correct?

04:21 13   A.   Yes, if it knows of them, correct.

04:21 14   Q.   And that would include permanent, irreversible alopecia?

04:21 15   A.   If they knew that there was a statistically significant

04:22 16   higher rate with their drug, the answer is yes.

04:22 17   Q.   And Sanofi was obligated to provide that information to

04:22 18   Dr. Carinder if it knew of that risk, correct?

04:22 19   A.   To disclose it publicly.  It's, in part, incumbent on

04:22 20   Dr. Carinder to stay in touch with what's coming out publicly.

04:22 21   Q.   Right.  And the means by which it's communicated publicly

04:22 22   in the label is something that you would defer to a regulatory

04:22 23   expert like Dr. Kessler, correct?

04:22 24   A.   What's the --

04:22 25   Q.   Whether or not evidence exists to compel Sanofi to provide

JOHN GLASPY - CROSS

04:22 1   label warnings or adverse event precautions to doctors so that
04:22 2   they can communicate with their patients -- that's a regulatory
04:22 3   decision and you would defer to a regulatory expert on that,
04:22 4   correct?
04:22 5   A.   If it's the regulatory question, yes; if it's a medical
04:23 6   question, no.  I would want it to be a valid, statistically
04:23 7   significant observation.
04:23 8   Q.   Now, you have to have full and complete and accurate
04:23 9   information in order to have a fully informed discussion with
04:23 10  your patients, correct?
04:23 11  A.   Yes.
04:23 12  Q.   And you trust, don't you, that drug companies provide
04:23 13  full, complete, accurate information about risks so that you
04:23 14  can have your discussions with your patient?
04:23 15  A.   Those are one of the entities whose good faith I rely on.
04:23 16  Q.   I want to put something up on the ELMO here and ask if you
04:23 17  can help me answer some questions.
04:24 18        Doctor, are you familiar with Taxotere, 5-FU,
04:24 19  Adriamycin, Cytoxan, and Taxol?
04:24 20  A.   Yes.
04:24 21  Q.   And you see that I have rows and columns here.
04:24 22        Does Taxotere have a risk of death?  Is that one of
04:24 23  the things you have to talk to your patients about?
04:24 24  A.   Yes.
04:24 25  Q.   Does 5-FU have that, as well?

JOHN GLASPY - CROSS

04:24  1    A.    Yes.

04:24  2    Q.    Adriamycin?

04:24  3    A.    Yes.

04:24  4    Q.    Cytoxan?

04:24  5    A.    Yes.

04:24  6    Q.    Taxol?

04:24  7    A.    That's correct.

04:24  8    Q.    Do they all -- does Taxotere have a risk for fatal damage

04:24  9    to the liver?

04:24 10    A.    Taxotere?  Yes.

04:24 11    Q.    5-FU?

04:24 12    A.    Yes.

04:24 13    Q.    Adriamycin?

04:24 14    A.    Yes.

04:24 15    Q.    Cytoxan?

04:24 16    A.    Yes, but a qualified yes, because it takes time.

04:25 17    Q.    Okay.  I will put a little check.

04:25 18    A.    Put a little check.

04:25 19    Q.    Okay.  Taxol?

04:25 20    A.    Yes.

04:25 21    Q.    Does Taxotere have a risk of fatal anaphylaxis?

04:25 22    A.    Yes.

04:25 23    Q.    Does 5-FU have a risk of fatal anaphylaxis?

04:25 24    A.    I don't think so.

04:25 25    Q.    Does Adriamycin have a risk of fatal anaphylaxis?

JOHN GLASPY - CROSS

04:25 1   A.   Yes.

04:25 2   Q.   Does Cytoxan have a risk of fatal anaphylaxis?

04:25 3   A.   Yes.

04:25 4   Q.   And does Taxol have that risk?

04:25 5   A.   Yes.

04:25 6   Q.   Does Taxotere have a risk of cardiovascular abnormalities?

04:25 7   A.   Yes.

04:25 8   Q.   Does 5-FU have a risk of cardiovascular abnormalities?

04:25 9   A.   I don't know.  It must be very rare if it occurs.

04:25 10  Q.   Does Adriamycin?

04:25 11  A.   Yes.

04:25 12  Q.   Cytoxan?

04:25 13  A.   Yes.

04:25 14  Q.   Taxol?

04:25 15  A.   Yes.

04:26 16  Q.   Does Taxotere have a risk of other cancers?

04:26 17  A.   Yes.

04:26 18  Q.   Does 5-FU carry that risk?

04:26 19  A.   Probably not.

04:26 20  Q.   Does Adriamycin carry that risk?

04:26 21  A.   Two checks --

04:26 22  Q.   Two checks.

04:26 23  A.   -- if we can do that.

04:26 24  Q.   If you tell me to do it, I'm going to do it, Doctor.

04:26 25       Cytoxan?

JOHN GLASPY - CROSS

04:26  1   **A.**   Yes.

04:26  2   **Q.**   And Taxol?

04:26  3   **A.**   Yes.

04:26  4   **Q.**   Does Taxotere have a risk of neuropathy?

04:26  5   **A.**   Yes.

04:26  6   **Q.**   Does 5-FU have a risk of neuropathy?

04:26  7   **A.**   No.

04:26  8   **Q.**   Does Adriamycin have a risk of neuropathy?

04:26  9   **A.**   Not that I'm aware of.

04:26 10   **Q.**   Does Cytoxan?

04:26 11   **A.**   Also not that I'm aware of.

04:26 12   **Q.**   And how about Taxol?

04:26 13   **A.**   So there, I'd put two checks.

04:26 14   **Q.**   How about nausea and vomiting?  Does Taxotere carry that

04:26 15   risk?

04:26 16   **A.**   Yes.

04:26 17   **Q.**   5-FU?

04:26 18   **A.**   Tiny check.

04:26 19   **Q.**   Adriamycin?

04:27 20   **A.**   Yes.  Maybe two checks for that.

04:27 21   **Q.**   Cytoxan?

04:27 22   **A.**   Yes.

04:27 23   **Q.**   Does Taxol --

04:27 24   **A.**   Yes.

04:27 25   **Q.**   -- carry the risk?

JOHN GLASPY - CROSS

04:27 1   A.   Yes.

04:27 2   Q.   Doctor, since you are Sanofi's expert in this case, I'm

04:27 3   going to ask you a question.

04:27 4        We have heard testimony from witnesses from Sanofi

04:27 5   that have told us that in 1996, "hair generally grows back" did

04:27 6   not mean a warning for permanent hair loss, and we have heard

04:27 7   in 2011 the language "hair generally grows back" does mean a

04:27 8   warning for permanent hair loss.

04:27 9        As Sanofi's expert in this case, can you tell us what

04:27 10  date between 1996 and 2011 the meaning of the words "hair

04:28 11  generally grows back" went from not being a warning to being a

04:28 12  warning for permanent hair loss?

04:28 13       MR. STRONGMAN:   Objection, Your Honor.   Misstates the

04:28 14  testimony.   Lacks foundation with this witness.   It's just

04:28 15  argument.

04:28 16       THE COURT:   Overruled -- I mean sustained.

04:28 17       MR. MICELI:   Okay.

04:28 18  BY MR. MICELI:

04:28 19  Q.   Doctor, did Sanofi's label in 2011 warn doctors and

04:29 20  patients that Taxotere causes permanent, chemotherapy-induced

04:29 21  hair loss?

04:29 22  A.   Are we talking about the label that Dr. Carinder, who was

04:29 23  treating in 2011, was relying on or the 2011 label?

04:29 24  Q.   Well, either one, Doctor.

04:29 25  A.   Okay.   So the one he was relying on, which was the earlier

JOHN GLASPY - CROSS

04:29  1   one, said "generally grows back."  And to me, that means
04:29  2   sometimes it doesn't grow back.  We talked about that earlier.
04:29  3   Q.   Yes.
04:29  4        But you testified in your deposition that you don't
04:29  5   warn your patients about permanent hair loss, do you?
04:29  6   A.   I don't, because it's not life-threatening -- neither
04:29  7   life-threatening or common.
04:29  8        What is common is dissatisfaction with hair recovery,
04:29  9   which is another form of hair loss.
04:29 10   Q.   Okay.
04:29 11   A.   And that, I do warn them of.
04:29 12   Q.   Doctor, have you looked at with me today more Sanofi
04:29 13   documents on the issue of TAX 316 and permanent hair loss -- or
04:30 14   hair loss, period, than you have looked at since you have been
04:30 15   retained in this case by Sanofi?
04:30 16   A.   I don't know.  I would have to go back and pull out my
04:30 17   little zip drives and count things up.  I don't know.
04:30 18   Q.   Other than the labels, Sanofi's clinical overviews, and
04:30 19   the package inserts, what else have you looked at to try to
04:30 20   understand what Sanofi knew -- of Sanofi's documents, what else
04:30 21   have you looked at to try to understand what Sanofi knew and
04:30 22   when they knew it?
04:30 23   A.   So now we are at the minefield again.
04:30 24   Q.   You know what, let's not go across that minefield.
04:30 25        MR. MICELI:  Nothing further, Your Honor.  Thank you.

JOHN GLASPY - REDIRECT

04:30  1          THE COURT:  Thank you.

04:30  2               Mr. Strongman.

04:30  3          MR. STRONGMAN:  Thank you, Your Honor.  Briefly.

04:30  4                    REDIRECT EXAMINATION

04:30  5  BY MR. STRONGMAN:

04:30  6  Q.   Dr. Glaspy, when you were going through the chart that

04:30  7  Mr. Miceli just put up and he had all the risks across the

04:31  8  chart for the various side effects -- do you remember that?

04:31  9  A.   I do.

04:31 10  Q.   -- why did you put two checks in the Taxol box?

04:31 11  A.   Because it's about twice as likely to cause serious

04:31 12  neuropathy as Taxotere is.

04:31 13  Q.   And what about Adriamycin and cardiotoxicity?

04:31 14  A.   Well, it's the king of cardiotoxicity.  It invented it and

04:31 15  put it on the landscape.  Adriamycin is a real problem.

04:31 16               And now we are learning that it doesn't just cause

04:31 17  heart failure immediately.  It causes hearts to age faster so

04:31 18  that the curves between people who didn't get Adriamycin and

04:31 19  people who did continue to separate in terms of there being

04:31 20  more and more congestive heart failure.

04:31 21               So that's the reason.  It's a big problem.

04:31 22  Q.   And I think you were asked some questions about Taxotere

04:32 23  and Taxol having the same efficacy.

04:32 24               Do you remember that?

04:32 25  A.   I do.

JOHN GLASPY - REDIRECT

04:32  1   **Q.**   Now, with regard to that, the point you made was what
04:32  2   regarding the one weeks and three weeks?  Why does that matter?
04:32  3   **A.**   Because Taxol, every --
04:32  4              **MR. MICELI:**  Your Honor, this was asked and answered
04:32  5   in the direct.  We are going into the --
04:32  6              **MR. STRONGMAN:**  It's just responding to a point that
04:32  7   Mr. Miceli asked.
04:32  8              **THE COURT:**  I'm going to allow you one question, but
04:32  9   that's it.
04:32 10              **THE WITNESS:**  Because --
04:32 11              **THE COURT:**  Not any others.
04:32 12              **THE WITNESS:**  -- Taxol every three weeks is inferior
04:32 13   to Taxol weekly.  Taxol weekly is equal to Taxotere every three
04:32 14   weeks --
04:32 15   **BY MR. STRONGMAN:**
04:32 16   **Q.**   You were also asked --
04:32 17   **A.**   -- so far as we know.  And we've got randomized trials to
04:32 18   base that on.
04:32 19   **Q.**   You were also asked some questions about the study
04:32 20   protocol, and I think you were read some paragraphs about
04:32 21   confidentiality and whatnot.
04:32 22              Do you remember that?
04:33 23   **A.**   I do.
04:33 24   **Q.**   As an investigator, if there was any concern about safety,
04:33 25   were you or your institution prohibited from putting out any

JOHN GLASPY - REDIRECT

04:33 1    information at all?

04:33 2    **A.**   No, they weren't.  In fact, we won't sign a contract with

04:33 3    anybody where we are not free to report, for ethical reasons.

04:33 4    **Q.**   And was TAX 316 published in the medical literature?

04:33 5    **A.**   It was.

04:33 6    **Q.**   Was the ten-year data published?

04:33 7    **A.**   It was.

04:33 8    **Q.**   Was the five-year data published?

04:33 9    **A.**   Yes.

04:33 10   **Q.**   Mr. Miceli also drew up his chart -- his timeline charts.

04:33 11          Do you remember that?

04:33 12   **A.**   I do.

04:33 13   **Q.**   And he was citing you to footnotes in your report.

04:33 14          Do you remember that?

04:33 15   **A.**   I do.

04:33 16   **Q.**   And in your report, were you citing every single piece of

04:33 17   literature that could possibly be found regarding reports with

04:33 18   Adriamycin or Cytoxan, or were you just citing representative

04:34 19   examples?

04:34 20   **A.**   I --

04:34 21          **MR. MICELI:**  Your Honor, I object.  Leading.

04:34 22          **THE COURT:**  Sustained.  You need to rephrase your

04:34 23   question.

04:34 24   **BY MR. STRONGMAN:**

04:34 25   **Q.**   Doctor, you were asked about footnotes in your article.

JOHN GLASPY - REDIRECT

04:34 1            Do you remember that?

04:34 2   A.   I do.

04:34 3   Q.   What was the purpose of the specific citations in the

04:34 4   footnotes?

04:34 5   A.   The purpose was to cite some examples in the literature.

04:34 6   Q.   Was the purpose to cite every single piece of literature

04:34 7   you could find on Cytoxan?

04:34 8            THE COURT:   Sustained.

04:34 9   BY MR. STRONGMAN:

04:34 10  Q.   Doctor, you were also asked some questions about

04:34 11  Dr. Kopreski's deposition and whether you had read it and when

04:34 12  you disclosed that.

04:34 13           Do you remember those questions?

04:34 14  A.   I do.

04:34 15  Q.   And you were deposed in this case, correct?

04:34 16  A.   I was.

04:34 17  Q.   And you were actually asked about that in your deposition,

04:34 18  weren't you?

04:34 19  A.   I was.

04:34 20  Q.   There's no surprise here that you had reviewed

04:34 21  Dr. Kopreski's information, correct?

04:34 22  A.   There was surprise expressed.  I'm not in a position to

04:35 23  tell you whether it's accurate or not.

04:35 24  Q.   I believe that you were also asked some questions about --

04:35 25  I think a table was discussed with regard to Dr. Kopreski.

JOHN GLASPY - REDIRECT

04:35  1          Do you remember that?

04:35  2   A.    I do.

04:35  3   Q.    And I think you said -- and correct me if I'm wrong -- I

04:35  4   think you said:  "If there's anything in the chart that is

04:35  5   inaccurate, then my analysis is inaccurate."

04:35  6          Do you remember that?

04:35  7   A.    I do.

04:35  8   Q.    Has the plaintiff in this case pointed you to one single

04:35  9   piece of data in Dr. Kopreski's analysis that was inaccurate?

04:35 10   A.    No.

04:35 11   Q.    Questions were asked about risks of hair loss with

04:35 12   Adriamycin and cyclophosphamide, and Mr. Miceli was writing on

04:35 13   his chart.

04:35 14          Do you remember that?

04:35 15   A.    I do.

04:35 16   Q.    Doctor, in your experience, has hair loss and alopecia

04:36 17   always been a known effect of Adriamycin?

04:36 18          MR. MICELI:  Objection.  Leading.

04:36 19          THE COURT:  I think you need to rephrase your

04:36 20   question.

04:36 21   BY MR. STRONGMAN:

04:36 22   Q.    Doctor, is hair loss a known side effect of Adriamycin?

04:36 23          MR. MICELI:  Same, Your Honor.  I'm sorry.

04:36 24          THE COURT:  I'm going to allow it.

04:36 25          THE WITNESS:  It is.

**JOHN GLASPY - REDIRECT**

04:36 1    **BY MR. STRONGMAN:**

04:36 2    **Q.**    And is hair loss a known side effect of Cytoxan?

04:36 3    **A.**    It is.

04:36 4    **Q.**    You were also asked on that chart about controlled trials.

04:36 5             Do you remember that?

04:36 6    **A.**    Yes.

04:36 7    **Q.**    And in TAX 316, Mr. Miceli pointed out that is a

04:36 8    controlled trial, correct?

04:36 9    **A.**    It is.

04:36 10   **Q.**    And so is -- we have called it TAX 301 or GEICAM.

04:37 11            That's a controlled trial, correct?

04:37 12   **A.**    That's correct.

04:37 13   **Q.**    And there are arms of that study that involve no Taxotere

04:37 14   at all, correct?

04:37 15   **A.**    That's correct.

04:37 16   **Q.**    And in those arms, were there reports of persistent hair

04:37 17   loss also?

04:37 18   **A.**    Yes.

04:37 19   **Q.**    And lastly, Doctor, you were asked some questions about

04:37 20   the fact that you have given speeches or talked about studies

04:37 21   on behalf of industry.

04:37 22            Do you remember those questions?

04:37 23   **A.**    I do.

04:37 24   **Q.**    Is that money that goes to you or is it money that goes to

04:37 25   the university?

JOHN GLASPY - REDIRECT

04:37 1   **A.**   In every year, I give all the checks to the university.

04:37 2   And if I haven't exceeded my amount that I'm allowed to keep, I

04:37 3   get the checks back.

04:37 4         I don't know if any of those ended up being money I

04:37 5   took home, but if they did, it would have stopped at the cap.

04:37 6   **Q.**   And, Doctor, why, in your role as an oncologist and a

04:38 7   researcher, do you work with industry?

04:38 8   **A.**   Because otherwise we can't make progress.  There isn't an

04:38 9   entity other than the pharmaceutical industry that's willing to

04:38 10  invest the time and effort and build the machinery you need to

04:38 11  make drugs that are safe and consistent batch to batch and then

04:38 12  pay for clinical trials.  If we want to be involved in making

04:38 13  treatment better, we need to work with pharma.

04:38 14        **MR. MICELI:**  Objection.

04:38 15        **MR. STRONGMAN:**  No further questions.

04:38 16        **THE COURT:**  Yes.  Thank you.

04:38 17        **MR. STRONGMAN:**  No further questions.

04:38 18        **THE COURT:**  Okay.  You may step down, Dr. Glaspy.

04:38 19  Thank you.

04:38 20        **MS. SASTRE:**  Your Honor, may we approach for one

04:38 21  moment before we excuse the witness?

04:38 22        **THE COURT:**  Please.

04:38 23        **MS. SASTRE:**  Thank you.

04:38 24        (The following proceedings were held at the bench.)

04:38 25        **MS. SASTRE:**  So, Your Honor, there were a couple of

04:39 1    comments about these landmines.  I just don't like the sound of

04:39 2    those words.  He doesn't need to be here for it, but I think we

04:39 3    should think about the jury being told something that, you

04:39 4    know, there were some rulings made by the Court, there's

04:39 5    nothing to it, put it out of your mind.

04:39 6              THE COURT:  The landmines.

04:39 7              MS. SASTRE:  He said it like three times.

04:39 8              THE COURT:  A couple of times he said that there were

04:39 9    some rulings that I made --

04:39 10              MR. MICELI:  That's fine.

04:39 11              MS. SASTRE:  Just so there's no pejorative.  Okay.

04:39 12              THE COURT:  Let me ask this:  Do you have any other

04:39 13    witnesses?

04:39 14              MR. STRONGMAN:  No.

04:39 15              THE COURT:  Do we have rebuttal?

04:39 16              MR. COFFIN:  We might.

04:39 17              THE COURT:  I think you have to decide pretty

04:39 18    quickly.

04:39 19              MR. COFFIN:  We've got to do what?

04:39 20              THE COURT:  I think you have to decide pretty

04:39 21    quickly.

04:39 22              MR. COFFIN:  I need to talk to them.  I can't just do

04:39 23    that right this second, Judge.

04:39 24              THE COURT:  Okay.

04:39 25              MS. SASTRE:  And I would just say, of course, we have

04:39  1    no notice at this point.  We wouldn't know where to begin if we
04:40  2    had to cross somebody.
04:40  3            THE COURT:  Right, right.  I just am trying to
04:40  4    schedule things.
04:40  5            MS. SASTRE:  Okay.  I understand.
04:40  6            THE COURT:  All right.  Okay.  Thank you.
04:40  7            (The following proceedings were held at the bench.)
04:40  8            THE COURT:  You may step down, Dr. Glaspy.
04:40  9                I'm sorry.  Mr. Coffin.  Mr. Coffin.
04:40 10            MS. SASTRE:  Can we let him go?
04:40 11            (The following proceedings were held at the bench.)
04:40 12            MS. SASTRE:  Mr. Strongman is just concerned about
04:40 13    even reminding them of the term again.  Maybe it's like they
04:40 14    don't think of the elephant in the room.  What do you think?
04:40 15            THE COURT:  I have to tell you, I would let it go.
04:40 16            MS. SASTRE:  Okay.
04:40 17            THE COURT:  I think sometimes you make it worse.  He
04:40 18    kind of laughed it off.  Everybody kind of laughed it off.
04:40 19            MS. SASTRE:  Can I see what Mr. Moore thinks?  Then
04:40 20    we will have a vote.
04:40 21            THE COURT:  I would just let it go.
04:41 22            MS. SASTRE:  I've been overruled.  Let it go.  I'm
04:41 23    sorry, Your Honor.  I appreciate it.
04:41 24            (End of bench conference.)
04:41 25            THE COURT:  Mr. Strongman, please call your next

04:41  1    witness.

04:41  2                 **MR. STRONGMAN:**  The defense rests, Your Honor.

04:41  3                 **MS. SASTRE:**  Subject to our pending motions,

04:41  4    Your Honor.

04:41  5                 **THE COURT:**  Members of the jury, the defense has

04:41  6    rested.  As I indicated to you yesterday, you have now heard

04:41  7    the defendants' case.  We are going to recess now and we will

04:41  8    return tomorrow.

04:41  9                 Under any circumstance, I would believe that we

04:41 10    would have argument tomorrow and instructions, but the

04:41 11    plaintiff may, if they choose to, present rebuttal evidence in

04:42 12    response to the defense's case.

04:42 13                 Now, I'm going to caution you and admonish you

04:42 14    clearly and unequivocally, even though the plaintiff has rested

04:42 15    in their case-in-chief and the defendant has rested in the

04:42 16    their case-in-chief, you should not discuss this case amongst

04:42 17    yourselves or with anyone else, nor should you perform any

04:42 18    independent research.

04:42 19                 Tomorrow, when we return, if the plaintiff

04:42 20    chooses to, they may present rebuttal evidence, and then

04:42 21    following that we will proceed with argument and instruction

04:42 22    from the Court.

04:42 23                 Understand, you should not discuss this case at

04:42 24    all until you have heard all of the evidence, the argument of

04:42 25    counsel, the instructions from the Court, and then you may

04:42  1    begin your deliberations.

04:42  2                    With that, Court is at recess until 8:30

04:42  3    tomorrow morning.  Please leave your tablets on your chairs.

04:42  4    Thank you.

04:43  5                    (The jury exited the courtroom.)

04:43  6              MR. MOORE:  We have a proffer, Your Honor.  Ms. Byard

04:43  7    can do that while we work on the charges.

04:43  8              THE COURT:  Okay.

04:43  9              MR. MOORE:  She's out in the hallway.

04:43 10              THE COURT:  All right.

04:43 11              (Off the record.)

04:43 12              THE COURT:  There's a proffer.  We also have to deal

04:43 13    with this exhibit and then we are prepared for a charge

04:43 14    conference.

04:43 15                    I don't need to deal with this proffer, right?

04:43 16              MS. SASTRE:  No.  She will just read it the same way

04:44 17    the plaintiffs did.

04:44 18              THE COURT:  Okay.  Perfect.

04:44 19              THE DEPUTY CLERK:  Can we clear up these exhibits as

04:44 20    far as what's in?

      21              THE COURT:  Yes.  Okay.  Wait.  I believe there

      22    was -- let's deal with these -- okay.  Somebody is going to

      23    stay and deal with those exhibits, and then let's talk about

      24    this.

      25                    (Proceedings adjourned.)

```
 1                            * * *

 2                         CERTIFICATE

 3           I, Toni Doyle Tusa, CCR, FCRR, Official Court

 4    Reporter for the United States District Court, Eastern District

 5    of Louisiana, certify that the foregoing is a true and correct

 6    transcript, to the best of my ability and understanding, from

 7    the record of proceedings in the above-entitled matter.

 8

 9

10                              /s/ Toni Doyle Tusa
                                Toni Doyle Tusa, CCR, FCRR
11                              Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```