```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
 2

     ****************************************************************
 3

     IN RE:  TAXOTERE (DOCETAXEL)        Docket No. 16-MD-2740
 4   PRODUCTS LIABILITY LITIGATION       Section H
                                         New Orleans, LA
 5   Relates to:  Barbara Earnest        Thursday, September 26, 2019
                  16-CV-17144
 6

     ****************************************************************
 7

                    TRANSCRIPT OF TRIAL PROCEEDINGS
 8           HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
                     UNITED STATES DISTRICT JUDGE
 9                       DAY 9, MORNING SESSION


10

     APPEARANCES:
11

     FOR THE PLAINTIFF:                  BACHUS & SCHANKER, LLC
12                                       BY:  DARIN L. SCHANKER, ESQ.
                                              J. KYLE BACHUS, ESQ.
13                                       1899 Wynkoop St., Suite 700
                                         Denver, CO 80202
14
                                         FLEMING NOLEN & JEZ
15                                       BY:  RAND P. NOLEN, ESQ.
                                         2800 Post Oak Blvd., Suite 4000
16                                       Houston, TX 77056

17                                       GIBBS LAW GROUP, LLP
                                         BY:  KAREN B. MENZIES, ESQ.
18                                       6701 Center Drive West, 14th Floor
                                         Los Angeles, CA 90045
19
                                         DAVID F. MICELI, LLC
20                                       BY:  DAVID F. MICELI, ESQ.
                                         P.O. Box 2519
21                                       Carrollton, GA 30112-0046

22                                       PENDLEY BAUDIN & COFFIN
                                         BY:  CHRISTOPHER L. COFFIN, ESQ.
23                                       2505 Energy Centre
                                         1100 Poydras St.
24                                       New Orleans, LA 70163

25
```

```
 1                                    BARRIOS KINGSDORF & CASTEIX
                                      BY:  DAWN M. BARRIOS, ESQ.
 2                                    701Poydras St., Suite 3650
                                      New Orleans, LA 70139
 3
                                      GAINSBURGH BENJAMIN DAVID
 4                                    MEUNIER & WARSHAUER
                                      BY:  M. PALMER LAMBERT, ESQ.
 5                                    2800 Energy Centre
                                      1100 Poydras St.
 6                                    New Orleans, LA 70163

 7                                    MORGAN & MORGAN
                                      BY:  EMILY C. JEFFCOTT, ESQ.
 8                                    700 S. Palafox St., Suite 95
                                      Pensacola, FL 32502
 9
10   FOR THE DEFENDANT:               SHOOK HARDY & BACON
                                      BY:  HILDY M. SASTRE, ESQ.
11                                    201 Biscayne Blvd., Suite 3200
                                      Miami, FL 33131
12
                                      SHOOK HARDY & BACON
13                                    BY:  JON A. STRONGMAN, ESQ.
                                           HARLEY V. RATLIFF, ESQ.
14                                    2555 Grand Blvd.
                                      Kansas City, MO 64108
15
                                      IRWIN FRITCHIE URQUHART & MOORE
16                                    BY:  DOUGLAS J. MOORE, ESQ.
                                      400 Poydras St., Suite 2700
17                                    New Orleans, LA 70130

18
     Official Court Reporter:         Karen A. Ibos, CCR, RPR, CRR, RMR
19                                    500 Poydras Street, B-275
                                      New Orleans, Louisiana 70130
20                                    (504) 589-7776

21
       Proceedings recorded by mechanical stenography, transcript
22   produced by computer.

23

24

25
```

I N D E X

PAGE/LINE:

CLOSING ARGUMENTS

  By Mr. Schanker                                    2157/25

  By Ms. Sastre                                      2188/18

  By Mr. Schanker                                    2219/9


JURY CHARGE                                          2227/14


VERDICT                                              2245/24

P R O C E E D I N G S

(THURSDAY, SEPTEMBER 26, 2019)

(MORNING SESSION)

08:38:34  (OPEN COURT.)

08:38:35          THE COURT:  Mr. Coffin, you want to put a couple of

08:38:38  things on the record or make some motions?

08:38:41          MR. COFFIN:  Yes, your Honor.  Chris Coffin on behalf of

08:38:44  plaintiff, Ms. Barbara Earnest.  Two issues, as we discussed in

08:38:49  chambers, your Honor.  The first one is plaintiff's move to reopen

08:38:53  the evidence for the limited purpose of establishing that

08:38:59  Ms. Barbara Earnest received a phone call from her brother in

08:39:03  February of 2016, which her brother indicated that he had seen

08:39:10  advertisements -- an advertisement about the lawsuit related to

08:39:15  Taxotere and permanent alopecia.

08:39:18          That specific testimony is in Mr. Jules LeBlanc's

08:39:28  deposition.  It's not controversial testimony.  He specifically

08:39:33  says, "QUESTION:  So you saw this phone number on TV for a lawyer

08:39:39  roughly two years ago?

08:39:40          "ANSWER:  Roughly two years ago."

08:39:42          "Do you remember the time of the year that you saw it?"

08:39:45          "ANSWER:  Say, early part of the year, somewhere around

08:39:47  February, up in that area.

08:39:49          "QUESTION:  February of what year?

08:39:52          "ANSWER:  Two years ago would have been '16."

08:39:56 1          In this courtroom, Ms. Barbara Earnest was asked,

08:40:00 2     "QUESTION:  Now, at the time -- during the time you saw

08:40:05 3     Dr. Carinder when your hair wasn't growing back, did you ever ask

08:40:08 4     him about that?

08:40:09 5          "ANSWER:  Oh, yes, I've asked him.

08:40:11 6          "QUESTION:  And when did you ask him?

08:40:14 7          "ANSWER:  I'd say it was early April I asked him about my

08:40:18 8     hair.  And all he said, 'Honey, it's going to grow.  It takes

08:40:26 9     time.'  So that's what I kept doing.  I kept waiting."

08:40:29 10          "That's April of 2012?"

08:40:31 11          "Yes."

08:40:32 12          And how long -- "QUESTION:  And how long did you hold out

08:40:36 13     hope that your hair was going to grow back?

08:40:38 14          "ANSWER:  Until I found out about this lawsuit, which was

08:40:42 15     when my brother called."

08:40:45 16          Next question, Mr. Schanker moves to a different topic.

08:40:49 17     The reason for that is, as the Court knows, in MIL No.3, the Court

08:40:53 18     precluded any testimony about lawsuits preceding Ms. Earnest's

08:40:58 19     treatment.  Mr. Schanker, in questioning, was concerned about

08:41:00 20     violating that MIL, so he did not continue to ask questions about

08:41:04 21     when that phone call was made, you know, when she learned about

08:41:08 22     this other lawsuit, when she learned about the TV ads.  He

08:41:13 23     purposely stopped in order to avoid violating the MIL.

08:41:18 24          The standard in the Fifth Circuit is under *Garcia v.*

08:41:22 25     *Women's Hospital of Texas* which is the standard for reopening the

08:41:25  1   presentation of additional evidence.  There are three pillars to

08:41:32  2   get over; No. 1 is the importance of the probative value of the

08:41:35  3   evidence; No. 2 is the reason for the moving party's failure to

08:41:39  4   introduce the evidence earlier; and No.3 is the possibility of

08:41:42  5   prejudice to the non-moving party.

08:41:44  6            This is not a controversial issue, Judge.  And the

08:41:48  7   deposition testimony is very clear it was February of 2016 when the

08:41:51  8   call came around.  The reason for the moving party --

08:41:54  9            THE COURT:  Let me ask you this, Mr. Coffin.

08:41:57 10            MR. COFFIN:  Yes.

08:41:58 11            THE COURT:  What does this look like?

08:41:59 12            MR. COFFIN:  I'm sorry.

08:42:00 13            THE COURT:  What is it you intend to do?

08:42:03 14            MR. COFFIN:  There are multiple potential solutions.

08:42:06 15   First of all, I forgot to tell your Honor, we did attempt to enter

08:42:10 16   a stipulation with the defense letting them know this technicality

08:42:13 17   and they just couldn't agree to it.

08:42:15 18            The second thing is reading the testimony of Mr. Jules

08:42:18 19   LeBlanc that specifically states when he made that phone call.

08:42:25 20   Dr. Bianchini's deposition yesterday, or two days ago, perhaps, at

08:42:30 21   trial, the issue came up about whether Dr. Bianchini's note, and

08:42:33 22   Mr. Schanker asked under the rule of completeness to read in an

08:42:37 23   additional page.  That additional page of Dr. Bianchini's testimony

08:42:41 24   establishes that he was told by Ms. Earnest that it wasn't until

08:42:46 25   approximately five years after her treatments that she made the

08:42:50 1 connection between her permanent hair loss and Sanofi's failure to

08:42:55 2 warn.  So that could be read into the record.

08:43:00 3         So there are a couple of different solutions here, if the

08:43:04 4 Court were to reopen the evidence.

08:43:06 5         THE COURT:  Okay.  Mr. Strongman.

08:43:09 6         MR. STRONGMAN:  Good morning, your Honor.

08:43:14 7         THE COURT:  Good morning.

08:43:16 8         MR. STRONGMAN:  Sanofi would oppose reopening of the

08:43:18 9 evidence in this case.  I think it's clear that there was

08:43:20 10 absolutely nothing prohibiting this question from being asked of

08:43:23 11 Ms. Earnest.  And, obviously, the prejudice lies in our ability to

08:43:26 12 cross-examine that evidence.  We all know trials are dynamic

08:43:32 13 things, so there is simply no reason that this could not have been

08:43:36 14 done during the normal presentation of evidence.  And had it been

08:43:40 15 done, it would have been something that we would have been able to

08:43:42 16 explore on cross-examination and test the veracity of.

08:43:47 17         With regard to reading the deposition, I mean, assuming

08:43:50 18 we even get there, there's no establishment that the witness is

08:43:54 19 unavailable, for example.  I mean, it's just hearsay at this point.

08:43:57 20 And so for those reasons, we think it's inappropriate to open the

08:44:01 21 evidence.  The evidence is closed and the plaintiffs have put on

08:44:04 22 the case that they have and they need to live with it.  Thank you.

08:44:07 23         THE COURT:  Thank you.

08:44:13 24         MR. COFFIN:  Our real concern is that we don't want the

08:44:16 25 jury to misread that question that we've been debating on the

08:44:20 1   verdict form in light of the fact that there wasn't an actual date.

08:44:25 2   And really concerned that there is -- over a technicality the jury

08:44:30 3   may believe that Ms. Earnest actually did know earlier than that.

08:44:36 4   And testimony is clear from the depositions.

08:44:39 5        THE COURT:  Well, you know, I go back to what I said in

08:44:50 6   chambers.  There was no reason why she could not have been asked,

08:45:01 7   "Did you know -- when was the date you found out -- when was the

08:45:06 8   date you made this determination?"

08:45:09 9        MR. COFFIN:  I understand.  But we concluded and she

08:45:14 10  blurted out that answer, and Mr. Schanker was very concerned about

08:45:16 11  going into that any further because we've been trying to be careful

08:45:20 12  of violating --

08:45:21 13       THE COURT:  And I appreciate that, but she blurted out

08:45:23 14  the answer and there was a follow-up, "And when did that call

08:45:26 15  occur?"  And that wasn't asked.  I mean, the problematic testimony

08:45:32 16  was already out and that -- you couldn't put that back in the bag.

08:45:38 17  But the question that was perfectly appropriate was, "What was the

08:45:42 18  date?

08:45:43 19       I am not going to reopen the evidence.  There is no

08:45:46 20  reason why this should happen at this time.  All right.

08:45:52 21       I believe there's another motion as well.

08:45:53 22       MR. COFFIN:  Yes, your Honor.  As -- the plaintiffs move

08:45:57 23  for a mistrial.  As we've discussed multiple times at the bench,

08:46:03 24  there have been multiple violations of the motions in limine by the

08:46:07 25  defense, which I've articulated in the past.  I'll make them short

08:46:10  1    here.

08:46:10  2            And most importantly, yesterday the testimony of Sanofi's

08:46:16  3    employee, a non-expert, Dr. Michael Kopreski, was let in.  And the

08:46:24  4    Court's reasoning in Docket 6160 regarding plaintiff's motion to

08:46:30  5    exclude expert testimony that relies upon defendant's employee,

08:46:33  6    Dr. Michael Kopreski, is very important here.  Because in the

08:46:38  7    Court's order and reasons, your Honor made it clear that

08:46:44  8    defendant's experts are allowed to rely on Dr. Kopreski's

08:46:50  9    reanalysis if, for example -- if they had did independent reviews

08:46:57 10    of the work.  You gave an example regarding Dr. Arrowsmith, who was

08:47:02 11    not called by the defense.  And you said Dr. Arrowsmith, for

08:47:07 12    example, examined patient data for two TAX316 patients and reached

08:47:11 13    the same conclusions as Dr. Kopreski leading her to conclude his

08:47:16 14    analysis was reliable; which makes some sense.

08:47:20 15            The problem that occurred yesterday and the prejudice to

08:47:24 16    the plaintiffs is Dr. Kopreski was allowed to testify about his

08:47:30 17    reanalysis.  The defense put up the actual reanalysis, which was

08:47:36 18    shown to the jury, which your Honor had instructed them not to do.

08:47:39 19    The defense put up pictures related to an article on tamoxifen and

08:47:46 20    hair loss, which, as your Honor knows, the plaintiff did not take

08:47:51 21    in this case.  That was a violation of an MIL.

08:47:54 22            And then Dr. Glaspy gets on the stand and -- as the

08:48:00 23    plaintiff predicted, Dr. Glaspy gets on the stand and he

08:48:03 24    specifically says that he did not independently verify the data

08:48:07 25    that Dr. Kopreski had put together.  In fact, he looked at a chart

08:48:13  1   that Dr. Kopreski had prepared, and he didn't look at any of the

08:48:18  2   underlying data.  As the evidence shows, Dr. Kopreski conducted

08:48:23  3   this analysis in 20 -- either '18 or '19, but certainly well after

08:48:29  4   the TAX316 data had been locked, post hoc analysis.  We find it

08:48:36  5   very prejudicial and that there's no probative value for most of

08:48:40  6   the opinions that were given.

08:48:42  7           To be clear, we do understand that the Court instructed

08:48:46  8   the jury that Dr. Kopreski is not an expert.  Although we

08:48:51  9   appreciate that, that doesn't get us over the fact of the prejudice

08:48:55 10   that Dr. Kopreski was allowed to bring into this courtroom; and

08:49:01 11   quite frankly, Dr. Glaspy couldn't validate at all.

08:49:05 12           Specifically, if I may quickly, your Honor, one example

08:49:09 13   the question that Dr. Glaspy was asked by my colleague Mr. Miceli,

08:49:15 14   "QUESTION:  You didn't make the chart" -- referring to

08:49:18 15   Dr. Kopreski's chart -- "You didn't make the chart.  You didn't do

08:49:22 16   anything to validate it either, did you?

08:49:24 17           "ANSWER:  That's correct."

08:49:25 18           There are at least a few examples in Dr. Glaspy's

08:49:31 19   testimony that are similar to that.  In addition, the multiple

08:49:36 20   expert opinions that Dr. Kopreski gave were improper as he was not

08:49:40 21   an expert as the Court clearly noted.

08:49:44 22           Your Honor, the standard in the Fifth Circuit is under

08:49:49 23   *Hollybrook Cottonseed Processing v. American Guaranty and Liability*

08:49:53 24   *Insurance Company*, 772 F.3d 1031.  It's a Fifth Circuit 2014 case.

08:50:02 25   And the Court stated, "When faced with a motion for a mistrial

08:50:06 1  based on the submission of prejudicial information to the jury, the

08:50:09 2  district court must decide whether the error is harmless or

08:50:13 3  assessing whether the error did not influence the jury or have but

08:50:17 4  a very slight effect."

08:50:19 5          In this situation, your Honor, this is major testimony

08:50:23 6  from Sanofi that offered opinions outside of this gentleman's -- he

08:50:31 7  wasn't even an expert, so he was a lay person; offered multiple

08:50:34 8  expert opinions.  And when Dr. Glaspy testified, he said he could

08:50:38 9  not validate the data.  Wholly improper and highly prejudicial to

08:50:44 10 the plaintiffs.

08:50:45 11         In addition, I have mentioned -- I'll make this short.  I

08:50:49 12 mentioned multiple MIL violations in the past at the bench.  I

08:50:53 13 think the Court -- I know your Honor has recognized some of those

08:50:57 14 MIL violations.  I'll point out just one specifically.

08:51:01 15         With regard to whether or not Dr. Carinder is responsible

08:51:03 16 for a patient's condition, that was MIL No. 7, which the Court

08:51:08 17 granted in part.  The defendants have on multiple times violated

08:51:13 18 this inferring that somehow Dr. Carinder's prescription of the

08:51:19 19 regimen that he gave Ms. Earnest somehow caused her permanent

08:51:25 20 alopecia.  The Court has specifically stated in that MIL ruling

08:51:30 21 that that type of suggestion to the jury was not to happen, and

08:51:35 22 it's happened multiple times, your Honor.

08:51:37 23         So for these multiple reasons, we move for a mistrial,

08:51:40 24 your Honor.

08:51:40 25         THE COURT:  Thank you.  Mr. Strongman.

08:51:43 1        MR. STRONGMAN:  Your Honor, Sanofi would oppose the

08:51:47 2   mistrial.  And, obviously, this is an issue that has been discussed

08:51:51 3   and debated numerous times over the last several days in terms of

08:51:56 4   the Dr. Kopreski analysis.  So we would simply incorporate all of

08:51:59 5   the arguments that have been made before.

08:52:01 6        We think what transpired was entirely appropriate.

08:52:05 7   Dr. Kopreski's testimony was entirely appropriate.  The video that

08:52:09 8   was shown was viewed and cleared by both sides days before it was

08:52:13 9   shown.

08:52:13 10        And with regard to the reliance of Dr. Glaspy relying on

08:52:18 11   data such as that is entirely appropriate.  It's no different than

08:52:22 12   an expert relying on a piece of literature that -- the expert

08:52:25 13   didn't go through that literature and look at all of the underlying

08:52:28 14   data in that literature, but they can rely on the literature.  So

08:52:31 15   this is certainly appropriate evidence, and we just simply

08:52:34 16   incorporate all of our responses that we had previously to this

08:52:38 17   issue.

08:52:39 18        THE COURT:  When faced with a motion for mistrial, the

08:52:45 19   Court has various options to undertake; one, I can grant it, deny

08:52:50 20   it outright, or take other precautionary measures.  I know both

08:52:57 21   prior to and following the testimony of Dr. Kopreski the Court

08:53:03 22   notes specifically told the jury that Dr. Kopreski was not -- had

08:53:09 23   not been tendered nor accepted by this Court as an expert in this

08:53:15 24   field.  The Court gave Mr. Miceli wide latitude in cross-examining

08:53:21 25   Dr. Glaspy related to the testimony of Dr. Kopreski, and he did,

08:53:29  1   indeed, say, "I just relied on it."  What you didn't answer was the

08:53:33  2   following answer, which was when Dr. Glaspy had to admit, "If this

08:53:37  3   is wrong, I am wrong, and I didn't look it and I can't verify this

08:53:42  4   information."  I think that was fully vetted for the jury.

08:53:46  5        Additionally, as to Dr. Carinder, there was some

08:53:55  6   intimation that he did not follow the exact dosage in the label.

08:54:06  7   However, Dr. Glaspy said this was all within the standard of care.

08:54:11  8   There was no one that said that he violated the standard of care,

08:54:14  9   or this was inappropriate, or not a reasonably anticipated use of

08:54:19 10   the product.  I believe that's been clearly established that this

08:54:24 11   dosage was in the standard of care.

08:54:27 12        There was testimony as to the cumulative dosage.  I do

08:54:30 13   not believe that any question regarding what the label says

08:54:34 14   vis-a-vis the dosage in any way prejudiced anybody.  I think it was

08:54:41 15   very clear that this was an appropriate treatment, and I don't find

08:54:48 16   that.

08:54:49 17        For those reasons, the mistrial is denied.

08:54:52 18        MR. COFFIN:  Your Honor, one last thing.  We just want to

08:54:54 19   make a proffer at some point later on; have Ms. Earnest testify

08:55:00 20   about when she got that phone call.

08:55:02 21        THE COURT:  Fine.  But let's go ahead and get --

08:55:09 22        MR. COFFIN:  Thank you, your Honor.

08:55:11 23        MR. MOORE:  Your Honor, real briefly, I just raised this

08:55:13 24   with Sam.  One of the things that we talked about on the jury

08:55:16 25   verdict form --

08:55:17 1          THE COURT:  That's my thing.  Any objections to the
08:55:19 2  charge?  Let me do that.  Are there -- is there anything else?
08:55:23 3          MR. MOORE:  It was a typo.  Remember we said we were
08:55:25 4  going to change the word from "had" to "lacked."  Do the
08:55:29 5  plaintiff's bear the burden on contra non valentem...
08:55:34 6          THE COURT:  Right.
08:55:35 7          MR. MOORE:  So Sam can make that correction and
08:55:37 8  recirculate.
08:55:38 9          THE COURT:  Okay.  Thank you.
08:55:39 10          MR. MOORE:  And very briefly, your Honor, we have the
08:55:41 11  plaintiff's slide deck.  They are not numbered, but we have been
08:55:46 12  through them.  I am not going to raise any individual objections to
08:55:51 13  them.
08:55:51 14          We will simply state the objections that we have
08:55:55 15  previously made as appears from the slide deck that they will
08:55:58 16  potentially be making arguments that we failed to warn or failing
08:56:04 17  to include the TAX316 data in our label.  There's also references
08:56:11 18  in the slides to labels that were changed by FDA and not by Sanofi.
08:56:17 19  We've, obviously, been precluded from showing that.  We tried to
08:56:21 20  put the TAX316 data in the label and FDA took it out.  There were
08:56:24 21  other changes made by FDA.
08:56:27 22          And so, to the extent that those arguments were made, we,
08:56:31 23  obviously, preserve all of our objections as to those arguments.
08:56:32 24          THE COURT:  Okay.  Let me ask, as to the --
08:56:38 25          MR. STRONGMAN:  I just wanted to clarify one thing.  I

08:56:40 1  had a conversation with Mr. Schanker about one of their slides, and

08:56:43 2  it has a chart that goes beyond 2011.  He agreed to cover it up, so

08:56:47 3  he's done that.  He's been courteous to do that.

08:56:50 4          THE COURT:  Okay.  Thank you.  Now, charge objections.

08:56:53 5  Do we have any objections to the jury charge from the plaintiffs?

08:56:56 6          MR. CENTOLA:  Yes, your Honor.  The plaintiffs object to

08:56:59 7  the jury charges regarding reasonably anticipated use.  Those

08:57:02 8  charges are on page 6, page 7, and the specific heading on page 7.

08:57:07 9  There's no evidence in this case that the plaintiff used the drug

08:57:12 10 in anything other than a reasonably anticipated use, that was per

08:57:16 11 the NCCN guidelines and even per Dr. Glaspy's testimony.

08:57:19 12         Plaintiff's object to the FDA charge on page 8 and

08:57:24 13 page 9.  Plaintiff's propose an FDA charge in their written

08:57:27 14 submission prior to trial, and plaintiff's object to any charge

08:57:31 15 that's different from the FDA charge submitted by the plaintiffs.

08:57:35 16         Plaintiff's object to the general cause burden of proof

08:57:40 17 language that was added to the charge on page 11.  This language is

08:57:43 18 different from the Louisiana pattern jury charges, and it increases

08:57:48 19 the plaintiff's requirement because the Louisiana pattern jury

08:57:52 20 charges general cause is already subsumed in the specific cause and

08:57:56 21 adding this extra burden is improper.

08:57:59 22         And plaintiff's object to any jury charge on statute of

08:58:02 23 limitation or prescription.  This issue should not go to the jury.

08:58:06 24 This was a legal issue that was already decided by your Honor.

08:58:10 25         And in conjunction with the objection to all of the

08:58:13  1   statute of limitation questions, the plaintiffs also object to

08:58:16  2   Question 4 on the verdict form involving the prescription, statute

08:58:22  3   of limitation, contra non valentem argument.  Specifics of our

08:58:27  4   objection to Question 4, object to the overall question.  In

08:58:30  5   addition, we object to the lack of the word "cause" or "causal

08:58:33  6   association" within the text of the question itself.

08:58:36  7        THE COURT:  Thank you, Mr. Centola.  Any objection by

08:58:40  8   defendants?

08:58:48  9        MS. EISENSTEIN:  Ilana Eisenstein.  Your Honor,

08:58:51 10   defendants object to in the learned intermediary instruction, the

08:58:58 11   statement that Dr. Carinder would have altered his prescribing or

08:59:02 12   treating decision or behavior.  We believe that the proper

08:59:07 13   formulation would just be concluded that altered his prescribing

08:59:12 14   decision without the addition of "or behavior."

08:59:17 15        We would also like to note for the record that in

08:59:21 16   conversations in chambers under the requirement of adequate warning

08:59:31 17   definition, it states that a manufacturer of a product shall not be

08:59:34 18   liable for damage proximately caused by a product if at the time

08:59:39 19   the product left the manufacturer's control it did not know, and in

08:59:44 20   light of the existing reasonably available scientific knowledge

08:59:48 21   could not have known of the characteristic that caused the damage

08:59:51 22   or the danger of such characteristics.  That defendants had

08:59:55 23   suggested that it say, "If" -- after it says, "by characteristic of

09:00:02 24   the product if the manufacturer shows that at the time the product

09:00:06 25   left its control it did not know."  And plaintiff's did not want to

09:00:09  1    include that additional language which would indicate it's our

09:00:13  2    burden to do that.  So I just wanted to be clear that that is

09:00:17  3    something the plaintiff's had agreed to.

09:00:18  4         If this is the appropriate time, your Honor, I also

09:00:21  5    wanted to note -- or not to note, to formally renew the defendant's

09:00:26  6    motion for a directed verdict given that there's been additional

09:00:30  7    evidence that has been presented for all of the reasons that

09:00:34  8    Mr. Moore had stated on the record under Rule 50, we would like to

09:00:37  9    renew our motion.

09:00:39  10        THE COURT:  Okay.  The Court's going to defer any motions

09:00:44  11   and consider that in any written submissions after a verdict.  Are

09:00:51  12   we ready?

09:00:55  13        MS. SASTRE:  Not really.

09:00:56  14        THE COURT:  There's that.

09:01:29  15     (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

09:01:29  16        THE COURT:  All jurors are present.  Court's back in

09:01:29  17   session.  You may be seated.

09:01:32  18        Good morning.  Do the plaintiffs have any rebuttal

09:01:37  19   evidence they wish to present?

09:01:39  20        MR. COFFIN:  No, we do not, your Honor.

09:01:41  21        THE COURT:  Okay.  Members of the jury, you have now

09:01:45  22   heard all of the evidence that will be presented in this case.  Now

09:01:48  23   we're going to prepare for argument of counsel.

09:01:51  24        Mr. Schanker, are you ready to proceed?

09:01:54  25        MR. SCHANKER:  I am, your Honor.  May it please the

09:01:58  1   Court.  Good morning, folks.  Thank you, and more importantly,

09:02:13  2   Ms. Barbara thanks you for your sacrifice, your service these last

09:02:17  3   two weeks.  She asked me to pass that along.

09:02:20  4          In a little while you're going to have two jobs.  First

09:02:25  5   job you're going to have is to answer the questions that Judge

09:02:31  6   Milazzo gives you in this case.  The second job you're going to

09:02:34  7   have is to explain to your fellow jurors why you answered the

09:02:40  8   question the way you answered it.  And I would like to give you

09:02:43  9   some suggestions for that.

09:02:44 10          I told you last Monday that this was a simple case, and

09:02:54 11   it really is.  We put on a lot of evidence in this case, but it's a

09:02:58 12   simple case.  You've seen that Taxotere causes permanent

09:03:04 13   chemotherapy-induced alopecia.  Probably a phrase you hadn't heard

09:03:09 14   before, initials you hadn't heard before, come to be known in this

09:03:13 15   case as what?  PCIA.

09:03:17 16          We've also shown you that Sanofi knew that Taxotere

09:03:23 17   causes PCIA, and that Barbara Earnest, unfortunately, as a result

09:03:33 18   of this, must live with permanent baldness.

09:03:38 19          Now, we've heard a lot in this case about the fact that

09:03:44 20   there are no guarantees in medicine.  Do you remember hearing that

09:03:52 21   a few times throughout this trial?  But, ladies and gentlemen,

09:04:31 22   there may be no guarantees in medicine, but we're not in a

09:04:36 23   hospital.  You see that seal up there?  We're in a court of law,

09:04:41 24   and there are guarantees in the law.  And you heard about some of

09:04:48 25   those in this case.

09:05:30  1          Legal guarantee.  When a company knows it must disclose

09:05:35  2   in the label.  When a company knows, it must disclose.  And why is

09:05:46  3   that?  We heard from her honor on the second day of court in an

09:05:55  4   instruction, and we heard from Dr. Kessler about this throughout

09:05:59  5   his testimony, the former commissioner of the Food & Drug

09:06:05  6   Administration, and what did he share with y'all?  That a drug

09:06:08  7   manufacturer is responsible for the content of its label.  Period.

09:06:15  8          Dr. Kessler explained this in detail.  The way he put it

09:06:22  9   was Sanofi owns it.  The defendant owns the label and is

09:06:28 10   responsible for the safety of Taxotere at all times.  And the drug

09:06:33 11   label must provide information about severity, duration, and

09:06:38 12   nature.  Remember, he showed us.  Literally, they own the label,

09:06:43 13   the last page of the label with the copyright on it.  That's

09:06:48 14   Sanofi's.  And by owning it, they have the responsibility.

09:06:55 15          So what does all of that mean, the fact that they own the

09:06:58 16   label?  What did we learn in the last two weeks in court?  That

09:07:04 17   this, through the label, that's how Sanofi can let everyone know

09:07:09 18   what it knows.

09:07:11 19          Dr. Kessler explained to us the importance of the drug

09:07:15 20   label.  He taught us that the drug label controls the flow of

09:07:20 21   information from a drug company to doctors and patients.  Sanofi

09:07:25 22   owns the label.  If Sanofi knows, they must disclose.  So Sanofi

09:07:31 23   controls the flow of the information about Taxotere's risks to

09:07:35 24   doctors and patients.  Sanofi must clearly and prominently warn

09:07:41 25   about PCIA in its label.

09:07:46  1          So why is it so important?  Why is this label so
09:07:50  2  important?  How is the system set up?  We heard a lot of testimony
09:07:57  3  that without a label update, what happens; and then, with a label
09:08:03  4  update, what happens.  When the label is updated, the megaphone
09:08:08  5  comes out, and this is how the company blasts the information to
09:08:14  6  all of the doctors.  That's how the system is set up.  And if the
09:08:18  7  label is not updated, then nothing comes out of the megaphone.

09:08:24  8          If it's updated, get a new label.  The sales
09:08:29  9  representatives go out and talk about it.  Promotional materials
09:08:33 10  are handed out.  The article reprint carriers.  The call center now
09:08:38 11  talks about the new label.  The reference books that the pharmacies
09:08:44 12  use, the infusion clinics use.  The patient information leaflets
09:08:48 13  are updated.  Dear doctor letters can go out.

09:08:51 14          Remember hearing about first chance best chance?  Well,
09:08:54 15  think about it in this context.  The first chance best chance for
09:08:57 16  doctors to learn about the risks is with an updated label.

09:09:06 17          From a commonsense standpoint, why is the system set up
09:09:10 18  this way?  The system is set up this way so that patients can get a
09:09:16 19  consistent warning.  What happens is the label is updated, the
09:09:23 20  megaphone blasts the information through all of the resources
09:09:26 21  available, including the label itself, and the doctors are
09:09:32 22  informed.  Thousands of doctors who talk to millions of patients.
09:09:37 23  They're having conversations about this.  This is how you can have
09:09:41 24  uniform and consistent conversations.  This is how the system is
09:09:45 25  set up.

09:09:46  1        Imagine if it didn't work this way.  Imagine if it was
09:09:51  2  just up to the doctors to figure it out on their own.  Well, one
09:09:55  3  doctor may have gone to a conference and learned information.  But
09:09:58  4  what if another doctor didn't?  Then the doctor who didn't is
09:10:02  5  unable to pass this information onto the patient.  Or what if one
09:10:06  6  doctor happens to read an article in a publication and another
09:10:11  7  doctor doesn't?  Then that other doctor isn't able to pass the
09:10:16  8  information onto the patient and the patient's not protected.  That
09:10:20  9  system wouldn't work.  That's why the system and the law is set up
09:10:25 10  the way it is.
09:10:26 11        And the responsibility is on the company, right?  The
09:10:32 12  responsibility is on the company.  If the company knows, they must
09:10:37 13  disclose.
09:10:45 14        Back in the jury selection and then a little bit in the
09:10:48 15  opening we talked about the burden of proof.  Do you remember when
09:10:54 16  we talked about the burden of proof?  Y'all remember thinking about
09:10:57 17  the difference between a criminal case and a civil case?  And this
09:11:02 18  is not a criminal case where the burden of proof is what?  It's
09:11:06 19  beyond a reasonable doubt.  That's not what we're doing here.
09:11:08 20  That's not the law that Judge Milazzo will be giving you.
09:11:12 21        Instead, what we have is the preponderance of the
09:11:17 22  evidence.  Plaintiff, Barbara, has the burden of proving her case
09:11:22 23  by a preponderance of the evidence.  This, by the way, is the jury
09:11:25 24  instruction that the judge is going to read to you, the law that
09:11:28 25  you will get.  To establish preponderance of the evidence means to

09:11:31  1  prove something is more likely so than not.  And if the plaintiff

09:11:36  2  fails to prove any element of her claim by a preponderance of the

09:11:41  3  evidence, she won't recover.  So every element of the claim, you as

09:11:45  4  the juror, are to use that standard.  That burden.  The

09:11:52  5  preponderance of the evidence.

09:11:53  6          Now, we believe, ladies and gentlemen, in this case that

09:11:56  7  we've proved this to you like this.  But this is what the law

09:12:00  8  requires.  This is what the law requires, and you all took an oath

09:12:04  9  and we trust you that you will follow that.

09:12:09  10          But, ladies and gentlemen, if one of your fellow jurors,

09:12:12  11  whether it be on this or any other jury instruction, is not

09:12:16  12  following along, then I encourage you to respectfully point that

09:12:22  13  law out to them and ask them to follow it.  Because that's

09:12:27  14  important in this case.  And no matter what your decision is, when

09:12:32  15  you lay your head down at the end of this case, on your pillow, you

09:12:37  16  have a right to know that you've been on a jury that follows the

09:12:40  17  law.

09:12:40  18          So we'll be talking about preponderance a lot as we go

09:12:44  19  through those questions that the judge will be giving you in this

09:12:48  20  case.  And that's what I would like to do, is go through those

09:12:52  21  questions with you and talk about them a little bit.

09:13:01  22          One of the first questions that you'll be going

09:13:05  23  through -- and this is the verdict form.  This is it.  "Do you find

09:13:10  24  by a preponderance of the evidence that Sanofi inadequately warned

09:13:19  25  Dr. Carinder of the risk of permanent chemotherapy-induced

09:13:21  1    alopecia" -- there it is, PCIA.  "Do you find by a preponderance of

09:13:26  2    the evidence that Sanofi inadequately warned Dr. Carinder of the

09:13:29  3    risk of PCIA associated with Taxotere?"  Question that you're going

09:13:36  4    to have to answer.

09:13:37  5         So what I would like to discuss with you is what Sanofi

09:13:43  6    knew and didn't do.  What was it that Sanofi knew and didn't do?

09:13:56  7    Opening statement walked through the timeline of Sanofi's knowledge

09:14:02  8    in this case.  And we'll touch on just a few things here because

09:14:08  9    you've heard this evidence come in.

09:14:10  10        We know Barbara Earnest got her treatment over here in

09:14:13  11   2011.  We know Taxotere came on the market for metastatic breast

09:14:17  12   cancer in 1996.  And we went through the evidence that was

09:14:21  13   presented.  We know that Sanofi did not know, so they had no

09:14:25  14   obligation to disclose in 1996.  But we saw the evidence build and

09:14:31  15   build and build such that by 2006, Sanofi knew.  And if the company

09:14:38  16   knows, they must disclose.

09:14:40  17        And I ask you, ladies and gentlemen, at any point in time

09:14:44  18   in this case did you hear any evidence that the label was changed

09:14:48  19   to warn Dr. Carinder of the risk of PCIA?  Because that's the

09:14:54  20   question you're going to be asking yourself and that you're going

09:14:57  21   to be answering in this case.

09:15:02  22        We heard from Dr. Freedman, who is Sanofi Taxotere global

09:15:09  23   safety officer, specifically for Taxotere.  Dr. Freedman testified

09:15:14  24   on the video on the first day.  She admits that Sanofi is required

09:15:18  25   to update the safety information in Taxotere's label.  Dr. Freedman

09:15:23  1   admits that by 2006 Sanofi knew that Taxotere caused PCIA.  And if

09:15:32  2   the company knows, it must disclose.  In this case, did Sanofi

09:15:36  3   warn -- change their label and warn of PCIA?  No.

09:15:42  4          Dr. Freedman admits in 2006 that she told employees to

09:15:47  5   not search the literature for important information about PCIA.  Do

09:15:51  6   you remember that e-mail that came through from the Danish doctor

09:15:54  7   with a request about it?  And what did Dr. Freedman do?  We know

09:15:59  8   she knew.  She acknowledged in that e-mail that she was aware of

09:16:04  9   this issue.  She was aware of adverse event reports of PCIA, but

09:16:08 10   she said don't do a literature search.

09:16:13 11          Dr. Freedman also admits that temporary and permanent are

09:16:17 12   two clearly different hair loss outcomes.

09:16:26 13          This was actually a picture, defense showed you this

09:16:30 14   image in their opening statement.  And they said Taxotere -- 2000

09:16:41 15   Taxotere label warned of the risk of hair loss.  Do you remember

09:16:44 16   this image?  You may from back on Monday, and they pulled out the

09:16:48 17   word "alopecia, alopecia, alopecia" throughout the label was in

09:16:52 18   there.  Well, what did Dr. Freedman tell us about that word

09:16:56 19   "alopecia"?  We heard this from Dr. Freedman, as well as many

09:17:01 20   others in this case, but right from Sanofi's employee's mouth in

09:17:06 21   charge of Taxotere.  Why can't this word "alopecia" warn about two

09:17:11 22   different types; temporary hair loss and permanent -- PCIA?  Why

09:17:16 23   can't it?  Because according to Sanofi's own rules, separate

09:17:20 24   warnings are necessary when the outcome of a side effect is

09:17:25 25   different.

09:17:25 1          So if you have a different outcome, then you have to have

09:17:28 2   a different warning.  Well, we had different outcomes in this case,

09:17:33 3   right, folks?  We have temporary hair loss.  That's one outcome,

09:17:36 4   which means the hair comes back; and then we have permanent hair

09:17:41 5   loss, which -- and PCIA specifically, which means the hair does not

09:17:46 6   come back.

09:17:47 7          And so, from this analysis and this explanation by

09:17:52 8   Dr. Freedman, she admits that you must have two different

09:17:57 9   definitions for alopecia in a label.  And if the company knows

09:18:03 10  this, if the company knows, it must disclose.  But at any time were

09:18:07 11  there two different definitions for alopecia in the label?  No.  As

09:18:17 12  a matter of fact, we saw at the same time on that time line of 2006

09:18:22 13  was a big year.  You remember everything that was happening in

09:18:26 14  2006?  The company knows.

09:18:27 15         Well, what is the company publicly saying to doctors and

09:18:32 16  patients?  The nurse tear sheet, this was plaintiff Exhibit 0192 in

09:18:37 17  the case.  You're familiar with the nurse tear sheet.  You heard a

09:18:40 18  lot about it and saw it quite a bit.  This was a document that was

09:18:45 19  given -- dropped off by the sales representatives.  Specifically

09:18:49 20  dropped off in the doctors' offices for nurses and patients to use.

09:18:55 21         2006, at the same time the company knows and it must

09:18:59 22  disclose.  What are they saying publicly in doctors' offices to

09:19:06 23  nurses and patients with their paperwork?  They're defining

09:19:10 24  "alopecia" as a common yet temporary side effect.

09:19:16 25         But that's not the only place that they're doing that.

09:19:20  1   We know what the company knows at that time, but what are they

09:19:26  2   saying at that time?  You saw this document, Plaintiff's

09:19:32  3   Exhibit 0185.  2006, Sanofi's informed consent.  What does it tell

09:19:37  4   the FDA about alopecia with Taxotere?  So this is a clinical trial

09:19:43  5   informed consent.  And we learned about clinical trial informed

09:19:47  6   consents in this case.  And the clinical trial informed consent --

09:19:51  7   because Sanofi is testing their drug Taxotere in a clinical trial,

09:19:56  8   and so they are responsible for and create the submission and the

09:20:00  9   FDA approves it.

09:20:01 10        So what is Sanofi telling doctors and patients in 2006

09:20:07 11   about side effects of docetaxel or Taxotere?  They're saying that

09:20:12 12   hair loss is reversible.  So the company knows, but here it does

09:20:18 13   not disclose.  In fact, it's saying the exact opposite.

09:20:30 14        Dr. Kopreski.  You heard a lot of testimony from

09:20:33 15   Dr. Kopreski.  Dr. Kopreski, who is the vice-president of global

09:20:45 16   pharmacovigilance and epidemiology.  Remember, he testified about a

09:20:48 17   sampling of the many reports of PCIA that Sanofi received from 2005

09:20:53 18   to 2006.  There is a long list of adverse event reports that had

09:20:58 19   been reported to the company and he ran through those.  Ran through

09:21:03 20   those in detail.  But those have been submitted by doctors, nurses,

09:21:07 21   sales representatives, those adverse event reports.  The company

09:21:11 22   knows what these adverse event reports and it must disclose.  But

09:21:15 23   did you hear any evidence following this that the company changed

09:21:18 24   its label and warned of PCIA?  No.

09:21:24 25        Dr. Kopreski also testified about another interesting

09:21:28  1  fact that we've heard about in this case, and, again, in that 2006,

09:21:32  2  five full years before Barbara received her chemotherapy, that was

09:21:35  3  a big year.  2006 the company had an internal meeting on the label

09:21:42  4  in which they discussed these two different types of hair loss.

09:21:46  5  They discussed it.  Temporary and permanent.  If the company knows,

09:21:52  6  it must disclose.  Was there any change in the label following this

09:21:56  7  2006 meeting to add and warn doctors of PCIA?  No.

09:22:08  8          And then we saw 2007 informed consent.  This was the

09:22:16  9  Canadian informed consent in a clinical trial that was being done

09:22:21 10  in Canada.  So this is a private clinical trial of Sanofi's that's

09:22:25 11  being done in Canada in the same time period, not in the United

09:22:30 12  States.  And remember, the clinical trials is done by the company.

09:22:33 13  The company creates the informed consent form for the doctors to

09:22:36 14  use.  And what did that clinical trial consent form have in it in

09:22:43 15  2007?  It had hair loss and then it had permanent hair loss.  So

09:22:50 16  clearly, the company knows in 2007 and must disclose.  But did we

09:22:57 17  ever see the label changed to add PCIA so that the megaphone could

09:23:02 18  come up and blast it to the doctors in the United States?  No.

09:23:11 19          We heard about this from the defense in this case, this

09:23:15 20  idea of the language that was originally in the label.  Do you

09:23:22 21  remember this language here, "generally grows back" in 1996?  You

09:23:26 22  remember there's been a lot of conversation about that, right?  So

09:23:29 23  this language, "hair generally grows back" as well as "alopecia."

09:23:32 24  Back way back in 1996 when the drug was only approved in the

09:23:35 25  metastatic setting, what did that language really mean?  Because

09:23:39  1   remember women who were taking this drug would go from one cancer

09:23:43  2   drug to another to another in the metastatic setting to extend

09:23:47  3   life.  And nobody knew about this condition PCIA.

09:23:51  4         You remember Dr. Tosti, who we'll talk more about,

09:23:55  5   testified that from a science standpoint, history standpoint the

09:23:59  6   condition didn't exist back in 1996.  How can you warn about a

09:24:03  7   condition that doesn't exist?  Well, that's consistent with Jean

09:24:08  8   Philippe Aussel, the Sanofi employee who you heard testify.  He is

09:24:13  9   the Sanofi medical director of oncology and global medical affairs.

09:24:18 10   Mr. Aussel worked on all of the long-term studies on Taxotere.

09:24:22 11   This guy knows Taxotere.  Sanofi did not and could not in 1966 know

09:24:29 12   that -- 1996 know that Taxotere caused both temporary hair loss and

09:24:34 13   PCIA for the reasons I touched on.  And Dr. Aussel explains that

09:24:40 14   because of this "hair generally grows back" and "alopecia," he

09:24:44 15   tells you that those were never warnings of PCIA.

09:24:47 16   But here we are now in the courtroom in 2019 and we hear the

09:24:52 17   lawyers telling you that, "Oh, wait.  This language way back in

09:24:57 18   1996 before the condition even existed was meant to warn of it."

09:25:03 19   Warn of a condition that doesn't exist.  Is that commonsense?  We

09:25:09 20   call that a lawyer-invented excuse.

09:25:17 21         Heard from Lesley Fierro.  Lesley Fierro, another Sanofi

09:25:27 22   employee.  She is the head of medical information services.  And

09:25:30 23   you remember Ms. Fierro's testimony.  She ran the call center that

09:25:36 24   answered questions from doctors, nurses, and patients.  The call

09:25:41 25   center could not give out information that's not in the label.  Why

09:25:44  1    can't it give out information that's not in the label?  Because

09:25:47  2    that's the way the rules are set up.  The call center is only

09:25:52  3    allowed to talk about the things that are in the label.  So the

09:25:55  4    call center was muzzled.  They weren't allowed to pull up the

09:25:59  5    megaphone and blast it out.  So you have doctors, patients, others

09:26:03  6    calling in and asking questions because they didn't know.

09:26:08  7         The company knows, but did not disclose.

09:26:12  8         Interesting that Ms. Fierro, an employee, said that she

09:26:17  9    read the label -- and she is a pharmacist.  She read the label when

09:26:23  10   she joined the company and she didn't see a warning of PCIA.  She's

09:26:26  11   a pharmacist who prescribes medications.  She read the label and

09:26:29  12   she didn't see anything in there about PCIA.  And her go-to

09:26:33  13   reference as a pharmacist, *Pharmacopoeia*.  That's a book that we

09:26:38  14   saw that she talked about.  That go-to reference understood

09:26:43  15   Taxotere's label to only warn about reversible hair loss.

09:26:47  16        This is another one of the problems because books like

09:26:49  17   that get updated when the label changes.  When the label changes,

09:26:54  18   the megaphone comes up and blasts it from the mountaintop and

09:26:59  19   everybody knows.  Pharmacists find out, nurses find out who infuse,

09:27:04  20   and, most importantly, doctors find out.  But in this case, the

09:27:08  21   company knows, does not disclose, and so none of those folks knew

09:27:13  22   about PCIA and Taxotere.

09:27:20  23        Ruth Avila.  She testified live.  Sat right there.

09:27:26  24   Ms. Avila, the sales representative, important testimony.  She was

09:27:32  25   taught by Sanofi that hair loss is temporary.  She wasn't aware of

09:27:37  1    this risk of permanent hair loss.  No promotional material from

09:27:42  2    Sanofi said that hair loss could be permanent.  She was giving out

09:27:45  3    that nurse tear sheet, do you remember, she believed she said she

09:27:49  4    was giving it out like candy, handing it out at the same time in

09:27:54  5    2006 when -- and after she is giving materials to the doctors'

09:28:00  6    offices that talk about temporary hair loss.  That's what the word

09:28:04  7    that's going out.  When behind the scenes, the company knows.  And

09:28:07  8    if the company knows, it must disclose.

09:28:10  9          She never told the doctor or nurse, including

09:28:13  10   Dr. Carinder, about PCIA because PCIA was not in the label.  And if

09:28:17  11   it's not in the label, her toolbox is limited.  She is not allowed

09:28:22  12   to talk about it.  She is not permitted to.  And her toolbox was

09:28:26  13   limited because they hadn't updated the label.  The megaphone had

09:28:30  14   not come up, and she couldn't blast the information out.  She

09:28:33  15   wasn't allowed.

09:28:34  16          As a matter of fact, she heard a rumor.  She heard a

09:28:38  17   rumor that Taxotere was causing PCIA.  She discussed it at a sales

09:28:43  18   rep meeting and were informed by Sanofi that she was not allowed to

09:28:46  19   tell anyone.  She was not allowed to tell doctors.  So the doctors

09:28:51  20   could not warn patients.  She was muzzled as well.

09:29:22  21          THE DEPUTY CLERK:  Mr. Schanker, you have about

09:29:24  22   48 minutes left.

09:29:29  23          MR. SCHANKER:  Thank you.  Let's take a look at the label

09:29:38  24   that was in effect when Barbara Earnest received her chemotherapy

09:29:43  25   from Dr. Carinder.  So this is Taxotere's 2011 label.  You remember

09:29:53  1   the timeline of all of the information they had up to 2006, all of

09:29:57  2   the information that was piling up.  What exactly was the label in

09:30:02  3   effect?  And it's the 2010 label.  We saw this and that's in

09:30:05  4   evidence, 0396.  This label is in evidence.  You can look at it.

09:30:11  5   Remember, we took Dr. Carinder through this label.  What's in

09:30:16  6   there?  Alopecia.  And that's under the doctor section for adverse

09:30:22  7   reactions.  And then the patient section simply hair loss.  At this

09:30:28  8   point in time the company knows and must disclose.  But what's in

09:30:32  9   the label?  Is there any information about PCIA and Taxotere?

09:30:39 10   None.

09:30:46 11         You also had several opportunities to look at Barbara's

09:30:51 12   own informed consent that she signed.  The informed consent that

09:30:55 13   was given to her by Dr. Carinder.  Remember, this is created by the

09:31:00 14   doctor's office, not created by Sanofi.  And Dr. Carinder's

09:31:05 15   informed consent warned of hair loss, nothing about PCIA, and it

09:31:13 16   also listed previously unknown side effects.  We heard a lot of

09:31:18 17   questions about this, and it appeared that the defense was

09:31:21 18   attempting to insinuate in 2011 -- all the way over in 2011, that

09:31:28 19   Taxotere caused an unknown side effect of PCIA.  Ask yourself, in

09:31:35 20   2011, was that an unknown side effect?  No.  The company knows and

09:31:41 21   must disclose years before.  But there was no language, no change

09:31:47 22   to the label to put in PCIA.

09:31:56 23         Dr. Carinder came and testified for you.  And you

09:32:00 24   remember we worked through all of those opportunities.  The

09:32:06 25   megaphone.  If the company allows the label to be updated, then the

09:32:12  1   megaphone comes up to the lips and it's blasted to the world from

09:32:16  2   the mountaintop that the label is changed and the entire medical

09:32:20  3   community finds out about it.  That's the way the system is

09:32:23  4   supposed to work.  Did Sanofi warn Dr. Carinder of Taxotere's risk

09:32:27  5   of permanent hair loss?  Do you remember when we went through all

09:32:31  6   of the ways -- all of the ways that they could have warned, the

09:32:37  7   megaphone could have reached him?  Answer, Dr. Carinder, "No, no,

09:32:44  8   no, no," over and over and over and over again.  The company knows

09:32:50  9   at this point in time and does not disclose.

09:33:02  10          Sanofi.  Did it warn doctors, including Dr. Carinder,

09:33:06  11  about PCIA?  Before 2011, did Sanofi update its label to warn about

09:33:13  12  2011?  No.  Did it allow its sales team to warn about PCIA?  No.

09:33:20  13  Did it create promotional materials for its sales team to give out

09:33:25  14  or for it to send out, drop off about PCIA?  No.  Did it train its

09:33:31  15  call center to warn about PCIA?  It did not.  No.  Did it create

09:33:37  16  patient educational material to warn about PCIA?  No.  Did it send

09:33:42  17  a dear doctor letter, an e-mail, snail mail to warn doctors about

09:33:48  18  PCIA?  No.  Did Sanofi do anything to warn doctors, including

09:33:53  19  Dr. Carinder, about PCIA?  They did not.

09:34:00  20          So, ladies and gentlemen, I submit to you this question

09:34:06  21  that I put up earlier, question that you'll answer on this verdict

09:34:12  22  form:  "Do you find by a preponderance of the evidence that Sanofi

09:34:17  23  inadequately warned Dr. Carinder of the risk of PCIA associated

09:34:23  24  with Taxotere?"  I submit to you that that is a resounding yes.

09:34:37  25          Other questions that you will be going through.  Next

09:34:45  1    question:  "Do you find by a preponderance of the evidence that

09:34:49  2    Barbara Earnest has PCIA that's been caused by Taxotere?"  So does

09:34:57  3    Barbara have, by a preponderance of the evidence, more likely than

09:34:59  4    not, that her PCIA was caused by Taxotere?

09:35:07  5          Important fact in this case.  It's not what caused the

09:35:15  6    hair to fall out, is it?  That's not what the issue is in this

09:35:19  7    case, because what does everybody know?  When you do chemotherapy,

09:35:24  8    what's the side effect?  Your hair falls out, right?  Everybody

09:35:28  9    knows that.  You knew that when you came into this courtroom.

09:35:31 10    That's not what this case is about.  It's about the fact that it's

09:35:34 11    the Taxotere that stopped it from growing back.

09:35:42 12          Who did we hear from on this issue?  Antonella Tosti took

09:35:52 13    the stand and educated all of us on hair and hair loss and hair

09:35:59 14    regrowth.  It's not an exaggeration to say that Dr. Tosti may be

09:36:05 15    the preeminent hair and hair loss expert in the entire world.

09:36:11 16    She's a clinician and a scientist who is experienced with PCIA.

09:36:18 17    Probably more experienced than anybody in the world.  She explained

09:36:26 18    it's not about what causes the hair to fall out, it's a question of

09:36:29 19    what prevented it from growing back.  She conducted a credible

09:36:33 20    scientific investigation and concluded that Mrs. Earnest, Barbara,

09:36:36 21    has PCIA caused by Taxotere.

09:36:40 22          She also explained to you that stem cells are useless for

09:36:45 23    her diagnosis.  She reaches it without them.  She also touched on

09:36:49 24    the fact that Rogaine would not help Barbara to the point that she

09:36:54 25    doesn't need a turban; that Rogaine is not going to improve

09:36:58  1   Barbara's condition such that she doesn't have to cover her head

09:37:02  2   all the time when she goes out in public.  It's not some magic

09:37:08  3   involved there.

09:37:10  4          But, most importantly, she conducted this credible

09:37:14  5   scientific investigation that I would just like to talk to you

09:37:16  6   about.  You remember she explained to us this concept of a

09:37:19  7   differential diagnosis, and she painstakingly walked through her

09:37:25  8   clinic evaluation.  She saw the person personally.  She laid hands

09:37:29  9   on Barbara, and her credible scientific investigation she ruled

09:37:32  10  out, through differential diagnosis, the other potential causes of

09:37:36  11  hair loss of which she is a preeminent expert.  She ruled out

09:37:40  12  something called telogen effluvium.  She ruled out and -- she

09:37:44  13  considered and ruled out alopecia areata.  She considered and ruled

09:37:49  14  out anagen effluvium.  You may remember that's what causes the hair

09:37:54  15  to fall out.  That's what everybody gets with chemotherapy.  But

09:37:56  16  that's not what this case is about.  This case is about what

09:38:00  17  prevented the hair from coming back.

09:38:02  18          She considered and ruled out what's called androgenic

09:38:06  19  alopecia; also known as female patterned hair loss, FPHL.  How did

09:38:16  20  she rule that out specifically?  She explained that Barbara's

09:38:21  21  diffuse alopecia covers her entire scalp, does not match the

09:38:25  22  pattern of any androgenic alopecia, from the mildest to the most

09:38:30  23  severe.  And she explained that in a couple of ways.  She explained

09:38:35  24  with the female pattern hair loss -- and she touched on the back of

09:38:39  25  her head and explained and showed these pictures that with the

09:38:42  1  female pattern hair loss, the hair loss is much higher up on the

09:38:45  2  back of the scalp than what Barbara has.  A clear sign.

09:38:48  3        She also explained, as did Dr. Carinder, that this

09:38:52  4  situation with this dramatic hair loss is not something that they

09:38:55  5  see.  Dr. Tosti sees with the androgenic -- I apologize, with the

09:39:04  6  androgenic alopecia the pattern is different.  Male pattern hair

09:39:10  7  loss, male pattern hair loss, which is another form of androgenic

09:39:15  8  alopecia, the pattern is different in that the rim of hair that a

09:39:19  9  man has is much thicker.  She explained that it's much thicker than

09:39:23  10  what Barbara has.  And so she ruled out FPHL, as well as MPL, male

09:39:31  11  pattern loss.  So in her differential diagnosis she clearly ruled

09:39:37  12  out androgenic alopecia.

09:39:39  13        She next considered what she called endocrine-induced

09:39:46  14  alopecia.  Endocrine-induced alopecia and she ruled that out as

09:39:52  15  well.  And she explained that with endocrine hair loss -- and

09:39:56  16  remember, that's the hormone suppressant drug, the Arimidex that

09:40:00  17  Barbara Earnest takes.  That, first of all, that the hair thinning

09:40:04  18  is much, much less than what she sees typically.  And that's what

09:40:09  19  Dr. Carinder confirmed in his practice.  Remember, he's prescribed

09:40:12  20  a lot of Arimidex, and he says that he doesn't even notice -- that

09:40:16  21  women may notice some hair thinning, but he can't even notice.

09:40:20  22  Clearly distinguishable from what Barbara suffers from.

09:40:23  23        And again, the pattern of hair loss does not match as

09:40:28  24  well.

09:40:30  25        And Dr. Tosti also explained that with both of these,

09:40:33  1   androgenic alopecia and Arimidex, that the loss of the eyebrows

09:40:39  2   doesn't present.

09:40:45  3              So Arimidex was ruled out in the differential diagnosis.

09:40:50  4              And then, Dr. Tosti considered PCIA.  PCIA was

09:40:57  5   considered.  And you remember we went through photographs after

09:41:02  6   photograph after photograph that appeared in the literature that

09:41:07  7   showed us Barbara's pattern of hair loss and the remarkable

09:41:11  8   similarity over and over and over again to the diffuse hair loss

09:41:18  9   and the particular pattern of the thinning of the hair in the rim

09:41:21  10  and how low it came on the back of the head.  And Dr. Tosti

09:41:25  11  explained that through that process and that analysis, she was able

09:41:32  12  to conclude that by ruling out others and ruling in PCIA, that

09:41:40  13  Barbara Earnest, within a reasonable degree of scientific

09:41:43  14  probability, suffers from PCIA.  Permanent chemotherapy-induced

09:41:47  15  alopecia.

09:41:48  16             But she didn't stop there.  She explained that she

09:41:53  17  analyzed which of the chemotherapy drugs, the A, the C, or the T

09:42:00  18  caused Barbara's PCIA.  And in that analysis, she looked in her

09:42:09  19  credible scientific investigation.  Remember, Dr. Tosti had

09:42:12  20  published on PCIA four times.  And some of that literature in

09:42:18  21  specific to PCIA caused by Taxotere -- she had first diagnosed

09:42:24  22  Taxotere caused PCIA back in 2006.  And she reviewed the literature

09:42:31  23  and determined that overwhelming evidence supporting her finding

09:42:41  24  Taxotere versus the A or the C in the literature.  And within a

09:42:51  25  reasonable degree of scientific probability that it's the Taxotere

09:42:56    1    that caused Barbara's permanent chemotherapy-induced alopecia.

09:43:04    2          Through her testimony and the testimony of Dr. Glaspy

09:43:08    3    yesterday, you might have noticed something interesting.  We heard

09:43:11    4    through the evidence about A and C and when it came on the market

09:43:17    5    for early stage breast cancer treatment and when it was used in

09:43:20    6    that respect.  We also heard about when Taxotere was, right?  And

09:43:24    7    the C came on the market 1959.  That's C, which Barbara took.  The

09:43:38    8    A comes on the market in 1974.  And then 2004 Taxotere is approved

09:43:48    9    for early-stage breast cancer.

09:43:55   10          Well, what did we hear about the history of this

09:43:58   11    condition, PCIA, from Dr. Glaspy, from Dr. Tosti?  Dr. Glaspy is

09:44:08   12    not a dermatologist but he is an oncologist, the defense person

09:44:12   13    that you heard from yesterday.  C comes on in '59, A comes on in

09:44:20   14    '74, PCIA doesn't exist.  Doesn't exist for decades.  Dr. Tosti

09:44:25   15    sees her first case here in 2006, and then you've seen the evidence

09:44:30   16    of all of the case reports and everything else that's going on from

09:44:33   17    this point on since Taxotere comes on the market.  Commonsense,

09:44:39   18    folks.  What's the cause?  It's the Taxotere.

09:44:54   19          The hair experts in this particular case, Dr. Tosti, who

09:44:57   20    is the only dermatologist that you heard from, world renowned hair

09:45:03   21    researcher, did a physical exam.  The only expert in this case, no

09:45:07   22    expert from the defense, laid hands or examined Barbara.  Dr. Tosti

09:45:15   23    used her dermatoscope, as she explained, she developed to really

09:45:20   24    revolutionize the treatment of hair diagnosis so that biopsies were

09:45:24   25    not necessary in many cases.  She confirmed through the

09:45:27  1    dermatoscope, as well as the laboratory pathology results, and she

09:45:31  2    systemically determined that Taxotere caused Ms. Earnest's PCIA.

09:45:37  3         Dr. Glaspy is not a hair researcher or dermatologist, he

09:45:40  4    is an oncologist, and he never examined Ms. Earnest before

09:45:44  5    rendering an opinion in this case.  Never examined her.  No one did

09:45:48  6    from the defense side.

09:45:54  7         So this question:  "Do you find by a preponderance of the

09:45:58  8    evidence that Barbara Earnest has permanent chemotherapy-induced

09:46:01  9    alopecia caused by Taxotere?"  Based on what you've seen, ladies

09:46:06 10    and gentlemen, overwhelmingly, yes.

09:46:37 11         Next question that you'll see:  "Do you find by a

09:46:46 12    preponderance of the evidence," more likely true than not, "that

09:46:49 13    the defendant's failure to warn Dr. Carinder was the proximate

09:46:54 14    cause, was the proximate cause, of Barbara Earnest's injuries?"

09:46:58 15    Was the defendant's failure to warn the proximate cause of Barbara

09:47:04 16    Earnest's injuries by a preponderance of the evidence?

09:47:08 17         Proximate cause.  This legal term, what does that mean in

09:47:14 18    the law?  Proximate cause -- this is the jury instruction that you

09:47:20 19    are to apply, the judge's instruction to you.  Proximate cause does

09:47:24 20    not mean the sole cause.  The defendant's conduct can be a

09:47:28 21    proximate cause if it was at least one of the direct concurring

09:47:32 22    causes of the alleged injury.  However, plaintiff must show that

09:47:35 23    defendant's conduct was a substantial contributing factor in

09:47:39 24    bringing about the result.  In other words, it's not necessary for

09:47:44 25    plaintiff to negate all other contributing factors or causes of

09:47:50  1   Ms. Earnest's injuries provided they show that the defendant's

09:47:53  2   failure to provide an adequate warning in Taxotere's label

09:48:02  3   substantially contribute.  So that's what you have to look at, did

09:48:05  4   it substantially contribute?  We believe in this case, ladies and

09:48:07  5   gentlemen, that it was the sole cause, but the law doesn't require

09:48:10  6   that.  You must determine if it substantially contributed.  Did

09:48:15  7   Taxotere substantially contribute?

09:48:16  8        And this idea of proximate cause -- we touched on this in

09:48:24  9   the opening as well.  You remember this patient protection system,

09:48:27  10  which we've heard a lot about it in this case and how it's supposed

09:48:31  11  to work?  Well, this is how it actually worked in this case.

09:48:35  12  Sanofi did not warn Dr. Carinder about everything that it knew.

09:48:39  13  Dr. Carinder was presented with treatment recommendation to

09:48:42  14  Ms. Earnest without the knowledge of PCIA as a risk and side

09:48:48  15  effect.  Dr. Carinder and Ms. Earnest could not weigh all of the

09:48:51  16  risks and benefits; and, therefore, Dr. Carinder prescribed

09:48:54  17  Taxotere to Barbara with neither of them knowing.  And the patient

09:48:58  18  protection system is shattered.

09:49:05  19       Barbara on her cancer journey and how it fits in to all

09:49:10  20  of this is important for you to consider.  She conducted the self

09:49:15  21  exams two times a week; found the lump.  When she found it, she

09:49:19  22  went quickly to a doctor.  She met with Dr. Lagarde who recommended

09:49:22  23  a double mastectomy.  Barbara was concerned about that and sought a

09:49:28  24  second opinion, and she's glad she did.  She sought out that second

09:49:32  25  opinion and ended up having a lumpectomy instead.  She then chose

09:49:36  1    Dr. Carinder.  Barbara was actively involved in her care.

09:49:42  2            Dr. Carinder.  Dr. Carinder stays up-to-date on drug

09:49:47  3    safety through journals, conferences, ASCO, that's how he stays

09:49:52  4    up-to-date on the drug label.  He served on the Taxotere advisory

09:49:55  5    board.  Did you catch that?  Did you hear that testimony?  And yet

09:49:58  6    he wasn't told.  If the company knows, it must disclose.  Certainly

09:50:03  7    to individuals on an advisory board.

09:50:05  8            He helps create the doctor tests for cancer doctors and

09:50:10  9    blood doctors.  He creates the tests for people to become doctors.

09:50:16 10    He was never warned about this risk of PCIA.

09:50:19 11            What else do we know about Dr. Carinder?  Dr. Lagarde

09:50:21 12    refers patients to him.  Dr. Karlin refers patients to him because

09:50:26 13    they trust him.  And what did we hear of Ruth Avila?  Ruth Avila

09:50:31 14    trusted him when she was diagnosed with breast cancer.

09:50:38 15            And yet something interesting happened in this case, and

09:50:42 16    I bet you noticed it.  Sanofi's double speak.  Week 1, what was all

09:50:47 17    of Week 1 about?  Taxotere doesn't really cause PCIA.  Did you

09:50:52 18    notice the pivot that took place in Week 2?  It's so obvious that

09:50:56 19    Taxotere causes PCIA that Dr. Carinder should have known and told

09:51:01 20    Barbara.  Doesn't make sense, does it?  That's talking out of both

09:51:06 21    sides of your mouth.  Which is it?

09:51:13 22            We saw this idea that Sanofi versus Dr. Carinder.

09:51:21 23    Dr. Carinder should have been warned because Dr. Carinder had one

09:51:25 24    journal article that he said he didn't see that doesn't even

09:51:28 25    mention PCIA in 2001, but was in the literature in some literature

09:51:32 1   that he may review, that he had one patient older than Barbara who

09:51:36 2   was already balding, and that he didn't examine -- he is not a

09:51:41 3   dermatologist, didn't use a dermatoscope, isn't qualified to

09:51:45 4   diagnosis PCIA, but somehow that should have done it for him.  And

09:51:48 5   there was one abstract from a conference he didn't attend.  And

09:51:51 6   yet, somehow we saw the finger being pointed at him that he is

09:51:54 7   responsible.  You've heard no expert come in in this case, by the

09:51:57 8   way, and say that he did anything wrong.  We heard it from defense

09:52:00 9   counsel in the questioning.

09:52:02 10          Compare that to the mountain of evidence that Sanofi has,

09:52:06 11  the mountain of evidence of random control trials.  168 confirmed

09:52:11 12  cases of PCIA.  Safety signals from multiple strands.  The mountain

09:52:16 13  of evidence.  With that mountain of evidence, the company knows and

09:52:20 14  must disclose.  But did they ever warn Dr. Carinder?

09:52:26 15          Options.  Dr. Carinder explained this is a case in which

09:52:35 16  there were multiple options.  Ladies and gentlemen, this is not --

09:52:39 17  and this is an important fact, this is not a case of Taxotere or

09:52:44 18  death for Barbara.  Instead, it is a case of life with PCIA or life

09:52:49 19  without PCIA.  As I told you, it's really simple.  All we had to

09:52:54 20  have was the company disclose.  If the company knows, it must

09:52:58 21  disclose.  And they never disclosed, never changed the warning to

09:53:02 22  inform Dr. Carinder of PCIA.

09:53:04 23          And Dr. Carinder explained that Barbara had options,

09:53:07 24  multiple options in this case that he could have given her.  That

09:53:12 25  he would have had that conversation with her.  Red light, green

09:53:17  1   light.  There was the one Taxotere option that we know, we've seen

09:53:22  2   the evidence, causes PCIA.  These are the options that he would

09:53:25  3   have given her; equally effective options.  This is a case of life

09:53:30  4   with PCIA or life without PCIA.

09:53:34  5        And Barbara explained that she would have chosen and

09:53:38  6   asked for one of these options.  That if told, if warned, that she

09:53:45  7   would have asked if there's an option that doesn't cause PCIA

09:53:49  8   according to the information that you have, Doctor?  And

09:53:52  9   Dr. Carinder would have given her the other options.  They would

09:53:56 10   have had the conversation in the room, and they would have worked

09:53:58 11   through it.

09:53:59 12        We heard about neuropathy.  We heard about other side

09:54:02 13   effects as well.  All of the talk about side effects, more serious

09:54:12 14   side effects even, the adverse reactions.  Remember, all of the

09:54:15 15   testimony that we hear, long cross examination on adverse reactions

09:54:19 16   from Taxotere; death, liver damage, paralysis, cardiovascular

09:54:23 17   abnormalities, neuropathy, et cetera, et cetera.  Well, you know,

09:54:27 18   it's interesting.  There's other chemotherapy options.  They all

09:54:30 19   have that.  That's part of chemotherapy.  Those are known risks

09:54:36 20   that are accepted.  What was the one unknown risk?  PCIA.

09:54:49 21   Taxotere.  Dr. Carinder wasn't warned.

09:55:09 22        Heard from Dr. Madigan, the statistician.  He explained

09:55:16 23   about options in this case and looked for a signal -- for the

09:55:22 24   signal statistical analysis of significance and only Taxotere,

09:55:27 25   compared to all of the others, rose above.  Taxotere causes.  We

09:55:32  1  heard this from Dr. Feigal as well.

09:55:40  2          Dr. Plunkett talked to us about the baskets of fruit and

09:55:44  3  the weight of the evidence compared to just individual case

09:55:49  4  reports.

09:55:52  5          Ladies and gentlemen, for this question that I put up

09:55:56  6  earlier: "Do you find by a preponderance of the evidence that the

09:55:59  7  defendant's failure to warn Dr. Carinder was the proximate cause of

09:56:03  8  Barbara's injuries?"  The answer is overwhelmingly yes.

09:56:13  9          As you work through your next issue and question -- and I

09:56:22 10  don't have a board for this, but I'll briefly read it to you.  Your

09:56:30 11  next question:  "Do you find by a preponderance of the evidence

09:56:34 12  that Barbara Earnest lacked actual or constructive knowledge of

09:56:37 13  facts indicating she was a victim of a tort prior to December 12th

09:56:44 14  of 2015?  Do you find by a preponderance of the evidence that she

09:56:48 15  lacked actual or constructive knowledge of facts indicating that

09:56:52 16  she was the victim of a tort?"

09:56:54 17          Did she know that Sanofi did something wrong to her?  We

09:56:58 18  heard the testimony from Dr. Tosti, who could explain PCIA, but

09:57:04 19  Dr. Tosti is an expert.  Barbara Earnest didn't know from a

09:57:09 20  scientific standpoint what caused her hair loss.  She was unaware

09:57:13 21  of that.  She did not understand.  And so to try to say that she

09:57:18 22  should have known she was the victim of a tort, to explain -- to

09:57:22 23  try to say that she should have been aware, she wasn't aware of all

09:57:25 24  of the information that the company had.  She didn't know about the

09:57:29 25  clinical trial.  She was unaware of all of that.  She still took

09:57:36  1   Arimidex at the time.  She took the Arimidex and she wasn't sure

09:57:39  2   what was causing her permanent hair loss.  Dr. Tosti knows because

09:57:43  3   she is an expert.  But there was no diagnosis for Barbara until

09:57:48  4   Dr. Tosti diagnosed it in 2018.

09:57:51  5          This is just another attempt by the defendant to blame

09:57:54  6   someone other than itself, the plaintiff.

09:57:57  7          And don't forget, if Sanofi can't even admit that their

09:58:01  8   drug causes PCIA.  Then how can you expect Barbara Earnest, a

09:58:06  9   housewife/grandmother in Slidell to have this knowledge?  So on

09:58:12  10  this question:  "Do you find by a preponderance of the evidence

09:58:14  11  that Barbara Earnest lacked actual or constructive knowledge that

09:58:19  12  she was a victim of a tort?"  Clearly, yes.

09:58:29  13         The pink cancer book.  Again, I think that's an attempt

09:58:31  14  to try to blame Barbara with a mountain of evidence.  One thing I

09:58:37  15  will tell you is this pink cancer book, I'll tell you to look at

09:58:41  16  page 84 in this book, which is in Chapter 10.  And it says that

09:58:45  17  chemotherapy for breast cancer produces temporary alopecia.  It

09:58:49  18  varies from thinning to complete baldness.  Barbara was given this

09:58:52  19  book by Dr. Lagarde and told to read two chapters; one on pathology

09:58:56  20  and one on surgery.  She wasn't told to read any of the rest of the

09:59:00  21  book.

09:59:00  22         If she had read the rest of the book, in Chapter 10 she

09:59:05  23  would have heard that chemotherapy causes thinning to complete

09:59:07  24  baldness.  And then, if she'd looked all the way to the appendix,

09:59:11  25  she would have seen this information about rare cases of PCIA with

09:59:16  1   Taxotere that a nurse, a nurse somehow found and put into the

09:59:21  2   appendix back on page 195.  To try to claim that this information

09:59:28  3   would have said that Barbara Earnest had knowledge, conflicting

09:59:34  4   information?  She would have gone to her doctor who goes to the

09:59:38  5   label.  And what did the label say?  What did the label say at that

09:59:43  6   time?  Did it say anything about PCIA?  No.  The company knows and

09:59:46  7   doesn't disclose.

09:59:51  8        Last question that you'll be faced with in this case:

09:59:58  9   "What amount do you find by a preponderance of the evidence is

10:00:02 10   appropriate to fairly and adequately compensate Barbara Earnest for

10:00:07 11   her injuries?"  We heard Barbara testify, her family testify about

10:00:19 12   what she could do before Taxotere.  She could believe her

10:00:25 13   husband -- she could believe her husband when he said that she was

10:00:28 14   beautiful.  She could feel confident about her appearance.  She

10:00:34 15   could go to a public place and not have people staring at her.

10:00:37 16   Those are pretty simple things, right?  She could keep her medical

10:00:42 17   issues private.  She and Ralph could feel like a normal couple and

10:00:47 18   carefree.  She went to social events with her friends and family

10:00:53 19   without drawing attention.  She could feel comfortable being

10:00:56 20   photographed.  She could spend time with her friends without having

10:01:01 21   to explain her appearance.

10:01:05 22        We heard Barbara explain what it's like to live with this

10:01:09 23   now what she's left with.  Disfigurement.  Severe permanent balding

10:01:19 24   and lack of eyebrows make her feel like she doesn't even look like

10:01:23 25   a woman.  She's lost a part of her forever, she said.  She's lost a

10:01:30 1  part of herself.  She shared that with you.  The embarrassment that

10:01:34 2  she has -- she feels having to explain what happened to her hair

10:01:38 3  all the time.  She shies away from activities as a result.  She

10:01:43 4  avoids being photographed.  She permanently appears sick and

10:01:48 5  doesn't look like a cancer survivor that she is.

10:01:52 6  Imagine, ladies and gentlemen, she was fortunate enough, and not

10:01:57 7  everyone is, but she was fortunate enough to beat cancer, but she

10:02:00 8  never got to experience that -- the hair regrowth and the outward

10:02:07 9  feeling of that.  She fears her wig moving during the day without

10:02:11 10  her knowing.  She has the shame, self conscious in a crowd.  She'll

10:02:16 11  never feel beautiful again because she doesn't look like a woman.

10:02:24 12       And it's a cycle.  She can't -- she knows that her hair

10:02:32 13  will never grow back.  Knows her life will never be the same.  She

10:02:36 14  knows she doesn't look like a woman.  She's constantly reminded of

10:02:39 15  her cancer.  People come up and ask her about it.  You had an

10:02:44 16  opportunity to see her.  She looks like she is -- Barbara looks

10:02:48 17  like she is in the middle of cancer treatment and that's the way

10:02:51 18  she is going to look for the rest of her life.  Trapped like that.

10:02:55 19       She's never a survivor; always a victim.  She feels

10:03:00 20  humiliated.  Doesn't believe she'll ever be beautiful again.  She

10:03:05 21  has the fear of embarrassment.  She cannot escape the unwanted

10:03:10 22  pity.  She just tells people she is undergoing cancer, that she's

10:03:13 23  treating.  She doesn't want to have to explain it all the time.

10:03:17 24       Ladies and gentlemen, this is a cycle that continues and

10:03:20 25  goes on.  It doesn't stop.

10:03:27  1          Ask yourself what must it be like to know -- for her to

10:03:36  2   know she is a woman and not feel like a woman or look like that in

10:03:42  3   her mind?

10:03:45  4          And, ladies and gentlemen, we heard in this case what I

10:03:48  5   believe was real arrogance from the defense, arrogance of we save

10:03:53  6   lives.  Well, congratulations.  So do other drugs that are equally

10:04:00  7   effective that don't cause PCIA.  All you had to do was warn and

10:04:07  8   none of us would be here.  It's really simple.

10:04:13  9          Almost feel like what we hear from the company is,

10:04:16 10   "Barbara get out of the way.  We have more important things to do."

10:04:20 11   But what did Barbara do?  She decided to stand up to this company.

10:04:26 12   She decided to stand up to them.  But now she needs your help.

10:04:33 13   Ladies and gentlemen, in a case like this, I am compelled to ask

10:04:37 14   you for $12 million.

10:04:45 15          When you hear the defense attorney get up and speak here

10:04:53 16   in just a moment, I want to pose three questions.  See if they're

10:05:03 17   answered.

10:05:54 18          Question No. 1:  Simple.  Why didn't Sanofi warn of PCIA?

10:06:03 19   Why didn't they just warn?  Listen for a response.

10:06:09 20          Why was there no exam done by Sanofi of Barbara Earnest

10:06:13 21   in this case?  Why was that?  Why didn't they just have someone

10:06:20 22   examine her?

10:06:20 23          And lastly, why not just say the word "permanent"?  Have

10:06:26 24   you noticed in this case that's one word that we haven't heard

10:06:30 25   coming out of the defense attorneys' mouths.  They've avoided it

10:06:34  1    like the plague.  They haven't said the word "permanent" in this

10:06:38  2    courtroom.

10:06:38  3            Ladies and gentlemen, when the company knows, it must

10:06:43  4    disclose.  And if they had in this case, we wouldn't be here.

10:06:47  5            I thank you for your attention, and I'll get to speak

10:06:51  6    with you for a moment a little bit later.  Thank you.

10:06:59  7            THE COURT:  Members of the jury, do you need a quick

10:07:01  8    break?  Okay.  Court's going to be at recess for as short a period

10:07:09  9    of time as we can.

10:07:10 10            Do not discuss the case amongst yourselves or with anyone

10:07:13 11    else.

10:07:13 12        (WHEREUPON, THE JURY EXITED THE COURTROOM.)

10:07:13 13        (OPEN COURT.)

10:07:13 14            THE COURT:  All jurors are present.  Court's back in

10:15:17 15    session.  You may be seated.

10:15:17 16            MS. SASTRE:  Thank you, your Honor.

10:15:18 17            THE COURT:  Ms. Sastre.

10:15:18 18            MS. SASTRE:  May it please the Court, counsel,

10:15:21 19    Mrs. Earnest.

10:15:22 20            Ladies and gentlemen, good morning.  Now, I know we've

10:15:26 21    spent the last two weeks together in this courtroom hearing the

10:15:31 22    evidence presented by both of the parties.  I think I speak for

10:15:35 23    everybody.  I know that we're all happy that the trial is coming to

10:15:39 24    an end.  But let me start by simply saying thank you to each and

10:15:45 25    every one of you.  Ladies and gentlemen, we know that some of you

10:15:50  1   have driven long distances, back and forth every day, to be here

10:15:53  2   with us to help us settle this dispute.  And that means a lot to

10:16:02  3   us.  We understand that you all have your own lives, your own

10:16:06  4   families and things to do.  But you have come forward to serve as

10:16:12  5   jurors in this case, and we appreciate that very, very much.

10:16:18  6        And we've also paid close attention to you, seeing you

10:16:23  7   pay close attention to the evidence.  And that's something that's

10:16:30  8   been incredibly important in this case, ladies and gentlemen.  And

10:16:33  9   it told us, it told me, Jon, Doug, that you took your job

10:16:39 10   seriously.  So thank you again very, very much for all of that.

10:16:46 11        Now, as you know, this is my last opportunity to get a

10:16:49 12   chance to speak with you.  And we've heard a lot of evidence over

10:16:54 13   the past two weeks, so let me just say this at the outset:

10:16:59 14   Everybody is very thankful that Mrs. Earnest is alive today, living

10:17:05 15   cancer-free eight years removed from that day in 2011 when she

10:17:13 16   learned that she had Grade II invasive breast cancer.  Mrs. Earnest

10:17:23 17   is a breast cancer survivor.  There is no question about that.  And

10:17:28 18   she is a testament to the fact that her treatment worked.  And it

10:17:33 19   continues, ladies and gentlemen, to work today.

10:17:37 20        Now, let me also say this at the outset.  Of course

10:17:42 21   everybody wishes that Mrs. Earnest had had more of her hair grow

10:17:48 22   back, and it is unfortunate that that hasn't happened.  But as you

10:17:55 23   have heard many, many times since the first day of trial in this

10:18:01 24   courtroom, when it comes to chemotherapy, including the risk of

10:18:08 25   hair loss, there simply are no risk-free options.

10:18:15  1        Now, ladies and gentlemen, why have plaintiffs failed to

10:18:21  2   prove this case to you by the weight of the evidence?  Why does

10:18:25  3   this case fail?  First, doing nothing was not an option.

10:18:35  4   Mrs. Earnest told you that herself.  She said her number one goal

10:18:40  5   was to survive.  She told you the number one thing on her mind when

10:18:45  6   she met with Dr. Carinder on March 31st, 2011, was survival.

10:18:52  7   Because beating breast cancer was more important than any of the

10:18:58  8   risks.  Mrs. Earnest told you survival was the most important.

10:19:04  9        She told you Dr. Carinder recommended Taxotere.  And you

10:19:09 10   know that.  You heard that testimony.  She told you she trusted his

10:19:13 11   decision and that she believes today that Dr. Carinder did the

10:19:18 12   right thing.  And everyone who came in agreed, ladies and

10:19:28 13   gentlemen.  Mrs. Earnest needed chemotherapy to fight cancer if she

10:19:32 14   wanted to live and survive breast cancer.

10:19:35 15        Now, ladies and gentlemen, I want to be clear here.

10:19:42 16   You've heard a lot of different things about a lot of different

10:19:45 17   medications, and I know it's probably been confusing at times and

10:19:48 18   I'm sorry for that.  Lots of different letters and acronyms, right?

10:19:53 19   But what you know after being here two weeks with us is that there

10:19:57 20   simply is no magic chemotherapy drug.  All of these drugs have

10:20:02 21   risks and all of these come with the risk of persistent hair loss.

10:20:07 22        I have been waiting for two weeks sitting in this

10:20:09 23   courtroom and trying to find out exactly which drug is it that

10:20:14 24   Mrs. Earnest would have taken instead of Taxotere?  And the answer

10:20:18 25   is:  We still don't know.  And that is because Mrs. Earnest wants a

10:20:24  1   drug that's equally as effective as Taxotere but without the risk

10:20:31  2   of permanent hair loss.  And what you have learned during the

10:20:35  3   course of that trial is that that drug simply doesn't exist.

10:20:39  4   That's not a reality.  There were no equally effective risk-free

10:20:47  5   options when it came to hair loss.

10:20:51  6          And, ladies and gentlemen, if Mrs. Earnest had taken

10:20:54  7   Taxol and ended up with painful neuropathy, maybe you would have

10:21:00  8   been hearing about that for the past two weeks.

10:21:07  9          Mrs. Earnest wanted Dr. Carinder to tell her, "You are

10:21:14 10   going to lose your hair and it's not going to grow back if you take

10:21:18 11   this medication."  Well, ladies and gentlemen, Dr. Carinder doesn't

10:21:23 12   see into the future.  He doesn't have a crystal ball.  You heard

10:21:27 13   him answer those questions.  That's not how things work in the real

10:21:32 14   world with doctors and cancer and chemotherapy.  No person could

10:21:38 15   have told Mrs. Earnest if she would be alive after treatment in one

10:21:41 16   year, two years, eight years.  There's no crystal ball.  And no one

10:21:47 17   could have told Mrs. Earnest what side effects that she would have

10:21:51 18   or how severe they would be or how long they would last.

10:21:55 19          Why else does this case fail, ladies and gentlemen?  This

10:22:01 20   case fails because Dr. Carinder stands by his decision.  At the

10:22:05 21   time he prescribed Mrs. Earnest dose dense AC followed by Taxotere,

10:22:12 22   Dr. Carinder believed it was in Mrs. Earnest's best interest.  He

10:22:16 23   came here and he told you that from that witness stand, and he

10:22:19 24   looked you in the eye and he said, "I stand by my decision today."

10:22:22 25   And he said that to you, think about this, with something called

10:22:25 1   the benefit of hindsight, right?  So even after knowing this

10:22:28 2   lawsuit was filed, right, even after his deposition was taken, even

10:22:33 3   after he met, as you heard, with the plaintiff's attorneys so many

10:22:36 4   times, he still came in here and he said that was my recommendation

10:22:40 5   and I'd do it again.

10:22:44 6          Why else does this case fail?  It fails because the

10:22:49 7   warning was adequate.  And, ladies and gentlemen, you don't need a

10:22:56 8   two-week long trial with a bunch of doctors or experts or lawyers

10:23:01 9   or anyone coming in here to tell you what does the word "generally"

10:23:05 10  mean.  I mean, it has an agreed-upon meaning in our language.

10:23:11 11  There are many witnesses who used the word while they testified

10:23:16 12  during the course of trial, and all of the experts agreed that

10:23:19 13  "generally" means "usually" or "most of the time."  And you know

10:23:22 14  that.  You know that.

10:23:25 15         Hair grows back usually.  That's the warning Dr. Carinder

10:23:29 16  read in 1999.  That is completely consistent with his experience.

10:23:35 17  He'd only see hair loss like this once before Mrs. Earnest in all

10:23:39 18  of the time that he was practicing medicine.  It's easy to come

10:23:43 19  into court, ladies and gentlemen, and be critical.  But it is

10:23:47 20  another thing to come forward with evidence and prove that the

10:23:51 21  warning was inadequate.  Does hair, generally, after Taxotere grow

10:23:57 22  back?  Yes.  That's what the evidence in this case has proven and

10:24:01 23  that's just what the warning says.

10:24:06 24         Here is what Dr. Kessler says -- this is plaintiff's

10:24:09 25  expert.  This is the only expert that came into court to talk with

10:24:12  1    you about the warning and tell you whether it was adequate or not.

10:24:15  2    Look at his testimony.  This is the label Dr. Carinder read and Dr.

10:24:20  3    Kessler said it's adequate.

10:24:22  4             Dr. Plunkett, another one of plaintiff's experts.  She

10:24:25  5    came into court and she said the same thing.  With Taxotere, hair

10:24:28  6    generally grows back.  And that's exactly what the label said.

10:24:33  7             Dr. Carinder told you the same thing.  He said, "I read

10:24:36  8    the 1999 label for Taxotere and I agree it says, 'Hair generally

10:24:41  9    grows back.'"  And he said, "If that told me -- Sanofi told me,

10:24:45 10    that that meant hair grows back most of the time."  Usually.  Not

10:24:50 11    always.

10:24:54 12             Why else does this case fail, ladies and gentlemen?

10:24:59 13    Plaintiff's claim that if the label had changed and if there was

10:25:06 14    different information in the label that Dr. Carinder would have

10:25:09 15    told Mrs. Earnest something different.  But, ladies and gentlemen,

10:25:13 16    ask yourself, how could a different label have made any difference

10:25:17 17    when Dr. Carinder hadn't read the label since 1999?  How could it

10:25:24 18    have made a difference if he didn't read it?  It wouldn't have

10:25:28 19    affected him or impacted him in any way if he never read it, and

10:25:32 20    that's clear uncontroverted testimony in this case.

10:25:36 21             You heard that he didn't read the 2004 updated label.

10:25:39 22    You heard that he didn't read the 2010 label, which was in place at

10:25:44 23    the time he made this prescription.  He hadn't looked at it in over

10:25:48 24    12 years.  And to be really blunt, that label, which was in place

10:25:54 25    in 2010, could have said, "Dr. Carinder, don't prescribe Taxotere

10:26:01 1   to any woman in the State of Louisiana."  It could have said,

10:26:05 2   "Don't give it to Mrs. Earnest," but he wouldn't have known that

10:26:08 3   because he didn't read it.  A different label does not make a

10:26:15 4   difference in this case.

10:26:19 5         Now, why else does plaintiff's case fail?  One of the

10:26:26 6   things you have to do, ladies and gentlemen, is to look back and to

10:26:30 7   determine what Mrs. Earnest would have done if the label had

10:26:35 8   changed before 2011, if a label that Dr. Carinder never read said

10:26:42 9   something different about hair loss.  But, ladies and gentlemen, if

10:26:46 10  you want to know what Mrs. Earnest would have done, you have to

10:26:49 11  look at what she did do.

10:26:52 12        This is the courtroom versus the real world.  In this

10:26:56 13  courtroom you heard testimony that if she had knowledge of just a

10:26:59 14  little more information about hair loss, she would have walked away

10:27:03 15  from that consent form.  You remember I wrote in the word

10:27:08 16  "permanent" and she said, "Nope."  But look at all of the risks

10:27:11 17  that she did accept.

10:27:24 18        Are you okay?

10:27:24 19        THE COURT:  Please proceed.

10:27:31 20        MS. SASTRE:  If you want to know what Mrs. Earnest was

10:27:33 21  supposedly going to do, look at what she did.

10:27:36 22        Why else does the case fail, ladies and gentlemen?  You

10:27:39 23  know that Mrs. Earnest lost her hair before she took Taxotere, and

10:27:42 24  then right after her chemo and radiation, she went on Arimidex.

10:27:46 25  And here is the time line.  You've seen this.  We showed this to

10:27:50  1   you in our opening statement.  Hair loss, weeks and weeks and weeks

10:27:54  2   before the drug that they're coming in here telling you, "Oh, this

10:27:58  3   is the cause."  How could someone say that to you?

10:28:04  4        What else did you learn during trial?  We told you this,

10:28:07  5   ladies and gentlemen, on the very first day we met.  In our opening

10:28:11  6   statement we said to you, "There are reports of permanent hair loss

10:28:20  7   with all of these drugs."  Well, look at this.  This is Adriamycin

10:28:23  8   and Cytoxan, the drugs Mrs. Earnest was taking when she lost her

10:28:27  9   hair.  These are plaintiff's experts and Dr. Carinder on this

10:28:32 10   issue.  They're all associated with reports of permanent hair loss.

10:28:38 11        And then this is Dr. Feigal.  This is from the TAX316

10:28:42 12   study.  And remember, there's the two arms; the Taxotere arm and

10:28:45 13   what's called the FAC arm, right, the non-Taxotere arm.  And, of

10:28:48 14   course, you see persistent, permanent, whatever they want to call

10:28:53 15   it, hair loss in the arm for the patients that never took Taxotere,

10:28:57 16   right?  And my partner, Jon, he said, "Dr. Feigal, well, what drug

10:29:03 17   out of the fluorouracil, Adriamycin, or Cytoxan is causing this

10:29:09 18   permanent hair loss in TAX316?"

10:29:10 19        And she said, "Well, it's the Adriamycin and the

10:29:12 20   Cytoxan."  The same two drugs Mrs. Earnest was taking when she lost

10:29:16 21   her hair.

10:29:22 22        What did Dr. Tosti tell you?  She said, "There is no way

10:29:26 23   to know which drug caused Mrs. Earnest's hair loss."  That's what

10:29:34 24   Dr. Tosti said.  Again, plaintiff's expert.  So, ladies and

10:29:38 25   gentlemen, if Dr. Tosti doesn't know, how can they ask you to

10:29:41 1   conclude that it was Taxotere as the substantial cause without

10:29:47 2   making even the beginning of an effort to rule out the Adriamycin

10:29:50 3   or the Cytoxan or the Arimidex?  It hasn't been done.

10:29:59 4        So what has plaintiff's evidence been in this case,

10:30:02 5   ladies and gentlemen?  Did they prove the things they told you that

10:30:06 6   they would two weeks ago when we were here last Monday together?

10:30:13 7   This was one of plaintiff's slides from their opening statement.

10:30:16 8   And if you look at the first thing highlighted, Mr. Schanker showed

10:30:19 9   you this slide and he stood up in court and he said to you, "Unlike

10:30:23 10  other chemotherapy drugs, Taxotere has the risk of causing

10:30:26 11  permanent hair loss."  This simply is untrue.  And we brought you

10:30:35 12  that evidence from the first day of trial and every day afterwards.

10:30:38 13       Now, why does it matter?  And maybe you were asking

10:30:42 14  yourselves that, well, why does it matter?  This goes back to the

10:30:47 15  idea of there being some highly effective, magical chemotherapy

10:30:53 16  drug that doesn't have a risk of permanent hair loss.  And now you

10:30:57 17  know, after being here for two weeks with us, it doesn't exist.

10:31:02 18  It's not reality.

10:31:06 19       Plaintiff's expert -- here it is again.  And this is not

10:31:10 20  just Adriamycin and Cytoxan.  This is also Taxol.  You heard all

10:31:14 21  about Taxol as this alternative.  Is it effective?  For sure.  As

10:31:18 22  effective as Taxotere?  That's what witnesses said.  We didn't

10:31:22 23  dispute that.  But what else did Taxol do?  It causes hair loss.

10:31:26 24  This is out of the mouths of their experts.  Every one of them.

10:31:32 25  Taxol causes hair loss.

10:31:34  1          Don't forget the article that Dr. Tosti, who came here
10:31:37  2   from Miami, published that -- recently.  She published it this
10:31:41  3   year.  And she had patients that took Taxol and patients that took
10:31:44  4   Taxotere.  Do you remember which ones had more PCIA, permanent
10:31:50  5   chemotherapy-induced alopecia?  The Taxol group.
10:31:57  6          And I won't spend much time on this, but these experts
10:32:01  7   were paid a lot of money.  Some of them millions of dollars that
10:32:08  8   they've made testifying on behalf of plaintiffs in cases like this.
10:32:15  9   Don't forget that.
10:32:19 10          With the 5-FU, what did the experts say about that?  They
10:32:25 11   all told you, "Well, it's less effective."
10:32:28 12          And Mrs. Earnest said, "Well, I don't want that."  That
10:32:32 13   wasn't an option for her.
10:32:35 14          Dr. Feigal came in.  This was the plaintiff's oncologist
10:32:39 15   on causation.  And she put up this chart, ladies and gentlemen, and
10:32:43 16   it was incredibly misleading.  I don't know if you remember her
10:32:47 17   testimony on this.  So again, my partner, Jon asked her, he said,
10:32:52 18   "Dr. Feigal, you have this column here" where she had counted up
10:32:56 19   all of the reports of persistent or permanent hair loss in the
10:32:59 20   literature, and she labels this column "Taxotere."  And he says,
10:33:02 21   "But, Dr. Feigal, in virtually every single one of those patients
10:33:07 22   they also took Adriamycin and Cytoxan."  And do you remember what
10:33:10 23   her answer was?
10:33:11 24          She said, "Well, that's true, but the words wouldn't fit
10:33:15 25   in there.  That's why I didn't write them in."  Literally sat here

10:33:18  1   and told you the word wouldn't fit.  Turn the page sideways, get a

10:33:24  2   second page, write A plus C.  You know that's not true.

10:33:35  3          You also heard from Dr. Plunkett, ladies and gentlemen.

10:33:39  4   Every one of these she says "persistent hair loss."  How frequent?

10:33:43  5   She didn't know.  She had no idea.  So ask yourselves, how could

10:33:50  6   Mr. Schanker have come in here two weeks ago, looked you in the eye

10:33:54  7   and said to you, "Unlike other chemotherapy medications, Taxotere

10:33:59  8   causes persistent hair loss."

10:34:05  9          What else did you hear from plaintiff in their opening

10:34:07 10   statement?  This is from their slide deck.  You heard that

10:34:11 11   Mrs. Earnest actively questioned her doctors and actively

10:34:13 12   participated in choosing her treatment options.  That's what

10:34:19 13   Mr. Schanker stood up and told you last Monday.  Why have they been

10:34:25 14   working so hard for two weeks to convince you of that?  And I think

10:34:29 15   now you know.  Because they want to rewrite history.  They want you

10:34:35 16   to think that Mrs. Earnest was actively engaged in questioning

10:34:39 17   Dr. Carinder about his choice of treatment because they want you to

10:34:44 18   think that she would have done the very same thing if Dr. Carinder

10:34:48 19   had just given her one additional word about hair loss.  But you

10:34:55 20   know that's not true.

10:34:56 21          Look at what actually happened.  Dr. Carinder gave

10:35:00 22   Mrs. Earnest one option.  He walked in the door with that option,

10:35:02 23   and she said, "I'll take it."  She told you she didn't ask a single

10:35:08 24   question about a single risk.  She didn't ask for one single

10:35:12 25   option.  She didn't ask even, "How often do these things occur?

10:35:16  1   They sound terrible.  What are the chances of this happening?"  She

10:35:20  2   didn't ask any of that.  And we don't say that to be critical,

10:35:25  3   ladies and gentlemen, at all, but we do say it so you understand

10:35:29  4   why there's been this idea coming from plaintiff's that

10:35:35  5   Mrs. Earnest was an active participant in choosing this drug.  It's

10:35:38  6   simply not true.

10:35:42  7        Now, what else have you heard a lot about from

10:35:45  8   plaintiff's, ladies and gentlemen?  You've heard about the TAX316

10:35:48  9   study.  And I am reluctant to mention it again because you probably

10:35:54 10   heard a lot more than you care to.  And I recognize it's not the

10:35:58 11   most interesting topic in the world, so I am going to try and be

10:36:01 12   straightforward here and keep it short, but there are a couple of

10:36:04 13   things I need to talk with you about.

10:36:07 14        Now, you were told repeatedly about 29 patients who had

10:36:12 15   reports of persistent or ongoing hair loss in the Taxotere group,

10:36:16 16   and then you heard about 16 patients in what was called the FAC

10:36:20 17   group, right, the fluorouracil, Adriamycin and Cytoxan.  And you

10:36:25 18   were told by plaintiff's experts that those patients in both groups

10:36:30 19   had persistent and irreversible alopecia.  Dr. Madigan, their

10:36:36 20   biostatistician, relied on that information.  Dr. Kessler, their

10:36:40 21   warnings expert from -- the gentleman who used to be with the FDA,

10:36:43 22   same thing, he relied on it, and so did Dr. Feigal their

10:36:47 23   oncologist.  But, ladies and gentlemen, when it comes to TAX316,

10:36:52 24   not a single expert in plaintiff's case bothered to look under the

10:36:56 25   hood.  Right?  None of them bothered to pop the hood.

10:37:01  1          Now, what do I mean when I say that?  If you want to know

10:37:06  2   what was going on with those 29 patients and those 16 patients, you

10:37:11  3   have to look at the underlying information on each one of them to

10:37:16  4   see did they truly report ongoing alopecia or permanent hair loss.

10:37:23  5   The only person in this trial to do that was Dr. Kopreski, and he

10:37:28  6   did it at plaintiff's request.  Dr. Kopreski told you that he

10:37:32  7   looked at the underlying data patient by patient, record by record,

10:37:36  8   and what do you find when you do that?  It's not 29 patients with

10:37:39  9   ongoing alopecia in the Taxotere arm.  It's six.  And it's not 16

10:37:44 10   in the FAC arm.  It's four.  And remember, this is out of over 700

10:37:51 11   patients on each one of these sides.

10:37:54 12          Now, why is that so?  Because what happened, ladies and

10:37:59 13   gentlemen, is that, unfortunately, some of the patients in this

10:38:03 14   study passed away.  They also happened because some of the patients

10:38:08 15   left the study.  But in that case, these patients were still

10:38:12 16   counted as having ongoing or permanent alopecia at the conclusion

10:38:19 17   of the study.  But if you want to know what really happened with

10:38:23 18   TAX316, just like a book, you have to read the book to know how the

10:38:27 19   story ends.  And the only person in this case that did that was

10:38:30 20   Dr. Kopreski.

10:38:31 21          Now, Dr. Madigan, plaintiff's expert on statistics, the

10:38:36 22   biostatistician, even he had to admit with these numbers, 6 and 3,

10:38:39 23   it's just not statistically significant.  And what that means is

10:38:44 24   it's not meaningful.  You heard Dr. Plunkett talk about it, she

10:38:48 25   said it could just be due to chance.

10:38:50  1          And, ladies and gentlemen, if the numbers from TAX316 are

10:38:53  2   not meaningful to Dr. Madigan, how can they support the opinion of

10:38:57  3   the rest of the experts in this case who rely upon it?  The whole

10:39:02  4   case fails once you look at what's under the hood with TAX316.

10:39:10  5          Now, I'm sure someone from the plaintiff's side is going

10:39:14  6   to get up here and say, "Well, even if the numbers were six and

10:39:17  7   three, it was still greater with Taxotere.  Ladies and gentlemen,

10:39:20  8   this was a study involving over 1,400 women.  And when you're

10:39:25  9   talking about the numbers of six and three in that context, it's so

10:39:29 10   small that it's not meaningful.  It would be like if I put one

10:39:33 11   piece of paper here and two pieces on top of each other here.  When

10:39:40 12   you look, you couldn't see the difference.  It's not meaningful,

10:39:44 13   the difference.

10:39:46 14          What else did you hear about TAX316?  You were told that

10:39:50 15   even if the numbers are 29 and 16, that it's not statistically

10:39:54 16   significant.  Dr. Kessler told you that, Dr. Madigan.  That means

10:39:59 17   it's meaningless.  That's what that means.  Their own experts

10:40:03 18   admitted that.

10:40:05 19          Don't forget about the patients on the right-hand side of

10:40:07 20   the page.  They never took Taxotere.  And what happened?  They

10:40:11 21   reported persistent permanent hair loss.  Never took a drop of

10:40:17 22   Taxotere.

10:40:17 23          And let me say one other thing about TAX316.  TAX316 was

10:40:22 24   not a study that was engineered or developed to study hair loss.

10:40:26 25   It was looking at efficacy.  Is Taxotere effective?  And when they

10:40:31  1    looked, as you'll recall, Taxotere was found to be much more

10:40:35  2    effective than the other arm.

10:40:38  3           One other thing that Dr. Madigan told you because they

10:40:45  4    know that the information in TAX316 doesn't support their case.  He

10:40:48  5    said, "Well, you know, I looked at these reports between 1996 and

10:40:52  6    2011 when Mrs. Earnest had her treatment, and I counted up the

10:40:56  7    reports of hair loss -- permanent hair loss for folks -- for women

10:41:01  8    who used Taxotere."  And I hope you remember how many he found, 11.

10:41:07  9    Eleven reports between 1996 and 2011.  Remember the label?  Hair

10:41:15 10    generally grows back.  That's right.  That's true.  That's

10:41:20 11    adequate.

10:41:23 12           What other information is plaintiff focused on?  So on

10:41:28 13    the left-hand side you have a tear sheet that plaintiff has

10:41:32 14    repeatedly showed you from 2006.  And, ladies and gentlemen, it

10:41:36 15    simply has no connection to this case.  Dr. Carinder and

10:41:39 16    Mrs. Earnest never saw it.  What have they, on the other hand,

10:41:45 17    tried to diminish, and they just did in their closing statement,

10:41:48 18    they're trying to diminish the very information that Mrs. Earnest

10:41:51 19    was provided.  Information telling her there's rare reports of

10:41:56 20    permanent hair loss with this drug.

10:42:00 21           What else do plaintiff's focus on in this case?  On the

10:42:03 22    left-hand side they want to talk with you about consent forms that

10:42:07 23    were not seen or signed by the plaintiff in this case.  We brought

10:42:09 24    you the consent form that Mrs. Earnest signed.  And they also want

10:42:18 25    to focus you, ladies and gentlemen, on a warning from 2010, the

10:42:21  1    2010 label that Dr. Carinder never read.  The label he read tells

10:42:26  2    you everything you need to know about what he knew.  And that's

10:42:30  3    from 1999.

10:42:33  4          Now, let me say this briefly.  I told you in opening

10:42:36  5    statements that you would see short clips of testimony from folks

10:42:39  6    from Sanofi, and I told you that with some of these folks they just

10:42:44  7    literally had nothing to do with the label.  Plaintiff chose to

10:42:48  8    show you that testimony.  But please keep in mind what connection

10:42:53  9    do they have to Dr. Carinder and Mrs. Earnest?  Which we all know

10:42:58 10    what this case is about.  The question is what Dr. Carinder knew

10:43:03 11    about this potential outcome.  That's what this case is about.

10:43:08 12          Now, ladies and gentlemen, I would like to spend the

10:43:11 13    remainder of my time walking through the verdict form with you.  I

10:43:14 14    am going to move fairly quickly.  So please, please bear with me.

10:43:20 15          The first question, as you see, is:  "Do you find by a

10:43:24 16    preponderance of the evidence that Barbara Earnest has permanent

10:43:27 17    chemotherapy-induced alopecia caused by Taxotere?"  As I mentioned

10:43:32 18    to you, earlier, this is one of the instructions you'll get.  It's

10:43:36 19    the burden of proof, and it means that they have to prove every

10:43:41 20    element of their claims to you by the weight -- the greater weight

10:43:44 21    of the evidence, ladies and gentlemen.  If you're on the fence on

10:43:48 22    an issue, if you're undecided, got to come back with a verdict for

10:43:52 23    Sanofi.  They have the burden.

10:43:56 24          Now, Mr. Schanker went through this instruction with you

10:44:01 25    on causation, so I am just going to focus on the third paragraph.

10:44:04 1   Causation, in fact, is provided by establishing a plaintiff's

10:44:09 2   injury would not have occurred but for the defendant's actions.   In

10:44:13 3   order to prove cause-in-fact in this case, plaintiff must show to a

10:44:16 4   reasonable degree of medical probability that Taxotere can cause

10:44:19 5   permanent hair loss, that Taxotere caused permanent hair loss for

10:44:23 6   Mrs. Earnest, and that a failure to warn Dr. Carinder was the cause

10:44:26 7   of Mrs. Earnest's injury.

10:44:29 8         So in the context of the first question on the verdict

10:44:32 9   form, what does this mean?   It means that you have a list of

10:44:37 10  potential causes of hair loss in this case.   Adriamycin, Cytoxan,

10:44:43 11  Taxotere, put it on the list.   We didn't spend time fighting that

10:44:47 12  in this case.   Put Taxotere on the list.   Put Arimidex on the list.

10:44:53 13  Plaintiff has to prove to you that they've been able to rule out

10:44:59 14  everything on that list as being the substantial cause of

10:45:02 15  Mrs. Earnest's hair loss.

10:45:04 16        Said another way.   If you take that list, ladies and

10:45:07 17  gentlemen, and you cross Taxotere off of it, you would have to be

10:45:10 18  convinced that Mrs. Earnest would have her hair today.   That's what

10:45:13 19  this question asks you to decide.

10:45:18 20        You know that Mrs. Earnest lost her hair before.   I am

10:45:22 21  not going to go over that again.   What else do you know about

10:45:25 22  Adriamycin and Cytoxan?   Again, all of plaintiff's experts agree it

10:45:30 23  causes permanent hair loss.

10:45:33 24        Go back.   I'm sorry.   You heard from Dr. Tosti.   I just

10:45:40 25  want to remind you again.   I showed you it earlier.   She said, "No

10:45:44  1    one can tell you what drug has caused this."  So how can

10:45:49  2    Mr. Schanker tell you?  She said, "No one can tell you."  And

10:45:52  3    that's their expert, not mine.

10:45:53  4         What else do you know about the medications Mrs. Earnest

10:45:56  5    is taking?  She takes Arimidex.  You heard from the witnesses,

10:46:01  6    including Dr. Tosti and Dr. Carinder, it causes hair loss.  This is

10:46:05  7    from Dr. Tosti's article from this year.  Twenty five percent -- up

10:46:09  8    to 25 percent of the patients taking drugs like Arimidex experience

10:46:14  9    persistent hair loss, and it was significant.  Grade II.  That

10:46:18 10    means over 50 percent or more of your hair is gone.  You've heard

10:46:23 11    about Mrs. Earnest, eyebrows and eyelashes, Arimidex does that.

10:46:28 12    That's right in plaintiff expert's recent article.

10:46:31 13         And the number of patients who took Arimidex or drugs

10:46:35 14    like it in Dr. Tosti's paper who developed permanent or persistent

10:46:40 15    hair loss, it was 12 out of 92.  That's Arimidex.  That's not a

10:46:44 16    rare event.  It happens, and it has not been ruled out as the cause

10:46:49 17    in this case.

10:46:50 18         What did you hear from Mrs. Earnest on Arimidex?  I

10:46:54 19    showed her a medical -- showed her a record from a conversation she

10:46:58 20    had with a doctor named Dr. Bianchini.  And she said to

10:47:03 21    Dr. Bianchini, "I didn't get treatment for my hair loss because I

10:47:06 22    thought the Arimidex was causing it."  That is what Mrs. Earnest

10:47:12 23    told Dr. Bianchini.

10:47:28 24         Now, let me move on.  What else have you heard in this

10:47:33 25    case?  You've heard about stem cells and you've heard that the

10:47:35 1    theory from plaintiff's expert was that there is a mechanism where

10:47:40 2    chemotherapy attacks the stem cells, right?  And you heard that

10:47:44 3    they ran a test, their experts, not ours, to determine if

10:47:48 4    Mrs. Earnest had damaged stem cells.  The results showed positive

10:47:53 5    that her stem cells were present, didn't show they were damaged.

10:47:59 6         And what did the plaintiff's experts do?  They came into

10:48:02 7    court.  They knew about all of this.  It was their test, their

10:48:07 8    test.  They ran it, they designed it, they did it.  And they came

10:48:11 9    in here and they looked you in the eye and they testified about

10:48:15 10   their opinions and they never told you about this.  We had to ask

10:48:19 11   these questions on cross-exam, ladies and gentlemen.  It is

10:48:26 12   literally the definition of cherry picking.  Only talk about the

10:48:30 13   information that you like.  And if you don't like it, just push it

10:48:34 14   aside.  That's what they came in here and they did.

10:48:37 15        Now, ladies and gentlemen, no doctor has told

10:48:41 16   Mrs. Earnest that she has permanent hair loss.  She told you that.

10:48:44 17   Or told her that her hair loss was caused by Taxotere.  Why is that

10:48:48 18   important?  When you look at this question, the word "permanent" is

10:48:51 19   in it.  If you are not convinced by the weight of the evidence that

10:48:56 20   this is a permanent injury, if you think her hair would look

10:49:00 21   different if she stopped taking Taxotere, then you put down no to

10:49:04 22   Question 1 on the verdict form.

10:49:11 23        Remember Mrs. Earnest's statement to Dr. Bianchini what

10:49:18 24   she attributes her hair loss to when you're answering this

10:49:23 25   question.  For all of these reasons, ladies and gentlemen, the

10:49:24  1    answer to Question 1 on the verdict form as to whether Taxotere is

10:49:27  2    the cause of Mrs. Earnest's permanent chemotherapy-induced

10:49:32  3    alopecia, the answer is no.  And if that is your verdict, you check

10:49:35  4    off no.  You sign the verdict form.  You date it and let us know

10:49:39  5    you have a verdict and you get to go home.  Okay.

10:49:42  6          Now, there are other questions, and I am going to run

10:49:44  7    through them quickly with you.  I don't think you're going to get

10:49:47  8    to them, but I don't want you to wonder about what I would have

10:49:50  9    said, okay.  So let me quickly run through the rest of the verdict

10:49:53  10   form with you.

10:49:56  11         The second question, "Do you find by a preponderance of

10:49:59  12   the evidence that Sanofi inadequately warned Dr. Carinder of the

10:50:04  13   risk of permanent chemotherapy-induced alopecia associated with

10:50:07  14   Taxotere?"  So is the warning adequate, right?  Here is what the

10:50:15  15   law says, "An adequate warning is one that would lead an ordinary

10:50:23  16   reasonable user, such as a prescribing physician, to contemplate

10:50:26  17   the danger."  Did Dr. Carinder have enough information on the label

10:50:30  18   he read to contemplate the danger?

10:50:33  19         Let me move on a little more quickly.  So here is what

10:50:38  20   Dr. Carinder read in 1999.  Hair generally grows back.  He told you

10:50:42  21   exactly what that means.  He said it means "most of the time."

10:50:46  22   That was consistent with his experience.  Two patients in his whole

10:50:51  23   career.  And don't forget Taxotere was his go-to drug.

10:50:54  24         Is the warning adequate?  Of course.  Of course it is.

10:51:02  25         And the experts agree, Dr. Kessler agrees.  What does

10:51:05  1   "generally" mean?  It doesn't mean all the time.  Dr. Carinder told

10:51:08  2   you the same thing.  And as I said, you don't need a bunch of

10:51:11  3   lawyers and doctors telling you what that word means, for heaven's

10:51:17  4   sake.

10:51:17  5        What did Dr. Kessler say about the label that they are

10:51:20  6   trying to convince you is inadequate, the 1996 label?  Dr. Kessler

10:51:28  7   says, "No, it's adequate."  That's plaintiff's expert.

10:51:32  8        Now, we showed you this slide in our opening.  It's

10:51:35  9   really not that important now, ladies and gentlemen, and do you

10:51:38 10   know why?  Because Dr. Carinder never read it.  This is 2010.

10:51:42 11   Right?  I mean, what does it have to do with informing

10:51:46 12   Dr. Carinder?  And I bring it up because I do want you to

10:51:51 13   understand.  As we mentioned, it has over 13 different references

10:51:54 14   to alopecia and hair loss.  It never says, "temporary" or

10:51:58 15   "short-term."  But the question in this case is whether Sanofi

10:52:04 16   adequately warned Dr. Carinder, and we cannot be at fault for him

10:52:07 17   not reading a label since 1999.  This label has nothing to do with

10:52:13 18   this case.  The case of Barbara Earnest.

10:52:18 19        What did plaintiff's expert tell you "alopecia" means?

10:52:21 20   Hair loss.  That's what they told you.  Is that an adequate

10:52:27 21   warning?  Did it say anywhere that it was short-term or temporary?

10:52:31 22   It never did.

10:52:33 23        And let me touch on one other point quickly.  You will

10:52:36 24   see an instruction in this case that says to you, if

10:52:40 25   Dr. Carinder -- and it's in this question, if he knew of the risk

10:52:46 1  or should have known -- if he reasonably should have known of the

10:52:50 2  risk of this kind of hair loss, then Sanofi is not under an

10:52:53 3  obligation to give him a warning.  What did Dr. Carinder know?

10:52:57 4  Prior patient?  Hair loss?  Yes, same drugs.  The label he read in

10:53:01 5  '99, he told you what that meant.

10:53:04 6      I also showed him one of the papers in the case, the

10:53:06 7  Nabholtz study, sponsored by Sanofi.  He said, "I read it.  Yeah,

10:53:10 8  there were reports of persistent alopecia there."  So if you find

10:53:13 9  that Dr. Carinder had knowledge of this possible outcome and this

10:53:18 10 risk, that's another reason that your answer to Question 1 --

10:53:22 11 excuse me, Question 2 is no.

10:53:26 12      Let me talk with you -- and here is the slide on that,

10:53:30 13 ladies and gentlemen.  This is what Dr. Carinder knew.  This is

10:53:34 14 what he knew.

10:53:36 15      The third question on the verdict form.  This relates to

10:53:40 16 what's called warnings causation.  "Did plaintiff prove by the

10:53:44 17 weight of the evidence, the preponderance of the evidence, that the

10:53:46 18 defendant's failure to warn was the proximate cause of the

10:53:50 19 plaintiff's injuries?"  We already looked at the causation

10:53:54 20 instruction so, I am going to move on, ladies and gentlemen.

10:53:59 21      What you're being asked here is would a different warning

10:54:03 22 have made a difference?  How can a different warning make a

10:54:05 23 difference if Dr. Carinder never read it, as I mentioned earlier.

10:54:09 24 For that reason alone, your answer to Question 3 should be no.

10:54:17 25      Why else is your answer to Question 3 no?  Because

10:54:22   1   Dr. Carinder knew of the risk of persistent hair loss.  He was not

10:54:25   2   waiting for Sanofi to tell him something he didn't know.  If he had

10:54:30   3   even read an updated label, it wouldn't have informed him of

10:54:33   4   anything he didn't already know.  He told you he understood from

10:54:37   5   reading the '99 label that this could happen.  He knew from a prior

10:54:40   6   patient.  He saw that with his own eyes.

10:54:47   7          What else did Dr. Carinder tell you?  He said, "Well, I

10:54:50   8   still use Taxotere," right?  "I'd do it all over again."  He stands

10:54:55   9   by his treatment decision.  So would a different warning have made

10:54:59  10   a difference to him?  Of course not.  His goal was to pick the best

10:55:03  11   treatment, and that's exactly what he did, ladies and gentlemen.

10:55:08  12          Now, you've heard from Dr. Glaspy yesterday.  And he told

10:55:14  13   you Mrs. Earnest needed chemotherapy to treat her cancer before it

10:55:19  14   became incurable.  She needed a taxane to prevent a recurrence, and

10:55:24  15   Taxol has a higher risk of severe neuropathy.  So why is this

10:55:29  16   important, ladies and gentlemen?  Because everyone agrees that the

10:55:32  17   Taxotere regimen was the best choice for Mrs. Earnest.

10:55:35  18          You heard about a risk of allergic reaction with Taxol.

10:55:40  19   You heard about that from Dr. Carinder and Dr. Glaspy.  You heard

10:55:43  20   that with Taxol there's a greater risk of neuropathy and a risk of

10:55:47  21   developing worse neuropathy with Taxol.  And even if there had been

10:55:56  22   additional information in the label and even if Dr. Carinder had

10:55:59  23   read it, which is a lot of ifs, it would have made no difference

10:56:06  24   because Mrs. Earnest asked no questions, right?  And that's okay.

10:56:10  25   But in the context of this case, when she doesn't ask any questions

10:56:14  1    and doesn't ask for any other options and says, "I'm in your hands.

10:56:18  2    I'll do whatever you tell me to do," all roads lead back to her

10:56:22  3    taking Taxotere.  These are the risks she accepted, and you've seen

10:56:27  4    that.  She accepted the risk of cardiac toxicity from Adriamycin.

10:56:32  5    That was the one called the red devil.  You can die of congestive

10:56:36  6    heart failure years later with that.

10:56:38  7         And, ladies and gentlemen, don't forget that Dr. Carinder

10:56:41  8    told you, he said, "Well, you know what?  I always told my patients

10:56:46  9    about my prior patients."  And then counsel got up and asked him a

10:56:50 10    different question and he sort of said, "Well, if -- we had a

10:56:54 11    conversation about hair loss if they asked."  Well, Mrs. Earnest

10:56:57 12    said they did have a conversation about hair loss.

10:56:59 13    And I said, "So, Dr. Carinder, you agree, you told her about your

10:57:02 14    prior patients?"

10:57:02 15         And he said, "Yep."

10:57:04 16         And then I asked, Mrs. Earnest and she said, "You know

10:57:08 17    what?  Maybe he did.  I don't remember."  Right?

10:57:12 18         Don't forget what Mr. Earnest said.  And unfortunately,

10:57:16 19    you know, my colleague, Doug, had to get out his deposition to

10:57:19 20    remind him.  Mr. Earnest came into this court.  And you saw his

10:57:24 21    testimony from his deposition was that he heard Dr. Carinder tell

10:57:29 22    his wife that her hair may not come back.  That's what he testified

10:57:33 23    to under oath in his deposition.

10:57:40 24         And finally, ladies and gentlemen, you know that

10:57:42 25    Mrs. Earnest accepts the risk of taking Arimidex every day.  And

10:57:46  1  you know that it has a risk of hair loss, and you know that she

10:57:50  2  thinks that because she told her doctor, "I think the Arimidex is

10:57:55  3  causing my hair loss."  And why is that important?  Because she

10:57:58  4  accepts the risk of hair loss with Arimidex because she cares more

10:58:03  5  about her breast cancer returning -- she cares more about

10:58:06  6  preventing the return.  You know she would have done the same thing

10:58:09  7  when it came to Taxotere.

10:58:10  8        Now, I am going to move quickly through this.  This is

10:58:14  9  basically saying all roads lead back to Taxotere.  You start at the

10:58:17 10  beginning with Taxol, increased neuropathy, infusion problem,

10:58:22 11  permanent hair loss?  Yep.  So let's assume that Dr. Carinder and

10:58:26 12  Mrs. Earnest had this series of, you heard hypothetical questions

10:58:30 13  after hypothetical.  What would you have done if he said X?  What

10:58:34 14  would he have said?  It's back and forth, right?  We never got a

10:58:37 15  real answer to it.

10:58:38 16        The FEC regimen; more neuropathy, infusion reaction,

10:58:42 17  still permanent hair loss.  AC Taxol C, same thing.

10:58:45 18        Now, the FEC -- FAC and FEC are different.  Mrs. Earnest

10:58:50 19  flat out said, "I wouldn't have taken that."  Because they don't

10:58:53 20  have a taxane, they're less effective.  And she said that she

10:58:57 21  didn't want that.

10:58:58 22        So where is this magical drug?  It's missing.  It's

10:59:02 23  missing from this trial, ladies and gentlemen.  And the series of

10:59:06 24  options you've been presented with are false choices.  They all

10:59:10 25  carry a risk of persistent hair loss.

10:59:22  1          Mrs. Earnest never told us what drug she would have taken

10:59:27  2   instead of Taxotere.  Once she was informed of the risks of that

10:59:35  3   drug, which she said she wanted to know, and whether she was

10:59:39  4   informed whether that drug was equally effective and whatever that

10:59:42  5   drug is, remember, it would still have a risk of persistent hair

10:59:45  6   loss.

10:59:47  7          For all of these reasons, ladies and gentlemen, the

10:59:50  8   answer to Question 3 as to whether a different warning would have

10:59:54  9   made a difference is no.  It's no.

10:59:59 10          Now, I am going to briefly talk with you about the

11:00:01 11   statute of limitations.  "Do you find that Barbara Earnest had

11:00:05 12   actual or constructive knowledge of facts indicating that she was a

11:00:08 13   victim of a tort prior to December 12, 2015?"

11:00:13 14          Now, here is the instruction you'll get from Judge

11:00:17 15   Milazzo.  In this case, it is necessary for you to determine

11:00:19 16   whether the plaintiff had actual or constructive knowledge of the

11:00:22 17   facts indicating to a reasonable person, that's the standard.  It's

11:00:27 18   not enough to just come in and say, "I didn't know."  It's a

11:00:32 19   reasonable person standard.  What would a reasonable person do

11:00:35 20   under similar circumstances, okay.

11:00:38 21          This occurs when the plaintiff has actual or constructive

11:00:42 22   knowledge of causal relationship between the object or product and

11:00:47 23   the injury.  And then it says, "There is no requirement that the

11:00:51 24   patient be informed by an attorney or physician of a possible claim

11:00:54 25   before prescription runs."  And prescription is basically sort of a

11:00:58  1   legal word for time, before the time runs, right?

11:01:02  2        And here is the other important part:  "Rather,

11:01:06  3   prescription begins to run when there is enough notice to call for

11:01:10  4   an inquiry about a claim, not when an inquiry reveals the facts or

11:01:15  5   evidence that specifically outline the claim."  So I know that's a

11:01:18  6   mouthful, and I am sorry, but that is what the law is on this.

11:01:22  7        Let's talk about what it means in the context of this

11:01:25  8   case.

11:01:26  9        You are being asked -- in this question, you're being

11:01:33 10   asked about something called the statute of limitations, ladies and

11:01:37 11   gentlemen.  And what it does is it requires a person like

11:01:40 12   Mrs. Earnest to file her lawsuit within a certain period of time.

11:01:44 13   "Constructive knowledge" means that you've had enough information

11:01:48 14   to know that you had been wronged, or at least -- this is the

11:01:51 15   important part, at least to call for an inquiry, right, to inquire.

11:01:58 16        So what do we know about this case?  You know that

11:02:03 17   Mrs. Earnest's treatment with Taxotere concluded in August of 2011.

11:02:09 18   You heard about -- about six or seven months after that concluded,

11:02:13 19   you heard about a visit that Mrs. Earnest had with Dr. Carinder.

11:02:16 20   They both talked about it.  And they had a conversation at about

11:02:20 21   six or seven months.  And it was sort of like, "Hey, why isn't my

11:02:25 22   hair coming back," right?  And Dr. Carinder testified that he said,

11:02:28 23   "At that point I would have told her it was unusual."  Okay.  And

11:02:37 24   he also told her, importantly, it was unusual, but that it had been

11:02:44 25   caused by the chemotherapy.  And of course, he said that.  I mean,

11:02:49  1   he just gave her these drugs, the A plus the C, and she lost all of

11:02:54  2   her hair, right?  So Dr. Carinder tells her, "You've lost your hair

11:02:58  3   because of chemotherapy."  Mrs. Earnest thought it was because of

11:03:01  4   the chemotherapy.  That's what she's told you the whole trial.

11:03:04  5   Right?  And he says to her, "This is unusual at this point."

11:03:09  6         Now, here is what we know happens or I should probably

11:03:13  7   say doesn't happen between that time in April of 2012 and all the

11:03:21  8   way in December of 2015.  Mrs. Earnest never followed up with

11:03:25  9   Dr. Carinder about this again.  She lived more than -- over the

11:03:29  10  next three years, ladies and gentlemen, as you heard, without hair

11:03:33  11  regrowth.

11:03:34  12        I know sometimes when we talked about some of these

11:03:36  13  things during trial, it might not have made sense, and I hope it

11:03:41  14  does now that you understood why we asked some of these questions.

11:03:45  15  And doctors visit after doctors visit Mrs. Earnest never followed

11:03:52  16  up during that period to say, "Why is this happening to me?"  And

11:03:57  17  think about that for a second.

11:03:59  18        You have been told for weeks now that the fact that

11:04:04  19  Mrs. Earnest's hair didn't grow back came as some unbelievable

11:04:09  20  surprise, right?  So you have this treatment and you have this

11:04:15  21  reaction from it that is supposedly, supposedly -- we know this

11:04:20  22  isn't true, but supposedly completely contrary to everything that

11:04:24  23  your doctor has told you, right?  And for the next three-and-a-half

11:04:28  24  years you sit on your hands?

11:04:30  25        You don't go back to Dr. Carinder and say, "There's a

11:04:34  1    problem," right?  This is unexpected.  You don't go to some other

11:04:38  2    doctor, other oncologist Mrs. Earnest was seeing or any doctor of

11:04:43  3    her choosing to find out what is going on?

11:04:47  4           Now, did she have actual knowledge?  Sure she had been

11:04:50  5    told it was the chemotherapy.  Did she have constructive knowledge?

11:04:54  6    Did she have reason or basis to call for inquiry to look into this

11:05:00  7    before December of 2015?  Definitely.  Definitely.  And if you find

11:05:12  8    that, ladies and gentlemen, then her claims would be time barred.

11:05:17  9           Courts have deadlines, just like anything else.  And as

11:05:21  10   you know, all goes back to 2011, and the law requires that people

11:05:25  11   bring lawsuits on time.

11:05:27  12          Now, again, I don't think you're going to get this far in

11:05:29  13   the verdict form, but I wanted to explain the statute of

11:05:32  14   limitations with you, especially since we hadn't talked about it

11:05:35  15   much at trial.  The answer to this question is yes -- I'm sorry.

11:05:46  16   There is a change in the question this morning the way it was

11:05:50  17   written.  Answer to the question is no.

11:05:52  18          And I am going to read the question, and I apologize.

11:05:55  19   The question is:  "Do you find by a preponderance of the

11:05:59  20   evidence" -- let me go back.  Here it is.  "Do you find by a

11:06:05  21   preponderance of the evidence that Barbara Earnest lacked actual or

11:06:08  22   constructive knowledge of the facts indicating that she was a

11:06:13  23   victim of a tort prior to December 12, 2015?"  Okay.

11:06:24  24          Now, the next question you'll have is on damages.  Again,

11:06:36  25   I don't think you'll get this far, but I just heard Mr. Schanker

11:06:40  1    come up here and ask you for $12 million.  And I have to respond to

11:06:45  2    that.  I just simply have to.  How did Mr. Schanker come up with

11:06:53  3    that number?  Is it any different than me coming up here and

11:06:56  4    telling you, "Well, just give Mrs. Earnest $100,000?"  Is it any

11:07:03  5    different than that?  Did he just pull the number out of thin air?

11:07:10  6         The plaintiff has the burden in this case on all of the

11:07:14  7    causes of action, including damages.  Ladies and gentlemen, they

11:07:18  8    have to prove to you by the weight of the evidence every single

11:07:22  9    dollar that they ask you for.  So ask yourself, is there any

11:07:28 10    evidence in this case to support the number of $12 million that

11:07:33 11    Mr. Schanker just asked you for?  What would justify such a huge

11:07:39 12    number based upon the evidence you heard in this trial, ladies and

11:07:42 13    gentlemen?  How do you get to $1 million in a case like this,

11:07:45 14    ladies and gentlemen, let alone 12 million?  The number defies

11:07:50 15    common sense.

11:07:54 16         Mrs. Earnest was 60 years old when she was diagnosed with

11:07:58 17    Stage II invasive breast cancer.  Eight years later, today, she is

11:08:04 18    alive and cancer free thanks in part to Taxotere.  And maybe

11:08:09 19    Mr. Schanker wants to trivialize that or minimize it.  I don't

11:08:14 20    think you should.  I don't think Mrs. Earnest does.  It means

11:08:19 21    something.  She received a benefit like no other.  It's the gift of

11:08:28 22    life.  It's time with her husband.  They have a happy marriage.

11:08:32 23    You heard that.  She had two grandbabies born since she was

11:08:36 24    diagnosed, and you know she loves them.  We don't question that.

11:08:48 25         Ladies and gentlemen, should Mrs. Earnest be handed over

11:08:52  1    millions of dollars where the evidence has proven that a Taxotere

11:08:59  2    regimen gave her the best chance to survive and the best chance to

11:09:02  3    prevent her cancer from coming back and the best chance -- don't

11:09:05  4    leave this part out -- to minimize potentially serious

11:09:13  5    consequences?  Hair loss isn't the only risk.  It's just the only

11:09:15  6    one they want to talk about.

11:09:20  7         Given the evidence that you've heard in this case, ladies

11:09:23  8    and gentlemen, we don't believe any money damages are appropriate.

11:09:27  9    But if you get this far, we would ask you, please, just use your

11:09:32 10    commonsense.  Use your every day life experiences in deciding how

11:09:38 11    much money would be appropriate to compensate Mrs. Earnest, and

11:09:42 12    please consider the value of the benefit that you believe Taxotere

11:09:45 13    gave her.

11:09:50 14         Now, ladies and gentlemen, I am going to go and sit down

11:09:53 15    in a moment, and plaintiff's counsel is going to get another

11:09:59 16    opportunity to come up here and talk with you.  They get the

11:10:02 17    advantage of going first and going last.  It's because they have

11:10:05 18    the burden of proof.  So that's what the law says that they get.

11:10:09 19         I don't know what Mr. Schanker is going to say, but I am

11:10:12 20    pretty sure he is going to say some things that are very critical

11:10:16 21    of Sanofi.  I ask you, please, that as you listen to what he is

11:10:20 22    saying to you, ask yourself, what does this have to do with the

11:10:24 23    decision made by Dr. Carinder that he stood by today -- stands by

11:10:31 24    today in this courtroom?

11:10:37 25         Ladies and gentlemen, we very, very much appreciate the

11:10:40 1   time that you've devoted to us, to this trial, and your good

11:10:48 2   attention that you have paid throughout.  Based on the evidence you

11:10:50 3   have heard through this trial, there is only one correct verdict in

11:10:54 4   this case, and it's a verdict for Sanofi.

11:10:58 5          On behalf of my colleagues, Doug and Jon, thank you again

11:11:01 6   very, very much.

11:11:04 7          Thank you, your Honor.

11:11:04 8          THE COURT:  Thank you.  Mr. Schanker, rebuttal.

11:11:12 9          MR. SCHANKER:  Yes, your Honor.  Thank you.  May I, your

11:11:39 10  Honor?

11:11:39 11         THE COURT:  Please.

11:11:39 12         MR. SCHANKER:  Ladies and gentlemen, I just heard one

11:11:42 13  thing we agree with defense counsel, please answer yes on No. 4.

11:11:48 14         Now, in this case, here is the way I characterize what

11:11:59 15  we've seen from the defense.  Pointing fingers.  And as I listened

11:12:07 16  to the defense counsel's closing, here is the way I heard it.

11:12:11 17  First, our drug does not cause this, but if it does, then we warn

11:12:19 18  from the beginning with hair generally grows back in 1996, even

11:12:23 19  though we didn't know at that time that it caused it.  But if that

11:12:27 20  was not a good enough warning, then alopecia is a good enough

11:12:32 21  warning, even though our own company rules say that that word can't

11:12:36 22  mean "temporary" and "permanent."  But if that's not it, if that

11:12:41 23  doesn't warn, then Barbara wouldn't have made another choice if

11:12:46 24  given the choice that was taken away from her.  But if she wouldn't

11:12:50 25  have made another choice, then all of the other drugs cause this

11:12:54  1    anyway.  But if all of the other drugs don't cause it anyway, then

11:13:00  2    she should just be happy she's alive because of the benefit we gave

11:13:05  3    her.  And if she is not just happy she is alive, then she should

11:13:12  4    have sued us earlier because she should have known that we were at

11:13:16  5    fault, even though we hid the fact from our own individual

11:13:22  6    employees of this risk and side effect.

11:13:26  7         This is the defenses -- these are the defenses that

11:13:29  8    you've heard in this case.  They're throwing the kitchen sink at

11:13:33  9    this.  They can't decide what.  And they think you're gullible

11:13:36 10    enough to fall for it.

11:13:39 11         What's this case about?  Remember the legal guarantee.

11:13:47 12    The company robbed Barbara Earnest of her choice.  This company

11:13:51 13    knows.  And if the company knows, it must disclose.  She had

11:13:57 14    choices.  She had choices that she -- that were taken from her.

11:14:01 15         This isn't a case of Taxotere or death?  You heard

11:14:06 16    Dr. Carinder explain, who is respected by many that you've heard in

11:14:10 17    this courtroom, Dr. Carinder explained that Barbara Earnest had

11:14:13 18    five different choices.  Choices where she would have her hair and

11:14:17 19    her life here today.  That's the false choice.

11:14:22 20         Defense attorney indicated that Barbara should know the

11:14:26 21    cause of this because of some conversation with Dr. Bianchini in

11:14:30 22    which Barbara indicated she didn't know the cause for sure.  She

11:14:34 23    thought maybe it was Arimidex.  She wasn't sure because she is not

11:14:37 24    an expert.  How is she supposed to know what caused this?

11:14:42 25         Dr. Tosti, one of the experts in the world came and

11:14:45  1   clearly explained it to you.  But trying to put that burden on

11:14:50  2   Barbara Earnest when the company is who hid this information

11:14:52  3   through its own employees, muzzled its own employees, didn't let

11:14:57  4   them do what they're supposed to.  If the label had been changed,

11:15:03  5   then what happens?  The megaphone comes out and everybody knows.

11:15:09  6   Dr. Carinder would have known, and we wouldn't be here.

11:15:15  7        This idea that Barbara Earnest is not actively involved

11:15:18  8   in her care?  What was the key piece of evidence you heard on that?

11:15:23  9   She refused the double mastectomy.  When she is in this traumatic

11:15:28 10   time in her life with cancer, she's got the judgment and

11:15:32 11   discernment to seek a second opinion to figure this out and to get

11:15:35 12   a lumpectomy.  That's the kind of person that wants her choice and

11:15:41 13   would have used it.  But we don't know because the defense, Sanofi

11:15:46 14   in this case, the defendant, took that away from her by not warning

11:15:51 15   Dr. Carinder.

11:15:59 16        We heard about cherry picking from the defense.  This

11:16:03 17   idea of cherry picking.  Well, who is cherry picking in this case?

11:16:09 18   By trying to, out of one side of their mouth, say Dr. Carinder did

11:16:13 19   nothing wrong but somehow cherry pick the fact that he had this one

11:16:17 20   patient and that's enough, that somehow with this one patient it's

11:16:22 21   Dr. Carinder's responsibility that this -- it's his fault because

11:16:27 22   he didn't tell her about a woman who was older than Barbara, who

11:16:32 23   ended up with hair thinning.  And he wasn't even sure, because he's

11:16:37 24   not a dermatologist, what the cause of it was.

11:16:40 25        How could this all have been prevented?  If the company

11:16:43  1   had disclosed.  If the company had told what they know, we wouldn't

11:16:48  2   be here today.

11:16:53  3          This idea of proximate cause, which you're going to have

11:16:56  4   to look at, and ruling in and ruling out the other combination

11:17:04  5   therapy.  And let's just make sure we're clear, hopefully at this

11:17:07  6   point we know this is not about what caused the hair to fall out.

11:17:10  7   What's the case about?  It's about what prevented the hair from

11:17:15  8   coming back.  And we heard Dr. Tosti explain that in a crystal

11:17:19  9   clear manner and rule out the other causes and look at the

11:17:25 10   scientific evidence and decide that it's more likely true than not

11:17:28 11   that it's the Taxotere.  That it's the Taxotere that caused it.

11:17:34 12          You saw the time line I made.  That's commonsense.  A and

11:17:38 13   C, did you see any evidence that it causes it before Taxotere

11:17:42 14   enters?

11:17:43 15          When you look at proximate cause and substantial cause,

11:17:47 16   the substantial factor in this case, which is what the law says

11:17:51 17   you're to do with proximate cause, and the basket of fruit and all

11:17:56 18   of the strands of evidence that you heard about, the mountain of

11:18:00 19   evidence for Taxotere versus case reports, case reports, that's all

11:18:06 20   you have for the A and C.

11:18:13 21          This idea that Dr. Carinder didn't read the label.  In

11:18:18 22   the 21st century, ladies and gentlemen, doctors don't sit around

11:18:24 23   reading paper labels.  They get updates.  How do they get the

11:18:28 24   updates?  Through ASCO.  And the reason that we know that

11:18:33 25   Dr. Carinder didn't know is because the bullhorn was not used.  The

11:18:39   1   company didn't activate by changing the label.  If they had,
11:18:46   2   Dr. Carinder would have been warned.
11:18:49   3        Ladies and gentlemen, as I said, this is a very, very
11:18:53   4   simple case.  We wouldn't be here if the company had changed the
11:18:59   5   label and put in PCIA.  You can take time going through all of
11:19:05   6   those labels.  You won't find PCIA in there.  And that's what this
11:19:10   7   case is all about.  And because they did not warn Dr. Carinder,
11:19:17   8   because Dr. Carinder wasn't able to tell Barbara, the choice was
11:19:22   9   taken from her.  And because the choice was taken from her, she
11:19:27  10   must live with permanent baldness for the rest of her life.
11:19:33  11        Thank you for your attention, ladies and gentlemen.
11:19:35  12   Thank you.
11:19:42  13        THE COURT:  I think I am having trouble seeing members of
11:19:45  14   the jury.  Members of the jury, we're going to take a brief recess,
11:19:48  15   and when we return, I am going to instruct you on the law that you
11:19:51  16   should apply.
11:19:55  17        Do not discuss this case amongst yourselves at all until
11:20:00  18   you understand the law that you should apply in this case.
11:20:05  19        So we're going to be briefly at recess before I give the
11:20:09  20   jury charge.
11:20:09  21        THE DEPUTY CLERK:  All rise.
11:20:36  22      (WHEREUPON, THE JURY EXITED THE COURTROOM.)
11:20:36  23        THE COURT:  We have a packed courtroom, which is just
11:20:39  24   fine, but when I begin reading the charge, if you do not intend to
11:20:44  25   stay throughout the entire charge, I am going to ask you to leave

11:20:47  1   before I get started.  I don't want any interruptions during the

11:20:54  2   course of giving the charge to the jury.  Thank you.

11:20:58  3         (WHEREUPON, A RECESS WAS TAKEN.)

11:29:00  4         (OPEN COURT.)

11:29:00  5         MR. COFFIN:  Your Honor, a couple of issues before the

11:29:03  6   jury comes back in.  Erin mentioned something about an exhibit, do

11:29:07  7   you want to handle that later or now?

11:29:08  8         THE DEPUTY CLERK:  It's up to you.

11:29:09  9         MR. COFFIN:  Well, the jury is going to be going back, so

11:29:12 10   you need to know whether or not, so we probably should deal with

11:29:15 11   that now.

11:29:16 12         THE COURT:  Okay.

11:29:17 13         MR. COFFIN:  I don't know what the exhibit number is.

11:29:18 14         THE DEPUTY CLERK:  Defense Exhibit 2331, the Bianchini

11:29:22 15   note.

11:29:23 16         MR. COFFIN:  Correct.  Okay.  Thank you.  There was a

11:29:25 17   note that Dr. Bianchini, presumably Dr. Bianchini had written.  It

11:29:33 18   appears to be one single note that was most likely in a compilation

11:29:39 19   of his notes.  This particular note appears to be from a

11:29:43 20   conversation he had with Dr. Thompson about Ms. Earnest --

11:29:51 21         THE COURT:  I remember the note.

11:29:53 22         MR. COFFIN:  -- so it's double hearsay.  We object to the

11:29:55 23   admission of that.

11:29:55 24         THE COURT:  Was that moved in evidence?

11:29:58 25         MS. SASTRE:  I thought it was, your Honor.

11:30:01  1          MR. MOORE:  It was definitely published to the jury.

11:30:03  2          THE COURT:  I think you questioned her about it.

11:30:05  3          MS. SASTRE:  We put it up.

11:30:06  4          THE COURT:  You showed it to her I don't recall it

11:30:09  5  being --

11:30:10  6          MS. SASTRE:  It was published.  Our recollection is that

11:30:12  7  it was moved in, but of course we checked and we found out that

11:30:17  8  wasn't the case, so.

11:30:19  9          THE COURT:  We might need to look at the record.  My

11:30:23 10  recollection is that it was not.  I thought it was something to

11:30:26 11  confront her with, she showed it, she read it.  I thought it was

11:30:30 12  more impeachment.

11:30:33 13          MR. COFFIN:  I think it was impeachment for sure.

11:30:35 14          THE COURT:  It definitely was impeachment, but I don't

11:30:37 15  recall it being moved in.  And we might have to look through the

11:30:41 16  record.  Trust me, they're going to have time to get this straight.

11:30:45 17  Let me go ahead and charge the jury.  By the time Ms. Mouledous

11:30:50 18  gets all of this in order, it will take a few minutes, and we can

11:30:55 19  dig through the transcript.  I think we have people on both sides

11:30:58 20  that can probably pull up Ms. Earnest's testimony pretty quickly.

11:31:03 21          MR. COFFIN:  Just a couple of other notes for the record,

11:31:05 22  your Honor.

11:31:05 23          Following up on the plaintiff's motion for a mistrial.

11:31:10 24  In closing statement regarding Dr. Kopreski, we heard from defense

11:31:14 25  counsel this quote, "but if you want to know what really happened

11:31:17  1    with TAX316, just like a book, you have to read the book and know

11:31:22  2    how the study ends.  And the only person in this case that did that

11:31:28  3    was Dr. Kopreski."  That's the end of the quote.  Now, Dr. Kopreski

11:31:32  4    is not an expert and it's improper to say that he is the, quote,

11:31:35  5    only person when he is not qualified to provide expert testimony

11:31:39  6    and no one else can validate his numbers.

11:31:44  7         The second thing is, as your Honor is aware, the defense

11:31:46  8    requested that the Court add in the jury instructions an issue

11:31:52  9    about the value of the benefit of Taxotere, that's not the law in

11:31:55 10    the State of Louisiana.  And your Honor struck that.  Unfortunately

11:31:59 11    Ms. Sastre said in front of the jury that they should consider the

11:32:03 12    value of the benefit of Taxotere, which is not something that they

11:32:06 13    should consider.

11:32:07 14         The third thing is, there's a stem cell slide and the

11:32:13 15    inference was that there was a failed study of stem cells, and that

11:32:18 16    clearly isn't the case and that violates another one of your

11:32:22 17    MILs --

11:32:23 18         THE COURT:  Well, the MIL on that, to be clear for more

11:32:31 19    than the second or third time, was that I was allowing testimony as

11:32:38 20    to the stem cell review of Ms. Earnest's slide.  And there was

11:32:49 21    testimony as to the presence of stem cells, it was responded to by

11:32:54 22    Dr. Tosti.  I believe there was another expert that spoke to the

11:33:03 23    slide, but certainly Dr. Tosti spoke to it and it was appropriate.

11:33:07 24         This is argument.  The jury is going to be clearly

11:33:11 25    informed that that is not evidence, it is argument.

11:33:18  1          MR. COFFIN:  I understand.  I just want to make the notes

11:33:19  2   for the record.

11:33:20  3          THE COURT:  Sure.

11:33:21  4          MR. COFFIN:  One last thing with regard to Mr. Kopreski.

11:33:23  5   Ms. Sastre represented to the jury that, quote, he did it at

11:33:25  6   plaintiff's request, unquote.  That was in reference to his

11:33:30  7   reanalysis, which clearly did not happen.

11:33:32  8          THE COURT:  That's why you get rebuttal.

11:33:34  9          MR. COFFIN:  Thank you.

11:33:35 10          THE COURT:  Thank you.

11:34:46 11      (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

11:34:46 12          THE COURT:  All jurors are present.  Court's back in

11:34:46 13   session.  You may be seated.

11:34:56 14          Members of the jury, it is my duty and responsibility to

11:34:59 15   instruct you on the law you are to apply in this case.  The law

11:35:03 16   contained in these instructions is the only law you may follow.  It

11:35:08 17   is your duty to follow what I instruct you the law is, regardless

11:35:12 18   of any opinion that you might have as to what the law ought to be.

11:35:16 19          If I have given you the impression during the trial that

11:35:20 20   I favored either party, you must disregard that impression.  If I

11:35:24 21   have given you the impression during the trial that I have an

11:35:27 22   opinion about the facts of this case, you must disregard that

11:35:31 23   impression.  You are the sole judges of the facts of this case.

11:35:38 24   Other than my instructions to you on the law, you should disregard

11:35:41 25   anything I may have said or done during the trial in arriving at

11:35:45  1    your verdict.

11:35:45  2            You should consider all of the instructions about the law

11:35:50  3    as a whole and regard each instruction in light of the others,

11:35:54  4    without isolating a particular statement or paragraph.

11:35:59  5            The testimony of the witnesses and other exhibits

11:36:02  6    introduced by the parties constitute the evidence.  The statements

11:36:07  7    of counsel are not evidence; they are only arguments.  It is

11:36:13  8    important for you to distinguish between the arguments of counsel

11:36:17  9    and the evidence on which these arguments rest.  What the lawyers

11:36:22 10    say or do is not evidence.  You may, however, consider their

11:36:28 11    arguments in light of the evidence that has been admitted and

11:36:32 12    determine whether the evidence admitted in this trial supports the

11:36:36 13    arguments.  You must determine the facts from all of the testimony

11:36:41 14    you have heard and other evidence submitted.  You are the judges of

11:36:46 15    the facts, but in finding those facts, you must apply the law as I

11:36:51 16    instruct you.

11:36:51 17            You are required by law to decide the case in a fair,

11:36:57 18    impartial, and unbiased manner, based entirely on the law and on

11:37:02 19    the evidence presented to you in the courtroom.  You may not be

11:37:06 20    influenced by passion, prejudice, or sympathy you might have for

11:37:12 21    the plaintiff or the defendant in arriving at your verdict.

11:37:16 22            Plaintiff Barbara Earnest has the burden of proving her

11:37:19 23    case by a preponderance of the evidence.  To establish by a

11:37:24 24    preponderance of the evidence means to prove something is more

11:37:27 25    likely so than not so.  If you find that the plaintiff has failed

11:37:32 1  to prove any element of her claim by the preponderance of the

11:37:36 2  evidence, then she may not recover on that claim.

11:37:39 3       The evidence you are to consider consists of the

11:37:44 4  testimony of the witnesses, the documents, and other exhibits

11:37:48 5  admitted into evidence, and any fair inferences and reasonable

11:37:53 6  conclusions you may draw from the facts and circumstances that have

11:37:58 7  been proven.

11:37:58 8       Generally speaking, there are two types of evidence.  One

11:38:03 9  is direct evidence, such as the testimony of an eye witness.  The

11:38:08 10 other is indirect or circumstantial evidence.  Circumstantial

11:38:13 11 evidence is evidence that proves a fact from which you can

11:38:18 12 logically conclude another fact exists.  As a general rule, the law

11:38:24 13 makes no distinction between direct and circumstantial evidence,

11:38:29 14 but simply requires that you find the facts from a preponderance of

11:38:34 15 all of the evidence, both direct and circumstantial.

11:38:37 16      You alone are to determine the questions of credibility

11:38:44 17 or truthfulness of the witnesses.  In weighing the testimony of the

11:38:48 18 witnesses, you may consider the witness's manner and demeanor on

11:38:52 19 the witness stand, any feelings or interest in the case, or any

11:38:57 20 prejudice or bias about the case, that he or she may have, and the

11:39:02 21 consistency or inconsistency of his or her testimony considered in

11:39:08 22 light of the circumstances.  Has the witness been contradicted by

11:39:13 23 other reliable evidence?  Has he or she made statements at other

11:39:18 24 times and places contrary to those made here on the witness stand?

11:39:23 25 You must give the testimony of each witness the credibility that

11:39:27  1   you think it deserves.

11:39:29  2           Even though a witness may be a party to the action and

11:39:34  3   therefore interested in the outcome, the testimony may be accepted

11:39:38  4   if it is not contradicted by direct evidence or by any inference

11:39:42  5   that may be drawn from the evidence, if you believe the testimony.

11:39:46  6           You are not to decide the case by counting the number of

11:39:51  7   witnesses who testify on the opposing sides.  Witness testimony is

11:39:56  8   weighed; witnesses are not counted.  The test is not the relative

11:40:01  9   number of witnesses, but the relative convincing force of the

11:40:05 10   evidence.  The testimony of a single witness is sufficient to prove

11:40:10 11   any fact, even if a greater number of witnesses testified to the

11:40:16 12   contrary, if after considering all of the other evidence, you

11:40:19 13   believe the witness.

11:40:21 14           When knowledge of technical subject matter may be helpful

11:40:26 15   to the jury, a person who has special training or experience in

11:40:30 16   that technical field is permitted to state his or her opinion on

11:40:34 17   those technical matters.  However, you are not required to accept

11:40:39 18   that opinion.  As with any other witness, it is up to you to decide

11:40:44 19   whether to rely on it.

11:40:45 20           The fact that a person brought a lawsuit and is in court

11:40:51 21   seeking damages creates no inference that the person is entitled to

11:40:55 22   a judgment.  Anyone may make a claim and file a lawsuit.  The act

11:41:01 23   of making a claim in a lawsuit, by itself, does not in any way tend

11:41:06 24   to establish that claim and is not evidence.

11:41:11 25           A "stipulation" is an agreement.  When there is no

11:41:16  1    dispute about certain facts, the attorneys may agree or "stipulate"

11:41:20  2    to those facts.  You must accept a stipulated fact as evidence and

11:41:26  3    treat that fact as having been proven here in court.

11:41:30  4         Plaintiff Barbara Earnest and defendant Sanofi have

11:41:33  5    stipulated to the following facts:

11:41:36  6         1.  For the purposes of this trial, Taxotere and

11:41:40  7    docetaxel mean the same thing;

11:41:42  8         2.  Defendant is the "manufacturer" of the

11:41:50  9    Taxotere/docetaxel administered to Ms. Earnest within the meaning

11:41:52 10    of the Louisiana Products Liability Act, or LPLA;

11:41:57 11         3.  The use of Taxotere to treat Barbara Earnest's breast

11:42:04 12    cancer in 2011 was a reasonably anticipated use of the product

11:42:09 13    within the meaning of the LPLA;

11:42:12 14         4.  Mrs. Earnest filed this action against Sanofi on

11:42:17 15    December 12, 2016.

11:42:19 16         Certain testimony has been presented to you through

11:42:24 17    depositions.  A deposition is the sworn, recorded answers to

11:42:29 18    questions a witness was asked in advance of trial.  Under some

11:42:34 19    circumstances, if a witness cannot be present to testify from the

11:42:38 20    witness stand, that witness's testimony may be presented, under

11:42:42 21    oath, in the form of a deposition.  Some time before this trial,

11:42:47 22    attorneys representing the parties in this case questioned these

11:42:51 23    witnesses under oath.  A court reporter was present and recorded

11:42:56 24    the testimony.  The questions and answers have been shown to you.

11:43:01 25    This deposition testimony is entitled to the same consideration and

11:43:06  1    is to be judged by you as to the credibility as if the witnesses

11:43:10  2    had been present and had testified from the witness stand in court.

11:43:14  3         Certain charts, summaries, and demonstrative aids have

11:43:21  4    been shown to you solely to help explain and summarize the facts

11:43:26  5    disclosed by the evidence.  These charts, summaries, and

11:43:30  6    demonstrative aids are not evidence or proof of any facts.  You

11:43:34  7    should determine the facts from the evidence.

11:43:37  8         Do not let bias, prejudice, or sympathy play any part in

11:43:44  9    your deliberations.  A corporation and all other persons are

11:43:49 10    equally before the law and must be treated as equals in the court

11:43:53 11    of justice.

11:43:54 12         Let me now discuss the law specifically applicable to

11:44:02 13    this case.

11:44:03 14         As you know, this action arises out of Barbara Earnest's

11:44:10 15    use of Taxotere.  Sanofi is the manufacturer of Taxotere.

11:44:15 16    Ms. Earnest contends that Taxotere prevented her hair from growing

11:44:20 17    back, and that she now has permanent hair loss on her head,

11:44:24 18    eyebrows, eyelashes, and other areas that was caused by Taxotere.

11:44:28 19    Ms. Earnest also asserts that Sanofi, the manufacturer of Taxotere,

11:44:32 20    did not warn her doctor, Dr. Carinder, about the risk of permanent

11:44:35 21    hair loss associated with Taxotere.  Ms. Earnest seeks damages for

11:44:42 22    her injures from Sanofi.

11:44:44 23         Sanofi denies these allegations and contends that it

11:44:47 24    provided adequate warning to Ms. Earnest's doctor.  Sanofi contends

11:44:54 25    that Taxotere did not cause Ms. Earnest's alleged injury.  Sanofi

11:44:57  1   contends that the approved prescribing information contained

11:45:01  2   accurate, science-based information that enabled Mrs. Earnest's

11:45:06  3   doctors to make an informed decision about the benefits and risks

11:45:11  4   of Taxotere.

11:45:12  5        The law applicable to this case is the law of Louisiana.

11:45:15  6   In Louisiana, a products liability action, such as this one, is

11:45:21  7   governed by the Louisiana Products Liability Act or "LPLA."  The

11:45:25  8   LPLA provides that the manufacturer of a product shall be liable to

11:45:29  9   a plaintiff for damage proximately caused by one or more

11:45:34 10   characteristics of the product that render it unreasonably

11:45:38 11   dangerous when such damage arose from a reasonably anticipated use

11:45:42 12   of the product by the plaintiff.  One of the ways in which a drug

11:45:48 13   can be unreasonably dangerous is by failing to include adequate

11:45:54 14   warnings.  In order recover, the plaintiff in this case must show

11:45:57 15   that her damages were proximately caused by the defendants' failure

11:46:00 16   to provide adequate warnings about one or more characteristics of

11:46:05 17   the product that render it unreasonably dangerous, and that her

11:46:08 18   damages arose from a reasonably anticipated use of the product.

11:46:12 19        A "reasonably anticipated use" of a product means a use

11:46:17 20   or handling of a product that the manufacturer should reasonably

11:46:21 21   expect, in this case by a prescribing or treating physician.  The

11:46:26 22   parties have stipulated that Ms. Earnest's use of Taxotere was a

11:46:32 23   reasonably anticipated use of the product.

11:46:34 24        In order to decide plaintiff's failure to warn claim, you

11:46:38 25   must determine whether the plaintiff has proven by a preponderance

11:46:43  1    of the evidence that defendants failed to adequately warn

11:46:47  2    Mrs. Earnest's prescribing physician, Dr. Carinder, and if so,

11:46:50  3    whether defendants' failure to warn was a proximate cause of

11:46:56  4    Ms. Earnest's injuries.

11:46:58  5         Plaintiff claim that Taxotere is unreasonably dangerous

11:47:03  6    because of inadequate warning about its potential risk of permanent

11:47:07  7    alopecia.

11:47:08  8         In order to be successful, plaintiff must prove by a

11:47:11  9    preponderance of the evidence that:

11:47:14 10         1.  Sanofi (SIC) had a potentially damage-causing

11:47:16 11    characteristic;

11:47:19 12         2.  Sanofi failed to use reason care to provide an

11:47:22 13    adequate warning to the plaintiff's prescribing physician about

11:47:27 14    this characteristic and its danger to users of the product;

11:47:32 15         3.  Ms. Earnest's injuries were proximately caused by an

11:47:37 16    inadequate warning;

11:47:38 17         4.  The injury Ms. Earnest suffered from a reasonably

11:47:44 18    anticipated use of the product.

11:47:45 19         An "adequate warning" under the LPLA is defined as a

11:47:50 20    "warning that would lead an ordinary -- an ordinary reasonable user

11:47:55 21    or handler of the product such as a prescribing physician to

11:47:59 22    contemplate the danger in using or handling the product and either

11:48:04 23    to decline to use or handle the product, or, if possible, to use or

11:48:09 24    handle the product in such a manner as to avoid damage for which

11:48:13 25    the claim is made."

1    There are certain circumstances, however, under which a

2  manufacturer does not have to provide an adequate warning as

3  described above.  A manufacturer does not have to provide such a

4  warning when a prescribing physician already knows or reasonably

5  should be expected to know of the dangerous characteristics of the

6  product that may cause injury.

7    A manufacturer of a product shall not be liable for

8  damage proximately caused by a characteristic of the product if, at

9  the time the product left the manufacturer's control, it did not

10  know and, in light of then-existing reasonably available scientific

11  and technological knowledge, could not have known of the

12  characteristic that caused the damage or the danger of such

13  characteristic.

14    The FDA is a regulatory body of the United States, and

15  Sanofi is a pharmaceutical company.  Pharmaceutical companies are

16  heavily regulated by the FDA.  The FDA, however, does not bear the

17  primary responsibility for creating or updating a drug's label.  It

18  is the drug manufacturer who bears the responsibility for the

19  contents of its label.  In creating or updating a label, the

20  pharmaceutical companies must comply with the regulations of the

21  FDA.  However, FDA approval, although relevant, does not in and of

22  itself absolve the defendants of all liability nor does it

23  establish that warnings provided with the drugs were adequate under

24  the standards of Louisiana law.

25    Louisiana applies the "learned intermediary" doctrine to

11:50:02  1    warning cases involving prescription drugs.  A drug manufacturer

11:50:06  2    has a duty to provide an adequate warning only to a "learned

11:50:11  3    intermediary," such as a prescribing physician.  It does not have a

11:50:16  4    duty to provide any warnings directly to the patient.  This is

11:50:20  5    because physicians are generally in a superior position to evaluate

11:50:25  6    the warning and to impart such warning to the patient, and can

11:50:32  7    provide an independent medical decision as to whether use of the

11:50:36  8    drug is appropriate for a particular patient.  Although a drug

11:50:41  9    manufacturer's duty to warning about the potential risks of its

11:50:45 10    product is directed to the physician, the manufacturer is directly

11:50:50 11    liable to the patient for breach of this duty.

11:50:53 12            The warning must both lead the physician to contemplate

11:50:59 13    the risks in using the product and to (1) advise the patient or (2)

11:51:05 14    decline to use it.

11:51:06 15            In determining the scope of a manufacturer's duty to warn

11:51:11 16    of risks and dangers of its products, the manufacturer is held to

11:51:14 17    the knowledge and skill of an expert in the field.  The

11:51:18 18    manufacturer must keep up with scientific knowledge, discoveries,

11:51:22 19    and advances and is presumed to know what could be learned by doing

11:51:26 20    so.  This duty is continuing.  If the manufacturer learns of a

11:51:32 21    characteristic or danger that may cause injury after its product is

11:51:37 22    on the market, the manufacturer has a continuing duty to use

11:51:42 23    reasonable care to provide adequate warning to prescribing and

11:51:46 24    treating physicians concerning such later discovered matters.  That

11:51:51 25    is to say, under the law applicable to this case, drug

11:51:56 1   manufacturers are responsible to draft the initial label for their

11:52:00 2   product, and they have a continuing duty to ensure that the label

11:52:04 3   remains adequate at all times.

11:52:06 4        It is a physician's duty to remain abreast of the

11:52:12 5   medication's characteristics and to take into account the

11:52:15 6   information contained in the prescription medication's label.  The

11:52:19 7   manufacturer may reasonably assume that the prescriber or treater

11:52:22 8   will apply the same knowledge or professional expertise, and good

11:52:29 9   judgment that a reasonable physician would apply in using the

11:52:32 10  product.  Providing an adequate warning to the prescribing or

11:52:37 11  treating doctor relieves the manufacturer of its duty to warn the

11:52:42 12  patient regardless of how or if the prescribe or treater warns the

11:52:47 13  patient.

11:52:47 14       In order for plaintiff to prevail on her claims, she must

11:52:52 15  establish that the inadequate warning was the "proximate cause" of

11:52:56 16  Ms. Earnest's alleged injuries.

11:53:00 17       Proximate cause means the efficient or direct cause.  The

11:53:05 18  law defines proximate cause as something that produces a natural

11:53:08 19  chain of events which, in the end, brings about the injury.  In

11:53:13 20  other words, proximate cause is the cause without which the injury

11:53:17 21  would not have occurred.  Proximate cause requires proof of both

11:53:22 22  cause cause-in-fact and legal cause.

11:53:26 23       Cause-in-fact is proved by establishing that a

11:53:30 24  plaintiff's injury would not have occurred "but for" the

11:53:34 25  defendant's actions.  In order to prove cause-in-fact in this case,

11:53:40  1   the plaintiff must show to a reasonable degree of medical

11:53:43  2   probability that Taxotere can cause permanent hair loss, that

11:53:47  3   Taxotere caused permanent hair loss for Ms. Earnest, and that the

11:53:52  4   failure to warn Dr. Carinder was the cause of Ms. Earnest's injury.

11:53:58  5         Legal cause is proved by establishing foreseeability.

11:54:02  6   The test of foreseeability is whether some injury to another is a

11:54:06  7   natural and probable consequence of the complained-of conduct.  The

11:54:11  8   law requires only reasonable foresight.  It is not necessary for

11:54:16  9   the plaintiff to demonstrate that the defendant should have

11:54:21 10   foreseen the particular event which occurred, but merely that the

11:54:26 11   defendant should have foreseen that its actions would probably

11:54:30 12   cause injury to someone.  The plaintiff proves legal cause by

11:54:35 13   establishing that the injury in question occurred as a natural and

11:54:41 14   probable consequence of the defendant's actions or inactions.

11:54:47 15         Proximate cause does not mean the sole cause.  The

11:54:51 16   defendants' conduct can be a proximate cause if it was at least one

11:54:56 17   of the direct, concurring causes of the alleged injury.  However,

11:55:02 18   plaintiff must show that defendants' conduct was a substantial

11:55:06 19   contributing factor in bringing about the result.  In other words,

11:55:11 20   it is not necessary for plaintiff to negate all other contributing

11:55:16 21   factors or causes of Ms. Earnest's injuries, provided they show

11:55:21 22   that defendants' failure to provide an adequate warning in the

11:55:25 23   Taxotere label substantially contributed to her injuries.  Where

11:55:30 24   two or more possible causes for an injury are identified, plaintiff

11:55:36 25   must establish with reasonable probability that Mrs. Earnest's

11:55:41 1  injury resulted from a cause for which defendants would be liable.

11:55:45 2  Moreover, plaintiff must proffer a competent medical expert to

11:55:51 3  testify to a reasonable degree of medical probability that Taxotere

11:55:54 4  was a proximate cause of Ms. Earnest's injuries.

11:55:58 5      To recover for the failure to warn claim, plaintiff must

11:56:03 6  prove by a preponderance of the evidence that an inadequate warning

11:56:08 7  itself - in addition to the medication - was the proximate cause of

11:56:13 8  Ms. Earnest's injury.  In other words, plaintiff must prove by a

11:56:19 9  preponderance of the evidence that, if an adequate warning had

11:56:22 10 accompanied Taxotere, then Dr. Carinder would have altered his

11:56:27 11 prescribing or treating decision or behavior and Ms. Earnest would

11:56:32 12 not have suffered her injury.

11:56:33 13     If you decide that the plaintiff has established the

11:56:43 14 other elements of her case by a preponderance of the evidence, you

11:56:47 15 must decide the question of whether there has been damage to

11:56:51 16 plaintiff and if so, the amount of that damage.  Louisiana law

11:56:55 17 suggests simple reparation is just and adequate compensation for

11:57:02 18 injuries.  Your award should be designed to fully and fairly

11:57:07 19 compensate the plaintiff for her injury, if you find one has

11:57:10 20 occurred, and should not go beyond such reparation.

11:57:14 21     The law recognizes the difficulty of translating personal

11:57:18 22 injuries into dollars and cents figures, but that is what must be

11:57:23 23 done if you decide plaintiff has proven her claims by a

11:57:27 24 preponderance of the evidence.  You must arrive at a figure that

11:57:31 25 will fairly and adequately compensate the plaintiff for damages she

11:57:35   1   has suffered.  In estimating such damages, you may take into

11:57:39   2   account the following elements:  Physical injury, pain and

11:57:44   3   suffering, loss of enjoyment of life, and physical (VERBATIM)

11:57:48   4   disability, if any.

11:57:49   5          Like other parts of the plaintiff's case, these damages

11:57:54   6   must be established by a preponderance of the evidence.  This

11:57:58   7   means, on the one hand, you are not entitled to award speculative

11:58:02   8   damages for injuries which you think the plaintiff might have

11:58:05   9   experienced or might experience in the future.  On the other hand,

11:58:12  10   it means that you may also make an effort to reasonably proximate

11:58:17  11   the damages which the plaintiff has proved are more probable than

11:58:22  12   not, even though they cannot be computed with mathematical

11:58:26  13   certainty.

11:58:26  14          You may award compensatory damages only for the injuries

11:58:31  15   that plaintiff prove were caused by defendants' wrongful conduct.

11:58:35  16   The damages you award must be fair compensation for plaintiff's

11:58:38  17   damages, no more and no less.  Compensatory damages are not allowed

11:58:43  18   as punishment and cannot be imposed or increased to penalize the

11:58:48  19   defendants.

11:58:48  20          If you decide to award compensatory damages, you should

11:58:54  21   be guided by dispassionate common sense.  That is to say, you

11:58:58  22   should not be affected by sympathy, compassion, prejudice, or bias.

11:59:03  23   Computing damages may be difficult, but you must not let that

11:59:07  24   difficulty lead you to engage in arbitrary guesswork.  On the other

11:59:12  25   hand, the law does not require plaintiffs to prove the amount of

11:59:16  1   their losses with mathematical precision, but only with as much

11:59:23  2   definiteness and accuracy as the circumstances permit.

11:59:25  3        You must use sound discretion in fixing and awarding of

11:59:31  4   damages, drawing reasonable inferences where you find them

11:59:34  5   appropriate from the facts and circumstances in evidence.

11:59:37  6        In reaching a verdict on the question of damages, I

11:59:42  7   caution you not to include anything for the payment of expenses and

11:59:46  8   attorneys fees; the law does not consider these as damages

11:59:50  9   experienced by the plaintiff.  If you decide to make an award,

11:59:53  10  follow the instructions I have given you, and do not add or

11:59:57  11  subtract from that award on account of federal or state income

12:00:02  12  taxes.

12:00:03  13       Finally, let me say that the fact that I have given you

12:00:06  14  these statements about the law of damages does not in any way imply

12:00:10  15  or suggest that I feel or do not feel that any damages are due in

12:00:15  16  this case.  Whether or not damages are due is solely for you to

12:00:18  17  determine.

12:00:19  18       The law recognizes that a plaintiff may experience mental

12:00:25  19  distress and anguish as a result of an injury.  You are permitted

12:00:30  20  to consider such consequences as a part of the general damages

12:00:33  21  which you may award.  By "mental distress and anguish," I mean

12:00:39  22  substantial worry or concern, grief and the like.

12:00:41  23       As I have mentioned to you, there is no practical way to

12:00:47  24  introduce evidence as to the general damages which plaintiff claims

12:00:51  25  for pain and suffering and for mental distress.  There is no

12:00:54  1   precise standard to fix these damages or assign some value to them.

12:00:59  2   Rather, your job is to determine an amount that will be fair and

12:01:03  3   just on the basis of the evidence of plaintiff's injury and

12:01:07  4   treatment that you have heard, and that will fairly compensate

12:01:11  5   plaintiff for any damage she may have suffered.

12:01:14  6          In this case, it is necessary for you to determine

12:01:17  7   whether the plaintiff had actual or constructive knowledge of facts

12:01:22  8   indicating to a reasonable person that she was the victim of a tort

12:01:26  9   on or before December 12, 2015.  This occurs when the plaintiff has

12:01:32 10   actual or constructive knowledge of a causal relationship between

12:01:36 11   the object or product and the injury.  There is no requirement that

12:01:41 12   a patient be informed by an attorney or physician of a possible

12:01:45 13   claim before prescription begins to run.  Rather, prescription

12:01:50 14   begins to run when there is enough evidence to call for an inquiry

12:01:55 15   about a claim, not when an inquiry reveals the facts and evidence

12:02:00 16   that specifically outline the claim.  The ultimate issue is the

12:02:05 17   reasonableness of the plaintiff's action or inaction, in light of

12:02:10 18   her education, intelligence, the severity of the symptoms, and the

12:02:15 19   nature of the defendant's conduct.

12:02:16 20          It is now your duty to deliberate and to consult with one

12:02:23 21   another in an effort to reach a verdict.  Each of you must decide

12:02:27 22   the case for yourself, but only after an impartial consideration of

12:02:31 23   the evidence with your fellow jurors.  During your deliberations,

12:02:36 24   do not hesitate to re-examine your own opinions and change your

12:02:41 25   mind if you are convinced that you were wrong.  But do not give up

12:02:44  1   your honest beliefs because the other jurors think differently, or

12:02:49  2   just to finish the case.

12:02:51  3          Remember at all times, you are the judges of the facts.

12:02:58  4   You have been allowed to take notes during this trial.  Any notes

12:03:03  5   that you took during this trial are only aids to memory.  If your

12:03:06  6   memory differs from your notes, you should rely on your memory and

12:03:10  7   not on the notes.  The notes are not evidence.  If you did not take

12:03:15  8   notes, rely on your own independent recollection of the evidence

12:03:20  9   and do not be unduly influenced by the notes of other jurors.

12:03:24 10   Notes are not entitled to greater weight than the recollection or

12:03:29 11   impression of each juror about the testimony.

12:03:32 12          When you go into the jury room to deliberate, you may

12:03:37 13   take with you a copy of this charge, the exhibits that I have

12:03:40 14   admitted into evidence, and your notes.  You must select a jury

12:03:46 15   foreperson to guide you in your deliberations and to speak for you

12:03:49 16   here in the courtroom.

12:03:51 17          Your verdict must be unanimous.  After you have reached a

12:03:56 18   unanimous verdict, your jury foreperson must fill out the answers

12:04:01 19   to the written questions on the verdict form and sign and date it.

12:04:05 20   After you have concluded your service and I have discharged the

12:04:10 21   jury, you are not required to talk with anyone about this case.

12:04:14 22          If you need to communicate with me during your

12:04:18 23   deliberations, the jury foreperson should write the inquiry and

12:04:23 24   give it to the court security officer.  After consulting with the

12:04:27 25   attorneys, I will respond either in writing or by meeting with you

12:04:32 1    here in the courtroom.  Keep in mind, however, that you must never

12:04:37 2    disclose to anyone, not even to me, your numerical division on any

12:04:43 3    question.

12:04:44 4         You will be given a verdict form, and I am going to

12:04:50 5    review it with you briefly here.  And it's the first question is:

12:04:55 6    "Do you find by a preponderance of the evidence that Barbara

12:04:59 7    Earnest has permanent chemotherapy-induced alopecia caused by

12:05:04 8    Taxotere?"  And you must unanimously conclude either yes or no.

12:05:10 9         Depending upon what your answer is to the question, there

12:05:14 10   are directions that follow.  If your answer to Question 1 is "No,"

12:05:18 11   please sign the verdict form and return to the courtroom.  If the

12:05:20 12   answer to Question 1 is "Yes," please proceed to question two.

12:05:24 13        And Question 2 says:  "Do you find by a preponderance of

12:05:28 14   the evidence that Sanofi inadequately warned Dr. Carinder of the

12:05:32 15   risk of permanent chemotherapy-induced alopecia associated with

12:05:36 16   Taxotere?"  And again, the answer is yes or no, and there are

12:05:41 17   instructions that follow each of the questions on the verdict form.

12:05:45 18        And so I caution you to carefully follow the instructions

12:05:48 19   that follow each question.  Once you have completed the verdict

12:05:52 20   form, as outlined in following the questions, the jury foreperson

12:05:57 21   would date and sign the verdict form.

12:06:00 22        You may now proceed to the jury room to begin your

12:06:04 23   deliberations.

12:06:05 24        THE DEPUTY CLERK:  All rise.

12:06:08 25   (WHEREUPON, THE JURY EXITS THE COURTROOM AT 12:06 TO BEGIN

```
12:06:12  1        DELIBERATIONS.)

12:06:33  2             THE COURT:  The court is at recess until the jury has

12:06:36  3   reached a verdict.

12:06:37  4             MR. MOORE:  Your Honor, can we approach?

12:06:51  5        (WHEREUPON, A DISCUSSION HELD OFF THE RECORD.)

12:16:11  6             MR. COFFIN:  In regard to the plaintiff's motion to

12:16:15  7   reopen the evidence, I am going to make a proffer.  Mr. Strongman,

12:16:20  8   who represents Sanofi, and I have agreed to a stipulation, only for

12:16:26  9   purposes of this proffer, that if called to the stand, Ms. Earnest

12:16:33 10   would testify that she received the call from her brother Jules

12:16:39 11   LeBlanc informing her that he had seen a TV commercial that

12:16:46 12   informed of a lawsuit related to Taxotere.  He had made that call

12:16:52 13   to her in February of 2016.

12:16:57 14             That's our stipulation, solely for the purposes of

12:17:00 15   proffer.

12:17:01 16             MR. STRONGMAN:  For the proffer, thank you.

12:17:03 17             MR. COFFIN:  Thank you.

12:17:03 18        (WHEREUPON, THE PROCEEDINGS WERE RECESSED FOR JURY

12:17:03 19        DELIBERATIONS.)

14:58:30 20        (OPEN COURT.)

14:58:30 21             THE COURT:  I understand we have a verdict.  Please bring

14:58:32 22   in the jury.

14:59:32 23        (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

14:59:32 24             THE COURT:  All jurors are present.  Court's back in

14:59:32 25   session.  You may be seated.
```

14:59:36  1            Has the jury selected a foreperson?

14:59:39  2            THE FOREPERSON:  Yes.

14:59:39  3            THE COURT:  And I understand that you reached a unanimous

14:59:41  4  verdict?

14:59:41  5            THE FOREPERSON:  Yes.

14:59:42  6            THE COURT:  Would you please deliver the verdict.

14:59:59  7            The verdict appears to be in proper form.  I am going to

15:00:02  8  ask listen as the verdict is published, Ms. Mouledous.

15:00:13  9            THE DEPUTY CLERK:  In the matter of *Barbara Earnest v.*

15:00:17 10  *Sanofi-Aventis, U.S. LLC, et al*, Civil Action 16-17144.

15:00:25 11            Do you find by a preponderance of the evidence that

15:00:26 12  Barbara Earnest has permanent chemotherapy-induced alopecia caused

15:00:30 13  by Taxotere?

15:00:32 14            Answer:  No.

15:00:35 15            This is signed and dated, 26th day of September, 2019 by

15:00:40 16  jury foreperson.

15:00:42 17            THE COURT:  Do the parties request poling?

15:00:47 18            MR. SCHANKER:  No, your Honor.

15:00:48 19            THE COURT:  Thank you.  Jurors, you are excused.  If you

15:00:53 20  return to the jury room, I will meet you there shortly.  Please

15:01:01 21  record the verdict.

15:01:01 22        (WHEREUPON, THE JURY EXITED THE COURTROOM.)

15:01:17 23            THE COURT:  The Court will enter a verdict in accordance

15:01:21 24  with the -- a judgment in accordance with the jury's verdict.  Any

15:01:24 25  post trial motions should be filed in accordance with law.

15:01:27  1          Anything further?

15:01:30  2          MR. SCHANKER:  No, thank you, your Honor.

15:01:32  3          MS. SASTRE:  No, thank you.

15:01:33  4          THE COURT:  Court's adjourned.

15:01:34  5        (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

          6

          7                        *  *  *  *  *  *

          8

          9

         10                  REPORTER'S CERTIFICATE

         11

         12          I, Karen A. Ibos, CCR, Official Court Reporter, United

         13   States District Court, Eastern District of Louisiana, do hereby

         14   certify that the foregoing is a true and correct transcript, to the

         15   best of my ability and understanding, from the record of the

         16   proceedings in the above-entitled and numbered matter.

         17

         18

         19                   __/s/ Karen A. Ibos_____

         20                   Karen A. Ibos, CCR, RPR, CRR, RMR

         21                   Official Court Reporter

         22

         23

         24

         25