UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION | MDL NO. 2740 |
| | SECTION "H" (5) |
| THIS DOCUMENT RELATES TO: | |
| Barbara Earnest, Case No. 2:16-cv-17144. | |

**DEFENDANTS SANOFI-AVENTIS U.S. LLC AND SANOFI US SERVICES INC.'S RESPONSE IN OPPOSITION TO PLAINTIFF BARBARA EARNEST'S MOTION FOR A NEW TRIAL**

## PRELIMINARY STATEMENT

After a two-week trial, the jury unanimously concluded that Mrs. Earnest failed to prove that Taxotere caused her permanent hair loss. Plaintiff now seeks a new trial by rehashing her baseless challenge to the expert testimony of Dr. John Glaspy. Plaintiff has repeatedly tried to prevent Dr. Glaspy and other Sanofi experts from drawing expert opinions based on Dr. Michael Kopreski's review of the TAX316 clinical trial. Plaintiff's Motion for a New Trial is an attempt to revive the same flawed claim, premised on a selective and misleading recitation of the trial record and this Court's prior decisions. This Court has already considered and correctly rejected Plaintiff's arguments. The trial only confirmed the propriety of Dr. Glaspy's expert opinions.

Plaintiff first claims that Dr. Glaspy's testimony about the TAX316 study should have been excluded because he relied on Dr. Kopreski's data review rather than independently verifying it. As this Court explained in its pre-trial *Daubert* order, experts "are permitted to rely on analyses or studies conducted by others," and, in any event, Sanofi's experts, including Dr. Glaspy, did "conduct[] independent reviews of Dr. Kopreski's work." Order, Rec. Doc. 7974, at 5. At trial,

Dr. Glaspy testified at length to his independent, personal knowledge of TAX316 from his own work as a clinical investigator who designed, executed, and reviewed the study. There is simply no basis for Plaintiff's claim that Dr. Glaspy merely "parroted" Dr. Kopreski. Rec. Doc. 8394-1, at 14.

This Court, moreover, has already rejected Plaintiff's contention that Dr. Glaspy's opinion impermissibly drew on Dr. Kopreski's work. Order, Rec. Doc. 7974, at 5. This Court's pre-trial ruling noted that two Sanofi experts had independently reviewed Dr. Kopreski's testimony and found their opinions reliable. That conclusion was confirmed at trial where Dr. Kopreski himself expounded on his review of the TAX316 data and records. Dr. Glaspy explained his familiarity with TAX316 and why he relied upon Dr. Kopreski's testimony. And, as the Court noted, Plaintiff's counsel deposed Dr. Kopreski for more than 25 hours, and thus had every opportunity to discover any basis for impeachment of his testimony. Plaintiff cross-examined Dr. Glaspy extensively about why he relied on Dr. Kopreski's testimony and attempted to point out its perceived flaws. Even with the benefit of days of deposition time and cross-examination at trial, Plaintiff points to no evidence demonstrating that Dr. Kopreski's testimony about the data was incorrect, much less so unreliable that it could not be reasonably considered by an expert in Dr. Glaspy's field.

In any event, the trial record, including testimony by Plaintiff's own experts provided substantial evidence, independent of any testimony by Dr. Glaspy, that supported the jury's verdict that Taxotere did not cause Mrs. Earnest's permanent alopecia. Mrs. Earnest lost her hair before ever taking Taxotere in 2011. Evidence showed that the chemotherapy drugs Mrs. Earnest took before taking Taxotere—Adriamycin and Cytoxan—carry reports of permanent hair loss. Further, since receiving chemotherapy, Mrs. Earnest has taken Arimidex, a hormone suppression therapy

also associated with reports of persistent hair loss. Plaintiff's own expert witnesses admitted that these other medications have been linked to permanent hair loss. The jury thus had ample evidence to support its verdict aside from Dr. Glaspy's testimony about the TAX316 clinical trial data. Under such circumstances, Plaintiff plainly cannot show that any error (there was none) impacted "substantial justice," justifying the extraordinary remedy of a new trial.

## LEGAL STANDARD

"Courts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done." *Streber v. Hunter*, 221 F.3d 701, 736 (5th Cir. 2000). "Modifying or setting aside a judgment under Rule 59 is an extraordinary remedy." *In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*, MDL No. 2592, 2017 WL 4168410, at *3 (E.D. La. Sept. 20, 2017), *appeal filed*, No. 17-30845 (5th Cir. Oct. 19, 2017). Because Plaintiff claims that the Court's evidentiary rulings entitle her to a new trial, her burden is particularly heavy. She must show that, considering the record as a whole, "manifest injustice will result from letting the verdict stand." *Learmonth v. Sears, Roebuck & Co.*, 631 F.3d 724, 731 (5th Cir. 2011) (quoting *Foradori v. Harris*, 523 F.3d 477, 506-07 (5th Cir. 2008)). Plaintiff "must clearly establish either a manifest error of law or fact," *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 344 (5th Cir. 2007), and she has "the burden of showing harmful error," *Streber*, 221 F.3d at 736.

## BACKGROUND

Dr. John Glaspy is a world-renowned oncologist and clinical researcher at UCLA hospital, specializing in breast cancer. Trial Tr. ("Tr.") 1966 (excerpts of the trial transcript are attached as Exhibit A). Dr. Glaspy has been recognized with highly competitive center grants from the National Cancer Institute and serves as a reviewer for some of the most prestigious medical

journals in the country, including the *New England Journal of Medicine* and the *Journal of Clinical Oncology*.  Tr. 1968-70.

Before trial, Plaintiff filed a *Daubert* motion seeking to exclude any testimony by Dr. Glaspy and two other Sanofi experts that relied on Dr. Kopreski's review of the TAX316 study, contending that Dr. Kopreski's review was unreliable and that the experts failed to independently evaluate it.  Rec. Doc. 6160.  In response, Sanofi argued that Dr. Glaspy had personal knowledge and experience with the TAX316 clinical trial, which made his reliance reasonable.  Rec. Doc. 7471, at 14-15.  In particular, Dr. Glaspy was an investigator in the TAX316 clinical trial who knew the trial's protocol and oversaw the collection and reporting of patient follow-up data.  Tr. 1974, 1989, 2039.  Sanofi also noted that the two other experts that were the subjects of Mrs. Earnest's motion had independently verified Dr. Kopreski's testimony by reviewing the underlying TAX316 documentation themselves.  Rec. Doc. 7471, at 15.

The Court denied Plaintiff's *Daubert* motion in its entirety.  Rec. Doc. 7974.  The Court observed that, under Federal Rule of Evidence 703, experts may reasonably rely on facts and data provided to them.  *Id.* at 5.  The Court's order further observed that Sanofi's experts "conclude[d] [that Dr. Kopreski's] analysis was reliable" after they "conducted independent reviews of Dr. Kopreski's work." *Id.*  The Court therefore found that "reliance on Dr. Kopreski's analysis . . . passes muster." *Id.*  And, to the extent that Plaintiff disagreed with Dr. Kopreski's conclusions, the Court noted that she was free "[o]n cross examination" to "illuminate for the jury that these experts relied on Dr. Kopreski's re-analysis" and explore "why such reliance was warranted." *Id.* It was then the jury's province to "decide whether to credit the experts' testimony." *Id.*

Notwithstanding Plaintiff's claim that Dr. Kopreski's testimony on TAX316 was unreliable, it was *Plaintiff* who initially called Dr. Kopreski to testify via his videotaped deposition.

4

Dr. Kopreski was an Associate Vice President and the Head of Oncology at Sanofi, is trained in pharmacovigilance, and is a physician who is board certified in internal medicine and oncology. Tr. 1696, 1917. Sanofi also played Dr. Kopreski's videotaped deposition so that the jury could hear his testimony about the TAX316 data. Dr. Kopreski explained that TAX316 was a controlled, long-term efficacy study that collected data on patients taking one of two chemotherapy regimens over a ten-year period. Tr. 1928-29. The study also reported on the number of patients who reported certain adverse events, including ongoing alopecia. Dr. Kopreski testified that the study data had limitations because, over the ten years, some patients died, some were removed from the study, some patients were switched to different medicines, and some decided to leave the study. Tr. 1929. As a result, the TAX316 alopecia results only reflected patients who experienced ongoing hair loss as of the date of their last safety follow-up, not necessarily the actual number of patients who experienced alopecia lasting longer than six months beyond the completion of chemotherapy (the definition Plaintiff adopted in her complaint as constituting the injury of persistent alopecia, Tr. 1929; *see* Order, Rec. Doc. 3473). Importantly, Dr. Kopreski reviewed the available underlying clinical trial documentation for each of the 45 patients who were listed as experiencing ongoing alopecia in the study table. By excluding patients who either regrew their hair or stopped participating in follow-up for safety within six months, Dr. Kopreski was able to identify patients with alopecia present six months after they completed chemotherapy. Tr. 1923-24; 1928-30.[1]

On cross-examination, Plaintiff's counsel attempted to poke holes in Dr. Kopreski's testimony by asking about specific patients that Dr. Kopreski concluded did not have hair loss beyond six months. In response to these inquiries, Dr. Kopreski explained that he excluded some

---

[1] Dr. Kopreski's testimony during Sanofi's case ran for less than 80 minutes. *See* Tr. at 1917-55.

5

patients from his count because their alopecia had resolved (*i.e.*, their hair regrew) or because certain adverse events were not followed beyond six months for one of many reasons. Tr. 1929-30.

Sanofi called Dr. Glaspy in its defense case. Dr. Glaspy testified that he was "heavily" involved in the TAX316 study because his medical center was a clinical study site for TAX316 and he was one of the investigators conducting the study. Tr. 1986; 2039. Dr. Glaspy opined, based on his *own* review, that the TAX316 study's reported cases of permanent alopecia lacked follow-up data and only reflected ongoing alopecia "when the patient was last seen," not necessarily at the conclusion of the study. *See* Tr. 2040-41, 2071-72. Although he acknowledged that he did not review the raw datasets, Dr. Glaspy testified that his knowledge of the TAX316 data was not simply "learned from Dr. Kopreski," but rather "came from . . . the blood and guts of doing this clinical trial, being involved in its planning and its execution and knowing how it took place." Tr. 2072-73. Based on his expert knowledge of chemotherapy agents and review of the scientific literature, Dr. Glaspy further testified that there was no way to rule out the chemotherapy medications Cytoxan and Adriamycin as the cause of Plaintiff's hair loss. Tr. 2043.

## ARGUMENT

I. **The Court properly admitted Dr. Glaspy's testimony.**

   A. **The *Daubert* standard.**

Rule 703 provides that experts may base their conclusions "on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. Experts may rely on inadmissible evidence, such as hearsay, if "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." *Id.* The rule is "intended . . . to 'bring the judicial practice into line with the practice of the experts themselves when not in court.'" *Soden v. Freightliner Corp.*, 714 F.2d 498, 502-03 (5th Cir. 1983) (quoting Fed. R. Evid.

6

703 advisory committee's 1972 note). "A trial court's inquiry into whether this standard is satisfied must be made on a case-by-case basis and should focus on the reliability of the opinion and its foundation rather than merely on the fact that it was based, technically speaking, upon hearsay." *Id.*

In performing the Rule 703 analysis, "the trial court should defer to the expert's opinion of what data they find reasonably reliable." *Peteet v. Dow Chem. Co.*, 868 F.2d 1428, 1432 (5th Cir. 1989). The Fifth Circuit has not established strict rules for what is reliable because the analysis is fact intensive. *See Soden*, 714 F.2d at 502-03. Rule 703 does not require that the expert have personal knowledge of the facts on which they base their opinion, so long as their reliance on "analyses or studies conducted by others . . . is reasonable." Order, Rec. Doc. 7974, at 5; *see Peteet*, 868 F.2d at 1432-33 (affirming introduction of a physician-expert's opinions on medical causation based on review of documents provided by counsel and the medical literature, not his own examination of the plaintiff).

### B. Dr. Glaspy's testimony, including his discussion of Dr. Kopreski's testimony, was plainly admissible under the *Daubert* standard.

Plaintiff's Motion for a New Trial is premised on a selective and misleading description of the Court's *Daubert* order and the trial record. Plaintiff does not now directly challenge this Court's pre-trial *Daubert* motion. Rather, she incorrectly asserts that this Court only allowed Dr. Glaspy to testify about the TAX316 study results relayed in Dr. Kopreski's testimony if he "independently verified his work." Rec. Doc. 8394-1, at 14. Quoting from a parenthetical in a footnote of this Court's order, Plaintiff asserts that the Court's decision to allow Dr. Glaspy's testimony required "his own knowledge as to the nature and extent of the source from which statistics were gathered." *Id.* at 5 (quoting Order, Rec. Doc. 7974, at 5 n.19).

7

As an initial matter, Plaintiff entirely misreads this Court's opinion. This Court's order imposed no requirement that Sanofi present evidence that Dr. Glaspy had independently verified Dr. Kopreski's testimony in order for Dr. Glaspy's testimony to be admissible. *See generally* Rec. Doc. 7974. No such requirement is imposed by Rule 703 either. To the contrary, "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Fed. R. Evid. 703.

Worse still, Plaintiff's motion distorts the trial transcript by ignoring Dr. Glaspy's testimony about his deep, personal knowledge of TAX316, its methodology, and its reliability. Tr. 1986. It is a gross mischaracterization of the trial record for Plaintiff to claim that Dr. Glaspy "merely parroted Dr. Kopreski's re-analysis." Rec. Doc. 8394-1, at 14. In fact, Dr. Glaspy directly refuted that implication on cross examination, explaining that he was immersed in the "blood and guts" of TAX316, and that he was one of its prime investigators, who planned the study, executed it, and knew how it took place. Tr. 2051, 2072-73. He further discussed why, after reviewing Dr. Kopreski's testimony, he concluded that TAX316 did not present statistically significant evidence of permanent hair loss following the use of Taxotere. Dr. Glaspy also explained that TAX316's 5-year and 10-year study results have been published and are publicly available. The fact that Dr. Glaspy did not personally review the raw datasets certainly does not disqualify him from testifying about the TAX316 study conclusions or Dr. Kopreski's testimony on the same, as Plaintiff suggests. Tr. 2060-62. No such rule was imposed by this Court's pre-trial *Daubert* ruling or by Rule 703.

For those same reasons, Plaintiff's reliance on *Hunt v. McNeil Consumer Healthcare*, 297 F.R.D. 268 (E.D. La. 2014), is misplaced. In that case, the expert "conceded in his deposition that he did not read most of the material cited in the opinions nor verify the data referenced therein," and that expert simply copied the opinions of expert reports "so scrupulous[ly] that he maintained typographical errors from the original reports." *Id.* at 275. Dr. Glaspy's intimate knowledge of TAX 316 and his careful testimony about the implications of Dr. Kopreski's review bears no resemblance to the expert testimony excluded in *Hunt*.

Plaintiff's arguments are further flawed because they are premised on her unfounded critique of Dr. Kopreski's testimony. Before and throughout trial, Plaintiff repeatedly and unsuccessfully pressed this same challenge to Dr. Kopreski's testimony and the Court correctly allowed his selected testimony to be admitted.[2] But Plaintiff does not cite evidence of any error in Dr. Kopreski's review of TAX316, much less errors so pervasive as to render his testimony unreliable. Dr. Kopreski's experience within Sanofi's pharmacovigilance team gave him deep knowledge about monitoring the side effects of medications through the process of safety signal detection. Tr. 1291-95. In addition, Dr. Kopreski's training and experience as a medical doctor, oncologist, and pharmacovigilance specialist clearly show that he is capable of reviewing TAX316's underlying patient documentation to identify and tally patients whose alopecia remained six months after chemotherapy. *See In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 193-95 (S.D.N.Y. 2009) (holding that medical doctor with experience in drug safety and

---

[2] Before trial, Plaintiff objected to designated portions of Dr. Kopreski's video deposition testimony, including his testimony about TAX316, on the grounds that Dr. Kopreski was not an expert witness under the Federal Rules. The Court painstakingly reviewed Dr. Kopreski's deposition designations and ruled on objections from both parties. At trial, Plaintiff again objected to Dr. Kopreski's TAX316 testimony, including on the ground that Dr. Kopreski was not an expert witness, Tr. 1914-16, and the Court again overruled Plaintiff's objection, Tr. 1916-17. Plaintiff's objections regarding Dr. Kopreski are not the basis of her present motion.

clinical trials was qualified to review and interpret clinical trial data); *In re Wright Med. Tech. Inc., Conserve Hip Implant Prods. Liab. Litig.*, 127 F. Supp. 3d 1306, 1320-24 (N.D. Ga. 2015) (holding that party's experts could form opinions in reliance upon a surgeon's observations during hip implant revision surgery).

In light of these facts, this case is readily distinguishable from the case Plaintiff relies upon in her Motion for New Trial—*Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 201 (5th Cir. 2016)—where the Fifth Circuit found that "the district court clearly abused its discretion by not conducting a *Daubert* inquiry or making a *Daubert* determination on the record." *Id.* In that products liability case, the chiropractor opined about medical causation, wound care, and the plaintiff's medical conditions, but the district court never conducted the required *Daubert* analysis. *Id.* at 198. Here, the Court conducted a *Daubert* analysis and found correctly that Dr. Glaspy's testimony was based on personal knowledge and reasonable reliance on Dr. Kopreski's testimony.

In sum, Mrs. Earnest is relitigating an issue repeatedly raised and rejected by the Court before trial, at multiple stages during trial and now after the jury resoundingly rejected Plaintiff's case. The Court's *Daubert* decision was correct. The trial testimony confirmed that Dr. Glaspy's testimony was proper.

**II. Mrs. Earnest cannot show a harmful error occurred because multiple witnesses, including her own experts, testified that other medications she has taken to eradicate her breast cancer have been linked to permanent hair loss.**

Even if Plaintiff could demonstrate a *Daubert* error, she has not met her burden to establish a harmful error that caused a "substantial injustice" warranting the extraordinary relief of a new trial. The totality of the trial evidence demonstrates that Plaintiff could not come close to meeting that high standard, particularly where her own experts' testimony supported the jury's causation verdict.

10

A plaintiff's burden to win a new trial is high where there was conflicting evidence and the jury made credibility determinations. For example, in *Reyes v. Wyeth Laboratories*, the court affirmed the trial court's denial of a new trial where there was conflicting testimony about the cause of the plaintiff's polio. 498 F.2d 1264, 1288-89 (5th Cir. 1974). The Fifth Circuit reasoned that, "[p]resented with conflicting credible evidence, [crediting one party's experts over the other's] was within the jury's prerogative." *Id.* at 1288; *see also Tompkin v. Philip Morris USA, Inc.*, 362 F.3d 882, 896 (6th Cir. 2004) (holding in lung cancer toxic-tort case that no harmful error occurred where the plaintiff's experts conceded medical causation). Plaintiff's motion is severely undermined by the fact that her experts agreed that various other medications she took (and continues to take to this day) are associated with permanent alopecia. This is not a case where "substantial justice" has been impacted by one aspect of one expert's testimony.

Many patients who are prescribed chemotherapy to treat invasive breast cancer receive a regimen of multiple chemotherapy agents. Mrs. Earnest was no exception, and she received Adriamycin and Cytoxan simultaneously in 2011. Tr. 1828-30. She lost her hair before she received her first treatment with Taxotere. Tr. 1033, 1830-31. After receiving four infusions of Adriamycin and Cytoxan, Mrs. Earnest received four doses of Taxotere. *See* Tr. 1830-31. Since completing her radiation treatments, Mrs. Earnest has taken Arimidex on a daily basis. Tr. 1831.

Plaintiff's experts admitted during trial that Adriamycin, Cytoxan, and Arimidex have all been associated with permanent hair loss. Tr. 1219-36. Dr. Ellen Feigal searched for medical literature relating to permanent hair loss after chemotherapy, reviewed the articles identified in her search, and she presented to the jury a chart with the total number of permanent hair-loss reports in the papers she found. Tr. 1219-20. Like Mrs. Earnest's other experts, she testified that cases of permanent hair loss have been reported with Adriamycin and Cytoxan. Tr. 1219, 1224-25.

11

After reviewing the results of TAX316, she admitted that some patients in the study experienced ongoing hair loss following Adriamycin and Cytoxan without ever receiving Taxotere. Tr. 1235-36; *see also* Tr. at 908 (Dr. Laura Plunkett testifying to the same). She admitted that those instances of permanent hair loss may have been caused by Adriamycin, Cytoxan, or both. Tr. 1236.

Dr. Plunkett testified that permanent hair loss is a hazard of Adriamycin and Cytoxan. Tr. 861, 873. She admitted that she could not quantify the incidence rates of permanent hair loss with any of the chemotherapy agents she analyzed, including Taxotere. Tr. 883-85. Moreover, Dr. Plunkett did not provide an opinion that Taxotere causes persistent hair loss. Tr. 916.

Similarly, Dr. Antonella Tosti admitted that she found reports in the medical literature of permanent hair loss associated with Adriamycin and Cytoxan.[3] Tr. 1030-31, 1057; *see also* Tr. at 478 (Dr. David Kessler testifying that there are reports in the medical literature of Adriamycin being associated with permanent hair loss). Dr. Tosti also agreed that Arimidex causes persistent hair loss. Indeed, she recently published a paper reporting that endocrine therapy, like Arimidex, can cause endocrine-induced alopecia in 25% of patients following chemotherapy. Tr. 1064, 1066.

Plaintiff also misstates the significance of Dr. Tosti's trial testimony. *See* Rec. Doc. 8394-1, at 5-10. Although Dr. Tosti provided a lengthy recitation of her diagnosis of Mrs. Earnest as having Permanent Chemotherapy Induced Alopecia, Dr. Tosti also conceded that Mrs. Earnest lost her hair before ever taking Taxotere and admitted that her hair loss could have been caused by Adriamycin, Cytoxan, or both. Tr. 1033. Then, Dr. Tosti admitted that Arimidex could cause

---

[3] Similarly, Plaintiff's experts agreed that permanent hair loss has been reported after use of Taxol, 5-FU, anthracyclines, FEC, and fluorouracil. Tr. 1218, 1224-25, 861, 874, 1030-31, 1058.

12

patients' hair not to regrow. Tr. 1060. Given those admissions, the jury was entitled to discredit Dr. Tosti's contradictory opinion that Ms. Earnest's hair loss was caused by Taxotere.

The jury had ample evidence upon which to find that Mrs. Earnest's hair loss was caused by Adriamycin, Cytoxan, or both. She did, after all, lose her hair before taking Taxotere. The jury also heard from Mrs. Earnest's experts that her daily dose of Arimidex may contribute to or prolong her hair loss.[4] Even if Dr. Glaspy had not testified to the TAX316 data, the jury could have readily rejected Plaintiff's causation claims based solely on the evidence presented at trial by Plaintiff's own expert witnesses. Under such circumstances, Plaintiff cannot demonstrate that any error in admitting Dr. Glaspy's testimony was harmful, much less that it warrants the extraordinary remedy of a new trial.

## CONCLUSION

For the foregoing reasons, Sanofi respectfully requests that the Court deny Barbara Earnest's Motion for a New Trial.

Date:  November 20, 2019

Respectfully submitted,

*/s/ Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE URQUHART & MOORE LLC**
400 Poydras Street, Suite 2700
New Orleans, LA  70130
Telephone: 504-310-2100
Facsimile: 504-310-2120
dmoore@irwinllc.com

---

[4] The jury may also have concluded that Mrs. Earnest does not have permanent hair loss because she has never tried any treatment for her hair loss, and she underwent a punch biopsy that her own experts demonstrated exhibited stem cells on her scalp that were both present and proliferating.  *See* Tr. at 1004 (Dr. Tosti testified at trial that Mrs. Earnest's biopsies tested positive for stem cells), 1099 (same), 1089 (Dr. Tosti also testified at trial that "[e]verybody believes" that chemotherapy-induced alopecia is caused by damage to the stem cells).

>Jon Strongman
>**SHOOK, HARDY & BACON L.L.P.**
>2555 Grand Boulevard
>Kansas City, Missouri 64108
>Telephone: 816-474-6550
>Facsimile: 816-421-5547
>jstrongman@shb.com
>
>Hildy Sastre
>**SHOOK, HARDY & BACON L.L.P.**
>201 S. Biscayne Blvd., Suite 3200
>Miami, Florida 33131
>Telephone: 305-358-5171
>Facsimile: 305-358-7470
>hsastre@shb.com
>
>Ilana H. Eisenstein
>Rachel A.H. Horton
>**DLA PIPER LLP (US)**
>1650 Market St., Suite 5000
>Philadelphia, PA 19103
>Telephone: 215-656-3351
>Facsimile: 215-606-3351
>Ilana.Eisenstein@dlapiper.com
>Rachel.Horton@dlapiper.com
>
>*Counsel for sanofi-aventis U.S. LLC and Sanofi US Services Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on November 20, 2019, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

>*/s/ Douglas J. Moore*